# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .        Case No.   01-1139 (JKF)
                                .
W.R. GRACE & CO.,               .
et al.,                         .        USX Tower - 54th Floor
                                .        600 Grant Street
                                .        Pittsburgh, PA 15219
                Debtors.   .
                                .        September 16, 2009
. . . . . . . . . . . ..        .        9:09 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                Kirkland & Ellis, LLP
                                By:  DAVID BERNICK, ESQ.
                                200 East Randolph Drive
                                Chicago, IL  60601


For the Asbestos                Caplin & Drysdale, Chartered
Creditors Committee:            By:  NATHAN FINCH, ESQ.
                                     JAMES WEHNER, ESQ.
                                One Thomas Circle, NW
                                Washington, D.C. 20005


For the Future                  Orrick, Herrington & Sutcliffe, LLP
Claimants                       By:  ROGER FRANKEL, ESQ.
Representatives:                     JONATHAN GUY, ESQ.
                                Washington Harbour
                                3050 K Street, N.W.
                                Washington, D.C.  20007


Audio Operator:                 Janet Heller

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311       Fax No. (609) 587-3599**

1  A     No, I was not.

2  Q     Okay.  If we wanted to capture what the state of play is

3  concerning solvency pre-plan, what definition can we work with

4  of solvency for purposes of understanding your work?

5  A     I think if you're asking me precisely in terms of a

6  definition or a test, various tests of solvency, there are

7  typically three tests that are put forth; a balance sheet test,

8  an adequate capital test and whether or not the debtor has the

9  ability to pay its debts as they come due.

10  Q     Okay.  If we wanted to take a look at what do all the --

11  do all of the different kinds of approaches that you've talked

12  about, do all of them require some examination of assets?

13  A     Yes.

14  Q     What about liabilities?

15  A     Yes.

16  Q     Okay.  As of the time that the -- as of the time that the

17  terms sheet was negotiated and, indeed, up through the present

18  time, have you looked at the question of whether it's possible

19  to quantify, with any degree of precision, the extent of the

20  personal injury asbestos liability of the company?

21  A     Yes, I have looked into that.

22  Q     And what have you done in order to look at that?

23  A     I have evaluated the various estimates put forth during

24  the estimation hearing, as well as rebuttal reports to those

25  estimates.  I have looked at the plan document, the amended

**J&J COURT TRANSCRIBERS, INC.**

1 accepting it as an opinion.  I'm just accepting it as what she

2 was doing in analyzing the best interest test in her report.

3 Okay.

4 Q    In addition, Ms. Zilly, you are the debtor's sole expert

5 witness with regard to solvency, that's correct?

6 A    That's correct.

7 Q    And you've submitted in that context your expert rebuttal

8 report to Mr. Frezza, the committee's expert and the lender's

9 expert, and you've also submitted an affidavit in connection

10 with the debtor's objection to the bank lender's proofs of

11 claim, correct?

12 A    That's correct.

13 Q    Now, in performing all of the analysis and preparing and

14 reviewing the financial reports, spread sheets, cash flows, all

15 of the items that we just discussed and referenced, you will

16 agree that you have never performed a solvency analysis of

17 Grace?

18 A    I have not performed a complete solvency analysis of

19 Grace, that's correct.

20 Q    I'm sorry, did you say a complete solvency analysis of

21 Grace or you --

22 A    Yes, in my view there are several tests for solvency.

23 Q    So, in your view there are simple tests for solvency?

24 A    Several.

25 Q    Several, okay.  Thank you.  And you would agree that

1  you're offering no opinion in this confirmation process with

2  regard to whether Grace is solvent?

3  A      That is correct.

4  Q      And you also are offering no opinion as to whether Grace

5  is insolvent?

6  A      That is correct.

7  Q      As of any date with respect to both of those questions?

8  A      I'm offering a rebuttal to Mr. Frezza's report.

9  Q      And you will agree with me that for purposes of the plan

10  that is before the Court -- I think it's be referred to as the

11  joint plan, I'll call it the plan for purposes of our

12  discussion -- that for purposes of the plan, the Court must

13  determine whether Grace will be solvent as of the effective

14  date of the plan, correct?

15         MR. BERNICK:  Objection, calls for the witness to

16  discuss procedures that the Court may or may not follow.

17  That's not an appropriate question for an expert in this case.

18         MR. COBB:  Your Honor, she's a -- she's been offered

19  as a financial restructuring expert.

20         THE COURT:  Yes, but --

21         MR. COBB:  She has extensive expertise apparently in

22  -- not only in testifying in bankruptcy processes, but also in

23  providing advice --

24         THE COURT:  Yes.

25         MR. COBB:  -- in connection with the bankruptcy.

**J&J COURT TRANSCRIBERS, INC.**

1 what I would consider to be the better stuff.

2         THE COURT:  All right.

3 BY MR. COBB:

4 Q    And you would also agree, Ms. Zilly -- would you agree,

5 Ms. Zilly, that under the plan through this bankruptcy process

6 that Grace's asbestos personal injury claims and lawsuits

7 against the company are resolved?

8         MR. BERNICK:  Objection, to form.  Are we assuming

9 the plan has now gone effective?

10         MR. COBB:  We are assuming that the plan, for

11 purposes of this question, is confirmed by the Court.

12         MR. BERNICK:  Well, then under -- strike that.

13 That's fine.  Is confirmed by the Court and goes effective?

14         MR. COBB:  And goes effective.

15 A    If the amended plan is confirmed by the Court and goes

16 effective, then I believe that pursuant to the settlement set

17 forth in the plan that relates to the amount of assets that

18 Grace and others will contribute to the PI trust, then the

19 asbestos claims will be resolved.

20 Q    And let's talk for a moment about the solvency test that I

21 think you had spoken briefly with, with Mr. Bernick.  You had

22 identified the ability to pay debts as when they -- as they

23 come due test, correct, that is one of the accepted methods --

24 expert methodologies for determining solvency of a company?

25 A    That is a test to determine solvency, correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And one of the tests?

2  A    And one of the tests.

3  Q    And it's also referred to as the cash flow test, is that

4  fair?

5  A    I don't, but perhaps others do.

6  Q    I'll stick with your definition then.  There's a second

7  test described as the adequate capital test, correct?

8  A    That's correct.

9  Q    And then the balance sheet test, correct?

10 A    Excuse me.  That's correct.

11 Q    And under the balance sheet test there are three generally

12 accepted methodologies for arriving at the value of a company's

13 assets, correct?

14 A    (No audible response).

15 Q    Well, let me walk you through them.  One of those

16 methodologies is determining the asset value by determining the

17 fair market value of the assets, correct?

18 A    That's correct.

19 Q    Second method would be determining the enterprise value of

20 the debtor?

21 A    That's another method.

22 Q    And then determining the debtor -- the value of the

23 debtor's assets by using the discounted cash flow method,

24 correct?

25 A    I would put three with two because I believe that the

**J&J COURT TRANSCRIBERS, INC.**

1 discounted cash flow method is a way -- one way of determining

2 the debtor's enterprise value.

3 Q    Okay.  Well, let's talk about total enterprise value then.

4 How would an expert, in a solvency context, calculate an

5 entity's total enterprise value?

6        MR. BERNICK:  Your Honor, this goes beyond the scope

7 of my examination.  They've got their own expert who's going to

8 go back and review all of this stuff, but she's not expressed

9 -- Ms. Zilly has not expressed as an expert an opinion

10 regarding how those would work.

11        MR. COBB:  Your Honor, I'm entitled to inquire of the

12 debtor's expert whether she has any issue, or any problems or

13 concerns or criticisms of Mr. Frezza's methodologies that he

14 employs in his report.

15        THE COURT:  Overruled.

16 Q    So, the question, I'll restate it.

17        MR. BERNICK:  I -- I'm sorry.  If that's the question

18 then I want you to ask that question.

19        MR. COBB:  I'm just trying to facilitate the witness

20 by simply restating the question, but you can read it back to

21 her if she'd like to hear it.

22        THE COURT:  No, I think that wasn't the objection.

23 He wanted to eliminate the preliminaries and get to the end

24 question was the point.  You may restate this question which

25 was how would an expert calculate an entity's enterprise value?

1  BY MR. COBB:

2  Q    Ms. Zilly, assuming that the plan is confirmed and goes

3  effective, isn't it true that as of the effective date of the

4  plan Grace will have the ability to pay its debts as and when

5  they come due?

6  A    That is my opinion in my feasibility report assuming

7  confirmation of the plan and consummation of the plan.

8  Q    And isn't it true that there's no difference between that

9  conclusion in your feasibility analysis and the conclusion that

10 would be reached if a solvency analysis was performed using the

11 same test, that is, Grace's ability to pay its debts as and

12 when they come due on the effective date?

13         MR. BERNICK:  I'm sorry.  So, object to the form of

14 the question.  If you make the assumption that the test of

15 solvency is identical to the test of feasibility, then the

16 question is -- it states a truism.  So, I don't believe that

17 you're asking for a truism, so I don't understand what the

18 incremental evidence that you're asking for from this witness

19 is.  Object to the form of the question.

20 Q    I'll restate it and try it a different way.  Is there any

21 difference, Ms. Zilly, between the solvency test of a company's

22 ability to pay its debts, when due, and under a feasibility

23 analysis a company's ability to pay its debts when due,

24 speaking generally, not of Grace?

25 A    No.

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Direct/Pasquale                 255

1      THE COURT:  Why don't we take a five-minute recess

2  just to let everybody stretch and then we'll start again.

3                        (Recess)

4      THE COURT:  Mr. Pasquale.

5      MR. PASQUALE:  Thank you, Your Honor.  The creditor's

6  committee and the bank lender group call Robert Frezza.

7              ROBERT FREZZA, WITNESS, SWORN

8                   DIRECT EXAMINATION

9  BY MR. PASQUALE:

10 Q    Good afternoon, Mr. Frezza.

11 A    Hello, Mr. Pasquale.

12 Q    Can you please describe for the Court your education?

13 A    Certainly.  I graduated from Pace University in New York

14 in 1990 -- 1983, excuse me -- with a bachelor of business

15 administration degree.

16 Q    Did you have a concentration while at Pace?

17 A    Yes.  It was a concentration in accounting and finance,

18 and that program was an intensive accounting and finance

19 program designed to prepare students for the CPA exam.

20 Q    And did you take the CPA exam?

21 A    I did.

22 Q    And are you a CPA?

23 A    I am a CPA.

24 Q    Are you a member of any professional organizations?

25 A    I'm a member of the American Institute of Certified Public

**J&J COURT TRANSCRIBERS, INC.**

1  Accountants, as well as the American Institute of Restructuring

2  Advisors.

3  Q    Can you please describe your professional experience

4  starting with your graduation from the Pace University

5  accounting program?

6  A    Certainly.  I spent my first 15 years out of school as an

7  audit professional in firms including Arthur Young, Massar

8  International which is actually a Paris-based CPA firm.  I

9  spent eight years with Massar and was a partner there for many

10  years.  Subsequent to that I joined Ernst & Young's Transaction

11  Services Group as a mergers and acquisitions professional.

12  Thereafter I had joined a firm that performed roll-ups of

13  businesses, smaller businesses in the pursuit of creating a

14  larger business to sell to a strategic or run.

15  Q    What was the name of that firm?

16  A    The name of that firm was Wellesley.  Thereafter I worked

17  as an interim executive, chief financial officer and chief

18  operating officer for a couple of companies which were my own

19  clients.  This brings us to 2000.  And thereafter joined

20  Capstone Advisory Group which I am a partner at currently.

21  Q    When specifically did you join Capstone?

22  A    I've been with Capstone Advisory Group since January 2001.

23  Q    And what is the business of Capstone Advisory Group?

24  A    Capstone Advisory Group is a nationwide restructuring

25  firm.  Primarily restructuring, but we also have the evaluation

1  practice as well as a forensic investigation and litigation

2  support group.  I primarily spend my time in the restructuring

3  side, and that is the largest part of the business.

4  Q    Do you consider yourself to be a financial advisor?

5  A    I do.

6  Q    And what is a financial advisor?

7  A    As a financial restructuring advisor at Capstone we

8  perform, depending on whether it's a debtor or a creditor

9  assignment, a situation analyses, determine the situation in a

10  particular -- in particular situations as we're engaged,

11  perform business plan reviews, analyze the near-term cash flow

12  need to the company, determine whether they're able to meet

13  their debts as they come due based on their cash flow forecast,

14  perform detail financial modeling -- complex financial modeling

15  projects, and a whole host of other types of financial analyses

16  in an effort to help the client move through a potential

17  restructuring both in and out of court.

18  Q    Now, you said we do these things.  Do you personally do

19  the things you just described?

20  A    I personally do these things, and it is what Capstone does

21  as well, in general.

22  Q    Can you describe for the Court some representative matters

23  on which you have been involved in your period -- excuse me --

24  in your tenure at Capstone?

25  A    Certainly.  I've been involved with the restructuring of

**J&J COURT TRANSCRIBERS, INC.**

1 Polaroid Corporation, Sunbeam products, American Commercial

2 Lines which is the largest inland barge company in the United

3 States, U.S. Shipping, Gainey Trucking, Great Wide Logistics,

4 to name a few.

5 Q    And whom -- keeping in mind the capital structure is what

6 I'm thinking about -- what types of parties did Capstone advise

7 in those matters?

8 A    Most of those matters involved Capstone's advising the --

9 either the senior lenders -- the senior lenders in each case,

10 actually.

11 Q    Now, does Capstone serve in any role with respect to the

12 W.R. Grace bankruptcy case?

13 A    It does.  Capstone represents the official committee of

14 unsecured creditors.

15 Q    So, Capstone is our financial advisor, is that right?

16 A    Capstone is your financial advisor, yes.

17 Q    Okay.  Describe your personal role with respect to

18 Capstone's services for the creditor's committee.

19 A    Sure.  My personal role has been since some time in 2005

20 working with the unsecured creditor's committee primarily

21 reviewing the annual business plan of W.R. Grace, analyzing the

22 quarterly actual performance to that business plan in each

23 case, analyzing business acquisitions or asset divestitures as

24 well as other issues that arose during the settlement.  And we

25 would analyze the situation, interface with management and its

**J&J COURT TRANSCRIBERS, INC.**

1  advisors of Grace and then report back to the creditor's

2  committee.

3  Q     Mr. Frezza, have you ever been qualified as an expert by

4  any federal court?

5  A     I have.

6  Q     When was that?

7  A     That was in October 2008.

8  Q     And in which matter?  Can you please describe for the

9  Court?

10 A     In the matter of Gainey Trucking.  Sorry.  In the matter

11 of Gainey Trucking in the U.S. Bankruptcy Court of the Western

12 District of Michigan.  I was engaged by the pre-petition

13 lenders to analyze the company's cash flow forecasts that were

14 put forth in connection with that company's Chapter 11 filing.

15 I was asked to opine on whether the company's -- the company

16 was cash flow solvent in that case based on those financial

17 forecasts.

18         MR. PASQUALE:  Your Honor, at this time we would move

19 that Mr. Frezza be qualified as an expert in the fields of

20 accounting and as a financial advisor in restructuring matters.

21         MR. BERNICK:  Your Honor, I don't have any objection

22 to those qualifications, but I don't believe that that proffer

23 will support the opinions that are going to be offered.  And

24 so, I don't have an objection at this time, but I -- we're

25 going to very, very shortly run into the issue of whether he's

1 objecting to the witness' ability to express an opinion.  It's

2 just that you were objecting to the opinion that was being

3 expressed for reasons you were going to get into.  Maybe I

4 misunderstood.

5          MR. BERNICK:  What I tried to say, and I probably was

6 not clear, is that we don't believe that this witness has

7 sufficient expertise to offer an opinion regarding solvency.  I

8 think that's what --

9          THE COURT:  You did say that with respect to

10 solvency, yes.

11          MR. BERNICK:  And so, to the extent that the

12 proffer -- I didn't hear that the proffer was a proffer about

13 him as an expert in making solvency determinations.

14          THE COURT:  It was not.  It was about accounting and

15 advising and financial forecasts.

16          MR. BERNICK:  Right.  He is now going to be -- he is

17 now being asked to get into his analysis and opinions regarding

18 solvency because he's already talking about the date on which

19 he chose to measure solvency.

20          MR. PASQUALE:  Let me -- may I ask a foundation

21 question --

22          THE COURT:  Yes.

23          MR. PASQUALE:  -- and try to address this?

24 BY MR. PASQUALE:

25 Q    Mr. Frezza, in your experience, do professionals in the

1 areas of your expertise of accounting and financial advisors,

2 do they render solvency opinions?

3 A    They do.

4 Q    Okay.  And have you been involved in cases where you've

5 seen that?

6 A    I have.

7         MR. PASQUALE:  Your Honor, I don't know what else I

8 need to say in that --

9         MR. BERNICK:  Now I have some voir dire because it

10 relates to that foundation.

11         THE COURT:  All right.  You may voir dire.

12         MR. BERNICK:  Well, if Your Honor would prefer that I

13 not do it I can --

14         THE COURT:  I don't have a preference.

15                    VOIR DIRE EXAMINATION

16 BY MR. BERNICK:

17 Q    Isn't it true -- good afternoon, Mr. Frezza.

18 A    Hi, Mr. Bernick.  How are you?

19 Q    Isn't it true that you've never personally issued an

20 expert report on solvency?

21 A    That's true.

22 Q    So, this would be your first time?

23 A    This will be my first report issued on solvency.

24 Q    Expert report on solvency.

25 A    Expert report, excuse me.

1  Q    Isn't it true that you've never issued a valuation

2  opinion?

3  A    I've never issued an expert report on valuation, that's

4  true.  However, I've done much work in the field of valuation.

5  Q    Had you ever -- and I asked this question of you in your

6  deposition -- "Have you ever issued an opinion -- a valuation

7  opinion", Answer, "I've never issued a valuation opinion, no."

8  Is that your answer?

9  A    That's correct.  That's correct.

10 Q    Is it also true that you don't hold yourself out in the

11 marketplace -- non-litigation marketplace, you don't hold

12 yourself out in the non-litigation marketplace as an expert in

13 valuation?

14 A    That's correct because in doing so it would presuppose

15 that you are someone certified by the American Society of

16 Appraisers, for instance, just to be clear.

17 Q    Would it also be clear that you would not hold yourself

18 out in the marketplace as being an expert in valuation or

19 quantification of liabilities?  Isn't that true that you would

20 not so hold yourself out?

21 A    That's correct.

22       MR. BERNICK:  I don't believe that there should be

23 different standards in court from in the marketplace.  I think

24 the witness has been candid.  That he would not be able to

25 issue these opinions in the marketplace and wouldn't hold

**J&J COURT TRANSCRIBERS, INC.**

1 quantification of liabilities and valuation if he says that he

2 doesn't hold himself out as an expert in those areas.

3          MR. PASQUALE:  In the areas of valuation, Your Honor,

4 that's right.

5          THE COURT:  And quantification.

6          MR. PASQUALE:  And Mr. Frezza said that's because

7 he's not certified by the organization.

8          MR. BERNICK:  Well --

9          MR. PASQUALE:  He has done, and I'm happy to ask him,

10 he has done valuation work in his experience.  Just hasn't

11 rendered an expert valuation report, and Mr. Frezza started to

12 say that on the stand, and he certainly said that at his

13 deposition.

14          MR. BERNICK:  I understand the witness' testimony,

15 but the fact of the matter is, that in his field that

16 certification's required.

17          MR. PASQUALE:  The other thing I'd just raise, Your

18 Honor, on a procedural level is, there's been no Daubert or

19 motion in limine filed about Mr. Frezza.  This is the first

20 we're hearing about a problem with his qualifications.  That

21 deadline has long since passed.

22          MR. BERNICK:  Well, in point of fact, this is

23 something that developed very, very late in the process because

24 the testimony was taken very late in the process.  And I think

25 that the Daubert problems go not only -- this is a Daubert

1  problem, they go way beyond it, and we're going to see that if

2  he were to testify.  I know that Your Honor is generally very

3  reluctant to preclude testimony.  You want to hear it.  But, we

4  do have an objection based upon his expertise.  And I'm

5  prepared in service of getting the witness done and getting

6  this part of the trial done to suggest, perhaps, that the Court

7  reserve on this and to be flexible about it.  But, I -- you

8  know, I don't think we're going to get there over this issue.

9              THE COURT:  I'm concerned about the witness'

10  qualification when he says he does not hold himself out as

11  someone who quantifies liabilities because you certainly can't

12  do this type of a solvency analysis without quantifying to some

13  extent the liabilities that have to be paid.

14              MR. PASQUALE:  I'd ask for just the opportunity to

15  ask the witness a few questions in that regard --

16              THE COURT:  All right.

17              MR. PASQUALE:  -- so the Court can hear it from the

18  witness.

19              THE COURT:  Okay.

20                    CONTINUED DIRECT EXAMINATION

21  BY MR. PASQUALE:

22  Q    Mr. Frezza, please explain for the Court your experience

23  with respect to valuations.

24  A    Okay.  Prior to joining Capstone, as I mentioned, I was

25  with a firm that rolled up entities.  That entailed -- and I

1   was also the director of due diligence for that entity.  And

2   what that entailed was finding small middle market companies,

3   working through their financial statements and their

4   operations, and then actually putting a value on them to create

5   a tranche of value in order to sell to a strategic buyer.  That

6   entailed a substantial amount of financial due diligence

7   valuing assets not from the perspective of a court expert, but

8   from the perspective of doing the analyses of a valuation

9   person or a -- let's say a financial expert in valuing these

10  companies.

11          Since turning Capstone I've been involved with

12  various cases where valuation work was required, but not an

13  expert opinion.  In terms of valuing liabilities, a liability

14  from an accounting standpoint is that which is owed, and when

15  we say an expert in valuing liability, it's sort of irrelevant

16  from the perspective of a solvency opinion because it's based

17  on stated liabilities.  Those stated liabilities are the stated

18  liabilities of the company.  So, I honestly don't know what Mr.

19  Bernick meant by an expert in valuing liabilities because --

20          THE COURT:  I'm sorry.  Just so the witness is clear,

21  it was not about valuing liabilities, it was about quantifying

22  liabilities.

23  A    Well, if that's the case, quantifying liabilities is a

24  very basic part of financial accounting, quite frankly.

25          MR. BERNICK:  That's the problem.  I mean, these were

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Continued Direct/Pasquale                    268

1  not my -- these were not -- there wasn't a lot of back and

2  forth here.  It was pretty clean.  And, Your Honor, the

3  testimony is going to be, as we're going to see here shortly,

4  he didn't quantify him here.  I mean, he just took somebody

5  else's number because the lawyers told him to.

6          MR. PASQUALE:  Well, that's only one aspect of the

7  work that Mr. Frezza --

8          MR. BERNICK:  If we can have -- I'm sorry.  If we can

9  have an agreement that he won't testify about that, that at

10  least will be progress.

11          THE COURT:  Won't testify about --

12          MR. PASQUALE:  Well, let's be clear.  You have

13  testified -- I'm not sure I follow --

14          MR. BERNICK:  You know, we've made our objection,

15  Your Honor.

16          THE COURT:  All right.  At this point I will accept

17  it because we have the witness here.  So, you're right, Mr.

18  Bernick.  I'll hear it.  But, Mr. Pasquale, I am really

19  concerned.  I am not at all sure that the witness has stated

20  the qualifications necessary to render this opinion.  So, I'm

21  going to hear it, but I may strike it.

22          MR. PASQUALE:  I appreciate that Your Honor, and let

23  me just say one more comment before we get back into the

24  testimony, and that is, an expert witness need not be a

25  professional expert.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  No, obviously not.

2          MR. PASQUALE:  The fact that it's Mr. Frezza's first

3   time --

4          THE COURT:  That has --

5          MR. PASQUALE:  -- has explained -- I'm sorry, Your

6   Honor.

7          THE COURT:  That has no bearing on this

8   determination.  The problem is that he said in his deposition

9   that he is not an expert.  He does not hold himself out to be

10  an expert in quantifying liabilities.  I don't know how you do

11  a solvency analysis without quantifying liabilities.  So, okay,

12  go ahead.

13  BY MR. PASQUALE:

14  Q    I think the question I left you with, Mr. Frezza, is, in

15  considering solvency of the plan before the Court, on what date

16  did you test solvency?

17  A    Upon the effective date of the proposed plan.

18  Q    And what date is that?

19  A    12/31/2009.

20         MR. BERNICK:  The effective date -- can we be clear

21  that that is -- assumes that the plan has gone into effect?

22         THE WITNESS:  That's correct.

23         MR. BERNICK:  Thank you.

24         THE COURT:  And what date, Mr. Frezza?

25         THE WITNESS:  December 31st, 2009.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Did you form an opinion as to whether Grace will be

2  solvent on the effective date of the plan now being considered

3  by the Court?

4  A    I did.

5  Q    What is your opinion?

6  A    That Grace --

7        MR. BERNICK:  Can we just -- sorry.  It would solve

8  the objection problem if he could just say assuming the plan

9  was effective because --

10        MR. PASQUALE:  All of my questions for Mr. Frezza

11  will assume that the plan is confirmed and becomes effective.

12        MR. BERNICK:  Thank you very much.

13  A    Could you repeat your question, Mr. Pasquale?

14  Q    I asked you, I believe, what is your opinion?

15  A    In my opinion, upon the effective date Grace will be

16  solvent.

17  Q    What did you do to form that opinion?

18  A    I did a number of things.  I performed a number of tests

19  that are commonly done in forming an opinion on solvency.

20  Q    Please describe those tests.

21  A    Let me describe the tests.  The three most common tests

22  are the cash flow test -- what is commonly known as the cash

23  flow test or the ability to pay debts as they come due.  The

24  adequate capital test which is more of a qualitative test of

25  considerations -- various considerations that are professional

1  we'll take into consideration in forming an opinion.  And

2  finally, a balance sheet test.

3  Q    Let me ask you about each of those, one by one.  Please

4  describe for the Court what is entailed with a cash flow test

5  of solvency.

6  A    A cash flow test is designed -- the professional would

7  approach it by reviewing a cash flow forecast prepared by the

8  company, evaluating whether the forecast makes sense,

9  critically challenging the underlying assumptions, considering

10  sensitivities to that forecast in view of the company's

11  historical performance.  And once you've considered those

12  factors and form an opinion as to whether the company is able

13  to at a particular test date as well as in the future able to

14  meet its obligations as they come due.

15  Q    Is there anything else involved in the cash flow test?

16  A    And that's principally the cash flow test.

17  Q    Please describe for the Court the components, or what you

18  do in performing an adequate capital test of solvency.

19  A    The adequate capital test is more of a qualitative test

20  whereby the professional would consider, for instance, the

21  results of the cash flow test which is more quantitative.  In

22  addition, you would look to see what indicators would allow one

23  to determine whether a company is solvent or insolvent such as,

24  does the company have cash on its balance sheet.  Does the

25  company have access to a revolver in order to fund debts as

1   they come due in excess of cash for instance.  Does the company

2   have credit terms from its vendors.  Does the company have an

3   equity cushion that would be determined based on the balance

4   sheet test which we'll discuss in a moment, and various other

5   factors.

6           One might look at various ratios, as well, whether

7   the company's current assets exceed its current liabilities and

8   so forth.  So, that -- and once you take those data points into

9   consideration, it would allow the professional to form an

10  opinion on whether the company passes the capital test.

11  Q    Thank you.  And you mentioned in passing the third of the

12  test, the balance sheet test, please describe that test for the

13  Court.

14  A    In general, the balance sheet test is a test to determine

15  whether the company -- the company's assets exceed its

16  liabilities at a test date.  And taking that one step further,

17  the balance sheet test can be administered in up to three

18  different ways in its most common form.  Those three methods

19  that could be performed under the balance sheet test include

20  the market approach, the income approach, and the cost

21  approach.

22  Q    I'll stop you there.  Let's break that down.  Please

23  describe for the Court the market approach to the balance sheet

24  test.

25  A    Certainly.  In the market approach the professional would

**J&J COURT TRANSCRIBERS, INC.**

1  analyze peer group companies or guideline companies that are

2  comparable to the company being tested and review, for

3  instance, their enterprise value and compare that to the

4  company's EBITDA, earnings before interest, taxes,

5  depreciation, and amortization.

6          And after reviewing those companies, determine sort

7  of a mean and median multiple of EBITDA to enterprise value of

8  those entities.  In addition, the professional would look to

9  precedent transactions or MNA transactions in the market that

10  would be indicative of a value for the target company or the

11  company being discussed for solvency.

12          And one would take the combination of the results of

13  those two analyses and determine a range of multiples to apply

14  to, for instance, Grace's EBITDA, for let's say all of 2009.

15  And then that would result in what would be called enterprise

16  value.  In the market approach to the balance sheet test,

17  enterprise value is a proxy for the fair value of the assets.

18  when you're performing the balance sheet test in each case, one

19  must look to the fair value of the assets.  Not the book value,

20  but the fair value of those assets in determining whether the

21  company has -- is solvent in terms of assets exceeding

22  liabilities, and by how much those assets exceed liabilities,

23  which is also referred to as an equity cushion.

24  Q    Now, you mentioned also the income approach.  Can you

25  please describe the income approach?

1  A    Sure.  The income approach is an approach whereby you

2  would take the company's detailed financial projections over

3  whatever period is involved -- or available.  Excuse me -- and

4  also taking a terminal value year which is to -- the terminal

5  value year is generally thought to be the normalized income

6  statement performance of a company ad infinitum.

7       And then a professional would perform a discounted

8  cash flow analysis on those projections, including the terminal

9  year, and come up with and apply an appropriate discount

10  factor.  And then determine a -- again, an enterprise value

11  which again would be the proxy for asset value -- fair value of

12  assets.  And then --

13  Q    And finally -- I'm sorry.  Were you finished?

14  A    And then, again, there would be an examination of

15  liabilities against those assets to determine what the equity

16  cushion is on the income approach.

17  Q    Thank you.  And finally is the cost approach.  Can you

18  please describe the cost approach?

19  A    Sure.  Under the cost approach one would take the

20  traditional stated balance sheet as of the test date, in this

21  case 12/31/2009 projected pro forma balance sheet, and one

22  would need to seek to find the fair value of those assets,

23  compare them to the stated liabilities as reported, and

24  determine what the equity cushion is.

25       And the thought under the cost approach is, what

1  would it cost the willing buyer to replace these assets because

2  the book value of a company's assets, depending on the asset

3  class, typically are lower than fair value.  So, one would need

4  appraisals or a business valuation of the assets to determine

5  what the fair value of those assets would be under the cost

6  approach and then compare the stated liabilities on the balance

7  sheet to determine the equity cushion.

8  Q    Let me ask you, Mr. Frezza -- well, a foundational

9  question first.  What is GAAP?

10  A    GAAP stands for generally accepted accounting principles,

11  and it is the codification of accounting principles by which

12  all United States reporting companies, and even companies that

13  don't report, use to record transactions and report their

14  financial statements.

15  Q    And are you familiar with the GAAP principles?

16  A    Yes, I am.

17  Q    How do GAAP principles, if at all, impact a balance sheet

18  test?

19  A    Under GAAP, typically -- well, again, there are 161

20  statements of financial accounting standards that have to be

21  applied.  Many of them are for specific purposes or specific

22  accounting issues, but the entire codification of GAAP requires

23  assets to be recorded on the books at the most conservative

24  value, for instance, the lowest value possible.

25          And just to provide an example, for instance,

**J&J COURT TRANSCRIBERS, INC.**

1  inventory -- let's say a company has inventory that is a highly

2  traded commodity.  GAAP requires that inventory to be recorded

3  at the lower of cost or market.  So, if the market value of

4  that inventory is actually higher than book value, the book

5  value is used.  If the market value of that inventory is below

6  its cost of the company, then you use the market value only to

7  the extent it does not exceed cost.

8         With respect to property and equipment, a good

9  example is the purchase of real estate for a facility prior to

10 1980 let's say.  And the company functioning now has this real

11 estate, and assuming it's their own environmental issues, if it

12 were to sell it the land value would likely exceed what the

13 company purchased the land and building for because keep in

14 mind when you purchase land and building you're actually

15 depreciating the building and any improvements over a long

16 period of time, so the book value actually declines over a long

17 period of time such that if you were to sell that facility it

18 would likely be -- again, if it was not soiled by environmental

19 issues -- likely be valued higher than its book value.

20        On the liability side, GAAP, again being -- taking

21 the most conservative approach to recording transactions,

22 liabilities have to be at their highest level possible.  Any

23 liability that is likely to be paid and is estimable must be

24 recorded on the balance sheet.  So, a balance sheet reflects

25 all the liabilities that the company could possibly be aware

**J&J COURT TRANSCRIBERS, INC.**

1  of, and as long as they're estimable -- reasonably estimable --

2  they are on the balance sheet.  So --

3  Q    And -- I'm sorry.

4  A    I'm sorry.  So, just to wrap up, GAAP really is the most

5  conservative approach to recording transactions on financial

6  statements.

7  Q    Now, doing a balance sheet analysis of solvency, you

8  mentioned on the asset side fair value of assets is a standard,

9  with respect to liabilities, is that a book value or a fair

10 value or something else?

11 A    The typical language is stated value which would be

12 normally book value.

13 Q    Now, do each of the three tests that you've described, a

14 cash flow test, adequate capital test, balance sheet test, do

15 each of those tests have to be satisfied in order for -- in

16 order to determine that a company is solvent or insolvent as of

17 a specific date?

18 A    No, there's no requirement to perform all three tests.

19 And it also depends on the situation to the extent solvency is

20 very clear versus murky.  A professional who is approaching a

21 solvency analysis would not need to do all three tests and just

22 take into consideration whatever factors are demonstrative of

23 solvency or insolvency.

24 Q    Now, let's turn to Grace specifically.  Did you consider

25 whether Grace is solvent under the cash flow test?

Frezza - Continued Direct/Pasquale          278

1  A     I did.

2  Q     What did you do?

3  A     I started off with Ms. Zilly's feasability study --

4  feasibility report, and that was the only source of financial

5  projections that I had available to me.  In that report she

6  provides a summary of the company's financial projections.

7  What I did is, in reviewing those projections I analyzed the

8  revenue trend being assumed, the core EBITDA trend being

9  assumed.  I considered the underlying assumptions by deriving

10 them from my analysis in that report.

11          As well as in reading her report, it's very clear

12 that -- very clear -- a number of things are very clear by

13 reading her report.  In looking at the trends being assumed, it

14 was clear to me that the assumptions being used in that

15 forecast are very conservative considering my knowledge of

16 Grace's performance in the past, as well as what she stated in

17 her report, just for some data points, sales have doubled since

18 the company filed, or I should say from the year 2000 to 2008.

19 Core EBITDA has increased by 64 percent from the year 2003 to

20 2008.

21          The company has generated operating-free cash flow of

22 over $1.6 billion in that period, and the company is currently

23 sitting on $622 million, or I should say at the end of June,

24 $622 million of cash.  Very strong performance, and in my

25 analyses of the company's performance over the years, has

Frezza - Continued Direct/Pasquale                279

1  continuously exceeded -- with the exception of 2008 has

2  continually exceeded its performance -- its budget, excuse me.

3          So, based on my knowledge of the company and my

4  involvement with the company, based on my analysis of the

5  summarized cash flow forecast in her report, and also taking

6  into consideration all the facts and data that she laid out, I

7  completely concurred with her view that the projections are

8  reasonable and easily met.  And quite frankly, I would go as

9  far to say that, you know, that the work that she had done to

10 come up with that view is the same work that I did, or was able

11 to do, to come up with my solvency opinion.

12 Q    Well, let's be clear.  The work that you reviewed of Ms.

13 Zilly was not a solvency report, was it?

14 A    That's correct.  But, it could've been.

15 Q    Please elaborate on that.  What do you mean by you

16 could've?

17 A    Just simply, as I said already, that the analyses and the

18 work performed by me and by Ms. Zilly is the identical work

19 that would be performed if she were to render a solvency

20 opinion.  It's the same thing.

21 Q    And just so we're clear, this is with respect to the cash

22 flow test?

23 A    With respect to the cash flow test, correct.

24 Q    What conclusion, if any, did you draw from the cash flow

25 analysis that you did?

**J&J COURT TRANSCRIBERS, INC.**

1  A      That Grace will be solvent on the effective date and

2  thereafter based on those financial projections under the cash

3  flow test.  It passes the cash flow test.

4  Q      Did you consider whether Grace is solvent as of the

5  effective date under the adequate capital test?

6  A      I did.

7  Q      And what did you do?

8  A      As mentioned earlier, I looked at all the factors that I

9  listed, including the fact that leading up to the proposed

10 effective date, Grace has, with one exception, has really never

11 used its debtor in possession borrowing facility with the

12 exception of the payment to the EPA, I believe, where they had

13 drawn it down, but paid it back very quickly.

14        Other than that, to my knowledge, the company's

15 really never used its DIP facility for any substantial reason

16 other than to provide liquidity for letters of credit

17 requirements.  The company has maintained a very significant

18 cash balance, and while it -- these are periods in time leading

19 up to, they're all indicative of the fact that the company was

20 very strong -- had a very strong financial performance in its

21 ability to generate cash and have capital available to -- where

22 there are bumps in the road -- financial bumps in the road.

23        In addition, we understand that the company's very

24 far along in negotiating with exit lenders.  Generally, lenders

25 aren't going to spend the amount of time that we understand is

1  being spent here if they felt that the company was insolvent.

2  Based on -- to the best of our knowledge, and when I say our

3  knowledge, in the work that I've done over the quarters and

4  over the years, that Grace's vendor community holds it in high

5  regard.  The company continues to get full vendor terms.  So,

6  that providing of credit is an indication that the company is

7  solvent, and the fact that the company has a substantial equity

8  cushion under the balance sheet test.

9  Q    We'll talk about that in a second.  Mr. Frezza, did you

10 draw a conclusion as to whether Grace is solvent under the

11 adequate capital test?

12 A    In my report I concluded that it passed the adequate

13 capital test, yes.

14 Q    Now, did you consider whether Grace is solvent as of the

15 effective date under the balance sheet test?

16 A    I did.

17 Q    Okay.  And how did you perform a balance sheet test as of

18 the effective date?

19 A    As of the effective date.  I started with the company's

20 disclosure statement.  So, first let me say, the approach I

21 took was the market approach.  And I first went to the

22 company's disclosure statement because there were substantial

23 disclosures about how the company arrived at its enterprise

24 value for instance.  And as I mentioned, what a professional

25 would do will seek to find guideline companies, analyze the

**J&J COURT TRANSCRIBERS, INC.**

1  statistics related to those companies, key statistic being its

2  EBITDA multiple or its enterprise values to EBITDA, as well as

3  precedent transactions.

4       It was very clear from the disclosure statement that

5  a substantial amount of work had been done by the company and

6  its advisors to determine guideline companies and precedent

7  transactions.  And one point that I noted in the disclosure

8  statement was the fact that -- it was a very good point -- that

9  the company indicates the key -- a key to the success of this

10  test is the appropriate selection of the guideline companies

11  such that we're certain that those guidelines -- those

12  guideline companies are appropriate in comparing them to the

13  various businesses within Grace, and in my opinion, who better

14  to make that decision but the company.

15       And it's completely appropriate for a professional to

16  rely on other professional's analyses to determine, for

17  instance, what enterprise value is.  So, I used the disclosure

18  statements enterprise value to determine what the proxy for

19  fair value of the assets were under the market approach of the

20  balance sheet test.

21  Q    Did the disclosure statement provide amounts, figures,

22  that you could use in determining -- in applying a balance

23  sheet test under the market approach?

24  A    It did.  It did.  Yes.

25  Q    Please explain what you did.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Okay.  So, once I felt comfortable with the fact that I

2  had the appropriate proxy for fair value of assets under the

3  market approach of the balance sheet test, I reviewed the

4  company's balance sheet -- pro forma balance sheet at 2009 and

5  looked through the liability section to determine which

6  liabilities should be deducted from enterprise value.  And in

7  doing so, the liabilities that I would deduct from enterprise

8  value were the same that were included in the disclosure

9  statement.  And I created an analysis to that effect and --

10  Q    You created a chart --

11  A    I created a chart that was --

12  Q    -- and that was included in your expert report?

13  A    It was included in my expert report, yes.

14        MR. PASQUALE:  Your Honor, may I approach the

15  witness?

16        THE COURT:  Yes.

17  Q    Mr. Frezza, I've just shown you what we've marked for

18  identification purposes as CCBLG Exhibit 41.  Is this the chart

19  that you've prepared?

20  A    It is.

21  Q    Okay.  Can you tell us what this chart demonstrates?

22  A    Sure.  As I mentioned, it's typical to do a range of

23  values because it's not -- these types of analyses are not that

24  precise such that it's one number.  So, the --

25        MR. BERNICK:  I'm sorry.  Just so I don't have a

1 waiver issue.  We object to all testimony regarding his

2 ultimate opinions insofar as numbers are concerned, as

3 irrelevant as well because he's measuring the wrong thing.

4 He's measuring the assumed effect of an assumed to be modified

5 plan, and that has no relevance to any issue before the Court.

6 And I just wanted to make sure that I've got that objection,

7 and can I have a continuing objection on those grounds so I

8 don't have to --

9         THE COURT:  That it's --

10         MR. BERNICK:  Thank you.

11         THE COURT:  -- a soon to be modified plan?  I'm

12 sorry.

13         MR. BERNICK:  Assumed to be --

14         THE COURT:  Oh, assumed.

15         MR. BERNICK:  -- modified and effective plan.  He

16 assumes that a plan becomes effective, and it's not the one

17 that's before the Court.  So --

18         MR. PASQUALE:  Well, I -- I'm sorry.

19         MR. BERNICK:  I'm sorry.  So, we object on relevance

20 grounds and we'd like to have a continuing objection.

21         THE COURT:  You have that continuing objection.

22         MR. BERNICK:  Thank you.

23         MR. PASQUALE:  I think -- just for the record, Your

24 Honor, I think Mr. Bernick's mistaken, and as the witness will

25 explain.  And in any event, I think that's a subject he can

1  cross examine the witness on.

2  BY MR. PASQUALE:

3  Q    So, Mr. Frezza, please explain what your chart

4  demonstrates.

5  A    Sure.  So, as we discussed, the disclosure statement was

6  very clear on its approach which it would be considered the

7  market approach to determining enterprise value which would be

8  the proxy for the fair value of assets under that balance sheet

9  test.  And the disclosure statement indicated that a range of

10  2.1 billion to 2.5 billion represents the enterprise value of

11  Grace, which again is the fair value of those assets.

12        The next step in looking at the balance sheet, only

13  selected liabilities are deducted from enterprise value to

14  determine an equity cushion under this approach which -- so

15  the --

16  Q    Let me stop you, Mr. Frezza.

17  A    Yes, sure.

18  Q    I'm sorry.  When you say looking at the balance sheet,

19  what did you look at?

20  A    Just using the company's second corrected Exhibit 12 to

21  the POR.  On the last page there are historical and projected

22  balance sheets, and I used the projected 2009 balance sheet.

23        MR. PASQUALE:  Your Honor, what I put on the ELMO,

24  and I had -- you have copies, is Exhibit -- Plan Proponents

25  Exhibit 277.12.  If Your Honor would like a copy I'll

**J&J COURT TRANSCRIBERS, INC.**

1 certainly --

2          THE COURT:  Please.  Thank you.

3 Q    And specifically, it is the very last page of that

4 exhibit?

5 A    That's correct.

6 Q    Mr. Frezza, is this what you were just referring to in

7 your testimony?

8 A    It was.

9 Q    Okay.  So, I interrupted you.  You were starting to

10 explain the liability section of the chart there.

11 A    Correct.  So, because you're starting out with enterprise

12 value, you don't take a GAAP balance sheet approach to

13 deducting liabilities, and I'll explain what I mean by that.

14 For instance, certain liabilities such as current liabilities,

15 accounts payable, accrued expenses and anything considered

16 current liabilities are already considered within the

17 enterprise value because there's a notion that the enterprise

18 value takes into consideration with the networking capital of

19 the company.  And when I say networking capital, that typically

20 means current assets minus current liabilities.  So --

21 Q    Well, then, let's -- I'm sorry, Mr. Frezza.  Let's go down

22 the balance --

23 A    Sure.

24 Q    -- sheet then, which is the 277.12, and first, just so

25 we're clear, which of the balance sheets set forth here, which

1  did you rely upon for purposes of the market approach to the

2  balance sheet?

3  A      It's projected December 31st, 2009 balance sheet.

4  Q      I'm sorry.  December 31st, 2009?

5  A      Yes.

6  Q      Okay.  And that's the second to last column on the exhibit

7  on the balance sheet?

8  A      Second from the right on the last page of the exhibit,

9  yes.

10 Q      Thank you.  Okay.  So, let's look at the liabilities --

11 liability section of that balance sheet.  And let's first focus

12 on the top section, current liabilities.  Are the current

13 liabilities included in the liabilities that you considered

14 with respect to the market approach to the balance sheet test?

15 A      Those liabilities are not listed below enterprise value

16 because they're already considered in the enterprise value,

17 again, because there's a notion that it includes the networking

18 capital of the company and its valuing of the assets.

19 Q      Okay.

20 A      So, those are not deducted under this approach.

21 Q      So, we don't find them on your chart?

22 A      So, they're not on my chart.

23 Q      Okay.  Let's look at the next section, and let's take

24 these one at a time.  Debts payable after one year.  Is that  a

25 deduction that you included in your market approach?

Frezza - Continued Direct/Pasquale                288

1  A      That's correct.  That's a billion dollars of funded debt

2  that would have to be deducted from enterprise value to

3  determine equity cushion.

4  Q      So, on the chart it's called funded debt upon emergents,

5  is that right?

6  A      Correct.

7  Q      Okay.  Why use a different terminology there?

8  A      Just to be consistent with the disclosure statement.  You

9  know, just --

10 Q      That was the terminology used in --

11 A      Yes.  These are the terms used in the disclosure

12 statement, so it was just to be consistent.

13 Q      Okay.  The next item is a deferred payments, 395 million.

14 And is that --

15 A      That is also listed as a deduction, and it's referred to

16 as deferred payment agreements.

17 Q      Okay.  The next item is deferred income taxes, is that

18 included?  Let me be clear.  Let me withdraw that question.

19 Deferred income tax, is that an item that you deducted from

20 reorganize enterprise value?

21 A      It's not because, again, there are substantial deferred

22 income tax assets, and as a result of having a proxy for those

23 deferred value of those assets under enterprise value, it's

24 considered -- it's already considered, so you wouldn't deduct

25 it.  It would be a theoretical double count if you did.

**J&J COURT TRANSCRIBERS, INC.**

1  Q     The next item is minority interest.  Is that a deduction?

2  A     That is a deduction and it is listed on the chart.

3  Q     And let's take the next two together.  They both pertain

4  to define benefit pension plans.  Are those amounts deductions

5  from reorganize enterprise value on your chart?

6  A     That -- those two together are not for a couple of reasons

7  because, again, pension liabilities are based on actuarial

8  calculations of plan value because there are plan assets that

9  offset plan liabilities.  These represent an underfunding of

10  the plan due to low asset value that is reconsidered every

11  year.

12        And in addition, the related pension expense that is

13  a component or directly related to these liabilities is already

14  considered an EBITDA.  And as we mentioned, the way we come up

15  with enterprise value is a multiple applied to EBITDA.  So,

16  again, it's theoretically taken into consideration in the

17  enterprise value, so it wouldn't be deducted.

18  Q     The last item in that section is other liabilities.  Is

19  that a deduction that you made from reorganize enterprise

20  value?

21  A     That is not, and again, the thought is that the related

22  expense is already considered in enterprise value.

23  Q     Now, I think we can take the entire next section in one

24  lump sum.  Liabilities subject to compromise, is that a

25  deduction?

Frezza - Continued Direct/Pasquale                    290

1    A     I took the entire amount because those are debts that have

2    to be paid over time.

3    Q     Okay.  So, they are a deduction from reorganize

4    enterprise --

5    A     They are a deduction because they're not considered

6    anywhere else.

7    Q     Mr. Frezza, the bottom line, total liabilities figure for

8    the 2000 -- excuse me -- projected December 31st, 2009 balance

9    sheet is a $2.9 billion number, do you see that?

10   A     I do.

11   Q     And the total reductions on your chart using the market

12   approach is low, mid and high, but they're just under 1.7

13   billion?

14   A     That's correct.

15   Q     Okay.  And how do you explain that difference just in sum?

16   A     Again, because the calculated enterprise value, which is a

17   proxy for the fair value of those assets, already considers

18   certain of these liabilities, so you wouldn't deduct them

19   again, so we don't want to have a double count here.  So, you

20   wouldn't have a 2.9 billion of liabilities deducted from the

21   enterprise value because it's just not intuitive.  It's not how

22   the calculation and the analysis is done.  So --

23   Q     So, let's go back to your chart then.  We've now discussed

24   the proxy -- excuse me -- the liability section, the deductions

25   from reorganized enterprise value.  Please explain the bottom

**J&J COURT TRANSCRIBERS, INC.**

1  line, the reorganized equity value and what that represents?

2  A     As I mentioned earlier, this test is designed to determine

3  whether the fair value of assets exceeds stated liabilities,

4  and the equity cushion, therefore, represents that asset value,

5  fair value of assets, in excess of stated liabilities which

6  indicates that there's a substantial equity cushion at the

7  effective date.

8  Q     When you say there's an equity cushion as of the effective

9  date, did that inform a conclusion that you formed with respect

10 to whether Grace would be solvent under the market approach as

11 of the effective date?

12 A     It does.  Under the market approach of the balance sheet

13 test, that indicates that the company is solvent.

14 Q     Now, did you perform a balance sheet test applying the

15 income approach as of the effective date, December 31st, 2009?

16 A     Sorry?  Restate the question?

17 Q     Let me try that again.  Did you perform a balance sheet

18 test applying the income approach as of the effective date?

19 A     I did not.

20 Q     And why not?

21 A     Because, again, having the -- one would need detailed

22 financial projections over a period of time to determine that

23 and I didn't have -- while there was a summary, set of summary

24 projections, in Ms. Zilly's report, I did not have access to or

25 I did not have available to me those -- any projections that

**J&J COURT TRANSCRIBERS, INC.**

1    would have allowed me to do a discounted cash flow approach.

2             MR. BERNICK:  I object to that, Your Honor.  This now

3    gets into a whole history of the information room that was made

4    available and I don't really think it's an appropriate thing

5    for an expert to testify to.  He can't testify to facts he

6    doesn't know about.  He can say that he didn't have it, but to

7    say that it wasn't available goes beyond his factual knowledge.

8             THE COURT:  Okay.  That's sustained unless you can

9    substantiate that he had knowledge on his own.

10            MR. PASQUALE:  Your Honor, I'm actually --

11   Q    You didn't do that test, did you?

12   A    I didn't do that test.

13   Q    Okay.  Did you perform a balance sheet test applying a

14   cost approach with respect to this plan as of the effective

15   date?

16   A    With respect to this plan, I did not.  Again --

17   Q    And why not?

18   A    Because you would need -- as I mentioned earlier, under

19   the cost approach, you would look at -- you would take a more

20   traditional balance sheet, but -- like this GAAP balance sheet,

21   but you would need -- one would need to determine the fair

22   value of those assets as stated on the GAAP balance sheet and

23   that would require either having had an independent third party

24   business valuation or set of appraisals on individual assets.

25   Again, for instance, if there were appraisals available on

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Continued Direct/Pasquale                    293

1  facilities, the myriad of facilities that Grace owns, whether

2  there would also be, to the extent available, when one would

3  require appraisals of intellectual property and other

4  intangible property, and that I did not have.

5  Q    Now, in addition to the tests that you've already

6  described, were you also asked by counsel to consider Grace's

7  solvency under any specific assumptions?

8  A    Yes.  I was asked by counsel to substitute the --

9  substitute Grace's experts' median asbestos PI claim liability

10  estimate of -- I want to say -- I forget -- four sixty eight to

11  substitute that amount for the amount in the currently proposed

12  plan.

13  Q    What, if anything, did you conclude from that analysis?

14  A    Well, based on the work that I had done, had that level of

15  liabilities been at issue, and assuming other components of the

16  current plan, such as the Fresenius and Sealed Air settlement

17  amounts been available, as well as with insurance, that Grace

18  would be solvent in that case, as well.

19  Q    Now, with the various methods that you used in determining

20  whether Grace is solvent under a plan before the Court as of

21  the December 31st, 2009 effective date, is any one method

22  preferable to the other?

23  A    No.  All of these methods are probative.  You know, the

24  desire is to have as many tests performed as possible and have

25  as much data available to the professional to do it, but there

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Cross/Cobb                    294

1  is no one best way to do it and there's no stipulation that all

2  three have to be done.  So, there's no best, one best, plan --

3  I'm sorry -- approach.

4          MR. PASQUALE:  Nothing more at this time, Your Honor.

5  We pass the witness.

6          THE COURT:  Mr. Cobb?

7                    CROSS EXAMINATION

8  BY MR. COBB:

9  Q    Mr. Frezza, in producing your opinion with regard to

10  Grace's solvency as of 12/31/09, under the balance sheet test

11  using the market approach, what was the range of values that

12  you discovered that Grave's assets will exceed its liabilities?

13  A    The resultant numbers were 430 million to 821 million.

14  Q    Now, in performing any of the tests -- and let me step

15  back and be more specific.  In forming the cash flow test to

16  determine Grace's solvency as of 12/31/09 under this plan,

17  assuming it's effective, did you need to quantify any

18  liabilities?

19  A    No.  You just needed to take the stated liabilities from

20  the company's balance sheet.

21  Q    And that's an accepted expert methodology --

22  A    Yes.

23  Q    -- of determining solvency?

24          MR. BERNICK:  Objection.

25  A    Yes.

1          MR. BERNICK:  Objection.  Leading.

2          THE COURT:  It's leading.  Sustained.

3          MR. COBB:  I'm sorry, Your Honor.

4          MR. BERNICK:  He already answered it.  Go ahead.

5  It's not worth it.

6          THE COURT:  Well, if he did, I didn't hear it so --

7          MR. BERNICK:  It's just simply --

8          MR. COBB:  Your Honor, I'm going to try this again

9  with the second test --

10         THE COURT:  All right.

11         MR. COBB:  -- we'll get the timing right.  We're all

12 ready now.  Okay?

13 Q    With the second test you performed, Mr. Frezza, to

14 determine Grace's solvency as of 12/31/09 under the plan before

15 the Court, assuming it's confirmed and it goes effective, that

16 is the adequate capital test, did you need to quantify any

17 liabilities in issuing your opinion?

18 A    No.

19 Q    And why is that?

20 A    Because it's not the accepted method under the -- there's

21 nothing under the adequate capital test that requires anyone to

22 value liabilities.

23 Q    Okay.  And then lastly, under the balance sheet test where

24 you used the market approach to value assets, and you issue an

25 opinion that as of 12/31/09, under this plan, assuming it's

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Cross/Bernick                    296

1 confirmed and goes effective, did you need to quantify any

2 liabilities in order to reach your -- in order to issue your

3 opinion?

4 A    No.    The rule is using stated liabilities at the test

5 date.

6             MR. COBB:    Thank you.

7             MR. BERNICK:    Okay?

8             MR. COBB:    All yours.

9             MR. BERNICK:    Well, hardly.

10                     CROSS EXAMINATION

11 BY MR. BERNICK:

12 Q    Different board.    Mr. Frezza, all of your work -- can you

13 hear this?    I'm sorry.    Can you hear it?    All of your work

14 assumes that a plan has gone effective and that plan is the

15 agreed plan that is now before the Court, but with a change,

16 right?

17 A    Not exactly correct, because my conclusion clearly states

18 also --

19 Q    Okay.    Well, if that's not true --

20 A    I'm sorry.

21 Q    -- then I'll withdraw the question.

22 A    Okay.

23 Q    I'll get to it a different way.    Grace has done analyses

24 which assume that the plan that actually is before the Court,

25 the agreed plan, has gone effective, correct?

**J&J COURT TRANSCRIBERS, INC.**

1    A     Yes.  They have made sufficient data available.

2    Q     Right.  And you used that, right?

3    A     Sure.

4    Q     Okay.  And you used the balance sheet, right?  The pro

5    forma balance sheet, you used in your work?

6    A     Sure, as a basis for --

7    Q     Right.

8    A     -- one of the tests, correct.

9    Q     Okay.  And you used Ms. Zilly's feasibility analysis,

10   true?

11   A     I used it to have data available to do my own analysis.

12   Q     I'm not criticizing you.  I just want to get the facts.

13   A     Oh, okay.  I just want to be precise.

14   Q     I just -- I want to be very precise.

15   A     Okay.

16   Q     As a matter of fact, you borrowed -- for whatever reason,

17   you borrowed Grace's pro forma balance sheet and assuming that

18   the plan goes effective, it's capitalization presentation

19   assuming that the plan goes effective, and Ms. Zilly's

20   feasibility analysis assuming that the plan goes effective.

21   Right?

22   A     Correct.

23   Q     Okay.  So, let's now talk about what you did.  Okay?

24   A     Okay.

25   Q     What you did.

**J&J COURT TRANSCRIBERS, INC.**

1 motion to find that this testimony and these opinions are

2 inadmissible because they don't satisfy the requirements of the

3 Federal Rules 702 and 703 by the witness' own testimony.

4       MR. PASQUALE:  And we obviously disagree with that,

5 and I think Mr. Cobb's questions made that quite clear, as well

6 as the witness' testimony, but let me do my redirect.

7       THE COURT:  All right.

8           REDIRECT EXAMINATION

9 BY MR. PASQUALE:

10 Q    Mr. Bernick spent an awful lot of time talking about the

11 one simple clear assumption.  Was that the only analysis you

12 did?

13 A    No.  As I testified, I performed all three tests on the

14 plan that is before the Court, the market approach or the

15 balance sheet test, the adequate capital test and the cash flow

16 test.

17 Q    Okay.  Let me ask you, did your cash flow test assume the

18 Florence amount for personal injury claims?

19 A    It did not.

20       MR BERNICK:  I've already -- there's no issue about

21 that.

22       MR. PASQUALE:  Well, I'm asking questions on

23 redirect.

24       MR. BERNICK:  Okay.

25 Q    Did your adequate capital test assume the Florence number

**J&J COURT TRANSCRIBERS, INC.**

1  for personal injury claims?

2  A     No, it did not.

3  Q     Did your balance sheet test, using the market approach,

4  assume the Florence personal injury estimate?

5  A     One version did, but I did one for the plan before the

6  Court so I did it -- I did the market approach for both.

7  Q     And Mr. Bernick asked you about a cash flow test.  Why

8  didn't you do your own cash flow test?

9  A     Well, we keep saying I didn't do my own, but I used the

10  information in the Zilly report to do my own analyses.  To just

11  simply restate the projections included in her report would

12  have just been redundant, but I did analyze those projections.

13  I did consider those projections in the context of Grace's past

14  performance that I'm well-aware of due to my participation in

15  the case.  So, I did do my own analysis.  It's just -- I just

16  refer to the Zilly report as relying on that in terms of laying

17  out the information in the report.

18  Q     And as an accountant and a financial advisor, did you

19  believe it was reasonable to rely upon the information provided

20  by Grace in the documents?

21            MR. BERNICK:  Again, there's no --

22  A     I do and --

23            MR. BERNICK:  (A) it's leading, (B) it's not in

24  dispute.

25            THE COURT:  Well, it's leading.

**J&J COURT TRANSCRIBERS, INC.**

1  Honor.

2        THE COURT:  I think so, too, but I'll let him answer.

3  Go ahead, sir.

4  A    First of all, it's perfectly appropriate for a

5  professional to rely on another professional's work.  Secondly,

6  it wouldn't be appropriate for me to create my own version of

7  Grace's projections without, for instance, access to management

8  or time with the company.  So, it's perfectly appropriate to do

9  that in arriving at an opinion if, in my opinion, that

10  professional did all the appropriate work that they needed to

11  do to come to a view of reasonableness in those cash flow

12  projections and whether those cash flow projections indicate

13  the company could pay its debts as they come due.

14  Q    And did you make that conclusion with regard to Ms.

15  Zilly's work in this case on feasibility?

16  A    I did.  I did.

17        MR. COBB:  Your Honor, I have nothing more of this

18  witness.  I would like to speak very briefly to Mr. Bernick's

19  efforts to try to eliminate this witness' opinions from the

20  evidentiary record.

21        THE COURT:  All right.

22        MR. COBB:  Your Honor, I think --

23        MR. BERNICK:  Your Honor, if I --

24        MR. COBB:  First, Mr. Bernick has presented the Court

25  --