UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


```
IN RE:                      .    Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .    USX Tower - 54th Floor
                            .    600 Grant Street
                            .    Pittsburgh, PA 15219
              Debtors.  .
                            .    October 7, 2009
. . . . . . . . . . . . ..        3:04 p.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                                 BARBARA HARDING, ESQ.
                                 JANET BAER, ESQ.
                                 LISA ESAYIAN, ESQ.
                                 ELLI LEIBENSTEIN, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601


For the Debtors:            Kirkland & Ellis, LLP
                            By:  THEODORE FREEDMAN, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  10022


                            W.R. Grace & Co.
                            By:  MARK. A SHELNITZ, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21044


Audio Operator:             Cathy Younker


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (Contd'):

For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                           By:  PETER LOCKWOOD, ESQ.
                                NATHAN FINCH, ESQ.
                           One Thomas Circle, NW
                           Washington, D.C.  20005

For the Future             Orrick, Herrington & Sutcliffe, LLP
Claimants                  By:  ROGER FRANKEL, ESQ.
Representatives:                JONATHAN GUY, ESQ.
                                RICHARD H. WYRON, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For the Equity             Kramer Levin Naftalis & Frankel
Committee:                 By:  DAVID E. BLABEY, JR., ESQ.
                           919 Third Avenue
                           New York, NY  10022

For the                    Stroock & Stroock & Lavan
Unsecured Creditors'       By:  ARLENE KRIEGER, ESQ.
Committee:                 180 Maiden Lane
                           New York, NY  10038-4982

For the Property           Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                           By:  MATTHEW KRAMER, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

For the Ad Hoc             Dewey & LeBoeuf, LLP
Committee of Equity        By:  JENNIFER WHITENER, ESQ.
Sec. Holders:              125 West 55th Street
                           New York, NY  10019

For Committee of           Campbell & Levine
Asbestos Personal          By:  MARK T. HURFORD, ESQ.
Injury Claimants:          800 North King Street
                           Suite 300
                           Wilmington, DE  19701

TELEPHONIC APPEARANCES (Contd'):

For Maryland Casualty:      Eckert Seamans Cherin & Mellott, LLC
                            By:  EDWARD LONGOSZ, II, ESQ.
                            1747 Pennsylvania Avenue, N.W.
                            Suite 1200
                            Washington, D.C.  20006


For Sealed Air:             Skadden, Arps, Slate, Meagher & Flom,
                              LLP
                            By: DAVID TURETSKY, ESQ.
                            One Rodney Square
                            Wilmington, DE  19801


For AXA Belgium:            Tucker Arensberg, P.C.
                            By:  MICHAEL A. SHINER, ESQ.
                            1500 One PPG Place
                            Pittsburgh, PA  15222


For the Debtors:            Pachulski, Stang, Ziehl &Jones
                            By:  JAMES O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705


For Various Claimant        Stutzman, Bromberg, Esserman & Plifka
Firms:                      By:  SANDER ESSERMAN, ESQ.
                                 DAVID J. PARSONS, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, TX  75201


For Allstate Insurance:     Cuyler Burke, LLP
                            By:  ANDREW CRAIG, ESQ.
                            Parsippany Corporate Center
                            Four Century Drive
                            Parsippany, NJ  07054


For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser, LLP
& Gleser, LLP:              By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                            Wall Street Plaza, 23rd Floor
                            New York, NY  10005-1875


For Royal Indemnity         O'Melveny & Myers, LLP
& Arrowood:                 By:  TANCRED SCHIAVONI, ESQ.
                            Times Square Tower
                            Seven Times Square
                            New  York, NY  10036


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For Maryland Casualty:      Connelly Bove Lodge & Hutz, LLP
                            By:  JEFFREY WISLER, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19899

                            Eckert, Seamans, Cherin & Mellott, LLC
                            By:  GABRIELLA CELLAROSI, ESQ.
                            1747 Pennsylvania Avenue, NW
                            Suite 1200
                            Washington, DC  20006

For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            LECG
                            By:  ELIZABETH DEVINE, ESQ.
                            1725 Eye Street NW, Ste 800
                            Washington, DC,  20006

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Bank Lenders:       Paul Weiss Rifkind Wharton &
                              Garrison, LLP
                            By:  ANDREW N. ROSENBERG, ESQ.
                                 MARGARET PHILLIPS, ESQ.
                                 REBECCA ZUBATY, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019

For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864

For PD FCR:                 Law Office of Alan B. Rich
                            By:  ALAN RICH, ESQ.
                            1201 Main Street, Suite 1910,
                            Dallas, TX  75202

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

```
For Official Committee      Anderson Kill & Olick
of Asbestos Personal        By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:           1251 Avenue of the Americas
                            New York, NY  10020-1186


For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:             Rhoads, LLP
                            By:  NATALIE D. RAMSEY, ESQ.
                            300 Delaware Avenue, Ste. 750
                            Wilmington, DE  19801


For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'       By:  JOHN C. PHILLIPS, ESQ.
Representative:             1200 North Broom Street
                            Wilmington, DE  19806


                            Lincoln International, LLC
                            By:  JOSEPH RADECKI


For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:        By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899


For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser
& Gleser:                   By:  SHAYNE SPENCER, ESQ.
                            Wall Street Plaza
                            New York, NY  10005


For Official Committee      Duane Morris, LLP
of Unsecured Creditors:     By:  MICHAEL LASTOWSKI, ESQ.
                            1100 North Market Street, Suite 1200
                            Wilmington, DE  19801-1246


For Official Committee      Brandi Law Firm
of Asbestos Property        By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                TERENCE D. EDWARDS, ESQ.
                            44 Montgomery St., Suite 1050
                            San Francisco, CA  94104


                            Lieff, Cabraser, Heimann & Bernstein
                            By:  ELIZABETH J. CABRASER, ESQ.
                            Embarcadero Center West
                            275 Battery Street, Suite 3000
                            San Francisco, CA  94111
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For Travelers Casualty        Morris, Nicholas, Arsht & Tunnell, LLP
Surety Company:               By:  ANN C. CORDO, ESQ.
                              1201 North Market Street, 18th Floor
                              Wilmington, DE  19899

                              Simpson, Thacher & Bartlett
                              By:  MINDY LOK, ESQ.
                              425 Lexington Avenue
                              New  York, NY  10017

For Everest                   Crowell & Moring LLP
Reinsurance Co.:              By:  LESLIE A. DAVIS, ESQ.
                                   MARK PLEVIN, ESQ.
                              1001 Pennsylvania Avenue, N.W.
                              Washington, DC  20004

For the PD Committee:         Speights & Runyan
                              By:  DANIEL SPEIGHTS, ESQ.
                                   MARION FAIREY, ESQ.
                                   ALAN RUNYAN, ESQ.
                              200 Jackson Avenue, East
                              Hampton, SC  29924

For Everest Reinsurance       Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:              By:  BRIAN L. KASPRZAK, ESQ.
                                   JOHN D. MATTEY, ESQ.
                              913 North Market Street
                              Suite 800
                              Wilmington, DE  19801

For Anderson Memorial         Kozyak, Tropin & Throckmorton, PA
Hospital:                     By:  JOHN W. KOZYAK, ESQ.
                                   DAVID L. ROSENDORF, ESQ.
                              2525 Ponce de Leon, 9th Floor
                              Miami, Florida 33134

For ZAI Claimants             Hogan Firm Attorneys at Law
& various law firms:          By:  DANIEL K. HOGAN, ESQ.
                              1311 Delaware Avenue
                              Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For Royal Insurance:          Wilson Elser Moskowitz Edelman
                                & Dicker, LLP
                              By:  CARL PERNICONE, ESQ.
                                  150 East 42nd Street
                                  New York, NY  10017

For Official Committee        Richardson Patrick Westbrook &
of Asbestos Property            Brickman, P.C.
Claimants:                    By:  EDWARD J. WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, SC  29401

For the State of              Hahn & Hessen
California:                   By:  CHRISTINA J. KANG, ESQ.
                              488 Madison Avenue
                              New York, NY  10022

For Asbestos                  Pryor Cashman, LLP
Property Damage               By:  RICHARD LEVY, ESQ.
Claimants:                    7 Times Square
                              New York, NY  10036

For Montana Department        Womble, Carlyle, Sandridge & Rice
of Environmental              By:  FRANCIS MONACO, ESQ.
Quality:                      222 Delaware Avenue
                              Wilmington, DE  19801


                                  ---


                      **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good afternoon.  This is the matter of
2  W.R. Grace, 01-1139.  There are several matters scheduled for
3  argument this afternoon.  Everyone is appearing by phone, and
4  the list I have is, Scott Baena, Janet Baer, David Bernick,
5  David Blabey, Stan Blatnick, Thomas Brandi, Elizabeth Cabraser,
6  Gabriella Cellarosi, Ann Cordo, Andrew Craig, Leslie Davis,
7  Elizabeth DeCristofaro, Elizabeth Devine, Martin Dies, Terence
8  Edwards -- would whoever is using some handheld device please
9  either put your phone on mute or stop using is so that it
10 doesn't interfere with the recording system here, please --
11 Terrence Edwards, Lisa Esayian, Sander Esserman, Marion Fairey,
12 Nathan Finch, Richard Fink, Roger Frankel, Theodore Freedman,
13 Jonathan Guy, Barbara Harding, Daniel Hogan, Robert Horkovich,
14 Mark Hurford, Christina Kang, Brian Kasprzak, John Kozyak,
15 Matthew Kramer, Arlene Krieger, Michael Lastowski, Elli
16 Leibenstein, Richard Levy, Mindy Lock, Edward Longosz, John
17 Mattey, Francis Monaco, James O'Neill, Kate Orr, David Parsons,
18 Carl Pernicone, Marc Phillips, Margaret Phillips, John
19 Phillips, Mark Plevin, Joseph Radecki, Natalie Ramsey, Alan
20 Rich, Andrew Rosenberg, David Rosendorf, Alan Runyan, Jay
21 Sakalo, Tancred Schiavoni, Darrell Scott, Mark Shelnitz,
22 Michael Shiner, Walter Slocum, Jason Solganick, Daniel
23 Speights, Shayne Spencer, Theodore Tacconelli, David Turetsky,
24 Edward Westbrook, Jennifer Whitener, Jeffrey Wisler, Richard
25 Wyron, Rebecca Zubaty and Peter Lockwood.  Ms. Baer?  Mr.

1  Bernick?

2          MS. BAER:  Good afternoon, Your Honor.

3          THE COURT:  Oh, Ms. Baer.  Okay.

4          MS. BAER:  Sorry, I had it on mute.  Your Honor,

5  there are three matters, I believe, on the agenda today.

6  Debtors' motion in limine with respect to Anderson Memorial's

7  witnesses, William Ewing and Gibson Solomon, as well as

8  Anderson's motion to compel.  And I believe Mr. Bernick is on

9  to address all of those issues.

10          THE COURT:  All right, Mr. Bernick.

11          MR. SPEIGHTS:  Your Honor, while we're waiting on Mr.

12  Bernick.  This is Dan Speights representing Anderson Memorial

13  Hospital.  I'm not sure which order Mr. Bernick intends to

14  proceed in, but we believe strongly that we should proceed

15  chronologically in the order they were filed.  We filed our

16  motion to compel back in August and without just being petulant

17  about the matter, we think substantively, as well, our

18  arguments would flow from having that matter heard.  That

19  involves Mr. Shelnitz and Ms. Zilly and Mr. La Force.  Mr.

20  Bernick asked that Mr. Ewing be added to the agenda after you

21  agreed to hear that matter that we filed, and in addition,

22  after the hearing Mr. Bernick filed the Solomons matter.  But

23  any event, we would request that we proceed with the third

24  matter first.

25          THE COURT:  All right, that's fine.  Go ahead.

1          MR. SPEIGHTS:  Thank you, Your Honor.

2          MS. BAER:  Your Honor, before Mr. Speights proceeds,

3  I was just wanting to make sure Mr. Bernick is on the line,

4  because I did not hear him yet.

5          MR. BERNICK:  Yes, I'm sorry, Your Honor.  This is

6  David Bernick.  I am on the phone.  I apologize, I'm in the

7  back of a limo and it should be very quiet, but I have a Ninth

8  Circuit argument tomorrow and I'm on my way to the airport.

9  So, I'm going to try to keep it as quiet as I can and also put

10 my phone on mute.  Understand I just got on, Mr. Speights wants

11 to take up Mr. Shelnitz's motion first, which is fine with us.

12         THE COURT:  All right.  Oh, not again.

13              (Technical Difficulties)

14         THE COURT:  Okay.  At the moment we're free of that

15 noise.  So, Mr. Speights, if you don't mind starting.  If it

16 happens again, I apologize, I'll have to interrupt and try to

17 get it fixed, because we can't hear over that noise, but we'll

18 try it.

19         MR. SPEIGHTS:  That's fine, Your Honor.  And I

20 couldn't hear over the noise either, so I'll know immediately

21 if it starts again.

22         Your Honor, the motion to compel Anderson is filed,

23 and as Your Honor is aware from the briefing, deals with three

24 witnesses, Mr. Shelnitz, Ms. Zilly and Mr. La Force.  Of course

25 much of the focus is on Mr. Shelnitz, because most of the

1  instructions not to answer dealt with Mr. Shelnitz's

2  deposition.  With only six days before the confirmation hearing

3  resumes, Your Honor, I'm not going back into all of the history

4  of this.  It's covered in the brief and prior hearings.

5        It seems to me that the issue before Your Honor is

6  pretty straightforward.  The burden is on Grace to show why Mr.

7  Shelnitz should not be permitted to answer these questions.  We

8  served a discovery deposition, a notice of deposition back in

9  May and that's where we are today.  We are trying to get

10  discovery from Mr. Shelnitz and also from the other two

11  witnesses.

12        Mr. Shelnitz is not even going to be called by the

13  plan proponents during Anderson's phase of these proceedings.

14  It seems to me that we ought to look at the three areas where

15  Grace objects or instructs Mr. Shelnitz not to answer the

16  questions and see if we can resolve those three areas.

17        First of all, we asked Mr. Shelnitz and we asked Ms.

18  Zilly and Mr. LaForce a series of questions about one item

19  dealing with feasibility.  The debtors have produced a

20  confidential report.  During the examination of Judge Sanders

21  the other day in the courtroom, they permitted me to refer to a

22  37.3 number out of that report and read into the record what

23  that number is supposed to be.  That number deals with property

24  damage.  We don't know anything else.  We asked Ms. Zilly and

25  Mr. La Force about that number.  They are relying on that

1 number in their feasibility work, but neither one of them would

2 reveal what that number is because they were supposedly told

3 about that and I assume that that's correct that they were told

4 about it by Mr. Shelnitz and the debtors instructed Mr.

5 Shelnitz, when we later asked him, as well as Ms. Zilly and Mr.

6 La Force not to discuss that number, that somehow it was

7 protected or privileged.

8         Leaving aside all the other arguments I'm going to

9 make on the other issues pertaining to Mr. Shelnitz, once Grace

10 had its own expert, Ms. Zilly, relying on that information and

11 put that report into evidence, there is no basis, that I'm

12 aware of, for keeping us from legitimate inquiry into the basis

13 of that 37.3 property damage number.  So, Your Honor, we would

14 request you to direct all three witnesses to discuss that 37.3

15 number.

16         The second matter, Your Honor, deals with what we

17 refer to as our good faith issue that we have presented in our

18 objection from the time our objections were first due.  We have

19 taken the position, as Your Honor knows, that this plan was not

20 proposed in good faith.  Mr. Shelnitz -- and he's the only one

21 involved on this issue that's before the Court -- Mr. Shelnitz,

22 has testified that he was actively involved, indeed he was the

23 lead company man involved in the negotiation of the plan and

24 the negotiation of the plan with a PI constituency, with a ZAI

25 constituency and with equity and the bank.  He has been

1  identified as really the hub of the negotiation of this plan

2  with all groups except property damage which we say --

3  traditional property damage -- which we say was excluded from

4  the process.

5       Under those circumstances, we believe that we are

6  entitled to go into those negotiations, which led to this plan

7  of reorganization to show that the plan, in fact, was not

8  proposed or has not been proposed in bad faith, that

9  discriminates against property damage claimants, that was

10 directed, directly intended to exclude property damage,

11 traditional property damage from those negotiations.

12      Leaving that aside, however, Your Honor, and I

13 believe that would be a perfectly legitimate reason to question

14 Mr. Shelnitz.  In fact, the debtors had made the lynchpin of

15 their good faith argument, of course they have the burden of

16 proof to show the plan's proposed in good faith, they have made

17 a lynchpin of it, the fact that, according to the debtors and

18 according to the other plan proponents, that this plan was

19 negotiated in good faith, that it was negotiated at arm's

20 length.  In their major brief before Your Honor, they refer to

21 good faith negotiations of the plan some 50 times.

22      In addition, Your Honor, the debtors have referred to

23 negotiations when it's in their interest to do so.  For

24 example, Mr. Shelnitz also negotiated with the bank.  And

25 there's Mr. Shelnitz's deposition, the same deposition where

1 the debtor's instructed Mr. Shelnitz not to answer a large

2 number of questions that I propounded, he testified in detail

3 concerning his negotiations with the bank in response to

4 questions by the Creditors' Committee.  We think there's also a

5 waiver issue.

6          THE COURT:  But, Mr. Speights --

7          MR. SPEIGHTS:  I hear it, Your Honor.

8          THE COURT:  It's apparently coming from this

9 microphone when I turn this speaker up so I can hear him.

10 Otherwise, I can't hear him.  And then when I try to talk,

11 that's what noise is happening.

12          I apologize, Mr. Speights.  If you can give me a

13 second here, I've got some people who are looking at this.

14          MR. SPEIGHTS:  That's fine, Your Honor.  I'm not in

15 any kind of hurry.

16          THE COURT:  All right.  I'm hoping not to fry

17 anybody's ears.  There's still all kinds of feedback coming

18 from here.

19          Mr. Speights, the question I was going to ask is,

20 with respect to discrimination against property damage, doesn't

21 this plan provide for 100 percent payment of all the allowed

22 property damage claims, both present and future?

23          MR. SPEIGHTS:  Your Honor, I'm going to answer that

24 partially and I also have Mr. Rosendorf on the phone, as well,

25 if he would like to elaborate.  But, it certainly provides for

1   100 percent plan.  I do not think it provides for interest

2   which we are entitled to.  In addition to that, unlike the

3   future property damage claims, we are prohibited from having a

4   jury trial.  And, in fact, as we showed, during the last

5   hearing, originally, traditional property damage claims and

6   future property damage claims, but both have a right to a jury

7   trial in the District Court of Delaware, and then when the

8   debtors changed that -- and I might add they changed that after

9   discussions between Mr. Shelnitz and Judge Sanders, that's the

10  testimony on the record -- that Mr. Shelnitz discussed the

11  matters with Judge Sanders.  They changed that and Judge

12  Sanders got for future claimants the right to a jury trial not

13  only in Delaware, but any other District Court.  But they

14  didn't just stop there, they, without discussions with us,

15  changed the plan so that we no longer had a right to a jury

16  trial in Delaware, we were sent back to the Bankruptcy Court to

17  try our case.

18          And we want to explore that now.  I know ultimately

19  Your Honor's going to hear arguments that there's no

20  discrimination, legal discrimination, because we get 100 cents

21  on the dollar.  And we want to make our argument, yes there is

22  discrimination because of this and other reasons, and right now

23  we're just trying to get the discovery deposition on that

24  point, Mr. Shelnitz is the one who knows why they changed that.

25          THE COURT:  Okay, go ahead, Mr. Speights.

1          MR. SPEIGHTS:  In any event, Your Honor, the first

2   argument was, there's a feasibility issue that we want to

3   examine all three witnesses about, and Mr. Shelnitz is probably

4   the most knowledgeable person about the 37.3.  Second reason,

5   Your Honor, is that we believe that we're entitled to question

6   him about good faith and while there may be many occasions when

7   you can't go into so-called settlement negotiation, we believe

8   that we are entitled to go into the negotiations of this plan

9   of reorganization regardless of whether that information is

10  admissible or not, we think it will be, to show that the

11  debtors have designed a plan here to discriminate or not treat

12  appropriately traditional property damage claims.  And in more

13  particular we believe that the debtors, going back not only to

14  the negotiations that took place in the past year, but going

15  back to starting in 2005 that Mr. Shelnitz had designed the

16  plan to specifically attempt to -- and I use this word because

17  it is the word that was used against us -- to smear Anderson

18  Memorial Hospital.  And we believe that we're entitled to

19  question Mr. Shelnitz about that.  Mr. Solomons' deposition has

20  now been taken, we'll discuss Mr. Solomons in a few minutes,

21  but we have support that the debtor's aware of, it's had his

22  affidavit for a couple of months, and we now have a deposition

23  testimony in which the debtor, about the time that Mr. Shelnitz

24  took over as general counsel, decided to smear Anderson

25  Memorial Hospital and its counsel in an effort to treat them

1 differently than other asbestos claimants in this bankruptcy.

2         And for those reasons, Your Honor, we think we're

3 entitled to take the deposition.  Again, it's a discovery

4 deposition.  Your Honor can deal with the admissibility of

5 evidence if we try to publish it.  We think that we might also

6 get other information which we might be able to use at the

7 confirmation hearing, but we don't think it's appropriate that

8 the debtors have shown any basis, at this point, to stop

9 Anderson from asking the questions altogether.  Thank you, Your

10 Honor.

11         THE COURT:  Mr. Speights, with respect to, you said

12 something, let me see in my note, because I hadn't fully formed

13 the thought, so I'm not sure I can ask the question.  Just one

14 second.  The debtor's not treating property damage claimants

15 equally in singling out Anderson.  Actually, I'm not, there is

16 a difference in treatment between the current property damage

17 claims and the futures to the extent that some can be tried in

18 a different court other than the Bankruptcy Court, the futures

19 can and the currents can't.  But, I'm not sure that Anderson's

20 going to end up being the only claimants in that position.

21         To the extent that the California claims are now

22 somehow or other going to be tried in bankruptcy because the

23 summary judgment was reversed, it appears that those claims

24 will be there, too.  So, I also don't understand the

25 discrimination argument on that score.  If you could elucidate

1  that for me, I would appreciate it.

2          MR. SPEIGHTS:  Your Honor, and I might add that Mr.

3  Rosendorf is on the line that he might take a stab at that for

4  you, my bankruptcy lawyer.

5          THE COURT:  All right.

6          MR. ROSENDORF:  Your Honor, thank you, and thank you,

7  Mr. Speights.  I would be glad to address that, Your Honor.

8  When this plan and disclosure statement were drafted, and when

9  they were circulated and when they were proposed, there was

10 only one claim that was singled out under the proposed property

11 damage case management order, which is an attachment to the

12 plan, which was going to be treated in a way that was unique to

13 any other property damage claim, and that was the Anderson

14 claim.  And that treatment was singled out for Anderson and for

15 no other claim and there are references in the PDCMO that deals

16 specifically with the Anderson claims and no other.

17         So, we believe that the plan, as it was filed, did

18 certainly single out Anderson for particular treatment.  And I

19 think to some degree, Your Honor, we are overlapping two

20 potentially related but still distinct issues.  One of them is

21 a classification issue, and the other is a good faith issue,

22 and they have some bearing upon each other, but I do think that

23 they are separate.  And it is our intention to show that

24 Anderson has been singled out for particular treatment that has

25 been disparate from that of other claimants and other creditors

1 in this case and that that has been done in a manner that is

2 reflective of a lack of good faith and which was integrated and

3 incorporated into the plan.

4        So, the purpose for seeking the testimony from Mr.

5 Shelnitz on this issue is not simply to speak to a

6 classification objection under one section of 1129, but also to

7 speak to the good faith issue, which addresses, I think, a

8 broader panoply of issues, particularly in light of the debtors

9 and plan proponents having staked their argument on good faith,

10 on their good faith, arm's length negotiations as they

11 repeatedly described and referred to in the plan proponents'

12 brief.  So, we do think that it is a broader issue than just a

13 classification issue.

14        THE COURT:  All right.  Well, I did take a look at

15 the deposition of Mr. Solomon that was done, and my

16 understanding from reading that deposition, so please correct

17 me if I'm wrong, is that that discussion to the extent it

18 occurred, I'm not making findings that it did, but let me just

19 assume for purposes of this discussion that what Mr. Solomon

20 says was said, was said.  Just making that assumption.  It

21 doesn't appear that that discussion came up in the context of

22 plan negotiations.  It came up in the context of trying to

23 figure out what to do with the objections to claims of Anderson

24 Memorial and -- I'm sorry, not of Anderson Memorial -- of any

25 of the claimants represented by the Speights' law firm that as

1  to which there was no purported authority to represent the

2  claimants.  So, how does that discussion assist in the good

3  faith negotiation issue if it wasn't undertaken in the context

4  of plan negotiation?

5        MR. SPEIGHTS:  Well, Your Honor, I'm not sure,

6  because we're not in the same room, whether Mr. Rosendorf wants

7  to address it, as well, but I do think by that time that the

8  debtors had filed their plan in late 2004 or early 2005, and in

9  order to push this plan through, they began discussions with

10 various groups and the record will show that they started

11 discussions with the PI group then that led ultimately to the

12 deal, and that overall they were promoting a plan and trying to

13 get rid of the Speights and Runyan claim, we think, in a

14 disparate way as a part of trying to get a plan pushed through

15 the Bankruptcy Court.  So, I don't think it's completely

16 separate from a plan negotiation.

17        THE COURT:  All right.  The second issue, the one

18 that I was attempting to ask before, as I understand your

19 contention, somehow or other because at the time that the

20 property damage case management order was entered, there was

21 only one claim of record that hadn't been resolved that that is

22 singling out that one claimant, even though the plan treatment

23 will apply to any current claimant, not just to Anderson

24 Memorial, and if there are additional current claims, they're

25 going to have the same result that Anderson faces.

1        MR. SPEIGHTS:  Again, Your Honor, Mr. Rosendorf may

2   address that, but you are correct in the sense that the plan

3   does provide if some other claimant, such as the State of

4   California, comes back before Your Honor it would propose to

5   treat the State of California in the same way.  However, I'm

6   not sure what the State of California's position is going to be

7   on that.  At the time when objections were due to the plan, the

8   State of California was in another jurisdiction, it was up in

9   the District Court.  I'm not sure what the State of

10  California's position is going to be, or any other who may come

11  back.

12        THE COURT:  Well, I don't know what their position is

13  going to be, but the issue is whether or not the plan

14  discriminates.  And to the extent that the plan calls for

15  treatment of all current property damage claim trials to be

16  treated in the same fashion, I'm losing where there is

17  discrimination.

18        MR. SPEIGHTS:  And I would say to Your Honor, and

19  again Mr. Rosendorf may comment as well, but it depends on

20  where you draw the line from.  I look at it as the treatment of

21  asbestos claims.  524(g), in addition to the other sections,

22  but 524(g) deals with all asbestos claims.  And so I start with

23  the proposition that there is a difference of treatment between

24  personal injury claims and property damage -- traditional

25  property damage claims.  There are, as I have spoken to Your

1  Honor previously about, the personal injury claimants have the

2  benefit of a trust where defenses will not be allowed and

3  claims will be resolved by an administrator, albeit for less

4  than 100 cents on the dollar, I understand that, but there are

5  advantages and disadvantages.  Asbestos ZAI claims will be

6  decided in accordance with the trust, with procedures drawn by

7  the claimants themselves with advantages and the disadvantage

8  of not having 100 cents on the dollar.  And asbestos property

9  damage future claims we'll get to go to the tort system and

10 litigate those claims.  And at the same time, one of the

11 asbestos property damage, traditional property damage claims,

12 there are only seven, according to the debtors, which were

13 filed before the bankruptcy.  Originally, the debtor said that

14 those seven could return to the tort system.  It's now flipped

15 the world upside down and it is said that five of those seven

16 -- or actually six of those seven must now go to the Bankruptcy

17 Court and everybody else can go to the tort system, including

18 one of the seven, which is the Solo case, which is on appeal in

19 the State Court in New York, so it will go back to the State

20 Court while Anderson would remain in the bankruptcy court.

21        Again, at this discovery stage, we just want to

22 develop the facts on how all that came about and then make

23 these arguments either next week or whenever we are briefing

24 all the arguments.

25        THE COURT:  All right.  Anything else, Mr. Speights

1  or Mr. Rosendorf?  Mr. Bernick?

2       MR. BERNICK:  I'm hopeful my voice will override the

3  background here.  There are a bunch of different things that

4  have been said, many of them relating to legal confirmation

5  issues.  I know that Your Honor, in fairness to Mr. Speights,

6  raised these questions, and I will address them, albeit, I

7  don't think that that's necessarily the heart of why we're

8  talking here today.

9       I think that basically we're here today because of

10 privilege issues.  And when it comes to the assertion of those

11 privilege issues, the initial burden of establishing the

12 existence for the privilege clearly is on us.  But, the burden

13 of going forward and saying that that privilege needs to be

14 overridden, either because it was waived or because the

15 probative value of the materials sought is so overwhelming and

16 whether or not available by other means than by inquiring into

17 privilege matters, that burden is on Mr. Speights and his

18 client.  It is not on us.

19      And to cover the two specific matters that have been

20 raised, although I'll add, Your Honor, that we did, in fact, in

21 response to Mr. Speights' brief, as I think Your Honor is

22 aware, put together kind of a spreadsheet which took each of

23 very specific questions.  Mr. Speights actually broke down his

24 concerns into specific questions.  We, on a spreadsheet listed

25 those questions, listed the depositions where -- part of a

1  deposition where those questions were posed, listed the basis

2  for the objection and then set out a position.  And in many,

3  many cases, we set out a position that was fully responsive to

4  the questions that were put, even when those questions were not

5  even asked during the course of the deposition.  So all the

6  information is there.

7           Now, Mr. Speights may say, well, why can't I get that

8  from Mr. Shelnitz?  And that's basically part of the problem

9  that exists by virtue of Mr. Speights having chosen to ask Mr.

10 Shelnitz those questions as opposed to other people who might

11 be able to answer those questions, experiencing what would be a

12 risk of waiver.  There already has been discovery regarding the

13 negotiation of this plan, and discovery could have been

14 conducted with respect to many individuals.  Mr. Speights has

15 chosen to single out Mr. Shelnitz who is the general counsel of

16 the company.  And, obviously, taking the deposition of the

17 general counsel of the company poses all kinds of risks of

18 waiver and compromising properly asserted privileges.  It is

19 for that reason that generally the practice, and what the

20 Courts have said in the case law, is that you can't ask counsel

21 questions unless you can establish to the Court that only

22 counsel has got the information that's responsive.  Essentially

23 you don't have any other recourse.  And that's not been

24 established with respect to any aspect the Court's being

25 inquired of with respect to Mr. Shelnitz.

1          But, the bottom line is that we were retained to go

2    through each and every one of the questions and provide a

3    position and provide a response to information.  The specific

4    issues that Mr. Speights now raises today, as I can see it,

5    although it kind of meanders a little bit, are basically

6    twofold.  One, is that he wants to inquire into the genesis of

7    a $37 million number.  And he says that there's a need to do so

8    because it's part of the feasibility issue of the case.  It is

9    only part of the feasibility of issue of the case insofar as

10   that 37 million is a reserved number, and therefore appears on

11   the pro forma balance sheet of the debtor and therefore is part

12   of any feasability analysis or any best interest analysis.  I

13   mean, liquidation analysis would have to consider as one of the

14   figures in the analysis; a reserve.  That's the only real

15   reason that it's there.  Thirty-seven million dollars doesn't

16   make or break feasibility, doesn't make or break best interest.

17   And the reason that Mr. Speights is so single-mindedly focused

18   on the 37 million is that he knows that if they reserve what's

19   been set for the already filed traditional PD claim, i.e., it

20   covers the PD claims outstanding that have not been resolved,

21   and specifically would cover the claims of Anderson Memorial,

22   if in fact any money has been set aside for Anderson Memorial.

23   It would also cover other claims that are still pending, have

24   not been settled.

25          A reserve number established in litigation is clear

1  work product.  It is not subject to inquiry.  It would not only

2  incur on the work product privilege, it would also violate the

3  rule against discovery of settlement information, because it

4  may well be that those numbers reflect projected settlement of

5  cases.  Reserve numbers have never, for liability, have never

6  been the subject of specific inquiry to unpack them in this

7  case, inquiry that's been -- and there should be no exception

8  here.  That this is evidence it is also evident from Mr.

9  Speights' question, because he asked specifically whether

10  estimates had been done of the liability for the unresolved

11  traditional PD claims, and he asked specifically whether an

12  estimate was done for the Anderson claimant, particularly.  And

13  all those questions were objected to and there were

14  instructions, because they are improper questions.  The fact

15  that $37 million is down there as a litigation reserve that is

16  considered as one of a thousand points of data on feasibility

17  doesn't make it discoverable.  It's classic attorney/client

18  privilege, work product and Rule 408 and it should not be

19  discoverable.

20       You don't have an opponent given access to

21  information about what the company may well consider to be a

22  reasonable value and settlement (indiscernible).

23       The second issue or area where Mr. Speights seeks to

24  conduct inquiry relates to the negotiation process.  And as I

25  understand it, the genesis, or the more particular genesis of

1  the request focuses on the feelings that he has that Anderson

2  Memorial was somehow singled out or targeted for less favorable

3  treatment.  And that that gives rise to a claim of lack of good

4  faith in the negotiations of the plan and it gives rise to an

5  allegation that there's discrimination against Anderson

6  Memorial.  And I think that those were the two rationales that

7  were advanced to support that particular request.

8       Again, we have to go back to the rule.  Settlement

9  negotiations are classic Rule 408.  Rule 408 material is not

10 only not admissible, it's not discoverable.  That's the

11 Goodyear decision out of the Sixth Circuit.  I don't know

12 whether it's been adopted in the Third Circuit, but I think

13 that it has.  Memory serves that it has.  But, that clearly is

14 the right answer under the law.  It's also the answer that Your

15 Honor afforded when the issue of taking Mr. Shelnitz's

16 deposition came up and was discussed before the Court whenever

17 it was in July or some earlier point in time, Your Honor made

18 clear that the deposition, while it could be taken, could not

19 stray into the area of negotiation and litigation strategy.

20 Which is exactly both of these points are negotiations --

21 settlement negotiations and litigation strategy.

22      Rule 408 is about work product and attorney/client

23 information, because it comes through Mr. Shelnitz.  So the

24 question then becomes, has Mr. Speights sustained his burden of

25 establishing that notwithstanding those privileges, there is a

1    sufficient need and an absence of availability of the same

2    information through other sources to nonetheless warrant the

3    discovery going forward?  The issue doesn't go away because

4    we're not yet talking about admissibility.  The issue is posed

5    when the question is asked and answered, so the fact that it's

6    a discovery deposition doesn't make any difference.  Maybe it

7    makes a difference under certain state courts, I doubt it, but

8    it certainly doesn't make a difference in federal court.

9            So, the question then becomes, what's the rationale,

10    or what's the justification that's been afforded for breaching

11    the privilege that would apply to the negotiation process?  The

12    first is to simply say, well, gee, good faith is an issue and

13    discrimination is an issue, and therefore, well, I've got to be

14    able to inquire into it.  That's not the question.  Of course

15    there are issues, there are issues in every case.  The question

16    is, on what basis does the existence of those issues, which is

17    really dictated by code, mean that the privilege that's

18    otherwise applied under federal rules and are incorporated in

19    the Bankruptcy Code are that there's an exception to those.

20    So, to simply state that there are issues, doesn't accomplish

21    anything, at all.  You have to establish you can't get the --

22    the information's actually relevant and you can't get it from

23    any other source, and he hasn't established that in any way,

24    shape or form.

25            The specifics that he provides are twofold.  First,

1   that there was a meeting that took place in 2005 where Mr.

2   Solomon attests that I made certain statements regarding Mr.

3   Speights.  The fact of the matter is, as Your Honor has

4   recognized, and without regard to, and I'm not going to testify

5   about what actually took place in that meeting insofar as any

6   such statements were concerned, that's an inaccurate recitation

7   of what happened at the meeting.  But, Your Honor's absolutely

8   correct.  That meeting took place at the very early stage in

9   the process.  We had just filed our first plan.  We were in the

10  process of lodging objections.  In fact, the objections to PD

11  claims were filed that very afternoon and that's why I

12  certainly don't remember spending hours and hours in that room

13  because we were busy working on other things.  And the issue

14  was Mr. Speights' continued prosecution of these claims where

15  he didn't have authority.  That was the issue.  It was not a

16  negotiation session concerning the plan at issue.  Indeed, it's

17  probably best to say it wasn't a negotiation session concerning

18  any plan.  There was no plan on the table, other than the plan

19  that didn't make any differentiation between current and

20  futures, it treated everybody the same way, because it's a plan

21  that basically called to litigate pretty much anything that

22  couldn't be settled, whether it was during the bankruptcy

23  process or subsequently.  It was certainly not the negotiation

24  of the plan that is at issue.

25          So, whatever happened that day, even in Mr. Solomons

1  view, has no bearing on a discrimination charge and no bearing

2  on a good faith charge because those relate specifically, those

3  are (indiscernible) insofar as the plan at issue is concerned.

4          The second point, and it is that at some point a

5  decision was made to single out Anderson Memorial,

6  subsequently, not to give them the same treatment under the

7  plan before the Court.  And all that I can say is that I think

8  the discrimination charge and the good faith charge are

9  frivolous and for reasons that are well apparent to the Court.

10 The good faith is established even with respect to Mr. Speights

11 in this case.  Mr. Restivo, who had charge and undertook the

12 very considerable burden of negotiating all of the individual

13 settlements that was done on an individual basis, negotiated

14 and settled with everybody he could settle with.  And while --

15 and there are very, very few claims that are left, and Mr.

16 Speights -- even Mr. Speights has got basically a claim for

17 Anderson Memorial that is left.  How he can say that somehow

18 there was a singling out of him is contrary to fact.  To single

19 out Anderson Memorial, he singled out Anderson Memorial because

20 he's insisted upon Anderson Memorial pursuing its thus far

21 unsuccessful class claim.  It's probably the reason why we

22 haven't settled Anderson Memorial.  But, the negotiation

23 process shows no aspect of bad faith.  It shows to the

24 contrary, assiduous good faith.

25          On the discrimination point, there is no

1  discrimination.  Any claim that's not settled is litigated.

2  And the only question is what courts it litigated, and they're

3  all litigated in federal court.  And the only reason why

4  there's any differentiation between currents and futures is

5  that we clearly required the currents because their claims were

6  already active and because the litigation was already mature

7  before Your Honor that we weren't going to have them go off and

8  be handled by some other court.  And that was a clear and

9  reasonable and nondiscriminatory differentiation.

10         Whereas the future demands, all that we really were

11  concerned about was that they would be in federal court.  We

12  would have preferred that they also be before Your Honor, but

13  the futures' representative negotiated successfully to obtain

14  the result that they can be prosecuted in other federal courts.

15  The treatment is exactly the same.  And financially, treatment

16  is exactly the same in terms of their being litigated.  The

17  only difference is, one, that it's driven by the maturity of

18  litigation and there's nothing in the discrimination or equal

19  treatment provision of the code that basically requires that in

20  mature cases that they start all over again before a different

21  judge.  I don't think that that's a proper and reasonable

22  construction of the code.

23         In any event, all of these issues, good faith,

24  discrimination, involve minimal facts that are other than what

25  is set forth in the plan.  We've already had this discussion

1  with Your Honor.  It is not necessary in order to ascertain

2  good faith or discrimination to go into the negotiation

3  process.  In the ordinary course, there is no such requirement.

4  The process simply has to be discussed in general terms, as

5  often happens in the bankruptcy process, and the whole focus is

6  then on the plan.  What does the plan actually do?  Does the

7  plan show good faith or bad faith?  Does it show

8  discrimination?  And that again I think is the only way to

9  harmonize the Bankruptcy Code's position to incorporate Rule

10 408 which precludes requiring the settlement negotiations with

11 the plan requirements of good faith and equal treatment.  And

12 Mr. Speights has not introduced any evidence that would suggest

13 that somehow they must be in conflict in connection with this

14 case.

15       So, we think that we've given -- we tried to provide

16 Mr. Speights everything that possibly can be provided by way of

17 information and understanding in response to his specific

18 questions.  We've also provided the deposition of Mr. Shelnitz.

19 He's also had access to other people whom he could have deposed

20 upon any one of these issues, including Mr. Finke.  And he had

21 just decided that, you know, for whatever reason, he wants to

22 make this an issue about the general counsel of Grace and we

23 don't believe that that's appropriate under the rules.

24       THE COURT:  Mr. Speights, anything else?  Hello?

25       UNIDENTIFIED SPEAKER:  Your Honor, he just joined

1  back.

2          MR. SPEIGHTS:  Excuse me, Your Honor.  I got

3  disconnected.

4          THE COURT:  Oh.  When did that happen?

5          MR. SPEIGHTS:  I think I heard all of Mr. Bernick.  I

6  think he was winding up.

7          THE COURT:  All right.  Where did you leave off?

8          MR. SPEIGHTS:  I think he was saying we've been

9  through all of this before.  I mean, it's only been, you know,

10 60 or 70 seconds since I've been disconnected.

11         THE COURT:  All right.  Go ahead then on any further

12 comments you have, Mr. Speights.

13         MR. SPEIGHTS:  Thank you, Your Honor.  I assume Mr.

14 Bernick did not concede during the one minute I was off the

15 line.

16         THE COURT:  No, I don't think so.

17         MR. SPEIGHTS:  Quickly, Your Honor.  First on the

18 chart, I think it's self evident that we do not accept service

19 on Mr. Bernick's summary of what our positions are, what our

20 position is.  And I want to point out again that we asked a

21 number of questions and we wanted to ask more questions and the

22 debtors took the position that they would seek sanctions if we

23 pursued any of these lines.  So, that's not the beginning and

24 end of all the questions we wanted to ask, although I believe

25 that we could finish the deposition of Mr. Shelnitz certainly

1  in less than two hours.

2       Number two, Mr. Bernick said, why Mr. Shelnitz, the

3  corporate counsel, the general counsel for W.R. Grace?  Mr.

4  Shelnitz was the one identified by Judge Sanders as the one he

5  spoke to.  He was the one identified by Mr. La Force.  He was

6  the one identified by Ms. Zilly.  And finally, he was the one

7  identified by Mr. Finke, at least inferentially, when Mr. Finke

8  testified the change in direction that occurred in 2005 and

9  when Grace abandoned the discussions between Mr. Finke and Mr.

10 Beber and Speights and Runyan.  That was a decision of the

11 general counsel.  So, Mr. Shelnitz is at the center of this

12 matter.  We're not picking on him simply because he is the

13 general counsel.

14      Number three, back at the 37.7 or 37.3.  I appreciate

15 Mr. Bernick's explanation today about what that number is, but

16 that's an explanation we have never received.  In fact, the

17 witnesses, Mr. Shelnitz, Ms. Zilly, Mr. La Force, all refused

18 to describe what that number is.  And with due respect to any

19 member of the bar describing an understanding, we think that

20 testimony as to what that number is should come from the

21 witness.  If, upon pursuing that number, the witness is

22 prepared to say what Mr. Bernick said today, that somehow it's

23 a reserve, et cetera, they may reassert some objection to it.

24 But, they haven't laid the foundation yet for that.  Which

25 leads me to a more basic reason for Mr. Shelnitz's deposition,

1  and that is, what estimation, what forecast have they made for

2  a traditional PD liability in this case?  And that's clearly a

3  feasibility issue.  Perhaps 37.3 is part of that, perhaps it's

4  not.  What Grace says in this chart, Item Number 6 is, any such

5  estimate is privileged.  So, I don't know what the privilege is

6  that prevents the debtors regarding feasibility to say what

7  estimate they have made for traditional PD claims.

8         Number five.  Good faith.  Part of the good faith,

9  and it goes back starting in 2005 until recently, but part of

10 the good faith is the very last thing they did.  The good faith

11 is that they discussed their proposed treatment of PD claims

12 under the plan which provided identical treatment, identical

13 tort remedies for future PD claimants and further PD claimants.

14 And then they had negotiations, they had discussions with Judge

15 Sanders and his counsel.  Mr. Bernick has again acknowledged it

16 today.  But, at the same time, they refused to have discussions

17 with Anderson, perhaps with the PD Committee, I don't know, I'm

18 not here representing the PD Committee.  They refused to have

19 discussions with Anderson and, in fact, then changed the plan

20 to reverse what they had previously provided and took away what

21 they originally had provided for Anderson while leaving it in

22 place for Solo and for future PD claims.

23         Your Honor, Mr. Bernick has referred to the Goodyear

24 case out of the Sixth Circuit.  I don't think the Goodyear case

25 has been adopted by the Third Circuit.  If it has, I have not

1 seen that opinion, and there are numerous other cases.

2 Although I'm aware that in another bankruptcy in which I was

3 involved, Your Honor has followed the <u>Goodyear</u> decision in the

4 particular facts of that case.  I don't think there's anything

5 in <u>Goodyear</u>, and there's certainly nothing in the Third Circuit

6 that I'm aware of that says a debtor can go forward with the

7 plan and argue that it's proposed in good faith and it was

8 negotiated in good faith, and then prohibit an objector to

9 having discovery about that process.

10       Lastly, Your Honor -- or next to last, Mr. Bernick

11 says the litigation with respect to Anderson should proceed in

12 this court because it's mature.  Your Honor, there has been

13 nothing done with respect to Anderson Memorial Hospital's case

14 in this court.  They didn't file summary judgment motions

15 against Anderson.  They did against most of my other claimants.

16 There's been no hearing on the merits of Anderson Memorial

17 Hospital's claim.

18       On the other hand, the Anderson Memorial Hospital

19 claim has been litigated in South Carolina, was litigated in

20 South Carolina for eight years and was ready for trial and

21 could go to trial if it was returned to the court of general

22 jurisdiction in South Carolina, it would be ready for trial.

23 There has been nothing done in this court.  So, the idea that

24 somehow it's mature and ought to stay here is not supported by

25 the facts.

1          Many of the assertions of Mr. Bernick are simply

2     factual issues, and I urge again, Your Honor, just let us have

3     the discovery and then we will see where we are when we argue

4     on the merits before the Court.  Thank you, Your Honor.

5          THE COURT:  All right.  I am going to do an order to

6     address this issue, because I want to get through the rest of

7     the arguments, and I want to consider what your arguments have

8     been.  I saw some of the questions that were asked appear to me

9     to be proper questions that could be answered.  For example,

10    what the nature of the $37 million claim is.  And by that, I

11    mean in broad terms.  Is it a reserve, is it something else?  I

12    think is a proper question.  And a witness, not Mr. Bernick,

13    should be available to answer that question.

14         What it comprises, however, is not the proper subject

15    for discovery because Mr. Bernick is quite correct.  If in fact

16    it's a reserve -- I'll just assume for purposes of this that

17    the witness would say it's a reserve -- if it's a reserve, it

18    does constitute both work product and attorney/client privilege

19    and potentially settlement discussion negotiations, none of

20    which would, I think, be overridden on the basis of this

21    record.  To say that it's a reserve for property damage claims

22    is, I think, something that a witness, in fact, can be

23    compelled to state.  But, beyond that, the basis for it, if

24    it's a reserve, I think Mr. Bernick's correct, would not lead

25    to admissible evidence and therefore is outside the parameters.

1          So, my concern is, I think some of the questions may
2    be proper, others I think are not.  And I'm not sure based on
3    the record that I have here how I'm going to be able to get
4    through that type of analysis.  Just because --
5               MR. BERNICK:  Well, Your Honor --
6               MR. SPEIGHTS:  Your Honor, if I could --
7               MR. BERNICK:  I'm sorry.
8               THE COURT:  -- if I could finish please.  You had
9    your turns.  Just because Mr. Shelnitz is general counsel does
10   not prohibit him from, I think, having his deposition taken to
11   the extent that he participated as a representative of the
12   debtor, not as its general counsel, in the negotiation process.
13   However, he is the general counsel and it is improper to ask
14   him for advice that he would have given to the debtor or for
15   work product in that respect.
16          So, there is a very fine line, which is why the cases
17   say that if the information can be obtained elsewhere, it
18   should be.  I am not aware of which witnesses might be able to
19   provide this other information.  To the extent that other
20   witnesses could answer the questions that I think are
21   permissible, then I believe it would be more appropriate to
22   have other witnesses answer those questions for that reason.
23   And I would not permit an invasion of the attorney/client
24   privilege or the negotiation privilege.  I've already addressed
25   the concept of the plan negotiations and I don't think I need

1 to go back into that again.

2        So, I'm a little confused with respect to this one

3 motion to compel as to how to go about making a principled

4 resolution.  It seems to me that some questions are appropriate

5 and others are not.  Yes, Mr. Speights.

6        MR. SPEIGHTS:  Excuse me, Your Honor.  I didn't

7 realize you were not finished.  All I was going to do was point

8 out to you that we did attach a copy of the full deposition to

9 our reply brief.

10        THE COURT:  Yes, sir.  And I've read most of the

11 deposition, but I'm not going to go through it question by

12 question and determine whether every objection is proper.

13 That's not how this motion has been raised.  It's been raised

14 to compel the answers to basically three specific inquiries as

15 opposed to question by question.  If you want to go through it

16 and point out which questions you think should be answered, I'd

17 be happy to take a look at that.  But, I'm not going to make

18 that, that's your burden, not mine.

19        MR. SPEIGHTS:  If I could just respond to that, Your

20 Honor.  And I agree that we don't think it's a question by

21 question, because we had more questions, but we did think there

22 was subject matter that we were entitled to go into.  So I

23 think Your Honor's correct on that.  Thank, Your Honor.

24        MR. BERNICK:  Your Honor, I have to say, we, (a) had

25 the deposition go forward, (b) all those questions were asked,

1  (c) he filed his motion to compel.  He attached the transcript

2  and he had the opportunity to do whatever excerpt that he

3  wanted to point out, whatever questions he wanted to, and he

4  did.  And we then responded to that.  And the way that we

5  responded to it was completely in good faith.  We gave him

6  answers, we focused our objections, we narrowed the scope of

7  what was at issue.  And I'm happy to go through, at another

8  time when it's better for the Court, the areas where you think

9  -- Your Honor thinks that further inquiry is appropriate, and

10  then determine exactly what that inquiry is and who should be

11  asked this question.

12         For example, the question about what the $37 million

13  reserve is for is not something that we have to take Mark

14  Shelnitz's deposition to find out.  There are any kind of

15  number of people, and I would assume that an officer of the

16  Court, that Mr. Speights would accept, particularly if the

17  Court were to encourage it, an affirmation as a response to an

18  interrogatory that said pretty much what I said.  I'm not sure

19  it hasn't already been described, but I'll accept that it

20  hasn't and I'll accept that it should be described.  There's no

21  reason to have a deposition to do that.  But, to go back and to

22  have Mr. Speights now be given the opportunity to go back

23  through the deposition and flag more questions and raise more

24  issues and more subject matters than what were spelled out

25  specifically in his motion when we are at the point where we're

1  at and the process that's been undertaken is where it is, I

2  just think it's abusive.

3          And I think that it's fine, I mean, we'll do whatever

4  it is that Your Honor obviously requires.  But, the burden

5  really is on Mr. Speights.  And if Your Honor believes that

6  there's further questions that should be answered, we're happy

7  to do it.  But, we think that the most --

8          THE COURT:  Well, Mr. Bernick, I think you're

9  correct.  When I look at the motion itself, which is at Docket

10 Number 23028.  There are -- I'm not certain that these are

11 actually the questions.  It says instructions not to answer

12 were made to the following questions, but they're not stated

13 necessarily as questions, and I didn't go back --

14         MR. BERNICK:  Right.

15         THE COURT:  -- and check every one of these against

16 the citations to see whether they are questions.  But, I accept

17 the proposition that these are the areas that were -- and maybe

18 they're the specific question that was inquired about.  I don't

19 think so, because, for example, one of the questions under Mark

20 Shelnitz is, what the elements of that $37.3 million number

21 are.  Then there's the citation to the August 20th deposition

22 and it goes on for three pages.  That's a pretty long question

23 to be summarized in one phrase.

24         MR. BERNICK:  Yes.  Well, Your Honor, we sent through

25 a chart, and the chart went through the specific areas that

1 were listed in Mr. Speights' motion, by number, including the

2 misnumbering.  And in that chart we repeated the question.  We

3 then provided the Court with the deposition pages, and in many

4 instances, a few instances, I think the first two, there were

5 no questions that were posed of Mr. Shelnitz.  We then showed

6 the basis for the objection, but then we indicate in the last

7 column whether we're standing on it.  But, more particularly,

8 what the answer is, because it may be as the answer is not

9 problematic, albeit having Mr. Shelnitz testify about it would

10 be because it would create the risk of waiver.  I guess I want

11 to ask here, I know that we've sent it to court --

12             THE COURT:  I have it.

13             MR. BERNICK:  -- maybe if Your Honor --

14             THE COURT:  No, I have it.

15             MR. BERNICK:  Okay.

16             THE COURT:  For example, the first one, to make sure

17 I'm referring to the same thing you are, under "Topic" is

18 Question 1, "Why is Anderson's claim not being 'returned to the

19 tort system?'"  And the answer says, "Not asked," or the

20 deposition pages say, "Not asked."  The basis for objection

21 says, "Not applicable."

22             MR. BERNICK:  Right.  And that's what we went through

23 in being responsive to this motion.  These are the very

24 questions that he decided in his own motion to ask for answers

25 to.  So, you know --

43

1           THE COURT:  All right.  I will go through Mr.

2 Speights' motion and this chart with respect to the debtors'

3 position.  I have read the response and the reply, just so

4 you're comfortable that I have done that.  But, I haven't done

5 it with this analysis.  And then I'll give you a ruling.

6           MR. BERNICK:  Okay, that's fine.  I think that the

7 other motions that Mr. Speights had were on Solomon and Ewing.

8           MR. SPEIGHTS:  I didn't have them as a motion.

9           THE COURT:  That's the debtors.

10           MR. BERNICK:  I'm sorry.  We had a motion on Solomon

11 and Ewing.  And I think that those are pretty straightforward.

12 Solomon, we regard as -- well, we set it out in the motion.

13 I'm not going to take and respond to this charge, it is a

14 fallacious charge, but I'm not going to turn this into a

15 swearing contest, an issue that's of no consequence in order to

16 get -- to satisfy Mr. Speights' desire to have Your Honor rule

17 on the issue.  I'm just not -- I'm sorry, are you still there?

18           THE COURT:  Yes.

19           MR. BERNICK:  I'm not going to do that.  Our position

20 is that it's irrelevant to any issue in the case.  It is a

21 matter that should not be brought before the Court, and

22 particular for the purpose for which it's proffered, and we'll

23 simply rest on our brief.

24           THE COURT:  All right.  With respect to Solomon then,

25 Mr. Speights?

1        MR. SPEIGHTS:  Well, Your Honor, at the omnibus

2  hearing a few days ago, Mr. Bernick said he would address that

3  when it comes up at the confirmation hearing.

4        THE COURT:  Actually that's my recollection, too, Mr.

5  Speights.  I did agree to put this on the agenda, because it

6  was filed and I thought it would be better to address it now

7  than trying to do it at the confirmation hearing, but that's my

8  recollection, as well.

9        MR. BERNICK:  That is correct.  And I was content to

10  do that on the theory that why make more of a big deal than

11  what it was, except that in thinking about it, (a) it brings

12  Mr. Solomon there, which is unnecessary in our view, and (b) it

13  makes an even bigger issue out of this.  This is just

14  grandstanding, Your Honor, and it's improper grandstanding.

15  And he has absolutely no answers.  He has four pages reciting

16  this long history, all of which is belied by the fact that as

17  recently as July the 20th -- as recently as July the 20th, he

18  was still not prepared to commit to whether he was going to

19  call Mr. Solomon.  He only committed to do that, literally, I

20  think, two days before the end of the confirmation hearing that

21  we just had.

22        So, while it's true that we could have raised it

23  before, there was no reason for raising it before.  Now, we've

24  raised it and he has absolutely no answer to why it is that

25  this event that he believes took place back in 2005 is germane

1 with respect to a different plan.

2          THE COURT:  Okay, Mr. Bernick, you were relying on

3 your papers, so this is Mr. Speights' turn.  Mr. Speights?

4          MR. SPEIGHTS:  Thank you, Your Honor.  As I said,

5 number one, we didn't think it's appropriate to be heard today

6 but for the reason I said.  But, in addition, Your Honor, what

7 we have said consistently since July 20th and said in our most

8 recent papers is, we needed to finish Mr. Shelnitz's deposition

9 before we would make a final determination.

10          When we were up at the confirmation hearing and he

11 asked can we take his deposition, we said, sure and we made him

12 available the next day.  We thought we were doing something

13 good when we agreed to let his deposition be taken on 24 hours

14 notice.  But, we are still in the position of arguing, Your

15 Honor, that we ought to have Mr. Shelnitz first.  I asked Mr.

16 Shelnitz -- I don't have a page by it, I could provide one -- I

17 asked Mr. Shelnitz about Mr. Solomon.  Mr. Shelnitz said he had

18 read the affidavit, but when I tried to inquire as to whether

19 if that occurred it would be appropriate, he was instructed not

20 to answer.  So, I do want to ask Mr. Shelnitz -- and Your

21 Honor's going to rule, I'm not rearguing that -- I do want to

22 ask Mr. Shelnitz about the events of 2005 when Mr. Finke

23 identified him, at least implicitly, as the person who approved

24 this campaign against Speights and Runyan and Anderson Memorial

25 Hospital, and that is what Mr. Solomon was tied to.  But, I

1  think we need to resolve the Shelnitz matter, and whether I'm

2  going to be able to inquire in that so I can make a

3  determination of whether I'm going to call Mr. Solomon.

4  Everybody knows --

5          THE COURT:  Okay, I've lost --

6          MR. SPEIGHTS:  -- what Mr. Solomon is going to say

7  now, because they've taken his deposition, although he might

8  elaborate a little more because they didn't ask every question

9  they could have asked.

10          THE COURT:  But, I've lost how this is leading to

11  some discrimination in the plan.  If that's the argument,

12  regardless of whether the statement took place or not, I don't

13  know how it shows discrimination in the plan.

14          MR. SPEIGHTS:  And I'll respond in two ways, Your

15  Honor.  First, I think when it's our time, it's not our time

16  yet, they're still on their case --

17          THE COURT:  Mr. Bernick, you need to put your phone

18  on mute.

19          MR. BERNICK:  Your Honor, I'm sorry.  You know.

20          THE COURT:  Mr. Speights, go ahead.

21          MR. SPEIGHTS:  I do think, and I am going to address

22  your question on the merits, Your Honor, but I do think the

23  debtor needs to rest its case on good faith, and they haven't

24  done so.  And then we're going to turn around and Mr. Solomon

25  will be there.  We would like to call Mr. Solomon, and Your

1 Honor knows exactly what it is he's going to testify about, but
2 we will have -- call him at the point in time where we present
3 our whole case on the plan is not presented in good faith.

4        We think that we can show a picture that started in
5 2005 after they filed a proposed plan of reorganization.  They
6 filed their proposed plan.  We started negotiations with Mr.
7 Beber and Mr. Finke and all of a sudden for reasons I suspect,
8 but need to be able to prove through Mr. Shelnitz, but for
9 whatever reason they pulled the plug on negotiating with
10 Anderson and Mr. Speights and decided to "smear" Mr. Speights
11 and his PD claims in this bankruptcy.  And that process
12 continued from 2005 through at least the final blow was when
13 they took the treatment of Anderson in the plan and changed it
14 from what they originally provided and said, well, Anderson,
15 you will be the only one or perhaps now if California comes
16 back, that would go back to the bankruptcy and try a prefiled
17 case that we said could be returned to the torts system on at
18 least four occasions in papers presented in the early part of
19 this case.

20        And Mr. Solomons' testimony is just one piece of that
21 puzzle to show the entire picture.  Again, Your Honor, we urge
22 you to rule on that at the confirmation hearing.  But, at least
23 until after Your Honor rules on Mr. Shelnitz so we can evaluate
24 --

25        THE COURT:  All right, but with respect to -- I'm

48

1  sorry, just a second.  With respect to Mr. Shelnitz's

2  deposition on that point, first of all, was Mr. Shelnitz there

3  to have participated in the discussion?  Because if not, what

4  difference does it make whether Mr. Shelnitz has an opinion

5  that this was or wasn't an improper method of negotiating or

6  statement to make, whatever the question is going to be?

7           MR. SPEIGHTS:  We think the evidence will show, Your

8  Honor, that Mr. Shelnitz instructed, made a decision to reverse

9  the Court on negotiation that was in place with Mr. Finke and

10  Mr. Beber.  And Mr. Shelnitz instructed its counsel to go after

11  "Speights and Runyan," and Anderson's claim, and Mr. Bernick's

12  statement made at that meeting was in furtherance of a position

13  that Mr. Shelnitz had taken on behalf of W.R. Grace.

14           Only in the alternative, if I'm mistaken, Mr.

15  Shelnitz can disavow whatever -- such a statement if, in fact,

16  it was made.  Mr. Shelnitz can say if that statement was made,

17  I disagree with it, and that was not the policy of W.R. Grace.

18  I believe the circumstantial evidence and the testimony of Mr.

19  Finke support the proposition that Mr. Shelnitz himself was the

20  key decision maker that decided to reverse course and go after

21  Speights and Runyan after the plan had been filed.

22           MR. BERNICK:  Your Honor, this is Mr. Bernick.  The

23  affidavit -- to answer Your Honor's question -- from Gibbs and

24  Solomon says that the attendees at the meeting were myself, Ms.

25  Brody, Bob Beber, Richard Finke, Dan Speights, Alan Runyan and

1  himself.  There was no mention in this affidavit of Mr.

2  Shelnitz being there, because he was not, nor was there any

3  testimony from Mr. Finke that it was Mr. Shelnitz who made the

4  decision to reverse course and smear Anderson.  This is a

5  scurrilous matter.  This is absolutely beyond the bounds.  Mr.

6  Spieghts was doing it for only one reason, which we now know,

7  which was to obstruct this process and make a spectacle of it.

8  This is sanctionable conduct.  There should be sanctions here

9  for pursuing it and taking up the Court's time in making these

10  allegations.  And he can't even tell Your Honor the answer to a

11  simple question of who was there.  He just got done telling

12  Your Honor, this is now all being held hostage to his getting

13  testimony from Mr. Shelnitz.  We've seen this before.

14          There's no way, short of an order from Your Honor,

15  that these issues ever get resolved with Mr. Speights.  He'll

16  continue to pursue them forever.  We have got a confirmation

17  hearing to complete.  Your Honor's worked unbelievably hard, so

18  has everybody else.  It's time to end.  Let Mr. Speights call

19  the witnesses that he's permitted to call and that we end this

20  process, because it will not end otherwise.

21          MR. SPEIGHTS:  Your Honor, I never suggested, never

22  have suggested that Mr. Shelnitz was at the meeting in

23  Washington.  The affidavit doesn't say that.  Mr. Finke's

24  testimony was that that decision was made in April before the

25  June or July meeting and it was made by the general counsel of

 1  W.R. Grace.

 2          MR. BERNICK:  There was no testimony concerning that

 3  decision --

 4          MR. SPEIGHTS:  May I finish please?

 5          MR BERNICK:  It's just a lie, Your Honor.

 6          MR. SPEIGHTS:  That is not --

 7          THE COURT:  Then give me the point in the --

 8          MR. SPEIGHTS:  -- that is highly inappropriate.

 9          THE COURT:  Just give me the point in the deposition

10  transcript where it shows up so that I don't have to decide

11  whether one of you is or isn't telling me the truth, please.

12  Just give me the deposition cites.

13          MR. SPEIGHTS:  I think you're asking for the Finke

14  deposition cites, Your Honor.

15          THE COURT:  Yes, sir.

16          MR. SPEIGHTS:  May I e-mail that to --

17          THE COURT:  Yes.

18          MR. SPEIGHTS:  Thank you, Your Honor.  I will do that

19  in the next few minutes.

20          MR. BERNICK:  Well, I'm not in a position to get the

21  e-mail.

22          THE COURT:  Ms. Baer is on the phone.  Ms. Baer's on

23  the phone, is there anyone else there who can then contact you

24  and give it to you?

25          MR. BERNICK:  Yes.

1          THE COURT:  Who else?  Or is Ms. Baer satisfactory?

2          MR. BERNICK:  No, that's fine.  I don't --

3          THE COURT:  All right.

4          MR. BERNICK:  It doesn't --

5          THE COURT:  Ms. Baer, are you able to get in touch

6  with Mr. Bernick?

7          MS. BAER:  Your Honor, I am in front of my computer

8  and can get whatever Mr. Shelnitz is e-mailing, but I believe

9  Mr. Bernick's on his phone, so it will be a little hard to

10  contact him.

11          THE COURT:  Well, I understand that.  But, you know,

12  if it comes through now, then we can get it here and I can read

13  it.  If you get it, Ms. Baer, we can read it.  So, okay.  Let's

14  move on to something else while I'm waiting for this.

15          MR. SPEIGHTS:  Well, Your Honor, now I can't -- do

16  you want me to get off the phone and find the deposition send

17  it to you or do you want me to argue the next matter?  I'll do

18  whatever you want.

19          THE COURT:  No, I want you to argue the next matter,

20  Mr. Speights, and then you can submit the deposition and the

21  transcript cite later.

22          MR. SPEIGHTS:  It will just be shortly after the

23  hearing.

24          THE COURT:  I'm sorry?

25          MR. SPEIGHTS:  It will be shortly after the hearing.

1            THE COURT:  All right.

2            MR. BERNICK:  Your Honor, again, this is just

3  absolutely -- after the hearing means we can't get a -- we are

4  days away from getting this thing done --

5            THE COURT:  Mr. Bernick ---

6            MR. BERNICK:  -- and we still can't get a commitment.

7            THE COURT:  Mr. Bernick, I'm going to have to make

8  rulings as to whether or not the deposition will or won't go

9  forward.  So, I want to see the deposition citation that

10  indicates that Mr. Finke has somehow or other indicated that

11  W.R. Grace, through its general counsel, is negotiating the

12  plan that is before me in bad faith.

13            MR. BERNICK:  But, we know that that can't be,

14  because the plan before you didn't come into existence until

15  years later.

16            THE COURT:  Well, that's what I was asking earlier,

17  Mr. Speights.  I'm still not sure how this discussion shows

18  that -- well, Mr. Speights indicated that it's a course of

19  conduct that has continued to date.

20            MR. BERNICK:  Right.  That's what it -- right, that's

21  what it always is when somebody wants to make out the

22  conspiracy theory.  Well, this is the course of conduct and

23  let's link this and this and this and this and this, and he's

24  already told you, Your Honor, that that's what he's going to

25  continue to do.  And the only way to deal with that is to deal

1  with the elements of the course of conduct that he alleges one

2  by one and see if they link up.  That was a meeting that took

3  place in connection with a completely different set of

4  discussions about a completely different plan.  There's nothing

5  to do -- there's no plan on the table called this plan that was

6  the subject of that discussion at that meeting.

7          Contrary -- then he takes the other element and he

8  says, oh, nobody talked to me about this plan.  That's outright

9  false.  I sat in the Atlanta airport with Mr. Baena, Mr.

10 Speights and a whole group of people talking about this plan

11 and in particular the case management order, face to face.  And

12 that's why this whole thing is just not going to end until we

13 take this from being a discussion about conducing inquiry of

14 Mr. Shelnitz to get under his skin and to get into an issue

15 that he knows is going to continue to generate litigation, and

16 get back to what the case is about.  The case is about this

17 plan, not whether Mr. Speights can smear people with a broad

18 allegation.  It is outrageous, Your Honor.  And this is not a

19 question of --

20          THE COURT:  Okay, let's move on.

21          MR. BERNICK:  -- his supplying deposition cites, he

22 should have supplied -- he should have done this a long time

23 ago.  He should have brought these matters up back in July, and

24 when Your Honor said this is off limits, that's what you said

25 in July, it's off limits.

1           THE COURT:  Okay, let's get on to the next --

2           MR. SPEIGHTS:  Your Honor, for the record, I have

3  cited Mr. Finke's testimony in one or more of the briefs

4  dealing with Mr. Shelnitz.  But, I will again send you that

5  portion of the deposition which Mr. Finke said the general

6  counsel made the determination to terminate the negotiations

7  with Mr. Finke and Mr. Beber and then move on to another

8  subject.

9           MR. BERNICK:  Oh, okay.  So, that's what it is.  If

10 Mr. Finke and Mr. Beber --

11          MR. SPEIGHTS:  That's what I had consistently said,

12 Your Honor.  I said it over and over again.

13          MR. BERNICK:  Oh, no, no, no.

14          THE COURT:  Gentlemen, stop.

15          MR. BERNICK:  What Mr. Speights --

16          THE COURT:  Gentlemen.  Gentlemen, I am not going to

17 have you shouting over each other.  I will terminate this call.

18          MR. BERNICK:  I'm sorry.

19          THE COURT:  Mr. Speights, you were making a statement

20 that I couldn't hear.

21          MR. SPEIGHTS:  Your Honor, I have been consistent

22 about this in every brief that I have filed concerning Mr.

23 Shelnitz since their first motion for protective order which

24 was filed in June.  And that is that in February 2005 in

25 connection with the plan that they proposed at that time, I had

settlement negotiations going forward with Mr. Finke and Mr.
Beber.  And then in April of 2005 they "declared war," on
Speights and Runyan.  So, I took Mr. Finke's deposition back in
March, I think.  The first deposition I took.  And I asked Mr.
Finke about this.  Mr. Finke confirmed that we did have ongoing
discussions and I asked him, in effect, to confirm that they
ceased talking to me about those discussions, about those
resolutions of those claims.  He acknowledged that W.R. Grace
did cease talking to me.  I said to Mr. Finke, in effect, Mr.
Finke, you and I have dealt with each other for many years, I
have never known you to stop talking to me without at least
picking up the phone and calling me and saying, I'm not going
to talk about this anymore.  And he acknowledged that was true.
And I asked him why he did it in this case, and he said he was
directed not to talk to me.  And I asked him who directed him
not to talk to me, and he said the general counsel of Grace.

        Now, Mr. Finke took over as general counsel in April.
So, he wasn't 100 percent sure it was Mr. Finke -- it was Mr.
Shelnitz, but all indications are that it is for various other
reasons, Mr. Finke himself having testified that he was in
charge of claims during that period of time.  That's a fact.

        THE COURT:  All right.  I don't need the cites for
that, Mr. Speights.  I thought there was a different citation
that you were giving me.  I do not need the cites for that.

        MR. SPEIGHTS:  I'm giving you Mr. Finke's deposition

1 citation.

2          THE COURT:  I don't need it.  I have seen portions of

3 briefs and transcripts and so forth that essentially

4 acknowledge that the negotiations with Anderson Memorial broke

5 off.  My understanding though, and please again, correct me if

6 my time sequence is wrong, but I thought that you and Mr.

7 Restivo were still settling cases, not Anderson Memorial, but

8 other cases, as recently as a couple months ago.

9          MR. SPEIGHTS:  There is no question that after the

10 onslaught of litigation that started on September 1, 2005 and

11 went up to maybe in 2007, that, as Your Honor recalls, I came

12 to Pittsburgh, and when no one else was in the courtroom but

13 Mr. Restivo.  And after, at the end of that hearing, I

14 suggested to Your Honor that we mediate the Speights and Runyan

15 claim.  And Your Honor agreed with me, even though at some

16 point Grace objected to a mediation process.  And as a result

17 of that, and I appreciate that, Your Honor, ordering that

18 mediation, as a result of that we started the mediation and

19 discussions resumed with Mr. Restivo, and Mr. Beber and Mr.

20 Finke that resulted in a number of the non-Anderson claims

21 being resolved.

22          MR. BERNICK:  Your Honor, again, that is a completely

23 misleading recitation.  First of all, Mr. Finke is no longer,

24 per Mr. Speights, acknowledging some smear campaign and saying

25 it was due to Mr. Shelnitz or declaration of war.  Yes, there

1  was a break off.  The sequence, though, is entirely different.

2  Mr. Beber had a long history of relations, not only with

3  Speights and Runyan, but with many people.  And he was

4  initially enlisted by Mr. Siegel to try to bring people to the

5  table and talk, and that didn't end up working.  And one of the

6  reasons why it didn't was that Mr. Speights was not interested

7  in playing ball.  So, effectively, that initial round of

8  discussions that Mr. Siegel, I think who even has testified

9  about in this case, didn't come to fruition.

10          We then went with the global discussions and Judge

11  Pointer, and they didn't come to fruition.  We then took them

12  one step at a time and we did PI, and as we made progress with

13  PI, we also recommended PD, a mediation that he says broke the

14  log jam, didn't break the log jam.  Mr. Restivo negotiated with

15  each and every one of the law firms to resolve each and every

16  one of their claims, including Mr. Speights.

17          This whole process is totally transparent.  It's been

18  the subject of numerous reports to the Court in connection with

19  the exclusivity hearing, and the outcome of it is, yes,

20  discussions broke off at one point, as they did at many points,

21  because they were not productive.  But, no, they did continue

22  and Grace was successful in resolving the overwhelming bulk of

23  claims and this plan now reflects that resolution --

24          THE COURT:  All right.  Gentlemen --

25          MR. BERNICK:  -- and Mr. Speights was involved every

1  step of the way.

2         THE COURT:  All right.  It seems to me that the

3  essential facts are not in dispute.  What is disputed by you is

4  the spin that should be put on those facts.  No one seems to

5  dispute the fact that the negotiations broke off, that they

6  resumed at a later time.  That what wasn't settled was Anderson

7  Memorial, that Anderson Memorial is in a class in the plan

8  that's going to require litigation before the Bankruptcy Court

9  whereas futures are not.  That other property damage claims

10 that are current would also be in the class with Anderson

11 Memorial.

12        Those seem to me to be the essential facts.  I don't

13 see at this point where discovery is going to elucidate any

14 additional facts.  I think you can make arguments, as you're

15 already making, as to what the outcome of those facts should

16 be, but I'm not seeing where discovery is going to generate

17 additional facts.

18        MR. SPEIGHTS:  Your Honor, I respectfully disagree

19 with Mr. Bernick's statement of facts, and I agree that it's

20 not the appropriate time to argue that.  I think the

21 confirmation hearing is a more appropriate time.  And I do

22 believe, first of all, that Mr. Solomon -- we've had full

23 discovery on that, he will or will not testify, depending on

24 Your Honor's ruling either today or at the confirmation

25 hearing.  And with respect to Mr. Shelnitz, we want to get

1  behind the decision to treat Anderson in a disparate way and I

2  understand Your Honor's concern and I'm not going to repeat all

3  the arguments I made, but I do think that I need to make clear

4  that I disagree with many of the factual assertions that Mr.

5  Bernick has made, as he disagrees with many of my factual

6  assertions.

7        THE COURT:  All right.  Well, to the extent that

8  there is a suggestion on the record, I haven't seen any

9  evidence of this anywhere.  There is the fact that negotiations

10 broke off.  I have not seen evidence that I think you're trying

11 to elicit, Mr. Speights, that indicates that Anderson was

12 somehow or other singled out for this process.

13       MR. SPEIGHTS:  And that's what I want to get through

14 Mr. Shelnitz.

15       MR. BERNICK:  No, no, no.  Your Honor, it broke off

16 in connection -- in 2005 in connection with all of Mr. Beber's

17 efforts.  Not only with Mr. Speights, but I think also with

18 respect to others.  But, even if was just Mr. Speights, which I

19 don't think it was, it wasn't focused just on Anderson

20 Memorial.  It wasn't working.  We had thousands of unauthorized

21 claims.  So, the idea that somehow 2005 links up with what

22 subsequently happened with respect to Anderson Memorial, which

23 was the only one of Mr. Speights' cases that was either not

24 dismissed or settled, there's no basis for that fact, it's

25 just an assertion of a conspiracy connection that comes out of

1 Mr. Speights.  There was no break off of discussion.  No break

2 off of discussion such that Anderson Memorial was singled out

3 for any kind of special treatment.

4          There was an effort to settle Anderson Memorial,

5 along with all of Mr. Speights' other claims.  It so happens

6 that Anderson was not settled, we think in part because Mr.

7 Speights wants to keep his class issue alive.  But, whatever it

8 was, it's not the appropriate subject of inquiry --

9          THE COURT:  Hello.  Court Call operator, do we still

10 have everyone?

11          OPERATOR:  It looks like I do.

12          THE COURT:  Okay, thank you.  Go ahead, Mr. Bernick.

13          MR. BERNICK:  That's why, again, each one of these

14 things he wants to weave together.  But, just like we saw about

15 2005 and the somehow, you know, the war, the smear campaign is

16 all Mr. Shelnitz, now it turns out to be Mr. Siegel, and yes,

17 they broke off discussions, but they broke of discussions with

18 respect to all of the Anderson claims, and Anderson was -- not

19 the Anderson claims -- all of the Speights' claims, and the

20 plan that was on the table then is not the plan now.  You go to

21 what happened with Anderson in settlement years later, it's a

22 completely different story.  The whole deal of how things are

23 being handled is different.  It's claim by claim.  We're

24 dealing separately with the PI people.  And again, all of this,

25 every single scrap of the process was open book.  In fact, it

1  was discussed again before the Court, when Judge Sanders was on

2  the stand.

3         So, Mr. Speights is not satisfied with the treatment

4  that Anderson Memorial got, and he thinks this case has got

5  more value than we did, and he wants to make objections, fine.

6  But, the idea that this serves as a springboard for pursuing

7  some kind of conspiracy theory, I just think it's abusive.  And

8  there's no record for it.  We've now exposed that the Finke

9  deposition did nothing to indicate or endorse the idea that

10 there was some campaign to target Anderson Memorial or even Mr.

11 Speights, and he testified about this.  He wasn't prevented

12 from testifying about it.

13        THE COURT:  I'm losing the relevance, and I think

14 that's the problem.  But, the difficulty is, it's a relevance

15 issue that I'm hung up on.  It seems to me, Mr. Speights, if

16 you want to call Mr. Solomon at trial, I'll deal with whether

17 or not he is an appropriate witness in the context of your

18 case, because I think at this point what you're attempting to

19 allege, through Mr. Solomon, is not going to be relevant.  But,

20 I'm hesitant to say that until I hear that in the context of

21 the case.  Because if it turns out to be relevant, I don't want

22 to preclude you from calling a witness in that regard.

23        So, I am going to deny the motion in limine, but I am

24 going to reserve any rulings with respect to Mr. Solomons'

25 testimony until -- unless and until he is called at trial.

1    With respect to the fact that you need to conclude
2 the Shelnitz deposition before you make that determination, I
3 can't give you that ruling until later when I go back through.
4 So, as soon as you determine whether you're going to call Mr.
5 Solomon, you are to let counsel know, and definitely before
6 your case in chief starts, at least a day before your case in
7 chief starts, so that they can prepare.  But, I will not grant
8 the motion in limine, because it seems to me that this is going
9 to come down to a relevance issue.

10    Okay, next.  Ms. Baer, if you could, when you have an
11 opportunity, submit an order that will deny the motion in
12 limine without prejudice to raising any issues if and when Mr.
13 Solomon is called at trial, I will take that order.

14    MS. BAER:  Thank you, Your Honor.  I will.

15    THE COURT:  Okay.  Obviously, show it to Mr.
16 Speights.

17    MS. BAER:  Yes.

18    THE COURT:  Okay.  Next, Mr. Bernick?

19    MR. BERNICK:  I'm sorry?

20    THE COURT:  I think you wanted to argue the William
21 Ewing motion in limine.

22    MR. BERNICK:  Well, Mr. Speights has told me he can't
23 tell whether he's going to call Ewing until he finds out about
24 the Shelnitz depositions.  I had a call with him where he
25 confirmed that.  So, I guess we have to go forward on that one,

1 too.  Mr. Ewing has no expert report.  So, he shouldn't testify

2 as an expert.

3        MR. SPEIGHTS:  Your Honor, I believe that Mr. Bernick

4 misunderstood what I said to him earlier today, and I will

5 repeat what I said to him earlier today.  If the plan

6 proponents are not putting into evidence or relying on some

7 evidence that is already there that I'm not aware of or any

8 other piece of evidence, that they are not putting in any

9 evidence or relying on any evidence of the value of the

10 traditional PD claims, present and future, then I have no

11 intention of offering Mr. Ewing as a witness in the case.  I

12 have said for some period of time that Mr. Ewing is a

13 feasibility expert on the value of traditional PD claims.  But,

14 as I understand, I may be mistaken, I'll let Mr. Bernick speak

15 for the debtors, and they're not offering any evidence, they're

16 not relying on any evidence as to the value of the traditional

17 PD claim.

18        MR. BERNICK:  Your Honor, that again is a

19 misrepresentation of what we've discussed, and I should have

20 known better than to try to recite it or count on it.  What was

21 actually discussed was whether the debtor is going to put in an

22 estimate of the liability that may be associated with future

23 traditional PD demand.  It wasn't whether there's going to be

24 any evidence in the record about this, or that or the other.

25 It was whether we're going to proffer expert testimony to

1  provide an estimate -- whether we would proffer expert

2  testimony to provide such an estimate.  I said we would not and

3  I thought that that was the end of it.  But, now apparently the

4  language is different.  I can't stay on the call.  I'm sorry,

5  Your Honor.  I've got to get on an airplane or I'll miss a

6  Ninth Circuit argument 8:30 tomorrow morning.  I think the only

7  issue now that remains is not an -- an issue of relevance, too,

8  it is whether an individual who put no expert report in can now

9  testify as an expert witness.  I can't negotiate over the phone

10 with Mr. Speights on what the scope of his deal is that he

11 intends or believes that he offered us, because that will just

12 go down the same rabbit hole that we've been just now.

13         THE COURT:  Well, all right.  On the issue of not

14 having an expert report, I think the case management order is

15 pretty clear, that a witness is not going to testify if there's

16 no expert report.  So, on that score, I would not be hearing

17 from an expert as an expert if no expert report has been

18 provided, and I guess maybe that will end that matter.

19         With respect to what the debtor's going to rely on

20 for its estimates for feasibility, that's going to be up to the

21 debtors' burden of proof.  Mr. Speights, I'll hear from you at

22 the close of the debtors' evidence as to why it is that you may

23 need either to produce Mr. Ewing or whatever it is you may

24 choose to do at the end of that case, because I don't know what

25 the debtor is going to produce either.

1          MR. SPEIGHTS:  I understand that, Your Honor.  And

2 again, I said this earlier, but I know this has been a lengthy

3 hearing, that we did inquire of Mr. Shelnitz and they refused

4 to allow Mr. Shelnitz to testify as to whether the debtors have

5 made an estimate about PD liability --

6          THE COURT:  Well, I think Mr. Shelnitz --

7          MR. SPEIGHTS:  -- and that was one of the areas we

8 wanted to inquire about.

9          THE COURT:  Well, Mr. Shelnitz would not be the

10 appropriate witness, because he is counsel.  I mean, there must

11 be other witnesses who could identify that area.  And it would

12 be very difficult to substantiate that he's the only person

13 within Grace who knows whether an estimate has been made.  So,

14 to that --

15          MR. SPEIGHTS:  We also asked Ms. Zilly and Mr.

16 La Force, but we have not been able to discover any estimate of

17 PD liability, I'm trying to do so in good faith.

18          MR. BERNICK:  I'm sorry, Your Honor.  That is again

19 false.  Look at .5 on our chart.  It says, has Grace made an

20 estimate for future traditional PD demands?  We did instruct

21 Mr. Shelnitz and Ms. Zilly not to answer it because it related

22 to matters that might potentially be privileged.  But, we then

23 said, we can provide the answer and will do so by way of

24 interrogatories.  The answer says, no.  No such estimate has

25 been prepared since 1995 when an estimate was done in

1  connection with the Sealed Air transaction or the Fresenius

2  transaction.  So, the answer is out there in black and white

3  and I've told Mr. Speights this over the telephone, there's no

4  reason on God's earth to conduct inquiry of Mr. Shelnitz with

5  respect to something that does not exist.

6          THE COURT:  All right, well --

7          MR. SPEIGHTS:  And I would ask you to read Number 6,

8  right under that, Your Honor, but --

9          MR. BERNICK:  That's a different question.  Had Grace

10 made an estimate for its unresolved traditional PD claims.  If

11 there's any such estimate, it's privileged, and that gets back

12 to the reserve.  They're totally consistent.

13         THE COURT:  Okay, gentlemen, I will give you rulings.

14         I am not going to grant the motion in limine with

15 respect to Mr. Shelnitz.  I am going to grant it, without

16 prejudice, with respect to Mr. Ewing for the reasons that I

17 have just expressed, which are that it appears that Mr. Ewing

18 has not provided an expert report.  Mr. Shelnitz does not

19 appear to be the only person within Grace who would have the

20 knowledge as to whether an estimate has been prepared or not.

21 A finance witness or someone -- Ms. Zilly, perhaps -- could

22 certainly answer the questions as to whether they have or have

23 not prepared that estimate.  I've already made rulings with

24 respect to the attorney/client privilege and work product and

25 Rule 408 issues concerning a reserve, but the question as to

what 37 million is, i.e. is it a reserve, can be answered.  If

it can be done by interrogatory, that's fine.  I will go

through these questions and the debtors' responses and give you

an order, hopefully tomorrow.

MR. SPEIGHTS:  Thank you, Your Honor.

THE COURT:  We're adjourned.  Oh, Ms. Baer -- we're

not adjourned.

MS. BAER:  Yes, Your Honor, I'm on.

THE COURT:  I'd just like an order from you with

respect to Mr. Ewing.

MS. BAER:  I will do so, Your Honor.

THE COURT:  All right.  Thank you.  Now, we're

adjourned.

MS. BAER:  Thank you.

* * * * *

# **C E R T I F I C A T I O N**

I, RITA BERGEN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Rita Bergen                    DATE:  October 14, 2009

RITA BERGEN

J&J COURT TRANSCRIBERS, INC.

(CR)