UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    USX Tower - 54th Floor
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
               Debtors.  .
                              .    September 11, 2009
. . . . . . . . . . . . . ..    8:42 a.m.



TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  LISA G. ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  NATHAN FINCH, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C. 20005


For the Future            Orrick, Herrington & Sutcliffe, LLP
Claimants                 By:  ROGER FRANKEL, ESQ.
Representatives:               JONATHAN GUY, ESQ.
                               RICHARD H. WYRON, ESQ.
                               PERI N. MAHALEY, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants: Lewis, Slovak & Kovacich, P.C.
                         By:  TOM L. LEWIS, ESQ.
                              MARK KOVACICH, ESQ.
                         725 Third Avenue North
                         Great Falls, MT 59401

                         McGarvey, Heberling, Sullivan and
                          McGarvey, P.C.
                         By:  JON HEBERLING, ESQ.
                              JOHN LACEY, ESQ.
                         725 Third Avenue North
                         Great Falls, MT  59401

                         Cohn Whitesell & Goldberg, LLP
                         By:  DANIEL C. COHN, ESQ.
                         101 Arch Street
                         Boston, MA  02110

For Arrowwood:           Wilson, Elser, Moskowitz, Edelman,
                          & Dicker, LLP
                         By:  CARL J. PERNICONE, ESQ.
                         150 East 42nd Street
                         New York, NY 10017

                         O'Melveny & Myers, LLP
                         By:  TANCRED SCHIAVONI, ESQ.
                         Times Square Tower
                         Seven Times Square
                         New York, NY 10036

For the Property         Bilzin Sumberg Baena Price &
Damage Committee:         Axelrod LLP
                         By:  MATTHEW KRAMER, ESQ.
                         200 South Biscayne Boulevard
                         Suite 2500
                         Miami, FL  33131

For BNSF Railway:        Pepper Hamilton, LLP
                         By:  LINDA CASEY, ESQ.
                              BOB PHILLIPS, ESQ.
                         3000 Two Logan Square
                         Philadelphia, PA  19103

For CNA:                 Goodwin Procter, LLP
                         By:  MICHAEL GIANNOTTO, ESQ.
                         Exchange Place
                         Boston, MA  02109-2881

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Fireman's Fund:        Stevens & Lee, P.C.
                           By:  JOHN DEMMY, ESQ.
                           1105 North Market Street, 7th Fl.
                           Wilmington, DE  19801

For Maryland Casualty:     Connelly Bove Lodge & Hutz, LLP
                           By:  JEFFREY WISLER, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Wilmington, DE  19899

For MCC & Zurich:          Eckert Seamans
                           By:  EDWARD D. LONGOSZ, ESQ.
                           1747 Pennsylvania Avenue, NW
                           Suite 1200
                           Washington, DC 20006

                           Wiley Rein, LLP
                           By:  RICHARD A. IFFT, ESQ.
                           1776 K Street NW
                           Washington, DC 20006

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser, LLP
& Gleser, LLP:             By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                           Wall Street Plaza, 23rd Floor
                           New York, NY  10005-1875

For Allstate Insurance:    Cuyler Burke, LLP
                           By:  ANDREW CRAIG, ESQ.
                           Parsippany Corporate Center
                           Four Century Drive
                           Parsippany, NJ  07054

For the Equity             Kramer Levin Naftalis & Frankel
Committee:                 By:  DAVID E. BLABEY, JR., ESQ.
                           919 Third Avenue
                           New York, NY  10022

For The Hartford:          Wilmer Cutler Pickering Hale & Dorr,
                            LLP
                           By:  NANCY MANZER, ESQ.
                           1875 Pennsylvania Avenue, NW
                           Washington, D.C. 20006

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (CONT'D):

For Kaneb Pipe Line          Fulbright & Jaworski
Operating Partnership,        By:  STEVE PEIRCE, ESQ.
LP:                          300 Convent Street, Suite 2200
                             San Antonio, TX 78205-3792

                             Gilbert & Renton, LLC
                             By:  ROBERT GILBERT, ESQ.
                             344 North Main Street
                             Andover, MA 01810

For Travelers:               Simpson Thacher
                             By:  MARY BETH FORSHAW, ESQ.
                                  ELISA ALCABES, ESQ.
                             425 Lexington Avenue
                             New York, NY  10017

TELEPHONIC APPEARANCES:

For the Debtors:             Kirkland & Ellis, LLP
                             By:  JANET BAER, ESQ.
                                  DAVID M. BERNICK, ESQ.
                                  ELLI LEIBENSTEIN, ESQ.
                             200 East Randolph Drive
                             Chicago, IL  60601

For the Debtors:             Kirkland & Ellis, LLP
                             By:  THEODORE FREEDMAN, ESQ.
                                  CHRISTOPHER GRECO, ESQ.
                                  CLEMENT YEE, ESQ.
                             Citigroup Center, 153 East 53rd St.
                             New York, NY  10022

For the Debtors:             Pachulski, Stang, Ziehl &Jones
                             By:  JAMES O'NEILL, ESQ.
                             919 North Market Street
                             17th Floor
                             Wilmington, DE  19899-8705

For AXA Belgium:             Tucker Arensberg, P.C.
                             By:  MICHAEL A. SHINER, ESQ.
                             1500 One PPG Place
                             Pittsburgh, PA  15222

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Various Claimant          Stutzman, Bromberg, Esserman & Plifka
Firms:                        By:  DAVID J. PARSONS, ESQ.
                              2323 Bryan Street
                              Suite 2200
                              Dallas, TX  75201

For State of Montana          Womble Carlyle Sandridge & Rice
Dept. of Environmental        By:  FRANCIS MONACO, ESQ.
Quality:                      222 Delaware Avenue, Suite 1501
                              Wilmington, DE 19801

For Morgan Stanley            Katten Muchin Roseenman, LLP
Senior Funding, Inc.:         By:  JEFF FRIEDMAN, ESQ.
                                   MERRITT PARDINI, ESQ.
                              575 Madison Avenue
                              New York, NY  10022-2585

                              Edwards Angell Palmer Dodge, LLP
                              By:  ROBERT CRAIG MARTIN, ESQ.
                              919 N Market St.
                              Wilmington, DE 19801-3023

For Travelers Casualty        Morris Nichols Arsht & Tunnell, LLP
& Surety Company:             By:  ERIN FAYE, ESQ.
                              1201 North Market Street
                              PO Box 1347
                              Wilmington, DE 19801

For Federal Insurance         Cozen O'Connor
Company:                      By:  JACOB C. COHN, ESQ.
                              1900 Market Street
                              Philadelphia, PA  19103

For Serengeti:                Vinson & Elkins, LLP
                              By:  ARI BERMAN, ESQ.
                              Trammell Crow Center
                              2001 Ross Avenue, Suite 3700
                              Dallas, TX  75201

For Scott Company:            Vorys, Sater, Seymour & Pease, LLP
                              By:  TIFFANY COBB, ESQ.
                              52 East Gay Street
                              Columbus, OH  43216

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            LECG
                            By:  ELIZABETH DEVINE, ESQ.
                            1725 Eye Street NW, Ste 800
                            Washington, DC,  20006

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                               JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Bank Lenders:       Paul Weiss Rifkind Wharton &
                              Garrison, LLP
                            By:  MARGARET PHILLIPS, ESQ.
                               REBECCA ZUBATY, ESQ.
                               ANDREW N. ROSENBERG, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019

For the Bank Lenders:       Crowell & Moring LLP
                            By:  TACIE YOON, ESQ.
                            1001 Pennsylvania Avenue, N.W.
                            Washington, DC  20004

For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  ROBERT GUTTMANN, ESQ.
                                    MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022


For the Future                 Orrick, Herrington & Sutcliffe,
Claimants                        LLP
Representatives:               By:  DEBRA FELDER, ESQ.
                                    JOSHUA CUTLER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007


For Federal Insurance          Cozen O'Connor
Company:                       By:  ILAN ROSENBERG, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103


For Allstate Insurance:        Cuyler Burk, LLP
                               By:  STEFANO CALOGERO, ESQ.
                                    ANDREW K. CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054


For Official Committee         Anderson Kill & Olick
of Asbestos Personal           By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:              1251 Avenue of the Americas
                               New York, NY  10020-1186


For Grace Certain              Montgomery, McCracken, Walker &
Cancer Claimants:                Rhoads, LLP
                               By:  NATALIE D. RAMSEY, ESQ.
                               300 Delaware Avenue, Ste. 750
                               Wilmington, DE  19801


For Pentwater Capital          Pentwater Capital Management
Management:                    By:  JORDAN FISHER


For David T. Austern,          Phillips, Goldman & Spence, P.A.
the Future Claimants'          By:  JOHN C. PHILLIPS, ESQ.
Representative:                1200 North Broom Street
                               Wilmington, DE  19806


                               By:  DAVID T. AUSTERN



**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:        By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser
& Gleser:                   By:  SHAYNE SPENCER, ESQ.
                                 ELIZABETH DeCRISTAFARO, ESQ.
                            Wall Street Plaza
                            New York, NY  10005

For Official Committee      Duane Morris, LLP
of Unsecured Creditors:     By:  MICHAEL LASTOWSKI, ESQ.
                            1100 North Market Street, Suite 1200
                            Wilmington, DE  19801-1246

For Official Committee      Brandi Law Firm
of Asbestos Property        By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                TERENCE D. EDWARDS, ESQ.
                            44 Montgomery St., Suite 1050
                            San Francisco, CA  94104

                            Lieff, Cabraser, Heimann & Bernstein
                            By:  ELIZABETH J. CABRASER, ESQ.
                            Embarcadero Center West
                            275 Battery Street, Suite 3000
                            San Francisco, CA  94111

                            Riker, Danzig, Scherer, Hyland &
                             Perretti, LLP
                            By:  TARA MONDELLI, ESQ.
                                 CURTIS PLAZA, ESQ.
                            Headquarters Plaza
                            One Speedwell Avenue
                            Morristown, NJ  07962

For the Libby Claimants:    Cohn, Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For the Libby Claimants:    Landis, Rath & Cobb, LLP
                            By:  KERRI K. MUMFORD, ESQ.
                                 JAMES S. GREEN, JR., ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Bloomberg, LLP:          Bloomberg, LLP
                             By:  STEVEN H. CHURCH

For the Bank Lenders:        Landis, Rath & Cobb, LLP
                             By:  RICHARD COBB, ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899

For Everest                  Crowell & Moring LLP
Reinsurance Co.:             By:  LESLIE A. DAVIS, ESQ.
                                  MARK PLEVIN, ESQ.
                             1001 Pennsylvania Avenue, N.W.
                             Washington, DC  20004

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                                  MARION FAIREY, ESQ.
                                  ALAN RUNYAN, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Garlock Sealing          Morris James, LLP
Technologies:                By:  BRETT FALLON, ESQ.
                             500 Delaware Avenue
                             Suite 1500
                             Wilmington, DE  19801

For Hound Partners:          BRIAN M. GOOTZEIT, ESQ.

For Everest Reinsurance      Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:             By:  BRIAN L. KASPRZAK, ESQ.
                                  JOHN D. MATTEY, ESQ.
                             913 North Market Street
                             Suite 800
                             Wilmington, DE  19801

For Murray Capital           Murray Capital Management, Inc.
Management                   By:  MARTI MURRAY

For Normandy Hill            Normandy Hill Capital, LLP
Capital, LLP:                By:  MATTHEW CANTOR

For Anderson Memorial        Kozyak, Tropin & Throckmorton, PA
Hospital:                    By:  JOHN W. KOZYAK, ESQ.
                                  DAVID L. ROSENDORF, ESQ.
                             2525 Ponce de Leon, 9th Floor
                             Miami, Florida 33134


                    **J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For ZAI Claimants            Hogan Firm Attorneys at Law
& various law firms:         By:  DANIEL K. HOGAN, ESQ.
                             1311 Delaware Avenue
                             Wilmington, DE  19801


For the U.S. Trustee:        Office of the U.S. Trustee
                             By:  DAVID KLAUDER, ESQ.
                             844 King Street, Suite 2313
                             Wilmington, DE  19801


For Arrowwood                Bifferato Gentilotti LLC
Indemnity Co.:               By:  GARVAN McDANIEL, ESQ.
                             800 North King Street
                             Wilmington, DE  19801


For AXA Belgium:             Mendes & Mount
                             By:  ANNA NEWSOM, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019


For Royal Insurance:         Wilson Elser Moskowitz Edelman
                               & Dicker, LLP
                             By:  CARL PERNICONE, ESQ.
                             150 East 42nd Street
                             New York, NY  10017


For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property           Brickman, P.C.
Claimants:                   By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401


For Dow Jones                Dow Jones News Wires
News Wires:                  By:  PEG BRICKLEY


**J&J COURT TRANSCRIBERS, INC.**

# I N D E X

| | PAGE |
|---|---|
| **WITNESSES** | |
| ALAN WHITEHOUSE | |
|   Direct Examination by Mr. Heberling | 49 |
|   Cross Examination by Mr. Bernick | 81 |
|   Cross Examination by Mr. Finch | 139 |
|   Redirect Examination by Mr. Heberling | 162 |
|   Recross Examination by Mr. Finch | 173 |
| | |
| DOCTOR DAVID WEILL | |
|   Direct Examination by Mr. Bernick | |
|   Cross Examination by Mr. Lacey | 210 |
|   Redirect Examination by Mr. Bernick | 237 |
|   Recross Examination by Mr. Lacey | 237 |
| | |
| DOCTOR SURESH MOOLGAVKAR | |
|   Direct Examination by Mr. Harding | 239 |
|   Cross Examination by Mr. Heberling | 248 |
| | |
| JEFFREY POSNER | |
|   Direct by Mr. Horkovich | 264 |
|   Cross by Ms. Forshaw | 292 |
|   Cross by Mr. Plevin | 306 |
|   Cross by Mr. Brown | 309 |
|   Cross Examination by Mr. Wisler | 319 |
|   Cross by Mr. Phillips | 322 |
|   Cross by Mr. Kovacich | 335 |
|   Redirect Examination by Mr. Horkovich | 345 |

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| 16A   Chart | --- | 64 |
| Plan Proponents' 502-2, 502-3, 502-1, | | |
|   502-10A, B, C, D, 502-12, 13, 14, 15 | | |
|   Demonstrative exhibits* | --- | 208 |
| Plan Proponents' 600A | | |
|   Demonstrative exhibit* | 141 | 174 |
| OS-1 Revised to OS-7 Revised | --- | 316 |
| Plan Proponents' Exhibit 700 Pre-petition | | |
|   Insurance Settlements | 282 | 291 |
| Plan Proponents' Exhibit 701 Reimbursement | | |
|   Agreements | 283 | 291 |
| Travelers' Exhibit 1 - 1992 Agreement | --- | 304 |
| Travelers' Exhibit 5 - Settlement Agreement | 293 | 296 |
| Travelers' Exhibit 7 - Letter | --- | 298 |
| Travelers' Exhibit 8 - Letter | --- | 301 |
| 831 Deposition Designations | --- | 335 |

*Admitted subject to relevance determination by the Court

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  This is the matter of W.R. Grace,

2   bankruptcy number 011139.  This is the time set for argument on

3   the motion to compel discovery and also there was a motion to

4   strike the discovery requests.

5          I have parties listed by phone but I'm not really

6   sure if they're for this proceeding or for, oh, I see, I'm

7   sorry, I do.

8          Kerri Mumford apparently is on the phone for this

9   8:30 proceeding and then the rest of the list I have is for

10  9:00.

11         So why don't I just get entries of the people who are

12  going to be participating in the 8:30 hearing now and then

13  we'll deal with the 9:00 matters later.

14         MS. ESAYIAN:  Good morning, Your Honor.  Lisa Esayian

15  for W.R. Grace.

16         MR. FINCH:  Nathan Finch for the ACC, Your Honor.

17         THE COURT:  Mr. Guy, your speaker's not on.

18         MR. GUY:  Jonathan Guy for the Asbestos PIFCO.

19         MR. KOVACICH:  Mark Kovacich for the Libby claimants.

20         MR. LEWIS:  Tom Lewis for the Libby claimants.

21         MR. COHN:  Dan Cohn for the Libby claimants.

22         MR. SCHIAVONI:  Your Honor, Tancred Schiavoni and

23  Carl Pernicone for Arrowwood and I'm glad to tell you we've

24  resolved the Arrowwood motion.  At the appropriate time I'll

25  just come up and tell you how we've resolved it.

1          THE COURT:  All right.  Thank you.

2          MR. LEWIS:  And for the Libby claimants that's

3  correct, Your Honor.

4          THE COURT:  All right.

5          MR. WISLER:  Good morning, Your Honor.  Jeffrey

6  Wisler here for Maryland Casualty for these motions and for

7  Maryland Casualty and Zurich for the rest of the hearing.

8          THE COURT:  All right.

9          MS. DeCRISTOFARO:  Good morning, Your Honor.

10  Elizabeth DeCristofaro for Continental Casualty Company.  We

11  filed a joinder to the Arrowwood motion and we will be joining

12  the resolution.

13          THE COURT:  All right.

14          MR. PHILLIPS:  Good morning, Your Honor.  Bob

15  Phillips here for Burlington Northern Santa Fe Railway.

16          THE COURT:  Okay.  Why don't we start with the

17  Arrowwood issue if it's been settled, Mr. Schiavoni.

18          MR. SCHIAVONI:  Judge, Your Honor, let me just we've

19  reached a stipulation with the Libby claimants.  There's only

20  three paragraphs.  Let me just read it to you and then I think

21  we'll submit the stipulation.

22          THE COURT:  All right.

23          MR. SCHIAVONI:  We've agreed that the Libby claimants

24  may only offer the deposition designations that they have filed

25  for the 21 witnesses deposed outside of this bankruptcy against

**J&J COURT TRANSCRIBERS, INC.**

1 the plan proponents in support of the Libby Claimant's

2 discrimination objections and shall not offer those deposition

3 designations against Arrowwood, Maryland Casualty or CNA for

4 any purpose.

5          Second the Libby claimants are going to withdraw for

6 all purposes those deposition designations that contain

7 testimony where one of the 21 non-bankruptcy deponents purport

8 to describe what his or her doctors said or diagnosed.  When

9 they get time they're going to look at the transcripts over the

10 weekend or next week and deal with that.

11          And then third Arrowwood is withdrawing its motion to

12 strike and the joinders will be withdrawn upon execution of the

13 stipulation which is now and we will then submit the

14 stipulation to Your Honor.

15          THE COURT:  All right.

16          MR. SCHIAVONI:  Thank you, Your Honor.

17          THE COURT:  Anyone disagree that that's the

18 stipulation?

19          MR. LEWIS:  No, Your Honor.  That reflects our

20 agreement.

21          THE COURT:  And you're going to submit that

22 electronically or hand it up, Mr. Schiavoni?

23          MR. SCHIAVONI:  If we can hand it up at lunch we will

24 do so otherwise --

25          THE COURT:  That's fine.  All right.  Then with

1  respect to the motion to compel, is that the full resolution or

2  is there still something more to be said?

3          MR. KOVACICH:  No, Your Honor, the motion --

4          THE CLERK:  Your name please?

5          MR. KOVACICH:  Mark Kovacich for the Libby claimants.

6  The motion to compel concerns a different subject matter.

7          Several months ago the Libby claimants served

8  discovery requests on two of the insurers in this case, CNA and

9  Maryland Casualty, requesting among other things copies of any

10 communications relating to insurance coverage for the asbestos

11 injury claims against Grace arising in Libby.

12         At the same time the BNSF Railway Company served

13 discovery on the plan proponents including W.R. Grace similarly

14 requesting communications relating to insurance coverage under

15 those same policies.

16         During a deposition in May, the deposition of Jeff

17 Posner, we learned that Mr. Posner had specifically demanded

18 coverage for claims arising in Libby under a number of policies

19 issued by both CNA and Maryland Casualty and we had not seen

20 that correspondence.

21         We made a request for the correspondence during the

22 deposition.  Grace took that request under advisement.

23         At that same time the parties were discussing a

24 protective order dealing with insurance and there was along the

25 line discussions about that and it was unclear how those things

J&J COURT TRANSCRIBERS, INC.

1  were going to be dealt with.

2          My partner Tom Lewis and co-counsel Dan Cohn

3  subsequently had additional conversations with representatives

4  of the debtors about coverage correspondence.  Ultimately we

5  were unsuccessful in reaching an agreement that any of that

6  would be provided.  And so we filed this motion to compel.

7          With respect to CNA and Maryland Casualty, we did not

8  make a request of them to provide the correspondence until

9  about two weeks ago or maybe ten days ago.  I certainly agree

10 it was fairly recently.

11         The correspondence was clearly requested though a

12 number of months ago and it should have been provided at that

13 time.

14         The thrust of the opposition from both the plan

15 proponents and these insurers is a criticism that this motion

16 is being brought at this late stage.  I would only note, Your

17 Honor, that we're dealing with motions and ongoing discovery

18 throughout this trial.  There is nothing unusual about this.

19         We certainly could have brought the motion earlier,

20 but we were hopeful in the months leading up to the trial that

21 we would have some success getting an agreement from Grace that

22 the correspondence would be produced as it was requested to be

23 produced.

24         With respect to the discoverability of the

25 correspondence, the issue here is not whether the

1 correspondence will be admissible in evidence, it is whether

2 this discovery might lead to the discovery of admissible

3 evidence.

4        We don't know what's in the correspondence other than

5 the fact that Mr. Posner demanded coverage specifically for the

6 claims that are being brought by our clients that may be

7 admissible for a number of reasons.

8        It appears that it will demonstrate that the plan

9 proponent's argument that Mr. Bernick supported the other day

10 with testimony from Mr. Hughes about the vermiculite

11 concentrate and Libby being a final product is inconsistent

12 with Grace's position prior to the bankruptcy that the claims

13 were covered by the premises coverage under these policies or

14 the demand for premises coverage was specific to CNA.

15        The coverage correspondence may also include

16 information about how Grace valued the claims.  I believe Mr.

17 Posner was instructed not to answer questions about numbers

18 that he perhaps had put on the values for the Libby claims at

19 that time and for those reasons we think it should be produced.

20        There are some complaints in the oppositions to the

21 motion that it would be burdensome at this point in time for

22 these parties to go find this correspondence.

23        We haven't asked that Grace or anybody else produce

24 all of its coverage correspondence.  We're talking about very

25 discreet issues here.  This is correspondence where Grace

1 specifically demanded coverage for the claims arising in Libby.

2          And I have to tell the Court I've never seen as

3 impressive an army of lawyers as I have witnessed in this

4 courtroom here this week.  I am quite confident that the people

5 we have seen handling this trial are fully capable of finding a

6 few letters from Mr. Posner demanding coverage and the

7 insurer's responses without a lot of hardship if in fact they

8 don't already have them somewhere readily available to them.

9          Thank you, Your Honor.

10          THE COURT:  Ms. Esayian.

11          MS. ESAYIAN:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MS. ESAYIAN:  I'd like to just talk briefly about the

14 merits of the materials that are being requested and then come

15 back to this question of the lateness of the requests.

16          I think there's some confusion that's been created by

17 the motion and the way the motion was framed as to what

18 insurance -- what these insurance policies are that this

19 correspondence relates to.

20          This is not a request for coverage correspondence

21 relating to any insurance policies that are issue in this

22 bankruptcy proceeding.  This is a request for coverage -- for

23 correspondence between Grace and the two insurers represented

24 here today, Maryland Casualty and CNA, for an entirely

25 different set of insurance policies that are called workers

                    **J&J COURT TRANSCRIBERS, INC.**

1   compensation and employers liability coverage.

2           They are not among the insurance policies that are

3   being transferred to the trust pursuant to this reorganization,

4   they are not at issue in this bankruptcy proceeding.

5           So the notion that somehow they were covered by some

6   kind of discovery request, you know, months ago that relate to

7   this bankruptcy proceeding is a very strange notion because

8   they're just not at issue at all.

9           Having said that, because they're not at issue

10  there's just no reason for this correspondence to have to be

11  produced at this late date in the course of this confirmation

12  proceeding.

13          The correspondence is not relevant to anything that

14  is going on in this confirmation proceeding.  It relates to a

15  different set of policies.  Doesn't matter whether Grace

16  tendered or didn't tender.  Has nothing to do with premises

17  liability coverage that Mr. Kovacich is suggesting.  Completely

18  different set of issues.

19          And leaving aside the fact that it should have been

20  requested a long time ago, absolutely no relevance of it to the

21  present proceedings.

22          In addition to that this material goes way back to

23  the mid-1980's and then continuing forward from there until at

24  least the year 2000 when CNA filed a lawsuit disclaiming

25  coverage for these claims, and I'm sure CNA's counsel will

1  speak to that.

2          So what Grace did when it first received this motion
3  is we said, well, could we actually produce these materials
4  quickly in the course of this confirmation proceeding if we had
5  to?

6          We set out to look for the materials and it is
7  scattered all over the place among tons of different boxes and
8  we were able to find a small sample quickly which I attached to
9  our response to the motion to compel.

10          And anyone who looks at it can see that it doesn't
11 say anything juicy, it doesn't say anything about premises
12 coverage, doesn't say anything about any issue that's relevant
13 to these confirmation proceedings.

14          So now if we would have to comply with this request
15 in the course of these confirmation proceedings, we would have
16 to go out and search a whole bunch of files that are in storage
17 and do it very quickly and it would not be easy.  It is not as
18 if these materials are all in one place.

19          This of course is not unusual in complex litigation
20 and of course Grace can do it, but it's a very late request for
21 materials that are not relevant and it is not something we
22 should be forced to do during the course of this confirmation
23 proceeding.

24          Now I want to come back briefly to the lateness.  Mr.
25 Posner -- I defended Mr. Posner's deposition.  He was asked

1  about these materials in his deposition and then I heard

2  absolutely nothing until August 27th.

3         I don't know who the Libby claimant's counsel had

4  these conversations with where they say they talked with

5  debtor's counsel, but I have checked with all of my colleagues

6  and no one has any recollection of being asked for any of this

7  coverage correspondence period.

8         So Mr. Posner was deposed in early May and we don't

9  hear anything further about it until August 27th.

10        THE COURT:  Well was there a demand made for the

11 information during the deposition?

12        MS. ESAYIAN:  The material was requested.  We took it

13 under advisement and we heard nothing further.

14        THE COURT:  Well but if you take it under advisement,

15 isn't it your obligation to get back to them?  I mean they made

16 the request.  You have to then say it's either relevant or not

17 relevant or you're producing it.  I don't see why they have to

18 ask again.

19        MS. ESAYIAN:  Well --

20        THE COURT:  They made the demand.

21        MS. ESAYIAN:  -- well, Your Honor, that's a fair

22 point, but at the time that the request was made in the

23 deposition it was represented to us that the material had been

24 requested in discovery requests by the Libby claimants.

25        It was not, not to the debtors.  Maybe it was to

1   Maryland Casualty and CNA, but it was not to us.  We went back

2   after Mr. Posner's deposition, we looked at the discovery

3   requests from the Libby claimants to us, we looked at all of

4   them, there were a lot of different requests, and there was no

5   request for this material.

6         THE COURT:  All right.  So the debtor took it under

7   advisement to see if there was a request and in fact there was

8   no request?

9         MS. ESAYIAN:  That's correct.

10         THE COURT:  Look, if this is related to workers comp

11   claims, I don't have any understanding of what it's related to

12   this bankruptcy for anyway.  It's clearly not going to be

13   premises coverage if it's workers comp claims.

14         MR. KOVACICH:  May I respond to this, Your Honor?

15         THE COURT:  Yes, sir.

16         MR. KOVACICH:  First on the last issue that wasn't

17   requested.  Again with respect to the debtors it was requested

18   in discovery propounded by the BNSF Railway Company.

19         THE COURT:  But that's not Libby.  They don't have to

20   produce to Libby what somebody else asks them for.

21         MR. KOVACICH:  Well the practice is --

22         THE COURT:  And frankly I don't know how you have

23   standing to file a motion to compel a request by somebody else.

24         MR. KOVACICH:  -- the practice in this case, Your

25   Honor, has been for parties to join in and rely on discovery

1  propounded by other parties rather than asking the same request

2  over and over of the same party.

3          THE COURT:  Yes.

4          MR. KOVACICH:  And that was the case with respect to

5  the BNSF request for coverage communication.

6          THE COURT:  Okay.  And how would the debtor know?  I

7  mean was there something transmitted?  These requests aren't

8  filed so I don't have any way of tracking that information.

9          MR. KOVACICH:  Well the request was made during the

10 deposition and if the response was that we hadn't requested it,

11 that was never communicated to us.  If it had been then we

12 could have entered into a dialogue about the BNSF request and

13 the appropriateness of that.

14         THE COURT:  Okay.  But --

15         MR. KOVACICH:  We never heard back.

16         THE COURT:  -- if I understand Ms. Esayian -- I don't

17 have the portion of the -- maybe I do.  Maybe I just didn't

18 read the portion of the transcript where the request was made.

19         If I understood Ms. Esayian, it was based on the

20 representation that there had been a request and in fact there

21 hadn't.

22         MR. KOVACICH:  Your Honor, I believe if we look at

23 the transcript that there was actually a specific reference to

24 the discovery of the BNSF Railway Company --

25         THE COURT:  All right.

1          MR. KOVACICH:  -- in the deposition.  With respect to

2    the nature of the coverage, what Ms. Esayian represented is

3    partially correct, but it requires further explanation.

4          The workers compensation policies also had what's

5    called employers liability coverage on them, Part B of the

6    workers compensation policy.

7          And the demands for coverage were not, for coverage

8    of workers compensation claims, they were for coverage of the

9    employee tort claims that we've been talking about all week.

10          And I find it difficult to believe that in the

11    context of this bankruptcy that the 250 or so employee claims

12    that still exist at the conclusion of the bankruptcy that this

13    employers liability coverage, if it applies to those claims,

14    would not be affected by the bankruptcy.  It will be --

15          THE COURT:  She said their policies aren't being

16    transferred to the trust.  So if in fact the debtor's going to

17    retain that liability the debtor will retain it and, you know,

18    at some point you will have to deal with the debtor if in fact

19    there is no coverage.

20          But apparently there's also a lawsuit about the fact

21    that the insurer is denying any coverage.

22          MR. KOVACICH:  Well the claimants will have claims

23    only against the trust, they won't have the ability to pursue

24    these insurance policies which we argue cover the claims.

25          THE COURT:  To the extent that the insurance polices

1 are being transferred to the trust, that is clearly the case,

2 that the funds will go into the trust and the claims will go

3 against the trust.

4          To the extent that the insurance policies aren't

5 being transferred to the trust, there is nothing that prohibits

6 anybody from making a claim against those policies because the

7 policies aren't in the trust.

8          So the debtor still retains all of the rights and

9 responsibilities under those policies, but I don't know how an

10 employee has standing to make a claim in that fashion anyway,

11 it's the debtor's coverage.

12          So you'd have to sue the debtor and the debtor would

13 have the defense like they would any other place.  It might not

14 be a suit if it's workers comp.  I don't know the exact

15 parameters of how that would work.  But the demand at least

16 would be on the debtor.

17          MR. KOVACICH:  The coverage is not subject to

18 aggregate limits, we don't believe, like all of the other

19 coverage and therefore these claims should be treated

20 differently than the other claims which are not -- should not

21 get the benefit of the type of coverage that was available for

22 these claims.

23          The other issue here, Your Honor, Mr. Posner did

24 testify that he made a demand for premises coverage under the

25 CNA policies that were in effect between 1973 and 1985 for the

1  non-employee claims in Libby.

2          So this motion is not related only to the

3  correspondence on the Part B employers liability policies.  It

4  does also involve a demand for coverage, for premises coverage

5  from CNA.

6          THE COURT:  And who made that discovery request and

7  when of the debtor?

8          MR. KOVACICH:  It would be covered by the same

9  discovery request asking for communications relating to

10  coverage under these policies.

11          THE COURT:  During the deposition without any formal

12  request earlier.

13          MR. KOVACICH:  Well the BNSF discovery request covers

14  this correspondence and during the deposition we made a request

15  for that information after Mr. Posner testified that it exists

16  and we referenced not only our discovery request but also those

17  of the BNSF.

18          They took that request under advisement and we didn't

19  get a formal response from them.  Again Mr. Cohn and Mr. Lewis

20  did have some conversations.  If it's important who they talked

21  to I'm sure they are willing to share that with us.

22          In any event those conversations didn't get anywhere

23  and therefore we filed this motion.

24          THE COURT:  Okay.  Well, yes, I think apparently the

25  debtor somehow or other isn't aware of conversation so maybe

1 you need to talk to the debtor's counsel about who the

2 conversations were with because that piece seems to be missing

3 from the debtor.

4      My concern about it is you have to, in order to

5 comply with local rule, try to resolve this.  Surely you had to

6 talk to somebody in an effort to try to resolve it.

7      But I don't see how Libby has standing to move to

8 compel a discovery request that's made by another party.  I

9 mean if BNSF is satisfied with the responses or non-response

10 and Libby's joined in that request, then I don't think you get

11 any more than BNSF gets.

12      MR. KOVACICH:  Well if counsel for BNSF is here this

13 morning, Your Honor, I think that perhaps they're not satisfied

14 that --

15      THE COURT:  But they haven't filed this motion or

16 joined in it.  So to the extent that it's workers comp policies

17 and the policies are not being transferred to the trust, it's

18 not an issue that's involved in this case and I think you need

19 those requests somewhere else at some other time, not during

20 the middle of trial.

21      To the extent that it is related somehow to premises

22 coverage policies that may be transferred to the trust, then it

23 seems to me that on your theory which is that the Libby

24 claimants should have access to those policies because in, as I

25 understand your theory, nobody else will, the employees that

1 is, nobody else will because they were premises issues.

2           I think it's a reasonable demand.  But you can't make

3 these demands three days or four days before trial.  There's a

4 discovery cutoff and there's a reason for a discovery cutoff

5 and I expect all counsel to comply with it.

6           I didn't get any of these motions within that cutoff

7 period.  So, you know, it's too little too late all the time

8 and it's not as though this is the first issue where this has

9 come up on the eve of trial where demands are being made.

10           I have a schedule in place for a reason.  Ms.

11 Esayian, I don't understand quite why the debtor, if it's

12 premises coverage issues, doesn't already have that information

13 available because those policies are being transferred to the

14 trust.  So I don't know why that can't be produced.

15           MS. ESAYIAN:  Your Honor, frankly that's news to me

16 that that's part of the request.  And if that's part of the

17 request we can discuss it with them and if we can find the

18 materials in a reasonable fashion we can produce them.

19           I can't guarantee that they can be produced

20 immediately or even during the course of this confirmation

21 proceeding.

22           But the questions that were directed to Mr. Posner

23 and are the subject of the motion relate to the workers

24 compensation and employers liability coverage.

25           So if now it's also a separate request for the

1  premises liability correspondence, I understand the notion that

2  that's relevant, but it's a different request.

3          And I want to if Your Honor wouldn't mind I would

4  like to read for the record the BNSF discovery request that all

5  of this is being premised on.

6          THE COURT:  All right.

7          MS. ESAYIAN:  Because it is so broad and vague that I

8  would have no idea that all of this material is being

9  encompassed by this request.

10         The request was produce any documents related to any

11  of the insurance policies that should be produced in response

12  to document requests 1 through 8 above without limitation, any

13  certificates of insurance, letters, endorsements,

14  communications, settlement agreements, records of settlement

15  payments, and/or copies of cancelled checks relating to

16  payments made on such policies.

17         I don't know how I am supposed to deduce from that a

18  specific request for correspondence related to policies not at

19  issue in this case and premises liability coverage.  That's the

20  problem with such a broad, vague, general request and that's

21  the reason why we objected to it.

22         MR. KOVACICH:  The specific request, Your Honor, was

23  made during the deposition and I've got the transcript here.

24  Mr. Posner very clearly testified that he demanded coverage for

25  the non-employee claims in Libby under the CNA premises

1  coverage.  So the request was for that in addition to the --

2          THE COURT:  Well tell me -- read me the language with

3  respect to the request and how it ties in to the BNSF issue.

4          MR. KOVACICH:  From the discovery request?

5          THE COURT:  Well, no, from whatever it is that Libby

6  is basing the fact that you made a request on.  I thought you

7  said it was during the deposition.

8          MR. KOVACICH:  I'm sorry, Your Honor.  Do you want

9  Mr. Posner's testimony or my request of Ms. Esayian?

10         THE COURT:  I guess I want both so that I understand

11  what the request is.

12         MR. KOVACICH:  The portion of the transcript I have

13  here, my request was, counsel, I don't believe that any of

14  those policies or that correspondence has been produced and

15  once again for the record we've been prejudiced by that lack of

16  production and all of those materials are within the scope of

17  discovery propounded in this proceeding.

18         Ms. Esayian states in response, for the record I'll

19  take your request under advisement, but each time that you make

20  these requests for the record we dispute that all of these

21  materials are within the scope of the discovery request that

22  remains to be seen.

23         And it was in the context of a series of questions

24  about his demands for coverage under the employers liability

25  coverage and also the premises coverage for the non-employee

1  claims.

2         THE COURT:  Well that's what I'm trying to get to

3  with respect to what it is because it seems to me that the

4  workers comp claims are not relevant to this proceeding and

5  there's no need to produce irrelevant information.

6         They're not being transferred to the trust.  They

7  simply have no bearing in this case and there's no need for

8  that information now.

9         If you've got the right to it in some other

10 proceeding and some other context you can pursue it, but it's

11 not going to lead to relevant information here if they're not

12 being transferred to the trust.

13        MR. KOVACICH:  Okay.  I guess I don't understand the

14 or have a list or knowledge of which policies are being

15 transferred to the trust, but I would find it hard to believe

16 that the trust would not be able to make a demand for that

17 coverage if it covers claims that are being transferred to the

18 trust.

19        THE COURT:  The list of policies being transferred

20 hasn't been filed yet?

21        MR. KOVACICH:  I'm sure it has, Your Honor.  I don't

22 know whether or not those policies are listed.  If she says

23 they're not, I'm sure they're not.

24        MS. ESAYIAN:  They're not, Your Honor.  There's a

25 complete list of policies that are being transferred that's

1 attached to Exhibit 6 to the plan and these policies are not on

2 that list.

3          I might also point out that the definition of

4 asbestos personal injury claims in the plan is very clear that

5 it does not include workers compensation claims.

6          And if you trace through the definitions it's very

7 clear that the coverage for those claims would not be

8 transferred.

9          MR. KOVACICH:  These are not workers compensation

10 claims.  These are tort claims being brought by workers because

11 they're not subject to workers compensation exclusivity.

12          THE COURT:  Well --

13          MR. KOVACICH:  In any event the other --

14          THE COURT:  -- they wouldn't be covered by the

15 policies then would they?

16          MR. KOVACICH:  The --

17          THE COURT:  If they're not --

18          MR. KOVACICH:  -- Part B employers liability

19 coverage, it's our contention, applies to the claims brought by

20 these employees against Grace.

21          In other context we have succeeded in securing that

22 coverage for injured workers who have tort claims not subject

23 to exclusivity.  It's a form that every workers compensation

24 insurer in Montana uses and it's been -- it's had that

25 employers liability coverage on it for many years going back to

1  when Grace was operating in Libby.

2           The other language that I want to read here just to

3  make sure this is clear in the record.  I asked Mr. Posner at

4  some point subsequent to that settlement agreement, and this is

5  referencing a settlement with CNA, you demanded coverage on

6  behalf of Grace for claims, asbestos injury claims arising in

7  Libby, Montana, right?

8           And his answer, correct, for the non-employee claims

9  arising out of Libby, Montana.

10           And he made that demand under the premises coverage

11  which  is --

12           THE COURT:  What demand?

13           MR. KOVACICH:  -- very clearly being --

14           THE COURT:  I'm sorry.  What demand?

15           MR. KOVACICH:  Mr. Posner's demand --

16           THE COURT:  Oh.

17           MR. KOVACICH:  -- for CNA to cover --

18           THE COURT:  Okay.

19           MR. KOVACICH:  -- the claims of my clients who are

20  not employees under the premises coverage that very clearly is

21  being transferred to the trust.

22           THE COURT:  Okay.  I, well, this is just simply too

23  little, too late in my view.  If you need this information you

24  need to get it within the discovery period.

25           As to the workers comp claims, if the policies are

1 not being transferred there is no issue here.  So to the extent

2 that Libby has some right to access it, it's not being

3 transferred to the trust, I think I need to find out whether or

4 not there is some contention that any activity against those

5 policies is going to be barred.  Because if it is, there may be

6 a structural issue with this plan if it's not being transferred

7 and any claims against it are being barred.  That I don't know.

8 I need to hear about that.

9        With respect to the premises coverage, if the debtor

10 is transferring premises policies to the trust, the debtor

11 ought to have that information available anyway and in fact you

12 should have it.  The list is already filed of record so you

13 should already have that information.

14        MR. KOVACICH:  The policy, but not Mr. Posner's

15 written demands for coverage under that policy for the claims

16 of my clients.

17        THE COURT:  Okay.  Why do you need Mr. Posner's

18 demands?  What relevance does Mr. Posner's demand have?

19        MR. KOVACICH:  Well again it's going to reflect what

20 Grace's position was on this coverage which is clearly

21 inconsistent with Mr. Bernick's, the direct testimony of Jay

22 Hughes where he illustrated that the vermiculite concentrate in

23 Libby was a final product.

24        And we don't know what's in the demand.  It may,

25 again, it may have information about how Grace valued these

1   claims.

2            THE COURT:  So the contention is that the employees

3   in Libby can somehow or other bifurcate their claim to exposure

4   to vermiculite as opposed to exposure to some other portion of

5   the mined asbestos or milled asbestos.

6            MR. KOVACICH:  Well the --

7            THE COURT:  That's the issue.

8            MR. KOVACICH:  -- the employee claims are separate.

9   With respect to the employee claims we were talking about the

10  employers liability coverage --

11           THE COURT:  Okay.

12           MR. KOVACICH:  -- on the comp policies.

13           THE COURT:  All right.

14           MR. KOVACICH:  The demand for premises coverage was

15  for the non-employee claims and it was based on Grace's theory,

16  consistent with ours, that these exposures were not to final

17  products.  They were not subject to the aggregate limits on the

18  policy for products completed operations and therefore every

19  one of these claims would be fully covered subject to the

20  limits of the policy.

21           THE COURT:  Okay.  I see.  So the debtor's contention

22  that vermiculite is a product that it bagged and sold you're

23  saying is now inconsistent with the fact that the actual end

24  product was not what came out of the mill but what was then

25  sold and transmitted to somebody else for further processing?

1          MR. KOVACICH:  Right.  And there's other issues.  A

2 lot of these exposures were from miners bringing dust home to

3 their families.  That's not a final product.

4          There was mine waste throughout Libby.  That's not a

5 final product.

6          THE COURT:  That's not any product is it?

7          MR. KOVACICH:  And the vermiculite concentrate -- the

8 vermiculite concentrate was not a final product because the

9 purpose of it was to ultimately be expanded and incorporated

10 into products that were sold.

11          THE COURT:  But it's a final product for the debtor,

12 it's what the debtor sold.

13          MR. KOVACICH:  Most of the vermiculite concentrate

14 the debtor did not sell.  I can't tell the Court whether it

15 sold some vermiculite concentrate or not, but the majority of

16 that material was not sold by Grace until it was expanded and

17 incorporated into --

18          THE COURT:  Okay.

19          MR. KOVACICH:  -- insulation products and a variety

20 of other things.

21          THE COURT:  Okay.  In any event I think the premises

22 issue to the extent the policies are being transferred, that

23 information should be available because the debtor had to

24 search for those policies in order to figure out how to

25 transfer them.

1          So I don't know about the correspondence, I'll have

2    to find out.  I think that that is at least related to your

3    theory in the case.  I don't think the workers comps policies

4    are.

5          MR. KOVACICH:  Thank you, Your Honor.

6          THE COURT:  Ms. DeCristofaro.

7          MS. DeCRISTOFARO:  Your Honor, only as Mr. Kovacich

8    already mentioned, we did not receive this request until August

9    27th.

10         Certainly as Your Honor can imagine there is not --

11   first of all it wasn't our witness.  We had no idea what Mr.

12   Posner had in mind or what he was referencing.

13         And the other aspect is as Your Honor said, the

14   workers comp policies here are not at issue.

15         With respect to any claim for coverage under policies

16   being transferred to the trust the disclosure statement already

17   states that my client filed a declaratory judgment action in

18   2000.  That declaratory judgment action seeks a declaration

19   that there is no coverage for among other things the Libby

20   claims under the policies.

21         Now any correspondence to the extent we even know

22   what that would mean to look for would not supercede the fact

23   that there's a pending DJ action that needs to be resolved.

24         Your Honor is not going to be addressing the subject

25   matter of that DJ action here, so that correspondence and all

1 of that is beyond the scope of our litigation here.

2       We do think it's untimely.  We think it's way too

3 vague and unspecified for even us to look for.  As Your Honor

4 may imagine the debtor attached some random correspondence they

5 got.  It's listed under some one person's name in 1988.  How

6 would we ever even look for that?

7       So the request is especially to be made at this very

8 late date for matters that are not before the Court, for

9 matters that are not going to be determined here, that have

10 been superceded by a declaratory judgment action, seeking no

11 coverage, does it matter what happened between -- to the extent

12 this could be found, what difference would it make what was

13 said in letters between Grace and us?

14       THE COURT:  Well the issue is that somehow or other,

15 I'm not sure how that would affect the valuation of a claim,

16 but nonetheless there is the assertion that some of this

17 correspondence may contain claim value information.  That

18 doesn't seem too likely, but maybe it's there.

19       MS. DeCRISTOFARO:  Your Honor, if there's been no

20 determination that there's any coverage, how could that have

21 any significance to Your Honor?  So at this phase we're beyond

22 --

23       THE COURT:  The theory that they're raising.

24       MS. DeCRISTOFARO:  I'm sorry, Your Honor.  I just

25 meant -- I just wanted to finish that we're beyond the point of

1  like looking for the next steps because in all fairness anybody

2  else, the debtor or us, might have if this had been brought up

3  earlier, need to produce counter materials or look for counter

4  materials or take counter discovery or go -- what they want now

5  is to say, okay, we need this right now, forget all the other

6  requirements.

7           But what about the rest of us who might want to

8  litigate or deal with that?  It's too late and it just seems so

9  tangential and to drag us into collateral matters, unfairly I

10 think, when it doesn't involve anything before the Court.

11          So for those reasons, Your Honor -- first of all we

12 think the motion is totally misdirected.  We couldn't even

13 begin to, you know, an insurance company can't look for 1988

14 correspondence with no definition.

15          And I think it's all pointless at this point.  We

16 have a declaratory judgment action that will determine whether

17 or not there is coverage for those things.

18          Until that's done there is no point of getting into

19 who said what to who about it.  Besides the fact it's a matter

20 of law.  And so --

21          THE COURT:  Well --

22          MS. DeCRISTOFARO:  -- so, Your Honor, for all those

23 reasons we think this motion is totally inappropriate and

24 totally unfair at this point.

25          THE COURT:  Mr. Wisler.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. WISLER:  Thank you, Your Honor.  I'll try not to

2  repeat what others have said.

3          Your Honor, this motion should be denied as to

4  Maryland Casualty if not completely.  And I think Your Honor

5  was going there.

6          Five months ago Maryland Casualty served objections

7  and responses to Libby's discovery requests.  We objected to

8  their specific requests as being overly broad and unduly

9  burdensome when we said here's the settlement agreements,

10  that's what we're producing.

11          It wasn't until August 27 that they said, oh, we

12  might want some more.  At that deposition four months ago Libby

13  counsel asked Grace to look into some documents.  They did not

14  ask Maryland Casualty for anything.

15          So the first time -- and, by the way, two and a half

16  months after the close of discovery, Your Honor's order, was

17  the first time that Libby came to us and said we want these

18  documents.

19          So it's just too late and as Your Honor said you put

20  those orders in place for a reason and we all have to comply

21  with them.  So that's number one on its own.

22          Number two, Your Honor, if you look at the order that

23  Libby is asking Your Honor to enter, that just demonstrates how

24  broad this is.  They want all communications regarding

25  insurance coverage.  That's enormous.

1            And as my colleagues who did the discovery work for

2    me for Maryland Casualty in this case tell me, that's going to

3    be a nightmare to find something like this and it will not take

4    the three days Libby wants this stuff produced in, it will take

5    weeks, in the middle of this trial.

6            Then they want insurance coverage regarding claims

7    which have been asserted by Libby claimants.  What are those?

8    Who are those?  There's hundreds of claims filed by Libby

9    claimants and hundreds of Libby claimants.  And, again, they

10   want all this in three days.

11           So, Your Honor, I think this motion needs to be

12   denied particularly as to Maryland Casualty.  If Your Honor

13   wants to deny it without prejudice to see if Libby can come up

14   with something more specific they want or something more

15   reasonable that they've asked us for, that's fine.

16           But as to Maryland Casualty, Your Honor, we please

17   ask you to deny this motion.

18           THE COURT:  Mr. Kovacich, anything else you want to

19   add?

20           MR. KOVACICH:  Your Honor, I think we've covered it.

21   The demand was more specific than Mr. -- the request and the

22   motion is more specific than what was just described.

23           We're asking for these demands that Mr. Posner

24   testified that he made.  It's very specific.

25           THE COURT:  Okay.  Well as to Mr. -- the demands,

**J&J COURT TRANSCRIBERS, INC.**

42

1  that demand in the deposition of a witness of the debtor

2  clearly doesn't affect the insurers.  And to the extent that

3  the request was made and there was an objection, I don't have

4  any motion to compel and it's too little, too late.

5          This discovery should have been done within the time

6  frame set by the Court and I'm not reopening discovery for that

7  purpose.

8          So as to the insurers, the demands are denied.  There

9  is no evidence that there was any proper demand on the

10 insurance company that remains open because there was no timely

11 motion to compel anything that was objected to by the insurers.

12 That's denied.

13         As to the premises issues for the debtor.  I'm still

14 not clear why the debtor has some difficulty getting those I

15 guess correspondence related to Libby if in fact the policy

16 issues have already been addressed by the debtor.

17         The policy's located -- I don't know how the debtor

18 keeps its documents, but isn't the relevant correspondence and

19 so forth kept in some fashion along with the policies?

20         MS. ESAYIAN:  Your Honor, the policies have already

21 been produced, they're on the --

22         THE COURT:  Yes.

23         MS. ESAYIAN:  -- as to the premises coverage.  They

24 are a part of the polices that are being transferred to the

25 trust.  They're on the list of policies attached to the plan

43

1  and the policies have been produced.

2          As to the correspondence it's a morass, it's in, you

3  know, boxes and boxes everywhere labeled Continental Casualty

4  and Maryland Casualty and it's not differentiated by premises

5  coverage or products coverage or employers liability coverage

6  or anything else.

7          Having said that, you know, of course W.R. Grace

8  could go into the boxes and find the correspondence.  But the

9  point is that still, same as the insurance companies, a request

10 was never made to us, not a written request.

11         And the request in Mr. Posner's deposition was made

12 on the representation that a written discovery request had been

13 made to us previously and it hadn't, not by the Libby claimants

14 and not by the BNSF claimants for these materials.

15         So the notion that we should have to go looking for

16 it now is the difficult part of this.  And in any event we went

17 and started to look, which is how I know that there is boxes

18 and boxes of material and it would be hard to find, and we

19 attached a few samples to our response to the motion to compel

20 and they don't say anything.  They don't say here's a claim and

21 here's what we think the claim value is and we're tendering it

22 under premises coverage or products coverage.

23         They just say a claim came in, we're tendering it to

24 CNA, would you please pay it.  Period.

25         THE COURT:  All right.  And the deposition doesn't

1  ask Mr. Posner whether in the course of making these demands
2  there was some valuation added to the correspondence.  It
3  doesn't involve any details that are being sought now?

4         MS. ESAYIAN:  That's correct.  There's no details of
5  that type regarding the correspondence.

6         MR. KOVACICH:  Can I respond to that, your Honor.
7  First of all there was a request and I referenced the BNSF
8  discovery which we relied on during the deposition.

9         Secondly, I don't think I asked Mr. Posner if he put
10 values in his letter.  But I did ask him if he had valued the
11 Libby claims prior to the bankruptcy and counsel instructed him
12 not to answer those questions.

13        MS. ESAYIAN:  May I respond briefly, Your Honor?

14        THE COURT:  Mm-mm.

15        MS. ESAYIAN:  That line of questioning had nothing to
16 do with the coverage correspondence between Grace and CNA.
17 That had to do with settlement negotiations between Grace and
18 CNA and Mr. Posner was asked whether in the course of those
19 settlement negotiations he had come up with some overall
20 general dollar value lump sum amount that Grace might accept
21 from CNA in settlement of all of these Libby claims.

22        That is what we objected to as privileged in terms of
23 settlement communications.

24        THE COURT:  All right.  Okay.

25        MS. DeCRISTOFARO:  Your Honor, if I may?

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Yes.

2           MS. DeCRISTOFARO:  And just for the record, to the

3 extent it expressly referenced settlement, we did object that

4 that was an improper question.

5           THE COURT:  It is an improper question to the extent

6 that it involves settlement and the documents themselves would

7 not be discoverable nor would they likely lead to discoverable

8 evidence because there was no settlement.  CNA is still denying

9 coverage.

10          So under those circumstances it seems to me that the

11 declaratory judgment action is the place where if there is

12 going to be discovery of the CNA correspondence that it should

13 be brought assuming, and I'm not deciding, but assuming that

14 the Libby claimants have any standing in that proceeding at

15 all.

16          For purposes of this, I don't think the demand is

17 specific enough.  I don't think it is calculated to lead to the

18 discoverable evidence because there is a denial of coverage and

19 at this point in time it's not certain whether there will or

20 won't be.

21          To the extent that there is nothing on the record

22 that indicates that the correspondence itself will do anything

23 other than tender a request for a particular coverage,

24 apparently under the workers comp policy, even to the extent

25 that it covers the premises liability, you've got the policies

1 and the policies themselves surely must be the best evidence in

2 that respect.

3          Mr. Posner is going to be a witness, is he not?

4          MS. ESAYIAN:  Yes, Your Honor.

5          THE COURT:  All right.  You can ask Mr. Posner the

6 questions that you didn't ask him before and if in fact there

7 is some basis in his testimony to substantiate that this

8 correspondence may lead to discoverable evidence after that,

9 then I'll reconsider.

10          But otherwise I don't see a basis for it.  I have no

11 base on this record to determine that a letter would say

12 anything more than give me the policies or provide the coverage

13 and nothing with respect to valuation so and it's late.

14          I am also not going to reopen discovery.  This is

15 late.  It should have been done on time.  If not shortly after

16 the deposition, then at least before the end of discovery and

17 not on the eve of trial.

18          So the motion's denied.  As to the debtor I'm denying

19 it without prejudice.  As to the insurers I'm denying it

20 because I don't see any base or any request on the insurers at

21 all.

22          I'll take an order from the debtor when you have a

23 chance to submit one to that effect.

24          MS. ESAYIAN:  Thank you, Your Honor.

25          THE COURT:  I'll take a few minutes recess so that

1 you can get set up.  We'll take a ten minute recess and then

2 we'll start with the evidence.

3                    (Recess)

4              COURT CLERK:  All rise.

5              THE COURT:  Please be seated.  This is the

6 continuation of the Phase II plan confirmation hearing in the

7 matter of W.R. Grace Bankruptcy Number 011139.  The participant

8 list by phone is David Austern, Scott Baena, Janet Baer, Ari

9 Berman, David Bernick, Davie Blabey, Thomas Brandi, Peg

10 Brickley, Elizabeth Cabraser, Stefano Calogero, Christopher

11 Candon, Matthew Cantor, Steven Church, Richard Cobb, Tiffany

12 Cobb, Jacob Cohn, Andrew Craig, Joshua Cutler, Leslie Davis,

13 Michael Davis, Elizabeth DeCristofaro, Elizabeth Devine, Martin

14 Dies, Terence Edwards, Marion Fairey, Brett Fallon, Erin Fay,

15 Debra Felder, Theodore Freedman, Jeff Friedman, Brian Gootzeit,

16 Christopher Greco, James Green, Robert Guttmann, Daniel Hogan,

17 Robert Horkovich, Brian Kasprzak, David Klauder, John Kozyak,

18 Matthew Kramer, Michael Lastowski, Elli Leibenstein, Robert

19 Craig Martin, John Mattey, Garvan McDaniel, Francis Monaco,

20 Tara Mondelli, Kerri Mumford, Marti Murray, Anna Newsom, James

21 O'Neill, Merritt Pardini, David Parsons, Steve Peirce, Carl

22 Pernicone, Margaret Phillips, John Phillips, Curtis Plaza, Mark

23 Plevin, Natalie Ramsey, Andrew Rosenberg, Ilan Rosenberg, David

24 Rosendorf, Alan Runyan, Jay Sakalo, Darrell Scott, Michael

25 Shiner, Marnie Simon, Daniel Speights, Shayne Spencer, Theodore

1 Tacconelli, Edward Westbrook, Clement Yee, Tacie Yoon, Rebecca

2 Zubaty, Jordan Fisher, and Brian Gootzeit.

3          Are there any changes in court of counsel that need

4 to be noted on the record?  Good morning.

5          MR. HEBERLING:  Good morning, Your Honor.

6          THE COURT:  People behind you, Mr. Heberling.  Good

7 morning.

8          MS. MANZER:  Sorry, Your Honor.  Nancy Manzer with

9 the law firm of Wilmer, Cutler, Pickering & Hale & Dorr, LLP on

10 behalf of certain Hartford Insurance Companies.

11          THE COURT:  Thank you.  Good morning.

12          MR. PEIRCE:  Good morning, Your Honor.  Steve Peirce

13 with Fulbright & Jaworski for Kaneb Pipe Line Operating

14 Partnership.

15          THE COURT:  Thank you.  Good morning.

16          MR. GILBERT:  Good morning, Your Honor, Robert

17 Gilbert, Gilbert & Renton also for Kaneb.

18          THE COURT:  Thank you.  Anyone else?  Okay, Mr.

19 Heberling.  Good morning doctor.  I just remind you, sir,

20 you're still under oath.  And are you ready to proceed?

21          MR. HEBERLING:  I am.

22          THE COURT:  Okay.  Mr. Heberling, when you're ready.

23          MR. HEBERLING:  Your Honor, in an attempt to limit

24 the time we'll just address two subjects.  There's a chart of

25 settled and non-settled cases, and then there'll be a limited

**J&J COURT TRANSCRIBERS, INC.**

1  rebuttal to the Weill report.

2         THE COURT:  All right.  Cathy, can you turn the

3  system on, please.

4  ALAN WHITEHOUSE PREVIOUSLY SWORN

5                      DIRECT EXAMINATION

6  BY MR. HEBERLING:

7  Q    Do you have Exhibit 16A in front of you?  It should be a

8  separate sheet we put on the --

9  A    This one here?

10 Q    Yes.  Are you familiar with that exhibit?

11 A    Yes, I am.

12 Q    Did you supply information for it?

13 A    Well, I supplied the information concerning their

14 pulmonary functions and the measurements and the chest x-rays,

15 but I did not provide any of the settlement amounts.

16 Q    Okay.  Please turn to Page 2.

17 A    Okay.

18 Q    Do you see a list of 18 people?

19 A    I do.

20 Q    At my request did you do chest x-ray measurements on those

21 people?

22 A    Yes, we did.  I did.

23 Q    And was that done in the same format as the spreadsheets

24 that we saw yesterday with regard to the CARD mortality study?

25 A    Yes they were.

                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    As to the 18 people, do you recognize any of the names?

2  A    I believe that I've actually seen everyone of them.  I

3  have.

4  Q    They are or have been your patients?

5  A    Yes.

6  Q    And the information regarding community, family member or

7  worker status, do you know that?

8  A    Let me review it quickly, but I'm pretty sure it's

9  correct.  It appears fine to me.

10 Q    And they're all still alive?

11 A    They're all still alive.  Yes.

12 Q    Okay.  Then with regard to pulmonary function data do you

13 have a book of the pulmonary function tests on each one?

14 A    I do.

15 Q    And has the data from the individual pulmonary function

16 test for the dates indicated been transferred to this Exhibit

17 16A?

18 A    I see it has been.  Yes.

19 Q    Then at the CARD clinic -- strike that.  First, what is

20 the best way to measure severity of asbestos lung disease?

21 A    Well, probably scientifically is the pulmonary function

22 studies although there's a lot more that goes into it in

23 addition.

24 Q    And the a lot more may include whether the person's on

25 oxygen and their personal limitations and so forth?

1  A    Right.  Their history of how much difficulty they're

2  having.  Actually everything goes into it just like it does to

3  make the diagnosis of asbestosis.  But the pulmonary functions

4  are the single most salient numerical number that you wind up

5  with.

6  Q    Then for forced vital capacity FVC, total lung capacity

7  TLC, and fusion capacity DLCO, what is the normal range for

8  numbers?

9  A    Well, all of those have been established by large groups

10 of people that have been studied.  And it's basically -- those

11 numbers are done for all age groups and various sexes, various

12 races so that you've got a wide variety.  And then for all --

13 each individual group you produce basically a bell shaped curve

14 and you consider two standard deviations to the norm is to be

15 within the normal range which as it turns out is plus or minus

16 80 percent.  And then below or above that are considered out of

17 the normal range although above that in some things like vital

18 capacity have no meaning whatsoever when they're above normal.

19 But --

20 Q    And at the CARD clinic, what levels of numbers do you use

21 for mild, moderate and severe?

22          MR. FINCH:  Objection.  Relevance?

23 A    Well, mild is somewhere between --

24          MR. FINCH:  Objection.  Relevance, Your Honor.

25          THE COURT:  The relevance?

1          MR. HEBERLING:  The purpose of the exhibit is to

2    compare people who are settled and nonsettled in terms of how

3    they're treated under the -- ultimately mechanically under the

4    TDP.  So we need to get these numbers onto the sheets and have

5    a characterization by Dr. Whitehouse based upon his -- the

6    standards he applies as to mild, moderate or severe.

7          THE COURT:  All right.

8          MR. FINCH:  I fail to see how that's relevant to the

9    TDP, Your Honor.

10          THE COURT:  I don't know either, but I'm going to

11    permit the testimony subject to figuring out whether it's

12    relevant later.

13   Q    Okay.  So what number ranges did you use for mild,

14    moderate and severe?

15   A    I considered basically under 80 percent as mild down to 70

16    percent or so.  There's some variability, a little bit about

17    it, but anything under 60 is very severe.  Anything in the 60

18    to 70 range is moderate -- is considered moderately severe.

19   Q    Okay.  And then it's just a matter of mechanically

20    applying the pulmonary function test numbers on the chart to

21    determine whether somebody's mild, moderate or severe?

22   A    Well, yes, but you have to look at all the numbers,

23    because they may be somewhat divergent.  So you have to put

24    them into perspective.

25   Q    Okay.  Then are you familiar with the TDP medical criteria

1  Level 4B?

2  A     Yes, I am.

3  Q     And did you apply those to these people?

4  A     Yes.

5  Q     Was that a mechanical operation?

6          MR. FINCH:  Objection.  Lack of foundation.

7          THE COURT:  Lack of foundation?

8          MR. HEBERLING:  Your Honor, he's testified he's

9  familiar with the criteria.  He's applying them mechanically to

10  these numbers.

11          THE COURT:  Oh, whether he is applying them

12  mechanically.  I'm sorry.  Would you restate the question?  I

13  think I misunderstood the question.

14  Q     As to the lung function test numbers, did you mechanically

15  apply the ranges set in the TDP medical criteria to the numbers

16  on the sheet?

17  A     Yes.

18  Q     Okay.  Then please refer to the TDP 4B column.

19  A     I see it.

20  Q     There are several entries which say, "No blunt," what does

21  that mean?

22  A     It means there was no blunting of the costophrenic angle

23  so that they were excluded because it was not considered to be

24  diffuse pleural --

25          MR. FINCH:  Objection to the --

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Mr. Finch, you need to turn your

2   microphone on.  You don't need to talk into it.  You just need

3   to --

4          MR. FINCH:  Objection.  Lack of --

5          THE COURT:  Stand up or sit down and then just turn

6   it on.  Okay.

7          MR. HEBERLING:  I'm not sure if the witness was able

8   to finish the answer.  Does that answer show completely on the

9   screen?

10         THE COURT:  I don't have a screen.  I don't know what

11  you're referring to.

12         MR. HEBERLING:  I'm sorry.

13         MR. FINCH:  I withdraw the objection, Your Honor.

14         THE COURT:  All right, would you repeat your answer,

15  doctor, so we make sure we have it.

16  A    Yes, I will.  I'll be happy to.  It says, "No blunting,"

17  or "No blunt."  But it means no blunting.  Refers to the fact

18  that there's no blunting of the costophrenic angle which means

19  that by the criteria they don't have diffused pleural

20  thickening.

21  Q    Okay.  Then also did you consider TDP Level -- okay.

22  Let's finish with column TDP 4B first.  Then I see on the -- in

23  that column a couple of entries, DQ FVC TLC.  What does that

24  mean?

25  A    It means they were disqualified because of the levels of

1  the FVC and the total lung capacity were higher than the limit

2  that was required -- the low limit that was required to meet

3  the criteria of the TDP.

4  Q    Then the top one says DQ MM EXT.  What does that mean?

5  Does that relate to the thickness and extent?

6  A    Yes, it does.  I'm trying to remember what MM means,

7  because I don't usually use that term.

8  Q    Could it be millimeters?

9  A    Well, I think it's -- you're right.  Thank you.  It's

10 millimeters and extent.  It refers to the extent of the chest

11 wall that's affected whether it's 20, ten, whatever the

12 percentage is.

13 Q    Then did you also for the next column make determinations

14 as to whether these people fall into Level 2 or Level 3?

15 A    Yes.

16          MR. FINCH:  Objection.  Lack of foundation to make a

17 determination as to what level of the trust would ultimately

18 compensate these people at.

19          MR. HEBERLING:  Again, Your Honor, we're talking

20 about the TDP medical criteria for Level 4B in the expedited

21 review process.  But there are no medical criteria elsewhere so

22 we just refer to it as medical criteria.

23          THE COURT:  Okay.  So what is the relevance to Level

24 2 or 3 then from a medical doctor?

25

1          MR. HEBERLING:  Well, he has applied the criteria

2    mechanically to make this determination.  That's not absolutely

3    necessary because anybody could do it.  But we've displayed it

4    here.  I'm not going to ask him about the numbers.

5          THE COURT:  I think Mr. Finch's objection is correct.

6    How to determine what the trust would actually compensate

7    somebody at a level is not a determination at this point that

8    this witness can make.  To the extent it's a mechanic

9    application then the documents will speak for themselves.

10         MR. HEBERLING:  And we are focusing simply on the

11   medical criteria for Level 4B in an expedited review not --

12         THE COURT:  But you've got Level 2 and 3.  That's not

13   Level 4B.

14         MR. HEBERLING:  Well, we're getting -- if they're out

15   of 4B under the medical criteria then they're into either Level

16   2 or Level 3 and we've applied mechanically again criteria to

17   get to that.  And again, all this testimony simply relates to

18   the expedited review process.  Nothing about the ultimate

19   determination.

20         MR. BERNICK:  Your Honor, it just really seems to me

21   that looking at this this is essentially an argument which is

22   that if they don't qualify this is what they might receive.

23   And that's not really an appropriate subject for a medical

24   expert at all.

25         THE COURT:  Well, and it's also not necessarily a

1  correct application of the TDP.

2          MR. BERNICK:  Right.

3          THE COURT:  Because the concept of -- I know I sound

4  like a broken record.  The concept that because there is not an

5  automatic qualification for the expedited review does not mean

6  that the folks with these conditions won't qualify for

7  individual review under that same level.  The objections are

8  sustained.

9  Q    Let's go to Page 1.

10          MR. HEBERLING:  Your Honor, there is one more point

11  that I think I should make on the last discussion.  And that is

12  that where a person gets into Level 2 or Level 3 under the TDP

13  medical criteria or expedited review they have a maximum cap on

14  what they can obtain regardless of whether they even go to jury

15  trial.  So that goes to our jury trial arguments as to people

16  being limited, the right to jury trial being impaired, and also

17  to our contention which I think it's -- which the Court may not

18  accept that the discrimination occurs at the TDP level that is

19  determined through expedited review process.  We believe that

20  is a discrimination and we understand if the Court is not

21  inclined to agree with that.

22          THE COURT:  No, so far --

23          MR. HEBERLING:  So I wanted to make that point.

24          THE COURT:  Okay.  So far with respect to the

25  discrimination argument within Level 4B so far.  The trial's

1  not done so I reserve the right to reserve my judgment.  But so

2  far I don't see that there is discriminatory impact.  But we're

3  a long way from being finished.  So at this point I don't know.

4  But I haven't seen it so far.  With respect to the concept that

5  there is a waiver of jury trial right there is no waiver of

6  jury trial right.  The individuals have the right to go to a

7  jury trial, there is a cap, because that's how the trusts work

8  to put a cap on the damages.  That does not affect the fact

9  that you are entitled to pursue the issues through jury trial.

10 There may be other triable issues.

11              I understand for Libby that generally speaking there

12 is no other mining manufacturing facility that is co-liable,

13 but certainly the Libby plaintiffs have tried in at least three

14 different efforts before this Court to assert that there is co-

15 liability by at least the BNSF, Maryland Casualty and the state

16 of Montana.  So there may be jury trials and there may be other

17 sources of recovery that are not against this enterprise.  And

18 so that argument doesn't hold water either.  The objection is

19 sustained.

20 Q    Let's go to Page 1.

21 A    I have it.

22 Q    Does this appear to be a list of settled cases?

23 A    Yes, it does.

24 Q    And are these listed individuals likewise all patients or

25 former patients?

1  A    Yes, they are.  They were.

2  Q    Just very briefly, did you obtain information as to those

3  who were dead from the CARD mortality study?

4  A    Well, that and my own charts.  I'd known they were dead.

5  Many of them I actually signed the death certificate.

6  Q    And did you perform chest x-ray measurements on some of

7  these in connection with your work related to the alive

8  patients?

9  A    Yes.

10         THE COURT:  Related to the what, I'm sorry?

11         MR. HEBERLING:  The alive patients on Page 2.

12         THE COURT:  Okay.  Thank you.

13  Q    And otherwise did you present the data in the same way

14  that we discussed -- did you present the data in the same way

15  that we discussed as to the page regarding nonsettled cases?

16  A    Yes.

17  Q    And just a couple of things to explain.  For Line 12 over

18  in the TDP 4B column you see DQ ratio?

19  A    Yes.

20  Q    So does that involve applying the limit of the FEV1 FEC

21  ratio to the force vital capacity number?

22  A    Yes, it does.

23  Q    And then there's one at Line 10 that says, "Pass?"  Did he

24  pass the pulmonary function requirements?

25  A    It would appear that he did on the basis of the FEC.

1 Q    Okay.  And do you have a chest x-ray measurement on him?

2 Were you able to --

3 A    We do.  I don't have it here on this sheet.

4 Q    Were you able to determine whether he was -- he passed or

5 not?

6 A    I'm trying to remember.  I think that was -- that may have

7 been the one we couldn't find the chest x-ray on.  It goes back

8 a long way.  I think that's why there's a question mark, yes.

9 Now I do recall that.

10 Q    Okay.

11       MR. HEBERLING:  Your Honor, we will offer this

12 exhibit as a summary of voluminous data.  And we offer it for

13 the purposes of simply establishing chest x-ray measurements

14 facts and pulmonary function facts on various patients.  And

15 the TDP medical criteria can be applied mechanically.  We offer

16 this in lieu of having Dr. Whitehouse testify as to the exact

17 entries for each line for each person.  We would hope to save

18 time by offering it in this way.  I realize it's -- well, I'll

19 leave it at that.

20       THE COURT:  All right.  Mr. Finch.

21       MR. FINCH:  Your Honor, I'll let the debtor speak for

22 itself, but the ACC would certainly object to the last four

23 columns of the -- of both charts.  The one entitled TDP 4B

24 passed, disqualified with reason, TDP level, TDP amount, and

25 settlement amount.  And I'll go in reverse order backward.  In

1  settlement amount there's been no foundation established that

2  Dr. Whitehouse knows what the settlements were other than

3  through hearsay.  He didn't settle the cases.  He wasn't Grace.

4  He isn't the witness to prove that.

5          For the TDP amount that is, as Mr. Inselbuch

6  testified, if you don't meet all the specific requirements of

7  category 4B nonetheless you can still receive a category 4B

8  settlement offer from the trust through the individual review

9  process or even through a jury trial.  There's no cap on the

10 jury rights other than the top end cap for nonmalignant cases

11 overall of 50,000 times eight if you have extraordinary

12 exposure.  And Dr. Whitehouse has absolutely no experience or

13 expertise or foundation to know what settlement offer a trust

14 would make to resolve any nonmalignant claim from Libby or

15 anywhere else in the world and therefore there's been no

16 foundation laid for the TDP amount column.

17         For the TDP level column that's the same issue.  If

18 you don't qualify on the expedited review for Level 4 it is

19 absolutely not the case that you could say oh, then you

20 automatically you -- well, then it's just mechanically that

21 you're Level 3 or Level 2 or someone else.  You go into

22 individual review.  If you say I have a severe pleural disease

23 the trust can value that case and anything up to, as Mr.

24 Inselbuch testified, the $50,000 settlement offer which could

25 be increased by the multiplier.  And so again this witness

1  doesn't have the foundation or the expertise to opine about

2  what TDP level someone would fall into and what offer they

3  would get from the trust.  How they'd be categorized by the

4  trust if they didn't meet the Schedule 4b -- Level 4B

5  requirements.

6         The column TDP 4B pass disqualified with reason, if

7  that column is made clear that all he has done is talking about

8  is the expedited review for Level 4B and it's not pass

9  disqualified, but do they meet -- because pass disqualified is

10  not an accurate description of what's going on in the TDP

11  process.  If it is -- do they meet the expedited review

12  criteria requirements for TDP 4B and his reason, then I

13  wouldn't have an objection to that column if the chart is so

14  amended.  But the last three columns on the chart there's been

15  -- there's no foundation laid that this witness could possibly

16  testify to that.

17         MR. HEBERLING:  Your Honor, I can cure these

18  problems.  I have written on the exhibit expedited review for

19  the -- all the TDP columns.  We prepared this back in Montana

20  before we knew that there would be a misunderstanding possibly

21  as to what that might mean.  The last column is established by

22  request for admission in the record, and that can be

23  disregarded by the Court on this particular exhibit though I

24  think we can cure the problems with the labeling of the

25  columns.

1            MR. FINCH:  He can cure the problem with respect to

2    the column TDP 4B pass disqualified with reason by calling it

3    --

4            MR. HEBERLING:   I wrote expedited review for all

5    three.

6            MR. FINCH:  But it's not for all three, Mr.

7    Heberling.  Excuse me.  Your Honor, it's not for all three.

8    That doesn't cure it for all three, because TDP level if you

9    don't qualify for Level 4B you don't go to Level 3 expedited

10   review.  If you believe you have a severe pleural disease you

11   go in to individual review.  That's why it's inherently

12   misleading and inaccurate and there's no foundation laid that

13   this witness can give an opinion that if someone doesn't meet

14   the expedited review criteria for Level 4B they will end up at

15   Level 3 or Level 2.  He has no expertise to do that.

16           THE COURT:  I agree.  I think I already sustained the

17   objection with respect to that.  So the column labeled TDP

18   level and the column labeled TDP amount that is obviously

19   associated with the level, are stricken.  The settlement

20   amount, there is absolutely no evidence before me with respect

21   to the settlement amount and I don't -- at this point so I

22   can't consider this settlement amount through this witness'

23   testimony.

24           With respect to the column 4B, I agree that the

25   pass/disqualified with reason is misleading.  It is not

1 misleading as this witness' opinion as to what would happen to

2 these individuals applying the criteria.  And I'm willing to

3 accept it, if that's the connection in which it's offered.  But

4 it is not a -- but the column itself can't be used to say that

5 this is how the trust would determine whether or not somebody

6 does or doesn't get into Level 4B because that's -- neither

7 this witness nor anybody else so far except perhaps one of the

8 debtors' witnesses can make that assessment.  The trust doesn't

9 even exist at this point.

10         So with that caveat I would accept everything through

11 and including the now labeled expedited review TDP 4B with

12 reason, but not the last three columns.

13         MR. BERNICK:  Your Honor, I had a different objection

14 which is that I don't think that there's any relevance that's

15 been established with this document.  All this is is the

16 application of the TDP to certain individuals.  Of what

17 relevance is that?  Obviously certain people are going to pass

18 the TDP and certain people are going to fail the TDP.  So what?

19         THE COURT:  This goes to the discrimination issue.

20 So I think it is relevant to that extent and as to how at least

21 one doctor's view of his patients and their lung function may

22 be applied.  Whether it's going to turn out to be relevant

23 overall, I don't know.  But I'm going to admit the exhibit

24 subject to a relevance objection.  But I want it amended to

25 delete the last three columns and to change the title of 4B so

1 that I have -- so that I know specifically when I'm looking at

2 the evidence what it is that can be viewed.  Let me make a

3 note, please.

4                      (Pause)

5           THE COURT:  Okay, Mr. Heberling.

6           MR. GUY:  Your Honor, to help the Court maybe Mr.

7 Heberling could just cross through those sections so that it

8 doesn't get lost in the wash later on.

9           THE COURT:  That's probably a good idea if the

10 chart's going to be -- if that's going to be the chart that's

11 handed up.  Yes.  Just the last three.

12           MR. FINCH:  Your Honor, on the second page of the

13 document it'll be the last two columns, is that correct?

14           THE COURT:  No, it's the last three.  There's nothing

15 in the settlement amount, but it's still the last three.

16           MR. FINCH:  Okay.  Right.

17           THE COURT:  This is the same exhibit that I have in

18 the book.  The only things I need you to hand up are the

19 exhibits that were marked that haven't been put in the books

20 somewhere, Mr. Heberling.  So if you need this for your records

21 you may have it.  Thank you.

22           MR. HEBERLING:  And final detail on this Exhibit

23 LC-270 yesterday was admitted which provides the settlement

24 amounts for these individuals listed on LC-16A.  So we can

25 connect that up in argument.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.

2  Q    Dr. Whitehouse, have you reviewed the report of Dr. Weill

3  dated July 24, '09?

4  A    Yes, I have.

5  Q    Does Dr. Weill do a follow up on lung function test in

6  addition to those reported in your publication Whitehouse 2004?

7  A    Yes.

8  Q    What was the closing date for lung function test in

9  Whitehouse 2004?

10  A    I believe it was probably November or December.  I can't

11  remember the exact date.  But it was of 2001.

12  Q    And what was the closing date for the Weill data?

13  A    I believe it was in 2008.

14  Q    So how long was the average time of observation of the

15  subjects in Whitehouse 2004?

16  A    Well, it averaged 35 months.  It ranged as far as about

17  eight or nine years.  And the minimum acceptable in the study

18  was one year.

19          THE COURT:  Was what, sir, I couldn't hear you?  I

20  didn't hear you.

21  A    Oh, I said it -- the longest follow up in that study was

22  from nine years to the end of the study as I recall.  There was

23  a minimum of one year that they had to be followed to be

24  included at all.

25          THE COURT:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And what does the Weill study show for total follow up

2  years?

3  A    Well, apparently he followed the survivors, basically, all

4  the way until 2008.  He followed pulmonary functions.

5  Q    And of the 123 subjects in the Weill -- excuse me the

6  Whitehouse '04 study can you tell me approximately what number

7  is dead?

8  A    Well, at last count that I had it was 36 dead at the time

9  that Dr. Weill did his study.

10           THE COURT:  Your microphone's not on.

11           MR. BERNICK:  I object.  I don't believe that this is

12  disclosed anywhere.

13           MR. HEBERLING:  Yes, it is in the Whitehouse report.

14  I think it's Exhibit 5.  It was follow up on the patients in

15  the Whitehouse 2004 study.

16           MR. BERNICK:  Okay.  Well, I'll accept that

17  representation.

18           THE COURT:  All right.  So what is the question?  How

19  many people that Dr. Weill followed are dead?

20  Q    How many in the Whitehouse 2004 study of 123 subjects, how

21  many are dead?

22  A    At least 36.

23  Q    And of that number how many died of asbestos disease?

24  A    I don't recall.  It was either -- I think it was 28.

25  Q    In the Weill follow up did you find any indication that

1 Dr. Weill accounted for the dead in his analysis?

2 A    No, he did not.

3 Q    Is there a problem with this?

4 A    It was apples and oranges.  I mean, all the 36 that died

5 excluded -- were excluded which makes basically a study totally

6 invalid, because those are part of the original 123.

7 Q    And do patients' lung functions go to zero when they are

8 deceased?

9 A    No doubt.

10 Q    Is there any indication that Dr. Weill included a zero

11 value for the patients who had died?

12 A    No, but of course there's no way to know how low it got

13 before they died, either.

14 Q    Then did Dr. Weill also present data on what he called all

15 patients?

16 A    Yes.

17 Q    And in the CARD mortality study were there approximately

18 110 patients deceased from asbestos disease?

19 A    Yes.

20 Q    And you mentioned also that there's a problem with people

21 near death doing lung function tests.  What could that be?

22 A    Well, usually when people are very ill there's two reasons

23 for not doing it.  One is they can't physically do it, it does

24 require some effort particularly some breath holding.  Or we

25 don't see much point to it at that point.  Putting them through

1  something that was just going to tire him and we know that it's

2  not going to make any difference as to how we approach things.

3  Q    And did you see any indication in Weill's work on the all

4  patients row which might indicate that he accounted for the 110

5  dead?

6  A    No.

7  Q    And what effect does that have on any comparison between

8  his analysis and yours?

9  A    It's the same argument as the original one with the 36

10  that died and the 123.  You don't have a complete study.

11  Q    Do you consider the all patients analysis done by -- do

12  you have an opinion whether the all patients analysis done by

13  Dr. Weill is valid?

14  A    No, it's invalid also.

15                         (Pause)

16  Q    I'm now showing you Table 8 from the Weill study.

17            THE COURT:  What exhibit number, please?

18            MR. HEBERLING:  From LC-116.

19            THE COURT:  Thank you.

20  Q    And you see the all patients row at the bottom of the

21  table?

22  A    The note there --

23  Q    The row --

24  A    Oh, the column all patients.  Yes, I see it.

25  Q    Okay.  And over at the far right do you see negative

                    **J&J COURT TRANSCRIBERS, INC.**

1 1.636?

2 A    Correct.

3 Q    And what does that mean for DLCO?

4 A    That means that was an annual change in the patients that

5 he selected to check.

6 Q    And would that number include any -- would it include

7 sufficient consideration for the 110 dead?

8 A    No, it wouldn't.  It doesn't include any consideration for

9 those.

10 Q    And your rebuttal report of August 19 states that if the

11 follow up is average for these people was 5.2 years and this

12 lung function loss was 1.636, that's a total of 8.3 percent or

13 24 percent in 15 years.  Would a 24 percent loss over 15 years

14 be significant?

15 A    Yes.

16        THE COURT:  Sir, I'm sorry, what was the -- what two

17 factors were you adding together?

18        MR. HEBERLING:  Actually I went pretty quickly.  I

19 used a number from the Table 7, but the point is that the

20 question goes to a loss of 24 percent in 15 years.

21        THE COURT:  Yes.  But I didn't hear what the question

22 was.  I'd like to be able to refer to it in my notes.  I don't

23 know what other number you're referring to.

24        MR. HEBERLING:  Okay.  Could we have the question

25 read back?

**J&J COURT TRANSCRIBERS, INC.**

1    THE WITNESS:  You confused me a little bit, too, so I

2  think -- why don't you go back over it, please.

3    MR. HEBERLING:  Well, if there's difficulty I can

4  create a new question.

5    THE COURT:  Oh, it'll just take a while because it's

6  an oral system.  So she has to back up.  And if you talk then

7  she can't record.  So we just have to wait if you want it read

8  back.

9    (Playback of a previous question)

10    THE COURT:  You can go back to the current spot,

11  Cathy.

12    THE WITNESS:  I'm losing all this unfortunately.  I

13  mean, it's hard for me to hear it if I'm supposed to hear it.

14    MR. HEBERLING:  Has the Court heard the question?

15    THE COURT:  I heard the question, yes, and I --

16    MR. HEBERLING:  Okay.

17    THE COURT:  If you want to repeat it so that the

18  doctor can understand it, too, that might be helpful.

19  Q    So for Dr. Whitehouse I'll just ask the end of the

20  question.  Would a loss of 24 percent in 15 years be

21  significant?

22  A    Highly significant.  Yes.

23  Q    Can you explain that?

24  A    Well, usually that -- you know, we're talking about loss

25  of percent of predicted.  So that's loss over and beyond what

1  would have normally occurred over a 15 year period of time.  In

2  that 15 year period of time you normally would have lost a

3  number of percentage points.  And so you've taken somebody that

4  may have been 80 percent and you've got them down into quite a

5  severe category and they would go from being perhaps

6  asymptomatic to severely short of breath.

7  Q    We'll move onto the Section 3 of the Weill report of July

8  24th, 2009, LC-116.  That's the CARD mortality study section.

9  In this section does Dr. Weill present his own readings on

10 chest x-rays for some of the 76 deceased in the CARD mortality

11 study?

12 A    What number -- what does the number in here -- it'll be a

13 little easier to look at it in here.  Maybe I don't have it in

14 this book.  I don't know.  Thank you.  I have it in front of

15 me.

16        THE COURT:  Go ahead, Mr. Heberling.

17 Q    So at the end of the report does Dr. Weill present his own

18 readings on chest x-rays for some of the 76 deceased in the

19 CARD mortality study?

20 A    Yes, he does.

21 Q    Can you tell how he selected the ones he did?

22 A    No, not from this.  There's some other data later on that

23 suggests how he might have selected it.  There's some names,

24 but not in this table.

25 Q    And in his -- for his data did he exclude 1/0 or more?

1  A    Yes, he did.

2  Q    What does that mean?

3  A    Any ILO number 1/0 or more he excluded from this analysis.

4  Q    And what affect does that have on any numbers produced in

5  the study?

6  A    Well, there's obviously an additive effect.  If you look

7  at any interstitial disease it goes along with pleural disease.

8  And I suspect that maybe he was just trying to look at pure

9  pleural disease.  He didn't look at the CT scans as far as I

10  know either.  So for the same sort of reasons it's not complete

11  data.

12  Q    Not, complete --

13  A    Not complete -- not complete data.

14  Q    And in the population of Libby claimants who are CARD

15  patients, are there people who have both pleural disease and

16  interstitial disease?

17  A    Yes.

18  Q    And the 1/0 is a measure of interstitial disease?

19  A    It is.

20  Q    Could one exclude the patients with a 1/0 or more on

21  interstitial disease and then compare that group to the group

22  which may be applying for compensation under the TDP medical

23  criteria?

24  A    No, I don't see how you could do it.

25  Q    Why?

1  A    Well, because the -- there's probably two reasons.  First

2  off they may qualify under the category of interstitial

3  disease, but there's also very much of an additive factor

4  between those two aspects of asbestos disease.  There's pleural

5  asbestosis and the interstitial asbestosis.  And it's not like

6  they exist independently in the same patient.  They're very

7  much additive.

8  Q    With regard to Dr. Weill's chest x-ray readings toward the

9  end of the report on selected patients have you reviewed those?

10 A    Are you talking about the ones that's -- further back in

11 those tables in this report?

12 Q    Well, yeah, tables or individual entries.  Pages 20 to --

13 please refer to Pages 20 to 22.

14 A    Yes.  That's what I thought you meant.  Yeah, I'm on Page

15 20 right now.

16 Q    Are the chest x-ray readings -- how do they compare to the

17 standards for the presentation of a pulmonologist's chest x-ray

18 reading?

19 A    Well, first off the whole chart is confusing.  It took a

20 long time for me even to figure out what he was doing with it.

21 He basically took his readings, as I understand it, he makes a

22 comment up there as can be seen, "Not all individuals had

23 readable radiographic images for my review," which would have

24 surprised me very much just by that point alone because the

25 stuff that we've been producing up there is very high quality

1  images.  There may be a rare one that's difficult to read, but

2  particularly the computerized images are very high quality.

3  Q    As far as the presentation of Dr. Weill's readings in his

4  report do they conform to standard practice as far as

5  presentation of chest x-ray readings?

6  A    Oh, absolutely not.  The way you present a chest x-ray is

7  that you start off with a chest x-ray, you state the date,

8  state the quality of the film and you go through it

9  systematically to read it.  You read about the bony thorax, the

10  heart size, the lungs, and in the case of pneumoconiosis you

11  would read the lung fields, the pleura.  We look for masses.  I

12  mean, there's a lot of things that go into reading a chest x-

13  ray and it takes a bit of time to do it.  Even the ILO -- if

14  you use an ILO form you would have had to have gone through

15  that format.

16  Q    And did Dr. Weill do a sufficient presentation of that

17  kind of information?

18  A    No, actually it's -- I consider it very poorly done.

19  Q    Then out of the 22 he read, did he read diffuse pleural

20  thickening on any of them?

21  A    I don't believe so.

22  Q    And have there been disagreements between the CARD clinic

23  doctors' chest x-ray readings and Dr. Weill's chest x-ray

24  readings in the past?

25  A    Yes, there have been.  Large disagreements.

1  Q    I am now showing you LC-40 which was Exhibit 19 to the

2  Whitehouse report.  Are you familiar with this chart?

3  A    Yes, I am.  In this format it can be very hard for people

4  to read off of a computer.  There's a lot of data on it.

5  Q    But briefly can you state what was done?  Did you do a

6  comparison of Dr. Weill's readings?

7  A    Well, we took Dr. Weill's readings which are on the left

8  here and what he read as far as interstitial disease, pleural

9  thickening and plaques, and we took the ATSDR readings which

10 were readings that were done in the screenings in 2000, 2001.

11 Then we took the CARD readings.  We also had readings from the

12 radiologist that we have in Libby at the hospital.  And we

13 assembled those and created a summary.  And on the ones that we

14 had CT scans we also looked at the CT scans because that was

15 very germane to this.

16 Q    So you compared Dr. Weill's readings, the CARD clinic

17 readings and the ATSDR readings?

18 A    Yes.

19 Q    And did you use this overhead, which we will mark with the

20 next number, to explain the findings?

21 A    Well, first off if you look down there where there's a six

22 and a hole that's a one in front of it.  That's a 16.

23          THE COURT:  I'm sorry.  I need exhibit numbers,

24 please.

25          MR. HEBERLING:  LC-279

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  Your Honor, at this point I have a

2   relevance objection.  Dr. Weill's progression study is the only

3   study from Dr. Weill that we will be using in this case.  We're

4   not going to be putting into evidence his other analyses

5   because it's not necessary given the state of the evidence.  In

6   the progression study that Dr. Weill did he didn't do his own

7   readings.  So whether Dr. Whitehouse disagrees with the quality

8   of Dr. Weill's readings or not is entirely irrelevant.

9        MR. HEBERLING:  Well, Your Honor, Dr. Weill's report

10  certainly seems to indicate that he did his own readings.  He's

11  presenting readings on chest x-rays for which he's responsible

12  in his report.  It certainly appears that he did chest x-ray

13  readings.

14        MR. BERNICK:  He did for purposes of his analysis of

15  the CARD mortality data in connection with the sorts that were

16  done that compared those -- that compared the CARD mortality

17  data to the ATSDR data for purposes of a different analysis of

18  the TDP.  In connection with the progression study he relied

19  upon the reads that were done historically by others.  It was

20  not an x-ray re-read.

21        MR. HEBERLING:  I think Mr. Bernick is confusing

22  matters a little bit.  We're only talking about the third

23  section of his report, the CARD mortality study where I think

24  Mr. Bernick acknowledges that Dr. Weill did readings.  So

25  there's an issue as to whose readings are more correct, more

1 believable to the Court.  And we want to show this comparison

2 that was done on a whole series of readings to show that the

3 CARD readings are more reliable.

4        MR. BERNICK:  It's a rebuttal to something that's

5 never going to be in evidence.  That's what I just said.  It's

6 Dr. Weill's mortality data analysis for purposes of the

7 comparison with ATSDR is part of his TDP analysis.  And given

8 the fact that the objectors here have done nothing to establish

9 discrimination we're not going to present Dr. Weill's analysis

10 as interesting as it might be.  The progression study which he

11 will present involved no reading of x-rays by Dr. Weill.  So

12 the evidence that's being presented now is irrelevant to the

13 case.

14        MR. HEBERLING:  Does this mean that -- there are

15 three sections --

16        COURT CLERK:  Speak into the mike, please.

17        MR. HEBERLING:  Excuse me.  There are three sections

18 to the Weill report.  The first ATSDR, Whitehouse '04, then

19 CARD mortality study.  Is it correct then you're not presenting

20 the third section of the report?

21        MR. BERNICK:  We're presenting the section of the

22 report that deals with progression.  That is not the CARD

23 mortality section of the report.

24        MR. HEBERLING:  So you're only presenting Section 2

25 of the report.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Your Honor, I've said it five times

2  now.

3          THE COURT:  Well, he's trying to figure it out by

4  sections.  I don't have the report here, I don't know what the

5  sections mean.  But the debtor is only going to be talking

6  about the progression study, not about the mortality study,

7  correct?

8          MR. BERNICK:  That's correct.  The progression study

9  works with a population of people that may or may not overlap

10 with the CARD mortality study.  But we just work with the

11 progression study.  And we use the data on reads that was

12 provided in the records.  He didn't do new reads.  So this

13 discussion here is irrelevant.

14         MR. HEBERLING:  So just to be clear -- with Mr.

15 Bernick, I like to be clear -- you're not offering --

16         COURT CLERK:  Speak into the mike, please.

17         MR. HEBERLING:  You will not be offering the opinions

18 stated on Page 24 of the report.

19         MR. BERNICK:  I don't have Page 24 of the report here

20 with me.

21         MR. HEBERLING:  The last page.

22         MR. BERNICK:  There's a section of the report, Roman

23 II called Whitehouse Patient Population.  And this deals with

24 the Whitehouse 2004 progression study.  And that goes on

25 through Pages 15, 16, and 17.  That is the progression study.

1  That is what we're relying upon.  The CARD mortality analysis,

2  Section 3 is not what we are relying on because it's done for

3  an entirely different purpose which is meeting the TDP

4  criteria.  So again, the progression study does not require a

5  re-read of x-rays.  It was not done on that basis and we won't

6  be offering anything about re-reads of x-rays.

7          MR. HEBERLING:  I'm concerned because there's an

8  opinion on Page 24 which Dr. Weill states, "There are no data

9  to suggest that the Grace TDP excludes individuals who are

10 impaired by an asbestos-related lung disease."  That appears to

11 be in Section 3.  We can end our examination if that opinion

12 which is in the CARD mortality section of the report is not to

13 be offered.

14         MR. BERNICK:  Mr. Heberling, I don't know how to be

15 any clearer.

16         THE COURT:  You need to use the microphone.

17         MR. BERNICK:  It's in the language right there.  The

18 language talks about the effect of the TDP.  The progression

19 study as Dr. Whitehouse himself well knows, has nothing

20 whatever to do with an analysis of the TDP.

21         MR. HEBERLING:  So you're not offering that opinion.

22         MR. BERNICK:  I'm not offering any opinion.  I'm

23 saying the opinion that you're reciting is entirely irrelevant

24 and yes, Dr. Weill, for the ninth time, will not be talking

25 about the TDP criteria including the last three lines of his

1  report.

2          MR. HEBERLING:  I think that's clear enough, Your

3  Honor.  With that we can end the examination because we were

4  rebutting Section 3 of the Weill report which is not being

5  offered.

6          THE COURT:  Okay.

7          MR. HEBERLING:  Thank you, doctor.

8          MR. BERNICK:  Okay.  Yeah, if we could just have a

9  couple minutes, Your Honor, to set up.

10          THE COURT:  Why don't we take a five minute recess.

11  It'll probably be good to stretch legs anyway.

12                          (Recess)

13          THE COURT:  Please be seated.  Dr. Whitehouse, are

14  you ready, sir?

15          DR. WHITEHOUSE:  I'm sorry?

16          THE COURT:  Are you ready to begin?

17          DR. WHITEHOUSE:  Oh, yes, ma'am.

18          THE COURT:  All right, Mr. Bernick.

19                    CROSS EXAMINATION

20  BY MR. BERNICK:

21  Q    Good morning, again, Dr. Whitehouse.

22  A    Good morning.  I didn't know you were waiting for an

23  answer.

24  Q    Oh, well, you know.  We've seen a lot of each other during

25  the course of the last several weeks.

**J&J COURT TRANSCRIBERS, INC.**

1            I want to go over, first of all, some of your

2 testimony regarding the progression study.  In order to do that

3 I want to do a little chart here to keep track.  We'll talk

4 about people in Libby.  We'll talk about people outside Libby.

5 And within Libby I want to distinguish people who are coming

6 forward with claims today.  We'll talk about the current and

7 future claimants.

8            It's true, is it not that beginning, or was it, the

9 end of 2000, early part of 2001 that the -- I guess it was 2000

10 that the ATSDR came into Libby, Montana and conducted a very,

11 very --

12            THE COURT:  Mr. Bernick, excuse me.  Your

13 microphone's fading in and out.  I don't know if we need new

14 batteries or what but I'm only getting about every other word.

15            MR. BERNICK:  Is this better?

16            THE COURT:  Maybe.

17            MR. BERNICK:  Maybe.  Probably not.  Let me just try

18 this one.  Is that better?

19            THE COURT:  That is.  Thank you.

20 Q    In 2000 the ATSDR came into Libby and they performed a

21 very substantial screening process for the Libby population, is

22 that correct?

23 A    That's true.

24 Q    Is it fair to say that as a result in part of the very

25 significant publicity in 1999 and the very sudden arrival of

1  the EPA onsite and the investigations they conducted, the

2  people who were in the town were very, very concerned about

3  their health and wanted to take advantage of the fact that

4  there was a screening process underway, fair?

5  A    True.

6         MR. HEBERLING:  Your Honor, I don't understand the

7  relevance to Dr. Whitehouse's critique of the Weill report on

8  the progression issue.

9         MR. BERNICK:  We're going to establish what it is

10  that the 2004 study covered and of what relevance it is to the

11  case.

12         THE COURT:  All right.

13         MR. HEBERLING:  Your Honor, we didn't bring any

14  testimony on the 2004 study.  We didn't inquire into it.  We

15  only rebutted Dr. Weill that I understand.

16         MR. BERNICK:  We believe the 2004 study is a flawed

17  study that will come as an insult to Dr. Whitehouse, but it is

18  no new news.  And one of the ways in which it's flawed is the

19  population that it uses.  And part of Dr. Weill's testimony

20  will focus on that.  This witness is offering rebuttal, and

21  we're bringing out aspects of the subject matter that are in

22  dispute.

23         THE COURT:  Okay.  I'm going to take it subject to a

24  relevance determination because of the way this trial is

25  proceeding where I'm getting rebuttal before I'm getting the

1  witnesses.  I don't know what is relevant at this point and

2  what isn't.  So I'll take it but subject to a relevance

3  analysis later.

4          MR. HEBERLING:  And, Your Honor, a second basis for

5  the objection is that the -- this Court has ordered that Dr.

6  Whitehouse may not testify to opinions based in whole or in

7  part upon the 1800 patients.  And that limited him from talking

8  about, in our view, from talking about the progression study

9  and general statements regarding patients.  And we've heard

10 this objection over and over during trial.  Now Mr. Bernick --

11 I don't see that it's quite fair that Mr. Bernick should be

12 able to inquire generally.

13         THE COURT:  Well, I don't know what he's going to

14 inquire into, but so far I haven't heard any questions about

15 that.  All I know is, and I think I heard the doctor agree,

16 that people were concerned about their health and when there

17 was a screening process they decided to take advantage of it.

18 And that's all I know.  I don't think there's anything so far

19 that's either surprising or prejudicial or anything of the

20 kind.  So I'm going to permit this, but subject to the

21 relevance objection.  And if it does get into matters that this

22 witness is not permitted to testify about then please raise an

23 objection at that time.

24         MR. BERNICK:  We are going to do our level best not

25 to get into that subject matter.  I'm acquainted with Your

1 Honor's rulings and that's not where I'm going.

2 Q    As a result of the ATSDR screening process and all the

3 people that came to be screened, did you see people who had

4 gone through the screening process start to come into your

5 practice?

6 A    Yes.  Before and after the screening practice.

7 Q    Okay.  I want to talk then about the 123 people that are

8 part of your progression study.  There were 123 people,

9 correct?

10 A    That's correct.

11 Q    Okay.  Is it true that that 123 person population was

12 actually a subset of the people that you had in your patient

13 practice on or about sometime in 2001?

14 A    The people in that study, I don't know what the percentage

15 ante-dated the Andy Schneider's paper and the PI that got all

16 of the business started concerning Libby.  But a significant

17 number of them had been -- were patients before that that I'd

18 been seeing '98, '99.  There was also, as you recall 153 which

19 started that had two sets of studies and all the ones with

20 intervening surgeries and various things that could modify it,

21 were not used, were thrown out.

22 Q    Right.  That's what I wanted to get to.  And I didn't mean

23 -- by putting this line here I didn't mean to suggest there was

24 a match or anything like that.  To the contrary.  I want to get

25 into that a little bit.  But the 123 people were a subset, as I

1 recall your testimony, of approximately 491 people that you

2 were seeing on a regular basis in your patient population as of

3 sometime in 2001.  Is that roughly correct?

4          MR. HEBERLING:  Your Honor, may we have a continuing

5 objection based upon relevance to the direct and the Court's

6 order regarding Dr. Whitehouse testifying about 491 people or

7 123 people as included in the 1800 patients?

8          MR. BERNICK:  Yeah, but --

9          THE COURT:  Wait.  I don't know anything about the

10 1800 patients, but Mr. Bernick is asking questions on cross.

11 He's permitted to ask leading questions on cross.  So that

12 objection is overruled.  You do have a continuing objection to

13 relevance.  I said I have to accept the testimony and figure

14 that out later.  I just don't know at this point what the

15 relevance is.

16 Q   Are the 123 ultimately, after a step we'll talk about in a

17 minute, a subset of a patient group that you were seeing on a

18 regular basis as of 2001 that comprised close to 500 people?

19 A    Yeah, but you have to remember that the one that were in

20 the 123 had more than one set of lung functions.  The whole

21 491, most of those did not.

22 Q    Right.  That's exactly where I'm going.  You started out

23 with a population of 491, we agreed on that thereabouts?

24 A    Uh-huh.  Yes.  That was the number that was in the paper,

25 I think, at the end of this the number of people that I had

Whitehouse - Cross/Bernick                    87

1  seen from Libby that I had that on.

2  Q    And then within the 491 you decided in order to conduct

3  your study to use as a criteria for inclusion that you had to

4  have two x-rays, right?

5  A    No, they had to have two sets of pulmonary functions.

6  Q    I'm sorry.  Two sets of pulmonary function.

7  A    One year or more apart.

8  Q    Okay.  And on the basis of that selection criteria you,

9  after another step in between, came down to having a study

10 comprised of 123 people, fair?

11 A    I did.

12 Q    Now, with respect to that progression study that was done

13 and published in 2004, it's true, is it not, that there was no

14 control group, correct?

15 A    No, the controls were the normal values for pulmonary

16 function.

17 Q    There's no control group, correct?

18         MR. HEBERLING:  Objection.  Asked and answered.

19         THE COURT:  No, it wasn't.  Overruled.  You can

20 answer, doctor.

21 A    It depends on what you're talking about are controls.  I

22 mean there was not a group of people that were controls.

23 Q    Right.  There were no matched controlled people for

24 purpose --

25         MR. HEBERLING:  Your Honor, we're now beyond scope of

**J&J COURT TRANSCRIBERS, INC.**

1  the Weill report.  There's no critique of the Whitehouse 2004

2  study.  Way beyond the scope of direct.  I think this is

3  improper.

4          THE COURT:  There has been multiple testimony about

5  this paper from everybody but its author.  It seems to me that

6  it's proper to ask the author about this paper with respect to

7  either rebuttal or direct examination.  It's overruled.  But

8  again subject to relevance when I can figure it out.  Okay, I

9  lost it.  There were no --

10          MR. BERNICK:  I'll just reput it, Your Honor.

11  Q    Is it a fact, Dr. Whitehouse, that there was no group of

12  matched controls for this study?

13  A    No, there was not.

14  Q    Okay.  Is it also true that there was no data gathered or

15  analyzed regarding the exposures in doses for the people in the

16  study?

17  A    That's correct.

18  Q    Is it also true that there was no correlation of disease

19  with lung function?

20          MR. HEBERLING:  Your Honor, may we have a continuing

21  objection based upon the grounds I just stated in the last

22  objection?

23  Q    Correct?

24          THE COURT:  Other than relevance which is what?

25          MR. HEBERLING:  That we did not go into the

1  Whitehouse 2004 study, nor did Dr. Frank, and so we haven't --

2  so we have not presented evidence which would be the subject of

3  rebuttal or cross examination. It's beyond the scope of our

4  case.

5        MR. BERNICK:   There was extensive testimony from Dr.

6  Molgaard.   And Dr. Molgaard, as Your Honor will recall, I

7  objected to his talking about these different studies unless

8  they would produce Dr. Whitehouse to cover the same studies

9  because he was sprinkling holy water -- to quote Mr. Heberling

10 -- he was sprinkling holy water over Dr. Whitehouse's study.

11 And so I think in fact an undertaking was made by counsel for

12 the Libby claimants at that time, that indeed Dr. Whitehouse

13 would be produced and he would be available for cross

14 examination on the subject.

15       MR. HEBERLING:   Your Honor, Dr. Molgaard was an

16 epidemiology expert discussing the epidemiology.   And he was

17 doing so in response -- as a rebuttal to criticisms from the

18 other side that we did things out of order.   Dr. Molgaard was

19 cross examined.   Dr. Whitehouse is not testifying to the

20 epidemiology of his study.   We didn't offer anything on that.

21       MR. BERNICK:   To the contrary.   What the actual

22 sequence was -- excuse me -- I can't -- what the actual

23 sequence was, was that Dr. Molgaard was one of their original

24 experts and he, together with Dr. Whitehouse, submitted a

25 report that included the discussion of the progression study.

1 The progression study was a key part of their objection as to

2 which they had the burden of proof.  Dr. Molgaard was brought

3 in before Dr. Whitehouse to bless a report that Dr. Whitehouse

4 had done.  And it's not a question of rebuttal, it's a question

5 of what their case is to support their objection.  They were

6 the ones that made the decision to call them essentially out of

7 sequence.

8             MR. HEBERLING:  We did not offer --

9             MR. BERNICK:  Excuse me, counsel.

10            MR. HEBERLING:  Any -- we did not offer --

11            MR. BERNICK:  Excuse me, counsel.

12            MR. HEBERLING:  -- Dr. Whitehouse in support of the

13 -- or any testimony --

14            THE COURT:  Regardless.  This is cross examination.

15 He's permitted to explore the parameters of this paper.  This

16 paper has been testified to by several witnesses.  He's the

17 author.  Clearly, he has some understanding of what the paper's

18 all about.  If it's not relevant I will disregard it and strike

19 it later.  Because of the progression I can't -- there is no

20 way I can determine relevance.  To the extent that it's outside

21 the scope of this witness' direct testimony, this witness did

22 not cover this issue in his direct.  But that doesn't mean he

23 can't be explored -- some of this can't be explored on cross

24 examination.  But I'm going to determine relevance when I see

25 it.  If it's not relevant I will disregard it and strike it.

1  Okay, Mr. Bernick.

2  Q    Is it true, Dr. Whitehouse, that there's no correlation

3  between disease and lung function in the progression study?

4  A    That's not true.  There's no correlations made except

5  there's a very clear statement of the patient population

6  relative to their x-rays.

7  Q    Okay.  So there's no statistical correlation, is that

8  correct?

9         MR. HEBERLING:  Objection.  Unclear as to what the

10  correlation might be.

11  A    Well, in a sense there is because when I separated --

12         THE COURT:  Dr. Whitehouse, your counsel's objecting.

13  If you could just wait a second.  I'm sorry, Mr. Heberling.

14         MR. HEBERLING:  Objection.  Unclear as to the nature

15  of the correlation inquired about.

16         THE COURT:  All right.

17         MR. BERNICK:  I'll withdraw the question and put it

18  very precisely.

19  Q    Are there statistical tests that are available to measure

20  correlations between two variables?

21  A    In this particular instance or --

22  Q    No.  Are there available to doctors and people doing

23  research on medical issues, well established statistical tests

24  that are designed to find correlations between two variables?

25  A    Sure.

1  Q    And were any of those well established methods applied to

2  determine whether there was a correlation between disease and

3  lung function in connection with the progression study?

4  A    In a sense there was, because the ones that had no

5  interstitial disease at all or no chest x-ray were analyzed

6  separately from the ones that had pleural and interstitial

7  disease.  And there was no difference between the two groups.

8  There wasn't a statical correlation, but the numbers were

9  almost identical.

10 Q    My question though is statistical correlation.  Was there

11 -- did you apply statistical tests to measure whether there

12 were correlations and to what extent there were correlations

13 between disease and lung function in your study?

14 A    There's no need to under the circumstances of the study.

15 Q    Now, you also brought out something just now that I wanted

16 to bring out.  You talked with Mr. Heberling on direct

17 examination about the fact that people in this study have gone

18 on to die, do you recall that?

19 A    I did.

20 Q    Isn't it true that this study is not simply a study of

21 pleural disease, that there's more than pleural disease in this

22 population, isn't that true?

23 A    It was well defined.

24 Q    I didn't ask you that.  I just simply ask you did this

25 population include many people who had something other than or

1 in addition to pleural disease?

2 A    In addition to pleural?  Yes, they had some interstitial

3 disease.

4 Q    Interstitial disease meaning interstitial asbestosis.

5 A    Right.

6 Q    Okay.

7 A    Zero ones and occasional one zeros.

8 Q    Okay.  Now, I want to then ask you -- and there are also

9 other conditions, were there not, in this population that is

10 people also had disease that wasn't related to asbestos, true?

11 A    Yeah.  This was an older population.  You would expect

12 that.

13 Q    Okay.  So when you made the statement about how many

14 people had died in this population, that was a general

15 statement that included death from any cause, correct?

16         MR. HEBERLING:  Objection.  Unclear as to what, "this

17 population," may be.

18         MR. BERNICK:  123 people where Dr. Whitehouse

19 represented on direct examination from Mr. Heberling that

20 people had gone on to die.

21 Q    They died of a variety of causes, true, Dr. Whitehouse?

22 A    I testified previously that 28 of them died of asbestos

23 diseases, related diseases.

24 Q    Testified previously when?  Here?

25 A    Yes.

1  Q    Twenty.

2  A    28 of the 36.

3  Q    And 28 of the 36 --

4  A    Or 26.  I can't remember, but it was one or the other.

5  Q    I see.

6  A    But at any rate that's the approximate number.

7  Q    And have you done -- that's just 28 of the 36, right?

8  A    Right.

9  Q    And so when you made that determination about cause, you

10 didn't testify as to how you made that determination about

11 cause, did you, as to any of those individuals?

12 A    Most of it's in the mortality study.  It's death

13 certificates, et cetera.

14 Q    Oh, the mortality studies.  Okay.  Now, the last thing I

15 want to bring out is that a criteria -- the criteria for

16 inclusion, the main one was to have two pulmonary function

17 tests taken over a year -- taken a year or more apart, correct?

18 A    It was the first and the last one.

19 Q    Okay.  And first and last.  And you made that decision to

20 just take two?

21 A    Yes, I did.  Actually that was --

22 Q    Once you made the decision -- I'm sorry -- once you made

23 the decision that they had two therefore it could be included,

24 you had to make an additional decision about whether to use

25 just those two points or all points, all pulmonary function

1 tests in performing your analysis, correct?

2 A    There was no reason to do so.  The study plan which was a

3 --

4            MR. BERNICK:  I just asked the doctor --

5            MR. HEBERLING:  Objection.

6            MR. BERNICK:  -- Dr. Whitehouse, it's not responsive.

7            MR. HEBERLING:  Objection.

8            MR. BERNICK;  Move to strike as not responsive.

9            MR. HEBERLING:  The witness is not --

10            THE COURT:  Folks, you can't talk over each other.

11 Please.  Mr. Bernick, state your case then Mr. Heberling I'll

12 hear what you're saying.

13            MR. BERNICK:  I move to strike, the answer is

14 nonresponsive.  I simply asked whether he had to make an

15 additional decision.

16            THE COURT:  Mr. Heberling.

17            MR. HEBERLING:  I believe the witness was

18 interrupted.

19            THE COURT:  I can't hear you.

20            MR. HEBERLING:  I believe the witness was

21 interrupted, and was not permitted to finish his answer so it's

22 a little difficult to analyze how the answer relates.

23            THE COURT:  The witness didn't start out with a yes

24 or no.  So let's lay some ground rules.  Could you start out

25 with a yes or a no to the question and then you may explain

1 your answer, Dr. Whitehouse.

2 A    Yes.

3 Q    We'll get through it.  So is it true that you had to make

4 an additional decision about whether in performing the analysis

5 of these individuals to use just those two data points or to

6 use all of the data points that were available, correct?

7 A    Only used it to the study plan that was done for that.

8 That was how it was planned out originally.  It was planned out

9 and peer reviewed in advance.

10 Q    Thank you.  Now, since that study has come out -- that

11 study came out in 2004?

12 A    Yes.

13 Q    And when did that data for that study become available to

14 W.R. Grace?  That is the underlying data?

15 A    After it was published.

16 Q    Do you remember if that was in about 2006 in connection

17 with the criminal case?

18 A    Oh, they would have had ability to get it well before

19 then.

20 Q    Was that the first time -- I didn't ask whether they would

21 have had the ability.  Is it a fact that Grace did not get the

22 underlying data for your research until 2006?

23 A    I don't know the answer to that.

24 Q    Isn't it true that that was the first time since -- for

25 how long had you been talking about progression in connection

1  with Libby claimants?

2  A    In what form are you talking about?  You have to clarify

3  what you're talking about in the way of progression.

4  Q    Sure.  It was the first time that you expressed the

5  opinion the people who got sick with nonmalignant disease at

6  Libby, Montana had a special trend for fast progression?  What

7  time did you first make that statement publicly?

8  A    It was before 2006, but I don't know the date.

9  Q    Was 2006 the first time that Grace had had the opportunity

10 to test that proposition with your actual data?

11          MR. HEBERLING:  Objection.  Calls for the state of

12 mind of another.

13          THE COURT:  Sustained.

14 Q    Well, was 2006 the first time that in fact Grace had the

15 access to the actual data underlying your theory of

16 progression?

17          MR. HEBERLING:  Objection.  Asked and answered.  He

18 said he didn't know.

19          THE COURT:  Sustained.

20 Q    Let's talk about some of the people -- well, first let me

21 ask you this.  You've responded to certain criticisms that Dr.

22 Weill has made with respect to your progression study, correct?

23 A    Yes.

24 Q    And in so doing is it true that you have had access -- you

25 have had access -- to the data and the analyses that Dr. Weill

1 has done?

2 A     Yeah, I've looked at them.  I've seen it.

3 Q     Okay.  And isn't it true that when you looked at that data

4 you never actually reviewed these statistical analysis, that

5 is, the codes that were applied to the underlying data,

6 correct?

7 A     No, I did not.  And I rejected it because of the fact that

8 it was very incomplete data that he used.

9 Q     I'm just asking you the first question.  The first

10 question is whether you actually examined how he analyzed the

11 data itself.  That is reviewed his data codes and determined

12 how it is that he included or excluded data?

13 A     I cursorily looked at it.  I can't say that I know it

14 intimately.

15 Q     In fact, you told us before that you basically -- it was

16 hard to read because it was so small so you didn't spend much

17 time with it, fair?

18 A     Well, yes, because he provided, I don't know, it must have

19 been 40 or 50 pages of exhale data forms that were virtually

20 unreadable because they were so small when they were printed

21 off.  It was just page on page on page of numbers.

22 Q     Now, you testified in response to Mr. Heberling's question

23 expressing a strong view that people who had died were excluded

24 from the study.  Do you recall that?

25 A     Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And you said that as an expert on the stand under oath and

2  therefore I'm assuming that that's something that you really

3  have verified.  Is that true?

4  A    I read his report.

5  Q    I didn't ask you that.  Have you --

6       MR. HEBERLING:  Objection.  He's not being permitted

7  to finish his answer.

8       MR. BERNICK:  I didn't know that I had interrupted

9  him.  I apologize if I did.  Go ahead and finish your answer.

10 A    This report says that he looked at -- I forget what the

11 number is -- 70 some odd.  He basically, in his report, did not

12 do any verification that he looked at anybody else except for

13 the ones that were survivors until 2008 whenever he ended it.

14 Q    Did you actually --

15 A    Now, he may have --

16 Q    Did you actually verify that people who had died were

17 excluded, their data was excluded because they had died?

18 A    I have no idea whether he excluded or not.  I assume he

19 did because of the way it was written.

20 Q    In fact it's true, is it not, that that is simply an

21 assumption on your part that you testified to?  You haven't

22 verified it.

23 A    Yes, I verified it.  I read his report.  His report was

24 real clear.

25 Q    Have you actually taken a look at the underlying data to

1  see which -- why it was that certain data points were excluded?

2  Have you done that?

3  A    No.

4         MR. HEBERLING:  Objection.  Assumes --

5  A    I could hardly read the data to begin with.

6         MR. HEBERLING:  Assumes a fact not in evidence that

7  there would be data points for people who are dead in the years

8  after they are dead.

9         THE COURT:  I don't think that's the question.

10  Overruled.

11        MR. BERNICK:  It's all right.  We have Dr. Weill

12  here.  He'll be the next witness on the stand.  He'll explain

13  what happened.

14  Q    I want to deal with progression of some of the other

15  people that you've talked about here.  You showed the Court

16  Exhibit LC-16A which is a chart of settled claims.  And then on

17  the next page unsettled claims.  Do you recall that?

18  A    Yes.  I have it here in hard copy, too.

19  Q    Now, I see that there are a total of 19 people who have

20  settled on the first page, is that right?

21  A    That's correct.

22  Q    How did those people relate to the 76 people who were in

23  the CARD mortality study?  Do any of them overlap?

24  A    I'm sure there is some although I have not done that

25  analysis.

1  Q    Okay.  So when we talk about the CARD study, and we've

2  talked about the CARD study extensively with other people, this

3  is not simply a subset of your study, right?

4  A    No.  This is a separate data that's basically on

5  settlement amounts.

6  Q    Okay.  And when was it that you first began to work on

7  this project that's reflected in LC-16A?

8  A    Well, the first time I actually -- I saw the numbers

9  themselves.

10 Q    No, I didn't -- I apologize.  Go ahead.  Go ahead.  I

11 don't want to interrupt.  Go ahead.

12 A    It was probably some months ago.  I mean, it wasn't very

13 long ago, because those numbers were basically confidential

14 numbers and they've only appeared to me recently.  The other

15 stuff has been done as part of -- a good part of it was done as

16 part of the mortality study.  And then I've also in the last

17 three months or so looked at every one of these x-rays to do

18 the scoring as far as their pleural thickening is concerned.

19 Q    There are 19 people on the first page, right?  Those are

20 the settleds.

21 A    Yes.

22 Q    And how many are on the second page which are the

23 nonsettleds?

24 A    18.

25 Q    When did you first start to analyze this particular group

1  of people?

2           MR. HEBERLING:  Objection.

3  Q    I know that you have data on them that goes back before.

4  But when did you first start to analyze them as a group?

5           MR. HEBERLING:  This objection is unclear as to

6  whether he means the 19 or the 18.

7           THE COURT:  Are you talking about the collective

8  group?

9           MR. BERNICK:  Yes.

10          THE COURT:  The collective group.

11 A    Well, it was done somewhat piecemeal because a lot of them

12 were done back in 2008 -- not a lot of them, but the ones that

13 were dead were done in 2008 as part of the mortality study and

14 then added to this.  And then the ones that are alive were done

15 more recently.

16 Q    I'm talking about --

17 A    But I don't know the exact dates.

18 Q    I'm going to make my question clear as the Court asked me

19 and I responded.  I'm talking about when you first began to

20 work on this particular group of people as a separate

21 collection.  When you first begin to work on that little

22 grouping.

23 A    There was no single specific time.  It was done piecemeal.

24 The data was produced.  I produced the data on scoring sheets.

25 They were given to a paralegal who then put them into the

1  chart.

2  Q    Who decided which people should be in this particular

3  chart?  Who decided that it should be the 19 people on the

4  first page and the 18 on the second?

5  A    That was decided by the lawyers.  They're the ones that

6  knew about it.

7  Q    Oh.  Okay.

8  A    I had no idea.

9  Q    No idea.

10  A    I didn't have a chart of who had settled or hadn't

11  settled.

12  Q    Oh, okay.

13  A    No way of knowing.

14  Q    Got it.  When did the lawyers first tell you that they

15  wanted you to look at this particular group of people?

16  A    I'm not sure I could tell you.  Probably some time last

17  spring.

18  Q    Last spring.

19  A    But I'd already looked at most of them already.  So -- and

20  I don't know when the exact date was.  You're asking me a

21  question I don't know the answer to.

22  Q    Well, you're the one that got the instruction from the

23  lawyers, right?  You were the one that got the instruction from

24  the lawyers to look at these particular people as a group,

25  right?

1  A     No.  I did not look at them initially as a group.  They

2  were done, as I said before, piecemeal, because of the fact

3  that they were part of the mortality study.  And then they

4  asked me to look at some of the other ones that were still

5  alive, and I think it was probably last spring or last winter.

6  Q     When was this document, LC-16A first created in some form?

7  This particular grouping.

8  A     The final grouping like you're seeing right here?

9  Q     Yes.  Yes.  Yes.  Yes.

10 A     I have no idea.  Probably about two or three months ago.

11 Q     When was it first produced to the plan proponents in this

12 case?

13 A     I have absolutely no idea.

14 Q     You didn't know that it wasn't until the end of August

15 that this was furnished?

16        MR. HEBERLING:  Objection.  He's already answered he

17 doesn't know.

18 Q     You have an expert report, an expert report, Dr.

19 Whitehouse that includes this as an attachment.

20        MR. HEBERLING:  Objection to the use of the term

21 expert report since he testified as a treating physician, being

22 the treating physician for all these people.

23        THE COURT:  All right.  Sustained.  There wasn't a

24 question there.  Can you ask him a question, please?

25 Q     When -- did you ever attach 16A to any of your expert

1  reports?

2  A    When did I attach it?

3  Q    Did you ever attach it?

4  A    I knew it was being attached.

5  Q    No.  Did you actually look at your final expert report and

6  see -- any of your expert reports, and actually see that this

7  particular document, 16A, was attached?

8            MR. HEBERLING:  Objection, irrelevant.

9            THE COURT:  Overruled.

10           THE WITNESS:  You know, I'm not sure I even know the

11 answer.  I see so many documents and so many stuff that comes

12 across my computer, by e-mail that I look at and that I file

13 and I keep in a stack and then ultimately we put together the

14 final report.  Now when this got put with everything else, I

15 have no idea.

16 Q    When was the first time that you knew you were going to be

17 testifying at this trial about the groupings and the data that

18 is LC-16A? When did you first learn that?

19 A    I don't know, maybe a month ago.

20 Q    And, whose idea was it that you should present this?

21 A    It wasn't mine.  I assume it was the attorneys thought

22 that it was appropriate.

23 Q    And this document is not a scientific study, is it?

24 A    Well, I'd say yes and no.  Basically, what it is, is a

25 compilation of data plus the readings of the x-rays relative to

1  the TDP.

2  Q    There was no scientific methodology used to select the

3  individuals who are listed on 16A, correct?

4  A    I don't believe that you're right about that. I think

5  these are all the ones, as far as I know, that have settled.

6  Now, there may be more that I don't know about.

7  Q    I'm asking you whether it's true, is it not, that there's

8  no scientific method, no scientific research method or analysis

9  that was used --

10            MR. HEBERLING:  Objection.

11  Q    -- that was used to select the particular claimants who

12  are on 16A.

13            THE COURT:  Turn your microphones off if you're going

14  to be speaking out loud.  It's highly improper, please stop it.

15            UNIDENTIFIED ATTORNEY:  Mine is off, Your Honor.  I

16  apologize, but mine is off.

17            MR. HEBERLING:  And we object that this document was

18  not offered as a study, so it's irrelevant.

19            MR. BERNICK:  Well, then it ought to be easy.

20  Q    Dr. Whitehouse, this isn't the study, is it?

21  A    No.

22  Q    Okay.

23  A    It's just a chart.

24  Q    It's just a chart.  Now, this chart is incomplete, isn't

25  it?

Whitehouse - Cross/Bernick                 107

1  A    Well, in the sense that there's one particular patient

2  that we couldn't find the x-ray on, so we couldn't measure it.

3  Q    Well, it's incomplete in another way, isn't it?  Let's

4  take a look at the settled claims.  I have PFT date and all the

5  dates appear to be long ago, back in 1997, 1998, 1999, 2000,

6  right?

7  A    That's because Grace filed bankruptcy back then.

8  Q    No, Grace didn't file --

9  A    That's why it ended.

10 Q    -- Grace didn't file bankruptcy until April of 2001.  So,

11 the dates that appear here are old dates, correct?

12 A    I wouldn't say --

13 Q    It's not current information, fair?

14 A    No, it's information that dates back to right around the

15 turn of the century, yes.

16 Q    Isn't it true that this data, these dates are on or about

17 the date, near to the time that the cases settled?

18 A    I do not know the answer to that, exactly what date they

19 settled, because that's --

20 Q    Who was it that determined that these particular dates and

21 reads would be included in this chart?

22 A    The attorneys did.

23 Q    Did you ask them why?

24 A    My presumption from --

25 Q    No, no, did you ask them why?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Not specifically, no.

2  Q    Now, if we took Mr. -- let's begin with Claimant Number 2,

3  we see he's Number 2, and we see that he's got a number for FVC

4  of -- he's got an FVC number that's 100 percent of predicted,

5  right?

6  A    Yes, he does.

7  Q    I want to show you Exhibit 340 and ask you whether this is

8  the medical record for Claimant Number 2, dated much more

9  recently, in July of 2008, almost ten years later?

10  A    Sure.

11        MR. HEBERLING:  Objection, irrelevant.  His case

12  settled back in 2000.

13        MR. BERNICK:  That's the whole point.

14        THE COURT:  Whose exhibit is this, please?

15        MR. BERNICK:  This is our exhibit, Plan Proponents

16  340.

17        THE COURT:  All right.  Overruled.  I'm reserving on

18  relevance objections.

19  Q    Was Claimant Number 2 seen more recently and his pulmonary

20  function measured more recently?

21  A    It would appear that he is.  I don't know whether I saw

22  him back then at that time or not.

23  Q    Well, isn't it true that in Claimant Number 2's case, he

24  has gone from 100 percent of predicted values for the forced

25  vital capacity, all the way up now to 106?  His forced vital

1 capacity actually has improved over the last ten years,

2 correct?

3 A     As a percentage of predicted it has, yes.  I would agree.

4 Q     Let's take a look at -- I've only got two more and then

5 we'll go onto something else.  Let's take a look at Claimant

6 Number 8.  Claimant Number 8 --

7          THE COURT:  Which number is he, Mr. Bernick?  My

8 chart doesn't have names.

9          MR. BERNICK:  This is eight.

10          THE COURT:  Eight?  Thank you.

11          MR. BERNICK:  Yes.

12 Q     Claimant Number 8 was seen by you in 1998 and again in

13 2005, right?  Have you continued to see Claimant Number 8?

14 A     I don't know when I last saw him.  I've been seeing less

15 and less patients from Libby over the last few years.

16 Q     Well, he was at 81 and 83 for forced vital capacity, in

17 total lung capacity, back in 1998, correct?

18 A     That's correct.

19 Q     Isn't it true that in his case, interestingly enough you

20 say, this is Plan Proponents 321, he has lost absolutely no

21 lung function since 1998 and I looked at all the old studies

22 that we have on him.  His vital capacity and diffusion are

23 virtually identical, he has no symptomatology.  Wasn't that

24 your view of Claimant Number 8?

25 A     Let me see the chart, please.  The whole chart.

Whitehouse - Cross/Bernick                    110

1  Q    That's what I have.

2  A    Well, I think there's other factors involved here.  I

3  don't know exactly what they are and, of course, I don't make

4  the decision over settling cases at all.  Not in the least.

5  Q    I didn't ask you about that.

6  A    Okay.  Well, just so you're aware of that.

7  Q    My point is that with respect to Claimant Number 8, there

8  certainly hasn't been progression of Claimant Number 8 since

9  the settlement, correct?

10  A    I would like to see the entire chart because of other

11  issues such as pleurisy, chest pain, other problems that go

12  along with asbestos, that may or may not have been a major

13  factor.

14  Q    Fair enough.  I'm not talking about whether the settlement

15  -- I'm not getting you into the world of settlement, I just

16  want to know whether in your view, isn't it a fact that since

17  the settlement, he has seen no progression in his

18  symptomatology, true or not?

19  A    Would you show me --

20          MR. HEBERLING:  Objection. Lack of foundation.

21          THE WITNESS:  -- would you show me the pulmonary

22  function, please.

23          MR. BERNICK:  He's just said, he just -- he says

24  right here --

25          MR. HEBERLING:  Objection.  Lack of foundation.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  -- he has absolutely no --

2          THE COURT:  Mr. Bernick, you need to let them make an

3    objection.  This is -- I thought this was the witness' own

4    statement of a history of a patient?

5          MR. BERNICK:  It is.

6          THE COURT:  Then that's overruled.

7          MR. HEBERLING: Dr. Whitehouse needs to see the rest

8    of the statements, he needs to see the other lung function

9    values, in order to give any kind of opinion here.

10         THE COURT:  Well, there is an opinion expressed.  The

11   document that's being shown says, his vital capacity and

12   diffusion are virtually identical.  The sentence before says,

13   he, interestingly enough, has lost absolutely no lung function

14   since 1998 and I looked at all the old studies that we have on

15   him.  His vital capacity and diffusion are virtually identical,

16   he has no symptomatology and so forth.  It's overruled.

17         THE WITNESS:  Okay.  I see that at this point.

18   Q    Now, let's look take a look at another one in order to get

19   through this.  Number 14, Claimant Number 14.  Do you know

20   Claimant Number 14?

21   A    I do.

22         UNIDENTIFIED ATTORNEY:  There's two Claimant Number

23   14 Last Name.

24         MR. HEBERLING:  Objection.  Unclear as to which

25   Claimant Number 14.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  This is Claimant Number 14.  Did I get

2   that one, Brian?  Right?

3          THE WITNESS:  Okay.

4          MR. BERNICK:  Or is it -- hang on.  No, I'm sorry,

5   this is Claimant Number 13.  I want Claimant Number 13.  That's

6   number 13, Your Honor.  Thank you.

7   Q    Claimant Number 13, back in 1997, settled the case -- or

8   the PFT date is January 27, 1977, and his vital capacity was 76

9   percent of predicted, and his total lung capacity is 75, right?

10  A    Did you say 1997, or '77?

11  Q    1997.  If I mis-spoke I apologize.  Right?

12  A    Yes, that's correct.

13  Q    And, in fact, looking at Exhibit 325, you say -- you

14  report those numbers, this is a document that you created, a

15  medical record, January 27, 1977.  That's the same date as the

16  date that's reflected on Exhibit 16A, correct?

17  A    I see that.

18  Q    And you have those numbers in there, 76 and 75, that would

19  tend to be very -- I mean, it's the same thing as what's

20  reflected on 16A, correct?

21  A    Well, I'd like to see the intervening numbers, for one

22  thing, and also if there was a fair amount of x-ray progression

23  during that period of time.  And I don't know what actually

24  happened to the pulmonary function numbers in the interim.

25  Q    Well, I just asked you whether these are the same numbers

Whitehouse - Cross/Bernick                113

1  on Exhibit 325 for his pulmonary function --

2  A     They do --

3  Q     -- that are set forth for his pulmonary function on

4  Exhibit 16A for 1997?

5  A     Show me that sheet again, please?  No, this progress note.

6  Q     76 --

7  A     Where is the percentage of predicted for the diffusion?

8  Do you have the pulmonary function here?

9  Q     Yes.  I am working with the document that I have, which is

10  your note.

11  A     Well, obviously --

12  Q     And I'm just asking you --

13  A     Obviously the diffusion is 17.3.  I made a comment that it

14  was down.  I don't know how much it's down.  I don't know what

15  the percent of predicted is --

16  Q     Well, that's fine.  I'm not really --

17  A     -- relative to the prior one.

18  Q     -- asking you about that.

19         THE COURT:  Mr. Bernick, the documents speak for

20  themselves.

21         MR. BERNICK:  I understand.

22         THE COURT:  They obviously have the same numbers --

23         MR. BERNICK:  Yes.

24         THE COURT:  -- for forced vital capacity and total

25  lung capacity.

**J&J COURT TRANSCRIBERS, INC.**

Whitehouse - Cross/Bernick                    114

1          MR. BERNICK:  I'm sorry, Your Honor.

2  BY MR. BERNICK:

3  Q    So, let's, then, take a look at the last thing.  It says,

4  "You were saying --"  "You were saying at the time of the

5  settlement, were you not --"  Is this -- there we go.

6          THE COURT:  Cathy, do you need to turn it back?

7          MR. BERNICK:  No, I --

8          THE COURT:  Oh, you did it?  Okay.

9  Q    "You were saying at the time of the settlement, you said

10 it is apparent that his asbestosis has progressed, and when one

11 looks at the exposure time from 1974 to 1982, he is still

12 certainly within the range where he may continue to have rather

13 marked progression of his asbestosis."  That's what you were

14 saying at the time, correct?

15                         (Pause)

16 A    Wait a minute.  This is dated 1/27/97.

17 Q    Right.

18 A    It's dated the same as the original pulmonary function,

19 and you're saying --

20 Q    That's what it is.

21 A    -- it is now 76 percent of predicted lung capacity, 75.

22 Where's the original one, the earlier one?

23 Q    That's not the point.  The point is what happened to him

24 after you made the prediction that he may have marked --

25 continued marked progression going forward.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.  I said that. He may.

2  Q    He may.

3  A    That's my obligation, when I see changes in the x-ray like

4  that.

5  Q    I'm not being critical of you, Dr. Whitehouse.  In fact,

6  he didn't, did he?

7  A    I don't know.  Where's the rest of the data?  I haven't

8  seen him for a long time.

9  Q    I'll show you what we have for three twenty-six.  This is

10 December 5th, 2005, where he is at 72 and 75.  Is 72 --

11          THE COURT:  I'm sorry, Mr. Bernick.  Could you stop

12 moving the chart for a minute?

13          MR. BERNICK:  Sorry.

14          THE COURT:  All right.  Thank you.

15 Q    72 and 75, after eight years, after 76 and 75, that's not

16 marked progression, is it?

17          MR. HEBERLING:  Objection.  Under the rule of

18 completeness I think it should be -- the doctor should be

19 allowed to address the 53 number under DLCO.

20          THE COURT:  All right.  Mr. Bernick?

21          MR. BERNICK:  He can address it if he wants.  I'd

22 like him to answer my question first, which is whether --

23          THE COURT:  Yes, he may answer your question first.

24          MR. BERNICK:  Yes.

25 Q    Dr. Whitehouse, isn't it true that when it comes to his

1  forced vital capacity and his total lung capacity, there

2  certainly has not been marked progression, correct?

3  A    There hasn't been much change, no.

4            THE COURT:  Could you ask him, please, about the --

5            MR. BERNICK:  Sure.

6  Q    Now, what about DLCO?  I don't think we -- let's see, we

7  have DLCO here as 68 back in 1997, and then the DLCO is -- is

8  the 53.  Is that right?

9  A    Yes.

10 Q    Okay.

11 A    That had progressed.

12 Q    Well, but is that a marked progression over eight years?

13 A    It's not a marked progression, but it is a progression.

14 Q    I want to talk about the TDP work and testimony that

15 you've done here.  You've got these statements, or these

16 indications of whether or not the data that's set forth for

17 these individuals would or would not meet the medical criteria

18 for Section 4B of the TDP, and so I want to talk a little bit

19 about the TDP, and then I'll be done.  I'll draw the same

20 little picture that I had with Dr. Frank yesterday -- you were

21 back during the testimony of Dr. Frank, were you not?  Respond

22 orally, please.

23 A    I was.

24 Q    Section 4B of the TDP deals with pleural disease involving

25 severe impairment, correct?

1  A    Correct.

2  Q    Okay.  And the first thing that I want to talk about is

3  the science regarding impairment.  It's true, is it not, that

4  diffuse pleural thickening -- diffuse pleural thickening is a

5  distinct diagnostic entity, correct?

6  A    It's not necessarily a diagnostic entity as much as it is

7  a manifestation of a disease.

8  Q    Distinct manifestation of disease?  I think that -- so,

9  Dr. Frank yesterday said it was a distinct diagnostic entity.

10 You disagree with that?

11 A    I don't disagree with it particularly except that when

12 you're looking at -- you know, you're looking at a disease you

13 look at asbestos exposure, then you look at pleural asbestosis,

14 then you look at --

15          THE CLERK:  Could you speak more into the mike,

16 please?

17          THE WITNESS:  I'm sorry.

18 A    When you're looking at any disease you look at the basic

19 disease and then you look at the various things that occur with

20 it.  And so --

21 Q    Is --

22 A    -- this may just be semantics, but I think that's an

23 important point sometimes.

24 Q    It may be.  Would you agree with me, then?  I won't say

25 distinct diagnostic entity, is DDP -- diffuse pleural

1 thickening, DPT, a basic disease?

2 A    In its own right?

3 Q    That's what I just -- you said --

4 A    No.  It's not a disease in its own right.  It's a

5 manifestation of another disease, an asbestos disease.

6 Q    Well, diffuse pleural thickening is also something that

7 takes place -- well, I'll just leave it at that.  You can get

8 diffuse pleural thickening for other causes, correct?

9 A    Well, very rarely.  And --

10 Q    I just asked you whether you could get it from other

11 causes.

12 A    Diffuse pleural thickening?

13 Q    Diffuse pleural thickening, can you get it from other

14 causes or not, Dr. Whitehouse?

15 A    Define it, whether you're unilateral or bilateral.

16 Q    Bilateral.

17 A    Probably not.

18 Q    Unilateral?

19 A    Unilaterally you can from a prior empyema, yes.

20 Q    Okay.  Now, is it true that when it comes to the science,

21 there is scientific research that's been done on the

22 relationship between diffuse pleural thickening from asbestos

23 and impairment?

24 A    Yes, there is.

25 Q    Okay.  And has that science included science that's looked

1  to see whether blunting of the costophrenic angle is a feature

2  of diffuse pleural thickening that is associated with severe

3  impairment?

4          MR. HEBERLING:  Objection.  The question goes way

5  beyond direct.

6          THE COURT:  It does go beyond the direct.

7          MR. BERNICK:  Well, the --

8  Q    When you went through and made all these different

9  assessments of how these criteria applied, did those

10  assessments include an assessment regarding diffuse -- blunting

11  of the costophrenic angle?

12  A    Yes.

13  Q    Okay.  So, I now go back to my question.  Isn't it true

14  that blunting of the costophrenic angle has been found to be

15  strongly associated with severe impairment and diffuse pleural

16  thickening?

17          MR. HEBERLING:  Objection.  Beyond the scope of

18  direct.  He simply applied mechanical statements from the

19  medical criteria.  He didn't offer any opinions.

20          MR. BERNICK:  Your Honor, this whole document is an

21  opinion.

22          THE COURT:  Yes, it is an opinion.  This column that

23  talks about why the -- that is labeled past disqualified with

24  reason is clearly an opinion.  The objection is overruled.

25  Q    Isn't there a clear track record of research that's found

1 that blunting of the costophrenic angle is strongly associated

2 with severe impairment from diffuse pleural thickening?

3 A    I'm not sure I'd use the word strongly, but there has been

4 an association, yes.

5 Q    It's a clear track record, correct?

6 A    Well, there's a lot of controversy in the literature, as

7 you know.

8 Q    Did you give us testimony in your deposition, question,

9 Page 157 of your June deposition:

10 "Q    Would you therefore agree with me that the diffuse pleural

11 thickening associated with blunting of the costophrenic angle

12 has a clear track record of being associated with very severe

13 impairment?"

14 Q    Your answer was, "Yes."  Did you give that testimony in

15 June under oath?

16 A    All right.

17 Q    Isn't it true that when you take a look -- when you talk

18 to experts who are involved in the scientific community, people

19 who are authorities in the scientific community, the mainstream

20 of those people say that diffuse pleural thickening requires

21 that there be blunting of the costophrenic angle?

22 A    Well, you can answer this a number of ways.  First off,

23 there is a lot of people that disagree with that.  It also was

24 not stated in the ATS 2004 that it was a requirement.  There's

25 as many articles relative to blunting and diffuse pleural

1  thickening that say that it does not need to be a part of it as

2  there are that say.  So, there's a lot of controversy.

3  Q    I asked you that very question in your June deposition.

4  This is at Line 15 of Page 159.  "Okay.  I'm talking about the

5  experts involved in the scientific community, whether or not

6  they are part of this trial.  I'm talking about people who are

7  recognized as being authorities in the scientific community in

8  this area.  The mainstream of those people say that diffuse

9  pleural thickening requires that there be blunting of the

10 costophrenic angle, correct?"

11 "A    That's correct.  That's what they say."

12 Q    Was that your testimony in June under oath?

13 A    That was sort of a qualified answer when I said that's

14 what they say, wasn't it?

15 Q    That's what I asked you.

16 A    What?

17 Q    That's what I asked you.

18 A    That's what you asked me?

19 Q    Yes.

20 A    What was the whole answer?  The way you said it?

21 Q    That's correct.  "That's what they say."

22 A    Oh.

23 Q    Correct?  The mainstream --

24 A    But that was my quote, then I said, "That's what they

25 say."?

1  Q    Yes.

2  A    That's what I --

3  Q    It's right there on the screen.  Take a look --

4  A    That's what I said.  That's a qualification, also.

5  Q    No.  I asked you the mainstream of those people, the

6  mainstream of people in the scientific community who are

7  authorities in the scientific community in this area, the

8  mainstream of those people say you need blunting of the

9  costophrenic angle, correct?

10         MR. HEBERLING:  Counsel, what date of deposition and

11 what page are we on?

12         MR. BERNICK:  June '09, Page 159.  Seattle,

13 Washington.

14         THE WITNESS:  That was the one in Seattle.

15 Q    Is that what your testimony was?

16 A    Well, basically that's what I said.  Yeah.

17 Q    Okay.  And in fact, that includes --

18         MR. HEBERLING:  Excuse me, Your Honor.  I need to

19 know what line.

20         MR. BERNICK:  It's right here.  It's on the screen.

21         MR. HEBERLING:  I can't see that.

22         MR. BERNICK:  You can't see it on your screen?

23         THE COURT:  Line 15.

24         MR. HEBERLING:  It's too far, and it's faint.

25         MR. BERNICK:  Oh, well, then maybe you want to scoot

1  over a little bit.

2            THE COURT:  Gentlemen, it's Line 15.

3            MR. BERNICK:  15 through 23.

4  Q    Isn't it true that that statement, that the mainstream of

5  those people who say that diffuse pleural thickening requires

6  that they're blunting, includes both the ILO and the American

7  Thoracic Society?

8            MR. HEBERLING:  Objection.  Under the rule of

9  completeness there was a correction that Dr. Whitehouse made --

10           THE WITNESS:  Yes.

11           MR. HEBERLING:  -- to that statement, and I think

12 that should be included in the record.

13 Q    Do you see the question that I --

14 A    That was a --

15 Q    I'm sorry.  I'm just asking you as a fact, isn't it true

16  --

17           THE COURT:  Wait.  What correction are we talking

18 about?

19           MR. HEBERLING:  On Page 115, Line 23, he said they

20 should be some.

21           THE COURT:  Page 115.  That's before the 159.

22           MR. HEBERLING:  159.

23           THE COURT:  159.

24           MR. HEBERLING:  Line 23.  Is that up on --

25           MR. BERNICK:  I don't see what you're talking about.

1  There's no correction.

2          MR. HEBERLING:  The answer, as read, was, Line 22,

3  "That's correct.  That's what they say."

4          THE COURT:  Yes.

5          MR. BERNICK:  Right.

6          MR. HEBERLING:  He made a change to the deposition

7  and in lieu of what they say he said what some say.

8          THE COURT:  Where is the change?

9          MR. HEBERLING:  It's in the signed deposition.  I

10  have the correction page here.

11          THE COURT:  Oh, I see.  There's a correction page

12  that isn't being shown.

13          MR. BERNICK:  That's not a -- Your Honor, we can go

14  through -- respond to that point.  We can go through -- I'd be

15  happy to go through that so-called errata sheet and cover with

16  the Court how it's not an errata sheet anymore, it is

17  substantial revisions to the language of the deposition.  The

18  purpose of the errata sheet is basically to correct minor

19  grammatical points --

20          MR. HEBERLING:  Now --

21          MR. BERNICK:  Excuse me.

22          THE COURT:  Yes.  That is the purpose of the errata

23  sheet, to make sure that the --

24          MR. HEBERLING:  Your Honor, the rule says that

25  substantive changes may be made.

1            MR. BERNICK:  Substantive --

2            THE COURT:  Substantive changes can -- okay.  In any

3  event there is a substantive change.  He has changed it to say

4  some, not many.  Is that the point?

5            MR. HEBERLING:  That's correct, Your Honor.

6            THE COURT:  All right.

7            MR. BERNICK:  Well, that can be -- if that's true,

8  Your Honor, that goes to his credibility.

9  BY MR. BERNICK:

10 Q    Isn't it true that that mainstream, the some that you now

11 say is some people, includes the ILO and the American Thoracic

12 Society?

13 A    The American Thoracic Society does not require, in their

14 2004.  It says in there, and I can't exactly quote to you, but

15 if you give me the ATS thing, I can find you the quote, that

16 there's a lot of consideration of blunting may be an important

17 part of that, in some degree it says that.  It does not require

18 it.

19 Q    Isn't it true that in your deposition you were asked this

20 question.  "That is true, that is referring to the fact that

21 the mainstream of those people say that diffuse pleural

22 thickening requires that there be blunting of the costophrenic

23 angle?"  I say, "That's true of the American -- the ATS, the

24 American Thoracic Society, and that's true of the ILO,

25 correct?"  And your answer was, on the next page, Page 160,

1  Line 1:  "That's true."  That's what your testimony was,

2  correct?

3  A    I did, and I mis --

4           MR. HEBERLING:  Objection.  Again, under the rule of

5  completeness, may I read the full --

6           THE COURT:  As soon as he answers the question, yes,

7  you may, but you need to wait until he answers the question.

8  Would you answer, Doctor?  I'm sorry.

9  A    That's what's written there.  Yes.

10           THE COURT:  All right.

11  Q    That's what you said, right?

12  A    That's what I said at the time, too.

13           MR. HEBERLING:  Objection.   May we read in the

14  correction that was made?

15           MR. BERNICK:  Your Honor, they can read it in as part

16  of their redirect examination and Your Honor can assess the

17  credibility, because the witness just admitted that that's

18  exactly what he said in the deposition.

19           MR. HEBERLING:  Under the rule of completeness --

20           THE COURT:  I can't hear you, Mr. Heberling.

21           MR. HEBERLING:  Under the rule of completeness we

22  would like to cover this subject at this time.  He --

23           THE COURT:  You can do it on cross.

24           MR. HEBERLING:  Okay.

25           THE COURT:  That's what I had Mr. Finch do after the

1  first one, so I've now given every side one fair chance.  You

2  can do it on cross.

3  BY MR. BERNICK:

4  Q    Isn't it true that there's no article that you've --

5  strike that.  Isn't it true that you've not seen any article in

6  the literature which says that it's wrong to require, as the

7  TDP does, blunting of the costophrenic angle in the definition

8  of diffuse pleural thickening?

9  A    How far back are you wanting to go?

10 Q    I'm just -- just as I put the question.  Isn't it true

11 that there -- you've not seen anything in the peer reviewed

12 scientific literature anywhere to say that it's wrong to

13 require blunting?

14 A    Well, McLoud's article discusses DPT, it discusses

15 blunting, and does not require it to be part of it.  Is that

16 what we're talking about?

17 Q    Were you asked this question and did you give this answer

18 at Page 164 of your deposition in June?

19 "Q    Are you aware of anybody who has written a peer reviewed

20 article anywhere in the scientific literature that says it is

21 wrong to require blunting of the costophrenic angle in the

22 definition of diffuse pleural thickening?"

23 Q    And your answer was, "I haven't seen that it says that in

24 the literature.  No."  Was that your testimony in June?

25 A    Basically I said no, I have never seen that exact quote,

1  basically, is what it amounts to.

2  Q    No, that's not what you said in June, is it?

3  A    It is.  I haven't --

4  Q    You said, "I haven't seen that it says that in the

5  literature.  No."  That's what you said in the deposition,

6  correct?

7  A    Yeah, basically, but it refers to what you said about says

8  it is wrong to require blunting.

9  Q    Right.

10  A    There's a lot of discussion in the literature.  I don't

11  know that their exact terminology of wrong is ever used.

12             MR. BERNICK:  Move to strike as non-responsive.

13             THE COURT:  No, it's responsive.

14  Q    Isn't it true that someone who relies upon the 2000 ILO

15  guidelines is following accepted medical practice if they

16  followed those definitions for purposes of trying to determine,

17  give an opinion about whether someone has diffuse pleural

18  thickening or pleural plaques?

19  A    Where is that quote?  Show me that?

20  Q    Isn't it true that somebody who relies upon the ILO

21  guidelines in -- strike that.  Isn't it true that somebody who

22  relies upon the ILO guidelines follows accepted medical

23  practice if they follow those definitions for purposes of

24  trying to determine, give an opinion about whether someone has

25  diffuse pleural thickening or pleural plaques?  If they follow

1  the guidelines in making a medical decision about whether

2  somebody has diffuse pleural thickening, they would be

3  following accepted medical practice?

4  A    Well, accepted medical practice is that the ILO guidelines

5  are for screening purposes, or for epidemiologic purposes, and

6  not for diagnostic purposes.  Now, you have to define what

7  you're talking about there, then.  Are you talking about

8  diagnostic reasoning from the ILO guidelines?  Or what are you

9  doing?

10 Q    I'm going to move along, Dr. Whitehouse.  Let's talk about

11 Libby and outside Libby.  TDP, Section 4B.  Isn't it true that

12 in applying the TDP requirements, medical criteria requirements

13 under Section 4B to people in Libby, that those are tests, that

14 is the TDP provides tests, that science says if they are

15 satisfied the claimant will be a pretty clear case of having

16 severe disabling pleural disease?

17 A    Let me see that again in writing.

18 Q    Yes.  At Libby -- at Libby, the TDP tests are such that

19 science says if they're satisfied, the claimant would be a

20 pretty clear case of having severe disabling pleural disease?

21        MR. HEBERLING:  Objection.  Unreasonably complex

22 question, contains statements that are not part of the

23 question.  It's unintelligible.

24        THE COURT:  Restate the question.

25        MR. BERNICK:  I'll restate the question.

1 Q    Where the TDP is applied to people in Libby and they

2 actually satisfy the medical criteria of the TDP, science says

3 that those are people who are pretty clear cases of diffuse

4 pleural thickening and severe disabling disease, correct?

5 A    Probably so, but it doesn't include into that -- I'm not

6 sure exactly how to answer the question.  I assume that's

7 probably the case.

8 Q    Well, actually what you said was yes in your deposition.

9 I'm asking you, this is Page 180, Line 15.

10          MR. HEBERLING:  Objection.  Improper impeachment.

11 That's not in --

12 Q    I'm asking you the kinds of questions --

13          THE COURT:  Wait.  I'm sorry, Mr. Bernick.  It's

14 improper impeachment why?

15          MR. HEBERLING:  Because the answer he gave is not

16 inconsistent with the deposition.

17          MR. BERNICK:  It's a totally different answer.  He

18 said, well, that's probably, but he then went on to qualify it.

19 At his deposition he said in responding to this question, "That

20 as the tests that are imposed by the TDP for severe disabling

21 pleural disease for the diagnosis of it, those are tests that

22 science says if they're satisfied the claimant will be a pretty

23 clear case of having severe disabling pleural disease,

24 correct?"  And your answer was a simple, "Yes."  Isn't that

25 what you said?

1    THE COURT:  The objection is overruled.  The answer

2  was qualified here and not qualified there.  That is

3  impeachment.  You may answer, Doctor.

4  BY MR. BERNICK:

5  Q    Isn't that what you said at the deposition?

6  A    Yes, that's what I did say in the question, but you had

7  asked such a convoluted question I wasn't sure what the heck

8  you were asking.

9  Q    Well, I always try to be as clear as I can, Dr.

10  Whitehouse.  In fact, isn't it true that at that deposition, at

11  the very beginning I specifically told you that one of the

12  rules of the deposition was that if at any point in time, and

13  my words were if at any point in time in this deposition you do

14  not understand a question that I'm asking you, please tell me

15  and I'll do my best to rephrase it.  Do you recall my saying

16  that to you in Seattle?

17  A    I do.

18  Q    You didn't ask me to rephrase that question, did you?

19  A    No.  In fact, I answered your question for you.

20  Q    You answered it simply and clearly, correct?

21  A    Yes.

22  Q    Yes.  Now, it's true, is it not, that by virtue of those

23  TDP -- the TDP, some people will be included in the expedited

24  review based upon medical criteria, and some people would be

25  excluded, correct?

1  A     True.

2  Q     And that's true both at Libby and it's true outside of

3  Libby, correct?

4  A     I assume so.  Outside of Libby it's the same rules, yes.

5  Q     Isn't it true that you've not done any scientific

6  analysis, any scientific analysis of diffuse pleural thickening

7  in any patient population outside of Libby?

8            MR. HEBERLING:  Objection.  Irrelevant.  That's not

9  related to any contention that we're making.  We're only

10 talking about discriminations against Libby people.  We have

11 not presented anything relating to studies on other people.

12           THE COURT:  Yes, but the debtor then has to meet that

13 burden, so this is proper in the debtor's, at least, rebuttal

14 case, because you've now presented a witness who has given

15 other statistics, so it's clearly relevant.  Overruled.

16           MR. HEBERLING:  And we also object that it's outside

17 the scope of direct examination.

18           THE COURT:  It is outside the scope, but this is

19 either cross or rebuttal, depending on where we are in this

20 case, so it's still proper.

21           MR. BERNICK:  Well -- okay.  I'm not going to belabor

22 it, Your Honor.  I mean, they're offering an opinion -- there's

23 a discrimination that inherently requires a comparison of Libby

24 and outside of Libby.

25           THE COURT:  That's why I said it's relevant.

1          MR. HEBERLING:  Objection.  Objection.  No.

2  BY MR. BERNICK:

3  Q    Isn't it true --

4          THE COURT:  Pardon me.

5          MR. HEBERLING:  Our contention is that people in

6  Libby have severe pleural disease and they're discriminated

7  against by the TDP medical criteria.  That is a discrimination.

8  It -- our case is not that we're being discriminated against

9  relative to other people outside of Libby.

10          MR. BERNICK:  Is that a stipulation, Your Honor?

11  Because then I'll stop asking questions.

12          THE COURT:  So --

13          MR. HEBERLING:  And --

14          THE COURT:  Go ahead.

15          MR. HEBERLING:  -- we would like to add that we don't

16  represent people outside Libby.  There may be people with

17  severe pleural disease outside Libby who are similarly

18  discriminated against, but we are part of a discriminated

19  against group, which is severe pleurals, and that's all we need

20  to show in our contentions.

21          MR. BERNICK:  Okay.  Well, can we have an agreement,

22  a stipulation that there is not a contention that people at

23  Libby are treated differently with respect to the TDP than

24  people outside of Libby?

25          MR. HEBERLING:  We don't know.  We haven't -- we

1  don't know.  There's no proof of that, so I'm not going to make

2  any agreements or stipulations at this point.

3           MR. BERNICK:  My request is that there simply be a

4  stipulation that you don't have the contention that people in

5  Libby are treated differently than people outside of Libby.

6  We're not dealing with that contention in this case.  If that's

7  true and you say so, then I'll stop asking Dr. Whitehouse

8  questions.

9           MR. HEBERLING:  No.  I think we would get into

10 complexities.  I do -- let the record stand as it is.

11          THE COURT:  Okay.  Then you can continue.  It's

12 relevant.

13          MR. BERNICK:  And I'll try, then, to be very brief,

14 Your Honor.

15 BY MR. BERNICK:

16 Q   Is it accurate that you have not done any scientific

17 analysis of diffuse pleural thickening in any patient

18 population outside of Libby?

19 A   That's true.

20 Q   Is it true that the McLoud paper actually does analyze

21 people outside of Libby?

22 A   It does.  Mostly chrysotile patients.

23 Q   And is it true that according to the McLoud paper the

24 effect of the requirements of the TDP outside of Libby is very

25 comparable to the effects of the TDP as you've observed it

Whitehouse - Cross/Bernick                          135

1   inside of Libby?

2   A    I don't agree with you.

3   Q    Isn't it true that when it comes to the blunting criteria

4   in Level 4B, that has the same proportion and effect inside

5   Libby as outside Libby?

6   A    Their proportion of people with blunting, as I recall, was

7   45 percent, or something like that, similar to what it is in

8   Libby.

9   Q    Yes.  So --

10  A    But there's other criteria also associated with it, of

11  course, and that's the thickness and the extent.

12  Q    I just asked about the blunting.  Isn't it true that when

13  it comes to blunting, that criteria, that has the same

14  proportion and effect inside Libby as outside Libby?  And your

15  answer was, "Very close."

16         MR. HEBERLING:  Objection.  Improper impeachment.  He

17  asked a general question, then he asked a specific question

18  about blunting, which Dr. Whitehouse agrees --

19         MR. BERNICK:  Forget about the deposition.  I'll ask

20  it to you again.

21  Q    Isn't it true that when you compare the effect of the

22  blunting requirement of the TDP inside and outside Libby,

23  they're very close?

24  A    Yes.  They are.  I think -- I assume -- I think that's how

25  I answered it, didn't I?

1  Q    Yes.   That's fine.   Isn't it true that what McLoud

2  observed with respect to low exposure outside of Libby is

3  consistent with what you observed at Libby with respect to low

4  exposure?

5           MR. HEBERLING:   Objection.   Unclear as to low

6  exposure.   There's no study, no numbers on what low exposure

7  may mean.

8           MR. BERNICK:   I'll withdraw the question.

9  BY MR. BERNICK:

10 Q    DLCO.   With respect to DLCO isn't it true that you suspect

11 that the impact of the DLCO requirement outside of Libby and

12 inside of Libby are probably similar, but you don't know for

13 sure?

14 A    That's true.

15 Q    Okay.   Now, under the TDP -- are you familiar with the

16 fact that under the TDP there's something called individual

17 review?

18 A    Yes.

19 Q    And isn't it true that when it comes to individualized

20 review, you, based upon what you have experienced in your many,

21 many years at Libby and studying this patient population, you,

22 in the context of an individual review, if you were asked to

23 participate, could explain why a person, though not meeting the

24 TDP criteria, was still entitled to being classified as having

25 severe disease, correct?

1  A    My understanding is there's no physicians involved in that

2  review.

3  Q    I just asked you in the context of an individualized

4  review whether you would have the background, experience and

5  qualifications to explain to -- in whatever context you would

6  explain, either in a submission or otherwise, why a person,

7  though not meeting the TDP criteria, was still entitled to

8  being classified as having severe disease?

9  A    I can explain that.

10  Q    Okay.  And you can certainly do that with other Libby

11  claimants even if you hadn't been their doctor, correct?

12  A    I probably would not do -- I would choose not to do that

13  unless I had seen the patient.

14  Q    Okay.  And I'm talking about people in Libby.  But if you

15  were able, given the opportunity to see --

16  A    I would be able to see them.  There's no question about

17  that.

18  Q    Okay.

19        MR. BERNICK:  That's all I have, Your Honor.  That's

20  all I have.

21        THE COURT:  Mr. Finch?

22        MR. FINCH:  Your Honor, I have a fair amount of

23  cross.  I could probably shorten it up substantially if we take

24  the lunch recess now.

25        THE COURT:  All right.  We'll be in recess for lunch

1  until one o'clock.

2                        (Recess)

3         THE COURT:  Please be seated.  I think we've lost

4  some of the people --

5         UNIDENTIFIED SPEAKER:  We've lost a couple of the

6  lawyers.

7         THE COURT:  You can be seated if you'd like, Doctor.

8  We're going to --

9         UNIDENTIFIED SPEAKER:  We probably bored them to

10 death.

11        THE COURT:  No, I don't think that's the case.  I'm

12 noticing substantial slippage in the time frame that we're

13 allotting for lunch.  Am I supposed to just allot an hour?  Is

14 it not -- can't get up in 45 minutes?  Is that a problem?

15        UNIDENTIFIED SPEAKER:  There's a problem with the

16 elevators.

17        UNIDENTIFIED SPEAKER:  It's the elevators, Your

18 Honor.

19        UNIDENTIFIED SPEAKER:  A few of them are running, and

20 --

21        THE COURT:  Ah.

22        MR. GUY:  We were here, Your Honor, ready to go at

23 one o'clock.

24                        (Laughter)

25        UNIDENTIFIED SPEAKER:  Otherwise we could just order

**J&J COURT TRANSCRIBERS, INC.**

1  lunch in, just keep right on working.

2             THE COURT:  That's what we do.

3             UNIDENTIFIED SPEAKER:  It wouldn't bother me, but it

4  might bother somebody, and make quite a mess.

5             MR. FINCH:  Your Honor, I am prepared to start, but

6  it is the debtor's plan, and --

7             THE COURT:  I --

8             MR. FINCH: -- and substantially the debtor's money,

9  and --

10            THE COURT:  He's coming.

11                         (Pause)

12            THE COURT:  Okay.  Dr. Whitehouse, are you ready,

13 sir, to start?

14            THE WITNESS:  I am.

15            THE COURT:  All right.  Mr. Finch?

16            MR. FINCH:  Okay.  Can you hear me on the microphone?

17            THE COURT:  Yes, sir.  Thank you.

18                    CROSS EXAMINATION

19 BY MR. FINCH:

20 Q    Nathan Finch for the Asbestos Claimants' Committee.  Good

21 afternoon, Dr. Whitehouse.  We met in Seattle several months

22 ago, is that right?

23 A    That's correct.

24 Q    And you were sitting in the courtroom yesterday when I was

25 speaking with Dr. Frank about asbestos-related diseases and

1 what might be different about pleural (indiscernible) in Libby?

2 Were you in the courtroom for that testimony?

3 A    I was.

4 Q    And do you recall that I showed Dr. Frank this chart?

5 A    Actually, I couldn't see it from where I was.

6 Q    Okay.

7         MR. FINCH:  May I approach the witness?

8         THE COURT:  Yes.

9 Q    Can you see it now?

10 A    I can see it fine now.

11 Q    Okay.  Looking at the first four lines on that chart --

12        THE COURT:  I'm sorry.  What's the exhibit number

13 again?

14        MR. FINCH:  It's Exhibit -- Plan Proponent's 600 for

15 demonstrative purposes, Your Honor.

16        THE COURT:  All right.  Thank you.

17 Q    Dr. Whitehouse, you would agree with Dr. Frank that there

18 is nothing different in terms of severity, by that I mean if

19 you're going to get sick and you're going to die, a prognosis

20 for mesothelioma in Libby versus outside Libby, correct?

21 A    Yeah, I would agree.

22 Q    And you would agree with that with respect to lung cancer,

23 correct?

24 A    Yes.

25 Q    And you would agree with that with respect to

                    **J&J COURT TRANSCRIBERS, INC.**

1  gastrointestinal cancer, correct?

2  A    Yes.

3  Q    And you would agree with that with respect to asbestosis,

4  right?

5  A    Are we talking about interstitial disease?

6  A    We're talking about interstitial disease defined as

7  interstitial fibrosis of the parenchyma of the lung?

8  A    Yes.  No, I would agree with that.

9  Q    Okay.  And -- but you do believe that pleural disease seen

10 in Libby, the severity and prognosis of that, is that correct?

11 A    Very much.

12 Q    Okay.  Now, Mr. Heberling didn't ask you any questions

13 about the add on to the TDP medical and exposure criteria on

14 direct, did he, sir?

15 A    No, he did not.

16 Q    Okay.  So, I'm not going to ask you about that either.  It

17 doesn't -- just -- let me --

18          MR. FINCH:  This is -- this is Whitehouse --

19          THE COURT:  Why don't you mark it as, perhaps, 600A,

20 so that --

21          MR. FINCH:  I will mark this one as 600A.  When I've

22 finished marking on it I'll offer it as -- for demonstrative

23 purposes, too.

24          THE COURT:  Okay.  I think the record would be more

25 clear that way.  Thank you.

1  Q    Okay.  The chart I -- well, let me back up.  Do you

2  recall, on your direct examination, being shown this document,

3  which is Libby Claimant's Exhibit 16A?

4  A    Yes, I do.

5  Q    Can you see that up on the screen?  Can you see it in

6  front of you on the -- I think it's the same thing, on the --

7  A    I can see it better here.

8  Q    Okay.

9  A    Actually, I have a hard copy, which I prefer, if it's okay

10 with you.

11 Q    Sure.  Sure, Dr. Whitehouse.  Whatever --

12 A    I'll just ignore the last three columns.

13 Q    The first person on this chart is a gentleman named

14 Claimant Number 1, right?

15 A    Correct.

16 Q    And Claimant Number 1 was a patient of yours, correct?

17 A    He was.

18 Q    Dr. Whitehouse, in addition to seeing these patients don't

19 you also provide expert testimony from time to time in

20 litigation?

21 A    Yes.

22 Q    And you get paid for that by the lawyers of Libby

23 claimants?

24 A    Yes.

25 Q    And you've made over $100,000 in your career with that

1  kind of testimony?

2  A    Total, yeah, over many years.

3  Q    Focusing on Claimant Number 1, he was someone that was

4  also in your CARD mortality study; is that correct?

5  A    Yes, he was.

6  Q    Would you turn in your notebook --

7        MR. FINCH:  May I approach the witness, Your Honor?

8        THE COURT:  Yes.

9        MR. FINCH:  And, Your Honor, I believe you have a

10  copy of that notebook right on top there.

11        THE COURT:  All right.

12        MR. FINCH:  It's a notebook labeled Molgaard, Frank,

13  and Whitehouse exhibits.

14        THE COURT:  I do.

15  BY MR. FINCH:

16  Q    Dr. Whitehouse, could you turn to Tab 17 in that notebook?

17  A    I've got it.

18  Q    Okay.

19        MR. FINCH:  And, Your Honor, for the record this is

20  Exhibit Libby Claimant's 10.

21        THE WITNESS:  Yes, it is.

22        THE COURT:  All right.

23  Q    You recognize that, sir, as a printout of the list of the

24  76 people who have died from non-malignant disease in the CARD

25  mortality study?

1 A    Yes.

2 Q    And the third gentleman is Claimant Number 1?

3 A    Yes.

4 Q    That's the same Claimant Number 1 that is on -- number one

5 on this chart of settled, non-settled, non-malignant cases?  Is

6 that right?

7 A    Yes.

8 Q    Okay.  If you turn to the second page of Libby Claimant's

9 10, you see that the third one down, that's still Claimant

10 Number 1?

11 A    I take your word for it.

12 Q    Well, if you just -- see the columns continue over?

13 That's Claimant Number 1, and that is the third one down?

14 A    Yes, I know.  It just -- it is always hard to follow on

15 these long sheets, but I'm sure it is.  I don't doubt that.

16 Q    It's also a little hard to read --

17                         (Laughter)

18 Q    A magnifying glass.  But -- and then, going over to the

19 next page, there's a column on the chart that's I-F?

20 A    Yes.

21 Q    And I-F, that stands for interstitial fibrosis?

22 A    Right.

23 Q    And you've got a series of numbers there, one/two, zero,

24 two/two.  These are different numbers for different people,

25 right?

1   A    Right.

2   Q    And those numbers are what you viewed their x-ray would be

3   as using the ILO scale for classification of x-rays?

4   A    Well, basically the I-F number, the two/two, would be

5   using the ILO.  But the numbers related to the pleural disease

6   are really sort of different than that as far as a lot of those

7   are just measurements and so when you see -- sometimes when you

8   see zero -- I'm not sure where we are in the chart.  There's

9   one area where it's --

10  Q    Okay.  I'm just --

11  A    -- moderate.

12  Q    -- focusing -- I just want to focus your attention,

13  Doctor, just on this column, I-F.

14  A    I-F.  Okay.  Fair enough.

15  Q    Okay.  I-F, that's interstitial fibrosis, and you record

16  it for each of these 76 people who died, whether they had

17  interstitial fibrosis as seen on an x-ray, correct?

18  A    I did.

19  Q    And the way you recorded and talked about that is you used

20  the ILO stages, correct?

21  A    I did.

22  Q    And so, a 1/1 means -- I think it is probably a one, but

23  it could be a one, or a 2/1 means, I think it could be a -- I

24  think it's probably a two, but it could also be a one, right?

25  A    Correct.

1  Q    And generally speaking, the higher you go up on the scale

2  the more evidence you see on the x-ray of interstitial fibrosis

3  in the parenchyma of the lung, right?

4  A    That's correct.

5  Q    Okay.

6            THE COURT:  Mr. Whitehouse, I think the microphone is

7  off.

8            THE WITNESS:  The microphone is off?

9            THE CLERK:  No, it's not.

10           THE WITNESS:  Can you hear it now?

11           THE COURT:  No, it's not amplifying.

12           THE WITNESS:  It's got a green light.

13           THE COURT:  Could you hit it anyway?  The lights are

14  always green.

15           THE WITNESS:  Oh.

16           THE COURT:  It's -- so, but that doesn't mean that

17  they're on.

18           THE CLERK:  I can turn it up, Judge, but it's --

19           THE WITNESS:  Do I need to push this button?

20           THE COURT:  Yes.  That's it.

21           THE WITNESS:  Oh, now it's --

22           THE COURT:  Now it's on.  Thank you.

23           THE WITNESS:  Can you hear it now?

24           THE COURT:  Yes, sir.  Thank you.

25           THE WITNESS:  Okay.

1       THE COURT:  I'm sorry.  And the higher up you go -- I

2 lost the question.

3 BY MR. FINCH:

4 Q    The higher up you go on the scale, the more interstitial

5 fibrosis you observe in the parenchyma of the lungs, correct?

6 A    That's correct.

7 Q    So, 3/3 is a much more severe asbestosis, at least as we

8 would say on an x-ray as compared to a 1/0, right?

9 A    That's correct.

10 Q    Okay.  And the -- are you familiar with the 2004 American

11 Thoracic Society statement on the diagnosis and treatment of

12 non-malignant diseases, correct?

13 A    I am.

14 Q    And you have that document.  We'll come back to this in

15 just a minute, because I'm still going through it, but you have

16 that document in your notebook, and I believe it's found behind

17 Tab 3 in the same notebook, the same black notebook?

18 A    Uh-huh.

19       MR. FINCH:  And, Your Honor, for the record, this has

20 been received into Evidence as Plan Proponent's Exhibit 147.

21       THE COURT:  All right.  Thank you.

22 Q    Are you with me, Doctor?

23 A    Yes.

24 Q    Okay.  And would you turn to Page 700 of that document?

25 A    Okay.

1            THE COURT:  I'm sorry.  What page?

2            MR. FINCH:  700.

3            THE COURT:  All right.

4            MR. FINCH:  And, Chris, could I have Plan Proponent's

5   Exhibit 147 up on the ELMO -- not on the ELMO, whatever the

6   thing -- you know what?  I'll just do it this way.  Leave the

7   ELMO --

8                        (Pause)

9   Q    Okay.  Do you see the language that I've highlighted, Dr.

10  Whitehouse?

11  A    Well, we have a problem with that.  I'm color blind.

12  Q    Okay.  Can I --

13  A    And greens and yellows I have a real problem with.

14           MR. FINCH:  May I approach the witness, Your Honor?

15           THE COURT:  Yes, sir.

16  A    I think I see it, but I'm not sure I do.

17  Q    Well, I'm going to just mark it in your book.

18  A    Oh.  Okay.  Oh, yes.  I can see that good.

19  Q    Okay.  I'll make it green on the ELMO in case --

20  A    Thank you.

21  Q    Okay.  Do you see where it says that compensation systems

22  may require that the chest radiographs be classified by the ILO

23  system once it is established that the patient has been exposed

24  to asbestos.  A profusion of irregular opacity at the level of

25  1/0 is used as the boundary between normal and abnormal in the

                    J&J COURT TRANSCRIBERS, INC.

1  evaluation of the film although the measure of profusion is

2  continuous and there is no clear demarcation between 0/1 and

3  1/0.  Did I read that correctly?

4  A    You did.

5  Q    So, in general, is it correct that 1/0, it means I think

6  there may be interstitial fibrosis, which is asbestosis, but

7  there may not be, correct?

8  A    That's correct.

9  Q    Whereas 0/1 is a shorthand for a doctor's opinion, right?

10 You've got to say yes.

11 A    Yes.

12 Q    So, the whole ILO system is sort of a shorthand for the

13 doctor's opinion about what they see on the x-ray, right?

14 A    Yes.

15 Q    And so, a 0/1 as contrasts to a 1/0 is that I don't think

16 it's interstitial fibrosis that's shown on the x-ray, but it

17 may be, right?

18 A    Yes.

19 Q    Okay.

20 A    I don't have any problems with the ILO system concerning

21 interstitial disease, by the way, if that makes it any easier

22 for you.

23 Q    We'll get there.  Okay.  Back to the 76 people on the CARD

24 mortality study.

25 A    Okay.

1  Q    Again, we're just focusing on the interstitial fibrosis

2  category, right?

3  A    Yes.

4  Q    And of the 76 people, isn't it true that a little more

5  than half of them have 1/0 or higher on the ILO scale for

6  purposes of interstitial fibrosis?

7  A    I think probably so.  I don't know that I know the exact

8  number, but it's probably in that range.

9  Q    Okay.  And let's go back to this.  Claimant Number 1, who

10 is now dead, he appears on the Libby Claimant's Exhibit 10,

11 right, sir?

12 A    Yes.

13 Q    And he's the third one down on the chart?  We established

14 that a moment ago, right?

15 A    Yes.

16 Q    And so, his interstitial fibrosis score is 2/2, right?

17 A    Right.

18 Q    That means he, at least in your view, he had asbestosis?

19 He had asbestosis as defined as interstitial fibrosis of the

20 parenchyma of the lung?

21 A    Yes.  I would agree.  I did feel that he did, indeed, have

22 that.

23 Q    Okay.  And, Dr. Whitehouse, another person shown on Libby

24 Claimant's Exhibit 16A is a gentleman by the name of Claimant

25 Number 12.  Do you see that?  It's right in front of you on top

Whitehouse - Cross/Finch                    151

1  of your big fat notebook.

2            THE COURT:  You have to tell me the numbers.

3            MR. FINCH:  Sure.

4            THE COURT:  My charts don't have names.

5            MR. FINCH:  Sure.  Libby Claimant's Exhibit 16A,

6  which was I guess partially in Evidence subject to relevancy

7  objection.  I guess it was in Evidence as kind of edited like

8  that.

9  Q    Do you have that in front of you, sir?

10 A    I do.

11 Q    Okay.  Do you see that one of the deceased people on there

12 is a gentleman named Claimant Number 12?

13 A    I do.

14 Q    And he --

15           THE COURT:  What line is he associated with?  My

16 chart doesn't have names.

17           MR. FINCH:  Oh, your chart doesn't have names?

18           THE COURT:  No.

19           MR. FINCH:  I'm sorry, Your Honor.  Line Number 1 was

20 Claimant Number 1.

21           THE COURT:  Yes.

22 Q    Do you agree with that, Dr. Whitehouse?

23 A    Yes.

24 Q    And Line Number 12 is Claimant Number 12.  Line 12?

25           THE COURT:  All right.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Do you agree with that, Dr. Whitehouse?

2  A    Yes.

3  Q    Okay.  And on Libby Claimant's 10, Line 55 is that same

4  Claimant Number 12, correct?

5  A    I have it.

6  Q    Do you see him there, sir?

7  A    Yes, I do.

8  Q    Okay.  And if you turn two pages over, the next page, are

9  you with me?  Do you also see Claimant Number 12?  He continues

10 on?

11 A    I'm trying to follow it over here.  I've got it.  Yes.

12 Q    You've got it?  And he keeps on going over.  And I think

13 on your copy I put a little red star?

14 A    Yes.

15 Q    You've got to --

16 A    You did.  Thank you, because it's really hard to see when

17 you get out that far.

18 Q    Yes.  It does.  But it's the same -- and he also has a

19 2/2, right?

20 A    He does.

21 Q    So, you determined that he had asbestosis too, right?

22 A    Yes, I do.

23 Q    Would you agree with me that in making a diagnosis of a

24 lung disease, would you agree with me generally that medical

25 practice, is sometimes as much of an art as it is a science?

1  A    Yes.

2  Q    And would you agree that in making a diagnosis of what

3  lung disease someone has, if they might have multiple things

4  wrong with them, you often rely on your own experience and

5  judgment?

6  A    Yes.

7  Q    And some of these people in the Libby claimant population

8  -- excuse me -- some of these people -- some of the people that

9  are your patients you've known for years, right?

10  A    Yes.

11  Q    And would you agree with me that in coming to a diagnosis

12  of an asbestos-related disease there are some things that are

13  what I would call objective findings that are measurable by

14  tests you can do, and there are other things that are more

15  subjective, such as people's memory about what they were

16  exposed to, their symptoms, how they tell you they're feeling?

17  Do you agree with that?

18  A    Yes.

19  Q    Okay.  So, going back again, I hate to keep shuffling

20  papers around, but that's just the way I am, I guess.  Libby

21  Claimant's 16A, do you have that in front of you, sir?

22  A    16A?

23  Q    Yes.  It's the --

24          MR. FINCH:  May I approach the witness, Your Honor?

25  A    Yes.  This is a settler -- this -- I'm sorry.

1  Q    It's the same --

2  A    Are you talking about the -- 16A is the whole sheet?

3  Q    I think 16A is the whole document, but I'm just -- I'm

4  looking at the --

5  A    Oh, okay.  All right.  I understand.  Oh, I see it down at

6  the bottom here.

7  Q    Okay.  There's a gentleman on there named Claimant Number

8  16, correct?

9  A    And I knew him well.

10  Q    He died, correct?

11  A    He did.

12  Q    He died as a result of peritoneal mesothelioma?

13  A    Yes, he did.

14          THE COURT:  What's the line, please?

15          MR. FINCH:  It's Line 16.  Line 16, Your Honor --

16          THE COURT:  All right.

17          MR. FINCH:  -- on Exhibit 16A.  It's a gentleman

18  named Claimant Number 16.  Correct, Mr. Whitehouse?

19          THE WITNESS:  That's correct.  And he died of a

20  mesothelioma.

21  Q    And for a disease like mesothelioma, in the ordinary

22  course of treatment that diagnosis is confirmed by doing

23  pathology, right?

24  A    Yes.

25  Q    And so, a path report usually comes back for many

1 different types of cancer, correct?

2 A    Yes.

3 Q    A pathology report, sorry for the shorthand, but -- you

4 understood when I said path I meant pathology, right?

5 A    I understood.  Yes.

6 Q    Okay.  And so, the pathology report confirms the

7 mesothelioma, that's an objective item in a medical file that

8 you can say, yes, sir, this man had mesothelioma?

9 A    Yes.

10 Q    And you know from the medical science, and from everything

11 you know about medicine, that if you have mesothelioma, very,

12 very few people survive it, correct?

13 A    Correct.

14 Q    The vast majority of the people who get mesothelioma die,

15 correct?

16 A    Correct.

17 Q    Okay.  Another item of objective evidence that might be in

18 a file is an x-ray, and then a -- an x-ray.  An x-ray is a

19 picture of someone's lungs, correct?

20 A    Correct.

21 Q    A CAT scan is a picture of someone's lungs, correct?

22 A    Correct.

23 Q    And doctors look at that, and for an x-ray, at least,

24 there is a standardized system for how you classify x-rays for

25 pneumoconiosis, right?

1   A     Yes.   The ILO system.

2   Q     The ILO system.   And so, you would say my opinion is that

3   this is a 2/2, that's shorthand for saying it's my opinion this

4   shows interstitial fibrosis of the parenchyma of the lung,

5   correct?

6   A     Correct.

7   Q     And if you have that on a piece of paper, another doctor

8   can look at that, and he may or may not agree with you of what

9   he sees on the x-rays, but he could look at that and say, okay,

10  I know objectively what some doctor thought about what this

11  man's x-ray showed, correct?

12  A     Yes.

13  Q     Okay.   And similarly, when people do lung function tests,

14  there are printouts, or a machine that will show what the test

15  results are, correct?

16  A     Yes.

17  Q     That's another objective piece of medical evidence in a

18  file that helps you decide -- that can be used to help you make

19  a diagnosis, right?

20  A     Yes.

21  Q     Okay.   But -- and I'm talking about non-malignant diseases

22  as compared to mesothelioma, would you agree with me there is

23  more dispute as to how severe a non-malignant disease will be,

24  and how much it will progress as compared to a mesothelioma?

25  A     Yes.

1  Q    And as compared to a lung cancer?

2  A    Yes.

3  Q    And in making the assessment -- let me just give you a

4  hypothetical.  If someone came into your office who had smoked

5  three packs of cigarettes a day for 30 years and he weighed 350

6  pounds, and he had a reduced DLCO, and he was also exposed to

7  Libby asbestos, you would have to make an assessment based on

8  your medical judgment as to whether or not his lung problems

9  were caused by his obesity or his smoking, or the asbestos

10 exposure, right?

11 A    Yes.

12 Q    That's not something -- you could write a letter about

13 that, but you're using partly your subjective skill in making

14 that assessment and determination, correct?

15 A    Correct.

16 Q    And that's not a piece of -- that's not like an x-ray or a

17 pathology report, correct?  Well, let me rephrase the question.

18 It's --

19 A    Yeah, I'm not so sure I totally agree with that, because,

20 you know, pulmonary functions are sort of a definitive report,

21 although it's all subject to interpretation.  So is an x-ray,

22 and so is a path report.

23 Q    Okay.  But I'm talking about on the one category --

24                           (Pause)

25 Q    Okay.  I drew a chart, OBJ is objective, SUBJ is

**J&J COURT TRANSCRIBERS, INC.**

1  subjective, right?

2  A    Yes.

3  Q    So, on the objective you would have something like a path

4  report, right?

5  A    Yes.

6  Q    X-ray --

7              THE CLERK:  Mr. Finch?

8              MR. FINCH:  Yes?

9              THE CLERK:  Would you get a microphone, please?

10             MR. FINCH:  Can you hear me now?

11             THE CLERK:  Just --

12             MR. FINCH:  Can you hear me now?

13             THE COURT:  Now it's on.  Okay.

14             MR. FINCH:  You are picking me up?  Okay.

15 BY MR. FINCH:

16 Q    X-ray is another objective piece of medical evidence,

17 right?

18 A    Yes.

19 Q    So, is a lung function test result, right?

20 A    Yes.

21 Q    Okay.  By contrast, your judgment that the -- the man I

22 was talking about in the hypothetical, the large man who had

23 smoked cigarettes for 60 years, who was also exposed to

24 asbestos, your diagnosis of him in part relies on your

25 subjective training and experience and your knowledge of his

1  life history, correct?

2  A    Correct.

3  Q    So, you put the objective evidence together with your own

4  subjective knowledge and views, and that's how you make a

5  diagnosis, right?

6  A    Yes.

7  Q    And you said you had some problems -- you said you

8  basically agreed with the ILO system, the use of the ILO system

9  for purposes of asbestosis defined as interstitial fibrosis of

10 the parenchyma of the lungs, correct?

11 A    Correct.

12 Q    And you had some problems with the ILO guidelines as they

13 relate to pleural disease defined as either pleural plaques,

14 pleural thickening, or something that is not interstitial

15 fibrosis of the parenchyma of the lungs, correct?

16 A    Correct.

17 Q    Okay.  But notwithstanding your problems with that, would

18 you agree that in general if someone followed the ILO

19 guidelines requirement for saying that blunting would be

20 required to define something as diffuse pleural thickening,

21 that person would not be outside of the bounds of generally

22 accepted medical practice?

23 A    I don't know that I can answer that because I don't know

24 what all the pulmonary docs that are involved in this, how they

25 feel about that.

1  Q    Well --

2  A    I mean, I know what's on paper.  You know?  I know what

3  the ATS says, which is sort of wishy-washy, and I realize the

4  Amelia (phonetic) report, and what you're discussing here and

5  all, but I don't know how all the pulmonary docs in the country

6  actually really feel about that.

7  Q    Okay.  I met you in Seattle several months ago, right?

8  A    Yes.

9  Q    I was -- Mr. Bernick took your deposition, but I took it

10 too, right?

11 A    Correct.

12 Q    And after you got the deposition transcript back you

13 carefully reviewed it and made changes, correct?

14 A    I did.

15 Q    And you didn't just fix typos, you made substantive

16 changes, right?

17 A    I did.

18 Q    And you have a copy of your deposition in front of you,

19 Dr. Whitehouse, this one, the fat one, the big, fat one.  I

20 also took your deposition by telephone last week, right?

21 A    You did.

22 Q    Okay.  The one in Seattle was a lot longer, right?

23 A    Yes.

24 Q    Okay.  Could you turn to Page 62, Line 23?

25 A    62.

1  Q    Line 23?  Are you with me, Doctor?

2  A    Yes.

3  Q    Okay.  And at your deposition I asked you, "In general, if

4  someone followed the ILO guidelines requirement for saying that

5  blunting --"

6  A    Hang on a minute.  I'm on the wrong page.  What did you

7  say it was?  62?

8  Q    62.  Can I -- excuse me.

9          MR. FINCH:  Excuse me, Your Honor.  May I approach

10 the witness?

11 A    I got it.  The bottom of 62.  Yes.  Right here.  Yes.

12 Q    Okay.  You were at your deposition, and I asked you this

13 question.  "In general, if someone followed the ILO guidelines

14 requirement for saying that blunting would be required to

15 define something as diffuse pleural thickening, that person

16 would not be outside of the bounds of the generally accepted

17 medical practice, correct?"

18 "A    Probably not."

19 Q    Did I read that question and answer correctly, sir?

20 A    You did.  And I understand what you're getting at very

21 clearly.  The answer is almost a little bit wishy-washy, too,

22 as the answer I gave you a few minutes ago was wishy-washy,

23 because I actually don't know for sure because I'm not in touch

24 with huge numbers of pulmonary docs anymore.  So, it may very

25 well be that they feel that that's appropriate, but I don't

1 know that --

2 Q    Well --

3 A    -- for certain.  But I doubt that all of them understand

4 that.

5 Q    You certainly didn't add that long qualification to your

6 answer when you had the chance to review it and make changes to

7 your deposition, correct, Dr. Whitehouse?

8 A    No, I did not change it, and I don't know that I would

9 have necessarily changed it.  I think I've just explained what

10 -- you know, sort of how I feel about it.  And if it sounds a

11 little bit wishy-washy, it is.

12          MR. FINCH:  That's all I have, Your Honor.

13          THE COURT:  Mr. Heberling?

14          MR. HEBERLING:  Just a few questions.

15                    REDIRECT EXAMINATION

16 BY MR. HEBERLING:

17 Q    I won't take time going back through all the exhibits, but

18 Dr. Whitehouse, do you remember talking about Claimant Number

19 2's lung function test?

20 A    Did we talk about Claimant Number 2's?

21 Q    Claimant Number 2's lung function test with Mr. Bernick.

22 A    Oh, yeah.  Earlier.  Okay.  Sure.

23 Q    And he pointed out that at the time of settlement Claimant

24 Number 2's forced vital capacity was a hundred?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    And did you -- do you have the sheet in front of you, 16A?

2 A    I do.

3 Q    What was his diffusion capacity at the time of settlement?

4 A    62 percent of predicted.

5 Q    And what is that in terms of severity?

6 A    That's getting down into very severe range.  It's

7 moderately severe.

8 Q    And of the three lung functions, forced vital capacity,

9 total lung capacity, and diffusion capacity, can a patient have

10 just one number be severe?

11 A    Yes.

12 Q    And does that make for severe disease in most cases?

13          MR. BERNICK:  Objection.  This is all leading.

14          THE COURT:  It is.  You can answer this question,

15 doctor.

16 A    Yeah, it does.  You know, you can have any -- any one

17 number, in some senses, although the FVC and TLC tend to go

18 together most of the time, but an isolated DLCO is a common

19 phenomena in Libby, and it's associated with severe shortness

20 of breath frequently.

21          THE COURT:  I'm sorry, Doctor.  You're fading out,

22 and I can't hear you.  I'm sorry.  Could you --

23          THE WITNESS:  I was not close enough?

24          THE COURT:  Yes.  I think that's the -- yes, sir.

25          THE WITNESS:  Are you okay now?

1          THE COURT:  Thank you.

2          THE COURT:  Do you want me to repeat my answer?

3          THE COURT:  Please.

4   A    You know, frequently the FVC and TLC tend to mirror each

5   other a little bit, but in Libby we have an awful lot of people

6   with isolated DLCO numbers that are low, in fact, even a lot

7   lower than that, and they may be very short of breath, and

8   that's an observation that is present when you look through a

9   lot of pulmonary functions from there.

10  Q    And then, with regard to the progression of two or three

11  people, do you recall that you had two or three patients whose

12  data was shown to you, and it appeared that they didn't

13  progress?

14  A    Yes.

15  Q    Is that unusual?

16  A    No, it's not unusual.  In fact, even in the study that I

17  had done we had -- I forgot how many -- 24 percent that had not

18  progressed during the period of that study.

19  Q    Okay.  Then, Claimant Number 13, his DLCO was shown on

20  cross examination to have moved from 68 at the time of

21  settlement to 53 currently.  Do you recall that?

22  A    I do.

23  Q    What is the meaning of a 53 diffusion capacity?

24  A    That's a fairly severe decrement.

25  Q    And having used up my one or two shots at the completeness

1  rule, I think what I -- do you have your deposition from June

2  2009 in front of you?

3  A    Yes, it's here.

4  Q    Page 161?  Let's say 159, at the beginning?

5  A    I have it.

6  Q    Do you see at the bottom of 159 you were asked about --

7  the question of whether the ILO and the ATS may require

8  blunting of the costophrenic angle?

9  A    Yes.

10 Q    And --

11 A    It's on 159.

12 Q    Yes.  And then, at the top of 160 --

13 A    Yes.

14 Q    You said, "That's true."?

15 A    Yes.

16 Q    Then, if the --

17        MR. HEBERLING:  If I may, I'd like to read the

18 correction that he had --

19        THE COURT:  All right.  When is the -- where is the

20 correction coming from?  Is it part of the transcript?

21        MR. HEBERLING:  From the corrections page to the

22 deposition, which was dated June 16, 2009.

23        THE COURT:  I don't think it's attached.

24        MR. BERNICK:  It's not.  It was filled out

25 subsequently, I think.

1          THE COURT:  Okay.  So, I don't have it.  I think

2    you're going to have to make that correction sheet, if, in fact

3    there are corrections, part of the record, because I don't

4    think any of these exhibits have it.

5          MR. HEBERLING:  Okay.  Well, we --

6          THE COURT:  But, yes, you can read it.

7          MR. HEBERLING:  -- we sent it to the Court reporter,

8    and the Court reporter may not have delivered it somehow.

9          THE COURT:  It's not in the binder.  But in any

10   event, I think you'll just have to mark them as a -- as the

11   correction sheet so we have it as part of the record, please.

12         MR. HEBERLING:  We'll do that.

13         MR. BERNICK:  I would object to that.  I don't

14   believe that they are proper corrections, and therefore they

15   shouldn't come into Evidence, they shouldn't be part of the

16   record unless they comply with the rules.  These are

17   substantive changes.  If Mr. Heberling wants to have the

18   witness alter the testimony under oath on the stand, I don't

19   have any problem with that.

20         THE COURT:  Well, I thought --

21         MR. BERNICK:  But that is effectively the same thing.

22         THE COURT:  Okay.  That's what I thought we were

23   getting into, and I think if that's what happens we should have

24   them as part of the record.  If I'm not correct about what's

25   happening, then, okay.  Let's just start with yes, you may read

1  the -- you may ask the doctor a question about it is I think

2  the way to proceed.

3  BY MR. HEBERLING:

4  Q    Did you make a correction to the deposition?

5  A    Yeah, I did, relative to the ATS statement.

6  Q    And 160 --

7                          (Pause)

8  Q    As to the entry at Page 160, Line 1, is that the

9  correction you made?

10  A    Yes.

11  Q    Would you read that into the record?

12  A    I said, of the ILO I answered that part of the question,

13  but I added, I do not think ATS 2004 should be read to always

14  require blunting to define diffuse pleural thickening.  At the

15  same page, 707, the ATS recognizes a DPT by DPT superimposed on

16  circumscribed plaques and caused by extension of interstitial

17  fibrosis to the visceral pleura.  These two conditions do not

18  involve blunting.  Also, ATS 2004 did not change its definition

19  of pleural plaques to include all pleural thickening without

20  blunting.

21  Q    Is there --

22          MR. BERNICK:  Your Honor, I -- again, I don't think

23  that that is proper procedure to simply have him say that's

24  what the correction was.  It's not a proper correction.  If he

25  wants to change his answer now, I don't want to put him through

1 the process of reiterating it all over again, but if we're

2 going to continue to do this, Mr. Heberling should simply say

3 do you want to change your answer from the deposition?  Yes.

4 And then he can explain why.

5          THE COURT:  That's, I think, correct.  That clearly

6 goes beyond what the concept of changing the record on a

7 deposition is all about.

8          MR. HEBERLING:  Your Honor, I would submit that it's

9 in Rule 30, Federal Rules of Civil Procedure, the rule on

10 corrections for depositions says both as to form and substance.

11          THE COURT:  It does say as to form and substance,

12 however, I don't think it was contemplated that somebody is

13 going to add an answer to a question that essentially would

14 lead to other questions.  I mean, the substance can be that the

15 Court reporter put in a not, and maybe you mis-spoke and it

16 shouldn't be a not.  I don't think it's intended to -- I don't

17 think it's intended to have a whole page of additional

18 testimony that may relate to something.  However, that's not an

19 issue for today.  The issue for today is how to proceed, and

20 Mr. Bernick is correct.  The witness is here on the stand.  If

21 he said something and he wants to explain it or change it, he

22 should be given that opportunity, but you need to ask him the

23 question, not show him the document and ask him whether that's

24 his correction.  You need to ask him what his testimony is.

25          MR. HEBERLING:  Okay.  I'll shorten it up by asking

1  --

2  BY MR. HEBERLING:

3  Q    Does the correction reflect your views on this point?

4           MR. BERNICK:  I really don't -- I want to get this

5  thing over with, but again, that is just not proper.  That's

6  totally leading.  Maybe you just ought to say what should your

7  answer be in your own words so that we don't simply have

8  something that's been written and gone over after the

9  deposition now be, you know -- now constitute a question that's

10  not even a proper question to begin with.  That's a leading

11  question.

12           THE COURT:  That's sustained.

13           MR. HEBERLING:  Okay.  I'm sorry.  I tried to do it

14  quicker.

15  BY MR. HEBERLING:

16  Q    So, as to the issue of whether you believe the ATS 2004

17  document requires blunting for calling out diffuse pleural

18  thickening, what is your view?

19  A    Well, I actually alluded to that.  I read that, then I

20  realized I mis-spoke.  Basically it does not require blunting

21  as part of the definition of diffuse pleural thickening, and it

22  goes on --

23           THE CLERK:  Speak up, sir.

24  A    And then it goes on to say that the causes of diffuse

25  pleural thickening may be related to confluent plaques, or to

1    asbestosis with fusion of the pleura.  That sort of -- that

2    whole business concerning the three types of causes of diffuse

3    pleural thickening, and so -- put in in some other articles.

4    And that's basically what I was saying when I changed it.

5    Q    And then, under the ILO system, if there's no blunting of

6    the costophrenic angle and you have read diffuse pleural

7    thickening but there's no blunting, then what does the ILO call

8    the pictures?

9    A    Currently they call it plaques now.

10   Q    Do you think that's correct?

11   A    No, I don't.

12   Q    Why?

13   A    Well, two reasons.  I agree with the ATS standard.  But

14   secondly, from my experience and a lot of my experience

15   obviously is Libby, we see all kinds of people with diffuse

16   pleural thickening.  They are seriously impaired without any

17   blunting.

18   Q    And then, Mr. Finch went through mesothelioma, lung

19   cancer, and asbestos disease with you as to how it may be

20   diagnosed, and the objective symptoms versus subjective, and so

21   forth.  Now, as to all three of those diseases, may they be

22   caused by asbestos?

23        THE COURT:  All three of which diseases?

24        MR. HEBERLING:  Mesothelioma, lung cancer, and

25   asbestos-related disease.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. HEBERLING:  Maybe I didn't mention the third one.

3  A    Yes.

4  Q    And is ARD, or asbestos-related disease, what is referred

5  to in the ATS 2004 document?

6  A    Yes.

7  Q    And in connection with your diagnosis, with any doctor's

8  diagnosis, is information taken as to the history of exposure?

9          MR. BERNICK:  Your Honor, A, this is repetitive of

10  probably three different people's testimony; B, it's leading;

11  and C, it's not appropriate redirect examination.

12          THE COURT:  Well, it's leading, but he was asked

13  about some of this on cross examination, so it's leading.

14  That's sustained.

15  Q    Do you take a history of asbestos exposure?

16  A    Absolutely.  The first thing.

17  Q    And can doctors disagree about a history of asbestos

18  exposure, whether or not it may have caused or been sufficient

19  to cause disease?

20  A    Yes.

21  Q    Is that true with lung cancer?  Or can it be true with

22  lung cancer?

23  A    It can to the extent that you can disagree whether it's

24  asbestos related, smoking related, or just occurred, or -- so,

25  it's possible, yes.

1 Q    Can that occur with asbestos-related disease, as well?

2 A    Well, you always have to come to the conclusion --

3         MR. FINCH:  Objection.  Asbestos-related disease --

4 objection, Your Honor.  Asbestos-related disease is vague.

5         MR. HEBERLING:   Okay.

6 Q    Can that occur with non-malignant asbestos-related disease

7 that doctors may disagree as to the factors that you indicated?

8 A    Well, yeah.  They not only disagree whether it is asbestos

9 related, but they can also disagree as to what the exposure was

10 and how significant it was.  There's a lot of areas that they

11 could disagree on.

12 Q    And can it also occur with regard to mesothelioma in the

13 same way?

14 A    I don't think so.  The phrase that I have heard -- I'm not

15 sure who to attribute this to -- was that if you have somebody

16 with a mesothelioma and you can't find the asbestos exposure,

17 you haven't looked hard enough.

18 Q    And then, can there be a disagreement as to what era or

19 what time of asbestos exposure may have caused the

20 mesothelioma?

21         MR. FINCH:  Objection, Your Honor.  Well beyond the

22 scope of cross.

23         THE COURT:  That's sustained.

24 Q    And then, as to all three diseases, mesothelioma, lung

25 cancer, and non-malignant asbestos-related disease, can it

1  occur that doctors disagree as to whether the disease in

2  question is correctly diagnosed?

3  A    Well, generally the -- the question of diagnosis of

4  mesothelioma and cancers is pretty well established, but there

5  is certainly disagreement concerning non-malignant asbestos

6  diseases.

7            MR. HEBERLING:  Okay.  That's all I have.  Thank you.

8            MR. FINCH:  Recross -- very  brief recross, Your

9  Honor.

10                      RECROSS EXAMINATION

11 BY MR. FINCH:

12 Q    Dr. Whitehouse, this is the --

13            THE CLERK:  Speak into the mike, please.

14 Q    Dr. Whitehouse, do you see on the ELMO, or in the screen

15 in front of you, that's the demonstrative exhibit I had showed

16 you on direct?  Do you see that, sir?  Do you agree with that?

17 A    Yes, I do.

18 Q    And I added something, 2004 ATS, blunting, question mark?

19 A    Yes.

20 Q    Okay.  You were not a major in English in college,

21 correct?

22 A    I was what?

23 Q    You were a chemistry major in college, correct?

24 A    Well, that was just a -- to get out of Cornell.  Actually

25 I was a pretty much liberal arts student.

                    **J&J COURT TRANSCRIBERS, INC.**

1              (Laughter)

2    Q    Okay.  Isn't it true that the 2004 ATS statement, and it's

3    in your book behind -- can you see the screen?

4    A    Yes, I see it.

5    Q    Okay.  What it says is diffuse pleural fibrosis extends

6    continuously over a portion of the visceral pleura, often

7    caused, comma -- it has a comma there, right?

8    A    Yes.

9    Q    Often causing adhesion to the parietal pleura, comma,

10   right?

11   A    Yes.

12   Q    Involving the fissures and obliterating the costophrenic

13   angle, period.  Correct?

14   A    Oh, yes.  It does say that.

15   Q    Okay.

16            MR. FINCH:  Your Honor, I would at this time offer,

17   just for demonstrative purposes, what has been marked 600A, and

18   I'd also like to hand up at the same time, we put an exhibit

19   sticker on Plan Proponent's Exhibit 600.  600 is in Evidence

20   for demonstrative purposes, but it was shown to this witness

21   before I wrote all over it.  600A is the document as I wrote on

22   it for demonstrative purposes.

23            THE COURT:  I need to go back to the exhibit you were

24   just using to read, because I don't know what exhibit that was.

25            MR. FINCH:  This, Your Honor, this is Exhibit Plan

1 Proponent's, in Evidence, 147.

2          THE COURT:  Page what?

3          MR. FINCH:  Page 707.

4          THE COURT:  All right.  With respect to Exhibit 600A,

5 it's admitted for demonstrative purposes only, but let me make

6 a note before you go on, please.

7                    (Pause)

8          THE COURT:  All right.  Thank you.

9          MR. FINCH:  I don't have anything further.  If I

10 could just hand up the documents?

11          THE COURT:  Yes.  Thank you.  Mr. Bernick, did you

12 have any recross?

13          MR. BERNICK:  No.  Thank you, Your Honor.

14          THE COURT:  All right.  You're excused, Dr.

15 Whitehouse.  Thank you.  Oh, Mr. Heberling.  I'm sorry.  Did

16 you have anything in response to that --

17          MR. HEBERLING:  No.

18          THE COURT:  Okay.  You're excused, Doctor.  Thank

19 you.

20          MR. HEBERLING:  We rest our case.

21          THE COURT:  All right.

22          MR. HEBERLING:  Well, I can't quite say that because

23 of the crossovers with the other witnesses.

24          THE COURT:  I don't --

25          MR. HEBERLING:  I withdraw my statement that we rest.

1          THE COURT:  You're finished with your evidence in

2  this part of the trial; is that what you're saying?

3          MR. LEWIS:  Well, we have some other evidence, Your

4  Honor.

5          THE COURT:  Oh, you do?

6          MR. LEWIS:  Yes.  Some stipulated -- we want --

7          THE COURT:  All right.  I need a moment, then, so I

8  can put some things away so I don't lose track of them first,

9  please.

10          MR. LEWIS:  I will wait on that, counsel.

11          THE COURT:  Mr. Lewis?

12          MR. LEWIS:  Counsel objects to me putting this

13  evidence now because he wants to use the time to get his

14  witnesses.  I think he's right.  We'll get the witnesses on and

15  I'll bring this evidence back later.

16          THE COURT:  All right.

17          MR. LEWIS:  If that's satisfactory with the Court.

18          THE COURT:  That's fine.

19          MR. FINCH:  We have no objection to that.

20          MR. BERNICK:  Thank you very much.  Plan proponents

21  call Dr. David Weill.

22          THE CLERK:  If you could raise your right hand,

23  please?

24       DR. DAVID WEILL, PLAN PROPONENT'S WITNESS, SWORN

25          THE CLERK:  Please be seated.


                    **J&J COURT TRANSCRIBERS, INC.**

1                    DIRECT EXAMINATION

2  BY MR. BERNICK:

3  Q    Good afternoon, Dr. Weill.

4  A    Good afternoon.

5  Q    I'm going to stand over here so I don't create problems

6  with the other microphone.  I know that you appeared before the

7  Court before, correct?

8  A    I did.

9  Q    Okay.  Could you just tell us a little bit about your

10 educational background, leading up to the time of your

11 graduating from medical school?

12 A    Sure.  I grew up in New Orleans, Louisiana, went to

13 College at Tulane in New Orleans, and then ultimately went to

14 medical school in New Orleans as well.

15 Q    Okay.  Did you complete fellowships thereafter?

16 A    I did.

17 Q    And where were they?

18 A    I did a internal medicine residency at University of Texas

19 Southwestern in Dallas at Parkland Hospital and then did a

20 pulmonary and critical care fellowship at the University of

21 Colorado Health Sciences Center and also did an extra year in

22 lung transplantation training at Colorado as well.

23 Q    Okay, and after that what was your next position or next

24 professional position?

25 A    I ran a heart and lung transplant program in Dallas, Texas

1   at a private hospital after training then had two other

2   academic positions in Birmingham at the University of Alabama

3   at Birmingham and then back to the University of Colorado, and

4   now I'm at Stanford University for the last four years

5   directing the lung and heart lung transplant program there as

6   well as the adult cystic fibrosis program.

7   Q    And do you have a position at Stanford University Medical

8   Center, an academic or professorship position?

9   A    I do.  I'm an Associate Professor of Medicine there.

10  Q    Okay, and are you board certified?

11  A    I am in pulmonary and critical care medicine.

12  Q    Have you testified regarding -- have you done work in the

13  area of asbestos in particular?

14  A    Yes, I have.

15  Q    Could you tell us a little bit about that?

16  A    I've authored a book chapter on the clinical aspects of

17  asbestos-related diseases as well as a publication in the

18  American Thoracic Society Journal.  I've also seen numerous

19  patients in my end-stage lung disease practice with

20  pneumoconiosis and have been referred hundreds of cases for

21  medical legal consultation.

22  Q    Okay.  Have you done work at a governmental level

23  involving asbestos?

24  A    Yes, I've had the opportunity to testify twice before

25  senate subcommittees regarding various aspects of asbestos and

1  silica-related diseases.  I have also had the opportunity to

2  testify in the Texas State Legislature about the same.

3            MR. BERNICK:  Okay.  Hang on for half a second.

4                      (Pause)

5            MR. BERNICK:  We tender -- we proffer Dr. David Weill

6  as an expert in pulmonary medicine, Your Honor.

7            THE COURT:  No objection.  He's accepted and able to

8  offer expert opinion in the area of pulmonary medicine.

9  BY MR. BERNICK:

10 Q    Dr. Weill, have you done work in analyzing the progression

11 study that was published by Dr. Whitehouse in 2004 involving

12 123 people who have been diagnosed with asbestos-related

13 illness?

14 A    Yes, I have.

15 Q    And for the record, that is Exhibit 1 -- Libby Claimant's

16 Exhibit 1.  And did you do that work in connection with this

17 case?

18 A    I did.

19 Q    Okay.  I want to go through a few demonstratives and have

20 you explain to the Court what it is that you did, and I want to

21 begin with Demonstrative -- Plan Proponents' Demonstrative 502-

22 10, and let me begin by the left-hand part of the page.  Could

23 you tell us a little bit about the group or population that Dr.

24 Whitehouse studied in connection with that work?

25 A    His population was a patient population, so they were

1  defined by having had a clinical disease or a respiratory

2  problem for which they sought his help as a pulmonologist.

3  Q    Okay.  Was this a randomly selected population?

4  A    No, it was not.

5  Q    Was this a population that had a control -- a group of

6  matched controls?

7  A    No, it did not.

8  Q    I take it from that that it was not a controlled study in

9  the sense of a controlled --

10             MR. LACEY:  Objection.  Vague.

11             THE COURT:  Vague?  Overruled.

12             THE WITNESS:  Could you repeat --

13 Q    Tell us whether -- tell -- you -- there's been a lot of

14 testimony before this Court about controlled epidemiological

15 studies.  Are you familiar with that term?

16 A    Yes.

17 Q    Could you tell us whether --

18             MR. LACEY:  Your Honor, objection.  I know that we

19 discussed this at length this morning, but for the record we

20 need to make an objection on the nature of the testimony here

21 today.  There was -- Dr. Whitehouse is a rebuttal expert -- or

22 excuse me -- Dr. Weill is a rebuttal expert, and Dr. Whitehouse

23 did not testify to the Whitehouse '04 study, and all of this

24 testimony is going beyond the scope of the direct evidence that

25 the Libby claimants brought in.

1          MR. BERNICK:  There's an individual named Dr.

2   Molgaard who testified as part of the Libby claimants' case.

3   That individual testified regarding the progression study

4   published in 2004 by Dr. Whitehouse.  It may be that Dr.

5   Whitehouse -- the claimants chose not to have Dr. Whitehouse go

6   back to the study itself and explain it in detail.  This

7   witness is entitled -- we are entitled to proffer this witness

8   for his response to the testimony of Dr. Molgaard as well as

9   the testimony of Dr. Whitehouse concerning the progression

10  study.

11         MR. LEWIS:  Your Honor, there's a big problem here.

12  Counsel stood before this Court and said this witness would

13  only testify as to the progression study.  We might have

14  handled our witness considerably different if he had not made

15  that representation to the Court, and we need him to honor his

16  representation to the Court.

17         THE COURT:  You did say that.

18         MR. BERNICK:  I said that I would just talk about the

19  progression study.

20         THE COURT:  Right.

21         MR. BERNICK:  That's what this is.

22         THE COURT:  He's talking about the 123.  It's the

23  same issue.  I'm lost as to what the objection is.

24         MR. BERNICK:  Let me be very clear.  The 123 -- I

25  just asked him five questions ago whether he did work on the

1  2004 progression study --

2          THE COURT:  Yes, you did.

3          MR. BERNICK:  -- involving 123 people.  This is the

4  population for that study.

5          THE COURT:  That's why I said I'm --

6          MR. HEBERLING:  Your Honor, Dr. --

7          THE COURT:  -- I'm lost.

8          MR. HEBERLING:  Dr. Weill's report contained nothing

9  on issues --

10          THE COURT:  You need to turn your microphone on.

11          MR. HEBERLING:  Dr. Weill's report contained nothing

12  on issues of randomness or control or anything like that.

13          THE COURT:  It --

14          MR. HEBERLING:  He's beyond --

15          THE COURT:  This is about the study.

16          MR. HEBERLING:  -- his report.

17          THE COURT:  No, Dr. Molgaard testified about that.

18  Somebody else in this case has testified about it.  This is not

19  the first time the progression study has come up.

20          MR. HEBERLING:  We understand that --

21          THE COURT:  All right, then this --

22          MR. HEBERLING:  -- but --

23          THE COURT:  -- is a rebuttal witness concerning the

24  progression study.

25          MR. HEBERLING:  But other people -- other experts

Weill - Direct/Bernick                        183

1  covered this in their report.

2          MR. BERNICK:  You know what, Your Honor?

3          MR. HEBERLING:  Dr. Weill didn't -- we're beyond Dr.

4  Weill's report.

5          MR. BERNICK:  I'll tell you what.  This --

6          THE COURT:  Oh, I see.

7          MR. BERNICK:  This is so -- such an -- in light of

8  Dr. Whitehouse's own testimony over their objection on this

9  subject, I'll go on to something else.

10 BY MR. BERNICK:

11 Q    This patient population of 123 people, Dr. Weill, let's

12 just focus on that for just a moment.  Could you tell us, as

13 you understood it, the protocol that was filed by -- followed

14 by Dr. Whitehouse in analyzing pulmonary function testing for

15 this population?

16 A    Yes.  The 123 patients had two pulmonary function tests,

17 at least, defined as being separated by more than one year, and

18 he also had the first and last tests conducted up until 2001.

19 Q    Okay, so if we wanted to kind of illustrate this.  He

20 would take with respect to an individual claimant, so claimant

21 or Person 1, we have how many tests?

22 A    At least two.

23 Q    At least two, separated by at least a year.

24 A    That's right.

25 Q    So we have Test 1 and Test 2.  Now, tell us in your own

Weill - Direct/Bernick                    184

1  words what Dr. Whitehouse did in order to analyze progression

2  in this population of 123 people using those two data points.

3  A    Basically what he was trying to report is a slope

4  analysis, and a slope analysis looks at change in lung function

5  over time, and it's a longitudinal study by its very design.

6  Q    Slope.  As between Points 1 and 2, what would the slope

7  be?

8  A    So the slope would represent the annual loss in lung

9  function.  In this case the percent predicted forced vital

10  capacity, or FVC.

11  Q    The slope is the slope of a line?

12  A    That's right.

13  Q    So you draw a line between --

14  A    Test 1, Test 2.

15  Q    And then you figure out the slope.

16  A    That's right.

17  Q    Okay.  Now in order -- once he does that calculation for

18  one of the claimants, that is the slope between 1 and 2 for one

19  of the claimants, what does he do for all the rest?

20  A    The exact same thing.

21  Q    And after he's got the slope lines for all 123, what does

22  he do next?

23  A    He then averages the annual change, if any, seen in the

24  percent predicted FVC.

25  Q    Okay, and what is it that Dr. Whitehouse ultimately

**J&J COURT TRANSCRIBERS, INC.**

1  determined --

2  A    He --

3  Q    -- as being the annual decline yearly -- year-by-year

4  annual decline in pulmonary function test results in this

5  population of people?

6  A    He found that on average, among the 123 patients, there

7  was a loss of 2.2 percent of percent predicted FVC.

8  Q    Okay.  Do we have that reflected here on Plan Proponents'

9  502-10?

10 A    That's right.

11 Q    That's the number over here?

12 A    Right.

13 Q    Okay.  Now did you -- what did you do in order to analyze

14 this data?

15 A    We were concerned about two things primarily with regards

16 to the slope analysis.  One was the number of data points that

17 were contained in the analysis and, secondly, the length of

18 followup, which is very important when you're doing

19 longitudinal slope analysis.

20 Q    Okay.  Beyond that --

21       MR. LACEY:  Objection.  Non-responsive.  Move to

22 strike.  He asked for what he did, and all Dr. Weill did is

23 address concerns.

24       MR. BERNICK:  Oh, okay, I'll tell you what.  That's

25 fine.  We will accept that motion.

1  Q    And now I'd like to go over carefully one by one by one

2  all of the different concerns, if you had any, regarding Dr.

3  Weill's study -- Dr. Weill's study -- Dr. Whitehouse's study.

4  A    Sure.  And I believe we have a demonstrative --

5  Q    I understand that --

6  A    -- to demonstrate that.

7  Q    -- but they've been very concerned over here about showing

8  you the demonstrative in advance, so we're going to ask you for

9  your views, and if you leave something out, maybe I'll remind

10 you.

11 A    Very good.

12 Q    I want to list all the concerns that you had with the work

13 that Dr. Whitehouse did in this progression study.

14 A    So in the context of being concerned about the number of

15 data points and the length of followup of that data, we tried

16 to collect as much data as we could -- as many data points as

17 we could over as long a period of time as possible.  We also

18 wanted to address concerns about, for instance, height, which

19 will affect a percent predicted FEV1s.

20 Q    What?

21 A    Height.

22 Q    Height?

23 A    Yes.

24 Q    Okay.

25 A    Age of the study subject, all things that might influence

1 the results of a slope analysis.

2 Q    Okay.

3 A    We wanted to also when we were looking at individual

4 slopes in the Whitehouse patient population put some

5 plausibility tests to them.  In other words, we wanted to

6 figure out if someone's loss of lung function is biologically

7 plausible, and one of the things I did as the clinician in our

8 multi-disciplinary group is take a close look at that.

9 Q    Okay.  Did you perform your own study based upon the data

10 that was available to you concerning Dr. Whitehouse's work?

11 A    We did.

12 Q    I want to show you Exhibit 502-10, and we have the same

13 top line of what Dr. Whitehouse did here.  Do the next two bars

14 relate to what it is that you did?

15 A    We did.

16 Q    And could you explain to the Court what it is that you did

17 in your analysis of that data that was different from what Dr.

18 Whitehouse had done?

19 A    So the second bar indicates that we looked at the same 123

20 patients, but this time considered all the pulmonary function

21 testing that was available.

22 Q    Oh, stop.  Stop.  So you looked to the same people, the 1

23 through 123.  Tell me whether you found that -- with respect to

24 the same people, tell me whether or not there was additional

25 data that you found.

1  A    Nearly uniformly, we were able to find quite a significant

2  number of additional pulmonary function tests.

3  Q    And these are function tests for exactly the same people?

4  A    That's right.

5  Q    Tell me whether there was any indication that Dr.

6  Whitehouse had even taken the time or -- let me just take that

7  back.  That is a wrong -- tell me whether Dr. -- you found any

8  indication that Dr. Whitehouse had analyzed that data in

9  connection with his research.

10  A    There was no indication of that.

11  Q    So we now have some additional data points?

12  A    We do.

13  Q    Were some of them in the middle of the first two?

14  A    Some of them were.

15  Q    Were some of them after the ones that had been analyzed?

16  A    Some of them were.

17  Q    Okay.  What else -- is that the second bar that we have

18  here, same population, all data?

19  A    And I should also point out, just to be complete, that

20  some of them were before the Whitehouse data.

21  Q    So in that case tell me whether the Whitehouse protocol

22  had been followed in all cases?

23  A    No, it wasn't.

24  Q    By Dr. Whitehouse?

25  A    That's right.

1 Q    Okay.  What was the next thing that you did that was

2 different?

3 A    We also wanted to -- for that same patient population

4 wanted to create our own slope analysis.

5 Q    Okay, and so if you now have more data points, I take it

6 you wanted to see whether that would affect the slope.

7 A    That's exactly right.

8 Q    Did you rerun all the slope curve -- all the slopes using

9 now all data points for the same patients?

10 A    We did.

11 Q    Okay, and did you then go ahead and determine in the same

12 fashion that Dr. Whitehouse did what the annual decline was

13 based on those slopes?

14 A    We did.

15 Q    Okay.  Now, let's take a look at the third bar and ask you

16 was there something else that you did beyond looking at all of

17 the data that was available with respect to each one of the

18 original patients in the 123?

19 A    Yes, it was.  We actually received data on patients that

20 were not included in the 123 but were taken care of by Dr.

21 Whitehouse in his practice, and he -- we analyzed their lung

22 function as well.

23 Q    Okay, so we're now talking about people that are beyond

24 the 123.  There are other patients.

25 A    That's right.

Weill - Direct/Bernick                    190

1  Q    And so you've got more people where you do essentially the
2  same thing.
3  A    Yes.
4  Q    Now, once you had done this additional work on other
5  patients, did you run again the same analysis?
6  A    We did.
7  Q    When you ran the analysis this third time, did you combine
8  all of the data into one analysis?
9  A    The -- we actually looked at it both ways.  We looked at
10 it separately and together as was in my -- as was stated in my
11 report.
12 Q    Are there additional aspects of the protocol that you
13 followed that are set out in Plan Proponents' Exhibit 502-10?
14 A    We did have concerns about the data, and one of the things
15 that we paid close attention to was reconciling all the
16 information that was coming in to us.  And so by reconciling, I
17 really mean making sure that we had accurate dates of birth,
18 for instance, so that we can calculate proper control values.
19 We also wanted to make sure that we had height recorded
20 accurately, because in some places a patient had an implausible
21 change in their height over a very short period of time.  And
22 so we wanted to make sure that we developed a height that was
23 reliable and did so by creating a mean or a medium height when
24 we analyzed these data.
25 Q    Okay.  Let's now take a look at the results.  Turning to

J&J COURT TRANSCRIBERS, INC.

1 Plan Proponents' Exhibit 502-10, does this display the results

2 of the slope calculations run with the two different approaches

3 that you used?

4 A    Yes, it does.

5 Q    And what we find is that for the same population with all

6 data, the annual decline in forced vital capacity percent

7 predicted, was what?

8 A    Less than one percent per year, and specifically around

9 three quarters of a percent per year.

10 Q    And in relationship to the slopes that Dr. Whitehouse had

11 calculated, what roughly is the relationship between the two?

12 A    It's about at one third of the lung function loss that he

13 reported.

14 Q    And finally with respect to the second approach, what did

15 you determine was the annual percent decline when all of the

16 data was considered?

17 A    We found that there was about two thirds of one percent

18 loss of predicted FVC per year or .652 percent.

19 Q    Two thirds --

20 A    Of a percent.

21 Q    Two thirds of a percent.  And again that would've been

22 what, roughly a third to a quarter of what Dr. Whitehouse had

23 found?

24 A    Yes.

25 Q    Okay.  Now, as an expert in pulmonary medicine, of what

Weill - Direct/Bernick                    192

1  significant -- what significance, if any, does the decline of

2  less than one percent per year mean?

3  A    That would --

4  Q    -- does it have?

5  A    That would be in keeping with normal lung function loss

6  associated with aging even in a non-smoking population.  The

7  clinical significance of that would be zero.

8  Q    Okay.  Now, there have been some criticisms that have been

9  lodged against your work, and let's just go through them.  One

10 of the things that was said, both by Dr. Whitehouse, and,

11 actually, this is a quote taken from something that counsel

12 said yesterday, "Weill threw out the dead people from --" or

13 maybe this was Dr. Frank.  Excuse me.  "Weill threw out the

14 dead people from the Whitehouse patient population analysis."

15 Is that right?

16 A    Absolutely not.

17 Q    Well, then I want you just to explain what it is that

18 apparently is being said here and why it is wrong.

19 A    We didn't exclude any dead people.  In fact, we took all

20 the data as it came in to us and calculated slopes for all the

21 data.  Whether or not a patient subsequently died or not wasn't

22 particularly relevant to this study.  We created slope analysis

23 for all data and all patients that we received data on.

24 Q    Okay.  Were there any ex -- were there any data points

25 that were not useable?  That is, was there data that could not

Weill - Direct/Bernick                    193

1  be included in your analysis that does not appear?  Let me just

2  put it this way.  Roughly how many different tests ended up

3  being the subject of your analysis?

4  A    Just a little over 38 hundred.

5  Q    Okay, and were all of those tests ultimately useable for

6  purposes of your work?

7  A    All but around 30, although we didn't think that any or

8  very few met ATS criteria.  We wanted to be as inclusive as

9  possible in this study, and so only threw out about 30 tests

10 when it was indicated by Dr. Whitehouse's respiratory

11 technician that the patient was not able to perform the test

12 properly.

13 Q    Were there any people in the patient population -- any

14 people in the patient population where you couldn't use their

15 data -- they didn't -- since the people themselves weren't

16 included in the final analysis?

17 A    The only people that we couldn't include in the final

18 analysis -- and I think there was a total of 13 -- are people

19 that did not have lung function tests two or more over greater

20 than two years.  So, in other words, the length of followup was

21 so short that we weren't able to really draw a slope analysis.

22 One of the most important things lending precision to

23 longitudinal lung function analyses is to make sure that you

24 have an adequate period of followup for those patients.  So, in

25 other words, the tests that you're interested in studying have

J&J COURT TRANSCRIBERS, INC.

Weill - Direct/Bernick                    194

1  to be separated by a sufficient amount of time.  Most authors

2  think that that's somewhere in the three- to five-year range,

3  but we decided to be as inclusive as possible and go down to

4  two years or more of followup.

5  Q    Okay.  Another criticism that has been lodged I believe in

6  the reports is that the population in what -- you know, that's

7  analyzed in the Whitehouse paper can't be compared to the

8  broader patient practice that Whitehouse had.  Is that a

9  criticism that you're familiar with?

10 A    Yes, I am.

11          MR. LACEY:  Objection.  Misstates the record.

12 Q    Well, is that your understanding of the criticism?

13          THE COURT:  Wait.  I'm sorry.  What's the

14 misstatement of the record?

15          MR. LACEY:  The concern -- counsel was --

16          MR. BERNICK:  Go ahead.

17          MR. LACEY:  Counsel is stating -- Can you hear me?

18          THE COURT:  Yes.

19          MR. LACEY:  Counsel is stating what the Libby

20 claimants' position is, and that is not the Libby claimants'

21 position.

22          THE COURT:  No, I thought there was -- I thought the

23 statement was that it was a criticism of the study.

24          MR. BERNICK:  Yes.

25          THE COURT:  Would you rephrase the question?

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                    195

1  Q    What did you understand to be a second criticism that has
2  been lodged on your work -- as to your work by Dr. Whitehouse?
3  A    That the Whitehouse patient population that he reported on
4  in his manuscript was never meant to be representative of any
5  other group.
6  Q    Okay, and what is your response to that?
7  A    I agree with him.  I don't think it is.
8  Q    There's also a reference to the use of -- the fact that
9  you in your work used the PFT scores that had been taken from
10 four or five different machines.  Did I get that right or is
11 there a better way to put it?
12 A    No, that's correct.
13 Q    And is that another criticism that you're familiar with?
14 A    Yes.
15 Q    And what is your answer to that criticism?
16 A    We don't think that that's an ideal situation to study
17 longitudinal lung function, but in order to be again as
18 inclusive as possible, making sure that we had as many data
19 points as possible, that we would accept pulmonary function
20 tests from four or five different machines.
21 Q    Okay.  What effect, if any, would you expect that might
22 have on the ultimate integrity of the conclusions that were
23 reached?
24 A    I don't think it would affect them.
25 Q    Did you also do some further work on -- in taking a look

Weill - Direct/Bernick                          196

1  at the data that related to certain individuals?

2  A    We did.

3  Q    And showing you Plan Proponents' 502-12 regarding Claimant

4  Number 101, could you explain what the work was that you did in

5  connection with that individual?

6          MR. LACEY:  Objection.  First of all, foundation.

7  Second, this is beyond the scope of the report.

8          THE COURT:  Mr. Bernick.

9          MR. BERNICK:  Whose report?  I'm sorry.  I don't

10 understand.  Whose report?

11         MR. LACEY:  Dr. Weill's report.  Dr. Weill's report

12 is a series of tables and one sentence of summary.  It is not

13 an individual reflection of data this way.

14         MR. BERNICK:  Well, I'll try to lay a foundation.

15 Q    Is this data data that was included in the data that you

16 analyzed?

17 A    Yes.

18 Q    Okay, and what is the purpose of your -- what is the

19 purpose that you had in taking a look at this individual's

20 data?

21 A    Just as illustrative of some of the concerns that we

22 talked about just a minute ago.

23 Q    Okay.  Is all the data the same data that you used and

24 said that you were relying upon in your report?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And is the opinion that you ultimately are going to

2  address an opinion that's expressed in your report?

3  A    Yes.

4          MR. LACEY:  Objection.  None of Dr. Weill's report

5  includes actual medical records.  He's testified that he had

6  the PFT reports, but those things do not include the height

7  this way.  These are not medical records that were in his

8  report.  This was not in the underlying data.

9          THE COURT:  Mr. Bernick.

10 Q    Well, did you refer to medical records in your report?

11 A    These are actually from pulmonary function tests, and this

12 data is available on the PFT itself.

13         MR. LACEY:  Your Honor, I reiterate it was not within

14 the scope of the report.

15         MR. BERNICK:  Well, I -- this now is -- respectfully,

16 and I understand the objection, but it's dancing on the head of

17 a pin a little bit.  He said in his report he included in his

18 reliance materials the PFT tests.  The PFT tests as a set of

19 data includes information, as the witness has just testified,

20 about height and weight, and he then on the basis of his

21 examination, as he says, of those tests.  He expresses an

22 ultimate opinion.

23         Does he have to in his report match up the ultimate

24 opinion with particular data?  I don't believe that an expert

25 report is required to do that.  Under Rule 26 you have to have

1 the opinions and what you're relying upon in support of the

2 opinions, and that's exactly what he has here.

3          THE COURT:  If the --

4          MR. LACEY:  Your Honor, especially -- let me respond.

5 Especially in the context of Libby claimants' objection about

6 the evidence that did not come in through Dr. Whitehouse, Dr.

7 Whitehouse's substantive opinions about the 123 patients was

8 not included.  I don't know whether this patient is among the

9 123.

10          We understand that the plan proponents want to make a

11 record, because they believe that some element of progression

12 is at issue in their case, but this is not within the scope of

13 their report.  It's definitely not in response -- is a proper

14 rebuttal to any evidence that Libby's put on.  We can't go

15 through 123 patients one by one.

16          THE COURT:  Well, you have.

17          MR. LACEY:  No, we haven't.  Not in this case.

18          THE COURT:  I missed something in the objection.  I'm

19 sorry.  You just -- you went too fast, and it blew by me, and I

20 didn't get it.  I need you to restate what your objection is.

21          MR. LACEY:  I apologize.  Libby claimants did not put

22 on any direct evidence regarding the 123 patients beyond Dr.

23 Molgaard's general statements about the epidemiological methods

24 that were employed by Dr. Whitehouse.

25          THE COURT:  Okay.

1          MR. LACEY:  There was no evidence about specific

2    findings, definitely not medical data, or PFT readings

3    regarding specific patients.  (1) right now we don't know

4    whether this patient is among the 123, (2) this is -- any

5    discussion about individual patients, be they within the 123 or

6    within Dr. Weill's own analysis, was not disclosed in the

7    context of his report, and (3) and because Dr. Weill is a

8    rebuttal expert here, he ought to be held to the standards

9    about what evidence did come on through Libby claimants, and

10   individual analysis of patients and their own PFT records is

11   far beyond the scope of any general analysis that Dr. Weill

12   might want to make about the work that he's done in this.

13         MR. BERNICK:  Dr. Weill expressed an opinion in his

14   report.  That opinion was based upon data relating to the 123

15   and data relating to people who were in addition to the 123.

16   That reliance material was expressly stated in his report, and

17   it was furnished to opposing counsel.

18         Rule 23 says he had to give the opinion, and he had

19   to give the basis for the opinion.  So he's done that.  It's

20   clearly in compliance.  All he's doing now is plucking out a

21   couple illustrative examples of that same data that he

22   disclosed, that he identified and was available to the other

23   side, and how it relates to the opinions that were disclosed

24   and available to the other side and is subject to cross

25   examination.  So the question of whether it was properly

1  disclosed or not is a non-question.

2          They then say, well, it's not proper rebuttal.  Dr.

3  Molgaard comes in, and with respect to Dr. Molgaard, he says

4  here is the 123, and the opinions that Dr. Whitehouse has on

5  the 123, because he recited the opinions that are set forth in

6  the paper on the 123, and Molgaard says it's good epi, but he

7  put the opinions before the Court, and in the course of putting

8  the opinions before the Court, the opinions are based on the

9  123.  So this clearly opens the door to Weill's response to

10 those opinions based on the 123, and in that response Weill is

11 now saying I think he's wrong, and I've demonstrated it both

12 with respect to the 123 and with respect to the 124.

13         So on the question about whether Dr. Weill's work is

14 responsive to a subject that's been introduced at this trial,

15 of course, it is, because the work was done precisely to

16 respond to that subject.  What they're suggesting to the Court

17 is that because Dr. Molgaard's an epidemiologist, somehow he

18 can express an opinion endorsing Dr. Whitehouse's opinion, and

19 then we can't bring somebody else in to say that opinion is

20 wrong, because the underlying opinion is flawed.  That's

21 ridiculous.

22         So we think that their objection is not well taken

23 and particularly in light of all of the different additional

24 work that came in, including the presentation that was just

25 made by Dr. Whitehouse regarding a spreadsheet that we received

1  three weeks ago.

2          MR. LACEY:  Your Honor, first of all, nothing about

3  Dr. Molgaard endorsed Dr. Whitehouse's opinions in that study.

4  Dr. Molgaard gave an independent epidemiological opinion based

5  upon his understanding of the method as presented in that

6  paper.  It was not a substantive endorsement of any of Dr.

7  Whitehouse's medical opinions, and this Court knows that he was

8  not qualified to so.  So any representations now that it is an

9  endorsement I think are just patently not correct.

10         MR. BERNICK:  Let me ask a question.

11         MR. LACEY:  And let me respond to the rest of it,

12 please, Mr. Bernick.  In the context of what opinions have been

13 reported and, therefore, what things now Dr. Weill's entitled

14 to testify to about in this case right now, I'm reading from

15 his deposition that we took on August 24th of this year in

16 response to the July 24, '09 report that he submitted.

17 "Q   So if it's not specifically cited in one of these three

18 reports --"

19         MR. LACEY:  -- meaning an April, '09 report, August

20 -- July 24, '09 report, and then an additional August report

21 that he made --

22 "Q   -- it's not something that you intend to rely upon.

23 "A   That's right."

24         MR. LACEY:  If there were individual, tip of the

25 iceberg, illustrative examples about Dr. Weill's concerns with

1  his view of Dr. Whitehouse's 123 patients and how he

2  incorporated them, it was not disclosed in these reports.  He's

3  -- his reports right now reflect concerns about -- it's his own

4  study.  That's what it is.  It's not about Dr. Whitehouse's

5  criticism other than the fact that he came up with different

6  numbers.  It is not about individual patients, and it should

7  not be permitted here, especially given our objection on

8  rebuttal.

9          MR. BERNICK:  I have a solution.  If they are

10 withdrawing -- they're now saying that the only evidence before

11 the Court regarding the progression study -- the only evidence

12 before the Court regarding the progression study is through Dr.

13 Molgaard.  I think that's what they're saying.  And that Dr.

14 Molgaard didn't get into the progression research itself, and,

15 therefore, it is improper for us to respond to it.  If they

16 want to strike from the record and withdraw all of Dr.

17 Molgaard's evidence with respect to the 123 progression

18 studies, and there is the progression study of 123 people, and

19 there is no evidence on progression in this case, because I

20 believe that's the only source of evidence on progression in

21 this case, then we don't need Dr. Weill, because progression is

22 no longer in the case.  I don't hear that undertaking, and the

23 reason the undertaking is not made is that they would like to

24 have progression in the case.

25          With respect to the issue about whether we had to

1 disclose illustrative examples that were included within the

2 data that was specifically referred to, then there is this

3 document called LC-16A, which just was used extensively by Dr.

4 Whitehouse.  LC-16A contained 19 cases where he had extracted

5 or his lawyers extracted -- not his lawyers, the Libby

6 claimants' lawyers had extracted the data.  Those 19 people

7 were never identified specifically to us in any report.  The

8 spreadsheet was turned over to us on August the 24th after all

9 the depositions were done.

10         So if their position is that we can't use data as

11 illustrative examples, because somehow you have to have an

12 expert report that says illustrative examples, then we should

13 strike in its entirety all of the evidence that was offered

14 with respect to LC-16A.  I don't hear either one of those

15 undertakings, and, therefore, I think it's appropriate that we

16 proceed.

17         MR. LACEY:  And, Your Honor, this has -- 16A has

18 nothing to do with Dr. Weill's testimony.  It has nothing to do

19 with it.

20         THE COURT:  It doesn't have to do with Dr. Weill's

21 testimony.  It has to do with the point as to the disclosures.

22 Look, I have not had a chance to take a look at all these

23 reports.  I simply don't know what is rebuttal and what isn't,

24 because the methodology by which this case is proceeding where

25 somebody's rebutting a witness who hasn't yet testified, I

Weill - Direct/Bernick                          204

1 simply can't put all those pieces together in this fashion.

2          So I am going to admit this data.  I will admit it

3 subject to a relevance objection.  You folks are going to be

4 doing post-trial statements.  You will point out to me the

5 error of this admission, and I will consider it at the time.

6 That --

7          MR. LACEY:  May I clarify?  At what point here is

8 there a limitation, if any, upon the piece by piece by piece

9 review of individual patients with Dr. Weill?

10          MR. BERNICK:  I've got two examples that we could

11 already have been through.

12          THE COURT:  I'm going to hear the examples.  I don't

13 know if they're relevant.  I'm going to hear it subject to a

14 relevance objection.  If I understand what the use of this is

15 going to be for, it is to illustrate this witness' opinion.  If

16 the information has been disclosed in discovery as part of the

17 PFT findings, then you folks had it -- this is proper.  So I'm

18 going to hear it and find out.  I don't know.  If you can re-

19 put the question to the witness, please.

20          MR. BERNICK:  Yes.

21 BY MR. BERNICK:

22 Q    The -- what was the purpose of your looking at Claimant

23 Number 101's information as set forth on 502-12?

24 A    I wanted to put forth an example of some of the concerns I

25 had about Dr. Whitehouse's methodology and compare it to my

1 own.

2 Q    Okay.  I want to show you Exhibit 502-13.  Tell me the

3 difference between 502-13 and 502-12.

4 A    This is an example in the first panel where there were two

5 pulmonary function tests performed with different heights

6 involved.  So, as you can see, in the October, 1996 example the

7 patient was 70 inches, and then in April, 1997 the pulmonary

8 function test said that the patient was 73 inches, and,

9 therefore, that changed the predicted values for that

10 individual of the diffusing capacity.  And you can see then

11 that in a very short period of time, namely, about six months,

12 the patient went from 81 percent, according to Dr. Whitehouse,

13 to 63 percent on the predicted diffusing capacity, which would

14 be a 35 percent predicted per year loss if we extrapolated it

15 to 12 months.

16 Q    Okay.  And what does that tell you?

17 A    It would be a very alarming rate of loss, and one of the

18 things I testified about earlier was to look to see if there

19 was plausibility to that rate of lung function loss.  And so

20 what we thought then is that we would dig further and see if

21 there was any additional data that might shed light on whether

22 or not that kind of pulmonary function testing could even be

23 possible.  And so in the second panel we see again in October

24 22, 1997 the DLCO analysis, where the patients again measured

25 is 73 inches, this time though the percent predicted value is

1 69 percent.  So if we were to use all the data that was

2 available to us, standardize the height, we would see an

3 estimated lung loss in the neighborhood of 9.8 percent per

4 year, which is a plausible slope analysis although still a lot

5 of lung loss.  This, by the way, is a patient --

6 Q    As opposed to how much that was indicated by using only

7 the two data points.

8 A    35 percent per year.  So it's about a quarter of the lung

9 loss.  And this, by the way, is a patient who ultimately died,

10 and we, of course, used the data that was available to us even

11 though the patient had been deceased.

12 Q    Now, this is an example of adding all of the data.  Rather

13 than two points, you used three points for people within the

14 123.

15 A    That's right.

16 Q    Okay.  What about Claimant Number 102 as reflected in 502-

17 14 and 15?

18         MR. LACEY:  Same objection.  We don't need to argue.

19         THE COURT:  All right.  Same ruling.

20 A    So what we see in the first panel then is the Dr.

21 Whitehouse PFT date on the left-hand side and then his annual

22 decline or slope and percent predicted FVC.  And just to be

23 clear on this, Dr. Whitehouse used just two of these four data

24 points over two years, but we couldn't tell which of the two of

25 the four he used, but --

Weill - Direct/Bernick                                    207

1  Q    So what did you do?

2  A    Well, we essentially decided to just accept, based on

3  these data, that he had found a six percent lung loss per year

4  of FVC.  Then we showed on the second slide that there were

5  multiple data points available if we used all the data that

6  came into us, and we then used all those data points, and it

7  ended up being 17 data points over 20 years of lung function

8  measurements, and then we calculated our own annual decline in

9  percent predicted FVC and found that to be just around two

10  percent per year.

11  Q    So he found six percent loss.  You with two data points

12  used out of the four that he -- out of the four that he used,

13  and you couldn't figure out which two?

14  A    We couldn't figure it out.

15  Q    Okay.  So it was four, and he used two, and you didn't

16  know which.  You used all the data, and you find a loss of two

17  percent, which is -- again what's the relationship, although we

18  all know it?

19  A    It's about a third of the lung function loss that he

20  found.

21  Q    Is that pretty much the same as what was the difference

22  that you had overall?

23  A    Yes.

24       MR. BERNICK:  Your Honor, at this point we would

25  offer for demonstrative purposes only 5-0 -- Proponents' --

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                    208

1 Plan Proponents' Demonstrative 502-2, 502-3, 502-1, 502-10 --

2 actually, there are two 502-10s, and we'll have to re-mark

3 those -- three 502-10s. We'll have to re-mark those -- four.

4 And I'll tender these to counsel. Actually, what I'll do right

5 now is I'll just mark them A, B, and C -- A, B, C, and D. And

6 502-12, 13, and 14.

7          THE COURT: All right. They're accepted as

8 demonstratives only subject to the relevance determination as I

9 explained earlier.

10                    (Pause)

11          MR. BERNICK: I pass the witness.

12          THE COURT: All right. One -- I need a minute,

13 please.

14                    (Pause)

15          THE COURT: I want to make sure I got them all, Mr.

16 Bernick. It's 502-1, 2, 3, 10A, B, C, and D, 12, 13, and 14.

17          MR. BERNICK: And 15.

18          THE COURT: And 15?

19                    (Pause)

20          THE COURT: All right. Would you like a short recess

21 or do you want -- yes?

22          MR. BERNICK: Actually, I passed the witness.

23          MR. LACEY: I guess we should ask the witness do you

24 need a break?

25          THE WITNESS: I'm fine.


                    **J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.  We'll keep going for a while.

2           MR. LACEY:  Well, let's take five minutes.  Is that

3  okay?

4           THE COURT:  Yes, we'll take a five-minute recess.

5           MR. LACEY:  I apologize.  Thank you.

6                        (Recess)

7           THE CLERK:  All rise.

8           THE COURT:  Please be seated.  Before you begin, I'd

9  like to discuss the scheduling matter on Monday in case this

10 affects anybody's schedules.  I have a personal event that I

11 have to be at on Monday evening, so Monday we are going to have

12 to terminate the proceedings at 5:30, and I do mean terminate,

13 motions, discussions, arguments, everything.  I need to be out

14 the door at 5:30 on Monday.  So in case that affects anybody's

15 schedules, I just want you to know that fact.  Okay.  Are you

16 ready, Doctor?

17          THE WITNESS:  Yes, I am.

18          THE COURT:  All right.

19          MR. LACEY:  Good afternoon, Dr. Weill.

20          THE WITNESS:  Hi.  Good afternoon.

21                   CROSS EXAMINATION

22 BY MR. LACEY:

23 Q    We met before.  Haven't we?

24 A    Yes, we have.

25 Q    Back in August at your deposition?

1  A    Yes.

2  Q    We're both a long way from home.  Aren't we?

3  A    Yes, we are.

4  Q    Would you agree that the analysis that you did regarding

5  the Whitehouse lung function study, that's not regarding the --

6  that doesn't -- it wasn't a study of the 950 Libby claimants.

7  Was it?

8  A    I would agree with that.

9  Q    Nor was it a study of the Libby asbestos population of 18

10 hundred as it's been represented in this court.

11 A    It was -- the patient populations were never characterized

12 that way.

13 Q    Okay, so it was a sum subset of Libby asbestos patients.

14 A    We assume so.

15 Q    Different than Dr. Whitehouse's 123?

16 A    I'm sorry.  I don't understand the last part?

17 Q    There -- you went beyond Dr. Whitehouse's 123 patients and

18 added your own patients.  Correct

19 A    We studied additional information that we got on

20 additional Dr. Whitehouse patients.

21 Q    And as I understand it, that came in on a rolling basis.

22 Correct?

23 A    It did.

24 Q    So we don't really know right now other than the actual

25 data that you have what people have been studied by you.  There

1  is no other study that we can reference about where their

2  medical information is included or analyzed.  Correct?

3           MR. BERNICK:  I'm sorry.  I don't understand the

4  question.  Is this a question about whether the underlying

5  information has been made available to the Libby claimants and

6  their counsel or is it something else?  I think it's ambiguous.

7           MR. LACEY:  Let me just -- I can make this very

8  clear.

9  Q    We've talked about a lot of different studies and numbers

10 in this case.

11 A    Yes.

12 Q    And your analysis here represents a new number.  It's not

13 the CARD mortality study.  Is it?

14 A    No, it's not.

15 Q    And it's not the Whitehouse 123 alone.  It's more patients

16 than that.

17 A    Part of our study was the 123 specifically, and part of it

18 included additional Dr. Whitehouse patients.

19 Q    And so as we begin to analyze what this group is, it's

20 some brand new body of Libby asbestos patients.  Correct?

21 A    We didn't define it in any other way than what I just

22 stated.

23 Q    Okay.  And your study was not strictly a reexamination

24 study.  Was it?

25 A    I'm not sure what you mean by reexamination.

1 Q    I mean you didn't just look at Dr. Whitehouse's numbers

2 and run the exact same study trying to test whether he got the

3 math right.

4 A    No, not in terms of the actual calculations.  No.

5 Q    You went and did you own new study.

6 A    We incorporated some of Dr. Whitehouse's data, of course,

7 as you know, but we performed a different, more comprehensive

8 analysis.

9 Q    And do I understand your testimony that you were

10 collecting data points for your study going up to and possibly

11 even through 2008?

12 A    No, we didn't -- we weren't able to go that far.  We got

13 most of the information -- I would say all of the information

14 in a two-year period, the summer of 2006 to around the summer

15 of 2008, so we weren't able to really go all the way through

16 2008 with our analysis.

17 Q    So it's not necessarily current and reflective of the

18 Libby asbestos population at this time in its progression.  Is

19 it?

20 A    We weren't able to study any tests subsequent to that.  It

21 takes a long time to do these analyses, and that's -- the only

22 way we were able to look at it was to take the information that

23 we received through the summer of 2008.

24 Q    And would you agree that every study has to have some

25 ending date?

1  A    It depends really on what kind of study you're setting up.

2  There are certain studies that do require a start date and an

3  end date.

4  Q    The kind of study that you performed here and that Dr.

5  Whitehouse performed, do you agree that in order to perform a

6  slope analysis you need to define that last date on which the

7  data's going to come in?

8  A    Well, for each individual you have to define it based on

9  when the last piece of data came in, but we didn't, for

10 instance, confine our study to a certain date and exclude all

11 other data.

12 Q    Now, you mentioned that you received your data on a

13 rolling basis.  Correct?

14 A    That's right.

15 Q    And who did you receive the data from?

16 A    The attorneys that represented W.R. Grace.

17 Q    And are you being paid by the attorneys who are

18 representing W.R. Grace?

19 A    Yes.

20 Q    Or I should say W.R. Grace?

21 A    Yes, I am.

22 Q    Okay.  And when you mentioned that -- I think you used the

23 phrase we a number of times.  Who is we?

24 A    There is a multi-disciplinary team that I worked with in

25 doing this analysis who were at Tulane University in New

1  Orleans.

2  Q    Is W.R. Grace paying all of them, too?

3  A    Yes.

4  Q    And who is giving you and your team the instructions on

5  what analysis you're to perform?

6         MR. BERNICK:  Objection.  Assumes facts not in

7  evidence.

8  A    We --

9         THE COURT:  It does assume a fact not in evidence.

10 Do you want to restate the question?

11 Q    Were you given instructions about what analysis you should

12 do?

13 A    Not initially.  The analysis that we did evolved over the

14 period of time that I've been involved in this case, which is

15 almost four years now, and so we started out with very broad

16 objectives, and then as the scope of the matter narrowed, we

17 were given more specific assignments to study, because they

18 became very relevant to the bankruptcy proceeding.  So,

19 initially, I would say the study was very broad and instigated

20 entirely by us, the investigators, and then as the matter

21 narrowed, the questions became more specific that we were

22 interested in studying.

23 Q    When you say you initiated it, you made a request for this

24 data before W.R. Grace ever contacted you?

25 A    No, I didn't mean to imply that.  I meant that when we got

1  the data, we were coming up with types of studies that we could

2  do based on the data that came in to us, and primarily what we

3  were -- what we became interested in doing was a longitudinal

4  slope analysis like the data I showed earlier in my direct.

5  Q    And you told me that you had your own plan for what to do.

6  Right?

7  A    In that regard, yes.  Yes.

8  Q    This is from your deposition I'm reading you starting at

9  Page 159.

10         THE COURT:  What deposition date?

11         MR. LACEY:  This is August 24th, 2009.

12  Q    And at Line 21 you're answering, "What we were asked to

13  do."  And I said, "By Grace," and you answered, "By Grace."

14  Was to take that data such as it is, statute of limitations

15  that we talked about, and analyze it, and that is what we did."

16  Now, W.R. Grace told you what to do in this case, correct?

17         MR. BERNICK:  Objection to the form of question.

18         THE COURT:  Sustained.

19         MR. LACEY:  I'm sorry.  This was directly the kind of

20  question that Mr. Bernick asked Dr. Whitehouse earlier this

21  morning as far as the involvement of --

22         THE COURT:  Nobody objected to the form of the

23  question.  That form of question is improper.  Restate the

24  question.

25         MR. LACEY:  I understand.

1  Q    You mentioned that your directives changed throughout

2  this -- your involvement with this case over the last four

3  years, correct?

4  A    Yes.

5  Q    And those directives came from W.R. Grace, correct?

6        MR. BERNICK:  I object to the breadth of the

7  question.  If he could -- it can be clarified that the -- that

8  counsel's only asking Dr. Weill regarding the progression study

9  because that is all that he's testifying to today.

10        MR. LACEY:  Again, and my response to that is that

11  this morning there were many implications made of Dr.

12  Whitehouse's specific questions about the involvement of the

13  lawyers in what he did and things like that and --

14        THE COURT:  He's not objecting to the fact that

15  you're asking whether the lawyers gave the instruction.  He's

16  asking whether you're limiting this to the testimony of the

17  witness concerning the progression study and his report

18  concerning that progression study.

19  Q    That section that I showed you earlier from your

20  deposition --

21  A    Yes.

22  Q    -- was that in reference as you know to the -- your work

23  on the progression study?

24  A    I don't know.

25  Q    Okay.  I can show you if you need to --

1          MR. BERNICK:  We accept that it was.  I read it and .

2  Q    Now, just a little bit ago you mentioned that it takes a

3  long time to do these kind of studies, is that right?

4  A    Yes.

5  Q    And I think in your direct examination you mentioned that

6  you had over 3800 PFTs, is that correct?

7  A    Yes.

8  Q    And it took you and your whole team, multiple people,

9  approximately 18 months, is that accurate?

10 A    That's about right.

11 Q    Okay.  When did you produce your report to Libby claimants

12 in this case?

13 A    The -- I assume you mean in the last report.

14 Q    Yes.  The August one.

15 A    The very end of July.

16 Q    Okay.  And that included all of those spreadsheets that

17 Dr. Whitehouse referred to this morning, correct?

18 A    That's right.

19 Q    The kind that he said he needed a magnifying glass to

20 read?

21 A    Yes.  I did a lot of changing of the fonts on the Excel

22 spreadsheet to be able to look at those.

23 Q    Make them bigger?

24 A    I tried to.

25 Q    Because it's a lot data, huh?

1  A    It's a lot of data.

2  Q    It kind of would've been real hard to really analyze in a

3  couple of weeks, huh?

4           MR. BERNICK:  Objection.  Objection.

5           THE COURT:  Sustained.  Argumentative.

6  Q    Is this a table from your report?

7  A    Yes, it is.

8           THE COURT:  Can I have the exhibit number?

9           MR. LACEY:  This is LC-116.

10          THE COURT:  Thank you.

11          MR. BERNICK:  Jack, could you zoom that in a little

12  bit?  It's very hard to see.  Thank you.  No, that's -- yes,

13  there you go.

14          MR. LACEY:  Uncover the button.

15          MR. BERNICK:  Yes.  There you go.  Thank you.

16  Q    Now, does this data, or does this table reflect your

17  analysis in comparison to Dr. Whitehouse's?

18  A    Yes, it does.

19  Q    And am I correct that your analysis of Dr. Whitehouse's

20  data -- or you would agree that your analysis showed --

21  including all data points for Dr. Whitehouse's 123 patients

22  still reflected a loss of 1.7 percent to the DLCO per year?

23  A    Yes, it did.

24  Q    And that that was over a span of approximately 7.86 years

25  looking at your Table 7?

1  A    Yes, it was.

2  Q    And that loss of 1.7 percent per year over a span of 7.86

3  years constitutes a loss of approximately 16 or 7 percent over

4  that seven-year span, correct?  I can put the table back up if

5  you want.

6  A    Sure.  Yes, it would be if it was looked at that way,

7  but --

8  Q    I'm sorry.  I just needed you to verify that I had the

9  math right.

10  A    The math's right.

11  Q    And is it your opinion that a 16.6 percent loss of lung

12  function over that time would be clinically significant?

13  A    Yes, it would've been.

14  Q    And that's your analysis, correct?

15  A    That's my analysis.

16  Q    Now, in addition, you also added your own patients -- or,

17  not your own patients, but an additional larger set of patients

18  to Dr. Whitehouse's 123, and that's reflected in your "All

19  patients" row, is that correct?

20  A    That's right.

21  Q    Okay.  And the loss in DLCO of that group is 1.6 percent a

22  year?

23  A    That's right.

24  Q    And that that's recorded over a period of 4.61 years?

25  A    Also correct.

1  Q    So, again, just verifying the math, that's a loss of

2  approximately 8.3 percent in a little less than five years?

3  A    That's correct.

4  Q    And would you consider that clinically significant?

5  A    Yes, I would.

6  Q    And none of the tables that you're shown here reflects

7  where in relationship to actually predicted percentages the

8  averages is, correct, the averages are?  For example, yours

9  show slope, correct?

10 A    That's right.

11 Q    They don't tell us whether that average is approximately

12 80 percent of predicted or 60 percent of predicted?

13 A    That's correct.

14 Q    Now, as I understand your testimony from Mr. Bernick, you

15 said you had a lot of concerns about the way Dr. Whitehouse did

16 his study?

17 A    Yes, that's right.

18 Q    You understand that Dr. Whitehouse's study was peer

19 review, correct?

20 A    I do.

21 Q    And one of the roles of peer review is to analyze for

22 publication the methodology that would be employed, correct?

23 A    That's correct.

24 Q    And that peer review effectively addresses any concerns

25 from an epidemiological standpoint before publication, correct?

1  A    It addresses the concerns and the opinions of that

2  reviewer, correct.

3  Q    And peer review is generally -- involves a team of

4  reviewers, correct?

5  A    There's typically -- I'm involved in this process rather

6  heavily.  It typically involves two or three reviewers per

7  manuscript.

8  Q    And are you aware that Dr. Whitehouse had additional

9  experts in this field review his study before publication?

10  A    I wasn't aware of that.

11  Q    Do you recognize the name James Lockey?

12  A    I do.

13  Q    And is he an expert in asbestos?

14  A    I think he is, yes.

15  Q    And concerns about a follow-up period, is that something

16  that typically would be involved in a peer review?

17  A    Yes, especially if it speaks to methodology.

18  Q    Now, you mentioned that you had approximately 3800 PFTs to

19  review in this analysis?

20  A    That's correct.

21  Q    And that you took all data for those patients that you

22  could find, correct?

23  A    Correct.

24  Q    And so, all of that data was not necessarily from CARD,

25  was it?

1  A    You mean the origin of the PFTs themselves?

2  Q    Yes.

3  A    Yes.  No, it was not all from CARD.

4  Q    It could've been from any number of PFT labs?

5  A    There weren't that many.  Four or five as I recall.

6  Q    And the concerns that you had about Claimant Number 101,

7  and again, we never had a chance to discuss those in your

8  deposition, did we?

9  A    No, we didn't.

10  Q    Okay.  We didn't discuss any individual patients in your

11  deposition, correct?

12  A    That's right, as I recall.

13  Q    The concerns that you had -- or that you testified to

14  about Claimant Number 101 and the differences in that PFT, you

15  can't tell us today which of those three PFTs were or were not

16  necessarily conducted at Dr. Whitehouse's own lab, can you?

17  A    I can't tell you without looking at the spreadsheet.

18  Q    And you don't have that data that's -- that led to your

19  example with Claimant Number 101, do you?

20  A    Not on my person, but it's available here.

21  Q    But, you haven't highlighted that to us or discussed that

22  in this court today, have you?

23  A    No.

24  Q    And isn't that one of the exact concerns that Dr.

25  Whitehouse addressed in his study, the need to verify across

1  PFT, the reliability of that data that's being collected?

2  A    Well, he -- we don't think he adequately addressed that

3  because in review of those pulmonary function tests we really

4  didn't find any that would've been by themselves compliant with

5  ATS criteria.

6  Q    But, I understand that those are exactly the kind of

7  things that you just admitted peer reviewers look at, correct?

8  They look at the reliability of the data.

9  A    They're not able to assess the reliability of the data.

10  They have to take it on face value and trust the researchers

11  who submit the manuscript.

12  Q    Now, your analysis, it's not been peer reviewed, has it?

13  A    We have not submitted it for peer review.

14  Q    Are you intending to submit it anywhere?

15  A    If you're talking specifically, and I assume you are about

16  the Whitehouse progression, the answer is no.

17  Q    That's a litigation report and analysis, correct?

18  A    It was done for the purpose of litigation, correct.

19  Q    And you also eluded to the fact that many of the people --

20  you were able to go to get lots of data for these people,

21  correct?

22  A    Yes.

23  Q    What is your understanding of the last date of inclusion

24  of PFT data from Dr. Whitehouse?

25  A    Through 2001.

1  Q    In 2001, it's not 2009, you collected data until 2006 or

2  so, correct?

3  A    More like the middle of 2008.

4  Q    Okay.  So, that's a lot of years -- seven years that you

5  had an opportunity to collect data on a sick population that

6  Dr. Whitehouse didn't even intend to look at, correct?

7  A    Well, remember, and I mentioned this specifically to Mr.

8  Bernick during the direct, we found data points that were

9  before the Whitehouse study period, during the Whitehouse study

10 period, and after the Whitehouse study period, and included all

11 of those data points regardless of where they occurred in that

12 spectrum.

13 Q    But, you can't show me which ones you're talking about?

14 A    Well, we would have to -- they varied from study subject

15 to study subject, so we would have to go through each

16 individual patient and look to see where their PFTs fell in

17 that spectrum.

18 Q    And that wasn't the subject of your latest report here in

19 either April '09 or August '09, was it --

20 A    To specifically report each --

21 Q    -- to address those concerns?

22 A    -- individual subject, no.  But, it was to address the

23 broader concern about data inclusion.

24 Q    It was to present your analysis of this data, correct?

25 A    It was, but I think we also made mention about data

1  inclusion in that table you showed just a minute ago.

2  Q    You certainly didn't tell us these are the people we have

3  concerns about?

4  A    No.

5  Q    Now, I understand you're involved in end-stage lung

6  disease treatment, correct?

7  A    Yes, that's right.

8  Q    And, in fact, your primary patient interaction is with

9  transplant recipients, correct?

10 A    It's part of my patient population.  I have an end-stage

11 lung disease practice, and it also involves pulmonary fibrosis

12 patients, patients with emphysema.  I run the adult cystic

13 fibrosis program at Stanford, so quite a wide variety of types

14 of patients, not just transplant recipients.

15 Q    How do people get on the list for a transplant?

16       MR. BERNICK:  Your Honor, this is not relevant.

17 Object.  And it also goes totally beyond scope.

18       MR. LACEY:  There's -- given the leeway that Mr.

19 Bernick has had these last two days I'd like to tie it up.  It

20 especially relates to some of the judgment that's involved that

21 Mr. Finch addressed with Dr. Whitehouse.

22       MR. BERNICK:  I'm sorry.  Whether Mr. Finch addressed

23 something with Dr. Whitehouse doesn't make it more germane to

24 the cross examination of this witness, nor does it put it

25 within the scope of my direct examination.

1          THE COURT:  I'm not sure what getting on a transplant

2     list has to do with the issues in this case.

3          MR. LACEY:  I think it's -- it'll be pretty clear

4     here in a second.  Is that all right if I --

5          THE COURT:  All right.  I'll give you a chance to

6     connect it up.

7     A     I'm sorry, Mr. Lacey, could you repeat --

8     Q     Is there a finding that has to be made that a certain

9     patient is within a period of death?

10    A     We do rather comprehensive evaluation in determining if

11    somebody needs a transplant or not, so there's a lot that goes

12    into it.

13    Q     And is there a determination, for example, like hospice

14    care that you're going to die within six months and,

15    therefore, there's a certain amount of prediction about when

16    that person -- how much longer that person's going to live

17    before they get a transplant?

18    A     There is.  By definition the patients that we list for a

19    lung transplant have a very short life expectancy.

20    Q     And when you make that determination you're predicting

21    their current health and how long they're going to live,

22    correct?

23    A     That's part of the art of what we do to the best we can.

24    Q     And you call it an art, don't you?

25    A     It is often --

1         MR. BERNICK:  Your Honor, at this point I'll renew

2    the objection as there's no --

3         MR. LACEY:  And --

4         MR. BERNICK:  Excuse me.  This has no relevance and

5    it's beyond scope.

6         MR. LACEY:  My next question will --

7         THE COURT:  All right.

8         MR. LACEY:  -- bring this altogether.

9  Q    The Plan Proponents have suggested that Dr. Whitehouse is

10   in error for predicting that certain patients' disease would

11   progress.

12        MR. BERNICK:  To the contrary, Your Honor.  That

13   establishes the irrelevance.  That was not the purpose of the

14   proffer.  The purpose of the proffer was to establish as Mr.

15   Hughes testified as to tie it back to Mr. Hughes that when

16   these cases were settled progression was a big deal and we

17   didn't have the ability to analyze data and respond to Dr.

18   Whitehouse.  We now have that data, and this witness' testimony

19   illustrates that that data shows a much more equivocal picture

20   than what drove the settlement to those cases thereby

21   establishing that the values then are not appropriate to be

22   applied today.  That's the whole purpose of that proffer.

23        MR. LACEY:  And if I understand Plan Proponent's

24   statement during Mr. Hughes' testimony, what was relevant was

25   the notice.  As I understand counsel's representation right

1  now, what is significant is Dr. Whitehouse was wrong.  If it

2  was simply for purposes of notice that Dr. Whitehouse was

3  making his representation, we didn't need to go into any of

4  this analysis and we renew, absolutely, our relevance

5  objection.  In fact, the relevance of progression is not on a

6  substantive basis.  As counsel just represented it, they want

7  to say that Dr. Whitehouse said, and I told him in -- during

8  the course of settlement, that people were going to progress.

9  Whether it happened or not has no bearing right now on this

10 plan.

11            MR. BERNICK:  It does because the question that we

12 have posed, the values -- the 1990s values have been

13 highlighted by the Libby claimants as evidence in support of

14 the idea that they're being discriminated against because the

15 scheduled values aren't high enough.  We wanted to establish

16 that the high values that were paid in settlement in the late

17 1990s were due to a series of circumstances, prominently, the

18 new progression theory that we couldn't deal with at the time

19 because we didn't have the data, and we then produced through

20 Dr. -- through Mr. Hughes the fact that a variety of the

21 factors that were important to the 1990 settlement values had

22 changed post-petition.

23            And this is one of the factors that has changed.  And

24 the sole purpose of the proffer of progression evidence through

25 Dr. Weill is only that.  Progression isn't relevant to the TDP

1  criteria because people can always come back if there's

2  progression.  It is, however, relevant to the relevance of the

3  scheduled -- of the values that were paid back in the 1990s.

4  It's the only reason for the proffer.

5        MR. LACEY:  And if it were simply relevant for that

6  purpose then we didn't need to hear anything about the

7  substantive numbers in Dr. Weill's analysis.  The relevance

8  would've been limited to there is now data available to us.

9  Instead they put on evidence about the actual comparative

10  differences between the two studies.

11        THE COURT:  No, that -- I don't think that's correct.

12  I mean, they have to have some basis on which to determine

13  whether the data at the time it was produced by Dr. Whitehouse

14  is consistent with the data now to determine whether the

15  scheduled values have some basis to a relationship to the

16  settlement values when Libby's claiming that they don't.  So,

17  that's overruled.  It's clearly relevant to that issue.

18        MR. LACEY:  Well, as I understand it that was in

19  response to a question, so -- to the witness.

20        THE COURT:  Actually, I probably lost the question in

21  that discussion.  I don't think I even got it down.  I'm sorry.

22  If you could repeat it, please.  Oh, I don't think you --

23  actually, I don't think you asked the question.  Maybe you did

24  and I just missed it, but I think the last part was with

25  respect to the answer that that's part of the art of the

1 diagnostic process.  And I think you said your next question

2 would tie it up, but I don't think I ever heard the next

3 question.

4            MR. LACEY:  Yes.  And I'll withdraw the question

5 since -- in light of the ruling on relevance of prediction.

6            THE COURT:  I said it is relevant.

7            MR. LACEY:  Oh, wait.  The objection's -- correct.

8 I'm sorry.

9 BY MR. LACEY:

10 Q   Dr. Weill, in your practice where you predict -- try to --

11 in the art of potential progression of disease, are you wrong

12 sometimes?

13 A   The main purpose of listing patients for transplant is not

14 so much to be right or wrong.  We're trying as best we can to

15 be -- to provide a safety net to patients.

16 Q   I guess I want to have you answer the question more

17 directly.  When you make that prediction and put people on that

18 list, you don't know that they are going to die by a certain

19 period, do you?

20 A   Well --

21            MR. BERNICK:  Sorry.  Particularly in light of the

22 dialogue and the proffer, again, this is entirely irrelevant.

23            THE COURT:  Overruled.

24 A   I'm sorry, Mr. Lacey, could you restate the question?

25 Q   I asked you whether you knew that they were going to die

1  when you made that prediction.

2  A    I would not say that.  No, there's no way to know that.

3  Q    You make your best guess all times?

4        MR. BERNICK:  I object to the form of the --

5  actually, go ahead.  Answer the question.

6  A    We make our best medical judgment.

7  Q    And that's an art sometimes, isn't it?

8  A    It is sometimes.

9  Q    That you develop over years of experience?

10  A    It is.

11  Q    And specific experience with that population?

12  A    That's right.

13        MR. LACEY:  That's all the questions I have.  Thank

14  you.

15                    REDIRECT EXAMINATION

16  BY MR. BERNICK:

17  Q    I just have a couple questions.  Mr. -- Dr. Whitehouse

18  testified about the small print and it was hard to read all

19  those voluminous things.  Was the data that you relied upon and

20  gathered in connection with your work on this progression

21  analysis, was that data also made available electronically?

22  A    Yes.

23  Q    Peer review, the suggestion -- or it was brought out that

24  Dr. Whitehouse's study was a peer reviewed study, do you recall

25  that?

1  A    I do.

2  Q    Based upon your own experience with peer review, is the

3  fact that Dr. Whitehouse's study was peer reviewed either

4  consistent, inconsistent or unrelated to the criticisms -- not

5  to criticisms, but the work that you've done and the opinions

6  that you have crafted?

7            MR. LACEY:  Objection.

8            UNIDENTIFIED ATTORNEY:  Unrelated.

9            MR. LACEY:  Compound, unintelligible and vague and

10  argumentative.

11            THE COURT:  Sustained.

12            MR. BERNICK:  Jeez.

13                    (Laughter)

14            MR. BERNICK:  Now that really hurts.

15                    (Laughter)

16            MR. BERNICK:  I'll go on to something else.

17  Q    But, you've done your analysis and it was brought out that

18  while your analysis is not peer reviewed and his analysis was

19  peer reviewed, can you comment on that comparison?

20  A    It's not particularly relevant to what we're discussing

21  here.  What I was asked to do was provide an analysis of my own

22  and let it stand on its own two feet, which it has.

23  Q    Is peer review somehow an endorsement?

24  A    No.

25  Q    When peer reviewers conduct peer review, do they do the

Weill - Redirect/Bernick                              233

1  kinds of reanalyses in new research that you've done here?

2  A    No --

3         MR. LACEY:  Objection.  Speculative.

4  Q    Well, do you have a basis for knowing what peer review is

5  about?

6  A    Strong -- I'm heavily involved in.

7  Q    Okay.  So, now would you continue the answer to your

8  question -- to my question.

9  A    Sure.

10  Q    That is whether reanalyses are done by peer reviews -- is

11  that part of the peer review process?

12  A    No.  The kind of analysis that we did wouldn't be possible

13  under a peer review process because of the detail that was

14  available to us in terms of the data itself.  The underlying

15  data is rarely, if ever, available in the peer review process.

16  Q    Okay.  A question was asked about whether you knew that

17  the data reflected on 502-13 regarding Claimant Number 101,

18  whether that data was obtained from the same --

19         THE COURT:  I think you turned the button off.  I'm

20  sorry for interrupting.

21         MR. BERNICK:  No.  Oh, do you know -- there we go.

22  It was on here, but I pressed some other button.

23  Q    You were asked whether you knew whether the data came from

24  the same machine, do you recall that?

25  A    Yes.

1  Q    I want to show you Exhibits -- Plan Proponent Exhibit 607,

2  8 and 9 and ask you whether you can determine from that whether

3  or not it came from the same machine.

4         MR. LACEY:  Do you have a copy for counsel?

5         MR. BERNICK:  Yes.  I'm sorry.

6  A    It was performed at the same clinic.  And whether or not

7  it was the same machine I'm not sure.

8  Q    Thank you.  And I want to go back to this chart which

9  was -- counsel asked some interesting questions about the

10  different slopes.  And I think what he brought out in his

11  examination was that the first slope, that is the slopes that

12  you had found, I'm sorry, for Dr. Whitehouse's patient

13  population which we had featured, that is, those kinds of

14  slopes, that those slopes were smaller than the decline in

15  DLCO, is that right?

16  A    That's right.

17  Q    So, you found only .628, whereas on DLCO, it was a much

18  more pronounced slope of 1.6?

19  A    That's right.

20         MR. LACEY:  Objection.  Leading.

21         MR. BERNICK:  This is all foundation and we're going

22  back over what he was asked.

23         THE COURT:  All right, but don't lead.

24         MR. BERNICK:  That's fine.  We'll just do it this

25  way.  I'll put it right up and we'll get it right done.

1          MR. LACEY:  Again, objection.  This is exactly what

2  we talked about a few days ago.  Writing it on the board is

3  even more leading.

4          THE COURT:  He's using the exhibit because -- so that

5  the witness can see the exhibit.

6  Q    I've written down from the exhibit, and you can confirm

7  this if you would, Dr. Weill, is the slope that you found for

8  FVC for the 123 population the same group as Dr. Whitehouse's

9  less than the slope for DLCO?

10 A    Can I just make one change to it?  Actually, it's a cell

11 above that that we're talking about.  It's a WPSAD.

12 Q    Yes.  I thought I did that one.

13 A    I think you took the all minus WPSAD.  The point's going

14 to be very similar.

15 Q    Okay.  So, what are the right numbers?

16 A    Okay.  So, it's 0.752 minus 0.752 for the FEC.

17 Q    FEC is minus point --

18 A    Yes, 752.  And then DLCO minus 1.713.

19 Q    Okay.  So, much greater drop off in DLCO then FEC?

20 A    Yes.

21 Q    What about Dr. Whitehouse?  What did Dr. Whitehouse find

22 himself about the drop off -- the comparative drop offs?

23 A    So, for the FVC minus 2.2 percent, and for the DLCO minus

24 3.0 percent.

25 Q    So, this was a roughly 50 percent increase.  Yours was an

Weill - Recross/Lacey                                      236

1  even higher percent increase -- decrease?

2  A    That's right.

3  Q    Okay.  Now, what other things can cause drop in DLCO?

4  A    Nearly every lung condition causes a drop in DLCO,

5  including people that don't have specific lung disease for

6  cigarette smokers.

7  Q    Smokers.  Is there -- if we take the fact that -- were

8  some of these people in this population smokers?

9  A    As I recall 85 or 90 percent were either current smokers

10 or ex-smokers.

11 Q    What, if any, relationship is there or could there be,

12 medically, between the difference in the drop off of FVC and

13 DLCO on the one hand and the fact that a lot of these folks

14 were current or former smokers on the other?

15 A    We relied more heavily on the FVC values because they're

16 less influenced by other lung conditions and less influenced by

17 cigarette smoking.

18 Q    The kind of -- you said that the drop off in DLCO over

19 time was clinically significant in your view.

20 A    Yes.

21 Q    Based upon your experience, can smoking -- and based upon

22 your experience in the literature -- tell us whether smoking

23 can cause that kind of drop off over time?

24 A    It certainly can.

25       MR. BERNICK:  That's all I have, Your Honor.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Mr. Finch, did you have anything?

2          MR. FINCH:  No, Your Honor.

3          MR. LACEY:  Just one quick question.

4          THE COURT:  All right.

5                    RECROSS EXAMINATION

6    BY MR. LACEY:

7    Q    The inclusion of smokers in -- let me back up.  Dr.

8    Whitehouse recognized in his study that smoking can have an

9    affect on PFTs, correct?

10   A    He did.

11   Q    And he attempted to correct for that, didn't he?

12   A    I'm not sure how he corrected for it.

13   Q    Are you aware that he took 30 patients who had, in his

14   opinion, primarily smoking disease and pulled them out?

15   A    Well, those are two different questions.  One, yes, he

16   took out some people that he felt had a cigarette-related

17   illness, but he was not able to take out all of the cigarette

18   smokers.

19   Q    And what you did with your study was, you put everybody

20   back into the study, correct?

21   A    We wanted to be as inclusive as possible.  Included as

22   many patients as possible with all their data points.

23   Q    And so, the fact now that smoking may be reflected in

24   study is, in fact, a problem that you created, correct?

25   A    Well, not at all because we actually found less lung

                    **J&J COURT TRANSCRIBERS, INC.**

Moolgavkar - Direct/Harding                238

1 function decline, and so we didn't feel like our data was

2 skewed by other illness or cigarette smoking in that fashion.

3 Q    Okay.  Let me ask you -- or show you what you testified to

4 at your deposition.  This is Page 143 --

5 A    Yes.

6 Q    -- Line 17.

7 A    Yes.

8 Q    "And so, the concern that you're reflecting now about DLCO

9 and its inclusion of smokers having skewed things is actually a

10 problem of your own creation that Dr. Whitehouse tried to

11 solve, correct?" and you answered, "No doubt."  Are you

12 changing your answer now?

13 A    It's the same answer.  We didn't try to exclude patients.

14 Really, there were cigarette smokers because we wouldn't really

15 have any patients left to study if we did that.

16 Q    But, that was a problem --

17         MR. LACEY:  That's all I have.  Thank you.

18         THE COURT:  Mr. Bernick?

19         MR. BERNICK:  No.

20         THE COURT:  You're excused, Dr. Weill.  Thank you.

21         THE WITNESS:  Thank you.

22         THE COURT:  Give me a minute, please.

23                     (Pause)

24         THE COURT:  Ms. Harding, are you calling your next

25 witness?

**J&J COURT TRANSCRIBERS, INC.**

1       MS. HARDING:  Yes, Your Honor.  Your Honor, we call

2  Dr. Suresh Moolgavkar.

3               SURESH MOOLGAVKAR, WITNESS, SWORN

4                      DIRECT EXAMINATION

5  BY MS. HARDING:

6  Q    Good afternoon, Dr. Moolgavkar.

7  A    Good afternoon.

8  Q    The Court is familiar with your qualifications.  I believe

9  you qualified as an expert here before, so I'll quickly --

10       MS. HARDING:  -- if you'd like may -- quickly go

11  through them.

12       THE COURT:  It's up to the Libby folks.  He -- I have

13  qualified this witness as an expert, in certain fields you can

14  tell me what because at the moment I don't remember the

15  specifics.

16       MS. HARDING:  We'll be offering him as an expert in

17  the field of biostatistics and epidemiology.

18       MR. HEBERLING:  No objection.

19       THE COURT:  All right.  And he's qualified to offer

20  opinions in those fields.

21  BY MS. HARDING:

22  Q    Dr. Moolgavkar, you've sat in the courtroom over the last

23  few days and listened to the -- all the testimony that's come

24  into the court, correct?

25  A    With great interest.

                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    I want to ask you about -- the first study I want to ask

2  about has been discussed in court today is the Whitehouse

3  progression study.  You've heard that testimony, correct?

4  A    Yes, I have.

5  Q    And did you review that study in connection with your

6  expert report in this case?

7  A    Well, not as carefully as Dr. Weill reviewed it.  I didn't

8  have the underlying data.  But, I did review it and I was

9  amazed.  Although I had not seen Dr. Weill's report, that my

10 report --

11          MR. HEBERLING:  Objection.  Beyond the scope of the

12 question.

13          THE COURT:  It is.

14          MS. HARDING:  Okay.

15 Q    Well, let me ask you this.  Do you agree that -- with Dr.

16 Molgaard -- that the Whitehouse progression study is a case

17 series?

18 A    It is a case series.

19 Q    And you heard Dr. Molgaard testify that he believed that

20 the Whitehouse progression study met proper epidemiological

21 standards?  Did you hear that?

22 A    Yes.

23 Q    And do you agree with that?

24 A    No.

25 Q    Why not?

**J&J COURT TRANSCRIBERS, INC.**

1  A    For many of the reasons that have been stated by Dr. Weill

2  today, and which are enunciated in my expert report.  First of

3  all, it's not clear what population the -- a subpopulation of

4  patients that was studied is drawn.  I would've liked to see

5  ICD codes on people who were identified with a respiratory

6  disease of any type.  And I believe that the study is not

7  representative of the larger population in any way, not even

8  the larger respiratory disease population that Dr. Whitehouse

9  looks at, certainly not representative of the Libby population.

10 And the statistical methods that were used were fatally flawed

11 in my view.

12 Q    Now, you heard Dr. Molgaard respond to your criticism that

13 the study was not representative of the Libby population, do

14 you recall that?

15 A    I recall -- I don't exactly remember what his comments

16 were.

17 Q    Do you recall that he said that it was not intended to be

18 representative?  Do you remember that?

19 A    Yes.

20 Q    And do you recall whether or not Dr. Whitehouse stated in

21 his publication to the scientific community that was published

22 in peer review literature whether or not the 123 patients were

23 representative of his CARD population and the Libby population?

24 A    Well, that is what he stated in his publication.  He later

25 retracted that and said that it was representative of the --

1  of his patient population, but I don't believe that is true

2  either.

3        MS. HARDING:  If I can -- I'm showing Dr. Moolgavkar

4  Libby claimants' Exhibit Number 1, and that's the Whitehouse

5  progression study, Page 221.

6        MR. BERNICK:  You need to blow it up more.  Press the

7  zoom.

8        MS. HARDING:  I have the zoom.  Got it.

9        THE COURT:  I'm sorry.  What was the exhibit number?

10        MS. HARDING:  Libby claimants' Exhibit Number 1, Your

11  Honor.

12        THE COURT:  All right.  Thank you.

13        MS. HARDING:  Page 221.

14  BY MS. HARDING:

15  Q    Can you see that, Dr. Moolgavkar?

16  A    Yes.

17  Q    Is this the place where Dr. Whitehouse stated in the

18  publication that was -- in his published paper that the 123

19  patients were representative of the Libby area and his patient

20  population?

21  A    That's correct.

22  Q    Okay.  Now, there's been some discussion also of the 76

23  CARD patients or an analysis of the 76 CARD patients, do you

24  recall that?

25  A    Yes, I do.

1  Q    Okay.  And there's been testimony from Dr. Molgaard that

2  that analysis is descriptive epidemiology and it meets proper

3  epidemiological standards, do you recall that?

4  A    Yes, I do.

5  Q    Do you agree with that?

6  A    No, I do not.

7  Q    Why not?

8  A    Well, Dr. Molgaard tries to characterize this study as a

9  proportionate mortality ratio study, and it is not.  I

10 explained in some detail to Mr. Heberling at my deposition as

11 to why this study could not be considered a proportionate

12 mortality ratio study.

13 Q    Could you tell the Court that, please?

14 A    Yes.  Very briefly, the proportionate mortality ratio

15 study requires a numerator and a denominator and whereas this

16 study has a numerator of some type, it has no denominator at

17 all.

18 Q    Okay.  Without getting into -- did you have other

19 criticisms of the analysis of the 76 patients?

20 A    Yes.  Again, it's not clear what patient population the 76

21 are being drawn for -- drawn from.  It simply does not meet any

22 of the standards of even a regular descriptive epidemiological

23 study.

24 Q    And I think it goes without saying, but let me ask you

25 this question.  Would you use that study to draw any causal

1 inferences, Dr. Moolgavkar?

2 A    Absolutely not.

3 Q    Now, there's been a contention in this case, and I think

4 you've heard this week, that there is some different or new

5 disease or disease process in individuals in Libby exposed to

6 asbestos from a Libby mine.  Do you understand that to be a

7 contention?

8 A    Yes.

9 Q    Now --

10        MR. HEBERLING:  Objection.  Contrary to the record.

11 Dr. Hammar's declaration went into evidence indicating that

12 there is no difference in the set of diseases suffered in Libby

13 than elsewhere.  Dr. Frank also agreed with that.  There's no

14 such contention that a separate new disease is in Libby.

15        MS. HARDING:  Well, I think I asked also if there was

16 a new different disease process that involved Libby.

17        THE COURT:  You did ask the new disease process.  Is

18 there an objection to that question?

19        MR. HEBERLING:  It depends on how one looks at

20 disease process.  It's a different presentation, and so that's

21 close enough.

22        THE COURT:  All right.

23 BY MS. HARDING:

24 Q    So, in connection with that, Dr. Moolgavkar, have

25 individuals who have been exposed to asbestos from the Libby

1  mine that live in Libby, have they been studied by analytical

2  epidemiology -- have they been studied in studies that involve

3  analytical epidemiology that permits causal inferences?

4  A    Yes.

5  Q    How many such studies like that have taken place?

6  A    Well, there are at least five studies of the cohort of

7  Grace workers who were exposed to very high levels of Libby

8  asbestos.  And there's also been one study that looked at

9  community risks, and this study was conducted by the ATSDR.

10  Q    Who conducted the first five studies you discussed?

11  Briefly, who conducted those studies?

12  A    Well, the first studies were conducted in the mid-1980s or

13  thereabouts by Amandus and Wheeler from NIOSH and by McDonald

14  and his colleagues.  And later on the McDonald study was

15  updated in 2004.  There was a minor update in 2002, then a

16  major update in 2004.  And the entire cohort was updated.  Many

17  more employees added to the cohort by Sullivan in 2007.

18  Q    And was that -- was Dr. Sullivan with NIOSH at that time?

19  A    Dr. Sullivan, I believe, is still at NIOSH, yes.

20  Q    You mentioned another study.  Who performed the sixth

21  study?

22  A    Well, I did a reanalysis of the Sullivan.

23  Q    I'm sorry.  I was referring to the -- I think you said

24  something about -- well, I'm sorry.  I'm going to ask you about

25  the reanalysis in a second, but you said there were

1 occupational cohort studies, then I thought you said there was

2 another study, as well.

3 A    Yes.  There was a mortality study done by the ATSDR in

4 2002, and that looked at the risk of mortality in Libby and in

5 Lincoln County and found no increase in risk among those only

6 environmentally exposed.

7 Q    Now, in connection with all six of those studies, have any

8 of the researchers or in the studies themselves, the published

9 studies, all of those are published studies, correct?

10 A    Yes, with the exception of ATSDR which is a technical

11 report.

12 Q    A government report?

13 A    Yes.

14 Q    Okay.  In connection with all six of those studies, have

15 any of the researchers or the studies themselves reported a new

16 disease process found in the individuals exposed to asbestos

17 from Libby?

18 A    No.

19 Q    Finally, I want to ask you, Dr. Moolgavkar, you sat here

20 during Dr. Molgaard's testimony, do you recall hearing Mr.

21 Heberling ask Dr. Molgaard about your reanalysis of Dr.

22 Sullivan's data?

23 A    Yes, I do.

24 Q    And you conducted a reanalysis of that data?

25 A    Yes.

Moolgavkar - Direct/Harding                     247

1  Q    And we're not going to talk about that today because we're

2  not talking -- that issue isn't in the case.  You heard that,

3  right?

4  A    Yes.

5  Q    Okay.  Did you also -- do you recall hearing Mr. Heberling

6  mention that there were -- that there are five additional cases

7  of mesothelioma that have been reported since the close of Dr.

8  Sullivan's study, do you recall that?

9  A    Yes.

10 Q    And do you recall hearing Dr. -- I'm sorry -- Mr.

11 Heberling ask Dr. Molgaard if it would be unethical to exclude

12 those cases from the reanalysis that you did, do you recall

13 that?

14 A    Yes, I do.

15 Q    Okay.  Would you like to respond to that?

16 A    Yes, certainly.  I explained to Dr. -- to Mr. Heberling

17 again in great detail in my deposition.  Dr. Molgaard clearly

18 misunderstands the design of these studies.  I mean, as was

19 discussed earlier today, studies have a beginning and they have

20 an end.  The collection of data in the Sullivan study stopped,

21 I believe, in 2001, and to include these five mesothelioma

22 cases past that time, beyond 2001, the proper procedure to do

23 that would be also to update the entire cohort of Grace

24 workers.  Namely, we would've had to have vital status, dead or

25 alive and cause of death, on all other workers in that Sullivan

1  cohort which would be a major undertaking.  Without that,

2  adding the five mesothelioma cases simply does not make any

3  scientific sense at all.

4  Q    Would it be improper or proper to include them from an

5  epidemiological prospective in your reanalysis?

6  A    Only if the entire cohort could be updated, not in the

7  reanalysis that I did.

8        MS. HARDING:  No further questions, Your Honor.

9                    CROSS EXAMINATION

10  BY MR. HEBERLING:

11  Q    Good afternoon, Dr. Moolgavkar.

12  A    Good afternoon, sir.

13  Q    First of all, as to the Whitehouse 2004 publication, you

14  are aware that Dr. Whitehouse clarified at a deposition long

15  ago that his statistical findings in the Whitehouse 2004

16  publication were not intended to be extended to the Libby

17  population of people who have no disease, correct?

18  A    Well, I said that in my direct testimony just a couple of

19  minutes ago.

20  Q    Yes.  And so, the -- and you didn't find any statistical

21  work in Whitehouse 2004 which made an extension of findings

22  anywhere beyond the initial patient population all diagnosed

23  with asbestos disease, correct?

24  A    Sorry.  You'll have to rephrase that.

25  Q    Did you find in the Whitehouse 2004 publication any

                    J&J COURT TRANSCRIBERS, INC.

1 statistical work which would extend the findings of 76 percent

2 progression and three percent loss of DLCO per year beyond

3 those diagnosed with asbestos disease already?

4          MS. HARDING:  Objection, Your Honor.  I don't

5 understand what he's talking about.  The 2004 --

6          THE COURT:  Yes.  It started out as the 2004 study.

7          MS. HARDING:  But, then he talked about the 76 --

8 I'm -- all right.

9 A    I've lost the question now, so please repeat it.

10          MR. HEBERLING:  I think it's easier if I just ask it

11 again.

12          THE COURT:  All right.

13 Q    And you didn't find any statistical extensions of the

14 findings in the 2004 study by Dr. Whitehouse to people outside

15 his population which are the population of diseased patients,

16 correct?

17          MS. HARDING:  Objection to statistical extensions,

18 but if Dr. Moolgavkar can answer, go ahead.

19 A    Yes.  I'm wondering -- you asked me two questions here.

20 One question ended with a yes.  Are you asking me about whether

21 the -- his population of patients -- diseased patients?  Are

22 you asking me about that, or are you asking me about the

23 general Libby population?  I'm saying that the study conducted

24 on 123 patients cannot be extended either to his total

25 population of 491 patients or even the total population of

1  patients that he has, and neither can it be extended to Libby.

2  Q    Okay.

3  A    And he has a statement in his paper.  I'm answering your

4  question.  He has a statement in his paper saying that the

5  results of the study are applicable to the Libby population.

6  Q    And isn't it true as you testified just a minute ago that

7  that statement has been clarified to mean the population of

8  asbestos disease patients?  Aren't you aware of that?

9  A    Yes, and I conceded --

10  Q    And you so testified on direct, correct?

11  A    I conceded that, and I --

12  Q    So, is there any extension --

13        MS. HARDING:  Objection, Your Honor.  Let the witness

14  answer his question, please.

15        THE COURT:  That's sustained.  You can ask a

16  question.

17  Q    Okay.  As to the statistics in Dr. Whitehouse's paper, is

18  it correct that they only -- the only analysis is for the 123

19  subjects in the paper, correct?

20  A    That is correct, yes.

21  Q    Is any number given for the population of Libby in the

22  paper, or what might be a greater Libby population?

23  A    I think we are going around and around on the same issue.

24  All I'm saying is that when you do a statistical analysis on a

25  subpopulation or a sample --

1       MR. HEBERLING:  Your Honor, that's not responsive to

2  the question.

3  A    I don't understand your question, Mr. Heberling.

4       MS. HARDING:  I think it is responsive to the

5  question.

6       MR. HEBERLING:  I asked about whether he had any --

7  whether there was anything in the Whitehouse paper which would

8  give even a population estimate for the greater Libby area.

9       MS. HARDING:  Objection, Your Honor.  The paper

10  itself says that it's representative.  Did he say it was -- I

11  mean --

12       MR. HEBERLING:  Your Honor --

13       THE COURT:  It says that.  And the witness has

14  recognized that Dr. Whitehouse changed what the paper said as

15  to what the representativeness of this population was.  He's

16  recognized that.  But, I think he's losing you when you're

17  asking him about the statistical analysis in the paper.

18  BY MR. HEBERLING:

19  Q    The statistical analysis in the paper, that's on the 123

20  subjects, correct?

21  A    Correct.

22  Q    Is there any statistical analysis on the greater Libby

23  population?

24  A    No, there isn't.

25  Q    So, isn't it a false issue to even talk about the greater

Moolgavkar - Cross/Heberling                    252

1  Libby population which has no asbestos disease?

2  A    Absolutely not.  It is not.  I mean, you're trying to make

3  it a false issue now, Mr. Heberling, because the paper clearly

4  states that the results are applicable.  I mean, you keep on

5  jumping back and forth between the paper and his retraction of

6  that statement later on.  So, let's decide what you want to

7  talk about.

8  Q    Okay.  Let's talk about the CARD mortality study.  You

9  said that the proportionate mortality ratio was improper

10 because there's no denominator.

11            MS. HARDING:  Objection.  He said there was no

12 proportionate mortality ratio.

13            THE COURT:  That's sustained.

14 Q    Okay.  You said a proportionate mortality ratio could not

15 be determined because there was no denominator, is that more

16 correct?

17 A    That's closer, yes.

18 Q    Okay.  So, the numerator is 110 patients who died of

19 asbestos disease, correct?

20            MS. HARDING:  Objection, Your Honor.  I don't think

21 that those patients are in the testimony.  I think it was --

22            MR. HEBERLING:  Yes.

23            MS. HARDING:  No, it was -- Your Honor sustained an

24 objection to anything beyond the 76 patients.  And the analysis

25 that I restricted my questions to were the 76 patients, and

1 those are the patients that Dr. Molgaard testified about, as

2 well.

3          THE COURT:  Okay.  I'm sorry.  I don't recall.  I

4 just don't recall.

5 Q    We've done the flow chart with the -- we start with 100

6 and 227 patients, 185 are in the study, 110 died of asbestos

7 disease of which 76 are non-malignant and 34 are cancers.  I

8 can bring out the overhead --

9          THE COURT:  What does that have to do with the 123?

10          MR. HEBERLING:  We're looking for a numerator -- oh,

11 excuse me.  This is the CARD mortality study we're on now.

12          THE COURT:  Okay.  I thought you asked him about the

13 123.

14          MR. HEBERLING:  No.

15          THE COURT:  Okay.  Could you restate the question?

16 Q    In the CARD mortality study, the issue now is whether

17 there's a denominator.

18          THE COURT:  Okay.  I apologize.  I thought you were

19 asking about the other paper.  So, if you've switched I just

20 didn't make the switch.  Would you just restate the question

21 for me, please?

22 Q    So, if in the CARD mortality study 110 patients died and

23 there were -- or died of asbestos-related disease, and if the

24 total number of subjects is 185, isn't the numerator 110 and

25 the denominator 185?

Moolgavkar - Cross/Heberling                254

1  A    Well, that is a numerator and a denominator.  That is not

2  the numerator -- those are not the numerator and denominator

3  that go into a proportionate mortality ratio statistic.

4  Q    So, you disagree with Dr. Molgaard on how a proportionate

5  mortality ratio may be applied, correct?

6        MS. HARDING:  Object.  I think applied and

7  calculated, but go ahead, doctor.

8  A    Dr. Molgaard completed misunderstands the notion of a

9  proportionate mortality ratio.  We went through this on my

10  deposition, Mr. Heberling.  You pulled out last.  You pulled

11  out the definition of proportionate mortality ratio, and I

12  pointed out to you in my deposition that Dr. Whitehouse did not

13  have the numbers to actually compute a proportionate mortality

14  ratio.

15  Q    Okay.  Now, just earlier you said it failed for lack of a

16  numerator, correct?

17  A    Correct.

18  Q    And we've --

19  A    Improperly constructed numerator, yes.

20  Q    And --

21  A    And improperly -- and no denominator at all.

22  Q    Now you're saying there's no denominator?

23  A    There's no denominator at all for the proportionate

24  mortality ratio statistic.  If you like I can explain to you

25  what the --

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Let's move on to the analytic epidemiology studies you

2  talked about.  Do you consider them analytic because of

3  exposure response data that is presented?

4  A    No.  I consider them analytic because a proper analysis of

5  a cohort of individuals was undertaken using rigorous

6  statistical techniques and used to address a hypothesis.

7  Q    Okay.  Then in Sullivan you just -- on direct you

8  discussed the five additional mesos -- let me back up.  First

9  of all, in Sullivan 2007, what was the year for the close of

10  data?

11  A    I believe it was 2001, but I'd have to have the paper in

12  front of me to be absolutely sure.

13  Q    And at your deposition we discussed the five additional

14  mesos since that date?

15  A    Yes.

16  Q    And so, in your reanalysis of Sullivan, are you -- let me

17  back up.  And Sullivan had 15 mesos in her paper, correct?

18  A    It depends on how you count the mesos.

19  Q    One result would be 15, correct?

20  A    The upper limit would be 15.

21  Q    Okay.  And that data stretched all the way back to early

22  '80s?

23  A    Yes.

24  Q    And then in -- and so, her data closed in 2001, and there

25  had been five additional mesos since 2001, correct?

1  A    I know where you're going with this, Mr. Heberling, and --

2  Q    Can you answer that yes or no?

3  A    Yes, yes.

4  Q    Okay.  Then in your analysis are you trying to make -- are

5  you offering to the Court any opinion on what the current meso

6  rate in Libby is, or are you --

7          MS. HARDING:  Objection, Your Honor.  It's --

8  Q    -- getting it back to 2001?

9          MS. HARDING:  -- beyond the scope.  And the Court has

10  already ruled that the rates of disease in Libby are not

11  relevant.

12          THE COURT:  I think I did rule that those rates were

13  not relevant.

14          MS. HARDING:  We specifically didn't go into them

15  because the Court had ruled that they weren't relevant.

16          MR. HEBERLING:  Disease rates, we introduced the

17  NIOSH studies indicating Libby is number three in the country

18  for meso, and that's -- those are death rates, so --

19          MS. HARDING:  And the Court then sustained objections

20  to further testimony about them because they weren't relevant.

21          THE COURT:  The rate of death, I think, is not

22  relevant.  You were making an offer that indicated that there

23  is something unique about Libby, and I thought the information

24  about where Libby fit in the statistical charts that are

25  prepared by the government in terms of the rankings may have

1   some bearing on that, but the rate of death itself is not

2   relevant.  The trust will deal with every meso claim whether

3   it's the person who has -- who is currently still alive or not

4   alive.

5            MR. HEBERLING:  Well, we're addressing something that

6   they covered on direct, so --

7            MS. HARDING:  I did not cover rates on direct, Your

8   Honor.

9            MR. HEBERLING:  You talked about the five additional

10  mesos, correct?

11           MS. HARDING:  No.  All I did was ask Dr. Moolgavkar

12  whether he would include additional reported cases in a study

13  of the kind that he did.  I was very careful not to get into

14  the analysis.

15           THE COURT:  I think the question had to do with the

16  criticism of his report based on the fact that they weren't

17  included and he was asked --

18           MS. HARDING:  And he was -- I wanted to allow him to

19  respond to Mr. Heberling's charge that it was unethical to not

20  include them.

21           THE COURT:  Okay.  So, I don't think the rates -- but

22  I'm going to do the same thing I said before.  You can pursue

23  it.  I will hear it subject to relevance because it's too late

24  in the day, frankly, at this point to worry about it.  Ms.

25  Harding, if that means you need to reopen to rebut something

1  I'll give you that leave.  But, I'm going to hear it subject to

2  relevance objection.  I think I've already said it's not

3  relevant, and if I did, I'm going to strike all of this

4  testimony anyway --

5           MS. HARDING:  Thank you, Your Honor.

6           THE COURT:  -- but I'll hear it just in case.

7  BY MR. HEBERLING:

8  Q    So, your rework of the Sullivan data did not include the

9  five additional mesos since the date of the -- closing date of

10 the Sullivan study, correct?

11 A    That's what I said, and I explained why not.

12 Q    And so, any opinion you're offering here is strictly

13 limited to the year 2001 and does not include anything that has

14 happened since 2001, correct?

15          MS. HARDING:  Your Honor, I have to object to that

16 because he didn't offer an opinion on rates.  Dr. Moolgavkar

17 did not offer an opinion on rates.

18          THE COURT:  He has not, at least in the record here

19 today, offered an opinion on rates.

20          MR. HEBERLING:  That's all I have, Your Honor.

21          THE COURT:  Ms. Harding?

22          MS. HARDING:  I have no questions, Your Honor.

23          THE COURT:  You're excused, Dr. Moolgavkar.  Thank

24 you, sir.

25          THE WITNESS:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1        UNIDENTIFIED ATTORNEY:  Your Honor, these are --

2        THE COURT:  Just one second.

3                    (Pause)

4        THE COURT:  Okay.  I'm ready.  Thank you.

5        UNIDENTIFIED ATTORNEY:  (Inaudible).

6        THE COURT:  Okay.

7        UNIDENTIFIED ATTORNEY:  (Inaudible).  Excuse myself

8   if that's alright with the Court.

9        THE COURT:  Oh.  What about the affidavits and things

10  from Libby?

11       UNIDENTIFIED ATTORNEY:   The affidavits

12  (indiscernible). I think it's probably (indiscernible).  Do you

13  guys want to do that now before we start insurance?

14       MR. HORKOVICH:  Your Honor, we don't request a break,

15  but I think counsel for the insurance companies want to just

16  rearrange right now.

17       THE COURT:  That's fine.  I don't think I'm finished

18  with Libby.  I think there was an offer that I needed some

19  affidavits introduced that I don't have yet.  So, before the

20  insurers start I need to finish Libby.

21       MR. HEBERLING:  I believe Mr. Lewis said that the

22  offer would be made next week through an appropriate witness --

23       THE COURT:  Oh.  Oh.

24       MR. HEBERLING:   -- as to the offer of the affidavits.

25  Is that next week or --

1           THE COURT:  That's fine.  If you're coming back -- I

2    didn't appreciate that the Libby folks were coming back.  If

3    you're going to be here anyway we ought to make use of witness

4    time today.  Gentlemen?  Gentlemen?  Hello?

5                          (Laughter)

6           MR. FINCH:  We're sorry, Your Honor.  I apologize.

7           THE COURT:  What I was saying is, if the Libby

8    lawyers are coming back next week we could make the use of

9    today for witness time.  I thought that they would not be

10   coming back.  But, if you're coming for the insurance cases

11   anyway we can do the affidavits at a different time.

12          MR. LEWIS:  Some of us will be here, and I just have

13   an offer of proof that I just want to submit to the Court.  If

14   the Court will recall, the Court has struck as irrelevant the

15   testimony of Terry Spear, Ph.D.  And we represented to the

16   Court that we requested permission to make a written offer of

17   proof, and this is the time we would've called Dr. Spear in all

18   probability, and it's appropriate to make the offer of proof

19   now.

20          THE COURT:  All right.

21          MR. LEWIS:  And I'd like to hand up the offer to the

22   Court.

23          THE COURT:  Any objection to my accepting it by way

24   of written proffer?

25          MR. BERNICK:  None, Your Honor.


**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.

2           MR. BERNICK:  We'll take a look at it and see what it

3  says, obviously, but in terms of this being the right way to

4  place the proffer before Your Honor -- I've already talked with

5  Mr. Lewis and we have --

6           AUDIO RECORDER:  You should use a microphone.

7           MR. BERNICK:  I've already talked with Mr. Lewis and

8  assured him that we didn't have any problem with that, and we

9  think it's appropriate to have it submitted in that fashion.

10          THE COURT:  All right.  I'll take it then.

11          MR. WISLER:  Your Honor, Jeff Wisler on behalf of

12 Maryland Casualty.  May I read it before it's presented to the

13 Court?

14          THE COURT:  Oh, yes.  Does it have something to do

15 with insurers?  Yes.  You may read it.

16          MR. WISLER:  Thank you, Your Honor.

17          MR. BERNICK:  Here.  Here you go.

18          MR. WISLER:  Thanks.  Your Honor, I'm not looking to

19 hold things up.  I'm going to take my time and look at this and

20 maybe we'll get back to it before today's over.

21          THE COURT:  All right.  I have a copy.  I will not

22 look at it until whatever objections there are may be done, but

23 I just want you to know I've been handed a copy.  So, I'm going

24 to have it here in --

25          MR. BERNICK:  It's just a proffer.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I know it is.  I understand that.

2          MR. BERNICK:  I don't know what --

3          MR. LEWIS:  All this is, is an offer of proof.  It's

4 not offered as evidence.  It's offered to show what the witness

5 would have testified if he were allowed to do so.  That's all

6 it is.

7          THE COURT:  I under --

8          MR. LEWIS:  And it's about industrial hygiene.  It's

9 about conditions at the facility.  I don't think it has any

10 impact on insurance.  It's certainly not intended to and the

11 Court's obviously rejected the evidence and we just want to

12 preserve the record.  That's all it is.

13          THE COURT:  Okay.  I understand it is a record

14 preservation.  I have it.  I will -- if somebody has some

15 objection -- I'm not sure why, but if they do I'll hear -- have

16 it -- hear it after they have a chance to read it.

17          Okay.  Do you need a five minute recess to be able --

18          MR. LEWIS:  And then there's another matter.  There's

19 some affidavits that we've prepared.  There's a stipulation as

20 to them and I -- we were going to offer them today, but counsel

21 wants to get on with witnesses and they would like to review

22 them one more time before we offer them.

23          THE COURT:  All right.  So, you're going to do that

24 next week?

25          MR. LEWIS:  We'll do that next week.

J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  All right.  That's fine.

2          MR. LEWIS:  So, we can get on with the --

3          MR. HORKOVICH:  Good afternoon, Your Honor.  Bob

4 Horkovich, insurance counsel for the ACC.  I don't think we

5 need a recess, but I think that the counsel for the insurance

6 companies wanted to rearrange.

7          THE COURT:  All right.  Let me see whether my staff

8 needs a recess.

9          MR. HORKOVICH:  Thank you.

10         THE COURT:  Cathy, do you need a recess?

11         COURT CLERK:  I'm okay, Judge.

12         THE COURT:  Because we'll -- all right.  We'll

13 probably try to go through until six.  Okay.

14         MR. HORKOVICH:  Your Honor, the next witness will be

15 the -- Jeffrey Posner, former director of risk management for

16 W.R. Grace.

17      JEFFREY POSNER, PLAN PROPONENTS' WITNESS, SWORN

18         COURT CLERK:  Please be seated.

19         MR. HORKOVICH:  And, Your Honor, I just --

20         THE COURT:  Pardon me, folks.  I do have one -- I'm

21 not sure, things that gets me.  When a witness is being sworn,

22 I wish you would pay attention to the witness being sworn.

23 That is a significant portion of a trial to have a witness put

24 under oath and I would appreciate no talking and paying

25 attention to that fact for that brief 30 seconds that it takes.

1 Thank you.

2          Cathy, do you have any white paper?  I need a couple

3 of sheets of white paper for exhibits.  I don't care if it has

4 something on it.  I just need white paper.

5          Those orders -- the order's okay.  Okay.  I don't

6 care what it is.  I just needed to take notes.

7          MR. HORKOVICH:  May I approach the bench, Your Honor?

8          THE COURT:  No, I'm -- not that.  I just -- I need a

9 sheet of this.  Thank you, though.  Thanks very much.

10          When you're ready, Mr. Horkovich.

11                    DIRECT EXAMINATION

12 BY MR. HORKOVICH:

13 Q    Thank you, Your Honor.  Please state your name, sir?

14 A    Jeffrey Posner.

15 Q    Mr. Posner, at one point were you director of risk

16 management of W.R. Grace?

17 A    Yes, I was.

18 Q    Let me start with some background information, could you

19 please tell the Court a brief description of your educational

20 background?

21 A    I graduated college in 1973 with a BS degree from

22 Fairleigh Dickinson University.

23 Q    And before you went to W.R. Grace, could you please

24 briefly describe your employment history?

25 A    I started working in the insurance industry in 1973.  I

**J&J COURT TRANSCRIBERS, INC.**

1 first began with the Liberty Mutual Insurance Company as a

2 claims adjuster trainee.  I became a claims adjuster at Liberty

3 and then a suit adjuster.  I was responsible for adjusting

4 basically liability claims for policyholders of Liberty Mutual.

5 I spent two years at Liberty Mutual from 1973 until 1975.

6          Thereafter, I went to the Reliance Insurance Company.

7 I started there as a suit adjuster and then was promoted to

8 position of claims supervisor.  I was supervising basically

9 liability claims, auto liability, general liability, commercial

10 and personal lines claims as well as property claims.  I spent

11 five years at Reliance and I left Reliance in 1980.

12          I then went to what was then Marsh & McLennan which

13 is the world's largest insurance broker.  They now call it

14 Marsh.  I spent two years at Marsh as a claims broker.  While

15 working at Marsh, I was working on the W.R. Grace account and

16 was offered a job in W.R. Grace's risk management department.

17 I went to Grace in 1982.  I initially went there as the

18 assistant claims manager in the risk management department.

19 Q    Okay.  How long were at W.R. Grace, sir?

20 A    I spent 17 years at W.R. Grace in total.

21 Q    Okay.  So, you worked there roughly from 1982 to 1999?

22 A    I worked there as an employee from 1982 to 1999.  In 1999,

23 Grace moved its headquarters out of Florida to Maryland.  I

24 didn't go with them, so they outsourced the function to me and

25 I started my own consulting business, but since 1999 I have

1   been serving as its outsourced risk manager.

2   Q    Okay.  Can you briefly describe your duties in risk

3   management at W.R. Grace from 1982 to 1999?

4   A    Again, I initially started as the assistant claims

5   manager.  I had a series of promotions over the years.  In

6   1988, I was promoted to the director of risk management and I

7   became an assistant vice president of the corporation.  I was

8   responsible for all of the purchasing and administering of

9   Grace's worldwide insurance policies.  I was a chairman of the

10  board at Grace's captive insurance company.  And early on in my

11  career at Grace I became embroiled in Grace's asbestos and

12  environmental coverage issues and, you know, ensuing coverage

13  litigation.

14  Q    Since 1999, what have your duties been with regard to

15  Grace and working them as -- working with Grace as the

16  outsourced risk manager?

17  A    Generally speaking they have been the same as when I was

18  am employee.  I still purchase and administer all of Grace's

19  worldwide insurance policies.  I oversee insurance claims.  I

20  have management responsibility for the captive insurance

21  company and I have continued to be involved in Grace's asbestos

22  and environmental issues.

23  Q    I'd like to ask some general questions about insurance and

24  about the insurance that Grace purchased, what are the

25  different types of insurance that W.R. Grace purchased?

1 A     Like any other major corporation, Grace purchased, you

2 know, liability insurance, what we call comprehensive general

3 liability insurance, auto liability insurance, property

4 insurance to protect its assets and businesses, directors and

5 officers liability insurance, fiduciary liability insurance and

6 a whole host of other specialized insurances for Grace's

7 businesses.

8 Q     Were there any insurances that Grace purchased that had

9 relation to asbestos lawsuits?

10 A     Yes, well basically it's the comprehensive general

11 liability known as CGL coverage, that is, the coverage, you

12 know, the asbestos bodily injury and property damage claims

13 that have been filed against Grace over the years.

14 Q     Okay.  About that CGL coverage or comprehensive general

15 liability coverage, did Grace purchase that for specific

16 locations or premises?  Well, let me ask -- let me withdraw

17 that question.  What was the geographic scope of the general

18 liability coverage that Grace purchased?

19 A     The primary coverage that covered all of Grace's

20 operations in the United States, Canada and Puerto Rico.  The

21 excess policies covered Grace's operations worldwide.  We

22 didn't purchase insurance for specific locations.

23 Q     So, you don't purchase locations for a specific plant or a

24 specific -- you don't purchase the insurance for a specific

25 plant or city or state?

1  A    No, the policies that Grace purchased, you know, basically

2  covered all of their operations.

3  Q    You used two different terms, you talked about primary and

4  excess, could you please tell the Court the difference between

5  primary liability insurance and excess liability insurance,

6  generally?

7  A    Primary insurance is the first level of insurance coverage

8  at a company or a person will purchase.  The key

9  characteristics of a primary insurance policy is that it has a

10  duty to investigate claims.  It has a duty to defend the claims

11  and it has a duty to pay settlements or judgments where

12  applicable.

13       Sitting above the first level of insurance -- the

14  first level of primary insurance is what we refer to as

15  umbrella insurance.  And sitting above the umbrella insurance

16  is excess insurance.  Although there are slight differences

17  between umbrella and excess policies, people in the insurance

18  industry typically interchange the terms and they call them

19  excess umbrella policies.

20       The difference between an excess umbrella policy and

21  a primary policy is that an excess umbrella policy typically

22  doesn't have a duty to investigate claims and doesn't have a

23  duty to defend claims.  They generally have a duty to reimburse

24  defense costs and reimburse settlement and judgement costs when

25  they're paid.

Posner - Direct/Horkovich                    269

1  Q    There's been a term used in this hearing of products

2  coverage and another term used of non-products coverage, could

3  you please explain to the Court these two different forms of

4  coverage that are part of the liability insurance coverage that

5  Grace purchased?

6  A    All of these coverages are contained within the

7  comprehensive general liability policy.  The products coverage

8  is a coverage which basically covers claims arising out of the

9  manufacture -- manufacturer sale, or distribution of a

10 insured's products.  And there may be caveats to that, for

11 example, in the Grace policies.  In addition to that, the

12 insured -- or Grace had to have relinquished possession of the

13 product and the incident for which coverage is being sought

14 must have occurred on premises not owned or away from Grace's

15 premises.

16          THE COURT:  I'm sorry.  Not owned or away --

17          THE WITNESS:  Not -- it had to -- the claim had to

18 have occurred away from premises owned by W.R. Grace and Grace

19 had to have relinquished possession of the product.

20 Q    As a practical matter is there a different way in which

21 products coverage and non-products differ as part of the

22 insurance program of W.R. Grace?

23 A    No.

24 Q    Are there differences between those forms of coverage?

25 A    Well, I mean, the key issue really is that products claims

**J&J COURT TRANSCRIBERS, INC.**

1  typically contain an aggregate on each policy meaning --

2  Q    What do you mean by an aggregate?

3  A    Well, it's the maximum amount of money that the insurance

4  company has to pay generally in an annual period.  So, for

5  example, a policy might read that it has limits of $1 million

6  per occurrence and $2 million in the aggregate for products

7  claims.  So, that policy could never pay more than $2 million

8  in products claims plus defense costs, whereas the general

9  liability portion, the non-products portion, could pay

10  unlimited amounts of claims as long as each individual claim

11  did not exceed, you know, $1 million per occurrence.

12  Q    There's been other discussions during the case,

13  description of other forms of coverage, did Grace, in addition

14  to purchasing general liability coverage, purchase worker's

15  compensation coverage?

16  A    Yes, like all corporations, Grace purchased worker's

17  compensation coverage and --

18  Q    Did the worker's compensation coverage that Grace

19  purchased come in parts?

20  A    Yeah, well basically there are two parts to a worker's

21  compensation policy.

22  Q    What are they?

23  A    There is what we refer to as Part A, which provides the

24  statutory worker's compensation benefits for injured employees.

25  And there is Part B, which is known as the employer's liability

1 portion of the worker's comp. policy.  And the employer's

2 liability portion covers claims by employees who are able to

3 get around the worker's compensation statute and file what

4 amounts to a liability claim against W.R. Grace.

5        So, employer's liability coverage is essentially, you

6 know, general liability coverage for claims by employees who

7 are able to sue Grace.

8 Q    Over your experience with W.R. Grace, were there people

9 who filed worker's compensation claims attempting to seek

10 claims under Part B or Coverage B, employer's liability

11 coverage?

12 A    Yes, there have been incidents over the years.

13 Q    Okay.  And in your typical experience, what were the

14 impediments to obtaining that coverage?

15 A    Well, particularly with respect to the asbestos claims --

16 and I'm really now referring to the Libby worker claims, the

17 Libby workers filed employer's liability claims against Grace

18 and the two primary carriers that Grace had, Maryland Casualty

19 and CNA, you know, paid some claims, some amounts early on, but

20 ultimately began to deny coverage to Grace because there was an

21 exclusion in the policy which basically says that if a claim is

22 filed -- a claim must be filed within 36 months after the

23 expiration of the policy in order for coverage to be available.

24        So, most of the claims that came in were filed after

25 the 36 month period and, hence, Maryland and CNA denied most of

1  those claims.

2  Q    And under the liability coverage, up until what year was

3  coverage available for W.R. Grace for asbestos claims?

4  A    Grace basically had coverage under its own policies from

5  1962 until 1985.  Sometime in 1984 Grace's insurance carriers

6  began putting asbestos exclusions into Grace's insurance

7  policies.  So, the last --

8           THE COURT:  I'm sorry.  What year, I didn't hear you?

9           THE WITNESS:  In 1984, Your Honor.

10          THE COURT:  Okay.

11 A    So, the last year we had coverage was really the policy

12 that ran from June 30, 1984 to June 30, 1985, was the last year

13 of coverage for Grace.

14 Q    Let me just talk about another aspect of coverage and

15 that's trigger, have you heard the term of our trigger used

16 with relation to insurance coverage?

17 A    Yes, I have.

18 Q    And what does the term trigger mean to you?

19 A    Trigger is the event which causes an insurance policy to

20 respond.  The insurance policies that we're dealing with here

21 are what we call occurrence-based insurance policies.  And

22 occurrence-based insurance policies are generally triggered by

23 an event which results in bodily injury or property damage

24 during the policy period.  So, it's really the bodily injury

25 with respect to the personal injury claims, it's the bodily

1  injury during the policy period which causes the insurance

2  policy to respond and pay.

3  Q    Does trigger of each individual claim or the coverage

4  triggered under each individual claim differ?

5  A    Well, I mean, the trigger is the same, but the facts of

6  the claim may be different.  So, for example, in the context of

7  asbestos, you know, the exposure dates to the product for a

8  given person, you know, would determine which policies are, in

9  fact, triggered by that claim.

10  Q    Can you give me some examples?

11  A    Sure.  Well, remember it's the bodily injury during the

12  policy period that triggers the policy, so if a person is first

13  exposed, for example, in 1960, you know, theoretically he

14  sustained bodily injury in 1960 and continued to sustain bodily

15  injury over the course of time.  So, the policies that would be

16  triggered by that claim would be the policies in effect from

17  1960 as a practical matter until 1985 when Grace could no

18  longer obtain insurance.

19        If a person were first exposed in 1965, well then the

20  first policy trigger would be the 1965 policy and any policy

21  prior to 1965 would not have to respond because there was no

22  bodily injury or property -- no bodily injury during the policy

23  period.

24  Q    Well, what if the first person's in an individual claim

25  first exposure was 1984 and they had not previously been

1 exposed to asbestos prior to 1984?

2 A    Then the first policy that could possibly be triggered

3 would be the 1984 policy.

4 Q    And would coverage in the 1960s and 1970s be available to

5 satisfy that particular claim?

6 A    Those policies would not be implicated.

7 Q    What if a person's first exposure to asbestos -- the very

8 first exposure to asbestos was in 1990?

9           MS. DeCRISTOFARO:  Objection.

10          THE COURT:  You need to use the microphone.

11          MS. DeCRISTOFARO:  I don't want to slow up, but all

12 of these questions involve complex legal issues and the

13 question -- Mr. Posner said that as answering as to generally

14 and I won't object to every question with Your Honor's

15 understanding that a lot of insurers dispute and that they

16 involve legal interpretation.  For example, he said that the

17 policies are triggered by bodily injury.  There's a lot of case

18 law as to what bodily injury means and whether bodily injury is

19 the same as exposure.  The questions you're hearing now are

20 about exposure.

21          And I don't want a debate all of this, but I do want

22 to object and say that we think all of these questions involve

23 complex legal issues as applied to specific polices and we are

24 understanding that this is general background without debating

25 the application of coverage issues as to specific policy.

J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  I am going to do my very best not to get

2    into any specific coverage issues hopefully ever, but at least

3    for the purpose of this case.

4    BY MR. HORKOVICH:

5    Q    Your Honor, I was just trying to set general background

6    for the insurance case for Your Honor's general understanding

7    and I'll move on.

8          In your experience as the director of risk management

9    to W.R. Grace and since, does every claim get the same amount

10   of coverage?

11   A    Well, no.  I mean, again, particularly in the W.R. Grace

12   situation, you know, you would have to have -- the exposure

13   dates would be key to determining which policies are triggered.

14   That's the basis on which we have settled with many of the

15   insurance companies.

16   Q    Is it correct that the coverage that -- to which a person

17   would be entitled to under a claim or that Grace would be

18   entitled to under a claim turn on the individual facts of the

19   claim?

20   A    Yes, definitely.

21   Q    You mentioned products and non-products coverage, was

22   there a time period in which you submitted claims for asbestos

23   liability coverage for non-products to any insurance companies?

24   A    Yes.

25   Q    And to whom did you submit them?

A    Well, I mean, we certainly submitted them to our primary carriers, you know, Maryland Casualty and CNA.  You know, they may have been part of larger submissions to excess carriers.  I really, you know, don't know the specifics, but, you know, certainly they would have been submitted to Maryland Casualty and CNA.

Q    Do you recall generally CNA's response after receiving non-products claims?

MS. DeCRISTOFARO:  Objection, vague.

THE COURT:  You need to use the microphone.  I'm sorry.  You're going to have to --

MR. HORKOVICH:  I'm sorry.  Okay.

THE COURT:  No, no, I was talking to Ms. DeCristofaro.  She was making an objection, but you can't hear her when she's not using the microphone.

MS. DeCRISTOFARO:  Your Honor, I'll move up.  I'm sorry.

THE COURT:  All right.

MS. DeCRISTOFARO:  It was crowded up here, so -- I made an objection that it was vague.

THE COURT:  You need to turn the microphone on now and then we'll be in good shape.

MS. DeCRISTOFARO:  Okay.  I made an objection.  The question was vague.

THE COURT:  I still can't -- it's still not on

Posner - Direct/Horkovich                           277

1  apparently.

2           MS. DeCRISTOFARO:  The green light is on.

3           THE COURT:  I know, but the green light's always on.

4  Just try pushing it, so that the bright green light's on.  Oh,

5  now it's on.  Move the other microphone back, so we don't get

6  the feedback.

7           MS. DeCRISTOFARO:  Okay.

8           THE COURT:  Thank you.

9           MS. DeCRISTOFARO:  I made an objection that the

10 question was vague.

11          THE COURT:  Of what was CNA's response generally?

12 Yes, that's vague.  Sustained.

13 BY MR. HORKOVICH:

14 Q    I'm just trying not to lead the witness, Your Honor.  What

15 happened -- strike that.  Did you receive any responses from

16 CNA after you submitted non-products claims to CNA?

17 A    Well, I --

18          MS. DeCRISTOFARO:  Objection, with -- there's been no

19 identification of what that means.

20          THE COURT:  I'm not sure -- isn't this related to

21 specific policies, I mean, in general -- unless there is just

22 one global response that CNA always gave, is that what you're

23 getting to?

24 Q    What I'm getting to is generally what CNA's reaction was

25 to receiving non-products claims.  When you first submitted

**J&J COURT TRANSCRIBERS, INC.**

1  claims to CNA for non-products, how did CNA respond to the

2  first claims for non-products that you submitted to CNA?

3              MS. DeCRISTOFARO:  Objection.

4              THE COURT:  Well, this is about apparently specific

5  claims.  The first claim submitted to CNA, what was the

6  response?  That's not vague.

7              MS. DeCRISTOFARO:  Your Honor, but there's been no

8  identification to what non-products claims on the -- it's

9  generally --

10             THE COURT:  Okay.  I see.  Yes, you're correct.

11             MS. DeCRISTOFARO:  But, what are we talking about?

12             THE COURT:  Sustained.

13             MS. DeCRISTOFARO:  A slip and fall case is a

14  non-products claim.

15             THE COURT:  I sustained it.

16  BY MR. HORKOVICH:

17  Q    When -- did there come a time when Grace submitted

18  asbestos bodily injury non-products claims to CNA?

19  A    Yes.

20  Q    Okay.  Of those very first asbestos bodily injury

21  non-products claims submitted to CNA, what was CNA's response?

22  A    I need to give a little history here.  CNA was Grace's

23  primary insurance carrier at least as pertains to asbestos for

24  the period 1973 to 1985.  When Grace started receiving asbestos

25  claims in the late 70s and early 80s, Grace was turning these

1 claims over to CNA and CNA was handling those claims and paying

2 those claims.  A lot of the amounts that CNA was paying or all

3 of the amounts for the most part that CNA was paying were being

4 billed back to Grace under deductibles and what we call

5 retrospectively rated insurance policies

6          CNA continued to handle Grace's claims and paid those

7 claims up until some time around I want to say 1990 when Grace

8 was no longer reimbursing CNA under the deductibles and

9 retrospective premium agreements.  CNA began to look closer at

10 the claims.  Ultimately a lawsuit ensued between Grace and CNA,

11 you know.  The lawsuit was settled.  The lawsuit pertained to

12 products claims.  You know, thereafter when Grace sought

13 coverage for the non-products asbestos claims, principally the

14 claims emanating out of Libby, CNA declined to pay them.  CNA

15 ultimately filed a declaratory action against Grace in New York

16 with respect to coverage for those claims.

17 Q    And it's -- to your knowledge is that lawsuit resolved?

18 A    No, to my knowledge that lawsuit has been stayed I believe

19 because of the bankruptcy filing.

20 Q    You mentioned Grace had litigation with at least one of

21 its insurance companies over asbestos claims, did Grace have

22 litigation with any of its other -- the liability insurance

23 companies over asbestos bodily injury claims?

24 A    Grace was in litigation, I believe, with all of its

25 primary excess carriers that wrote coverage for Grace from 1962

**J&J COURT TRANSCRIBERS, INC.**

1  to 1985 as well as primary insurers that wrote coverage for the

2  Zonolite Company which was a predecessor to -- Grace's

3  predecessor.

4  Q    And did there come a time when Grace settled some of those

5  lawsuits?

6  A    Yes.  I mean, Grace has entered into a number of

7  settlements with many primary and excess insurance carriers

8  over the years.

9  Q    Were there different types of settlements in which Grace

10  had entered into with its insurance -- with its lower level

11  insurance companies?

12  A    Well, I mean, generally there were probably three

13  different types of settlements that Grace had entered into over

14  the years with its insurance carriers.  We did settlements

15  which I will call complete buy-outs where an amount of money

16  was paid to Grace.  Grace gave a release -- a policy release

17  and, you know, we were finished with that particular carrier

18  and that particular policy at least.

19       And then Grace did two forms of what I will call

20  coverage and place agreements which I believe in this case

21  they're calling reimbursement agreements.  And those agreements

22  essentially set up a mechanism by which Grace would submit

23  claims to the carriers, allocate the claims to the various

24  policies pursuant to the settlement agreement and then the

25  carriers would reimburse Grace pursuant to the terms of the

1 settlement agreement that Grace had entered into.

2 Q    I am showing you -- I am handing you a document which is

3 a slide for demonstration -- demonstrative purposes entitled

4 pre-petition insurance settlements with indemnities.

5          THE COURT:  Okay.  I need a description.  All right.

6 I see one -- Posner Slide 1 -- actually --

7          MR. HORKOVICH:  Posner Slide 1 on the upper right.

8 Yes, Your Honor.

9          THE COURT:  I think it would be helpful if we had

10 exhibit stickers so that we can carry exhibit labels through.

11 Otherwise, these things are going to get lost even as

12 demonstratives.  So, can we pick a number that Grace hasn't

13 used or is like the 700 series available?

14          MR. HORKOVICH:  Yes, Your Honor.

15          THE COURT:  I think we're only up to 600.

16          MR. HORKOVICH:  Yes, Your Honor.  We'll make this

17 Plan Proponents' Exhibit 700.

18          THE COURT:  All right.

19 BY MR. HORKOVICH:

20 Q    Mr. Posner, do you have a -- Posner Slide 1 or Plan

21 Proponents' Exhibit 700 before you?

22 A    Yes, I do.

23 Q    Can you generally describe what it is?

24 A    Yeah, these are the settlements that Grace entered into

25 with insurance carriers, you know, pre-petition in which a lump

1  sum was paid either immediately or over a period of time and

2  the insurance carriers were, you know, completely released from

3  any further obligation for asbestos related claims.

4  Q    And at the very least did these settlements release the

5  products aspect of the coverage for asbestos bodily injury

6  claims?

7  A    Yes, they at least released the products aspect and some

8  released more than the products aspect of the coverage.

9  Q    Were you involved in -- generally in the period of '82 to

10 '99 and then since beyond have you been involved in Grace's

11 settlements with the insurance companies?

12 A    Well, I personally negotiated I think all of these

13 settlements and was involved in the drafting of the documents

14 and have drafted many of the clauses that are contained in the

15 settlement agreements.

16 Q    Generally, did these agreements include indemnities?

17 A    Yes, they did.

18 Q    Did they all include indemnities?

19 A    No.  Most of them did, but there were a couple that did

20 not include indemnities as I recall.

21 Q    Okay.  And those that included indemnities, did they all

22 look -- what was -- those that included indemnities, generally

23 what was the scope of the indemnity?

24 A    Well, generally speaking when an insurance carrier had

25 paid an amount of money to the extent that insurance carrier

1  got sued or a claim was being pursued against them by a third

2  party such as a bodily injury claimant, a former subsidiary,

3  some company making claim under that policy, Grace was

4  obligated to defend and indemnify that insurer up to some

5  amount and that amount may differ from settlement to

6  settlement.

7  Q    Mr. Posner, if I could ask you to take a look at the next

8  demonstrative and this will be Plan Proponents' Exhibit 701,

9  Posner Slide 2, entitled Asbestos Insurance Reimbursement

10 Agreements, do you see this, sir?

11 A    Yes, I do.

12 Q    What is it?

13 A    These are the lists of asbestos insurance reimbursement

14 agreements that Grace entered into.  I think it's all

15 pre-petition.

16 Q    And, again, what -- did you have any roll in any of these

17 settlements?

18 A    I'm sorry.  I just missed that.

19 Q    Did you have any roll in any of these settlements?

20 A    Yes, I negotiated all of these settlements personally.

21 Q    And did these settlements contain indemnities?

22 A    I believe that each one of them did, yes.

23 Q    And, again, were there any common features about the

24 indemnities in these asbestos insurance reimbursement

25 agreements?

1 A    Yeah, I mean, the common theme was that if a claim was

2 pursued by a settling carrier, you know, Grace would be

3 responsible for defending and indemnifying that carrier up to

4 some amount set forth in the settlement agreement.  And there

5 were certain parameters.  The claim had to be turned over

6 timely and certain things had to occur, but in a general sense

7 Grace was obligated to defend and indemnify each one of these

8 carriers pursuant to the terms of the settlement agreement.

9 Q    You mentioned before that the reimbursement agreements

10 rather than pay a lump sum pay differently, how do -- under

11 these insurance reimbursement agreements generally how was the

12 amount calculated that the insurance company would pay?

13 A    Well, I mean, let me just clarify one thing here.  Some of

14 the reimbursements -- reimbursement agreements required payment

15 up front and then, you know, the coverage in place feature of

16 the agreement took place.

17        But, basically what these agreements did was we

18 agreed with the insurance carriers to spread each individual

19 asbestos bodily injury claim over Grace's coverage block and

20 we'd spread it based upon the claimant's first exposure date up

21 through some ending date and that ending date was generally

22 1985.  So, if a claimant were exposed, for example, from 1950

23 to 1985, the dollars associated with his claim would be, you

24 know, allocated over that 35 year period.  So, if you had paid

25 $100 on the claim you would divide $100 by 35 and that's, I

1  guess what, you know, $3.  You know, $3 would be assigned to

2  each year.

3          And when money got assigned to a year that money in

4  conjunction with other monies assigned to that year would be

5  assigned to the insurance policies and you would start with the

6  lowest level first and as a policy was triggered, you know,

7  that carrier would pay.  When that carrier's coverage got

8  exhausted, we would move to the next level of insurance,

9  usually the next level of excess insurance and then that policy

10  would pay and so on and so forth.

11          So, it was a process -- a mechanism set up where we

12  were submitting claims on a quarterly basis and we were

13  allocating the claims through our computer system and sending

14  the information to the carriers for reimbursement.

15  Q    And how much coverage was available to Grace would then

16  depend upon the facts of each individual claim, is that

17  correct?

18  A    Correct.  You would need to -- the key factor really was,

19  you know, what were the exposure dates and how much was paid on

20  the claim.

21  Q    Have you heard a term in working at Grace in risk

22  management to consent rights?

23  A    Yes.

24  Q    And what does that term mean to you?

25  A    Well, I mean, generally -- well, at Grace and in the

Posner - Direct/Horkovich                    286

1 insurance industry, you know, there are what we refer to as,

2 you know, consent rights or consent to settle clauses meaning

3 that for example, you know, Grace may need to obtain an

4 insurance carrier's consent to settle a claim if the insurance

5 carriers don't pay that claim under its policy.

6          You know, or the reverse could be true.  There could

7 be instances where an insurance carrier, you know, may need to

8 seek consent to settle from a policyholder.

9 Q    With regard to the asbestos insurance reimbursement

10 agreements with the exception of AIG, were there consent rights

11 in the asbestos insurance reimbursement agreements?

12 A    To my recollection I believe the only agreement that

13 required Grace to obtain consent to settle was the London

14 agreement with London Market Insurers and with Lloyds of

15 London.  Other than that I don't recall there being any

16 requirement that Grace obtain consent to settle.

17 Q    As a practical matter with regard to the asbestos

18 insurance reimbursement insurance companies, what did that mean

19 in involving them or not involving them with regard to Grace's

20 decision to settle any individual claim?

21 A    Well, I mean, generally speaking, you know, Grace made the

22 decisions, you know, settled the claims and then allocated

23 those claims pursuant to the terms of the settlement agreement

24 and sent it on to the insurance carriers for reimbursement --

25 sent the information to the insurance carriers to obtain

1 reimbursement.

2 Q    And other than the London Market Insurance Companies, did

3 any of the asbestos insurance reimbursement insurance companies

4 attempt to involve themselves in the decision by Grace to

5 settle an individual claim?

6 A    You know, I do not recall an instance where they did.

7 Q    Have you heard another term in insurance parlance of audit

8 rights?

9 A    Yes.

10 Q    And what does audit rights mean to you?

11 A    Well, in the context of the settlements agreements that we

12 had completed with the insurance carriers, I think most, if not

13 all of the agreements, you know, give audit rights to the

14 insurance company meaning that they can come in and audit the

15 data on which Grace is relying to obtain reimbursement.

16       So, for example, they could audit, you know, the

17 underlying case to determine, you know, if, in fact, the

18 exposure dates are correct and they could also audit Grace's

19 allocation methodology, you know, to ensure that the

20 information that we're providing and the request for

21 reimbursement is proper.

22 Q    Did -- in your experience, did any of the asbestos

23 insurance reimbursement insurance companies exercise their

24 audit rights?

25 A    Some did, yes.

1  Q    Okay.  And in what cases --- what insurance companies did

2  so?

3  A    AIG I think probably audited the most.  My recollection is

4  that London did an audit, maybe one or two audits early on.

5  American Re performed one audit and I think CNA may have

6  audited.  Other than that I don't recall other carriers coming

7  in to perform an audit.

8  Q    Generally, what would -- do you recall generally what the

9  results of the audits were?

10         MS. DeCRISTOFARO:  Objection to form, Your Honor.

11         MR. HORKOVICH:  I'll withdraw it.

12 Q    Over the years did any asbestos insurance reimbursement

13 insurance company question a settlement that Grace had entered

14 into an asbestos bodily injury claim?

15 A    I don't believe so, although I will tell you AmRe -- I

16 don't think they questioned the settlements.  They questioned

17 our methodology of allocating claims.  You know, London had

18 consent rights.  You know, they may have had discussions, for

19 example, with Jay Hughes about it and I was not privy to those

20 discussions.  I don't believe however that any settlement ever

21 got held up where there was not a disagreement which could not

22 be worked out.  Other than that I don't believe anyone ever

23 did.

24 Q    Well, let's focus on that, other than the London AmRe, do

25 you recall any other asbestos insurance reimbursement insurance

1  company ever questioning Grace's settlement of an individual

2  asbestos claim, not gee, you've put this claim down for 1965 to

3  1985 when it should've been 1984 to 1985, but come in and say,

4  you know what, you really shouldn't have settled this claim?

5  A    No, that never occurred to my knowledge.

6  Q    Did any asbestos insurance reimbursement insurance company

7  ever come in and say, you paid too much for that claim.  You

8  paid X amount for that claim and you shouldn't have.  You

9  should've paid a lesser amount?

10 A    No, that never occurred to my knowledge and I think I

11 would have known if it occurred.

12 Q    The last theory I'd like to ask you about now is about

13 BNSF, have you heard of a company called BNSF?

14 A    Yes, I have.

15 Q    In the course of your experience at W.R. Grace, did --

16 back up.  You purchased liability insurance for W.R. Grace, is

17 that correct?

18 A    Yes, I did.

19 Q    In the course of your experience in -- at W.R. Grace in

20 purchasing insurance at W.R. Grace, did you ever purchase a

21 policy covering W.R. Grace in which BNSF was a named insured or

22 an additional named insured?

23 A    I mean, not during my tenure there and not only during my

24 tenure, but I've never seen a policy at Grace --

25 Q    Well, that was my next question?

1  A     I'm sorry.

2  Q     My first question is whether you purchased it?

3  A     I did not.

4  Q     Have you ever seen a policy purchased by W.R. Grace for

5  W.R. Grace in which BNSF was the named insured or the

6  additional named insured?

7  A     I've never seen such a policy at Grace.

8            MR. HORKOVICH:  One moment, Your Honor.

9                        (Pause)

10  Q   Mr. Posner, I'd like you to take a look at Grace

11  Exhibit -- the Plan Proponents' Exhibit 700 if you would again

12  please, this is the pre-petition insurance settlements with

13  indemnities, do you see that, sir?

14  A     Yes, I do.

15  Q    Okay.  I think you said that some of the settlements that

16  Grace entered into may not have had indemnities, could I ask

17  you to take a look at Slide 700 for a moment, do each of these

18  settlements contain indemnities?

19  A     Yes, I believe so.

20            MR. HORKOVICH:  Okay.  Your Honor, I'd like to move

21  the admission of 700 and 701 for demonstrative purposes only.

22            UNIDENTIFIED ATTORNEY:  No objection.

23            THE COURT:  All right.  It's -- 700 and 701 are

24  admitted as demonstratives.  One second, please.

25            MR. HORKOVICH:  Nothing further from the plan

Posner - Cross/Forshaw                                291

1  proponents, Your Honor.

2           THE COURT:  All right.  Let's take a five minute

3  break and then we'll reconvene with the cross examination.

4                         (Recess)

5           THE COURT:  Let's sit down and get started.

6                    (Attorney conversation)

7           THE COURT:  All right.  I apologize.  Mr. Posner, are

8  you ready?

9           THE WITNESS:  Yes.  Yes, I am.

10           THE COURT:  Okay.  Thank you.  Good afternoon.

11           MS. FORSHAW:  Good afternoon, Your Honor.  Mary Beth

12  Forshaw for Travelers Casualty & Surety Company which was

13  formerly known as Aetna Casualty & Surety Company.

14           Good afternoon, Ms. Posner.  Good to see you again.

15           THE WITNESS:  Hello, Ms. Forshaw.

16                    CROSS EXAMINATION

17  BY MS. FORSHAW:

18  Q    If I use Travelers Casualty and Aetna Casualty

19  interchangeably, will you be comfortable with that?

20  A    Sure.

21  Q    Mr. Posner, I have very few questions for you.  You

22  indicated on your direct that on Grace's behalf you negotiated

23  a number of settlement agreements with insurance companies,

24  correct?

25  A    Yes.

                    **J&J COURT TRANSCRIBERS, INC.**

Posner - Cross/Forshaw                                292

1  Q    And am I correct that since the 1990s you've also had

2  responsibility for insuring Grace's compliance with agreements

3  with insurance companies?

4  A    Yes, I think that's a fair statement.

5           MS. FORSHAW:  I have put in front of you, Mr. Posner,

6  a big fat binder, do you see that?  Don't be alarmed.  I'm not

7  going to use much of it.  Mr. Horkovich was very helpful in his

8  examination.  Your Honor, would you like a copy of the binder,

9  as well?

10          THE COURT:  Absolutely.

11          MS. FORSHAW:  Is it okay if I approach?

12          THE COURT:  Please.  Thank you.

13 Q    Mr. Posner, could you turn to Travelers' Exhibit 5 in the

14 binder?

15 A    Okay.  I have it.

16 Q    And do you recognize this as a settlement agreement

17 between Grace and Travelers dated May 22nd, 1996?

18 A    Yes, I do.

19 Q    And that, in fact, is one of the agreements that appears

20 on the slide that Mr. Horkovich gave you --

21 A    Yes.

22 Q    -- relating to asbestos insurance reimbursement

23 agreements?

24 A    Yes, it does.

25 Q    And if you could turn to Page 48 of Travelers' Exhibit 5,

**J&J COURT TRANSCRIBERS, INC.**

Posner - Cross/Forshaw                    293

1  am I correct that you signed this agreement on behalf of Grace?

2  A    Yes, that's correct.

3  Q    And am I correct that you were the person at Grace

4  principally responsible for negotiating this agreement on

5  Grace's behalf?

6  A    That's correct.  Yes.

7  Q    And this is the coverage in place agreement, right?

8  A    Yes, it is although there -- I think there was an initial

9  payment made with respect to the pre-1973 policies.  But, yes,

10  this is what I would call a reimbursement agreement.

11  Q    And this agreement, Travelers' Exhibit 5, resolved various

12  litigations that were pending between Grace and Aetna Casualty,

13  correct?

14  A    Yes, that's correct.

15  Q    And those litigations related to Grace's request for

16  coverage for asbestos related personal injury and property

17  damage claims, correct?

18  A    Yes.  Correct.

19        MS. FORSHAW:  Okay.  Your Honor, I would like to

20  admit Travelers' Exhibit 5 into evidence in this case.  It's

21  produced under the protective order because it was a

22  confidential agreement and I would just ask that that portion

23  of the record be sealed.

24        UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

25        UNIDENTIFIED ATTORNEY:  No objection.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  What am I sealing, the agreement itself?

2              MS. FORSHAW:  The agreement and the testimony that's

3    about to follow about the agreement.

4              THE COURT:  Okay.  Do I need to clear the courtroom?

5              MS. FORSHAW:  I believe everybody in the courtroom is

6    party to the protective order based on my quick scan.

7              THE COURT:  How about the phone?

8              MS. FORSHAW:  I don't know who's on the phone.  I

9    guess we could ask if anybody on the phone who's not party to

10   the agreement if they would hang up.

11             THE COURT:  They're -- I have no way of knowing

12   whether they will or won't.

13             MS. FORSHAW:  We had asked the debtors two days ago

14   to confer with us about the procedure for dealing with these

15   confidential exhibits and we never heard back.  I understood in

16   the Libby part of the case that we had sealed portions of the

17   record.

18             THE COURT:  No, actually not.  What happened was that

19   there was an agreement that the personal identification

20   information would be used, but deleted from the records and, in

21   fact, will be substituted with a different identifier.  So,

22   there was no need to seal.  So, that's -- that's the problem.

23             MS. FORSHAW:  Is there a problem with sealing the

24   record?

25             THE COURT:  The problem is that I have an order so

1  that everybody can get as close as to immediate a transcript as

2  possible that says that the unredacted transcripts are to be

3  put on the docket in Delaware and then substituted with the

4  corrected versions after they're corrected.

5          In addition, we have two court reporters who are not

6  government court reporters who are not under any obligation to

7  keep information confidential although I think they may work

8  for the law firms, so maybe they are.  But, I don't -- I

9  honestly don't know who they work for, so those are the issues.

10          MS. FORSHAW:  Your Honor, we'll proceed with the

11  documents in evidence if that's okay with Grace.

12          MR. HORKOVICH:  That would be fine, Your Honor.

13          THE COURT:  All right.

14          MS. FORSHAW:  Okay.  And is the exhibit admitted into

15  evidence?

16          THE COURT:  Any objection to the admission of exhibit

17  -- Travelers' Exhibit 5?

18          MR. HORKOVICH:  No, no objection, Your Honor.

19          THE COURT:  It's admitted.

20  BY MS. FORSHAW:

21  Q    Okay.  I'd like to talk a little bit about the 1996

22  agreement and we'll do this quickly in light of your testimony

23  on direct.  Pursuant to this agreement Aetna Casualty agreed to

24  reimburse Grace for future asbestos related claims, correct?

25  A    Yes, claim payments, correct.

1  Q    And it agreed to do so pursuant to the allocation formula
2  you testified about on direct, correct?
3  A    Generally speaking, yes.  I mean, obviously it's the
4  allocation formulas in this particular agreement, but generally
5  speaking, yes.
6  Q    And to the best of your knowledge Aetna Casualty, now
7  Travelers Casualty, has reimbursed Grace in accordance with the
8  provisions of the 1996 agreement?
9  A    That is my understanding, yes.
10 Q    Now, Grace for its part assumed certain obligations under
11 the agreement as well, correct?
12 A    Yes.
13 Q    And, for example, do you recall that Grace agreed to
14 supply Aetna with various reports and information?
15 A    Yes, I do.
16 Q    And Grace agreed to obtain and retain documents supporting
17 the allocations under the agreement, correct?
18 A    That is my recollection, yes.
19 Q    And Grace agreed to send periodic quarterly reports of new
20 filings of asbestos claims to Aetna, correct?
21 A    That is my recollection, yes.
22 Q    And to the best of your knowledge, Grace has not failed to
23 perform any of those obligations under the 1996 agreement?
24 A    To the best of my knowledge.
25 Q    Now, on your direct examination you testified very

1  generally about indemnification requirements under asbestos

2  insurance reimbursement agreements, do you recall that?

3  A    Yes, I do.

4  Q    The 1996 agreement, Travelers' Exhibit 5, contains an

5  indemnification obligation on the part of Grace, correct?

6  A    Correct.  Yes.

7  Q    And generally speaking the 1996 Aetna agreement provides

8  that Grace shall indemnify Travelers -- strike that.  The 1996

9  agreement provides that Grace shall indemnify Aetna against

10 certain claims brought by third parties relating to any

11 insurance policy released under the agreement, is that fair?

12 A    Generally speaking that's my recollection, yes.

13 Q    And to the best of your knowledge Grace has, in fact,

14 indemnified Aetna against claims pursuant to the 1996

15 agreement, right?

16 A    Well, you know, you brought this up at my deposition I

17 think and I -- you indicated to me there was an instance and I

18 didn't recall that instance as I recall and I still don't

19 recall it, but I'm not disputing what you say.  I just don't

20 remember.  It was probably so many years ago, but it's

21 certainly possible and I'm not disputing what you're

22 suggesting.

23         THE COURT:  Wait.  I'm sorry.  I don't know the

24 answer.  The debtor has not or has honored its obligations?

25         THE WITNESS:  Well, I don't think we have ever

1 dishonored our obligations.  Ms. Forshaw is suggesting that a

2 claim was made against Grace and we performed under it.  I

3 simply don't know sitting here factually, but I'm not

4 disagreeing with her.  We may have, in fact, done it.

5          THE COURT:  Okay.

6 Q    Let me see if I can refresh your recollection.  If you

7 could turn to Travelers' Exhibit 7 in your binder?

8 A    Yes, I have it.

9 Q    I need you to just take a moment to look at that document,

10 let me know when you're ready?

11 A    I've skimmed it.

12 Q    And Exhibit 7 is a July 3rd, 1996 letter from Patricia

13 Hooper Kelly of Travelers to W.R. Grace and Co., do you see

14 that?

15 A    Yes, I do.

16 Q    And if you could turn to the second page of the document,

17 you're listed as a CC recipient of this letter, correct?

18 A    Yes, I am.

19 Q    And going back to Page 1, the gray line indicates that the

20 letter pertains to indemnification under asbestos settlement

21 agreement between W.R. Grace and Co. Conn. and the Aetna

22 Casualty & Surety Company, correct?

23 A    Yes, it does.

24 Q    And if you take a look at Page 1 of the letter, the first

25 sentence, there's a reference to Paragraph 13.3 of the above

1 referenced asbestos settlement agreement, do you see that?

2 A     Yes, I do.

3 Q     And that's a reference to the 1996 agreement?

4 A     Yes, it is.

5 Q     Now, running your eyes down the letter, if you look at the

6 paragraph denominated first, it says -- Ms. Kelly says, "I

7 request that Grace defend and indemnify Aetna from and against

8 the pending cross claims that have been filed by Continental

9 Casualty Company against Aetna in the following two Minnesota

10 garnishment actions," do you see that?

11 A     Yes, I do.

12 Q     And then two actions are listed, the Eco Lab action and

13 the County of Hennepin action?

14 A     I see that, yes.

15 Q     Does review of that refresh your recollection that Grace

16 stepped in and defended and indemnified Aetna in those two

17 cases?

18 A     You know, I simply don't have a recollection.  And, again,

19 I -- if you're suggesting, and I'm sure it's true if you say it

20 is, and I just simply don't have a recollection of this to be

21 honest with you.  It's 12 years ago.

22 Q     All right.  I appreciate the compliment.  If you would

23 look at the next paragraph there's a reference to the _Ieyoub_

24 case, are you familiar with that case?

25 A     I actually do remember the _Ieyoub_ case.  I actually have a

1  general recollection of that case.

2  Q    And do you recall that Grace defended and indemnified

3  Aetna on that case?

4  A    You know, the only thing that I recall was that there were

5  issues about indemnification involving the _Ieyoub_ case.  I just

6  don't specifically recall Aetna being involved.  But, again, I

7  certainly don't dispute what you're suggesting.  I simply don't

8  have a recollection.

9  Q    Okay.  To move this along, go to Page 2.  There are two

10  more requests by Ms. Kelly for indemnification by Grace, do you

11  see that?

12  A    Yes, I do.

13  Q    Okay.  Let me see if I can help move this along.  Take a

14  look at Travelers' Trial Exhibit 8 which is the next document

15  in your binder.  Maybe this will get us where we want to go.

16  A    I'm here.  I see it.

17  Q    Okay.  This is a letter from a Mr. Barber -- Phillip G.

18  Barber at Constantine and Partners to Patricia Hooper Kelly, do

19  you see that?

20  A    Yes I do.

21  Q    And -- sorry about that, it's dated July 17th, 1996, do

22  you see that?

23  A    Yes, I do.

24  Q    And it, in the first sentence, refers to Ms. Kelly's July

25  3rd, 1996 letter, do you see that?

Posner - Cross/Forshaw                    301

1  A    Yes, I do.

2  Q    And that's Trial Exhibit 7, correct?

3  A    Well, it says Trial Exhibit 8 here.  I --

4  Q    No, the reference in the first sentence is to Ms. Kelly's

5  letter --

6  A    Oh, okay.  Yes, I understand.  Yes, I think that's

7  correct.

8  Q    Okay.  And then if you run your eyes down this letter in

9  Paragraph 1 -- by the way, who is -- who was Phillip Barber, he

10  was an attorney who represented Grace, correct?

11  A    Yes, he represented Grace in coverage litigations for many

12  years.

13  Q    Okay.  And if you look at the first paragraph --

14        MR. HORKOVICH:  Objection, Your Honor.  Could we

15  establish whether the witness has ever seen this letter before

16  or has any knowledge of it before we begin reading each of the

17  provisions?

18        THE COURT:  Yes.

19        MS. FORSHAW:  I'm using the letter to try to refresh

20  his recollection, Your Honor.  I don't think I need to.

21        THE COURT:  Okay.  That's fine.

22  Q    So, if you would take a look at the first paragraph

23  number.  It says, "As Aetna has requested, Grace will assume

24  the defense of Aetna against the cross claims of Continental

25  Casualty," do you see that?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I do.

2  Q    And does that refresh your recollection that Grace, in

3  fact, did indemnify Aetna with respect to those Minnesota

4  claims?

5  A    You know, actually, in looking at this letter from Mr.

6  Barber I do now have a general recollection of this letter.  I

7  don't recall the specifics, but yes, I do have a general

8  recollection of Mr. Barber having sent this letter.

9  Q    And he sent it with authorization?

10  A    Yes, he would have.

11  Q    And it refreshes your recollection that Grace did, in

12  fact, indemnify Aetna for those Minnesota cases?

13  A    Yes, it does.

14  Q    And looking at the next paragraph, the letter says, "As

15  Aetna has requested, Grace will assume the defense of Aetna in

16  the Ieyoub action in Louisiana," do you see that?

17  A    Yes, I do.

18  Q    And does that refresh your recollection that Grace

19  indemnified Aetna in that case, as well?

20  A    Yes, it does.

21  Q    And then looking at the third paragraph of Mr. Barber's

22  letter, it indicates that, "Grace is undertaking to have the

23  proceeding captioned American Employer's Insurance Company

24  versus W.R. Grace and Company dismissed.  In the meantime,

25  Grace will assume Aetna's defense as you requested and will

1 select this firm to represent Aetna," do you see that?

2 A    Yes, I do.

3 Q    And does that refresh your recollection that Grace

4 indemnified Aetna in that case, as well?

5 A    Yes, it does.

6 Q    Thank you.  So, now that your recollection is refreshed we

7 can agree that on several occasions pre-petition Grace did, in

8 fact, indemnify Aetna pursuant to the 1996 agreement, is that

9 fair?

10 A    Yes, it is.

11 Q    Okay.  If you could turn in your exhibit book to

12 Travelers' Trial Exhibit 1.  This is another settlement

13 agreement between Aetna Casualty and Grace, correct?

14 A    Yes, it is.

15 Q    And this one is dated February 20th, 1992, correct?

16 A    Yes, it is.

17 Q    And, this agreement -- well, you referred to complete

18 buy-back agreements in your direct examination, do you recall

19 that?

20 A    Yes, I do.

21 Q    And, this agreement is a complete buy-back agreement, is

22 that right?

23 A    That is my recollection, yes.

24 Q    And you negotiated this 1992 agreement on Grace's behalf,

25 correct?

Posner - Cross/Forshaw                                304

1 A    Yes. I did.

2         MS. FORSHAW:  I'd like to call for the admission of

3 Travelers' Exhibit 1 into the record.

4         MR. HORKOVICH:  No objection, Your Honor.

5         THE COURT:  Travelers' 1 is admitted.

6 Q    Now, like the 1996 agreement, this 1992 agreement resolved

7 various asbestos coverage litigations, correct?

8 A    Yes, that's my recollection.  At least one coverage

9 litigation.

10 Q    And if you would turn to Section 7A of Travelers' Exhibit

11 1, it is on Page 9.

12 A    I am there, yes.

13 Q    Can we agree that Travelers' Exhibit 1, the 1992 agreement

14 also provides that Grace shall indemnify Aetna against certain

15 third party claims?

16 A    Correct, yes.

17 Q    And, Grace has indemnified Aetna Casualty pursuant to this

18 provision as well?

19 A    Again, I don't have a recollection if we did or we didn't.

20 Q    To the best of your knowledge, Mr. Posner, in connection

21 with any indemnification that Grace has provided to Aetna over

22 the years, has Grace ever applied a payment percentage or

23 discount to the payments it made to Aetna?

24 A    I don't believe we would have.

25         MS. FORSHAW:  Thank you, that's all I have.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  What's going to make most sense, to do --

2  to finish one insurance company and then move to the next so

3  that I should have, for example, cross examination or is it

4  going to be better to have all the insurers and then the cross?

5  I just don't know what's going to make more sense.

6          MR. HORKOVICH:  I would prefer all the insurance

7  companies to go and then if there's any redirect, we would do

8  it then.

9          THE COURT:  Oh, redirect, I'm sorry, I said, cross.  I

10  apologize.

11          MR. HORKOVICH:  That's okay.

12          THE COURT:  Redirect.  Okay.  That's fine.  Mr.

13  Plevin.

14          MR. PLEVIN:  Thank you, Your Honor.

15                    CROSS EXAMINATION

16  BY MR. PLEVIN:

17  Q    Mr. Posner, my name is Mark Plevin, we haven't met, have

18  we?

19  A    I think I know your name, but I don't think we've met.

20  Q    Okay.  I represent Fireman's Fund in this case with

21  respect to a supercedious bond that Fireman's Fund issued for a

22  case in Texas called Edwards.  Do you have a general

23  familiarity with that bond?

24  A    You know, I recall hearing about it, I don't have a

25  general familiarity with it.

1 Q    Would it be correct that you were not the person at Grace
2 who was responsible for procuring that bond?
3 A    I do not believe I procured that bond, that is my
4 recollection.
5 Q    Is that something that would have been a function of the
6 Treasury Department at Grace, to your knowledge?
7 A    Well, actually, I was responsible for procuring bonds, I
8 just don't believe I procured that one.  I mean it may have
9 been procured, possibly by counsel, maybe by Jay Hughes, or one
10 of the property damage lawyers, I can't remember.
11 Q    Would you disagree if I suggested that Mr. Tarola and Mr.
12 Hunter were the ones who procured the Edwards bond?
13 A    I don't think I would have any knowledge, I don't think I
14 know enough to agree or disagree.  I know Mr. Hunter and I know
15 Mr. Tarola.  If they did that, they did that.  I really don't
16 know.
17 Q    And, they were in the Treasury function at Grace in June
18 or July of 2000?
19 A    Well, Mr. Tarola was the Chief Financial Officer and Mr.
20 Hunter was in a Treasury role.
21 Q    And, was Mr. Tarola also the Treasurer of Grace at that
22 time?
23 A    I can't remember his precise titles  I know he was the
24 Chief Financial Officer.
25        MR. PLEVIN:  All right.  No more questions, Your

1    Honor.

2              THE COURT:  Mr. Brown?

3              MR. BROWN:  Good afternoon, Your Honor, Michael Brown

4    on behalf of One Beacon and Seaton.  I was not here this

5    morning, I signed in, Your Honor, this afternoon.  I signed in

6    on behalf of One Beacon America Insurance Company, Seaton

7    Insurance Company, Geico and Republic.  My questioning for Mr.

8    Posner today is only for One Beacon and Seaton.

9              THE COURT:  All right.

10             MR. BROWN:  And, Your Honor, we have a bit of a

11   housekeeping matter.  I'm going to be showing Mr. Posner some

12   exhibits.  They were provided to you, I believe, in the

13   original binders, or the original CDs that you received.  They

14   were since replaced, there's no substantive difference in them,

15   other than they now have Bates numbers that were requested by

16   the plan proponents.  And I have a copy of these on disk for

17   you and we provided hard copies to Mr. Horkovich.

18             THE COURT:  If you're going to use them as trial

19   exhibits, I'm probably going to need the paper copies that are

20   marked, but I'm happy to take the disk.

21             Mr. Brown, the other -- you're saying they're

22   substituted.  Does that mean the last disk that I got should be

23   taken off my computer and this one should be put on?

24             MR. BROWN:  I'll allow Mr. Berger to answer that, he

25   did the logistics, Your Honor.

1          MR. BERGER:  I'm sorry, Your Honor, these are just

2    select exhibits that were stipulated among the plan proponents

3    and One Beacon and Seaton and Geico and Republic as of last

4    Friday.  I don't recall the docket entry number, but it was

5    filed last Friday.

6          MR. BROWN:  It's Docket Entry 23173, Your Honor.

7          MR. BERGER:  And they simply replace the same

8    numbered exhibits.  They're labeled, for example, OS-1(rev.)

9    and in sequence and they simply replace seven, One Beacon and

10   Seaton exhibits and several of the Geico, Republic ones which

11   are not being -- not subject today.

12         THE COURT:  I'm happy to take the disk, but I think

13   at some point we had better have paper copies especially if

14   it's substitution.  As you can see, there's a little paper, in

15   addition to everything that's on the disk.

16         MR. BROWN: I understand, Your Honor.  We'll get that

17   sorted out and provide you with the disk.

18         THE COURT:  All right.  Thank you.

19                         CROSS EXAMINATION

20   BY MR. BROWN:

21   Q    Good afternoon, Mr. Posner.

22   A    Good afternoon.

23   Q    In your capacity as the Director of Risk Management at

24   Grace, you negotiated settlement agreements with Commercial

25   Union, correct?

1  A    Yes, I did.

2  Q    And, Commercial Union, today is known as One Beacon

3  America Insurance Company, correct?

4  A    I believe so.  I don't really know the corporate

5  structure.  I'm not disagreeing, I simply don't know enough to

6  agree or disagree.

7  Q    Okay.  Do you have Posner -- or excuse me, Plan

8  Proponents' 700 in front of you, the chart that Mr. Horkovich

9  showed you?

10 A    Yes, I do.

11 Q    If you look on the left hand column you'll see Commercial

12 Union.  Does that refresh your recollection?

13 A    Yes.  I mean I believe they're called One Beacon, but I

14 really don't know enough about it, but I'm not disagreeing at

15 all.

16 Q    All right.  And you also negotiated the settlement

17 agreements with Uniguard, is that correct?

18 A    That is correct, yes.

19 Q    And you understand Uniguard today is referred to as Seaton

20 Insurance Company, correct?

21 A    Yes, I do understand that.

22 Q    Could you take a look at what has been marked OS-1 and it

23 has in parentheses, rev, for revised.

24 A    I have Exhibit 1 here.

25 Q    Okay.  You recognize that document don't you?

1  A    Yes, I do.

2  Q    Okay.  It's a settlement agreement that Grace entered into

3  with Commercial Union and its affiliated companies with respect

4  to coverage for asbestos products claims, correct?

5  Ayes.

6  Q    And it's dated May 1993, correct?

7  A    Yes, correct.

8  Q    All right.  You negotiated this agreement, did you not?

9  A    Yes, I did.

10 Q    I'm correct, am I not, that under this agreement

11 Commercial Union agreed to pay and did pay Grace $81.2 million?

12 A    That is my recollection, yes.

13 Q    And Mr. Beber, Robert Beber signed this on behalf of

14 W.R. Grace and Co.?

15 A    W.R. Grace and Co.-Conn.

16 Q    Okay.  Do you see the signature line for W.R. Grace & Co.

17 as well?

18 A    Yeah, I'm sorry, I do, it's on the left.

19 Q    He signed it for both?

20 A    Yes, he did.

21 Q    And you witnessed his signatures?

22 A    Yes, I did.

23 Q    The company that was known as W.R. Grace & Co., in May of

24 1993 has a different name today, does it not?

25 A    I suspect that it does.

1  Q    It's called Fresenius Medical Care Holdings, Inc., is it

2  not?

3          MS. ESAYIAN:  Your Honor, objection to foundation.  I

4  mean, there's -- the witness has already made it clear he's not

5  sure and now the questioning is going on, on this line.

6          THE COURT:  Well, if the witness knows, he can

7  answer.

8          THE WITNESS:  You know, I think you're correct, but I

9  can't swear to it, I'm in court, so I just don't know that

10 much.

11 Q    Do you know whether it's a Fresenius entity even if it's

12 not -- even if you don't know that it's Fresenius Medical Care

13 Holdings, Inc.?

14 A    Well, I mean my recollection was that, you know, W.R.

15 Grace was a New York corporation at that time and that New York

16 corporation became Fresenius.  That's kind of my general

17 recollection.  So, I think you're correct, but, again, I'm just

18 not 100 percent sure.

19 Q    Fresenius is a non-debtor, correct?

20 A    Yes.

21          MR. BROWN:  Your Honor, I'd move for the admission of

22 OS-1 revised, in evidence.

23          MR. HORKOVICH:  No objection, Your Honor.  In fact,

24 we previously had signed and executed a stipulation with Mr.

25 Brown regarding a whole series of settlement agreements and

1  insurance policies and I hope, in light of the fact that we've

2  executed a signed stipulation that we're not going to go

3  through each one of the settlement agreements.

4        THE COURT:  Mr. Brown, first of all OS-1 revised is

5  admitted.

6        MR. BROWN:  Your Honor, Mr. Horkovich is correct,

7  this is -- this document and the six others that I will go

8  through if necessary, are the subject of a stipulation.

9        The stipulation waived all objections, except

10 relevance.  And if the plan proponents are willing to drop

11 their relevance objection and allow me to admit the remaining

12 six, then I can probably let Mr. Posner go.

13                          (Pause)

14        THE COURT:  Apparently it's not an easy answer.

15        MR. BROWN:  I thought Mr. Horkovich said they were

16 admitted, Your Honor.

17        THE COURT:  Is that what's on the substituted disk,

18 Mr. Brown, these polices that are stipulated as admitted, but

19 for relevance?

20        MR. BROWN:  Yes.  What you have on the disk, Your

21 Honor, is the seven settlement agreements, three for Commercial

22 Union, and four for Uniguard.  And then in addition to that,

23 there were a number of policies which I'm not going to deal

24 with today, that were also stipulated to, again, subject to a

25 relevance objection.

1              THE COURT:  Okay.

2              MR. HORKOVICH:  Your Honor, relevance depends on what

3     they're being offered for.  If it's whether Fresenius executed

4     the document and whether -- and its relationship to Grace, then

5     there's relevance.  And, we will agree to that.  We'd like a

6     proffer as to what he'd like to use these documents for, to

7     establish -- so we understand what the relevance is.

8              THE COURT:  All right. Mr. Brown.

9              MR. BROWN:  Your Honor, the relevance of these

10    documents is that they contain contractual indemnity

11    agreements, which Mr. Posner testified to earlier.

12             W.R. Grace and Conn., as well as Fresenius Medical

13    Care Holdings, Inc., and Sealed Air Corporation, were

14    signatories to some of these agreements.

15             The indemnity provisions in those agreements have

16    been triggered by, among other claims, that brought by Scotts,

17    and threatened claims by other, and the plan, purports to

18    release the claims against non-debtors, Fresenius and Sealed

19    Air.

20             One of the agreements, the last one, does not have a

21    contractual indemnity agreement, it's a Uniguard policy, Your

22    Honor, and Uniguard has asserted the misrepresentation claim

23    against Sealed Air and Fresenius Medical Care Holdings, and

24    that claim is to be released and enjoined under the plan and

25    it is our contention, Your Honor, that that is illegal.

1       MR. HORKOVICH:  Your Honor, we acknowledge that these
2  are true and correct copies of the settlements and they are
3  what they are and the entities that signed them are what they
4  are and Mr. Posner has testified that Grace has had indemnities
5  and Grace has honored the indemnities.
6       MR. FREEDMAN:  Just to be clear, Your Honor --
7       THE CLERK:  Use the mike, please.
8       MR. FREEDMAN:  Your Honor, Theodore Freedman, for
9  Grace.  To be clear, Your Honor, with respect to Fresenius, the
10 signature line on that document is executed by the same person
11 that executed the document on behalf of Grace, and we would not
12 want the admission of these documents to constitute any waiver
13 of any argument that anybody may make as to whether or not this
14 document is a binding agreement as to Fresenius.  It may or it
15 may not be but the fact that these documents are admitted
16 wouldn't, in itself, establish that.
17      THE COURT:  Okay.  That sounds like a coverage issue
18 of the first order, which I don't think I'm going to have to
19 get into, in fact, I don't think anybody wants me to.  I think
20 the issue though is if -- whether Mr. Brown can make use in his
21 arguments and briefing, of the fact that the plan does not
22 comply with applicable law and, therefore, can't be confirmed
23 because of whatever it was he argued, just now, whatever he
24 stated now with respect to Fresenius.
25      If it's conceded that these documents are relevant to

1 that argument, then I guess they can come in, with the

2 stipulation that the only thing this Court is going to be

3 looking at is whether the plan complies with the provisions of

4 the bankruptcy code, not whether a particular policy is or

5 isn't applicable, binding, effective, whatever the words are

6 that you want to use.

7          MR. BROWN:  Your Honor, that's fine and, actually,

8 we're not dealing with policies at all at this point, we're

9 actually dealing with the settlement agreements.

10          THE COURT:  Or the settlement agreements.

11          MR. FREEDMAN:  On that basis, Your Honor, and subject

12 to the comments I just put on the record, we wouldn't have any

13 objection to this being admitted.

14          THE COURT:  So, they would -- all of these policies

15 and stipulations would be admitted for the purposes of use in

16 determining plan confirmation and no other use.

17          MR. BROWN:  Your Honor, we're not asking for the

18 policies to be admitted at this point, this is not -- it's an

19 entirely different issue.

20          THE COURT:  All right.

21          MR. BROWN:  It's really OS-1 revised, OS-2 revised,

22 OS-3 revised, OS-4 revised, OS-5 revised, OS-6 revised and OS-7

23 revised, that we would like admitted into evidence.  And those

24 are respectively, the three settlement agreements between

25 Commercial Union and various Grace entities, and the four

1 settlement agreements between Uniguard and various Grace

2 entities.

3           And if I understood Mr. Freedman's qualification, he

4 doesn't want to be waiving the ability to argue, I guess, in

5 post trial briefing, that these documents mean whatever they

6 mean and, I mean, I would assume that we would all be in that

7 position.

8           THE COURT:  All right.  So, I will admit OS-1 revised

9 through OS-7 revised, subject to their use for purposes of

10 determining the confirmation of the plan and no other use.

11           MR. BROWN:  That's fine, Your Honor.

12           THE COURT:  Mr. Freedman, that's your understanding,

13 too?

14           MR. FREEDMAN:  Yes, Your Honor.

15           THE COURT:  All right.

16           MR. BROWN:  I do have, Your Honor, a couple of --

17 probably just one question for Mr. Posner, in light of that.

18           THE COURT:  All right, I need to make a note, Mr.

19 Brown, if you'll just give me one second, please.

20                     (Pause)

21           THE COURT:  Okay, sir, thank you.

22 Q    Okay.  Mr. Posner, can you take a look at, just generally,

23 OS-1, OS-2 and OS-3?  Well, actually, strike that.  Can you

24 take a look at OS-2, please, revised?  I'm correct, am I not,

25 that that agreement required Commercial Union to pay, and

1  Commercial Union did pay $12 million?

2  A    Yes, that's correct.

3  Q    Okay. Could you turn to OS-3 revised, please?

4  Specifically, you'll note that that document has some Bates

5  labels on it.  It's XXX-1734.

6  A    I just didn't hear you.

7  Q    I'm sorry, XXX-1734.

8  A    I'm there.

9  Q    Okay.  I'm correct, am I not, that this agreement required

10 Commercial Union to pay and Commercial Union did pay Grace

11 $57.6 million?

12 A    That is correct, yes.

13 Q    Could you turn to OS-4 revised, specifically Page

14 XXX-1759?  I'm correct, am I not, that this agreement required

15 Uniguard to pay and Uniguard did pay Grace $10 million?

16 A    That is correct.

17 Q    I'm going to turn to OS-5 revised.  Specifically Page

18 XXX-1775.  Am I correct that this agreement required Uniguard

19 to pay and Uniguard did pay Grace $32.5 million?

20 A    That's correct.

21 Q    Turn to OS-6 revised. Specifically Page XXX-1790.  This

22 agreement required Uniguard to pay $2 million, correct?

23 A    Yes.

24 Q    And Uniguard paid that $2 million?

25 A    That is correct.

1  Q    Could you turn to OS-7 revised, please?  Specifically Page
2  XXX-1806.  Am I correct, Mr. Posner, that under this agreement
3  Uniguard agreed to pay and did pay $2 million?
4  A    That is correct.
5  Q    Can you turn to Page XXX-1815 of OS-7 revised?
6  A    I'm there.
7  Q    And you'll see the top signature line says, W.R. Grace &
8  Co. (a New York corporation which changed its name to Fresenius
9  National Medical Care Holdings, Inc.).  I'm correct, am I not,
10 that the entity that bore that description in March of 1997,
11 is now known as Fresenius Medical Care Holdings, Inc.?
12 A    Again, I believe you're correct, but I don't know.
13 Q    Okay.
14 A    I'm going to have to believe you're correct.
15 Q    Can you turn to the page before that, XXX-1814?  The party
16 that signed on that page is W.R. Grace & Co., (a Delaware
17 corporation).  Do you see that?
18 A    Yes, I do.
19 Q    Okay.  The company that had that name in March of 1997, is
20 now known as Sealed Air Corporation, is it not?
21 A    Again, I think you are correct, but I am not 100 percent
22 sure.  But I believe you are correct.
23      MR. BROWN:  That's all I have for Mr. Posner.  Thank
24 you.
25      THE COURT:  All right.  Mr. Wisler.

1          MR. WISLER:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3                    CROSS EXAMINATION

4  BY MR. WISLER:

5  Q    Good afternoon, Mr. Posner.  Jeff Wisler on behalf of

6  Maryland Casualty.  I just have a few questions for you, Mr.

7  Posner.  You're familiar with the Maryland Casualty settlement

8  agreements listed on Exhibit 700, is that right?

9  A    Yes, I am.

10  Q    And, you participated in their negotiation and execution?

11  A    Yes, I did.  Well, I know I participated in their

12  negotiation.  If I signed them, I did, or I don't know.

13  Q    That's fine.  And those agreement were negotiated at arms

14  length?

15  A    Yes.

16  Q    And that was after extensive coverage litigation, am I

17  correct?

18  A    Yes.

19  Q    And, did Maryland Casualty pay to Grace the sums required

20  under those agreements?

21  A    Yes, they did.

22  Q    And, would you agree with me that under the settlement

23  agreements, Grace has an ongoing obligation to indemnify

24  Maryland Casualty, consistent with those settlement agreements?

25  A    There is one agreement listed on slide one, and I'm

**J&J COURT TRANSCRIBERS, INC.**

1  looking for and I don't see an agreement listed --

2  Q    I believe --

3  A    You were referring to a number of agreements and I just

4  want to make sure we're talking about the same thing.

5  Q    You're looking at Exhibit 700?  I believe there are two

6  dates listed next to Maryland Casualty.

7  A    Okay, you're correct, sir.  Yes, you're correct, yes.

8  Q    Do you want me to repeat my last question?

9  A    Yes, please.

10 Q    Okay.  Would you agree with me that under the settlement

11 agreements, Grace has an ongoing obligation to indemnify

12 Maryland Casualty, consistent with the terms of those

13 settlement agreements?

14 A    Yes, I would.

15 Q    And, is it true that Grace's obligation to indemnify

16 Maryland Casualty under those settlement agreements, is not

17 limited to products claims?  In other words, the scope of the

18 indemnity that Maryland achieved in those settlement

19 agreements, was not limited to just products claims brought

20 against Maryland Casualty it was end claims?

21        MR. HORKOVICH:  Objection, calls for a legal

22 conclusion.

23        THE WITNESS:  I would have to look at the agreements.

24 Oh, I'm sorry, I apologize.

25        THE COURT:  Okay.  I don't think that's calling for a

1 legal conclusion, I think it's asking for a description under

2 the insurance policies, not the legal affect of that, this is

3 Grace's insurance expert.  If he can't answer this, nobody can.

4         MS. ESAYIAN:  May I state just an objection for the

5 record that the settlement agreements speak for themselves,

6 Your Honor.

7         THE COURT:  They do speak for themselves.  I don't

8 know if they're in evidence, however.

9 Q    Is your answer you're not sure?

10 A    I would need to look at the agreements, you know,

11 particularly the '96 agreement because there's some question in

12 my mind as to whether or not you've phrased it exactly

13 correctly.

14 Q    You would agree with me that the scope of Grace's

15 indemnity obligations to Maryland Casualty is defined in those

16 agreements, is that correct?

17 A    Yes, I would.

18         MR. WISLER:  Okay. Your Honor, that's all I have,

19 subject to any further examination of this witness.

20         THE COURT:  All right.

21         MR. PHILLIPS:  Good afternoon, Your Honor

22         THE COURT:  Good afternoon.

23         MR. PHILLIPS:  Robert Phillips representing BNSF

24 Railway.  I'm not an insurer, but I don't mind being painted

25 with that brush.

1                        CROSS EXAMINATION

2  BY MR. PHILLIPS:

3  Q    Mr. Posner, good afternoon.  I'll try to be brief here,

4  but I have a number of questions for you, in view of your

5  comments earlier.  First of all, did I understand you to say

6  that you weren't involved in the purchase of any policies where

7  BNSF or one of its predecessors was the named insured?

8            MR. HORKOVICH:  Objection, Your Honor.

9            UNIDENTIFIED MALE SPEAKER:  Objection.

10           MR. HORKOVICH:  Foundation.  Incorrect assumption.

11           MR. PHILLIPS:  Well, that's --

12           THE COURT:  I don't think that was the witness'

13  testimony, but he's asking the witness if that was the

14  testimony, so the objection is sustained.  Do you want to

15  rephrase the question?

16           MR. PHILLIPS:  Sure.

17  Q    Were you involved, sir, with the purchase of any insurance

18  policies where the BNSF or any of its predecessors was the only

19  named insured?

20  A    I was not personally involved in the purchase of those

21  policies to the extent they exist.

22  Q    Were those policies, if there were any, were they

23  purchased by the Risk Management Department of W.R. Grace?

24           MS. ESAYIAN:  Objection to foundation.

25           MR. PHILLIPS:  If you know.

1          THE COURT:  Well, that's sustained because you've got

2   to at least substantiate that there are such policies under the

3   formulation of that question.

4   Q    Are you aware of policies that W.R. Grace purchased from

5   anywhere, that listed BNSF as the sole named insured?

6   A    I have recently been made aware of policies that listed

7   BNSF as a named insured.  Now, whether or not they're the sole

8   named insured, I can't testify to that, I simply don't know,

9   but I have been made aware of the policies that I believe

10  you're referring to.

11  Q    Let me tell you why I used the word sole named insured

12  because under the recent modifications to the plan that we're

13  attempting to confirm here, the question is whether or not BNSF

14  is the named insured under certain policies of insurance.  Are

15  you aware of that issue at all, Mr. Posner?

16  A    I don't believe I'm aware of that issue.

17  Q    Very good.  If I showed you policies with various

18  insurance companies that listed BNSF as the named insured,

19  would you be able to identify them as policies that W.R. Grace

20  purchased?

21  A    If you showed them to me, I could look at them and try.  I

22  don't know if I could or I couldn't until you show them to me.

23  Q    Let me show you, sir, what has been identified as BNSF

24  Exhibit 16A and ask you if you can tell me what it is?

25          MS. DeCRISTOFARO:  Objection, Your Honor.  The

1 witness said he didn't participate, all he can do is look at

2 what is put in front of him.  It's lack of a foundation for his

3 knowledge to be able to say whether it was issued or not.

4          THE COURT:  Well, we're going to have to get a

5 foundation to see whether (a) they're business records and so

6 forth but he said that he would attempt to identity them if

7 they were shown to him, so -- but you're going to have to lay a

8 foundation.

9 Q    Mr. Posner, have you seen this document that's marked BNSF

10 Exhibit 16B, before?  I can give you 16A but it's a pretty bad

11 copy.  That's 16A but I have trouble reading it, so --

12          THE COURT:  So you just made a new copy and labeled

13 it as 16B, but they're the same document?

14          MR. PHILLIPS:  They are the same document.  The one

15 that's labeled 16A has the confidentiality designation at the

16 bottom.  The one that's 16B doesn't have it, and I don't know

17 why it doesn't, but it is designated confidential.

18          THE COURT:  All right.

19          MR. PHILLIPS:  May I show the witness 16A?

20          THE COURT:  Yes.

21 Q    Do you recognize, Mr. Posner, what it is we're looking at

22 there?

23 A    I mean I can read it and I may have seen it before, I'm

24 not quite sure.

25 Q    Is your office, the Risk Management Department at W.R.

1  Grace responsible for, or when you were an employee there, was

2  it responsible for acquiring insurance under arrangements with

3  the one that W.R. Grace had with BNSF?

4  A    Well, just to clarify here, you know, this policy is in

5  effect from 1971 to 1974.  I didn't come to Grace until 1982.

6  I can speculate, but I don't think anybody wants me to do that.

7  Q    No.  So, when you were negotiating policy years or periods

8  or anything, or looking for old policies of W.R. Grace, did you

9  run across this 16A, or 16B, sorry?

10  Q    You know, to the extent I've seen this, I don't believe

11  I've seen it until some time, say, within the last year or so,

12  when this issue seemed to have surfaced.

13  Q    If I showed you other policies like this, would I be

14  getting the same answers?

15  A    I believe you would be.

16  Q    Okay.  I'll not waste my time, then.  In the course of

17  doing settlement agreements and looking at the policies that go

18  back a number of years, you looked at policies that predated

19  your employment with W.R. Grace, yes?

20  A    Yes, I did.

21  Q    And you probably saw the policies of the Royal Indemnity

22  Company, or Royal Insurance Company, I'm not sure exactly what

23  its proper name is, going back to the 50s?

24  A    Yes.  The Royal Indemnity policies that were issued to the

25  Zonolite Companies, I've seen those, yes.

Posner - Cross/Phillips                    326

1  Q    And, did you see any Royal policies that listed BNSF as

2  the named insured?

3           MR. GUY:  Objection, vague, Your Honor.

4  A    Well, I mean the policies --

5           THE COURT:  No, I think it's --

6           MR. POSNER:  I'm sorry.

7           THE COURT:  Why is it vague?

8           MR. GUY:  Your Honor, because it -- does he mean a

9  Royal policy that was issued to BNSF?

10          THE COURT:  Oh, I see.

11          MR. GUY:  Or does he mean --

12          THE COURT:  Would you restate the question, please?

13          MR. PHILLIPS:  Yes.

14 Q    What I'm asking about, Mr. Posner, is whether you saw any

15 policies issued by Royal and I'll just use that name because

16 I'm not certain exactly of its correct name, where the BNSF was

17 the named insured, that was provided to BNSF by W.R. Grace?

18 A    I'm just trying -- I think I lost the question there, can

19 I have it read back?

20 Q    Have you seen any of the Royal policies where BNSF is

21 listed on the dec sheet as the named insured?

22 A    I certainly didn't see any during my review of the Grace

23 policies, over the course of time.

24 Q    Right.  How about the review of any of the policies at

25 Grace?

**J&J COURT TRANSCRIBERS, INC.**

1          UNIDENTIFIED ATTORNEY:  Assumes a fact not in

2    evidence.  If there is such a policy.

3          THE COURT:  Okay, you have to use the microphones.

4    The objection is that it assumes a fact not in evidence, if

5    there are such policies, that's sustained.

6    Q    Are there such policies?

7    A    I would have no knowledge.

8    Q    Okay.  And I noticed that -- you told us at the time of

9    your deposition that Grace had hired an insurance archeologist

10   to find policies, is that correct?

11   A    That is correct, yes.

12   Q    Who did that for you?

13   A    Her name was Allison Watts and she had worked with

14   somebody prior to that, but Allison Watts was basically the

15   main archeologist that we had worked with.

16   Q    I want to turn to the settlement agreements that you

17   talked about with first of all, well, with any of the insurance

18   entities we've been talking about here.  Did those settlement

19   agreements purport to settle any claim of BNSF?

20   A    Any claim of BNSF?

21   Q    Yes.

22   A    I mean, the settlement agreements basically settled, you

23   know, claims that were made against Grace which Grace was

24   seeking coverage under its insurance policies.

25   Q    Right.  BNSF wasn't involved in any of those settlements?

1          MS. ESAYIAN:  Objection to form.

2   Q    Was BNSF involved in any of those settlements?

3   A    They were not involved in the negotiation of any of these

4   settlement agreements that Grace had entered into, if that's

5   your question.

6   Q    And, they weren't invited to those discussions.

7   A    They were not invited to those discussions.

8   Q    In those discussions, the Grace, or your involvement

9   there, didn't evaluate any claims by third parties, like

10  Burlington Northern or BNSF, in those settlement discussions?

11         MR. HORKOVICH:  Objection, Your Honor, in relevance.

12  I have no idea what this has to do with any confirmation issue.

13  BNSF may have separate insurance policies, separate from Grace,

14  which Grace is not covered, and may want to go after insurance

15  companies.  It may want to do that, it may not want to do that.

16  It has absolutely nothing to do with the confirmation issue.

17  That would be a coverage issue in a separate coverage action by

18  BNSF and has nothing to do with confirmation,.

19         MR. GUY:  Your Honor, I have a separate objection.

20         THE COURT:  Mr. Guy.

21         MR. GUY:  And I don't want to interrupt Mr. Phillips,

22  but I'm not sure what settlements he's referring to.  That's a

23  loose term.  Does he mean the settlements that the counsel just

24  put into the record?  I don't know what he's talking about.

25         MR. PHILLIPS:  The agreements that are listed on

Posner - Cross/Phillips                                329

1  Exhibit 700.

2              THE COURT:  All right.  Well, that clarifies the

3  agreements, but I think -- I'm still a little confused as to

4  what the confirmation issue is.

5              MR. PHILLIPS:  We are simply trying to establish that

6  there's no provision of those settlement agreements, that is or

7  could be binding on BNSF.

8              MR. SCHIAVONI:  Your Honor --

9              THE CLERK:  Please use the mike.

10             THE COURT:  You have to use the microphone, Mr.

11 Schiavoni.

12             MR. SCHIAVONI:  Thank you.  If you will recall, Your

13 Honor, we addressed this issue in part on the motion to approve

14 the Arrowood settlement and fundamentally, the issue here is

15 whether they have any rights in the Grace policies and it's

16 BNSF's obligation to come forward with some proof that they

17 actually have rights to those policies.  They haven't done it,

18 they've asked this witness whether he's seen any evidence of

19 rights in those policies and he's given his answers on that.

20             The testimony or the questions here going forward,

21 unless they're able to establish that there's actually, they're

22 named as an insured in the Grace policies, there's not a

23 relevant issue to go forward here on.

24             THE COURT:  Mr. Phillips.

25             MR. PHILLIS:  Thank you, Your Honor.  What we're

Posner - Cross/Phillips                                330

1  concerned about is that the -- once this plan is confirmed, if

2  confirmed, and the effective date passes, that there's going to

3  be litigation that's going to occur against my client in the

4  State of Montana.

5          We want to be able to number one, defend those cases,

6  to be able to tender those defenses, to various insurers and we

7  want to make certain that the injunction either the 524(g)

8  injunction or the 105(a) injunction, does not apply to us.

9          THE COURT:  Well, but it will to the extent that

10  there are settled insurance policies and the insurers are the

11  beneficiaries of either or both of those injunctions.  It will

12  apply to everyone.

13          MR. PHILLIPS:  And under your earlier ruling, which

14  is on appeal, as you know, but which I think also makes this --

15          THE COURT:  Actually, I don't know.  I don't track

16  appeals, so unless somebody tells me I don't have jurisdiction

17  to adjudicate something, then I have to take a look but --

18          MR. PHILLIPS:  Well, the reason I mentioned that is

19  because I think you still do have jurisdiction to adjudicate

20  it.  But it's just that the -- well, the 524(g) injunction is

21  what we are principally concerned about and we just -- what

22  we're trying to establish is that there are policies that BNSF

23  has an interest in, it will not affect the estate of the

24  debtor.

25          THE COURT:  If BNSF has it's own independent policies

**J&J COURT TRANSCRIBERS, INC.**

1 that will not affect the estate of the debtor, provided that

2 the debtor is not a co-insured.

3          MR. PHILLIPS:  Right.  Understood.  And that under

4 the settlement agreements, likewise, those restrictions, if you

5 will, or the indemnity clauses going back between the insurer

6 as the indemnitee and W.R. Grace as the indemnitor, will not

7 affect BNSF.

8          MR. HORKOVICH:  Your Honor --

9          MS. ESAYIAN:  Your Honor, I object.  I don't

10 understand that statement at all and I think that there's --

11 that counsel is trying to suggest something about the

12 settlement agreements that's a completely different issue from

13 whether there are policies specific to BNSF.  It's a completely

14 different question and it's all getting muddled together and I

15 find that objectionable.

16          THE COURT:  Well, there is definitely a difference

17 between the settlement agreements and who is bound by what and

18 what terms, then there are the policies.  So far, I have not

19 seen a policy that names BNSF as the co-insured with Grace.  I

20 understand that there may be some separate and independent

21 policies that Grace purchased for BNSF and to the extent that

22 they're out there, and Grace purchased them for BNSF, and

23 they're not coming into the trust, they're not involved in this

24 case, whatsoever, and no injunction is going to prohibit you

25 from suing whoever you choose to sue, under those policies.

1          MR. PHILLIPS:  Right.

2          THE COURT:  To the extent that there are co-insurer

3   issues, those policies are coming into this estate and BNSF

4   will not be able to sue, to the extent that they are property

5   of the estate, but I haven't seen any such policies.

6          MR. PHILLIPS:  Thank you.

7   Q    I want to turn for a moment to the -- based on your

8   experience in the insurance world, the defense -- the duty to

9   defend under an insurance policy can be a very expensive

10  proposition, can't it?

11  A    I believe that's a fair statement.

12  Q    And, that for instance, you told us at the time of your

13  deposition that the defense costs in defending asbestos cases

14  can actually exceed the indemnity costs, true?

15  A    I believe that's a fair statement.

16  Q    A couple last questions, Mr. Posner.  Were you aware of

17  the company Zonolite that was one of the predecessors of W.R.

18  Grace and its insurance policies or issues?

19  A    Yes, I have knowledge of Zonolite and the insurance

20  policies that were issued to Zonolite, you know, as they

21  pertain to Grace and this hearing.

22  Q    And do you know who the insurance agent was for Zonolite

23  prior to its acquisition by W.R. Grace?

24  A    I did know at one time.  Maybe Tootis and Titan, a Detroit

25  agency, something like that.  I can't remember sitting here,

1  but something like that.

2  Q    And, from the time that W.R. Grace acquired Zonolite, then

3  the agent, or one of its agents has been the Marsh and McLennan

4  Company, correct?

5  A    Yes.  Marsh McLennan was a broker, not an agent.

6  Q    I'm sorry, the broker.

7  A    Correct.

8  Q    The producer, I guess.

9  A    Broker.

10          MR. PHILLIPS:  Thank you.  No further questions.

11          THE COURT:  Okay, thank you.  How much longer,

12  because, frankly, folks, I've had it.  I'm tired.  So how many

13  other people are expecting to question today?

14          MR. KOVACICH:  I have a few minutes, Your Honor, not

15  very much.

16          THE COURT:  Like how many is a few?  If it's ten or

17  less, fine.  Otherwise, we're going to start on Monday.

18          MR. KOVACICH:  I think it would be ten or less.

19          THE COURT:  All right.

20          MR. SCHIAVONI:  Your Honor, just so you -- in the

21  interest of disclosure, I had designated testimony from Mr.

22  Posner in support of Arrowood's settlement, it was tendered at

23  that time, those designations.  There were no objections made.

24  We re-tendered it for the confirmation hearing.  As long as

25  that designated testimony, for which I believe there's no

1  objections from anyone, is part of the record, I don't need to

2  ask any questions.  If there's a question about it, it's going

3  to take me ten, 15 minutes to get through it.

4          MR. HORKOVICH:  We have no questions, Your Honor.  We

5  have no objections to that.

6          MS. ESAYIAN:  The debtors do not have any objections

7  to that testimony.

8          THE COURT:  Somebody is still going to have to give

9  it to me in some format where it's tendered.  Is it on the

10  disks, I'm not sure.

11          MR. SCHIAVONI:  It's on the disk and I actually,

12  physically have a copy, so I can hand it up also.

13          THE COURT:  I think that would be a good idea.  All

14  right.  And then if you can just mark it so that I have a

15  record on my trial notes as to what it is.

16          MR. SCHIAVONI:  Your Honor, I've marked it as Exhibit

17  Number --

18          THE CLERK:  Use the microphone --

19          THE COURT:  You need to use the microphone, Mr.

20  Schiavoni.

21          MR. SCHIAVONI:  I've marked it as Exhibit Number

22  831.  It's an exhibit but these are deposition designations

23  also.  And I will physically hand that up as soon as Libby

24  counsel is finished.

25          MR. KOVACICH:  Good evening, Mr. Posner.

1          THE COURT:  I'm not ready yet.

2          MR. KOVACICH:  I apologize, Your Honor.

3          THE COURT:  All right. I'll accept Exhibit 831 by

4  stipulation and I'm going to make a note that it's offered and

5  admitted, even though it's testimonial, just so I have a record

6  of what it is that's admitted.  Okay.  Thank you.

7                          CROSS EXAMINATION

8  BY MR. KOVACICH:

9  Q    Good evening, Mr. Posner, Mark Kovacich for the Libby

10  claimants.

11  A    Hello, sir.

12  Q    You mentioned on your direct testimony that during your

13  time as Director of Risk Management for Grace, you became

14  familiar with some claims for asbestos-related disease arising

15  in Libby, Montana, right?

16  A    Yes.

17  Q    And, I can't recall if I asked you this at your deposition

18  or not, but have you ever been to Libby?

19  A    I have not.

20  Q    You understood that there were claims brought by employees

21  of Grace who alleged exposure to asbestos at the Libby mine and

22  mill, right?

23  A    Yes, that's my understanding.

24  Q    And, you also understood there were claims brought by

25  family members of those employees for exposures as a result of

1 asbestos dust being brought home from the mine and mill, right?

2 A    Yes, that's correct.

3 Q    And, you also understood that there were claims asserted

4 by member of the community who did not have an occupational

5 connection of that kind, but were nonetheless exposed to

6 asbestos generated from Grace's operations in and around Libby.

7 A    That's my general understanding.

8 Q    You mentioned that there was a period of time that CNA was

9 actually paying premises coverage for some premises claims for

10 asbestos bodily injury?

11        MR. LOCKWOOD:  Objection.  Misstates the record.

12        THE COURT:  I'm sorry, you have to use a microphone.

13        MR. KOVACICH:  I'll withdraw the question.

14        MR. LOCKWOOD:  It misstates the record.  He testified

15 that they paid claims, he didn't characterize them as premises

16 claims.

17        THE COURT:  All right, that's sustained.

18 Q    Mr. Posner, was there a period of time when CNA actually

19 paid claims for asbestos bodily injury, paid claims pursuant to

20 its premises coverage?

21 A    To the best of my recollection, I believe CNA may have

22 paid some claims.

23 Q    And were those claims, claims that arose in Libby,

24 Montana?

25 A    I believe they may have.  I'm not 100 percent certain, but

1  I believe they may have.

2  Q    And, then at some point, you testified that CNA began

3  denying coverage for claims of that kind?

4  A    That is correct, yes.

5  Q    And subsequent to that, you, on behalf of W.R. Grace, made

6  an additional demand for premises coverage for claims arising

7  in Libby?

8           MR. HORKOVICH:  Objection, foundation.

9           MS. ESAYIAN:    Objection.  Misstates the testimony.

10          THE COURT:  Both sustain --

11          MR. KOVACICH:  I didn't refer to his testimony, I

12 just asked him --

13          MR. HORKOVICH:  Objection, foundation.

14          THE COURT:  Foundation you need to lay.

15 Q    Mr. Posner, did you subsequent to CNA's denial of coverage

16 on its premises coverage that you just testified about,

17 subsequent to that coverage denial, did you make an additional

18 demand for coverage from CNA on behalf of W.R. Grace for

19 asbestos injury claims arising in Libby, Montana?

20 A    Let me say this.  I believe it's fair to characterize it

21 as a demand.  We certainly made requests to CNA for coverage

22 under its premises liability coverage for the claims, for some

23 of the claims arising out of Libby, Montana.

24 Q    And by some of the claims, is your distinction with

25 respect to non-employee claims versus employee claims?

**J&J COURT TRANSCRIBERS, INC.**

1  A    That is correct, yes.

2  Q    And when you talk about non-employee claims, that would

3  include both the family member claims and the community claims

4  that we talked about just a few minutes ago, right?

5  A    Yes.

6  Q    It was Grace's position at the time that those claims were

7  covered by the premises coverage and not subject to the

8  aggregate limits applicable to products coverage, right?

9  A    That has been --

10         THE COURT:  I'm sorry, that went by me too fast.  I'm

11  sorry.

12         MR. KOVACICH:  Sorry, Your Honor.

13  Q    It was Grace's position, was it not, Mr. Posner, that the

14  non-employee Libby claims were covered by the premises coverage

15  and, therefore, not subject to the aggregate limits applicable

16  to products coverage.

17  A    Right, to the CNA policies.  That has been Grace's

18  position, yes.

19  Q    And, it was also Grace's position that those non-employee

20  Libby claims were multiple occurrences, right?

21  A    I don't think we ever talked about it, but I think

22  generally that was the position, yes, sir.

23  Q    And since you were demanding coverage or requesting

24  coverage, however you want to characterize it.  Obviously, it

25  was Grace's position that the coverage applicable to those

1 claims was not subject to any settlement agreement.

2 A    That is correct, yes.

3        MR. HORKOVICH:  Sorry, late objection, Your Honor,

4 but the settlement agreement with CNA.

5        MR. KOVACICH:  I did mean a settlement agreement with

6 CNA.

7        MR. HORKOVICH:  Thank you.

8 Q    Did you understand my question that way, Mr. Posner?

9 A    I understood it to mean CNA and my answer was, therefore,

10 appropriate to that.

11 Q    And, Grace's position that the non-employee Libby claims

12 were covered by the premises coverage, was based on Grace's

13 contention that the exposures were not to finished products,

14 right?

15 A    Well, I think, you know, I had looked at the general facts

16 of the claims and I compared them to the insurance policies and

17 I did not believe that they were subject to the product

18 limitations in the policies.  I thought they were generally

19 premises claims.

20 Q    Did you believe that dust that workers brought home to

21 their families from the mine and mill was a finished product?

22 A    I don't think I ever really, personally thought about it

23 in terms of finished products.  I didn't believe they were

24 product claims, but I'm not -- that was not the way I thought

25 about it.

1  Q    Well, you provided a definition of what constitutes a

2  finished product for purposes of this insurance analysis that

3  we're talking about on your direct examination, right?

4  A    I don't think I used the term finished product.

5  Q    Tell me, again, how you define a product for purposes that

6  testimony.

7  A    Well, products -- a products claim generally, under some

8  Grace insurance policies, and I think the CNA policies is that

9  it has to be a product that is manufactured, sold, handled, or

10 distributed by Grace. I think the product has to be

11 relinquished to others by Grace, and I think the incident has

12 to occur away from premises.  I think the words are owned and

13 controlled, by Grace.  The policy speaks for itself, but that's

14 kind of my general recollection of what that definition say.

15 Q    And, based on your understanding of that definition, you

16 would agree that dust brought home from the mine and mill to

17 family members of workers was not product?

18        MS. ESAYIAN:  Objection to the extent it calls for a

19 legal conclusion, but he can answer if he can.

20        THE COURT:  I'm sorry, if somebody over there is

21 speaking, I can't hear you.  Is someone making an objection?

22        MS. DeCRISTOFARO:  Your Honor, I just joined --

23        THE COURT:  Your microphone is not on.

24        MS. DeCRISTOFARO:  Your Honor, I just joined Ms.

25 Esayian's objection.

1          THE COURT:  Okay, I'm sorry.  Can you restate your

2  objection.  It calls for a legal conclusion?

3          MS. ESAYIAN:  Calls for a legal conclusion.

4          THE COURT:  All right.  This is not -- I don't think

5  the witness is being asked to make a legal conclusion.  I think

6  he's being asked to make a policy definition.  Will you specify

7  what it is that he's being asked to do, please?

8          MR. KOVACICH:  I'm asking Mr. Posner, based on the

9  definition that he testified to, as to what constitutes a

10  product, both on direct and now on cross, whether he would

11  agree that dust brought home to family members of W.R. Grace

12  workers in Libby, would not meet that definition of a product.

13          THE COURT:  All right.

14          MS. ESAYIAN:  Same objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  Yeah, in my opinion, that would not

17  meet the definition of product.

18  Q    And asbestos waste discarded on and around, in the

19  vicinity of Grace's operations in Libby, likewise, would not

20  meet that definition of a product, right?

21          MS. ESAYIAN:  Same objection for the record.

22          MS. DeCRISTOFARO:  Objection, Your Honor.

23          THE COURT:  On what basis?

24          MS. DeCRISTOFARO:  Your Honor, I do think it calls

25  for a legal conclusion.  I also think that as Mr. Posner has

1  testified on his direct, whether any particular claim would be

2  a product under the law is -- can't be answered by a question

3  that broad, general and just generally, I think all of these

4  questions are simply asking a matter of his opinion based on

5  some generalized issues, and I --

6          THE COURT:  Yes, that's right, it is, but he's the

7  insurance expert for Grace, who is in charge of Grace's

8  insurance program.  Surely he must know, from his point of

9  view, how a claim would be submitted or handled on behalf of

10 Grace.  If he doesn't there hasn't been anyone else proffered

11 who does.  I don't think it's being asked for a legal

12 conclusion.  I'm not accepting it as legal testimony, but the

13 witness has provided a definition and the question is, under

14 your definition, does this particular circumstance fit that

15 definition.  I think that's a proper question for the witness

16 who has the capacity this witness has.

17         MS. DeCRISTOFARO:  I'm sure Your Honor has heard me

18 for a long time say this, but a lot of this a matter of law,

19 it's disputing and I just want to make sure that it's clear

20 that by these questions being asked, that we don't necessarily

21 concur that these would be or that there's a basis in the

22 record to say one way or another.  I just wanted to --

23         MR. KOVACICH:  I'll stipulate that the insurers don't

24 agree with Mr. Posner's testimony, and I'm not asking him to

25 adjudicate coverage.

                    **J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Okay.  You do need to rephrase that

2   question, though, because you did not limit the question to his

3   definition and that is what I think is appropriate for his

4   testimony.

5   Q    Okay.  Mr. Posner, in the confines of your definition of a

6   product that you've provided here today, would you agree that

7   asbestos waste discarded on and around Grace's operations in

8   Libby, Montana, would not constitute a product?

9   A    That would be my view, yes.

10  Q    Were you aware that there was an expansion plant that

11  operated in Libby, Montana for a period of time, where

12  vermiculite concentrate was expanded?

13  A    I may have been aware of it.  Sitting here today, I'm not.

14  I may have been aware of it at one time.

15  Q    Would you agree that emissions of asbestos dust from an

16  expansion plant of that kind would not meet your definition of

17  a product?

18        MS. ESAYIAN:  Objection to foundation.

19        THE COURT:  That's sustained.

20  Q    Mr. Posner, have you ever seen a Grace expansion plant?

21  A    I have not.

22  Q    Do you have any knowledge as to how a Grace expansion

23  plant operated?

24  A    I -- very, very little knowledge.  I mean, I think it was

25  explained to me at one time, but to be honest with you, sitting

1  here, I don't know.

2  Q    Were you aware --

3           THE COURT:  How long are you going to be, Mr.

4  Kovacich?  You're past your ten minutes and I really -- I need

5  to let my staff go, so how long are you going to be?

6           MR. KOVACICH:  I apologize, Your Honor.  It'll be

7  just a couple more minutes.

8           THE COURT:  No, tell me in terms of questions.  If

9  you've got two or three questions, fine, if it's more than

10  that, we're recessing until Monday.

11           MR. KOVACICH:  I'll move on.

12  Q    Mr. Posner, do you agree with me that the overwhelming

13  majority of asbestos injury claims asserted against Grace were

14  products claims?

15  A    Yes.

16  Q    In fact, you would agree that more than 99 percent of the

17  claims asserted against Grace were products claims?

18  A    Yes, I would agree with that.

19  Q    Thank you, Mr. Posner, that's all I have.

20  A    Thank you, sir.

21           THE COURT:  All right.  We will be in recess until --

22           MR. HORKOVICH:  Your Honor, I have two questions on

23  redirect and I think we'll be done with the witness.

24           THE COURT:  Oh, all right.  Mr. Schiavoni, I'll take

25  your --

1          MR. SCHIAVONI:  I'm just going to hand up --

2          THE COURT:  All right, Mr. Horkovich.

3          MR. HORKOVICH:  Thank you, Your Honor.

4                         REDIRECT EXAMINATION

5    BY MR. HORKOVICH:

6    Q    Mr. Posner, on those last questions you were just asked,

7    would you agree that waste around expansion plants, around the

8    country, other than in Libby, would also not constitute

9    products?

10          MR. KOVACICH:  Objection, that's leading, Your Honor.

11          THE COURT:  You need to use the microphone.  It is

12   leading.  Sustained.

13          MR. HORKOVICH:  Okay.  I'm just trying to move

14   quickly, but I understand, Your Honor.

15   Q    You've just testified about expansion plants, do you

16   recall that, sir?

17   A    Um --

18   Q    Are you aware that there are expansion plants for W.R.

19   Grace other than in Libby, Montana?

20   A    Yes, I am.

21   Q    Now, you just answered questions about your view that

22   waste at expansion plants in Libby, would not constitute

23   products, do you recall that?

24          MR. KOVACICH:  I object, Your Honor.  It's --

25          THE COURT:  You have to use a microphone, I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

1 Folks, truly, I am really getting tired and my patience is

2 getting at an end, so if this going on for more than two

3 questions, we are terminating until Monday.  So, please.

4                MR. HORKOVICH:  Okay.

5                THE COURT:  What's the objection, Mr. Kovacich, I

6 didn't hear you?

7                MR. KOVACICH:  The objection, Your Honor was that

8 that misstated the testimony and he actually declined to talk

9 about expansion plants, based on a lack of foundation

10 objection.

11                THE COURT:  That's correct.

12                MR. GUY: Your Honor, he was talking about waste.  I

13 think that was the issue.  Waste.

14                MR. KOVACICH:  Okay.

15                THE COURT:  Oh, asbestos waste, all right.

16 Q    Do you have a view as to waste, asbestos waste outside of

17 Libby, Montana, constitutes product?

18 A    I believe it would probably not constitute a product.

19 Q    And, do you have a view as to whether dust, asbestos dust,

20 outside of Libby, Montana, constitutes product?

21 A    I mean, it's possible that it would not constitute

22 product.

23                MR. HORKOVICH:  No further questions, Your Honor.

24                THE COURT:  Okay.  Now, we're in recess until nine

25 o'clock on Monday morning.  Is this witness excused?  Does

**J&J COURT TRANSCRIBERS, INC.**

1 anybody need him, I should ask that first?

2          UNIDENTIFIED ATTORNEY:  Your Honor, one question.

3 Are we going to get an update on what's going to be covered

4 Monday?

5          THE COURT:  We'll do that right now,  Mr. Posner,

6 you're excused, sir.

7          THE WITNESS:  Thank you, very much.

8          THE COURT:  All right.  Mr. Horkovich, what will be

9 covered on Monday?

10          MR. LOCKWOOD:  Mr. Horkovich is not in charge on

11 Monday.

12                      (Laughter)

13          THE COURT:  Oh, all right, who is?

14          MR. LOCKWOOD:  The first witness on Monday will be

15 Mr. Inselbuch.

16          THE COURT:  Okay.

17          UNIDENTIFIED ATTORNEY:  Who?

18          UNIDENTIFIED ATTORNEY:  Inselbuch.

19          MR. LOCKWOOD:  Inselbuch.

20

21                      * * * * *

22

23

24

25

# C E R T I F I C A T I O N

We, JANET PERSONS, KIMBERLY UPSHUR, TAMMY DeRISI, KATHLEEN BETZ, AMY RENTNER & ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Janet Persons

JANET PERSONS


/s/ Kimberly Upshur

KIMBERLY UPSHUR


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Kathleen Betz

KATHLEEN BETZ


/s/ Amy Rentner

AMY RENTNER


/s/ Elaine Howell          Date:   September 16, 2009

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**