UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                        .  Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .  824 North Market Street
                              .  Wilmington, DE 19801
            Debtors.          .
                              .  October 26, 2009
. . . . . . . . . . . . . . . 10:34 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               JANET BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Future           Orrick, Herrington & Sutcliffe, LLP
Claimants                By:  RICHARD WYRON, ESQ.
Representatives:         Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


Audio Operator:          Sherry Stiles


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For W.R. Grace: | W.R. GRACE<br>By: RICHARD FINKE |
| For State of Montana<br>Dept. of Environmental<br>Quality: | Womble Carlyle Sandridge & Rice<br>By: FRANCIS MONACO, ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE 19801 |
| For Arrowwood: | Wilson, Elser, Moskowitz, Edelman,<br>& Dicker, LLP<br>By: CARL J. PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY 10017 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By: MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE 19701 |
| For the Unsecured<br>Creditors' Committee: | Strook & Strook & Lavan<br>By: KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For the Bank Lenders: | Landis, Rath & Cobb, LLP<br>By: RICHARD COBB, ESQ.<br>919 Market Street, Suite 1800<br>Wilmington, DE 19899 |
| For the Bank Lender<br>Group: | Landis, Rath & Cobb, LLP<br>By: JAMES S. GREEN, JR., ESQ.<br>919 Market Street, Suite 1800<br>Wilmington, DE 19899 |
| For PD/FCR: | Law Office of Alan B. Rich<br>By: ALAN B. RICH, ESQ.<br>1201 Main Street<br>Suite 1910, LB 201<br>Dallas, TX |
| For the Asbestos<br>Creditors Committee: | Ferry Joseph & Pearce, P.A.<br>By: THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE 19899 |
| For the U.S. Trustee: | Office of the U.S. Trustee<br>By: DAVID KLAUDER, ESQ.<br>844 King Street, Suite 2313<br>Wilmington, DE 19801 |

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Arrowood<br>Indemnity Co.: | Bifferato Gentilotti LLC<br>By:  GARVAN McDANIEL, ESQ.<br>800 North King Street<br>Wilmington, DE  19801 |
| For Gloria Munoz: | Hildebrand, McLeod & Nelson, LLP<br>By:  ANTHONY S. PETRU, ESQ.<br>     QUYNH L. NGUYEN, ESQ.<br>350 Frank H. Ogawa Plaza, 4th Floor<br>Oakland, CA  94616 |
| | Sullivan Hazeltine Allinson, LLC<br>By:  ELIHU E. ALLINSON, ESQ.<br>4 East 8th Street, Suite 400<br>Wilmington, DE  19801 |
| For Maryland Casualty<br>& Zurich Insurance: | Eckert Seamans Cherin & Mellott, LLC<br>By:  GABRIELLE V. CELLOROSI, ESQ.<br>4 East 8th Street, Suite 200<br>Wilmington, DE  19801 |
| | Connolly Bove Lodge & Hutz LLP<br>By:  KELLY CONLAN, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19801 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  BARBARA HARDING, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  CHRISTOPHER GRECO, ESQ.<br>Citigroup Center, 153 East 53rd St.<br>New York, NY  10022 |
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By:  JAMES O'NEILL, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899-8705 |
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  NATHAN FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C. 20005 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For Allstate Insurance:   Cuyler Burk, LLP
                          By:  ANDREW K. CRAIG, ESQ.
                          Parsippany Corporate Center
                          Four Century Drive
                          Parsippany, NJ  07054

For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131

For OneBeacon Ins. Co.,   Drinker Biddle & Reath LLP
Geico, Seaton Ins. Co.,   By:  MICHAEL F. BROWN, ESQ.
& Republic Ins. Co.:      One Logan Square
                          18th and Cherry Streets
                          Philadelphia, PA  19103

For the Libby             Cohn Whitesell & Goldberg, LLP
Claimants:                By:  DANIEL C. COHN, ESQ.
                          101 Arch Street
                          Boston, MA  02110

For CNA:                  Goodwin Procter, LLP
                          By:  MICHAEL GIANNOTTO, ESQ.
                          Exchange Place
                          Boston, MA  02109-2881

For Ford, Marrin,         Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer          Gleser
& Gleser:                 By:  ELIZABETH DeCRISTOFARO, ESQ.
                          Wall Street Plaza
                          New York, NY  10005

For AXA Belgium:          Tucker Arensberg, P.C.
                          By:  MICHAEL A. SHINER, ESQ.
                          1500 One PPG Place
                          Pittsburgh, PA  15222

For Sealed Air:           Skadden, Arps, Slate, Meagher &
                           Flom, LLP
                          By:  DAVID TURETSKY, ESQ.
                          One Rodney Square
                          Wilmington, DE  19801

For the Unsecured         Strook & Strook & Lavan
Creditors' Committee:     By:  ARLENE KRIEGER, ESQ.
                          180 Maiden Lane
                          New York, NY 10038

**J&J COURT TRANSCRIBERS, INC.**

```
For Continental          Goodwin Procter, LLP
Casualty Co.:            By:  DANIEL GLOSBAND, ESQ.
                         Exchange Place
                         Boston, MA  02109-2881

For the Debtors:         Kirkland & Ellis, LLP
                         By:  THEODORE FREEDMAN, ESQ.
                         Citigroup Center, 153 East 53rd St.
                         New York, NY  10022

For the PD Committee:    Speights & Runyan
                         By:  DANIEL SPEIGHTS, ESQ.
                              ALAN RUNYAN, ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924

For Anderson Memorial    Kozyak, Tropin & Throckmorton, PA
Hospital:                By:  JOHN W. KOZYAK, ESQ.
                              DAVID ROSENDORF, ESQ.
                         2525 Ponce de Leon, 9th Floor
                         Miami, Florida 33134

In Pro Per/Pro:          ALEXANDER SANDERS, JR.

For the Debtors:         Onex Credit Partners
                         By:  LEWIS KRUGER, ESQ.

For Various Claimant     Stutzman, Bromberg, Esserman &
Firms:                    Plifka
                         By:  DAVID J. PARSONS, ESQ.
                         2323 Bryan Street, Suite 2200
                         Dallas, TX  75201

For Morgan Stanley       Katten Muchin Roseenman, LLP
Senior Funding, Inc.:    By:  MERRITT PARDINI, ESQ.
                         575 Madison Avenue
                         New York, NY  10022-2585

For Fireman's Fund       Crowell & Moring LLP
Insurance Co.:           By:  LESLIE A. DAVIS, ESQ.
                              MARK PLEVIN, ESQ.
                         1001 Pennsylvania Avenue, N.W.
                         Washington, DC  20004
```

TELEPHONIC APPEARANCES (Cont'd.):

| | |
|---|---|
| For Fireman's Fund Insurance Co.: | Stevens & Lee<br>By:  JOHN D. DEMMY, ESQ.<br>1105 North Market Street<br>Wilmington, DE  19801 |
| For Serengeti: | Vinson & Elkins, LLP<br>By:  ARI BERMAN, ESQ.<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX  75201 |
| For Official Committee of Asbestos Property Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701 |
| | LECG<br>By:  ALAN MADIAN, ESQ.<br>1725 Eye Street NW, Ste 800<br>Washington, DC,  20006 |
| | Hamilton, Rabinovitz & Alshuler<br>By:  DR. FRANCINE RABINOVITZ<br>26384 Carmel Rancho Lane, Suite 202<br>Carmel, California 93923 |
| For the Property Damage Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  SCOTT BAENA, ESQ.<br>     JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Bank Lenders: | Paul Weiss Rifkind Wharton &<br>  Garrison, LLP<br>By:  MARGARET PHILLIPS, ESQ.<br>     REBECCA ZUBATY, ESQ.<br>     ANDREW N. ROSENBERG, ESQ.<br>1285 Avenue of the Americas<br>New York, NY  10019 |
| For Asbestos Property Damage Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>1001 East Main Street, Suite 500<br>Sevierville, TN  37864 |

TELEPHONIC APPEARANCES (Cont'd.):

| | |
|---|---|
| For National Union Fire Insurance Co.: | Zeichner Ellman & Krause, LLP<br>By:  ROBERT GUTTMANN, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  ROGER FRANKEL, ESQ.<br>      KATE ORR, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For State of California, Dept. of General Services: | Hahn & Hessen LLP<br>By:  STEVEN J. MANDELSBERG, ESQ.<br>488 Madison Avenue<br>14th and 15th Floor<br>New York, NY  10022 |
| For Official Committee of Equity Security Holders: | Kramer, Levin, Naftalis & Frankel, LLP<br>By:  DOUGLAS H. MANNAL, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For General Insurance: | Sonnenschein Nath & Rosenthal LLP<br>By:  ROBERT B. MILLNER, ESQ.<br>Sears Tower<br>Suite 8000<br>233 South Wacker Drive<br>Chicago, IL  60606 |
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Ford, Marrin, Esposito, Witmeyer & Gleser: | Ford, Marrin, Esposito, Witmeyer & Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |

TELEPHONIC APPEARANCES (Cont'd.):

For Official Committee of Asbestos Property Damage Claimants:
Brandi Law Firm
By:   THOMAS J. BRANDI, ESQ.
        TERENCE D. EDWARDS, ESQ.
44 Montgomery St., Suite 1050
San Francisco, CA  94104

Lieff, Cabraser, Heimann & Bernstein
By:  ELIZABETH J. CABRASER, ESQ.
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA  94111

For Grace Certain Cancer Claimants:
Montgomery, McCracken, Walker & Rhoads, LLP
By:  NATALIE D. RAMSEY, ESQ.
123 South Broad Street
Philadelphia, PA  19109

For the Libby Claimants:
Cohn, Whitesell & Goldberg, LLP
By:  CHRISTOPHER M. CANDON, ESQ.
101 Arch Street
Boston, MA  02110

For the PD Committee:
Speights & Runyan
By:  MARION FAIREY, ESQ.
200 Jackson Avenue, East
Hampton, SC  29924

For Everest Reinsurance Co., et al:
Marks, O'Neill, O'Brien & Courtney LLP
By:  BRIAN L. KASPRZAK, ESQ.
        JOHN D. MATTEY, ESQ.
913 North Market Street
Suite 800
Wilmington, DE  19801

For Official Committee of Asbestos Property Claimants:
Richardson Patrick Westbrook & Brickman, P.C.
By:  EDWARD J. WESTBROOK, ESQ.
174 East Bay Street
Charleston, SC  29401

For Hartford Financial Service Group:
Wilmer Wilmer Cutler Pickering Hale & Dorr, LLP
By:  MELANIE R. DRITZ, ESQ.
399 Park Avenue
New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For Asbestos Property          Pryor Cashman, LLP
Damage Claimants:              By:  RICHARD LEVY, ESQ.
                               410 Park Avenue
                               New York, NY  10022

For David T. Austern,          Lincoln International, LLC
Future Claimants'              By:  JOSEPH RADECKI
Representative:                     GEORGE COLES

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For W.R. Grace:                W.R. Grace
                               By:  MARK SHELNITZ, ESQ.
                               7500 Grace Drive
                               Columbia, MD  21044

For the Debtors:               Reed Smith, LLP
                               By:  JAMES RESTIVO, ESQ.
                                    DOUGLAS E. CAMERON, ESQ.
                               435 Sixth Avenue
                               Pittsburgh, PA  15219

For Travelers Casualty         Simpson, Thacher & Bartlett, LLP
& Surety Co.:                  By:  SAMUEL J. RUBIN, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017

For a Creditor:                Bilzin Sumberg Baena Price &
                                 Axelrod LLP
                               By:  JOE SCHWARTZ, ESQ.
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131

1            THE CLERK:  All rise.

2            THE COURT:  Good morning.  Please be seated.  This is

3  the matter of W.R. Grace, Bankruptcy Number 01-1139.  I have a

4  list of participants by phone.  Scott Baena, Janet Baer, Ari

5  Berman, David Bernick, Thomas Brandi, Michael Brown, Elizabeth

6  Cabraser, Douglas Cameron, Christopher Candon, Daniel Cohn,

7  George Coles, Andrew Craig, Leslie Davis, Michael Davis,

8  Elizabeth DeCristofaro, John Demmy,  Martin Dies, Melanie

9  Dritz, Terrence Edwards, Marion Fairey, Nathan Finch, Roger

10 Frankel, Theodore Freedman, Michael Giannotto, Daniel Glosband,

11 Christopher Greco, James Green, Robert Guttmann, Barbara

12 Harding, Robert Horkovich, Brian Kasprzak, John Kozyak, Matthew

13 Kramer, Arlene Krieger, Lewis Kruger, Richard Levy, Alan

14 Madian, Steven Mandelsberg, Douglas Mannal, John Mattey, Robert

15 Millner, James O'Neill, Kate Orr, Merritt Pardini, David

16 Parsons, Carl Pernicone, Anthony Petru, Margaret Phillips, John

17 Phillips, Mark Plevin, Francine Rabinovitz, Joseph Radecki,

18 Natalie Ramsey, James Restivo, Andrew Rosenberg, David

19 Rosendorf, Samuel Rubin, Alan Runyan, Jay Sakalo, Alexander

20 Sanders, Joe Schwartz, Darrell Scott, Mark Shelnitz, Michael

21 Shiner, Walter Slocum, Daniel Speights, Shayne Spencer, Brandi

22 Thomas, David Turetsky, Edward Westbrook, Richard Wyron, and

23 Rebecca Zubaty.  And I'll take entries in court, please.

24           MR. BERNICK:  Good morning, Your Honor.  David

25 Bernick for Grace.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BAER:  Good morning, Your Honor.  Janet Baer for

2 Grace.

3          MR. PASQUALE:  Good morning, Your Honor.  Ken

4 Pasquale from Stroock for the Unsecured Creditors' Committee.

5          MR. COBB:  Good morning, Your Honor.  Richard Cobb

6 for the Bank Lender Group.

7          MR. HURFORD:  Good morning.  Mark Hurford, Campbell &

8 Levine, for the ACC.

9          MR. WYRON:  Good morning, Your Honor.  Richard Wyron

10 of Orrick for the PI FCR.

11          MR. McDANIEL:  Good morning, Your Honor.  Garvan

12 McDaniel and Carl Pernicone for Arrowood.

13          MS. MAKOWSKI:  Good morning, Your Honor.  Kathleen

14 Makowski from Pachulski for the debtors.

15          THE COURT:  Excuse me.  One second.

16                         (Pause)

17          THE COURT:  Okay.  Thank you.

18          MR. TACCONELLI:  Good morning, Your Honor.  Theodore

19 Tacconelli for the Property Damage Committee.

20          MR. ALLINSON:  Good morning, Your Honor.  Elihu

21 Allinson for lift stay movant Gloria Munoz.

22          THE COURT:  Good morning.

23          MS. CELLOROSI:  Good morning, Your Honor.  Gabrielle

24 Cellorosi for Maryland Casualty and Zurich Insurance.

25          MS. CONLAN:  Good morning, Your Honor.  Kelly Conlan

**J&J COURT TRANSCRIBERS, INC.**

1 for Maryland Casualty and Zurich Insurance.

2        THE COURT:  I'm sorry.  What was your name?  I

3 apologize.

4        MS. CONLAN:  Kelly Conlan.

5        THE COURT:  Okay.  Thank you.

6        MS. CONLAN:  Thank you.

7        THE COURT:  For?

8        MS. CONLAN:  Maryland Casualty and Zurich.

9        THE COURT:  Thank you.

10        MS. CONLAN:  Thank you.

11        MR. RICH:  Good morning, Your Honor.  Alan Rich for

12 the PD FCR.

13        MR. MONACO:  Good morning, Your Honor.  Frank Monaco

14 of Womble Carlyle for the State of Montana.

15                    (Pause)

16        THE COURT:  Good morning.

17        MS. BAER:  Good morning, Your Honor.  Janet Baer

18 again on behalf of Grace.  Your Honor, I want to take very

19 quickly to get through the items on the agenda that are not

20 opposed, so we can get to the contested matters.

21        Agenda Item Number 1, Your Honor, the Massachusetts

22 Department of Revenue claim objection, that matter's being

23 continued again to November 23rd.  That is working its way

24 through the Department of Revenue and the IRS, which is why it

25 keeps getting continued.

1          Agenda Item Number 2, Your Honor, is the debtors'

2   25th omnibus objection.  There are a number of matters still

3   pending in that objection.  All but the Munoz one are being

4   continued to November 23rd.  The objection to the Munoz claim

5   will be discussed in conjunction with matter Number 23, which

6   is Munoz's lift -- motion to lift stay, so I'd just like to

7   pass that particular matter for right now.

8          THE COURT:  All right.

9          MS. BAER:  Agenda Item Number 3, Your Honor, the

10  objection to Maryland Casualty's claim, by agreement of the

11  parties, that's been continued to the December 14th omnibus

12  hearing.

13         Agenda Item Number 4, Your Honor, the Fireman's Fund

14  lift stay motion, the parties are discussing that matter and

15  trying to resolve it.  That's also being continued to November

16  23rd.

17         THE COURT:  All right.

18         MS. BAER:  Your Honor, that takes us to Agenda Items

19  5 through 18, which are all property damage settlements with

20  certificates of no objection having been filed.  I understand

21  that they're starting to hit the docket.  That instructions

22  have been given to sign all those orders.

23         THE COURT:  That's true, and also 20 through 22.

24         MS. BAER:  Thank you, Your Honor.  Agenda Item Number

25  19, Your Honor, is the General Insurance motion to lift -- I'm

**J&J COURT TRANSCRIBERS, INC.**

1  sorry -- motion to file a late proof of claim.  The parties are

2  also discussing that matter and how to address it.  That is

3  being continued by agreement to November 23rd.

4          With the matters 20 through 22, as you indicated,

5  orders being entered, that leaves on the agenda, Your Honor,

6  agenda Items Number 23, the Munoz lift stay, 24, just a

7  confirmation status, and 25 is the motion with respect to Mr.

8  Frezza, which we'd like to take first, and Mr. Bernick will

9  address that matter.

10          THE COURT:  All right.

11                       (Pause)

12          THE COURT:  What is this?  Did the debtors file a

13  brief, because if they did, I haven't seen it.

14          MR. BERNICK:  No, Your Honor.  In fact, I'll be

15  taking that up in just a moment.  Remember that we filed -- we

16  filed -- we made our motion orally, and then in connection with

17  -- this is a motion -- a Daubert motion orally.  And then in

18  connection with the hearing that took place -- I guess it was

19  really the end of the confirmation hearing in matters -- the

20  Court turned attention to the issue of how we would be taking

21  up matters going forward.  We indicated that we wanted to have

22  a Daubert hearing take place.  This is actually in the context

23  of the day that was set aside in part for Daubert hearings.  So

24  we were prepared to argue that oral motion, and then we reached

25  agreement with counsel for the other side.  In fact, we would

1  not argue it, because they hadn't had the opportunity to brief

2  it.

3         So we had our oral motion.  We then submitted as part

4  of Your Honor's binder on the <u>Daubert</u> -- that binder contained

5  information relating to the Libby opinions.  And the last tab

6  of Your Honor's binder was a clip of materials that we

7  submitted to the Court that we're going to use for argument.

8  We simply submitted it to the Court, and there was no objection

9  to our doing that.

10         So following all that, per the schedule that was

11  agreed, the lenders and the unsecured creditors then filed a

12  brief.  So they filed a responsive brief, which is in the

13  binder for today.  So we had an oral motion, a submission in

14  support of the oral motion, and then we had -- which was the

15  submission that was made at the hearing and is in your binder.

16  And then we had further a brief that was filed in opposition.

17  I'm sure Your Honor has that brief.

18         THE COURT:  I do have that brief.

19         MR. BERNICK:  Okay.

20         THE COURT:  I expected to get something from the

21  debtors.

22         MR. BERNICK:  Well, there was no --

23         THE COURT:  It's your motion.

24         MR. BERNICK:  There was no -- there was no provision

25  that was made for a reply brief, Your Honor, and, as a

1  consequence -- and this is something that, basically, we were

2  prepared to do in service of getting this matter heard for

3  today.  So --

4             THE COURT:  Well, I'm willing to hear it today,

5  because I've had an opportunity to take a look at the brief

6  that was filed and a review -- Mr. Frezza's testimony, and,

7  frankly, at this point I don't think there's grounds to strike

8  it.  It seems to me that everything that the debtor is arguing

9  at this point goes to the weight not to the admissibility.

10             Mr. Frezza, and to a certain extent, Ms. Zilly were

11  quite clear on the method that was used to come up with the

12  opinion that was offered.  I just -- I don't see a basis for a

13  <u>Daubert</u> challenge.

14             MR. BERNICK:  Well --

15             MR. PASQUALE:  Your Honor, if I may -- and thank you

16  for the comment, but we just were handed this.

17             THE COURT:  Yes, I see that.

18             MR. PASQUALE:  And I haven't seen any of this

19  material.  There were new demonstratives in here.  I can call

20  the Speights Rule.  But this is not acceptable, and I have no

21  idea -- I've not even tried turned the pages yet in listening

22  to Mr. Bernick first.  I'm not prepared to address anything

23  other than the sheet that was handed out in court and, of

24  course, the issues raised orally and in our papers.  But I

25  don't know what's even here, Your Honor.

1          MR. BERNICK:  Yes, that is entirely disingenuous.

2   First of all, I'm going to create the charts.  This business

3   about the charts was really developed initially -- was

4   initially developed, because people were coming to court with

5   new material, and now it's been used as an excuse to basically

6   say you can't submit anything that may actually be of aid to

7   the Court, because they don't have notice of it, and that's

8   really absurd.  That's what led us to the exercise that took

9   place in the confirmation hearing where you can't even have

10  witnesses testify using demonstratives, because in some fashion

11  that's leading.  I --

12          MR. PASQUALE:  Your Honor, it's not the fact of --

13          MR. BERNICK:  Excuse -- excuse me, Mr. Pasquale, I

14  did not interrupt you.  So I'm going to create the charts that

15  we're talking about here today, and I'm prepared to go forward,

16  and I think that I will persuade Your Honor that, in fact, this

17  is a clear Daubert case.  If Your Honor wished to have a reply

18  brief, we can submit a reply brief, although in point of fact,

19  we will be submitting our trial -- our post-trial brief anyhow

20  on November the 2nd.

21          But the fact of the matter is that we set this whole

22  thing up in service of the proposition of getting this matter

23  heard on Daubert as a threshold matter in doing so promptly,

24  and that's why we didn't submit a brief.  But I --

25          THE COURT:  But I didn't have a Daubert motion from

1  the debtor --

2          MR. BERNICK:  Yes, there --

3          THE COURT:  -- with respect to Mr. Frezza.

4          MR. BERNICK:  Well, the --

5          THE COURT:  The oral motion was made, but there was a

6  time schedule set for raising those issues.

7          MR. BERNICK:  No, Your Honor, I respectfully -- and I

8  know that a lot of things have happened, but that's not the way

9  that it was left.  The way that it was left was that we filed

10 -- we made an oral motion, and then by agreement -- we reached

11 an agreement not to argue this during all the Daubert

12 proceedings.

13         THE COURT:  That's right.

14         MR. BERNICK:  In lieu of that, that there would be an

15 -- our motion would be oral, that it would be supported -- our

16 initial piece would be supported by the submission that was

17 contained in Your Honor's binder that --

18         THE COURT:  But that was a chart.  That wasn't a

19 brief.

20         MR. BERNICK:  I understand that.

21         THE COURT:  Okay.

22         MR. BERNICK:  And that the agreement then was that

23 they would file -- they would respond to that.  There was no

24 agreement, and there was no schedule that contemplated we'd be

25 filing any brief.

1              THE COURT:  Okay.

2              MR. BERNICK:  And that's how it ended up here.

3              THE COURT:  That's fine.  If you want to argue a

4   motion without a brief on a matter like this, go ahead.

5              MR. BERNICK:  Well, I don't want to --

6              THE COURT:  I'm prepared to hear it.

7              MR. BERNICK:  I don't want to --

8              THE COURT:  I've the lenders', and I'm prepared to

9   hear it.  I don't know what it is that you've submitted.  Let's

10  walk through it.  Go ahead.

11             MR. BERNICK:  Well, I apologize, Your Honor, if it

12  was a misunderstanding.  I thought that we were all reading off

13  exactly the same page, and this was not -- this was to be

14  argued today.  In lieu of a reply brief, we are going to argue

15  it today, so that the matter would be right for today.  And if

16  I made a mistake, I apologize, but this was exactly the

17  agreement that was reached with counsel before we came in.  It

18  was --

19             THE COURT:  Okay.

20             MR. BERNICK:  -- they would be only ones --

21             THE COURT:  That's fine.

22             MR. BERNICK:  -- with a brief.

23             THE COURT:  Let's get to the merits.

24             MR. BERNICK:  Okay.  So with respect to the law on

25  Daubert, I don't think that there's very much about the law in

1  Daubert that's disputed here, except that we're still dealing

2  with -- this has no battery.  Oh, it does now.  It went from

3  red to green.  We're still dealing with one artifact that comes

4  out of the lenders and the unsecured creditors brief, and that

5  artifact is the notion that practical experience of an expert

6  is sufficient to satisfy 702/703.  Their brief cites in

7  Footnote 3 the McCullough case for the proposition that Mr.

8  Frezza's qualified to render a solvency opinion based upon his

9  specialized knowledge gained through experience, training, or

10  education.

11          Unfortunately, that is old law.  There's a case

12  called Kumho Tire that was decided by the Supreme Court

13  subsequently to the McCullough case.  The McCullough case

14  indeed has been limited by subsequent decisions of the Second

15  Circuit.  The Kumho tire case specifically addressed the

16  question of practical experience and said no go.  There still

17  has to be a reliable methodology, otherwise, practical

18  experience amounts to ipse dixit or back to the same problems

19  all over again.

20          So the notion that practical experience gets you

21  there is just not so, and indeed the submissions that the

22  lenders and unsecured creditors made as part of their brief

23  indicates, in fact, there are standards that govern

24  methodologies that have been adopted and govern the testimony

25  of people within his field.  So practical experience is not

1  sufficient.  They can't get around the fact that in his field,

2  in order to issue a valuation decision, you need a

3  certification.  He doesn't have that certification.

4        Now, they are in pains in the course of their brief

5  to introduce the AICPA standards and say, well, this is really

6  not the same thing as a valuation opinion.  And I'm going to

7  return to that before I close my remarks, but let me say that

8  again their reliance on practical experience in their brief

9  speaks volumes, because that's really what it is that Mr.

10  Frezza claims to have is practical experience in doing a lot of

11  this kind of thing, and that is not sufficient to get you to

12  the point of being qualified under 702/703.

13        We then come to the question of, well, is there a

14  dispute on the law?  Should there be a dispute on the law as to

15  what solvency is?  And this now has emerged as an issue in

16  their brief, and really for the first time they've really taken

17  on the whole question of, well, what really is solvency at the

18  end of the day.  And the answer to that is that there should

19  not be a dispute, because again the Code actually defines what

20  insolvency is.

21        The Code definition is at Section 10132(a).

22  Insolvency is a -- "a financial condition such as the sum of

23  such entity's debts is greater than all of such entity's

24  property at fair valuation."  And the cases are clear that this

25  is basically -- and this is important -- basically a balance

1  sheet test, but it is not the same thing as a balance sheet.

2  It is not controlled, and it is not governed by GAAP.  It is

3  the assets at fair valuation, not something that may be carried

4  on the balance sheet, and it is the liabilities that are the

5  actual liabilities, even if they're not properly useable under

6  GAAP.

7          And, Janet, if we could turn around the first chart

8  here?  We're here talking about the amount of the actual

9  liability.  That's what all the cases say.  We've got a series

10 of cases that are in the binder.  Here they include Waccamaw's

11 Home Place which is a District of Delaware decision 2005, In

12 re:  Wallace Bookstores, Eastern District of Kentucky 2004, and

13 then, importantly, the Transworld Airlines decision which

14 specifically deals with the question of -- in Covey, which is

15 out of the Seventh Circuit, both of which specifically deal

16 with the question of what is the nature of the obligation

17 that's at issue that is a debt, and how is it that it's -- how

18 is it that it's determined.  And the classic example of the

19 situation in which GAAP liabilities are not the same as actual

20 liabilities is the -- are the facts of this case.  They're

21 contingent liabilities.  Contingent liabilities aren't

22 necessarily accrued and presented under GAAP, and that's the

23 whole FAS 5 issue.

24         But the courts are clear, and this is out of the

25 Transworld Airlines decision of the Third Circuit, "Bankruptcy

**J&J COURT TRANSCRIBERS, INC.**

1 Court -- agree with the Bankruptcy Court it is proper to

2 consider contingent liabilities when evaluating the insolvency

3 of a corporation."  And so the whole question of what

4 liabilities we're dealing with, it is the actual amount of the

5 liabilities, and I really want to underscore that here we are

6 talking about actual liabilities rather than some hypothetical

7 liabilities.

8     THE COURT:  Okay, but here's my question though.  I

9 understand the argument that you're making, and I doubt that

10 there's a disagreement about the fact that we're looking at

11 actual liabilities in some fashion.  But the  question is

12 assuming that this plan is confirmed and goes effective, this

13 plan sets the debtors' liability, because it sets the

14 contribution that the debtor has to pay, and  everything else

15 is going to be discharged against this debtor.

16     MR. BERNICK:  That --

17     THE COURT:  So that does set the liability.

18     MR. BERNICK:  I disagree, and I'm going to get there.

19 The first step is what does the Code say, and the Code says

20 they must be the actual liabilities.  They are not hypothetical

21 liabilities.  They are not it may be liabilities.  They are the

22 actual liabilities.

23     THE COURT:  Well, now, just -- but just a second.

24 The Code definition is typically used to determine whether or

25 not a debtor is solvent for purposes, I think, other than plan

1 confirmation.  And, for example, that definition is routinely

2 not used in certain actions that take place under the Code.  So

3 the fact that the definition is there I don't think drives

4 whether or not on confirmation, on the effective date, that the

5 debtor is judged by that same solvency.  But if it is, then it

6 seems to me, that the plan at that stage states what the

7 liabilities are.

8             MR. BERNICK:  Again, Your Honor, the -- step one is

9 the definition, and the definition is not just the -- the

10 definition is the Code definition.  It is consistently applied

11 by the courts to be a definition that focuses on the reality,

12 not some projection, not some what if, but what is the case.

13 That's step one.

14             THE COURT:  Right, but that is the reality.

15             MR. BERNICK:  No, it's not the --

16             THE COURT:  The debtor will be subject on the

17 effective date to pay a maximum -- in fact, a dollar sum

18 regardless of what it's liabilities are.

19             MR. BERNICK:  That's not -- that actually is not even

20 -- that is not even true.

21             THE COURT:  Well --

22             MR. BERNICK:  It's not even true in the following

23 sense.  But I don't think you get there under the Code

24 definition.  I mean --

25             THE COURT:  Wait.  How isn't it true?

1          MR. BERNICK:  It's not true, because the plan's on

2   the -- that's before the Court doesn't call for this.  It

3   doesn't call for it at all.

4          THE COURT:  What -- doesn't call for what?

5          MR. BERNICK:  It calls for a specified rate of

6   interest.  It doesn't say -- the plan before the Court doesn't

7   say --

8          THE COURT:  Oh, no.  No.  No.  That's not what I'm

9   talking about.  I'm sorry.  I'm talking about the amount of the

10  tort -- personal injury tort claims.

11          MR. BERNICK:  Same thing.

12          THE COURT:  I thought that's what the issue was.

13          MR. BERNICK:  Well, no, but they're all part and

14  parcel of the same thing.  Let me go forward.  Just give me a

15  couple minutes, Your Honor, and we'll take the thing up.  But

16  the base line point is solvency is an exercise in reality.

17  It's not the -- an exercise in hypotheticals.  And the only

18  reality -- and this is where there's a misstatement in their

19  brief, and it's just -- it's very, very prominent.  It's very

20  important.

21          They say that there is no opinion regarding solvency

22  in this case other than Mr. Frezza's opinion.  That's what they

23  say.  That's false.  Ms. Zilly specifically issued an opinion,

24  and it's in the materials -- the transcript pages are in the

25  materials, and it says you can't determine solvency on these

1  facts.  It is where you have -- the amount of liability is so

2  much in dispute, and Mr. Frezza agrees.  He says the same

3  thing.  That is if you take the actual facts about what is in

4  place during this period of time and remains true today -- as

5  we sit here today, there is record -- undisputed record

6  evidence that the liabilities are actually disputed, and,

7  therefore, you can't determine solvency.  And that is the

8  opinion of Ms. Zilly.  She testified, and Mr. Frezza on cross

9  examination conceded it.

10        THE COURT:  But you made a statement about this

11  period of time.  I don't know what the this --

12        MR. BERNICK:  This period of time is prior to the

13  effective date.  That's why I've got it on this side of the

14  chart.

15        THE COURT:  All right.

16        MR. BERNICK:  Okay, so all of this really is

17  undisputed.  There is no question -- there's no question but

18  that until that plan goes effective, the liabilities are

19  disputed, that the opinions that have been offered by both

20  experts is that we can't possibly find solvency.  Mr. Frezza

21  says that, and in the cross examination -- I'll show it to Your

22  Honor, if you'd like -- Ms. Zilly says it.  They say that

23  there's no such opinion by Ms. Zilly.  That's flat wrong.  And

24  to contradict it, we brought indeed expressly for the purpose

25  of issuing the opinion saying given the dispute about actual

1    liabilities, you can never offer an opinion about solvency.

2              THE COURT:  You can't at that time.

3              MR. BERNICK:  Absolutely.

4              THE COURT:  Okay.

5              MR. BERNICK:  So we're all agreed on that.  This is

6    the period of time, incidentally, Your Honor, when the plan

7    gets negotiated.  The plan doesn't get negotiated after the

8    fact.  The plan gets negotiated before the event becomes

9    effective.

10             THE COURT:  Yes.

11             MR. BERNICK:  So, as we're sitting in the context of

12   a bankruptcy, this now begins to address the question of

13   timing.  We're sitting here in the context of a bankruptcy, and

14   we're saying, okay, we've got to figure out how to negotiate a

15   plan, and the only way that we can get on the record to date

16   and in the marketplace this record reflects -- that only way

17   that we can get to a plan is with a plan that limits the payout

18   to PI way below what they want, that limits all kinds of

19   people, and it limits the amount of default interest.  That is

20   a part of the plan.  It is a significant part of the plan.

21   It's a precondition of the plan, and it was all negotiated in

22   the context where nobody could say there was solvency.

23             So now we get to Your Honor's question.  The plan

24   goes forward, limited payout for PI, if it goes effective, a

25   determined rate of interest, and Mr. Frezza comes on to the

1  scene, and the issue becomes, well, what does Mr. Frezza do.

2  And it's clear that all of his analyses, every single one of

3  his analyses say it's solvency as of the effective date giving

4  effect to the plan.

5       THE COURT:  Yes.

6       MR. BERNICK:  As of the effective date giving effect

7  to the plan.  And, of course, as Your Honor points out, if you

8  give effect to the plan, there's no PI liability.  There's

9  none.  It's gone.  It disappears.  Now, it didn't just

10 disappear, because the issue is resolved and all of a sudden it

11 became apparent that under the Code Grace was solvent.  That is

12 completely and utterly counterfactual.  The plan came into

13 existence, and if it goes effective, yes, the PI liability will

14 disappear, only because the plan is there.  Only because the

15 plan is there.

16       So we're sitting here in the context of a Chapter 11

17 saying, gee,  how do we get to the point of reorganization.

18 How do we get done with this case?  And the overwhelming

19 problem with this case are a lot of high competing demands,

20 including the demands of the unsecured creditors, and the

21 central problem is the PI case.  And we reach agreement with

22 the PI and indeed, as Your Honor well knows, we reach agreement

23 with the PI in the context of a long history of dealing with

24 the unsecured creditors on what we felt to be a very fair and

25 equitable basis as did they.  And in this context, trying to

1  get to the finish line, we reach a plan.  The plan is

2  absolutely integrated, negotiated down to the last dollar.

3       Now, in that negotiation there is no question that

4  the solvency was disputed, absolutely no question.  So the

5  proposition that Mr. Frezza advances and in service of which

6  the argument of the brief is made is that, oh, I'll tell you

7  what.  If it turns out that the plan produces a solvent

8  company, there's default interest.  If, if, if, if, if.  That

9  is an absurd proposition.  Absurd proposition.

10       And why is it absurd?  What reorganization is going

11 to produce an insolvent company?

12       THE COURT:  I've had several that have been confirmed

13 even though I made findings that they wouldn't reorganize, that

14 three days later filed a new bankruptcy --

15       MR. BERNICK:  Oh, okay.  Okay, but that's --

16       THE COURT:  -- in a different district.

17       MR. BERNICK:  That's not the way the world --

18       THE COURT:  Having taken their DIP financing --

19       MR. BERNICK:  -- ideally --

20       THE COURT:  -- and used it.

21       MR. BERNICK:  Yeah, okay.  Okay.  Well, it would make

22 it all the more absurd if in that context every one of those

23 creditors got default interest.  Oh, well, let's make it worse.

24 Let's pile on the default interest, and that will make the

25 whole thing all cool.  Well, the fact of the matter is that

1   when you give effect to a plan of reorganization, of course,

2   there's not going to be insolvency.  The test -- indeed the

3   tests of the Code are designed to foreclose that result by

4   saying there must be a showing of feasibility.

5          Feasibility, incidentally, is the very predicate of

6   their expert's work.  He says, oh, well, the plan's feasible,

7   therefore, you must be solvent, therefore, you get default

8   interest.  It is completely backwards.  Reorganization.

9   Successful, actual liability can't be ignored, because,

10  otherwise, you would never get to the point of having a

11  negotiation that actually produced a reorganization.  You would

12  slay the goose that lays the egg.  Everybody's got to deal with

13  actual liability.  And when they're dealing with liabilities,

14  you can't then say, well, if it turns out that you put it all

15  together in a package and it works, guess what, there is an add

16  on of default interest that would undercut the fabric of the --

17  certainly undercut the deal that we have, completely contrary

18  to the purposes of reorganization.  That's one.

19         Two.  It's contrary to the Code.  The Code has as the

20  test for whether there can be default interest fair and

21  equitable.  Fair and equitable does not equal feasible,

22  because, otherwise, if -- it's feasibility is always forward

23  looking from the plan.  Fair and equitable says what is fair

24  and equitable given the whole history.  It looks backwards a

25  well as forward.  So if we're talking about fair and equitable

1 that's driving this whole equation, it encompasses the whole

2 history.  It doesn't simply go forward like feasibility.

3        So, effectively, the argument that you hear these

4 people make, it is, Your Honor, it's an argument that makes a

5 mockery of the whole idea that Your Honor has to balance fair

6 and equitable.  It replaces it with a formula, and the formula

7 is if it turns out you have a successful reorganization, you

8 get default interest.  Almost every Chapter 11, there would be

9 a formula, and say, oh, we're all done.  The plan provides it's

10 a successful reorganization.  There's equity that's left over,

11 and as a consequence, we're free and clear.  Forget about those

12 pesky liabilities.  They're all gone, and we get default

13 interest.

14        That's not the test.  The test is whether it's fair

15 and equitable.  And if fairness and equity is determined, by

16 taking a look at solvency in the real world, which is the

17 solvency that existed in the context of which the plan was

18 developed, and if it turns out you solve the solvency -- the

19 dispute of liability problem, of course, you're going to do

20 that.

21        Now, there's a case that deals with this.  The

22 argument is so extreme.  We looked around and say has  anybody

23 ever said, well, just because the Chapter 11 is successful as a

24 reorganization, that means that, well, gees, everybody gets

25 paid default and couldn't find a case like that.  But there is

1  a case called New Valley -- Valley View.  New Valley is a

2  different favorite case.  Now, Valley View decided District of

3  Kansas at 20 -- at 260 Bankruptcy 10, 2001, and it specifically

4  -- the interesting thing about that case is that it has one

5  analysis for feasibility, and it has another analysis for

6  whether you award default interest.  And, of course, the plan

7  is one that produces feasibility, but the question is yes, it's

8  feasible, but no, we're not going to award default interest.

9       Now, given their view of the case, feasibility

10 controls, because the world is simply what is consequence of

11 the plan, and that's why every single thing that their expert

12 talks about is all based upon the feasibility view.  That is if

13 this plan goes into effect, in fact, there will be enough money

14 to pay everybody in the world.  God bless.  Well, of course,

15 that's true.  It's self-evident from the proposition that it

16 purports to be a plan that's feasible.  That ain't the test.

17 This case specifically recognizes that.

18      So when Your Honor poses the question and says, well,

19 gee, isn't it true that as of a certain date giving effect to

20 the plan, there will be solvency, yeah, there will be solvency,

21 at least given some analysis of solvency.  Notably, Your Honor,

22 actually under the '09 pro forma there is negative equity.  On

23 a balance sheet basis there is negative equity.  The only way

24 that their expert can get above negative equity and get

25 positive equity is to -- is to -- he takes the balance sheet

1 for those purposes, but then he adds to the balance sheet and

2 says, well, we've got to have fair market value.  You've got to

3 consider enterprise value, and it's with enterprise value that

4 he gets over the top and then is able to say that there is

5 equity, positive equity.  But on a pro forma balance sheet

6 basis, the company has got negative equity.

7           But all of that is an exercise in after the fact.  So

8 first basic problem is that he completely -- now we've been

9 through like five different versions of what is the rule when

10 default interest is awarded, five different versions.  And the

11 first version was, well, if the stock's trading now in a

12 positive value, well, there's clearly solvency.  Then the next

13 version was, well, if there's any recovery at all for the --

14 there's a presumption of solvency, then there was no

15 presumption of solvency.  And if there's any money at all left

16 over at the end of the day, well, then clearly there's

17 solvency.  We're now into another immigration and a very

18 revolutionary one which is throw out fairness and equity.

19 Every time you have a test for reorganization, there's money

20 there.  But we're still not yet to Mr. Frezza.  I'm going to

21 run out of colors here.

22           Mr. Frezza is a bold soul.  So what does he do next?

23 He says it's not just giving effect to the plan.  It's giving

24 effect to a changed plan, a different plan.  And  what is that

25 different plan?  One, the interest is determined by the Court.

1  Now we had a plan like that in the <u>Dow Corning</u> case.  Rather

2  than specify something, they said,  oh, we'll leave it up to

3  the Court to decide, and it'll simply be plugged in.  That's

4  not this plan.  This plan says here's a rate of interest, and

5  the reason it says here's a rate of interest is that these

6  folks were completely and utterly satisfied with it all the way

7  to the time the plan was proposed.  Even when the plan was

8  proposed, they simply didn't object to it.  They simply said,

9  well, we want to reserve the right of individual lenders to

10  come in and say they disagree.

11       So there's a whole history here built into fairness

12  and equity based on fairness and equity that is -- drives this

13  plan, and it is not a fill-in-the-blank plan.  Mr. Frezza is

14  working with a different plan not a fill-in-the-blank plan.

15  He's working with one that specifies a rate.

16       And number two, his analysis has a different payout

17  for PI.  Well, it's an absurd thing we ever heard.  He says,

18  oh, we're going to take -- instead of having the amount that is

19  paid out under this plan to the personal injury claimants,

20  we're going to substitute a different value.  That is Mr.

21  Florence's value, which is a lower payout and make that work.

22  Give me a break.  He himself recognized -- and this is the

23  ultimate definition of fit.  Is there fit -- here's what he

24  said, Page 318.

25  "Q   I'm suggesting to you that the analysis that you've done

1 is contrary to historical fact."

2        MR. BERNICK:  That's what I ask him.

3 "Q   Can we agree on that?

4 "A   I guess we can agree on that, yes.

5 "Q   Okay, and in point of fact, it's so bad that you've

6 recognized that the plan proponents -- if the PI claimants'

7 representatives would've been presented with the idea of

8 agreeing to the Florence estimate, that they would've said when

9 hell freezes over.  Right?"

10        MR. BERNICK:  And there's a little colloquy on that.

11 And then I ask --

12 "Q   They probably would've said when hell freezes over.

13 Right?"

14        MR. BERNICK:  He says --

15 "A   I can't answer that."

16        MR. BERNICK:  And he says -- I said --

17 "Q   Well, you did at your deposition."

18        MR. BERNICK:  He says --

19 "A   I know."

20        MR. BERNICK:  He then admits that that is what he

21 said during his deposition.  That is the essence, Your Honor,

22 when you give effect to the plan in doing an analysis of what

23 rate should be applicable in a negotiation process that led to

24 the plan and was based on actual liability.  And then when you

25 go further and change the plan, that is the whole problem of

1 fit.  It doesn't fit the facts, and it doesn't the law.  And,

2 Your Honor, if -- you could say it goes to the weight of the

3 evidence.  Sure, it goes to the weight of the evidence if they

4 didn't have these basic problems that make it not fit the facts

5 and not fit the law.

6          It's not a situation where you have to weigh his

7 credibility.  The reason that this is not a question that goes

8 to the weight of the evidence, it's a threshold issue that the

9 facts in the law is that everything is that we're saying --

10 every single thing that we're saying he admits.  He admits that

11 you can't determine solvency based on the actual liabilities.

12 He admits that he'd give us effect to a plan that liquidates

13 the PI liabilities, and he admits that he changes that plan.

14 You don't have to weigh a credibility.  It's not a weight

15 issue.  He has admitted it flat on cross examination.  So it's

16 an issue of law, and it's an issue of admitted and undisputed

17 facts.

18          What about reliability?  And then I'll sit down.

19 Expertise and reliability.  Well, he said, oh, you guys forgot

20 about the AICPA.  And under the AICPA he doesn't have to do a

21 valuation as a valuation expert.  Well, what's interesting

22 about the AICPA is the AICPA, which is Exhibit D to their

23 brief, and we have attached it in our exhibit as well, says,

24 you have to do all three approaches, which is adequate capital,

25 cash flow, and balance sheet.  He didn't do adequate capital.

1  Didn't do it, by his own admission.  Didn't do it, and,

2  therefore --

3           THE COURT:  I think -- the AICPA standard, if I -- I

4  think -- I better go back and check, but I think it said that

5  if the debtor failed on any of the tests, there wouldn't be

6  solvency.  That's why --

7           MR. BERNICK:  He has to do all --

8           THE COURT:  -- you had to do all three.

9           MR. BERNICK:  -- three tests.

10          THE COURT:  Right, and if the debtor failed any of

11  them, there would not be a determination of solvency.

12          MR. BERNICK:  But he didn't follow the procedure.  He

13  didn't do all three.  I'll take a look, Your Honor.  I honestly

14  don't remember.

15          THE COURT:  All right.

16          MR. PASQUALE:  That's correct, Your Honor.

17          THE COURT:  That is correct.  Okay.  Thank you.

18          MR. BERNICK:  He then says does he have the expertise

19  to quantify liability, and the answer is no.  He's admitted

20  that.  Doesn't have it.  They don't purport to say that he

21  does.

22          But what they then say is did he quantify liability,

23  and they say no, that's not true.  He didn't quantify

24  liability.  That's obviously completely contrary to fact.  Of

25  course, he quantified liability.  He quantified liability,

because that was the only way that he could actually put
numbers into his charts.  This is right out of his report.
He's got his two little tables of the balance sheet analysis.
They both quantify the liability.  You've got quantification of
395, and you've got quantification that's -- he basically says
that on quantifying liability, to the extent that I now take
the pro forma, and in the pro forma I either use the liability
to the trust that's built into the plan as it is, or I use the
liability based upon the Florence estimate.  Those are both
quantifications of liability.  So he selected them.

And even more importantly -- even more importantly,
what about the decision to use those liabilities as opposed to
these liabilities, the actual liabilities?  He had to make a
selection.  He had to decide how to use the balance sheet test.
And in order to do so, he had to quantify liabilities.  He
could've gone pre the effectiveness of the plan and used the
actual liabilities.  He could've gone post but used the actual
liabilities that are in the plan, or he could've done -- what
did Tom Florence -- he's the one that made those selections.

Now, the lawyers gave him the last one, but he was
the one who decided he was going to testify about it.  So to
say that he didn't quantify is completely illusory.  You
couldn't have a balance sheet analysis without the
quantification.  So he most certainly did quantify.  He made a
selection.

1       And then the question is when he made the selection,

2  was there a reliable methodology that was applied?  That is

3  he's now got all these different options. He can take the

4  Florence number.  He can take the Peterson number.  He can take

5  a mix of those numbers.  He can take no numbers.  He can take

6  the plan numbers.  He can do whatever he wants.  He made that

7  decision.  He made it.

8       And the question then is in doing so was there any

9  reliable methodology that was applied?  Now, Your Honor, the

10  simple thrust of it is you go back over and you take a look at

11  their briefs, everything that they've said.  Where did they say

12  here is the methodology that I used in selecting -- not

13  selecting A, not selecting B, selecting C, and then within C?

14  That is a different plan making the changes that I did.  He had

15  lots of options.

16       What methodology did he use in making that selection?

17  You can't find it anywhere in their brief.  You can't find it

18  anywhere in his testimony.  It doesn't exist.  And the reason

19  it doesn't exist is we all know what's going on.  This all

20  stands in service -- he's now the second expert that they've

21  tried to put together to -- this stands in service of a purely

22  legal construct.  The construct that they're wrestling with

23  here is not a construct within the world of financial analysis.

24  It's not a construct within the world of solvency analyses done

25  by financial advisors.  This entire construct is all legal

**J&J COURT TRANSCRIBERS, INC.**

1  argument, and they made the legal arguments, and they're just

2  having him go fill in the blanks.  That is classic gatekeeper

3  function.  And, Your Honor, it is true, as their briefs says,

4  that often judges are reluctant to decide under Daubert,

5  because they say, well, let's wait for the trial.

6         We have been extremely -- and we've been up front

7  that Your Honor likes to see everything.  You have now seen

8  everything, and the issue now is whether it passes Daubert, and

9  that is not a question of, in a sense, management.  Do I wait

10  or do I do something?  It's all done.  We're here.  The real

11  question is is there -- is it correct that it passes 702/703?

12  And that is an issue of law.  It's not an issue of weighing and

13  balancing credibility.  It is an issue of law and the

14  undisputed facts, and it then becomes -- it is -- it's

15  mandatory.  This is the whole idea of Daubert, the gate keeping

16  function, and this is a piece of testimony where a guy came in

17  who has never done a solvency expert analysis,  never done a

18  solvency report before, never testified as to a solvency

19  opinion before by his own admission, and he basically went down

20  a road that is unbelievably sophisticated legally, not because

21  of a methodology that exists in his business.

22         Your Honor, we have the clip of materials that we'll

23  tender -- will be tendered to the Court, but that will be the

24  materials that we'll rely upon to supplement our arguments that

25  are in the record.  Thank you.

41

1        THE COURT:  Mr. Pasquale.

2        MR. PASQUALE:  Thank you, Your Honor.  Ken Pasquale

3  from Stroock for the Unsecured Creditors' Committee.  We've now

4  heard what I'm sure we're going to hear again in January, which

5  is Mr. Bernick's -- part of Mr. Bernick's closing argument on

6  the issues of solvency and the Committee's and the lenders'

7  objections to the plan.  We didn't hear a <u>Daubert</u> argument.

8  Yeah, I heard Mr. Bernick use the name of the case and tried to

9  fit it to the standard, but that's not what we just heard.

10        When Mr. Bernick talks about fit, that's an argument

11  of fit to Mr. Bernick's theory of the case.  It's  not an

12  argument of fit to the solvency issue before the Court, because

13  the issue before the Court is solvency as of the effective date

14  under the plan before this Court.  Why is that?  We've objected

15  to that plan.  It's a confirmation hearing of that plan.

16        Ms. Zilly testified quite clearly on direct, and I

17  think Mr. Bernick pretty much acknowledged it, that as of

18  confirmation, should this Court confirm the plan, the asbestos

19  liabilities are resolved.  They're done.  They're over.  We

20  have a number.  We know what they are.  There's no question

21  about that.

22        The argument the objection that the Committee and the

23  lenders have made is for post-petition interest under that

24  plan.  Now, Mr. Bernick spent a lot of time.  He was very

25  animated about this whole idea that every plan is solvent as of

1  the effective date.  Every plan does not have a 2 billion --

2  almost $2 billion today recovery for equity.  This plan is

3  different.

4         And we are not ignoring fair and equitable.  We spent

5  a whole day with witnesses on that issue.  Solvency's

6  different.  We agree.  I mean we -- we've -- I remember

7  standing up here six weeks ago, or whenever it was, Your Honor

8  saying I don't understand why we're arguing solvency, but we

9  were put to our burden, and we've satisfied that burden, and

10 Mr. Frezza did that.

11        Now, let's talk about a couple of things, and I'm --

12 excuse me, Your Honor.  I'll be quick.  Everything you heard

13 goes to weight.  Your Honor is right.  Your inclination as you

14 sat at the bench today was doesn't this go to weight, and it

15 does, because they all go to argument.  And so Mr. Bernick will

16 say this, Your Honor, is how you would look at it.  You just

17 heard that.  We'll do the same at closing argument, and then

18 Your Honor will decide how to weigh Mr. Frezza's testimony in

19 that construct.

20        There is no question on methodology.  Mr. Frezza did

21 the standard methodology for solvency analysis, adequate

22 capital test, cash flow test, balance sheet test.  Only one of

23 his analyses used the Florence number, and however the Court

24 decides at the end of the day to weigh that use of that number,

25 it has nothing to do with the other tests that he did that did

1 not include that number.

2          THE COURT:  Let me just put that issue to bed,

3 because I can't see how on the plan on the table use of the

4 Florence numbers is appropriate at all.  So I can't see how,

5 even in a weight analysis, I give any weight to that portion --

6          MR. PASQUALE:  And that --

7          THE COURT:  -- because that isn't the plan that's

8 before the table.

9          MR. PASQUALE:  And, Your Honor -- I'm sorry, Your

10 Honor.

11          THE COURT:  I'm sorry.

12          MR. PASQUALE:  That's right.  It is not, and it was

13 proposed, because we wanted to be complete and be sure the

14 Court had an alternative.  You didn't hear much about that when

15 Mr. Frezza testified, because we certainly agree with Your

16 Honor that it's -- as of the effective date, that matters.

17          Now, we talk about --

18          THE COURT:  Well, what matters I think is it's more

19 than just the effective date issue.  It's the --

20          MR. PASQUALE:  It's the plan.

21          THE COURT:  -- fact that -- that's right.

22          MR. PASQUALE:  Yes.

23          THE COURT:  This plan doesn't use Dr. Florence's

24 numbers.

25          MR. PASQUALE:  Correct.

1          THE COURT:  And so I don't see how judging solvency

2   in any concept can use numbers that no one has agreed are going

3   to be incorporated into this or any other plan.

4          MR. PASQUALE:  And Mr. Frezza's testimony, as Your

5   Honor will recall, and we've certainly presented in our papers,

6   almost all of it was based on the numbers in the debtor's plan.

7          Qualifications.  Didn't hear too much about that

8   today, actually, but earlier we did about is Mr. Frezza

9   qualified to render this opinion.  Mr. Bernick did say, oh,

10  well, it's not just practical experience.  We agree.  It's not

11  just practical experience.  There has to be a reliable

12  methodology.  Mr. Frezza followed that methodology.  Ms. Zilly

13  said she would've done the same thing.  Here's what a solvency

14  analysis should encompass, and it's exactly the same.  So

15  there's no question about that.

16          Mr. Bernick had raised an argument orally at the

17  trial about Mr. Frezza not being certified.  I think we've put

18  that issue to rest now, but just to be clear under both the

19  American Society of Appraisals, which we've attached as Exhibit

20  C, and the AICPA, certification isn't required for a solvency

21  analysis.  It's expressly carved out.  And so if you want to

22  render a valuation opinion, a business valuation in this court,

23  an expert should be certified, but there's no such requirement

24  for a solvency analysis.  It is not a business appraisal.  So

25  that Mr. Frezza did not have that certification was irrelevant.

1          The quantification of liabilities, you know, I
2   thought it was very amusing to hear Mr. Bernick address that
3   and try to twist that around today.  Mr. Frezza was quite clear
4   in the TWA case that we cite and Mr. Bernick actually cited
5   today -- makes quite clear there's just no issue.  You take the
6   stated liabilities from the balance sheet.

7          What's to quantify?  Mr. Frezza didn't do any
8   adjustments to the liabilities.  He took the stated
9   liabilities.  And I think Your Honor, although this is not the
10  premise of our argument, I think Mr. Frezza was perhaps
11  confused on the question, because in answering a question from
12  Your Honor at trial, he told the Court quantifying liabilities
13  is what accountants do all the time.  Just mention it, but I'm
14  not -- he did testify, as Mr. Bernick said at trial, at his
15  deposition, but he did answer Your Honor in that regard.  But I
16  think it's irrelevant for this purpose, because Mr. Frezza did
17  not quantify liability.  He took stated liabilities.

18         Mr. Bernick talked about GAAP.  I don't want to spend
19  a lot of time on that today, Your Honor.  Mr. Frezza testified
20  at length about GAAP and how that impacts the solvency opinion.
21  It wasn't ignored.  It was addressed directly by Mr. Frezza,
22  again keeping with the well accepted methodology for doing
23  solvency opinions.

24         I've changed my argument a little bit in light of
25  what Mr. Bernick said, so I apologize for taking a little

1 longer to just be sure I hit my points.

2          Well, let me just wrap up on this, Your Honor, and

3 that is Mr. Bernick used the phrase that what Mr. Frezza did

4 was not the real world.  Well, this is the real world.  It's a

5 confirmation hearing on the plan before the Court.  There can't

6 be anything more real than considering solvency as of the

7 effective date under this plan, the settlements in this plan,

8 and how that impacts what we say are the bank lenders -- bank

9 debt holders' rights to post-petition interest under this plan.

10 No point in making that argument under some other plan, and

11 that's not what our objection is premised upon, and certainly

12 was not what Mr. Frezza's testimony was premised on.  Unless

13 the Court has questions, I think that's all I have for now.

14          THE COURT:  No.  Thank you.

15          MR. PASQUALE:  Thank you, Your Honor.

16          MR. COBB:  Your Honor, Richard Cobb on behalf of the

17 bank lenders.  Very briefly to follow Mr. Pasquale.  I think

18 first and foremost Mr. Bernick has done a wonderful job of kind

19 of throwing the dust in the Court's eyes with regard to who is

20 seeking the default interest here at the correct rate, under

21 the Bankruptcy Code, and under this plan.  It's the bank

22 lenders who've objected, and by constantly referring to the

23 Committee did this, and the Committee did that, and the

24 Committee was -- and the Committee was on board, and it was --

25 let's be very careful, Your Honor, that there is a group of

**J&J COURT TRANSCRIBERS, INC.**

1   creditors here that have objected, and those creditors are

2   pursuing this default interest.  Lumping them under the

3   Committee -- and we spent -- we'll spend lots of time on this

4   in our post-trial brief -- is entirely inappropriate, factually

5   and legally.

6          Secondly, Your Honor, Mr. Frezza does describe in

7   detail the methodology that he used to perform the tests that

8   he performed and make the observations that he made and why he

9   selected the liabilities as he did.

10          Your Honor, we think the record is clear, there was

11   no additional or other or, frankly, some difficult expert

12   analysis that needed to be performed in order to determine

13   whether Grace would be solid as of the effective date of this

14   plan.

15          And, Your Honor, I almost am -- I'm apologetic to the

16   Court that we've come this far, when this has been our argument

17   all along and it's been over a year with the Court's time and

18   arguments and papers on what is solvency and when does it need

19   to be measured.  We've always said it's solvency under this

20   plan as proposed and if this plan demonstrates solvency, and

21   equity is receiving a distribution, it stands bankruptcy law on

22   its head, to not pay us the entire amount of the default

23   interest provided for by our contract, unless you can prove

24   that there's some bad conduct the bank lenders engaged in.

25   That it's unfair and inequitable, based upon our conduct and,

1  therefore, we should not be entitled to receive the full amount

2  of default interest.  That's the only issue that's ever really

3  been in dispute before this Court.  We think their evidence is

4  dramatically, dramatically falls short of the legal standard

5  that this Court needs to apply in order to determine that it is

6  unfair and inequitable if we're to receive the full amount of

7  default interest.

8         Your Honor, the last piece is and I just want to

9  drive this home, Your Honor, the last piece of this is, this

10 Court under Mr. Bernick's world, when do you prove solvency?

11 Do you prove it on the petition date, do you prove it a week

12 after, do you prove it eight and a half years later, do you

13 prove it the minute before the clock strikes midnight on the

14 effective date?

15        Your Honor, it's their burden to show that they have

16 satisfied 1129, it is their burden to demonstrate, and we'll

17 make this argument in our papers, that the debtors are

18 insolvent and, therefore, they don't need to pay us interest.

19 If what they're conceding is that the debtors are solvent and,

20 by the way, Your Honor, we don't give away money lightly, and

21 that's why we're paying these guys 600 basis points, or

22 whatever they're providing us, they are providing us post

23 judgment interest under the plan but, Your Honor, the point is

24 is that we're going to make the argument and we think it's well

25 supported, that it is their burden to show that they don't have

1  to pay us interest.  It's their burden to show that our conduct

2  was so egregious that we're not deserving of interest.  They

3  can't meet that burden.  Mr. Frezza's testimony is really

4  uncontroverted by their expert, who has not submitted an expert

5  opinion on solvency.  She hasn't.  Read very carefully what she

6  has written in her only report issued with regard to Mr. Frezza

7  and that is --

8          THE COURT:  But, I thought she testified that she did

9  not -- she was not opining about solvency.

10          MR. COBB:  Very direct.  Somehow she's come up with

11  an opinion now, according to Mr. Bernick, on solvency.  He used

12  it in his reference that she has issued an opinion.

13          THE COURT:  I think Mr. Bernick is correct.  What she

14  said is, that she couldn't determine solvency, but she was not

15  offering an opinion about solvency and on, I think, cross exam,

16  I don't remember who was asking what questions, she was asked

17  whether the same analysis that she had used to determine

18  feasibility would be the same analysis that she would use to

19  determine solvency and, in essence, she said yes.

20          MR. BERNICK:  No, no, no.  That is not correct, Your

21  Honor.

22          THE COURT:   Well, okay.

23          MR. BERNICK:  I'll go over it.

24          MR. COBB:  You sure you don't want to start now?

25          THE COURT:  Go ahead, Mr. Cobb.  Gentlemen --

1          MR. BERNICK:  Hey --

2          THE COURT:  -- gentlemen, you're not going to do

3    this. I told you at the last hearing that if you started this

4    kind of bantering and bickering back and forth, I was going to

5    throw you all out, and I mean it.  Now, don't do it.

6          MR. COBB:  Your Honor, I was in the middle of

7    providing comments in response to the comments I heard --

8          THE COURT:  Yes.

9          MR. COBB:  -- and there was an exhibit placed on the

10   ELMO and I don't know how to respond to that, Your Honor,

11   because it's never happened to me before.  So, I apologize.

12         THE COURT:  Then you can ask me to do something about

13   it, and I will.  I don't want this continual bickering,

14   gentlemen.

15         MR. COBB:  Thank you, Your Honor.  Your Honor, I'll

16   sit down, but I think --

17         THE COURT:  No, I wasn't asking you to sit down, I

18   was just ask you to go on with your argument.

19         MR. COBB:  Your Honor, in conclusion, this really

20   belongs in the post-trial briefing and in our argument in

21   January and you're going to hear most, if not all of this

22   again.

23         The _Daubert_ standard is designed to protect juries,

24   lay people, from hearing expert testimony that is not deserving

25   of being given any weight, whatsoever, because it doesn't meet

1  the Daubert standard.  This is a bench trial, Your Honor has

2  already heard it all, she can give it the weight it deserves,

3  there is no reason, whatsoever, to strike his testimony.

4          THE COURT:  Well, I think the gate keeping function

5  of Daubert is different from that.  I mean, the Court has to

6  determine whether it meets the three R's, essentially, and if

7  it does not, then the testimony doesn't come in.  So, it's more

8  that just protecting a jury from hearing it, and if it doesn't

9  meet those standards,  then this Court can't consider it

10 either, and if it doesn't meet those standards, even though

11 I've heard it, I won't consider it.  So, I do need to know how

12 it satisfied at least the Rule 702, 703 standards which, you

13 know, Daubert, basically incorporates or explains.

14         MR. COBB:  Your Honor, I'm not going to joust with

15 you on that point.  I can't disagree with you.  But I would

16 simply note that I think our papers directly address why it

17 meets those standards and I think it is very clear that Ms.

18 Zilly, based upon her own testimony, as the Court has noted,

19 she issued no opinion solvency, whatsoever.  Thank you, Your

20 Honor.

21         THE COURT:  Mr. Bernick.

22         MR. BERNICK:  First on the point of the testimony by

23 Ms. Zilly and Ms. Zilly was specifically called to the stand to

24 address the question of whether solvency could be determined.

25         THE COURT:  Right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  That was the whole thrust of her

2     testimony.  She didn't issue a solvency opinion in the sense of

3     saying, here is my solvency opinion, her opinion was, it could

4     not be done because of the disputed nature of the liability.

5          THE COURT:  Right.  I don't think anybody is

6     disagreeing with that.

7          MR. BERNICK:  Well, no, they said that there was no

8     opinion expressed regarding solvency.  Well, it make an

9     enormous difference, Your Honor.  The whole problem here is

10    that you couldn't have issued an opinion regarding solvency,

11    this is not a case where it's clear what the liability was.

12    This is a case where there was an assertion of massive

13    liability and it was disputed and that has remained true all

14    the way up to today.  There is no plan that is in effect today,

15    there's no plan that's agreed today because the plan that has

16    been agreed is executory pending Your Honor's determination,

17    including regarding this issue.

18         THE COURT:  That's right.

19         MR. BERNICK:  So, as we sit here today, she issued

20    the opinion and it's the only opinion that matches the actual

21    facts, that opinion is that you cannot determine solvency.

22         THE COURT:  But when do we haves to determine it as

23    of?   That's the issue.

24         MR. BERNICK:  As of -- that's correct, but it's

25    really as of the effective date --

1           THE COURT:  Right.

2           MR. BERNICK:  -- before giving effect to the plan. I

3  mean, you are now --

4           THE COURT:  I see what you're saying.

5           MR. BERNICK:  That's the whole thing.  Is that -- but

6  this is not the beginning of the case.  We've now been through

7  the entire case and as we go forward to the effective date,

8  this is the problem so I put it in quotes, this whole as of

9  problem.  I did, I was talking with my colleagues, well, where

10 does this term come from.  It's a convention, it's used as

11 cutoff point to make the code work and to make plans work.  It

12 is not designed, never has been designed, never has been found

13 to be somehow the litmus test about when you determine

14 solvency.

15          THE COURT:  Yeah, I see what you're saying.  Your

16 argument as I get it, is that to say that you're solvent

17 because the plan makes you solvent is, basically, an _ipse_

18 _dixit_, it doesn't have anything to do with whether the reality

19 -- of what would happen in the world absent that plan and then

20 the question is, whether in determining the default rate of

21 interest I have to give effect to the plan, or not.

22          MR. BERNICK:  Exactly right. That's exactly right.

23 That is to say -- well, that's exactly right.  And we're not

24 early on, we've got all of the evidence, we've got everything,

25 but literally until this plan goes effective, I mean, goes

1 effective, the state of affairs is, there's a massive dispute

2 about liability, there is a proposed plan that would resolve

3 everything, but only if the interest rate is the one that we

4 believe was agreed to historically and is fair and equitable

5 and if that doesn't happen, it's not all of a sudden the

6 liabilities have been extinguished, they're still there, but

7 the operative issue that Your Honor has now hit upon is, well,

8 what is the right answer, what is the right answer.

9 And if you take a look at the New Valley case, excuse

10 me, the Valley View case, the court deals with exactly this

11 issue, but I want to draw one last little chart here because I

12 think there's a very logical and consistent way, indeed, it's

13 the only way to make the code consistent, answer to the

14 question to the question that Your Honor has posed.

15 So, we have as of the effective date and then there's

16 plan or no plan, that is the issue.  So, what we have heard

17 from the other side are a bunch of different things and the

18 question at the end of the day is whether there can be

19 reconciled with the structure of the code.  The code looks at

20 default interest as a question of fair and equitable.  And

21 that's what all the cases have held, that this is the test,

22 fair and equitable.  So, that governs everything.

23 A statement was made, solvency is not the same thing

24 as fair and equitable.  That statement was made either by Mr.

25 Pasquale or by Mr. Cobb.  That's wrong.  Solvency is part of

1  the analysis of fair and equitable.  If there is solvency, then

2  you get to the question of whether default interest is fair and

3  equitable.  Solvency for purposes of Chapter 7, in the best

4  interest test is one thing, solvency for purposes of fair and

5  equitable is another Chapter 11.  And, under the fair and

6  equitable test, there are all kinds of things that get brought

7  to bear.  Fairness and equity dominates everything.  Nothing

8  else, that's the test.

9          So, we now take a look at all of the circumstances,

10  all of the circumstances.  What's been the history, how was the

11  plan put together, what does the plan do, could the plan have

12  been achieved in some other way, what's been the history of the

13  conduct of the unsecured creditors and the lenders in

14  particular who are very ably represented here today by the

15  esteemable Mr. Cobb.  All of that is relevant.  All that is

16  germane to fairness and equity which then means Your Honor has

17  to make the determination at the end of the day about what

18  makes sense and this is really the heart of the whole issue.

19          We have full default rate, we have base contract

20  rate, we have the plan rate.  We picked the plan rate based

21  upon history of negotiations and based upon the fact that

22  liability was disputed, so there wasn't a clear case of

23  solvency.  You weren't clearly insolvent, you weren't clearly

24  insolvent.  It was in the middle and it corresponded with

25  history.  The essence of our position is, fairness and equity

**J&J COURT TRANSCRIBERS, INC.**

1 requires consideration of all the factors and converges on,

2 well, what should the interest rate be and solvency,

3 particularly where it's disputed, that is the essence of our

4 whole case, is that solvency is not a number, it is disputed

5 and where solvency is disputed, the only way that you can look

6 at fairness and equity about whether they get default interest

7 is by acknowledging that it's disputed.  You can't change in

8 the course of a fair and equitable analysis, you can't change

9 the fact about the dispute and pretend that once the plan has

10 gone effective, it all goes away, so there was no dispute and

11 then it's default interest.  That's the essence of the problem,

12 is that fairness and equity requires you consider the facts as

13 they are before the plan goes effective in order to determine

14 whether the plan is fair and equitable, before it goes

15 effective.

16         Now, what we have in place of fairness and equity are

17 all these other theories and Mr. Cobb was very candid when he

18 said, our position has not changed.  Well, what's their

19 position been?  First, it was market value of equity,

20 pre-effective date, today, yesterday.  That's what their

21 position was, let's measure it before the plan goes effective.

22 They argued that at length.  Then it was, there should be a

23 presumption of solvency, based upon the same fact.  Then there

24 was what we now have as the -- what we actually have as the

25 argument, so long as there's one dollar of equity at the end of

1    the day, default interest.  The cases doesn't say that.  That

2    wouldn't -- and then there's now the feasibility test of

3    solvency.  What is the common denominator of all of these

4    different approaches?  The common denominator is, they are all

5    formulas, they all say that, and this would be great for the

6    lenders if this could be the rule of law, that once we have

7    market value as a positive, once we have solvency being

8    presumed, once we have a dollar of equity, once we have

9    feasibility, the analysis is over.  It's all done and the

10   difficulty with that is that that is not the law, the law is,

11   this is a question of fairness and equity and then you say,

12   well what facts does that apply -- and you have to determine

13   that, before the plan goes effective.  The whole idea is, where

14   are we today and does this plan make sense in light of where we

15   are today.

16          You can't say, well -- you can't have your cake and

17   eat it too, we put the plan into effect, now there's solvency

18   and now we say that there's default interest and, therefore,

19   you modify the plan.  It makes no sense.

20          THE COURT:  Okay.  Well, I'm sure this in either the

21   record, the plan or something, somewhere, but I think it would

22   be helpful if you and the lenders can figure out whether you

23   can agree on a couple of facts that I think I may need to

24   consider.

25          MR. BERNICK:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  One is, what the amount of the -- I guess

2  the shareholder equity in the company would be, as of the date

3  of filing and as of the date of the plan.  Two is, what the

4  distribution percentage and number would be to that equity, and

5  then the same information with respect to the lenders, to the

6  lender group, because part of -- if I accept your analysis and

7  I'm not making decisions now, I'm just looking to what you have

8  to say.

9          MR. BERNICK:  Right.

10          THE COURT:  If part of the analysis has to

11  incorporate the entire history, then it also seems to me that

12  part of the composition that the Court has to consider is this

13  return to the shareholders as opposed to the return to the

14  banks.  So, I want to know what that return is. Both in terms

15  of raw dollars and in terms of percentages.

16          MR. BERNICK:  Well, those are -- that's interesting.

17  They're actually a little bit, you know, bank debt doesn't have

18  returns like equity does.

19          THE COURT:  Right, I understand, but under the plan,

20  the bank is going to get the amount of its claims plus whatever

21  the rate of interest is, which should generate a number.

22          MR. BERNICK:  It does.  Yeah, it does generate --

23          THE COURT:  Okay.

24          MR. BERNICK:  -- well that is in the plan. The plan

25  itself calls it out.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I know that's what I'm saying.  I know

2   it's in a variety of documents, it's just that it would be --

3   you folks probably know this, more or less at the tip of your

4   fingers, and I don't, so it would be helpful to have it stated

5   somewhere.

6          MR. BERNICK:  We'd be happy to do it, the question

7   is, I just want to make sure that I understand what you want us

8   to do.  The plan calls out a rate of interest, we do have a

9   record that exists of how much money in dollars --

10          THE COURT:  Right, that would be.

11          MR. BERNICK:  -- that would mean to the unsecured

12   creditors under the plan.

13          THE COURT:  Yes.

14          MR. BERNICK:  Okay.  Then what else did you -- what

15   did you want with respect to equity?

16          THE COURT:  I want to know what the amount of the

17   claims are that are going to receive a distribution and what

18   the distribution is, in terms of raw dollars, and in terms of a

19   percentage, on the equity that remains in the company.

20          MR. BERNICK:  There's no -- that's the problem.

21   There's no distribution to equity.  That is to say --

22          THE COURT:  It's a value, though.

23          MR. BERNICK:  No, it's not even a value.  All it is

24   -- old equity remains equity.  There's no new equity.  It is

25   old equity, the old stockholders that are still -- that all

**J&J COURT TRANSCRIBERS, INC.**

1 along are the new stockholders of the reorganized Grace. So,

2 there's no distribution to them at all. What there is, is the

3 expectation, in marketplace expectation or otherwise, we'll

4 know what the stock is worth after the plan goes effective.

5 There's stock values today, but we'll know what it's worth

6 after the plan goes effective.

7        That, however, will be, again, the post fact world.

8 I mean, and I understand Your Honor appreciates that.

9        THE COURT: I do appreciate that.

10       MR. BERNICK: But that's what we would be talking

11 about, is how the stock will trade the day, God willing, we get

12 to a confirmed and effective plan. So, we can't get that

13 number, that's a question of projection. The numbers that

14 you've seen in Mr. Frezza's report and the like, that deal with

15 equity value, are either based upon the assets and liabilities

16 in the pro forma balance, which is not the same thing as a

17 market value, or they're based upon substituting for the asset

18 value of the company, the enterprise value of the company. And

19 enterprise value is something that he's estimated, that I think

20 Ms. Zilly has also estimated for purposes of the Chapter 11

21 case.

22       So, Your Honor would have the enterprise value, less

23 the plan distributions to creditors, which would then yield a

24 delta, I think that actually is pretty much Mr. -- similar to

25 Mr. Frezza's first number, which is about 670 odd million

1  dollars.  But that is -- that's another thing.  That's a

2  marketplace valuation based upon the expectation about what the

3  enterprise value is.

4       I'm not aware of anything that says at the time the

5  bankruptcy was filed, you -- I mean the status quo was not

6  different, vis-a-vis, the personal injury claimants and equity,

7  that is to say, the demands of the personal injury claimants in

8  this case became quantified but their position always was, that

9  Grace was insolvent because based upon history, the liabilities

10 were huge.  That, in fact, has not changed.

11      THE COURT:  I'm not asking -- I don't think that's

12 what I was asking for.

13      MR. PASQUALE:  Your Honor, may I just -- if I could

14 just, sorry, Mr. Bernick, just to address the documentation.

15      MR. BERNICK:  Sure.

16      MR. PASQUALE:  We've already agreed on an exhibit, I

17 don't have the number with me, Your Honor, that is a chart

18 showing from the beginning of the case until, I forget the end

19 date, but recent, that shows the amount of shares outstanding,

20 the price for those shares, which will give you the market

21 capitalization, throughout the life of the case, which would be

22 the amount at those points in time that the outstanding equity

23 is worth, the value of that equity.  So, there is a document in

24 the record that's been stipulated to, that we can site to and

25 will, in our post-trial brief and be able to give the Court

**J&J COURT TRANSCRIBERS, INC.**

1  some of that information.

2         THE COURT:  All right.

3         MR. BERNICK:  Yes, that's fine.  The only thing I

4  would say, Your Honor, is that there has been testimony and it

5  was put before the Court in the context of the prior briefs,

6  about whether that market value, at any point in time for the

7  equity or for the debt, really tells you what the value of the

8  company is.

9         THE COURT:  Oh, I understand that.

10        MR. BERNICK:  Because they're all anticipations about

11 what's going to happen with this case.

12        THE COURT:  Well, I understand, but one problem I'm

13 faced with, which I'm not always sure I agree with, is the TWA

14 view as to how you go about taking a look at the net worth of

15 the -- or the worth of the company and so, I'd still like to

16 have that information.

17        MR. BERNICK:  Okay.  So, you want the trading price

18 of the stock over time?

19        THE COURT:  Sure, and I think -- I understand that

20 that's going to change on the effective date, I don't know how

21 anybody can know what that will be on the effective date, so

22 that's a difficult thing to project but, nonetheless, there are

23 probably some people who have given it some pretty good

24 estimates.

25        MR. BERNICK:  Yes.  Well, but the -- and I'll sit

1   down here in a second, both Ms. Zilly and their prior expert, a

2   Mr. Ordway, addressed it, that was one of the first things was,

3   what happened to th stock value, and they both said, I know Ms.

4   Zilly said, I'm almost positive Mr. Ordway did, indeed we

5   originally designated this testimony, that that price for the

6   stock over time doesn't reflect anything other than a whole

7   variety of factors including what might ultimately happen in

8   the case, long before it happens.

9          So, it's not -- it's just a prediction, it's not a

10  valuation of anything.

11          THE COURT:  I understand.

12          MR. BERNICK:  Okay.  Well, we'd be happy to provide

13  that -- I'm sure we can figure it out.

14          MR. PASQUALE:  It's already, as I said --

15          THE COURT:  Okay.

16          MR. PASQUALE:  Your Honor, I just want to close with

17  one thing, and that is, even in Mr. Bernick's reply, it's

18  closing argument.  This is the issue that we disagree on and

19  well will -- I agree, it's the ultimate issue.  We will have to

20  convince the Court of our view and Mr. Bernick will attempt to

21  convince the Court of his view for his client.  It has nothing

22  to do with the admissibility of Mr. Frezza's testimony, because

23  if Your Honor agrees with us, Mr. Frezza's testimony fits the

24  issue exactly, and it's not a matter of methodology, it's not -

25  - excuse me, it's not an issue of methodology, it's not an

1  issue of qualifications, it's closing argument.  The evidence

2  in the record is necessary for the factual predicate, the

3  expert testimony for those legal arguments, there's no basis to

4  exclude Mr. Frezza's testimony.

5          THE COURT:  Well, I agree with that.  It seems to me

6  that the -- you do have to lay the predicate.  I asked for

7  evidence concerning the solvency issue because I needed to hear

8  what it was going to be, now I've heard what the testimony is.

9  If it turns out to be irrelevant because I don't agree with the

10 bank lenders viewpoint, then at that point I suppose it doesn't

11 fit and I won't consider it, because it doesn't fit, but I'm

12 not sure that in that -- that right now, I can judge it as a

13 <u>Daubert</u> issue because it seems to me that it does support the

14 lenders viewpoint and if that viewpoint is adopted, then

15 there's testimony in the record that supports it. So, I don't

16 see it as striking Mr. Frezza's testimony, but I do think it's

17 something the Court has to weight carefully, in determining

18 where I think the law takes me on this issue.

19         MR. PASQUALE:  Thank you, Your Honor.

20         THE COURT:  Okay.  I'm going to -- I will deny the

21 motion to strike.  I think this goes to weight for the reasons

22 that I've just expressed.  I agree it does not fit the debtors

23 view, it does fit the lenders view, it's the lenders expert in

24 their case and for that reason, I'll take an order from --

25 who's going to submit it, that denies this motion?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PASQUALE:  We'll take care of it.

2          THE COURT:  All right.

3          MR. CONLAN:  Your Honor, I apologize for

4   interrupting, may I be excused?  Our portion is --

5          THE COURT:   Yes, sir.

6          MR. CONLAN:  Thank you very much.

7          MR. BERNICK:  Same for me, Your Honor, may I be

8   excused?

9          THE COURT: Yes, sir.  This order, Mr. Pasquale, if

10  you don't mind, I'd like it clear that I'm reserving the weight

11  to be attributed and whether or not, if I don't agree with the

12  lenders and Creditors' Committee view, at that point it doesn't

13  fit the evidence and may be subject to that type of motion, but

14  for now it seems to me that that's not correct approach.

15         MR. PASQUALE:  Well, Your Honor, if I may on that,

16  certainly Your Honor, it's your responsibility to weigh

17  evidence.

18         There is an issue, however, as far as -- you know a

19  motion like this for Daubert, with respect to Mr. Frezza and

20  his own reputation.

21         THE COURT:  Oh, no, no, I wasn't talking about

22  re-upping a Daubert issue, I was just simply saying that if I

23  think it doesn't fit, I can't attribute any weight to that

24  testimony.

25         MR. PASQUALE:  Okay.  Of course, Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

1 understood and we'll reserve that, put the language in the

2 order.

3           THE COURT:  All right. Yes.

4           MR. PASQUALE:  Thank you.

5           MR. BERNICK:  Thank you, Your Honor.

6           THE COURT:  Thank you.  Give me one second, Ms. Baer.

7           MS. BAER:  Sure.

8           THE COURT:  Okay, thank you.

9           MS. BAER:  Your Honor, what that leaves is two

10 matters.  Number one the debtors objection to the claim of

11 Munoz, which is the second agenda item, it's specifically their

12 response to our objection, it's item f of the second item and

13 then item number 23 on the agenda, which is the Munoz matter to

14 lift stay.

15           Before counsel for Munoz argues the lift stay matter,

16 I just wanted to address the objection matter for a moment.

17           THE COURT:  All right.

18           MS. BAER:  Your Honor, the omnibus objection, the

19 25th omnibus objection was filed on August 26, 2008.  It was

20 not an objection to Munoz alone, it was and objection on an

21 omnibus.  On the Munoz claim the objection was no liability.

22 That objection was filed as part of the omnibus because the

23 debtors books and records did not show any liability and,

24 frankly, it was filed in order to sort of start a dialogue, if

25 you will.

**J&J COURT TRANSCRIBERS, INC.**

1    Your Honor, a dialogue has been started and at this
2  point in time we don't see that that objection to the claim is
3  going to be resolved and, in fact, the ultimate response from
4  Munoz was to file the lift stay.

5    Your Honor, the debtor is in the position that it has
6  a number of alternatives on how this matter should be addressed
7  and based on where the debtor is and especially based on where
8  we are in confirmation and being in the middle of doing
9  post-trial briefing, and ultimately having the closing
10 arguments in January, the debtor is in a position where it does
11 not seek to go forward on the merits of the claim objection at
12 this time.  It has a number of alternatives with this claim.
13 Obviously, it could ultimately settle it.  It probably needs
14 to, in fact, take discovery.  The discovery on the case stopped
15 when the case was filed eight and a half years ago, when we
16 filed Chapter 11.

17    There's a potential that we could use the ADR process
18 in this case to mediate the claim, but we're not there yet.
19 Given how old this claims is and how discovery has not taken
20 place, there is still the option that we could remove the case
21 to this court. The removal order entered by this Court gives us
22 until the effective date to do so or, ultimately, we could
23 agree that the stay should be lifted and it should go back to
24 the California state court, but we're not in a position right
25 now to make that determination.  We're not familiar enough with

1  the case anymore after eight and a half years, to make that

2  determination.

3          What we would like to do, Your Honor, what we would

4  suggest would be the best thing to do here is that we either

5  dismiss our motion to object to the claim without prejudice to

6  reasserting it again and at the same time have the motion to

7  lift stay dismissed to be reasserted, probably when we reassert

8  the claim objection, after the effective date.

9          The plan of reorganization here, Your Honor, calls

10 for a period of 180 days after the effective date to address

11 all remaining claims.  The debtors in the position of having

12 probably a hundred different contested litigation claims that

13 it needs to address and, again, has all of the various

14 alternatives in its quiver as to the best way to address each

15 and every claim.

16         Given where we are now, in the middle of the

17 confirmation process, hopefully, closing this process out and

18 getting it before Your Honor to make a decision, is about the

19 worst time in the world to lift the stay and begin arguing and

20 doing discovery and getting ready for trial on a contested

21 matter that is, you know, sort of a combination of employment

22 discrimination, harassment and various tort as well as contract

23 and common law theories.

24         So, under these circumstances, Your Honor, again,

25 what we're suggesting is on the claim as well as the lift stay,

1  that things be delayed until a time when the debtor is in a

2  position to actually address the merits of the claim and

3  determine what is the best alternative for going forward with

4  the claim.

5          With that, Your Honor, I'll sit down, as I know that

6  counsel for Munoz wants to argue the motion to lift stay and

7  then I'll respond.

8          THE COURT:  All right.  Good morning.

9          MR. ALLINSON:  Good morning, Your Honor, Elihu

10  Allinson on behalf of Gloria Munoz.  On the telephone is my

11  co-counsel, Anthony Petru from the Hildebrand, McLeod & Nelson,

12  Inc., law firm in Oakland, California.

13          I think I'd like to start with addressing the claim

14  objection.  Just a few comments on that, but before I do, I

15  want to make the Court aware, this motion and this claim

16  objection, have nothing to do with asbestos liability.  This is

17  an employment discrimination and sexual battery claim, that was

18  brought against the debtors, prepetition, in California state

19  court, by a production worker, a $34,000 a year production

20  worker and the debtors San Leandro, California plant, which I

21  believe is in Alemeda County, a plant that made Darex, which I

22  understand is some kind of a lining for food containers and can

23  be an additive for concrete and things like that.  And this

24  person's job, Ms. Munoz's job, was pretty much stirring, mixing

25  chemicals, very line oriented work.

1        The claim objection.  We objected in our stay relief

2    motion to the 25th omnibus objection on two grounds of the

3    local rules.  One, that to the extent that Ms. Munoz is

4    asserting a personal injury claim and she has raised sexual

5    battery, intentional infliction of emotional distress,

6    negligent inflicting of emotional distress, that this Court

7    doesn't have jurisdiction over the claim and, therefore, it was

8    improper to include it in th 25th omnibus claim objection.

9        THE COURT:  Well, that's actually not correct.  The

10    Court has clear jurisdiction over all claims.  The only thing

11    this Court cannot do is try the personal injury or wrongful

12    death claims.  There is absolutely nothing that says the Court

13    doesn't have jurisdiction over it and, in fact, in most

14    instance, we go through the whole way through the discovery

15    processes before the claim is returned wherever it's going to

16    go for trial.  So, the only thing that the core, non-core

17    issues address is whether or not the Court can try the case.

18    It does not, in any way, prohibit the Court from asserting

19    jurisdiction over claims.

20        MR. ALLINSON:  Your Honor, with all due respect, I

21    would refer you to Local Rule 3007-1(f)V, which states as

22    follows: "The court will not consider any substantive objection

23    to personal injury or wrongful death claims that would be in

24    violation of 28 U.S. Code 157(b)(2)(b).

25        THE COURT:  Right.  That means the court won't try

**J&J COURT TRANSCRIBERS, INC.**

1  them.  Won't consider them in violation of that section, means

2  I can't try them.  And it certainly doesn't mean I don't have

3  jurisdiction over them, in any event.  So, I mean the whole --

4  otherwise, this Court could never hear an asbestos claim

5  because every single asbestos claimant and there have been at

6  least, I don't know, 17 or 18 of them now that have gone

7  through plan confirmation, involves personal injury claims.

8  That makes absolutely no sense. It would prohibit somebody from

9  filing an asbestos or any other type of mixed dust claim, or

10  case, it the District of Delaware.  So, that interpretation is

11  doesn't make sense.

12        MR. ALLINSON:  Very well, Your Honor.  We also

13  objected to omnibus 25 on the issue that it mixed a substantive

14  and a non-substantive objection, in violation of the same local

15  rule.  Those were our two objections to the claim.

16        I understand that the debtors have withdrawn it, or

17  continued it, until next month.  We -- I'm hearing from counsel

18  that that's not correct, so --

19        MS. BAER:  Your Honor, I just made it very clear at

20  the beginning of the hearing that this particular one we have

21  not made a decision on.  We pulled it out, if you will, the

22  25th omnibus schedule of continuing everything until next month

23  so we could address it now and decide in the context of the

24  lift stay, what to do with it.

25        THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1         MR. ALLINSON:  Well, Your Honor, I thought the agenda

2    said that as to Ms, Munoz, the 25th omnibus objection was

3    continued to next month's hearing, but I may have

4    misunderstood.

5         THE COURT:  Well, it can be continued, I don't think

6    it makes a difference at this point because, look, even with

7    respect to the lift stay, I appreciate the fact that Ms. Munoz

8    was not injured by exposure to asbestos, but she is not the

9    first debtor in this very long case now that has attempted to

10   get back into the state court to try a non-asbestos related

11   case.  And I have routinely denied that relief and the reason

12   is because it is a claim that the debtor can reconcile through

13   its plan confirmation process.  If that doesn't happen, then at

14   some point, yes, this claim obviously has to be liquidated, so

15   that the debtor knows how much it's going to have to pay, the

16   reorganized debtor knows what it's going to have to pay, but

17   this is not the time to grant relief from stay in this, or any

18   other, similar circumstance because the debtor is in the

19   process of figuring out the plan confirmation processes.

20        I know it's been a very long time, I'm sure I regret

21   that as much as every other party in the case does, but it's

22   just the way this case has come down.

23        MR. ALLINSON:  Well --

24        THE COURT:  So, I think that with respect to the

25   objection to claim and to the relief from stay, the idea that,

1 perhaps, you go to mediation is probably a good one.  These are

2 serious allegations that the plaintiff has made, the plaintiff

3 in the state court action has made and it seems to me that

4 taking the opportunity to try to mediate or arbitrate, whatever

5 you prefer, the underlying matters that would go back to the

6 state court and the debtors' objection to claim is probably a

7 good one.

8          MR. ALLINSON:  Well, Your Honor, maybe I can ask Mr.

9 Petru, if he is on the line, whether there was an attempt at

10 mediation previously, in the state court action and, I guess, a

11 follow-up question to Your Honor would be, even if not, would

12 alternative dispute resolution have to take place here in

13 Delaware or could it take place in California, where the

14 debtors already have local defense counsel?

15          THE COURT:  It can be wherever you want it.  If you

16 want it in California, that's fine.

17          MR. ALLINSON:  The other thing I would ask the Court

18 to consider is, since this doesn't appear to be the time to

19 grant stay relief, rather than coming back with a renewed

20 motion, would we set now a prospective deadline by which if the

21 matter hasn't been resolved, stay relief or relief from the

22 plan injunction, automatically becomes effective.

23          THE COURT:  No, I won't do that, but what I will do

24 is give you a new date to raise the issue by way of argument

25 because I'm not attempting today to get to the merits of

1  whether it should or shouldn't be granted on the merits. I'm

2  simply saying that procedurally, at this time in the debtors

3  reorganization, where they're getting ready for post

4  confirmation briefing and we have the arguments on the plan

5  confirmation itself set in January.  This is not the time to

6  force the debtors back into state court on a pretty serious

7  matter.

8          I will force them into an arbitration issue, I'd

9  prefer to do that even after the confirmation, because I think

10  even that may be somewhat disruptive, but that's preferable to

11  starting wholesale litigation again.

12          So, I'll give you a continued hearing date, if you

13  like, rather than dismissing this motion, but not an automatic

14  relief.

15          MR. ALLINSON:  Well, I'll certainly take the

16  continued hearing date over a dismissal but let me ask for a

17  clarification.  Is Your Honor stating that we can begin an ADR

18  procedure in California now, or are you saying that we must

19  wait until confirmation?

20          THE COURT:  Ms. Baer, what would the debtors -- would

21  and ADR position at this point jeopardize the reorganization?

22          MS. BAER:  It would, Your Honor.  The supervisor on

23  this case is Richard Finke, who is in the courtroom today, you

24  know that he is responsible for getting this company through

25  the confirmation process.  To begin an ADR process is like

1  beginning, you know, the case again.  So I would say that that

2  would be a very, very difficult position to put us in until

3  after we're done with all the confirmation matters.

4          THE COURT:  All right.  All right.  So February

5  because the arguments will be done in January, so I'd say

6  February for an ADR?

7          MS. BAER:  Your Honor, maybe the thing to do is to

8  continue our claim objection and continue the lift stay motion

9  to February, in the meantime, we can think about, from a merit

10 standpoint, what's the best way to proceed with this case to

11 get it to completion.

12         MR. ALLINSON:  Well, Your Honor, I think they've had

13 plenty of time to think about that and we've been invited to

14 negotiate with them and we've actually received no response to

15 our settlement offer, so I find that suggestion disingenuous.

16         I think at the very least, we should have a date

17 certain by which we can start ADR.  And I would also request,

18 and it can be at the end of the 180 day window after the plan

19 goes effective, that if the ADR hasn't been successful or if

20 the issue hasn't otherwise been resolved, that automatic stay

21 relief, relief from the plan injunctions take effect at that

22 time. I don't see how that prejudices the debtors in any

23 possible way.  It gives them the full opportunity, under

24 Article 5 of the plan, to try and resolve this and if it can't

25 be resolved, then Ms. Munoz doesn't have to spend more money to

**J&J COURT TRANSCRIBERS, INC.**

1  send me here again to raise these same issues.

2       THE COURT:  Well, okay, in terms of having you come,

3  I understand that the phone participation still involves your

4  time, but it doesn't involve the travel expense and you

5  certainly can participate by phone, I have no problem with that

6  issue, especially when it's going to be some type of procedural

7  issue that's going to be discussed as opposed to some argument

8  on the merits, but I'm not uncomfortable at all if you wish to

9  do it by phone.  People, obviously, deal by phone all the time.

10 We have a hundred, probably on the phone today.  So, if that

11 helps with the expense side, that's fine.

12       I think the best result is for me to set a time

13 period within which if you agree to go to ADR and I guess

14 that's what I'm trying to find out from you, whether your

15 client is willing to go, when that should happen.  And at the

16 end of that period of time, set you back for a status

17 conference if it hasn't been resolved, so that we can figure

18 out where to go next, and I think you'll be in that 180 day

19 window if the plan has been confirmed by then, and if it hasn't

20 then that doesn't stop me from deciding the issue anyway.  So,

21 is she willing to go to ADR?  You had wanted to ask Mr. Petru

22 whether --

23       MR. ALLINSON:  Yeah, I just don't know the

24 answer to that question.  I don't know whether he's on the line

25 or his colleague, Ms. Quynn Nguyen, is on the line and even if

1 they are, whether they're prepared to respond to that at this

2 time.

3          THE COURT:  Let me find out.  Is anyone on the phone

4 representing Ms. Munoz, who would know whether or not there was

5 some, either mediation or arbitration process started before

6 the bankruptcy was filed?  If there is someone and their lines

7 are on mute, can the lines be unmutted for a moment, please?

8          COURT CALL OPERATOR: Certainly, one moment, Your

9 Honor.

10          THE COURT:  Thank you.

11                    (Pause)

12          THE COURT:   Are the lines unmutted?

13          COURT CALL OPERATOR:  There's quite a few, Your

14 Honor, I'm still working on it. I apologize.

15          THE COURT:  Oh, I'm sorry.  If you just let me know,

16 please.

17          MS. BAER:  Your Honor, in the meantime, I'd ask a

18 question, which is, this Court has entered an ADR order and set

19 up and ADR procedure and we have a mediator and the question I

20 would have is, whether or not we would use that procedure or

21 what procedure counsel is referring to, because I don't clearly

22 know what the California procedure is and in what context it

23 would be done.  I'm very familiar with our procedure here and

24 our mediator and certainly that has some logic to proceeding

25 that way, that's what we've done with other contested claims.

1          THE COURT:  I think the issue that I was attempting

2     to address is the location not the who the mediator would be

3     and from my point of view, based on the fact that Ms. Munoz is

4     in California and the debtor has a plant there, I don't see why

5     the mediation itself  could not take place in California.

6          MS. BAER:  Your Honor, first of all, our mediator

7     has, in fact, mediated a case in California, we are not wedded

8     to have to do them here.  We have gone and used these

9     procedures in many places.  Second of all the plant is closed

10    down, Your Honor.  We do not have a presence in that area any

11    more.

12         THE COURT:  Oh, okay.  But you're still willing to go

13    to California?

14         MS. BAER:  Your Honor, if -- that may have some logic

15    to it.  Again, our mediator has gone to several different

16    places.  My question was more of procedures, what rules are we

17    using, what ADR process are we using, where do we get the

18    mediator from and we already have that set in this court, so

19    there's a logic in using that process here.

20         THE COURT:  And frankly, it's been pretty successful.

21         MR. ALLINSON:  Your Honor, it may be, I simply

22    haven't reviewed it yet, and I don't know whether it would be

23    acceptable to my client and co-counsel or not.

24         THE COURT:  Yes.

25         MR. ALLINSON:  I have noticed at Exhibit B to our

*J&J COURT TRANSCRIBERS, INC.*

1  lift stay motion which lists all the pretrial activities that

2  have occurred so far, that an ADR case management conference

3  was held in the California state court action on February 17th

4  of 2000.  I don't know whether that conference was anything

5  more than a status report or whether anything material came out

6  of it.

7            THE COURT:  All right, are the lines unmutted?

8            COURT CALL OPERATOR:  Yes, Your Honor, they are now.

9            THE COURT:  Okay. If I could ask, again, then please,

10  is anyone on the phone representing Ms. Munoz?

11            MS. NGUYEN:  Good morning, Your Honor, this is Quynn

12  Nguyen, I'm appearing for Anthony Petru. No, there's no been

13  mediation or arbitration process and I think we'd be open to

14  some kind of mediation process within the time that you

15  mentioned.

16            THE COURT:  All right.  So, I think that's -- there's

17  the answer.  I think, then, perhaps what I need to do is just

18  give you two the opportunity to figure out what that process

19  is.  The process here has, I think, been relatively successful.

20  It's -- I think it's been pretty well documented in this case

21  that the mediator has done some pretty good work.  Not

22  everything will settle, obviously, but many things do.  So, I

23  can recommend that process, but if your client is uncomfortable

24  with it, then I think you can talk to the debtor and see

25  whether or not some other process can be agreed upon and in

1 California, if that's where you want it, is fine.

2       MR. ALLINSON:  And, Your Honor, if my client and

3 co-counsel are amenable, can we begin the process sooner rather

4 than later, that is not have to wait until February 1st or post

5 confirmation?

6       THE COURT:  Well, I think waiting till February,

7 based on the fact that the principles of the debtor, who are

8 going to have to attend or participate in some fashion in that

9 mediation, also engaged in the plan confirmation right now

10 would be a problem.  So, I think February should be the month.

11       MR. ALLINSON:  Well, I also note, Your Honor, that

12 the debtors are ably represented by Seyfarth Shaw in California

13 on this matter.

14       THE COURT:  Well, I'm not sure it's the issue of

15 counsel, I think it's an issue of the officers, directors,

16 employees of the debtor who would have to input somehow or

17 other into the process.  I believe that's the issue.

18       MR. ALLINSON:  I believe that the plant was -- this

19 plant was closed in March of 2009.  I believe that the

20 witnesses, so to speak, are no longer employed by the debtor

21 but if Your Honor isn't persuaded, we can --

22       THE COURT:  Well, I don't think you need witnesses

23 for the mediation, that's not --

24       MR. ALLINSON:  Well I would assume that the debtors

25 senior executives can receive reports from their counsel as to

1 how the ADR is proceeding without disrupting them.

2          THE COURT:  Oh, I see what you're saying.

3          MR. ALLINSON:  Yes.

4          THE COURT:  Yes, they could certainly receive reports

5 but I really do not want the distraction from the plan

6 confirmation. This is the most highly contentious plan

7 confirmation process I have ever been involved in, there are a

8 gazillion issues and I do not think this would be the -- that's

9 a term of art, gazillion --

10         MR. ALLINSON:  Understood, Your Honor.

11         THE COURT:  -- that I do not think at this point

12 should be added to as a distraction for the debtor.  So, I

13 know it's been a long time, but February is three months from

14 now, I don't think that that three month delay will cause a

15 problem.

16         Now, in the meantime, I think you and Ms. Baer should

17 work out the process, agree on the mediator, set the time and

18 place, get the mediator line up so that in February mediation

19 can actually take place.

20         MR. ALLINSON:  Okay. And will it be February or will

21 it be February, assuming confirmation occurs in January?

22         THE COURT:  In February, no matter what.

23         MR. ALLINSON:  Okay.  And I guess two other issues of

24 clarification.  Do I need to appear next month for --

25         THE COURT:  No.

**J&J COURT TRANSCRIBERS, INC.**

82

1          MR. ALLINSON:  Omnibus 25.

2          THE COURT:  No, sir.

3          MR. ALLINSON:  Will that be continued?

4          THE COURT:  I will give you a continued date, right

5    now, if anybody knows when my continued calendar is for next

6    year.  I'm not sure I do.  Wait till I see.

7          MS. BAER:  Your Honor, I can give you the -- well, I

8    know the March date, I don't know February date off the top of

9    my head.

10          THE COURT:  Well, actually, I think the March date

11   may be the best one to continue it to, because if you do arrive

12   at a settlement, you're going to want to file something and if

13   you don't, you probably need some time to talk, to see how

14   you're going to try to resolve the motions, not the underlying

15   liabilities.

16          MS. BAER:  Your Honor, the March omnibus date is

17   March 22nd, and what I would suggest is that the debtors

18   omnibus objection and the motion to lift stay both be continued

19   to the March 22nd date.

20          THE COURT:  The omnibus, that's item 2, correct?

21          MS. BAER:  Item 2 and 2(f) is their response to our

22   objection.

23          THE COURT:  All right, and only 2(f) though.  The

24   rest of them were continued to another date.

25          MS. BAER:  Yes, until next month.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ALLINSON:  Your Honor, as far as continuing the

2  lift stay motion, I just wanted to seek clarification, one last

3  time.  Was your -- it sounded to me at one point like Your

4  Honor was, perhaps, amenable to having some sort of a springing

5  date, perhaps at the end of the 180 day period.

6          THE COURT:  No, I don't think so. I think what I said

7  is, I'd continue it to a hearing date so that we can then

8  discuss on the merits whether or not relief from stay is

9  appropriate.

10          MR. ALLINSON:  Very well.  Thank you, Your Honor.

11          THE COURT:  So, March 22nd?

12          MS. BAER:  Yes, Your Honor.

13          THE COURT:  All right.  And you may call in, if you

14  want to call in, for you.

15          MR. ALLINSON:  It's no trouble for me to get here.

16          THE COURT:  Okay.

17          MR. ALLINSON:  Thank you.

18          MS. NGUYEN:  Thank you, Your Honor.

19          THE COURT:  All right, thanks.  In the meantime, to

20  the extent that it would otherwise be a violation of the stay

21  for you folks to attempt to get this lined up for mediation,

22  I'm lifting the stay for that purpose.  So any discussions

23  leading toward mediation, arbitration, whatever you determine

24  to go to, the stay is lifted with respect to that and for the

25  mediation/arbitration to occur, but not for any other purpose.

84

1          MR. ALLINSON:  Thank you, Your Honor.  And I will

2     submit Ms. Nguyen's motion pro hac vice.  I do appreciate

3     you're permitting her to appear by telephone today.

4          THE COURT:  All right, that would be fine, thank you.

5          MS. NGUYEN:  Thank you, Your Honor.

6          THE COURT:  Okay, thanks very much.  Operator, you

7     can mute the lines again, thank you.

8          MS. BAER:  Your Honor, the only other matter that's

9     on your agenda is just a basic placeholder for confirmation

10    status.  There's nothing specific that the debtor seeks to

11    address at this point, everything is moving along in terms of

12    timing, but we do note that the Court has not yet signed the

13    post-trial briefing order, although we're all complying with

14    it.  And I just wanted to bring that to the attention of the

15    Court.

16         THE COURT:  Yes, I haven't because I received two

17    forms of order and I thought, perhaps, it was related to this

18    status conference and we would discuss it today.  So, that's

19    where I would like to head next.

20         MS. BAER:  Your Honor, I'm certainly willing to

21    discuss it.  We tried to work out the form of the order with

22    Mr. Speights.  Everybody else was in agreement on the form of

23    the order and the real question was, what goes into the

24    alternative briefing schedule for the Anderson Memorial

25    matters.  And it was our understanding from our takeaway at

**J&J COURT TRANSCRIBERS, INC.**

1   court that the Anderson Memorial matters that went into the

2   alternative briefing schedule were specifically discrimination

3   as to Anderson Memorial, classification of their claim and good

4   faith, which are issues unique to Anderson Memorial and that

5   issues that are not unique to Anderson Memorial, specifically

6   mentioned at the hearing, which were feasibility, and best

7   interest, were on the same briefing schedule as everybody else.

8          We asked Mr. Speights whether that was agreeable and

9   I believe that they took the position that the only issues that

10  were -- that all issues were on the alternative briefing

11  schedule, other than best interest and feasibility.

12         THE COURT:  All issues related to Anderson Memorial.

13         MS. BAER:  Right.

14         THE COURT:  Well, I think that's correct, except that

15  I'm not aware of what other issues there are related to

16  Anderson Memorial.

17         MS. BAER:  That's where we left off, Your Honor.  We

18  actually asked Anderson Memorial if they could specify what are

19  the other issues, so we could make sure that the order made it

20  clear what they were and which briefing schedule they were on

21  and Anderson was not able to give us a response to that, which

22  is why we came to this point of filing the alternative orders.

23         THE COURT:  Mr. Speights, are you on the phone?

24         MR. SPEIGHTS:  Yes, Your Honor, can you hear me?

25         THE COURT:  Yes, sir, thank you.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. SPEIGHTS:  Your Honor, actually, I've had no

2   discussions with the debtor regarding this.  Mr. Kozyak was

3   dealing with Mr. Bernick, I believe regarding this.  So, I'm

4   not the one to respond to it, but I believe Mr. Rosendorf is on

5   the phone if Mr. Kozyak is not and can respond to Ms. Baer.

6        THE COURT:  All right.

7        MR. ROSENDORF:  Yes, thank you, this is David

8   Rosendorf.  My partner, John Kozyak is in court on another

9   hearing this morning, but I am generally up to speed on this.

10        Your Honor, it really is sort of a very simple issue

11   which is, I think in large part that the characterization of

12   the common issues, so to speak, that are supposed to be briefed

13   on November 2nd, by us, as well as other parties, is largely

14   correct.  I think that the identification of individual

15   Anderson issues is also largely correct.  The only concern, I

16   think that we have, that we don't want to be hamstrung on when

17   it comes to the briefing is, quite candidly, you know, there

18   are a number of issues that we raised in the multitude of

19   various prehearing confirmation briefs that were filed and we

20   do not want to be faced with the scenario where, frankly, not

21   having reviewed every word of every other of the dozens of

22   briefs that were filed by other parties here, that somebody

23   argues that we somehow waived an issue or lost the opportunity

24   to brief it, by not having raised it or argued it, in our

25   November 2nd brief because that issue appears somewhere else in

**J&J COURT TRANSCRIBERS, INC.**

1 one of the dozens of other briefs that were filed by some other

2 party.

3         THE COURT:  Well, how would you be briefing an issue

4 that you hadn't raised?

5         MR. ROSENDORF:  Well, I'm not saying that we are.

6 The point, Your Honor, is that while we certainly -- we know

7 and we've certainly laid out in extensive detail the issues

8 that we have raised, we don't necessarily know, certainly

9 didn't know in the, you know, roughly 24 hours or so that we

10 were presented with this order, what other issues were raised

11 by the dozens of other parties that filed confirmation

12 objections which arguably might have some commonality with the

13 Anderson issues.

14         We believe the debtors have identified those that

15 they believe are the common issues, best interest and

16 feasibility, and we concur that those are issues that other

17 parties have raised and that we're prepared to brief on the

18 2nd.

19         THE COURT:  Okay.  But I'm still confused.  The brief

20 from Anderson would be on Anderson's issues, whether it's on

21 the common issues, or whether it's on the Anderson Memorial

22 only issues, Anderson is only going to brief issues that it

23 thinks it has.  So, if some other party has raised and briefed

24 an issue, how does that affect Anderson?

25         MR. ROSENDORF:  The only way that it arguably would,

1  Your Honor, is if the debtors somehow argue that because there

2  is an issue that Anderson has raised, which we think of as an

3  issue that we, perhaps, have uniquely raised, but which some

4  other party has also raised in its brief, that we are somehow

5  foreclosed from briefing that issue in our later brief.

6          THE COURT:  Okay.  I don't think that's the intent.

7  No one is trying to use this as some kind of strangle hold on

8  what Anderson is going to brief. I think the issue is, what

9  objections did Anderson have to the plan as to which there was

10 evidence that Anderson is now going to submit these post-trial

11 submissions about and as I understand it, the issues were the

12 best interest and feasibility that any other party has raised

13 and should be briefed on the same schedule because the evidence

14 was finished as to that first, and then the issues related only

15 to Anderson, as to which the Court heard the trial at the end

16 of the trial process, were the discrimination classification

17 and good faith issues and if there was anything else, I think

18 you should say what it is so we know that those additional

19 facts are also supposed to be briefed, but I don't recall any

20 others.   There was a lot that went on, Mr. Rosendorf, so I may

21 have forgotten, but I don't --

22          MR. ROSENDORF:  I agree and I think focusing as you

23 have on those that there was evidence presented on, I think

24 that that's right. I think that that's right.

25          THE COURT:  Okay.  So, I think the order, then,

1  actually both of your orders are pretty similar, so I think the

2  orders really get to the same point, which is, best interest

3  and feasibility should be addressed by all parties by November

4  2nd, and the issues that are clearly unique to Anderson, which

5  are defined here as discrimination, classification and good

6  faith, are to follow the supplemental schedule.  If Anderson

7  identifies another issue, you need to let Ms. Baer know that

8  immediately so we can add it to an order for the supplemental

9  briefing schedule.  But otherwise, I'm looking at briefs on

10  those five issues from Anderson.

11          MR. ROSENDORF:  Okay.  And I -- just to make to

12  clear, Your Honor, I think that there are other legal issues

13  that we may have raised in our brief, for instance, with

14  respect to release and exculpation clauses, but there was no

15  evidence presented by parties with respect to those and so,

16  it's not -- it is not a matter as to which any factual matter

17  was presented at the trial.

18          THE COURT:  Okay, but those issues have been raised

19  by other parties, too.

20          MR. ROSENDORF:  And that's the point of clarification

21  that we required, Your Honor.

22          THE COURT:  Oh, okay.  Then it's -- I see what you're

23  saying.

24          MS. BAER:  Your Honor, what -- I think this is the

25  heart of the issue.  Those issues should be briefed by November

**J&J COURT TRANSCRIBERS, INC.**

1    2nd.

2                THE COURT:  Correct.  They should be briefed by

3    November 2nd.  Because they're not related just to Anderson,

4    they are not peculiarly Anderson issues.  The discrimination,

5    classification and good faith issues are related specifically

6    to Anderson Memorial's claim and maybe that's the best way to

7    define it.  The rest are general plan objections and maybe

8    that's the better way to describe it, I think.

9                MR. PASQUALE:  Your Honor, if I may, Ken Pasquale for

10   the Committee. I'm a little confused by that comment, only in

11   the last part of this.  I had thought that if there was no

12   evidence, the Court didn't want that rebriefed.  That --

13               THE COURT:  I don't want rebriefs.

14               MR. PASQUALE:  Okay.

15               THE COURT:  No.  What I -- if you're going to make an

16   argument on those, you can point out to me where in the briefs

17   you've already raised them.  What I'm really looking for are

18   briefs in the nature of post-trial submissions of findings of

19   fact and conclusions of law and how they tie into the

20   objections that you've raised.  So, if it's pure legal argument

21   and you've already briefed it, I don't need a brief, but if you

22   haven't briefed it, and you want to brief it, it's due by

23   November 2nd.

24               MR. PASQUALE:  Thank you.

25               MR. ROSENDORF:  Okay.  That's really what we wanted

1 to understand, Your Honor.  Is that those arguments that were

2 legal arguments, that we had raised, which might be in common

3 with other parties, did not disappear and were not somehow

4 waived as a result of this briefing schedule.

5         THE COURT:  Oh, no.  I don't think anybody has waived

6 anything with respect to briefing these issues or submitting

7 proposed findings and conclusions, this is just a schedule to

8 try to get it done in a fashion that makes sense and so that at

9 some point, I have this mass -- some handle, I guess, on this

10 mass of evidence that's been submitted.

11         MR. ROSENDORF:  Okay.  Thank you.

12         THE COURT:  So, okay, then I don't know whose order

13 this is, that I'm looking at.  It's the one at 23520.

14         MS. BAER:  That's the debtors' order, Your Honor.

15         THE COURT:  Okay.  I think this one is okay.  I do

16 want -- I notice that Anderson took out the one sentence in

17 this order that indicated that the Court could not determine

18 different times even though the parties can't, but I am

19 reserving the right to determine different allocations of time,

20 if necessary.  I think I said that at the argument.  I hope

21 not to do it, but if something just absolutely unforeseen in

22 my mind, or if I end up asking a series of questions that

23 sidetrack people, I want the opportunity to have a full and

24 fair argument.  So, I am reserving the right to reallocate for

25 those reasons.  So --

**J&J COURT TRANSCRIBERS, INC.**

1        MS. BAER:  Your Honor, in fairness we added that at

2   the last minute and so I think when Anderson copied our order

3   and then changed it, they didn't have that sentence.  So,

4   that's -- I don't think they purposely wanted to take that away

5   from you.

6        THE COURT:  Okay. Oh, okay.  Well, I don't know the

7   sequence of events, so thank you that, for correcting that.

8   So, I will sign the debtors' order. I think this record then is

9   clear as to what's happening.  Mr. Rosendorf, is that okay with

10  you?

11       MR. ROSENDORF:  With that clarification, I think so,

12  Your Honor.  Thank you.

13       THE COURT:  All right.  Then I'm entering that order

14  and I'll have it docketed.

15       MS. BAER:  Thank you, Your Honor.

16       THE COURT:  Okay.  Anyone else have any plan issues

17  to address?  Confirmation process issues to address?

18                      (No audible response)

19       THE COURT:  All right, we're adjourned.  Thank you.

20       MS. BAER:  Thank you, Your Honor.

21

22                    *  *  *  *  *

23

24

25


                    **J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

We, PATRICIA REPKO & ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Patricia Repo
PATRICIA REPKO


/s/ Elaine Howell          Date:   October 28, 2009
ELAINE HOWELL
J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**