UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No.  01-1139 (JKF) |
| | . | |
| W.R. GRACE & CO., | . | |
| et al., | . | USX Tower – 54th Floor |
| | . | 600 Grant Street |
| | . | Pittsburgh, PA 15219 |
| Debtors. | . | |
| | . | October 13, 2009 |
| . . . . . . . . . . . . | . | 9:06 a.m. |

TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP |
| | By:  DAVID BERNICK, ESQ. |
| | JANET BAER, ESQ. |
| | LISA G. ESAYIAN, ESQ. |
| | ELLI LEIBENSTEIN, ESQ. |
| | 200 East Randolph Drive |
| | Chicago, IL  60601 |
| | |
| For the Asbestos | Caplin & Drysdale, Chartered |
| Creditors Committee: | By:  NATHAN FINCH, ESQ. |
| | PETER LOCKWOOD, ESQ. |
| | One Thomas Circle, NW |
| | Washington, D.C. 20005 |
| | |
| For the Future | Orrick, Herrington & Sutcliffe, LLP |
| Claimants | By:  ROGER FRANKEL, ESQ. |
| Representatives: | JONATHAN GUY, ESQ. |
| | RICHARD WYRON, ESQ. |
| | PERI MAHALEY, ESQ. |
| | Washington Harbour |
| | 3050 K Street, N.W. |
| | Washington, D.C.  20007 |
| | |
| Audio Operator: | Cathy Younker |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For W.R. Grace: | W.R. GRACE<br>By:  RICHARD FINKE<br><br>W.R. Grace<br>By:  MARK SHELNITZ, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW K. CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>    Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For OneBeacon Ins. Co.,<br>Geico, Seaton Ins. Co.,<br>& Republic Ins. Co.: | Drinker Biddle & Reath LLP<br>By:  MICHAEL F. BROWN, ESQ.<br>One Logan Square<br>18th and Cherry Streets<br>Philadelphia, PA  19103 |
| For State of Montana<br>Dept. of Environmental<br>Quality: | Womble Carlyle Sandridge & Rice<br>By:  KEVIN MANGAN, ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE 19801 |
| For the Libby Claimants: | Lewis, Slovak & Kovacich, P.C.<br>By:  MARK KOVACICH, ESQ.<br>725 Third Avenue North<br>Great Falls, MT 59401<br><br>McGarvey, Heberling, Sullivan and<br> McGarvey, P.C.<br>By:  JON HEBERLING, ESQ.<br>725 Third Avenue North<br>Great Falls, MT  59401<br><br>Cohn Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Arrowood:                Wilson, Elser, Moskowitz, Edelman,
                               & Dicker, LLP
                             By:  CARL J. PERNICONE, ESQ.
                             150 East 42nd Street
                             New York, NY 10017

For BNSF Railway:            Pepper Hamilton, LLP
                             By:  LINDA CASEY, ESQ.
                             3000 Two Logan Square
                             Philadelphia, PA  19103

For CNA:                     Goodwin Procter, LLP
                             By:  MICHAEL GIANNOTTO, ESQ.
                             Exchange Place
                             Boston, MA  02109-2881

For Maryland Casualty:       Connelly Bove Lodge & Hutz, LLP
                             By:  JEFFREY WISLER, ESQ.
                             The Nemours Building
                             1007 North Orange Street
                             Wilmington, DE  19899

For MCC & Zurich:            Eckert Seamans
                             By:  EDWARD D. LONGOSZ, ESQ.
                             1747 Pennsylvania Avenue, NW
                             Suite 1200
                             Washington, DC 20006

                             Wiley Rein, LLP
                             By:  RICHARD A. IFFT, ESQ.
                             1776 K Street NW
                             Washington, DC 20006

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser
& Gleser:                    By:  ELIZABETH DeCRISTOFARO, ESQ.
                             Wall Street Plaza
                             New York, NY  10005

For Kaneb Pipe Line          Fulbright & Jaworski
Operating Partnership,       By:  STEVE PEIRCE, ESQ.
LP:                          300 Convent Street, Suite 2200
                             San Antonio, TX 78205-3792

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (Cont'd.):

```
For AXA Belgium:          Tucker Arensberg, P.C.
                          By:  MICHAEL A. SHINER, ESQ.
                          1500 One PPG Place
                          Pittsburgh, PA  15222

For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. HURFORD, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701

For Kaneb Pipe Line       Gilbert & Renton, LLC
Operating Partnership,    By:  ROBERT GILBERT, ESQ.
LP:                       344 North Main Street
                          Andover, MA 01810

For Garlock Sealing       Robinson, Bradshaw & Hinson, P.A.
Technologies:             By:  RICHARD WORF, ESQ.
                          101 North Tryon Street
                          Suite 1900
                          Charlotte, NC  28246

For Sealed Air:           Skadden, Arps, Slate, Meagher & Flom,
                            LLP
                          By:  DAVID TURETSKY, ESQ.
                          One Rodney Square
                          Wilmington, DE  19801

For the Unsecured         Strook & Strook & Lavan
Creditors' Committee:     By:  ARLENE KRIEGER, ESQ.
                               KENNETH PASQUALE, ESQ.
                          180 Maiden Lane
                          New York, NY 10038

For Continental           Goodwin Procter, LLP
Casualty Co.:             By:  DANIEL GLOSBAND, ESQ.
                          Exchange Place
                          Boston, MA  02109-2881

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                                  ALAN RUNYAN, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Anderson Memorial        Kozyak, Tropin & Throckmorton, PA
Hospital:                    By:  JOHN W. KOZYAK, ESQ.
                                  DAVID ROSENDORF, ESQ.
                             2525 Ponce de Leon, 9th Floor
                             Miami, Florida 33134

For the Equity               Kramer Levin Naftalis & Frankel
Committee:                   By:  DAVID E. BLABEY, JR., ESQ.
                             919 Third Avenue
                             New York, NY  10022

For the Bank Lenders:        Landis, Rath & Cobb, LLP
                             By:  RICHARD COBB, ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899

For PD/FCR:                  Law Office of Alan B. Rich
                             By: ALAN B. RICH, ESQ.
                             1201 Main Street
                             Suite 1910, LB 201
                             Dallas, TX

                             ALEX SANDERS, ESQ.

TELEPHONIC APPEARANCES:

For the Debtors:             Kirkland & Ellis, LLP
                             By:  SAM BLATNICK, ESQ.
                                  BARBARA HARDING, ESQ.
                                  ANDREW R. RUNNING, ESQ.
                             200 East Randolph Drive
                             Chicago, IL  60601

For the Debtors:             Kirkland & Ellis, LLP
                             By:  KRISTINA ALEXANDER, ESQ.
                                  DEANNA BOLL, ESQ.
                                  CHRISTOPHER GRECO, ESQ.
                                  CLEMENT YEE, ESQ.
                             Citigroup Center, 153 East 53rd St.
                             New York, NY  10022


                    **J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By:  JAMES O'NEILL, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899-8705 |
| For the Debtors: | Onex Credit Partners<br>By:  LEWIS KRUGER, ESQ. |
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel<br>By:  PHILIP BENTLEY, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For National Casualty<br>Co.: | Dorsey & Whitney, LLP<br>By:  JOSE L. HERNANDEZ, ESQ.<br>250 Park Avenue<br>New York, NY  10177-1500 |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street,  Suite 2200<br>Dallas, TX  75201 |
| For Morgan Stanley<br>Senior Funding, Inc.: | Katten Muchin Roseenman, LLP<br>By:  JEFF FRIEDMAN, ESQ.<br>     MERRITT PARDINI, ESQ.<br>575 Madison Avenue<br>New York, NY  10022-2585 |
| For Fireman's Fund<br>Insurance Co.: | Crowell & Moring LLP<br>By:  LESLIE A. DAVIS, ESQ.<br>     MARK PLEVIN, ESQ.<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC  20004 |
| For Serengeti: | Vinson & Elkins, LLP<br>By:  ARI BERMAN, ESQ.<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX  75201 |
| For Scott Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |

TELEPHONIC APPEARANCES (Cont'd.):

For Official Committee       Dies & Hile, LLP
of Asbestos Property         By:  MARTIN DIES, ESQ.
Damage Claimants:            1601 Rio Grande, Suite 330
                             Austin, TX  78701

                             LECG
                             By:  ELIZABETH DEVINE, ESQ.
                             1725 Eye Street NW, Ste 800
                             Washington, DC,  20006

For the Property             Bilzin Sumberg Baena Price &
Damage Committee:               Axelrod LLP
                             By:  SCOTT BAENA, ESQ.
                                  JAY SAKALO, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For the Bank Lenders:        Paul Weiss Rifkind Wharton &
                                Garrison, LLP
                             By:  MARGARET PHILLIPS, ESQ.
                                  REBECCA ZUBATY, ESQ.
                                  ANDREW N. ROSENBERG, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019

For Asbestos Property        Scott Law Group
Damage Claimants:            By:  DARRELL SCOTT, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864

For National Union Fire      Zeichner Ellman & Krause, LLP
Insurance Co.:               By:  ROBERT GUTTMANN, ESQ.
                             575 Lexington Avenue
                             New York, NY  10022

For the Future              Orrick, Herrington & Sutcliffe,
Claimants                       LLP
Representatives:             By:  DEBRA FELDER, ESQ.
                                  KATE ORR, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For Federal Insurance        Cozen O'Connor
Company:                     By:  ILAN ROSENBERG, ESQ.
                             1900 Market Street
                             Philadelphia, PA  19103

For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                             New York, NY  10020-1186

For David T. Austern,        Phillips, Goldman & Spence, P.A.
the Future Claimants'        By:  JOHN C. PHILLIPS, ESQ.
Representative:              1200 North Broom Street
                             Wilmington, DE  19806

For the Asbestos             Ferry Joseph & Pearce, P.A.
Creditors Committee:         By:  THEODORE TACCONELLI, ESQ.
                             824 Market Street, Suite 19899
                             Wilmington, DE  19899

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser
& Gleser:                    By:  SHAYNE SPENCER, ESQ.
                             Wall Street Plaza
                             New York, NY  10005

For Official Committee       Duane Morris, LLP
of Unsecured Creditors:      By:  MICHAEL LASTOWSKI, ESQ.
                             1100 North Market Street, Suite 1200
                             Wilmington, DE  19801-1246

For Official Committee       Brandi Law Firm
of Asbestos Property         By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                 ESQ.TERENCE D. EDWARDS, ESQ.
                             44 Montgomery St., Suite 1050
                             San Francisco, CA  94104

                             Lieff, Cabraser, Heimann & Bernstein
                             By:  ELIZABETH J. CABRASER, ESQ.
                             Embarcadero Center West
                             275 Battery Street, Suite 3000
                             San Francisco, CA  94111

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For the Libby Claimants: Cohn, Whitesell & Goldberg, LLP
                         By:  CHRISTOPHER M. CANDON, ESQ.
                         101 Arch Street
                         Boston, MA  02110

For the Libby Claimants: Landis, Rath & Cobb, LLP
                         By:  KERRI K. MUMFORD, ESQ.
                              JAMES S. GREEN, JR., ESQ.
                         919 Market Street, Suite 1800
                         Wilmington, DE  19899

For the PD Committee:    Speights & Runyan
                         By:  MARION FAIREY, ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924

For Everest Reinsurance  Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:         By:  BRIAN L. KASPRZAK, ESQ.
                              JOHN D. MATTEY, ESQ.
                         913 North Market Street
                         Suite 800
                         Wilmington, DE  19801

For the U.S. Trustee:    Office of the U.S. Trustee
                         By:  DAVID KLAUDER, ESQ.
                         844 King Street, Suite 2313
                         Wilmington, DE  19801

For Arrowwood            Bifferato Gentilotti LLC
Indemnity Co.:           By:  GARVAN McDANIEL, ESQ.
                         800 North King Street
                         Wilmington, DE  19801

For Official Committee   Richardson Patrick Westbrook &
of Asbestos Property        Brickman, P.C.
Claimants:               By:  EDWARD J. WESTBROOK, ESQ.
                         174 East Bay Street
                         Charleston, SC  29401

For Hartford Financial   Wilmer Wilmer Cutler Pickering Hale &
Service Group:              Dorr, LLP
                         By:  MELANIE R. DRITZ, ESQ.
                         399 Park Avenue
                         New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For Asbestos Property          Pryor Cashman, LLP
Damage Claimants:              By:  RICHARD LEVY, ESQ.
                               410 Park Avenue
                               New York, NY  10022

For David T. Austern,          Lincoln International, LLC
Future Claimants'              By:  JOSEPH RADECKI
Representative:

For Travelers:                 Simpson Thacher
                               By:  ELISA ALCABES, ESQ.
                                    MARY BETH FORSHAW, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017

                               Morris Nichols Arsht & Tunnell, LLP
                               By:  ANN C. CORDO, ESQ.
                                    ERIN FAY, ESQ.
                               1201 N. Market Street
                               PO Box 1347
                               Wilmington, DE 19899-1347

For State of Montana           Womble Carlyle Sandridge & Rice
Dept. of Environmental         By:  FRANCIS MONACO, ESQ.
Quality:                       222 Delaware Avenue, Suite 1501
                               Wilmington, DE 19801

For Garlock Sealing            Robinson, Bradshaw & Hinson, P.A.
Technologies:                  By:  GARLAND CASSADA, ESQ.
                               101 North Tryon Street
                               Suite 1900
                               Charlotte, NC  28246

                               Morris, James, Hitchens & Williams,LLP
                               By:  BRETT D. FALLON, ESQ.
                               PNC Bank Center
                               222 Delaware Avenue
                               10th Floor
                               P.O. Box 2306
                               Wilmington, DE  19899

For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For National Union Fire      Zeichner Ellman & Krause, LLP
Insurance Co.:               By:  MICHAEL DAVIS, ESQ.
                             575 Lexington Avenue
                             New York, NY  10022

For Deborah Pace:            DebtWire
                             By:  DEBORAH PACE

For the State of             Hahn & Hessen
California:                  By:  ALISON SCHRAG, ESQ.
                             488 Madison Avenue
                             New York, NY  10022

For Party Siegel:            Traub, Lieberman, Straus & Shrewsberry
                             By:  ROBERT SIEGEL, ESQ.
                             Seven Skyline Drive
                             Hawthorne, NY 10532

**I N D E X**

| **WITNESSES:** | **PAGE** |
|---|---|
| PAMELA ZILLY | |
| Direct Examination by Mr. Bernick | 21 |
| Cross Examination by Mr. Finch | 81 |
| Cross Examination by Mr. Kovacich | 89 |
| Cross Examination by Mr. Brown | 136 |
| Cross Examination by Mr. Cobb | 136 |
| Cross Examination by Mr. Mangan | 152 |
| Cross Examination by Mr. Rosendorf | 158 |
| Redirect Examination by Mr. Bernick | |
| | |
| RICHARD C. FINKE | |
| Direct Examination by Mr. Bernick | 183 |
| | |
| DR. DENISE MARTIN | |
| Direct Examination by Mr. Bernick | 217 |
| Cross Examination by Mr. Brown | 226 |

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| PP-511-10 Demonstrative | -- | 21 |
| PP-511-11 Demonstrative | -- | 23 |
| PP-511-12 Demonstrative | -- | 24 |
| PP-511-21 Demonstrative | -- | 55 |
| PP-511-21A Demonstrative | -- | 57 |
| PP-511-21B Demonstrative | -- | 62 |
| PP-511-23 Demonstrative | -- | 64 |
| PP-511-15 Demonstrative | -- | 65 |
| PP-511-16 Demonstrative | -- | 65 |
| PP-511-17 Demonstrative | -- | 68 |
| PP-511-18 Demonstrative | -- | 70 |
| PP-511-19 Demonstrative | -- | 72 |
| PP-511-20 Demonstrative | -- | 73 |
| PP-511-22 Demonstrative | -- | 78 |
| PP-518-1 Demonstrative | -- | 201 |
| PP-381 Proffer of Mr. Finke | 216 | 227 |

1           THE CLERK:  All rise.

2           THE COURT:  Good morning, everyone.  Please be

3    seated.  This is the matter of W.R. Grace, 01-1139, the

4    continuation of the plan confirmation hearing in Phase 2.  I

5    have a list of participants by phone.  Elisa Alcabes, Kristina

6    Alexander, Scott Baena, Janet Baer -- my other glasses broke

7    over the weekend, and these don't focus very well, so I'm sorry

8    if I'm making mistakes.  It's because I can't see very well.

9           Philip Bentley, Ari Berman, David Bernick, David Bla

10   -- oh, I can't see them at all.  I'll try it this way.  David

11   Blabey, Sam Blatnick, Deanna Boll, Thomas Brandi, Elizabeth

12   Cabraser, Christopher Candon, Garland Cassada, Richard Cobb,

13   Tiffany Cobb, Jacob Cohn, Ann Cordo, Andrew Craig, Leslie

14   Davis, Michael Davis, Elizabeth DeCristofaro, Elizabeth Devine,

15   Martin Dies, Melanie Dritz, Terrence Edwards, Lisa Esayian,

16   Marion Fairey, Brett Fallon, Erin Fay, Debra Felder, Mary Beth

17   Forshaw, Theodore Freedman, Robert Frezza, Jeff Friedman,

18   Robert Gilbert, Christopher Greco, James Green, Robert

19   Guttmann, Barbara Harding, Jose Hernandez, Robert Horkovich,

20   Brian Kasprzak, David Klauder, Stuart Kovensky, Matthew Kramer,

21   Lewis Kruger, Michael Lastowski, Elli Leibenstein, Richard

22   Levy, John Mattey, Garvan McDaniel, Francis Monaco, Kerri

23   Mumford, James O'Neill, Kate Orr, Deborah Pace, Merritt

24   Pardini, David Parsons, Margaret Phillips, John Phillips, Mark

25   Plevin, Joseph Radecki, Andrew Rosenberg, Ilan Rosenberg,

1  Andrew Running, Alan Runyan, Jay Sakalo, Alison Schrag, Darrell

2  Scott, Robert Siegel, Daniel Speights, Shayne Spencer, Theodore

3  Tacconelli, Edward Westbrook, Clement Yee, Rebecca Zubaty,

4  Philip Bentley, David Blabey, and that's all.  I'll take

5  entries in court, please.  Good morning.

6          MR. BERNICK:  Good morning, David Bernick for Grace.

7  I hope and assume it wasn't reading all these papers that

8  destroyed your glasses.

9          THE COURT:  No, actually, I had a run in with a tree

10 limb that fell out of a tree as I happened to be going under

11 it, and it -- thank goodness I had my glasses on.  It probably

12 saved my eye.  But, as you can see, my nose, that already was

13 rather prominent, is a little bigger today, but that's life.

14 So okay.  Good morning.

15         MR. BERNICK:  Good morning.

16         MR. FINCH:  Good morning, Your Honor.  Nathan Finch

17 for the ACC.

18         MR. LOCKWOOD:  Good morning, Your Honor.  Peter

19 Lockwood for the ACC.

20         MR. GUY:  Good morning, Your Honor.  Jonathan Guy and

21 Roger Frankel for the Asbestos PI FCR.

22         MR. HURFORD:  Thank you.  Good morning, Your Honor.

23 Mark Hurford, Campbell & Levine, for the ACC.

24         THE COURT:  Good morning.

25         MR. KOVACICH:  Good morning, Mark Kovacich for the

**J&J COURT TRANSCRIBERS, INC.**

1 Libby Claimants.

2         MR. KOZYAK:  John Kozyak on behalf of Anderson

3 Memorial with David Rosendorf.

4         MR. RUNYON:  Alan Runyan on behalf of Anderson

5 Memorial.

6         MR. SPEIGHTS:  Dan Speights on behalf of Anderson

7 Memorial.

8         THE CLERK:  Gentlemen, please make sure you hit the

9 green button on the microphone when you speak.

10         THE COURT:  Even when it's -- even when the

11 microphone is green, it's not necessarily on.  It's always

12 green.  It should be bright green to be turned on.  Good

13 morning.

14         MR. PERNICONE:  Good morning, Your Honor.  Carl

15 Pernicone for Arrowwood.

16         THE COURT:  Good morning.

17         MR. BROWN:  Good morning, Your Honor.  Michael Brown

18 on behalf of One Beacon American Insurance Company, Seton

19 Insurance Company, Geico, and Republic Insurance Company.

20         MR. GIANNOTTO:  Good morning, Your Honor.  Michael

21 Giannotto on behalf of Continental Casualty and the other CNA

22 companies.

23         THE COURT:  Good morning.

24         MR. PASQUALE:  Good morning, Your Honor.  Ken

25 Pasquale, and with me is Arlene Krieger from Stroock for the

1  Unsecured Creditors' Committee.

2           MR. COBB:  Good morning, Your Honor.  Richard Cobb on

3  behalf of the bank lender group.

4           MS. DeCRISTOFARO:  Good morning, Your Honor.

5  Elizabeth DeCristofaro for Continental Casualty Company and

6  related companies.

7           MR. PEIRCE:  Good morning, Your Honor.  Steve Peirce,

8  Fulbright & Jaworski, for Kaneb Operating -- Pipeline

9  Operating.

10          MR. GILBERT:  Good morning, Your Honor.  Robert

11  Gilbert, Gilbert & Renton, for Kaneb and Support Terminal

12  Services.

13          MR. WORF:  Good morning, Your Honor.  Richard Worf

14  for Garlock Sealing Technologies.

15          MR. MANGAN:  Your Honor, Kevin Mangan, Womble Carlyle

16  Sandridge & Rice, for the State of Montana.

17          MR. TURETSKY:  Good morning, Your Honor.  David

18  Turetsky of Skadden Arps for Sealed Air Corporation.

19          MR. GLOSBAND:  Good morning, Dan Glosband for CNA

20  Insurance.

21          THE COURT:  Good morning.

22          MR. COHN:  Good morning, Your Honor.  Dan Cohn for

23  the Libby claimants.

24          MS. CASEY:  Good morning, Your Honor.  Linda Casey of

25  Pepper Hamilton for BNSF Railway Company.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Good morning.

2            MR. CRAIG:  Good morning.  Andrew Craig for Allstate

3 Insurance Company.

4            MR. LONGOSZ:  Good morning, Your Honor.  Edward

5 Longosz for Maryland Casualty and Zurich.

6            MR. IFFT:  Good morning, Your Honor.  Richard Ifft

7 for Maryland Casualty Company and Zurich companies.

8            MR. WISLER:  Good morning, Your Honor.  Jeffrey

9 Wisler for Maryland Casualty and Zurich.

10            MR. BERNICK:  Good morning, Your Honor.

11            THE COURT:  Good morning.

12            MR. BERNICK:  I think that basically to give the

13 Court an overview of where we are and where we're going, I'd

14 like to obviously call Ms. Zilly back to the stand to complete

15 her testimony.  After that we'd be calling Richard Finke to

16 talk about good faith in connection with the property damage

17 claims.  And then Denise Martin, who is going to talk about the

18 prospect of there being additional PD demands in the future,

19 and that will conclude our live testimonial evidence.  I --

20 there are probably -- well, I could say that that will be our

21 case.

22            THE CLERK:  Could you adjust your microphone --

23            MR. BERNICK:  Sure.

24            THE CLERK:  -- because I'm not picking it up.  It

25 shouldn't --

1          MR. BERNICK:  But I want to make sure that we have

2    the opportunity to cover also the state of the deposition

3    designations and the state of the exhibits and also for people

4    to fill in whatever blanks they want to as part of the plan

5    proponents' case.  I expect then that there's going to be some

6    testimony that will be proffered by Anderson Memorial.  I think

7    that they have Mr. Solomons, who is prepared to testify.  We're

8    not aware of any other live witnesses, who, however are planned

9    to be called in response to the status of the case, and,

10   therefore, we can then turn to the question of the resting, and

11   I don't mean to invite a lot of discussion about all this.

12          I just think we think we've have a limited number of

13   live witnesses.  We'll then take up whatever matters are

14   associated with closing the evidence.  Whoever wants to talk

15   and whatever they want to say at that point, I suppose we can

16   deal with all of that.  Then I think we're going to have a

17   brief status report, I believe, regarding where we are in the

18   process of trying to reach resolution on the outstanding

19   issues.

20          THE CLERK:  Mr. Bernick, you mic's not on.

21          MR. BERNICK:  It says on.  It says on.  Is this

22   better?  And then last of all, we would take up the motions in

23   limine, and we have a full agenda set for the motions in limine

24   and other matters that are set forth on the agenda.  I don't

25   think -- don't know that we'll get to that today at all, but

1  that would be last of all.

2          So the priority is to finish the live evidence, then

3  finish any other evidence that has to be taken up in connection

4  with this phase, brief report on resolutions followed by the

5  motions in limine.  I believe that's where we are.  And with

6  the Court's permission, therefore, we would resume the

7  examination of Ms. Zilly.

8          THE COURT:  For scheduling purposes, I scheduled a

9  hearing.  It should not take very long today -- in Armstrong --

10 at 12:30 by phone.  So we will take a lunch recess today at

11 12:30, so that I can deal with the Armstrong issue while you

12 folks have a lunch recess.  Does anybody have anytyhing else to

13 go over before the debtor -- the plan proponents recall Ms.

14 Zilly?

15                    (No verbal response)

16         THE COURT:  All right, Mr. Bernick, you can -- may

17 proceed.  Thank you.

18         MR. BERNICK:  Is our microphone really that bad

19 still?

20         THE COURT:  It's fading in and out, Mr. Bernick.

21         MR. BERNICK:  Well, let's try this one.

22         THE COURT:  Ms. Zilly, you're still under oath --

23         MS. ZILLY:  Yes.

24         THE COURT:  -- from the last --

25         MS. ZILLY:  I believe so.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  -- proceeding when you were here.  Yes.

2          PAMELA ZILLY, PLAN PROPONENTS' WITNESS, PREVIOUSLY SWORN

3                            (Pause)

4          MR. BERNICK:  Your Honor, we handed up to the Court

5    two notebooks.  These contain the demonstratives and other

6    materials relating to the continuation of Ms. Zilly's

7    testimony.  We handed up to the Court a notebook, I believe,

8    for Ms. Zilly before.  I don't believe any of those exhibits

9    actually were tendered for use, because we had the issue about

10   the demonstratives.  These are slightly revised, so they really

11   take priority at this point in time.  We furnished copies also

12   to the counsel that we're aware are going to be cross examining

13   Ms. Zilly and also to Ms. Zilly herself.

14          So to the extent that you have -- you got notebooks

15   last time from Ms. Zilly, these are the current versions of the

16   slides with the right slide numbers --

17          THE COURT:  All right.

18          MR. BERNICK:  -- and exhibit numbers.  Yes, and I

19   think that probably the first order of business in connection

20   with Ms. Zilly is to kind of bring ourselves up to -- I guess

21   I'll avoid doing that, because of the feedback -- up to where

22   we were when we last broke off and also bring ourselves up to

23   the current status insofar as the slides are concerned.

24          THE COURT:  Cathy, do you have the machine on?

25                            (Pause)

**J&J COURT TRANSCRIBERS, INC.**

1                    DIRECT EXAMINATION

2  BY MR. BERNICK:

3  Q    Your Honor, last time Ms. Zilly testified at Pages 126 and

4  127 of the trial transcript regarding the estimated value of

5  Grace, both from the Chapter 7 liquidation context and the

6  context of the plan, and I would show the witness -- have the

7  witness turn to Exhibit 511-10 in the notebook for past

8  interest, which also is in your notebook, and ask Ms. Zilly

9  whether this slide reflects the substance of the testimony that

10 she offered on that subject last time.

11 A    Yes, it does.

12        MR. BERNICK:  Your Honor, we'd offer for

13 demonstrative purposes plan proponents' Exhibit 511-10.

14        THE COURT:  It's admitted for that purpose.

15        MR. BERNICK:  Thank you.

16 Q    A couple followup questions, Ms. Zilly.  Chapter 7

17 liquidation you've told us that you put down an estimated value

18 of Grace as an enterprise between basically a billion 50 and a

19 billion 250, and in the context of a plan full value or 2.1 to

20 2.5 billion.  Do you recall that and see that on the slide?

21 A    Yes.

22 Q    I want to cover one particular aspect of this before we go

23 on to the next slide.  This slide indicates -- and I think it

24 reflects your testimony -- that when it comes to the Chapter 7

25 liquidation, you assumed a 50 percent valuation for the Grace

**J&J COURT TRANSCRIBERS, INC.**

1 business, and you provided some of the reasons for that.  Would

2 that be fair?

3 A    A 50 percent discount, yes.

4 Q    Now, at 50 percent is that -- I guess really what I want

5 to ask is is it clear that it would be possible to sell Grace

6 at all in the context of a Chapter 7 liquidation?

7 A    No, it's not clear.  In fact, the 50 percent discount is

8 really meant to reflect the probability, if you will, that

9 either the company could be sold at full value or not sold at

10 all.  And so 50 percent off of the full value price would give

11 you the lower numbers.

12       As a practical matter, there hasn't been a company in

13 a Chapter 11 with asbestos liability that's been sold at all,

14 as far as I can recall, for the last 50 years.  And

15 notwithstanding 363 sales and theories of successor

16 liabilities, I think it would take a very brave soul to offer a

17 billion dollars for Grace given the possibility of over 300,000

18 personal injury claims.

19 Q    Thank you.  At Pages 129 through 132 of your testimony

20 last time, you talked about the value of Sealed -- the Sealed

21 Air and Fresenius settlements in the context of the Chapter 7

22 liquidation in the context of a plan.  Directing your attention

23 to Exhibits 5 -- Exhibit -- Plan Proponents' Exhibit 511-11,

24 does that set forth in summary form the substance of your

25 testimony on that subject?

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Direct/Bernick                                    23

1  A     Yes, it does.

2            MR. BERNICK:  We offer that for demonstrative

3  purposes.

4            MR. KOVACICH:  Libby Claimants object for the same

5  reasons we object to this testimony when it was offered

6  previously.  The witnesses opinions about the likelihood of

7  payment from Sealed Air and Fresenius under a Chapter 7

8  liquidation lack foundation and are speculative.

9            MR. BROWN:  Your Honor, we join in that objection.

10           MR. BERNICK:  Those objections were all dealt with in

11 connection with the prior testimony.  All we're doing -- and

12 we'll talk in a minute about the demonstratives generally,

13 because I want to take that issue up.  But all that we're doing

14 is offering this demonstrative as a demonstrative relating to

15 the testimony that she's already given.

16           THE COURT:  Yes, it's admitted as a summary of her

17 testimony for demonstrative purposes only, and that is the

18 limit of why 511-11 is admitted.

19           MR. BERNICK:  I don't have any further followup

20 questions on this, Your Honor.  I'd like to go then on to the

21 next slide and in the interest of advancing the testimony.

22 Q     You also offered testimony, Ms. Zilly, concerning the

23 total value of assets.  That is considering both the value of

24 Grace and the value of the Sealed Air and Fresenius -- and

25 Sealed Air and Fresenius settlements as well as certain other

1 matters, cash, insurance, and the like.  You offered testimony

2 on that subject at Pages 135 and 136, and I want to show you

3 Exhibit 511-12 and ask you whether this covers the substance of

4 the testimony that you offered on that subject for

5 demonstrative purposes.

6 A    Yes, it does.

7            MR. BERNICK:  We offer it.

8            MR. KOVACICH:  And only for the record, Your Honor,

9 we assert the same objection.

10            THE COURT:  Mr. Brown, you're joining?

11            MR. BROWN:  Yes.

12            THE COURT:  Yes.  Okay.  The same ruling.  One

13 second, please.  Exhibit 511-12 is admitted for demonstrative

14 purposes only.

15            MR. BERNICK:   Thank you.

16 Q    Now, Ms. Zilly, you told us towards the end of your

17 testimony last time that when you total up the estimated value

18 of Grace, the Sealed Air and Fresenius payments, cash,

19 insurance, and you said then subtracted out certain costs, that

20 under the Chapter 7 liquidation you produced a range of 2.2 to

21 3.3 billion and then a high value of Grace excluding the Sealed

22 Air and Fresenius payments of 2.4 billion.  And then on the

23 plan side the all in numbers were 4.2 to 4.6 billion.  Do you

24 recall your testimony there?

25 A    Yes.

1  Q     I now want to turn from the asset side or the value of

2  assets side to the liability side and catch us up there as

3  well.  You testified at Pages 141 to 146 --

4          MR. BERNICK:  And Your Honor will recall that all of

5  Ms. Zilly's testimony so far has been literally by memory,

6  without referring to anything in all these different contexts.

7  Q     You testified, first of all, to the liquidation --

8  expected liquidation numbers for asbestos personal injury

9  liabilities, and on an NPV basis, net present value basis,

10 through 2009 -- that is all of the PI claims through 2009 on an

11 NPV basis you provided a number for that liability of 4.5 to

12 5.7, and that was -- this is at Page 144, Line 13 from the

13 unofficial transcript.

14          You said, "In a Chapter 7 I've used a liability that

15 represents a current -- an estimate of current claimants

16 ranging from 4.5 to 5.7, which was based upon, assuming the

17 same ratio of currents to total as Dr. Peterson assumed in his

18 reports, as well as testimony with respect to his 2.8 billion,

19 which was current -- and currents NPV to 2001 over his total

20 NPV number to 2001 of 5.4 billion."  Do you recall that?

21 A     Yes.

22 Q     And I want to show you now with respect to Dr. Peterson's

23 actual testimony on Day 6 of the confirmation trial, Pages 1971

24 to 1972, and at that point were you present during Dr.

25 Peterson's testimony?

1  A    No, I've reviewed it though.

2  Q    You've reviewed it.  At that point I asked Dr. Peterson

3  the question --

4  "Q   What would be the NPV?  Does the NPV now for the pre-2010

5  claims, so the NPV for that, bear roughly the same relationship

6  as the NPV for the all."

7          MR. BERNICK:  There's then a fairly extended

8  colloquy, and we then get an answer from Dr. Peterson at Page

9  17 -- 1972, Line 6.

10 "Q   What is the answer?

11 "A   Well, the $10 billion would be about $5.2 billion --"

12 referring to NPV "-- and the 9 billion --" which is the overall

13 NPV -- overall nominal for 2010 claims "-- and the 9 billion

14 would be about 4.7 billion.  I could put caveats on it, but we

15 may not want to go there."

16 Q    Does that refresh your recollection as to the range of NPV

17 values that Dr. Peterson assigned to the liability -- projected

18 liability at Chapter 7 as of 2010?

19 A    Yes, it does.  The numbers I meant to refer to was the 4.7

20 billion to the 5.2 billion.

21 Q    Okay.  Now also last time you testified to the liquidation

22 liability -- Chapter 7 liquidation liability for the non-ZAI PD

23 claims, the traditional PD claims, and you provided testimony

24 along those lines where you used the fact of the 85/15 split

25 that had been agreed to previously by the PI and PD

**J&J COURT TRANSCRIBERS, INC.**

                         Zilly - Direct/Bernick                    27

1  constituencies and applying that math to the PD claims.  You

2  ended up with a number of about a billion dollars.  This is

3  Page 149 of the trial transcript.  The answer is at Lines 11

4  through 21.  Do you recall that?

5  A    Yes.

6        MR. KOVACICH:  Objection.  Your Honor actually

7  sustained an objection to that testimony on the basis that the

8  85/15 agreement between the PI constituency and the property

9  damage constituency some time ago was not an adequate

10 foundation for this witness to provide that testimony.

11       MR. BERNICK:  I don't believe that's correct.  The

12 testimony is right out there at Page 149 of the transcript.

13       MR. KOVACICH:  It's at Page 151.  The Court's ruling

14 is -- starts at Line 19.  There were multiple objections

15 throughout the time that testimony was taken leading up to the

16 -- this discussion at the end.

17       My objection, "Her testimony about the 85/15 split is

18 not a sufficient foundation for the witness to speculate about

19 how liabilities would be divided in a Chapter 7 liquidation,"

20 and the Court agreed and sustained the objection.

21       MR. BERNICK:  Well, let's -- then I -- first of all,

22 the testimony is in on the impact of the 85/15 split, and that

23 is the basis for the witness' testimony, and that testimony is

24 in the record.

25       With respect to what this witness can say about

                    **J&J COURT TRANSCRIBERS, INC.**

Zilly - Direct/Bernick                    28

1  whether the 85/15 would apply in a Chapter 7, that was

2  sustained, and I'm prepared to go back over that right now.

3  But the fact of the matter is that the 85/15 yields the number

4  of $1 billion.  There was absolutely no objection to that

5  question when asked.  It's now in the record.  It's part of the

6  basis of the witness' testimony.  If he wants to pursue cross

7  examination on whether it's relevant or not, he can, but I

8  will, in fact, lay the foundation a little bit further at this

9  point.

10 Q    In the context of a Chapter 7 -- I believe you've already

11 testified that in the context of a Chapter 7, given what's

12 already indicated on Slide 511-10, that there be a need to

13 liquidate quickly in a Chapter 7 context.

14          MR. KOVACICH:  Objection.  Leading.

15          MR. BERNICK:  This is totally foundational.

16          THE COURT:  It's foundational.  Overruled.

17 Q    Do you recall that testimony?

18 A    Yes, I do.

19 Q    What bearing, if any, does that have on your decision to

20 use what previously was in the allocation agreement between the

21 PD and PI constituencies?

22 A    The Chapter 7 analysis is by definition a hypothetical

23 analysis.  In the Chapter 11 there were settlements reached

24 after extensive litigation with respect to property damage

25 claims as well as personal injury claims.  You cannot assume

**J&J COURT TRANSCRIBERS, INC.**

1 the same settlements and the same benefits of those settlements

2 as a result of that litigation would apply in the Chapter 7.

3        Therefore, you have to look elsewhere and take into

4 account what, in fact, circumstances would apply in a Chapter

5 7.  In the Chapter 7 the Trustee wold not have the resources

6 that were available to this debtor in the Chapter 11 to

7 litigate extensively at a fair amount of cost, particularly

8 property damage claims.

9        And with respect to having the time pressures, again,

10 as everyone obviously knows, this case has gone on for seven

11 years.  A fair amount of that time was used to litigate claims

12 including property damage claims.  In a Chapter 7 what the

13 Trustees need to -- and fiduciary resposibilities to exepdite

14 the liquidation of the company and to pay creditors, it would

15 strike me that it's highly unlikely that they're going to have

16 the time or the resources to litigate property damage claims

17 and given that, the 85 percent/15 percent split that was an

18 agreed upon split between personal injury claimants and

19 property damage claimants that was reached in the context of no

20 litigation, that was something that each party would agree to,

21 seemed to me to be a reasonable estimate as with respect to

22 what, in fact, the liabilities could be in a Chapter 7 with

23 respect to property damage claims.

24 Q    Thank you.  I want to go on to talk about now -- I want to

25 show you Exhibits -- Exhibit 511-21.  Now this is another

**J&J COURT TRANSCRIBERS, INC.**

1  demonstrative.  I want to ask you, Ms. Zilly, in connection

2  with this demonstrative, are you familiar with this

3  demonstrative?

4  A    Yes.

5  Q    Okay.  Tell us whether during the course of your work as

6  an expert in this case what input you had into this

7  demonstrative.

8  A    There's nothing on the screen, but 511-21, is that the one

9  you're referring to?

10  Q    511-21, right.

11  A    Yes.

12  Q    I'm not showing it yet.

13  A    Oh, sorry.  Well, I basically in reviewing --

14        MR. KOVACICH:  You can show it to everyone else.  The

15  issue would be the witness seeing it.

16        THE WTNESS:    Well, I actually have it.  Thank you.

17        MR. BERNICK:  Well, she can't be asked a question

18  about it, unless she sees it.

19        MR. KOVACICH:  Well --

20  A    The personal injury liabilities, we've already discussed

21  in terms of where that number came from.

22        MR. BERNICK:  Wait.  I'm going to want to object in a

23  second -- just a very general question.

24  Q    Looking over it, tell us what, if any, input you had into

25  the content of the slide.

**J&J COURT TRANSCRIBERS, INC.**

1  A    A lot on each line item.

2  Q    Thank you.  And would using the slide aid you in telling

3  the Court your opinions with regard to the payouts that would

4  be expected, in your view, under the plan, on the one hand, and

5  Chapter 7 on the other?

6  A    Yes, it would.

7          MR. BERNICK:  Okay.  We offer it for demonstrative

8  purposes, Your Honor, for that purpose.

9          MR. KOVACICH:  And I object, Your Honor.  It includes

10 the unsubstantiated opinion that the non-ZAI property damage

11 liability in a Chapter 7 liquidation would be $1 billion.

12 There is no foundation for the opinion.  It's speculative.  And

13 as was discussed during the hearing previously, it was also not

14 disclosed as part of Ms. Zilly's report -- either of her

15 reports.

16         MR. ROSENDORF:  Your Honor, David Rosendorf on behalf

17 of Anderson Memorial Hospital.  We join in that objection as

18 well.

19         MR. BERNICK:  Your Honor, I would note, first of all,

20 that we've now had two separate questions.  The first question

21 was put -- regarding the billion dollars was put to the witness

22 and was answered without objection at Page 149 of the last

23 trial transcript.

24         I then in response to the concern that was raised

25 about foundation for the 85/15, I asked Ms. Zilly to provide

**J&J COURT TRANSCRIBERS, INC.**

1 that foundation.  There was no objection to the question that

2 asked her to provide that foundation, and she provided that

3 foundation.

4        So if there's been an objection, it's been waived,

5 because it wasn't posed, and the witness has now answered

6 factually and with respect to her opinion as well both of those

7 questions.  The answers are now both in the record, and there

8 hasn't been an objection.

9        Moreover, this all goes to the weight of the cross

10 examination.  For that reason, it is clear that the -- there is

11 a basis in the record for the number that's in the

12 demonstrative.  And that's all we're talking about, is offering

13 the demonstrative up for demonstrative purposes.

14        THE COURT:  Well, it goes to the weight of her

15 testimony not to the weight of cross examination.  Mr.

16 Kovacich.

17        MR. KOVACICH:  If I could respond, first of all, the

18 question on Page 149 is what use she made of the 85/15 split.

19 She went on to go -- provide an answer that was non-responsive

20 to that question, including the opinion that the non-ZAI

21 property damage liability would be a billion dollars.  There

22 were multiple objections throughout Ms. Zilly's testimony on

23 these matters.  Just a couple of questions later I objected.

24 That the opinion lacked foundation.  That objection was

25 sustained.

1          Mr. Bernick did ask Ms. Zilly here this morning to

2    explain her foundation, how she uses the 85/15 split to arrive

3    at the 1 billion figure.  I didn't object to her attempting to

4    explain how she did that.  The problem is her explanation is

5    completely inadequate.  It does not provide a valid, competent

6    basis for her to opine that in a Chapter 7 liquidation, the

7    non-ZAI liability would be $1 billion.

8          THE COURT:  I've actually never heard a witness

9    before, even as an expert, use an assertion that an agreement

10   executed during or -- reached during the Chapter 11 process

11   sets the value for what would happen in a Chapter 7 liquidation

12   proceeding.  I don't think that's a competent methodology by

13   which you calculate asbestos liabilities in Chapter 7.  I don't

14   see a foundation for this question.  The objection's sustained.

15         MR. BERNICK:  Well, let me -- I'll try again.  Your

16   Honor, I really think that the key thing that is -- that -- in

17   a Chapter 7 context, obviously, the witness has provided what I

18   think is absolutely standard fare for what the dynamics and

19   process would be in a Chapter 7.  So if that is, in fact,

20   accurate, and there's not going to be claim-by-claim

21   resolution, then the Trustee is facing the prospect of trying

22   to figure out how to allocate the resources available in

23   Chapter 7, the competing constituencies.  And the competing

24   constituencies don't have the benefit of what you have in

25   Chapter 11, which is claim-by-claim litigation.

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Direct/Bernick                34

1        So the competing constituencies then say, well, you

2   know exactly how it's going to work.  It's what happened in

3   this case.  It's what happened in other cases, which is that

4   the PI constituency says their claims are worth X, the PD

5   constituency says their claims are worth Y, the debtor, of

6   course, says that they're not worth anything at all, and the

7   Trustee then has to determine, well, how am I going to allocate

8   the resources as between these people with dramatically

9   different kinds of claims.

10       In that context, if the -- and I don't think the fact

11  that it hasn't been done before really goes to the question

12  about whether the analysis is meritorious here.  The -- if, in

13  fact, the PD and PI constituencies were to come to the Trustee

14  and say we've agreed on the allocation, we're not going to

15  quarrel with one another regarding the relative split, the

16  Trustee would say glory hallelujah.

17       And  that is exactly what happened in this case.  The

18  85/15 split, as the Court is aware, and it was described by

19  counsel, was a split that was agreed to between the PI and PD

20  constituency in this Chapter 11 case before there was any, in a

21  sense, claim-by-claim litigation with respect to PD and before

22  there was the estimation of PI.  All that we have done -- all

23  that Ms. Zilly has done here is to look for a proxy -- a proxy

24  for what would happen in Chapter 7, and the proxy exists here.

25  Proxies are absolutely standard fare.  We would not have the

**J&J COURT TRANSCRIBERS, INC.**

1  ability to actually gather data on Chapter 7s, and to the

2  extent that Your Honor recites the experience that's happened

3  in Chapter 7s before, well, of course, that's accurate.

4         I also don't know of another case in which a proxy

5  exists like exists in this case.  This is a unique case, and

6  that prior to any litigation there was a deal reached in terms

7  of a split, and the split would be applied to a wide range of

8  potential outcomes.  If they got 3 billion all together, they'd

9  split it 85/15.  Four billion, 85/15.

10        So all Ms. Zilly did was take the 85/15 and then

11 apply it to the aggregate liability that was assumed and came

12 up with the billion dollars.  So if you took 6 billion, which

13 was originally what the estimated liability was or the asserted

14 liability, that's exactly how you come out with a billion

15 dollars.  It is a proxy, and it's a proxy that is uniquely here

16 in this case, because due to the circumstances of this case,

17 there was, in fact, exactly this allocation agreement.

18        Otherwise, I would venture to say, Your Honor, that

19 there be no ability to determine what the value of disputed

20 claims would've been in the Chapter 7.  And so if you assumed

21 we're not going to have claim-by-claim litigation, the Trustee

22 has got to look to a mechanism to allocate, I think that Ms.

23 Zilly's analysis is dead on, and it makes no difference whether

24 it's been done before, because we didn't have the proxy that we

25 have in this case.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It may be that there's no way to make

2    that determination in a Chapter 7, and if that's the case, and

3    the Trustee can't come to some negotiation with the party in

4    this hypothetical Chapter 7, I suppose the case ends up getting

5    dismissed, and everybody's left to figure out how to pick up

6    the bones.  But I don't -- I still don't see how the fact that

7    someone has come to an agreement in a Chapter 11 reorganization

8    context as to what they will split, given what the debtor has

9    or will agree to commit to the plan --

10          MR. BERNICK:  No.  No.  That was not the agreement.

11          THE COURT:  Well, then I don't know what the

12   agreement is.

13          MR. BERNICK:  The agreement was -- well, let's be

14   clear.  The agreement was described by Mr. Frankel.  It was

15   described by I think Mr. Inselbuch to the Court.  It's in the

16   transcript, and that's what Ms. Zilly read.

17          THE COURT:  All right.

18          MR. BERNICK:  The agreement said that after consider

19   -- after allocating certain insurance to one side or the other,

20   depending upon what kind of insurance it was, there was then an

21   agreement that said the remaining pool of assets -- and they

22   also tried to reach agreement with Mr. Pasquale's client as

23   well if they would agree to take a haircut in that process, and

24   they wouldn't.  But whatever pot remained, they would divide

25   85/15.

**J&J COURT TRANSCRIBERS, INC.**

1              It was not an agreement tied to any particular

2    number.  It said we agree that whatever the pot is, we'll

3    divide it up, and that is about as close a proxy as you can

4    possibly get to the dynamic that would take place in a Chapter

5    7.  There's no litigation of individual claims.  It's a pot

6    claim.  It says here's the plan.  It gets divided up in PD and

7    PI.  And if you were the Trustee, Your Honor, they were

8    prepared to come and say we don't need to litigate any claim.

9    We're prepared to do a deal, and here's the deal, 85/15.  You

10   say glory hallelujah.  We'll save all the litigation costs.  We

11   have a deal.

12             Now, it may be that Mr. Kovacich and others can say

13   to Ms. Zilly and confront her on cross examination and say,

14   well, but do you really know that's what would happen.  Of

15   course, the answer would be no, all of this is inherently

16   speculative.  But what's not speculative and what the witness

17   has testified to is that Chapter 7 is different from Chapter

18   11, and it's different in exactly the ways the witness has

19   testified.  That's fact one.

20             Fact two.  Becuase it's different, there's going to

21   be a rough justice allocation, and the question is what is the

22   best way to determine how that allocation would work.

23             Fact three.  Here we have a settlement between the

24   warring parties as to what the allocation would be, and they

25   have all the same issues, facts, and motivations.  PI will say

Zilly - Direct/Bernick                              38

1  just like in a Chapter 7, we got thousands of claims.  PD would

2  say we got these hugely valuable claims.  They've already been

3  asserted, and they would be negotiating.  We have as the

4  protagonists in the negotiation the same people who would be

5  there in a Chapter 7, Mr. Inselbuch and counsel to the PI

6  Committee, and we have the prominent people, very distinguished

7  members of the PD bar from all over the country representing

8  Anderson Memorial, and Mr. Dies, and this is what they all

9  agreed to represented by counsel.  That is about as good -- and

10 I'll ask the witness whether -- whether and to what extent that

11 is a good proxy for what occurred.  I don't know how else it

12 can be sliced, and we are required to demonstrate best

13 interest, what would happen in the Chapter 7.  This is a sound

14 basis for doing it.  There's a methodology that is A, B, C.  I

15 don't think it gets any better.

16       THE COURT:  I think it gets better.  You can estimate

17 what the liabilities are not through a witness saying what

18 people have agreed to take as a distribution but to what the

19 actual underlying liability is.

20       MR. BERNICK:  That's not -- respectfully, Your Honor,

21 that is --

22       THE COURT:  Well --

23       MR. BERNICK:  -- (a) that's an issue of law, (b) I

24 don't think that that is -- I don't think that that is correct

25 in a Chapter 7 to estimate on a binding basis the PI claims.

**J&J COURT TRANSCRIBERS, INC.**

1  You could not estimate on a binding basis the PI claims in the

2  Chapter 7.

3          THE COURT:  That's not the purpose of the liquidation

4  analysis.  The purpose of a liquidation analysis is basically

5  to give me, to use somebody else's term, rough justice as to

6  what the debtors' assets are worth and what the debtors'

7  liability is worth and whether there is any net worth that's

8  going to be applied to equity.  That's the purpose.  And until

9  you go down the essentially bricks and mortars type of

10  allocation in the Chapter 7, a piecemeal analysis, I don't know

11  where you tell me that information.

12          MR. BERNICK:  Well, I thought --

13          THE COURT:  Just because somebody says I'm willing to

14  take 60 percent if you take 40 percent of whatever's left over

15  doesn't tell me what the liabilities are worth.

16          MR. BERNICK:  Well --

17          THE COURT:  It tells me what the distributive share

18  may be, but it doesn't tell me on what basis they're going to

19  share.

20          MR. BERNICK:  Well, but -- but no, it tells you on

21  the basis -- what basis they're going to share it.  It doesn't

22  tell you what the pie is that they're going to share in, and

23  the witness already has a number for the pie.  It's the $6

24  billion number, and that is based upon statements that were

25  made by the PD Committee.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  During the settlement negotiations.

2          MR. BERNICK:  No.  No.  No.  No, to the contrary --

3          THE COURT:  Okay.

4          MR. BERNICK:  -- in this case.  Let's be clear.

5  BY MR. BERNICK:

6  Q    What's the 85/15 applied to, Ms. Zilly?

7  A    The 85/15 -- the 85 percent/15 percent split, my

8  understanding was, was a proposal put forth to the Court with

9  respect to -- during a court hearing on the extension of

10 exclusivity for the debtor whereby the property damage

11 claimants and personal injury claimants were suggesting that

12 that plan, the 85/15 plan, was something that they could go

13 forward and prosecute and, therefore, shorten the entire length

14 of the case.

15 Q    Okay, but what is -- when you applied the 85/15 to reach

16 the billion dollars for PD, what did you apply it to?

17          MR. KOVACICH:  I object.  He's again asking her for

18 the billion dollar opinion that has been excluded by the Court.

19          MR. BERNICK:  It's not been excluded by the Court.

20          MR. KOVACICH:  And if I could respond to the lengthy

21 speech counsel made about why this ruling should be changed,

22 there are all kinds of problems with this.  Number one, the

23 witness hasn't even indicated whether she knows whether or not

24 the 85/15 split included the ZAI liability, which she wants to

25 treat separately.  The agreement was part of a plan that was

Zilly - Direct/Bernick                    41

1  not adopted.

2          There has since been settlements involving both the

3  PI and PD constituencies, and the split is not 85/15.  And,

4  furthermore, that agreement was prior to this Court's ruling in

5  the ZAI science trial that a substantial number of the property

6  damage claims would be impacted by the Court's finding that

7  Zonolite attic insulation does not pose an unreasonable risk of

8  harm to humans.

9          MR. BERNICK:  Your Honor --

10          MR. ROSENDORF:  Your Honor, we will object on

11  relevance as well.  We believe that the Court has made its

12  ruling on this subject.  Unless it wants to invite further

13  argument from us, we believe the testimony is irrelevant at

14  this point.

15          MR. BERNICK:  Your Honor, well, I -- well, those

16  aren't even worth -- those are simply reiterations of the same

17  objections and argument, and we're now establishing, I think,

18  that the approach here has not been understood at all.  And

19  indeed those arguments indicate that they still don't

20  understand the approach, and I understand that maybe Your

21  Honor --

22          THE COURT:  Well, neither do I, so I'll let --

23          MR. BERNICK:  -- Your Honor doesn't understand the

24  approach.

25          THE COURT:  No, I don't, so I'll let you have this

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Direct/Bernick                          42

1  witness explain the approach, what she applied it to, so that I

2  understand her testimony is fine.  Whether I will accept it as

3  testimony after I hear it, I don't know.

4          MR. BERNICK:  Right.  So let's talk about 7, and

5  let's talk about 11.  And as I understand the best interest

6  test, it is key to 7.  We've got no choice but under the best

7  interest test to use 7 as the benchmark.

8          THE COURT:  I understand.  I understand the

9  requirements of the best interest test.  What I don't

10 understand is how I pick up a billion dollar number based on an

11 85/15 split that was never approved, as I understand it, by

12 anybody at any time, because that plan wasn't approved and take

13 it and apply it from that plan to a liquidation analysis when I

14 don't know the liquidation values that the debtor is applying

15 for the underlying claims.  If you want to have this witness

16 explain --

17         MR. BERNICK:  Yes.

18         THE COURT:  -- what she did, I'm more than willing to

19 hear that.

20         MR. BERNICK:  Well, let's kind of do some basics here

21 and get on the same page.  And I'm first going to make a

22 statement, and then I'm going ask the witness a question.  And

23 the statement is to the Court, because it's purely a question

24 of law, and that is in a Chapter 7 -- in a Chapter 11 plan or

25 case we have the ability to use estimation.  Estimation can be

Zilly - Direct/Bernick                                43

1  used to value and liquidate the PD claims.

2          MR. ROSENDORF:  Your Honor, I'm going to object to

3  this.  He's either asking questions, or he's making argument,

4  but right now it appears that he's coaching the witness.

5          THE COURT:  Gentlemen, I'm not going to do this.  I

6  -- the next time you folks interrupt each other, regardless of

7  who it is, who does the interruption, you're going to be fined.

8  Now that's it.  I -- this has been going on for two weeks.  I'm

9  not going to have it go on for the rest of this time, so,

10 please, hold your tongues, stand up, and I will see that you

11 want to speak, and I will get to you in order.  I'm sorry.

12 Would you please repeat your objection?

13         MR. ROSENDORF:  Yes, Your Honor.  I am objecting,

14 because he's in the middle of the examination of the witness,

15 and I believe that by proffering things or making arguments in

16 the middle of the examination he's effectively coaching the

17 witness, and I'd ask that he resume questioning of the witness.

18         THE COURT:  All right.  Mr. Bernick, I think I

19 understand the parameters of the law and the purpose for

20 estimation.  You may proceed with questions to the witness.

21         MR. BERNICK:  Well, I'd ask the witness be excused,

22 because they're all making a bunch of legal arguments, and the

23 legal arguments are flat wrong, and I think it's important to

24 create a context here.  Otherwise, we're going to spend the

25 next half hour going back over this thing.

**J&J COURT TRANSCRIBERS, INC.**

1          There's no way we can avoid the Chapter 7 test, and,

2     apparently, there's a disagreement on what the Chapter 7 test

3     is.  So I would ask that Ms. -- Ms Zilly and all the expert

4     witnesses have been present throughout this proceeding.

5     There's been no exclusion of witnesses, and now all of a sudden

6     they have a legal argument while a witness is on the stand

7     becomes coaching the witness.  Give me a break.

8          THE COURT:  I'm not certain it's coaching the

9     witness.  I don't think I need it now.  To the extent that it's

10    argument, put it into your briefs and argue it later.

11         MR. BERNICK:  Well, then I would -- I would

12    propose --

13         THE COURT:  I don't need the argument in the middle

14    of this.

15         MR. BERNICK:  I would propose then that we do that,

16    Your Honor, because Ms. Zilly engaged in an analysis that is

17    dead on, on the basis of the law.

18         THE COURT:  Then have her explain it.

19         MR. BERNICK:  I'll try, Your Honor.  Again, this is

20    all on the record now without objection, and they're now saying

21    that somehow the objection's been sustained, and I can't even

22    use a demonstrative that's got the number in it.  That's also

23    ridiculous.

24         THE COURT:  Mr. Kovacich.

25         MR. KOVACICH:  Your Honor, there's a way that we can

Zilly - Direct/Bernick                                45

1  get on with this, which is to accept the Court's ruling and

2  resume examining the witness.  The Court sustained the

3  objection.  We don't have to argue about this for half an hour.

4  We need to move on to something else.

5          THE COURT:  Then let's not.  Okay.  You may ask this

6  witness to explain what she did, so that I can understand it,

7  Mr. Bernick.  Apparently, I don't understand what the witness

8  did.

9          MR. BERNICK:  Right.

10 BY MR. BERNICK:

11 Q    In -- in the -- this Chapter 11 case tell us, Ms. Zilly,

12 whether or not the PD claims were subject to litigation.

13 A    Yes.

14 Q    In the Chapter 11 case tell us whether or not the PI

15 claims were subjected to litigation?

16 A    Yes.

17 Q    When you've taken a look at the Chapter 7 context, tell us

18 whether -- what assumption you have made for purposes of your

19 expert testimony -- tell us what assumption you have made as to

20 whether there would be merits litigation over PI and merits

21 litigation over PD.  What assumption have you made?

22 A    In a Chapter 7 liquidation analysis I have assumed that it

23 would be very difficult for a Chapter 7 Trustee, given the cost

24 of the litigation in Chapter 11 with respect to the PD claims

25 and the PI claims and ZAI claims, if you want to include those.

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Direct/Bernick                          46

1 The time constraint with respect to other creditors in the

2 Chapter 7 wanting to get paid, money constraint in the Chapter

3 7.  We are not going to have an ongoing business.  We're not

4 going to have a business that could continue to fund litigation

5 over seven years, which is what this debtor could do in the

6 Chapter 11.

7         And so given that, I think the Trustee is going to

8 face severe constraints with respect to being able to litigate

9 300,000 personal injury claims, an unknown number of property

10 damage claims, class settlement actions, and any other creditor

11 that comes forward in a Chapter 7.  A litigated approach, as

12 was taken in the Chapter 11, is not going to be possible in the

13 Chapter 7.

14 Q    Thank you.  Now, if we are working with that assumption,

15 and you'll be subjected to cross examination about this,

16 there's no litigation on the basis of which to determine how to

17 allocate available values as between PI and PD.  What have you

18 looked for in order to determine relative share between --

19 relative share between PI and PD?

20 A    It was my assumption in the Chapter 7 that both the

21 personal injury claimants and the property damage claimants

22 would have -- would present the same demands that they

23 initially presented to this Court with respect to what they

24 thought their views were as -- with respect to their respective

25 liabilities.

**J&J COURT TRANSCRIBERS, INC.**

1          And if, in fact, that happened, and if, in fact, the

2   Trustee was not in a position as the Chapter 11 debtor was to

3   litigate extensively each of these claims, then I think it

4   would be something that the Trustee would need to refer to is

5   if, in fact, those two parties, just like they did in the

6   Chapter 11, came into the Chapter 7 and said we have an

7   agreement that regardless of what the amount of the liabilities

8   for personal injury and/or property damage, if we even never

9   got to that point, we're prepared to split those proceeds 85

10  percent/15 percent.

11          MR. BERNICK:  Okay.

12          MR. KOVACICH:  I'll object and move to strike the

13  last opinion offered by the witness.  It went beyond the

14  question.  I don't want to have counsel continue to say that he

15  elicited testimony without an objection in an attempt to use

16  that testimony.  This is still not adequate foundation for this

17  witness to predict $1 billion in property -- non-ZAI property

18  damage liability in a Chapter 7 liquidation.

19          THE COURT:  That objection is overruled, because this

20  is what the witness was asked.  What did you do?  How did you -

21  - what assumptions did you make?  And the effect, in essence --

22  those weren't the -- those weren't the words of the questions,

23  but in essence -- I don't think the answer goes beyond the

24  scope of the questions, so that objection's overruled.

25  BY MR. BERNICK:

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Ms. Zilly, the 85/15 split which came from the Chapter 11

2  -- at what point during the Chapter 11 was the 85/15 split

3  agreed?

4  A    I believe it was in -- well, it was certainly before -- I

5  don't remember the year per se, but it was certainly before any

6  significant progress, I believe, had been made with respect to

7  estimation, personal injury questionnaires, or any settlement

8  in this case.

9  Q    Okay.  85/15, as you understood it, was pre-litigation?

10  A    Yes, I think it was, in fact, 2006.

11  Q    Okay.  Now, there's been discussion from time to time in

12  the course of this case where we've been wrestling with how to

13  get -- how to get calculations done.  There's been discussions

14  in this case of the use of proxies.  Are you familiar with the

15  notion of the use of proxies?

16  A    Yes.

17  Q    What does it mean to use a proxy?

18  A    When you're doing a hypothetical analysis, which a Chapter

19  7 is, you clearly don't have an ability to know exactly what's

20  going to happen.  You could arguably use in certain cases what

21  happened in the Chapter 11.  You cannot do that in this

22  circumstance, because the same circumstance that existed in the

23  Chapter 11 in this case would not exist in the Chapter 7, and,

24  therefore, in order to be able to do a proper Chapter 7

25  analysis, you have to be able to look to other estimates, other

**J&J COURT TRANSCRIBERS, INC.**

1 places in order to be able to estimate what a potential

2 liability could be under different circumstances in the Chapter

3 7.  And by doing that you look at other estimates, you look at

4 other settlements, you look at other agreements, you look at

5 other statements that have been made throughout this case with

6 respect to what the parties would be prepared to do.  I don't

7 think it's a reach to take it from a Chapter 11 to a Chapter 7

8 in the context of no litigation and a fixed pool of assets to

9 apply the 85 percent/15 split.

10 Q    Now, we've talked about the proxy for the allocation.  We

11 haven't talked about what it is applied to as a number.  What

12 did you apply the 85/15 allocation to?

13        MR. KOVACICH:  I object, Your Honor.  She's offering

14 the same opinion as is speculative, and there's no foundation.

15        THE COURT:  No, this is a process question, I think,

16 asking what her analysis is based on, and since I don't

17 understand it and asked Mr. Bernick to pursue it so I do

18 understand it, I'm going to overrule the objection.  Otherwise,

19 I don't have any understanding, I guess, of what the -- of what

20 the debtor -- the plan proponents expected evidence would -- on

21 this issue is.  So I'm going to overrule it, so I can at least

22 understand what the witness did.

23 A    The 85/15 percent allocation between personal injury and

24 property damage was applied to an estimate of personal injury

25 claims that was part of -- that was part of ongoing discussions

1  with the personal injury claimants, and that number was

2  approximately $6 billion for personal injury claims.  Of that

3  $6 billion, the 85 percent/15 split that was theoretically and

4  at least purported by Mr. Frankel as something that had been

5  agreed to by the parties, would result in approximately a

6  billion dollars to the property damage claims under that

7  scenario.

8  Q    Okay.  Now why is it that you would apply the 85/15 to the

9  $6 billion for PI estimated liability?

10  A    That was a pre-litigated number that was -- and also a

11  number that -- I won't say negotiations but in discussions with

12  the personal injury claimants was a number that we understood

13  that they were seeking.

14  Q    Okay, and that would then get you down to your billion

15  dollars?

16  A    That's correct.

17  Q    Now, is the billion dollars an estimate in the sense of --

18  an estimate if estimation took place on the basis of a

19  litigated record on the merits?

20          MR. KOVACICH:  If I can have a continuing objection,

21  Your Honor?  I think this is just the same testimony.  And

22  counsel has already taken the position that if he asks one

23  question that's not objected to on the record, then somehow

24  that makes the evidence provident.  I just want to make sure

25  that we're not getting in this billion dollar opinion in the

Zilly - Direct/Bernick                              51

1  record now.

2              THE COURT:  I am still trying to figure out what the

3  billion dollar opinion is.  So to that extent, this is

4  overruled.  At the end of this what I will call foundation

5  testimony, so that I understand the process that the witness

6  went through, if you have an objection, raise it.  In the

7  meantime, your objection to the process questions is -- doesn't

8  need to be restated, because I'm going to overrule it, so I can

9  understand what the testimony is.  But at the end of that, if

10 you have an objection, raise it.  All right.  Now, Mr. Bernick,

11 I didn't understand the question.  Could you restate it for me,

12 please?

13 Q   Where did the -- well, first of all, is this billion

14 dollars -- does it represent a -- an estimation based upon the

15 merits of the litigated record as we now have in the Chapter 11

16 process?

17 A   No, the billion dollars -- and just to be perfectly clear

18 where the billion dollars came from, if there was agreement to

19 split proceeds that were received or recoveries that were

20 received by the personal injury claimants with the property

21 damage claimants to split those proceeds 85 percent/15 percent,

22 and in discussions with the personal injury claimants it was

23 our understanding that the amount of claims, liabilities,

24 whatever word you want to use, that they were seeking was equal

25 to $6 billion dollars, what the agreement provided is that of

1  that $6 billion, if that was a number that they were, in fact,

2  going to receive from the debtor, and that is what they were

3  seeking from the debtor with respect to their claims, 15

4  percent of $6 billion or exactly $900 million -- a billion

5  dollars of that money would go to the property damage claimants

6  based on the 85/15 percent split.

7  Q    Now, okay.  Now, that 6 billion, was that -- is that a

8  number that you made up or did that come from someplace?

9  A    That's a number that's been inherent in -- as far as I

10 know, inherent in what the personal injury claimants were

11 seeking.

12 Q    Including in the estimation?

13 A    Well, it was further down the road with respect to the

14 estimation evidence purported by Dr. Peterson in his report

15 that that number is, in fact, in the midst of his estimate

16 number.

17 Q    Okay.  Now, if it turns out -- the question's been raised,

18 well, what is in the pie that gets allocated 85/15.  What if --

19 what if the number was bigger in the sense that it not only

20 included PI, but it also included additional money for PD

21 claims?  What if the pot included the fruits of Mr. Speights'

22 and Mr. Dies' success?  What would be the allocation to PD

23 under those circumstances?

24 A    15 percent in addition.

25 Q    The billion dollars, therefore -- is the billion dollars a

1 liberal number, a conservative number?

2 A    It's -- in my view, it's a conservative number.  First of

3 all, you're not positive 6 billion would've been the number.

4 Second of all, it does not include other potential recoveries

5 by property damage claimants.

6 Q    What if you added ZAI in, what would happen to that

7 number?

8 A    It's a fixed number.  Then the percentage would -- the

9 percentage takes the number -- if the number went up, the

10 number that would go to the property damage would go up.

11 Q    Now for purposes of your base line analysis, questions

12 have been raised on ZAI.  Did you include in the liability

13 number for PD -- did you include anything for ZAI?

14 A    No.

15           MR. BERNICK:  We go back, Your Honor, then to, for

16 demonstrative purposes only -- and we offer it for

17 demonstrative purposes, so we can get on with the analysis,

18 plan proponents' Exhibit 511-21, which includes the 4.7 to 5.2,

19 includes only a billion dollars as the estimated traditional PD

20 liability in Chapter 7, includes nothing for ZAI liabilities.

21           MR. KOVACICH:  I object, Your Honor.  There's no

22 basis for this witness to testify that a billion dollars would

23 be allocated for non-ZAI property damage liability in a Chapter

24 7 liquidation.  The methodology is not in any way adequate to

25 support that testimony.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  There is no other way, Your Honor, to

2     do it.  That is the standard.  That's inherently speculative,

3     and, frankly, you know, Mr. Kovacich's client is estoppped,

4     because they were members of the PI Committee that agreed to

5     all of this.  They basically agreed on an allocation outside

6     the context of litigation, because it proceeded.  That is

7     apples and apples to Chapter 7.

8          And all that Ms. Zilly has done is applied that

9     allocation to the estimated numbers that came from exactly the

10    same constituency.  So if you had an estimate -- the Trustee's

11    there on 7.  He's got an estimate from PI people, $6 billion.

12    He's got the PD people saying even more, and he --

13         THE COURT:  Okay.  I -- here --

14         MR. BERNICK:  -- applies the 85/15.

15         THE COURT:  Here's the issue.  I thought what you

16    were attempting to do was make this essentially an asset

17    allocation, but I see from -- and I'm looking at Exhibit 511-

18    21, so that I can make a ruling on that exhibit.

19         MR. BERNICK:  Yes.

20         THE COURT:  I see from looking at this chart that

21    what you are doing is estimating the PD liabilities not the

22    distribution to the PD claims.

23         MR. BERNICK:  Exactly right.

24         THE COURT:  I thought you were trying to estimate a

25    distribution to the PD claims --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  No.

2          THE COURT:  -- and based on what allocation I

3 couldn't understand.

4          MR. BERNICK:  I apologize then.  That's part of the

5 reason why we wanted demonstratives, so that it can be a little

6 clearer.

7          THE COURT:  All right.

8          MR. BERNICK:  This is all on the liability side.

9          THE COURT:  The objection is overruled.  This

10 testimony that the witness has gone through goes to the weight

11 of her testimony.  And whether or not the methodology is

12 appropriate, you folks can argue in your post-trial

13 submissions.  I will admit 511-21 as a demonstrative only to

14 summarize what the witness has testified to not as substantive

15 evidence in any way.

16          MR. BERNICK:  Okay.

17 Q    Based upon -- let's just go through the other elements of

18 511-21.  We have the ZAI liabilities.  You carry that

19 uncertain.  Right?

20 A    That's correct.

21 Q    The non-ZAI PD liabilities was just traditional.  It's a

22 billion.  The asbestos PI, 4.7 to 5.2.  Did that or did that

23 not include acceleration per Mr. Peterson's testimony?

24 A    It does not include acceleration.

25 Q    General unsecured claims, where did that number come from?

**J&J COURT TRANSCRIBERS, INC.**

1  A    The general unsecured claims that were approximately a

2  billion dollars is -- it's a number that comes from the books

3  and records of the companies as well as a review of all the

4  claims that were filed in this case that could be categorized

5  as general unsecured claims in the Chapter 11 which would flow

6  through to Chapter 7.

7  Q    Thank you.  Based upon that -- you then have assets of 2.2

8  to 2.4.  Does that go back to slide 511-12?

9  A    Yes.

10 Q    You then get a percentage payout.  What is the percentage

11 payout?

12 A    If you sum the items under total pool of liability and

13 then take the two ranges of assets, depending on which range of

14 assets to use, the high or the low, divided by 6.7 or 7.2 of

15 liabilities, the percentage payout would range from 30 percent

16 to 36 percent.

17 Q    Okay.  I want to go back over two different parts of this,

18 the plan scenario and the Chapter 7 scenario, and I want to ask

19 you now about the question of certainty and uncertainty.  I

20 take it that -- well, let me say did you look at the question

21 of the relative certainty of the payouts in Chapter 7 versus

22 Chapter 11?

23 A    Yes.

24 Q    Okay.  Let's, first of all, talk about Chapter 11.

25 Working through the liabilities and the payouts, what opinion

**J&J COURT TRANSCRIBERS, INC.**

1 did you reach regarding the certainty of payouts to the various

2 constituencies in the Chapter 11 context?

3 A    In the Chapter 11 context the amount of the assets that

4 are going to pay these liabilities is certain.  There is a

5 estimation of asbestos personal injury liabilities that the

6 trust would face, which, if not certain, has certainly been

7 estimated, which would give more certainty to percentage payout

8 of 25 to 35 percent under the Chapter 11.

9 Q    Okay.  I'm showing you Exhibit 511-21A.  Does this

10 demonstrative reflect the analysis that you've gone through for

11 demonstrative purposes?

12 A    Yes, it does.

13          MR. BERNICK:  We offer it for demonstrative purposes.

14          THE COURT:  It's admitted for that purpose.

15 Q    Let's talk now about certainty and the Chapter 7

16 liquidation context, and to give it concrete application I want

17 to go back to 511-21.  And I, first of all, want to ask you

18 have assumed for your base line analysis when ZAI liabilities

19 are coming in, you have a question mark.  You don't have a

20 number.  Did you find whether or not there was any data that

21 where the ZAI claimants themselves talked about the value of

22 their claims in this case?

23 A    They had various testimonies and pleadings.  The ZAI

24 claimants have made various representations with respect to

25 what they think the amount of the liability is.  It's ranged

1  frankly from a low of say a billion homes to as high as, you

2  know, 11 million homes -- excuse me -- a million homes to as

3  high as 11 million homes, and I've seen at least discussions,

4  if not numbers, that refer to even higher estimates of homes.

5  And also with respect to the cost of remediating the

6  contamination, anywhere from 3 or 5 thousand dollars to $7,000.

7  Q    What if you use $5,000 per home, the middle of that range,

8  and only a million as opposed to 7 million homes, what would be

9  the asserted liability for ZAI?

10 A    That would be $5 billion, whereas, we currently have zero

11 estimated.

12 Q    What about if we go down to 4.7 to 5.2 not including

13 acceleration?  What uncertainty is associated with that?

14 A    The 4.7 to 5.2 is a number that reflects pending claims --

15 in Dr. Peterson's analysis pending claims as well as claims

16 that accrued through the bankruptcy through the date of today

17 or close to today.  It doesn't take into account any affect of

18 acceleration, and I think you could only assume that with a bar

19 date in a Chapter 7 situation where basically the noise is out

20 that the company's going out of business, that those parties

21 who have any concern about being able to get paid through

22 exposure or disease or alleged disease would file a claim, and

23 that you would see the number of these claims, and, therefore,

24 the potential liability facing a Chapter 7 trustee increase

25 dramatically.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    In the Babcock & Wilcox case, were you involved in that?

2  A    Yes, I was.

3  Q    Was there a bar date, and was -- tell us what happened.

4  Was there a bar date in that case?

5  A    Yes, there was.

6  Q    And what happened in terms of acceleration, if you recall?

7            MR. KOVACICH:  Objection.  This was not any part of

8  Ms. Zilly's disclosure.  We received no reliance material that

9  she was going to testify about the experience in Babcock &

10 Wilcox, wasn't asked about it in either of her depositions.

11           MR. BERNICK:  What?

12           THE COURT:  Mr. Bernick.

13           MR. BERNICK:  I believe she was asked about it, but I

14 think that Ms. Zilly was going to indicate that same thing.

15           THE COURT:  Well, no, she has to I think -- you have

16 to respond to the objection.

17           MR. BERNICK:  Well, we can get -- we can get -- we

18 can get the cite.  Let's see.  Do you have that here?  One

19 million homes, five billion, one million, ZAI acceleration.

20 First of all, the acceleration point is made in the report by

21 Peterson, and I think Mr. Peterson -- Dr. Peterson also talked

22 about Babcock & Wilcox, although I'm not positive about that.

23           MR. KOVACICH:  Dr. Peterson's report includes a very

24 brief discussion about acceleration, and he did testify about

25 that.  My objection is that there was no opinion from this

                    **J&J COURT TRANSCRIBERS, INC.**

1  witness disclosed that she was going to address acceleration

2  and support that opinion by providing facts from her experience

3  in Babcock & Wilcox.

4         MR. BERNICK:  Well, first of all, her experience --

5  the fact that she was in Babcock & Wilcox was specifically

6  disclosed, and she testified in her deposition about the fact

7  of acceleration at Page -- at Pages 52 and 53 of her

8  deposition.  All that she has referred to now is Babcock &

9  Wilcox, and, frankly, Your Honor could take judicial notice of

10  Babcock & Wilcox on that subject.  I don't know that there's

11  anybody who seriously doubts -- oh, here, Page 64, Babcock &

12  Wilcox, "flood filings once it was issued -- its bar date for

13  personal injury claims."  Page 64 of Ms. Zilly's deposition

14  that was taken in this case on these matters.  "In the Babcock

15  & Wilcox case there was a flood of filings once it issued its

16  bar date for personal injury claims."  Right there, black and

17  white.

18         THE COURT:  Well, apparently, she testified about it.

19  Whether or not she -- this is part of her expert opinion, that

20  I don't know.  Had she provided this as part of her report?

21         MR. BERNICK:  Her report incorporate -- remember, we

22  had the whole deal with the report.  It incorporated by

23  reference her expert report.  It incorporated by reference her

24  depositions, I believe -- previous deposition, and then she was

25  deposed in this case.  So there's no issue but that it was

1  disclosed before her -- disclosed in this case in connection

2  with the deposition.  I would add that there are all kinds of

3  witnesses who have disclosed in their depositions matters that

4  are supplemental to their reports, and we've all had to deal

5  with this.  That's the name of the game.

6          THE COURT:  All right.

7          MR. KOVACICH:  Your Honor, it was not in the reports,

8  to answer the question directly, and the deposition reference

9  that Mr. Bernick has now provided, I do see that.  This witness

10 had testified in her deposition that she expected people who

11 didn't even have disease to file claims in the bankruptcy.  I

12 asked her a question about that.  She provided a very lengthy

13 answer at the end of which she mentioned Babcock & Wilcox.

14 That is not a proper expert disclosure.  We didn't receive any

15 reliance material addressing anything that happened in that

16 case, and the witness should not be permitted --

17         THE COURT:  The objection --

18         MR. KOVACICH:  -- to support her opinions with it.

19         THE COURT:  The objection's sustained.  To the extent

20 that you want me to take judicial notice of something, ask me,

21 give me the appropriate places, and I can do that.  The

22 objection as to this witness testifying about it is sustained.

23         MR. BERNICK:  I will note that the Libby witnesses,

24 in particular Dr. Whitehouse, expressed numerous opinions in

25 their last depositions.  We've had to deal with every single

Zilly - Direct/Bernick                                       62

1  one of them, Your Honor.  But that's Your Honor's ruling.

2  We'll provide the citations in Babcock & Wilcox.  I don't know

3  if it was also the subject -- did Mr. Inselbuch mention it?

4             MR. LOCKWOOD:  No.

5  BY MR. BERNICK:

6  Q    That's that element of uncertainty acceleration, and then

7  what about again the certainty that they -- that the -- the

8  certainty, what -- how does certainty affect the asset part of

9  the Chapter 7 equation?

10 A    The bulk of the assets are coming from the sale of the

11 company and/or cash that the company has on hand.  I believe

12 that the sale of the company could be very problematic with

13 respect to the asbestos overhang.  This company is going to

14 have a fixed amount of cash going into this process.  To the

15 extent that there's extensive litigation on any of these

16 matters, that cash is only going to decline, and, therefore, I

17 believe that the asset value could be very uncertain.

18 Q    Thank you.  I'm going to show you plan proponents' Exhibit

19 511-21B and ask whether this document reflects the uncertainty

20 analysis insofar as it reflects -- insofar as it pertains to

21 Chapter 7 liquidation.

22 A    Yes, it does.

23            MR. BERNICK:  Offer it for demonstrative purposes.

24            THE COURT:  It's admitted for that purpose.

25            MR. KOVACICH:  Your Honor, just so the record is

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Direct/Bernick                                          63

1  clear, we object to this exhibit.  It includes the $1 billion

2  opinion as to non-ZAI PD liability, and the calculation at the

3  bottom of the page, 25 to 35 percent, doesn't square with the

4  figures that are actually on the --

5         MR. BERNICK:  It says, "less than -- less than 25 to

6  35 percent."  If you want to do a calculation, it just depends

7  on how big a number you want to put in for each one of these

8  different things.  It's an uncertainty analysis.  So it says

9  it's less.  If Your Honor wants, we can certainly fill in --

10        THE COURT:  No, that objection is overruled.  I

11 believe that is in conformity with the witness' testimony.

12 With respect to $1 billion, I've already addressed that issue.

13 So the exhibit is admitted as a demonstrative only.

14        MR. BERNICK:  Thank you, Your Honor.  We're now going

15 to go and address feasibility, and I think  that there's a

16 separate folder -- separate notebook that you have in

17 connection with feasibility.

18                        (Pause)

19        THE COURT:  Just one minute, Mr. Bernick, please.

20        MR. BERNICK:  Sure.

21        THE COURT:  Thank you.

22                        (Pause)

23        THE COURT:  Okay.  Thank you.

24 Q    Ms. Zilly, have you gone ahead and done an analysis of

25 feasibility in connection with the proposed plan?

**J&J COURT TRANSCRIBERS, INC.**

1 A     Yes, I have.

2             MR. BERNICK:  Out of an abundance of caution, Your

3 Honor, I have been asked by my client to make sure that we have

4 in the record Plan Proponents' Exhibit 511-23, which is simply

5 a disclaimer regarding forward looking statements and we'd like

6 to make that a matter of the record.  But it's necessary, we're

7 talking --

8             THE COURT:  It is necessary, it's admitted.

9             MR. BERNICK:  Thank you.

10             THE COURT:  Where is it, though?

11             MR. BERNICK:  It's at 511-23.

12             THE COURT:  No, what book is it in?

13             MR. BERNICK:  You should have a separate notebook on

14 feasibility.

15             THE COURT:  Okay.

16             MR. BERNICK:  Mr. Lockwood is just jealous that he

17 didn't --

18             THE COURT:  I actually -- oh, there it is, okay,

19 fine.  It's admitted.

20             MR. BERNICK:  Thank you.

21 Q     In connection with doing the feasibility analysis, have

22 you considered various factors?

23 A     Yes, I have.

24 Q     What factors have you considered?

25 A     We considered the historical operating performance of the

1  company, we considered the financial projections that were

2  developed by the company, we considered the prospects of exit

3  financing and we considered whether or not the debtor would

4  have the ability to meet its debts, both upon exit and as they

5  became due.

6  Q    Okay.  Are those reflected in Demonstrative Exhibit

7  511-15?

8  A    Yes.

9           MR. BERNICK:  Offered for demonstrative purposes.

10          THE COURT:  It's admitted for that purpose.

11 Q    Let's talk about the feasibility test when it comes to

12 historical financial performance.  I want to show you Exhibit

13 511-16 and ask you whether that would aid your presentation to

14 the Court of Grace's historical financial performance while in

15 bankruptcy?

16 A    Yes, it would.

17          MR. BERNICK:  We offer it for demonstrative purposes.

18          THE COURT:  It's admitted for that purpose.

19 Q    Showing you 511-16, could you please explain your views

20 regarding Grace's historical financial performance while in

21 bankruptcy?

22 A    In analyzing feasibility, we looked at Grace's historical

23 operating performance, financial performance starting in the

24 year 2000, which would basically cover a number of cycles in

25 the chemical industry and looked at sales and a measure of what

1 is known as core EBITDA, which is a measure that the company

2 uses to distinguish between what is EBITDA related specifically

3 to its core businesses, as opposed to, including, cost that are

4 "non-core".

5          The sales as you can see, have increased dramatically

6 over an eight year period and from 2000 to 2008, in fact,

7 increasing over a hundred percent.  And this -- let me remind

8 everyone, obviously, this was during bankruptcy and the core

9 EBITDA has increased approximately, on a compound annual growth

10 rate of about the same, about 10 percent from $255 million to

11 $418 million in 2008 and, again, this was during a time of --

12          THE COURT:  I'm sorry, you're going way too fast. I

13 can't even -- I can't even hear you, it's going so fast, let

14 alone comprehend it.

15          THE WITNESS:  Sorry.

16          THE COURT:  I'm sorry.

17          THE WITNESS:  That's all right.  I'm sorry.

18          MR. BERNICK:  Where did the tape run out, Your Honor?

19          THE COURT:  Somewhere around -- after the core EBITDA

20 and the businesses were all increasing during bankruptcy and I

21 have no conception of the numbers.  I understand the principle,

22 but not the numbers.  I didn't get any of them.

23 Q    Okay.  Slow down and just go through the numbers, please.

24 With clarity and keep your voice up, please.

25 A    The sales -- the sales number on this chart are

1   represented by the tall blue boxes and are set forth starting

2   in the year 2000 to 2008.  The sales numbers run from

3   approximately a billion five, a billion five ninety-seven in

4   the year 2000 to over $3 billion in 2008.  That represents

5   almost a doubling, if you will, of the sales of Grace during

6   this period of time and as I attempted to point out during the

7   period of time, most of this period of time, this company was

8   operating in Chapter 11.

9         The core EBITDA numbers, which is a measure that's

10  used by the company to measure its profitability, this company

11  has a lot of non-core legacy items and so with respect to

12  properly measuring, in its view, what the real profitability of

13  the company is, it uses a measure of core EBITDA and that is

14  the number -- those are the numbers that are reflected starting

15  in 2003 by the green boxes, that begin with $255 million in the

16  year 2003, increasing in 2008 to $418 million, that's a

17  compound annual growth rate of about 10 percent, and what I

18  stated was that this time period is over a time period of not

19  necessarily always positive industry conditions for the

20  industry that Grace is in and, therefore, covers a time period

21  where the chemical industry, the specialty chemical industry

22  went through a period of difficulty and the point is that Grace

23  was still able, during this period of time and during its time

24  in Chapter 11, to significantly increase its sales as well as

25  its core EBITDA.

Zilly - Direct/Bernick                                    68

1   Q      Thank you.  Let's talk about the second test that you

2   applied, which is exit financing, showing you Exhibit 511-17.

3   Is this a demonstrative that you were involved in preparing?

4   A      Yes, I was.

5   Q      Would it aid you in explaining the factor -- the current

6   status of the exit financing to the Court?

7   A      Yes.

8          MR. BERNICK:  We offer it for demonstrative purposes

9   in connection with the witness' testimony about exit financing,

10  Your Honor.

11         THE COURT:  It's admitted for that purpose.

12  Q      Could you review the current status, Ms. Zilly, of the

13  company's efforts to obtain exit financing?

14  A      Let me just give a bit of history.  The company began its

15  efforts to obtain exit financing May, June of 2009.  In

16  relationship to that,  we prepared lender presentations, held

17  lender meetings, set up data rooms, identified lenders who we

18  thought would be in a position, have an interest in providing

19  approximately a billion dollars of exit financing to Grace

20  which the amount of money that is anticipated to be needed in

21  order for it to meet its obligations upon exit.

22         In connection with that effort, Grace received

23  proposals for commitment letters for financing from lenders in

24  July. With respect to the commitment letters, what we were

25  seeking at the time was a commitment today to provide financing

1 in the future and a firm commitment by these lenders,

2 regardless, basically of when Grace needed to actually draw

3 down those funds.

4          Those commitment letters provided fee arrangements,

5 it provided timing with respect to when they expected Grace to

6 actually have to enter the public markets and if, in fact,

7 Grace was not successful, bridge financing that was going to be

8 provided by these lenders.

9          We received a number of proposals from lenders and,

10 if necessary, Grace could have used those proposals and exited

11 bankruptcy under those proposals.

12          As we went into the discussion with these lenders,

13 with respect to these various proposals, it became obvious that

14 in connection with these proposals there are significant fees

15 associated with them.  You lose flexibility with respect to

16 your capital structure, the potential timing of when you access

17 the market and also with respect to rates because, obviously,

18 under the commitment letters, the commitment letters would also

19 provide for fixed rates.

20          Given the strength of Grace's operations to date and

21 currently given the strength of the markets, given the

22 expressions of interest that we have received from major

23 lending institutions, all of whom have expressed an interest

24 and a strong desire to be a part of Grace's exit financing, we

25 have decided not to seek firm commitment letters and, instead,

1  proceed on a more traditional basis in terms of having exit

2  financing available when the company needs it.

3          In that regard, we are currently negotiating with a

4  number of lenders regarding our distribution and syndication

5  strategy and by that it basically means what role these lenders

6  will play, what the fees will be, what our timetable is and the

7  work that needs to be done in order to be able to be in a

8  position to access the market when we need to access the market

9  and who will be involved in conjunction with the lead lenders

10 in order to be able to successfully syndicate our financing.

11         Under any of the financing structures that we're

12 currently discussing, Grace will be able to meet all of its

13 obligations upon its exit.

14 Q    Thank you.  Had you also done an analysis in connection

15 with exit financing of the sources and uses of funds in

16 connection with the company's emergence from Chapter 11?

17 A    Yes, I have.

18 Q    Showing you Exhibit 511-18, would this demonstrative aid

19 you in explaining your findings to the Court?

20 A    Yes.

21         MR. BERNICK:  Offer it for demonstrative purposes.

22         THE COURT:  It's admitted for that purpose.

23         MR. BERNICK:  Let me just -- in order to -- it occurs

24 to me, Your Honor, when you were careful to ask, when the Court

25 was carful to ask Ms. Zilly to go back over the chart that had

1 the numbers on the company's financial performance, perhaps, a

2 light went on in my head that said that just because it's on

3 the chart, because its admitted for demonstrative purposes,

4 doesn't mean that it's actually in evidence and, therefore, Ms.

5 Zilly's testimony regarding the numbers becomes important.  I

6 don't want to be accused of leading the witness.  I know that

7 that's improper.  At the same time, I would like to get on the

8 record, I want the witness to explain in general terms what

9 this chart shows, but I also want to be able to get in the

10 record that the numbers are the numbers that the witness

11 believes are accurate without going through every single one of

12 them.

13 Q   So, I think that what I'd like to do is to begin with the

14 questions, Ms. Zilly, of whether the numbers that are set forth

15 in 511-18 are accurate numbers, at least insofar as your expert

16 testimony is concerned.  Do you believe that they're accurate?

17 A   Yes, I do.

18 Q   Okay.  Now, could you explain to the Court what 511-18

19 shows?

20 A   What the exhibit shows is a listing of uses of cash that

21 the debtor anticipates upon exit and going through those uses,

22 this is basically -- uses are another word for what claims,

23 what dollar amounts, either pursuant to settlements, or other

24 factors that the debtor needs to actually have the cash on hand

25 at the effective date in order to be able to consummate the

1  plan.  Those are the uses of cash, the sources of cash column,

2  obviously are, in fact, sources and they are made up of, in

3  this case, $589 million of balance sheet cash which is an

4  estimate of the cash that the debtor will use of its cash on

5  hand, as of the effective date in order to be able to meet its

6  obligations and the remainder 950 million from exit financing

7  proceeds, totaling 1,539,000,000 of sources which match the

8  uses of cash that the debtor anticipates on the effective date.

9  Q    Okay.  What conclusions did you draw with respect to the

10 third prong, which is exit financing and sources and uses

11 insofar as your analysis of feasibility was concerned?

12 A    The combination of the company's balance sheet cash, as

13 well as the company's ability to access the markets and achieve

14 its exit financing proceeds makes this plan feasible.

15 Q    Thank you.  Let's turn to the third feasibility test which

16 is financial projections.  Does Plan Proponents' Exhibit

17 511-19, is that a demonstrative that would aid in your

18 explanation of what you found with respect to that test?

19 A    Yes, it would.

20       MR. BERNICK:  We offer it for that limited purpose as

21 a demonstrative.

22       THE COURT:  It's admitted as a demonstrative.

23 Q    What did you conclude regarding that third test of

24 feasibility, that is financial projections?

25 A    The company has prepared a set of financial projections

**J&J COURT TRANSCRIBERS, INC.**

1  for purposes of its discussions with the lenders.  These

2  projections, again, were developed by the company.  What they

3  show is that they -- notwithstanding the negative environment

4  currently in the industry which has affected the company's

5  operating performance as well as everyone else's, for 2009,

6  that the company still is projecting a very strong financial

7  track record with respect to 2009 and ongoing.  Frankly, its

8  growth rate of sales is reasonable when compared to what it has

9  achieved over the last eight to ten years.  That same

10  assumption holds true with respect to its core EBITDA, that

11  their expectations with respect to their core EBITDA are

12  reasonable for a number of reason.  Number one, what they've

13  managed to achieve in the past; number two, given the

14  productivity programs that have been implemented in the last

15  several years; number three, with respect to the cost cutting

16  measures that this company took in 2008 and 2009, that both the

17  -- in my view, the financial projections with respect to sales

18  and its core EBITDA are reasonable projections which would

19  sustain its ability to meet its obligations under the plan

20  Q    Let's take a look at the fourth test of feasibility, and

21  directing your attention to 511-20, would this demonstrative

22  aid your explanation to the Court of your findings with respect

23  to the fourth test of feasibility?

24  A    Yes.

25       MR. BERNICK:  We offer it as a demonstrative, 511-20.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  It's admitted as a demonstrative.

2  Q    Could you please explain to the Court the conclusions

3  you've reached with respect to this last test?

4  A    The last test basically looked at the ability of the

5  company to meet its obligations under the plan and, in

6  addition, looking at the projections, we also analyzed whether

7  or not Grace would have the ability to meet all of its

8  operating expenses, just not obligations under the plan.  Based

9  on the projections, based on the reasonableness of the

10 projections, it is reasonable to assume that Grace will be able

11 to pay its operating expenses as they become due. In addition

12 to that, Grace has ongoing obligations with respect to legacy

13 items as well as -- that pass through the bankruptcy, as well

14 as obligations under settlement agreements reached in the

15 bankruptcy and it is clear, even assuming very little growth

16 after the year 2013, that Grace will be able to make and meet

17 the deferred payment obligations that are required under the

18 Asbestos PI trust, and as well as under the ZAI agreement if,

19 in fact, they're so required.

20          In addition to that, we have looked at, primarily

21 based on the settlement with respect to asbestos property

22 damage claims, what, if any, claims that Grace may have to face

23 in the future with respect to that agreement and have analyzed

24 the ability of Grace to pay those claims if, in fact, any come

25 up and have made the assumption and find it reasonable to

1 assume that Grace could pay at least a billion six of property

2 damage claims over 25 years if, in fact, those were presented

3 to the trust.

4 Q    Okay.  So --

5          MR. ROSENDORF:  Your Honor, I'm going to object and

6 move to strike the last portion of that.  There's been no

7 foundation laid for any of the testimony with respect to the

8 settlement.  I'm not sure what settlement is being referred to

9 with respect to property damage claims, or foundation for any

10 of the other evidence with respect to the 1.6 billion.

11          THE COURT:  I believe the witness' testimony was that

12 the debtor has legacy obligations as to settlements that the

13 debtor has negotiated during the case, which if I understand

14 have been approved.

15          MR. BERNICK:  I'll pursue this a little bit and I'll

16 respond to the objection that's been made because I don't -- I

17 think it's a misapprehension of the nature of the witness'

18 testimony.

19          THE COURT:  Okay.

20 Q    Based upon all of the work that you've done, as set forth

21 in your testimony today, tell us what conclusion you've reached

22 as to whether the Grace -- I'm sorry, the plan that's being

23 proposed here by Grace and the plan proponents is feasible or

24 not.

25 A    Based on all of my analysis and the factors that I

1  reviewed, I believe the plan is feasible.

2  Q     Now, in the course of your work, have you come across a

3  $37.3 million estimate?

4  A     Yes, I have.

5  Q     Okay.  And did you previously offer testimony regarding

6  that estimate?

7  A     Yes, and it's certainly in depositions.

8  Q     Okay.  Now, pursuant to court order, Mr. Shelnitz has now

9  given written answers as to what the $37.3 million figure means

10 and I'm going to show you Plan Proponents' 368, which is the

11 written answers that Mr. Shelnitz has provided and this

12 document, Your Honor, has been previously served on counsel for

13 Anderson Memorial and others.

14             THE COURT:  What's the exhibit number, please?

15             MR. BERNICK:  It's Plan Proponents' 368.

16             THE COURT:  Okay, thank you.

17 Q     And, Your Honor asked the question what the $37.3 million

18 is, in generic terms, Mr. Shelnitz's answer provided on the

19 10th of October, was "The 37.3 million figure is an estimate of

20 the cost to resolve pending, unsettled asbestos property

21 related damage claims, after the effective date of the proposed

22 plan and the defense costs for any future property damage

23 demands that may be made after the effective date."  Do you see

24 that?

25 A     Yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Does that have any impact, or change anything that you've
2 concluded regarding feasibility?

3 A    No.

4 Q    There's further the answer that says -- I'm sorry, the
5 questions says, four, "Whether Grace has attempted to project
6 future traditional property damage claims? Yes, or no."  And
7 the answer to that is "No."  You see that?

8 A    Yes.

9 Q    Now, when you testified about -- have you done any kind of
10 estimate about how many traditional property damage demands may
11 be made in the future, have you done any such estimate?

12 A    No.

13 Q    Have you made any kind of assessment about whether any
14 future traditional property damage demands would be
15 meritorious?  Have you made any kind of assessment of that?

16 A    No, I have not.

17 Q    Now, you offered testimony in your deposition regarding, I
18 think Mr. Rich asked you questions and you talked about a $1.6
19 billion number.  Did the $1.6 billion dollar number represent
20 some kind of estimate or projection as to the total value of
21 future property damage demands?

22 A    Mr. Rich asked me questions and he, himself, brought up
23 the number of $1.6 billion.

24 Q    Okay.  And was that given to you as a hypothetical?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And as a hypothetical did he ask you whether -- what

2  impact, if any, 1.6 -- whether Grace would be able to have a

3  feasible plan, or the plan would still be feasible, in the

4  event that it turned out that Grace had to pay $1.6 billion

5  worth of future PD demands over the next 25 years?  Is that the

6  essence of the question that you answered?

7  A    Yes, that's what he asked and that's what I answered.

8  Q    Okay.  And your answer was what?  If, in fact,

9  hypothetically, Grace had to pay in traditional property

10 demands over the next 25 years, post effective date, $1.6

11 billion, could you tell the Court whether the plan would still

12 be feasible?

13 A    Yes, in my opinion the plan would still be feasible.

14 Q    511-22, we'd like, again, to have a matter of record,

15 seriously, we would like to have 511-22 at least included in

16 the record, regarding Ms. Zilly's testimony, as a further --

17            THE COURT:   Another forward looking statement issue?

18            MR. BERNICK:  I'm sorry?

19            THE COURT:   This is another forward looking statement

20 issue?

21            MR. BERNICK:  Yes, that's correct.

22            THE COURT:  All right.  It's admitted.

23 Q    And, then the last thing, just to be clear, because of

24 Your Honor's focus on the numbers, Ms. Zilly going back over

25 511-12, which is total value of assets, I'll just show them on

1  the screen, 511-21 which is the percentage payout analysis,

2  511-21(a), which is certainty on the plan and 511-21(b), which

3  is certainty with respect to Chapter 7 liquidation, could you

4  tell us whether or not the numbers that are contained in all

5  these demonstratives, are the numbers that you're testifying to

6  as an expert, are the numbers that you have used in connection

7  with your best interest analysis?

8        MR. KOVACICH:  For the record, I would object for the

9  same reasons we objected to all of these exhibits previously.

10       THE COURT:  I don't think your microphone is on, Mr.

11 Kovacich.

12       MR. KOVACICH:  I'm sorry.  I object to this question

13 for the same reasons we objected to all of these exhibits

14 previously, and many of the numbers are not supported by

15 proper, competent opinions.

16       THE COURT:  Okay.  I've got the same ruling, the

17 objection is overruled.  That goes to the weight not to the

18 admissibility.  But I think they were offered -- oh, that was

19 an objection to her testimony?

20       MR. KOVACICH:  Well, she's being asked if all of

21 these numbers are accurate and, for example, the one billion

22 opinion on non-ZAI property damage liability is in here

23 repeatedly.  So, I don't want it to be in the record without

24 asserting the objection.

25       THE COURT:  Okay.  It's -- I think the question was,

1  with respect to her expert computations, and to that extent

2  she's testified as to how she used them.  So, the objection is

3  overruled.

4          MR. BERNICK:  Right. Thank you.  And with that I'll

5  pass the witness.

6          MR. KOVACICH:  May we take a brief recess, Your

7  Honor?

8          THE COURT:  Sure.  We'll take a ten minute recess.

9          MR. BERNICK:  I'm sorry, did she answer the last

10  question?

11          THE COURT:  I think I have -- apparently, I left the

12  witness hanging with respect to the answer to the question, so

13  before we recess, I need to get the answer to the question and

14  I'm sorry.

15          MR. BERNICK:  Just say yes.  No.

16          THE COURT:  If you would, Ms. Zilly.

17  Q    The last question, Ms. Zilly, was whether the

18  demonstratives that I've listed which were 511-21(b),

19  511-21(a), 511-21 and 511-12, whether the numbers set forth in

20  those demonstratives, essentially whether the content of those

21  demonstratives accurately reflects the opinions and conclusions

22  that you've reached with regard to the best interest test.

23  A    Yes, they do.

24          MR. BERNICK:  Thank you

25          THE COURT:  All right.  Now, we'll be in recess for

**J&J COURT TRANSCRIBERS, INC.**

1  ten minutes.

2                         (Recess)

3            THE COURT:  Please be seated.  Ms. Zilly, are you

4  ready?

5            THE WITNESS:  Yes, thank you.

6            THE COURT:  Okay, Mr. Finch.

7                    CROSS EXAMINATION

8  BY MR. FINCH:

9  Q    Nathan Finch for the Asbestos Claimants Committee.  Good

10 morning, Ms. Zilly.

11 A    Good morning.

12 Q    I've put on the ELMO a slide that's already in evidence

13 for demonstrative purposes, Plan Proponents' Exhibit 511-21(a).

14 Do you still have that in front of you, ma'am?

15 A    Yes.

16 Q    Under the 2.214 billion that's the plan amount payment,

17 what does that consist of?

18 A    That basically is the value, if you will, of the assets

19 going into the Asbestos PI Trust.

20 Q    And, do those assets that are going to the Asbestos PI

21 524(g) Trust include future cash payments that are owed by

22 Grace?

23 A    It includes the present value of those stream of cash

24 payments by Grace.

25 Q    Okay.  And do you happen to know what the interest rate

**J&J COURT TRANSCRIBERS, INC.**

1 that was used to present value that future cash stream?

2 A    Yes.   Ten percent.

3 Q    Okay.  And just as a matter of financial economics, if the

4 interest rate that the trust uses to value that future stream

5 of payments is lower than 10 percent, let's say it's 5 percent,

6 what would that do to the value of the assets going to the

7 trust?

8         MR. KOVACICH:  Objection.  This is a new opinion,

9 Your Honor.  He's asking her to change --

10         MR. FINCH:  This is not an opinion, Your Honor.

11         THE COURT:  Gentlemen.

12         MR. KOVACICH:  He's asking her to change the

13 calculation of assets available under the plan by changing the

14 interest rate that she used.

15         THE COURT:  No.  This isn't an opinion, this is a

16 mathematical computation.  He's simply asking for a ratio

17 determination. That's overruled.

18 Q    Ms. Zilly, let me restate the question.  You testified

19 that the interest rate used to discount to present value the

20 future cash obligations that Grace owes to the trust, you used

21 a rate of 10 percent, correct?

22 A    That's correct.

23 Q    Okay.  If you used instead of 10 percent, a lower interest

24 rate, let's say 5 percent, what would that do to the asset

25 value you've shown on the plan amount payment?

**J&J COURT TRANSCRIBERS, INC.**

1  A    It would increase under the plan amount payment because
2  the present value then of the future obligations of Grace to
3  the Asbestos PI Trust would go up in value.
4  Q    Okay.  Now, do you recognize that slide?  The slide for
5  the record, Plan Proponents' 511-21(b), as in basketball?
6  A    Yes.
7  Q    Would you agree with me that the -- other than, perhaps,
8  the general unsecured claims, the values shown on here in
9  dollars, are estimates subject to a greater or lesser degree of
10 uncertainty?
11        MR. KOVACICH:  Objection, leading.
12        THE COURT:  That's sustained.
13 Q    Let me rephrase the question.  Could you tell us whether
14 or not the dollar figures shown on this chart are fixed or
15 fixed values or estimates?
16 A    They're estimates, or products of estimates.
17 Q    Okay.  Without regard to the likelihood of any particular
18 dollar figure estimate shown on this chart, do you have an
19 opinion, an overall opinion, about whether Asbestos PI
20 claimants will receive a higher value on account of their
21 claims under the plan or if Grace is liquidated?
22 A    I believe that the Asbestos PI claimants would achieve a
23 higher percentage payout under the plan.
24 Q    You are the financial advisor for W.R. Grace in this case?
25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    As part of that, do you monitor important events that go

2 on, such as bar dates, et cetera?

3 A    Yes.

4 Q    Were you aware that there was a bar date set for personal

5 injury claims in this case that only applied to cases that were

6 pending as of the bankruptcy petition date?

7 A    Yes.

8 Q    What role did you have -- let me ask one more question.

9 You helped prepare Slide 511-21, is that correct, Ms. Zilly?

10 A    Yes.

11 Q    And, you helped to put the word acceleration on that

12 slide?

13 A    Yes.

14 Q    Okay.  Without getting into any expert opinion, what did

15 you mean by acceleration when you put it on that slide?

16 A    That the amount of Asbestos PI liability shown there, the

17 4.7 to 5.2 billion, was a calculation done by -- based on a Dr.

18 Peterson's analyses, that basically simply reflected pending

19 claims as well as claims that have accrued through the

20 bankruptcy date, on a present value basis, to 2009 as opposed

21 to 2001.  So, in other words, it didn't include any future

22 claims as of this date.  As of today's date.

23 Q    Okay.  Now, did you actually have a role with respect to

24 the Babcock and Wilcox bankruptcy?

25 A    I was Babcock and Wilcox's financial advisor.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You were personally involved in that case?

2  A    Yes.

3  Q    Did your personal involvement extend to -- did you have an

4  understanding that Babcock and Wilcox was a subsidiary of a

5  public company?

6  A    Yes.

7          MR. KOVACICH:  I object.  This is leading, number

8  one, and second, her personal involvement in Babcock and Wilcox

9  is not relevant to any issue here.  Counsel is just trying to,

10 again, support her acceleration opinion by referencing what

11 happened in that case and it was not part of the disclosure for

12 this expert witness.

13         MR. FINCH:  Your Honor, this is not expert testimony,

14 this is Ms. Zilly's observations in a fact witness capacity.

15 It's no different than if, in a traffic accident case, I hired

16 an accident investigator who happened to see part of the

17 accident.  The expert opinion is, in my opinion X, Y, Z.  I'm

18 not asking her opinion, would there be acceleration, would

19 there not be acceleration, what's the meaning of acceleration

20 for an expert opinion.  I'm asking her, did you, when you were

21 standing at the intersection, see the truck hit my client.

22 That's all it is, it's fact witness testimony not expert

23 testimony.

24         THE COURT:  Yes.  And the conclusion to be drawn from

25 that is because hypothetically that may have happened in

**J&J COURT TRANSCRIBERS, INC.**

1 Babcock and Wilcox, it will happen in this case in the event

2 that there is a bar date in Chapter 7.  That's getting as close

3 to expert opinion as you can get.

4         MR. FINCH:  I'm not seeking to elicit what is the

5 opinion.  People can argue about that, but I can -- I believe I

6 am entitled to elicit the facts as to what happened in Babcock

7 and Wilcox, that she is personally aware of based on her role

8 as the financial advisor.

9         THE COURT:  What's the relevance?  If you can't

10 elicit the opinion that says because it happened there it's

11 going to happen here, what's the relevance?

12         MR. FINCH:  I can certainly argue and you can decide

13 for yourself the weight to give the argument, I would like to

14 establish the fact that the truck ran over my client.

15         THE COURT:  I think by taking judicial notice of

16 those facts in the pleadings that are filed of record, you may

17 get to the same point, as I understand what the debtor is

18 intending to do.  I don't know whether the facts are supported

19 on the public record, but that's what I understood was going to

20 happen.

21         MR. BERNICK:  Your Honor, from the debtors' point of

22 view we're happy to do that.  It might actually be a little bit

23 more efficient, given the fact that this can be put into the

24 evidence in some other fashion anyhow, it might be a little bit

25 more efficient just to get Ms. Zilly to say -- I don't really

**J&J COURT TRANSCRIBERS, INC.**

1  think it's going to be disputed at all.  I mean, there's an

2  overwhelming acceleration in Babcock and Wilcox.  But we're

3  satisfied with whatever it is Your Honor wants to do.

4           MR. FINCH:  If Your Honor --

5           THE COURT:  To the extent that you're asking for fact

6  questions, I will let you pursue it, but I don't know the

7  relevance.  So, it's subject to a relevance determination.

8           MR. FINCH:  Okay.

9           THE COURT:  The objection is overruled.

10 Q   Okay.  Without getting into any opinions, did you, as part

11 of your job in Babcock and Wilcox, have occasion to review the

12 McDermott Incorporated, publicly filed financial statements

13 that describe the flow rate of claims against Babcock and

14 Wilcox before the bankruptcy and its financial statements that

15 describe what was going on in the bankruptcy.

16          MR. KOVACICH:  Objection, that's leading, and I don't

17 want to continue to interfere with the examination.  In fact,

18 can I have a continuing objection that the whole line of

19 questioning is irrelevant and also serves no purpose but to

20 support an expert opinion that was not part of the disclosure.

21          THE COURT:  The question went well beyond, I think,

22 the prior question that you had asked this witness and has a

23 lot of facts as to which there is no evidence.

24          MR. FINCH:  The question -- I was attempting to lay a

25 foundation as to how she would know this.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well, it's a did she do it.  She may

2  answer yes or no.

3  Q    Did you review McDermott's financial statements as part of

4  your role in Babcock and Wilcox?

5          THE COURT:  Who is McDermott?

6          MR. FINCH:  Let me elicit that.

7          MR. BERNICK:  Parent of Babcock and Wilcox.

8          THE COURT:  I'm sorry?

9          MR. BERNICK:  It was the parent of -- was and is the

10 parent of Babcock and Wilcox.

11         THE COURT:  You know, we are getting onto so many

12 collateral issues, folks.  Go ahead, Mr. Finch.

13 Q    Ms. Zilly, did you come to have an understanding as to how

14 many claims Babcock and Wilcox was receiving on an annual basis

15 before it went into bankruptcy, on average?

16 A    Yes.

17 Q    And, what was that?

18 A    It was under 50,000 a year.

19 Q    And was there a bar date for asbestos personal injury

20 claims that was set for a period approximately a year and a

21 half after the company went into bankruptcy?

22         MR. KOVACICH:  Objection, leading.

23         THE COURT:  Sustained

24 Q    Was there a bar date set in the Babcock and Wilcox

25 bankruptcy?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, there was, for personal injury claims,

2  Q    And approximately how long after the bankruptcy petition

3  was filed was that bar date set for?

4  A    Year to year and a half.

5  Q    And, do you have an understanding as to how many claims

6  were filed in response to that bar date number for asbestos

7  personal injury claims?

8  A    My recollection is, it was over 200,000 claims.

9         MR. FINCH:  Thank you, Your Honor.  With that, I pass

10 the witness.

11        THE COURT:  Mr. Kovacich.

12                   CROSS EXAMINATION

13 BY MR. KOVACICH:

14 Q    Mark Kovacich for the Libby Claimants.  Good morning, Ms.

15 Zilly.

16 A    Good morning.

17 Q    A number of months ago you prepared a best interest

18 analysis that was included as Exhibit 8 in the book of exhibits

19 for the amended joint plan of reorganization in this case.  Do

20 you recall that?

21 A    Yes.

22 Q    And when you prepared that best interest analysis it was

23 your intent, obviously, to provide accurate information?

24 A    Accurate information or reasonable assumptions in the

25 event that accurate information was not available.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    I'm going to show you another demonstrative that was

2 included in the binder provided by the plan proponents this

3 morning.  I don't believe it was displayed during your

4 testimony but do you recall Plan Proponents' 511-13?  Have you

5 seen that before?

6 A    Yes, I have.

7 Q    And, that's actually copied right out of the best interest

8 analysis that you performed for inclusion in the amended joint

9 plan, right?

10 A    No, not exactly.

11 Q    If you could look at the -- your best interest analysis is

12 under Tab B in the binder that I handed you, and on the third

13 page is a detailed liquidation analysis.  Do you see that?

14 A    Yes.

15 Q    The figures that are set forth on 511-13 are taken right

16 out of your detailed liquidation analysis from the exhibit to

17 the joint plan, right?

18 A    Right.  What Exhibit 13 does not have are the footnotes.

19 Q    Okay.  Under your estimated value of the debtors under

20 Chapter 7, in the best interest analysis you performed for

21 Exhibit 8 to the joint plan, you came up with the figures, 2.3

22 billion to 3.5 billion, right?

23 A    That represents the range of values from the low to the

24 high, yes.

25 Q    And, the difference between the high end of that and what

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Kovacich                    91

1  you've testified to here today, in terms of a high end, would

2  be the amounts that were attributed to the Fresenius payment

3  and the Cryovac payment, in your best interest analysis, right?

4  A    Primarily.

5  Q    And, if you look at the detailed liquidation analysis

6  where you included those sums, you wrote a Note C down next to

7  the lines where those appear, which is a reference to some text

8  in your best interest analysis, right?

9          MR. BERNICK:  I'm sorry, where are we in 511-13?

10         MR. KOVACICH:  We're actually not in 511-13, counsel.

11 There's a Note C on the detailed liquidation analysis which is

12 the --

13         MR. BERNICK:  I know where it is.  So, we're no

14 longer on this slide, we're on another document?

15         MR. KOVACICH:  Well, my question was it on another

16 document?  Yeah.

17         MR. BERNICK:  Okay.  So, can we get -- I'm sorry,

18 Your Honor.  Do you think we could have just a document

19 reference, so that we keep track, because I think it has an

20 exhibit number for it.

21         MR. KOVACICH:  It's in evidence, I believe, as part

22 of the plan.  I don't have an exhibit number, I --

23         THE COURT:  Did you give counsel a copy of the

24 binder?

25         MR. KOVACICH:  I did give counsel a copy.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes.

2          THE COURT:  It's Exhibit B.  He is looking at the

3    third page, which is the chart and then the fourth page which

4    has Note C.

5          MR. KOVACICH:  I'm not going to put it in evidence,

6    I'm just going to ask her some questions about it.  It's her

7    report.

8          MR. BERNICK:  I understand, I don't have any issue

9    with that, I think just -- this has got an actual plan

10   proponents' exhibit number and all I was suggesting is that we

11   have as a matter -- but I think as part of the plan, which --

12                    (Someone whispering)

13         MR. BERNICK:  -- I understand that, but what's the

14   plan as a whole?

15         MR. FINCH:  Your Honor, I believe the plan of

16   reorganization is in evidence already as Plan Proponents'

17   Exhibit 277 and somebody behind me can correct me if I'm wrong.

18   This would be Plan Proponents' Exhibit 277.08.

19         MR. BERNICK:  Okay, great.

20   Q    Thank you.  On the detailed liquidation analysis, Page 3

21   of your best interest analysis, you reference the Fresenius

22   payment and the Cryovac payment with a Note C, right?

23   A    Yes.

24   Q    And that corresponds to some language on the next page of

25   your best interest analysis under the caption fraudulent

**J&J COURT TRANSCRIBERS, INC.**

1 transfer actions, right?

2 A    Yes.

3 Q    And the second to the last sentence that appears on Page 4

4 under that section you stated, "It is assumed, however, that a

5 Chapter 7 Trustee would pursue similar litigation actions which

6 resulted in the agreements", right?

7 A    That's what that sentence says, yes.

8 Q    And, then the start of the next sentence you indicated

9 that the outcome of that litigation cannot be known, right?

10 A    Right.

11 Q    And, because the outcome of that litigation cannot be

12 known, you provided a range which is reflected on the figures

13 that we see on 511-13 of 2.3 billion to 3.5 billion in

14 estimated value for the debtors, right?

15        MR. BERNICK:  Objection to the form of the question.

16 The range that's referenced is a different range.

17        MR. KOVACICH:  Well, that's the only -- I'll ask a

18 better question than that.

19 Q    Because the outcome of the litigation could not be known,

20 you provided a range under Sealed Air payment and Fresenius

21 payment of zero to 873 million and zero to 105 million, right?

22 A    Well, it was also -- the zero also reflected the fact that

23 there was -- our assumption was that there's no way that you

24 would get the settlement with Sealed Air and Fresenius in the

25 Chapter 7.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    On Page 4 of your detailed liquidation analysis, you noted

2  that the outcome of the litigation between the Chapter 7

3  Trustee and those parties, could not be known and for that

4  reason you provided a range under your Chapter 7 liquidation

5  analysis with respect to Sealed Air of zero to 873 million,

6  right?

7  A    No, I don't believe that correctly characterizes what it

8  says on Page 4.  What it says on Page 4, it says that because

9  the channeling injunctions are not available, the liquidation

10 analysis assumes these settlement payments would not be made.

11 That's number one.  That means zero in a Chapter 7, under

12 settlement.  And therefore, the trustee would have to decide

13 whether to pursue those litigations, and we have established a

14 range under that as well, of zero to a higher number. It takes

15 into account there are no settlements and the potential of zero

16 either because the trustee doesn't pursue the litigation or

17 because it amounts to a zero recovery.

18 Q    You included the zero and you also included the 873

19 million, right?

20 A    That's a range.

21       MR. BERNICK:  Objection, objection to form.  As to

22 what question.

23 Q    Your Chapter 7 liquidation analysis on Exhibit 8 to the

24 amended joint plan of reorganization included a range of zero

25 to 873 million as possible estimated value of the debtors under

1  a Chapter 7 liquidation, right?

2          MR. BERNICK:  Objection to the form of the question.

3  It's ambiguous and it's not making the distinction that the

4  witness has made, both in writing there and in her testimony.

5          THE COURT:  I don't think it's fairly restating her

6  question.  If you want her to restate it, though, you may

7  certainly ask her to do so.

8          MR. KOVACICH:  I'm not restating her question, I'm

9  just asking her a very simple question which is, if she agrees

10  with me that when she did the Chapter 7 liquidation analysis

11  for inclusion in Exhibit 8 to the joint plan, she included a

12  range of zero to $873 million, as possible payment from Sealed

13  Air under a Chapter 7 liquidation.

14          MR. BERNICK:  Objection to the form of the question.

15          THE COURT:  Overruled.

16  A    The Chapter 7 liquidation assumes a low and a high range.

17  The low end assumes zero for the Sealed Air and Fresenius

18  payments because of my opinion, there would not be any

19  settlements in the Chapter 7 and the trustee would either not

20  pursue the litigation over -- it'd result in a zero recovery to

21  the estate.  The high end is simply assuming that in the

22  Chapter 7, as a proxy for what was achievable under the plan,

23  but at a later date, and at a lower dollar amount based on time

24  value of money.

25  Q    And, you actually explained on Page 4 and continuing onto

**J&J COURT TRANSCRIBERS, INC.**

1  Page 5 of the best interest analysis, why you included that

2  range, starting on the last sentence of Page 4, where you

3  indicated, because the outcome of this litigation cannot be

4  known, a range is shown from zero, at the low end, to a level

5  of Sealed Air proceeds equal to the Cryovac payment and

6  Fresenius proceeds, equal to the Fresenius payment on a present

7  value basis, assuming a discount rate of 3 percent in a three

8  year time period, to collect the proceeds at the high end,

9  right?

10 A    If you're attempting to say that's why the low end is

11 zero, as I've stated before, that's not the only reason that

12 the low end is zero.  If you look at the prior sentence it

13 says, because the Asbestos PI and PD channeling injunctions are

14 not available, the liquidation analysis assumes these payments

15 would not be made.

16 Q    I'm not attempting to do anything other than to ask you a

17 question, Ms. Zilly.  I read accurately from your report where

18 it states, that because the outcome of this litigation cannot

19 be known, a range is shown from zero to the other figures that

20 are reflected in the analysis, right?

21 A    That's what --

22 Q    That what you wrote in your report, isn't it?

23 A    That is one sentence out of this paragraph, correct.

24 Q    Then in August of this year you prepared another expert

25 report addressing the best interest test, do you recall that?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And, in that report you incorporated seven pages of the

3  plan proponents' trial brief in this case, right?

4  A    That's correct.

5  Q    You didn't write those pages in the trial brief, did you?

6  A    I reviewed them and provided comments on them.

7  Q    You reviewed them after someone provided a draft to you,

8  right?

9  A    That's what I mean by review.

10  Q    Someone else wrote those pages of the brief, provided them

11  to you and you provided some comments and then there was a

12  final version of the brief filed with the Court, right?

13  A    No, I don't think that's quite what I said.  What I said

14  was that I reviewed them and provided comments which range from

15  a word here or there, or changing specific sentences or

16  structure of a paragraph.

17  Q    You don't recall providing any comments with respect to

18  the likelihood of recovery on the fraudulent conveyance claims

19  in a Chapter 7 liquidation, do you?

20  A    Are you referring to something in this document?

21  Q    You've testified that you provided some comments on the

22  seven pages of the plan proponents' trial brief that you

23  incorporated into your expert report, right?

24  A    Right.

25  Q    But the comments that you provided did not include

**J&J COURT TRANSCRIBERS, INC.**

1  comments on the likelihood of a recovery in the fraudulent

2  transfer actions, did they?

3  A    My estimate with respect to the Sealed Air and Fresenius

4  payments under a Chapter 7, my Exhibit 8, was done in March of

5  2009.  My views were well known with respect to what I believed

6  the achievability in a Chapter 7 under those payments would be.

7  So, I assume that this does reflect some of those views.

8  Q    You didn't actually have any personal involvement in the

9  fraudulent conveyance litigation involving Sealed Air and

10 Fresenius, did you?

11 A    I was present at certain of the negotiations that took

12 place in Judge Wolin's courtroom.  I was not present

13 specifically in his courtroom, I was present in the courtroom

14 corridors when the negotiations or settlement discussions were

15 going on.

16 Q    You were present somewhere where things were happening,

17 but you were present for other reasons, right?  You didn't work

18 on the fraudulent conveyance litigation, did you?

19 A    The debtor, as a practical matter, was not a key party, as

20 it turned out to the fraudulent conveyance action, the debtor

21 was there, I was there as their financial advisor.

22 Q    You didn't consult with any issues in the fraudulent

23 conveyance litigation, did you?

24 A    Consult with anyone?

25 Q    With anyone.  Did anyone pay you to provide consultation

1 services with respect to the fraudulent conveyance litigation?

2          MR. BERNICK:  You know, in fairness to the witness,

3 she's paid -- the firm is paid as the financial advisor.  If

4 the question is, did she render any services in connection with

5 the fraudulent conveyance litigation that might, respectfully

6 to Mr. Kovacich, might be a little bit cleaner, and I wouldn't

7 have an objection.

8 Q    Ms. Zilly, did you render any services in connection with

9 the fraudulent conveyance litigation?

10 A    No.

11 Q    And, you understand, of course, because that litigation

12 was settled, there was no adjudication of the merits of that

13 litigation.

14 A    I understand the litigation was settled.

15 Q    In another part of your best interest analysis, you

16 estimated costs that would be expected under both the Chapter 7

17 scenario and under the Chapter 11 plan of reorganization,

18 right?

19 A    That's correct.

20 Q    And, the costs that you estimated were higher under

21 Chapter 11 than they were under Chapter 7, right?

22 A    Yes.

23 Q    And, that's the only analysis of costs that you've done

24 with respect to a possible Chapter 7 liquidation in this case,

25 right?

1  A    That is my analysis of the costs.

2  Q    In the detailed liquidation analysis that was part of your

3  best interest analysis in the plan, it's also reflected on

4  Exhibit 511-13 in the figures here, under Chapter 7 you left

5  the line item for Asbestos  PI and PD claims blank, right?

6  A    Yes.  I mean that also has a footnote associated with it,

7  the same way that costs had a footnote associated with it.

8  Q    And, the footnote associated with it references a line

9  that states you assumed Asbestos PI and PD claims would be in

10 dispute, right?

11 A    Under the Chapter 7 column, that's correct.

12 Q    To calculate a payment percentage that would be utilized

13 in a Chapter 7 liquidation, you have to quantify the

14 liabilities that the debtors' estate would have, right?

15 A    You would have to do a mathematical calculation if you're

16 assuming --

17        COURT CLERK:  Did you hit the button --

18        THE WITNESS:  I don't know what I did --

19        MR. BERNICK:  You probably, accidentally popped the

20 button.  Is it green?

21        THE WITNESS:  It is green.

22        COURT CLERK:  Bright green?

23        THE WITNESS:  Bright green.

24        MR. BERNICK:  Say something.

25        THE WITNESS:  Can I go home?

1          THE COURT:  I don't think your microphone is on.

2          THE WITNESS:  It is green.

3          COURT CLERK:  It's bright green, now it's on.

4          THE WITNESS:  Oh, bright green, I'm sorry.  I didn't

5    draw that distinction.

6          THE COURT:  Yes, you'd think they'd make them red and

7    green, but it's green and green.

8          THE WITNESS:  Okay.  So, bright green, okay.  Now I

9    know what bright green is. I'm sorry.  I apologize, could you

10   repeat the question?

11   Q    I can.  To calculate the payment percentage that would be

12   used for unsecured claims in a Chapter 7 liquidation, you have

13   to quantify the liabilities, the amount of those claims, right?

14   A    If you want to do a mathematical calculation, that take

15   assets over liabilities to come up with a payment percentage,

16   you would have to have numbers for each of those.

17   Q    You've never actually worked on a Chapter 7 case, have

18   you?

19   A    Not a formal Chapter 7 case.  I've worked on liquidating

20   Chapter 11s.

21   Q    Do you understand that under Chapter 7, every claim would

22   have to be either allowed or disallowed?

23   A    Yes.

24   Q    You understand that under a Chapter 7 liquidation, the

25   trustee would have an obligation to review and disallow

**J&J COURT TRANSCRIBERS, INC.**

1  improper claims?

2  A    To the extent I presume they were objected to.

3  Q    Who is it that you would expect to object to those claims

4  if it was not the trustee making the decision to review and

5  disallow an improper claim?

6  A    Other parties could object and I suppose the trustee would

7  certainly have the obligation to do that.  I think that would

8  be a pretty overwhelming task in a Chapter 7.

9  Q    Are you suggesting that the Chapter 7 Trustee, absent an

10  objection from some other party, would not review or disallow

11  an improper claim?

12  A    I think it depends on what you mean by an improper claim.

13  Q    In the pages of the trial brief that you incorporated as

14  part of your report --

15        MR. BERNICK:  Is there an exhibit?

16  Q    -- this is under Tab C in the book that I provided

17  counsel.  There's not an exhibit, this is the plan proponents

18  main brief in support of plan confirmation.  It was

19  incorporated as part of Ms. Zilly's expert report.

20        MR. BERNICK:  Let me see if I can get one.  Do we

21  have an exhibit number for that?  We'll see if we can supply

22  one.

23        MR. KOVACICH:  It's the brief.

24        MR. BERNICK:  I know, I know. I just want to have a

25  record of -- go ahead.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It's listed at the top, if this helps, as

2    filed August 8th, of '09 at Docket Number 22733, in somebody's

3    handwriting.

4          MR. BERNICK:  We have it, Your Honor, as the expert

5    report.  We have it as an attachment to Plan Proponents' 366,

6    it'll be 366 -- part of Exhibit 2 for the record.  That way

7    we're sure where we can get --

8          THE COURT:  Wait, I'm sorry, Exhibit 2?

9          MR. BERNICK:  No.  Plan Proponents 366 --

10         THE COURT:  Yes.

11         MR. BERNICK:  -- Exhibit 2 to that document is --

12         THE COURT:  Oh, okay.

13         MR. BERNICK:  -- that is the expert report and then

14   Exhibit 2 to the document is the portion of the trial brief

15   that she refers to.

16         THE COURT:  All right, thank you.

17   Q    And, Ms. Zilly, this is under the Tab C in the binder that

18   we gave you this morning.

19   A    Yes.

20   Q    And, these are the pages of the trial brief that you

21   reference in your report, right?

22   A    I assume so, I don't have my report here, but I'll take

23   your word for it.

24   Q    You do actually have the report, it's under Tab A if you

25   need --

Zilly - Cross/Kovacich                              104

1  A    Oh, sorry.

2  A    -- to take a look at that to be comfortable that this is

3  actually the language that you incorporated as your opinion.

4  A    Yes, I see that.

5  Q    Okay.  On Page 44 of the brief, under the first caption

6  section there, that first paragraph, towards the end there's a

7  discussion of PI and PD liabilities under the joint plan,

8  right?

9  A    Yes.

10  Q    And you note that at the low end, the Asbestos PD payments

11  under the joint plan consist of 209.1 million, right?

12  A    That's what it says, yes.

13  Q    And, then your footnote indicates that includes both the

14  ZAI property damage claims and the non-ZAI property damage

15  claims, right?

16  A    It includes 112 million of the non-ZAI property damage

17  settlement and the 54 and a half million of the ZAI settlement.

18  It refers specifically to those numbers.

19  Q    And then the next sentence in the brief indicates that the

20  high end, under the plan, the Asbestos PD claims consist of

21  212.3 million, right?

22  A    Yes.

23  Q    And, those figures are taken from settlement agreements

24  that were reached between the PD constituency and the debtors,

25  right?

**J&J COURT TRANSCRIBERS, INC.**

1  A    In general, yes.

2  Q    You don't have any reason to believe that those

3  settlements don't represent a fair resolution of the asbestos

4  property damage liability in this case, do you?

5           MR. BERNICK:  Which -- the Chapter 7 case or the

6  Chapter 11 case?  Objection to form.

7           THE COURT:  Which case, the 7 or the 11?

8           MR. KOVACICH:  Well, the settlements are certainly in

9  the Chapter 11 case, so I'll phrase the question that way.

10  Q    You don't have any reason to believe that those

11  settlements don't represent a fair resolution of the Asbestos

12  PD claims in the Chapter 11 case, do you?

13           MR. LOCKWOOD:  Objection to form.  Is the question

14  encompassing the 100 -- is the question encompassing the part

15  of the settlement that requires 100 cents on the dollar payment

16  for those claims or is it just -- is the dollar number without

17  regard to the payment percentage for those claims a fair

18  settlement?

19           MR. KOVACICH:  This is from the witness' report.

20  Actually, it's from the plan proponents' brief but it's been

21  incorporated as her report.  I'm referencing whatever she's

22  talking about where she says that Asbestos PD payments consist

23  of 209.1 million, she's testified that figure came from a

24  settlement, right, Ms. Zilly?

25           THE WITNESS:  The 209 million is the sum of the

Zilly - Cross/Kovacich                                    106

1  settlements achieved in the Chapter 11, after significant
2  litigation for non-ZAI PD claims, as well as the dollar amount
3  that the debtor agreed to pay for ZAI settlements.
4  Q    And, my question is simply whether you have some reason to
5  believe that wasn't a fair resolution of the claims encompassed
6  by the settlement.
7            MR. LOCKWOOD:  Same objection.
8            THE COURT:  Overruled.
9            MR. BERNICK:  In this case, again, the Chapter 11
10 case.  It makes a big difference.
11           THE COURT:  It's overruled.  The witness can answer.
12 I think she can understand whether it's in a 7 or 11.  She
13 knows her report.  She may answer.  You may answer, Ms. Zilly.
14 A    The settlements in the Chapter 11, whether or not they
15 represent a fair settlement is something I have no knowledge
16 of.  It was -- all I know is that the settlements were achieved
17 after costly, expensive and lengthy litigation with respect to
18 both of those items.
19 Q    So, you don't know, one way or the other, whether -- you
20 don't have a view on whether the 209 to 212 million agreed to
21 by the PD constituency and the debtors was a fair resolution of
22 the claims encompassed by those settlements?
23 A    I don't have a point of view.
24 Q    You don't have any knowledge with respect to whether those
25 settlements include future property damage claims, do you?

**J&J COURT TRANSCRIBERS, INC.**

1  A    The non-ZAI PD settlement, I believe, reflects the

2  settlement of pending, or extant claims.  The ZAI settlement, I

3  don't know.

4  Q    I'm sorry, I didn't hear your -- I didn't hear the answer,

5  the first part of your answer.

6  A    I said my understanding is that the non-ZAI PD settlements

7  of 212 million was a dollar amount associated with the

8  settlement of pending or outstanding claims.  The ZAI

9  settlement of 54 and a half million, I said I did not know.

10 Q    Did you learn at some point since your deposition in

11 September, that some portion of those PD settlements applied

12 only to pending claims?

13 A    Are we speaking of non-ZAI or ZAI or both?

14 Q    We're speaking of the claims that you just indicated were

15 only resolved if they were pending.

16 A    I'm sorry, you've confused me.  The original question was,

17 I thought, was did any of the PD settlements include future

18 claims.  I differentiated between non-ZAI PD and ZAI.  So now I

19 don't know where we are.

20 Q    Okay.  My question now is whether you learned at some

21 point since your deposition a month ago, that any portion of

22 that $200 million settlement represented future claims?

23 A    I don't know how to answer that, because I don't know what

24 I knew in September, I guess.

25 Q    Well, maybe I misunderstood your testimony.  Have you

Zilly - Cross/Kovacich                                    108

1  indicated that a portion of the $200 million property damage

2  settlement was paid to satisfy future claims?

3  A    What I testified was that the non -- my understanding of

4  the non-ZAI PD settlement of 112 million was for pending, or

5  claims in the Chapter 11 and that I did not know about the US

6  ZAI settlement.

7  Q    You provided some testimony earlier today about an 85

8  percent, 15 percent split that was agreed to between the PI

9  constituency and the PD constituency, do you recall that?

10 A    Yes.

11 Q    That was part of a plan that was not adopted in this case,

12 right?

13 A    I'm sorry, could you repeat the question?

14 Q    Was the 85/15 split that you testified about incorporated

15 into a proposed plan that was never adopted in this case?

16 A    No, it was an agreement that was reached and events

17 overtook, best as I can tell, their putting that forth in a

18 plan.

19 Q    Well, the debtors didn't agree to that 85/15 split, did

20 they?

21 A    I'm not sure the debtors had the time to properly evaluate

22 it.

23 Q    Is it your understanding that the 85/15 split is part of

24 the current plan?

25 A    No.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Okay.  Do you know whether or not it was part of some

2 other plan that was not adopted in this case?

3 A    I think as I testified to a moment ago, the 85 percent, 15

4 percent split was an agreement, that because events overtook

5 the timing of that being put forth before the Court, was not

6 put in a plan.

7 Q    And, I understood that testimony, my question is whether

8 you know, was it part of an earlier plan?

9 A    If you're speaking of the plan as the plan that was put

10 forth before the Court, the plan of reorganization, the answer

11 is no.

12 Q    Do you know whether the 85/15 split included both ZAI and

13 non-ZAI claims?

14 A    I believe it included only property damage claims.

15 Q    And when I say ZAI and non-ZAI claims, I'm talking about

16 property damage claims.  Those are all property damage claims.

17 A    Okay.  It did not include ZAI claims.

18 Q    And, what did you base that understanding on?

19 A    My understanding of the agreement.

20 Q    Where did you gain the understanding that the 85/15 split

21 agreement did not include ZAI claims?

22 A    There were general discussions between us and the debtor

23 regarding this proposal and the transcript in court, where Mr.

24 Frankel was speaking of his proposal.

25 Q    The transcript in court that Mr. Frankel spoke about, do

1  you recall that he said in that transcript that the agreement

2  did not include any ZAI claims?

3  A    I don't recall.

4  Q    And, what else did you indicate, some discussions between

5  you and the debtor?

6  A    Correct.

7  Q    Who did you have those discussions with?

8  A    It was most likely on a conference call with any number of

9  representatives of the debtor at the time.

10  Q    You can't tell us as you sit here under oath today who

11  told you that the 85/15 split did not include ZAI claims?

12  A    That's correct.

13  Q    You understand that since that time there have been

14  settlements between the PI constituency and the debtors, as

15  well as between the PD constituency and the debtors?

16  A    Yes.

17  Q    And the amounts allocated to those settlements don't

18  divide up 85/15, do they?

19  A    A lot happened in the Chapter 11 between the time of that

20  agreement, including an estimation and litigation with respect

21  to all of these claims and the ultimate result was no, they

22  were not split 85/15.

23  Q    One of the other things that happened since that agreement

24  was the resolution of the ZAI Science trial, right?

25  A    There was an opinion issued in the ZAI Science trial,

**J&J COURT TRANSCRIBERS, INC.**

1  that's correct.

2  Q    And, the Court found in that opinion that ZAI does not

3  pose an unreasonable risk to the health of humans, right?

4          THE COURT:  Pardon me.  That is actually not what I

5  found.

6          MR. KOVACICH:  I'll get back to that and reference

7  the actual opinion.

8  Q    You provided some testimony about estimates by the counsel

9  representing ZAI property damage claimants of a number of homes

10 that may contain ZAI, right?

11         THE COURT:  I'm sorry.  I apologize, would you

12 restate that for me.  She provided estimate of --

13 Q    She testified earlier about estimates that were put forth

14 by the ZAI claimants counsel regarding the number of homes in

15 the United States with ZAI in them, right?

16 A    Yes, I made reference to that earlier.

17 Q    And that was also referenced in the trial brief that you

18 incorporated in your report and this is at Page 46 of that

19 brief, do you see that?

20 A    Yes.

21 Q    And, you reference a hearing transcript in this court

22 dated June 2nd, 2008 for that, correct?

23 A    Yes.

24 Q    The one million figure that you referenced, that was

25 referenced in the trial brief and incorporated in your report

**J&J COURT TRANSCRIBERS, INC.**

1 was a figure that was represented by counsel preparing for the

2 ZAI claimants at that hearing, right?

3 A    Yes.  This actual number was a bit higher than that, but

4 that's what the one million homes refers to.

5 Q    By a bit higher, it was 60 or 70,000 more than a million,

6 something on that order, right?

7 A    Yes.

8 Q    You don't know where he actually got that number do you?

9 A    He references in the trial transcript work that they had

10 done regarding the number of homes as well as using an expert

11 in order to put forth evidence in front of the State of

12 Washington.

13 Q    He references some expert work that was done, but you

14 don't know who the expert was, right?

15 A    That's correct.

16 Q    And you don't know how the expert went about determining

17 how many homes may contain Zonolite Attic Insulation, do you?

18 A    I don't know the exact methodology the expert used, I just

19 know that Mr. Scott was relying on it in testimony in the

20 court.

21 Q    Do you recall that Mr. Scott also -- during that hearing

22 there was discussion about the establishment of a bar date for

23 ZAI claims, right?

24 A    That's correct.

25 Q    And, you recall that Mr. Scott was opposing that, the

1 request for a ZAI bar date and one of the reasons he opposed it

2 was that, in his belief, many homeowners who have ZAI in their

3 home don't even know it, right?

4 A    He was opposing it on a number of grounds.  I frankly

5 thought mostly he was opposing it on the grounds he thought a

6 class action would be better.  He referenced the fact that

7 people would not know that ZAI was in their homes or if they

8 knew it was in their homes, they wouldn't know it would be

9 Zonolite and made the observation that he thought any bar date

10 would result in a much lower number of claims being filed than

11 were actually out there.

12 Q    Did you -- you read the June 2, 2008 hearing transcript?

13 A    Yes, I did.

14 Q    This is -- portions of it are under Tab G in the binder

15 that you have there, if you could refer to that.  And on Page

16 77 of the transcript in the first full paragraph, do you recall

17 Mr. Bernick indicating that the attempts to estimate how many

18 homes might have ZAI were rank speculation?

19 A    Yes, I see that.

20 Q    And do you recall seeing Mr. Bernick's suggestion that the

21 best way to know how many claims there are would be to have a

22 bar date and see how many claims come in?

23 A    Well, it doesn't surprise me that Mr. Bernick made the

24 comment of the number of homes referred to by the ZAI lawyer

25 was rank speculation and the whole point of the motion was to

1 establish a bar date.

2 Q    If you could refer to Page 133 and 134 of the transcript.

3 Do you recall Mr. Scott advising the Court that something like

4 60 to 65 percent of homeowners don't even know what kind of

5 insulation they have in their home?

6 A    Yes.

7 Q    And, do you --

8 A    That's why -- I'm sorry, go ahead.

9 Q    And, do you recall him also telling the Court that nine

10 out of ten people wouldn't recognize Zonolite Attic Insulation

11 if they saw it?

12 A    That's what he states, which is why he didn't think the

13 bar date would be adequate to bring out everyone who had a

14 claim.

15 Q    And a bar date was later established with respect to ZAI

16 claims, right?

17 A    That's correct.

18 Q    And approximately 17,000 such claims were filed, right?

19 A    That's correct.

20 Q    Do you understand that in a Chapter 7 liquidation the

21 trustee would establish a bar date for claims such as Asbestos

22 PI and PD claims?

23 A    Yes.

24 Q    You don't have any reason to believe that the type of

25 notice a Chapter 7 trustee would use would be any different

**J&J COURT TRANSCRIBERS, INC.**

1 than the notice used with respect to the ZAI bar date in this

2 case, do you?

3 A    I'm not familiar enough with the notice that was provided

4 in the Chapter 11 to make a distinction as to whether it'd be

5 different or not in the Chapter 7.

6 Q    Did you read Denise Martin's report on property damage in

7 this case?

8 A    I'm assuming you're referring to Exhibit I, H, I in this

9 binder?

10 Q    Yes. It is under I in this binder.

11 A    I.

12 Q    And it also has a Bates stamp starting with PP 007667.

13 A    Yes, I read this.

14 Q    Did you see her conclusion that the amount of asbestos

15 property damage claims is indeterminate?

16 A    Yes.  I believe she's referring to in a Chapter 11, or her

17 report covers classes, so I assume this was under the Chapter

18 11.

19 Q    Okay.  But she actually provides a number of reasons why,

20 factors supporting her opinion that the amount of property

21 damage claims is indeterminate, right?

22 A    She states several -- yes. On Page 2 she states several

23 factors.

24 Q    And there's a number of factors listed, starting on Page 8

25 as well, right?

Zilly - Cross/Kovacich                    116

1  A    Yes.

2  Q    Do you see anywhere in the report where she expresses the

3  opinion that one of the reasons the amount of claims is

4  indeterminate is that Grace is in Chapter 11 and not Chapter 7?

5  A    My only point is that this is a report that attempts to,

6  based on her own statements, attempts to -- has been asked

7  whether or not the likely subject of future demands, and she

8  lists Classes 7B, 7A and Class 8, which, at least infers to me

9  that she was doing this report based on a Chapter 11.  I don't

10 have enough knowledge to know whether or not she would make the

11 same assumptions in Chapter 7 or Chapter 11.  I just know this

12 report was based on Chapter 11.

13 Q    Let's look at, specifically at some of the factors that

14 she lists, starting on Page 8 and the first factor in

15 particular states, the number of buildings potentially

16 containing a Grace asbestos containing product is not known,

17 right?

18 A    That's what it says.

19 Q    And, you don't have any reason to think the number --

20 estimates of the number of buildings containing Grace products

21 would be different under Chapter 7 than Chapter 11, do you?

22         MR. BERNICK:  Can I have the question read back,

23 please?  I'm sorry.  Let me just take a look.  I'm going to

24 object to the question.  The witness at this point is being

25 asked to offer a potentially competing or different opinion,

**J&J COURT TRANSCRIBERS, INC.**

1  she's being asked to comment on the opinion of an estimator.

2  She's not been proffered to testify about estimation, her

3  testimony on direct is clear that she did no estimate, she

4  assumed no estimate and, therefore, it is improper to raise

5  with her basically the question of whether she agrees or

6  disagrees with an expert estimator.

7         MR. KOVACICH:  Your Honor, she testified that there

8  were one million homes containing Zonolite Attic Insulation, at

9  least there were claims by the claimants counsel that there

10 were one million homes and that the cost to remediate those

11 homes would be 5,000 each, which she does the simple math and

12 suggests that we could have ZAI liability of up to $5 billion

13 under Chapter 7 and that's a completely unrealistic assumption

14 for her to make and the other opinions of the plan proponents

15 own expert, who is more knowledgeable about these things,

16 refute that.

17        MR. BERNICK:  Your Honor, first of all it's

18 completely apples and oranges.  Ms. Martin talks about the

19 prospect of there being future traditional PD demands.  That's

20 number one.  Number two, the witness hasn't testified to any

21 estimate concerning ZAI in homes.  What she's testified to is

22 that others, speaking on behalf of the ZAI claimants have.  So,

23 this doesn't go to cross examination at all.

24        THE COURT:  I don't think this witness has said that

25 she supplied these numbers. I think she's testified that, in

1    various places, she's used numbers that have been provided by,

2    or estimates have been provided by other witnesses.  So, I'm

3    not clear.  Your question was, does she have any reason to

4    assume that the number of buildings with asbestos product as

5    unknown would be different in a 7 from an 11, I'm not sure how

6    she would have the expertise to know that.  If you want to lay

7    a foundation you may lay a foundation.

8            MR. KOVACICH:  Well, Your Honor, I agree, she didn't

9    have the expertise to suggest how many claims would be filed in

10   the Chapter 7 and she did that.

11           MR. BERNICK:  No, she absolutely didn't.  That's not

12   what the document says.

13           THE COURT:  She did what experts do.  She took the

14   opinion of someone else and used it in a report.  She's

15   permitted to use types of material that experts in making her

16   projections would use and as I understand it, she took the

17   expert that was provided by counsel for the claimants.  And

18   that's what she used in the report.

19           MR. KOVACICH:  Well, she referenced what the property

20   damage claimants said at a hearing without even knowing what

21   that was really based on.

22           THE COURT:  That goes to the weight of her opinion

23   and those are things you'll be arguing, I understand, but I

24   don't know that she has --

25           MR. KOVACICH:  And that -- I'm sorry, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Kovacich                          119

1          THE COURT:  -- I just don't know that she has the

2   foundation to be able to answer the question, but if you want

3   to show me her foundation, you may proceed.

4          MR. KOVACICH:  Well, it should go to the weight of

5   her testimony, that she didn't consider other more detailed

6   expert information which is inconsistent with what she

7   suggested on direct about the amount of property damage claims

8   that would burden a Chapter 7 estate.

9          THE COURT:  Well, you --

10          MR. LOCKWOOD:  Your Honor, I don't believe she's

11   testified as to any dollar amount of ZAI claims in her best

12   interest analysis.  As I recall, there were question marks in

13   that analysis and all she testified was that there was

14   uncertainty.

15          MR. KOVACICH:  They used one million homes and $5,000

16   on the little chart to drive the numbers out.  There were

17   question marks, but then Mr. Bernick pointed out that the less

18   than 25 to 35 incorporates all this uncertainty and it's been

19   suggested in her testimony that we might have up to $5 billion

20   in ZAI claims.

21          THE COURT:  Right.  That was her testimony, that she

22   used those numbers that were provided and if you want to ask

23   her questions about whether she considered anything else, you

24   may certainly do that.

25          MR. BERNICK:  But, again, to be fair --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  The question that is --

2          MR. KOVACICH:  I can just ask one question and maybe

3 we can move on from this.

4 Q   Ms. Zilly, you don't have any reason to disagree with Ms.

5 Martin's conclusion that the amount of future property damage

6 claims is indeterminate, do you?

7          MR. BERNICK:  That I object to and that's what I said

8 before.  That is wrong.  Ms. Martin, Dr. Martin's report deals

9 with the prospect of there being future additional demands and

10 it's not with respect to ZAI for the specific reason that

11 future demands with respect to ZAI are already taken care of.

12 It is on the traditional property damage claims.

13          MR. KOVACICH:  And it's also very inconsistent with

14 the opinion that we're going to have $1 billion in traditional

15 property damage claims under Chapter 7.

16          MR. BERNICK:  But that, again, that's not even --

17 that is completely apples and oranges.  That is not --

18          THE COURT:  Okay, wait.  I think -- the question has

19 to relate -- the witness has to be given an opportunity -- I

20 need an opportunity to rule, the witness needs an opportunity

21 to answer the question that's asked before we go off on another

22 tangent.  The question that was asked of this witness is

23 whether she had any reason to dispute the figures that Dr.

24 Martin uses with respect to Zonolite ZAI.  Now is that the

25 question that you want to ask?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. KOVACICH:  Did I reference ZAI, what I intended

2   to ask simply, whether she has any reason to dispute Dr.

3   Martin's conclusion as set forth in this report, that the

4   amount of future property damage demands are indeterminate.

5          THE COURT:  All right, she may answer that question.

6          MR. BERNICK:  Just note our objection that this asks

7   for her expert opinion, but I understand that's been overruled

8   and the witness will answer.

9          THE COURT:  If you know, ma'am.  I'm not trying to

10  force you to anser a question to which you don't know the

11  answer, I should make that clear, if you know.

12         THE WITNESS:  Could you repeat the question?

13  Q    Do you have any reason to dispute, is it Dr. Martin, I'm

14  sorry, her conclusions as set forth in this report that the

15  amount of future property damage demands against Grace are

16  indeterminate?

17  A    I don't have a reason to doubt Dr. Martin's conclusions

18  that the amount of future property, asbestos property damage

19  claims -- excuse me, asbestos property damage demands in the

20  Chapter 11 as she had set them forth here, I have no reason to

21  doubt that they're indeterminate which strikes me as higher

22  than a million homes.

23         THE COURT:  I'm sorry, I didn't understand the

24  answer.  You have no reason in the 11 --

25         THE WITNESS:  I said I had no reason to doubt -- Dr.

1 Martin's report refers, as far as I can tell, refers

2 specifically to whether or not it is possible to estimate

3 future demands arising from asbestos property damage claims and

4 in particular, in the Chapter 11.  If the question is, do I

5 have any reason to doubt what her conclusions were, in her

6 report, I have no reason to doubt them, I have no reason to

7 believe them, but I have no reason to doubt them.

8 Q     And you have no reason to believe that any of the factors

9 supporting her conclusions would be any different under Chapter

10 7 than they are under Chapter 11?

11 A     I have no basis to answer that question.

12 Q     You are familiar with the Court's order following the ZAI

13 Science trial?

14 A     Yes.

15 Q     Have you read that order?

16 A     Yes.

17 Q     Did you consider that for purposes of your allocation of

18 property damage liability under the Chapter 7 -- let me start

19 over.  Did you consider the Court's opinion following the ZAI

20 Science trial in forming your conclusions with respect to best

21 interest in this case?

22 A     Yes.  Sorry.  Yes.

23 Q     The opinion is under Tab F of the binder.  And if you

24 could refer to Page 3 in the second paragraph, partway through

25 the first sentence it states, "This court decided to address

Zilly - Cross/Kovacich                    123

1  the threshold issue of whether ZAI poses an unreasonable risk
2  of harm under the assumption that any property damage claim
3  ultimately arises from the risk of someone getting sick from
4  the contaminated property." Did you see that?
5  A    Yes.
6  Q    Did you understand that Grace took the position that the
7  ZAI property damage claims would be invalid if the product did
8  not pose an unreasonable risk of harm?
9        MR. BERNICK:  Object to all these questions as being
10 entirely irrelevant to a Chapter 7 liquidation.
11       MR. KOVACICH:  Let me ask a couple of questions about
12 that then.
13 Q    Ms. Zilly, do you understand that if this case were
14 converted to a Chapter 7 liquidation that the ZAI Science
15 ruling would be available to the Chapter 7 Trustee?
16       MR. BERNICK:  Objection to the form of the question.
17 What are we assuming concerning the timing of that?
18       MR. KOVACICH:  We're assuming a conversion to a
19 Chapter 7 liquidation in the best interest of certain creditors
20 going forward.
21       MR. BERNICK:  From today?
22       MR. KOVACICH:  Yes.
23 Q    Do you understand that the ruling following the ZAI
24 Science trial would be available to the Chapter 7 Trustee?
25       MR. LOCKWOOD:  Objection, calls for a legal opinion.

**J&J COURT TRANSCRIBERS, INC.**

1  What does available mean?

2          MR. KOVACICH:  Well, it's already been entered and

3  the Trustee could certainly use it when deciding whether and in

4  what amount to allow property damage --

5          MR. LOCKWOOD:  That is not -- that's a question of

6  res judicata, it's a question of a jurisdiction in a Chapter 7

7  cases versus a Chapter 11 interim ruling that didn't resolve a

8  -- I mean --

9          THE COURT:  The objection is sustained.  It calls for

10 a legal conclusion.

11 Q    Ms. Zilly, you testified in your direct examination that

12 you provided an estimate of PI liability ranging from 4.7

13 billion to 5.2 billion, do you recall that?

14 A    Yes, under -- that's what I testified to under the

15 specific circumstances as it played out on this exhibit.

16 Q    And you took those figures, I believe you stated, from

17 estimates that were provided by Dr. Mark Peterson?

18 A    In general, yes.

19 Q    And the amounts as I think we made clear in the discussion

20 about acceleration did not include future claimants, right?

21         MR. FINCH:  Object to form.

22         THE COURT:  Overruled.

23         THE WITNESS:  I'm sorry, could you repeat the

24 question?

25 Q    The amounts, your 4.7 to 5.2 billion, did not include

1  future claimants, is that correct?

2  A    It's an estimate based on pending and claims that have

3  accrued through the bankruptcy.

4  Q    When you performed your best interest analysis several

5  months ago was it your assumption that future claimants would

6  be paid in a Chapter 7 liquidation?

7  A    It was my assumption -- it is my assumption that in a

8  Chapter 7 liquidation that the Trustee is not going to have the

9  resources that were available to this debtor in the Chapter 11

10  to litigate over 300,000 personal injury claims to determine

11  which ones had injury, alleged injury, and were proper claims.

12  Q    But you understand that the Chapter 7 proceeding has to be

13  closed at some point after which there won't be additional

14  personal injury claims, right?

15  A    I understand there's going to be a bar date by which folks

16  have to file claims.

17  Q    And you understand that following that bar date there

18  would be a process where claims are allowed and disallowed and

19  then ultimately the Trustee would close the estate, right?

20  A    I'm not certain that's actually the way it would work.

21  The Trustee may in fact set up a trust for the proceeds from

22  the sale of the assets.

23  Q    It's your understanding that a Chapter 7 Trustee could

24  establish a trust for the payment of future claims?

25  A    I didn't say that.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FINCH:  Objection to form to the extent that it

2   calls for a legal conclusion.

3          THE COURT:  The witness is I think about to explain

4   her testimony.  You may explain your testimony, Ms. Zilly.

5   A    What I said was you made the proposition that the Trustee

6   would, I guess, "close down the estate" I believe were your

7   words and distribute all the proceeds, and I simply made the

8   observation that the Trustee may set up a trust to pay claims.

9   I didn't differentiate between whether they were pending,

10  future or current claims.

11  Q    In your liquidation analysis you actually assumed a time

12  frame of one year for the Chapter 7 liquidation to take place,

13  right?

14  A    I assumed that primarily for purposes of determining the

15  amount of costs associated with the Chapter 7 since we had

16  assumed a monthly cost for the Chapter 7 Trustee and other

17  professionals.

18  Q    But regardless of the time frame, you do understand that

19  under a Chapter 7 liquidation there is a point in time where

20  the estate would be closed and claims would be paid, right?

21  A    Yes, at some point in time the estate would be closed and

22  claims would be paid or arrangements for those claims to be

23  paid.

24  Q    And there would be no ability for the Chapter 7 Trustee to

25  pay future claims arising after that date, is that true?

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Kovacich                     127

1  A    Well if all the proceeds had been distributed the answer

2  would be no.  However, during the course of the time prior to

3  that, claims could be made that in your definition, if what I

4  assume you're getting at is future claims, could be brought

5  against the estate.

6  Q    As a financial advisor and expert in restructuring you're

7  not aware of any methodology that can be used to establish what

8  Grace's PI liability would be, are you?

9          MR. BERNICK:  Objection.  PI liability where, when?

10         THE COURT:  All right, sustained.

11 Q    As a financial advisor and expert in restructuring you're

12 not aware of any methodology that could be used to establish

13 what Grace's PI liability would be under a Chapter 7

14 liquidation, are you?

15         MR. BERNICK:  Objection to the form of the question,

16 asking for legal liability.  It calls for a legal conclusion.

17         MR. KOVACICH:  The point is just that she's not

18 aware, and she's testified previously, of any methodology that

19 can be used to establish what that liability would be.

20         THE COURT:  That's a slightly different question than

21 you just asked, I think.  But does she know of a methodology to

22 establish Grace's personal injury liability, is that the

23 question?

24         MR. KOVACICH:  Yes.

25         THE COURT:  If the objection was to that question

1  it's overruled.  You may answer, Ms. Zilly.

2  A    There are methodologies that exist to certainly estimate

3  the amount of that liability, so I'm not sure what you mean by

4  establish.

5  Q    On September 16th in this courtroom Mr. Bernick asked you

6  as of this point in time absent the plan of reorganization that

7  is confirmed as a financial advisor and expert in restructuring

8  is there any methodology that you're aware of that can be used

9  to establish exactly or even approximately what that personal

10 injury ultimate liability ultimately would be determined to be

11 and your answer was no, there is not.  Did I read that

12 correctly?

13 A    What it says is is there any methodology that you're aware

14 of that can be used to establish exactly or even approximately

15 what that personal injury ultimate liability would be

16 determined to be and what I answered today was --

17 Q    I'm sorry, Ms. --

18 A    -- that there are ways to estimate it.

19 Q    My question is simply whether I read the transcript of the

20 proceedings in this court accurately.

21 A    You read the five lines that you've highlighted.

22 Q    I didn't leave out part of the question or answer, did I?

23 A    I have no idea in what context this testimony was given

24 based on what you've shown me.

25 Q    You don't recall --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I'm at a disadvantage.  I don't really

2 have the context of the question that I asked.  That is really

3 taken completely out of context.  I object to that.  That's not

4 proper impeachment.

5          THE COURT:  It's not inconsistent with what the

6 witness is saying, so let's move on to what you're going to

7 establish.

8 Q    Do you recall preparing a rebuttal report addressing some

9 opinions by Mr. Robert Frezza in this case?

10 A    Yes.

11 Q    And you criticized Mr. Frezza's solvency analysis because

12 he picked a single number among many estimates of Grace's

13 asbestos PI liability, right?

14 A    What I criticized was that in his attempt to prove that

15 Grace was solvent picking just one number without indicating

16 what the ramification of that number could be on everything

17 else and assuming that the plan would still be in effect was

18 flawed.

19 Q    Do you recall the exhibit that I've displayed here, this

20 was admitted for demonstrative purposes, Plan Proponent's

21 511-6?

22          MR. BERNICK:  In connection with what?

23          MR. KOVACICH:  In connection with her testimony

24 earlier in this case.  I just simply asked if she recalls it.

25 A    Yes, I recall it.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You've seen the widely diverging estimates of asbestos PI

2  liability that were done in connection with the estimation

3  proceeding in this case?

4  A    That's what this chart says.

5  Q    And you've seen those, right?

6  A    I'm sorry, what are these -- those?

7  Q    The widely diverging estimates of PI liability that were

8  displayed on this chart that was admitted for demonstrative

9  purposes following your testimony about a month ago.

10  A    I have seen this chart if that's what you're asking me.

11  Q    And you've seen the estimates, you've seen documents

12  reflecting the estimates that are referenced on this chart,

13  right?

14  A    Yes.

15  Q    You're not an expert with respect to the estimation of

16  asbestos liability, are you?

17  A    No, I am not an expert.

18  Q    One of the reasons you criticized Mr. Frezza's use of the

19  -- well let's be specific about that -- it was the 468 million

20  median estimate by Dr. Thomas Florence that Mr. Frezza used,

21  correct?

22  A    That's correct.

23  Q    And one of the reasons you criticized him for using that

24  was that the PI liability as estimated by that number had not

25  been adjudicated, right?

**J&J COURT TRANSCRIBERS, INC.**

1 A    I don't recall if I stated that in my report, but I'm

2 looking at Paragraph 9, which simply says that he doesn't take

3 into account the wide range of estimates.

4 Q    The report is Tab H attach in this binder, I believe.  You

5 have that?

6 A    Yes, I have it.

7 Q    If I can find it with all my sticky tabs.

8            THE COURT:  I'm sorry, it's at Tab what?

9            MR. KOVACICH:  Tab H.

10            THE COURT:  H.

11            THE WITNESS:  It's on Page 2.

12            THE COURT:  Thank you.

13 Q    On Page 5 of the report you indicate under Paragraph 14

14 Mr. Frezza's analysis is flawed for the reasons described

15 above, to wit, Mr. Frezza relies on a number that has never

16 been adjudicated, right?

17 A    That's one of three reasons I give.

18 Q    And one of the other reasons was that he ignored the

19 uncertainty associated with the wide range of liability

20 estimates that have been done, right?

21            THE COURT:  Cathy, did we lose the phone?

22            AUDIO OPERATOR:  Yes, Judge, we did.

23            THE COURT:  Can you reconnect, please.

24 A    I'm sorry, yes, that's what it --

25            THE COURT:  We need to wait until we reconnect the

1  phone, Ms. Zilly.

2                      (Pause)

3           THE COURT:  Thank you.  Would you restate your

4  question since we lost the phone, please.

5           MR. KOVACICH:  Yes, Your Honor, thank you.

6  Q    In addition to the fact that Mr. Frezza relied on a number

7  that was never adjudicated you also criticized him for ignoring

8  the substantial uncertainty associated with the amount of

9  liability for asbestos PI claims, right?

10 A    Yes, that's one of the other reasons I criticized his

11 report, which was basically -- I mean, this is a solvency

12 analysis.  It purports to say that Grace is solvent using a

13 certain number.  And for those --

14 Q    For you to --

15          MR. BERNICK:  I'm sorry, could we have the -- go

16 ahead.

17          MR. KOVACICH:  I thought she was finished.

18 A    And for those purposes because it is a solvency analysis

19 there were certain criticisms of the use of that number and

20 that was one of them.

21 Q    For your best interest analysis you used only numbers that

22 were provided by Dr. Peterson for the PI liability, right?

23 A    Well, in the -- yes, Dr. Peterson's numbers with respect

24 to -- that I used for purposes of estimating claims in the

25 Chapter 7 reflected Dr. Peterson's estimates as to what he

1 believed the appropriate estimate was of asbestos PI claims.

2 That was an estimate that was put forth for purposes of the

3 estimation hearing in the Chapter 11 through extensive

4 litigation.

5              MR. KOVACICH:  Your Honor, this is not responsive.

6              THE WITNESS:  Excuse me.

7              MR. KOVACICH:  I simply asked if she used only

8 numbers provided by Dr. Peterson.  She answered yes.  That's

9 acceptable.  And now she's giving a speech and it's not

10 responsive to the question.

11             THE COURT:  This can be straightened out if there's

12 some confusion on redirect.  Go ahead, ask your next question.

13 Q    Dr. Peterson's estimated liability much like Dr.

14 Florence's was never adjudicated, is that true?

15             MR. BERNICK:  Objection to the form of the question.

16             THE COURT:  Overruled.

17 A    No, it was not.

18 Q    I just have a couple of quick questions about this Exhibit

19 511-21.  Under your percentage payout on the bottom for the

20 Chapter 7 liquidation, in order to calculate 30 to 36 percent

21 you took the -- for the low end of that range you took the low

22 end of the range for assets and divided that by the high end of

23 the range for liabilities?

24 A    Yes.

25 Q    And then for the high end of the range you took the high

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Kovacich                    134

1  end assets and divided that by the low end liabilities, right?

2  A    That's right.

3  Q    If we were to decrease what you've allocated here for

4  property damage liability the effect of that would be to

5  increase the percentage payout, right?

6  A    If you're asking me a mathematical question whether or not

7  the asset number stays the same and the liability number goes

8  down then yes, due to ratio, you know, would change.

9  Q    So and that would be true if you added -- or if you

10  reduced the numbers for PI liabilities or property damage

11  liabilities, right, your percentage payout would increase under

12  Chapter 7?

13  A     If you kept the asset number the same, the numerator the

14  same, and reduced the denominator the percentage payout would

15  increase as a mathematical truism.

16  Q    If you increase the assets to account for some portion of

17  recovery from a fraudulent conveyance action that would

18  likewise increase the percentage payout, right?

19  A     If you increase the assets the numerator -- and kept the

20  denominator the same that would also increase the percentage

21  payout.

22         MR. KOVACICH:  Thank you, Ms. Zilly.  That's all I

23  have.

24         THE COURT:  All right, why don't we stop here for the

25  lunch recess because Armstrong is scheduled to start in five

1  minutes anyway.  How long would you --

2          MR. BERNICK:  Can we -- I'm sorry.  Can we find out

3  who else intends to examine and how long we're going to go.

4          THE COURT:  Anderson is going to cross examine.

5  Anyone else?  How long will you be?

6          MR. ROSENDORF:  I would estimate approximately 45

7  minutes.

8          THE COURT:  All right.  Two insurers, how long will

9  you be?

10          MR. BROWN:  Thirty seconds, Your Honor.

11                        (Laughter)

12          MR. BERNICK:  That would be inspiring.

13          THE COURT:  Okay.  We may do you first Mr. Brown.  Mr

14  Cobb.

15          MR. COBB:  Maybe 20 minutes, Your Honor.

16          THE COURT:  All right.  Mr. Mangan.

17          MR. MANGAN:  About two to five minutes, Your Honor.

18          THE COURT:  All right.  So approximately an hour

19  overall.

20          MR. BERNICK:  That's fine.

21          THE COURT:  Okay.  How long do you want for the lunch

22  recess, an hour?  But we'll start on time at 2:30, which means

23  --

24          MR. LOCKWOOD:  1:30.

25          THE COURT:  Oh, I'm sorry, 1:30, yes.  Thank you.

1            MR. BERNICK:  Okay.  Thank you.

2            THE COURT:  I really do need to get my glasses back.

3  All right, we'll be in recess until 1:30.

4                         (Recess)

5            THE COURT:  Ms. Zilly, are you ready, ma'am?

6            THE WITNESS:  Yes.  Thank you.

7            THE COURT:  Who's next?  Mr. Brown.

8            MR. BROWN:  Good afternoon, Your Honor.

9            THE COURT:  Good afternoon.

10            MR. BROWN:  Michael Brown for One Beacon and Seton.

11                     CROSS EXAMINATION

12  BY MR. BROWN:

13  Q    Ms. Zilly, you were not involved in the negotiations of

14  the Sealed Air settlement agreement, were you?

15  A    No.

16  Q    And would your answer be the same with respect to the

17  Fresenius settlement agreement?

18  A    Yes.

19  Q    Thank you.

20            THE COURT:  Mr. Cobb.

21                     CROSS EXAMINATION

22  BY MR. COBB:

23  Q    Good afternoon, Ms. Zilly.  A few questions about the exit

24  financing.  I had reserved the right to do that when we were

25  here last.  What is your experience at Blackstone representing

**J&J COURT TRANSCRIBERS, INC.**

1  clients in the area of exit financing in a bankruptcy context?

2  A    Well, over the years to the extent that my clients exited

3  bankruptcy and were in a position to require third party exit

4  financing as opposed to getting it, for example, from a parent

5  I have experience in negotiating those exit financings with

6  individual lenders.

7  Q    Now you provided an opinion earlier today, I believe, that

8  Grace will be able to obtain exit financing if this plan is

9  confirmed, correct?

10 A    Yes, that's correct.

11 Q    And that was an expert opinion?

12 A    Yes.

13 Q    And in rendering that opinion you took into account or

14 consideration all of the terms -- possible terms, requirements

15 and conditions that may apply to Grace's exit financing,

16 correct?

17 A    Yes.

18 Q    Let's talk about what you see in the typical exit

19 financing context.  How does that process usually begin?  And

20 I'll be more specific.  Does it begin with a, what we typically

21 see as a term sheet presented by possible lenders?

22 A    It may, yes.

23 Q    And in that term sheet what typically is disclosed?

24 A    Well, depending on the level of detail in the term sheet

25 it typically lays out the names of institutions, how much debt

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Cobb                         138

1  is covered in the term sheet, what the structure of that debt

2  is in terms of whether it's bank debt or high yield debt,

3  estimations or provisions of ranges of interest rates and

4  sections on reps and warranties and typically statements to the

5  effect that such instrument would have traditional covenants

6  associated with that instrument.

7          MR. BERNICK:  Your Honor, I object.  There's no

8  objection that's been allowed by the -- asserted by either the

9  lenders that Mr. Cobb represents or the unsecured creditors

10 committee going to the feasibility issue.  What this is is

11 backdoor discovery in examination of the witness making her

12 into their expert in connection with the solvency issue.  That

13 is not proper and these questions should not be allowed.

14         THE COURT:  Mr. Cobb?

15         MR. COBB:  Your Honor, the -- we believe that Grace

16 will be required to provide a solvency opinion as a condition

17 of obtaining exit financing and therefore Grace will need to

18 represent to the lenders of its -- that will provide the exit

19 financing facility that it will be solvent as of the closing

20 date of that exit financing.  And we further believe that that

21 exit financing will close prior to or on the effective date and

22 therefore Grace will be solvent as of the effective date of

23 this plan if this plan is confirmed.  Now if the debtors will

24 stipulate to that I'll sit down.

25         MR. BERNICK:  We don't have to stipulate to anything

**J&J COURT TRANSCRIBERS, INC.**

1 along those lines.  This is an effort to again conduct some

2 examination that Mr. Cobb feels is in service of his clients

3 issues in connection with solvency that's now become explicit.

4 They could have had their expert do that analysis.  They did

5 not.  Mr. Frezza was here, didn't talk about any such thing.

6 They can't now call this witness on cross examination with

7 regard to feasibility and have her elicit -- have her testify

8 on cross as to matters as an expert that relate to solvency.

9 That's completely improper.

10        MR. COBB:  Your Honor, she's an expert on exit

11 financing.  If the debtors are going to admit today or at some

12 point in the future that they will be solvent as of the date at

13 which solvency must be determined by this Court in order to

14 conduct an appropriate examination to confirm this plan, then

15 this is entirely relevant.

16        MR. BERNICK:  It's not the question --

17        THE COURT:  Well, it's not a question of relevance,

18 it's a question of whether or not your own expert in your case

19 is the one who has to produce the evidence of solvency if

20 debtor contests it.  You can't make this witness your expert.

21 You need to produce that I think from your own expert witness.

22 Certainly she's an expert in some areas and you can pursue by

23 way of cross examination, matters related to credibility and

24 those sorts of things, but you can't convert her into your

25 expert.

1          MR. COBB:  Well, Your Honor, it seems to me that it
2   is an issue of fact as to whether or not the debtors will be
3   required to provide that solvency opinion letter that we,
4   frankly, know must be provided.  and I think that's fair game
5   to ask the person who has the most knowledge of these facts.
6   She is the debtors' expert in that regard.  I don't know why
7   that's out of bounds.
8          THE COURT:  Well, what you've asked her so far is
9   what a typical letter would provide.  You haven't asked her any
10  questions about whether the lenders that they're negotiating
11  with are requiring that information.  If you want to ask as a
12  matter of fact about those questions you may, but I don't think
13  you can ask her about her expert opinion as your expert.  I
14  have to make a distinction between her own expert report and
15  calling her as your expert.
16         MR. COBB:  I understand that, Your Honor.
17         THE COURT:  Okay.
18         MR. COBB:  I'm happy to proceed directly in that
19  fashion.  I designed my cross examination in more the
20  traditional sense, but I'm happy to ask her directly those
21  questions.
22  Q    Ms. Zilly, have you reviewed any of the -- well, let me
23  step back because I need to lay a foundation as to what exists
24  in this case with regard to exit financing and what doesn't and
25  what you have reviewed in that context and what you --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Again, just so I can have a standing

2  objection that there is no objection to feasibility by Mr.

3  Cobb's clients or by any other general unsecured creditors.  So

4  we're now having the witness testify as a fact witness

5  regarding solvency matters that are of interest to him.  That

6  goes beyond the scope of her examination and her presentation

7  here today.  And again, they could have, if they wanted to,

8  elicit her as a fact witness on this issue.  They didn't even

9  do that.  So again, this is all procedurally completely

10  improper.

11          MR. COBB:  Well, two points, Your Honor.  We did ask

12  questions of this nature in kind in Ms. Zilly's deposition and

13  there was no objection with regard to certainly the general

14  questioning area.  There were objections lodged by the debtors

15  over concerns of confidentiality and proprietary information.

16  I did not ask specific questions like interest rates and who

17  the lenders were or are, and I don't intend to do that today.

18  The second piece is, I expressly reserved our right to question

19  Ms. Zilly with regard to the solvency area when she came to

20  testify with regard to feasibility.  Mr. Bernick didn't stand

21  at the time and say uh, I object because I know where this is

22  going.

23          THE COURT:  You may ask the factual questions.  I

24  tried to make my ruling clear.  I hope it is.

25          MR. COBB:  I understand, Your Honor.  I was headed

**J&J COURT TRANSCRIBERS, INC.**

1 that way.

2 Q    Ms. Zilly, I believe that what exists today with regard to

3 documentation concerning the debtors' exit financing are

4 proposals to provide commitment letters, is that correct?

5 A    We received, when we were seeking commitment letters,

6 primarily term sheets with respect to those commitment letters.

7 We are no longer seeking commitment letters.

8 Q    And have you reviewed those term sheets that have been

9 provided?

10 A    I did at one time.

11 Q    Did any of those term sheets require as a condition to

12 closing, that Grace must provide an opinion of counsel or a

13 qualified expert that it will be solvent as of the closing of

14 the exit financing?

15        MR. BERNICK:  I object to the form of the question.

16 Could we have one or the other.

17        THE COURT:  Yes.  You asked a compound question.

18        MR. COBB:  Well, it's a difficult topic, Your Honor,

19 so I will try to break it up into small bites.

20 Q    Did any of the term -- well, let me step back.  How many

21 term sheets did you review?

22 A    There were various -- we started with various -- a certain

23 number of lenders received preliminary term sheets.  That would

24 have been seven or eight, I believe.  And then we received more

25 detailed term sheets from five or six.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Did any of those term sheets that you just testified

2  regarding, did any of them contain any references to conditions

3  to closing the exit financing?

4  A    Some did, some did not.

5  Q    Of the ones, that is the term sheets that did include

6  those conditions, or references to those conditions, did any of

7  those term sheets reference a condition to Grace's exit

8  financing that Grace must provide an opinion letter or opinion

9  of a qualified expert that Grace will be solvent as of the

10  closing of that exit financing?

11  A    I think one did.

12  Q    With regard to the term sheets where there were no listed

13  -- excuse me -- no reference to conditions to closing was there

14  any reference in those term sheets that there would be

15  customary or ordinary conditions to closing in this exit

16  financing context?

17  A    No, there wasn't that level of detail.

18  Q    Would you expect that there would be such conditions, that

19  is condition -- specifically a condition that Grace would need

20  to provide a solvency opinion of counsel or a qualified expert

21  that it will be solvent as of the closing under the exit

22  financing?

23       MR. BERNICK:  Objection, calls for an expert opinion.

24  and for all the reasons stated before it's improper.

25       THE COURT:  That is asking for an opinion.  It's

1  sustained.

2          MR. COBB:  Fair enough, Your Honor.

3  Q    With regard to the one term sheet that did provide for a

4  condition to closing that Grace would need to provide a

5  solvency opinion, do you recall specifically what that

6  requirement stated?

7  A    No, it was simply -- it was that general and we had never

8  reached a level of discussion with respect to what was intended

9  with that opinion.

10 Q    Let's assume for the moment that there is a condition to

11 closing that Grace must provide an opinion of counsel or an

12 expert opinion that Grace will be solvent as of the closing

13 date of the exit financing.  Do you have any doubt in your mind

14 that Grace will not be able to provide such an opinion?

15         MR. BERNICK:  Objection, calls for (a) speculation as

16 thus phrased; (b) to the extent that it's not speculative it

17 calls for an expert opinion.

18         THE COURT:  Sustained.

19 Q    You had testified I believe that -- and I think it was

20 referenced in the exhibit -- that Grace has received proposals

21 for commitment letters, do you recall that testimony?

22 A    Yes.  At the time we were seeking commitment letters we

23 received proposals for commitment letters.

24 Q    And what is the difference between a proposal for a

25 commitment letter and a term sheet?

**J&J COURT TRANSCRIBERS, INC.**

1 A    The way we were using it here was to indicate the lack of

2 detail with respect to the actual proposal.

3 Q    And I think you had testified that Grace could have exited

4 bankruptcy under proposals -- and I don't know how to use the

5 ELMO, but I guess if it's this simple I can -- look at that,

6 put it right up there.  Excuse my writing.  I think that's the

7 second bullet point, if necessary Grace could have exited

8 bankruptcy under its proposals.  That's referencing the

9 received proposals, correct?

10 A    That's correct.

11 Q    And that includes the proposal that required an opinion

12 that Grace would be solvent as of the closing of that exit

13 financing, correct?

14         MR. BERNICK:  Objection, lack of foundation.

15         THE COURT:  I'm sorry, would you restate the

16 question.

17         MR. COBB:  The question was the -- let me step back.

18 I can describe for Your Honor what the question was, but we are

19 post lunch and to be -- to give it back to you by rote would be

20 difficult.  We can either have the question read back or I can

21 explain where we were headed.

22         THE COURT:  All right.  Do you have a simultaneous --

23         MR. COBB:  I'm sorry.

24             (Question read back)

25         MR. BERNICK:  My objection was foundation because he

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Cobb                    146

1  hasn't established the witness' knowledge of exactly -- of
2  which proposals we're talking about and whether any of them
3  contain the provision.
4        THE COURT:  I think you're going to need some
5  clarification.  She said there was only one out of a number
6  that had that requirement, so I think the question is over
7  inclusive.  The objection is sustained.
8  Q    Ms. Zilly, the first bullet point says Grace received
9  proposals, plural, for commitment letters for financing from
10 lenders in July, isn't that what the bullet point states?
11 A    Yes.
12 Q    And that is your testimony, correct?
13 A    Yes, I believe we've used the word proposals and term
14 sheets interchangeably.
15 Q    Thank you.  The second bullet point says if necessary
16 Grace could have exited bankruptcy under proposals.  The
17 question is using the word proposals in the second bullet
18 point, is that identical to the phrase received proposals in
19 the first bullet point?
20 A    Yes.
21 Q    Thank you.  Now I'll ask the penultimate question here,
22 which is, so isn't it true that it is your opinion that Grace
23 could have exited bankruptcy under a exit financing proposal
24 that contained a requirement or a condition of closing on that
25 exit financing that Grace could provide an opinion of counsel

1 that it would be solvent as of the closing date of that exit

2 financing?

3          MR. BERNICK:  Objection.  Goes beyond the scope,

4 calls for an expert opinion of this witness as Mr. Cobb's

5 expert on a subject she hasn't testified to.

6          THE COURT:  Well --

7          MR. BERNICK:  And the reason that that's true is that

8 just because the witness says she could have exited bankruptcy

9 under proposals, doesn't mean that she's now testified to each

10 and every element, including offered an expert opinion

11 regarding solvency.  So the only purpose of this, again

12 completely improper, is to elicit from Ms. Zilly an opinion

13 about whether the condition was in fact there in those

14 proposals and could in fact have been met and that goes only to

15 solvency.

16          THE COURT:  It seems to go to solvency.  I don't

17 think she's been called in that regard, but --

18          MR. COBB:  Your Honor, she just testified, she just

19 agreed with me.  She just agreed, frankly, with the truth,

20 which I think is what this is all about, getting to the truth.

21          THE COURT:  Well, she agreed that her testimony is

22 that Grace could have exited bankruptcy under proposals, but it

23 doesn't say which.  Let's establish which, i.e., with or

24 without the financing.  I'm not trying to get the names of the

25 prospective lenders and violate the confidentiality issue.

1  That's what I'm trying to articulate.

2          MR. COBB:  Your Honor, I thought I walked carefully

3  through the questions, but I will restate them if the Court

4  would like me to.

5  Q    Ms. Zilly, were there any -- is your Bullet Point Number

6  2, which is up on the ELMO, if necessary Grace could have

7  exited bankruptcy under proposals?  Would you like to qualify

8  in any sense the use of the word proposals in the second bullet

9  point?

10         MR. LOCKWOOD:  Objection, Your Honor, to form.

11  There's a difference between some of the proposals, all of the

12  proposals, each of the proposals.  Using the generic term

13  proposals is vague, ambiguous.

14         THE COURT:  Well, it's her word.  The objection is

15  overruled.  You may -- she may answer that question.

16         MR. BERNICK:  Well -- I'm sorry.

17         THE COURT:  I'm sorry, Mr. Bernick.

18         MR. BERNICK:  Yeah, I just -- there's a little bit of

19  being clever here.  Why don't we just -- because Mr. Cobb wants

20  to ask the question and Your Honor has said a least he can find

21  out the answer to this, why don't we simply find out whether

22  the proposal that she referred to in her prior testimony that

23  may have included this condition was included under Bullet

24  Point 2.

25         THE COURT:  Well that's what he's getting to, but he

**J&J COURT TRANSCRIBERS, INC.**

1  --

2          MR. BERNICK:  No, I don't think -- it said would you

3  know, amend, qualify, ba, da, da, da, da.  Why don't you just

4  ask it flat out.

5          THE COURT:  She --

6          MR. COBB:  Your Honor, she carefully -- I'm sorry.

7          THE COURT:  The objection is overruled and she may

8  answer the question, whether she wishes to qualify the words

9  under proposals in Bullet Point 2

10         THE WITNESS:  Could you repeat the question?

11         MR. COBB:  Sure.

12         THE WITNESS:  I mean, is that the sum total of the

13 question?

14         MR. COBB:  I'll do my best to restate it because this

15 has -- there has been a lot of back and forth here.

16 Q    Let me step back and try to walk through this so that we

17 can get to an answer that counsel would like you to give.  The

18 first question is under Bullet Point A, Grace received

19 proposals, plural, for commitment letters for financing from

20 lenders in July, and that was your testimony, correct?

21 A    That's correct.

22 Q    All right.  And the use of the phrase received proposals

23 includes all of the proposals, including term sheets, that

24 Grace received regarding exit financing?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    The second bullet point says if necessary Grace could have

2 exited bankruptcy under proposals, and that was your testimony,

3 correct?

4 A    That's correct.

5 Q    And the use of the word proposals in the second bullet

6 point, is that word and its meaning in the context and

7 definition by which you used it, is that identical to the

8 phrase received proposals that you used in the first bullet

9 point, meaning it includes all of the term sheets and

10 commitment proposals?

11         MR. BERNICK:  I object to the form on that.  That is

12 really obscure instead of being direct and asking a simple

13 question which is available here.

14         THE COURT:  It's a pretty --

15         MR. COBB:  Your Honor, she's a very, very bright and

16 qualified witness.

17         THE COURT:  She can answer this question.

18         MR. COBB:  She knows exactly what I'm asking.

19         THE COURT:  She may answer this question.  Overruled.

20         MR. COBB:  Thank you.

21 A    The first bullet point simply states a fact that Grace

22 received proposals from commitment letters for financing from

23 lenders in July.  The second bullet point Grace could have

24 exited bankruptcy under proposals, was an attempt to say that

25 given the scope of the proposals as they had been outlined to

1  us to date without any further negotiation, without any further

2  delineation of reps and warranties, without further negotiation

3  as to covenants, that it was Grace's belief that if it was

4  necessary we could have reached an accommodation with the

5  lenders with respect to any of their reps, warranties and

6  covenants and other terms that were important to the debtor to

7  be able to exit.

8  Q    All right.  Now you had testified previously that one of

9  the term sheets or proposals -- we use that term

10 interchangeably -- one of the term sheets contained a condition

11 that Grace provide an opinion that it will be solvent as of the

12 closing of the exit financing, you recall that testimony?

13 A    Yes.

14 Q    Now, is that term sheet included under the word -- or is

15 it included under the definition of the word proposals in the

16 second bullet point?

17 A    The proposal that set forth as a condition a solvency

18 opinion, was included under the proposals as I just qualified

19 it in my testimony, which was proposals that would have

20 required further negotiation with respect to all the terms and

21 conditions which I believed that Grace would have been in a

22 position to meet such that we could have exited.

23 Q    Do you mean by that testimony that you believe that Grace

24 would have had to negotiate out from that condition that it

25 provide a solvency opinion?

Zilly - Cross/Mangan                    152

1  A    No.   I simply meant that the condition had not been -- any

2  of these conditions had not been fully negotiated.

3           MR. COBB:  That's all I have.  Thank you.

4           THE COURT:  Mr. Mangan?

5           MR. BERNICK:  Is there anybody else?

6           THE COURT:  Mr. Mangan.

7           MR. MANGAN:  Thank you, Your Honor.

8                        CROSS EXAMINATION

9  BY MR. MANGAN:

10 Q    Ms. Zilly, my name is Kevin Mangan and I represent the

11 State of Montana in this matter.  You had testified earlier

12 with regard to feasibility and Mr. Bernick had utilized a

13 overhead and I'll put that up there just for your reference.

14 Do you recall testifying that Grace will be able to pay

15 operating expenses as they become due, is that one of the

16 integral parts of your testimony earlier this morning?

17 A    Yes.

18 Q    And I believe Mr. Bernick made reference to a hypothetical

19 question that you've answered in deposition and you were asked

20 it again with regard to your belief that Grace would be able to

21 pay future asbestos PD claims of at least 1.6 billion over the

22 25 years post-confirmation, do you recall that testimony?

23 A    Yes.

24 Q    Is it your testimony that there will be sufficient cash

25 balance at the end or at confirmation for Grace to continue on

**J&J COURT TRANSCRIBERS, INC.**

1  and pay its operating expenses?

2  A    Well, I -- my -- I'm not sure I testified to that.  What I

3  would testify to if I had testified to that would be that the

4  combination of the cash balance as well as the cash flow

5  generated by Grace in the future would be sufficient to pay its

6  ongoing expenses and legacy obligations.

7  Q    Okay.  I'd like to have you assume that there is a non-

8  dischargeable post-confirmation judgment in the amount of $750

9  million for the purposes of this question.  Supposing that

10 there is such a catastrophic judgment against Grace post-

11 petition in this amount of $750 million, would Grace have the

12 ability to make immediate payment of that?

13          MR. LOCKWOOD:  Objection, lack of foundation.

14          MR. BERNICK:  Well, I think that it's also unclear.

15 at what point in time post-confirmation, immediately, after ten

16 years, fifteen years, twenty-five years?

17          THE COURT:  Both objections are sustained.

18          MR. MANGAN:  Let me lay some foundation for this

19 hypothetical question, Your Honor.

20 Q    Ms. Zilly, you're aware that -- you're familiar with the

21 Libby claimants, is that fair to say?

22 A    Yes.

23 Q    Okay.  There had been testimony throughout this hearing --

24 I think it was the last time back in September -- that there

25 may be as many as 1,800 Libby claimants, but certainly not less

1  than 900?

2          MR. BERNICK:  Objection to the form of the question.

3          MR. KOVACICH:  I object.  I don't think that was the

4  testimony.

5          THE COURT:  I'm sorry, Mr. Mangan, I don't recall

6  that testimony, but it's been awhile and I didn't look at the

7  transcript.

8          MR. MANGAN:  Okay.

9  Q    Let's -- for purposes of this line of questioning let's

10 assume there's a thousand Libby claimants.  Are you aware that

11 the Libby claimants had asserted state court claims against the

12 State of Montana?

13 A    Generally aware.

14 Q    And there has been roughly 148 complaints filed by Libby

15 claimants against the State of Montana that (indiscernible)

16 have been offered into evidence already.

17 A    I'm not aware of that, but I'll take that as a

18 hypothetical or truth of the matter.

19 Q    Thank you.  Are you aware that the State of Montana has

20 filed a proof of claim for contribution indemnification against

21 the debtor?

22         MR. BERNICK:  Objection to form.  For all of those

23 claims, I don't believe that's accurate, but we ought to find

24 out if there's a proof of claim how many it covers.

25         THE COURT:  Is the question just whether she is

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Mangan                          155

1  aware?

2              MR. MANGAN:  Whether she's aware that there has been

3  a proof of claim for contribution indemnification against the

4  debtor.

5              THE COURT:  All right.  Not with respect to any

6  specific claims?

7              MR. MANGAN:  No.

8              THE COURT:  All right.  That question you may answer,

9  Ms. Zilly.

10 A    Yes, I'm aware of that.

11 Q    Again, for purposes of this question can you assume that

12 the Libby claimants obtained verdicts against Montana for the

13 maximum amount allowed under Montana Statutes in the amount of

14 $750,000 per claimant, okay?

15 A    Okay.

16 Q    Thank you.  So again I'm going back.  We're assuming that

17 there is a thousand Libby claimants and multiplying that

18 thousand by $750,000 each, that would come out to $750 million,

19 is that accurate?

20 A    I believe so.

21 Q    Again, let's assume that Montana successfully asserts a

22 contribution indemnification claim against the debtors and that

23 this contribution indemnification claim is non-dischargeable

24 and it's post-confirmation.

25             MR. LOCKWOOD:  Your Honor, I object again.  I mean,

**J&J COURT TRANSCRIBERS, INC.**

1  he hasn't created a foundation that there's any realistic

2  possibility that a thousand Libby claimants could each come up

3  with the 750,000, all he did was ask this witness to assume

4  that that would be the case.  That's like assuming that each

5  Libby claimant can have a judgement for $750 million.  I mean

6  --

7           MR. BERNICK:  Let's not get carried away.

8           MR. LOCKWOOD:  -- there's no foundation of evidence

9  as to the value of these claims.

10          THE COURT:  There isn't, but the question is that

11 he's trying to get to, assuming that the maximum horrible --

12 set of horribles could happen to the debtor what's the

13 consequence?  She's the financial expert.  She can answer that

14 question.

15          MR. BERNICK:  Your Honor, perhaps in order to

16 expedite this, because there are a lot of other steps, counsel

17 hasn't worked into his hypothetical that each and every one of

18 those judgments would be paid in full, that a lawsuit would

19 then be brought over and against reorganized Grace, that it

20 would be successful in the full amount as if Montana had no

21 responsibility and that judgment were not subject to any kind

22 of appeal and he still hasn't given a time frame for any of

23 this.

24          THE COURT:  The time frame is -- I agree with.  With

25 respect to the rest he hasn't substantiated those actions or

44444444

1  those elements.  That's not his question at the moment.  It is
2  assume that Montana successfully asserts the contribution claim
3  against debtor post-confirmation and that it's non-
4  dischargeable.  Assuming that it's a successful claim, means
5  that they've established all of those elements.  Mr. Bernick I
6  --
7           MR. BERNICK:  Well then just give me the -- at least
8  get the time frame down.
9           THE COURT:  Fine, let's get the time frame down.
10          MR. MANGAN:  I'd be glad to, Your Honor.
11  Q    Taking that assumption that was just laid out -- do you
12  understand that assumption?
13  A    (No audible response)
14  Q    We're going to break it down into at the time -- let's say
15  one year post-confirmation -- post-effective date of this.
16          MR. LOCKWOOD:  Your Honor, why don't we assume that
17  they -- it's a 250 billion dollar claim against Grace.  I think
18  the witness would say yeah, if that happens Grace can't pay it.
19  I mean, unless he's going to establish some reasonable basis
20  for this hypothetical it is an exercise in pure fantasy.
21          THE COURT:  Mr. Mangan.
22          MR. MANGAN:  Your Honor, it is a hypothetical and as
23  simply as that.
24          THE COURT:  You may pursue the hypothetical.
25  Q    Again, assuming a 750 million dollar non-dischargeable

1  post-confirmation judgment, would Grace have the ability to pay

2  that one year after the effective date?

3  A    Well, needless to say, I have not done the analysis, but

4  you know, it's possible they might be able to pay it based on

5  an accrual of cash as well as additional borrowings.  But, you

6  know, again, it's totally based on two assumptions which I have

7  not put down on a piece of paper or figured out what the

8  ramifications of those would be.

9  Q    So as you sit here today you're unable to determine that?

10 A    I think that's a fair statement.

11 Q    How about my same question in the year 2013, would Grace

12 have the ability to pay a $750 million dollar non-dischargeable

13 post-confirmation judgment?

14 A    I think -- assuming Grace continues to have the positive

15 operating experience it has in the past the short answer is the

16 farther out the payment would be the more likely it would be

17 that Grace would have the resources to pay it.

18          MR. MANGAN:  That's all I have.  Thank you.

19          THE COURT:  Mr. Rosendorf.

20          MR. ROSENDORF:  Thank you, Your Honor.

21                        CROSS EXAMINATION

22 BY MR. ROSENDORF:

23 Q    Good afternoon, Ms. Zilly.  You've been working with the

24 company since 2001 as a financial advisor, correct?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    In that role one of your job functions has been to assist

2 the company in obtaining exit financing?

3 A    Lately, yes.

4 Q    You've helped prepare presentations that were made to

5 lenders for that purpose?

6 A    I've reviewed presentations and made -- suggested comments

7 to those presentations.

8 Q    You've assisted and participated in the presentations to

9 the lenders?

10 A    In one presentation.  Well, I'm sorry, one in-person

11 presentation and several phone calls.

12 Q    Do you receive any success fee if the company obtains exit

13 financing?

14 A    No.

15 Q    Does the company receive any success fee if the company

16 obtains exit financing?

17 A    I assume by company you mean Blackstone --

18 Q    Correct.

19 A    -- but the answer is no.

20 Q    Does Blackstone receive a success fee if the company

21 successfully emerges from bankruptcy?

22 A    Blackstone has part of its engagement letter that was

23 approved by this Court in 2001, the opportunity to apply to the

24 Court for a $5 million success fee upon the exit of Grace from

25 bankruptcy subject to objections and/or approval of the Court.

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Rosendorf                    160

1  Q    Does the company under the plan that has been proposed

2  have the ability to emerge from bankruptcy without exit

3  financing?

4          MR. BERNICK:  Objection, relevance.

5          THE COURT:  To whether the company can emerge without

6  exit financing?

7          MR. BERNICK:  Yes, because she specifically assumed

8  exit financing in connection with her feasability analysis and,

9  in fact, has provided the evidence that it's there.  He's

10 asking a hypothetical for something that's not been put before

11 the witness or is even proposed.

12         THE COURT:  I'm sorry, maybe I misunderstood her

13 testimony.  I thought that she had testified that Grace is no

14 longer looking for -- oh no, I'm sorry, she said more

15 traditional forms of exit financing.  I think you've assumed a

16 fact that's not in evidence.  The objection is sustained.

17 Q    I'm not sure that I'm assuming any facts.  The only thing

18 I want to know is under the plan as the debtors have proposed

19 it is it necessary for them to obtain some form of exit

20 financing in order to successfully emerge from bankruptcy?

21 A    Yes, it is.

22 Q    As part of the presentations to lenders you have assisted

23 in the preparation of materials that reflect the debtors'

24 projected future financial operations, correct?

25 A    No, that's not correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You played no role in the preparation of the financial
2  projections contained in the materials?
3  A    That's correct.
4  Q    But there are financial projections that are contained in
5  those materials, correct?
6  A    That's correct.
7  Q    They include a five year projection that was prepared by
8  the debtors?
9  A    That's correct.
10 Q    And it is that same five year projection that you relied
11 upon in part in forming your feasability opinions, correct?
12 A    That's correct.
13 Q    I'd like to talk about your role today.  You're appearing
14 here today as an expert with respect to the feasability of the
15 plan, correct?
16 A    Yes.
17 Q    In order to do so one of the things that you must do is to
18 apply your training, expertise and experience in critically
19 evaluating the debtors' financial projections, correct?
20 A    I believe I have to reach a determination if the financial
21 projections are reasonable.
22 Q    And you do so by applying your own training and expertise
23 and experience, correct?
24 A    Yes.
25 Q    If you were simply regurgitating the projections that the

1 debtor had made without any critical analysis that wouldn't

2 require any particular expertise or specialized knowledge,

3 right?

4 A    Not of the type that I have.

5 Q    So to evaluate feasability you have to take into account

6 the reasonableness of the debtors' financial projections,

7 correct?

8 A    That's correct.

9 Q    And in this particular case to evaluate feasability you

10 have to take into account the debtors' ability to service,

11 among other things, operating expenses and legacy claim

12 objections in future years, correct?

13          MR. LOCKWOOD:  Legacy claim objections.

14          MR. ROSENDORF:  I'm sorry, obligations.  I misspoke.

15 I can restate the question if you'd like.

16 Q    To evaluate feasability you have to take into account the

17 debtors' ability to service, among other things, their

18 operating expenses and legacy claim obligations in future

19 years, correct?

20 A    That's correct.

21 Q    Now, legacy claim obligations would include both, among

22 other things, unresolved property damage claims and future

23 property damage demands, correct?

24          MR. BERNICK:  Sorry, is this traditional property or

25 ZAI or both?

1    MR ROSENDORF:  Well, I'll be more specific.

2  Q    Legacy claim objections includes, among other things,

3  traditional property damage claims which are unresolved and

4  traditional property damage future demands, correct?

5  A    Those are the obligations, yes, that's correct.

6  Q    There are certain asbestos liabilities that pass through

7  the plan, correct?

8  A    Yes.

9  Q    And the feasability of the debtors' plan depends in part

10 on the reorganized debtors' ability to pay those liabilities

11 which are passed through, correct?

12 A    Yes.

13 Q    And the liabilities that pass through, in effect, include

14 unresolved traditional property damage claims and future

15 traditional property damage claims, correct?

16 A    Among others, yes.

17 Q    Among others.  But you have not made any estimation of

18 these legacy traditional property damage claims in order to

19 reach your opinion on feasability, correct?

20 A    There is a projection.

21 Q    You have not prepared one?

22 A    I relied on the company's projection.

23 Q    When you say the company's projection what is it that

24 you're referring to?

25 A    In its projections the company has stated an obligation,

or a line item if you will, for future asbestos obligations.

Q    Is there a particular line item that you are aware of that

the company has estimated with respect to unresolved

traditional property damage claims?

A    Yes.

Q    What is that amount?

        MR. KOVACICH:  I object.  This witness is now being

asked to offer an opinion on the amount of future property

damage liability.  That was not disclosed in their --

        THE COURT:  No, the question is does she know of a

line item in which the company estimated unresolved traditional

property damage claims.  She wasn't asked to express an

opinion.  She's asked whether she's aware of it.  The objection

is overruled.

        MR. KOVACICH:  I thought she answered yes and then

the question was what is the amount.

        THE COURT:  Oh.  If that happened I missed that

question.  I'm sorry.  I was waiting for the answer to the

first one.  Could you answer the first one first, Ms. Zilly,

which is are you aware of a line item.

        MR. BERNICK:  The answer already is yes, but then I

think she's being asked for the amount of the line item.

        THE COURT:  Okay, well then I missed the question.

        MR. ROSENDORF:  That's correct.  I'm not -- I have

not -- let me be clear.  I have not asked for any opinion.  She

1  has said that she did not estimate it, she relied upon the

2  company.  I'm simply asking for the information that was given

3  to her by the company.

4         THE COURT:  All right.  So what is the amount of the

5  line item is the question?

6         MR. ROSENDORF:  Correct.

7         THE COURT:  All right.  The objection is overruled as

8  to that question, too.

9  A    $37.3 million for traditional asbestos property damage

10  claims.

11  Q    But you've not made any independent effort to determine if

12  that number is reasonable, correct?

13  A    I relied on --

14         MR. BERNICK:  Objection to the form of the question.

15         THE COURT:  She made no independent effort to

16  determine if it's reasonable?

17         MR. BERNICK:  Yeah, what's an independent effort to

18  determine whether it's reasonable or not?

19         THE COURT:  You restate the question, Mr. Rosenberg

20  (sic).  I --

21  Q    Did you critically evaluate that number to determine if it

22  was a reasonable projection?

23  A    I relied on the company's estimate who I believe was in

24  the best position to know.

25  Q    So you did not apply any independent expertise or

                    **J&J COURT TRANSCRIBERS, INC.**

1  knowledge to determine whether or not that number was a

2  reasonable projection?

3           MR. BERNICK:  Same objection.  I don't know what

4  independent expertise or knowledge is.  You certainly haven't

5  clarified that with the witness, what procedure she's supposed

6  to follow and whether she felt it was appropriate.

7           MR. ROSENDORF:  I have asked her earlier in my

8  examination as part of the feasability analysis if she applies

9  her training, expertise and experience to critically evaluate

10 the debtors' financial projections.  I'm talking about the same

11 training, experience and expertise that she was able to use

12 when she answered that question.

13          MR. BERNICK:  Oh, so she -- okay.  And so the

14 question is did she apply that or not?

15          MR. ROSENDORF:  Correct.

16          MR. BERNICK:  Okay.

17 A    Yes, the answer is I did.  I relied on those individuals,

18 as I would in other cases, who were in a better position to

19 know, who are experts in that field to know what the proper

20 amount was.

21 Q    So you are not opining as to that number?

22          MR. BERNICK:  Objection.  She just did.  I object to

23 the form of the question.  The witness has --

24          THE COURT:  It's overruled.  She can answer this

25 question.  You may answer, Ms. Zilly.

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE WITNESS:  I'm sorry, could you repeat the

2  question?

3  Q    It's not your number, it's the company's number, correct?

4  A    It is the company's number because -- upon which I relied

5  as I do in any number of situations in preparing an expert

6  report.  When I'm not an expert in that one particular area I

7  rely on other experts.

8  Q    Well here, you're not relying on another expert, you were

9  relying on the company, correct?

10 A    And what the company relied upon.

11 Q    Do you know what the company relied upon?

12 A    The company was in the best position to know what that

13 number was.  How they --

14 Q    Do you know what information the company relied upon in

15 order to come up with that number?

16 A    My understanding is that the company had an understanding

17 of what the proper number was and I relied upon that.

18 Q    Do you know what portion, if any, of that $37 million

19 number represents unresolved property damage claims versus

20 future property damage claims?

21         MR. BERNICK:  Objection.  This has been litigated.

22 It calls for privileged information that should not be the

23 subject of inquiry before this Court.

24         THE COURT:  I'm sorry.  Why?  It's an estimate that

25 the debtor is providing for, according to what the witness

1    said, unresolved traditional property damage claims.

2              MR. BERNICK:  The 37.3 was the subject of the motion

3    practice we just went through.  It's the reserve number.  And

4    the reserve number is not subject, I believe Your Honor has

5    already determined --

6              THE COURT:  I have ruled that.

7              MR. BERNICK:  Yes.

8              THE COURT:  Yes.  Okay.  The objection is sustained.

9    Q    To your understanding, Ms. Zilly, is Grace likely to be

10   subject to substantial future asbestos property damage demands

11   for payment arising out of similar conduct or events as

12   existing property damage claims?

13             MR. BERNICK:  Objection.  Asks for an estimation

14   opinion.  As an expert, she's not proffered for that purpose.

15             MR. ROSENDORF:  I've not asked for any estimation,

16   Your Honor.  I've just asked if she understands that they're

17   likely to be subject to the claims.

18             MR. BERNICK:  I don't know how that does not ask for

19   an expert opinion, Your Honor.

20             THE COURT:  It -- I think it has to be asking for an

21   expert opinion, doesn't it?  I mean, how else would she -- why

22   else would she have such information if she has it?

23             MR. ROSENDORF:  Well, I don't know because I don't

24   know what's been communicated to her by the company as far as

25   what to anticipate with respect to property damage claims.  I

1  don't know what -- whether this 37 million is intended to

2  encompass both unresolved and future claims.  I'm looking for

3  her understanding as it was communicated to her and as she

4  relied upon it.

5        MR. BERNICK:  Your --

6        MR. ROSENDORF:  She's already testified that the

7  legacy claims include both unresolved property damage claims

8  and future claims.

9        THE COURT:  Yes.

10        MR. ROSENDORF:  And I'm trying to understand whether

11  her reliance upon this $37 million number encompasses both of

12  those categories.

13        THE COURT:  All right.

14        MR. BERNICK:  May I be heard, Your Honor?  That was

15  disingenuous as a recitation of what the witness has testified

16  to, it's disingenuous in light of the hours that we've now

17  spent litigating exactly these same issues.  If and to the

18  extent that the witness did hear of some estimate that the

19  company had done with respect to future expected demands, that,

20  too, would be privileged information because it would go to

21  exactly the same point that we've been dealing with before.

22  And point of fact, Mr. Shelnitz has supplied a deposition

23  answer by written questions that deals specifically with that

24  and everybody knows that as he said, there has not been an

25  actual estimate.  All there is is Dr. Martin's testimony.

1          To the extent that the witness is asked does she have

2    an understanding of what Dr. Martin has said or what Mr.

3    Shelnitz has said, that's fine.  But this witness has expressed

4    no view that she has done any kind of independent estimate or

5    has heard of any kind of independent estimate and all these

6    questions somehow assume that she has.  So at least there ought

7    to be a foundation of what the witness has been told before we

8    go down this road.

9          THE COURT:  Well, yes.  So far, actually, there is no

10   foundation.  She said that she relied on a number, but she has

11   not substantiated what the basis for that reliance other than

12   the fact that she feels the company's in a position to evaluate

13   it and she doesn't provide those estimates.  So I think there

14   is no foundation for that question.  That's sustained.

15   Q    Have you done or have you been advised of any estimate of

16   the future property damage demands which may be asserted

17   against the property damage trust?

18   A    Those are two questions, but the answer to both of them is

19   no.

20   Q    You have not done an analysis or estimate and you've not

21   been advised of one, correct?

22   A    Correct.  What I've been advised of, just to be clear,

23   there are two things actually I'd like to clarify.  What I've

24   been advised of was the $37.3 million number, and the second

25   thing is when you spoke about the asbestos passing through, my

**J&J COURT TRANSCRIBERS, INC.**

1  answer also related to future personal injury asbestos

2  obligations of the company.

3  Q    Okay.

4          MR. LOCKWOOD:  Did you intend to say future

5  personal --

6          MR. BERNICK:  Peter --

7          THE WITNESS:  Pursuant to the Asbestos PI Trust.

8          MR. LOCKWOOD:  Oh.

9  Q    This $37 million number that you've referred to, was it

10 also incorporated into the materials that were provided to

11 prospective lenders?

12 A    Yes.

13 Q    And it was incorporated as reflecting the total legacy

14 payments to be made for non-ZAI property damage claims?

15         MR. BERNICK:  Objection to the form of the question.

16 We're now into the word usage of legacy.  Objection, ambiguous.

17         MR. ROSENDORF:  I believe the witness defined legacy

18 payments as including both unresolved and future property

19 damage claims and I'm using it in the same way that she did.

20         THE COURT:  All right.  Overruled.

21         MR. BERNICK:  That's fine.

22 A    The debtor has reflected on its balance sheet an

23 obligation under the Asbestos PI Trust.  It's part of the

24 settlement in the Chapter 11.  It has reflected on its balance

25 sheet an obligation with respect to the Asbestos PD Trust and

1 the Asbestos ZAI Trust.  That's what I mean by legacy

2 obligations.  If that was a misnomer, those are obligations the

3 debtor has reflected on its balance sheet.  That's all the

4 debtor has reflected on its balance sheet.

5 Q    And when you say balance sheet, you're referring not only

6 to current balance sheet, but also to the five-year

7 projections, correct?

8         MR. BERNICK:  Objection to the form of the question.

9 Five-year --

10         THE COURT:  That's sustained.

11         MR. BERNICK:  -- there's not even a foundation for

12 that.

13         THE COURT:  The objection's sustained.

14 Q    The legacy payments that you're referring to are included

15 not only in a current balance sheet, but in a five-year

16 projection that was provided to the lenders, correct?

17 A    No, that's not correct.  The five-year projections assumes

18 an effective date of the plan as of 12/31/2009.  As of that

19 date, its obligations under the Chapter 11 plan are pro forma

20 and reflected on its balance sheet and that is what appears in

21 its projections on a go forward basis.

22 Q    And those projections assume and reflect a $37 million

23 payment in fiscal year 2011 with respect to non-ZAI property

24 damage claims, correct?

25 A    I believe that's the year, yes.

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Rosendorf                    173

1  Q    And that is the only payment reflected in those

2  projections with respect to non-ZAI property damage claims,

3  other than those to be made on the effective date?

4  A    That's correct.

5  Q    During your deposition in this case, you were asked about

6  a $1.6 billion number.  Do you know what the source of that

7  number was?

8  A    I don't recall offhand.

9  Q    It's the same 1.6 billion that was reflected in the

10  demonstrative that you testified to on your direct examination,

11  is that correct?

12         MR. BERNICK:  It wasn't the $1.6 billion in the

13  demonstrative.

14         THE CLERK:  I'm sorry, I didn't pick that up.

15         MR. BERNICK:  I don't think that there was a 1.6

16  billion in the demonstrative.

17         UNIDENTIFIED ATTORNEY:  It's 511.20.  511.20.

18         UNIDENTIFIED ATTORNEY:  Forgive me.

19         MR. BERNICK:  I stand corrected.

20         THE COURT:  What's the exhibit number?

21         MR. ROSENDORF:  This is Exhibit PP-511.20.

22         THE COURT:  Thank you.

23  Q    That -- you don't know what the source of that number is,

24  correct?

25  A    I was questioned about that in my deposition, I believe,

**J&J COURT TRANSCRIBERS, INC.**

1 back in August by I believe it was Mr. Rich and I have

2 forgotten what he said was the source of that number.

3 Q    Prior to being asked about it by Mr. Rich, though, it was

4 not a number that had significance to you?

5 A    Not, it was part of a hypothetical expressed by Mr. Rich.

6 Q    It was not part of your expert report or your expert

7 opinions, correct?

8 A    That's correct.

9 Q    And sitting here today, do you have any understanding of

10 what the significance of that number is?

11         MR. BERNICK:  Objection.  Apart from the fact of what

12 she testified as to whether it could be paid.  Objection to the

13 form of the question.

14         THE COURT:  Sustained.

15 Q    You have no understanding of any basis for that $1.6

16 billion number other than as a hypothetical, correct?

17 A    It was my understanding since we've now spent five minutes

18 talking about it, it's my recollection now that that was an

19 estimate that was done by an expert for the Property Damage

20 Committee some time ago.

21 Q    But you've --

22 A    Other than that, I have no independent knowledge of that

23 number.

24 Q    You have not relied upon or evaluated that number,

25 correct?

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Rosendorf                    175

1  A    That's correct.

2          MR. BERNICK:  Just so that we don't have a problem

3  with the record later, the last question was ambiguous in the

4  same way and I want to make sure that it's not construed to

5  mean that she has no opinions regarding it because she has

6  expressed opinions regarding it.

7          THE COURT:  I think her testimony was clear.

8          MR. BERNICK:  Okay.

9          THE COURT:  She said she has no other knowledge of it

10 other than what she testified to.  She didn't rely on it and

11 she didn't evaluate the number.

12         MR. BERNICK:  But she did talk about its feasibility,

13 that's my point.  And to that extent, she did.

14         THE COURT:  That's a different issue.  She wasn't

15 asked about feasibility.

16         MR. BERNICK:  Yeah, okay.  Fair.

17 Q    The company's minimum operating cash balance required to

18 operate the business is approximately $100 million, right?

19 A    Yes.  That's their view.

20 Q    As part of your analysis, you have not made any

21 determination of what the amount of either unresolved PD claims

22 or future PD claims would render the plan unfeasible, correct?

23         MR. BERNICK:  Objection to the form of the question.

24 Yeah, it totally misstates the testimony.

25         THE COURT:  No.  The question is did she determine --

**J&J COURT TRANSCRIBERS, INC.**

1  she did not, it was phrased in the negative -- determine as

2  part of her analysis the amount that at which this plan would

3  become unfeasible.  That's a clear enough question.  Overruled.

4          MR. BERNICK:  Well -- okay.

5  A    Well, I did not do an independent analysis.  What's

6  included in my testimony is that at 1.6 billion asbestos

7  property damage claims I believe the plan would be feasible.

8  Q    Other than that testimony which was not included in your

9  report, but was a response to a hypothetical in a deposition,

10 you've not done any analysis of the amount of allowed

11 unresolved property damage claims or future claims that would

12 render the plan unfeasible, correct?

13         MR. BERNICK:  Objection to the form of the question.

14 Move to strike the prefatory statement.

15         THE COURT:  Other than -- no, overruled.  You may

16 answer, Ms. Zilly.

17 A    No, that's correct.

18 Q    Have you made a determination of how many or the amount of

19 allowed unresolved property damage claims or future property

20 damage claims in any particular year that would render the plan

21 unfeasible?

22         MR. BERNICK:  Objection.  This is the same exercise,

23 Your Honor.  We've had now several questions that are all

24 designed to skirt around the 1.6 billion and are hoping to get

25 an answer they can use to somehow undercut the 1.6 billion --

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENDORF:  I'm --

2          MR. BERNICK:  -- and it's not appropriate.  Her

3  testimony is clear and she's repeated it.

4          THE COURT:  The question is whether she has made that

5  type of a determination.  That's appropriate cross examination.

6  Overruled.  You may answer, Ms. Zilly.

7  A    I'm sorry, could you repeat the question?

8  Q    Have you made a determination of the amount of allowed

9  unresolved property damage claims or future property damage

10 claims which would render this -- in any given year, which

11 would render this plan unfeasible?

12 A    I haven't made a determination of the amount.  I've used

13 an amount that was presented as a possible amount and

14 determined that the plan was feasible.

15 Q    And what amount was that?

16 A    $1.6 billion over 25 years.

17 Q    But that's over 25 years.  I'm asking you a different

18 question.  I'm asking you a question with respect to a

19 particular year.  In any given year, if unresolved property

20 damage claims are allowed or future property damage claims are

21 allowed, have you made a determination of the aggregate amount

22 in any given year that would render this plan unfeasible?

23         MR. BERNICK:  Unfeasible?

24         MR. ROSENDORF:  Correct.

25 A    I haven't made -- I haven't done a year by year analysis

**J&J COURT TRANSCRIBERS, INC.**

1  to how many claims would have to be in any one year to render

2  the plan infeasible.

3  Q    Are you familiar with a recent decision that has been

4  rendered by the District Court with respect to the State of

5  California claims?

6  A    In general.

7  Q    I'm sorry?

8  A    In general.

9  Q    You're aware that the District Court reversed a summary

10  judgment that was entered against those claimants on the basis

11  of statute of limitations grounds?

12  A    I don't know the basis of its reversal.

13  Q    But you know that the claims had been disallowed and that

14  that disallowance was reversed by the District Court?

15        MR. BERNICK:  Objection.  That misstates the opinion.

16        THE COURT:  It -- well, I think it does misstate the

17  opinion.  It, basically, says that the claims have to be tried.

18  I don't --

19        MR. ROSENDORF:  I said that the disallowance of the

20  claims was reversed --

21        THE COURT:  I think the -- all right.  Overruled.

22        MR. ROSENDORF:  -- which I think is correct.  And

23  they've been remanded to this Court.

24        THE COURT:  They're remanded.  You may answer, Ms.

25  Zilly, if you know.

**J&J COURT TRANSCRIBERS, INC.**

1  A    I -- my understanding is the decision was reversed and

2  they've been remanded for trial.

3  Q    Have you undertaken any further analysis in light of the

4  State of California decision as to the effect of that decision

5  on your opinions?

6          MR. BERNICK:  Objection to the form of the question.

7  Your Honor, I'm just concerned about the privilege.  I don't

8  know what the witness has done or not done, but to the extent

9  that she's been asked to provide any kind of advice regarding a

10 reserve, then we would instruct her not to answer that

11 question.  If she's being asked has she done the work in

12 connection with her testimony here in light of the California

13 decision, we wouldn't have an objection to that, even though

14 they've been at pains to limit our ability to have our witness

15 continue to do work, but we would not object.  So the question

16 is which one.

17          MR. ROSENDORF:  I think the question stands for

18 itself.  I asked her if she'd done any work to evaluate whether

19 the District Court decision has affected her opinions here.

20          THE COURT:  The problem is that it's too broad.  She

21 may have done work for legal counsel and it could be

22 privileged.  To the extent that you're asking whether it would

23 affect her opinion rendered here as an expert witness, that

24 objection I would overrule if there was one.

25          MR. ROSENDORF:  That's the question.  Now, let me

Zilly - Cross/Rosendorf                    180

1  say, I think, that if there is work that she did even if it was

2  in what is believed to be a confidential capacity which in any

3  way affects her opinion, I think we have the right to know

4  that.

5       MR. BERNICK:  That's the whole idea of a privilege is

6  that it's --

7       THE COURT:  There is a problem with the

8  attorney/client privilege, but if she can answer with respect

9  to whether she's done anything that would affect her opinion

10 here, it's a yes or no.  She may answer that question.

11 Q   Have you undertaken any analysis to determine whether the

12 State of California opinion in any way affects your opinions

13 here with respect to --

14      MR. BERNICK:  It's now yet a different question.  So

15 if we just make the same instruction regarding privilege, then

16 we have no other objection.

17      THE COURT:  All right.  That's sustained.  You may

18 answer, ma'am, with respect to the opinion you're testifying

19 about in these proceedings.

20 A   I haven't done any additional work because a final

21 determination about those claims has not been made.

22                    (Pause)

23 Q   You don't know sitting here today what the amount or even

24 the potential amount of unresolved property damage claims and

25 future property damage claims may be?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Objection.  Calls for an expert opinion

2    regarding estimation matters.  She's not been asked and not

3    been proffered to express opinion about that.  As to whether

4    she knows, that's ambiguous.  She's here as an expert.

5          MR. ROSENDORF:  If she is not being asked to opine in

6    any way as to the amount or potential amount of traditional --

7    of unresolved property damage claims or future property damage

8    claims, then I can accept that.  But that's what I was asking.

9          MR. BERNICK:  We have never --

10          THE COURT:  Well, her -- I think her testimony has

11    been pretty clear about what she did.  She's put certain

12    numbers together in a format that assists in a feasibility

13    analysis.  But she did not do the underlying development of

14    those numbers.  Her testimony is very clear.  Every person's

15    asked her about it.  She hasn't changed her testimony.  Mr.

16    Rosenberg, unless you're trying to get to some other point, I

17    don't think that one's contested.

18          MR. ROSENDORF:  Well, it was more of a wrap up than a

19    new point, Your Honor.

20          THE COURT:  All right.

21          MR. BERNICK:  Excellent wrap up.

22          MR. ROSENDORF:  Thank you, I appreciate that.

23    Q    Now, you began meetings with the lenders in May and June

24    of 2009, correct?

25          MR. LOCKWOOD:  Exit lenders?

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Rosendorf                    182

1  Q    Yes, correct, exit lenders.

2  A    I recall those formal meetings.  We've been having

3  meetings with lenders probably going back three or four years.

4  Q    You received proposals for commitment letters from the

5  exit lenders in July?

6  A    Yes.

7  Q    You were deposed in this case in late August, on August

8  20th, correct?

9  A    I believe that's the date.

10  Q    And when you were deposed in late August, you testified

11  that it was your intention to finalize commitment letters prior

12  to the confirmation hearing, correct?

13  A    That's correct.

14  Q    Yet here we are at the confirmation hearing and there are

15  no finalized commitment letters, correct?

16        MR. BERNICK:  Objection.  That is really an argument

17  of counsel.  We'd love to respond to why it is that we're still

18  here, but I don't think it's really germane to the witness's

19  testimony.

20        THE COURT:  It was stated in an argumentative

21  fashion.  If you want to restate the question, you may.

22  Q    But you have not to date obtained executed commitment

23  letters, correct?

24  A    We made the decision not to obtain commitment letters.  We

25  had commitment letters.  We could execute under those

**J&J COURT TRANSCRIBERS, INC.**

1 commitment letters based on a number of reasons having to do

2 with cost, flexibility, timing, rates, structure.  We

3 determined it was in the best interest of the debtors not to

4 obtain the commitment letters.

5 Q    But that determination was apparently made sometime

6 between August 20th and the commencement of the confirmation

7 hearing in September 8th or 9th?

8 A    Certainly after the 20th.

9         MR. ROSENDORF:  Okay.  May I take a moment, Your

10 Honor, to confer with my co-counsel?

11         THE COURT:  Yes.

12                    (Pause)

13         MR. ROSENDORF:  I have no further questions, Your

14 Honor.  Thank you.

15         THE COURT:  All right.

16         MR. ROSENDORF:  Thank you, Ms. Zilly.

17         THE COURT:  Anyone else in the nature of cross

18 examination?  Mr. Bernick, redirect?

19                REDIRECT EXAMINATION

20 BY MR. BERNICK:

21 Q    Good afternoon, Ms. Zilly.  Is this microphone working

22 here this afternoon, kind of yes, kind of no, kind of sort of?

23 Yeah, okay.  Let's kind of go a little bit in the reverse

24 order.  You were asked questions by counsel for Anderson

25 Memorial just now about whether you did your own independent

1  review of the $37.3 million number, do you recall that?

2  A    Yes.

3  Q    And I think your statement was in response to several

4  questions you felt that the company was in the best position to

5  know what that number should be, do you recall that?

6  A    Yes.

7  Q    Why is it that you believed and still believe that the

8  company is in the best position to provide that number?

9  A    The company has the experience based on its historical

10 precedent with respect to asbestos property damage claims.  It

11 has expert reports that were prepared for it with respect to

12 whether or not it could be a determined number, and it also had

13 its own internal records and claim histories with respect to

14 asbestos property damage claims.

15 Q    Thank you.  In connection with this case, who is it that's

16 negotiated the settlements of all of the individual property

17 damage claims that have been settled?  Who's negotiated those?

18 A    The debtor has.

19 Q    Thank you.  Now, there are a lot of questions asked about

20 your testimony concerning the $1.6 billion that Mr. Rich, as

21 able counsel for the PD Future Claimants Representative,

22 burdened you with during the deposition.  And the question is,

23 it was suggested that somehow, well, gee, this came up in the

24 deposition and you kind of said, yeah, it's still feasible.  Is

25 that number a number that you feel somehow uncomfortable about

  
1  that you haven't done a sufficient analysis?  It was just

2  thrown at you at a deposition?

3  A    It was initially brought up in a deposition.  I've since

4  done more analysis.  It's been asked numerous times.  I've done

5  more analysis with respect to what that number would mean with

6  respect to feasibility and what it means with respect to its --

7  the fact that it exists, yes.

8  Q    Okay.  Thank you.

9           UNIDENTIFIED ATTORNEY:  Your Honor, I'm sorry.  I'm

10  having trouble hearing the witness here.

11           THE WITNESS:  Sorry.

12           UNIDENTIFIED ATTORNEY:  Thank you.

13           THE COURT:  Could you see if your microphone's on

14  because I was having trouble, too?

15           THE WITNESS:  It's bright green.

16           THE COURT:  It is bright green.

17           UNIDENTIFIED ATTORNEY:  On the other hand --

18           THE WITNESS:  It's bright green.  I mean, the voice

19  may be dropping --

20           UNIDENTIFIED ATTORNEY:  Yeah, I was going to say --

21           THE WITNESS:  -- but the light's still green.

22           THE COURT:  Okay.

23           MR. BERNICK:  Ms. Zilly, at this point in the day, is

24  getting kind of a little less bright green in her voice.

25           THE WITNESS:  More green, less bright, but --

1          MR. BERNICK:  More green, less bright, yeah.

2          THE COURT:  If you could just keep your voice up

3  then, Ms. Zilly, that would help.

4          THE WITNESS:  Yes.  Thank you.

5          THE COURT:  Okay.

6  Q    Okay.  There are questions asked of you about whether the

7  so-called 85/15 allocation, 85/15 included ZAI, do you remember

8  that?

9  A    Yes.

10 Q    So let's assume that it did include ZAI and let's further

11 assume your analysis had it in there as question mark, question

12 mark, question mark which basically counted as zero?

13 A    Correct.

14 Q    If it turns out that the 85/15 included ZAI and ZAI had a

15 positive number, what would happen to the percentage recovery?

16 85/15 includes ZAI.  There is a positive recovery.  What

17 happens to your $1 billion number if, in fact, the ZAI number

18 is positive, it was included?

19         MR. KOVACICH:  I object that he's asking her for a

20 new and different opinion now.  The 1 billion was calculated

21 using the 15 percent.  Now he wants her to increase that based

22 on an assumption that hasn't even been substantiated.

23         MR. BERNICK:  Actually, I disagree, but I'll re-frame

24 the question so we avoid the billion dollars all together and

25 just get to the bottom line which is the percentage recovery.

1  Q    If it turns out the ZAI number, the real liability number,

2  would have been higher than zero, what happens to net

3  recoveries under your analysis?

4  A    Net recoveries to the property damage --

5  Q    The net recoveries to the claimants.

6  A    To the claimants, it would be higher.

7  Q    The recovery to the claimants would be higher?

8          MR. KOVACICH:  Objection, now he's --

9  A    Which claimants are we referring to?  Sorry.  And I can't

10 see your chart.  I'm sorry.

11 Q    Yeah.  If, in fact, the liability to the ZAI claimants is

12 not zero as you have assumed, but it turns out to be positive,

13 the ZAI is not question mark, question mark, question mark,

14 it's positive, what happens to the percent recovery of assets

15 to the claimants?  The liability is higher.

16 A    I'm only confused because I'm not sure if you're talking

17 about the 85/15 or pursuant to the document --

18 Q    What I'm really saying is no matter what it is.  Your

19 analysis assumes that the question mark, question mark,

20 question mark is there for ZAI no matter whether it's included

21 in the 85/15 breakup or it's not included in the 85/15 breakup.

22 If the ZAI liability is now a positive figure, what happens to

23 the percentage recovery for liability based upon the same

24 number of assets?

25 A    If you have the same number of assets and a higher

**J&J COURT TRANSCRIBERS, INC.**

1 liability number, the percentage recovery would have gone down.

2 Q    Down.  Okay.  Let's talk about --

3         MR. BERNICK:  Coincidently, Your Honor, there was a

4 comment made about the ZAI opinion being binding in the Chapter

5 7.

6 Q    Let me -- Ms. Zilly, do you know how claimants were

7 actually present before the Court?  Out of all of the 15,000

8 ZAI claimants that showed up by the bar date, how many of those

9 claimants were actually before the Court when the ZAI Science

10 opinion was being litigated, do you know?

11        MR. KOVACICH:  I object, Your Honor.  The Court

12 sustained an objection to my examination on this point, so Mr.

13 Bernick has gone beyond the scope of what was permitted in my

14 cross.

15        MR. BERNICK:  Not at all.  It was a completely

16 different point that was made.  The point was that the ZAI

17 Science opinion hadn't been considered by this witness.  And my

18 point was that apparently they're assuming that that ZAI

19 opinion would have been binding on all these 15,000 claimants

20 and they weren't even before the Court.

21        THE COURT:  I don't know who, at this point, it would

22 be binding on or not.  I think the question is simple.  It's a

23 yes or no answer.  Does she know how many claimants were before

24 the Court in the ZAI Science trial?  She can answer that yes or

25 no.

**J&J COURT TRANSCRIBERS, INC.**

1  A    No.

2          MR. BERNICK:  Now we are going to get faster and

3  faster, right?

4  Q    Let's talk about your views regarding Mr. Frezza.  You

5  were asked questions about a statement you made in your expert

6  report as concerning Mr. Frezza and it was brought out that you

7  focused on the fact that there had been no adjudication of the

8  PI liability and Mr. Frezza couldn't look to an adjudication.

9  The other thing is you said he didn't take into account

10  uncertainty.  Do you recall that?

11  A    Yes.

12  Q    Okay.  Now, Mr. Frezza you said was dealing with solvency.

13  Tell us how, if at all, it is important to analyzing Mr.

14  Frezza's assessment of solvency, how it is important, if it is,

15  that there hadn't been an adjudication of PI liability.  Why

16  does it make a difference?

17  A    In Mr. Frezza's analysis with respect to solvency, he was

18  assuming that all other parts of the plan stayed in place.  And

19  the only thing that he did was to change the one number, the PI

20  number, and so by definition or by assumption he was assuming

21  that that number was part of a plan process.  That number is

22  not the plan -- the number that came out of the settlement

23  discussions that was part of this Chapter 11 discussion.

24  Q    Okay.  In dealing with liability, does it make a

25  difference whether -- strike that.  In dealing with solvency,

**J&J COURT TRANSCRIBERS, INC.**

1  does the degree to which the liability has been fixed make a

2  difference?

3  A    Yes.

4  Q    Let's now deal with your own work in connection with

5  feasibility -- well, actually, let's make it best interest

6  because the questions were asked concerning best interest.

7           THE COURT:  Mr. Bernick, I can't hear anything that

8  you're saying.

9           MR. BERNICK:  Okay.  I guess that --

10          THE COURT:  Cathy, do we have different log in the

11  room -- mic?

12          UNIDENTIFIED ATTORNEY:  No, they're --

13          MR. BERNICK:  I think I can probably get it up a

14  little bit closer.  Is that -- I sometimes look away from it

15  and that may be a problem.  Can you hear me now?

16          THE COURT:  Yes.

17  Q    Okay.  In your best interest analysis, did you or did not

18  consider the effect of uncertainty?

19  A    Yes, I did.

20  Q    In connection with this best interest analysis, in looking

21  at Chapter 7, is there any way that there would have been an

22  adjudication in Chapter 7 for purposes of your best interest

23  analysis?

24  A    The best interest analysis -- my best interest analysis

25  assumed Dr. Peterson's estimate of what the liabilities that

**J&J COURT TRANSCRIBERS, INC.**

1  Grace would face in the tort system, and that was a -- purposes

2  of Chapter 7 analysis.  I mean, there is no -- it's an

3  estimate.  It's not adjudicated.  It's a hypothetical.

4  Q    Fine.  That actually is a more precise answer to what

5  should have been a more precise question.  It was brought out

6  on cross examination that you had a best interest analysis in

7  connection with the plan that didn't -- yeah, that is, I'm now

8  referring to the Graphic 511-13, but the underlying best

9  interest analysis, I believe, is at Plan Proponents' 277.8.  It

10  was brought out that what was in the plan as a liquidation

11  analysis, didn't include, for example, the 4.7 to 5.2 billion

12  that we now see in your best interest analysis at 511-21.  I

13  want to ask you about a couple dates.  When was the best

14  interest analysis that is referred to as part of the plan, when

15  was that required to be submitted to the Court?

16  A    February 27th, 2009.

17  Q    As of that point in time, could you tell us whether the

18  numbers that now have been included in the Chapter 7

19  liquidation analysis for asbestos PI liabilities, can you tell

20  us whether those were even available?

21  A    No, they were not.

22  Q    I want to show you what we've marked as Plan Proponents'

23  234 which is an e-mail dated June 8, 2009 from Dr. Peterson to

24  -- actually, from Mr. Finch to Dan Cohn regarding materials

25  supplied by Dr. Peterson.  Are you aware of whether the

1 breakout of NPV value for claims before and after 2010 was

2 available prior to the time that Dr. Peterson's analysis was

3 conveyed on during June of this year?

4 A    Yes, my understanding is that it was.

5 Q    Beyond that, beyond the best interest analysis that you

6 presented in the plan in that particular feature, did you, in

7 fact, continue to do work on this whole thing, even after

8 February of 2009?

9 A    Yes.

10 Q    Last question relates also to the feasibility -- excuse me

11 -- the best interest analysis going back to the liquidation

12 analysis that was set forth in the plan documents.  I want to

13 zoom in and ask you a couple questions.  Do you remember being

14 asked a bunch of questions about the Fresenius and Cryovac

15 payments which in the analysis contained in plan were put in at

16 amounts ranging from zero to about $873 million?

17 A    Yes.

18 Q    Okay.  So Fresenius, Sealed Air put in amounts.  Now, that

19 paragraph that was read to you kind of in pieces in connection

20 with different questions said, this is the Note C, "Because the

21 asbestos PI and PD channeling injunctions are not available to

22 Chapter 7 liquidation, the liquidation analysis assumes those

23 settlement payments would not be made."  Okay.  So, on the one

24 hand I want to talk about settlements.

25          And then it goes on to say later on, "It is assumed,

**J&J COURT TRANSCRIBERS, INC.**

1  however, that a Chapter 7 Trustee would pursue similar

2  litigation actions which resulted in those agreements because

3  the outcome of this litigation cannot be known.  A range is

4  shown from zero at the low end to a level equal to the payment

5  proceeds."  So we have litigation.  So as I understand from

6  that note, for purposes of the best -- the liquidation analysis

7  you used for the prospect of settlement, that is, the claims

8  would be paid voluntarily, zero, is that correct?

9  A    Yes.

10 Q    Now, the settlements that actually took place -- and God

11 willing will be part of this case -- were for about $890

12 million, right?

13 A    Approximately.

14 Q    The $890 million, as you understand it, did it settle the

15 fraudulent conveyance claims?

16 A    Yes.

17 Q    As you understand it, was the benefit that was obtained,

18 was the -- did the settlement give Sealed Air and Fresenius not

19 only the settlement of the fraudulent conveyance claim, did it

20 give them anything else?

21 A    Yes.

22 Q    What was it?

23 A    Protection from successor liability or future claims,

24 successor claims.

25 Q    So both were in the settlement?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Now, if, in fact, litigation were to unfold as you've

3  described in your liquidation analysis going back to February

4  and the liquidation claim were to be brought by the trustee,

5  would that litigation include fraudulent conveyance, as you

6  understand it, successor liability or both?

7  A    Both.

8  Q    Both.  You think that the -- that's -- is that why you

9  came up with this higher number?

10  A    No, I think that the trustee would pursue the litigation

11  but that he can't, even if there's a judgment in their favor,

12  he can't -- there can be no limitation on the successor claims

13  in the Chapter 7.

14  Q    Okay.  So if the trustee is successful, do you know

15  whether the trustee can ever give relief for this, that is, the

16  successor liability?

17  A    I don't believe so, no.

18  Q    Do you know for a fact -- if I were to tell you that the

19  trustee can't even sue for successor liability, but can only

20  sue for fraudulent conveyance, how would that bear upon your

21  range of zero to 890 million as the results of the litigation,

22  if the trustee can't even ask for successor liability?

23         MR. KOVACICH:  I object, Your Honor.  This is, again,

24  asking Ms. Zilly to testify about the value of the fraudulent

25  conveyance action in a Chapter 7 liquidation.  She's not

**J&J COURT TRANSCRIBERS, INC.**

1 competent to do so.  There's no foundation and it's a

2 speculative opinion.

3          MR. BERNICK:  I'm just asking how -- in fact, this is

4 exactly --

5          MR. BROWN:  Your Honor, I join in that objection.

6          MR. BERNICK:  This is exactly the consequence of

7 their pursuing what actually was embedded in the liquidation

8 analysis which was the hypothetical that the trustee would

9 pursue similar litigation, and they brought it out, and having

10 brought it out, I'm now asking a hypothetical which is what if,

11 as we all know is true, the trustee could only pursue

12 fraudulent conveyance, what effect, if any, that would have on

13 the analysis.

14          THE COURT:  That's fair redirect based on the cross

15 examination, so I'll allow the question.

16          MR. BERNICK:  Yeah, that's it.

17          THE COURT:  But we could afford to get to something

18 that's really material.

19          MR. BERNICK:  Yes.

20          THE COURT:  You may answer, Ms. Zilly.

21 A    Under that scenario, my -- I would assume that the low end

22 of my range was the more likely outcome.

23          MR. BERNICK:  Thank you.

24          THE COURT:  Mr. Finch?

25          MR. FINCH:  No redirect.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Recross?

2              MR. ROSENDORF:  No, Your Honor.

3                          (Pause)

4              MR. KOVACICH:  No, Your Honor.

5              THE COURT:  You're excused, Ms. Zilly.  Thank you.

6              THE WITNESS:  Thank you.

7              THE COURT:  Let's take a five-minute recess --

8              MR. BERNICK:  Sure.

9              THE COURT:  -- just a little stretch and then we'll

10   start with the next witness.

11                          (Recess)

12             THE CLERK:  Please rise.

13             THE COURT:  Please be seated.  Mr. Bernick?

14                          (Pause)

15             THE COURT:  Cathy, will you swear Mr. Finke in,

16   please?

17             THE CLERK:  Yes.  Raise your right hand, please.

18           RICHARD FINKE, PLAN PROPONENTS' WITNESS, SWORN

19             THE CLERK:  Please be seated.

20             MR. SPEIGHTS:  May it please the Court, Dan Speights

21   representing Anderson Memorial.  Mr. Bernick apparently intends

22   to call Mr. Finke at this time and I have several matters to

23   take up with the Court before Mr. Finke starts his testimony --

24             THE COURT:  All right.

25             MR. SPEIGHTS:  -- in regard to Mr. Finke's testimony.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Yes, sir.

2              MR. SPEIGHTS:   Number one, the debtors or perhaps the

3  plan proponents have circulated a proffer of Mr. Finke's direct

4  testimony.   Initially, they circulated a proposed stipulation

5  for Anderson and the debtors to agree upon and I told them that

6  it would be better to put it in a proffer.  They put it in a

7  proffer over the weekend and circulated it to all parties and I

8  advised Kirkland & Ellis that I had no objection to the

9  proffer.  I have no objection as I stand here to the proffer.

10 And if the proffer is put in and that's it, I have no

11 questions.

12             Shortly before we started today and I mean like

13 9 a.m. or a minute before or after, Mr. Bernick or one of his

14 assistants handed me a notebook with a proposed exhibit in it,

15 probably a demonstrative exhibit, but that's neither here nor

16 there at the moment, which I had never seen before.  Of course,

17 I object to the demonstrative exhibit and will tell you in a

18 while why I object to the demonstrative exhibit if we get

19 there, but I have a more fundamental problem, several more

20 fundamental problems.

21             My first fundamental problem is having circulated and

22 proposed a proffer from Mr. Finke, I don't think it's

23 appropriate for the debtors to go beyond the proffer.  I'm not

24 claiming I'm surprised that the debtor wants to do so.

25 Candidly, I'm never surprised at Mr. Bernick, but the point is

1  not a question of surprise as much as or the question is

2  whether it's appropriate.  When you have a proffer, you

3  circulate the proffer and now you want to intend to go further

4  than the proffer.  So first objection is to Mr. Bernick going

5  beyond the proffer.  And I'm sure he intends to.  If he

6  doesn't, he can say I'm not going beyond the proffer.  But if

7  that's all he's doing, I'll sit down.

8         Secondly, Your Honor, having reviewed the proposed

9  exhibit, it's evident to me that the debtor is going to do

10  something that I'll politely call very clever.  He wants now to

11  have a complete about face.  Since March when I first took Mr.

12  Finke's deposition until a couple of days ago when we last

13  argued for the third time, I think, about Mr. Shelnitz, the

14  debtors have consistently taken the position that when it comes

15  to good faith, we are limited to the documents themselves and

16  they have put up one objection after another objection to all

17  attempts of Anderson to go into good faith about what happened

18  in 2005 or what happened in 2008 or any other time.

19         Their position has been, and I understand their

20  position, that none of that is relevant.  They have instructed

21  witnesses not to answer questions.  They have claimed

22  privilege.  They have claimed settlement negotiations.  That's

23  been their consistent position since March when I first took

24  Mr. Finke through a large number of depositions, many of which

25  I have not visited with you about, although I refer to them in

1  some of the briefs we filed.  That's their position.

2         Now, at 9 a.m. on the perhaps next to the last day of

3  the confirmation hearing, the debtors intend to call Mr. Finke

4  and forgetting all of the objections that they have made

5  heretofore, attempt to reverse their position and put in good

6  faith apparently through everything they've done since 2001 in

7  this case.  Now, in one sense, I applaud the debtors for

8  finally coming around to my view that good faith -- that we can

9  look at the whole picture when we're deciding whether this plan

10 is presented in good faith.  However, having taken all those

11 positions beforehand and having limited my discovery, I'm in

12 the position now of having to say to Your Honor, well, if they

13 really want to go into this now, I have some more discovery I

14 need to do, including more questions of Mr. Finke and other

15 witnesses and I can try to organize those thoughts, but I just

16 got served at nine this morning with the notebook.

17        So, Your Honor, that's the position I'm in facing a

18 witness to be asked questions about a new strategy or a new

19 theory of the debtor's case that now everything comes in as Dan

20 Speights has been saying everything should come in from day

21 one.  So number one is the proffer, number two is the flip flop

22 in the debtor's position.

23        Next, Your Honor, if you should get to the, I

24 believe, demonstrative exhibit and I would urge Your Honor not

25 to permit Mr. Bernick to flash it on the cameras until we have

**J&J COURT TRANSCRIBERS, INC.**

1  a ruling on it.  If Your Honor should get to that, then among

2  other things this violates the rule that I asked Your Honor to

3  impose years ago, the 24-hour rule.  And I did so after Mr. --

4  after the debtors would pull out these demonstrative exhibits

5  and Your Honor ruled in clear and unmistakable terms and has

6  held the feet to the fire of everybody in this case, it's 24

7  hours in advance by the calendar.

8         So this was due on Friday.  It wasn't due at 9 a.m.

9  this morning.  And had I gotten it at -- on Friday perhaps at

10 11:59 p.m., perhaps during the day, at least I would have had

11 all weekend, you know, to prepare, et cetera on this summary,

12 demonstrative exhibit which they now intend to put in, perhaps

13 prepared something of my own.  And I think they have violated

14 the Court's rule on that and they have done it blatantly so.

15 And given the fact that they had a proffer and now want to

16 bring everything else in, apparently, from this demonstrative

17 exhibit, it was obviously with intent to ambush Anderson,

18 ambush Anderson's counsel with this complete turnaround in

19 position and now go from A to Z with Mr. Finke.  If they want

20 to put in good faith through, you know, in accordance with the

21 rules of the Court and want to adopt my theory at this point, I

22 need the rest of my discovery that they have prohibited me from

23 getting over the past six or seven months.

24        THE COURT:  With respect to the demonstrative, Mr.

25 Speights, since I don't know what you're referring to, do you

**J&J COURT TRANSCRIBERS, INC.**

1  want to tell me what that may be?  I have to take a look at it

2  so I can rule it.

3         MR. BERNICK:  It's in your -- Kim, did you give her

4  the notebook yet?

5         THE COURT:  I have a notebook.  I just don't know --

6         MR. BERNICK:  It's just the first -- it's the time

7  line at the beginning.

8         THE COURT:  The Chapter 11 negotiations time line?

9         MR. SPEIGHTS:  And with many statements on it, some

10  of which would require me to pull items to deal with, some of

11  which are rank hearsay, some of which are inaccurate.  But,

12  again, it violates the 24-hour rule.

13         THE COURT:  Okay.  For the record, I just want an

14  identification.  We're speaking about what is labeled as

15  Exhibit PP-518-1.

16         MR. SPEIGHTS:  Thank you, Your Honor.

17         THE COURT:  Mr. Bernick?

18         MR. BERNICK:  Yes, and so we're happy to address

19  these issues.  It is true that the proffer was going to be the

20  sum and substance of Mr. Finke's direct examination that would

21  be -- that was a decision that was a, basically, a decision

22  that said we didn't need anything more from Mr. Finke.  And so

23  it was just going to be a proffer, the proffer was going to

24  relate to what are fairly technical but important bankruptcy

25  matters and we prepared the proffer to see if it would -- we

1  could obviate the need to even call Mr. Finke.

2          Proffer was shared.  We asked specifically whether

3  Mr. Finke would still have to appear or whether there would be

4  cross examination or not, and it was Mr. Speights' view, as he

5  expressed to us, that Mr. Finke still had to appear because he

6  wasn't going to waive his cross examination.  And that was the

7  state of affairs as of last week as part of our effort to get

8  to the conclusion of the confirmation hearing.

9          I would add in note and emphasize that that was

10 strictly a decision made by the plan proponents that said we

11 didn't need anything more.  Mr. Finke has been consistently

12 identified as an individual who would talk about a variety of

13 things in connection with the pre-trial disclosures, most

14 specifically, good faith in connection with the property damage

15 litigation and resolution.

16         Last week two things happened that changed our

17 perspective.  The first thing that happened was that -- and I

18 guess they really, basically, both emanate from the same source

19 which is the motion practice that took place before the Court

20 with respect to Mr. Shelnitz and the -- and then the further

21 discussion that took place before the Court in motion practice

22 with respect to Mr. Solomons.  And not withstanding our

23 consistent view of Mr. Speights' right, we have regarded good

24 faith as being something largely determined from the face of

25 the plan documents and from the process that led up to those

**J&J COURT TRANSCRIBERS, INC.**

1  plan documents.  That has been our consistent position.  On the

2  basis of that position, we have resisted the idea that it's

3  appropriate to conduct discovery and to rules that are barred -

4  - and to matters that are barred by Rule 408 and into matters

5  that encroach upon the attorney/client work product privileges.

6  Those matters being matters relating to strategy or to

7  planning.  That has been our consistent position.

8          That was our consistent position, as Your Honor will

9  recall, in connection both with the Shelnitz issue and in

10 connection with the Solomons issue.  But what happened when

11 those matters were litigated was two things.  One is that Mr.

12 Speights insisted upon bringing Mr. Solomons.  Mr. Solomons'

13 proffer was, in fact, through the affidavit to get squarely

14 into the heart of settlement discussions.  And he wasn't

15 prepared to go by the notion that there wouldn't be, in fact,

16 evidence put before the Court of what took place during the

17 settlement discussions, even though settlement discussions

18 didn't even relate to the current plan.

19         And for all we know Mr. Solomons is here.  I wouldn't

20 recognize him, so I don't know if he is here.  But, apparently,

21 they still intend to call Mr. Solomons to delve precisely into

22 the issue of the settlement negotiations that have taken place

23 because they attempt -- they want to show their "course of

24 conduct" theory of bad faith; that is, to link up this meeting

25 in our offices in June or July of 2005, some stipulation

1  process in March of 2005 and then jump over a few years and

2  link it up with how Mr. Speights believes that he's been

3  unfairly disadvantaged when it comes to the treatment of

4  Anderson in the post-confirmation world.  He has wanted to

5  pursue the course of conduct theory.  Although it doesn't

6  respect the integrity of the documents, it gets into the

7  substance of the settlement discussions.  We think it's

8  fundamentally wrong.

9       Where we are today is that we don't know it's not

10 going to happen.  Mr. Solomons is still here.  Moreover, in the

11 context of the discussion that took place telephonically with

12 Your Honor, Mr. Speights pursued this whole theory of the

13 course of conduct and, in our view, put a lot of facts out

14 before the record, made a lot of claims about how Mr. Finke had

15 represented in his deposition that where there's this change of

16 course that was dictated from on high and, you know, it was all

17 Mr. Shelnitz's problem and he even conceded that there had been

18 this change in the whole course of the case.

19      Well, Mr. Finke never testified to any such thing in

20 his deposition.  And Your Honor I think was concerned, although

21 it was very hard for me to determine because I was in the back

22 seat of a car, as I know everyone became familiar, during the

23 course of the trip to the airport, became concerned about,

24 well, what really had been the negotiations with Mr. Speights,

25 in particular.  And weren't there discussions with Mr. Restivo

1 and the like.

2         As a result of both of these developments, it was
3 Grace's determination that we could not put this confirmation
4 hearing at risk of the so-called conspiracy theory and these
5 allegations by Mr. Solomons and this argument by Mr. Speights
6 and this mischaracterization of Mr. Finke's testimony.  And so
7 we made the decision to be -- to put it out before the Court
8 exactly how the sequence of settlement discussions evolved
9 without getting into the details of those discussions, but
10 process-wise and to illustrate how whatever took place back in
11 2005 and what it was has got absolutely nothing whatsoever to
12 do with this plan and to do it through Mr. Finke.  He was
13 clearly identified as being able to and, in fact, the intent
14 was to call him.

15         And on the basis of our determination, Ms. Baer
16 communicated with Mr. Speights last Friday and said we are
17 going to come with Mr. Finke.  And the question was put very
18 specifically -- Ms. Baer can address this -- well, but should I
19 bring my Finke boxes or is it going to be confined to the
20 proffer.  And Ms. Baer says you ought to bring the Finke boxes.
21 And I now see that they're very time worn and they have -- you
22 know, they almost have this kind of, you know, friendly feel
23 about them they've been so well used over the years.

24         But, obviously, Mr. Speights didn't learn of Mr.
25 Finke's testimony in the morning and he decided when he came

1  out yesterday before he received this time line that he was

2  going to be prepared to cross exam Mr. Finke.  And, in fact,

3  the existence of these boxes demonstrates most tangibly that,

4  yes, he did intend to cross examine Mr. Finke and he's prepared

5  to do it.  So it all comes down now to this demonstrative and

6  what's the demonstrative.

7        The demonstrative time line, it breaks out the basic

8  periods of time that are going to be -- that were covered, that

9  covered the basic approaches to the settlement process.  We are

10 not going to get into the details of Mr. Solomons' affidavit or

11 any of that.  We'll see if they call Mr. Solomons, if the Court

12 lets them call Mr. Solomons.  If they don't call Mr. Solomons,

13 Your Court says they can't call Mr. Solomons, we don't have to

14 get back into all these discussions.  We're going to have a

15 relatively short overview that establishes based upon process,

16 based upon the plan documents, why it is that there is good

17 faith and that's what Mr. Finke is here to do.

18       As to whether that demonstrative was timely

19 submitted, Mr. Speights is working under the wrong set of

20 rules.  There was a convention that was adopted in the

21 pre-trial phases of this case that said that 24 hours before an

22 argument to be made there would be demonstratives exchanged and

23 that was designed to give people some protection.  But we --

24 all of us negotiated a fourth amended case management order

25 related specifically to this hearing and to the last hearings.

1  And it calls out specifically a rule that has been followed

2  pretty religiously by everybody which is that demonstratives

3  are -- to be used for direct examination of witnesses must be

4  produced to opposing parties the morning of the day they are to

5  be used.  And this morning we produced, as we have for every

6  other witness, the demonstratives to be used on direct

7  examination, including Mr. Finke.

8        So Mr. Finke was properly identified.  We gave them

9  adequate notice, both formally and informally also last Friday.

10  We timely produced a demonstrative that will be a very

11  substantial aid, we believe, to a relatively short examination.

12  My argument and Mr. Speights' argument probably are going to

13  last longer than the direct examination that provides an

14  overview of the different phases of how it is that the debtor

15  and the plan proponents negotiated with each and every element

16  of the property damage constituency and successfully, including

17  Mr. Speights.  We'll then make the proffer and we won't have

18  any further questions of the witness.  It's up to Mr. Speights

19  whether he wants to cross examine.  It's up to Mr. Speights

20  whether he wants to call Mr. Solomons.  It's up to the Court

21  whether Mr. Solomons will be permitted to testify.  But if he

22  is called and he does testify, we are most certainly going to

23  ask Mr. Finke then to come back and respond in detail to the

24  allegations that are being made.

25        So to the extent that the chart gets into the March

**J&J COURT TRANSCRIBERS, INC.**

1 course of conduct and the July course of conduct '05, and then

2 the '09 course of conduct, I'm not going to have Mr. Finke

3 testify to any of those things today.  And if they are

4 permitted to get into matters that go into the settlement

5 discussions themselves, then Mr. Finke will come back on

6 rebuttal and will give specific rebuttal to the so-called

7 course of conduct case that Mr. Speights wants to talk about

8 before the Court.

9          THE COURT:  Well, why isn't this entire thing

10 appropriate for rebuttal because it seems to me that Mr.

11 Speights has a point?  The depositions have not permitted

12 discovery into the settlement process.  And it may not just be

13 Mr. Speights, it may be others who have raised this issue and

14 who may want additional discovery as to good faith.  So I think

15 the debtor and the plan proponents have a choice.  I think

16 either if you're going to go into this issue, we're not going

17 to finish the trial tomorrow because I will open it up for

18 discovery on the issue of good faith and the plan negotiation

19 process if the debtor and the plan proponents are going to get

20 into that.  My understanding has been throughout the course of

21 the pre-trial and trial phases of this case that the debtor was

22 not going to introduce that type of testimony.  And if you're

23 changing it two days before the end of trial, I'm reopening

24 discovery.

25          MR. BERNICK:  To be clear, Your Honor, and I'll

**J&J COURT TRANSCRIBERS, INC.**

1  accept responsibility for not being clear with the Court.  If

2  Your Honor turns to that demonstrative --

3          THE COURT:  All right.

4          MR. BERNICK:  -- it's that page.  There is nothing

5  about the demonstrative that gets into the specifics of the

6  negotiations except to the extent that it gets into, number

7  one, the discussions in March of '05 relating to a proposed

8  stipulation, the meeting in July of '05 getting into the

9  authority issue.  That was the meeting that took place at our

10 offices.  Those are really the only two points that get into

11 detailed substantive matters.  And we are not going to pursue

12 those at all in connection with our examination of Mr. Finke

13 today.

14          The essence of what the chart will demonstrate is

15 that the settlement process went into -- went in phases,

16 different kinds of approaches and that nobody was excluded, the

17 same kind of process testimony that came from Mr. Austern, and

18 the same kind of process testimony that came from Mr.

19 Inselbuch, and that'll be it.  And it really is designed, Your

20 Honor, specifically to give Your Honor a record that says we're

21 bearing the burden on good faith and simply says there was very

22 active settlement discussions that took place over time

23 resulting in this plan.  And Your Honor will see question by

24 question that it is exactly at that level of generality, no

25 different than what has taken place already with other

1 witnesses.  And that is all that we would elicit from Mr.

2 Finke.  And it is part of our case.

3          What we would say is responding to the particular

4 allegations that Mr. Speights has made that try to get into the

5 substance of discussions that took place with him individually.

6 We do not intend to pursue those.  And if Your Honor determines

7 that they're not appropriate, that they can't be put in through

8 Mr. Solomons or anybody else, then there will be no rebuttal

9 from Mr. Finke.

10          So there is no desire -- we're not changing the rules

11 of the game at all.  We are sticking by the rules of the game

12 in all respects, but we are not going to be unprepared to

13 respond to Mr. Speights' attempt, as he has made repeatedly

14 before, to get into the substantive details of the negotiation

15 process.  I got to have somebody who is going to respond to Mr.

16 Solomons if he testifies on those matters and to put them also

17 into context.  And that's the only reason that the chart now

18 contains them is that they're to anticipate -- and we won't

19 offer them into evidence -- that Mr. Finke is going to have to

20 be recalled to testify in response to Mr. Solomons.  So we're

21 not changing any rules.

22          THE COURT:  Well, I don't know.  I think it's a

23 dangerous ground.  If you want to pursue it, I'm not going to

24 prohibit you from pursuing it.  I agree that the case

25 management order does say that the demonstratives are to be

1  produced the day of the witness's testimony.  So that is

2  timely.  With respect to whether it's -- this particular

3  demonstrative is necessary, I don't know.  I'll reserve ruling

4  on that.

5          MR. BERNICK:  I'll do it even differently.  I won't

6  even use the demonstrative unless we get into the senior side

7  of the equation tomorrow and we have to recall Mr. Finke.

8  Won't even use it.  Don't need it.

9          THE COURT:  Mr. Speights?

10         MR. SPEIGHTS:  Let me say one thing before I get to

11 substance.  None of these boxes about which Mr. Bernick was so

12 dramatic about deal with Mr. Finke.  I'll be glad to read the

13 labels if there's any question.  I'll be glad for Mr. Bernick

14 to go and read the labels himself.  I do have a few Finke

15 materials in my briefcase and, in fairness, they would not -- I

16 said I was not surprised -- they would not agree that they

17 wouldn't ask anything else, but of course they didn't tell me

18 anything and didn't tell me anything until 9:00 this morning.

19 But that's --

20         MR. BERNICK:  That's misrepresentation, Your Honor.

21         MR. SPEIGHTS:  -- not what I want to address.

22         THE COURT:  It doesn't matter.

23         MR. SPEIGHTS:  Your Honor -- right.  Your Honor, you

24 were right on in your initial reaction, you and Mr. Rosendorf

25 when he turned to me over there.  Why isn't this a matter for

1  rebuttal?  You have not ruled on Mr. Solomons.  You said to

2  have Mr. Solomons here and you would rule at the time and when

3  we put on our case.  We have no other live witnesses to present

4  to you today or tomorrow.  We have some depositions we will

5  offer, we'll argue about those, including Mr. Finke's

6  deposition, so if someone thinks that I have somehow

7  mischaracterized Mr. Finke's testimony, the deposition itself

8  will be offered.  That's what we were going to call as a live

9  witness is Mr. Solomons presumably tomorrow.

10        So I think Mr. Bernick wants his cake and eats it,

11  too.  And I think if he goes in this today, I do think -- I

12  don't know why I'm -- I don't like to say warning Mr. Bernick,

13  but I just want to make it clear that if they do this, that

14  I'll be, as Your Honor predicted, I'll be here saying

15  discovery, discovery, discovery, and I'm going to just point to

16  one thing that Mr. Bernick mentioned in Mr. Finke's deposition

17  and then I'll sit down.  He's mentioned it twice today already

18  and that has to do with Mr. Finke's testimony which I

19  characterize as a change in direction when we were arguing some

20  motion sometime, et cetera.  And it was a Question 144.  This

21  was after the Question 143.

22  "Q   Mr. Finke, you and I have dealt with each other close for

23  20 years, I think.  I never recall except for this one instance

24  of your not getting back to me.  Without yet discussing why or

25  what happened or anything else, do you agree that after I sent

1 you the revised stipulation, you did not get back to me

2 concerning the stipulation?

3 "A   I would agree with that.

4 "Q   Did Grace decide to proceed in another direction?

5 "A   I cannot answer that question without divulging privileged

6 communications.

7 "Q   Would that be privileged communications with outside

8 counsel?

9 "A   No.

10 "Q   Would that be privileged communications with the general

11 counsel of W.R. Grace?

12 "A   Yes."

13          Now, that's --

14          MR. BERNICK:  (Indiscernible).

15          MR. SPEIGHTS:  Please, Mr. Bernick.

16          MR. BERNICK:  I'm sorry.  I'm sorry.

17          MR. SPEIGHTS:  That's the state of the record now.

18 Okay.  If Mr. Finke starts testifying about the history of good

19 faith and all our relationships and everything else, that's

20 just one of a plethora of incidences when I'm going to be

21 coming back in and say I want discovery.  I now want to go find

22 out what general counsel told and when he told him, were there

23 any memos about it, et cetera.  So that's my position, Your

24 Honor.  Thank you.

25          MR. BERNICK:  Your Honor, that is exactly what Mr.

1  Speights has done both in the class certification process and

2  again today.  He's just threatened the Court.  The fact --

3          THE COURT:  He's not threatening me, Mr. Bernick.  My

4  ruling is pretty clear.  If you get into this issue --

5          MR. BERNICK:  Well -- but, Your Honor, respectfully

6  it's now at our peril.  Mr. Speights has now said -- first of

7  all, he got the discovery that led to that transcript.  He got

8  the -- he was reading from a deposition transcript with respect

9  to Mr. Finke and he was able to pursue questions.  The subject

10 matter of those questions is how -- this is how one-sided this

11 is.  The subject matter of that question was an exchange in the

12 settlement process regarding a stipulation.  It is absolutely

13 heart and soul Rule 408.

14         THE COURT:  Okay.

15         MR. BERNICK:  He already got it.  He got that, he got

16 other things.  He's had the discovery he's needed.  He's now

17 saying, oh, you can't call -- as soon as Mr. Finke answers one

18 question about this whole thing, we're going to put the whole

19 case off track and yet he still wants to use the deposition.

20 He still wants to use Mr. Solomons.  So he has his cake and

21 eats it, too.  He says to us I've got this, I'm going to put

22 this in, but if you dare to call a witness who responds to what

23 I have to say, I'm going to put this case through yet more

24 discovery.  It can't be both ways.

25         THE COURT:  It's rebuttal.  Yes, Mr. Bernick, it can

**J&J COURT TRANSCRIBERS, INC.**

1  be because what you're suggesting is that if Mr. Finke is going

2  to respond to something that another witness says, that's

3  classic rebuttal.  That's not what the debtor has as a burden

4  of proof --

5          MR. BERNICK:  But, if Your Honor --

6          THE COURT:  -- at the outset.

7          MR. BERNICK:  -- okay.  If Your Honor is going to put

8  us in that position, and I understand that, then all we'll do

9  is have Mr. Finke talk about the proffer.  Mr. Finke will then

10 leave the stand.  We will reserve the right to call Mr. Finke

11 in rebuttal to respond to anything and everything that Mr.

12 Speights has to deal with.  But then I believe that you're

13 going to hear the same speech from Mr. Speights which is that,

14 oh, well, now that the debtor has responded to what I was able

15 to obtain, I can't finish this confirmation trial because he

16 has now opened the door to all of us.  And that is as false as

17 it is today.

18          We've been conscientious in adhering to the rules.

19 We were threatened with a motion to compel because we

20 adhered and tried to adhere very careful to Your Honor's

21 guidelines.  And it's completely inappropriate at this point to

22 say the debtor is damned if it does and damned if it doesn't.

23 It's damned if it does if it calls -- doesn't call a witness to

24 respond, then I get my way on the record.  But if you call a

25 witness to respond, the confirmation hearing is held hostage to

Finke - Direct/Bernick                          216

1  my continuing demands for discovery that's not appropriate.  It

2  can't be right.  But I know we'll argue about that tomorrow.

3  I'm happy to put Mr. Finke on and ask him some questions now

4  regarding his proffer and then we'll get on with the next

5  witness.  And then maybe this afternoon we can talk about Mr.

6  Solomons and whether that testimony is going to take place.

7              THE COURT:  All right.

8              MR. BERNICK:  So we will limit our examination.

9                     DIRECT EXAMINATION

10 BY MR. BERNICK:

11 Q    Mr. Finke, you're under oath.  We now know that you're

12 going to have the fastest examination in the world because

13 you're going to be asked a question where Mr. Speights of all

14 people has promised that there won't be any cross examination.

15 Do you have in front of you a notebook that contains a proffer?

16 A    Yes.

17             MR. BERNICK:  Your Honor, that's also in your

18 notebook, I believe under the cover of the first page.

19 Q    Could you just read the title of the proffer and give us

20 the exhibit number?

21 A    Proffer from Richard C. Finke relating to the first

22 amended plan of reorganization's treatment of asbestos property

23 damage claims and other matters, Exhibit PP-381.

24 Q    Okay.  Are you familiar with that proffer, Mr. Finke?

25 A    Yes, I am.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Is that proffer true and accurate to the best of your

2  knowledge?

3  A    Yes, it is.

4          MR. BERNICK:  We pass the witness.

5          MR. SPEIGHTS:  No questions.

6          THE COURT:  Does anybody have any questions for Mr.

7  Finke with respect to the proffer?  You're excused, Mr. Finke,

8  but subject to recall.

9          THE WITNESS:  Thank you.

10         MR. BERNICK:  Well, we now have such sterling and

11 moving examples of efficiency both from Mr. Brown -- I give him

12 credit -- and from Mr. Speights, as always I give him credit.

13 And we'll see if he looks into those boxes yet today.  But

14 we'll call our next witness who's Dr. Martin.

15         THE CLERK:  Would you raise your right hand, please?

16    DR. DENISE MARTIN, PLAN PROPONENTS' WITNESS, SWORN

17         THE CLERK:  Please be seated.

18         THE COURT:  Thank you.

19                    DIRECT EXAMINATION

20 BY MR. BERNICK:

21 Q    Dr. Martin, you're been before the Court and been

22 qualified as an expert previously and on the basis of those

23 same qualifications, I want to ask you whether you have

24 conducted an examination regarding the prospects for future

25 property damage demands in connection with this case?

**J&J COURT TRANSCRIBERS, INC.**

1 A    Yes, I have.

2 Q    Could you tell us the question that you sought to address

3 and how it is that you went you about answering that question?

4 A    Sure.   There are really two questions.   The first was

5 whether Grace is likely to be subject to substantial future

6 property damage demands.   And the second question was whether I

7 was able to put a number on that, whether the -- those demands

8 were determinable or deterministic.

9 Q    Okay.   Let's focus on the first question which is, is

10 Grace likely to be subject to substantial future property

11 damage demands.   Directing your attention to the second slide

12 in your notebook which is Plan Proponents' 512-8, is that a

13 demonstrative that would aid you in explaining to the Court the

14 factors that you considered in connection with your work?

15 A    Yes, it is.

16            MR. KOZYAK:   Excuse me, which one?

17            MR. BERNICK:   512-8.

18            MR. KOZYAK:   Your Honor, I object to this.   We just

19 went over the ground rules of the demonstrative evidence.

20            THE CLERK:   I'm not picking you up, sir.

21            MR. KOZYAK:   This was supposed to be given to us this

22 morning.

23            THE COURT:   We can't hear you.

24            MR. BERNICK:   Was it given this morning?

25            MR. KOZYAK:   Mr. Bernick just told the Court, just

1 went over the four CMO.  If this is supposed to be introduced

2 today, it should have been produced to us this morning.  It was

3 handed out a second ago and I object to it.

4        MR. BERNICK:  Your Honor, I was operating under an

5 error.  I thought actually it had been provided last week

6 because we anticipated calling Ms. Martin last week.  I think

7 it actually has.  Did you look for last week?

8        MR. KOZYAK:  Well, we weren't here last week.

9        MR. BERNICK:  Not last week when she last was here.

10 You didn't have it before?  If counsel's representing you've

11 never seen this before in the entire case, then that's fine and

12 we won't use it.

13 Q   You can't look at it.  So we now got to do this by memory.

14 Okay.  So what analysis did you go through in analyzing whether

15 property damage demands in the future would or would not be

16 substantial?

17 A    There are really three parts to my analysis.  First I

18 looked at Grace's historical litigation experience both for

19 what I would call traditional property damage claims, so the

20 acoustical plaster and the Monokote claims and then the ZAI

21 claims.  And we found that there had been significant

22 historical claim activity.  I think for ZAI there had been

23 10 -- 11 class actions in the U.S. and 10 in Canada and then at

24 the time of the bar date there was something like 18,000

25 additional claims filed.  And for the traditional property

1 damage claims, there were, I think, 370 or so cases filed prior

2 to the bankruptcy.  And we know from the company's 10-Ks that

3 those involved thousands of buildings.  And then at the time of

4 that bar date, which I think was in March of 2003, there had

5 been approximately 4,000 additional claims filed.  So one of

6 the pieces of information I considered in concluding that Grace

7 would have substantial future property damage demands was that

8 it had significant historical property damage demands.

9 Q    Thank you.  Second factor?

10 A    Second factor was thinking about the future and what

11 events were likely to trigger additional property damage

12 demands.  You know, we know there are estimates of the number

13 of buildings that were --- that might have been affected that

14 might have had a Grace product and sort of considered that

15 remodeling or renovation or sales of those buildings might sort

16 of raise owner awareness and trigger new demands, trigger

17 demands going forward.  So that was with the second -- that was

18 the second piece of our analysis.

19 Q    Okay.

20 A    And --

21 Q    And the third?

22 A    So and then finally we looked at the experience of other

23 defendants who were in similar situations.  So there are other

24 -- I went through 10-Ks and looked for the words asbestos and

25 property damage in close proximity, got a bunch of hits for,

**J&J COURT TRANSCRIBERS, INC.**

1  you know, publically traded companies, solvent companies and

2  then read those -- the excerpts to find that there were 14

3  companies that had had reported on historical property damage

4  experience and also warned that they expected to have property

5  damage claims going forward.  And there were another almost 40

6  who said there were some risk that it'd have property damage

7  claims going forward.  So we learned from our review of the 10-

8  Ks that there were more than 50 companies who were concerned

9  about property damage claiming activity going forward.  So that

10 was the third factor going into my conclusion that Grace would

11 likely face substantial property damage claims going forward.

12 Q    Now, these factors, you've been qualified as an expert in

13 estimation, correct?

14 A    Yes.

15 Q    And estimation -- the estimation work that you've done,

16 could you tell us, whether a lot of that has related to

17 asbestos?

18 A    Yes, a good deal of it has related to asbestos.

19 Q    Now, you've talked in your analysis about history and

20 you've talked in your analysis about what might take place or

21 the factors that might indicate future claim activity going

22 forward?

23 A    Yes.

24 Q    Are these factors factors that are somehow unique to this

25 case or are these factors factors that within your field of

1  expertise are often considered in connection with performing

2  estimates?

3  A    No, these are often considered.  They're sort of standard

4  procedure that would go into forming an estimate and they, you

5  know, they were obviously tailored to a case and some of the

6  specifics are going to vary, but generally those -- I would

7  consider those factors in any case.

8  Q    Terrific.  Let's go to the question about whether the

9  amount, number and timing of future property damage demands is

10 indeterminate.  Again, in the asbestos estimation world, is

11 this a common question or an uncommon question; that is,

12 whether, in fact, it is feasible on the basis of a reliable

13 methodology to actually fix the amount of a liability?  Is this

14 unique to this case or does this happen in the other context,

15 as well?

16 A    No, it certainly happens in other contexts and really it

17 goes to the issue of whether there's uncertainty, you know,

18 deterministic in statistical parlance means it's knowable

19 certainly.  In other words, there's a process and the outcome

20 of that process has no probability built into it.  So it's sort

21 of known.  And in forecasting sort of in general it's going to

22 be the case that there are uncertainties involved in the

23 forecasting and so the outcome of the process is not a

24 deterministic one.

25 Q    Okay.  What factors did you consider in analyzing the

1 question of whether the amount, number and timing of future

2 property demands would be or was indeterminate?  What did you

3 look at there?

4 A    Again, we considered a number of different factors.  One

5 of them was looking at the historical demands and I'm thinking

6 specifically of the 4,000 claims that were filed at the time of

7 the traditional property damage bar date.  We learned how --

8 investigating those 4,000 that something like 1,500 of them, so

9 a fairly large proportion, did not have the proper authority to

10 file.  And of that group, only about 70 subsequently re-filed

11 with authority.  So one reason for concluding that the future

12 demands are indeterminate is that even demands that we thought

13 existed historically turned out to sort of vanish, not to

14 exist.  That's one basis.

15       Another basis was that there's a lot of uncertainty

16 in the inputs here, the inputs to a forecast.  We don't know

17 with certainty the amount of the product that were sold, how

18 much product was used per building, the number of buildings

19 that would have been affected, how many of those buildings have

20 subsequently had the product removed.  So that's another

21 element that leads me to conclude that the -- any forecast, any

22 estimate would be indeterminate.  We don't know the degree of

23 owner awareness or concern, right.  We don't know whether -- we

24 don't know how many -- with this population that we can't -- we

25 don't have a rigorous number for of buildings that are

Martin - Direct/Bernick                    224

1  affected.  We don't know how many owners are aware that a

2  product is contained in their building.  And if they became

3  aware, you know, when they would become aware and whether

4  they'd be concerned about the presence of the product in their

5  building.

6        And then finally we don't know with certainty the

7  outcome of a cost benefit analysis.  Anytime there's

8  litigation, the plaintiff or the plaintiff's law firm is going

9  to weigh is it worth bringing this case.  Is it -- you know,

10 there's a cost of the time and effort that of bringing the case

11 going to be outweighed by the likely benefits.  And there's a

12 whole host of factors that are going into that analysis and

13 that's sort of a fourth reason why I concluded that an estimate

14 would be indeterminate here.

15 Q    Okay.  All those factors that you considered in connection

16 with your answering the question about indeterminacy, are those

17 all factors that are customarily regarded as being reliable

18 sources for purposes of people doing work in your field of

19 expertise?

20 A    Yes, they're all factors that one would consider.

21 Q    Let me make sure, have you relied upon or -- strike that.

22 Have you -- are you offering here today any opinion that says

23 that future traditional property damage claims, in fact, will

24 be made?

25 A    The claims will be made.  Yes, it's my opinion that there

1  will be substantial -- substantial claims will be made.

2  Q    Okay.  Are you offering any opinion that says that those

3  claims, if and when they're made, will have merit?

4  A    No, not at all.  This is purely looking at the demand

5  side, not at all at the liability or the merit side.

6  Q    Have you performed an actual estimate of the amount of the

7  -- of future liability to demand holders for property damage

8  claims?

9  A    No, I have not performed that estimate.

10            MR. BERNICK:  Pass the witness.

11            (Attorney conversation)

12            MR. BERNICK:  Yeah, just to be clear, Ms. Esayian is

13  being careful pointing this out.  We're relying upon the prior

14  qualification of this witness as being an expert in estimation.

15  I believe she was already qualified in connection with her

16  opinions regarding certainty and uncertainly regarding the

17  estimates which we did in connection with a prior phase.

18            THE COURT:  She was.  I don't know if anybody is here

19  who was not participating in that phase who wishes to examine

20  her on qualifications, but she was qualified in that phase of

21  this exam.  Is there anybody who has questions about the

22  witness's qualifications to offer an expert opinion in this

23  area?  All right.  No one's asking for that, Mr. Bernick --

24            MR. BERNICK:  Okay.  Thank you.

25            THE COURT:  -- so that's fine.  Are you passing the

Martin - Cross/Brown                              226

1  witness then?

2          MR. BERNICK:  Well, I'm now looking at another piece

3  of paper.  The Court accepted proffer --

4          UNIDENTIFIED ATTORNEY:  Prior witness.

5          MR. BERNICK:  Prior witness, oh, okay.

6                  (Attorney conversation)

7          MR. BERNICK:  Oh, okay.  Another housekeeping matter.

8  Another error that I have made here today, but it doesn't

9  relate to this witness.

10         THE COURT:  All right.  Anybody on the proponents'

11 side have additional questions?

12         MR. FINCH:  No, Your Honor.

13         THE COURT:  Okay.  Cross examine, Mr. Brown?

14                  CROSS EXAMINATION

15 BY MR. BROWN:

16 Q   Dr. Martin, I just have one question for you.  You are not

17 qualified to provide a legal opinion as to what constitutes a

18 demand versus what constitutes a claim under the bankruptcy

19 code, are you?

20 A    No.

21         MR. BROWN:  Thank you.

22         THE COURT:  Anyone else?

23         UNIDENTIFIED ATTORNEY:  No questions.

24         THE COURT:  Any redirect?

25         MR. BERNICK:  I thank you for your kindness in

                    **J&J COURT TRANSCRIBERS, INC.**

1 asking --

2          THE COURT:  You're excused --

3          MR. BERNICK:  -- but I don't have any redirect.

4          THE COURT:  You're excused Dr. Martin.

5          THE WITNESS:  Thank you.

6          THE COURT:  Thank you.

7          MR. BERNICK:  At this point, we have -- the plan

8 proponents -- I'll speak for Grace, have no further live

9 witnesses in connection with this phase of the proceeding.  We

10 have various exhibits that have been tendered to the Court and

11 testimony through designation and subject to whatever Your

12 Honor determines regarding ultimately the admissibility of

13 those materials.  And also subject to Your Honor's disposition

14 on the motions in limine, we have no further testimony to

15 offer.  I would hasten to add, as I've now been prompted to

16 add and ask, we did make a proffer through Mr. Finke and Your

17 Honor probably has right in front of you there the exhibit

18 number for that proffer.

19          THE COURT:  Yes, 381 I think you --

20          MR. BERNICK:  But it was a proffer and we don't know

21 whether Your Honor accepted it or not.

22          THE COURT:  I do accept the proffer.

23          MR. BERNICK:  Thank you.

24          THE COURT:  I'm sorry.  I should have put that on the

25 record.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  So with those caveats, we have no

2 further witnesses and we would rest this phase of our case.

3          THE COURT:  All right.  One second to let me get back

4 to --

5          MR. BERNICK:  I don't want to deal with -- I think we

6 don't have to deal documents now, do we, Your Honor?  I --

7          THE COURT:  Let me get back to Mr. -- my notes on Mr.

8 Finke for one minute please so I don't miss the fact that

9 Exhibit 381.  I take it since no one had any questions of the

10 witness that there's no objection to the proffer.  So I will

11 accept the written proffer which is PP Exhibit 381 as the

12 summary of the witness's testimony by way of proffer --

13          MR. BERNICK:  Thank you.

14          THE COURT:  -- as the witness's testimony by way of

15 proffer.

16          MR. BERNICK:  Thank you.  And, again, to be clear,

17 there are exhibit issues and there are deposition designation

18 issues that we are proposing be moved for discussion to the end

19 of the agenda.  We know that (a) a lot of that is being

20 essentially taken under advisement by the Court under the

21 procedure that we have adopted.  I know that there are probably

22 a couple other exhibits that people, various constituencies

23 might want to offer and nobody is waiving their right to do

24 that.  But with respect to live testimony, we're resting and we

25 would propose that any rebuttal witnesses now or any responsive

1  witnesses now on behalf of objectors be called so that we can

2  finish the live witness testimony in the case.

3        THE COURT:  All right.  How about we'll start with

4  the insurers?  The insurers have anything in this phase of the

5  case?  Do the lenders have anything in this phase of the case?

6  All right.  What about the BNSF or the other third party --

7        UNIDENTIFIED ATTORNEY:  No, Your Honor.

8        THE COURT:  -- witnesses?  Scotts?  The State of

9  Montana?  Okay.  Then either Libby and AMH, I think you're --

10  I'm sorry, Anderson Memorial Hospital.  Have I mentioned

11  everyone except those two entities?  All right.  Libby have

12  anything in this phase of the case?

13        MR. KOVACICH:  Libby does not have any witnesses,

14  Your Honor.

15        THE COURT:  All right.  Mr. Speights, does Anderson?

16        MR. SPEIGHTS:  Your Honor, at this time we have a

17  number of depositions to offer.  My understanding of the

18  procedure is that except for one caveat that we will argue the

19  portions of the depositions and admissibility during the

20  post-confirmation briefing.  We won't sit here and read

21  depositions into the record.  However, the debtors have moved

22  to strike all of Anderson's deposition designations on the

23  grounds that they're tardy.  And we need to have that argued

24  first to know what's going to be in this record.  We're

25  confident that we can convince you that the deposition

1  designation should come in.  But we need to know what's in the

2  record before deciding what else to offer into the record.  And

3  it's the debtor's motion if you want us -- willing to hear that

4  now.  We think that would be the appropriate thing to do next.

5       MR. BERNICK:  Your Honor, that is, again, completely

6  out of order given the procedures that have been adopted here.

7  All of the deposition designation matters are to be handled by

8  briefing as everybody in this case has agreed.  Mr. Speights

9  did not timely do the designations and he has to live with

10  that.  He has had the opportunity, also, to examine witnesses,

11  gave us no notice that anybody had to be here for any live

12  examination of any kind.

13       So, once again, Mr. Speights is basically saying

14  that, geez, he can't close the case, can't make up his mind

15  about what he wants to do, and that's completely inappropriate.

16  He was not timely on his deposition designations.  If Your

17  Honor rules that he was not timely that does not entitle him

18  then to call those people live because he's been ruled to be

19  untimely.

20       If Your Honor finds that the timeliness objection is

21  not well-taken then they'll come in by way of deposition.  But,

22  there is no alternative that says that we wait until the last

23  minute.  There's no notice of live testimony.  There's no

24  motion before the Court from relief from the Court procedures,

25  and he announces that if he doesn't get his way on his

1 designations we're not going to finish the trial.

2          But, rather than have any argument about this now

3 more than we have already had, why don't we finish the live

4 testimony that we have, and Your Honor can take that up in

5 connection with whatever it is that you want to decide as Item

6 10 on the agenda for this proceeding.

7          MR. SPEIGHTS:  I thought I understood Mr. Bernick at

8 the beginning to say one thing and if it's -- and I just had a

9 clarification.  Is it the debtor's position, or more

10 importantly, is it the Court's position, that the Court will

11 also consider the timeliness argument at the same time they

12 consider those other objections to depositions?

13          THE COURT:  Yes.

14          MR. SPEIGHTS:  Okay.  So, we will not argue the

15 timeliness this week.

16          THE COURT:  That's not necessary from my point of

17 view, Mr. Speights.  If --

18          MR. SPEIGHTS:  I thought they wanted to argue that

19 out and I rested, so I understand now that that will be done as

20 a part of the post-confirmation briefing.  May I confer with

21 counsel just a minute?

22          THE COURT:  Yes.

23          MR. BERNICK:  Well, before there's a conference, Mr.

24 Speights' motion was noticed up -- was put on the agenda for a

25 hearing today along with many other items.  And, therefore, it

1  will presumably be heard unless there's some determination to

2  defer it.  There was no notice given that he intended to have

3  it deferred.  We need to have that motion heard so that we know

4  the status of those designations.  But, however that takes

5  place it cannot mean that we're now subject to an argument that

6  says, well, he can't rest his case because there's more live

7  testimony that he wants to offer.

8           THE COURT:  That's not what I think I'm

9  understanding.  I think what I heard is that Mr. Speights is

10 intending to offer certain portions of the depositions.  The

11 debtors -- the plan proponent's objection is based on the fact

12 that they are not timely.

13          MR. BERNICK:  Yes.

14          THE COURT:  Why do I need an argument on that now as

15 opposed to in the context of the rest of the briefing schedule?

16          MR. BERNICK:  If it doesn't affect the -- it doesn't

17 affect the close of evidence in the case --

18          THE COURT:  It will not.  If the witnesses are not

19 designated as live witnesses then they haven't been designated

20 to be called as live witnesses.  So, if they'll -- if they come

21 in through the deposition designations they will, and if they

22 don't then there is no evidence.

23          MR. BERNICK:  I have no issue with deferring the

24 timeliness of the designations as a post-trial matter provided

25 it does not affect the close of the evidence at trial.

1          THE COURT:  I want to make sure that I understand the

2    designations.  Anderson has designated certain portions of

3    witnesses' testimony.  There have been objections.  To the

4    extent that those objections are overruled, has everyone else

5    had an opportunity to, and actually designated anything that

6    you want to address in response to those designations?  I want

7    to make sure I have a complete record.

8          MR. BERNICK:  That's a fair question, and Ms. Baer

9    tells me that because of the timeliness issue it has not gone

10   through the same process of objection and supplementation -- or

11   supplemental designation.  So, maybe it would be a good idea, I

12   think where Your Honor's going, to have the matter heard

13   tomorrow so that we have some opportunity to -- how voluminous

14   are the designations?  Voluminous.

15         THE COURT:  There are a lot of designations.  I

16   haven't looked at all of them because I have -- frankly, I

17   haven't had time, but there are a lot.  If you want to go

18   through the argument -- if you feel the need to go through the

19   argument we can do it tomorrow.  It appears that there isn't

20   going to be much else.  I still don't know why it can't be done

21   in connection with a post-trial briefing.  And to the extent

22   that the parties need to do some supplemental designation,

23   these designations were not done on the schedule that was

24   proposed by the Court.  So, I would give the other side

25   sufficient time to do the designations.  There is time before

1 the briefing is due anyway, so --

2        MR. BERNICK:  That's fine, Your Honor.  I -- maybe

3 this is not on point, and I'll say that, but these designations

4 are voluminous.  They come from Grace witnesses.  And all that

5 this means is that -- and this is why I think I would counsel

6 in favor of doing this tomorrow rather than deferring it, it's

7 all a question of how much Your Honor's going to have to read

8 of all of this stuff.  And --

9        THE COURT:  Lots.

10        MR. BERNICK:  Yes.  So, with that said, we don't

11 have -- if we're given the opportunity to supplement our

12 designations after Your Honor rules, we don't have any issue

13 with deferring the timeliness objection for post-trial

14 consideration.

15        THE COURT:  All right.  I think I'm suggesting that

16 the designations ought to be supplemented before the argument

17 because it appears that, to a certain extent, some of the

18 designations are things that the plan proponents have already

19 proposed in some fashion anyway.

20        MR. BERNICK:  Oh.

21        THE COURT:  So, the fact that they're being

22 designated by Mr. Speights late doesn't mean that they're not

23 already part of the record somewhere.  They may not be as that

24 deposition testimony, but they're in somewhere.  So, I'm

25 really -- I guess the prejudice issue is what I'm attempting to

1  get to.

2        MR. BERNICK:  Okay.  So, what Your Honor's suggesting

3  is that we ought to, I wouldn't say suck it up because I guess

4  it is suck it up, and provide the designations and the

5  objections in lieu of arguing the timeliness point.  And I

6  guess I'd want to consult with counsel here in a moment, but I

7  don't have -- I can't see a reason in principle not to go down

8  that road.  The only exception would be if there are

9  designations from somebody who were -- it really would be

10 prejudicial because we really didn't know that an issue was

11 being put -- that there was an issue being put, and therefore

12 haven't had the need to respond with live testimony.

13       So, if it's the usual stuff and we've known about it

14 and it's already covered by others, I don't think there's any

15 prejudice.  I just don't know.  And I'd like to have an

16 opportunity to confer with Ms. Baer who does know the

17 designations better than I do.

18       THE COURT:  That's fair enough.  And it seems to me

19 that if we're going to go on to some other matter we could take

20 this issue up first thing in the morning as well after you have

21 a chance to adequately --

22       MR. BERNICK:  Right.

23       THE COURT:  -- confer, and perhaps look at those

24 designations because to the extent that the evidence is in in

25 some fashion anywhere, frankly I don't know why the timeliness

1  objection even needs to be raised because it's going to be

2  either cumulative or the same evidence anyhow.

3          MR. BERNICK:  Right.

4          MR. LOCKWOOD:  When you say the evidence is in

5  anyway, you mean some other plan --

6          THE COURT:  Yes.

7          MR. LOCKWOOD:  -- objector or proponent designated

8  the exact same testimony, and so it's already in?

9          THE COURT:  Well --

10         MR. LOCKWOOD:  Or you mean it's in in the form of --

11         MR. LOCKWOOD:  Something other than testimony?

12         THE COURT:  Some of both.  I mean --

13         MR. BERNICK:  What she really wants is the prejudice

14  point, so --

15         THE COURT:  Right.  That's the point.

16         MR. BERNICK:  Yes.  So --

17         THE COURT:  You know, if there's prejudice I want to

18  hear the argument and understand what the prejudice is.  If

19  there isn't, frankly at this point, it's been a long trial.  I

20  don't know what difference it's going to make to have some

21  additional deposition designations done provided that the plan

22  proponents have an opportunity -- and everybody else to the

23  extent that you're interested -- have the appropriate

24  opportunity to cross designates.

25         But, if there's the prejudice  issue I think tomorrow

1  would be the day to address that as to specific witnesses, and

2  then I can take a look at those particular issues, and I think

3  that will save everyone -- well, it may not save you, but it

4  will probably save me a lot of time in the long run which will

5  save you time in the long run.  So, what about having the -- do

6  you want to confer now or simply do it tonight?

7        MR. BERNICK:  We'll be able to confer -- I think we

8  ought to finish the live testimony if there is going to be any

9  live testimony, and then we may have time to confer yet this

10 afternoon and be able to apprise both the Court and Mr.

11 Speights where we're coming out.  I -- we'll just have to see,

12 but I certainly would like to work towards a solution that

13 saves us the time for argument.

14       THE COURT:  Mr. Speights, is that all right if I

15 simply at this point give the debtors some -- plan proponents

16 an opportunity to see whether they have cross -- and anyone

17 else.  This isn't limited to the plan proponents.  It's as to

18 anyone who may have an issue with cross designations to see how

19 this may come out.

20       MR. SPEIGHTS:  I'll be more than happy for Mr.

21 Lockwood and his fellow plan proponents to do that, Your Honor.

22 I will say -- I mean, and I hope we work it out.  If we

23 don't -- if we have to do it this week then I don't want to

24 rest until the motion is argued.  But, I'm perfectly happy to

25 defer it as Your Honor has outlined.

1          THE COURT:  All right.  Well, I think if you can come

2    to some agreement to limit the argument where someone feels

3    that there has been prejudice as the result of the delay then I

4    will provide the opportunity for everyone else to cross

5    designate because this was filed out of time and only hear

6    argument on issues that people want to raise by way of

7    prejudice.  And I do -- I don't think every designation is

8    going to cause prejudice.

9          MR. SPEIGHTS:  And, Your Honor, I might, without

10   getting in another argument, I do not think we're dealing with

11   a wealth of material, and I will be glad to share with the

12   debtors if they'd like to discuss it which ones I'm offering

13   and which ones I'm not offering now that we are at the eleventh

14   hour.

15         THE COURT:  All right.  I think that would be

16   helpful, too.

17         MR. BERNICK:  I think we're all on the same page.

18   Mr. Speights says if we have to do it this week then I don't

19   want to rest until the motion is argued.  I don't understand

20   what that means.

21         MR. SPEIGHTS:  If we're going to argue the motion I'd

22   like to argue the motion in the morning first thing before we

23   rest.

24         THE COURT:  Because if I make a ruling --

25         MR. SPEIGHTS:  But, I'm happy to postpone it and deal

1 with it.

2          THE COURT:  If, in fact, you come to some agreement

3 that, you know, I'll just -- I'll make up something.  Person X

4 deposition on August 20th.  The testimony of Pages 15, Lines 1

5 through 25 is not going to be something that somebody will

6 raise by way of a prejudicial argument.  I'm going to admit

7 that testimony, and you'll have an opportunity to cross

8 designate whatever it is that you wish to cross designate.  If,

9 however, you say that is prejudicial because of whatever

10 reasons you're going to argue we'll argue that and I'll give

11 you a ruling.  Then if the ruling is, yes, it's prejudicial,

12 the testimony won't come in.  If it's no, the testimony will

13 come in and you'll still then have to cross designate.

14          MR. BERNICK:  But, nothing is going to be -- fall

15 into that category because the only issue that would be argued

16 tomorrow if there were to be an issue would be timeliness.  It

17 doesn't go to the issue of whether the testimony is admissible

18 given all the other issues under the rules.

19          THE COURT:  Right.

20          MR. BERNICK:  So, I don't think that there's going to

21 be any way -- everybody is going to be resting in the sense

22 that they're resting the live testimony, and they will not be

23 seeking to offer in any evidence beyond the exhibits and the

24 designations.  That's what resting is going to mean, I think.

25 And that's what, again, makes me very leery about whether Mr.

1 Speights intends to argue, depending upon the outcome of the

2 motion or the outcome of the designations, that he's got

3 further testimony that he wants to take.  I haven't heard a

4 confirmation that says that he is -- that what the live

5 testimony is and that he is going to rest live testimony.  I

6 guess that's what makes me nervous.

7        THE COURT:  All right.  Well, let's discuss live

8 testimony for a minute, Mr. Speights.  Are you offering any

9 live testimony?

10       MR. SPEIGHTS:  We expect to offer Mr. Solomons, Your

11 Honor.  And we have -- before getting to that -- and then we

12 have some exhibits.  And can I just go through exhibits just a

13 second with you?  What is -- I haven't been here for all of the

14 other days.  What is the process you would prefer for exhibits?

15 Do you just want me to read off the numbers we want to offer

16 and we'll put them in and we argue about those in

17 post-confirmation or are we going to argue about those now?

18       MR. BERNICK:  First of all, we should get on with Mr.

19 Solomons.  Find out whether he's going to be permitted to

20 testify and take it.  Everybody --

21       MR. SPEIGHTS:  Your Honor --

22       MR. BERNICK:  I'm sorry.  Everybody in this case,

23 everybody, and without exception, including Mr. Speights and

24 his firm, has been told and has discussed and has received all

25 the same information which said that exhibits had to be

1  provided by a certain date, and then there would be an

2  objection process so that objections could be lodged unless

3  there was agreement.  And the same thing with respect to

4  deposition designations.

5       Ms Baer really under -- you know, after a lot of

6  discussion before this Court, and frankly a lot of pressure on

7  the debtor to address everybody's document's concerns, made

8  this proposal.  It was adopted by the Court.  The Court entered

9  an order.  That is the process for dealing with exhibits.

10 Under that process exhibit issues, that is whether they're

11 going to be admissible or not, are to be taken up in the

12 post-trial briefing.

13      Same thing with the deposition designations, although

14 those had to be made and they had to be objected to.  And that

15 is what everybody in this courtroom, I think, with the

16 potential exception of Mr. Speights, has now done.  All the

17 packages are in.  They're all before the Court.  And again, if

18 Mr. Speights wants to ask for something different, that's fine.

19 We can deal with that tomorrow, but it shouldn't bear upon live

20 testimony and we should get the live testimony done.  We have

21 almost two hours in which to get any live testimony done.

22      MR. SPEIGHTS:  Your Honor, I'm not stalling.  We have

23 a seven-part trial.  This is Anderson's part of the trial and

24 I'm just dealing with my exhibits.  I understand now.  I'll

25 designate which exhibits I'll offer and Your Honor will rule on

1  them as part of the post-confirmation.  We've now reached the

2  point.  Your Honor, could I have a request?  I don't think I've

3  done this before, but could I request a five-minute break to

4  confer with counsel about Mr. Solomons --

5           THE COURT:  Yes.

6           MR. SPEIGHTS:  -- and confirm that we will call him

7  now?

8           THE COURT:  Yes, sir.  We will take a recess.  In

9  fact, I'm going to make it ten minutes so that the debtor and

10 the --

11          MR. BERNICK:  Yes, we'll talk about the other thing.

12          THE COURT:  -- plan proponents concur with respect to

13 the exhibits -- I'm sorry, the designations in any event.

14          MR. SPEIGHTS:  Thank you.

15                    (Recess)

16          THE COURT:  Mr. Speights?

17          MR. SPEIGHTS:  Your Honor, we will not be calling any

18 live witnesses, and I -- we have a few discovery issues.  It's

19 like Mr. Shelnitz and things of that nature.  I'm going to

20 offer in those exhibits hopefully in the morning.  I can pare

21 them down, and I believe Mr. Bernick and I have a meeting of

22 the minds regarding the deposition designations.

23          THE COURT:  All right.

24          MR. BERNICK:  Do you want to tell us what that was

25 there, Dan, so that --

**J&J COURT TRANSCRIBERS, INC.**

1               (Laughter)

2          MR. BERNICK:  -- so I don't have to guess?

3          MR. SPEIGHTS:  He said he would stipulate to bad

4    faith and --

5               (Laughter)

6          THE COURT:  That makes my life easy.

7          MR. BERNICK:  Yeah, right.

8          MR. SPEIGHTS:  I'm going to provide Ms. Baer by

9    Friday night a revised chart like Your Honor wants which will

10   be limited to those we actually want to put forward.  I'm

11   eliminating maybe not half, but probably a third of the

12   witnesses listed.  Don't hold me to the numbers because I

13   haven't really studied it, but I'm definitely eliminating some.

14   And we'll fill in the third column as I call it which I

15   understand is important to Your Honor.  We'll fill in the third

16   column and provide it.

17         MR. BERNICK:  And all of the other columns, as well.

18         MR. SPEIGHTS:  The other columns, I don't believe,

19   are for me.  I believe they're for you.  But, I'll be glad to

20   counter-designate for you, as well.

21         THE COURT:  And then when were the

22   counter-designations?  Did you come to an agreement?

23         MR. SPEIGHTS:  That's --

24         MR. BERNICK:  Yes, that's our part.  If Mr. Speights

25   completes all the -- or his able assistants complete all of the

**J&J COURT TRANSCRIBERS, INC.**

1 parts of the chart that are theirs to complete by Friday night

2 we'll be in a position to have a notebook -- have the

3 submission to the Court with our counters and objections by a

4 week from this coming Monday so that we would then hope that

5 the Anderson Memorial deposition designations are on the same

6 footing in terms of completion as the other deposition

7 designations.

8        THE COURT:  All right.  So, Mr. Speights is doing his

9 by October 16 and then you're doing yours by October 20?

10        MR. BERNICK:  Yes.  We have to do the --

11        UNIDENTIFIED SPEAKER:  The following Monday.

12        MR. BERNICK:  It's the following Monday.

13        THE COURT:  Oh, 27.

14        MR. BERNICK:  Yes.  We have to do the objections and

15 counters and get them to Your Honor, so that is they'd be in

16 your hands by that Monday.

17        THE COURT:  Okay.  That's fine.  That's actually

18 Tuesday which is fine --

19        MR. BERNICK:  Oh, is that right?

20        THE COURT:  -- as opposed to --

21        MR. BERNICK:  Okay.

22        THE COURT:  The 27 -- I was looking at Tuesday

23 because today's Tuesday.  I didn't appreciate the Monday, and

24 Tuesday's fine.

25        MR. BERNICK:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Actually, I think I'm in Delaware.  If I

2    am then Wednesday will be all right because I won't see them

3    anyway, so let me see if that helps with the timing.

4          UNIDENTIFIED SPEAKER:  Why?  Are the depositions --

5          THE COURT:  Monday.  So, we'll be back Tuesday?

6    Okay.  All right.  So, some time in that week would be helpful

7    for me if that helps --

8          MR. BERNICK:  Well, we'll do it to the early part --

9    I'm also concerned about having it so that it's available to

10   everybody for the -- for briefing and the like.

11         THE COURT:  All right.

12         MR. BERNICK:  And we do have that November 2 date.

13         THE COURT:  Okay.  So, then, Mr. Speights, we'll take

14   up your issue of your designations -- oh, we don't need to do

15   them tomorrow.  You've come to this agreement, is that correct?

16         MR. SPEIGHTS:  That's correct, Your Honor.

17         THE COURT:  We're not -- unless somebody raises

18   prejudice issues or are you not raising those issues?

19         MR. BERNICK:  No, I'm saying that we're -- I've

20   consulted and we're prepared to waive the timeliness issue with

21   respect to the designations by Anderson Memorial that were to

22   be heard as part of Item 10 of the agenda for this hearing --

23         THE COURT:  All right.

24         MR. BERNICK:  -- subject to -- on the understanding.

25   It was not subject to.  On the understanding that we'll then

1  implement the schedule that's now been recited to the Court.

2  So --

3      THE COURT:  All right.  Mr. Speights, any concerns

4  about that?

5      MR. SPEIGHTS:  I don't.  Maybe I should, but I --

6                  (Laughter)

7      MR. SPEIGHTS:  -- (indiscernible).

8      THE COURT:  All right.  Is anyone other than plan

9  proponent -- does anyone other than the plan proponents intend

10  to designate or cross designate?  All right.  So, it's just the

11  plan proponents then?

12      MR. BERNICK:  If -- I mean, if anybody else wants to

13  do designations or objections to the designations made by

14  Anderson Memorial, they just have to follow the same procedure.

15  I mean, we'll circulate the designations that we receive to

16  whatever -- however it was done for everybody else.  And other

17  people if they object and whatever, we'll try to get it all

18  incorporated.  We want it to be the same as it is for any other

19  designation.

20      THE COURT:  I just thought you may want them from

21  other parties a couple days before you're actually producing

22  the notebook.

23      MR. BERNICK:  That would be a good idea.  How

24  about --

25      THE COURT:  If anybody else is cross designating,

1  that's the issue I'm raising.  Does anybody else have any cross

2  designations?  I'm not hearing any, Mr. Bernick, so I --

3           MR. BERNICK:  Okay.

4           THE COURT:  -- think it's just between the Anderson

5  Memorial and the plan proponents.  Okay.  What's next?

6           MR. BERNICK:  I think the only thing that would be

7  next is that we then have -- I don't know if Mr. Lockwood's

8  going to be prepared at this late hour and while the Martini

9  beckons, but if we can prevail upon Mr. Lockwood to give us an

10  update on what's happening on the claims resolution front, or

11  issue resolution front, but then what I would propose is that

12  we adjourn and then tomorrow begin with the agenda.

13           And the agenda covers -- the substantive parts of the

14  agenda will be the Daubert motions that Your Honor wanted to

15  hear.  And I know Your Honor is going to want to have that be a

16  succinct presentation.  And then there are various matters that

17  relate to designations that were made by the Libby claimants.

18  Those are Items 6 through 8 that I think have -- a lot of them

19  have been -- have shrunk in size because much of the evidence

20  has already been the subject of rulings.

21           Then there is an item that relates to Mr. Frezza.

22  That's Item 9.  And then Item 10 is now essentially withdrawn

23  because that was the timeliness of the designations.  So, Ms.

24  Baer has some other things in -- there are documents.  People

25  are going to want to talk by the -- before the end of the day

1  about documents.

2        So, what I would propose is that we go through the

3  agenda, get that done, and then leave time after that if people

4  have other things they want to take up so that we at least get

5  through the agenda and people, if they want to leave can leave,

6  and then we'll take care of housekeeping matters at the

7  conclusion.

8        THE COURT:  All right.  Well, with respect to the

9  agenda, I have instructed my staff to enter the order on the

10 certificate of no objection on Item 1 and on the certification

11 of counsel on Item 2.  I have a question about Item 3 because

12 one of the certifications, and I think it was with the bank

13 lenders, but I'm sorry if I'm not correct about that, have a --

14 this is -- I'm talking about Item 3, the certification

15 concerning the admissibility of certain evidence.  One of them

16 came in by way of a stipulation with an order to sign.  And I

17 don't have any problem signing that order if that's how you

18 want to handle these, but the others didn't come in that way.

19 Mr. Cobb?

20        MR. COBB:  Sure, Your Honor.  Richard Cobb on behalf

21 of the bank lenders.  Your Honor, we have had very collegial

22 and productive discussions with the plan proponents on this

23 precise issue and they did not object.  They said we can do it

24 that way or we can actually stand up in court and take up your

25 time and everyone else's time.  We thought this was the more

1 efficient way to do it, and it was under certification of

2 counsel.  They agree with the process.  And so, if you prefer

3 to do it another way --

4          THE COURT:  No, that's fine with me.  I just want to

5 make it clear because I don't know that the stipulation in the

6 order actually had a docket number.  I have to look.  It is

7 23 --

8          MR. COBB:  I think it's -- it's on my BlackBerry, and

9 that's not with me.

10          THE COURT:  -- 23441.

11          MR. COBB:  I think that's correct, Your Honor.  I

12 think that's correct.

13          THE COURT:  And so, I will have the order entered on

14 that stipulation, as well.

15          MR. COBB:  Great.  Thank you, Your Honor.  And that

16 would -- that takes care of the bank lenders' exhibits for the

17 confirmation proceeding and the committee.  That was a joint

18 submission.

19          THE COURT:  Yes.

20          MR. COBB:  Thank you.

21          THE COURT:  All right.  So, that was Item A on Agenda

22 Number 3.  Okay, Mr. Brown.

23          MR. BROWN:  Your Honor, I -- just for clarification.

24 You're on Item Number 3.  I didn't know whether you said you

25 had issued orders for all of Number 3 or just A.

1          THE COURT:  No.  The only order that I was given was

2  the one with respect to Item 3A.  The others came in as

3  certifications, but without orders.  Item 3A came in as a

4  stipulation with an order.

5          MR. BROWN:  Gotcha.  Okay.  So, B, C and D will be

6  taken up tomorrow, then?  I guess I should ask Ms. Baer that.

7          MS. BAER:  Your Honor, I have a list of about 11

8  items that are similar to this.  My thought was, frankly, on

9  all of the various stipulations, to the extent we have

10 stipulations and documents, I thought we'd kind of go through

11 them all and then move for the admission of all those documents

12 rather than have to give you separate orders.  Whatever you

13 would like is fine, but that includes the one -- the insurer

14 stipulation.  It includes the stipulation from CNA and it

15 includes a number of other document agreements that we

16 reflected on our admission chart.

17         MR. BERNICK:  Can I ask -- I'm sorry.

18         THE COURT:  Go ahead.

19         MR. BERNICK:  No, I was just going to say that in

20 terms of ordering, maybe what makes sense is that -- are they

21 all picked up by Item 3 or there are some others or --

22         MR. BAER:  No.  Item 3 just has the three

23 stipulations that were filed.  The other documents -- well,

24 they are essentially, yes.

25         MR. BERNICK:  Yes, because I was going to propose

1  that we just begin with Item 4, which is <u>Daubert</u>, then go to --

2  five is, in our view, moot -- 4, which is <u>Daubert</u>, 6 through 8,

3  which are Libby deposition designations, 9, which is Frezza,

4  and then I think everything else, if I'm not mistaken, Jan,

5  should not entail a lot of argument that's mostly --

6          MS. BAER:  Right.

7          MR. BERNICK:  So, that would be my proposal.

8          THE COURT:  I think it may actually be helpful

9  somewhere in some context, but I'll leave to you folks to

10  discuss how, to have these certifications with respect to the

11  admissibility of records somewhere.  I'm happy -- if you want

12  to file them, that's fine.  If you want to put them all in a

13  binder and tell me on the record what they are that's okay,

14  too.  But, I think it would be helpful to have them aggregated

15  somewhere.

16          MR. BERNICK:  Yes, that's make a lot --

17          MS. BAER:  We can certainly do that, Your Honor.  And

18  we -- frankly, we expect that at the conclusion of all the

19  evidence we would submit a final admitted exhibit chart.  And

20  if you look at the admitted exhibit chart we've already

21  submitted, the last column tells you how it's been submitted --

22          THE COURT:  Right.

23          MS. BAER:  -- by stipulation, the date.  We can add

24  the docket number.  And I would propose we would fill that out

25  so you know exactly on each and every document how it came into

1  evidence.

2          THE COURT:  That would be very helpful because

3  otherwise I'm going to have to go back and do that anyway.

4          MS. BAER:  Right.

5          THE COURT:  So, if you're doing it and file it, then

6  everyone can see it in advance and make sure that you agree.

7  So, I think if you actually do just file them and give me

8  proposed orders to approve them I will approve them since

9  they're stipulations, I take it, you've worked out the issues.

10          MS. BAER:  Right.

11          THE COURT:  Mr. Brown?

12          MR. BROWN:  Your Honor, on just Item 3B, there were a

13  couple of issues that Ms. Baer and I had been discussing over

14  the last few days, and my understanding is we'll take them up

15  tomorrow.  They're hopefully minor issues.

16          THE COURT:  All right.

17          MR. BROWN:  And there may be one or two on C, as

18  well.

19          THE COURT:  Okay.

20          MR. BROWN:  3C, that is.

21          THE COURT:  All right.

22          MR. BROWN:  Thank you.

23          MR. PASQUALE:  Thank you, Your Honor.  Ken Pasquale

24  for the -- from the secured creditors committee.  Mr. Bernick

25  has now mentioned a couple of times this Item 9 which on the

1   agenda is a motion to exclude the testimony of Mr. Frezza.  I

2   wanted to raise it now so we can talk scheduling for tomorrow,

3   but frankly, Your Honor, we think it inappropriate to take this

4   up now at all.

5          This is an oral motion.  The Court has no papers on

6   this matter.  This is no different than we discussed when we

7   were here last.  I've proposed to Mr. Bernick that we do this

8   in the post-trial briefs and we save it for closing argument

9   and he declined.  I don't see the point.  The Court has no

10  guidance, has no papers, we've not responded in writing, and I

11  think this should wait, Your Honor.

12         MR. BERNICK:  Your Honor, the only -- not the only, I

13  don't want to minimize it.  The reason that I put it on the --

14  suggest it be put on the agenda, and I recognize that we were

15  contacted by Mr. Pasquale with the same essential suggestion is

16  that there is, in fact, an obvious and real threshold issue

17  with respect to Mr. Frezza.  And we -- it's very simple to

18  muster the record evidence.  And Your Honor asked for Daubert,

19  and I think that we're prepared to essentially support our

20  motion with a little package of citations to the record and

21  some argument that says it should be out.

22         If they want to defer their argument and they want to

23  file a brief, that's fine.  We don't really think it's

24  necessary to file a brief.  It's just all there in the record.

25  And all that we've done is to muster it and we've got a little

1  package of materials to hand to the Court.  And if Mr. Pasquale

2  doesn't want to argue it the thing is going to last about five

3  or ten minutes.  But, the idea that we have to file now a

4  separate <u>Daubert</u> brief, they have to respond, and then there

5  has to be a reply, and then we're going to have a <u>Daubert</u>

6  argument during all of these other arguments is essentially a

7  way of burying the <u>Daubert</u> issue.  Remember, Mr. Frezza is the

8  individual who recognized that he doesn't hold himself out in

9  his marketplace as being a solvency expert.  It's just --

10          MR. PASQUALE:  Well, do you think that's not the

11  testimony?

12          MR. BERNICK:  Well, I -- but whatever it is, there's

13  no point in having this matter be buried.  It ought to be

14  addressed, and that's our concern.  It ought to be addressed as

15  a threshold issue and not lost and not consume time and

16  argument in January.  It is a threshold issue.

17          MR. PASQUALE:  Your Honor, the point is process.

18  This package of materials I don't have, you don't have.  How

19  are we going to do this tomorrow properly?  We are preparing

20  post-trial briefs November 2nd.  There doesn't have to be a

21  separate motion, and nor did I propose there be a separate

22  briefing for the <u>Daubert</u> issues.  We have three hours allotted

23  for arguments for the lender committee and plan proponents

24  issues.  It's more than enough time to address this issue in

25  the context of that.  The Court's already heard the testimony.

1  Obviously it's a bench trial.  This is not as significant an

2  issue process-wise as Mr. Bernick makes it out to be.  The

3  appropriate way to address this is with proper briefing which

4  we already have scheduled.  Nothing new needs to be added.  It

5  should just be as part of that process.

6       MR. BERNICK:  Your Honor, all the <u>Daubert</u> motions

7  were the subject of separate briefing.  Every single one.  We

8  moved orally with respect to Mr. Frezza because his testimony

9  was so obviously problematic, and Your Honor expressed concern.

10  We're prepared to waive our first brief, submit the record in

11  the package that I've described.  We'll obviously furnish it to

12  Mr. Pasquale.  But, we don't want it to be part of the

13  post-trial briefing on the merits because it is a threshold

14  issue.  Whether Mr. Frezza's testimony comes in at all is a

15  threshold issue.  And it shouldn't be buried in all these

16  papers.

17       MR. PASQUALE:  Your Honor, you'll make that decision

18  at the same time regardless.  I call it a threshold issue.

19  You'll be considering the record as a whole and making all

20  kinds of evidentiary rulings that you've deferred until you get

21  the post-trial briefs and can look at that in the universe.

22  You've said that many times in the case.  This is no different.

23       THE COURT:  I'm not sure I understand how this is

24  different because to the extent that you think that the

25  testimony is not admissible you'll argue that fact.  I guess

**J&J COURT TRANSCRIBERS, INC.**

1 the issue is whether your post-trial submissions are somehow

2 going to be dependent on whether this testimony is or isn't

3 admitted.  But, I think that's true with all of the witnesses

4 I've --

5        MR. BERNICK:  It is.  But, that's why we had a

6 separate track for <u>Daubert</u> and why we have separate <u>Daubert</u>

7 motions that, in fact, are going to be heard tomorrow, and why

8 there should be a <u>Daubert</u> motion practice with respect to Mr.

9 Frezza who's one of the clearest cases that we have of there

10 being a <u>Daubert</u> issue.  And if Mr. Pasquale wants to defer the

11 argument from tomorrow and make us write a brief to support

12 the -- we already made the motion.  We already made the motion.

13        So, it ought to be up to us whether we file a brief.

14 If he wants to file a brief in response to the motion and the

15 materials that we will tender to the Court tomorrow, we have no

16 quarrel with that.  But, we're prepared to make our pitch,

17 argue it tomorrow, get it before the Court subject to whatever

18 brief they want to write so that it's on the same footing as

19 all of the other <u>Daubert</u> issues because it should be determined

20 as the threshold matter.  It's not a question of, well, this

21 kind of gets all mixed up in the pot of post-trial proceedings.

22 It's the whole idea of the <u>Daubert</u> gatekeeping function is

23 that -- is the threshold issue.

24        MR. PASQUALE:  Well, I think it's up to the Court to

25 decide whether it's helpful.  But, as far as the process being

1 off track for this, that's the plan proponent and the debtor's

2 own choosing.  Mr. Frezza was deposed on August 13th.  The

3 Daubert deadline was the 14th.  By no means am I saying that

4 the brief should've been filed by the 14th.  I'm not.  But,

5 there's plenty of time between August 13th and the start of the

6 confirmation trial for a motion to have been filed.

7             Nothing changed in that period of time.  Many other

8 things were filed in that period of time.  So, the process is

9 of their own making, Your Honor.  And now all I'm concerned

10 about is that the Court has the information in the right format

11 to decide what is a very important issue for us, needless to

12 say.  And I don't think this is the proper approach.

13             THE COURT:  My --

14             MR. BERNICK:  I'm sorry.

15             THE COURT:  Is there anything on the omnibus agenda

16 that will be on the 26th of October?

17             MR. BERNICK:  Yes.  We have plenty -- we have a

18 matter I'm told that would take about 45 minutes.  So, we would

19 have time for this.

20             THE COURT:  Why don't we do it on that day, then?

21             MR. BERNICK:  That's fine.

22             THE COURT:  That will be before the final briefs are

23 due.  Only a few days, but nonetheless, before the final briefs

24 are due, and then we can do the argument in a principled

25 fashion.  The debtor can put together whatever it's going to

1  proffer, and then the bank lenders can do a response.  So, I

2  guess if I have the debtor's information by -- how about Monday

3  the 19th?

4           MR. BERNICK:  We can give it --

5           THE COURT:  Oh, I'm sorry.  That -- how about by

6  Friday the 16th?  Is that possible?

7           MR. BERNICK:  That's --

8           THE COURT:  So that I can give the lenders until

9  Friday the 23rd to file something.  I need it by the 26th for

10  the argument.

11          MR. BERNICK:  That's fine.  What I would -- again,

12  rather -- we can go and write a brief.  It's going to be harder

13  to write a brief by Friday than to provide Your Honor with the

14  package of material tomorrow.  We won't even argue it.  It's a

15  summary slide and excerpts from the testimony, pure and simple.

16  And --

17          THE COURT:  All right.  That's fine.

18          MR. BERNICK:  -- they can respond to it and then

19  we'll argue it.

20          MR. PASQUALE:  I have nothing as I stand here today,

21  Your Honor, and nor does the Court.

22          MR. BERNICK:  Well, but it's in lieu of a brief, Ken.

23  I mean --

24          MR. PASQUALE:  No, no.  I'm not -- if --

25          MR. BERNICK:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PASQUALE:  -- that's what you want to give us

2     then we'll respond to it.  That's fine.

3          MR. BERNICK:  Yes.

4          THE COURT:  Okay.  Then I -- if that's the case I

5     would like the bank lender's response by the 22nd so that I

6     actually make sure I get it and have time to read it before the

7     26th.  The 22nd is a Thursday and the argument is the following

8     Monday.

9          MR. PASQUALE:  That's fine, Your Honor.  Thank you.

10          MR. BERNICK:  So, that would take Item 9 off the

11     agenda.  So, we've gotten rid of 9 and 10.  So, I think

12     substantively we're down to Daubert which is 4, and then 6

13     through 8.  And I would observe to Your Honor that most of the

14     Daubert discussion focuses on the Libby issues.  So, 4 and 7

15     and 8 you'll be hearing from us and from the Libby claimants.

16     I'm not sure that there's anything else in those items that is

17     on Libby.

18          THE COURT:  One second.

19          MR. BERNICK:  5 is moot.  5, I think, is moot.  Yes,

20     the Reliance materials is the 1800 issue, and I think that

21     that's moot.  I think Your Honor ruled that out.

22          THE COURT:  I'm sorry.  Which one is moot?

23          MR. BERNICK:  5 was the issue of whether Dr.

24     Whitehouse could rely upon the 1800.

25          THE COURT:  Oh.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  And I -- it's one of the confusing

2    things that you'll -- that we've spent a lot of time trying to

3    sort out so that Your Honor is focused on what remains at

4    issue.  Your Honor ruled that he couldn't testify to the 1800,

5    and so that issue is moot.  On 6 through 8 there are also a lot

6    of matters that are nominally encompassed by those motions

7    which have been mooted.

8          So, 6 through 8, the issues are alive, but they're

9    only alive in connection with the designations of testimony by

10   the Libby claimants.  So, I think if Your Honor takes a look at

11   Item 7, which are the Arrowood and plan proponent objections,

12   you'll see the full menu of the pieces of testimony that Libby

13   seeks to offer in through designation and that the plan

14   proponents object to and Arrowood objects to.  And that would

15   be, I think, a way of streamlining Your Honor's review of Items

16   6 through 8 which take up a variety of matters that were

17   germane at differing points in time.

18          THE COURT:  Okay.  First, let's discuss Item 5 for a

19   moment.  Do -- I'm not sure who on Libby's behalf is going to

20   argue this.

21          MR. KOVACUCH:  Mr. Heberling is going to address

22   that.  I believe he's in the --

23          THE COURT:  He is.  Mr. Heberling, do you agree that

24   Item 5 at this point is moot?  Item 5 was the plan proponents'

25   motion in limine to exclude expert testimony because of the

1 Reliance materials not being produced by Dr. Whitehouse.

2          MR. HEBERLING:  We believe it's moot also.

3          THE COURT:  All right.  Then I will take an order

4 from the debtor that simply marks Item 5 as moot.  One second,

5 please.

6                    (Pause)

7          THE COURT:  Okay.  With respect to Item 6 is the plan

8 proponents' motion to exclude the testimony regarding Grace's

9 culpability and the effect of asbestos illness.  7 are the plan

10 proponents' objections and counter-designations, and Arrowood's

11 also, to the Libby designations.  But, I think it also involved

12 the State of Montana and Anderson Memorial -- oh, that's the

13 untimely issue, so that's now waived.

14          MR. BERNICK:  As to Anderson Memorial.  What are we

15 on the -- we're fine on Montana, Ms. Baer tells me, so that --

16          THE COURT:  All right.  Can I get an order, then, on

17 Item -- this is 7B.  Can I get an order from the debtor that

18 will simply terminate this motion and objection on the docket

19 that will say that they're waiving the Anderson issue, and I'm

20 not sure what the resolution is with respect to Montana?

21          MR. BERNICK:  Yes, we'll address that.

22          THE COURT:  All right.  8 is the motion in limine to

23 preclude Libby from identifying additional individual claimants

24 outside the scope of the Court's orders.  So, I think I'm down

25 to, for today, those three issues on 6, 7 and 8.

**J&J COURT TRANSCRIBERS, INC.**

1            MR. BERNICK:  Right.  And what I'm suggesting to Your

2    Honor is that they, at least from the debtor's point of view,

3    while the issues of culpability, medical condition, and number

4    of witnesses are live issues, the focal point is now narrowed

5    to the designations of individual testimony and the

6    depositions.  And then there are also some designations of

7    other testimony and other proceedings.  There's a designation

8    of the opening statements -- some portion of the opening

9    statements in the Missoula criminal trial and the like.  That

10   full list, I think, is in Item 7.

11           So, while culpability is at issue per Item 6, it only

12   bears upon the testimony that is listed in its fullness in Item

13   7.  Likewise, as to 8, which focuses on the number of

14   witnesses, that's germane, again, only to the extent that it's

15   implicated in the number of witnesses who are being designated.

16   So, it already comes down to the designations because

17   everything else either hasn't been offered or it's already been

18   ruled on.  It is the designations that now tee-up these issues

19   of culpability, number of witnesses, and the like.

20           THE COURT:  All right.

21           MR. BERNICK:  I don't know if that's -- it took me a

22   while to sort it out, but I think that that's what it boils

23   down to.  And we will list the -- we'll list the testimony that

24   is still at issue.

25           THE COURT:  All right.  So, you are proposing not

                    **J&J COURT TRANSCRIBERS, INC.**

1  doing any of that argument today?

2        MR. BERNICK:  None of that argument today.  It won't

3  take very long tomorrow either for that matter.

4        THE COURT:  Mr. Heberling?

5        MR. KOVACICH:  Your Honor, I am actually going to

6  address those issues.

7        THE COURT:  Oh.  All right.  Mr. Kovacich?

8        MR. KOVACICH:  Your Honor, I am actually going to

9  address --

10       THE COURT:  Oh.  All right, Mr. --

11       MR. KOVACICH:  -- those issues.  It's acceptable to

12  Libby to argue that tomorrow.  The only point I'd like to make,

13  and I believe I'm recalling this correctly, but the motion

14  filed by Arrowood was actually resolved.  They had asked for an

15  expedited decision on that.  The Court set a hearing during the

16  confirmation hearing last time we were here.  And Mr. Schiavoni

17  and Mr. Lewis agreed on a resolution of that that was put into

18  the record.  So, to the extent the plan proponents want to

19  argue about the admissibility of that deposition testimony

20  that's fine.  We can do that tomorrow.  But, I believe

21  Arrowood's objection to that has been resolved.

22       MR. BERNICK:  Yes.  There's a different -- I believe

23  there was a joint brief that was filed -- well, Mr. --

24       MR. PERNICONE:  Your Honor, Carl Pernicone for

25  Arrowood.  I will double check that with Mr. Schiavoni this

**J&J COURT TRANSCRIBERS, INC.**

1 evening and report tomorrow on that one.

2          THE COURT:  All right.

3          MR. PERNICONE:  Thank you.

4          THE COURT:  I think there was a resolution that was

5 put on record.

6          MR. PERNICONE:  I believe that you're correct.

7          THE COURT:  I don't know that I ever had a written

8 order that was entered with respect to that.  Did I get it so

9 ordered on the basis of the record?  I think that's what the

10 resolution was, but I'm not sure I actually got one on

11 Arrowood's objection.  Why don't you folks see about that.  If

12 that's the case and I need it to get the docket cleaned up then

13 you can let me know that tomorrow.  Okay.  So, everything, I

14 guess, is deferred until tomorrow, that we -- except, I guess,

15 Mr. Lockwood, the request that was made of you to give me a

16 status report.

17          MR. LOCKWOOD:  I was hoping the -- you'd forget that,

18 Your Honor.  I want to -- I have to be fairly unusually for me

19 discreet about this because I don't want to run the risk of,

20 you know, overstating things or getting out ahead of the

21 process, or for that matter even disagreeing with my

22 co-plan proponents on the exact status.

23          Let me try and see if I can summarize it this way.

24 First, sort of on the broader front, I think I can, and I'm

25 sure Mr. Giannotto and Mr. Brown will correct me if I'm wrong

**J&J COURT TRANSCRIBERS, INC.**

1  on this, say that we are very close on the insurance neutrality

2  front.

3        I believe that we have an agreed-upon set of plan

4  language, and that the only remaining issue, if it's indeed an

5  issue, is the stipulation package that will accompany that.

6  So -- I mean, it's obviously been somewhat hard to get the

7  parties -- there's lots of people involved in it and we've had

8  the confirmation, so we perhaps haven't moved it on as fast as

9  we might've, but I -- now that we're coming to the culmination

10 of the hearings I'm hopeful that we can wrap that up fairly

11 soon.

12       That, however, you know, is not going to take a lot

13 of players out of the game necessarily because by its very

14 definition it doesn't apply to reimbursement insurers and

15 insurers who are starting creditor status in one way or

16 another.  With respect to the latter categories of insurers on

17 the reimbursement insurer front, Your Honor just told us that

18 you approved two settlements that were on the agenda for today.

19       We are continuing to have discussions with a broad

20 range of insurers, both reimbursement, non-settling, and

21 creditor.  There are several that are very, I would say, you

22 know, pretty close to either term sheets or even, indeed,

23 possibly actual settlement agreements.  But, it's -- they're

24 not there yet in this league, and as Yogi Berra was fondly

25 quoted, "It ain't over till it's over."  And so, I don't want

1  to overstate, but I would say that the chances are, in my

2  opinion, quite good that there will be a number of other

3  settlements that will be able to be presented to the Court over

4  the next month or two.  I don't really want to go into

5  identifying the entities --

6              THE COURT:  No.

7              MR. LOCKWOOD:  -- or the precise status because that

8  really what I think, in effect, amounts to negotiating in open

9  court almost.  Let's see.  Oh.  And then we have some

10 discussions with some non-insurer objectors, at least one set

11 of which is quite far along.  And we are continuing to have

12 discussions with the Libby claimants.  Whether or not we're

13 going to get there or not I don't feel comfortable in making

14 predictions of our discussions about it, but I know that the

15 Court has been interested in that particular one, so I'll

16 violate my proposition.  I won't name anybody and just say that

17 we are having discussions with them and there has been progress

18 made, but we're not there yet and I can't tell you whether for

19 sure we're ever going to get there.

20             And I -- there are some objectors that we're not

21 having settlement discussions with because there didn't appear

22 to be a whole lot to discuss.  Fortunately, they're relatively

23 speaking given the vast number of objectors that we started

24 with.  Relatively few, but I don't want to leave the Court with

25 the impression that I see any real likelihood that we're going

1  to wind up at the end of the day with a totally consensual

2  plan.  It would be nice, but it just --

3           THE COURT:  Work harder, Mr. Lockwood.

4                      (Laughter)

5           MR. LOCKWOOD:  I understand, Your Honor.  But, on the

6  other hand you can't get blood from a turnip.

7           THE COURT:  My father used to try.

8           MR. LOCKWOOD:  So, unless Your Honor has any specific

9  questions.

10           THE COURT:  No, that's all.  Thank you.  Anybody have

11  anything further that you want to add in the way of

12  housekeeping or status conference matters?  Do you want to

13  start at nine tomorrow?  Okay.  We are in recess until 9 a.m.

14  Thank you.

15                      * * * * *

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T I O N**

1
2          WE, PATRICIA REPKO, ELAINE HOWELL, LORI AULETTA,
3    KELLI PHILBURN and KATHLEEN BETZ, court approved transcribers,
4    certify that the foregoing is a correct transcript from the
5    official electronic sound recording of the proceedings in the
6    above-entitled matter, and to the best of our ability.

7

8    /s/ Patricia Repko
9    PATRICIA REPKO

10

11   /s/ Elaine Howell
12   ELAINE HOWELL

13

14   /s/ Lori Auletta
15   LORI AULETTA

16

17   /s/ Kelli Philburn
18   KELLI PHILBURN

19

20   /s/ Kathleen Betz                      DATE:  October 16, 2009
21   KATHLEEN BETZ
22   J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**