IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Case No. 01-01139 (JKF) |
| | : | |
| W. R. GRACE & CO., et al., | : | Jointly Administered |
| | : | |
| Debtors. | : | Chapter 11 |
| | : | |
| | : | Related to: D.I. 19579, 20864, 21752, |
| | : | 22374, 23567 |
| | : | |
| | : | |

**POST-TRIAL BRIEF OF MORGAN STANLEY SENIOR FUNDING, INC. IN
OPPOSITION TO CONFIRMATION OF THE FIRST AMENDED JOINT PLAN
OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY
CODE OF W. R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE
CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS, DATED FEBRUARY 27, 2009**

EDWARDS ANGELL PALMER & DODGE LLP
Stuart M. Brown (Bar No. 4050)
R. Craig Martin (Bar No. 5032)
919 North Market Street
15th Floor
Wilmington, Delaware 19801
(302) 777-7770

-and-

KATTEN MUCHIN ROSENMAN LLP
Jeff J. Friedman (admitted pro hac vice)
Noah Heller (admitted pro hac vice)
Merritt A. Pardini (admitted pro hac vice)
575 Madison Avenue
New York, New York 10022
(212) 940-8800

*Attorneys for Morgan Stanley
Senior Funding, Inc.*

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Table of Authorities | ii |
| Introduction | 1 |
| Preliminary Statement | 2 |
| Statement of the Facts | 3 |
|     A. The Letters Of Credit And The Reimbursement Agreements | 3 |
|     B. The Treatment Of The Morgan Stanley Claims Under The Plan | 4 |
|     C. Factual Evidence Provided At The Confirmation Hearing | 6 |
| Objection | 9 |
|     A. The Plan Improperly Characterizes the Morgan Stanley Claim as Unimpaired | 10 |
|     B. The Plan Cannot Satisfy the Absolute Priority Rule | 13 |
| Incorporation of Other Post-Trial Briefs | 14 |
| Conclusion | 14 |

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*In re Armstrong World Indus., Inc.*,
   432 F.3d 507 (3d Cir. 2005) ................................................................................................13

*In re Consolidated Rock Prods Co.*,
   312 U.S. 510 (1941) .............................................................................................................12

*In re Dow Corning Corp.*,
   456 F.3d 668 (6th Cir. 2006), *cert. denied*, 549 U.S. 1317 (2007) .....................................13

*In re The Duplan Corp.*,
   9 B.R. 921 (S.D.N.Y. 1980) .................................................................................................12

*In re Insilco Techs., Inc.*,
   480 F.3d 212 (3d Cir. 2007) .................................................................................................13

*In re Los Angeles Lumber Prods. Co.*,
   308 U.S. 106 (1939) .............................................................................................................12

*In re Mid-State Raceway, Inc.*,
   No. 04-65746, 2006 WL 4050809 (Bankr. N.D.N.Y. Feb. 10, 2006) ..................................12

*In re Monclova Care Center, Inc.*,
   59 Fed. Appx. 660 (6th Cir. 2003) .......................................................................................10

*In re New Midland Plaza Assocs.*,
   247 B.R. 877 (Bankr. S.D.Fla. 2000) ...................................................................................10

*In re New Valley Corp.*,
   168 B.R. 73 (Bankr. D.N.J. 1994) ........................................................................................10

*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y.) ............................................................................................12

**FEDERAL STATUTES**

11 U.S.C. § 1123(a)(4) ............................................................................................................ 1-2, 9

11 U.S.C. § 1124(1) ................................................................................................................. 3, 10

11 U.S.C. § 1124(3) ................................................................................................................. 3, 10

11 U.S.C. § 1129(a)(8) ................................................................................................................10

84409147v5
WLM 519186.1

11 U.S.C. § 1129(b) ........................................................................................ 3-4, 9, 10, 12, 13

11 U.S.C. § 1129(b)(2)(B) ..............................................................................................10, 13

11 U.S.C. § 1129(b)(2)(B)(i) ...............................................................................................11

11 U.S.C. § 1129(b)(2)(B)(i)-(ii) ..................................................................................... 10-11

Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), by and through its undersigned counsel, submits this post-trial brief in opposition to the confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders, dated February 27, 2009 (the "Plan").[1]

**Introduction**

Morgan Stanley is the holder of a Class 9 General Unsecured Claim in the amount of $16,489,380 (the "Morgan Stanley Claim") which has been Allowed pursuant to that certain Court-approved Stipulation Regarding Classification of Claims of Morgan Stanley Senior Funding, Inc. as Assignee of Certain Claims of Bank of America, N.A. under the Plan. See D.I. 21835 (the "Claim Allowance Stipulation"). In opposition to confirmation of the Plan, Morgan Stanley filed an objection dated May 19, 2009. See D.I. 21752 (the "Plan Objection"). Morgan Stanley also filed a supplemental brief on the issue of impairment dated July 17, 2009. See D.I. 22502 (the "Impairment Brief" and together with the Plan Objection, the "Morgan Stanley Plan Objections").

The Morgan Stanley Plan Objections raised four distinct objections to confirmation of the Plan:

1) the Plan violates section 1123(a)(4) of the Bankruptcy Code because it does not provide the same treatment for each Claim in Class 9;

2) the Plan's classification scheme amounts to improper gerrymandering of an impaired class intended to secure a Class 9 affirmative vote;[2]

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2] Even though each sub-group within Class 9 should vote separately, Morgan Stanley understands that Class 9 as a whole has voted to reject the Plan. Morgan Stanley does not know whether the Plan Proponents intend to challenge any votes or take any other actions to contend that Class 9 has accepted the Plan.

1

3) the Plan improperly characterizes the Morgan Stanley Claim as unimpaired because it does not provide for the payment of post-petition interest at the Morgan Stanley Contract Rate (defined below); and

4) the Plan does not satisfy the absolute priority rule because Equity Interests are retaining property under the Plan while the Morgan Stanley Claim remains impaired and is paid post-petition interest at less than the Morgan Stanley Contract Rate (defined below) on its Allowed Claim.

Morgan Stanley submits that objections 1 and 2 are issues of law that require no separate factual determinations by this Court beyond the plain language of the Plan itself. Accordingly, in compliance with the Court's instructions, Morgan Stanley will not repeat herein its legal arguments on issues 1 and 2 and respectfully refers the Court to the Morgan Stanley Plan Objections. See Plan Objection at ¶¶ 7 – 10; Impairment Brief at pp. 11 – 14.

With respect to objections 3 and 4, Morgan Stanley submits that these are mixed issues of law and fact, the resolutions of which turn primarily upon the issue of the Debtors' solvency.[3] Morgan Stanley will not repeat the substance of its legal arguments in connection with these issues, but will only summarize those arguments below and otherwise refer the Court to the Morgan Stanley Plan Objections. Because these two issues require consideration of evidence, this post-trial brief focuses upon the factual record developed at the Confirmation Hearing held before this Court and its relevancy to Morgan Stanley's legal arguments.

## Preliminary Statement

Morgan Stanley respectfully requests that this Court deny confirmation of the Plan. The Plan does not provide for equality of treatment within Class 9 as required by section 1123(a)(4) of the Bankruptcy Code. Rather, the Plan Proponents have created multiple sub-classes within

---

[3] Although Morgan Stanley asserts that unimpairment in this case requires payment of the Morgan Stanley Contract Rate as a matter of law and that equity's retention of value constitutes solvency per se, the Court has indicated that it believes solvency is relevant to its determinations.

2

Class 9, each of which provide for arbitrary and starkly different treatment in connection with the payment of post-petition interest.

Additionally, the Plan is simply incorrect in classifying the Morgan Stanley Claim as unimpaired because Morgan Stanley is receiving, under the Plan, less than its bargained for Morgan Stanley Contract Rate (defined below). The Plan's effective "cash-out" of the Morgan Stanley Claim thwarts Congress's intention in amending the Bankruptcy Code to eliminate former section 1124(3) and to require a reorganizing solvent debtor to pay post-petition interest in addition to the "allowed" amount of the claim. Accordingly, as Class 9 has rejected the Plan, the cramdown provisions of section 1129(b) of the Bankruptcy Code must be satisfied[4] – a situation that requires the payment of the allowed claims of an unsecured class in full plus post-petition interest, where (as they do here) Equity Interests receive or retain property under the Plan.

## Statement of the Facts

### A.  The Letters Of Credit And The Reimbursement Agreements

Prior to the Petition Date, Bank of America, N.A. ("BofA") issued three standby letters of credit for the account of Debtor Grace-Conn (collectively, the "Letters of Credit") as collateral for certain insurance transactions and surety bonds issued in favor of the Debtors. See Claim Allowance Stipulation at p. 1. Upon any draw under the Letters of Credit, Grace-Conn was obligated to reimburse BofA in accordance with the terms of certain agreement(s) between Grace-Conn and BofA (the "Reimbursement Agreements"). See Post Petition Interest Determination Notice [D.I. 21753] at Exhibit B. The Reimbursement Agreements provide for the payment of interest "on demand, on any amount not paid when due . . . from the due date

---

[4] To the extent that the Plan Proponents rely on unimpairment under section 1124(1) of the Bankruptcy Code to effect a cash out that was formerly only permitted under section 1124(3), depriving Class 9 of a vote, then Morgan Stanley submits that such unimpairment can treat Class 9 creditors no worse than if they had voted to reject the Plan (which they did) and the Plan Proponents had to satisfy the cramdown standards.

84409147v5
WLM 519186.1

until payment in full at a rate per annum equal to the rate of interest publicly announced from time to time by Bank of America as its <u>prime rate, plus three percentage points</u> (not to exceed the maximum rate permitted by applicable law)" (the "<u>Morgan Stanley Contract Rate</u>"). <u>See</u> <u>id.</u> at 1(g) (emphasis added). Notably, it is the only interest rate mentioned in the Reimbursement Agreement. <u>See</u> <u>id.</u>

On November 11, 2005, the Debtors and BofA entered into that certain Stipulation Regarding Allowance of Certain Claims (the "<u>2005 Stipulation</u>"), pursuant to which the Debtors agreed that, as a result of National Union Fire Insurance Company of Pittsburgh, PA having drawn on two of the Letters of Credit, BofA was entitled to (i) an allowed, unsecured nonpriority claim against Grace-Conn in the amount of $9,779,270, and (ii) an allowed, contingent, unliquidated and undisputed claim against Grace-Conn with respect to all undrawn amounts of the outstanding Letters of Credit. <u>See</u> Claim Allowance Stipulation at p. 1. On November 14, 2005, this Court entered its Order Authorizing Settlement with Bank of America, N.A. and Granting Related Relief, which authorized the Debtors' entry into the 2005 Stipulation. <u>See</u> Claim Allowance Stipulation at p. 2.

In light of National Union's subsequent draws under the Letters of Credit, BofA's allowed, contingent, unliquidated and undisputed claim against Grace-Conn with respect to such subsequent draws under the outstanding Letters of Credit was liquidated in the amount of $6,710,110. <u>See</u> Claim Allowance Stipulation at p. 2.

**B.   The Treatment Of The Morgan Stanley Claims Under The Plan**

The Plan provides for five (5) different post-petition interest treatments under which post-petition interest would be paid on the Effective Date to a holder of an allowed Class 9 General Unsecured Claim, and one treatment where no post-petition interest is paid to a holder of an allowed claim until entry of a Final Judgment in a litigated dispute over post-petition interest:

1) Claims arising from the Pre-petition Credit Facilities will receive interest at 6.09% from the Petition Date through December 31, 2005 and thereafter

4

84409147v5
WLM 519186.1

at floating prime, compounded quarterly through the Effective Date. See Plan at § 3.1.9(b)(A).

2) Claims arising from Environmental Claims that include a liquidated amount for post-petition future cleanup liabilities will receive interest at 4.19% from the date specified in an order allowing the claim, compounded annually through the Effective Date. See Plan at § 3.1.9(b)(B).

3) Claims arising from existing contracts that specify payment of interest will receive interest at the specified non-default rate from the Petition Date and compounded annually through the Effective Date. See Plan at § 3.1.9(b)(C).

4) Claims of "other" unsecured creditors – i.e., those without a contract or with a contract that does not specify a non-default contract rate – will receive interest at 4.19% from the Petition Date compounded annually through the Effective Date. See Plan at § 3.1.9(b)(D)

5) Claims of those that file a Notice of Non-Default Contract Rate of Interest (assuming they have not also filed a Post-Petition Interest Determination Notice) will receive post-petition interest at 4.19% or the non-default rate (per the Debtor's books and records) from the Petition Date and compounded annually until resolution of the Notice of Non-Default Contract Rate of Interest by Final Judgment. See Plan at § 3.1.9(e).

6) Claims of those that file a Post-Petition Interest Determination Notice will receive no interest on their Allowed General Unsecured Claim until resolution of their Post-Petition Interest Determination Notice by a Final Judgment. See Plan at § 3.1.9(d).

The Debtors have contended that the Morgan Stanley Contract Rate is a "default" rate of interest and under the Plan, absent objection, would receive post-petition interest at only a 4.19% interest rate. Accordingly, Morgan Stanley was required to protect its rights to seek the Morgan Stanley Contract Rate by filing a Post-Petition Interest Determination Notice and thus falls into category 6 above. See Post-Petition Interest Determination Notice.

Thus, under the Plan, Morgan Stanley would receive, on the Effective Date, the principal amount of the Morgan Stanley Claim, but no interest thereon. Instead, Morgan Stanley would be required to wait for an indeterminate period of time after the Effective Date until the issue of its entitlement to interest is resolved by a Final Judgment. See Plan at § 3.1.9(d). Moreover, after the Effective Date, no additional interest will accrue even though Morgan Stanley will be

5

deprived of the time value of the interest that would have been paid on the Effective Date, but for the litigation. See Plan at § 3.1.9(d)(iii). Although the Debtors have informally indicated that Morgan Stanley is free to seek whatever it wants in the litigation over post-petition interest, despite numerous amendments to the Plan, it still does not provide that such a litigant can recover its attorneys' fees and costs to the extent its contract so provides.

The Plan also provides that equity holders will retain their interests in the Debtors, and the Debtors have admitted that those interests have a value between $430 million and $821 million. See Disclosure Statement at § 2.11.2.6.

### C. Factual Evidence Provided At The Confirmation Hearing

At the Confirmation Hearing, the Court heard testimony from two expert witnesses with respect to the Debtors' solvency. Specifically, Ms. Pamela Zilly was called by the Plan Proponents, and Mr. Robert Frezza was called by the Unsecured Creditors' Committee and by the bank lender group.

Ms. Zilly did not attempt to render an opinion regarding the Debtors' solvency, or lack thereof. See 9/16 Tr. at 115-16.

> Q. And you would agree that you're offering no opinion in this confirmation process with regard to whether Grace is solvent?
>
> A. That is correct.
>
> Q. And you also are offering no opinion as to whether Grace is insolvent?
>
> A. That is correct.

Rather, she asserted that she was unable to offer *any* opinion about whether, upon emergence from chapter 11 under the Plan, the Debtors would be solvent. See, 9/16 Tr. at 106-07:

6

> Q. Based upon the current state of affairs with these different estimates that are out there, is it possible to render an opinion, a formal opinion, regarding Grace's solvency?
>
> A. No, I don't believe it is.

In contrast, Mr. Frezza was competently able to opine that, assuming confirmation and implementation of the Plan, the Debtors would be solvent. See 9/16 Tr. at 270.

> Q. I asked you, I believe, what is your opinion?
>
> A. In my opinion, upon the effective date Grace will be solvent.

Moreover, Mr. Frezza was able to formulate this opinion under three separate, commonly-recognized tests for solvency: (i) the "cash flow" test, 9/16 Tr. at 270, 277-80; (ii) the "adequate capital" test, 9/16 Tr. at 270-72, 281; and (iii) the "balance sheet" test, 9/16 Tr. at 272-75, 291. That Mr. Frezza was able to formulate the same opinion based upon three distinct tests is particularly telling because, as Mr. Frezza testified, a professional approaching a solvency analysis would not need to perform the analysis under multiple protocols as he did. 9/16 Tr. at 277, 293. And yet, under each of these three separate tests, the same conclusion was reached – the Debtors will be solvent on the Effective Date of the Plan.

Not only was Mr. Frezza able to opine as to the Debtors' solvency, but he was able to quantify that solvency at being between $430 million and $821 million. See 9/16 Tr. at 294.

> Q. Mr. Frezza, in producing your opinion with regard to Grace's solvency as of 12/31/2009, under the balance sheet test using the market approach, what was the range of values that you discovered that Grace's assets will exceed its liabilities?
>
> A. The resultant numbers were 430 million to 821 million.

This is the same estimated value for the retained interests of the equity holders as the Plan Proponents admitted to in the Disclosure Statement. See Disclosure Statement at § 2.11.2.6.

But perhaps even more telling is the fact that Mr. Frezza was able to formulate his opinion utilizing the information provided by the Debtors and by the Plan Proponents' own

7

expert – Ms. Zilly. Specifically, in connection with the "cash flow" test, Mr. Frezza detailed his use of Ms. Zilly's feasibility analysis, explaining that it was effectively the same as a solvency report. 9/16 Tr. at 279:

> Q. Well, let's be clear. The work that you reviewed of Ms. Zilly was not a solvency report, was it?
>
> A. That's correct. But it could've been.
>
> Q. Please elaborate on that. What do you mean by it could've?
>
> A. Just simply, as I said already, that the analyses and the work performed by me and by Ms. Zilly is the identical work that would be performed if she were to render a solvency opinion. It's the same thing.

Mrs. Zilly's own testimony supports the identical nature of a feasibility analysis and a solvency report. 9/16 Tr. at 138.

> Q. Is there any difference, Ms. Zilly, between the solvency test of a company's ability to pay its debts, when due, and under a feasibility analysis of a company's ability to pay its debts when due, speaking generally, not of Grace?
>
> A. No.

In reaching his opinion regarding the Debtors' solvency under the "adequate capital" test, Mr. Frezza noted several facts that, even absent expert testimony, empirically establish Grace's solvency. Specifically, Mr. Frezza noted that the Debtors had made very little use of their DIP financing, that exit financing was being negotiated (something one would not expect for an insolvent debtor), that vendors hold the Debtors in high regard, and that the Debtors have a substantial equity cushion. 9/16 Tr. at 280-81. In reaching his conclusion of the Debtors' solvency under the market approach to the to the "balance sheet" test, Mr. Frezza relied in large part upon information provided by the Debtors themselves: the information contained in the

Disclosure Statement. 9/16 Tr. at 281. Accordingly, the Debtors' own information casts strong doubt their own expert's opinion regarding the ability to determine Grace's solvency.

Importantly Mr. Frezza measured solvency as of the Effective Date as opposed to being measured on some indeterminate, arbitrary date prior to that. 9/16 Tr. at 269. In fact, solvency as of the Effective Date was effectively conceded by Debtors' counsel. See 9/16 Tr. at 326:

> Q. We all hope and pray and expect that the plan, as styled, will go effective, and if it does go effective, the good news is that Grace won't be insolvent, right?
>
> A. Correct
>
> .....
>
> Q. It wouldn't have made an awful lot of sense to come up with a plan of reorganization and these guys would never have agreed to it if it turns out that once Grace came out of bankruptcy it was insolvent, right?
>
> A. I would hope that's the case. Right.

Ms. Zilly's determination that solvency or insolvency cannot be determined prior to Effective Date, even if true (which Morgan Stanley disputes), is irrelevant to the issues that must be determined by the Court. Equity does not retain value and creditors do not get paid unless and until the Effective Date occurs. It cannot be disputed that absolute priority is measured as of the effective date of a plan. See 11 U.S.C. § 1129(b).

## Objection

With respect to Morgan Stanley's arguments regarding the Plan violating section 1123(a)(4) of the Bankruptcy Code because it does not provide the same treatment for each Claim in Class 9 and the Plan's classification scheme amounting to improper gerrymandering,

9

Morgan Stanley respectfully refers this Court to the Morgan Stanley Plan Objections. See Plan Objection at ¶¶ 7 – 10; Impairment Brief at pp. 11 – 14.

A.   **The Plan Improperly Characterizes the Morgan Stanley Claim as Unimpaired**

The Debtors are incorrect in their assertion that the Morgan Stanley Claim is unimpaired under the Plan. What the Plan proposes is not unimpairment but rather a "cash-out" of creditors such as Morgan Stanley by paying their allowed claims – without post-petition interest – on the Effective Date. See Plan at § 3.1.9(d). Specifically, because Morgan Stanley was compelled to file a Post-Petition Interest Determination Notice, Morgan Stanley would receive no interest on its allowed claim until the interest allowance protocol is brought to Final Judgment at some indeterminate future date. See Plan at § 3.1.9(d). [5]

Such a plan provision resuscitates the Bankruptcy Code's long-dead section 1124(3) and the holding in In re New Valley Corp., 168 B.R. 73 (Bankr. D.N.J. 1994). Congress repealed section 1124(3), and, in doing so, made clear that in the case of a reorganizing solvent debtor, unimpairment requires paying a creditor a separate payment of post-petition interest in addition to the "allowed" amount of the claim.

As a result of Congress's repeal of section 1124(3), a plan proponent is left with two options: either the class must vote to accept the proposed treatment by the requisite voting/claim majorities, or, if the class rejects the plan, the cramdown provisions of section 1129(b) of the Bankruptcy Code must be satisfied. 11 U.S.C. §§ 1124(1); 1129(a)(8), (b)(2)(B). The

---

[5] Whatever the appropriate amount of post-petition interest to be paid on the Effective Date is, where equity is retaining property, as it is here, that rate simply cannot be zero merely because Morgan Stanley and the Plan Proponents disagree on the proper interest rate. In re Monclova Care Center, Inc., 59 Fed. Appx. 660, 664 (6th Cir. 2003) ("[A] class of claims would be impaired by a plan if the claims would not be paid in full with interest on the effective date of the plan."); In re New Midland Plaza Assocs., 247 B.R. 877, 896 (Bankr. S.D. Fla. 2000) ("Thus, under § 1124 as amended, if a class of claims is not paid in full with interest on the effective date, the class is impaired.")

10

cramdown option requires the payment of the allowed claims of an unsecured class in full plus post-petition interest, as of the Effective Date, if equity holders receive or retain any property on account of their equity interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii).

Here, equity interest holders are retaining substantial property: property which the Plan Proponents themselves admittedly value at between $430 million and $821 million. See Disclosure Statement at § 2.11.2.6. As Class 9 has rejected the Plan, holders of Claims in Class 9 such as Morgan Stanley must receive payment of principal and interest on the Effective Date. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii).

Morgan Stanley refers the Court to paragraphs 11 – 16 of the Plan Objection and the entirety of the Impairment Brief. See Plan Objection at ¶¶ 11 – 16. See Impairment Brief.

During the course of the Confirmation Hearing, the Court heard a great deal of testimony, and a great deal of colloquy from counsel, on the issue of solvency – and in particular, whether the appropriate date for measuring solvency is the Effective Date or some date prior to the commencement of these bankruptcy cases. Morgan Stanley respectfully submits that the proper date to measure solvency for impairment purposes is the effective date of the plan. This is clear from the plain langue of the Bankruptcy Code which, in discussing "fair and equitable", references as the time of measurement, the effective date of the plan. See 11 U.S.C. § 1129(b)(2)(B)(i). Moreover, Morgan Stanley respectfully submits that the application of any other date to the question of solvency simply turns the Bankruptcy Code – and the confirmation process – on its head. Presumably most debtors are insolvent prior to the effective date. If solvency is measured from some date before the effective date, then the requirement that solvent debtors pay post-petition interest will be illusory.

Here, there can be no doubt as to the Debtors' solvency on the Effective Date. Importantly, no party in these cases is contending that the Debtors are insolvent for purposes of the Plan. Mr. Frezza opined that the Debtors will be solvent on the Effective Date as measured under three separate commonly- recognized tests for solvency: (i) the "cash flow" test, 9/16 Tr.

at 270, 277-80; (ii) the "adequate capital" test, 9/16 Tr. at 270-72, 281; and (iii) the "balance sheet" test, 9/16 Tr. at 272-75, 291. Indeed, the Debtor's counsel conceded that if the Plan becomes effective, the Debtors will be solvent. See 9/16 Tr. at 326. Moreover, Morgan Stanley submits that the mere fact that equity interests are retaining value here means that the Debtors are solvent per se. See In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984) ("Implicit in [the absolute priority rule] is that stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent.") citing In re Consolidated Rock Prods Co., 312 U.S. 510 (1941); In re Los Angeles Lumber Prods. Co., 308 U.S. 106 (1939); In re The Duplan Corp., 9 B.R. 921, 924-25 (S.D.N.Y. 1980). See also, In re Mid-State Raceway, Inc., No. 04-65746, 2006 WL 4050809, at *18 (Bankr. N.D.N.Y. Feb. 10, 2006) quoting In re Toy & Sports, 37 B.R. at 152. It is an elementary accounting principle that if the equity interests of an entity have a positive value, that entity's assets must exceed its liabilities. In this case, the Plan Proponents' have admitted that as of the Effective Date, their assets will exceed their liabilities by between $430 million and $821 million. See Disclosure Statement at § 2.11.2.6

Accordingly, given the Debtors' solvency, the Plan Proponents are left with only two options as Class 9 has rejected the Plan: they must either render the Morgan Stanley Claims truly unimpaired as required under the above-referenced case law which requires the payment of interest at the Morgan Stanley Contract Rate or they must satisfy the cramdown standards of 1129(b) of the Bankruptcy Code – a process that requires consideration of the absolute priority rule. The absolute priority rule requires the payment of the allowed claims of an unsecured class in full plus post-petition interest, if equity holders receive or retain any property on account of

their equity interests. See In re Armstrong World Indus., Inc., 432 F.3d 507, 512-13 (3d Cir. 2005). Here, as described below, the Plan Proponents cannot satisfy the absolute priority rule.

**B.    The Plan Does Not Satisfy the Absolute Priority Rule**

Because the Plan enables owners of equity interests to retain those interests without rendering Class 9 claimants such as Morgan Stanley unimpaired, the Plan cannot be confirmed unless Class 9 votes in favor of the plan, which Class 9 has not done, or the Plan Proponents satisfy the "cramdown" requirements of 1129(b) – a process that implicates the "fair and equitable" standard and the absolute priority rule. "Even in the flexible world of Chapter 11 reorganizations, the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all creditors are paid in full." In re Insilco Techs., Inc., 480 F.3d 212, 218 (3d Cir. 2007). For purposes of the absolute priority rule, payment in full means payment of default interest to creditors whose contracts require such. In In re Dow Corning Corp., 456 F.3d 668, 679 (6th Cir. 2006), cert. denied, 549 U.S. 1317 (2007).

Morgan Stanley refers the Court to paragraphs 17 - 20 of the Plan Objection. See Plan Objection at ¶¶ 17 – 20.

The Plan calls for equity holders to retain their interest which are valued by the Plan Proponents at between $430 million and $821 million. See Disclosure Statement at § 2.11.2.6. At the same time, the Morgan Stanley Claims – which fall into rejecting Class 9 – are not being paid in full because, rather than receiving interest at the Morgan Stanley Contract Rate, they will simply be lumped into the interest allowance protocol which provides for the payment of no interest on the Effective Date.

### Incorporation of Other Post-Trial Briefs

Morgan Stanley hereby incorporates, to the extent not inconsistent herewith, the post-trial briefs of the Committee and the Lender Group.

### Conclusion

Ultimately, confirmation of the Plan must be denied as the Plan improperly classifies the Morgan Stanley Claims as unimpaired when in fact they are impaired by the Plan Proponent's attempt to cash-out Morgan Stanley without the payment of postpetition interest at the Morgan Stanley Contract Rate. Morgan Stanley must be paid its contractual rate of interest where, as here, the Court is faced with a solvent debtor and holders of equity interests will retain substantial value.

For the reasons set forth above, Morgan Stanley respectfully requests that this Court deny confirmation of the Plan and grant such other and further relief as is just and proper.

Dated: November 2, 2009.

    /s/ R. Craig Martin                         .
EDWARDS ANGELL PALMER & DODGE LLP
Stuart M. Brown (Bar No. 4050)
R. Craig Martin (Bar No. 5032)
919 North Market Street
15th Floor
Wilmington, Delaware 19801
(302) 777-7770

-and-

KATTEN MUCHIN ROSENMAN LLP
Jeff J. Friedman (admitted pro hac vice)
Noah Heller (admitted pro hac vice)
Merritt A. Pardini (admitted pro hac vice)
575 Madison Avenue
New York, New York 10022
(212) 940-8800

*Attorneys for Morgan Stanley Senior Funding, Inc.*

## SPECIAL NOTE REGARDING HYPERLINKED BRIEF

The hyperlinked brief being provided to the Court will contain links to each document, transcript page and case cited above. The brief being filed on the Court's docket will have only the following attachments:

A.  D.I. 21835 - the Claim Allowance Stipulation

B.  D.I. 21753 – the Post Petition Interest Determination Notice

C.  Cited Transcript Pages