D.I. 21835 - the Claim Allowance Stipulation

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | RE: Doc. No. 21722 |

**ORDER APPROVING STIPULATION REGARDING ORDER APPROVING
STIPULATION REGARDING CLASSIFICATION OF CLAIMS OF MORGAN
STANLEY SENIOR FUNDING, INC. AS ASSIGNEE OF CERTAIN
CLAIMS OF BANK OF AMERICA, N.A. UNDER THE PLAN**

Upon consideration of the *Stipulation Regarding Classification of Claims of*

*Morgan Stanley Senior Funding, Inc. as Assignee of Certain Claims of Bank of America, N.A.*

*Under the Plan* attached hereto as Exhibit 1 (the "Stipulation") and after due deliberation and

sufficient cause appearing therefore;

IT IS HEREBY ORDERED THAT:

1.    The Stipulation and all of its terms are approved.

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

2.    This Court shall retain jurisdiction to hear and determine all matters

arising from or in connection with the implementation, enforcement and interpretation of this

Order.

Dated: __May 22__ , 2009

_Judith K. Fitzgerald_

The Honorable Judith K. Fitzgerald
United States Bankruptcy Court Judge

# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W.R. GRACE & CO., *et al.*, | ) Case No. 01-1139 (JKF) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## STIPULATION REGARDING CLASSIFICATION OF CLAIMS OF MORGAN STANLEY SENIOR FUNDING, INC. AS ASSIGNEE OF CERTAIN CLAIMS OF BANK OF AMERICA, N.A. UNDER THE PLAN[1]

WHEREAS, on April 2, 2001 (the "Petition Date"), W. R. Grace & Co. and W. R. Grace & Co. – Conn. ("Grace-Conn") and certain of their affiliates and subsidiaries (together with W. R. Grace & Co. and Grace-Conn, the "Debtors") petitioned the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") for relief under chapter 11 of title 11 of the United States Code;

WHEREAS, prior to the Petition Date, Bank of America, N.A. ("BofA") issued three standby letters of credit for the account of Grace-Conn (collectively, the "Letters of Credit") as collateral for certain insurance transactions and surety bonds issued in favor of the Debtors;

WHEREAS, upon any draw under the Letters of Credit, Grace-Conn was obligated to reimburse BofA in accordance with the terms of certain agreement(s) between Grace-Conn and BofA in accordance with the terms thereof (the "Reimbursement Agreements");

WHEREAS, on November 11, 2005, the Debtors and BofA entered into that certain Stipulation Regarding Allowance of Certain Claims (the "2005 Stipulation");

WHEREAS, pursuant to the terms of the 2005 Stipulation, the Debtors agreed that, as a result of National Union Fire Insurance Company of Pittsburgh, PA having drawn on two of the Letters of Credit, BofA was entitled to (i) an allowed, unsecured nonpriority claim against Grace-Conn in the amount of $9,779,270, and (ii) an allowed, contingent, unliquidated and undisputed claim against Grace-Conn with respect to all undrawn amounts of the outstanding Letters of Credit;

---

[1]    This Stipulation relates to classification of the Claims described herein under the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., The Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009 (the "Plan"). If the Plan, as amended from time to time, is not confirmed, this Stipulation shall have no force and effect.

WHEREAS, on November 14, 2005, the Bankruptcy Court entered its Order Authorizing Settlement with Bank of America, N.A. and Granting Related Relief which authorized the Debtors' entry into the 2005 Stipulation;

WHEREAS, in light of National Union's further draws under the Letters of Credit, BofA's allowed, contingent, unliquidated and undisputed claim against Grace-Conn with respect to all undrawn amounts of the outstanding Letters of Credit was liquidated in the amount of $6,710,110 (the $6,710,110 claim and the $9,779,270 claim being, collectively, the "Claims"); WHEREAS, pursuant to Transfer of Claim Agreements dated April 24, 2006 and February 22, 2008, Morgan Stanley Senior Funding, Inc. ("Morgan Stanley") became the owner of all of BofA's right, title and interest in and to the Claims;

WHEREAS, on February 27, 2009, the Debtors and others (collectively, the "Plan Proponents") filed their Disclosure Statement (the "Disclosure Statement") in support of the Plan;

WHEREAS, pursuant to Section 3.2.16 of the Disclosure Statement, the Debtors confirmed the amount of the Claims;

WHEREAS, on March 9, 2009, the Bankruptcy Court entered its Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedules and Related Relief (the "Disclosure Statement Order");

WHEREAS, the Disclosure Statement Order approves certain procedures to be followed by creditors who object to the classification of their claim under the Plan;

WHEREAS, the Plan may be interpreted in such a way as to classify the Claims other than as Class 9 Claims (as defined in the Plan) and the Debtors initially so contended;

WHEREAS, Morgan Stanley contends that the Claims should be classified as Class 9 General Unsecured Claims (as defined in the Plan),

WHEREAS, upon consideration of the 2005 Stipulation, the Debtors and other Plan Proponents agree with Morgan Stanley's contention and desire to memorialize their agreement regarding the classification of the Claims under the Plan;

NOW, THEREFORE, it is hereby stipulated and agreed (this "Stipulation") by and between Morgan Stanley and the Plan Proponents:

1.      Notwithstanding any provisions of the Plan and Disclosure Statement to the contrary, the Claims shall be allowed as Class 9 General Unsecured Claims (as defined in the Plan).

2.      Neither Morgan Stanley, BofA, nor any other party shall be required to file a Disputed Classification Declaration as provided under the Disclosure Statement Order in connection with the Claims, and execution of this Stipulation shall be considered to be satisfaction of such requirement.

3.    This Stipulation shall inure to the benefit of Morgan Stanley, the Plan Proponents, their successors and assigns.

4.    The Debtors shall submit this Stipulation to the Bankruptcy Court for approval.

5.    This Stipulation may be signed in counterparts and by facsimile, with each signed counterpart being deemed a part of the original document.

6.    This Stipulation may not be modified, altered, or amended except by a writing signed by the parties.

7.    All disputes regarding or arising under this Stipulation shall be determined by the Bankruptcy Court.


KATTEN MUCHIN ROSENMAN LLP

_____
Jeff J. Friedman, Esq.
Noah Heller, Esq.
Merritt A. Pardini, Esq.
575 Madison Avenue
New York, New York 10022
(212) 940-6539

*Attorneys for Morgan Stanley*
*Senior Funding, Inc.*


KIRKLAND & ELLIS LLP

_____
Theodore L. Freedman, Esq.
Deanna D. Boll, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
212-446-4800

and

Janet S. Baer, Esq.
The Law Offices of Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
312-644-2162


and

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)

James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Attorneys for the Debtors*

4

D.I. 21753 – the Post Petition Interest Determination Notice

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Case No. 01-01139 (JKF)** |
| | : | |
| **W. R. GRACE & CO., et al.,** | : | **Jointly Administered** |
| | : | |
| Debtors. | : | **Chapter 11** |
| | : | |
| | : | Related to: Docket Nos. 19579, 20864 |
| | : | |
| _____ | : | |

### POST-PETITION INTEREST DETERMINATION NOTICE

Morgan Stanley Senior Funding, Inc. ("Morgan Stanley") respectfully submits this Post-Petition Interest Determination Notice as required pursuant to the approved Notice of Procedures Relating to Payment of Post-Petition Interest on General Unsecured Claims.

### Background

1.      On April 2, 2001 (the "Petition Date"), W. R. Grace & Co., W. R. Grace & Co. – Conn ("Grace-Conn") and certain of their affiliates and subsidiaries (together with W. R. Grace & Co. and Grace-Conn, the "Debtors") filed with this Court their petitions for relief under chapter 11 of title 11 of the United States Code.

2.      Prior to the Petition Date, Bank of America, N.A. ("BofA") issued three standby letters of credit for the account of Grace-Conn (collectively, the "Letters of Credit") as collateral for certain insurance transactions and surety bonds issued in favor of the Debtors. Upon any draw under the Letters of Credit, Grace-Conn was obligated to reimburse BofA in accordance with the terms of certain agreement(s) between Grace-Conn and BofA (the "Reimbursement Agreements").

3.      On November 11, 2005, the Debtors and BofA entered into that certain Stipulation Regarding Allowance of Certain Claims (the "2005 Stipulation"), pursuant to which

the Debtors agreed that, as a result of National Union Fire Insurance Company of Pittsburgh, PA having drawn on two of the Letters of Credit, BofA was entitled to (i) an allowed, unsecured nonpriority claim against Grace-Conn in the amount of $9,779,270, and (ii) an allowed, contingent, unliquidated and undisputed claim against Grace-Conn with respect to all undrawn amounts of the outstanding Letters of Credit. On November 14, 2005, this Court entered its Order Authorizing Settlement with Bank of America, N.A. and Granting Related Relief which authorized the Debtors' entry into the 2005 Stipulation.

4.    In light of National Union's subsequent draws under the Letters of Credit, BofA's allowed, contingent, unliquidated and undisputed claim against Grace-Conn with respect to all undrawn amounts of the outstanding Letters of Credit was liquidated in the amount of $6,710,110 (the $6,710,110 claim and the $9,779,270 claim being, collectively, the "Claims"). Pursuant to Section 3.2.16 of the Disclosure Statement in these cases, the Debtors confirmed the amount of the Claims.

5.    Pursuant to Transfer of Claim Agreements dated April 24, 2006 and February 22, 2008, Morgan Stanley became the owner of all of BofA's right, title and interest in and to the Claims.

6.    Pursuant to a Stipulation Regarding Classification of Claims of Morgan Stanley Senior Funding, Inc. as Assignee of Certain Claims of Bank or America, N.A. Under the Plan, the Claims are allowed in full as Class 9 General Unsecured Claims.

### Non-Default Contract Rate of Interest

7.    The Reimbursement Agreements provide for the payment of interest "on demand, on any amount not paid when due . . . from the due date until payment in full at a rate per annum equal to the rate of interest publicly announced from time to time by Bank of America as its

2

prime rate, plus three percentage points (not to exceed the maximum rate permitted by applicable

law)". See Reimbursement Agreement at ¶ 1(g).

8.    Copies of the Letters of Credit and Reimbursement Agreements are attached as

Exhibit "A" hereto and fully incorporated herein by reference.  A more legible copy of the form

of Reimbursement Agreement is attached as Exhibit "B" hereto.

Dated: May 19, 2009

           /s/ Stuart M. Brown
EDWARDS ANGELL PALMER & DODGE LLP
Stuart M. Brown (Bar No. 4050)
919 North Market Street
15th Floor
Wilmington, Delaware 19801
(302) 777-7770

-and-

KATTEN MUCHIN ROSENMAN LLP
Jeff J. Friedman (admitted pro hac vice)
Noah Heller (admitted pro hac vice)
Merritt A. Pardini (admitted pro hac vice)
575 Madison Avenue
New York, New York 10022
(212) 940-8800

*Attorneys for Morgan Stanley*
*Senior Funding, Inc.*

3

# EXHIBIT A

## LETTERS OF CREDIT AND
## REIMBURSEMENT AGREEMENTS

OCT 27 2004 11:22 FR BANK OF AMERICA    704 386 7515 TO 97042642405    P.01

**BankofAmerica**

PAGE: 1

DATE: OCTOBER 17, 2000

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER: 7404289

BENEFICIARY
NATIONAL UNION FIRE INSURANCE CO.
OF PITTSBURGH, PA
AMERICAN HOME ASSURANCE COMPANY
THE INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA
COMMERCE AND INDUSTRY INSURANCE
COMPANY
AIU INSURANCE COMPANY

BIRMINGHAM FIRE INSURANCE COMPANY
OF PENNSYLVANIA
ILLINOIS NATIONAL INSURANCE COMPANY
AMERICAN INTERNATIONAL SOUTH

INSURANCE COMPANY
NATIONAL UNION FIRE INSURANCE
COMPANY OF LOUISIANA
AMERICAN INTERNATIONAL PACIFIC

INSURANCE COMPANY
GRANITE STATE INSURANCE COMPANY
NEW HAMPSHIRE INSURANCE COMPANY
LANDMARK INSURANCE COMPANY,

AND ANY OTHER AFFILIATE OF ANY OF
THESE, AS THEIR INTERESTS MAY
APPEAR
P.O. BOX 923

WALL STREET STATION
NEW YORK, N.Y. 10268
ATTN: MR. ART STILLWELL

APPLICANT
W.R. GRACE & CO. - CONN
7500 GRACE DRIVE
COLUMBIA, MD 21044

AMOUNT
USD 10,439,830.00
TEN MILLION FOUR HUNDRED THIRTY NINE
THOUSAND EIGHT HUNDRED THIRTY AND
00/100'S US DOLLARS

EXPIRATION
OCTOBER 17, 2001 AT OUR COUNTERS

WE HEREBY ESTABLISH THIS IRREVOCABLE LETTER OF CREDIT IN FAVOR OF THE
AFORESAID ADDRESSEE ("BENEFICIARY") FOR DRAWINGS UP TO UNITED STATES
DOLLARS 10,439,830.00 (TEN MILLION FOUR HUNDRED THIRTY NINE THOUSAND
EIGHT HUNDRED THIRTY AND 00/100'S UNITED STATES DOLLARS) EFFECTIVE
IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE AND PAYABLE
AT OUR OFFICE AT 231 S. LASALLE STREET, CHICAGO, ILLINOIS 60697,
ATTENTION: STANDBY L/C DEPT., MAIL CODE: IL1-231-17-00 AND EXPIRES
WITH OUR CLOSE OF BUSINESS ON OCTOBER 17, 2001.

THE TERM "BENEFICIARY" INCLUDES ANY SUCCESSOR BY OPERATION OF LAW OF
THE NAMED BENEFICIARY, INCLUDING, WITHOUT LIMITATION, ANY LIQUIDATOR,
REHABILITATOR, RECEIVER OR CONSERVATOR.

WE HEREBY UNDERTAKE TO PROMPTLY HONOR YOUR SIGHT DRAFT(S) DRAWN ON
US, INDICATING OUR CREDIT NUMBER 7404289, FOR ALL OR ANY PART OF THIS
CREDIT IF PRESENTED AT OUR OFFICE SPECIFIED IN PARAGRAPH ONE ON OR
BEFORE THE EXPIRY DATE OR ANY AUTOMATICALLY EXTENDED EXPIRY DATE.

Bank of America, N.A. Trade Operations
Mail Pode: IL1-231-17-00
231 S. LaSalle Street, 17th Floor, Chicago, IL 60697
G52.11953080 04/000_X: 11

COPY

♻ Recycled Paper

OCT 27 2004 11:22 FR BANK OF AMERICA    704 386 7515 TO 97042642405    P.02

**BankofAmerica**

PAGE: 2

THIS IS AN INTEGRAL PART OF LETTER OF CREDIT NUMBER: 7404289

EXCEPT AS EXPRESSLY STATED HEREIN, THIS UNDERTAKING IS NOT SUBJECT TO ANY AGREEMENT, CONDITION OR QUALIFICATION. THE OBLIGATION OF BANK OF AMERICA N.A. UNDER THIS LETTER OF CREDIT IS THE INDIVIDUAL OBLIGATION OF BANK OF AMERICA N.A., AND IS IN NO WAY CONTINGENT UPON REIMBURSEMENT WITH RESPECT THERETO.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ONE YEAR FROM THE EXPIRY DATE HEREOF, OR ANY FUTURE EXPIRATION DATE, UNLESS THIRTY DAYS PRIOR TO ANY EXPIRATION DATE WE NOTIFY YOU BY REGISTERED MAIL THAT WE ELECT NOT TO CONSIDER THIS LETTER OF CREDIT RENEWED FOR ANY SUCH ADDITIONAL PERIOD.

THIS LETTER OF CREDIT IS SUBJECT TO AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, AND THE 1993 REVISION OF THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS OF THE INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION 500) AND, IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL. IF THIS CREDIT EXPIRES DURING AN INTERRUPTION OF BUSINESS AS DESCRIBED IN ARTICLE 17 OF SAID PUBLICATION 500, THE BANK HEREBY SPECIFICALLY AGREES TO EFFECT PAYMENT IF THIS CREDIT IS DRAWN AGAINST WITHIN THIRTY (30) DAYS AFTER THE RESUMPTION OF BUSINESS.

IF YOU REQUIRE ANY ASSISTANCE OR HAVE ANY QUESTIONS REGARDING THIS TRANSACTION, PLEASE CALL 312-828-7614.

----------------------        ----------------------
AUTHORIZED SIGNATURE          AUTHORIZED SIGNATURE
          THIS DOCUMENT CONSISTS OF 2 PAGE(S).

Bank of America, N.A. Trade Operations
Mail Code: IL1-231-17-00
231 S. LaSalle Street, 17th Floor, Chicago, IL 60697

COPY

Recycled Paper

OCT 27 2004 11:22 FR BANK OF AMERICA    704 386 7515 TO 97042642405    P.03

**BankofAmerica** ⚫

Application and Agreement for Standby Letter of Credit
TO: Bank of America, N.A. ("Bank of America")

| For Bank of America Use Only |
|---|
| L/C No. _____ |

## A. Application

1. __W. R. Grace & Co. - Conn__ ("Applicant") requests Bank of America to issue an irrevocable standby letter of Credit ("Letter of Credit") as follows:

☐ Full text teletransmission    ☐ Airmail with brief preliminary teletransmission advice    ☐ Airmail    ☒ Courier

2. Applicant Address:

__W.R. Grace & Co. - Conn__
__7500 Grace Drive__
__Columbia, MD 21044__
__410-531-4000__

3. For Account of (Name and address, if different from Applicant):

4. Advising Bank:

5. In favor of (Beneficiary Name and Address):
__See attached format__

6. Amount: __TEN MILLION FOUR HUNDRED THIRTY NINE THOUSAND EIGHT HUNDRED__    ( __$10,439,830__ )
(In words and figures)    __THIRTY DOLLARS AND 00/00__

Currency __United States Dollar__

Expiration Date. Drafts to be drawn on and presented at Bank of America's Address set forth in the Letter of Credit on or before: __OCT-19-01__

☐ If this box is marked, Applicant authorizes Bank of America to effect payment of any sums due under this Application and Agreement by means of debiting Applicant's account with Bank of America set forth below. This authorization does not effect the obligation of Applicant to pay such sums when due. If there are insufficient funds in such account to make such payment when due, or if Bank of America fails to debit the account, and this authorization does not affect any setoff rights of Bank of America at law or equity. Applicant's account number with Bank of America is

7. Available by drafts drawn at sight on Bank of America when accompanied by the following documentation:
1. The original Letter of Credit.
2. The signed statement of the Beneficiary worded as follows (state wording that is to appear in the statement accompanying the draft; Specify if such wording must be exact): See attached format.

8. Special Instructions:

1 - also fax copy of final documents to: attn: Ren Lapidario at fax# 410-531-4461

2 - part B of this Application and Agreement for Standby Letter of Credit is amended by the attached "Rider to Application and Agreement for Standby Letter of Credit made by W. R. Grace & Co. - Conn."

OCT 27 2004 11:22 FR BANK OF AMERICA    704 386 7515 TO 97042642405    P.04

**BankofAmerica**

06/10/02
Attn: Michael J. McKenney
Fax: 704-386-1759

From: Dale J. Robertson                    PAGE: 1
Fax: 312-974-0142

DATE: JULY 31, 2000

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER: 7403968

BENEFICIARY
NATIONAL UNION FIRE INSURANCE CO.
OF PITTSBURGH, PA
AMERICAN HOME ASSURANCE COMPANY
THE INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA
COMMERCE AND INDUSTRY INSURANCE
COMPANY
AIU INSURANCE COMPANY

BIRMINGHAM FIRE INSURANCE COMPANY
OF PENNSYLVANIA
ILLINOIS NATIONAL INSURANCE COMPANY
AMERICAN INTERNATIONAL SOUTH

INSURANCE COMPANY
NATIONAL UNION FIRE INSURANCE
COMPANY OF LOUISIANA
AMERICAN INTERNATIONAL PACIFIC

INSURANCE COMPANY
GRANITE STATE INSURANCE COMPANY
NEW HAMPSHIRE INSURANCE COMPANY
LANDMARK INSURANCE COMPANY

AND ANY OTHER AFFILIATE OF ANY OF
THESE, AS THEIR INTERESTS MAY
APPEAR
P.O. BOX 923

WALL STREET STATION
NEW YORK, NY 10268
ATTN: MR. ART STILLWELL

APPLICANT
W.R. GRACE AND COMPANY
7500 GRACE DRIVE
COLUMBIA, MD 21044

AMOUNT
USD 2,190,000.00
TWO MILLION ONE HUNDRED NINETY
THOUSAND AND 00/100'S US DOLLARS

EXPIRATION
JULY 31, 2001 AT OUR COUNTERS

WE HEREBY ESTABLISH THIS IRREVOCABLE LETTER OF CREDIT NO. 7403968 IN
FAVOR OF THE AFORESAID ADDRESSEE ("BENEFICIARY") FOR DRAWINGS UP TO
UNITED STATES DOLLARS USD.2,190,000.00 (TWO MILLION ONE HUNDRED
NINETY THOUSAND AND NO/100 UNITED STATES DOLLARS) EFFECTIVE
IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE AND PAYABLE
AT OUR OFFICE AT 231 S. LASALLE STREET, CHICAGO, ILLINOIS 60697, MAIL
CODE: IL1-231-17-00 AND EXPIRES WITH OUR CLOSE OF BUSINESS ON JULY
31, 2001.

THE TERM "BENEFICIARY" INCLUDES ANY SUCCESSOR BY OPERATION OF LAW OF
THE NAMED BENEFICIARY, INCLUDING, WITHOUT LIMITATION, ANY LIQUIDATOR,
REHABILITATOR, RECEIVER OR CONSERVATOR.

WE HEREBY UNDERTAKE TO DULY HONOR YOUR SIGHT DRAFT(S) DRAWN ON US,
INDICATING OUR CREDIT NUMBER 7403968, FOR ALL OR ANY PART OF THIS
CREDIT IF PRESENTED AT OUR OFFICE SPECIFIED IN PARAGRAPH ONE ON OR

Bank of America, N.A. Trade Operations
Mail Code: IL1-231-17-00
231 S. LaSalle Street, 17th Floor, Chicago, IL 60697

COPY

Recycled P:

19-04-0002MR33  7-1699_IU 19

**Bank of America** 

PAGE: 2

THIS IS AN INTEGRAL PART OF LETTER OF CREDIT NUMBER: 7403968

BEFORE THE EXPIRY DATE OR ANY AUTOMATICALLY EXTENDED EXPIRY DATE.

EXCEPT AS EXPRESSLY STATED HEREIN, THIS UNDERTAKING IS NOT SUBJECT TO ANY AGREEMENT, CONDITION OR QUALIFICATION. THE OBLIGATION OF BANK OF AMERICA N.A. UNDER THIS LETTER OF CREDIT IS THE INDIVIDUAL OBLIGATION OF BANK OF AMERICA N.A., AND IS IN NO WAY CONTINGENT UPON REIMBURSEMENT WITH RESPECT THERETO.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ONE YEAR FROM THE EXPIRY DATE HEREOF, OR ANY FUTURE EXPIRATION DATE, UNLESS AT LEAST THIRTY DAYS PRIOR TO ANY EXPIRATION DATE WE NOTIFY YOU BY REGISTERED MAIL OR COURIER THAT WE ELECT NOT TO CONSIDER THIS LETTER OF CREDIT RENEWED FOR ANY SUCH ADDITIONAL PERIOD.

THIS LETTER OF CREDIT IS SUBJECT TO AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, AND THE 1993 REVISION OF THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS OF THE INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION NO. 500) AND. IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL. IF THIS CREDIT EXPIRES DURING AN INTERRUPTION OF BUSINESS AS DESCRIBED IN ARTICLE 17 OF SAID PUBLICATION 500, THE BANK HEREBY SPECIFICALLY AGREES TO EFFECT PAYMENT IF THIS CREDIT IS DRAWN AGAINST WITHIN THIRTY (30) DAYS AFTER THE RESUMPTION OF BUSINESS.

IF YOU REQUIRE ANY ASSISTANCE OR HAVE ANY QUESTIONS REGARDING THIS TRANSACTION, PLEASE CALL 312-923-5885.

---------------------------
AUTHORIZED SIGNATURE

---------------------------
AUTHORIZED SIGNATURE

THIS DOCUMENT CONSISTS OF 2 PAGE(S).

Bank of America, N.A. Trade Operations
Mail Code: IL1-231-17-09
231 S. LaSalle Street, 17th Floor, Chicago, IL 60697
00-35-4782HEB 8-1999_ILL 17

COPY

♻ Recycled

OCT 27 2004 11:24 FR BANK OF AMERICA    704 386 7515 TO 97042642405          P.03/04

**Bank of America** ⬧

Application and Agreement for Standby Letter of Credit
TO: Bank of America, N.A. ("Bank of America")

| For Bank of America Use Only |
| --- |
| L/C No. _____ |

**A. Application.**

1.  W. R. Grace & Co. - Conn. _____ ("Applicant") requests Bank of America to issue an irrevocable standby letter of

Credit ("Letter of Credit") as follows:
☐ Full teat teletransmission   ☐ Airmail with brief preliminary teletransmission advice   ☐ Airmail   ☒ Courier

2. Applicant Address:                                                     3. For Account of (Name and address, if different from Applicant):

W.R. Grace & Co. - Conn.
7500 Grace Drive
Columbia, MD 21044
410-531-4000

4. Advising Bank:                                                         5. In favor of (Beneficiary Name and Address):

AIG
PO Box 923
Wall Street Station
NYC, NY 10268
attn: Art Stillwell

6. Amount: **Two Million One Hundred and Ninety Thousand Dollars**   |  $2,190,000  |
(in words and figures)

Currency:  United States Dollar
Expiration Date, Drafts to be drawn on and presented at Bank of America's Address set forth in the Letter of Credit on or before:   Jul 31, 2001

☐  If this box is marked, Applicant authorizes Bank of America to effect payment of any sums due under this Application and Agreement by
means of debiting Applicant's account with Bank of America set forth below. This authorization does not either the obligation of Applicant
to pay such sums when due, if there are insufficient funds in such account to make such payment when due, or if Bank of America fails to
debit the account, and this authorization does not affect any setoff rights of Bank of America at law or equity. Applicant's account number
with Bank of America is _____

7. Available by drafts drawn at sight on Bank of America when accompanied by the following documentation:

1. The original Letter of Credit.
2. The signed statement of the Beneficiary worded as follows (same wording that is to appear in the statement accompanying the draft; Specify if
such wording must be exact):   **SEE ATTACHED**

8.  Special Instructions:

1 - also fax copy of final documents to attn: Martin Hunter at fax# 410-531-4461

2 - part B of this Application and Agreement for Standby Letter of Credit is amended by the attached "Rider to Application
and Agreement for Standby Letter of Credit made by W. R. Grace & Co. - Conn."

**B. Agreement.**

In consideration of Bank of America's issuing the Letter of Credit at the request of Applicant, Applicant agrees to the following:

**1.** Applicant Payments.

*(a)* Applicant shall pay Bank of America, on demand, at each place specified by Bank of America under or in respect of the Letter of Credit.

*[body text illegible due to document quality]*

** TOTAL PAGE.04 **

DEC 19 2002 11:54 FR BANK OF AMERICA    3129740142 TO 917044090904    P.02



# Bank of America

DATE   **SEPTEMBER 16, 2002**

AMENDMENT TO IRREVOCABLE DOCUMENTARY CREDIT NUMBER 07404163

BENEFICIARY
NATIONAL UNION FIRE INSURANCE CO.
OF PITTSBURGH, PA
AMERICAN HOME ASSURANCE COMPANY
THE INSURANCE COMPANY OF THE STATE

APPLICANT
W.R. GRACE AND CO. - CONN
7500 GRACE DRIVE
COLUMBIA, MD 21044

EXPIRY
SEPTEMBER 15, 2003

DEAR SIR(S),

THIS AMENDMENT IS TO BE CONSIDERED AS PART OF THE ABOVE LETTER OF CREDIT AND MUST BE ATTACHED HERETO.

THE ABOVE NAMED LETTER OF CREDIT IS AMENDED AS FOLLOWS:

VALIDITY EXTENDED TO: SEPTEMBER 15, 2003

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

BANK OF AMERICA

------------------------------------
FOR CASHIER

------------------------------------
FOR CASHIER

Bank of America, N.A. Trade Operations
Mail Code: IL1-231-17-00
231 S. LaSalle Street, 17th Floor, Chicago, IL 60697

00-33-0201 (REV) P-1999_IL1 17

** TOTAL PAGE.02 **

OCT 27 2004 11:25 FR BANK OF AMERICA     704 386 7515 TO 97042642405     P.02/04

**BankofAmerica**

PAGE: 1

DATE: SEPTEMBER 15, 2000

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER: 7404163

| BENEFICIARY | APPLICANT |
|---|---|
| NATIONAL UNION FIRE INSURANCE CO. | W.R. GRACE AND CO. - CONN |
| OF PITTSBURGH, PA | 7500 GRACE DRIVE |
| AMERICAN HOME ASSURANCE COMPANY | COLUMBIA, MD 21044 |
| THE INSURANCE COMPANY OF THE STATE | |

OF PENNSYLVANIA
COMMERCE AND INDUSTRY INSURANCE
COMPANY
AIU INSURANCE COMPANY

BIRMINGHAM FIRE INSURANCE COMPANY
OF PENNSYLVANIA
ILLINOIS NATIONAL INSURANCE COMPANY
AMERICAN INTERNATIONAL SOUTH

INSURANCE COMPANY
NATIONAL UNION FIRE INSURANCE
COMPANY OF LOUISIANA
AMERICAN INTERNATIONAL PACIFIC

INSURANCE COMPANY
GRANITE STATE INSURANCE COMPANY
NEW HAMPSHIRE INSURANCE COMPANY
LANDMARK INSURANCE COMPANY,

AND ANY OTHER AFFILIATE OF ANY OF
THESE, AS THEIR INTERESTS MAY
APPEAR
P.O. BOX 923

WALL STREET STATION
NEW YORK, N.Y. 10268
ATTN: MR. ART STILLWELL

AMOUNT
USD 6,000,000.00
SIX MILLION AND 00/100'S US DOLLARS

EXPIRATION
SEPTEMBER 15, 2001 AT OUR COUNTERS

WE HEREBY ESTABLISH THIS IRREVOCABLE LETTER OF CREDIT IN FAVOR OF THE
AFORESAID ADDRESSEE ("BENEFICIARY") FOR DRAWINGS UP TO UNITED STATES
DOLLARS 6,000,000.00 (SIX MILLION AND NO/100 UNITED STATES DOLLARS)
EFFECTIVE IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE
AND PAYABLE AT OUR OFFICE AT 231 S. LASALLE STREET, CHICAGO, ILLINOIS
60697, MAIL CODE: ILL-231-17-00 AND EXPIRES WITH OUR CLOSE OF
BUSINESS ON SEPTEMBER 15, 2001.

THE TERM "BENEFICIARY" INCLUDES ANY SUCCESSOR BY OPERATION OF LAW OF
THE NAMED BENEFICIARY, INCLUDING, WITHOUT LIMITATION, ANY LIQUIDATOR,
REHABILITATOR, RECEIVER OR CONSERVATOR.

WE HEREBY UNDERTAKE TO PROMPTLY HONOR YOUR SIGHT DRAFT(S) DRAWN ON
US, INDICATING OUR CREDIT NUMBER 7404163, FOR ALL OR ANY PART OF THIS
CREDIT IF PRESENTED AT OUR OFFICE SPECIFIED IN PARAGRAPH ONE ON OR
BEFORE THE EXPIRY DATE OR ANY AUTOMATICALLY EXTENDED EXPIRY DATE.

Bank of America, N.A., Trade Operations
Mail Code: IL-231-245-02
231 S. LaSalle Street and. 17th Floor, Chicago, IL 60697

COPY

♻ Recycled Paper

OCT 27 2004 11:26 FR BANK OF AMERICA    704 386 7515 TO 97042642405    P.03/04

**Application and Agreement for Standby Letter of Credit**
TO: Bank of America, N.A. ("Bank of A   rica")

| LC N° | 74P 4163 |

Doc TRK 6560582

**A. Application.**

1. __W. R. Grace & Co. - Conn__ ("Applicant") requests Bank of America to issue an irrevocable standby letter of Credit ("Letter of Credit") as follows:

☐ Full wire telecommunication    ☐ Airmail with brief preliminary telecommunication advice    ☐ Airmail    ☒ Courier

2. Applicant Address:                                   3. For Account of (Name and address, if different from Applicant):

__W.R. Grace & Co. - Conn__

__7500 Grace Drive__

__Columbia, MD  21044__

__410-531-4000__

4. Advising Bank:                                       5. In favor of (Beneficiary Name and Address):
                                                           See attached format

6. Amount    __Six million dollars__                                      ( __$6,000,000__ )
(in words and figures)

Currency    __United States Dollar__

Expiration Date. Drafts to be drawn on and presented at Bank of America's Address set forth in the Letter of Credit on or before:    1 year after LC is issued

☐ If this box is marked, Applicant authorizes Bank of America to effect payment of any sums due under this Application and Agreement by means of debiting Applicant's account with Bank of America set forth below. This authorization does not affect the obligation of Applicant to pay such sums when due, if there are insufficient funds in such account to make such payment when due, or if Bank of America fails to debit the account, and this authorization does not affect any setoff rights of Bank of America at law or equity. Applicant's account number with Bank of America is _____

7. Available by drafts drawn at sight on Bank of America when accompanied by the following documentation:

    1. The original Letter of Credit.

    2. The signed statement of the Beneficiary worded as follows (state wording that is to appear in the statement accompanying the draft. Specify if such wording must be exact): See attached format.

8. Special Instructions:

    1 - Also fax copy of final documents to attn: Ron Lapidario at fax# 410-531-4461

    2 - part B of this Application and Agreement for Standby Letter of Credit is amended by the attached "Rider to Application and Agreement for Standby Letter of Credit made by W. R. Grace & Co. - Conn."

| **RELEASED** |
| S. Perez |
| GP  9 - 15-04 |
| Standby - Chicago |

This Application and Agreement is executed by Applicant on ____ Sep. 13, 00

R. Strano & Co., Conn

BANK (Print Name)                    (Bank Address)

# EXHIBIT B

# REIMBURSEMENT AGREEMENTS

**Bank of America** ⬟⬟⬟

**Application and Agreement for Standby Letter of Credit**
TO: Bank of America, N.A. ("Bank of America")

For Bank of America Use Only

L/C No. _____

## A. Application.

1. _____ ("Applicant") requests Bank of America to issue an irrevocable standby letter of credit ("Letter of Credit") as follows:

☐ Full text teletransmission          ☐ Airmail with brief preliminary teletransmission advice          ☐ Airmail          ☐ Courier

2. Applicant Address:

_____
_____
_____
_____
_____

3. For Account of (Name and address, if different from Applicant):

_____
_____
_____
_____
_____

4. Advising Bank:

_____
_____
_____
_____
_____

5. In favor of (Beneficiary Name and Address):

_____
_____
_____
_____
_____

6. Amount: _____ ( _____ )
                      (in words and figures)

Currency _____
                      (if left blank, U.S. Dollars)

Expiration Date. Drafts to be drawn on and presented at Bank of America's Address set forth in the Letter of Credit on or before: _____

☐   If this box is marked, Applicant authorizes Bank of America to effect payment of any sums due under this Application and Agreement by means of debiting Applicant's account with Bank of America set forth below. This authorization does not effect the obligation of Applicant to pay such sums when due, if there are insufficient funds in such account to make such payment when due, or if Bank of America fails to debit the account, and this authorization does not affect any setoff rights of Bank of America at law or in equity. Applicant's account number with Bank of America is _____

7. Available by drafts drawn at sight on Bank of America when accompanied by the following documentation:

   a. The original Letter of Credit.

   b. The signed statement of the Beneficiary worded as follows (state wording that is to appear in the statement accompanying the draft; specify if such wording must be exact):

8.   Special Instructions:

## B. Agreement.

In consideration of Bank of America's issuing the Letter of Credit at the request of Applicant, Applicant agrees to the following:

1. **Applicant Payments.**

(a) Applicant shall pay Bank of America, on demand, all amounts paid by Bank of America under or in respect of the Letter of Credit.

(b) On each fee payment date, so long as any undrawn amount of the Letter of Credit remains available, Applicant shall pay Bank of America a Letter of Credit fee. The fee payment date(s) shall be the date(s) as Applicant and Bank of America may agree, or in the absence of such agreement, the fee payment date shall be the date on which Bank of America issues the Letter of Credit. The fee shall be at such rate per annum as Applicant and Bank of America may agree or, in the absence of such agreement, at the rate customarily charged by Bank of America for letters of credit to applicants of similar financial standing or creditworthiness, as determined by Bank of America in its sole discretion. The applicable Letter of Credit fee shall be calculated and payable on the undrawn amount of the Letter of Credit as of each fee payment date, and shall be for the period commencing on such fee payment date and ending on the day preceding the next fee payment date (or the expiration date of the Letter of Credit, as the case may be), both dates inclusive. The Letter of Credit fee will be computed on the basis of a 360-day year and actual days elapsed. Bank of America shall not be required to refund any portion of the Letter of Credit fee paid for any period during which (a) the Letter of Credit expires or otherwise terminates or (b) the undrawn amount of the Letter of Credit is reduced by drawings or by amendment.

(c) Applicant shall pay Bank of America, on demand, commissions and fees for amendments to, payments under, extensions of or cancellation of the Letter of Credit, and other services in the amounts customarily charged by Bank of America may agree or, in the absence of such agreement, in the amounts customarily charged by Bank of America on the date of Bank of America's demand.

(d) All payments and deposits of any kind by Applicant under this Application and Agreement, including prepayments, shall be made at the banking center or office Bank of America may designate from time to time. Bank of America shall have no obligation to pay Applicant interest on any such payment, prepayment or deposit made by Applicant under this Application and Agreement.

(e) (i) All payments and deposits by Applicant under this Application and Agreement shall be in the currency in which the Letter of Credit is payable, except that Bank of America may, at its option, require payments and deposits by Applicant under this Application and Agreement to be made in U.S. Dollars if the Letter of Credit is payable in a foreign currency.

(ii) The amount of each payment and each deposit by Applicant under this Application and Agreement in U.S. Dollars for a Letter of Credit payable in a foreign currency shall be determined by converting the relevant amount to U.S. Dollars at the Conversion Rate in effect:

(A) with respect to each payment under Section 1(a) of this Agreement, on the date the payment is made by Bank of America under or in respect of the Letter of Credit; and

(B) with respect to each payment not falling under the preceding clause (A) and each deposit, on the date of Bank of America's demand for such payment or deposit.

(iii) If a U.S. Dollar deposit by Applicant under this Application and Agreement for a Letter of Credit payable in a foreign currency becomes less than the U.S. Dollar equivalent of the undrawn amount of the Letter of Credit because of any variation in rates of exchange, Applicant shall deposit with Bank of America, on demand, additional amounts in U.S. Dollars so that the total amount deposited by Applicant under this Application and Agreement is not less than the U.S. Dollar equivalent of the undrawn amount of the Letter of Credit, determined by using the Conversion Rate on the date of Bank of America's latest demand.

(iv) "Conversion Rate" means the rate quoted by Bank of America for the purchase from Bank of America of the relevant foreign currency with U.S. Dollars.

(f) Applicant shall reimburse or compensate Bank of America, on demand, for all costs incurred, losses suffered and payments made by Bank of America which are applied or allocated by Bank of America to the Letter of Credit (as determined by Bank of America) by reason of any and all present or future reserve, capital, deposit, assessment or similar requirements against (or against any class of or change in or in the amount of) assets or liabilities of, or commitments or extensions of credit by, Bank of America.

(g) Applicant shall pay interest, on demand, on any amount not paid when due under this Application and Agreement from the due date until payment in full at a rate per annum equal to the rate of interest publicly announced from time to time by Bank of America as its prime rate, plus three percentage points (not to exceed the maximum rate permitted by applicable law). The prime rate is set by Bank of America based on various factors, including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some credits. Bank of America may price credit at, above or below the prime rate. Any change in Bank of America's prime rate shall take effect at the opening of business on the day specified in Bank of America's public announcement of a change in Bank of America's prime rate. Interest will be computed on the basis of a 360-day year and actual days elapsed.

2. **Deposit Events.** Upon the occurrence of any of the following events, Applicant shall deposit with Bank of America, on demand (except that such demand shall not be required in the event of an occurrence described in (b) below) and as cash security for Applicant's obligations to Bank of America under this Application and Agreement, an amount equal to the undrawn amount of the Letter of Credit:

(a) Applicant defaults under any provision of this Application and Agreement;

(b) Any bankruptcy or similar proceeding is commenced with respect to Applicant;

(c) Any default occurs under any other agreement involving the borrowing of money or the extension of credit under which Applicant may be obligated as borrower, installment purchaser or guarantor, if such default consists of the failure to pay any indebt-edness when due or if such default permits or causes the acceleration of any indebtedness or the termination of any commitment to lend or to extend credit;

(d) Applicant or any of its affiliates defaults on any other obligation to Bank of America;

(e) In the opinion of Bank of America, any material adverse change occurs in Applicant's business, operations, financial condition or ability to perform its obligations under this Application and Agreement;

(f) Any guarantee of Applicant's obligations under this Application and Agreement terminates, is revoked or its validity is contested by the guarantor, or any of the events set forth in (b) through (e) above occur with respect to the guarantor rather than the Applicant; or

(g) Any court order, injunction or other legal process is issued restraining or seek-ing to restrain drawing or payment under the Letter of Credit.

3. **Charge to Accounts.** If Bank of America is unable to debit the account, if any, specified on the Application, Applicant authorizes Bank of America to charge any of Applicant's accounts with Bank of America, or any affiliate of Bank of America, for all amounts then due and payable to Bank of America under this Application and Agreement.

4. **Indemnities.**

(a) Applicant will indemnify and hold Bank of America (such term to include for purposes of this Section 4 affiliates of Bank of America and its affiliates' officers, directors, employees and agents) harmless from and against (i) all loss or damage arising out of the issuance by Bank of America, or any other action taken by any such indemnified party in connection with the Letter of Credit including any loss or damage arising in whole or in part from the negligence of the party seeking indemnification, but excluding any loss or damage resulting from the gross negligence or willful misconduct of the party seeking indemnification, and (ii) all costs and expenses (including reasonable attorneys' fees and allocated costs of in-house counsel and legal expenses) of all claims or legalproceedings arising out of the issuance by Bank of America, of the Letter of Credit or incident to the collection of amounts owed by Applicant hereunder or the enforcement of the rights of Bank of America hereunder, including, without limitation, legal proceedings related to any court order, injunction, or other process or decree restraining or seeking to restrain Bank of

America from paying any amount under the Letter of Credit. Additionally, Applicant will indemnify and hold Bank of America harmless from and against all claims, losses, damages, suits, costs or expenses (including reasonable attorneys' fees and allocated costs of in-house counsel, and legal expenses) arising out of Applicant's failure to timely procure licenses or comply with applicable laws, regulations or rules, or any other conduct or failure of Applicant relating to or affecting the Letter of Credit.

(b) If any award, judgment or order is given or made for the payment of any amount due under this Application and Agreement and such award, judgment or order is expressed in a currency other than the currency required under this Application and Agreement, Applicant shall indemnify Bank of America against and hold Bank of America harmless from all loss and damage incurred by Bank of America as a result of any variation in rates of exchange between the date of such award, judgment or order and the date of payment (or, in the case of partial payments, the date of each partial payment thereof) in the required currency

(c) Each of these indemnities shall constitute an obligation separate and independent from the other obligations contained in this Application and Agreement, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by Bank of America from time to time, and shall continue in full force and effect notwithstanding any award, judgment or order for a liquidated sum in respect of an amount due under this Application and Agreement.

5. **Governing Law and Rules.** The Letter of Credit will be subject to, and performance under the Letter of Credit by Bank of America, its correspondents, and the beneficiary will be governed by, the rules of the "International Standby Practices 1998" ("ISP98") or such later revision as may be published by the Institute of International Banking Law & Practice, subject to applicable laws. The Letter of Credit and this Application and Agreement shall be governed by and construed under the laws of the state in the United States where Bank of America issues the Letter of Credit, without reference to that state's provisions regarding conflicts of laws, to the jurisdiction of which the parties hereto submit. If the Letter of Credit is not issued in any state, the law of the State of California will govern.

6. **Applicant Status.** The word "Applicant" in this Application and Agreement refers to each signer (other than Bank of America) of this Application and Agreement. If this Application and Agreement is signed by more than one Applicant, their obligations under this Application and Agreement shall be joint and several.

7. **Representations and Warranties.** Applicant represents and warrants to Bank of America that it has the authority to enter into this Application and Agreement and that such Agreement will not violate or conflict with any of the provisions of its constituent documents or any other agreement or undertaking to which it is a party or to which it is bound.

8. **Miscellaneous.**

(a) No delay, extension of time, renewal, compromise or other indulgence which may occur or be granted by Bank of America shall impair the rights and powers of Bank of America hereunder. Bank of America shall not be deemed to have waived any of its rights hereunder, unless Bank of America shall have signed such waiver in writing.

(b) Any notice from Bank of America to Applicant shall be sent to the address of Applicant set forth on the Application and shall be effective upon receipt by Applicant. Any notice from Applicant to Bank of America shall be sent to the address of Bank of America specified by Bank of America to Applicant and shall be effective upon receipt by Bank of America.

(c) Each provision of this Application and Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Application and Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Application and Agreement.

(d) Any and all payments made to Bank of America hereunder shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding income or franchise taxes imposed by the United States and any political subdivisions thereof (such nonexcluded taxes being herein called "Taxes"). If Applicant shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 8(d)), Bank of America shall receive an amount equal to the sum Bank of America would have received had no such deductions been made, (ii) Applicant shall make such deductions, and (iii) Applicant shall pay the full amount deducted to the relevant authority in accordance with applicable law. Applicant will indemnify Bank of America for the full amount of Taxes (including, without limitation, any Taxes imposed by any jurisdiction on amounts payable under this Section 8(d)) paid by Bank of America and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date Bank of America makes written demand therefor. Within 30 days after the date of any payment of Taxes, Applicant will furnish to Bank of America the original or a certified copy of a receipt evidencing payment thereof.

(e) This Application and Agreement shall be binding upon Applicant, its successors and assigns, and shall inure to the benefit of Bank of America, its successors, transferees and assigns; provided that any assignment by Applicant of any of its rights or obligations under this Application and Agreement without the prior written consent of Bank of America shall be void.

(f) Unless the Applicant has specified in the Application that the wording of the Letter of Credit must be exact, Applicant understands that the final form of the Letter of Credit may vary from the wording specified in the Application, and Applicant authorizes Bank of America to make such changes, not materially inconsistent with the Application, which Bank of America deems necessary or appropriate. Applicant understands that the risk to Applicant is greater if Applicant requests a standby letter of credit which requires only a draft, rather than a standby letter of credit which requires supporting documentation.

(g) In the event of any change or modification, with the consent of Applicant, which consent may be given by any means of submission acceptable to Bank of America, including, without limitation, computer, facsimile or telex, relative to the Letter of Credit or any instrument called for hereunder, including any waiver made or in good faith believed by Bank of America to have been made by Applicant of any term hereof or the noncompliance of any such instruments with the terms of the Letter of Credit, this Application and Agreement shall be binding upon Applicant with regard to the Letter of Credit as so changed or modified, and to any action taken by Bank of America or any of its correspondents relative thereto. No term or provision of this Application and Agreement can be changed orally, but only in a writing and signed by Applicant and Bank of America.

(h) Bank of America assumes no liability or responsibility for the consequences arising out of delay and/or loss in transit of any message, letter or documentation, or for delay, mutilation or other error arising in the transmission of any teletransmission. In no event shall Bank of America be liable for any special, indirect, consequential or exemplary damages.

(i) If Applicant includes in the Application any language describing events or conditions that would not be possible for Bank of America to verify solely from the documents required to be presented under the Letter of Credit, Applicant acknowledges and agrees that Bank of America has no obligation to verify compliance with such requirements.

NOTICE OF FINAL AGREEMENT. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

This Application and Agreement is executed by Applicant on _____

Name of Applicant

By:                                               Title

Name of Applicant (if any, co-signing with the Applicant above)

By:                                               Title

(WHERE SPECIMEN SIGNATURES OF THE APPLICANT NAMED ABOVE ARE NOT ON FILE WITH BANK OF AMERICA, THE FOLOWING SIGNATURE VERIFICATION IS REQUIRED.)

The above signature of an officer, partner or agent of each Applicant indicated above confirms to that on file with us and such officer, partner or agent is fully authorized to sign this Agreement for such Applicant.

By:    BANK (Full Name)              (Bank Address)

Authorized Signature/Title (Specimen signature of the signer must be on file with Bank of America)
05-35-0521BW    05-2001

| FOR OFFICE USE ONLY | | | |
|---|---|---|---|
| 05-35-0521BW: | ☐ Trade Operations | Mail Code# | |
| COMMISSION | ☐ Per Standard Fee Schedule  ☐ Charge Directly | ☐ Other  ☐ Commissions and Charges only | ☐ Charge Banking Center  ☐ Drawings, Commissions and Charges |
| APPROVING OFFICER (Printed Name) | | PHONE # | |
| OFFICER TELEPHONE # | | FAX # | |
| DDA APPLICANT A/C # | | | |
| APPROVING BANK OFFICER SIGNATURE | | | |
| OFFICER – INTEROFFICE ADDRESS | | | |
| OFFICER NUMBER AND COST CENTER NUMBER | | | |

Bank of America, N.A.

Cited Transcript Pages

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                            .        Case No.  01-1139 (JKF)
                                  .
W.R. GRACE & CO.,                 .
et al.,                           .        USX Tower - 54th Floor
                                  .        600 Grant Street
                                  .        Pittsburgh, PA 15219
              Debtors.   .
                                  .        September 16, 2009
. . . . . . . . . . . . . ..               9:09 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:              Kirkland & Ellis, LLP
                              By:  DAVID BERNICK, ESQ.
                              200 East Randolph Drive
                              Chicago, IL  60601

For the Asbestos              Caplin & Drysdale, Chartered
Creditors Committee:          By:  NATHAN FINCH, ESQ.
                                   JAMES WEHNER, ESQ.
                              One Thomas Circle, NW
                              Washington, D.C. 20005

For the Future               Orrick, Herrington & Sutcliffe, LLP
Claimants                    By:  ROGER FRANKEL, ESQ.
Representatives:                  JONATHAN GUY, ESQ.
                              Washington Harbour
                              3050 K Street, N.W.
                              Washington, D.C.  20007


Audio Operator:               Janet Heller

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

1 plan document, with respect to the assets that are going into
2 the PI trust, asbestos PI trust.  And, obviously, in connection
3 with looking at the estimation reports, also obviously read
4 those estimation -- the actual reports.

5 Q    I'm showing you the Plan Proponents' Demonstrative 511-6,
6 could you tell us what is reflected in that document?

7 A    This page shows the ranges, or certain of the ranges that
8 were set forth, I believe, in connection with the estimation
9 hearing either expert reports or rebuttal reports as to the
10 estimates of asbestos personal injury liabilities ranging from
11 a -- for purposes of this chart a low of $200 million to a high
12 of $6.2 billion.

13 Q    Okay.  At any point in time has the extent of Grace's
14 personal injury liabilities, absent a plan that is confirmed,
15 has the -- as an estimate -- strike that.  Has an estimate of
16 Grace's personal liability injuries actually been fixed?

17 A    No, it has not.

18 Q    As of this point in time, absent a plan of reorganization
19 that is confirmed, as a financial advisor and an expert in
20 restructuring, is there any methodology that you're aware of
21 that can be used to establish exactly or even approximately
22 what that personal injury ultimate -- liability ultimately
23 would be determined to be?

24 A    No, there is not.

25 Q    Based upon the current state of affairs with these

**J&J COURT TRANSCRIBERS, INC.**

1 different estimates that are out there, is it possible to

2 render an opinion, a formal opinion, regarding Grace's

3 solvency?

4 A    No, I don't believe it is.

5 Q    Now, are you familiar with the fact that the plan of

6 reorganization that's been proposed in this case spells out a

7 rate of interest for -- post-petition interest to be paid to

8 the general and secured creditors?

9 A    Yes, I'm aware of that.

10 Q    And within that, are you aware of the rate that is

11 specified for the debt holders, in particular?

12 A    Yes, I'm aware of that.

13 Q    Okay.  And what is that rate?

14 A    The plan provides for a rate that beginning as of the

15 petition date was 6.09 percent, compounded annually, and then

16 beginning, I believe, January 1st, 2006, that rate now floats

17 with prime, also compounded annually.

18 Q    Okay.

19 A    Quarterly -- compounded quarterly, I'm sorry.

20 Q    Turning to Plan Proponents' Exhibit 511-7 for

21 demonstrative purposes.  And I'd say, Your Honor, this is a

22 chart that we've created for demonstrative purposes, not

23 representing that it was prepared by Ms. Zilly.

24          THE COURT:  It's not on yet.

25 Q    Now, let me ask you some questions, I've put on the

1  accepting it as an opinion.  I'm just accepting it as what she
2  was doing in analyzing the best interest test in her report.
3  Okay.

4  Q    In addition, Ms. Zilly, you are the debtor's sole expert
5  witness with regard to solvency, that's correct?

6  A    That's correct.

7  Q    And you've submitted in that context your expert rebuttal
8  report to Mr. Frezza, the committee's expert and the lender's
9  expert, and you've also submitted an affidavit in connection
10  with the debtor's objection to the bank lender's proofs of
11  claim, correct?

12  A    That's correct.

13  Q    Now, in performing all of the analysis and preparing and
14  reviewing the financial reports, spread sheets, cash flows, all
15  of the items that we just discussed and referenced, you will
16  agree that you have never performed a solvency analysis of
17  Grace?

18  A    I have not performed a complete solvency analysis of
19  Grace, that's correct.

20  Q    I'm sorry, did you say a complete solvency analysis of
21  Grace or you --

22  A    Yes, in my view there are several tests for solvency.

23  Q    So, in your view there are simple tests for solvency?

24  A    Several.

25  Q    Several, okay.  Thank you.  And you would agree that

**J&J COURT TRANSCRIBERS, INC.**

1  you're offering no opinion in this confirmation process with

2  regard to whether Grace is solvent?

3  A    That is correct.

4  Q    And you also are offering no opinion as to whether Grace

5  is insolvent?

6  A    That is correct.

7  Q    As of any date with respect to both of those questions?

8  A    I'm offering a rebuttal to Mr. Frezza's report.

9  Q    And you will agree with me that for purposes of the plan

10 that is before the Court -- I think it's be referred to as the

11 joint plan, I'll call it the plan for purposes of our

12 discussion -- that for purposes of the plan, the Court must

13 determine whether Grace will be solvent as of the effective

14 date of the plan, correct?

15       MR. BERNICK:  Objection, calls for the witness to

16 discuss procedures that the Court may or may not follow.

17 That's not an appropriate question for an expert in this case.

18       MR. COBB:  Your Honor, she's a -- she's been offered

19 as a financial restructuring expert.

20       THE COURT:  Yes, but --

21       MR. COBB:  She has extensive expertise apparently in

22 -- not only in testifying in bankruptcy processes, but also in

23 providing advice --

24       THE COURT:  Yes.

25       MR. COBB:  -- in connection with the bankruptcy.

Zilly - Cross/Cobb                    138

1 BY MR. COBB:

2 Q    Ms. Zilly, assuming that the plan is confirmed and goes

3 effective, isn't it true that as of the effective date of the

4 plan Grace will have the ability to pay its debts as and when

5 they come due?

6 A    That is my opinion in my feasibility report assuming

7 confirmation of the plan and consummation of the plan.

8 Q    And isn't it true that there's no difference between that

9 conclusion in your feasibility analysis and the conclusion that

10 would be reached if a solvency analysis was performed using the

11 same test, that is, Grace's ability to pay its debts as and

12 when they come due on the effective date?

13        MR. BERNICK:  I'm sorry.  So, object to the form of

14 the question.  If you make the assumption that the test of

15 solvency is identical to the test of feasibility, then the

16 question is -- it states a truism.  So, I don't believe that

17 you're asking for a truism, so I don't understand what the

18 incremental evidence that you're asking for from this witness

19 is.  Object to the form of the question.

20 Q    I'll restate it and try it a different way.  Is there any

21 difference, Ms. Zilly, between the solvency test of a company's

22 ability to pay its debts, when due, and under a feasibility

23 analysis a company's ability to pay its debts when due,

24 speaking generally, not of Grace?

25 A    No.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  No, obviously not.

2          MR. PASQUALE:  The fact that it's Mr. Frezza's first

3    time --

4          THE COURT:  That has --

5          MR. PASQUALE:  -- has explained -- I'm sorry, Your

6    Honor.

7          THE COURT:  That has no bearing on this

8    determination.  The problem is that he said in his deposition

9    that he is not an expert.  He does not hold himself out to be

10   an expert in quantifying liabilities.  I don't know how you do

11   a solvency analysis without quantifying liabilities.  So, okay,

12   go ahead.

13   BY MR. PASQUALE:

14   Q    I think the question I left you with, Mr. Frezza, is, in

15   considering solvency of the plan before the Court, on what date

16   did you test solvency?

17   A    Upon the effective date of the proposed plan.

18   Q    And what date is that?

19   A    12/31/2009.

20         MR. BERNICK:  The effective date -- can we be clear

21   that that is -- assumes that the plan has gone into effect?

22         THE WITNESS:  That's correct.

23         MR. BERNICK:  Thank you.

24         THE COURT:  And what date, Mr. Frezza?

25         THE WITNESS:  December 31st, 2009.

1  Q    Did you form an opinion as to whether Grace will be
2  solvent on the effective date of the plan now being considered
3  by the Court?

4  A    I did.

5  Q    What is your opinion?

6  A    That Grace --

7       MR. BERNICK:  Can we just -- sorry.  It would solve
8  the objection problem if he could just say assuming the plan
9  was effective because --

10      MR. PASQUALE:  All of my questions for Mr. Frezza
11  will assume that the plan is confirmed and becomes effective.

12      MR. BERNICK:  Thank you very much.

13 A    Could you repeat your question, Mr. Pasquale?

14 Q    I asked you, I believe, what is your opinion?

15 A    In my opinion, upon the effective date Grace will be
16 solvent.

17 Q    What did you do to form that opinion?

18 A    I did a number of things.  I performed a number of tests
19 that are commonly done in forming an opinion on solvency.

20 Q    Please describe those tests.

21 A    Let me describe the tests.  The three most common tests
22 are the cash flow test -- what is commonly known as the cash
23 flow test or the ability to pay debts as they come due.  The
24 adequate capital test which is more of a qualitative test of
25 considerations -- various considerations that are professional

**J&J COURT TRANSCRIBERS, INC.**

1 we'll take into consideration in forming an opinion.  And
2 finally, a balance sheet test.

3 Q    Let me ask you about each of those, one by one.  Please
4 describe for the Court what is entailed with a cash flow test
5 of solvency.

6 A    A cash flow test is designed -- the professional would
7 approach it by reviewing a cash flow forecast prepared by the
8 company, evaluating whether the forecast makes sense,
9 critically challenging the underlying assumptions, considering
10 sensitivities to that forecast in view of the company's
11 historical performance.  And once you've considered those
12 factors and form an opinion as to whether the company is able
13 to at a particular test date as well as in the future able to
14 meet its obligations as they come due.

15 Q    Is there anything else involved in the cash flow test?
16 A    And that's principally the cash flow test.

17 Q    Please describe for the Court the components, or what you
18 do in performing an adequate capital test of solvency.

19 A    The adequate capital test is more of a qualitative test
20 whereby the professional would consider, for instance, the
21 results of the cash flow test which is more quantitative.  In
22 addition, you would look to see what indicators would allow one
23 to determine whether a company is solvent or insolvent such as,
24 does the company have cash on its balance sheet.  Does the
25 company have access to a revolver in order to fund debts as

1 they come due in excess of cash for instance.  Does the company

2 have credit terms from its vendors.  Does the company have an

3 equity cushion that would be determined based on the balance

4 sheet test which we'll discuss in a moment, and various other

5 factors.

6          One might look at various ratios, as well, whether

7 the company's current assets exceed its current liabilities and

8 so forth.  So, that -- and once you take those data points into

9 consideration, it would allow the professional to form an

10 opinion on whether the company passes the capital test.

11 Q    Thank you.  And you mentioned in passing the third of the

12 test, the balance sheet test, please describe that test for the

13 Court.

14 A    In general, the balance sheet test is a test to determine

15 whether the company -- the company's assets exceed its

16 liabilities at a test date.  And taking that one step further,

17 the balance sheet test can be administered in up to three

18 different ways in its most common form.  Those three methods

19 that could be performed under the balance sheet test include

20 the market approach, the income approach, and the cost

21 approach.

22 Q    I'll stop you there.  Let's break that down.  Please

23 describe for the Court the market approach to the balance sheet

24 test.

25 A    Certainly.  In the market approach the professional would

1  analyze peer group companies or guideline companies that are

2  comparable to the company being tested and review, for

3  instance, their enterprise value and compare that to the

4  company's EBITDA, earnings before interest, taxes,

5  depreciation, and amortization.

6           And after reviewing those companies, determine sort

7  of a mean and median multiple of EBITDA to enterprise value of

8  those entities.  In addition, the professional would look to

9  precedent transactions or MNA transactions in the market that

10 would be indicative of a value for the target company or the

11 company being discussed for solvency.

12          And one would take the combination of the results of

13 those two analyses and determine a range of multiples to apply

14 to, for instance, Grace's EBITDA, for let's say all of 2009.

15 And then that would result in what would be called enterprise

16 value.  In the market approach to the balance sheet test,

17 enterprise value is a proxy for the fair value of the assets.

18 when you're performing the balance sheet test in each case, one

19 must look to the fair value of the assets.  Not the book value,

20 but the fair value of those assets in determining whether the

21 company has -- is solvent in terms of assets exceeding

22 liabilities, and by how much those assets exceed liabilities,

23 which is also referred to as an equity cushion.

24 Q    Now, you mentioned also the income approach.  Can you

25 please describe the income approach?

**J&J COURT TRANSCRIBERS, INC.**

1 A    Sure.  The income approach is an approach whereby you
2 would take the company's detailed financial projections over
3 whatever period is involved -- or available.  Excuse me -- and
4 also taking a terminal value year which is to -- the terminal
5 value year is generally thought to be the normalized income
6 statement performance of a company ad infinitum.

7          And then a professional would perform a discounted
8 cash flow analysis on those projections, including the terminal
9 year, and come up with and apply an appropriate discount
10 factor.  And then determine a -- again, an enterprise value
11 which again would be the proxy for asset value -- fair value of
12 assets.  And then --

13 Q    And finally -- I'm sorry.  Were you finished?
14 A    And then, again, there would be an examination of
15 liabilities against those assets to determine what the equity
16 cushion is on the income approach.

17 Q    Thank you.  And finally is the cost approach.  Can you
18 please describe the cost approach?

19 A    Sure.  Under the cost approach one would take the
20 traditional stated balance sheet as of the test date, in this
21 case 12/31/2009 projected pro forma balance sheet, and one
22 would need to seek to find the fair value of those assets,
23 compare them to the stated liabilities as reported, and
24 determine what the equity cushion is.

25          And the thought under the cost approach is, what

**J&J COURT TRANSCRIBERS, INC.**

1 would it cost the willing buyer to replace these assets because

2 the book value of a company's assets, depending on the asset

3 class, typically are lower than fair value.  So, one would need

4 appraisals or a business valuation of the assets to determine

5 what the fair value of those assets would be under the cost

6 approach and then compare the stated liabilities on the balance

7 sheet to determine the equity cushion.

8 Q    Let me ask you, Mr. Frezza -- well, a foundational

9 question first.   What is GAAP?

10 A    GAAP stands for generally accepted accounting principles,

11 and it is the codification of accounting principles by which

12 all United States reporting companies, and even companies that

13 don't report, use to record transactions and report their

14 financial statements.

15 Q    And are you familiar with the GAAP principles?

16 A    Yes, I am.

17 Q    How do GAAP principles, if at all, impact a balance sheet

18 test?

19 A    Under GAAP, typically -- well, again, there are 161

20 statements of financial accounting standards that have to be

21 applied.  Many of them are for specific purposes or specific

22 accounting issues, but the entire codification of GAAP requires

23 assets to be recorded on the books at the most conservative

24 value, for instance, the lowest value possible.

25           And just to provide an example, for instance,

**J&J COURT TRANSCRIBERS, INC.**

1  inventory -- let's say a company has inventory that is a highly
2  traded commodity.  GAAP requires that inventory to be recorded
3  at the lower of cost or market.  So, if the market value of
4  that inventory is actually higher than book value, the book
5  value is used.  If the market value of that inventory is below
6  its cost of the company, then you use the market value only to
7  the extent it does not exceed cost.

8          With respect to property and equipment, a good
9  example is the purchase of real estate for a facility prior to
10 1980 let's say.  And the company functioning now has this real
11 estate, and assuming it's their own environmental issues, if it
12 were to sell it the land value would likely exceed what the
13 company purchased the land and building for because keep in
14 mind when you purchase land and building you're actually
15 depreciating the building and any improvements over a long
16 period of time, so the book value actually declines over a long
17 period of time such that if you were to sell that facility it
18 would likely be -- again, if it was not soiled by environmental
19 issues -- likely be valued higher than its book value.

20         On the liability side, GAAP, again being -- taking
21 the most conservative approach to recording transactions,
22 liabilities have to be at their highest level possible.  Any
23 liability that is likely to be paid and is estimable must be
24 recorded on the balance sheet.  So, a balance sheet reflects
25 all the liabilities that the company could possibly be aware

1 of, and as long as they're estimable -- reasonably estimable --

2 they are on the balance sheet.  So --

3 Q    And -- I'm sorry.

4 A    I'm sorry.  So, just to wrap up, GAAP really is the most

5 conservative approach to recording transactions on financial

6 statements.

7 Q    Now, doing a balance sheet analysis of solvency, you

8 mentioned on the asset side fair value of assets is a standard,

9 with respect to liabilities, is that a book value or a fair

10 value or something else?

11 A    The typical language is stated value which would be

12 normally book value.

13 Q    Now, do each of the three tests that you've described, a

14 cash flow test, adequate capital test, balance sheet test, do

15 each of those tests have to be satisfied in order for -- in

16 order to determine that a company is solvent or insolvent as of

17 a specific date?

18 A    No, there's no requirement to perform all three tests.

19 And it also depends on the situation to the extent solvency is

20 very clear versus murky.  A professional who is approaching a

21 solvency analysis would not need to do all three tests and just

22 take into consideration whatever factors are demonstrative of

23 solvency or insolvency.

24 Q    Now, let's turn to Grace specifically.  Did you consider

25 whether Grace is solvent under the cash flow test?

1  A    I did.

2  Q    What did you do?

3  A    I started off with Ms. Zilly's feasability study --
4  feasibility report, and that was the only source of financial
5  projections that I had available to me.  In that report she
6  provides a summary of the company's financial projections.
7  What I did is, in reviewing those projections I analyzed the
8  revenue trend being assumed, the core EBITDA trend being
9  assumed.  I considered the underlying assumptions by deriving
10 them from my analysis in that report.

11        As well as in reading her report, it's very clear
12 that -- very clear -- a number of things are very clear by
13 reading her report.  In looking at the trends being assumed, it
14 was clear to me that the assumptions being used in that
15 forecast are very conservative considering my knowledge of
16 Grace's performance in the past, as well as what she stated in
17 her report, just for some data points, sales have doubled since
18 the company filed, or I should say from the year 2000 to 2008.
19 Core EBITDA has increased by 64 percent from the year 2003 to
20 2008.

21        The company has generated operating-free cash flow of
22 over $1.6 billion in that period, and the company is currently
23 sitting on $622 million, or I should say at the end of June,
24 $622 million of cash.  Very strong performance, and in my
25 analyses of the company's performance over the years, has

Frezza - Continued Direct/Pasquale                279

1  continuously exceeded -- with the exception of 2008 has

2  continually exceeded its performance -- its budget, excuse me.

3        So, based on my knowledge of the company and my

4  involvement with the company, based on my analysis of the

5  summarized cash flow forecast in her report, and also taking

6  into consideration all the facts and data that she laid out, I

7  completely concurred with her view that the projections are

8  reasonable and easily met.  And quite frankly, I would go as

9  far to say that, you know, that the work that she had done to

10 come up with that view is the same work that I did, or was able

11 to do, to come up with my solvency opinion.

12 Q   Well, let's be clear.  The work that you reviewed of Ms.

13 Zilly was not a solvency report, was it?

14 A   That's correct.  But, it could've been.

15 Q   Please elaborate on that.  What do you mean by you

16 could've?

17 A   Just simply, as I said already, that the analyses and the

18 work performed by me and by Ms. Zilly is the identical work

19 that would be performed if she were to render a solvency

20 opinion.  It's the same thing.

21 Q   And just so we're clear, this is with respect to the cash

22 flow test?

23 A   With respect to the cash flow test, correct.

24 Q   What conclusion, if any, did you draw from the cash flow

25 analysis that you did?

**J&J COURT TRANSCRIBERS, INC.**

1 A    That Grace will be solvent on the effective date and
2 thereafter based on those financial projections under the cash
3 flow test.  It passes the cash flow test.

4 Q    Did you consider whether Grace is solvent as of the
5 effective date under the adequate capital test?

6 A    I did.

7 Q    And what did you do?

8 A    As mentioned earlier, I looked at all the factors that I
9 listed, including the fact that leading up to the proposed
10 effective date, Grace has, with one exception, has really never
11 used its debtor in possession borrowing facility with the
12 exception of the payment to the EPA, I believe, where they had
13 drawn it down, but paid it back very quickly.

14      Other than that, to my knowledge, the company's
15 really never used its DIP facility for any substantial reason
16 other than to provide liquidity for letters of credit
17 requirements.  The company has maintained a very significant
18 cash balance, and while it -- these are periods in time leading
19 up to, they're all indicative of the fact that the company was
20 very strong -- had a very strong financial performance in its
21 ability to generate cash and have capital available to -- where
22 there are bumps in the road -- financial bumps in the road.

23      In addition, we understand that the company's very
24 far along in negotiating with exit lenders.  Generally, lenders
25 aren't going to spend the amount of time that we understand is

**J&J COURT TRANSCRIBERS, INC.**

1  being spent here if they felt that the company was insolvent.

2  Based on -- to the best of our knowledge, and when I say our

3  knowledge, in the work that I've done over the quarters and

4  over the years, that Grace's vendor community holds it in high

5  regard.  The company continues to get full vendor terms.  So,

6  that providing of credit is an indication that the company is

7  solvent, and the fact that the company has a substantial equity

8  cushion under the balance sheet test.

9  Q    We'll talk about that in a second.  Mr. Frezza, did you

10  draw a conclusion as to whether Grace is solvent under the

11  adequate capital test?

12  A    In my report I concluded that it passed the adequate

13  capital test, yes.

14  Q    Now, did you consider whether Grace is solvent as of the

15  effective date under the balance sheet test?

16  A    I did.

17  Q    Okay.  And how did you perform a balance sheet test as of

18  the effective date?

19  A    As of the effective date.  I started with the company's

20  disclosure statement.  So, first let me say, the approach I

21  took was the market approach.  And I first went to the

22  company's disclosure statement because there were substantial

23  disclosures about how the company arrived at its enterprise

24  value for instance.  And as I mentioned, what a professional

25  would do will seek to find guideline companies, analyze the

1  statistics related to those companies, key statistic being its

2  EBITDA multiple or its enterprise values to EBITDA, as well as

3  precedent transactions.

4       It was very clear from the disclosure statement that

5  a substantial amount of work had been done by the company and

6  its advisors to determine guideline companies and precedent

7  transactions.  And one point that I noted in the disclosure

8  statement was the fact that -- it was a very good point -- that

9  the company indicates the key -- a key to the success of this

10 test is the appropriate selection of the guideline companies

11 such that we're certain that those guidelines -- those

12 guideline companies are appropriate in comparing them to the

13 various businesses within Grace, and in my opinion, who better

14 to make that decision but the company.

15      And it's completely appropriate for a professional to

16 rely on other professional's analyses to determine, for

17 instance, what enterprise value is.  So, I used the disclosure

18 statements enterprise value to determine what the proxy for

19 fair value of the assets were under the market approach of the

20 balance sheet test.

21 Q    Did the disclosure statement provide amounts, figures,

22 that you could use in determining -- in applying a balance

23 sheet test under the market approach?

24 A    It did.  It did.  Yes.

25 Q    Please explain what you did.

1  line, the reorganized equity value and what that represents?

2  A   As I mentioned earlier, this test is designed to determine

3  whether the fair value of assets exceeds stated liabilities,

4  and the equity cushion, therefore, represents that asset value,

5  fair value of assets, in excess of stated liabilities which

6  indicates that there's a substantial equity cushion at the

7  effective date.

8  Q   When you say there's an equity cushion as of the effective

9  date, did that inform a conclusion that you formed with respect

10 to whether Grace would be solvent under the market approach as

11 of the effective date?

12 A   It does.  Under the market approach of the balance sheet

13 test, that indicates that the company is solvent.

14 Q   Now, did you perform a balance sheet test applying the

15 income approach as of the effective date, December 31st, 2009?

16 A   Sorry?  Restate the question?

17 Q   Let me try that again.  Did you perform a balance sheet

18 test applying the income approach as of the effective date?

19 A   I did not.

20 Q   And why not?

21 A   Because, again, having the -- one would need detailed

22 financial projections over a period of time to determine that

23 and I didn't have -- while there was a summary, set of summary

24 projections, in Ms. Zilly's report, I did not have access to or

25 I did not have available to me those -- any projections that

**J&J COURT TRANSCRIBERS, INC.**

1  would have allowed me to do a discounted cash flow approach.

2          MR. BERNICK:  I object to that, Your Honor.  This now

3  gets into a whole history of the information room that was made

4  available and I don't really think it's an appropriate thing

5  for an expert to testify to.  He can't testify to facts he

6  doesn't know about.  He can say that he didn't have it, but to

7  say that it wasn't available goes beyond his factual knowledge.

8          THE COURT:  Okay.  That's sustained unless you can

9  substantiate that he had knowledge on his own.

10          MR. PASQUALE:  Your Honor, I'm actually --

11 Q    You didn't do that test, did you?

12 A    I didn't do that test.

13 Q    Okay.  Did you perform a balance sheet test applying a

14 cost approach with respect to this plan as of the effective

15 date?

16 A    With respect to this plan, I did not.  Again --

17 Q    And why not?

18 A    Because you would need -- as I mentioned earlier, under

19 the cost approach, you would look at -- you would take a more

20 traditional balance sheet, but -- like this GAAP balance sheet,

21 but you would need -- one would need to determine the fair

22 value of those assets as stated on the GAAP balance sheet and

23 that would require either having had an independent third party

24 business valuation or set of appraisals on individual assets.

25 Again, for instance, if there were appraisals available on

1  facilities, the myriad of facilities that Grace owns, whether

2  there would also be, to the extent available, when one would

3  require appraisals of intellectual property and other

4  intangible property, and that I did not have.

5  Q    Now, in addition to the tests that you've already

6  described, were you also asked by counsel to consider Grace's

7  solvency under any specific assumptions?

8  A    Yes.  I was asked by counsel to substitute the --

9  substitute Grace's experts' median asbestos PI claim liability

10  estimate of -- I want to say -- I forget -- four sixty eight to

11  substitute that amount for the amount in the currently proposed

12  plan.

13  Q    What, if anything, did you conclude from that analysis?

14  A    Well, based on the work that I had done, had that level of

15  liabilities been at issue, and assuming other components of the

16  current plan, such as the Fresenius and Sealed Air settlement

17  amounts been available, as well as with insurance, that Grace

18  would be solvent in that case, as well.

19  Q    Now, with the various methods that you used in determining

20  whether Grace is solvent under a plan before the Court as of

21  the December 31st, 2009 effective date, is any one method

22  preferable to the other?

23  A    No.  All of these methods are probative.  You know, the

24  desire is to have as many tests performed as possible and have

25  as much data available to the professional to do it, but there

Frezza - Cross/Cobb                          294

1  is no one best way to do it and there's no stipulation that all

2  three have to be done.  So, there's no best, one best, plan --

3  I'm sorry -- approach.

4          MR. PASQUALE:  Nothing more at this time, Your Honor.

5  We pass the witness.

6          THE COURT:  Mr. Cobb?

7                      CROSS EXAMINATION

8  BY MR. COBB:

9  Q    Mr. Frezza, in producing your opinion with regard to

10 Grace's solvency as of 12/31/09, under the balance sheet test

11 using the market approach, what was the range of values that

12 you discovered that Grave's assets will exceed its liabilities?

13 A    The resultant numbers were 430 million to 821 million.

14 Q    Now, in performing any of the tests -- and let me step

15 back and be more specific.  In forming the cash flow test to

16 determine Grace's solvency as of 12/31/09 under this plan,

17 assuming it's effective, did you need to quantify any

18 liabilities?

19 A    No.  You just needed to take the stated liabilities from

20 the company's balance sheet.

21 Q    And that's an accepted expert methodology --

22 A    Yes.

23 Q    -- of determining solvency?

24          MR. BERNICK:  Objection.

25 A    Yes.


                    **J&J COURT TRANSCRIBERS, INC.**

1 judgment of the professional performing the test.

2 Q    Well, in your judgment, the analysis that you did was not
3 complete.  True or not?

4 A    It was less complete had I spent more time focusing on the
5 adequate capital test.

6 Q    Right.  Now, under the balance sheet, the only way that
7 you can conclude that -- strike that.  If the plan goes
8 effective, you believe that Grace will be solvent under that
9 plan, correct?

10 A    Correct.

11 Q    As it's currently constituted; that is, with no changes?

12 A    Correct.

13 Q    We all hope and pray and expect that the plan, as styled,
14 will go effective, and if it does go effective, the good news
15 is that Grace won't be insolvent, right?

16 A    Correct.

17 Q    Okay.  What you -- and we already knew that before you
18 came into the case, right?

19 A    Right.

20 Q    It wouldn't have made an awful lot of sense to come up
21 with a plan of reorganization and these guys would never have
22 agreed to it if it turns out that once Grace came out of
23 bankruptcy it was insolvent, right?

24 A    I would hope that's the case.  Right.

25 Q    So, in fact, your whole analysis is designed to show that

**J&J COURT TRANSCRIBERS, INC.**