IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | * | |
| W.R. GRACE & CO., et al., | * | Chapter 11 |
| Debtors. | * | Case No. 01-01139 (JKF)<br>(Jointly Administered) |
| | * | Related Docket Nos. 21794, 22415, 23567 |

--------------------------------------------------------x

## PHASE II POST-TRIAL BRIEF FOR THE CNA COMPANIES

FORD MARRIN ESPOSITO WITMEYER
   & GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900
Facsimile: (212) 344-4294

WILDMAN, HARROLD, ALLEN
   & DIXON LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone:  (312) 201-2662
Facsimile:  (312) 416-4524

ROSENTHAL, MONHAIT & GODDESS, P.A.
Edward B. Rosenthal (Bar No. 3131)
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
Facsimile: (302) 658-7567

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
-and-
Michael S. Giannotto (*pro hac vice*)
Frederick C. Schafrick (*pro hac vice*)
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444

*Counsel for Continental Casualty Company, Transportation Insurance Company and their
American Insurance Affiliates*

## TABLE OF CONTENTS

Page #

I.     CNA HAS STANDING TO RAISE ITS PHASE II OBJECTIONS.............................1

    A.    CNA's Contentions ...............................................................................1

    B.    Evidence Supporting CNA's Contentions ..........................................3

        (a)    CNA's Standing as a Creditor Holding Indirect PI Trust Claims................................................................................. 3

        (b)    CNA's Standing as an Insurer .................................................. 5

        (c)    CNA's Standing Under the Third Circuit's *Congoleum* Decision .................................................................................... 6

II.    THE TAC MEMBERS HAVE INAPPROPRIATE CONFLICTS OF INTEREST. ...................................................................................................7

    A.    CNA's Contentions ...............................................................................7

    B.    Evidence Supporting CNA's Contentions ..........................................7

III.   THE PLAN DISCRIMINATES AGAINST INDIRECT PI TRUST CLAIMS.........17

    A.    The Court's Findings Must Clarify That Indirect PI Trust Claims Are Not Subject to Disallowance.................................................................17

    B.    The Plan Discriminates Against Indirect PI Trust Claims in Other Respects................................................................................................19

        (a)    CNA's Contentions ................................................................. 19

        (b)    Evidence Supporting CNA's Contentions ........................... 19

IV.    THE PLAN IMPROPERLY LIMITS SECTION 524(g) PROTECTION TO INSURERS WHO SETTLE BEFORE THE END OF THE CONFIRMATION HEARING...........................................................................20

    A.    CNA's Contentions .............................................................................20

    B.    Evidence Supporting CNA's Contentions ........................................21

V.     THE PLAN FAILS TO COMPLY WITH SECTION 524(g) FUNDING REQUIREMENTS..................................................................................................22

    A.    The Plan Fails to Comply with the Section 524(g)(2)(B)(i)(II). ........23

        (a)    CNA's Contentions ................................................................. 23

        (b)    Evidence Supporting CNA's Contentions ........................... 23

    **B.**    **The Plan Fails to Satisfy Section 524(g)(2)(B)(i)(III)**.........................**24**

        **(a)**    **CNA's Contentions** ............................................... **24**

        **(b)**    **Evidence Supporting CNA's Contentions** ............................ **25**

**VI.**    **THE PLAN CANNOT BE CONFIRMED BECAUSE IT MODIFIES CNA'S RIGHTS UNDER ITS POLICIES AND AGREEMENTS WITH DEBTORS**..........**27**

    **A.**    **The Court's Findings Should Make Clear That the Plan Does Not Impair CNA's Rights Under Its Asbestos Insurance Reimbursement Agreement**......................................................................................**27**

    **B.**    **The Section 524(g) Injunction Fails to Include All of the CNA Policies Encompassed by CNA's Asbestos Insurance Reimbursement Agreement and Its Asbestos Insurance Settlement Agreements.** ...................**29**

        **(a)**    **CNA's Contentions** ............................................... **29**

        **(b)**    **Evidence Supporting CNA's Contentions** ............................ **30**

    **C.**    **The Plan Abrogates the Anti-Assignment Provisions In CNA Policies.** .........**32**

        **(a)**    **CNA's Contentions** ............................................... **32**

        **(b)**    **Evidence Supporting CNA's Contentions** ............................ **32**

    **D.**    **The Sealed Air Injunction and Release Violates the Terms of CNA's Settlement Agreements with Debtor and Sealed Air with Respect to Asbestos and Non-Asbestos Claims.** ......................................................**34**

        **(a)**    **CNA's Contentions** ............................................... **34**

        **(b)**    **Evidence Supporting CNA's Contentions** ............................ **35**

**VII.**    **INCORPORATION BY REFERENCE OF CERTAIN OTHER OBJECTIONS**.........................................................................................**38**

**CONCLUSION** .............................................................................................**38**

## TABLE OF AUTHORITIES

**CASES:**

*Consolidated Freightways Corp v. Osier*, 605 P.2d 1076 (Mont. 1979)........................................3

*In re ACandS, Inc.,* 297 B.R. 395 (Bankr. D. Del. 2003) ...........................................................17

*In re ACandS, Inc.,* 311 B.R. 36 (Bankr. D. Del. 2004) .............................................................17

*In re Combustion Engineering,* 391 F.3d 190 (3d. Cir. 2004)....................................................23

*In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D.N.J. 2007) ...................................................23, 26

*In re Congoleum Corp.,* 426 F.3d 675 (3d Cir. 2005) ...........................................................2, 6, 7

*In re Continental Airlines,* 203 F.3d 203 (3d Cir. 2000) ..........................................................38

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407
    (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir.
    1988) ...........................................................................................................................24

*In re Mid-Valley Inc.*, 305 B.R. 425, 434 (Bankr. W.D. Pa. 2004) ............................................16

*Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195 (2009)...................................................18, 19

*United States v. Hayes*, 129 S.Ct. 1079 (2009)..........................................................................27


**STATUTES:**

Bankrupcty Code:

   11 U.S.C. § 102(7) ..................................................................................................26

   11 U.S.C. § 502(e) ..............................................................................................17, 18

   11 U.S.C. § 524(g) .............................................................................................. *passim*

   11 U.S.C. § 524(g)(2)(B)(i)(II)...............................................................................23

   11 U.S.C. § 524(g)(2)(B)(i)(III)..........................................................................24, 25

   11 U.S.C. § 524(g)(2)(B)(ii)(V)................................................................................18

   11 U.S.C. § 524(g)(4)(B)(ii) ....................................................................................20

   11 U.S.C. § 524(h) ...................................................................................................24

11 U.S.C. § 1123(a)(4) ........................................................................................................18, 20, 30

11 U.S.C. § 1123(a)(5) ..................................................................................................................21, 29

11 U.S.C. § 1129(a)(1) ........................................................................................................................20

11 U.S.C. § 1129(a)(7) ........................................................................................................................22

Dictionary Act, 1 U.S.C. § 1 ...............................................................................................................27

Mont. Code Ann. § 27-1-703(4) ...........................................................................................................3

**RULES:**

Fed. R. Bankr. P. 2019 ...........................................................................................................................9

Fed. R. Civ. P. 30(b)(6) ...........................................................................................................................9

Fed. R. Evid. 408 .............................................................................................................................10, 11

**LEGISLATIVE HISTORY:**

140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994) ...............................................................................24

Pursuant to the Court's Order Establishing the Schedule of Post-Trial Briefing and Related Matters [Docket No. 23567], Continental Casualty Company and Continental Insurance Company, on their own behalf and on behalf of their predecessor companies, affiliates and subsidiaries which issued insurance policies to the Debtors (individually or collectively "CNA"), submit this Post-Trial Brief in support of their Phase II Objections to the Proposed First Amended Joint Plan of Reorganization (the "Plan").[1]  This Brief does not reiterate in detail the objections and legal arguments made in CNA's Phase II Trial Brief ("Phase II Trial Brief") [Docket No. 22415].  Instead, it summarizes the objections and then cites to the evidence, and the concessions that have been made by the Plan Proponents, that support CNA's objections.

All Exhibits cited in this Brief have been admitted into evidence by this Court for all purposes, or for the purpose for which they are being cited in this brief.  *See* Docket Nos. 23454, 23574.  Unless otherwise specified, all citations to deposition testimony are to testimony that has not been objected to by the Plan Proponents or any other party.  *See* Docket No. 23576.

## I.    CNA HAS STANDING TO RAISE ITS PHASE II OBJECTIONS.

### A.    CNA's Contentions

In its Phase II Trial Brief at 3-10, CNA argued that it has standing in three respects to raise its Phase II objections.  First, CNA has creditor standing, as the Holder of Indirect PI Trust Claims, to object to the Plan on the grounds that: (a) the TDP discriminates against Indirect PI

---

[1] The Plan is PP Ex. 277.01 Rev., as revised at Docket No. 23474, Ex. B; the Asbestos PI Trust Agreement ("Trust Agreement") is PP Ex. 277.02 Rev.; and the Asbestos PI Trust Distribution Procedures ("TDP") are Exhibit PP Ex. 277.04 Rev., as revised at Docket No. 23474, Ex. D.  Unless the context otherwise indicates, citations to the Plan and TDP are to the versions as modified through October 12, 2009.

Capitalized terms not otherwise defined herein have the same meaning as used in the Plan.  Citations to confirmation hearing transcripts are to "[date] Tr. at [page: lines] (witness)"; citations to depositions are to "[deponent] dep. [date] at [page: line]"; and citations to exhibits are to the designations used in the list of Admitted Trial Exhibits, Docket No. 23574.

Trust Claims; (b) the members of the Asbestos PI Trust Advisory Committee ("TAC") have conflicts of interest; (c) the Asbestos PI Channeling Injunction is overly narrow as it applies to Settled Asbestos Insurance Companies; and (d) the Trust is not properly funded.  On account of these infirmities, the Plan directly and adversely affects CNA's rights, as a creditor holding Indirect PI Trust Claims, to achieve the maximum possible recovery from the Trust.

CNA bases its creditor standing upon its common law and contractual contribution and indemnity rights against the Debtors arising out of claims against CNA by the Libby Claimants, The Scotts Company ("Scotts"), and the BNSF Railway Company ("BNSF"), premised on personal injuries caused by exposure to Grace asbestos.  CNA showed in its Phase II Trial Brief that these claims for contribution and/or indemnity satisfy the standards set forth in the Bankruptcy Code, and in the relevant Third Circuit case law, for standing to object as a creditor at a confirmation hearing.  The Plan Proponents, in their Main Brief in Support of Plan Confirmation [Docket 22733] ("Plan Proponents Main Brief") at 71 n.173, assert that CNA and other Insurance Companies "claim to be creditors and potential beneficiaries of the Asbestos PI Trust, but fail to substantiate that allegation."  Other than that passing statement, the Plan Proponents do not, in their brief, challenge CNA's contentions that it does have standing as a creditor in this case.

Second, CNA claims standing as both an unsettled and settled Asbestos Insurance Entity to object to provisions of the Plan that (a) abrogate the anti-assignment clauses in CNA's policies; and (b) eliminate or modify CNA's rights under certain agreements with the Debtors and CNA's indemnity rights against Sealed Air Corporation ("Sealed Air").

Third, CNA claims standing under *In re Congoleum Corp.,* 426 F.3d 675 (3d Cir 2005), to raise conflicts of interest concerns respecting the TAC.

B.     **Evidence Supporting CNA's Contentions**

(a)     **CNA's Standing as a Creditor Holding Indirect PI Trust Claims**

The evidence of record establishes the following facts:

1.     In March 2002, certain claimants filed a Complaint against CNA in the State courts of Montana captioned *Pennock et al. v. Maryland Casualty Co. et al.*, No. CDV-2002-233 (Mont. 1st Jud. Dist. Ct.).   *See* State of Montana Ex. 99.   The claimants allege that CNA, in its capacity as insurer of the Debtor, had obligations to claimants in connection with the Debtor's facilities in and near Libby, Montana, and they seek to recover damages from CNA for personal injury as a result of exposure to asbestos in vermiculite released from the Grace facilities.   *Id.* ¶¶ 41-52.

2.     Were these "Libby Claimants" to continue to pursue their claims against CNA after the stay in bankruptcy is lifted (which they have claimed they will), CNA would have a right to pursue third-party claims against the Debtors for contribution or indemnity under Montana law, based on the fact that those claimants' injuries were allegedly caused by exposure to Grace asbestos.[2]   CNA has also reserved its rights to seek contractual indemnity from the Debtors for the Libby claims under certain agreements it has entered into with the Debtors.[3]

3.     On March 16, 2006, BNSF sent a letter to CNA notifying CNA of certain claims and lawsuits that had been filed against BNSF by individuals claiming asbestos-related injuries caused by exposure to vermiculite mined by Grace in Libby, Montana.   *See* CNA Ex. 31.   That letter demands that CNA defend and indemnify BNSF pursuant to certain policies issued by

---

[2]   *See* Mont. Code Ann. § 27-1-703(4); *Consolidated Freightways Corp. v. Osier*, 605 P.2d 1076, 1081 (Mont. 1979).

[3]   *See* CNA Ex. 5.

CNA, including policies issued to the Debtors under which BNSF claims to be an insured.  One such listed policy is Policy No. 2483440.  *Id.* at CNA0391.

4.       Previously, on August 1, 1990, CNA and the Debtors entered into an agreement settling certain coverage claims relating to certain policies issued by CNA to the Debtors, including Policy No. 2483440 ("1990 Settlement Agreement").  *See* CNA Ex. 32(A) at CNA0394.  Pursuant to the 1990 Settlement Agreement, should "any Person who is, was, or purports to have been an insured under" Policy No. 2483440 make a "claim against [CNA] … based on the Primary Policies [which include Policy No. 2483440], [Debtors] will indemnify [CNA] should [CNA] be held liable under the" policies.  *Id.* at CNA0400-02.  As a result, CNA possesses a claim for indemnity against the Debtors in the event that BNSF successfully recovers from CNA under Policy No. 2483440.

5.       On September 2, 2004, Scotts filed an adversarial proceeding in this Court asserting that it is entitled to coverage from CNA for asbestos-related liabilities arising out of the incorporation of Grace vermiculite into Scotts products, pursuant to so-called vendor endorsements contained in policies issued by CNA to the Debtors.  *See* CNA Ex. 3.

6.       Among the CNA policies under which Scotts seeks coverage are two policies (Policy Nos. 902-36-70 and 2483440) that were the subject of the 1990 Settlement Agreement between CNA and the Debtors referenced above (*id.* at CNA0074; CNA Ex. 32(A) at CNA0394).  Pursuant to the 1990 Settlement Agreement, and as discussed above, the Debtors are obligated to indemnify CNA should any successful claims be made by Scotts or any other person on those policies.  Although Scotts and the Debtors have recently entered into a settlement that this Court has approved (Docket No. 23203) in which Scotts has waived its rights under the Debtors' policies, that settlement agreement expressly states that it provides no rights

to CNA and other persons not expressly protected by it.  *See* <u>Docket No. 22735, Ex. A at 1, 11,</u> <u>§ 7.02</u>.  Therefore, this settlement agreement does not clearly protect CNA from Scotts' claims for coverage under policies issued to the Debtors.

7.    CNA's right to common law contribution or indemnity in connection with the *Pennock* lawsuit instituted by the Libby Claimants, and its rights to seek indemnity from the Debtors under the 1990 Settlement Agreement in connection with the claims that have been made against it by the Libby Claimants, BNSF, and Scotts (as well as any other claimant who may similarly assert claims triggering the Debtors' indemnification obligations) makes CNA the Holder of Indirect PI Trust Claims under the Plan.[4]  Because CNA is an Indirect PI Trust Claimant, and thus a creditor, it has standing under the Bankruptcy Code and Article III to object to those aspects of the Plan that directly and adversely affect its right as a creditor to achieve the maximum recovery possible on its Indirect PI Trust Claims, including those aspects of the Plan listed in CNA's <u>Phase II Trial Brief at 7</u>.

**(b)    CNA's Standing as an Insurer**

The evidence admitted at the Phase II hearing establishes the following:

1.    CNA has issued 16 high-level excess insurance policies and three primary insurance policies to the Debtors with policy periods that incept prior to June 30, 1985, and that potentially provide insurance coverage for Asbestos Claims.  *See* <u>CNA Exs. 17(A) through (P),</u>

---

[4] *See* <u>Plan § 1.1 (139)</u> (defining "Indirect PI Trust Claim" as including: (1) any claim or demand against the Debtors by any entity "who has been, is, or may be a defendant in an action seeking damages for death, bodily injury, sickness, disease, or other personnel injuries … to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability" and seeking to hold the Debtors liable for "indemnification … or contribution of any portion of any damages such Entity has paid or may pay to the plaintiffs in such action" or (2) any claim seeking "indemnification, subrogation, or contribution from the Debtors with respect to any insurance settlement agreement ….").

18(A) through (E) and 19(A) through (C).  CNA is therefore an Asbestos Insurance Entity under the Plan.  (*See* Plan § 1.1(9), (11)).

2.      CNA has entered into certain pre-petition settlement agreements with the Debtors.  *See* CNA Exs. 32(A) and (B) and 38.  These Settlement Agreements make CNA a Settled Asbestos Insurance Company under the Plan.  (Plan §§ 1.1(14), 1.1(200)).

3.      In May 1997, CNA entered into an Asbestos Insurance Reimbursement Agreement with the Debtors.  *See* CNA Ex. 32(C).

4.      In the light of these policies and agreements, CNA has standing as an insurer to object in Phase II to the Plan's (a) purported abrogation of the anti-assignment clauses in CNA's unsettled policies and (b) elimination or modification of CNA's rights under pre-petition settlement agreements (including the Asbestos Insurance Reimbursement Agreement) entered into with the Debtors, including elimination of CNA's rights to indemnity from Sealed Air.  These modifications of CNA's rights under its insurance policies and pre-petition agreements unquestionably directly and adversely affect CNA.

### (c)      CNA's Standing Under the Third Circuit's *Congoleum* Decision

CNA also has standing to object to the selection of TAC members who will be in violation of the Rules of Professional Conduct because they will have conflicting duties as Trust fiduciaries and as lawyers representing, under contingent fee arrangements, individual clients who will be pursuing claims before the Trust.  That is the holding of *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005).  *See* CNA Phase II Trial Brief at 8-9.

The Plan Proponents describe *Congoleum* as dealing with a "'preliminary issue' like retention of professionals" and imply that it is inapplicable to the present case involving conflicts of interest that would arise following confirmation.  Plan Proponents Main Brief at 71.  This is incorrect.  A reading of *Congoleum* that ignores conflicts of interest embodied in the Plan and

the Plan Documents is contrary to the plain holding of the Third Circuit, and to sound policy and legal ethics.  CNA Phase II Trial Br. at 8-9.  While the Court in *Congoleum* distinguished *In re Combustion Engineering* on the ground that *Combustion Engineering* was an appeal from a confirmation order, nothing in the *Congoleum* opinion implied that the Court of Appeals would put its imprimatur on a Plan that contained built-in conflicts of interest.  *See* 426 F.3d at 685-86.

## II.    THE TAC MEMBERS HAVE INAPPROPRIATE CONFLICTS OF INTEREST.

### A.    CNA's Contentions

CNA's Phase II Trial Brief argues that the proposed members of the Asbestos PI Trust Advisory Committee ("TAC") will have conflicts of interest that violate the Rules of Professional Conduct and applicable Delaware trust law, and that these conflicts directly impact CNA as a creditor with Indirect PI Trust Claims.  This is because CNA will be adversely affected by a Trust structure that places extensive influence over Trust procedures and claim validity criteria in the hands of lawyers who have an incentive and duty to maximize the recoveries from the Trust for their individual clients at the potential expense of other claimants, such as CNA. CNA Phase II Trial Br. at 10-19.

### B.    Evidence Supporting CNA's Contentions

The evidence admitted at the Phase II Conformation establishes the following facts:

1.    The members of the TAC serve in a fiduciary capacity representing all Holders of present PI Trust Claims.  (Trust Agreement § 5.2; 9/14/09 Tr. at 51:5-9 (Mr. Inselbuch)).  This includes insurance companies, such as CNA, that are present Indirect PI Claimants with valid claims against the Trust.  (9/14/09 Tr. at 52:4-9 (Mr. Inselbuch)).

2.    The Futures Representative ("FCR") serves in a fiduciary capacity in connection with the Trust, representing the interests of Holders of future PI Trust Claims.  (Trust Agreement

§ 6.1; 9/17/09 Tr. at 49:22-25 (Mr. Austern)).  This includes insurance companies that may assert future Indirect PI Trust Claims.

3.      The proposed TAC members (Messrs. Budd, Cooney, Rice, and Weitz) are all "prominent asbestos personal injury attorneys." 9/14/09 Tr. at 47:14-25 (Mr. Inselbuch).

4.      The TAC members were selected by the Official Committee of Asbestos Personal Injury Claimants ("ACC").  Plan § 7.2.6; 9/14/09 Tr. at 47:5-18 (Mr. Inselbuch).

5.      Each of the TAC members is counsel to asbestos claimants who are members of the ACC.  Indeed, the proposed TAC members are "the four lawyers who constituted the negotiating subcommittee of the ACC for purpose of negotiating the plan." 9/14/09 Tr. at 48:1-3 (Mr. Inselbuch).  They nominated themselves to be on the TAC and voted in favor of their own candidacies. Id. at 48:4-11.

6.      In considering who would serve as TAC members, the ACC selected its "negotiating subcommittee," and did not look beyond personal injury attorneys representing clients on the ACC for TAC candidates. 9/14/09 Tr. at 49:1-16 (Mr. Inselbuch).

7.      The law firms of each TAC member represent thousands, if not tens of thousands, of claimants who will be submitting claims to the Trust.  Amended Statement of Baron & Budd under Bankruptcy Rule 2019, ¶ 4 (Feb. 25, 2009) (CNA Ex. 6 at CNA0101) ("As of the date of this Amended Statement, the Firm represents thousands of personal injury claimants ...."); 9/14/09 Tr. at 50:5-10 (Mr. Inselbuch) (Each of the TAC members' firms will "be submitting at least a thousand claims to the Trust."); ACC Response to GEICO and Columbia Request for Admission No. 41, OneBeacon/Seaton Ex. 34 at 000032 (admitting that "[e]ach member of the

Trust Advisory Committee, or his respective law firm, represents at least 1,000 Asbestos PI Claimants").[5]

8.      Peter Van N. Lockwood, the Rule 30(b)(6) witness for the ACC, testified in his deposition that he was "sure that the number of claims [that will be submitted by the TAC members' firms to the Trust] is more than 10,000." Lockwood 5/1/09 Dep. Tr. at 200:3-8.[6] The Court can determine a more precise number by reviewing *in camera* the exhibits to the Rule 2019 statements for the TAC members, which have been admitted into evidence and are available to the Court, but not to CNA.  CNA Exs. 6, 7, 8, 9.

9.      The ACC has admitted that "it is likely that each proposed member of the Asbestos PI TAC, or his respective law firm, will receive, or plans to receive, compensation in exchange for representing Asbestos PI Claimants."   ACC Response to CNA Request for Admission No. 12 (CNA Ex. 30(A) at CNA0326).  And, it is also "likely" that those lawyers "will be getting compensated through contingency fee arrangements."   9/14/09 Tr. at 51:1-4 (Mr. Inselbuch).

---

[5] *See also* Supplemental Verified Statement in Connection with the Representation of Creditors as Required by Fed. R. Bankr. P. Rule 2019, filed by Cooney & Conway (Mar. 2, 2009) (CNA Ex. 7); Third Amended Verified Statement in Connection with the Representation of Creditors as Required by Fed. R. Bankr. P. Rule 2019, filed by Weitz & Luxenberg (Aug. 7, 2006) (CNA Ex. 8); Eleventh Amended Verified Statement Pursuant to Fed. R. Bankr. P. 2019 filed by Motley Rice (Feb. 20, 2009) (CNA Ex. 9).  Unlike CNA Exhibit 6 (the Baron & Budd 2019 statement), the public versions of these other 2019 statements do not provide the number of the firms' clients.

[6] The Plan Proponents have objected to this portion of Mr. Lockwood's testimony on the grounds of relevance, foundation, and best evidence.  *See* Docket No. 23576, Attachment.  Mr. Lockwood's testimony is relevant to whether the TAC members, because they represent thousands of individual clients, have a conflict between their duties to their clients and their duties as TAC members.  Moreover, Mr. Lockwood (as counsel to the ACC whose members are clients of the TAC members' firms) has sufficient personal knowledge to testify on this point, and the best evidence rule is inapplicable because Mr. Lockwood was not testifying as to the content of a writing.

10.     In contrast to the proposed TAC members, the FCR, who will serve as the representative of future claimants under the Trust, is not a personal injury attorney, and has never "represented any individual asbestos plaintiff in any capacity." 9/17/09 Tr. at 49:8-10 (Mr. Austern). Moreover, the FCR, unlike the proposed members of the TAC, will not "have any contingency fee arrangement with any claimants who submit claims to the Trust, whether present or future." 9/14/09 Tr. at 55:4-7 (Mr. Inselbuch).

11.     Counsel for the ACC drafted the Trust Agreement and the Trust Distribution Procedures ("TDP"). 9/14/09 Tr. at 46:12-21 (Mr. Inselbuch); Lockwood 5/1/09 Dep. Tr. at 381:12 to 383:3. After the ACC was satisfied with the drafts, they were circulated to the proposed FCR for his review. 9/14/09 Tr. at 46:19-21. Mr. Lockwood could not "recall" "any changes made to [the draft TDP] at the behest of Grace." Lockwood 5/1/09 Dep. Tr. at 383:15-21.

12.     The ACC, with the concurrence of the FCR, selected the Trustees (Messrs. Huge, Sifford, and Trafelet), and proposed them to the other Plan Proponents. 9/14/09 Tr. at 46:22 to 47:1 (Mr. Inselbuch). The ACC and FCR did not propose any candidates for Trustee that the other Plan Proponents rejected. Lockwood 5/4/09 Dep. Tr. at 603:24 to 604:3.[7]

_____

[7] The Plan Proponents have objected to this portion of Mr. Lockwood's testimony on the grounds of relevance, foundation, best evidence, and Fed. R. Evid. 408. See Docket No. 23576, Attachment. This testimony is offered to support the contention that the TAC, whom CNA contends will have conflicting duties to their clients and to the Trust, can exercise control over the Trustees because the ACC (on which the TAC members sit as representatives of their clients), acting in conjunction with the FCR, chose the proposed Trustees. As such the TAC members, due to their relationship with these individuals, have a greater ability to control the decisions of the Trustees that affect all Trust claimants (including those decisions that could benefit the TAC members' asbestos personal injury clients). Moreover, because the Trustees "owe their job" to the TAC, they are more likely to heed the TAC's "advice" in connection with administering the Trust and/or amending the Trust Agreement or TDP. The best evidence rule is not applicable because the testimony does not concern the contents of a writing, and there is in

13.    The proposed members of the TAC "were involved in selecting the Trustees." (9/14/09 Tr. at 48:12-16 (Mr. Inselbuch)).

14.    All of the proposed Trustees have served in similar roles in other asbestos personal injury trusts drafted and approved by the same asbestos personal injury lawyers involved in this case, and where the TAC members involved here were also TAC members, as shown in the following table.

| Roles of Grace PI Trust Trustees and TAC Members In Other Asbestos Bankruptcy Trusts | | |
|---|---|---|
| **Asbestos Case** | **Role of Grace Trustee** | **Role of Grace TAC Member** |
| Armstrong World Industries, Inc.[8] | • Harry Huge (trustee)<br>• Dean M. Trafelet (FCR)<br>• Lewis Sifford (trustee) | • Russell W. Budd (TAC)<br>• John D. Cooney (TAC)<br>• Joseph Rice (TAC)<br>• Perry Weitz (TAC) |
| Owens Corning/ Fibreboard[9] | • Harry Huge (trustee)<br>• Dean M. Trafelet (trustee) | • Russell W. Budd (TAC)<br>• John D. Cooney (TAC)<br>• Joseph Rice (TAC)<br>• Perry Weitz (TAC) |
| USG Corp.[10] | • Lewis Sifford (trustee)<br>• Dean Trafelet (FCR) | • Russell W. Budd (TAC)<br>• John D. Cooney (TAC)<br>• Joseph Rice (TAC)<br>• Perry Weitz (TAC) |
| ABB Lummus[11] | • Dean M. Trafelet (trustee) | • Perry Weitz (TAC) |

---

any event no "better" evidence on the issue of who selected the Trustees.  Finally, Rule 408 is not on point because the testimony is not evidence of a compromise offered to prove liability.

[8] *See* CNA Ex. 13 at CNA0119-20 (trustees and TAC) and Ex. 14 at CNA0123 (FCR).

[9] *See* CNA Ex. 23 at CNA0165.

[10] *See* CNA Ex. 26 at CNA0180-81.

[11] *See* CNA Ex. 10 at CNA0111.

15.     Additionally, the proposed TAC members of the Grace Trust have served in that capacity in numerous other asbestos bankruptcies, including ACandS, Babcock & Wilcox, Combustion Engineering, Federal Mogul, Kaiser Aluminum, Mid-Valley, North American Refractories Co./Global Industrial, and Pittsburgh Corning.[12]

16.     The Trust Agreement and TDP require that the TAC and the FCR consent to any change of significance to the operation of the TDP.  Among other things, the Trustees must obtain the consent of the TAC and FCR to:

- Amend the TDP or the Trust Agreement, (Trust Agreement §§ 2.2(f)(xii)); 9/14/07 Tr. at 67:23-25 (Mr. Inselbuch));

- Change the Claim Payment Ratio between amounts paid for (i) claims for severe asbestosis, severe disabling pleural disease, and cancer and (ii) claims for asbestosis or pleural disease (Trust Agreement § 2.2(f)(ii); TDP § 2.5);

- Amend the Medical/Exposure Criteria for payable claims (Trust Agreement § 2.2(f)(iii); TDP § 5.3(a)(3); 9/14/09 Tr. at 68:1-3 (Mr. Inselbuch));

- Require claimants to provide additional kinds of medical evidence (Trust Agreement § 2.2(f)(v); TDP § 7.1; 9/14/09 Tr. at 68:7-12 (Mr. Inselbuch));

- Revise the Scheduled, Maximum or Average Values applicable to various categories of claims (Trust Agreement § 2.2(f)(iii); TDP § 5.3(b)(1), (3));

- Contract with another claims resolution organization in order to process claims that are submitted to the Trust.  (Trust Agreement, § 2.2(f)(xiv); 9/14/09 Tr. at 68:4-6 (Mr. Inselbuch) (TAC consent is needed for Trustees to hire a "claims handling facility to process the claims" if "it's something outside the Trust itself.")); or

- Revise the criteria and determine the procedures for the Payment of Indirect PI Trust Claims, such as the Indirect PI Trust Claims that will be submitted by CNA (Trust Agreement § 2.2(f)(xi); TDP § 5.6).

---

[12] *See* CNA Ex. 12 at CNA0115; Ex. 15 at CNA0126; Ex. 16 at CNA0129; Ex. 17 at CNA0132; Ex. 20 at CNA0149; Ex. 21 at CNA0153; Ex. 22 at CNA0162; and Ex. 24 at CNA0175-76.

The Trustees must also consult with the TAC on a periodic basis regarding the general administration and implementation of the Trust (Trust Agreement § 2.2(e)).

17.     The TAC also has a significant role in determining how the Trustees will be compensated and whether they will keep their jobs.  The Trustees must obtain the consent of the TAC and FCR to change the Trustee compensation other than to reflect cost-of-living adjustments or, alternatively, seek Court approval (Trust Agreement § 2.2(f)(ix); 09/14/09 Tr. at 169:8-25 and 170:7-15 (Mr. Inselbuch)).  Also, if a trustee position falls vacant, the TAC and FCR can veto (subject to Court review) the recommendation of the remaining Trustees for a replacement (Trust Agreement § 4.3(a)).   Finally, a Trustee can be removed at the recommendation of the TAC and FCR with court approval for "good cause" (id. § 4.2(c)).

18.     While in theory the Trustees can attempt to obtain court approval as to any action to which the TAC does not consent (Trust Agreement § 7.13), the most reasonable inference from the facts of record is that it is highly unlikely that the Trustees would do so given that (a) the TAC possesses the continued ability to obstruct other Trustee proposed actions by utilizing its failure to consent; (b) the Trustees have been hand-picked by the TAC and other members of the ACC (in this as well as in other asbestos bankruptcies) because they are expected to heed the "recommendations" of the TAC; and (c) the TAC members have a say in the compensation and continuing service of the Trustees.  Mr. Inselbuch testified that not only does he know of "no occasion" where "trustees [of similar asbestos trusts have] gone to courts … to override refusals to consent by the TAC," but also that he knows of "no occasion where the consent was refused." 9/14/09 Tr. at 74:17-24.  This testimony supports the conclusion that Trustees appointed by leading members of the plaintiffs' bar are not likely to propose changes to a TDP that those attorneys are likely to reject.

13

19.      The Plan Proponents emphasize that the consent of the FCR is also required with respect to the matters as to which the TAC possesses "consent" powers, and that the FCR can act as a check on the ability of the TAC members to unfairly favor their own clients over other Trust Claimants.  But this is not true.  By requiring the consent of the TAC to any change in the TDP or the Trust Agreement, the TAC members can effectively "veto" any change proposed by the Trustees that, while potentially benefitting all claimants as a whole, might disadvantage the personal injury clients of the TAC members.  The FCR's consent or non-consent to any such proposal would not eliminate the TAC members' ability by withholding consent to preclude the proposal from going forward.

20.      Mr. Inselbuch testified that the TAC must be comprised of leading members of the asbestos plaintiffs' bar, because only such persons have "knowledge and understanding of how claims are administered …."  9/14/09 Tr. 35:3-4.  As the Plan Proponents put it in their brief:  "[B]ecause the trustee of an asbestos PI trust was not usually a practicing asbestos personal injury lawyer, and therefore would have limited experience with asbestos personal injury cases, the TAC was created to advise the trustee on such matters."  Plan Proponents Main Brief at 72.  But there is no reason why other experienced lawyers, who do not represent asbestos claimants, cannot advise the Trustees and act as advocates for present PI Trust claimants.  The FCR, David Austern, who has a comparable role to the TAC with respect to future claimants, has never "represented any individual asbestos plaintiff in any capacity."  9/17/09 Tr. at 49:8-10.

21.      Moreover, the Plan Proponents have not advanced any good reason why the TAC's role cannot be purely advisory without including consent powers.  The Plan Proponents claim that requiring the TAC's consent is necessary to "help preserve the agreement struck in the bankruptcy case and embodied in the trust itself."  Plan Proponents Main Brief at 72; *see* 9/14/09

14

Tr. at 68:22 to 69:22 (Mr. Inselbuch).  But CNA is not a party to this so-called "agreement"; it was not asked to and did not participate in drafting of the TDP.[13]

22.     The ACC has presented no reason why a purely advisory role for the TAC would not allow it to provide the benefit of its expertise to the Trustees, given that the asbestos personal injury clients of the TAC members and other ACC members would always be free, if they believed that the Trustees were acting contrary to the governing instruments, to petition the Bankruptcy Court for relief.  Rather, the only reasonable inference is that the ACC wishes to have the TAC members be prominent personal injury attorneys who represent claimants to the Trust, and to have "consent" powers, to ensure that the Trustees cannot exercise their discretion in a way that might harm the clients of the TAC members, as well as the clients of other ACC members who work closely with the TAC members.

23.     In their Phase II Main Brief at 75, the Plan Proponents argue that the TAC members' roles as attorneys for individual Asbestos PI Trust claimants and as fiduciaries to all present Trust Claimants are "compatible," asserting that there is "no inherent conflict in those dual roles."  But there is an inherent and irreconcilable conflict between (1) a duty to be impartial in exercising consent and consultation authority as a TAC member for the benefit of all present beneficiaries (including Indirect PI Trust Claimants like CNA) even though that impartiality can result in lesser recoveries for a lawyer's individual claimants and (2) the duty under the Rules of Professional Conduct to utilize all reasonable efforts to ensure that the recoveries of their individual clients are not diminished even where such a diminution might be in the overall interest of all present PI Trust Claimants.

---

[13]  *See* CNA Ex. 30(A) at CNA0322-23, Ex. 30(C) at CNA0347, and Ex. 30(E) at CNA0367-68 (Plan Proponents' Responses to CNA's Request for Admission No. 7).

24.     There is no reason to believe that the TAC members will approve changes to the TDP (such as the changes that will be required to specify procedures for Indirect PI Trust Claims) with the interests of Indirect PI Trust Claimants (such as CNA) kept paramount. Moreover, there is good reason to believe that the TAC members will not approve changes to the TDP and Trust Agreement that disadvantage their own clients — because this would result in less recovery by their clients and the TAC members themselves (in the form of reduced contingency fees), and would also violate their duties, under the Rules of Professional Conduct, to their individual clients. Indeed, the Plan Proponents argue that "the insurance companies' 'interests are entirely adverse to those of the asbestos claimants ….'" Plan Proponents Main Brief at 71 (quoting *In re Mid-Valley, Inc.*, 305 B.R. 425, 434 (Bankr. W.D. Pa. 2004)). Precisely. That is why the TAC members have a conflict in their duties as fiduciaries to all present Trust claimants, including insurance companies that are Indirect PI Trust Claimants, and their duties to their individual clients.

25.     The Plan Proponents attempt to dismiss CNA's contentions as "hypothetical" and claim that there is no "substantial risk" that their dual roles as TAC members and as attorneys for personal injury claimants will result in favoritism of their clients over other present PI Trust Claimants, such as insurance companies. Plan Proponents Main Brief at 77. The facts of this record demonstrate that this is not correct. As discussed earlier, the TAC members (through their effective ability to "veto" increases in Trustee compensation and changes in the TDP sought by the Trustees that require TAC consent, and through their ability to influence whether these Trustees will be selected as Trustees in this and other asbestos trusts) have the ability to exercise control over the operation and functioning of the Trust, and thus the ability to have the Trust

adopt procedures (such as hiring a particular outside claims facility) that will benefit their individual clients.

26.     That there is "significant risk" that the TAC members will use their powers under the Trust Agreement to enhance the recoveries of their own clients, compared with other claimants to the Trust, is shown in reported decisions in other asbestos bankruptcy cases in which the same TAC members have been found by courts to have engaged in questionable conduct.  For example, in the ACandS bankruptcy, a plaintiffs' prepetition committee composed, in part, of the same TAC members involved here, drafted a proposed plan of reorganization, supposedly on behalf of all asbestos personal injury claimants.  The Bankruptcy Court refused to confirm the Plan, on the ground that it had been drafted for "by and for the benefit" of the clients of the Committee members and was rife with "self-dealing."  *In re ACandS, Inc.,* 311 B.R. 36, 39, 42-43 (Bankr. D. Del. 2004).  In that same case, the debtor, during a period in which it was subject to "unbridled dominance" by the plaintiffs' committee, had retained a firm to process and screen asbestos claims, which in turn (unbeknownst to the debtor) subcontracted the work to an outfit (Clearing House) whose sole principal was a paralegal on leave from the firm of one of the plaintiffs' committee members (Mr. Rice), who is also a TAC member here.  The Bankruptcy Court refused to approve retroactively the retention of this claims processing facility.  *In re ACandS, Inc.,* 297 B.R. 395, 398-400 (Bankr. D. Del. 2003); *In re ACandS*, 311 B.R. at 40, 43.

**III.     THE PLAN DISCRIMINATES AGAINST INDIRECT PI TRUST CLAIMS.**

    **A.     The Court's Findings Must Clarify That Indirect PI Trust Claims Are Not Subject to Disallowance.**

In CNA's Phase II Trial Brief at 20-22, CNA contended that the Plan might discriminate against Indirect PI Trust Claims by making them potentially subject to disallowance by the Court under section 502(e) of the Code on the ground that they are contingent and unliquidated on the

date of Plan Confirmation, even though no such disallowance procedure would be permitted with respect to Direct Asbestos PI Claims that are similarly contingent and unliquidated on the date of Confirmation.  To the extent that the Plan is construed to permit disallowance of Indirect PI Trust Claims, it would discriminate against Indirect Claims and in favor of Direct Claims in contravention of sections 1123(a)(4) and 524(g)(2)(B)(ii)(v) of the Code.

In their Trial Brief, the Plan Proponents dismiss CNA's contention, stating that "nowhere in the Joint Plan or the TDPs is there any process for 'disallowing' [Indirect PI Trust] claims, or an indication that such claims will be 'disallowed' on that basis."  Plan Proponents Main Brief at 68.  They further assert that Indirect PI Trust Claims will not be disallowed under section 502(e). *Id.*[14]

These concessions by the Plan Proponents, while welcome, are not sufficient to rectify CNA's concerns.  Only clarifying findings by this Court in its Confirmation Order will suffice. Concessions by Plan Proponents that were not reflected in either the Plan or a court's findings were recently deemed insufficient by the Supreme Court in *Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195 (2009).  There, the Supreme Court upheld a ruling that the language of the *Manville* channeling injunction applied to certain lawsuits against Travelers even though there was a contemporaneous agreement among interested parties, signed by Travelers, that appeared

---

[14] *See also* Debtors' Chart Summarizing Final Objections to its First Amended Joint Plan of Reorganization at 8 [Docket No. 23114]  (in response to objection that "Plan may discriminate against Indirect PI Trust Claims by making them subject to disallowance on the ground that they constitute Demands," Plan Proponents state that "Indirect PI Trust Claims are not subject to disallowance on such grounds under the Plan"); *id.* at 9 (in response to CNA's objection that Plan may subject Indirect PI Trust Claims to disallowance under section 502(e) if they are "unliquidated and contingent," Plan Proponents state that "CNA's objection is groundless. Nowhere in the Plan or the TDPs is there any process for 'disallowing' such claims, or any indication that such claims would be 'disallowed on this basis.'")

to acknowledge that such lawsuits would not be covered by the channeling injunction. *Id* at 2204.

**B.**    **The Plan Discriminates Against Indirect PI Trust Claims in Other Respects.**

        **(a)**    **CNA's Contentions**

In its Phase II Trial Brief at 22-23, CNA argued that the TDP treats Indirect PI Trust Claimants less favorably than other Asbestos PI Claimants.

        **(b)**    **Evidence Supporting CNA's Contentions**

The following evidence of record supports CNA's position:

1.    All Asbestos PI Claims are classified under the Plan in Class 6.  *See* Plan § 3.1.6. This includes Indirect PI Trust Claims.  *Id.* § 1.1 (33).

2.    CNA is the Holder of Indirect PI Trust Claims as a consequence of claims made against it by the Libby Claimants, Scotts, and BNSF.  *See* Part I.B. *supra*.

3.    Claims of Direct Claimants (*i.e.*, personal injury claimants) will be paid under the TDP upon satisfaction of specified medical/exposure criteria or, alternatively, based on a determination in an individual review process that the claim would be compensable in the tort system (i.e. under applicable state law).  *See* TDP §§ 5.3(a)(3), 5.3(b).

4.    Claims of Indirect Claimants will not be paid under the TDP simply by establishing that they are compensable under applicable state law.  Instead an Indirect Claimant must pay all or a portion of a liability of the Trust to the Direct Claimant before it becomes entitled to make a claim under the TDP, even though the Indirect Claimant would have a viable claim against the Trust under state law without first satisfying the Trust's liability.[15]

---

[15] CNA has the right under Montana law to join Grace in a lawsuit by the Libby Claimants against CNA and seek contribution and indemnity from Grace in that same lawsuit. *See* note 2 *supra*.

5.      Indirect PI Trust Claimants are also placed in a less favorable position in the FIFO Queue than Direct Claimants.  Post-Effective Date Direct PI Claims are placed in the FIFO Queue as of the date filed (TDP § 5.1(a)(1)), while Indemnified Insurer TDP Claims are placed in the FIFO Queue, not as of the date filed, but rather only after an agreement is reached with the Trust as to the amount due or after an ADR award is made. (TDP § 5.13).

6.      The Plan Proponents assert that there is no discrimination between the treatment of Indirect PI Trust Claims and Direct PI Trust Claims since both are "subject to the same claims process — the Asbestos PI Trust governed by the terms of the Asbestos PI TDP." Plan Proponents Main Brief at 67.  However, the TDP is not a single "process" but contains multiple processes.  The less favorable TDP treatment of Indirect Claimants compared to the treatment of Direct Claimants discriminates among claimants in the same class, Class 6, and thereby violates sections 1123(a)(4) and 1129(a)(1) of the Code.

## IV.    THE PLAN IMPROPERLY LIMITS SECTION 524(g) PROTECTION TO INSURERS WHO SETTLE BEFORE THE END OF THE CONFIRMATION HEARING.

### A.    CNA's Contentions

In its Phase II Trial Brief at 23-27, CNA argued that the Plan violates section 524(g) of the Code by precluding insurers that settle with the Debtors and/or the Trust post-confirmation from being eligible to obtain the benefits of a section 524(g) channeling injunction.  CNA argued that section 524(g), by its plain wording, does not provide that a Plan may impose any restrictions, whether temporal or otherwise, on a court's ability to find that an insurer has made a "fair and equitable" contribution to the Trust justifying the extension of the Channeling Injunction to such insurer.  *See* 11 U.S.C. § 524(g)(4)(B)(ii).  CNA also argued that limiting the availability of a section 524(g) injunction only to insurers who settle pre-confirmation would mean that the Plan would not have adequate means for implementation, as required by section

20

1123(a)(5). Specifically, by precluding section 524(g) injunctive protection for certain insurers that settle post-confirmation, the likelihood of future settlements by the Trust with insurers would be diminished, and those insurers that do settle would not be willing to pay as much as they would have if they had been able to obtain the benefit of the section 524(g) injunction.

### B.    Evidence Supporting CNA's Contentions

The following evidence supports CNA's position:

1.    The Plan provides that only a "Settled Asbestos Insurance Company" can obtain the protection of the section 524(g) injunction. *See* Plan §§ 1.1(50); 8.2; 8.3. An earlier version of the Plan defines "Settled Asbestos Insurance Company" to include "any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement ***prior to the conclusion of the Confirmation Hearing* ...."** PP Ex. 277.01 Rev. § 1.1(200) (emphasis added). During the trial, the Plan Proponents submitted a modified Plan that defines "Settled Asbestos Insurance Company" as "any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement ***prior to the eleventh day following entry of the Confirmation Order by the Bankruptcy Court* ...."** Plan § 1.1(201) [Docket No. 23474] (emphasis added).

2.    The modified definition of "Settled Asbestos Insurance Company" still will not allow the Court to extend the section 524(g) injunction to insurers that settle with Debtors or the Trust more than 10 days after the Confirmation Order is entered.

3.    Eliminating the ability of an insurer to obtain section 524(g) relief post-Confirmation will diminish the likelihood of settlement, as well as the amount of monies that might be put forth to settle. The Plan Proponents concede that Sealed Air and Fresenius are contributing a combined $1.1 billion to the Trust "for one primary reason … the protection from future successor liability offered by section 524(g) of the Bankruptcy Code." Plan Proponents

<u>Main Brief at 40</u>.[16]  And the Plan Proponents' feasibility expert, Pamela Zilly, testified that one "major difference" between a Chapter 7 liquidation and a Chapter 11 reorganization is that Sealed Air and Fresenius could not have received the protection of section 524(g) protection against successor liability under Chapter 7.  <u>9/17/09 Tr. at 131:10-21</u>.  Ms. Zilly stated that "the fact that there would be 524(g) protection for those parties going forward [is] in my view, and I believe it's a reasonable view, [what] drove the settlement discussions and the dollars that Sealed Air and Fresenius ultimately settled for."  <u>*Id.* at 131:22–132:1</u>.

4.      The same result attaches to insurers' willingness to settle.  On that score, Mr. Austern, the FCR, testified that he had agreed that section "524(g) protection should be extended to … settled insurers  ….  [b]ecause 524(g) specifically articulates the fact that such protection can be granted, and … ***it is an inducement for such settlements***, and I believe it, again, will provide ***enormous benefit to the future beneficiaries***."   <u>9/17/09 Tr. at 65:13-21</u> (emphasis added).

## V.      THE PLAN FAILS TO COMPLY WITH SECTION 524(g) FUNDING REQUIREMENTS.

As a holder of Indirect PI Trust Claims and a creditor of the Debtors, CNA has a direct interest in ensuring the long-term viability of the Trust.  Section 524(g) of the Code prescribes specific requirements for funding of asbestos trusts to ensure such long term viability.  Because the Plan does not comply with these requirements, it cannot be confirmed.

---

[16] *See also* <u>Plan Proponents' Response to Supplemental Trial Brief of Libby Claimants Addressing Best Interests of Creditors Test under 11 U.S.C. § 1129(a)(7) at 6 [Docket No. 23170]</u> ("[I]t is a virtual certainty that Sealed Air and Fresenius have no incentive to contribute to a Chapter 7 liquidation ….  The main impetus behind Sealed Air and Fresenius settling with Debtors was for protection against successor liabilities under § 524(g) of the Bankruptcy Code, which is available only in a chapter 11 case.")

**A.      The Plan Fails to Comply with the Section 524(g)(2)(B)(i)(II).**

(a)      **CNA's Contentions**

In its <u>Phase II Trial Brief (at 27-30)</u>, CNA argued that the Plan does not satisfy section 524(g)(2)(B)(i)(II) of the Code, which requires that an asbestos trust be "funded in whole or in part by the securities of 1 or more debtors … and by the obligation of such debtor or debtors to make future payments, including dividends."   CNA's Trial Brief argued that by requiring that "securities" be placed in asbestos trusts, Congress modeled section 524(g) on the *Manville* Plan, and that, as in *Manville*, asbestos trusts must have an equity stake in the reorganized debtor.   The two purported "securities" to be placed in the Grace Trust are: (a) a Warrant to purchase stock in the Reorganized Debtor and (b) a Deferred Payment Agreement.   Neither gives the Trust (or the asbestos claimants) a stake in the Debtors' successful reorganization, since the reorganized company's success would not increase the value of the Warrant (which expires one year after confirmation) or the deferred payments that are due.   As such, they do not constitute the kind of equity securities that are needed to satisfy section 524(g).   CNA's Phase II Trial Brief also discussed caselaw from this Circuit supporting the view that the "securities" requirement of section 524(g) is intended to ensure that the Reorganized Debtor will provide an "evergreen" funding source for future asbestos claimants.[17]

(b)      **Evidence Supporting CNA's Contentions**

The following evidence supports CNA's position:

---

[17] *See* <u>*In re Combustion Engineering,*</u> 391 F.3d 190, 248 (3d Cir. 2004) (the "implication of [section 524(g)(2)(B)(i)(II)] is that the reorganized debtor must be a going concern, such that it is able to make future payments into the Trust to provide an 'evergreen' funding source for future asbestos claimants"); <u>*In re Congoleum Corp.*</u>, 362 B.R. 167, 175 (Bankr. D.N.J. 2007) ("despite the express requirements of § 524(g), and explicit concern expressed by the Third Circuit, it was not until the Seventh Modified Joint Plan was filed … that the Debtors [or the Debtors' parent] proposed contributing any equity toward the Plan Trust.")

1.      Under the Plan, no equity securities of the Debtor or an affiliate will be placed in the Asbestos PI Trust.  Rather, the only purported "securities" to be placed in the Trust are:  (a) a Warrant for ten million shares of Reorganized Grace common stock, at $17 per share, which must be exercised roughly within one year of the confirmation date; and (b) the Deferred Payment Agreement to make deferred payments of $110 million for five years beginning in 2019 and $100 million per year for ten years beginning in 2024.  Plan §§ 1.1(36), 1.1(46), 7.1.4.

2.      The concept of the channeling injunction, as specified in sections 524(g) and (h) of the Code, was "modeled on" the injunction that "came out of the *Manville* bankruptcy." 9/14/09 Tr. at 76:2-3 (Mr. Inselbuch).

3.      The *Manville* personal injury trust "received equity stock in the reorganized debtor" and "had a right to share in the reorganized Manville's profits in the future." *Id.* at 76:14-20 (Mr. Inselbuch).  More specifically, the *Manville* trust became the largest shareholder in the reorganized company and received a call on 20% of future profits.[18]  As a result, asbestos claimants had "a stake in Johns-Manville's successful reorganization, because the company's success would increase both the value of the stock held by the trust and the company profits set aside for it."  140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994).

**B.      The Plan Fails to Satisfy Section 524(g)(2)(B)(i)(III).**

**(a)      CNA's Contentions**

CNA's Phase II Trial Brief (at 30-32) argues that the Plan does not satisfy section 524(g)(2)(B)(i)(III) of the Code, which requires that the Trust must "own, or by the exercise of rights granted under such plan [of reorganization] be entitled to own if specified contingencies occur, a majority of the voting shares" of the debtor or certain named affiliates of the debtor.  11

---

[18] *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

U.S.C. § 524(g)(2)(B)(i)(III).  Under the Plan, the PI and PD Trusts have the right to jointly own 50.1% of the voting shares of the Reorganized Debtor if it defaults on its deferred payment obligations to the Trusts.  CNA argued that this "contingency" fails to satisfy section 524(g) both because (1) the contingency would only occur if the Reorganized Debtor was *in extremis;* and (2) in any event, it would now not allow the Asbestos PI Trust (or the Asbestos PD Trust for that matter) to own, on its own, a majority of the voting shares of the Debtor or an affiliate, since only the two trusts <u>together</u> would be entitled to own 50.1% of the voting shares of the Reorganized Debtor.

### (b)  Evidence Supporting CNA's Contentions

The following evidence adduced at trial, and concessions made by the Plan Proponents in their trial briefs, support CNA's contention.

1.    The Plan provides that, upon the occurrence of certain "Events of Default," the Asbestos PI Trust and the Asbestos PD Trust have the right to jointly obtain 50.1% of the voting shares the Reorganized Debtor.  (<u>Plan § 7.7(h)</u>).  These "Events of Default" consist of: (a) failure to timely make any PI or PD Deferred Payment, or other breaches of the Deferred Payment Agreement; or (b) voluntary or involuntary bankruptcy, dissolution, liquidation, failure to pay debts as they become due, the appointment of a receiver or a general assignment for the benefit of creditors by Grace or the Parent Guarantor.  *See* <u>PP Ex. 277.11 [Rev.], § 8 [at PP 017334-35]</u>.

2.    None of these "contingencies" will be realized unless and until the Reorganized Debtor is effectively unable pay its obligations as they accrue, and therefore will be *in extremis*.  At that point, the right to obtain any common stock of the Reorganized Debtor could or would be worthless.

3.    The Plan Proponents concede that the contingencies under which the Trust obtains majority ownership "'need to precede the financial "point of no return" for the Debtor.'"

Plan Proponents Main Brief at 122 (quoting *In re Congoleum Corp.,* 362 B.R. at 167, 176 (Bankr. D.N.J. 2007)).   The Plan Proponents argue, however, that certain specified Events of Default might occur without the Reorganized Debtor necessarily passing the financial point of no return.   These Events of Default, as identified by the Plan Proponents in their brief, are "a failure by Grace to maintain licenses and qualifications necessary to conduct its businesses" or "payment of a dividend when the company's value is below the Threshold Amount."   Plan Proponents Main Brief at 122.   An enterprise that has failed to maintain the licenses and qualifications necessary to conduct its business is a company that is *in extremis*.   So, too, is a company that pays dividends when it does not have specified value to continue as a going enterprise.

4.     While the Asbestos PI Deferred Payment Agreement is secured against payment default by 50.1% of the common stock of Reorganized Grace (Plan § 1.1(36)), the Class 7A and Class 7B Asbestos PD Deferred Payment Agreements are secured by the same 50.1% of the Parent's Common Stock.   (Plan §§ 1.1(77), (80)).   Thus, in the event of default, neither Trust would be able to obtain majority voting control of the Reorganized Grace, contrary to the plain language of section 524(g)(2)(B)(i)(III).

5.     The Plan Proponents contend that section 524(g) permits the employment of multiple trusts based on the rule of statutory construction that the singular includes the plural. Plan Proponents Main Brief at 116-18, 122-23 (citing 11 U.S.C. § 102(7)).   Even if that is so, this does not change the fact that section 524(g) requires that each trust separately have the right, under specified contingencies, to obtain a majority of voting shares of the debtor or of certain affiliates.   In any event, the rule that the "singular includes the plural" does not apply when the

intent of Congress is that "singular" means "singular."[19]  Here, the purpose of the voting control requirement is to ensure that the Trust on its own can obtain control of the Reorganized Debtor prior to the enterprise becoming so far gone that its stock becomes worthless, and use that control to benefit Trust beneficiaries.  That purpose would be thwarted if ownership of the shares are split between multiple Trusts, which could hinder the efforts of the PI Trustees to use voting control for the benefit of PI Claimants.

## VI.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT MODIFIES CNA'S RIGHTS UNDER ITS POLICIES AND AGREEMENTS WITH DEBTORS.

### A.    The Court's Findings Should Make Clear That the Plan Does Not Impair CNA's Rights Under Its Asbestos Insurance Reimbursement Agreement.

In its Phase II Trial Brief at 32-34, CNA showed that it entered into a May 22, 1997 Settlement Agreement with the Debtor that constitutes an "Asbestos Insurance Reimbursement Agreement" under the Plan.  The Agreement provides that CNA will pay the Debtors for defense and indemnity of asbestos-related claims, and also imposes certain obligations on the Debtors. These include an obligation to indemnify CNA against asbestos-related claims arising out of specified policies to the extent of CNA's payments under the May 1997 Agreement.  CNA Ex. 32(C) at CNA0489-90.  They also include an obligation to follow a specific payment formula (id. at CNA 0476-80), to provide information and quarterly reports (id. at CNA 0484) and allow for inspection of Grace's and its counsel's files (id. at CNA 0486).

CNA argued that Plan § 7.2.2(d)(iv) could be construed to mean that the Trust's payments under the TDP constitutes full compliance with all of Grace's obligations under the Asbestos Insurance Reimbursement Agreement, such that the Trust would not be obligated to

---

[19]  As the Supreme Court recently stated, it has relied on the rule of the analogous provision of the Dictionary Act  (1 U.S.C. § 1) that the singular includes the plural only "[o]n the rare occasions when … doing so was 'necessary to carry out the evident intent of the statute.'" United States v. Hayes, 129 S.Ct. 1079, 1085 n.5 (2009).

satisfy Grace's other obligations under the Agreement, including the duty to indemnify CNA.[20]

When combined with the language of Plan § 7.13, which discharges the Debtors from any further

obligations to perform, section 7.2.2(d)(iv) arguably eliminates CNA's rights to performance by

Grace under the Asbestos Insurance Reimbursement Agreement with no compensation from the

Debtors or the Trust.

     In their Phase II Trial Brief Regarding Insurance Issues [Docket No. 22728] at 24, the

Plan Proponents assert that section 7.2.2(d)(iv) of the Plan merely means that payments made by

the Asbestos PI Trust under the TDP "must be accorded the same status as payments made by

the pre-petition Debtors with respect to Asbestos Insurance Reimbursement Agreements."  The

Plan Proponents argue that "nothing in Section 7.2.2(d)(iv) purports to strip alleged obligations

from the Asbestos Insurance Reimbursement Agreements" and that "the Insurance Companies

remain free to complain about any alleged failure by the Asbestos PI Trust, for example, to abide

by any audit or reporting obligation in those agreements …." Id. at 24.[21]

     In order to try to render innocuous the Plan's modification of Asbestos Reimbursement

Agreements, the Plan Proponents, in their Trial Brief, further represent to the Court that, under

the Plan, any indemnification obligations contained in Asbestos Insurance Reimbursement

Agreements "would be treated as obligations of the Trust … (assuming that [the] Insurance

Companies were performing under those agreements), and not as Indirect PI Trust Claims," and,

---

    [20] Section 7.2.2(d)(iv) of the Plan provides that the Trust's payment of a claim under the TDP "shall be deemed to constitute settlement and payment of such claim by or on behalf of the Debtors … within the meaning of, and in full compliance with, each Asbestos Insurance Reimbursement Agreement."

    [21] See also Debtors' Chart Summarizing the Final Objections to W.R. Grace Joint Chapter 11 Plan at 26 [Docket No. 23114] ("§ 7.2.2(d)(iv) merely makes it clear that the Trust is a successor to the Debtors with respect to the Asbestos Reimbursement Insurance Agreements and must make payments the Debtors would have made under the framework of the TDP …. Other than this narrow, legal, necessary exception nothing in § 7.2.2(d)(iv) strips obligations from the Agreements.").

as such, would be paid in full, and not pursuant to the Trust's payment percentage.  <u>Plan Proponents Phase II Brief Regarding Insurance Issues at 32</u>.[22]

The Plan Proponents' construction of <u>Plan § 7.2.2(d)(iv)</u> is not clear from the wording of that provision.  Nor is it clear, from the wording of the Trust Agreement or the TDP, that the Debtors' indemnification obligations under Asbestos Insurance Reimbursement Agreements would be deemed obligations of the Trust, and not Indirect PI Trust claims.  If the Court permits the transfer to the Trust of the rights under CNA's May 1997 Asbestos Insurance Reimbursement Agreement, then it should also, at a minimum, make clear in its Confirmation Order that: (1) all obligations of the Debtors under Asbestos Insurance Reimbursement Agreements will likewise be transferred to the Trust and must be performed by the Trust; and (2) any indemnification obligations in such Agreements are enforceable in full against the Trust as obligations of the Trust, and are not Indirect PI Trust Claims.  As discussed above in Part III.A., concessions made by Plan Proponents themselves might not be given effect in the future if not reflected in the decision of this Court.

> **B.    The Section 524(g) Injunction Fails to Include All of the CNA Policies Encompassed by CNA's Asbestos Insurance Reimbursement Agreement and Its Asbestos Insurance Settlement Agreements.**
>
> **(a)    CNA's Contentions**

In its <u>Phase II Trial Brief at 34-35</u>, CNA argued that the Plan has inadequate means of implementation in violation of section 1123(a)(5) of the Code because it fails to enjoin claims against CNA that could, and should, be enjoined under section 524(g) of the Code.  Specifically,

---

[22]   *See also* <u>Debtors' Chart Summarizing Final Objections to the W.R. Grace Joint Chapter 11 Plan at 26</u> ("enforceable indemnification claims [under Asbestos Insurance Reimbursement Agreements] will be treated as obligations of the Trust under the transferred agreements (assuming the insurers are performing under those agreements), and not as Indirect PI Trust Claims.").

at least as listed on the Schedule of Settled Asbestos Insurers Entitled to 524(g) Protection ("524(g) Schedule") (PP Ex. 277.05 Rev.), the Plan fails to enjoin claims under section 524(g) to the full extent of indemnity obligations of the Debtors to CNA under pre-petition settlement agreements. In this regard, the 524(g) Schedule omits certain CNA excess policies which have been settled and for which the Debtors have provided indemnity, and with respect to CNA primary policies, the 524(g) Schedule fails to adequately describe the scope of the claims being enjoined.

CNA also argued that the Plan provides for disparate treatment among settled insurers in violation of both sections 524(g) and 1123(a)(4) because the Plan provides some Settled Asbestos Insurance Companies with contingent and non-contingent Class 6 claims or demands for indemnification from the Debtors the full protection of the section 524(g) injunction while not providing such protection to other settled insurers, such as CNA, that also hold Class 6 claims for indemnification. CNA Phase II Trial Brief at 35-36.

> ### (b)     Evidence Supporting CNA's Contentions

The following evidence supports CNA's position:

1.      In February and May of 1997, CNA and Grace entered into two settlement agreements that resolved disputes related to certain asbestos-related claims under excess policies issued by CNA to Grace. These Agreements require that Grace indemnify CNA for certain asbestos-related claims as set forth in those Agreements. *See* CNA Ex. 32(B) at CNA0464; CNA Ex. 32(C) at CNA0489-90. CNA is presently entitled to indemnification from Grace against claims arising out of those policies to the extent CNA has already made payments pursuant to those Agreements. Nonetheless, the 524(g) Schedule omits the policies (Policy Nos. RDX893683, RDX915664, and RDX178452) settled under the February and May 1997

Settlement Agreements.  *Compare* PP Ex. 277.05 Rev. at PP017241 *with* CNA Ex. 32(C) at CNA0499 and CNA Ex. 32 (B) at CNA0464.

2.    CNA and Grace also entered into an August 1990 Agreement to resolve disputes related to three primary policies issued by CNA to Grace for the period June 30, 1973, through June 30, 1987.[23]  CNA Ex. 32(A) at CNA0394-96.  The August 1990 Agreement requires that Grace indemnify CNA for certain claims arising out of these primary policies.  *Id.* at CNA0400-02.  There are multiple complex terms and definitions in the 1990 Settlement Agreement that may affect the scope of the claims released.  For instance, the releases and indemnity in the August 1990 Agreement indisputably cover asbestos personal injury claims within certain "Operations" as included in the definition of "Products" in the primary policies, and cover policies running through June 3 1987.  *See* id. at CNA0397-98, CNA0400-02; CNA Ex. 19(A) at 14-15 (defining "products"); CNA Ex. 19(B) at 10-11(same); CNA Ex. 19(C) at 9 (same).  Yet the current 524(g) Schedule reduces CNA's indemnity for these primary policies to claims for "Products coverage," and only under policies through 1985.  PP Ex. 277.05 Rev. at PP017241.  Similarly, there are broad definitions in the policies that may impact the scope of the releases and indemnities in the August 1990 Agreement.  *See* CNA Ex. 19(C) at 8-10.

3.    Construction of the August 1990 Agreement and applicable indemnities involve coverage issues not presently before this Court, and a simple modification to the 524(g) Schedule, stating that claims are enjoined to the extent that the Debtors in the August 1990 Settlement Agreement released claims against CNA and agreed to provide CNA with indemnity, would easily correct obvious deficiencies in the Plan Proponents' characterization, and obviate

_____

[23] The August 1990 Agreement covered Policy Nos. CCP902-36-70 (effective 6/30/73-6/30/76) and CCP2483440 (effective 6/30/76-6/30/83) for their entire policy periods, and CCP2483440 (effective 6/30/83-6/30/88) for the period 6/30/83-6/30/87.  CNA Ex. 32(A) at CNA0394.

other issues.  The Plan Proponents have in fact already so provided with respect to certain other settlements.  For example, the Debtors' settlements with Royal and Allstate are now listed in the revised 524(g) Schedule as being enjoined "pursuant to" those settlement agreements.  *See* Notice of First Set of Plan Modifications to Joint Plan of Reorganization, Ex. 5 at 1, 12 [Docket No 23177].

4.    The Plan cannot be confirmed until it is modified to provide section 524(g) protection to CNA for policies covered by the February 1997 and May 1997 Agreements and to provide section 524(g) protection to CNA that is coextensive with the indemnification Grace is required to provide to CNA under the August 1990 Agreement.  Modification of the Plan so that the section 524(g) injunction is coextensive with the terms of the settlements ensures that the Court will refrain from construing the terms of the settlements and thus avoid making any coverage decisions related to the terms of the settlements.

### C.    The Plan Abrogates the Anti-Assignment Provisions In CNA Policies.

#### (a)    CNA's Contentions

In its Phase II Trial Brief at 36-38, CNA argued that the Plan impermissibly allows the Debtors to assign to the Trust all Asbestos Insurance Rights in violation of the express provisions of the CNA policies that preclude the assignment of interests in the policies without CNA's consent.

#### (b)    Evidence Supporting CNA's Contentions

The following evidence supports CNA's position:

1.    The Plan states that, on the Effective Date, all Asbestos Insurance Rights "shall be irrevocably transferred to and vested in the Asbestos PI Trust."  Plan § 7.2.2(d)(ii).  Asbestos Insurance Rights include, among other things, all rights, titles, privileges, and interests with respect to any Asbestos Insurance Policy.  Plan § 1.1(13).  While the Plan transfers all Asbestos

Insurance Rights, it is unclear whether the Debtors' obligations under the policies are also
transferred.  CNA Phase I Trial Brief at 9-14.

    2.    CNA issued 16 high-level excess insurance policies to Grace between July 17,
1974, and June 30, 1985, that are not the subject of an Asbestos Insurance Settlement Agreement
or an Asbestos Insurance Reimbursement Agreement.  See CNA Exs. 17(A)-(P).  The CNA
policies either contain an anti-assignment provision,[24] or follow form to first layer excess
policies that include anti-assignment provisions.[25]  For example, a Harbor Insurance Company

---

[24] See, e.g., Harbor Insurance Company Policy #120346 (CNA Ex. 17(B) at prior bates
no. 00610; Buffalo Reinsurance Company Policy #508040 (CNA Ex. 17(K) at prior bates no.
002833).

[25] CNA's excess policies follow form to first-layer excess policies that have anti-
assignment provisions as follows:

The Boston Old Colony Policy #LX2666569 (CNA Ex. 17(A) at prior bates no. 556)
follows form to three policies, each of which includes an anti-assignment provision: Unigard
Mutual Insurance Co. Policy #1-2517 (CNA Ex. 18(A) at prior bates no. 00474) for policy
period 7/17/74-6/30/75; Northbrook Insurance Co. Policy #63-001-170 (CNA Ex. 18(B) at page
13) for policy period 6/30/75-6/30/76; and Lloyds of London Policy #76DD1594C (CNA Ex.
18(C) at prior bates no. WRG0637) for policy period 6/30/76-6/30/77.

Continental Casualty Co. Policy #RDX1788117 (CNA Ex. 17(C) at prior bates no.
01111) and Continental Casualty Co. Policy #RDX1788118 (CNA Ex. 17(D) at prior bates no.
1173) also follow form to Lloyds of London Policy #76DD1594C (CNA Ex. 18(C) at prior bates
no. WRG0637), which contains an anti-assignment clause.

Continental Casualty Co. Policy #RDX1784282 (CNA Ex. 17(E) at unnumbered page 7),
Continental Casualty Co. Policy #RDX1784981 (CNA Ex. 17(F) at unnumbered page 7), and
Buffalo Reinsurance Co. Policy #BR507551 (CNA Ex. 17(G) at unnumbered page 11), follow
form to Lloyds of London Policy #79DD1633C (CNA Ex. 18(D) at page numbered 8 of 11),
which contains an anti-assignment clause.

Continental Insurance Co. Policy #SRX3193093 (CNA Phase I Ex. 17(H) at prior bates
no. 2527) follows form to the C.T. Bowring cover note PY107779 for the Lloyds of London
Policy #79DD1633C (CNA Ex. 18(D) at numbered page 8 of 11). The complete London
Guarantee and Accident Co. Policy #LX3193640 (CNA Ex. 17(I)) would include the same
follow-form endorsement as earlier London Guarantee and Accident Co. policies and thus would
follow form to Lloyds of London Policy #79DD1633C (CNA Ex. 18(D) at page numbered 8 of
11).

Continental Casualty Co. Policy #RDX1785056 (CNA Ex. 17(J) at unnumbered page 8),
Continental Insurance Co. Policy #SRX1591702 (CNA Ex. 17(L) at prior bates no. 2822),

policy includes an anti-assignment provision that states:  "This policy shall not be assigned in whole or in part without the written consent of the company or its authorized representative."[26]

3.      The Plan Proponents have conceded that the proposed transfer of Asbestos Insurance Rights was formulated without CNA's participation, and without its consent.  CNA Ex. 30(A) at CNA0321; CNA Ex. 30(C) at CNA0345-0346; CNA Ex. 30(E) at CNA0366 (Responses of ACC, Debtors, and FCR to CNA's Request for Admission No. 1).

4.      The anti-assignment clauses that preclude the transfer of any rights or obligations under CNA's policies are enforceable private contractual rights that have been upheld under state law and have not been preempted by the Bankruptcy Code.  CNA has neither waived the anti-assignment provisions of its policies, nor has it consented to the transfer of any Asbestos Insurance Rights under the policies.  The transfer of Asbestos Insurance Rights under the Plan abrogates CNA's right to enforce the anti-assignment provisions of its policies, and requires that Plan confirmation be denied.

**D.      The Sealed Air Injunction and Release Violates the Terms of CNA's Settlement Agreements with Debtor and Sealed Air with Respect to Asbestos and Non-Asbestos Claims.**

**(a)      CNA's Contentions**

The non-debtor release and injunction under the Plan running in favor of Sealed Air improperly releases and enjoins contractual indemnification claims that CNA has against Sealed Air (including indemnification claims arising from asbestos and environmental coverage claims)

---

London Guarantee and Accident Co. Policy #LX1898010 (CNA Ex. 17(M) at prior bates no. 2873), Continental Casualty Co. Policy #RDX1785096 (CNA Ex. 17(N) at unnumbered page 7), Continental Insurance Co. Policy #SRX1591976 (CNA Ex. 17(O) at unnumbered page 6), and London Guarantee and Accident Co. Policy #LX2107836 (CNA Phase I Ex. 17(P) at unnumbered page 3), follow form to Lloyds of London Policy #KY017582 (CNA Ex. 18(E) at page numbered 8 of 11), which contains an anti-assignment clause.

[26] CNA Ex. 17(B) at prior bates no. 00610.

and is impermissible for the reasons set forth in CNA's <u>Final Plan Objections at 15 and 35-36</u> <u>[Docket No. 21794]</u> and the <u>Phase II Trial Brief of OneBeacon America Insurance Company and</u> <u>Seaton Insurance Company at pp. 24-25 and 38-39 [Docket No. 22433]</u>.[27]

### (b)    Evidence Supporting CNA's Contentions

The following evidence of record supports CNA's position.

1.    On February 13, 1997, CNA and certain Grace entities (including W.R. Grace & Co., a Delaware corporation ("Grace-Del.")) entered into a settlement agreement that resolved disputes related to asbestos-related claims under certain excess policies issued by CNA to Grace. *See* <u>CNA Ex. 32(B)</u>. The February 13, 1997 Agreement required Grace-Del., among other Grace parties, to indemnify CNA for specified asbestos-related claims as set forth in the Agreement. *See* <u>CNA Ex. 32(B) at CNA0464</u>.

2.    Various Grace entities (including Grace-Del.) and CNA also entered into a settlement agreement dated May 22, 1997.    <u>CNA Ex. 32(C)</u>.    That Agreement required that Grace-Del. and other Grace parties indemnify CNA for certain asbestos-related claims based upon excess policies RDX893683, RDX915664 (for multiple policy years) and RDX178452. <u>CNA Ex. 32(C) at CNA0489-90</u>, <u>CNA0499</u>.

3.    On May 30, 1997, CNA entered into a settlement agreement with Grace, including Grace-Del. which imposes certain obligations on Grace and Grace-Del., including to indemnify and defend CNA against, *inter alia*, certain environmental claims asserted by third parties claiming coverage under certain policies settled pursuant to the Agreement.  *See* <u>CNA Ex. at CNA0952</u> (Grace-Del. "shall indemnify and hold [CNA] harmless against any and all liability … as result of any claims … which are based upon the Policies and … matters expressly released

---

[27] CNA expressly reserved its right to adopt Plan objections made by other parties.  *See* <u>CNA's Phase II Trial Brief at 38</u>; <u>CNA's Final Plan Objections at 39</u>.

herein."). The matters released in the agreement included all pollution claims under any asserted "Gradual Pollution" limits of the policies. _Id._ at CNA0951. These policies include primary policies CCP 902-36-70, CCP 2483440 with a policy period from 6/30/1976 to 6/30/1983, and CCP 2483440 with a policy period from 6/30/1983 to 6/30/1987.[28] _See_ CNA Ex. 38 at CNA0959.

4.      In connection with the Cryovac Transaction, Grace-Del. in 1998 changed its name to Sealed Air Corporation. _See_ Plan § 1.1(193) (definition of "Sealed Air Corporation"); Tr. 9/15/09 at 112:1–113:14 (Mr. Shelnitz); PP Exs. 507.006-.008; PP Ex. 243 at PP009942 (Declaration of David B. Siegel, Senior Vice President and General Counsel of Grace).

5.      Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc. (collectively, "Kaneb") have asserted environmental coverage claims against CNA under the three CNA primary insurance policies and three of the excess policies that were the subject of the May 30, 1997 Agreement.[29] Kaneb's claims against CNA arise out of alleged pollution damage at Otis Air Force Base in Massachusetts and a fuel pipeline site in Macon, Georgia.[30] Kaneb's claims trigger the Debtors' and Sealed Air's indemnification obligations under the May 30, 1997 Agreement.

6.      On September 2, 2004, Scotts filed an Adversary Proceeding against Grace and certain of its insurers, including CNA. _See_ CNA Phase II Ex. 3. In that action, Scotts claims to be a "vendor" of Grace's alleged asbestos contaminated vermiculite and purports to be entitled to

---

[28] As noted in footnote 23 _supra_, while the later Primary Policy CCP 2483440 had a policy period from 6/30/83 to 6/30/88, the May 30, 1997, Agreement settled certain coverage under the policy only from 6/30/83 to 6/30/87.

[29] _See_ Motions of Kaneb Pipe Line Operating Partnership, L.P., and Support Terminal Services For an Order Modifying the Automatic Stay [Docket Nos. 20538 and 20846].

[30] _Id._ In a subsequent settlement agreement approved by this Court in 2005, the Debtor expressly released CNA from claims arising from the Otis site. _See_ Docket Nos. 7619, 8023.

coverage under certain Grace insurance policies, including the excess policies that are the subject of the May 22, 1997 Agreement.  Thus, the Scotts Adversary Proceeding triggers, *inter alia*, Sealed Air's obligations to indemnify CNA under that Agreement.

7.    Sealed Air is not a debtor in these chapter 11 cases.  *See* Plan § 1.1(95) (definition of "Debtors").  The Plan provides for various injunctions and releases in favor of Sealed Air that improperly bar CNA from asserting indemnification claims against Sealed Air arising from the February 13, May 22 and May 30, 1997 Agreements.  Section 7.13 of the Plan provides that "Asbestos-Protected Parties shall be … fully released from … any and all Asbestos-Related Claims …."  Plan § 7.13.  "Asbestos-Protected Parties" include Sealed Air.  *Id*. § 1.1(50).  The definition of Asbestos-Related Claims includes Asbestos PI Claims.  *Id*. §§ 1.1(51), (6).  Asbestos-Related Claims also include: "SA Claims … based on or arising from … Successor Claims based on or arising from, in whole or in part, directly or indirectly, … the Cryovac Transaction…."  *Id*. § 1.1(51).  This includes claims in addition to claims arising from exposure to asbestos.  *See id*. §§ 1.1(182), (188), (195) and (205).  Because CNA's indemnification claims are premised on the contractual indemnification obligation of Grace-Del., which is now Sealed Air, and thus could be encompassed by the definition of Asbestos-Related Claims, the effect of § 7.13 of the Modified Plan is to bar CNA's indemnification claims against Sealed Air.  *Id*. at §§ 1.1(51), 7.13.

8.    The Plan also provides for a Successor Claim Injunction in favor of Asbestos Protected Parties which may similarly bar CNA's claims against Sealed Air arising from the May 30, 1997 Agreements.  *See* Plan § 8.5.1.

9.    The Plan Proponents assert that the releases and injunctions running in favor of Sealed Air have previously been approved by the Court and are otherwise permitted under

applicable Third Circuit law.  <u>Plan Proponents Main Brief at 81-98</u>.  For the reasons set forth in

<u>OneBeacon and Seaton Phase II Post-Trial Brief</u>, the Plan Proponents' *res judicata* arguments are

incorrect, both as a matter of law and fact.  In this regard, the Third Circuit requires that specific

findings must be made that a proposed release of a non-debtor is fair to a creditor of the non-

debtor.  *See* <u>*In re Continental Airlines,* 203 F.3d 203, 214 (3d Cir. 2000)</u>.  Here, the Sealed Air

release cannot be considered "fair" to CNA, as the Plan gives CNA nothing in return for

eliminating CNA's rights against Sealed Air.  Since CNA's indemnification claims against

Sealed Air are improperly enjoined and released without CNA's consent and without any

compensation, such releases and injunctions are impermissible and render the Plan

unconfirmable.  *See* <u>CNA Final Objections at 15, 35-36</u>; <u>OneBeacon and Seaton Phase II Trial</u>

<u>Brief at 24-25, 38-39</u>.

## VII.    INCORPORATION BY REFERENCE OF CERTAIN OTHER OBJECTIONS

CNA reserves the right to join the post-trial briefs filed by other Objectors.

## CONCLUSION

CNA respectfully requests that the Court not confirm the Plan unless the Plan is modified

to satisfy CNA's objections, and that it provide such further relief as is just and proper.

Dated:  November 2, 2009

FORD MARRIN ESPOSITO WITMEYER &          ROSENTHAL, MONHAIT &
GLESER, L.L.P.                                               GODDESS, P.A.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875                     By:  /s/ Edward B. Rosenthal
Telephone: (212) 269-4900                              Edward B. Rosenthal (*Bar No. 3131*)
Facsimile: (212) 344-4294                               P.O. Box 1070
                                                                    Wilmington, Delaware 19899
                                                                    Telephone: (302) 656-4433x6
                                                                    Facsimile: (302) 658-7567

WILDMAN, HARROLD, ALLEN
& DIXON LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone:  (312) 201-2662
Facsimile:  (312) 416-4524

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
-and-
Michael S. Giannotto (*pro hac vice*)
Frederick C. Schafrick (*pro hac vice*)
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444

*Counsel for Continental Casualty Company, Transportation Insurance Company
and their American Insurance Affiliates*

LIBW/1720925.9