HN7⚡It is well settled that a bankruptcy court's order confirming a chapter 11 plan is treated as a final judgment on the merits with full res judicata effect. 11 U.S.C.S. § 1141(a) provides that a confirmed plan binds the debtor and all other parties to the bankruptcy proceeding as to all of the plan's provisions, and all related claims which could have been litigated in the same cause of action. Consequently, all parties that were privy to a plan are bound by the plan and are precluded from later raising claims that could have been raised prior to confirmation.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Effects of Confirmation 🖫
HN8⚡See 11 U.S.C.S. § 1141(a).

Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Effects of Confirmation 🖫
HN9⚡11 U.S.C.S. § 1141(b) states that except as otherwise provided in the chapter 11 plan or the order confirming the plan, the confirmation of the plan vests all of the property of the estate in the debtor.  More Like This Headnote

Bankruptcy Law > Reorganizations > Plans > Contents > Discretionary Provisions 🖫
HN10⚡See 11 U.S.C.S. § 1123(b)(3).

Bankruptcy Law > Reorganizations > Plans > Contents > General Overview 🖫
HN11⚡Unless a chapter 11 plan provides for the retention and enforcement of a claim or interest in an entity other than the debtor, the claim will vest in the reorganized debtor.  More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Conforming Pleadings to Evidence 🖫
HN12⚡Fed. R. Civ. P. 15(b) is mandatory, not merely permissive, and requires that issues that are tried, though not raised in the pleadings, be treated as though they were raised in the pleadings. The objective of the rule is to decide cases based on the actual dispute between the parties. Any issues actually tried by express or implied consent at the hearing on the merits must be treated in all respects as if they had been raised in the pleadings.  More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Conforming Pleadings to Evidence 🖫
HN13⚡See Fed. R. Civ. P. 15(b).

Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Conforming Pleadings to Evidence 🖫
HN14⚡In considering whether to allow an amendment pursuant to Fed. R. Civ. P. 15(b), a court must consider whether the new issues were tried by the parties' express or implied consent and whether the defendant would be prejudiced by the implied amendment. Express consent may be found in a stipulation or pretrial order, and implied consent may be found where evidence is introduced at trial without objection. For a defendant to be prejudiced by the Rule 15(b) amendment, a party's failure to plead an issue that it later presents must disadvantage its opponent in its case. Generally, a party cannot show that it suffered prejudice simply because of a change in its opponent's legal theory.  More Like This Headnote

Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview 🖫
HN15⚡In the absence of a strong countervailing public policy, the parties to litigation

AUTH6-000003

may consent by their conduct to the law to be applied.  More Like This Headnote

Business & Corporate Law > General Partnerships > Formation > Elements 🔲

*HN16*➕To demonstrate the existence of a partnership, a plaintiff must prove four
    elements: (1) the parties' sharing of profits and losses; (2) the parties' joint
    control and management of the business; (3) the contribution by each party of
    property, financial resources, effort, skill, or knowledge to the business; and (4)
    the parties' intention to be partners. No one factor is dispositive; it is necessary
    to examine the parties' relationship as a whole.  More Like This Headnote

Business & Corporate Law > General Partnerships > Formation > Elements 🔲

*HN17*➕Sharing of profits is prima facie evidence that an individual is a partner in the
    business, as long as these profits were not received by an employee as wage
    payments.  More Like This Headnote

Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action >
General Overview 🔲

Torts > Procedure > Multiple Defendants > Joint & Several Liability 🔲

*HN18*➕As a partner in a partnership, under New York law, a partner would be jointly and
    severally liable for the wrongful acts or omissions performed by another partner
    while acting in the ordinary course of partnership business. N.Y. P'ship Law § 24
    (2006); According to N.Y. P'ship Law § 26(a) (2006), partners are held jointly
    and severally liable for acts chargeable to the partnership under N.Y. P'ship Law
    § 24 (2006). Under New York law, general partners have joint and several
    liability for torts committed by the partnership, and a plaintiff may bring an
    action against the partner individually, and does not have to sue the partnership
    first.  More Like This Headnote

Trade Secrets Law > Misappropriation Actions > Definitions 🔲

Trade Secrets Law > Misappropriation Actions > Elements > General Overview 🔲

*HN19*➕A plaintiff claiming misappropriation of a trade secret must prove: (1) it
    possessed a trade secret, and (2) defendant is using that trade secret in breach
    of an agreement, confidence, or duty, or as a result of discovery by improper
    means. Under New York law, a trade secret may consist of any formula, pattern,
    device or compilation of information that is used in one's business, and that gives
    the owner an opportunity to obtain an advantage over competitors who do not
    know or use it.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Trade Secrets Law > Misappropriation Actions > Definitions 🔲

*HN20*➕In determining whether information constitutes a trade secret, New York courts
    have considered the following factors: (1) the extent to which the information is
    known outside of the business; (2) the extent to which it is known by employees
    and others involved in the business; (3) the extent of measures taken by the
    business to guard the secrecy of the information; (4) the value of the information
    to the business and its competitors; (5) the amount of effort or money expended
    by the business in developing the information; and (6) the ease or difficulty with
    which the information could be properly acquired or duplicated by
    others.  More Like This Headnote

Trade Secrets Law > Civil Actions > Remedies > Damages > Unjust Enrichment 🔲

*HN21*➕The elements of an unjust enrichment claim under New York law are (1) a benefit
    to the defendant, (2) at the plaintiff's expense, and (3) that equity and good
    conscience require restitution. The essence of this claim is that one party has

received money or a benefit at the expense of another.  More Like This Headnote

Torts > Business Torts > Unfair Business Practices > Elements 🔖

*HN22*⊕The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods. In an action for damages based on a common law unfair competition claim, the plaintiff must show actual confusion to recover.  More Like This Headnote

Torts > Business Torts > Commercial Interference > Business Relationships > Elements 🔖

*HN23*⊕To prevail on a claim for tortious interference with existing business relations, a plaintiff must establish: (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages. Courts have dismissed tortious interference claims where the plaintiff has failed to identify specific contracts that were breached as a result of the defendant's actions.  More Like This Headnote

Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty 🔖

Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities 🔖

*HN24*⊕Under the doctrine of corporate opportunity, corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation. This doctrine still applies even after an employee leaves her corporate employment, but the scope of the fundamental duty is determined by the circumstances of each case and does not run to every act where the employee appears to act in her own self-interest. Taking steps not involving any neglect of positive duties to a current employer in preparation for engaging in competition with that employer after the employee leaves the employment may not involve breach of fiduciary duties. An employee does cross the line by actively soliciting the customers of her current employer and diverting her current employer's business to herself.  More Like This Headnote

Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty 🔖

Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities 🔖

*HN25*⊕The corporate opportunity doctrine prohibits a former employee from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation. However, the doctrine of corporate opportunity is limited to situations where the corporation has an "interest" or "tangible expectancy" in the opportunity. Further, although a former employee is not barred from competing with a former employer, a former employee may not misappropriate and utilize confidential information, such as customer lists and other confidential information not generally known to the public, but available only to employees in their employment capacity. However, a former employee may utilize information obtained while employed, including the identity of customers, if the information is generally available from public sources to members of the trade, without breaching a fiduciary duty of loyalty to the former employer.  More Like This Headnote

Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty 🔖

Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities 🔖

*HN26*⊕An employee may create a competing business prior to leaving his employer

AUTH6-000005

without breaching any fiduciary duty unless he makes improper use of the
employer's time, facilities or proprietary secrets in doing so. More Like This Headnote

**COUNSEL:** [**1]  For Plaintiffs: Kevin Fritz, Esq. ▾, STORCH AMINI & MUNVES PC, New
York, NY.

For Defendants: David H. Wander ▾, Steven I. Super ▾, WANDER & ASSOCIATES, P.C., New
York, New York.

**JUDGES:** MARTIN GLENN, United States Bankruptcy Judge.

**OPINION BY:** MARTIN GLENN

**OPINION**

[*439]

**MEMORANDUM OF OPINION**

This adversary proceeding, easily resolved once the merits are reached, presents a thicket of
legal issues -- post-confirmation subject matter jurisdiction, res judicata and other equitable
defenses (and whether those unpleaded affirmative defenses were waived), standing to
assert the claims contained in the complaint, amendment of the pleadings pursuant to FED.
R. CIV. P. 15 to conform to the pretrial order and proof, and choice of law -- that must be
cleared away before the merits of the claims can be reached. The plaintiffs,
Cross Media Marketing Corporation ▾ and its wholly owned subsidiary, Media Outsourcing,
Inc. (collectively, "Cross Media" or the "Plaintiff"), were debtors in a chapter 11 case filed in
this Court on June 16, 2003. A liquidating chapter 11 plan was confirmed on May 19, 2004,
and became effective on July 23, 2004. [1] The case has not yet been [**2]  closed however.

**FOOTNOTES**

[1] Under the confirmed Plan, Media Outsourcing, Inc. merged into
Cross Media Marketing Corporation, ▾ and thus did not exist as a separate entity when the
adversary complaint was filed. As explained in Section D, infra at 22-23, Cross Media is
referred to in the Plan as "Reorganized Cross Media," but it is merely a continuation of the
pre-existing corporate entity. Therefore this Court refers to the two merged entities as
"Plaintiff."

On October 20, 2005, Cross Media commenced this adversary proceeding against CAB
Marketing, Inc. and Carol Bolak (collectively the "Defendants"). The Plaintiff alleged that
Defendants misappropriated Plaintiff's customer lists and other trade secrets, engaged in
unfair competition through deceptive marketing, tortiously interfered with Plaintiff's existing
and prospective business relations, were unjustly enriched by the misappropriation of the
customer lists, and that Carol Bolak, formally employed by Cross Media, diverted corporate
opportunities and breached [**3]  her duty of loyalty to Plaintiff. In the joint pretrial order
Defendants raised two issues of law, contending that Plaintiff lacked standing to bring these
claims and that Plaintiff's claims were barred by the doctrines of res judicata, judicial
estoppel and/or equitable estoppel. The Court conducted a two-day trial on December 4 and
5, 2006. Thereafter, the parties submitted post-trial briefs, and on February 7, 2007, the
Court heard closing arguments. The following constitute the Court's findings of facts and
conclusions of law pursuant to FED. R. CIV. P. 52(a) made applicable to this adversary
proceeding by FED. R. BANKR. P. 7052.

AUTH6-000006

**[\*440]**  For the reasons provided below, the Court holds that (1) the Court has "related to" subject matter jurisdiction under 28 U.S.C. § 1334(b) over this post-confirmation adversary complaint, (2) the claims asserted in the adversary complaint are not barred by *res judicata* or any equitable defenses, (3) Cross Media has standing to pursue the claims asserted in the adversary complaint, (4) Cross Media's motion to amend the adversary complaint to conform **[\*\*4]** to the pretrial order and to the evidence presented at trial is granted, and (5) New York law will be applied to all claims and defenses. Reaching the merits, however, the Court concludes that Cross Media has failed to prove any of its claims by a preponderance of the evidence. Therefore, Defendants are entitled to have judgment entered in their favor on all claims. After describing the background facts, this opinion deals with subject matter jurisdiction, *res judicata* and equitable defenses, standing, the Rule 15 motion to amend the adversary complaint, choice of law, and, finally, the merits of the claims, in that order.

## I. BACKGROUND

2

### FOOTNOTES

2 The following conventions are used in citing to the trial record. The daily transcript is cited by date and page. For example, "Tr. (12/4), at 7" refers to page 7 of the December 4, 2006 transcript. 'PX" refers to the Plaintiff's trial exhibits and "DX" refers to the defendants trial exhibits. The Joint Pre-Trial order will be cited as "PTO."

Cross Media, **[\*\*5]** primarily through telemarketing, sold magazine subscriptions to consumers who purchased "bundles" of several magazines with subscription periods ranging from one to four years. (PTO at 3). Cross Media also engaged in the business of renewing these subscription bundles for those customers whose subscriptions were about to expire (the "Renewal Business"). Through the course of its business, Cross Media compiled lists of its customers, which included confidential customer information including: the customer's name, address, origin of the source lead, credit or debit information, titles of magazines the customer subscribed to, current subscriptions up for renewal and other miscellaneous information (the "customer lists"). (PTO at 3). The software used to compile the customer lists was unique to Cross Media's magazine business and access to the customer lists was protected by a three-tier security structure that only certain employees had access to based on their role in the company. (Tr. (12/4) at 70, 71).

A separate part of Cross Media's business involved the acquisition and sale of potential customers, known in the industry as "leads." (PTO at 3). Leads provide the key contact information **[\*\*6]** for customers, to try to sell magazine subscription bundles. (Tr. (12/4) at 65). Cross Media acquired leads through third parties and either contacted the leads or sold the leads to independent telemarketing dealers who contacted the potential consumers directly. (Tr. (12/4) at 65; PTO at 3). If the independent dealer made a magazine subscription sale through a lead provided by Cross Media or another lead source, the dealer would then "clear" the sale through Cross Media or another clearinghouse and would receive a commission on the sale. (Tr. (12/4) at 65-66; PTO at 3).

The customer lists differ from the leads lists, as the customer lists provide information about unique attributes of the customer after the customer has gone through the entire sales process. (Tr. (12/4) at 67). For example, the customer lists include key contact information about the customer, payment method, as well as the particulars of the magazine bundle, whether or not the customer accepted a cross sale, an up sale, or down sale offer of a

AUTH6-000007

magazine **[*441]** bundle. (Tr. (12/4) at 67-68). Leads lists contain the customer name, the customer's contact information, possibly a credit card number, where the lead originated **[**7]** from, and any costs associated with the lead. (Tr. (12/4) at 65, 84-85; Tr. (12/5) at 10-12).

## Carol Bolak's Employment at Cross Media

Carol Bolak ("Bolak") was employed by Cross Media and its predecessor entity for over ten years. (PTO at 5). Bolak served as a lead broker for Cross Media until her termination in February 2003. (PTO at 5). As a lead broker, Bolak's responsibilities included contacting other lead brokers from whom Cross Media purchased names of potential magazine subscribers, managing the list of potential magazine subscribers, determining which entities were not viable leads, and distributing a revised list to dealers. (PTO at 5). In February 2003, Bolak was released from employment at Cross Media. [3] (Tr.(12/5) at 57).

---

**FOOTNOTES**

3 Bolak was terminated for suspected theft of leads due to correspondence that had been monitored on Bolak's computer between Bolak and Donnie West, a former Cross Media employee. (Tr. (12/5) at 62-63). After meeting with Andrew Nelson, the person Bolak directly reported to at Cross Media, and explaining the communication, Nelson assured her that she was not let go for theft and promised to correct the miscommunication. (DX L at 23).

---

**[**8]** In October 2002, while still employed at Cross Media, Bolak formed CAB Marketing, Inc. ("CAB"), but CAB did not conduct business until after Bolak's termination from Cross Media. (Tr. (12/5) at 64). Bolak formed the corporation because she recognized that Cross Media was having financial difficulties and could soon go out of business. *Id.* Bolak formed CAB for the purpose of conducting business as a lead management company for acquiring and selling leads, (Tr. (12/5) at 65), and the company also did business as Community Reading Club of Canton, for the portion of the business that cleared magazine orders for independent dealers. (PTO at 8; Tr. (12/5) at 68-69).

## Brad Barlow & the BCM Partnership

Beginning in 2000, Brad Barlow became the director of sales at Cross Media, and his duties included overseeing the renewal department. (PX 9 at 10). In June 2003, when Cross Media initially closed its renewal department upon filing for bankruptcy protection, Barlow was terminated along with the rest of the sales department. (PTO at 6, 9). In the summer of 2003, after Barlow had been laid off, Carol Bolak, Marcella Jones (another former Cross Media employee), Brad Barlow, **[**9]** and Robert Bolak (an independent dealer), discussed forming a partnership called "BCM." (PTO 8-9; Tr. (12/5) at 23). The partners agreed to divide profits equally, each receiving 25%, and attempted to hold regular meetings. (PTO at 9; Tr. (12/5) at 24). The purpose of this business was to obtain potential renewal orders from Tom Meehan, an independent magazine dealer. (Tr. (12/5) Jones testimony unavailable); [4] (Tr. (12/5) at 76). Meehan sent leads to CAB and CAB forwarded these leads to Barlow who was in charge of contacting the potential customers. (Tr. (12/5) at 25-28). Barlow would then forward any sales to CAB to "clear" the orders. (Tr. (12/5) at 26-28). Jones contributed to the partnership through her involvement in back office operations at CAB, and she also obtained additional renewal orders from **[*442]** her industry contacts. (Tr. (12/5) at 28). Robert Bolak contributed his customers from CRC of Canton, and Carol Bolak held the contract with PPSB, which allowed them to clear orders. (Tr. (12/5) at 28).

**FOOTNOTES**

AUTH6-000008

4 The testimony on the second day of trial, on December 5, 2006, was recorded through the court's ECRO system. The electronic sound file was corrupted and the recorded testimony could not be retrieved. All references to this testimony are made based on the Court's notes from that morning or from the parties recollections.

**[\*\*10]** In July 2003, when Cross Media decided to reopen its renewal department, it rehired Barlow to again manage the department. (PTO at 6, 9). Between June 2003, when Barlow was terminated by Cross Media, and July 2003 when Barlow was re-hired, Barlow hired key Cross Media employees including Rennie Abrams to work for a company that he later incorporated as "A Magazine Cafe." 5 (PTO at 9). When Barlow was re-hired by Cross Media he did not disclose his involvement with A Magazine Cafe. (PTO at 9). While Barlow worked at Cross Media, Rennie Abrams ran A Magazine Cafe's day to day operations. (Tr. (12/5) at 78).

**FOOTNOTES**

5 Barlow incorporated A Magazine Cafe on August 8, 2003. (Px. 9 at 24).

The purpose of A Magazine Cafe's operations was to contact the potential renewal orders that Barlow received from CAB, pursuant to their agreed venture. (Tr. (12/5) at 27-28). Barlow also obtained cold leads from independent sources and contacted them, although this was not part of the original plan contemplated by BCM. (PX 9 at **[\*\*11]** 35). Problems soon arose between Barlow and the other BCM partners. Barlow had attempted to independently acquire a PPSB license, and he was obtaining leads from sources other than CAB, in contravention of the partnership agreement. (Tr. (12/5) at 79). In March or April 2004, the remaining partners -- Carol Bolak, Marcella Jones, and Robert Bolak -- stopped sending potential renewal orders to Barlow and severed their business relationship with him. (Tr. (12/5) at 82).

**Discovery of Misappropriation**

Cross Media began experiencing financial difficulties in 2002, and on June 16, 2003, it filed for bankruptcy protection. (PTO at 4-5, 6). Upon commencement of the bankruptcy case, Cross Media closed its entire sales and marketing department, terminated its sales force and reduced the number of employees from 750 to 40. (PTO at 6). Cross Media maintained only those employees needed to collect the remaining accounts receivable, manage its renewal portfolio, and wind-down the company's affairs. (PTO at 6). Initially, as part of the wind-down process, Cross Media closed its magazine renewal department. But, in July 2003, Cross Media reopened its renewal department, rehired Barlow **[\*\*12]** as its manager, and directed all of its marketing efforts toward its renewal business, until February 2004 when the department was again closed. (PTO at 7).

Members of the renewal department had direct access to those customers whose accounts receivables had matured. (Tr. (12/4) at 77). Upon successful collection of the accounts receivable from a current customer, the customer's name would return to the queue and a member of the renewal department would call the customer in attempts to renew the customer's subscription. *Id.* As head of the renewal department, Barlow had direct access to the renewals and reclamations 6 modules of the customer lists. (Tr. (12/4) at 78). However, Barlow's access was limited to printing **[\*443]** each lead individually and his access did not allow him to download all of the customer lists. (Tr. (12/4) at 78-79). During the relevant time period, from 2002 to 2004, Barlow was never suspected of any wrongdoing or improper conduct. (Tr. (12/4) at 81).

AUTH6-000009

**FOOTNOTES**

6 A reclamation order is an order that was submitted for verification, but during the verification process the customer chose to cancel the order -- typically because the order was too expensive. (Tr. (12/4) at 125-26). A representative would attempt to contact the customer again and reclaim the customer by configuring a smaller magazine bundle at a less expensive price. (Tr. (12/4) at 126). These reclamation order forms would have included credit card information and the magazines that the customer had initially selected. *Id.* at 127.

[**13]  However, in June 2003, Cross Media discovered that an anonymous party was attempting to auction its customer lists on the internet. (PTO at 6); *Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.),* Adv. Proceeding No. 03-08278 (ECF Doc. No. 69), 2006 Bankr. LEXIS 4219 (Bankr. S.D.N.Y. April 6, 2006), *aff'd,* No. 06 Civ. 4228, 2006 U.S. Dist. LEXIS 56112, 2006 WL 2337177 *1 (S.D.N.Y. Aug. 11, 2006). The auction was linked to an email account held with Yahoo!, and after extensive investigation, the unauthorized auction was linked to Michael Nixon and his wife Marie Labesky Nixon. (PTO at 5-6). Mr. Nixon had previously entered into a consulting agreement with Cross Media in January of 2002, and at that time was given full access to Cross Media's customer lists. *Id.* After trial against Marie Nixon, 7 Judge Lifland found that Mrs. Nixon misappropriated Cross Media's trade secret when she either auctioned or conspired to auction the customer lists; that Nixon had converted Cross Media's property; and that Nixon had been unjustly enriched because she benefited from access to the customer lists she did not bear the cost of developing. *Cross Media Mktg. Corp. v. Nixon,* Adv. Proceeding No. 03-08278, 2006 Bankr. LEXIS 4219 (ECF Doc. No. 69). The Bankruptcy Court [**14] awarded Cross Media $ 236,000 in compensatory damages and $ 50,000 in punitive damages. 8 (PTO at 6). On appeal, Judge Mukasey affirmed the Bankruptcy Court's findings in all respects and denied Marie Nixon's motion for a new trial. *Cross Media Mktg. Corp. v. Nixon,* 2006 U.S. Dist. LEXIS 56112, 2006 WL 2337177 at *1.

**FOOTNOTES**

7 The adversary proceeding went forward against Marie Nixon only because prior to trial Michael Nixon filed for bankruptcy protection, staying the action against him pursuant to § 362 of the Bankruptcy Code. On the morning of trial, the Bankruptcy Court granted Cross Media's oral motion to sever the action against Michael Nixon and the action proceeded against Marie Nixon. *Cross Media Mktg. Corp. v. Nixon,* 2006 U.S. Dist. LEXIS 56112, 2006 WL 2337177 at *2.

8 In computing the actual damages, the Court found that the customer lists contained 944,000 customers and each lead cost Cross Media $ 0.25 to develop. (PTO at 6). Therefore, Cross Media was entitled to $ 236,000 in compensatory damages.

[**15]  In August 2003, during routine calls to renewal customers, notifying them of a promotion and advising them that their subscriptions were due for renewal, Cross Media discovered that third-party competitors had already contacted its customers seeking to secure their renewal business. (PTO at 7). During this period, numerous Cross Media customers declined to renew their subscriptions with Cross Media because they believed that they had already renewed these subscriptions with Cross Media, when they had in fact renewed with another entity. (PTO at 7). These customers informed Cross Media that these representatives knew the exact magazines to which they had subscribed, knew their personal identification information, and some customers indicated that the representatives possessed

AUTH6-000010

their credit card information. (PTO at 7). Additionally, some customers indicated that these entities had invoiced or charged customers amounts that had clearly exceeded the limit that Cross Media representatives were authorized to charge. (PTO at 7). The information that these representatives possessed was not publicly available, but was something that was maintained in Cross Media's customer lists. 9 (PTO at **[\*\*16]** 7).

---

**FOOTNOTES**

9 No evidence was presented at trial further identifying these customers, or indicating that these customers were contacted by CAB or by an entity related to CAB.

---

**[\*444]** At trial, in an attempt to link this misconduct to Defendants, Plaintiff presented the testimony of Sandy Prey ("Frey"), a former Cross Media customer. In Spring 2004, after Cross Media closed its renewal department, Frey received a call from A Magazine Cafe, claiming to be her "magazine subscribers." (Tr. (12/4) at 20). Frey was told that she had won three years of magazine subscription service, but that she would have to pay for one year to receive the additional three years for free. (Tr. (12/4) at 20). After agreeing to the transaction, Frey was transferred to a third-party agent and was asked additional questions. *Id.* The entity already had Frey's credit card information, phone number and address on record, but it did not know the magazines that Frey had previously ordered from Cross Media. (Tr. (12/4) at 20). Frey testified that **[\*\*17]** she thought that she was speaking with MOS. (Tr. (12/4) at 21). On April 13, 2004, Frey's credit card was charged $ 24.57 by CRC of Canton. (PX 2 at 489). After receiving this charge Frey contacted CRC because she was unaware of who they were and Frey testified that they identified themselves as her magazine subscription service. (Tr. (12/4) at 22). After reviewing her previous credit card statements, Frey contacted MOS and informed them of the call that she had received from CRC. (Tr. (12/4) at 22-23). Frey ultimately cancelled her subscription with CRC because they were not affiliated with MOS and she received a full credit for the charge. (PX 2 at 490; Tr. (12/4) 20-29). At closing argument Plaintiff admitted that MOS did not suffer any damage with regard to the loss of Frey's business because this transaction occurred after Cross Media had closed its renewal department. (Tr. (2/7) at 32). To date, Frey is the only customer that Plaintiff has identified who was contacted by an entity connected to the Defendants.

In October 2005, Cross Media sold approximately 391,000 customer accounts (extracted from the customer lists) with open receivable balances to Cavalry Portfolio Services **[\*\*18]** ("Cavalry"). (PX 26 at 11; PX 27). Plaintiff has been unable to access its original customer lists with all of its 944,000 customers, which would indicate those customers who had paid in full and were not delinquent. (PX 26 at 20). CAB'S customer list of 1,450 names was compared against the 391,000 names sold to Cavalry, and seven customers with matching names and addresses were found to be on both lists. (PX 26 at 18-25).

## II. DISCUSSION

### A. Subject Matter Jurisdiction

This adversary proceeding, which alleges pre- and post-petition misconduct by Defendants, was brought after the confirmation of the Plaintiff's confirmed chapter 11 liquidation plan. Although the parties have not challenged the Court's jurisdiction in this proceeding, *HN1* the court has an obligation to inquire *sua sponte* into its subject matter jurisdiction. *In re Recticel Foam Corp.,* 859 F.2d 1000, 1002 (1st Cir. 1988). The Plaintiff's confirmed chapter 11 plan is a liquidation plan. Therefore, the Court retains jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b). *See Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr, Inc.),* 410 F.3d 100, 106-07 (1st Cir. 2005) **[\*\*19]** (holding that *HN2* the court's jurisdiction does not diminish post confirmation if the debtor, pursuant to a liquidating plan,

AUTH6-000011

seeks to commence litigation to collect the debtor's assets for the benefit of its creditors).

In the pleadings and the joint pretrial order the parties disputed whether the matter before the Court was a core proceeding pursuant to 28 U.S.C. § 157(b)(2). However, on the second day of trial, on **[*445]** December 5, 2006, the parties stipulated, pursuant to 28 U.S.C. § 157(c)(2), that the court could hear and determine the matter and enter appropriate orders and judgments, obviating the need to decide whether the matter was a core proceeding.

## B. Unpleaded Affirmative Defenses

Defendants now contend that Plaintiff's claims are barred by *res judicata* by virtue of the Plaintiff's confirmed chapter 11 plan, which Defendants assert did not expressly preserve the claims against Defendants in this adversary proceeding. Defendants waived the *res judicata* defense by failing timely to assert it in their answer or amended answer. *HN3⇑*Under Federal Rule of Civil Procedure 8(c), made applicable **[**20]** by Rule 8 of the Federal Rules of Bankruptcy Procedure, parties are required to raise affirmative defenses, such as estoppel and *res judicata,* in the pleadings. [10] Fed. R. Civ. P. 8(c). It is a generally accepted principle that a party's failure to plead such affirmative defenses results in the waiver of those defenses. 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1278 (3d ed. 2006) (cases collected); *see also Arizona v. California,* 530 U.S. 392, 394, 120 S. Ct. 2304, 147 L. Ed. 2d 374 (2000) (stating that "res judicata [is] an affirmative defense ordinarily lost if not timely raised"). However, the Second Circuit recognizes an exception to this waiver when the affirmative defense was initially unavailable, "is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party." *Rose v. AmSouth Bank of Florida,* 391 F.3d 63, 65 (2d Cir. 2004) (quoting *Am. Fed. Group, Ltd. v. Rothenberg,* 136 F.3d 897, 910 (2d Cir. 1998)). Courts have been willing to accommodate the defendant where the defense of *res judicata* was not available at the pleading **[**21]** stage. *Gonzalez v. City of New York,* 396 F. Supp. 2d 411, 421 (S.D.N.Y. 2005) (stating that "[w]hen [*res judicata* is] not available at the pleading stage because the prior action has not yet finished, the rule is more flexible [and courts]... have allowed parties to raise the defense on motion for summary judgment, as long as the plaintiff has adequate opportunity to respond to the defense") (quoting *Morrison v. Blitz,* No. 88 Civ. 5607, 1995 U.S. Dist. LEXIS 17039, 1995 WL 679259, at *3 (S.D.N.Y. Nov. 15, 1995)).

## FOOTNOTES

10 Rule 8(c) provides in relevant pan:

> *HN4⇑*In pleading to a preceding pleading, a party *shall* set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, *res judicata,* statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

Fed. R. Civ. P. 8(c) (emphasis added).

**[**22]** In *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 46-48 (2d Cir. 1983), the Second Circuit reversed the district court's decision to grant defendant leave to amend its answer to assert a claim for *res judicata* because the defendant failed to establish good cause for the delay in asserting the *res judicata* defense and permitting an amendment at such a late date prejudiced the plaintiff. In reaching this ruling, the court observed that *HN5⇑*"any

AUTH6-000012

delay in asserting an affirmative defense for a significant period of time will almost invariably result in some 'prejudice' to the nonmoving party. . . . [T]he proper standard is one that balances the length of the delay against the resulting prejudice." _Evans, 704 F.2d at 46-47_ (quoting _Advocat v. Nexus Indus., Inc., 497 F. Supp. 328, 331 (D. Del 1980)_). The court further noted that the nonmoving party's showing of prejudice may be lessoned based on the length of the unexplained delay. _Id._ In _Evans,_ the **[\*446]** defendant's request for leave to amend to assert a _res judicata_ defense was clearly dilatory and was unduly delayed because defendant failed to seek leave to amend until **[\*\*23]** two years and nine months after the defense became available, six days before trial and after two pre-trial conferences.

In the instant case, Defendants failed to raise any affirmative defenses until the eve of trial. It was not until November 29, 2006, only days before trial, that Defendants first raised the affirmative defense of _res judicata,_ judicial estoppel, and/or equitable estoppel in the Joint Proposed Pre-Trial Order submitted to the Court. Defendants did not move to dismiss these causes of action until December 4, 2006, the first day trial. Defendants failed to raise these affirmative defenses in the answer or the amended answer, dated December 28, 2005, one year prior to the submission of the Joint Pretrial Order. Further, Defendants amended answer only contained a general defense for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and a general equitable defense stating that the "[p]rinciples of waiver, estoppel, laches and equity provide Defendants a defense to the cause of action alleged in the complaint." (Amend. Answer PP 69, 71); _see Saks v. Franklin Covey Co., 316 F.3d 337, 350_ **[\*\*24]** _(2d Cir, 2003)_ (holding that a general defense for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is insufficient to preserve an enumerated affirmative defense under Rule 8(c) because "[o]ne of the core purposes of Rule 8(c) is to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice"), Additionally, although Defendants purported to reserve "the right to amend their answer to assert different and additional defenses," (Amend. Answer P 72), Defendants never sought leave from the court to amend the answer to raise these affirmative defenses. Therefore, unless Defendants can assert that the affirmative defenses now being alleged were not available at the pleading stage, Defendants failure to plead these defenses should result in a waiver. [11]

## FOOTNOTES

[11]

In footnote 4 of Defendants trial memorandum. Defendants cite to the Eleventh Circuit to support the proposition that failure to assert an affirmative defense in an answer can be cured by inserting the defense in the pretrial order. _Pulliam v. Tallapoosa County Jail, 185 F.3d 1182, 1185 (11th Cir. 1999)_ (stating that "omission of an affirmative defense is not fatal as long as it is included in the pretrial order"); _Hargett v. Valley Fed. Sav. Bank, 60 F.3d 754, 763 (11th Cir. 1995)_ (holding that the statute of limitations defense was not waived for failing to plead in the answer because the party plead the defense in the pretrial order and the other party was not unreasonably surprised by the defense). As shown in the Second Circuit cases discussed in the text, these cases do not reflect the prevailing view of this circuit.

**[\*\*25]** The affirmative defenses that Defendants now seek to assert were available at the pleading stage. Defendants' _res judicata_ defense is based on the assertion that Plaintiff failed properly to preserve all claims against Defendants in its confirmed chapter 11 plan. Plaintiff's chapter 11 plan was confirmed on May 19, 2004, approximately one year and five months before this action was commenced. As such, Defendants cannot allege that the _res judicata_ defense was unavailable at the commencement of this litigation. Accordingly, on the eve of trial and almost one year after Defendants submitted their amended answer, to allow

AUTH6-000013

Defendants now to raise these defenses, would unduly prejudice the Plaintiff. *See Evans, 704 F.2d at 47* (asserting that "the proper standard is one that balances the length of the delay against resulting prejudice" to the nonmovant).

### [*447] C. *Res Judicata Does Not Bar the Claims*

Even if Defendants timely plead the defense of *res judicata,* Plaintiff's claims would survive dismissal because the elements of *res judicata* have not been met. *HN6* *Res judicata* precludes the parties from re-litigating claims if the earlier decision was **[**26]** (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same claim. *In re Indesco Int'l, Inc., 354 B.R. 660, 664 (Bankr. S.D.N.Y. 2006)* (citing *In re Teltronics Services, Inc., 762 F.2d 185, 190 (2d Cir. 1985)* (establishing the required elements for *res judicata*). Furthermore, in the bankruptcy context, the court must also consider "whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan." *Corbett v. MacDonald Moving Servs., Inc., 124 F.3d 82, 88 (2d Cir. 1997)* (quoting *Sure-Snap Corp. v. State St. Bank and Trust Co., 948 F.2d 869, 875-76 (2d Cir. 1991)).*

*HN7* It is well settled that a bankruptcy court's order confirming a chapter 11 plan is treated as a final judgment on the merits with full *res judicata* effect. *Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 00 Civ. 8688, 2004 U.S. Dist. LEXIS 9153, 2004 WL 1119652, at *2 (S.D.N.Y. May 20, 2004)* (citing *Sure-Snap Corp., 948 F.2d at 872-73)* **[**27]** (holding that the provisions of a confirmed plan under section 1141 (a) of the Bankruptcy Code binds the debtor and all other parties to the proceeding, which "therefore, constitutes a final judgment on the merits entitled to preclusive effect under the doctrine of *res judicata*"). Section 1141 (a) of the Bankruptcy Code provides that a confirmed plan binds the debtor and all other parties to the bankruptcy proceeding as to all of "the plan's provisions, and all related ... claims which could have been litigated in the same cause of action." *See Sure-Snap Corp., 948 F.2d at 873; 11 U.S.C. § 1141(a).* [12] Consequently, all parties that were privy to the Plan are bound by the Plan and are precluded from later raising claims that could have been raised prior to confirmation. *In re Indesco Int'l, Inc., 354 B.R. at 664-65* (citing to *Sure-Snap, 948 F.2d at 873)* (noting that a confirmed plan binds the debtors and its creditors as to all of the Plan's provisions and all related claims which could have been litigated in the same cause of action).

#### FOOTNOTES

12 Section 1141(a) provides:

> *HN8* [T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C. § 1141.

**[**28]** In the instant case, the Plaintiff's chapter 11 plan cannot be considered a final judgment on the merits for Defendants because Defendants are not bound by the Plan. Defendants were not creditors or a party in interest in the chapter 11 case and therefore are not bound by it. Further, there is no identity of parties between the bankruptcy case and the

AUTH6-000014

adversary proceeding. *See LJM2 Co-Investment, L.P. v. Dodson (In re LJM2 Co-Investment, L.P.),* 327 B.R. 786, 792 (Bankr. N.D. Tex. 2005) (holding that the doctrine of *res judicata* did not apply when the defendant did not file a proof of claim in the bankruptcy case and was not otherwise a party to the bankruptcy case). Therefore, Defendants cannot now assert the doctrine of *res judicata* as a shield to protect them from litigating the claims against them.

### [*448] D. Plaintiff Has Standing

Upon review of the Plaintiff's chapter 11 plan, Defendants' challenge to Plaintiff's standing to bring suit must fail. Plaintiff's standing to sue is challenged on two grounds. First, Defendants assert that Plaintiff lacks standing to litigate these causes of action because section 5.13 of the Plaintiff's chapter 11 plan transferred all **[**29]** "Other Actions" and "Avoidance Actions" to the Unsecured Creditor Trust. Defendants assert that Plaintiff's causes of action falls into the definition of "Other Actions," preventing the Plaintiff from bringing suit. Second, Defendants assert that all other property of the Plaintiff's estate not otherwise distributed by the Plan's effective date was vested in Reorganized Cross Media, an entity that Defendants assert is separate and apart from the Plaintiff. The Court will address each issue in turn.

*HN9*Section 1141(b) of the Bankruptcy Code states that "[e]xcept as otherwise provided in the [chapter 11] plan or the order confirming the plan, the confirmation of the plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1141(b). Section 1123 of the Bankruptcy Code governs the contents of the chapter 11 plan. Section 1123(b)(3)(A) and (B) provide as follows:

   *HN10*(b) Subject to Subsection (a) of this section a plan may-- . . .

   (3) provide for --

   (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

   (B) the retention and enforcement by the debtor, **[**30]** by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest.

11 U.S.C. § 1123(b)(3)(A) & (B).

*HN11*Unless a chapter 11 plan provides for the retention and enforcement of a claim or interest in an entity other than the debtor, the claim will vest in the reorganized debtor.

Section 5.13(a) of the Plaintiff's chapter 11 plan, "Transfer of Rights of Action," states in pertinent part:

   (a) Except as otherwise specifically provided in this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on the effective Date, the Debtors shall transfer the Other Actions and Avoidance Actions . . . to the Unsecured Creditor Trust. . . . The Unsecured Trust Administrator shall retain and may exclusively enforce any and all such Avoidance Actions and Other Actions transferred, and shall have the exclusive right to pursue, institute, abandon settle or compromise any and all such Avoidance Actions or Other Actions transferred.

(*Plaintiff's Third Amended Joint Plan,* § 5.13, p. 19 (May 19, 2004)).

Plaintiff has raised six different tort related causes of action against **[**31]** CAB Marketing, BCM partnership and Carol Bolak. [13] Defendants assert that Plaintiff lacks standing because

AUTH6-000015

these claims are included in the definition of "Other Actions" and were therefore transferred to the Unsecured Trust Administrator for enforcement. "Other Actions" is defined in the Plan as:

> [A]ll actions, causes of action, suits or claims of the Debtors or their estates arising under any theory of law or equity, including for breach of contract, **[\*449]** breach of fiduciary duty, negligence, tort or otherwise, with respect to former officers and directors of the Debtors or subsidiaries of the Debtors or that may be satisfied from that certain directors' & officers' insurance policy, or against prepetition professionals or agents of the Debtors (other than parties released under the Plan).

(*Plaintiff's Third Amended Joint Plan,* § 1.61, p. 7).

As evidenced from the language in the Plan, this definition does not encompass all actions against *any* prospective defendant, but it could include Carol Bolak if the Plan considered prepetition former employees to be agents of the Plaintiff. Under the Plan definition of "Other Actions," Plaintiff transferred all claims **[\*\*32]** "arising under any theory of law or equity" against "prepetition agents of the Debtors" to the Unsecured Creditor Trust. Since Carol Bolak was a former prepetition employee of the Plaintiff, as a matter of contract construction, if the term employee is used interchangeably with the term agent, then all claims against Carol Bolak will fall into the category of "Other Actions" and Plaintiff will lack standing to pursue these claims.

**FOOTNOTES**

13 The causes of action that Plaintiff has raised, all relating to Plaintiff's customer lists, are: common law misappropriation, misappropriation of trade secrets, unfair competition, tortuous interference with Plaintiff's existing and potential business relations, unjust enrichment, and diversion of corporate opportunity by Carol Bolak.

The Plaintiff's chapter 11 plan and the accompanying disclosure statement (hereinafter the "Disclosure Statement") use the term "agents" and "employees" in many different contexts. 14 There are several instances in both the Disclosure Statement **[\*\*33]** and the chapter 11 plan where the words "agent," and "employee" are used consecutively. 15 Furthermore, there are several instances in the chapter 11 plan where the drafters will only refer to either "agents" or "employees" without referring to the other. 16 From these examples, and **[\*450]** from additional instances in both the Plan and the Disclosure Statement, the Court concludes as a matter of contract construction that the drafter did not intend for the usage of these terms to be interchangeable. As the definition of "Other Actions" only includes claims against "former officers and directors of the Debtors" or against "prepetition professionals or agents," and excludes claims against prepetition employees, all claims against Carol Bolak are not encompassed in the definition. Therefore, the Court concludes that the claims remained property of the Plaintiff, and Plaintiff has standing to bring suit. 17

**FOOTNOTES**

14 Since the definition of "Other Actions," refers to "agents" with a lower-case "a" the court must determine what the drafters intended this term to mean. The use of the term "Agent" with an uppercase "A" is a defined term in the Plan. **[\*\*34]**

15 Section L paragraph 4 of the Disclosure Statement states that "all holders of Claims and Equity Interests and other parties in interest, along with their respective present or

AUTH6-000016

former *employees, agents,* officers, directors, or principals, shall be enjoined from taking actions to interfere with the implementation or consummation of the Plan." *Disclosure Statement,* § L P 4 (emphasis added). In the section providing for a limited release of the Creditor's Committee and Professionals, the Disclosure Statement states that "each of their respective current *agents,* current *employees,* and current representatives shall be released by the Debtors." *Disclosure Statement,* § L P 6. Section 11.6 of the chapter 11 plan, also directed at limited releases of the Creditor's Committee and Professionals, contained identical language. Section 11.6 also provides that "each of their respective current *agents,* current *employees,* and current representatives shall be released by the Debtors." *Plaintiff's Third Amended Joint Plan,* § 11, p. 32 (emphasis added). In providing for the release of the Agent and Lender, the Plan states that "the Former Agent and Former Lenders and counsel to the Agent and Lenders and Former Agent and Former Lenders and each of their respective *agents, employees,* attorneys and representatives shall be release by the Debtors and the Debtors' estates, each of their *agents, employees,* attorneys and representatives." *Plaintiff's Third Amended Joint Plan,* § 11.6, p. 32 (emphasis added). **[**35]**

**16** The following sections make reference to agents without referring to employees. Section 6.1 of the Plan provides that, "the various transfer registers for each of the classes of Claims or Equity Interests as maintained by the Debtors or their *respective agents* shall be deemed closed." *Plaintiff's Third Amended Joint Plan,* § 6, p. 23 (emphasis added). Section 8.3 provides that "a Claim for such damages. . . shall not be enforceable against the Debtors, or their respective properties or interests in property as *agents,* successors, or assigns." *Id.* § 8, p. 29 (emphasis added). The following sections in the Plan only refer to employees. Section 5.11(c) provides that "[a]ny professionals retained or other *employees* hired by the Plan Administrator shall be entitled to reasonable compensation for services rendered . . . . The payment of fees and expenses of the Plan Administrator and its retained professionals and *employees* shall be made in the ordinary course of business." *Id.* § 5.11, p. 18-19 (emphasis added). The Exculpation clause in section 11.5 provides in relevant part that "[o]n the Effective Date, the respective current officers, current directors, *current employees,* current members, current financial advisors, current financial advisors, current attorneys, as applicable, of the Debtors . . . shall be exculpated." *Id.* § 11.5, p. 32 (emphasis added). **[**36]**

**17** Under the confirmed chapter 11 liquidation plan and the Disclosure Statement, Cross Media's unsecured creditors were to receive, among other things, 85 percent (85%) of proceeds, if any, from the Avoidance Actions and Other Actions. *Disclosure Statement,* § II, p. 3-4. Cross Media's Lenders, Summit Bridge National Investments LLC and Signature Bank, would receive 15 percent (15%) of the net recovery from any Avoidance Actions or Other Actions up to a total amount of $ 750,000. *Plaintiff's Third Amended Joint Plan,* § 1.5, p. 7. All remaining actions that are not Avoidance Actions or Other Actions vest in Reorganized Cross Media, and are sold, liquidated or disposed of in a matter compatible with the best interests of the Agents and Lenders. *Plaintiff's Third Amended Joint Plan,* § 5.7, p. 16. The Lenders will receive 100% of the recovery from these non-Cash assets.

Defendants also challenge Plaintiff's standing to bring suit based on the theory that other property of the estate not otherwise distributed by the Plan's effective date was vested in Reorganized Cross Media, an **[**37]** entity that Defendants assert is separate and apart from the Plaintiff. The Court must look elsewhere in the Plan to determine if Defendants' second challenge to Plaintiff's standing has merit. Under sections 5.7 and 5.11(b)(iv) of the Plan, the remaining causes of action are vested in Reorganized Cross Media. **18** The Court must now determine if Plaintiff and Reorganized Cross Media are substantially the same entity, entitling the Plaintiff to bring these causes of action against Defendants. Defendants assert that Plaintiff, the debtors in possession, are a separate entity from Reorganized Cross

AUTH6-000017

Media and, therefore, Plaintiff lacks standing to bring these claims. To support Defendants' argument, they point to sections 1.24, 5.7, 5.8 and 12.1(n) and (q) of the Plan to emphasize **[\*451]** that the Plan explicitly recognizes that the debtors in possession and Reorganized Cross Media are distinct entities because the Plan refers to them separately. [19] This argument is largely formalistic. To determine whether or not the entities are the same the court must look to the substance of the Plan.

---

**FOOTNOTES**

[18] Section 5.7 "Vesting of Other Assets," provides:

> Other than Cash and as provided under the Plan, the property of the Debtors' estate not otherwise distributed as of the Effective Date shall be vested in Reorganized Cross Media on the Effective Date. Such property shall continue to be subject to the jurisdiction of the Bankruptcy Court. The Plan Administrator shall sell or otherwise dispose of, and liquidate or convert into Cash, any non-Cash assets of the Debtors' estates in a manner compatible with the best interests of the Agent and the Lenders.

*Plaintiff's Third Amended Joint Plan,* § 5.7, p. 16.

Section 5.11(b) "Rights, Powers and Duties of Reorganized Cross Media and the Plan Administrator," provides in relevant part:

> Reorganized Cross Media shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under this Plan…. [S]uch rights, powers and duties shall include: (iv) initiating or continuing litigation to recover amounts due to Cross Media.

*Plaintiff's Third Amended Joint Plan,* § 5.11, p. 17. **[\*\*38]**

[19] For example, Defendants cite to section 1.24, "Contributed Assets," which refers to "the Debtors, Newco or Reorganized Cross Media or holders of Credit Facility Claims," when addressing possible reserves and remittances of assets. *Plaintiff's Third Amended Joint Plan,* § 1.24, p. 3. Section 5.7 provides that "the property of the Debtors' estate not otherwise distributed as of the effective date shall be vested in Reorganized Cross Media on the Effective Date." *Plaintiff's Third Amended Joint Plan,* § 5.7, p. 16. The Defendants argue that since the Plan refers to them separately they are separate entities.

---

Sections 5.3 [20] of the Plan addresses the status of Reorganized Cross Media and makes clear that "Cross Media shall continue to exist as Reorganized Cross Media after the Effective Date." It simply requires Cross Media to amend its Charter and By-Laws to reflect the merger with former subsidiary Media Outsourcing. *See, e.g., In re Boston Reg'l Med. Ctr., Inc.,* 410 F.3d at 104 n. 1 (noting that the debtor and the reorganized debtor were not distinct legal entities, **[\*\*39]** but that the reorganized entity was the continuation of the original entity as reorganized); *see also Tennessee Wheel and Rubber Co. v. Captron Corporate Air Fleet (In re Tennessee Wheel and Rubber Co.),* 64 B.R. 721, 725 (Bankr. M.D. Tenn. 1986) (holding that the "'reorganized debtor' is the same corporation indistinguishable from the 'debtor' for § 1123 purposes"). The debtors in possession and Reorganized Cross Media are at times referred to separately in the Plan because when the Plan refers to the "Debtors" it refers to the pre-confirmation debtors, and when it refers to Reorganized Cross Media, it is referring to the post confirmation merged entity. Therefore, Plaintiff has standing to bring the remaining five causes of action against CAB Marketing.

AUTH6-000018

**FOOTNOTES**

**20** Section 5.3, "Continued Corporate Existence; Amended and Restated Charter and By-laws; Dissolution of Reorganized Cross Media," provides that: "Cross media shall continue to exist as Reorganized Cross Media after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the Amended Charter and By-laws to be filed with the Bankruptcy court as part of the Plan Supplement." *Plaintiff's Third Amended Joint Plan,* § 5.3, p. 14.

### [**40] E. The Rule 15 Motion to Amend the Pleadings is Granted

In Plaintiff's post-trial memorandum of law, it moved pursuant to Rule 15(b) of the Federal Rules of Civil Procedure to amend and conform the pleadings to the evidence presented at trial, arguing that the parties expressly consented in the joint pretrial order to try issues relating to the BCM Partnership. [21] *HN12* Rule 15(b) is "mandatory, not merely permissive," and requires that "issues that are tried, though not raised in the pleadings, be treated as though they were raised in the pleadings." *Ostano Commerzanstalt, v. Telewide Sys., Inc.,* 880 F.2d 642, 646 (2d Cir. 1989) (quoting *SEC v. Rapp,* 304 F.2d 786, 790 (2d Cir. 1962) (Hand, J.)). The objective of the **[*452]** rule is to decide cases based on the actual dispute between the parties. *Id.*; 6A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE CIVIL § 1493 (2d ed. 1990) (an amendment brings the pleadings in line with the issues that were actually developed at trial). Any issues actually tried by express or implied consent at the hearing on the merits must be treated in all respects as if they had [**41] been raised in the pleadings. *O'Brien v. Moriarty,* 489 F.2d 941, 943(1st Cir. 1974).

**FOOTNOTES**

**21** Rule 15(b) provides in relevant part:

> *HN13* **(b) Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Fed. R. Civ. P. 15(b).

*HN14* In considering whether to allow an amendment pursuant to Rule 15(b), the court must consider "whether the new issues were tried by the parties' express or implied consent and whether the defendant would be prejudiced by the implied amendment...." *United States v. Certain Real Property & Premises,* 945 F.2d 1252, 1257 (2d Cir. 1991) [**42] (citations omitted). Express consent may be found in a stipulation or pretrial order, and implied consent may be found where evidence is introduced at trial without objection. *Casey v. Lewis,* 43 F.3d 1261, 1269 (9th Cir. 1994), *rev'don other grounds,* 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996); *Telewide Sys., Inc.,* 880 F.2d at 646 (concluding that the addition of a new plaintiff after close of trial on damages did not result in prejudice to defendants, because the multiple references to the party in the pretrial order put defendants on notice); *Rodriguez v. Doral Mortg. Corp.,* 57 F.3d 1168, 1172 (1st Cir. 1995) (finding that consent is implied if at trial "a party acquiesces in the introduction of evidence which is

AUTH6-000019

relevant only to that issue" and the parties understood that the evidence was aimed at an unpleaded issue) (citations omitted); *see generally* 6A FEDERAL PRACTICE AND PROCEDURE CIVIL § 1493 ("[E]xpress consent may be given by stipulation, or may be incorporated in a pretrial order"). For the defendant to be prejudiced by the Rule 15(b) amendment, a party's failure to plead an issue that it later presents **[**43]** must disadvantage its opponent in its case. *New York State Elec. & Gas Corp. v. Sec'y of Labor,* 88 F.3d 98, 104-05 (2d Cir. 1996). Generally, a party cannot show that it suffered prejudice simply because of a change in its opponent's legal theory. *Id. at 105* (finding no prejudice where the material fact issues would be the same regardless whether it was tried on the preliminary or amended theory).

Plaintiff's motion to amend the pleadings to have it conform to the evidence presented at trial is granted because Defendants stipulated to certain facts regarding the BCM partnership in the pretrial order (PTO at 8), the issue of BCM's liability was clearly identified as a legal issue for trial (PTO at 19), and without any objection from Defendants, several witnesses testified about the BCM partnership at trial. [22] The purpose of Plaintiff's motion is to modify its legal theory to impose liability on Bolak based on the vicarious nature of the alleged misconduct of other BCM partners and based on her own allegedly tortious conduct. Defendants were on notice that Plaintiff was seeking to impose liability on Bolak through the BCM partnership and they defended **[**44]** by challenging the formation of a partnership in the factual contentions in the pretrial order (PTO at 16-17), and at trial during the direct examination of Carol Bolak and Marcella Jones. *See supra,* n. 22. Further, at trial, Defendants failed to object when Plaintiff raised issues on cross-examination relating to the BCM partnership. [23] Therefore, **[*453]** Defendants explicitly and implicitly consented to try issues relating to the BCM partnership at trial, and Defendants are not prejudiced by the amendment. The material facts at issue are the same regardless whether the Court considers the original or the new theory of liability. Therefore, the Court deems the pleadings amended to include claims against the BCM partnership for misappropriation of trade secrets, unfair competition, tortious interference with business relations, and unjust enrichment.

## FOOTNOTES

[22] Both Marcella Jones and Carol Bolak testified about BCM. *See* Jones testimony (Tr. (12/5) at 22-25, 26, 27-28, 30-31, 33, 39) and Bolak testimony ( Tr. (12/5) at 76, 84, 97, 98, 106-108).

[23] Defendants now object to the amendment on the grounds that Brad Barlow is an indispensable party, and that allowing Plaintiff's new theory would prejudice the Defendants by exposing them to the possibility of inconsistent judgments. (Defendants' Post-Trial Memorandum of Law, at 24). The Court is not persuaded by Defendants' argument. Defendants were well aware that Plaintiff intended to focus on issues relating to BCM partnership and it is likely that Defendants chose not to implead Barlow because, instead, they sought to impute any tortious misconduct to Barlow.

## [**45] F. Choice of Law

The Court will apply New York state law to all of the state law causes of action alleged. None of the parties raised any choice of law issues in the pleadings, joint pretrial order or post-trial briefing. For the most part, the parties briefed the issues applying New York law. The Plaintiff was a Georgia corporation with its principal place of business in Georgia. Bolak, Jones and Barlow were employed by Cross Media in Georgia, and the alleged tortious conduct took place in Georgia. The Court raised the choice of law issue during the closing arguments. (Tr. (2/7) at 5). The parties then agreed that the Court should apply New York law. (Tr. (2/7) at 5); *see Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir. 1997) ("[w]here the parties have agreed to the application of the forum law, their consent concludes the

AUTH6-000020

choice of law inquiry."); _Walter E. Heller & Co. v. Video Innovations, Inc._, 730 F.2d 50, 52 (2d Cir. 1984) HN15 ("[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied."). Therefore, the Court will apply New York law.

### [**46] G. Plaintiff Has Failed to Prove Its Claims By a Preponderance of the Evidence

Finally, reaching the merits of the claims, the Court concludes that Plaintiff has failed to prove any of its claims by a preponderance of the evidence. Each claim will be examined in turn, but the overriding conclusion is that Plaintiff failed to establish that Bolak, or in the case of the activities of the BCM partnership for which Bolak may be chargeable, that Bolak, Barlow, Jones, or anyone else acting on behalf of the partnership, took or converted any of Cross Media's trade secrets or corporate opportunities in the form of its customer lists.

Plaintiff offered no direct evidence, by testimony or documents, that Defendants took or converted any trade secrets from Cross Media. While it is clear from the earlier _Nixon_ adversary proceeding that Cross Media's customer lists were improperly taken by someone -- Nixon, and for all the Court knows, by others as well -- no direct evidence was presented to show that these Defendants took the lists. The uncontroverted evidence shows that Cross Media _suspected_ Bolak of diverting potential customer leads, or of participating with or assisting others [**47] in doing so. (PX 7 at 10-12; PX 8 at 8-9). Bolak's employment with Cross Media was terminated based on these suspicions. (Tr. (12/5) at 57). But suspicions are not enough to establish misappropriation or the other alleged torts by a preponderance of the evidence as required for liability. 24

---

**FOOTNOTES**

24 Plaintiff never attempted to impose liability on Defendants for diversion of prospective customer leads. Even if Plaintiff attempted to argue that customer leads were a protectable trade secret that is covered under the misappropriation claim, Plaintiff failed to provide sufficient evidence to establish that customer leads are a protectable trade secret.

---

[*454] The closest Plaintiff has come to establishing any liability on the part of Defendants arises from the proof relating to a single Cross Media customer, Sandy Frey. Frey testified as a witness for Plaintiff at trial that Barlow's company, A Magazine Cafe, contacted her by telephone in Spring 2004 (after Cross Media closed its renewal department), misrepresenting [**48] itself as her magazine subscription service, seeking to place an order for magazines. (Tr. (12/4) at 20). Frey testified that the caller had confidential information about her that Cross Media had, including her credit card number. _Id._ In response to the call, Frey placed an order for magazines with A Magazine Cafe. _Id._ The order was "cleared" by Bolak's company, defendant CAB (through CRC of Canton), which charged Frey's credit card for the purchase. (Tr. (12/4) at 20-23). Frey then became suspicious and upset, calling Cross Media and advising it about the call. (Tr. (12/4) at 21-22). Frey then cancelled the order with A Magazine Cafe, and her money was refunded. (Tr. (12/4) at 27-28; PX 2 at 490). Cross Media admitted at trial that it suffered no damages as a result of this transaction. (Tr. (2/7) at 32).

When and how A Magazine Cafe received information about Frey, utilized in the telephone call to Frey, was never established at trial. While it could well have come in some way at some time from Cross Media, it likewise could have come from some other source, as Frey purchased products from other telemarketers as well. 25 (Tr. (12/4) 43, 46, 106-07; PX 1 at 488-490). Plaintiff [**49] was unable to offer any proof that Bolak, Barlow, Jones, or

anyone else who was associated with Cross Media took or obtained the information about Frey from Cross Media and gave it to A Magazine Cafe.

---

**FOOTNOTES**

**25** At trial, Marcella Jones testified that one customer could come from various lead sources. (Tr. (12/5) at (unavailable)). If the customer is an impulse buyer, then the customer's name might appear on several lead lists from sales of exercise equipment, vitamins, or other sources. *Id.*

---

Over the life of its magazine subscription business, Cross Media had 944,000 names apparently reflected in its computerized customer lists. (PTO at 14). Because of the shut-down and liquidation of Cross Media's business following its bankruptcy, Plaintiff was unable to offer proof of the actual customer lists. (PX 16 at 26-28). Apparently, no paper copies ever existed (Tr. (12/4) at 128), and Plaintiff's evidence established that neither Bolak nor Barlow or any BCM partner had access to or the ability to copy or download **[**50]** Cross Media's electronic customer list files because of security protection built-in to the system. (Tr. (12/4) at 78, 123, 126-27). Under these circumstances, while Plaintiff cannot be faulted for its inability to produce the customer lists during discovery or to offer the lists in evidence at trial, Plaintiff also cannot be excused from meeting its evidentiary burden in proving its claims.

As part of its liquidation, Cross Media sold 391,000 past-due customer accounts (part of its much larger customer lists) to Cavalry. (PX 26 at 11). Only seven former Cross Media customers from this list had matching names and addresses to names found on CAB'S 1,450 name customer list. (PX 26 at 18-25). Plaintiff acknowledged that it did not contact any of these matches other than Frey to find out whether Defendants made any improper solicitations of these customers, and Plaintiff offered no other evidence to support liability against Defendants for these accounts. No evidence was presented that any additional names on CAB'S list **[*455]** matched names on Cross Media's full customer lists.

In short, the Court is left at most with some proof that one of 944,000 Cross Media customers *may* have been improperly **[**51]** solicited by or on behalf of Defendants resulting in a single transaction totaling $ 24.57 that was promptly reversed and for which Plaintiff admits that it suffered no damages. (PX 2 at 489-90; Tr. (2/7) at 32).

While the Court has concluded that judgment should be entered for Defendants on all claims because of the failure of the proof, the Court will nevertheless briefly address each of the theories of liability advanced by Plaintiff. Plaintiff asserts that Bolak is liable vicariously as a partner of BCM for tortious conduct by Barlow in furtherance of the partnership business, and that she and CAB are also liable directly based on her own conduct. As explained below, the Court concludes that Plaintiff has succeeded in proving that the BCM partnership existed, and that Bolak would therefore be liable vicariously for tortious acts committed by Barlow in furtherance of the partnership business if the proof supported that conclusion. Plaintiff, however, failed to prove that Barlow on behalf of the BCM partnership misappropriated Cross Media's trade secrets. Plaintiff also failed to prove that Bolak and CAB are liable directly for Bolak's own conduct as Plaintiff failed to prove that **[**52]** Bolak misappropriated the customer lists.

## H. Bolak Would Be Jointly and Severally Liable As a BCM Partner

At trial, Bolak disputed the existence of the BCM partnership, and also disputed that Plaintiff established any actionable wrongs by BCM for which she could be liable.

AUTH6-000022

HN16⊕To demonstrate the existence of a partnership, a plaintiff must prove four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners. *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004). No one factor is dispositive; it is necessary to examine the parties' relationship as a whole. *Kyle v. Ford*, 184 A.D.2d 1036, 584 N.Y.S.2d 698, 698 (N.Y. App. Div. 1992).

The trial testimony of Marcella Jones and Carol Bolak, and the deposition testimony of Brad Barlow introduced at trial, along with supporting documentary evidence, established that the parties intended to and did form a partnership. *See* (PX 9 at 101-04, 119-20) (Barlow's testimony **[**53]** regarding the formation of the partnership). Both Jones and Bolak admitted that it was the parties' intent to create a partnership. (Tr. (12/5) at 23, 39, 97). In email correspondence between the parties they referred to each other as partners and indicated that money left after expenses was to "pay back partners." (PX 11 at 308-309). At one point, the parties contemplated trying to create a formal agreement. (Tr. (12/5) at 24). Evidencing that the partners shared joint control and management, the BCM partners attempted to hold regular meetings to discuss the business affairs of the partnership, including the number of orders that had been cleared and how the partnership could obtain additional subscription orders. (Tr. (12/5) at 24-25, 97; PX 9 at 152-153). The partners also scheduled a meeting to discuss costs and division of profits. (PX 11 at 305-306).

Furthermore, there is considerable testimony to substantiate the claim that each partner contributed property, financial resources, effort, skill, or knowledge of the **[*456]** business, in further support of the existence of the partnership. Jones testified that each partner contributed equal amounts of time toward making the partnership **[**54]** work and confirmed each partner's individual contribution to the partnership. (Tr. (12/5) at 25-28). Jones contributed her prior experience in sales and her relationship to dealers like Tom Meehan and others. (Tr. (12/5) at 27). Barlow was experienced in renewing magazine subscriptions, and it was his job to renew magazine subscriptions received from Tom Meehan. (Tr. (12/5) at 25-27). Robert Bolak contributed his knowledge of the magazine business and he also acted as a sales manager. (Tr. (12/5) at 28). And Carol Bolak contributed her contract with PPSB, which allowed the partnership to clear orders. *Id.*

Most telling, both Jones and Barlow attested to the fact that each of the BCM partners was entitled to and received a 25% share of the profits. (Tr. (12/5) at 30; PX 9 at 101-104, 197). It was established in Bolak's testimony and in emails documenting partnership distributions, that profits were split equally among the four parties. (PX 11 at 308-309; Tr. (12/5) at 97, 107-108). In a December 2, 2004 email from Carol Bolak to Barlow, Jones and Marsha Mann, the partnership's accountant, Bolak informed Barlow of an unaccounted for balance and informed him that he was entitled to **[**55]** 1/4 of that amount. (PX 11 at 308). After indicating that she, Jones and Robert Bolak were paid their share, she also stated that Donnie West was due a one-time payment for work done for A Magazine Cafe since West "was not a partner and not entitled to any compensation from profits . . . ." *Id.* Although no evidence was presented indicating that the partners agreed to equally share in the losses, evidence that each individual receives a share of profits is *prima facie* evidence that the individual is a partner in the business. *Olson v. Smithtown Med. Specialists, P.C.*, 197 A.D.2d 564, 602 N.Y.S.2d 649 (N.Y. App. Div. 1993) (holding that HN17⊕sharing of profits is prima facie evidence that an individual is a partner in the business, as long as these profits were not received by an employee as wage payments); *see* N.Y. PARTNERSHIP LAW § 11 [4] [b] (McKinney 2006). There is no evidence that any partner was being paid as an employee. Plaintiff has established by a preponderance of the evidence that the relevant parties formed and functioned as a partnership for the relevant time period.

HN18⊕As a partner in the BCM partnership, under New York law, Carol Bolak **[**56]** would

AUTH6-000023

be jointly and severally liable for the wrongful acts or omissions performed by another partner while acting in the ordinary course of partnership business. N.Y. PARTNERSHIP LAW § 24 (McKinney 2006); N.Y. PARTNERSHIP LAW § 26(a) (McKinney 2006) (partners are held jointly and severally liable for acts chargeable to the partnership under § 24). Under New. York law, general partners have joint and several liability for torts committed by the partnership, and plaintiff may bring an action against the partner individually, and does not have to sue the partnership first. Lewis v. Rosenfeld, 138 F. Supp.2d. 466, 476 (S.D.N.Y. 2001).

While Plaintiff proved by a preponderance of the evidence the existence of the BCM partnership. Plaintiff failed to prove misappropriation of the customer lists either by Bolak or by Barlow or someone else acting on behalf of CAB or the BCM partnership.

## I. Plaintiff Failed to Prove Misappropriation of a Trade Secret by Bolak or Barlow

HN19 ✦A plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant [*457] is using that trade secret [**57] in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. Integrated Cash Mgmt Services, Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990); Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.), Adv. Proceeding No. 03-08278 (ECF # 69), 2006 Bankr. LEXIS 4219 (Bankr. S.D.N.Y. April 6, 2006), aff'd. No. 06 Civ. 4228, 2006 U.S. Dist. LEXIS 56112, 2006 WL 2337177 at *1. Under New York law, "a trade secret may consist of any formula, pattern, device or compilation of information [that] is used in one's business, and [that] gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." Houbigant, Inc. v. Dev. Specialists, Inc., 229 F. Supp. 2d 208, 221 (S.D.N.Y. 2002) (quoting RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939)); North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999).

HN20 ✦In determining whether information constitutes a trade secret, New York courts have considered the following factors:

> (1) the extent to which the information is known outside of the business;

> (2) the extent to which it is known by employees and others involved in the business; (3) [**58] the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Integrated Cash Mgmt. Servs., 920 F.2d at 173.

In a reprise of its evidence in the earlier Nixon case, Plaintiff has easily established by a preponderance of the evidence that its customer lists were protected trade secrets. For the reasons given by Judge Lifland in Nixon, and affirmed by the District Court in that case by Judge Mukasey, I find that Cross Media's customer lists were protected trade secrets.

In Nixon, the evidence was clear that the defendant misappropriated Cross Media's entire customer lists, offering them for sale over the internet. Nixon, 2006 U.S. Dist. LEXIS 56112, 2006 WL 2337177 at *5. The evidence was equally clear that Nixon's husband had access to all of Cross Media's customer lists through computer consulting services he performed for Cross Media. Id.

In this case, the same protected [**59] trade secrets are at issue, but the Plaintiff failed to prove by a preponderance of the evidence that the customer lists were misappropriated by

AUTH6-000024

the Defendants, or by Barlow or anyone else acting for the BCM partnership.

### 1. Plaintiff Failed to Prove that Bolak Misappropriated the Customer Lists

Bolak was employed by Cross Media as a lead broker. (PTO at 5). Her duties included purchasing names of potential magazine subscribers and distributing a revised list to targeted dealers. (PTO at 5; Tr. (12/5) at 48-49, 51-52). In the winter and following spring of 2002, Cross Media began to monitor the activity of suspected employees, including Bolak, due to a noticeable decline of verified sales. (PX 7 at 10-12). Bolak was ultimately fired in 2003, but was not fully informed of the circumstances for her firing. (Tr. (12/5) at 57-58). When Bolak heard rumors that she had been fired for theft and fraud, she contacted Andy Nelson, to whom she had reported, to explain the conduct that management may have misinterpreted. (Tr. (12/5) at 58-64; DX L 20-22). Bolak had been contacting dealers that Cross Media was no longer doing business with due to downsizing, and helped them place **[**60]** business with magazine **[*458]** dealers directly. (DX L at 20-22; PTO at 8) ("After Cross Media began downsizing its business . . . [it] reduced the number of brokers from whom the company acquired leads and Cross Media reduced the number of dealers to whom the company sold leads."). Bolak explained that any suspicious communication between her and Donnie West, a former Cross Media employee with whom she was romantically involved, was to put West in contact with these former dealers. (Tr. (12/5) at 62-63; DX L at 20-22). Nelson understood that her only misconduct was conducting personal business at work. (DX L at 20-22, 23, 34). Nelson promised Bolak that he would, and did, clear up any confusion about her termination, and testified at deposition that Bolak had been fired for conducting personal business during working hours. (DX L at 20-22).

Even if Bolak diverted leads to other dealers. Plaintiff has not established that these leads were part of Plaintiff's customer lists. (Tr. (12/4) at 66-67) (explaining that customer lists are different from leads in that a customer list speaks to the unique attributes of a customer after they've gone through the entire [described] process"). Instead, **[**61]** Plaintiff attempts to use the business and an allegedly personal relationship between Bolak and West to establish that West was remotely accessing the customer lists through Ricky Wilson, a domain administrator who had access to all systems at Cross Media. (Tr. (12/4) at 136, 138, 150). However, Plaintiff failed to provide any evidence establishing that it was possible to remotely access and download Cross Media's customer lists. Plaintiff introduced testimony of Chris Hamburg, the former vice president of operations, who said that Wilson's activities were being monitored, but Plaintiff failed to provide any evidence that Wilson had downloaded the customer lists. (Tr. (12/4) at 122-136). Plaintiff's suspicions about Bolak, West or Wilson are not a substitute for proof. Therefore, Plaintiff's has failed to prove by a preponderance of the evidence that Bolak, on her own behalf or on behalf of CAB, misappropriated Plaintiff's customer lists.

### 2. Plaintiff Failed to Prove That Barlow Misappropriated The Customer Lists

The evidence failed to establish that Barlow had access to Cross Media's customer lists. Chris Hamburg testified that when Barlow returned to Cross Media as renewal **[**62]** manager, when that business was reopened after the bankruptcy filing. Barlow's access was limited to the renewals and reclamations modules of the customer lists. (Tr. (12/4) at 78). The renewals modules only included information about those customers whose payment structure was about to be completed and was up for renewal. (Tr. (12/4) at 77-78). The reclamation modules only included information as to customers who during the verification process cancelled their magazine order -- the Cross Media representative would attempt to reclaim these orders by selling the customers a smaller bundle. (Tr. (12/4) at 125-26). Further, if Barlow wished to copy even this customer information, he would have had to print each customer form individually -- his access did not allow him to download the entire renewal list. (Tr, (12/4) at 78-79). No evidence was presented that Barlow printed-out or took information about even this limited subset of customers from Cross Media's customer lists.

AUTH6-000025

The only evidence of possible misconduct by Barlow relates to the solicitation of an order from Sandy Frey by Barlow's business, A Magazine Cafe, already discussed above, *see supra*, at Section G, which is insufficient **[\*\*63]** to establish liability for misappropriation of Cross Media's customer lists. The solicitation of Frey is a **[\*459]** troublesome episode, but not enough to predicate liability against Defendants in this case.

During trial Defendants tried to distance themselves from Barlow and A Magazine Cafe. (Tr. (12/5) 39-40, 42, 77, 79). Bolak and Jones testified that Barlow created A Magazine Cafe on his own, and that they were not affiliated with it. (Tr. (12/5) 26, 79-80). According to Bolak and Jones, the purpose of the BCM partnership was limited to clearing orders from Tom Meehan, but the evidence shows that the partnership benefited from clearing at least 600-700 orders from A Magazine Cafe that were not Meehan orders. (Tr. (12/5) 26-27, 76). The Court concludes that the testimony by Bolak and Jones about their lack of involvement with A Magazine Cafe is not credible. Rather, A Magazine Cafe was an entity that Barlow established to utilize his skills to benefit the BCM partnership. The email correspondence between Bolak, Jones, Barlow and Marsha Mann (PX 11 at 308) indicates that as early as December 2, 2004, the BCM partners were aware of A Magazine Cafe, and the partners had loaned the company **[\*\*64]** money for its operations. *Id.* Bolak writes in reference to the money received, and monies due to other partners, "[h]ere is what we have now that we have paid back all monies loaned to AMC. . . . We also agreed to pay Donnie [West] a one time payment of $ 1500 for work that was done for AMC since he is not a partner and not entitled to compensation from profits and was never paid for services due him." *Id.* The court understands the reference to "AMC" to mean "A Magazine Cafe."

The Court is left with a clear sense that neither Bolak nor Jones was entirely truthful in their trial testimony. Barlow, with whom Bolak and Jones had a serious falling-out, was likewise not a credible witness. But the Court's discomfort about the testimony of these witnesses is not enough to overcome the lack of proof of misappropriation by or on behalf of Defendants. Plaintiff has simply failed to prove that Barlow, acting on behalf of the BCM partnership, misappropriated Cross Media's customer lists.

### J. Plaintiff Failed to Prove Unjust Enrichment

Plaintiff cannot establish a claim for unjust enrichment because it failed to establish that Defendants misappropriated Plaintiff's customer **[\*\*65]** lists. *HN21* The elements of an unjust enrichment claim under New York law are (1) a benefit to the defendant, (2) at the Plaintiff's expense, and (3) that "equity and good conscience" require restitution. *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000). The "essence" of this claim "is that one party has received money or a benefit at the expense of another." *Id;* (citing *City of Syracuse v. R.A.C. Holding, Inc.,* 258 A.D.2d 905, 685 N.Y.S.2d 381, 381 (N.Y. App. Div. 1999)). Since Plaintiff failed to establish that Defendants have, at the Plaintiff's expense, taken Plaintiff's trade secret. Plaintiff therefore cannot establish that Defendants acquired a benefit or were enriched at Plaintiff's expense. Furthermore, with respect to any unjust enrichment claim that may be alleged with regard to Sandy Frey, it is undisputed that Defendants never received a benefit from Frey or that Plaintiff was not damaged by the call to Frey, because Cross Media had been paid in full for Frey's magazines and when she was contacted in March, Cross Media had already closed its renewal department. (Tr. (12/4) at 82). Plaintiff's claim for unjust enrichment necessarily fails.

### K. Plaintiff **[\*\*66]** Failed to Prove Unfair Competition

Plaintiff's claim for unfair competition, based on the misappropriation claim, also must fail. *HN22* The essence of unfair **[\*460]** competition under New York common law is "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Rosenfeld v. W.B. Saunders, Div. of*

AUTH6-000026

*Harcourt Brace Jovanovich, Inc., 728 F. Supp. 236, 249-250 (S.D.N.Y. 1990)* (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc., 678 F. Supp. 424, 429 (S.D.N.Y. 1987)*). In an action for damages based on a common law unfair competition claim, the plaintiff must show actual confusion to recover. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 35 (2d Cir. 1995)*.

**[*461]** At trial, Plaintiff failed to prove that Defendants misappropriated the customer lists. Therefore, Plaintiff solely relies on the argument that Defendants, through the BCM partnership, engaged in deceptive marketing by "falsely representing" to Plaintiff's customer, Sandy Frey, that they were her magazine subscription company. (Pl. Memorandum of Law, at 31; Tr. (12/4) at 20-21). Although Frey testified **[**67]** that the company that called her in March identified itself as her "magazine subscription company," the caller never identified the company as MOS or Cross Media. (Tr. (12/4) at 36-37). In fact, when Frey called MOS to verify if they had changed their name, in the recorded conversation Frey said, "I got a call from somebody saying they are ACI Magazine. Is that you guys?" (PX 1 at 0002). Furthermore, Plaintiff has admitted that it suffered no damage with respect to the loss of Sandy Prey as a customer. (Tr. (2/7) at 32).

Plaintiff also cannot establish the "bad faith" requirement for its unfair competition claim. Plaintiff asserts that bad faith is clearly established through the misappropriation of Plaintiff's customer lists, but since the Court has not found that Defendants misappropriated the customer lists, the Court does not find that the alleged deception was done in bad faith. Plaintiff has failed to establish that Defendants deceived any other former Cross Media customers. Therefore, this claim also fails.

### L. Plaintiff Failed to Prove Tortious Interference with Business Relationships

Plaintiff has failed to establish by a preponderance of the evidence that Defendants **[**68]** have tortiously interfered with Plaintiff's existing business relations. [HN23]To prevail on a claim for tortious interference with existing business relations, a plaintiff must establish: (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages. *White Plains Coat & Apron Co., v. Cintas Corp., 460 F.3d 281, 285 (2d Cir. 2006); Foster v. Churchill, 87 N.Y.2d 744, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583 (N.Y. 1996)*. Courts have dismissed tortious interference claims where the plaintiff has failed to identify specific contracts that were breached as a result of the defendant's actions. *Fun-Damental Too v. Gemmy Indus. Corp.,* No. 96 Civ. 1103, 1996 U.S. Dist. LEXIS 18653, 1996 WL 724734, at *3 (S.D.N.Y. Dec. 17, 1996)* (dismissing the claim for tortious interference of contract because plaintiff failed to allege specific contracts that were breached as a result of defendants' action) (citing *Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 273 (E.D.N.Y. 1994)* ("The Proposed Amended Complaint does not allege the existence of any specific contracts with **[**69]** identified third-parties . . . .")). Here, the only existing contract that Plaintiff could potentially show Defendants interfered with is the contract with Sandy Frey. [26] Even with respect to Frey, Plaintiff's claim fails.

### FOOTNOTES

[26] Further, in Plaintiff's Post-trial Memorandum of Law, Plaintiff limits the argument to tortious interference of contract to Sandy Frey, and does not attempt to extend this argument to other alleged customers. (Pl. Post-trial Memorandum, at 32).

At trial, Plaintiff established that a valid contract existed between Cross Media and Frey. (Tr. (12/4) at 7-19; PX 1 at 02-04). However, it is also clear from the evidence that as of February 2004, Frey's existing account was paid in full. (PX 1 at 02-04). Further, Plaintiff

AUTH6-000027

cannot allege that Defendants tortiously interfered with the renewal of Frey's magazine subscriptions because Cross Media terminated its renewal department in February 2004, and Frey was not contacted by the Defendants for a possible renewal until March 2004. [27] (Tr. **[\*\*70]** (12/4) at 20). Instead, Plaintiff relies on Frey's testimony that "after the problem that I had with my credit card, I cancelled all of my magazine subscriptions with MOS, CRC and everybody," (Tr. (12/4) at 40), to establish that Frey cancelled her subscription with MOS. However, at this point in the contractual relationship, the only performance left on the contract was on behalf of MOS. According to Frey's testimony, after speaking with MOS, she understood that her bill was paid in full, and that her subscription was good for another year. [28] (Tr. (12/4) at 39). Therefore, if Frey did actually cancel her subscription with MOS, Frey may be the only damaged party if MOS did not send her the magazines that she had rightfully paid for in advance. [29]

### FOOTNOTES

[27] Plaintiff cannot as a matter of law assert that Defendants tortiously interfered with prospective business relations with respect to Frey because Plaintiff closed its renewal department before Frey's contract was up for renewal. (Tr. (12/4) at 82). Therefore, Plaintiff had no intention of renewing Frey's subscriptions in the future.

[28] After Frey was asked whether she believed her subscriptions were paid up when she received her statements from MOS, she stated that: "[o]nly after the conversation I had with MOS -- after I called them that day. She said that my magazine subscription had been paid up and was good for another year and I wasn't going to get another bill for it." (Tr. (12/4) at 39). **[\*\*71]**

[29] If this is the case, MOS may have benefited to Frey's detriment, because it was required to pay for and deliver a years worth of a magazine bundle.

Plaintiff admits that it has not suffered any actual damages with respect to Frey, but instead is seeking punitive damages for the alleged misconduct. (Tr. (2/7) at 32; Pl. Post-Trial Memorandum, at 32-33). The Court does not need to reach the issue of punitive damages, because Plaintiff cannot establish the third element of the claim, that Defendants intentionally procured the breach of the contract. [30] Plaintiff cannot establish this element because there was no requirement that Frey breach her existing contract with MOS in order to execute a new contract with the Defendants. In effect, Frey executed a new agreement with Defendants that had no bearing on Prey's prior contract with MOS. If Frey had not contacted MOS about ACI, both contracts would have run simultaneously. Plaintiff has failed to establish that Defendants had the requisite intent to cause the breach of the contract with Frey, because the procurement of the new contract with **[\*\*72]** Frey did not require a breach of the prior contract. Therefore, Plaintiff's claim for tortious interference with existing business relations fails.

### FOOTNOTES

[30] The facts do point to some evidence that Defendants may have had knowledge of Plaintiff's prior contract because Plaintiff was aware that Frey was paying $ 15 a month for magazines. (PX 1 at 02).

## M. Plaintiff Failed To Prove Diversion of a Corporate Opportunity

Plaintiff failed to establish by a preponderance of the evidence that Carol Bolak diverted

AUTH6-000028

corporate opportunities **[\*462]** from Plaintiff. *HN24*⟟Under the doctrine of corporate opportunity, "corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 671-72 (S.D.N.Y. 2005) (quoting *Alexander & Alexander, Inc. v. Fritzen*, 147 A.D.2d 241, 542 N.Y.S.2d 530, 533-534 (N.Y. App. Div. 1989). This doctrine still applies even after an employee **[\*\*73]** leaves her corporate employment, but the scope of the fundamental duty is determined by the circumstances of each case and does not run to every act where the employee appears to act in her own self-interest. *American Federal Group, Ltd. v. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998). Taking steps not involving any neglect of positive duties to a current employer in preparation for engaging in competition with that employer after the employee leaves the employment may not involve breach of fiduciary duties. *Id.; Schneider Leasing Plus, Inc. v. Stallone*, 172 A.D.2d 739, 569 N.Y.S.2d 126, 128 (N.Y. App. Div. 1991). An employee does cross the line by actively soliciting the customers of her *current employer* and diverting her *current employer's* business to herself. *American Fed. Group*, 136 F. 3d at 906 (emphasis added).

*HN25*⟟The corporate opportunity doctrine prohibits a former employee from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation. *American Fed. Group*, 136 F. 3d at 906. However, the doctrine of corporate opportunity is limited to situations where the **[\*\*74]** corporation has an "interest" or "tangible expectancy" in the opportunity. *Design Strategies*, 384 F. Supp. 2d at 672 (explaining this to mean "something much less tenable than ownership, but. . . more certain than a desire or a hope"). Further, although a former employee is not barred from competing with a former employer, a former employee may not misappropriate and utilize confidential information, such as customer lists and other confidential information not generally known to the public, but available only to employees in their employment capacity. *American Fed. Group*, 136 F.3d at 906 (citing *Abraham Zion Corp. v. Lebow*, 593 F. Supp. 551, 569-70 (S.D.N.Y. 1984)). However, a former employee may utilize information obtained while employed, including the identity of customers, if the information is generally available from public sources to members of the trade, without breaching a fiduciary duty of loyalty to the former employer. *Abraham Zion Corp., 593 F. Supp. at 570.*

Plaintiff failed to prove that Bolak misappropriated the confidential customer lists from Plaintiff while employed at Cross Media, or at any time **[\*\*75]** thereafter. ³¹ Therefore, Plaintiff's claim of diversion of corporate opportunity cannot rest on this factor and ultimately fails because of this. *See, e.g., Schneider Leasing Plus, Inc. v. Stallone*, 172 A.D.2d 739, 569 N.Y.S.2d 126, 128 (N.Y. App. Div. 1991) *HN26*⟟("An employee may create a competing business prior to leaving his employer without breaching any fiduciary duty unless he makes improper use of the employer's time, facilities or proprietary secrets in doing so.")

### FOOTNOTES

**31** This last claim for diversion of corporate opportunity was only brought against Bolak, not against CAB Marketing or BCM.

Plaintiff fundamentally failed to establish a factual basis for the diversion of a corporate opportunity. While it is true that Bolak did owe a fiduciary duty to Plaintiff, the only possible evidence relating to the diversion of customers occurred close to a year after Bolak was terminated **[\*463]** from Cross Media. (PX at 29). Therefore, the evidence does not support the contention that Bolak diverted these customers for **[\*\*76]** her own benefit while employed at Cross Media. Although Bolak formed CAB Marketing in October 2002, during her employment at Cross Media, this is insufficient to establish that Bolak breached a fiduciary duty to the company, because the entity did not begin operating until after Bolak stopped

AUTH6-000029

working for Cross Media. (Tr. (12/5) at 64-65). Therefore, Plaintiff has failed to prove that Bolak diverted corporate opportunities from Plaintiff.

**III. CONCLUSION**

For the foregoing to reasons, Defendants are entitled to have judgment entered in their favor on all claims asserted against them. Defendants' counsel shall prepare and present a judgment in accordance with this opinion.

DATED: April 25, 2007

New York, New York

**/s/ Martin Glenn**

United States Bankruptcy Judge

Service: **Get by LEXSEE®**
Citation: **367 B.R. 435**
View: Full
Date/Time: Monday, November 2, 2009 - 11:54 AM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

LexisNexis® About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AUTH6-000030

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Out | ? Help

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Cour

**FOCUS™** Terms [                    ]  Search Within [Original Results (1 - 2)     ▾] [Go →]
Advanced...

Service: **Get by LEXSTAT®**
TOC: United States Code Service: Code, Const. Rules, Conventions & Public Laws > /. . . / >
      CHAPTER 1. GENERAL PROVISIONS > § 105. Power of court
Citation: **11 U.S.C. § 105**

⌁Select for FOCUS™ or Delivery
☐

*11 USCS § 105*

Retrieve Legislative Impact® **($)**

UNITED STATES CODE SERVICE
Copyright © 2009 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

**\*\*\* CURRENT THROUGH PL 111-82, APPROVED
10/26/2009 \*\*\***

TITLE 11. BANKRUPTCY
CHAPTER 1. GENERAL PROVISIONS

**Go to the United States Code Service Archive
Directory**

11 USCS § 105

⟟ **NITA Commentary:**

Review expert commentary from The National Institute for
Trial Advocacy

§ 105.  Power of court

(a) The court may issue any order, process, or judgment
that is necessary or appropriate to carry out the provisions
of this title. No provision of this title providing for the
raising of an issue by a party in interest shall be construed
to preclude the court from, sua sponte, taking any action
or making any determination necessary or appropriate to
enforce or implement court orders or rules, or to prevent
an abuse of process.

(b) Notwithstanding subsection (a) of this section, a court
may not appoint a receiver in a case under this title [11
USCS §§ 101 et seq.].

▴ **Practitioner's Toolbox**   [?] ☐▸

⬇ **History**

⬇ **Interpretive Notes and
Decisions**

⬇ **History; Ancillary Laws and
Directives**

**Resources & Practice Tools**

⊕ **NITA Commentary**

⊕ **Related Statutes & Rules**

⊖ **Research Guide**

Federal Procedure:

> 8 Moore's Federal Practice
  (Matthew Bender 3d ed.), ch 42,
  Consolidation; Separate Trials §
  42.14.

> 13 Moore's Federal Practice
  (Matthew Bender 3d ed.), ch 66,
  Receivers § 66.02.

> 18 Moore's Federal Practice
  (Matthew Bender 3d ed.), ch 131,
  Claim Preclusion and Res Judicata §
  131.23.

Forms:

> 14 Bender's Federal Practice Forms,
  Form 4530, Admiralty--Bankruptcy
  Forms.

Commercial Law:

> 1A Debtor-Creditor Law (Matthew
  Bender), ch 8, Fair Debt Collection
  § 8.08.

> 3A Debtor-Creditor Law (Matthew
  Bender), ch 33, Bankruptcy Law §§
  33.03, 33.06, 33.08.

> 3A Debtor-Creditor Law (Matthew
  Bender), ch 34, Consumer
  Bankruptcy §§ 34.09, 34.11.

⬇ More...

(c) The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title [11 USCS §§ 101 et seq.] shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28 [28 USCS §§ 1 et seq.]. This subsection shall not be interpreted to exclude bankruptcy judges and other officers or employees appointed pursuant to chapter 6 of title 28 [28 USCS §§ 151 et seq.] from its operation.

(d) The court, on its own motion or on the request of a party in interest--
   (1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and
   (2) unless inconsistent with another provision of this title [11 USCS §§ 101 et seq.] or with applicable Federal Rules of Bankruptcy Procedure, issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically, including an order that--
      (A) sets the date by which the trustee must assume or reject an executory contract or unexpired lease; or
      (B) in a case under chapter 11 of this title [11 USCS §§ 1101 et seq.]--
         (i) sets a date by which the debtor, or trustee if one has been appointed, shall file a disclosure statement and plan;
         (ii) sets a date by which the debtor, or trustee if one has been appointed, shall solicit acceptances of a plan;
         (iii) sets the date by which a party in interest other than a debtor may file a plan;
         (iv) sets a date by which a proponent of a plan, other than the debtor, shall solicit acceptances of such plan;
         (v) fixes the scope and format of the notice to be provided regarding the hearing on approval of the disclosure statement; or
         (vi) provides that the hearing on approval of the disclosure statement may be combined with the hearing on confirmation of the plan.


⊤ **History:**

   (Nov. 6, 1978, P.L. 95-598, Title I, § 101, 92 Stat. 2555; July 10, 1984, P.L. 98-353, Title I, § 118, 98 Stat. 344; Oct. 27, 1986, P.L. 99-554, Title II, Subtitle A, § 203, 100 Stat. 3097; Oct. 22, 1994, P.L. 103-394, Title I, § 104(a), 108 Stat. 4108; April 20, 2005, P.L. 109-8, Title IV, Subtitle B, § 440, 119 Stat. 114.)


⊤ **History; Ancillary Laws and Directives:**

   ⊥ 1. Prior law and revision
   ⊥ 2. Effective date of section
   ⊥ 3. Amendments


⊤ 1. Prior law and revision:
*Senate Report No. 95-989*
   Section 105 is derived from section 2a (15) of present law [section 11(a)(15) of former title 11], with two changes. First, the limitation on the power of a bankruptcy judge (the power to enjoin a court being reserved to the district judge) is removed as inconsistent with the increased powers and jurisdiction of the new bankruptcy court. Second, the bankruptcy judge is prohibited from appointing a receiver in a case under title 11 under any circumstances. The bankruptcy code has ample provision for the appointment of a trustee when needed. Appointment of a receiver would simply circumvent the established procedures.

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Out | ? Help

Search  Research Tasks  Get a Document  Shepard's®  Alerts  Total Litigator  Transactional Advisor  Cour

FOCUS™ Terms [                    ]  Search Within  Original Results (1 - 3) [   ▾]  Go →

Advanced...

Service: **Get by LEXSTAT®**

TOC: United States Code Service: Code, Const, Rules, Conventions & Public Laws > /.../  >
CHAPTER 1. GENERAL PROVISIONS > § 101. Definitions

Citation: **11 USCS § 101**

↵Select for FOCUS™ or Delivery
☐

## 11 USCS § 101

Retrieve Legislative Impact® **($)**

**Practitioner's Toolbox**  ? ⬓

↧ **History**

↧ **Interpretive Notes and Decisions**

↧ **History; Ancillary Laws and Directives**

UNITED STATES CODE SERVICE
Copyright © 2009 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

**Resources & Practice Tools**

⊕ **Related Statutes & Rules**

⊖ **Research Guide**

Federal Procedure:

> 3 Moore's Federal Practice (Matthew Bender 3d ed.), ch 13, Counterclaim and Crossclaim § 13.50.

> 15 Moore's Federal Practice (Matthew Bender 3d ed.), ch 104, Specific Grants of Federal Question Jurisdiction §§ 104.12, 104.41.

> 16 Moore's Federal Practice (Matthew Bender 3d ed.), ch 107, Removal §§ 107.14, 107.15.

Forms:

Intellectual Property:

> 4 Nimmer on Copyright (Matthew Bender), ch 19A, Bankruptcy § 19A.06.

> 2 Milgrim on Licensing (Matthew Bender), ch 12, Considerations Relating to the Parties and Their Affiliates § 12.03.

> 2 Milgrim on Licensing (Matthew Bender), ch 15, Rights Granted and Licensed §§ 15.00, 15.37.

↧ More...

*** CURRENT THROUGH PL 111-82, APPROVED
10/26/2009 ***

TITLE 11. BANKRUPTCY
CHAPTER 1. GENERAL PROVISIONS

**Go to the United States Code Service Archive Directory**

11 USCS § 101

§ 101.  Definitions

In this title the following definitions shall apply:
   (1) The term "accountant" means accountant authorized under applicable law to practice public accounting, and includes professional accounting association, corporation, or partnership, if so authorized.
   (2) The term "affiliate" means--
      (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--
         (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
         (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
      (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or

(D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

(3) The term "assisted person" means any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $ 164,250.

(4) The term "attorney" means attorney, professional law association, corporation, or partnership, authorized under applicable law to practice law.

(4A) The term "bankruptcy assistance" means any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title.

(5) The term "claim" means--

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(6) The term "commodity broker" means futures commission merchant, foreign futures commission merchant, clearing organization, leverage transaction merchant, or commodity options dealer, as defined in section 761 of this title [11 USCS § 761], with respect to which there is a customer, as defined in section 761 of this title [11 USCS § 761].

(7) The term "community claim" means claim that arose before the commencement of the case concerning the debtor for which property of the kind specified in section 541(a)(2) of this title [11 USCS § 541(a)(2)] is liable, whether or not there is any such property at the time of the commencement of the case.

(7A) The term "commercial fishing operation" means--

(A) the catching or harvesting of fish, shrimp, lobsters, urchins, seaweed, shellfish, or other aquatic species or products of such species; or

(B) for purposes of section 109 [11 USCS § 109] and chapter 12 [11 USCS §§ 1201 et seq.], aquaculture activities consisting of raising for market any species or product described in subparagraph (A).

(7B) The term "commercial fishing vessel" means a vessel used by a family fisherman to carry out a commercial fishing operation.

(8) The term "consumer debt" means debt incurred by an individual primarily for a personal, family, or household purpose.

(9) The term "corporation"--

(A) includes--

(i) association having a power or privilege that a private corporation, but not an individual or a partnership, possesses;

(ii) partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association;

(iii) joint-stock company;

(iv) unincorporated company or association; or

(v) business trust; but

(B) does not include limited partnership.

(10) The term "creditor" means--

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

(B) entity that has a claim against the estate of a kind specified in section 348(d), 502

(f), 502(g), 502(h) or 502(i) of this title [11 USCS § 348(d), 502(f), 502(g), 502(h) or 502 (i)]; or

(C) entity that has a community claim.

(10A) The term "current monthly income"--

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on--

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii) [11 USCS § 521(a)(1)(B)(ii)]; or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1) (B)(ii) [11 USCS § 521(a)(1)(B)(ii)]; and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act [42 USCS §§ 301 et seq.], payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18 [18 USCS § 2331]) or domestic terrorism (as defined in section 2331 of title 18 [18 USCS § 2331]) on account of their status as victims of such terrorism.

(11) The term "custodian" means--

(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;

(B) assignee under a general assignment for the benefit of the debtor's creditors; or

(C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

(12) The term "debt" means liability on a claim.

(12A) The term "debt relief agency" means any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration, or who is a bankruptcy petition preparer under section 110 [11 USCS § 110], but does not include--

(A) any person who is an officer, director, employee, or agent of a person who provides such assistance or of the bankruptcy petition preparer;

(B) a nonprofit organization that is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986 [26 USCS § 501(c)(3)];

(C) a creditor of such assisted person, to the extent that the creditor is assisting such assisted person to restructure any debt owed by such assisted person to the creditor;

(D) a depository institution (as defined in section 3 of the Federal Deposit Insurance Act [12 USCS § 1813]) or any Federal credit union or State credit union (as those terms are defined in section 101 of the Federal Credit Union Act [12 USCS § 1752]), or any affiliate or subsidiary of such depository institution or credit union; or

(E) an author, publisher, distributor, or seller of works subject to copyright protection under title 17 [17 USCS §§ 101 et seq.], when acting in such capacity.

(13) The term "debtor" means person or municipality concerning which a case under this title has been commenced.

(13A) The term "debtor's principal residence"--

(A) means a residential structure, including incidental property, without regard to whether that structure is attached to real property; and

(B) includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer.

(14) The term "disinterested person" means a person that--

(A) is not a creditor, an equity security holder, or an insider;

LexisNexis® *Total Research System*

Switch Client ┊ Preferences ┊ Sign Out ┊ ? Help

Search ┊ Research Tasks ┊ Get a Document ┊ Shepard's® ┊ Alerts ┊ Total Litigator ┊ Transactional Advisor ┊ Cour

FOCUS™ Terms [                    ] Search Within Original Results (1 - 1) [ ▼ ] Go ►
Advanced...

Service: **Get by LEXSTAT®**
TOC: <u>United States Code Service: Code, Const. Rules, Conventions & Public Laws</u> > *[ . . . ]* >
<u>SUBCHAPTER II. DEBTOR'S DUTIES AND BENEFITS</u> > **§ 524. Effect of discharge**
Citation: **11 USCS § 524**

*11 USCS § 524*

<u>Retrieve Legislative Impact® **($)**</u>

UNITED STATES CODE SERVICE
Copyright © 2009 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** CURRENT THROUGH PL 111-82, APPROVED
10/26/2009 ***

TITLE 11. BANKRUPTCY
CHAPTER 5. CREDITORS, THE DEBTOR, AND THE ESTATE
SUBCHAPTER II. DEBTOR'S DUTIES AND BENEFITS

**<u>Go to the United States Code Service Archive
Directory</u>**

11 USCS § 524

⚓ **NITA Commentary:**

<u>Review expert commentary from The National Institute for
Trial Advocacy following 11 USCS § 105 (relating to the
power of the court).</u>

§ 524. Effect of discharge

(a) A discharge in a case under this <u>title [11 USCS §§ 101</u>
et seq.]--
   (1) voids any judgment at any time obtained, to the
extent that such judgment is a determination of the
personal liability of the debtor with respect to any debt
discharged under section 727, 944, 1141, 1228, or 1328
of this <u>title [11 USCS § 727</u>, <u>944</u>, <u>1141</u>, <u>1228</u>, or <u>1328</u>],
whether or not discharge of such debt is waived;
   (2) operates as an injunction against the
commencement or continuation of an action, the employment of process, or an act, to
collect, recover or offset any such debt as a personal liability of the debtor, whether or not
discharge of such debt is waived; and
   (3) operates as an injunction against the commencement or continuation of an action, the

◆ **Practitioner's Toolbox**    ? ❏ ▲

⤓ **History**

⤓ **Interpretive Notes and
Decisions**

⤓ **History; Ancillary Laws and
Directives**

**Resources & Practice Tools**

⊕ **NITA Commentary**

⊕ **Related Statutes & Rules**

⊖ **Research Guide**
Forms:
> 8 <u>Rabkin & Johnson, Current Legal
Forms, § 5A.96</u>, Creditors'
Agreements.
Commercial Law:
> 1 <u>Debtor-Creditor Law (Matthew
Bender), ch 1</u>, Truth in Lending §
1.06.
> 1A <u>Debtor-Creditor Law (Matthew
Bender), ch 8</u>, Fair Debt Collection
§ 8.08.
> 1A <u>Debtor-Creditor Law (Matthew
Bender), ch 12</u>, Student Loans and
Trade School Abuses § 12.06.
Bankruptcy:
> 4 <u>Collier on Bankruptcy (Matthew
Bender 15th ed. rev), ch 524</u>,
Effect of Discharge PP 524.01 et
seq.
> 2 <u>Collier Bankruptcy Manual, ch
524</u>, Effect of Discharge PP 524.01
et seq.
> 1 <u>Collier Bankruptcy Practice Guide,
ch 1</u>, Initial Client Contact PP 1.04,
1.07, 1.50.
⤓ <u>More...</u>

employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title [11 USCS § 541(a)(2)] that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a) (1), or 1328(a)(1) [11 USCS § 1228(a)(1), or 1328(a)(1)], or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title [11 USCS §§ 523(c) and 523(d)], in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

(b) Subsection (a)(3) of this section does not apply if--
    (1) (A) the debtor's spouse is a debtor in a case under this title, or a bankrupt or a debtor in a case under the Bankruptcy Act, commenced within six years of the date of the filing of the petition in the case concerning the debtor; and
       (B) the court does not grant the debtor's spouse a discharge in such case concerning the debtor's spouse; or
    (2) (A) the court would not grant the debtor's spouse a discharge in a case under chapter 7 of this title [11 USCS §§ 701 et seq.] concerning such spouse commenced on the date of the filing of the petition in the case concerning the debtor; and
       (B) a determination that the court would not so grant such discharge is made by the bankruptcy court within the time and in the manner provided for a determination under section 727 of this title [11 USCS § 727] of whether a debtor is granted a discharge.

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if--
    (1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title [11 USCS § 727, 1141, 1228, or 1328];
    (2) the debtor received the disclosures described in subsection (k) at or before the time at which the debtor signed the agreement;
    (3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that--
       (A) such agreement represents a fully informed and voluntary agreement by the debtor;
       (B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and
       (C) the attorney fully advised the debtor of the legal effect and consequences of--
          (i) an agreement of the kind specified in this subsection; and
          (ii) any default under such an agreement;
    (4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;
    (5) the provisions of subsection (d) of this section have been complied with; and
    (6) (A) in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as--
          (i) not imposing an undue hardship on the debtor or a dependent of the debtor; and
          (ii) in the best interest of the debtor.
       (B) Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.

(d) In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141, 1228, or 1328 of this title [11 USCS § 727, 1141, 1228, or 1328], the court may hold a hearing at which the debtor shall appear in person. At any such hearing, the court shall inform the debtor that a discharge has been

AUTH9-000002

granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section and was not represented by an attorney during the course of negotiating such agreement, then the court shall hold a hearing at which the debtor shall appear in person and at such hearing the court shall--

  (1) inform the debtor--

    (A) that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and

    (B) of the legal effect and consequences of--

      (i) an agreement of the kind specified in subsection (c) of this section; and

      (ii) a default under such an agreement; and

  (2) determine whether the agreement that the debtor desires to make complies with the requirements of subsection (c)(6) of this section, if the consideration for such agreement is based in whole or in part on a consumer debt that is not secured by real property of the debtor.

(e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

(f) Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt.

(g) (1) (A) After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 [11 USCS §§ 1101 et seq.] may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.

    (B) An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.

  (2) (A) Subject to subsection (h), if the requirements of subparagraph (B) are met at the time an injunction described in paragraph (1) is entered, then after entry of such injunction, any proceeding that involves the validity, application, construction, or modification of such injunction, or this subsection with respect to such injunction, may be commenced only in the district court in which such injunction was entered, and such court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy.

    (B) The requirements of this subparagraph are that--

      (i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization--

        (I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

        (II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

        (III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of--

          (aa) each such debtor;

          (bb) the parent corporation of each such debtor; or

          (cc) a subsidiary of each such debtor that is also a debtor; and

        (IV) is to use its assets or income to pay claims and demands; and

(ii) subject to subsection (h), the court determines that--

(I) the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

(II) the actual amounts, numbers, and timing of such future demands cannot be determined;

(III) pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands;

(IV) as part of the process of seeking confirmation of such plan--

(aa) the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and

(bb) a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

(V) subject to subsection (h), pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

(3) (A) If the requirements of paragraph (2)(B) are met and the order confirming the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan--

(i) the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6);

(ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

(iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason;

(B) Subparagraph (A) shall not be construed to--

(i) imply that an entity described in subparagraph (A) (ii) or (iii) would, if this paragraph were not applicable, necessarily be liable to any entity by reason of any of the acts described in subparagraph (A);

(ii) relieve any such entity of the duty to comply with, or of liability under, any Federal or State law regarding the making of a fraudulent conveyance in a transaction described in subparagraph (A) (ii) or (iii); or

(iii) relieve a debtor of the debtor's obligation to comply with the terms of the plan of reorganization, or affect the power of the court to exercise its authority under sections 1141 and 1142 [11 USCS §§ 1141 and 1142] to compel the debtor to do so.

(4) (A) (i) Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.

(ii) Notwithstanding the provisions of section 524(e) [11 USCS § 524(e)], such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of--

(I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a

related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to--

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

(iii) As used in this subparagraph, the term "related party" means--

(I) a past or present affiliate of the debtor;

(II) a predecessor in interest of the debtor; or

(III) any entity that owned a financial interest in--

(aa) the debtor;

(bb) a past or present affiliate of the debtor; or

(cc) a predecessor in interest of the debtor.

(B) Subject to subsection (h), if, under a plan of reorganization, a kind of demand described in such plan is to be paid in whole or in part by a trust described in paragraph (2) (B)(i) in connection with which an injunction described in paragraph (1) is to be implemented, then such injunction shall be valid and enforceable with respect to a demand of such kind made, after such plan is confirmed, against the debtor or debtors involved, or against a third party described in subparagraph (A)(ii), if--

(i) as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind, and

(ii) the court determines, before entering the order confirming such plan, that identifying such debtor or debtors, or such third party (by name or as part of an identifiable group), in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

(5) In this subsection, the term "demand" means a demand for payment, present or future, that--

(A) was not a claim during the proceedings leading to the confirmation of a plan of reorganization;

(B) arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1); and

(C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i).

(6) Paragraph (3)(A)(i) does not bar an action taken by or at the direction of an appellate court on appeal of an injunction issued under paragraph (1) or of the order of confirmation that relates to the injunction.

(7) This subsection does not affect the operation of section 1144 [11 USCS § 1144] or the power of the district court to refer a proceeding under section 157 of title 28 or any reference of a proceeding made prior to the date of the enactment of this subsection [enacted Oct. 22, 1994].

(h) Application to existing injunctions. For purposes of subsection (g)--

(1) subject to paragraph (2), if an injunction of the kind described in subsection (g)(1)(B) was issued before the date of the enactment of this Act, as part of a plan of reorganization confirmed by an order entered before such date, then the injunction shall be considered to meet the requirements of subsection (g)(2)(B) for purposes of subsection (g)(2)(A), and to satisfy subsection (g)(4)(A)(ii), if--

(A) the court determined at the time the plan was confirmed that the plan was fair and equitable in accordance with the requirements of section 1129(b) [11 USCS § 1129(b)];

(B) as part of the proceedings leading to issuance of such injunction and confirmation of such plan, the court had appointed a legal representative for the purpose of protecting the

rights of persons that might subsequently assert demands described in subsection (g)(4)(B) with respect to such plan; and

(C) such legal representative did not object to confirmation of such plan or issuance of such injunction; and

(2) for purposes of paragraph (1), if a trust described in subsection (g)(2)(B)(i) is subject to a court order on the date of the enactment of this Act staying such trust from settling or paying further claims--

(A) the requirements of subsection (g)(2)(B)(ii)(V) shall not apply with respect to such trust until such stay is lifted or dissolved; and

(B) if such trust meets such requirements on the date such stay is lifted or dissolved, such trust shall be considered to have met such requirements continuously from the date of the enactment of this Act.

(i) The willful failure of a creditor to credit payments received under a plan confirmed under this title, unless the order confirming the plan is revoked, the plan is in default, or the creditor has not received payments required to be made under the plan in the manner required by the plan (including crediting the amounts required under the plan), shall constitute a violation of an injunction under subsection (a)(2) if the act of the creditor to collect and failure to credit payments in the manner required by the plan caused material injury to the debtor.

(j) Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if--

(1) such creditor retains a security interest in real property that is the principal residence of the debtor;

(2) such act is in the ordinary course of business between the creditor and the debtor; and

(3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

(k) (1) The disclosures required under subsection (c)(2) shall consist of the disclosure statement described in paragraph (3), completed as required in that paragraph, together with the agreement specified in subsection (c), statement, declaration, motion and order described, respectively, in paragraphs (4) through (8), and shall be the only disclosures required in connection with entering into such agreement.

(2) Disclosures made under paragraph (1) shall be made clearly and conspicuously and in writing. The terms "Amount Reaffirmed" and "Annual Percentage Rate" shall be disclosed more conspicuously than other terms, data or information provided in connection with this disclosure, except that the phrases "Before agreeing to reaffirm a debt, review these important disclosures" and "Summary of Reaffirmation Agreement" may be equally conspicuous. Disclosures may be made in a different order and may use terminology different from that set forth in paragraphs (2) through (8), except that the terms "Amount Reaffirmed" and "Annual Percentage Rate" must be used where indicated.

(3) The disclosure statement required under this paragraph shall consist of the following:

(A) The statement: "Part A: Before agreeing to reaffirm a debt, review these important disclosures:";

(B) Under the heading "Summary of Reaffirmation Agreement", the statement: "This Summary is made pursuant to the requirements of the Bankruptcy Code";

(C) The "Amount Reaffirmed", using that term, which shall be--

(i) the total amount of debt that the debtor agrees to reaffirm by entering into an agreement of the kind specified in subsection (c), and

(ii) the total of any fees and costs accrued as of the date of the disclosure statement, related to such total amount.

(D) In conjunction with the disclosure of the "Amount Reaffirmed", the statements--

(i) "The amount of debt you have agreed to reaffirm"; and

(ii) "Your credit agreement may obligate you to pay additional amounts which may come due after the date of this disclosure. Consult your credit agreement.".

AUTH9-000006

(E) The "Annual Percentage Rate", using that term, which shall be disclosed as--

(i) if, at the time the petition is filed, the debt is an extension of credit under an open end credit plan, as the terms "credit" and "open end credit plan" are defined in section 103 of the Truth in Lending Act [15 USCS § 1602], then--

(I) the annual percentage rate determined under paragraphs (5) and (6) of section 127(b) of the Truth in Lending Act [15 USCS § 1637(b)], as applicable, as disclosed to the debtor in the most recent periodic statement prior to entering into an agreement of the kind specified in subsection (c) or, if no such periodic statement has been given to the debtor during the prior 6 months, the annual percentage rate as it would have been so disclosed at the time the disclosure statement is given to the debtor, or to the extent this annual percentage rate is not readily available or not applicable, then

(II) the simple interest rate applicable to the amount reaffirmed as of the date the disclosure statement is given to the debtor, or if different simple interest rates apply to different balances, the simple interest rate applicable to each such balance, identifying the amount of each such balance included in the amount reaffirmed, or

(III) if the entity making the disclosure elects, to disclose the annual percentage rate under subclause (I) and the simple interest rate under subclause (II); or

(ii) if, at the time the petition is filed, the debt is an extension of credit other than under an open end credit plan, as the terms "credit" and "open end credit plan" are defined in section 103 of the Truth in Lending Act [15 USCS § 1602], then--

(I) the annual percentage rate under section 128(a)(4) of the Truth in Lending Act [15 USCS § 1638(a)(4)], as disclosed to the debtor in the most recent disclosure statement given to the debtor prior to the entering into an agreement of the kind specified in subsection (c) with respect to the debt, or, if no such disclosure statement was given to the debtor, the annual percentage rate as it would have been so disclosed at the time the disclosure statement is given to the debtor, or to the extent this annual percentage rate is not readily available or not applicable, then

(II) the simple interest rate applicable to the amount reaffirmed as of the date the disclosure statement is given to the debtor, or if different simple interest rates apply to different balances, the simple interest rate applicable to each such balance, identifying the amount of such balance included in the amount reaffirmed, or

(III) if the entity making the disclosure elects, to disclose the annual percentage rate under (I) and the simple interest rate under (II).

(F) If the underlying debt transaction was disclosed as a variable rate transaction on the most recent disclosure given under the Truth in Lending Act, by stating "The interest rate on your loan may be a variable interest rate which changes from time to time, so that the annual percentage rate disclosed here may be higher or lower.".

(G) If the debt is secured by a security interest which has not been waived in whole or in part or determined to be void by a final order of the court at the time of the disclosure, by disclosing that a security interest or lien in goods or property is asserted over some or all of the debts the debtor is reaffirming and listing the items and their original purchase price that are subject to the asserted security interest, or if not a purchase-money security interest then listing by items or types and the original amount of the loan.

(H) At the election of the creditor, a statement of the repayment schedule using 1 or a combination of the following--

(i) by making the statement: "Your first payment in the amount of $ ---- is due on ---- but the future payment amount may be different. Consult your reaffirmation agreement or credit agreement, as applicable.", and stating the amount of the first payment and the due date of that payment in the places provided;

(ii) by making the statement: "Your payment schedule will be:", and describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party; or

(iii) by describing the debtor's repayment obligations with reasonable specificity to the extent then known by the disclosing party.

(I) The following statement: "Note: When this disclosure refers to what a creditor 'may' do, it does not use the word 'may' to give the creditor specific permission. The word 'may' is

used to tell you what might occur if the law permits the creditor to take the action. If you have questions about your reaffirming a debt or what the law requires, consult with the attorney who helped you negotiate this agreement reaffirming a debt. If you don't have an attorney helping you, the judge will explain the effect of your reaffirming a debt when the hearing on the reaffirmation agreement is held.".

(J)

(i) The following additional statements:

"Reaffirming a debt is a serious financial decision. The law requires you to take certain steps to make sure the decision is in your best interest. If these steps are not completed, the reaffirmation agreement is not effective, even though you have signed it.

"1. Read the disclosures in this Part A carefully. Consider the decision to reaffirm carefully. Then, if you want to reaffirm, sign the reaffirmation agreement in Part B (or you may use a separate agreement you and your creditor agree on).

"2. Complete and sign Part D and be sure you can afford to make the payments you are agreeing to make and have received a copy of the disclosure statement and a completed and signed reaffirmation agreement.

"3. If you were represented by an attorney during the negotiation of your reaffirmation agreement, the attorney must have signed the certification in Part C.

"4. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, you must have completed and signed Part E.

"5. The original of this disclosure must be filed with the court by you or your creditor. If a separate reaffirmation agreement (other than the one in Part B) has been signed, it must be attached.

"6. If you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court unless the reaffirmation is presumed to be an undue hardship as explained in Part D.

"7. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, it will not be effective unless the court approves it. The court will notify you of the hearing on your reaffirmation agreement. You must attend this hearing in bankruptcy court where the judge will review your reaffirmation agreement. The bankruptcy court must approve your reaffirmation agreement as consistent with your best interests, except that no court approval is required if your reaffirmation agreement is for a consumer debt secured by a mortgage, deed of trust, security deed, or other lien on your real property, like your home.

"Your right to rescind (cancel) your reaffirmation agreement. You may rescind (cancel) your reaffirmation agreement at any time before the bankruptcy court enters a discharge order, or before the expiration of the 60-day period that begins on the date your reaffirmation agreement is filed with the court, whichever occurs later. To rescind (cancel) your reaffirmation agreement, you must notify the creditor that your reaffirmation agreement is rescinded (or canceled).

"What are your obligations if you reaffirm the debt? A reaffirmed debt remains your personal legal obligation. It is not discharged in your bankruptcy case. That means that if you default on your reaffirmed debt after your bankruptcy case is over, your creditor may be able to take your property or your wages. Otherwise, your obligations will be determined by the reaffirmation agreement which may have changed the terms of the original agreement. For example, if you are reaffirming an open end credit agreement, the creditor may be permitted by that agreement or applicable law to change the terms of that agreement in the future under certain conditions.

"Are you required to enter into a reaffirmation agreement by any law? No, you are not required to reaffirm a debt by any law. Only agree to reaffirm a debt if it is in your best interest. Be sure you can afford the payments you agree to make.

"What if your creditor has a security interest or lien? Your bankruptcy discharge does not eliminate any lien on your property. A 'lien' is often referred to as a security interest, deed of trust, mortgage or security deed. Even if you do not reaffirm and your personal liability on the debt is discharged, because of the lien your creditor may still have the right to take the security property if you do not pay the debt or default on it. If the lien is on an item of

personal property that is exempt under your State's law or that the trustee has abandoned, you may be able to redeem the item rather than reaffirm the debt. To redeem, you make a single payment to the creditor equal to the current value of the security property, as agreed by the parties or determined by the court.".

    (ii) In the case of a reaffirmation under subsection (m)(2), numbered paragraph 6 in the disclosures required by clause (i) of this subparagraph shall read as follows:

    "6. If you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court.".

  (4) The form of such agreement required under this paragraph shall consist of the following:

    "Part B: Reaffirmation Agreement. I (we) agree to reaffirm the debts arising under the credit agreement described below.

    "Brief description of credit agreement:

    "Description of any changes to the credit agreement made as part of this reaffirmation agreement:

    "Signature:          Date:

    "Borrower:

    "Co-borrower, if also reaffirming these debts:

    "Accepted by creditor:

    "Date of creditor acceptance:".

  (5) The declaration shall consist of the following:

    (A) The following certification:

    "Part C: Certification by Debtor's Attorney (If Any).

    "I hereby certify that (1) this agreement represents a fully informed and voluntary agreement by the debtor; (2) this agreement does not impose an undue hardship on the debtor or any dependent of the debtor; and (3) I have fully advised the debtor of the legal effect and consequences of this agreement and any default under this agreement.

    "Signature of Debtor's Attorney:        Date:". ·

    (B) If a presumption of undue hardship has been established with respect to such agreement, such certification shall state that in the opinion of the attorney, the debtor is able to make the payment.

    (C) In the case of a reaffirmation agreement under subsection (m)(2), subparagraph (B) is not applicable.

  (6) (A) The statement in support of such agreement, which the debtor shall sign and date prior to filing with the court, shall consist of the following: ·

    "Part D: Debtor's Statement in Support of Reaffirmation Agreement.

    "1. I believe this reaffirmation agreement will not impose an undue hardship on my dependents or me. I can afford to make the payments on the reaffirmed debt because my monthly income (take home pay plus any other income received) is $ ----, and my actual current monthly expenses including monthly payments on post-bankruptcy debt and other reaffirmation agreements total $ ----, leaving $ ---- to make the required payments on this reaffirmed debt. I understand that if my income less my monthly expenses does not leave enough to make the payments, this reaffirmation agreement is presumed to be an undue hardship on me and must be reviewed by the court. However, this presumption may be overcome if I explain to the satisfaction of the court how I can afford to make the payments here: ----.

    "2. I received a copy of the Reaffirmation Disclosure Statement in Part A and a completed and signed reaffirmation agreement.".

    (B) Where the debtor is represented by an attorney and is reaffirming a debt owed to a creditor defined in section 19(b)(1)(A)(iv) of the Federal Reserve Act [12 USCS § 461(b)(1) (A)(iv)], the statement of support of the reaffirmation agreement, which the debtor shall sign and date prior to filing with the court, shall consist of the following:

    "I believe this reaffirmation agreement is in my financial interest. I can afford to make the payments on the reaffirmed debt. I received a copy of the Reaffirmation Disclosure Statement in Part A and a completed and signed reaffirmation agreement.".

  (7) The motion that may be used if approval of such agreement by the court is required in

AUTH9-000009

order for it to be effective, shall be signed and dated by the movant and shall consist of the following:

"Part E: Motion for Court Approval (To be completed only if the debtor is not represented by an attorney.). I (we), the debtor(s), affirm the following to be true and correct:

"I am not represented by an attorney in connection with this reaffirmation agreement.

"I believe this reaffirmation agreement is in my best interest based on the income and expenses I have disclosed in my Statement in Support of this reaffirmation agreement, and because (provide any additional relevant reasons the court should consider):

"Therefore, I ask the court for an order approving this reaffirmation agreement.".

(8) The court order, which may be used to approve such agreement, shall consist of the following:

"Court Order: The court grants the debtor's motion and approves the reaffirmation agreement described above.".

(l) Notwithstanding any other provision of this title the following shall apply:

(1) A creditor may accept payments from a debtor before and after the filing of an agreement of the kind specified in subsection (c) with the court.

(2) A creditor may accept payments from a debtor under such agreement that the creditor believes in good faith to be effective.

(3) The requirements of subsections (c)(2) and (k) shall be satisfied if disclosures required under those subsections are given in good faith.

(m) (1) Until 60 days after an agreement of the kind specified in subsection (c) is filed with the court (or such additional period as the court, after notice and a hearing and for cause, orders before the expiration of such period), it shall be presumed that such agreement is an undue hardship on the debtor if the debtor's monthly income less the debtor's monthly expenses as shown on the debtor's completed and signed statement in support of such agreement required under subsection (k)(6)(A) is less than the scheduled payments on the reaffirmed debt. This presumption shall be reviewed by the court. The presumption may be rebutted in writing by the debtor if the statement includes an explanation that identifies additional sources of funds to make the payments as agreed upon under the terms of such agreement. If the presumption is not rebutted to the satisfaction of the court, the court may disapprove such agreement. No agreement shall be disapproved without notice and a hearing to the debtor and creditor, and such hearing shall be concluded before the entry of the debtor's discharge.

(2) This subsection does not apply to reaffirmation agreements where the creditor is a credit union, as defined in section 19(b)(1)(A)(iv) of the Federal Reserve Act [12 USCS § 461 (b)(1)(A)(iv)].


## ⌐ History:

(Nov. 6, 1978, P.L. 95-598, Title I, § 101, 92 Stat. 2592; July 10, 1984, P.L. 98-353, Title III, Subtitle A, § 308, Subtitle H, § 455, 98 Stat. 354, 376; Oct. 27, 1986, P.L. 99-554, Title II, Subtitles B, C, §§ 257(o), 282, 283(k), 100 Stat. 3115-3117; Oct. 22, 1994, P.L. 103-394, Title I, §§ 103, 111(a), Title V, § 501(d)(14), 108 Stat. 4108, 4113, 4145.)

(As amended April 20, 2005, P.L. 109-8, Title II, Subtitle A, §§ 202, 203(a), Title XII, § 1210, 119 Stat. 43, 194.)


## ⌐ History; Ancillary Laws and Directives:

± 1. Prior law and revision
± 2. References in text
± 3. Effective date of section
± 4. Amendments

AUTH9-000010

LexisNexis® *Total Research System*

Switch Client ⋮ Preferences ⋮ Sign Out ⋮ ☒ Help

Search ╲ Research Tasks ╲ Get a Document ╲ Shepard's® ╲ Alerts ╲ Total Litigator ╲ Transactional Advisor ╲ Cour

FOCUS™ Terms [                    ]  Search Within  Original Results (1 - 1)   [▾]  Go ⇒

Advanced...

Service: **Get by LEXSEE®**
Citation: **60 F.3d 1031**

*60 F.3d 1031, *; 1995 U.S. App. LEXIS 20200, **;*
*34 Collier Bankr. Cas. 2d (MB) 152; 27 Bankr. Ct. Dec. 738*

IN RE: FLAGSTAFF REALTY ASSOCIATES t/a F.R.A. LIMITED PARTNERSHIP Debtor
MEGAFOODS STORES, INC., Appellant, v. FLAGSTAFF REALTY ASSOCIATES, t/a F.R.A.
LIMITED PARNERSHIP; MAURICE L. MCALISTER; J.E. ROBERT COMPANY, INC.; KENNETH D.
HINSVARK

No. 94-5650

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

60 F.3d 1031; 1995 U.S. App. LEXIS 20200; 34 Collier Bankr. Cas. 2d (MB) 152; 27 Bankr.
Ct. Dec. 738

June 27, 1995, Argued
July 31, 1995, Filed

**PRIOR HISTORY: [**1]** On Appeal from the United States District Court for the District of
New Jersey. (D.C. No. 93-cv-1713).

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant tenant sought review of a ruling from the United
States District Court for the District of New Jersey, which allowed appellee landlord to
reject the lease in its bankruptcy case, because the lease specifically provided that the
tenant could offset future rent to cure the landlords' default.

**OVERVIEW:** The tenant cured the landlord's default by making repairs to demised
premises and it offset improvement costs against future rents as provided for in lease. The
landlord filed a voluntary bankruptcy petition under Chapter 11, and the bankruptcy court
granted the landlord's motion to reject the lease, which was affirmed by the district court.
The tenant sought review of the district court's judgment on the ground that it had a valid
recoupment claim because the lease specifically provided for a reduction in rent when the
tenant cured the landlord's default. The court reversed, holding the tenant had a valid
recoupment claim because the lease specifically provided for reduction in rent, and the
landlord had no interest in the future rental income to the extent of the tenant's claim.

**OUTCOME:** The court reversed the judgment.

**CORE TERMS:** tenant, landlord, rent, lease, recoupment, repair, confirmation,
reorganization plan, offset, rent reserved, rental payments, rental, lessee, rent payments,
security interest, confirmed, renewal, pertinent part, amount of rent, citations omitted,
debtor-landlord, leasehold, relieve, prepaid, monthly, setoff, recoup, notified, withhold,

AUTH10-000001

default

## LEXISNEXIS® HEADNOTES                                    ⊟ **Hide**

Bankruptcy Law > Case Administration > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

Contracts Law > Types of Contracts > Lease Agreements > General Overview

*HN1* See 11 U.S.C.S. § 365(h)(2).

Contracts Law > Types of Contracts > Lease Agreements > General Overview

Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview

*HN2* The phrase, "rent reserved under such lease," plainly refers to the rent due under the lease.  More Like This Headnote

Bankruptcy Law > Case Administration > Administrative Powers > General Overview

Contracts Law > Types of Contracts > Lease Agreements > General Overview

*HN3* Rejection does not alter the substantive rights of the parties to the lease, and thus does not alter the continuing vitality of terms affecting the amount of rent. The primary function of rejection is to allow a debtor-lessor to escape the burden of providing continuing services to a tenant. Rejection affects the lessor's duties to the tenant.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > General Overview

Contracts Law > Types of Contracts > Lease Agreements > General Overview

*HN4* The obligations under a lease and rights associated with the tenant's leasehold interest do not just vanish because a debtor has rejected the lease. The leasehold interest remains intact and the lease remains operative between the parties.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > General Overview

Civil Procedure > Joinder of Claims & Remedies > Claims

*HN5* Recoupment, which has its origins as an equitable rule of joinder, permits claims arising out of the same transaction to be adjudicated in one proceeding.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > General Overview

*HN6* The trustee of a bankruptcy estate takes the property subject to rights of recoupment.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Case Administration > Administrative Powers > General Overview

*HN7* The court requires that both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations.  More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** Peter W. Sorensen, Esq. (argued), Robbins & Green, 3300 North Central Avenue, Norwest Tower, Suite 1800, Phoenix, AZ 85012, Joseph E. Sales, Esq. Norris, McLaughlin & Marcus, P.C. 721 Route 202-206, P.O. Box 1018, Somerville, NJ 08876-1018, Attorneys for Appellant.

Roger B. Kaplan, Esq. (argued), Deborah Del Nobile Tanenbaum, Esq. Wilentz, Goldman &

AUTH10-000002

Spitzer, P.C. 90 Woodbridge Center Drive, P.O. Box 10, Woodbridge, NJ 07095

, , Attorneys for Appellee Flagstaff Realty Associates

**JUDGES:** Before: MANSMANN, GREENBERG, SAROKIN, Circuit Judges.

**OPINION BY:** SAROKIN

**OPINION**

[*1032] OPINION OF THE COURT

SAROKIN, *Circuit Judge:*

A landlord defaulted on its responsibility to make necessary repairs to the demised premises, and the commercial tenant, as provided in the lease, cured the default by making the repairs. The lease permitted the tenant to offset the cost of those improvements against future rents. The issue presented is whether the monies expended by the tenant before bankruptcy can be recouped [*1033] or otherwise credited against rental payments due thereafter, where the landlord, [**2] now debtor-in-possession, rejects the lease. We conclude that they can, and thus reverse.

I.

In August 1991, tenant Megafoods Stores, Inc. ▾ became a lessee of commercial property located in Flagstaff, Arizona. Under the lease, landlord Flagstaff Realty Associates was obligated to maintain the parking area and exterior of the building in good repair. Property Lease at PP 9, 14. Tenant notified landlord of the need to repair the roof and parking lot and learned of landlord's "financial inability to perform its obligations under the lease." App. at 136. As early as February 1992, tenant notified landlord that if it did not confirm that it would perform the repairs at its expense, then tenant would repair the property and exercise its right of offset against the rent. Tenant performed the work and in July 1992 notified landlord of its intent to withhold rent. In response, landlord declared that failure to pay rent constituted default under the lease, and tenant subsequently agreed to remit the July rent and expressed its willingness to cooperate with landlord in resolving this dispute either through cash reimbursement, offset against rent, or otherwise. Having failed to hear from [**3] landlord, tenant gave notice in mid-August 1992 that it would commence withholding rent pursuant to paragraph 29 of the lease and again expressed its willingness to cooperate. Paragraph 29 provides in pertinent part:

> in the event the Landlord shall . . . fail to perform any obligation specified in this lease, then Tenant may . . . do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

App. at 95.

A little more than two weeks later, landlord filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code, and in October 1992, filed a motion to reject the lease.

AUTH10-000003

The specific bases for rejection were that the rent provided in the lease was below market value and that tenant had asserted a claim for $ 477,969. Landlord listed tenant's claim in its petition as a disputed prepetition unsecured claim without priority. Tenant commenced **[\*\*4]** a separate adversary proceeding seeking a declaration of the rights of the parties with respect to the rental payments and repair issue, and the bankruptcy court decided to address this issue together with the motion to reject. The bankruptcy court granted landlord's motion to reject and denied tenant's application to offset its repair claims pursuant to the recoupment doctrine or, in the alternative, to 11 U.S.C.A. § 365(h)(2) (West 1993). It also determined that tenant had exercised its statutory prerogative to remain in possession of the property for the balance of the lease and therefore owed landlord, as debtor-in-possession, its prerejection amount of rent. 11 U.S.C.A. § 365.

Tenant appealed, and the district court, exercising jurisdiction under 28 U.S.C.A. § 158(a) (West 1993), affirmed the bankruptcy court's ruling. Tenant has filed a timely notice of appeal. We have jurisdiction over this appeal pursuant to 28 U.S.C.A. §§ 158(d) and 1291 (West 1993).

During the pendency of this appeal, the bankruptcy court confirmed the landlord's plan of reorganization. Tenant did not appeal the confirmation order nor did it seek a stay pending the resolution of this appeal.

II.

We **[\*\*5]** exercise plenary review over the legal issues presented in this appeal. There are no disputes as to the material facts.

Section 365(h)(2) provides in pertinent part:

> **HN1** if such lessee . . . remains in possession as provided in paragraph (1) of this subsection, such lessee . . . may offset against the *rent reserved under such lease* . . . any damages occurring after such date [of rejection] caused by the nonperformance of **[\*1034]** any obligation of the debtor under such lease . . . .

11 U.S.C.A. § 365(h)(2) (emphasis added). Therefore, our first inquiry is what rent is reserved under the lease.

**HN2** The phrase, "rent reserved under such lease," plainly refers to the rent due under the lease. See *Consumer Product Safety Com. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 64 L. Ed. 2d 766, 100 S. Ct. 2051 (1980)("plain meaning of legislation should be conclusive"); *see also In re TM Carlton House Partners*, 97 Bankr. 819, 823 (Bankr. E.D. Pa. 1989)("tenant is entitled to remain under the same rental terms as are set forth in the lease")(citations omitted).

Here, paragraph 29 of the lease plainly provides for a reduction in the rent when the tenant cures the landlord's default. In essence, the parties agreed that **[\*\*6]** if tenant advanced certain costs which were the obligation of landlord, the rent would be reduced accordingly. The reduced rent is the "rent reserved," and it is that rent which the tenant is required to pay.

**HN3** "Rejection does not alter the substantive rights of the parties to the lease," and thus does not alter the continuing vitality of terms affecting the amount of rent such as paragraph 29. *In re Chestnut Ridge Plaza Associates, L.P.*, 156 Bankr. 477, 483 (Bankr. W.D. Pa. 1993). The primary function of rejection is to "allow[] a debtor-lessor to escape the burden of providing continuing services to a tenant." *In re Lee Road Partners*, 155 Bankr. 55, 60 (Bankr. E.D.N.Y. 1993)(citing cases), *aff'd*, 169 Bankr. 507 (E.D.N.Y. 1994). Rejection affects

AUTH10-000004

the lessor's duties to the tenant. *See also In re Stable Mews Associates, Inc.,* 41 Bankr. 594, 597 (Bankr. S.D.N.Y. 1984)(rejection "relieves the estate from covenants requiring future performance, such as the provision of utilities, repairs, maintenance and janitorial services by the debtor")(citation omitted); 2 *Collier on Bankruptcy* § 365.09, at 356-58 (15th ed. 1995) (rejection "results merely in the cancellation of covenants **[**7]** requiring performance in the future by the landlord"). The *Chestnut Ridge* court emphasized that

> *HN4*the obligations under the lease and rights associated with the tenant's leasehold interest do not just vanish because a debtor has rejected the lease. The leasehold interest remains intact and the lease remains operative between the parties.

156 Bankr. at 485 (citations omitted). Thus, although the rejection of the lease by the debtor-landlord relieves it of prospective obligations to perform under the lease, it does not relieve it of its obligation to accept the agreed upon reduced rent provided for under the terms of the lease.

Although not the type of transaction traditionally recognized as creating a security interest, this situation is analogous to the assignment of rents to secure a loan. If the landlord had borrowed the money to make the repairs and assigned the rents to a lender, the landlord could not disavow the assignment after filing a bankruptcy petition and insist that it receive the rent payments. *See, e.g., In re Wheaton Oaks Office Partners Limited Partnership,* 27 F.3d 1234, 1239-41 (7th Cir. 1994)(assignment of rents to secure mortgage is **[**8]** an interest in real property and hence a lien giving rise to security interest); *Prudential Ins. Co. of America v. Boston Harbor Marina Co.,* 159 Bankr. 616, 619 (D. Mass. 1993)(lien on rents gives rise to security interest in future rent payments); *In re Buckley,* 73 Bankr. 746, 749 (D.S.D. 1987)(interest in rent gives rise to perfected security interest where lender obtains possession of property). *Cf. In re Tavern Motor Inn, Inc.,* 80 Bankr. 659, 660-62 (D. Vt. 1987)(landlord's assignment of right to receive future rent gave lessee bank a security interest in real property). Similarly, the debtor in this case, in effect, assigned to the tenant its own interest in the rental payments and thus permitted tenant to reimburse itself.

From yet another perspective, paragraph 29 can be interpreted as treating the monies so advanced by the tenant as more akin to prepaid rent, rather than a loan to the landlord or a debt the landlord owes the tenant. Certainly if a tenant paid a year's rent in advance and the landlord filed for bankruptcy during the course of that year, the tenant should not be required to pay the rent a second time for the remaining balance of that **[*1035]** year. *Cf. In re* **[**9]** *M.W. Ettinger Transfer Co.,* 1988 Bankr. LEXIS 2720, 1988 WL 129334, * 4 (Bankr. D. Minn. 1988)(concluding it is "wholly unjust, improper and foolish" to require debtor-tenant who spent more than $ 300,000 in capital improvements in form of prepaid rent to pay rent and to force tenant to sue separately for a prepaid rent claim). Thus, on statutory grounds, we conclude that the "rent reserved" under the lease is the fixed rent less the reasonable and customary cost of the improvements, to be apportioned towards tenant's monthly rental obligation by the bankruptcy court on remand.

Even if statutory grounds were not available, we hold that the doctrine of recoupment would provide relief to tenant. A claim subject to recoupment avoids the usual bankruptcy channels and thus, in essence, is given priority over other creditors' claims. *HN5*Recoupment, which has its origins as an equitable rule of joinder, permits claims arising out of the same transaction to be adjudicated in one proceeding. *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir. 1984); *In re B & L Oil Company,* 782 F.2d 155, 157 (10th Cir. 1986). This common law doctrine is not codified in the Bankruptcy Code, but has been established through decisional **[**10]** law.

*HN6*The "trustee of a bankruptcy estate 'takes the property subject to rights of

AUTH10-000005

recoupment.'" *In re Holford*, 896 F.2d 176, 179 (5th Cir. 1990)(quoting *In re Career Consultants, Inc.*, 84 Bankr. 419, 426 (Bankr. E.D. Va. 1988)); *In re University Medical Center*, 973 F.2d 1065, 1080 (3d Cir. 1992). In recognition of the special nature of recoupment, courts have permitted its application even in situations where the Code does not permit application of the related doctrine of setoff, 11 U.S.C.A. § 553 (West 1993). Thus, postpetition funds owing to the landlord may be recouped against prepetition claims owed by the landlord despite the usually inflexible automatic stay provision of the Code, 11 U.S.C.A. § 362(a) (West 1993). *See, e.g.*, *In re Klingberg Schools*, 68 Bankr. 173, 178-79 (N.D. Ill. 1986), *aff'd*, 837 F.2d 763 (7th Cir. 1988).

However, recoupment is not available without limitation. As noted above, the contending claims must derive from the same transaction. Recoupment also cannot be the basis for asserting an independent claim against the estate. *In re American Central Airlines, Inc.*, 60 Bankr. 587, 590 (Bankr. N.D. Iowa 1986)(citation omitted).

[**11]  This case satisfies the "same transaction" test. *HN7*We have required that "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *University Medical Center*, 973 F.2d at 1081. Both the claim for repair costs and the rent arise from the lease, and it would be inequitable for the landlord to receive rent without compensating tenant for undertaking the repairs.

Although the usual posture of recoupment cases involves a defensive invocation of recoupment in response to a landlord or trustee filing suit to recover sums owing to the estate, the creditor may take the "offensive" as in this case. *See Public Service*, 107 Bankr. 441 at 445-46 (landlord's argument that recoupment may be raised only in defense is "misplaced"); *B & L Oil*, 782 F.2d at 156 (creditor brought suit for adjudication of its right to recoupment). Although the creditor is the tenant here, this does not contradict the essentially defensive nature of tenant's position. It is not seeking affirmative recovery of the repair costs, but rather an adjudication that it may deduct the repair costs [**12] from its post-rejection rent.

Thus, at the time of filing, tenant had a valid recoupment claim, and hence the landlord had no interest in the future rental income to the extent of tenant's claim.

## III.

Having concluded that the tenant has the right to reduce future rent payments to the extent that it expended monies to make improvements which were the obligation of the debtor-landlord, we must next consider the impact of confirmation from which tenant neither appealed nor sought a stay.

[*1036]  Section 1141 of the Bankruptcy Code states, in pertinent part and subject to exceptions not relevant herein:

> (a) . . . the provisions of a confirmed plan bind the landlord . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan.

> *****

> (c) . . . except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the landlord.

AUTH10-000006

11 U.S.C.A. § 1141(a,c)  **[\*\*13]**  (West 1993). Landlord posits this as a *per se* bar to tenant's assertion of its right to now reduce the rent where the plan listed tenant as an unsecured creditor without any special rights to offset against rental income. Debtor also contends that the plan has been implemented such that the court can no longer provide effective relief to tenant without jeopardizing the success of the plan, which depends primarily on the unreduced rental flow. We reject these contentions for the following reasons.

This is not a situation where a creditor has slept on its rights while a plan has been proposed, confirmed, and relied upon by others. Tenant's position has been known and pursued from the outset. The equities are clearly with tenant. It made the improvements which were the obligation of landlord. It was entitled by agreement to deduct the cost of those improvements from the rent. To now prohibit it from doing so would create a windfall for the debtor. The approximately 15 partners have contributed only $ 50,000 to the plan. Debtor and its other creditors proceeded to implement the plan under the specter of potential reversal of the district court in favor of granting tenant's recoupment **[\*\*14]**  claim and consequent reduction in rent. In fact, in its objections to confirmation of the reorganization plan, tenant specifically noted the pendency of this appeal. Objection to Confirmation of Proposed Third Amended Plan of Reorganization at P1, n.1.

We conclude that all parties proceeded to implement the plan with knowledge that the district court's determination was subject to reversal upon appeal. Thus, although challenging the plan or seeking a stay pending appeal was preferable, tenant's failure to do so does not render this appeal moot. Tenant otherwise diligently pursued its claim and gave landlord early indication of its intent to abate rent if landlord defaulted on its duties. *See also In re Rooster, Inc.*, 127 Bankr. 560 (Bankr. E.D. Pa. 1991)(creditor permitted to recoup despite failure to appeal from the confirmation order nor seek a stay pending appeal); *In re Maine*, 32 Bankr. 452, 453 (Bankr. W.D.N.Y. 1983)(creditor permitted to recoup despite failure to object to confirmation of the plan nor appeal the confirmation order). *Cf. In Re De Laurentiis Entertainment Group Inc.*, 963 F.2d 1269, 1271 (9th Cir.)(creditor had right to setoff although it did not object **[\*\*15]**  to reorganization plan nor challenge confirmation order), *cert. denied sub nom Carolco Television, Inc. v. National Broadcasting Co.*, __ U.S. __, 113 S. Ct. 330 (1992); *In re Ford*, 35 Bankr. 277 (Bankr. N.D. Ga. 1983)(creditor permitted to setoff despite failure to object to the reorganization plan nor appealed the confirmation).

Thus, although we recognize the importance of maintaining the integrity of confirmed plans from later attack, these unique circumstances permit the plan to be reopened and readjusted. We reach this conclusion, recognizing that the continuation of the lease has been at the instance of tenant and not the debtor-landlord.

Furthermore, permitting tenant to pay the rent reserved or to recoup against rent payments will not necessarily upset the successful implementation of the plan. Landlord assumes that tenant would be able to withhold all rental payments until it recovers the $ 325,000. Under such a scenario, the plan would indeed fail. However, the bankruptcy court has considerably more flexibility in fashioning an equitable remedy than debtor acknowledges. On remand, we suggest that the district court return the matter to the bankruptcy court for a determination **[\*16]**  of whether there is an amount of rent abatement **[\*1037]**  which would best balance ensuring the ultimate, if more gradual, success of the reorganization plan with reimbursing tenant for the repair costs. Tenant's memorandum to this court indicates that it has no immediate plans to vacate the premises, particularly considering tenant's other substantial improvements to the property, and so adjusting the monthly payments appears to be a viable option.

In sum, we conclude that confirmation and implementation of the reorganization plan does not prevent tenant from paying the "rent reserved" under the lease nor from asserting its right to recoupment. As we have held that tenant may pay reduced rent on statutory and recoupment grounds, we need not reach tenant's other contentions on this issue.

AUTH10-000007

IV.

We now clarify one remaining issue. The bankruptcy court concluded that tenant has elected to remain in possession of the lease "*and* any renewals or extensions thereof," March 25, 1993 Order at P E (emphasis added), and the district court affirmed. Tenant argues that the bankruptcy court erred in holding that it had elected to remain in possession for the remaining term of the lease and for all extension **[\*\*17]** periods provided therein. We agree with tenant that the language of § 365(h)(1) is permissive, not mandatory: the lessee "*may* remain in possession of the leasehold . . . for the balance of such term and for any renewal or extension of such term . . . ." 11 U.S.C.A. § 365(h)(1). There is no statutory requirement that a tenant who elects to remain on the premises must remain throughout all possible renewal periods nor that tenant must exercise its options as to renewal periods at the time it elects to remain in possession.

V.

For the foregoing reasons, we will reverse the district court and remand to the bankruptcy court for reconsideration of its order confirming the reorganization plan and for a determination of the amount of monthly rent.

    Service: **Get by LEXSEE®**
   Citation: **60 F.3d 1031**
      View: Full
Date/Time: Monday, November 2, 2009 - 11:38 AM EST

\* Signal Legend:
- 🔴 - Warning: Negative treatment is indicated
- 🇶 - Questioned: Validity questioned by citing refs
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- Ⓐ - Citing Refs. With Analysis Available
- 🅘 - Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

 **LexisNexis®**    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

AUTH10-000008

LexisNexis® *Total Research System*                    Switch Client ⋮ Preferences ⋮ Sign Out ⋮ ? Help

Search ⫼ Research Tasks ⫼ Get a Document ⫼ *Shepard's®* ⫼ Alerts ⫼ Total Litigator ⫼ Transactional Advisor ⫼ Cour

FOCUS™ Terms [                    ] Search Within [ Original Results (1 - 1) ▼ ] Go ⇒
Advanced...

Service: **Get by LEXSEE®**
Citation: **280 B.R. 680**

*280 B.R. 680, *; 2001 Bankr. LEXIS 1945, ***

In the Matter of: MORRIS C. BLACK SSN: 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, BOBBYE H. BLACK SSN: 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, Debtor(s).

CASE NO. 99-81705-JAC-11, CHAPTER 11

UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHERN DIVISION

280 B.R. 680; 2001 Bankr. LEXIS 1945

December 17, 2001, Decided
December 17, 2001, Date Opinion Filed

**DISPOSITION:** **[**1]** Estate entitled to assert right of recoupment and alternatively assert setoff as defense in state court.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** The debtors were involved in a civil action with an individual. The debtors later filed for relief under Chapter 11 of the Bankruptcy Code and listed the individual as an unsecured creditor. The individual filed a proof of claim and the debtors did not object. The individual filed an adversary proceeding to determine the debt's dischargeability, which was dismissed. The debtor's filed a motion to enforce the confirmed plan.

**OVERVIEW:** The individual died and her estate asserted that it had a right to recoup any amounts owed under the debtors' promissory note to the extent damages were awarded in the debtors' favor. This right of recoupment did not preclude any independent cause of action that may have arisen out of the warranties in the chain of title to the property at issue. The estate was not seeking an affirmative judgment for money damages, but wanted to assert the equitable doctrine of recoupment as a defense. The court disagreed with the debtors and found that the estate was entitled to assert the right of recoupment in the state court action. The estate was not obligated to object or appeal the debtors' plan to assert its right of recoupment. The court found that it was inequitable to allow the debtors to obtain a money judgment against the estate for breach of warranty of title and fraud without allowing the estate to recoup the amounts originally due under the terms of the debtors' promissory note, less any amounts to be paid through the confirmed plan. The court rejected the debtors' claim that the estate waived its right of setoff by failing to assert it prior to the plan confirmation.

**OUTCOME:** The court found that the individual's estate was entitled to assert setoff as a defense in state court. The action was dismissed.

AUTH11-000001

**CORE TERMS:** recoupment, setoff, confirmed, cause of action, breach of warranty, confirmation, promissory note, prepetition, warranty, claims asserted, free and clear, counterclaim, civil action, permanently, asserting, enjoined, mutual, recoup, proof of claim, adversary proceeding, plan of reorganization, security interests, accounts receivable, encumbrances, contractor, equitable, purchaser, pursuing, assigned, mortgage

## LEXISNEXIS® HEADNOTES                                                    ⊟ **Hide**

Bankruptcy Law > Reorganizations > Plans > Confirmation > Cramdowns

Contracts Law > Remedies > Equitable Relief > General Overview

*HN1* For the purposes of bankruptcy, a confirmed Chapter 11 plan of reorganization does not bar a creditor from asserting the right of recoupment. Recoupment is an equitable remedy which permits the offset of mutual debts when the respective obligations are based on the same contract or transaction. The United States Court of Appeals for the Eleventh Circuit defines the equitable doctrine of recoupment the right of a defendant, in the same action, to cut down a plaintiff's demand either because the plaintiff has not complied with some obligation of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract. More Like This Headnote

Bankruptcy Law > Claims > Setoffs

Contracts Law > Remedies > Equitable Relief > General Overview

*HN2* For the purposes of bankruptcy, recoupment is in the nature of a defense and is intended to permit judgment to be rendered that does justice in view of the one transaction as a whole allowing a creditor to recoup damages simply allows a debtor precisely what is due when viewing the transaction as a whole. To assert a right of recoupment, it is essential that the parties respective obligations arise from the same transaction. Recoupment differs from setoff which requires mutual obligations arising from separate transactions. The difference is important because 11 U.S.C.S. § 553 of the Bankruptcy Code places certain limitations on a creditor's right to assert setoff, whereas there is no comparable provision that limits a creditor's right to assert recoupment. Unfortunately, there is no general standard governing whether respective obligations are part of the same transaction. Instead, courts have focused on the facts and the equities of each case. More Like This Headnote

Bankruptcy Law > Reorganizations > Plans > Confirmation > Cramdowns

Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Effects of Confirmation

*HN3* See 11 U.S.C.S. § 1141.

Bankruptcy Law > Claims > Types > Unsecured Priority Claims > General Overview

Bankruptcy Law > Discharge & Dischargeability > Reorganizations

Contracts Law > Remedies > Equitable Relief > General Overview

*HN4* In the context of bankruptcy, a creditor's participation in a Chapter 11 case does not preclude it from recovery under the doctrine of recoupment even though the creditor does not assert the defense during the case. The right of recoupment is unaffected by a discharge in bankruptcy and gives priority over other creditor's claims. Nothing in the Bankruptcy Code requires a creditor to raise its right to recoupment. More Like This Headnote

Bankruptcy Law > Claims > Setoffs

AUTH11-000002

*HN5* ⬆ For the purposes of bankruptcy, setoff is a right of a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of a transaction which is different from that on which plaintiff's claim is based. 11 U.S.C.S. § 553(a) of the Bankruptcy Code preserves a creditor's right of setoff where it exists under applicable non-bankruptcy law. To establish a claim for setoff, the creditor must demonstrate that: (1) the debt owed by a creditor to a debtor arose prior to commencement of the bankruptcy case; (2) the claim of the creditor against the debtor arose prior to commencement of the bankruptcy case; and (3) the debt and claim are mutual or reciprocal obligations. More Like This Headnote

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > Setoffs 🔍
Bankruptcy Law > Claims > Setoffs 🔍
Bankruptcy Law > Discharge & Dischargeability > Reorganizations 🔍

*HN6* ⬆ 11 U.S.C.S. § 1141 of the Bankruptcy Code provides for the discharge of prepetition debts and provides that any assets retained by a debtor under the confirmed plan are free and clear of any prepetition debts. However, the plain language of 11 U.S.C.S. § 553(a) states except as otherwise provided in this section and in 11 U.S.C.S. §§ 362-363 of this title, this title does not affect any right of a creditor to offset. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Claims > Setoffs 🔍
Bankruptcy Law > Discharge & Dischargeability > Reorganizations 🔍

*HN7* ⬆ For the purposes of bankruptcy, after analyzing two code sections, the United States Court of Appeals for the Ninth Circuit has concluded that 11 U.S.C.S. § 553 must take precedence over 11 U.S.C.S. § 1141, otherwise § 553 would essentially be a nullity. Section 553 provides that this title does not affect the right of any creditor to offset a mutual debt. This language not only establishes a right to setoffs in bankruptcy, subject to enumerated exceptions, but seems intended to control notwithstanding any other provision of the Bankruptcy Code. To give § 1141 precedence would be to ignore this language. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Claims > Setoffs 🔍
Bankruptcy Law > Claims > Types > Definitions 🔍
Real Property Law > Bankruptcy > Sales 🔍

*HN8* ⬆ For the purposes of bankruptcy, the United States Court of Appeals for the Third Circuit has held that the term "any other interests" is limited to the same kind of interests enumerated in the sale order i.e. a lien, mortgage, security interest, encumbrances, liability or claim. A purchaser argued that a right of recoupment constitutes a claim, but the Third Circuit found that recoupment is essentially a defense. The Bankruptcy Code defines a claim as a right to payment whereas recoupment is a defense to a debtor's right to payment. As stated by the United States Supreme Court, recoupment is in the nature of a defense arising out of some feature of the transaction upon which a plaintiff's action is grounded. The doctrine of recoupment is not a claim in the bankruptcy context. More Like This Headnote

**COUNSEL:** FOR DEBTOR: Zach Higgs, Esq., Higgs & Emerson, Huntsville, AL.

FOR ESTATE OF DOROTHY CHRISTENSON: John Baggette, Jr., Esq., Eyster, Key, Tubb, Weaver & Roth, LLP, Decatur, AL.

AUTH11-000003

FOR BINGHAM EDWARDS: Phil Mitchell, Esq., Edwards, Mitchell & Reeves, Decatur, AL.

**JUDGES:** JACK CADDELL, United States Bankruptcy Judge.

**OPINION BY:** JACK CADDELL

**OPINION**

### [*681] ORDER

The dispute before the Court involves a civil action pending since 1994 in the Circuit Court of Limestone County, Alabama in which the reorganized debtors (hereinafter the "Blacks") are pursuing claims for breach of warranty of title and fraud against the Estate of Dorothy D. Christensen (hereinafter the "Christensen estate"). The Blacks are in the business of buying, developing and selling real estate. On March 9, 1989, the Blacks purchased approximately 123 acres of land located on the Tennessee River in Limestone County, Alabama for $ 1,125,000.00 from James and Dorothy Christensen, both now deceased. On October 19, 1994, Mrs. Christensen **[*682]** initiated a civil action styled *Dorothy D. Christensen v. Morris C. Black, Jr. and Bobbye J. Black, Case No. CV 94-449 in the Circuit Court of Limestone County*, **[**2]** Alabama to collect on a $ 450,000.00 promissory note executed by the debtors in partial payment of the total purchase price and to establish a vendor's lien against the property. On December 23, 1994, the Blacks filed a counterclaim against Mrs. Christensen for breach of the warranty contained in the deed executed on September 25, 1989 from them to the debtors for failure to convey good and merchantable title to two acres.

On May 14, 1999, the debtors filed for relief under Chapter 11 of the Bankruptcy Code and listed Mrs. Christensen as an unsecured creditor with a claim in the amount of $ 450,000.00. The petition stayed the civil action.

On October 8, 1999, Mrs. Christensen filed a proof of claim in the amount of $ 1,025,161.64. The debtors did not object to the proof of claim. On October 14, 1999, Christensen filed an adversary proceeding to determine the dischargeability of the debt pursuant to 11 U.S.C. § 523(a)(2),(4) and (6) and to deny the Blacks' discharge pursuant to 11 U.S.C. § 727(a)(2). [1]

---

**FOOTNOTES**

1 Christensen did not pursue the § 727 count as its was obviously inapplicable.

---

**[**3]** On May 3, 2000, the Court entered an order confirming the debtors' second amended plan of reorganization. The plan, as confirmed, placed the Christensen claim in class 10 as a general unsecured claim. Pursuant to the plan, class 10 claimants are entitled to receive deferred cash payments of $ 500,000.00 in satisfaction of all prepetition claims. The Christensen estate will receive approximately half of the class 10 distribution.

The Court entered a final decree on June 22, 2000 closing the case. On June 7, 2000, the Court entered an order dismissing the adversary proceeding because debtors' confirmed plan provided for the Christensen claim.

On October 2, 2000, the Blacks filed a motion to enforce the plan to require the Christensen estate to dismiss the state court action with prejudice and satisfy the lis pendens filed on October 19, 1994 by Mrs. Christensen against the entire property. On October 27, 2000, the

AUTH11-000004

Court entered an order requiring the estate to dismiss the state court action, with prejudice, and to withdraw and satisfy any and all notices of its pendens related to the state court action. The ordered provided in part:

**ORDERED, ADJUDGED and DECREED** that **[\*\*4]** any and all claims, liens and interests of the Christensen Estate against the Debtors asserted in or related to that certain cause of action styled *Dorothy D. Christensen v. Morris C. Black, Jr. and Bobbye J. Black et al.*, Civil Action No. CV 94-449, pending in the Circuit Court of Limestone County, Alabama (the "State Court Action") were satisfied and discharged by the Debtors' plan of reorganization (the "Plan"), as confirmed by the order of this Court dated May 3, 2000; and it is further

\* \* \* \*

**ORDERED, ADJUDGED and DECREED** that based upon the discharge of the Christensen Estate's claim against the Debtors, pursuant to 11 U.S.C. § 524 the Christensen Estate is permanently enjoined from prosecuting the State Court Action and the claims asserted therein; and it is further

**ORDERED, ADJUDGED and DECREED** that based upon the discharge of the Christensen Estate's claim **[\*683]** against the Debtors, pursuant to 11 U.S.C. § 524 the Christensen Estate is permanently enjoined from commencing or continuing any other claim or cause of action based on, related to or derivative of the claims asserted in the State Court Action **[\*\*5]** . . .

On February 15, 2001, with the consent of the Christensen estate, the state court entered an order dismissing all claims, counterclaims, and cross claims asserted by the estate. However, the debtors' counterclaim for breach of warranty of title is still pending because the confirmed plan retained the debtors' right to pursue all prepetition causes of action.

On July 23, 2001, the debtors filed a motion to amend their counterclaim to allege the Christensens committed fraud by representing that they held good and merchantable title to the entire 123 acres. The debtors allege that as a result of this fraud, they suffered lost profits, loss of use of the property, increased development expenses, decreased property value, as well as mental pain and anguish. The Blacks seek damages in the amount of five million dollars.

Crossplaintiffs, Bingham D. Edwards, Esq., and Elizabeth W. Edwards, also claim damages against the Christensen estate in the civil action for the alleged breach of warranties in the warranty deed executed by the Christensens in favor of the debtors. On June 30, 2000, the debtors assigned all their right, title and interest in their breach of warranty counterclaim **[\*\*6]** to the Edwards with regard to Lot 1 in the subdivision. On January 26, 2001, the debtors assigned the same rights to the Edwards with regards to lots 2 and 3. The Edwards do not assert a claim of fraud against the Christensen estate.

On August 7, 2001, the Christensen estate filed a motion in the state court for permission to assert the defenses of setoff and recoupment against the debtors and the Edwards "based on the failure to pay amounts due under a promissory note and sales contracts given by the [debtors] in exchange for the sale of the property, which is now the subject matter of the [debtors'] and Edwards' claim for breach of warranties." The Blacks' confirmed plan only pays approximately $ 250,000.00 to the Christensen estate in deferred cash payments, but the pre-plan amount due on the sales contract and delinquent promissory note with interest and attorney fees is in excess of $ 1,025,161.64. Christensen attached the following itemization

AUTH11-000005

to her proof of claim to which the Blacks never objected:

| Principal due on promissory note: | $ 450,000.00 |
|---|---|
| 6% interest to date petition filed: | $ 125,161.64 |
| Attorney fees pursuant to note: | $ 90,000.00 |
| Lot compensation pursuant to sales contract: | $ 360,000.00. |
| Total: | $ 1,025,161.64 |

## [**7] ANALYSIS

### I. The Blacks' *HN1* confirmed Chapter 11 plan of reorganization does not bar the Christensen estate from asserting the right of recoupment.

Recoupment is an equitable remedy which permits the offset of mutual debts when the respective obligations are based on the same contract or transaction. [2] The Eleventh Circuit defines the equitable doctrine of recoupment as follows:

> Recoupment is "the right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some obligation [*684] of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract. [3]

### FOOTNOTES

[2] *In re Telephone Warehouse, Inc.,* 259 B.R. 64, 66 (Bankr. D. Del. 2001); *Cox v. Billy Pounds Motors, Inc. (In re Cox),* 214 B.R. 635, 647 (Bankr. N.D. Ala. 1997).

[3] *Smith v. American Fin. Systems, Inc. (In re Smith),* 737 F.2d 1549, 1552 (11th Cir. 1984).

[**8] The Christensen estate asserts that it has a right to recoup any amounts owed under the promissory note to the extent any damages are awarded in favor of the debtors or the Edwards on any causes of action that were assigned to them by the Blacks against the estate based on their breach of warranty of title and fraud claims. This right of recoupment does not preclude the Edwards on any independent cause of action they may have arising out of the warranties in the chain of title to the property. The estate is not seeking an affirmative judgment for money damages. It only seeks to raise the equitable doctrine of recoupment as a defense. In *United Structures of Amer. v. G.R.G. Eng'g,* 9 F.3d 996, 999 (1st Cir. 1993), the court explained that *HN2* recoupment is "in the nature of a defense and is intended to permit . . . judgment to be rendered that does justice in view of the one transaction as a whole . . . allowing the creditor to recoup damages simply allows the debtor precisely what is due when viewing the transaction as a whole."

To assert a right of recoupment it is essential that the parties respective obligations arise from the same transaction. [4] Recoupment differs [**9] from setoff which requires mutual obligations arising from separate transactions. The difference is important because § 553 of

AUTH11-000006

the Bankruptcy Code places certain limitations on a creditor's right to assert setoff, whereas there is no comparable provision that limits a creditor's right to assert recoupment. [5] Unfortunately, there is no general standard governing whether respective obligations are part of the same transaction. [6] Instead, courts have focused on the facts and the equities of each case. [7] The facts and equities of this case require the Court to find that the respective obligations of the parties arise from the same transaction in that the debtors gave the promissory note in exchange for the property on which the Blacks and Edwards seek a judgment for breach of warranty of title and fraud.

---

**FOOTNOTES**

[4] *A & C Elec. Co., Inc. v. Meade Elec. Co., Inc. (In re A & C Elec.),* 211 B.R. 268, 272 (Bankr. N.D Ill. 1997).

[5] *Id.; In re Cox,* 214 B.R. at 647.

[6] *Kosadnar v. Metropolitan Life Ins. (In re Kosadnar),* 157 F.3d 1011, 1014 (5th Cir. 1998). **[\*\*10]**

[7] *Id.*

---

The Blacks and Edwards argue that recoupment does not apply to Chapter 11 cases. Alternatively, they contend that the Christensen estate waived its right of recoupment pursuant to 11 U.S.C. § 1141(c) by failing to assert same prior to confirmation. The Court disagrees and finds that the estate is entitled to assert the right of recoupment in the state court action. The majority of the courts that have addressed this issue have held that a confirmed Chapter 11 plan is not a *per se* bar to a creditor's right of recoupment. [8] Section 1141 of the Bankruptcy Code states in part and subject to certain exceptions not relevant herein:

**[\*685]**

[HN3](a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan.

\* \* \* \*

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in **[\*\*11]** the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

---

**FOOTNOTES**

[8] *In re Flagstaff Realty Assocs.,* 60 F.3d 1031 (3rd Cir. 1995)(citing *In re Rooster, Inc.,* 127 B.R. 560 (Bankr. E.D. Pa. 1991)); *In re Maine,* 32 B.R. 452, 543 (Bankr. W.D.N.Y

AUTH11-000007

1983); *In re DeLaurentiis Entm't Group, Inc.* 963 F.2d 1269, 1271 (9th Cir. 1992); *In re Ford*, 35 B.R. 277 (Bankr. N.D. Ga. 1983).

In *A & C Elec. Co., Inc. v. Meade Elec. Co., Inc. (In re A & C Elec.),* 211 B.R. 268 (Bankr. N.D. Ill. 1997), the court held that ᴴᴺ⁴⁺a creditor's participation in a Chapter 11 case did not preclude it from recovery under the doctrine of recoupment even though the creditor did not assert the defense during the case. The court stated that "the right of recoupment is unaffected by [**12] a discharge in bankruptcy and gives priority over other creditor's claims." [9] Nothing in the Bankruptcy Code requires a creditor to raise its right to recoupment. [10]

**FOOTNOTES**

[9] *Id.* at 272.

[10] *Id.* at 274.

The Third Circuit Court of Appeals in *Flagstaff Realty Assocs.,* 60 F.3d 1031 (3rd Cir., 1995), held that § 1141(c) is not a *per se* bar to post-confirmation recoupment. The creditor, a commercial tenant, undertook the debtor's lease obligation to repair and maintain the premises in reliance on the lease terms that allowed the tenant to reduce its rent if the tenant cured the lessor's default on its obligations to maintain the premises. The Third Circuit held that to allow the debtor to receive rent without compensating the creditor for undertaking the repairs would be inequitable.

The creditor diligently pursued its claim against the debtor despite the creditor's failure to appeal the confirmed plan. Prior to confirmation, debtor rejected the creditor lease. [**13] The creditor filed an adversary proceeding to recoup the repairs. The bankruptcy court entered judgment in favor of the debtor and the creditor appealed. While the appeal was pending, the debtor's Chapter 11 plan was confirmed. Although it would have been better to appeal the plan or seek a stay pending appeal, the Third Circuit found the unique circumstances of the case entitled the creditor to assert its right of recoupment.

As in *Flagstaff,* the Christensen estate was not obligated to object or appeal the debtor's plan to assert its right of recoupment. The estate diligently pursued its claim against the debtors despite its failure to appeal the confirmation order. When the Court entered the confirmation order, dated May 3, 2000, the creditor's complaint under § 523(a)(2),(4) and (6) was still pending. Subsequently on June 7, 2000, the Court dismissed the complaint because the confirmed plan satisfied the Christensen claim which eventually led to the dismissal of the estate's claims for affirmative relief against the debtors in state court. However, the debtors reserved the right to maintain their cause of action in state court against the estate. Under the unique circumstances [**14] of this case, the Court finds that it would be inherently inequitable to allow the debtors to obtain a money judgment against the estate for breach of warranty of title and fraud without allowing the estate to recoup the amounts originally due under the [*686] terms of the promissory note less any amounts to be paid through the plan.

**II SETOFF**

Alternatively, the Court finds that the Blacks' confirmed plan does not bar the Christensen estate from asserting the right of setoff. ᴴᴺ⁵⁺Setoff is a right of a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of a

AUTH11-000008

transaction which is different from that on which plaintiff's claim is based. Section 553(a) of the Bankruptcy Code preserves a creditor's right of setoff where it exists under applicable non-bankruptcy law. [11] To establish a claim for setoff, the creditor must demonstrate that: (1) the debt owed by creditor to the debtor arose prior to commencement of the bankruptcy case; (2) the claim of creditor against debtor arose prior to commencement of the bankruptcy case; and (3) the debt and claim are mutual or reciprocal obligations. [12]

**FOOTNOTES**

[11] *In re Patterson,* 967 F.2d 505 (11th Cir. 1992); *In re Orlinski,* 140 B.R. 600 (Bankr. S.D. Ga. 1991). **[**15]**

[12] *United States v. Jones,* 230 B.R. 875 (Bankr. M.D. Ala. 1999).

The Blacks argue that the Christensen estate waived its right of setoff pursuant to 11 U.S.C. § 1141(c) by failing to assert same prior to confirmation. *HN6* Section 1141 of the Bankruptcy Code provides for the discharge of prepetition debts and provides that any assets retained by the debtor under the confirmed plan are free and clear of any prepetition debts. However, the plain language of § 553(a) states "except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset. . ."

In *DeLaurentiss Entm't Group, Inc.,* 963 F.2d 1269 (9th Cir. 1992), the Ninth Circuit considered the tension between §§ 553 and 1141 and held that a television network had a right to setoff its $ 1.6 million quantum meruit claim against the $ 1.25 million dollars it owed the Chapter 11 debtor, even after confirmation of the debtor's plan discharging all prepetition debts not provided for in the plan. *HN7* After analyzing the **[**16]** two code sections, the court of appeals concluded that § 553 must take precedence over § 1141, otherwise § 553 would essentially be a nullity. As the court stated:

> We conclude that section 553 must take precedent over 1141. In reaching this conclusion, we rely not only on the foregoing persuasive authority, but also on the language and structure of section 553 and the policies which underlie it. Section 553 provides that, with listed exceptions not relevant here, "this title does not affect the right of any creditor to offset a mutual debt. . . ." This language not only establishes a right to setoffs in bankruptcy, subject to enumerated exceptions, but seems intended to control notwithstanding any other provision of the Bankruptcy Code. To give section 1141 precedence would be to ignore this language. [13]

**FOOTNOTES**

[13] *In re DeLaurentiis,* 963 F.2d at 1276.

Based upon the foregoing, the Court finds that the estate is entitled to assert setoff as a defense in state court. The Blacks' confirmed **[**17]** plan is not a bar to setoff.

**III. The order dated October 27, 2001 required the Christensen estate to dismiss its affirmative claims against the Blacks in the state court action, but it does not limit the estate's defenses to the debtors' claims which are still pending therein.**

AUTH11-000009

The Blacks argue that the estate is estopped from asserting recoupment and **[*687]** setoff pursuant to the order dated October 27, 2000 in which the Court permanently enjoined the estate "from commencing or continuing any other claim or cause of action based on, related to or derivative of the claims asserted in the State Court Action."

The order dated October 27, 2000 provides that "any and all claims, liens and interests of the Christensen Estate" were satisfied by the Blacks' confirmed plan and permanently enjoined the estate from pursuing same. The order does not enjoin the estate from raising affirmative defenses in the state court. The Third Circuit Court of Appeals in _Folger Adam Security, Inc. v. Dematteis/MacGregor JV,_ 209 F.3d 252 (3rd Cir. 2000), had to decide whether an order authorizing the sale of accounts receivable free and clear of all liens, claims and interests resulted **[**18]** in the transfer of the accounts receivable free of any defense of setoff or recoupment that the account debtor might have. In _Folger,_ a contractor purchased material from the debtor prepetition, but refused to pay for the material due to alleged defects and late delivery. The bankruptcy court entered an order authorizing the sale of debtor's account receivables "free and clear of all liens, mortgages, security interests, encumbrances, liabilities, claims, or other interests. . ." The purchaser then sued the contractor for breach of contract. The contractor raised the defenses of setoff and recoupment, but the district court held that the term "any other interests" included setoff and recoupment.

The Third Circuit reversed finding that the creditor was entitled to raise the affirmative defenses despite the bankruptcy court order providing for the sale free and clear of "liens, mortgages, security interests, encumbrances, liabilities, claims, or any other interests." The purchaser argued that the term "other interests" included the right of recoupment or setoff and prevented same from being asserted. _HN8_ The court of appeals held that the term "any other interests" was limited to the **[**19]** same kind of interests enumerated in the sale order i.e. a lien, mortgage, security interest, encumbrances, liability or claim. The purchaser argued that a right of recoupment constitutes a claim, but the Third Circuit found that recoupment is essentially a defense. The Bankruptcy Code defines a claim as a right to payment whereas recoupment is a defense to a debtor's right to payment. [14] As stated by the Supreme Court in _Bull v. United States,_ 295 U.S. 247, 79 L. Ed. 1421, 55 S. Ct. 695, 81 Ct. Cl. 974 (1935) "recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded." The doctrine of recoupment is not a claim in the bankruptcy context and, thus, the order enjoining the Christensen estate from pursuing any other claim or cause of action based on the claims asserted in state court does not enjoin the Christensen estate from raising a defense that is related to the dismissed action. [15] To find otherwise would unjustly enrich the Blacks.

## FOOTNOTES

14 11 U.S.C. § 101(5)(A).

15 _In re Folger,_ 209 F.3d at 259.

## [**20] IV Breach of warranty of title.

Finally, the Court notes that a general warranty deed conveys a covenant of warranty that runs with the land on which a remote assignee may sue. [16] Any cause of action the Edwards may have based on this general principal is a dispute between **[*688]** third parties over non-estate property over which this Court lacks jurisdiction. [17]

## FOOTNOTES

AUTH11-000010

16 *Chicago, Mobile Dev. Co. v. G.C. Coggin Co.,* 259 Ala. 152, 66 So.2d 151 (1953); *Blaum v. May,* 245 Ala. 156, 16 So. 2d 329 (1944).

17 *Romar Int'l Ga., Inc. v. SouthTrust Bank,* 198 B.R. 401 (Bankr. M.D. Ga. 1996).

Done and Ordered this the 17th day of December 2001.

JACK CADDELL

United States Bankruptcy Judge

Service:   **Get by LEXSEE®**
Citation:  **280 B.R. 680**
View:      **Full**
Date/Time: Monday, November 2, 2009 - 11:39 AM EST

* Signal Legend:
🔴 -   Warning: Negative treatment is indicated
[Q] -   Questioned: Validity questioned by citing refs
⚠ -   Caution: Possible negative treatment
✦ -   Positive treatment is indicated
Ⓐ -   Citing Refs. With Analysis Available
ⓘ -   Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®

About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AUTH11-000011