institute the action itself. Id. at 828. However, the panel held that the creditor must receive court approval **before** instituting the proceeding and the action must be brought in the name of the bankruptcy estate as the real party in interest. [5] Id. at 828-29.

---

**FOOTNOTES**

[5] The caption to the adversary complaint failed to name the Spaulding estate. We think naming the estate in the caption is the better practice, but it is not cause to dismiss. In the first paragraph of the complaint, the Committee clearly stated that the action was filed on behalf of the estate. HN6⊕Federal Rule of Civil Procedure 17(a), applicable in adversary proceedings by virtue of Bankruptcy Rule 7017, states that no action shall be dismissed on the grounds that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed for ratification by the real party in interest. Here, Spaulding ratified the Committee's complaint when it stipulated to its consent. See Fed. R. Civ. P. 17(a)(ratification shall have the same effect as if the action had originally been commenced in the name of the real party in interest).

---

### [**10]   [*904]   1. Stipulated Representation

This case is somewhat unusual in that the setting for derivative litigation often involves a debtor-in-possession ("DIP") who is hostile to proposed litigation. See e.g., Curry, 57 B.R. at 828; Louisiana World Exposition v. Federal Ins. Co., 858 F.2d at 247; In re STN Enterprises, 779 F.2d at 901. In that setting, the concern is that the DIP is failing to attend to litigation which it **should** pursue. Here, however, rather than opposing the Committee's suit, Spaulding approved of it, and Liberty argues the converse to the above -- that is, Liberty argues that the Committee is fostering estate litigation which **should not** be pursued. The question, then, is whether HN7⊕a DIP may stipulate to representation by an unsecured creditors' committee. We hold that it may.

Liberty points out that Nortek, its opponent in the New York action, also co-chairs the Unsecured Creditors Committee. Liberty claims that Nortek, to gain an advantage in the New York suit, has convinced the Committee to appropriate and pursue an automatic stay claim belonging to Spaulding's estate. [6] Liberty's concerns warrant pause, but its proposed rule -- a flat prohibition [**11] against any surrogate representation -- not only conflicts with accepted practice, it also fails to recognize the potential benefits of allowing an unsecured creditors' committee to conduct estate litigation. HN8⊕The DIP has an obligation to pursue all actions that are in the best interests of creditors and the estate. Curry, 57 B.R. at 828. An unsecured creditors' committee has a close identity of interests with the DIP in this regard. Allowing the DIP to coordinate litigation responsibilities with an unsecured creditors' committee can be an effective method for the DIP to manage the estate and fulfill its duties. Here, for example, Spaulding was able to concentrate its resources on rehabilitating the business while the Committee prosecuted the adversary complaint. Rather than a flat prohibition, impartial judicial balancing of the benefits of a committee's representation better serves the bankruptcy estate. So long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial, allowing a creditors' committee to represent the estate presents no undue concerns. See Coral Petroleum, Inc. v. Banque Paribas-London, 797 [**12] F.2d 1351, 1362-63 (5th Cir. 1986)(debtor-in-possession's stipulation effective to confer standing on unsecured creditors' committee).

---

**FOOTNOTES**

[6] The parties to this appeal accuse each other of improper forum shopping. New York courts purportedly interpret the "pollution exclusion clause" differently than New Jersey

AUTH17-000009

courts. Compare, e.g., Powers Chemco, Inc. v. Federal Ins. Co., 74 N.Y.2d 910, 548 N.E.2d 1301, 549 N.Y.S.2d 650 (1989) and Technicon Electronics Corp. v. American Home Assur. Co., 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989)(both applying New York law) with Morton Int'l, Inc. v. General Acc. Ins. Co. of America, 134 N.J. 1, 629 A.2d 831 (Sup. Ct. N.J. 1993)(applying New Jersey law).

Apparently, Liberty might lay claim to "first-to-file" status to obtain a New York forum. *HN9* The "first-to-file" rule is an aspect of the doctrine of comity. It holds that when two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and the other court should abstain. Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 94-95 (9th Cir. 1982).

We need not, and do not, express any opinion on New York or New Jersey insurance law, the "first-to-file" rule and Liberty's putative first-to-file status, or the parties' allegations of forum shopping.


### [**13] 2. Retroactive Authorization

Liberty also points out that the Committee failed to secure the bankruptcy court's approval before filing the complaint. As stated above, Curry held that *HN10* a creditor must seek the court's consent in advance. Id. at 828. Other circuits have imposed this same requirement. Louisiana World Exposition v. Federal Insurance Co., 858 F.2d at 247; Matter of Pointer, 952 F.2d 82, 88 (5th Cir. 1992). But the significant fact here is that the Committee did, eventually, seek the bankruptcy court's permission to represent the estate and to continue prosecution of the suit. The court, exercising its judicial oversight, found that the Committee was an appropriate plaintiff. Additionally, the court entertained Liberty's objections to the Committee's representation at a lengthy hearing. **[*905]** As stated in Curry, it is this "judicial intervention [that] is crucial." Curry, 57 B.R. at 828. While the better practice is for the plaintiff to secure approval before filing the complaint, we will not foreclose the ability of a court to make its approval of the representation retroactive to the time of the filing. To hold otherwise would generate needless **[**14]** dismissals and refilings. See, e.g., In re Catwil Corp., 175 B.R. 362, 365 (Bankr. E.D.Cal. 1994)(approving the unsecured creditors' committee application for retroactive authorization to prosecute actions on behalf of debtor); In re Louisiana World Exposition, Inc., 832 F.2d 1391, 1398 (5th Cir. 1987)(refusing to force creditors' committee to go through "empty, formalistic ritual" of refiling complaint when approval of standing foreordained).

### B. MOOTNESS

The Committee also presents a threshold attack, arguing that the Panel should reject Liberty's appeal altogether on the grounds of mootness. In In re Baker & Drake, Inc., 35 F.3d 1348, 1351 (9th Cir. 1994)(citations omitted), the court stated that "we also dismiss *HN11* an appeal as moot if a party opposing a reorganization plan has failed to obtain a stay pending appeal, and the plan has been carried out to 'substantial culmination.'" However, failure to obtain a stay is not fatal in every case; it is not always impossible to grant relief simply because the plan has been consummated nor is it always impossible to undo a plan. Rather, "whether to unscramble the eggs turns on what is practical and equitable." Id. **[**15]** at 1352. See also In re Arnold & Baker Farms, 85 F.3d 1415, 1419 (9th Cir. 1996), cert. denied, 136 L. Ed. 2d 607, 117 S. Ct. 681 (1997) (appeal not moot if bankruptcy court can fashion effective relief on remand).

The Committee notes, and Liberty does not dispute, that the Plan has been substantially consummated: administrative and priority claims have been paid in cash; restructured notes have been executed and delivered; proceeds from the sale of equipment have been

AUTH17-000010

distributed; and the reorganized debtor has been vested with all of the debtor's property not otherwise transferred. The Committee also argues that the PRPs, the EPA, and Spaulding all settled the environmental claims on the premise that the insurance litigation would occur in New Jersey. If Liberty prevails in this appeal, the Committee fears the entire settlement could be at risk.

Those fears are unfounded. This appeal only addresses the bankruptcy court's order voiding Liberty's New York action. If reversed, Liberty could then proceed with the suit against Nortek and Monogram. This remedy, if warranted, has no implications for the Plan of Reorganization: it would not require a retraction of any payments or [**16] proceeds distributed to creditors; the debtor could continue to manage the rehabilitated business; and all the parties to the settlement agreement would still be bound by it. As for the Committee's claim that the parties expected to litigate in New Jersey, they cannot argue they relied on the invalidation of the New York action when entering the settlement or voting on the Plan since the court approved both the Plan and the settlement **before** resolving the status of Liberty's New York action. But, more importantly, granting Liberty the relief it requests would not require the EPA, PRPs, or Spaulding to litigate in New York -- only Nortek, Monogram, and Liberty are parties to that suit. In short, plan consummation is no bar to relief in this case.

Alternatively, the Committee contends that Liberty's own actions render the appeal moot. After filing this appeal, Liberty initiated a new New York action naming Nortek, Monogram, and Spaulding as defendants, and the Committee reasons that Liberty already has its New York forum. Again, the Committee's argument is unpersuasive. The bankruptcy court voided Liberty's first New York action against Nortek and Monogram, rendering it a nullity. [**17] Liberty notes that, although it has filed a new suit, the date of filing may be a relevant factor in venue selection, and *HN12*☞the bankruptcy court's order voiding Liberty's original suit terminated Liberty's first-to-file status against Nortek and Monogram. See Alltrade, Inc. v. Uniweld Products, Inc., 946 F.2d 622, 625 [*906] (9th Cir. 1991); Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 94-95 (9th Cir. 1982). If the bankruptcy court erred, then, according to Liberty, the court's order impinged upon a potentially cognizable interest.

We are inclined to agree, but need not rest our conclusion on the effect upon Liberty's asserted first-to-file status. In the court below, the Committee continues to press *HN13* ☞claims against Liberty for attorneys' fees and for subordination of Liberty's unsecured claims. It premises these claims on Liberty's alleged violation of the stay. Given that those claims will stand or fall depending upon the panel's decision, the outcome of this appeal will have a very real effect on the proceedings below. The appeal is not moot.

## C. THE AUTOMATIC STAY

Turning to the merits, the central issue is whether Liberty's New York lawsuit -- naming only [**18] Nortek and Monogram -- violated the automatic stay imposed in the Spaulding case. *HN14*☞Section 362(a)(3) states:

> (a) Except as provided in subsection (b) of this section, a petition filed . . . operates as a stay, applicable to all entities, of -- . . .

>> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

11 U.S.C. § 362.

## 1. "Property Of The Estate"

AUTH17-000011

Several cases have held that [HN15] a debtor's insurance policies are property of the estate. See In re Minoco Group of Companies, Ltd., 799 F.2d 517, 519 (9th Cir. 1986); Matter of Vitek, Inc., 51 F.3d 530, 533 (5th Cir. 1995)(and cases cited therein). In Minoco, the debtor owned director and officer ("D & O") liability policies, and, after the debtor filed its bankruptcy petition, the insurance company gave notice that it intended to cancel the policies. The insurance company argued that the policies were not property of the estate because the coverage only benefited the directors and officers. The Ninth Circuit disagreed. The bankruptcy court had made a factual finding that the policies also benefited the debtor in [**19] that they insured the debtor against any claims the directors or officers might levy directly against it. Canceling the insurance policies would extinguish the debtor's right to this indemnification. Consequently, the Ninth Circuit ruled that the policies represented property of the estate and cancellation was automatically stayed. 799 F.2d at 519 & n.2.

In Minoco, the insurer unambiguously sought to extinguish the debtor's **own right** to insurance coverage. In the case at bar, however, Liberty makes no threat to Spaulding's insurance coverage. Although Spaulding claims an interest in many of the policies, Nortek and Monogram also claim coverage under those policies. That two separate property interests might exist in a single policy was a point recognized by the Fifth Circuit:

> [HN16] On one extreme, when a debtor corporation owns a liability policy that *exclusively* covers its directors and officers, we know from *Louisiana World Exposition* [832 F.2d 1391, 1987 U.S. App. LEXIS 15750 (5th Cir. 1987] that the proceeds of that D&O policy are not part of the debtor's bankruptcy estate. [7] On the other extreme, when a debtor corporation owns an insurance policy that covers its own liability *vis-a-vis* [**20] third parties, we -- like almost all other courts that have considered the issue -- declare or at least imply that both the policy *and the proceeds* of that policy are property of the debtor's bankruptcy estate. [8] But we have not yet grappled with how to treat the proceeds of a liability policy when (1) the policy-owning debtor is but one of two or more coinsureds [*907] or additional named insureds, (2) the rights of the other coinsured(s) or additional named insured(s) are *not* merely derivative of the rights of one primary named insured, and (3) the aggregate potential liability substantially exceeds the aggregate limits of available insurance coverage.

Matter of Vitek, Inc., 51 F.3d at 535 (citations omitted)(emphasis in original).

**FOOTNOTES**

7 The policy described here is analogous to the contractor's surety bond at issue in Matter of Lockard, 884 F.2d 1171 (9th Cir. 1989). In that case, the debtor obtained a contractor's license bond running to the benefit of a third party. After the debtor filed for bankruptcy, the third party sued the surety directly. The Ninth Circuit held that the surety bond was not 'property of the estate' within the meaning of § 541, even though the action against the surety would have a significant, albeit indirect, impact on the estate and unsecured creditors. Id. at 1178 n. 12. [**21]

8 The policy described here is analogous to the policy at issue in Minoco. 799 F.2d at 519.

Here, Nortek and Monogram are both coinsured with the debtor. Additionally, their property rights are not merely derivative of Spaulding's rights; Nortek and Monogram assert their own, independent rights to coverage. Liberty meticulously circumscribed the scope of the

AUTH17-000012

New York suit to include only non-debtors and to place at issue only non-debtor property interests. True, Spaulding asserts an interest in the policies, but, as the Seventh Circuit has stated, **HN17** a "debtor's interest in a portion of property does not subject the entire property to § 541. Nor does a debtor's claim to property mean that the entire property is a part of the bankruptcy estate." Matter of Carousel Int'l. Corp., 89 F.3d 359, 362 (7th Cir. 1996)(citations omitted).

The Committee seeks to avoid this bifurcation and argues that the bankruptcy estate includes both its own and the Nortek/Monogram interests. The Committee cites to In re Pintlar Corp., 175 B.R. 379 (Bankr. D.Idaho 1994). In Pintlar, the bankruptcy court held that § 362(a) stayed a declaratory judgment action brought against the debtor's former directors by an insurance company under the debtor's D & O policies. The court reasoned that any benefits paid to directors and officers would increase the debtor's liability exposure. Id. at 385. See also Minoco, 799 F.2d at 519 n.2. In this case, however, the Committee failed to establish that predicate fact in the court below; nothing in the record indicates fulfilling the duty owed to Nortek or Monogram would impair Liberty's ability to satisfy its obligations to Spaulding or increase Spaulding's liability exposure.

Additionally, the court in Pintlar relied on A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986). The Ninth Circuit has declined to endorse the A.H. Robins holding on several occasions and recently stated that A.H. Robins and the other "unusual circumstances" cases, "although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate." In re Chugach Forest Products, **[**23]** Inc., 23 F.3d 241, 247 n.6 (9th Cir. 1994) (quoting Patton v. Bearden, 8 F.3d 343, 349 (6th Cir. 1993)). Here, the bankruptcy court did not rely upon its injunctive power; it found Liberty's suit threatened estate property. We do not agree. Such an expansive definition of estate property would have the effect of bringing into the bankruptcy court litigation that is properly situated outside of it.

## 2. "Exercise Control Over"

Even assuming Liberty's suit involved property of the estate, Liberty merely made mention of the debtor's insurance policies; **HN18** for the action to fall within the automatic stay, Liberty must have also attempted to "exercise control" over the estate's property. [9] The Ninth Circuit, in In re Bialac, 712 F.2d 426 (9th Cir. 1983), applied a three part test to determine whether a creditor violated § 362(a)(3). First, the court examined whether the debtor had a property right at state law. Second, the court asked whether that right was property of the estate. Third, the court determined "if the property was altered in a manner contrary to the relevant provisions of 11 U.S.C. § 362(a). . . ." Id. at 429-430 (9th Cir. 1983). See also In re Bibo, **[**24]** Inc., 200 B.R. 348, 351 (9th Cir. BAP 1996).

### FOOTNOTES

[9] The "exercise control" clause of § 362(a)(3) was added to the bankruptcy code by amendment in 1984. Pub.L. No. 98-353, reprinted in 1984 U.S.C.C.A.N. (98 Stat.) 371. Congress did not provide an explanation for the new language. In re Del Mission Ltd., 98 F.3d 1147, 1151 (9th Cir. 1996).

This case falters on the third prong. As discussed above, Liberty narrowly crafted the New York lawsuit. It named only Nortek **[*908]** and Monogram (both non-debtors) and the suit sought solely to determine Nortek's and Monogram's rights to insurance coverage. Even if it is assumed Liberty's New York action included property interests of the estate, the suit asked only for a **declaration** of its liability to two **non-debtors**. We fail to see how such an action

AUTH17-000013

amounts to an "exercise of control over the property of the estate." 11 U.S.C. 362(a)(3).

We find support for this conclusion in several cases reconciling interpleader actions to the automatic stay. They hold that **[\*\*25]** *HN19* ̄"the right to pursue an interpleader action is not affected by the fact that one of the claimants has filed a petition in bankruptcy." Price & Pierce Int'l. v. Spicers Int'l. Paper Sales, Inc., 50 B.R. 25, 26 (S.D.N.Y. 1985); See also Holland America Ins. Co. v. Succession of Roy, 777 F.2d 992, 996 (5th Cir. 1985) (interpleader action does not seek to obtain property of the estate as proscribed by § 362(a) (3)); Rett White Motor Sales Co. v. Wells Fargo Bank, 99 B.R. 12, 14 (N.D. Cal. 1989) (neither interpleader relief nor declaratory relief are actions to exercise control over property of debtor's estate); cf. Bigelow v. C.I.R., 65 F.3d 127, 129 (9th Cir. 1995)(action to determine whether estate property in fact exists does not violate stay); Corso v. DeWitt, 180 B.R. 589, 592 (C.D. Cal. 1994)(maritime limitation action does not violate § 362(a)(3)). The rationale for this rule is based upon the defensive nature of the suit: the nominal plaintiff in an interpleader is, in actuality, defending against multiple claims to the property, one of the claimants being the debtor. Price & Pierce Int'l, 50 B.R. at 26; Corso v. DeWitt, 180 B.R. at 592; cf. In re Merrick, **[\*\*26]** 175 B.R. 333, 334 (9th Cir. BAP 1994)(defense issues not affected by automatic stay). Liberty's New York action is also defensive in nature. Liberty seeks a declaration of its responsibilities to a claimant to an insurance policy. But more significantly, Liberty abstained from including the debtor. *A fortiori,* if an interpleader action which names the debtor falls outside of the stay, Liberty's suit, which leaves the debtor out of the suit altogether, also falls outside the automatic stay.

Moreover, this holding properly reflects the purpose of the automatic stay. Congress intended § 362(a)(3) to prevent dismemberment of the estate and to enable an orderly distribution of property, In re Chugach Forest Products, Inc., 23 F.3d at 245, but nothing in Liberty's New York suit will have any effect on Spaulding's estate or on Spaulding's creditors. On the contrary, the bankruptcy court's order had the effect of extending the stay beyond the domain of bankruptcy to a suit between non-debtors. As the Ninth Circuit has stated: "while seemingly broad in scope, the automatic stay provisions should be construed no more expansively than is necessary to effectuate Legislative purpose." **[\*\*27]** Id. at 245. No bankruptcy purpose is served by letting Nortek and Monogram use Spaulding's automatic stay as a tool to halt litigation which leaves the debtor and estate property untouched. See also U.S. v. Inslaw, Inc., 289 U.S. App. D.C. 383, 932 F.2d 1467, 1473 (D.C. Cir. 1991)(the purpose of the automatic stay does not require that every party who acts in resistance to the debtor's view of its rights violates § 362(a)); In re Edgins, 36 B.R. 480, 484 (9th Cir. BAP 1984)(shield of § 362 should not be used as a sword to divest other parties of legitimate interests in property).

## D. THE PRELIMINARY INJUNCTION

In the Amended Notice of Appeal, and in its appellate brief, Liberty refers to a permanent injunction. We have searched the record and can find neither an oral nor written order to that effect. The only injunctive order is the Order On Motion For Preliminary Injunction. That document by its terms and in the context in which it was prepared and signed was intended to be of limited duration, namely until the court could hear and determine whether the New York action violated the stay.

After the Committee filed its adversary complaint, it filed a motion **[\*\*28]** seeking a preliminary injunction. At a hearing on August 1, 1994, the bankruptcy court orally granted the motion, but only until August 29, 1994 (the date scheduled for hearing Liberty's motion to dismiss). However, the August 29 hearing was continued to September 14. Since counsel prepared the preliminary injunction order **[\*909]** with the expectation that it would only continue to August 29, the bankruptcy judge had to strike the month and day when he signed the order on September 6. The signed order thus reads that the injunction shall continue until "     1994." As written, the order is, perhaps, ambiguous. But, in context, it is

AUTH17-000014

clear that the bankruptcy court simply granted a preliminary injunction until the date on which it could hear the summary judgment motion. [10] At that hearing, the bankruptcy court stated that Liberty's New York action was void as a violation of the automatic stay and the court's written order is to the same effect. *HN20* The preliminary injunction order has long since expired by its own terms rendering Liberty's challenge to it moot.

---

**FOOTNOTES**

[10] The transcript of the hearing on August 1, 1994 reads:

THE COURT:. . . I think there's irreparable harm to the debtor and I'm going to hear the matter in a very short time on the motion itself, on the complaint itself. Like within about ten or fifteen days.

MR. DRESSLER: There's a motion to dismiss set for the 29th of August.

THE COURT: Well, we'll hear it that day.

MR. DRESSLER: Are you granting preliminary injunction through the 29th?

THE COURT: Only to the 29th.

---

### [**29] CONCLUSION

Liberty's New York lawsuit against Nortek and Monogram did not violate Spaulding's automatic stay. The bankruptcy court's partial summary judgment in favor of the Committee declaring Liberty's New York lawsuit void is reversed.

Service: **Get by LEXSEE®**
Citation: **207 B.R. 899**
View: **Full**
Date/Time: Monday, November 2, 2009 - 11:44 AM EST

\* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis® About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AUTH17-000015

LexisNexis® *Total Research System*                  Switch Client ¦ Preferences ¦ Sign Out ¦ ? Help

Search ¦ Research Tasks ¦ Get a Document ¦ Shepard's® ¦ Alerts ¦ Total Litigator ¦ Transactional Advisor ¦ Cour

FOCUS™ Terms [                                ] Search Within [ Original Results (1 - 1) ▼ ] [ Go → ]
Advanced...

Service: **Get by LEXSEE®**
Citation: **121 B.R. 257**

*121 B.R. 257, \*; 1990 Bankr. LEXIS 2405, \*\*;*
*Bankr. L. Rep. (CCH) P73,740; 24 Collier Bankr. Cas. 2d (MB) 917*

In re the CIRCLE K CORPORATION, Circle K Convenience Stores, Inc., Circle K Management Company, Lar-Lin, Inc., First Circle Properties, Inc., Utotem, Inc., Utotem Markets of Arizona, Inc., U Totem of Alabama, Inc., U-Tote'M of Colorado Inc., U-Tote'M of Miami, Inc., Tic Toc Systems, Inc., Monterre Properties, Inc., Shop & Go, Inc., Circle K General, Inc., Circle K Hawaii, Inc., Combined Aviation Co., Charter Marketing Company (Connecticut), Charter Marketing Company, Mr. B's Oil Co., Inc., Mr. B's Food Mart, Inc., NPI Corporation, Old Colony Petroleum Company, Inc., New England Petroleum Distributors, Inc., and 44th Street & Camelback Limited Partnership, Debtors. The CIRCLE K CORPORATION, Debtor and Debtor In Possession, Plaintiff, v. Stanley MARKS, as Trustee for the Benefit of Cynthia Alice MARKS, Ehud Hubner and Rebecca Weiss a/t/f Keogh Plan, H. Mark Solomon, and Eleanor Werbowsky, Defendants

Nos. B-90-5052-PHX-GBN, B-90-5053-PHX-GBN, B-90-5054-PHX-GBN, B-90-5055-PHX-GBN, B-90-5056-PHX-GBN, B-90-5057-PHX-GBN, B-90-5058-PHX-GBN, B-90-5059-PHX-GBN, B-90-5060-PHX-GBN, B-90-5061-PHX-GBN, B-90-5062-PHX-GBN, B-90-5063-PHX-GBN, B-90-5064-PHX-GBN, B-90-5065-PHX-GBN, B-90-5066-PHX-GBN, B-90-5067-PHX-GBN, B-90-5068-PHX-GBN, B-90-5069-PHX-GBN, B-90-5070-PHX-GBN, B-90-5071-PHX-GBN, B-90-5072-PHX-GBN, B-90-5073-PHX-GBN, B-90-5074-PHX-GBN, B-90-5075-PHX-GBN Chapter 11, (Jointly Administered) Adversary No. 90-415-GBN

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ARIZONA

121 B.R. 257; 1990 Bankr. LEXIS 2405; Bankr. L. Rep. (CCH) P73,740; 24 Collier Bankr. Cas. 2d (MB) 917

November 14, 1990, Decided
November 14, 1990, Filed

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Debtor corporation moved for a preliminary injunction to bar continued securities litigation in federal district court involving debtor's officers.

**OVERVIEW:** Plaintiffs brought a federal securities action against the officers and directors of debtor in a federal district court. Debtor moved for a preliminary injunction against continued litigation. The court granted the motion. The court found that debtor's insurance polices, which provided liability coverage for debtor's officers and indemnification coverage for debtor, were a valuable estate asset. The court reasoned that the insurance policies, which covered reimbursement of the officers' litigation expenses, would become depleted through the ongoing litigation. Consequently, debtor's exposure in other litigation would increase as the policy limits were exhausted. The court held that continued prosecution of

AUTH18-000001

the securities litigation affected debtor's property interests in a valuable estate asset, in violation of the automatic stay. The court stated, however, that plaintiffs in the district court action would not be permanently deprived of their right to seek redress, and that litigation could proceed as circumstances changed and the reorganization progressed.

**OUTCOME:** The court granted the motion for a preliminary injunction, finding that debtor's insurance policies were a valuable estate asset that would become depleted through continued litigation.

**CORE TERMS:** indemnification, coverage, deposition, insurer, estate property, reimbursement, estate assets, policy periods, debtor's estate, automatic stay, liability coverage, legal expenses, diminution, enjoin, insured person, insuring clause, reorganization, cancellation, indemnify, insured, senior, bylaws, indemnity agreements, owning, Wrongful Act, inter alia, former officers, insurance policies, policy provides, distinguishable

## LEXISNEXIS® HEADNOTES                                        ⊟ **Hide**

Bankruptcy Law > Case Administration > Administrative Powers > Stays > General Overview 🗐
Bankruptcy Law > Estate Property > Content 🗐
**HN1** ⬦ The automatic stay is for the benefit of debtor, debtor's property, and the estate. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Estate Property > Content 🗐
Bankruptcy Law > Estate Property > Contractual Rights 🗐
Governments > Courts > Court Personnel 🗐
**HN2** ⬦ Insurance policies are estate property. 11 U.S.C.S. § 541(a) is intended to be broad and all-inclusive; an interest is not outside its reach because it is novel, contingent or enjoyment must be postponed. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > General Overview 🗐
Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays >
General Overview 🗐
Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > Automatic Stays 🗐
**HN3** ⬦ Actions related to the bankruptcy proceedings against the insurer or against officers or employees of the debtor who may be entitled to indemnification under such policy or who qualify as an additional insured under the policy may be stayed under 11 U.S.C.S. § 362(a)(3). More Like This Headnote | *Shepardize: Restrict By Headnote*

**COUNSEL:** [**1] John J. Dawson, Streich, Lang, Weeks & Cardon, Phoenix, Arizona, Attorneys for Plaintiff/Debtors. D. J. Baker, Weil, Gotshal & Manges, Houston, Texas, Attorneys for Plaintiff/Debtors. Tad R. Smith, Kemp, Smith, Duncan & Hammond, El Paso, Texas, Attorneys for Plaintiff/Debtors. Jerry C. Bonnett, Bonnett, Fairbourn & Friedman, P.C., Phoenix, Arizona, Attorneys for Plaintiffs in Marks Action in the U.S. District Court. Joseph H. Weiss, Law Offices of Joseph H. Weiss, New York, New York, Attorneys for Plaintiffs in Marks Action in the U.S. District Court. Kevin Yourman, Law Offices of Joseph H. Weiss, Los Angeles, California, Attorneys for Plaintiffs in Marks Action in the U.S. District Court. Jules Brody, Stull, Stull & Brody, New York, New York, Attorneys for Plaintiff in Marks Action in the U.S. District Court. Stanley D. Bernstein, Kreindler & Kreindler, New York, New York, Attorneys for Plaintiffs in Marks Action in the U.S. District Court.

AUTH18-000002

Bernard M. Gross, Gross & Metzger, P.C., Philadelphia, Pennsylvania, Attorneys for Solomon.

Nadeem Faruqui, Kaufman, Malchman, Kaufmann & Kirby, New York, New York, Attorneys for Werbowsky.

Don Dreyfus, Arthur Andersen & Co., Chicago, Illinois, **[**2]** Attorneys for Arthur Anderson & Co.

Jonathan Sack, Cravath, Swaine & Moore, New York, New York, Attorneys for Wasserstein, Perella & Co.

Bruce Rabin, Drexel Burnham Lambert, Beverly Hills, California, Attorneys for Drexel Burnham Lambert.

Stephen W. Craig, Brown & Bain, P.A., United States Trustee Phoenix, Arizona. Attorneys for Karl Eller.

**JUDGES:** George B. Nielsen, Jr., United States Bankruptcy Judge.

**OPINION BY:** NIELSEN, JR.

**OPINION**

**[*258]** MEMORANDUM OF DECISION

GEORGE B. NIELSEN, JR., United States Bankruptcy Judge

This matter having come before the Court on the debtor's request for entry of a preliminary injunction against continued litigation of three consolidated civil actions pending in the United States District Court for the District of Arizona, [1] the request having been prosecuted on the basis of the parties' papers, exhibits, affidavits and declarations, a hearing having been conducted, a preliminary order having been entered on October 16, 1990, and a preliminary injunction having been entered on November 6, 1990, the Court finds and concludes as follows:

**FOOTNOTES**

[1] The actions, *inter alia,* raise claims of securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; Rule 10(b)(5) of the Securities Exchange Commission, 17 C.F.R. § 240.10(b)(5) and A.R.S. § 44-1521, *et seq.* of the Arizona Consumer Fraud Act, against The Circle K Corporation ("debtor"), Karl Eller ("Eller"), former Chairman of the Board and Chief Executive Officer of debtor, who served from 1983 until May 7, 1990, and Robert Reade ("Reade"), who served as debtor's President, Chief Executive Officer and Director until his January 18, 1990 resignation. The consolidated actions are currently pending before the Honorable Stephen M. McNamee, United States District Court Judge for the District of Arizona.

**[**3]** I

It is axiomatic $^{HN1}$ the automatic stay is for the benefit of debtor, debtor's property and the estate. 11 U.S.C. § 362(a). The first inquiry is whether certain insurance policies, covering

AUTH18-000003

debtor's present and former directors and officers, are property of the estate. Debtor has two policies: the principal contract provides $ 10,000,000 in liability and reimbursement coverage; the second is an excess coverage policy for $ 10,000,000. Adversary Docket No. 60, Exhibits 18 and 19.

The Ninth Circuit has addressed this issue in terms of whether an insurance company can cancel a policy post petition. *In re Minoco Group of Companies, 799 F.2d 517 (9th Cir. 1986).* In that case, the bankruptcy court made findings concerning the impact of cancelling the policies:

> [Debtor] would be required to indemnify present and former officers and directors for legal expenses and judgments which arise from their activities as officers and directors. The bankruptcy court also found that cancellation of the policies would render reorganization of Minoco more difficult, if not impossible, for two reasons: (a) the difficulty of attracting **[*259]** and retaining competent personnel to **[**4]** serve as officers and directors, and (b) the increase in claims against the debtor's estate resulting from claims for indemnification by present and former officers and directors.

799 F.2d at 518.

On the basis of these findings, the bankruptcy court found that cancellation of the policies was stayed. *Id.* The circuit court affirmed on grounds that the bankruptcy petition automatically stayed cancellation. *See* 11 U.S.C. §§ 362(a)(3), 541(a).

The court based this result by finding the **HN2**insurance policies were estate property, noting § 541(a) was intended to be broad and all-inclusive; an interest is not outside its reach because it is novel, contingent or enjoyment must be postponed. *Id.* Although the insurer argued the policies were not estate property, since they only benefited directors and officers, the court held the policies also benefited the estate as they insured debtor against indemnity claims. 799 F.2d at 519.

In short, the policies met the fundamental test of estate property because "the debtor's estate is worth more with them than without them." *Id.*

As noted by the Fourth Circuit: "A products liability policy . . . . is a valuable **[**5]** property . . . . particularly if the debtor is confronted with substantial liability claims within the coverage of the policy in which case the policy may well be . . . . 'the most important asset of [the] estate.'" *A. H. Robins Co. v. Piccinin, 788 F.2d 994, 1001 (4th Cir. 1986),* cited, with approval, in *Minoco, supra, 799 F.2d at 519. See also In re Johns-Manville Corp., 40 Bankr. 219, 229 (S.D.N.Y. 1984). Cf. Matter of Lockard, 884 F.2d 1171, 1177-79 and* n.14 (9th Cir. 1989) (where contractor's bond is not estate property and no 11 U.S.C. § 105 relief requested, third party litigation not stayed.)

II

Plaintiff cites *In re Louisiana World Exposition, 832 F.2d 1391 (5th Cir. 1987),* to argue the policies are not estate assets. *Louisiana World* appears distinguishable as it primarily focused on director-officer liability coverage, not indemnification coverage. Thus, that court had no need to address the issue confronted by the Ninth and Fourth Circuits: Whether the policy protects against a diminution of estate assets.

There, the unsecured creditors' committee sued directors and officers **[**6]** of debtor and certain insurance companies. Debtor had purchased policies providing payment of legal expenses, liability and indemnification coverage. The policies provided a single total amount

AUTH18-000004

of coverage applicable to both indemnification and liability; hence, payment under either reduced coverage under both.

The creditors' committee filed an adversary proceeding to prevent the insurers from paying legal expenses, arguing such amounts were estate assets.

The court of appeals phrased the issue as whether liability proceeds, not indemnification proceeds, were property of debtor's estate. The court concluded they were not, even though debtor owned the policies. What was found to be important was who owned the proceeds; since debtor did not, the proceeds were not estate property. Citing, *inter alia,* the *Minoco Group* decision, the court remarked: "It is true that policies in some of the above-cited cases provided directors' and officers' liability coverage, and indemnification coverage . . . . and still the cases held that the *policies* were property of the . . . . estate." *Id. at 1400* (emphasis in original).

Notwithstanding this, the court emphasized the distinction **[\*\*7]** between owning a policy and owning its proceeds, noting suit was brought on behalf of debtor to *"enlarge* the debtor's estate." *Id.* (emphasis added).

In the other cases, the situation was different:

> "The court *stayed* the third-party actions against the directors and officers in part because of the likelihood that their liability coverage would be exhausted. They would then turn to the bankrupt . . . . for their statutory right to indemnification, and at that point an asset of the estate -- the indemnification proceeds -- would be **[\*260]** threatened . . . . The question before those courts was, should the third party suits *against* the debtor and its directors and officers be stayed. The courts answered yes, partly because they considered the indemnification proceeds threatened."

832 F.2d at 1400 (emphasis in original.)

The court concluded: "Here, any payment under the liability coverage reduces the amount of the potential indemnification claim to the same extent that policy amounts available for indemnification are thus reduced. There is not the potential for increasing the estate's exposure by payment of liability proceeds due." *Id.* Finally, **[\*\*8]** the court noted that the committee's claims were not related to the indemnification coverage. The court distinguished *Minoco* by noting that decision only dealt with whether an insurance company could cancel a policy without violating the stay.

As noted previously, *Louisiana World* appears distinguishable, due to its focus on liability rather than indemnification coverage. Further, the *Louisiana World* analysis fails to consider the Ninth Circuit's *Minoco* rationale for holding insurance is estate property: the estate was worth more with than without it. *See Minoco Group, 799 F.2d at 519,* citing Jackson, *Translating Assets and Liabilities to the Bankruptcy Forum,* 14 J. Legal Stud. 73, 99 (1985). If the instant policies only provided coverage for directors and officers, and not indemnification coverage for debtor, the *Louisiana World* case could perhaps be on point.

III

Here, however, Circle K, like the debtor in *Minoco,* can recover against the policies in limited instances. [2]

**FOOTNOTES**

AUTH18-000005

2 Both policies are "claims made" policies which offer coverage for claims asserted against the officers or directors within the policy periods. Deposition of Joel Sterrett, Associate Legal Counsel for Debtor, at 153-54. Exclusions include claims for damages, settlements and legal expenses brought about by dishonest or fraudulent acts or omissions, willful violation of statutes, rules or law, attributable to the insured person gaining a personal profit improperly or from shareholder derivative suits or class actions brought by shareholders owning 10% or more of company stock. Besides providing for reimbursement to the insured officers and directors, the policy provides reimbursement to the company "which the Company pays as indemnification to the insured persons during the policy period . . . ." Adversary Docket No. 60, Exhibit 18 at Policy pp. 4-5, para. IV(A), (1)-(16).

[**9] First, debtor has previously executed indemnity agreements. On September 9, 1987, debtor executed indemnity agreements with Eller and Reade as an amendment to its bylaws. Debtor's board authorized a similar indemnity agreement at a special meeting held on December 14, 1989. The 1987 and 1989 indemnification agreements allow indemnification and advancement of expenses to the fullest extent permitted or not prohibited by law, including the Texas Business Corporation Act, the Texas Miscellaneous Corporation Law Act or any other applicable law. Although the indemnification language is broad, there are exclusions and debtor has yet to act on the demands of Eller and Reade for indemnification. September 4, 1990 Correction of Deposition Testimony of Joel A. Sterrett, Docket No. 60, at Exhibit 13. Deposition of Gehl Paul Babinec of August 16, 1990, at 36. *Cf.* Deposition of Karl Eller of August 16, 1990, at 70 (stating his belief debtor had agreed to indemnify him for the Arizona securities litigation). Docket No. 54, Exhibits 1 and 2.

Besides the Eller-Reade indemnification claims, debtor reports other claims are pending, or will be made, against the indemnification policies. These include: [**10] the *Albrecht* litigation, a California State lawsuit subsequently removed to federal district court in which the insurers have taken the position the litigation is not within the policy period. Sterrett Deposition at 160-72. The *Fleischer* litigation, commenced August 3, 1990, against Eller, Reade, a current director of debtor, and Robert Dearth, debtor's current President and Chief Executive Officer, and the *Weinberger* litigation, an Arizona State stockholders derivative suit against various former and present officers and directors. Debtor has sent notice of suit to the insurance [*261] company but has not yet requested a defense. Sterrett Deposition at 157-60.

Second, as in *Minoco, supra,* the insurance policies provide indemnification coverage. In *Minoco,* the insuring clause provided: "If during the policy period any . . . . claims are made against the Directors or Officers . . . . for a Wrongful Act, the Insurers shall pay . . . . all loss for which the Company may be required or permitted by law to indemnify the Directors or Officers." 799 F.2d at 518, n. 1.

In the present case, the pertinent insuring clause provides: "Underwriter [**11] will reimburse the Company for the percentage of Loss set forth . . . . which is in excess of the Deductible . . . . subject to the Conditions and Limitations (B)(4), which does not exceed the available Limit of Liability and which the Company pays as indemnification to the Insured Persons resulting from any Claim first made against the Insured Persons during the Policy Period . . . . for a Wrongful Act . . . ." (Insuring Agreement B), Policy p. 1, Docket No. 60, Exhibit 18.

Although the complete insuring clause in the instant case appears riddled with exceptions (as often occurs), the end result is consistent with *Minoco:* In certain instances, debtor can make a claim for reimbursement for indemnification claims paid.

AUTH18-000006

Here, also, the policies protect debtor from diminution of estate assets. The fact that the insurers have reserved their rights not to defend or pay is not unique. ³ The same was true in *In re Johns-Manville Corp., 26 Bankr. 420 at 429 (S.D.N.Y. 1983), partially reversed on unrelated grounds, 41 Bankr. 926 (S.D.N.Y. 1984)*. The fact debtor may not receive all benefits or proceeds under the insurance does not affect its current status **[**12]** as estate property. *In re Johns-Manville, 40 Bankr. at 230-31*. If the insurer fails to provide coverage, the officers will look to debtor's assets for reimbursement, pursuant to the bylaws. *26 Bankr. at 429*.

---

**FOOTNOTES**

3 Based on the allegations of the District Court complaint, Aetna Casualty and Surety Company took the position in a letter of October 31, 1989, that claims Eller and Reade defrauded stockholders, engaged in dishonest acts, violated statutes and knew, but failed, to disclose that a leveraged buyout or merger was highly improbable, would not be covered by the policy. Adversary Docket 60 at Exhibit 17.

---

Finally, debtor presented evidence concerning the effect of continuing the litigation. Senior Vice President and General Counsel Gehl Paul Babinec testified there is a diminution of the insurance asset when a claim or payout is made, as underwriting considerations go into effect. If the insurance company determines a potential for payout, it reduces availability of debtor's coverage. **[**13]** Babinec Deposition at 151.

Babinec also testified there is an impact on management, debtor's ability to retain management and the willingness of managers to make strong decisions if they lack insurance protection. *Supra*, at 151-52. However hard to quantify, this results in a diminution of the estate.

Similarly, Robert Dearth, debtor's President and Chief Operating Officer, testified the relationship between a company and its directors and officers is fostered by such coverage. If a claim is settled or judgment entered, a reduction or exhaustion of coverage may result. In that event, other directors and officers will be left with reduced, little or no coverage. Additionally, renewals may become more expensive. Deposition of Robert A. Dearth, Jr. of August 22, 1990, Docket No. 54, Exhibit 3.

IV

Based on the evidence and papers submitted to date, continued prosecution of the District Court security litigation affects debtor's property interests in a valuable estate asset in violation of the automatic stay. 11 U.S.C. § 362(a). As stated in *Robins:* **HN3**"Actions 'related to' the bankruptcy proceedings against the insurer or against officers or employees of the debtor who may be entitled **[**14]** to indemnification under such policy or who qualify as [an] additional [insured] under the policy are to be stayed under section 362(a) (3)." *788 F.2d at 1001-02*. Accordingly, defendants would be required to comply with this Court's General Order 47 to seek relief **[*262]** from the automatic stay. 11 U.S.C. § 362 (d). Although much evidence in the form of exhibits, documents, affidavits and depositions has been submitted, there has been no evidentiary hearing conducted, corresponding to a final stay relief hearing. Rule 4001(a)(2), *F.Br.R.*

V

In the alternative, at the very least, debtor has created a substantial issue which enables the Court to utilize § 105 to enjoin plaintiff's prosecution at this early stage in a series of complex, interrelated Chapter 11 filings. Plaintiff has demonstrated that serious questions

AUTH18-000007

concerning impact of the District Court litigation on the pending reorganization have been raised, convincing this Court that the balance of hardship tips sharply in its favor. *Lucas v. Bechtel Corp.,* 800 F.2d 839, 847 (9th Cir. 1986); *American Passage Media Corp. v. Cass Communications,* 750 F.2d 1470, 1472 (9th Cir. 1985).

**[**15]** VI

In summary, there are similarities here with *In re Johns-Manville Corp., supra,* 26 Bankr. at 428-31, where the court extended the automatic stay to enjoin a federal securities action against certain officers and directors of the debtor. There, as in this case, debtor contended insurance currently in force covered reimbursement of the litigation expenses of the officers. Likewise, the insurer reserved its rights to contest such payments. If the insurer fails to pay, the directors and officers will look to debtor for reimbursement pursuant to company bylaws. 26 Bankr. at 428-29. In any event, the policies have specific dollar limits beyond which debtor must pay. To the extent expenditures exhaust policy limits, an estate asset is diminished and debtor's exposure in other litigation increases. *Id.* at 429. Finally, here as in *Johns-Manville,* the deposition or trial testimony of debtor's senior executives may be used against the company subsequently, and debtor expects to have to divert personnel and management to respond to discovery and monitor this litigation to protect its interests. [4]

**FOOTNOTES**

[4] Unsurprisingly, Karl Eller reports he will call "everybody as a witness." Eller Deposition at 176-78. General Counsel Babinec believes that given the broad allegations of the complaint, discovery will involve many senior management officers. Babinec Deposition at 58-141, Docket No. 54, Exhibit 2.

**[**16]** This is not to suggest the District Court plaintiffs are to be permanently deprived of their right to seek redress. It is not the function of the bankruptcy laws to shelter nondebtors for the entirety of these proceedings. *See American Hardwoods v. Deutsche Credit (In re American Hardwoods),* 885 F.2d 621, 624-25 (9th Cir. 1989); *Seaport Automotive Warehouse v. Rohnert Park Auto Parts (In re Rohnert Park Auto Parts),* 113 Bankr. 610, 615 (9th Cir. 1990) (bankruptcy court may preliminarily enjoin action against nondebtors but lacks authority to permanently enjoin such litigation.) The Court has been convinced that, at this stage of these complex·cases, it benefits debtor, its estate and thousands of creditors not to divert management's attention or resources into equally complex issues involving securities law. While this Court is not the proper venue for such litigation, it could provide a forum for negotiation or settlement, if all parties are willing. If they are not, as circumstances change and the reorganization progresses, the time will come for the litigation to proceed.

Service: **Get by LEXSEE®**
Citation: **121 B.R. 257**
View: Full
Date/Time: Monday, November 2, 2009 - 11:45 AM EST

* Signal Legend:
🔴 - Warning: Negative treatment is indicated
🔲 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

AUTH18-000008

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor |
Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help

 LexisNexis®   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

AUTH18-000009

LexisNexis® *Total Research System*

Switch Client ¦ Preferences ¦ Sign Out ¦ ? Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Cour

FOCUS™ Terms [                    ] Search Within [Original Results (1 - 1)]  [Go] →

Advanced...

Service: **Get by LEXSEE®**
Citation: **325 B.R. 851**

*325 B.R. 851, \*; 2005 Bankr. LEXIS 1177, \*\*;*
*54 Collier Bankr. Cas. 2d (MB) 757*

In re: METROPOLITAN MORTGAGE & SECURITIES CO., INC., Debtor. In re: SUMMIT
SECURITIES, INC., Debtor. METROPOLITAN INVESTMENT SECURITIES, INC., Debtor.
METROPOLITAN MORTGAGE & SECURITIES CO., INC., SUMMIT SECURITIES, INC., and
BRUCE BOYDEN, as Trustee for the Chapter 7 estate of METROPOLITAN INVESTMENT
SECURITIES, INC., Plaintiffs, vs. KEITH CAUVEL and MARJORIE CAUVEL, husband and wife,
et al., Defendants.

Adversary No. A04-00061-W11

UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF WASHINGTON

325 B.R. 851; 2005 Bankr. LEXIS 1177; 54 Collier Bankr. Cas. 2d (MB) 757

June 20, 2005, Decided
June 20, 2005, Filed

**PRIOR HISTORY: [\*\*1]** Jointly Administered Under No. 04-00757-W11, No. 04-00756-
W1B.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Debtors sought a determination that the proceeds of four
insurance policies were property of the estate under 11 U.S.C.S. § 541, and that all claims
against the proceeds of the policies should be stayed under 11 U.S.C.S. § 362(a).

**OVERVIEW:** Debtors' policies insured payment of claims against debtors and their
affiliates, payment of claims against debtors' directors and officers, and payment to
debtors for any indemnification claims which may be made against them by their directors
and officers. There were several lawsuits and arbitration proceedings pending in various
state and federal courts on behalf of hundreds of plaintiffs against the directors and
officers alleging violations of securities law, fraud, and similar wrongful acts. Under the
terms of the policies, the directors and officers and other insured defendants were entitled
to have their costs of defense paid by the insurance carriers from the policy limits.
Because of the scope of the various proceedings, it was likely that the limits of the policies
would be exhausted before most of the claims were fully litigated. The court held that, not
only were the policies property of the estate, but the proceeds were also property of the
estate because the estate was worth more with them than without them and because
debtors held claims payable from the proceeds. The court held that the proceeds were
subject to the protections afforded by 11 U.S.C.S. § 362(a)(3).

**OUTCOME:** The court held that the proceeds were property of the estate subject to the
protections afforded by the automatic stay.

AUTH19-000001

**CORE TERMS:** policy proceeds, claimant's, insured, insurance policy, broker, automatic stay, settlement, preliminary injunction, non-debtor, named insureds, coverage, legal interests, policy limits, arbitration, co-insureds, affiliates, global, insurance carriers, insurance proceeds, payment of claims, arbitration proceedings, indemnification, reimbursement, monetary, lawsuits, pay claims, declaratory judgment action, applicability, subsidiaries, intangible

## LEXISNEXIS® HEADNOTES                                  ⊟ **Hide**

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > Estate Property 🔍
Bankruptcy Law > Estate Property > Content 🔍

*HN1*⚓11 U.S.C.S. § 362(a)(3) precludes any act to obtain possession of property of the estate. Property of the estate is defined in 11 U.S.C.S. § 541 as all legal or equitable interests of the debtor in property (wherever located) as of the commencement of the case. 11 U.S.C.S. § 541(a)(1). It includes intangible or contingent interests of the debtor as well as intangible property itself. More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Estate Property > Content 🔍
Insurance Law > Business Insurance > General Overview 🔍

*HN2*⚓Insurance policies are property of the estate. More Like This Headnote

Bankruptcy Law > Estate Property > Content 🔍

*HN3*⚓11 U.S.C.S. § 541 renders a legal interest in property, property of the estate, and does not require that legal interest to be reduced to a monetary amount nor to be absolute and non-contingent. More Like This Headnote

**COUNSEL:** For METROPOLITAN MORTGAGE & SECURITIES Co. Inc., Plaintiff: Charles R Ekberg, James B. Stoetzer, Bruce W. Leaverton, Julia A Bahner, Lane Powell Spears Lubersky, LLP, Seattle, WA.

For BRUCE BOYDEN, CHAPER 7 TRUSTEE for Metropolitan Investment Securities, Inc: Mary Ellen Gaffney-Brown, Lineberger & Gaffney-Brown, Spokane, WA.

For KEITH CAUVEL, Defendant: F Mike Shaffer, Gordon Thomas Honeywell et al, Tacoma, WA; John D Munding, Crumb & Munding, Spokane, WA; Robert Dunn, Dunn & Black, SPOKANE, WA.

For MARJORIE CAUVEL, KENT WEAVER, KATHIE WEAVER, ROY SIMMS ET AL, L V FREEL, MARILYN J FREEL, JOANNA ELLINGTON, CYNTHIA MACGEAGH, THOMAS MASTERS, GREGORY A WEED, PAMELA A WEED, BIO-ORIGYN, Defendants: John D Munding, Crumb & Munding, Spokane, WA; Robert Dunn, Dunn & Black, SPOKANE, WA.

For ANTONIA M BAKER, Defendant: Gary I Grenley, Grenley Rotenberg Evans Bragg, Portland, OR; John D Munding, Crumb & Munding, Spokane, WA; **[**2]** Paul H Trenchero, Portland, OR.

For KENNETH A RIGERT, ALEXANDRA ANDRONIKOS, NIKOS ANDRONIKOS, Defendants: Gary I Grenley, Grenley Rotenberg Evans Bragg, Portland, OR; John D Munding, Crumb & Munding, Spokane, WA; Paul H Trenchero, Portland, OR; Robert Dunn, Dunn & Black,

AUTH19-000002

SPOKANE, WA.

For ESTHER HALL, DEANETTE R HALL, DIANE M HALL, Defendants: Darrell W Scott, The Scott Law Group, Spokane, WA.

For B Elaine Hoskin, Defendant: Stellman Keehnel, Gray Cary Ware et al, Seattle, WA.

For Western United Life Assurance Company, Defendant: Ian Ledlin, Phillabaum Ledlin Matthews & Sheldon PLL, Spokane, WA.

For Gordon Adams, Suzanne Adams, Daniel Adams, Ryan Saccomanno, Defendants: James K Barbee, Golbeck, Roth, et al, Seattle, WA; Mark Roth, Golbeck Roth PLLC, Seattle, WA.

For Patricia Jean Sears-Million, William E Sears, PJM & Associates, Defendants: Andrew A Guy, Sotel Rives LLP, Seattle, WA.

For Howard & Zelda Smith Family, Gary & Rita Adams, Defendants: Robert S Banks, Jr, Banks Law Office PC, Portland, OR.

For Charles Ault, As Trustee of the Charles F Ault Living Trust, Gregory Ault, Mary Bader, Floyd Bodner, Norbert & Sharon Chartrey, as Trustees of [**3] the Norbert & Sharon Chartrey Living Trust, Florence S Christiansen, Richard Coons, Loren Davis, Verna Davis, Gary Dimbat-IRA, Sherrill Dimbat-IRA, Margaret L Dresbach, as Trustee of the Margaret L Dresbach Trust, James E & Mary L Dryden, as Trustees of the James E and Mry L Dryden Revocable Living Trust, John Egnatoff, as Trustee of the John and Pauline Egnatoff Revocable Trust, Wayne and Jackie Frase, as Trustees of the Frase Trust, Vernon Freel, Marilyn Freel, Duane Garoutte, Evelyn Garoutte, Dolores M Geier, Dolores M Geier, as Trustee of the Dolores M Geier Living Trust, Dolores M Geier-IRA, Lillian Gordon, Curt Hastings, Deanna Hess, Les Snyder, Richard Jacobs, Beverly Jacobs, Joyce & Hubert Janicke, as Trustees of the Janicke Living Trust, Emmett Kirby, Sandra Kirby, Catherine B Klostermann-IRA, Catherine B Klostermann, Victor Klostermann, Russell Kramer, Katherine Kramer, Mary Lou Kumor, Ted Langton, Willowdean Langton, Bob Larimore, Ralph and Jacqueline McLaughlin, as Trustees of the Ralph & Jacqueline McLaughlin Trust, Jacqueline McLaughlin-IRA, Ralph B McLaughlin-IRA, James T & Darlene Mears, as Trustees of the James T Mears Revocable Trust, S Dennis Miller, Nancy Kornfeld [**4] Miller, Raymond Niehaus, William R Olson, Jean Olson, Dean Paterson, Charlotte Paterson, Jack H Pattie, Barbara Pattie, Malcom Pompe, Diana Pompe, Patricia Regner, Roy Fulton, Roy Resner, Barbara Resner, Roy Resner, as Trustee of the Helen Resner Irrevocable Sole Benefit Trust, Derald Dolores Riggleman-IRA, Derald Riggleman, Dolores Riggleman, Derald Riggleman-IRA, Corrine Rose, Barbara Ross, as Trustee of the Barbara Ross Living Trust, Ardeth Savage, Virginia Scott, Clarence Ben & Mary M Seeley, as Trustees of teh Seeley Revocable Living Trust, Floralee Stadelman, as Trustee of the Floralee Stadelman Revocable Living Trust, Edward Stadelman, as Trustee of the Edward H Stadelman Revocable Living Trust, William A Stady-IRA, Robert R Turner, as Trustee of the Robert R Turner Trust, Norma Turner, as Trustee of teh Norma C Turner Trust, Inara Vehvilainen, Robert Veley, Beverly Veley, Robert W Veley-IRA, Jr, Jerry Veley, Jo A Veley, Harold Williams, Phyllis J Wilson, as Trustee of teh Phyllis J Wilson Living Trust, Connie Vandehey, Defendants: Gary I Grenley, Grenley Rotenberg Evans Bragg, Portland, OR.

For Norma Hanke, Lucille Campbell, Catherine Perisich, Edward Kulawiak, Lynda Kulawiak, [**5] John Patrick Campbell, Berry Campbell, Diane Campbell, William Bennett, Defendants: Darrell W Scott, The Scott Law Group, Spokane, WA.

For Marie & David H Shepard, Ginger D Berning Roth IRA, Ronald J Berning Roth IRA, Nick Von Flue, James Bentz, Gary Adams, Rita Adams, James Bentz, Nick VonFlue, Marie Ann Shepard, David Harold Shepard, 3rd Pty Defendants: Robert S Banks, Jr, Banks Law Office PC, Portland, OR.

AUTH19-000003

For Antonia Baker, Antonia Baker, Trustee for the Antonia Baker Revocable Living Trust, Eugene R Barnett, Catherine Bastian, Trustee of the Catherine Bastian Trust, Catherine Bastian, Catherine Bastian, IRA, Catherine Bastian, Trustee of the Robert W Bastian Trust, Colleen L Baughman, Robert G Baughman, Craig Bauske, Karen Bauske, Craig Bauske, IRA, Karen Bauske, IRA, Arthur J Becker, Trustee of the Arthur J Becker Trust, Calvin M Behrens, Donna M Behrens, Calvin M Behrens, Trustee of the Calvin M Behrens and Donna M Behrens Family Trust, Donna M Behrens, Trustee of the Calvin M Behrens and Donna M Behrens Family Trust, William Berg, Steve W Biggs, Ellen M Black, Floyd Bodner, Dayle J Boucher, IRA, Gerald L Boucher, IRA, Terri C Bourne, IRA, Carol Breese, Donald Breese, **[\*\*6]** IRA, June Brown, Barbara Camp, Dolores M Geier-IRA, Gary Goodman, Vickie Goodman, Lillian Gordon, Coleman Greer, Susan Griffin, Ella Griffin, Susan Griffin-IRA, Viola Grisi, as Trustee of the Viola Grisi Family Trust, Alice Gustafson, Kenneth Haas, Patricia Haas, Kenneth Haas-IRA, Curtis Hastings, Duane Hesketh, Jr, Duane Hesketh, Sr, Deanna Hess, Les Snyder, Doanld C & Helen A Hill, as Trustees of the Hill Family Trust, Shirley M Hungate-IRA, Merle Irish, Maragret Irish, Norbert Chartrey, Trustee of the Norbert and Sharon Chartrey Living Trust, Richard Jacobs-IRA, Sharon Chartrey, Trustee of the Norbert and Sharon Chartrey Living Trust, Beverly Jacobs, Amanda Jacobson, through Gail K Jacobs, Power of Attorney, Eva C Chatas, Through Barbara Lane Hillson with Power of Attorney, Gail Jacobson, Jesse Dale Christiansen, Florence S Christiansen, Gail Jacobson-IRA, Charles Cole, Marlene Cole, Cathryn Jiroch, Charles Cole, IRA, Edward Johnson, Jean Elizabeth Johnson, Marlene Cole, IRA, Estate of Murrl C Jones, through Karen K Bauske, Personal Representative, Richard Coons, Leland D Jossey-IRA, Frederick L Joyner-IRA, Loren Davis, Sherry Joyner-IRA, Verna Davis, Sheila Davis, Jack Keeler & **[\*\*7]** Jane Keeler, as Trustees of the Keeler Living Trust, Sheila Davis, IRA, Emmett Kirby, Donald Deboer, Trustee of the Donald and Beverly Deboer Revocable Living Trust, Emmett Kirby, Beverly Deboer, Trustee of the Donald and Beverly Deboer Revocable Living Trust, Sandra Kirby, Gene Klein, Barbara Klein, Catherine B Klostermann, Catherine B Klostermann-IRA, Victor Klostermann, David Deese, Catherine Klostermann, Kathleen Deese, Kathleen Deese, IRA, Matthew S Knight, Eleanor Delamarter, Trustee for the Delamarter Family Trust, Katherine Kramer, Russell Kramer, Eleanor Delamarter, Mary Lou Kumor, Gary Dimbat-IRA, Sherrill Dimbat-IRA, Marilyn J Landeros-IRA, Ted Langton, Langton, Bob Larimore, Don Leatherman, Irmgard Leatherman, Carol Lenherr, Burnell Lenherr, Burnell Lenherr-Ira, through Carol, Lenherr, Power of Attorney, Sunrise Gutter Service Inc, Rodger Lewis, Lorie Lewis, Lloyd Lundberg, Donna Lundberg, Jonathan Lundy, Cynthia McLaughlin-IRA, Jacqueline McLaughlin-IRA, David McNeill, through Craig Plunkett, Guardian, Keith Meerdink-IRA, Dale H Pemberton, Lois Meerdink-IRA, Pompe, S Dennis Miller, Nancy Kornfeld Miller, Gertraud K Miller, Walter Lee Powell, Joanne S Powell, Walter Lee **[\*\*8]** Powell, IRA, Mark A Montgomery, Patricia Regner, Bruce T Montgomery, Mark A & Bruce T Montgomery, as Trustees of the Mark A Montgomery Trust, Roy Fulton, Dennis C Murphy, Dennis C Murphy-IRA, William L Murphy, Shirley Murphy, Shirley Murphy-IRA, Antone Remsing, IRA, William L Murphy, as trustee of Money Purchase Plan, Fidelia Navarro, Liborio Navarro, William F Netzer, through William Chaussee Guardian & Conservator, Roy Resner, Barbara Resner, Raymond Niehaus, Dorothy M & Harry E Olson, as Trustees of the Dorothy M Olson and Harry E Olson Trust, Jean Olson, William Paris-IRA, Charlotte Paterson, Jack H Pattie, Roy Resner, Trustee of the Helen Resner Irrevocable Sole Benefit Trust, Lilian Daily, Leonard Riegler, Leonard Riegler, IRA, Derald Riggleman, Dolores Riggleman, Dolores Riggleman, IRA, Derald and Dolores Riggleman, Derald Riggleman-IRA, Irma Robinson, as trustee of the Irma Robinson Revocable Living Trust, Charlotte Rodgers, Margaret L Dresbach, Trustee of the Margaret L Dresbach Trust, Robert Leslie Dresbach, Dryden, James E and Mary L, Trustees of the James E and Mary L Dryden Revocable Living Trust, East Gate Lodge, Through Phillip Quirk and Peter Morrison, Trustees, Barbara **[\*\*9]** Ross, trustee of Barbara Ross Living Trustt, Egnatoff, John, Trustee of the John and Pauline Egnatoff Revocable Trust, Enzler, Denise, Trustee of the Enzler Living Trust, Lynn Erichson, Bruce Erickson, Trustee of the Bruce, Erickson Charitable Trust, Bruce Erickson Net Asset Value Trust, Bruce Erickson Net Asset Charitable Trust, Verlene Erickson, Lavonne Ferwenda, Dorothy Field, Elsie Forno, Frase, Wayne and Jackie, Trustees of the Frase Trust, Vernon

AUTH19-000004

Freel, Marilyn Freel, Virginia Lee Gallagher, Duane Garoutte, Evelyn Garoutte, Edward Gass, Carole Gass, Dolores M Geier, Delores M Geier, Trustee of the Delores M Geier Living Trust, Barbara Pattie, Myrtle F Thomas-IRA, William J Thomas-IRA, Betty Jean Trumbo, Loran Trumbo, Loran Trumbo-IRA, Art Valverde, Debbie Valverde, Art Valverde-IRA, Rodrigo Valverde, Sylvia VanSlyke, through Steven G Miller, Power of Attorney, Connie S Vandehey, as Trustee of the Connie S Vandehey, Vincent Varnes-IRA, Inara Vehvilainen, Robert W Veley-IRA, Jr, Robert Veley, Beverly Veley, Jerry Veley, Jo A Veley, Ervin Waldrep, Gladys Waldrep, Caroline Ward, Harold Williams, Allen J & Geraldine R Wirfs, And Trustees of the Allen J Wirfs Family Trust, Roy Woo-IRA, **[\*\*10]** Judy Woo-IRA, Roy Woo, Judy Woo, Darlene P Sanders, Ardeth Savage, Virginia Scott, Clarence Ben Seeley and Mary M Seeley, trustees of Seeley Revocable Living Trust, John E Seller, as trustee of the John E Seller Revocable Living Trust, George Smith, Floralee Stadelman, trustee of Floralee Stadelman revocable trust, Edward Stadelman, trustee of the Edward H. Stadelman Revocable Living Trust, William A Stady-IRA, Ralph E Sturgeon, as trustee of the Ralph E Sturgeon Loving Trust, Molly Thaler, Donald C & Helen A Hill, Jean M Kennedy, Philip & Carolyn J Lanstrum, Myron Lewis, Iris Newton, Dorothy & Harry Olson, Joanne S Powell, Clarence Ben & Mary Seeley, Janet Smith, Paul & Nancy Stolberg, Stephen G Miller, Allen J & Geraldine Wirfs, Bonnie Lundy, Iris Newton, as trustee of the Newton Trust, Walter Lee Powell IRA, James Mears, Personal Representative of the Estate of Mary Bader, Gregory Ault, Charles Ault, ALEXANDRA ANDRONIKOS, NIKOS ANDRONIKOS, ANTONIA M BAKER, 3rd Pty Defendants: Gary I Grenley, Grenley Rotenberg Evans Bragg, Portland, OR.

For METROPOLITAN MORTGAGE & S, Counter-Claimant: Charles R Ekberg, Lane Powell Spears Lubersky LLP, Seattle, WA.

For DEANETTE R HALL, Counter-Defendant: **[\*\*11]** Darrell W Scott, The Scott Law Group, Spokane, WA.

For PJM & Associates, Patricia Jean Sears-Million, William E Sears, 3rd Party Plaintiffs: Andrew A Guy, Sotel Rives LLP, Seattle, WA.

**JUDGES:** PATRICIA C. WILLIAMS, Bankruptcy Judge.

**OPINION BY:** PATRICIA C. WILLIAMS

### OPINION

**[\*853]** MEMORANDUM DECISION RE: PLAINTIFFS' AND INTERVENING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PATRICIA C. WILLIAMS, Bankruptcy Judge:

This controversy arises out of two conflicting legal philosophies; one found in insurance law and one found in bankruptcy law. When multiple claims exist against an insurance policy, the distribution scheme is based upon a race with the fleetest claimant winning the policy proceeds. When multiple claims in bankruptcy exist against an insolvent debtor, the distribution scheme is based upon equitable distribution. When the asset to be distributed is insurance proceeds arising from an insurance policy held by the debtor, those very different philosophies may be in conflict.

### FACTS

This controversy involves three debtors; the combined Chapter 11 proceedings of Summit Securities, Inc. and Metropolitan Mortgage & Securities Co., Inc., and the Chapter 7

AUTH19-000005

proceeding of Metropolitan **[\*\*12]** Investment Securities, Inc. There are four insurance policies at issue. Two of these policies are referred to as the D&O policies and two of these policies are referred to as the E&O policies. The D&O policies are the National Union policy with limits of $ 10,000,000 and the excess St. Paul Mercury Insurance policy with limits of $ 5,000,000. The E&O policies relate to broker members of the National Association of Securities Dealers (hereinafter referred to as "NASD") who dealt with securities issued by the debtors. The E&O policies regarding the NASD brokers are the AIG policy with limits of $ 10,000,000 and the excess Chubb policy for $ 2,000,000.

Simplistically, the debtors and their affiliates and subsidiaries are named insureds under all the policies. The D&O policies insure payment of claims against the debtors and their affiliates, payment of claims made against the debtors' respective directors and officers, and payment to the debtors for any indemnification claims which may be made against them by their directors and officers. The debtors as named insureds also have the right to seek payment of certain types of claims, such as loss caused by negligent acts of officers. Again, **[\*\*13]** very simplistically, the same is true of the E&O policies which also include the NASD brokers as insureds. There are several lawsuits pending in various state and federal courts on behalf of hundreds of plaintiffs against the directors and officers alleging violations of securities law, fraud and similar wrongful acts. There are five lawsuits pending against various directors and officers and affiliates alleging wrongful conduct as to certain employees of the debtors. There are dozens of lawsuits and NASD arbitration proceedings pending on behalf of hundreds of plaintiffs against dozens of NASD brokers associated with the debtors which allege violation of securities law and similar wrongful acts. Additional claims are known to exist for which no litigation or arbitration has yet been commenced.

Under the terms of the policies, the directors and officers and NASD brokers and other insured defendants are entitled to have their costs of defense paid by the insurance carriers from the policy limits. The policies are commonly referred to as "wasting policies" or "burning candle policies," meaning that as the litigation continues, the amount available to a successful plaintiff under the **[\*\*14]** policy is being reduced by the costs of defense of the litigation. Because of the number of lawsuits and arbitrations and the number of third-parties seeking recovery, it is quite likely that **[\*854]** the limits of these policies will be exhausted before the majority of the claims are fully litigated. Earlier in the bankruptcy cases, a motion to lift stay was filed requesting that policy proceeds be distributed to reimburse the costs incurred by certain non-debtor co-insureds in defending against third-party claims. The question of applicability of the automatic stay was reserved for determination in this adversary proceeding. With Court permission, a procedure was developed whereby defendants' counsel circulate and file with the Bankruptcy Court requests for reimbursement under the policies before submitting the same to the insurance carriers for payment. When last reviewed, the filings indicated that in the course of about 14 months nearly $ 2,300,000 has been sought as costs of defense. The amount currently reflected by the pleadings is relatively low as an agreement was reached among the Creditors' Committees in the Chapter 11s, the Chapter 7 Trustee and the defendants' counsel and most **[\*\*15]** of the third-party claimants to "stand still" in the pending litigation and arbitrations.

The debtors filed this action seeking an injunction to stay all litigation and arbitration on March 22, 2004. As the litigation and arbitration proceedings proliferated, so has the number of parties to the adversary proceeding. Objections to the granting of injunctive relief were filed at various times by various claimants, but since many claimants then agreed to the "stand still," the request for injunctive relief was not noted for hearing until March 8, 2005. At that time, various counsel for various claimants indicated that they had initially objected to the preliminary injunction but had withdrawn their objections as they had become persuaded that it was in their clients' best interest to pursue the possibility of a "global settlement" before policy limits were significantly reduced or exhausted by the costs of defending the numerous claims and payment of the first claims ripe for resolution.

AUTH19-000006

The efforts of the parties during the past several months have been primarily directed at negotiating a so-called global settlement which would require the insurance carriers to pay the policy limits **[\*\*16]** with various groups of claimants sharing in the policy proceeds on a negotiated basis. At the time of the first hearing for preliminary injunction in March of 2005, counsel for debtors reported, and some claimants' counsel confirmed, that significant progress had been made in negotiating a global settlement and they were cautiously optimistic a settlement would result, although not all claimants had participated in the process.

The March hearing resulted in the imposition of a preliminary injunction scheduled to expire on June 7, 2005. All litigation by third-party claimants against the named insureds under the D&O and E&O policies was enjoined as well as litigation among the named insureds. The question of the applicability of the automatic stay was not addressed due to the imposition of the preliminary injunction. Upon expiration of the preliminary injunction on June 7, 2005, another hearing was held to consider the debtors' position that the automatic stay precludes the prosecution of claims against the policy proceeds and to determine if the circumstances regarding a global settlement had changed. As of that hearing, it was apparent that no global settlement would occur.

The **[\*\*17]** pending request of the debtors is a determination that the proceeds of the insurance policies are property of the estate and that the suits and arbitration proceedings are stayed under 11 U.S.C. § 362(a). If the automatic stay is inapplicable, the debtors alternatively argue the preliminary injunction entered on March 29, 2005 **[\*855]** should be extended. The insurance carriers have indicated that an interpleader will be commenced and policy proceeds paid into the registry of the Court. There may be some issues regarding policy coverage for particular types of claims or for specific claims, but the total pending claims are approximately $ 600,000,000. Those claims for which no coverage issues exist far exceed the total policy limits. To date, no such interpleader has been filed.

Metropolitan Mortgage and Summit have filed a joint liquidating plan. The plan, as proposed, establishes a liquidation trust. The liquidation trustee would be appointed to pursue some unrelated suits on behalf of the debtors as well as the debtors' claims under these policies, i.e., claims the estates may directly hold against the directors and officers and other insureds as well as claims against **[\*\*18]** the policies for the costs of indemnifying directors and officers, brokers and other insureds. The three debtors also hold claims for reimbursement from the proceeds for expenses actually incurred by the estates for responding to the investigations by various securities law agencies and for costs incurred due to unrelated officer negligence. Those claims for reimbursement of out-of-pocket costs total approximately $ 3,400,000. Arguably, the policy proceeds would be available to pay claims held by the debtors thus resulting in additional funds to pay all creditors.

## ISSUE

Are the policy proceeds property of the estate?

## ANALYSIS

*HN1* 11 U.S.C. § 362(a)(3) precludes "any act to obtain possession of property of the estate." Property of the estate is defined in § 541 as "all legal or equitable interests of the debtor in property (wherever located) as of the commencement of the case." 11 U.S.C. § 541 (a)(1). It includes intangible or contingent interests of the debtor as intangible property itself. If these insurance proceeds are property of the bankruptcy estates, the litigation and arbitration proceedings, to the extent **[\*\*19]** they seek monetary judgments or reach monetary settlements payable from the proceeds, would be acts to obtain property of the estate. To the extent the third-party defendants in the litigation and arbitration proceedings request reimbursement of defense costs from the insurance proceeds, such

AUTH19-000007

requests would be acts to obtain property of the estate.

The applicability of § 541 to proceeds of insurance policies is not yet a settled question in the Ninth Circuit. It has been determined that *HN2*insurance policies are property of the estate. In *In re Minoco Group of Companies, Ltd.,* 799 F.2d 517 (9th Cir. 1986), the court held that D&O insurance policies were property of the estate. The court reasoned that since the estate was worth more with the policies than without them, they constituted property of the estate. The policies insured the debtor for any indemnity claims against it by its directors and officers as well as insuring the directors and officers against third-party claims. The court concluded that the all-inclusive purpose of § 541(a) required all interests of the debtor in property, even interests which were contingent or not yet realized, to become subject to [**20] the reorganization process.

In 1990, in *In re Circle K Corp.,* 121 B.R. 257 (Bankr. D. Ariz. 1990), the court, relying on *Minoco,* held that D&O insurance policies and proceeds were property of the estate. The court reasoned that since the policies at issue were indemnity policies and not just liability policies, the debtor had a right to the proceeds. Consistent with *Minoco,* the estate was worth [*856] more with the policies and proceeds than without them. Those policies were also "wasting" or "burning candle" policies. As the defense costs exhaust the policy limits, the estate asset was depleted which increased the debtor's exposure to third-party claims and decreased realization of the debtor's claims against the proceeds. Thus, the court concluded that the debtor had an interest in the proceeds rendering the proceeds property of the estate as defined in 11 U.S.C. § 541.

In 1997, the Bankruptcy Appellate Panel, in *Liberty Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of Spaulding Composites Co. (In re Spaulding Composites Co.),* 207 B.R. 899 (B.A.P. 9th Cir. 1997), concluded that certain insurance policies themselves were property of the estate but that the proceeds were not. The insurance company had [**21] brought a state court declaratory judgment action seeking to determine rights of non-debtor co-insureds in the policy proceeds. The precise issue presented was whether that declaratory judgment action violated the automatic stay as the debtor was also an insured under the policy. The conclusion was that the commencement of the state court action did not violate the stay. That conclusion was based not only upon the fact the debtor was not named in the declaratory judgment action, but also upon the failure to demonstrate that the insurance company's payment of claims brought by the non-debtor insureds would impair the insurance company's ability to satisfy its obligations to the debtor under the policy. In the present controversy, the evidence is overwhelming that satisfaction of the insurance companies' duty to pay claims brought against non-debtor co-insureds, including satisfaction of the defense costs being incurred by the co-insureds, will render it impossible to satisfy the claims against the proceeds held by the debtors.

It is the general rule that the automatic stay of § 362(a)(1) and (a)(3) is available only to debtors and not to third-party defendants or co-defendants. This [**22] general principle has been extended by some courts to situations where a potential judgment against the individual insured under a D&O policy may effectively be a judgment against the debtor due to existing indemnification provisions contained within the policies. *See A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, *cert. denied,* 479 U.S. 876, 107 S. Ct. 251, 93 L. Ed. 2d 177 (1986); *In re Eagle-Picher Industries, Inc.,* 963 F.2d 855 (6th Cir. 1992). Similarly, certain courts have extended the protection of the automatic stay in circumstances where collection actions against non-debtor parties creates an "identity of interests" with the debtor such that a judgment against non-debtor defendants becomes in effect, a claim against the debtor for indemnification. *In re Family Health Services, Inc.,* 105 B.R. 937 (Bankr. C.D. Cal. 1989). *See also, A.H. Robbins Co., supra.* Finally, § 362(a)(3) has been used to stay actions against a debtor's partners to prevent parties from proceeding in an action that indirectly affects the debtor's property interest or attempts to obtain possession of property of the estate. *In re Bialac,* 712 F.2d 426 (9th Cir. 1983). [**23] That decision involved a debtor's undivided

AUTH19-000008

one-sixth interest in a promissory note. The analysis focused on the debtor's right to redeem the note after the creditor foreclosed on the five-sixth interest in the note held by non-debtors. The conclusion was that the right to redeem, although intangible and of unknown value, constituted property of the estate.

The debtors, their affiliates, subsidiaries, officers and directors and the NASD brokers are named insureds under the policies. As such, each has the right to utilize the **[\*857]** policy proceeds to satisfy claims by third-party claimants. The debtors also have the right to utilize the policy proceeds to satisfy claims the debtors may have against co-insureds and to satisfy requests for indemnification made by the directors and officers. The debtors also have a non-derivative right to receive proceeds to compensate for the costs of responding to certain investigations by regulatory agencies. Realization of the debtors' legal interests is contingent upon the debtors meeting conditions established by the policy for the bringing of claims and those legal interests are not yet in the form of monetary recovery. However, _HN3_$\S$ 541 renders a legal **[\*\*24]** interest in property, property of the estate, and does not require that legal interest to be reduced to a monetary amount nor to be absolute and non-contingent.

## CONCLUSION

Lacking controlling precedent on the issue of whether or not the policies and proceeds at issue in this case are property of the estate, this Court is inclined to follow the analysis found in _In re Circle K Corp._ It is this Court's opinion that not only are the insurance policies property of the estate, but that the proceeds are also property of the estate because the estate is worth more with them than without them and because the debtors hold claims payable from the proceeds.

The debtors and all other insureds have undivided, unliquidated interests in the identical asset, i.e., the policy proceeds. Continued diminution of those proceeds affects the debtors' interests in and rights to recover the proceeds. The stay prevents any action which affects the debtors' interests in the proceeds. This is consistent with and necessary to promote the fundamental bankruptcy principles of preserving estate property and ensuring ratable distribution to creditors.

Under principles of insurance law, all entities **[\*\*25]** or persons having an interest in the policy proceeds would engage in a race to judgment or settlement with the fleetest claimants realizing upon their interest while the slower claimants were deprived of their interest. Such a result is contrary to the fundamental principle of bankruptcy law that all of the debtors' interests in property are to be equitably distributed. The problem is worsened in this case by the fact that the cost of determining each claimant's interest in the policy proceeds may deplete the proceeds before all but the very fleetest claimants recover.

Therefore, this Court concludes that the debtors hold legal interests in the insurance proceeds of the four policies described above which interests are of value to the estate. The proceeds are property of the debtors' estates and are subject to the protections afforded by 11 U.S.C. §§ 362(a)(3). This renders it unnecessary to address the alternative argument that if the proceeds are not property of the estate and the automatic stay is therefore inapplicable, an injunction should be entered to stay prosecution of the various claims against the proceeds.

Finally, there is a fifth insurance policy **[\*\*26]** also at issue. It is a policy issued by Arch Insurance Company which provides coverage to approximately five NASD brokers who are specifically named as insureds under that policy. The amount of coverage is in dispute as the insurance company maintains that coverage is limited to a maximum of $ 2 million whereas the NASD brokers maintain the coverage is for a maximum of $ 2 million for each insured. None of the debtors, their affiliates or subsidiaries are named insured under the Arch policy.

AUTH19-000009

None of the debtors have any right or claim to any of the policy proceeds. The debtors hold no legal interest in the proceeds of the Arch policy. Consequently, the Arch policy **[*858]** does not constitute property of the estate. [1]

---

**FOOTNOTES**

[1] The five NASD brokers insured under the ARCH policy are among the dozens of NASD brokers covered by the other E&O policies. The Arch policy imposes a duty to defend on the insurance company but it is not a "wasting" or "burning candle" policy as the costs of defense do not reduce the proceeds available to pay claims. The evidence indicates that Arch maintains that half of the costs of defense incurred under the Arch policy should be paid from the proceeds of the other E&O policies which constitute property of the estate. This opinion does not address that issue. Distribution of the E&O policy proceeds, for payment of claims or costs of defense or for any reason, must await later determination.

---

**[**27]** DATED this 20th day of June, 2005.

PATRICIA C. WILLIAMS

Bankruptcy Judge


Service: **Get by LEXSEE®**
Citation: **325 B.R. 851**
   View: Full
Date/Time: Monday, November 2, 2009 - 11:46 AM EST

* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.


Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor |
Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help

 **LexisNexis®**   About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AUTH19-000010

**LexisNexis®** *Total Research System*                    Switch Client ┆ Preferences ┆ Sign Out ┆ ⍰ Help

┆Search╲Research Tasks╲Get a Document╲Shepard's®╲Alerts╲Total Litigator╲Transactional Advisor╲Cour

FOCUS™ Terms [                                    ]  Search Within [Original Results (1 - 2)    ▼]  [Go ⇒]
Advanced...

Service: **Get by LEXSEE®**
Citation: **993 F.2d 51**

✔Select for FOCUS™ or Delivery
☐

*993 F.2d 51, \*; 1993 U.S. App. LEXIS 12734, \*\*;*
*Bankr. L. Rep. (CCH) P75,291; 29 Collier Bankr. Cas. 2d (MB) 306*

IN THE MATTER OF: LEWIS ANSON DAVID EDGEWORTH, M.D., Debtor, DONNA ELAINE
HOUSTON, ET AL., Appellants, v. LEWIS ANSON DAVID EDGEWORTH, M.D., Appellee.

No. 92-4645

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

993 F.2d 51; 1993 U.S. App. LEXIS 12734; Bankr. L. Rep. (CCH) P75,291; 29 Collier Bankr.
Cas. 2d (MB) 306

May 27, 1993, Decided

**SUBSEQUENT HISTORY:** **[\*\*1]** As Corrected. Petition for Rehearing Denied June 30,
1993, Reported at: 1993 U.S. App. LEXIS 17610.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of
Texas. D.C. DOCKET NUMBER 6:91-CV-670. JUDGE Robert M. Parker

**DISPOSITION:** For the foregoing reason, the decisions of the bankruptcy and district courts
are REVERSED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appellants challenged the decision of the United States District
Court for the Eastern District of Texas, which affirmed the decision of the bankruptcy court
which enjoined, pursuant to 11 U.S.C.S. § 524(a), appellants' medical malpractice claim in
state court against appellee doctor.

**OVERVIEW:** Appellants did not participate in appellee's bankruptcy case but, after
appellee received a discharge, appellants sought and obtained a bankruptcy court approval
to file a malpractice claim in state court. The bankruptcy court later reversed its approval,
enforced appellee's discharge, and pursuant to 11 U.S.C.S. § 524(a), enjoined appellants
from filing their malpractice claim in state court. The district court affirmed. On appeal, the
court reversed. The court held that appellees' discharge under 11 U.S.C.S. § 524 did not
preclude appellants' malpractice suit against appellee. The scope of 11 U.S.C.S. § 524(a)
did not affect the liability of appellee's malpractice insurer and did not prevent appellants
from establishing the insurer's liability by proceeding against appellee, even though
appellee had received a discharge. Also, appellee did not have a cognizable interest in the
proceeds of his liability insurance policy because those proceeds were payable only for the

AUTH20-000001

benefit of those harmed by appellee under the terms of the policy. Although appellee's insurance policy was part of the bankruptcy estate, the proceeds of the policy were not.

**OUTCOME:** The court reversed, holding that appellants could pursue their medical malpractice action against appellee in state court even though appellee had received a discharge from the bankruptcy court because the proceeds of appellee's liability insurance policy were not part of the bankruptcy estate as a matter of law.

**CORE TERMS:** insurer, insurance policy, insurance proceeds, bankruptcy proceeding, liability policy, insured, bankruptcy estate, injunction, discharged, coverage, medical malpractice, policy proceeds, personal liability, commencement, continuation, personally, lawsuit, nominal, entity, matter of law, bankruptcy case, debtor's estate, equitable interests, adequately protect, malpractice, nondebtor, claimants', insurance premiums, cognizable, ownership

## **LEXISNEXIS® HEADNOTES**                                             ⊟ **Hide**

Bankruptcy Law > Estate Property > Content

Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1* Questions of law are reviewed de novo.  More Like This Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection

*HN2* In general, 11 U.S.C.S. § 524 protects a debtor from any subsequent action by a creditor whose claim has been discharged in a bankruptcy case. To ensure that a discharge will be completely effective, it operates as an injunction against enforcement of a judgment or the commencement or continuation of an action in other courts to collect or recover a debt as a personal liability of the debtor.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Third Parties

*HN3* A discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt. 11 U.S.C.S. § 524(e) specifies that the debt still exists and can be collected from any other entity that might be liable.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection

*HN4* The scope of an 11 U.S.C.S. § 524(a) injunction does not affect the liability of liability insurers and does not prevent establishing their liability by proceeding against a discharged debtor. 11 U.S.C.S. §524 (a)(2) enjoins only suits to collect, recover or offset a debt as the personal liability of the debtor, a phrase that has been interpreted to exclude merely nominal liability.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection

Insurance Law > Claims & Contracts > Costs & Attorney Fees > Failure to Defend

Insurance Law > Claims & Contracts > Reservation of Rights > General Overview

*HN5* As long as the costs of defense are borne by the insurer and there is no execution on judgment against the debtor personally, 11 U.S.C.S. § 524(a) will not bar a suit against the discharged debtor as the nominal defendant.  More Like This Headnote | *Shepardize:* Restrict By Headnote

AUTH20-000002

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > General Overview
Insurance Law > Claims & Contracts > Estoppel & Waiver > Policy Coverage
*HN6* In a case where no question has been raised about the sufficiency of the liability insurance coverage, a plaintiff's failure to file in the bankruptcy proceeding shall not impair the right to file suit against another party who may be liable on the debt. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Estate Property > Content
Contracts Law > Debtor & Creditor Relations
Insurance Law > Claims & Contracts > Policy Interpretation > General Overview
*HN7* Property of the estate, defined in 11 U.S.C.S. § 541(a), includes all legal or equitable interests of the debtor in property as of the commencement of the case. The definition is intended to be broadly construed, and courts are generally in agreement that an insurance policy will be considered property of the estate. Insurance policies are property of the estate because, regardless of who the insured is, the debtor retains certain contract rights under the policy itself. Any rights the debtor has against the insurer, whether contractual or otherwise, become property of the estate. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Estate Property > Content
*HN8* For purposes of 11 U.S.C.S. § 541(a), the question is not who owns the policies, but who owns the liability proceeds. Ownership of a policy does not inexorably lead to ownership of the proceeds. More Like This Headnote

Bankruptcy Law > Estate Property > Content
*HN9* When the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Coverage > General Overview
Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > Cause
*HN10* Once a court has determined that an insurance policy is property of the estate, 11 U.S.C.S. § 362 should stay any injured party from suing or recovering from the debtor's insurer. The stay will adequately protect both the bankruptcy estate and the claimants' interests in the proceeds of the policy. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Estate Property > Content
Contracts Law > Debtor & Creditor Relations
*HN11* Proceeds of insurance policies, if made payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors. But under the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract. More Like This Headnote | *Shepardize: Restrict By Headnote*

**COUNSEL:** For Appellants: MALLOIS & ASSOCIATES, James D. Blume, John C. Mallios, Kathy L. Weber, 5910 N. Central Expy., Ste. 1050, Dallas, TX. 75206 (214-373-6566).

For Appellee: COWLES & THOMPSON, Christian E. Bryan, Charles T. Frazier, Jr. 901 Main St., Ste. 4000, Dallas, TX 75202-3793, 214/670-1124.

AUTH20-000003

**JUDGES:** Before JOHNSON, GARWOOD, and JONES, Circuit Judges.

**OPINION BY:** EDITH H. JONES

**OPINION**

[*53]   EDITH H. JONES, Circuit Judge:

Christine Genson, the appellant's mother, died on June 7, 1989, while under the care of appellee Dr. Lewis Edgeworth. A month later, Edgeworth filed for protection under chapter 7 of the Bankruptcy Code. Appellants did not participate in the bankruptcy case [1] but, after Edgeworth received a discharge, they sought and obtained bankruptcy court approval to file a medical malpractice claim in state court. [2] Shortly afterward, Edgeworth persuaded the bankruptcy court to reverse itself -- to enforce his discharge by enjoining the lawsuit pursuant to 11 U.S.C. § 524(a). The district court affirmed. The question before us is whether the appellants may pursue their lawsuit against Dr. Edgeworth in order to collect any judgment solely from the proceeds of his malpractice liability policy. We hold that they may do so, because 11 U.S.C. § 524(e) excludes the liability insurance carrier from the protection of bankruptcy discharge and the proceeds [**2] of the policy were not property of Edgeworth's estate.

---

**FOOTNOTES**

[1] There is some dispute about whether the appellants were properly listed on the schedule of creditors. Houston filed no proof of claim in the bankruptcy proceeding.

[2] In April 1991, Houston filed a motion to lift the stay pursuant to 11 U.S.C. § 362. Edgeworth did not respond, and the bankruptcy court granted the motion on May 22, 1991. Technically, this motion was improper because the discharge had extinguished the stay and replaced it with a permanent injunction under section 524(a).

---

**STANDARD OF REVIEW**

As this case turns on the construction of sections 524 and 541 of the Bankruptcy Code, it presents *HN1* questions of law that are reviewed *de novo*. [3]

---

**FOOTNOTES**

[3] *In re Besing*, 981 F.2d 1488, 1491 (5th Cir. 1993); *In re Bradley*, 960 F.2d 502, 507 (5th Cir. 1992), *cert. denied*, ____ U.S. ____, ____ S. Ct. ____, 61 U.S.L.W. 3403 (Mar. 8, 1993); *In re Fussell*, 928 F.2d 712, 715 (5th Cir. 1991), *cert. denied*, ____ U.S. ____, 112 S. Ct. 1203, 117 L. Ed. 2d 443 (1992).

---

[**3]   **DISCUSSION**

**A. A Discharge Under § 524 Does Not Preclude a Suit to Recover from an Insurer**

AUTH20-000004

The bankruptcy court and district court enjoined appellants from proceeding with their state court lawsuit against Dr. Edgeworth because they apparently believed that the malpractice claim was discharged under section 727 and 524. *HN2*In general, section 524 protects a debtor from any subsequent action by a creditor whose claim has been discharged in a bankruptcy case. To ensure that a discharge will be completely effective, it operates as an injunction against enforcement of a judgment or the commencement or continuation of an action in other courts to collect or recover a debt as a personal liability of the debtor. 3 Collier on Bankruptcy P 524.01, at 524-4 (15th ed.). *HN3*A discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt. Section 524(e) specifies that the debt still exists and can be collected from any other entity that might be liable. 4

**FOOTNOTES**

4 See *Underhill v. Royal*, 769 F.2d 1426, 1431-32 (9th Cir. 1985) (stating that the bankruptcy court has no power to discharge the liabilities of a nondebtor); *Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir. 1982) (reaching the same result under section 16 of the Bankruptcy Act); see also, 3 Collier on Bankruptcy P 524.01[3], at 524-16 to -17. But see *In re A.H. Robins Co.*, 880 F.2d 694, 700-02 (4th Cir.) (rejecting a literal application of section 524(e) and upholding the bankruptcy court's injunction preventing tort claimants from seeking recovery from nondebtor entities that had participated in an aggregated settlement), cert. denied, 493 U.S. 959, 110 S. Ct. 376, 107 L. Ed. 2d 362 (1989).

[**4] In the liability insurance context, of course, a tort plaintiff must first establish the liability of the debtor before the insurer becomes contractually obligated to make any [*54] payment. 5 The question, then, is whether section 524(a) acts to bar such liability-fixing suits even if a plaintiff has agreed to foreswear recovery from the debtor personally and to look only to the policy proceeds.

**FOOTNOTES**

5 Texas, the state in which this case arose, does not allow direct actions against the insurer.

Most courts have held that *HN4*the scope of a section 524(a) injunction does not affect the liability of liability insurers and does not prevent establishing their liability by proceeding against a discharged debtor. 6 This interpretation is grounded in both textual and equitable foundations. Section 524(a)(2) enjoins only suits "to collect, recover or offset" a debt as the "personal liability of the debtor," a phrase that has been interpreted to exclude merely nominal liability. *In re Fernstrom Storage and Van Co.*, *supra* note [**5] 6.

**FOOTNOTES**

6 See, e.g., *First Fidelity Bank v. McAteer*, _____ F.2d _____, 1993 WL 23782 (3d Cir. Feb. 3, 1993); *Green v. Welsh*, 956 F.2d 30, 35 (2d Cir. 1992); *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 733-34 (7th Cir. 1991); *In re Jet Florida Systems, Inc.*, 883 F.2d 970, 976 (11th Cir. 1989) (per curiam) (adopting the district court opinion); *In re Beeney*, 142 Bankr. 360, 362 (Bankr. 9th Cir. 1992); *In re Greenway*, 126 Bankr. 253, 255 (Bankr. E.D. Tex. 1991); *In re Peterson*, 118 Bankr. 801, 804 (Bankr. D.N.M. 1990); *In re*

AUTH20-000005

*Traylor*, 94 Bankr. 292, 293 (Bankr. E.D.N.Y. 1989); *In re Lembke*, 93 Bankr. 701, 702-03 (Bankr. D. N.D. 1988); *In re White*, 73 Bankr. 983 (Bankr. D.D.C. 1987); *In re Mann*, 58 Bankr. 953, 956 (Bankr. W.D. Va. 1986). *But see In re White Motor Credit*, 761 F.2d 270 (6th Cir. 1985) (barring continuation of personal injury claims that would have been paid by the debtor's insurers). The holding of *White Motor Credit* was explicitly rejected by the courts in *Green* and *Jet Florida*.

[**6] The foundation of this reading of § 524(a)(2) is that it makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge. "The 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured." *Jet Florida*, 883 F.2d at 975; *see Green*, 956 F.2d at 33. "Such a result would be fundamentally wrong." *Lembke*, 93 Bankr. at 703. [7]

**FOOTNOTES**

[7] *See Green*, 956 F.2d at 35; *Jet Florida*, 883 F.2d at 976; *Mann*, 58 Bankr. at 958 ; *Rowe v. Ford Motor Co.*, 34 Bankr. 680 (N.D. Ala. 1983); *Elliott*, 25 Bankr. at 310; *McGraw*, 18 Bankr. at 143.

Finally, allowing commencement or continuation of such actions [**7] does not inequitably burden the debtor. Burden there is, in the sense that attending depositions and trial may take up Edgeworth's time. But this is not a burden alleviated by § 524 when the purpose of the suit is to establish Edgeworth's nominal liability in order to collect from his insurance policy. [8] Edgeworth has not asserted that he will be required to pay the costs of his defense against appellants' suit or that the insurance company denied coverage or is defending under a reservation of rights. Such threats to Edgeworth's pocketbook might require a different result under § 524. [9] Thus, *HN5* as long as the costs of defense are borne by the insurer and there is no execution on judgment against the debtor personally, section 524(a) will not bar a suit against the discharged debtor as the nominal defendant. [10]

**FOOTNOTES**

[8] Edgeworth argues that such transactions actually harm debtors, causing their post-bankruptcy insurance premiums to be higher. This is not true. Edgeworth confounds cause and correlation. Higher insurance premiums result not from a plaintiff's recovery from the insurance company, but from the debtor's actions that make the debtor a greater risk to insurer. While insurance companies often use policy claims as a surrogate measure of risk, allowance of the claim does not *cause* the higher premiums. [**8]

[9] *But see In re Walker*, 927 F.2d 1138, 1144 (10th Cir. 1991) (allowing a post-discharge suit to continue even though the debtor would incur legal expenses).

[10] Even if the insurance company denies coverage, the debtor will not be impermissibly burdened. If the insurance company is unwilling to defend its insured, the debtor may simply default, knowing that the judgment will be unenforceable except against the insurance company. *See Jet Florida*, 883 F.2d at 976. The judgment creditor may then litigate with the insurance company.

Edgeworth makes much of the fact that the appellants never filed a claim in the bankruptcy proceeding, and it is true that their failure to do so waived their ability to recover from

AUTH20-000006

Edgeworth personally. But, at **[\*55]** least *HN6* in a case like this where no question has been raised about the sufficiency of the liability insurance coverage, a plaintiff's failure to file in the bankruptcy proceeding should not impair the right to file suit against another party who may be liable on the debt. *See Green, 956 F.2d at 35;* **[\*\*9]** *Jet Florida, 883 F.2d at 974-75,* and cases cited therein; *In re White, 73 Bankr. at 984; Mann, 58 Bankr. at 958.*

**B.**

### The Insurance Proceeds Were Not Property of the Estate

As part of his argument that Houston's claim is barred, Edgeworth also asserts that the insurance proceeds sought by Houston were part of the bankruptcy estate and may not now be recovered. Edgeworth does not argue that these "insurance proceeds" literally came into the estate and were distributed as part of his Chapter 7 liquidation. In fact, Edgeworth never explicitly tendered the insurance policy or any insurance proceeds into the bankruptcy estate. [11] Instead, Edgeworth argues that the insurance proceeds were part of the estate as a matter of law and that his discharge acted to bar forever any prepetition claims against the insurance policy.

---

**FOOTNOTES**

[11] In his schedule of personal property, Edgeworth specifically denied any interest in any insurance policies.

---

**[\*\*10]** *HN7* "Property of the estate," defined in 11 U.S.C. § 541(a), includes all legal or equitable interests of the debtor in property as of the commencement of the case. This definition is intended to be broadly construed, [12] and courts are generally in agreement that an insurance policy will be considered property of the estate. [13] Insurance policies are property of the estate because, regardless of who the insured is, the debtor retains certain contract rights under the policy itself. [14] Any rights the debtor has against the insurer, whether contractual or otherwise, become property of the estate. [15]

---

**FOOTNOTES**

[12] *United States v. Whiting Pools, Inc., 462 U.S. 198, 205, 103 S. Ct. 2309, 2314, 76 L. Ed. 2d 515 (1983).*

[13] *See First Fidelity Bank v. McAteer, ___ F.2d ___, 1993 W.L. 23782 (3d Cir. Feb. 3, 1993); McArthur Co. v. Johns-Manville Corp., 837 F.2d 89 (2d Cir.), cert. denied, 488 U.S. 868, 109 S. Ct. 176, 102 L. Ed. 2d 145 (1988); In re Louisiana World Exposition, Inc., 832 F.2d 1391, 1399 (5th Cir. 1987); Tringali v. Hathaway Machine Co., 796 F.2d 553 (1st Cir. 1986); A.H. Robins Co. v. Piccinin, 788 F.2d 994 (4th Cir. 1985), cert. denied, 479 U.S. 876, 107 S. Ct. 251, 93 L. Ed. 2d 177 (1986); In re Davis, 730 F.2d 176 (5th Cir. 1984); Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir. 1983).* **[\*\*11]**

[14] *See, e.g., McAteer, ___ F.2d at ___; In re Titan Energy, Inc., 837 F.2d 325 (8th Cir. 1988); In re Mego Int'l, Inc., 28 Bankr. 324 (Bankr. S.D.N.Y. 1983).*

[15] *See Palmer v. Travelers Ins. Co., 319 F.2d 296 (5th Cir. 1963) (claim against the insurer for failure to settle was part of the estate); In re Soliz, 77 Bankr. 93 (Bankr. N.D. Tex. 1987) (claims against the insurer for bad faith and failure to defend were part of the

AUTH20-000007

estate).

Acknowledging that the debtor owns the policy, however, does not end the inquiry. "The [HN8] question is not who owns the policies, but who owns the liability proceeds." [16] In *In re Louisiana World Exposition, Inc.*, for example, even though the policy was property of the estate, the proceeds of the liability policy were payable to the directors and officers of the corporation and were not part of the debtor's estate. [17] Likening the circumstances before it to cases in which a purchaser of an insurance policy assigned its proceeds [**12] to other entities, [18] the court noted that ownership of a policy "does not inexorably lead to ownership of the proceeds." [19]

---

**FOOTNOTES**

[16] *Louisiana World Exposition, 832 F.2d at 1399.*

[17] *Id. at 1400.*

[18] *In re Ivory, 32 Bankr. 788, 793-94 (Bankr. D. Or. 1983); In re Family & Industrial Medical Facilities, Inc., 25 Bankr. 443, 450-51 (Bankr. E.D. Pa. 1983); In re Dias, 24 Bankr. 542, 545 (Bankr. D. Id. 1982); In re Moskowitz, 14 Bankr. 677, 680-81 (Bankr. S.D.N.Y. 1981).*

[19] *Louisiana World Exposition, 832 F.2d at 1401; see McAteer, _____ F.2d at _____.*

---

The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the [**13] debtor's pecuniary benefit, then that payment should neither enhance nor decrease [*56] the bankruptcy estate. [20] In other words, [HN9] when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate. [21]

---

**FOOTNOTES**

[20] *See McAteer, _____ F.2d at _____* (stating that "if the owner of a life insurance policy did not have an interest in its proceeds, the filing of the petition in bankruptcy cannot create one"); *In re Gagnon, 26 Bankr. 926, 928 (Bankr. N.D. Pa. 1983)* (stating that "the estate's legal and equitable interests in property rise no higher than those of the debtor").

[21] [HN10] Once a court has determined that an insurance policy is property of the estate, 11 U.S.C. § 362 should stay any injured party from suing or recovering from the debtor's insurer. The stay will adequately protect both the bankruptcy estate and the claimants' interests in the proceeds of the policy. In the mass tort context, the decisions by several courts to include the proceeds as property of the estate appear to have been motivated by a concern that the court would not otherwise be able to prevent a free-for-all against the insurer outside the bankruptcy proceeding. See cases cited *supra* note 13. There was also a threat that unless the policy proceeds, were marshalled in the bankruptcy proceeding, they would not cover plaintiffs' claims and would expose the debtor's estate. These concerns are answered once the court finds that the policy itself is property of the estate; the section 362 stay should adequately protect the interests of all parties involved.

AUTH20-000008

[**14]  Examples of insurance policies whose proceeds are property of the estate include casualty, collision, life, and fire insurance [22] policies in which the debtor is a beneficiary. *HN11* ♣Proceeds of such insurance policies, if made payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors. But under the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.

---

**FOOTNOTES**

[22] *See, e.g., McAteer*, ____ F.2d at ____ (life insurance); *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 996 (5th Cir. 1985) (fire insurance); *Bradt v. Woodlawn Auto Workers*, 757 F.2d 512, 515 (2d Cir. 1985) (insurance payment for auto repairs).

---

Although Dr. Edgeworth's liability policy was part of the Chapter 7 estate, the proceeds [**15] of that policy were not. Dr. Edgeworth has asserted no claim at all to the proceeds of his medical malpractice liability policy, and they could not be made available for distribution to the creditors other than victims of medical malpractice and their relatives. Moreover, no secondary impact has been alleged upon Edgeworth's estate, which might have occurred if, for instance, the policy limit was insufficient to cover appellants' claims or competing claims to proceeds. Consequently, in this case the insurance proceeds were not part of the estate as a matter of law, and section 524 does not bar appellants from pursuing their state court suit against Dr. Edgeworth so they can recover against policy proceeds.

**CONCLUSION**

For the foregoing reasons, the decisions of the bankruptcy and district courts are REVERSED.

Service: **Get by LEXSEE®**
Citation: **993 F.2d 51**
View: Full
Date/Time: Monday, November 2, 2009 - 11:47 AM EST

* Signal Legend:
 - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated
(A) - Citing Refs. With Analysis Available
(i) - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

**LexisNexis®**   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AUTH20-000009

LexisNexis® *Total Research System*                    Switch Client ⋮ Preferences ⋮ Sign Out ⋮ 🔲 Help

Search ⎮ Research Tasks ⎮ Get a Document ⎮ *Shepard's®* ⎮ Alerts ⎮ Total Litigator ⎮ Transactional Advisor ⎮ Cour

FOCUS™ Terms [_____] Search Within  Original Results (1 - 1) ▼  Go ➡
Advanced...

Service: **Get by LEXSEE®**
Citation: **181 B.R. 769**

*181 B.R. 769, \*; 1995 U.S. Dist. LEXIS 6880, \*\*;*
*33 Collier Bankr. Cas. 2d (MB) 1466*

IN RE CONSTON, INC., ET AL., Debtors. UNITED STATES OF AMERICA, Appellant, v.
CONSTON, INC., ET AL., Appellees.

Civil Action No. 93-573 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

181 B.R. 769; 1995 U.S. Dist. LEXIS 6880; 33 Collier Bankr. Cas. 2d (MB) 1466

May 10, 1995, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff creditor appealed decision of United States Bankruptcy Court disallowing its claim as a priority claim and allowing it as a general unsecured claim in second bankruptcy action filed by defendant debtor under 11 U.S.C.S. § 1101 et seq.

**OVERVIEW:** Defendant debtor filed for bankruptcy under 11 U.S.C.S. § 1101 et seq. Plaintiff creditor filed claims for unpaid corporate income taxes, and its claims were given priority as tax claims in the reorganization plan confirmed by the court. Defendant debtor subsequently defaulted under the reorganization plan and refiled for bankruptcy under 11 U.S.C.S. § 1101 et seq. Plaintiff argued its claims should receive the same priority in the second action. The court held that the bankruptcy created characteristic of priority did not survive confirmation of the plan and did not automatically resurrect itself in a future bankruptcy proceeding. However, discharge did not divest plaintiff's claims of tax characteristics because post-confirmation collection and assessment was possible. Plaintiff's claims were granted priority status as a tax claim as plaintiff established its claims had tax characteristics as set forth in 11 U.S.C.S. § 507(a)(7).

**OUTCOME:** Decision disallowing plaintiff's claim as a priority claim was reversed and remanded because attributes of the underlying tax claim survived confirmation and discharge. As plaintiff established that its claims retained tax characteristics, tax claim priority status was granted in defendant's second bankruptcy action.

**CORE TERMS:** tax claim, reorganization plan, confirmation, confirmed, collection, serial, post-confirmation, discharged, corporate income taxes, gloss, Bankruptcy Reform Act, plain language, extinguish', unsecured claims, new' claim, pre-confirmation, reorganization, collecting, qualify, dicta, conversion, evident, tax periods, tax liability, automatic stay, legislative history, modification, shareholder, injunction, judicata

AUTH21-000001

## LEXISNEXIS® HEADNOTES                                               ⊟ **Hide**

Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Administrative Expenses > Taxes
Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Prepetition Customs Duties & Taxes
Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts >
Government Penalties & Taxes

**HN1** See 11 U.S.C.S. §§ 507(a)(7)(A)(i) & (ii).

Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts >
Government Penalties & Taxes

Bankruptcy Law > Discharge & Dischargeability > Reorganizations
Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites >
Administrative & Gap Claims

**HN2** See 11 U.S.C.S. § 1129(a)(9)(C).

Bankruptcy Law > Discharge & Dischargeability > Reorganizations

**HN3** See 11 U.S.C.S. § 1141(d)(1)(A).

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Protection
Civil Procedure > Judgments > Relief From Judgment > Void Judgments

**HN4** Discharge voids any existing judgments against the debtor and operates as an
injunction against the commencement or continuation of an action, the
employment of process, or an act, to collect, recover or offset any such debt as a
personal liability of the debtor, whether or not discharge of such debt is waived.
11 U.S.C.S. §§ 524(a)(1)-(2).  More Like This Headnote

Bankruptcy Law > Discharge & Dischargeability > Reorganizations

**HN5** When a court states that discharge "extinguishes" a debt, the creditor can enforce
only those pre-confirmation claims found in the confirmed plan and the creditor
can enforce those claims only in the manner and amount specified in the
confirmed plan. From a commercial vantage point, the old debt is "extinguished,"
and a new debt is put in its place.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Bankruptcy Law > Discharge & Dischargeability > General Overview

**HN6** A discharge does not cancel the obligation; the obligation still exists. A discharge
merely disables the creditor from enforcing its claim.  More Like This Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Third Parties

**HN7** Discharged debts continue to exist despite their unenforceability against the
debtor on the basis of 11 U.S.C.S. § 524(e).  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Bankruptcy Law > Discharge & Dischargeability > Effects of Discharge > Third Parties

**HN8** See 11 U.S.C.S. § 524(e).

Bankruptcy Law > Discharge & Dischargeability > Reorganizations
Real Property Law > Purchase & Sale > Fraudulent Transfers

**HN9** Although unenforceable in their pre-confirmation form against the debtor,
"discharged" debts, and their attendant duties, obligations, and liabilities, remain
viable post-confirmation. Thus, while the creditor may not enforce her claim as it
existed pre-confirmation, the claim nevertheless continues to

AUTH21-000002

exist. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Claims > Types > Classification
Bankruptcy Law > Discharge & Dischargeability > General Overview
HN10⚡Once the reorganization plan is approved by the bankruptcy court, each claimant
gets a new claim, based upon whatever treatment is accorded to it in the plan
itself. Thereafter, each claimant's remedies for any future nonpayment of claims
acknowledged in the plan are limited to the usual remedies for the type of claim
granted by the plan's provisions. More Like This Headnote

Governments > Courts > Judicial Precedents
HN11⚡It is a maxim not to be disregarded, that general expressions, in every opinion,
are to be taken in connection with the case in which those expressions are used.
If they go beyond the case, they may be respected, but ought not to control the
judgment in a subsequent suit when the very point is presented for decision.
Thus, while dicta may be instructive as to the position of a particular appellate
panel, it is not binding on the lower court. More Like This Headnote |
*Shepardize: Restrict By Headnote*

Bankruptcy Law > Claims > Types > Classification
Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Prepetition Customs Duties & Taxes
Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts >
Government Penalties & Taxes
HN12⚡The bankruptcy created characteristic of priority does not, of its own accord,
survive confirmation of the plan and automatically resurrect itself in a future 11
U.S.C.S. § 1101 et seq. proceeding. More Like This Headnote

Tax Law > Federal Tax Administration & Procedure > Effect of Regulations >
Authority of U.S. Secretary of the Treasury
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Assessments (IRC secs.
6201-6207, 6501-6533) > Assessment Authority
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Assessments (IRC secs.
6201-6207, 6501-6533) > Collection After Assessment
HN13⚡The Internal Revenue Code, 26 U.S.C.S. § 101 et seq., authorizes the Secretary
of the Treasury to make an assessment of all federal taxes not paid in a timely
manner. 26 U.S.C.S. § 6201(a). An assessment is essentially a bookkeeping
notation made when the Secretary of the Treasury establishes an account against
the taxpayer on the tax rolls, and assessment fixes the amount of tax liability.
Absent voluntary payment, the Internal Revenue Service (IRS) has no statutory
power to collect a tax, including a corporate income tax, until the IRS makes a
valid assessment. 26 U.S.C.S. § 6501(a). Once a tax is properly assessed, the
Secretary of the Treasury may collect it by levy or by a proceeding in court. 26
U.S.C.S. § 6502(a). More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays >
General Overview
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Assessments (IRC secs.
6201-6207, 6501-6533) > General Overview
Tax Law > Federal Taxpayer Groups > General Overview
HN14⚡When the debtor files a petition for relief, the automatic stay provisions of the
Bankruptcy Code, 11 U.S.C.S. § 101 et seq., restrain the Internal Revenue
Service from assessing or collecting delinquent taxes. 11 U.S.C.S. § 362(a)(6).
The automatic stay does not indefinitely forestall assessment of delinquent taxes,
however; 11 U.S.C.S. § 505(c) permits assessment of a tax, notwithstanding 11

AUTH21-000003

U.S.C.S. § 362, once the bankruptcy court has made a determination of tax liability. More Like This Headnote

Tax Law > Federal Tax Administration & Procedure > Collateral Estoppel & Res Judicata > Res Judicata
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Assessments (IRC secs. 6201-6207, 6501-6533) > General Overview
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Deficiencies (IRC secs. 6211-6216) > General Overview

*HN15* The Internal Revenue Service (IRS) may immediately assess any deficiency on the debtor as soon as liability for such tax has become res judicata pursuant to a determination in a case under 11 U.S.C.S. § 101 et seq. 26 U.S.C.S. § 6871(b)(2). In other words, Congress authorized the IRS to assess a tax as soon as the tax has become fixed by a final judgment by an appropriate court in the bankruptcy process. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Government Penalties & Taxes
Governments > Legislation > Statutes of Limitations > Time Limitations
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > General Overview

*HN16* The only limitation on the period of assessment in a bankruptcy case appears in 26 U.S.C.S. § 6503(h)(1), which suspends the limitations period for assessment for the period during which the Secretary of Treasury is prohibited by reason of such case from making an assessment, and for 60 days thereafter, regardless, apparently, of whether the debtor has received a discharge of the tax claim against her. In sum, 26 U.S.C.S. §§ 6871 and 6503(h) demonstrate Congress contemplated that assessment may occur before or after confirmation and discharge. More Like This Headnote

Governments > Legislation > Statutes of Limitations > Time Limitations
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Assessments (IRC secs. 6201-6207, 6501-6533) > Collection After Assessment
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Assessments (IRC secs. 6201-6207, 6501-6533) > Limitations

*HN17* The Internal Revenue Code (IRC), 26 U.S.C.S. §101 et seq., contemplates assessment activity during the post-confirmation period, and contemplates that the Internal Revenue Service (IRS) may undertake tax collection activities during the post-confirmation period. The IRC provides that the Secretary or Treasury may collect an assessed tax by levy or by a proceeding in court within the applicable limitations period. 26 U.S.C.S. § 6502(a)(1). A bankruptcy petition will suspend this limitations period, however, for the period during which the Secretary of Treasury is prohibited by reason of such from collecting and for 6 months thereafter. 26 U.S.C.S. § 6503(h)(2). As with assessment, the fair import of these sections is that the monies collected by the IRS for claims granted in the confirmed plan are tax monies. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Taxation > Disputes
Tax Law > Federal Tax Administration & Procedure > Settlements > Bankruptcy & Receivership (IRC secs. 6871-6873)
Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Assessments (IRC secs. 6201-6207, 6501-6533) > Limitations

*HN18* Nothing in the plain language of the Internal Revenue Code, 26 U.S.C.S. § 101 et seq., or Bankruptcy Code, 11 U.S.C.S. § 101 et seq., suggests that confirmation of the reorganization plan relieves the Secretary of Treasury from following 26 U.S.C.S. §§ 6501 - 6503 when collecting priority tax claims. More Like This Headnote

AUTH21-000004

| *Shepardize:* Restrict By Headnote

Bankruptcy Law > Claims > Types > Classification
Tax Law > Federal Income Tax Computation > Retirement Plans >
Tax-Sheltered Annuities (IRC sec. 403)
   Tax Law > Federal Tax Administration & Procedure > General Overview
*HN19* Because tax collection requires assessment, the claims granted in the confirmed
     plan must have an identity as claims for taxes.  More Like This Headnote

Bankruptcy Law > Claims > Types > Classification
Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Administrative Expenses > Taxes
Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Prepetition Customs Duties & Taxes
*HN20* Claims' tax characteristics may be used to determine how to treat the claims
     under 11 U.S.C.S. § 507(a)(7). That is not to say that a tax debt automatically
     arises to priority status in a second Chapter 11 simply because it held that status
     in the first Chapter 11; at most, the tax claim may rise to priority
     status.  More Like This Headnote

Bankruptcy Law > Discharge & Dischargeability > Reorganizations
Governments > Federal Government > U.S. Congress
Governments > Legislation > Interpretation
*HN21* A lack of congressional anticipation of a particular circumstance, however, in no
     way modifies the conventional judicial duty to give faithful meaning to the
     language congress adopted in the light of the evident legislative purpose in
     enacting the law in question. As a consequence, while the court proceeds under
     the rubric of congressional intent, in reality the court can only attempt to
     faithfully implement the law enacted by congress with an eye to assuring that the
     changed circumstances do not frustrate the evident congressional
     intent.  More Like This Headnote

Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts >
Government Penalties & Taxes
   Bankruptcy Law > Discharge & Dischargeability > Reorganizations
   Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites >
Administrative & Gap Claims
*HN22* Congress did not intend to permit 11 U.S.C.S. §1101 et seq. reorganization
     petitioners to choose whether to pay uncontested delinquent corporate income
     taxes that the Bankruptcy Code, 11 U.S.C.S. § 101 et seq., requires the debtor
     to pay in full to secure the much desired discharge.  More Like This Headnote

Bankruptcy Law > Claims > Types > Classification
Bankruptcy Law > Reorganizations > Plans > Confirmation > Prerequisites >
Administrative & Gap Claims
Bankruptcy Law > Reorganizations > Tax Provisions
*HN23* Priority corporate income tax claims contained in a confirmed reorganization plan
     must embody the characteristics that may entitle them to priority treatment if a
     second Chapter 11 petition is filed.  More Like This Headnote

Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Administrative Expenses > Taxes
Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Prepetition Customs Duties & Taxes
Bankruptcy Law > Discharge & Dischargeability > General Overview
*HN24* Once it is established that corporate income tax claims contained in the
     confirmed plan have tax characteristics, the claims may, but do not necessarily,

AUTH21-000005

qualify for continued priority status in a second Chapter 11. Generally, 11 U.S.C.S. § 507(a)(7) looks for certain characteristics of tax claims, such as the date of accrual, to determine whether the claims merit priority status.  More Like This Headnote

Bankruptcy Law > Claims > Types > Classification 🔳
Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Administrative Expenses > Taxes 🔳
Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts >
Government Penalties & Taxes 🔳

*HN25* The bankruptcy created characteristic of priority does not exist beyond the bankruptcy case in which it was created; an 11 U.S.C.S. § 507 priority, if it exists at all, must stem from the claim's characteristics extant in the current bankruptcy proceeding.  More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Claims > Types > Classification 🔳
Bankruptcy Law > Claims > Types > Unsecured Priority Claims > General Overview 🔳

*HN26* To receive an administrative priority in the second Chapter 11, the creditor must demonstrate its claims relative to the second Chapter 11; an administrative priority in the first Chapter 11 does not translate to an administrative priority in the second Chapter 11.  More Like This Headnote

**COUNSEL:** **[**1]** Gregory M. Sleet, United States Attorney, and Ellen W. Slights, Assistant United Stated Attorney, United States Department of Justice, Wilmington, Delaware; attorneys for appellant; Of Counsel: Gregory S. Hrebiniak, Esq., United States Department of Justice, Washington, D.C.

James L. Patton, Jr., Esq., Laura Davis Jones, Esq., and David W. O'Connor, Esq., of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Of Counsel: Marvin Krasny, Esq., Michael L. Temin, Esq., and Pamela A. Morone, Esq., of Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pennsylvania.

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINION BY:** Murray M. Schwartz

**OPINION**

**[*770] OPINION**

Dated: May 10, 1995

Wilmington, Delaware

Murray M. Schwartz, Senior District Judge

When one travels the roads leading to the intersection of the Internal Revenue and Bankruptcy Codes, one may expect some curves. The present matter lives up to expectations! This bankruptcy appeal poses the question of whether an Internal Revenue Service claim for corporate income taxes, accorded seventh priority in a Chapter 11 reorganization case and contained in a confirmed reorganization plan, may reacquire a priority position when **[**2]** the debtor defaults on the Reorganization Plan and thereafter files a second Chapter 11. Pared to its core, this question implicates the meaning of

AUTH21-000006

"discharge" in the context of serial or sequential Chapter 11 cases and asks whether discharge causes a corporate income tax claim to lose its metaphysical nature as a tax claim when a reorganization plan is confirmed. The bankruptcy court held that the IRS tax claims became a non-priority general unsecured claims after confirmation of the debtor's plan in the initial Chapter 11 proceedings. For the reasons that follow, the Court holds that the IRS claims may qualify for priority treatment in a serial Chapter 11 proceeding, provided the claims meet the statutory requirements for priority set out in the Bankruptcy Code as measured in relation to the debtor's second Chapter 11 petition.

## I. Proceedings Below

On June 20, 1990, Conston Corporation  ▾and its subsidiaries (collectively "Conston") filed their first petition for reorganization under Chapter 11 of the Bankruptcy Code in the Eastern District of Pennsylvania. Docket Item ("D.I.") 1, Exhibit ("Exh.") B at P2, Exh. C at P12. The Internal Revenue Service ("IRS") filed claims against **[\*\*3]** the debtor's estate for unpaid corporate income taxes accruing during periods prior to the debtor's bankruptcy petition. These unsecured claims received seventh priority for payment by the estate pursuant to 11 U.S.C. § 507(a)(7), [1] and **[\*771]** the reorganization plan provided for full payment of the claims as required by 11 U.S.C. § 1129(a)(9)(C). [2] The bankruptcy court confirmed the plan on April 18, 1991. See generally D.I. 1, Exh. B at PP 2-3, Exh. C at PP 2-3.

---

**FOOTNOTES**

[1] 11 U.S.C. §§ 507(a)(7)(A)(i) & (ii) provide:

> HN1 The following expenses and claims have priority in the following order: . . . . Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for . . . a tax on or measured by income or gross receipts --
>
>> (i) for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;
>>
>> (ii) assessed within 240 days, plus any time plus 30 days during which an offer in compromise with respect to such tax that was made within 240 days after such assessment was pending, before the date of the filing of the petition . . . .

The Bankruptcy Reform Act of 1994 amended several Code provisions that apply to this case, including §§ 507(a)(7)(A)(i) & (ii). However, these amendments do not apply to this and other cases commenced prior to the enactment of the statute. Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 702(b)(1), 108 Stat. 4106, 4150 (1994). Therefore, unless otherwise noted, all citations in this opinion refer to the Code as it existed prior to the enactment of the Bankruptcy Reform Act of 1994. **[\*\*4]**

[2] 11 U.S.C. § 1129(a)(9)(C) provides:

> HN2 The court shall confirm a plan only if . . . the plan provides that . . . with respect to a claim of a kind specified in section 507(a)(7) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the

AUTH21-000007

allowed amount of such claim.

Conston began to operate under the reorganization plan and made several payments to the IRS. Id., Exh. B at P 4, Exh. C at P 4. The reorganization plan did not solve Conston's financial woes, however, and, on February 26, 1992, less than one year from the confirmation of the reorganization plan, Conston filed a new Chapter 11 petition in the bankruptcy court for the District of Delaware. D.I. 4 at 2. The present appeal stems from this second Chapter 11 petition.

In the second Chapter 11 proceeding, the IRS filed claims for unpaid portions of corporate income taxes included in the confirmed reorganization plan of the initial [**5] Chapter 11. D.I. 1, Exh. A. The IRS again asserted priority for these taxes under 11 U.S.C. § 507(a)(7). ³ Conston agreed that it had an outstanding obligation to the IRS, but asserted that because the original tax claims were discharged in the first reorganization plan, Conston's obligations to the IRS stemming from the reorganization plan should be allowed in the present Chapter 11 only as general unsecured claims. D.I. 1, Exh. B. Relying on In re Benjamin Coal Co., 978 F.2d 823 (3d Cir. 1992), the bankruptcy court agreed with Conston and held by order dated November 1, 1993, that "the claims filed by the Internal Revenue Service are disallowed except to the extent that the Internal Revenue Service is allowed a claim in the amount of $ 367,862.51 as a general unsecured claim." D.I. 1, Exh. E. Following the bankruptcy court's decision, the IRS appealed. D.I. 1. This Court has jurisdiction to hear the IRS's appeal pursuant to 28 U.S.C. § 158(a). The Court's review of questions of law is plenary. Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir. 1988).

**FOOTNOTES**

3 The tax claims related to the 1986, 1987, 1988, and 1990 tax periods. the IRS had assessed the 1986, 1987, and 1990 tax period claims in the time between Conston's two Chapter 11 proceedings; the second Chapter 11 petition and the concomitant automatic stay have prevented the IRS from assessing the 1988 tax period claim. Id.; D.I. 4 at 2. No information appears in the record concerning the 1989 tax period.

## [**6] II. Stepping Back to View the Big Picture

Before turning to the specific issue presented in this appeal, it is beneficial to briefly survey the "big picture" under the Bankruptcy Code. Broadly speaking, when Congress enacted the Bankruptcy Code in 1978, it envisioned three remedies for a debtor who defaults on a non-fraudulent confirmed Chapter 11 reorganization plan: i) plan modification, including possible modification from a reorganizing to a liquidating plan 11 U.S.C. § 1127(b) (permitting modification prior to substantial consummation of the confirmed plan); ii) conversion to Chapter 7, 11 U.S.C. §§ 1112(b)(7)-(8) (permitting conversion following default or failure to substantially consummate the reorganization plan); and iii) dismissal of the Chapter 11, id. (permitting dismissal following default or failure to substantially consummate the confirmed plan). Over time, debtors began to utilize a fourth option never envisioned by Congress but also not prohibited under the Code enacted by Congress -- a second or serial Chapter 11 petition for relief, such as Conston has pursued in this case. Cf. Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.), 886 F.2d 859, [**7] 869 n.12 (7th Cir. 1989) (noting "the Code, legislative history and commentators to date simply do not consider the possibility of a situation [*772] in which a completely new liquidating Chapter 11 case could be used to deal with problems that arise in the course of consummation of a prior Chapter 11 plan"). ⁴

AUTH21-000008

**FOOTNOTES**

**4** The parties before the Court have not contested the propriety of this fourth post-default option for a debtor, and the Court will assume, without deciding, that the Code permits Conston's second Chapter 11 petition. The Court does note that although Congress did not expressly enumerate serial Chapter 11 filings as a viable post-default option, the courts have generally permitted them. See, e.g., Elmwood Dev. Co. v. General Elec. Pension Trust (Matter of Elmwood Dev. Co.), 964 F.2d 508, 511 (5th Cir. 1992) (approving serial Chapter 11 petitions filed in good faith); Matter of Official Comm. of Unsecured Creditors of White Farm Equip. Co., 943 F.2d 752 (7th Cir. 1991), cert. denied, 503 U.S. 919, 117 L. Ed. 2d 515, 112 S. Ct. 1292 (1992); Fruehauf Corp. v. Jartran Inc. (In re Jartran, Inc.), 886 F.2d 859, 866-70 (7th Cir. 1989) (same); cf. Johnson v. Home State Bank, 501 U.S. 78, 87, 115 L. Ed. 2d 66, 111 S. Ct. 2150 (1991) (holding that Congress did not foreclose a Chapter 13 following a Chapter 7 filing and noting that the absence of statutory prohibition of a form of serial filing indicates Congress did not intend to foreclose such a course of action). The Third Circuit Court of Appeals impliedly charted this same course in In re Benjamin Coal Co., 978 F.2d 823 (3d Cir. 1992), a conversion from Chapter 11 to Chapter 7, when it questioned the holding in White Farm Equip. Co., but not the propriety of serial Chapter 11 cases themselves.

**[**8]** Within the pre-serial Chapter 11 universe of modification, conversion, and dismissal, the courts developed legal constructs to describe the practical implications of the discharge and confirmation concepts found in the Code. The general concept of discharge flows from § 1141, which provides *HN3*"except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). The purpose of this section is to give the debtor a fresh start -- "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting [sic] debt." Local Loan Co. v. Hunt, 292 U.S. 234, 244, 78 L. Ed. 1230, 54 S. Ct. 695 (1934); accord Citizens Bank & Trust Co. v. Case (Matter of Case), 937 F.2d 1014, 1024 (5th Cir. 1991); Owaski v. Jet Fla. Sys., Inc. (In re Jet Fla. Sys., Inc.), 883 F.2d 970, 972 (11th Cir. 1989).

To put teeth into § 1141(d), the Code states that *HN4*discharge voids any existing judgments against the debtor and "operates as an injunction against the commencement or **[**9]** continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. §§ 524(a)(1)-(2); see also S. Rep. No. 989, 95th Cong., 2d Sess. 80 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5866 (stating that discharge acts "as a total prohibition on debt collection actions"). **5** The § 524(a) discharge injunction operates into perpetuity to ensure the post-confirmation debtor receives the fresh start envisioned in § 1141(d)(1), and, *"in effect,* the discharge extinguishes the debt," Id. (emphasis added). The sanctuary of the discharge injunction is limited only as "provided in this subsection, in the plan, or in the order confirming the plan." 11 U.S.C. § 1141(d)(1).

**FOOTNOTES**

**5** The reorganization plan in Conston's first Chapter 11 case provided that confirmation had an arguably broader effect:

> Except for the obligations of the Debtors under this Plan, confirmation shall discharge all existing claims or interests of any nature whatsoever against or

AUTH21-000009

in the Debtors, or any of them, or against or in any of their assets or other property pursuant to § 1141 of the Bankruptcy Code. Except as provided in this Plan, all creditors or holders of interests shall be precluded from asserting against any of the Debtors, their assets or other properties, any other or further claims or interests based upon any act, omission, transaction or other activity of any kind, nature or description that occurred prior to the confirmation date.

D.I. 5 at 4-5.

[**10] In the pre-serial Chapter 11 universe of plan modification, conversion, or dismissal of a defaulting Chapter 11 plan, the courts borrowed the adjective "extinguished" to create a judicial gloss describing how discharge impairs a creditor's post-confirmation ability to enforce its pre-confirmation claim. *HN5*When a court states that discharge "extinguishes" a debt, the judicial gloss implies, quite accurately, that the creditor can enforce only those pre-confirmation claims found in the confirmed plan and that the creditor can enforce those claims only in the manner and [*773] amount specified in the confirmed plan. From a commercial vantage point, the old debt is "extinguished," and a new debt is put in its place. Nevertheless, the courts have recognized the gloss on § 524 for what it is -- a legal construct that describes a statutory effect -- and plainly held that the statutory definition of discharge, by its own terms, does not cause the underlying debt to vanish. Johnson v. Home State Bank, 501 U.S. 78, 84, 115 L. Ed. 2d 66, 111 S. Ct. 2150 (1991) (holding "the Court of Appeals thus erred in concluding that the discharge of petitioner's *personal liability* . . . constituted the [**11] complete termination of the Bank's *claim* against petitioner. Rather, a bankruptcy discharge extinguishes only one mode of enforcing a claim -- namely, an action against the debtor *in personam");* Houston v. Edgeworth (Matter of Edgeworth), 993 F.2d 51, 53 (5th Cir. 1993) ("A discharge in bankruptcy does not extinguish the debt itself . . . . Section 524(e) specifies that the debt still exists . . . ."); Shure v. Vermont (In re Sure-Snap Corp.), 983 F.2d 1015, 1018, 1019 (11th Cir. 1993) (holding "that confirmation did not terminate debtor-creditor contract, and instead "prevented . . . enforcing the terms of the Agreement . . . to collect pre-confirmation debt," so that the discharged contract could therefore support award of attorney's fees incurred post-confirmation); Copeland v. Merrill Lynch & Co., Inc., 162 Bankr. 743, 746, 747 (E.D. La. 1993) ("the bankruptcy reorganization plan did not extinguish or 'novate' the obligations to repay or reduce the [debts]"); Polysat, Inc. v. Union Tank Car Co. (In re Polysat, Inc.), 152 Bankr. 886, 895 (Bankr. E.D. Pa. 1993); Shade v. Fasse (In re Fasse), 40 Bankr. 198, 200 (Bankr. D. Colo. 1984) ("Although a discharge [**12] . . . relieves the debtor from personal liability . . . it does not have the effect of extinguishing the debt"); cf. Wagner v. United States, 573 F.2d 447, 453 (7th Cir. 1978) (noting "that *HN6*a discharge does not cancel the obligation; the obligation still exists. A discharge merely disables the creditor from enforcing its claim") (interpreting the Bankruptcy Act of 1898).

In a separate line of cases, the courts, including the Third Circuit Court of Appeals, have recognized that *HN7*"discharged" debts continue to exist despite their unenforceability against the debtor on the basis of 11 U.S.C. § 524(e), which states *HN8*"discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." See, e.g., First Fidelity Bank v. McAteer, 985 F.2d 114, 118-19 (3d Cir. 1993) (holding that § 524(e) did not release non-debtor parties from their obligations and liabilities arising from the discharged debt) (collecting cases); see also Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1449 (6th Cir. 1993) (holding debtor's discharge did not affect guarantor's obligation to creditor); Hendrix v. Page (Matter of Hendrix), [**13] 986 F.2d 195, 197 (7th Cir. 1993) (relying on §§ 524(a)(2) and 524(e)); Walker v. Wilde (In re Walker), 927 F.2d 1138, 1141-44 (10th Cir. 1991) (holding § 524(e) did not prohibit creditor from bringing action against the debtor to establish existence of the debt, albeit "discharged,"

AUTH21-000010

that was a prerequisite to suit against guarantor); <u>Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (Matter of Sandy Ridge Dev. Corp.), 881 F.2d 1346, 1351 (5th Cir. 1989)</u> (holding that discharge does not release non-debtor guarantors); <u>Kathy B. Enter., Inc. v. United States, 779 F.2d 1413, 1414-15 (9th Cir. 1986)</u> (holding that discharge did not prevent the IRS from collecting discharged taxes from recipient of debtor's fraudulent conveyance); <u>Pettibone Corp. v. Hawxhurst, 163 Bankr. 989, 993-95 (N.D. Ill.), aff'd, 40 F.3d 175 (7th Cir. 1994)</u>. These cases, and the plain language of <u>§ 524</u> itself, all illustrate Congress's underlying premise in enacting § 524: _HN9_ although unenforceable in their pre-confirmation form against the debtor, "discharged" debts, and their attendant duties, obligations, and liabilities, remain viable post-confirmation. Thus, while the creditor may not _enforce_ **[\*\*14]** her claim as it existed pre-confirmation, the claim nevertheless continues to exist.

### III. Conston's Position

In the face of this well-settled understanding, Conston seeks to extend and redefine the meaning of discharge in a manner far removed from that contemplated by Congress and in derogation of Congress's explicit statutory directives. The essence of Conston's position is that confirmation of the **[\*774]** Chapter 11 reorganization plan strips a tax claim of its identity as a tax claim and substitutes in its stead a contractual obligation to make payment under the plan. Without the characteristics of a claim for taxes, then, Conston asserts the IRS claim cannot qualify for priority treatment under <u>11 U.S.C. § 507(a)(7)</u> in a second Chapter 11 proceeding.

Conston finds support in <u>In re Benjamin Coal Co., 978 F.2d 823 (3d Cir. 1992)</u>. In Benjamin Coal, the debtor originally filed a Chapter 11 petition in October, 1984, and the bankruptcy court confirmed a reorganization plan on October 4, 1985. This reorganization plan provided for payment of an administrative priority claim held by the debtor corporation's majority shareholder. As in this case, the debtor could not fulfill **[\*\*15]** the terms of the confirmed plan, and the debtor subsequently moved to convert its Chapter 11 reorganization to a Chapter 7 liquidation. In the converted Chapter 7 case, the shareholder argued that his claim continued to merit administrative priority status. Id. at 825-26.

The bankruptcy court, the district court, and the Third Circuit Court of Appeals all disagreed with the shareholder and held that administrative expenses incurred in a Chapter 11 reorganization do not automatically retain administrative expense priority in a subsequent conversion to Chapter 7. The court of appeals held that, post-confirmation, the creditor had only _"former_ administrative claims" and no longer held the _right_ to preferential treatment that the creditor had held before confirmation. Id. at 827. In other words, the court held the shareholder "simply no longer had an 'administrative claim'" and stated:

> _HN10_ Once the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself. Thereafter, each claimant's remedies for any future nonpayment of claims acknowledged in the plan are limited to **[\*\*16]** the usual remedies for the type of claim granted by the plan's provisions.

Id. According to Conston, Benjamin Coal stands for the proposition that, post-confirmation, the IRS holds former tax claims with no relationship whatsoever to the claims' original nature as corporate income taxes and that these IRS claims consequently cannot qualify as taxes for priority treatment under § 507(a)(7).

Conston draws further support from dicta found in Benjamin Coal. In the concluding portion of its opinion, the Benjamin Coal court questioned a Seventh Circuit Court of Appeals holding on the issue identical to that presently before this Court. In the Matter of Official Comm. of Unsecured Creditors of White Farm Equip. Co., the court of appeals held that a trust fund tax

AUTH21-000011

claim contained in a confirmed Chapter 11 plan could acquire priority status in a subsequent Chapter 11 if the claim could independently qualify for priority status in the second bankruptcy proceeding. 943 F.2d 752, 757 (7th Cir. 1991), cert. denied, 503 U.S. 919 (1992). Implicitly, the White Farm Court thus recognized that tax characteristics survive confirmation and discharge so as to potentially [**17] fall under the purview of § 507(a)(7) in a subsequent Chapter 11 proceeding. In questioning the Seventh Circuit, the Third Circuit Court of Appeals stated that "White Farm may be contrary to the legislative intent underlying Section 1141(d)(2)" and characterized White Farm as a "debatable interpretation of the effects of Section 1141(d) on tax claims." In re Benjamin Coal Co., 978 F.2d at 828.

The Court does not read Benjamin Coal as broadly as Conston and the bankruptcy court below. First, although the court of appeals did use broad language in criticizing the Seventh Circuit's White Farm decision, this language amounts to no more than dicta, albeit strong dicta. Chief Justice Marshall established long ago that $^{HN11}$"it is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399, 5 L. Ed. 257 (1821). Thus, while dicta may be instructive as to the position of a [**18] particular appellate panel, it is not [*775] binding on the lower Court. Menell v. First Nat'l Bank (In re Menell), 37 F.3d 113, 114-15 n.1 (3d Cir. 1994) (finding unpersuasive cases cited in dicta by the Supreme Court); Children's Hosp. of Pittsburgh v. 84 Lumber Co. Medical Benefits Plan, 834 F. Supp. 866, 868 n.4 (W.D. Pa. 1993); Furcini v. Equibank, NA, 660 F. Supp. 1436, 1441 (W.D. Pa. 1987) (Aldisert, J., sitting by designation). In fact, it is not uncommon for the Third Circuit Court of Appeals to avoid its own prior statements or positions by explaining them away as dicta and implying they are not binding on the appellate court. See, e.g., Pansy v. Borough of Stroudsburg, 23 F.3d 772, 778 n.4 (3d Cir. 1994); United States v. Ricks, 5 F.3d 48, 50 (3d Cir. 1993). As a consequence, while enjoying the benefit of dicta discussing priority tax claims in serial Chapter 11 cases, this Court is nonetheless free to independently examine the issue.

Second, the Benjamin Coal court quite simply never discussed whether a claim's intrinsic pre-petition attributes survive discharge, and the court never stated the 'new' claims granted in the reorganization plan may never acquire [**19] priority status in a subsequent Title 11 proceeding. What the court of appeals unequivocally *did* hold was that $^{HN12}$the bankruptcy created characteristic of priority does not, of its own accord, survive confirmation of the plan and automatically resurrect itself in a future Title 11 proceeding. In re Benjamin Coal Co., 978 F.2d at 827. Benjamin Coal therefore did not address the issue presented by Conston -- does confirmation change the "type of claim" so as to eliminate the characteristics that would permit the claim to qualify for priority treatment in a subsequent Chapter 11 proceeding?

Third, Benjamin Coal neither endorsed the judicial gloss of discharge that would 'extinguish' all vestiges of the original claim nor displaced the bedrock principle that discharge only enjoins enforcement while leaving the underlying debt in place. Furthermore, because "characteristic[s] fitting in certain contexts may be unsuitable in others," Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co., 130 L. Ed. 2d 740, 115 S. Ct. 810, 816 (1995), the Court will not lightly assign to the court of appeals an intent to apply a judicial gloss developed at a time when serial Chapter [**20] 11 cases were unknown. Cf. also Furcini v. Equibank, 660 F. Supp. at 1440 ("Just as meanings are sometimes lost in the translation of expressions from one language to another, the utility of formulae can be lost in their migration across legal fields."). [6] In sum, I read nothing in Benjamin Coal that forecloses a claim arising pre-second petition, including a claim treated in a prior reorganization plan, from meriting priority status in a second Chapter 11, provided that the claim's attributes fall within the strictly defined priority categories of § 507 as those categories relate to the second Chapter 11. [7]

AUTH21-000012

## FOOTNOTES

**6** Conston also cites American Bank and Trust Co. v. United States ( In re Barton Indus., Inc., 159 Bankr. 954 (Bankr. W.D. Okla. 1993), and Matter of DePew, 115 Bankr. 965 (Bankr. N.D. Ind. 1989), for the proposition that confirmation bars the assertion of § 507 (a)(7) priorities because confirmation binds the IRS to the terms of the confirmed plan. Conston's reliance on these cases is misplaced. Both cases deal with the *res judicata* effect of an order confirming a reorganization plan. Neither case discusses the characteristics of a claim contained in a confirmed reorganization plan or whether these characteristics, if they exist, may support a finding of priority status in a serial Chapter 11 case. **[\*\*21]**

**7** One additional issue bordering on the metaphysical requires mention -- are priority corporate income tax claims contained in a confirmed plan the same claims that existed pre-confirmation, albeit with the limitations on enforcement that accompany confirmation and discharge, as suggested by the plain language of § 1141 and the cases interpreting § 524, see supra text at 6-8, see also Matter of Ribs-R-Us, Inc., 828 F.2d 199, 203 (3d Cir. 1987) ("confirmation of a plan discharges most preconfirmation debts except to the extent that they are included in the plan") (citation omitted), or, on the other hand, does confirmation replace priority tax claims with entirely new claims, as suggested by the court of appeals' language in Benjamin Coal Co., see 978 F.2d at 827 ("each claimant gets a 'new' claim")? This Court is, of course, bound by Benjamin Coal, but as the next section will demonstrate, whichever theory is followed, the post-confirmation claim held by the IRS must have tax characteristics.

## IV. Analysis

The Court concludes that, at least in the case of corporate **[\*\*22]** income taxes, some attributes of the underlying tax claim must **[\*776]** survive confirmation and discharge, and therefore that the IRS claims in this case may qualify for priority treatment in the present Chapter 11 proceeding. Accepting any other position conflicts with the plain language of both the Bankruptcy and Internal Revenue Codes. Furthermore, accepting any other position confounds the clearly expressed congressional policies concerning taxes embodied in the Bankruptcy Code. As always, the inquiry must begin with the plain language of the statute. Norfolk and W. Ry. Co. v. American Train Dispatchers Ass'n, 499 U.S. 117, 128, 113 L. Ed. 2d 95, 111 S. Ct. 1156 (1991).

A. Assessment of Tax Claims

Broadly speaking, **HN13** the Internal Revenue Code authorizes the Secretary of the Treasury to make an assessment of all federal taxes not paid in a timely manner. 26 U.S.C. § 6201(a). An assessment is "essentially a bookkeeping notation . . . made when the Secretary . . . establishes an account against the taxpayer on the tax rolls," Laing v. United States, 423 U.S. 161, 170 n.13, 46 L. Ed. 2d 416, 96 S. Ct. 473 (1976), and assessment fixes the amount of tax liability, Cohen v. **[\*\*23]** Gross, 316 F.2d 521, 522-23 (3d Cir. 1963). Absent voluntary payment, the IRS has no statutory power to collect a tax, including a corporate income tax, until the IRS makes a valid assessment. 26 U.S.C. § 6501(a) ("no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period [for assessment]"); Philadelphia & Reading Corp. v. United States, 944 F.2d 1063, 1064 n.1 (3d Cir. 1991); Ewing v. United States, 914 F.2d 499, 503-04 (4th Cir. 1990) ("This section simply mandates that the United States has no authority to collect a tax forcibly after the applicable period for assessment has expired."), cert. denied, 500 U.S. 905, 114 L. Ed. 2d 78, 111 S. Ct. 1683 (1991); In re Flanigan's Enter., Inc., 75 Bankr. 446, 449 (Bankr. S.D. Fla. 1987) ("Until a tax is assessed, the statutory prerequisites of the

AUTH21-000013

Internal Revenue Code have not been met, and an unassessed tax cannot be collected by filing a proof of claim or otherwise."). Once a tax is properly assessed, the Secretary may collect it "by levy or by a proceeding in court." 26 U.S.C. § 6502(a).

Not unexpectedly, it is common for corporations to file a Chapter **[**24]** 11 reorganization petition while delinquent in the payment of as yet unassessed corporate income taxes. *HN14* When the debtor files a petition for relief, the automatic stay provisions of the Bankruptcy Code restrain the IRS from assessing or collecting delinquent taxes. 11 U.S.C. § 362(a)(6). The automatic stay does not indefinitely forestall assessment of delinquent taxes, however; 11 U.S.C. § 505(c) permits assessment of a tax, "notwithstanding section 362 of this title," once the bankruptcy court has made a determination of tax liability. Congress also coordinated the automatic stay with the procedural aspects of the assessment in the Bankruptcy Tax Act of 1980. See S. Rep. No. 1035, 96th Cong., 2d Sess. 48 (1980), reprinted in 1980 U.S.C.C.A.N. 7017, 7061 see generally id. at 46-53, reprinted at 7059-66. *HN15* The IRS may immediately assess any deficiency on "the debtor" as soon as "liability for such tax has become res judicata pursuant to a determination in a case under title 11 of the United States Code," 26 U.S.C. § 6871(b)(2); [8] in other words, Congress authorized the IRS to assess a tax as soon as the tax has become fixed by a final judgment by an appropriate court **[**25]** in the bankruptcy process. See also S. Rep. No. 1035 at 49, reprinted in 1980 U.S.C.C.A.N. at 7062 ("[Because] no purpose would be served by requiring issuance of a deficiency notice prior to assessment . . . . , the bill permits immediate assessment of a corporate debtor's tax liabilities once the bankruptcy court has made a determination which is res judicata."); id. at 50, reprinted at 7063 ("if the bankruptcy court has made a determination of the debtor's tax liability which (under the doctrine of res judicata) precludes the debtor from relitigating the **[*777]** issue in any other court, the Revenue Service can make an immediate assessment of such liability without issuing a deficiency notice"). *HN16* The only limitation on the period of assessment in a bankruptcy case appears in 26 U.S.C. 6503(h)(1), which suspends the limitations period for assessment "for the period during which the Secretary is prohibited by reason of such case from making an assessment" and for 60 days thereafter, regardless, apparently, of whether the debtor has received a discharge of the tax claim against her. In sum, §§ 6871 and 6503(h) of the Internal Revenue Code demonstrate Congress contemplated **[**26]** that assessment may occur before or after confirmation and discharge. Indeed, in this case, the IRS assessed the 1986, 1987, and 1990 tax period claims after the bankruptcy court confirmed Conston's reorganization plan. D.I. 1, Exh. A.

## FOOTNOTES

**8** Title 26 U.S.C. § 6216(1) states that subchapter B of chapter 70 of Title 26 [26 U.S.C. §§ 6870-72] details assessment procedures for receivership proceedings. Accord Cohen v. Gross, 316 F.2d 521, 523 (3d Cir. 1963) (holding that Chapter 70 of the Internal Revenue Code provides "[a] different collection scheme for assessment and collection in cases where bankruptcy intervenes") (analyzing Internal Revenue Code interaction with Bankruptcy Act).

Just as *HN17* the Internal Revenue Code contemplates assessment activity during the post-confirmation period, the Code contemplates that the IRS may undertake tax collection activities during the post-confirmation period. The Code provides that the Secretary may collect an assessed tax "by levy or by a proceeding in court" within **[**27]** the applicable limitations period. 26 U.S.C. § 6502(a)(1). A bankruptcy petition will suspend this limitations period, however, "for the period during which the Secretary is prohibited by reason of such . . . from collecting" and for 6 months thereafter. 26 U.S.C. § 6503(h)(2). As with assessment, the fair import of these sections is that the monies collected by the IRS for claims granted in the confirmed plan are tax monies.

AUTH21-000014

Several other factors point to the same conclusion. First, the legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended "the provisions of the Code relating to collection of assessed taxes apply" after assessment in a bankruptcy case. S. Rep. No. 1035 at 50, reprinted in 1980 U.S.C.C.A.N. at 7063. Second, neither the Internal Revenue nor the Bankruptcy Codes limit the application of § 6503(h)(2) to any class of debtor entity or to any class of priority tax claims. Third, when Congress amended § 6503(h) in the Bankruptcy Tax Act of 1980, it did not add any restrictions on § 6503(h)'s applicability to Chapter 11 cases. Finally, while at least one court has held that § 6503(h) applies only to Chapter 7 and individual Chapter [**28] 11 cases see In re Flanigan's Enter., Inc., 75 Bankr. 446, 449-50, 451 (Bankr. S.D. Fla. 1987), nothing in the plain language of the Titles 11 or 26 restricts the operation of § 6503(h)(2). Further, the Court's interpretation of § 6503 (h) has the benefit of not reading a restriction into the statute -- the Flanigan's Enterprises limitation of the statute to Chapter 7 and individual Chapter 11 cases -- not alluded to in either the text of Titles 26 and Title 11 or in the legislative histories of the Bankruptcy Reform Act of 1978, the Bankruptcy Tax Act of 1980, and other more recent amendments to the Bankruptcy Code and its correlative Internal Revenue Code provisions. In sum, notwithstanding In re Flanigan's Enterprises, Inc., *HN18* nothing in the plain language of the Internal Revenue or Bankruptcy Codes suggests that confirmation of the reorganization plan relieves the Secretary from following §§ 6501 - 6503 when collecting priority tax claims.

Placed against the backdrop of the post-confirmation assessment and collection activities permitted by statute, the difficulties with Conston's position emerge. For example, under Conston's theory, the IRS could not assess the 'new' claim pursuant to 26 U.S.C. § 6871 because discharge "extinguishes" the original tax claim and eviscerates the very identification of the IRS claim as a claim arising from taxes. In fact the IRS could never assess a discharged priority tax, regardless of whether a second Chapter 11 occurs or not, because the IRS claim would no longer exist as a tax claim. Likewise, the IRS would have no authority to collect its post-discharge claim because the statutory prerequisite to collection, the assessment, could not take place. Indeed, it is not at all inconceivable that a discharged debtor would attempt to defend against an IRS action for unpaid discharged priority taxes by asserting the maxim "taxation is a game which must be played strictly in accordance with the rules," Philadelphia & Reading v. United States, 944 F.2d 1063, 1070 (3d Cir. 1991) (quoting Richardson v. Smith, 301 F.2d 305, 306 (3d Cir.) (per curiam), cert. denied, 371 U.S. 820, 9 L. Ed. 2d 60, [*778] 83 S. Ct. 36 (1962), and arguing the IRS has no statutory authority to collect, as a contract claim or otherwise, for failure to make a valid assessment. Such a result is inconsistent with the provision for priority tax [**30] claims in the first instance and does not comport with the IRS practice of making its assessment after plan confirmation. Therefore, *HN19* because collection requires assessment, the only conclusion is that the claims granted in the confirmed plan must have an identity as claims for taxes.

Nothing in this analysis derogates from the discharge and confirmation provisions of § 1141 (d)(1). Permitting the IRS to assess a claim that is *res judicata,* even after confirmation, does not expand the debts and claims against the debtor. Further, the discharge injunction does not act as a blanket prohibition on collection activities; § 1141(d)(1) discharges the debtor "except as otherwise provided in this subsection, in the plan, or in the order confirming the plan." As such, if the plan provides for payment of debts, statutorily required actions to create collection authority in the IRS, such as assessment, may be treated as falling within the § 1141(d)(1) caveat to the scope of discharge. Accord Norris Grain Co. v. United States (In re Norris Grain Co.), 168 Bankr. 264, 265 (M.D. Fla. 1993) (permitting assessment post-confirmation on grounds that plan provision calling for payment of taxes [**31] over six year period "contemplated that assessments would be made"), aff'd, 42 F.3d 643 (11th Cir. 1994). While one could object that 26 U.S.C. § 6322 creates a lien against the debtor at the time of assessment, Congress appears to have foreseen and resolved this potential discharge violation, as 26 U.S.C. § 6325 requires the Secretary to release of all tax liens rendered legally unenforceable. Section 6325 thus acts in a sort of symmetry with § 524(a)(2) and

AUTH21-000015

prevents any clash between the tax and bankruptcy codes stemming from a post-petition assessment. [9]

---

**FOOTNOTES**

[9] This view of assessment is consistent with Congress's most recent pronouncement on the automatic stay in the Bankruptcy Reform Act of 1994. In an amendment that permits assessment despite the automatic stay, the Act states that "any tax lien that would otherwise attach to property of the estate by reason of such assessment *shall not take effect* unless such tax is a debt of the debtor that will not be discharged in the case." Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 116, 108 Stat. 4106, 4119 (1994) (amending 11 U.S.C. § 362(b)(9)) (emphasis added). Contra United States v. W.F. Monroe Cigar, Co. (In re W.F. Monroe Cigar, Co.), 166 Bankr. 110, 113 (N.D. Ill. 1994) (permitting the IRS to perfect lien on discharged tax claim). While instructive as to congressional intent on the interplay between the discharge injunction and the Internal Revenue Code, the Court is cognizant that the Bankruptcy Reform Act of 1994 does not apply to cases commenced prior to the enactment of the statute. Bankruptcy Reform Act of 1994, § 702(b)(1), 108 Stat. at 4150.

---

**[\*\*32]** What discharge means is that the IRS no longer retains its full panoply of collection powers; the plan defines to the exclusion of all else the permissible modes of collecting the debt. But defining the mode of payment and collection does not mean that the 'new' claim loses the character of the underlying debt. The key is to distinguish between permissible modes of post-confirmation collection and the statutory prerequisites to collection, i.e., what does the IRS have to do to have the power to collect? While the confirmed plan may give the IRS the right to collect, the Internal Revenue Code requires an assessment prior to authority attaching in the IRS to collect.

The fact that post-confirmation collection and assessment is possible demonstrates beyond question the existence of tax characteristics in the IRS claims at issue in this appeal. Therefore, the Court holds the [HN20]claims' tax characteristics may be used to determine how to treat the claims under § 507(a)(7). That is not to say that a tax debt automatically arises to priority status in a second Chapter 11 simply because it held that status in the first Chapter 11; at most, the tax claim *may* rise to priority status.

B. **[\*\*33]** Legislative Intent

The evident legislative purpose that gave rise to tax priorities in the first instance further verifies the conclusion mandated by the statutory structure. There is no indication in the legislative history that Congress ever contemplated the advent of serial Chapter 11 cases or the effect of § 524 on the debtor's obligations in a second Chapter 11 **[\*779]** proceeding. The plain language of the Code simply does not treat serial Chapter 11 cases; no extant legislative history treats "discharged" debts in serial Chapter 11 cases. [HN21]A lack of Congressional anticipation, however, "in no way modifies the conventional judicial duty to give faithful meaning to the language Congress adopted in the light of the evident legislative purpose in enacting the law in question." United States v. Bornstein, 423 U.S. 303, 310, 46 L. Ed. 2d 514, 96 S. Ct. 523 (1976). As a consequence, while the Court proceeds under the rubric of congressional intent, in reality the Court can only attempt to faithfully implement the Code enacted by Congress with an eye to assuring that the changed circumstances of serial Chapter 11 petitions do not frustrate the evident congressional intent. As Judge **[\*\*34]** Rosenn has stated somewhat analogously:

> when a statute is adopted from one jurisdiction into the jurisprudence of another, it will be construed so as to harmonize it with its new environment in preference

AUTH21-000016

to a rigid adherence to the interpretation given it in its original home; especially is this true when the construction given it in its original home would render it inconsistent with the system into which it has been adopted.

Berkeley v. West Indies Enter., Inc., 480 F.2d 1088, 1095 (3d Cir. 1973) (dissenting opinion) (citation omitted).

Independent examination of the evident legislative purpose must begin with the recognition that Congress provided priority payment status for the claims of certain unsecured creditors because "special circumstances or special need" warranted a departure from the fundamental bankruptcy policy of pro rata distribution of assets to unsecured creditors. H. Rep. No. 595, 95th Cong., 2d Sess. 186 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6147. The Senate Judiciary Committee Report provided some broad insight into why taxes received special treatment in the Bankruptcy Code. After noting the "collection of taxes . . . has presented **[\*\*35]** one of the most difficult problems for the committee," the committee articulated the principle that "the goals of rehabilitating debtors and giving equal treatment to private voluntary, creditors must be balanced with the interests of governmental tax authorities who, if unpaid taxes exist, are also creditors in the proceeding." See S. Rep. No. 989, 95th Cong., 2d Sess. 13-14 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5799-5800. The Senate Committee Report goes on with respect to taxes:

> Since tax authorities are creditors of practically every taxpayer, another important element is that tax collection rules for bankruptcy cases have a direct impact on the integrity of the Federal, State and local tax systems. These tax systems, generally based on voluntary assessment, works [sic] to the extent that the majority of taxpayers think they are fair. This presumption of fairness is an asset which should be protected and not jeopardized by permitting taxpayers to use bankruptcy as a means of improperly avoiding their tax debts. To the extent that debtors in a bankruptcy are freed from paying their tax liabilities, the burden of making up the revenues thus lost must be shifted **[\*\*36]** to other taxpayers.

> A three-way tension thus exists among (1) general creditors, who should not have the funds available for payment of debts exhausted by an excessive accumulation of taxes for past years; (2) the debtor, whose "fresh start" should likewise not be burdened with such an accumulation; and (3) the tax collector, who should not lose taxes which he has not had reasonable time to collect or which the law has restrained him from collecting.

Id. at 14, reprinted at 5800. In adjusting the tension between a Chapter 11 debtor, the debtor's creditors, and taxing authorities, Congress intended and ultimately provided taxes a seventh priority coupled with a mechanism for relegating to general creditor status statutorily defined "stale" taxes. See 11 U.S.C. § 507(a)(7). Keeping in mind that Congress did not anticipate serial Chapter 11 cases, this statement of Congressional intent concerning treatment of tax claims cannot be seriously controverted.

The issue then becomes whether this evident legislative purpose in treating tax claims should be frustrated by the unforeseen **[\*780]** legal maneuver of serial Chapter 11 cases. Conston offers no explanation as to how its **[\*\*37]** position comports with congressional intent. In the hypothetical circumstance where officers and/or shareholders have general claims against a Chapter 11 debtor (a not uncommon occurrence), for example, the Conston theory would place these creditors in a relatively better position if the reorganization plan provided for payment of their allowed claims prior to those of the IRS and if the debtor should then file a second Chapter 11 petition. In the second proceeding, these creditors could argue that the IRS claims are general unsecured claims entitled to no priority and, quite probably, thereby diminish or eliminate them in a manner that 11 U.S.C. § 1129(a)(9)(C) would not have

AUTH21-000017

permitted in the first reorganization plan. While the tax system of this country has been characterized as voluntary, it is voluntary as to payment, not liability. Conston's theory, if adopted, would redefine the phrase "voluntary tax system," and I find that *HN22* Congress did not intend to permit Chapter 11 reorganization petitioners to choose whether to pay uncontested delinquent corporate income taxes that the Bankruptcy Code requires the debtor to pay in full to secure the much desired discharge. See 11 U.S.C. **[**38]** § 1129(a)(9)(C); see also Matter of Ribs-R-Us, Inc., 828 F.2d 199, 202 (3d Cir. 1987) ("[a] plan of reorganization cannot be confirmed unless the statutory requirements regarding priority claims are met, including the requirement that priority' tax claims be paid in full"). Rather than comport with the will of Congress, Conston's theory would permit the debtor to avoid § 1129(a)(9)(C)'s mandate to pay priority tax claims in full and thereby skillfully subvert the carefully crafted Congressional balance between taxpayers, the government, and the creditors.

## V. Conclusion

The advent of serial Chapter 11 cases has forced litigants and the courts to confront a host of interpretive issues fraught with the danger of unwittingly expanding accepted precepts in contravention of Congress's overall bankruptcy scheme, not to mention expanding those precepts in a manner unforeseen by those who first articulated them in a universe devoid of the potential for serial Chapter 11 filings.

In this case, Conston's position that the judicial gloss of discharge 'extinguishes' the original IRS corporate income tax claim creates a raft of conceptual and practical problems. The conceptual problems **[**39]** arise from the fact that the gloss would cause the IRS's priority corporate income tax claims to cease to exist as tax claims at the time of confirmation, thereby preventing the IRS from making the assessment requisite to cloaking the IRS with statutory collection authority. In fact, the gloss would prohibit all assessment activities after confirmation, whether a subsequent Chapter 11 ensues or not, and would even prohibit the assessments made in the period intervening between the two Chapter 11 proceedings in this case. These conceptual problems highlight the inherent contradiction between Conston's proposed extension of the judicial gloss and the plain language of the Internal Revenue and Bankruptcy Codes. Additionally, these conceptual problems arise whether the IRS's post-discharge claim is a 'new' claim or a continuation of the pre-confirmation claim, albeit with limitations on the manner of enforcement.

The practical problems arise from the fact that Conston's position would allow the Chapter 11 debtor to choose whether to abide by the evident Congressional purpose embodied in the priorities of 11 U.S.C. § 507(a)(7). Granting the taxpayer the ability to convert a claim within **[**40]** the sphere of 11 U.S.C. § 1129(a)(9)(C) into a general unsecured claim by filing a second Chapter 11 petition would have to be considered remarkable. Without some indication that Congress intended this result, I hold that *HN23* priority corporate income tax claims contained in a confirmed reorganization plan must embody the characteristics that may entitle them to priority treatment if a second Chapter 11 petition is filed.

Finally, *HN24* once it is established that the corporate income tax claims contained in the confirmed plan have tax characteristics, it is clear that the claims may, but do not necessarily, qualify for continued priority status in a second Chapter 11. Generally, § 507(a)(7) looks for certain characteristics of tax claims, **[*781]** such as the date of accrual, to determine whether the claims merit priority status. The IRS has conceded that, at most, only those claims that have the characteristics described in § 507(a)(7), as measured from Conston's second Chapter 11 petition, are entitled to priority treatment in this proceeding. D.I. 4 at 18-20. In other words, the IRS, at least for this litigation, does not assert that simply because priority existed in Conston's first Chapter **[**41]** 11 case, priority exists in this case. This comports with the broad lesson of Benjamin Coal -- that *HN25* the bankruptcy

AUTH21-000018

created characteristic of priority does not exist beyond the bankruptcy case in which it was created; a § 507 priority, if it exists at all, must stem from the claim's characteristics extant in the current bankruptcy proceeding. In re Benjamin Coal Co., 978 F.2d at 827; cf. Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.), 886 F.2d 859, 870 (7th Cir. 1989) ("To receive an administrative priority in [the second Chapter 11, the creditor] must demonstrate its claims relative to [the second Chapter 11]; an administrative priority in [the first Chapter 11] does not translate to an administrative priority in [the second Chapter 11]").

An order will issue remanding this matter to the bankruptcy court for entry of judgment consistent with this Opinion, including fixing the amount of priority indebtedness.

Service:  **Get by LEXSEE®**
Citation:  **181 B.R. 769**
    View:  Full
Date/Time:  Monday, November 2, 2009 - 1:34 PM EST

* Signal Legend:
🔴 -   Warning: Negative treatment is indicated
[Q] -   Questioned: Validity questioned by citing refs
⚠ -   Caution: Possible negative treatment
◆ -   Positive treatment is indicated
Ⓐ -   Citing Refs. With Analysis Available
ⓘ -   Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

**LexisNexis®**   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AUTH21-000019