**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-1139(JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |

**POST TRIAL BRIEF OF BNSF RAILWAY COMPANY REGARDING
CONFIRMATION OF THE FIRST AMENDED CHAPTER 11 PLAN
OF W.R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI
FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS DATED FEBRUARY 3, 2009**

There is a fatal flaw in the First Amended Chapter 11 Plan of W.R. Grace & Co., *et al.*, The Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders, dated February 3, 2009 (the "Plan"): The Plan impermissibly eviscerates the contractual rights of BNSF Railway Company and its predecessors (collectively, "BNSF"), by disallowing its valid claims without justification, in violation of the Bankruptcy Code and general bankruptcy principles.

Under the terms of the Plan, BNSF will be granted an award against the Asbestos PI Trust in an amount roughly equal to approximately **6%** of what it would have been entitled to receive under non-bankruptcy law. However, in stark contrast, other creditors in the same class (Class 6) will be entitled to an award roughly equal to **100%** of what they would be entitled to receive under non-bankruptcy law. Applying the Plan Proponents' estimate of 30% distribution on

allowed claims, Class 6 creditors generally will receive 30% payment on their claims; BNSF, on the other hand, will receive only 1.8% payment.[1]

## I.    PROPOSED FINDINGS OF FACT

### A.    Relationship Between BNSF and Grace

1.    W.R. Grace & Co. and its predecessors ("Grace"), including The Zonolite Company ("Zonolite"), operated a mine in Libby, Montana, at which it mined vermiculite which contained tremolite asbestos.  *See* Debtors Disclosure Statement for The First Amended Chapter 11 Plan Of W.R. Grace & Co., et al., The Official Committee Of Asbestos Personal Injury Claimants, The Asbestos Pi Future Claimants' Representative, And The Official Committee Of Equity Security Holders, Dated February 3, 2009 (the "Disclosure Statement"), at page 18-19; 9/9/09 Tr. 37:6-37:18; 41:25-42:6 (Hughes)[2].

2.    Between 1938 and 1963, Zonolite and BNSF's predecessors, entered into various quit-claim deeds, right-of-way agreements and leases relating to Zonolite's operations at the Libby mine.  BNSF Exs. 1A ,2A, 3A, 4A, 5A, 6A, 7A, 8A & 9A.

3.    Pursuant to the leases, Zonolite leased the property owned by BNSF adjacent to BNSF's railway tracks.  BNSF Exs. 5A, 7A, 8A, & 10A.

4.    These leases granted Zonolite the authority to construct, maintain and operate a loading dock, suspension bridge and belt conveyor, as well as a loading platform, steel water pipe, lumber shed, storehouse and parking area.  BNSF Exs. 5A, 7A, 8A, & 10A.

---

[1]  For example, if BNSF's non-bankruptcy claim were equal to $100, the Plan will grant BNSF an award against the Trust for $6, and a 30% distribution will result in a payment to BNSF of only $1.80.  However, an asbestos personal injury claimant with a non-bankruptcy claim equal to $100 is granted an award against the Trust for $100, and a 30% distribution will result in a payment to such creditor of $30.

[2]  Citations to the Confirmation Hearing transcripts shall be in the form "Date Tr. page:line – page:line (witness)."

5.     Zonolite, and subsequently Grace, mined vermiculite ore from the Libby mine, processed it into vermiculite concentrate, and then transported the concentrate over the suspension bridge and conveyor belt located on the Zonolite-leased BNSF property. Zonolite/Grace then loaded it onto railway cars, and shipped the concentrate throughout the country initially on BNSF's railway.  9/9/09 Tr. 37:6-38:24 (Hughes); BNSF Exs. 7A.

6.     In 1963, Grace's Dewey & Almy Division purchased the business and assets of Zonolite.[3]  On April 16, 1963, Zonolite and Grace entered into an agreement, whereby Grace accepted the assignment of the agreements between BNSF and Zonolite.  BNSF Ex. 10A.

7.     On April 1, 1974, BNSF's predecessor and Grace entered into a lease for the maintenance and operation of storage tanks, a pumphouse and a loading dock on the railway's right of way.  BNSF Ex. 12A.

8.     The terms of the contracts and leases between Grace and BNSF obligate Grace to indemnify BNSF for asbestos-related claims asserted against BNSF.  These provisions require Grace to provide full indemnity to BNSF, including providing a defense.  9/14/09 Tr. 265:2-265:17 (Hughes); BNSF Exs. 5A, 7A, 8A, & 10A.

9.     For example, the contract between Grace and BNSF dated April 20, 1950, provides:

> [Grace] shall, and hereby does, further agree to indemnify and hold harmless the Railway Company of and from any and all liability, damages, recoveries, judgments, cost, expense or other charges and demands, on account of injuries to or death of one or more persons, or damage to or destruction of the property of one or more persons, resulting from or during the construction, repair, maintenance or operation of said bridge and conveyor belt, or resulting from or during the use of said premises by the Applicant,

---

[3] Disclosure Statement at page 18.

the applicant's agents, servants, employees, patrons or customers, or by any other persons, whether caused by the negligence of the Railway Company, its agents, servants and employees, or otherwise. The Applicant further agrees to appear and defend in the name of the Railway Company any suits or actions at law brought against it on account of any such personal injuries, death, or damage to property, and to pay and satisfy any final judgment that may be rendered against the Railway Company in any such suit or action. The liability assumed by the Applicant herein shall not be affected or diminished by the fact, if it be a fact, that any such suit or action brought against the Railway Company may arise in whole or in part out of the negligence of the Railway Company, its officers, agents, servants or employees, or be contributed to in whole or in part by such negligence. The foregoing language of this Section 8 shall not be construed as imposing on the Applicant liability for any loss or damage to persons or property which would have occurred in the absence of the construction, repair, maintenance, operation or existence of the said suspension bridge, conveyor belt and loading dock and their appurtenances upon the property of the Railway Company.

BNSF Ex. 7A.

**B.    Claims Asserted Against BNSF.**

10.    Grace's operations at the Libby mine resulted in the release of tremolite asbestos into the community. This allegedly resulted in significant levels of asbestos-related diseases in and around Libby. *See* BNSF Exs. 85 – 279; 9/8/09 Tr. 44:9-44:25, 55:5-55:16.

11.    BNSF is defending suits asserting injuries allegedly resulting from vermiculite mined in Libby, loaded by Grace and initially transported by BNSF. 9/14/09 Tr. 264:23 – 265:15; . BNSF Exs. 85 – 279.

12.    These lawsuits include allegations that BNSF is liable to the claimants for the alleged exposure to Grace's asbestos-containing vermiculite because (a) BNSF is strictly liable for the conduct of Grace on BNSF property resulting from Grace's use and handling of a hazardous material; or (b) BNSF was negligent by permitting Grace to handle asbestos-containing vermiculite on its property. *Id.*

C.      **Plan Treatment of BNSF's Claims**

13.     The Plan classifies BNSF's claims and demands for contractual indemnification as Class 6, Indirect PI Trust Claims.  *See* Plan at Section 1.1, page 28 (definition 137).

14.     Indirect PI Trust Claims, which are included in the defined term "Asbestos PI Claims" are channeled to the Asbestos PI Trust.  *See* Plan at Section 1.1, pages 11-12 (definition 32); Section 3.16.

15.     Claims channeled to the Asbestos PI Trust "shall be resolved in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI TDP."  *See* Plan at Section 3.1.6(b)(i).

16.     The Asbestos PI TDP provides scheduled, maximum and extraordinary claim values for asbestos-related claims asserted against it, based upon the medical condition of the individual claimant.  WRG Asbestos PI Trust Distribution Procedures ("Asbestos PI TDP), ¶¶ 5.3(a)(3), 5.3(b)(3), 5.4.

17.     The intent in setting the value of the claims under the Asbestos PI TDP was to provide claim values roughly equivalent to what the asbestos-related claimant would have received in the tort system.  9/8/09 Tr. 60:9-60:12, 75:6-76:3; 83:16-82:21(Inselbuch); 9/8/09 Tr. 243:14-243:23; 244:12-244:18; 246:19-246:23 (Peterson).

18.     The scheduled and maximum values of claims are based, in part, on the fact that the majority of the asbestos-related claims asserted against the Debtors arose in cases where the claimants were exposed to numerous sources of asbestos, and, as a result, will be able to recover against numerous other manufacturers of asbestos-related products.  9/8/09 Tr. 45:14-45:21, 9/8/08 Tr. 96:14-97:1, 100:9-100:28 (Inselbuch).

19. The extraordinary values for claims are designed to capture those circumstances where the claimant was exposed principally to Grace asbestos-related materials or products. As a result, the claimant will not be able to recover against numerous other manufacturers. 9/8/09 Tr. 52:6-53:18; 96:14-97:1 (Inselbuch); 9/8/09 Tr. 253:1-253:11; 254:7-255:19; 256:11-256:25 (Peterson).

20. The Asbestos PI TDP prevents an indirect trust claimant (such as BNSF) from receiving an award against the Trust in excess of what the underlying asbestos claimant would have received. Asbestos PI TDP ¶5.6; 9/14/09 Tr. 112:10:112:14 (Inselbuch).

21. A claimant who may receive a substantial recovery from a third party is not entitled to the extraordinary claim value, even where such third party defendants are derivatively liable for Grace's conduct, as opposed to independent manufacturers of asbestos-related products. Abestos PI TDP ¶5/4(a).

22. To the extent a claimant is successful in asserting a claim against BNSF, BNSF will be prohibited from receiving an award equal to the extraordinary claim value, but will be entitled to a likely award equal to 1/8th the extraordinary claim value. 9/14 Tr. 131:13-131:23 (Inselbuch).

23. The Plan Proponents did not consider the rights of contractually indemnified third parties to recover attorneys' fees and other defense costs when establishing the claim values ascribed by the Asbestos PI TDPs. 9/14/09 Tr. 114:19-116:7, 121:18-122:3 (Inselbuch).

24. As expressly acknowledged by Grace's former Director of Risk Management, costs in defending asbestos cases can actually exceed the indemnity costs. 9/11 Tr. 332:7-332:15 (Posner).

## II.    ARGUMENT

### A.    The Plan Cannot Be Confirmed Because it Does Not Extend the Channeling Injunction to All Derivative Claims[4]

As set forth in its previous briefs and objections, the claims against BNSF are purely derivative of claims against Grace.  Claims against BNSF constitute indirect attempts to recover on claims arising out of Grace's mining, milling, processing and transporting asbestos-containing vermiculite.  As such, the channeling injunction should extend to derivative claims asserted against BNSF.

### B.    Alternatively, BNSF's Claims Should Be Treated As General Unsecured Claims.

To the extent claims against BNSF are not enjoined and channeled to the Asbestos PI Trust, they should not be classified as Class 6 claims.  BNSF hereby incorporates the following objections and arguments as if fully set forth: *Preliminary Objection of the State of Montana*, Dated December 22, 2008, Docket No. 20305, pages 8-10; *Brief of State of Montana*, dated May 20, 2009, Docket No. 21785, pages 7-15; *Trial Brief of State of Montana*, dated July 13, 2009, Docket No. 22429, pages 11-14 & 19-21; *Arrowood Indemnity Company f/k/a Royal Indemnity Company's Objections to Debtors' Amended Joint Plan of Reorganization*, Dated May 20, 2009, Docket No. 21814; *Phase II Trial Brief of Allstate Insurance Compnay*, Dated July 13, 2009, Docket No. 22406, pages 10-14; *Trial Brief of Maryland Casualty Company*, Dated July 13, 2009, Docket No. 22426, pages 7-8.

---

[4] The Court has directed the parties not to file briefs restating arguments previously made.  BNSF includes this brief reiteration to prevent any party from asserting that BNSF has waived this argument.

C.      **The Plan Impermissibly Strips BNSF's Contract Rights[5]**

BNSF is contractually entitled to full indemnity for claims relating to Grace's operations at the Libby mine, including indemnification for defense costs.  The Plan channels these claims to the Asbestos PI Trust, but then impermissibly eviscerates BNSF's contract rights by limiting the likely award BNSF will ever receive against the Asbestos PI Trust to no more than what the Plan Proponents assert is roughly equal to $1/8^{th}$ of the indemnity costs BNSF will have to pay to third parties, and with no right to recover any portion of BNSF's attorneys' fees.

The Asbestos PI TDP claim values were calculated to roughly equal 100% of the claims that the asbestos creditors would receive in the traditional tort system.  The scheduled and maximum values reflect the fact that the vast majority of the claimants will have been exposed to asbestos that was processed or contained in products manufactured by numerous other defendants.  The Plan Proponents have established that these values roughly equal the expected proportion of liability that Grace would face in the tort system where other asbestos-related manufactures (as many as 20 other defendants) would also be liable to the plaintiff.

Recognizing that some creditors were exposed solely or predominately to asbestos-containing materials or products of Grace, the Asbestos PI TDP provides for an enhanced recovery to such claimants.  If a claimant can establish that their exposure to asbestos was 95% or more to Grace asbestos, they are eligible for an award equal to 8 times the maximum value.  The Plan Proponents have provided testimony and other evidence that the 8 times

---

[5] BNSF previously asserted that the Plan violates the Absolute Priority Rule and that the Plan is not fair and equitable.  These arguments were based on BNSF's understanding that the Asbestos PI TDP did not restrict a jury from entering judgment against the Trust for the full amount of a creditors' claim, even if such claim was in excess of the maximum amount permitted to be awarded in the expedited or individual review process.  Testimony at trial demonstrated that it is the Plan Proponents' intent to restrict jury awards to the maximum value established by these processes.  As such, BNSF's arguments that the Plan cannot be confirmed are more compelling.  BNSF preserves its remaining objections to the TDPs as set forth in its previous filings, and will not restate them here.

multiplier renders the award to such claimants roughly equal to the liability that Grace would face in the traditional tort system.

However, if a claimant could potentially recover a substantial amount from *any* third party (including third parties whose liability is derivative of Grace and not based upon their own processing, manufacture or sale of asbestos containing materials or products), the claimant is not entitled to the enhanced award calculated with the 8 times multiplier.

A claimant asserting a right to contractual indemnity is limited to an award no greater than the award that the underlying claimant would receive against the Trust.  Thus, BNSF will be unable to recover an award against the Asbestos PI Trust calculated by utilizing the 8 times multiplier, because any award rendered against it in the tort system would necessarily disqualify the underlying creditor from receiving an award equal to the 8 times multiplier value. Thus, the Asbestos PI TDP effectively and improperly re-writes the contracts between BNSF and Grace, limiting Grace's indemnification to a partial indemnification, limited to what Grace would have been liable for if there were other asbestos manufacturers who are liable to the plaintiff, despite the fact that, in Libby, there are no such other defendants.  This evisceration of BNSF's contract rights is simply impermissible as fundamentally inequitable.

But it does not end there.

Grace is contractually obligated to provide BNSF with a defense of the claims. The Asbestos PI TDP, however, provides no mechanism by which BNSF can receive an award that includes its defense costs, which often exceed indemnity costs.  Thus, the Asbestos PI TDP impermissibly restricts BNSF to an award roughly equal to $1/8^{th}$ of the indemnity claim Grace is contractually obligated to pay, with no reimbursement for defense costs.  As such, the Asbestos

PI TDP results in an award equal to approximately 1/16[th] of the amount BNSF is contractually entitled to receive, inconsistent with what other creditors in the same class are obtaining.

BNSF is entitled to an award equal to the full value of its contract rights, and there is no basis for unilaterally eliminating BNSF's bargained-for contractual rights. The Plan's elimination and absolute disallowance of BNSF's contractual claims renders the Plan unconfirmable, as inconsistent with the Bankruptcy Code. *See* 11 U.S.C. 502(b) & 1123(a)(4); *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 24-25 (2000) ("Bankruptcy courts do indeed have some equitable powers to adjust rights between creditors. *See, e.g.,* § 510(c) (equitable subordination). That is, within the limits of the Code, courts may reorder distributions from the bankruptcy estate, in whole or in part, for the sake of treating legitimate claimants to the estate equitably. But the scope of a bankruptcy court's equitable power must be understood in the light of the principle of bankruptcy law discussed already, that the validity of a claim is generally a function of underlying substantive law. Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides.").

      **D.**     **The Plan Violates the Absolute Priority Rule**

Because general unsecured creditors are receiving payment in full, and equity holders are maintaining their interest, the Plan will violate the absolute priority rule if any class of claims votes to reject it. *See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 119 S. Ct. 1411 (1999).

BNSF, and other holders of contractual indemnity claims, are being treated substantially differently from other creditors in Class 6, and should not have been included in Class 6 for voting purposes. Holders of full contractual indemnity rights, including rights to

recover defense costs, are receiving awards against the estate roughly equal to 1/16[th] of their

claim.  Direct holders of asbestos claims are receiving awards roughly equal to 100% of their

claims.  Applying the anticipated payment percentage of approximately 30%, BNSF and other

holders of full contractual indemnity rights are receiving payment equal to less than 2% of their

otherwise allowable claims, while direct asbestos claimants will receive a 30% distribution.

Unsecured creditors are receiving 100% distribution, plus interest, and equity is retaining

significant value.

In a case where equity is not only retaining their interests, but are retaining

interests likely worth hundreds of millions of dollars, it is imperative that the Debtors either pay

all claims in full or achieve a consensual plan whereby the claimants receiving less than full

payment agree to the less favorable treatment.  By including BNSF and other similarly situated

claimants (who will receive less than 2% payment on the value of their claims outside of

bankruptcy) in the same class as creditors who will receive 30% payment on a "rough justice"

value approximating 100% of their claims outside of bankruptcy, the Plan Proponents effectively

diluted BNSF's and other claimants' votes, ensuring that the class would vote in favor of the

Plan.  The Court should see past this subterfuge, and deny confirmation to a Plan that permits

equity to retain value on the backs of disenfranchised creditors.

E.    **The Asbestos PI Trust Distribution Procedures Are Not Fair and Equitable.**

The Asbestos PI TDP does not adequately protect the rights of Indirect PI Trust

Claimholders such as BNSF.  If a claim is channeled to an asbestos trust, the trust must

undertake that claim.  A claim cannot be channeled to a trust who is not obligated to make

payment on such claim.  There is no provision in Section 524(g), or elsewhere in the Bankruptcy

Code, that permits a debtor to strip a creditor of its contractual rights.  The present plan,

however, does just that.  Without any justification, the Asbestos PI Trust TDP rewrites the

contractual indemnity between Grace and BNSF, limiting BNSF to only partial, as opposed to

full, indemnity, and eliminating BNSF's rights to defense costs.  This is wholly impermissible

and renders the plan unconfirmable.

> F.      **JOINDER & RESERVATION OF RIGHTS**

BNSF incorporates by reference its previously filed objections and briefs and

joins in other objectors' trial briefs, post-trial briefs and objections.

## III.    CONCLUSION

The Plan is unconfirmable because it improperly eliminates BNSF's bargained-

for contractual rights, and its trust distribution mechanisms will result in an award equal to only

a fraction of the value of BNSF's claims.

BNSF is treated in a dissimilar and inequitable manner.  The Plan and Asbestos PI

TDP do not attempt to provide a mechanism that will permit BNSF to obtain even a "rough

justice" award close to its full claims, while other creditors in the same class will receive an

award roughly approximating the value of their claims outside of bankruptcy.  This

discriminatory treatment is improper.

BNSF was disenfranchised, by being included in the same class with other

creditors receiving substantially better treatment.  A Plan that pays unsecured creditors in full,

and retains significant value for equity, cannot be confirmed by disenfranchising creditors who

are receiving only a small fraction of the value of their claims.

As such, the Plan is unconfirmable.

Dated:  November 2, 2009
        Wilmington, Delaware

PEPPER HAMILTON LLP

/s/ Evelyn J. Meltzer
Evelyn J. Meltzer (DE No. 4581)
Hercules Plaza, Suite 5100
1313 North Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(Courier No. 19801)
Telephone: (302) 777-6500
Facsimile:  (302) 421-8390

Of Counsel:

Edward C. Toole, Jr.
Linda J. Casey
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
Tel: (215) 981-4000
Fax: (215) 981-4750

Counsel for BNSF Railway Company

Counsel for BNSF Railway Company