**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | (Jointly Administered) |

**LIBBY CLAIMANTS' POST-TRIAL BRIEF IN SUPPORT OF OPPOSITION TO
CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION**

**Table of Contents**

I.    Summary of Argument ................................................................................1

II.   Post-Trial Briefing on Certain Objections to Plan Confirmation .........................6

      A.   The Plan Discriminates Against the Libby Claimants
           By Under Valuing Their Claims ..........................................................6

      B.   The Plan Fails to Account for Factors Other Than Disease
           Which had a Profound Impact on Claim Values in the Tort
           System..............................................................................................8

      C.   The TDP Medical Criteria Impermissibly Discriminate Against
           Certain Asbestos Personal Injury Claimants ........................................10

           1.   Medical Criteria for Level IV-B are More Exclusionary than
                Medical Criteria for other Disease Levels .....................................11

           2.   The TDP Medical Criteria are Not Medically Reasonable.................15

      D.   Availability of Individual Review Provides No Defense to
           Discriminations at Level IV-B .............................................................18

      E.   The Plan Impermissibly Places the Libby Claimants in a Class
           With Claims That Are Not Substantially Similar, In Violation
           of Section 1122(a).............................................................................19

      F.   The Plan Discriminates Against the Libby Claimants by Depriving
           Them of Insurance Coverage for Which They Do Not Compete
           With Other Claimants ........................................................................21

      G.   The Plan Proponents Failed to Demonstrate that the Libby Claimants
           Will Receive Greater Recoveries Under the Plan Than Under a
           Chapter 7 Liquidation .......................................................................24

III.  Libby Claimants' Response to Plan Proponents' Epidemiology/Daubert
      Challenges Libby Claimants' Experts' Evidence .............................................27

      A.   The Percentages Developed in the Card Morality Study May
           Inform Expert Opinion ......................................................................28

      B.   The Libby Claimants Need Not Produce Nationwide Studies to Prove
           "Impermissible Discrimination" Or That Their Claims Are "Not
           Substantially Similar" To Others .......................................................30

VI.   Conclusion .........................................................................................32

Claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, submit this post trial brief in support of their opposition to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated as of February 27, 2009 (the "Plan") [D.I. 20872].

This brief is divided into three parts. Part I briefly summarizes why the Plan is unfair and unconfirmable as to the Libby Claimants. Part II demonstrates, with specific reference to the evidentiary record, that the Plan may not be confirmed. Part III replies to the *Daubert* motions whereby the Plan Proponents seek to exclude expert testimony offered by the Libby Claimants in support of their objections to confirmation of the Plan. At this Court's request, this brief focuses on the evidentiary record, does not present legal arguments that have already been presented elsewhere, and does not discuss at all those arguments that are legal in nature and do not involve disputed facts.[2]

## I.      Summary of Argument

Grace's operations in the vicinity of Libby, Montana, blanketed the area in asbestos dust. The severity of conditions in Libby has most recently been demonstrated by the EPA's

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 21365], as it may be amended and restated from time to time.

[2] For the bases of Libby Claimants' opposition to confirmation in addition to those addressed in this brief, please see: Supplemental Trial Brief of Libby Claimants in Opposition to Confirmation of First Amended Joint Plan of Reorganization, Addressing Best Interests of Creditors Test Under 11 U.S.C. 1129(a)(7) dated August 26, 2009 [Docket No. 22965]; Trial Brief of Libby Claimants In Opposition to Confirmation of First Amended Joint Plan of Reorganization dated July 13, 2009 [Docket No. 22439]; Supplement to Libby Claimants' Objection to the First Amended Joint Plan of Reorganization dated July 10, 2009 [Docket No. 22385]; and Libby Claimants' Objection to the First Amended Joint Plan of Reorganization dated May 20, 2009 [Docket No. 21811].

declaration of a Public Health Emergency.[3]  In this poisoned environment, Libby has experienced the highest asbestosis rate in the country, including severe pleural disease resulting in death—a phenomenon well documented in Libby but not elsewhere.  Before Grace's bankruptcy, victims of asbestos disease in Libby obtained strikingly higher average verdicts and settlements against Grace than claimants whose exposure occurred elsewhere.  This was not due to runaway juries.  As is demonstrated by the "not guilty" verdict in the criminal case along with Montana's reputation as a low-verdict jurisdiction in civil actions, Montana juries are fair.  Rather, as Grace's own executives have testified, Libby claims present exceptionally strong evidence of exposure to Grace's asbestos and lack of other parties significantly sharing culpability.

As in all bankruptcy cases, claims in asbestos cases are to be determined in accordance with state law.  Accordingly, the professed goal of the TDP proposed as part of the Plan is to liquidate Asbestos Personal Injury Claims at their tort system values.  Yet the terms of the TDP make it impossible for many of the Libby Claimants to achieve this goal.  For other Libby Claimants, the TDP places obstacles in their path—obstacles that other claimants do not face—in order to have the possibility that their claims will be liquidated at tort system value.  As is shown in detail below, evidence at the confirmation hearing established that the TDP discriminates against the Libby Claimants by:

- Establishing maximum claim values for Disease Levels II and III so far below the verdict/settlement levels for such claims in Libby that, even if accorded the status of "Extraordinary Claims" under the TDP, the claims cannot be liquidated for anywhere near their demonstrated tort system value.[4]

---

[3] LC Exhibit 48.
[4]  See Section II(A) below.

- Failing to take account of the factors, apart from disease level, that have led to high verdicts/settlements in Libby.[5]

- Establishing a gauntlet of medically unreasonable criteria for Level IV-B (the severe pleural diseases which is endemic to Libby) so as to relegate to Individual Review a larger portion of Level IV-B Claims than claims in other disease categories[6]—a discrimination exacerbated by the highly discretionary nature of Individual Review.[7]

Thus, the provisions of the TDP unfairly discriminate against the Libby Claimants by making it disproportionally difficult or outright impossible to obtain claim liquidation at tort system value.

These discriminations are exacerbated by the Plan's failure to provide a "safety valve" by permitting Asbestos PI Claimants to liquidate their claims through the tort system. Plaintiffs in civil actions have a constitutional right to trial by jury, and Congress has expressly provided that the jury-trial rights of personal injury claimants are not abridged by the Bankruptcy Code. As a legal issue, the right of the Libby Claimants to trial by jury was not the subject of evidence at the confirmation nor will it be otherwise addressed in this brief.[8] But this Court should remain aware that no finding or ruling on this subject, other than denial of confirmation of the Plan, will adequately address this key issue of Constitutional rights.

The Plan also violates the statutory right of the Libby Claimants to be classified separately from other claims. The evidentiary record indicates that the Libby Claims are

---

[5] See Section II(B) below.
[6] See Section II(C) below.
[7] See Section II(D) below.
[8] Libby Claimants' Trial Brief at pp. 82-86.

3

sufficiently dissimilar to other asbestos personal injury claims that it is unjust to place them in the same class.[9]

The Plan is improper, and discriminates against the Libby Claimants, by failing to compensate them for the greater value of their insurance rights in comparison to those of other personal injury claimants.  Under the Plan, all proceeds of insurance for Asbestos PI Claims are turned over to the Asbestos PI Trust to be distributed to Asbestos PI Claimants in proportion to the liquidated valued of their respective claims.  At first glance, providing the same percentage distribution to all claimants might seem fair.  But the Libby Claimants have "non-product claims" under insurance policies.  These claims are more valuable than products claims because products claims are subject to aggregate limits resulting in exhaustion of coverage.  Just as it would be improper to throw a secured creditor into the same class as unsecured creditors because the secured creditor would be giving up more valuable legal rights in exchange for the same percentage distribution, so it is improper to provide non-products claimants such as the Libby Claimants with the same percentage distribution of insurance proceeds that products claimants will receive.[10]

Similarly, Libby Claimants assert claims against certain insurers for their own tortious conduct ("Independent Claims").  The Libby Claimants assert that Independent Claims are not enjoined by the Asbestos PI Channeling Injunction, cannot under the terms of Section 524(g) of the Bankruptcy Code be the subject of a channeling injunction, and are beyond the subject matter jurisdiction of this Court to enjoin.[11]  Certain insurers argue otherwise.  The Plan Proponents

---

[9]  See Section II(E) below.
[10]  See Section II(F) below.
[11]  The Asbestos PI Channeling Injunction by its terms protects its beneficiaries to the maximum extent permitted under Section 524(g).  The Libby Claimants assert that their Independent Claims are beyond the scope of claims that may permissibly be enjoined.  See Travelers Casualty and Surety Co. v. Chubb Indemnity Insurance Co. (In re Johns-Manville Corp.), 517 F.3d 52 (2d Cir. 2008); In re Combustion Engineering, 391 F.3d 190 (3d Cir. 2004); Libby Claimants' Trial Brief at pp. 92-98.

have refused the Libby Claimants' request to clarify the proposed Asbestos PI Channeling Injunction to make clear that it does not purport to enjoin Independent Claims. To the extent that the Asbestos PI Channeling Injunction *does* enjoin Independent Claims, the Plan discriminates against the Libby Claimants by taking such claims without compensation and without due process.

Finally, the Plan Proponents have failed to meet their burden of proving that the Plan satisfies the "best interests" requirement of Bankruptcy Code Section 1129(a)(7). The Plan Proponents were required to demonstrate that, in a Chapter 7 case, Asbestos PI Claimants such as the Libby Claimants would receive at least as great a percentage distribution as the 25% to 35% distribution they are projected to receive from the Asbestos PI Trust pursuant to the Plan. Yet, at the confirmation hearing, the Plan Proponents did not offer an opinion as to the estimated percentage distribution general unsecured creditors would receive in a Chapter 7 case. Instead, they offered a hodge-podge of testimony that would require this Court to accept a series of unsupported assumptions to conclude that *present claimants* will do as well under the Plan as they would in a Chapter 7 case. For Libby Claimants, moreover, this Court must consider the impact of their insurance rights. In Chapter 7 the Libby Claimants would be permitted to pursue their uncapped insurance coverage. The evidence at confirmation demonstrated that Libby Claimants would be better off in Chapter 7.[12]

In sum, the Plan cannot be confirmed over the continued objection of the Libby Claimants. The Plan discriminates against them, improperly takes away their jury trial rights and provides less value than they would receive under Chapter 7. For these reasons (and based on the additional arguments set forth in the trial brief and other oppositions filed by the Libby Claimants (see footnote 2)), confirmation of the Plan must be denied.

---

[12] See Section II(G) below.

## II.    Post-Trial Briefing on Certain Objections to Plan Confirmation

### A.    The Plan Discriminates Against the Libby Claimants By Under Valuing Their Claims.

Prior to its petition for bankruptcy, Grace settled nearly 200,000 asbestos injury claims nationwide. PP Exhibit 178B, p. 16. Grace settled the claims for an average of approximately $4,000 each. LC Exhibit 63, p. 12. Along with thousands of cases nationwide, Grace settled a number of asbestos personal injury cases arising in Libby prior to its bankruptcy. In contrast to the $4,000 national average, the Libby claims settled for an average of $268,000. LC Exhibit 63, p. 12.

Like most of the settlements nationwide, the majority of settlements in Libby involved claims for non-malignant disease. The average non-malignant disease claim in Libby settled for $242,681, compared to a nationwide average of $3,472. LC Exhibit 270; PP Exhibit 178A, p. T4.[13] Nationwide, even mesothelioma claims, the most highly compensated claims under the Plan, settled on average for less than half the value Grace paid to settled non-malignant disease claims in Libby. PP Exhibit 178A, p. T4.

The Plan Proponents acknowledge that Grace paid far more to settle claims in Libby than it paid for most of the other claims nationwide. Recognizing the need to treat claims similarly by valuing them in accordance with the pre-bankruptcy tort values for similar claims, the Plan Proponents adopted extraordinary claim provisions they claim are intended to address the circumstances in Libby. 9/8/09 Tr., p. 253 (Peterson). Under the extraordinary claim provisions, certain claimants can recover up to eight times the scheduled value for their disease level under

---

[13]PP Exhibit 178A was admitted for demonstrative purposes, based on the testimony of Dr. Mark Peterson. Dr. Peterson's testimony regarding the average settlements was based on figures brought current to 2001 dollars. The average settlement value for non-malignant claims in Libby, on the other hand, was calculated based on actual dollars paid dating back as far as 1987. The true disparity in these average settlement amounts is therefore even larger.

the TDP. PP Exhibit 277.04, § 5.4(a). The decision to treat a claim as extraordinary is entirely within the discretion of an extraordinary claims panel and is not subject to judicial review or the right to trial by jury. 9/8/09 Tr., pp. 90-91 (Inselbuch); PP Exhibit 277.04, § 5.4(a). This is improper, see In re G-I Holdings, Inc., 323 B.R. 583, 616 (Bankr. D. N.J. 2005) and discussion below (Section II.D), and a violation of due process. Furthermore, given the vast disparity between settlement values in Libby and settlement values nationwide, the eight times multiplier does not accomplish its stated purpose of valuing Libby claims consistent with their tort system values.

The Plan Proponents' expert on claim values testified the eight times multiplier would allow claimants in Libby to receive "a level of compensation that is quite close to what people got historically. . ." 9/8/09 Tr., p. 254 (Peterson). To arrive at that conclusion, the Plan Proponents' witness multiplied the scheduled value for disease category Level IV-B under the TDP by eight, and compared that figure to average settlement values for non-malignant claims in Libby prior to the bankruptcy. 9/8/09 Tr., p. 262 (Peterson). The analysis was meaningless, however, because the Plan Proponents gave no consideration to whether the claimants who settled historically in Libby suffered from disease that would fall under category Level IV-B in the TDP. 9/8/09 Tr., p. 263 (Peterson).

The medical testimony admitted in this case established that most of the claims historically settled in Libby involved disease that would not meet the criteria for Level IV-B. LC Exhibit 16AR. With one possible exception, none of the 19 settled claimants identified on LC Exhibit 16AR meet the expedited review criteria for severe disabling pleural disease under Level IV-B of the TDP. Only five of the 19 were characterized as having severe disease by their own treating physician. The other 14 settled claimants were diagnosed with moderate or mild pleural

disease. LC Exhibit 16AR. Claimants with similar disease, diagnosed as moderate or mild, would have no ability to claim severe disabling pleural disease through expedited review, individual review, or any other mechanism provided by the TDP.[14] Unable to meet the TDP criteria for Level IV-B, such claimants would be relegated to either Level III or Level II, with scheduled values of $7,500 and $2,500 respectively. PP Exhibit 277.04, § 5.3(a). At most, even with extraordinary claims treatment, such claims would be valued at $60,000 under the TDP. PP Exhibit 277.04, § 5.4(a). The 14 claimants identified on LC Exhibit 16AR with moderate or mild pleural disease settled their claims for an average of nearly $450,000. LC Exhibit 270. Only one of the claimants settled for less than $150,000, and five received more than $500,000, including one settlement exceeding $1,000,000. LC Exhibit 270. Thus, while the TDP appears to permit claimants around the country to receive values consistent with the values of similar claims in the tort system, claimants with non-malignant disease in Libby will receive values based on a small fraction of the tort system values for similar claims—even if they obtain "Individual Review" and "Extraordinary Claims" treatment.

**B.  The Plan Fails to Account for Factors Other Than Disease Which had a Profound Impact on Claim Values in the Tort System.**

One of the principal reasons the TDP undervalues claims in Libby is that it fails to adequately consider factors such as exposure and aggravated liability which influenced claim values in the tort system. Jay Hughes, Grace's senior litigation counsel, testified that a number of factors influenced the value of asbestos personal injury claims against Grace. According to Mr. Hughes, two of the four most important factors were the "number of Defendants" and the "quality and quantity of the product exposure that was going to be presented against Grace. . . ." 9/9/09 Tr., pp. 49-50 (Hughes). With specific reference to Libby, Mr. Hughes explained that the

---

[14] PP Exhibit 277.04, § 5.3.

Libby cases were valued higher for various reasons, including the lack of any other Defendants and the "fundamental difference" in the strength of exposure-to-Grace-asbestos evidence for Libby claims compared with exposure evidence elsewhere. 9/9/09 Tr., pp. 52-53 (Hughes).

This fundamental difference in strength of exposure evidence between claims arising in Libby and most other claims arising elsewhere is effectively illustrated by Grace's defense during the estimation proceeding in this case. Arguing almost all of the claims asserted against Grace had no value, Grace's lead counsel advised the Court that as many as 95% of the cases involved exposures of less than one fiber per millimeter per year to Grace asbestos. 1/14/08 Tr., p. 42 (Bernick). Grace went on to present expert testimony to the effect that no reliable scientific evidence supports the proposition that exposure to a Grace product caused any disease to 77% of the claimants in this bankruptcy. 3/26/08 Tr., pp. 92-93, 98, 112 (Anderson). Describing Libby, by contrast, Grace's counsel told a jury in Missoula, Montana, "[t]here is no question that the miners and their families suffered tragic losses as a consequence of the operation of [Grace's] mine." United States of America v. W.R. Grace & Company, Case No. CR05-07-M-DWM, 2/23/09 Tr., pp. 112-13 (Bernick).

When valuing cases for settlement prior to the bankruptcy, Mr. Hughes questioned the credibility of the product exposure evidence in many of the cases around the country. 9/9/09 Tr., p. 182 (Hughes). In Libby, on the other hand, the exposure evidence was so strong Grace could not defend the cases by questioning exposure. 9/9/09 Tr., p. 183 (Hughes). In fact, Mr. Hughes acknowledged the existence of an epidemiological study finding an increased incidence of asbestos-related disease among the individuals filing claims against Grace in Libby. 9/9/09 Tr., p. 66 (Hughes). The study provided strong evidence of causation which did not exist elsewhere. 9/9/09 Tr., p. 66 (Hughes).

Because evidence of exposure to Grace asbestos was weak in many of the products cases filed throughout the country, Grace frequently prevailed in cases tried to verdict. 9/9/09 Tr., p. 181 (Hughes). In fact, Grace achieved defense verdicts in more than two-thirds of the cases it tried. LC Exhibit 271B. With respect to claims arising in Libby, however, Grace lost every trial. LC Exhibit 271. The lack of any causation defense in Libby, and the fact that Libby claimants were exposed only to Grace asbestos, contributed to the huge disparity in settlement values referenced herein.

The Plan Proponents claim the TDP individual review process takes factors such as exposure and the lack of any other Defendants into consideration. While the TDP does provide for some discretion in the assessment of claim values on individual review, it establishes caps on claim values which are based solely on medical condition. As a result of the strong evidence of exposure and aggravated liability in Libby, claimants with non-malignant disease, including those with mild and moderate impairment, received an average of nearly $250,000 in the tort system. LC Exhibit 270. As a result of the medically based caps in the TDP, claimants with identical claims now are restricted to a maximum value of $60,000, even with extraordinary claims treatment. By capping claim values based only on medical condition, the TDP fails to recognize the important impact of other factors on the tort system value of asbestos injury claims against Grace and is impermissible discrimination under In re Combustion Engineering, 391 F.3d 190, 239 (3d Cir. 2004).

### C.     The TDP Medical Criteria Impermissibly Discriminate Against Certain Asbestos Personal Injury Claimants.

In violation of Section 1123(a)(4) and Combustion Engineering, the TDP medical criteria impermissibly discriminate against claimants with severe pleural disease (Level IV-B under the TDP)—the level of nonmalignant asbestos disease endemic to Libby. The

discrimination takes two forms: (1) Whereas claimants at other disease levels, from

mesothelioma (Level VIII) down to nonmalignant asbestos disease without impairment (Level

II) are designed to be straightforward and to permit the vast majority of claims to be liquidated

on Expedited Review, the evidence adduced at the confirmation hearing demonstrates that the

medical criteria for Level IV-B exclude by far the majority of legitimate claims; and (2) Whereas

there has been no suggestion that medical criteria for other disease levels are medically

unreasonable, the evidence adduced at the confirmation hearing demonstrates that Level IV-B

includes criteria that are medically unreasonable. These discrimination are impermissible under

Section 1123(a)(4) and <u>Combustion Engineering</u> and violate the Libby Claimants' right to equal

protection of the laws. The Libby Claimants recognize that the Court has not accepted the

discrimination argument as a theory of relief.

**1.      Medical Criteria for Level IV-B are More Exclusionary
than Medical Criteria for Other Disease Levels.**

In the TDPs, cancer claimants qualify on a standard diagnosis. PP Exhibit 275, pp.24-25.

This operates at Level VIII (mesothelioma), Level VII (lung cancer), and Level V (other

cancers). At Level IV-B (severe pleural disease), the TDPs place several "add-ons" onto the

standard diagnosis and evaluation of severity. The blunting requirement is not necessary to a

clinical diagnosis of diffuse pleural thickening, and is not a measure of severity. 9/10/09 Tr., p.

200-01 (Frank). The 3mm thickness requirement is not a part of the diagnosis of diffuse pleural

thickening, and is not a measure of severity. 9/10/09 Tr., p. 213:9 (Frank); 9/8/09 Tr., pp.

175:15, 176:18 (Welch). Likewise, the 25% extent of the chest wall requirement is not a part of

the diagnosis of diffuse pleural thickening, and is not a measure of severity. 9/10/09 Tr., p.

217:9 (Frank); 9/8/09 Tr., pp. 175:23. 176:18 (Welch). Whereas 100% of cancer claimants with

a standard diagnosis are compensated, the result of the above "add-ons" to the standard diagnosis

and evaluation of severity is that the large majority of severe pleurals are excluded from Level IV-B on expedited review.  This is a categorical discrimination against Libby severe pleurals in particular, and severe pleurals in general.

The exclusionary effect of these medical criteria[15] is demonstrated by how they operate upon a group of patients who died of non-malignant asbestos disease.  Death is the ultimate indicator of severe asbestos disease.  9/10/09 Tr., p. 189:21 (Frank).  Accordingly, a group of deceased patients may be used to evaluate the operation of the medical criteria in Level IV-B "Severe and Disabling Pleural Disease."

The CARD Mortality Study was an evaluation of all deceased patients seen at the Center for Asbestos Related Disease (CARD) in Libby, Montana.  9/10/09 Tr., p. 139:5 (Frank).  The study was done by Dr. Alan C. Whitehouse (pulmonologist at CARD), Dr. Arthur L. Frank (occupational medicine), and Dr. Craig Molgaard (epidemiology).  9/10/09 Tr., p. 139:1 (Frank).  There were 227 deceased.  41 were eliminated because data was incomplete, leaving 186 subjects.  9/9/09 Tr., p. 238:10 (Molgaard).  See LC Exhibit 274, Chart of CARD Mortality Study Subjects.  Of the 186, 110 died of asbestos-related disease, with 34 cancers and 76 non-malignant asbestos-related disease deaths.  9/9/09 Tr., p. 238:16 (Molgaard); LC Exhibit 8, Summary of Mortality Study Disease Percentages.

Dr. Frank performed chest x-ray measurements for the 76 non-malignant deceased.  Data was entered on a spreadsheet, and Dr. Frank verified the data.  9/10/09 Tr., p. 178:7 (Frank).  Specifically in relation to the TDP medical criteria for Level IV-B, Dr. Frank made entries for present/absence of blunting of the costophrenic angle, thickness of pleural thickening in millimeters, and extent of pleural thickening in percentage of the chest wall.  LC Exhibit 13, CARD Mortality Study, 76 Non-malignant Deaths, CHX Readings by Dr. Frank.

---

[15]  The medical criteria are found at PP Exhibit 277.04, pp. 24-27.

Specifically, 43% of the deceased did not meet the Level IV-B requirement of blunting of the costophrenic angle. 9/10/09 Tr., p. 203:12 (Frank). 16% did not meet the Level IV-B requirement of a minimum 3mm thickness for pleural thickening. 9/10/09 Tr., p. 214:13 (Frank). 20% did not meet the Level IV-B requirement of extent of pleural thickening over 25% of the chest wall. 9/10/09 Tr., p. 217:19 (Frank).

Dr. Frank's spreadsheet, LC Exhibit 13, also presents lung function test information for each of the deceased. This can be used to evaluate how well the deceased meet the Level IV-B and Level III lung function requirements.

For asbestos disease, the best measure of severity is the clinical functioning of the individual. 9/10/09 Tr., p. 190:5 (Frank). With regard to pleural disease, there is no correlation between radiographic severity and functional severity. 9/10/09 Tr., p. 289:15 (Frank). Physical function is best measured by pulmonary function testing. 9/10/09 Tr., p. 289:15 (Frank). Diffusion capacity (DLCO) is one of the three main indicators of functional severity. The TDP medical criteria omit to include DLCO in the qualifying medical criteria for Level IV-B. 48% of the deceased in the CARD Mortality Study had only DLCO in the severe range (under 65). LC Exhibit 13 spreadsheet by Dr. Frank, DLCO column. Exclusion of DLCO operates as a discrimination without reasonable medical basis. 9/10/09 Tr., p. 219:14 (Frank).

In the Level III and IV-B lung function criteria, the FEV1/FVC ratio is used as a limit on the FVC (forced vital capacity) requirement. 9/10/09 Tr., p. 289:5 (Frank). 40% of the non-malignant deceased in the CARD Mortality Study did not meet the Level IV-B requirement that the ratio exceed 65. 9/10/09 Tr., p. 218:9 (Frank).

Dr. Frank ran all 76 deceased through the Level IV-B medical criteria, including both the chest x-ray criteria and the lung function test criteria, and determined that only 14% pass and

qualify for Level IV-B, Expedited Review.  9/10/09 Tr., p. 223:13 (Frank).  This means that 86% of the CARD patients who died from non-malignant asbestos-related disease are excluded from Level IV-B on Expedited Review.

There are additional discriminations.  The Level IV-B medical criteria require bilateral asbestos disease, whereas Level IV-A does not.  The TDP medical criteria for Level IV-B thus exclude about 7% of asbestos disease patients who have unilateral disease.  9/10/09 Tr., p. 245:9 (Frank).  This is not medically reasonable.  9/10/09 Tr., p. 221:7 (Frank).

CT scans are used under the TDP medical criteria for Levels I, II, III and V, but not for Level IV-B.  PP Exhibit 277.04, § 5.3(a)(3).  CT scans are much more effective in detection of pleural disease than are chest x-rays.  9/10/09 Tr., p. 220:18 (Frank).  Chest x-rays miss 20-50% of cases of pleural thickening.  Id.; 9/8/09 Tr., p. 183:22 (Welch).  There is a medical consensus on this point.  9/10/09 Tr., p. 220:20 (Frank).  Nevertheless, where they would be most effective, CT scans may not be used to identify blunting and to measure thickness and extent of pleural thickening.  9/10/09 Tr., p. 220 (Frank).  Exclusion of CT scans is a discrimination against severe pleurals without medical basis.

In sum, the TDP discriminates against claimants with severe pleural disease by making them run a gauntlet of medical criteria that are different in character and effect from those of other disease categories.  The criteria are different in character because they go beyond a simple and straightforward diagnosis of the disease.  The criteria are different in effect because they will exclude by far the majority of severe pleural claims.  The Plan Proponents have not presented this Court with any study whatsoever of severe pleural disease, let alone one that would demonstrate that the medical criteria of the TDP are reasonable and consistent with the criteria for other diseases and disease levels under the TDP.  By contrast, the Libby Claimants have

demonstrated through the CARD Mortality Study data that the Level IV-B medical criteria

impermissibly discriminate against claimants who have severe pleural disease.

    The discrimination falls disproportionately on the Libby Claimants.  While there are

undoubtedly a few cases of severe pleural disease from outside Libby, Libby Claimants

constitute by far the majority of severe pleural cases.  Whether viewed as discrimination against

claimants with a certain type of asbestos disease (severe pleural disease) or against claimants

from a particular area (Libby), the discrimination embodied in the TDP medical criteria is

impermissible under Combustion Engineering.

### 2.    The TDP Medical Criteria Are Not Medically Reasonable.

    Not only are the medical criteria for Level IV-B blatantly discriminatory, as just

explained, but the evidence demonstrates that the criteria are medically unreasonable.

    The 3mm minimum thickness requirement for pleural thickening at Level IV-B is not

medically reasonable.  9/10/09 Tr., p. 218:13 (Frank).  There is no such requirement in the

diagnostic criteria for asbestos-related pleural disease.  9/10/09 Tr., p. 213:12 (Frank); 9/8/09 Tr.,

p. 175:23 (Welch).  The 3mm requirement is not a measure of severity of disease.  9/10/09 Tr., p.

213:15 (Frank); 9/8/09 Tr., p. 176:18 (Welch).  The 3mm comes from the International Labor

Organization system, which is a system of classification.  9/10/09 Tr., p. 242:23 (Frank).  The

ILO system is not diagnostic, and is not used in treating real patients.  9/10/09 Tr., p. 289:18

(Frank); 9/8/09 Tr., p. 178:12 (Welch).

    The requirement at Level IV-B that the pleural thickening exceed 25% of the chest wall

is not medically reasonable.  9/10/09 Tr., p. 219:5 (Frank).  It is not an element of the diagnosis

of asbestos-related pleural disease.  9/10/09 Tr., p. 217:9 (Frank); 9/8/09 Tr., p. 175:23 (Welch).

Nor is it a measure of severity of the disease.  9/10/09 Tr., p. 217:11 (Frank); 9/8/09 Tr., p.

176:18 (Welch). Similarly, the 25% extent requirement comes from the ILO classification system, which is not diagnostic.

The requirement at Level IV-B of blunting of the costophrenic angle is not medically reasonable. 9/10/09 Tr., p. 204:12 (Frank). Clinically, blunting of the costophrenic angle is not always found in a diagnosis of diffuse pleural thickening. 9/10/09 Tr., p. 200:20 (Frank). It is not a measure of severity of asbestos-related disease. 9/10/09 Tr., p. 201:4 (Frank). It is "pulmonary function criteria that define the severe disability." 9/8/09 Tr., p. 132:20 (Welch). Blunting was described on a drawing of the lung. LC Exhibit 277; 9/10/09 Tr., p. 201:24 (Frank).

American Thoracic Society (2004) "Diagnosis and Initial Management of Non-Malignant Diseases Related to Asbestos," p.707, describes three kinds of pleural thickening. 9/10/09 Tr., p. 210:7 (Frank). The two kinds of pleural thickening without blunting would not qualify under Level IV-B. 9/10/09 Tr., pp. 211:17 and 212:22 (Frank). Per the McLoud et al (1985) study, less than half of cases of diffuse pleural thickening had blunting of the costophrenic angle. 9/10/09 Tr., p. 209:23 (Frank); 9/8/09 Tr., p. 194:12 (Welch); LC Exhibit 278. In the CARD Mortality Study data, about half of the deceased had blunting. 9/10/09 Tr., p. 211:20 (Frank). The Level IV-B requirement of blunting in all cases is not medically reasonable. 9/10/09 Tr., p. 204:12 (Frank).

The TDP medical criteria at Levels IV-B and III omit to use diffusion capacity (DLCO) as a measure of severity. DLCO is one of the three measures of severity for asbestos-related disease. 9/10/09 Tr., p. 190:11 (Frank). For patient care, one would certainly use DLCO as a measure of patient functioning. 9/10/09 Tr., p. 219:15 (Frank). ATS (2004) recommends DLCO for evaluation of asbestos disease. 9/8/09 Tr., p. 185:12 (Welch). The AMA Guides to

16

Permanent Impairment used nationwide use DLCO as an indicator of severity. 9/8/09 Tr., p. 185:21 (Welch). Exclusion of DLCO is without medical basis. 9/10/09 Tr., p. 219:17 (Frank)

CT scans are much more effective in detection of pleural disease than are chest x-rays. 9/10/09 Tr., p. 220:18 (Frank). Chest x-rays miss 20-50% of cases of pleural thickening. 9/10/09 Tr., p. 201:24 (Frank); 9/8/09 Tr., p. 183:22 (Welch). There is a medical consensus on this point. 9/10/09 Tr., p. 220:20 (Frank). Nevertheless, CT scans are used under the TDP medical criteria for Levels I, II, III and V, but not for Level IV-B where they would be most effective. CT scans may be used to identify blunting and to measure thickness and extent of pleural thickening. 9/10/09 Tr., p. 220 (Frank). Exclusion of CT scans is without medical basis.

The Level IV-B medical criteria require bilateral asbestos disease, whereas Level IV-A does not. The TDP medical criteria thus exclude about 7% of asbestos disease patients who have unilateral disease. 9/10/09 Tr., p. 245:9 (Frank). This is not medically reasonable. 9/10/09 Tr., p. 221:7 (Frank).

In sum, the medical criteria for Level IV-B are medically unreasonable and present a barrier to severe pleural claimants that claimants in other disease categories do not face. The Plan Proponents claim that the intent of the medical criteria for Level IV-B is to capture "clear cases" of severe pleural disease. 9/8/09 Tr., p. 123:6 (Welch). The TDP does not so state. But even if the Court were to accept this transparently *post hoc* rationalization, the question still remains: why are the medical criteria for severe pleural disease designed to bar all but a few claimants while the medical criteria for all other disease categories are designed to let most claimants in? The Plan Proponents never offered any explanation, let alone a satisfactory one. The overly exclusionary medical criteria for Level IV-B are discriminatory against severe pleural claimants, most of whom happen to be from Libby.

### D.      Availability of Individual Review Provides No Defense to Discriminations at Level IV-B.

The availability of Individual Review under the TDP does not cure this discrimination against those with severe pleural disease.  First, as just demonstrated, claimants in other disease categories are not forced to run a gauntlet of unreasonable medical criteria resulting in most claims being relegated to Individual Review.  But in addition, the Individual Review process itself is unfair; it lacks standards and represents an impermissible delegation of what is properly a judicial function.  Even assuming that it is proper to relegate any claimant to the vagaries of Individual Review, it is certainly discriminatory to consign the majority of claimants with severe pleural disease to the unbridled discretion of the Asbestos PI Trust.

Individual Review has no medical criteria, no medical guidelines, and no physician involvement is required.  PP Exhibit 275, p.29.  The review is entirely discretionary with the Asbestos Personal Injury Trust.  The provisions for Individual Review are devoid of medical reasonableness.  9/10/09 Tr., p. 233:23 (Frank).

In the case of In re G-I Holdings, Inc., 323 B.R. 583, 616 (Bankr. D. N.J. 2005), the bankruptcy court rejected the asbestos debtor's claims estimation methodology, because it attempted to impermissibly delegate the court's liquidation authority to a non-judicial entity.  The estimation methodology rejected by the court—which provided for a court-appointed committee to determine claim values based on exposure criteria, a matrix of disease levels and values, and limited possibility for judicial review—bears a striking resemblance to the proposed terms of the Asbestos PI Trust.  Id. at 590-95.  The heart of the debtor's proposal consisted of a "Claims Liquidation Committee" which would be charged with the responsibility of administering the claims procedures approved by the court:

> Section 3.1 of the Claims Liquidation Procedures states that in order to have an allowed claim based upon an asbestos-related injury, each claimant must provide the CLC with "sufficient evidence" that the claimant . . . (b) suffers from a medical condition which meets the criteria of at least one of the Scheduled Diseased Categories . . .

Id. at 590.  However, "[t]he claims liquidation procedures do not specify what would constitute 'sufficient evidence' nor do they describe the process of how such a conclusion is reached." Id. at n.8.  The court pointed to "the deficiency in the claims liquidation procedures (which) underscores this court's inability to appoint a special, non-judicial entity for liquidating asbestos-related personal injury and wrongful death claims prior to confirmation of a plan of reorganization." Id. at 617.  This analysis in G-I Holdings concerning a proposed pre-confirmation estimation procedure applies even more forcefully in the instant case, where the non-judicial Individual Review process will serve to determine the actual distribution to individual claimants.  Discriminations in the TDP medical criteria are not cured by Individual Review.

**E.      The Plan Impermissibly Places the Libby Claimants in a Class With Claims That Are Not Substantially Similar, in Violation of Section 1122(a).**

Section 1122(a) of the Bankruptcy Code provides that a "plan may place a claim or an interest in a particular class if such claim is **substantially similar** to the other claims or interests of such class." 11 U.S.C. § 1122(a)(emphasis added).  Combustion Engineering, 391 F.3d at 239, observes that Section 1122(a) operates in furtherance of the policy of "equality of distribution among creditors," per Begier v. IRS, 496 U.S. 53, 58 (1990).

The Libby claims are not substantially similar to other non-malignant claims in a number of ways.  The severity and the prognosis of pleural disease caused by exposure to Libby asbestos is different than elsewhere.  9/10/09 Tr., p. 226:9 (Frank).  The probability of death analysis per the CARD Mortality Study for Libby (described above) contrasts with the world literature on the

other hand, which shows only three or four people have died of pleural disease elsewhere.

9/10/09 Tr., p. 226 (Frank).[16]  As even the Plan Proponents' expert acknowledged, outside Libby

"most people with non-malignant asbestos related disease die of something else." 9/8/09 Tr., p.

203:12 (Welch).  Another distinguishing aspect of asbestos disease in Libby, as indicated by the

CARD Mortality Study, is that there were 20 individuals who died of pure pleural disease, with

no evidence of interstitial disease; this has occurred nowhere else.  9/10/09 Tr., p. 187 (Frank).

Lincoln County, Montana (where Libby is located) has the highest asbestosis death rate

of all counties in the United States.  LC Exhibit 53.  This is very powerful epidemiologic

evidence.  9/11/09 Tr., p. 23:2 (Molgaard).  Lincoln County also has the third highest death rate

for mesothelioma.  LC Exhibit 54a.  The Libby Asbestos Site in Lincoln County, Montana, has

been declared by the EPA as a Public Health Emergency.  LC Exhibit 48.  The Determination

and Findings of Public Health Emergency for the Libby Asbestos Site in Lincoln County,

Montana, p.1, states:

> The Libby Asbestos Site is unique with regard to the multiplicity of
> exposure routes, the cumulative exposures experienced by community
> members, and the adverse health effects from asbestos exposure already
> present and documented in the residents.

LC Exhibit 48.  Libby asbestos is winchite asbestos, which is another distinguishing

characteristic.

Because the Libby claims are not substantially similar to other non-malignant asbestos

disease claims, under 11 USC § 1122(a), the Libby Claimants must be separately classified.  The

Plan Proponents presented no evidence of other groups holding claims with a probability of

death by asbestos disease, upon diagnosis of non-malignant asbestos disease.  Separate

---

[16]Note that this evidence was admitted on cross-examination. On direct, the Court sustained objections to the
relevance of a probability of death analysis. 9/10/09 Tr., p. 166. An offer of proof was made on the probability of
death comparison. 9/10/09 Tr., p. 167 (Frank). The Libby Claimants recognize that the Court will likely reject the
probability of death evidence as irrelevant.

classification is necessary, because the probability of death brings with it the probability of

future medical expenses for care and treatment all the way to death.  The medical expenses

amount is greatly different from classes with no probability of death.

F.      **The Plan Discriminates Against the Libby Claimants By Depriving Them of Insurance Coverage for Which They Do Not Compete With Other Claimants.**

Assessing equality of treatment under a plan of reorganization requires analysis of not

only what the creditor will receive, but also what the creditor must give up.  In re AOV

Industries, Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986).  Requiring similarly situated creditors to

give up unequal consideration for the same treatment under a plan necessarily results in unfair

treatment.  Id.[17]

In this case, the Plan requires all claimants to forfeit their insurance rights to the Asbestos

P.I. Trust, and the trust lumps all insurance recoveries together before applying the same

percentage payment to all claims.  9/8/09 Tr., pp. 61-62 (Inselbuch).  The problem with this

approach is that the Libby Claimants possess different, and far more valuable, insurance rights

than the overwhelming majority of claimants.

During many of the years Grace operated the vermiculite mine and mill in Libby,

Montana, it purchased comprehensive general liability insurance coverage.[18]  Grace's general

liability coverage was provided by Royal Indemnity Company from 1954 to 1963, by Maryland

Casualty Company from 1962 to 1973, and Continental Casualty Company ("CNA") from 1973

to 1985.  CNA Exhibits 19A, 19B, and 19C; LC Exhibits 283, 284.

---

[17] See Libby Claimants' Trial Brief at pp. 80-81for further discussion of this legal issue.
[18] During the early years of the mine's operation, Grace's predecessor, the Zonolite Company, purchased the insurance.  As part of the purchase of Zonolite's assets, Grace "obtained all rights under the insurance policies purchased by Zonolite."  PP Exhibit 276, § 2.10.2.1.

Like other comprehensive general liability policies of the same era, Grace's policies distinguished between "products" claims and "non-products" claims. With varying amounts, all of the policies included aggregate limits to cover products claims, while non-products claims were not subject to any aggregate limit. Jeff Posner, who worked as the director of Risk Management for Grace for many years, described the difference in coverage for these two types of claims, explaining Grace's policies would never pay more than the aggregate limits *for products claims*, "whereas the general liability portion, the non-products portion, could pay unlimited amounts of claims as long as each individual claim did not exceed" the per occurrence limit on the policy. 9/11/09 Tr., pp. 270-71 (Posner). Each annual policy issued by Royal Indemnity provided for coverage up to $500,000 per occurrence and each annual policy issued by Maryland Casualty and CNA provided for coverage of up to $1 million per occurrence. CNA Exhibits 19A, 19B, and 19C; LC Exhibits 283, 284. According to Mr. Posner, Grace exhausted or settled all of the products coverage available on its primary insurance policies prior to the bankruptcy. 9/11/09 Tr., p. 282 (Posner). The Plan Proponents estimate the value of available excess liability coverage, applicable to products claims, at $500 million. PP Exhibit 277.12. The Plan Proponents estimate claims against the Asbestos P.I. Trust with total values ranging from $6.3 billion to $7.4 billion. 9/15/09 Tr., p. 207 (Peterson). Coverage applicable to products claims therefore totals less than 10% of the value of the claims.

Coverage for claims arising in Libby, on the other hand, is not so limited. Because the Libby Claimants were exposed to asbestos dust and asbestos waste generated by Grace's mining and milling activity in Libby, and not asbestos-containing products sold in the stream of

commerce, the claims are not subject to the aggregate limits applicable to products claims.[19]

According to Jeff Posner, more than 99% of the asbestos injury claims against Grace are

products claims. 9/11/09 Tr., p. 345 (Posner). By contrast, Mr. Posner viewed the Libby claims

as premises or non-products claims, not subject to the aggregate limit on product coverage

contained in the policies, and Grace claimed non-products coverage from CNA for the Libby

claims prior to its bankruptcy. 9/11/09 Tr., pp. 339-40 (Posner). Mr. Posner provided the Court

his understanding, as an insurance specialist, of the types of claims subject to the product

limitations in Grace's policies, and he agreed the circumstances under which many of the Libby

Claimants were exposed to Grace asbestos take them outside those limitations. 9/11/09 Tr., pp.

340-43 (Posner).[20] Because they are not subject to the aggregate limits applicable to products

claims, the Libby claims are covered at 100% of their value, up to the per occurrence coverage

limits in the policies. By mixing the Libby Claimants' insurance rights with the more limited

insurance rights of products claimants, the Plan improperly subjects the Libby Claimants to

unequal treatment.

The Plan Proponents attempt to minimize the distinct insurance rights of the Libby

Claimants by pointing out that some claimants outside Libby were likewise entitled to non-

products coverage. In particular, the Plan Proponents identify a handful of individuals exposed

to asbestos near Grace vermiculite expansion plants in different parts of the country. PP Exhibit

506.003A. Like the Libby Claimants, some of these individuals were exposed to asbestos

---

[19]The Plan Proponents' claim that non-products coverage available from Royal Indemnity Company and Maryland Casualty Company was resolved by settlements between Grace and the insurers prior to the bankruptcy. For the reasons set forth in the Libby Claimants' trial brief, the Libby Claimants disagree and contend coverage is available to them. Nonetheless, almost all of the Libby Claimants had exposures to Grace asbestos after 1973; their claims are covered by the CNA policies under which the Plan Proponents agree coverage for non-products claims remains available.

[20]Mr. Posner is correct in this regard. The Libby Claimants' claims do indeed arise from exposure to asbestos generated by Grace's operations—such that they are non-products claims under the applicable insurance policies— rather than from exposure to Grace's products.

generated by Grace's operations as opposed to asbestos incorporated into a final product. As such, coverage for their claims would not be limited by the aggregate limits for products claims in Grace's policies. However, the fact that the Plan unfairly deprives a small minority of claimants outside of Libby of similarly valuable insurance rights does not legitimize the Plan's unequal treatment of the Libby Claimants. Among substantially more than 100,000 claimants, the Plan Proponents have identified less than 50 with non-products exposures outside of Libby. These individuals, like the Libby Claimants, have the right to receive the value of the coverage applicable to their claims (except to the extent they have waived such right by accepting the Plan). By mixing their insurance rights together with the less valuable rights of the overwhelming majority of claimants, the Plan unfairly discriminates against claimants with non-products exposures, including the Libby Claimants.

G.    **The Plan Proponents Failed to Demonstrate that the Libby Claimants Will Receive Greater Recoveries Under the Plan Than Under a Chapter 7 Liquidation.**

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, the Plan Proponents have the burden to establish that each claimant not accepting the Plan would achieve a greater recovery under the Plan than under a Chapter 7 liquidation. This test is commonly referenced as the best interest of creditors test. The Plan Proponents project that asbestos PI claimants will recover 25% to 35% of the value of their claims pursuant to the Plan. PP Exhibit 277.04, § 4.2. The Plan Proponents failed to meet their burden, because the evidence before the Court does not establish that claimants would receive less than 25% to 35% of the value of their claims under a Chapter 7 liquidation.

Over objection from the Libby Claimants, Pamela Zilly testified as an expert witness for the Plan Proponents with respect to the best interest of creditors test. Ms. Zilly prepared a best

interest analysis, attached as Exhibit 8 to the Plan. PP Exhibit 277.08. In her best interest analysis, Ms. Zilly determined that under a Chapter 7 liquidation, assets ranging from $2.211 billion to $3.371 billion would be available to satisfy the claims of unsecured creditors. Ex. PP 277.08. In her confirmation hearing testimony, Ms. Zilly attempted to back away from the high end of the range based on the unsupported opinion that a Chapter 7 trustee would not recover any funds from Sealed Air or Fresenius in fraudulent transfer litigation. 9/17/09 Tr., p. 135 (Zilly). In her original best interest analysis, Ms. Zilly more credibly recognized that a Chapter 7 trustee would pursue the fraudulent transfer litigation, and that the outcome of the litigation "cannot be known." 10/13/09 Tr., p. 93 (Zilly). Thus, her original analysis assumed a range of assets available in a Chapter 7 liquidation which included the possibility of a zero dollar recovery from Sealed Air and Fresenius up to approximately $1 billion in recovery from Sealed Air and Fresenius. PP Exhibit 277.08.

With respect to the total value of unsecured claims, Ms. Zilly's original best interest analysis estimated approximately $1 billion in general unsecured claims and included a separate line item for asbestos personal injury and property damage claims. Ms. Zilly left the line item for asbestos PI and PD claims blank, however, noting the asbestos PI and PD claims "would be in dispute." 10/13/09 Tr., p. 100 (Zilly). Ms. Zilly subsequently prepared an expert report in August of this year, wherein she incorporated a portion of the Plan Proponents' trial brief. The portion of the trial brief she incorporated referenced the 2007 expert report of Dr. Mark Peterson to estimate total asbestos PI liability ranging between $5.4 billion and $6.2 billion. Plan Proponents' Main Brief in Support of Plan Confirmation, p. 45 [Docket No. 22733]. The total asbestos PI liability estimated by Dr. Peterson, however, included future claims which could not be presented in a Chapter 7 liquidation. With respect to claims presented through 2009, the brief

estimated the value of those claims at $2.8 billion.  Id.  At trial, again over the Libby Claimants'

objection, Ms. Zilly expressed a new opinion projecting the 2009 value of current asbestos PI

claims to be expected in a Chapter 7 liquidation at $4.7 billion to $5.2 billion.[21]  10/13/09 Tr., p.

26 (Zilly).  While the improperly disclosed opinion should be disregarded, as noted below, it

does not support a conclusion that the Plan satisfies the best interest of creditors test in any event.

      With respect to property damage, the trial brief incorporated into Ms. Zilly's expert

report acknowledges that the asbestos property damage constituencies settled all of the pending

property damage claims, as well as future zonolite attic insulation (ZAI) property damage claims,

for approximately $210 million.  10/13/09 Tr., pp. 104, 107 (Zilly).  Despite the concession, Ms.

Zilly opines that property damage liability under a Chapter 7 liquidation would exceed $1

billion.  PP Exhibit 511-21.  Ms. Zilly based the opinion on a tentative settlement agreement

between the asbestos PI and PD constituencies, whereby those parties proposed splitting a total

recovery from Grace 85% to PI claimants and 15% to PD claimants.  Ms. Zilly demonstrated a

lack of understanding regarding the terms of the tentative agreement, which was discussed in the

context of this Chapter 11 reorganization and never finalized.  10/13/09 Tr., pp. 109-10 (Zilly).

As the Plan documents clearly reflect, the PI and PD constituencies did ultimately agree to settle

in the same Chapter 11 proceeding on terms which allocated less than 15% of the total payments

to property damage claims.  10/13/09 Tr., p. 110 (Zilly).  The best available evidence of the

value of property damage claims to be expected in a Chapter 7 liquidation is the value assigned

to those claims by the parties themselves, approximately $200 million.  In fact, in a Chapter 7

---

[21]Ms. Zilly has no expertise with respect to estimating asbestos personal injury liability.  For her best interest
analysis, she simply accepted the opinions of Dr. Mark Peterson without considering any opinions developed by
other parties.  In her earlier testimony, Ms. Zilly criticized another expert witness, Mr. Robert Frezza for taking the
same approach with respect to solvency.  9/16/09 Tr., pp 109-10 (Zilly).  Dr. Peterson's opinions regarding the
extent of Grace's asbestos PI liability fell at the high end of a wide range of estimates prepared by multiple parties.
10/13/09 Tr., pp. 129-33 (Zilly); PP Exhibit 511.006.

liquidation, some lesser amount could be expected as the $200 million in settlements include future ZAI claims which could not be presented under Chapter 7.

Even using Ms. Zilly's improperly disclosed and inflated figures for asbestos PI liability, the evidence does not support a conclusion that the Libby Claimants would receive more under the Plan than a Chapter 7 liquidation. Assuming general unsecured claims of $1 billion, and property damage claims of $200 million, the total liabilities under Chapter 7 would range from $5.9 billion to $6.4 billion. Utilizing Ms. Zilly's original asset range of $2.2 billion (assuming no fraudulent transfer recovery) to $3.3 billion, the Chapter 7 payment percentage ranges from a low end of 34% to a high end of 56%. Since the expected payment percentage under the Plan will be only 25% to 35%, the Plan Proponents have failed to meet their burden with respect to the best interest of creditors test.

Furthermore, as discussed in greater detail in the Libby Claimants' Supplemental Trial Brief Regarding the Best Interests of Creditors Test, under Chapter 7, the Libby Claimants would benefit from the non-products insurance covering their claims and the lack of a cap on a jury's determination regarding the value of their claims. Under Chapter 7, the Libby Claimants would be entitled to relief from the automatic stay to pursue Grace's insurance. The Libby Claimants would also have the right to a jury trial, without arbitrary caps, to establish the allowed amount of their claims. Taking these differences into account, the Libby Claimants would be far better off in a Chapter 7 liquidation than under the current plan of reorganization.

III.    **Libby Claimants' Response to Plan Proponents' Epidemiology/Daubert Challenges to Libby Claimants' Experts' Evidence**

Prior to the start of the Confirmation Hearing, the Plan Proponents filed several Daubert motions or motions in limine seeking to exclude expert testimony on behalf of the Libby

Claimants.[22]  In accordance with this Court's case management order, the Libby Claimants

timely filed responses to each of these motions.[23]  On October 14, 2009, the Court heard oral

argument on the motions.  At the hearing, the Libby Claimants requested, and the Court granted,

that they be allowed to respond to certain of the allegations made by the Plan Proponents in this

post-trial submission.

A.    **The Percentages Developed in the Card Mortality Study May
Inform Expert Opinion.**

The Plan Proponents argue that the CARD Mortality Study as a descriptive epidemiology

study may not be used to prove causation, and therefore it cannot be used as a basis for expert

opinion.  Interestingly, Grace made this argument to Judge Molloy in the criminal case against

W.R. Grace.  Judge Molloy accepted Grace's position and was reversed by the Ninth Circuit.

U.S. v. Grace et al., 504 F.3d 745, 766 (9th Cir. 2007).

At issue in U.S. v. Grace was the Peipins et al. (2003) publication and the related ATSDR

(2001) report, which presented the results of chest x-ray screenings in Libby in 2000-2001.

Grace, 504 F.3d at 763.  Peipins et al (2003) "found that 1,186 of 6,668 participants

(approximately 18% of those x-rayed) had abnormalities of the linings of their lungs (pleural

abnormalities)."  LC Exhibit 49, p.13.  Peipins et al (2003) was a descriptive study.  9/9/09 Tr.,

p. 229:1 (Molgaard).  The Peipins study was "not designed as an epidemiology study to show

causality."  Grace, 504 F.3d at 765.  The Ninth Circuit ruled that the Peipins study could be used

to inform expert opinion, as follows:

---

[22] Plan Proponents' Motion in Limine to Exclude Testimony of Alan Whitehouse, M.D., Arthur Frank, M.D., and Craig Molgaard, PH.D., and Terry Spear, PH.D. [Docket No. 22766];  Plan Proponents' Motion in Limine to Preclude Expert Testimony on Behalf of the Libby Claimants Where the Reliance Materials on Which the Testimony is Based Have Not Been Produced [Docket No. 22800].

[23] Libby Claimants' Opposition to Plan Proponents' Motion in Limine to Exclude Libby Experts' Testimony [Docket No. 23072]; Libby Claimants' Brief in Response to Plan Proponents' Motion in Limine to Preclude Expert Testimony on Behalf of the Libby Claimants Based Upon an Alleged Failure to Produce Reliance Materials [Docket No. 23033].

> Further, the fact that a study is **associational rather than an epidemiological study intended to show causation does not bar it from being used to inform an expert's opinion** . . .
>
>     . . .
>
> Moreover, the study which was published in a peer reviewed journal and relevant to association, is adequate under 702. **The study's failure to establish causation goes to the weight it should be accorded**, but does not mean that an expert could not rely on it in forming opinion. (Emphasis added).

Id. The CARD Mortality Study is a descriptive epidemiology study. 9/9/09 Tr., p. 237:21 (Molgaard). Where a doctor publishes a medical study following patients over time and describes a disease process, that is a descriptive epidemiology study. 9/9/09 Tr., p. 231:3 (Molgaard). Descriptive studies establish associations. 9/9/09 Tr., p. 231:15 (Molgaard); 9/10/09 Tr., p. 101:15 (Molgaard). "An association" is a relationship between two events that is usually statistically shown to be true. 9/9/09 Tr., p. 233:6 (Molgaard). An association can be expressed in the form of a percentage. 9/9/09 Tr., p. 233:10 (Molgaard). The CARD Mortality Study developed associations in the form of percentages, e.g., 43% of the deceased did not have blunting of the costophrenic angle. 9/10/09 Tr., p. 203:12 (Frank).

Descriptive studies may provide evidence of epidemiologic causation. 9/10/09 Tr., p. 121:1 (Molgaard). The CARD Mortality Study as a descriptive epidemiology study, using population surveillance, may provide evidence of epidemiologic causation. 9/10/09 Tr., p. 125:18 (Molgaard). Proof of causation in epidemiology requires replication. 9/9/09 Tr., p. 232:2 (Molgaard).

In the law, a "mere hypothesis" is one without validation by data or careful observation. In re Scrap Metal Anti-Trust Litigation, 527 F.3d 517, 530-31, (6th Cir. 2007) ("unsupported speculation"); see also Libby Claimants' Opposition to Plan Proponents' Motion in Limine to Exclude Libby Experts' Testimony dated September 1, 2009, p.13, n.27 [Docket No. 23072]. In

29

contrast, in epidemiology a hypothesis may be an established statistical association, validated by published data, but it nevertheless remains a hypothesis until replicated a sufficient number of times. 9/9/09 Tr., p. 232:2 (Molgaard).

Even though the percentage associations developed in the CARD Mortality Study remain as "hypotheses" in epidemiologic terms, they may be used to inform expert opinion. U.S. v. Grace so directs: "The fact that a study is associational - rather than an epidemiological study intended to show causation does not bar it from being used to inform an expert's opinion." Grace, 504 F.3d at 765.

The Plan Proponents' argument seeks to supplant the legal definition of causation with the epidemiology definition of causation. The legal definition of causation is that an action be a "substantial factor" in producing a result. Epidemiologic causation requires statistical establishment of an association, then replication. 9/9/09 Tr., p. 232:2 (Molgaard). The Ninth Circuit rejected the same attempt by Grace to impose epidemiologic causation to supplant the legal standard in the courtroom. This court should do the same.

### B.   The Libby Claimants Need Not Produce Nationwide Studies To Prove "Impermissible Discrimination" Or That Their Claims Are "Not Substantially Similar" To Others.

The Plan Proponents argue that the Libby Claimants must produce nationwide studies on how severe pleural disease claims elsewhere are treated under the TDP medical criteria. With regard to the discrimination claim, the Libby Claimants presented a study upon patients with pleural disease, who died of non-malignant asbestos-related disease, showing how they fared under the TDP medical criteria for Level IV-B "Severe and Disabling Pleural Disease." The group discriminated against is "severe pleurals." Only 14% of this group of Libby "severe pleurals" qualified under Level IV-B, Expedited Review. 9/10/09 Tr., p. 223:13 (Frank). The

discrimination is not limited to Libby severe pleurals.  Those from elsewhere may be discriminated against as well.

The issue of pleural disease phenomena in Libby versus what is reported elsewhere may be the subject of expert opinion and observation.  Dr. Frank has been familiar with the literature on asbestos disease since 1968, having read thousands of medical articles.  9/10/09 Tr., p. 134:6 (Frank).  He has taken a special interest in pleural disease.  9/10/09 Tr., p. 134:13 (Frank).  Dr. Frank testified that in the CARD Mortality Study there were 20 pure pleural deaths, with no evidence of interstitial disease.  9/10/09 Tr., pp. 265:3 and 188:13 (Frank).  The world literature shows that elsewhere only three or four people have died of pleural only disease.  9/10/09 Tr., p. 266:17 (Frank).  This testimony establishes that Libby pleural disease is different from elsewhere.  No nationwide study of pleural disease is necessary.  Dr. Frank also testified that pleural disease is different from elsewhere in terms of the severity and prognosis for pleural disease caused by exposure to Libby asbestos.  9/10/09 Tr., p. 226:9 (Frank).  This again was based on a comparison of the Libby experience to elsewhere, as reported in the world literature.  9/10/09 Tr., p. 226:9 (Frank).  By offer of proof, Dr. Frank would testify that the probability of death from asbestos disease for those diagnosed with asbestos disease from Libby exposures is unmatched elsewhere.  There is no reported cohort in the United States or anywhere else which has that probability of death.  9/10/09 Tr., p. 167:11 (Frank); see also 9/8/09 Tr., p. 203:12 (Welch).  Testimony on probability of death was refused by the court as irrelevant to the "discrimination" and "not substantially similar" issues.  9/10/09 Tr., p. 170 (Frank).  The point here is that scientific issues may be proved by expert opinion comparing the Libby experience to that reported in the world literature.  Nationwide studies on pleural disease outside Libby are not necessary to the Libby Claimants' burden of proof.

## IV.    Conclusion

Based on the foregoing and prior oppositions to the Plan filed by the Libby Claimants,

confirmation of the Plan must be denied.

Dated: November 2, 2009          **LANDIS RATH & COBB LLP**
          Wilmington, Delaware

_(signature)_

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

                          - and -

Daniel C. Cohn
Christopher M. Candon
**COHN WHITESELL & GOLDBERG LLP**
101 Arch Street
Boston, MA 02110
Telephone:  (617) 951-2505
Facsimile:  (617) 951-0679

_Counsel for Libby Claimants_