## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | (Jointly Administered) |
| W.R. GRACE & CO., *et al.*, | ) | |
| | ) | Case No. 01-01139 (JKF) |
| Debtors. | ) | |
| | ) | **Re: Docket No. 23567** |

## ANDERSON MEMORIAL HOSPITAL'S
## POST-TRIAL BRIEF REGARDING FEASIBILITY

Anderson Memorial Hospital ("Anderson") by and through counsel, and in accordance with this Court's October 26, 2009 Order Establishing Schedule of Post-Trial Briefing and Related Matters [DI 23567],[1] submits this Post-Trial Brief on feasibility, in opposition to confirmation of the Debtors' First Amended Plan of Reorganization ("Plan") [DI 20872]. In accordance with the Court's scheduling order, Anderson's post-trial brief regarding all other issues particular to Anderson will be submitted on December 8, 2009. Anderson incorporates by reference all of its earlier objections to confirmation of the Plan, including Anderson's Memorial Hospital's Objections to Confirmation of Debtors' First Amended Joint Plan filed May 20, 2009 [DI 21782], Anderson Memorial Hospital's Trial Brief on Phase II Objections to Confirmation of Debtors' First Amended Joint Plan filed July 13, 2009 [DI 22437], and Anderson Memorial Hospital's Objections to Confirmation of Debtors' First Amended Joint Plan Regarding Feasibility filed August 25, 2009 ("Feasibility Objections") [DI 22963].[2]

---

[1] References to the docket in the main bankruptcy case shall be by their docket entry number, i.e. "[DI ___]." References to trial exhibits from the confirmation hearing shall be by the party propounding them, and then by the exhibit number, i.e. "[AMH Ex. ___]". References to the transcript of the confirmation hearing shall be by the date, the page, and the testifying witness, i.e. "[10/13/09 Tr. ____ (Zilly)]". References to deposition designations shall be by the name of the witness, the date, and the page, i.e. "[Zilly, 8/20/09, p. ___]".

[2] Any issues other than feasibility which were common to Anderson and other objecting parties' briefs, but which are not addressed herein (i.e. the scope of the releases and exculpations provided under the Plan), are not being waived by Anderson. Rather, Anderson is relying on and incorporating the arguments made in its prior briefs with respect to such issues.

## INTRODUCTION

In its Feasibility Objections, Anderson predicted that the Plan Proponents would fail to meet their burden of proof in demonstrating the Plan's feasibility, as is required by 11 U.S.C. § 1129(a)(11).  With the Plan Proponents' evidence now closed, it is clear that they have not satisfied their burden of demonstrating that the Debtors are likely to able to make the payments required to be made by them under the Plan.  Indeed, even though the Debtors' expert acknowledged that there are liabilities that "pass through" the Plan and are to be borne by reorganized Grace, the Plan Proponents made no effort to put on evidence that would quantify the potential scope of those pass-through liabilities, or to demonstrate that there will be sufficient funds available to satisfy such liabilities as they arise.  The Plan Proponents further failed to provide sufficiently reliable proof of committed exit financing which is necessary for the Debtors to consummate the Plan.  They have also failed to address other potential threats to the viability of the Plan which put at risk future payments to be made under the Plan.  Confirmation of the Plan must be denied, because the Plan Proponents have failed to satisfy their burden with respect to the Bankruptcy Code's requirements.  Moving forward with the Plan puts all creditors who are not to be paid in full on the effective date of the Plan – which includes not just Anderson but many others – at unreasonable risk of the Plan's failure.

## BURDEN OF PROOF AND STANDARD FOR PROVING FEASIBILITY

As is true of all of the elements of 11 U.S.C. § 1129(a), the Plan Proponents bear the burden of proof on feasibility.  *See, e.g.*, In re Exide Technologies, Inc., 303 B.R. 48, 58 (Bankr. D. Del. 2003) (plan proponent bears burden of proof of establishing compliance with each of the requirements of confirmation).  Accordingly, it was the Plan Proponents' obligation to present competent evidence sufficient to meet their burden that the Plan is feasible: i.e., that under 11

U.S.C. § 1129(a)(11), that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

At the heart of 1129(a)(11) is the requirement that the plan proponent demonstrate the substantial likelihood of its ability to perform and satisfy its obligations under the plan.  For asbestos cases, the paradigm for the quantum of evidence that is required to establish feasibility is set forth in Kane v. Johns-Manville Corp., 843 F.2d 636, 649-50 (2d Cir. 1988).  There, the feasibility requirement was satisfied where:

> the evidence submitted by the Debtor … provides a reasonable estimation, based upon known present claimants and reasonable extrapolations from past experience and epidemiological data, of the number and amount of asbestos-related claims that the AH Trust will be required to satisfy.  The Debtor has also established that the Trust will, in fact, meet this burden.

As set forth in Johns-Manville, there are two key components to this proof: (1) the estimated claims to be satisfied by the trust; and (2) the trust's ability to satisfy them.  These two key components have been reiterated in subsequent asbestos bankruptcies. *See, e.g.*, In re Nat'l Gypsum Co., 139 B.R. 397, 405, fn. 19 (N.D. Tex. 1992) ("Estimation of unliquidated and contingent claims 'is essential prior to the hearing on confirmation of a plan, in order for the court to evaluate the feasibility of the plan without delaying the confirmation process."); In re Combustion Engineering, Inc., 391 F.3d 190, 248 (3d Cir. 2005), citing 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("When an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims.  The underlying company funds the trust with securities and the company remains viable.  Thus, the company continues to generate assets to pay claims today and into the future.  In essence, the reorganized company becomes the goose

that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.").

Accordingly, it was the Plan Proponents' burden at the confirmation hearing to present evidence sufficient to sustain their burden of persuasion as to (1) the anticipated liabilities to be dealt with under the Plan, both on the effective date and through the post-confirmation trusts;[3] and (2) the ability of the Debtors to satisfy those liabilities.

## THE EVIDENCE PRESENTED AT THE CONFIRMATION HEARING

### Pamela Zilly, the Plan Proponents' Sole Feasibility Witness

At the confirmation hearing, the Plan Proponents did not present a single representative of the Debtors to testify in support of the feasibility of the Plan. Rather, the Plan Proponents presented only one witness on the subject of feasibility: Pamela Zilly, the Debtors' financial advisor. Ms. Zilly is far from an independent expert, however. She has been the Debtors' financial advisor since 2001 (the year the case was commenced), and her company has the right under the terms of its engagement to seek a $5 million success fee in the event that the Debtors successfully emerge from bankruptcy [10/13/09 Tr. 158-59 (Zilly)]. The resulting bias, both from the long-standing relationship as financial advisor, and the financial incentive to see this case confirmed, must be considered in weighing the value and reliability of Ms. Zilly's testimony. See Finkelstein v. Liberty Digital, Inc., 2005 WL 1074364, *20 (Del. Ch. 2005) (valuation expert who had served as company's investment banker was not "ideally positioned"

---

[3] As this Court is well aware, the Plan proposes for all unresolved "traditional" (i.e., claims not arising from Zonolite Attic Insulation or "ZAI") Asbestos Property Damage Claims ("PD Claims") and all future demands relating to PD Claims ("Future PD Demands") that are allowed after the effective date of the Plan to be paid, supposedly in full, through the WRG Asbestos Property Damage Settlement Trust (the "PD Trust"). The PD Trust, however, is not funded as of the effective date of the Plan with any amount beyond that needed to pay all presently allowed PD Claims; for any unresolved PD Claims or Future PD Demands, the PD Trust must rely on reorganized Grace to fund such amounts as are needed to pay those claims in full. Under the terms of the Plan, the PD Trust, and the Deferred Payment Agreement (Class 7A PD), reorganized Grace is supposed to pay to the PD Trust, every six months, the amount of all claims allowed during the prior six months, plus interest, for distribution to the holders of such claims. Plan [DI #20872], Ex. 3 (PD Trust), Ex. 27 (Deferred Payment Agreement).

to be an independent expert and such bias-producing factors must be taken into account in evaluating his testimony).

**Evaluating Feasibility Requires Critical Evaluation of Company's Projections**

Ms. Zilly testified that in order to evaluate feasibility, one must consider the historical operating performance of the company, its financial projections, its prospects for exit financing, and "whether or not the debtor would have the ability to meet its debts, both upon exiting [and] as they became due." [10/13/09 Tr. 64-65 (Zilly)]. One of the things a feasibility expert must do, Ms. Zilly acknowledged, is to apply one's own training, expertise and experience in critically evaluating the company's own financial projections. [10/13/09 Tr. 161 (Zilly)].

**The Debtors' Pass-Through Liabilities Under the Plan**

Ms. Zilly testified that to evaluate feasibility of the Plan Proponents' Plan, it was necessary to take into account the Debtors' ability to service certain "legacy claim obligations" – which includes both unresolved PD Claims and Future PD Demands:

> Q    To evaluate feasibility you have to take into account the debtors' ability to service, among other things, their operating expenses and legacy claim obligations in future years, correct?
>
> A    That's correct.
>                          * * *
> Q    Legacy claim obligations includes, among other things, traditional property damage claims which are unresolved and future traditional property damage demands, correct?
>
> A    Those are the obligations, yes, that's correct.

[10/13/09 Tr. 162-163 (Zilly)]  These are liabilities which, to use Ms. Zilly's terminology, "pass through" the Plan and are borne by reorganized Grace. [10/13/09 Tr. 163 (Zilly)].

More specifically, the liabilities for unresolved PD Claims and Future PD Demands are directed to the PD Trust, which must rely on reorganized Grace to contribute sufficient funds

every six months to the PD Trust to pay all such Claims and Demands which were allowed in the prior six month period. The Plan, with respect to these Class 7A Claims, is not a "pot" plan. Rather, the Plan requires the Debtors to pay each such allowed claim in full. Plan [DI 20872], Ex. 3, Ex. 27. Indeed, the Plan Proponents represented in the Plan and Disclosure Statement that Class 7A Claims were "unimpaired" under the Plan because they were being paid in full, and did not solicit votes on the Plan from Class 7A (except for purposes of 11 U.S.C. § 524(g)) based upon that representation.

The feasibility of the Plan depends on the reorganized debtors' ability to pay those "pass-through" liabilities:

> Q    And the feasibility of the debtors' plan depends in part on the reorganized debtors' ability to pay those liabilities which are passed through, correct?
>
> A    Yes.

[10/13/09 Tr. 163 (Zilly)].

## The Plan Proponents Fail to Quantify the Potential Range of "Pass-Through" Liabilities

Even though the Plan Proponents' sole feasibility witness, Ms. Zilly, acknowledged the existence of these "pass-through" liabilities, and even though she acknowledged that the feasibility of the Plan depends on the ability to satisfy those liabilities, the Plan Proponents presented no evidence at the confirmation hearing to quantify the magnitude of the pass-through liabilities.

Ms. Zilly herself did not make any estimate of the "legacy" PD Claims or Future PD Demands as part of her feasibility determination; rather, she relied on a projection that was given to her by the Debtors:

> Q    But you have not made any estimation of these legacy traditional property damage claims in order to reach you opinion on feasibility, correct?

A        There is a projection.

Q        You have not prepared one?

A        I relied on the company's projection.

[10/13/09 Tr. 163 (Zilly)].  The projection to which Ms. Zilly was referring was a $37.3 million

figure which was contained in the Debtors' five-year financial projections [10/13/09 Tr. 163,

165, 171-73 (Zilly)].

When asked whether she critically evaluated the projection or if she could describe the

information that the Debtors relied upon in preparing that projection, she was unable to describe

any critical evaluation she conducted nor any details as to how the Debtors arrived at the

projection:

Q        Did you critically evaluate that number to determine if it was a reasonable
projection?

A        I relied on the company's estimate who I believe was in the best position
to know.

* * *

Q        It's not your number, it's the company's number, correct?

A        It is the company's number because – upon which I relied as I do in any
number of situations in preparing an expert report.  When I'm not an expert in that
one particular area I rely on other experts.

Q        Well here, you're not relying on another expert, you were relying on the
company, correct?

A        And what the company relied upon.

Q        Do you know what the company relied upon?

A        The company was in the best position to know what that number was.
How they –

Q        Do you know what information the company relied upon in order to come
up with that number?

A    My understanding is that the company had an understanding of what the proper number was and I relied upon that.

[10/13/09 Tr. 165, 167 (Zilly)].[4]  Ms. Zilly's failure to apply her own training, expertise and experience in critically evaluating the Debtors' projection was inconsistent with her own earlier-avowed standards for conducting a feasibility analysis.

Ms. Zilly further acknowledged that she had not done, nor had she been advised of, any estimate of the potential Future PD Demands which might be asserted against the PD Trust:

Q    Have you done or have you been advised of any estimate of the future property damage demands which may be asserted against the property damage trust?

A    Those are two questions, but the answer to both of them is no.

Q    You have not done an analysis or estimate and you've not been advised of one, correct?

A    Correct.

[10/13/09 Tr. 170 (Zilly)].

Though Ms. Zilly's feasibility testimony relied upon this $37.3 million figure, the Debtors did not present any other witness to testify to that "projection." While Ms. Zilly chose to rely on the Debtors' "projection," the "projection" itself is not in evidence and has not been substantiated or explained. Quite to the contrary, both during discovery and during the course of the trial, the Debtors have repeatedly opposed Anderson's efforts to elicit the basis, the method of calculation, and the assumptions underlying the Debtors' "projection" on the basis of attorney client or work product privilege. *See, e.g.*, 10/13/09 Tr. 167-68 (Mr. Bernick, counsel for the Debtors, objects on the basis of privilege to a question as to whether the $37 million includes

---

[4] The Court clearly understood that Ms. Zilly had failed to provide any basis for her reliance on the Debtors' projection, noting later: "She said that she relied on a number, but she has not substantiated what the basis for that reliance [was] other than the fact that she feels the company's in a position to evaluate it and she doesn't provide those estimates." [10/13/09 Tr. 170].

both unresolved PD Claims and Future PD Demands); for multiple further examples, *see* Anderson's Motion to Compel Debtors to Provide Full and Complete Deposition Answers [DI 23028]. In any event, the Debtors presented no evidence at the confirmation hearing to introduce, support or in any way substantiate the $37 million figure as a projection of the potential scope of either or both of the unresolved PD Claims or the Future PD Demands.[5]

As a result, the Debtors failed to satisfy the first component of the proof required for feasibility: to establish the anticipated liabilities to be dealt with under the Plan. The fact that Ms. Zilly relied upon the $37 million figure as an assumption in her feasibility analysis does not mean that the amount comes in as evidence. Indeed, expert testimony based on assumptions that are not supported by the record should be excluded. Elcock v. Kmart Corp., 233 F.3d 734, 756 (3d Cir. 2000). Ms. Zilly's ultimate opinion as to feasibility is without foundation and should be excluded; and the absence of any evidence supporting Ms. Zilly's assumption only highlights the failure of proof with respect to feasibility of this Plan. The magnitude of this failure is compounded by the fact that the Plan requires payment in full of all of the "pass-through" liabilities that the Debtors failed to quantify. Absent a determination of how much the Debtors may have to pay to the PD Trust, it is impossible to know whether they have the ability to do so. Accordingly, the Plan Proponents cannot establish proof of the feasibility of the Plan.

---

[5] To the extent that the $37 million *does* represent an estimate of the aggregate obligations of the reorganized Debtors for both traditional PD Claims and Future PD Demands, then such a figure would self-evidently undermine the Debtors' claim of entitlement to the broad injunctive relief provided by 11 U.S.C. § 524(g) with respect to PD Claims. In order to avail itself of the provisions of § 524(g), a debtor must show, among other things, that it is likely to be subject to substantial future demands for payment arising from asbestos-related claims, that the actual amounts, numbers and timing of such future demands cannot be determined, and that the pursuit of such demands outside the procedures prescribed by the plan is likely to threaten the plan's purpose to deal equitably with claims and future demands. If all of the Debtors' remaining traditional PD liability could be resolved for $37 million, then a business of the magnitude of the Debtors ought to have little trouble dealing with such claims outside of the constructs of the Plan and PD Trust – particularly when the Plan and PD Trust do not set up the kinds of claims resolution facilities and alternative dispute resolution procedures typically used in asbestos cases, but rather return the Future PD Demands to traditional litigation.

**The Plan Proponents Fail to Establish the Ability to Pay the "Pass-Through" Liabilities**

Since the Plan Proponents have failed to quantify the scope of the "pass-through" liabilities, it is impossible to know whether they could meet the next part of the feasibility test: whether the Debtors have sufficient funds to satisfy the liabilities. There is no way to know if it is "enough" if you don't know the "how much?" part first. Notwithstanding their failure to satisfy the initial burden of establishing the magnitude of the liabilities to be dealt with under the Plan, the Plan Proponents made a half-hearted attempt during the confirmation hearing to meet the second part of the test. Based on a hypothetical question asked of her at her deposition, Ms. Zilly opined that the reorganized Debtors would be able to pay $1.6 billion for Future PD Demands over a period of 25 years and still be feasible. [10/13/09 Tr. 77-78 (Zilly)]. However, that number was only given to her as hypothetical, and she had not relied upon or evaluated that number in any way in forming her opinions:

> Q       Did the $1.6 billion dollar number represent some kind of estimate or projection as to the total value of future property damage demands?
>
> A       Mr. Rich asked me questions and he, himself, brought up the number of $1.6 billion.
>
> Q       Okay. And was that given to you as a hypothetical?
>
> A       That's correct.
>
> * * *
>
> Q       You have not relied upon or evaluated that number, correct?
>
> A       That's correct.

[10/13/09 Tr. 78, 174 (Zilly)].

Ms. Zilly's testimony on this subject proves nothing with respect to feasibility for at least two reasons. First, the $1.6 billion figure has not been substantiated in any way, whether as an estimate, a projection, or an outer range of the potential Future PD Demands. Because the Plan

Proponents put on no evidence as to the magnitude of either unresolved PD Claims or Future PD Demands, there is no record from which this Court could conclude that such claims can be expected to be $37 million, $1.6 billion, $3.7 billion, or something else.    Absent evidence sufficient to meet the Plan Proponents' burden of proof as to the potential magnitude of the Future PD Demands, Ms. Zilly's testimony as to the reorganized Debtors' ability to pay $1.6 billion over 25 years is arbitrary and meaningless.

Second, the Plan does not provide the means for the reorganized Debtors to stretch out their liabilities to the PD Trust over a 25 year period.    To the contrary, the Plan Documents require the reorganized Debtors to fund the PD Trust every six months with the amount of all unresolved PD Claims and Future PD Demands which become allowed during the prior six-month period.    Accordingly, Ms. Zilly's testimony on this particular subject does nothing to establish the Plan's feasibility.

In fact, the confirmation hearing confirmed that Ms. Zilly – the Debtors' sole feasibility witness – has not determined the amount of unresolved PD Claims or Future PD Demands which, either in the aggregate or in any particular time period, would render the Plan unfeasible:

> Q     As part of your analysis, you have not made any determination of what the amount of either unresolved PD claims or future PD claims would render the plan unfeasible, correct?
>
> [overruled objection omitted]
>
> A     Well, I did not do an independent analysis.    What's included in my testimony is that at 1.6 billion asbestos property damage claims I believe the plan would be feasible.
>
> Q     Other than that testimony which was not included in your report, but was a response to a hypothetical in a deposition, you've not done any analysis of the amount of unresolved property damage claims or future claims that would render the plan unfeasible, correct?
>
> [overruled objection omitted]

A    No, that's correct.

Q    … In any given year, if unresolved property damage claims are allowed or future property damage claims are allowed, have you made a determination of the aggregate amount in any given year that would render this plan unfeasible?

\* \* \*

A    I haven't made – I haven't done a year by year analysis to how many claims would have to be in any one year to render the plan infeasible.

[10/13/09 Tr. 177-78 (Zilly)]. In other words, there is a complete dearth of evidence as to the Debtors' ability to sustain any sizable allowed unresolved PD Claim or Future PD Demand.

This is not an idle concern. Grace's own expert has opined that there are in excess of 114,000 buildings that may have asbestos PD Claims with respect to the Debtors.[6] Another of

---

[6] Anderson has designated portions of the depositions of Daniel Rourke, a statistical analysis expert who was engaged by the Debtors in 1995 through KPMG Peat Marwick to perform an estimate of the liability arising from personal injury and property damage claims related to asbestos. [Rourke, 6/20/02, pp. 10-17, 21-25, 31-32, 39-40]. In performing that engagement, Mr. Rourke participated in the preparation of a presentation summarizing the results up to that time. [Rourke, 7/11/02, pp. 7-8]. The presentation, which was marked as Exhibit 3 to Mr. Rourke's deposition [Rourke, 6/20/02, pp. 43-44] and is identified as AMH Ex. 42 in the confirmation hearing exhibits, includes, at the page bates stamped as "AMH-4176," a chart entitled "Estimate of Property Damage Costs From 2000 On Based Upon Estimated Number of Buildings Which May Contain Grace Product and Exclusions to the Estimate." [AMH Ex. 42, p. AMH-4176]. The chart identifies 114,444 buildings that "May Contain Product." Later, in December 1995, a final report was prepared [Rourke, 7/11/02, p. 25], which was identified as Exhibit 21 to Mr. Rourke's deposition and is identified as AMH Ex. 56(H). The December 1995 report likewise contains a chart of "Estimate of Property Damage Costs…" which again identifies 114,444 private sector buildings that "May Contain Product." [AMH Ex. 56(H), p. AMH-4124.181].

Both versions of the report list all such buildings as "Excluded," however, for purposes of estimating anticipated property damage costs. Mr. Rourke explained at deposition that the 114,444 private sector buildings were excluded from the estimate of property damage costs based on the oral statements of Grace lawyers that the statute of limitations had passed as to all such claims:

Q    And then for "Private Sector," you excluded all –
A    -- all of them.
Q    Now, why did you do that?
A    The statute of limitations.
Q    I'm sorry. I don't understand.
A    By that time the statute of limitations would have not allowed suits for private sector buildings.
Q    Where did you get that information from?
A    The Grace attorneys.
\* \* \*
Q    Did they give you any basis for that conclusion?
\* \* \*
A    They said that by 2000, certainly, that the statute of limitations would apply uniformly.
\* \* \*

the Plan Proponents' experts, Dr. Denise Martin (whose purpose was to provide testimony in support of the Plan Proponents' request for relief under 11 U.S.C. §524(g)) noted in her expert report that more than 140,000 steel-frame building projects were built that may contain Grace's Monokote product, and that more than 324,000 construction projects involving the types of buildings in which Grace acoustical plaster products would have been used are estimated to have occurred up to 1973. [PP Ex. 206, p. 6]. She further noted that the Debtors have received claims "for just a fraction of the potential future demands." [PP Ex. 206, p. 7]. Anderson sought to put evidence into the record reflecting the average amount of a PD Claim, but its efforts to introduce the evidence were rejected on relevance grounds (improperly, Anderson would submit) by the Court. [9/14/09 Tr. 149-50, 156-59].[7]

Regardless, it does not take much imagination to envision a scenario where the "pass-through" PD Claims and Future PD Demands could overwhelm the ability of the reorganized Debtors to satisfy those pass-through liabilities. For instance, entirely apart from the Anderson claims, the unresolved PD Claims include the claims of the State of California. In a recent decision, the Delaware District Court reversed a decision of this Court which had disallowed California's sixteen claims on statute of limitations grounds. State of California v. W.R. Grace and Co., Case No. 08-863 (D. Del. 9/29/09). As indicated in the District Court decision, California's sixteen claims are asserted to be for an amount in excess of $130 million. Such claims, if ultimately allowed, would be well in excess of the amounts implicit in Ms. Zilly's

---

> Q    But just for purposes of understanding, you had no other basis to make the 100 percent exclusion of private buildings, save for the oral statements of the Grace lawyers?
> A    That's correct.

[Rourke, 7/11/02, pp. 141-144]. Mr. Rourke's deposition, and the exhibits authenticated thereby, are admissible in this proceeding because he is unavailable as a witness. [AMH Ex. 63].

[7] AMH Ex. 40, to which the Court sustained an objection, reflects that in the Celotex Corp. bankruptcy case, Case No. 90-10016, pending in the United States Bankruptcy Court for the Middle District of Florida, claims relating to 52 Anderson buildings were allowed in an average amount of $5 million per building.

testimony that the Debtors could pay a total of $1.6 billion over 25 years (which would equal $64 million per year) and consequently could exceed the reorganized Debtors' ability to satisfy such claims, even if Ms. Zilly's testimony were accepted.[8]

Anderson found it more than a little disturbing that in the final day of the confirmation hearing, the Plan Proponents proposed an amendment to the Plan and PD Trust that expressly contemplates the possibility that the PD Trust will *not* have sufficient funds in the future to pay allowed PD Claims in full. [DI 23474]. Notwithstanding the promise of payment in full contained in the Plan, which was the basis for characterizing Class 7A Claims as unimpaired and not soliciting their vote on the Plan, the proposed amendments provide for procedures including "maximum annual payments" and a "payment percentage" with respect to Class 7A Claims to be paid by the PD Trust. At hearing, Debtors' counsel acknowledged that the amendments were included "in that event that the PD trust would then be operating as a limited fund," and further, that the procedures would apply not only to Future PD Demands claims but to any unresolved PD Claims that were to be paid by the PD Trust:

> MR. FREEDMAN: ... I mean, theoretically if there were a default before any existing PD claims that have not yet been resolved were to be resolved, then that would require the same changes to kick in. But, that's really a feasibility issue, that is, it goes to whether or not the terms of the plan that the debtors intend to pay all these claims 100 cents will be complied with.

[10/14/09 Tr. 150]. What the Plan "gives" (a promise of payment in full), the proposed amendments to the PD Trust "take away" – which in and of itself suggests that the Plan (to the

---

[8] Ms. Zilly testified that she had not done any additional work to determine whether the State of California opinion in any way affected her opinions with respect to feasibility. [10/13/09 Tr. 180 (Zilly)]. The failure to do so is a curious oversight, since the California decision would appear to substantially alter any assumptions with respect to whether potential PD Claims are barred by applicable statutes of limitation, in that the Court determined that: (1) the law of the location of the property, not necessarily Delaware law, governs the applicable limitations period; (2) under California law, at least, the statute does not begin to run unless and until the property owner suffers damage (i.e. by way of contamination) as a result of the asbestos-containing material, rather than simply by virtue of knowledge of the presence of asbestos-containing material; and (3) even if Delaware law applied, the Court would find that under Delaware law a claim did not accrue until the date of contamination.

extent predicated on payment in full of all PD Claims and Future PD Demands, which are supposedly unimpaired) is not feasible. The fact that the Plan Proponents are expressly contemplating and addressing a scenario in which not only is there a default under the Plan, but the default results in there being insufficient funds to pay PD Claimants the full amount of their claims, is entirely antithetical to the contention that the Plan is feasible.

More specifically as to Anderson, the Debtors' feasibility analysis has not in any way accounted for the possibility that the Anderson class claims may ultimately be allowed. The failure to address this possibility precludes confirmation of the Plan. This was precisely the holding in In re Harbin, 486 F.3d 510 (9th Cir. 2007). In Harbin, a creditor sued the debtor on a breach of contract claim. The jury found in favor of the creditor, but the court set aside the verdict and ruled in favor of the debtor. The creditor appealed the trial court ruling. The creditor filed a proof of claim in the bankruptcy case, which the bankruptcy court disallowed, noting that the creditor could seek to reinstate the claim should he prevail on the appeal. Id. at 514.

The debtor sought to confirm a Chapter 11 plan while the appeal was pending. The bankruptcy court found the plan feasible because allowed claims were to be paid in full, notwithstanding the creditor's objection that the plan failed to reserve an allowance for his claim should he prevail on appeal and that the debtor lacked sufficient assets to satisfy the claim if it were allowed. Id. at 514-15. The Ninth Circuit held:

> To be feasible for purposes of section 1129(a)(11), a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor. ... [A] bankruptcy court cannot adequately determine a plan's feasibility for purposes of section 1129(a)(11) without evaluating whether a potential future judgment may affect the debtor's ability to implement its plan. ... A bankruptcy court's failure to consider such a possibility in discharging its duties under section 1129(a)(11) is clear error.

Id. at 517, citing Matter of Pizza of Hawaii, Inc., 761 F.2d 1374 (9th Cir. 1985) (citations

omitted). The court specifically rejected the notion that such consideration could be avoided

because the claim was on appeal at the time of confirmation:

> [T]he bankruptcy court's obligation to evaluate the effect of a pending claim on
> the feasibility of a plan does not hinge on whether the claim is pending in the state
> trial court rather than in the state appellate court.

Id. at 518. Finally, the court further rejected the notion that such consideration could be avoided

because the bankruptcy court had conditionally disallowed the claim:

> [Creditor's] claim could significantly affect the plan's feasibility in the future.
> For example, the bankruptcy court held that [Creditor's] claim was not being
> discharged, and [Creditor] could move to have his claim reinstated if he prevailed
> on appeal. ... Because [Creditor]'s claim could affect the feasibility of [Debtor's]
> plan notwithstanding the bankruptcy court's conditional disallowance of the
> claim, the bankruptcy court was still obliged to consider the claim under section
> 1129(a)(11).

Id.

The posture of the creditor's claim in Harbin at the time of confirmation is identical to the

status of the Anderson class claims here.  The Debtors have failed to demonstrate that the

Anderson class claims, if ultimately allowed after appeal, could be satisfied under the Plan

structure that they have proposed.  More generally speaking, they have failed to establish that

there will be sufficient funds available to satisfy the "pass-through" PD liabilities under the Plan,

and as a result cannot satisfy their burden of proving feasibility.

**The Plan Proponents Fail to Provide Adequate Evidence of Necessary Exit Financing**

Under the Plan, the Debtors must secure exit financing in order to successfully emerge

from bankruptcy:

> Q      ... [U]nder the plan as the debtors have proposed it is it necessary for them
> to obtain some form of exit financing in order to successfully emerge from
> bankruptcy?

A     Yes, it is.

[10/13/09 Tr. 160 (Zilly)].  When Ms. Zilly was deposed in late August 2009, she testified that

the Debtors' intention was to finalize commitment letters prior to the confirmation hearing:

> Q     And when you were deposed in late August, you testified that it was your
> intention to finalize commitment letters prior to the confirmation hearing, correct?
>
> A     That's correct.

[10/13/09 Tr. 162 (Zilly)].  But the Plan Proponents did not present any evidence of committed

exit financing at the confirmation hearing.  To the contrary, Ms. Zilly now claims that sometime

between her August 20, 2009 deposition and the commencement of the confirmation hearing on

September 8, 2009, they made the decision not to obtain commitment letters.  [10/13/09 Tr. 162

(Zilly)].

Instead, creditors and the Court are being asked to accept it on faith that the Debtors will

be able to obtain the required exit financing, based upon no evidence whatsoever other than Ms.

Zilly's confidence that they will be able to do so.  The confidence of the Debtors' financial

advisor, standing alone and without any more concrete evidence of committed financing that is

required under the Plan, hardly rises to the quantum of proof necessary to demonstrate

feasibility.  *Compare* In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000)

(burden of proof as to feasibility would be satisfied by evidence that exit financiers had issued

commitment letters and/or agreed to term sheets which are detailed and contingent only upon

final documentation, confirmation of the plan, and no materially adverse changes occurring; but

for fact that debtors valuation of its assets was insufficient to support the financing).

Concern with the availability of exit financing is magnified by consideration of the

information that has been provided to prospective lenders.  Ms. Zilly testified that the

unsubstantiated $37 million "projection" described above was the only information provided to

prospective lenders with regard to the reorganized Debtors' potential exposure for "pass-through" traditional PD liabilities:

> Q    This $37 million number that you've referred to, was it also incorporated into the materials that were provided to prospective lenders?
>
> A    Yes.
>
> * * *
>
> Q    The legacy payments that you're referring to are included not only in a current balance sheet, but in a five-year projection that was provided to the lenders, correct?
>
> A    No, that's not correct.  The five-year projections assumes [sic] an effective date of the plan as of 12/13/2009.  As of that date, its obligations under the Chapter 11 plan are pro forma and reflected on its balance sheet and that is what appears in its projections on a go forward basis.
>
> Q    And those projections assume and reflect a $37 million payment in fiscal year 2011 with respect to non-ZAI property damage claims, correct?
>
> A    I believe that's the year, yes.
>
> Q    And that is the only payment reflected in those projections with respect to non-ZAI property damage claims, other than those to be made on the effective date?
>
> A    That's correct.

[10/13/09 Tr. 171, 172-73 (Zilly)].

In other words, the financing proposals which Ms. Zilly testifies that the Debtors previously received, and upon which she relies to assume that exit financing will be available to the Debtors, were predicated on financial projections which presumed that all of the liabilities of the reorganized Debtors to the PD Trust for unresolved PD Claims and Future PD Demands would be satisfied with the payment of $37 million in 2011.  But the Debtors have put forward no evidence to support that presumption.  If the exit financing proposals previously obtained by the Debtors were solicited based upon unreliable information – and the Debtors have presented

no evidence to support their reliability with respect to that projection – then there is no sound basis for relying on those earlier proposals to reach the conclusion that exit financing will be available to the Debtors as required under the Plan. Since the Plan depends on exit financing, and the only evidence as to the availability of exit financing is based solely upon the personal confidence of the Debtors' financial advisor, in reliance on proposals that were solicited using unfounded assumptions, the Plan Proponents have failed to meet their burden of demonstrating the feasibility of the Plan.

**Other Threats to Feasibility**

There are other factors which also pose threats to the feasibility of the Plan. The Plan Proponents presumably rely on the Court's order setting a deadline for the filing of traditional PD Claims [DI 1963] ("Bar Date Order") to minimize the likelihood of additional PD Claims being asserted against them in the future. Yet the PD Claim bar date notice and procedures were flawed; consequently, they are subject to challenge by creditors who did not receive adequate or appropriate notice of the bar date or of the confirmation proceedings, who will be able to argue that they cannot, as a matter of due process, be bound by the terms of the Plan.[9]

The Bar Date order set a March 31, 2003 deadline for filing traditional property damage claims, and contained a provision that "all counsel of record for holders of Asbestos Property Damage Claims" were required to provide the Debtors with certain information about "their clients" who have, or may have, claims against the Debtors, "so that the Debtors will be able to provide their clients with the Bar Date Package," or a "certification" that counsel "has contacted or attempted to contact all of their clients whom they represent, provided them with the Bar Date Package and advised them regarding their rights to assert a claim against the Debtors and their

---

[9] The Property Damage Advisory Committee sought to appeal the Bar Date Order [DI #2019], but the appeal was rejected as interlocutory. [DI #2554, 2555].

need to file their proofs of claim on the court-ordered Proof of Claim forms by the deadlines set forth herein."

The Debtors' notice plan, as eventually approved by the Court, did not contemplate that the Debtors would provide direct notice to buildings or building owners with PD claims who could be identified through the Debtors' sales records and other documents, and indeed the Debtors made no effort to identify asbestos PD Claimants from their sales records but instead argued that such an effort would have been "unreasonable."[10]   Contrary to what the Debtors represented to the Court, however, Grace has now admitted that it had the ability to identify buildings where its product had been placed.

At deposition, the Debtors' in-house counsel, Richard Finke, testified that Grace maintained an index of documents in a computerized depository, that the depository included fields for the product type, job sites, product names, dates, and addresses, and that it also included invoices generated by Grace showing the sale of product, which would reflect the location and recipient to whom product was shipped [Finke 3/30/09, pp. 29-31, 134-140]. Jay Hughes, another Grace in-house counsel, likewise confirmed in deposition that the Debtors maintained a searchable, indexed document depository that was created in the late 1980s or early 1990s, as well as a searchable, indexed database of privileged documents, and that to the extent that job sites were identified in the course of a case, such information would be stored in the document depository. [Hughes 6/11/09, pp. 401, 406, 412-13].

As a result of the Debtors' failure to serve notice of the bar date, and consequently notice of the confirmation proceedings, on easily identified building owners, the Plan Proponents have denied such claimants the ability to participate in these proceedings in violation of their due

---

[10] In contrast, in at least three other asbestos cases in this district, Judge Newsome required direct notice to building owners who could be identified from the Debtors' records: In re Federal-Mogul Global, Inc., Case No. 01-10578; In re U.S. Mineral Products Co., Case No. 01-2471; In re USG Corp., Case No. 01-2094.

process rights, leaving the Plan subject to challenge post-confirmation by any such creditor.  The terms of the Plan cannot be enforced against creditors who have been the due process right to participate in the confirmation process, and therefore such claims will continue to exist and constitute a threat to the future viability of the Plan.  *See, e.g.*, In re Northwestern Corp., 324 B.R. 529, 536 (Bankr. D. Del. 2005) (creditors who were denied right to participate in confirmation hearing because they were not given notice "have not been afforded due process ... in the reorganization effort" and enforcing the Plan against them is "is simply beyond any standard of timely fairness and notice, which this Court cannot tolerate or condone."); *see also* In re 50-Off Stores, Inc., 231 B.R. 592, 595 (Bankr. W.D. Tex. 1999) (creditors who are deprived of the opportunity to vote on the plan are deprived of their due process rights under the Constitution).

A similar related issue is presented by the Debtors' solicitation process with respect to Class 6 Personal Injury Claims.  Other than with respect to claims that were already pending as of the petition date, the Debtors have not sought a claims bar date with respect to PI Claims. [10/13/09 Tr. 84 (Zilly)].  As a result, the "vote" by the Class 6 claimants is in large part only the vote of those claimants who have voluntarily elected to file proofs of claim despite the absence of a deadline for doing so.  It is unfair and inappropriate to bind an entire class of creditors in this manner where the universe of claimants has not been defined through the establishment of a claims bar date. *See, e.g.*, In re Amster Yard Assocs., 214 B.R. 122, 125 (Bankr. S.D.N.Y. 1997) ("Debtor has not identified any emergent circumstances that warrant expedited action, and as practical matter, it could not obtain approval of the disclosure statement, solicit votes or confirm a plan until it has determined the outer universe of potentially allowable claims.").  Accordingly, any holder of a PI Claim whose participation in the confirmation process was not solicited,

because no claim had been filed, will be able to challenge the efficacy of the Plan post-confirmation.

## CONCLUSION

The Plan Proponents have failed to quantify the scope of the liabilities that will "pass through" to the reorganized Debtors with respect to unresolved traditional PD Claims and Future PD Demands, even though the Plan requires the reorganized Debtors to pay such claims in full. Consequently, there is a complete failure of proof with respect to feasibility, since the Plan Proponents cannot demonstrate either the amount of the liabilities expected to be dealt with under the Plan, or the ability of the reorganized Debtors to satisfy those liabilities. The Plan Proponents have also failed to present adequate evidence of a committed source for the exit financing which is necessary for the Debtors emergence from bankruptcy under the Plan, and instead ask creditors and the Court to rely solely on the unfounded confidence of their financial advisor that such financing will be available. It is frankly astonishing that in a case of this magnitude and significance, the Plan Proponents' presentation on the Plan's feasibility amounts to, in essence, "trust us." For all of the foregoing reasons, and those expressed in Anderson's prior pleadings, Anderson submits that the Court should find and conclude that the Debtors have failed to establish that the Plan is feasible, and accordingly confirmation must be denied.

DATED:  November 2, 2009

Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:    (302) 654-0248
Facsimile:    (302) 654-0728
E-mail:       loizides@loizides.com

Daniel A. Speights (SC Fed. ID No. 4252)
C. Alan Runyan (SC Fed ID No.3683)
SPEIGHTS & RUNYAN
200 Jackson Avenue, East
Post Office Box 685
Hampton, SC  29924
Telephone:      (803) 943-4444
Facsimile:      (803) 943-4599

- and -

John W. Kozyak
David L. Rosendorf
KOZYAK TROPIN & THROCKMORTON PA
2525 Ponce de Leon, 9th Floor
Coral Gables, FL  33134
Telephone:      (305) 372-1800
Facsimile:      (305) 372-3508

*Counsel for Anderson Memorial Hospital*