## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |

---

**PHASE II POST-TRIAL BRIEF OF GARLOCK SEALING TECHNOLOGIES, LLC
IN OPPOSITION TO CONFIRMATION OF PLAN PROPONENTS'
FIRST AMENDED JOINT PLAN OF REORGANIZATION**

---

Dated:  November 2, 2009

MORRIS JAMES LLP
Brett D. Fallon (DE Bar No. 2480)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
Email:  bfallon@morrisjames.com

-and-

ROBINSON, BRADSHAW & HINSON
Garland Cassada
Richard C. Worf
101 North Tyron Street, Suite 1900
Charlotte, NC  28246
Telephone:  (704) 377-8135
Email:  GCassada@rbh.com
        RWorf@rbh.com

*Attorneys for Garlock Sealing Technologies, LLC*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT AND SUMMARY OF EVIDENCE........................ 1

ARGUMENT ................................................................................................ 6

I.   ENTRY OF THE CHANNELING INJUNCTION WILL NOT BE
     "FAIR AND EQUITABLE" BECAUSE THE PLAN VIOLATES
     THE ABSOLUTE PRIORITY RULE. ......................................................... 6

     A. Garlock Will Assert Demands Against the
        Grace Trust in the Future. ......................................................... 7

     B. Garlock's Demands Will Not Be Paid in Full
        But Shareholders Will Receive Property, In
        Violation of the Absolute Priority Rule. ......................... 8

II.  ENTRY OF THE CHANNELING INJUNCTION WILL NOT BE
     FAIR AND EQUITABLE BECAUSE GARLOCK WILL RECEIVE
     NO CONSIDERATION FOR THE ENJOINING OF ITS
     CONTRIBUTION DEMANDS .................................................................. 12

     A. Co-Defendant Settlement Values Should
        Decrease When Trusts Begin Paying Claims ...................... 13

     B. The Standard TDP Enable Plaintiffs to
        Conceal and Defer Trust Claims, Distorting
        the Marketplace of Settlement ................................................. 17

     C. The Record Contains Direct Evidence of the
        "Conceal and Defer" Strategy ................................................. 23

     D. The Concealment and Deferral of Claims Is
        The Only Credible Explanation Why Trust
        Payments Have No Effect On Settlement
        Values      ....................................................................................... 26

     E. The Provisions That Permit The Concealment
        and Deferral Of Claims Serve No Valid
        Purpose      ....................................................................................... 28

F. The Solution To The Problem Of Concealed
   And Deferred Claims Is Obvious And Impairs
   No Valid Trust Interest .............................................................. 32

CONCLUSION ..................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Doe v. City of Chicago*, 360 F.3d 667(7th Cir. 2004) ... 22

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003) ................... 31

*Jaffee v. Redmond*, 518 U.S. 1 (1996) ................. 26

*Ohio Consumers' Counsel v. Public Utilities Comm'n*, 856 N.E.2d 213 (Ohio 2006) ......................... 30

*Qualls v. Rumsfeld*, 228 F.R.D. 8 (D.D.C. 2005) ....... 22

**Statutes**

11 U.S.C. § 524(g)(4)(B)(ii) .................... 3, 6, 8

11 U.S.C. § 524(g)(5) ................................ 6

Del. Code Ann. tit. 10, § 6304(b) ................... 13

Md. Code Ann., Cts. & Jud. Proc. § 3-1405 ........... 13

**Other Authorities**

Weinstein's Federal Evidence (2d ed.) § 501.04[4] ..... 32

William Blackstone, 3 Commentaries *250-51, *306-8 .... 31

Garlock Sealing Technologies, LLC ("Garlock"), through its undersigned counsel, hereby submits this Phase II Post-Trial Brief in opposition to confirmation of the First Amended Joint Plan Of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., Et Al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and The Official Committee Of Equity Security Holders (the "Proponents"), dated February 27, 2009 PP Ex. 274 (the "Plan").

## PRELIMINARY STATEMENT AND SUMMARY OF EVIDENCE

Garlock is a once and future co-defendant of Grace's that has had countless contribution claims against Grace in the past, and will certainly hold contribution claims against Grace in the future. To issue the Asbestos PI Channeling Injunction (the "Channeling Injunction"), the Court must determine, before confirmation, that "identifying such debtor or debtors . . . in such injunction with respect to such demands for purposes of this subparagraph is *fair and equitable with respect to the persons that might subsequently assert such demands*, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors . . . ." 11 U.S.C. § 524(g)(4)(B)(ii)  The Proponents have failed to carry their burden because the Plan ignores the rights of an entire class of demand holders: co-defendants such as Garlock.

By way of background, the enjoining of co-defendant contribution claims against the reorganized Grace is vital to the success of the Plan. The typical asbestos case contains multiple defendants. *See* 9/9/09 Tr. 53 (Hughes).[1]  In joint and several liability jurisdictions, cases

---

[1] Citations in this brief to the Confirmation Hearing record are to the revised transcripts (except for citations to the 9/15/09 transcript, which are to the uncorrected version), and indicate the day, page number, and name of each witness. Citations to admitted exhibits indicate the party and exhibit number. The proposed WRG Asbestos PI Trust Distribution Procedures ("Grace TDP") are located at PP Ex. 277.04, and are cited as "Grace TDP § __."

includes not just claims by plaintiffs against defendants, but also contribution claims by all defendants against each other.[2]   These contribution claims exist from the moment the plaintiff is injured, and therefore can be (and are) asserted from the beginning of a suit.   Garlock Trial Brief 19-20.   To the extent such claims arise against Grace in the future, they will be demands against Grace within the meaning of section 524(g) ("Demands").

Cases settle against this backdrop of rights in the tort system, which the Proponents' expert, Dr. Mark A. Peterson, referred to as a "marketplace of settlement."   9/15/09 Tr. 159:2-23 (Peterson).   Under principles of joint and several liability, a plaintiff might seek to hold any one defendant liable for his whole damages.   But because all joint and several states also give defendants rights of contribution against each other, defendants are protected from ever having to bear the entirety of a plaintiff's damages.   Because each defendant is exposed only to bearing its several share of the judgment, where several share is defined as the plaintiff's damages divided by the number of defendants, Dr. Peterson testified that, in the marketplace of settlement, defendants almost always succeed in settling for their several shares.   9/15/09 Tr. 239:20-240:6, 240:16-23 (Peterson).

As a consequence of this web of contribution claims, if plaintiffs' claims against Grace were enjoined, but contribution claims were not, Grace would obtain virtually no peace from the asbestos liability problem it currently faces.   Plaintiffs would no longer be able to sue Grace, but

---

On September 10, 2009, Garlock and the Proponents filed the Phase II Stipulation stipulating to (1) certain undisputed facts relating to Phase II confirmation issues and (2) the admissibility of certain of Garlock's confirmation exhibits and the Declaration of John A. Turlik, one of Garlock's asbestos defense lawyers. Citations to the Phase II Stipulation and the Turlik Declaration are referenced herein as "Garlock Stipulation ¶ __" and "Turlik Declaration ¶ __," respectively.

[2] Contribution law provides the substantive basis for these claims.   Before trial, a contribution claim may be asserted through cross-claim, impleader, or third-party practice.   After trial, a contribution claim may be asserted through separate action.   Garlock Trial Brief 19-20.

any co-defendant of Grace's could implead Grace as soon as the co-defendant is sued, litigate the issue of Grace's liability to the plaintiff, and expose Grace to bearing a portion of any judgment the plaintiff obtains against the co-defendant.  Grace, to avoid trials, would have to settle that liability with the co-defendant.  Thus, without a Plan that enjoins contribution claims, Grace would be in nearly the position it was in on the day it filed the bankruptcy petition, and would obtain peace only in the relatively small number of cases where Grace was the sole defendant (such as Libby cases).

Accordingly, Grace's co-defendants are not mere bystanders to this bankruptcy proceeding.  They are holders of Demands, just like future plaintiffs.  Co-defendants' rights are not confined to the rare cases where they have suffered and paid judgments, and actually have ripe claims for payment from Grace.[3]  To the contrary, a co-defendant has rights against Grace in every case where Grace would have appeared if it had not filed for bankruptcy, from the moment that case begins.  If Grace is to extricate itself from the tort system, it must prove that its Plan will treat Grace's co-defendants fairly and equitably, in the same way the Plan will treat plaintiffs fairly and equitably.

The Plan, however, fails to accord fair and equitable treatment to Grace's co-defendants in two basic respects, one that benefits shareholders at the expense of co-defendants, and another

---

[3] Indirect Claim provisions in previous Trust Distribution Procedures ("TDP") drafted by the plaintiff's bar have fostered an incorrect impression of co-defendant rights.  The standard Indirect Claim provision (including the one in section 5.6 of the proposed Grace TDP) allows a co-defendant to assert a claim against the Trust only in the rare instance where it has suffered and paid a judgment, and thus actually paid a portion of the Trust's liability.  This restriction on when a defendant can assert a contribution claim conflicts with state and federal practice, which allows a defendant to assert a contribution claim against another party from the moment it is sued by the plaintiff, and gives rise to the web of contribution claims that provides the backdrop for the marketplace of settlement.  *See* Garlock Trial Brief 19-20.

The ill effects of the Indirect Claim provisions' departure from state law, and the way it helps plaintiffs and the plaintiff's bar, are discussed in detail in the second half of this brief.  But it is important at the outset to make clear that extant Indirect Claim provisions vastly understate the extent of defendants' rights against each other under state law.

that benefits plaintiffs at the expense of co-defendants.  First, the Grace Trust (to which all asbestos claims against Grace will be channeled) will have assets sufficient to pay no more than 35% of Grace's tort system several share.  In joint and several jurisdictions, Garlock and Grace's other co-defendants will be responsible for bearing the rest of that several share (at least 65%), and will at most have the opportunity to recover 35% of the Grace share.  Yet Grace's shareholders will keep equity in a reorganized, asbestos-free Grace that is worth perhaps $1.6 billion or more.  Grace itself is contributing property valued at far less than $1 billion to the Grace Trust.

That shareholders will receive any property at all, while Garlock's Demands are not paid in full, violates Garlock's right to absolute priority, and makes entry of the Channeling Injunction per se unfair and inequitable.  That shareholders will receive a billion dollars or more in a major asbestos defendant, cleansed for all time of its asbestos liability, and leave the unpaid liability for defendants that have managed to survive in the tort system, should shock the conscience of this Court.

The Channeling Injunction also will be unfair and inequitable because the plaintiff's bar that drafted the Grace TDP has ensured that co-defendants will receive no benefit whatsoever in the tort system from the payments made by the Grace Trust.  Asbestos cases are resolved almost entirely in the tort system's marketplace of settlement, and if Garlock and Grace's other co-defendants are to receive any benefit from the Grace Trust, they must obtain it there.  A fair and equitable Grace TDP would force plaintiffs to bring their Trust claims while that marketplace is open for business, during the pendency of the tort action, or lose those claims for all time— exactly what occurs in the tort system.  Then, Grace's co-defendants would know whether they have viable contribution claims against the Grace Trust and have access to evidence thereof at

the time they settle their shares, allowing them to take their contribution rights against the Trusts into account when doing so.

Instead, the plaintiffs' bar that controls the Official Committee of Asbestos Personal Injury Claimants (the "ACC") has drafted the Grace TDP in a way that will enable plaintiffs to conceal evidence of the Grace Trust's liability, and then assert claims against the Grace Trust after resolving tort system claims. This will thus isolate the substantial payments the Grace Trust will make to asbestos plaintiffs from the tort system. Grace's co-defendants, like Garlock, will be deprived of evidence that they have viable contribution claims against the Grace Trust to decrease their trial risk, and will be forced to settle for amounts that do not take the existence of such claims into account. Defendants' one right against the Grace Trust—the right to make a Trust claim after paying and suffering a judgment that extinguishes the Grace Trust's liability— will be meaningless because almost all asbestos cases are resolved through settlement, not through judgments after trials. The provisions that enable this "conceal and defer" strategy to flourish serve no legitimate purpose whatsoever, but are instead intended to allow plaintiffs to recover full damages in the tort system, and then pursue claims in an entirely separate "trust market."

Thus seen in its proper light, the Plan is an overt attempt to transfer 100% of Grace's asbestos liability to defendants surviving in the tort system. Meanwhile, Grace's shareholders will preserve a billion dollars or more in equity, and asbestos plaintiffs will be allowed to obtain Grace's entire share from tort system defendants followed by another 35% of Grace's share from the Grace Trust after settling with all tort system defendants. Co-defendants will be the losers from this bargain between equity and asbestos plaintiffs. Entry of the Channeling Injunction is a

condition of confirmation of the Plan.  Because the entry of the Channeling Injunction will be
unfair and inequitable to Grace's co-defendants, this Court should deny confirmation.

**ARGUMENT**

I.   **ENTRY OF THE CHANNELING INJUNCTION WILL NOT BE "FAIR AND
     EQUITABLE" BECAUSE THE PLAN VIOLATES THE ABSOLUTE PRIORITY
     RULE.**

To issue the Channeling Injunction, the Court must determine, before confirmation, that
"identifying such debtor or debtors . . . in such injunction with respect to such demands for
purposes of this subparagraph is *fair and equitable with respect to the persons that might
subsequently assert such demands*, in light of the benefits provided, or to be provided, to such
trust on behalf of such debtor or debtors . . . ."  11 U.S.C. § 524(g)(4)(B)(ii).  "Demands" are
claims for payment that Asbestos PI Claimants will hold in the future, but that are not currently
"claims" as defined in section 101(5) of the Bankruptcy Code, including future claims for
contribution by co-defendants such as Garlock.  11 U.S.C. § 524(g)(5).  The words "fair and
equitable" in bankruptcy law have a long established meaning at their core: unless the prior
claims of creditors—in this case, holders of Demands—are paid in full, shareholders may not
retain their stock in a reorganized debtor.  This principle is known as the absolute priority rule.
Garlock Trial Brief 10-16.

The evidence is undisputed: Garlock will hold Demands against the Grace Trust in the
future, those Demands will receive one-third or less of their values, but the Plan will award
Grace's shareholders their current stockholdings, worth approximately $1.6 billion.  This is a
blatant violation of the absolute priority rule that makes the Channeling Injunction unfair and
inequitable to Garlock and therefore prevents confirmation of the Plan.

6

A.    **Garlock Will Assert Demands Against the Grace Trust in the Future.**

Garlock has been an asbestos defendant for several decades.  Turlik Declaration ¶ 3;

Garlock Ex. 13.  And Grace, by the time it sought bankruptcy protection on April 2, 2001, was

one of the most highly targeted asbestos defendants.  9/15/09 Tr. 230:14-19 (Peterson).[4]  It thus

comes as no surprise that prior to Grace's April 2, 2001 petition, plaintiffs routinely named

Grace and Garlock together in thousands of asbestos cases annually.  Garlock Ex. 13.  Plaintiffs

in these cases alleged that the products of multiple defendants, including Grace and Garlock,

were substantial contributing causes of the plaintiffs' indivisible asbestos-related injuries.  *Id.*;

Garlock Stipulation ¶¶ 1-2.  In each of these cases that arose in joint and several liability

jurisdictions, Grace and Garlock had contribution claims against each other from the moment the

plaintiff sued.  Garlock Trial Brief 19-20.

During Grace's bankruptcy case, this trend continued.  Individuals claiming to hold

Asbestos PI Claims against Grace continued to assert claims against Garlock alleging that

Garlock contributed to their injuries as well.  Garlock Stipulation ¶ 2.  Based on Garlock's

random sample of the thousands of Asbestos PI Claimants who voted to accept or reject the Plan,

at least 57% of such claimants asserted asbestos claims in the tort system against Garlock.

Garlock Ex. 98.

Given these undisputed facts, the Proponents were willing to stipulate that "[t]he Asbestos PI

Trust is likely to receive some Claims and Demands in the future by Asbestos PI Claimants who

also assert claims in the tort system against Garlock alleging that Garlock's products also

---

[4] During the two years preceding the petition, over 45% of persons diagnosed with an asbestos-related
cancer sued Grace, PP Ex. 199, p. 70, 9/15/09 Tr. 233:24-234:3 (Peterson), and Grace made settlement
payments to well over 90% of such claims asserted against it.  PP Ex. 199, p. 15, 9/15/09 Tr. 235:1-5
(Peterson).

contributed to their asbestos injuries," and that "[a]s a result of such Claims and Demands, Garlock itself may assert Claims and Demands in the future against the Asbestos PI Trust," and "*Garlock might hold Indirect PI Trust Claims against the Asbestos PI Trust on account of such Claims and Demands.*" (emphasis added.)  Garlock Stipulation ¶ 4.[5]  Garlock is therefore certain to have contribution Demands against Grace, and it is indisputable that Garlock will hold Demands against the Grace Trust.

**B.      Garlock's Demands Will Not Be Paid in Full But Shareholders Will Receive Property, In Violation of the Absolute Priority Rule.**

If the Plan is confirmed, Garlock's contribution Demands will be channeled to the Grace Trust, and Garlock will have no recourse against the reorganized Grace or any other Protected Party.  Plan §§ 7.2.3, 8.1.2, 8.2.1, 3.1.6, 9/14/09 Tr. 79:11-14 (Inselbuch).  Grace Trust assets, however, will not be sufficient to pay Garlock's Demands in full.  The nominal value of Grace's projected total liability for Asbestos PI Claims, present and future, is approximately $9.6 billion with a net present value as of the projected Effective Date of approximately $7.4 billion.  PP Ex. 201, p. 15; 9/15/09 Tr. 203, 212-16 (Peterson).  The projected net present value of assets that would be contributed to the Grace Trust, on the other hand, is approximately $1.9 billion, plus approximately $600 million of insurance.  *See* discussion, *infra* 10-11  As a result, the Grace Trust is expected to pay only a fraction of the value of Demands (the "Payment Percentage"), which will initially be between 25% and 35%.  Grace TDP §§ 4.1, 4.2; 9/15/09 Tr. 252: 18-21

---

[5] Garlock was prepared to offer evidence that, prior to Grace's bankruptcy case, a *majority* of asbestos personal injury claimants who sued Garlock in many states, including states that follow principles of joint and several liability, also named Grace as a defendant and alleged that Grace's products contributed to their asbestos injuries as well. Garlock Stipulation ¶ 1.  The Proponents, however, agreed to stipulate that Grace and Garlock were sued by some of the same asbestos personal injury plaintiffs and that the scale of common claims is irrelevant.  Garlock Stipulation ¶ 2.

8

(Peterson); Grace TDP §7.7; 9/14/09 Tr. 99:1-3 (Inselbuch).   Thus, Asbestos PI Claimants, including Demand holders, will not be paid the full value of their claims.[6]

Despite this impairment of Demands should the Plan become effective, equity holders would retain their interests in the Parent and the Parent would retain its interests in the other Debtors.  Plan § 3.1.10 ("Equity Interests in the Parent shall be retained, subject to the issuance of the Warrant and the terms of the Share Issuance Agreement.") and 3.1.11 ("This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interests in the Debtors other than the Parent entitled the Holder of such Equity Interest.").   The value of these retained interests would be substantial.   Even with Plan confirmation uncertain, the market capitalization of the Parent as of November 2, 2009 is approximately $1.6 billion.[7]   Should the Plan be confirmed and the uncertainty removed, the retained equity in the asbestos-free Parent would likely be well in excess of $1.6 billion.

The shareholders' retention of any property, while Garlock's Demands go unpaid, violates absolute priority, making entry of the Channeling Injunction per se unfair and

---

[6] The Payment Percentage applies to all demands, regardless of how their value is liquidated, i.e. via Expedited Review or Individual Review.  Furthermore, should a Demand holder opt out to the tort system and obtain a judgment, the demand will still not be paid in full.  First, Demand holders would receive only 25% to 35% of the amount of a judgment up to the Maximum Amount. The portion of any judgment exceeding the Maximum Amount would simply be ignored.  As a result, if Garlock obtained a $1,000,000 judgment against the Trust for having paid Grace's several share of a demand based on mesothelioma, Garlock's total payment from the Trust would be only $112,500 to $157,500 (25% to 35% of the Maximum Amount of $450,000). Furthermore, the present value of the payment to demand holders would be further reduced by Draconian payment terms.  To the extent the judgment amount exceeded the greater of the Trust's settlement offer or arbitration award, the Applicable Percentage of such excess amount would be paid in five annual installments commencing at the end of the fifth year following entry of the judgment.  In sum, it is beyond dispute that Garlock's demands will not be paid in full.  Grace TDP §7.7; 9/14/09 Tr. 93:17 – 98:25 (Inselbuch).

[7] Financial date obtained from www.google.com/finance?q=NYSE:GRA, last visited on November 2, 2009.

inequitable.   The text and history of section 524(g) indicate that Congress required fealty to absolute priority as a condition to entry of the Channeling Injunction.  Garlock Trial Brief 12-16.

Additional facts, however, add to the inequity of the Grace Plan.  The approximately $1.6 billion of equity value Grace's shareholders will retain will be approximately two times more than the value of what Grace itself, which has direct responsibility for the full asbestos liability, will contribute to the Grace Trust.   On the Effective Date, Grace would transfer to the Grace Trust: (1) $250 million in cash, Plan §§ 1.1(40) and 3.1.6,  and (2) warrants to acquire 10 million shares of Grace common stock at an exercise price of $17.00 per share.  PP Ex. 277.24 (Warrant Agreement), §4.1.  The warrants, currently $4.89 in the money, would be worth approximately $49 million today. *See infra*, fn7.   Beginning in 2019, Grace would make fifteen annual payments to the Grace Trust with a net present value of approximately $400 million to $500 million.[8]   In sum, the net present value of Grace's contributions to the Grace Trust will be approximately $700 million  to $800 million, or approximately $420 million to $480 million, after tax.[9]

In the meantime, the Plan will leave $4.8 billion to $5.6 billion of unfunded Grace asbestos personal injury liability, the brunt of which will fall not on plaintiffs, but on Grace's surviving co-defendants, such as Garlock.  Under joint and several liability principles applied in most states, Asbestos PI Claimants will have the right (and have had the right during the bankruptcy) to pursue Garlock and Grace's other co-defendants to recover the unpaid portion of Grace's several share.  The recourse Asbestos PI Claimants have against other tort system

---

[8] The annual payments would be $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024.  The net present value calculation depends on the rate at which this stream of payments is discounted to January 1, 2010.

[9] Grace would also transfer to the Trust the Asbestos Insurance Rights, rights to proceeds under Grace's asbestos-related insurance coverage.  Plan §§1.1(12) and 1.1(40).

10

defendants explains, in part, why they were willing to vote overwhelmingly in favor of a Plan that severely underfunds Grace's asbestos liability while preserving over $1 billion in equity for Grace's shareholders.[10]

The overall consequence of joint and several liability is that Garlock and the other co-defendants will be left with the 65% of the Grace share: including the portion that could be funded if Grace shareholders were required to give up their stock.  Thus, the shareholders in a major asbestos defendant will preserve over one billion dollars of value in an asbestos-free company, while handing the bill to defendants that have managed to survive in the tort system without the help of Section 524(g).  Congress cannot have intended this fundamentally unfair result.

To the contrary, Congress, by using the term "fair and equitable," with its century-old accretions of meaning, indicated that a Plan may not allow shareholders in a debtor with asbestos liabilities to retain *any* property, if that debtor is not going to pay asbestos Demands in full.[11]  To achieve the extraordinary benefits of a 524(g) injunction, a debtor must give up its equity.  Or it must pay Demands in full.  The Plan does neither.  Therefore, the Plan is not confirmable.

---

[10]  The other half of the explanation lies in the second part of Garlock's brief.  In return for allowing Grace's shareholders to preserve equity, plaintiffs are receiving the ability to conceal from the tort system and defer claims against the Grace Trust, ensuring they will recover Grace's *entire* several share from tort system defendants, and then collect the Grace Trust payment as an added bonus.  *See infra* Part II.

[11]  Confirmation of this Plan would also set a dangerous new precedent.  To Garlock's knowledge, no previous 524(g) bankruptcy has allowed shareholders in a debtor that will not pay future asbestos liabilities in full to retain property.  The Proponents' test for when shareholders may retain equity looks only to whether the debtor is making a "substantial" contribution to the underfunded Trust.  The test is infinitely malleable—as it must be to allow a Grace Plan where the debtor gives up less than the value of the equity its shareholders are retaining.  If the Court accepts that test, and confirms the Plan, the door will be open for every future 524(g) Plan to favor shareholders over higher-priority holders of asbestos demands, in violation of fundamental tenets of bankruptcy law and policy.

II.     **ENTRY OF THE CHANNELING INJUNCTION WILL NOT BE FAIR AND EQUITABLE BECAUSE GARLOCK WILL RECEIVE NO CONSIDERATION FOR THE ENJOINING OF ITS CONTRIBUTION DEMANDS.**

The Plan should not be confirmed for a second, independent reason.  When Grace and other major defendants left the tort system in the early part of this decade, Garlock and other co-defendants left behind lost their ability to make contribution claims against the bankrupts in joint and several jurisdictions, and became responsible for bearing the bankrupts' several shares of the asbestos liability.  Settlement values in the "marketplace of settlement" increased dramatically as a result.  When the major defendants began paying claims again—in the form of payments made by section 524(g) trusts—defendants' newly acquired contribution claims against such trusts should have reduced their trial risk and caused their settlement values to decrease.

In reality, the billions of dollars being paid by 524(g) trusts ("Trusts") have had no effect on co-defendant settlement values, for one simple reason.  The plaintiffs' bar has rigged the TDP of all the Trusts to allow plaintiffs to conceal and defer making Trust claims until after settling with all tort system defendants.  As a result, co-defendant settlement values have remained at the elevated level caused by the wave of bankruptcies.  Co-defendants have received no benefit from the Trusts established to compensate them for the enjoining of their contribution claims.

Because the proposed Grace TDP have the same features that allow plaintiffs to conceal and defer claims, and thus render co-defendants' contribution claims against the Grace Trust valueless, Garlock will receive no benefit from the Grace Trust in consideration for the enjoining of contribution Demands it will hold against Grace.  As a result, the Channeling Injunction will not be "fair and equitable" to Garlock, and the Plan cannot be confirmed.

2370147/1

A.      **Co-Defendant Settlement Values Should Decrease When Trusts Begin Paying Claims**

In the tort system, asbestos cases generally get resolved through settlement.  9/15/09 Tr. 159:2-23 (Peterson); *see also* 9/8/09 Tr. 96:3-4 (Inselbuch) ("Something north of 95 percent of . . . asbestos cases in the tort system settled.  Very, very few actually go to verdict.").  The Proponents' witnesses testified at length that the number of potentially liable defendants is a principal driver of settlement values.  9/8/09 Tr. 52:12-53:25 (Inselbuch); 9/9/09 Tr. 49:17-50:10, 178:9-18 (Hughes); PP Ex. 501-2.  This is true because settlement values ultimately depend on trial risk, 9/8/09 Tr. 249:15-23, 284:19-24 (Peterson), 9/15/09 Tr. 172:2-6, 240:24-241:3 (Peterson), and the more contribution claims a defendant has against other defendants before trial, the less risk that defendant faces at trial.

For example, when a case moves from having one to two known viable defendants, the risk of the first defendant is halved, and the amount it will have to pay in settlement decreases correspondingly.  In the highly developed marketplace of settlement, according to Dr. Peterson, defendants are almost always successful in paying only their several shares of the plaintiff's damages: i.e., the partial share of the entire liability divided among the various responsible defendants.  9/15/09 Tr. 239:20-240:6, 240:16-23 (Peterson).[12]

Numerous facts developed by the Proponents at trial show these principles at work.  First, the Proponents demonstrated that Grace's settlement values in Libby were extremely high because Grace was the only defendant with potential liability.  9/8/09 Tr. 250:15-25 (Peterson);

---

[12] The timing of defendants' settlements is largely immaterial, because non-settled defendants receive credit for settlements in various ways, and often are protected from bearing any part of the several shares of settled defendants. *See, e.g.*, Md. Code Ann., Cts. & Jud. Proc. § 3-1405; Del. Code Ann. tit. 10, § 6304(b).  Accordingly, regardless of when a defendant settles before trial, it settles for its several share, as Dr. Peterson testified.

13

9/9/09 Tr. 52:22-53:13 (Hughes).  Grace had no other defendants that could bear trial risk in Libby, and thus faced the prospect of paying the plaintiffs' entire damages were it to lose at trial. As a result, Grace's settlement values in Libby were far greater than its settlement values in other jurisdictions, where Grace had co-defendants that bore the risk of paying portions of plaintiffs' damages.  9/9/09 Tr. 52:22-53:13 (Hughes).

Second, the Proponents explained that the Grace TDP need an "extraordinary claims" provision to take into account the impact the number of defendants has on tort system settlement values.  According to Mr. Inselbuch, the scheduled values in the Grace TDP represent a national average of Grace's "several share" in the standard, multiple defendant case.  9/8/09 Tr. 52:12-15 (Inselbuch).  But Mr. Inselbuch recognized that Grace's settlement values were much higher in any case where Grace was the sole (or nearly sole) defendant, and accordingly inserted an extraordinary claims provision into the Grace TDP that allows such a plaintiff to recover up to five or eight times the scheduled value for his disease category.  9/8/09 Tr. 52:12-53:25, 59:19-22, 100:9-25 (Inselbuch); Grace TDP § 5.4(a).  The extraordinary claims provision thus also demonstrates the importance of a defendant having known contribution claims in the marketplace of settlement.

Finally, the Proponents demonstrated that Grace's settlement values before the bankruptcy increased (and would have continued increasing after the bankruptcy) primarily because of the exit of major asbestos defendants in the wave of bankruptcies that took place during the early part of this decade.[13]  9/15/09 Tr. 170-172 (Peterson).  Settlement values

---

[13] From January 2000 through December 2001, W.R. Grace and eight other "top tier" asbestos defendants each filed for bankruptcy protection, thereby removing from the tort system "the biggest sources of compensation of asbestos claims."  PP Ex. 199, p. 25; *see also* 9/15/09 Tr. 170-72 (Peterson).  These eight defendants were Babcock & Wilcox (February 2000), Pittsburgh Corning (April 2000), Owens Corning and Fibreboard (October 2000), Armstrong World Industries (December 2000), GAF (January

increased because, when the major defendants left the tort system, the tort system became a "riskier environment," where the remaining defendants faced the prospect of bearing the bankrupts' shares of judgments at trial.  9/15/09 Tr. 172:2-6 (Peterson); *see also* 9/9/09 Tr. 82 (Hughes).  The increased pressure on surviving co-defendants resulted in additional bankruptcies which in turn further increased the settlement value of claims against surviving defendants. 9/8/09 Tr. 224 (Peterson).

The exit of other major tort system defendants was, according to the Proponents' witnesses, the most important factor behind the increases in Grace's settlement values just before its bankruptcy.  9/8/07 Tr. 222:20-223:12, 288:9-18 (Peterson); 9/15/09 Tr. 170-72 (Peterson). Principally as a result of this wave of co-defendant bankruptcies, the settlement value of asbestos claims against defendants multiplied several times; for Grace, the increase was over 300%.[14] Had Grace remained in the tort system, its settlement values would have continued to increase because even more defendants exited the tort system for bankruptcy.  9/8/09 Tr. 77:3-7 (Inselbuch); 9/8/07 Tr. 224:11-225:6 (Peterson).  The exception that proves the rule would have been Libby.  There, because Grace was the sole defendant, it already faced all the trial risk, so that the co-defendant bankruptcies did not affect, and would not have affected, Grace's settlement values there.  9/8/09 Tr. 77:22-78:9, 96:14-21 (Inselbuch); 9/8/09 Tr. 227:22-228:2, 237:10-17 (Peterson).

---

2001), USG (June 2001), and Turner & Newall and other Federal Mogul companies (October 2001).  PP Ex. 199, p. 25.

[14] For example, Grace's average settlement payment for a mesothelioma claim in 1999, the year before the co-defendant bankruptcy wave, was $49,586. PP Ex. 199, p. 23. By April 2001, when Grace sought bankruptcy protection, the average value had increased to almost $98,000.  *Id*; 9/15/09 Tr. 251:22-25 (Peterson).  Today the average value of mesothelioma claims against Grace is $225,000.  PP Ex. 199, p. 36; 9/15/09 Tr. 251:17 (Peterson).

In addition, the Proponents' witnesses testified that the effect of the bankruptcies was not confined to Grace. The principle applied equally well to other defendants—like Garlock—that were left behind in the tort system. Like Grace, these defendants saw their settlement values increase due to the wave of bankruptcies, an effect that continued during the pendency of the Grace bankruptcy. 9/8/09 Tr. 223:16-20, 224:17-225:6 (Peterson); 9/9/09 Tr. 82:19-83:2 (Hughes).

These three facts—Grace's high settlement values in Libby, the need to draft an extraordinary claims provision to account for cases without multiple defendants, and the effect of major defendant bankruptcies on Grace's settlement values and those of other defendants— demonstrate the crucial importance that contribution claims against co-defendants have on the settlement value of asbestos cases in the tort system. This principle should operate with equal force when Trusts come online and begin paying plaintiffs. When co-defendants' contribution claims (in existence from the start of the tort system case) are channeled to the Trust, and the Trust begins paying claims to plaintiffs, co-defendants should face less trial risk and should see their settlement values decrease accordingly.

In our two-defendant hypothetical, if one defendant has filed for bankruptcy (Bankrupt Defendant), and created a Trust paying 50% of Bankrupt Defendant's several share, the remaining defendant (Surviving Defendant) should see its trial risk decrease by 25% (half of the Bankrupt Defendant's several share) and see its settlement value decrease accordingly. Just as settlement values increased when major defendants left the tort system through bankruptcy, 9/15/09 Tr. 170-72 (Peterson), tort system settlement values should decrease when Trusts begin paying plaintiffs.

16

Instead, according to Dr. Peterson, the payments made by the Trusts that now stand in for the bankrupt companies have had no impact at all on surviving co-defendant settlement values. 9/15/09 Tr. 250-55, 253:19-255:4 (Peterson).  This was true despite the fact that the Trusts pay billions of dollars per year to asbestos plaintiffs (the eight largest Trusts nearly $2.5 billion in payments during 2008), and a mesothelioma claimant with claims against the eight largest Trusts would expect to recover in excess of $400,000.  Exhibit A.[15]

The only reasonable explanation for the fact that billions of dollars in Trust money has had no effect on co-defendant settlement values is that Trust money being paid to plaintiffs has been isolated from the tort system and its marketplace of settlement.  The evidence presented at trial shows how the plaintiffs' bar has accomplished this.   They have successfully drafted standard TDP—followed by the Grace TDP in all material respects—that allow plaintiffs to conceal the existence of Trust claims.   They thereby prevent co-defendants from obtaining evidence of viable contribution claims against the Trusts, and keep co-defendant settlement values as high as when the major defendants were in bankruptcy.

B.    **The Standard TDP Enable Plaintiffs to Conceal and Defer Trust Claims, Distorting the Marketplace of Settlement**

If plaintiffs could successfully conceal and defer claims against emerging Trusts, they would prolong the bankruptcys' effect on settlement values, by ensuring that defendants never

---

[15] Garlock requests that the court take judicial notice, pursuant to Federal Rule of Evidence 201, of the facts contained in Exhibit A to this brief.  Exhibit A contains information on the assets of a number of large trusts, the amounts they paid to claimants in 2008, and the average value of a mesothelioma claim against the trusts.  The information is all derived from trust reports filed with this and other bankruptcy courts, payment percentages and average values found on publicly available trust websites, and simple arithmetic involving these figures, all "sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

obtain evidence that they have viable contribution claims that mitigate trial risk. In the two-defendant example, if the plaintiff can prevent Surviving Defendant from learning it has a contribution claim against the Bankrupt Defendant's Trust, Surviving Defendant will settle by paying in full both several shares, then the plaintiff would collect 50% of Bankrupt Defendant's several share as well, in the form of a Trust payment, for a total of 2.5 several shares. For Surviving Defendant, it is as if the Bankrupt Defendant's Trust was never established, with settlement values left as high as when Bankrupt Defendant retreated from the tort system to bankruptcy. *See* 9/8/09 Tr. 222:20-223:12, 288:9-18 (Peterson); 9/15/09 Tr. 170-72 (Peterson); 9/9/09 Tr. 82:19-83:2 (Hughes).

In the tort system, defendants have rights that prevent plaintiffs from concealing and deferring claims. In the first place, if a plaintiff declines to join a third party, any defendant can nevertheless initiate binding adjudication of the party's liability to the plaintiff, by impleading that party. The defendant has this right from the start of litigation against it, and need not suffer and pay a judgment before bringing a contribution claim that puts the party's liability to the plaintiff at issue. Garlock Trial Brief 19-20; 9/14/09 Tr. 83:16-21 (Inselbuch). If the plaintiff fails to put on evidence of the impleaded party's liability, he must suffer the consequences.

Even if the absent party is not actually impleaded (for example, because the defendant has no reason to suspect that the absent party contributed to the plaintiff's injuries), the plaintiff still faces significant barriers to concealing and deferring claims against unnamed co-defendants. Defendants in the first action take discovery from the plaintiffs and their witnesses about their exposure to any and all asbestos-containing products. *See* Turlik Declaration ¶ 6; 9/14/09 Tr. 92:3-6 (Inselbuch). If a plaintiff denies or fails to name alternative exposures, and later contradicts that testimony by making claims against new parties, the later claims are public and

18

will alert both the new defendants and the old defendants of the inconsistency, so that both can seek an appropriate remedy from the court. The publicity of claim filings, therefore, significantly deters the practice of claim concealment and deferral.

Because the "conceal and defer" strategy is difficult if not impossible to pursue in the tort system, the tort system marketplace of settlement is unitary. All exposure evidence that will ever be available is forced to the table during the tort action. When defendants pay their several shares, 9/15/09 Tr. 159:2-23, 239:20-240:6, 247:16-248:3 (Peterson), they are paying their real several shares, in light of all information about contribution claims the defendants may have against co-defendants.

The standard form TDP, by contrast, make it quite easy for plaintiffs to conceal evidence of Trust claims during pretrial discovery in the tort system and defer making those Trust claims until after resolving all claims in the tort system. A variety of provisions in the standard form TDP (which the Grace TDP follow in all material respects) allow this strategy to flourish.

First, in contrast to a defendant's tort system right to implead other potentially culpable parties at the beginning of litigation and require the plaintiff to put forward evidence or be barred for all time, the standard form TDP do not allow a defendant to initiate the resolution of the Trust's liability to the plaintiff. A co-defendant has no right to initiate resolution of the Trust claim until it acquires an "Indirect Claim," which does not happen until the defendant has suffered and paid a judgment. Grace TDP § 5.6; 9/14/09 Tr. 43:2-10, 79:22-80:4, 84:6-15 (Inselbuch).

Until then, only the plaintiff has the right to initiate resolution of the claim, and may wait to exercise it until after resolving all his tort system claims. The plaintiff faces a nominal three-year statute of limitations under the Grace TDP, which is longer. But the Grace TDP allow

claimants the right to withdraw a claim "at any time" and file another claim "subsequently without affecting the status of the claim for statute of limitations purposes."  Grace TDP § 6.3. As a result, the plaintiff may wait an indefinite period of time before submitting discoverable evidence to the Trust.  According to Mr. Inselbuch, principal drafter of the Grace TDP, 9/8/09 Tr. 74:13-16 (Inselbuch), a plaintiff might delay "ten or 20 years" before submitting discoverable evidence to the Trust, and suffer no adverse consequence to his Trust claim.  9/14/07 Tr. 85:21-86:18, 91:24-92:2 (Inselbuch).  Co-defendants have no way to shorten the clock.  Grace TDP § 5.6; 9/14/09 Tr. 43:2-10, 84:6-15, 101:22-102:1 (Inselbuch).

In this way, the standard TDP and Grace TDP give plaintiffs free reign to postpone resolution of some claims (Trust claims) until after resolving some others (tort system claims). Mr. Inselbuch flatly admitted that claimants may delay resolving their Trust claims until after they resolve their claims in the tort system, "if that's what they wanted to do."  9/14/09 Tr. 86:21-87:2 (Inselbuch).

But, say the Proponents, this has no ill effect on co-defendants, because co-defendants may still learn whether they have viable contribution claims against the Trust by requiring the plaintiff in pretrial discovery to disclose his exposures to Trust products.  *See* 9/14/09 Tr. 92:3-6 (Inselbuch).   In this way, according to the Proponents, co-defendants can learn they have contribution claims against the Trust, and take those claims into account when they are assessing their trial risk and settling their several shares in the marketplace of settlement.

Unfortunately, pretrial discovery is no remedy because the standard TDP, like the Grace TDP, give plaintiffs the ability and incentive to conceal claims with impunity in tort system discovery.  The confidentiality provision in the Grace TDP (which follows the provision in the standard form TDP in all material respects) provides that "All submissions to the PI Trust by a

2370147/1

holder of a PI Trust Claim or a proof of claim form and materials related thereto shall be treated as made in the course of settlement discussions between the holder and the PI Trust, and intended by the parties to be confidential." Grace TDP § 6.5. The standard TDP then require the Trust to "preserve the confidentiality of such claimant submissions," and allow the Trust to disclose the submissions without the permission of the claimant in only one circumstance: "in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court or the United States District Court for the District of Delaware." *Id.* In the absence of subpoena, confidentiality is absolute. The provision conceals not just arguably sensitive information such as medical reports, social security numbers, and settlement discussions between Trust and claimant, but "all submissions to the PI Trust . . . and materials related thereto"— including the exposure evidence the claimant submits, *and even the fact that a claim has been filed at all*. 9/15/09 Tr. 255:5-11 (Peterson).

The pernicious effect of this confidentiality provision is that it erects an impenetrable veil of secrecy around the existence and content of deferred claims, which gives plaintiffs the incentive and ability to conceal exposure to Trust products during pretrial discovery. No one— not co-defendants and not the general public—can find out whether a claimant has concealed and deferred a Trust claim, because after all tort claims are resolved, no defendant has a pending action in which a subpoena may issue, so that the only exception to confidentiality is unavailable. Grace TDP § 6.5; 9/14/09 Tr. 90:5-91:13 (Inselbuch). As a result, after the tort case is resolved on the evidence that a plaintiff has no Trust claim and the marketplace of settlement has closed for business, there is literally no way for settled defendants or the interested public to find out whether a claimant has subsequently submitted a deferred claim, much less what exposure evidence he used to support the claim.

2370147/1

Because of the confidentiality provision, plaintiffs can deny exposure to Trust products in pretrial discovery, and rest safe in the knowledge that no one will be able to discover that they have concealed and deferred claims. The standard TDP remove the crucial safeguard of publicity: a safeguard that every state and federal court insists upon. As Judge Posner put it, "Judicial proceedings are supposed to be open . . . in order to enable the proceedings to be monitored by the public. The concealment of a party's name impedes public access to the facts of the case, which includes the parties' identity." *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004). The court held that "[t]he presumption that parties' identities are public information" can be rebutted only "by showing that the harm to the plaintiff . . . exceeds the likely harm from concealment" in the particular case, and denied such protection in a case where a woman alleged sexual harassment by a police officer because she was "not a minor, a rape or torture victim . . . or . . . a likely target of retaliation." *Id.* Some courts have questioned whether pseudonymous claims are ever permissible. *See Qualls v. Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005).

The confidentiality provision in the Grace TDP flouts these longstanding principles, and provides near-perfect cover for the practice of deferring Trust claims. This is why the Proponents' words ring hollow when they insist that pretrial discovery and the subpoena exception to the confidentiality provision cure all. *See* 9/14/09 Tr. 90:21-91:13, 92:3-6 (Inselbuch). The savvy plaintiff conceals and defers claims, which prevents the Trust from ever having any evidence that could be subpoenaed, and nothing in the Grace TDP prevents this result. *See* 9/14/09 Tr. 107:9-12 (Inselbuch). Confidentiality provides an absolute guarantee of secrecy after the tort system has run its course, which gives plaintiffs every incentive to conceal

evidence against the Trusts during pre-trial discovery, to the detriment of tort system co-defendants.[16]


### C.    The Record Contains Direct Evidence of the "Conceal and Defer" Strategy

The precise extent of the "conceal and defer" practice enabled by the standard form TDP is currently unknown, because the veil of secrecy erected by the confidentiality provision is so absolute.  However, the ease with which a plaintiff may defer claims under the standard TDP, and the fact that billions of dollars in Trust payments have had *no* effect on co-defendant settlement values, 9/15/09 Tr. 250-55 (Peterson), suggest the practice is routine.  Furthermore, despite the virtually impenetrable veil of secrecy around the claim concealment and deferral practice, Garlock has acquired direct evidence showing that claim concealment is no hypothetical problem.

Garlock suffered and paid multi-million dollar judgments in Maryland to the Estates of Gary Snyder and Reginald Puller.[17]   Garlock Ex. 21, 23, 48, 100.  Before trial, Garlock took extensive discovery, and deposed all plaintiff witnesses about the full extent of the plaintiff's exposure to all sources of asbestos, including the products of bankrupt defendants.  Turlik Declaration ¶ 6.

---

[16]  Admittedly, concealment in the tort system may not involve affirmative misrepresentation by the plaintiff and his witnesses: it may instead stem from a calculated lack of investigation into the plaintiff's exposure to Trust products.  But because plaintiffs know or should know about exposures to Trust products that occurred decades ago, the Grace TDP should give them incentives to produce that information in timely fashion: incentives that the tort system provides, but that the Trust system currently does not.

[17]  The cases were *Reginald Puller, et al. v. ACandS, Inc., et al.* (Circuit Court for Baltimore City No. 24-X-02-000023) ("*Puller*") and *Gary Snyder, et al. v. ACandS, Inc., et al.* (Circuit Court for Baltimore City No. 24-X-01-001969) ("*Snyder*").  Garlock paid $3,883,495.70 to satisfy the judgment in *Puller*.  Turlik Declaration ¶ 7.  Garlock paid $4,149,850.48 to satisfy the judgment in *Snyder*.  *Id.*

After Garlock suffered and paid the judgments, the plaintiffs began filing Trust claims, including against the AWI Trust, the DII Trust, both sub-accounts of the Owens Corning/Fibreboard Trust, the USG Trust, and (in the case of Mr. Puller) the NGC Trust. Garlock Ex. 52-64. Each of the claims was based on decades-old evidence that could have been disclosed in pretrial discovery. *See, e.g.*, Garlock Ex. 55 pp. 5-12 (Mr. Puller, Fibreboard); Garlock Ex. 62 pp. 5-8 (Mr. Snyder, Fibreboard). Yet the plaintiffs' exposure to several products for which these Trusts were responsible had never been disclosed in pretrial discovery. Turlik Declaration ¶ 8. All of these Trusts had TDP provisions that, like the Grace TDP, allowed plaintiffs to defer claims indefinitely and enjoined absolute secrecy about the fact that the plaintiff had filed the claims. *See, e.g.*, Garlock Ex. 65 §§ 6.3, 6.5 (AWI), 67 §§ 6.3, 6.5 (Owens Corning/Fibreboard), 68 §§ 6.3, 6.5 (USG).

Mr. Puller's estate even collected from one of the Trusts whose products had not been identified in tort system discovery (the NGC Trust), between the time when Garlock suffered the judgment and paid it. Garlock Ex. 56. The evidence his representatives submitted to the NGC Trust, shortly after Garlock suffered the judgment, was decades old. *Id.* pp. 17-18. Garlock, despite paying a multi-million dollar judgment to Mr. Puller, which his attorney marked as satisfied in full, has not and may never receive payment from the NGC Trust.

The conduct of the representatives for Mr. Puller and Mr. Snyder demonstrates the "conceal and defer" strategy in action. Only after all tort system claims were resolved did they begin to file Trust claims and disclose decades-old evidence of exposure to Trust products not revealed in pre-trial discovery.[18] It was apparently a deliberate tactic, employed to isolate

---

[18] Many of the deferred claims were supported by competent evidence, as demonstrated by the fact that the NGC Trust paid Mr. Puller and Garlock (the rightful holder of the claims after it suffered and paid the judgments) eventually received payment on many of the other deferred claims. Garlock Ex. 73.

evidence of trust liability from the tort system, where it could alert co-defendants such as

Garlock that they had additional contribution claims.[19]

The Puller and Snyder incidents cannot be dismissed as examples of a rogue plaintiffs'

firm abusing the civil justice system.  Plaintiffs' firms just like the firm that represented the

Puller and Snyder estates staffed the ACC that was principally responsible for the Grace TDP,

D.I. 95, 9/14/09 Tr. 46:8-21 (Inselbuch), all of which have a direct interest in prolonging the

settlement value-inflating effects of the bankruptcy, through pursuing the conceal and defer

practice.[20]  These are the same firms that are involved in every asbestos bankruptcy, that were

responsible for the standard form TDP, and that staff the TACs of each Trust.  *See* CNA Exh. 10,

12-13, 15-17, 19-24, 26.

The firms that drafted these claim deferral provisions will be filing thousands of claims

against the Grace Trust and receiving contingency fees to do so, 9/14/09 Tr. 50:5-51:4

(Inselbuch), just as they will be filing thousands of claims against tort system defendants like

Garlock, and collecting contingency fees there as well.  The firms have every incentive to draft

---

[19] The only unusual fact was that these particular plaintiffs ended up obtaining large judgments in the tort system, yet their representatives were bold enough to continue making deferred claims despite marking the judgments as satisfied in full.  This is what gave Garlock the rare opportunity to penetrate the veil of secrecy around the claim deferral practice, and discover direct evidence that it occurs.

Garlock, suspicious that this practice was occurring, employed a strategy of blanketing the Trusts with "blind" Indirect Claims, seeking to piggyback on whatever evidence the plaintiffs had filed with the Trusts.  *See* Garlock Ex. 80, 81, 83, 84.  This is not a strategy that would work in the vast majority of cases where Garlock settles rather than takes a judgment.  As described above, a settling defendant has no right to bring an Indirect Claim, and thus would never have the opportunity to learn whether the plaintiff files Trust claims he did not disclose during pretrial discovery.  Nor could a settled defendant bring a valid subpoena to which the Trust would respond, because there is no pending proceeding to which the defendant is a party.

[20] Co-defendants that are likely to have demands against Grace had no input into the content of the Grace TDP.  9/14/09 Tr. 99:4-18 (Inselbuch).

TDP that enable the isolation of Trust money from the tort system. They have ensured that "conceal and defer" will be a viable strategy under the Grace TDP.

The ACC's overriding intent to allow the concealment of evidence is made clear by another TDP provision: "Evidence submitted to establish proof of Grace Exposure is for the sole benefit of the PI Trust, not third parties or defendants in the tort system." Grace TDP § 5.7. This claim that the Trust somehow owns "evidence" conflicts with a more venerable principle: "that *the public* has a right to every man's evidence"—a "fundamental" maxim that is now "more than three centuries" old. *Jaffee v. Redmond*, 518 U.S. 1, 7 (1996) (emphasis added).

At trial, Mr. Inselbuch, the principal drafter of the Grace TDP, pled ignorance of that ancient principle. Inselbuch 88:23-25 (9/14/09). The drafters of the standard TDP either never knew it or have chosen to ignore it. They truly believe that evidence of plaintiffs' exposure to Trust products is their property, to be used only when it benefits them, and to be concealed forever when it hurts their interests, contrary to centuries of Anglo-American legal practice. Informed by perverse ideas like this, they have devised TDP that make it as easy as possible for plaintiffs to conceal the existence of Trust claims from co-defendants, and thus distort the marketplace of settlement.

### D.    The Concealment and Deferral of Claims Is The Only Credible Explanation Why Trust Payments Have No Effect On Settlement Values

The "conceal and defer" strategy enabled by the TDP of every extant 524(g) Trust explains why billions of dollars in Trust payments have had no discernible effect on tort system settlement values. 9/15/09 Tr. 250-55, 253:19-255:4 (Peterson). The plaintiffs' bar has succeeded in creating a two-track system that effectively isolates the Trust payments from the tort system. This is a credible explanation for Dr. Peterson's testimony, with substantial support

in the record of this case.  As shown by the plaintiffs' conduct in the *Puller* and *Snyder* cases, claim deferral is easy to accomplish under the standard form TDP and the Grace TDP.

At trial, Dr. Peterson attempted to give two alternative explanations for the fact that billions of dollars in Trust payments have had no effect on tort system settlement values.  Neither is persuasive.  First, Dr. Peterson argued that settlement values are "sticky": once they go up, plaintiffs' attorneys don't like to let them go back down.  9/15/09 Tr. 251:19-24 (Peterson).  Dr. Peterson had no explanation for why settlement values are "sticky," so any argument based upon this testimony amounts to a circular one, amounting to: Trust payments have no effect on settlement values because they have no effect on settlement values.

Furthermore, the "stickiness" theory is inconsistent with the evidence the Proponents developed at length at trial, showing that the principal driver of tort system settlement values is how many paying defendants are in the case.  The Proponents deployed this principle in countless settings at trial.  It explained why Grace's settlements in Libby were high; why an extraordinary claims provision is necessary; why Grace's settlement values went up before the bankruptcy; why Grace's settlement values would have kept increasing after the bankruptcy; why other defendants' settlement values increased as a result of the wave of bankruptcies; and why Grace's settlement values in Libby would not have increased during the pendency of the bankruptcy.  *Supra* Part II.A.

Yet suddenly, the principle does not hold true when it hurts the Proponents' interests, and we come to the topic of how Trust payments affect and should affect co-defendant settlement values.  The Proponents cannot explain why the same principle that applies in Libby, to other plaintiffs with "extraordinary claims," to Grace before the bankruptcy, and to tort system defendants after the wave of bankruptcies does not mandate that tort system settlement values go

27

down when Trusts begin paying claims. It is far more likely that any observed "stickiness" in settlement values when Trusts begin paying claims is a symptom of claim concealment and deferral, not an explanation for why Trust payments have no effect on tort system settlement values.

Second, Dr. Peterson argued that the Trust payments have no impact because the Trusts are not paying the full several shares of the bankrupt defendants. 9/15/09 Tr. 252:7-11 (Peterson). This explanation also is not credible. As evidenced in Exhibit A to Garlock's brief, Trust payments are not trivial. The eight largest Trusts distributed nearly $2.5 billion to claimants in 2008. A mesothelioma claimant with claims against all these Trusts would expect to recover more than $400,000.[21] Exhibit A. These are significant sums.

To be sure, one could argue that tort system settlement values should not go down to pre-2000 levels, since the Trusts are allegedly not paying the full several share of the bankrupt defendants. But the Proponents cannot credibly argue that the Trust payments should have *no* impact on settlement values. The asserted "insignificance" of Trust payments is simply false, and is not a credible explanation for why Trust payments do not affect tort system settlement values, especially when the "conceal and defer" explanation has substantial support in the record.

E.    **The Provisions That Permit The Concealment and Deferral Of Claims Serve No Valid Purpose**

Not only do the standard form TDP facilitate claim concealment and deferral through allowing plaintiffs to postpone claims and shroud them in perfect secrecy, and not only did the

---

[21] Since these Trusts were all major defendants, it is quite likely that a mesothelioma claimant would have claims against all or most of the Trusts. Mr. Puller and Mr. Snyder, for instance, had valid claims against most of the major Trusts. *See* Garlock Ex. 73.

drafters have every incentive to make the Grace TDP this way, but the relevant provisions also serve no conceivable Trust purpose. The Proponents' witnesses testified that the purpose of the Grace TDP is to resolve present and future claims efficiently and similarly over time, with a minimum of transaction costs. *See* 9/8/09 Tr. 33:2-21, 36:1-8 (Inselbuch); 9/8/09 Tr. 255:22-256:1 (Peterson). The challenged provisions advance none of these goals, and can have no purpose except to enable claim concealment and deferral.

First, the Proponents have offered no evidence to justify provisions that allow plaintiffs to postpone claims indefinitely. They should not be heard to offer any now, after Garlock's and the Court's opportunity to cross-examine the Proponents' witnesses has passed.

Nor is it possible to imagine any legitimate reason to allow plaintiffs to indefinitely defer claims. Plaintiffs know or should know about their Trust claims by the time they file their tort system claims—the relevant asbestos exposures occurred decades ago. Plaintiffs should have no problem meeting a deadline that forces them to put forth evidence of Trust liability before the tort system marketplace of settlement closes for business. Indeed, the Trust itself has an interest in having claimants file promptly, to ensure that the exposure evidence is as fresh as possible when the Trust is called upon to assess whether it is "meaningful and credible." Grace TDP § 5.7(b)(3).[22] Nobody except plaintiffs interested in concealing and deferring claims could have an interest in denying defendants the right to force resolution of the Trust's liability during the

---

[22] The lack of a real limitations period for Trust claims is also virtually without precedent. Garlock is aware of no current civil claim in American practice that does not have a statute of limitations attached. Under the common law, only an action to enforce the right of advowson (the right to appoint the parson at a particular church) lacked a limitations period, for reasons unique to that right, and Blackstone argued that even this was undesirable. *See* William Blackstone, 3 Commentaries *250-51, *306-8. In this, as in so many other respects, the standard TDP are sui generis. Nor can the Trust have any interest in allowing infinite time to file; after all, "The use of these statutes of limitation is . . . to prevent those innumerable perjuries which might ensue, if a man were allowed to bring an action for any injury committed at any distance of time." *Id.* at *307.

pendency of tort actions.   Defendants already have this right in the tort system, through

impleader.[23]  Garlock Trial Brief 19-20.

Similarly, the broadly drawn confidentiality provisions of the Grace TDP can serve no

purpose, other than to conceal the existence and extent of the claim deferral practice.   No

justification appears in evidence (and none should be heard now) for why the fact of a claim

filing and the exposure evidence to support the claim are kept secret.   Unlike medical

information or social security numbers, this information is not sensitive and does not constitute a

settlement discussion.   In state and federal court, the fact that a claim has been filed, as well as

the exposure evidence submitted to support the claim, is always public.   The procedure should be

no different under quasi-judicial TDP operated under the continuing supervision of this court.

The Proponents apparently insist that everything the claimant communicates to the Trust

constitutes a "settlement discussion" that is appropriately considered privileged: even the fact of

filing the Trust claim and the exposure evidence the claimant submits.   Mr. Inselbuch testified

that in the tort system, "whatever [plaintiffs] submitted to Grace by way of settlement wouldn't

be available to the public, under any adage."  9/14/09 Tr. 89:12-15 (Inselbuch).  Mr. Inselbuch is

wrong.   Most jurisdictions do not recognize a privilege for settlement negotiations.   *See*

Weinstein's Federal Evidence (2d ed.) § 501.04[4] (only one circuit court has recognized the

settlement negotiations privilege); *Ohio Consumers' Counsel v. Public Utilities Comm'n*, 856

N.E.2d 213, 235 (Ohio 2006) ("There is no broad consensus of support, in federal courts or in

---

[23] To be clear, Garlock is not seeking the opportunity to implead the Trust into tort system litigation. Requiring the Trust to litigate in the tort system would obviously be inconsistent with the legitimate interest the Trust has in conserving its resources.   Rather, Garlock is seeking Grace TDP that close the claim deferral loophole, through requiring plaintiffs to make prompt claims and making the fact of claim filing public.   Non-deferred claims would be liquidated just as Trust claims always are, under Trust procedures designed to minimize litigation expense.   The problems Garlock has identified here have nothing to do with litigation expense, but only with the plaintiffs' bar's strategy to segregate Trust money from the tort system.

other states, for such a privilege."). But even those that have such a privilege protect only statements made in settlement negotiations, not the probative evidence exchanged during the course of those negotiations. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003) (recognizing a privilege that by its terms applies only to "matters discussed by parties during settlement negotiations"). The filing of a claim is never privileged, as discussed above, except in the narrow circumstances where pseudonymous filing is permitted (even then, the fact that *someone* has filed a claim is public). The Proponents cannot explain why the fact a Trust claim has been filed should be kept confidential.

In contrast to the utter lack of justification for the confidentiality provisions, co-defendants—as well as the general public—have a strong interest in the integrity of the civil justice system and the prevention of practices that give plaintiffs an incentive to hide and defer claims, as happened in *Puller* and *Snyder*. The Trust has a similar interest in avoiding claims made on the basis of evidence inconsistent with what is developed in the tort system. *See* 9/14/09 Tr. 93:11-94:16 (Inselbuch) (noting that Trustees may reject claims based on exposure evidence inconsistent with tort system evidence). Indeed, deferred claims hidden from public view are more likely to be bogus and more likely to subtract from the corpus available to pay legitimate claims.

The fact that the Grace TDP contains provisions that serve no valid Trust goal and are inconsistent with fundamental principles of American justice provides further evidence that they are intended to promote the practice of claim deferral.[24] Given the possibility of even a single

---

[24] In explaining why the Trust will be able to pay higher sums to claimants who retain certain law firms, Mr. Inselbuch asserted "We tried to mirror the tort system as best we could." 9/14/09 Tr. 101:9-10 (Inselbuch). As shown here, the ACC attorneys mirrored the tort system only where it suited their interests, and departed from other features of the tort system (such as impleader and public claiming) when that suited their interests.

instance of preventable abuse, and the utter lack of justification for the provisions, the court should require the provisions to be changed before this Plan may be confirmed.

**F.      The Solution To The Problem Of Concealed And Deferred Claims Is Obvious And Impairs No Valid Trust Interest**

A simple solution is at hand.  The Court should require two changes to the Grace TDP. First, the court should require the addition of provisions that eliminate the plaintiff's ability to postpone claims.  This could be accomplished in one of two ways: either through adding a real statute of limitations, short enough to ensure that claims get filed during the pendency of the tort action, or through giving co-defendants the right to initiate binding determination of the Trust's liability to the plaintiff, through having the opportunity to file Trust claims in the nature of impleader.  Second, the court should require a narrower confidentiality provision that covers only medical information, true settlement negotiations, and other sensitive information, not the fact that a claim has been filed or the exposure evidence submitted to substantiate the claim.

These changes would eradicate claim concealment and deferral.  Just like in the tort system, plaintiffs would have to submit their evidence to the Trust during the pendency of the tort system action, or else lose the ability to maintain the claim for all time.  Tort system defendants would learn that they have viable contribution claims against the Grace Trust to insulate them from trial risk.  The marketplace of settlement will price in the Grace Trust claims. Some of the effects of the wave of bankruptcies will finally be reversed, and co-defendants will finally receive some benefit from the billions of dollars in payments the Trusts are making.  The suggested changes would impinge on no conceivable Trust interest, but would serve Trust interests while they rectify the potential for substantial injustice.

2370147/1

Until these changes are made, the Grace TDP will cause the Channeling Injunction to be unfair and inequitable to Garlock and all other co-defendants that will have contribution Demands against Grace.  Co-defendants' contribution claims against Grace will be enjoined, plaintiffs will be paid by the Grace Trust while co-defendants will be denied access to evidence of contribution claims at a time when they can act on that information.  For these reasons, co-defendants will receive no benefit from the Grace Trust, and the Plan should not be confirmed absent the requested changes.

## CONCLUSION

For the foregoing reasons, the Court should deny the issuance of the Channeling Injunction and confirmation of the Plan.


Dated:  November 2, 2009             MORRIS JAMES LLP

                                     /s/ Brett D. Fallon #2480
                                     Brett D. Fallon (DE Bar No. 2480)
                                     500 Delaware Avenue, Suite 1500
                                     P.O. Box 2306
                                     Wilmington, DE  19899-2306
                                     Telephone:  (302) 888-6800
                                     Facsimile:  (302) 571-1750
                                     Email:  bfallon@morrisjames.com

                                         -and-

                                     ROBINSON, BRADSHAW & HINSON
                                     Garland Cassada
                                     Richard C. Worf
                                     101 North Tyron Street, Suite 1900
                                     Charlotte, NC  28246
                                     Telephone:  (704) 377-8135
                                     Email:  GCassada@rbh.com
                                          RWorf@rbh.com

                                     *Attorneys for Garlock Sealing Technologies, LLC*