## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 01-01139 (JFK) |
| W.R. GRACE & CO., <u>et al</u>., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

## JOINT POST-TRIAL MEMORANDUM OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND BANK LENDER GROUP IN OPPOSITION TO CONFIRMATION OF FIRST AMENDED JOINT PLAN OF <u>REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................................... 2

COMPARISON OF EQUITY VALUE AND THE BANK CLAIMS ............................................. 5

ARGUMENT ................................................................................................................................... 7

I.  GRACE DEFAULTED ON ITS OBLIGATIONS UNDER THE CREDIT
    AGREEMENTS AND TRIGGERED THE DEFAULT RATE OF INTEREST AND
    THE PLAN THEREFORE VIOLATES SECTION 1129(A)(1) AND 1124 OF THE
    BANKRUPTCY CODE BY IMPROPERLY CLASSIFYING THE CLAIMS OF THE
    BANK LENDERS AS "UNIMPAIRED" .......................................................................... 9

II. THE ABSOLUTE PRIORITY RULE COMPELS PAYMENT OF POSTPETITION
    INTEREST BECAUSE GRACE IS SOLVENT ............................................................. 13

    A.  The "Solvency" of a Debtor for Purposes of Confirmation Is Determined as of
        the Effective Date and Applying the Terms of the Plan Before the Court. ........... 13

    B.  The Evidence Establishes That Grace is Solvent Under the Terms of the
        Proposed Plan as of the Contemplated Effective Date. ......................................... 17

    C.  Grace's Market Capitalization Establishes Its Solvency. ...................................... 22

    D.  The Proposed Asbestos Settlement Concedes That Grace is Solvent ................... 23

    E.  In a Solvent Debtor Case, Unsecured Creditors Are Entitled to Payment of
        Postpetition Interest Pursuant to the Absolute Priority Rule. ................................ 24

III. UNDER THE FAIR AND EQUITABLE TEST, THE BANK LENDERS SHOULD
     RECEIVE POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE ...... 24

    A.  The Bank Lenders Have Not Done Anything to Impede the Administration of
        These Chapter 11 Cases. ........................................................................................ 27

    B.  The Contract Default Interest Rate Is Reasonable. ................................................ 29

    C.  All of Grace's Reliance Arguments Fail. ............................................................... 29

IV. THE PLAN VIOLATES SECTION 1129(A)(3) BECAUSE IT WAS NOT PROPOSED
    IN GOOD FAITH AND GRACE HAS NOT INCLUDED ANYTHING IN THE
    RECORD TO SUPPORT ITS GOOD FAITH ............................................................... 40

V.   THE CREDITORS' COMMITTEE'S ADDITIONAL OBJECTIONS TO THE
     PLAN ................................................................................................................................41

     A.   The Plan Continues To Appear To Impair The Holders Of Other Class 9
          Claims Not Derived From The  Prepetition Credit Facilities ...............................41

     B.   The Plan Violates The Bankruptcy Code As it Still Does Not Provide A
          Sufficient Post-Effective Date Role For The Committee .....................................43

CONCLUSION...........................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*266 Washington Assocs.* v. *Citibank, N.A. (In re Washington Assocs.)*,
 147 B.R. 827 (E.D.N.Y. 1992) ......................................................................................7

*Beverly Hills Bancorp* v. *R.H. Hine*,
 752 F.2d 1334 (9th Cir. 1984) ....................................................................................15

*Connecticut Gen. Life Ins. Co.* v. *Schaumburg Hotel Owner Ltd. P'ship (In re
 Schaumburg Hotel Owner Ltd. P'ship)*,
 97 B.R. 943 (Bankr. N.D. Ill. 1989) ...........................................................................25

*Debentureholders Protective Comm. of Cont'l Invest. Corp. v. Cont'l Inv. Corp.*,
 679 F.2d 264 (1st Cir. 1982)........................................................................................27

*Del Sontro* v. *Cendant Corp., Inc.*,
 223 F. Supp.2d 563 (D.N.J. 2002) ...............................................................................38

*Derry Finance N.V.* v. *Christiana Cos., Inc.*,
 616 F. Supp. 544 (D. Del. 1985), *aff'd*, 797 F.2d 1210 (3d Cir. 1986) ....................38

*Dow Chem. Co.* v. *Schaefer Salt & Chem. Co.*,
 No. 91-4027, 1992 WL 672289 (D.N.J. July 21, 1992) ........................................38, 39

*Gen. Elec. Co.* v. *Compagnie Euralair, S.A.*,
 945 F.Supp. 527 (S.D.N.Y. 1996).................................................................................38

*In the Matter of Lernout & Hauspie Speech Prods., N.V.*,
 301 B.R. 651 (Bankr. D. Del. 2003) .........................................................................7, 8

*In re Aquila Inc.*,
 805 A.2d 184 (Del. Ch. 2002)......................................................................................37

*In re Armstrong*,
 432 F.3d 507 (3d Cir. 2005)..........................................................................................13

*In re Armstrong World Indus., Inc.*,
 348 B.R. 111 (D. Del. 2006).......................................................................................7, 8

*In re Coram*,
 315 B.R. 321 (Bankr. D. Del. 2004) ............................................................................25

*In re Cornwall Personal Ins. Agency, Inc.*,
    308 B.R. 771 (Bankr. N.D. Tex. 2003)................................................................7

*In re Dana Corp.*,
    No. 06-10354, 2007 WL 4589331 (Bankr. S.D.N.Y. Dec. 26, 2007) ....................................14

*In re Dow Corning Corp.*,
    270 B.R. 393 (Bankr. E.D. Mich. 2001) ..............................................................7, 25

*In re Envirodyne Indus.*,
    No. 93 B 310-319, 1993 WL 566566 (Bankr. N.D. Ill. Dec. 13, 1993) ................................14

*In re Frascella Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) .................................................................7

*In re Good, et. al.*,
    No. 08-40955, 2009 WL 1024651 (Bankr. E.D. Tex. Apr. 13, 2009)....................................13

*In re Hand*,
    No. 08-61264-11, 2009 WL 1306919 (Bankr. D. Mont. May 5, 2009) ..................................7

*In re Harman*,
    141 B.R. 878 (Bankr. E.D. Pa. 1992) .................................................................7

*In re Insilco Techs., Inc.*,
    480 F.3d 212 (3d Cir. 2007)........................................................................13

*In re JTS/Simms, LLC*,
    No. 11-07-12153, 2008 WL 80123 (Bankr. D.N.M. Jan. 4, 2008).......................................25

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004)........................................................................30

*In re Kentucky Lumber Co.*,
    860 F.2d 674 (6th Cir. 1998) ......................................................................14

*In re Millburn Peat Co., Inc.*,
    384 B.R. 510 (N.D. Ind. 2008) .....................................................................7

*In re Phillips Petroleum Sec. Litig.*,
    881 F.2d 1236 (3d Cir. 1989).......................................................................38

*In re Refco, Inc.*,
    336 B.R. 187 (Bankr. S.D.N.Y. 2006)................................................................30

*In re Terry Ltd. P'ship.*,
    27 F.3d 241 (7th Cir. 1994) .......................................................................25

*In re U.S. West, Inc. Securities Litigation*,
  65 Fed. Appx. 856 (3d Cir. 2003)........................................................37

*In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*,
  58 F.3d 896 (3d Cir. 1995)..................................................................39

*In re Valley View Shopping Ctr.*,
  260 B.R. 10 (Bankr. D. Kan. 2001) ..............................................12, 14

*In re WebSci Techs., Inc.*,
  234 Fed. Appx. 26 (3d Cir. 2007).......................................................13

*In re White*,
  88 B.R. 498 (Bankr. D. Mass. 1988) ..................................................25

*Liberty Warehouse Assocs.* v. *Limited P'ship*,
  220 B.R. 546 (Bankr. S.D.N.Y. 1998) ..........................................15, 16

*Ramone* v. *Lang*,
  No. Civ.A.1592-N, 2006 WL 905347 (Del. Ch. Apr. 3, 2006) .............38

*Ripple's of Clearview, Inc.* v. *Le Havre Assocs.*,
  452 N.Y.S.2d 447 (2d Dep't 1982)......................................................38

*Ruskin v. Griffiths*,
  269 F.2d 827 (2d Cir. 1959)..........................................................25, 27

*Urban Communicators PCS Ltd. P'ship* v. *Gabriel Capital, L.P.*,
  394 B.R. 325 (S.D.N.Y. 2008)............................................................25

## STATUTES

11 U.S.C. § 101(32)(A)........................................................................13

11 U.S. C. §  1124..............................................................................2, 8

11 U.S. C. §  1124(1).............................................................................42

11 U.S. C. §  1129 .........................................................................passim

11 U.S.C. § 1129 (a)............................................................................13

11 U.S.C. § 1129 (a)(1).........................................................................8

11 U.S.C. § 1129 (a)(3).........................................................................5

11 U.S.C. § 1129 (a)(7).........................................................................5

11 U.S.C. § 1129 (a)(7) (A)(ii) ..................................................................................14

11 U.S.C. § 1129(a)(11) ...........................................................................................14

11 U.S.C. § 1129(b) .......................................................................................... passim

11 U.S.C. § 1129(b)(2)(B) .......................................................................................13

Pursuant to the Bankruptcy Court's Order, dated October 26, 2009 [Dkt. No. 23567], the Official Committee of Unsecured Creditors (the "Creditors' Committee") and certain lenders under the Prepetition Bank Credit Facilities[1] (the "Bank Lender Group"),[2] by their undersigned counsel, hereby submit this post-trial brief in connection with their objection to confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 20872] (the "Plan"),[3] filed by the above-captioned debtors ("Grace" or the "Debtors"), and their co-proponents the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Holders (together with Grace, the "Plan Proponents").

---

[1]    The Prepetition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, including on May 3, 2000, the "1999 Credit Agreement", together with the 1998 Credit Agreement, the "Credit Agreements"). The Credit Agreements are in evidence as CC-BLG Exs. 2 and 3. In this Post-Trial Brief, all references to CC-BLG Exhibits will be to "UCC Exs."

[2]    The Bank Lender Group includes (i) Anchorage Advisors, LLC; (ii) Babson Capital Management LLC; (iii) Bass Companies; (iv) Caspian Capital Advisors, LLC; (v) Catalyst Investment Management Co., LLC; (vi) DE Shaw Laminar Portfolios, LLC; (vii) Farallon Capital Management, L.L.C., (viii) Halcyon Asset Management LLC; (ix) Intermarket Corp.; (x) JP Morgan Chase, N.A. Credit Trading Group; (xi) Loeb Partners Corporation; (xii) MSD Capital, L.P.; (xiii) Normandy Hill Capital, L.P.; (xiv) Onex Debt Opportunity Fund Ltd.; (xv) P. Schoenfeld Asset Management, LLC; (xvi) Restoration Capital Management, LLC; (xvii) Royal Bank of Scotland, PLC, and (xviii) Visium Asset Management LLC. The Bank Lender Group, together with all holders of claims under the Credit Agreements, including the previous holders of such claims, are collectively referred to as the "Bank Lenders."

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## PRELIMINARY STATEMENT

Now that the Confirmation Hearing is concluded and the evidentiary record is complete, Grace's arguments for not providing contractual default interest to its Bank Lenders are exposed for what they are: clever theories without any legal or factual basis. Grace's arguments in support of its efforts to award its shareholders some $1.58 billion of value at the expense of its creditors and in abrogation of such creditors' express contractual rights boil down to:

- Grace's assertion that it is not legally in "default" of the Credit Agreements (despite uncontested evidence that Grace is in default per the terms of the Credit Agreements and has not paid any principal or interest since the Petition Date), and thus, Class 9 Claimants are somehow not "impaired" pursuant to section 1124 of the Bankruptcy Code for purposes of voting on the Plan;

- Grace's assertion that the Creditors' Committee's agreement to a rate of postpetition interest for purposes of a different plan at a different point in time somehow equitably mandates that individual Bank Lenders accept the current Plan, which provides for a specified rate of interest other than that provided for in the Credit Agreements;

- Grace's purported reliance on an alleged agreement with JPMorgan Chase, N.A., the administrative agent for the bank debt, as to the rate of postpetition interest to be paid on the Bank Claims;

- Grace's assertion that the Bank Lenders somehow acted inequitably during the course of these bankruptcy cases; and

- the alleged absence of proof regarding Grace's solvency.

As demonstrated in the Joint Pre-Trial Memorandum of the Creditors' Committee and Bank Lender Group, dated July 13, 2009 [Dkt. No. 22441] (the "Pre-Trial Brief"), and supported herein, these arguments are faulty and contrary to well-established law.[4] A review of

---

[4] Consistent with the Court's instructions, we will not restate legal arguments in this post-trial brief that were previously set forth in the Pre-Trial Brief and in the Joint Supplemental Brief Of The Official Committee Of Unsecured Creditors And Bank Lender Group With Respect To The Issue Of Class 9

the evidentiary record established at the Confirmation Hearing reveals that Grace and the Plan Proponents have failed to produce a scintilla of evidence to satisfy their affirmative burdens imposed by the Bankruptcy Code or support their various legal theories offered to deprive the Bank Lenders of their contractual default rate of interest.

The few factual issues that existed with respect to the Bank Lenders' contractual right to default interest were resolved at the Confirmation Hearing. First, it was established during "Phase I" of the Confirmation Hearing that Grace is in default of its obligations under the Credit Agreements. There is no dispute that by the Credit Agreements' terms, Grace's obligations to pay under such agreements became due on their scheduled maturity dates of May 2, 2001 for the 1999 Credit Agreement and May 16, 2003 for the 1998 Credit Agreement (in the absence of a bankruptcy or payment default), and were not paid. There is no dispute that under the terms of the Credit Agreements, the failure to pay amounts due at the scheduled maturity automatically provides thereafter for payment of the default interest rate, without reliance on any default or the need to otherwise accelerate the loans. There is also no dispute that Grace never paid postpetition either the principal or interest due under the Credit Agreements. Further, the commencement of these Chapter 11 cases was an automatic default under the Credit Agreements. Those non-payments and the bankruptcy filing defaults constitute postpetition defaults under the Credit Agreements that require the payment of default interest under the Credit Agreements. Because the Plan does not provide contractual default interest to the Bank

---

Impairment And In Opposition To Confirmation Of First Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code dated July 17, 2009 [Dkt. No. 22498] (the "Supplemental Impairment Brief"). We instead provide cites to those portions of the arguments set forth in the Pre-Trial Brief and Supplemental Impairment Brief. The Pre-Trial Brief and Supplemental Impairment Brief are expressly incorporated by reference in their entirety as if fully set forth herein.

Lenders, Class 9 is impaired and the Plan Proponents must satisfy the "cramdown" requirements of 11 U.S. C. § 1129.

Second, there is no dispute as to the standard to be applied: under 11 U.S.C. § 1129(b), in determining whether the Plan is "fair and equitable," the Court is to enforce the contract default interest rate in a solvent debtor case, absent compelling equitable considerations warranting a different outcome. It was conclusively determined at the Confirmation Hearing that Grace is solvent under the terms of the proposed Plan on its contemplated Effective Date, December 31, 2009. The Creditors' Committee and Bank Lender Group introduced the expert testimony of Robert Frezza, who performed the required solvency tests and concluded that Grace is solvent. Grace and its co-Plan Proponents presented no contrary evidence.

No compelling equitable circumstances were identified at trial by Grace to justify anything less than payment to the Bank Lenders of their contractual default interest. Grace's own witnesses conceded that Grace never sought or obtained any agreement with any creditor or Bank Lender to support any postpetition interest arrangement, let alone the rate provided for in the Plan. Grace's management also admitted being aware prior to agreeing to the term sheet that is the foundation for the Plan that holders of Grace's bank debt were expecting to recover postpetition interest at the default rate, yet Grace provided for the lesser rate in the Plan notwithstanding that knowledge. Grace's position that the Bank Lender Group's and the Creditors' Committee's objection to the Plan and argument for payment of contractual default interest in and of itself constitutes inequitable conduct has no basis in law.

In sum, then, the evidence and law support findings by this Court that:

- Grace defaulted pursuant to the terms of the Credit Agreements;

- the Bank Lenders and thus Class 9 are impaired by the Plan;

- Grace has proposed a Plan that seeks to retain significant value for shareholders *before* paying creditors in full under their contracts;

- there is *no* evidence of any inequitable conduct justifying shareholders retaining value before creditors are paid in full in accordance with their contracts; and

- therefore, Grace's Plan violates the absolute priority rule 11 U.S.C. § 1129(b).[6]

Accordingly, the Creditors' Committee and Bank Lenders respectfully urge this Court to deny confirmation of the Plan unless the Bank Lenders are paid postpetition interest at the contractual default rate provided in the Credit Agreements.

## COMPARISON OF EQUITY VALUE AND THE BANK CLAIMS

At the hearing held on October 26, 2009, the Court requested that counsel for Grace and the Creditors' Committee provide certain information that the Court believed it might require in considering the default interest dispute. Specifically, the Court asked for information concerning the "return to the shareholders as opposed to the return to the banks. So, I want to know what that return is. Both in terms of raw dollars and in terms of percentages" and, expanding on that request, said that it "want[s] to know what the amount of the claims are that are going to receive a distribution and what the distribution is, in terms of raw dollars, and in terms of a percentage, on the equity that remains in the company." (Tr. Oct. 26, 2009 at 58:13-15; 59:16-19).[7] On the equity side, Grace's market capitalization increased from $99.3 million,

---

5   The Plan also violates section 1129(a)(7), the best interest of creditors test, and section 1129(a)(3) of the Bankruptcy Code, because it has not been proposed in good faith. *See* Pre-Trial Brief at 68-69, ¶¶ 142-44.

6   The Plan also violates section 1129(a)(7), the best interest of creditors test, and section 1129(a)(3) of the Bankruptcy Code, because it has not been proposed in good faith. *See* Pre-Trial Brief at 68-69, ¶¶ 142-44.

7   References to "Tr." are to the official court trial transcript for the date indicated, by page and line numbers.

based on the closing share price of $1.52 on March 30, 2001, the business day prior to the Petition Date, to $1.58 billion, based on the closing share price of $21.89 on October 30, 2009 (the last business day prior to the filing of this post-trial memorandum), for a 1,592 % increase in shareholder's value between those dates.

In comparison, the aggregate amount of the principal and postpetition interest to be paid to Bank Lenders under the Plan increased from approximately $503.1 million (the "Claim Amount") as of the Petition Date (UCC Exs. 4, 5; comprised of $500.0 million principal amount and approximately $3.1 million in accrued prepetition interest), to $849.1 million as of October 30, 20098 (comprised of the Claim Amount and $346 million of postpetition interest provided to Bank Lenders under the terms of the Plan). This reflects an increase in value from the Claim Amount of 69%. If postpetition interest was instead provided to the Bank Lenders at the 2% contractual default rate in accordance with the Credit Agreements, the amount to be paid to the Bank Lenders as of October 30, 2009 would be approximately $954 million, comprised of the Claim Amount and $450.9 million of postpetition interest. This reflects an increase in value from the Claim Amount of 90%.

As compared to Grace's shareholder value as of October 30, 2009, the total Bank Claims (principal and interest) represent 54% of the aggregate equity value using the postpetition interest rates provided for in the Plan, and 60% of the aggregate equity value using the contractual default rate.

---

8   We use October 30, 2009 merely for demonstrative purposes, so that the amount of the Bank Lenders' claim can be compared, as requested by the Court, to the equity value as of the most recent date upon which Grace's share value is available. We will update these figures as of the December 31, 2009 contemplated Effective Date for discussion during closing arguments to take place in January 2010.

<u>**ARGUMENT**</u>

Section 1129 of the Bankruptcy Code sets forth the requirements that must be met for plan confirmation. The plan proponent "bears the burden of establishing the satisfaction of each of the confirmation requirements." *In re Frascella Enters., Inc.*, 360 B.R. 435, 441 (Bankr. E.D. Pa. 2007); *see also In the Matter of Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003) ("[t]he plan proponent bears the burden of establishing the plan's compliance with each of [the requirements under section 1129]"); *In re Harman*, 141 B.R. 878, 889 (Bankr. E.D. Pa. 1992) ("[t]he burden of proving conformity with each and every requirement of [section] 1129 always rests with a plan proponent").[9]

The Plan Proponents must therefore show, by a preponderance of the evidence, that the Plan satisfies the "absolute priority rule" and "does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable." *Lernout*, 301 B.R. at 656; *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("[i]n the context of a cramdown, the debtor's standard of proof that the requirements of [section] 1129 are satisfied is preponderance of the evidence"); *In re Hand*, No. 08-61264-11, 2009 WL 1306919, at *11 (Bankr. D. Mont. May 5, 2009) ("[t]he Court must confirm a Chapter 11 debtor's plan of reorganization if the debtor proves by a preponderance of the evidence [that] . . . the Plan satisfies the 'cramdown' [requirements under section 1129(b)]"); *In re Dow*

---

9   Decisions from several other jurisdictions also support the view that the plan proponent has the burden to show that the requirements set forth under section 1129 of the Code are satisfied. *See, e.g.*, *In re Millburn Peat Co., Inc.*, 384 B.R. 510, 515 (N.D. Ind. 2008) ("Debtors had the burden of proving that the plans satisfied all requirements for confirmation, including that the plans did not unfairly discriminate against the unsecured creditors and were fair and equitable."); *In re Cornwall Personal Ins. Agency, Inc.*, 308 B.R. 771, 774 (Bankr. N.D. Tex. 2003) ("the proponent of the Plan, bears the burden of proving that the Plan satisfies all requirements for confirmation . . . ."); *266 Washington Assocs.* v. *Citibank, N.A., (In re Washington Assocs.)*, 147 B.R. 827, 830 (E.D.N.Y. 1992) ("The burden of proof rests squarely on the plan's proponent . . .").

*Corning Corp.*, 270 B.R. 393, 402 (Bankr. E.D. Mich. 2001) ("[t]he burden is . . . on the proponent to demonstrate that the plan is 'fair and equitable'").

Although Grace must show that the Plan comports with the requirements of section 1129 by a preponderance of the evidence, the Creditors' Committee and the Bank Lender Group, as parties objecting to the plan, "bear the burden of producing evidence to support their objection." *Armstrong*, 348 B.R. at 122 (*citing Lernout*, 301 B.R. at 656). Additionally, the Court itself has an "independent duty" to ensure that all requirements of section 1129 are satisfied. *Lernout*, 301 B.R. at 656 ("[t]he Code imposes an independent duty upon the court to determine whether a plan satisfies each element of [section] 1129 . . . .").

Section 1129(a)(1) of the Bankruptcy Code requires, as a condition to confirmation, that the plan must "comply with applicable provisions of this title." The Plan does not satisfy section 1129(a)(1) because it violates: (a) section 1124 by classifying the Bank Lenders' claims as "unimpaired"; (b) section 1129(b)'s fair and equitable test and absolute priority rule; and (c) section 1129(a)(3) because the Plan is not proposed in good faith.

As explained in detail below, after the development of an extensive evidentiary record, the Plan Proponents have not satisfied their *affirmative* burden that the Plan complies with section 1129 of the Bankruptcy Code. Specifically, they cannot establish that the Plan is "fair and equitable" with respect to the Bank Lenders and that it complies with the "absolute priority rule." The Plan Proponents have failed to introduce any evidence for purposes of confirming the Plan that Grace is "insolvent" to justify their efforts to deprive the Bank Lenders of their contractual default rate of interest, while simultaneously seeking to retain approximately $1.58 billion of value for shareholders. This is not surprising: there is of course no legal way

that Grace can simultaneously show that it is insolvent, but its shareholders are nevertheless retaining $1.58 billion and its Plan is still somehow confirmable.

In turn, the Creditors' Committee and the Bank Lender Group have carried their burden and established (without any contrary evidence) that for purposes of section 1129(b)'s "fair and equitable" standard, Grace is solvent. In addition, the Creditors' Committee and the Bank Lender Group have established that the Plan, as proposed, violates the absolute priority rule because it provides significant value to equity without paying more senior creditors, the Bank Lenders, in full.

## I.
### GRACE DEFAULTED ON ITS OBLIGATIONS UNDER THE CREDIT AGREEMENTS AND TRIGGERED THE DEFAULT RATE OF INTEREST AND THE PLAN THEREFORE VIOLATES SECTION 1129(a)(1) AND 1124 OF THE BANKRUPTCY CODE BY IMPROPERLY CLASSIFYING THE CLAIMS OF THE BANK LENDERS AS "UNIMPAIRED"

The Bank Lenders are entitled to the contract default rate of interest because, as established by the record, Grace has defaulted under the Credit Agreements. The essential terms and circumstances surrounding the Credit Agreements are uncontroverted:

- Grace, prepetition, entered into two Credit Agreements under which Grace owes the Bank Lenders $500 million in aggregate principal amount as of April 2, 2001 plus an additional $3.1 million of interest that accrued prepetition up until April 2, 2001;[10]

- JPMorgan serves as administrative agent under the Credit Agreements, and timely submitted proofs of claim nos. 9159 and 9168 dated March 27, 2003 for amounts owed on account of, but not limited to, principal,

---

10  *See* UCC Ex. 2, 1998 Credit Agreement at Sch. 1 ($250 million aggregate commitment); UCC Ex. 3, 1999 Credit Agreement at Sch. 1 ($250 million aggregate commitment); );UCC Ex. 4, at Sch. II ($1.47 million of prepetition interest); UCC Ex. 5, at Sch. II ($1.57 million of prepetition interest).

interest, and fees on the loans and advances made under the Credit Agreements;[11]

- The Credit Agreements have a non-default rate equal to the Alternate Base Rate;[12]

- The Credit Agreements each have a post-default rate equal to the non-default rate plus 2%; [13]

- The scheduled maturity (*i.e.* the date the loans came due outside of a bankruptcy) of the 1998 Credit Agreement occurred over five years ago on May 16, 2003;[14]

- The scheduled maturity (*i.e.* the date the loans came due outside of a bankruptcy) of the 1999 Credit Agreement occurred over eight years ago on May 2, 2001;[15] and

- The Credit Agreements provide for quarterly payments of interest through the scheduled maturity dates.[16]

Grace's defaults on its obligations under the Credit Agreements are also established by the

record:

- During its almost nine years in bankruptcy, Grace has not only failed to pay the Bank Lenders the $500 million in principal it owes them but has

---

11  *See* UCC Exs. 4, 5, Proofs of Claim, Exs. C & D to Freedgood Affidavit; UCC Ex. 1, Freedgood Aff. at ¶ 14; UCC Ex. 6, Responses and Objections of Debtors to Official Committee of Unsecured Creditors of W.R. Grace & Co. and Bank Lender Group's First Request for Production of Documents, First Set of Interrogatories, and First Request for Admissions, at 24 (request for admission no. 26 and attendant response).

12  UCC Exs. 2, 3 at §§ 1.1, 5.1(b), 5.5; UCC Ex. 1, Freedgood Aff. at ¶¶ 7, 10.

13  UCC Exs. 2, 3 at §§ 5.1(c); UCC Ex. 1, Freedgood Aff. at ¶¶ 8, 11.

14  UCC Exs. 2, 3 at §§ 1.1, 2.2; UCC Ex. 1, Freedgood Aff. at ¶ 6.

15  UCC Ex. 2 at §§ 1.1, 2.2; UCC Ex. 3 at § 1.2 (amending definition of Termination Date); UCC Ex. 1, Freedgood Aff. at ¶ 9.

16  UCC Exs. 2, 3 at § 1.1.

never paid any of the interest owed on that money or any fees or expenses, due thereon or in connection therewith;[17]

- Grace further defaulted on a number of non-monetary reporting obligations under the Credit Agreements which constitute "Events of Default" under the Credit Agreements;[18]

- The Credit Agreements provide that a bankruptcy filing is an event of default which automatically accelerates the loans without the need for a demand or notice;[19]

- The Credit Agreements provide that the failure to pay principal or interest when due is an "Event of Default" under the Credit Agreements;[20] and

- The *only* interest rate provided for under the Credit Agreements upon the scheduled natural maturity of the obligations in May 2001 and May 2003 is the default rate. [21]

On these facts, the failure to pay postpetition interest to the Bank Lenders at the contractual default rate under the terms of the Plan renders the Bank Lenders, and all of Class 9, impaired as a matter of law. The legal issues were previously briefed and do not require any further briefing. *See* Pre-Trial Brief at 19-39, ¶¶ 44-87; Supplemental Impairment Brief. We also note that the terms of the Plan further exacerbate this impairment. Section 3.1.9 (d)(iii) of the Plan provides in pertinent part: "the Debtors shall pay the principal amount of the General

---

[17]  UCC Ex. 1, Freedgood Aff. at ¶¶ 12, 13, UCC Ex. 6, Resp. and Obj. of Debtors to First Set of Interrog. and First Request for Admissions, at 20, (request for admission no. 5 and attendant response).

[18]  UCC Ex. 1, Freedgood Aff. at ¶ 13; UCC Exs. 2, 3 at § 10(d).

[19]  UCC Exs. 2, 3 at § 10(f)(i)(A); *id.* § 10(A) (providing that if a bankruptcy filing default occurs with respect to any Borrower, "*automatically* the Commitments to such Borrower shall immediately terminate and the Loans made to such Borrower hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the Notes of such Borrower shall *immediately* become due and payable") (emphasis supplied); *see also* UCC Ex. 1, Freedgood Aff. at ¶ 13.

[20]  UCC Exs. 2, 3 at § 5.1(c) (applying the default interest rate "if all or a portion of (i) the principal amount of any Loan or (ii) any interest payable thereon shall not be paid when due (whether at the stated maturity, by acceleration or otherwise)").

[21]  *Id.*

Unsecured Claims arising from the Pre-petition Credit Facilities on the Effective Date, provided, however, that no payment of post-petition interest will made with respect to such General Unsecured Claims until the Debtors' objection in relation thereto has been resolved by a Final Order." So even if Grace and the Equity Committee jointly waive the condition to confirmation that there must first be a final disposition of the Bank Lenders' interest entitlement, this provision precludes the payment of interest until there has been a Final Order.[22] Accordingly, by the Plan, Grace seeks to cease paying interest for what could be an indefinite period contrary to whether interest on interest is required by the terms of the applicable credit documents or state law. The Plan's arbitrary cut-off of the Bank Lender's state law contract rights represents an independent reason why the Plan impairs the Bank Lenders as a matter of law. *See, e.g., In re Valley View Shopping Ctr.*, 260 B.R. 10, 32 (Bankr. D. Kan. 2001) (when unsecured claims were to be paid in full 90 days postconfirmation, without postconfirmation interest, the court held that the deferral "undisputably impairs these unsecured claims").

Because Class 9 is impaired and has voted against the Plan, the law dictates that Grace and its co-Plan Proponents must satisfy the cramdown standards of section 1129.

---

[22] Section 7.7(xx) of the Plan provides that it cannot be confirmed until the entry of a "Final Order allowing claims for post-petition interest on account of the General Unsecured Claims arising from the Pre-Petition Credit Facilities in amounts that are not in excess of the rates set forth in Section 3.1.9(b) of this Plan." Section 7.7 of the Plan permits Grace and the Equity Committee to jointly waive this condition.

## II.
## THE ABSOLUTE PRIORITY RULE COMPELS PAYMENT OF POSTPETITION INTEREST BECAUSE GRACE IS SOLVENT

Class 9 has voted to reject the Plan.[23]  Accordingly, the Plan Proponents must satisfy the requirements of section 1129(b) of the Bankruptcy Code, including the absolute priority rule, which mandates that "senior classes receive full compensation for their claims before other [junior] classes can participate."  *In re WebSci Techs., Inc.*, 234 Fed. App'x 26, 30 (3d Cir. 2007); *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 n.10 (3d Cir. 2007).[24]  The Plan Proponents cannot satisfy this burden if Grace is insolvent but equity holders nevertheless retain value; the liquidation priorities of the Bankruptcy Code dictate that if a debtor is insolvent, equity is not entitled to a recovery under a plan.  11 U.S.C. § 101(32)(A); *id.* § 726.  The corollary to this rule is that for equity interest holders to receive any recovery, the debtor must be solvent.  Yet, to the extent that solvency must be proven by the Creditors' Committee and the Bank Lender Group, the solvency measurement date is the Effective Date of this Plan, and the unrebutted testimony establishes that Grace will be solvent as of such date.

A.  **The "Solvency" of a Debtor for Purposes of Confirmation Is Determined as of the Effective Date and Applying the Terms of the Plan Before the Court.**

Section 1129 provides that the relevant date for determining whether a plan may be confirmed is the *effective date* of that proposed plan.  *See* 11 U.S.C. § 1129 (a) ("The court

---

[23]  UCC Ex. 8, Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization, at ¶ 7.

[24]  *See, e.g.*, *In re Armstrong*, 432 F.3d 507, 513 (3d Cir. 2005)  ("In its initial form, the absolute priority rule required that 'creditors…be paid before the stockholders could retain equity interests for any purpose whatsoever.'"); *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 n.10 (3d Cir. 2007) ("Even in the flexible world of Chapter 11 reorganizations, the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B), requires that equity holders receive nothing unless all creditors are paid in full."); *In re Good, et. al.*, No. 08-40955, 2009 WL 1024651, at *5-6, *8 (Bankr. E.D. Tex. Apr. 13, 2009) (in a case in which the shareholder retain[ed] his equity interest in the [d]ebtors under the plan" there was no dispute that the debtors were "solvent").

shall confirm a *plan* only if all of the following . . ."); 11 U.S.C. § 1129 (a)(7) (A)(ii) ("will

receive or retain under the plan on account of such claim or interest property of a value, as of the

*effective date of the plan,* that is not less than the amount that such holder would so receive or

retain if the debtor were liquidated under chapter 7 of this title on such date").

 Testing solvency on any date other than the Effective Date of the proposed Plan,

giving effect to the terms of the Plan, would be illogical and contrary to confirmation standards.

Section 1129 of the Bankruptcy Code (as well as the "solvent" debtor exception with respect to

payment of postpetition interest to unsecured creditors), is not invoked at any stage of the

bankruptcy case except for confirmation of a proposed plan. The solvency analysis can only be

undertaken here on the Effective Date because the "solvency" question—whether, after paying

creditors in full, there is excess value available to be retained by equity under the Plan—is only

answerable on the Effective Date after taking into account claims settled through the Plan.

 Numerous courts have affirmed that for purpose of applying section 1129, the

debtor's solvency is measured as of the effective date of the proposed plan. *See Kentucky

Lumber Co.*, 860 F.2d 674 (6th Cir. 1998) (finding that debtor was insolvent as of effective date

of plan and estate's post-effective date litigation recovery, sufficient to pay all claims in full, did

not then entitle creditors to postpetition interest); *In re Dana Corp.*, No. 06-10354, 2007 WL

4589331 at *9 (Bankr. S.D.N.Y. Dec. 26, 2007) (confirming plan and finding pursuant to 11

U.S.C. § 1129(a)(11) that "each Reorganized Debtor is deemed to be solvent as of the Effective

Date after giving effect to the Restructuring Transactions"); *In re Valley View Shopping Ctr.,

L.P.*, 260 B.R. 10 at 30 (rejecting testimony that debtor was solvent prior to confirmation

because "it does not show Debtor was solvent on the effective date of the Plan"); *In re*

*Envirodyne Indus.*, No. 93 B 310-319, 1993 WL 566566, at *3 (Bankr. N.D. Ill. Dec. 13, 1993) (in applying absolute priority rule, the court valued the enterprise as of the effective date).

In *Beverly Hills Bancorp* v. *R.H. Hine*, 752 F.2d 1334 (9th Cir. 1984), the holders of commercial paper issued by the debtor asserted claims for postpetition interest, which the bankruptcy court denied. In reversing the decision of the bankruptcy court, the Ninth Circuit commented upon the solvency of the debtor, giving effect to the terms of the plan of reorganization before the court:

> The record indicates that the debtor **will be solvent upon the discharge of all claims, with a net return to shareholders in excess of $4 million.** The [creditors] have been awaiting patiently the complete discharge of their claim, after considerable litigation, for more than ten years. Under these circumstances, we hold that the denial of their claim for postpetition interest was an abuse of discretion.

*Id.* at 1339 (emphasis added).[25] Here, of course, Grace shareholders stand to retain some $1.58 billion in value[26] *after* the discharge of all of Grace's claims.

Grace has yet to identify, and we have been unable to locate, a single case in which a court ignored the terms of the plan itself in assessing the Debtors' solvency for purposes of determining whether payment of postpetition interest was due to unsecured creditors. For example, in *In re Liberty Warehouse Assocs.* v. *Limited P'ship*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998), a single-asset real estate case, the debtor filed for chapter 11 after it had defaulted on its mortgage payments. Pursuant to an asset sale made *under the plan*, the debtor was able to recover enough value to pay its creditors in full—including postpetition interest to unsecured

---

[25] Notably, because the agreement was silent as to any applicable interest rate, the court then proceeded to award interest at the California legal rate of 7%. The Ninth Circuit also noted that the equities weighed in favor of awarding interest, because "the Trustee has had the use of these funds and has earned interest on them." *Beverly Hills Bancorp*, 752 F.2d at 1339.

[26] *See* infra*, § IIC.

creditors. Based on the value recovered from the sale, the court recognized that "[h]ere, the debtor is solvent." The *Liberty Warehouse* court did not speculate whether the debtor would have been insolvent if the property were less marketable or no purchaser had been available. Instead, the court concluded that the debtor was solvent because "on the effective date" the debtor had sufficient assets to "pay the allowed claims of unsecured creditors in full, with interest." *Id.* at 547, 551.

Grace's solvency argument narrows to this: Grace concedes that if the proposed asbestos settlements were consummated today, those claims would be resolved for purposes of section 1129(b) and Grace would be solvent. Grace, however, argues that because the Proposed Asbestos Settlement is consummated as part of the Plan itself that Grace's solvency is somehow in question. There is, of course, no principled basis to differentiate between claims settled before a claim is proposed and claims settled through a plan. This is a distinction without a difference if there ever was one: in either event Grace is solvent on the Effective Date of the Plan and its equityholders will retain $1.58 billion in value under such Plan—the *sine qua non* of solvency. Taken to its logical conclusion, Grace's argument would mean that bankruptcy courts are required to ascertain a debtor's "actual" liability on *every* claim compromised or settled as part of a plan as a prerequisite to finding that a plan is fair and equitable. Every confirmation hearing would degenerate into protracted litigation over the merits of already-resolved claims. And debtors, like Grace, would squander estate resources to establish the *validity* of claims that they had already expended resources trying to refute or settle. This is exactly the point Grace itself makes in favor of the settlements encompassed in the Plan: that they avoid the significant costs and risks of litigation. The terms of the Plan cannot be recognized for one purpose - the merits of the settlements - yet ignored for purposes of determining solvency.

To deflect attention from the substantive requirements of section 1129(b) and decades of relevant case law, Grace makes the circular argument that "payment in full" does not require making a payment in respect of postpetition interest in accordance with the Credit Agreements unless Grace is solvent—which Grace maintains is impossible to establish because there is no final and binding determination of Grace's liabilities. *See* Plan Proponents' Pre-Trial Brief dated August 7, 2009, [Dkt. No. 22732] at 42. But this is a straw-man argument. Upon confirmation, Grace's contingent liabilities will be resolved under the terms of the Plan and there will be $1.58 billion left over for equity holders; *ergo*, Grace is solvent. Grace's own expert witness, Pamela Zilly of Blackstone, so testified:

> If the amended [P]lan is confirmed by the Court and goes effective, then I believe that pursuant to the settlement set forth in the [P]lan that relates to the amount of assets that Grace and others will contribute to the PI trust, *then the asbestos claims will be resolved*.

(Tr. Sep. 16, 2009 at 118:17-21) (emphasis supplied).

The only legally cognizable conclusion, then, is that for purposes of evaluating solvency in connection with the Creditors' Committee and Bank Lender Group's objections pursuant to section 1129, the Court must consider the terms of the proposed Plan on its contemplated Effective Date.

**B.      The Evidence Establishes That Grace is Solvent Under the Terms of the Proposed Plan as of the Contemplated Effective Date.**

The evidence is undisputed that Grace is solvent as of the contemplated December 31, 2009 Effective Date, applying the terms of the proposed Plan. The Creditors' Committee and Bank Lender Group presented the expert testimony of Robert Frezza, who concluded that Grace is solvent by performing a solvency analysis applying well-accepted tests, utilizing data from Grace's financial statements as contained in the disclosure statement and information provided by Grace's financial expert. Grace and its co-Plan Proponents presented

no contrary evidence.  Indeed, Grace's own expert, Ms. Zilly, similarly testified that the Plan is feasible and that her feasibility test equates to a solvency test.  Accordingly, the record is devoid of any evidence that Grace is anything but solvent.

Mr. Frezza was qualified by this Court as an expert in accounting and as a financial advisor in restructuring matters.  (Tr. Sep. 16, 2009 at 259:20-22; 260:6-8).  Mr. Frezza earned an undergraduate degree in business administration in 1983 and is a Certified Public Accountant and financial advisor with Capstone Advisory Group, with some 25 years of professional experience.  (Tr. Sep. 16, 2009 at 255:14-257:23).  He is a member of the American Institute of Certified Public Accountants ("AICPA") and the American Institute of Restructuring Advisors.  (Tr. Sep. 16, 2009 at 256:1-4).  Mr. Frezza has first-hand experience regarding Grace since 2005, as the financial advisor to the Creditors' Committee in these bankruptcy cases, with personal involvement in numerous aspects, including reviewing Grace's annual business plan, analyzing business acquisitions and divestitures and interfacing with management.  (Tr. Sep. 16, 2009 at 258:19-259:4).  He was previously qualified as an expert to testify at trial in the Gainey Trucking matter concerning whether a debtor was cash flow solvent, applying the company's financial forecasts.  (Tr. Sep. 16, 2009 at 259:5-19).

Mr. Frezza is the only witness who offered an opinion with respect to solvency at the Confirmation Hearing and the only expert witness who performed a solvency analysis.  Ms. Zilly, for Grace, did not perform a solvency analysis and did not offer any opinion as to whether Grace was solvent or insolvent.  (Tr. Sep. 16, 2009 at 115:15-116:8).  Mr. Frezza testified at length that he "performed a number of tests that are commonly done in forming an opinion on solvency."  (Tr. Sep. 16, 2009 at 270:20-21).  He described the "three most common tests:" the cash flow test, the adequate capital test, and the balance sheet test, and further explained that the

balance sheet test may include three methods, specifically the market approach, the income approach and the cost approach. (Tr. Sep. 16, 2009 at 270:23-277:25). As summarized below, Mr. Frezza then testified in detail during his direct testimony that he performed each of the cash flow, adequate capital and balance sheet tests (using the market approach) in concluding that Grace is solvent under the proposed Plan as of the presumed Effective Date, December 31, 2009.

First, Mr. Frezza explained that a "cash flow test is designed -- the professional would approach it by reviewing a cash flow forecast prepared by the company, evaluating whether the forecast makes sense, critically challenging the underlying assumptions, considering sensitivities to that forecast in view of the company's historical performance. And once you've considered those factors and form an opinion as to whether the company is able to at a particular test date as well as in the future able to meet its obligations as they come due." (Tr. Sep. 16, 2009 at 271:8-16). In performing the cash flow test to determine whether Grace was solvent, Mr. Frezza "started off with Ms. Zilly's feasibility study -- feasibility report, and that was the only source of financial projections that I had available to me. In that report she provides a summary of the company's financial projections. What I did is, in reviewing those projections I analyzed the revenue trend being assumed, the core EBITDA trend being assumed. I considered the underlying assumptions by deriving them from my analysis in that report." (Tr. Sep. 16, 2009 at 278:5-12). He analyzed Grace's "very strong performance" and concluded "[t]hat Grace will be solvent on the effective date and thereafter based on those financial projections under the cash flow test. It passes the cash flow test." (Tr. Sep. 16, 2009 at 279:1; 280:3-5).

Next, Mr. Frezza described the adequate capital test as "more of a qualitative test" under which the expert considers factors such as the amount of cash a company has on its balance sheet, the company's access to other sources of cash, such as a revolver, the company's

credit terms with its vendors, and various ratios such as whether the company's current assets exceed its current liabilities. (Tr. Sep. 16, 2009 at 271:21-272:12). Mr. Frezza concluded that Grace passed the adequate capital test on the bases that Grace, with one insignificant exception, had never used its debtor-in-possession borrowing facility, maintained a very significant cash balance, has a very strong financial performance and excellent terms with its vendors and was apparently far along in obtaining exit financing.[27] (Tr. Sep. 16, 2009 at 280:10-281:15).

Finally, Mr. Frezza performed a balance sheet solvency test applying the market approach. He explained that under the market approach, "the professional would analyze peer group companies or guideline companies that are comparable to the company being tested," as well as precedent transactions in the market, and "determine a range of multiples" to apply to the company at issue to determine the company's enterprise value. (Tr. Sep. 16, 2009 at 273:2-18). Mr. Frezza explained that:

> In the market approach to the balance sheet test, enterprise value is a proxy for the fair value of the assets. when you're performing the balance sheet test in each case, one must look to the fair value of the assets. Not the book value, but the fair value of those assets in determining whether the company has -- is solvent in terms of assets exceeding liabilities, and by how much those assets exceed liabilities, which is also referred to as an equity cushion.

(Tr. Sep. 16, 2009 at 273:18-25). Mr. Frezza applied the market approach to Grace by using the values provided in the Disclosure Statement "because there were substantial disclosures about how the company arrived at its enterprise value for instance." (Tr. Sep. 16, 2009 at 281:21-282:1). Using the company's enterprise value as a proxy for fair value of Grace's assets, Mr.

---

[27] Mr. Frezza did not perform a "complete" adequate capital test because the other solvency tests that he performed so clearly indicated Grace's solvency: "you don't need more than that in a situation like this to come to a conclusion under the adequate capital test because it is very much a judgmental test, qualitative judgmental test." (Tr. Sep. 16, 2009 at 325:14-326:8; 328:11-329:13).

Frezza then reviewed Grace's pro forma balance sheet at 2009 (PP Ex. 277.12), to determine the liabilities to evaluate in performing a balance sheet solvency analysis. (Tr. Sep. 16, 2009 at 282:19-283:11). Mr. Frezza prepared a demonstrative chart (UCC Ex. 41)[28] that showed an enterprise value range of $2.1 billion to $2.5 billion, from which he deducted certain liabilities listed on Grace's projected 2009 balance sheet (PP Ex. 277.12) to determine the equity cushion. (Tr. Sep. 16, 2009 at 285:5-24). Those liabilities are deducted because "certain liabilities such as current liabilities, accounts payable, accrued expenses and anything considered current liabilities are already considered within the enterprise value because there's a notion that the enterprise value takes into consideration with the networking capital of the company." (Tr. Sep. 16, 2009 at 286:16-21). Mr. Frezza explained which liabilities he deducted and which were already included in enterprise value (Tr. Sep. 16, 2009 at 286:23-289:24), and concluded that "there's a substantial equity cushion at the effective date" and "that indicates the company is solvent." (Tr. Sep. 16, 2009 at 291:4-15). That equity cushion ranged from $430 million to $821 million as of December 31, 2009. (Tr. Sep. 16, 2009 at 294:11-15).[29]

Accordingly, under each of the cash flow, adequate capital and balance sheet tests to determine solvency, Mr. Frezza concluded that Grace is solvent under the terms of the proposed Plan as of the contemplated effective date of December 31, 2009. Grace's own financial expert, Pamela Zilly of Blackstone, affirmed that the methodology applied by Mr.

---

[28] UCC Ex. 41 was admitted into evidence only for demonstrative purposes.

[29] Mr. Frezza also performed a balance sheet test using the market approach that substituted a specific estimate of the value of Grace's personal injury asbestos liabilities – that offered by Grace's own expert, Thomas Florence, during the estimation trial. (Tr. Sep. 16, 2009 at 293:7-20). The Court stated at the hearing on October 26, 2009 that it did not "see how on the plan on the table use of the Florence numbers is appropriate at all." (Tr. Oct. 26, 2009 at 43:2-5). Accordingly, the Creditors' Committee and Bank Lender Group are not relying upon this single analysis done by Mr. Frezza that assumed Dr. Florence's estimate to demonstrate Grace's solvency.

Frezza is the accepted methodology for performing a solvency analysis. Ms. Zilly testified that: "I think if you're asking me precisely in terms of a definition or a test, various tests of solvency, there are typically three tests that are put forth; a balance sheet test, an adequate capital test and whether or not the debtor has the ability to pay its debts as they come due." (Tr. Sep. 16, 2009 at 105:7-11; *see also* Tr. Sep. 16, 2009 at 118:22-120:4). Ms. Zilly also affirmed that Grace was solvent as of the Effective Date of the Plan based on Grace's ability to pay its debts as they come due, which Ms. Zilly acknowledged is the same test applied for feasibility upon which she provided an expert opinion. Specifically:

> Q.(Mr. Cobb): Ms. Zilly, assuming the plan is confirmed and goes effective, isn't it true that as of the effective date of the plan Grace will have the ability to pay its debts as and when they come due?
>
> A. (Ms. Zilly): That is my opinion in my feasibility report assuming confirmation of the plan and consummation of the plan.

(Tr. Sept. 16, 2009 at 138:4-9)

> Q. (Mr. Cobb): Is there any difference, Ms. Zilly, between the solvency test of a company's ability to pay its debts, when due, and under a feasibility analysis a company's ability to pay its debts when due, speaking generally, not of Grace?
>
> A. (Ms. Zilly): No.

(Tr. Sept. 16, 2009 at 138:22-139:2).

Accordingly, there is no dispute on the facts before this Court that Grace is solvent under the terms of the Plan, on its Effective Date.

## C.  Grace's Market Capitalization Establishes Its Solvency.

The evidence establishes that the share price of Grace equity has increased since the Petition Date, and has a market value as of October 30, 2009 of $21.89 per share.[30] Grace's

---

[30]  *See* www.bloomberg.com/apps/quote?ticker=GRA.

market capitalization has increased from $150 million as of the Petition Date to over $1.58 billion as of October 30, 2009.[31] As a matter of Third Circuit law, Grace's substantial market capitalization is significant evidence of its solvency. *See* Pre-Trial Brief at 41-43, ¶¶ 93-95.

**D.    The Proposed Asbestos Settlement Concedes That Grace is Solvent.**

As a matter of law, if Grace is acting lawfully in giving its shareholders approximately $1.58 billion of value, Grace has to be solvent (*i.e.*, there must be surplus value after all non-consenting creditors are paid in full). *See* Pre-Trial Brief at 43-44, ¶¶ 96-98. If Grace's theory described above is correct, it amounts to a concession that the Plan Proponents have not met their burden in proving that the Plan is fair and equitable. It is undeniable, and the Plan and Disclosure Statement make clear that, on the Effective Date, Grace's shareholders will retain their equity interests in Grace,[32] which Grace estimates is worth between $430 million and $821 million.[33] Indeed, the market capitalization of Grace as of October 30, 2009 was $1.58 billion.[34] Since it is black-letter law that shareholders are not entitled to a recovery from an insolvent estate, the shareholders' retention of their equity interests under the Plan is uncontested evidence that Grace's assets must exceed its debts as of the Effective Date, and hence, that Grace will be solvent on the Effective Date.

---

[31]    *See* UCC Ex. 18 at CC-BLG002185; UCC Ex. 19 (Form 10K period ending 12/31/01) at CC-BLG002187; www.bloomberg.com/apps/quote?ticker=GRA.

[32]    Equity Interests are retained subject to issuance of the Warrant, the terms of the Share Issuance Agreement and the Stock Trading Restrictions Term Sheet. *See* PP Ex. 276 REV, at 018157, § 4.3.1.10 at 98.

[33]    *See* PP Ex. 276REV at PP 018108, Debtors' Disclosure Statement for the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, § 2.11.2.6 at 49 [Dkt No. 20873] (the "Disclosure Statement").

[34]    *See* www.bloomberg.com/apps/quote?ticker=GRA

**E.  In a Solvent Debtor Case, Unsecured Creditors Are Entitled to Payment of Postpetition Interest Pursuant to the Absolute Priority Rule.**

Grace's solvency argument ultimately makes little sense when considered in the context of the "so-called" solvent debtor exception.  The purpose of the solvent debtor requirement for post-petition interest is to protect *one creditor group from receiving post-petition interest at the expense of another creditor group*; the requirement was not created to protect shareholders and the requirement never allows shareholders to retain value before creditors receive post-petition interest.  Once equity holders receive a recovery, the inquiry into solvency simply becomes an academic exercise, which of course shows the absurdity of Grace's argument that unsecured creditors are only entitled to post-petition contractual interest in a "solvent" debtor case and not a case where equity holders retain, by the Plan Proponents' own calculation, between $430 million and $821 million in value without a solvency determination**.**  *See* Pre-Trial Brief at 44-49, ¶ ¶99-108.

The Creditors' Committee and Bank Lender Group have proven that Grace is solvent under the proposed Plan as of its contemplated Effective Date, December 31, 2009.  Accordingly, as a solvent debtor, the law provides that "full payment" to the Bank Lenders includes postpetition interest at the contract rate.  Anything less violates the absolute priority rule.  *See* Pre-Trial Brief at 44-49, ¶¶ 99-108.

### III.
### UNDER THE FAIR AND EQUITABLE TEST, THE BANK LENDERS SHOULD RECEIVE POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE

Grace's defaults under the Credit Agreements and its solvency are established by the facts demonstrated at the Confirmation Hearing, as detailed above.  In such circumstances, as recognized by the majority of courts (most comprehensively by the Sixth Circuit in *Dow Corning*), under the "fair and equitable" test of Section 1129(b), a court must enforce the

contract default interest rate absent compelling equitable considerations warranting a different outcome. With a solvent debtor, a bankruptcy court enforces the contractual rights of the parties, and the role of equitable principles in the allocation of competing interests is "significantly reduced." *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006); *see* Pre-Trial Brief at 49-54, ¶¶ 109-116.

As explained above, it is Grace's burden to prove, by a preponderance of the evidence, that the plan is "fair and equitable" under section 1129(b). It has failed to meet that burden. The equitable factors that courts typically consider to rebut the presumption that creditors are awarded their contract rate of interest are as follows:

(i)  whether the creditor unduly protracted the length of the chapter 11 case;[35]

(ii)  whether the default interest rate "shocked the conscience" of the court;[36]

(iii)  whether the creditor faced a significant risk of non-payment,[37] and

---

[35]  *See, e.g.*, *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("[W]here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act."); *Urban Communicators PCS Ltd. P'ship* v. *Gabriel Capital, L.P.*, 394 B.R. 325, 340-41 (S.D.N.Y. 2008) (allowing default interest where default rate did not violate state usury laws, and debtors cited to case where the court found any equitable basis for reducing a lawful contractual interest rate prescribed by a contract when the debtor was able to pay all of its unsecured creditors); *In re JTS/Simms, LLC*, No. 11-07-12153, 2008 WL 80123, at *4-5 (Bankr. D.N.M. Jan. 4, 2008) (allowing 24% default rate where the 6% spread was "not surprising or shocking," but noting that the ultimate entitlement could be limited if "the creditor has effectively increased the expense of the loan (and thereby likely increased its return) by actions it takes in the bankruptcy case"); *Coram*, 315 B.R. 321, 346-47 (Bankr. D. Del. 2004) (denying default interest where egregious conduct on the claimant's part was viewed to have caused prejudicial postpetition delay in the case); *In re White*, 88 B.R. 498, 511 (Bankr. D. Mass. 1988) (denying 48% interest rate that shocked the court's conscience, even though creditor had "not engaged in any obstructive tactics" during the bankruptcy case).

[36]  *See, e.g.*, *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) (upholding 17.25% rate as "reasonable" over the objection of third-lien holder who would not be paid in full).

[37]  The fact of a nine year old bankruptcy case in and of itself establishes that there was a risk of non-payment. *See, e.g.*, *Connecticut Gen. Life Ins. Co.* v. *Schaumburg Hotel Owner Ltd. P'ship (In re Schaumburg Hotel Owner Ltd. P'ship)*, 97 B.R. 943, 952 (Bankr. N.D. Ill. 1989) (awarding default

(iv)     whether the differential between default and non-default rates, even if not

unconscionable, was unreasonable or punitive rather than a bargained-for attempt

to compensate creditors for their extra costs after a default.

The Plan Proponents have presented no evidence to support a denial of

contractual default interest on account of any of these factors.  Instead, Grace has raised a series

of equitable and reliance-based arguments, including its argument that "there is no better

evidence that the Plan's rate of postpetition interest is fair and equitable than the fact that this

rate resulted from arms-length negotiations . . . ."[38]  The mere existence of a prior and moot

agreement, based upon a different plan, and entered into years ago *only* by the Creditors'

Committee, an entity that cannot legally bind individual creditors, is wholly insufficient to

satisfy Grace's burden that the Plan is "fair and equitable" under 1129(b) and overcome the

presumption articulated by *Dow Corning*.  As the Plan Proponents have offered no factual

evidence that the Plan satisfies the "fair and equitable" standard of section 1129(b) of the

Bankruptcy Code, they have failed to satisfy their burden and thus, the Plan should not be

confirmed.

In contrast, the Creditors' Committee and the Bank Lender Group presented facts

at the Confirmation Hearing proving that any equitable arguments advanced by the Plan

Proponents to justify imposition of a lower rate of interest are completely baseless.  We recite

those facts below.

---

interest to a creditor who "faced a substantial risk of non-payment both before and after the
commencement of [the] bankruptcy case").

[38]  *See* Plan Proponent's Phase II Brief Regarding Bank Lender Issues in Support of Confirmation of
Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, at 49.

## A. The Bank Lenders Have Not Done Anything to Impede the Administration of These Chapter 11 Cases.

There is no evidence that JPMorgan, as the Administrative Agent, and the Bank Lenders, including the Bank Lender Group, have done *anything* to impede the administration of these chapter 11 cases.[39] Rather than impede progress, the Bank Lenders have made the administration of these cases possible because Grace has had the use of the Bank Lenders' low-interest loans (the contract rate was as low as 6% "during some portion of these cases and as low as 8% on a weighted average basis") over the course of the first seven and one-third years of these cases.[40]

The record further demonstrates that Grace's business has dramatically improved, including an increase in net sales, since it commenced these chapter 11 cases. Its share price has dramatically increased, and its shareholders' return on their investment is substantially greater than that of the Bank Lenders.[41] *See, e.g.,* UCC Ex.19 (Form 10K period ending 12/31/01) at

---

[39] In fact, one of the Plan Proponents, the Equity Committee, admits that it does not contend that "any of the Bank Agent or Lenders have committed any inequitable act or wrongdoing, or engaged in inequitable conduct, during the process of formulating a plan of reorganization during the pendency of the Debtors' bankruptcy case. UCC Ex. 39, response to interrogatory 3, at CC-BLG 004476. *See Ruskin*, 269 F.2d at 832 ("[W]here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act.").

[40] Declaration of Edwin Ordway In Support of the Response of the Official Committee of Unsecured Creditors to Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999 [Dkt. No. 19321] at 2; UCC Ex. 20 (Form 10K period ending 12/31/02) at CC-BLG002444-5; UCC Ex. 21 (Form 10K period ending 12/31/03) at CC-BLG002830-1; UCC Ex. 22 (Form 10K period ending 12/31/04) at CC-BLG002913-4, CC-BLG003038; UCC Ex. 23 (Form 10K period ending 12/31/05) at CC-BLG003163, CC-BLG003180; UCC Ex. 24 (Form 10K period ending 12/31/06) at CC-BLG003299, CC-BLG003314-6; UCC Ex. 25 (Form 10K period ending 12/31/07) at CC-BLG003539, CC-BLG003556-7; UCC Ex. 26 (Form 10K period ending 12/31/08) at CC-BLG003729, CC-BLG003791, CC-BLG003724.

[41] *See Debentureholders Protective Comm. of Cont'l Invest. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982) (enforcing contract provision is "fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to creditor, and, correspondingly, the creditor will have been deprived

CC-BLG 002187; UCC Ex. 20 (Form 10K period ending 12/31/02) at CC-BLG002377; UCC

Ex. 21 (Form 10K period ending 12/31/03) at CC-BLG 002623; UCC Ex. 22 (Form 10K period

ending 12/31/04) at CC-BLG 002852; UCC Ex. 23 (Form 10K period ending 12/31/05) at CC-

BLG 0023115; UCC Ex. 24 (Form 10K period ending 12/31/06) at CC-BLG003202-3, CC-

BLG003287-8, CC-BLG003338; UCC Ex. 25 (Form 10K period ending 12/31/07) at CC-

BLG003437-8, CC-BLG003524, CC-BLG003575; UCC Ex. 26 (Form 10K period ending

12/31/08) at CC-BLG003633, CC-BLG003710-11, CC-BLG003776, and CC-BLG003782.

As of March 30, 2001, on the eve of the Petition Date, Grace had 65,418,000

shares outstanding with an aggregate market value of approximately $150 million[42] and as of

August 30, 2009, Grace had 72,159,000 shares outstanding with an aggregate market value of

over $1.2 billion based on a closing price of $17.71/share.[43] And, as of October 30, 2009 (the

most recent business day prior to the filing of this memorandum), Grace had 72,182,000 shares

outstanding, with a market capitalization of $1.58 billion based on a closing share price of

$21.89.[44] This is an approximately 1,592% increase in shareholder value.

Further, the record establishes that shareholders would have to "give up" less than

7% of their equity value based on Grace's current market capitalization to ensure full payment of

the postpetition interest at the rate set forth in the Credit Agreements. Specifically, based on the

---

of the opportunity to use the money to his advantage"); *In re Consol. Operating Partners*, 91 B.R. 113, 117 (Bankr. D. Colo. 1988) ("The equities of this case do not favor any deviations from the imposition of the Late Payment Rate. The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11. No such result was intended by Congress.").

[42]    UCC Ex. 18 at CC-BLG 002185.

[43]    UCC Ex. 18 at CC-BLG 002182.

[44]    *See* www.bloomberg.com/apps/quote?ticker=GRA

admissions in Grace's Disclosure Statement and the value of Grace's market capitalization based

on a share price of $21.89/share as of October 30, 2009, Grace's equity has a value of $1.58

billion, while the difference between the interest owed to the Bank Lenders at the default

contract rate of interest versus the Plan rate of interest is approximately $100 million.

(Deposition Tr. Designation of Edwin Ordway at 30:20-31:3; 34:24-35:5).[45]  After paying the

Bank Lenders what they are owed under the Credit Agreements, equity would still have a

significant increase in value—of more than 980% compared to the value of equity at the Petition

Date.  In these circumstances, equity overwhelmingly weighs in favor of payment of contract

default interest to creditors.

**B.      The Contract Default Interest Rate Is Reasonable.**

At the Confirmation Hearing, Grace and its co-Plan Proponents submitted no

evidence to establish that the default rate of 2% above the base interest rate in the Credit

Agreements[46] is unreasonable or "exorbitant."  Indeed, the 2% default rate falls well within the

range regularly accepted by courts as reasonable.[47]  The record lacks any evidence to the

contrary.

**C.      All of Grace's Reliance Arguments Fail.**

Grace's primary equitable argument is that the Bank Lenders (and the Creditors'

Committee) have "reneged" on a prior agreement to accept the postpetition interest rate now

provided in the Plan.  The evidence and testimony presented at the Confirmation Hearing

---

[45]   The parties stipulated on October 1, 2009 to the admission into evidence of the designations, counter-designations and counters to counter designations for the deposition of Edwin Ordway [Dkt. No. 23392].

[46]   *See* UCC Exs. 2, 3, Credit Agreements § 5.1(c); UCC Ex. 1, Freedgood Aff. at ¶¶ 8, 11.

[47]   *See* Pre-Trial Brief at 55, ¶ 120, fn. 50.

conclusively establishes that there was never such an agreement by any Bank Lender and that even the Creditors' Committee's prior agreement, as to a different plan,[48] with different terms at a different point in time, was moot at the time the current Plan was being negotiated.[49]

It is incontrovertible that no Bank Lender was a party to any postpetition agreement with Grace by which the lender agreed to the postpetition interest rate provided in the Plan, or indeed, provided for in any prior plan of reorganization. First, the 2005 Letter Agreement was executed only by counsel for Grace and counsel for the Creditors' Committee; the 2006 Letter Agreement only by counsel to the Creditors' Committee. UCC Ex. 27; UCC Ex.

---

[48] *See* Amended Joint Plan of Reorganization, dated January 13, 2005 [Dkt. No. 7560] ("2005 Joint Plan"). Among other differences, the unconfirmed January 2005 Plan provided non-asbestos general unsecured creditors a substantial equity stake in the reorganized Debtors. Specifically, section 3.1.9 of the 2005 Joint Plan provides that general unsecured, non-asbestos, claims were to recover 85% in cash and 15% in Parent Common Stock. In addition, Mr. Tarola's confirmed that the proposed plan incorporating the interest rate agreement in the 2005 Letter Agreement and 2006 Letter Agreement was the 2005 Joint Plan. *See* Tr. Sept. 16, 2009 at 37:6-13, 40:18-23. In addition, Mr. Tarola testifies that the 2005 Joint Plan was different—and provided for payment in 85% cash and 15 % equity. *See* Tr. Sept. 16, 2009 at 40:13-17.

[49] In its Order Sustaining Debtors' Objection to The Unsecured Claims Insofar As Claims Include Postpetition Interest At The Contract Default Rate dated May 19, 2009 (the "PPI Claim Decision," Dkt. No. 21744), this Court appears to have made two factual findings that bear directly on these issues and eviscerate Grace's arguments. First, the Court found that the 2005 Letter Agreement and 2006 Letter Agreement had apparently expired by their own terms and were no longer in effect. (PPI Claim Decision at 2 n.3.) Indeed, both the 2005 Letter Agreement and 2006 Letter Agreement provide that the Committee would be a plan proponent of the prior joint plan, but only "as such Plan may be amended with the prior consent of the Creditors' Committee." (UCC Exs. 27, 33). The evidence is undisputed that the Creditors' Committee never consented to the terms of the current Plan. Second, the Court found that the expired agreements were made on behalf of the entire Creditors' Committee—and not, as Grace had previously alleged—by individual institutions on their own behalf. (*Id.*) The Court, however, then appears to conclude as a legal matter that an agreement entered into on behalf of the Creditors' Committee as a whole could bind individual creditors. We believe that this is likely a drafting issue in the May 19 Opinion (involving the use of "former and "latter" in note 3 of the PPI Claim Decision) and that the Court likely meant to say that a decision made by the committee chair in its capacity as committee chair on behalf of the whole committee could *not* bind individual creditors, a result consistent with Third Circuit law. *See, e.g.*, *In re Kensington Int'l Ltd.*, 368 F.3d 289, 315 (3d Cir. 2004) (holding that an official creditors' committee does not have the authority to bind each individual creditor); *see also In re Refco, Inc.*, 336 B.R. 187, 197 (Bankr. S.D.N.Y. 2006) (noting that "a committee's assent to a plan or a transaction does not bind its members, let alone its constituents"). In any event, based on the Court's first finding that any prior agreement was no longer in effect, the legal conclusion would be of no impact anyway.

33. Neither the 2005 Letter Agreement (UCC Ex. 27) nor the 2006 Letter Agreement (UCC Ex. 33) purport by their express terms to bind any Bank Lender.

Second, Grace's own witnesses admitted that Grace never had an agreement with any Bank Lender regarding a postpetition interest rate. Robert Tarola, Grace's former Chief Financial Officer, testified that he was not aware of any signed agreement or document by any Bank Lender or JPMorgan obligating *any* Bank Lender to support the interest rate that was negotiated by the Creditors' Committee:

> Q. (Mr. Pasquale): Now, at or about the time of this letter in January of 2005, did Grace obtain the signature of any bank debt holder on any document obligating that holder to support the joint plan?
>
> A. (Mr. Tarola): Not to my knowledge.

(Tr. Sept. 16, 2009 at 38:25-39:3)

> Q. (Mr. Pasquale): Did W.R.Grace obtain the signature of J.P. Morgan on any document obligating J.P. Morgan to support the joint plan?
>
> A. (Mr.Tarola): Not to my knowledge.

(Tr. Sept. 16, 2009 at 39:4-6)

> Q. (Mr. Pasquale): Did Grace obtain the signature of any bank debt holder on any document by which that bank debt holder agreed to the post-petition interest rate negotiated between you and Mr. Maher of the [Creditors'] Committee?
>
> A. (Mr. Tarola): Again, not to my knowledge.

(Tr. Sept. 16, 2009 at 39:16-20)

> Q. (Mr. Pasquale): And did Grace get J.P. Morgan's signature on any document by which J.P.Morgan agreed to the interest rate that you negotiated with Mr. Maher on behalf of the [Creditors'] Committee.
>
> A. (Mr. Tarola): Not to my knowledge.

(Tr. Sept. 16, 2009 at 39:21-24)

Q. (Mr. Pasquale): Sure. At any time from this point, February 2006 to the time you left W.R. Grace, did W.R. Grace ever obtain the signature on any document from any bank debt holder by which that bank debt holder agreed to the terms of the joint plan?

A. (Mr. Tarola): Again, not to my knowledge, but I would like to say my understanding of the bankruptcy process was that if individual creditors objected to a proposed plan, that would come out at the time the plan was voted upon, not in some interim period . . .

(Tr. Sept. 16, 2009 at 42:5-12).

Grace's current General Counsel, Mark Shelnitz, similarly testified that there was no separate agreement or signed document with any Bank Lender or JPMorgan, in its capacity as Bank Lender or Administrative Agent, binding any Bank Lender to a specified rate of interest (other than the rates set forth in the Credit Agreements) or to vote in support of a particular plan. (Tr. Sept. 16, 2009 at 74:13-75:8).[50]

Grace has argued that it was nevertheless misled into believing the then-Chair of the Creditors' Committee, Thomas Maher of JPMorgan, somehow bound Bank Lenders to the 2005 Letter Agreement and the 2006 Letter Agreement. The record establishes that there is not a single document signed by a Bank Lender, nor even by Mr. Maher for JPMorgan, binding anyone to the terms of the 2005 Letter Agreement or the 2006 Letter Agreement. What's more, Mr. Tarola repeatedly acknowledged in his testimony before this Court that he understood that Mr. Maher was acting in his capacity as Chairman of the Creditors' Committee during their discussions concerning the interest rate for unsecured creditors and that the agreement reached

---

[50] Lewis Kruger, counsel for the Creditors' Committee also testified there never was any agreement or signed document between any Bank Lender or JPMorgan and Grace. (Tr. Sept. 16, 2009 at 197:16-20).

was solely between Grace and the Creditors' Committee. (Tr. Sep. 16, 2009 at 25:15-21; 26:7-9, 20-24; 30:10-12, 20-31:1; 32:25-33:3; 33:16-19; 36:6-25).

> Q. (Mr. Pasquale): And that wasn't surprising to you because you understood did you not, that Mr. Maher was negotiating as chair of the Creditors' Committee.
>
> A. (Mr. Tarola): That's correct. Yes, sir.

(Tr. Sept. 16, 2009 at 38:16-19).

Mr. Tarola further admitted that he understood that Grace had an agreement with the Creditors' Committee and not any individual creditors when he testified in connection with the 2006 Letter Agreement that he thought that Grace had a business arrangement with the Creditors' Committee, and that "We intended to honor it. I thought it would be honored by the *Committee*." (Tr. Sept. 16, 2009 at 48:16-18) (emphasis supplied).

Other evidence corroborates Mr. Tarola's testimony that he understood he was dealing with Mr. Maher in his capacity as Chairman of the Creditors' Committee. In an e-mail recounting a discussion with Mr. Maher, Mr. Tarola confirms that "the *committee* of general unsecured creditors will continue to be co-proponents of Grace's current plan of reorganization until an event or events (to be defined by you after consultation with the committee) occur." *See* UCC Ex. 32, E-mail from R. Tarola, CFO of Grace, to T. Maher, Chairman of Creditors' Committee (Feb. 14, 2006) (emphasis supplied).[51] The record is also completely devoid of any evidence that any individual Bank Lender engaged in any conduct, misleading or otherwise, that would lead Grace to believe that the Administrative Agent had the authority to waive rights under, or amend or modify, the Credit Agreements. There simply was no such conduct, and

---

[51] In the same e-mail, Mr. Tarola also asks Mr. Maher "how best to describe the *committee's* continued support for [Grace's] plan of reorganization" along with the "*committee's* view of required documentation and bankruptcy court disclosure." (*Id.*; emphasis supplied).

absent such conduct, there could be no legally recognizable reliance by Grace that the Administrative Agent had such authority. *See* Pre-Trial Brief at 63-64, ¶¶ 133-34.

Finally, in any event, it is legally irrelevant whether Grace believed that Mr. Maher or the Creditors' Committee was acting on behalf of particular Bank Lenders, because neither JPMorgan, as agent, nor the Creditors' Committee, could legally bind the Bank Lenders. *See* Pre-Trial Brief at 57-59, ¶¶ 123-26.

1. **Grace Could Not Reasonably Rely On The Letter Agreements With the Creditors' Committee or Any Conduct of the Bank Lenders in Negotiating the Plan.**

Grace plainly acknowledged that there was no agreement with any Bank Lender or any of their agents to accept an interest rate other than what was provided for in the Credit Agreements and that, absent such an agreement, it could not have reasonably relied on its prior agreement with the Creditors' Committee in negotiating the postpetition interest rate provisions provided in the current Plan because individual creditors were free to object. Mr. Shelnitz testified that he understood that the 2006 Letter Agreement was an agreement only with the Creditors' Committee, as opposed to any individual creditors, and that creditors always had the right to object to those terms regardless of any agreement with the Creditors' Committee. Specifically, Mr. Shelnitz testified, in explaining the position of the Creditors' Committee's counsel with respect to the proposed term sheet for the Plan now before this Court:

> **A. (Mr. Shelnitz): I understood it as the committee and committee counsel continued to be supportive of the letter agreement, but they knew there were certain members of their class that might want—might object, and they [the Creditors' Committee] sought to preserve their rights to object, *a right that,* I guess*, we believe that they had all along anyway*, but she [A. Krieger] sought to give express comfort to a holder who might want to seek a higher rate, that they could do so.**

(Tr. Sept. 16, 2009 at 71:17-24) (emphasis supplied).

Q. (Mr. Pasquale): Mr. Shelnitz let me start pretty much where Mr. Bernick left off, and that's with Exhibit 284. Mr. Bernick asked you some questions in particular about the last clause in Ms. Krieger's email; do you remember that"

A. (Mr. Shelnitz): Yes.

Q. (Mr. Pasquale): You understand that clause applied not only to the claims of the bank debt holders, but also all other unsecured claims, didn't you?

A. (Mr. Shelnitz): I don't recall, but I do recall in discussion with Stroock that you had specifically raised the issue with me having it applied to others as well, yes.

Q.(Mr. Pasquale): So, just so we're clear for the record, the issue being that all unsecured creditors, bank debt holders and non-bank debt holders, have the right to petition the Court for the rate of interest they believe appropriate, correct?

A. (Mr. Shelnitz): Yes, I think that's right.

(Tr. Sept. 16, 2009 at 73:10-25) (emphasis supplied). This evidence alone conclusively puts to rest any reliance argument advanced by Grace.

In fact, Grace publicly asserted in January 2005 that its agreement with the Creditors' Committee was not binding on any Bank Lender or unsecured creditor. In Grace's Amended Disclosure Statement for the Amended Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated January 13, 2005 [Dkt. No. 7559] (the "2005 Disclosure Statement"), the Debtors provided on pages 58-59 for the treatment of General Unsecured Claims, who would receive payment in the form of 85% cash and 15% Parent Common Stock,[52] including postpetition interest at the agreed-upon rate established in the negotiations resulting in the 2005 Letter Agreement. In footnote 18 on page 59, Grace discloses

---

[52] As opposed to the 2005 Joint Plan, the current Plan provides for an all cash payment to Class 9 unsecured creditors, by which Grace now argues that Class 9 is not impaired. Under the 2005 Joint Plan, Class 9 was impaired, and there was never a question of whether general unsecured creditors would vote on its terms, including the rate of postpetition interest.

the 2005 Letter Agreement and specifically states that "[t]his agreement does not commit *any member* of the Unsecured Creditors' Committee *or any creditor* to vote for the Plan." (emphasis added). Accordingly, even by Grace's own pen, the Creditors' Committee's prior agreement did not bind any creditor to its terms.

E-mail correspondence between counsel for the Creditors' Committee and Grace further corroborates the fact that Grace was aware all along that the individual members of the Creditors' Committee, as well as individual creditors, were never bound by the 2005 Letter Agreement. Although the Creditors' Committee and Grace never executed a plan support agreement, the Creditors' Committee drafted and proposed one, and Grace's counsel commented on it. *See* UCC Ex. 30 (Feb. 28, 2005 e-mail from Arlene Krieger, counsel for the Creditors' Committee, to Janet Baer, counsel for Grace, attaching draft plan support agreement); UCC Ex. 31 (Mar. 16, 2005 e-mail from Janet Baer to Arlene Krieger, providing comments to draft plan support agreement). In its comments to the draft plan support agreement, Grace left *unchanged* language providing that the Creditors' Committee's agreement to support that plan would not bind or "lock up" individual members of the Creditors' Committee or individual creditors. UCC Ex. 31, blackline of Plan Support Agreement at ¶ 6, 7.

Grace also knew at the time of the negotiations that resulted in the current Plan in late 2007 and early 2008 that Bank Lenders were at that time expecting to receive default interest in any plan brought before the Court. The Creditors' Committee repeatedly communicated to Grace that Bank Lenders expected contract default interest and that Grace should not enter into any settlement that did not provide for payment of such interest (precisely what Grace went ahead and did anyway). Mr. Shelnitz testified that Mr. Kruger, counsel for the Creditors' Committee, "indicated to me that the trading price of the debt indicated there may be some bank

debt holders that had an expectation of a higher rate of interest, I recognized that that could be an issue, but that the committee support would [be] very powerful in getting the plan confirmed." (Tr. Sept. 16, 2009 at 75:16-21). Mr. Shelnitz conceded that he knew that certain bank debt holders were not agreeable to the postpetition interest rate provided in the term sheet (and now in the Plan) *before* the term sheet was signed. (Tr. Sept. 16, 2009 at 76:4-9). Mr. Shelnitz also acknowledged that "somewhere in the spring of 2007 time frame, Mr. Kruger happened to mention to me that he saw that the bank debt, or he had been advised that the bank debt was trading at a level that indicated some expectation of interest above the accrual rate in the 2006 letter agreement." (Tr. Sept. 16, 2009 at 57:2-7). Mr. Kruger likewise testified that he began to tell Mr. Shelnitz no later than the spring of 2007 that the bank debt was trading in the marketplace at a price that indicated that many if not most holders were expecting to receive default interest. (Tr. Sept. 16, 2009 at 199:8-22).

> **2.** **Grace Did Not Reasonably Rely on the Agreements with the Creditors' Committee or Any Agreement with the Bank Lenders and Thus, Cannot Satisfy any Estoppel or other Reliance Based Exception.**

Grace cannot satisfy the elements of any known reliance doctrine. Promissory estoppel certainly does not apply here. Under that doctrine, a party must prove not by a preponderance, but by *clear and convincing* evidence, that (i) a definite and certain promise was made; which was (ii) reasonably expected to induce reliance by promisee; (iii) the alleged promisee acted in reliance on the promise (i.e. action was unequivocally referable to the alleged promise and inconsistent with any other explanation); and (iv) the alleged promisee sustained an unconscionable injury such that enforcement of the promise is necessary to avoid injustice.[53]

---

[53] *See generally, e.g.*, *In re Aquila Inc.*, 805 A.2d 184, 193 (Del. Ch. 2002) (quoting *Lord* v. *Souder*, 748 A.2d 393, 399 (Del. 2000)), *cited in In re U.S. West, Inc. Securities Litigation*, 65 Fed. Appx. 856,

A review of elements (i) and (ii) alone defeat Grace's ability to invoke promissory estoppel. Grace failed to show *any* evidence, and certainly not clear and convincing evidence, of any express written or oral representation that the Creditors' Committee's offer to accept the 6.09% interest rate would remain irrevocable, once the conditions in the respective letter agreements occurred.[54] To the contrary, the 2005 Disclosure Statement indicated that Grace and the Creditors' Committee "intend[ed] to memorialize their [2005 Letter Agreement] in a plan support agreement," but they never did so. (2005 Disclosure Statement at 59 n.18).[55] Nor did Grace show by clear and convincing evidence that its continued reliance on the Creditors' Committee's agreement to suspend temporarily its right to object to certain treatment of its constituents was foreseeable or reasonable. Both letter agreements stated that, once the conditions failed to materialize by a date certain, the "Debtors and the Creditors' Committee agree[d] that the Creditors' Committee had the right to withdraw as Plan Proponent…" UCC Exs. 27, 33.[56] And those conditions certainly did not materialize. Specifically, under the terms

---

863-64 (3d Cir. 2003); *Ripple's of Clearview, Inc.* v. *Le Havre Assocs.*, 452 N.Y.S.2d 447, 449 (2d Dep't 1982).

[54] "A promise is an expression of commitment to act in a specified way, or to bring about a specified result in the future, or to take responsibility that the result ... will occur, communicated in such a way that the addressee of the expression may justly expect performance...." *Ramone* v. *Lang*, No. Civ.A.1592-N, 2006 WL 905347, at *15 (Del. Ch. Apr. 3, 2006) (ellipses in original) (citation omitted).

[55] "A truthful statement as to the present intention of a party with regard to his future acts is not the foundation upon which an estoppel may be built. The intention is subject to change." *Derry Finance N.V.* v. *Christiana Cos., Inc.*, 616 F. Supp. 544, 550 (D. Del. 1985), *aff'd*, 797 F.2d 1210 (3d Cir. 1986) (quoting *Metro. Life Ins. Co.* v. *Childs Co.*, 130 N.E. 295, 298 (N.Y. 1921)). In other words, an "agreement[] to agree" does not constitute a sufficiently definite to form a basis of a promissory estoppel claim against the Creditors' Committee. *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir. 1989).

[56] An "indefinite proposal, subject to modification or withdrawal at [defendant's] sole discretion, cannot form the basis of a promissory estoppel claim." *Del Sontro* v. *Cendant Corp., Inc.*, 223 F. Supp.2d 563, 575 (D.N.J. 2002); *Dow Chem. Co.* v. *Schaefer Salt & Chem. Co.*, No. 91-4027, 1992 WL 672289, at *12 (D.N.J. July 21, 1992) (same); *see also, e.g., Gen. Elec. Co.* v. *Compagnie Euralair,*

of the 2005 Letter Agreement, the Creditors' Committee could withdraw as a plan proponent for a host of reasons, including (a) if this Court did not approve the Disclosure Statement incorporating Grace's proposed 2005 Joint Plan by November 30, 2005, (b) if Grace's exclusive period to file its 2005 Joint Plan terminated, or (c) if its 2005 Joint Plan failed to become effective on or before January 1, 2007. *See* UCC Ex. 27. As with the 2005 Letter Agreement, the Creditors' Committee under the 2006 Letter Agreement could withdraw as a plan proponent for a host of reasons, including (a) if this Court did not approve a disclosure statement incorporating Grace's amended 2005 Joint Plan by December 31, 2005, (b) if Grace's exclusive period to file its amended 2005 Joint Plan terminated, or (c) if its amended 2005 January Plan failed to become effective on or before February 28, 2007. The record of these Chapter 11 cases and testimony of Mr. Tarola establish that the conditions for the Creditors' Committee's support did not materialize.[57] This Court never approved the disclosure statement for the 2005 Joint Plan, the 2005 Joint Plan did not become effective on or before January 1, 2007, and this Court terminated Grace's exclusive period by order dated July 26, 2007 [Dkt. No. 16396]. The evidence in fact establishes that the circumstances changed dramatically since 2005 and 2006: as noted above, the terms of the currently contemplated Plan differ substantially from the 2005 Joint Plan, the equity value has soared since 2005, reorganized companies in other asbestos cases have paid their creditors in full when their shareholders have retained value (*i.e., Dow Corning*),

---

*S.A.,* 945 F.Supp. 527, 536 (S.D.N.Y. 1996) (reliance for promissory estoppel claim destroyed by contract language vesting sole discretion in defendant); *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 58 F.3d 896, 907-08 (3d Cir. 1995) (reliance on employer representations regarding benefits "may never be 'reasonable' where the participant is in possession of a written document notifying him of the conditional nature of such benefits").

[57] *See* Tr. Sept. 16, 2009 at 38:7-13 (Tarola testimony that disclosure statement was not approved and 2005 Joint Plan not confirmed).

numerous termination events have occurred and, more than five years have passed since the Creditors' Committee executed any agreement to support the 2005 Joint Plan.

And, as set forth above, Mr. Kruger testified that he informed Grace's General Counsel, Mr. Shelnitz, on multiple occasions prior to Grace entering into the Proposed Asbestos Settlement that creditors, including Bank Lenders would not vote in favor of a plan based on the 2006 Letter Agreement,[58] and knowing this Grace made the strategic decision to exclude the representatives of *all* general unsecured creditors, the Creditors' Committee, from participating in the negotiations that resulted in the current Plan before this Court.[59]  For all these reasons, and those described above, Grace knew that it did not have the support of the Creditors' Committee or its constituency at the time it agreed to the terms of the current Plan.[60]

Accordingly, the facts conclusively establish that Grace had no reasonable basis to rely upon the Creditors' Committee's prior agreement as in any way binding upon any individual Bank Lender.  *See* Pre-Trial Brief at 60-68; ¶¶ 128-141.

## IV.
### THE PLAN VIOLATES SECTION 1129(a)(3) BECAUSE IT WAS NOT PROPOSED IN GOOD FAITH AND GRACE HAS NOT INCLUDED ANYTHING IN THE RECORD TO SUPPORT ITS GOOD FAITH

The record fails to include any evidence of the Plan Proponents' good faith in proposing the Plan.  Accordingly, the Plan cannot be confirmed because the Plan Proponents

---

[58]  Tr. Sept. 16, 2009 at 199:10-18; 201:12-19; 202:18-24.

[59]  *See* Tr. Sept. 16, 2009 at 76:10-77:2 (Mr. Shelnitz testifying that it was his strategic decision to exclude the Creditors' Committee from negotiations with the "Asbestos Claimants' Committee").

[60]  *See also* UCC Ex. 35 (Transcript of April 7, 2008 Conference Call, at 7, documenting public comments of Alfred Festa, Grace's CEO, that the term sheet underlying the current Plan "has received the endorsement of the official committee of equityholders, the official committee of asbestos personal injury claimants, and the future claimants representative[,]" but that the Creditors' Committee "really not had a complete chance to look at all the documents and make a recommendation to all of their members . . .").

have satisfied their burden that the Plan was proposed in good faith as required by section

1129(a)(3).  *See* Pre-Trial Brief at 68-69; ¶¶ 142-44.

**V.**

**THE CREDITORS' COMMITTEE'S
ADDITIONAL OBJECTIONS TO THE PLAN**

In addition to the objections to the Plan that it jointly asserts with the Bank

Lender Group, described above and in the jointly submitted Pre-Trial Brief, the Creditors'

Committee maintains two additional objections on its individual behalf.  Although no evidence

was necessary with respect to these objections, we state them here so that the Court is aware that

these objections remain extant.

**A.  The Plan Continues To Appear To Impair The Holders
Of Other Class 9 Claims Not Derived From The  Prepetition Credit Facilities**

The Creditors' Committee objected to confirmation because the Plan is

ambiguous as to whether the legal, equitable and contractual rights of creditors holding "other"

(non-Bank Lender) General Unsecured Claims in Class 9 are entirely unaltered.[61]  Although the

Plan contained procedures enabling Holders of such other Class 9 Claims to challenge "the rate

or calculation" of postpetition interest the Plan proposes to pay to such creditors, the Plan's

procedures are ambiguous whether such creditors could raise other postpetition interest related

matters, including entitlements to other late or default payment amounts, interest on interest, or

entitlements to state statutory rates of interest, as might be applicable, and receive payment of all

---

[61]  Objection of the Official Committee of Unsecured Creditors To Confirmation of The First Amended Joint Plan of Reorganization Under Chapter 11 of The Bankruptcy Code of W. R. Grace & Co., et al., The Official Committee of Asbestos Personal Injury Claimants, The Asbestos PI Future Claimants' Representative, and The Official Committee of Equity Security Holders, dated February 27, 2009 [Dkt. No. 21790] (the "Committee's Plan Objection") at 10-12.

such amounts ultimately determined to be due each such other Class 9 Claims. PP Ex. 274, Plan at 50-54, §§ 3.1.9(b)(i)(b), (d) and (e).

Further giving rise to the Creditors' Committee's uncertainty was that the Plan failed to affirmatively state that the Plan leaves unaltered the legal, equitable and contractual rights to which each such other Class 9 Claim entitles the Holder of such Claim. As is clear from other sections of the Plan, the Plan Proponents know how to definitively state that claims are being left unimpaired by the Plan by using the language directly from section 1124(1) of the Bankruptcy Code.[62] The Debtors' informed the Creditors' Committee that the Plan Proponents were willing to accede to the Committee's request and add clarifying language to that effect to the Plan.[63]

However, the recent modifications to Section 3.1.9(b) of the Plan[64] fail to remedy the existing uncertainties with respect to whether other non-lender Class 9 Claims are treated as unimpaired by the Plan.[65] Modified section 3.1.9(b) to the Plan now states in relevant part,

> Each Holder of an Allowed General Unsecured Claim shall
> be paid …. The Plan leaves unaltered the legal, equitable, and
> contractual rights to which each such General Unsecured Claim
> entitles the Holder of each such General Unsecured Claim subject
> to the preemptory effect of bankruptcy law. Subject to ….

(emphasis added). The phrase "subject to the preemptory effect of bankruptcy law" at the end of the new sentence does not comport with the language of section 1124(1) of the Bankruptcy Code

---

[62]   PP Ex. 274, at 46, §3.1.3(b), at 46, §3.1.4(b), at 47, §3.1.5(b), and at 55, §3.1.11(b).

[63]   Tr. June 22, 2009 at 127:6 – 128:17.

[64]   Notice of Second Set of Modifications to Joint Plan of Reorganization dated October 12, 2009 [Dkt. No. 23474].

[65]   As reflected elsewhere in this Post-Trial Brief and other pleadings addressing the treatment of Bank Lender Claims under the Plan, the Committee and the Bank Lender Group dispute that Bank Lender Claims are unimpaired by the Plan.

and is inconsistent with other affirmative statements in the Plan purporting to identify Classes of Claims as unimpaired by the Plan. The Committee submits that this additional text should be deleted.

**B.     The Plan Violates The Bankruptcy Code As it Still Does Not Provide A Sufficient Post-Effective Date Role For The Committee**

Section 11.8 of the Plan has not been modified in response to the issue raised by the Creditors' Committee in the Committee's Plan Objection[66] to provide for the Creditors' Committee's continued existence, standing and capacity post-Effective Date in connection with the default interest litigation commenced by Grace against the Bank Lenders. Since the filing of the Committee's Plan Objection, the first appeal from an order of this Court spawned by the default interest litigation has been filed and transferred to the District Court. The Creditors' Committee's continued active role in the litigation includes the appeal it took from the Court's PPI Claim Decision, and the statement of issues and designation of items for the appellate record it filed, along with the multiple filings in this Court, which have addressed fundamental legal issues relevant to the propriety of the treatment to all Class 9 Claimants. Barring a consensual resolution of the outstanding issues, or a substantial delay in the Effective Date occurring, it is very likely the default interest litigation, including the pending appeal will be pending post-Effective Date.

The Debtors maintain that there is no need for the Creditors' Committee to continue to participate as the Bank Lenders are otherwise separately adequately represented.[67] That might have been true if the Debtors had not made the Creditors' Committee's conduct

---

[66]   Committee's Plan Objection at 18-20.

[67]   Notice of Filing of Debtors' Chart Summarizing Its First Amended Joint Plan of Reorganization [Dkt. No. 23114]

relating to the 2005 Letter Agreement and 2006 Letter Agreement a center piece of the Debtors' fair and equitable arguments to the Court against the payment of default interest to the Bank Lenders, and if all issues relating to the treatment of other General Unsecured Claims in Class 9 were resolved.  But the record of these confirmation proceedings tells a very different story. Grace's attempt to adversely hamper the default interest litigation by precluding the Creditors' Committee's continued active participation in any appeals should not be countenanced by the Court, and the offending text in section 11.8 of the Plan should be removed.

## CONCLUSION

For all the reasons set forth above and in their Pre-Trial Brief, the Bank Lender

Group and Creditors' Committee respectfully request that the Court deny confirmation of the

Plan.

Dated:     Wilmington, Delaware
           November 2, 2009

| | |
|---|---|
| **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** | **STROOCK & STROOCK & LAVAN LLP** |

Stephen J. Shimshak                  Lewis Kruger
Andrew N. Rosenberg                  Kenneth Pasquale
Margaret A. Phillips                 Arlene Krieger
Rebecca R. Zubaty                    180 Maiden Lane
1285 Avenue of the Americas          New York, New York 10038
New York, New York 10019-6064        Telephone: (212) 806-5400
Telephone: (212) 373-3000            Facsimile: (212) 806-6006
Facsimile: (212) 757-3990

-and-                                -and-

**LANDIS RATH & COBB LLP**           **DUANE MORRIS LLP**

*/s/ James S. Green*                 */s/ Michael R. Lastowski*
Richard Cobb (No. 3157)              Michael R. Lastowski (No. 3892)
James Green (No. 4406)               Richard W. Riley (No. 4052)
919 Market Street, Suite 600         1100 North Market Street, Suite 1200
Post Office Box 2087                 Wilmington, Delaware 19801-1246
Wilmington, Delaware 19899           Telephone (302) 657-4942
Telephone: (302) 467-4400            Facsimile: (302) 657-4901
Facsimile: (302) 467-4450

                                     -and-

Counsel for the Bank Lender Group    William S. Katchen, Esquire
                                     744 Broad Street, Suite 1200
                                     Newark, New Jersey  07102-3889
                                     Telephone: (973) 424-2031
                                     Facsimile: (973) 556-1380

                                     Counsel for the Official Committee of
                                     Unsecured Creditors of W.R. Grace & Co. *et. al.*