UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No. 01-01139 |
| W.R. GRACE & CO., et. al., | : | Jointly Administered |
|  | : |  |
| Debtors-in-possession. | : | **Response Deadline:  Nov. 20, 2009** |
|  | : |  |

## PLAN PROPONENTS' PHASE II POST-TRIAL BRIEF IN RESPONSE TO CONFIRMATION OBJECTIONS OF THE LIBBY CLAIMANTS

David M. Bernick, P.C.
Theodore L. Freedman
Barbara M. Harding
Brian T. Stansbury
KIRKLAND & ELLIS LLP

Janet S. Baer, P.C.
THE LAW OFFICES OF
JANET S. BAER, P.C.

Laura Davis Jones (#2436)
James E. O'Neill (#4042)
Timothy Cairns (#4228)
PACHULSKI STANG
ZIEHL & JONES LLP

*Counsel for the Debtors and
Debtors in Possession*

Elihu Inselbuch
Peter Van N. Lockwood
Nathan D. Finch
CAPLIN & DRYSDALE,
CHARTERED

Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
CAMPBELL & LEVINE,
LLC

*Counsel for the Official
Committee of Asbestos
Personal Injury Claimants*

Roger Frankel
Richard H. Wyron
Jonathan P. Guy
ORRICK, HERRINGTON &
SUTCLIFFE LLP

John C. Phillips, Jr. (#110)
PHILLIPS, GOLDMAN &
SPENCE, P.A.

*Counsel for David T.
Austern, Asbestos PI Future
Claimants' Representative*

Philip Bentley
Douglas Mannal
KRAMER LEVIN
NAFTALIS & FRANKEL
LLP

Teresa K.D. Currier (#3080)
SAUL EWING LLP

*Counsel for the Official
Committee of Equity Security
Holders*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ..................................................................................................... 3

I.     The Grace TDP Was Carefully Designed to Fulfill the Bankruptcy Code's
       Mandate of Equal Treatment for Similarly Situated Claimants ........................ 3

       *The Trust Distribution Procedures* ...................................................... 4

       *Expedited Review* ............................................................................. 5

       *Individual Review* ............................................................................. 6

       *Extraordinary Claims* ........................................................................ 8

       *The TDP Provides Similar Treatment to Similarly Situated Claims* ............. 8

       *The TDP Fairly Accommodates all Claimants Whose Claims May be More
       Valuable than the "Typical" Claim* ..................................................... 9

II.    The Plan Proponents Adjusted the Grace TDP in Response to the Libby
       Claimants' Concerns and in a Manner that is Consistent With the Rights of All
       Asbestos PI Claimants ................................................................................ 10

       *Inclusion of Severe Disabling Pleural Disease (Level IV-B)* ................... 10

       *Enhanced Comeback Rights* ............................................................... 11

       *Increased Extraordinary Claims Multiplier* ......................................... 12

       *Waiver of Occupational Exposure Requirement for Libby Claimants* ......... 13

III.   There is No Evidence that the Grace TDP Discriminates Against the Libby
       Claimants ................................................................................................ 13

       A.   The Medical Criteria for Severe Pleural Disease Do Not Discriminate Against
            the Libby Claimants ........................................................................ 13

            *The TDP Medical Criteria are Based Upon Sound Science* ............... 14

            *The TDP Medical Criteria Properly Aim at the "Sweet Spot" of Expedited
            Review — Clear Cases of Disease* ................................................. 16

i

*There Is No Evidence That the Medical Criteria Favor Those Outside of Libby Over Those in Libby* ................................................................... 16

*There Is No Evidence that the Individual Review Process Discriminates Against the Libby Claimants* .................................................... 20

B.      The Scheduled Values in the TDP Do Not Discriminate Against the Libby Claimants ............................................................................................. 21

*Purpose and Goals of Scheduled Values in TDPs* ............................ 21

*Grace's Scheduled Values Are Properly Designed to Encourage Settlement of Large Numbers of Claims and to Conserve Trust Resources* ........ 22

*The Process of Assigning the TDP Values Reflects a Well-Established Method* ................................................................................................. 22

*National Settlement Averages Are Appropriate* ................................ 23

*The Scheduled Values for Severe Pleural Disease Are Appropriate and Are Designed to Achieve the Goals of the Expedited Review Process* ................ 24

*The Comparisons Offered By the Libby Claimants Miss the Mark* ..... 24

*The Scheduled Values Assigned to Severe Pleural Disease Permit the Libby Claimants to Achieve Historical Libby Settlement Values* ........ 26

*The Scheduled Values Set for Severe Pleural Disease Actually Favor the Libby Claimants in Light of Changed Circumstances Negatively Affecting Their Claim Values* ........................................................................... 26

C.      The Disposition of Proceeds from Grace's Non-Products Insurance Coverage Does Not Discriminate Against the Libby Claimants .............................. 28

*Much of Grace's Primary-Layer Non-Products Coverage Has Been Settled and the Remainder Is Disputed by CNA* ................................ 28

*The Libby Claimants Have No Exclusive Rights to Non-Products Coverage* ............................................................................................. 31

*Events Potentially Giving Rise to Non-Products Coverage Are Not Geographically Limited to Libby* ....................................................... 31

*Libby Claimants Have No Right of Direct Action Against Grace's Insurers* ....... 33

*The Plan's Use of the Asbestos Insurance Rights Satisfies Bankruptcy Code §§ 524(g) and 1123(a)(4)* ......................................................... 34

*The Libby Claimants' Equal Treatment Objections Based on Their Claims to Grace's Insurance Coverage Lack Merit* ....................................................... 36

IV.    The Libby Claimants' Various Additional Objections to the Plan's Confirmability Lack Merit .................................................................................................... 37

*The Libby Claimants are Properly Classified as Class 6 Claimants* ................... 37

*The Grace TDP Resolves Wrongful Death, Survival, and Consortium Claims in Accordance with the Bankruptcy Code's Mandate of Equal Treatment for Similarly Situated Claims* ............................................................. 40

*The Grace TDP does not Provide for Payment of Punitive Damages in Order to Preserve the Assets of the Trust and Protect Future Claimants* ............ 43

*The Limit on Jury Awards Included in the Grace TDP Does not Violate any Right Held by the Libby Claimants* ............................................................... 43

CONCLUSION ........................................................................................................... 46

# TABLE OF AUTHORITIES

## FEDERAL CASES

ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252 (3d Cir. 2006) .................................. 31

In re AOV Indus., 792 F.2d 1140 (D.C. Cir. 1986) ........................................36, 37, 40

In re Armstrong World Indus., Inc., 348 B.R. 136 (D. Del. 2006) ............................................. 38

In re Babcock & Wilcox, No. 00-10992, Reasons for Order
(Bankr. E.D. La. Apr. 4, 2003)....................................................................................... 38

Begier v. I.R.S., 496 U.S. 53 (1990) ...................................................................................... 4

In re Central Med. Ctr., Inc., 122 B.R. 568 (Bankr. E.D. Mo. 1990).......................................... 4

In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004)...........................................3, 37, 44

In re Congoleum Corp., 362 B.R. 198 (Bankr. D.N.J. 2007) ...................................................... 37

In re Dow Corning Corp., 255 B.R. 445 (E.D. Mich. 2000),
aff'd, 280 F.3d 648 (6th Cir. 2002) ........................................................................ 4

In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660
(Bankr. D.D.C. 1992)...................................................................................................... 39

John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,
987 F.2d 154 (3d Cir. 1993)..................................................................................38, 40

Estate of Lellock v. Prudential Ins. Co., 811 F.2d 186
(3d Cir. 1987) ................................................................................................................ 31

In re Lisanti Foods, Inc., 329 B.R. 491 (D.N.J. 2005) ............................................................. 37

In re Martin's Point Ltd. P'ship, 12 B.R. 721 (Bankr. N.D. Ga. 1981) ...................................... 38

In re Monroe Well Serv., Inc., 80 B.R. 324 (Bankr. E.D. Pa. 1987).......................................... 44

In re Montgomery Ward Holding Corp., 306 B.R. 489
(Bankr. D. Del. 2004).................................................................................................... 44

In re Paolini, 312 B.R. 295 (Bankr. E.D. Va. 2004) ................................................................ 39

In re Quigley Co., 377 B.R. 110 (Bankr. S.D.N.Y. 2007)................................................4, 38, 40

Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233
(3d Cir. 2001) ..................................................................................... 31

In re World Health Alternatives, Inc., 369 B.R. 805
(Bankr. D. Del. 2007)........................................................................... 31

## STATE CASES

Bain v. Gleason, 726 P.2d 1153 (Mont. 1986) ........................................... 40

Barragan v. Superior Ct., 470 P.2d 722 (Ariz. Ct. App. 1970)..................... 40

Horwich v. Superior Ct., 980 P.2d 927 (Cal. 1999) .................................... 40

Johns Hopkins Hosp. v. Pepper, 697 A.2d 1358 (Md. 1997) ...................... 39

National Freight, Inc. v. Snyder, 191 S.W.3d 416 (Tex. App. 2006) .......... 39

Stevens v. Gordon, 74 P.3d 653 (Wash. Ct. App. 2003)............................. 39

Thompson v. Wing, 637 N.E.2d 917 (Ohio 1994)...................................... 40

Ulrigg v. Jones, 907 P.2d 937 (Mont. 1995).............................................. 34

## FEDERAL STATUTES

11 U.S.C. § 105(a)................................................................................... 35

11 U.S.C. § 524(g)...............................................................................passim

11 U.S.C. § 524(g)(4)(B)(i) ..................................................................... 44

11 U.S.C. § 524(g)(4)(B)(ii) .................................................................... 44

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ....................................................... 44

11 U.S.C. § 524(g)(2)(B)(ii)(V) ...........................................................passim

11 U.S.C. § 541 ...................................................................................... 31

11 U.S.C. § 1122(a)................................................................................. 37

11 U.S.C. § 1123(a)(4) .........................................................................passim

11 U.S.C. § 1141(a)................................................................................................................. 44

## OTHER AUTHORITY

H.R. Rep. No. 103-835 (1994)................................................................................................ 4

Mont. Code Ann. § 33-18-242 (2008).................................................................................... 34

The Plan Proponents[1] submit this post-trial brief in response to the confirmation objections of the Libby Claimants.

## PRELIMINARY STATEMENT

The Confirmation Hearing has served to expose the fundamental disconnect which pervades the position taken by the Libby Claimants in this case.  Put simply, that position fails to recognize that this is a bankruptcy case, that the tasks to be accomplished are unique to bankruptcy, and that the governing legal tests are dictated by the Bankruptcy Code.  This case need not decide:

- Whether all of the Libby claimants in fact are sick

- What the probability of death is in Libby

- Whether the medical criteria for expedited review are broad enough to include all claimants who have severe pleural disease at Libby

- Whether physicians would actually use those criteria for clinical diagnosis

- Whether Grace has culpability for its conduct at Libby

Many of these questions have had relevance to other litigation matters and may still have relevance in some other context.  But they are not relevant here.

The issue here is principally discrimination under 11 U.S.C. § 1123(a)(4).  That is a bankruptcy issue.  But even this point has been misapprehended by the Libby Claimants.  Discrimination turns upon a comparison of the treatments afforded to claimants who are similarly situated.  The question is whether similarly situated claimants receive similar treatment

---

[1]    The Debtors consist of the 62 entities identified in Attachment A.  Except for the term "Libby Claimants," and unless otherwise defined herein, all capitalized terms have the meanings given to them in the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated February 27, 2009 [D.I. 20872].

under a chapter 11 plan.  In a most revealing moment mid-trial, it became clear that the Libby Claimants had a different issue in mind, one that compared apples to oranges: whether Libby Claimants with Severe Pleural Disease, a non-malignant disease, should be compensated as generously, proportionately, as Libby Claimants with malignant diseases such as mesothelioma and lung cancer.  It was inevitable, therefore, that the Libby Claimants presented no evidence to address the right issue.  In fact, their experts conceded, one after the other, that they had not performed the comparisons of like claimant to like claimant — apples to apples — that are the focus of § 1123(a)(4).

The efforts of the Libby Claimants to find a classification problem reflect the same disconnection from the law.  Again, the question is not whether Libby Claimants are identical to other claimants medically or in the strength of their claims.  Rather, the issue is whether their being grouped with other unsecured asbestos tort claimants compromises the integrity of the voting process.  And again, on that point, the Libby Claimants presented no evidence.  Indeed, as the Court already has observed, separate classification of the Libby Claimants for voting purposes would produce precisely the gerrymandering that classification is designed to avoid.

The same problem infects the Libby Claimants' assertions that certain "non-products" insurance belongs to them alone.  Outside of bankruptcy, Grace might seek to access certain insurance policies in order to fund settlements of Libby claims.  But that fact does nothing to create in the Libby Claimants any right to control the disposition of insurance proceeds in a chapter 11 plan.  Moreover, whether this coverage exists at all is certainly disputed by CNA, the insurance company that wrote the policies that could be interpreted to provide such coverage.  But even assuming it exists, the evidence was clear that the types of claims that would potentially give Grace or the Trust the right to access this coverage arise at places outside of

Libby. The law is similarly clear that the Libby Claimants have no special access to this coverage as compared to other asbestos claimants, and that the potential existence of such coverage provides no basis for the Libby Claimants' cries of unequal treatment or for separate classification.

Finally, the Libby Claimants' other objections based on the TDP's "cap" on jury verdicts, the elimination of punitive damages, the treatment of consortium and wrongful death claims, and their various other complaints do not affect them any differently or disadvantage them in comparison to the tens of thousands of other asbestos personal injury claimants in Class 6 which voted overwhelmingly in support of the Plan of the Reorganization. The Libby Claimants' objections to the Plan are without merit and should be overruled.

## ARGUMENT

### I.   The Grace TDP Was Carefully Designed to Fulfill the Bankruptcy Code's Mandate of Equal Treatment for Similarly Situated Claimants

1.1     The Plan Proponents carefully crafted the W.R. Grace Asbestos PI Trust to fulfill the Bankruptcy Code's central requirement that "a plan of reorganization provide similar treatment to similarly situated claims." In re Combustion Eng'g, Inc., 391 F.3d 190, 239 (3d Cir. 2004). These obligations are codified in 11 U.S.C. §§ 524(g) and 1123(a)(4).

1.2     Specifically, Section 524(g) of the Code requires that the trust "operate through mechanisms" that will "provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." Id. § 524(g)(2)(B)(ii)(V). The intent was to emulate the "creative solution" devised in the Johns-Manville bankruptcy "to help protect the future asbestos claimants, in the form of a trust into which would be placed stock of the emerging debtor

company and a portion of future profits, along with contributions from [the debtor's] insurers."
See H.R. Rep. No. 103-835, at 3348-49 (1994).

1.3      Section 1123(a)(4), in turn, requires that a chapter 11 plan "provide the same treatment for each claim or interest of a particular class." Id. Section 1123(a)(4) "does not require precise equality, only approximate equality." In re Quigley Co., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (citations omitted). There are two important components of equal treatment under § 1123(a)(4). First, all members of the class "must receive equal value," id., meaning the members' claims must be subject to the same pro rata distribution or payment percentage. See Begier v. I.R.S., 496 U.S. 53, 58 (1990) (stating that "creditors of equal priority should receive pro rata shares of the debtor's property."). Second, all class members must be subject to the "same process for claim satisfaction." In re Central Med. Ctr., Inc., 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990). In other words, their claims must be subject to the same procedures for liquidating or resolving them. See In re Dow Corning Corp., 255 B.R. 445, 497-98 (E.D. Mich. 2000), aff'd, 280 F.3d 648 (6th Cir. 2002).

### The Trust Distribution Procedures

1.4      The evidence in this case shows that the Grace TDP has multiple objectives — to distribute money fairly to claimants, to conserve assets, and to prevent a "run on the store." 9/8/09 Tr. at 255-56 (Peterson). The Grace TDP provides the means to accomplish these objectives by liquidating and paying the Debtors' several share of liability to each claimant as efficiently and inexpensively as possible in light of the inadequacy of the available resources to pay that liability in full. See 9/8/09 Tr. at 33 (Inselbuch).

1.5      To accomplish these goals within the mandate of sections 524(g) and 1123(a)(4), the Grace TDP provides for two forms of claim processing — Expedited Review and Individual Review. See 9/8/09 Tr. at 33-34 (Inselbuch); PP Ex. 277.4 (Asbestos PI Trust Distribution

Procedures) §§ 2.1 & 2.2.  In this, the Grace TDP was modeled after TDPs that previously were adopted in a long line of asbestos bankruptcy cases, having been found to satisfy the requirements of the Bankruptcy Code, including § 524(g).  See 9/8/09 Tr. at 33 (Inselbuch).  The Grace TDP "is the latest in a long iteration of trust distribution processes that have developed in these bankruptcies over a number of years.  The purpose that it is trying to accomplish is to resolve all present and all future claims as efficiently and inexpensively as possible so that the bulk of the corpus that comes into the trust can actually go to the claimants and not be lost in transaction costs.  And to resolve the claims over time more or less as similarly as can be reasonably expected so that we would, in effect, obey the mandate of Section 524(g) which is to pay presents and futures in the same or as similar possible manner."  Id.

### *Expedited Review*

1.6    As in previous asbestos-related TDPs, the Grace TDP contains an accelerated claims process known as "Expedited Review."  See 9/8/09 Tr. at 36-37 (Inselbuch); see also PP Ex. 277.4 §§ 5.3(a)(3) & 5.3(b)(3).  In general, under the Expedited Review process, if a claimant satisfies certain medical and exposure criteria for a particular disease level, the claimant will, in effect, receive an "automatic" settlement offer to pay the scheduled value for that disease level, multiplied by the payment percentage.  9/8/09 Tr. at 34 (Inselbuch).  The Expedited Review procedures are designed to encourage settlement, conserve resources, and make it possible for the Trust to be able to more reliably estimate its future asbestos liability.  See 9/8/09 Tr. at 37 (Inselbuch).

1.7    The Expedited Review framework is defined by eight asbestos-related disease levels, and provides medical and exposure criteria for each disease level.  See id.; see also PP Ex. 277.4 §§ 5(3)(a)(3) & 5.3(b)(3).  The criteria are designed to efficiently identify, process and pay claims for clear-cut cases of asbestos-related disease.  See 9/8/09 Tr. at 123 (Welch) ("[T]he

criteria is set so . . . if you meet these criteria [the] trust can be confident that that person has an asbestos related disease."). They "provide bright line criteria for the various disease processes and for exposure requirements. So that they would basically require no debate. They could be administered by a processing department someplace and you could check off these things and it would make the process very simple and inexpensive." 9/8/09 Tr. at 37 (Inselbuch).

1.8    The specific medical and exposure criteria in the Grace TDP were developed using existing medical science, knowledge about exposure requirements, and relevant tort system considerations. See 9/8/09 Tr. at 44 (Inselbuch). They "came from a combination of the knowledge that the personal injury bar has of the medical criteria for these diseases, plus consultations with medical advisors. The exposure criteria came from discussions originally among the personal injury bar in order to provide these various categories and ultimately with representatives of the other constituencies in each of these Chapter 11s." Id.

1.9    As to the compensation provided for claims that meet the medical and exposure criteria, the offers made through the Expedited Review process are intended to approximate nationwide settlement values obtained for different claims in the tort system, while at the same time giving all claimants the same rights and procedures for resolving and liquidating their claims against the 524(g) trust. See 9/8/09 Tr. at 45-47 (Inselbuch); 9/8/09 Tr. at 233-35 (Peterson). The schedule of values for claims set by the Grace TDP are designed to capture Grace's several share of liability for each case, determined in reference to Grace's settlement history and trends in that history. See 9/8/09 Tr. at 45 (Inselbuch); 9/8/09 Tr. at 233-35 (Peterson).

### Individual Review

1.10    The second type of claims process available under the Grace TDP is "Individual Review." See PP Ex. 277.4 § 5.3(b). The Grace TDP's Individual Review is modeled after

individual review processes contained in numerous other TDPs that have been approved by courts.  See 9/8/09 Tr. at 43 (Inselbuch).  During the confirmation hearing, Mr. Inselbuch testified that "[f]or those claimants who cannot satisfy the specific criteria of the categories or for those claimants who for one reason or another would like an opportunity to seek a greater amount of compensation, we provide in [the Grace TDP] what's called an individual review process."  9/8/09 Tr. at 34 (Inselbuch).

1.11    The Grace TDP includes Individual Review because a small but not insignificant percentage of claimants who may well have had viable claims against Grace in the tort system will not meet the bright-line medical or exposure criteria for Expedited Review.  See 9/8/09 Tr. at 123 (Welch) ("There are going to be other people definitely who don't meet those criteria, but have an asbestos related disease that's caused by Grace.  But there's something about their case that requires a little more review.  And that's what the individual review is for."); 9/8/09 Tr. at 39 (Inselbuch) ("So people who for one reason or another can't satisfy the specific criteria or some of the specific criteria can come to individual review and have their particular situations evaluated on a one by one basis.").

1.12    Under the Grace TDP Individual Review process, "the trust personnel appl[y] particular criteria that are provided in the [TDP] document in an effort to reach agreement with a claimant on an amount of compensation."  9/8/09 Tr. at 34 (Inselbuch); see also PP Ex. 277.4 § 5.3(b).  The Grace TDP's Individual Review includes mediation, arbitration, and even litigation to liquidate the claims.  See 9/8/09 Tr. at 47 (Inselbuch); PP Ex. 277.4 §§  5.10 & 5.11.  The TDP's provisions for Individual Review allow the Trust, and/or a jury, to compensate claims that are viable but do not fit within the "bright line" criteria of the Expedited Review.  See 9/8/09 Tr. at 39 (Inselbuch).

### *Extraordinary Claims*

1.13     Another feature of the TDP that accommodates atypical claims is the "Extraordinary Claims Multiplier."  Set out in section 5.4 of the Grace TDP, the multiplier addresses the relatively unusual situation in which a claimant in the tort system was exposed predominantly to the Debtors' asbestos and would be unlikely to recover substantial damages from other defendants.  So, for example, if a claimant had been exposed predominantly to Grace asbestos and had little likelihood of a substantial recovery from other defendants, the extraordinary claims multiplier increases the recovery from the Grace Trust.  See 9/8/09 Tr. at 52 (Inselbuch); see also PP Ex. 277.4 § 5.4.  The multiplier is consistent with the overall purpose of the Trust because the regular scheduled values provided by the TDP "provide Grace's several share on the assumption that the claimant would have claims for liability against a number of other defendants in the tort system."  9/8/09 Tr. at 52 (Inselbuch).

1.14     The extraordinary claims multiplier has been included in the TDPs of many previous asbestos related bankruptcies.  Id. at 52.  Like prior TDPs, the Grace TDP provides that, if the exposure is at least 75 percent the result of exposure to asbestos or asbestos-containing products for which Grace has responsibility and there is little likelihood of a substantial recovery elsewhere, then the maximum that can be recovered in individual review is multiplied.  Id. at 52-53; PP Ex. 277.4 § 5.4(a).

### *The TDP Provides Similar Treatment to Similarly Situated Claims*

1.15     The foregoing procedures apply to all claims, providing one uniform set of procedures for liquidating or resolving all Class 6 claims.  See 9/8/09 Tr. at 290 (Peterson) (testifying that the TDP provides the same process for the Libby Claimants and the other claimants to resolve their claims, and that the "values and benefits of the TDP are the same

across the country and in each state"). The TDP's medical criteria apply to all Asbestos PI Claimants. See PP Ex. 277.4 §§ 5.3(a)(3) & 5.3(b)(1)(A).

1.16    Similarly, because the Trust will not be able to pay every claimant 100% of the liquidated value of his or her claim, the Grace TDP provides for the application of a payment percentage to the liquidated value of all claims, whether liquidated through Expedited or Individual Review. See 9/8/09 Tr. at 34, 45-48 (Inselbuch). All Class 6 claims will be subject to this same payment percentage. See PP Ex. 277.4 § 4.3.

1.17    The claim processing mechanisms embodied in the Grace TDP therefore comply with 11 U.S.C. § 524(g), which requires the resolution of asbestos claims and demands on "substantially the same" basis through a trust, and with § 1123(a)(4), which requires that a chapter 11 plan "provide the same treatment for each claim or interest of a particular class."

### The TDP Fairly Accommodates all Claimants Whose Claims May be More Valuable than the "Typical" Claim

1.18    All Claimants (including the Libby Claimants) have several avenues open to them if they believe a claim is worth more than the scheduled value. They may pursue Individual Review. See PP Ex. 277.4 § 5.3(b); see also 9/8/09 Tr. at 35, 47-49 (Inselbuch). For example, in Individual Review, even if a claimant does not meet the medical criteria for category IV-B treatment (severe pleural disease), the claimant might still recover the maximum scheduled value for such a claim. See 9/8/09 Tr. at 41, 54 (Inselbuch). If any Claimant is dissatisfied with the outcome of Individual Review, the Grace TDP permits him or her to seek further review through non-binding arbitration and then a jury trial in the tort system. See PP Ex. 277.4 §§ 5.10, 5.11, 7.6 & 7.7; see also 9/8/09 Tr. at 35, 47-49 (Inselbuch). All Claimants, including the Libby Claimants, also may seek extraordinary claims treatment under the Grace TDP, which would, as explained above, increase the payment in certain cases if the claimants can show a higher

proportion of Grace exposure.  See PP Ex. 277.4 § 5.4(a); see also 9/8/09 Tr. at 52-54 (Inselbuch).

## II.    The Plan Proponents Adjusted the Grace TDP in Response to the Libby Claimants' Concerns and in a Manner that is Consistent With the Rights of All Asbestos PI Claimants

2.1    In the course of developing the Grace TDP, several changes were made in order to address the concerns of the Libby Claimants.  See 9/8/09 Tr. at 54-59 (Inselbuch).  These modifications were carefully crafted to ensure compliance with the Bankruptcy Code.  Id.

### Inclusion of Severe Disabling Pleural Disease (Level IV-B)

2.2    First, the Grace TDP's medical criteria were supplemented to include a diagnostic category for a disease not specifically addressed in any other bankruptcy plan, "Severe Disabling Pleural Disease" (Disease Level IV-B).  See 9/8/09 Tr. at 54 (Inselbuch); see also 9/8/09 at Tr. 118-19 (Welch).  Mr. Inselbuch testified that the Libby Claimants "took the position . . . that there was a disease process that was common in Libby that they call or is described as severe disabling pleural disease, and that the TDP, as written previously, did not provide for that disease."  9/8/09 Tr. at 44 (Inselbuch).  The drafters of the TDP then consulted with medical experts, who "confirmed the existence in the literature of this disease, although it was apparently unusual to observe in practice.  But because it existed in the medical literature and because the Libby claimants took the position that people from Lincoln County, Montana suffered from this process, we added a new disease level to the TDP to provide for severe disabling pleural disease, which is now Level [IV] B."  Id.

2.3    The drafters worked closely with Dr. Welch to develop the medical and exposure criteria for the new category.  See 9/8/09 Tr. at 118-19 (Welch).  Dr. Welch "looked at all the literature I could find relating to severe disabling pleural disease . . . In addition, I looked at all the Libby specific information, government reports, published papers that related to Libby, and

testimony and reports from Dr. Whitehouse and Dr. Frank that talk about the impact of pleural disease in that population so I could kind of understand what the questions were and design a TDP that I thought was medically reasonable in that context." Id.  Dr. Welch also consulted several of her colleagues in the asbestos medical field about Libby specific issues, id. at 121-22, and met with Dr. Whitehouse and Dr. Frank to further discuss those matters.  Id. at 122.

2.4    Because severity is an important element of compensation, Dr. Welch testified that she looked to and relied on medical literature to distinguish between asbestos-related pleural disease that was likely to cause lung function impairment on the one hand, and less serious forms of pleural disease on the other.  Id. at 132-34.

### Enhanced Comeback Rights

2.5    Second, in order to respond to the Libby Claimants' assertion (as yet still unsubstantiated) that Libby nonmalignant disease may progress more rapidly than other nonmalignant disease throughout the world, the Grace TDP permits any claimant at a lower level of disease to come back later and assert a subsequent claim, not only for the initial development of a malignant disease, but also for the progression of their disease to severe asbestosis or Severe Disabling Pleural Disease.  See PP Ex. 277.4 § 5.9; see also 9/8/09 Tr. at 55 (Inselbuch) (because "it was explained to us by the Libby folks that their pleural disease was progressive, we provided a second opportunity to come back and claim for Level 4B which is severe disabling pleural disease even after first recovering in Level 3, which had not been the case in other TDPs.").

2.6    This accommodation expanded the comeback rights that had been approved in prior TDPs.  Mr. Inselbuch testified that because "[m]any jurisdictions take the view that cancer is a second disease, a different disease from non-malignant asbestos disease" the TDPs in place in other asbestos bankruptcy plans and in this Plan "provide[] for what we call comeback rights. You can then file another claim for the second disease."  9/8/09 Tr. at 56 (Inselbuch).  In the

present case, the Grace TDP was modified in order to respond to the Libby Claimants arguments regarding disease progression in Libby.  The Grace TDP now allows a "comeback right from Level 3 to Level 4 even though it's not perhaps a new disease.  We thought that they should have an opportunity since they say that these diseases are progressive and over a period of time to first seek whatever the lower level of compensation might be and then come back again if they then succumb to more severe problems." Id.

### *Increased Extraordinary Claims Multiplier*

2.7     Third, the Grace TDP was modified to include an additional category of extraordinary claims treatment, again in response to the Libby Claimants concerns.  See 9/8/09 Tr. at 52-55 (Inselbuch); PP Ex. 277.4 § 5.4.  Dr. Peterson testified that the extraordinary claims multiplier was adjusted "to address the issue that the Libby claimants raised about the fact that they had claimants who were exposed exclusively, or almost exclusively, by W.R. Grace. . . . it was a concession on the part of the ACC to have a more generous treatment of extraordinary claims in order to give greater compensation to the Libby claimants." See 9/8/09 Tr. at 253 (Peterson).

2.8     Specifically, the highest extraordinary claims multiplier found in section 5.4 of the TDP was raised from five times the Expedited Review scheduled value to *eight* times the scheduled value, so that any Claimant whose injuries were caused almost entirely by exposure to Grace asbestos would receive compensation in line with what severely injured prepetition claimants from Libby had received in settlement of their claims.  See 9/8/09 Tr. at 252-70 (Peterson).  Dr. Peterson testified that the modified multiplier "provides compensation to Libby claimants and people with -- well, in Libby specifically, it would apply a level of compensation that is quite close to what people got historically, consistently with the multiple objectives of the trust distribution procedures." Id. at 254.

2.9     In keeping with the requirements of the Code, the adjusted extraordinary claims multiplier is available to any claimant who was exposed exclusively to Grace asbestos, not just the Libby Claimants.  See 9/8/09 Tr. at 253 (Peterson) (testifying that the modified multiplier "applies to claims from any location.").

### Waiver of Occupational Exposure Requirement for Libby Claimants

2.10    Fourth and finally, the significant occupational exposure requirement was waived for Libby Claimants.  See 9/8/09 Tr. at 152-53 (Welch); 9/8/09 Tr. at 290-92 (Peterson); PP Ex. 277.4 §§ 5.3(a)(3) & 5.7(b)(3).  Mr. Inselbuch testified that the TDP's exposure requirements were modified "to take account for the fact that, as described to us, the Libby exposure was not in many situations industrial exposure."  9/8/09 Tr. at 55 (Inselbuch).  He explained that the TDP originally required "something called significant occupational exposure which is on the job working with asbestos fibers or in the close proximity to someone else working with asbestos fibers that will get you exposed," but, because "a lot of the Libby exposure, as it was described to us, was not of that nature, we modified the exposure requirements to accommodate claimants whose claims arose in Lincoln County, Montana in that respect."  Id.

### III.    There is No Evidence that the Grace TDP Discriminates Against the Libby Claimants

#### A.    The Medical Criteria for Severe Pleural Disease Do Not Discriminate Against the Libby Claimants

3.1     The Libby Claimants' allegations that the TDP Medical Criteria discriminate against them focus on the criteria for Severe Disabling Pleural Disease (Level IV-B).  Thus, their experts acknowledged during the Confirmation Hearing that their contention that "Libby Disease is different" applied only to pleural disease in Libby and not to mesothelioma, lung cancer, or asbestosis.  See PP Exs. 600 (Demonstrative), 600A (Demonstrative with Finch mark-ups); 9/10/09 Tr. at 224-26, 233 (Frank) (recognizing that he has "no basis to say" that the severity and

prognosis of mesothelioma, lung cancer, GI cancer, and asbestosis in Libby are different); 9/11/09 Tr. at 140-41 (Whitehouse) (same).

### *The TDP Medical Criteria are Based Upon Sound Science*

3.2    The medical literature makes a clear distinction between pleural plaques (one form of pleural disease) and the more severe type of pleural disease called diffuse pleural thickening.  9/8/09 Tr. at 128 (Welch); <u>see</u> 127-28 (pleural plaques); 130-34 (diffuse pleural thickening); <u>see also</u> PP Ex. 147 (2004 ATS Statement) at 707.  Diffuse pleural thickening generally can cause significant impairment, while pleural plaques typically do not.  <u>See</u> PP Ex. 147.

3.3    The Grace TDP provisions for expedited review were supplemented in order to provide greater compensation to claimants with severe diffuse pleural thickening.  This was done to accommodate the Libby Claimants, whose counsel and experts asserted that some Libby Claimants with nonmalignant disease suffer from pleural disease with severe impairment.  <u>See</u> 9/8/09 Tr. at 44 (Inselbuch); 9/8/09 Tr. at 157-58 (Welch).

3.4    The evidence shows that the medical criteria for expedited payment for Severe Disabling Pleural Disease are reasonably informed by the medical literature:

*(A)    Blunting of the costophrenic angle*

3.5    The literature reports that pleural disease is associated with a loss of lung function when blunting of the costophrenic angle is present.  9/8/09 Tr. at 130, 134-36 (Welch) (on Lilis article); PP Ex. 174 at Slide 14 (Welch's demonstrative showing graph from Lilis).  The Libby Claimants' experts do not dispute this.  <u>See</u> 9/10/09 Tr. at 237-40, 257-58 (Frank); 9/11/09 Tr. at 120 (Whitehouse).  Accordingly, the International Labor Organization (ILO) Guidelines — which have been used to classify x-rays in hundreds of epidemiological studies of asbestos disease for many decades — go so far as to state that pleural disease should be classified as

14

diffuse pleural thickening, as opposed to pleural plaquing, *only* in instances where pleural fibrosis involves blunting of the costophrenic angle. 9/8/09 Tr. at 134, 141-42 (Welch); PP Ex. 115 (ILO Guidelines) at 1, 6-8. While Dr. Whitehouse quarrels with this definition as too restrictive, he acknowledged that, if a doctor followed the ILO Guidelines in defining diffuse pleural thickening, he or she "would not be outside the bounds of the generally accepted medical practice[.]" 9/11/09 Tr. at 161 (Whitehouse); see PP Ex. 115 at 7-8. ***More to the point***, while he disagreed with ***medically defining*** diffuse pleural disease to require blunting, he admitted that imposing the blunting requirement in the TDP would help assure that ***severe*** impairment was present, see 9/11/09 Tr. at 120 (Whitehouse), an important ***compensation*** objective for expedited review where the goal is to focus on clear cases.

    *(B)*    *Extent and width of the pleura*

3.6    The requirements that pleural thickening cover 25% of the pleura and that the width of the thickening be at least 3 millimeters thick for a claimant to be compensated under the TDP expedited review process are also based on the guidelines set by the ILO and supported by medical literature. 9/8/09 Tr. at 133, 142-43 (Welch); PP Ex. 115 at 7-8.

    *(C)*    *FEV1/FVC ratio*

3.7    Diffuse pleural thickening causes ***restrictive*** lung disease. 9/8/09 Tr. at 147, 191 (Welch). And asbestos-related, non-malignant diseases are generally restrictive in nature. 9/10/09 Tr. at 244-45, 260 (Frank); PP Ex. 147 at 706-07. The FEV1/FVC ratio can be used to determine whether the loss of lung function in an individual is restrictive or, ***instead***, is caused by an ***obstructive*** condition, usually smoking-related disease. 9/8/09 Tr. at 147-48 (Welch); see also 9/11/09 Tr. at 236 (Weill). Under the expedited review process, the FEV1/FVC ratio is used to identify and pay clear cases of pleural disease with impairment, where the impairment is caused by asbestos rather than by other factors.

(D)      *Excluding DLCO as indicative of asbestos-related impairment*

3.8      By contrast, DLCO is a highly sensitive yet **non-specific** measurement of lung function.  Reduced diffusing capacity can reflect numerous conditions, including Chronic Obstructive Pulmonary Disorder (COPD), any form of interstitial disease, and smoking-related lung injuries.  9/8/09 Tr. at 146 (Welch); see also 9/10/09 Tr. at 244 (Frank) ("Q. Would you agree with me that a lot of things can cause a reduction in DLCO besides asbestos disease?  A. Certainly.").  It is unlikely that individuals who have only a decrement in DLCO are losing lung function because of pleural fibrosis.  9/8/09 Tr. at 146 (Welch).

### The TDP Medical Criteria Properly Aim at the "Sweet Spot" of Expedited Review — Clear Cases of Disease

3.9      The TDP's *Expedited* Review criteria are designed to capture clear cases of asbestos-related disease.  9/8/09 Tr. at 123, 148 (Welch) (noting that "the expedited criteria are set to pick out the really clear cut cases").  Equivocal cases of disease can still obtain equal or greater recovery through the Individual Review process.  9/8/09 Tr. at 37-41 (Inselbuch) .

3.10     The Libby Claimants have failed to provide any evidence that the medical criteria of the "severe pleural disease" category are not designed to catch clear cases of pleural disease in Libby.  Indeed, Drs. Whitehouse and Frank both **acknowledged** that the criteria for "severe pleural disease" in the TDP **would** compensate those individuals in Libby who clearly have diffuse pleural thickening and severe pulmonary impairment.  9/10/09 Tr. at 284-87 (Frank); 9/11/09 Tr. at 130-31 (Whitehouse).

### There Is No Evidence That the Medical Criteria Favor Those Outside of Libby Over Those in Libby

3.11     On the ultimate issue of discrimination, the Libby Claimants' experts and counsel both admit that they have not even compared how the TDP criteria will treat people in Libby compared to similarly situated claimants outside Libby.  Specifically, those experts do not know

of *any analyses* done on the effect of the TDP criteria on people outside of Libby. 9/10/09 Tr. at 288 (Frank). There was *no* demonstration of what the capture rate outside of Libby was, as compared to the capture rate within Libby. 9/10/09 Tr. at 270-71, 273-74 (Frank). Nor have the experts even done any scientific analysis of diffuse pleural thickening outside of Libby. 9/11/09 Tr. at 134 (Whitehouse). Thus, the Libby Claimants cannot assert discrimination in favor of claimants outside Libby. 9/11/09 Tr. at 133 (Whitehouse). Counsel for the Libby Claimants, Mr. Heberling, conceded that the Libby Claimants have not even argued that they are discriminated against *relative to people outside Libby*. 9/11/09 Tr. at 133. Moreover, in making his relevance objection, Mr. Heberling acknowledged that people outside of Libby likely would be affected by the TDP criteria for severe pleural disease in the *same way* that Libby Claimants are. See 9/11/09 Tr. at 133.

3.12    All of the Libby Claimants' efforts at trial were dedicated to showing that some number of people at Libby who are sick or had allegedly died of an asbestos-related disease would not meet the TDP criteria for expedited recovery for severe pleural disease. Those efforts, of course, miss the mark legally and factually. The expedited recovery is designed to be exclusive and to capture the clear cases, while allowing less clear cases to be individually evaluated. How much exclusion is appropriate is not a matter of law but of settlement and compensation policy, which balances the need for achieving clarity of entitlement for those who are compensated without further review with the need to avoid overburdening the individual review process. No legal requirement applies. The only legal requirement is to provide similar treatment, under § 524(g) and § 1123(a)(4).

3.13    And evidence submitted by the Libby Claimants to support the assertion of exclusion even within Libby was hopelessly flawed as well. First, Dr. Whitehouse admitted that

17

the Libby Claimants' settled and unsettled claims chart, Libby Claimants Ex. 16A, was not a study but rather a selected group of individuals chosen by counsel for the Libby Claimants. 9/11/09 Tr. at 106-07 (Whitehouse) (stating that Exhibit 16 was not a study, "it's just a chart"). Application of the TDP criteria to the 76 people from the "CARD Mortality Study," who allegedly died from a non-malignant asbestos disease, also missed the mark.  There was no evidence that the 76 alleged non-malignant deaths from the "CARD Mortality Study" were representative of any larger population.  See 9/10/09 Tr. at 257-58 (Molgaard).  And, while Dr. Frank asserted that all had died of asbestos related disease, this was merely hearsay, as he relied upon Dr. Whitehouse's statements without performing his own analysis.  See 9/10/09 Tr. at 228, 283-84 (Frank).  Moreover, Dr. Frank admitted that only 20 of the 76 had pure pleural disease, was unable to identify who these people were, and could not demonstrate that they were unfairly denied expedited recovery under the TDP.  9/10/09 Tr. at 265 (Frank).

3.14    Further, not only have the Libby Claimants failed to prove discrimination resulting from the Expedited Review criteria as a whole, but the evidence relating to the specific elements comprising the criteria actually demonstrated the opposite, *i.e.*, equal treatment. Specifically:

*(A)    Progression*

3.15    The Libby Claimants have contended in their briefing and objections that Libby Claimants with pleural disease have progressed rapidly and uniquely, ***based upon Dr. Whitehouse's progression theory***.  At best, however, Dr. Whitehouse's theories of progression are mere hypotheses.  9/11/09 Tr. at 88 (Whitehouse); 9/10/09 Tr. at 66, 87, 93 (Molgaard).  The Libby Claimants' own epidemiologist testified that these hypotheses have not been tested and therefore are not proven.  9/10/09 Tr. at 66, 87, 93 (Molgaard).  Indeed, Dr. Weill's analysis

demonstrated that Dr. Whitehouse's claims of rapid progression were over-stated and not supported by Dr. Whitehouse's own patient population data.  9/11/09 Tr. at 192 (Weill).

3.16    Critically, the Libby Claimants' experts and counsel admit that no comparison has been done between progression of disease in Libby and progression outside of Libby.   Dr. Whitehouse cannot and does not contend that people in Libby progress more rapidly than those outside of Libby.  9/11/09 Tr. at 134 (Whitehouse); 9/10/09 Tr. at 288 (Frank).

3.17    Finally, for claimants outside of Libby who are exposed to the same kind of asbestos as claimants inside of Libby, it makes no medical sense (indeed, there is no current medical theory to support a contention) that the same disease would progress differently inside Libby as opposed to outside Libby.  The Libby Claimants' experts readily admit this.  9/10/09 Tr. at  63-65 (Molgaard); 9/10/09 Tr. at 275 (Frank).  And the Libby Claimants have stipulated that the pathology for asbestos disease seen in Libby is no different than anywhere else in the world.  Stipulation Regarding Testimony and Report of Samuel P. Hammar, M.D., July 29, 2009 [D.I. 22730]; PP Ex. 214 (Hammar Report).

3.18    Of course, individuals who do progress in their disease have the right to go back and seek recovery ("comeback rights").  9/8/09 Tr. at 55-56 (Inselbuch); PP Ex. 277.4 § 5.9.

*(B)    Low exposure*

3.19    Libby concentrate was transported to hundreds of expanding plants throughout the country.  9/9/09 Tr. at 38 (Hughes).  Many of the same "community" exposure pathways alleged at Libby also occurred outside of Libby in dozens of cities with facilities that expanded vermiculite shipped from Libby.  9/8/09 Tr. at 120 (Welch).   The Grace TDP criteria for exposure — six months in Libby — is quite minimal.  If anything, the Grace TDP exposure criteria are more lenient to, and thus favor, the Libby Claimants.  9/8/09 Tr. at 291-92 (Peterson); 9/8/09 Tr. at 153 (Welch); see 9/8/09 Tr. at 55 (Inselbuch).

*(C)      Pleural thickness*

3.20     The Libby Claimants provided no analysis comparing the impairment of those with thin pleura in Libby with those individuals who have thin pleura outside of Libby.  9/10/09 Tr. at 277-79 (Frank).  Without a comparison, Libby Claimants have no evidence upon which to base their claim of discriminatory treatment under this medical criterion.

*(D)      Blunting of the costophrenic angle*

3.21     No  evidence  supports  the  Libby  Claimants'  contention  that  the  blunting requirement discriminates against them either.  In fact, Dr. Whitehouse concedes that the impact of the blunting requirement inside and outside of Libby is "very close."  9/11/09 Tr. at 135 (Whitehouse).

*(E)      "Restrictive" Medical Criteria*

3.22     Many of the Libby Claimants' "objections" essentially allege that certain medical criteria in the TDP are too restrictive or are not necessary to diagnose an individual with disease. These criticisms are not relevant.   Expedited review is designed to capture clear cases, for compensatory purposes.   This is not discrimination.   The Libby Claimants continue to confuse the issue of discrimination with their complaints that the TDP Expedited Review criteria do not capture every meritorious case of disease.   The TDP Expedited Review criteria are not designed to capture every case, nor is there any statutory or legal requirement that they do so.

### There Is No Evidence that the Individual Review Process Discriminates Against the Libby Claimants

3.23     For the first time at the Confirmation Hearing, the Libby Claimants objected to the Individual Review process.   After acknowledging that claimants who do not qualify for expedited treatment under the TDP have the opportunity to seek recovery under the Individual Review process, counsel for the Libby Claimants claimed that the Individual Review process

discriminated against the Libby Claimants, 9/9/09 Tr. at 311-12, and that this was a matter of "first impression." 9/9/09 Tr. at 315-16. The new objection is improper. It was not articulated in the Libby Claimants' objections, has not been briefed, and is not supported by their expert reports.

3.24    And there is no evidentiary foundation for the objection. The Libby Claimants did not offer a single exhibit to support it. Nor did they offer a single witness. There simply is no evidence that the Individual Review process will treat Libby Claimants unfairly or unequally or in some way differently than non-Libby Claimants. On their face, the Individual Review criteria and the Individual Review process apply in the same manner to all claimants, Libby and non-Libby alike. In fact, Dr. Whitehouse acknowledged that, given his experience and knowledge, he was well-positioned to participate in the Individual Review process and explain why a Libby claimant not meeting the TDP expedited review criteria nevertheless was "entitled to being classified as having severe disease." 9/11/09 Tr. at 137 (Whitehouse).

### B.    The Scheduled Values in the TDP Do Not Discriminate Against the Libby Claimants

*Purpose and Goals of Scheduled Values in TDPs*

3.25    Scheduled values are designed to encourage settlement of large numbers of claims expeditiously. 9/8/09 Tr. at 36 (Inselbuch). Properly selected scheduled values preserve the assets of the Trust and ensure as much as possible that the Trust's assets are available to pay claims, rather than being diverted to pay for costly claims adjudication. 9/8/09 Tr. at 33 (Inselbuch). Historically, these values are assigned to specific disease categories and reflect a debtors' several share of liability. See 9/8/09 Tr. at 37, 45 (Inselbuch). The values are set just above the midpoint of the Debtors' national settlement average. 9/8/09 Tr. at 46, 65 (Inselbuch). The values "are not jurisdiction specific." 9/8/09 Tr. at 60 (Inselbuch). The maximum values

also are set to allow recovery at substantially higher numbers, but "cutting off the upper end of what we would call the outliers." 9/8/09 Tr. at 46 (Inselbuch). In short, the values are set to encourage the greatest number of claimants to opt for settlement under Expedited Review, to allow for quick payment, and to conserve the Trust's resources. 9/8/09 Tr. at 36 (Inselbuch).

### Grace's Scheduled Values Are Properly Designed to Encourage Settlement of Large Numbers of Claims and to Conserve Trust Resources

3.26    The Grace Scheduled Values were selected in the same way. Mr. Inselbuch, one of the architects of the Grace TDP, testified that the Grace Scheduled Values are based upon an expert analysis of Grace's litigation history and are designed to capture the "Grace several share of the liability of each disease process." 9/8/09 Tr. at 45 (Inselbuch). As in past bankruptcies, the Grace Scheduled Values are set at just above the historical Grace national average settlement for each disease. 9/8/09 Tr. at 60 (Inselbuch) (Grace Scheduled Values are designed to "capture a number that is a bit above the 50 percent mark for settlements historically that Grace entered into throughout the country"). Like prior TDP scheduled values, the Grace Scheduled Values were established  "in an effort to encourage people to opt for the expedited review process." 9/8/09 Tr. at 46 (Inselbuch).

### The Process of Assigning the TDP Values Reflects a Well-Established Method

3.27    The Scheduled Values reflected in the TDP were recommended to the ACC by Dr. Peterson, who studied Grace's litigation history and historical settlements. 9/8/09 Tr. at 219 (Peterson). The ACC, in essence, adopted Dr. Peterson's recommendations with minor changes. See 9/8/09 Tr. at 46-47 (Inselbuch).

3.28    The basic framework for the Grace Scheduled Values is based upon disease. 9/8/09 Tr. at 220 (Peterson). Dr. Peterson examined disease-specific data and generated scheduled values close to the national forecasted tort settlement average, after taking into

account trends that affected and would continue to affect Grace's claim values on a national level.  9/8/09 Tr. at 223-228 (Peterson); PP Ex. 178B (Slides 23, 25, 26, 27 of the Peterson Demonstrative:  "Forecasting Asbestos Liabilities").

3.29    Dr. Peterson testified that his method produced "TDP values that [were] not inconsistent with the tort values" at the national level.  9/8/09 Tr. at 246 (Peterson).

### National Settlement Averages Are Appropriate

3.30    During the Confirmation Hearing, Dr. Peterson explained the importance of using national as opposed to local values in developing scheduled values.   There are high value jurisdictions and low value jurisdictions in many different parts of the country, at various times, and based on numerous different factors.  See 9/8/09 Tr. at 227-28 (Peterson).   A national approach promotes fairness and efficiency at the same time:

> Q:   Dr. Peterson, why do you use national values in the estimates you provided for purposes of the TDP instead of local values?
>
> A:   Because the structure of the trust distribution procedures are an attempt to have -- develop a plan that's applicable in every state across the country and to treat people in a uniform manner as well as they can and indeed that's an edict of 524(g).  So you do that rather than creating a favorite son [sic] analysis state-by-state.  Moreover, you can't construct a TDP that would have scheduled values and so on differently from state-to-state.  It would be unmanageable and it would promote potentially abusive practices by some claimants.

9/8/09 Tr. at 285 (Peterson).

3.31    Moreover, the TDP recognizes that the nationally-based scheduled values, which essentially act as a settlement offer, ***will not induce all claimants to settle***.  Those claimants who seek higher values for their claims can, instead, opt for Individual Review, where there "isn't a set value" assigned to each level of disease.   See 9/8/09 Tr. at  246 (Peterson).

3.32    The Libby Claimants' offered no evidence, expert or otherwise, to contradict Dr. Peterson and Mr. Inselbuch's testimony concerning the importance of using national settlement averages in deriving scheduled values for the Expedited Review process.

### The Scheduled Values for Severe Pleural Disease Are Appropriate and Are Designed to Achieve the Goals of the Expedited Review Process

3.33    The Libby Claimants have not objected to the values assigned to claims for mesothelioma, lung cancer, and asbestosis, and offered no evidence at trial challenging the scheduled values assigned to mesothelioma, lung cancer or asbestosis.  See Libby Claimants Pre-trial Brief; see also 9/10/09 Tr. at 224-26, 244 (Frank); 9/11/09 Tr. at 140-41 (Whitehouse).  The focus of the Libby Claimants' objection to Grace scheduled values centers on the value for severe pleural disease (Category IV-B).   But the evidence at trial demonstrated that the scheduled value for severe pleural disease was also derived with the same purpose in mind as the other disease categories.   Mr. Inselbuch testified that "we were trying to put a value on the severely disabled pleural disease and couple that with a multiple which made available in the extreme cases would come up to values which we were told by the Libby claimants were achieving against Grace before the bankruptcy."   9/8/09 Tr. 82 (Inselbuch).   In fact, the scheduled value for severe pleural disease (Category IV-B) is set at a level that provides compensation that is quite close to what similarly situated claimants from Libby received pre-petition (provided the claimant could establish greater than 95% exposure to Grace asbestos and little likelihood of substantial recovery elsewhere, which was the case for every pre-petition claimant from Libby) 9/8/09 Tr. 254, 265-266 (Peterson).

### The Comparisons Offered By the Libby Claimants Miss the Mark

3.34    In support of their claims of discrimination, **nowhere** have the Libby Claimants demonstrated that groups of comparable non-malignant claimants from other regions are treated

more favorably in light of the scheduled values assigned to severe pleural disease.  The record is devoid of such a comparison.  Rather, the Libby Claimants offer comparisons that have no relevance to their discrimination objection.  As noted by Dr. Peterson:

> Q:   You were asked some questions about Libby settlements versus settlements outside of Libby and said it was a meaningless comparison. . . Why is that a meaningless comparison?
>
> A:   Well, it's a mere mixing of apples and oranges in doing the calculation.  The average payment settlement involves meso and lung cancer and non-malignants and all these mixed together and the distribution of those may -- they differ state-by-state, location by location and when you try and sum -- by being an employee or not.  And when you compare -- if you want to compare what's the relative amount of payments to people, you have to do it at the level of the disease because now you're dealing with like kinds of claims.  But if you do it across, you don't know what you're comparing.

9/8/09 Tr. at 286-87 (Peterson).

3.35    Further, the evidence adduced at trial demonstrated that Grace's historical settlement values fluctuated by jurisdiction over time and by law firm.  9/9/09 Tr. at 59-67, 77-78 (Hughes).  The Libby Claimants failed to consider this fact.  They ignored the settlement history demonstrating that there are other jurisdictions and other law firms that achieved higher settlement values than Libby at various points in time.  9/9/09 Tr. at 50 (Hughes).

3.36    And finally, in making their comparisons, the Libby Claimants never looked to other high verdict jurisdictions.  As demonstrated at trial, the evidence demonstrated that the verdict history inside and outside of Libby does not support the Libby Claimants' contention of discrimination.  The average non-malignant verdicts inside of Libby were actually less than half the average non-malignant verdicts outside of Libby.  9/8/09 Tr. at 241 (Peterson).

3.37    At bottom, the Libby Claimants have failed to make any comparison demonstrating that the Scheduled Values discriminate against them.

### The Scheduled Values Assigned to Severe Pleural Disease Permit the Libby Claimants to Achieve Historical Libby Settlement Values

3.38   Beyond the fact that it does not even address discrimination, the Libby Claimants'
allegation that the scheduled values assigned to severe pleural disease do not adequately reflect
Libby's historical tort system values is just plain wrong.   Dr. Peterson testified, unrebutted, that
the value ultimately adopted by the ACC for severe pleural disease is *almost identical* to the
historical settlement average value for "impaired" non-malignant cases in Libby, assuming the
claimant qualifies for the eight-times multiple for predominantly Grace exposure.   9/8/09 Tr. at
254, 262, 266-69 (Peterson); compare 9/9/09 Tr. at 77 (Hughes) (historical nonmalignant
settlement values in Libby averaged approximately $240,000); with PP Ex 277.4 §§ 5.3 & 5.4
(under the TDP, Libby Claimants with severe pleural disease who meet the extraordinary claims
multiplier will receive up to $400,000).   It is undisputed on this record that, pre-petition, (1) *all
pre-petition settlements* of claims in Libby involved Grace workers, or family members of Grace
workers, and (2) in each of these settlements, it was alleged that Grace asbestos was the sole or
predominant cause of the claimants' disease. 9/9/09 Tr. at 53-54 (Hughes). The current
scheduled value ($50,000) for severe pleural disease, coupled with the extraordinary claims
multiplier for predominant Grace exposure (8 times), thus allows for a Libby Claimant, similarly
exposed, to achieve a result that approximates what could have been achieved by a similarly
situated pre-petition Libby Claimant.

### The Scheduled Values Set for Severe Pleural Disease Actually Favor the Libby Claimants in Light of Changed Circumstances Negatively Affecting Their Claim Values

3.39   The evidence presented at trial shows that pre-petition settlement history in Libby
is not even a proper bench mark for the value of most Libby claims today.   Pre-petition, there
were factors in Libby that drove higher settlement values.   See, e.g., 9/9/09 Tr. at 49-55, 65-69

(Hughes); 9/8/09 Tr. at 222-29 (Peterson).  These factors included: (1) the number of defendants; (2) product identification; (3) the severity of disease; and (4) jurisdiction.  See PP Ex. 501.08A (Hughes Demonstrative:  "Factors Influencing Settlements – Pre-Bankruptcy" with attorney comments and mark-ups).  Each of these factors have changed post-petition in ways that would negatively impact settlement values in Libby going forward.

3.40    First, the *number of defendants* was a factor that historically increased Libby values and lowered values outside Libby.  Outside Libby, numerous defendants shared the burden of the overall settlement.  Inside Libby, this factor had the effect of pushing up values of Grace's settlements because, historically, there were no other defendants to share the settlement burden.  Grace shouldered the settlement burden almost exclusively.  9/8/09 Tr. at 227 (Peterson); 9/9/09 Tr. at 52-53 (Hughes).  This dynamic has changed post-petition.  Since Grace filed for bankruptcy, other defendants have filed for bankruptcy, driving up per-company settlement values outside of Libby.  9/8/09 Tr. at 227-28 (Peterson); 9/9/09 Tr. at 82-83 (Hughes).  In Libby, by contrast, other defendants have been identified and sued (including BNSF, Maryland Casualty and the State of Montana), which would likely drive down per-company settlement values inside Libby.  9/8/09 Tr. at 227-28 (Peterson); 9/9/09 Tr. at 81-82 (Hughes).

3.41    Regarding *product identification* (*i.e.*, the amount and extent of exposure to Grace asbestos), pre-petition claims in Libby involved workers or family members of workers whose only exposure was occupational or paraoccupational in nature.  Thus, product identification was not an issue.  9/9/09 Tr. at 83 (Hughes).  In other jurisdictions, workers were exposed to multiple products, not exclusively Grace products.  9/9/09 Tr. at 53-54 (Hughes).  Now, many claims in Libby are community-only exposure cases, where there are issues of product identification and

extent of exposure.  9/9/09 Tr. at 84 (Hughes) ("There's an issue of exposure when you're dealing with community only case.").

3.42    As to *severity of disease*, the highest settlements in Libby involved young individuals and evidence from Dr. Whitehouse that their disease would progress.  See 9/9/09 Tr. at 68-69 (Hughes).  Dr. Whitehouse's theory, articulated in the mid-1990's, was that people with relatively low impairment from pleural disease would inevitably progress to a more serious condition.  See 9/9/09 Tr. at 55-59 (Hughes).  At the time, Grace lacked the ability to test Dr. Whitehouse's allegations of progression and had to pay higher settlements.  9/9/09 Tr. at 55, 68-69 (Hughes).  Today, however, Grace has a complete set of data from Dr. Whitehouse's progression study.  9/9/09 Tr. at 85 (Hughes).  Grace can, and has, tested this theory of progression through its expert, Dr. Weill.  9/11/09 Tr. at 180 (Weill).

3.43    In sum, the Libby Claimants did not offer any evidence to support their claim of discrimination with respect to the Scheduled Values in the Grace TDP.  The record demonstrates that the values were transparently set, using a well-established method, and are designed to achieve legal and appropriate goals.  The Grace TDP allows for individual claimants to seek Individual Review if they are not satisfied with the offer in the Expedited Review process.

**C.    The Disposition of Proceeds from Grace's Non-Products Insurance Coverage Does Not Discriminate Against the Libby Claimants**

***Much of Grace's Primary-Layer Non-Products Coverage Has Been Settled and the Remainder Is Disputed by CNA***

3.44    Grace's comprehensive general liability ("CGL") policies provided Grace with insurance against a wide range of possible liabilities arising out of bodily injury or property damage claims.  9/11/09 Tr. at 266-67 (Posner).  In the specialized language of insurance, the policies afford both "products" and "non-products" coverage.  9/11/09 Tr. at 269 (Posner).

3.45    "Products" coverage, in the asbestos context, applies to liabilities arising out of injuries from a Grace asbestos-containing product after its manufacture and distribution. Products coverage also embraces "completed operations" coverage — *i.e.*, coverage of liabilities arising from injuries due to exposure to Grace asbestos after completion of operations at a particular plant or facility.  9/11/09 Tr. at 269 (Posner).  Conversely, "non-products" coverage applies to other asbestos-based liability claims, such as those arising from exposure to asbestos before it became a finished product.  Id.

3.46    Grace had three primary insurance carriers over the years:  Royal Indemnity (now known as Arrowood), Maryland Casualty Company, and Continental/CNA.  9/11/09 Tr. at 275-76, 325 (Posner); PP Ex. 276 (Debtors' Disclosure Statement) at 41; PP Ex. 277.6 (Asbestos Insurance Transfer Agreement (Revised)).  The policies' aggregate limits — *i.e.*, the ceiling on the total amount that the insurance company is required to pay — apply only to "products/completed operations" coverage.  Id.  Because the policies set no aggregate limits for "non-products" coverage, each new "non-products" claim potentially gives rise to coverage up to the full amount of the per-claim or per-occurrence limit, subject to any deductibles or self-insured retentions.  9/11/09 Tr. at 270-71 (Posner).

3.47    Grace's primary-layer "products/completed operations" coverage is exhausted. PP Ex. 276 at 41; 9/11/09 Tr. at 278-79 (Posner).  But to the extent it is not resolved in prior settlements with insurance companies, primary-layer "non-products" coverage remains.  Id.

3.48    The primary-layer coverage was not Grace's only liability insurance.  Grace also procured "excess" coverage — *i.e.*, products and non-products coverage for liabilities that exceeded the policy limits of the primary coverage.  9/11/09 Tr. at 267-68 (Posner); PP Ex. 276 at 41-43.  As of December 31, 2008, there was approximately $916 million of excess

products/completed operations coverage for Asbestos PI Claims from 53 solvent insurance carriers.  PP Ex. 276 at 42-43.

3.49    Prior to bankruptcy, Grace entered into settlements with both Royal and Maryland Casualty regarding their primary coverage.  9/11/09 Tr. at 280 (Posner); PP Exs. 45 (Settlement Agreement between W.R. Grace and Maryland Casualty Company), 67 (Settlement Agreement between W.R. Grace and Royal Indemnity Company) & 700 ("Pre-Petition Insurance Settlements" Demonstrative).  As agreed to by the parties to the settlements, these settlements covered *both* the products and the non-products coverage available under those policies.  PP Ex. 45 at 19-20; PP Ex. 67 at 7.[2]  Given that the Royal and Maryland Casualty settlements resolved the non-products coverage, the only primary-layer "non-products" coverage remaining is under the Continental/CNA policies.  CNA, however, has declined to pay "non-products" claims, and has instituted a declaratory judgment action against Grace in New York with respect to the non-products coverage.  9/11/09 Tr. at 279 (Posner).  Thus, the accessibility of CNA's non-products coverage is, at best, disputed.

3.50    Nothing in the Continental/CNA policies, or any of the other policies, limits the non-products coverage to Grace facilities in Libby, Montana.  9/11/09 Tr. at 267-68 (Posner).  To the extent non-products coverage is available, the remaining non-products coverage applies equally to claims arising from operations and other non-products exposures, wherever located.  Id.

---

[2]    Additionally, at a hearing to approve a settlement on July 27, 2009, this Court concluded that the 1995 settlement agreement with Royal was "clear on its face" and evidenced an intent of the parties to settle the products and non-products coverage under the Royal policies.  7/27/09 Tr. at 136.

***The Libby Claimants Have No Exclusive Rights to Non-Products Coverage***

3.51    Grace and its predecessors purchased CGL insurance to protect their own assets and operations around the country and beyond.  9/11/09 Tr. at 267 (Posner).  In other words, they acquired the insurance for themselves, to protect their own assets.

3.52    When Grace filed for bankruptcy, its rights under the policies became property of the estate.  See 11 U.S.C. § 541; ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate."); accord Estate of Lellock v. Prudential Ins. Co. of Am., 811 F.2d 186, 189 (3d Cir. 1987); In re World Health Alternatives, Inc., 369 B.R. 805, 810 (Bankr. D. Del. 2007); see also Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 242 (3d Cir. 2001) (stating that definition of property of the estate under § 541 "encompasses rights and interests arising from ordinary contractual relationships").

3.53    There is nothing in the policies at issue that could sustain a claim that the Libby Claimants' asserted "rights" to Grace's policies are superior to those of any other asbestos claimant whose claims are covered by Grace's policies.  Nor have the Libby Claimants shown that they possess a lien on the non-products coverage for the proceeds thereof.

***Events Potentially Giving Rise to Non-Products Coverage Are Not Geographically Limited to Libby***

3.54    The Libby Claimants are not unique in having claims potentially covered by non-products insurance.  Grace had operations all over the United States that could give rise to "non-products"-type asbestos claims.  9/11/09 Tr. at 345-46 (Posner).

3.55    Grace shipped asbestos-containing vermiculite from Libby, Montana, to more than 200 processing sites across the country where, *inter alia*, the vermiculite was "expanded" so that it could be converted into products.  9/9/09 Tr. at 39-42 (Hughes); 9/8/09 Tr. at 120 (Welch).

At those expansion plants, and in the communities surrounding them, individuals were potentially exposed to asbestos-containing vermiculite from Libby.  9/8/09 Tr. at 170 (Welch); 9/9/09 Tr. at 111-12 (Hughes).

3.56   This exposure to Libby amphiboles as a result of "non-products" type exposures at sites remote from Libby leaves Grace — as, upon confirmation, it will leave the Trust — exposed to potential claims that involving allegations of asbestos exposures that may trigger "non-products" insurance coverage.

3.57   Prior to bankruptcy, Grace resolved asbestos claims asserted by individuals who were either employees or invitees onto Grace-owned premises outside Montana.  PP Exs. 506-2A (Resolved Grace Asbestos PI Claims Demonstrative), 506-3A (Resolved Grace Asbestos PI Claims Demonstrative); 9/9/09 Tr. at 150-53 (Hughes); 9/14/09 Tr. at 276 (Hughes).  Former Grace employees outside Libby have asserted claims against Grace, alleging injury from exposure to asbestos on its premises, as opposed to exposure to a finished asbestos-containing product.  PP Exs. 506-2A, 506-3A; 9/14/09 Tr. at 283 (Hughes).  These potential non-products claims outside Libby are also represented in the pending claimant pool.  See PP Ex. 630 (Affidavit of Terry L. Thiele).

3.58   In one prepetition case, a mesothelioma plaintiff, Dr. Dayton Prouty, whose father had worked in a Michigan exfoliation plant, alleged exposure to asbestos-containing vermiculite from Libby, Montana, due to, inter alia, playing near the plant and from his father's dirty clothes.  PP Ex. 118 (Prouty, Jerry Dell Davis, et al. v. Alde Supply Co., et al., 1/14/00 Dep. Tr.) at 6, 8, 11-22, 24-27; see also 9/14/09 Tr. at 276-77, 283 (Hughes).  Grace settled Dr. Prouty's asbestos-related claim for nearly $4 million.  See PP Ex. 506-2A; PP Ex. 513 (Summary Claims Data for Dayton L. Prouty, Jr. Resolved Asbestos PI Claim).

3.59    Another asbestos PI claimant, Eugene Gilman, alleges that he was exposed to asbestos-containing vermiculite at a Grace plant in Minneapolis, having played in vermiculite piles outside the plant as a child.  See PP Ex. 630.  Similarly, Terry Thiele lived less than a block from the Minneapolis plant, and testified that, as a child, he played in waste piles around the plant, including the loading docks and railroad tracks.  He described encountering broken bags of material around the loading docks and railcars, and stated that the dust from the plant settled onto homes, vehicles, laundry, and gardens.  See id.  While these claimants were prevented by the automatic stay from suing Grace post-petition, the post-consummation assertion of such non-Libby claims against the Trust could give rise to potential non-products coverage.

3.60    Additionally, Thomas F. Nordberg, who has a pending claim for his asbestosis, alleges that he was exposed to asbestos-contaminated vermiculite at the northwest expansion plant in Portland, Oregon in the late 1960s.  PP Ex. 630.

3.61    Because claimants, such as the ones described above, may allege that they were exposed to asbestos in connection with Grace's vermiculite-processing operations outside Libby, or were invitees on Grace-owned premises outside Libby, their allegations, if true, could give rise to claims that potentially would be covered by non-products insurance.  Given these extensive expansion plant operations outside Libby, the Libby Claimants are not the only potential "non-products claimants" that Grace faced or the Trust will process.

### Libby Claimants Have No Right of Direct Action Against Grace's Insurers

3.62    The Libby Claimants have suggested in pre-hearing pleadings that, under Montana law, they "would be entitled to pursue both Grace and its insurers for the full value of available insurance coverage in effect as of the time of the covered asbestos exposure."  Libby Obj. 90-91.  Montana law, however, recognizes a right of direct action against a defendant's insurance carrier only in very limited circumstances, none of which applies to the Libby claims.

As a general rule in Montana, "a direct action against an insurer does not lie until the liability of the insured has been established," unless the direct action has been "expressly sanctioned by the legislature and not merely inferentially deduced."   Ulrigg v. Jones, 907 P.2d 937, 943 (Mont. 1995) (citations omitted).

3.63    Here, the Libby Claimants have not yet established Grace's liability to them on their claims.  There is no evidence of any unpaid judgments from Libby.  See LC Ex. 271B (List of verdicts attached to set of discovery).   And, there are no unpaid settlements that have been consented to by CNA, the only primary carrier that potentially has any remaining non-products coverage.  9/11/09 Tr. at 278-79 (Posner).

3.64    Moreover, no Montana statute has been cited by the Libby Claimants that purports to vest them with a right of direct action against the insurance companies that have extended non-products coverage to Grace.  Without such "legislative sanction," the Libby Claimants have no right of direct action under Montana law.  See Ulrigg, 907 P.2d at 943-44.[3]

3.65    The Montana cases cited by the Libby Claimants are inapposite and cannot support their contentions.  See Plan Proponents' Phase II Trial Brief in Response to Confirmation Objections of the Libby Claimants, filed August 7, 2009 [D.I. 22731] ("PP Pre-Trial Libby Br.") at 52-53.

### The Plan's Use of the Asbestos Insurance Rights Satisfies Bankruptcy Code §§ 524(g) and 1123(a)(4)

3.66    In a 524(g) case, no asbestos PI claimant or class of such claimants should have exclusive access to insurance policies, to the detriment of other asbestos PI claimants who would

---

[3]    In Ulrigg, the Montana Unfair Trade Practices Act, Mont. Code Ann. § 33-18-242 (2008), was the "legislative sanction" allowing the direct action against the insurance carrier to occur.  The Libby Claimants have never cited the Montana Unfair Trade Practices Act as being the legal basis for their direct action or "vested rights" claims.

stand to receive a lesser pro rata share of recovery.  To ensure that all present claims and future demands are paid "in substantially the same manner," it is necessary to pool all of the debtors' insurance rights into the 524(g) trust.

3.67    Here, the Plan provides that, on the Effective Date, Grace and other Insurance Contributors will transfer their Asbestos Insurance Rights to the Asbestos PI Trust.  PP Ex. 277.01 § 7.2.2(d) (Plan); see also PP Ex. 277.06 REV (Asbestos Insurance Transfer Agreement); 9/8/09 Tr. at 60 (Inselbuch).  The Trust will then "step into the shoes" of Grace and the Insurance Contributors vis-à-vis the transferred Asbestos Insurance Rights.  Id.  Having assumed those rights, the Trust will pursue indemnity from the relevant insurance carriers for the Asbestos PI Claims channeled to it.  When paid to the Trust, those proceeds will join with the Trust's other assets and be available to pay Asbestos PI Claims generally.  See PP Ex. 277.01 § 1.1(46).  "The trust merges those [insurance] assets with all the other assets that it has under the plan . . . irrespective of the particular pattern of exposure that any individual plaintiff might have had historically . . . ."  9/8/09 Tr. at 60-61 (Inselbuch).  In this critical respect, the Trust's rights to liability insurance coverage and proceeds are exactly the same as its rights in any other asset of Grace that is transferred to the Trust under the Plan.

3.68    The Plan further contemplates the entry of a 11 U.S.C. § 105(a) injunction to protect Grace's non-settling insurance carriers from suit.  PP Ex. 277.01 § 8.4.  This is intended to ensure the orderly administration of the insurance rights and proceeds that are transferred to the Trust, and to prevent one or more claimants from receiving "100-cent dollars" as a recovery simply because they were able to find a way to sue the non-settling insurance carrier ahead of the Trust and its other claimant beneficiaries.  Lockwood 5/1/09 Dep. Tr. at 191-92.

3.69    The extent to which the Trust will be able to access Grace's insurance to pay some or all of the liability presented by any particular claim against the Trust will vary enormously depending in large part on the facts specific to that claim.  See 9/11/09 Tr. at 273-76 (Posner).   When Grace was a defendant in the tort system, the insurance companies would reimburse Grace for part or all of the cost of resolving any particular asbestos PI claim, and how much insurance would cover the cost of the claim turned on the unique facts applicable to that claim, such as the claimant's years of exposure to a Grace asbestos-containing product.  See id. For some claims, Grace received a substantial recovery from its insurance companies; for others, nothing or almost nothing.  Id.

3.70    The Trust's payments to claimants will be in the form of cash, which the Trust will have because it is funded by a variety of assets contributed by the Debtors or other parties on behalf of themselves and the other Asbestos Protected Parties in exchange for the channeling injunction that frees the Debtors from present and future asbestos claims.  Based on the estimated value of the Trust assets at any particular point in time as compared to the estimated value of the Trust liabilities at the same point in time, the Trust will pay the same pro-rata payment percentage of the value of each claim to all of the claimants whose claims are channeled to the Trust.   9/8/09 Tr. at 61 (Inselbuch).  Because the Trust uses the same procedures (the TDP) to liquidate all Class 6 claims, and pays them all the same pro-rata payment percentage, the Plan is able to satisfy the equal treatment provision of § 1123(a)(4).

### The Libby Claimants' Equal Treatment Objections Based on Their Claims to Grace's Insurance Coverage Lack Merit

3.71    Because the Libby Claimants have neither exclusive nor direct rights to the Debtors' non-products coverage, they are not giving up more valuable insurance rights than other Class 6 claimants in exchange for treatment under the Plan.  The Libby Claimants' reliance on In

re AOV Indus., 792 F.2d 1140, 1151-52 (D.C. Cir. 1986), is misplaced for the reasons set forth in the Plan Proponents' pre-trial brief.  See PP Pre-Trial Br. at 59-60.

3.72    As noted above, the Libby Claimants have no vested rights or rights of direct action against the insurance companies, and at the very least, they enjoy no unique rights against the non-products insurance coverage.  As such, all Asbestos Insurance Rights are property being transferred to the Trust where they will be asserted for the benefit of all Asbestos PI Claimants as required by the Bankruptcy Code.

3.73    Additionally, the Libby Claimants offered no proof that they would in fact be able to access the CNA non-products coverage — only that their allegations of exposure may give rise to non-products coverage if Grace or the Trust were able to prevail in coverage litigation with CNA, a showing completely absent from the record here.

## IV.    The Libby Claimants' Various Additional Objections to the Plan's Confirmability Lack Merit

### The Libby Claimants are Properly Classified as Class 6 Claimants

4.1    The Libby Claimants are properly classified as Class 6 Claimants because the legal character of their claims is substantially similar to that of the other Asbestos PI Claimants. Section 1122(a) of the Bankruptcy Code provides in pertinent part that "a plan may place a claim . . . in a particular class only if such claim . . . is substantially similar to the other claims . . . of such class."  11 U.S.C. § 1122(a).  In order to determine whether claims are "substantially similar" under § 1122(a), courts look to the "legal character" of the claims, particularly as they relate to the debtor's assets.  See, e.g., Combustion Eng'g, Inc., 391 F.3d at 244 n.63; In re Congoleum Corp., 362 B.R. 198, 203 (Bankr. D.N.J. 2007); In re Lisanti Foods, Inc., 329 B.R. 491, 510 (D.N.J. 2005).  A plan's classification thus satisfies § 1122 if the claims are "of equal

rank with each other, [and] against the same property . . . ." In re Martin's Point Ltd. P'ship, 12 B.R. 721, 725 (Bankr. N.D. Ga. 1981).

4.2    Indeed, courts often favor broadly defined and more general classes of unsecured claims to avoid the type of gerrymandering in the plan voting process that is possible with more narrowly defined or highly specific classes.  See, e.g., John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 158 (3d Cir. 1993) (holding the confirmation requirements would be seriously undermined if a debtor could gerrymander classes).

4.3    It is beyond dispute that all of the Class 6 claims, including those of the Libby Claimants, are unsecured, non-priority claims against the Debtors' estates, that arise directly or indirectly from personal injury caused by exposure to Grace's asbestos or asbestos-containing products.  On the Plan's Effective Date, all Class 6 claims will be channeled to the Asbestos PI Trust pursuant to § 524(g).  For these reasons, all Class 6 claims, including those of the Libby Claimants, are of the same legal character.  Their common attributes are sufficient to classify them together in Class 6.

4.4    The Libby Claimants' assertions that they have "different" asbestos-related diseases or "stronger and more valuable claims," even if true (which they are not, see Section III, supra) do not provide any basis for separate classification.  Courts have approved classes encompassing asbestos claims with far more significant differences than those the Libby Claimants assert here.  See, e.g., Quigley Co., 377 B.R. at 116 (settled and unsettled asbestos PI claimants classified together); In re Babcock & Wilcox, No. 00-10992, Reasons for Order at 4 (Bankr. E.D. La. Apr. 4, 2003) (same); In re Armstrong World Indus., Inc., 348 B.R. 136, 159-60 (D. Del. 2006) (upholding combined classification of asbestos-related PI claims arising under contract or tort law).  Moreover, the evidentiary strength of a claim or its value is wholly

unrelated to the nature of the legal character of the claim against the debtor.[4]  See e.g., In re Paolini, 312 B.R. 295, 314 (Bankr. E.D. Va. 2004) ("the existence of a dispute over claim validity does not support a separate classification"); In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 670 (Bankr. D.D.C. 1992) ("That the claims arise from different facts does not warrant separate classification").

4.5     Finally, the Libby Claimants are not entitled to separate classification on the basis of their alleged rights in the non-products insurance coverage.  As explained supra, the Libby Claimants hold no rights of direct action against Grace's insurance carriers, and, they are not the only claimants whose claims may potentially implicate Grace's "non-products" insurance coverage.  See Section III(c), supra.

4.6     As discussed above, insurance proceeds are generally part of the bankruptcy estate.  However, even if the Court were somehow to find that the Libby Claimants had access to insurance policies or proceeds outside the estate that other Class 6 claimants could not access (a finding we submit is impossible based on the record), that still would not justify a separate class for the Libby Claimants.  For classification purposes, it makes no difference if one group of

---

[4]     The Libby Claimants' argument that they require separate classification because only their claims demonstrate a "probability of death" that would entitle claims to future medical expenses is premised on an incorrect understanding of the law.  Generally, claims for future medical expenses require only a showing that such expenses will be reasonably certain to be incurred, not a probability of death.  See, e.g., Johns Hopkins Hosp. v. Pepper, 697 A.2d 1358, 1366 (Md. 1997) (the general rule is "that 'recovery of damages based on future consequences of an injury may be had . . . if such consequences are reasonably probable or reasonably certain' to occur."); National Freight, Inc. v. Snyder, 191 S.W.3d 416, 422 (Tex. App. 2006) ("To sustain an award of future medical expenses, the plaintiff must present evidence to establish that in all reasonable probability future medical care will be required and the reasonable cost of that care"); Stevens v. Gordon, 74 P.3d 653, 660 (Wash. Ct. App. 2003) ("Damages are awardable for medical expenses that are reasonably certain to be necessary in the future").  Moreover, the argument would require separate classification of claimants with fatal diseases such as mesothelioma and lung cancer, a result clearly at odds with the relevant precedent.

claimants can look to recourse outside the bankruptcy estate. Courts have consistently ruled that "[t]he fact that some members of the class may also look to third parties for payment, while others in the class do not have the same right, does not mandate separate classification." Quigley Co., 377 B.R. at 116; see also Route 37 Bus. Park Assocs., 987 F.2d at 161 (rejecting as "beside the point" the debtor's contention that Hancock should be classified separately from the trade creditors because Hancock had recourse against the debtor's general partners); AOV Indus., 792 F.2d 1151 ("The existence of a third-party guarantor does not change the nature of a claim *vis-à-vis* the bankrupt estate and, therefore, is irrelevant to a determination of whether claims are 'substantially similar' for classification purposes.").

### The Grace TDP Resolves Wrongful Death, Survival, and Consortium Claims in Accordance with the Bankruptcy Code's Mandate of Equal Treatment for Similarly Situated Claims

4.7    The Grace TDP properly resolves claims for wrongful death, survival, and loss of consortium. Most states allow a certain class of persons, usually the decedent's heirs, to bring a claim for wrongful death. See, e.g., Barragan v. Superior Ct., 470 P.2d 722, 724 (Ariz. Ct. App. 1970); Horwich v. Superior Ct., 980 P.2d 927, 935 (Cal. 1999). Further, many states have "survival" statutes, which allow the decedent's personal representative to continue with the decedent's personal injury claim, for the benefit of his or her estate. See, e.g., Thompson v. Wing, 637 N.E.2d 917, 920 (Ohio 1994). More than 30 states permit recovery for wrongful death actions and survival actions. Many states also recognize claims for loss of consortium. See, e.g., Bain v. Gleason, 726 P.2d 1153, 1155 (Mont. 1986). Mr. Hughes testified that "[v]irtually every case involving certainly a married plaintiff would have had an associated consortium claim," both in and outside of Libby, Montana. 9/9/09 Tr. at 87-88 (Hughes).

4.8    The Grace TDP treats all holders of claims for wrongful death, survival, and loss of consortium, whether they be from Libby or elsewhere, the same. See 9/8/09 Tr. at 69

(Inselbuch).  After the Plan becomes effective, all Asbestos PI Claims, including the personal injury claims preserved under the survival statutes, the wrongful death claims, and any other claims deriving from the disease claim, such as loss of consortium, will be channeled to the Asbestos PI Trust.  See PP Ex. 277 (Exhibit Book to the Plan) §§ 1.1.33, 1.1.34 & 8.2.1.  The TDP provides that all derivative claims, such as the wrongful death claims and the loss of consortium claims, will be subsumed in the personal injury claims, to minimize multiple recoveries for the same injury.  See 9/8/09 Tr. at 62-63, 102 (Inselbuch).  The "concept of the TDP is that there is one claim, one injury.  Various state laws will carve up rights to collect because of that injury among various entities.  We have, of course, the injured party himself or herself.  We have potentially loss of consortium claims.  If the person dies, there are wrongful death claims . . . But from the standpoint of the TDP, there is only one injury and we -- the trust pays once to cover all of those claims."  9/8/09 Tr. at 62 (Inselbuch).  The TDP was not modified to include separate categories and values for wrongful death and consortium only claims, as the Libby Claimants requested, because "it would create a multiplicity of differing calculations depending upon what the operative state law would be.  And in our judgment if you permitted for a multiplicity of claims by various people around the same tort or the same damage . . . the process costs would be imponderable."  Id. at 102.

4.9     The Grace TDP's process for resolving consortium claims emulates that used by defendants in the tort system.  "They seek to resolve the claim for the injury and put to rest whatever the various pieces of that claim might be at the same time . . . . There's a package of injury there that the TDP designs to pay once and provides the trust with the right to seek releases from whomever it might think might have such a claim."  9/8/09 Tr. at 102 (Inselbuch).  Mr. Hughes testified that Grace's Historical Claims' Database, PP Ex. 7 (W.R. Grace Historical

Case Management System Database), dealt with consortium claims as "sub-plaintiffs to individual case number, so they're considered one claim," and that the dollar value for any consortium settlement in that database was "always incorporated in the value that we show for the particular -- for the injured party." 9/9/09 Tr. at 87 (Hughes).

4.10    Individual review of consortium claims is available under the Grace TDP for claimants dissatisfied with the scheduled value of their claims. <u>See</u> PP Ex. 277.4 §§ 2.2 & 5.3(b); <u>see also</u> 9/8/09 Tr. at 62-63 (Inselbuch). In valuing the derivative claim under Individual Review, the Trust will take into account various factors, including household disruption and loss of consortium resulting from the decedent's asbestos-related disease. <u>See</u> PP Ex. 277.4 § 5.3(b)(2); <u>see also</u> 9/8/09 Tr. at 62-63 (Inselbuch). As a consequence, the values fixed by the Trust under the TDP will reflect, in appropriate cases, factors such as the claimant's death and the number of dependents, which are typical elements considered in resolving a wrongful death claim. <u>Id.</u>

4.11    The treatment of wrongful death, survival, and consortium claims under the TDP does not constitute "allowance" or "disallowance" of the claim, as the Libby Claimants have argued. Rather, as a practical matter, when the trust pays a claim through the ordinary settlement process, it obtains a release from any party who might bring a claim arising from the injury, including heirs and family members. 9/8/09 Tr. at 64-65 (Inselbuch). If not resolved by settlement through this claims process, however, such claims are not "disallowed" but would be dealt with by the Trust. The person with such a claim could settle with the Trust through the claims process, or seek individual review, arbitration, and ultimately litigate the claim against the Trust, subject to the appropriate caps.

### *The Grace TDP does not Provide for Payment of Punitive Damages in Order to Preserve the Assets of the Trust and Protect Future Claimants*

4.12     The Grace TDP's disallowance of punitive damages does not improperly discriminate against the Libby Claimants because it applies to all claimants, not just those from Libby.  See 9/8/09 Tr. at 51 (Inselbuch).  Mr. Hughes testified that "in virtually every case, barring exceptions based on state law, both inside Libby, outside Libby, there were claims for punitive damages asserted against the company."  See 9/9/09 Tr. at 88 (Hughes).  The Grace TDP does not provide for the payment of punitive damages to any Class 6 member (see PP Ex. 277.4 § 7.4), however, because no Class 6 member will receive full payment of their compensatory claims.  See 9/8/09 Tr. at 50-51 (Inselbuch).  Punitive damages are not included in the compensation scheme in order to protect the pro rata share concept of the trust, in keeping with the objectives of Section 524(g).  See 9/8/09 Tr. at 50-51 (Inselbuch).

### *The Limit on Jury Awards Included in the Grace TDP Does not Violate any Right Held by the Libby Claimants*

4.13     The Grace TDP's limit on the amount of damages that a jury may award does not violate the Bankruptcy Code.  The limits on jury verdicts applicable under the Grace TDP affect all Class 6 claimants the same way.  See PP Ex. 277.4 §§ 5.11 & 7.7; see also 9/8/09 Tr. at 34-35, 45-50 (Inselbuch).  In fact, nearly all verdicts and judgments in the tort system exceed the settlement values contemplated under this TDP.  See LC Ex. 271 (Chart re W.R. Grace Settlements); 9/15/09 Tr. at 175-77 (Peterson).  In that respect, the TDP will "cap out" all claimants, not just the Libby Claimants.  See 9/8/09 Tr. at 49 (Inselbuch) (testifying that the cap on judgments applies to all claimants).  Indeed, jury verdicts outside of Libby, Montana are higher than those in Libby.  9/8/09 Tr. at 241-43 (Peterson).

4.14     The Grace TDP's cap on jury damages does not unconstitutionally deprive the Libby Claimants of their Seventh Amendment right to a jury trial because the Libby Claimants

have waived that right.  Over 99% of Class 6, in which class the Libby Claimants are properly included, voted in favor of the Plan.  Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization at Ex. 1, August 5, 2009 [D.I. 22706].  If the Plan is ultimately confirmed, all members of that class will be bound by the Plan's terms, which will significantly alter their right to have a jury liquidate their claim in the tort system or their pre-consummation rights to a § 502 allowance proceeding.

4.15    Section 524(g) provides "supplemental injunctive relief" that not only discharges a debtor from its asbestos liability, but also establishes a mechanism, the 524(g) trust, to be governed by a TDP, for valuing and paying asbestos-related claims outside the bankruptcy case. See Combustion Eng'g, Inc., 391 F.3d at 234.  In order for § 524(g) injunctive relief to be available, a debtor must satisfy many requirements that "are specifically tailored to protect the due process rights of future claimants."  Id. at 234 n.45.  For example, before granting 524(g) relief, a court must determine that the channeling injunction is "fair and equitable" to future claimants.  § 524(g)(4)(B)(ii).  The court must also appoint a legal representative to represent the interests of future claimants.  § 524(g)(4)(B)(i).  Importantly, too, claimants whose claims are to be addressed by the trust are given a say as to whether the proposed injunction-trust arrangement is acceptable to them; the court cannot grant 524(g) relief unless these claimants vote by a 75% super-majority to accept the plan.  § 524(g)(2)(B)(ii)(IV)(bb).

4.16    Upon confirmation of a plan, a contract is created between the debtors and their creditors, binding all creditors to its terms, whether or not they voted to accept it.  See 11. U.S.C. § 1141(a); see also In re Montgomery Ward Holding Corp., 306 B.R. 489, 495 (Bankr. D. Del. 2004) (stating that upon confirmation "the plan becomes a legally binding agreement"); In re Monroe Well Serv., Inc., 80 B.R. 324, 334 (Bankr. E.D. Pa. 1987) ("The provisions of the

confirmed plan bind all creditors whether or not a particular creditor has voted to accept the plan."). When a section 524(g) plan becomes effective, the asbestos PI claims are channeled to the 524(g) trust, which is commanded by statute to "operate through mechanisms" that will "value" and "pay" such claims "in substantially the same manner." § 524(g)(2)(B)(ii)(V). Because the trusts, and not the courts, are bestowed the responsibility for valuing and paying present claims and future demands, it is clear that Congress intended the § 524(g) trusts to be an alternative to the tort system. Under a confirmed § 524(g) plan accepted by a supermajority of asbestos PI claimants, all such claimants are bound to the new, alternative mechanism for "valuing" and "paying" their claims.

4.17    The Grace TDP provides that all claimants, including the Libby Claimants, may elect to have a jury determine their claims in the tort system when the Grace TDP's mechanisms for facilitating a settlement have failed. See PP Ex. 277.4 §§ 2.2 & 5.1. The Grace TDP's jury caps do not violate the Libby Claimants' alleged right to have their claims "allowed" or liquidated in accordance with state law. Section 524(g) requires asbestos settlement trusts to employ "mechanisms" providing reasonable assurance that the trusts will "value" present claims and future demands "in substantially the same manner." § 524(g)(2)(B)(ii)(V). Section 524(g) mandates consistency when valuing similarly-situated claims. If the Libby Claimants were not subject to the TDP's caps, it is possible that they could theoretically obtain verdicts, judgments, or even settlement values larger than the values awarded to non-Libby claimants holding similar claims. 9/8/09 Tr. at 34-35 (Inselbuch). This is exactly the kind of disparate treatment § 524(g) is aimed at minimizing. Id. at 45-46.

4.18    The Grace TDP provision that would stretch out, over the course of six to 10 years, the payments to those who obtained judgments in the tort system post-confirmation

complies with the Bankruptcy Code because it applies to all Class 6 members, and not just the Libby Claimants.  See PP Ex. 277.4 § 7.7.  All claimants under the TDP will have the option to liquidate their claim by judgment in the tort system after pursuing Individual Review and non-binding arbitration.  9/8/09 Tr. at 45-47 (Inselbuch); PP Ex. 277.4 §§ 5.11 & 7.6.

4.19     Likewise, the Grace TDP's "first in, first out" ("FIFO") payment queue applies uniformly to all Asbestos PI Claims.  All claimants at the back of the FIFO queue (and all holders of future demands) bear the same risk that the Trust will end up with insufficient funds to pay them under the same payment percentage that applied to those claimants at the front of the FIFO queue.  See PP Ex. 277.4 §§ 2.5 & 5.1(a)(1).  That "risk" is not uniquely shouldered by the Libby Claimants, however.  And, in any event, § 524(g) requires all trusts to minimize that risk by employing "mechanisms," such as "matrices" and a "periodic review" of claims estimates, that will provide "reasonable assurance" that all present claims and future demands will be paid in substantially the same manner.  § 524(g)(2)(B)(ii)(V).  Finally, the Libby Claimants' argument that the queue treats present and future claims unequally presupposes a viable alternative. Suspending payment of claims for the decades the trust will be in existence and paying out only at the end of that period is neither realistic nor necessary.

## CONCLUSION

For all the reasons stated herein, the Plan Proponents respectfully request that this Court confirm the Plan and overrule the Libby Claimants' objections.

**[Signatures of counsel on following pages]**

Dated: November 2, 2009
Wilmington, Delaware

Respectfully submitted,


KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Barbara Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200

*and*

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

*and*


/s/ James E. O'Neill
PACHULSKI, STANG, ZIEHL & JONES LLP
Laura Davis Jones (#2436)
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC


/s/ Mark T. Hurford
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

*and*

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

*Counsel for the Official Committee*
*of Asbestos Personal Injury Claimants*


PHILIPS, GOLDMAN & SPENCE, P.A.


/s/ John C. Philips
John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

*and*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron

Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern,*
 *Asbestos PI Future Claimants' Representative*


SAUL EWING LLP


/s/ Teresa K.D. Currier
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone:  (302) 421-6800
Facsimile:  (302) 421-6813

*and*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone:  (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity*
*Security Holders*