IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date:  January 4-5, 2010 at 9:00 a.m.** |

**PLAN PROPONENTS' MAIN POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE <u>BANKRUPTCY CODE</u>**

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# TABLE OF CONTENTS

I.    THE JOINT PLAN HAS BEEN PROPOSED IN GOOD FAITH THEREBY
      SATISFYING SECTION 1129(a)(3) OF THE BANKRUPTCY CODE. ....................2

      1.1.    Proposed Finding ...............................................................................2

      1.2.    Argument  ...........................................................................................2

II.   CONFIRMATION OF THE JOINT PLAN IS NOT LIKELY TO BE
      FOLLOWED BY THE NEED FOR FURTHER FINANCIAL
      REORGANIZATION OR LIQUIDATION OF THE DEBTORS............................10

      2.1.    Proposed Finding .............................................................................10

      2.2.    The Evidence Demonstrates That The Joint Plan Is Feasible...............10

      2.3.    The Objections Are Without Merit ......................................................14

III.  THE DEBTORS HAVE SATISFIED THE BEST INTERESTS TEST. ...................17

      3.1.    Proposed Finding .............................................................................17

      3.2.    Application of the Best Interests Test in This Case Must be Tailored to
              Address the Disputed and Unliquidated Nature of Grace's Asbestos
              Liabilities, the Need to Preserve Grace's Full Value as An Ongoing
              Enterprise, and the Mandate of Section 524(g). ...................................17

              3.2.1.    Grace's Asbestos Liabilities Are Disputed and Uncertain. ................20

              3.2.2.    Chapter 7 Provides No Efficient or Effective Way to Litigate
                        Claims or Maximize Asset Value. ......................................................20

              3.2.3.    The Grace Chapter 11 Has Provided Mechanisms For
                        Maximizing Asset Value and Fixing the Amount of Liability. ..........21

              3.2.4.    The Overriding Goals of Section 524(g) Must Be
                        Accommodated. ..................................................................................22

      3.3.    Given These Basic Facts, the Prospects for Grace's Creditors in a Chapter
              7 Liquidation Must Be Heavily Discounted. ........................................25

      3.4.    The Joint Plan Satisfies the Best Interests Test. ...................................26

              3.4.1.    Grace's Assets Are More Valuable Under the Joint Plan With
                        Section 524(g) Protection Than They Would Be in a Chapter 7
                        Liquidation...........................................................................................26

3.4.2.   Personal Injury Claimants Will Receive 25% to 35% of Their Claims Under the Joint Plan. ...............................................................29

3.4.3.   Personal Injury Claimants in a Chapter 7 Liquidation Would Likely Receive Far Less Than They Will Receive Under the Joint Plan............................................................................................30

IV.   **THE JOINT PLAN'S CLASSIFICATION OF INDIRECT PI TRUST CLAIMS IN CLASS 6 SATISFIES THE REQUIREMENTS OF 11 U.S.C. § 1122(a).**...........................................................................................................**37**

4.1.   Proposed Finding ...............................................................................37

4.2.   Argument ...........................................................................................37

4.3.   Classification Objections Related to Grace's Operations at the Libby Mine ........39

4.3.1.   MCC.....................................................................................39

4.3.2.   Montana ...............................................................................41

4.3.3.   BNSF....................................................................................42

4.4.   Other Indirect PI Trust Claim Classification Objections.....................43

4.4.1.   Fireman's Fund ....................................................................43

4.4.2.   Longacre ..............................................................................44

4.4.3.   Seaton and OneBeacon .......................................................46

V.   **THE SUCCESSOR CLAIMS INJUNCTION IN SECTION 8.5 OF THE JOINT PLAN IS NECESSARY TO THE REORGANIZATION AND PERMITTED BY THIRD CIRCUIT LAW.**................................................**47**

5.1.   Proposed Finding ...............................................................................47

5.2.   Argument ...........................................................................................48

5.2.1.   The Court Has Subject Matter Jurisdiction to Issue the Successor Claims Injunction.....................................................48

5.2.2.   The Court Has the Authority Pursuant to Section 105 of the Bankruptcy Code to Issue the Successor Claims Injunction. .............53

5.2.3.   Seaton and OneBeacon are Barred by Principles of *Res Judicata* from Objecting to the Successor Claims Injunction. ............59

**VI.**     **THE ASBESTOS INSURANCE ENTITY INJUNCTION IS NECESSARY TO FULFILL THE JOINT PLAN'S PURPOSE OF EQUITABLE DISTRIBUTION BETWEEN CURRENT AND FUTURE CLAIMANTS, AND IS PERMISSIBLE UNDER THIRD CIRCUIT LAW........................................63**

      6.1.     Proposed Finding ....................................................................63

      6.2.     Argument ...............................................................................63

      6.3.     The Libby Claimants' Objections to the Insurance Injunction Are Without Merit ................................................................67

      6.4.     The Objections of BNSF and Certain Insurers to the Scope of the Insurance Injunction Are Moot in Light of Recent Amendments to the Joint Plan. ............................................................................69

**VII.**    **THE RELEASES AND EXCULPATION PROVISIONS IN THE JOINT PLAN ARE PROPER AND SHOULD BE APPROVED.............................................69**

      7.1.     Debtor and Committee Releases........................................................70

          7.1.1.     Proposed Finding ................................................................70

          7.1.2.     Argument ...........................................................................70

      7.2.     Certain Consensual Third Party Releases ...............................................72

          7.2.1.     Proposed Finding ................................................................72

          7.2.2.     Argument ...........................................................................72

          7.2.3.     Argument for Article 8.8.1 and 8.8.3  Releases of Sealed Air and Fresenius ...........................................................74

      7.3.     Exculpation ...........................................................................76

          7.3.1.     Proposed Finding ................................................................76

          7.3.2.     Argument ...........................................................................76

**VIII.**   **THE JOINT PLAN PROVIDES FOR EQUAL TREATMENT OF CLAIMANTS IN THE SAME CLASS IN SATISFACTION OF SECTION 1123(a)(4) OF THE BANKRUPTCY CODE. ........................................................78**

      8.1.     Proposed Finding ....................................................................78

      8.2.     Argument ...............................................................................78

IX.     THE INSURANCE COMPANIES ONLY HAVE STANDING TO OBJECT
        TO ISSUES THAT DIRECTLY AND PECUNIARILY AFFECT THEM. ..............79

        9.1.1.    Proposed Finding ................................................................79

        9.1.2.    Argument ...........................................................................79

X.      THE ASSIGNMENT OF ASBESTOS INSURANCE RIGHTS UNDER THE
        JOINT PLAN IS APPROPRIATE AND DOES NOT PROVIDE
        INSURANCE COMPANIES WITH A VALID OBJECTION TO
        CONFIRMATION. ......................................................................................80

        10.1.    The Bankruptcy Code Permits the Assignment of Asbestos Insurance
                 Rights Pursuant to the Joint Plan Despite Allegedly Contrary Anti-
                 Assignment Clauses in Insurance Policies...........................................80

                 10.1.1.    Section 1123(a)(5)  of the Bankruptcy Code Expressly
                            Preempts Any Anti-Assignment Clauses in the Applicable
                            Policies................................................................................81

                 10.1.2.    Section 1123(b)(3)(B)  of the Bankruptcy Code Also Permits
                            the Transfer of Asbestos Insurance Rights from Policies to the
                            Asbestos PI Trust. ..............................................................87

                 10.1.3.    Section 524(g) Impliedly Preempts Any Anti-Assignment
                            Clauses in the Policies. ......................................................88

        10.2.    The Bankruptcy Code Permits the Assignment of Asbestos Insurance
                 Rights Pursuant to a Plan Despite Allegedly Contrary Anti-Assignment
                 Clauses in Asbestos Insurance Reimbursement Agreements. ................89

                 10.2.1.    Section 7.2.2(d)(iv) is Appropriate. .....................................90

XI.     THERE HAS BEEN NO EVIDENCE PRESENTED TO SUPPORT THE
        ARGUMENT THAT THE TAC OF THE ASBESTOS PI TRUST SUFFERS
        FROM CONFLICTS OF INTEREST. ......................................................96

XII.    ALL OTHER REQUIREMENTS UNDER SECTIONS 1123 AND 1129 OF
        THE BANKRUPTCY CODE ARE SATISFIED.......................................97

        12.1.    Section 1129(a)(4) of the Bankruptcy Code. .......................................97

                 12.1.1.    Proposed Finding ................................................................97

                 12.1.2.    Argument ...........................................................................97

        12.2.    Section 1129(a)(1) of the Bankruptcy Code. .......................................98

                 12.2.1.    Proposed Finding ................................................................98

12.2.2.        Argument ..................................................................................98

12.3.    Section 1123(a)(1) of the Bankruptcy Code. ........................................99

12.3.1.        Proposed Finding ........................................................99

12.3.2.        Argument ....................................................................99

12.4.    Section 1123(a)(2) of the Bankruptcy Code. ........................................99

12.4.1.        Proposed Finding ........................................................99

12.4.2.        Argument ....................................................................99

12.5.    Section 1123(a)(6) of the Bankruptcy Code. ......................................100

12.5.1.        Proposed Finding ......................................................100

12.5.2.        Argument ..................................................................100

12.6.    Section 1123(a)(7) of the Bankruptcy Code. ......................................101

12.6.1.        Proposed Finding ......................................................101

12.6.2.        Argument ..................................................................101

12.7.    Section 1123(b)(2) and (3) of the Bankruptcy Code ..........................101

12.7.1.        Proposed Finding ......................................................101

12.7.2.        Argument ..................................................................102

12.8.    Section 1123(b)(6) of the Bankruptcy Code. ......................................102

12.8.1.        Proposed Finding ......................................................102

12.8.2.        Argument ..................................................................102

12.9.    Section 1129(a)(2) of the Bankruptcy Code ......................................103

12.9.1.        Proposed Finding ......................................................103

12.9.2.        Argument ..................................................................103

12.10.    Section 1129(a)(6) of the Bankruptcy Code. ....................................104

12.10.1.        Proposed Finding ..................................................104

12.10.2.        Argument ..............................................................104

12.11.  Section 1129(a)(9) of the Bankruptcy Code ......................................104

    12.11.1.  Proposed Finding ...............................................104

    12.11.2.  Argument ...........................................................104

12.12.  Section 1129(a)(10) of the Bankruptcy Code ...................................105

    12.12.1.  Proposed Finding ...............................................105

    12.12.2.  Argument ...........................................................105

12.13.  Section 1129(a)(12) of the Bankruptcy Code ...................................106

    12.13.1.  Proposed Finding ...............................................106

    12.13.2.  Argument ...........................................................106

12.14.  Section 1129(a)(13) of the Bankruptcy Code ...................................106

    12.14.1.  Proposed Finding ...............................................106

    12.14.2.  Argument ...........................................................106

XIII.  **THE JOINT PLAN COMPLIES WITH ALL REMAINING PROVISIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE.**...................................**107**

13.1.  As of the Effective Date, the Asbestos PI and PD Trusts shall be created. .........107

    13.1.1.  Proposed Finding ...............................................107

    13.1.2.  Argument ...........................................................107

13.2.  The Debtors Have Been Named as Defendants in Personal Injury, Wrongful Death, and Property Damage Actions Seeking Recovery for Damages Allegedly Caused By the Presence of, or Exposure to, Asbestos or Asbestos-Containing Products.......................................................108

    13.2.1.  Proposed Finding ...............................................108

    13.2.2.  Argument ...........................................................108

13.3.  Pursuant to the Joint Plan, the Asbestos PI and PD Trusts Are to Assume the Liabilities of the Debtors With Respect to All Asbestos PI and PD Claims, and the CDN ZAI PD Claims Fund Is to Assume the Liabilities of the Debtors With Respect to All CDN ZAI PD Claims.......................................109

    13.3.1.  Proposed Finding ...............................................109

13.3.2.    Argument ............................................................................109

13.4.    The Asbestos PI and PD Trusts Are to Be Funded in Part By Securities of the Reorganized Parent and By the Obligation of the Reorganized Parent to Make Future Payments. ..................................................................110

    13.4.1.    Proposed Finding ..............................................................110

    13.4.2.    Argument ............................................................................110

13.5.    The Asbestos PI Trust and the Asbestos PD Trust Will Own a Majority of the Voting Shares of the Reorganized Parent Under Specified Contingencies....................................................................................112

    13.5.1.    Proposed Finding ..............................................................112

    13.5.2.    Argument ............................................................................112

13.6.    The Asbestos PI and PD Trusts Will Pay Claims and Demands, and the CDN ZAI PD Claims Fund Will Use the Funds Identified in the CDN MInutes of Settlement to Pay CDN ZAI PD Claims and Expenses. ..................113

    13.6.1.    Proposed Finding ..............................................................113

    13.6.2.    Argument ............................................................................113

13.7.    Grace is likely to be subject to substantial future Asbestos PI and PD Demands, of which the actual amounts, numbers, and timing cannot be determined..............................................................................................114

    13.7.1.    Proposed Finding ..............................................................114

    13.7.2.    Argument ............................................................................114

13.8.    Pursuit of PI, PD, and CDN ZAI PD Demands Outside the Procedures Described By the Joint Plan is Likely to Threaten the Joint Plan's Purpose to Deal Equitably With the Asbestos PI, PD, and CDN ZAI PD Claims............117

    13.8.1.    Proposed Finding ..............................................................117

    13.8.2.    Argument ............................................................................118

13.9.    The Terms of the Asbestos PI and PD Channeling Injunction, Including All Provisions Barring Actions Against Third Parties, Are Set Out in the Joint Plan and Disclosure Statement................................................119

    13.9.1.    Proposed Finding ..............................................................119

    13.9.2.    Argument ............................................................................119

13.10.  Separate Classes of Claimants Whose Claims Are to Be Addressed By the PD and PI Trusts Have Been Established, and Have Voted, By at Least 75% of Those Voting, In Favor of the Joint Plan. ...............................................120

    13.10.1.  Proposed Finding ...........................................................120

    13.10.2.  Argument .......................................................................120

13.11.  The Asbestos PI Trust's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner....................120

    13.11.1.  Proposed Finding ...........................................................120

    13.11.2.  Argument .......................................................................121

13.12.  The Asbestos PD Trust's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner, and the CDN ZAI PD Claims Fund's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner....................124

    13.12.1.  Proposed Finding ...........................................................124

    13.12.2.  Argument .......................................................................125

13.13.  The Sealed Air Indemnified Parties Are Appropriately Included Within the Asbestos PI and Asbestos PD Channeling Injunctions.................................126

    13.13.1.  Proposed Finding ...........................................................126

    13.13.2.  Argument .......................................................................127

13.14.  The Fresenius Indemnified Parties Are Appropriately Included Within the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction. ...................................................................................................131

    13.14.1.  Proposed Finding ...........................................................131

    13.14.2.  Argument .......................................................................131

13.15.  The Remaining Asbestos Protected Parties Are Appropriately Included in the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction. ...................................................................................................136

    13.15.1.  Proposed Finding ...........................................................136

    13.15.2.  Argument .......................................................................136

13.16.  The Asbestos PI and PD FCRs Have Been Appointed By the Bankruptcy
Court, and CCAA Representative Counsel Has Been Appointed By the
Canadian Court. ................................................................................................138

    13.16.1.    Proposed Finding ...........................................................................138

    13.16.2.    Argument .......................................................................................139

13.17.  Identifying Each of the Entities In the Asbestos PI Channeling Injunction
Is Fair and Equitable, With Respect to the Parties That Might
Subsequently Assert Demands, In Light of the Benefits to Be Provided to
the Asbestos PI Trust on Behalf of Such Entities. .............................................139

    13.17.1.    Proposed Finding ...........................................................................139

    13.17.2.    Argument .......................................................................................140

13.18.  Identifying Each of the Entities in the Asbestos PD Channeling Injunction
Is Fair and Equitable, With Respect to the Parties That Might
Subsequently Assert Demands, in Light of the Benefits to Be Provided to
the Asbestos PD Trust on Behalf of Such Entities. ............................................142

    13.18.1.    Proposed Finding ...........................................................................142

    13.18.2.    Argument .......................................................................................143

**XIV.  THE COURT HAS JURISDICTION OVER EACH CLAIM THAT IS
ENJOINED OR RELEASED UNDER THE JOINT PLAN -- PLAN § 7.7(R). ......144**

14.1.  Proposed Finding .................................................................................................144

14.2.  Argument ..............................................................................................................144

**XV.  CERTAIN ADDITIONAL CONDITIONS TO PLAN CONFIRMATION
ARE NOT IN DISPUTE...........................................................................................146**

15.1.  Plan § 7.7(e). ........................................................................................................146

    15.1.1.    Proposed Finding: ..........................................................................146

    15.1.2.    Supporting Evidence .....................................................................147

15.2.  Plan § 7.7(m)........................................................................................................147

    15.2.1.    Proposed Finding: ..........................................................................147

    15.2.2.    Supporting Evidence .....................................................................147

15.3.  Plan § 7.7(s). ........................................................................................................148

15.3.1.    Proposed Finding ...................................................................148

15.3.2.    Supporting Evidence ..............................................................148

15.4.    Plan § 7.7(t)......................................................................................149

15.4.1.    Proposed Finding: ................................................................149

15.4.2.    Supporting Evidence ..............................................................149

15.5.    Plan § 7.7(u)......................................................................................149

15.5.1.    Proposed Finding ...................................................................149

15.5.2.    Supporting Evidence ..............................................................150

15.6.    Plan § 7.7(v)......................................................................................151

15.6.1.    Proposed Finding: ................................................................151

15.6.2.    Supporting Evidence ..............................................................151

15.7.    Plan § 7.7(w).....................................................................................152

15.7.1.    Proposed Finding: ................................................................152

15.7.2.    Supporting Evidence ..............................................................153

15.8.    Plan § 7.7(x)......................................................................................154

15.8.1.    Proposed Finding: ................................................................154

15.8.2.    Supporting Evidence ..............................................................154

15.9.    Plan § 7.7(y)......................................................................................155

15.9.1.    Proposed Finding ...................................................................155

15.9.2.    Supporting Evidence ..............................................................156

15.10.  Plan § 7.7(z)......................................................................................156

15.10.1.    Proposed Finding .................................................................156

15.10.2.    Supporting Evidence ...........................................................157

15.11.  Plan § 7.7(cc). ..................................................................................157

15.11.1.    Proposed Finding: ..............................................................157

15.11.2.    Supporting Evidence ...................................................................157

15.12.  Plan § 7.7(ww)..............................................................................................158

15.12.1.    Proposed Finding .........................................................................158

15.12.2.    Supporting Evidence ...................................................................158

15.13.  Plan § 7.7(xx)................................................................................................158

15.13.1.    Proposed Finding: .......................................................................158

15.13.2.    Supporting Evidence ...................................................................159

15.14.  Plan § 7.7(yy)................................................................................................159

15.14.1.    Proposed Finding: .......................................................................159

15.14.2.    Supporting Evidence ...................................................................159

XVI.   **CERTAIN ADDITIONAL FORWARD-LOOKING REQUIREMENTS SHOULD BE INCLUDED IN THE CONFIRMATION ORDER TO COMPLY WITH THE REQUIREMENTS OF SECTION 7.7 OF THE JOINT PLAN . ..................................................................................159**

16.1.   Plan § 7.7(aa) ................................................................................................160

16.2.   Plan § 7.7(bb)................................................................................................160

16.3.   Plan § 7.7(dd)................................................................................................161

16.4.   Plan § 7.7(ee) ................................................................................................161

16.5.   Plan § 7.7(ff) .................................................................................................162

16.6.   Plan § 7.7(gg)................................................................................................163

16.7.   Plan § 7.7(hh)................................................................................................163

16.8.   Plan § 7.7(ii).................................................................................................164

16.9.   Plan § 7.7(jj).................................................................................................164

16.10.  Plan § 7.7(kk)................................................................................................165

16.11.  Plan § 7.7(ll).................................................................................................165

16.12.  Plan § 7.7(mm)..............................................................................................165

16.13.  Plan § 7.7(nn) .................................................................................................. 166

16.14.  Plan § 7.7(oo) .................................................................................................. 166

16.15.  Plan § 7.7(pp) .................................................................................................. 167

16.16.  Plan § 7.7(qq) .................................................................................................. 167

16.17.  Plan § 7.7(rr) ................................................................................................... 168

16.18.  Plan § 7.7(ss) ................................................................................................... 168

16.19.  Plan § 7.7(tt) ................................................................................................... 168

16.20.  Plan § 7.7(uu) .................................................................................................. 168

16.21.  Plan § 7.7(vv) .................................................................................................. 169

16.22.  Plan § 7.7(zz) .................................................................................................. 169

# TABLE OF AUTHORITIES

**Cases**

Aaron Clifton Edwards v. Pittsburgh Corning Corp.,
     Case No. B-150, 896J (Tex. D. Ct. March 28, 2000) ........................................ 44

Adler v. Jones,
     109 F. 967 (6th Cir. 1901) ........................................................................ 18

Andreiu v. Ashcroft,
     253 F.3d 477 (9th Cir. 2001) ..................................................................... 25

Celotex Corp. v. Edwards,
     514 U.S. 300 (1995)................................................................................ 48, 63

Chemetron Corp. v. Jones,
     72 F.3d 341 (3rd Cir. 1995) ...................................................................... 60

Cisneros v. Alpine Ridge Group,
     508 U.S. 10 (1993)............................................................................ 82, 83, 84

Egelhoff v. Egelhoff ex rel. Breiner,
     532 U.S. 141 (2001)................................................................................. 83

Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,
     541 U.S. 246 (2004)................................................................................. 83

First Fidelity Bank v. McAteer,
     985 F.2d 114 (3d Cir. 1993)....................................................................... 92

Fleischmann & Devine, Inc. v. Saul Wolfson Dry Goods Co.,
     299 F. 15 (5th Cir. 1924) .......................................................................... 18

Gen. Elec. Credit Equities, Inc. v. Brice Rd. Dev., L.L.C. (In re Brice Rd. Dev., L.L.C.),
     392 B.R. 274 (B.A.P. 6th Cir. 2008)............................................................. 11

Hartford Accident & Indem. Co. v. Global Indus. Techs.,
     2008 U.S. Dist. LEXIS 108185 (W.D. Pa. July 25, 2008) ............................... 64

In re ABB Lummus Global, Inc.,
     No. 06-10401 (JKF), WL 2052409 (Bankr. D. Del. June 29, 2006) .................. 5

In re American Family Enters.,
     256 B.R. 377 (D. N. J. 2000) ................................................................. 53, 64

In re Armstrong World Indus., Inc.,
     348 B.R. 136 (D. Del. 2006).............................................................. 38, 142

In re Asbestos Claims Mgmt. Corp.,
    294 B.R. 663 (N.D. Tex. 2003).......................................................... 38

In re Babcock & Wilcox Co.,
    2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004) .................................... 89, 92

In re Babcock & Wilcox Co.,
    2005 WL 4982364 (E.D. La. Dec. 28, 2005).................................... 89

In re Burns and Roe Enters. Inc.,
    2009 WL 438694 (D.N.J. Feb. 23, 2009) ........................................ 38

In re Carolina Tobacco Co.,
    360 B.R. 702 (D. Or. 2007) ......................................................... 84

In re Celotex Corp.,
    204 B.R. 586 (M.D. Fla. 1996) .................................................... 38

In re Century Glove, Inc.,
    Nos. Civ. A. 90-400 SLR, 1993 WL 239489 (Bankr. D. Del. 1993) ................................. 6

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004).................................................... 82, 84

In re Continental Airlines,
    203 F. 3d 203 (3rd Cir. 2000) .............................................. 53, 57, 64

In re Coram Healthcare Corp.,
    315 B.R. 321 (Bankr. D. Del. 2004) .................................... 70, 71, 74

In re Dow Corning Corp.,
    280 F.3d 648 (6th Cir. 2002) ................................................ 53

In re Drexel Burnham Lambert Group, Inc.,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)............................................. 5

In re Eagle-Picher Indus.,
    189 B.R. 681 (Bankr. S.D. Ohio 1995)........................................... 23

In re Eagle-Picher Indus., Inc.,
    172 F.3d 48 (6th Cir. 1998) ....................................................... 23

In re Eagle-Picher Indus., Inc.,
    1996 U.S. Dist. LEXIS 22742 (S.D. Ohio 1996)........................................ 23

In re Eagle-Picher Indus., Inc.,
    203 B.R. 256 (Bankr. S.D. Ohio 1996)...................................... 23, 24

In re Exide Techs.,
    303 B.R. 48 (Bankr. D. Del. 2003) .......................................................................... 64, 72

In re FCX, Inc.,
    853 F.2d 1149 (4th Cir. 1988) ...................................................................................... 84

In re Federal- Mogul Global, Inc.
    2007 WL 4180545 (Bank. D. Del. Nov. 16, 2007)................................................. 38, 142

In re Federal-Mogul Global, Inc.,
    300 F.3d 368 (3rd Cir. 2002) ........................................................................................ 52

In re Federal-Mogul Global, Inc.,
    385 B.R. 560 (Bankr. D. Del. 2008) .............................................................................. 88

In re Federal-Mogul Global, Inc.,
    Case No. 01-10578 (Bankr. D. Del. Nov. 8, 2007).......................................................... 65

In re Great Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D.N.J. 2000) ................................................................................ 11

In re Indian Palms Assocs., Ltd.,
    61 F.3d 197 (3d Cir. 1995).............................................................................................. 86

In re Johns-Manville Corp.,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ........................................................................... 103

In re Johns-Manville Corp.,
    78 B.R. 407 (S.D.N.Y. 1987)........................................................................................ 103

In re Kaiser Aluminum Corp.,
    343 B.R. 88 (D. Del. 2006)...................................................................................... 83, 141

In re Kellogg Square Partnership,
    160 B.R. 343 (Bankr. D. Minn. 1993) ............................................................................ 19

In re Lason, Inc.,
    300 B.R. 227 (Bankr. D. Del. 2003) ............................................................................... 19

In re Moore,
    290 B.R. 851 (Bankr. N.D. Ala. 2003) ........................................................................... 86

In re New Valley Corp.,
    168 B.R. 73 (Bankr. D.N.J. 1994) .................................................................................... 2

In re North American Refractories Co.,
    2007 Bankr. LEXIS 4721 (W.D. Pa., Nov. 13, 2007) ......................................... 53, 58, 64

In re Owens Corning,
    Case No. 00-03837 (Bankr. D. Del. Sept. 26, 2006) ...................................................... 65

In re Porter Hayden Co.,
    2006 WL 4667137 (Bank. D. Md. June 30, 2006) ........................................................ 38

In re Prussia Assoc.,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...................................................................... 53, 64

In re PWS Holding Corp.,
    228 F. 3d 224 (3d Cir. 2000).................................................................................... 2, 76

In re Sierra-Cal,
    210 B.R. 168 (Bankr. E.D. Cal. 1997)................................................................... 19, 20

In re Smidth & Co.,
    2009 Bankr. LEXIS 780 (Bankr. D. Del., March 16, 2009)........................................... 59

In re Tate,
    253 B.R. 653 (Bankr. W.D.N.C. 2000)............................................................... 89

In re Texaco Inc.,
    84 B.R. 893, 905 (Bankr. S.D.N.Y.) ........................................................................ 98

In re Texaco Inc.,
    92 B.R. 38 (S.D.N.Y. 1988)................................................................................ 98

In re Thorpe Insulation Co.,
    No. 07-19271 (Bankr. C.D. Cal. Apr. 2, 2009)......................................................... 89

In re USG Corp.,
    Case No. 01-2094 (Bankr. D. Del. June 16, 2006) ......................................................... 65

In re W. R. Grace & Co. (W. R. Grace & Co. v. Chakarian),
    315 B.R. 353 (Bankr. D. Del. 2004) ............................................................. 50, 51, 52

In re Western Asbestos Co.,
    313 B.R. 456 (Bankr. N.D. Cal. 2004) .......................................................... 84

Integrated Solutions, Inc. v. Service Support Specialties, Inc.,
    124 F.3d 487 (3d Cir. 1997).................................................................................. 83

Kane v. Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988).................................................................................. 103

Kawaauhau v. Geiger,
    523 U.S. 57 (1998)............................................................................................. 85

*Lamie v. U.S. Trustee,*
    540 U.S. 526 (2004)................................................................................. 85

*MacArthur Co. v. Johns-Manville Corp.,*
    837 F.2d 89 (2d Cir. 1988)...................................................................... 64

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950)................................................................................. 60

*Nevada v. United States,*
    463 U.S. 110 (1983)................................................................................. 59

*Pacific Gas & Elec. Co. v. California,*
    350 F.3d 932 (9th Cir. 2003) ................................................................. 84

*Pacor, Inc. v. Higgins,*
    743 F.2d 984 (3rd Cir. 1984) ............................................... 48, 50, 63

*Top Hat, Ltd. v. Aurora Foods, Inc. (In re Aurora Foods, Inc.),*
    2006 U.S. Dist. LEXIS 91659 (D. Del. Dec. 19, 2006)................... 19

*Travelers Indem. Co. v. Bailey,*
    129 S.Ct. 2195 (2009)...................................................................... 59, 76

*Tulsa Professional Collection Services v. Pope,*
    485 U.S. 478 (1988)................................................................................. 59

*United States v. Ron Pair Enters., Inc.,*
    489 U.S. 235 (1989)................................................................................. 85

*United States v. Wilson,*
    503 U.S. 329 (1992)................................................................................. 25

*W.R. Grace & Co. v. Chakarian,*
    386 B.R 17 (Bankr. D. Del. 2008) ...................................................... 43

**Statutes**

11 U.S.C § 502(e) .......................................................................................... 123

11 U.S.C. § 101(49)(A)(i).............................................................................. 111

11 U.S.C. § 105 ............................................................................................... 139

11 U.S.C. § 105(a) ................................................................................... passim

11 U.S.C. § 1109 ............................................................................................. 139

11 U.S.C. § 1114.............................................................................................. 106

11 U.S.C. § 1114(a) ................................................................................................. 106

11 U.S.C. § 1122 ................................................................................................. 1, 98

11 U.S.C. § 1122(a) ........................................................................................... 37, 38

11 U.S.C. § 1123 ................................................................................................. 1, 98

11 U.S.C. § 1123(a) ...................................................................................... 83, 85, 86

11 U.S.C. § 1123(a)(1) ............................................................................................ 99

11 U.S.C. § 1123(a)(2) ............................................................................................ 99

11 U.S.C. § 1123(a)(4) ....................................................................................... 78, 79

11 U.S.C. § 1123(a)(5) ..................................................................................... passim

11 U.S.C. § 1123(a)(5)(B) .......................................................................... 81, 82, 83, 87

11 U.S.C. § 1123(a)(5)(F) ........................................................................................ 86

11 U.S.C. § 1123(a)(5)(G) ....................................................................................... 86

11 U.S.C. § 1123(a)(5)(H) ....................................................................................... 86

11 U.S.C. § 1123(a)(6) .......................................................................................... 100

11 U.S.C. § 1123(a)(7) .......................................................................................... 101

11 U.S.C. § 1123(b)(2) .................................................................................... 101, 102

11 U.S.C. § 1123(b)(3) ................................................................................. 88, 101, 102

11 U.S.C. § 1123(b)(3)(A) ................................................................................. 70, 74

11 U.S.C. § 1123(b)(3)(B) ......................................................................... 81, 87, 91, 92

11 U.S.C. § 1123(b)(6) .......................................................................................... 102

11 U.S.C. § 1124 .................................................................................................... 1

11 U.S.C. § 1125 .................................................................................................. 103

11 U.S.C. § 1129 .................................................................................................... 1

11 U.S.C. § 1129(a)(1) ................................................................................... 81, 98, 99

11 U.S.C. § 1129(a)(10) ......................................................................................... 105

11 U.S.C. § 1129(a)(11)................................................................................................ 11, 14

11 U.S.C. § 1129(a)(12)...................................................................................................... 106

11 U.S.C. § 1129(a)(13).............................................................................................. 106, 107

11 U.S.C. § 1129(a)(2)........................................................................................................ 103

11 U.S.C. § 1129(a)(3)................................................................................................... passim

11 U.S.C. § 1129(a)(4)................................................................................................... 97, 98

11 U.S.C. § 1129(a)(6)........................................................................................................ 104

11 U.S.C. § 1129(a)(7)........................................................................................ 17, 19, 23, 25

11 U.S.C. § 1129(a)(9).............................................................................................. 104, 105

11 U.S.C. § 1322(c)(1).......................................................................................................... 86

11 U.S.C. § 1334(b)............................................................................................................ 145

11 U.S.C. § 327.................................................................................................................... 139

11 U.S.C. § 363...................................................................................................................... 83

11 U.S.C. § 363(l)................................................................................................................. 83

11 U.S.C. § 365.................................................................................................................... 168

11 U.S.C. § 365(c)(3)............................................................................................................ 86

11 U.S.C. § 365(n)(1)(B)...................................................................................................... 86

11 U.S.C. § 507(a)(2)............................................................................................................ 99

11 U.S.C. § 507(a)(3)............................................................................................................ 99

11 U.S.C. § 507(a)(8)............................................................................................................ 99

11 U.S.C. § 510...................................................................................................................... 20

11 U.S.C. § 524(e)................................................................................................................. 92

11 U.S.C. § 524(g).......................................................................................................... passim

11 U.S.C. § 524(g)(1)(B).............................................................................................. 138, 145

11 U.S.C. § 524(g)(2)(B)(i)................................................................................................. 107

11 U.S.C. § 524(g)(2)(B)(i)(I) ................................................................ 108, 109

11 U.S.C. § 524(g)(2)(B)(i)(II) .............................................................. 110, 111

11 U.S.C. § 524(g)(2)(B)(i)(III)..................................................................... 112

11 U.S.C. § 524(g)(2)(B)(i)(IV) .................................................................... 113

11 U.S.C. § 524(g)(2)(B)(ii)(I) .............................................................. 114, 117

11 U.S.C. § 524(g)(2)(B)(ii)(II) .................................................................... 115

11 U.S.C. § 524(g)(2)(B)(ii)(III).......................................................... 117, 118

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa) ............................................................ 119

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)............................................................ 120

11 U.S.C. § 524(g)(2)(B)(ii)(V)................................................... 22, 24, 25, 121

11 U.S.C. § 524(g)(3)(A) ............................................................................... 136

11 U.S.C. § 524(g)(3)(A)(ii) .......................................................................... 137

11 U.S.C. § 524(g)(3)(A)(II).......................................................................... 137

11 U.S.C. § 524(g)(3)(A)(III) ........................................................................ 137

11 U.S.C. § 524(g)(4)(A)(ii) ..................................................................... passim

11 U.S.C. § 524(g)(4)(A)(ii)(I) .............................................. 130, 133, 135, 137

11 U.S.C. § 524(g)(4)(A)(ii)(II)..................................................................... 137

11 U.S.C. § 524(g)(4)(A)(ii)(III) ............................................................ 67, 137

11 U.S.C. § 524(g)(4)(A)(ii)(IV) ................................................................... 133

11 U.S.C. § 524(g)(4)(B)(i) ........................................................................... 139

11 U.S.C. § 524(g)(4)(B)(ii) ......................................................... 140, 141, 142

11 U.S.C. § 541(c) ........................................................................................... 83

11 U.S.C. § 541(c)(1)....................................................................................... 81

11 U.S.C. § 704................................................................................................ 83

11 U.S.C. § 723................................................................................................ 20

11 U.S.C. § 728(b) ..................................................................................................... 83

140 Cong. Rec. H10,764 .......................................................................................... 25

140 Cong. Rec. H10,765 .......................................................................................... 25

140 Cong. Rec. H10,772 (1994) .............................................................................. 25

28 U.S.C. § 1334(b) ................................................................................................. 63

28 U.S.C. § 1930 ...................................................................................................... 106

Bankruptcy Rule 3016(c) ............................................................................... 119, 147, 148

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) .............................................. 103

H.R. Rep. No. 595, 95th Cong., 2d Sess. 126 (1977) ................................................ 98

S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978) .................................................... 103

**Other Authorities**

4 Collier on Bankruptcy ¶ 524.07[2] (15th ed. 2005) .............................................. 112

7 Collier on Bankruptcy ¶ 1129.03[7][b][iii] ........................................................... 19

7 Collier on Bankruptcy ¶ 1129.03[7][e] (15th ed. 2004) ....................................... 18

The above-captioned debtors (the "Debtors"), together with the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Equity Security Holders, and the Asbestos PI Future Claimants' Representative (collectively, the "Plan Proponents"), hereby submit this Main Post-Trial Brief in support of confirmation of their First Amended Joint Plan of Reorganization (as amended, the "Joint Plan").[2]

## PRELIMINARY STATEMENT

The evidence adduced at the Confirmation Hearing establishes that the Joint Plan complies with all relevant sections of the Bankruptcy Code including sections 1122, 1123, 1124, 1129 and 524(g). In addition, the provisions of the Joint Plan addressing the transfer of Asbestos Insurance Rights and the treatment of Asbestos Insurance Reimbursement Agreements are fully appropriate,[3] the release and exculpation provisions in the Joint Plan are entirely appropriate, the injunctions pursuant to § 105(a) are necessary and appropriate, and the evidence supports the conditions to confirmation set forth in section 7.7 of the Joint Plan.

This brief sets forth the legal arguments in order to present this evidence in context, arguments which are set forth more fully in the Plan Proponents' Pretrial Phase II Insurance

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Joint Plan. The "Insurance Companies" are the Insurers who filed objections to the Joint Plan and have not yet settled. Citations in this brief take the following form: (1) Plan Proponents' Exhibits -- PP Ex. ____(description); (2) various Plan Objectors' Exhibits -- [Name of Objector] Ex. ____(description); (3) trial transcripts -- [date] Tr. [page number] [witness name]; prior briefs of Plan Proponents -- PP [short form name of brief]; prior briefs of Plan Objectors -- [short form name of Objector, followed by short form name of brief].

[3]  Certain other concerns and objections noted in the PP Pretrial Phase II Ins. Br. were raised only by insurance companies who have now settled and/or have already been shown to be baseless by the PP Pretrial Phase II Ins. Br., and will be further responded to only as appropriate if the Insurance Companies continue to raise such objections in their post-trial briefs.

Brief (Dkt. No. 22728) ("PP Pretrial Phase II Ins. Br.") and the Plan Proponents' Pretrial Phase II

"Main" Brief in support of confirmation (Dkt. No. 22733) ("PP Pretrial Phase II Main Br.").  Per

this Court's instructions, this brief does not reiterate all of the law and analysis from the pretrial

briefs, but incorporates those briefs by reference as if fully set forth herein.

## ARGUMENT

**I.    THE JOINT PLAN HAS BEEN PROPOSED IN GOOD FAITH THEREBY SATISFYING SECTION 1129(a)(3) OF THE BANKRUPTCY CODE.**

### 1.1.    Proposed Finding

The Joint Plan has been proposed in good faith and not by any means forbidden by law.

### 1.2.    Argument

Under 11 U.S.C. § 1129(a)(3), a debtor must propose a plan of reorganization "in good

faith and not by any means forbidden by law."  Although the Bankruptcy Code does not

specifically define good faith in the context of section 1129(a)(3), the Third Circuit has held that

"'[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of

inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the

objectives and purposes of the Bankruptcy Code.'"  *In re Combustion Eng'g, Inc.,* 391 F.3d 190,

247 (3d. Cir. 2004) (citing *In re PWS Holding Corp.*, 228 F. 3d 224, 242 (3d Cir. 2000)).  Other

courts within the Third Circuit have followed this approach.  *See, e.g., In re New Valley Corp.*,

168 B.R. 73, 80 (Bankr. D.N.J. 1994) ("It is generally held that a plan is proposed in good faith if

there is a reasonable likelihood that the plan will achieve a result consistent with the objectives

and purposes of the Bankruptcy Code.").  Furthermore, as discussed in the Plan Proponents'

Pretrial Phase II Main Brief, the good faith standard requires that the plan be "proposed with

honesty, good intentions and a basis for expecting that a reorganization can be effected with

results consistent with the objectives and purposes of the Bankruptcy Code." PP Pretrial Phase II Main Br. at 34 (citations omitted).

In addition, courts find that plans of reorganization that are proposed after arm's-length negotiations for the purposes of maximizing the value of the debtor's estates satisfy section 1129(a)(3). PP Pretrial Phase II Main Br. at 35. There is no doubt that this Joint Plan has been the product of contentious arm's-length negotiations between numerous constituencies in these cases. The most significant creditor groups in these cases are Holders of Asbestos PI Claims and Holders of Asbestos PD Claims. With respect to the Asbestos PI Claims, the Asbestos PI FCR made clear that the negotiations involving the settlement of such claims were arm's-length and made in good faith:

> Q: Was there ultimately a settlement concerning the estimation litigation?
>
> A: Yes. After that litigation began and while it was ongoing there were numerous, in fact, more than numerous meetings and negotiations concerning a settlement, and ultimately there was a settlement.
>
> Q: And who was involved in the settlement negotiations?
>
> A: Well, there was me and my advisors, the debtors and their legal advisors, representatives of the equity committee, and the asbestos claimants' committee.
>
> . . .
>
> Q: To your knowledge, sir, was the settlement negotiated at arm's length?
>
> A: It was certainly negotiated at arm's length.
>
> Q: Can you explain further to the Court?
>
> A: Well, it was -- in addition to how long it took, I think it would be fair to say that the discussions that led to the settlement were intense and lively.

9/17/09 Tr. 51-52 (Austern); *see also* PP Ex. 160 (Term Sheet of Plan Settlement Terms).

With respect to the Asbestos PD Claims, the Asbestos PD FCR made clear that these claims were the product of arm's-length negotiations and made in good faith. *See* PP Ex. 633 (Sanders Proffer at ¶¶ 14, 17, 26) (explaining that the PD FCR performed a thorough examination of the Asbestos PD Claims, and performed other diligence such as reviewing the Sealed Air and Fresenius settlement agreements, meeting with the Debtors' advisors and officers, and participating in extensive negotiations to ensure that the Joint Plan would treat present and future Asbestos PD Claims fairly); 9/17/09 Tr. 101 (Sanders) (testifying that he had his counsel negotiate with the Debtors to change some of the terms of the proposal related to Asbestos PD Claims to better protect his constituency). Good faith negotiations surrounding the Asbestos PD Claims is also evident from the fact that most PD claims have been resolved through settlements or allowance proceedings involving the Court,[4] and hotly contested ZAI Claims are now the subject of settlements in both the U.S. and Canada.[5]

It is also clear that the Joint Plan has been proposed in good faith by incorporating the settlements with key parties such as Sealed Air and Fresenius into the Joint Plan, which settlements are critical to the success of the Joint Plan. Indeed, the entire reorganization is dependent upon receiving the funds that are set forth in the Sealed Air and Fresenius settlement agreements.[6]

---

[4]   *See* PP Ex. 633 (Sanders Proffer ¶ 8).

[5]   *See*  PP 277.09 Rev (CDN ZAI Minutes of Settlement); PP 277.28 Rev (Deferred Payment Agreement (Class 7B ZAI); PP 277.33 Rev (ZAI PD Trust Distribution Procedures); Motion to Approve Class Settlement and Certify U.S. ZAI Class, dated December 15, 2008 (Dkt. No. 20275).

[6]   *See* 9/17/09 Tr. at 63 (Austern) (explaining that the $1.1 billion settlement contribution from Sealed Air and Fresenius is an "enormous benefit" to the future claimants); *see also* PP Ex. 277.22 Rev (Sealed Air Settlement Agreement); PP Ex. 277.23 Rev (Sealed Air Settlement (Continued…)

Furthermore, the Joint Plan incorporates the numerous (and ongoing) settlements with insurers, which result in additional key assets for the Asbestos PI Trust and Holders of Asbestos PI Claims:

> Q: Do those post-petition [insurance] settlements, in general, as far as you're concerned as the FCR, provide benefits to the trust?
>
> A: Yes, the same benefits I've mentioned.  Those proceeds are going to the trust and are extremely valuable to the trust.

9/17/09 Tr. 65 (Austern).  Various other settlements were effectuated during these cases, such as the Libby environmental settlement,[7] the Multi-Site Agreement,[8] and various other settlements and/or other resolution for thousands of General Unsecured Claims, all of which impacted upon how the Joint Plan ultimately would be framed.

Moreover, the good faith of the Joint Plan is evidenced by the overwhelming support of the Joint Plan by Claim Holders -- all impaired classes voted overwhelmingly in favor of the Joint Plan.[9]  *See In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (finding that the fact that the plan was accepted overwhelmingly by all classes of impaired creditors and two out of three classes of equity holders was an important factor leading to a determination of good faith); *In re ABB Lummus Global, Inc.,* No. 06-10401 (JKF), WL 2052409, at *16 (Bankr. D. Del. June 29, 2006) (stating that the overwhelming acceptance of the

---

Order); PP Ex. 277.13 Rev (Fresenius Settlement Agreement); PP Ex. 277.14 Rev (Fresenius Settlement Order).

[7]    *See* Order Approving Libby Environmental Settlement, dated June 3, 2008 [Dkt. No. 18848].

[8]    *See* Order Approving Multi-Site Agreement, dated June 3, 2008 [Dkt. No. 18847].

[9]    PP Ex. 281 (Amended and Original Declarations of Kevin A. Martin Certifying the Tabulation of Ballots).

plan was a factor leading to a determination of good faith).   In addition, various technical

modifications were made to the Joint Plan to accommodate concerns of objecting parties and

again reflecting the cooperative efforts by the Plan Proponents with the Plan opponents and the

good faith with which the Plan has been proposed.[10]

A number of the objecting parties alleged unfair treatment under the Joint Plan; therefore,

they have concluded that the Joint Plan was filed in bad faith.[11]   However, disagreements over a

creditor's plan treatment are not enough to sustain an allegation of bad faith, as a plan proponent

only needs to show that the purpose of the proposed plan is to reorganize and that the plan has a

reasonable hope of success.[12]   In any event, there has been absolutely no evidence presented that

the unfair treatment arguments have any merit.   Not only is there a lack of evidence showing

unfair treatment toward any of these parties, but there is clear evidence that the Indirect PI Trust

---

[10]   *See* PP Ex. 352 (First Set of Technical Plan Modifications filed on 9/4/09); Second Set of Technical Plan Modifications, dated 10/12/09 [Dkt. No. 23474].  With respect to the Second Set of Technical Plan Amendments and modifications being made to the Asbestos PD Trust Agreement, the Court expressed concern that if the Asbestos PD Trust were amended to become a limited fund as to both current and future claimants in the event of payment defaults, then it might be necessary to re-solicit current claimants.  *See* 10/14/09 Tr. at 150-51.  In order to avoid re-solicitation, the Asbestos PD FCR and the Plan Proponents have agreed to limit the amendment to future Asbestos PD Claims or Demands

[11]   *See, e.g.*, Bank Lender Plan Obj. at ¶¶ 56-58 [Dkt. No. 21789]; Phase II Joint Lender/GUC Br. at 68 [Dkt. No. 22441] (plan benefits shareholders at expense of creditors); CNA Plan Obj. at 6-7, 26-28 [Dkt. No. 21794]; CNA Phase II Br. at 32-34 [Dkt. No. 22415] (plan modifies CNA's existing contract rights); MCC Plan Obj. at ¶8 [Dkt. No. 21783]; MCC Phase II Br. at 8-9 [Dkt. No. 22426] (plan does not provide equal treatment to Indirect PI Trust Claims that may arise after the Effective Date).

[12]   *In re Century Glove, Inc.,* Nos. Civ. A. 90-400 SLR, 1993 WL 239489, at *4 (Bankr. D. Del. 1993) (bad faith claim without merit since it did not address the purpose of the proposed plan or whether the plan had a reasonable hope of success).

Claimants will receive the *same* treatment under the Joint Plan as the Direct Claimants in Class 6.[13]

In addition, certain of the insurers have taken the position that the Joint Plan violates section 1129(a)(3) of the Bankruptcy Code by impermissibly attempting to confer jurisdiction to this Court of non-core matters such as coverage disputes.[14]  However, the Joint Plan is insurance neutral; therefore, it does not call for this Court to adjudicate coverage disputes.  Some insurers argue that the Joint Plan actually is not insurance neutral, and by not being insurance neutral, the Joint Plan has not been proposed in good faith.[15]  The Plan Proponents assert that section 7.15 of the Joint Plan expressly preserves all insurers' rights, and to the extent this complaint has any validity, it has been preserved as a coverage defense, a treatment that the Third Circuit found appropriate in *Combustion Engineering*.  *See* PP Phase I Pretrial Ins. Br. at 27-28 [Dkt. No. 22021]; PP Ex. 277:01 Rev (Plan § 7.15).

Some insurers also attempt to argue a section 1129(a)(3) violation by claiming that the TDP is too lax in that it permits payment of illegitimate claims.[16]  However, the evidence proves that *the TDP is more strict than the Grace pre-petition settlement criteria*:

> Q: Could you just tell us in general terms what the settlement criteria [pre-petition] were . . . (239)

---

[13]  *See* Part VIII, *infra.*

[14]  *See* Fireman's Fund Non-Surety Plan Obj. at ¶ 41-56 [Dkt. No. 21781]; Fireman's Fund Phase II Non-Surety Br. at 17 [Dkt. No. 22418].

[15]  *See* Fireman's Fund Non-Surety Plan Obj. at ¶¶ 25-27; Fireman's Fund Phase II Non-Surety Br. at 5-6.

[16]  *See* Fireman's Fund Non-Surety Plan Obj. at 12-13; Fireman's Fund Phase II Non-Surety Br. at 23-24.

A: Generally, we required some evidence of exposure to a various product and a diagnosis of an asbestos-related disease from a qualified physician.  (240)

Q: " . . other than being able to show there was product at the site and the claimant was working there during a time when they could have been exposed at the site, was there any other exposure requirement?  (242)

A: No, there wasn't.  (242).

Q: And when it comes to medical evidence -- and I want to direct your attention specifically to medical evidence relating to non-malignant asbestos-related disease, what did it take -- what was sufficient to get a settlement of a non-malignant asbestos-related disease in connection with this settlement [discussing settlement with Baron and Budd - PP Ex. 1]?  (242)

A: Diagnosis by a competent physician.  (242).

Q: But if you didn't have that but you had a B-read confirming the condition was that also enough?  (242)

A: Yes.  (242).

Q: . . . was there any other real requirement in order to get qualification of the medical criteria other than simply having the diagnosis or having the B-read?  (242)

A: No, generally there wasn't. (242).

9/14/09 Tr. at 239-242 (Hughes); *see also* discussion in Part 10.2(b), *infra* at 98-102 (describing criteria set forth in Asbestos PI TDP.

The State of Montana has alleged that the Joint Plan was not proposed in good faith because it violates the absolute priority rule and the settlement of Asbestos PI Claims did not involve discussions with the State of Montana.[17]   There has been absolutely no evidence presented during the Confirmation Hearing that the absolute priority rule has been violated, and

---

[17]   Montana Phase II Br. at 37 [Dkt. No. 22429].

the good faith determination does not require that every individual creditor participate in plan settlement negotiations. The State of Montana's claims are Class 6 claims, and an overwhelming majority of Class 6 participated in the negotiation through the Asbestos Claimants' Committee, and approved the terms of the settlement by voting in favor of the Joint Plan.

Other objectors, such as Fireman's Fund and Seaton OneBeacon, have argued that the Joint Plan was proposed in bad faith because of the scope of the releases and exculpation as they apply to the TAC.[18]  As noted below, the Plan Proponents have amended the Joint Plan to eliminate the TAC from the parties receiving protection under section 11.9 of the Joint Plan.[19]

In effect, the objectors have used section 1129(a)(3) as a "catch-all" to object those aspects of the Joint Plan with which they disagree, without tying such objections to the proper substantive provisions of the Bankruptcy Code.  In addition, none of these parties, have introduced any evidence in connection with the Confirmation Hearing in support of their bad faith allegations.  It is clear that the Joint Plan (a) is the objective product of negotiations among all key constituents, (b) incorporates critical settlements that have been negotiated during these Chapter 11 Cases which result in substantial and necessary financial contributions on account of creditors affected under the Joint Plan, and (c) provides for reorganization of the Debtors' operations, such that there is ample evidence to support that the Joint Plan has been proposed in good faith.  In light of the above, the Joint Plan has been conceived and proposed with the "honest purpose" and "reasonable hope of success" by which "good faith" under section 1129(a)(3)  is measured, and the requirements of section 1129(a)(3) are therefore satisfied.

---

[18]  *See* Fireman's Fund Plan Obj. at ¶ 32; Seaton OneBeacon Plan Obj. at ¶¶ 81-82 [Dkt. No. 21763]; Seaton OneBeacon Phase II Br. at 37-38 [Dkt. No. 22433].

[19]  *See* PP Ex. 352 (First Set of Technical Plan Modifications filed 9/4/09).

## II. CONFIRMATION OF THE JOINT PLAN IS NOT LIKELY TO BE FOLLOWED BY THE NEED FOR FURTHER FINANCIAL REORGANIZATION OR LIQUIDATION OF THE DEBTORS[20]

### 2.1.    Proposed Finding

Confirmation of the Joint Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Joint Plan.

### 2.2.    The Evidence Demonstrates That The Joint Plan Is Feasible

As a condition for confirmation, the proponents of a plan of reorganization must demonstrate that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the

---

[20] This document contains forward-looking information, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "projects," "will," "expects," "suggests," "anticipates," or similar expressions. Forward-looking information includes all statements regarding potential future actions in Grace's Chapter 11 Cases; expected financial positions; results of operations; cash flows; financing plans; business strategy; budgets; capital and other expenditures; competitive positions; growth opportunities; benefits from new technology and cost reduction initiatives, plans and objectives; and markets for securities. For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy and proposed plan of reorganization, Grace's settlements with certain creditors, Grace's legal proceedings, Grace's environmental proceedings, the cost and availability of raw materials and energy, Grace's unfunded pension obligations, risks related to foreign operations, especially security, regulation and currency risks, costs of compliance with environmental regulation and those factors set forth in Grace's most recent Annual Report on Form 10-K,Quarterly Report on Form 10-Q and Current Reports on Form 8-K, which have been filed with the Securities and Exchange Commission. Like other businesses, Grace is subject to risks and uncertainties that could cause its actual results to differ materially from its projections or that could cause other forward-looking information to prove incorrect. Further, Grace's reported results should not be considered as an indication of its future performance. Readers are cautioned not to place undue reliance on Grace's projections and forward-looking information, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revision to the projections and forward-looking information contained in this document and the related testimony or to update them to reflect events or circumstances occurring after the date of this document and the related testimony.

need for further financial reorganization, of the Debtor."[21]   To meet this requirement, courts require proof that A plan is reasonably likely to succeed.[22]   In making this determination, it is appropriate for a court to consider: (1) a debtor's financial performance while in bankruptcy, (2) a debtor's ability to obtain exit financing, and (3) the reasonableness of a debtor's projections.

The evidence presented at the Confirmation Hearing through the testimony of Pamela Zilly, the Debtors' financial expert, pertaining to each of these factors, clearly demonstrates that Reorganized Grace will be a financially strong company that will generate steady growth and significant profits for the foreseeable future, and will be able to meet its obligations as they come due.

First, Ms. Zilly testified that Grace has achieved outstanding performance while in bankruptcy.[23]   Specifically, Grace's sales approximately doubled between 2000 and 2008, a period that spans most of the time that Grace has spent in bankruptcy and reflects several cycles in the chemical industry.[24]   In addition, Grace's Core EBITDA increased by approximately 64%

---

[21]   11 U.S.C. § 1129(a)(11) .

[22]   *See, e.g.*, *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Dev., L.L.C. (In re Brice Rd. Dev., L.L.C.)*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) ("[i]mportantly, the Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility"); *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000) ("[a]lthough the standards for determining feasibility are not rigorous, the court is obligated to independently evaluate the plan and determine whether it offers a reasonable probability of success"); *see also* Plan Proponents' Brief in Support of Plan Confirmation Regarding Feasibility, at 2-3 [Dkt. No. 22959] (explaining legal standard for determining feasibility under § 1129(a)(11)).

[23]   10/13/09 Tr. 65-67 (Zilly) (describing process of using sales and EBITDA to analyze Grace's financial performance in bankruptcy).

[24]   *Id.* (sales approximately doubled from 2000-2008, a period that covers "a number of cycles in the chemical industry," and during most of which time Grace was operating under chapter 11). *See also* PP Ex. 511-16 (Zilly Demonstrative) (demonstrating Grace's growth in sales).

between 2003 and 2008, demonstrating the strength of Grace's business and its ability to generate large cash flows.[25]

Second, Ms. Zilly testified that Grace has demonstrated that it can obtain exit financing that will allow it to pay all obligations that will be due on the Effective Date.[26]  In July, Grace received proposals from lenders for commitment letters under which Grace could have successfully exited bankruptcy.[27]  To maintain flexibility in its capital structure and in its timing in accessing the market, Grace has decided to negotiate actual exit finance agreements and not to seek commitment letters.[28]  Currently, Grace is negotiating exit financing that will allow Grace to pay all of its obligations due under the Joint Plan upon exit from Chapter 11.[29]  Grace estimates that it will have $1.539 billion of liabilities due upon exit from Chapter 11, which it plans to pay with $589 million of balance sheet cash and $950 million in proceeds from exit financing.[30]

---

[25] 10/13/09 Tr. 67 (Zilly) (Core EBITDA experienced a compound annual growth rate of 10%). *See also* PP Ex. 511-16 (Zilly Demonstrative) (demonstrating Grace's growth in Core EBITDA).

[26] *Id.* at 137 (Zilly) (Zilly's expert opinion that Grace will be able to obtain exit financing).

[27] *Id.* at 68-69 (Zilly) (describing proposals for commitment letters received in July).  *See also* PP Ex. 511-17 (Zilly Demonstrative) (summarizing Ms. Zilly's testimony regarding exit financing).

[28] *Id.* at 69-70 (Zilly) (to maintain flexibility in its capital structure and its timing in accessing the market, Grace has decided not to seek firm commitment letters).

[29] *Id.* at 70 (Zilly) ("we are currently negotiating with a number of lenders . . . [u]nder any of the financing structures that we're currently discussing, Grace will be able to meet all of its obligations upon its exit").

[30] *Id.* at Tr. 72 (Zilly).  *See also* PP Ex. 511-18 (Zilly Demonstrative) (demonstrating the Debtors' estimated use of cash upon emergence from bankruptcy).

Third, Ms. Zilly evaluated Grace's financial projections and determined that they are reasonable and conservative in light of Grace's historical performance. Grace has a strong financial track record, demonstrated by its growth in sales and Core EBITDA during its chapter 11 reorganization.[31] Thus, when compared with its historical performance, Grace's projected rate of growth in sales is conservative.[32] Moreover, Grace's projected Core EBITDA is reasonable given its historical Core EBITDA performance, its productivity programs that have been implemented in the last several years, and cost-cutting measures taken in 2008 and 2009.[33]

In light of Grace's past performance, its ability to obtain exit financing, and its reasonable and conservative projections, Reorganized Grace will clearly be able to pay its debts as they come due.[34] Even assuming little or no growth in the years after 2013, Reorganized Grace will be able to make the deferred payments to the Asbestos PI Trust and Asbestos PD Trust for ZAI.[35]

---

[31]   *Id.* at 73 (Zilly) (finding that Grace's projected sales and Core EBITDA are reasonable in light of its past sales and Core EBITDA performance). *See also* PP Ex. 511-19 (Zilly Demonstrative) (demonstrating Grace's financial projections).

[32]   *Id.* (Zilly) ("Frankly, its growth rate of sales is reasonable when compared to what it has achieved over the last eight to ten years.").

[33]   *Id.* (Zilly).

[34]   *Id.* at 72 (Zilly) ("The combination of the company's balance sheet cash, as well as the company's ability to access the markets and achieve its exit financing proceeds makes this plan feasible.").

[35]   *Id.* at 74 (Zilly) ("it is clear, even assuming very little growth after the year 2013, that Grace will be able to make and meet the deferred payment obligations"). *See also* PP Ex. 511-20 (Zilly Demonstrative) (demonstrative exhibit summarizing Zilly's testimony).

Moreover, although Grace believes that it will not be required, Reorganized Grace would be able to pay future Asbestos PD Claims of at least $1.6 billion over 25 years.[36]  There was simply no evidence presented at the Confirmation Hearing which suggests that Grace would have any material liability on account of future traditional Asbestos PD Claims, much less a liability approaching $1.6 billion.

In light of the evidence of Grace's financial strength, Grace has far more than a "reasonable probability of success" under the Joint Plan; and thus, the Joint Plan meets the requirements of 11 U.S.C. § 1129(a)(11).

### 2.3.    The Objections Are Without Merit

Two parties, Anderson Memorial and the State of Montana, have argued that the Joint Plan is not feasible.  Their objections are without merit.

Anderson Memorial argues that the Joint Plan is not feasible because:  (1) the Debtors have not provided an estimate of their future liability for traditional Asbestos PD Claims and (2) because the Joint Plan does not account for the possibility that Anderson's class claim will be upheld on appeal.  But contrary to Anderson's assertions with respect to its argument that Debtors have not provided an estimate of future liability, section 1129(a)(11) does not require that a debtor estimate all possible future liabilities -- it requires only that the Joint Plan have a "reasonable probability of success."[37]  Moreover, in reaching her conclusion that the Joint Plan is feasible, Ms. Zilly considered Grace's reserve of $37.3 million to resolve pending, unsettled

---

[36]  *Id.* at 78 (Zilly) (stating that the Plan would still be feasible if Grace had to pay $1.6 billion in PD claims over 25 years), *Id.* 185 (since initial testimony regarding Mr. Rich's $1.6 billion hypothetical, Ms. Zilly has done more analysis regarding what that number would mean with respect to feasibility).

[37]  *See supra*, note 22.

Asbestos Property Damage Claims and to pay defense costs for any future property damage Demands that may be made after the Effective Date.[38]  Ms. Zilly used this number because, in her judgment, "[t]he company has the experience based on its historical precedent with respect to asbestos property damage claims.  It has expert reports that were prepared for it with respect to whether or not it could be a determined number, and it also had its own internal records and claim histories with respect to asbestos property damage claims."[39]  Finally, even if Grace would be subject to liability far in excess of the $37.3 million reserve, Ms. Zilly found that it could pay $1.6 billion in traditional Asbestos PD Claims over 25 years,[40] an amount which, as noted, is unrebutted by any evidence addressed at the Confirmation Hearing as to the value of Grace's future liability on account of traditional Asbestos PD Claims.

Anderson's argument that the Joint Plan is not feasible because it does not account for Anderson's class claim is equally unavailing.  The Bankruptcy and District Courts have both ruled against class certification, and there is no reason to believe that this ruling will be reversed on appeal.  Even if Anderson ultimately prevails, Grace has found that it could pay $1.6 billion in Traditional Asbestos PD Claims over 25 years, providing far more than adequate funds to pay Anderson's claim.[41]

---

[38]  10/13/2009 Tr. 76 (Zilly) (discussing Ms. Zilly's use and the significance of the $37.3 million number).

[39]  *Id.* at. 184 (Zilly).

[40]  *Id.* at 78 (Zilly) (stating that the Joint Plan would still be feasible if Grace had to pay $1.6 billion in PD claims over 25 years).

[41]  *Id.*

The State of Montana has argued that the Joint Plan is not feasible because its claims purportedly cannot be discharged, and, thus, confirmation of the Joint Plan would allegedly need to be followed by liquidation or further reorganization of the Debtors if Montana asserts a claim for $750 million or more against Reorganized Grace.  This argument fails for at least three independent reasons.  First, for the reasons explained in the Plan Proponents' Pretrial Phase II Main Brief, Montana's claims against Grace -- to the extent that they exist and become liquidated -- will be channeled to the Asbestos PI Trust and will not in any way affect the viability of Reorganized Grace.[42]  Second, Montana has provided no basis for its assertion that it might have a claim for $750 million against Grace within one year of the Effective Date.  At the Confirmation Hearing, the Court agreed that there was no foundation for the $750 million figure put forward by Montana, and refused to allow anything other than purely hypothetical questions based on that number.[43]  Finally, Ms. Zilly testified that even if the Debtors were faced with a $750 million liability based on Montana's claims one year after the Effective Date, it is possible that Grace could pay such a claim "based on an accrual of cash as well as additional borrowings."[44]  Because Montana's claims are channeled to the Asbestos PI Trust and, therefore, will not threaten Grace's viability, and because the Plan Proponents have demonstrated that the

---

[42]  *See* PP Pretrial Phase II Main Br. at 124-126.

[43]  10/13/2009 Tr. 156 ("COURT: There isn't [a foundation], but the question is that he's trying to get to, assuming that the maximum horrible -- set of horribles could happen to the debtor what's the consequence?").

[44]  10/13/09 Tr. 158 (Zilly) ("it's possible [Grace] might be able to pay" a $750 million judgment one year after the effective date "based on an accrual of cash as well as additional borrowings.").

Joint Plan has a reasonable likelihood of success even if those claims are not channeled, Montana's objection to the Joint Plan's feasibility must fail.

## III.    THE DEBTORS HAVE SATISFIED THE BEST INTERESTS TEST.

### 3.1.    Proposed Finding

Weighing (1) the disputed and unliquidated nature of the asbestos liabilities at issue in this case, (2) the prospect that a Chapter 7 liquidation would provide no adequate mechanism for either resolving those liabilities on the merits or realizing the full value of Grace, (3) the availability through the Joint Plan of a vehicle for fixing disputed liabilities and realizing the full value of Grace, augmented by the Fresenius and Sealed Air settlements, and (4) the mandate of section 524(g) to provide for future demand holders, the Court finds that each holder of an impaired claim or equity interest who did not vote to accept the Joint Plan will receive or retain value under the Joint Plan, as of the Effective Date, that is not less than the value that such holder would receive or retain if the Debtors' estates were liquidated under Chapter 7 of the Bankruptcy Code.

### 3.2.    Application of the Best Interests Test in This Case Must be Tailored to Address the Disputed and Unliquidated Nature of Grace's Asbestos Liabilities, the Need to Preserve Grace's Full Value as An Ongoing Enterprise, and the Mandate of Section 524(g).

While the best interests test of section 1129(a)(7) adopts what is, on its face, an arithmetic legal test — will creditors get less under a plan of reorganization than they would under a Chapter 7 liquidation — application of the test in any particular case turns on the facts of that case and must serve the basic purpose of the test.  That purpose is to assure that Chapter 11 actually adds value for the creditors, as against the alternative of a prompt liquidation.  And the distinctive facts that must be considered here in the Grace case are, prominently, the disputed nature of the liabilities that gave rise to the case, the unquestionably greater value of the assets

made available to creditors through the proposed plan, and section 524(g)'s requirement that future demand holders be provided for.

Any presumption that the best interests inquiry must always be a simple formulaic exercise ignores legal history. That history is very old — meaning, of course, that the test must have the flexibility to accommodate the factual changes that time brings — and it is animated by a jurisprudential purpose that turns upon comparative judgments rather than a recipe. The origins of the best interests test are ancient, even predating its inclusion in Chapters XI and XII of the Bankruptcy Act. Both of these precursors to the Bankruptcy Code drew the best interests test from a provision of former Section 12d of the Bankruptcy Act of 1898.[45] Under Section 12d, the court was required to compare what creditors would receive under a composition offer[46] with what they would receive in a liquidation of the estate.[47] The early cases recognized that "a [debtor] can ordinarily do better with his own property, and realize more therefrom, than can be obtained in the course of judicial proceedings with compulsory sales and expense of administration."[48] But in the rare case that a composition offer would pay creditors "very considerably less than they might reasonably be expected to realize in the administration of the assets in due course, then the composition is not for the best interest of creditors."[49]

---

[45]  7 Collier on Bankruptcy ¶ 1129.03[7][e] (15th Ed. 2004).

[46]  The closest functional equivalent to a modern plan of reorganization.

[47]  *Id.*

[48]  *See Adler v. Jones*, 109 F. 967, 969 (6th Cir. 1901).

[49]  *Id.; see also Fleischmann & Devine, Inc. v. Saul Wolfson Dry Goods Co.,* 299 F. 15, 17-18 (5th Cir. 1924) ("The confirmation of an offered composition is manifestly not for the best interests of the creditors if it would pay them considerably less than they might reasonably expect to realize in the administration of the assets in due course.").

Section 1129(a)(7) codifies the best interests test. "Section 1129(a)(7) is designed to ensure that, in a more general way, creditors (both secured and unsecured) are no worse off under a plan of reorganization than they would be with the Debtor in Chapter 7."[50]  The goal is to prevent debtors from abusing the Chapter 11 process by putting forth a plan of reorganization that shortchanges creditors.[51]

Application of the best interests test should be simple arithmetic if the operative facts are amenable to a simple arithmetic approach.  But the cases and commentators recognize that the facts may not be so clear cut.  In particular, "[a]pplying the 'best interests' test requires the court to conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan."[52]  "The hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7.  It contemplates valuation according to the depressed prices that one typically receives in distress sales."[53]  It requires estimation of disputed and contingent claims and of chapter 7 administrative expenses.[54] And it requires application of the chapter 7 distribution scheme, taking into account such matters

---

[50]  *In re Kellogg Square Partnership*, 160 B.R. 343, 358 (Bankr. D. Minn. 1993).

[51]  *See, e.g.*, *Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997) ("If a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders, than a chapter 11 reorganization, then a reorganization is inappropriate.").

[52]  *Sierra-Cal*, 210 B.R. at 172; *see also Top Hat, Ltd. v. Aurora Foods, Inc. (In re Aurora Foods, Inc.)*, 2006 U.S. Dist. LEXIS 91659, *24 (D. Del. Dec. 19, 2006); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003).

[53]  7 Collier on Bankruptcy ¶ 1129.03[7][b][iii].

[54]  *Id*.

as subordinations (11 U.S.C. § 510) and recoveries from general partners (11 U.S.C. § 723) that would be applied in a chapter 7 liquidation. . . . ."[55]

In this case, as the Court has seen in the presentation of the evidence, many of the operative facts are both inherently judgmental and even, to a significant degree, speculative. Four such facts are key:

### 3.2.1.  Grace's Asbestos Liabilities Are Disputed and Uncertain.

The scope of Grace's asbestos personal injury and property damage liability in this case is highly uncertain because both the merit and amount of that liability are subject to vigorous dispute.[56]

### 3.2.2.  Chapter 7 Provides No Efficient or Effective Way to Litigate Claims or Maximize Asset Value.

A "prompt" Chapter 7 liquidation would not provide the tools necessary to determine the merit and value of Grace's liability on account of asbestos claims.  The Chapter 7 trustee would be facing over 300,000 personal injury claims and thousands of property damage claims.[57]  But that trustee would not have available to it a procedure commensurate with the task of litigating those claims or the means to achieve settlements similar to those under the Joint Plan.[58]  Global estimation of the amounts necessary to fund a trust simply does not exist in a Chapter 7.  Instead, there would be an unstructured, claim-by-claim adjudication.  Moreover, this procedural

---

[55]   *Sierra-Cal*, 210 B.R. at 172.

[56]   9/16/09 Tr. 106-108 (Zilly); 10/13/09 Tr. 57-58 (Zilly); 9/15/09 Tr. 278-285 (Peterson); *see also* PP 511-06 (Zilly Demonstrative).

[57]   10/13/09 Tr. 45-46 (Zilly).

[58]   9/17/09 Tr. 150-51 (Zilly); 10/13/09 Tr. 28-29, 45-47 (Zilly).

disadvantage would be debilitating where the number of Asbestos PI Claims would likely soar due to the acceleration of claims brought by claimants seeking to avoid losing their rights from passage of a Chapter 7 Bar Date.[59]  The net effect would be that no creditor could be compelled to assert anything less than its full liability demand.[60]

Likewise, the realized value of business assets in a Chapter 7 would be minimized. Asbestos liabilities, including future demands that the Court would not have jurisdiction to bind in a Chapter 7, would create an overhang because of successor liability issues.[61]  Who, exactly, would be prepared to pay value for assets without protection from future claims?  Accordingly, the value of Grace must be highly discounted to reflect that a buyer of a liquidating company could be subject to successor liability and would pay substantially less for the company to reflect that exposure.[62]  The testimony was that Grace might not even be sellable.[63]  Nor would insurers or fraudulent conveyance defendants have an incentive to settle.[64]

### 3.2.3.   The Grace Chapter 11 Has Provided Mechanisms For Maximizing Asset Value and Fixing the Amount of Liability.

Chapter 11 provides a fundamentally different and powerful mechanism to fix the liabilities and assets of a debtor facing asbestos claims.  In sharp contrast to Chapter 7, the combination of the Chapter 11 Joint Plan and section 524(g) have permitted Grace to accomplish

---

[59]  10/13/09 Tr. 58 (Zilly).

[60]  9/17/09 Tr. 150-51(Zilly); 10/13/09 Tr. 28-29, 45-47 (Zilly).

[61]  9/17/09 Tr. 126-27 (Zilly).

[62]  *Id.*

[63]  10/13/09 Tr. 62 (Zilly).

[64]  9/17/09 Tr. 131-32, 134-35 (Zilly).

an orderly settlement of its asbestos liability for a fixed sum which Grace has demonstrated its ability to satisfy.[65]  Similarly, Grace's assets have demonstrably been enhanced through the Joint Plan.   Reorganized Grace will emerge as a financially strong company.[66]   Contributions of Fresenius and Sealed Air will be maximized by protecting them from successor liability.[67]  There is no certainty that a trustee could realize any value on these rights against Sealed Air and Fresenius in a Grace Chapter 7 liquidation.[68]

### 3.2.4.   The Overriding Goals of Section 524(g) Must Be Accommodated.

Fourth, the interests of future demand holders must be considered in applying the best interests test.   Section 524(g) provides a clear statutory policy that future personal injury demands related to asbestos exposure must be treated in "substantially the same manner" as current claims.[69]  It cannot possibly have been Congress' intent, on the one hand, to require that a plan treat present and future claimants in a similar manner and, on the other hand, to prevent confirmation under the best interests test because a plan does just that.

---

[65]   9/17/09 Tr. 137 (Zilly); 10/13/09 Tr. 81 (Zilly); *supra* Part 2.2 (discussing feasibility of the Joint Plan).

[66]   *See supra* Part 2.2 (discussing feasibility of the Joint Plan).

[67]   9/17/09 Tr. 131-32 (Zilly).

[68]   *Id.* at 131, 134-35 (Zilly).

[69]   *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V) ("[T]he trust will operate . . . [to] provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.").

Indeed, at least one court has explicitly rejected the argument advanced by the Libby Claimants here.[70]  In *Eagle-Picher*, the debtors, a personal injury claimants' committee, and the legal representative for future claimants jointly prosecuted confirmation of a plan that included a section 524(g) trust mechanism for present and future asbestos claimants.[71]  Prior to the confirmation hearing, the debtors obtained from the court an estimation of the total present and future asbestos claims.[72]  In connection with the estimation proceeding the court held that "future, unknown Asbestos Personal Injury Claims constitute 'claims' within the meaning of section 101(5) of the Bankruptcy Code."[73]  One objection to confirmation was that the plan did not satisfy the best interests test of section 1129(a)(7) in regard to the treatment of present, as opposed to future, asbestos claimants.  As described by the court:

> The essence of the [objector's] position in this regard is that future claims are not claims in contemplation of the bankruptcy law, and if they are disregarded and liquidation were to occur, those holding claims properly so regarded under the bankruptcy law would receive a greater distribution than now contemplated by the Plan.[74]

The court, however, overruled this objection as "without merit"[75] and held it was "appropriate to take the value of future Asbestos Personal Injury Claims into account in determining the Claims

---

[70]  *See In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 274-76 (Bankr. S.D. Ohio 1996), *aff'd without op.*, 172 F.3d 48 (6th Cir. 1998).

[71]  *Id.* at 262 (outlining the structure of the trust).

[72]  *See generally In re Eagle-Picher Indus., Inc.*, 1996 U.S. Dist. LEXIS 22742 (S.D. Ohio 1996) (affirming *In re Eagle-Picher Indus.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995)).

[73]  *Eagle-Picher,* 203 B.R. at 263.

[74]  *Id.*

[75]  *Id*.

that would be required to be paid in a liquidation under chapter 7 of the Bankruptcy Code."[76]

The *Eagle-Picher* analysis is clearly correct in the context of an asbestos case.  The distinction drawn in section 524(g) between "present claims and future demands"[77] is not for purposes of determining whether a claim exists in a Chapter 7 case, but rather to address the *constitutional due process* aspects of whether a claim can be discharged.  One of the purposes of section 524(g) is to set up a mechanism, on the one hand, to protect future claimants and, on the other hand, to discharge their claims constitutionally.  Thus, the term "demand" is a section 524(g) *subsection specific* definition,[78] intended to distinguish between those claims that may otherwise not be dischargeable because of the claimant's lack of knowledge of his or her injury and claims that would otherwise be dischargeable because the injury has manifested itself. Holders of such future demands lack voting rights under a plan for practical reasons, but a futures representative is appointed to protect their interests.  This is what makes the section 524(g) injunction constitutional.  However, any attempt to distinguish between these two groups for the best interests test or any other reason outside the scope of section 524(g) is neither required by, nor necessary, to accomplish any purpose or policy under the Bankruptcy Code.

No court has ever ruled that the best interests test was violated by an asbestos plan that treats present and future claims in a similar manner.  To meet the requirements for an issuance of a section 524(g) channeling injunction, a plan of reorganization must treat "present claims" and

---

[76]  *Id.*  at 275.

[77]  *See, e.g.*, 11 U.S.C. § 524(g)(2)(B)(ii)(V) .

[78]  S*ee* 11 U.S.C. § 524(g)(5).

"future claims" in substantially the same manner.[79]   The only reasonable interpretation of the best interests test in the context of confirmation of a section 524(g) plan of reorganization is that section 524(g)'s distinction between "present claims" and "future demands" does not exist for purposes of section 1129(a)(7).   To hold otherwise would preclude numerous entities from ever utilizing section 524(g).   This would directly harm the future claimants whose interests section 524(g) was designed to protect.   Such an absurd result cannot be what Congress intended.[80]

### 3.3.    Given These Basic Facts, the Prospects for Grace's Creditors in a Chapter 7 Liquidation Must Be Heavily Discounted.

Application of the best interests test to this case is affected fundamentally by the foregoing basic facts.   The central effect is to require evaluating hypothetical Chapter 7 recoveries in order to account for the vastly greater risks attendant upon liquidation versus the "bird in hand" Plan here.   All of those risks cut against the Chapter 7 trustee's recovery.

---

[79]   11 U.S.C. § 524(g)(2)(B)(ii)(V) .

[80]   *See Andreiu v. Ashcroft*, 253 F.3d 477, 482 (9th Cir. 2001) (courts must interpret statutes so as to preclude absurd results) (*citing United States v. Wilson*, 503 U.S. 329, 334 (1992)); the legislative history of section 524(g) fully supports this interpretation of section 1129(a)(7). Notwithstanding the use of "claims" and "demands" in section 524(g), the legislative history refers only to "claims" -- present claims and future claims.   140 Cong. Rec. H10,764, H10,765,  H10,772 (1994) .   Congress enacted section 524(g) to afford debtor companies a constitutionally-acceptable mechanism to satisfy future asbestos "claims" where the victims were not yet identified.   *See* 140 Cong. Rec. H10,765 (stating "new subsection (g) to section 524 of the Code" was set up to establish equitable yet constitutional mechanisms to resolve "future personal injury claims against the debtor based on exposure to asbestos-containing products").   It would have been entirely illogical for Congress to have enacted section 524(g) -- a section designed to *protect* the rights of future claimants and to assist reorganizing debtors burdened with asbestos-related liabilities -- and also to have intended that such companies would be precluded from confirming a Chapter 11 plan precisely because their plan provided for the equality of treatment to which future claimants are entitled under section 524(g).

### 3.4.    The Joint Plan Satisfies the Best Interests Test.

The Plan Proponents have carried their burden of proving that the Joint Plan is in the best interests of the creditors.  Even if (1) *future claimants* are *not* included in an analysis of Chapter 7 liquidation liabilities; (2) we hypothesize that buyers *are* prepared to purchase Grace assets with *no protection* against successor liability; and (3) we hypothesize further that insurers would be prepared to settle on the *same terms without section 524(g) protection*, Grace has proven that (i) the value of Grace's assets for distribution to creditors under the Joint Plan is at least $2 billion higher than in a hypothetical Chapter 7 liquidation, and (ii) impaired creditors will not receive less under the Joint Plan than they would receive in a Chapter 7 liquidation.  Of course, adjusting the assumptions to make them more real only makes the case more overwhelming that the best interests test has been met.  By contrast, the Libby Claimants, the principal party objecting on the basis of the best interests test, offer *no* witness, fact or expert, to support their objection.

### 3.4.1.    Grace's Assets Are More Valuable Under the Joint Plan With Section 524(g) Protection Than They Would Be in a Chapter 7 Liquidation.

Under the Joint Plan, the value of assets available for distribution to Grace's creditors is *at least* $2 billion higher than it would be in a Chapter 7 liquidation.[81]  Both the value of Grace's assets and the value of the settlements with Sealed Air and Fresenius under both the Joint Plan and a hypothetical Chapter 7 liquidation were analyzed.[82]

---

[81]  9/17/09 Tr. 135-36 (Zilly); 10/13/09 Tr. 24 (Zilly); *see also* PP Ex. 511-10 (Zilly Demonstrative); PP Ex. 511-11 (Zilly Demonstrative); PP Ex. 511-12 (Zilly Demonstrative).

[82]  9/17/09 Tr. 126-27 (Zilly); PP Ex. 277.08 Rev (Best Interests Analysis).

First, in the best interests analysis attached to the Disclosure Statement, Ms. Zilly estimated that the value of Grace's assets is between $2.1 and $2.5 billion under the Joint Plan. At most, the value in a Chapter 7 liquidation would be between $1.050 and $1.250 billion, based on a 50% discount to the value of company.[83]  The 50% discount reflects:  (1) the time pressures faced by a Chapter 7 trustee to liquidate as quickly as possible; and (2) the probability that the assets could not be sold at fair market value, if at all, because there would be no section 524(g) protection to protect a potential buyer with respect to successor liability issues.[84]

There is severe downward pressure on this estimate.[85]  Ms. Zilly testified that it is unclear whether Grace could be sold for *even close* to 50 percent of its Chapter 11 value in a Chapter 7 liquidation because of the lack of section 524(g) protection:

> "As a practical matter, there hasn't been a company in a Chapter 11 with asbestos liability and been sold at all, as far as I can recall, for the last 50 years.  Notwithstanding 363 sales and theories of successor liabilities, I think it would take a very brave soul to offer a billion dollars for Grace given the possibility of over 300,000 personal injury claims."[86]

Second, under the Joint Plan, the estate will receive approximately $1.1 billion in value from Sealed Air and Fresenius.[87]  The Sealed Air and Fresenius Settlement Agreements require

---

[83]  9/17/09 Tr. 126-27 (Zilly); 10/13/09 Tr. 21-22 (Zilly); PP Ex. 277.08 Rev (Best Interests Analysis)*; see also* PP Ex. 511-10 (Zilly Demonstrative).

[84]  9/17/09 Tr. 126-27 (Zilly); PP Ex. 277.08 Rev (Best Interests Analysis); *see also* PP Ex. 511-10 (Zilly Demonstrative).

[85]  10/13/09 Tr. 62 (Zilly); *see also* PP Ex. 511-21b (Zilly Demonstrative).

[86]  10/13/09 Tr. 22 (Zilly); *see also* PP Ex. 511-21b (Zilly Demonstrative).

[87]  *Id.* at 22-24 (Zilly); 9/17/09 Tr. 59 (Austern); PP Ex. 277.13 Rev (Fresenius Settlement Agreement at § 2.03); PP Ex. 277.22 Rev (Sealed Air Settlement Agreement at § II(a)); *see also* PP Ex. 511-11 (Zilly Demonstrative).

entry of a section 524(g) injunction,[88] protecting Sealed Air and Fresenius from future asbestos lawsuits.[89]   Ms. Zilly opined that, given the importance given in the settlement documents to section 524(g) protection, section 524(g) was essential to the settlement discussions.[90]   This is fully consistent with the need at the outset of the case for a stay of litigation against Sealed Air, which faced thousands of new suits alleging liability for Grace products.[91]

In a hypothetical Chapter 7 liquidation, however, Sealed Air and Fresenius could not be protected by a section 524(g) injunction.[92]   As a consequence, Sealed Air and Fresenius would not be able to protect themselves from successor liability claims,[93] and it is unlikely that the estate would obtain much, if anything, from Sealed Air and Fresenius in a Chapter 7

---

[88]   9/17/09 Tr. 129 (Zilly); *see* PP Ex. 277.22 Rev (Sealed Air Settlement Agreement at § II(i)); PP Ex. 277.13 Rev (Fresenius Settlement Agreement at § 2.02(E)); 9/17/09 Tr. 60, 62 (Austern).

[89]   9/17/09 Tr. 131-32 (Zilly); 9/17/09 Tr. 57-59 (Austern).

[90]   9/17/09 Tr. 131-32 (Zilly); 9/17/09 Tr. 62 (Austern).

[91]   *See* OneBeacon/Seaton Ex. 20 (Sealed Air Proof of Claim, Schedule 1) (listing suits against Sealed Air involving asbestos-related claims for which it has claimed rights of indemnification against Grace); PP Ex. 121 (Class Action Complaint in *Chakarian v. W. R. Grace & Co.* at 1-2, 4) (complaint naming Sealed Air as a defendant in an action based on Grace's asbestos liabilities); PP Ex. 120 (Class Action Complaint in *Goldstein v. W. R. Grace & Co.* at 1-2, 5-6) (same); PP Ex. 129 (Class Action Complaint in *Abner v. W. R. Grace & Co.* at 1-3) (same).

[92]   9/17/09 Tr. 131 (Zilly); *see also* PP Ex. 511-11 (Zilly Demonstrative).

[93]   *Id.* at 131-32.

28

Case 01-01139-AMC    Doc 23662    Filed 11/03/09    Page 51 of 195

liquidation.[94]  The same problem would affect insurance recoveries as well, which Ms. Zilly conservatively assumed would be the same in Chapter 7.[95]

In sum, Ms. Zilly testified that, after adding insurance and cash and subtracting costs, expenses, and priority and secured claims from the value of the estate's assets, the amount remaining for the unsecured creditors is between $4.28 and $4.68 billion under the Plan, and most likely only $2.2 billion to $2.4 billion in a Chapter 7 liquidation.[96]  Moreover, given the uncertainty that "the sale of the company [in a Chapter 7 liquidation] could be very problematic with respect to the asbestos overhang," the value of Grace likely would be significantly less.[97]

### 3.4.2.  Personal Injury Claimants Will Receive 25% to 35% of Their Claims Under the Joint Plan.

Under the Joint Plan, the amount of Grace's liabilities is almost totally fixed.  The General Unsecured Creditors will receive $1.397 billion under the Joint Plan.[98]  Likewise, nearly all traditional property damage claims and the ZAI claims have been settled under the Joint

---

[94]   *Id.* at 134-35 ("there would not be any dollars contributed by Sealed Air or Fresenius in [a] Chapter 7 liquidation"); *see also* PP Ex. 511-11 (Zilly Demonstrative); PP Ex. 511-12 (Zilly Demonstrative).

[95]   9/17/09 Tr. 127 (Zilly); PP Ex. 277.08 Rev (Best Interests Analysis at 3); *see also* PP Ex. 511-12 (Zilly Demonstrative).

[96]   10/13/09 Tr. 23-24 (Zilly); 9/17/09 Tr. 135-36 (Zilly); *see also* PP Ex. 511-12 (Zilly Demonstrative).

[97]   10/13/09 Tr. 62 (Zilly); *see also* PP Ex. 511-21b (Zilly Demonstrative).

[98]   9/17/09 Tr. 136-37 (Zilly); PP Ex. 277.08 Rev (Best Interests Analysis).

Plan,[99] and all pending and future asbestos personal injury claims, including Libby claims, have been resolved for a value of $2.214 billion.[100]

Given an estimated total liability for asbestos personal injury claims (including future claims) between $6.3 billion and $9.3 billion, the asbestos personal injury claimants, including the Libby Claimants, will receive a percentage payout of 25 to 35 percent under the Joint Plan.[101] Specifically, Ms. Zilly testified that in Chapter 11 "[t]here is an estimation of asbestos personal injury liabilities that the Trust would face, which if not certain has certainly been estimated, which would give more certainty the percentage payout[s] are 25 to 35 percent under the Chapter 11."[102]  Moreover, these percentage payoffs assume the liability estimates of Dr. Peterson, which were the highest estimates presented in connection with the estimation hearing.  If the actual liabilities are in fact lower than his estimate, then obviously the $2.214 billion in assets would be used to pay the lower liabilities at a higher percentage than 35%.

### 3.4.3.   Personal Injury Claimants in a Chapter 7 Liquidation Would Likely Receive Far Less Than They Will Receive Under the Joint Plan.

On Grace's evidence, in a Chapter 7 liquidation, the trustee would lack the tools necessary to litigate or dispute the hundreds of thousands of personal injury claims in a "prompt"

---

[99] *Id.*

[100] 10/13/09 Tr. 81 (Zilly); *see also* PP Ex. 511-21 (Zilly Demonstrative); PP Ex. 511-21a (Zilly Demonstrative).

[101] 10/13/09 Tr. 56-57 (Zilly); 9/15/09 Tr. 207 (Peterson) (asbestos personal injury liability ranges "at a high from $9.3 billion to $6.3"); PP Ex. 178B (Peterson Demonstratives: "Forecasting Asbestos Liabilities" at T10); PP Ex. 277.04 (Asbestos PI Trust Distribution Procedures § 4.2); *see also* PP Ex. 511-21 (Zilly Demonstrative); PP Ex. 511-21a (Zilly Demonstrative).

[102] 10/13/09 Tr. 57 (Zilly); *see also* PP Ex. 511-21 (Zilly Demonstrative); PP Ex. 511-21a (Zilly Demonstrative).

liquidation and thus could not achieve settlements similar to those under the Joint Plan.[103]  Dr.

Peterson is the only expert to provide an estimate at confirmation of Grace's asbestos personal

injury liabilities outside Chapter 11 and the only expert at any time to provide an estimate of that

portion of Grace's liabilities that are current versus future.   He testified that Grace's total

liabilities, including future claims, would be $9 to $10 billion.[104]  Dr. Peterson also testified that,

even if only pending claims are included for purposes of calculating the liabilities in a Chapter 7

liquidation, the value of the claims that would be asserted against Grace through 2009 would be

between $4.7 billion and $5.2 billion.[105]   But the latter amount does not account for the

acceleration of claims that would be filed by claimants to ensure that they would be paid before

all of Grace's assets were liquidated.[106]  The phenomenon of acceleration is well documented.[107]

For example, Dr. Peterson testified that Manville saw a substantial acceleration of claims when a

---

[103]  9/17/09 Tr. 150-51 (Zilly); 10/13/09 Tr. 28-29, 45-47 (Zilly).

[104]  9/15/09 Tr. 209-210 (Peterson); *see also* PP Ex. 178B (Peterson Demonstratives: "Forecasting Asbestos Liabilities" at T10); 9/17/09 Tr. 145-46 (Zilly).

[105]  9/15/09 Tr. 223 (Peterson); 10/13/09 Tr. 25-26 (Zilly); *see also* PP Ex. 511-21 (Zilly Demonstrative).  Plan Proponents disclosed everything required to calculate Dr. Peterson's value of the pending claims and Dr. Peterson's calculation of such value at this point requires only basic math calculations which do not necessitate the need for expert testimony.  9/15/09 Tr. 222 (Court) ("to the extent that it is a mathematical calculation, I don't think it takes an expert witness to offer an opinion").

[106]  10/13/09 Tr. 58 (Zilly); 9/15/09 Tr. 225-29 (Peterson); *see also* PP Ex. 511-21 (Zilly Demonstrative).

[107]  10/13/09 Tr. 58 (Zilly) (Chapter 7 bar date would increase dramatically the number of claims filed).

deadline was imposed for claimants to file claims under a TDP with weaker criteria.[108]

Similarly, only 27,800 claims were filed against Babcock & Wilcox in the year before it filed for

bankruptcy, but Babcock & Wilcox received over **220,000** claims when a bar date was set only

18 months after it entered bankruptcy.[109]   Accordingly, Ms Zilly testified that there would be an

acceleration of claims in a Chapter 7 liquidation of Grace.[110]

        In addition, Ms. Zilly estimated that the asbestos property damage liabilities in a Chapter

7 liquidation would be approximately $1 billion.[111]   Ms. Zilly first determined that the trustee

would not have the tools to litigate property damage claims and would not be able to contest the

claimants' demands.[112]   The specialized, hand-tailored procedures deployed in these Chapter 11

Cases took years to complete.   To arrive at a proxy for the allocation of the PD versus PI

liabilities in a prompt Chapter 7 liquidation, Ms. Zilly used the pre-litigation split of the assets

agreed upon by the PD Committee, the PI Committee and the PI FCR earlier in this case.[113]

---

[108]  9/15/09 Tr. 193 (Peterson); PP Ex. 199 (Peterson Estimation Expert Report: Projected Liabilities for Asbestos Personal Injury Claims As of April 2001 (June 2007 revised January 2009) at 71).

[109]  10/13/09 Tr. 89 (Zilly); *see also* PP Ex. 383 (McDermott Int'l Inc., Annual Report (Form 10-K), (Dec. 31, 2001) at 92) (entry of bar date resulted in an additional 220,000 asbestos personal injury claims); PP Ex. 382 (The Babcock & Wilcox Company, Consolidated Financial Statements (Dec. 31, 2000 and 1999 and Mar. 31, 1999) at 17) (27,800 claims filed in 1999).

[110]  9/17/09 Tr. 149 (Zilly); 10/13/09 Tr. 58 (Zilly).

[111]  10/13/09 Tr. 26-27 (Zilly); *see also* PP Ex. 511-21 (Zilly Demonstrative).

[112]  9/17/09 Tr. 151 (Zilly); 10/13/09 Tr. 28-29 (Zilly) ("highly unlikely that [the trustee is] going to have the time or the resources to litigate property damage claims"); *see also* 10/13/09 Tr. 45-47 (Zilly).

[113]  10/13/09 Tr. 45-52 (Zilly); 9/17/09 Tr. 149-51 (Zilly); 9/17/09 Tr. 86 (Austern).

Under that agreement, 85% of the assets obtained was to go to the personal injury claimants and 15% to the property damage claimants.[114]   Applying that pre-litigation 85/15 split to the $6.2 billion estimate that Dr. Peterson estimated were the liabilities for personal injury claimants, Ms. Zilly calculated the property damage liability demand in a Chapter 7 liquidation would be approximately $1 billion.[115]   The currently pending PD settlements that have resulted from these Chapter 11 proceedings cannot, taken at face value, be used to hypothesize the outcome in Chapter 7: they were achieved using tools only available in Chapter 11 and they are paid in 100 cent dollars.  It is notable that just grossing them up to recognize the impact of a 25% payout in Chapter 7 ($171.8 million[116] in pending settlements x 4) would indicate a liability in Chapter 7 of $687.2 million.

Additionally, there would be a particularly high risk of higher asbestos property damage demands in a Chapter 7 liquidation of ZAI claims.[117]   For example, the ZAI claimants have estimated that ZAI was present in 1 million to 11 million homes.[118]   The ZAI claimants also

---

[114] *Id.*

[115] 10/13/09 Tr. 51-52 (Zilly); *see also* PP Ex. 511-21, (Zilly Demonstrative).  Moreover, Ms. Zilly testified that applying the 85/15 split to Peterson's $6.2 billion estimate as a proxy for calculating the property damage liabilities in a Chapter 7 liquidation without the ability to litigate is conservative.  To the extent the property damage and ZAI claimants obtained additional assets from the estate and thus the assets available to the property damage and personal injury claimants would increase, then the 15% split for the property damage claimants would be applied to a larger amount, and the liability amount would be higher than $1 billion.  10/13/09 Tr. 52-53 (Zilly).

[116] PP. Ex. 276 Rev (Debtors' Disclosure Statement for The First Amended Joint Plan of Reorganization at 8-9) (Total for Class 7A, Class 7B, and Class 8).

[117] 10/13/09 Tr. 57-58 (Zilly).

[118] 10/13/09 Tr. 57-58 (Zilly); 6/2/2008 Tr. 137 [Docket No. 18913] (ZAI in 1 million homes); *see also* PP Ex. 511-21b (Zilly Demonstrative).

estimated that the value for remediating ZAI was between $3,000 and $7,000 per home.[119]
Assuming one million homes at a cost of $5,000 per home,[120] the liability increases by $5 billion
in a Chapter 7 liquidation.[121] No science trial would have tempered these demands, as that was a
novel procedure adopted by the Court to inform the administration of the ZAI claims. And
requests for class certification of ZAI would not have been constrained by the prudential
considerations that limit class certification in bankruptcy[122] and are strongest in Chapter 11,
where all current and future claimants can be represented without using the class device.

After accounting for the additional $1 billion of liabilities for the general unsecured
creditors and including future personal injury claims, the liabilities in a Chapter 7 liquidation
would be between $11 billion and $12 billion:

---

[119] 10/13/09 Tr. 57-58 (Zilly).

[120] S*ee* ZAI Claimants' Opposition to Grace's Motion for an Immediate Bar Date, filed 4/10/2008 [Dkt. No. 18493] at 9 ($5,000 per home); *see also* PP Ex. 511-21b (Zilly Demonstrative).

[121] 10/13/09 Tr. 57 (Zilly); PP Ex. 511-21b (Zilly Demonstrative).

[122] *See* Debtors' Brief in Opposition to ZAI Claimants' Motion for an Order Recognizing and Permitting Filing of a Washington Class Proof of Claim [Dkt. 18496, April 10, 2008] at 10-12. ("Bankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action, such that class certification may be 'less desirable in bankruptcy than in ordinary civil litigation.' *In re American Reserve Corp.*, 840 F.2d 487, 493 (7th Cir. 1988) . . . Bankruptcy courts may reject a pre-petition certification where a class action would not be superior since '[a] bankruptcy case presents many of the same mechanisms to process large numbers of claims as a class action,' *In re Computer Learning Centers, Inc.*, 344 B.R. 79, 92 (Bankr. E.D. Va. 2006) . . .")

$9 billion to $10 billion (pending and future personal injury liabilities) [123]

+    $1 billion (property damage *without ZAI*)[124]

+    $1 billion (general unsecured claims)[125]

=    $11 billion - $12 billion

Assuming that Grace can in fact be sold for 50% of its value, the percentage payout in a Chapter 7 liquidation would be only 20% to 22%, which is less than the *low end* 25% percentage payout that the Asbestos Personal Injury Claimants in Class 6 will receive under the Joint Plan.

Even if future claims are excluded, the percentage payouts in a Chapter 7 liquidation would likely be less than 25%.  The liabilities in a Chapter 7 liquidation would total between $6.7 billion and $7.2 billion.[126]  If either or both the additional liabilities arising from the acceleration of personal injury claims and from ZAI are more than $3 billion, then the percentage payout would be less than 25%:[127]

$2.4 billion          (Grace sold at 50% of value)

÷    $9.7 billion          ($4.7 billion for PI liabilities — *without acceleration* — plus $1 billion for PD liabilities plus $1 billion for general unsecured claims plus $3 billion for acceleration uncertainties and ZAI )

_____

=    less than 25%

---

[123] 9/15/09 Tr. 209 (Peterson); *see also* PP Ex. 178B (Peterson Demonstrative: Forecasting Asbestos Liabilities at T10); 9/17/09 Tr. 145-46 (Zilly).

[124] 10/13/09 Tr. 26-27 (Zilly); *see also* PP Ex. 511-21 (Zilly Demonstrative).

[125] 9/17/09 Tr. 136-37 (Zilly); 10/13/09 Tr. 55-56 (Zilly); PP Ex. 511-21 (Zilly Demonstrative).

[126] 10/13/09 Tr. 56 (Zilly); *see also* PP Ex. 511-21 (Zilly Demonstrative).

[127] 10/13/09 Tr. 62, 83 (Zilly); *see also* PP Ex. 511-21b (Zilly Demonstrative).

A percentage payout in a Chapter 7 liquidation of less than 25% is less than the *low end* of the percentage payout that claimants will receive under the Joint Plan.[128]

And it cannot be forgotten that **all** of these calculations assume that Grace will be able to sell its assets for at least $1.050 billion in a Chapter 7 liquidation.[129]  Ms. Zilly opined, however, that "the sale of the company could be very problematic with respect to the asbestos overhang."[130]

The evidence thus demonstrates that the Libby Claimants and all other claimants in Class 6 would not receive more in  a Chapter 7 liquidation than they will receive under the Joint Plan.[131]  In fact "Asbestos PI claimants would achieve a higher percentage payout under the Plan."[132]  Ms. Zilly's expert testimony on this point was unrebutted.  Although the Libby Claimants and other parties quibbled with her on cross examination about the size of the (inherently uncertain) asbestos liabilities Grace would face in the context of a Chapter 7

---

[128]  *Id.*

[129]  10/13/09 Tr. 21, 23-24 (Zilly); 9/17/09 Tr. 135-36 (Zilly); *see also* PP Ex. 511-12 (Zilly Demonstrative).

[130]  10/13/09 Tr. 62 (Zilly); *see also* PP Ex. 511-21b (Zilly Demonstrative).

[131]  The Libby Claimants have argued that the Plan fails the best interests test because it does not allow them to "retain" their asserted direct-action rights against Grace's non-products insurance coverage, which would be available to them in a Chapter 7 case.  But, as explained in a prior brief, the Libby Claimants have no direct action rights against Grace's non-products insurance carriers to begin with, and even if they could recover directly from the carriers, such recoveries are irrelevant to the best interests analysis and should not be taken into account.  *See* Plan Proponents' Response to Supplemental Trial Brief of Libby Claimants in Opposition to Confirmation of First Amended Joint Plan of Reorganization, Addressing Best Interests of Creditors Test Under 11 U.S.C. § 1129(a)(7), dated Sept. 4, 2009, at 11-12 (and cases cited therein).

[132]  10/13/09 Tr. at 83 (Zilly); *see id.* at 62-63, 80; PP Ex. 511-21b (Zilly Demonstrative).

liquidation, they provided *no evidence* to rebut her conclusions.  Accordingly, the Plan satisfies the best interests test.

## IV.    THE JOINT PLAN'S CLASSIFICATION OF INDIRECT PI TRUST CLAIMS IN CLASS 6 SATISFIES THE REQUIREMENTS OF 11 U.S.C. § 1122(a).

### 4.1.    Proposed Finding

The claims of Maryland Casualty Co. ("MCC"), the State of Montana ("Montana"), Burlington Northern & Santa Fe Railroad ("BNSF"), Fireman's Fund Insurance Co. ("Fireman's Fund"), Longacre Master Fund ("Longacre"), Seaton Insurance Co. ("Seaton"), and OneBeacon America Insurance Co. ("OneBeacon") are Indirect PI Trust Claims and, as such, are properly classified in Class 6 because they are substantially similar to other Asbestos Personal Injury Claims.

### 4.2.    Argument

Section 1122(a) of the Bankruptcy Code provides that a plan of reorganization may place a claim in a particular class if it is "substantially similar to the other claims . . . of such class."[133] Under Plan § 1.1(33)(i), Asbestos PI Claims include Indirect PI Trust Claims, which are defined under the Joint Plan as claims for indemnification, contribution, or subrogation for damages paid to a plaintiff in an action seeking recovery for "personal injuries allegedly caused by exposure to asbestos or asbestos-containing products for which the Debtors have liability."[134]  The reason for classifying these claims together is that, as to the Debtors, these claims implicate and seek to recover the same liabilities and damages as direct claims for asbestos personal injuries asserted

---

[133]  11 U.S.C. § 1122(a).

[134]  PP Ex. 277.01 (Plan § 1.1(138)).

against Grace, and therefore, as explained in the Plan Proponents' Pretrial Phase II Main Brief,[135]

these claims must be channeled to the Asbestos PI Trust.  In particular, allowing Indirect PI Trust

Claims to be asserted against Grace as general unsecured claims would open a back door to

recovery against Grace, and would frustrate the purpose of section 524(g), which is to achieve a

global resolution of the Debtors' asbestos liabilities.[136]

There can be no disputing that this principle of classification is proper.  Courts,

interpreting section 1122(a) in the context of asbestos-driven Chapter 11 cases, have consistently

held that where claims for indemnification and contribution, contractual or otherwise, relate to

personal injury claims arising from the debtor's asbestos products and operations, such claims

are substantially similar and may be placed together in the same class.[137]  Thus, the classification

of Indirect PI Trust Claims in Class 6 is proper, and any claim that falls within the Joint Plan's

definition of an Indirect PI Trust Claim is properly classified in Class 6.

---

[135]  PP Pretrial Phase II Main Br. at 47-50.

[136]  *See id*. at 18-19.

[137]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 168-69 (D. Del. 2006) ("Because Indirect PI Trust Claims, including those arising under contract, relate to direct Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and have historically been channeled to trusts established in connection with asbestos related chapter 11 cases.") (emphasis added); *see also In re Burns and Roe Enters. Inc.*, No. 08-4191, 2009 WL 438694, at *24 (D.N.J. Feb. 23, 2009) (approving classification grouping direct and indirect asbestos claims in one class where definition of indirect claim under plan included claims for indemnification and subrogation); *In re Asbestos Claims Mgmt. Corp.*, 294 B.R. 663 (N.D. Tex. 2003) (affirming plan grouping direct and indirect asbestos claims together where definition of indirect claim under plan explicitly included contractual claims for reimbursement, indemnification, and other forms of relief); *In re Celotex Corp.*, 204 B.R. 586 (M.D. Fla. 1996) (same); *In re Porter Hayden Co.*, No. 02-54152, 2006 WL 4667137 (Bank. D. Md. June 30, 2006) (same); *In re Federal- Mogul Global, Inc.*,  No. 01-10578, 2007 WL 4180545 (Bank. D. Del. Nov. 16, 2007) (same).

Various parties that have objected to confirmation of the Joint Plan, whose claims clearly fit the definition of Indirect PI Trust Claims under the Joint Plan, argue that their claims are not substantially similar to other Asbestos PI Claims in Class 6 under the Joint Plan and, therefore, should not be placed in that Class.  As shown below for each of the objecting Indirect PI Trust Claimants, the evidence presented at the Confirmation Hearing demonstrates that their claims arise from Grace's asbestos business and implicate the same personal injury and wrongful death claims that are asserted by individual holders of Asbestos PI Claims against Grace.  Accordingly, each of these claims is an Indirect PI Trust Claim, and a reasonable basis exists for the classification of these claims with other Asbestos PI Claims in Class 6.[138]

**4.3.    Classification Objections Related to Grace's Operations at the Libby Mine**

The claims and objections to classification of MCC, Montana, and BNSF arise from the Debtors' asbestos liabilities from the mine operated by Grace at Zonolite Mountain in Libby, Montana.  At this mine, Grace extracted asbestos-containing vermiculite which was used in Grace products that, along with alleged exposures to asbestos at the Libby mine, ultimately led to much of the asbestos litigation that Grace faced before filing for chapter 11 relief.[139]

4.3.1.  <u>MCC</u>

Maryland Casualty Company ("MCC") provided Grace with consulting and industrial hygiene services at the Libby mine in connection with insurance coverage that it issued to Grace

---

[138] *See* PP Pretrial Phase II Main Br. at 47-50 (explaining that Indirect PI Trust Claims are properly channeled to the Asbestos PI Trust and therefore should be classified with other such claims).

[139] 9/9/2009 Tr. 37-42 (Hughes) (explaining the history of Grace's operations at Zonolite Mountain in Libby).

between 1963 and 1973.[140]   Certain former Grace employees who worked at the mine, many of whom have also sued Grace, have sued MCC for injuries allegedly arising from asbestos exposure at the mine.[141]   These claimants assert that MCC is liable to them because of MCC's failure to reduce their asbestos exposures at the Libby mine.   MCC has filed a proof of claim in which it asserts claims for indemnification and contribution from Grace if MCC is ultimately held liable to the Libby plaintiffs for these activities at the Libby mine.[142]   The underlying personal injury claims that MCC itself identifies as being asserted against it are "the same types of claims" asserted against Grace, and in many cases involve "the same claimant."[143]   Thus, MCC's contingent claims against the Debtors are claims for indemnification, contribution, or subrogation for damages paid to a plaintiff in an action seeking recovery for "personal injuries allegedly caused by exposure to asbestos or asbestos-containing products for which the Debtors have liability."[144]   Accordingly, MCC's claims are Indirect PI Trust Claims, and they are properly classified with other Asbestos PI Claims in Class 6.[145]

---

[140] 9/14/2009 Tr. 261-262 (Hughes).

[141] *Id.*

[142] PP Ex. 349 (MCC Proof of Claim, Attachment ¶¶ 1, 8, 9).

[143] 9/14/09 Tr. 262 (Hughes); *see also* MCC Plan Obj. at ¶ 2 [Dkt. No. 21783] (stating that MCC's claims arise from the Debtors' obligations to indemnify MCC against "all future liability, loss, cost, or expense *arising from asbestos-related claims*") (emphasis added).

[144] *See* PP Ex. 277.01 Rev (Plan § 1.1(138)); 9/14/09 Tr. 263 (Hughes) (testifying that MCC's claims arise from "the original bodily injury claims involving the Libby employees and family members and community").

[145] The Plan Proponents do not agree that the Debtors are contractually obligated to indemnify MCC for claims that are brought against it for its own conduct and reserve all rights in that respect.

4.3.2.  <u>Montana</u>

The State of Montana Department of Public Health performed safety inspections of the Libby mine beginning in the 1950's.[146]  Montana has been named as a defendant in numerous state-court actions in which plaintiffs are seeking damages for personal injuries on the ground that Montana took on affirmative duties by performing these inspections, and that Montana failed to warn of the dangers of asbestos injury associated with Grace's vermiculite operations in Montana.[147]  Montana has filed a proof of claim against the Debtors asserting claims for common-law indemnification and contribution arising from these state-court actions.[148] Significantly, Montana itself acknowledges that the actions against it "aris[e] from the mining and processing of vermiculite ore containing asbestos within Montana" by Grace.[149]  Thus, Montana's claims against the Debtors are claims for indemnification, contribution, or subrogation for damages paid to a plaintiff in an action seeking recovery for "personal injuries allegedly caused by exposure to asbestos or asbestos-containing products for which the Debtors

---

[146]  9/14/2009 Tr. 263 (Hughes).

[147]  BNSF Exs. 85, 87-88, 92-93, 104-108, 113-116, 121-126, 136-141, 143-145, 148-149, 153-156, 160-172, 174, 179-180, 185, 190-192, 200, 204, 211-214, 216, 219-220, 224-225, 229-230, 232-236, 240-241, 250-251, 254-256, 263-265, 267, 269, 271, 273-275 (complaints naming Montana as a defendant and seeking damages for asbestos-related injuries arising from Grace's operations at the Libby mine); CNA Ex. 004 (same); Montana Exs. 002-003, 005-028, 030-089, 091-149 (same); *see also* Montana Ex. 149 (pp. 2-3) (Montana's proof of claim – summarizing allegations in state court actions).

[148]  Montana Ex. 149 (Montana's proof of claim – explaining basis for claim at 4); *see also* 9/14/09 Tr. 264 (Hughes) ("The state of Montana, I don't believe it is a contractual indemnification. I think it is a common law contribution and indemnification claim, that they have asserted in . . . the proofs of claim against Grace . . . .").

[149]  Montana Final Plan Obj. at 5 [Dkt. No. 21785]; *see also* Montana Preliminary Plan Obj. at ¶ 10 [Dkt. No. 20305] ("[T]he actions against Montana are wholly and completely derivative of the Debtors' operations.").

have liability."[150]    Accordingly, Montana's claims are Indirect PI Trust Claims, and they are

properly classified with other Asbestos PI Claims in Class 6.[151]

### 4.3.3.  BNSF

After Grace extracted the asbestos-containing vermiculite from Zonolite Mountain, it was

typically milled on site into a substance known as vermiculite concentrate.[152]   The vermiculite

concentrate would then be moved down the mountain by a conveyor system to a loading

platform, owned and operated by BNSF, where the concentrate was loaded into rail cars and

shipped to expanding plants throughout the country.[153]   BNSF has been named as a defendant in

numerous cases asserting claims for personal injuries against it as a consequence of this

activity.[154]   While BNSF has not filed a proof of claim against Grace for indemnification or

contribution claims arising from Asbestos PI Claims, BNSF argues that the Joint Plan

misclassifies and discriminates against its indemnity and contribution claims.    BNSF

acknowledges that its alleged claims arise from suits based on injuries "allegedly resulting from

vermiculite mined in Libby, loaded by Grace and transported by BNSF."[155]   Clearly, BNSF's

alleged claims arise out of the "same basic tort, personal injury related to asbestos exposure," as

---

[150]  PP Ex. 277.01 Rev (Plan § 1.1(138)).

[151]  PP Pretrial Phase II Main Br. at 63 (explaining why Montana's legal argument that its claim
is "based on different acts" than Grace's asbestos liability is without merit).

[152]  9/9/2009 Tr. 38 (Hughes) ("Q. What was it that came out of the mill?  A. It was commonly
referred to as the Vermiculite concentrate.").

[153]  *Id.*

[154]  *See, e.g.,* BNSF Exs. 180, 181, 182 (complaints against BNSF for asbestos-related personal
injuries arising from BNSF's activities at the Libby mine).

[155]  BNSF Phase II Br. at 9-10 [Dkt. No. 22410].

Grace's asbestos liabilities, and "in many cases" will involve "the same claimants."[156]  Indeed, in ongoing suits against BNSF, this Court has already found that "it is the Debtors' operations and conduct at the Libby mines that are at the core of the issues raised."[157]  As with MCC and Montana, BNSF's claims are claims for indemnification, contribution, or subrogation for damages paid to a plaintiff in an action seeking recovery for "personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability."[158]  Accordingly, BNSF's claims are Indirect PI Trust Claims, and they are properly classified with other Asbestos PI Claims in Class 6.

### 4.4.    Other Indirect PI Trust Claim Classification Objections

#### 4.4.1.  Fireman's Fund

Fireman's Fund's "surety claim," as alleged in its proof of claim,[159] arises out of an indemnity agreement[160] obligating Grace to reimburse Fireman's Fund for losses suffered under a supersedeas bond[161] that it posted in connection with the Debtors' appeal of the judgment in

---

[156]  *See* 9/14/09 Tr. 265 (Hughes); *see also* BNSF Phase II Br. at 9-10 (acknowledging that claims against BNSF "aris[e] out of Grace's operation of the Libby mine and the transportation of [Grace's] vermiculite").

[157]  *W. R. Grace & Co. v. Chakarian*, 386 B.R 17, 30-31 (Bankr. D. Del. 2008); *see also id.* at 31 (taking notice of BNSF's admission that "'Grace's operations at Libby were a proximate cause of the individual Plaintiffs' injuries'" in the cases filed against BNSF).

[158]  *See* PP Ex. 277.01 Rev (Plan § 1.1(138)).

[159]  PP Ex. 144 (FFIC Proof of Claim at 1-4) (explaining nature of FFIC's "surety claim").

[160]  Fireman's Fund (Surety Claim) Ex. 3 (Surety indemnity agreement between FFIC and Grace, dated July 5, 2000).

[161]  Fireman's Fund (Surety Claim) Ex. 2 (Supersedeas bond in sum of $43,038,931.91 signed and notarized on July 5, 2000).

*Aaron Clifton Edwards et. al v. Pittsburgh Corning Corp. et al.*, Case No. B-150,896J, slip. op. (Tex. D. Ct. March 28, 2000)[162] (the "Edwards Judgment").    The claims that underlie the Edwards Judgment are personal injury claims based on exposure to the Debtors' asbestos products.[163]   Any loss that Fireman's Fund suffers under the supersedeas bond will result from satisfying those underlying claims.    Thus, Fireman's Fund's surety claim is a claim for indemnification, contribution, or subrogation for damages paid to a plaintiff in an action seeking recovery for "personal injuries (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability."[164]   Accordingly, Fireman's Fund's surety claim is an Indirect PI Trust Claim, and it is properly classified with other Asbestos PI Claims in Class 6.[165]

### 4.4.2.  Longacre

Longacre's claim against Grace arises out of certain surety bonds that National Union posted in connection with Grace's settlement of several asbestos tort claims.[166]   National Union's

---

[162]  Fireman's Fund (Surety Claim) Ex. 1 (Final judgment entered in *Edwards* case, filed on April 7, 2000).

[163]  *See* 9/15/09 Tr. 16 (Hughes) ("[T]he underlying claim that gave rise to the judgment was the same type of claim, a tort claim, personal injury claim, arising from exposures to Grace products.").

[164]  *See* PP Ex. 277.01 Rev (Plan § 1.1(138)).

[165]  *See* PP Pretrial Phase II Main Br. at 54 (explaining why Fireman's Fund's legal argument that the "legal character" of its claim is dissimilar from other claims in Class 6 is without merit).

[166]  9/14/09 Tr. 268-69 (Hughes) ("Longacre purchased the claims of National Union and National Union had issued bonds -- surety bonds, which was to guarantee Grace's performance under a settlement agreement . . . ."); 9/15/09 Tr. 52 (Hughes) ("Q. So National Union had posted a surety bond, correct? A. Yes. Q. And that surety bond was intended to secure debtor's obligations under settlement agreements with various asbestos personal

(Continued…)

proof of claim alleges a claim for reimbursement of losses suffered under these surety bonds.[167]

On November 13, 2007, National Union entered into a settlement with Grace whereby the parties

agreed to settle this claim for the sum of $9,806,018.[168]  National Union later assigned this claim

to Longacre.[169]   Any loss that National Union incurred under the surety bonds necessarily

resulted from satisfying the underlying asbestos tort claims.[170]  Thus, National Union's claim for

reimbursement, which is now held by Longacre, is a claim for indemnification, contribution, or

subrogation for damages paid to a plaintiff in an action seeking recovery for "personal injuries

(whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or

indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have

---

injury claimants? A. Yes."); *see also* Longacre Ex. A (Order associated with November 13, 2007 settlement agreement).

[167]  9/15/09 Tr. 52 (Hughes) ("Q. And the basis of National Union's claim was for repayments of those amounts that National Union had paid out under those surety bonds? A. Yes.").  It is unclear whether Longacre alleges that Grace's obligations arise from the surety bonds themselves or from agreements issued in connection with the surety bonds but either relate to Grace's asbestos liabilities.  *See* 9/15/09 Tr. 54 (Hughes) ("Q. But you don't know whether those obligations arose from the surety bonds themselves or from any agreements issued in connection with those surety bonds? A. That's correct. I don't know the answer to that.").

[168]  Longacre Ex. 1 (Stipulation of Facts Between Longacre and Debtors at 2, ¶ 4).

[169]  *Id.* at 3, ¶ 9.

[170]  9/15/09 Tr. 72 (Hughes) ("National Union agreed if for any reason that Grace was unable to meet its obligations to the tort claimants, that it would make the payments.").

45

liability."[171]   Accordingly, Longacre's claim is an Indirect PI Trust Claim, and it is properly

classified with other Asbestos PI Claims in Class 6.[172]

### 4.4.3.   Seaton and OneBeacon

Seaton and OneBeacon have filed proofs of claim against Grace alleging claims for

indemnification under settlement agreements between Seaton and OneBeacon's predecessors and

Grace.[173]   Certain of Seaton's and OneBeacon's alleged claims[174] against Grace are contingent

and unliquidated indemnification claims for asbestos-related claims that might at some future

point be made against the settled policies.  Seaton and One Beacon acknowledge that any claims

made against the settled policies will by definition arise from "underlying asbestos-related tort

claims,"[175] against Grace, because that is the liability covered by the policies in questions.  For

example, Seaton's and One Beacon's contingent and unliquidated claims emanate in part from

"underlying bodily injury claims" allegedly based on exposure to products containing the

---

[171]  *See* PP Ex. 277.01 Rev (Plan § 1.1(138)).

[172]  *See* PP Pretrial Phase II Main Br. at 51 (explaining why Longacre's legal argument that its indirect claim cannot be classified in Class 6 because it is substantially similar to claims in Class 9 is without merit).

[173]  *See* OS Ex. 48 (Seaton Proof of Claim); OneBeacon/Seaton Ex. 48 (OneBeacon Proof of Claim); OneBeacon/Seaton Exhibit 1Rev (§§ 5.0-5.1) (May 1993 agreement with Commercial Union); OneBeacon/Seaton Exhibit 2Rev (December 1996 agreement with Commercial Union); OneBeacon/Seaton Exhibit 3Rev § VI.A. (October 1998 agreement with Commercial Union); OneBeacon/Seaton Exhibit 4Rev §§ V.A.-B. (August 1992 agreement with Unigard Security Insurance Company); OneBeacon/Seaton Exhibit 5Rev §§ V.A.-B. (May 1995 agreement with Unigard Security Insurance Company); *see also* OneBeacon and Seaton Objection (¶¶ 24-25); OneBeacon and Seaton Phase II Br. at 13-14.

[174]  To the extent that Seaton and OneBeacon's claims do not arise from underlying asbestos claims, the Joint Plan does not purport to classify their claims in Class 6.

[175]  OneBeacon and Seaton Plan Objection at 23; OneBeacon and Seaton Phase II Br. at 13.

Debtors' vermiculite.[176]  Moreover, the nature of Seaton and OneBeacon's alleged claims is no different if they are triggered by claims against their policies by a co-defendant -- BNSF -- because in that case the underlying liabilities are still asbestos personal injury claims.[177]  Thus, Seaton's and One Beacon's claims are claims for indemnification, contribution, or subrogation for damages paid to a plaintiff in an action seeking recovery for "personal injuries (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability."[178] Accordingly, Seaton and OneBeacon's claims are Indirect PI Trust Claims, and they are properly classified with other Asbestos PI Claims in Class 6.[179]

## V.    THE SUCCESSOR CLAIMS INJUNCTION IN SECTION 8.5 OF THE JOINT PLAN IS NECESSARY TO THE REORGANIZATION AND PERMITTED BY THIRD CIRCUIT LAW.

### 5.1.    Proposed Finding

This Court has jurisdiction to issue the Successor Claims Injunction to be implemented under section 8.5 of the Joint Plan.  The Successor Claims Injunction is also proper under 11

---

[176]  9/14/09 Tr. 267 (Hughes).

[177]  Nor is there any reason why Seaton or OneBeacon would ever be subject to such a claim after the Effective Date.  As Settled Asbestos Insurance Companies, Seaton and OneBeacon are Asbestos Protected Parties and will receive full protection under the Asbestos PI Channeling Injunction from all Asbestos PI Claims, which include claims for recovery against their policies asserted by a co-defendant of Grace.  *See* PP 277.01 Rev (Plan § 8.2.1) (detailing the scope of the Asbestos PI Channeling Injunction).

[178]  *See* PP Ex. 277.01 Rev (Plan § 1.1(138)).

[179]  *See* PP Pretrial Phase II Main Br. at 51 (explaining why Seaton's and OneBeacon's legal arguments that their claims are "substantially dissimilar to, and broader in scope than" other claims in Class 6 because they sound in contract, rather than in tort, and include claims for defense costs is without merit).

U.S.C. §105(a) because the injunction is (1) warranted by the "unusual circumstances" of these Chapter 11 Cases, (2) necessary to the Debtors' reorganization, and (3) fair to all parties in interest.

### 5.2. Argument

The Successor Claims Injunction set forth in section 8.5 of the Joint Plan is essential to the successful reorganization of the Debtors.  It enjoins all entities from asserting Successor Claims against any Asbestos Protected Party.[180]  The purpose of the Successor Claims Injunction is to prevent the assertion of claims against Asbestos Protected Parties, including the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties, that would implicate the property of the Debtors.  In addition, the Successor Claims Injunction is a requirement of the Sealed Air and Fresenius Settlement Agreements and is a precondition of these parties' combined contribution of approximately $1.1 billion dollars to the Asbestos PI Trust and the Asbestos PD Trust.

### 5.2.1. The Court Has Subject Matter Jurisdiction to Issue the Successor Claims Injunction.

This Court has subject matter jurisdiction over claims "related to" bankruptcy matters, including proceedings that "could conceivably have any effect on the estate being administered in bankruptcy."[181]  Applying this standard, the Court clearly has "related-to" jurisdiction to issue the Successor Claims Injunction.   In the broad context of Grace's Chapter 11 Cases, the Successor Claims Injunction is part of a larger scheme to resolve the liabilities of Grace's two former parent companies, Sealed Air and Fresenius.  This scheme was achieved through the

---

[180]  PP Ex. 277.01 Rev. (Plan, § 8.5).

[181]  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984)); *Combustion Eng'g*, 391 F.3d at 227   ("Pacor … provides the controlling standard for assessing 'related to' bankruptcy jurisdiction").

settlement agreements with those parties, and absent these settlements substantial uncertainty regarding these liabilities would persist and could only be resolved through highly complex and costly litigation.

When Grace filed for Chapter 11 protection, it was unclear what, if any, liability Sealed Air and Fresenius would have for Grace's liabilities.  On March 18, 2002, the ACC and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee") filed actions against both Fresenius and Sealed Air (including certain of their subsidiaries) (the "Adversary Proceedings") alleging claims for fraudulent transfers, successor liability, piercing the corporate veil, and breach of fiduciary duty.[182]  The resolution of these claims through the Fresenius and Sealed Air Settlement Agreements has fixed these liabilities by requiring each party to make contributions to the Joint Plan and in turn granting various protections to Sealed Air and Fresenius, including the Successor Claims Injunction.[183]  The Successor Claims Injunction is

---

[182] PP Ex. 247 (Complaint from *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corporation* at 11-16) (setting forth counts alleged against Sealed Air); PP Ex. 248 (Complaint from *Official Comm. of Asbestos Pers. Injury Claimants v. Fresenius Med. Care Holdings, Inc.* at 10-16) (setting forth counts alleged against Fresenius).

[183] PP Ex. 277.14 Rev. (Fresenius Settlement Order, at ¶ JJ) (stating that Fresenius has agreed to make "a one-time lump sum payment of $115 million in exchange for full protection *from current and future Grace-Related Claims*") (emphasis added); PP Ex 277.23 Rev. (Sealed Air Settlement Order at ¶ 1) (authorizing and approving the Sealed Air Settlement Agreement "in all respects"); PP. Ex. 277.22 Rev. (Sealed Air Settlement Agreement §§ II(c)(vi)) (requiring that the Sealed Air Indemnified Parties receive the "full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code" with respect to all Asbestos-Related Claims, which is defined to include not only Asbestos Claims but Successor Claims (regardless or whether they are Asbestos Claims)); PP Ex. 277.22 Rev. (Sealed Air Settlement Agreement ¶ EE, II(i)) (indicating, among other things, that the protection afforded by the Successor Claims Injunction is "an essential and material term of this Agreement and the compromise settlement leading to this Agreement, and that, without such provision, neither Cryovac, Inc. nor Sealed Air Corporation would have executed this Agreement and the compromise settlement would not have been accomplished").

critical to the structure of these settlements because it draws a bright line that severs Fresenius

and Sealed Air from any tail of liability they might have based on their former status as Grace's

parent company.[184]   Because these settlements resolve liabilities that have a profound effect on

the Debtors' estates, and because the Successor Claims Injunction is a key element of these

settlement agreements, the Court clearly has jurisdiction to issue the injunction.

The Court also has subject-matter jurisdiction over claims against Sealed Air and

Fresenius based on the substantial indemnities granted to those parties by the Debtors.[185]   As this

Court already explained, the law is very clear that claims that would trigger a debtor's

underline indemnity obligations fall squarely within the Bankruptcy Court's subject matter

jurisdiction.[186]   This Court has distinguished such contractual indemnity obligations from the

common law indemnity claims that arose in *Pacor*,[187] noting that contractual indemnity

obligations are automatically triggered and thus have a "direct impact on the estate," whereas

common law indemnity claims of the type in *Pacor* require an intervening lawsuit to accrue.[188]

In *In re W. R. Grace & Co, Inc*., this Court found that "[i]nasmuch as Debtors assumed the

---

[184]   *See* PP Ex. 277.01 Rev. (Plan § 8.5.1) (providing that Sealed Air and Fresenius are protected
from all Successor Claims).

[185]   *See infra* notes 192, 193.

[186]   *See In re W. R. Grace & Co.* (*W. R. Grace & Co. v. Chakarian*), 315 B.R. 353 (Bankr. D.
Del. 2004); Memorandum Opinion Denying Debtors' Motion to Expand The Preliminary
Injunction to Include Actions Against the State of Montana, dated April 16, 2007 (Adv. 01-
0771, Dkt. No. 419).

[187]   *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).

[188]   Memorandum Opinion Denying Debtors' Motion to Expand The Preliminary Injunction to
Include Actions Against the State of Montana, dated April 16, 2007 (Adv. 01-0771, Dkt. No.
419) (quoting *In re W. R. Grace & Co.* (*W. R. Grace & Co. v. Chakarian*), 315 B.R. 353, 357
(Bankr. D. Del. 2004)).

obligation to indemnify Royal for any amounts Royal may have to pay with respect to MVC, Debtors will be affected by the outcome of the lawsuit." [189]    The Court has subject matter jurisdiction here just as it did to enjoin claims against MVC that implicated the Debtors' obligation to indemnify Royal Indemnity Company.[190]    In that matter, Grace was contractually obligated to indemnify its insurer Royal for asbestos-related claims pursuant to a settlement agreement between the parties.[191]    Here, the Debtors are also contractually obligated to indemnify Fresenius[192] and Sealed Air[193] pursuant to both pre-petition and post-petition agreements.

Seaton and OneBeacon's objection that the Court lacks jurisdiction to enjoin their Successor Claims against Fresenius and Sealed Air is patently wrong.    Seaton and OneBeacon concede that Fresenius and Sealed Air have contractual indemnification rights against Grace for

---

[189]  315 B.R. 353, 357 (Bankr. D. Del. 2004).

[190]  Order Granting the Motion to Expand the Preliminary Injunction to Include Actions Against Montana Vermiculite Company, dated Oct. 12, 2004 (Adv. 01-0771, Dkt. No. 299).

[191]  *See In re W. R. Grace & Co.* (*W. R. Grace & Co. v. Chakarian*), 315 B.R. 353 (Bankr. D. Del. 2004).

[192]  PP Ex. 359 (Distribution Agreement by and among W. R. Grace & Co., W. R. Grace & Co. -- Conn., and Fresenius AG*,* dated as of February 4, 1996, § 4.02, Indemnification) (in 1996, the Debtors granted the entity that is now Fresenius broad indemnities, including indemnification for losses "relating to any liability of the Grace -- Conn. Business [sic] under environmental law"); PP Ex. 277.13 (Fresenius Settlement Agreement § 2.02(F)).

[193]  PP Ex. 098 (Distribution Agreement by and among W. R. Grace & Co. (now "Sealed Air"), W. R. Grace & Co. -- Conn., and Grace Specialty Chemicals, Inc. (now "W. R. Grace & Co."), dated as of March 30, 1998, §§ 4.02, Indemnification, 5.04(b)) (in 1998, the Debtors agreed to indemnify Sealed Air for all liabilities of Grace and its subsidiaries, including environmental liabilities, with few exceptions); 09/15/09 Tr. 96 (Shelnitz) (Grace essentially indemnified Sealed Air for all liabilities except those arising from Grace's packaging business); PP Ex. 277.22 (Sealed Air Settlement Agreement, § I.c.(vii) and Exhibit 6, Indemnification Agreement).

Successor Claims.[194]   But they suggest that since the Debtors *might* decide to contest their

indemnity obligations, which *might* lead to lawsuits, the Debtors' indemnity obligations are not

"automatic."  This Court has already flatly rejected such an argument.  In the matter concerning

MVC discussed above,[195] plaintiffs argued that Grace's obligation to indemnify Royal Indemnity

Company was not "automatic" because the settlement agreement giving rise to the obligation

was ambiguous and might prompt an intervening action.  This Court "reject[ed] these arguments

as having no relevance" to whether the Court had subject matter jurisdiction over disputes that

trigger the agreement, stating that "[t]he validity or ambiguity of the settlement between Royal

and the Debtors is not at issue."[196]   The relevant question is whether a non-debtor's claim for

indemnification accrues automatically or only by virtue of an intervening lawsuit,[197] not whether

litigation concerning a contractual indemnity provision is a possibility.  Therefore, Seaton and

OneBeacon's objection lacks merit.

---

[194]  Seaton and OneBeacon Phase II Br. at 21-22 ("Fresenius and Sealed Air appear to have certain indemnity rights against the Debtors.").

[195]  *See In re W. R. Grace & Co.* (*W. R. Grace & Co. v. Chakarian*), 315 B.R. 353, 357-58 (Bankr. D. Del. 2004).

[196]  *Id.*

[197]  *In re Combustion Eng'g*, 391 F.3d at 227 ("The test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit."); *In re Federal-Mogul Global, Inc.,* 300 F.3d 368, 382 (3rd Cir. 2002) (denying section 105 jurisdiction because the third party defendant's claim for indemnification would not accrue automatically, but only by virtue of the third party defendant bringing an additional lawsuit against the debtor for indemnification).

5.2.2.   The Court Has the Authority Pursuant to Section 105 of the Bankruptcy Code to Issue the Successor Claims Injunction.

The Bankruptcy Court's authority under section 105(a) "permits a court to issue injunctive relief where 'unusual circumstances' exist, such as in cases involving 'settlement of massive liabilities against debtors and co-liable parties.'"[198]   The Debtors' cases involve massive asbestos liabilities and clearly fit within this framework.[199]   The Third Circuit has refused to adopt a rule "regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible," and has instead looked for "hallmarks of permissible non-consensual releases -- fairness, necessity to the reorganization, and specific factual findings to support these conclusions."[200] As explained below, the Successor Claims Injunction is both necessary and fair.

(a)      The Successor Claims Injunction is Necessary.

The Successor Claims Injunction is absolutely necessary to the Debtors' reorganization. At an early stage of Grace's Chapter 11 Cases it became clear that resolving the complex web of liabilities between Grace, Sealed Air, and Fresenius would pose a nearly impassible roadblock to

[198]   *In re North American Refractories Co.*, 2007 Bankr. LEXIS 4721, *35 (W.D. Pa., Nov. 13, 2007) (citing *In re Continental Airlines,* 203 F. 3d 203, 212 (3rd Cir. 2000)).

[199]   PP Ex. 276 Rev (Debtors' Disclosure Statement*)* (Preliminary Statement -- "As of the Petition Date, the Parent and certain of its subsidiaries were defendants in 65,656 asbestos related lawsuits…" and §§ 2.7, 2.8 -- describing generally the Debtors' asbestos-related litigation).

[200]   *In re Continental Airlines, Inc.* 203 F.3d 203, 214 (3rd Cir. 2000); *see also North American Refractories*, 2007 Bankr. LEXIS 4721 at *36-37;  *In re American Family Enters.,* 256 B.R. 377, 406 (D. N. J. 2000); *In re Prussia Assoc.,* 322 B.R. 572, 596 (Bankr. E.D. Pa. 2005); *In re Exide Techs.,* 303 B.R. 48, 72 (Bankr. D. Del. 2003).  Seaton and OneBeacon incorrectly cite to *In re Dow Corning Corp.,* 280 F.3d 648, 658 (6th Cir. 2002) as the standard to be applied. *See* Seaton and OneBeacon Plan Obj. at ¶ 51.  The Third Circuit has not adopted the *Dow Corning* seven-part test.

Grace's reorganization unless a comprehensive settlement could be reached.  On March 18, 2002, the ACC and the PD Committee filed the Adversary Proceedings against Sealed Air and Fresenius (including certain of their subsidiaries), which alleged claims for fraudulent transfers, successor liability, piercing the corporate veil, and breach of fiduciary duty.[201]  In turn, Sealed Air and Fresenius filed proofs of claim against Grace based on indemnifications granted to those parties in the Cryovac Transaction and the Fresenius Transaction.[202]  Litigation over these disputes demanded substantial time and resources from the parties and left too much uncertainty and insufficient attention from Grace's key personnel for the Debtors to effectively reorganize.[203]  The Fresenius and Sealed Air settlements, each of which requires the Successor Claims Injunction as a precondition to settlement, resolved the uncertainty surrounding these liabilities and allowed the Debtors' key personnel to focus their attention on reorganizing Grace.

Moreover, the fruits of these settlements — namely, the aggregate contribution of approximately $1.1 billion dollars to the Joint Plan — are vital to the Debtors' successful reorganization.  The Joint Plan before the Court simply could not have been accomplished

---

[201]  PP Ex. 247 (Complaint from *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corporation* at 11-16) (setting forth counts alleged against Sealed Air); PP Ex. 248 (Complaint from *Official Comm. of Asbestos Pers. Injury Claimants v. Fresenius Med. Care Holdings, Inc.* at 10-16) (setting forth counts alleged against Fresenius).

[202]  PP Ex. 148 (Proof of Claim filed by Fresenius) (alleging claims for indemnification); OS Ex. 20 at Annex A, B (Proof of Claim filed by Sealed Air) (same).

[203]  PP Ex. 277.23 Rev. (Sealed Air Settlement Order at ¶¶ F-J) (finding that the fraudulent conveyance action against Sealed Air involved uncertainty and large commitments of financial and human resources); PP Ex. 277.14 Rev. (Fresenius Settlement Order at ¶¶ PP-SS) (finding that the fraudulent conveyance action against Fresenius involved uncertainty and large commitments of financial and human resources).

without these funds,[204] and the Successor Claims Injunction is a necessary precondition to their payment.

The District Court's Order Approving the Fresenius Settlement Agreement states that Fresenius has agreed to make "a one-time lump sum payment of $115 million in exchange for full protection from current and future Grace-Related Claims. . . ."[205]  The District Court further found that "[t]he [Fresenius] Defendants are unwilling to settle the Fresenius Adversary Proceeding and provide the substantial contributions to these bankruptcy estates contemplated by the Settlement Agreement without the releases, protections and other benefits provided to the [Fresenius] Defendants by the Settlement Agreement."[206]  Moreover, the District Court also found that the "releases, protections, and other benefits provided to the [Fresenius] Defendants are necessary to the reorganization" of the Debtors.[207]

---

[204] 09/17/09 Tr. 59-60 (Austern) (Q: Does that [Fresenius and Sealed Air's] contribution provide a benefit to the trust?  A: It provides an enormous benefit to the trust.  $1.1 billion is a very significant portion of what will be the trust assets.   Q: If that contribution were not available, how would that impact future claimants?  A: It would seriously jeopardize my view that the - - that future claimants would receive the same or similar treatment as present claimants, and very candidly, I don't think that without that we would have an understanding with the debtors to settle this matter.  Q: Is the contribution by Sealed Air -- of the Sealed Air and Fresenius settlement monies, is that a condition of this plan?  A: It is a condition of this plan. Q: Are you aware of any condition precedents in the settlement agreements with Sealed Air and Fresenius regarding that contribution?  A: Yes. Q: What are those, sir?  A: Well, among other things, they have to receive 524(g) protection.  There are certain releases that are in effect, and there are further injunctions that are available.).

[205] PP Ex. 277.14 Rev (Fresenius Settlement Order, at ¶ JJ).

[206] *Id.* at ¶ AAA.

[207] *Id.* at 20-21.

Similarly, the Sealed Air Settlement Agreement, approved by the Court "in all respects"[208] on June 27, 2005, requires that Sealed Air receive the "full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code,"[209] and Sealed Air would not have entered into the Sealed Air Settlement Agreement without the Successor Claims Injunction.  The Sealed Air Settlement Agreement could not be clearer on this point, stating that the protection afforded by the Successor Claims Injunction is "an essential and material term of this Agreement and the compromise settlement leading to this Agreement, and that, without such provision, neither Cryovac, Inc. nor Sealed Air Corporation would have executed this Agreement and the compromise settlement would not have been accomplished."[210]  In approving the Sealed Air Settlement Agreement, the Court noted that "[a]pproval of the Settlement Agreement furthers the paramount interest of creditors"[211] and "would increase the funds available to fund a plan of reorganization" by "resulting in a net economic benefit to these bankruptcy estates and their creditors in the range of $1.2 billion [dollars]."[212]

Because the Successor Claims Injunction is a necessary component of the settlement agreements with Sealed Air and Fresenius, and because the Joint Plan is not possible without these settlement agreements, the Successor Claims Injunction is clearly necessary to the reorganization of Grace.

---

[208]  PP Ex. 277.23 Rev (Sealed Air Settlement Order at ¶1).

[209]  PP Ex. 277.22 Rev (Sealed Air Settlement Agreement § II(c)(vi)).

[210]  *Id.* at 24, ¶ (i).

[211]  PP Ex. 277.23 Rev (Sealed Air Settlement Order at ¶ K).

[212]  *Id.* at ¶¶ L - O.

(b)    The Successor Claims Injunction is Fair.

The Successor Claims Injunction is also fair.  The District Court has already determined that the protections afforded by the Successor Claims Injunction are fair to the Debtors and to their creditors.[213]  In addition, the District Court found that the Fresenius Settlement Agreement, which requires the Successor Claims Injunction, is "in the best interest of these bankruptcy estates and the creditors thereof,"[214] and the Bankruptcy Court found that the Sealed Air Settlement Agreement, which also requires the Successor Claims Injunction, "is in the best interests of the Plaintiffs, the Debtors, their bankruptcy estates, the creditors thereof and all parties in interest in these cases."[215]

Furthermore, the Joint Plan will compensate claimants affected by the Successor Claims Injunction.  Claims enjoined by the Successor Claims Injunction will be Class 9, General Unsecured Claims.[216]  Pursuant to the Joint Plan, Holders of Allowed General Unsecured Claims will receive payment in full for such claims plus post-petition interest.  Thus, the Joint Plan "provide[s] consideration to parties who [will] be enjoined from suing non-debtors."[217]

---

[213]  PP Ex. 277.14 Rev (Fresenius Settlement Order at ¶ ZZ) ("The releases, protections, and other benefits provided to [Fresenius] Defendants by the Settlement Agreement are fair to the Plaintiffs, these bankruptcy estates, and the creditors thereof.").

[214]  *Id.* at ¶ NN.

[215]  PP Ex. 277.23 Rev (Sealed Air Settlement Order at ¶ Q).

[216]  Additionally, "to the extent that Seaton and OneBeacon have any contract claims … arising from settlement agreements that released asbestos related products coverage under their policies, such claims are Class 6 claims [not Class 9 claims] and Seaton and OneBeacon's sole recourse is the Asbestos PI Trust pursuant to the Asbestos PI Channeling Injunction, not the Successor Claims Injunction."  PP Pretrial Phase II Main Br. at 93.

[217]  *Continental Airlines,* 203 F.3d at 212 (3rd Cir. 2002).

Seaton and OneBeacon argue that the Successor Claims Injunction, sought pursuant to the Court's authority under section 105(a), circumvents the requirements of section 524(g) and, therefore, the Court lacks authority to issue the injunction.   It appears that Seaton and OneBeacon either misunderstand the scope of the Successor Claims Injunction or the purpose of section 524(g).   Section 524(g) of the Bankruptcy Code does not apply to the claims enjoined by the Successor Claims Injunction.   The claims enjoined are *not* asbestos liability claims,[218] and, thus, are neither governed by section 524(g) nor contemplated in *Combustion Engineering*.   In fact, the Third Circuit in *Combustion Engineering* carefully and explicitly cabined their holding to asbestos liability claims[219] and "[n]umerous courts have concluded that the establishment of a trust and the entry of a channeling injunction under section 105(a) . . . are appropriate to resolve non-asbestos-related liabilities . . . ."[220]

---

[218] PP Ex. 277.01 Rev (Plan § 8.5.1) (The Successor Claims Injunction specifically excludes asbestos-related claims.   The injunction enjoins "any Successor Claim based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction or Fresenius Transaction (**other than Successor Claims arising out of or based on any Asbestos PI Claim, Asbestos PD Claim, or CDN ZAI Claim**) against any Asbestos Protected Party shall be stayed, restrained, and enjoined from taking any and all legal or other actions or making any demand for the purpose of directly or indirectly claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any such Successor Claim . . . .") (emphasis added).

[219] *Combustion Eng'g,* 391 F.3d at 237 n. 50 ("[w]e hold only that § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g), which is the means Congress prescribed for channeling the asbestos liability of a non-debtor").

[220] *North American Refractories*, 2007 Bankr. LEXIS 4721 at 35.

### 5.2.3.    Seaton and OneBeacon are Barred by Principles of *Res Judicata* from Objecting to the Successor Claims Injunction.

Both the Fresenius Settlement Order and the Sealed Air Settlement Order are final orders and clearly state that they are binding in all respects,[221] and are thus *res judicata* as to "the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."[222]

Seaton and OneBeacon received proper notice of the Fresenius and Sealed Air Settlement Agreements.    At the time of the Fresenius Settlement Agreement in 2003, Seaton and OneBeacon were unknown creditors in the Debtors' Chapter 11 Cases.   "A known creditor is one whose identity is either known or 'reasonably ascertainable' by the debtor,"[223] whereas an "'unknown' creditor is one 'whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of

---

[221] PP Ex. 277.14 Rev. (Fresenius Settlement Order at ¶ 6) ( "The terms of the Settlement Agreement and this Order shall be binding in all respects on the Debtors, their bankruptcy estates, all holders of claims and interests in the above-captioned cases, all parties in interest, and each of their respective successors and assigns, and upon entry of an order confirming a plan of reorganization in the above-captioned cases, any additional parties subject to the injunctions and releases provided through such plan."); PP Ex. 277.22 Rev. (Sealed Air Settlement Agreement, ¶ 6) ("The terms and provisions of the Settlement Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of the creditors, the Plaintiffs and the [Sealed Air Corporation] Defendants and their respective successors and assigns, and any affected third parties. . .").

[222] *Travelers Indem. Co. v. Bailey*, 129 S.Ct. 2195, 2197-98 (2009) (citing *Nevada v. United States,* 463 U.S. 110, 130 (1983)).

[223] *In re Smidth & Co.*, 2009 Bankr. LEXIS 780 *9 (Bankr. D. Del., March 16, 2009) (quoting *Tulsa Professional Collection Services v. Pope,* 485 U.S. 478, 490 (1988)).

the debtor].'"[224]  Aside from listing Commercial Union, OneBeacon's predecessor-in-interest, as party to an insurance agreement with the Debtors at the time the Debtors filed for chapter 11 relief,[225] the Debtors had no reason to know that Seaton or OneBeacon had claims related to these Chapter 11 Cases until 2005, at which time Seaton and OneBeacon were permitted to file late proofs of claim.[226]  In fact, Michael Brown, Seaton and OneBeacon's counsel in these cases, conceded that he was not aware of the alleged Otis Pipeline claim -- the primary Successor Claim at issue -- until late 2008, and that the Debtors were not notified of the alleged claim until July of 2009.[227]  It is simply unreasonable to expect that the Debtors, in due course of their business, could have uncovered the complex and contingent claims that Seaton and OneBeacon now allege they may or may not have.

Since Seaton and OneBeacon remained unknown creditors as of the Petition Date, "notice by publication was sufficient to satisfy the requirements of due process . . . ."[228]  The

---

[224] *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3rd Cir. 1995) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317 (1950)).

[225] Statement of Financial Affairs, Schedule G, filed June 1, 2001 [Dkt. 376].

[226] In 2005, it came to the Debtors' attention that Seaton and OneBeacon, as successors-in-interest to Unigard and Commercial Union, had not received actual notice of the Debtors' Chapter 11 filing or the March 2003 Bar Date. The Debtors stipulated to allow both Seaton and OneBeacon to file proofs of claim in 2005.  However, this was a mistake as to Seaton; contrary to the stipulation, Unigard, Seaton's predecessor, was not actually listed on Debtors' Schedule G.  *See* Certification of Counsel Regarding Stipulations Between the Debtors and Each of OneBeacon America Insurance Company and Seaton Insurance Company, dated Sept. 21, 2005 [Dkt. 9482].

[227] 09/16/09 Tr. 176 (remarks from counsel: M. Brown).

[228] *Chemetron*, 72 F.3d at 345.

Debtors publicized their chapter 11 filing in various publications,[229] and the fact of the Debtors' bankruptcy was widely known.[230] Indeed, this Court and the District Court have already determined that Grace's notice program was sufficient and that Grace did not have to provide actual notice to potential creditors not known to Grace and not discoverable through the exercise of "reasonable diligence."[231] Accordingly, Seaton and OneBeacon are barred by the doctrine of *res judicata* from challenging the terms of the Fresenius and Sealed Air Settlement Agreements, including the Successor Claims Injunction.

Moreover, Seaton and OneBeacon received *actual* notice of the Renewed Motion to approve the Sealed Air Settlement Agreement via first class mail on April 1, 2005.[232] Seaton and OneBeacon also received multiple notices that this Court would be hearing the Renewed Motion on June 27, 2005,[233] through the service of an agenda of hearing on June 20, 2005 and through

---

[229] PP Ex. 355 (Affidavit of Katherine Kinsella re Bar Date Publication); Affidavit of Publication re: Notice of Commencement of the Case, filed May 16, 2001 [Dkt. 275].

[230] 09/15/09 Tr. 148 (In response to Mr. Pratt's claim that Seaton/OneBeacon did not have notice of Grace's bankruptcy -- the Court interjects: "Pardon me. The fact that W. R. Grace was in bankruptcy wasn't known on an international level?").

[231] *See Pacificorp and VanCott Bagley Cornwall & McCarthy v. W. R. Grace.*, No. 05-764, 2006 WL 2375371 at *10 (D. Del. Aug. 16, 2006).

[232] PP Ex. 255 (Renewed Motion for An Order Approving, Authorizing, and Implementing Sealed Air Settlement Agreement (Adv. 02-2210, Dkt. No. 729) and Certificate of Service (showing service to Drinker, Biddle & Reath LLP, counsel for Seaton and OneBeacon); *see also* Verified Statement Pursuant to Fed. Rule Bankr. P. 2019, filed by Drinker, Biddle & Reath LLP (01-01139, Dkt. 7922); PP 277.23 (Sealed Air Settlement Order at ¶ D) ("Due, proper and sufficient notice of the Motion and the Hearing was given pursuant to Bankruptcy Rules 2002(a)(3) as modified by the Court for cause shown, and 9019(a)").

[233] Notice of Agenda of Matters Scheduled for Hearing on June 27, 2005 Before the Honorable Judith K. Fitzgerald (01-01139, Dkt. No. 8643), at 8 (listing Renewed Motion for approval of Sealed Air Settlement Agreement as item to be heard at hearing on June 27, 2005); (Continued…)

the service of an amended agenda of hearing on June 23, 2005.[234]  Yet, Seaton and OneBeacon did not object either to the Renewed Motion or to the entry of the Sealed Air Settlement Order, thus repeatedly waiving their opportunity to do so.   It would, therefore, be especially inappropriate, inequitable, and inconsistent with federal practice to allow Seaton and OneBeacon to belatedly challenge the Successor Claims Injunction, years after they were provided with ample notice and an opportunity to be heard, years after this Court ruled, and years after the Sealed Air Settlement Order was entered and became final.

In sum, the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement are *res judicata* as to Seaton and OneBeacon, and thus Seaton and OneBeacon are precluded from challenging those settlement agreements or the terms therein.   In addition and apart from this fact, the Court has subject matter jurisdiction to issue the Successor Claims Injunction to be implemented under section 8.5 of the Plan.   In light of the unusual circumstances of this case, and because the Successor Claims Injunction is fair and necessary to the Debtors' reorganization, the Successor Claims Injunction is proper under section 105(a).

---

Certificate of Service (showing service to Drinker, Biddle & Reath LLP, counsel for Seaton and OneBeacon).

[234] Amended Notice of Agenda of Matters Scheduled for Hearing on June 27, 2005 Before the Honorable Judith K. Fitzgerald (01-01139, Dkt. No. 8678), at 8 (listing Renewed Motion for approval of Sealed Air Settlement Agreement as item to be heard at hearing on June 27, 2005); Certificate of Service (showing service to Drinker, Biddle & Reath LLP, counsel for Seaton and OneBeacon).

VI.  **THE ASBESTOS INSURANCE ENTITY INJUNCTION IS NECESSARY TO FULFILL THE JOINT PLAN'S PURPOSE OF EQUITABLE DISTRIBUTION BETWEEN CURRENT AND FUTURE CLAIMANTS, AND IS PERMISSIBLE UNDER THIRD CIRCUIT LAW.**

6.1.  **Proposed Finding**

The Asbestos Insurance Entity Injunction is fair, is necessary to the reorganization of the Debtors, and is warranted by the unusual circumstances of the Debtors' Chapter 11 Cases.

6.2.  **Argument**

To achieve the Joint Plan's purpose of equitable distribution between current and future claimants, the Joint Plan provides for the issuance of the Asbestos Insurance Entity Injunction (the "Insurance Injunction"), which, in conjunction with the Asbestos PI Channeling Injunction, protects key assets of the Asbestos PI Trust.  Absent the Insurance Injunction, Asbestos PI Claimants could file direct claims against certain Asbestos Insurance Entities, thereby depleting one of the Asbestos PI Trust's most valuable assets — the Asbestos Insurance Rights — and circumventing the equitable distribution procedures of the Asbestos PI TDP.  The Insurance Injunction is therefore a necessary component of the Joint Plan, and is well within the Court's subject matter jurisdiction under 28 U.S.C. § 1334(b) and statutory authority under section 105(a) of the Bankruptcy Code.

Bankruptcy courts have broad jurisdiction over all civil proceedings "related to cases under title 11."[235]  The Court's "related-to" jurisdiction hinges on whether an action "could conceivably have any effect on the estate being administered in bankruptcy."[236]  Here, the

---

[235]  28 U.S.C. § 1334(b).

[236]  *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995), (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984)); *Combustion Eng'g*, 391 F. 3d at 227 ("Pacor . . . provides the controlling standard for assessing 'related to' jurisdiction").

Insurance Injunction protects the Asbestos Insurance Rights, which are substantial assets of the

Asbestos PI Trust, from being plundered by direct actions by Asbestos PI Claimants.   In

approving a similar injunction, the Second Circuit in *MacArthur v. Johns-Manville Corp.* held

that a debtor's insurance policies are property of the estate, and that the claims of third parties

seeking to collect out of the proceeds of a debtor's insurance policies are within a bankruptcy

court's jurisdiction.[237]   The Asbestos Insurance Rights are likewise property of the estate, and the

Court clearly has jurisdiction to enjoin claims against these assets.

The Court also has statutory authority under section 105(a) to issue the Insurance

Injunction.  An injunction issued under section 105(a) to bar actions against third parties must be

warranted by unusual circumstances, must be necessary to the reorganization, and must be

fair.[238]

The "unusual circumstances" required for issuance of a section 105(a) injunction often

involve the "settlement of massive liabilities against debtors and co-liable parties."[239]  Asbestos-

related chapter 11 cases frequently satisfy this requirement, and this Court has properly approved

similar asbestos insurance entity injunctions under § 105(a) in numerous other asbestos-driven

---

[237] *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92-93 (2d Cir. 1988) (upholding injunction blocking suits against debtor's insurers because the affected polices were "substantial property of the Manville estate" and third-party claims against these policies were "inseparable from [the debtor's] own insurance coverage").

[238] *North American Refractories*, 2007 Bankr. LEXIS 4721 at *36-37;  *Hartford Accident & Indem. Co. v. Global Indus. Techs.,* 2008 U.S. Dist. LEXIS 108185 (W.D. Pa. July 25, 2008); *In re American Family Enters.,* 256 B.R. 377, 406 (D.N.J. 2000); *In re Prussia Assoc.,* 322 B.R. 572, 596 (Bankr. E.D. Pa. 2005); *In re Exide Techs.,* 303 B.R. 48, 72 (Bankr. D. Del. 2003).

[239] *See, e.g., North American Refractories*, 2007 Bankr. LEXIS 4721, at *34 (citing *Continental Airlines,* 203 F. 3d at 212).

Chapter 11 cases.[240]  Here, this is clearly the case — when Grace filed for Chapter 11 protection,

127,770 Asbestos PI Claims were pending against Grace.[241]  Grace's Chapter 11 Cases have also

been complicated by numerous potentially co-liable parties, many of whom have alleged rights

of indemnification against Grace.[242]  Thus, the unusual circumstances of these cases, which

---

[240] *In re Kaiser Aluminum Corp*, Case No. 02-10429, 2006 WL 616243, (Bankr. D. Del. Feb. 6, 2006) (Fitzgerald, J.) [Dkt. 8225 at 46] ("In order to protect the Funding Vehicle Trust and each PI Trust and to preserve the PI Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue as part of the Confirmation Order the Channeled PI Insurance Entity Injunction…"); *In re USG Corp.*, Case No. 01-2094 (Bankr. D. Del. June 16, 2006) (Fitzgerald, J.) [Dkt. 11688 at 20] ("[T]he Asbestos Personal Injury Insurance Asset Entity Injunction shall be, and hereby is, issued as of the Effective Date, pursuant to section 105(a) of the Bankruptcy Code."); *In re Federal-Mogul Global, Inc.*, Case No. 01-10578 (Bankr. D. Del. Nov. 8, 2007) [Dkt. 13674 at 28] ("In order to protect the Trust and preserve the Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Asbestos Insurance Entity Injunction is issued pursuant to the Plan"); *In re Owens Corning*, Case No. 00-03837 (Bankr. D. Del. Sept. 26, 2006) [Dkt. 19366 at 45] ("In order to supplement, where necessary, the injunctive effect of the discharge as provided in section 1141 of the Bankruptcy Code, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code…it is hereby ordered…that any and all Persons and any Person claiming by or through them, that have held, currently hold, or may hold a Claim or other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability…that is discharged…shall be, and hereby are, permanently, forever and completely stayed . . .").

[241] 9/15/09 Tr. 168 (Peterson).  *See also* PP Ex. 276 (Debtors' Disclosure Statement for the First Amended Joint Plan*,* Preliminary Statement: "As of the Petition Date, the Parent and certain of its subsidiaries were defendants in 65,656 asbestos related lawsuits . . . involving 129,191 claims for personal injury.").

[242] 9/11/09 Tr. 284 (Posner) (testifying that pre-petition settlement agreements with insurers contained indemnities); 9/17/2009 Tr. 63 (Austern) (same); 9/15/2009 Tr. 96 (Shelnitz) (testifying that Grace gave indemnities to Fresenius and Sealed Air in their respective transactions with Grace); 9/14/2009 Tr. 183 (Finke) (testifying that the Joint Plan includes within the definition of asbestos protected parties settled asbestos insurance companies that had pre-petition settlement agreements with Grace and which included indemnity obligations).

involve the "settlement of massive liabilities against debtors and co-liable parties," clearly warrant issuance of the Insurance Injunction.[243]

The Insurance Injunction is also necessary to the reorganization. The proceeds of the Debtors' insurance policies are "a large part and a significant part" [244] of the assets of the Asbestos PI Trust, and these assets will be quickly depleted if Asbestos PI Claimants are permitted to make an "end run [around] the rights of the trust to the proceeds of that insurance."[245] In light of this problem, the Debtors included the Asbestos Insurance Entity Injunction in the Joint Plan to prevent "the type of backdoor liability" by which claims could be brought against the Debtors' insurance policies outside of the procedures governing distributions from the Asbestos PI Trust.[246] Addressing this issue is crucial to achieving the Joint Plan's purpose of treating future claimants equitably.

Finally, the Insurance Injunction is fair to all parties in interest. The total assets available to satisfy the claims of Asbestos PI Claimants are unaffected by the Insurance Injunction. All Asbestos Insurance Rights will be transferred to the Asbestos PI Trust under section 7.2.1(d)(ii) of the Joint Plan and will be available to pay Asbestos PI Claims. Thus, the proceeds of insurance policies issued to Grace will be used to pay Asbestos PI Claims via the Asbestos PI Trust. The net effect of the Asbestos Insurance Entity Injunction, in combination with the transfer of Asbestos Insurance Rights to the Asbestos PI Trust and the issuance of the Asbestos

---

[243] *See supra*, note 239.

[244] 09/17/09 Tr. 54-55 (Austern).

[245] *Id.*

[246] 09/14/09 Tr. 183 (Finke).

PI Channeling Injunction, is to ensure that all Asbestos PI Claims will be asserted against the Asbestos PI Trust and subject to the equitable payment procedures set forth in the Asbestos PI TDP.   Accordingly, the injunction is also consistent with   section524(g).   Far from using section 105(a) as a means of circumventing the more specific requirements of section 524(g), the Insurance Injunction aids in the implementation of the section 524(g) Asbestos PI Trust because it is necessary to achieve equitable distribution between present and future Asbestos PI Claimants.

### 6.3.    The Libby Claimants' Objections to the Insurance Injunction Are Without Merit.

The Libby Claimants object to the issuance of the Insurance Injunction, arguing that the injunction violates section 524(g) by protecting third parties from claims outside the permissible four categories of section 524(g)(4)(A)(ii) and by protecting parties that are not making a substantial financial contribution under the Joint Plan.   Libby also argues that the Insurance Injunction impermissibly bars the Libby Claimants and holders of future Libby Claims from pursuing claims for payment under non-products coverage.

Libby first argues that the Insurance Injunction violates section 524(g) because it purportedly protects claims that are not based on the insurers' "provision of insurance to the debtor or a related party."[247]   This claim is simply untrue and is belied by the plain language of the Insurance Injunction.   This Injunction is specifically limited to claims "based upon, or arising out of, any Asbestos PI Claim against the Debtors or any Asbestos Insurance Rights . . . ."[248] The Asbestos Insurance Rights are limited to the rights that, absent the Joint Plan and its

---

[247]  *See* 524(g)(4)(A)(ii)(III) .

[248]  PP Ex. 277.01 Rev (Plan § 8.4.1.1).

provision of the Asbestos PI Trust, an Insurance Contributor (such as Grace) would otherwise have against Asbestos Insurance Policies.  The Insurance Injunction therefore enjoins direct claims against insurers only to the extent of such insurers' "provision of insurance to the debtor or a related party."[249]

Despite the clear limiting language of the Insurance Injunction, Libby argues that the Injunction bars "independent claims" against insurers.  But Libby provides no definition or explanation of what their "independent claims" are, how the Insurance Injunction operates to bar them, or why barring such claims is not appropriate.  To the extent that Libby is suggesting that they have claims unrelated to the Debtors' liability or to asbestos coverage, the Insurance Injunction does not bar such claims.

Libby also argues that the injunction violates sect6ion 524(g) by protecting third parties who are not making a substantial financial contribution under the Joint Plan.  However, the Insurance Injunction only protects assets of the Asbestos PI Trust — the Asbestos Insurance Rights — and is not designed or intended to protect third-party insurers.[250]  The Joint Plan contemplates that the Debtors' insurance will be a protected asset that will benefit both present and future claimants of the Asbestos PI Trust, and the Insurance Injunction bars back-door claims against insurance proceeds that are being assigned to the Asbestos PI Trust.  The injunction is necessary because it protects the proceeds of insurance policies, some of which are not protected under the Asbestos PI Channeling Injunction.

---

[249] *See* 524(g)(4)(A)(ii)(III).

[250] PP Ex. 277.01 Rev (Plan § 8.4.1.1(c)) ("The Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is or may become a third-party beneficiary of the Asbestos Insurance Entity Injunction.").

Finally, the Libby Claimants argue that the Insurance Injunction impermissibly bars the Libby Claimants and holders of future Libby Claims from pursuing insurers for payment under non-products coverage containing no aggregate cap on insurance liability. The Libby Claimants cite no case in support of the theory that a section 105 injunction may not be issued to enjoin claims against an uncapped insurance policy. Whether a policy is capped or uncapped is not relevant to the Court's power to issue an injunction under section 105(a).

> ### 6.4. The Objections of BNSF and Certain Insurers to the Scope of the Insurance Injunction Are Moot in Light of Recent Amendments to the Joint Plan.

BNSF's objection that the Insurance Injunction improperly enjoins it from pursuing policies issued to Grace with BNSF as the sole insured are moot in light of the Plan Proponents' Second Set of Modifications to the Joint Plan of Reorganization, which create express reservations from the Insurance Injunction to protect BNSF's rights under any such policies.[251] The Joint Plan has also been amended to state that the Insurance Injunction does not enjoin an insurer from pursuing a contribution claim against any insurer that is not a Settled Asbestos Insurance Company, rendering moot any objection on that basis.[252]

## VII.  THE RELEASES AND EXCULPATION PROVISIONS IN THE JOINT PLAN ARE PROPER AND SHOULD BE APPROVED.

The Joint Plan provides for certain release and exculpation provisions. Such provisions are all appropriate under Third Circuit law and should be approved. The evidence adduced at trial in support of confirmation also supports the approval of these Joint Plan provisions because, among other things, they are the product of arm's-length negotiations, are required by certain

---

[251]  Second Set of Modifications to Joint Plan of Reorganization, dated October 12, 2009 [Dkt. No. 23474].

[252]  *Id.*

settlement agreements, are in exchange for substantial consideration, and are critical to obtaining the support of various constituencies for the Joint Plan.[253]

### 7.1.    Debtor and Committee Releases

#### 7.1.1.    Proposed Finding

The Debtor releases contained in Article 8.8.8 of the Joint Plan and the Debtor and Committee releases of Sealed Air and Fresenius contained in Articles 8.8.1 and 8.8.3 of the Joint Plan are consistent with applicable law.

#### 7.1.2.    Argument

The releases described in Article 8.8.8 of the Joint Plan release claims of the Debtors against their own affiliates and representatives.[254]    The Debtor releases provided by the Joint Plan represent a valid settlement of claims, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, that the Debtors may have had against their own representatives.[255]

The Debtors made the determination, in an exercise of their business judgment, that the benefits from releasing their own representatives from their actions and conduct during the course of these Chapter 11 Cases, greatly outweighs the potential costs, distractions, delays, and negative impact on employee morale that may arise from the Debtors' pursuit of claims against

---

[253] 9/14/09 Tr. 175 (Finke) ("[parties to be released] also made substantial contributions to the plan both financial and otherwise"); *Id.* at 180 (Finke) (exculpation clause allows parties to fully engage in the process of seeking settlements without fear of being subjected to liability for mistakes of judgment).

[254] PP Ex. 352 (Notice of First Set of Modifications to Joint Plan of Reorganization, Ex. 1:  Joint Plan Art. 8.8.8).

[255] *See* PP Pretrial Phase II Main Br. at 96; *see also In re Coram Healthcare Corp.,* 315 B.R. 321, 334-35 (Bankr. D. Del. 2004).(discussing standards for approval of settlements under section 1123(b)(3)(A) of the Bankruptcy Code).

their own representatives, especially considering that many of the representatives being released were and are "actively involved in running Grace businesses and operations."[256]   Additionally, these releases are an integral part of the global settlements embodied by the Joint Plan.[257]

Certain parties have objected to the Article 8.8.8 releases as being too broad, arguing that such releases should only apply to nondebtor defendants who are making substantial financial contributions.[258]   However, as described above, in their business judgment the Debtors believe such releases are necessary to their reorganization efforts and the goal of a fresh start.   A substantial financial contribution is not required to provide such releases.[259]   The objections are wholly without merit and should be overruled.   Of particular note, the Debtors have resolved the objections of the U.S. Trustee to the Article 8.8.8 release by modifying the release language to include only those debtor and nondebtor affiliates who have actually served during the Chapter 11 Cases.[260]

---

[256]  9/14/09 Tr. 178-79 (Finke) ("even assuming [Grace] had a substantial claim against a representative that pursuing such claims would be contrary to one of the principal objectives that Grace had in entering Chapter 11 in the first place, which was to try to put behind it to the fullest extent possible and feasible, all claims, disputes and litigation and come out of Chapter 11 with a fresh start").

[257]  9/14/09 Tr. 179-80 (Finke).

[258]  Libby Phase II Br. at 92-99 [Dkt. No. 22439]; Anderson Memorial Plan Obj. at 23-25 [Dkt. No. 21782]; Anderson Memorial Phase II Br. at 31-33 [Dkt. No. 22431]; Seaton OneBeacon Plan Obj. at ¶¶ 81-85 [Dkt. No. 21763]; Seaton OneBeacon Phase II Br. at 37-39 [Dkt. No. 22433]; Fireman's Fund Phase II Br. at 9-14 [Dkt. No. 22418].

[259]  *See* PP Pretrial Phase II Main Br. at 96; *see also Coram*, 315 B.R. at 334-335 (substantial financial contribution is only one of five factors for determining appropriateness of debtor releases).

[260]  9/14/09 Tr. 178 (Finke); PP Ex. 352 (Notice of First Set of Modifications to Joint Plan of Reorganization, Ex. 1:  Joint Plan Art. 8.8.8); *see also* PP Ex. 505-2 (Finke Demonstrative).

### 7.2.    Certain Consensual Third Party Releases

#### 7.2.1.    Proposed Finding

The third party releases contained in Article 8.8.7 of the Joint Plan are consistent with applicable law.

#### 7.2.2.    Argument

Article 8.8.7 of the Joint Plan provides for certain consensual third party releases.[261] Those who vote in favor of the Joint Plan are effectively releasing their claims and causes of action against certain third parties enumerated in Article 8.8.7.[262]  The third party releases only apply to Creditors voting to accept the Joint Plan.[263]  The Third Circuit has consistently approved consensual third party releases of similar scope.[264]

The releases in Article 8.8.7 of the Joint Plan release the enumerated third parties and their representatives to the extent they served during the Chapter 11 Cases from claims against them held by any holders of a claim or equity interest in the Chapter 11 Cases.[265]  The purpose of the third party releases is to protect the Debtors' own assets and those of the Reorganized Debtors in two ways:  (i) preventing backdoor liability through indemnification rights held by third parties against the Debtors; and (ii) encouraging "vigorous and unfettered participation" in

---

[261]  PP Ex. 352 (Notice of First Set of Modifications to Joint Plan of Reorganization, Ex. 1:  Joint Plan Art. 8.8.7).

[262]  *Id.*

[263]  *See* PP Pretrial Phase II Main Br. at 94.

[264]  *See* PP Pretrial Phase II Main Br. at 94; *In re Exide Techs*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (courts are not required to scrutinize a release of claims by third parties when the release binds only creditors who voted to accept a plan).

[265]  9/14/09 Tr. 173 (Finke).

the plan negotiation process.[266]   The third parties to be released also made substantial

contributions to the Joint Plan, both financial and otherwise, as consideration for the releases.[267]

The voting instructions accompanying the ballots sent to creditors entitled to vote on the

Joint Plan plainly stated that a vote in favor of the Joint Plan would be deemed to be a release of

certain claims as explained in Article 8.8.7 of the Joint Plan.[268]   The language of the consensual

third party releases was set out in boldface in a separate box in the voting instructions.[269]

The separate release of the Fresenius Indemnified Parties in Article 8.8.7 of the Joint Plan

is also appropriate as a function of the Fresenius Settlement Agreement and Order.[270]   Such

provision was mandated by the Fresenius Settlement Agreement and approved by order of the

Court.[271]

Certain parties have objected to the release provisions in Article 8.8.7 of the Joint Plan

alleging among other things, that the releases are too broad or do not satisfy the requirements for

a non-consensual release of third party claims.[272]   However, as explained above and at the

---

[266]   *Id.* at 173-75.

[267]   *Id.* at 175.

[268]   PP Ex. 352 (Notice of First Set of Modifications to Joint Plan of Reorganization, Ex. 1:  Joint Plan Art. 8.8.7); *see also* PP Ex. 505.004 (Finke Demonstrative).

[269]   9/14/09 Tr. 176 (Finke); *see also* PP Ex. 505-4 (Finke Demonstrative).

[270]   9/14/09 Tr. 177 (Finke); *see* PP Ex. 277.13 Rev (Fresenius Settlement Agreement § 2.02(B)); PP Ex. 277.14 Rev (Fresenius Settlement Order ¶ KK(b)).

[271]   9/14/09 Tr. 185-86 (Finke); *see* PP Ex. 277.13 Rev (Fresenius Settlement Agreement at § 2.02(B)); PP Ex. 277.14 Rev (Fresenius Settlement Order at ¶ KK(b)).

[272]   *See* Libby Phase II Br. at 99; Anderson Memorial Plan Objection at 23-25; Anderson Memorial Phase II Br. at 31; Seaton OneBeacon Plan Objection at ¶¶ 83-85; Seaton
(Continued…)

Confirmation Hearing, such objections are wholly without merit and should be overruled. Notably, the U.S. Trustee no longer objects to the Article 8.8.7 releases due to modifications made by the Debtors to narrow the scope of the released parties to only those who served during the Chapter 11 Cases.[273]

> 7.2.3.   Argument for Article 8.8.1 and 8.8.3  Releases of Sealed Air and Fresenius

Articles 8.8.1 and 8.8.3 of the Joint Plan release the Sealed Air and Fresenius Indemnified Parties from claims held by the Debtors and the asbestos committees.[274]  These releases of Sealed Air and Fresenius under the Joint Plan represent a valid settlement of claims, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.[275]  The Debtors and asbestos committees made the determination, in an exercise of their sound business judgment, that the benefits from releasing Sealed Air and Fresenius, arising out of their substantial contributions to the Joint Plan along with the extensive indemnification obligations owing by the Debtors to both Sealed Air and Fresenius, outweighed any potential claims they may have had against them.

---

OneBeacon Phase II Br. at 37-39; BNSF Plan Objection at ¶¶ 42-43; BNSF Phase II Br. at 21; GEICO Phase II Br. at 36; AXA Belgium Plan Objection at 4-5.

[273] 9/14/09 Tr. 174 (Finke); PP Ex. 352 (Notice of First Set of Modifications to Joint Plan of Reorganization, Ex. 1:  Joint Plan Art. 8.8.7); *see also* PP Ex. 505-1 (Finke Demonstrative).

[274] PP Ex. 277.01 Rev (Plan Arts. 8.8.1, 8.8.3).  Sections 8.8.1 and 8.8.3 of the Joint Plan call for the delivery of the Government Release and Fresenius Release in favor of Sealed Air that the Plan Proponents will deliver on the Effective Date of the Joint Plan in order to meet the requirements of the Sealed Air Settlement Agreement.  *See* PP 277.22 Rev (Sealed Air Settlement Agreement).

[275] *See* PP Phase II Main Br. at 85; *see Coram*, 315 B.R. at 334 (discussing standards for approval of settlements under section 1123(b)(3)(A) of the Bankruptcy Code).

Sealed Air and Fresenius are contributing approximately $1.1 billion in value to the Asbestos PI Trust and Asbestos PD Trust to fund the Joint Plan.[276]   Additionally, the Debtors share a substantial identity of interests with Sealed Air and Fresenius as a result of the indemnification obligations that resulted from the spinoffs of Fresenius and Sealed Air from the Debtors.[277]   Such indemnities are for liabilities outside of the core businesses spunoff.[278] Furthermore, and most significantly, this Court has already approved the Settlement Agreements for both Fresenius and Sealed Air, which contain the releases described in Articles 8.8.1 and 8.8.3 of the JointPlan.[279]   Notice of each of the Settlement Agreements was appropriately given to all parties in interest.[280]   Thus, approval of the releases is *res judicata*.[281]

---

[276] 9/15/09 Tr. 151 (Shelnitz) (noting that Sealed Air and Fresenius' contribution to this case was "very substantial"); PP Ex. 277.08 Rev (Best Interests Analysis); PP Ex. 277.13 Rev (Fresenius Settlement Agreement); PP Ex. 277.14 Rev (Fresenius Settlement Order); PP Ex. 277.22 Rev (Sealed Air Settlement Agreement); PP Ex. 277.23 Rev (Sealed Air Settlement Order).

[277] 9/15/09 Tr. 96 (Shelnitz).

[278] 9/15/09 Tr. 96 (Shelnitz); PP Ex. 98 (Sealed Air Distribution Agreement § 4.02(a)) (requiring indemnification from Grace); PP Ex. 277.22 Rev (Sealed Air Settlement Agreement § II.C.i.) (same); PP Ex. 359 (Fresenius Distribution Agreement § 4.02(a)) (same); PP Ex. 277.14 (Fresenius Settlement Order ¶ AAA) (same).

[279] *See* PP Ex. 277.13 Rev (Fresenius Settlement Agreement §§ 2.01(A), (B)); PP Ex. 277.14 Rev (Fresenius Settlement Order ¶ KK); PP Ex. 277.22 Rev (Sealed Air Settlement Agreement § II.c); PP Ex. 277.23 Rev (Sealed Air Settlement Order ¶ 1); *see also* PP Pretrial Phase II Main Br. at 82-85.

[280] PP Ex. 277.23 Rev (Sealed Air Settlement Order ¶¶ D) ("Due, proper and sufficient notice of the [Settlement Agreement] was given pursuant to Bankruptcy Rule 2002(a)(3)"); PP Ex. 277.14 Rev (Fresenius Settlement Order ¶ MM) (court finds that notice satisfies requirements of bankruptcy code, bankruptcy rules and due process); 9/15/09 Tr. 147-48 (Court) ("The fact that W.R. Grace was in bankruptcy wasn't known on an international level?"); PP Ex. 354 (Certificate of Service re Renewed Motion for an Order Approving, Authorizing, and Implementing Settlement Agreement).

### 7.3.    Exculpation

#### 7.3.1.    Proposed Finding

The exculpation clause in Article 11.9 of the Joint Plan is consistent with applicable law.

#### 7.3.2.    Argument

Article 11.9 of the Joint Plan contains a standard exculpation provision providing that certain parties will not incur any liability for any act or omission in connection with the confirmation, consummation, or administration of the Joint Plan, unless such act or omission rises to the level of "gross negligence or willful misconduct."[282]  Bankruptcy courts in the Third Circuit routinely uphold exculpation provisions similar to Article 11.9 of the Joint Plan where, as is the case here, each exculpated party remains liable for acts constituting gross negligence or willful misconduct.[283]  Article 11.9 of the Joint Plan merely establishes a standard of liability that is consistent with what is generally owed to creditors (*i.e.*, liability is limited to acts constituting willful misconduct or gross negligence).[284]

The exculpation clause allows those parties who participated in the process of seeking negotiated settlements of claims and the plan process to pursue such goals without fear of

---

[281]  *See* PP Pretrial Phase II Main Br. at 82; *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009).

[282]  PP Ex. 352 (Notice of First Set of Modifications to Joint Plan of Reorganization, Ex. 1:  Joint Plan Art. 11.9).

[283]  *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 235 (3d Cir. 2000) (where the plan provision at issue did not "eliminate liability but rather limit[ed] it to willful misconduct or gross negligence).

[284]  *See* PP Pretrial Phase II Main Br. at 99.

liability for misconduct or errors of judgment.[285]   Such exculpation clauses are typical in large

Chapter 11 cases.[286]   As with the release provisions contained in the Joint Plan, certain parties

also objected to the Article 11.9 exculpation clause, essentially stating that it was too broad as a

general matter.[287]   However, as stated, the exculpation clause only releases the enumerated

parties from general misconduct and errors of judgment.  Exculpation of nondebtor third parties

is "commonplace" where a plan does not purport to release claims for willful misconduct and

acts taken in bad faith.[288]   Article 11.9 of the Joint Plan merely states the standard of liability to

be applied to claims against the exculpated parties, and is therefore appropriate in this case.[289]

Significantly, the U.S. Trustee no longer objects to the exculpation clause as it has been modified

to remove the Trustees of the Asbestos PI Trust, the Asbestos PI Trust Advisory Committee, the

Trustees of the Asbestos PD Trust, and the Asbestos PD Trust Advisory Committee.[290]

---

[285]  9/14/09 Tr. 181-82 (Finke).

[286]  *Id.*

[287]  Libby Plan Obj. at 79 [Dkt. No. 21811]; Libby Phase II Tr. Br. at 92 [Dkt. 22439]; Seaton
OneBeacon Plan Obj. at ¶¶ 81-82 [Dkt. No. 21763]; Seaton OneBeacon Phase II Br. at 37-38
[Dkt. No. 22433]; Anderson Memorial Phase II Tr. Br. at 31-32 [Dkt. No. 22437]; Fireman's
Fund Plan Obj. at ¶ 32 [Dkt. 21781]; Fireman's Fund Phase II Br. at 9-14 [Dkt. No. 22418];
Zurich Plan Obj.at ¶ 12 [Dkt. No. 21764]; Zurich Phase II Br. at 6-7 [Dkt. No. 22413]; MCC
Plan Obj. at ¶ 12 [Dkt. No. 21783]; MCC Phase II Br. at 12-14 [Dkt. No. 22426]; GEICO
Phase II Br. at. 35-37 [Dkt. No. 22434]; Joinder of AXA Belgium to Fireman's Fund Phase II
Br. at 3 [Dkt. 24438].

[288]  *See* PP Pretrial Phase II Main Br. at 102.

[289]  *See id.* at 99, 102.

[290]  9/14/09 Tr. 181 (Finke), PP Ex. 352 (Notice of First Set of Modifications to Joint Plan of
Reorganization, Ex. 1:  Joint Plan Art. 11.9); *see also* PP Ex. 505-3 (Finke Demonstrative).

## VIII.   THE JOINT PLAN PROVIDES FOR EQUAL TREATMENT OF CLAIMANTS IN THE SAME CLASS IN SATISFACTION OF SECTION 1123(a)(4) OF THE BANKRUPTCY CODE.

### 8.1.    Proposed Finding

Claimants in the same class are treated equally.

### 8.2.    Argument

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  The Plan's treatment provisions will result in equality of treatment for each Claim or Interest within a particular class.  Thus, the Joint Plan complies with section 1123(a)(4) of the Bankruptcy Code.

Certain Indirect PI Trust Claimants raise objections related to section 1123(a)(4) based on alleged discriminatory treatment under the Asbestos PI TDP.[291]  However, the evidence is clear that the Indirect PI Trust Claimants receive equal treatment with direct claimants.  Indirect claimants "step into the [ ] shoes" of direct claimants.[292]  "The indirect claimant will then liquidate the claim in the same manner that the claim could've liquidated the claim.  And then the -- and be paid at the payment percentage just in the same way the claimant would've been paid."[293]  Furthermore, when asked what, if any, differences are there between this process and the individual review process for direct claimants, Mr. Inselbuch explained "none."[294]  The

---

[291] *See* MCC Plan Obj. at ¶ 8; MCC Phase II Br. at 8-9; CNA Plan Obj. at 30-32; Garlock Phase II Br. at 19-20.

[292] 9/14/09 Tr. 44 (Inselbuch).

[293] *Id.*

[294] *Id.* at 45;  *see also* PP 277.04 (Asbestos PI TDP); PP Pretrial Phase II Main Br. at 66-69.

Libby Claimants' objections under this section are addressed in detail in the Plan Proponents' Libby Brief.

Morgan Stanley and Longacre also argue that the Joint Plan violates section 1123(a)(4) of the Bankruptcy Code.  Morgan Stanley takes issue with the different rates of post-petition interest provided for under Article 3.1.9 of the Joint Plan,[295] and Longacre has argued that everyone should, at a minimum, receive 4.19% as the rate of post-petition interest even if they opt to litigate the issue of what is the correct interest rate.[296]  Both of these objections are pure legal argument, which have been addressed by the Plan Proponents in their pre-trial briefs[297] and will not be repeated here.

## IX.    THE INSURANCE COMPANIES ONLY HAVE STANDING TO OBJECT TO ISSUES THAT DIRECTLY AND PECUNIARILY AFFECT THEM.

### 9.1.1.  Proposed Finding

The Insurance Companies who are not creditors of the Debtors have no standing to object to the Joint Plan other than issues related to the transfer of Asbestos Insurance Rights and the Joint Plan's treatment of Asbestos Insurance Reimbursement Agreements.

### 9.1.2.  Argument

The limited issues as to which those Insurance Companies that are not creditors of the Debtors have standing involve the transfer of Asbestos Insurance Rights under the Joint Plan, and the Joint Plan's related treatment of Asbestos Insurance Reimbursement Agreements.  As

---

[295]  Morgan Stanley Plan Obj. at ¶¶ 7-9 [Dkt. No. 21752].

[296]  Longacre Plan Obj. at ¶¶ 19-21 [Dkt. No. 21778].

[297]  *See* PP Phase II Main Br. at 110-11; Plan Proponents' Supp. Br. In Support of the Plan's Designation of Morgan Stanley Senior Funding, Inc. as Not Impaired, dated 7/17/2009 [Dkt. No. 22509].

demonstrated conclusively in the pre- and post- trial Phase I insurance briefs filed by the Plan Proponents [Dkt. Nos. 22021 and 22478 respectively], other than those limited issues, the Joint Plan is entirely "insurance neutral" under controlling Third Circuit precedent.  Accordingly, as standing is determined issue by issue in the federal courts, such Insurance Companies have no standing to object to the Joint Plan on any other grounds.

## X.      THE ASSIGNMENT OF ASBESTOS INSURANCE RIGHTS UNDER THE JOINT PLAN IS APPROPRIATE AND DOES NOT PROVIDE INSURANCE COMPANIES WITH A VALID OBJECTION TO CONFIRMATION.

As set forth in the PP Pretrial Phase II Insurance Brief, the assignment of Asbestos Insurance Rights to the Asbestos PI Trust is appropriate as to both insurance policies and Asbestos Insurance Reimbursement Agreements, and Section 7.2.2(d)(iv) of the Joint Plan is properly tailored to the goal of preventing the transfer of Asbestos Insurance Rights under Asbestos Insurance Reimbursement Agreements from being rendered nugatory.[298]  Moreover, all pertinent evidence presented at the Confirmation Hearing demonstrates that the operation of the Asbestos PI TDP is consistent with the past practice of the parties to the Asbestos Insurance Reimbursement Agreements and appropriate.

### 10.1.   The Bankruptcy Code Permits the Assignment of Asbestos Insurance Rights Pursuant to the Joint Plan Despite Allegedly Contrary Anti-Assignment Clauses in Insurance Policies.

While most such insurance companies either did not object and/or settled their coverage obligations during the course of these proceedings, several Insurance Companies may continue to object to the assignment of Asbestos Insurance Rights under their policies to the Asbestos PI Trust, and argue that such assignment precludes the Joint Plan from being confirmed.  They have

---

[298]  PP Pretrial Phase II Ins. Br. at 2-31.

recognized that this Court has already rejected that argument multiple times in prior cases and that those rulings have been affirmed, and have stated that they included the issue in their briefs to preserve it for a potential future appeal.[299]

The Plan Proponents set forth the governing analysis below, an analysis that applies equally to the transfer of Asbestos Insurance Rights under Asbestos Insurance Reimbursement Agreements as well as under policies.

### 10.1.1. Section 1123(a)(5) of the Bankruptcy Code Expressly Preempts Any Anti-Assignment Clauses in the Applicable Policies.

(a)    Proposed Finding

The assignment of Asbestos Insurance Rights to the Asbestos PI Trust under the Joint Plan is valid and enforceable under sections 524(g), 541(c)(1), 1123(a)(5)(B), 1123(b)(3)(B) and 1129(a)(1) of the Bankruptcy Code, and the Bankruptcy Code preempts any anti-assignment contractual provisions and applicable state law.

(b)    Argument

Every court to consider the issue, including the Third Circuit, this Court and numerous other bankruptcy and district courts, has held that Section 1123(a)(5)(B) of the Bankruptcy Code permits the assignment, under a plan, of insurance-related rights and proceeds to a trust.[300]  This uniform precedent follows the clear and preemptory text of that section, which provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall * * * provide adequate means for the plan's implementation, such as * * * transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation

---

[299]  CNA Pretrial Br. at 38 [Dkt. 22415]; GEICO Pretrial Br. at 18 n.6 [Dkt. No. 22434].

[300]  PP Pretrial Phase II Ins. Br. at 3-4.

of such plan." 11 U.S.C. § 1123(a)(5)(B). The Supreme Court has confirmed that such a "notwithstanding" clause expresses a clear statement of intent "to supersede all other laws," and that "[a] clearer statement is difficult to imagine." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (citations omitted). The Bankruptcy Code expressly preempts any contractual provisions that would purport to prevent assignment of the Asbestos Insurance Rights.

(c)    *Combustion Engineering* Governs Here.

As set forth in detail in the pre-trial brief, the Third Circuit's decision in *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004), is controlling authority.[301] In *Combustion Engineering*, as here, a plan of reorganization assigned a debtor's rights to insurance proceeds from the debtor's estate to a trust, *see id.*, and the Third Circuit upheld the assignment as authorized by the Bankruptcy Code, despite insurance companies' contention that policy provisions prevented such assignment. The Insurance Companies remain unable to escape the clear rulings in that case. All courts to consider the issue, including this Court, have properly interpreted and applied the Third Circuit's decision in *Combustion Engineering*.[302] This Court should continue to follow that controlling precedent.

(d)    No Presumption Against Preemption Applies.

Pursuant to section 1123(a)(5)(B), "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall * * * provide adequate means for the plan's implementation,

---

[301]  *Id.* at 4-7.

[302]  *Id.* at 6.

82

such as * * * transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5)(B). The clear language of section 1123(a)(5)(B) demonstrates that no presumption against preemption applies here.[303]  See *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001) (noting that presumption against preemption "can be overcome where * * * Congress has made clear its desire for pre-emption"); *Cisneros*, 508 U.S. at 18 (noting that it is well-recognized that the term "notwithstanding" as found in Section 1123(a) expresses a clear statement of intent "to supersede all other laws."); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 256 (2004) (applying the plain language of the statute as written because "[t]he language of § 209(a) is categorical" and noted that "[t]he dissent objects to our interpretive method, which neither invokes the 'presumption against preemption' to determine the *scope* of pre-emption nor delves into legislative history.").[304]

        (e)    Preemption under Section 1123(a)(5) is Not Limited to Laws "Relating to the Financial Condition" of a Debtor.

---

[303] *Id.* at 7-8.

[304] As set forth more fully in the PP Pretrial Phase II Ins. Br. at 8-9 n.10, *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d Cir. 1997), further supports the preemptive effect of section 1123(a), by noting that "[t]he clear lack of Congressional intent to preempt state law restrictions on transferring property of the estate is even more telling given the explicit language that Congress uses when it intends to displace state nonbankruptcy law in other provisions of the Bankruptcy Code." *Id.* (citing as examples of such explicit preemption provisions sections 1123(a), 541(c)(1) , 728(b) and 363(l) of the Bankruptcy Code).  *See Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006) (noting that the "Third Circuit [in *Integrated Solutions*] distinguished Sections 363 and 704 from section 1123(a) of the Bankruptcy Code, which expressly provides for the preemption of nonbankruptcy law.  Accordingly, the Court concludes that the Bankruptcy Court did not err in concluding that the anti-assignment clauses in the [debtor's] insurance policies are preempted by the Bankruptcy Code.").

As also noted in the Plan Proponents' Pretrial Phase II Insurance Brief, the Insurance Companies' reliance upon *Pacific Gas & Elec. Co. v. California*, 350 F.3d 932 (9th Cir. 2003), is ill-founded.[305]   In that case, the Ninth Circuit violated basic rules of statutory construction and held that section 1123(a) preempts applicable nonbankruptcy law only insofar as such law relates to a debtor's financial condition.   The holding in *Pacific Gas* squarely conflicts with the holdings of the Third Circuit in *Combustion Engineering*, the Fourth Circuit in *In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988) and every other court that has considered the issue, including this Court.[306] Indeed, in *Cisneros*, 508 U.S. at 18, the Supreme Court itself cited *FCX* with approval regarding its interpretation of section 1123(a)(5) as "supersed[ing] all other laws."   The decision in *Pacific Gas* likewise violates various principles of statutory construction, including the plain meaning

---

[305]  PP Pretrial Phase II Ins. Br. at 9-10.

[306]  Indeed, even in the Ninth Circuit, no transfer of insurance rights to a trust has been rejected. *See, e.g., In re Western Asbestos Co.*, 313 B.R. 456, 462 (Bankr. N.D. Cal. 2004).  Given the breadth of the phrase "financial condition" (which is undefined by the statute) as applied in the Ninth Circuit, such a transfer would very well be approved even under the incorrect Ninth Circuit approach.  *See, e.g., In re Carolina Tobacco Co.*, 360 B.R. 702, 712 (D. Or. 2007) (rejecting a narrow definition of financial condition as "actions triggered by a bankruptcy filing or the debtor's insolvency," and holding that "[t]he term financial condition represents a concept that is somewhat broader than operational status," and that a statute that "would preclude Carolina from selling cigarettes if the company failed to make the escrow payments" was "relate[d] to financial condition").

rule,[307] and renders section 1123(a)'s "notwithstanding" clause meaningless with respect to several subsections of that section.[308]  This Court should continue to reject that case's analysis.

(f)    Section 1123(a) Preempts Provisions of Private Contracts.

The Third Circuit, and every other court that has considered the issue, has held that section 1123(a)(5) preempts the terms of private contracts that would interfere with the adequate implementation of a plan.[309]  Any attempted dichotomy here between contract rights and "nonbankruptcy law" is a false dichotomy, because the anti-assignment provisions of the insurance contracts are only relevant if those provisions would be enforceable under state law, as shown by controlling Supreme Court precedent.[310]  Such a narrow interpretation is also incorrect because it renders several subsections of section 1123(a) meaningless.[311]

---

[307] PP Pretrial Phase II Ins. Br. at 9-10 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here * * * the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (internal quotations omitted); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534-36 (2004) (refusing to import language to a Bankruptcy Code provision from another Bankruptcy Code provision)).

[308] Several subsections of section 1123(a) do not relate to financial condition and it is implausible that a statute relating to financial condition would interfere with their operation except under the most unlikely and strained of interpretations, including subsections (a)(5)(I) (amendment of debtor's charter); (a)(5)(H) (extension of maturity date or change in interest rate or other term of outstanding securities); and (a)(6) (mandatory inclusion in charter of provision restricting issuance of nonvoting equity securities).  *See Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (noting that courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law").

[309] PP Pretrial Phase II Ins. Br. at 11-14.

[310] PP Pretrial Phase II Ins. Br at 11-13 (citing, *inter alia*, *Norfolk & W. Ry. Co. v. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991) (the "exemption * * * from 'all other law' effects an override of contractual obligations, as necessary to carry out an approved transaction, by suspending application of the law that makes the contract binding.")).

[311] PP Pretrial Phase II Ins. Br. at 13.  The clause "[n]otwithstanding any otherwise applicable nonbankruptcy law" applies to each of the subsections of section 1123(a).  A number of these

(Continued…)

Moreover, under various sections of the Bankruptcy Code, the term "applicable nonbankruptcy law" includes private contract rights, even where there is no explicit use of the term "contract" or "agreement."   For example, section 365(c)(3) of the Bankruptcy Code prohibits a trustee from assuming a lease that has been "terminated under applicable nonbankruptcy law prior to the order for relief."   11 U.S.C. § 365(c)(3) (emphasis added).   It is clear that the statute applies to leases that have expired or terminated under their own contractual terms as well as to the largely theoretical possibility that leases somehow are terminated pursuant to state statutory or regulatory law.   *See In re Moore*, 290 B.R. 851, 879-80 (Bankr. N.D. Ala. 2003) (noting that section 365(c)(3)  encompasses contractual termination or expiration of lease). Other Bankruptcy Code sections also use "applicable nonbankruptcy law" to encompass private contract rights.   *See, e.g*., 11 U.S.C. § 365(n)(1)(B) (distinguishing between "exclusivity provision of * * * contract" and "any other right under applicable nonbankruptcy law") (emphasis added); 11 U.S.C. § 1322(c)(1) (plan may extend payment date on mortgage "notwithstanding * * * applicable nonbankruptcy law").

The Third Circuit agrees that section 1123(a) applies to private contracts.   *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 209 (3d Cir. 1995) (citing to section 1123(a)(5)(H)  to

---

subsections refer to strictly contractual matters and would have no meaning if the "notwithstanding" clause were read to only preempt state statutes and regulations.   *See* 11 U.S.C. § 1123(a)(5)(F)   ("cancellation or modification of any indenture or similar instrument"), § 1123(a)(5)(G)   ("curing or waiving of any default"), § 1123(a)(5)(H) (modifying certain terms of "outstanding securities") and § 1123(a)(6) (modifying certain terms of corporate charter).   For example, if the "notwithstanding" clause only provides for preemption of state laws and regulations and not privately agreed contract provisions, then section 1123(a)(5)(H), which explicitly allows a bankruptcy plan to extend the maturity date or change the interest rates or "other terms" of outstanding securities, is meaningless.

find that "the plain terms of the Bankruptcy Code refute the proposition that a plan may not extend the maturity date of a mortgage").[312]

### 10.1.2. Section 1123(b)(3)(B) of the Bankruptcy Code Also Permits the Transfer of Asbestos Insurance Rights from Policies to the Asbestos PI Trust.

(a)    Proposed Finding

As an alternative basis to reject objections to the Joint Plan regarding its assignment of Asbestos Insurance Rights and as an alternative finding to the finding that section 1123(a)(5)(B) and other provisions of the Bankruptcy Code preempt any anti-assignment contractual provisions and state law, this Court should also find that the Asbestos PI Trust is the successor to the Debtors with respect to the Asbestos Insurance Rights, that the Asbestos PI Trust is thus the representative of the estate under the Joint Plan within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code as to those rights, and that as provided for by section 1123(b)(3)(B), the Asbestos PI Trust thus retains the Asbestos Insurance Rights under the Joint Plan, which does not trigger any anti-assignment contractual provisions.

(b)    Argument

As set forth in detail in the Plan Proponents' Pretrial Phase II Insurance Brief, section 1123(b)(3) likewise demonstrates that the Asbestos PI Trust's receipt of the insurance rights is

---

[312] GEICO's previous suggestion, GEICO Pretrial Br. at 20-21, that the "forbidden by law" prong of section 1129(a)(3) conflicts with the plain language of section 1123(a) and precludes the assignment of Asbestos Insurance Rights suffers from the same infirmities. Moreover, as demonstrated in the Plan Proponents' Pretrial Phase II Insurance Brief, courts have recognized that section 1129(a)(3) deals with the proposal of the plan and that the plan proponent need not establish that the *contents* of the plan comply with all non-bankruptcy laws but rather the *proposal* of the plan is not by any means forbidden by law.  PP Pretrial Phase II Ins. Br. at 14 n.17.  As shown throughout the pretrial brief and this brief, numerous cases have held that section 1123(a)(5)(B) applies to permit the assignment of insurance rights and proceeds and preempts any anti-assignment clauses.

appropriate, and provides an alternate basis to approve that receipt.[313]  Indeed, Fireman's Fund acknowledged in its pretrial brief that the Asbestos PI Trust "is a successor to Debtors with respect to Asbestos Insurance Rights."[314]  The Asbestos PI Trust is the successor to the Debtors with respect to the Asbestos Insurance Rights, and as provided for by section 1123(b)(3), the Asbestos PI Trust retains the Asbestos Insurance Rights under the Joint Plan.  This analysis demonstrates that anti-assignment provisions are not even triggered by such retention.

### 10.1.3. Section 524(g) Impliedly Preempts Any Anti-Assignment Clauses in the Policies.

(a)    Proposed Finding

Under section 1123(a)(5) of the Code, the transfer of Asbestos Insurance Rights to the Asbestos PI Trust in this asbestos bankruptcy case is necessary to provide adequate means for this section 524(g) Plan's implementation. Enforcement of any contractual anti-assignment rights would also conflict with the purposes of section 524(g) of the Code.

(b)    Argument

As noted in the Plan Proponents' Pretrial Phase II Insurance Brief, section 524(g) impliedly preempts any anti-assignment clauses.[315]  The scope of section 524(g) as previously set forth by this Court[316] demonstrates that the Insurance Companies' interpretation of their contract rights would thwart the purposes of section 524(g).  This demonstrates that the transfer of the Asbestos Insurance Rights is necessary to provide adequate means for the Joint Plan's

---

[313]  PP Pretrial Phase II Ins. Br. at 14-16.

[314]  Fireman's Fund Pretrial Br. at 18 [Dkt. No. 22418].

[315]  PP Pretrial Phase II Ins. Br. at 16-19.

[316]  *In re Federal-Mogul Global, Inc.,* 385 B.R. 560, 573-74 (Bankr. D. Del. 2008).

implementation within the meaning of section 1123(a)(5) in this section 524(g) bankruptcy case.

Moreover, on the basis of conflict preemption principles, section 524(g) also impliedly preempts

the anti-assignment provisions in the Insurance Companies' policies. *See* PP Pretrial Phase II

Ins. Br. at 18-19 (citing *In re Thorpe Insulation Co.*, No. 07-19271, Tentative Ruling at 20

(Bankr. C.D. Cal. Apr. 2, 2009)) ("Section 524(g) expressly contemplates the creation of a trust

and the transfer of the debtor's assets to the trust for the purpose of paying claims.  You can't

have a plan under section 524(g) without creating a trust and transferring insurance proceeds to

the trust.  Any contractual provisions prohibiting such a transfer are preempted by section

524(g), among other provisions of the bankruptcy code."); *In re Babcock & Wilcox Co.*, No. 00-

10992, 2004 WL 4945985, at *18 (Bankr. E.D. La. Nov. 9, 2004) ("The implementation of

section 524(g) provides support for the argument that Congress intended to permit the transfers

contemplated by the Plan in asbestos cases. * * * [The insurance companies'] interpretation

would allow insurers to gut the reorganization and channeling injunction provisions specifically

provided for in § 524(g).  No law has been cited by the insurers to support such a proposition.

Authority does exist, however, to support the proposition that § 524(g) was adopted to foster

reorganization."); *vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005); *In re

Tate*, 253 B.R. 653, 671 (Bankr. W.D.N.C. 2000)).

### 10.2.    The Bankruptcy Code Permits the Assignment of Asbestos Insurance Rights Pursuant to a Plan Despite Allegedly Contrary Anti-Assignment Clauses in Asbestos Insurance Reimbursement Agreements.

Most of the Asbestos Insurance Reimbursement Agreements do not contain anti-

assignment clauses, and for those few Asbestos Insurance Reimbursement Agreements that were

alleged to contain anti-assignment clauses, all but one of the relevant insurance companies have

settled.  In any event, even if there were a basis for any insurer to object to the assignment of

rights under the Asbestos Insurance Reimbursement Agreements, the same legal principles that

make clear that the assignment of Asbestos Insurance Rights in *policies* to the Asbestos PI Trust are appropriate would also apply equally to such assignment of Asbestos Insurance Rights in *Asbestos Insurance Reimbursement Agreements*, as set forth in detail in the pretrial brief.[317] Accordingly, the Proposed Findings set forth above include Asbestos Insurance Rights as to both policies and Asbestos Insurance Reimbursement Agreements.

### 10.2.1. Section 7.2.2(d)(iv) is Appropriate.

(a)    Proposed Finding

Section 7.2.2(d)(iv) of the Joint Plan is appropriate and authorized under the Bankruptcy Code. Moreover, no evidence was presented by any objector at the Confirmation Hearing that payments by the Asbestos PI Trust under the TDPs would improperly disadvantage any insurance company compared to such payments in the tort system, including under settlements in the tort system. To the contrary, the Plan Proponents presented evidence that the TDPs were appropriate, consistent with Grace's historical practice, and advantageous to the insurance companies compared to the tort system. The resolution of the appropriateness of section 7.2.2(d)(iv) of the Joint Plan is a core issue, and does not constitute a declaratory judgment, much less one to recover "money or property" under Bankruptcy Rule 7001(1), and therefore no adversary proceeding is required. Indeed, the Insurance Companies themselves have raised the operation of section 7.2.2(d)(iv) of the Joint Plan as an objection to confirmation, which constitutes a contested matter under the Bankruptcy Rules, not an adversary proceeding.

---

[317]  PP Pretrial Phase II Ins. Br. at 19-23.

(b)    Argument

Section 7.2.2(d)(iv) of the Joint Plan appropriately makes clear that the Asbestos PI Trust is the successor to the Debtors with respect to the Asbestos Insurance Reimbursement Agreements, and that payments by the Asbestos PI Trust under the TDPs therefore must be accorded the same status as payments by the pre-petition Debtors with respect to the Asbestos Insurance Reimbursement Agreements.  The express language and scope of section 7.2.2(d)(iv) is that: (1) payments of an Asbestos PI Claim by the Asbestos PI Trust, rather than the Debtors, constitutes a valid payment by "Grace" within the meaning of those agreements, and relatedly; (2) that such payments by the Asbestos PI Trust, made within the framework of the PI TDPs as contemplated by section 524(g), likewise do not provide a valid excuse for the Insurance Companies with Asbestos Insurance Reimbursement Agreements to refuse to meet their payment obligations under those agreements.  Both of these are narrow rulings mandated by the federal preemptive law set forth above in sections 1123(a)(5) and 524(g), and likewise authorized by section 1123(b)(3)(B).  Absent such rulings, the transfer of Asbestos Insurance Rights under Asbestos Insurance Reimbursement Agreements may not be effective, in violation of the requirements of those sections.

With the two narrow and necessary exceptions set forth above, nothing in section 7.2.2(d)(iv) purports to strip alleged obligations from the Asbestos Insurance Reimbursement Agreements, and the Insurance Companies remain free to complain about any alleged failure by the Asbestos PI Trust to, for example, abide by any audit or reporting obligations in those agreements, limited only by the principle that such arguments cannot be used by the Insurance Companies to avoid their payment obligations because of the mere transfer of rights under those agreements to the Asbestos PI Trust, and its processing of those claims, as it must, under the Asbestos PI TDP.

Under similar circumstances, the *Babcock & Wilcox* court went even further and held that the "[t]he terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance Contributor under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement."  2004 WL 4945985, at *4 n. 16.  It is fully appropriate for the Joint Plan to, as required by section 1123(a)(5), "provide adequate means for the plan's implementation," and section 524(g)'s establishment of a trust mechanism likewise requires that such a trust be able to access estate property properly transferred to it, such as Asbestos Insurance Rights.  This is especially true given the Asbestos PI Trust's status as a successor to the Debtors' asbestos liabilities and insurance contracts covering those liabilities under sections 524(g) and 1123(b)(3)(B) of the Bankruptcy Code.

Section 524(e) of the Bankruptcy Code likewise makes clear that non-debtors, such as Insurance Companies, are not discharged of their obligations because of the discharge of a debtor.  11 U.S.C. § 524(e); *see also First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993).  Thus, section 524(e) further demonstrates the necessity of section 7.2.2(d)(iv) of the Joint Plan, to prevent Insurance Companies from attempting to rely on Grace's bankruptcy and resulting transfer to the Asbestos PI Trust to eliminate their insurance obligations.

Nor are the Insurance Companies prejudiced by the Asbestos PI TDP.  The settlement criteria in the Asbestos PI TDP are based upon appropriate medical standards and ensure that adequate information is gathered about a claim prior to paying it.[318]  No contrary evidence was presented at the Confirmation Hearing.  Indeed, the Asbestos PI TDP limits the amount any

---

[318] *See supra* Part 1.2 at 7-8 (discussing medical criteria in Asbestos PI TDP); *see also* PP Pretrial Libby Br. at §§1.4-1.12; 3.2-3.8.

claimant can recover from Grace in ways that do not exist in the tort system. As Jay Hughes testified at the Confirmation Hearing, in virtually every case brought against Grace in the tort system, punitive damages were asserted.[319] In the tort system, Grace did not have the ability to eliminate the risk of such punitive damages.[320] Under the Asbestos PI TDP, punitive damages are eliminated.[321]

Additionally, in the tort system, Grace did not have the ability to cap the damages awarded against it.[322] But the Asbestos PI TDP does cap such damages.[323] Specifically, the Asbestos PI TDP has a ceiling of $450,000 for the higher valued claims settled during individual review.[324] Even for an extraordinary mesothelioma claim (meaning that the claimant's exposure to asbestos was 95% the result of exposure to an asbestos-containing product or to conduct for which Grace has legal responsibility with little likelihood of substantial recovery elsewhere) the Asbestos PI TDP caps the maximum amount payable to the claimant at eight times the scheduled value — $1,440,000.[325] This is the highest recovery any claimant can achieve under the Asbestos PI TDP. Clearly, the removal of the threat of "home run" verdicts reduces the financial exposure of the Trust or Grace's insurers in all cases or any particular case.

---

[319] *See* 9/9/09 Tr. at 88 (Hughes).

[320] *See* 9/14/09 Tr. at 283 (Hughes).

[321] PP 277.04 Rev (Asbestos PI TDP § 7.4).

[322] *See* 9/14/09 Tr. at 275 (Hughes).

[323] *See* 9/8/09 Tr. at 45-46, 48 (Inselbuch); Asbestos PI TDP at §§ 2.1, 5.3(b)(3).

[324] *Id.* at § 5.3(b)(3).

[325] 8 x $180,000 = $1,440,000; *Id.* at §§ 5.4, 7.7.

The evidence at the Confirmation Hearing also showed that the Expedited Review medical and exposure criteria in the Asbestos PI TDP are similar to or more stringent than Grace's historical practices.  Mr. Hughes testified that over the course of Grace's experience in the tort system, prior to filing for bankruptcy, Grace developed certain criteria for settling cases.[326]  Generally, Grace merely required that a claimant produce "some evidence of exposure to a Grace product and a diagnosis of an asbestos-related disease from a qualified physician."[327]  For example, Mr. Hughes testified that a 1998 settlement agreement between Grace and settling plaintiffs represented by the law firm Baron and Budd (PP Ex. 1) which resolved approximately 9,800 claims required merely that claimants demonstrate their presence at a site where a Grace asbestos product was used, and either diagnosis by a competent physician or a B-read confirming the condition in order to recover under the settlement agreement.[328]  He stated that the settlement criteria included in that settlement were representative of the criteria included in numerous other inventory type settlement agreements that Grace entered into with plaintiffs' law firms that represented large numbers of claimants.[329]

The Asbestos PI TDP has stricter, more specific exposure criteria, requiring "meaningful and credible" evidence of exposure to asbestos for which Grace has responsibility for all disease categories, rather than just "some evidence" of exposure.[330]  Specifically, in order to satisfy the

---

[326]  *See* 9/14/09 Tr. at 239-40 (Hughes).

[327]  *Id.* at 240.

[328]  *Id.* at 242.

[329]  *Id.* at 243.

[330]  *See* PP 277.04 (Asbestos PI TDP at § 5.7).

Expedited Review criteria for Asbestos/Pleural Disease Level II, a claimant must prove six months of Grace Exposure, plus, for certain types of Grace Exposure, five years cumulative occupational asbestos exposure; to satisfy the criteria for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV-A), Severe Disabling Pleural Disease (Disease Level IVB), Other Cancer (Disease Level V) and Lung Cancer 1 (Disease Level VII), a claimant must show six (6) months of Grace Exposure, plus, for certain types of Grace Exposure, Significant Occupational Exposure (defined as regular exposure for five years, Asbestos PI TDP § 5.7(b)(2)) to asbestos.[331]   The Asbestos PI TDP also has more specific, and detailed medical criteria than Grace historically applied to settle claims.[332]

Mark Peterson also testified that Grace's or a successor's estimated liability if it were placed back into the tort system instead of having claims processed through the Asbestos PI TDP would be from $9.2 billion to 10.7 billion.[333]   Conversely, under the Asbestos PI TDP, the Asbestos PI Trust's estimated liability is from $6.3 billion to $7.4 billion.[334]

No reimbursement insurer presented any evidence to suggest that it would have to pay claims under the Asbestos PI TDP that Grace would not have settled pre-petition.  Moreover, no evidence was presented by any such insurance company that its actual reimbursements would be accelerated or would be higher in the aggregate under the Asbestos PI TDP than in the tort system.

---

[331]  *See id.* at § 5.7(b)(1).

[332]  *See id.* at § 5.3(a)(3).

[333]  *See* 9/15/09 Tr. at 208-210 (Peterson).

[334]  *Id*. at 207-08.

Section 7.2.2(d)(iv) of the Joint Plan, in conjunction with the Asbestos PI TDP, is fully appropriate and necessary to provide adequate means for the Joint Plan's implementation. Moreover, as shown above, given the operation of the Asbestos PI TDP, the Insurance Companies have no legitimate basis to complain. Nor did the Insurance Companies present any evidence at the Confirmation Hearing to the contrary.

Finally, as demonstrated conclusively in the Plan Proponents' Pretrial Phase II Insurance Brief, the issue of whether section 7.2.2(d)(iv) is authorized by the Bankruptcy Code, or conversely, whether its operation gives the Insurance Companies that are parties to Asbestos Insurance Reimbursement Agreements a valid objection to confirmation, is clearly a core issue.[335] Therefore, the resolution of this issue is not a declaratory judgment, much less one to recover "money or property" under Bankruptcy Rule 7001(1), and no adversary proceeding is required.[336]

## XI.    THERE HAS BEEN NO EVIDENCE PRESENTED TO SUPPORT THE ARGUMENT THAT THE TAC OF THE ASBESTOS PI TRUST SUFFERS FROM CONFLICTS OF INTEREST.

In pretrial briefing, certain objectors, including CNA and OneBeacon, argued that the Trust Advisory Committee ("TAC") to be created as part of the Asbestos PI Trust would suffer from conflicts of interest. At the Confirmation Hearing, Mr. Inselbuch testified about the limited role of the TAC and the qualifications of the TAC members.[337] Mr. Inselbuch made clear that the TAC would have no role in the processing and resolution of any individual claims, including

---

[335] PP Pretrial Phase II Ins. Br. at 26-28.

[336] *Id* at 28-30. As also noted in the pretrial brief, the same is true of the assignment of the Asbestos Insurance Rights to the Asbestos PI Trust. *See* PP Pretrial Phase II Ins. Br. at 30-31.

[337] 9/14/09 Tr. 34-37 (Inselbuch).

those of claimants represented by the TAC members' law firms.[338]   The objectors, however, produced no evidence of any conflicts of interest or other impropriety regarding the TAC, its composition, or purpose.   Moreover, the objectors withdrew experts designated to testify on these issues.   Accordingly, no findings should be made in support of this argument.   To the extent objectors retain the argument, the Plan Proponents refer the Court to, and incorporate by reference, the Plan Proponents' Pretrial Phase II Main Brief at 71-79.

## XII.    ALL OTHER REQUIREMENTS UNDER SECTIONS 1123 AND 1129 OF THE BANKRUPTCY CODE ARE SATISFIED.

### 12.1.    Section 1129(a)(4) of the Bankruptcy Code.

#### 12.1.1. Proposed Finding

Payments made to persons issuing securities or acquiring property under the Joint Plan for services or costs and expenses in connection with the case are approved by the Court as reasonable.

#### 12.1.2. Argument

Section 1129(a)(4) of the Bankruptcy Code requires that payments for services or for costs and expenses incurred in connection with the case, or in connection with the plan and incident to the case, have either been approved, or are subject to approval, by the Court as reasonable.   11 U.S.C. § 1129(a)(4).   The Joint Plan provides for the Court's retention of jurisdiction to hear and determine any and all applications by professionals for compensation and reimbursement of expenses arising out of or related to the Debtors' Chapter 11 Cases.[339]   Thus,

---

[338]  *Id.* at 36-37.

[339]  *See* PP 227.01 Rev (Plan § 10.5).

the Joint Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

Fireman's Fund alleged that the Joint Plan does not satisfy section 1129(a)(4) because the compensation to be provided to the TAC members is not set forth in the Joint Plan or Plan documents.[340]  But there is no requirement in section 1129(a)(4) that such compensation be set forth.[341]  *See also* PP Pretrial Phase II Main Br. at 114-115.  Accordingly, this Court should find that section 1129(a)(4) of the Bankruptcy Code has been satisfied.

### 12.2.  Section 1129(a)(1) of the Bankruptcy Code.

12.2.1. Proposed Finding

The Joint Plan complies with the applicable provisions of title 11.[342]

12.2.2. Argument

Section 1129(a)(1) states that a court can confirm a plan only if "[t]he plan complies with the applicable provisions of this title."   11 U.S.C. § 1129(a)(1); see also PP Pretrial Phase II Main Br. at 115-116.  As with section 1129(a)(3) discussed above, various objectors used section 1129(a)(1) as a "catch all" provision to object to the Joint Plan even if nothing else stuck.  There

---

[340]  Fireman's Fund Non-Surety Phase II Br. at 17.

[341]  In any event, the Asbestos PI Trust Agreement does address the compensation of the TAC. PP 277.02 Rev (Asbestos PI Trust Agreement § 5.6).

[342]  Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of title 11.  This provision is predominantly directed at compliance with sections 1122 and 1123 governing classification of claims and the contents of a plan, respectively. *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 126 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5963, 6087; *In re Texaco Inc.,* 84 B.R. 893, 905 (Bankr. S.D.N.Y.) ("In determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the classification of claims and the contents of a plan of reorganization."), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y. 1988).

simply has been no evidence presented to suggest that the Joint Plan violates section 1129(a)(1). Accordingly, any objections on this ground should be overruled, and the Court should find that this provision under the Bankruptcy Code has been satisfied.

### 12.3. Section 1123(a)(1) of the Bankruptcy Code.

#### 12.3.1. Proposed Finding

The Joint Plan designates classes of claims, other than claims of a kind specified in sections 507(a)(2), (a)(3) or (a)(8) of title 11, and classes of interests.

#### 12.3.2. Argument

Article 3 of the Joint Plan designates classes of claims and interests as follows: Class 1, Priority Claims; Class 2, Secured Claims; Class 3, Employee Benefit Claims; Class 4, Workers' Compensation Claims; Class 5, Intercompany Claims; Class 6, Asbestos PI Claims; Class 7, Asbestos PD Claims; Class 8, CDN ZAI Claims; Class 9, General Unsecured Claims; Class 10, Equity Interests in the Parent; Class 11, Equity Interests in the Debtors other than the Parent. *See* PP Ex. 277.01 Rev (Plan Art. 3); PP Pretrial Phase II Main Br. at 152-53. In addition, there are no pending objections alleging that the requirements of section 1123(a)(1) of the Bankruptcy Code are not met. Accordingly, the Court should find that the requirements of section 1123(a)(1) of the Bankruptcy Code have been satisfied.

### 12.4. Section 1123(a)(2) of the Bankruptcy Code.

#### 12.4.1. Proposed Finding

The Joint Plan specifies any class of claims or interests not impaired under the Joint Plan.

#### 12.4.2. Argument

Section 6.8 of the Joint Plan specifies that Classes 1, 2, 3, 4, 5, 7A, 9 and 11 are unimpaired under the Joint Plan. In addition, there are no pending objections alleging that the requirements of section 1123(a)(2) of the Bankruptcy Code are not met. *See* PP Ex. 277.01 Rev

(Plan § 6.8); PP Pretrial Phase II Main Br. at 152-53.  Accordingly, the Court should find that the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

**12.5.    Section 1123(a)(6) of the Bankruptcy Code.**

12.5.1. Proposed Finding

The Joint Plan provides for the inclusion in the charter of the debtor a prohibition regarding the issuance of non-voting securities and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

12.5.2. Argument

The Debtors have filed draft amended charters that comply with the requirement contained in section 1123(a)(6), which will be filed with the respective states of incorporation of all of the Debtors once the Joint Plan becomes effective.  *See* PP Ex. 279 (Plan Supplement to the First Amended Joint Plan of Reorganization, filed May 8, 2009 [Dkt. No. 21594], at Item 2: Amended Certificates of Incorporation of the Debtors); PP Pretrial Phase II Main Br. at 153-54. In addition,  there are no pending objections alleging that the requirements of section 1123(a)(6) of the Bankruptcy Code are not met.  Accordingly, the Court should find that the requirements of section 1123(a)(6) of the Bankruptcy Code have been satisfied.

**12.6.    Section 1123(a)(7) of the Bankruptcy Code.**

12.6.1. Proposed Finding

The Joint Plan contains only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or trustee under the plan and any successor to such officer, director or trustee.

12.6.2. Argument

The Debtors have disclosed the identity and affiliations of those individuals who are proposed to serve as officers and directors of the Reorganized Debtors.  *See* PP Ex. 279 (Plan Supplement to the First Amended Joint Plan of Reorganization, filed May 8, 2009 [Dkt. No. 21594], and Amended Item 3 to Plan Supp., filed May 15, 2009 [Dkt. No. 21706], at Item 3: Identity and Affiliations of Persons Proposed to Serve as Initial Board of Directors or Officers of the Reorganized Debtors).  The trustees of the Asbestos PI Trust are proposed as Harry Huge, Lewis Sifford, and Dean Trafelet.  *See* PP 277.02 Rev (Asbestos PI Trust Agreement); 9/14/09 Tr. 32-33 (Inselbuch).  The trustees of the Asbestos PD Trust shall be proposed in due course.  In addition, there are no pending objections alleging that the requirements of section 1123(a)(7) of the Bankruptcy Code are not met.  Accordingly, the Court should find that the requirements of section 1123(a)(7) of the Bankruptcy Code have been satisfied.

**12.7.    Section 1123(b)(2) and (3) of the Bankruptcy Code.**

12.7.1. Proposed Finding

The permissive provisions of section 1123(b)(2) (Plan may provide for the assumption/rejection of executory contracts and leases) and section 1123(b)(3) (Plan may provide for settlement of any claim or interest of the estate or the retention and enforcement of claims by the debtor, a trustee or representative of the estate) are satisfied.

12.7.2. <u>Argument</u>

Article 9 of the Joint Plan provides for the assumption or rejection of executory contracts or unexpired leases of the debtor pursuant to section 365 of the Bankruptcy Code.  *See* PP Ex. 277.01 Rev (Plan Art. 9); PP Ex. 277.18 Rev (Exh. 18 of the Exhibit Book to the First Amended Joint Plan of Reorganization, filed Feb. 27, 2009 [Dkt. No. 20974] -- Schedule of Rejected Executory Contracts and Unexpired Leases).  In addition, section 11.4 of the Joint Plan provides for the retention of certain causes of action by the Reorganized Debtors, and sections 7.2.4 and 7.3.4 of the Joint Plan provide for the transfer of certain claims to the Asbestos PI and Asbestos PD Trusts.  *See* PP Ex 277.01 Rev (Plan §§ 7.2.4 and 7.3.4); *see also* PP Pretrial Phase II Main Br. at 154-55.  In addition, there are no pending objections alleging that the requirements of sections 1123(b)(2) and (3) of the Bankruptcy Code are not met.  Accordingly, the Court should find that the requirements of sections 1123(b)(2) and (3) of the Bankruptcy Code have been satisfied.

**12.8.    Section 1123(b)(6) of the Bankruptcy Code.**

12.8.1. <u>Proposed Finding</u>

The Joint Plan does not include any provisions inconsistent with the applicable provisions of the Bankruptcy Code.

12.8.2. <u>Argument</u>

Section 1123(b)(6) of the Bankruptcy Code provides that the Joint Plan may include any other appropriate provisions not inconsistent with the applicable provisions of the Bankruptcy Code.  The Joint Plan does not include any provisions that are inconsistent with the Bankruptcy Code, and there are no pending objections alleging that the requirements of section 1123(b)(6) of the Bankruptcy Code are not met.  Accordingly, the Court should find that the requirements section § 1123(b)(6) of the Bankruptcy Code have been satisfied.

**12.9.    Section 1129(a)(2) of the Bankruptcy Code.**

12.9.1. Proposed Finding

The Plan Proponents have complied with the disclosure and solicitation provisions of the Bankruptcy Code.

12.9.2. Argument

Generally, the inquiry under section 1129(a)(2) focuses on whether a plan proponent has complied with the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (Section 1129(a)(2) "requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as § 1125 regarding disclosure"); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).    The Debtors' Disclosure Statement for the First Amended Joint Plan of Reorganization, filed February 27, 2009 [Dkt. No. 20873] (PP Ex. 276) was approved by this Court on March 9, 2009, along with the form of the ballots, the voting tabulation procedures, and the contents and manner of service and solicitation packets.    *See* Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief, dated March 9, 2009 [Dkt. No.20944]; *see also* PP Pretrial Phase II Main Br. at 149-150.    In addition, there are no pending objections alleging that the requirements of section 1129(a)(2) of the Bankruptcy Code are not met.    Accordingly, the Court should find that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

**12.10.  Section 1129(a)(6) of the Bankruptcy Code.**

12.10.1.        Proposed Finding

No rate changes are provided for in the Joint Plan; therefore, the Joint Plan satisfies section 1129(a)(6) of the Bankruptcy Code.

12.10.2.        Argument

Section 1129(a)(6) of the Bankruptcy Code provides that any regulatory commission having jurisdiction over the rates charged by the Reorganized Debtors in the operation of their business must approve any rate change provided for in the Joint Plan.  The Joint Plan does not provide any rate changes, and there are no pending objections alleging that the requirements of section 1129(a)(6) of the Bankruptcy Code are not met.  Therefore, the Court should find that the requirements of section 1129(a)(6) of the Bankruptcy Code have been satisfied.

**12.11.  Section 1129(a)(9) of the Bankruptcy Code.**

12.11.1.        Proposed Finding

The Joint Plan provides for appropriate payment of priority claims.

12.11.2.        Argument

Section 2.1 of the Joint Plan provides that each holder of Allowed Administrative Expense Claims and Allowed Priority Tax Claims get paid in full, in Cash, on the Effective Date unless less favorable terms are agreed to between the Holder of the Claims and the Reorganized Debtors.  Section 3.1 of the Joint Plan provides that Holders of Allowed Priority Claims shall be paid the Allowed Priority Amount plus interest at 4.19% from the Petition Date, compounded annually or at the non-default contract rate should one exist either (i) in full, in Cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date that the Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be agreed upon by the Holder of the Claim.  This payment

structure provides payment in full of the priority claims, which is an appropriate payment structure for priority claims in these Chapter 11 Cases.  In addition, there are no pending objections alleging that the requirements of section 1129(a)(9) of the Bankruptcy Code are not met.  Therefore, the Court should find that the requirements of section 1129(a)(9) of the Bankruptcy Code have been satisfied.

**12.12.  Section 1129(a)(10) of the Bankruptcy Code.**

12.12.1.    Proposed Finding

At least one class of claims that is impaired under the Joint Plan has accepted the Joint Plan, determined without including any acceptance of the Joint Plan by any insider.

12.12.2.    Argument

As set forth in Article 3 of the Joint Plan, Classes 6, 7B, 8, and 10 are impaired.  PP Ex. 277.1 Rev (Plan Art. 3).  Classes 6, 7B, 8, and 10 all voted to accept the Plan.  *See* PP Ex. 281 (Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization, Ballot Tabulation Report attached thereto as Exhibit A, filed August 5, 2009 [Dkt. No. 22706] with attached June 8, 2009 Original Declaration [Dkt. No. 22020]).  Thus, at least one class of claims that is impaired under the Joint Plan has accepted the Joint Plan.  In addition, there are no pending objections alleging that the requirements of section 1129(a)(10) of the Bankruptcy Code are not met.  Therefore, the Court should find that the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

**12.13.  Section 1129(a)(12) of the Bankruptcy Code.**

    12.13.1.          <u>Proposed Finding</u>

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Court at the Confirmation Hearing, have been paid or the Joint Plan provides for the payment of all such fees on the Effective Date of the Joint Plan.

    12.13.2.          <u>Argument</u>

Section 11.3 of the Joint Plan provides that all fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Court at the Confirmation Hearing on the Joint Plan, shall be paid by the Debtors on or before the Effective Date.  *See* PP Ex. 277.1 Rev (Plan § 1.3).  In addition, there are no pending objections alleging that the requirements of section 1129(a)(12) of the Bankruptcy Code are not met.  Therefore, the Court should find that the requirements of section 1129(a)(12) of the Bankruptcy Code have been satisfied.

**12.14.  Section 1129(a)(13) of the Bankruptcy Code.**

    12.14.1.          <u>Proposed Finding</u>

The Joint Plan provides for the continuation after its Effective Date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code for the duration of the period that the Debtors have obligated themselves to provide such benefits.

    12.14.2.          <u>Argument</u>

Section 9.3.2 of the Joint Plan provides that following the Effective Date of the Joint Plan, the Reorganized Debtors will continue to pay retiree (as defined in section 1114(a) of the Bankruptcy Code) and any similar health, disability or death benefits in accordance with the terms of the retiree benefit plans or other agreements governing the payment of such benefits, subject to any rights to amend, modify or terminate such benefits under the terms of the applicable retiree benefits plan, other agreement, or applicable non-bankruptcy law.  *See* PP Ex.

277.1 Rev (Plan § 9.3.2).  In addition, there are no pending objections from the Pension Benefit Guaranty Corporation or any other parties alleging that the requirements of section 1129(a)(13) of the Bankruptcy Code are not met.  Therefore, the Court should find that the requirements of section 1129(a)(13) of the Bankruptcy Code have been satisfied.

## XIII.  THE JOINT PLAN COMPLIES WITH ALL REMAINING PROVISIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE.

### 13.1.   As of the Effective Date, the Asbestos PI and PD Trusts shall be created.

#### 13.1.1. Proposed Finding

Effective as of the Effective Date, the Asbestos PI Trust shall be created and the Asbestos PD Trust shall be created pursuant to Bankruptcy Code section 524(g) and in accordance with the Plan Documents.  *See* 11 U.S.C. § 524(g)(2)(B)(i).

#### 13.1.2. Argument

Section 524(g)(2)(B)(i) requires that a section 524(g) injunction must be implemented "in connection with a trust."  The Joint Plan and Plan Exhibits demonstrate that, as of the Effective Date, the Asbestos PI Trust will be implemented in connection with the Asbestos PI Channeling Injunction,[343] and the Asbestos PD Trust will be implemented in connection with the Asbestos PD Channeling Injunction.[344]  For the reasons explained in the Plan Proponents' Pretrial Phase II

---

[343]  PP Ex. 277.01 Rev (Plan § 7.2.1) ("effective as of the Effective Date, the Asbestos PI Trust shall be created pursuant to section 524(g) of the Bankruptcy Code"); PP Ex. 277.02 Rev (Asbestos PI Trust Agreement § 1.1) ("The Debtors as Settlors hereby create a trust known as the 'WRG Asbestos PI Trust,' which is the Asbestos PI Trust provided for and referred to in the Plan.").

[344]  PP Ex. 277.01 Rev (Plan § 7.3.1) ("effective as of the Effective Date, the Asbestos PD Trust shall be created pursuant to section 524(g) of the Bankruptcy Code"); PP Ex. 277.03 Rev (Asbestos PD Trust Agreement § 1.1) ("The Debtors as Settlors hereby create a trust known as the 'WRG Asbestos PD Trust,' which is the Asbestos PD Trust provided for and referred to in the Plan.").

Main Brief, at 116-18, Anderson Memorial's objections that the Asbestos PD Trust is somehow not "genuine," and that section 524(g) does not permit a two-trust structure, are without merit.

**13.2.    The Debtors Have Been Named as Defendants in Personal Injury, Wrongful Death, and Property Damage Actions Seeking Recovery for Damages Allegedly Caused By the Presence of, or Exposure to, Asbestos or Asbestos-Containing Products.**

13.2.1. Proposed Finding

As of the Petition Date, the Debtors had been named as defendants in personal injury, wrongful death, and property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.  *See* 11 U.S.C. § 524(g)(2)(B)(i)(I).

13.2.2. Argument

A section 524(g) injunction must be issued in connection with a trust that is to assume the liabilities of a debtor that "has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by . . . asbestos . . . ."[345] There is substantial and incontrovertible evidence that, before the Petition Date, the Debtors had been named as defendants in numerous actions seeking damages for personal injuries and property damage allegedly caused by asbestos.  Grace's history of asbestos-related claims goes back several decades -- the Debtors' witness, Jay Hughes, testified that shortly after 1985, Grace was named in its one-thousandth asbestos personal injury case.[346]  The Plan Proponents' experts, Dr. Mark Peterson and Dr. Denise Martin, also testified that when Grace filed for Chapter 11 protection, 127,770 Asbestos PI Claims were pending against Grace, including 3,024 claims for

---

[345]  11 U.S.C. § 524(g)(2)(B)(i)(I).

[346]  9/9/2009 Tr. 46 (Hughes).

mesothelioma,[347] and that Grace had been named in numerous class actions based on ZAI and in

approximately 370 claims for traditional property damage.[348]

> **13.3.    Pursuant to the Joint Plan, the Asbestos PI and PD Trusts Are to Assume the Liabilities of the Debtors With Respect to All Asbestos PI and PD Claims, and the CDN ZAI PD Claims Fund Is to Assume the Liabilities of the Debtors With Respect to All CDN ZAI PD Claims.**

> 13.3.1. Proposed Finding

On the Effective Date, the Asbestos PI Trust shall assume the liabilities of the Debtors

with respect to all Asbestos PI Claims, the Asbestos PD Trust shall assume the liabilities of the

Debtors with respect to all Asbestos PD Claims, and the CDN ZAI PD Claims Fund

contemplated by the CDN ZAI Minutes of Settlement shall assume the liabilities of the Debtors

with respect to all CDN ZAI PD Claims. *See* 11 U.S.C. § 524(g)(2)(B)(i)(I).

> 13.3.2. Argument

Under section 524(g)(2)(B)(i)(I), a section 524(g) trust must "assume the liabilities of a

debtor."   Pursuant to the Joint Plan, the Asbestos PI Trust will assume the liabilities of the

Debtors with respect to Asbestos PI Claims,[349] the Asbestos PD Trust will assume the liabilities

---

[347] 9/15/2009 Tr. 168 (Peterson).  *See also* PP Ex. 276 (Debtors' Disclosure Statement for the First Amended Joint Plan, Preliminary Statement) ("As of the Petition Date, the Parent and certain of its subsidiaries were defendants in 65,656 asbestos related lawsuits . . . involving 129,191 claims for personal injury.")

[348] 10/13/2009 Tr. 219-20 (Martin).

[349] PP 277.01 Rev (Plan § 3.1.6(b)) (providing that Asbestos PI Claims shall be paid by the Asbestos PI Trust in accordance with the terms of the Asbestos PI TDP), *Id.* at § 7.2.3 (transferring Asbestos PI Claims against the Asbestos Protected Parties to the Asbestos PI Trust), *Id.* at § 7.2.1 (stating that the purpose of the Asbestos PI Trust shall be to, among other things: "(i) assume the liabilities of the Debtors with respect to all Asbestos PI Claims"); PP Ex. 277.02 Rev (Asbestos PI Trust Agreement § 1.2) (stating that "[t]he purpose of the PI Trust is to assume all liabilities and responsibility for all PI Trust Claims").

of the Debtors with respect to Asbestos PD Claims,[350] and the CDN ZAI PD Claims Fund will

assume the liability of the Debtors with respect to all CDN ZAI PD Claims.[351]

### 13.4. The Asbestos PI and PD Trusts Are to Be Funded in Part By Securities of the Reorganized Parent and By the Obligation of the Reorganized Parent to Make Future Payments.

#### 13.4.1. Proposed Finding

The Asbestos PI and PD Trusts are to be funded in part by the securities of the

Reorganized Parent, and by the obligation of the Reorganized Parent to make future payments.

*See* 11 U.S.C. § 524(g)(2)(B)(i)(II).

#### 13.4.2. Argument

Under section 524(g)(2)(B)(i)(II), a trust must be funded "in whole or in part by the

securities of one or more debtors" and by "the obligation of such debtor or debtors to make

future payments."    The Bankruptcy Code defines the term "security" broadly, and the

---

[350] PP 277.01 Rev (Plan § 3.1.7(b)(i)) (providing that Allowed Unresolved Traditional Asbestos PD Claims shall be paid in full in cash pursuant to the terms of the Asbestos PD Trust Agreement), *Id.* at § 3.1.7(b)(ii) (providing that ZAI claims shall be resolved in accordance with the terms of the Asbestos PD Trust Agreement and the ZAI TDP), *Id.* at § 7.3.3 (transferring Asbestos PD Claims against the Asbestos Protected Parties to the Asbestos PD Trust), *Id.* at § 7.3.1 (stating that the purpose of the Asbestos PD Trust shall be to, among other things: "(i) assume the liabilities of the Debtors with respect to all Asbestos PD Claims"); PP Ex. 277.03 Rev (Asbestos PD Trust Agreement § 1.2) (stating that "[t]he purpose of the PD Trust is to assume all liabilities and responsibility for all PD Trust Claims").

[351] PP Ex. 277.01 Rev (Plan § 3.1.8(b)(ii)) (providing that all CDN ZAI PD Claims shall be paid solely from the CDN ZAI PD Claims Fund in the manner set out in the CDN ZAI Minutes of Settlement); *Id.* at § 5.4 (providing that CDN ZAI PD Claims shall be resolved in accordance with the CDN ZAI Minutes of Settlement); PP Ex. 277.09 Rev (CDN ZAI Minutes of Settlement ¶ 29) (establishing procedure for payment of CDN ZAI Claims from CDN ZAI PD Claims Fund).

"securities" within this definition include warrants, notes, and bonds.[352]    The Joint Plan's

provisions for funding the Asbestos PI and PD Trusts fit the structure required by section 524(g).

The Asbestos PI Trust is funded in part by the Warrants, and by Grace's obligation to make

continuing payments under the Asbestos PI Deferred Payment Agreement.[353]    The Asbestos PD

Trust is funded in part by Cash and also by two different Deferred Payment Agreements, one for

Class 7A and one for Class 7B.[354]    Various parties have objected to this requirement on the

grounds that a warrant is not a security for purposes of section 524(g).[355]    For the reasons

explained in the Plan Proponents' Pretrial Phase II Main Brief at 119-20, these objections are

wholly without merit.

---

[352] 11 U.S.C. §§ 101(49)(A)(i), (XV); *see also In re Burns & Roe Enter.'s, Inc.*, No. 08-4191, 2009 WL 438694, at *31, *35 (D.N.J. Feb. 23, 2009) (holding that a promissory note is a "security" for purposes of § 524(g)(2)(B)(i)(II)).

[353] *See* PP Ex. 277.11 Rev (Asbestos PI Deferred Payment Agreement § 2(a)) (setting forth obligation to make deferred payments); PP Ex. 277.24 Rev (Warrant Agreement § 3.1) ("no later than five (5) Business Days after the Effective Date . . . the Company shall issue the Warrants to the Trust"); PP Ex. 277.01 Rev (Plan §§ 7.2.2, 1.1(46)) (providing that the definition of "Asbestos PI Trust Assets" includes the Warrant Agreement and the Warrant, and that "on the Effective Date, Grace-Conn. or Parent shall transfer . . . all other Asbestos PI Trust Assets . . . to the Asbestos PI Trust").

[354] *See* PP Ex. 277.27 Rev (Class 7A Deferred Payment Agreement § 2(a)) (setting forth the Debtors' obligation to make future payments to the PD Trust); PP Ex. 277.28 Rev (Class 7B Deferred Payment Agreement § 2(a))(same).

[355] Seaton OneBeacon Obj. at ¶¶ 68-78, Seaton OneBeacon Phase II Br. at 32-36; CNA Obj. at 32-34, CAN Phase II Br. at 27-30; GEICO Obj. at ¶¶ 54-62, GEICO Phase II Br. at 29-34; Fireman's Fund Obj. at ¶ 38, Fireman's Fund Phase II Non-Surety Br. at 14.

### 13.5.    The Asbestos PI Trust and the Asbestos PD Trust Will Own a Majority of the Voting Shares of the Reorganized Parent Under Specified Contingencies.

13.5.1. Proposed Finding

The Asbestos PI Trust and the Asbestos PD Trust will be entitled to own, if specified contingencies occur, a majority of the voting shares of the Reorganized Parent by the exercise of rights granted to them under the Joint Plan.  *See* 11 U.S.C. § 524(g)(2)(B)(i)(III).

13.5.2. Argument

Section 524(g)(2)(B)(i)(III) states that a section 524(g) trust "is to own, or by exercise of rights granted under [the] plan would be entitled to own if specific contingencies occur, a majority of the voting shares of [each debtor]; the parent corporation of each [] debtor; or a subsidiary of each [] debtor that is also a debtor."[356]  The Code does not define the term "specified contingencies," but this requirement is generally understood to "ensure that, if there are not sufficient funds in the trust otherwise, the trust may obtain control of the debtor company."[357]  The Joint Plan complies with this requirement of section 524(g) by granting the Asbestos PI and PD Trusts the right to majority ownership of the Reorganized Parent's voting stock upon any Event of Default.[358]  As explained in the Plan Proponents' Pretrial Phase II Main

---

[356]  11 U.S.C. § 524(g)(2)(B)(i)(III).

[357]  4 *Collier on Bankruptcy* ¶ 524.07[2] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. 2005) (citing 140 Cong. Rec. H10, 765 (daily ed. Oct. 4, 1994) (remarks of Rep. Jack Brooks)).

[358]  *See* PP Ex. 227.20 Rev (Share Issuance Agreement § 2) (setting forth Debtors' obligation to issue the Section 524(g) Shares, which are defined in the agreement to include 50.1% of the total number of shares of Common Stock issued and outstanding as of the Effective Date); PP Ex. 277.11 Rev (Asbestos PI Deferred Payment Agreement § 8)(defining Events of Default); PP Ex. 277.27 Rev (Deferred Payment Agreement (Class 7A PD) § 8) (same); PP Ex. 277.28 Rev (Deferred Payment Agreement (Class 7B ZAI) § 8 (same)); PP Ex. 277.26 Rev (Asbestos PI/PD Inter-Creditor Agreement § 4A(c)) (setting forth default term by which (Continued…)

Brief at 121-23, the contingencies under which the Trusts would hold majority ownership of the Reorganized Parent are broadly defined to give substantial leverage to the Trusts to ensure Grace's continued dedication to meeting its obligations under the Deferred Payment Agreements. Thus, the objections to the Joint Plan under this section are without merit.

**13.6.    The Asbestos PI and PD Trusts Will Pay Claims and Demands, and the CDN ZAI PD Claims Fund Will Use the Funds Identified in the CDN MInutes of Settlement to Pay CDN ZAI PD Claims and Expenses.**

13.6.1. <u>Proposed Finding</u>

The Asbestos PI Trust is to use the Asbestos PI Trust Assets to pay Asbestos PI Claims (including Demands) and Asbestos PI Trust Expenses, the Asbestos PD Trust is to use the Asbestos PD Trust Assets to pay Asbestos PD Claims (including Demands) and Asbestos PD Trust Expenses, and the CDN ZAI PD Claims Fund is to use to funds identified in the CDN ZAI Minutes of Settlement to pay CDN ZAI PD Claims and the expenses outlined in the CDN ZAI Minutes of Settlement. *See* 11 U.S.C. § 524(g)(2)(B)(i)(IV).

13.6.2. <u>Argument</u>

Under section 524(g)(2)(B)(i)(IV), a 524(g) Trust must use its assets or income to pay claims and demands. Pursuant to the Plan and accompanying documents, the Asbestos PD Trust and the CDN ZAI PD Claims Fund will use their assets and income to pay Claims and Demands,[359] and the Asbestos PI Trust will use its assets and income to pay Claims and Demands.[360]

---

PI and PD trusts will share the section 524(g) Shares *pro rata* according to each Trust's proportionate share of Total Obligations unless the parties reach a different agreement before the one-year anniversary of the Issuance Date of the 524(g) Shares).

[359] PP Ex. 277.01 Rev (Plan § 7.3.1) (stating that two goals of the Asbestos PD Trust are to pay Asbestos PD and ZAI claims); PP Ex. 277.33 Rev (ZAI TDP § 5.1) (establishing procedures (Continued…)

**13.7. Grace is likely to be subject to substantial future Asbestos PI and PD Demands, of which the actual amounts, numbers, and timing cannot be determined.**

13.7.1. <u>Proposed Finding</u>

The Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos PI and PD Claims, which Demands are addressed by the Asbestos PI and PD Channeling Injunctions.  The actual amounts, numbers, and timing of such future Demands cannot be determined.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(I).

13.7.2. <u>Argument</u>

For the Court to issue a section 524(g) injunction, the debtor must be "likely to be subject to substantial future demands for payment" of asbestos-related claims, [361] of which the actual amounts, numbers, and timing cannot be determined.[362]  At the Confirmation Hearing, the Plan Proponents presented the testimony of Dr. Mark Peterson to prove that Grace is likely to be subject to substantial future PI demands, and that any forecast of the amounts, numbers, and timing of such claims would be uncertain.  Dr. Peterson conducted a study to estimate Grace's

---

for payment of ZAI Claims by the PD Trust); PP Ex. 277.25 Rev (Case Management Order for Class 7A Asbestos PD Claims § II.C.4) (stating that the Asbestos PD Trust shall "pay in Cash the Allowed Amount of such Asbestos PD Claim"); PP Ex. 277.01 Rev (Plan § 5.4) ("CDN ZAI PD Claims shall be resolved in accordance with the terms, provisions, and procedures outlined in the CDN ZAI Minutes of Settlement"); PP Ex. 277.09 Rev (CDN ZAI Minutes of Settlement at ¶ 29(c)) (setting forth procedures for payment of CDN ZAI Claims by the CDN ZAI PD Claims Fund).

[360] PP Ex. 277.01 Rev (Plan § 7.2.1) (stating that one goal of the Trust is to "process, liquidate, pay and satisfy all Asbestos PI Claims . . ."); PP Ex. 277.04 Rev (Asbestos PI TDP §§ 5.1(c), 5.6, 5.13) (establishing procedures for payment of claims).

[361] 11 U.S.C. § 524(g)(2)(B)(ii)(I).

future liability for Asbestos PI Claims that used a three-part analysis based on the history of claims filed against Grace.[363]   This analysis examined historical trends in claim activity,[364] epidemiological estimates of how many asbestos-related deaths will occur each year,[365] and the experience of other companies since Grace entered bankruptcy.[366]   Based on his study, Dr. Peterson concluded that Grace "certainly would have had a large number of future asbestos [PI] claims. You can't know precisely how much they are right now, because they're forecasts, but they would have had a large number of future claims filed against them, but the exact number is imprecise."[367]   Moreover, Dr. Peterson specifically found that it is not possible to precisely determine the actual amount, number, and timing of future Asbestos PI Claims.[368]

The Plan Proponents also presented the testimony of Dr. Denise Martin concerning the likelihood of future Asbestos PD Claims against Grace.  Dr. Martin conducted a three-part study that examined historical claims activity against Grace,[369] future events that might trigger

---

[362]  11 U.S.C. § 524(g)(2)(B)(ii)(II).

[363]  9/15/2009 Tr. 183 (Peterson).

[364]  *Id.* at 183-84.

[365]  *Id.* at 184.

[366]  *Id.*

[367]  *Id.* at 181.

[368]  *Id.* at 204 ("Q. Dr. Peterson, is it possible to precisely determine the actual amount, number and timing of future asbestos personal injury claims?  A. Not precisely, no.").

[369]  10/13/2009 Tr. 219-20 (Martin) (finding "significant historical [PD] claim activity," including 10-11 ZAI class actions in the United States and 10 in Canada, as well as 370 traditional property damage claims filed before Grace's chapter 11 filing and 4,000 additional traditional PD claims filed by the Bar Date).

additional property damage demands,[370] and the historical experience of other defendants who faced similar situations.[371]   Based on her analysis, Dr. Martin concluded that Grace would be subject to substantial future PD claims.[372]   Dr. Martin also concluded that any estimate of the amount, number, and timing of future PD demands would be indeterminate.[373]  Dr. Martin based this conclusion on four findings: 1) some claims that were believed to have existed historically in fact were not made with proper authority;[374] 2) there is uncertainty concerning various "inputs," including the amount of product sold, how much product was used in each affected building, how many buildings contain Grace asbestos, and how many buildings have already had asbestos removed;[375] 3) there is uncertainty concerning the number of building owners who are aware that their buildings contain Grace asbestos;[376] and 4) there is uncertainty regarding whether a plaintiff or a plaintiff's attorney would consider any given case worth pursuing.[377]

---

[370] *Id.* at 220 (explaining that future events that could trigger additional claims included renovation of buildings that contain Grace asbestos).

[371] *Id.* at 221 (finding that "there were more than 50 companies who were concerned about property damage claiming activity going forward").

[372] *Id.* at 225 ("it's my opinion that . . . substantial [PD] claims will be made").

[373] *Id.* at 224 ("I concluded that an estimate would be indeterminate here").

[374] *Id.* at 223 ("So one reason for concluding that the future demands are indeterminate is that even demands that we thought existed historically turned out to sort of vanish, not to exist.").

[375] *Id.*

[376] *Id.* at 223-24 ("We don't know how many owners are aware that a product is contained in their building.").

[377] *Id.* at 224 ("Any time there's litigation, the plaintiff or the plaintiff's law firm is going to weigh [whether] it is worth bringing this case.").

Several parties have objected to confirmation of the Joint Plan under section 524(g)(2)(B)(ii)(I), arguing that is little or no evidence that Grace will face future Asbestos PD Demands.[378]   These objections are without merit.   Dr. Martin's testimony on this point has satisfied the Plan Proponents' evidentiary burden on this issue, and no contrary evidence has been offered.   Additionally, Anderson Memorial has criticized Grace for arguing that it will be subject to substantial future property demands for section 524(g) purposes, while also arguing that it will not be subject to liability in any material amount for feasibility purposes.[379]   But Grace's assertion that its ultimate liability will not be substantial is not inconsistent with Dr. Martin's expert opinion that claims will be made in the future.   Dr. Martin specifically testified that her opinion concerned only the likelihood of future demands, not the ultimate liability arising from such demands.[380]

### 13.8. Pursuit of PI, PD, and CDN ZAI PD Demands Outside the Procedures Described By the Joint Plan is Likely to Threaten the Joint Plan's Purpose to Deal Equitably With the Asbestos PI, PD, and CDN ZAI PD Claims.

#### 13.8.1. Proposed Finding

Pursuit of Asbestos PI Claims and Demands, Asbestos PD Claims and Demands, and CDN ZAI PD Claims and Demands outside the procedures prescribed by the Joint Plan is likely to threaten the Joint Plan's purpose to deal equitably with the Asbestos PI Claims, the Asbestos PD Claims, and the CDN ZAI PD Claims.   *See* 11 U.S.C. § 524(g)(2)(B)(ii)(III).

---

[378]   GEICO Obj. at ¶ 64; Phase II Br. at 34; Seaton/OneBeacon Obj. at ¶ 80; Phase II Br. at 37.

[379]   Feasibility Br. of Anderson Memorial at 3; Anderson Memorial Phase II Br. at 27.

[380]   9/13/2009 Tr. 225 (Martin) ("This is purely looking at the demand side, not at all at the liability or the merit side.").

### 13.8.2. Argument

Before issuing a section 524(g) injunction, the Court must determine that pursuit of asbestos-related claims outside the procedures described by the Joint Plan "is likely to threaten the plan's purpose to deal equitably with claims and future demands."[381]  At the Confirmation Hearing, the Court emphatically expressed its view that the Channeling Injunctions are critical elements of the Joint Plan:

> Somebody is going to have to give me a very detailed brief about why the channeling injunction would not be important in the context of this case.  Eight years down the road, I think the Channeling Injunction is important as a matter of law.[382]

The evidence presented in the Confirmation Hearing unequivocally supports this conclusion.  David Austern, the Asbestos PI FCR, testified that without the section 524(g) injunction, "after a discrete period of time there would be virtually no assets left for my clients, the future claimants."[383]  Moreover, Richard Finke stated in his written proffer of testimony that without the Asbestos PD Channeling Injunction, future Asbestos PD Claims "would not be subject to uniform procedures designed to determine whether they have been discharged by the Plan and the Asbestos PD Claims Bar Date,"[384] and that litigation concerning these claims "would not necessarily be asserted in a Federal District Court and accordingly be subject to the Federal Rules of Civil Procedure and Evidence."[385]

---

[381]  11 U.S.C. § 524(g)(2)(B)(ii)(III).

[382]   9/8/2009 Tr. 68 (Court).

[383]  9/17/2009 Tr. 55 (Austern).

[384]  PP 381 (Proffer of Richard C. Finke at 5, ¶ 21).

[385]  *Id.* at 5, ¶ 22.

**13.9.    The Terms of the Asbestos PI and PD Channeling Injunction, Including All Provisions Barring Actions Against Third Parties, Are Set Out in the Joint Plan and Disclosure Statement.**

13.9.1. Proposed Finding

The terms of the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction, and any provisions barring actions against third parties, are set out in the Joint Plan and Disclosure Statement, and the Joint Plan and Disclosure statement both adequately describe such injunctions and provisions (and the acts and entities to which they apply) in specific and conspicuous language in accordance with the requirements of Bankruptcy Rule 3016(c). *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).

13.9.2. Argument

For a section 524(g) injunction to issue, the terms of the injunction, including any provisions barring actions against third parties must be set out in the plan and the disclosure statement supporting the plan.[386]  The Joint Plan and the Disclosure Statement both clearly set out the terms of the Asbestos PI Channeling Injunction[387] and the Asbestos PD Channeling Injunction,[388] including in each instance all provisions barring actions against third parties.  Also, in accordance with Fed. R. Bankr. P. 3016(c), the Joint Plan and Disclosure Statement describe in conspicuous and specific language, in underlined text, all acts to be enjoined.

---

[386]  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).

[387]  PP Ex. 276 (Disclosure Statement § 4.8.2) (setting out the terms of the Asbestos PI Channeling Injunction); PP Ex. 277.01 Rev (Plan § 8.2) (same).

[388]  PP Ex. 276 (Disclosure Statement § 4.8.3) (setting out the terms of the Asbestos PD Channeling Injunction); PP Ex. 277.01 Rev (Plan § 8.3) (same).

**13.10.  Separate Classes of Claimants Whose Claims Are to Be Addressed By the PD and PI Trusts Have Been Established, and Have Voted, By at Least 75% of Those Voting, In Favor of the Joint Plan.**

13.10.1.    Proposed Finding

As part of the process seeking confirmation of the Joint Plan, separate classes of the claimants whose claims are to be addressed by the Asbestos PI Trust and the Asbestos PD Trust have been established, and have voted, by at least 75 percent of those voting, in favor of the Joint Plan.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

13.10.2.    Argument

Section 524(g)(2)(B)(ii)(IV)(bb) requires that, as part of the process of seeking confirmation of a plan that includes an injunction under section 524(g), a separate class or classes of the claimants whose claims are to be addressed by a section 524(g) trust must be established, and must vote, by at least 75 percent of those voting, in favor of the plan.  As stated in the Amended Declaration of Kevin C. Martin, Classes 6, 7A, 7B, and 8 all voted in favor of the Joint Plan by more than 75 percent.[389]

**13.11.  The Asbestos PI Trust's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner.**

13.11.1.    Proposed Finding

The Asbestos PI Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos PI Claims that provide reasonable assurance that the Asbestos PI Trust shall value, and be in a financial position to pay, Asbestos PI Claims (including

---

[389] PP Ex. 281 (Amended Declaration of Kevin C. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization) (Classes 6, 7A, 7B, and 8 voted to accept the Plan by 99.51%, 98.99%, 88.42%, and 100%, respectively).

Demands that involve similar claims) in substantially the same manner.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V).

            13.11.2.      <u>Argument</u>

The Asbestos PI TDP, which governs distributions from the Asbestos PI Trust, has all of the features set forth in section 524(g)(2)(B)(ii)(V) that are designed to provide reasonable assurance that the Asbestos PI Trust shall value, and be in a financial position to pay, Asbestos PI Claims and Demands in substantially the same manner.  Specifically, the Asbestos PI TDP provides for structured or periodic payments to claimants in various circumstances, including supplemental payments to "true up" claims paid by the trust in the past if the payment percentage goes up[390] and structured payments for paying judgments.[391]  The Asbestos PI TDP also provides for pro rata distributions of the Asbestos PI Trust's assets.  After an Asbestos PI Claim is liquidated by the Asbestos PI Trust, whether by Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant is entitled to a pro-rata share of that liquidated value based on a Payment Percentage.[392]  The Payment Percentage is subject to review and adjustment to reflect and respond to current estimates of the Asbestos PI Trust's assets, and the amount of pending and future claims.[393]  Further, the Asbestos PI TDP provides a matrix of

---

[390]  PP Ex. 277.04 Rev (Asbestos PI TDP § 4.3).

[391]  *Id.* at § 7.7.

[392]  *Id.* at §§ 4.2, 4.3.

[393]  *Id.* at § 4.2 ("The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future PI Trust Claims, the value of the assets then available to the PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of PI Trust Claims.").

settlement values for all claims settled through the Expedited Review process,[394] Maximum

Settlement Values,[395] and a cap to be applied to all judgments.[396]

Because the Asbestos PI TDP has these features and applies to all claims, present and

future, and because the Trustees have a fiduciary duty to apply the Asbestos PI TDP fairly and

follow the same process with respect to all claimants, Mr. Austern was confident in testifying

that he believes that the Asbestos PI Trust will be able pay similar present and future claims in

substantially the same manner because "there are mechanisms in place whereby the scheduled

values and the payment percentages can be adjusted if unforeseen circumstances arise."[397]

Various Indirect PI Trust claimants have objected to the Asbestos PI TDP, arguing that

the first-in, first-out ("FIFO") queue employed under the Asbestos PI TDP could result in a

higher payout for claimholders that rush to assert their claims.[398]  This argument ignores the fact

that the FIFO queue applies equally to all claimants, and that the Asbestos PI TDP provides

numerous protections, including the Payment Percentage, to ensure that Asbestos PI Claims

receive similar treatment regardless of where they fall in the FIFO queue.  Faced directly with

the question of whether the Asbstos PI Trust may run out of assets before it can pay

indemnification claims, the Asbestos PI FCR, David Austern, testified that he did not believe it

---

[394]  *Id.* at § 5.3(a)(3).

[395]  *Id.* at § 5.3(b)(3).

[396]  *Id.* at § 7.7.

[397]  9/17/2009 Tr. 57 (Austern).

[398]  *See* Montana Plan Obj. at 20-24, Montana Phase II Br. at 28-31; Garlock Sealing Obj. at ¶¶ 16-24; MCC Phase II Br. at 8-9.

was likely that the trust would run out of funds before paying indemnification claims.[399]    It would be unreasonable, unfair, and unprecedented to hold all distributions until the last claims against the Asbestos PI Trust have been liquidated, decades from the Effective Date, which is the only way that the trust could be absolutely certain of paying similar present and future claims the same amounts.  In light of the substantial evidence that the Asbestos PI Trust will be able to pay future claims, and the lack of any evidence to the contrary, the objections to the FIFO queue are unfounded and should be rejected.

Indirect PI Trust Claimants have also argued that the Joint Plan may subject Indirect PI Trust Claims to disallowance under section 502(e) if they are unliquidated and contingent, and that this would constitute discrimination against such claims in violation of section 524(g)(2)(B)(ii)(V).[400]    But nowhere in the Joint Plan or the Asbestos PI TDP is there any process for "disallowing" such claims, or any indication that such claims will be "disallowed" on this basis.  Indirect PI Trust Claims are to be processed and paid by the Asbestos Trust under section 5.6 of the Asbestos PI TDP, which provides **no** mechanism for disallowance pursuant to section 502 of the Bankruptcy Code.

Finally, various claimants object to the Asbestos PI TDP on the grounds that it is uncertain regarding the amounts of and procedures for distributions.[401]    Notably, these objectors

---

[399]  9/17/2009 Tr. 70 (Austern) ("Q. Now, in light of all this, first in, first out and uncertainty, is it possible that the trust could run out of funds before it is positioned to pay contribution [and] indemnification claims?  A. I don't believe that's likely.").

[400]  CNA Plan Objection at 31, CNA Phase II Br. at 20-22; MCC Objection at ¶ 13, MCC Phase II Br. at 10-12.

[401]  Montana Objection at 24-25, Montana Phase II Br. at 33-34; Fireman's Fund Phase II Surety Claim Br. at 18-19; MCC Phase II Br. at 9.

have provided no evidence that the flexibility afforded the Trustees of the Asbestos PI Trust will lead to lower distributions for their claims. Indeed, the only evidence is to the contrary -- the individual review process contemplated by the Asbestos PI TDP gives the Trustees flexibility to (1) pay otherwise meritorious claims that fall outside of the criteria for expedited review;[402] and (2) to account for situations where the scheduled values which are assigned to expedited review payments should be reexamined in an appropriate individual case. In particular, the scheduled values were designed to reflect Grace's "rough justice" share of liability, and individual review permits a claimant the opportunity to "prove up a greater value."[403] Given the inherent uncertainties concerning the Asbestos PI Trust's future liability for Asbestos PI Claims, including Indirect PI Trust Claims, the Asbestos PI TDP is as certain as practically possible at this time. Thus, this objection should also be rejected.

**13.12. The Asbestos PD Trust's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner, and the CDN ZAI PD Claims Fund's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner.**

13.12.1.    Proposed Finding

The Asbestos PD Trust and the CDN ZAI PD Claims Fund will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos PD Claims and CDN ZAI PD Claims that provide reasonable assurance that the Asbestos PD Trust and the CDN ZAI PD Claims Fund shall value, and be in a financial position to pay, Asbestos PD Claims and

---

[402] *See* 9/8/2009 Tr. 33-35 (Inselbuch) (explaining the review process contemplated by the Asbestos PI TDP).

[403] *Id.* at 36.

CDN ZAI PD Claims (including Demands that involve similar claims) in substantially the same manner.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V).

### 13.12.2.    Argument

The ZAI PD Trust Distribution Procedures (the "ZAI TDP") and the Case Management Order for Class 7A Asbestos PD Claims (the "Class 7A CMO") also satisfy section 524(g)(2)(B)(ii)(V) by providing reasonable assurance that the Asbestos PD Trust will value and pay similar present and future claims in substantially the same manner.  Specifically, the Class 7A CMO provides that all traditional Asbestos PD Claims will be paid the allowed amount in full, in cash,[404] and the ZAI TDP employs mechanisms similar to those used in the Asbestos PI TDP, including the Payment Percentage.[405]  As with Asbestos PI Claims, the Joint Plan and the ZAI TDP adopt the goal of treating present and future Asbestos PD Claims similarly.[406] Moreover, as the Asbestos PD Future Claimants' Representative, the Honorable Judge Alexander Sanders, has testified, all traditional Asbestos PD Claims -- both present and future -- will be paid 100% of their allowed value, and the ZAI TDP is structured to provide "mechanisms by which all valid current and future US ZAI PD claims in class 7B will be treated and paid on

---

[404]  PP Ex. 277.25 Rev (Class 7A CMO § II.C.4) (stating that the Asbestos PD Trust shall "pay in Cash the Allowed Amount of such Asbestos PD Claim").

[405]  PP Ex. 277.33 Rev (ZAI TDP §§ 4.1, 4.2, 4.3) (providing mechanisms for computation and application of the payment percentage which is designed to achieve similar treatment between present and future claims).

[406]  PP Ex. 277.01 Rev (Plan § 7.3.1) (stating that two goals of the Asbestos PD Trust are to pay Asbestos PD and ZAI claims in such a way that provides reasonable assurance that the Trust will value, and be in a position to pay, present claims and future demands that involve similar claims in substantially the same manner); PP Ex. 277.33 Rev (ZAI TDP § 1.1) (stating goal of equitable treatment).

substantially similar terms."[407]  Judge Sanders concluded that, because both presents and futures are being paid 100% of their allowed claims, they are treated in substantially the same manner under the Joint Plan.[408]

The CDN ZAI PD Claims Fund (the "CDN Fund") and the associated CDN ZAI Minutes of Settlement (the "CDN Settlement") also satisfy section 524(g)(2)(B)(ii)(V) by providing reasonable assurance that the CDN Fund will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner. Specifically, the CDN Settlement provides that if the CDN Fund lacks sufficient funds to pay the maximum amount recoverable for Allowed ZAI Claims, the CDN Fund will make distributions to claimants *pro rata*.[409]

### 13.13.  The Sealed Air Indemnified Parties Are Appropriately Included Within the Asbestos PI and Asbestos PD Channeling Injunctions.

#### 13.13.1.      Proposed Finding

The Sealed Air Indemnified Parties are appropriately included within the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction under 11 U.S.C. § 524(g)(4)(A)(ii).

---

[407] PP 633 (Proffer of Testimony from the Honorable Judge Alexander M. Sanders, Jr., Asbestos PD Future Claims Representative, in Support of Confirmation of the First Amended Joint Plan of Reorganization at ¶¶ 18, 23).

[408] 9/17/2009 Tr. at 99 (Sanders) ("Q. In that way, in the fact that they're receiving 100% of the allotted amount of their claims, is that what you mean by being treated in substantially the same manner?  A. Yes.").

[409] PP Ex. 277.09 Rev (CDN ZAI Minutes of Settlement § 30(a)) (providing for *pro rata* distribution to claimants if the CDN Fund does not have enough assets to pay the maximum amount recoverable for Allowed CDN ZAI Claims).  *See also* PP Ex. 277.01 Rev (Plan § 5.4) ("CDN ZAI PD Claims shall be resolved in accordance with the terms, provisions, and procedures outlined in the CDN ZAI Minutes of Settlement").

13.13.2.        <u>Argument</u>

By issuing the Sealed Air Settlement Order, which incorporates the terms of the Sealed Air Settlement Agreement,[410] this Court has already ruled that the Sealed Air Indemnified Parties (referred to in the Sealed Air Settlement Agreement as the "Released Parties") are to receive "the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code . . . with respect to any and all Asbestos-Related Claims."[411]  As explained in Part 5.2.3 *supra*, this order is a final order of the Court, is *res judicata* to all parties in interest in this case, and cannot be collaterally attacked or modified at this point.  The propriety of extending the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction to the Sealed Air Indemnified Parties has, therefore, already been determined by the Court.

Seaton Insurance Company ("Seaton") and OneBeacon America Insurance Company ("OneBeacon") have belatedly and untimely  objected to the extension of the Asbestos PI Channeling Injunction to Sealed Air, arguing that the Court lacks jurisdiction and statutory authority to enjoin their claims against Sealed Air.[412]  This argument has been waived and is without merit.  As explained above and in detail in Part 5.2.3 *supra*, the Sealed Air Settlement Order is a final order that is binding on Seaton and OneBeacon (who were, in addition, provided

---

[410] PP Ex. 277.23 Rev (Sealed Air Settlement Order ¶¶ 1, 5) (approving the Sealed Air Settlement Agreement "in all respects" and stating that the terms of the Agreement "shall not be subject to modification by this or any other Court through any order or judgment, including any order confirming any plan of reorganization in the above-captioned cases, unless the SAC Defendants consent in writing in their absolute discretion to such modification").

[411] PP Ex. 277.22 Rev (Sealed Air Settlement Agreement § II(c)(vi)).

[412] Seaton and OneBeacon Phase II Br. at 20-25; Seaton and OneBeacon Final Plan Obj. at 20-22.

multiple notices with respect to the Sealed Air Settlement), and principles of *res judicata* foreclose any argument by Seaton and OneBeacon that the channeling injunctions should not be extended to Sealed Air.

In the more than four years that have elapsed since the Sealed Air Settlement Order was entered and became final, no party (including Seaton and OneBeacon) has ever sought or obtained relief from that order.    Accordingly, it would be inappropriate, inequitable, and inconsistent with federal practice to allow Seaton and OneBeacon to collaterally attack the Sealed Air Settlement Order -- and the extension of the channeling injunctions to Sealed Air as required thereunder -- years after the Sealed Air Settlement Order was entered and became final.

Furthermore, even assuming *arguendo* that the Sealed Air Settlement Order does not dispose of Seaton and OneBeacon's objection (which it does), extending the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction to Sealed Air is clearly appropriate.

Section 524(g)(4)(A)(ii) permits the protection afforded by the Channeling Injunctions to be extended to non-debtor third parties if certain conditions are satisfied.    In particular, that section allows the Court to enjoin claims directed against a third party that is alleged to be liable for the conduct of or claims against the debtor to the extent that the third party's alleged liability arises by reason of "the third party's ownership of a financial interest in the debtor," or the third party's involvement in "a transaction changing the corporate structure . . . of the debtor . . . ."[413]

---

[413] Section 524(g)(4)(A)(ii) also requires that any third party protected by a section 524(g) injunction be "indentifiable from the terms of such injunction."  Here, Sealed Air is plainly identified as an "Asbestos Protected Party" in PP Ex. 277.01 Rev (Plan § 1.1(50)(f)) (defining "Asbestos Protected Party"); *Id.* at § 8.2.1 (extending protection to "Asbestos Protected Parties" under the PI Channeling Injunction); *Id.* at § 8.3.1 (extending protection to "Asbestos Protected Parties" under the PD Channeling Injunction).

Numerous complaints against Sealed Air prove that Sealed Air has, in fact, been alleged to be liable for Grace's asbestos liabilities.[414]  These claims -- each of which also names Grace as a defendant -- are predicated on the Cryovac Transaction, whereby the former parent company of Grace, W. R. Grace & Co., a Delaware corporation ("Grace-Del.") became Sealed Air Corporation, and on Grace-Del.'s former ownership of a financial interest in Grace-Conn.  At the Confirmation Hearing, Grace's General Counsel Mark Shelnitz testified that the relationship between the Grace entity that was allegedly liable for asbestos products and operations (Grace-Conn.) and the entity that eventually became Sealed Air (*i.e.*, Grace-Del.) was a parent-subsidiary relationship with Sealed Air's predecessor (*i.e.*, Grace-Del.) as the parent.[415]  Mr. Shelnitz further testified that no Grace entity other than the operating entity (*i.e.*, Grace-Conn.) ever held Grace's asbestos liabilities.[416]  Thus, to the extent that Sealed Air (*i.e.*, Grace-Del.) is alleged to be liable for Grace's asbestos liabilities, such alleged liability *must* arise from either the Cryovac Transaction or from Sealed Air's (*i.e.*, Grace-Del.'s) "ownership of a financial

---

[414]  PP Ex. 121 (Class Action Complaint in *Chakarian v. W. R. Grace & Co.* at 1-2, 4) (complaint naming Sealed Air as a defendant in an action based on Grace's asbestos liabilities); PP Ex. 120 (Class Action Complaint in *Goldstein v. W. R. Grace & Co.*, at 1-2, 5-6) (same); PP Ex. 129 (Class Action Complaint in *Abner v. W. R. Grace & Co.* at 1-3) (same); PP Ex. 247 (Complaint from *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corporation* at 14-15)(seeking to hold Sealed Air and Cryovac, Inc. liable for Grace's asbestos liabilities).

[415]  9/15/2009 Tr. 95 (Shelnitz) ("Q.  At all points in time . . . what was the relationship between that operating entity with the liabilities and the entity that respectively went off to do Fresenius and respectively went off to do Sealed Air? A. It was a parent subsidiary structure, directly held subsidiary.").  *See also* PP Ex. 507.06 - 507.09 (slides depicting the "Sealed Air Transaction").

[416]  9/15/2009 Tr. 95 (Shelnitz) ("Q. At any point in time did any Grace entity hold the asbestos liabilities other than the operating entity?  A. No.").

interest in the debtor,"[417] and such claims clearly fit the framework for third-party protection under section 524(g)(4)(A)(ii).

Moreover, as explained in detail in Part 14.2 *infra*, this Court has jurisdiction over Seaton and OneBeacon's alleged claims against Sealed Air.  In addition, as explained above, the Court has authority under section 524(g) to enjoin claims against Sealed Air because any liability that it is alleged to have for Grace's asbestos products and operations *must* arise either from the Cryovac Transaction or from its prior "ownership of a financial interest in the debtor."[418]

It is also significant that Seaton and OneBeacon are not affected by the extension of section 524(g) protection to Sealed Air because Sealed Air is not a party to any contract that grants indemnities to Seaton or OneBeacon for asbestos-related claims.  Grace settled its coverage for asbestos-related liabilities with Seaton and OneBeacon's predecessors in two agreements entered into on May 14, 1993[419] and May 15, 1995.[420]  Although a company identified as W. R. Grace & Co. is in fact a party to these contracts, the contracts could not possibly refer to the company that later became Sealed Air.  This is because that company *had not yet been incorporated* when these contracts were executed.  The company that is now known

---

[417] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I).

[418] 11 U.S.C. § 524(g)(4)(A)(ii)(I).

[419] OS-1 Ex. Rev (Settlement Agreement Between W. R. Grace & Co., W. R. Grace & Co. -- Conn., Commercial Union Ins. Co. and American Employers' Ins. Co., dated 5/14/1993 at 1-2, 7).

[420] OS-05 Ex. Rev (Settlement Agreement, Release and Indemnification/Hold Harmless Agreement between W. R. Grace & Co. -- Conn. and Unigard Security Ins. Co., dated 5/15/1995 at 1-4, 6-7).

as Sealed Air was incorporated as Grace Holding, Inc. on January 29, 1996, and changed its name to W. R. Grace & Co. on September 27, 1996.[421]

For the foregoing reasons, Seaton and OneBeacon's objection to the protection of Sealed Air under the Channeling Injunctions should be rejected, and it is entirely appropriate to extend the protections of the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction to Sealed Air.

### 13.14.  The Fresenius Indemnified Parties Are Appropriately Included Within the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction.

#### 13.14.1.    Proposed Finding

The Fresenius Indemnified Parties are appropriately included in the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction under 11 U.S.C. section 524(g)(4)(A)(ii).

#### 13.14.2.    Argument

By issuing the Fresenius Settlement Order, which incorporates the terms of the Fresenius Settlement Agreement,[422] the District Court has already ruled that the Fresenius Indemnified Parties (referred to in the Fresenius Settlement Agreement as the "NMC Defendants") are entitled to the protections of section 524(g) such that "any Person that receives property from the Asbestos Trust shall thereby be deemed, upon and after the making of the Settlement Payment, to have fully and finally released each and every of the NMC Defendants from all Grace-Related

---

[421]  PP Ex. 384 (Long-Form Certificate of Good Standing for Sealed Air Corporation at 1).

[422]  PP Ex. 277.14 Rev (Fresenius Settlement Order ¶¶ 1,5) (approving the Fresenius Settlement Agreement "in all respects" and stating that "[t]he terms of the Settlement Agreement shall not be modified by provisions in any plan of reorganization in the above captioned cases, or otherwise, without consent of the [Fresenius Indemnified Parties].").

Claims that the person has asserted or could have asserted in this or any other forum against any of the NMC Defendants."[423]  As explained in Part 5.2.3 *supra*, this order is a final order of the District Court, is *res judicata* to all parties in interest in this case, and cannot be collaterally attacked or modified at this point.[424]  The propriety of extending the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction to the Fresenius Indemnified Parties has, therefore, already been determined by the District Court.[425]

Seaton and OneBeacon have belatedly and untimely objected to the extension of the Asbestos PI Channeling Injunction to Fresenius Medical Care Holdings, Inc. ("FMCH"), arguing that the Court lacks jurisdiction and statutory authority to enjoin its claims against FMCH.[426] This argument is without merit.  As explained above and in detail in Part 5.2.3 *supra*, the Fresenius Settlement Order is a final order that is binding on Seaton and OneBeacon, and principles of *res judicata* foreclose any argument by Seaton and OneBeacon that the channeling injunctions should not be extended to FMCH.  The District Court entered the Fresenius Settlement Order in June 2003.  In the approximate six and a half intervening years, no party

---

[423]  PP Ex. 277.13 Rev (Fresenius Settlement Agreement § 2.02(C)).  *See also* PP Ex. 277.14 Rev (Fresenius Settlement Order ¶ KK(b)) (stating that "[t]he Plan of Reorganization shall provide that the NMC Defendants shall receive the full benefits and protections of an injunction entered pursuant to section 524(g) of the Bankruptcy Code.").

[424]  PP Ex. 277.14 Rev (Fresenius Settlement Order ¶ 6) (stating that "[t]he terms of the Settlement Agreement and this Order shall be binding in all respects on the Debtors, their bankruptcy estates, all holders of claims and interests in the above-captioned cases, all parties in interest, and each of the respective successors and assigns.").

[425]  PP Ex. 277.14 Rev (Fresenius Settlement Order ¶ XX) (finding that "the releases, protections, and other benefits provided to the NMC Defendants are necessary to the reorganization of the above-captioned cases.").

[426]  Seaton and OneBeacon Plan Obj. at 20-22; Seaton and OneBeacon Phase II Br. at 20-25.

(including either Seaton or OneBeacon) has ever sought or obtained relief from that order.  It would, therefore, be inappropriate, inequitable, and inconsistent with federal practice to allow Seaton and OneBeacon to collaterally attack the Fresenius Settlement Order -- and the channeling injunctions provided for thereunder -- years after the Fresenius Settlement Order was entered and became final.

Furthermore, even assuming *arguendo* that the Fresenius Settlement Order does not dispose of Seaton and OneBeacon's objection (which it does), extending the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction to FMCH is clearly appropriate.  As is the case with Sealed Air, FMCH is entitled to protection under section 524(g) because it is identifiable from the terms of the Asbestos PI and PD Channeling Injunctions,[427] and because it is alleged to be liable for the conduct of or the claims against the Debtors due to its "ownership of a financial interest in the debtor"[428] and its "involvement in a transaction changing the corporate structure of the debtor."[429]

Numerous complaints demonstrate that FMCH has been named as a defendant in actions seeking damages based on Grace's asbestos liabilities.[430]  These claims -- each of which also

---

[427] PP Ex. 277.01 Rev (Plan § 1.1(50)(g)) (defining "Asbestos Protected Party" to include Fresenius), *Id.* at § 8.2.1 (extending protection to "Asbestos Protected Parties" under the PI Channeling Injunction), and *Id.* at §8.3.1 (extending protection to "Asbestos Protected Parties" under the PD Channeling Injunction).

[428] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I).

[429] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(IV).

[430] PP Ex. 129 (Class Action Complaint in *Abner v. W. R. Grace & Co.)* (naming FMCH as a defendant in an action based on Grace's asbestos liabilities); PP Ex. 143 (Proof of Claim of FMCH, Addendum at 6-8) (listing actions based on Grace's asbestos liabilities in which FMCH has been named as a defendant).

names Grace as a defendant -- arise from the Fresenius Transaction whereby the former parent company of Grace, W. R. Grace & Co., a New York corporation ("Grace-NY"), became FMCH. At the Confirmation Hearing, Mark Shelnitz testified that the relationship between the Grace entity that held the liability for asbestos products and operations (*i.e.*, Grace-Conn.) and the entity that eventually became FMCH (*i.e.*, Grace-NY) was a parent-subsidiary relationship with FMCH's predecessor (*i.e.*, Grace-NY) as the parent.[431]   Mr. Shelnitz further testified that no Grace entity other than the operating entity ever held Grace's asbestos liabilities.[432]   Thus, to the extent that FMCH is alleged to be liable for Grace's asbestos liabilities, such alleged liability *must* arise either from FMCH's "ownership of a financial interest in the debtor,"[433] or its "involvement in a transaction changing the corporate structure . . . of the debtor . . . ."[434]

As explained in detail in Part 14.2 *infra*, the Court has jurisdiction over Seaton and OneBeacon's alleged claims against FMCH.  Moreover, it is clear that FMCH would have no alleged liability to Seaton and OneBeacon but for FMCH's prior ownership of a financial interest in Grace-Conn.  Grace settled its coverage for asbestos-related liabilities with Seaton and

---

[431]  9/15/2009 Tr. 95 (Shelnitz) ("Q.  At all points in time . . . what was the relationship between the operating entity with the liabilities and the entity that respectively went off to do Fresenius and respectively went off to do Sealed Air? A. It was a parent subsidiary structure, directly held subsidiary.").  *See also* PP Ex. 507.003 - 507.005 (slides depicting the "Fresenius Transaction").

[432]  9/15/2009 Tr. 95-96 (Shelnitz) ("Q. At any point in time did any Grace entity hold the asbestos liabilities other than the operating entity?  A. No.").

[433]  *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I).

[434]  *See* 11 U.S.C. § 524(g)(4)(A)(ii)(IV).

OneBeacon's predecessors in two agreements entered into on May 14, 1993[435] and May 15, 1995.[436]   But Grace-NY, FMCH's predecessor, would not have incurred any indemnification obligations for Grace-Conn.'s alleged asbestos liabilities absent its ownership of a financial interest in Grace-Conn., which is the only Grace entity that held the alleged asbestos liabilities.[437]   Absent its financial interest in Grace-Conn., Grace-NY would not have had any reason to indemnify Seaton and OneBeacon for asbestos-related claims because Grace-NY would not have had any connection to Grace-Conn.'s alleged asbestos liabilities, and Grace-NY had no independent asbestos liability.[438]   Thus, Seaton and OneBeacon's claims for indemnification against FMCH arise from Grace-NY's ownership of a financial interest in Grace-Conn. and clearly fit the framework for third-party protection under section 524(g)(4)(A)(ii)(I).

For the foregoing reasons, it is entirely appropriate for the section 524(g) injunction issued under the Joint Plan to channel Seaton and OneBeacon's Indirect PI Trust Claims to the

---

[435]   OS-1 Ex. Rev (Settlement Agreement Between W. R. Grace & Co., W. R. Grace & Co. -- Conn., Commercial Union Ins. Co. and American Employers' Ins. Co., dated 5/14/1993 at 1-2, 7).

[436]   OS-05 Ex. Rev (Settlement Agreement, Release and Indemnification/Hold Harmless Agreement between W. R. Grace & Co. -- Conn. and Unigard Security Ins. Co., dated 5/15/1995 at 1-4, 6-7).   (Seaton and OneBeacon also assert an alleged claim against FMCH arising under a certain Settlement Agreement, dated July 1, 1996 by and among Grace-Conn., Unigard and various Grace subsidiaries.   However, Fresenius' predecessor, Grace-NY, did not execute that agreement, as Seaton and OneBeacon allege.   Rather, Grace executed the settlement agreement purportedly on behalf of Grace-NY as "its Attorney-In-Fact.")

[437]   *See* 9/15/2009 Tr. 95 (Shelnitz) ("Q. At any point in time did any Grace entity hold the asbestos liabilities other than the operating entity?   A. No.").

[438]   *See id.*

Asbestos PI Trust, and Seaton and OneBeacon's objection to the protection of FMCH should be rejected.

### 13.15. The Remaining Asbestos Protected Parties Are Appropriately Included in the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction.

#### 13.15.1.    Proposed Finding

The remaining Asbestos Protected Parties are appropriately included in the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction under sections 524(g)(3)(A) and 524(g)(4)(A)(ii).

#### 13.15.2.    Argument

The remaining Asbestos Protected Parties are also appropriately included in the Asbestos PI and PD Channeling Injunctions under section 524(g)(4)(A)(ii).  With respect to these parties, the terms of the Asbestos PI and PD Channeling Injunctions are self-limiting.  The Asbestos PI Channeling Injunction applies only to Asbestos PI Claims, which are limited to claims arising from the Debtors' asbestos operations or asbestos-containing products.[439]  Likewise, the Asbestos PD Channeling Injunction applies only to Asbestos PD Claims, which are similarly limited to claims arising from the Debtors' asbestos operations or asbestos-containing products.[440]  Thus, each Asbestos PI or PD Claim, if asserted against a non-debtor Asbestos

---

[439] PP Ex. 277.01 Rev (Plan § 1.1(33)(i)(b)) (limiting the definition of "Asbestos PI Claim" to injuries caused by the Debtors' asbestos operations and products); *Id.* at § 8.2.1 (limiting scope of the Asbestos PI Channeling Injunction to Asbestos PI Claims).

[440] PP Ex. 277.01 Rev (Plan § 1.1(18)(i)(b)) (limiting the definition of "Asbestos PD Claim" to injuries caused by the Debtors' asbestos products), *Id.* at § 8.3.1 (limiting scope of the Asbestos PD Channeling Injunction to Asbestos PD Claims and CDN ZAI PD Claims).

Protected Party, would be derivative of the Debtors' asbestos liabilities and therefore appropriately channeled under section 524(g).

Specifically, the Entities included under Joint Plan § 1.1(50)(i) are appropriately included under section 524(g)(3)(A)(II), because by the terms of the Joint Plan, those parties are protected only to the extent that their liability arises "by reason of [their] becoming [] a transferee or successor."[441]   Similarly, the Entities included under Joint Plan § 1.1(50)(j) are appropriately included under section 524(g)(3)(A)(III) because their protection is limited to liability that arises by reason of making a loan, as permitted by section 524(g).[442]   Moreover, the Entities included under Joint Plan § 1.1(50)(h) and (k) are appropriately included under section 524(g)(4)(A)(ii)(I) because, due to the Debtors' economic interests relating to these parties, permitting claims against them would allow Claimants to "indirectly" collect from the Debtors.   Finally, the Entities included under Joint Plan § 1.1(50)(l) are appropriately included under section 524(g)(4)(A)(ii)(II), and the Entities included under Joint Plan § 1.1(50)(d) are appropriately included under section 524(g)(4)(A)(ii)(III).

Various insurers have objected to the timing restrictions on section 524(g) protection for settled insurers, arguing that insurers that settle after the effective date should still receive the protection of the Asbestos PI and PD Channeling Injunctions.   But section 524(g) does not require plans to provide injunctions in favor of every insurance company that settles after plan confirmation and the cases cited by the objecting parties do not hold otherwise.[443]   Also, the Plan

---

[441]  11 U.S.C. § 524(g)(3)(A)(ii); PP Ex. 277.01 Rev (Plan § 1.1(50)(i)).

[442]  11 U.S.C. § 524(g)(3)(A)(III); PP Ex. 277.01 Rev (Plan § 1.1(50)(j)).

[443]  *See* PP Pretrial Phase II Main Br. at 135.

Proponents have amended the Joint Plan's definition of "Settled Asbestos Insurance Company" to include any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement prior to the eleventh day following the entry of the Confirmation Order by the Bankruptcy Court.[444]

BNSF also argues that the Asbestos PI Channeling Injunction violates section 524(g)(1)(B) because it fails to cover derivative claims asserted against BNSF. This argument ignores the fact that protection of third parties under a section 524(g) injunction is permissive, not mandatory.[445]  Thus, the Bankruptcy Code does not require that BNSF be protected by the Asbestos PI Channeling Injunction.

### 13.16.   The Asbestos PI and PD FCRs Have Been Appointed By the Bankruptcy Court, and CCAA Representative Counsel Has Been Appointed By the Canadian Court.

13.16.1.      Proposed Finding

The Asbestos PI FCR and the Asbestos PD FCR have been appointed by the Bankruptcy Court and the CCAA Representative Counsel has been appointed by the Canadian Court as part of the proceedings leading to the issuance of the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction for the purpose of, among other things, protecting the rights of the Entities that might subsequently assert Demands of the kind that are addressed in the Asbestos PI Channeling Injunction and transferred to the Asbestos PI Trust, Demands of the kind that are addressed in the Asbestos PD Channeling Injunction and transferred to the Asbestos PD

---

[444] Second Set of Modifications to Joint Plan of Reorganization, Ex. 1, Edits to Joint Plan of Reorganization at 1 [Dkt. No. 23474] (stating new definition of "Settled Asbestos Insurance Company").

[445] *See* 11 U.S.C. § 524(g)(4)(A)(ii) ("such an injunction *may* bar any action directed against a third party . . .") (emphasis added).

Trust, and Demands that are addressed in the Asbestos PD Channeling Injunction and transferred to the CDN ZAI PD Claims Fund.  *See* 11 U.S.C. § 524(g)(4)(B)(i).

13.16.2.    Argument

For a section 524(g) injunction to be valid and enforceable, the Court must appoint a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands that are to be addressed by a section 524(g) trust.  In this case, the Court has appointed David Austern as the Asbestos PI Future Claimants' Representative,[446] and the Honorable Judge Alexander Sanders as the Asbestos PD Future Claimants' Representative.[447] Also, the Canadian Court has appointed Lauzon Bélanger S.E.N.C.R.L. and Scarfone Hawkins LLP as CCAA Representative Counsel.[448]

**13.17.  Identifying Each of the Entities In the Asbestos PI Channeling Injunction Is Fair and Equitable, With Respect to the Parties That Might Subsequently Assert Demands, In Light of the Benefits to Be Provided to the Asbestos PI Trust on Behalf of Such Entities.**

13.17.1.    Proposed Finding

In light of the benefits to be provided to the Asbestos PI Trust by or on behalf of each Asbestos Protected Party (including the Sealed Air Indemnified Parties and the Fresenius

---

[446] Order Granting Application of the Debtors Pursuant to 11 U.S.C. §§ 105, 327, and 524(g)(4)(B)(i), for the Appointment of a Legal Representative for Future Asbestos Claims, dated 5/25/2004, [Dkt. No. 5645].

[447] Order Granting Application of the Debtors, Pursuant to 11 U.S.C. §§ 105, 524(g)(4)(B)(i), and 1109, for Entry of an Order Appointing Alexander M. Sanders as Legal Representative for Future Asbestos-Related Property Damage Claimants, dated 10/21/2008, [Dkt. No. 19818.

[448] PP Ex. 632 (Affidavit of Orestes Pasparakis, Ex. A (court order) at 3, ¶ 2) ("**THIS COURT ORDERS** that Lauzon Bélanger S.E.N.C.R.L. and Scarfone Hawkins LLP be appointed as representative counsel, in these proceedings on behalf of all Canadian Claimants.").

Indemnified Parties), identifying each of the Asbestos Protected Parties in the Asbestos PI Channeling Injunction is fair and equitable (including with respect to the Entities that might subsequently asserts Demands against any Asbestos Protected Party) and is supported by reasonable consideration. *See* 11 U.S.C. § 524(g)(4)(B)(ii).

           13.17.2.    <u>Argument</u>

For a section 524(g) injunction to be valid and enforceable, identifying the Debtors and each third party receiving protection under the injunction must be fair and equitable to the persons that might later assert asbestos-related claims, in light of the benefits to be provided to the 524(g) Trust on behalf of the protected parties.[449]  Under the Joint Plan, the Debtors will provide immense value to the Asbestos PI Trust, including a $250 million cash payment to the Asbestos PI Trust on the Effective Date (plus interest from January 1, 2009), an additional amount equal to the Asbestos PD Initial Payment to be paid on the Effective Date,[450] $1.55 billion in deferred payments through January 2, 2033,[451] significant insurance assets,[452] and the Warrant Agreement.[453]  At the Confirmation Hearing, the Debtors' witness, Richard Finke, testified that Grace's contributions to the 524(g) Trusts will be made in part on behalf of insurance companies that entered into pre-petition settlement agreements with Grace as well as

---

[449]  11 U.S.C. § 524(g)(4)(B)(ii).

[450]  PP Ex. 277.01 Rev (Plan § 7.2.2(a)).

[451]  PP Ex. 277.11 Rev (Asbestos PI Deferred Payment Agreement § 2(a)) (setting forth obligation to make deferred payments).

[452]  PP Ex. 277.06 Rev (Asbestos Insurance Transfer Agreement § 1(a)) (transferring Debtors' insurance rights to the Asbestos PI Trust).

[453]  PP Ex. 277.24 Rev (Warrant Agreement § 3.1) ("no later than five (5) Business Days after the Effective Date . . . the Company shall issue the Warrants to the Trust").

the Non-Debtor Affiliates, the Reorganized Debtors, and Montana Vermiculite.[454]   Mr. Finke

also testified that the insurance companies that reached post-petition settlement agreements are

making their own contributions pursuant to those agreements.[455]   Moreover, Fresenius (on behalf

of the Fresenius Indemnified Parties) and Cryovac, Inc. (on behalf of the Sealed Air Indemnified

Parties) will make payments to the Asbestos PI Trust and the Asbestos PD Trust, having a

combined value of approximately $1.1 billion, that will add enormous value to the Trusts and to

the Joint Plan.[456]

Despite the substantial contributions to be made to the Asbestos PI Trust under the Joint

Plan, various parties have objected to the Joint Plan because certain parties included in the

Asbestos PI Channeling Injunction are not directly contributing funds to the Asbestos PI Trust.[457]

But it is clear under both the plain language of section 524(g)(4)(B)(ii) and under controlling

Third Circuit law that the fairness of a section 524(g) injunction is to be measured by the

contributions made **on behalf of** the parties to be protected by the injunction.[458]   Here, the Joint

---

[454] 9/14/2009 Tr. 183-84 (Finke).

[455] *Id.* at 184 ("Q. And those insurance companies that have reached settlements recently, is it your understanding that they are putting in their own contributions?  A. Yes, pursuant to the settlement agreements.").

[456] 9/17/2009 Tr. 59 (Austern) (testifying that the Sealed Air and Fresenius contributions will provide "enormous benefit to the [Asbestos PI] Trust.   $1.1 billion is a very significant portion of what will be the Trust assets.").

[457] *See, e.g.,* Libby Plan Obj. at 80-81, Libby Phase II Br. at 95-96.

[458] *See, e.g., In re Kaiser Aluminum Corp.*, 2006 WL 616243, at *17 (Bankr. D. Del. Feb. 6, 2006) (holding that extension of injunction to certain non-debtor protected parties was fair and equitable where debtor contributed $13 million to the trust on behalf of such parties); *In re Burns & Roe Enter.'s, Inc.*, 2009 WL 438694, at *9, *35 (D.N.J. Feb. 23, 2009) (holding that entry of injunction was fair and equitable "in light of the benefits provided, or to be provided . . . by or on behalf of the Protected Parties and Settling Insurance Entities"); *In re*

(Continued…)

Plan provides for substantial contributions to the Asbestos PI Trust which, as explained *supra*, are made on behalf of all protected parties, and therefore no direct contributions are needed. Also, for the reasons expressed in the Plan Proponents' Pretrial Phase II Main Brief, the objections to the Joint Plan on the grounds that section 524(g) incorporates the pre-Code version of the absolute priority rule,[459] and that the Asbestos PI TDP is not "fair and equitable,"[460] are without merit.

> **13.18.  Identifying Each of the Entities in the Asbestos PD Channeling Injunction Is Fair and Equitable, With Respect to the Parties That Might Subsequently Assert Demands, in Light of the Benefits to Be Provided to the Asbestos PD Trust on Behalf of Such Entities.**

> 13.18.1.    Proposed Finding

In light of the benefits to be provided to the Asbestos PD Trust by or on behalf of each Asbestos Protected Party (including the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties), identifying each of the Asbestos Protected Parties in the Asbestos PD Channeling Injunction is fair and equitable (including with respect to the Entities that might subsequently asserts Demands against any Asbestos Protected Party) and is supported by reasonable consideration.  *See* 11 U.S.C. § 524(g)(4)(B)(ii).

---

*Federal Mogul-Global*, 2007 WL 4180545, at *33 (Bankr. D. Del. 2007) (holding that entry of section 524(g) injunction was fair and equitable "[i]n light of the substantial contributions to be made to the Trust by or on behalf of the Protected Parties"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 156 (D. Del. 2006) (same).

[459]  *See* PP Pretrial Phase II Main Br. at 128-30.

[460]  *See id.* at 132-33.

13.18.2.    Argument

For a section 524(g) injunction to be valid and enforceable, identifying the Debtors and each third party receiving protection under the injunction must be fair and equitable to the persons that might later assert asbestos-related claims, in light of the benefits to be provided to the section 524(g) Trust on behalf of the protected parties.  Under the Joint Plan, the Debtors will provide substantial contributions to the Asbestos PD Trust, including the Deferred Payment Agreements (for both Class 7A PD and Class 7B ZAI)[461] and all funds identified in the CDN ZAI Minutes of Settlement.[462]  In addition, Fresenius (on behalf of the Fresenius Indemnified Parties) and Cryovac, Inc. (on behalf of the Sealed Air Indemnified Parties) will make substantial payments to the Asbetsos PD Trust (with the combined value of these payments to the Asbestos PD Trust and the Asbestos PI Trust being approximately $1.1 billion).[463]  At the Confirmation Hearing, the Debtors' witness, Richard Finke, testified that Grace's contributions to the section 524(g) Trusts will be made in part on behalf of insurance companies that entered into pre-petition settlement agreements with Grace as well as the Non-Debtor Affiliates, the Reorganized Debtors, and Montana Vermiculite.[464]  Mr. Finke also testified that the insurance companies that reached post-petition settlement agreements are making their own contributions pursuant to those

---

[461] PP Ex. 277.27 Rev (Deferred Payment Agreement (Class 7A PD) § 2(a)) (detailing the Debtors' obligation to make future payments to the PD Trust); PP Ex. 277.28 Rev (Deferred Payment Agreement (Class 7B ZAI) § 2.1) (detailing the Debtors' obligation to make future payments to the PD Trust).

[462] *See* PP Ex. 277.01 Rev (Plan § 7.3.2(d)) (requiring the Debtors to transfer to the Asbestos PD Trust all funds set forth in the CDN ZAI Minutes of Settlement); PP Ex. 277.09 Rev (CDN ZAI Minutes of Settlement ¶ 9) (requiring Grace to pay $6.5 million (Canadian)).

[463] PP Ex. 277.01 R\ev (Plan § 7.3.2(c)) (requiring Fresenius and Cryovac to transfer their respective shares of the Class 7B Initial Payment on the Effective Date).

agreements.[465]  Thus, under the Joint Plan, substantial contributions will be made to the Asbestos

PD Trust on behalf of the parties to be protected under the Asbestos PD Channeling Injunction.

## XIV.  THE COURT HAS JURISDICTION OVER EACH CLAIM THAT IS ENJOINED OR RELEASED UNDER THE JOINT PLAN -- PLAN § 7.7(R).

### 14.1.  Proposed Finding

The Court has jurisdiction over each of the Claims, SA Claims, Grace-Related Claims,

and Demands that is subject to any of (i) the Asbestos PI Channeling Injunction described in

section 8.2 of the Joint Plan, (ii) the Asbestos PD Channeling Injunction described in section 8.3

of the Joint Plan, (iii) the Successor Claims Injunction described in section 8.5 of the Joint Plan,

and (iv) the releases described in the Joint Plan.

### 14.2.  Argument

Through the Asbestos PI and PD Channeling Injunctions, the Successor Claims

Injunction, and through various releases, the Joint Plan permissibly enjoins and releases certain

claims against the Debtors and third parties.  These releases and injunctions are necessary to

effect an equitable and orderly reorganization of Grace,[466] and the Court clearly has jurisdiction

to enjoin and release the affected claims.

The Court has jurisdiction to issue the Asbestos PI Channeling Injunction.  The Asbestos

PI Channeling Injunction enjoins both claims against the Debtors and against third parties that

are designated as Asbestos Protected Parties.  Clearly, the Court has jurisdiction to enjoin

Asbestos PI Claims and Demands against the Debtors -- claims against a debtor are the very core

---

[464]  9/14/2009 Tr. 183-84 (Finke).

[465]  *Id.* at 184.

[466]  *See* Parts VII and 13.8.2, *supra*.

of a Bankruptcy Court's power to adjudicate claims "arising in or related to cases under title 11."[467]    Moreover, as explained in Part 13.15.2 *supra*, the third parties identified as Asbestos Protected Parties are properly protected by the Asbestos PI Channeling Injunction.  Therefore, the Court also has jurisdiction to enjoin Asbestos PI Claims against these Entities, because each such claim would constitute an attempt to "directly or indirectly" collect on the Debtors' asbestos liaibilities.[468]

The Court also has jurisdiction to issue the Asbestos PD Channeling Injunction.  Like the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction enjoins both claims against the Debtors and against third parties that are designated as Asbestos Protected Parties.  Again, the Court clearly has jurisdiction to enjoin Asbestos PD Claims and Demands against the Debtors.  Moreover, as explained in Part 13.15.2 *supra*, the third parties identified as Asbestos Protected Parties are properly protected by the Asbestos PD Channeling Injunction.  Therefore, the Court also has jurisdiction to enjoin Asbestos PD Claims against these Entities, because each such claim would constitute an attempt to "directly or indirectly" collect on the Debtors' asbestos liabilities.[469]

As explained in Part 5.2.1 *supra*, the Court has jurisdiction to issue the Successor Claims Injunction because it enjoins claims that would trigger rights of indemnification against the Debtors.

---

[467]  28 U.S.C. § 1334(b).

[468]  *See* 11 U.S.C. § 524(g)(1)(B).

[469]  *See* 11 U.S.C. § 524(g)(1)(B) .

Finally, the Court has jurisdiction to enter the releases set out in the Joint Plan.  The releases provided for in the Joint Plan apply only to claims held by the Debtors (for which the Court's jurisdiction is self-evident), to claims held by parties who have agreed to release such claims by voting for the Joint Plan, and/or to claims that would trigger a right of indemnification against the Debtors.[470]   Accordingly, the Court's jurisdiction to enter the releases in the Joint Plan is not at issue.

## XV.    CERTAIN ADDITIONAL CONDITIONS TO PLAN CONFIRMATION ARE NOT IN DISPUTE.

In addition to the requirements for confirmation under the Bankruptcy Code, certain additional conditions to confirmation of the Joint Plan are set forth in Plan § 7.7.  This section sets forth proposed findings for the Court to satisfy these requirements, along with the evidence supporting each finding.

### 15.1.   Plan § 7.7(e).

#### 15.1.1. Proposed Finding

The Asbestos PI Trust and the Asbestos PD Trust shall be "qualified settlement funds" for federal income tax purposes within the meaning of the treasury regulations issued pursuant to section 468B of the IRC and shall be subject to the continuing jurisdiction of the Bankruptcy Court.

---

[470]  *See* PP Pretrial Phase II Main Br. at 80-88.

### 15.1.2. Supporting Evidence

As established by the Declaration of Todd F. Maynes in Support of the Treatment of the Grace Asbestos Trusts as Qualified Settlement Funds,[471] the Asbestos PI Trust and the Asbestos PD Trust will be qualified settlement funds for federal income tax purposes.  The Asbestos PI Trust and the Asbestos PD Trust will also be subject to the continuing jurisdiction of the Bankruptcy Court "to hear and determine any issue involving the Asbestos PI Trust or Asbestos PD Trust in order to comply with section 468B of the IRC."[472]

**15.2.  Plan § 7.7(m).**

### 15.2.1. Proposed Finding

The Terms of the Successor Claims Injunction, the Asbestos Insurance Entity Injunction, and any provisions barring actions against third parties are set out in the Joint Plan and the Disclosure Statement, and both the Joint Plan and the Disclosure Statement adequately describe such injunctions and provisions (and the acts and entities to which they apply) in specific and conspicuous language in accordance with the requirements of Bankruptcy Rule 3016(c).

### 15.2.2. Supporting Evidence

The Joint Plan and the Disclosure Statement set out the terms of the Successor Claims Injunction,[473] the Asbestos Insurance Entity Injunction,[474] and all other provisions barring

---

[471] PP Ex. 242 at 6-9 (Declaration of Todd F. Maynes in Support of the Treatment of the Grace Asbestos Trusts as Qualified Settlement Funds).

[472] PP Ex. 277.01 Rev ( Plan § 10.4(m)).

[473] PP Ex. 276 Rev (Disclosure Statement § 4.8.5) (setting forth the terms of the Successor Claims Injunction); PP Ex. 277.01 Rev (Plan § 8.5 ) (same).

[474] PP Ex. 276 Rev (Disclosure Statement § 4.8.4) (setting forth the terms of the Asbestos Insurance Entity Injunction); PP Ex. 277.01 Rev (Plan § 8.4) (same).

actions against third parties in specific language,[475] in underlined text, in accordance with the requirements of Fed. R. Bankr. P. 3016(c).

### 15.3.    Plan § 7.7(s).

15.3.1. Proposed Finding

In light of the benefits provided, or to be provided, to the Asbestos PI Trust and the Asbestos PD Trust by, or on behalf of, each Asbestos Protected Party (including the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties), the Successor Claims Injunction is fair and equitable and is supported by reasonable consideration, and the releases in favor of the Asbestos Protected Parties described in the Joint Plan are fair and equitable and are supported by reasonable consideration.

15.3.2. Supporting Evidence

As explained in Part 13.17.2 *supra*, substantial contributions to the Joint Plan and to the Trusts are being made by or on behalf of the Asbestos Protected Parties (including the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties).    In light of these substantial contributions, the Successor Claims Injunction and the releases described in the Joint Plan are clearly fair and equitable and supported by reasonable consideration.

---

[475]  PP Ex. 277.01 Rev (Plan § 8.8.1) (setting out the terms of releases in favor of Sealed Air); PP Ex. 276 Rev (Disclosure Statement § 4.8.8.1) (same); PP Ex. 277.01 Rev (Plan § 8.8.3) (setting out the terms of releases in favor of Fresenius); PP Ex. 276 Rev (Disclosure Statement § 4.8.8.3) (same); PP Ex. 277.01 Rev (Plan § 8.8.6) (setting forth terms of Debtors' release of avoidance actions); PP Ex. 276 Rev (Disclosure Statement § 4.8.8.6) (same); PP Ex. 277.01 Rev (Plan § 8.8.7) (setting forth terms of specific releases by holders of Claims or Equity Interests); PP Ex. 276 Rev (Disclosure Statement § 4.8.8.7) (same); PP Ex. 277.01 Rev (Plan § 8.8.8) (setting forth terms of release of Representatives); PP Ex. 276 Rev (Disclosure Statement § 4.8.8.8) (same); PP Ex. 276 Rev (Disclosure Statement § 4.8.2) (setting out the terms of the Asbestos PI Channeling Injunction); PP Ex. 277.01 Rev (Plan § 8.2) (same); PP Ex. 276 Rev (Disclosure Statement § 4.8.3)(setting out the terms of the Asbestos PD Channeling Injunction); PP Ex. 277.01 Rev (Plan § 8.3)(same).

**15.4.    Plan § 7.7(t).**

15.4.1. Proposed Finding

The Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, the Successor Claims Injunction, the Asbestos Insurance Entity Injunction, and the releases in favor of the Asbestos Protected Parties described in the Joint Plan are to be implemented and granted in connection with the Joint Plan and the Plan Documents.

15.4.2. Supporting Evidence

The Plan Documents plainly provide that the Asbestos PI Channeling Injunction,[476] the Asbestos PD Channeling Injunction,[477] the Successor Claims Injunction,[478] the Asbestos Insurance Entity Injunction,[479] and the releases in favor of the Asbestos Protected Parties[480] will be granted and implemented in connection with the Joint Plan.

**15.5.    Plan § 7.7(u).**

15.5.1. Proposed Finding

The Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, the Successor Claims Injunction and, the releases in favor of the Asbestos Protected Parties under the Joint Plan (i) are essential to the Debtors' reorganization and the feasibility of the Joint Plan,

---

[476] PP Ex. 277.01 Rev (Plan § 8.2) (providing for issuance of the Asbestos PI Channeling Injunction under the Joint Plan).

[477] *Id.* at § 8.3 (providing for issuance of the Asbestos PD Channeling Injunction under the Joint Plan).

[478] *Id.* at § 8.5 (providing for issuance of the Successor Claims Injunction under the Joint Plan).

[479] *Id.* at § 8.4 (providing for issuance of the Asbestos Insurance Entity Injunction under the Joint Plan).

[480] *Id.* at §§ 8.8.1, 8.8.3, 8.8.7 (providing that the releases in favor of the Asbestos Protected Parties are to be granted under the Joint Plan).

(ii) provide necessary funding to the Joint Plan that otherwise would be unavailable absent the injunctions and releases, (iii) are necessary to induce the Asbestos Protected Parties (including Sealed Air and Fresenius) to enter into the settlements and agreements described in the Joint Plan and to otherwise settle their disputes, and (iv) are necessary to resolve finally all claims of the Debtors, the Non-Debtor Affiliates, and the Debtors' creditors against the other Asbestos Protected Parties (including the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties).

### 15.5.2. Supporting Evidence

As explained in Part 13.8.2 *supra*, the Asbestos PI and PD Channeling Injunctions are crucial elements of the Joint Plan. The Successor Claims Injunction[481] and the releases in favor of the Asbestos Protected Parties[482] are also necessary to Grace's reorganization. These injunctions and releases are express conditions to the achievement of the Fresenius and Sealed Air Settlement Agreements,[483] which provide necessary funding to the Joint Plan.

---

[481] *See supra,* Part 5.2.2(a).

[482] *See supra*, Part VII.

[483] PP Ex. 277.14 Rev (Fresenius Settlement Order § YY) ("In exchange for the releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement, the NMC Defendants are providing a substantial contribution . . ."), *Id.* at § XX ("Based on the foregoing, the releases, protections, and other benefits provided to the NMC Defendants are necessary to the reorganization in the above-captioned cases."), *Id.* at § AAA ("The NMC Defendants are unwilling to settle the Fresenius Adversary Proceeding and provide the substantial contributions to these bankruptcy estates contemplated by the Settlement Agreement without the releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement."); PP Ex. 277.23 Rev (Sealed Air Settlement Order ¶¶ 1, 5) (approving the Sealed Air Settlement Agreement "in all respects" and stating that the terms of the agreement "shall not be subject to modification by this or any other Court through any order or judgment . . . unless the SAC Defendants consent in writing in their absolute discretion to such modification"); PP Ex. 277.22 Rev (Sealed Air Settlement Agreement § II(c)(vi)) (requiring that, as a condition to settlement, "the Released

(Continued…)

**15.6.    Plan § 7.7(v).**

15.6.1. Proposed Finding

An identity of interests exists among the Debtors and the Asbestos Protected Parties such that an Asbestos PI Claim (including a Successor Claim based upon an Asbestos PI Claim and/or a Successor Claim based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction or the Fresenius Transaction) asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of the law of indemnity (contractual or otherwise) and/or contribution; and an Asbestos PD Claim or CDN ZAI PD Claim (including a Successor Claim based upon an Asbestos PD Claim or CDN ZAI PD Claim and/or a Successor Claim based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction or the Fresenius Transaction) asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of the law of indemnity (contractual or otherwise) and/or contribution.

15.6.2. Supporting Evidence

At the Confirmation Hearing, the Plan Proponents presented evidence that an Asbestos PI Claim, Asbestos PD Claim, or CDN ZAI PD Claim asserted against the Asbestos Protected

---

Parties shall receive the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code . . . with respect to any and all Asbestos-Related Claims," which Claims also include Successor Claims even if they are not asbestos-related), *Id.* at § II(i) (indicating that "Cryovac, Inc. and Sealed Air Corporation have entered into this [Settlement] Agreement in order to settle . . . forever any and all further controversy respecting any and all Asbestos-Related Claims against any and all of the Released Parties" and that "this provision is an essential and material term of this Agreement and the compromise settlement leading to this Agreement, and that, without such provision, neither Cryovac, Inc. nor Sealed Air Corporation would have executed this Agreement and the compromise settlement would not have been accomplished"); *Id.* at § II.c(i), (ii), (v), Exhibits 2, 3, 5 (requiring additional releases in favor of Sealed Air as a condition of the Settlement Agreement).

Parties, including Sealed Air and Fresenius, would give rise to a claim for indemnification or contribution against the Debtors.[484]

**15.7.    Plan § 7.7(w).**

15.7.1. Proposed Finding

The Sealed Air Settlement Agreement is essential and integral to the Joint Plan, and the payment of the Cryovac Payment to the Asbestos PI Trust and the Asbestos PD Trust in accordance with the Sealed Air Settlement Agreement and the terms of the Joint Plan, together with the other Asbestos PI Trust Assets and the Asbestos PD Trust Assets to be transferred to the Asbestos PI Trust and the Asbestos PD Trust, respectively, pursuant to the Joint Plan, constitute both (i) substantial assets of the Joint Plan and the reorganization, and (ii) a fair, reasonable, and equitable settlement of all claims, potential claims, and Demands against the Asbestos Protected Parties (including, with respect to the Sealed Air Indemnified Parties, all Asbestos-Related Claims and any other claims, potential claims, and Demands for which the Sealed Air Settlement Agreement contemplates a release or injunction in favor of the Sealed Air Indemnified Parties) that are subject to the injunctions and releases described in the Joint Plan, and the only unsatisfied conditions precedent to payment of the Cryovac Payment are the satisfaction or waiver of the conditions to the Effective Date in accordance with section 7.8 of the Joint Plan.

---

[484] 9/11/2009 Tr. 284 (Posner) (testifying that pre-petition settlement agreements with insurers contained indemnities); 9/17/2009 Tr. 63 (Austern) (same); 9/15/2009 Tr. 96 (Shelnitz) (testifying that Grace gave indemnities to Fresenius and Sealed Air in their respective transactions with Grace); 9/14/2009 Tr. at 183 (Finke) (testifying that the Joint Plan includes within the definition of Asbestos Protected Parties, Settled Asbestos Insurance Companies that had pre-petition settlement agreements with Grace and which included indemnity obligations).

15.7.2. <u>Supporting Evidence</u>

The Court has already found, in the Sealed Air Settlement Order, that the Sealed Air Settlement is essential and integral to the Joint Plan, provides necessary funding to the Joint Plan, and is in the best interests of all parties in interest in this case.[485]  Moreover, at the Confirmation Hearing, the Asbestps PI FCR, David Austern, testified that the Sealed Air and Fresenius Settlements provide "enormous benefit" to the Asbestos PI Trust,[486] and that he accepted the injunctions protecting the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties in light of the contributions that they would make to the Asbestos PI Trust.[487]  Subject to the Court's confirmation of the Joint Plan, and the inclusion of all necessary findings, orders, decrees, other statements, and conditions in the Confirmation Order as set forth in the Sealed Air Settlement Agreement and the Joint Plan, the only unsatisfied conditions precedent to payment of the Cryovac Payment will be the satisfaction or waiver of the conditions to the Effective Date in accordance with section 7.8 of the Joint Plan.

---

[485] PP Ex. 277.23 Rev (Sealed Air Settlement Order §§ K-Q) (finding that the Sealed Air Settlement furthers the paramount interests of the creditors, allows the Debtors to focus their attention on other matters, and provides a net economic benefit to the estate in the range of $1.2 billion).

[486] 9/17/2009 Tr. 59 (Austern) (testifying that the Sealed Air and Fresenius contributions will provide "enormous benefit to the [Asbestos PI] Trust.  $1.1 billion is a very significant portion of what will be the [t]rust assets.").

[487] *Id.* at 62 (Austern) (testifying that he accepted the terms of the injunctions as required in the Sealed Air and Fresenius Settlement Agreements, because he understood them to be conditions precedent to the $1.1 billion to be paid under those agreements).

**15.8.    Plan § 7.7(x).**

15.8.1. Proposed Finding

The Fresenius Settlement Agreement is essential and integral to the Joint Plan, and the payment of the Fresenius Payment to the Asbestos PI Trust and the Asbestos PD Trust in accordance with the Joint Plan, together with the other Asbestos PI Trust Assets to be transferred to the Asbestos PI Trust pursuant to the Joint Plan, constitute both (i) substantial assets of the Joint Plan and the reorganization, and (ii) a fair, reasonable, and equitable settlement of all claims, potential claims, and Demands against the Asbestos Protected Parties (including, with respect to the Fresenius Indemnified Parties, the Grace-Related Claims, all Asbestos-Related Claims and Demands related thereto and any other claims, potential claims, and Demands for which the Fresenius Settlement Agreement contemplates a release or injunction in favor of the Fresenius Indemnified Parties) that are subject to the injunctions and releases described in the Joint Plan, and the only unsatisfied conditions to payment of the Fresenius Payment are the satisfaction or waiver of the conditions to the Effective Date in accordance with section 7.8 of the Joint Plan

15.8.2. Supporting Evidence

The District Court has already found, in the Fresenius Settlement Order, that the benefits provided to Fresenius in the Fresenius Settlement are necessary to the reorganization of Grace; that Fresenius is providing reasonably equivalent value in exchange for the releases, protections and other benefits to it under the Fresenius Settlement Agreement, and that Fresenius is providing a substantial contribution to the estate.[488]  Moreover, at the Confirmation Hearing, the

---

[488]  PP Ex. 277.14 Rev (Fresenius Settlement Order §§ XX-YY).

Asbestos PI FCR, David Austern, testified that the Sealed Air and Fresenius Settlements provide "enormous benefit" to the Asbestos PI Trust,[489] and that he accepted the injunctions protecting the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties in light of the contributions that they would make to the Asbestos PI Trust.[490]    Subject to the Court's confirmation of the Joint Plan, and the inclusion of all necessary findings, orders, decrees, other statements, and conditions in the Confirmation Order as set forth in the Fresenius Settlement Agreement and the Joint Plan, the only unsatisfied conditions precedent to payment of the Fresenius Payment will be the satisfaction or waiver of the conditions to the Effective Date in accordance with section 7.8 of the Joint Plan.

### 15.9.    Plan § 7.7(y).

#### 15.9.1. Proposed Finding

The SA Debtors, the Plaintiffs, and the SA Non-Debtor Affiliates understand and agree, and the Court so finds, that Sealed Air has entered into the Sealed Air Settlement Agreement in order to settle, release, extinguish, and terminate fully, finally, and forever any and all further controversy respecting any and all Asbestos-Related Claims and any and all Demands related thereto against the Sealed Air Indemnified Parties.  The SA Debtors, the Plaintiffs, and the SA Non-Debtor Affiliates have acknowledged and agreed that this provision is an essential and material term of the Sealed Air Settlement Agreement and the compromise settlement leading to

---

[489] 9/17/2009 Tr. 59 (Austern) (testifying that the Sealed Air and Fresenius contributions will provide "enormous benefit to the [Asbestos PI] Trust.  $1.1 billion is a very significant portion of what will be the [t]rust assets.").

[490] *Id.* at 62 (Austern) (testifying that he accepted the terms of the injunctions as required in the Sealed Air and Fresenius Settlement Agreements, because he understood them to be conditions precedent to the $1.1 billion to be paid under those agreements).

the Sealed Air Settlement Agreement, and that, without such provision, neither Sealed Air Corporation nor Cryovac, Inc. would have executed the Sealed Air Settlement Agreement and the compromise settlement would not have been accomplished.

### 15.9.2. Supporting Evidence

The Sealed Air Settlement Agreement, which was authorized and approved "in all respects"[491] by the Sealed Air Settlement Order, clearly sets out this term.  This demonstrates that all parties agree that this statement accurately reflects Sealed Air's intent in entering into the Sealed Air Settlement Agreement.[492]

**15.10.  Plan § 7.7(z).**

### 15.10.1. Proposed Finding

The Debtors, the Plaintiffs, and the Non-Debtor Affiliates understand and agree, and the Court so finds, that Fresenius has entered into the Fresenius Settlement Agreement in order to settle, release, extinguish, and terminate fully, finally, and forever any and all further controversy respecting any and all Asbestos-Related Claims against the Fresenius Indemnified Parties. The Debtors, the Plaintiffs, and the Non-Debtor Affiliates have acknowledged and agreed that this provision is an essential and material term of the Fresenius Settlement Agreement, and that, without such provision, Fresenius would not have executed the Fresenius Settlement Agreement and the compromise settlement would not have been accomplished.

---

[491]  PP Ex. 277.23 Rev (Sealed Air Settlement Order at ¶ 1).

[492] PP Ex. 277.22 Rev (Sealed Air Settlement Agreement at 24, § II(i)).

15.10.2.       Supporting Evidence

The Court's Order Approving the Fresenius Settlement Agreement states that Fresenius has agreed to "make a one-time lump sum payment of $115 million in exchange for full protection from current and future Grace-Related Claims . . . ."[493]  The Court further found that "The [Fresenius] Defendants are unwilling to settle the Fresenius Adversary Proceeding and provide the substantial contributions to these bankruptcy estates contemplated by the Settlement Agreement without the releases, protections and other benefits provided to the [Fresenius] Defendants by the Settlement Agreement."[494]

**15.11.  Plan § 7.7(cc).**

15.11.1.       Proposed Finding

As of the Effective Date, the Reorganized Debtors will have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including any and all indemnification obligations to the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties with respect to present and future Asbestos-Related Claims and Demands related thereto, SA Indemnified Taxes, Fresenius Indemnified Taxes, and all other obligations set forth in the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement.

15.11.2.       Supporting Evidence

As explained in Part 2.2 *supra*, Reorganized Grace will be a financially strong company that will be able to pay its debts as they come due.

---

[493]  PP Ex. 277.14 Rev (Fresenius Settlement Order, pg. 13, ¶ JJ).

[494]  PP Ex. 277.14 Rev (Fresenius Settlement Order, pg. 21, ¶ AAA).

**15.12.  Plan § 7.7(ww).**

15.12.1.        Proposed Finding

All Asbestos PI Claims shall be resolved by and channeled to the Asbestos PI Trust, all Asbestos PD Claims shall be resolved by and channeled to the Asbestos PD Trust, and all CDN ZAI PD Claims shall be resolved by and channeled to the CDN ZAI PD Claims Fund.

15.12.2.        Supporting Evidence

The Joint Plan provides that the Asbestos PI Channeling Injunction will channel all Asbestos PI Claims to the Asbestos PI Trust,[495] that the Asbestos PI Channeling Injunction will channel all Asbestos PD Claims to the Asbestos PD Trust,[496] and that all CDN ZAI PD Claims shall be resolved by and channeled to the CDN ZAI PD Claims Fund in the manner set forth in the CDN ZAI Minutes of Settlement.[497]

**15.13.  Plan § 7.7(xx).**

15.13.1.        Proposed Finding

The Bank Lenders are not entitled to post-petition interest on account of the General Unsecured Claims arising from the Pre-petition Credit Facilities in amounts in excess of the rates set forth in Section 3.1.9(b) of the Joint Plan.  *See also* Grace's Post-Trial Brief With Respect to Lender Issues filed concurrently herewith.

---

[495] PP Ex. 277.01 Rev (Plan § 8.2) (providing for issuance of the Asbestos PI Channeling Injunction under the Plan).

[496] *Id.* at § 8.3 (providing for issuance of the Asbestos PD Channeling Injunction under the Plan).

[497] *Id.* at § 5.4 ("CDN ZAI PD Claims shall be resolved in accordance with the terms, provisions, and procedures outlined in the CDN ZAI Minutes of Settlement").

### 15.13.2.    Supporting Evidence

The Joint Plan provides, as a condition to the occurrence of the Confirmation Date, that the Court shall have entered a Final Order allowing claims for postpetition interest on account of the General Unsecured Claims arising from the Pre-petition Credit Facilities in amounts that are not in excess of the rates set forth in Section 3.19(b) of the Joint Plan.  On May 19, 2009, the Court entered an order disallowing claims for default interest in excess of the amounts provided in Plan § 3.1.9(b).[498]  Subject to this order becoming final on appeal, and to the Court not finding that confirmation of the Joint Plan requires payment of a rate of interest greater than the amounts set forth in section 3.1.9(b) of the Joint Plan, this requirement will be satisfied.

### 15.14.  Plan § 7.7(yy).

#### 15.14.1.    Proposed Finding

The Canadian Settlement Approval Order shall have been entered.

#### 15.14.2.    Supporting Evidence

The Canadian Settlement Approval Order has been entered.[499]

## XVI.    CERTAIN ADDITIONAL FORWARD-LOOKING REQUIREMENTS SHOULD BE INCLUDED IN THE CONFIRMATION ORDER TO COMPLY WITH THE REQUIREMENTS OF SECTION 7.7 OF THE JOINT PLAN .

Plan § 7.7 includes numerous orders and other statements that the Court must make in the Confirmation Order to comply with the Sealed Air and Fresenius Settlement Agreements and to give full effect to the Joint Plan and accompanying documents.  These orders and statements are prospective, they do not depend on any evidentiary finding or specific conclusion of law, and/or

---

[498] Order Sustaining Debtors' Objection to Unsecured Claims Insofar as Claims Include Postpetition Interest at the Contract Default Rate, 5/19/2009 [Dkt. 21747].

[499] PP Ex. 632 (Affidavit of Orestes Pasparakis, Ex. B (court order) at 1-6).

they are not disputed by any party.  Thus, to comply with these provisions, the Court should include the following orders and statements in the confirmation order:

**16.1.    Plan § 7.7(aa)**

The settlements, compromises, releases, and injunctions in favor of the Asbestos Protected Parties described in the Joint Plan (including those described in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement) are approved in all respects.

**16.2.    Plan § 7.7(bb)**

In approving the settlements, compromises, releases, and injunctions with respect to the Asbestos Protected Parties (including the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, and the releases and injunctions in favor of the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties), the Court has considered, among other things: (1) the nature of the claims asserted or potentially asserted by the Debtors, the Non-Debtor Affiliates, the Plaintiffs (on behalf of the Debtors' creditors, stakeholders, and estates), and/or the Debtors' creditors against the Asbestos Protected Parties, and the claims asserted or potentially assertable by the Asbestos Protected Parties against the Debtors and the Non-Debtor Affiliates, (ii) the balance of the likelihood of success of claims which might be asserted by the Debtors or other claimants against the Asbestos Protected Parties against the likelihood of success of the defenses or counterclaims possessed by the Asbestos Protected Parties, (iii) the complexity, cost, and delay of litigation that would result in the absence of these settlements, compromises, releases, and injunctions, (iv) the lack of objections by, or the overruling of objections of any creditor or party-in-interest to the settlements, compromises, releases and injunctions, (v) that the Asbestos PI Claims will be channeled to the Asbestos PI Trust rather than extinguished, (vi) that the Estate Parties and the Asbestos PI Trust will receive substantial consideration from the Asbestos Protected Parties described in the Joint Plan, (vii) that the

Asbestos PD Claims will be channeled to the Asbestos PD Trust rather than extinguished, and the CDN ZAI PD Claims will be channeled to the CDN ZAI PD Claims Fund rather than extinguished, (viii) that the Estate Parties and the Asbestos PD Trust will receive substantial consideration from the Asbestos Protected Parties described in the Plan, (ix) that the Asbestos Protected Parties that will benefit from the releases and injunctions share an identity of interest with the Debtors, (x) that the enjoined claims against the Asbestos Protected Parties would otherwise indirectly impact the Debtors' reorganization by way of indemnity or contribution, and (xi) the Joint Plan and the settlements, compromises, releases, and injunctions described in the Joint Plan are the product of extensive arms' length negotiations among the Debtors, the Asbestos PI Committee, the Asbestos PI FCR, the Asbestos PD FCR, and the Asbestos Protected Parties, among others.

### 16.3.   Plan § 7.7(dd)

Upon the transfer of the Sealed Air Common Stock to the Asbestos PI Trust, the Asbestos PI Trustees shall represent and warrant to and agree with (on behalf of the Asbestos PI Trust) Sealed Air, that the Asbestos PI Trust is acquiring the Sealed Air Common Stock for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act and the Asbestos PI Trust and its transferees will comply with all filing and other reporting obligations under all applicable laws which shall be applicable to such Asbestos PI Trust with respect to the Sealed Air Common Stock.

### 16.4.   Plan § 7.7(ee)

On or before the Effective Date, (i) the SA Debtors, the Asbestos PD Committee, and the Asbestos PI Committee shall have executed and delivered the "Release" (as defined in the Sealed Air Settlement Agreement), (ii) the "Government Plaintiff" (as defined in the Sealed Air Settlement Agreement) shall have executed and delivered the "Government Release" (as defined

in the Sealed Air Settlement Agreement), and (iii) the Asbestos PI Committee and the Asbestos PD Committee shall have delivered the "Fresenius Release" (as defined in the Sealed Air Settlement Agreement), all as provided for in the Sealed Air Settlement Agreement.  In addition, in consideration for the Cryovac Payment, (i) each of the SA Non-Debtor Affiliates shall irrevocably release, acquit, and forever discharge the Sealed Air Indemnified Parties from any and all (A) present and future Asbestos-Related Claims and Demands relating thereto and (B) present and future SA Claims, Canadian Claims, SA Debts, and SA Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties and (ii) each SA Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other Entity, any and all present and future Asbestos-Related Claims and/or Demands relating thereto, and any and all present and future SA Claims, Canadian Claims, SA Debts, and SA Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction.

### 16.5.   Plan § 7.7(ff)

The Asbestos Protected Parties shall receive the full benefit of the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction under section 524(g) of the Bankruptcy Code and the Successor Claims Injunction under section 105(a) of the Bankruptcy Code, which Asbestos PI Channeling Injunction, Asbestos PD Channeling Injunction, and Successor Claims Injunction (1) shall be in form and substance reasonably acceptable to Sealed Air Corporation, Cryovac Inc., and Fresenius, and (2) as applicable, include provisions enjoining any and all Entities from taking any and all legal or other actions (including the continued

prosecution of pending "Actions" or the commencement of future "Actions" as such term is used in paragraph II(c)(vi) of the Sealed Air Settlement Agreement) or making any Demand for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery, or any other relief whatsoever from any and all of the Asbestos Protected Parties with respect to any and all Asbestos PI Claims, Asbestos PD Claims, CDN ZAI PD Claims, and/or Successor Claims based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction or the Fresenius Transaction.

### 16.6.    Plan § 7.7(gg)

Each of the SA Debtors and the Plaintiffs have acknowledged and agreed that the Sealed Air Common Stock to be transferred to the Asbestos PI Trust has not been and, upon delivery of such Sealed Air Common Stock to the Asbestos PI Trust, shall not be registered under the Securities Act and that the certificates for such Sealed Air Common Stock shall bear a legend to that effect.  Each of the SA Debtors and the Plaintiffs understand and have acknowledged that any transfer by Cryovac, Inc. of Sealed Air Common Stock to the Asbestos PI Trust is being made pursuant to an exemption from registration contained in the Securities Act based in part upon the foregoing representation and the representations contained in the Sealed Air Settlement Agreement.

### 16.7.    Plan § 7.7(hh)

The SA Debtors shall, jointly and severally, at their sole expense, indemnify, defend, and hold harmless the Sealed Air Indemnified Parties from and against (1) any and all present and future Asbestos-Related Claims and Demands related thereto and all SA Indemnified Taxes, (2) any and all losses costs, and expenses incurred as a result of any breach of any of the SA Debtors' or SA Non-Debtor Affiliates' obligations, covenants, and agreements set forth or referred to in the Sealed Air Settlement Agreement, including any such obligation, covenant, or

agreement of any SA Debtors or SA Non-Debtor Affiliates set forth in the Joint Plan or Confirmation Order, (3) if any SA Non-Debtor Affiliate has not executed and delivered a "Release" (as defined in the Sealed Air Settlement Agreement), any and all Asbestos-Related Claims and Demands related thereto based on, arising out of, or attributable to, directly or indirectly, in whole or in part, such SA Non-Debtor Affiliate and (4) any and all attorneys' fees or costs and expenses attributable to any "SA Indemnity Claim" (as defined below), provided, however, that in each case such indemnification shall not apply to "Excluded Fees" (as defined in the Sealed Air Settlement Agreement) such indemnity obligations, collectively, the "SA Debtors' Indemnity Obligation"; and any and all SA Claims, SA Debts, or SA Damages that could be asserted by any of the Sealed Air Indemnified Parties under the SA Debtors' Indemnity Obligation, the "SA Indemnity Claims"), and provided, further, that nothing in the Sealed Air Settlement Agreement shall adversely affect any rights of any Entity to file and pursue, or object to, a proof of claim for "Excluded Fees" (as defined in the Sealed Air Settlement Agreement) in the Chapter 11 Cases.

### 16.8.   Plan § 7.7(ii)

Each SA Debtor shall execute and deliver an indemnity agreement in favor of the Sealed Air Indemnified Parties in the form annexed as Exhibit 6 to the Sealed Air Settlement Agreement.

### 16.9.   Plan § 7.7(jj)

The SA Debtors' Indemnity Obligation (and the obligations, covenants, and agreements of each of the SA Debtors and SA Non-Debtor Affiliates set forth or referred to in the Sealed Air Settlement Agreement, including any such obligation, covenant, or agreement of any SA Debtor or SA Non-Debtor Affiliate set forth in the Joint Plan or Confirmation Order) shall not be

discharged, expunged, estimated, or otherwise adversely affected in the Chapter 11 Cases or by the confirmation of the Joint Plan.

### 16.10.  Plan § 7.7(kk)

The SA Debtors' Indemnity Obligation (and the obligations, covenants, and agreements of each of the SA Debtors and SA Non-Debtor Affiliates set forth or referred to in the Sealed Air Settlement Agreement, including any such obligation, covenant, or agreement of any SA Debtor or SA Non-Debtor Affiliate set forth in the Joint Plan or Confirmation Order) shall continue unaffected as a post-confirmation obligation of each of the Reorganized Debtors.

### 16.11.  Plan § 7.7(ll)

The Debtors, the Asbestos PI Committee, the Asbestos PI FCR, the Asbestos PI TAC, and the Asbestos PI Trustees have (i) promptly provided to Cryovac, Inc. and Fresenius all "Material Drafts" (as defined in the Sealed Air Settlement Agreement) of the Asbestos PI Trust Agreement and each related "Trust Document" (as defined in the Sealed Air Settlement Agreement) (but excluding or redacting drafts of the Asbestos PI TDP), and (ii) incorporated promptly (if it was the party drafting such document), or if otherwise, urged the party drafting such document promptly to incorporate, into any such document each provision with respect to the subject matter set forth or referred to in paragraphs II(c)(ix), (x), and (xi) paragraph VI(g), clauses (i)(A) through (D), and paragraph VI(c) of the Sealed Air Settlement Agreement that were reasonably requested by Cryovac, Inc. or Fresenius.

### 16.12.  Plan § 7.7(mm)

The Debtors, the Asbestos PD Committee, and the Asbestos PD FCR have (i) promptly provided to Cryovac, Inc. and Fresenius all "Material Drafts" (as defined in the Sealed Air Settlement Agreement) of the Asbestos PD Trust Agreement and each related "Trust Document" (as defined in the Sealed Air Settlement Agreement) (but excluding or redacting drafts of the

ZAI TDP), and (ii) incorporated promptly (if it was the party drafting such document), or if otherwise, urged the party drafting such document promptly to incorporate, into any such document each provision with respect to the subject matter set forth or referred to in paragraphs II(c)(ix), (x), and (xi) paragraph VI(g), clauses (i)(A) through (D), and paragraph VI(c) of the Sealed Air Settlement Agreement that were reasonably requested by Cryovac, Inc. or Fresenius.

### 16.13.  Plan § 7.7(nn)

SA Debtors and SA Non-Debtor Affiliates shall take all actions required or requested by Sealed Air as contemplated in the Sealed Air Settlement Agreement and shall be prohibited from taking any actions prohibited by Sealed Air as provided by the Sealed Air Settlement Agreement with respect to tax matters, including those set forth in Annex I to the Joint Plan and those set forth in paragraphs II(c)(x), IV, and VI of the Sealed Air Settlement Agreement and those provisions of the Sealed Air Settlement Agreement are incorporated in the Joint Plan as if fully set forth therein and shall likewise be incorporated into the Confirmation Order as if fully set forth therein.

### 16.14.  Plan § 7.7(oo)

The Plaintiffs, Asbestos PI Trust and Asbestos PD Trust shall take all actions required or requested by Sealed Air as provided by the Sealed Air Settlement Agreement and shall be prohibited from taking any actions prohibited by Sealed Air as contemplated in the Sealed Air Settlement Agreement with respect to tax matters, including those set forth in Annex II to the Joint Plan and those set forth in paragraphs II(c)(ix), II(c)(x) and II(c)(xi) of the Sealed Air Settlement Agreement and those provisions of the Sealed Air Settlement Agreement are incorporated in the Joint Plan as if fully set forth therein and shall likewise be incorporated into the Confirmation Order as if fully set forth therein.

### 16.15.  Plan § 7.7(pp)

Each of the SA Debtors acknowledge and agree that (i) to the extent that any SA Debtor is required, pursuant to generally accepted accounting principles, to accrue a liability for asbestos which liabilities are satisfied by Cryovac, Inc. by a transfer made by Cryovac, Inc. directly to the Asbestos PI Trust or Asbestos PD Trust pursuant to this Joint Plan or the Confirmation Order and such SA Debtor is required pursuant to generally accepted accounting principles to reverse such accrual, to the extent that there is more than one methodology under generally accepted accounting principles pursuant to which the SA Debtors are allowed to reverse any such accrual, such SA Debtor shall adopt the methodology, if any, not inconsistent with the provisions of paragraphs VI(b) and VI(g) of the Sealed Air Settlement Agreement, (ii) any payment or transfer by Cryovac, Inc. directly to the Asbestos PI Trust or Asbestos PD Trust shall not be treated, for financial accounting purposes, as resulting in an expense or deduction of any SA Debtor or SA Non-Debtor Affiliate and (iii) to the extent that any payment or transfer by Cryovac, Inc. directly to the Asbestos PI Trust or Asbestos PD Trust results, for financial accounting purposes, in income to any SA Debtor, the SA Debtors shall treat such income as income from the cancellation of indebtedness or liabilities of the SA Debtors.

### 16.16.  Plan § 7.7(qq)

The Debtors and Estate Parties shall take all actions required or requested by Fresenius as contemplated in the Fresenius Settlement Agreement and be prohibited from taking any actions prohibited by Fresenius as contemplated in the Fresenius Settlement Agreement with respect to tax matters, including those outlined in Article III of the Fresenius Settlement Agreement and those provisions of the Fresenius Settlement Agreement are incorporated herein as if fully set forth and shall likewise be incorporated into the Confirmation Order as if fully set forth therein.

**16.17.  Plan § 7.7(rr)**

The 1998 Tax Sharing Agreement shall be an assumed agreement of each of the SA Debtors (including Grace New York and Grace-Conn) pursuant to section 365 of the Bankruptcy Code, and nothing contained in or contemplated by the Sealed Air Settlement Agreement, the Joint Plan, or the Confirmation Order shall adversely affect the rights of the Debtors, Sealed Air Corporation or any of their Affiliates under the 1998 Tax Sharing Agreement.

**16.18.  Plan § 7.7(ss)**

Upon confirmation, each of the Sealed Air Settlement Agreement, the Sealed Air Settlement Order, the Fresenius Settlement Agreement and the Fresenius Settlement Order shall be in full force and effect.

**16.19.  Plan § 7.7(tt)**

Subject to Section 7.7(uu) below, the duties and obligations of the Asbestos Insurance Entities under the Asbestos Insurance Policies, Asbestos Insurance Settlement Agreements, Asbestos In-Place Insurance Coverage, and Asbestos Insurance Reimbursement Agreements are not diminished, reduced or eliminated by (1) the discharge of the obligations and liabilities of the Debtors and the Reorganized Debtors for and in respect of all Asbestos PI Claims or (2) the assumption by the Asbestos PI Trust of responsibility and liability for all Asbestos PI Claims.

**16.20.  Plan § 7.7(uu)**

As of the Effective Date, the Asbestos Insurance Transfer Agreement shall be a valid and binding obligation of each the parties thereto, shall be in full force and effect and shall be valid and enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy, Asbestos Insurance Settlement Agreement, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreement, or under applicable non-bankruptcy law.

**16.21.  Plan § 7.7(vv)**

As of the Effective Date, each of the Asbestos PI Deferred Payment Agreement, the Class 7A Asbestos PD Deferred Payment Agreement, the Class 7B Asbestos PD Deferred Payment Agreement, the Share Issuance Agreement, the Grace PI Guaranty, the Grace PD Guarantee Agreement for Class 7A, the Grace PD Guarantee Agreement for Class 7B, the Plan Registration Rights Agreement, the Asbestos PI/PD Inter-Creditor Agreement, the Warrant, and the Warrant Agreement shall be a valid and binding obligation of each of the parties thereto and shall be in full force and effect and enforceable in accordance with its terms.

**16.22.  Plan § 7.7(zz)**

As of the Effective Date, pursuant to section 3.1(a) of the Asbestos PD Trust Agreement, the Class 7B Trustee (as defined in the Asbestos PD Trust Agreement) shall keep segregated the ZAI Trust Assets (as defined in the Asbestos PD Trust Agreement) from the other Asbestos PD Trust Assets at all times, and no non-US ZAI PD Claim or liability of any kind shall ever be satisfied, either voluntarily or involuntarily, with ZAI Trust Assets.

## CONCLUSION

For all of the foregoing reasons, the Joint Plan should be confirmed over all objections. In addition, the Court can and should make the proposed findings contained herein and required under the terms of the Joint Plan.

Dated: November 2, 2009
Wilmington, Delaware

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Deanna D. Boll
Justin S. Brooks
Nathaniel J. Kritzer
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800


Lisa G. Esayian
Elli Leibenstein
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and


  /s/James E. O'Neill
PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100


*Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC


/s/ Mark T. Hurford
Marla Rosoff Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900

and

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125


Peter Van N. Lockwood
Nathan D. Finch
Kevin C. Maclay
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000

*Counsel for the Official Committee of Asbestos
Personal Injury Claimants*

PHILLIPS, GOLDMAN & SPENCE, P.A.

/s/ John C. Philips
John C. Phillips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400

*Counsel for David T. Austern, Asbestos PI Future
Claimants' Representative*

SAUL EWING LLP

/s/ Teresa K.D. Currier
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone:  (302) 421-6800

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone:  (212) 715-9100

*Counsel for the Official Committee of Equity Security Holders*