IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et. al.[1] | ) | Case No. 01-01 139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

### GRACE'S POST-TRIAL BRIEF REGARDING BANK LENDER ISSUES

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/Ma Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (fMa Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace 11, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (fMa Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (fMa Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (fMa Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B I1 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G I1 Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (Wa Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal 11, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (fMa GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (fMa Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (Wa British Nursing Association, Inc.), Remedium Group, Inc. (Wa Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (flk/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS....................................................................................5

ARGUMENT....................................................................................................18

I.    THE LENDERS' DEMAND FOR DEFAULT INTEREST FAILS FOR THE SIMPLE REASON THAT THERE WAS NO DEFAULT UNDER THE CREDIT AGREEMENTS............................................................................18

    A.    Debtors' alleged violation of the Credit Agreements' reporting requirements does not entitle the Lenders to contractual default interest.............19

    B.    The ipso facto clauses in the Credit Agreements do not entitle the Lenders to default interest....................................................................................20

    C.    Debtors' failure to pay principal and interest under the Credit Agreements during the bankruptcy proceeding does not entitle the Lenders to contractual default interest....................................................................21

II.    SECTION 502(B) OF THE CODE DISALLOWS THE LENDERS' CONTRACTUAL RIGHT TO INTEREST....................................................23

III.    THE LENDERS ARE NOT IMPAIRED AND THEREFORE THE COURT NEED NEVER REACH THE IMPACT OF SECTIONS 1129(B) AND 1129(A)(7) OF THE BANKRUPTCY CODE. ...........................................24

    A.    The Lenders have no legal, equitable, or contractual right to default interest..........................................................................................................25

    B.    The Plan does not alter any entitlement to interest that the Lenders may have...........................................................................................................25

    C.    The Lenders are not impaired by the Plan's non-payment of the postpetition maturity rate of interest....................................................................26

IV.    THE BEST INTERESTS OF CREDITORS TEST IS SATISFIED. ...........................27

V.    THE FAIR AND EQUITABLE TEST DOES NOT ENTITLE THE LENDERS TO A DEFAULT RATE OF INTEREST ...............................................27

    A.    The Court need not reach the equities of default interest because the Lenders have failed to prove that Grace is solvent. ...............................28

        1.    The testimony of Mr. Frezza does not bear on the question of solvency because he only purported to measure Grace's solvency after Grace's plan goes effective............................................................30

2.  Mr. Frezza's adequate capital test fails for the additional reason that Mr. Frezza did not actually do a complete adequate capital test. ...................................................................................................33

3.  There is no basis for Mr. Frezza's alternate balance sheet test in which he substitutes Dr. Florence's asbestos liability estimate into the Plan. ..............................................................................................33

4.  Grace's market capitalization is not a proxy for solvency .........................36

5.  The fact that equity will retain value under the plan of reorganization contemplated by the proposed asbestos settlement does not establish solvency. ....................................................................37

B.  The Equities Weigh Against An Award Of Default Interest ..................................38

1.  The fact that the Committee negotiated for, and agreed to, the rate of postpetition interest in the Plan is proof positive that this rate is fair and equitable. ....................................................................................39

2.  The fair and equitable analysis must take into account the fact that the Creditors' Committee and the Lenders have provided no real support for Grace during these bankruptcy proceedings. ...........................41

3.  The Court Should Also Consider How The Lenders Fare Under The Plan In Relation To Other Constituencies ...........................................42

4.  But for Grace's litigation efforts, the Lenders would not even have recovered their principal, much less any postpetition interest. ..................43

C.  The Absolute Priority Rule Is inapplicable Because The Allowed Amount Of The Lenders' Claims Will Be Paid In Full. .......................................................43

CONCLUSION ...........................................................................................................................46

## TABLE OF AUTHORITIES

**PAGE**

**Cases**

*In re 222 Liberty Associates,*
    108 B.R. 971 (Bankr. E.D. Pa. 1990) .............................................................. 30

*In re Apples Tree Partners, L.P.,*
    131 B.R. 380 (Bankr. W.D. Tenn. 1991) ......................................................... 31

*In re Armstrong World Industries, Inc.,*
    432 F.3d 507 (3d Cir. 2005)............................................................................. 44

*In re Best,*
    365 B.R. 725 (Bankr. W.D. Kentucky 2007).................................................. 27

*In re Cardelucci,*
    285 F.3d 1231 (9th Cir. 2002) ........................................................................ 27

*In re Chateaugay Corp.,*
    156 B.R. 391 (S.D.N.Y. 1993)........................................................................ 23

*In re Coram Healthcare Corp.,*
    315 B.R. 321 (Bankr. D. Del. 2004) ......................................................... 38, 43

*In re Dow Corning,*
    456 F.3d 668 (6th Cir. 2006) .......................................................................... 45

*In re Duval manor Associates,*
    191 B.R. 622 (Bankr. E.D. Pa. 1996) ............................................................. 30

*In re Exide Technologies, et. al.,*
    303 B.R. 48 (Bankr. D. Del. 2003) ................................................................. 28

*In re Ferch,*
    333 B.R. 781 (Bankr. W.D. Tex. 2005).......................................................... 38

*In re Garriock,*
    373 B.R. 814, 816 (E.D. Va. 2007)..................................................... 24, 26, 27

In re New Midland Plaza Assocs.,
    247 B.R. 877 (Bankr. S.D. Fla. 2000) ....................................................... 39, 40

*In re NextWave Personal Communications, Inc.,*
    244 B.R. 253 (Bankr. S.D.N.Y. 2000)............................................................ 23

*In re Ogle,*
    261 B.R. 22 (Bankr. D. Idaho 2001)............................................................... 22

*In re One Times Square Associates Limited Partnership,*
   159 B.R. 695 (S.D.N.Y. 1993)............................................................................ 31

*In re Rota,*
   No. 89-14333S, 1990 WL 9068 (Bankr. E.D. Pa. June 26, 1990).................................... 31

*In re Stratford Associates Ltd. Partnership,*
   145 B.R. 689 (Bankr. D. Kan. 1992) ............................................................... 31

*In re Timbers of Inwood Forest Associates Ltd.,*
   793 F.2d 1380, 1414-15 (5th Cir. 1986) ......................................................... 22

*In re Trans World Airlines, Inc.,*
   134 F.3d 188 (3d Cir. 1998).......................................................................... 37

*In re Valley View Shopping Center,*
   L.P., 260 B.R. 10 (Bankr. D. Kan. 2001)........................................... 31, 32, 33, 37

*Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.) ("PPIE"),*
   324 F.3d 197, 204-05 (3d Cir. 2003) .............................................................. 24

**Statutes**

11 U.S.C. § 101(32)(A)........................................................................................ 37

11 U.S.C. § 1124 ................................................................................................ 24

11 U.S.C. § 1129(a)(7)........................................................................................ 27

11 U.S.C. § 1129(b)(2) ....................................................................................... 43

**Other Authorities**

House Report No. 95-595 ....................................................................................... 44

HR. Rep No. 595, 95th Cong., 1st Sess 414 (1977) ................................................. 45

**Treatises**

Collier on Bankruptcy ¶ 502.03[3][c] (15th ed. rev. 2007) ....................................... 24

## PRELIMINARY STATEMENT

The Unsecured Creditors' Committee (the "Committee") and the Bank Lender Group (the "Lenders") have litigated long and ably to get precisely what they would have received had there been no bankruptcy and Grace had failed to make payments on its loans. It is, to quote a current Serv-Pro advertisement, "As if it [the bankruptcy] never happened." But extensive briefing and argument has fleshed out both reality (the bankruptcy *did* happen) and the legal differences that apply here in the bankruptcy world versus the "it never happened" world in which the Lenders would prefer that the default interest issue be resolved. Those differences are profound. They affect each stage of the legal analysis and, in each stage, afford the Lenders more limited rights than they would have in the absence of bankruptcy. Specifically:

1. Has there been a default because Grace did not make payments after April 2, 2001? In the non-bankruptcy world, the answer clearly would clearly be "yes." But in bankruptcy, the answer is "no." It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor ability to make payment. Indeed, if failure to pay in bankruptcy were to constitute a default, filing for bankruptcy protection itself would be a default because it has the inevitable consequence of foreclosing payment. That is not the law.

2. Are the Lenders entitled to any interest as part of their claim? The unequivocal answer under the Code is "no." Section 502 of the Bankruptcy Code clearly and dramatically curtails any contractual right to interest by saying that unmatured interest is not allowable. No exceptions exist under Section 502.

3. Is there any way out under the Code -- are there any exceptions to section 502(b)'s prohibition on post-petition interest? The only exceptions in Chapter 11 are the best

1

interests test of section 1129(a)(7) and an equitable exception permitted within the confines of the fair and equitable test of section 1129(b).

4. Does the bests interests test always apply? The answer is "no." The bests interests tests can only be invoked (1) by a creditor who is impaired by the plan, rather than the Code, and (2) when the debtor has proven to be solvent. Here, both issues are moot because the Plan provides for interest at the legal rate.

5. Is the Court required to consider "fairness" and "equity" under 1129(b) in all cases? Again, the answer is no. The fair and equitable test of section 1129(b) only applies in the event that a class is impaired and votes against the plan. And it only permits consideration of default interest if the debtor is proven solvent. There is no presumption of solvency.

In order to invoke either exception to the Code's prohibition on allowance of post-petition interest, there must be default and impairment. Thus, the Lenders needed to show default and impairment in Phase I of the Confirmation Hearing. They proved neither.

In order to trigger equitable assessment of default interest in Phase II, the Lenders needed to show solvency. But the incremental evidence put before the Court utterly failed to prove that Grace is solvent. Again, the Lenders treat the facts that are dispositive of solvency and equity "[a]s if [they] never happened." Far from establishing solvency, the Lenders labored to demonstrate the truth of a tautology -- they assert that, if you assume that an as-yet hypothetical Plan which cannot be approved unless it is feasible is approved, then it is feasible, hence Grace is solvent. As Mr. Frezza admitted on cross examination -- no news there. That is the full extent of their efforts to prove solvency. They and their expert concede that in the real world that exists

today, without giving effect to the Plan, there is no way an expert can reliably come to the conclusion that Grace is solvent.

And what about "fairness" and "equity" themselves? Not a word from the Lenders or their Committee. Not one shred of evidence. The extent of their efforts at the Confirmation Hearing consisted of an attempt to refute the Plan Proponents' unequivocal evidence of the Committee's inequitable, and at times deceptive conduct during these bankruptcy proceedings. They want the Court to believe it never happened. Today, as at all times in the past, they want the Court to find in favor of default interest as a matter of formula: if the reorganized debtor emerges from bankruptcy solvent, which it must under the Code, unsecured creditors get default interest. Precisely the opposite of "fair and equitable." The relevant facts that the Court must consider in determining whether default interest is fair and equitable are clear and undisputed:

- Reality, when this case was filed and for years thereafter, was that the recovery of full principal on Grace debt was in great doubt.

- Reality was that the Committee sought out and obtained a deal with the Debtor fixing the payment of principal and a rate of interest on the assumption that Grace would be solvent. They did this once, and they did this twice. And they never terminated the deal until after Grace reached terms with the Asbestos Creditors' Committee (the "ACC") and the Future Claimants' Representative (the "FCR").

- Reality is that Grace did exactly what it was expected to do, to the direct and anticipated benefit of the Lenders.

- Reality is that the Committee's and Lenders' only suggested revision to the resulting term sheet was to preserve the right of any Lender to object.

And the final reality is that, notwithstanding the after-the-fact efforts of the Lenders to reach for yet more interest, Grace stood by its word in this Plan and provided that the Lenders would be paid every penny of principal and (notwithstanding the clear provisions of section 502 of the Bankruptcy Code) not only postpetition interest but such interest at rates far exceeding simple interest. If the Lenders got all they could ever want, the total amount of principal and

interest would be roughly $917 million.[2]  Under the Plan proposed by Grace, the Lenders get roughly $826 million, or 90% of what they have demanded.[3]  That is approximately 64% more money than they are entitled to receive under section 502, which limits recovery to their allowed claim of $502.23 million.[4]  And it is approximately 19% more money than they would be entitled to under the best interests test if it applied.[5]

The Committee's and Lenders' objection to the Plan ultimately reduces to the issue of whether the rate set forth in the Plan satisfies the Bankruptcy Code.  Grace respectfully submits that it does.  To the extent that the Code requires any postpetition interest, it at most requires that such interest be paid at the federal judgment rate.  Here, the rate in the Plan -- and the rate that the parties agreed to -- exceeds the federal judgment rate as well as the contract rate.  On the facts of this case, where both impairment and solvency are very much in doubt, the Plan rate is the perfect answer.

---

[2]    $500M principal + $414.2 in default interest + $2.23M in accrued prepetition interest = $916.43M.

[3]    $500M in principal + $323.4M +$2.23M in accrued prepetition interest = $825.64M/916.43M = .9009 *100 = 90.09%.

[4]    $500M in principal and approximately $2.23 million is accrued prepetition interest.

[5]    If the Lenders could invoke the best interests test, they would be entitled to receive interest at the federal judgment rate or 4.19% for a total of $ 190 million in interest and total sum of approximately $690 million. $500M * [1 + 4.19%) ^ (7.5 yrs) = $190 million.

4

## STATEMENT OF FACTS

### The Credit Agreements

1.      On April 2, 2001, when Grace filed for bankruptcy protection, it owed an aggregate principal amount of $500 million under two Credit Agreements -- $250 million under a 1998 Credit Agreement and another $250 million under a 1999 Credit Agreement. See CC-BLG Ex. 2 (1998 Credit Agreement) at Schedule 1; CC-BLG Ex. 2 (1999 Credit Agreement) at Schedule 1.[6] Each of the Credit Agreements has a non-default interest rate equal to the Prime Rate, with a default, or post-maturity, rate of Prime plus 2%.

### Postpetition Communications

2.      Since filing for bankruptcy protection, Grace has continued to keep all of its constituencies fully apprised of Grace's financial condition as well as developments in the bankruptcy proceedings. That includes the Committee. The record shows, for example, that throughout the bankruptcy proceedings, Grace hosted quarterly calls for the various constituencies and their financial advisors, and the Committee and its financial advisor were regular participants. 9/16/09 Tr. 23:10-19 (Tarola); see also Shelnitz Decl. at ¶ 5.[7] In addition, Grace held annual conferences with representatives of the Committee in which it provided special reports on its financial performance, and Grace further provided the Committee with a wealth of information concerning its financial condition in the form of monthly operating reports, summaries of annual operating plans, and projections of pro forma financial information. 9/16/06/09 Tr. 23:19-24:3 (Tarola); Shelnitz. Decl. at ¶¶ 6-7.

---

[6]    Grace also owes approximately $2.23M in accrued prepetition interest.

[7]    Notice of Submission of Affidavit of Charles O. Freedgood and Declaration of Mark A. Shelnitz, dated June 26, 2009, Ex. B [Dkt. No. 22279] (submitted pursuant to stipulation with the Bank Lender Group and Official Committee of Unsecured Creditors).

**Postpetition Payments**

3.      Grace has not paid any principal due under the Credit Agreements or any interest during the pendency of this bankruptcy.

**Post-Petition Interest Rate Negotiations and Letter Agreements**

4.      On November 13, 2004, Grace filed its original plan of reorganization ("Original Plan"), which contemplated that equity would retain significant value in the reorganized Grace. 9/16/09 Tr. 24:14-25:8 (Tarola) see also Original Plan at § 3.1.10 [Dkt. 6895]. Shortly after the Original Plan was filed, Grace entered into negotiations with the Committee in an effort to enlist their support for the plan. 9/16/09 Tr. 25:18-21 (Tarola). The point person for the Committee during those negotiations was Thomas Maher of JPMorgan Chase, while Robert Tarola, Grace's then Chief Financial Officer, took the lead for Grace. 9/16/09 Tr. 22:17-25; 27:20-25 (Tarola).

5.      During the negotiations, Mr. Maher stated that, based on his discussions with various debt holders, Grace would need to pay the Lenders postpetition interest at the rate of 6.09%, compounded quarterly, if Grace wanted "to get the support of his committee as co-proponent of [Grace's] plan." 9/16/09 Tr. 30:7-12 (Tarola). The 6.09% rate was higher than the federal judgment rate, higher than the non-default contract rate and, at the time, close to the default rate. 9/16/09 29:14-30:6 (Tarola). At the time the Lenders proposed the 6.09% rate, Grace's plan provided for equity to retain significant value, just as Grace's current Plan does and all of Grace's plan's have done. 9/16/09 Tr. 208:22-209:9 (Kruger); see also Amended Joint Plan of Reorganization ("Amended Plan") at § 3.1.10, dated Jan. 13, 2005 [Dkt. 7560]. But Grace's solvency was unprovable at the time because its asbestos liabilities were substantial and unresolved. See, e.g., 9/16/09 Tr. 106:7-107:6 (Zilly) (Grace's solvency cannot be determined because of the broad range of estimates of Grace's Asbestos PI Claims and the fact that Grace's

6

liability has not been fixed); 9/16/09 Tr. 314:13-316:5 (Frezza) (Grace's solvency could not be determined through April 2008 on account of not knowing its asbestos liabilities).

6.    Grace ultimately agreed to pay the rate of interest demanded by the Lenders. On January 12, 2005, the parties entered into a letter agreement, in which the Committee pledged its support for Grace's plan of reorganization. See January 2005 Letter Agreement, PP Ex. 285. The Letter Agreement memorialized the rate of interest that Grace agreed to pay, providing postpetition interest to (1) the Lenders at the rate of 6.09%, and (2) to all other unsecured creditors at the rate of 4.19%. 9/16/09 Tr. 29:2-13 (Tarola). The next day, January 13, 2005, Grace filed an amended plan or reorganization reflecting this agreement on postpetition interest. See Amended Plan at §3.1.9(b).

7.    Grace had every reason to expect that the Amended Plan would receive the full support of the Committee and the Lenders. Mr. Maher "clearly indicated to [Grace] that he was in consultation with certain lenders about what would be acceptable." 9/16/09 Tr. 30:24-31:5 (Tarola). The 6.09% was, according to Mr. Maher, "an amount that would provide an internal rate of return to the Lenders that would be acceptable." 9/16/09 Tr. 31:5-7 (Tarola). Moreover, Mr. Maher specifically led Grace to believe that "the Creditors' Committee was representing all general unsecured creditors." 9/16/09 Tr. 32:25-33.2 (Tarola). Indeed, as Lewis Kruger, counsel for the Committee admitted at trial, it would have been pointless for the Committee to sign an agreement concerning postpetition interest for the Lenders if the Committee did not expect the Lenders to actually support that agreement. 9/16/09 Tr. 219:21-220:1 (Kruger).

8.    In late 2005, Mr. Maher advised Grace that if it wanted the Committee's continued support for the plan of reorganization, Grace would need to amend the agreement on postpetition interest. Short term interest rates were moving up, and Mr. Maher "wanted to

7

capture that upward trend for the holders of [] prepetition bank debt in an amended agreement."
9/16/09 34:11-15 (Tarola). Messrs. Maher and Tarola thus embarked upon a new round of
negotiations. Critically, during those negotiations, Mr. Maher was only seeking to adjust the rate
of postpetition interest for the Lenders; he made no attempt to renegotiate the previously agreed-
upon rate of postpetition interest (4.19%) for all other unsecured creditors. 9/16/09 Tr. 33:10-
34:2 (Tarola). And the agreement ultimately reached expressly states that the 2005 Letter
Agreement would be modified such that the floating Adjusted Base Rate would accrue to the
benefit of "the Holders of the Debtors' pre-petition bank credit facilities" -- that is, the Lenders.
See PP Ex. 286 at 1.

9.      In this new agreement, Grace agreed to adjust the rate of postpetition interest for
the Lenders, so that, as of January 1, 2006, the 6.09% rate would change to a floating adjusted
rate that was tied to prime. There was no change to the rate for the other unsecured creditors.
9/16/09 Tr. 33:10-34:2 (Tarola). The new agreement was memorialized in a letter agreement
dated February 2006 (the "February 2006 Letter Agreement"). See PP Ex. 286. At the time that
the Committee entered into the February 2006 Letter Agreement, Grace's proposed plan of
reorganization still provided that equity would retain a majority interest in the new Grace. See
9/16/09 Tr. 208:22-209:9 (Kruger). And Grace's solvency was still disputed and unresolved.

10.     Again, Grace had every reason to believe that both the Committee and the
Lenders would fully support the February 2006 Letter Agreement. In negotiating the agreement,
"Mr. Maher was in consultation with committee members as well as anyone else he had to speak
with in order to sign this agreement." 9/16/09 Tr. 34:16-25 (Tarola). Thus, as this Court
previously found, the Committee entered into the February 2006 Letter Agreement "on behalf of
the entire Committee," that is, "as a committee which represented all its members." May 19,

8

2009 Memorandum Opinion ("Claims Objection Op.") [Dkt. 21747] at 2 n.3. As a result, "successors in interest such as the current Bank Lenders [are] bound by the agreement." Id.

11.    From January 2005 through March 2008, Grace relied upon its agreements with the Committee in all aspects of its business, and, at no point during that time did the Committee ever seek to terminate those agreements. A few examples prove the point.

12.    First, Grace adjusted its books and records. 9/16/09 Tr. 32:25-33:6; 35:1-7 (Tarola). Grace increased its accrual for interest on the prepetition bank debt, and this increased liability was included in all of Grace's financial statements from January 2005 through March 2008. See, e.g., CC-BLG Ex. 24 at 99. At no point did the Committee ever indicate that Grace was accruing for interest at the wrong rate.

13.    Second, Grace repeatedly relied upon its agreement with the Committee in its SEC filings. Each one of Grace's SEC filings from March 13, 2006 through February 29, 2008 included a specific reference to Grace's obligation to pay postpetition interest at the rates agreed to with the Committee. See, e.g., CC-BLG Ex. 23 at 67; CC-BLG Ex. 25 at 104. No one from the Committee gave any indication that they would no longer accept the interest rates reflected in the SEC filings.

14.    Third, the agreed-upon rates were reflected in the "Liabilities Subject to Compromise" component of the monthly operating reports that Grace filed with this Court. See, e.g., Debtor-In-Possession Monthly Operating Report for Filing Period January 2008, filed March 4, 2008 [Dkt. 18195]. Again, the Committee never suggested that Grace was using the wrong rates for postpetition interest.

**The Estimation Proceedings and the Asbestos Term Sheet**

15.    In early 2007, the estimation proceedings began, with the goal of determining the funding necessary to resolve Grace's asbestos liabilities. 9/16/09 Tr. 226:3-6 (Kruger). The

9

estimation proceedings were still underway when the parties reached a settlement in early April 2008. See Term Sheet For Resolution Of Asbestos Personal Injury Claims, dated April 6, 2008 (the "Proposed Asbestos Settlement" or "Asbestos Term Sheet"), PP Ex. 160. Throughout, Grace's liability and solvency were disputed. Throughout, the Committee never once sought to terminate the agreement on postpetition interest. 9/16/09 Tr. 241:3-5 (Kruger). Nor did it ever seek to reopen negotiations with Grace. 9/16/09 Tr. 225:17-21; 236:8-19 (Kruger).

16.    During the Confirmation Hearing, there was extensive testimony regarding a conversation that took place sometime in early 2007 between Lewis Kruger, counsel for the Committee and Mark Shelnitz, Grace's Vice President and General Counsel. Mr. Kruger testified that he told Mr. Shelnitz "the bank debt was trading in the marketplace at a price which reflected the understanding and expectation of the person holding that debt that they would receive default interest in these proceedings." 9/16/09 Tr. 199:14-18 (Kruger). Mr. Kruger says he told Mr. Shelnitz that "holders" of bank debt were expecting default interest. 9/16/09 Tr. 226:24-227:3 (Kruger). And that, according to Mr. Kruger, was all there was to the conversation.

17.    Mr. Kruger did *not* tell Mr. Shelnitz that a majority of debt holders would oppose Grace's plan if it did not provide for contractual default interest. 9/16/09 Tr. 229:7-14 (Kruger). Mr. Kruger could not say this, because he simply did not know whether a majority of debt holders would oppose a plan that did not include default interest. 9/16/09 Tr. 228:13-229:6 (Kruger). Both Mr. Kruger and Mr. Shelnitz specifically noted that, because Grace's debt is so thinly traded, the market price "may not be indicative of anyone's expectations and [they] really didn't know what to make of it." 9/16/09 Tr. 58-13 (Shelnitz).

10

18.     Additionally, as Mr. Shelnitz testified without contradiction, at no point during this conversation did Mr. Kruger say anything to suggest that the Committee was withdrawing from the February 2006 Letter Agreement. 9/16/09 Tr. 58:13-17 (Shelnitz). Nor did Mr. Kruger say that the Committee would oppose a plan that did not contain default interest. 9/16/09 Tr. 229:15-18 (Kruger). In fact, Mr. Kruger did not even ask Grace to pay postpetition interest at a different rate than the one previously agreed upon in the February 2006 Letter Agreement. 9/16/09 Tr. 57:14-21 (Shelnitz).

19.     The failure to terminate the February 2006 Letter Agreement or demand default interest was no mere oversight. The evidence showed that Mr. Kruger and Mr. Shelnitz had roughly five conversations in which the bank debt was discussed. 9/16/09 Tr. 77:22-78:4 (Shelnitz). During any one of these conversations, Mr. Kruger could have readily withdrawn from the February 2006 Letter Agreement. But he did not.

20.     As Mr. Kruger admitted during the Confirmation Hearing, the Committee's failure to terminate the February 2006 Letter Agreement was a calculated decision. The Committee's constituency wanted Grace's asbestos liabilities to be quantified at a level that would not impair full payment of the Lenders' claims. 9/16/09 Tr. 232:10-20 (Kruger). To that end, the Committee recognized that it was important to present a "united front" with the Debtors during the estimation proceedings. 9/16/09 232:21-233:1 (Kruger). And that is just what the Committee did -- they stood by the February 2006 Letter Agreement because they did not want to do anything to put the Lenders' interests at risk:

> Q.     Isn't it true that you actually had a strategy that drove your decision not to make a demand, not to seek enhancement, and not to terminate the letter? You had a strategy.
>
> A.     Correct.
>
> *          *          *          *          *

11

> Q.    .... But in point of fact your own strategy was not to take the risk, not to take the risk that a debate about rate of interest would break up an alliance that was important to your constituency because they were at risk if the estimation were lost, true?
>
> A.    Correct.

(9/16/09 Tr. 233:15-18; 234:4-9 (Kruger)).

21.    The Committee and the Lenders continued their strategy of showing support for Grace, and for the February 2006 Letter Agreement, when Grace and the Asbestos Personal Injury Claimants entered into serious settlement negotiations in early 2008. See 9/16/09 Tr. 58:18-59:13 (Shelnitz).

22.    The evidence is undisputed that Mr. Shelnitz kept the Committee -- specifically, Mr. Kruger -- fully apprised of developments in the negotiations with the ACC and FCR. 9/16/09 Tr. 67:2-9 (Shelnitz). And the Committee knew full well that Grace was negotiating on the assumption that the Committee and the Lenders would stand by the February 2006 Letter Agreement. Indeed, during the course of negotiating the Asbestos Term Sheet, Mr. Shelnitz had specifically agreed with the Committee that any settlement with the Asbestos Personal Injury Claimants would include postpetition interest for the Lenders at the same rates set forth in the February 2006 Letter Agreement. 9/16/09 Tr. 65:17-66:23 (Shelnitz).

23.    The Committee never voiced any objection. At any point during those negotiations, the Committee could have readily terminated the February 2006 Letter Agreement and demanded a higher rate of postpetition interest. But the Committee did not terminate the February 2006 Letter Agreement or even attempt to change its terms. 9/16/09 Tr. 225:12-226:2 (Kruger). Indeed, Mr. Kruger never gave Grace any warning that the Committee would oppose a plan that contained the same rate of interest set forth in the February 2006 Letter Agreement.

9/16/09 Tr. 229:15-18 (Kruger). Nor did Mr. Kruger, or any individual debt holder, ever

formally demand default interest for the Lenders. 9/16/09 Tr. 59:13-60:2 (Shelnitz).

**Reaction to the Term Sheet**

24.    Just before the Asbestos Term Sheet was filed, the Committee had another

opportunity to terminate the February 2006 Letter Agreement. And again, the Committee made

a strategic decision not to do so. On April 3, 2008, as Grace was finalizing the agreement with

the Asbestos Personal Injury Claimants, Mr. Shelnitz sent an e-mail to counsel for the

Committee, attaching a draft of the Asbestos Term Sheet. 9/16/09 Tr. 66:24-67:9 (Shelnitz); see

also PP Ex. 344. The draft Term Sheet included the following provision concerning postpetition

interest that would be paid to general unsecured creditors:

> **Allowed General Unsecured Claims:** 100% of allowed amount
> plus postpetition interest as follows: (i) for holders of pre-petition
> bank credit facilities, postpetition interest at the rate of 6.09% from
> the filing date through December 31, 2005 and thereafter at
> floating prime, in each case compounded quarterly in the manner
> provided for under such bank credit facilities; and (ii) for all other
> unsecured claims, interest at 4.19% compounded annually, or if
> pursuant to an existing contract, interest at the non-default contract
> rate.

PP Ex. 344 at p. 3 ¶ 7. These rates are exactly the same as those set forth in the February 2006

Letter Agreement. 9/16/09 Tr. 71:4-9 (Shelnitz); see also PP. Ex. 286.

25.    The very next day, April 4, 2008, Arlene Krieger, counsel for the Committee, sent

an email back to Mr. Shelnitz setting forth "our initial thoughts on changes to the Allowed

General Unsecured Claims treatment description in the Term Sheet." See PP Ex. 284 at 1.

Critically, Ms. Krieger did not object to the provisions for postpetition interest. The only change

that Ms. Krieger proposed was specifying that an individual "holder" would retain the option to

apply for a higher rate of postpetition interest than that provided for in the plan. Specifically,

Ms. Krieger proposed that Grace pay:

13

> 100% of allowed amount plus postpetition interest as follows: (i) for holders of pre-petition bank credit facilities, postpetition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly in the manner provided for under such bank credit facilities; and (ii) for all other unsecured claims, interest at 4.19% compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate; provided, however, any such holder may seek to obtain a higher interest rate and shall be entitled to such higher interest rate if the Court determines such rate is appropriate. PP Ex. 284 at 1.

26.     Ms. Krieger's email is compelling evidence that, as of April 4, 2008, the Committee still wanted to preserve the February 2006 Letter Agreement. It was still fair, and it was still equitable. For Grace's part, Mr. Shelnitz understood Ms. Krieger's email to express the Committee's continued support for the deal that Grace and the Committee struck on behalf of the Lenders back in February 2006. 9/16/09 Tr. 71:16-24 (Shelnitz). Accordingly, on April 6, 2008, Grace signed the Asbestos Term Sheet. The Asbestos Term Sheet provides that the Lenders will receive the full amount of their allowed claim and postpetition interest in accordance with the February 2006 Letter Agreement, just as the parties had bargained for. See PP Ex. 160 at 3.

**The Lenders make an after-the-fact demand for default interest.**

27.     On April 21, 2008, counsel for the Lenders sent a letter to Grace, rejecting the rate of postpetition interest in the Asbestos Term Sheet and demanding interest at the default rate. See Lenders' April 21, 2008 Letter at 2 [Dkt. 19072, Ex. C]. The Lenders asserted that the fact that equity retained value violated the absolute priority rule. Id. The letter did not terminate the February 2006 Letter Agreement. And in the months that followed, neither the Lenders nor the Committee stated that the February 2006 Letter Agreement was terminated. It was not until Mr. Kruger so announced at a September 29, 2008 hearing, over 5 months later, that the Committee

finally said the February 2006 Letter Agreement was terminated.[8]  9/16/09 Tr. 241:10-15

(Kruger); see also Transcript of Proceedings Before The Honorable Judith K. Fitzgerald United

States Bankruptcy Court Judge, dated September 29, 2008 at 134:2-21 [Dkt. 19874].

**Treatment Under the Plan**

28.     On February 27, 2009, Grace filed its First Amended Joint Plan of Reorganization

(the "Plan"). Under the Plan, Grace stood by the deal it made with the Committee and the

Lenders in the February 2006 Letter Agreement. Under the Plan, the Lenders will receive the

full amount of their principal plus postpetition interest at a rate of 6.09%, compounded quarterly.

See PP Ex. 277.1 rev. (Plan) at § 3.1.9(b)(B). This amounts to $323.4 million,[9] added to $500

million of principal and approximately $2.23 million in accrued prepetition interest for a total of

approximately $826 million. By comparison, the federal judgment rate of interest would yield

$190 million,[10] and a compounded default rate would yield $414 million. See Ordway Decl. at

4. Thus, the most that the Lenders ever could have claimed under the Credit Agreements was

roughly $916 million ($500 million in principal plus $414 million in postpetition interest and

$2.24M in prepetition interest). Put simply, the Plan already provides for over 90% of what the

Lenders demand.[11]

29.     Other constituencies will not do nearly as well. The Asbestos PI Claimants, for

example, will only receive roughly 25-35% of the total recovery for which they could argue.

---

[8]   Of course, the February 2006 Letter Agreement does not terminate automatically under any circumstances. The Creditors Committee had the "right to withdraw" under certain circumstances. See PP Ex. 286 at 1.

[9]   Declaration of Edwin N. Ordway, Jr. in Support of the Response of the Official Committee of Unsecured Creditors to Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999 ("Ordway Decl.") at 4, filed August 15, 2008 [Dkt. 19321].

[10]   $500M * [1 + 4.19%] ^ (7.5 yrs) = $190 million.

[11]   $500M in principal + $323.4M +$2.23M in accrued prepetition interest = $825.64M/916.43M = .9009 *100 = 90.09%.

9/16/09 Tr. 57:3-8 (Zilly).  If the Plan is confirmed and Grace resolves its claims through the

TDP, the estimated 2009 net present value of asbestos personal injury liabilities (including future

claims) ranges from $6.3 billion to $9.3 billion.  See 10/13/09 Tr. 56:24-57:8 (Zilly); 9/15/09 Tr.

207:18-24 (Peterson); see also PP Ex. 511-21a (Zilly demonstrative).  But under the Plan, all

pending and future asbestos personal injury claims have been resolved for a value of $2.214

billion.  See 10/13/09 Tr. 81:12-24 (Zilly); see also PP Ex. 511-21a, Zilly Demonstrative.[12]

Thus, on a percentage basis, the Lenders are doing far better under the Plan than the Asbestos PI

Claimants.

       30.     The Equity Holders are also making a far greater sacrifice than the Lenders.

Under the Plan, Equity will receive whatever is left of the reorganized Grace after it accounts for

its liabilities, including, most importantly, its asbestos liabilities.  During the estimation

proceedings, the Equity Holders had retained Dr. Florence, who valued Grace's asbestos

personal injury liabilities at a median value of $468 million.  Under the Asbestos Term Sheet,

however, the Equity Holders agreed to a settlement that values Grace's asbestos personal injury

liabilities at over $2.2 billion (9/16/09 Tr. 81:12-24 (Zilly)), which is approximately $1.632

billion more than the Equity Holders thought that the Asbestos PI Claimants should receive.

This again assumes an interest rate of 10%.  Use of a lower interest rate would increase the

amount the Asbestos PI Claimants will receive because the present value of the future

obligations of Grace to the Asbestos PI Trust would go up in value.  9/16/09 Tr. 81:16-83:3

(Zilly).

---

[12]  This assumes a interest rate of 10% to discount to present value.  If a lower interest rate were used, it would
      increase the amount of payment under the Plan because the present value of the future obligations of Grace to
      the Asbestos PI Trust would go up in value.  9/16/09 Tr. 81:16-83:3 (Zilly).

31.     Despite the fact that they are receiving 90% of the money they could ever receive, on May 20, 2009, the Lenders filed an objection to Grace's Plan, claiming that it deprives them of roughly $91 million in default interest allegedly owed under the Credit Agreements. See Bank Lender Group's Objection to Confirmation of First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at 2, dated May 20, 2009 [Dkt. 21789].

17

## ARGUMENT

32.    The Lenders are not entitled to interest at a rate in excess of the rate provided in the Plan because (1) the Debtors are not in default under the Credit Agreements, so there is no contractual right to default interest; (2) section 502(b) extinguishes any right the Lenders might have to interest under the Credit Agreements; (3) the Plan does not impair the Lenders; (4) the best interests test does not entitle the Lenders to more than the interest set out in the Plan; and (5) default interest is not warranted under the fair and equitable test.

## I.    THE LENDERS' DEMAND FOR DEFAULT INTEREST FAILS FOR THE SIMPLE REASON THAT THERE WAS NO DEFAULT UNDER THE CREDIT AGREEMENTS.

33.    There have been no defaults under the Credit Agreements.  What constitutes a 'default' in bankruptcy is fundamentally different than what would qualify as a default outside of bankruptcy.  And the Court has recognized as much.  On June 22, 2009, at Phase I of the Confirmation Hearing, the Court expressly asked the Committee and the Lenders to come forward with evidence of some postpetition default that is "not tied up in the Bankruptcy Code." 6/22 Hrg. Tr. at 51:9-12.  The Committee and the Lenders still have not done so.

34.    Rather, they have based their claim to default interest on shifting theories of alleged postpetition defaults, namely:  (1) certain alleged violations of the credit reporting requirements contained in the Credit Agreements; (2) violation of the *ipso facto* clauses in the Credit Agreements; and (3) the failure to pay principal and interest under the Credit Agreements during the bankruptcy proceeding.  None of these arguments gives the Lenders an enforceable legal right to default interest under the Credit Agreements.

**A.    Debtors' alleged violation of the Credit Agreements' reporting requirements does not entitle the Lenders to contractual default interest.**

35.    The Committee and Lenders first focused their claim for default interest on Grace's alleged violation of certain reporting requirements under the Credit Agreements. This claim failed. As the Court previously recognized, the Lenders never provided sufficient evidence "that any alleged reporting failures under the loan documents constitute a default of the type that would trigger any default interest provision in the loan documents." Claims Objection Op. at 4. In any case, mere non-compliance with reporting requirements would not give the Lenders a right to contractual default interest. The Credit Agreements set forth in detail the procedures by which the Administrative Agent, JP Morgan, may accelerate the loans and trigger default interest if it or a majority of the Lenders determined that was the appropriate course of action. The Credit Agreements provide that the Administrative Agent, JP Morgan, could have accelerated the loans, "making them immediately due and payable" by "notice of default to the Company and the Parent," under Section 10(B)(ii) of the Credit Agreements if it believed that Grace had defaulted and that it was in the best interest of the banks to accelerate the loans. See CC-BLG Ex. 2 at § 10(B)(ii); CC-BLG Ex. 3 at §10(B)(ii). Alternatively, JP Morgan could have provided written notice to Grace "upon the request of the Majority Banks." See CC-BLG Ex. 2 at § 13.2; CC-BLG Ex. 3 at § 13.2 (requiring the Administrative Agent to provide such notice of default to Grace in writing).

36.    Here, it is undisputed that the Lenders never followed the procedures for accelerating the loans set forth in the Credit Agreements. Indeed, the Lenders never provided any type of "notice of default to the Company and the Parent" that the Majority Banks were

19

accelerating or calling the loans. See Shelnitz Aff. ¶ 9.[13] Because the Administrative Agent did

not accelerate the loans by providing the Debtors with a notice of default and because the

Majority Banks did not request such acceleration, the Lenders cannot argue that a non-monetary

default occurred that would trigger default interest in an impairment context.[14]

**B.      The ipso facto clauses in the Credit Agreements do not entitle the Lenders to default interest.**

37.     At Phase I of the Confirmation Hearing on June 22, 2009, the Lenders tried a new

tack, arguing that "the mere filing of the bankruptcy, as clearly provided under Section 10 of the

credit agreement, accelerates -- causes a default without any notice required whatsoever and

accelerates all payment, and thereby kicks in default interest." See Transcript of Proceedings

Before The Honorable Judith K. Fitzgerald United States Bankruptcy Court Judge, dated June

22, 2009 ("6/22/09 Hrg. Tr.") at 56:16-20 [Dkt. 22294].

38.     But as this Court previously held, "the bankruptcy filing *per se* is not a

permissible basis for invoking the contract default interest rate." Claims Objection Op. at 4.

This Court's ruling is consistent with a long line of precedent holding that *ipso facto* clauses, like

those in the Credit Agreements, are unenforceable as a matter of law. See Plan Proponents'

Phase II Brief Regarding Bank Lender Issues In Support of Confirmation of Joint Plan of

Reorganization under Chapter 11 of the Bankruptcy Code ("Plan Proponents' Pre-Trial Brief On

Lender Issues") at 20-25 and cases cited therein. *Ipso facto* clauses frustrate a fundamental

purpose of the Bankruptcy Code -- to provide debtors with a fresh start. Id. Contrary to the

previous assertions by the Lenders and Committee, courts find *ipso facto* clauses broadly

---

[13]   See Notice of Submission of Affidavit of Charles O. Freedgood and Declaration of Mark A. Shelnitz, dated June 26, 2009, Ex. B. [Dkt. No. 22279] (filed pursuant to stipulation between Grace, the Lenders, and the Committee, stating that the facts stated are true).

[14]   See also Pre-Trial Brief on Lender Issues at

unenforceable as a general matter, without regard to any specific Code provision. As courts have

recognized, the specific provisions of the Code invalidating *ipso facto* clauses -- Sections 363(1),

365(e), and 541(c) -- serve as evidence of their general unenforceability, not as an exhaustive list

of situations where such clauses are unenforceable. Accordingly, courts have invalidated *ipso*

*facto* clauses based on more general principles of equity, even where none of the express Code

provisions applied. Id. at 23-25.

39.    A long line of precedent makes clear that the *ipso facto* clauses in Section 10 of

Grace's Credit Agreements, under which the loans purportedly accelerate and become

immediately due upon Grace's chapter 11 filing, are unenforceable regardless of whether these

clauses are tied directly to an express Bankruptcy Code provision related to *ipso facto* clauses

such as those found in sections 365, 363 and 541 of the Bankruptcy Code. To hold otherwise

would penalize debtors for invoking their constitutional rights and undermine the Bankruptcy

Code's long-standing policy of providing debtors with a fresh start.[15]

### C.   Debtors' failure to pay principal and interest under the Credit Agreements during the bankruptcy proceeding does not entitle the Lenders to contractual default interest.

40.    The Committee and the Lenders have also argued that Grace's failure to pay

interest on the loans (and its failure to repay the loans themselves when they matured during the

bankruptcy) trigger the Lenders' right to contractual default interest. But, as the Court also

correctly held, a debtor's failure to make postpetition payments cannot be deemed a legally

enforceable default. See Claims Objection Op. at 5.

---

[15]   There are no exceptions to the general unenforceability of *ipso facto* clauses that apply here. The Lenders have previously argued that § 365(e)(2)(B) would allow the clauses in the Credit Agreements. See Joint Pre-Trial Memorandum of the Official Committee of Unsecured Creditors and Bank Lender Group in Opposition to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("Lenders' Pre-Trial Memorandum, dated July 13, 2009 at ¶ 56 [Dkt. 22441]. But § 365(e)(2) does not apply here because it only applies to executory commitments to extend future credit. See, e.g., In re Texaco Inc., 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987); see also Plan Proponents' Pre-Trial Brief on Lender Issues at 27-28.

41.    The Court's Opinion is consistent with bedrock principles of contract interpretation that provide that the Credit Agreements, like all contracts, implicitly incorporate applicable existing law, including the Bankruptcy Code. See Plan Proponents' Pre-Trial Brief On Lender Issues at 30-34 and authorities cited therein. Thus, the Credit Agreements are deemed to incorporate the requirements of federal bankruptcy law, the provisions of which are regarded as "implied terms" of the Credit Agreements. See In re Timbers of Inwood Forest Associates Ltd., 793 F.2d 1380, 1414-15 (5th Cir. 1986), aff'd rehrng en banc, 808 F.2d 363 (1987) ("the bargain which the creditor enters into incorporates the applicable requirements of federal bankruptcy law"); see also In re Ogle, 261 B.R. 22, 30 (Bankr. D. Idaho 2001) ("[B]ankruptcy by its very nature deprives creditors of the benefit of their agreement with a debtor.").

42.    One of the implied terms of the Credit Agreements is section 502(b)(2) of the Bankruptcy Code, which prohibits the payment of any "unmatured interest." Other implied terms of the Credit Agreements include section 363(b) and the automatic stay in section 362(a) of the Bankruptcy Code, which prohibited Debtors from repaying the principal amount of the loans when they matured during the bankruptcy. To give effect to these prohibitions, the general interest provisions of the Credit Agreements must be interpreted to include a carve out for any interest that accrued after the Petition Date. And the provision of the Credit Agreements requiring repayment of the principal upon maturity must be interpreted as including an exception to this repayment requirement if the borrower is in bankruptcy. And so, the Debtors' non-payment of principal and interest during the bankruptcy was consistent with the terms of the Credit Agreements.

43.    It is precisely because the Credit Agreements are deemed to incorporate the

provisions of the Bankruptcy Code that it is "senseless" for the Committee and the Lenders to

claim a default based on Debtors' failure to make timely postpetition payments under the Credit

Agreements. See In re NextWave Personal Communications, Inc., 244 B.R. 253, 276 (Bankr.

S.D.N.Y. 2000) ("It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the

debtors had neither the authority nor the ability to make such payments absent notice and court

approval."). The Bankruptcy Code provisions are part and parcel of the Credit Agreements, and

those provisions prohibited Debtors from paying postpetition interest on the loans and from

repaying the principal amount of the loans upon maturity. The Committee and the Lenders

cannot credibly claim that the Lenders have a legally enforceable right to interest at the default

rate based on Debtors' failure to make payments that were prohibited under the terms of the

Credit Agreements.

## II.    SECTION 502(B) OF THE CODE DISALLOWS THE LENDERS' CONTRACTUAL RIGHT TO INTEREST.

44.    Section 502(b) prohibits allowance of unmatured post-petition interest from being

included within an allowed claim. See In re Chateaugay Corp., 156 B.R. 391, 403 (S.D.N.Y.

1993) ("502(b)(2) bars postpetition interest on a pre-petition unsecured claim"); Claims

Objection Op. at 3 ("under § 502(b)(2) allowed claims do not include unmatured interest").

45.    The absolute bar against the accrual of contractual postpetition interest imposed

by section 502(b) applies to all of the interest terms of the Credit Agreements. Thus, the default

provisions of the Credit Agreements are simply rendered void upon the commencement of a

Chapter 11 case. Similarly, the Lenders are not entitled to the rate of interest which applies

under the Credit Agreements if the Loans are not paid upon maturity. As noted by a leading

bankruptcy commentator, "[i]nterest does not survive the debt from which it stemmed; if the debt

23

was extinguished, so was any interest relating to it." 4 Collier on Bankruptcy ¶ 502.03[3][c]

(15th ed. rev. 2007); see also In re Garriock, 373 B.R. 814, 816 (E.D. Va. 2007) (same).

Accordingly, once Grace filed for bankruptcy, all contractual rights to accrue interest which the

Lenders might have had ceased by operation of section 502(b)(2). There is nothing in the

Bankruptcy Code that in any way revives these contractual rights. Instead, the Bankruptcy Code

makes it clear that the Committee and the Lenders have no *entitlement* to default interest.[16]

## III.   THE LENDERS ARE NOT IMPAIRED AND THEREFORE THE COURT NEED NEVER REACH THE IMPACT OF SECTIONS 1129(B) AND 1129(A)(7) OF THE BANKRUPTCY CODE.

46.     The question of whether a claim is impaired entails a two-pronged inquiry. The

first prong is governed by section 1124 of the Bankruptcy Code, which states in pertinent part:

"Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired

under a plan unless, with respect to each claim or interest of such class, the plan – (1) leaves

unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the

holder of such claim or interest[.]" 11 U.S.C. § 1124. The critical question under section

1124(1) is whether the Committee and the Lenders can demonstrate that they had a "legal,"

equitable," or "contractual" right to default interest in the first place. Absent such a showing,

they cannot even begin to argue that they are impaired under the Plan.

47.     The second prong of the impairment inquiry is governed by PPIE, where the

Third Circuit made clear that a claim is only impaired under section 1124 of the Bankruptcy

Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the

alleged rights of a claimant. Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)

("PPIE"), 324 F.3d 197, 204-05 (3d Cir. 2003). Thus, in the event that the Committee and the

---

[16]   See Plan Proponents' Pre-Trial Brief on Lender Issues at 15-18 for a more comprehensive analysis.

Lenders could demonstrate a right to contractual default interest, and they cannot, the question then becomes what is it that altered that right -- the Plan or the Bankruptcy Code. To the extent that the Committee and the Lenders ever had a right to contractual default interest, the impairment of that right resulted solely from the operation of the Bankruptcy Code, which, under PPIE, is statutory impairment. And statutory impairment is no impairment at all.

### A.    The Lenders have no legal, equitable, or contractual right to default interest.

48.    As a threshold issue, the Lenders are not impaired by the fact that Grace is not paying default interest. And the reason is simple and has already been discussed. There have been no cognizable defaults. See supra at 17-22. Because there have been no cognizable defaults, the Lenders' contractual right to default interest was never triggered, and the Lenders' "legal, equitable, and contractual rights" remain unaltered. This would be true even if section 502(b) of the Code did not otherwise extinguish any contractual right to postpetition interest. But it does.

### B.    The Plan does not alter any entitlement to interest that the Lenders may have.

49.    The Committee's and the Lenders' demand for default interest also fails under the second prong of the impairment analysis, which asks: Does the Plan itself alter the Lenders' legal, equitable or contractual rights? The answer to this question is clearly no. Both the Lenders' entitlement to postpetition interest and the rate of postpetition interest they must receive are dictated by the *Code*. Section 502(b) extinguishes the Lenders' contractual right to interest, including the right to the maturity rate of interest.

50.    In PPIE, the Third Circuit held that a claim is only impaired under section 1124 of the Bankruptcy Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant. PPIE, 324 F.3d at 204. The Third Circuit expressly

25

stated that "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment." Id. at 204. Here, any contractual rights to interest, if they exist, are impaired solely by operation of the Bankruptcy Code and, more specifically, section 502(b), which prohibits allowance of a claim for "unmatured interest." As the Third Circuit has held, this is not the type of "impairment" that will trigger a claimant's rights under section 1124. PPIE, 324 F.3d at 204-05 ("'[I]mpairment by statute' [is] an oxymoron. Impairment results from what the *plan* does, not what the statute does.") (emphasis in the original). See Plan Proponents' Pre-Trial Brief on Lender Issues at 35-41 for a comprehensive analysis.

### C.    The Lenders are not impaired by the Plan's non-payment of the postpetition maturity rate of interest.

51.    It is for this precise reason that Committee's and the Lenders' additional argument that they were impaired by virtue of Grace's failure to pay the post-maturity rate of interest fails.[17] This argument is squarely prohibited by section 502(b)(2). The fundamental flaw in the Committee's and the Lenders' argument is that it presupposes that they have a contractual right to the post-maturity rate of interest. But they do not because "[i]nterest does not survive the debt from which it stemmed; if the debt was extinguished, so was any interest relating to it." 4 Collier on Bankruptcy ¶ 502.03[3][c] (15th ed. rev. 2007); see also Garriock, 373 B.R. at 816 (same). Thus, any pre-petition right that the Lenders may have had to the post-maturity rate of interest under their contracts is irrelevant. It was extinguished by the Code as of the Petition Date. It was replaced, if at all, by the federal judgment rate. See Pre-Trial Brief on Lender Issues at 17-18, 34-35. Here, the Plan pays the Lenders more than the federal judgment rate and, therefore, more than they are legally entitled to receive under the Code. So there is no Plan impairment. Because the Lenders are not impaired, the bests interests and fair and equitable tests are never

---

[17]    The post-maturity rate happens to be the same as the default rate. See, e.g., CC-BLG Ex. 2 at Section 4.4.

reached. But, as shown below, those tests do not advance the Committee's and the Lenders' demand in any event.

## IV.    THE BEST INTERESTS OF CREDITORS TEST IS SATISFIED.

52.    The "best interests" test simply requires a plan of reorganization to provide "each dissenting creditor or interest holder in an impaired class of claims with value that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7." 11 U.S.C. § 1129(a)(7).  In the context of interests rates, this means that the Lenders must receive the same rate of interest they would receive under section 726(a)(5) in a chapter 7 liquidation. Under section 726(a)(5) the Lenders would, at most, be entitled to the "legal rate" of interest. See Plan Proponents' Pre-Trial Brief On Lender Issues at 46-47.  And courts have overwhelmingly held that the legal rate of interest is the federal judgment rate. Id. at 16-18. Indeed, the fundamental purpose of postpetition interest is to compensate creditors for the cost of delay that occurs between the time of entitlement (the petition date) and the time of payment, and this "cost of delay affects all creditors equally, and the federal judgment accurately reflects the time value of each creditors' claims." In re Garriock, 373 B.R. at 816; see also In re Cardelucci, 285 F.3d 1231, 1234 (9th Cir. 2002) (holding that Congress intended legal rate to refer to the federal judgment rate); In re Best, 365 B.R. 725, 727 (Bankr. W.D. Kentucky 2007) (same).  The bests interests test is satisfied because the Plan provides more than the federal judgment rate.[18]

## V.    THE FAIR AND EQUITABLE TEST DOES NOT ENTITLE THE LENDERS TO A DEFAULT RATE OF INTEREST

53.    As a threshold issue, the Lenders' and the Committee's failure to prove solvency is an insurmountable barrier to invoking the fair and equitable test.  But if the Court were to

---

[18]  Of course, the Lenders have no basis to invoke the bests interests test.  They fail to satisfy the threshold requirements because they are not impaired, and Grace has not been proven solvent.

reach the equities, they weigh squarely against the Lenders. First, they failed to provide any meaningful contribution during these bankruptcy cases. Next, their Committee negotiated the rate of interest the Plan provides. Since then, they have attempted to renege on their bargain. The evidentiary record shows a pattern of opportunistic behavior and broken promises by the Committee on behalf of the Lenders. This undisputed evidentiary record belies the Lenders' contention that the payment of contractual default interest is somehow fair and equitable. Nor can they escape these facts by invoking the absolute priority rule. The absolute priority rule simply requires that the Lenders' claims be paid in full, as they are being paid here. Nothing in the absolute priority rule prohibits equity holders from retaining value where this is the case.

A.    **The Court need not reach the equities of default interest because the Lenders have failed to prove that Grace is solvent.**

54.    Just as the Committee and the Lenders have failed to adduce any evidence of an alleged default under the Credit Agreements that is "not tied up in the Bankruptcy Code," they likewise have failed to come forward with evidence of Grace's solvency. As the parties objecting to the Plan, the Lenders and Creditors' Committee were charged with the burden of proving that Grace was solvent at the Confirmation Hearing. See, e.g., In re Exide Technologies, et. al., 303 B.R. 48, 58 (Bankr. D. Del. 2003) ("Creditors objecting to the proposed plan bear the burden of producing evidence to support their objection."). The Lenders and the Creditors' Committee did not come close to carrying their burden, and that is hardly surprising. On the facts of this case, where Grace's asbestos liabilities are still very much in dispute, it is simply not possible to determine whether Grace is solvent.

55.    The parties agree that solvency is measured as the value of a company's assets in excess of the value of its liabilities. And here, the most significant component of Grace's liabilities, the Asbestos PI Claims, has never been decided. The estimation proceedings, which

28

were designed specifically to estimate Grace's asbestos liabilities, were never completed. Instead, the constituencies agreed on a plan for paying asbestos personal injury claims (without agreeing on their merit), which now forms the basis for Grace's plan of reorganization. See Asbestos Term Sheet, PP Ex. 160. The Plan, everyone agrees, does not represent any type of binding and dispositive valuation of Grace's asbestos liabilities. Instead, the Plan represents a negotiated compromise that foreclosed the need for any such valuation by simply accepting a plan for payment.

56.    In the absence of a final adjudication of Grace's asbestos liabilities, the net present value of Grace's total liabilities remains an unknown. Indeed, as the record currently stands, Grace's asbestos liabilities could range anywhere from a low of $200 million to a high of $6.2 billion. 9/16/09 Tr. 105:25-106:14 (Zilly); see also PP Ex. 511-6.

57.    The Court, of course, never had occasion to reach a final determination as to Grace's asbestos liabilities, as the estimation proceedings were never completed. As Debtors' expert, Pamela Zilly stated, Grace's asbestos personal injury liabilities have never been "fixed." 9/16/09 Tr. 106:15-19 (Zilly). That being the case, Ms. Zilly testified that there is *no* methodology that can be used to even begin to approximate Grace's asbestos personal injury liabilities. 9/16/09 Tr. 106:20-107:1 (Zilly). And if it is not possible to fix Grace's asbestos liabilities, there is no way to know if the value of Grace's liabilities exceeds the value of Grace's assets. Therefore, according to Ms. Zilly, it is not possible to render a formal opinion regarding Grace's solvency. 9/16/09 Tr. 107:2-6 (Zilly).

58.    Critically, the Creditors' Committee's own expert, Robert Frezza, agrees that there can be no determination of Grace's solvency unless Grace's asbestos liabilities are first resolved. Indeed, Mr. Frezza specifically testified that, without knowing the precise amount of

29

that liability, he would have no basis to say whether Grace was solvent or insolvent. 9/16/09 Tr.

315:10-316:6 (Frezza). The mistake that Mr. Frezza makes is that he treats the Plan as a final

determination of Grace's asbestos liabilities, when in fact it is nothing of the sort.

        *1.*     *The testimony of Mr. Frezza does not bear on the question of solvency*
                    *because he only purported to measure Grace's solvency after Grace's*
                    *plan goes effective.*

      59.      The evidence amply demonstrated that Mr. Frezza's solvency analysis was, in

actuality, nothing more than a feasibility study in disguise. Mr. Frezza never attempted to

measure Grace's asbestos liabilities *before* Grace's Plan becomes effective, only after. His

testimony effectively boiled down to the unremarkable proposition that, after the consensual Plan

becomes effective, Grace would then be solvent. See 9/16/09 Tr. 270:12-13; 299:18-24; 326:9-

15 (Frezza). And his so-called "solvency tests" involved nothing more than looking at Grace's

*pro forma* financial statements under the Plan and opining that, if the Plan is approved and goes

effective, Grace will then be solvent under (1) the balance sheet test, (2) the adequate capital test;

and (3) the cash flow test. 9/16/09 Tr. 270:17-271:4 (Frezza). See 9/16/09 Tr. 299:18-24

(Frezza). He admits that he never even attempted to assess Grace's solvency outside the context

of the Plan. 9/16/09 Tr. 270:12-13; 299:18-24; 326:9-15 (Frezza).

      60.      Mr. Frezza simply testified to the wholly undisputed -- and entirely irrelevant --

proposition that the new Grace will be solvent after its plan of reorganization goes into effect.

All this shows is that Grace's Plan is feasible. The law makes this clear. Indeed, the whole issue

in a feasibility determination is whether a reorganized debtor will emerge from bankruptcy

solvent: "Basically, feasibility involves the question of emergence of the reorganized debtor in a

solvent condition and with reasonable prospects of financial stability and success." In re Duval

manor Associates, 191 B.R. 622, 632 (Bankr. E.D. Pa. 1996); In re 222 Liberty Associates, 108

B.R. 971 (Bankr. E.D. Pa. 1990) (same); In re Rota, No. 89-14333S, 1990 WL 9068 at *3

(Bankr. E.D. Pa. June 26, 1990) (same); In re One Times Square Associates Limited Partnership, 159 B.R. 695, 709 (S.D.N.Y. 1993) (same); In re Apples Tree Partners, L.P., 131 B.R. 380, 394 (Bankr. W.D. Tenn. 1991) (same); In re Stratford Associates Ltd. Partnership, 145 B.R. 689, 697 (Bankr. D. Kan. 1992) (same).

61.     Solvency is very different. Solvency turns on the question of whether a debtor's assets exceed its liabilities without regard to any plan of reorganization. See In re Valley View Shopping Center, L.P., 260 B.R. 10, 30 (Bankr. D. Kan. 2001). Thus, to show that Grace is a solvent debtor, the Committee and the Lenders had to show that the value of Grace's assets exceeds the value of its liabilities before the Plan goes into effect. They did not even attempt to make such a showing.

62.     The Valley View case is particularly instructive. In Valley View, the debtor filed for chapter 11 on December 24, 1998, and several years later, proposed a plan of reorganization under which all creditors would be paid the full amount of their allowed claims and equity would retain its interests. Valley View, 260 B.R. at 20. One of the largest creditors, an entity known as ANICO, disputed the plan's feasibility. Id. at 34. ANICO also objected to the plan on the ground that it did not satisfy the best interest of creditors test of section 1129(a)(7) because it did not provide for postpetition interest to the Class 3 unsecured creditors (of which there was only one -- ANICO). Id. at 30. In support of its best interests objection, ANICO pointed to evidence showing that the debtor was solvent in 1997 and 1998 and argued that this entitled unsecured creditors to postpetition interest on their claims. Id.

63.     The court rejected ANICO's objections and confirmed the plan. In doing so, the court crystallized the important distinction between a feasible plan and a solvent debtor. As to feasibility, the court noted that the key test is "[w]ill the reorganized debtor emerge from

31

bankruptcy solvent and with a reasonable prospect of success?" Id. at 33. In applying this test, the court noted that the undisputed evidence showed that the reorganized debtor was projected to have positive cash flows for the first two years after the anticipated effective date. Id. at 34. Accordingly, the court found that the debtor's plan satisfied the feasibility requirement. Id.

64.     Critically, notwithstanding that the evidence showed that the reorganized debtor would emerge a solvent entity after the effective date, the court rejected ANICO's argument that it was entitled to postpetition interest under section 1129(a)(7) of the Bankruptcy Code. And it did so specifically because it found that there was no evidence of debtor's solvency: "The Court has reviewed the testimony and finds that it does not show the Debtor was solvent *on the effective date of the Plan.*" Id. at 30 (emphasis added). As the court's holding makes clear, the fact that a reorganized debtor will emerge as a solvent entity may prove that a plan is feasible, but it does speak to the question of whether a debtor is solvent. To answer that question, the objecting party must come forward with evidence that a debtor is solvent without giving effect to a plan of reorganization.

65.     The Court's decision in Valley View makes perfect sense. It will always be the case (or at least it should always be the case) that a debtor will emerge as a solvent entity once a plan of reorganization becomes effective. So, if that were the test for solvency, then every debtor to emerge from chapter 11 would be solvent, and every unsecured creditor would always be entitled to postpetition interest in a chapter 11 reorganization. But that is not the test. Instead, section 502(b)(2) of the Bankruptcy Code broadly prohibits the payment of postpetition interest on unsecured claims in a chapter 11 case. To overcome this prohibition, unsecured creditors must come forward with persuasive evidence that the debtors are solvent before a plan of reorganization becomes effective, not afterward.

32

Here, just as in <u>Valley View</u>, there is simply no evidence of Grace's solvency. Mr. Frezza's testimony, at most, leads to the conclusion that, if and when the Plan becomes effective, a reorganized Grace will be solvent under a balance sheet test, an adequate capital test and a cash flow test. But Mr. Frezza's testimony does not even speak to, let alone answer, the dispositive question in measuring solvency -- whether Grace is solvent prior to the Plan becoming effective. For the reasons discussed above, neither Mr. Frezza nor anyone else can answer this question, because Grace's asbestos liabilities have never been determined.

### 2. *Mr. Frezza's adequate capital test fails for the additional reason that Mr. Frezza did not actually do a complete adequate capital test.*

66.     In addition to the fact that each of Mr. Frezza's tests purports to measure solvency at the wrong point in time, Mr. Frezza's adequate capital test suffers from a separate and independent defect. Quite simply, Mr. Frezza did not actually do a complete adequate capital test. He conceded this point at trial:

> Q.     The adequate capital analysis, the adequate capital test, you did not perform a complete adequate capital test, right?
>
> A.     A complete adequate capital test? I'm sorry.
>
> Q.     Did not perform a complete capital adequate test. True?
>
> A.     True.

(9/16/09 Tr. 325:14-19.) The Committee and the Lenders cannot ask this Court to reach a finding of solvency based on what is, at best, an "incomplete" adequate capital test.

### 3. *There is no basis for Mr. Frezza's alternate balance sheet test in which he substitutes Dr. Florence's asbestos liability estimate into the Plan.*

67.     At the Confirmation Hearing, Mr. Frezza claimed to have done two different balance sheet tests. The first, discussed above, consisted simply of Mr. Frezza looking at Grace's *pro forma* balance sheet assuming that the Plan became effective and opining,

33

incorrectly, that this meant Grace is solvent. The second balance sheet test consisted of Mr. Frezza assuming that the Plan would go effective as currently constituted, with one very significant exception -- Mr. Frezza replaced the asbestos liabilities reflected in the Plan with the asbestos liability estimates proffered by Grace's expert, Dr. Thomas Florence, during the estimation proceedings. See 9/16/09 Tr. 293:7-20 (Frezza). Since then, the Committee and the Lenders have all but abandoned this alternate balance sheet test, and for good reason.

68.     Perhaps the most glaring flaw in Mr. Frezza's "analysis" is that it is wholly divorced from historical fact. 9/16/09 Tr. 316:7-319:5 (Frezza). While Mr. Frezza assumes that Dr. Florence's median estimate of $468 million is the final and binding determination of Grace's asbestos liabilities, real world events make clear that this assumption has no basis in fact. The negotiations over the Asbestos Term Sheet required very knowledgeable constituencies, with very divergent interests, to reach agreement over a fair estimate of Grace's asbestos personal injury liabilities. Through these real world negotiations, the constituencies arrived at an estimate that is significantly higher than the $468 million proffered by Dr. Florence. 9/16/09 Tr. 316:7-25 (Frezza).

69.     Indeed, the record in this case is *undisputed* that the constituencies involved in negotiating the Asbestos Term Sheet would never have agreed to a plan premised upon only $468 million in asbestos liabilities. Mr. Frezza, the Lenders' own expert, acknowledged that the Asbestos Personal Injury Claimants would probably have said "when hell freezes over" if asked to consent to such a plan. 9/16/09 Tr. 319:6-22 (Frezza). Mr. Frezza was also forced to admit that there is absolutely no basis for substituting Dr. Florence's estimate of asbestos liabilities while keeping all other aspects of the Plan intact. As Mr. Frezza testified, this substitution is not the product of any convention or methodology in his area of expertise. In fact, it does not require

34

any expertise at all to make this substitution. Mr. Frezza could not even say that this substitution is proper. 9/16/09 Tr. 312:4-21 (Frezza). The only reason Mr. Frezza performed this substitution was because the counsel directed him to do so. 9/16/09 Tr. 293:7-14; 312:25-313:3 (Frezza).

70.    Thus, by Mr. Frezza's own admission, his alternate balance sheet test simply is not credible. His whole analysis is premised upon a counter-factual world -- one in which there was a consensual Plan based upon Dr. Florence's median estimate of Asbestos Personal Injury Liabilities. Such a plan does not exist and could never exist. In view of this glaring and incurable flaw, the Lenders cannot credibly argue that Mr. Frezza's alternate balance sheet test opinion is somehow persuasive evidence of Grace's solvency. The Court acknowledged as much during the October 26, 2009 omnibus hearing, stating: "Let me just put that issue to bed, because I can't see how on the plan on the table use of the Florence numbers is appropriate at all.... I don't see how judging solvency in any concept can use numbers that no one has agreed are going to be incorporated into this or any other plan." See Transcript of Proceedings Before The Honorable Judith K. Fitzgerald, United States Bankruptcy Court Judge, Oct. 29, 2009 at 43:2-4; 44:1-3 [Dkt. 23598].

71.    Moreover, the Lenders' attempt to rely on Dr. Florence's estimate as a final and binding determination of Grace's asbestos liabilities is all the more inappropriate in light of the undisputed evidence highlighting the uncertainties surrounding that estimate. Dr. Martin, a leading expert in the statistical analysis of asbestos liabilities, testified that applying a standard 95% confidence interval to Dr. Florence's estimates demonstrates that these estimates could range from $4.6 million to $6.3 billion. To reach this conclusion, which was never disputed by the Lenders, Dr. Martin identified the three key sources of uncertainty in Dr. Florence's analysis:

35

(1) the filing rate; (2) the exposure qualification rate; and (3) the percentage of claimants that would be able to prove they had exposure to a Grace containing-product. 9/16/09 Tr. 149:20-25 (Martin). Then, using a technique called the Monte Carlo simulation, Dr. Martin ran Dr. Florence's analysis using different values that had occurred historically for these three key inputs, as opposed to the single value that Dr. Florence applied for each input. Using this technique, Dr. Martin generated 100,000 estimates and took the middle 95% of these estimates to establish a 95% confidence interval. 9/16/09 Tr. 149:25-151:5 (Martin).

72.    Dr. Martin's analysis demonstrated that, at a 95% confidence level, Dr. Florence's estimates of asbestos liabilities yield a range of $4.6 million to $6.3 billion. Thus, there is 95% chance that the actual amount of Grace's asbestos liabilities is <u>somewhere</u> in this range, but it is not possible to statistically distinguish within this range. In fact, the difference between the low end of this range and the high end is not statistically significant. Thus, as Dr. Martin correctly concluded, "[t]he true estimate is uncertain." 9/16/09 Tr. 151:20-153:2 (Martin).

Absent a final and binding adjudication as to Grace's asbestos liabilities, Grace's overall liabilities remain a matter of disputed fact. Hence, there is no way to know whether the value of Grace's assets exceeds the value of Grace's liabilities, which means there is no way to know whether Grace is solvent. It was the Lenders' burden to come forward with persuasive evidence of solvency, and they failed to do so.

### 4.    Grace's market capitalization is not a proxy for solvency

73.    As the Court may recall, when the Creditors' Committee and the Lenders first demanded contractual default interest, they argued vigorously that it was a foregone conclusion that Grace was solvent because it had a positive market capitalization. Yet, since then, the Creditors' Committee and the Lenders have all but abandoned this argument.

36

The first expert offered up by the Creditor's Committee and the Lenders, Edwin Ordway of Capstone Advisory Group, LLC, implicitly conceded that Grace's equity value does not establish solvency. In his Declaration, Mr. Ordway specifically referred to the increase in the Debtors' market capitalization since the Petition Date. Ordway Decl. at 5. And during his deposition, Mr. Ordway testified that he has rendered opinions on solvency. Ordway 8/29/08 Dep. Tr. 59:4-8. Tellingly, however, Mr. Ordway did not opine that the Debtors' market capitalization provided a basis to conclude that Debtors are solvent. Id. at 36:3-25. Mr. Ordway went on to say that Grace's equity value -- that is, its stock price -- may reflect many things having nothing to do with the company's performance. And Mr. Ordway provided no methodology whatsoever that even attempted to draw some type of correlation between Grace's equity value and actual company performance. Id. at 31:7-15. See also Plan Proponents' Pre-Trial Brief on Lender Issues at 44-45.

### 5. The fact that equity will retain value under the plan of reorganization contemplated by the proposed asbestos settlement does not establish solvency.

74. The fact that equity would receive value under Grace's Plan also proves nothing. The Valley View case is right on point. The plan of reorganization in Valley View, like Grace's Plan, allowed equity security holders to retain their interests. In re Valley View, 260 B.R. at 28. And yet, the court refused to grant unsecured creditors postpetition interest under section 1129(a)(7) because there was no evidence that the debtor was solvent. Id. at 31. The same is true here.

75. Solvency is measured as the value of a company's assets in excess of the value of its liabilities. See In re Trans World Airlines, Inc., 134 F.3d 188, 191 (3d Cir. 1998); see also 11 U.S.C. § 101(32)(A). The Plan, however, does not even purport to determine Grace's liabilities. Indeed, the Committee and the Lenders need look no further than the history of these

cases to recognize that the Plan cannot possibly be considered a proxy of solvency. Grace filed

its first joint plan, which called for equity to retain significant value, in January 2005. At that

time, Grace had not even started the estimation litigation, the very purpose of which was to

determine Grace's liabilities. Clearly, then, the fact that Grace has filed a Plan calling for equity

to receive value cannot possibly be viewed as a proxy of solvency. See also Plan Proponents'

Pre-Trial Brief on Lender Issues at 45-46.

76.     Try as they might, the Committee and the Lenders cannot change the fact that, on

facts as they exist today, Grace's solvency has not been established and will never be established

unless the Plan is rejected. Absent a showing of solvency, the Lenders do not even reach the fair

and equitable analysis of section 1129(b).

### B.     The Equities Weigh Against An Award Of Default Interest

77.     As noted, the Court need not reach the equities to deny an award of default

interest because solvency has not been proven. But even if the Committee and the Lenders can

overcome this threshold barrier, they will be unable to change the fact that an award of default

interest in an amount beyond what is already provided in the Plan is not fair and equitable under

the circumstances of this case. In determining whether a proposed plan is "fair and equitable,"

courts will consider the Plan in light of the particular facts and circumstances of the case. See In

re Ferch, 333 B.R. 781, 785 (Bankr. W.D. Tex. 2005) (citation omitted); see also In re Coram

Healthcare Corp., 315 B.R. 321, 346 (Bankr. D. Del. 2004) ("[T]he specific facts of each case

will determine what rate of [postpetition] interest is 'fair and equitable.'"). Depending on the

balancing of these equitable factors, courts have held that the appropriate rate of postpetition

interest can be tied to the legal rate, the contract rate or the contract default rate.

78.     As a threshold matter, even under a fair and equitable analysis, doubts concerning

Grace's solvency are critical. The facts and circumstances demonstrate that the Plan's rate of

38

postpetition interest was agreed upon at a time when Grace's solvency was hotly disputed -- in

fact, it was the dispute over Grace's solvency that was the driving force behind the parties'

agreement. It would hardly be fair and equitable to allow the Committee and the Lenders to now

turn around and simply ignore the context in which the Plan rate of interest was negotiated. The

Plan rate was put in place under circumstances where solvency was very much in dispute, and

whether that rate is fair and equitable should be evaluated under those same circumstances.

### 1. The fact that the Committee negotiated for, and agreed to, the rate of postpetition interest in the Plan is proof positive that this rate is fair and equitable.

79.     In applying the fair and equitable test, courts recognize that "receiving the

benefits of one's bargain is indisputably fair and equitable treatment under a plan of

reorganization." In re New Midland Plaza Assocs., 247 B.R. 877, 894 (Bankr. S.D. Fla. 2000)

(emphasis added). And the evidence shows that Grace's Plan does just that -- it provides the

Lenders with the benefit of the bargain that they struck with respect to postpetition interest.

80.     The record evidence concerning the negotiations between Grace and the

Committee is set forth in detail above. And that evidence shows that, in 2005, when Grace's

proposed chapter 11 plan called for substantial value to remain with equity and Grace's solvency

was in dispute, the Committee demanded postpetition interest for the Lenders at the rate of

6.09% as a condition for supporting the plan. Grace agreed. And in 2006, when Grace's

proposed plan still called for substantial value to remain with equity and Grace's solvency was

still in dispute, the Committee demanded a revised rate of postpetition interest. Again, Grace

agreed, resulting in the February 2006 Letter Agreement. In the intervening years, Grace

regularly used the agreed rate in its financial statements and monthly operating reports, all of

which were reviewed with the Committee.

81.    For roughly two and a half years, the Committee led Grace to believe that it would continue to support a plan of reorganization that incorporated the February 2006 Letter Agreement.  Indeed, it did not terminate the Agreement it they saw SEC filings and monthly operating reports reflecting the agreed-upon rate, it did not terminate the Agreement during the estimation proceeding, and it did not terminate the Agreement during the Asbestos Term Sheet negotiations.  In fact, even when counsel for the Committee noted that the market price of Grace's debt indicated that some debt holders were expecting default interest, the Lenders and the Committee still did not terminate the February 2006 Letter Agreement.

82.    It was not until after the estimation proceedings were completed and the Asbestos Term Sheet was signed up that the Committee and the Lenders finally made a demand for default interest.  As we now know, this was their strategy all along.  The Committee had made a very calculated decision not to terminate the agreement so as not to jeopardize the Lenders' recovery of their principal.

83.    On this evidentiary record, all of which is undisputed, the Committee and the Lenders cannot credibly argue that they are entitled to contractual default interest under the fair and equitable test of Section 1129(b) of the Bankruptcy Code.  As noted above, "receiving the benefits of one's bargain is indisputably fair and equitable treatment under a plan of reorganization."  In re New Midland Plaza Assocs., 247 B.R. at 894.  And under Grace's Plan, the Committee and the Lenders will receive the exact benefit of their bargain -- that is, the rate of postpetition interest that they demanded and received in the February 2006 Letter Agreement.  Anything more would unjustly reward the Committee and the Lenders for their inequitable, and at times deceptive, conduct during these bankruptcy proceedings.

40

84.     The Lenders' cries of inequity and unfairness ring particularly hollow considering

that, as discussed above, the Lenders have failed to prove the most basic prerequisite to an award

of contractual default interest -- a default under the Credit Agreements. Absent a default, the

Lenders are not impaired for purposes of section 1124 of the Bankruptcy Code. In that case, the

most they could ever hope to receive is postpetition interest at the federal judgment rate, and that

is assuming that they could establish that Grace is a solvent debtor, which they cannot. But the

Plan will pay them postpetition interest at more than the federal judgment rate. In fact, it will

pay them more than the contract rate of interest. Considering that the Lenders cannot even prove

a default so as to claim impaired status under section 1124 of the Bankruptcy Code, the Plan's

treatment of the Lenders seems more than fair and equitable.

### 2.     The fair and equitable analysis must take into account the fact that the Creditors' Committee and the Lenders have provided no real support for Grace during these bankruptcy proceedings.

85.     A true balancing of the equities should consider the fact that, throughout these

bankruptcy proceedings, the Lenders have never provided any real support for Grace and its

reorganization efforts. As set forth in detail in the Debtors' brief in support of its Claims

Objection The Lenders have only created burdens for Grace without providing any

corresponding benefits. See Debtors' Trial Brief In Support Of Objection To the Unsecured

Claims Assert Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5,

1999, at 29-35 [Dkt. 19476].

86.     Recognizing that the absence of any support for Grace would severely undermine

their demand for postpetition interest, the Lenders long ago retained their expert, Mr. Ordway,

who vainly attempted to come up with some way in which the Lenders provided a benefit to

Grace. To that end, Mr. Ordway asserted that "[t]he value created by the Debtors during these

bankruptcy cases was made possible, in some part, by the creditors' support of the Debtors' use

of such cash to fund numerous strategic acquisitions and otherwise reinvest in their business."

Ordway Decl. at 3. But when pressed about this assertion during his deposition, Mr. Ordway

was forced to concede that the "creditors' support" consisted of nothing more than the fact that

the Committee *did not object* to the strategic acquisitions and reinvestments that were approved

by this Court without objection by any of the constituencies. Ordway 8/29/08 Dep. Tr. (Exhibit

49:7-11; 50:9-13. As Mr. Ordway testified, this is the extent of the Committee's support that

supposedly created value for the Debtors during this bankruptcy proceeding:

> Q:    And you regard that as being a favorable contribution to the
> case, that [the creditors] simply failed to get in the way?
>
> MR. PASQUALE: Objection to form.
>
> A:    Yes, I do.

(Id. 51:2-6) Despite Mr. Ordway's opinion, this is hardly the type of support that would justify

an award of postpetition interest at the contract rate of default.

### 3.    *The Court Should Also Consider How The Lenders Fare Under The Plan In Relation To Other Constituencies*

87.    One of the facts that should be considered under fair and equitable test is how the

Plan treats the Lenders in relation to the other constituencies. This fact certainly does not help

the Lenders. As discussed above, had Grace never filed for bankruptcy and defaulted under the

Credit Agreements, the Lenders would have been entitled to a total of roughly $917 million in

principal and interest. Under the Plan, they will receive roughly $826 million. Thus, the Plan

will pay the Lenders roughly 90% of the amount that ever could have received under the Credit

Agreements. The other constituencies are not so fortunate. As noted above, the Asbestos

Personal Injury Claimants, will only receive roughly 25-35% of the total recovery to which they

believe they are entitled. And Equity will sacrifice over $2 billion in value under the Plan.

### 4.    But for Grace's litigation efforts, the Lenders would not even have recovered their principal, much less any postpetition interest.

88.    The Lenders' rejection of the agreed-upon rate of postpetition interest, which is greater than the Lenders' bargained for standard contract rate of interest and is significantly greater than the federal judgment rate of interest, is particularly inequitable in light of the fact that, but for Grace's litigation and reorganization efforts throughout these cases, which resulted in the Asbestos Term Sheet and ultimately the Plan, the Lenders might not be in a position to demand full repayment of their principal, let alone postpetition interest at the contract default rate.

**C.    The Absolute Priority Rule Is inapplicable Because The Allowed Amount Of The Lenders' Claims Will Be Paid In Full.**

89.    With the equities squarely against them, the Lenders' demand for postpetition interest ultimately reduces to the legal argument that the absolute priority rule requires that they receive contractual default interest before equity can retain any value under the Plan. This argument is wrong as a matter of law. The absolute priority rule has nothing to do with the payment of postpetition interest. Instead, that rule simply requires that unsecured creditors must receive the full amount of their "allowed claims" before equity can retain value. See 11 U.S.C. § 1129(b)(2) (prohibiting confirmation of a plan over the dissent of an impaired class of unsecured claims unless "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such a claim...") (emphasis added). This requirement is plainly satisfied by Debtors' Plan.

90.    It is well settled that an "allowed claim" does not include postpetition interest. See In re Coram Healthcare Corp., 315 B.R. 321, 344 (Bankr. D. Del. 2004) ("an allowed claim does not include interest unmatured as of the petition date") (emphasis added). Tellingly, the

43

Lenders have not cited any cases where the allowed claim was paid in full and the Court held

that the absolute priority rule was violated because equity retained value. In all of the cases cited

by the Lenders in support of their argument, the allowed claim was not paid in full. See, e.g., In

re Armstrong World Industries, Inc., 432 F.3d 507 (3d Cir. 2005) (the absolute priority rule was

violated because equity retained value while the unsecured creditors were to be paid only 59.5%

of their allowed claim). In sharp contrast with the creditors in Armstrong, the Lenders in this

case will be paid 100% of the allowed amount of their claims. Therefore, in contrast with

Armstrong, the absolute priority rule is not implicated in this case.[19]

91.    While the express statutory language of section 1129(b) says nothing about any

type of postpetition interest, some courts have expressed the view that, even where the express

statutory requirements are met, general equitable considerations in a "cram down" situation may

justify an award of postpetition interest. But the legislative history of section 1129(b) casts

serious doubt upon this view and, instead, strongly suggests that the payment of an allowed

claim without postpetition interest is all that section 1129(b) contemplates. Indeed, in House

Report No. 95-595 of the Bankruptcy Reform Act of 1978, Congress explained that under §

1129(b), "[n]o class may be paid more than in full" an as an illustrative example explained that

where an allowed claim was $1000 and the Plan paid it five years from now, whether the plan

was confirmable depended on the discount rate. If the court found "the discount rate to be less

than the interest rate proposed under the plan, then the present value of the note would exceed

---

[19]   In re Resorts, 145 B.R. 412 (D.N.J. 1990), which has been cited by the Lenders, is readily distinguishable on
similar grounds. In that case, the plan of reorganization would have allowed equity to retain value even though
none of the three bondholder classes would receive the full amount of their allowed claims. Id. at 442. Here, in
contrast, it is undisputed that the Committee and the Lenders will receive the full amount of their allowed
claims. Neither Armstrong, In re Resorts nor any other case that Debtors have found has ever held that the
absolute priority rule prohibits equity from participating in a plan or reorganization where, as here, all senior
classes will receive the full amount of their allowed claims.

44

$1000 and the plan would fail confirmation. HR. Rep No. 595, 95th Cong., 1st Sess 414, 415 (1977).

92. Notwithstanding the express statutory language and legislative history of section 1129(b), in the past, the Committee and the Lenders have also argued that <u>Dow Corning</u> requires Debtors to postpetition interest at the contract default rate as a matter of law. <u>Dow Corning</u> recognized that in applying the absolute priority rule to a solvent debtor, "there is a presumption that the default interest should be allowed (in solvent debtor cases)...<u>unless the higher rate would produce an inequitable result</u>." <u>In re Dow Corning</u>, 456 F.3d 668, 680 (6th Cir. 2006) (emphasis added). The court's analysis is deeply flawed for many reasons, primarily because the cases on which <u>Dow Corning</u> relied involved prepetition defaults and oversecured creditors whose contract rights were expressly preserved under section 506(b) of the Code. The same standards should not applied to unsecured creditors whose contract rights are expressly extinguished under section 502(b). Pre-Trial Lenders' Brief at 54-56. But in this case, even applying the law as formulated by the Court in <u>Dow Corning</u>, the Lenders would not be entitled to default interest because Grace has not been proven to be solvent, and under the facts of this case, and award of default interest would produce an inequitable result. Thus, postpetition interest is not required under 1129(b).

## CONCLUSION

93.     For the foregoing reasons, Grace respectfully requests that the Plan should be

confirmed over the objection of the Creditors' Committee and the Lenders.

Dated: November 2, 2009          Respectfully submitted,
Wilmington, Delaware

                                 KIRKLAND & ELLIS LLP
                                 David M. Bernick, P.C.
                                 Theodore L. Freedman
                                 Eric Leon
                                 Justin S. Brooks
                                 601 Lexington Avenue
                                 New York, NY  10022
                                 Telephone: (212) 446-4800
                                 Facsimile: (212) 446-4900

                                 and

                                 THE LAW OFFICES OF JANET S. BAER, P.C.
                                 Janet S. Baer, P.C.
                                 70 W. Madison Street
                                 Suite 2100
                                 Chicago, IL 60602
                                 Telephone: (312) 641-2162

                                 and

                                 PACHULSKI, STANG, ZIEHL & JONES LLP
                                 James E. O'Neill (Bar No. 4042)
                                 Timothy Cairns (Bar No. 4228)
                                 919 North Market Street, 16th Floor
                                 P.O. Box 8705
                                 Wilmington, Delaware 19899-8705
                                 (Courier 19801)
                                 Telephone: (302) 652-4100
                                 Facsimile: (302) 652-4400

                                 *Counsel for the Debtors and Debtors in Possession*

                                        46