## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | (Jointly Administered) |

## LIBBY CLAIMANTS' POST-TRIAL REPLY BRIEF IN SUPPORT OF OPPOSITION TO CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION

## **Table of Contents**

I.    Libby Claimants' Reply to Post-Trial Arguments of Plan
Proponents and Certain Plan Objectors...................................................1

    A.  The Extraordinary Claims Provisions of the TDP Do Not Value
Libby Claims Consistent with Similar Claims in the Tort System......................2

    B.  Depriving Claimants With Non-Products Exposures of Superior
Insurance Rights is Discriminatory.....................................................4

    C.  The Plan Proponents Have Not Met Their Burden to Satisfy the
Best Interest of Creditors Test........................................................6

    D.  The Libby Claimants Have Not Waived Their Right to Trial By Jury....................9

    E.  Relevance of the Libby Claimants' Evidence...........................................12

    F.  Progression of Disease in Libby was Not the Subject of Expert
Medical Opinion at Trial..............................................................13

    G.  The Libby Claimants' Objection to the Individual Review
Process is Not New....................................................................14

    H.  BNSF's Assertion that Claims Asserted Against It Should be Included
in the Proposed Channeling Injunction Lacks Merit....................................15

    I.  Arrowood is Not Entitled to Section 524(g) Protection................................16

    J.  Unequal Payment to Asbestos Property Damage Claimants is Discriminatory........20

    K.  Limited Joinder in Post-Trial Brief of Garlock Sealing Technologies, LLC..........20

II.    Conclusion............................................................................21

Claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, submit this reply brief in response to the post-trial briefs filed by the Plan Proponents and certain objectors to the Plan, and in support of their continued opposition to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders dated as of February 27, 2009 (the "Plan") [D.I. 20872].[2]

## I.    Libby Claimants' Reply to Post-Trial Arguments of Plan Proponents and Certain Plan Objectors

The Plan Proponents' Phase II Post-Trial Brief in Response to Confirmation Objections of the Libby Claimants [Docket No. 23659] (the "PP's Post-Trial Libby Brief") largely repeats the arguments in their trial brief, including legal arguments. This is contrary to the Court's instructions. The Libby Claimants have countered most of these arguments before, and will not be repetitive here. The Libby Claimants have stated their positions in their various objections and trial briefs (see footnote 2), yet a few of the Plan Proponents' merit an additional response. Additionally, some objections included in certain Plan objectors' post-trial briefs warrant a brief reply.

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 21365], as it may be amended and restated from time to time.

[2] For the bases of the Libby Claimants' opposition to confirmation in addition to those addressed in this reply brief, please see: Libby Claimants' Post-Trial Reply Brief In Support of Opposition to Confirmation of First Amended Joint Plan of Reorganization dated November 2, 2009 [Docket No. 23649]; Supplemental Trial Brief of Libby Claimants In Opposition to Confirmation of First Amended Joint Plan of Reorganization, Addressing Best Interests of Creditors Test Under 11 U.S.C. 1129(a)(7) dated August 26, 2009 [Docket No. 22965]; Trial Brief of Libby Claimants In Opposition to Confirmation of First Amended Joint Plan of Reorganization dated July 13, 2009 [Docket No. 22439]; Supplement to Libby Claimants' Objection to the First Amended Joint Plan of Reorganization dated July 10, 2009 [Docket No. 22385]; and Libby Claimants' Objection to the First Amended Joint Plan of Reorganization dated May 20, 2009 [Docket No. 21811].

As an initial matter, there is a problem of credibility in the Plan Proponents' briefs. Many of the Plan Proponents' citations to the record do not support contentions made in their briefs. For example, several appear at page 19 of the PP's Post-Trial Libby Brief. The two transcript citations at § 3.16 do not support the contention they are cited for. In addition, at § 3.17, the PP's Post-Trial Libby Brief states: "It makes no medical sense (indeed there is no current medical theory to support a contention) that the same disease would progress differently inside Libby as opposed to outside Libby. The Libby Claimants' experts readily admit this." No such admission appears in the record. The trial transcript citations supplied by the Plan Proponents at § 3.17 only show that the particular matter has not been specifically studied, not that there is no medical explanation for it. Libby asbestos is winchite asbestos, a rare form of amphibole asbestos. Winchite has been little studied. However, Dr. Frank, the Libby Claimants' expert, as a careful scientist could not testify that winchite asbestos is the specific reason for the different presentation of asbestos disease in Libby.

### A. The Extraordinary Claims Provisions of the TDP Do Not Value Libby Claims Consistent With Similar Claims in the Tort System.

The Plan Proponents acknowledge that in order to satisfy the requirements of the Bankruptcy Code, a plan of reorganization must achieve equality of distribution by providing "similar treatment to similarly situated claims." PP's Post-Trial Libby Brief, p. 3. In recognition of this requirement, the Plan's proposed TDP states it is designed to pay claimants value consistent with "historical values for substantially similar claims in the tort system." PP Exhibit 277.04, § 2.1. The Plan Proponents do not dispute the fact that claimants in Libby historically achieved settlements and verdicts substantially exceeding the national averages from which the TDP's scheduled values were derived. The Plan Proponents contend the extraordinary claim provisions in the TDP properly account for the disparity in values between Libby claims and

other claims.  PP's Post-Trial Libby Brief, p. 12.  In support of their contention, the Plan

Proponents cite the testimony of Dr. Mark Peterson.  Dr. Peterson testified that in his opinion,

the eight times multiplier in Section 5.4 of the TDP would "apply a level of compensation that is

quite close to what people got historically" in Libby.  9/09/09 Tr., p. 254 (Peterson).  Dr.

Peterson's opinion is flawed, however, because he failed to consider the nature of the non-

malignant disease suffered by the claimants who historically settled for high values in Libby.

9/08/09 Tr., p. 263 (Peterson).

Dr. Alan Whitehouse provided medical testimony concerning many claimants from

Libby who settled prior to Grace's bankruptcy.  At least 18 of 19 settled claimants failed to meet

the Plan's expedited review criteria for severe disabling pleural disease (Level IV-B of the TDP),

and 14 of 19 suffered from mild or moderate pleural disease.  LC Exhibit 16AR.  Under the

TDP, the scheduled values for mild or moderate pleural disease claims could not exceed $7,500.

PP Exhibit 277.04, §5.3(a)(3).  The claimants Dr. Whitehouse identified with mild or moderate

pleural disease did not settle for eight times the scheduled value of their disease.  Rather, on

average, they settled for roughly 60 times the scheduled value for their disease.  LC Exhibit

16AR; LC Exhibit 270.  The Plan Proponents' contention that "[t]he current scheduled value

($50,000) for severe pleural disease, coupled with the extraordinary claims multiplier for

predominant Grace exposure (eight times), thus allows for a Libby claimant, similarly exposed,

to achieve a result that approximates what could have been achieved by a similarly situated pre-

petition Libby claimant" is based on the erroneous assumption that the prepetition claimants

from Libby suffered from severe pleural disease as defined by the Plan.  PP's Post-Trial Libby

Brief, p. 26.  Because most did not, the eight times multiplier in the TDP fails to value the Libby

claims consistent with prepetition values.  By under valuing the Libby claims, the Plan violates

the Bankruptcy Code's policy of equality of distribution and discriminates against the Libby

Claimants.  See In re Combustion Engineering, 391 F.3d 190, 239 (3d Cir. 2004), (quoting

Begier v. IRS, 496 U.S. 53, 58 (1990)("Equality of distribution among creditors is a central

policy of the Bankruptcy Code.")).

### B. Depriving Claimants With Non-Products Exposures of Superior Insurance Rights Is Discriminatory.

The Plan Proponents acknowledge the important distinction between products and non-

products coverage in Grace's liability insurance policies.  PP's Post-Trial Libby Brief, pp. 28-29.

While the policies contained aggregate limits applicable to products coverage, no such limits

applied to non-products coverage.  While Grace exhausted the aggregate limits of its primary

layer products coverage, "each new 'non-products' claim potentially gives rise to coverage up to

the full amount of the per-claim or per-occurrence limit . . . ."  Id. at p. 29.

The overwhelming majority of asbestos injury claims against Grace are products claims,

subject to the products limitations in Grace's insurance policies.  9/11/09 Tr., p. 345 (Posner).

Although some excess liability insurance remains available for products claims, the excess

insurance is limited and covers only a small fraction of the claims against Grace.  Ex. PP 277.12;

9/15/09 Tr., p. 207 (Peterson).  Due to the lack of aggregate limits, non-products claims are

covered at 100% up to the per occurrence limits in the policies which ranged from $500,000 to

$1 million.  Lumping the insurance rights of all claimants together therefore disadvantages, and

discriminates against, claimants with non-products exposures.

The Plan Proponents attempt to justify depriving the Libby Claimants of their valuable

insurance coverage by arguing they have "no vested rights" to the coverage.  PP's Post-Trial

Libby Brief, p. 37.  To the contrary, the Libby Claimants' third-party rights to the insurance

covering their claims vested at the time of their injuries.  McLane v. Farmers Ins. Exch., 432

P.2d 98, 100 (Mont. 1967). The Plan Proponents cannot simply take away their rights for the benefit of other, non-covered claimants, without violating the Bankruptcy Code's mandate to treat creditors fairly. In re AOV Industries, Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986).

The Plan Proponents do not dispute the fact that the Libby Claimants suffered non-products exposures. PP's Post-Trial Libby Brief, pp. 36-37. Grace's former director of risk management admitted as much at trial, and the Plan Proponents' Post-Trial Libby Brief describes a handful of other claimants with similar exposures as non-products exposures. 9/11/09 Tr., pp. 340-43 (Posner); PP's Post-Trial Libby Brief, pp. 31-33. The Plan Proponents' attempt to justify taking away the rights of all non-products claimants because CNA disputes the non-products coverage it sold to Grace. PP's Post-Trial Libby Brief, p. 30. The Plan Proponents also argue the Libby Claimants "offered no proof" that their claims would be covered. Id. at p. 37. The Plan Proponents' own witnesses, Jay Hughes and Jeff Posner, discussed the manner in which the Libby Claimants were exposed to asbestos. 9/09/09 Tr., pp. 111, 145-46 (Hughes); 9/11/09 Tr., pp. 340-43 (Posner). The Libby Claimants also offered the testimony of Dr. Terry Spear, who would have described the nature of the exposures in Libby in great detail. See Offer of Proof Regarding Testimony of Terry Spear, PhD [Docket No. 23241]. The primary liability policies CNA sold to Grace, like Grace's other primary policies, were admitted in evidence. CNA Exhibits 19A, 19B, and 19C; LC Exhibits 283, 284. The question of whether the Libby claims are covered by the policies is a question of law which the Court can and should address in order to rule on the Libby Claimants' objection to the Plan. The Plan Proponents offer no basis whatsoever to suggest Grace's liability policies do not serve their intended purpose of covering claims for damages on account of bodily injury.

Finally, the Plan Proponents continue to justify depriving the Libby Claimants of their more valuable non-products insurance coverage because the Plan similarly deprives a handful of claimants outside Libby of more valuable non-products insurance coverage.  In their brief, the Plan Proponents identify four such claimants.  PP's Post Trial Brief, pp. 32-33.  At trial, the Plan Proponents identified less than 50 others with allegations of non-products exposures.  PP Exhibits 506-2A, 506-3A.  Of course, it is undisputed that the vast majority of claims in this bankruptcy, totaling more than 100,000 in number, are based on products exposures.  9/11/09 Tr., p. 345 (Posner).  The Plan discriminates against all non-products claimants, including the Libby Claimants, by distributing their valuable insurance coverage across the overwhelming majority of claimants who do not share in the coverage.

### C. The Plan Proponents Have Not Met Their Burden to Satisfy the Best Interest of Creditors Test.

The Plan Proponents acknowledge their burden to satisfy the best interests of creditors test found at Section 1129(a)(7) of the Bankruptcy Code, by proving each claimant not accepting the Plan will achieve a greater recovery under the Plan than under a Chapter 7 liquidation.  Plan Proponents' Main Post-Trial Brief in Support of Confirmation of Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 23662] (the "PP's Main Post-Trial Brief"), p. 19.  Based on the evidence admitted at trial, the Plan Proponents failed to meet their burden.

It is not surprising that the Plan Proponents struggle to meet the best interest test given that the Plan drives down the Chapter 11 recovery percentage to personal injury claimants by paying unsecured creditors and property damage claimants 100% of the value of their claims, and preserving nearly $1 billion for Grace's shareholders.  To suggest that a plan paying only 25% to 35% to personal injury claimants satisfies the best interest test, the Plan Proponents make

several assumptions which are not supported by any competent evidence.  First, the Plan

Proponents assume a Chapter 7 trustee would make no recovery whatsoever from Sealed Air or

Fresenius in fraudulent transfer litigation.  PP's Main Post-Trial Brief, pp. 28-29.  In their

original best interest analysis, the Plan Proponents recognized that a Chapter 7 trustee would

pursue the fraudulent transfer litigation, and that the outcome of the litigation "cannot be

known."  PP Exhibit 277.08.

Next, the Plan Proponents assume a Chapter 7 trustee would be faced with non-ZAI

property damage liability of $1 billion.  PP's Main Post-Trial Brief, p. 32.  The assumption is

based on the opinion of Pamela Zilly, originally excluded by the Court, that a tentative

agreement between the asbestos personal injury and property damage constituencies, which

never went into effect, would somehow apply in a Chapter 7 liquidation.  PP's Main Post-Trial

Brief, pp. 32-33.  Even making the remarkable assumption that such a settlement agreement

would have application in Chapter 7, Ms. Zilly failed to substantiate whether the agreement

included ZAI claims, and she ignored the profound impact of this Court's ruling in the ZAI

Science Trial to overall property damage liability.  10/13/09 Tr., pp. 109-10 (Zilly).  After

assuming non-ZAI property damage liability of $1 billion, the Plan Proponents remarkably

contend ZAI property damaged liabilities would contribute an additional $3 billion to $5 billion

in liability under Chapter 7.  PP's Main Post-Trial Brief, pp. 34-35.  The only admissible,

credible evidence introduced at trial concerning the value of Grace's property damage liability

was the actual settlements Grace and the property damage claimants negotiated to resolve all

property damage liability for approximately $200 million.  10/13/09 Tr., p. 104 (Zilly).

Finally, the Plan Proponents not only assume the personal injury liabilities in a Chapter 7

liquidation would match the figures adopted in the highest among a wide-range of personal

injury liability estimates, but also that the Chapter 7 trustee would somehow pay future demands

which would not even exist at the date of liquidation.  PP's Main Post-Trial Brief, pp. 34-35.

The Plan Proponents ignore alternative estimates projecting the personal injury liability to be far

less, and further ignore the reality that a Chapter 7 liquidation could not possibly compensate

future claimants who would have no ability to file a proof of claim for lack of any existing

disease.  PP Exhibit 511-6.  The Plan Proponents contend that future demands should be

included when determining whether the best interests test has been satisfied.  PP's Main Post-

Trial Brief, pp. 22-25.  In support of this contention, the Plan Proponents cite to In re Eagle-

Picher Indus., Inc., 203 B.R. 256, 274-76 (Bankr. S.D. Ohio 1996).  Despite the Plan Proponents'

suggestion otherwise, the court's determination in Eagle-Picher that "future, unknown Asbestos

Personal Injury Claims are 'claims' within the meaning of Section 101(5)" was not a

determination on the merits but reflected law of the case based on an earlier agreed order from

which no appeal was taken.  Id. at 266.  No such order exists in this case.

       In a Chapter 7 liquidation of Grace, distributions would be made solely to creditors who

filed proofs of claim, in other words, current creditors.  See 11 U.S.C. § 726(a).  Future

claimants—those who have not yet been diagnosed with asbestos disease—have no basis to file

proofs of claim.  Section 524(g) is the sole provision of the Bankruptcy Code providing for

future claimants; and by its terms, Section 524(g) applies only in Chapter 11.  A Chapter 7

trustee--statutorily charged with "clos[ing] the estate" "expeditiously," 11 U.S.C. § 704(a)(1)--

would liquidate the Grace business and distribute the proceeds to existing creditors.

Accordingly, the Plan Proponents' inclusion of future claimants in their best interest analysis is

improper, and they have provided no persuasive authority to suggest otherwise.

Attempting to mask the weakness of their evidence, the Plan Proponents criticize the Libby Claimants for offering "no witness, fact or expert, to support their [best interest] objection." PP's Main Post-Trial Brief, p. 26. The Plan Proponents, and not the Libby Claimants, have the burden to prove the best interest test is met. Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491, 500 (D. N.J. 2005); In re Global Ocean Carriers Ltd., 251 B.R. 31, 46 (Bankr. D. Del. 2000). Regardless of who called witnesses on the issue, the evidence does not establish that the Libby Claimants would receive more under the Plan than under a Chapter 7 liquidation.

### D.   The Libby Claimants Have Not Waived Their Right to Trial by Jury.

There is not merit to the Plan Proponents' response to the Libby Claimants' argument that the Plan is unconfirmable because it denies them their right to trial by jury. Trial Brief of Libby Claimants, pp. 82-86. Without citing a single case, the Plan Proponents argue that the Libby Claimants, despite having objected to and voted against the Plan, are deemed to have waived their constitutional and statutory right to a trial by jury, because the class in which the Plan Proponents have placed the Libby Claimants voted in favor of the Plan. PP's Post-Trial Libby Brief, pp. 43-46. To suggest that the Plan Proponents or any other party has the power to waive the Libby Claimants' right to a jury trial is an unconstitutional abridgment of the Seventh Amendment and contrary to 28 U.S.C. § 1411(a).

The right to a jury trial in a civil case is a fundamental right expressly protected by the Seventh Amendment to the United States Constitution. Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1937); Bouriez v. Carnegie Mellon Univ., 359 F.3d 292, 294 (3d Cir. 2004). Because the "right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." Aetna, 301 U.S. at 393; Collins v. Gov't of Virgin Islands, 366 F.2d 279, 284

(3d Cir. 1966). As with other constitutional rights, however, the Supreme Court has long recognized that a private litigant may waive the right to a jury trial in a civil case. Commodity Futures Trade Comm'n v. Schor, 478 U.S. 833, 848-849 (1986); In re City of Phila. Litig., 158 F.3d 723, 726 (3d Cir. 1998). To be valid, a jury waiver must be made knowingly and voluntarily. Brookhart v. Janis, 384 U.S. 1, 4-5 (1966); Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 222-23 (3d Cir. 2007) (citations omitted). A waiver of the right to a jury trial "is not to be lightly inferred, and waivers should be scrutinized with the utmost care." Haynes v. W.C. Caye & Co., Inc., 52 F.3d 928, 930 (11th Cir. 1995).

There has been no knowing or voluntary waiver of the right to a jury trial by the Libby Claimants. The Libby Claimants have objected to the Plan and have voted against its acceptance. Indeed, there arguably has been no waiver by any Asbestos PI Claimant, even those that have voted in favor of the Plan. Nowhere in the Disclosure Statement did the Plan Proponents disclose that voting in favor of the Plan would waive the right to a jury trial. As the Plan Proponents acknowledge, that infringement is buried in the TDP. PP Post-Trial Brief, p. 43, citing PP Exhibit 277.4 §§ 5.11 and 7.7. A constitutional guarantee so fundamental as the right to jury trial cannot be waived unknowingly by mere insertion of a provision in the exhibits to the Plan. Nor have the Plan Proponents provided any authority for the proposition that constitutional rights—which by definition protect *individuals*—may be waived by majority vote of a class under a Chapter 11 plan. Accordingly, the Plan Proponents' assertion that the Libby Claimants have waived their constitutional right to trial by jury lacks merit.

As an alternative to their far-fetched waiver argument, the Plan Proponents contend that Section 524(g) by its terms permits the impairment of the Libby Claimants' right to a trial by jury. This contention is erroneous in two respects. First, Section 524(g) says nothing about jury

trial rights. Second, 28 U.S.C. § 1411(a) expressly provides that "title 11 do[es] not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim." In sum, Section 524(g) does not purport to take away jury trial rights, and if it did, it would be trumped by 28 U.S.C. § 1411(a).

While the words of the statutes fully dispose of the Plan Proponents' argument, it is worth noting that there is simply no basis for construing Section 524(g) to permit the Plan Proponents to take away jury trial rights from personal injury claimants. The Plan Proponents contend it is the only means for treating present claims and future demands "in substantially the same manner." PP Post-Trial Libby Brief, p. 45, citing § 524(g)(2)(B)(ii)(V). This is not true. Permitting all present and future claimants to have a jury trial would treat present claims and future demands in exactly the same manner. Indeed, since the substantive standard for valuation of claims under the TDP is, purportedly, tort system value, what better way to assure the accuracy of the valuation than to have it actually determined through the tort system? Since the TDP supplies a quicker and less expensive means to fix the value of a claim, it can be expected that jury trials would be elected solely by individuals in the position of the Libby Claimants, whose claims the TDP drastically under-values in comparison to tort system value. Thus, providing an option for all claimants to elect a jury trial would be the best means of assuring that all claims will be liquidated at their true tort system value, thus fulfilling the statutory goal to treat present and future claims "in substantially the same manner." Certainly the Plan Proponents have not demonstrated that violating the Seventh Amendment and 28 U.S.C. § 1411(a) is the only means for "satisfying" Section 524(g).

### E. **Relevance of the Libby Claimants' Evidence.**

The Plan Proponents assert that the Libby Claimants' evidence is irrelevant.  PP's Post-

Trial Libby Brief, p. 1.  They state that it is irrelevant "what the probability of death is in Libby."

Id.  Regarding probability of death, the Plan Proponents' Daubert/relevance hearing materials[3]

cite to the trial transcript at 9/10/09, p.170, where the Court sustained a relevance objection to

Libby Claimants' proof on probability of death.  The Court ruled the proof irrelevant to the "not

substantially similar" classification issue and the discrimination issue.  "It has nothing to do with

this case."  9/10/09 Tr., p. 166:20.  The Plan Proponents argue that discrimination under Section

1123(a)(4) of the Bankruptcy Code is procedural not substantive.  The Plan Proponents contend

that as long as the payout percentage is the same for everyone, and the same procedures for

liquidating claims apply to everyone, then the requirements of 11 USC 1123(a)(4) are met, since

everyone has the opportunity for Individual Review.  PP's Post-Trial Libby Brief, p. 4.

However, the Section 1123(a)(4) requirement of "equal treatment" is separate and apart from the

"substantially similar" standard of Section 1122, such that a violation of Section 1123(a)(4)

prohibits confirmation even when the requirements of Section 1122(a) have been satisfied.  E.g.,

In re Jersey City Medical Center, 817 F.2d 1055, 1061 (3d Cir. 1987); In re AOV Indus., Inc.,

792 F.2d 1140, 1151 (D.C. Cir. 1986); Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d

1352, 1362-63 (9th Cir. 1986); In re Richard Buick, Inc., 126 B.R. 840, 854 (Bankr. E.D. Pa.

1991).  Assessing equality of treatment under a plan requires analysis of not only what the

creditor will receive but also what the creditor must give up.  AOV Indus., 792 F.2d at 1152

(D.C. Cir. 1986).  Requiring similarly-situated creditors to give up unequal consideration for the

same treatment under a plan necessarily results in unfair treatment.  Id.  The Plan unfairly

compromises the more valuable Libby Claims in violation of Section 1123(a)(4).  See Libby

---

[3]Hearing 10/14/09, demonstrative exhibit PP-516-1, "Probability of Death - Out," citing note 13 at page 516-3.

{393.001-W0004282.}

Claimants' Post-Trial Brief [Docket No. 23649], pp.10-11; Libby Claimants' Trial Brief [Docket No. 22439], p.50; and Libby Claimants' Opposition to Plan Proponents' Motion in Limine to Exclude Libby Experts' Testimony [Docket No. 23072], pp.2-3.

**F.  Progression of Disease in Libby was Not the Subject of Expert Medical Opinion at Trial.**

The Plan Proponents' post-trial Libby brief discusses the Whitehouse (2004) progression study.  PP's Post-Trial Libby Brief, p. 18.  Why the Plan Proponents do so is a bit confusing, since the Whitehouse (2004) publication, LC Exhibit 1 was never offered into evidence.  Nor were any expert opinions based upon the study offered into evidence.  Nor do the Plan Proponents point to any.

On the progression issue, the Plan Proponents' Daubert/relevance hearing materials,[4] cite to the trial transcript 9/10/09, p.170, where the Court ruled that "evidence of the greater disease" is taken care of in the TDPs.  Progression of disease was ruled irrelevant, along with the probability of death.  Accordingly, the Libby Claimants offered no medical opinions on the issue of progression of disease in Libby.

Interestingly, the Plan Proponents' brief wanders into the same argument that was rejected by the Ninth Circuit in U.S. v. Grace et al., 504 F.3d 745, 766 (9th Cir. 2007).  The Plan Proponents' post-trial Libby brief states:  "Dr. Whitehouse's theories of progression are mere hypotheses" and "these hypotheses have not been tested and therefore are not proven."  PP's Post-Trial Libby Brief, p. 18.  This misuse of epidemiology terms is what caused the reversal in U.S. v. Grace in the Ninth Circuit.  There is also another credibility issue at page 18, § 3.15, as Plan Proponents' trial transcript citations do not say what they are said to say.

---

[4] Hearing 10/14/09, demonstrative Exh. PP-516-1 "Progression-Out," citing note 21 at page 516-3.

{393.001-W0004282.}

Finally, even though the Whitehouse progression study was not a trial issue, the Plan

Proponents state: "Dr. Weill's analysis demonstrated that Dr. Whitehouse's claims of . . .[5]

progression were overstated and not supported by Dr. Whitehouse's own patient population data.

9/11/09 Tr., p. 192 (Weill)."  PP's Post-Trial Libby Brief, pp. 18-19.  (A check of the transcript

cite reveals that Dr. Weill did not make such a statement.)  Dr. Weill's analysis was not the same

as Dr. Whitehouse's analysis, and cannot be compared to it.  Dr. Whitehouse followed 123

patients in his progression study.  Dr. Weill could only follow 87 of the 123, because 36 had

died.  Dr. Weill did not account for the dead in his analysis.  Accordingly, Dr. Weill's study was

only on the relatively healthy survivors.  Dr. Weill's "all patients" study had the same problem,

as he did not account for the 110 dead in the "all patients" group.  9/11/09 Tr., pp. 67-70

(Whitehouse).  None of this matters to the result in this case, as progression of disease in Libby

was not the subject of expert medical opinions at trial by reason of this Court's ruling that

progression is irrelevant.

### G.  The Libby Claimants' Objection to the Individual Review Process is Not New.

The Plan Proponents' post-trial Libby brief erroneously states: "3.23  For the first time, at

the Confirmation Hearing the Libby Claimants objected to the Individual Review process."  PP's

Post-Trial Libby Brief, p. 20.  Not so.  The Libby Claimants' Objections to First Amended Joint

Plan of Reorganization dated May 20, 2009 [Docket No. 21811], p.36, states:  "The Individual

Review process is wholly discretionary.  It cannot justify discrimination in the medical criteria."

Next the Plan Proponents present the Court with yet another misrepresentation of the trial

transcript.  They state: "Counsel for the Libby Claimants claimed that the Individual Review

process discriminates against Libby Claimants, 9/9/09 Tr. at 311-12."  PP's Post-Trial Libby

---

[5]The Plan Proponents speak of "rapid" progression, not understanding that disease progression and rapid progression are two different topics.

Brief, pp. 20-21. Not so. The transcript reads: "These discriminations against severe - people with severe pleural disease, not only Libby, but elsewhere, are not cured by an Individual Review process, which is entirely discretionary, has no standards, and is entirely private." It is not the Individual Review process which discriminates. It is the Individual Review process which does not cure the discrimination.

### H. BNSF's Assertion that Claims Asserted Against It Should be Included in the Proposed Channeling Injunction Lacks Merit.

In its post-trial brief, BNSF Railway Company ("BNSF") asserts that the Plan cannot be confirmed because it does not extend the proposed Section 524(g) channeling injunction to claims against BNSF. Post-Trial Brief of BNSF Railway Company Regarding Confirmation of the Plan [Docket No. 23648], p. 7. Although not stated in BNSF's post-trial brief, presumably the claims that BNSF seeks to have channeled are those asserted by the Libby Claimants against BNSF for its own tortious conduct (the "BNSF Claims"). In addition to being outside this Court's jurisdiction to permanently enjoin the Libby Claimants from pursuing the BNSF Claims,[6] BNSF has a mistaken understanding of the bounds of Section 524(g). BNSF is ineligible for a Section 524(g) injunction because the BNSF Claims do not fit within any of the four statutory causes of liability from which a third party may be shielded under Section 524(g):

> (I)    the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II)    the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

---

[6] In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004); In re Federal-Mogul Global, Inc., 300 F.3d 368 (3d Cir. 2002), cert. denied sub nom. Daimler Chrysler Corp. v. Official Comm. of Asbestos Claimants, 537 U.S. 1148 (2003); Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984).

{393.001-W0004282.}

(III)    the third party's provision of insurance to the debtor or a related party; or

(IV)    the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to--

(aa)    involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb)    acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV).  In conjunction with a Chapter 11 plan governed by Section 524(g), courts may not enter injunctions that exceed the limits imposed by Section 524(g).  In re Combustion Engineering, 391 F.3d 190, 235-38 (3d Cir. 2004).  Accordingly, the BNSF Claims cannot be channeled as BNSF suggests.

In any event, BNSF's request to extend the Channeling Injunction to include the BNSF Claims rests on two false premises: one is that every claim having anything to do with Grace's asbestos is "derivative" and somehow qualifies for an injunction; and the second is that BNSF (or any other party, for that matter) can have a right to a channeling injunction, when in fact it is up to the Plan Proponents to decide (within the limits of what the Court's jurisdiction and the statute permit) the scope and beneficiaries of any such injunction.

## I.  Arrowood is Not Entitled to Section 524(g) Protection.

In the post-trial brief of Arrowood Indemnity Company f/k/a Royal Indemnity Company ("Arrowood"), Arrowood asserts that it is entitled to the protections of the proposed Section 524(g) injunction to be entered in conjunction with the Plan.  Arrowood's Phase II Post-Trial Brief in Support of the Relief to be Provided to It Under the Plan of Reorganization [Docket No.

23658]. But Arrowood's asserted right to such protection runs afoul of Section 524(g) in three

respects:

- As noted above, Section 524(g) permits injunctions to protect claims arising out of the four specific relationships with the debtor set forth in Section 524(g)(4)(A)(ii). Although, as an insurer, Royal Indemnity Company itself may be protected under Section 524(g), the Arrowood Settlement (as defined in the Arrowood post-trial brief) contemplates extension of the injunction far beyond permissible parties under Section 524(g).

- Section 524(g) permits protection only of a party who is identifiable by the terms of the injunction. The Arrowood Settlement contemplates extension of the injunction to persons who are not identified or identifiable.

- Section 524(g) permits issuance of an injunction only where fair and equitable in light of the benefits provided by the beneficiary of the injunction. Under this standard, Arrowood may not be protected in relation to the primary policies it issued to Grace because it is providing no consideration for such release.

The Arrowood Settlement creates a broad definition of "Royal Parties":

"Royal Parties" means (1) Arrowood Indemnity Company, individually, and as corporate successor-in-interest to Royal Indemnity Company, and its parent company, Arrowpoint Capital Corp., and Royal Indemnity Company; (2) each other Person over which, as of the Execution Date, the Persons listed in (1) above have the legal right, by way of contract, express corporate authority, or direct or indirect majority ownership, to act on behalf of or to bind, including each of the respective directors, members, officers, shareholders, agents, and employees of the Persons listed above, solely in their capacities as such.

Arrowood Settlement § I.QQ (on page 10). The Libby Claimants acknowledge that Royal

Indemnity Company is a person who supplied insurance to a related party of Grace, and that

Arrowood, too, as a corporate successor to Royal Indemnity Company, would qualify as a person

who supplied insurance to a related party of Grace. But all the rest of the persons within the

definition of Royal Parties—including Arrowood's parent company—do not qualify.

Furthermore, the language of Section 524(g)(4)(A)(ii) requires that each beneficiary of a Section

524(g) injunction be "identifiable from the terms of such injunction (by name or as part of an

identifiable group)." While the companies in part (1) of the definition of Royal Parties are

identifiable, the persons in part (2) of the definition are not.

Even though only (at most) two of the potentially hundreds of persons and entities swept

up by the definition of Royal Parties are permissible beneficiaries of a Section 524(g) injunction,

Section V.A of the Arrowood Settlement requires that

> if any Person asserts against the Royal Parties an Asbestos PI Claim that is subject
> to the Asbestos PI Channeling Injunction ("Royal Channeling Injunction Claim")
> based on or arising under the Subject Insurance Policies, the [Asbestos PI Trust
> established under the proposed Chapter 11 plan] will expend its reasonable best
> efforts to establish that such Royal Channeling Injunction Claim is enjoined as to
> the Royal Parties and channeled to the Trust pursuant to the Asbestos PI
> Channeling Injunction and Bankruptcy Code Section 524(g).

The Arrowood Settlement goes on to provide (Section V.B) that

> the Trust shall bear the costs and expenses, including attorneys' fees, of defending
> the application of the Asbestos PI Channeling Injunction to any Royal Channeling
> Injunction Claim, provided that the Trust's total obligation . . . shall not exceed an
> amount equal to the Settlement Amount.

Thus, the Arrowood Settlement commits the Asbestos PI Trust to expend the entire $5.8 million

that Arrowood will pay under the Arrowood Settlement, to pay lawyers to advance the position

that persons who may not by the very terms of Section 524(g) be included in the Asbestos PI

Channeling Injunction are in fact so included.

It gets even worse. While the Asbestos PI Channeling Injunction under the Plan would,

by its terms, include Royal Indemnity Company itself and most likely Arrowood within its

protection, the Asbestos PI Channeling Injunction does not even purport to protect the rest of the

Royal Parties.[7] So under the Arrowood Settlement, the Asbestos PI Trust will be committed to

---

[7] Under the Plan, the Asbestos PI Channeling Injunction protects Asbestos Protected Parties. The only insurer-related parties included in the Plan's definition of Asbestos Protected Parties are Settled Asbestos Insurance Companies. A Settled Asbestos Insurance Company is an Asbestos Insurance Entity that meets various requirements. Asbestos Insurance Entity is defined to mean the insurance company alone, not its directors, officers, affiliates, etc.

expend the entire amount paid by Arrowod in order to advance the position that the Asbestos PI

Channeling Injunction protects parties who are not included in the injunction by its very terms.

Even as to persons who fit within the categories of third parties who may be beneficiaries

of a Section 524(g) injunction, there is an additional requirement:  Such injunction must be "fair

and equitable . . . in light of the benefits provided, or to be provided, to [the asbestos] trust on

behalf of such . . . third party."  11 U.S.C. § 524(g)(4)(B)(ii).  Largely this has been construed to

mean that in order to be protected by an injunction, a third party must make a substantial

financial contribution to the plan.  In re Congoleum Corp., 362 B.R. 167, 179-80 (Bankr. D. N.J.

2007), and authorities cited therein.

For the reasons just discussed, Arrowood's financial contribution is so illusory as to fail

the "fair and equitable test."  But even treating the $5.8 million settlement amount under the

Arrowood Settlement as real, the Arrowood Settlement provides Arrowood with an injunction

that is far broader than its financial contribution can justify.  It appears that the settlement

amount was negotiated solely with reference to Arrowood's unsettled excess coverage.  If the

Arrowood Settlement could otherwise pass muster, it would certainly be permissible for

Arrowood to receive Section 524(g) protection *against claims under the excess policies*.  But

Arrowood should not receive protection against claims under the primary policies—at least, not

without making an appropriate financial contribution in relation to the value of that coverage.  It

is understandable that Royal would want injunctive protection equivalent in scope to a general

release.  This Court need not decide whether an insurer may, over objection, receive this scope of

injunctive protection where the general scope of the injunction is a "throw-in" to assure the

settling insurer of comprehensive protection even from claims that no one thinks would be

asserted.  In this instance, the general scope of the injunction is not a *throw-in* but a *throw-away*,

because it has the effect of discarding valuable insurance rights that the Libby Claimants most certainly will assert to the full extent permitted by law.

Arrowood replies that the settlement must be viewed holistically such that everything Arrowood gave up was consideration for everything that Arrowood got.  If this Court were to so find, then it follows that a material portion of the $5.8 million settlement payment is attributable to Grace's release of primary coverage for non-products claims.  As discussed above, non-products claims against Grace are virtually all held by the Libby Claimants.  Yet the Plan does not direct any portion of the Arrowood settlement payment to the Libby Claimants, other than their single digit ratable percentage share of all assets of the Asbestos PI Trust.  Since the injunction deprives the Libby Claimants of valuable insurance rights without adequate consideration, it flunks the "fair and equitable" requirement of Section 524(g).

### J.  Unequal Payment to Asbestos Property Damage Claimants is Discriminatory.

Pursuant to the Plan, allowed asbestos property damage claims (Class 7A) will be paid in full.  At the same time, the Plan proposes to pay asbestos personal injury claimants just 25% to 35% of the value of their claims.  PP Exhibit 277.04, § 4.2.  Under Section 524(g) and the requirement under Combustion Engineering for equality of distribution, it's not appropriate and is discriminatory to pay one group of asbestos claimants in full while paying others only a fraction of the value of their claims.  In re Combustion Engineering, 391 F.3d 190, 239 (3d Cir. 2004).

### K.  Limited Joinder in Post-Trial Brief of Garlock Sealing Technologies, LLC

The Libby Claimants join in the Phase II Post-Trial Brief of Garlock Sealing Technologies, LLC in Opposition to Confirmation of Plan Proponents' First Amended Joint Plan of Reorganization [Docket No. 23656] (the "Garlock Post-Trial Brief") for a limited purpose.

Specifically, the Libby Claimants hereby join in and support argument I. ("Entry of the

Channeling Injunction Will Not Be 'Fair and Equitable' Because the Plan Violates the Absolute

Priority Rule") in the Garlock Post-Trial Brief, pp.6-11.

## II.    Conclusion

Based on the foregoing and prior oppositions to the Plan filed by the Libby Claimants,

confirmation of the Plan must be denied.

Dated: November 20, 2009
      Wilmington, DE

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri Mumford (No. 4186)
Rebecca L. Butcher (No. 3691)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

and

Daniel C. Cohn
Christopher M. Candon
**COHN WHITESELL & GOLDBERG LLP**
101 Arch Street
Boston, MA  02110
Telephone:  (617) 951-2505
Facsimile:  (617) 951-0679

*Counsel for Libby Claimants*