**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 01-01139 |
| | ) | CHAPTER 11 |
| W.R. GRACE & CO., et al. | ) | |
| | ) | Re: Docket Nos. 23656 & 23662 |
| Debtors. | ) | |
| | ) | Hearing Dates: January 4-5, 2010 |
| | ) | |

**REPLY BRIEF OF GARLOCK SEALING TECHNOLOGIES, LLC**
**IN OPPOSITION TO CONFIRMATION OF PLAN PROPONENTS'**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION**

Dated: November 20, 2009

MORRIS JAMES LLP
Brett D. Fallon (No. 2480)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1404
Telephone: (302) 888-6888
Facsimile: (302) 571-1750
E-mail: bfallon@morrisjames.com

-and-

Garland S. Cassada
Richard C. Worf
Robinson, Bradshaw & Hinson, P.A.
101 North Tryon Street
Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@rbh.com
         rworf@rbh.com

Attorneys for Garlock Sealing Technologies, LLC

2387183/2

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT AND SUMMARY OF RESPONSE ........................................ 1

I.   IN THE FORMULATION OF THE PLAN AND TDP, NO REPRESENTATIVE PROTECTED THE RIGHTS OF PERSONS THAT MIGHT ASSERT CONTRIBUTION DEMANDS. ............................ 2

   A. The Bankruptcy Court Did Not Appoint A Representative For The Purpose Of Protecting Persons that Might Subsequently Assert Contribution Demands. ................................................................................ 2

   B. Conflicts of Interest Between Co-Defendants and Bodily Injury Claimants Precluded The FCR From Adequately Representing The Interests Of Both Constituencies. .............................................................. 5

   C. As The Only Representative For The Interests Of Contribution Demand Holders, Garlock Has Standing To Participate In This Case. ............ 7

II.  THE EVIDENCE DOES NOT SUPPORT THE PROPONENTS' PROPOSED FINDING THAT IDENTIFYING GRACE IN THE CHANNELING INJUNCTION WILL BE FAIR AND EQUITABLE WITH RESPECT TO CO-DEFENDANTS LIKE GARLOCK. ...................... 8

   A. The Proponents Admit That Identifying Grace In The Channeling Injunction With Respect To Persons Who Might Subsequently Assert Contribution Demands Violates Absolute Priority. ........................................... 9

   B. Identifying Grace In The Channeling Injunction With Respect To Persons Who Might Subsequently Assert Contribution Demands Is Not Fair And Equitable Under Any Meaning Of Those Terms. ..................... 10

      1. Grace's proposed contribution to the PI Trust is relatively meager. ......... 11

      2. Identifying Grace in the Asbestos PI Channeling Injunction is not fair and equitable for the additional reason that contribution demand holders receive no benefit from Grace's trust contributions. ...................................................................................... 14

CONCLUSION ......................................................................................................... 17

## **TABLE OF AUTHORITIES**

**Cases**

*Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434 (1999) .................................................................................................. 10, 13

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939) ............................. 10

*In re Amatex Corp.*, 755 F.2d 1034 (3d Cir. 1985) ...................................................... 8

*Morse v. Homer's Inc.*, 4 N.E.2d 625 (Mass. 1936) .................................................. 15

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ........................ 8

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) .................................................................... 10

*SEC v. American Trailer Rentals Co.*, 379 U.S. 594 (1965) ..................................... 10

*SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434 (1940) ................................................ 10

*United States v. Key*, 397 U.S. 322 (1970) ................................................................ 10

**Statutes**

11 U.S.C. § 101(5) ........................................................................................................ 2

11 U.S.C. § 524(g)(4)(B) ..................................................................................... passim

11 U.S.C. § 524(g)(5) ................................................................................................... 2

**Other Authorities**

House Report No. 103-835, 1994 U.S.C.C.A.N. 3340, 3357 (1994) ......................... 10

Garlock Sealing Technologies, LLC ("Garlock"), through its undersigned counsel, hereby submits this Reply Brief in opposition to confirmation of the First Amended Joint Plan Of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., Et Al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and The Official Committee Of Equity Security Holders (the "Proponents"), dated February 27, 2009 (the "Plan").  PP Ex. 274.

### PRELIMINARY STATEMENT AND SUMMARY OF RESPONSE

Under section 524(g)(4)(B), the validity and enforceability of an injunction that bars contribution demands against Grace and channels future co-defendants holding such claims to a trust for their sole remedy depends on two conditions: (1) the Court must appoint a representative to protect the interests of future co-defendants in the case and (2) the Court must determine that protecting the debtor from contribution demands under such injunction is "fair and equitable" to co-defendants.  Although the Plan Proponents' Main Post-Trial Brief ("PP Post-Trial Brief") contains formulaic proposed findings of fact to the effect that each condition has been satisfied, PP Post-Trial Brief 138-40, the evidence supports neither.

First, the Court has never appointed a representative to protect the interests of contribution demand holders.  The Court appointed a single legal representative (the Asbestos PI FCR, or "FCR") to represent future claimants, and his constituency was limited to bodily injury claimants.  The FCR cannot be deemed a co-defendant representative after-the-fact.  He negotiated TDP that favor bodily injury claimants at the expense of co-defendants, and thus was not an adequate representative of future co-defendants.

In addition, the evidence is undisputed that naming Grace in the Channeling Injunction is not fair and equitable with respect to persons who might assert contribution demands.  First, the

2387183/2

injunction is per se unfair and inequitable because the Plan violates absolute priority, as the Plan Proponents concede. Second, the W.R. Grace & Co. Asbestos Personal Injury Settlement Trust ("Grace Trust") will operate under trust distribution procedures rigged against co-defendants by the FCR and the Official Committee of Asbestos Personal Injury Claimants ("ACC"). Naming Grace in the Channeling Injunction will extinguish co-defendants' contribution demands and channel them to a trust from which they can receive no benefit, which is unfair and inequitable "with respect to" them. 11 U.S.C. § 524(g)(4)(B)(ii).

I. **IN THE FORMULATION OF THE PLAN AND TDP, NO REPRESENTATIVE PROTECTED THE RIGHTS OF PERSONS THAT MIGHT ASSERT CONTRIBUTION DEMANDS.**

A. **The Bankruptcy Court Did Not Appoint A Representative For The Purpose Of Protecting Persons that Might Subsequently Assert Contribution Demands.**

The Code defines a demand as "a demand for payment" that was not a claim during the bankruptcy and that arises out of the debtor's asbestos liability. 11 U.S.C. § 524(g)(5). Essentially, a demand is a future asbestos claim, and is defined as broadly as "claim" is defined in the Code. 11 U.S.C. § 101(5) ("The term 'claim' means . . . right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"). Any future demand that Garlock might assert against Grace for contribution falls within the definition of Demand that the Asbestos PI Channeling Injunction would channel to the Grace Trust. Plan § 1.1.82.

Section 524(g)(4)(B)(i) then provides in pertinent part as follows:

> [I]f, under a plan of reorganization, a kind of demand described in such plan is to be paid in whole or in part by a trust described in paragraph (2)(B)(i) in connection with which an injunction described in paragraph (1) is to be implemented, then such injunction shall be valid and enforceable with respect to a demand of such kind made, after such

2

> plan is confirmed, against the debtor or debtors involved, or against a third party described in subparagraph (A)(ii), if—
>> (i) as part of the proceedings leading to the issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such a kind . . . .

The Code therefore requires the appointment of a legal representative "for the purpose of protecting the rights" of each person that might subsequently assert a "demand." Relevant to Garlock's objection, the Code requires the Court to appoint a representative for the purpose of protecting the rights of holders of contribution demands.

> The Plan Proponents propose the following finding with respect to the FCR in this case:

> The Asbestos PI FCR [… has] been appointed by the Bankruptcy Court […] as part of the proceedings leading to the issuance of the Asbestos PI Channeling Injunction […] for the purpose of, among other things, protecting the rights of Entities that might assert Demands of the kind that are addressed in the Asbestos PI Channeling Injunction and transferred to the Asbestos PI Trust […].

PP Post-Trial Brief 138-39.

The Proponents' finding implies that the Court appointed the FCR for the purpose of protecting the interests of persons who might assert any and all kinds of demands, including persons such as Garlock and other co-defendants. The record, however, thoroughly refutes that notion. The Bankruptcy Court has repeatedly made clear that the FCR was appointed only for the purpose of representing the interests of future asbestos bodily injury claimants. The following colloquy from the examination of Mr. Austern at the Confirmation Hearing is illustrative:

> Q: Mr. Austern, as the FCR, is the channeling injunction, the 524 channeling injunction, fair and equitable to futures in light of the contributions and benefits being provided to the trust by, on and behalf of asbestos protected parties?
> A: I believe it is.
> MR. CASSADA: Your honor, objection.
> THE COURT: Mr. Cassada.
> MR. CASSADA: He's asking a –
> THE COURT: You need to use a microphone.

3

2387183/2

> MR. CASSADA: Mr. Guy is asking the legal representative to make a—to state a conclusion of law which is a determination that the Court has to make.
> THE COURT: I think he was asked as the future representative whether in his view this treated the entities for which he has a fiduciary duty fairly. I think that is a standard that the future claims representative has to assure himself of in order to agree to participate in a 524(g) plan. There is no future demand holder here to raise that type of issue or objection other than the future claims representative. So I think he was being asked as a matter of fact, not a conclusion of law. But can you restate the question and make that clear please, Mr. Guy?
> MR. CASSADA: Your Honor, just to be clear on the record, there is—there are future demand holders here who have objected and appear (indiscernible).
> THE COURT: There can't be. We don't know who they are.
> MR. CASSADA: Garlock would be a future demand holder.
> THE COURT: No, you may be an indirect claimant, but you're not a future asbestos personal injury demand holder. Your client is not.
> MR. CASSADA: Well, when you say a future asbestos personal injury, are you referring just to bodily injury claim?
> THE COURT: Yes. That's who he represents.

9/17/09 Tr. 66:7-67:17 (Austern). The Court's explanation at the Confirmation Hearing was wholly consistent with its definition of the FCR's constituency when the Court appointed him. The Court repeatedly stated in the bench ruling appointing the FCR that his duty was to represent the interests of asbestos *bodily injury* claimants:

> THE COURT: … My definition of the FCR's constituency up front is all future demand holders, period, who have some asbestos-related disease. Period. End of story. . . . [I]n terms of who his constituents are, everybody and anybody who contends that they have an asbestos-related injury that has not yet manifested itself is his constituency.

Transcript of Hearing Held on May 24, 2004 Before the Honorable Judith K. Fitzgerald, D.I. 6018, 42:1-8.

> THE COURT: … I have answered it. This constituency for the FCR will be all future demand holders who claim exposure to or asbestos injury, just like that's what the ACC has for [presents] …

*Id.* at 44: 11-14.

> THE COURT: … And I have defined that term. This record stands for the definition of that term. …

*Id.* at 47: 20-21.

4

2387183/2

Because the FCR's constituency was limited to future bodily injury claimants, he was not appointed for the purpose of protecting the rights of Garlock and other co-defendants that might subsequently assert contribution demands. The FCR did not and could not protect the interests of co-defendants in this case, and he certainly did not bind them and preclude them from objecting to the Plan.

Recognizing this defect, the Plan Proponents ignored the Bankruptcy Court's definition of the FCR's constituency and elicited testimony at the confirmation hearing from the FCR to the effect that his constituency included holders of contribution demands. 9/17/09 Tr. 67:25-68:1 (Austern) ("Q: Does that constituency include indirect asbestos claimants? A: Yes.") As discussed below, the FCR's testimony was disingenuous because he was not an adequate representative of future contribution claimants but in fact intentionally assaulted their rights in the course of advancing the interests of bodily injury demandants. In any event, the FCR's testimony deserves no weight because he has no authority to expand his constituency beyond that established in the Court's bench ruling. Under section 524(g)(4)(B)(i), the FCR cannot appoint himself to represent persons who might assert contribution demands. Rather, "the court" must appoint a legal representative to protect future co-defendants, and the Court has not done so in this case.

**B. Conflicts of Interest Between Co-Defendants and Bodily Injury Claimants Precluded The FCR From Adequately Representing The Interests Of Both Constituencies.**

Even if the Bankruptcy Court had appointed the FCR to represent the interests of persons who might assert contribution demands, the record is clear that the FCR failed to provide adequate representation for such persons. To the contrary, if the FCR was a fiduciary to future contribution claimants, the evidence establishes that he willfully breached his duty to such

5

persons by agreeing to rig the TDP in a way that permits bodily injury claimants to hide from co-defendants evidence of Grace's contributions to their injuries and thereby frustrate the rights of contribution claimants.

Garlock's objection to the Channeling Injunction and Plan, set out in its opening brief, highlights the irreconcilable conflict of interest between bodily injury claimants and co-defendants when it comes to the terms of the TDP.  *See* Garlock Post-Trial Brief 12 *et seq.* When Grace's April 2001 bankruptcy removed Grace's several share from the tort system, most plaintiffs had other recourse for payment of Grace's share of liability.  They were made whole in joint and several liability jurisdictions because they sought and recovered Grace's share from Garlock and other co-defendants, who had no immediate recourse against bankrupt Grace.  The confirmation evidence documents how the liability of Grace and other bankrupt defendants shifted to surviving co-defendants, which saw their liability multiply.  Garlock Post-Trial Brief 14-16.

As a result, plaintiffs and defendants have sharply diverging interests with respect to the conditions for Grace's emergence from bankruptcy.  Co-defendants have an interest in finally restoring their recourse against Grace.  They wish to see Grace fund a trust that pays as much as possible of Grace's several share, under trust distribution procedures that protect co-defendants' right to access to evidence of Grace's liability and the possibility of trust payments in time for co-defendants to take evidence of Grace's several share of liability into account when claims against them are settled or tried.  On the other hand, bodily injury claimants already have recourse for the Grace share in the tort system against co-defendants. They therefore have an interest in obtaining trust distribution procedures that allow them to conceal Grace's share of liability for their claims, recover full damages from tort system defendants, and only then reveal

evidence of Grace Exposure to obtain payments from the Grace Trust on top of the full damages recovered in the tort system.

On this point of conflict, the FCR chose to advance the interests of bodily injury claimants who might assert demands over those of co-defendants. He agreed to the deferral and concealment provisions contained in section 6.3 and 6.5 of the TDP thereby giving future plaintiffs free reign to conceal the existence of Grace's several share from co-defendants in the tort system's "marketplace of settlement." Garlock Post-Trial Brief 12 *et seq.* He also agreed to allow shareholders in Grace to keep property, despite Grace's crushing asbestos liabilities: a move that does little to hurt most bodily injury claimants, but that cuts directly into co-defendants' recovery of the Grace several share. Thus, the FCR cannot be deemed to have adequately represented Garlock and other co-defendants, and certainly did not bind them to the Plan.

### C.  As The Only Representative For The Interests Of Contribution Demand Holders, Garlock Has Standing To Participate In This Case.

As established in Garlock's opening brief, the evidence proves that Garlock is a member of the class of future holders of contribution demands. For example, the Proponents have stipulated that "[t]he Asbestos PI Trust is likely to receive some Claims and Demands in the future by Asbestos PI Claimants who also assert claims in the tort system against Garlock alleging that Garlock's products also contributed to their asbestos injuries." Garlock Stipulation ¶ 4. A large portion of those claims against the Grace Trust will be valid. For example, 78.3% of the persons suffering from mesothelioma who sue the Grace Trust will be paid because they will have "meaningful and credible" evidence that Grace's products contributed to their injuries. PP Ex. 201 p. 13; 9/15/09 Tr. 235:16-24, 236:6-12 (Peterson). It is therefore certain that the joint

claims against Garlock and the Grace Trust—claims whose "likely" existence the Proponents have stipulated to—will give rise to valid contribution demands for Garlock.

Because the Court appointed no representative for future holders of contribution demands, and no other representative has been adequate, Garlock is the first representative of that class of demand holders to appear in the entire history of this case. As a matter of basic due process, Garlock must have standing to press its objections, if it is to be bound by the Plan. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950).

Furthermore, the Court would be well-advised to appoint Garlock as the representative for the class of future holders of contribution demands, and order the Plan Proponents to negotiate with Garlock to revise the Plan and TDP to address Garlock's objections. Otherwise, as a statutory matter, the Channeling Injunction cannot be valid or enforceable against future contribution demands. *See* 11 U.S.C. § 524(g)(4)(B); *see also In re Amatex Corp.*, 755 F.2d 1034, 1043 n.9 (3d Cir. 1985) (noting that "future claimants may have interests that call for the appointment of more than one representative").

Absent this proposed cure of the section 524(g)(4)(B)(i) problem, the Plan is not confirmable for yet another reason. The Proponents' argument that Garlock lacks standing is merely part of a continuing effort to keep Grace's co-defendants—parties that are profoundly affected by the Grace bankruptcy—from having any role in this proceeding.

II. **THE EVIDENCE DOES NOT SUPPORT THE PROPONENTS' PROPOSED FINDING THAT IDENTIFYING GRACE IN THE CHANNELING INJUNCTION WILL BE FAIR AND EQUITABLE WITH RESPECT TO CO-DEFENDANTS LIKE GARLOCK.**

The Proponents must meet a second condition if the Channeling Injunction is to be enforceable against Garlock and other holders of contribution demands. Identifying Grace in such injunction must be "fair and equitable to persons who might subsequently assert such

8

demands, in light of the benefits provided, or to be provided, to such trust on behalf of [Grace] . . . ." 11 U.S.C. § 524(g)(4)(B)(ii).

> The Proponents assert that the confirmation evidence supports the following finding:
>
> In light of the benefits to be provided to the Asbestos PI Trust by or on behalf of each Asbestos Protected Party […], identifying each of the Asbestos Protected Parties in the Asbestos PI Channeling Injunction is fair and equitable (including with respect to the Entities that might subsequently assert Demands against any Asbestos Protected Party) and is supported by reasonable consideration.

PP Post-Trial Brief 139-40. The sole basis for the finding is that the Protected Parties are, in the aggregate, making a purportedly "substantial" contribution to the Asbestos PI Trust. *Id.* at 141.

This proposed finding fails under any definition of the words "fair and equitable." First, as Garlock has shown, the injunction is per se not "fair and equitable" if it does not respect absolute priority. Second, even if "fair and equitable" requires only a "substantial" contribution from the debtor or on its behalf, this injunction fails the test because Grace's contributions to the Trust will fund no more than 11.8% to 17.4% of its asbestos liability, and Grace will keep far more assets than it contributes to the PI Trust. Finally, regardless of the size of the contribution, a "fair and equitable" injunction must be so with respect to each class of demand holders. The Channeling Injunction will not be, because it will channel co-defendants to a trust that will operate under procedures designed to hide partial payments of Grace's share so that such payments provide no benefit to contribution claimants.

### A. The Proponents Admit That Identifying Grace In The Channeling Injunction With Respect To Persons Who Might Subsequently Assert Contribution Demands Violates Absolute Priority.

As Garlock explained in detail in its Phase II Trial Brief, the words "fair and equitable" in section 524(g)(4)(B)(ii) incorporate the absolute priority rule, which provides that shareholders may not retain equity in a reorganized debtor unless prior claims of creditors are

9

2387183/2

paid in full. Garlock Trial Brief 12-16. This fundamental principle of bankruptcy law has been enunciated several times over the last century by Supreme Court cases considering the "fair and equitable" standard under the Bankruptcy Act and Bankruptcy Code.[1] Indeed, the very Congress that enacted section 524(g) observed, "The words 'fair and equitable' are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code." House Report No. 103-835, 1994 U.S.C.C.A.N. 3340, 3357 (1994).

The Plan Proponents admit that contribution demands will not be paid in full while stockholders will retain equity in reorganized Grace. *See* Plan Proponents' Phase II Post-Trial Brief in Response to Confirmation Objections of the Libby Claimants ¶ 1.16 ("[T]he Trust will not be able to pay every [asbestos] claimant 100% of the liquidated value of his or her claim"); Grace's Post-Trial Brief Regarding Bank Lender Issues ¶ 74 ("[E]quity would receive value under Grace's Plan."). This establishes as a matter of law that protecting Grace from contribution demands under the Channeling Injunction is not fair and equitable.

B.  **Identifying Grace In The Channeling Injunction With Respect To Persons Who Might Subsequently Assert Contribution Demands Is Not Fair And Equitable Under Any Meaning Of Those Terms.**

The Proponents argue that the words "fair and equitable" in section 524(g)(4)(B)(ii) do not mandate absolute priority. Instead, according to the Proponents, the injunction will be fair and equitable to demand claimants so long as the Protected Parties' contributions to the Trust are, in the aggregate, "substantial." PP Post-Trial Brief 140-142.

---

[1] The Supreme Court cases holding that the "fair and equitable" standard requires absolute priority include *Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 444 (1999); *United States v. Key*, 397 U.S. 322 (1970); *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968); *SEC v. American Trailer Rentals Co.*, 379 U.S. 594 (1965); *SEC v. U.S. Realty & Imp. Co.*, 310 U.S. 434 (1940); and *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939).

2387183/2

This test has no support in the text, structure, history, or purpose of the provision, and disregards the substantial evidence showing that those words incorporate absolute priority. Nevertheless, whether the Court adopts the absolute priority test, the Plan Proponents' "substantial contribution" test, or some other test for "fair and equitable," applying the Channeling Injunction to contribution demandants fails.

**1. Grace's proposed contribution to the PI Trust is relatively meager.**

Although the Plan Proponents espouse a "substantial contribution" test for fair and equitable, Grace's contribution to the Trust is by no means substantial. Grace itself apparently values its trust contributions at approximately $1.1 billion. This is true because the Proponents value the total contributions to the Grace Trust at $2.214 billion, PP Ex. 511-21a, 10/13/09 Tr. 81 (Zilly), and the contributions of Sealed Air and Fresenius at $1.1 billion. PP Post-Trial Brief 27. The difference is $1.114 billion.[2]

Though the Plan Proponents have offered no definition of "substantial contribution," or even proposed how the Court should measure Grace's contributions to determine whether they are indeed "substantial," two possible candidates for a measuring stick are (1) Grace's projected aggregate asbestos personal injury liability, or (2) the value of property that the Plan permits Grace to retain that could have been used to pay asbestos liabilities. Grace's contribution is not "substantial" when compared against either of those measures.

First, according to Dr. Peterson, the net present value in 2010 dollars of Grace's projected aggregate liability for Asbestos PI Claims is $6.3 billion to $9.3 billion. PP Ex. 201, pp. 14-17;

---

[2] Garlock valued Grace's non-insurance contribution in the range of $700 million to $800 million. Garlock Post-Trial Brief 10. This valuation discounted Grace's deferred cash payments more heavily than the 10% discount rate applied by Ms. Zilly. *Id.* at 10 n.8. Because the Proponents offered the only evidence at trial regarding applicable discount rate, Garlock agrees that the Court should adopt the Proponents' valuation of Grace's contribution, which Garlock believes based on the analysis above to be approximately $1.1 billion, before discount for tax benefits.

11

9/15/09 Tr. 203, 212-20 (Peterson); PP Ex. 511-21a.[3] Grace's approximately $1.114 billion contribution is only 11.8% to 17.4% of its asbestos aggregate personal injury liability. Whether "substantial" means three-quarters, one-half, one-third, or even one-fourth of the Grace asbestos liability, Grace will not be making a "substantial" contribution.

Alternatively, if the measure for "substantial contribution" is how much of Grace's value it is contributing to fund its asbestos liabilities, Grace still fails the test. The equity retained by Grace's shareholders will have value in excess of $1.5 billion, Garlock Post-Trial Brief 9, a figure much greater than its contributions to the Grace Trust. The equity cushion is so fat that Grace could absorb asbestos property damage claims of up to $1.6 billion more than projected, and still remain a viable enterprise. PP Post-Trial Brief 14. Grace is therefore keeping more value than it is contributing to the Trust, and its contribution cannot be considered "substantial" on this measure either. The Proponents simply have no plausible route to a "fair and equitable" finding.

The impossibility of arguing that the Grace contribution is "substantial" no doubt explains why the Proponents do not even attempt to sketch the contours of a judicially administrable "substantial contribution" test that would allow Grace shareholders to keep equity. Instead, they simply assert that Grace's contribution would be "substantial," and support that contention with no reasoning whatsoever. PP Post-Trial Brief 140-41.

More troubling, the Proponents provide no reason why "substantial contribution"—however defined—is the proper test for determining whether naming the debtor in the injunction will be "fair and equitable." The word "substantial" appears nowhere in section 524(g)(4)(B)(ii).

---

[3] As pointed out in Garlock's initial post-trial brief, Dr. Peterson favored a mid-point of approximately $7.4 billion. Garlock Post-Trial Brief 8.

Nor does the provision contain any measuring stick for "substantiality," much less a threshold for when a contribution becomes "substantial" enough when compared to that stick.

At a fundamental level, it could never be "fair" to preserve equity in the debtor when there is a chance that future demand holders will not be paid in full. Absolute priority is "fair" because the risk of operating an enterprise should fall first on equity. Otherwise, equity is receiving a windfall at the expense of creditors with higher priority. The Supreme Court originally found that the "fair and equitable" test requires absolute priority because of "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners." *See Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 444 (1999).

The concept makes even more sense in a 524(g) bankruptcy, where future claims are necessarily involved. Absolute priority is the only way to prevent shareholders in a 524(g) debtor from foisting the risk associated with their investment onto higher priority future creditors. For example, if this Plan is confirmed, Grace's co-defendants will principally bear the risk that the Florence estimate of Grace's asbestos liability is badly wrong—perhaps by billions of dollars—while Grace's shareholders whistle merrily all the way to the bank, their corporation's clean bill of health in hand. Congress did not intend to allow this result.

Quite simply, when a debtor has to enter Chapter 11 to obtain protection from unpredictably large future asbestos demands, no contribution short of all its equity is substantial enough, and for that reason alone, the Court should deny confirmation. In addition, because the Grace contribution is not "substantial" under any measure, the Court should deny confirmation for that reason as well.

13

**2. Identifying Grace in the Asbestos PI Channeling Injunction is not fair and equitable for the additional reason that contribution demand holders receive no benefit from Grace's trust contributions.**

The Proponents' only response to the unfair and inequitable treatment received by contribution demand holders from the Grace Trust to which the Channeling Injunction funnels them is to assert that "Section 524(g)'s 'fair and equitable' requirement . . . does not extend to <u>trust distribution procedures</u>." PP Post-Trial Brief 141 n.460; Plan Proponents' Trial Brief 132 (emphasis in original). According to the Proponents, the Grace TDP satisfy section 524(g) so long as they treat presents and futures equally. *Id.* Presumably, under the Proponents' reading, the TDP could cut out an entire class of future claimants, so long as current and future claimants in that class are treated similarly and the seventy-five percent voting requirement is met.

This cannot be the correct reading of the "fair and equitable" standard, which requires the Court to determine that naming the debtor in the injunction will be fair and equitable "with respect to the persons that might subsequently assert such demands." 11 U.S.C. § 524(g)(4)(B)(ii). The injunction will not be fair and equitable to holders of contribution demands if they receive no benefit from the Trust to which they will be channeled. Because the TDP determine how and when Trust payments will be distributed, they are absolutely central to whether the injunction will be "fair and equitable" to Garlock and other co-defendant demand holders.[4]

---

[4] Even if the Court credits the Proponents' argument that Garlock has not identified the correct legal "box" to hold its proof that the TDP are hopelessly unfair to Grace's co-defendants, the Court should rely on another provision to deny confirmation. Section 1123(a)(4) requires that a Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan also violates this provision because the TDP allow future plaintiffs (members of Class 6) to conceal Grace Trust payments from the marketplace of settlement (and thereby deny the state law rights of contribution demand holders to be free from having to pay the portion of Grace's several share paid by the Grace Trust), to the detriment of future defendants (also members of Class 6). (The Proponents admit that for purposes of non-524(g) provisions, demand holders are "claimants." PP Post-Trial Brief 24). Though Garlock has

14

Defending the deferral and concealment provisions, Mr. Inselbuch stated that, if a plaintiff deferred a trust claim until after such plaintiff resolved his tort system claim, refused to identify Grace exposure in the tort system, then filed a claim against the Trust based on Grace exposure, the Trustees would have reason to question the credibility of such plaintiff's evidence and "act on that." 9/14/09 Tr. 94:12-16 (Inselbuch). The problem is that, by virtue of section 6.3 and 6.5, the Grace trustees would never know about the plaintiff's misconduct in the tort system. The underlying tort action would be concluded, and the plaintiff's trust claim would be confidential, so that co-defendants would have no basis to learn about the abuse. In short, sections 6.3 and 6.5 leave plaintiffs with a clear path to double payments, to the detriment of co-defendants, the courts, and the general public.

The Proponents also suggested during the confirmation hearing that any gamesmanship by plaintiffs is a tort system problem, not a TDP problem that rises to a level sufficient to deny confirmation. *See* Plan Proponents' Trial Brief 133 ("Nor does the TDP affect Garlock's right to obtain materials submitted to the Trust by claimants from the claimants themselves."). But the Proponents cannot credibly argue that the TDP should not be judged by improper conduct they encourage in the tort system. Willful inaction in the face of foreseeable harm is unlawful. A bank that leaves the vault open is liable for the damages caused by a thief. *See Morse v. Homer's Inc.*, 4 N.E.2d 625, 627 (Mass. 1936). Here, it is more like the vault is being left open by bank employees who come back after hours to raid it, because the same plaintiffs' lawyers who drafted the TDP with the "conceal and defer" loophole will be the ones collecting

---

not relied on this provision to date, the Proponents have been apprised of the factual basis for Garlock's objection for months, and Garlock's reliance on it now does not prejudice the Proponents' ability to present their rebuttal to Garlock.

15

contingency fees from payments made by both Garlock and the Grace Trust. Garlock Post-Trial Brief 25-26.

The Proponents simply cannot explain why co-defendants, the public, and the Trusts should bear the risk that plaintiffs will conceal and defer claims—a real risk, as shown by the Puller and Snyder incidents recounted in Garlock's previous brief. Garlock Post-Trial Brief 23 *et seq.* The provisions that cause the problem are justified by no conceivable Trust interest, and the problem can be fixed as easily as the bank can close its vault—by requiring TDP that prevent plaintiffs from concealing and deferring claims. Co-defendants are entitled to such TDP, because the injunction must be "fair and equitable" with respect to them. 11 U.S.C. § 524(g)(4)(B)(ii).

**CONCLUSION**

For the foregoing reasons, the Court should deny the issuance of the Channeling Injunction and confirmation of the Plan.

Dated: November 20, 2009                    MORRIS JAMES LLP


*/s/ Brett D. Fallon #2480*
Brett D. Fallon (No. 2480)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware  19801-1404
Telephone:  (302) 888-6888
Facsimile: (302) 571-1750
E-mail: bfallon@morrisjames.com

-and-

Garland S. Cassada
Richard C. Worf
Robinson, Bradshaw & Hinson, P.A.
101 North Tryon Street
Suite 1900
Charlotte, NC  28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail:  gcassada@rbh.com
         rworf@rbh.com

Attorneys for Garlock Sealing Technologies, LLC