UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No. 01-01139 |
| W.R. GRACE & CO., et. al., | : | Jointly Administered |
|  | : |  |
| Debtors-in-possession. | : | Related Docket No.:23649; 23659 |
|  | : |  |

**PLAN PROPONENTS' RESPONSE TO LIBBY CLAIMANTS' POST-TRIAL BRIEF**

David M. Bernick, P.C.
Theodore L. Freedman
Barbara M. Harding
Brian T. Stansbury
KIRKLAND & ELLIS LLP

Janet S. Baer, P.C.
THE LAW OFFICES OF
JANET S. BAER, P.C.

Laura Davis Jones (#2436)
James E. O'Neill (#4042)
Timothy Cairns (#4228)
PACHULSKI STANG
ZIEHL & JONES LLP

*Counsel for the Debtors and
Debtors in Possession*

Elihu Inselbuch
Peter Van N. Lockwood
Nathan D. Finch
CAPLIN & DRYSDALE,
CHARTERED

Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
CAMPBELL & LEVINE,
LLC

*Counsel for the Official
Committee of Asbestos
Personal Injury Claimants*

Roger Frankel
Richard H. Wyron
Jonathan P. Guy
ORRICK, HERRINGTON &
SUTCLIFFE LLP

John C. Phillips, Jr. (#110)
PHILLIPS, GOLDMAN &
SPENCE, P.A.

*Counsel for David T.
Austern, Asbestos PI Future
Claimants' Representative*

Philip Bentley
Douglas Mannal
KRAMER LEVIN
NAFTALIS & FRANKEL
LLP

Teresa K.D. Currier (#3080)
SAUL EWING LLP

*Counsel for the Official
Committee of Equity Security
Holders*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 1

I.  THE LIBBY CLAIMANTS' OBJECTIONS ARE UNSUPPORTED BY THE
    RECORD EVIDENCE AND THE LAW .................................................................. 1

    a.  The Claim Values for Category II and Category III Non-Malignant Claims
        Do Not Discriminate Against the Libby Claimants ........................................... 1

    b.  The TDP Adequately Takes into Account Factors Other than Disease That
        Affect Claim Values ...................................................................................... 6

    c.  The TDP Medical Criteria Do Not Discriminate Against the Libby
        Claimants ..................................................................................................... 9

        (1)  The Level IV-B medical criteria achieve proper goals and are not
             discriminatory ....................................................................................... 9

        (2)  The TDPs properly used established science and medicine to
             accomplish legitimate compensation goals. ............................................ 13

    d.  Individual Review is an Agreed-to Settlement Process with an Exit to the
        Tort System, not Involuntary Claims Liquidation .......................................... 14

    e.  The Libby Claimants Are Properly Classified as Class 6 Claimants ................ 16

    f.  The Libby Claimants Have No Rights to Grace's Insurance ............................ 16

    g.  The Libby Claimants' Best Interest Arguments Are Meritless ........................ 18

II. THE LIBBY CLAIMANTS' DAUBERT RESPONSE REFLECTS A
    FUNDAMENTAL MISUNDERSTANDING OF THE W.R. GRACE
    CRIMINAL CASE ............................................................................................... 18

    a.  The Ninth Circuit Opinion in the Criminal Case Dealt with a Rule 703
        Analysis ...................................................................................................... 18

    b.  The Ninth Circuit's Opinion Does Nothing to Support Admission of the
        CARD Mortality Study .................................................................................. 19

CONCLUSION .............................................................................................................. 20

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re AOV Indus., 792 F.2d 1140 (D.C. Cir. 1986) ................................................... 17

In re G-I Holdings, Inc., 323 B.R. 583 (Bankr. D.N.J. 2005)......................................... 14, 15, 16

United States v. W.R. Grace, 504 F.3d 745 (9th Cir. 2007)....................................... 18

United States v. W.R. Grace, 597 F. Supp. 2d 1143 (D. Mont. 2009) ...................................... 19

## FEDERAL STATUTES AND RULES

11 U.S.C. § 502(c).............................................................................................. 15

11 U.S.C. § 502(b).............................................................................................. 15

11 U.S.C. § 524(g).............................................................................................. 15

11 U.S.C. § 1122(a).............................................................................................. 16

28 U.S.C. § 157(b).............................................................................................. 15

28 U.S.C. § 1411(a).............................................................................................. 15

Fed. R. Evid. 702 & Advisory Committee Note (2000)................................................. 18, 19, 20

Fed. R. Evid. 703............................................................................................... 18, 19

Fed. R. Evid. 801(d)(2)........................................................................................ 6

The Plan Proponents[1] submit this post-trial brief in response to the Libby Claimants' Post-Trial Brief in Support of Opposition to Confirmation of First Amended Joint Plan of Reorganization filed Nov. 2, 2009 [D.I. 23649] ("Libby Post Tr. Br.") and the confirmation objections of the Libby Claimants.

## PRELIMINARY STATEMENT

The post-trial brief of the Libby Claimants continues to reflect an urgent desire for special treatment in search of some viable theory under the bankruptcy law that would mandate such treatment. No such theory has emerged from the mountain of documents, expert reports, and briefs devoted to Libby because the compass of the bankruptcy law points in the opposite direction — toward equal treatment. In steadfast denial, the Libby Claimants once more recite their familiar list of contentions, some with new twists, and the Plan Proponents respond below.

## ARGUMENT

I.    **THE LIBBY CLAIMANTS' OBJECTIONS ARE UNSUPPORTED BY THE RECORD EVIDENCE AND THE LAW**

a.    **The Claim Values for Category II and Category III Non-Malignant Claims Do Not Discriminate Against the Libby Claimants**

The Libby Claimants argue that the TDP discriminates against them because the expedited review values for Disease Categories II and III are "so far below the verdict/settlement levels for such claims in Libby that, even if accorded the status of 'Extraordinary Claims' under the TDP, the claims cannot be liquidated for anywhere near their demonstrated tort system value." Libby Post Tr. Br. 2, 7-8. This assertion is not supported by any evidence in the record

---

[1]    The Debtors consist of the 62 entities identified in Attachment A. Except for the term "Libby Claimants," and unless otherwise defined herein, all capitalized terms have the meanings given to them in the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated Feb. 27, 2009 [D.I. 20872].

1

and in fact is contradicted directly by both the plain language of the TDP and the uncontroverted testimony of Mr. Inselbuch, Dr. Peterson, and Mr. Hughes.

**First**, the Libby Claimants can only point to their "Chart" of 19 selected cases that were settled prior to Grace's bankruptcy petition. Libby Post Tr. Br. at 7-8, citing LC Ex. 16A. There is no evidence that this chart of cherry-picked claimants is representative of the Libby Claimants with pending claims. To the **contrary**, as Dr. Whitehouse freely admitted, this "chart" is not a systematic study of anything, was put together by the Libby Claimants' lawyers, and is "just a chart." 9/11/09 Tr. 106-07 (Whitehouse). There is nothing in the chart or the testimony which would indicate how many of the Libby Claimants Dr. Whitehouse believes fall into any particular TDP expedited review disease category.[2]

**Second**, there is no evidence that the TDP prevents the Libby Claimants from attempting to persuade the Trust in the individual review process (or a Montana jury in litigation) that they suffer from severe disabling pleural disease notwithstanding their failure to meet one or more of the expedited review medical requirements for TDP Category IV-B. Although the Libby Claimants blithely assert that "claimants with similar [pleural] disease, diagnosed as moderate or mild, would have no ability to claim severe disabling pleural disease through expedited review,

---

[2] The Libby Claimants' chart of cherry-picked settled cases (LC Ex. 16A) is not even an accurate depiction of what expedited review disease category those individuals would likely have qualified for if they had not already settled their claims. As Dr. Whitehouse admitted on cross-examination, two of the claimants (Claimant No. 1 and Claimant No. 12) had severe (2/2) asbestosis (Category IV-A under the TDP), 9/11/09 Tr. 142, 150-52 (Whitehouse), and a third (Claimant No. 16) died from peritoneal mesothelioma (Category VIII). Id. at 154 (Whitehouse).

individual review, or any other mechanism provided by the TDP," there is no support for this

assertion.[3]  In fact the TDP provides just the opposite:

> Claims involving Disease Levels I-V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the PI Trust's Individual Review Process described in Section 5.3(b) below.  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

PP Ex. 277.04 Rev (TDP) § 2.2; see also id. § 5.3(b)(1)(A).  As Mr. Inselbuch testified, the TDP

in no way prevents a claimant who does not meet the expedited review criteria for Category IV-

A or Category IV-B from nonetheless persuading the Trust in individual review that he or she in

fact suffers from the more severe form of non-malignant disease and thus receiving

compensation up to the highest non-malignant disease level.  9/8/09 Tr. 41-43, 47-48, 54 & 82

(Inselbuch).  Mr. Inselbuch explained:

> Well, this would, again, be through individual review.  The idea here is, some claimants might – take a look, Your Honor, at Page 26 and let's look at severe asbestosis.  There are lots of medical criteria here.  And let's assume that instead of measuring a TLC of less than 65 percent, they meet all the other criteria, but the measurement is 70 percent.  The trustees might still consider that that person has satisfied this criteria for disease, because they recognize that the scores that are reflected here are variables that depend upon people and how young they are, how old they are and what averages are using in calculating these numbers.  That's just an example.
>
> On the other hand, they might, if the claimant missed more than one of these characteristics, the trustees might say, well, you're a lot sicker than somebody down in level three, but you're not really

---

[3]  The Libby Claimants cites only to TDP § 5.3 as support for that assertion.  See Libby Post Tr. Br. at 8 n.14.

> up to this level 4-A, we will offer you an amount that is less than
> $50,000, but substantially more than $7500.

9/8/09 Tr. 41-42 (Inselbuch).

Indeed, the Libby Claimants' assertion that they would be unable to present evidence to achieve higher disease values through the TDP's individual review process ignores the type of testimony from Dr. Whitehouse that the Libby Claimants' lawyers routinely advanced in support of Libby non-malignant disease cases settled pre-petition.  Throughout this case (and for years before Grace went into bankruptcy) the Libby Claimants' counsel and their doctor, Dr. Whitehouse, have repeatedly asserted that "Libby Pleural Disease" is more severe than non-malignant diseases seen elsewhere because 1) it progresses more rapidly 2) it primarily causes a reduction in DLCO as compared to causing a decline in other lung function tests and 3) people with "Libby Pleural Disease" have a "probability of death."  Trial Brief of Libby Claimants in Opposition to Confirmation of First Amended Joint Plan of Reorganization, filed July 13, 2009 [D.I. 22439] ("Libby Pre-Tr. Br.") at 16, 22 & 35-36.  As Mr. Hughes testified, one of the major factors that increased the value of pre-petition settlements in Libby was Dr. Whitehouse's testimony that people with mild pleural disease would inevitably progress to a more serious condition.  9/9/09 Tr. 55-59 & 68-69 (Hughes).

While the Plan Proponents have raised severe doubts about the reliability of Dr. Whitehouse's testimony concerning the alleged severity of "Libby Asbestos Disease," there is nothing in the Plan or the TDP that prevents the Libby Claimants from presenting this same type of evidence in the individual review process (or to a Montana jury) in an attempt to persuade the Trust or jury that although the claimant's medical records satisfy only the requirements for Category II or III, he nonetheless suffers from a severe disabling pleural disease and should be compensated at the Category IV-B level.  Indeed, Dr. Whitehouse even acknowledged that,

given his experience and knowledge, he was well-positioned to participate in the Individual Review process and explain why a Libby claimant not meeting the TDP expedited review criteria of the Category IV-B nevertheless was "entitled to being classified as having severe disease." 9/11/09 Tr. 137 (Whitehouse).

*Third*, the Libby Claimants address the wrong legal issue when they compare the historical settlement values in Libby to what the TDP offers in expedited review.  As explained previously, the TDP expedited review criteria and values are designed to encourage the largest number of claimants with clear cases to accept a settlement of their claims during an expedited process. 9/8/09 Tr. 46 (Inselbuch). This process is designed to comply with section 524(g)'s requirements of treating similarly situated claimants the same and to conserve the resources and assets of the trust.  9/8/09 Tr. 33 (Inselbuch); 9/8/09 Tr. 285 (Peterson).  In order to accomplish this goal, the TDP values were set using national averages where available.  See 9/8/09 Tr. 227-28 (Peterson).  This is the same approach used for the Grace TDP generally, and for other TDPs as well.  See Plan Proponents' Phase II Post Trial Brief in Response to Confirmation Objections of the Libby Claimants, filed Nov. 2, 2009 [D.I. 23659] ("PP Post Tr. Libby Br.") at ¶ 3.26. Thus, there is no discrimination.  The Libby Claimants are not entitled to pre-petition values, but, instead non-discriminatory treatment.

Finally, the Libby Claimants' criticism of the values for TDP Categories II and III also ignores the "comeback rights" in the TDP.  As the Court will recall, one of the provisions of the "standard" TDP was amended in this bankruptcy case to allow "comeback rights" between non-malignant disease categories.  That is, if a claim is initially settled by the claimant as a Category II or Category III claim and the disease progresses to the more serious non-malignant disease (Category IV), the claimant can "come back" and receive additional compensation from the

Trust at the Category IV level.  PP Ex. 277.04 Rev (TDP) § 5.9; 9/8/09 Tr. 55-56 (Inselbuch).  If any Libby Claimant chooses to settle his or her claim for $20,000 or $60,000 (i.e., 8 times the scheduled value for Category II or III), but then sees their disease progress in severity (as Dr. Whitehouse says it will), they may file a new claim with the Trust and receive additional compensation.  9/8/09 Tr. 56 (Inselbuch).

### b.    The TDP Adequately Takes into Account Factors Other than Disease That Affect Claim Values

The Libby Claimants argue that the TDP fails to account for two factors — strength of exposure evidence and number of defendants — which they assert supposedly make their cases "more valuable" than cases arising elsewhere.  Libby Post Tr. Br. at 8-10.  They rely in large part on Grace's counsel's statements in the estimation case and testimony presented in that proceeding that the ACC and FCR never had an opportunity to rebut (because the case settled shortly after Grace rested).[4]  Again, the Libby Claimants' contentions miss the mark.

*First*, when the Libby Claimants complain that the TDP does not reflect factors other than disease severity, they are simply wrong.  Dr. Peterson testified quite extensively about the non-medical factors that affected Grace's claim values in the tort system, and how he used those historical values in recommending the values that the Grace ACC ultimately adopted in the TDP. 9/8/09 Tr. 219-30, 233-37 (Peterson).  Thus, to the same extent that factors other than disease affected the value of claims historically, those factors are included within the relative values of the TDP disease categories.

---

[4]    Grace's counsel's statements about what the evidence would show in the estimation case were not even evidence in that case, much less in this completely separate hearing involving totally different issues.  Even if the statements were Rule 801(d)(2) admissions of Grace (which they are not), that only solves the hearsay problem, and does not cure the fact that Grace's counsel utterly lacks the foundation to state from personal knowledge or give an expert opinion what the expert testimony allegedly demonstrates.

***Second***, the Libby Claimants' assertions about the alleged strength of their asbestos exposure case against Grace in Libby as compared to claimants outside of Libby ignores 1) the testimony of their own expert Dr. Arthur Frank, whose opinions would support disease causation against Grace in almost any case outside of Libby, regardless of the number of defendants,[5] and 2) Mr. Hughes' testimony that the "non-disease" factors that increased the values for cases settled in Libby pre-petition would reduce the value of Libby claims for many if not most of the cases pending now.[6]

***Third***, and more specifically with respect to the two "non-disease" factors the Libby Claimants cite (i.e., exposure to Grace asbestos in Lincoln County Montana and the number of defendants in the case), the TDP provisions expressly take these factors into account:

---

[5]    Specifically, Dr. Frank testified:

> Q:    So, if somebody worked around a Grace asbestos-containing construction product for a couple of days and then worked around asbestos-containing products from 50 other companies for 10 years, your opinion would be to a reasonable agree of medical certainty that their exposure to the Grace products caused or contributed to causing their mesothelioma?

> A:    Yes.

9/10/09 Tr. 231 (Frank).  He had the same opinion with respect to asbestos related lung cancer, id., and testified with respect to non-malignant disease "if someone is diagnosed with the disease and they had a few days exposure, all of the exposures would have contributed." 9/10/09 Tr. 232 (Frank).

[6]    Mr. Hughes testified that pre-petition claims in Libby involved former Grace workers or their family members, where exposure and causation were not disputed.  9/9/09 Tr. 83 (Hughes). Now, however, many of the pending Libby Claimants' claims are community only exposure cases, where exposure and causation are much more defensible.  Id. at 83-84.  With respect to the number of defendants, pre-petition the only defendant claimants in Libby typically sued was Grace, 9/8/09 Tr. 227, 237 (Peterson); 9/9/09 Tr. 52-53 (Hughes); post-petition the Libby Claimants have identified and sued several other defendants (including BNSF, Maryland Casualty and the State of Montana) which would likely drive down per-company settlement values in Libby.  9/9/09 Tr. 81-82, 85 (Hughes).

Asbestos Exposure in Lincoln County:  As Mr. Inselbuch testified, at the request of the Libby Claimants, the definition of "Grace Exposure" in the TDP was modified to eliminate the requirement of "Significant Occupational Exposure" from the expedited review criteria for claimants whose claim was based on exposure to asbestos or asbestos contaminated vermiculite ore in Lincoln County, Montana.   9/8/09 Tr. 54-55 (Inselbuch); PP Ex. 277.04 Rev (TDP) §§ 5.3(a)(3), 5.7(b)(3).   As Dr. Peterson testified, this change to the exposure requirement "recognizes the realities" in Libby and makes it easier for Libby Claimants to qualify for payment.  9/8/09 Tr. 291-92 (Peterson).

Number of Defendants:  The concept that settlement values are much higher when Grace was the sole or predominant defendant in the case is explicitly taken into account in the "Extraordinary Claims" provision of the TDP.  PP Ex. 277.04 Rev (TDP) § 5.4(a).  If a claimant had been exposed predominantly to Grace asbestos and had little likelihood of a substantial recovery from other defendants, the extraordinary claims multiplier increases the recovery from the Grace Trust.  See 9/8/09 Tr. 52 (Inselbuch); see also PP Ex. 277.04 Rev (TDP) § 5.4.  The highest extraordinary claims multiplier found in section 5.4 of the TDP was raised at the request of the Libby Claimants from five times the Expedited Review scheduled value to *eight* times the scheduled value, so that any Claimant whose injuries were caused almost entirely by exposure to Grace asbestos would receive compensation in line with what severely injured prepetition claimants from Libby had received in settlement of their claims.  See PP Ex. 277.04 Rev (TDP) § 5.4; 9/8/09 Tr. 252-70 (Peterson); 9/8/09 Tr. 52-53 (Inselbuch).

*Fourth* and finally, the Libby Claimants are simply incorrect when they assert at page 10 of their post-trial brief that the "medically based caps" in the TDP would set a limit of $60,000 on awards for non-malignant disease claimants with "mild and moderate impairment," even with

extraordinary claims treatment. As discussed in Section I(a) above, there is nothing in the Plan or the TDP that prevents the Libby Claimants from presenting evidence in the individual review process (or to a Montana jury) that although the claimant's medical records satisfy only the requirements for Category II or III, he nonetheless should be compensated at the Category IV-B level, which could be up to $400,000 for Libby Claimants that prove extraordinary exposure. PP Ex. 277.04 Rev (TDP) § 2.2; see also id. § 5.3(b)(1)(A); 9/8/09 Tr. 41-43, 47-48, 54 (Inselbuch).

### c.   The TDP Medical Criteria Do Not Discriminate Against the Libby Claimants

The Libby Claimants' post-trial brief confirms outright that (1) their theory of the case fundamentally has mistaken the meaning of discrimination under the Code and (2) their strenuous efforts to challenge, scientifically, the medical criteria for expedited review willfully ignore the now undisputed purpose of that review.

### (1)   The Level IV-B medical criteria achieve proper goals and are not discriminatory

The Libby Claimants' post-trial brief reflects the abandonment of any claim that the TDP medical criteria for severe pleural disease are discriminatory within the meaning of the Code, i.e., that those criteria treat non-Libby claimants better than similarly situated Libby Claimants. Specifically, the Confirmation Hearing revealed no evidence whatsoever that the TDP criteria were more favorable to non-Libby severe pleural disease claimants than to Libby Claimants. Counsel for the Libby Claimants was pressed on this failure of proof and ultimately conceded that they had not examined the right question. See 9/11/09 Tr. 133-34. The heart of the Libby Claimants' technical and contorted "discrimination" case for the past several years is just gone.

A new theory, announced by Counsel at the end of the Libby Claimants' case, see id. at 133, now is brought center stage. As articulated now, the claimed "discrimination" appears to be that the medical criteria for expedited review of severe pleural disease are more "exclusionary"

than the criteria for other disease levels, thus requiring more individual review.  See Libby Post

Tr. Br. at 13-14 & 17.  As a threshold matter, this theory too fails to allege discrimination within

the meaning of the Code.  Where is any law cited to support the contention that variation among

*dis*similar claims for ***different diseases*** in the extent of "exclusion" constitutes unequal treatment

among ***similarly*** situated claimants?  There is none.  Again, there is no comparison of Libby

Claimants and non-Libby claimants who are similarly situated.

Beyond the Libby Claimants' continuing failure to follow the law, no record has been

developed to even attempt to prove the newly minted theory.  No expert testimony whatsoever

was offered regarding a standard or metric of "exclusion" because exclusion is a pejorative

characterization of a compensation policy.  See PP Post Tr. Libby Br. at ¶ 3.12.  It is not a term

of science or medicine.

And the list of other factual deficiencies goes on.  The Libby Claimants' complain that

the Level IV-B criteria require more than a doctor's diagnosis of this disease.  But the record is

clear that the Level IV-B criteria were chosen in order to effectuate the purpose of the TDP to

capture clear cases of disease, not every possible diagnosis of disease.

- **Blunting of the costophrenic angle, FEV1/FVC ratio, extent and width**:
  The Libby Claimants contend that medical criteria requiring (i) blunting of the
  costophrenic angle, (ii) a sufficient FEV1/FVC ratio, and (iii) extent and
  width requirements impermissibly discriminate against severe pleural
  claimants because similar "additional" medical criteria are not necessary to
  achieve payment under expedited review for other disease levels.  Libby Post
  Tr. Br. at 13.  But the record is clear that these criteria in Level IV-B help to
  fulfill the purpose of the TDP to capture clear cases of disease.  See 9/8/09 Tr.
  142 (Welch) ("blunting of the angle is now part of the standard definition of
  diffuse pleural thickening"); id. at 147-48 (noting that the FEV1/FVC ratio is
  designed to keep out those with obstructive lung disease often caused by
  smoking); id. at 143 ("The purpose of defining extent and width [of pleural
  thickening] is . . . so the trust can be sure that pleural thickening is really there
  . . . .").

- **DLCO**:  The Libby Claimants argue that claimants with severe pleural disease are discriminated against because they are not allowed to rely on DLCO to demonstrate impairment.  See Libby Post Tr. Br. at 13.  But, to include DLCO as part of the medical criteria would not effectuate the purpose of the TDP to capture clear cases.  See 9/8/09 Tr. 146 (Welch) (suggesting that use of DLCO would capture those claimants with diseases caused by smoking as opposed to clear cases caused by asbestos).

- **CT scans**:  The Libby Claimants contend that the fact that CT scans are permitted to support claims for Disease Levels I, II, III, and V, but not for Level IV-B, constitutes a "discrimination against severe pleurals."  Libby Post Tr. Br. at 14.  But again, it is clear from the record that allowing the use of CT scans for Level IV-B diseases would not effectuate the purpose of the TDP to capture clear cases.  See 9/8/09 Tr. 43-44 (Welch) (noting that there is no "standard system for classifying CT scans" for asbestos-related pleural scarring).

The Libby Claimants then contend that disease Level IV-B (severe pleural disease) is discriminatory towards the Libby Claimants because it is the ***only*** disease that does not permit recovery based on a "standard diagnosis" and has "'add-ons' to the standard diagnosis and evaluation of severity."  See Libby Post Tr. Br. at 10-12.  It is unsurprising that the TDP criteria do not always match the criteria for clinical diagnosis — their purpose is to serve compensation goals, not diagnosis.  But it is also false that "add-ons" are only used for expedited review of severe pleural disease.  All one need do is look to the TDP to see that this is not so.  For a Claimant to recover on an expedited basis for Disease Level VII (Lung Cancer I), a claimant must have a diagnosis of cancer ***and*** an independent diagnosis of an "underlying Bilateral Asbestos-Related Nonmalignant Disease."  PP Ex. 277.04 Rev (TDP) § 5.3(a)(3).  Similar "add-ons" also are part of the criteria for Disease Level IV-A (Severe Asbestosis).  To recover for this disease level, a claimant must have a diagnosis of asbestosis based on an ILO reading of 2/1 or greater or pathological evidence of disease, a much higher threshold finding than a standard diagnosis of asbestosis.  Id.  Moreover, "severity" is measured for Disease Level IV-A using the ***same*** pulmonary function tests and minimal impairment thresholds used for Disease Level IV-B

11

(severe pleural disease).  Id.  Any contention that Disease Level IV-B is the only disease category requiring more than a "standard diagnosis" is simply not true.[7]  Additional medical criteria were utilized where necessary, and not just for Level IV-B, to capture clear cases of disease.  See 9/8/09 Tr. 123 (Welch).

The Libby Claimants also assert that the medical criteria for severe pleural disease (IV-B) are "designed to bar all but a few claimants while the medical criteria for all other disease categories are designed to let most claimants in."  Libby Post Tr. Br. at 17.  But again — there is no evidence of such discrimination.  The Libby Claimants offered **no evidence** that the medical criteria for Level IV-B are more or less "exclusionary" than the medical criteria for any other disease category.  There is not one document nor any testimony addressing what percentage of claimants, utilizing the TDP medical criteria for Levels I, II, III, IV-A, V, VI, VII, or VIII, would be excluded or not excluded if the criteria were applied to their claims.  And there is no analysis of how the medical criteria of Level IV-B impact non-Libby claimants.  The sole purported evidence offered by the Libby Claimants is the CARD Mortality data, which (1) addresses only alleged exclusion under category IV-B, (2) only is applied to a lawyer-driven select group, and (3) pertains only to Libby Claimants, without comparison to non-Libby

---

[7]  The Libby Claimants' attempt to compare the TDP's requirements for mesothelioma (qualifying claims need only a "standard diagnosis") to the supposed "add-ons" in the criteria for severe disabling pleural disease is specious.  As Dr. Whitehouse testified, with a mesothelioma, the diagnosis is indisputable once confirmed in the ordinary course of treatment by pathology, the disease is almost invariably fatal, and, in Dr. Whitehouse's view, mesothelioma is always caused by asbestos exposure.  9/11/09 Tr. 154, 155 & 172 (Whitehouse).  With non-malignant diseases, in contrast, there is much more dispute as to how severe a non-malignant disease will be and doctors "not only disagree whether it is asbestos related, but they can also disagree as to what the exposure was and how significant it was."  Id. at 156, 172.

claimants.  See Libby Post Tr. Br. at 12-14.  There simply is no comparative analysis to support the discrimination claim.

> **(2)    The TDPs properly used established science and medicine to accomplish legitimate compensation goals**

The efforts of Libby Claimants to attack the scientific underpinnings for medical criteria also continue to ignore the purpose of the criteria.  They are compensation criteria that are to be used in the expedited review phase, not diagnostic criteria.  To be sure, they are based upon science and medicine.  But science and medicine are deployed in service of achieving the compensation objectives of the expedited review, not in service of diagnosis.  This distinction is fundamental, is a matter of undisputed record fact, and is assiduously ignored by the Libby Claimants.

And the record shows — without proper contradiction — that once the use of science and medicine is properly defined, the TDP criteria for expedited review of severe pleural disease do in fact find reasonable support in the literature.  Blunting of the costophrenic angle is a prime example.    The International Labor Organization (ILO) Guidelines use blunting of the costophrenic angle as *the* litmus test that separates diffuse pleural thickening from mere pleural plaques.  See 9/8/09 Tr. 134, 141-42 (Welch); PP Ex. 115 (ILO Guidelines) at 6-8.  These Guidelines reflect an international consensus, and were generated over several decades by pulmonary and radiological physicians throughout the world.  PP Ex. 115 at vii-ix.  Similarly, the published medical literature has established a clear association between the presence of blunting of the costophrenic angle, in the presence of pleural fibrosis, and an elevated loss of lung function.  9/8/09 Tr. 130, 134-36 (Welch) (on Lilis article); PP Ex. 174 at Slide 14 (Welch's demonstrative showing graph from Lilis).    Indeed, the Libby Claimants' own experts acknowledge that blunting of the costophrenic angle is associated with a more severe form of

asbestos related pleural disease.  See 9/10/09 Tr. 237-40, 257-58 (Frank); 9/11/09 Tr. 120

(Whitehouse).  Yet, in their brief to this Court, the Libby Claimants simply repeat the refrain that

blunting of the costophrenic angle is a "medically unreasonable" and "discriminatory"

requirement.  Libby Post Tr. Br. at 11, 15-16.  The refrain, now measured against the evidentiary

record in this case, is just wrong.

Beyond blunting, each aspect of the TDP criteria for severe pleural disease that the Libby

Claimants dismiss as "medically unreasonable" and "discriminatory" actually is derived from

consensus science:

- DLCO is highly sensitive and non-specific, as many conditions, including smoking and hundreds of forms of interstitial fibrosis, can cause a decrement in DLCO.  PP Post Tr. Libby Br. at ¶ 3.8; 9/8/09 Tr. 146 (Welch); see also 9/10/09 Tr. 244 (Frank).

- FEV1/FVC differentiates between restrictive disease, which is associated with asbestos, and obstructive disease, which is often caused by smoking-related diseases or asthma.  PP Post Tr. Libby Br. at ¶ 3.7; 9/8/09 Tr. 147-48 (Welch); see also 9/11/09 Tr. 236 (Weill).

- The ILO Guidelines establish minimum levels for the classification of pleural disease at an extent of 25% and a thickness of 3mm.  PP Post Tr. Libby Br. at ¶ 3.6; 9/8/09 Tr. 133, 142-43 (Welch); PP Ex. 115 at 7-8.

- There is no uniform standard for classifying CT or HRCT images for non-malignant asbestos related disease.  9/8/09 Tr. 143 (Welch).

    **d.    Individual Review is an Agreed-to Settlement Process with an Exit to the Tort System, not Involuntary Claims Liquidation**

Relying on the G-I Holdings case, the Libby Claimants argue that the TDP is improper

because it purports to insulate the liquidation of claims from judicial review and trial by jury.[8]

Yet, in making that argument, the Libby Claimants distort not only the TDP here, but the G-I

---

[8]  Libby Post Tr. Br. at 6-7, 18-19 (citing In re G-I Holdings, Inc., 323 B.R. 583 (Bankr. D.N.J. 2005)).

case as well.  In G-I, the debtor sought to have the bankruptcy court approve, under Bankruptcy Code § 502(c), its "claims liquidation procedures," which would have, *inter alia*, established a committee of putative experts to liquidate each asbestos claim according to a matrix of claim values.  See G-I Holdings, Inc., 323 B.R. at 590-96.  In claims allowance proceedings, it is the court — in the form of judge or jury — that determines the amount of a claim.  See 11 U.S.C. § 502(b) (providing that "the **court** . . . shall determine the amount of such claim . . . .") (emphasis added); see also 28 U.S.C. § 157(b)(2)(B) & (b)(5); id. § 1411(a).  The procedures proposed in G-I were fatally flawed, *inter alia*, because they would have usurped the judge and jury by vesting decision-making power in an "experts" panel and by relegating the court to reviewing the panel's decisions under a deferential standard of review.  See G-I Holdings, Inc., 323 B.R. at 595.

By contrast, the TDP here would be approved under § 524(g), which expressly authorizes the Trust to "operate through mechanisms," such as matrices, to "value" and "pay" all Asbestos PI Claims.  Id. § 524(g)(2)(B)(ii)(V).  There is no language in § 502, or in any of the other statutes addressed in the G-I case, that similarly grants trusts (or even "expert" liquidation panels) the authority to implement such "mechanisms" and to "value" and "pay" claims.  Contrary to their argument, there is *no* "impermissible delegation" of the Court's "liquidation authority."  To the extent any such "delegation" exists under the TDP, it is permissible because § 524(g) expressly authorizes it.

Furthermore, the debtor in G-I sought to impose its "liquidation procedures" on the asbestos PI claimants over the objections of the asbestos claimants committee and the future claimants' representative.  Here, by contrast, over 90% of Class 6 voted to accept the Plan, which includes the TDP.  The required supermajority has thus agreed to the TDP as the bona fide

process for resolving Asbestos PI Claims.  Decisions made by the Trust concerning disease classification and claim value will be subject to "appeal rights" through mediation, arbitration, and an exit to a jury trial in the tort system, and decisions as to a claim's status as "extraordinary" may be appealed to a specially constituted Extraordinary Claims Panel.  See PP Ex. 277.04 Rev (TDP) §§ 5.4(a), 5.10, 5.11 & 7.6.  Thus, contrary to what the Libby Claimants suggest, the TDP will permit Asbestos PI Claimants who are dissatisfied with the outcome of Individual Review to pursue other and further remedies.  For all of these reasons, the Libby Claimants' reliance on the G-I case is misplaced, and their objections should be overruled.

### e.    The Libby Claimants Are Properly Classified as Class 6 Claimants

In their post-trial brief, the Libby Claimants argue, once again, that their claims are not properly classified as Class 6 claimants because, given the "severity and the prognosis of pleural disease caused by exposure to Libby asbestos is different than elsewhere," their claims are not "substantially similar" to other non-malignant claims.  Libby Post Tr. Br. at 19.  As the Court recognized in its comments at the October 14, 2009 hearing, however, the Plan cannot distinguish between Libby Claimants and other Asbestos PI Claimants with the same disease – it would be gerrymandering. 10/14/09 Tr. 129; see also PP Post Tr. Libby Br. at 38-39 (explaining that courts determine whether claims are "substantially similar" under Section 1122(a) of the Bankruptcy Code, allowing them to be classified together, by looking to the "legal character" of the claims, particularly as they relate to the debtor's assets).

### f.    The Libby Claimants Have No Rights to Grace's Insurance

The Libby Claimants argue that the Plan is discriminatory because it allegedly requires them to forfeit "their insurance rights."  But that argument rests on a false premise because the Libby Claimants have *no rights* whatsoever to the non-products insurance coverage.  In

particular, the Libby Claimants have not shown that they hold any type of lien or security interest in the non-products coverage or any existing proceeds.  Because the non-products coverage provided by Royal Indemnity and Maryland Casualty has been settled or exhausted, the only potential source of primary non-products coverage to them is CNA.[9]  But the Libby Claimants have no rights of direct action against CNA under Montana law because none of their claims has been liquidated by an unpaid judgment or an unpaid settlement that CNA consented to.[10]  In short, the Plan does not require the Libby Claimants to forfeit "their insurance rights" because they have none to begin with.  And, as for their reliance on In re AOV Indus., 792 F.2d 1140 (D.C. Cir. 1986), it is misplaced because the plan in that case required a creditor to relinquish his rights under guaranty against a non-debtor.[11]  The Libby Claimants hold nothing that even remotely resembles the contractual guaranty in AOV.

Nothing in Mr. Posner's testimony or otherwise in the evidentiary record changes the conclusion that the Libby Claimants have no superior rights to the non-products coverage.  No evidence was offered that claim values are affected by the presence of insurance coverage. Indeed, there is substantial uncertainty (and no evidence) as to whether and how much non-products coverage will be available to the Trust.

---

[9]  See PP Post Tr. Libby Br. at ¶¶ 3.46-3.49.

[10]  See PP Post Tr. Libby Br. at ¶¶ 3.62-3.65; Plan Proponents' Phase II Trial Brief in Response to Confirmation Objections of the Libby Claimants, dated Aug. 7, 2009 [D.I. 22731] ("PP Pre-Tr. Libby Br."), at 52-55.

[11]  See PP Pre-Tr. Libby Br. at 59 (citing In re AOV Indus., 792 F.2d 1140, 1151-52 (D.C. Cir. 1986)).

g.    **The Libby Claimants' Best Interest Arguments Are Meritless**

The Libby Claimants' "best interest" contentions have no merit and are addressed in the

Plan Proponents' Main Brief.[12]

## II.    THE LIBBY CLAIMANTS' DAUBERT RESPONSE REFLECTS A FUNDAMENTAL MISUNDERSTANDING OF THE W.R. GRACE CRIMINAL CASE

### a.    The Ninth Circuit Opinion in the Criminal Case Dealt with a Rule 703 Analysis

In <u>United States v. W.R. Grace</u>, the Ninth Circuit reversed the trial court's exclusion of

certain scientific evidence because of the court's failure to conduct a Rule 703 analysis.  504

F.3d 745, 766 (9th Cir. 2007).  At the October 14, 2009 <u>Daubert</u> hearing in this case, the Libby

Claimants, for the first time, suggested that the Ninth Circuit's holding in <u>W.R. Grace</u> somehow

provides a legal basis for this Court to ignore its obligations to exclude expert testimony that

does not meet the "reliability" or "fit" requirements of Rule 702.  The Libby Claimants thus fail

to appreciate the difference between Rules 702 and 703 and misconstrue the Ninth Circuit's

opinion.

Specifically, in <u>W.R. Grace</u>, the Ninth Circuit did ***not*** disturb the District Court's

"unreliability" analysis with respect to Rule 702.  504 F.3d at 765-66.  Instead, the Court only

addressed whether the Montana District Court, which had excluded any expert testimony based

on the ATSDR Screening Study, committed error by failing to consider whether, under Rule 703,

---

[12]    The Libby Claimants also repeat their argument about jury trial rights, but offer no new evidence.  The Plan Proponents therefore respectfully refer the Court to their previous post-trial briefing on the subject.  PP Post Tr. Libby Br. at 43-46.  Similarly, with respect to the Libby Claimants' reprise of their arguments regarding the scope of the Channeling Injunction, the Plan Proponents incorporate their previous arguments.  Plan Proponents' Main Post-Trial Brief in Support of Confirmation of Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, Nov. 2, 2009 [D.I. 23662] at 140-42.

the ATSDR Screening Study was the type of study that an expert in his or her field typically relied upon when reaching an expert opinion.  Id.  On remand, the District Court held an evidentiary hearing which included testimony of two of the Government's experts.  After the remand hearing, the District Court (1) held that the ATSDR Screening Study was *not* the type of study that an expert would rely upon in reaching an opinion as to whether asbestos exposures caused disease in the Libby community, and (2) prevented any experts from relying on that study.  597 F. Supp. 2d 1143, 1152, 1157 (D. Mont. 2009).

> **b.**      **The Ninth Circuit's Opinion Does Nothing to Support Admission of the CARD Mortality Study**

The CARD Mortality Study is inadmissible under both Rule 702 and 703.  The Rule 703 inquiry is whether the "CARD Mortality Study" is the type of study that experts in the field would rely upon in order to support an opinion that the TDP medical criteria are discriminatory when applied to claims from Libby.  As discussed extensively in the Plan Proponents' Daubert Brief, a case series of deceased patients in Libby is not the type of study that experts in the relevant field (epidemiology) would rely upon to *prove* any contention that requires the comparison of two groups.  See 9/10/09 Tr. 88-90, 92 (Molgaard).

The Rule 702 analysis is different, but reaches the same result.  Rule 703 does not replace and is distinct from the Rule 702 inquiry this Court must make as to the reliability of the opinions being offered:

> There has been some confusion over the relationship between Rules 702 and 703. The amendment makes clear that the sufficiency of the basis of an expert's testimony is to be decided under Rule 702.  Rule 702 sets forth the overarching requirement of reliability, and an analysis of the sufficiency of the expert's basis cannot be divorced from the ultimate reliability of the expert's opinion.  In contrast, the 'reasonable reliance' requirement of Rule 703 is a relatively narrow inquiry.  When an expert relies on inadmissible information, Rule 703 requires the trial court to determine whether the information is of a type reasonably relied on by other experts in the field.  If so, the expert can rely on the information in

reaching an opinion.  However, the question whether the expert is relying on a *sufficient* basis of information—whether admissible information or not—is governed by the requirements of Rule 702.

Fed. R. Evid. 702 & Advisory Committee Note (2000).  Even if this Court were to determine that an expert could *consider* the "CARD Mortality Study" when opining as to whether the application of the TDP criteria in Libby is medically unreasonable and discriminatory, the Court would still need to conduct a Rule 702 analysis to determine whether the expert has employed a reliable methodology to reach an opinion and whether that opinion fits with the allegations at issue in the case.

Turning to the CARD Mortality Study, its use in connection with the issue of equal treatment reflects no reliable methodology whatsoever and does not fit with the Code's notion of equal treatment — equal treatment of similarly situated claimants.  As to methodology, the Libby Claimants argue that because, twenty people (out of 76 non-malignant decedents) with "pure pleural disease" died and would not (according to Drs. Whitehouse and Frank) be entitled to expedited recovery under the TDP, the Libby Claimants are being discriminated against.  However, when confronted, Dr. Frank was unable to identify on the stand who these twenty people are, much less replicate the analysis that was used to isolate them.  See 9/10/09 Tr. 265-67 (Frank).  Nor does the use of the decedents from the CARD Mortality Study fit with the legal test of discrimination under the Code.  As discussed above, the Libby Claimants have presented no comparison of the treatment proposed for Libby Claimants versus non-Libby claimants, much less shown that the treatment of the latter is more favorable than that afforded to the Libby Claimants.

## **CONCLUSION**

For all the reasons stated herein, the Plan Proponents respectfully request that this Court confirm the Plan and overrule the Libby Claimants' objections.

Dated: November 20, 2009
Wilmington, Delaware

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Barbara Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200

*and*

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

*and*


/s/ James E. O'Neill
PACHULSKI, STANG, ZIEHL & JONES LLP
Laura Davis Jones (#2436)
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC


/s/ Mark T. Hurford
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

*and*

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

*Counsel for the Official Committee
of Asbestos Personal Injury Claimants*


PHILIPS, GOLDMAN & SPENCE, P.A.


/s/ John C. Philips
John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

*and*

22

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern,*
 *Asbestos PI Future Claimants' Representative*


SAUL EWING LLP


/s/ Teresa K.D. Currier
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone:  (302) 421-6800
Facsimile:  (302) 421-6813

*and*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone:  (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity*
*Security Holders*