**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 01-01139 (JKF) |
| W.R. GRACE & CO., <u>et al.</u>, | (Jointly Administered) |
| Debtors. | Hearing Dates: January 4-5, 2010 at 9:00 a.m. |
| | Re: Docket Nos. 23567 and 23657 |

**JOINT REPLY OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND BANK LENDER GROUP TO
<u>GRACE'S POST-TRIAL BRIEF REGARDING BANK LENDER ISSUES</u>**

**November 20, 2009**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................2

ARGUMENT.............................................................................................................................7

      I     GRACE'S DEFAULTS ARE ESTABLISHED BY THE RECORD AND, IN ANY EVENT, THE IMPAIRMENT ISSUES WERE PREVIOUSLY FULLY BRIEFED AND ARGUED...............................................................7

      II.    UNDER THE FAIR AND EQUITABLE TEST, THE BANK LENDERS SHOULD RECEIVE POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE ................................................................10

      A.    Grace's Solvency Is Established As Of The Effective Date Under The Terms of The Plan ............................................................................10

      B.    The Equities Overwhelmingly Support Payment of Post-Petition Interest at the Contractual Default Rate....................................................15

      C.    The Plan Violates The Absolute Priority Rule By Failing To Pay The Bank Lenders Contract Default Interest When Equity Holders Are Retaining Value ..............................................................................24

CONCLUSION..........................................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Beverly Hills Bancorp* v. *R.H. Hine*,
    752 F.2d 1334 (9th Cir. 1984) ............................................................................10

*Butner* v. *United States*,
    440 U.S. 48 (1979) ..........................................................................................8, 9

*Connecticut Gen. Life Ins. Co.* v. *Schaumburg Hotel Owner Ltd. P'ship (In re*
    *Schaumburg Hotel Owner Ltd. P'ship)*,
    97 B.R. 943 (Bankr. N.D. Ill. 1989) ...................................................................24

*First Fidelity Bank* v. *Jason Realty, L.P. (In re Jason Realty)*,
    59 F.3d 423 (3d. Cir. 1995) .................................................................................8

*In the Matter of Lernout & Hauspie Speech Products, N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) ..................................................................15

*In re Ace-Texas*,
    217 B.R. 719 (Bankr. D. Del. 1998) ..................................................................15

*In re Armstrong World Industries*,
    432 F.3d 507 (3d Cir. 2005) ..............................................................................20

*In re Chicago, Milwaukee, St. Paul & Pac. R.R.*,
    791 F.2d. 524 (7th Cir. 1986) ............................................................................15

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) .............................................................25, 26

*In re Dow Corning Corp.*,
    456 F.3d 668 (6th Cir. 2006) ....................................................................... passim

*In re Frascella Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) ................................................................15

*In re Kensington International Ltd.*,
    368 F.3d 289 (3d Cir. 2004) ...........................................................................4, 19

*In re Ogle*,
    261 B.R. 22 (Bankr. D. Idaho 2001) ................................................................7, 8

*In re Refco, Inc.*,
    336 B.R. 187 (Bankr. S.D.N.Y. 2006) ..............................................................19

*In re Resorts Int'l, Inc.,*
    145 B.R. 412 (Bankr. D.N.J. 1990) ..................................................................13

*In re Smith,*
    No.-03-10666(1)(11), 2008 WL 73318 (Bankr. W.D.Ky Jan. 7, 2008) .................................15

*In re Terry Limited Partnership,*
    27 F.3d 241 (7th Cir. 1994) ..........................................................................24

*In re Timbers of Inwood Forest Associates Ltd.,*
    793 F.2d 1380 (5th Cir. 1986), *judgment aff'd,* 484 U.S. 365 (1988) ......................................7

*In re Valley View Shopping Center, L.P.,*
    260 B.R. 10 (Bankr. D. Kan. 2001) ...................................................................10

*In re W.R. Grace & Co., et al.,*
    No. 01-1139, 2009 WL 1469831 (Bankr. D. Del. May 19, 2009) ......................................1, 20

*Integrated Solutions, Inc.* v. *Service Support Specialties, Inc.,*
    124 F.3d 487 (3d Cir. 1997)..........................................................................8, 22

*Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.),*
    324 F.3d 197 (6th Cir. 2003) ..........................................................................25

*UPS Capital Bus. Credit* v. *Gencarelli (In re Gencarelli),*
    501 F.3d 1 (1st Cir. 2007)..............................................................................15

*VFB LLC* v. *Campbell Soup Co.,*
    482 F.3d 624 (3d Cir. 2007)..............................................................................5

STATUTES

11 U.S.C. § 1129(b) ............................................................................ passim

U.S. Bankr. C. Ch. 11 ......................................................................... passim

Pursuant to the Bankruptcy Court's Order, dated October 26, 2009 [Dkt. No. 23567], the Official Committee of Unsecured Creditors (the "Creditors' Committee") and certain lenders under the Prepetition Bank Credit Facilities[1] (the "Bank Lender Group"),[2] by their undersigned counsel, hereby submit this brief in reply to Grace's Post-Trial Brief Regarding Bank Lender Issues, filed November 3, 2009 [3] [Dkt. No. 23664; the "Grace Brief"], and in further support of their objections to confirmation of the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 20872] (the "Plan"),[4] filed by the above-captioned debtors ("Grace" or the "Debtors"), and their co-proponents the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Holders (together with Grace, the "Plan Proponents").

---

[1] The Prepetition Bank Credit Facilities include (i) that certain Credit Agreement, dated May 14, 1998, among the W.R. Grace & Co. (the "Company"), W.R. Grace & Co.-Conn, The Chase Manhattan Bank, as Administrative Agent, Chase Securities Inc., as arranger, and certain Banks party thereto (the "1998 Credit Agreement"), and (ii) that certain 364-Day Credit Agreement, dated May 5, 1999, among the Company, W.R. Grace & Co.-Conn, Bank of America National Trust Savings Assoc., as documentation agent, The Chase Manhattan Bank, as administrative agent, Chase Securities Inc., as book manager, and certain Banks party thereto (as amended, including on May 3, 2000, the "1999 Credit Agreement", together with the 1998 Credit Agreement, the "Credit Agreements"). The Credit Agreements are in the record as CC-BLG Exs. 2 and 3. As in the Creditors' Committee's and Bank Lender Group's Post-Trial Brief [Dkt. No. 23657, the "Post-Trial Brief"], all references to CC-BLG Exhibits in this Reply Brief will be to "UCC Exs."

2   The Bank Lender Group includes (i) Anchorage Advisors, LLC; (ii) Babson Capital Management LLC; (iii) Bass Companies; (iv) Caspian Capital Advisors, LLC; (v) Catalyst Investment Management Co., LLC; (vi) Farallon Capital Management, L.L.C., (vii) Halcyon Asset Management LLC; (viii) Intermarket Corp.; (ix) JP Morgan Chase, N.A. Credit Trading Group; (x) Loeb Partners Corporation; (xi) MSD Capital, L.P.; (xii) Normandy Hill Capital, L.P.; (xiii) Onex Debt Opportunity Fund Ltd.; (xiv) P. Schoenfeld Asset Management, LLC; (xv) Restoration Capital Management, LLC; (xvi) Royal Bank of Scotland, PLC, and (xvii) Visium Asset Management LLC. The Bank Lender Group, together with all holders of claims under the Credit Agreements, including the previous holders of such claims, are collectively referred to as the "Bank Lenders."

3   We note that Grace filed and served its post-trial brief late, on the morning of November 3, which is the day after the briefs were due pursuant to the Court's scheduling order. Grace's counsel notified us just prior to midnight on November 2 that Grace's post-trial brief would not be filed and served until the following morning, notwithstanding that the Creditors' Committee's and Bank Lender Group's brief was filed and timely served hours earlier.

4   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## PRELIMINARY STATEMENT

Although the Grace bankruptcy is a complicated affair, the dispute with the Bank Lenders and Creditors' Committee is straightforward.  After over a year of briefing and an extensive evidentiary hearing, the Grace Brief concedes that the basic issues remain unchanged.  It is undisputed that Grace is required both by the terms of the Credit Agreements and state law to pay the Bank Lenders default interest.  It is undisputed that under bankruptcy law the Bank Lenders must be paid in full before equity can retain any value at all—much less more than $1.5 billion[5] of value.  It is also undisputed that the Bank Lenders will not be paid the contract rate of default interest.  Grace's argument that bankruptcy allows it to rewrite the contracts so that "paid in full" means something less than all amounts due to the Bank Lenders under the terms of the Credit Agreements and state law is meritless, especially when equity is retaining more than $1.5 billion in value.  Grace cannot use its bankruptcy to rewrite its contracts with the Bank Lenders to confer a $100 million windfall to its equity holders.

There is no dispute that, under the Plan, Grace's shareholders retain their interests, and the law therefore provides that senior classes, including general unsecured creditors such as the Bank Lenders, must be paid *in full*, including post-petition interest.  In such circumstances, the law requires that the Bank Lenders' contractual rights be honored, absent "compelling equitable considerations."  *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) ("Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have 'free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness.' Rather, *absent compelling equitable considerations*, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights") (emphasis added).

---

[5]    As of October 30, 2009.  *See* Post-Trial Brief at section II.C., at 22-23.

DM3\1210941.1

Grace fails to point to any compelling equitable considerations in the record to justify not paying the Bank Lenders the default interest required by their contracts.    Grace claims that equity demands that this Court take away the Bank Lenders' contractual rights because the equity holders are making "a far greater sacrifice than [the] Lenders."[6]  But Grace's shareholders are retaining their equity interests, which are now worth approximately 1,592% more than such interests were worth on the Petition Date.[7]  That is neither equity nor sacrifice.

Grace has also chosen to ignore the witness testimony provided at the confirmation trial. Notwithstanding the repeated testimony of its own witnesses who acknowledge that individual creditors were not bound by any agreement that existed between the Creditors' Committee and Grace, Grace's post-trial brief is replete with references to the "Lenders" being bound by the 2005 and 2006 Letter Agreements between Grace and the Creditors' Committee, the "Lenders" not terminating such agreements, the deal Grace made with the "Lenders," and the strategy of the "Lenders" with respect to Grace's negotiations with asbestos, for example, all in an attempt to establish that it is equitable for this Court to bind the Bank Lenders to the terms of the 2005 and 2006 Letter Agreements between Grace and the Creditors Committee.  However, the extensive evidence presented by the Creditors' Committee and Bank Lender Group at trial established, *uncontroverted by Grace*, that no Bank Lender was party to any agreement as to the rate of postpetition interest to be paid under any plan.  There is not even any evidence that Grace ever spoke to a single Bank Lender when Grace entered into the Plan term sheet in April 2008 ("<u>Plan Term Sheet</u>").  The evidence is further uncontroverted that Grace knew full well before it agreed to the Plan Term Sheet that Bank Lenders were rejecting the rate being offered by Grace, and

---

[6]    Grace Brief at 16, ¶ 30.

[7]    *See* Post-Trial Brief at 6.

that notwithstanding that lack of support, Grace determined in any event to advance the terms of the Plan.

Accordingly, Grace's "equitable" case continues to rest upon its prior agreements with the Creditors' Committee's for a rate of interest with respect to a prior unapproved plan, with different terms, at a different time, which Grace ultimately abandoned for the current Plan. Grace's case is entirely off the mark, because even were the Creditors' Committee forever bound to those agreements (and it plainly was not), there is no legal or equitable basis upon which the Creditors' Committee's agreement to such a deal would bind the Bank Lenders. *See, e.g., In re Kensington Int'l Ltd.*, 368 F.3d 289, 315 (3d Cir. 2004) (holding that an official creditors' committee does not have the authority to bind each individual creditor).

The other issue under 11 U.S.C. § 1129(b) is Grace's solvency as of the Effective Date. Grace now concedes that "Grace will be solvent after its plan of reorganization goes into effect."[8]  Robert Frezza, the Creditors' Committee's solvency expert, testified at length to that fact, and no testimony was presented by Grace to the contrary.  Grace does not dispute that the asbestos settlement incorporated into the Plan renders Grace solvent as of the Effective Date, after giving effect to the settlement under the Plan.

The issue, then, is purely a legal one.  Grace's argument is that solvency is not measured as of the Effective Date under the Plan, but at some other, unspecified point in time that would allow Grace to disregard the asbestos settlement for purposes of solvency.  This argument is— and always was—too cute by half.  Determining solvency as of any date other than the Effective Date makes little sense and is without any legal precedent.  Not surprisingly, Grace fails to provide any authority to support its position that the solvency test date for plan purposes is some

---

[8]    Grace Brief at 30, ¶ 60.

date other than the Effective Date.  The Plan Effective Date has to be the measurement date—equity is retaining value in these cases under the Plan, and equity can only do so if Grace is solvent under the Plan on the Effective Date.

The single case cited by Grace on this solvency point, as we explain below, does not stand for Grace's proposition (and, in fact, supports the position that the date by which to measure solvency is the effective date of the plan being proposed for confirmation).  And Grace's proposition itself is absurd, because the issue before the Court is a confirmation issue arising under section 1129(b), premised in the terms of the Plan before the Court, the determination of which requires the Court to reconcile the terms of the Plan itself.  After fully resolving its liabilities under the Plan, Grace retains positive equity value for its existing equity holders: it is solvent under its Plan as of the Effective Date.  Grace's proposition is merely a litigation-derived fiction created for purposes of this case that has no basis in law.

Grace also argues that we have abandoned the arguments that it is solvent due to its positive market capitalization.  Nothing could be further from the truth.  Our position always was and remains that the entire solvency analysis presented at the confirmation trial is simply a third reason why Grace is solvent.  Grace must be solvent as a matter of law because equity is retaining value (otherwise the Plan violates the absolute priority rule) and because Grace's market capitalization is in excess of $1.5 billion.  *See* Pre-Trial Brief at 41-43, ¶¶ 93-95*; VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (holding that company's market capitalization provides a reliable measure of its value, since "it reflects all the information that is publicly available about a company at the relevant time of valuation").

Grace in its post-trial brief again tries to avoid the equitable issues entirely by rehashing its arguments concerning impairment (i.e., Bank Lenders are not impaired because they are paid

5

in full) that were previously fully briefed, regarding which the factual record was established months ago and which the Court previously took under advisement.[9]  At bottom, the issue here is simply stated:  Grace's defaults under the Credit Agreements are readily established by the record.  The fact that the so-called default rate is also the only interest rate available to Grace under the Credit Agreements upon the scheduled maturity of the debt in 2001 and 2003 is similiarly uncontroverted.  The impairment issue is thus purely a legal one that rests on the question of whether Class 9 is being paid in full.  Absent payment of the contract default rate, the Bank Lenders are not being paid in full and Class 9, of which the Bank Claims are part, is impaired.

Grace claims that the "Plan rate is the perfect answer."[10]  Perhaps it would be if the Plan were not structured to provide for Grace's shareholders to retain their interests when the Bank Lenders are not being paid what they are owed under their contracts.  A Plan that fails to comply with the bankruptcy laws cannot be "perfect."  Indeed, absent payment of the default rate to the Bank Lenders, the Plan is not even confirmable.

---

[9]    *See* Tr. Aug. 24. 2009 at 41:6-11.

[10]    Grace Brief at 4.

## ARGUMENT

### I.

### GRACE'S DEFAULTS ARE ESTABLISHED BY THE RECORD AND, IN ANY EVENT, THE IMPAIRMENT ISSUES WERE PREVIOUSLY FULLY BRIEFED AND ARGUED

Grace devotes ten pages of its post-trial brief to once again argue that it did not default under the Credit Agreements and that Class 9 is not impaired.  *See* Grace Brief at 18-27.  All of this was previously briefed and argued before the Court.  Indeed, counsel for Grace, the Bank Lender Group and the Creditors' Committee agreed on the record of the hearing held on August 24, 2009 that each would rest on their papers and that these issues were ready for determination by the Court.[11]  Accordingly, although we briefly respond below to Grace's most glaring misstatements of law, we respectfully refer the Court to the Bank Lender Group's and Creditors' Committee's previous briefing on the impairment issues, which we expressly incorporate by reference as if fully set forth herein.  *See* Pre-Trial Brief at 19-39, ¶¶ 44-88; Supplemental Impairment Brief.

In connection with the impairment issue, Grace in its post-trial brief presses its incorrect argument that the Bankruptcy Code is deemed to be incorporated into every state law contract, including the Credit Agreements.  *See* Grace Brief at 22, ¶ 41-42.  This proposition is the exact opposite of the law, is not supported by the case law Grace relies upon,[12] and is

---

[11]   Tr. Aug. 24, 2009 at 41:6-11 (THE COURT: Everyone is agreeing that this issue can be determined on the briefs in addition to Morgan Stanley's argument today; is that correct? So it's now under advisement for me. No one else is asking for additional argument. MR. BERNICK: I think that that is correct …."); *see also id*. at 38:2-9; 19:5-20:2; 20:9-11.  We therefore do not believe that it is necessary to again address these issues during the closing arguments scheduled for January 2010.

[12]   The cases cited by Grace are inapposite and do not stand for the proposition that contracts incorporate the entire Bankruptcy Code.  *In re Timbers of Inwood Forest Assocs. Ltd*., 793 F.2d 1380 (5th Cir. 1986), *judgment aff'd, 484 U.S. 365 (1988)* involved the issue of whether *under*secured creditors were entitled to periodic adequate protection payments during the pendency of a bankruptcy case.  *In re Ogle*, 261 B.R. 22 (Bankr. D. Idaho 2001) involved a chapter 12 bankruptcy case where the court was deciding what rate of interest to apply in connection

contrary to the Supreme Court's mandate in *Butner* v. *United States*, 440 U.S. 48, 54 (1979)

(holding that property interests created and defined by state law should be analyzed the same,

regardless of bankruptcy, absent a federal interest requiring a different result).[13]   As the Third

Circuit held in *Integrated Solutions, Inc.* v. *Serv. Support Specialties, Inc.*, 124 F.3d 487 (3d Cir.

1997), in the bankruptcy context,

> 'the usual rule is that congressional intent to pre-empt will not be
> inferred lightly.  Pre-emption must be either explicit, or compelled
> due to an unavoidable conflict between the state and federal law.' .
> . . Because [the Third Circuit] is reluctant to assume federal
> preemption, we noted that any analysis should begin with the basic
> assumption that Congress did not intend to displace state law.'

*Id.* at 491 *citing In re Roach*, 824 F.2d 1370, 1373-74 (3d Cir. 1987).  The Third Circuit further

recognized, as a general matter, "without explicit federal preemption, the trustee does not have

greater rights in the property of the estate than the debtor had before filing for bankruptcy."  *Id.*,

124 F.3d at 493.  It is undisputed that outside of bankruptcy Grace must pay the Bank Lenders

default interest in accordance with the Credit Agreements.  There is no federal purpose possibly

served by taking away the Bank Lenders' contractual rights such that they will receive some

$100 million less due to the happenstance of bankruptcy and that Grace's equity holders will

---

with its award of post-petition interest to an unsecured creditor.  The *Ogle* court was deciding which of the two recognized lines of cases it should adopt:  the state contract rate approach or the federal judgment rate approach. *Id.* at 30.  Ultimately, the *Ogle* court elected to adopt the federal judgment rate because such approach would relieve chapter 12 trustees of the administrative burden of calculating the rates of interest for individual creditor claims and also because it would promote "equity of distribution among creditors." *Id.* at 31.  This is a chapter 11 case, and Grace with the assistance of its many advisors is very capable of calculating the rate of interest for its various contracts.  Thus, the cases cited by Grace do not support its argument that the Bank Lenders' legal and contractual rights are not being altered because section 502 is deemed to be a term of the Credit Agreements and, accordingly, the Bank Lenders' right to post-petition interest was somehow extinguished.

[13]   *See also First Fidelity Bank* v. *Jason Realty, L.P. (In re Jason Realty),* 59 F.3d 423, 427 (3d. Cir. 1995) (citing *Butner* and finding that goal must be to ensure that creditor "is afforded in federal bankruptcy court the same protection [it] would have under state law if no bankruptcy had ensued").

receive a corresponding $100 million windfall as a result.[14]  Accordingly, there are no legally "implied terms" in the Credit Agreements incorporating sections 502(b)(2) or 362(a) of the Bankruptcy Code.

The lynchpin of Grace's impairment argument is that section 362(a) "prohibited Debtors from repaying the principal amount of the loans when they matured during the bankruptcy." Grace Brief at 22, ¶42.  There is, however, no such prohibition in section 362(a) or anywhere else in the Bankruptcy Code, for that matter, which bars a debtor from paying an unsecured claim during the course of a bankruptcy case.  Section 362(a) merely prohibits a creditor from enforcing its right to immediate payment.  A debtor can pay an unsecured pre-petition claim during its bankruptcy case as long as it first obtains a Court order authorizing it to do so.  Grace knows this full well, having sought and obtained the Court's permission to settle with and immediately pay the EPA some $250 million in satisfaction of the EPA's unsecured claim during these bankruptcy cases.  *See* Dkt. No. 18848 (Order Authorizing Settlement Agreement Resolving The United States' Proofs Of Claim Regarding The Libby, Montana Asbestos Site And Authorizing Payment Of The Claim, dated June 2, 2008).  What's more, even if Grace were prohibited from paying off claims during bankruptcy (which it is not), we have already demonstrated that the bankruptcy and payment defaults that occurred, coupled with the passage of the Credit Agreements' natural maturity thereunder in 2001 and 2003, require Grace to pay the default rate in connection with Grace's emergence from bankruptcy and that Grace is not excused from paying the default rate under any *ipso facto* type of defense.  *See* Pre-Trial Brief at 21-34, ¶¶ 47-75.

---

[14]    *See Butner*, 440 U.S. at 54 (quoting *Lewis* v. *Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)) ("[u]niform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy'").

**II.**

**UNDER THE FAIR AND EQUITABLE TEST, THE BANK LENDERS SHOULD RECEIVE POSTPETITION INTEREST AT THE CONTRACT DEFAULT RATE**

**A.    Grace's Solvency Is Established As Of The Effective Date Under The Terms of The Plan**

Grace argues that solvency for purposes of determining whether the Bank Lenders should receive default interest under the Plan should be evaluated "without giving effect to a plan of reorganization." Grace Brief at 32, ¶ 64. This is nonsensical. First, Grace's position ignores the fact that it is the Plan itself that is the subject of the Bank Lender Group's and the Creditors' Committee's objections pursuant to 11 U.S.C. § 1129(b). Second, Grace has cited absolutely no relevant legal authority to support its litigation posture.

As discussed in our opening brief (Post-Trial Brief at 13-17), the only relevant date by which to test solvency in connection with a postpetition interest determination is the effective date of the plan that is subject to confirmation. *See, e.g., Beverly Hills Bancorp* v. *R.H. Hine*, 752 F.2d 1334, 1339 (9th Cir. 1984) ("The record indicates that the debtor will be solvent upon the discharge of all claims, with a net return to shareholders in excess of $4 million. The [creditors] have been awaiting patiently the complete discharge of their claim, after considerable litigation, for more than ten years. Under these circumstances, we hold that the denial of their claim for post-petition interest was an abuse of discretion").

The single case relied upon Grace as support for its position that the terms of the Plan should be ignored, *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10 (Bankr. D. Kan. 2001), actually supports the position advanced by the Bank Lender Group and Creditors' Committee (and, indeed, we cited *Valley View* in our opening brief; *see* Post-Trial Brief at 12, 14). As an initial matter, *Valley View* did not involve a demand for default interest pursuant to section 1129(b) because the unsecured creditor class had voted in favor of the plan before the Court and,

10

therefore, section 1129(b) did not apply.[15]  *Id.* at 21.  Instead, both the debtor and its landlord

filed competing plans.  The landlord also purchased some small unsecured claims and, in that

capacity, asserted various objections to the debtor's plan, which proposed to pay all creditors in

full (without interest) and allowed equity holders to retain their interests.  *Id.* at 21, 28.  The

landlord argued that the debtor's plan did not comply with the best interests test of section

1129(a)(7) because the plan did not provide for payment of interest to unsecured creditors.  *Id.* at

30.  To support that argument, the landlord cited to testimony that purportedly showed that the

debtor was solvent years earlier, in 1997 and 1998.  Fully consistent with the Bank Lender

Group's and Creditors' Committee's position here, the *Valley View* court rejected the landlord's

contention because "it does not show Debtor was solvent *on the effective date of the Plan*."  *Id.*

(emphasis added).

        Grace hinges its reliance on *Valley View* on the court's finding that the debtor's plan was

feasible under section 1129(a)(11).  The court framed the feasibility question as "[w]ill the

reorganized debtor emerge from bankruptcy solvent and with a reasonable prospect of success?"

*Id.* at 33.  The court was not presented with the issue of whether the debtor was solvent "without

regard to any plan of reorganization," as Grace inaccurately suggests in its brief.  Grace Brief at

31, ¶ 61.  Indeed, the court specifically rejected the landlord's solvency argument for the very

reason that the landlord failed to offer proof of solvency "on the effective date of the Plan."  *Id.*

at 30.  The court was not asked to and did not consider whether solvency was proven by anything

other than the evidence presented by the landlord as of 1997 and 1998, years prior to the plan

---

[15]  Also, notably, the court held that because the unsecured creditor class was being paid without interest and 90
      days after the effective date of the plan, the class was impaired pursuant to section 1124 of the Code.  *Id.* at 32-
      33.

being presented to the court.  Grace's tortured reading of the case simply does not support its position.

Here, of course, there can be no reasonable dispute that the Bank Lender Group and Creditors' Committee established that Grace is solvent as of the Effective Date of the Plan, applying the Plan's terms.  Robert Frezza, the Bank Lender Group's and Creditors' Committee's expert, testified unequivocally that Grace is solvent on this basis.  *See* Post-Trial Brief, section II. B at 17-22.  Grace offered no evidence to rebut Mr. Frezza's conclusion of solvency, choosing to instead argue now that Mr. Frezza tested solvency under the wrong standard.[16]

Grace tries to obfuscate the proof of its solvency by noting that all post-reorganization Chapter 11 debtors are solvent after discharging their debts at a discount under a plan —a non-controversial but ultimately irrelevant point.  A debtor is not solvent under a plan if liabilities (for liquidated or settled amounts, as the case may be) are not paid in full and existing equity value is being extinguished—even if such debtor is solvent after the plan is fully consummated. Grace is solvent here because under its Plan on the Effective Date, after Grace's liabilities are paid in full, equity will retain its interests and substantial value.  The existence of equity value after payment of liabilities, whether for liquidated or settled amounts, is solvency by any measure.

---

[16] Grace again attacks Mr. Frezza for performing a balance sheet test utilizing Grace's expert's $468 million asbestos personal injury estimate.  As set forth in our opening brief, the Bank Lender Group and Creditors' Committee are not advocating solvency based upon this single analysis.  Post-Trial Brief at 21, fn. 29.  Rather, Grace is solvent under the three other tests that Mr. Frezza performed and explained at trial; a balance sheet test using the values as provided in the Disclosure Statement, a cash flow test, and an adequate capital test.  Post-Trial Brief at 18-21.  Grace also argues that Mr. Frezza's conclusion that Grace is solvent under the adequate capital test is not reliable because it was not "complete."  Grace Brief at 33, ¶ 66.  But Mr. Frezza did not perform a "complete" adequate capital test because the other solvency tests that he performed so clearly indicated Grace's solvency:  "you don't need more than that in a situation like this to come to a conclusion under the adequate capital test because it is very much a judgmental test, qualitative judgmental test."  Tr. Sep. 16, 2009 at 325:14-326:8; 328:11-329:13.  Indeed, Mr. Frezza testified that of the various solvency tests that he performed, no one is preferable to any other and that "there's no stipulation that all three have to be done."  Tr. Sep. 16, 2009 at 293:21-294:5.

12

Grace cannot have it both ways in arguing that solvency cannot be determined at any point because Grace's asbestos liabilities were never judicially determined (as opposed to being settled under the Plan). *See* Grace Brief at 28-30, ¶¶ 55-58. If solvency cannot be determined, as Grace contends, then it follows not only that the Bank Lenders would not receive default interest on their claims, but also that Grace's shareholders cannot retain any value under the Plan. *See, e.g., In re Resorts Int'l, Inc.,* 145 B.R. 412, 483 (Bankr. D.N.J. 1990) *(citing In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr. S.D.N.Y. 1984) ("stockholders cannot participate in a reorganization plan *unless it is established that the debtor is solvent*") (emphasis added). Grace, in fact, has cited to no cases or legal authority for the proposition that equity may retain value where a debtor is not solvent. Therefore, even were Grace's position to be adopted by the Court, the Plan still could not be confirmed because the Plan provides for equity to retain its interests notwithstanding that solvency could not be established.

In fact, were Grace's position adopted (and Mr. Frezza's testimony found irrelevant and the market capitalization is disregarded), the only remaining evidence in the record is that Grace is *insolvent*. For example, the consolidated balance sheets disclosed in Grace's Form 10-K annual report for the fiscal year ended December 31, 2008 indicate that Grace's liabilities exceed its assets, thus indicating that Grace would have been insolvent on that date (albeit on a book value basis, without valuing assets at fair value as would be appropriate). UCC Ex. 26 at F-8, CC-BLG003712. For purposes of that balance sheet, Grace valued its asbestos liabilities at $1.7 billion. *Id*. But the only evidence in the confirmation record before this Court as to the value of the personal injury asbestos liabilities is that presented by Dr. Mark Peterson, who estimated the present and future personal injury asbestos claims against Grace as worth approximately $5.4

billion.[17]  *See* Tr. Sep. 15, 2009 at 203:2-204:5.  If that figure was accurate, there could be no legitimate issue but that Grace would be insolvent and, accordingly, that equity could not receive any recovery under the Plan.  Although we believe Dr. Peterson's estimate is incredibly high (as apparently does Grace, which presented the expert testimony of Dr. Thomas Florence[18] during the estimation trial that those same asbestos personal injury liabilities were worth only $468 million),[19] and that Grace is solvent, this evidence in the record demonstrates the absurdity in Grace's position with respect to its solvency.  At some point, Grace can no longer have it both ways:  when forced to confront the ramifications of an insolvency finding in the context of Plan confirmation to its equity holders, we suspect that even Grace would concede that it is solvent.

In sum, the relevant inquiry here, when equity holders are retaining their interests under the Plan, is whether Grace is solvent on the Effective Date giving effect to the terms of the Plan. The Plan resolves all of Grace's liabilities for specific amounts to be paid by Grace (and others).[20]  Grace now admits that it is solvent on this basis: "Grace will be solvent after its plan

---

[17]   This figure reflects Dr. Peterson's estimate of Grace's liability for present and future personal injury claims on a net present value basis as of April 2001.

[18]   Grace now either disingenuously or mistakenly states that Dr. Florence was the Equity Committee's estimation expert.  Grace Brief at 16, ¶ 30.  He was, in fact, Grace's expert.  *See e.g.*, Updated Notice of Debtors' Order of Witnesses [for the estimation trial], dated March 14, 2008 [Dkt. No. 18300].

[19]   Grace incredibly presented testimony at the confirmation trial impeaching the opinions of its own expert, Dr. Florence.  Dr. Denise Martin testified for Grace that Dr. Florence's opinions of values presented at the estimation trial were so uncertain that his estimates could actually range from $4.6 million to $6.3 billion.  Tr. Sep. 16, 2009 at 151:20-23.  Dr. Martin's testimony, if reliable, would lend support to the reasonableness of the asbestos settlement that is the foundation of the Plan, but it does nothing to inform the issue of solvency now before the Court.

[20]   Grace's own expert witness, Pamela Zilly of Blackstone, so testified:  "If the amended [P]lan is confirmed by the Court and goes effective, then I believe that pursuant to the settlement set forth in the [P]lan that relates to the amount of assets that Grace and others will contribute to the PI trust, then the asbestos claims will be resolved."  (Tr. Sep. 16, 2009 at 118:17-21) (emphasis supplied).

of reorganization goes into effect."[21]  Accordingly, the solvency issue is now shown to be the red

herring that the Bank Lender Group and Creditors' Committee have been asserting all along.

**B.      The Equities Overwhelmingly Support Payment of Post-Petition Interest at the Contractual Default Rate.**

Grace and the other Plan Proponents "bear[] the burden of establishing the satisfaction of

each of the confirmation requirements."  *In re Frascella Enters., Inc.*, 360 B.R. 435, 441 (Bankr.

E.D. Pa. 2007).  *See* Post-Trial Brief at 7-8 and cases cited therein.  It is Grace's burden to

establish, by a preponderance of the evidence, that the Plan satisfies the "absolute priority rule"

and "does not unfairly discriminate against dissenting classes and that treatment of such

dissenting classes is fair and equitable."  *In the Matter of Lernout & Hauspie Speech Prods.,*

*N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003); Post-Trial Brief at 7-8.  And, it is Grace's burden

to demonstrate why this Court should not adopt the presumption that other courts have

recognized (most comprehensively by the Sixth Circuit in *Dow Corning*, 456 F.3d 668 at 679),

that "*absent compelling equitable considerations*, when a debtor is solvent," the bankruptcy

court should "enforce the creditors' contractual rights."[22]

Accordingly, the Bank Lenders should be paid their contractual default interest rate

unless Grace establishes there are "compelling equitable factors."  Grace tries mightily to show

that the equities weigh against awarding the Bank Lenders contractual default interest on their

---

[21]    Grace Brief at 30, ¶ 60.

[22]    *See In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d. 524, 528 (7th Cir. 1986) ("if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights"); *In re Smith,* No.-03-10666(1)(11), 2008 WL 73318 (Bankr. W.D.Ky Jan. 7, 2008); *In re Ace-Texas*, 217 B.R. 719 (Bankr. D. Del. 1998) (awarding contract default rate of interest after debtor failed to overcome the presumption in favor of the contract rate); *see also UPS Capital Bus. Credit* v. *Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007) (in awarding secured creditor's claims for prepayment penalties, the court held: "Let us be perfectly clear.  This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law." (citing *Dow Corning*, 456 F.3d at 679)).

claims, but the facts presented at trial render Grace's attempts futile.  Grace has failed to present any evidence at trial that establishes that there are any equitable factors —much less compelling equitable factors—that justify overcoming the *Dow Corning* presumption to award contract default rate interest.

Grace first argues that because solvency was in dispute when the Creditors' Committee agreed in January 2005 and February 2006 to a postpetition interest rate for its constituency's claims under a different, prior, unrelated plan, the Creditors' Committee and Bank Lender Group should not "now turn around and simply ignore the context in which the Plan rate of interest was negotiated."  Grace Brief at 39, ¶ 78.  Yet, it is Grace that is ignoring the context in which the Plan rate was negotiated.  The testimony at trial was unequivocal that Grace knew *before* it agreed to the Plan Term Sheet, including its provision for postpetition interest at less then the contract default rate, that circumstances had significantly changed between February 2006 and April 2008, when Grace negotiated the Plan Term Sheet.  By April 2008, Grace knew that Bank Lenders were expecting to recover postpetition interest at the default rate.  Mark Shelnitz, Grace's General Counsel, testified that Lewis Kruger, counsel for the Creditors' Committee, "indicated to me that the trading price of the debt indicated there may be some bank debt holders that had an expectation of a higher rate of interest, I recognized that that could be an issue, but that the committee support would [be] very powerful in getting the plan confirmed."  (Tr. Sep. 16, 2009 at 75:16-21).  Mr. Shelnitz acknowledged that "somewhere in the spring of 2007 time frame, Mr. Kruger happened to mention to me that he saw that the bank debt, or he had been advised that the bank debt was trading at a level that indicated some expectation of interest above the accrual rate in the 2006 letter agreement."  (Tr. Sep. 16, 2009 at 57:2-7).  And, as if there

could be any doubt that Mr. Shelnitz was fully aware that he did not have the support of Bank Lenders, he testified:

> Q    You were told during the discussions with Stroock, during that period of time, that certain bank debt holders were not agreeable to the rate provided in the term sheet, weren't you?
>
> A    I believe so.
>
> Q    So, you knew that before the term sheet was signed?
>
> A    Yes.

(Tr. Sep. 16, 2009 at 76:4-9). Grace's plowing ahead with a Plan that it knew would be opposed by Bank Lenders cannot be an equitable consideration that compels a finding that the Bank Lenders be bound to the terms of such Plan, especially (as further discussed below) in light of the admissions made by Mr. Tarola and Mr. Shelnitz on the witness stand that they knew that individual creditors, such as the Bank Lenders, were not bound by any prior "deal" with the Creditors' Committee. Grace's equitable reliance arguments are simply without any factual basis.[23]

Grace next contends that because the Bank Lenders are receiving the same postpetition interest rate negotiated by the Creditors' Committee in February 2006, their efforts to obtain contract default interest now under the Plan cannot be fair and equitable because they "will receive the exact benefit of their bargain." Grace Brief at 40, ¶ 83.[24] That argument ignores the

---

[23]    Grace also claims that it "relied" on those "agreements" and "adjusted" its books and records and operating reports accordingly. Grace Brief at 9, ¶¶ 12-13. This is legally irrelevant because Grace, to argue estoppel, must establish that in relying on the alleged promise, it sustained an unconscionable injury such that enforcement of the promise is necessary to avoid injustice. *See* Post-Trial Brief at section III.C. 2 at 37-40.

[24]    In more than one place in their brief, Grace accuses the Creditors' Committee and Bank Lender Group of "deceptive" conduct. *See, e.g.*, Grace Brief at 40, ¶ 83. Grace never attempts to explain what was deceptive about any of the actions taken by either the Creditors' Committee or the Bank Lender Group and, indeed, the facts demonstrate just the opposite --  that, for example, the Creditors' Committee, through its counsel, communicated to Grace the concerns of Bank Lenders regarding postpetition interest as early as 2007 and that

record and is legally unsustainable.  First, there was no bargain with the Bank Lenders entered post-petition.[25]  There is no evidence of any agreement with any individual Bank Lender.  The only bargain that the Bank Lenders ever struck with Grace were those set forth in the Credit Agreements, and all that the Bank Lenders are asking for is that they receive the "exact benefit of that bargain"—the interest rate set forth in the Credit Agreements.

Grace never obtained, or even attempted to obtain, the affirmative support of any Bank Lender to the prior plan.  The testimony on this point is incontrovertible  *See* Tr. Sep. 16, 2009 at 38:25-39:6; 39:16-24; 42:5-12 (Mr. Tarola's testimony that he is unaware of any agreement binding any bank debt holder to the terms of the prior plan); Tr. Sep. 16, 2009 at 74:13-75:8 (Mr. Shelnitz's testimony that there was no separate agreement or signed document with any Bank Lender or JPMorgan binding any Bank Lender to a specified rate of postpetition interest).   And, of course, Grace publicly acknowledged that individual creditors were not bound by the Creditors' Committee's agreement.  *See* Amended Disclosure Statement for the Amended Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated January 13, 2005 [Dkt. No. 7559] (the "2005 Disclosure Statement") at 59, fn. 18 (disclosing the 2005 Letter Agreement and that "[t]his agreement does not commit *any member* of the Unsecured Creditors' Committee *or any creditor* to vote for the Plan;" emphasis added); *see also* Tr. Sep.

---

the Creditors' Committee attempted to negotiate the postpetition interest rate contained in the term sheet before the term sheet was signed.  *See, e.g.*, Tr. Sep. 16, 2009 at 77:22-78:4; 198:14-23: 199:8-22.  It was Grace's choice to ignore the Creditors' Committee's warnings.  The cavalier use of words such as "deceptive" does not make it so.

[25]   The only evidence whatsoever of any Bank Lender involvement here is Mr.Tarola's statement that the then Committee Chair, Mr. Maher, told him in the context of negotiating the 2005 and 2006 Letter Agreements (which again were with respect to a different plan which was never approved) that Mr. Maher was in contact with some debt holders.  Tr. Sep. 16, 2009 at 31:1-7.  As the evidence at trial revealed, Grace's witnesses admitted that no Bank Lender ever signed anything and there is no evidence that any of those with whom Mr. Maher may have spoken are still Bank Lenders today. It cannot possibly be equitable to take away Bank Lenders contractual rights today based on what some other Bank Lenders may have told Grace or the Creditors' Committee years ago.

16, 2009 at 80:21-23 (Mr. Shelnitz: "I wasn't really focusing on the extent to which individual bank debt holders may or may not have been bound [to the 2006 Letter Agreement]").  How, then, given that individual creditors were not bound to the prior plan, could it be inequitable for them to now object to their treatment under the current Plan?

Second, as a matter of law, the Creditors' Committee's 2006 Letter Agreement is not and never was binding on any individual creditor.  *See In re Kensington Int'l Ltd.*, 368 F.3d at 315 (holding that an official creditors' committee does not have the authority to bind each individual creditors); *In re Refco, Inc.*, 336 B.R. 187, 197 (Bankr. S.D.N.Y. 2006) (noting that "a committee's assent to a plan or a transaction does not bind its members, let alone its constituents").  What's more, the 2006 Letter Agreement was entered into with respect to a different plan – the then proposed 2005 Joint Plan - with different terms, at a much earlier point in time.[26]  The 2006 Letter Agreement did not provide for the Creditors' Committee to be committed to support *any* Grace plan that provided the same treatment to general unsecured claims as was provided under the 2005 Joint Plan.[27]  The 2006 Letter Agreement was not even legally binding on the Creditors' Committee by April 2008, when the Plan Term Sheet was agreed to by Grace and the Plan Proponents.[28]  *See In re Armstrong World Indus.*, 432 F.3d 507,

---

[26]  Among other differences as compared to the current Plan, the 2005 Joint Plan (i) provided for the class of general unsecured claims to be paid 85% in cash and 15% in stock, (ii) provided that the general unsecured claims class was impaired and entitled to vote, and (iii) did not contain a settlement of asbestos personal injury claims.  *See* Post-Trial Brief at 30, fn. 48.

[27]  UCC Ex. 33. Further, the current Plan is not an amendment of the 2005 Joint Plan to which the Creditors' Committee gave its prior written consent.

[28]  As a factual matter, the deal entered into by the Creditors' Committee in February 2006 had lapsed.  The Creditors' Committee under the 2006 Letter Agreement could withdraw as a plan proponent for a host of reasons, including (a) if this Court did not approve a disclosure statement incorporating Grace's amended 2005 Joint Plan by December 31, 2005, (b) if Grace's exclusive period to file its amended 2005 Joint Plan terminated, or (c) if its amended 2005 January Plan failed to become effective on or before February 28, 2007.  It is beyond dispute that this Court never approved the disclosure statement for the 2005 Joint Plan, the 2005 Joint Plan did not become effective on or before January 1, 2007, and this Court terminated Grace's exclusive period by order dated July 26, 2007 [Dkt. No. 16396].  *See* Post-Trial Brief at 38-39; *see also* Memorandum Opinion, *In re W.R.*

517-18 (3d Cir. 2005) (refusing to apply judicial estoppel to silence creditors' committee from objecting to a plan of reorganization which it had previously actively supported). It is, of course, accurate that the Creditors' Committee did not terminate the 2006 Letter Agreement until after the litigation commenced concerning the default interest issues. But, it is also irrelevant.[29]

Grace's invective does not change the facts. Grace disingenuously states that "[t]he evidentiary record shows a pattern of opportunistic behavior and broken promises by the Committee on behalf of the Lenders." Grace Brief at 28, ¶ 53. This is both legally irrelevant and factually inaccurate: there is no evidence of any promises—broken or otherwise—by either the Creditors' Committee or the Bank Lenders. The record demonstrates a direct and repeated attempt by the Creditors' Committee to advise Grace that a key constituency, the Bank Lenders, were not supportive of a plan that did not provide for payment of contractual default interest. As Mr. Kruger, the Creditors' Committee's counsel, explained at trial, even after the Creditors' Committee was presented with a draft term sheet in April 2008 that did not provide for default interest, the Creditors' Committee still tried to find common ground with Grace by which it might be able to support the proposal,[30] *provided that* the Plan expressly set forth a mechanism for Bank Lenders (and all other unsecured creditors) to object to the postpetition interest rate terms if they were so inclined. *See* PP Ex. 284 (e-mail from Arlene Krieger, counsel to the

---

*Grace & Co., et al.*, No. 01-1139, 2009 WL 1469831, at 1 n.3 (Bankr. D. Del. May 19, 2009) (noting that the 2005 Plan was never presented for confirmation and is no longer before the Court, and concluding that the 2005 Letter Agreement, amended by the 2006 Letter Agreement, is no longer in effect).

[29]   Termination was, of course, unnecessary. There was no need to terminate the 2006 Letter Agreement given that Grace was no longer pursuing confirmation of the 2005 Joint Plan.

[30]   *See* Tr. Sep. 16, 2009 at 204:2-11 (Mr. Kruger's testimony: "We had discussed with Mr. Shelnitz both prior to this email and right at the time of this email that we thought that it was appropriate that if there was going to be a prospect of having the unsecured creditors committee support this plan that there needed to be a provision in the plan that allowed individual creditors to seek redress from the Court with respect to what they believe was appropriate interest rates for them to receive. We had suggested that there were similar provisions in the USG plan and that this was a model that ought to be followed in the Grace plan").

20

Creditors' Committee, to Mr. Shelnitz providing "initial thoughts' on the draft term sheet and suggesting language to be added to the term sheet: "provided, however, any such holder may seek to obtain a higher interest rate and shall be entitled to such higher interest rate if the Court determines such rate is appropriate"). Mr. Shelnitz understood this. He testified that:

> I understood it as the committee and committee counsel continued to be supportive of the letter agreement, but they knew there were certain members of their class that might want—might object, and they [the Creditors' Committee] sought to preserve their rights to object, *a right that,* I guess*, we believe that they had all along anyway,* but she [Ms. Krieger] sought to give express comfort to a holder who might want to seek a higher rate, that they could do so.

(Tr. Sep. 16, 2009 at 71:17-24) (emphasis supplied). Yet Grace, ignoring what it had been told by the Creditors' Committee concerning the lack of support from Bank Lenders, refused to revise the term sheet to include this language. The Plan, of course, also contains no such provision. On these facts, if anyone acted inequitably, it is Grace.

Grace's next attack is that the Creditors' Committee and the Bank Lenders have not provided any "real support" for Grace during these bankruptcy proceedings. Grace Brief at 41-42, ¶ 85-86. Not surprisingly, there is no legal authority presented by Grace for its contention that "real support"—whatever that means—is required in order for the Bank Lenders to obtain their contractual default interest. But regardless, this argument is definitively put to rest by Grace's own words, spoken immediately after the Plan Term Sheet was publicly announced by Grace. Its Chief Executive Officer, Mr. Festa, told participants on an investor conference call on April 7, 2008 that "while we've been in Chapter 11 we've worked very hard to try to maximize the total value, *and all of our creditors committees have worked with us* and as you know, we've been able to do some small acquisitions, roughly 20 of those all in cash, and we've been able to improve our operations as well through various small measures and programs." UCC Ex. 35 at 5 (emphasis added). Mr. Festa also then publicly stated, in explaining that the Creditors'

21

Committee was not a proponent of the Plan Term Sheet, that "we more than anticipate working with them [the Creditors' Committee], educating them during this week and *hopefully they will continue to support us as they have done for the last three plus years as we have worked very closely together as one group*." *Id*. at 7 (emphasis added). Even were the absence of "real support" an appropriate factor, there is simply no factual support for Grace's contention that the Creditors' Committee has not supported Grace during these bankruptcy cases.

Grace also tries to argue that other constituencies fare worse than do the Bank Lenders under the Plan's terms. Grace Brief at 42, ¶ 87. Grace's argument is misleading and faulty (and irrelevant to whether the Plan violates the absolute priority rule). Grace claims that the asbestos personal injury claimants will receive 25-35% "of the total recovery to which they believe they are entitled." *Id*. This is a meaningless percentage because it is calculated based upon Dr. Peterson's extraordinarily high estimate, an estimate that was vigorously contested by Grace (and others) during the estimation trial.[31] If we instead use Grace's expert's, Dr. Florence's, $468 million median estimate for this calculation, the asbestos claimants' recovery would be far in excess of full, some *473%* (and the Plan would not be confirmable as a result). The point here is not that the asbestos claimants are receiving more than they should; we all recognize that the settlement of the personal injury asbestos claims as proposed by the Plan resolves the central and most hotly contested issue in these bankruptcy cases. To the contrary, the point is that Grace's attempt to argue that the asbestos claimants are receiving something less on a percentage basis

---

[31] *See* Grace Brief at 15-16, ¶ 29. As Grace and its co-Plan Proponents state in their Main Post-Trial Brief In Support Of Confirmation Of Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, dated November 2, 2009 [Dkt. No. 23662; the "Plan Proponents Main Brief"], "[t]he scope of Grace's asbestos personal injury and property damage liability in this case is highly uncertain because both the merit and amount of that liability are subject to vigorous dispute." *Id*. at 20, § 3.2.1.

DM3\1210941.1

than are the Bank Lenders is nothing but playing with numbers and, accordingly, is neither compelling nor credible.[32]

Further, the Equity Committee is not sacrificing $2 billion in value under the Plan.  Grace Brief at 42, ¶ 87.  To the contrary, equity is *retaining* its interests in Grace, some $1.58 billion in value – a 1,592% increase from a value of $150 million as of the Petition Date.  *See* Post-Trial Brief at § II. C at 22-23.   Indeed, it is misleading for Grace to imply that all of the value being paid to the asbestos claimants is coming out of equity's pocket.  *See* Grace Brief at 16, ¶ 30 ("the Equity Holders agreed to a settlement … which is approximately $1.632 billion more than the Equity Holders thought that the Asbestos PI Claimants should receive").  This argument ignores the essential fact that a significant part of the value being paid to the asbestos claimants is being provided not by Grace, and thus not by its shareholders, but by Sealed Air and Fresenius under the settlements previously approved in these bankruptcy cases.  *See* PP Ex. 276 REV at 13, § 1.2.8 (describing funding of the Plan).[33]

Finally, Grace contends that the Creditors' Committee and the Bank Lenders should forgo their contractual rights because, but for Grace litigating throughout the case and obtaining the settlements set forth in the Plan, there might not be a solvent estate.  Like its other arguments of inequitable conduct, this one too is irrelevant.  Those settlements cannot legally be used to

---

[32]   Likewise, Grace's calculation of the Bank Lenders' putative recovery is equally disingenuous.  Grace includes in its calculation the $500 million principal amount due the Bank Lenders under the Credit Agreements, which amount is liquidated, not contingent and entirely undisputed.  Indeed, that amount is immediately payable upon the Plan's Effective Date, notwithstanding the postpetition interest dispute.  PP 277.01 REV, at 52-53,¶ 3.1.9.(d)(iii).  When the $500 million is subtracted from the amounts used by Grace to calculate the percentage amount the Bank Lenders will receive under the Plan as compared to contract default interest, as of the presumed December 31, 2009 Effective Date of the Plan, the percentage falls from 90% to approximately 78% ($326 million / $417 million).

[33]   *See* Plan Proponents Main Brief at 75 and fn. 276.  Grace's own contribution to all asbestos claimants (personal injury and property damage) is approximately $1.26 billion.   *See* PP Ex. 277.12 at 15 (Proforma Condensed Consolidated Balance Sheet, providing for $1263.4 million "consideration to Asbestos Trusts").

DM3\1210941.1

ignore the Bank Lenders' contractual rights when Grace's shareholders are retaining $1.58 billion in value under the same Plan.

Grace has simply not cited any recognized equitable consideration—much less a compelling one— to overcome the presumption in favor of contract default interest.  The Bank Lenders have done nothing to impede these cases.  In addition, Grace has failed to provide any evidence or law that the 2% default rate of the Credit Agreements is not reasonable, that the Bank Lenders have not faced a significant risk of non-payment,[34] or that the difference between default and non-default rates was unreasonable or punitive rather than a bargained-for attempt to compensate creditors for their extra costs after a default.[35]  There is simply no evidence in this record of any recognized factor or act on the part of the Bank Lenders themselves, much less some inequitable act, that can serve as the basis for depriving them of contract default interest pursuant to section 1129(b) of the Bankruptcy Code.

## C.    The Plan Violates The Absolute Priority Rule By Failing To Pay The Bank Lenders Contract Default Interest When Equity Holders Are Retaining Value

Although Grace takes the entirely predictable position that the absolute priority rule does not apply to the Bank Lender Group's demand for contract default interest because the Bank Lenders are being paid "in full," Grace now also claims that every court that has found that postpetition interest is to be paid to unsecured creditors in solvent debtor cases under section 1129(b) is wrong, as is the Sixth Circuit's view of the issue as expressed in *Dow Corning*, 456

---

[34]    Grace concedes that the Bank Lenders faced a significant risk of non-payment; according to Grace, "[r]eality, when this case was filed and for years thereafter, was that the recovery of principal on Grace debt was in great doubt."  Grace Brief at 3.

[35]    *See, e.g.*, *Pre-Trial Brief at 54-55, ¶¶ 118-20; Connecticut Gen. Life Ins. Co.* v. *Schaumburg Hotel Owner Ltd. P'ship (In re Schaumburg Hotel Owner Ltd. P'ship)*, 97 B.R. 943, 952 (Bankr. N.D. Ill. 1989) (awarding default interest to a creditor who "faced a substantial risk of non-payment both before and after the commencement of [the] bankruptcy case"); *In re Terry Ltd. P'ship*,  27 F.3d 241, 243 (7th Cir. 1994) (upholding 17.25% rate as "reasonable" over the objection of third-lien holder who would not be paid in full).

DM3\1210941.1

F.3d 668.  Grace Brief at 44-45, ¶ 91-92.  First, it entirely begs the question for Grace to state

that "the Lenders in this case will be paid 100% of the allowed amount of their claims."  Grace

Brief at 44, ¶90.  That statement says nothing.  As recognized by the Third Circuit in *Solow v.*

*PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197 (6th Cir. 2003), the right to

postpetition interest exists in addition to and apart from the allowed section 502 amount of a

creditor's unsecured claim.  The issue is therefore whether the Bank Lenders are entitled to

contract default interest pursuant to section 1129(b), not whether they are entitled to such interest

as part of their allowed claim under section 502 of the Bankruptcy Code.

Notwithstanding decades of cases on the topic, Grace posits that all these courts are

wrong in determining that unsecured creditors may be paid default interest in solvent debtor

cases like this one.  That position rests solely in Grace's read of the legislative history of section

1129(b), that "[n]o class may be paid more than in full."  Grace Brief at 44, ¶ 91.  But, as set

forth above, that legal proposition is fundamental and proves nothing here.

*In re Coram Healthcare Corp.*, 315 B.R. 321, 344 (Bankr. D. Del. 2004), cited by Grace

for the proposition that "an allowed claim does not include interest unmatured as of the petition

date,"[36] actually refutes Grace's position and entirely supports the Bank Lender Group's demand

for contract default interest.  Grace improperly cut off the quote midway and thus misleads this

Court; the complete quote from the *Coram* decision is "[w]hile section 502(b)(2) provides that an

allowed claim does not include interest unmatured as of the petition date, *it does not prohibit the*

*award of interest to creditors in all circumstances." Id*. (emphasis added).  And, the *Coram*

court then held that "payment of post-petition interest before any distribution to equity holders in

---

[36]   Grace Brief at 43, ¶ 90, citing *Coram*, 315 B.R. at 344.

a chapter 11 case is not prohibited by the Code and, in fact, may be required." *Id*.  In addressing

the rate of postpetition interest to be paid, the court held that

> we are not persuaded by the Equity Committee that section
> 1129(b) *requires* the use of the federal judgment rate for post-
> petition interest to be paid under a chapter 11 plan of
> reorganization.  Instead, we conclude that the specific facts of each
> case will determine what rate of interest is 'fair and equitable.'

*Id*. at 346.  On the facts before it, finding that an actual conflict of interest existed involving a

creditor that tainted the debtors' reorganization, the court held that the federal judgment rate

would be an appropriate postpetition rate: "[a]s a result of these peculiar facts, we conclude that

allowing the Noteholders to accrue post-petition interest at their contractual default rate would

not be fair and equitable." *Id*. at 347.

      As explained above and in our previous submissions, there are no facts in the record

before this Court that demonstrate any inequitable conduct by the Creditors' Committee, the

Bank Lender Group or any Bank Lender that would prevent this Court from enforcing the

provisions of the Credit Agreements that require payment of default interest to the Bank Lenders.

Grace's half-hearted attempt to distinguish *Dow Corning* falls flat and is nothing new.  *See* Grace

Brief at 45, ¶ 92.  We address those contentions in detail in our Pre-Trial Brief and need not

reiterate them here.  *See* Pre-Trial Brief at section III, 49-54, ¶¶ 109-16.

## CONCLUSION

For all the reasons set forth above and in our Post-Trial Brief, the Bank Lender Group and Creditors' Committee respectfully request that the Court deny confirmation of the Plan.

Dated:    Wilmington, Delaware
          November 20, 2009

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Stephen J. Shimshak
Andrew N. Rosenberg
Margaret A. Phillips
Rebecca R. Zubaty
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

-and-

**LANDIS RATH & COBB LLP**

*/s/ Richard Cobb*
Richard Cobb (No. 3157)
James Green (No. 4406)
919 Market Street, Suite 600
Post Office Box 2087
Wilmington, Delaware 19899
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

Counsel for the Bank Lender Group

**STROOCK & STROOCK & LAVAN LLP**

Lewis Kruger
Kenneth Pasquale
Arlene Krieger
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

-and-

**DUANE MORRIS LLP**

*/s/ Michael R. Lastowski*
Michael R. Lastowski (No. 3892)
Richard W. Riley (No. 4052)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Telephone (302) 657-4942
Facsimile: (302) 657-4901

-and-

William S. Katchen, Esquire
744 Broad Street, Suite 1200
Newark, New Jersey  07102-3889
Telephone: (973) 424-2031
Facsimile: (973) 556-1380

*Counsel for the Official Committee of Unsecured Creditors of W.R. Grace & Co. et. al.*

27