IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: January 4-5, 2010 at 9:00 a.m.** |

**PLAN PROPONENTS' MAIN POST-TRIAL RESPONSE BRIEF IN SUPPORT OF CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

I.     **THE JOINT PLAN HAS BEEN PROPOSED IN GOOD FAITH THEREBY SATISFYING SECTION 1129(a)(3) OF THE BANKRUPTCY CODE.......................1**

II.    **THE JOINT PLAN SATISFIES THE BEST INTERESTS TEST.................................4**
    2.1    The Libby Claimants Improperly Calculate the Value of the Assets. ....................5
    2.2    The Libby Claimants Miscalculate the Debtors' Liabilities...................................7
    2.3    In a Chapter 7 Liquidation, the Personal Injury Claimants Would Receive a Percentage Payment of Less Than 25%...............................................................9
    2.4    The Libby Claimants' Evidentiary Objection Is Meritless....................................13

III.   **THE JOINT PLAN IS FEASIBLE AND THE OBJECTIONS BY ANDERSON MEMORIAL AND THE STATE OF MONTANA ARE WITHOUT MERIT.................................................................................................16**
    3.1    AMH's Feasibility Objection Is Without Merit. ..................................................17
          3.1.1   AMH's argument that Grace was required to estimate its property damage liabilities is meritless...................................................................18
                 3.1.1.1 AMH's argument fails as a matter of law........................................18
                 3.1.1.2 AMH's objection fails as a matter of fact.......................................19
          3.1.2   The Plan Proponents are not required to estimate AMH's class action claim.............................................................................................24
          3.1.3   The Plan Proponents have demonstrated that Grace can obtain exit financing. ...................................................................................................26
          3.1.4   AMH's arguments regarding other supposed threats to feasibility are baseless. ................................................................................................27
    3.2    Montana's Objection Lacks Merit. .......................................................................30

IV.   **THE JOINT PLAN'S CLASSIFICATION OF INDIRECT PI TRUST CLAIMS IN CLASS 6 SATISFIES THE REQUIREMENTS OF 11 U.S.C. § 1122(a)...............................................................................................................31**
    4.1    Longacre's Objection to the Classification of Its Claim Lacks Merit..................32
          4.1.1   Longacre's claim is substantially similar to other Class 6 Claims...........35
          4.1.2   The NU Settlement Agreement does not require classification of the NU Claim in Class 9. ................................................................................39
          4.1.3   The Debtors have not taken any position contrary to any representation in the NU Settlement Agreement........................................39
          4.1.4   Longacre's Class 6 Claim is different from Morgan Stanley's Class 9 Claim. ..................................................................................................40
    4.2    MCC's Claims Are Properly Classified. ...............................................................41
    4.3    BNSF's Proposed Finding Regarding the Scope of Its Indemnity Rights Should Be Rejected. .............................................................................................43
    4.4    The Evidence Cited by Seaton and OneBeacon Does Not Support Their Argument Concerning Classification. ....................................................................44

V.  THE SUCCESSOR CLAIMS INJUNCTION IN SECTION 8.5 OF THE
    JOINT PLAN IS NECESSARY TO THE REORGANIZATION AND
    APPROPRIATE UNDER THIRD CIRCUIT LAW. ................................................45
    5.1  The Court Has "Related To" Subject Matter Jurisdiction and Authority
         Pursuant to Section 105 of the Bankruptcy Code to Issue the Successor
         Claims Injunction. ................................................................................................47
         5.1.1  The Court has subject matter jurisdiction to issue the Successor
                Claims Injunction. ...................................................................................47
         5.1.2  The Court has authority to issue the Successor Claims Injunction. ..........49
    5.2  Seaton, OneBeacon and CNA are Barred by Principles of *Res Judicata*
         from Objecting to the Successor Claims Injunction. ...........................................52
    5.3  Kaneb's Objections to the Successor Claims Injunction Are Also Without
         Merit. ..................................................................................................................57
         5.3.1  Kaneb has waived its objection to the Successor Claims Injunction. ......58
         5.3.2  The Court has jurisdiction to enjoin Kaneb's claims against Settled
                Asbestos Insurance Companies. ...............................................................58
         5.3.3  Section 1141 does not limit the Court's power to issue an
                injunction under section 105(a). ..............................................................60
         5.3.4  Kaneb should not be allowed to pursue the Debtors nominally. ..............60
         5.3.5  The Joint Plan does not prevent Kaneb from asserting any
                defensive rights. ......................................................................................61

VI.  THE RELEASE AND EXCULPATION PROVISIONS IN THE JOINT
     PLAN ARE PROPER AND SHOULD BE APPROVED. .....................................61

VII. THE JOINT PLAN PROVIDES FOR EQUAL TREATMENT OF
     CLAIMANTS IN THE SAME CLASS IN SATISFACTION OF SECTION
     1123(a)(4) OF THE BANKRUPTCY CODE. .....................................................64
     7.1  The Treatment Afforded to Longacre's Claim Complies with Section
          1123(a)(4). ..........................................................................................................64
     7.2  The Joint Plan Adequately Preserves BNSF's Contractual Rights. .....................65
     7.3  Other Objections to the Treatment of Indirect Claims Are Without Merit. ..........68

VIII. THE ASSIGNMENT OF ASBESTOS INSURANCE RIGHTS UNDER THE
      JOINT PLAN IS APPROPRIATE AND DOES NOT PROVIDE
      INSURANCE COMPANIES WITH A VALID OBJECTION TO
      CONFIRMATION. ...........................................................................................69
      8.1  Section 7.2.2(d)(iv) Is Appropriate. ....................................................................70

IX.  THE TRUST ADVISORY COMMITTEE IS A RECOGNIZED,
     NECESSARY, AND APPROPRIATE ELEMENT OF THE ASBESTOS PI
     TRUST. ...........................................................................................................72
     9.1  The Insurers Have Not Demonstrated Standing to Complain About the
          TAC. ...................................................................................................................73
     9.2  The TAC Is Based on Established Precedents and Serves Important
          Purposes. .............................................................................................................74
     9.3  The TAC's Powers Are Limited and Subject to Judicial Review. .......................74

ii

9.4    The Insurers Have Offered no Evidence to Support Their Hypothetical "Conflicts." ................................................................................................ 76

9.5    Courts Have Rejected the "Conflict of Interest" Argument. ................. 77

X.    **THE JOINT PLAN DOES NOT IMPLICATE THE ABSOLUTE PRIORITY RULE.** ................................................................................. 78

XI.    **THE JOINT PLAN COMPLIES WITH ALL REMAINING PROVISIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE** .................... 78

11.1    Pursuit of Asbestos PD Demands Outside the Procedures Described By the Joint Plan is Likely to Threaten the Joint Plan's Purpose to Deal Equitably With Such Claims. ........................................................................ 78

11.2    The Asbestos PI Trust Is Properly Funded Under the Joint Plan. .......... 80

     11.2.1 The Asbestos PI Trust will be funded by securities. ................... 80

     11.2.2 The Joint Plan satisfies the requirement that the Trusts are to own, under specified contingencies, a majority of the voting shares of the Reorganized Debtors. ........................................................... 81

     11.2.3 Section 524(g) permits multiple trusts, and therefore allows two trusts to share control of the Reorganized Debtors .................. 82

11.3    The Asbestos PI Trust's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner. ...... 84

11.4    Contrary to the Assertion of Seaton/OneBeacon, the Fresenius Indemnified Parties Are Appropriately Included in the Asbestos PI Channeling Injunction. ............................................................................. 84

11.5    The Objections by BNSF and CNA that They Must Be Fully Protected Under Section 524(g) Are Without Merit ............................................... 87

     11.5.1 The Asbestos PI Channeling Injunction cannot extend to claims asserted against BNSF. ............................................................... 87

     11.5.2 CNA's objections to the scope of section 524(g) protection are unfounded. .................................................................................. 88

11.6    Identifying Each of the Entities In the Asbestos PI Channeling Injunction Is Fair and Equitable, With Respect to the Parties That Might Subsequently Assert Demands, In Light of the Benefits to Be Provided to the Asbestos PI Trust on Behalf of Such Entities ...................................... 90

XII.    **GARLOCK'S ASSERTION THAT IT WILL RECEIVE NOTHING FROM THE ASBESTOS PI TRUST BECAUSE PLAINTIFFS WILL "CONCEAL AND DEFER" CLAIMS IS CONTRADICTED BY THE FACTS AND THE LAW** ......................................................................................................... 93

12.1    Co-Defendants Like Garlock Can Obtain Contribution from the Asbestos PI Trust, as the Evidence Shows They Have from Other Asbestos Trusts. .......... 93

12.2    Garlock Has Successfully Subpoenaed Other Asbestos Trusts for Claimant Information and Fails to Explain How Similar Provisions in the Grace TDP Would Result in an "Impenetrable Veil of Secrecy." ...................... 95

12.3    Garlock Offers No Evidence that the Confidentiality Provisions or the Ability to Defer Claims Will Affect Garlock's Liability or That of Other Non-Bankrupt Asbestos Defendants. .................................................... 96

iii

12.4    The TDP's Confidentiality Provisions and the Ability to Defer Claims
       Serve Valid Purposes. ........................................................................................ 98

12.5    Garlock Applies the Wrong Legal Standard to the TDP. ...................................... 98

**XIII. THE COMMITTEE'S AND MORGAN STANLEY'S NON-LENDER
IMPAIRMENT ARGUMENTS LACK MERIT. ......................................................... 98**

13.1    The Interest Dispute Procedures for Class 9 Are Not Ambiguous and Only
       Apply to Morgan Stanley. .................................................................................. 99

13.2    Morgan Stanley Is Not Impaired Under the Joint Plan, and Cannot Raise
       Any Of Its Interest-Related Arguments to the Court Under § 3.1.9(d) of
       the Joint Plan. .................................................................................................. 102

**XIV. THE PLAN'S DISSOLUTION OF THE CREDITORS' COMMITTEE
DOES NOT VIOLATE ANY PROVISION OF THE BANKRUPTCY
CODE. ....................................................................................................................... 104**

iv

**Cases**

ACandS v. Travelers Cas. & Surety Co.,
    435 F.3d 252 (3rd Cir. 2006)..........................................................................................59

Bey v. Daimlerchrysler Servs. of N. Am., LLC,
    No. 4-6186, 2005 WL 2090207 (D.N.J. Aug. 29, 2005)....................................................14

Bryant v. Farmers Ins. Exch.,
    432 F.3d 1114 (10th Cir. 2005) .......................................................................................14

California Dept. of Health Svcs. v. United States Bankruptcy Court (In re Community
    Hospital of the Valleys),
    51 B.R. 231 (9th Cir. B.A.P. 1985) .................................................................................54

California Dept. of Health Svcs. v. United States Bankruptcy Court (In re Community
    Hospital of the Valleys),
    820 F.2d 1097 (9th Cir. 1987) .........................................................................................54

Chemetron Corp. v. Jones,
    72 F.3d 341 (3d Cir. 1995) ..............................................................................................30

Evans v. BV Shipping Co. Lombok Strait,
    No. 07-3139, 2009 WL 3233524 (D.N.J. Oct. 5, 2009)....................................................97

Ford Motor Credit Co. v. Stevens (In re Stevens),
    130 F.3d 1027 (11th Cir. 1997).......................................................................................59

Gen. Elec. Credit Equities, Inc. v. Brice Rd. Dev., L.L.C. (In re Brice Rd. Dev., L.L.C.),
    392 B.R. 274 (6th Cir. B.A.P. 2008) ...............................................................................16

Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund,
    748 F.2d 42 (1st Cir. 1984)..............................................................................................37

Henry v. Candy Fleet Corp.,
    Nos. Civ.A. 98-1747, Civ.A. 98-2196, 2001 WL 121913 (E.D. La. Feb. 2, 2001) ..........15

In re 222 Liberty Associates,
    108 B.R. 971 (Bankr. E.D. Pa. 1990) .........................................................................26, 37

In re ABB Lummus Global,
    No. 06-10401, 2006 Bankr. LEXIS 1462 (Bankr. D. Del. June 29, 2006) .......................92

In re American Family Enters.,
    256 B.R. 377 (D.N.J. 2000)........................................................................................49, 58

In re Armstrong World Indus., Inc.,
    348 B.R. 111 (D. Del. 2006)..................................................................................18, 22, 24

In re Armstrong World Indus., Inc.,
 348 B.R. 136 (D. Del. 2006)............................................................................34, 35

In re Asbestos Claims Mgmt. Corp.,
 294 B.R. 663 (N.D. Tex. 2003) ..............................................................................34

In re B. Cohen & Sons Caterers, Inc.,
 124 B.R. 642 (E.D. Pa. 1991)..................................................................................18

In re Babcock & Wilcox Co.,
 No. 00-10992, 2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004)..................72

In re Burns and Roe Enters. Inc.,
 No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009)....................................34

In re Celotex Corp.,
 204 B.R. 586 (M.D. Fla. 1996)..............................................................................34

In re Cent. Med. Care Ctr., Inc.,
 122 B.R. 568 (Bankr. E.D. Mo. 1990)..................................................................65

In re Combustion Eng'g, Inc.,
 391 F.3d 190 (3d Cir. 2004) ..........................................................................47, 51

In re Combustion Eng'g, Inc.,
 No. 03-10495, 2005 Bankr. LEXIS 2623 (Bankr. D. Del. Dec. 19, 2005) .......92

In re Congoleum Corp.,
 362 B.R. 167 (Bankr. D.N.J. 2007) ................................................................81, 82

In re Continental Airlines,
 203 F.3d 203 (3rd Cir. 2000)...........................................................................49, 63

In re Eagle-Picher Indus., Inc.,
 203 B.R. 256 (Bankr. S.D. Ohio 1996) ................................................................77

In re Eagle-Picher Indus., Inc.,
 172 F.3d 48 (6th Cir. 1998)......................................................................................7

In re Equinox Oil Co. v. Anthill Constr. Co. (In re Equinox Oil Co.),
 No. Civ. A. 00-3320, 2001 WL 649806 (E.D. La. June 11, 2001)...................59

In re Exide Techs.,
 303 B.R. 48 (Bankr. D. Del. 2003).........................................................................49

In re Fantastic Homes Enterprises, Inc.,
 44 B.R. 999 (Bankr.M.D. Fla.1984).......................................................................37

vi

In re Federal- Mogul Global, Inc.
    No. 01-10578 2007, WL 4180545 (Bank. D. Del. Nov. 16, 2007) ....................................69

In re Federal-Mogul Global Inc.,
    No. 01-10578, 2007 Bankr. LEXIS 3940 (Bankr. D. Del. Nov. 8, 2007).........................92

In re Frascella Enter.'s, Inc.,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) ...............................................................................16

In re Gato Realty Trust Corp.,
    183 B.R. 15 (Bankr. D. Mass. 1995) ...........................................................................36, 38

In re Genesis Health Ventures, Inc.,
    266 B.R. 591 (Bankr. D. Del. 2001)..................................................................................63

In re Gibraltar Resources, Inc.,
    210 F.3d 573 (5th Cir. 2000) .............................................................................................54

In re Glenn,
    160 B.R. 837 (Bankr. S.D. Cal. 1993)...............................................................................54

In re Global Ocean Carriers LTD.,
    251 B.R. 31 (Bankr. D. Del. 2000)....................................................................................26

In re Greate Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D.N.J. 2000) ..............................................................................16, 22

In re Harbin,
    486 F.3d 510 (9th Cir. 2007) .............................................................................................25

In re J T Thorpe Co.,
    308 B.R. 782 (Bankr. S.D. Tex. 2003) ..............................................................................92

In re Kaiser Aluminum Corp.,
    No. 02-10429, 2006 Bankr. LEXIS 3945 (Bankr. D. Del. February 6, 2006) .................92

In re Lisanti Foods, Inc.,
    392 B.R. 491 (D.N.J. 2005)................................................................................................38

In re Mahoney Hawkes, LLP,
    289 B.R. 285 (Bankr. D. Mass. 2002) ..........................................................................36, 37

In re Matter of Vitek,
    51 F.3d 530 (5th Cir. 1995) ...............................................................................................59

In re Mid-Valley, Inc.,
    No. 03-35592, 2004 Bankr. LEXIS 1553 (Bankr. W.D. Pa. July 21, 2004) ....................92

DOCS_DE:155067.1

In re Nat'l Gypsum Co.,
    139 B.R. 397 (N.D. Tex. 1992) ...................................................................................21

In re Nat'l Gypsum Co.,
    219 F.3d 478 (5th Cir. 2000) ......................................................................................20

In re North American Refractories Co.,
    No. 02-21626, 2007 Bankr. LEXIS 4721 (W.D. Pa., Nov. 13, 2007)...............................49

In re Nutraquest, Inc.,
    434 F.3d 639 (3rd Cir. 2006).......................................................................................59

In re Orlando Investors L.P.,
    103 B.R. 593 (E.D. Pa 1989)......................................................................................64

In re Oxford Hosp., Inc.,
    No. 88-12629S, 1988 WL 138740 (Bankr. E.D. Pa. Dec. 20, 1988) ...............................14

In re Porcelli,
    319 B.R. 8 (Bankr. M.D. Fla. 2004) .............................................................................38

In re Porter Hayden Co.,
    No. 02-54152, 2006 WL 4667137 (Bank. D. Md. June 30, 2006)....................................34

In re Prussia Assoc.,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...........................................................................49

In re Reading Broad Inc.,
    386 B.R. 562 (Bankr. E.D. Pa. 2008) ...........................................................................26

In re USG Corp.,
    Case No. 01-2094 (JFK) (Bankr. D. Del. Mar 27, 2006) ................................................100

In re W. R. Grace & Co. (W. R. Grace & Co. v. Chakarian),
    315 B.R. 353 (Bankr. D. Del. 2004)..............................................................................49

In re W. R. Grace & Co.,
    No. 08-863, 2009 WL 3205194 (D. Del. Sept. 29, 2009). ...............................................25

In re W.R. Grace & Co.,
    366 B.R. 302 (Bankr. D. Del. 2007)..............................................................................29

In re Western Asbestos Company, et al.,
    313 B.R. 832 (Bankr. N.D. Ca. 2003) .......................................................................88, 91

In re. W. R. Grace & Co.,
    No. 08-118, 2008 WL 4234339 (D. Del. Sept. 4, 2008) ..................................................24

In the Matter of Jersey City Med. Ctr.,
    817 F.2d 1055 (3d Cir. 1987) ........................................................................................37

Jaffee v. Redmond,
    518 U.S. 1 (1996) ..........................................................................................................98

Kane v. Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988) ..............................................................................16, 17, 20

Miller v. The Fed. Land Bank of Spokane,
    587 F.2d 415 (9th Cir. 1978) .......................................................................................14

Mission Towers v. W. R. Grace,
    No. 07-287, 2007 WL 4333817 (D. Del. Dec. 6, 2007) .............................................29, 30

Pacificorp and VanCott Bagley Cornwall & McCarthy v. W. R. Grace,
    No. 05-764, 2006 WL 2375371 (D. Del. Aug. 16, 2006).....................................................30

Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.),
    324 F.3d 197 (3d Cir. 2003) ........................................................................................102

Travelers v. Bailey,
    129 S.Ct. 2195 (2009)..............................................................................................53, 54

United States v. Haynes,
    129 S. Ct. 1079 (2009)..............................................................................................82, 83

**Statutes**

1 U.S.C. § 1 ......................................................................................................................82, 83

11 U.S.C. § 101(49)(A)(xv)....................................................................................................80

11 U.S.C. § 102(7)....................................................................................................................83

11 U.S.C. § 105 ........................................................................................................................60

11 U.S.C. § 105(a) ..............................................................................................................51, 55, 60

11 U.S.C. § 105(a) ....................................................................................................................60

11 U.S.C. § 1111(b)..................................................................................................................38

11 U.S.C. § 1122(a) ............................................................................................................31, 34, 36

11 U.S.C. § 1123(a)(4) ....................................................................................................passim

11 U.S.C. § 1123(a)(5)(B)........................................................................................................69

11 U.S.C. § 1123(b)(3)(B)........................................................................................................69

DOCS_DE:155067.1

11 U.S.C. § 1129 ..........................................................................................56, 91

11 U.S.C. § 1129(a)(11) ......................................................................................16

11 U.S.C. § 1129(a)(3) ..........................................................................................1

11 U.S.C. § 1129(a)(5) ........................................................................................77

11 U.S.C. § 1129(a)(8) ........................................................................................78

11 U.S.C. § 1129(b) ........................................................................................78, 91

11 U.S.C. § 1141 ................................................................................................57

11 U.S.C. § 1141(a) ............................................................................................60

11 U.S.C. § 502(c)(1) ..........................................................................................21

11 U.S.C. § 502(e)(1)(B) ......................................................................................68

11 U.S.C. § 524(g) ......................................................................................passim

11 U.S.C. § 524(g)(2)(B)(i)(II) ............................................................................80

11 U.S.C. § 524(g)(2)(B)(i)(III) ..........................................................................81

11 U.S.C. § 524(g)(2)(B)(ii)(V) ....................................................................69, 84

11 U.S.C. § 524(g)(4)(A)(ii) ................................................................................87

11 U.S.C. § 524(g)(4)(A)(ii)(I) ............................................................................84

11 U.S.C. § 524(g)(4)(B)(ii) ................................................................................98

1129(a)(11) ........................................................................................................16

H.R. Rep. No. 103-835 (1984) ............................................................................91

Mont. Code Ann. § 27-1-703(2) ..........................................................................67

**Other Authorities**

4 Collier on Bankruptcy ¶ 524.07[2] (15th ed. 2005) ........................................81

**Rules**

Del. Super. Ct. Civ. R. 34(c) ..............................................................................96

Del. Super. Ct. Civ. R. 45 ....................................................................................96

x

Fed. R. Bankr. P. 9019 ................................................................................................................ 56, 57

Fed. R. Civ. P. 34(c) ......................................................................................................................... 96

Fed. R. Civ. P. 45 .............................................................................................................................. 96

Federal Rule of Evidence 703 .......................................................................................................... 20

Federal Rule of Evidence 201 .......................................................................................................... 14

DOCS_DE:155067.1

## PRELIMINARY STATEMENT

As explained in the Plan Proponents' opening post-trial briefs, the First Amended Joint

Plan of Reorganization (the "Joint Plan") complies with all applicable provisions of the

Bankruptcy Code (the "Code"), and the Joint Plan should be confirmed.  In this response brief,

the Plan Proponents answer certain plan objectors' arguments articulated in the post-trial briefs

of those parties.  In keeping with the Court's instructions, this brief does not reiterate all of the

law and analysis from the pretrial and opening post-trial briefs, but incorporates those briefs by

reference as appropriate.[2]

## ARGUMENT

**I.      THE JOINT PLAN HAS BEEN PROPOSED IN GOOD FAITH THEREBY
SATISFYING SECTION 1129(a)(3) OF THE BANKRUPTCY CODE.**

In the Plan Proponents' Main Post-Trial Brief in Support of Confirmation (the "PP Main

Post-Trial Brief" or "Main Post-Trial Brief"), the Plan Proponents asked this Court to find that

the Joint Plan "has been proposed in good faith and not by any means forbidden by law."  As

explained in detail in the Main Post-Trial Brief, the Court should make this finding because the

evidence introduced at the Confirmation Hearing demonstrates that the settlements executed to

accomplish the Joint Plan were negotiated at arm's length,[3] the Joint Plan is overwhelmingly

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Joint
Plan.  The "Insurance Companies" are the Insurers who filed objections to the Joint Plan and have not yet
settled.  Citations in this brief take the following form:  (1) Plan Proponents' Exhibits -- PP Ex.
____(description); (2) various Plan Objectors' Exhibits -- [Name of Objector] Ex. ____(description); (3) trial
transcripts -- [date] Tr. [page number] [witness name]; prior briefs of Plan Proponents -- PP [short form name of
brief]; prior briefs of Plan Objectors -- [short form name of Objector, followed by short form name of brief].

[3]   Plan Proponents' Main Post-Trial Brief in Support of Confirmation ("PP Main Post-Trial Br.") at 2-5 [Dkt. No.
23662].

supported by the impaired classes,[4] and various technical amendments have been made to the

Joint Plan to accommodate the concerns of objecting parties.[5]

Despite the substantial record of evidence demonstrating that the settlements that form

the basis of the Joint Plan were negotiated at arm's length, the State of Montana ("Montana")

argues that the Joint Plan has not been proposed in good faith because the settlement of Asbestos

PI Claims occurred "without any participation from Montana and other key constituencies in the

negotiations."[6] This argument erroneously assumes that every individual creditor must

participate in a plan negotiation process in order for a plan to be proposed in good faith. It also

assumes that Montana is somehow different from all of the other individual creditors in its class

and that it should be classified separately and represented separately from all other members of

its class. The fact, however, is that the evidence demonstrates that Montana's claims are properly

classified as Class 6 claims,[7] and Class 6 treatment has been the product of extensive litigation

and arm's length negotiations with the Asbestos Claimants' Committee (the "ACC")

representing the interests of present Asbestos PI Claimants, and the Asbestos Personal Injury

Future Claimants' Representative (the "PI FCR") representing the interests of holders of future

demands.[8] Montana has produced no evidence or law to suggest otherwise. Furthermore, as

certified by the balloting agent in these Chapter 11 Cases, over 99% of the claimants in Class 6

---

4    PP Ex. 281 (Amended and Original Declarations of Kevin A. Martin Certifying the Tabulation of Ballots).

5    PP Main Post-Trial Br. at 6 [Dkt. No. 23662].

6    The State of Montana's Post-Trial Brief in Opposition to Confirmation of the First Amended Joint Plan of
     Reorganization ("Montana Post-Trial Br.") at 11 [Dkt. No. 23654].

7    *See* PP Main Post-Trial Br. at 41-42 [Dkt. No. 23662].

8    9/17/2009 Tr. 51-52 (Austern) (describing litigation and settlement negotiation process).

2

approved the terms of the settlement by voting in favor of the Joint Plan.[9] The overwhelming

support by the claimants in Class 6 further substantiates that the Joint Plan, and the treatment of

claimants in Class 6 specifically, has been proposed in good faith. Thus, Montana's objection is

without merit.

The Official Committee of Unsecured Creditors (the "Committee") and the Bank Lender

Group (the "Lenders") also argue that the Joint Plan was not proposed in good faith. To the

extent that the Lenders and the Committee base this objection on their allegations that Grace

strategically excluded the Committee from certain negotiations,[10] this argument is groundless.

As explained in the Main Post-Trial Brief, the real reason that Grace did not include the

Committee in these negotiations was that Grace's General Counsel, Mark Shelnitz, and counsel

for the Committee, Lewis Kruger, had already reached an understanding that in "any

negotiations with the personal injury committee we [Grace] were going to fight for, negotiate for

the rate agreed upon in the 2006 letter agreement, and the committee and committee counsel

were quite content to let the debtors negotiate on their behalf."[11]

The Lenders and the Committee also allege that the Joint Plan was not proposed in good

faith because equity will retain value under the Joint Plan while the Bank Lenders will not be

---

[9]   PP Ex. 281 (Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First
     Amended Joint Plan of Reorganization).

[10]  *See* Joint Post-Trial Memorandum of the Official Committee of Unsecured Creditors and Bank Lender Group in
     Opposition to Confirmation ("Lenders' Post-Trial Br."), dated 11/2/2009, at 40 [Dkt. No. 23657].

[11]  Plan Proponents' Phase II Brief Regarding Bank Lender Issues, dated 8/8/2009, at 57 [Dkt. No. 22732] (quoting
     9/16/2009 Tr. 64:4-16 (Shelnitz)).

3

paid the interest rate to which they believe they are entitled.[12]  As explained in the Plan

Proponents' Phase II Brief Regarding Bank Lender Issues,[13] this argument lacks merit: the Joint

Plan's treatment of unsecured creditors, who will be paid the full amount of their allowed claims

and will receive post-petition interest at an appropriate rate, is entirely proper.  The fact that

Equity receives value under the Joint Plan, therefore, in no way renders the Plan not in good

faith.

## II.    THE JOINT PLAN SATISFIES THE BEST INTERESTS TEST.

The Libby Claimants are the only parties objecting on the basis that the Joint Plan does

not meet the best interests test. Their objection is fundamentally flawed because it fails to

recognize that application of the best interests test must turn on the facts of the case and must

serve the basic purposes of that test.[14]  Instead, they mechanically apply a mathematical formula

to argue that the Joint Plan does not meet the best interests test.[15]  In so doing, however, the

Libby Claimants improperly calculate the values of the assets and liabilities.  When the assets

and liabilities are properly estimated, it is clear that the Joint Plan meets the best interests test,

even when applying a mathematical formula.

---

[12]   Lenders' Post-Trial Br. at 40-41 [Dkt. No. 23657].

[13]   Plan Proponents' Phase II Brief Regarding Bank Lender Issues, dated 8/8/2009, at 57 [Dkt. No. 22732].

[14]   *See* PP Main Post-Trial Br. at 17-25 [Dkt. No. 23662].

[15]   Libby Claimants' Post-Trial Brief in Support of Opposition to Confirmation of First Amended Joint Plan of
       Reorganization ("Libby Post-Trial Br.") at 24-27 [Dkt. No. 23649].

## 2.1    The Libby Claimants Improperly Calculate the Value of the Assets.

The Libby Claimants assume that the value of Grace as a liquidating company, which would need to be sold without section 524(g) protection, would be over a billion dollars and only 50% less than Grace's value as an ongoing concern under the Joint Plan with section 524(g) protection.[16] The Libby Claimants ignore the testimony of Ms. Zilly -- the only expert who testified about the best interests test -- that there is substantial uncertainty as to whether Grace could be sold for even close to a billion dollars absent section 524(g) protection:[17] "I think it would take a very brave soul to offer a billion dollars for Grace given the possibility of over 300,000 personal injury claims."[18]

The Libby Claimants also value the Sealed Air and Fresenius settlements at potentially up to a billion dollars in a Chapter 7 liquidation.[19] The Libby Claimants, however, ignore the testimony of both Mr. Austern and Ms. Zilly, who testified that Sealed Air and Fresenius would not have agreed to settle claims against them for substantial sums without section 524(g) protection and that, in fact, section 524(g) was essential to the settlement discussions.[20] Indeed, the settlement agreements themselves make clear that the money that Sealed Air and Fresenius agreed to pay is expressly conditioned on obtaining section 524(g) protection.[21] In a Chapter 7

---

[16] Libby Post-Trial Br. at 25 [Dkt. No. 23649].

[17] 10/13/2009 Tr. 22, 62 (Zilly).

[18] 10/13/2009 Tr. 22 (Zilly).

[19] Libby Post-Trial Br. at 25 [Dkt. No. 23649].

[20] 9/17/2009 Tr. 129, 131-32 (Zilly); 9/17/2009 Tr. 57-59, 62 (Austern).

[21] PP Ex. 277.22 Rev. (Sealed Air Settlement Agreement at § II(j)); PP Ex. 277.13 Rev. (Fresenius Settlement Agreement at § 2.02(E)).

5

liquidation, Sealed Air and Fresenius could not be protected from successor liability claims through a section 524(g) injunction, and it is unlikely that the estate would obtain much, if anything, from Sealed Air and Fresenius in a Chapter 7 liquidation.[22] Likewise, the insurance settlements under the Joint Plan required section 524(g) protection, which would not be available in a Chapter 7 liquidation, and thus would likely decrease the value of insurance in a Chapter 7 liquidation.[23]

The following chart shows the value of the assets and their associated uncertainties in a Chapter 7 liquidation:

| CHAPTER 7 ASSETS | | | | | | |
|---|---|---|---|---|---|---|
| | Grace Business | SA and Fresenius | Insurance | Cash | Costs | Uncertainties |
| Libby Claimants' Argument | $1.050 – $1.25B | 0 – $978M | $500M | $787M | ($126-145M) | ——— |
| Grace Evidence | $1.050 – $1.25B (Minus uncertainty for asbestos overhang) | 0 – 0 (No §524(g) protection) | $500M (Minus uncertainty for no §524(g) protection) | $787M | ($126-145M) | ($0 - $1.050) ??? ( Decreased value of assets for uncertainties for asbestos overhang & no §524(g) protection) |

---

[22]   9/17/2009 Tr. 131-32 (Zilly).

[23]   The Libby Claimants' implication that Ms. Zilly was somehow inconsistent by developing her opinion since the filing of the best interests analysis in February 2009 as an attachment to the Disclosure Statement, Libby Post-Trial Br. at 25 [Dkt. No. 23649], is without merit.  In the months since the filing of the best interests analysis, Ms. Zilly has simply refined her analysis to account for new facts and analysis.  For example, Ms. Zilly's analysis led to her conclusion that it was unlikely that Sealed Air and Fresenius would provide any funds in the absence of section 524(g) protection.  Likewise, Ms. Zilly is currently using Dr. Peterson's asbestos liability estimates that were not included in her February 2009 best interests analysis because Dr. Peterson's report, including the $9 - $10 billion estimate for asbestos personal injury claims, was not served until March 2009 -- after the filing of the Disclosure Statement.

6

## 2.2    The Libby Claimants Miscalculate the Debtors' Liabilities.

With respect to calculating the value of personal injury liabilities in a Chapter 7

liquidation, the Libby Claimants argue, without any statutory or case law support, that "future

claims [can]not be presented in a chapter 7 liquidation."[24] As detailed in the Plan Proponents'

brief,[25] however, the overriding goals of section 524(g), the Bankruptcy Code, and the case law

make clear that it was "appropriate to take the value of future Asbestos Personal Injury Claims

into account in determining the Claims that would be required to be paid in a liquidation under

Chapter 7 of the Bankruptcy Code."[26]  Dr. Peterson testified that the total personal injury

liability in a Chapter 7 liquidation would be between $9 billion and $10 billion.[27]

Moreover, the Libby Claimants also underestimate the value of the current claims in a

Chapter 7 liquidation.  The Libby Claimants simply use the $4.7 billion to $5.2 billion that Dr.

Peterson estimated would be the value of the pending claims as of 2009.[28] These figures,

however, do not account for the well-documented and undisputed phenomenon of acceleration.

---

[24]  Libby Post-Trial Br. at 25 [Dkt. No. 23649].

[25]  PP Main Post-Trial Br. at 22-25 [Dkt. No. 23662].

[26]  *In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 275 (Bankr. S.D. Ohio 1996), *aff'd without op.*, 172 F.3d 48 (6th Cir. 1998).

[27]  9/15/2009 Tr. 209-10 (Peterson). The Libby Claimants complain that Ms. Zilly "simply accepted the opinions of Dr. Mark Peterson without considering any opinions developed by other parties." Libby Post-Trial Br. at 26 n.21 [Dkt. No. 23649]. Their argument is without merit. Dr. Peterson was the only expert who testified at the confirmation hearing regarding the value of personal injury liabilities in a Chapter 7 liquidation. Moreover, all the other experts developed their opinions in the context of an estimation hearing and no expert -- other than Dr. Peterson here -- testified about the value of personal injury claims if Grace were to return to the tort system in 2009. Finally, and most importantly, as Ms. Zilly explained, a Chapter 7 trustee would be facing 300,000 personal injury claims in addition to thousands of property damage claims, and would not be in a position to contest the claimants' demands.  9/17/2009 Tr. 150-51 (Zilly); 10/13/2009 Tr. 28-29, 45-47 (Zilly). · Accordingly, it is appropriate to use the $9 to $10 billion estimate of Dr. Peterson, who is the expert for the personal injury claimants, regarding the value of personal injury liabilities in a chapter 7 liquidation.

[28]  Libby Post-Trial Br. at 26-27 [Dkt. No. 23649].

7

Both Dr. Peterson and Ms. Zilly testified that once a deadline is set, claims are accelerated and filed earlier than they would have otherwise been filed.[29]  Accordingly, Ms. Zilly testified that there would be an acceleration of claims in a Chapter 7 liquidation of Grace.[30]

With respect to property damage liabilities, the Libby Claimants forgo Ms. Zilly's estimate based on the 85%/15% split between the personal injury and property damage constituencies, and instead use the "approximately $200 million" of property damage settlements under the Chapter 11 Joint Plan.[31]  In so doing, however, the Libby Claimants fail to consider that the personal injury claimants are recovering under the Joint Plan only 25% to 35% of their estimated total Chapter 7 liability.  Presumably, the $200 million of property damage settlements represents 25% to 35% of their estimated Chapter 7 liability, which translates into $600 million to $800 million in a Chapter 7 liquidation.

Moreover, the Libby Claimants ignore the basis for the $1 billion estimate for the property damage liabilities.  Given that a Chapter 7 trustee would not have the ability to litigate property damage claims and would not be able to contest claimants' demands, Ms. Zilly used the 85%/15% pre-litigation split of the assets agreed upon by the property damage and personal injury constituencies to arrive at a proxy for the allocation of the property damage and personal injury liabilities in a Chapter 7 liquidation.[32]  Applying the pre-litigation 85%/15% split to Dr. Peterson's $6.2 billion estimate for the estimation hearing, Ms. Zilly calculated that the property

---

[29]    10/13/2009 Tr. 58, 89 (Zilly); 9/15/2009 Tr. 193 (Peterson).

[30]    10/13/2009 Tr. 89 (Zilly).

[31]    Libby Post-Trial Br. at 26 [Dkt. No. 23649].

[32]    10/13/2009 Tr. 26-29, 45-52 (Zilly); 9/17/2009 Tr. 145-51 (Zilly).

8

damage liability in a Chapter 7 liquidation would be approximately $1 billion.[33]  Thus, Ms. Zilly's liability estimates for property damage claims is well founded.  Finally, the Libby Claimants ignore the substantial uncertainties surrounding the ZAI liabilities as detailed in the Plan Proponents' brief.[34]

The following is a chart showing the liabilities and their associated uncertainties in a Chapter 7 liquidation:

| CHAPTER 7 LIABILITIES | | | | |
|---|---|---|---|---|
| | PI Claims | PD Claims | GUCs | Uncertainties |
| **Libby Claimants' Argument** | $4.7 – $5.2B | $200M (based on Ch.11 settlements) [$600M - $800M in Ch.7 to reflect that only 25%-35% of liability in Ch. 7] | $1B | ——— |
| **Grace Evidence** | $4.7 – $5.2B (+ acceleration uncertainty) | $1B (+ ZAI uncertainty [1 million homes @ $5,000 per home]) | $1B | ? ? ? (Additional liability for acceleration and ZAI uncertaintes) |
| **Pending & Future PI Claimants** | $9 – $10B | | | |

### 2.3    In a Chapter 7 Liquidation, the Personal Injury Claimants Would Receive a Percentage Payment of Less Than 25%.

The Libby Claimants do not dispute that, under the Joint Plan, personal injury claimants will receive 25% to 35% of the value of their claims.[35]  If the assets, liabilities and the associated uncertainties are properly valued, it is clear that personal injury claimants would receive less than a 25% recovery in a Chapter 7 liquidation.  For example, if all personal injury claims,

---

[33]    10/13/2009 Tr. 51-52 (Zilly).

[34]    PP Main Post-Trial Br. at 33-34 [Dkt. No. 23662].

[35]    Libby Post-Trial Br. at 27 [Dkt. No. 23649].

9

including future claims, are considered for the purposes of a Chapter 7 liquidation, then, even

accepting all of the Libby Claimants' other assumptions concerning Grace's liabilities, the

personal injury claimants will receive less than a 25% recovery (the highlighted figures are

included in the calculation):

| CHAPTER 7 ASSETS | | | | | | |
|---|---|---|---|---|---|---|
| | Grace Business | SA and Fresenius | Insurance | Cash | Costs | Uncertainties | Totals |
| **Libby Claimants' Argument** | $1.050 – $1.25B | 0 – $978M | $500M | $787M | ($126-145M) | —— | |
| **Grace Evidence** | $1.050 – $1.25B (Minus uncertainty for asbestos overhang) | 0 – 0 (No §524(g) protection) | $500M (Minus uncertainty for no §524(g) protection) | $787M | ($126-145M) | ($0 – $1.050)? ? ? (Decreased value of assets for uncertainties for asbestos overhang & no §524(g) protection) | $2.2 – $2.4B |

| CHAPTER 7 LIABILITIES | | | | |
|---|---|---|---|---|
| | PI Claims | PD Claims | GUCs | Uncertainties | Totals |
| **Libby Claimants' Argument** | $4.7 – $5.2B | $200M (based on Ch.11 settlements) [$600M - $800M in Ch.7 to reflect that only 25%-35% of liability in Ch. 7] | $1B | —— | |
| **Grace Evidence** | $4.7 – $5.2B (+ acceleration uncertainty) | $1B (+ ZAI uncertainty [1 million homes @ $5,000 per home]) | $1B | ? ? ? (Additional liability for acceleration and ZAI uncertainties) | $10.2 – $11.2B |
| **Pending & Future PI Claimants** | $9 – $10B | | | | |

= 20-24%

Even if future claims are excluded, if either or both of the uncertainties arising from the

likely acceleration of personal injury claims and from ZAI PD Claims are more than $3 billion,

then the percentage recovery would be less than 25% (the highlighted figures are included in the

calculation):

10

| CHAPTER 7 ASSETS | | | | | | |
|---|---|---|---|---|---|---|
| | Grace Business | SA and Fresenius | Insurance | Cash | Costs | Uncertainties | Totals |
| **Libby Claimants' Argument** | $1.050 – $1.25B | 0 – $978M | $500M | $787M | ($126-145M) | ——— | |
| **Grace Evidence** | $1.050 – $1.25B (Minus uncertainty for asbestos overhang) | 0 – 0 (No §524(g) protection) | $500M (Minus uncertainty for no §524(g) protection) | $787M | ($126-145M) | ($0 – $1.050)? ? ? (Decreased value of assets for uncertainties for asbestos overhang & no §524(g) protection) | $2.2 – $2.4B |

| CHAPTER 7 LIABILITIES | | | | | |
|---|---|---|---|---|---|
| | PI Claims | PD Claims | GUCs | Uncertainties | Totals |
| **Libby Claimants' Argument** | $4.7 – $5.2B | $200M (based on Ch.11 settlements) [$600M - $800M in Ch.7 to reflect that only 25%-35% of liability in Ch. 7] | $1B | ——— | |
| **Grace Evidence** | $4.7 – $5.2B (+ acceleration uncertainty) | $1B (+ ZAI uncertainty [1 million homes @ $5,000 per home]) | $1B | ? ? ? $3B (Additional liability for acceleration and ZAI uncertainties) | $9.7 – $10.2B |
| **Pending & Future PI Claimants** | $9 – $10B | | | | |

| = 20- <25% |
|---|

Finally, for illustrative purposes, even an $800 million decrease in the value of Grace's assets, because of the uncertainties surrounding (1) a sale of Grace due to the asbestos overhang in a Chapter 7 liquidation and (2) the value of the insurance settlements because there would be no section 524(g) protection in a Chapter 7 liquidation, would cause the percentage payment to be less than 25%, even using all of the Libby Claimants' liability calculations (the highlighted figures are included in the calculation):

11

| CHAPTER 7 ASSETS | | | | | | |
|---|---|---|---|---|---|---|
| | Grace Business | SA and Fresenius | Insurance | Cash | Costs | Uncertainties | Totals |
| Libby Claimants' Argument | $1.050 – $1.25B | 0 – $978M | $500M | $787M | ($126-145M) | ——— | |
| Grace Evidence | $1.050 – $1.25B (Minus uncertainty for asbestos overhang) | 0 – 0 (No §524(g) protection) | $500M (Minus uncertainty for no §524(g) protection) | $787M | ($126-145M) | ? ? ? ($800M) (Decreased value of assets for uncertainties for asbestos overhang & no §524(g) protection) | $1.4B |

| CHAPTER 7 LIABILITIES | | | | |
|---|---|---|---|---|
| | PI Claims | PD Claims | GUCs | Uncertainties | Totals |
| Libby Claimants' Argument | $4.7 – $5.2B | $200M (based on Ch.11 settlements) [$600M - $800M in Ch.7 to reflect that only 25%-35% of liability in Ch. 7] | $1B | ——— | |
| Grace Evidence | $4.7 – $5.2B (+ acceleration uncertainty) | $1B (+ ZAI uncertainty [1 million homes @ $5,000 per home]) | $1B | ? ? ? (Additional liability for acceleration and ZAI uncertainties) | $5.9 – $6.4B |
| Pending & Future PI Claimants | $9 – $10B | | | | |

| = 22%- 24% |
|---|

Indeed, the evidence demonstrates that the Libby Claimants, along with all other Class 6 Claimants, would not receive more in a Chapter 7 liquidation than they will receive under the Joint Plan. In short, as Ms. Zilly testified, "asbestos personal injury claimants would achieve a higher percentage payout under the Plan."[36]

---

[36]    10/13/2009 Tr. 83 (Zilly).

### 2.4    The Libby Claimants' Evidentiary Objection Is Meritless.

The Libby Claimants argue that the $4.7 billion to $5.2 billion value of personal injury claims pending as of 2009 was a "new opinion" and therefore "should be disregarded."[37] That is simply not so. Dr. Peterson and Ms. Zilly long ago provided all of the information needed to make the simple mathematical calculations regarding the value of the current personal injury claims.

In his March 2009 report, Dr. Peterson explained that the tort system liabilities were between $9 billion and $10 billion.[38] In an email to the Libby Claimants, Dr. Peterson further provided a year-by-year analysis of an estimate that he used for the estimation hearing, which showed that, of a $5.4 billion estimate, $2.8 billion was for claims pending as of 2009, *i.e.*, 52% of the total estimate.[39] Those figures are disclosed in the Plan Proponents' Main Pre-Trial Brief, which Ms. Zilly incorporated into her report, and about which Dr. Peterson testified at the Confirmation Hearing.[40]

The mathematical relationship between the value of the liability for claims pending through 2009 and the value of the total liability for all pending and future claims is approximately the same for any of Dr. Peterson's forecasts, *i.e.,* the value of the liability of the

---

[37]    Libby Post-Trial Br. at 26 [Dkt. No. 23649].

[38]    PP Ex. 201 (Mark A. Peterson, Preliminary Expert Report on W.R. Grace Trust, March 2009, at 17 (revised June 2009)).

[39]    PP Ex. 234 (6/7/2009 e-mail from N. Finch to D. Cohn).

[40]    Plan Proponents' Pretrial Phase II Main Brief in Support of Confirmation ("PP Main Pre-Trial Br.") at 43 [Dkt. No. 22733], Exhibit 2 to Expert Report of Pamela D. Zilly Regarding The Best Interests Test [Dkt. No. 23042]; 9/15/2009 Tr. 216-17, 221-22 (Peterson); PP Ex. 178B (Peterson Demonstrative: "Forecasting Asbestos Liabilities" at T10).

13

claims pending as of 2009 is approximately 52% of the value of the liability for all pending and future claims.[41] As such, it is a simple mathematical calculation to determine the value of current personal injury claims for any total estimate by simply multiplying by 52%. Multiplying the $9 billion to $10 billion estimate of liability if Grace were to re-enter the tort system by .52 equals the $4.7 to $5.2 billion to which Dr. Peterson and Ms. Zilly testified at the Confirmation Hearing.[42]

These types of mathematical calculations are admissible even without any expert testimony. As one Court of Appeals has noted, "[a] mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701[]" rather than expert opinion under Rule 702.[43] In addition, courts routinely take judicial notice under Federal Rule of Evidence 201 of simple and basic mathematical calculations as they are "not subject to reasonable dispute." For example, the Ninth Circuit, in discussing a mathematical calculation related to mortgage debt, interest and amortization, said that such is "a matter of mathematics, of which the court could and should have taken judicial notice."[44] Indeed, this Court has already ruled that it does not think that it

---

[41]   9/15/2009 Tr. 221-23 (Peterson).

[42]   9/15/2009 Tr. 223 (Peterson); 10/13/2009 Tr. 25-26 (Zilly).

[43]   *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) (finding that a "mere calculation of an average of 103 numbers is not the sort of statistical determination which requires the special 'knowledge, skill, experience, training, or education' prescribed by Rule 702" and determining affidavit containing such calculation was improperly excluded from summary judgment evidence).

[44]   *Miller v. The Fed. Land Bank of Spokane*, 587 F.2d 415, 422 (9th Cir. 1978). *See also Bey v. Daimlerchrysler Servs. of N. Am., LLC*, No. 04-6186, 2005 WL 2090207, at *2 & n.1 (D.N.J. Aug. 29, 2005) (taking judicial notice of several calculations including "the fact that $54,758.40 minus $40,835.90 equals $13,922.50[,]" and the calculation for the monthly payment of a car loan, citing Federal Rule 201(b)(2)); *In re Oxford Hosp., Inc.*, No. 88-12629S, 1988 WL 138740, at *3, *4 n.4 (Bankr. E.D. Pa. Dec. 20, 1988) (calculating the rebate of finance charges and stating that "we believe that we can take judicial notice of such matters, which involve
(Continued...)

14

takes an expert witness to offer an opinion on a mathematical calculation and that "the witness can certainly state as a matter of fact whether a math calculation would lead to [a] result."[45]

Here, simple math exercises are the only requirement to determine the value of claims filed through 2009 by multiplying the total liability by 52%. Because such basic math does not require expert opinion testimony and a court can take judicial notice of indisputable mathematical calculations, Dr. Peterson's testimony should be admitted, as should any related testimony by Ms. Zilly.

---

mathematical calculations . . . "); *Henry v. Candy Fleet Corp.,* Nos. Civ.A. 98-1747, Civ.A. 98-2196, 2001 WL 121913, at *7 (E.D. La. Feb. 12, 2001) (taking judicial notice of the fact that a person earning $5.15 an hour would gross approximately $10,700 over a year working 40 hours a week).

[45]    *See* 9/15/2009 Hr'g Tr. 222 (Court).

15

**III.    THE JOINT PLAN IS FEASIBLE AND THE OBJECTIONS BY ANDERSON MEMORIAL AND THE STATE OF MONTANA ARE WITHOUT MERIT.**[46]

In accordance with the "feasibility" requirement of section 1129(a)(11), the Court must find that the Joint Plan has "a reasonable probability of success."[47] The Plan Proponents, through the testimony of Pamela Zilly, have clearly met this test. At the Confirmation Hearing, Ms. Zilly, Grace's financial expert, unequivocally concluded that the Joint Plan is feasible in light of Grace's historical performance, reasonable projections, management initiatives, and ability to obtain exit financing.[48]

---

[46] This document contains forward-looking information, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "projects," "will," "expects," "suggests," "anticipates," or similar expressions. Forward-looking information includes all statements regarding potential future actions in Grace's Chapter 11 Cases; expected financial positions; results of operations; cash flows; financing plans; business strategy; budgets; capital and other expenditures; competitive positions; growth opportunities; benefits from new technology and cost reduction initiatives, plans and objectives; and markets for securities. For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy and proposed plan of reorganization, Grace's settlements with certain creditors, Grace's legal proceedings, Grace's environmental proceedings, the cost and availability of raw materials and energy, Grace's unfunded pension obligations, risks related to foreign operations, especially security, regulation and currency risks, costs of compliance with environmental regulation and those factors set forth in Grace's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q and Current Reports on Form 8-K, which have been filed with the Securities and Exchange Commission. Like other businesses, Grace is subject to risks and uncertainties that could cause its actual results to differ materially from its projections or that could cause other forward-looking information to prove incorrect. Further, Grace's reported results should not be considered as an indication of its future performance. Readers are cautioned not to place undue reliance on Grace's projections and forward-looking information, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revision to the projections and forward-looking information contained in this document and the related testimony or to update them to reflect events or circumstances occurring after the date of this document and the related testimony.

[47] *See, e.g., In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000) ("[a]lthough the standards for determining feasibility are not rigorous, the court is obligated to independently evaluate the plan and determine whether it offers a reasonable probability of success."); *accord Gen. Elec. Credit Equities, Inc. v. Brice Rd. Dev., L.L.C. (In re Brice Rd. Dev., L.L.C.)*, 392 B.R. 274, 283 (6th Cir. B.A.P. 2008) ("Importantly, '[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.'"); *see also In re Frascella Enter.'s, Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007) (holding that the purpose of the feasibility test is to "prevent confirmation of visionary schemes which promise creditor and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (citations and internal quotation marks omitted). Contrary to AMH's argument that *Kane v. Johns-Manville* establishes additional requirements
(Continued...)

16

Nor is Grace alone in concluding that the Joint Plan is feasible. In fact, the two creditor constituencies with the most pertinent interests in Grace's long-term financial health -- the PI FCR and the Asbestos PD Future Claimants' Representative (the "PD FCR") -- both support confirmation of the Joint Plan. The only parties that have argued that the Joint Plan is not feasible are Anderson Memorial Hospital ("AMH") and the State of Montana ("Montana"). These objections are without merit.

### 3.1    AMH's Feasibility Objection Is Without Merit.

Despite Ms. Zilly's detailed and unambiguous testimony, AMH wrongly argues that the Plan Proponents have not met their burden of proving feasibility. Notably, AMH presents *no* testimony or other evidence that contradicts the unrebutted evidence demonstrating that Grace will be able to pay its debts as they come due. Rather, AMH's objection rests on three arguments: (1) the Joint Plan is not feasible because Grace did not "estimate" its asbestos property damage liability;[49] (2) AMH's class claim was not properly considered;[50] and (3) Grace was required to have arranged exit financing before the confirmation hearing.[51] Each of these arguments is wholly without merit both as a matter of law and fact.

---

in asbestos cases, *see* Anderson Memorial Hospital's Post-Trial Brief Regarding Feasibility ("AMH Post-Trial Feasibility Brief") at 3 [Dkt. No. 23650], the Second Circuit in *Kane* held that there is no different feasibility standard for asbestos cases and that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (citations omitted).

[48]    10/13/2009 Tr. 72 (Zilly) ("The combination of the company's balance sheet cash, as well as the company's ability to access the markets and achieve its exit financing proceeds makes this plan feasible.").

[49]    AMH Post-Trial Feasibility Br. at 6-9 [Dkt. No. 23650].

[50]    *Id.* at 15-16.

[51]    *Id.* at 16-19.

17

3.1.1    AMH's argument that Grace was required to estimate its property damage
liabilities is meritless.

Despite the substantial record demonstrating the Joint Plan's feasibility, AMH argues that

the Plan Proponents have failed to meet their burden of proof, alleging that "the Plan Proponents

presented no evidence at the confirmation hearing to quantify the magnitude of the [future

property damage] liabilities."[52] AMH's argument fails both as a matter of law, because AMH

did not provide any contrary evidence, and as a matter of fact, because Grace has shown that (1)

an estimate is not necessary, and (2) in any event, it could pay up to $1.6 billion.

### 3.1.1.1 AMH's argument fails as a matter of law.

It is black-letter law that an objecting party must produce evidence to support its

objection.[53] In the context of objections to feasibility, courts have required "evidence from the

record or objective data" to support an objector's allegation that a debtor's projections are

inadequate.[54] Here, AMH attacks Grace for not providing an estimate of property damage

liability without providing *any* contrary evidence. Instead, AMH merely asserts that it can

"imagine" scenarios in which the Debtors' projections might be incorrect.[55] But AMH's

"imagination" (*i.e.*, speculation) is no substitute for actual evidence. Its objection therefore fails

as a matter of law because it does not raise a genuine issue of material fact.

---

[52]    *Id.* at 6.

[53]    *See, e.g., In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006) ("The UCC [unsecured creditors committee], as dissenters, bear the burden of producing evidence to support their objection.").

[54]    *See, e.g., In re B. Cohen & Sons Caterers, Inc.*, 124 B.R. 642, 647 (E.D. Pa. 1991) ("New Plan contends that the Plan is not feasible because the debtor's ability to gross $500,000 in the first year of operations is speculative. New Plan, however, has failed to provide this Court with any evidence from the record or otherwise objective data to support this argument.").

[55]    AMH Post-Trial Feasibility Br. at 13 ("it does not take much imagination to envision a scenario where . . . PD Claims and Future PD Demands could overwhelm . . . the reorganized Debtors") [Dkt. No. 23650].

18

### 3.1.1.2 AMH's objection fails as a matter of fact.

(1)    Grace did not need to estimate future Property Damage
Claims because they would not be meritorious.

Grace set a reserve of $37.3 million to resolve pending, unsettled traditional Asbestos PD

Claims and to pay defense costs for any future property damage demands.[56] As detailed in

Debtor's Fifteenth Omnibus Objection, future asbestos property damage claims would be subject

to many defenses, including a statute of limitations defense and a defense that no health hazard

exists.[57] Moreover, any traditional Asbestos PD Claims brought in the future would be subject to

a defense of failure to file a proof of claim before the bar date.[58] Contrary to AMH's claim that

the $37.3 million reserve number has not been "substantiated or explained,"[59] the Debtors'

general counsel, Mark Shelnitz, answered AMH's questions regarding this figure.[60] Mr. Shelnitz

explained that Grace did not perform any estimate of liability for future traditional Asbestos PD

Claims because Grace does not believe that such claims "are reasonably estimable or that any

such claims are meritorious."[61] As such, there is no reason for Grace to estimate its liability for

future asbestos property damage claims.

---

[56]  10/13/2009 Tr. 76 (Zilly) (discussing Ms. Zilly's use and the significance of the $37.3 million number).

[57]  *See generally* Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims, dated 9/1/2005 [Dkt. No. 9315].

[58]  *See* Order as to All Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Date, (II) Approving Proof of Claim Forms and (III) Approving Notice Program, dated 4/22/2002 [Dkt. No. 1963].

[59]  AMH Post-Trial Feasibility Br. at 8 [Dkt. No. 23650].

[60]  *See* PP Ex. 368 (Written Answers of Mark A. Shelnitz to the Court's October 8, 2009 Order on Anderson Memorial Hospital's Motion to Compel, filed 10/12/2009).

[61]  *Id.* at ¶ 5.

19

Ms. Zilly testified that she relied on Grace's reserve because, in her judgment, "[t]he company has the experience based on its historical precedent with respect to asbestos property damage claims. It has expert reports that were prepared for it with respect to whether or not it could be a determined number, and it also had its own internal records and claim histories with respect to asbestos property damage claims."[62] Accordingly, contrary to AMH's suggestion that Ms. Zilly cannot rely on Grace's reserve,[63] Ms. Zilly's use of Grace's reserve is proper because experts may rely upon facts or data that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and "[t]he law is clear that experts 'may rely on the work of others.'"[64] Thus, it was appropriate for Ms. Zilly to rely on Grace's reserve.

AMH's reliance on *Kane v. Johns-Manville* and *In re National Gypsum* to support its argument that Grace was required to estimate its liability for traditional Asbestos PD Claims[65] is misplaced. In *Kane* and *National Gypsum*, it was indisputable that the debtors would be subject to significant, meritorious personal injury claims that needed to be estimated to determine the debtors' future liability.[66] Accordingly, it is not surprising that an estimate of those personal injury liabilities would be required. Here, given Grace's defenses to any future traditional

---

[62]  10/13/2009 Tr. 184 (Zilly).

[63]  AMH Feasibility Br. at 10 [Dkt. No. 23650].

[64]  Fed. R. Evid. 703; *Adani Exports Ltd. v. AMCI (Export) Corp.*, No. 2:05-cv-0304, 2008 WL 4925647, at *3 (W.D. Pa. Nov. 14, 2008).

[65]  AMH Post-Trial Feasibility Br. at 3 [Dkt. No. 23650].

[66]  *See In re Nat'l Gypsum Co.*, 219 F.3d 478, 480 (5th Cir. 2000) (noting that when the debtors filed for chapter 11 relief, they faced liability between $695 and $764 million for future asbestos claims; *Kane*, 843 F.2d at 639 (noting that the debtor's own pre-petition estimate of its liability for asbestos personal injury claims predicted liability of approximately $2 billion).

20

Asbestos PD Claims, there is simply no evidence that Grace will be subject to liability on

account of future traditional Asbestos PD Claims and, as such, no estimate is necessary.[67]

> (2) Grace would be able to pay $1.6 billion in property damage claims.

While Grace does not believe that its liability on account of future traditional Asbestos

PD Claims will approach this number, Ms. Zilly testified that the Joint Plan would still be

feasible even if Grace were required to pay $1.6 billion for these claims.[68] Moreover, contrary to

AMH's suggestion,[69] Ms. Zilly testified that after her deposition she analyzed the $1.6 billion

number with respect to feasibility and concluded that it would not affect the feasibility of the

Joint Plan.[70]

To try to circumvent Ms. Zilly's unrebutted testimony that Grace could pay $1.6 billion,

AMH argues that the evidence of feasibility is still insufficient because Ms. Zilly did not analyze

Grace's ability to pay the $1.6 billion on a year-by-year basis.[71] But AMH does not provide any

---

[67] The *Nat'l Gypsum* bankruptcy court decision, cited by AMH on page 3 of its brief, is inapposite for another reason as well: That case has nothing to do with feasibility. The case stands only for the unexceptional proposition that section 502(c)(1) of the Bankruptcy Code requires, for purposes of claims allowance, estimation of any contingent or unliquidated claim the liquidation of which would unduly delay the administration of the case. *In re Nat'l Gypsum Co.*, 139 B.R. 397, 405 (N.D. Tex. 1992) ("Furthermore, the Code requires the estimation of all contingent or unliquidated claims which 'unduly delay the administration of the case.'") (citing 11 U.S.C. § 502(c)(1)).

[68] 10/13/2009 Tr. 78 (Zilly) (stating that the Joint Plan would still be feasible even if Grace had to pay $1.6 billion in PD claims over 25 years).

[69] AMH Post-Trial Feasibility Br. at 10 (arguing that Ms. Zilly "had not relied upon or evaluated [the $1.6 billion number] in any way in forming her opinions") [Dkt. No. 23650].

[70] 10/13/2009 Tr. 185 (Zilly) ("It [the $1.6 billion estimate] was initially brought up in a deposition. I've since done more analysis . . . I've done more analysis with respect to what that number would mean with respect to feasibility . . .").

[71] AMH Post-Trial Feasibility Br. at 11-13 [Dkt. No. 23650].

21

*evidence* that a year-by-year analysis would render the Joint Plan infeasible.[72] Rather, the

undisputed testimony from Judge Sanders and Ms. Zilly is that Grace would be able to pay all

future property damage claims.[73]

(3)     AMH's reliance on Grace's experts is misplaced.

AMH attempts to show the number of buildings in which Grace product may have been

installed and then use these figures to speculate as to the potential future PD liability. To show

the number of buildings in which Grace product may have been installed, AMH improperly

refers to statements by Grace's expert, Dr. Martin, and Grace's former consultant in the 1990's,

Dr. Rourke,[74] whose work had nothing to do with feasibility.

With respect to Dr. Martin, as a threshold matter, there is nothing in the record regarding

the number of buildings that may contain Grace's product. Instead, AMH relies on Dr. Martin's

report,[75] which is not in the record and thus cannot be relied upon. Moreover, Dr. Martin

considered only whether substantial future demands would be made, and did not purport to

estimate Grace's future liability for Asbestos PD Claims: "This is purely looking at the demand

---

[72]   *See Armstrong*, 348 B.R. at 122 (requiring objecting party to produce evidence to support its objection).

[73]   *See* 10/13/2009 Tr. 78 (Zilly) (stating that the Joint Plan would still be feasible even if Grace had to pay $1.6 billion in PD claims over 25 years); PP Ex. 633 (Proffer of Testimony from the Honorable Alexander M. Sanders, Jr., Asbestos PD Future Claimants' Representative, in Support of Confirmation of the First Amended Joint Plan of Reorganization, at ¶ 16) ("Sanders Proffer") ("Under the Joint Plan, all current and future claims in Class 7A will be paid the full amount of their allowed claims."). AMH also complains that Ms. Zilly should have estimated a dollar figure that would exceed Grace's ability to pay future traditional Asbestos PD Claims. AMH Post-Trial Feasibility Br. at 11-12 [Dkt. No. 23650]. But this is simply not required to prove feasibility. A debtor is not required to speculate as to the outer bounds of its ability to pay liabilities beyond any estimate of such liabilities. *See Greate Bay*, 251 B.R. at 226 ("the standards for determining feasibility are not rigorous").

[74]   AMH Post-Trial Feasibility Br. at 12-13 [Dkt. No. 23650].

[75]   AMH Post-Trial Feasibility Br. at 13 [Dkt. No. 23650].

22

side, not at all at the liability or the merit side." [76]  Accordingly, Dr. Martin's testimony cannot be used to support AMH's arguments.

Likewise, AMH cannot rely on the deposition testimony of Daniel Rourke, who fourteen years ago undertook to estimate Grace's asbestos liability and tried to estimate the number of buildings that may have contained Grace product.[77] Not only is the estimate fourteen years old, but even at that time, Grace's former General Counsel, Robert Beber, was skeptical of Dr. Rourke's estimate of Grace's liability for Asbestos PD Claims and did not believe that it was meaningful.[78] In fact, Mr. Beber's assessment proved correct -- in contrast to Dr. Rourke's prediction of substantial liability for traditional Asbestos PD Claims from 1995 through 1999, only four cases were filed between 1995 and 1998, and none were filed between 1998 and the Petition Date.[79] Finally, even if the Court were to consider these estimates by Dr. Rourke of the number of buildings that may contain Grace product, these estimates say nothing about the number of *meritorious* future claims that might be asserted against the Asbestos PD Trust in light of the operation of the Bar Date, applicable statutes of limitation, and other defenses.[80] Thus, Dr. Rourke's work also does not support AMH's arguments.

---

[76]  10/13/2009 Tr. 225 (Martin).

[77]  AMH Post-Trial Feasibility Br. at 12 n.6 [Dkt. No. 23650].

[78]  Beber Dep., 7/30/2002 at 70 ("Q. So I take it, sir, based on your comments, that you didn't believe that the conclusions presented . . . were meaningful on the PD side? A. As to property, that's correct.  Q. Okay.  And did you so advise Dr. Rourke?  A. Yes."); *see also, id.* at 60-67, 82-83.

[79]  Anderson Memorial Ex. 53 (Debtors' Memorandum in Support of Entry of a Case Management Order, at 8) ("only four new [traditional PD] cases have been filed since 1995, and none since 1998").

[80]  *See generally* Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims, dated 9/1/2005 [Dkt. No. 9315] (detailing Debtors' objections to traditional Asbestos PD Claims).  AMH also points to recent amendments to the Joint Plan and the PD Trust that establish procedures to apply in the event that the
(Continued...)

23

### 3.1.2 The Plan Proponents are not required to estimate AMH's class action claim.

AMH also argues that the Joint Plan is somehow not feasible because Grace allegedly has not "accounted for the possibility that the AMH class claims might ultimately be allowed."[81] Once again, AMH has not provided any evidence as to what it believes is the value of the class action. As such, as a matter of law, AMH's argument should be rejected.[82]

Moreover, as a matter of fact, there is no reason to believe that AMH's class action claim will have any significant value in light of the Bankruptcy Court's and District Court's rulings denying class certification.[83] In addition, there is *no* evidence that AMH's class claim, even if allowed, would threaten the feasibility of the Joint Plan. Even if the class action were certified, that would only be a first step and the class would be subject to all of the defenses that Grace could and would raise. Finally, Grace has demonstrated that it would be in a position to pay up to $1.6 billion for any such class action.[84]

---

PD Trust is ever in the position of operating as a limited fund. AMH Post-Trial Br. at 14-15 [Dkt. No. 23650]. The amendments, however, reflect only a prudent measure requested by the PD FCR in the theoretical event there is a default. The PD FCR has never retreated from his unrebutted testimony that Grace will be able to pay future property damage claimants. *See* PP Ex. 633 (Sanders Proffer at ¶ 16) ("Under the Joint Plan, all current and future claims in Class 7A will be paid the full amount of their allowed claims."); 9/17/2009 Tr. 98-99 (Sanders) ("Q. But they're [present and future claimants] both getting what percentage of their claims? A. Hundred percent.").

[81]   AMH Post-Trial Feasibility Br. at 15 [Dkt. No. 23650].

[82]   *See Armstrong*, 348 B.R. at 122 (requiring objecting party to produce evidence to support its objection).

[83]   The District Court held: "The Court has looked at the class certification decision in detail, and in this case, the denial of class certification was neither imprudent nor erroneous. . . . Furthermore, the Court agrees with the Bankruptcy Court that certifying this class would effectively render the bar date useless and adversely affect claimants who filed timely proofs of claim. Therefore, the court declines to grant review of the class certification decision." *In re. W. R. Grace & Co.*, No. 08-118, 2008 WL 4234339, at *2 (D. Del. Sept. 4, 2008).

[84]   AMH's reliance on the District Court's recent reversal of the disallowance of the State of California's sixteen asbestos property damage claims is also misplaced. Grace sought summary judgment and disallowance as a
(Continued...)

24

AMH's reliance on *In re Harbin* is misplaced.[85]  In that case, the bankruptcy court failed

to consider the possibility that a judgment for the debtor setting aside a jury verdict of over

$414,000[86] might be reversed in a case in which all the other liabilities totaled only $707,000.[87]

Thus, in *Harbin*, there was substantial evidence of the disputed claim's possible value -- a jury

verdict that could have been reinstated on appeal.  Moreover, the claim at issue in *Harbin*

potentially accounted for over 35% of the debtor's total liabilities, and it could have jeopardized

the plan's promise to pay all creditors in full.  Here, there is ***no*** evidence that the class action

---

matter of law.  Grace still has the opportunity to show as a factual matter that the State had knowledge of contamination sufficiently prior to its filing of its proofs of claim such that its claims are time-barred.  *In re W. R. Grace & Co.*, No. 08-863, 2009 WL 3205194, at *17 (D. Del. Sept. 29, 2009).  And, Grace has asserted numerous other defenses to California's claims, including that certain of the claims: (i) do not rule out non-Grace asbestos-containing products; (ii) are for buildings built too late to contain Grace asbestos-containing products; (iii) are barred by statutes of limitations based on constructive notice; (iv) are barred by laches; and (v) provide no proof of hazard.  *See* Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims, dated 9/1/2005 [Dkt. No. 9315].

AMH's reliance on the State of California's claims is unconvincing for another reason.  Grace's February 2007 motion for summary judgment and disallowance as to the State's claims sought similar relief with respect to thirty-six California State University ("CSU") claims and fifty-six University of California ("UC") claims.  *See* Debtors' Motion and Memorandum for an Order pursuant to F.R.B.P. 7056 Disallowing and Expunging One Hundred Nine (109) California Asbestos Property Damage Claims Barred by the Statute of Limitations, dated 2/16/2007 [Dkt. 14594] (the "Motion").  While the Motion was pending, Grace settled the CSU claims for $9,375 per claim (for a total of $300,000) and the UC claims for $22,000 per claim (for a total of $1.1 million).  Motion for Approval of Settlement of Asbestos Property Damage Claims with California State University, dated 9/1/2008 [Dkt. No. 19515] and Motion for Approval of Settlement of Asbestos Property Damage Claims with University of California, dated 9/16/2008 [Dkt. No. 19551].  CSU and UC were co-represented by AMH's counsel Speights and Runyan and by another law firm.  The agreements were signed in September 2008 -- before this Court ruled on the Motion, and, therefore, before Speights & Runyan knew how any Court would rule on the Motion.  AMH's counsel Speights & Runyan thus thought that fair value for these California claims -- which were subject to the same limitations defenses as the State of California's Department of General Services claims -- was only $9,375 and $22,000 respectively.  Contrary to AMH's conjecture, *see* AMH Post-Trial Feasibility Br. at 13-14 [Dkt. No. 23650], the State of California's sixteen claims therefore are not likely to be worth anything even remotely close to $130 million.

[85]   *See* AMH Post-Trial Feasibility Br. at 15-16 [Dkt. No. 23650].

[86]   *In re Harbin*, 486 F.3d 510, 514 (9th Cir. 2007).

[87]   *Id.* at 516 (noting that the debtor used a $707,000 loan to retire the mortgage on a residence, pay off outstanding property taxes, and to fund his plan of reorganization "which, if confirmed, would have paid all creditors in full").

25

claim has any value, that it could account for any significant portion of Grace's liabilities, or that it would threaten the feasibility of the Joint Plan. Accordingly, the *Harbin* case is inapposite.

### 3.1.3 The Plan Proponents have demonstrated that Grace can obtain exit financing.

AMH also asserts that the Joint Plan is not feasible because "the Plan Proponents did not present any evidence of committed exit financing at the confirmation hearing."[88] The law, however, does not require formal execution of specific documents to prove feasibility. Courts have consistently confirmed plans where the debtor demonstrates that it will be able to obtain exit financing before the effective date.[89] Accordingly, AMH's objection fails as a matter of law.

In addition, Ms. Zilly explained that Grace could have obtained commitment letters but chose not to do so to maintain flexibility in its capital structure and in its timing in accessing the market.[90] For these reasons, Grace decided to negotiate actual exit finance agreements and not seek commitment letters.[91] Ms. Zilly concluded that Grace will be able to obtain exit

---

[88]  AMH Post-Trial Feasibility Br. at 17 [Dkt. No. 23650].

[89]  *See In re Reading Broad. Inc.*, 386 B.R. 562, 574 (Bankr. E.D. Pa. 2008) (rejecting the argument that the plan was infeasible due to the speculative nature of an asset sale because evidence presented at the confirmation hearing was sufficient to demonstrate that the sale "had a probability of closing and that the trustee's plan would be consummated"); *In re Global Ocean Carriers LTD.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000) (rejecting the argument that the plan was infeasible due to exit financing not being finalized); *see also In re 222 Liberty Assoc.'s*, 108 B.R. 971, 986 (Bankr. E.D. Pa. 1990) (holding that plan was feasible despite 17 conditions precedent to execution of exit financing).

[90]  10/13/2009 Tr. at 69 (Zilly) ("You lose flexibility with respect to your capital structure, the potential timing of when you access the market and also with respect to rates because, obviously, under the commitment letters, the commitment letters would also provide for fixed rates.").

[91]  *Id.* at 69-70.

26

financing.[92] AMH offers no witness, fact or expert, or other evidence contradicting Ms. Zilly's testimony. Accordingly, AMH's argument should be rejected.

### 3.1.4 AMH's arguments regarding other supposed threats to feasibility are baseless.

Incredibly -- after multiple previous attempts to assert this argument have failed -- AMH yet again asserts that the bar date notice program was flawed, and that consequently, the Joint Plan is not feasible because the notice program is subject to challenge by creditors who purportedly did not receive adequate notice. But as this Court is well aware, the approval of the bar date notice program became a final order in 2002. The time to appeal the publication notice program was in 2002; it was not appealed (with good reason),[93] and it is therefore law of the case.

For ten months after filing the Bar Date Motion, the Debtors worked with every official committee and the Court to craft the Bar Date Notice and a comprehensive system of publication notice (collectively, the "Notice Program"). This Court recognized that the forms of notice were comprehensive.[94] And the order approving the Notice Program specifically states that "notice of the entry of this Order and of the Bar Date to unknown claimants pursuant to the Debtors' Bar Date Notice plan for Asbestos Property Damage Claims and Other Claims (the "Notice

---

[92]  *Id.* at 70.

[93]  AMH asserts that the Property Damage Committee's appeal the of the Bar Date Order was rejected as interlocutory. AMH Post-Trial Feasibility Br. at 19 n.9. The PD Committee only sought to appeal two issues with respect to the Bar Date Order -- whether the Bankruptcy Court erred in issuing the Bar Date Order in light of the fact that no bar date order had been set with respect to other asbestos claimants, and whether the PD proof of claim form exceeded permissible bounds. AMH did not seek to appeal any aspect of the Notice Program. [Dkt. 2019 at 2-3].

[94]  4/22/2002 Tr. at 97 ("It seems to me that this is designed to cover the universe of plaintiffs who could be out there with property damage.").

27

Program"), as modified, and filed on April 12, 2002, shall be deemed good, adequate and sufficient notice of the Bar Date . . . ."[95]

AMH now claims that discovery during the confirmation process revealed a new fact -- that Grace has an index of documents that shows buildings and job sites to which its products were shipped.[96]  But there is absolutely nothing new about this information.  With full knowledge that Grace has records of sales to buildings and job sites, this Court, the District Court, and the Third Circuit have repeatedly rejected AMH's and its counsel Speights & Runyan's notion that the Notice Program was insufficient because Grace did not ascertain the names and addresses of thousands of current and former building owners.

AMH and its counsel unsuccessfully challenged the Notice Program in the context of AMH's quixotic quest for a property damage class and Speights & Runyan's failed attempt to maintain claims filed on behalf of claimants for which it lacked authority, arguing that the identities of potential property damage claimants were reasonably ascertainable from the very

---

[95]  Bar Date Order, dated 4/22/2002 [Dkt. 1963].

[96]  AMH Post-Trial Feasibility Br. at 20.

28

same Grace billing records that AMH points to now.[97]  In re-affirming the Notice Program, this

Court rejected AMH's assertion,[98] and the District Court agreed:

> Debtors . . . maintain that they have met the required reasonably diligent standard
> with respect to notice.  They contend that not only did they cease manufacturing
> the products at issue almost thirty years prior to the bar date, but in the ensuing
> decades, many of the buildings containing their products were demolished, sold,
> or had changed hands, often repeatedly.
>
> In the face of this complexity, the Bankruptcy Court worked with the parties,
> attorneys, and the Official Committee of Asbestos Property Damage Claimants to
> develop a workable notice package and system of publication. . . . It was made
> clear to claimants' attorneys, including Daniel Speights of S&R, that they had the
> responsibility to serve their clients, and would best know of clients who might be
> interested in filing property damage claims.[99]
>
> . . .
>
> Debtors' records of buildings and building owners to whom their products were
> sold to decades ago does little to assist in identifying claimants with reasonably
> diligent effort . . . As Debtors point out, they 'would have been required to
> conduct searches for thousands of buildings where Grace asbestos containing
> building materials might have been installed.'  The Court finds such a search to
> far exceed what constitutes reasonable diligence, and thus Appellants were not
> entitled to actual notice."[100]

---

[97]    *See* Joint Appellants' Brief Filed On Behalf of Forty-Four Claimants Whose Claims Were Dismissed by the
Bankruptcy Court's April 17, 2007 Order and Memorandum Opinion, at 19, *Mission Towers v. W. R. Grace &
Co.*, No. 07-287, D. Del. [Dist. Ct. Dkt. No. 7] ("Segregated in the repository are Grace's sales records for its
asbestos-containing products.  These records include thousands of purchase orders and billing invoices for
asbestos-containing products (mostly Monokote) which provide the physical address and building owner where
Grace's products were delivered.  Additionally, Grace maintained at least two separate catalogs of the
documents in the repository including one computerized catalog prepared by its counsel to assist in locating
documents.").

[98]    *In re W.R. Grace & Co.*, 366 B.R. 302, 307 (Bankr. D. Del. 2007).

[99]    *Mission Towers v. W. R. Grace & Co.*, No. 07-287, 2007 WL 4333817, *7 (D. Del. Dec. 6, 2007).

[100]   *Id.* at *8.

29

AMH's long-running challenge to the Notice Program was -- or should have been -- laid to rest once and for all earlier this year when the Third Circuit affirmed that Grace had no due process obligation to search out the owners of all buildings where Grace asbestos-containing product was installed:

> For Grace to notify claimants, it would have to (1) conduct searches for thousands of buildings where Grace asbestos-containing product was installed and (2) search those title records to locate the current owners of those buildings. We have held that debtors are not required to conduct title searches to locate prospective claimants because it is beyond the reasonably ascertainable standard. The Bankruptcy Court thus acted well within its discretion.[101]

AMH's argument that the notice program raises a threat to feasibility raises no new facts, and it has already been rejected a half-dozen times in these bankruptcy proceedings. It should be rejected again.

### 3.2    Montana's Objection Lacks Merit.

Incredibly, Montana maintains its objection to feasibility in its post-trial brief. As clearly demonstrated by Montana's inability to lay any foundation for the number on which it relies, this argument lacks any legitimate factual basis.[102] Likewise, Montana's argument rests on its mistaken interpretation of the law: Montana asserts that its claims are somehow not "claims" or "demands" as defined in the Bankruptcy Code, imagining that there is some undefined third

---

[101] *In re W.R. Grace & Co. (Mission Towers v. W.R. Grace & Co.)*, 2009 WL 648651, *2 (3rd Cir. March 11, 2009), citing *Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d Cir. 1995); *see also Pacificorp and VanCott Bagley Cornwall & McCarthy v. W. R. Grace*, No. 05-764, 2006 WL 2375371, *10 (D. Del. Aug. 16, 2006) (Grace did not have an obligation to conduct a search to determine the former and current owners of approximately thirty sites where Grace asbestos-containing vermiculite was processed; requiring Grace to "search for numerous current and prior owners at numerous sites" would far exceed the "reasonable diligence" required by the Third Circuit's *Chemetron* decision).

[102] 10/13/2009 Tr. 156 ("COURT: There isn't [a foundation], but the question is that he's trying to get to, assuming that the maximum horrible -- set of horribles could happen to the debtor what's the consequence?").

30

category into which they might fall. Montana even states that the Plan Proponents have "tacitly

conceded" this point.[103] This statement is a *flagrant* misrepresentation of the record -- the Plan

Proponents have correctly argued that Montana's purported claims are demands and are properly

channeled to the Trust in both their Main Pre-Trial Brief[104] and their Phase II Pre-Trial

Feasibility Brief.[105] Finally, as Ms. Zilly testified, even if Montana's unsupported, hypothetical,

worst-case scenario were to unfold, it is possible that Grace could pay such a claim "based on an

accrual of cash as well as additional borrowings."[106] Thus, Montana's argument lacks any basis

in law or fact and should be rejected.

## IV.    THE JOINT PLAN'S CLASSIFICATION OF INDIRECT PI TRUST CLAIMS IN CLASS 6 SATISFIES THE REQUIREMENTS OF 11 U.S.C. § 1122(a).

In the Main Post-Trial Brief, the Plan Proponents asked the Court to find that:

> The claims of Maryland Casualty Co. ("MCC"), the State of Montana
> ("Montana"), Burlington Northern & Santa Fe Railroad ("BNSF"), Fireman's
> Fund Insurance Co. ("Fireman's Fund"), Longacre Master Fund ("Longacre"),
> Seaton Insurance Co. ("Seaton"), and OneBeacon America Insurance Co.
> ("OneBeacon") are Indirect PI Trust Claims and, as such, are properly classified
> in Class 6 because they are substantially similar to other Asbestos Personal Injury
> Claims.[107]

As explained at length in both the PP Main Pre-Trial Brief and Main Post-Trial Brief,

each of these parties' claims are properly channeled to the Asbestos PI Trust under section

---

[103]  Montana Post-Trial Br. at 4-5 [Dkt. No. 23654].

[104]  PP Main Pre-Trial Br. at 124-26 [Dkt. No. 22733].

[105]  Plan Proponents' Brief in Support of Plan Confirmation Regarding Feasibility at 8 [Dkt. No. 22959].

[106]  10/13/2009 Tr. 158 (Zilly) (testifying that "it's possible [Grace] might be able to pay" a $750 million judgment one year after the effective date "based on an accrual of cash as well as additional borrowings").

[107]  PP Main Post-Trial Br. at 37 [Dkt. No. 23662].

31

524(g), and they are therefore properly classified with other Asbestos PI Claims that are

similarly channeled.[108] In their post-trial briefing, several parties still object to classification of

their claims in Class 6. Montana and BNSF simply restate their objections from previous briefs

or incorporate such objections by reference,[109] without citing new authority or evidence. Thus,

the Plan Proponents refer the Court to their previous briefs answering these objections to

classification[110] and respond in detail to the objections of Longacre, MCC, and

Seaton/OneBeacon.

### 4.1    Longacre's Objection to the Classification of Its Claim Lacks Merit.

Longacre's claim against Grace (the "NU Claim") is properly treated as an Indirect PI

Trust Claim because it arises out of surety bonds that National Union posted in connection with

Grace's settlement of several asbestos tort claims.[111] Specifically, Grace entered into settlement

agreements with two asbestos PI plaintiffs' law firms that required Grace to make settlement

payments in four annual installments.[112] Pursuant to these agreements, Grace was required to

obtain guarantees of its future obligations, and it satisfied this requirement by causing National

---

[108] PP Main Post-Trial Br. at 37-47 [Dkt. No. 23662]; PP Main Pre-Trial Br. at 47-63 [Dkt. No. 22733].

[109] *See* Post Trial Brief of BNSF Railway Company ("BNSF Post-Trial Br.") at 7 [Dkt. No. 23648]; Montana Post-Trial Br. at 5-6 [Dkt. No. 23654].

[110] *See supra*, note 108.

[111] 9/14/2009 Tr. 268-69 (Hughes) ("Longacre purchased the claims of National Union and National Union had issued . . . surety bonds, which [were] to guarantee Grace's performance under a settlement agreement . . . ."); 9/15/2009 Tr. 52 (Hughes) ("Q. So National Union had posted a surety bond, correct? A. Yes. Q. And that surety bond was intended to secure debtor's obligations under settlement agreements with various asbestos personal injury claimants? A. Yes."); *see also* National Union-Reaud Morgan Notice of Filing of Settlement Agreement, Ex. A, Settlement Agreement and Mutual Release, dated 12/14/2007, at ¶¶ A, B [Adv. 02-1657 Dkt. No. 113].

[112] National Union-Reaud Morgan Notice of Filing of Settlement Agreement, Ex. A, Settlement Agreement and Mutual Release, dated 12/14/2007, at ¶¶ A, B [Adv. 02-1657 Dkt. No. 113].

Union Fire Insurance Company of Pittsburgh, PA ("National Union") to issue two surety bonds to Grace.[113] After Grace filed these Chapter 11 Cases, the Debtors commenced an adversary proceeding to prevent National Union from making certain payments pursuant to the bonds, and, in turn, National Union sought a declaration that no more moneys were owed under the settlement agreements.[114]

In settlement of these disputes, the parties entered into an agreement on November 13, 2007, whereby the personal injury claimants were permitted to draw $15.35 million against the National Union bonds, National Union was allowed to draw $6.71 million against two letters of credit issued by the Bank of America, and National Union's claim against Grace was allowed for the sum of $9,806,018.[115] National Union later assigned its claim to Longacre.[116]

On these facts, it is clear that any payments by National Union under the surety bonds were necessarily made in direct satisfaction of the underlying asbestos tort claims,[117] and that the NU Claim is an attempt to obtain reimbursement for the payment of Asbestos Personal Injury Claims. As explained in the Main Pre-Trial Brief,[118] Courts have consistently held that where claims for indemnification and contribution, contractual or otherwise, relate to personal injury

---

[113] *Id.* at ¶ C.

[114] *Id.* at ¶¶ E, F.

[115] Longacre Ex. 1 (Stipulation of Facts Between Longacre and Debtors at 2, ¶ 4).

[116] *Id.* at 3, ¶ 9.

[117] 9/15/2009 Tr. 72 (Hughes) ("National Union agreed if for any reason that Grace was unable to meet its obligations to the tort claimants, that it would make the payments.").

[118] *See* PP Main Pre-Trial Br. at 37-38 [Dkt. No. 22733].

33

claims arising from the debtor's asbestos products and operations, such claims are substantially

similar and may be placed together in the same class.[119] Thus, the classification of Indirect PI

Trust Claims in Class 6 is proper, and Longacre's claim is properly treated as an Indirect PI Trust

Claim because it is a claim for indemnification, contribution, or subrogation for damages paid to

a plaintiff in an action seeking recovery for "personal injuries (whether physical, emotional or

otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to

asbestos or asbestos-containing products for which the Debtors have liability."[120]

Even though Longacre's claim is clearly an attempt to collect on exactly the same

liabilities that predominate Class 6 -- personal injury claims for asbestos-related injuries --

Longacre argues that its claim is incorrectly classified.[121] Longacre makes four erroneous

arguments in support of this contention: (1) that Longacre's claim is not "substantially similar"

to other Class 6 claims as required by section 1122(a), even though Longacre's claim seeks

recovery of payments made to satisfy a settlement of asbestos-related injuries;[122] (2) that

classification of Longacre's claim in Class 6 would be inconsistent with the agreement settling

---

[119] See In re Armstrong World Indus., Inc., 348 B.R. 136, 168-69 (D. Del. 2006) ("Because Indirect PI Trust Claims, including those arising under contract, relate to direct Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and have historically been channeled to trusts established in connection with asbestos related chapter 11 cases."); see also In re Burns and Roe Enters. Inc., No. 08-4191, 2009 WL 438694, at *24 (D.N.J. Feb. 23, 2009) (approving classification grouping direct and indirect asbestos claims in one class where definition of indirect claim under plan included claims for indemnification and subrogation); In re Asbestos Claims Mgmt. Corp., 294 B.R. 663 (N.D. Tex. 2003) (confirming plan grouping direct and indirect asbestos claims together where definition of indirect claim under plan explicitly included contractual claims for reimbursement, indemnification, and other forms of relief); In re Celotex Corp., 204 B.R. 586 (M.D. Fla. 1996) (same); In re Porter Hayden Co., No. 02-54152, 2006 WL 4667137 (Bankr. D. Md. June 30, 2006) (same); In re Federal-Mogul Global, Inc., No. 01-10578, 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) (same).

[120] See PP Ex. 277.01 Rev. (Joint Plan § 1.1(138)) (defining "Indirect PI Trust Claim").

[121] Post-Trial Brief of Longacre Master Fund, Ltd. ("Longacre Post-Trial Br.") at 20 [Dkt. No. 23655].

[122] Id. at 10-13.

34

the NU Claim (the "NU Settlement Agreement"), even though that agreement says **nothing**

about how the NU Claim should be classified;[123] (3) that the Debtors should be estopped from

classifying the NU Claim in Class 6, even though the Debtors made no representation in the

settlement agreement regarding classification of the NU Claim;[124] and (4) that the classification

of Morgan Stanley's claim in Class 9 requires that Longacre's claim receive similar treatment,

even though Longacre's claim arises from a transaction that contemplated payment of asbestos

liabilities while Morgan Stanley's claim does not.[125]

4.1.1    Longacre's claim is substantially similar to other Class 6 Claims.

The justification for classifying Longacre's claim with other Asbestos PI Claims is

simple: like the other Asbestos PI Claims, Longacre's claim is properly channeled to the

Asbestos PI Trust because it arises out of the Debtors' sale of asbestos-related products.[126]

"Because Indirect PI Trust Claims, including those arising under contract, *relate to* direct

Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and

have historically been channeled to trusts established in connection with asbestos related chapter

11 cases."[127]  It would be both impractical and illogical to classify a claim to be paid by the

---

[123]  *Id.* at 13-14.

[124]  *Id.* at 14-16.

[125]  *Id.* at 17-18.

[126]  *See supra* note 119.

[127]  *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 168-69 (D. Del. 2006) (emphasis added).

35

Asbestos PI Trust with general unsecured claims that will be paid by Grace upon exit from

bankruptcy.[128]

Longacre, in its post-trial brief, does **not** dispute that its claim will be channeled under

section 524(g). In fact, Longacre's brief does not even cite section 524(g) or any case that

considers classification issues in the context of a section 524(g) plan. The structure of the Joint

Plan is therefore lost on Longacre, and it fails to explain why its claim should be classified with

dissimilar, non-asbestos claims. Instead, Longacre clings to the notion that because its claim is

"contractual" and "liquidated" in nature, it cannot be classified with tort claimants.[129] Both of

these arguments fail. As the Plan Proponents explained in the PP Main Pre-Trial Brief, whether

or not a claim may be characterized as "contractual" is irrelevant to classification under section

1122(a).[130] Longacre's argument that its claim should be classified in Class 9 because it is

liquidated is also unavailing -- Longacre cites no evidence that the claims in Class 9 are any

more likely to be liquidated than claims in Class 6.[131]

Longacre cites two lower-court decisions from the First Circuit for the proposition that

the Joint Plan violates section 1122(a): *In re Mahoney Hawkes, LLP* and *In re Gato Realty Trust*

---

[128] This Court already rejected an argument similar to Longacre's by a party whose potential claim arose from an appeal bond (*Solow* claim). *See* 4/25/2005 Hrg. Tr. at 29 ("Yes, it is a contractual obligation, but it's an obligation to pay an asbestos claim which the debtor would otherwise have to pay and which is going to be addressed in the debtor's plan as payment of an asbestos claim.").

[129] Longacre Post-Trial Br. at 11 ("The chief distinction between the NU Claim and the Asbestos PI Claims is that the NU Claim is not based upon tort, or personal injury, or asbestos exposure. It is a *contractual* claim . . .") (emphasis in original) [Dkt. No. 23655].

[130] PP Main Pre-Trial Br. at 47-52 [Dkt. No. 22733].

[131] The Joint Plan also provides a procedure for liquidating all disputed non-asbestos claims, including Class 9 Claims. *See* PP Ex. 277.01 Rev. (Joint Plan § 5.1).

36

*Corp.*[132] First, these cases were decided under the First Circuit's strict classification standard, which holds that "[s]eparate classifications for unsecured creditors are only justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors . . . ."[133] The Third Circuit has not adopted this standard -- to the contrary, it has expressly held that it "agree[s] with the general view which permits the grouping of similar claims in different classes,"[134] and requires only that a plan's classification of claims be "reasonable."[135] Moreover, the cases cited by Longacre in fact support classification of its claim in Class 6 even under the stricter First Circuit standard. *Mahoney Hawkes* considered whether certain creditors, who held malpractice claims against the debtor, could be separately classified because they were entitled to collect against the debtor's liability insurance policy.[136] The Court held that because these claimants stood to collect against a different source of funds than other unsecured claimants, separate classification was appropriate.[137] Like the claims in *Mahoney* that were appropriately classified separately from other unsecured creditors because of their access to insurance, Longacre's claim, which will be paid by the Asbestos PI Trust, involves allocation of

---

[132] *See* Longacre Post-Trial Br. at 12-13 (citing cases) [Dkt. No. 23655].

[133] *Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984).

[134] *In the Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *see also In re 222 Liberty Assoc.'s*, 108 B.R. 971, 989 (E.D. Pa. 1990) ("While some courts have held that all unsecured claims must be placed into the same class, see, e.g., *Granada Wines v. New England Teamsters & Trucking Industry Pension Fund*, 748 F.2d 42, 46 (1st Cir.1984); and *In re Fantastic Homes Enterprises, Inc.*, 44 B.R. 999, 1000-01 (Bankr.M.D.Fla.1984), most courts have determined that Congress intended the classification provisions of § 1122 to be applied flexibly.") (additional citations omitted).

[135] *Jersey City Med. Ctr.*, 817 FF.2d at 1061 ("the authorities recognize that the classification of the claims or interests must be reasonable").

[136] 289 B.R. 285, 295 (Bankr. D. Mass. 2002).

[137] *Id.* at 296 ("The separate classification is appropriate.").

Grace's asbestos PI liability insurance among similarly situated creditors with like access to these assets.[138]  This shared interest in a limited, common asset is precisely the type of reasonable basis for classification that is contemplated by the Code, particularly given the need for distribution of the common assets to meet the requirements of section 524(g).  *Gato Realty Trust* likewise concluded that separate classification of a creditor's unsecured deficiency claim was appropriate in a single asset real estate case because, unlike the other general unsecured creditors, the creditor had the right to a to convert its claim into a secured claim under section 1111(b).[139]

The remaining cases cited by Longacre are simply inapposite.  *In re Lisanti Foods, Inc.* considered an objection to *consolidation* of unsecured creditors into a single class, not an objection to separate classification.[140]  And *In re Porcelli* merely stands for the proposition that when a plan classifies unsecured claims separately, the proponent of the plan must give some reason for this separate classification.[141]  Here, this requirement is clearly satisfied, because Longacre's claim will be channeled to the Asbestos PI Trust under the Joint Plan and must therefore be classified with other such claims in Class 6.

---

[138]  9/17/2009 Tr. 54-55 (Austern) ("the insurance proceeds are a large part and a significant part of the assets of . . . what will be the Grace trust.").

[139]  183 B.R. 15, 21-22 (Bankr. D. Mass. 1995) ("this Court will follow the holding of *Bjolmes* that a deficiency claim may be classified separately from other unsecured claims").

[140]  329 B.R. 491, 509 (D.N.J. 2005) ("[a]ppellants argue that under the Plan Class 3 improperly consolidated the following creditors . . .").

[141]  319 B.R. 8, 10 (Bankr. M.D. Fla. 2004) ("The Debtor argues that he has good business reasons to separately classify but does not state what they are.").

4.1.2   The NU Settlement Agreement does not require classification of the NU Claim in Class 9.

Longacre next argues that the NU Settlement Agreement requires classification of its claim in Class 9.[142] But in fact this agreement says **nothing** about how the NU Claim should be classified. Rather, the NU Agreement merely states that the NU Claim will be allowed as an "unsecured, pre-petition, non-priority claim."[143] Indeed, all of the Asbestos PI Claims are pre-petition, non-priority, unsecured claims, and the language of the NU Settlement Agreement does not preclude classification of the NU Claim with unsecured claims other than those in Class 9.

4.1.3   The Debtors have not taken any position contrary to any representation in the NU Settlement Agreement.

As explained *supra*, the NU Settlement Agreement contains no statement requiring classification of the NU Claim in Class 9. For this reason, Longacre's argument that the Debtors should be estopped from arguing for classification of its claim in Class 6 also fails. Longacre acknowledges that the NU Settlement Agreement only requires allowance of the NU Claim "as an unsecured, pre-petition, non-priority claim." But Longacre stretches this language, in combination with the requirement that the NU Claim receive post-petition interest if other unsecured creditors do, to argue that "[t]he clear implication of these promises is that Debtors would classify the NU Claim with all other general unsecured claims."[144] There is simply no such implication. The NU Claim is based on a right to reimbursement for payment of a settlement of asbestos personal injury claims, a fact which was known to National Union when it

---

[142] Longacre Post-Trial Br. at 13-14 [Dkt. No. 23655].

[143] *See* Longacre Ex. 1 (Stipulation of Facts Between Longacre and Debtors at ¶ 4); Longacre Ex. B (Settlement Agreement and Mutual Release, dated Nov. 13 2007, at ¶ 5).

[144] Longacre Post-Trial Br. at 15 [Dkt. No. 23655].

39

settled the claim and to Longacre when it purchased the claim. Nowhere in the agreement is there any prohibition on channeling the NU Claim to a section 524(g) trust or classifying it with other asbestos claims. Nor do any of the cases cited by Longacre require a different result.[145] Longacre's claim is properly classified in Class 6, and nothing in the NU Settlement Agreement precludes the Plan Proponents from arguing otherwise.

### 4.1.4   Longacre's Class 6 Claim is different from Morgan Stanley's Class 9 Claim.

Unlike Longacre's claim, Morgan Stanley's claim arises from a right to reimbursement for draws against two "evergreen" stand-by letters of credit that were not issued in connection with a specific transaction.[146] The Debtors therefore agreed to classify Morgan Stanley's claim in Class 9 because these letters of credit were not issued in connection with asbestos liabilities. Nonetheless, Longacre argues that because its claim is liquidated and relates to a transaction in which the Morgan Stanley letters of credit were eventually used as collateral, "there is no rationale [sic] basis for classifying one [claim] in Class 6 and another in Class 9."[147]

Longacre ignores the key distinction between these two claims: while the letters of credit that give rise to Morgan Stanley's claim were not issued in connection with asbestos liabilities, the National Union Claim arises from a surety bond that secured a specific settlement of asbestos

---

[145] *See* PP Main Pre-Trial Br. at 51-52 n.115 (distinguishing cases cited by Longacre) [Dkt. No. 22733].

[146] Post-Petition Interest Determination Notice, Ex. A Letters of Credit and Reimbursement Agreements, dated 5/19/2009, at 019, 023, 028 [Dkt. No. 21753] (listing numerous beneficiaries of the letters of credit that give rise to Morgan Stanley's claims).

[147] Longacre Post-Trial Br. at 17 [Dkt. No. 23655].

personal injury claims against the Debtors.[148]  Thus, there is a rational basis for separate

classification of these claims, and Longacre's objection should be rejected.

### 4.2    MCC's Claims Are Properly Classified.

MCC asserts that any claims asserted by the Libby Claimants against MCC that arise

from or relate to the Debtors' asbestos products and operations are derivative and not

independent in nature, and that any such claims are permanently enjoined by the Asbestos PI

Channeling Injunction.[149]  As explained in the Main Post-Trial Brief, the claims asserted against

MCC are purportedly based on services that it provided at Grace's Libby mine.[150]  Grace

disputes that any claim against MCC that is not based on a covered claim under a policy issued

by MCC to Grace could possibly give MCC indemnification rights against Grace.[151]  But to the

extent that MCC could ever assert such a claim against Grace, which it could not,[152] such a claim

would clearly be an Asbestos PI Claim because such claims are both "directly" and "indirectly"

related to Grace's operations at the Libby mine.  MCC asserts that all claims asserted against

MCC, including the Libby Claims, "are Asbestos PI Claims."[153]  Thus, any indemnification

---

[148]  9/14/2009 Tr. 268-69 (Hughes) (testifying that National Union's claim arises from a bond posted to guarantee Grace's performance under an agreement settling asbestos personal injury claims against Grace).

[149]  Maryland Casualty Company's Opening Post-Trial Brief in Support of its Phase II Objections ("MCC Post-Trial Br.") at 7 [Dkt. No. 23645].

[150]  PP Main Post-Trial Br. at 39-40 [Dkt. No. 23662].

[151]  See Debtors' Objection to Claims Filed by Maryland Casualty Co., dated 4/21/2009, at 18-25 [Dkt. No. 21345] (explaining that Grace did not agree to indemnify MCC for its own tortious conduct).

[152]  MCC admits that "[s]uch claims would never arise because the Third Party Claims are enjoined."  MCC Post-Trial Br. at 10, n.27 [Dkt. No. 23645].

[153]  Id. at 8.

41

claim asserted by MCC arising from these claims is also an Asbestos PI Claim and is properly

channeled to the Asbestos PI Trust and classified in Class 6.

In arguing that its claims should be classified in Class 9, MCC improperly cites

deposition testimony of Peter Lockwood in which he explains his understanding of how the Joint

Plan would treat claims for indemnification respecting a liability that is ultimately not channeled

to the Asbestos PI Trust.[154] Mr. Lockwood's testimony is a legal opinion, and it is not competent

evidence of how the Joint Plan will operate, nor is it binding on any party. For the reasons

expressed in the Plan Proponents' Bench Brief Detailing Objections to Deposition Testimony

Offered By the Insurers,[155] testimony on the operation of the Plan documents is not admissible

because interpretation of these documents is a function of the Court that is "not for a witness to

speak to."[156] Moreover, Mr. Lockwood's quoted testimony was given in response to a purely

hypothetical question based on a premise that is directly contrary to MCC's stated position that it

is fully protected under the Joint Plan, and therefore both the question and response lack

foundation and are irrelevant.

Certain of MCC's proposed findings of fact must also be rejected. MCC asks the Court

to make broad and ambiguous findings regarding the scope of MCC's indemnification rights and

to find that these rights are "ongoing."[157] The scope of MCC's rights is defined in the settlement

---

[154] MCC Post-Trial Br. at 10, n.28, 29 [Dkt. No. 23645].

[155] Bench Brief of the Debtors, David T. Austern, and the ACC Detailing Objections to Deposition Testimony Offered By the Insurers, dated 6/22/2009 [Dkt. No. 22200].

[156] 7 John H. Wigmore, Wigmore on Evidence, § 1955 (1978).

[157] MCC Post-Trial Br. at 5, ¶ 4 ("The MCC Settlement Agreements Obligated the Debtors to, among other things, indemnify and hold MCC harmless from and against all future liability, loss, cost, or expense arising from

(Continued...)

42

agreements themselves, and it would be unnecessary and prejudicial to Grace for the Court to make the vague and imprecise finding that MCC proposes.  Moreover, it would be inappropriate to find that MCC's rights against the Debtors are "ongoing" because MCC's claims will be channeled to the Asbestos PI Trust under the Joint Plan, and thus it will no longer have such rights against Grace as of the Effective Date.  Also, the record citations that MCC provides in support of these findings consist merely of testimony referring to MCC's settlement agreements and say nothing about their scope.[158]

### 4.3    BNSF's Proposed Finding Regarding the Scope of Its Indemnity Rights Should Be Rejected.

BNSF asks the Court to make a broad finding concerning the scope of its indemnity rights against Grace.[159]  Under the Joint Plan, BNSF's asbestos-related indemnification claims against Grace will be channeled to the Asbestos PI Trust.[160]  Thus, it would be inappropriate for the Court to find, in an order confirming the Joint Plan, that these agreements require Grace to indemnify BNSF.  Moreover, the scope of BNSF's rights is not as broad as it contends.  For example, the agreement quoted at length by BNSF limits its rights to injuries caused during the

---

asbestos-related claims . . . and those obligations are ongoing"); *id.* at 10, ¶ 1 ("The MCC Settlement Agreements obligated the Debtors to, among other things, indemnify and hold harmless from and against all future liability, loss, cost, or expense arising from asbestos-related claims, and those obligations are ongoing") [Dkt. No. 23645].

[158] For these same reasons, MCC's proposed finding at ¶ I.B.10 of its brief is also improper -- the scope of MCC's rights is defined in its agreements, and MCC will have no rights against the Debtors upon occurrence of the Effective Date. *See* MCC Post-Trial Br. at 8, ¶ 10 ("The initiation and/or prosecution of the Libby Claims, or any other Third Party Claims, will trigger the MCC Indemnity Rights and will result in the assertion of indemnity claims by MCC against Debtors under the MCC Settlement Agreement.").

[159] BNSF Post-Trial Br. at 5, ¶ 8 ("The terms of the contracts and leases between Grace and BNSF obligate Grace to indemnify BNSF for asbestos-related claims asserted against BNSF.").

[160] *See* PP Main Post-Trial Br. at 42-43 [Dkt. No. 23662].

43

maintenance, operation, or use of a single bridge and conveyor belt.[161]  Nowhere has Grace

agreed to indemnify BNSF for the full universe of "asbestos-related claims asserted against

BNSF."[162]  BNSF's proposed finding should therefore be rejected as overly broad and

unsupported by the record.

### 4.4     The Evidence Cited by Seaton and OneBeacon Does Not Support Their Argument Concerning Classification.

In their post-trial brief, Seaton and OneBeacon cite various exhibits from the record as

purportedly supporting their objection to classification of certain of their claims in Class 6.[163]

Seaton and OneBeacon do not attempt to explain how this evidence supports their earlier

arguments, which it does not.  Seaton and OneBeacon cite four settlement agreements with

Grace as evidence.  While these agreements may demonstrate that Seaton and OneBeacon have

certain indemnification rights against Grace, they say nothing about how any claims arising from

these agreements should be classified.  Next, Seaton and OneBeacon cite Scotts' complaint in its

adversary proceeding against them.  This complaint is wholly inapposite to any objection by

Seaton and OneBeacon because Scotts has agreed, as part of a settlement agreement with Grace,

to release all of its claims against Grace's insurers.[164]  Finally, Seaton and OneBeacon cite

various Plan provisions, including § 3.1.6(a) (classifying all Asbestos PI Claims in Class 6) and

---

[161] *See* BNSF Post-Trial Br. at 3-4.

[162] *See id.* at 3.

[163] Phase II Post-Trial Brief of Creditors OneBeacon America Insurance Company and Seaton Insurance Company in Opposition to Confirmation of the Amended Joint Plan of Reorganization ("Seaton/OneBeacon Post-Trial Br.") at 32-33 [Dkt. No. 23637].

[164] *See* Settlement Agreement Between Scotts Co. and W. R. Grace & Co., dated 8/8/2009, at § 2.01 [Dkt. No. 22735].

44

§ 1.1(33) (defining Asbestos PI Claims). The only relevance of these sections to Seaton and

OneBeacon's classification argument is that their claims, to the extent that they are Asbestos PI

Claims, will be classified in Class 6. This fact is not disputed, and, as explained in the Main

Post-Trial Brief,[165] these sections demonstrate that Class 6 is appropriately constituted of both

direct claims for asbestos-related personal injuries and indirect claims for indemnification and

contribution based on such claims.[166]

## V.   THE SUCCESSOR CLAIMS INJUNCTION IN SECTION 8.5 OF THE JOINT PLAN IS NECESSARY TO THE REORGANIZATION AND APPROPRIATE UNDER THIRD CIRCUIT LAW.

The Successor Claims Injunction set forth in section 8.5 of the Joint Plan is warranted by

the unusual circumstances of this case, and it is both essential to the Debtors' reorganization and

fair to the affected parties. Moreover, the Successor Claims Injunction was approved in both the

Fresenius and Sealed Air Settlement Agreements, and the orders approving these agreements are

*res judicata* as to each of the parties that now seek to collaterally attack the injunction.

Seaton, OneBeacon, and CNA assert that the Successor Claims Injunction improperly

enjoins certain alleged claims they have against Sealed Air and/or Fresenius arising out of

insurance settlement agreements with the Debtors in connection with coverage claims currently

being asserted, and that might be reasserted on or after the Effective Date, by Kaneb.[167] At the

---

[165] *See* PP Main Post-Trial Br. at 37-38 [Dkt. No. 23662].

[166] Seaton and OneBeacon also cite Plan sections "8.81" and "8.83" in support of their classification argument. The Joint Plan contains no such sections, and the Plan Proponents assume that these cites refer to Plan §§ 8.8.1 and 8.8.3. Seaton/OneBeacon Post-Trial Br. at 33 [Dkt. No. 23637]. These sections set forth releases and do not relate to classification of any party's claims.

[167] Seaton/OneBeacon Post-Trial Br. at 20-25 [Dkt. No. 23637]; Phase II Post-Trial Brief for the CNA Companies ("CNA Post-Trial Br.") at 34-38 [Dkt. No. 23644].

45

outset, it should be noted that the Successor Claims Injunction does not enjoin Seaton,

OneBeacon, and CNA's alleged claims against Sealed Air based on the settlement agreements

identified by Seaton, OneBeacon and CNA in their briefs to which Sealed Air might be found to

be a party.[168] As to Sealed Air, the Successor Claims Injunction enjoins SA Successor Claims,[169]

and the claims that OneBeacon, Seaton, and CNA have alleged against Sealed Air are not SA

Successor Claims.[170]

Moreover, as to Fresenius, while the Fresenius Settlement Agreement requires Grace to

provide protection against any liabilities of old Grace-NY that are not related to the Fresenius

National Medical Care Business, the Plan Proponents will amend the Joint Plan to permit

---

[168] This is not to say that such claims have any merit. Such claims would be subject to any and all defenses held by Sealed Air. Further, to the extent that Seaton, OneBeacon, or CNA ever assert any such claim against any of the Sealed Air Indemnified Parties, the Plan Proponents acknowledge that the provisions of the Plan, the Sealed Air Settlement Agreement, and the 1998 Distribution Agreement collectively require that the Debtors and Reorganized Debtors, jointly and severally, at their sole expense, defend, indemnify, and hold harmless the Sealed Air Indemnified Parties with respect to any such claim and that such requirement survives the Effective Date and remains in force post-bankruptcy. See Distribution Agreement by and among W. R. Grace & Co. (now "Sealed Air Corporation"), W. R. Grace & Co. -- Conn., and Grace Specialty Chemicals, Inc. (now "W. R. Grace & Co."), dated as of March 30, 1998, §§ 4.02, 5.04(b)), PP Ex. 098, (Joint Plan §§ 8.8.1, 8.8.2, 9.13); Sealed Air Settlement Agreement at ¶ II.(c)(vii). As to other claims (whether by Seaton, OneBeacon, CNA, or any other Entity), the Debtors' and Reorganized Debtors' obligations to defend, indemnify, and hold harmless the Sealed Air Indemnified Parties shall be governed by the applicable of the Sealed Air Settlement Agreement and the 1998 Distribution Agreement, and such obligations will survive the Effective Date and remain in force post-bankruptcy pursuant to the terms of the Plan. Furthermore, to the extent that the claims alleged by Seaton, OneBeacon, CNA, or any other Entity are Asbestos Claims, such claims would not be enjoined by the Successor Claims Injunction but would be enjoined by the Asbestos PI Injunction or the Asbestos PD Injunction.

[169] See PP Ex. 277.01 Rev. (Joint Plan § 8.5.1) (defining scope of Successor Claims Injunction, which only applies to Successor Claims); id. § 1.1(205) (defining Successor Claims).

[170] These claims include only claims attributable to:

> (i) chapter 5 of the Bankruptcy Code; (ii) successor liability, piercing the corporate veil, alter ego liability, agency liability, transferee liability, or other similar claims or causes of action seeking to hold an Entity liable for the debts or obligations of another Entity; (iii) chapter 176 of title 28 of the United States Code or any other similar statutes; (iv) any debtor-creditor, fraudulent transfer, or fraudulent conveyance statutes; or (v) any other similar claims or causes of action . . .

PP Ex. 277.01 Rev. (Joint Plan § 1.1(182)) (defining SA Successor Claims).

procedures allowing for claims against Fresenius that are enjoined by the Successor Claims Injunction to be channeled to Grace and paid in their full allowed amount. Finally, to the extent that the Successor Claims Injunction does enjoin any claims by the objecting parties, the injunction is within the Court's jurisdiction to issue and fully complies with applicable Third Circuit law.

**5.1   The Court Has "Related To" Subject Matter Jurisdiction and Authority Pursuant to Section 105 of the Bankruptcy Code to Issue the Successor Claims Injunction.**

      5.1.1   The Court has subject matter jurisdiction to issue the Successor Claims Injunction.

Seaton, OneBeacon, and now CNA argue that this Court lacks subject matter jurisdiction to issue the Successor Claims Injunction.[171] The test for whether a bankruptcy court has "related-to" jurisdiction over a claim is whether that claim could "'conceivably' have an effect on the bankruptcy proceeding."[172] The Successor Claims Injunction plainly satisfies this broad standard.

The fundamental purpose of the Successor Claims Injunction is to sever Sealed Air and Fresenius from certain legacy liabilities that have been assumed by Grace. As explained in the Main Pre-Trial Brief, this result is necessary to resolve numerous uncertainties pertaining to the assets and liabilities of the estate and to resolve expensive and protracted litigation.[173] Of all the

---

[171] Seaton/OneBeacon Post-Trial Br. at 33 [Dkt. No. 23637]; CNA Post-Trial Br. at 37-38 [Dkt. No. 23644]. It is unclear whether CNA has adopted Seaton/OneBeacon's argument that the Court lacks jurisdiction to issue the Successor Claims Injunction.

[172] *In re Combustion Eng'g*, 391 F.3d at 227.

[173] PP Main Pre-Trial Br. at 48-50 [Dkt. No. 22733].

47

parties in this case, CNA is particularly poorly positioned to dispute the distribution of liability

effected by the Successor Claims Injunction. CNA drafted and signed the March 31, 1998 Letter

Agreement (the "Letter Agreement") recognizing that Grace is contractually bound to indemnify

Sealed Air for environmental claims.[174]  Notably, the Letter Agreement provides that the New

Grace Group (now Grace) has assumed all obligations and liabilities not assumed by the

Packaging Entities (now Sealed Air) and that the Packaging Entities shall have no liability with

respect to obligations and liabilities not assumed by them.[175]  CNA is a signatory to that

agreement and, therefore, has agreed to this division of liabilities.[176]

CNA's alleged claims against Sealed Air arise from an agreement executed on May 30,

1997, in which CNA settled various insurance policies with Grace and Grace-Del. As part of

that settlement agreement, Grace and Grace-Del agreed to indemnify CNA for environmental

claims asserted by third parties such as Kaneb.[177]  The Plan Proponents have already established

that this Court clearly has subject matter jurisdiction over Seaton and OneBeacon's claims based

on Grace's contractual obligation to indemnify Sealed Air and Fresenius for such claims.[178]  This

same reasoning applies to CNA's alleged claims against Sealed Air because they would also

trigger the extensive indemnities granted by Grace to Sealed Air. Under the Distribution

Agreement by and among W. R. Grace & Co., W. R. Grace & Co. -- Conn., and Grace Specialty

---

[174]  PP Ex. 100 (3/31/1998 Letter Agreement: Grace Packaging-Sealed Air Agreement for the Allocation of and Securing of Certain Liabilities, at Bates PP 004895-004896).

[175]  *Id.* at Bates PP 004896.

[176]  *Id.* at Bates PP 004902.

[177]  CNA Ex. 38 at ¶7(A).

[178]  PP Main Post-Trial Br. at 48-52 [Dkt. No. 23662].

48