Chemicals, Inc, dated March 30, 1998 (the "Distribution Agreement"), Grace is contractually

obligated to indemnify Grace-Del (now Sealed Air) for certain environmental claims.[179]  In

effect, per the parceling of liability among parents and subsidiaries of Grace pursuant to the

Distribution Agreement and as recognized in the Letter Agreement, liability for CNA's alleged

indemnification claims was retained by Grace and not Sealed Air.  Having drafted and signed the

Letter Agreement, CNA is well aware of this fact.  Because claims that trigger contractual

indemnity obligations against a debtor fall squarely within the Bankruptcy Court's

jurisdiction,[180] it is beyond credible dispute that this Court has subject matter jurisdiction over

CNA's claims.

### 5.1.2   The Court has authority to issue the Successor Claims Injunction.

The Third Circuit's decision in *Continental Airlines* and its progeny have "endorsed a

'more flexible approach'" that allows for third-party injunctions in unusual circumstances, when

the injunction is both necessary and fair.[181]  The Successor Claims Injunction is required by both

the Fresenius and Sealed Air Settlement Agreements, which together provide a $1.1 billon

---

[179] PP Ex. 098 (Distribution Agreement by and among W. R. Grace & Co. (now "Sealed Air Corporation"), W. R. Grace & Co. -- Conn., and Grace Specialty Chemicals, Inc. (now "W. R. Grace & Co."), dated as of March 30, 1998, §§ 4.02, 5.04(b)) (in 1998, the Debtors agreed to indemnify Sealed Air for all liabilities of Grace and its subsidiaries, including environmental liabilities, with few exceptions); 09/15/2009 Tr. 96 (Shelnitz) (Grace essentially indemnified Sealed Air for all liabilities except those arising from Grace's packaging business); PP Ex. 277.22 Rev. (Sealed Air Settlement Agreement, § I.c.(vii) and Exhibit 6, Indemnification Agreement).

[180] *See In re W. R. Grace & Co.* (*W. R. Grace & Co. v. Chakarian*), 315 B.R. 353, 357-59 (Bankr. D. Del. 2004); Memorandum Opinion Denying Debtors' Motion to Expand The Preliminary Injunction to Include Actions Against the State of Montana, dated 4/16/2007 (Adv. 01-0771, Dkt. No. 419); PP Main Post-Trial Br. at 50-51 [Dkt. No. 23662].

[181] *In re North American Refractories Co.*, No. 02-21626, 2007 Bankr. LEXIS 4721, *36 (Bankr. W.D. Pa., Nov. 13, 2007) (citing *In re Continental Airlines*, 203 F.3d 203, 212 (3d Cir. 2000)); *see In re Continental Airlines, Inc.* 203 F.3d 203, 214 (3d Cir. 2000); *In re American Family Enters.*, 256 B.R. 377, 406 (D.N.J. 2000); *In re Prussia Assoc.*, 322 B.R. 572, 596 (Bankr. E.D. Pa. 2005); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003).

contribution to the Joint Plan, and without which the Joint Plan simply is not possible.[182] Thus, the Successor Claims Injunction is absolutely necessary to the Debtors' reorganization.

And as already determined by the District Court, the Successor Claims Injunction is also fair.[183] Contrary to the Insurers' assertion, the Joint Plan does compensate claimants affected by the Successor Claims Injunction. Claims enjoined by the Successor Claims Injunction will be Class 9, General Unsecured Claims. Pursuant to the Joint Plan, Holders of Allowed General Unsecured Claims will receive payment in full for such claims plus post-petition interest. In addition, as noted in Part 5.1 *supra*, the Plan Proponents will amend the Joint Plan to ensure that parties whose claims against Fresenius are enjoined by the Successor Claims Injunction, and who currently have no recourse against the Debtors for such claims because they failed to timely file proofs of claim, may now file such proofs of claim. Thus, the Joint Plan will provide consideration to parties whose claims are enjoined by the Successor Claims Injunction.

Moreover, for CNA to contest the fairness of enjoining its claims against Sealed Air is, at best, disingenuous. As explained *supra*, CNA drafted and signed the Letter Agreement, under which CNA acknowledged and agreed that Sealed Air did not assume liability for such environmental claims. CNA should not be permitted to object to the Joint Plan's effect on CNA's alleged claims against Sealed Air when, in fact, CNA is party to an agreement establishing that it is Grace -- and not Sealed Air -- that will be liable for such claims.

---

[182] PP Main Post-Trial Br. at 53-56 [Dkt. No. 23662].

[183] PP Ex. 277.14 Rev. (Fresenius Settlement Order at ¶ ZZ) ("The releases, protections, and other benefits provided to [Fresenius] Defendants by the Settlement Agreement are fair to the Plaintiffs, these bankruptcy estates, and the creditors thereof.").

50

Seaton and OneBeacon's continued reliance on *Combustion Engineering*[184] to argue that the Successor Claims Injunction violates section 524(g) is also misplaced.[185] The claims enjoined are *not* asbestos claims,[186] and therefore they are neither governed by section 524(g) nor contemplated in *Combustion Engineering*. As Seaton and OneBeacon correctly acknowledge, courts have used section 105(a) "to resolve massive non-asbestos-related liabilities under circumstances where the injunction played an important part [in] the debtor's reorganization plan."[187] But they next argue, incorrectly, that the Successor Claims Injunction is a "mere add-on[]"[188] that is not central to the Debtors' reorganization. This allegation could not be further from the truth. As explained in the Main Post-Trial Brief, the Successor Claims Injunction is necessary to draw a bright line severing two of Grace's former parent companies from significant alleged legacy liabilities in return for their settlement contributions of over $1.1 billion.[189] Thus, far from being a mere "add-on," the Successor Claims Injunction is an indispensable part of the settlements that make the Joint Plan possible.

---

[184] 391 F.3d 190 (3d Cir. 2004).

[185] Seaton/OneBeacon Post-Trial Br. at 25 [Dkt. No. 23637].

[186] PP Ex. 277.01 Rev. (Joint Plan § 8.5.1) (The Successor Claims Injunction specifically excludes asbestos-related claims. The injunction enjoins "any Successor Claim (**other than Successor Claims arising out of or based on any Asbestos PI Claim, Asbestos PD Claim, or CDN ZAI Claim**) against any Asbestos Protected Party shall be stayed, restrained, and enjoined . . .") (emphasis added).

[187] Seaton/OneBeacon Post-Trial Br. at 23 [Dkt. No. 23637].

[188] *Id.*

[189] *See* PP Main Post-Trial Br. at 48-50, 53-55 [Dkt. No. 23662].

**5.2    Seaton, OneBeacon and CNA are Barred by Principles of *Res Judicata* from Objecting to the Successor Claims Injunction.**

CNA's allegation that the Fresenius and Sealed Air Settlement Agreements and Orders are not *res judicata* as to CNA is completely hollow.[190]  In fact, CNA's objection to the Successor Claims Injunction is even more untimely than Seaton/OneBeacon's.  CNA has been a party to this case since the very start,[191] having received actual notice of the chapter 11 filing and submitted proofs of claim prior to the bar date.  CNA received actual notice of the Motion to Approve the Fresenius Settlement Agreement via first class mail sent April 15, 2003.[192]  CNA also received actual notice of the Renewed Motion to approve the Sealed Air Settlement Agreement via first class mail on April 1, 2005.[193]  Like Seaton and OneBeacon, CNA also received multiple notices of the Court's hearing of the Renewed Motion to approve the Sealed

---

[190]  CNA Post-Trial Br. at 38 (adopting Seaton/OneBeacon's arguments regarding the *res judicata* effect of the Fresenius and Sealed Air Settlement Orders) [Dkt. No. 23644].

[191]  *See* Notice of Entry of Appearance and Demand for Notices and Papers, by Wildman, Harrold, Allen, & Dixon, Attorneys for CNA, dated 4/12/2001 [Dkt. No. 91].

[192]  Motion for An Order Approving, Authorizing, and Implementing Fresenius Settlement Agreement and Certificate of Service and Service List, dated 4/15/2003 [Adv. 02-2211, Dkt. No. 16] (showing service on Wildman, Harrold, Allen & Dixon LLP, counsel for CNA).

[193]  PP Ex. 255 (Renewed Motion for An Order Approving, Authorizing, and Implementing Sealed Air Settlement Agreement, Certificate of Service) (showing service to Wildman, Harrold, Allen & Dixon LLP, counsel for CNA); *See* PP 277.23 Rev. (Sealed Air Settlement Order at ¶ D) ("Due, proper and sufficient notice of the Motion and the Hearing was given pursuant to Bankruptcy Rules 2002(a)(3) as modified by the Court for cause shown, and 9019(a)").

Air Settlement Agreement,[194] through the service of both an agenda of hearing on June 20, 2005 and an amended agenda of hearing served on June 23, 2005.[195]

Seaton and OneBeacon attempt to distinguish the U.S. Supreme Court's recent decision in *Travelers v. Bailey,*[196] in which the Court held that an injunction required by a pre-confirmation settlement agreement was *res judicata* as to parties challenging its validity.[197] But the reality is that *Travelers* could not be more on point, and it mandates that the Successor Claims Injunction in this case be honored under principles of *res judicata*. Seaton and OneBeacon claim that the *Travelers* injunction was only held to be *res judicata* because it was part of a confirmed plan.[198] The facts of the *Travelers* case prove this argument false. The injunction in *Travelers* was required by a settlement agreement achieved after the debtors and their insurers "litigated over the scope and limits of liability coverage . . . [and after] litigation among the insurers themselves, who brought various indemnity claims, contribution claims, and cross-claims."[199] The settlement agreement that provided for the injunction was achieved *prior to the confirmation of the plan* and was "incorporated by reference" in the Court's order

---

[194] Notice of Agenda of Matters Scheduled for Hearing on June 27, 2005 at 12:00 P.M. Before the Honorable Judith K. Fitzgerald, dated 6/20/2005, at 8 [Dkt. No. 8643] (listing Renewed Motion for approval of Sealed Air Settlement Agreement as item to be heard at hearing on June 27, 2005); Certificate of Service (showing service to Kevin Gross, counsel for CNA, via facsimile).

[195] Amended Notice of Agenda of Matters Scheduled for Hearing on June 27, 2005 at 12:00 PM Before the Honorable Judith K. Fitzgerald, dated 6/23/2005, at 8 [Dkt. No. 8678] (listing Renewed Motion for approval of Sealed Air Settlement Agreement as item to be heard at hearing on June 27, 2005); Certificate of Service (showing service to Kevin Gross, counsel for CNA, via facsimile).

[196] 129 S.Ct. 2195 (2009).

[197] Seaton/OneBeacon Post-Trial Br. at 25 [Dkt. No. 23637].

[198] *Id.* at 26.

[199] 129 S.Ct. at 2199.

53

confirming the plan.[200] Just as in this case, the Court found that "there would have been no such payment [contribution to the Trust by the settling parties] without the injunction at the heart of the present dispute."[201] The Supreme Court held that *both* orders -- the settlement agreement order *and* the order confirming the plan (collectively, the 1986 Orders)[202] -- became final on direct review and were *res judicata* such that parties were precluded from challenging the injunction required by the settlement agreement order.[203] The law is clear that approved settlements are entitled to full *res judicata* effect, and that parties may not use the plan process to collaterally attack an approved settlement.[204]

By quoting selectively from the Fresenius Settlement Order, Seaton and OneBeacon craft an argument that the Fresenius and Sealed Air Settlement Orders do not actually call for incorporation of the Successor Claims Injunction into the Joint Plan. This claim is belied by the terms of the Settlement Agreements, as well as the Orders. The Fresenius Settlement Agreement states that, as a precondition to Fresenius' payment, "[t]he Court shall have issued, pursuant to

---

[200]  *Id.* at 2209.

[201]  *Id.* at 2199.

[202]  *Id.* at 2195 ("Both the Confirmation Order and the Insurance Settlement Order (collectively, 1986 Orders) were affirmed by the District Court . . . and the Court of Appeals for the Second Circuit . . . .").

[203]  *Id.* at 2205 ("But once the 1986 Orders became final on direct review . . . they became res judicata . . . .").

[204]  *In re Gibraltar Resources, Inc.*, 210 F.3d 573, 576 (5th Cir. 2000) (holding that plaintiffs, who were not parties to an adversary proceeding, were precluded from bringing their claims by the approved settlement of the adversary proceeding and stating that "[a] settlement agreement approved and embodied in a judgment by a court is entitled to full *res judicata* effect"); *California Dept. of Health Svcs. v. United States Bankruptcy Court (In re Community Hospital of the Valleys)*, 51 B.R. 231, 235 (9th Cir. B.A.P. 1985) *aff'd* 820 F.2d 1097 (9th Cir. 1987) (holding that appellant had been properly precluded from raising a good faith objection to a plan where the plan incorporated an approved settlement agreement and stating that "[w]hether under principles relating to the doctrines of *res judicata*, collateral estoppel, or 'law of the case,' it was proper for the trial court to preclude a re-examination of its order approving the trustee's compromise"); *In re Glenn*, 160 B.R. 837, 838-839 (Bankr. S.D. Cal. 1993) (holding that approved settlement agreement was *res judicata* and that those who received notice of the settlement were parties to the settlement for *res judicata* purposes).

54

§ 105(a) of the Bankruptcy Code, a Final Order, effective upon the making of the Settlement Payment, permanently and forever enjoining . . . any suit, action or other proceeding . . . for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Grace-Related Claim . . . ."[205] The District Court understood this to be a precondition to the settlement, and held that "[t]he terms [and provisions] of the Settlement Agreement and this Order shall be binding in all respects . . ."[206] Similarly, the Sealed Air Settlement Agreement, approved by the Court "in all respects,"[207] requires that Sealed Air receive the "full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code."[208] The Sealed Air Settlement Order further provides that "[t]he terms and provisions of the Settlement Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of the creditors, the Plaintiffs, and the SAC Defendants and their respective successors and assigns, and *any affected third parties* . . . ."[209] The Sealed Air Settlement Order further states that "Debtors *shall and are hereby directed* to comply with the Settlement Agreement."[210]

Seaton and OneBeacon's additional claim that the Successor Claims Injunction is broader in scope than that required by the Fresenius and Sealed Air Settlement Agreements is also

---

[205]  PP Ex. 277.13 Rev. (Fresenius Settlement Agreement at ¶ (D)).

[206]  PP Ex. 277.14 Rev. (Fresenius Settlement Order at ¶6).

[207]  PP Ex. 277.23 Rev. (Sealed Air Settlement Order at ¶1).

[208]  PP Ex. 277.22 Rev. (Sealed Air Settlement Agreement § II(c)(vi)).

[209]  PP Ex. 277.23 Rev. (Sealed Air Settlement Order at ¶ 6) (emphasis added).

[210]  *Id.* at ¶4 (emphasis added).

mistaken. The Successor Claims Injunction enjoins "Successor Claims,"[211] which include SA

Successor Claims and Grace-Related Claims.[212] SA Successor Claims, which are SA Claims,[213]

are defined in[214] and required to be enjoined by the Sealed Air Settlement Agreement.[215]

Likewise, Grace-Related Claims are defined in[216] and required to be enjoined by the Fresenius

Settlement Agreement.[217] Thus, the Successor Claims Injunction enjoins only claims that are

required to be enjoined pursuant to the two settlement agreements.

Finally, Seaton and OneBeacon suggest that settlement agreements approved under

Bankruptcy Rule 9019 cannot be *res judicata* if their terms are to be incorporated in a plan that

must be evaluated pursuant to section 1129. While the Court approved the injunctive protections

in the context of a section 9019 settlement agreement, the Court clearly and fully understood that

any plan incorporating such provisions would be confirmed pursuant to section 1129. The Court

expressly "approved the [Settlement Agreement] in all respects" and expressly stated that "all of

[the terms and conditions of the Settlement Agreement] are hereby approved."[218] It is far-

fetched to suggest that, on the one hand, the Court approved these protections understanding that

they would be written into the Joint Plan, while, on the other hand, the Court made no ruling on

---

[211] PP Ex. 277.01 Rev. (Plan § 8.5).

[212] *Id.* at 38, ¶204.

[213] *Id.* at 35, ¶187.

[214] *Id.* at 34, ¶181; PP 277.22 Rev. (Sealed Air Settlement Agreement at ¶q).

[215] PP 277.22 Rev. (Sealed Air Settlement Agreement at § II(c)(ii)).

[216] PP Ex. 277.13 Rev. (Fresenius Settlement Agreement at Appendix A § 1.21) (defining Grace-Related Claims).

[217] PP Ex. 277.13 Rev. (Fresenius Settlement Agreement at ¶ (D))

[218] PP Ex. 277.23 Rev. (Sealed Air Settlement Order at ¶¶1, 2).

56

its ability to approve such provisions as part of a confirmed plan. In essence, Seaton, OneBeacon, and CNA take the implausible position that the Court would direct the parties to file a plan (and incur all of the associated expenses) that has, *as its cornerstone*, an approved settlement that could be illegal (thereby rendering the plan infeasible). That cannot be right.

Moreover, requiring the Court to reevaluate every settlement agreement during the plan confirmation stage would render meaningless the approval of any settlement that is subsequently implemented through a plan. That is not the law. Settlement orders under Fed. R. Bankr. P. 9019 are *res judicata* and parties may not use the plan process to collaterally attack a settlement that has been approved.[219] The idea that the Court would bind all parties to, and direct compliance with, a settlement without actually approving the terms of the settlement is plainly wrong. Therefore, Seaton, OneBeacon, and CNA's objections to the Successor Claims Injunction should be rejected.[220]

### 5.3    Kaneb's Objections to the Successor Claims Injunction Are Also Without Merit.

Kaneb Pipeline Operating Partnership ("Kaneb") also objects to the Successor Claims injunction on numerous grounds, arguing that 1) the Successor Claims Injunction inappropriately extends protection to certain third parties; 2) the Court lacks jurisdiction to enjoin Kaneb's claims against Grace's insurers; 3) the Successor Claims Injunction affords relief that is not available under section 1141 of the Code; 4) the Joint Plan improperly enjoins Kaneb's assertion

---

[219]   *See supra* n.204.

[220]   Seaton and OneBeacon also state that the Successor Claims Injunction violates their Fifth Amendment rights, but similarly, they provide no argument or case law to support this position except for citation to one inapposite case decided in 1855. *See* Seaton/OneBeacon Post-Trial Br. at 26 [Dkt. No. 23637].

of certain defensive rights; and 5) confirmation of the Joint Plan should not prevent Kaneb from

seeking recovery against the Debtors nominally in order to collect against Grace's insurers. All

of these objections should be rejected.

### 5.3.1 Kaneb has waived its objection to the Successor Claims Injunction.

In its post-trial brief, Kaneb asserts a brand-new objection to the Joint Plan: that the

Successor Claims Injunction impermissibly protects certain Asbestos Protected Parties, including

the Non-Debtor Affiliates and the Settled Asbestos Insurance Companies. Kaneb has had no

shortage of opportunities to raise this objection previously. Kaneb filed a Preliminary Objection

on December 22, 2008 [Dkt. 20307]; it also filed a Final Objection on May 15, 2009 [Dkt.

21707], a Trial Brief on July 13, 2009 [Dkt. 22417], and a Pretrial Submission on July 20, 2009

[Dkt. 22530]. In *none* of these objections did Kaneb raise any concerns about the protection of

these parties under the Successor Claims Injunction. Nor did Kaneb raise any such objection

during the twelve days of trial before this Court. Because Kaneb has repeatedly failed to raise

this objection, it must be overruled as untimely and prejudicial.[221]

### 5.3.2 The Court has jurisdiction to enjoin Kaneb's claims against Settled Asbestos Insurance Companies.

Kaneb also asserts that the insurance proceeds for which Kaneb asserts rights are not

property of the Debtors' estate and, therefore, this Court does not have jurisdiction to enter

injunctions concerning the Debtors' insurance.[222] Kaneb bases its argument on the notion that

"the proceeds of the insurance policies are not assets of the debtor [sic] estate because they

---

[221] *See In re Am. Family Enter.'s*, 256 B.R. 377, 394 (D.N.J 2000) (overruling objection to confirmation as untimely where objections were not asserted before plan objection deadline, and no extension of time to allow late-filed objection was sought). Moreover, Kaneb's objection is also improper because Kaneb never filed a proof of claim asserting such rights.

[222] Kaneb Post-Trial Br. at 15.

58

would not be payable to the debtor but, instead, would be payable to a non-debtor third party."[223]
But Kaneb has provided no evidence in support of this assertion. In the absence of such
evidence, it cannot be assumed that any portions of the proceeds of the Debtors' insurance
policies are not property of the estate, and Kaneb should not be permitted to maintain an
objection based on this argument.[224]

Moreover, the Settled Asbestos Insurers are protected by the Successor Claims Injunction
only to the extent of the policies listed in Exhibit 5 to the Disclosure Statement,[225] and such
policies are listed only as a result of a Court-approved, post-petition settlement, or to the extent
that claims against them would automatically trigger contractual rights of indemnification
against the Debtors. As explained in Part 5.1.1 *supra*, the Court has jurisdiction over post-
petition settlements and over claims that trigger contractual indemnification rights against the
Debtors. Thus, the Successor Claims Injunction is limited to claims over which the Court has
subject matter jurisdiction.

---

[223] *Id.* at 16.

[224] *See ACandS v. Travelers Cas. & Surety Co.*, 435 F.3d 252, 260 (3rd Cir. 2006) ("It has long been the rule in this circuit that insurance policies are considered part of the property of the bankruptcy estate."); *In re Nutraquest, Inc.*, 434 F.3d 639, 647 n.4 (3rd Cir. 2006) (Debtor's right to insurance policy proceeds is property of the estate); *In re Matter of Vitek*, 51 F.3d 530, 535 (5th Cir. 1995) (asserting that "almost all" courts have held that proceeds of a debtor's liability policies are property of the debtor's estate); *Ford Motor Credit Co. v. Stevens (In re Stevens)*, 130 F.3d 1027, 1030 (11th Cir. 1997) (determination of whether policy proceeds are property of the estate depends on "the nature and type of the insurance policy involved and its relationship to the bankruptcy estate"); *In re Equinox Oil Co. v. Anthill Constr. Co. (In re Equinox Oil Co.)*, No. Civ. A. 00-3320, 2001 WL 649806 (E.D. La. June 11, 2001) (proceeds of an indemnity policy, under which the debtor is to be reimbursed for losses owed to third parties, are property of the estate under Bankr. Code sections 541(a)(1) and (6)).

[225] PP Ex. 277.05 (Schedule of Settled Asbestos Insurers Entitled to § 524(g) Protection).

59

### 5.3.3    Section 1141 does not limit the Court's power to issue an injunction under section 105(a).

Kaneb next argues that the Successor Claims Injunction affords the Debtors a broader

discharge than is permissible under section 1141(a), and that Kaneb cannot be bound by the

Successor Claims Injunction because it is not a "creditor" vis-à-vis the Settled Asbestos

Insurance Companies.  Kaneb's reliance on section 1141 of the Code is misplaced.  The

Successor Claims Injunction is sought pursuant to the Court's authority under section 105, not

section 1141(a), and nothing in section 1141(a) precludes the Court from using its authority to

"issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions"[226] of the Bankruptcy Code.  The Court is entitled to use its authority under section

105(a) to bind creditors of third parties whose claims will affect the bankruptcy estate -- any

other interpretation would render meaningless the Court's established power to issue injunctions

under section 105(a) enjoining claims against third parties.[227]

### 5.3.4    Kaneb should not be allowed to pursue the Debtors nominally.

Kaneb boldly requests this Court to issue an order that it could pursue Debtors nominally

following confirmation of the Joint Plan in order to obtain access to Debtors' liability insurance

coverage.  Again, Kaneb has waited until this late hour to assert this objection.  Kaneb did not

object on this ground in any of its previous filings in this case, and did not raise this issue at trial.

Thus, Kaneb's argument on this ground should be overruled as untimely.[228]

---

[226]  11 U.S.C. § 105(a).

[227]  *See* discussion in Part 5.1.2 (explaining the Court's authority to issue an injunction under section 105(a) enjoining claims against third parties).

[228]  *See supra*, note 221.

Also, Kaneb is incorrect in its assertion that "Debtors and/or the Trust would not be harmed by Kaneb proceeding against these policies to recover amounts nominally owed by Debtors."[229]  In fact, such a suit would affect the Debtors because it would potentially allow Kaneb to collect against Grace's insurance, which would otherwise be available to pay other claims.  To the extent that Kaneb's claims against Grace's insurers would be barred as direct claims under the Joint Plan, Kaneb should not be allowed to use a suit against the Debtors as a back door to recovery.

> 5.3.5  The Joint Plan does not prevent Kaneb from asserting any defensive rights.

Finally, as the Plan Proponents explained in the PP Main Pre-Trial Brief, Kaneb's allegations that the Joint Plan somehow prevents it from asserting defensive rights[230] are without merit.  The Joint Plan does not prevent Kaneb's assertion of defensive rights, and the Plan Proponents have openly conceded as much.[231]

## VI.    THE RELEASE AND EXCULPATION PROVISIONS IN THE JOINT PLAN ARE PROPER AND SHOULD BE APPROVED.

For the same reasons that the Successor Claims Injunction is proper, the release in Plan § 7.13 is also permitted.  First, this release is required by both the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement,[232] which, as explained *infra*, were

---

[229]  Kaneb Post-Trial Br. at 18 [Dkt. No. 23647].

[230]  *See id.* at 13-14.

[231]  *See* PP Main Pre-Trial Br. at 148 [Dkt. No. 22733].

[232]  *See* PP Ex. 277.13 Rev. (Fresenius Settlement Agreement at § 2.02(A)), (B), (C) (requiring releases of Grace-Related Claims); PP Ex. 277.22 Rev. (Sealed Air Settlement Agreement at ¶¶ II(f), (i)) (stating that the payments under the Sealed Air Settlement Agreement "shall be made in full compromise and settlement of any and all Asbestos-Related Claims against any and all of the Released Parties" and that Cryovac, Inc. and Sealed Air Corporation have entered into this Agreement in order to settle, *release*, extinguish, and terminate fully,
(Continued...)

61

approved in all respects and are *res judicata*. Also, like the Successor Claims Injunction, § 7.13 of the Joint Plan is a necessary condition to the Sealed Air and Fresenius Settlement Agreements, without which the Joint Plan would not be possible.[233] Thus, § 7.13 is proper and the objections to this provision by CNA,[234] Seaton, and OneBeacon[235] should be rejected.

MCC,[236] Seaton, and OneBeacon have objected to the releases in § 8.8.7. of the Joint Plan. These releases are required by the Fresenius Settlement Order[237] which, as explained in Part 5.2 *supra*, is a final order and is *res judicata* to all parties. Thus, this objection should also be rejected.[238] Moreover, as discussed in Part V *supra*, the Plan Proponents will amend the Joint Plan to add procedures allowing for claims against Fresenius that are enjoined by the Successor Claims Injunction to be channeled to Grace and paid in their full allowed amount. Thus, the release of Fresenius in § 8.8.7 of the Joint Plan, which is the only portion of that provision that applies to entities that did not vote for the Joint Plan, causes no prejudice to these parties.

---

finally, and forever any and all further controversy respecting any and all of the Asbestos-Related Claims against any and all of the Released Parties") (emphasis added).

[233] *See* PP Main Post-Trial Br. at 48-50, 53-56 [Dkt. No. 23662].

[234] CNA Post-Trial Br. at 34-37 [Dkt. No. 23644].

[235] Seaton/OneBeacon Post-Trial Br. at 20-24 [Dkt. No. 23637].

[236] MCC Post-Trial Br. at 13-14 [Dkt. No. 23645]; Seaton/OneBeacon Post-Trial Br. at 20-24 [Dkt. No. 23637].

[237] PP Ex. 277.14 Rev. (Fresenius Settlement Order at ¶¶ KK(b)) ("The Plan of Reorganization shall provide that, in consideration of the Settlement Payment, any Person voting in favor of the Plan or receiving property under the Plan shall thereby be deemed to have fully released each and every claim of the NMC Defendants from all Grace-Related Claims that such Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.").

[238] *See* PP Main Pre-Trial Br. at 80-88 [Dkt. No. 22733]; PP Main Post-Trial Br. at 76-77 [Dkt. No. 23662].

62

MCC also objects to the exculpation provision in § 11.9 of the Joint Plan. MCC's objection is premised on two false assertions: first, that § 11.9 "immunizes" parties from liability, and second, that § 11.9 must satisfy the factors considered in this Court's decision in *In re Genesis Health Ventures*.[239]  Section 11.9 does **not** "immunize" any party from liability -- rather, it states the appropriate standard of conduct (*i.e.*, gross negligence or willful misconduct) to be applied in any cause of action against these parties arising out of their efforts to reorganize the Debtors and consummate the Joint Plan.[240]  Therefore, as explained in the Plan Proponents' Main Pre-Trial and Post-Briefs, § 11.9 is consistent with Third Circuit law.[241]  For this same reason, the case cited by MCC, *In re Genesis Health Ventures*, is inapplicable to this case. In *Genesis*, this Court applied certain factors to determine whether to confirm a plan after it determined that the plan's exculpation provision actually released certain claims instead of merely stating a standard of liability.[242]  Here, § 11.9 does not purport to release any claims and, therefore, MCC's reliance on *Genesis* is misplaced.

---

[239]  MCC Post-Trial Br. at 13-14 [Dkt. No. 23645].

[240]  *See* PP Ex. 277.01 Rev. (Joint Plan § 11.9).

[241]  *See* PP Main Pre-Trial Br. at 98-102 [Dkt. No. 22733]; PP Main Post-Trial Br. at 80-82 [Dkt. No. 23662].

[242]  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001) ("Rather than address a standard of liability for releasees in the context of performing services to further a Chapter 11 debtor's reorganization efforts, the Senior Lender release appears to offer to the non-debtor Senior Lenders a ***release*** of liability for causes that might be asserted by third party creditors or equity security holders against them in connection with their role as creditors in the case.  Such a ***release*** must be examined in light of the Third Circuit's reservation in *Continental Airlines* . . .") (emphasis added).

## VII. THE JOINT PLAN PROVIDES FOR EQUAL TREATMENT OF CLAIMANTS IN THE SAME CLASS IN SATISFACTION OF SECTION 1123(a)(4) OF THE BANKRUPTCY CODE.

### 7.1 The Treatment Afforded to Longacre's Claim Complies with Section 1123(a)(4).

Longacre argues that classification of its claim in Class 6 would violate

section 1123(a)(4) because, unlike the majority of claims in Class 6, Longacre allegedly is

entitled to post-petition interest on its claim. Longacre lacks standing to assert this objection

because, if it is correct that it is entitled to post-petition interest, it will receive *better* treatment

than other claimants in Class 6.[243] Moreover, this argument in no way demonstrates that the

Joint Plan discriminates against the NU Claim, and Longacre's objection poses no obstacle to

confirmation of the Joint Plan even if Longacre is heard to object on this basis. Longacre

essentially asks the Court to find that a plan cannot be confirmed when one creditor within a

class might be paid post-petition interest at a different rate from other creditors within its class,

regardless of whether the other creditors have any entitlement to post-petition interest.

Section 1123(a)(4) states that a plan must "provide the same treatment for each claim or

interest of a particular class, *unless the holder of a particular claim or interest agrees to a less*

*favorable treatment of such particular claim or interest.*" (emphasis added). Here, Longacre

objects to receiving more favorable treatment than other claimants in Class 6, because it will

allegedly receive post-petition interest on its claim while other Class 6 claimants will not. But

Longacre ignores the fact that other claimants in Class 6 have agreed to the treatment they will

---

[243] *See In re Orlando Investors L.P.*, 103 B.R. 593, 596-97 (E.D. Pa 1989) (holding that claimants lacked standing to object to plan confirmation under section 1123(a)(4) where the parties "who [were] receiving a greater distribution [were] the only complainants").

64

receive by voting overwhelmingly for the Joint Plan.[244] And, Longacre cites no evidence that other claimants in Class 6 would be entitled to interest for this period under non-bankruptcy law. Thus, Longacre's classification in Class 6 is consistent with section 1123(a)(4), and its objection is without merit.

### 7.2    The Joint Plan Adequately Preserves BNSF's Contractual Rights.

In its post-trial brief, BNSF theorizes that it could be forced to pay 100% of the value of certain asbestos-related claims that have been filed against it in state court, yet its recovery from the Asbestos PI Trust would be capped, pursuant to Section 5.4(a) of the Asbestos PI TDP, at the Scheduled Values of the underlying asbestos-related claims. From this, BNSF argues that the Asbestos PI TDP wrongly "strips" BNSF of its contractual indemnity rights by improperly limiting the liquidated values of its Indirect PI Trust Claims.[245] This argument, however, is without merit because it is based on three false assumptions.

First, BNSF wrongly assumes that it would be entitled to indemnification from the Asbestos PI Trust on account of asbestos-related claims that have been filed against BNSF in state court.[246] However, none of the state court complaints that BNSF says would trigger Grace's indemnity obligations have been judicially tested.[247] As to BNSF's alleged indemnity

---

[244] PP Ex. 281 (Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization) (stating that over 99% of claimants in Class 6 voted to accept the Joint Plan); *see In re Cent. Med. Care Ctr., Inc.*, 122 B.R. 568, 574-75 (Bankr. E.D. Mo. 1990) (holding that a plan providing for different rates of interest among claimants within a class was permissible because the affected claimants had voted in favor of the plan).

[245] BNSF Post-Trial Br. §§ II.C., II.E [Dkt. No. 23648].

[246] *Id.* at ¶¶ 8-9, 11-12.

[247] *Id.* at ¶¶ 11-12 (citing BNSF Exs. 85-279); BNSF Pre-Trial Br. at p. 9 (indicating that the suits against BNSF have been stayed) [Dkt. No. 23648].

65

rights, the indemnity clause upon which BNSF relies is not unlimited in scope.[248] If, for example, BNSF is found to have engaged in abnormally dangerous activities when transporting Grace's products through locations outside of the BNSF premises in Libby leased to Grace – a common allegation in the state court complaints in evidence – BNSF will not be entitled, by reference to the indemnity, to pursue Indirect PI Trust Claims against the Asbestos PI Trust.

Second, BNSF wrongly assumes that, even if the asbestos-related claims filed against BNSF were to fit within the scope of BNSF's indemnity rights, BNSF would automatically be entitled to an Indirect PI Trust Claim for 100% of the claim value.[249] But the complaints filed against BNSF in state court contain allegations against a number of additional third parties, including the State of Montana.[250] Thus, even if BNSF were found liable for asbestos exposure that was 95% attributable to Grace products – the situation that BNSF's brief focuses on[251] –

---

[248]  BNSF Ex. 7A § 8; *see also* BNSF Post-Trial Br. ¶ 9 (citing BNSF Ex. 7A § 8) [Dkt. No. 23648].

[249]  BNSF Post-Trial Br. at p. 8 [Dkt. No. 23648].

[250]  *See* BNSF Exs. 85-279.

[251]  BNSF assumes that if BNSF were not liable for any of the asbestos-related claims that have been filed against it in state court, the underlying claimants otherwise would have claims against the Asbestos PI Trust that would qualify as Extraordinary Claims and merit an award of eight times the Scheduled Value for the claims. Even if true, this is beside the point. The same could be said for any co-defendant of Grace who is sued by a plaintiff whose only asbestos exposure is to Grace's products. The fact that an indirect claimant can observe that if it did not exist the direct claimant would have a larger claim against the Asbestos PI Trust is not a reason to deviate from the fundamental principle that an indirect claimant steps into the shoes of the direct claimant. Moreover, BNSF is wrong on the facts. If BNSF were not liable for the asbestos-related claims, the underlying claimants' claims against the Asbestos PI Trust would not qualify as Extraordinary Claims if claims against any of the third party defendants, such as the State of Montana, are determined to have a likelihood of generating a substantial recovery. PP Ex. 277.04 Rev. (Asbestos PI TDP § 5.4(a)) (defining "Extraordinary Claim" as a claim held by a claimant who has "little likelihood of a substantial recovery elsewhere"). And even if the underlying claimants' claims would otherwise qualify as Extraordinary Claims, they would not automatically merit an award of eight times the Scheduled Value for such claims. "[I]f the claimant's exposure to asbestos was 95% the result of exposure to an asbestos-containing product or to conduct for which Grace has legal responsibility, the maximum extraordinary value shall be eight (8) times the Scheduled Value set forth in Section 5.3(b)(3) for claims qualifying for Disease Levels II-V, VII and VIII and eight (8) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage." *Id.* (emphasis added).

66

BNSF still would have contribution claims against other co-defendants and ultimately pay significantly less than 100% of the total claim value.[252] As a result, BNSF's indemnity claims against the Asbestos PI Trust could be substantially less than the total value of the underlying claim and, in many cases, may not even reach the applicable Scheduled Value.

Third, BNSF wrongly assumes that its Indirect PI Trust Claims against the Asbestos PI Trust would be capped at the Scheduled Value for the underlying claims.[253] As a holder of Indirect PI Trust Claims, BNSF would be entitled to obtain reimbursement up to the amount that the underlying claimants would otherwise have been entitled to claim against the Asbestos PI Trust.[254] Because the underlying claimants could have elected to have their claims undergo Individual Review and potentially receive an award that ranges up to the Maximum Values for their claims[255] – which values are substantially greater than the Scheduled Values[256] – BNSF would be entitled to receive awards up to the Maximum Values on its Indirect PI Trust Claims as well.[257]

---

[252] Indeed, under Montana law, if BNSF's negligence is determined to be 50% or less of the defendants' combined negligence, BNSF only would be severally liable for the percentage of negligence attributable to it. Mont. Code Ann. § 27-1-703(2).

[253] BNSF Post-Trial Br. ¶ 22 (stating that BNSF will be entitled to a likely award equal to Scheduled Value – which BNSF equates with 1/8th of the Extraordinary Claim value) [Dkt. No. 23648].

[254] PP Ex. 277.04 Rev. (Asbestos PI TDP § 5.6).

[255] Id. at § 5.3(b)(1)(B).

[256] Id. at § 5.3(b)(3).

[257] To the extent that BNSF's Indirect PI Trust Claims would be capped at the Maximum Values for the underlying claims, the same cap would apply to any other claimant (other than claimants with Extraordinary Claims).

67

In sum, BNSF's argument is not based on evidence that its liabilities would exceed the amounts of its Indirect PI Trust Claims, but on cascading, unsupported assumptions. As such, its indemnity argument fails.[258]

### 7.3    Other Objections to the Treatment of Indirect Claims Are Without Merit.

As explained in the Main Post-Trial Brief, the Joint Plan provides the same treatment for all claims within each class in accordance with section 1123(a)(4).[259] Nonetheless, several parties have stated objections under this section. MCC argues that the Joint Plan discriminates against its claim because the Debtors sought to disallow MCC's claims under section 502(e)(1)(B) of the Code.[260] But the Joint Plan in no way calls for disallowance of MCC's claim, and MCC has cited no authority for its conclusion that asserting a defense against a claim in the course of a chapter 11 case somehow "discriminates" against that claim in violation of section 1123(a)(4). Because the mere assertion of a defense does not constitute discrimination, and because the Joint Plan does not call for disallowance of MCC's claim, MCC's objection is without merit.[261]

---

[258] BNSF also asserts that its indemnity claim for attorneys' fees is not respected under the PI TDP. The Plan Proponents will modify section 5.6 of the PI TDP to make clear that, to the extent, if any, that any claim by BNSF for reimbursement of attorneys' fees is valid, such claim shall be paid by the Asbestos PI Trust at the applicable payment percentage, subject to the other provisions of the PI TDP.

[259] *See* PP Main Post-Trial Br. at 78-79 [Dkt. No. 23662].

[260] MCC Post-Trial Br. at 13 [Dkt. No. 23645].

[261] MCC also improperly cites inadmissible testimony from Peter Lockwood's deposition to support its objection. The cited testimony is not relevant to the proposition that it purportedly supports. Also, for the reasons explained in the Bench Brief of the Debtors, David T. Austern, and the ACC Detailing Objections to Deposition Testimony Offered By the Insurers, dated 6/22/2009 [Dkt. No. 22200], Mr. Lockwood's testimony concerning the operation of the Asbestos PI Trust is a legal opinion and is not admissible.

Next, CNA, MCC, and Montana allege that the Joint Plan violates sections 1123(a)(4) and 524(g)(2)(B)(ii)(V) of the Bankruptcy Code because, they say, the Asbestos PI TDP will result in disparate treatment among claims in the same class.[262]  For all of the reasons articulated in Section VIII of the PP Main Pre-Trial Brief and Section 13.11 of the Main Post-Trial Brief, their arguments are without merit and should be rejected.[263]

## VIII.   THE ASSIGNMENT OF ASBESTOS INSURANCE RIGHTS UNDER THE JOINT PLAN IS APPROPRIATE AND DOES NOT PROVIDE INSURANCE COMPANIES WITH A VALID OBJECTION TO CONFIRMATION.

Recognizing that this Court has clearly ruled that the Bankruptcy Code preempts contrary anti-assignment clauses in insurance policies, most of the insurers have not even contested such assignment.  While CNA and GEICO's post-trial briefs half-heartedly discuss the assignment issue,[264] GEICO openly acknowledges that its argument is contingent on a reversal of this Court's decision in *Federal-Mogul*.[265]  Nor did any insurance company address, much less refute, the detailed analysis in the Plan Proponents' Pre-Trial Phase II Insurance Brief of how the Joint Plan's assignment of Asbestos Insurance Rights under insurance policies in the Plan is not only supported by section 1123(a)(5)(B) of the Bankruptcy Code, but also by sections 524(g) and 1123(b)(3)(B).

---

[262]  CNA Post-Trial Br. at 19-20 [Dkt. No.23644]; MCC Post-Trial Br. at 11-12 [Dkt. No. 23645]; Montana Post-Trial Br. at 7-9 [Dkt. No. 23654].

[263]  *See* PP Main Pre-Trial Br. at 63-70 [Dkt. No. 22733]; PP Main Post-Trial Br. at 120-24 [Dkt. No. 23662].

[264]  Phase II Post-Trial Brief of Government Employees Insurance Company and Republic Insurance Company ("GEICO Post-Trial Br.") at 3-5 [Dkt. No. 23651]; CNA Post-Trial Br. at 32-34 [Dkt. No. 23644].

[265]  GEICO Post-Trial Br. at 4 [Dkt. No. 23651].

Also, no Insurance Company denied in the November 2 post-trial briefing that the same analysis applies to the transfer of Asbestos Insurance Rights under Asbestos Insurance Reimbursement Agreements, even to the extent that such agreements contain anti-assignment clauses. Indeed, none of the remaining objecting Reimbursement Insurance Companies even claimed that their Asbestos Insurance Reimbursement Agreements have such clauses.

### 8.1    Section 7.2.2(d)(iv) Is Appropriate.

No Insurance Company has presented any relevant evidence that the operation of section 7.2.2(d)(iv) of the Joint Plan is inappropriate, and only CNA and Hartford even filed a post-trial brief objecting to it. Even CNA and Hartford do not in their post-trial briefs contest the appropriateness of the operation of section 7.2.2(d)(iv) of the Joint Plan as set forth and explained by the Plan Proponents. Instead, they merely express unsubstantiated concerns about future interpretation of its unambiguous language.[266] Such concerns are not well-taken, and even if these concerns were valid, they could be addressed by clarifying language in the Confirmation Order.

As explained several times by the Plan Proponents, the language of section 7.2.2(d)(iv) is clear:

> On the Effective Date, the Asbestos PI Trust shall be the successor to all rights of the Debtors and Non-Debtor Affiliates under each Asbestos Insurance Reimbursement Agreement. The Asbestos PI Trust's payment of an Asbestos PI Claim under the PI TDP shall be deemed to constitute settlement and payment of such claim by or on behalf of the Debtors or Non-Debtor Affiliates within the

---

[266] For example, Hartford alleges that section 7.2.2(d)(iv) "can be construed as eliminating any defense that Hartford may have under the Hartford Agreement to any request by the Trust for reimbursement of any payment under the Asbestos PI TDP," Hartford's Post-Trial Brief in Support of Objections to Confirmation ("Hartford Post-Trial Br.") at 4 [Dkt. No. 23643], while CNA rests on the argument that "concessions made by the Plan Proponents themselves might not be given effect in the future." CNA Post-Trial Br. at 29 [Dkt. No. 23644].

70

meaning of, and in full compliance with, each Asbestos Insurance Reimbursement Agreement.[267]

This language does not purport to remove all obligations owed to insurers, but merely makes clear that payment by the "Asbestos PI Trust" under the "TDP" shall be treated as a payment "by or on behalf of the Debtors" within the meaning of, and in full compliance with, each Asbestos Insurance Reimbursement Agreement.[268]  In other words, the payment by the Trust under the TDPs complies with the Asbestos Insurance Reimbursement Agreements and cannot be used as an excuse by the insurers for non-payment, as that would prevent the assignment from being effective.  Other than that, any obligations that may be owed to the Insurance Companies remain intact under the clear language of section 7.2.2(d)(iv).  No clarification is needed.

It is also notable that few obligations are owed to Hartford and CNA under the Asbestos Insurance Reimbursement Agreements in the first place.  Other than indemnification obligations related to CNA's payments, for example, CNA merely points to the obligations to follow "a specific payment formula," to provide "information and quarterly reports" and to allow for "inspection" of files.[269]  Hartford and CNA have failed to demonstrate that section 7.2.2(d)(iv) threatens such obligations.

Finally, the Plan Proponents have already demonstrated that Hartford's solitary argument that section 7.2.2(d)(iv) calls for a declaratory judgment under Rules 7001(1) and (9) is false, and

---

[267] PP Ex. 277.01 Rev. (Plan § 7.2.2(d)(iv)) (emphasis added).

[268] *See id.*

[269] CNA Post-Trial Br. at 27 [Dkt. No. 23644].

have likewise demonstrated that the Court's determination of whether a plan containing that section can be confirmed is a "core issue."[270] None of Hartford's cases involve the determination of a similar plan section raised as an objection to confirmation, and Hartford fails to distinguish the directly on-point cases cited by the Plan Proponents where similar plan provisions were held appropriate as part of plan confirmation.[271] Moreover, even on its own terms, Hartford's argument depends on its characterization of section 7.2.2(d)(iv) as stripping any and all obligations owed to it under the Asbestos Insurance Reimbursement Agreements,[272] when, as shown both above and in the Plan Proponents' previous briefs, such a characterization is false.

Additionally, Hartford again fails to recognize that, having itself raised the validity of section 7.2.2(d)(iv) as an objection to confirmation, it is barred from asserting that such an objection cannot be resolved by this Court or that it can only be resolved in another proceeding.

## IX.    THE TRUST ADVISORY COMMITTEE IS A RECOGNIZED, NECESSARY, AND APPROPRIATE ELEMENT OF THE ASBESTOS PI TRUST.

Several insurers repeat arguments made in pre-trial briefing regarding alleged conflicts of interest of the Trust Advisory Committee ("TAC"), inserting cites to various portions of the trial

---

[270] Plan Proponents' Consolidated Phase II Brief Regarding Insurance Issues in Support of Confirmation ("PP Phase II Ins. Br.") at 26-30 [Dkt. No. 22728]; PP Main Post-Trial Br. at 90, 96 [Dkt. No. 23662].

[271] PP Phase II Ins. Br. at 27-28 (citing, *inter alia*, *In re Babcock & Wilcox Co.*, No. 00-10992, 2004 WL 4945985, at *5 (Bankr. E.D. La. Nov. 9, 2004) (*vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005)) [Dkt. No. 22728].

[272] *See* Hartford Br. at 5 ("With this provision, Plan Proponents seek to ensure the Trust's ability to collect from the insurers by obtaining a declaration that any defenses insurers may have to the Trust's demands for reimbursement simply do not apply. This constitutes a declaratory judgment relating to a proceeding to recover money.") [Dkt. No. 23643].

72

record.[273] The Plan Proponents accordingly refer the Court to, and incorporate by reference, the

PP Main Pre-Trial Brief at 71-79, and offer this short additional response.

### 9.1    The Insurers Have Not Demonstrated Standing to Complain About the TAC.

The insurers have no standing to raise "conflict of interest" issues with respect to the

TAC. As explained in the Plan Proponents' Main Pre-Trial Brief, the insurers do not have

standing as insurers under Third Circuit precedent. [274] In its post-trial briefing, CNA alleges that

it has standing as an Indirect Claimant to the Trust.[275] CNA, however, has filed no proof of

claim. It does not allege that it has actually paid all or part of a liability that a Direct Claimant

had against the Trust, as required by the TDP.[276] Instead, CNA suggests that it might someday

file an indirect claim against the Trust if certain things happen.[277] These developments are

speculative and entirely contingent on uncertain future developments in litigation. Nor has CNA

explained how any underlying claim against it, for which it might in the future seek

reimbursement from the Trust, could survive the injunctions that will be entered in connection

---

[273] One Beacon provides only a substitution chart for citations in its pre-trial brief but makes no new arguments. Seaton/OneBeacon Post-Trial Br. at 34 [Dkt. No.23637]. GEICO and Republic simply incorporate by reference the Phase II Post-Trial Brief of OneBeacon and Seaton. GEICO Post-Trial Br. at 5 [Dkt. No. 23651]. CNA repeats its previous arguments at some length, with citations to the trial record, adding little new. CNA Post-Trial Br. at 7-17 [Dkt. No. 23644]. At several points in their briefs, CNA and OneBeacon cite deposition transcripts on certain TAC issues, principally the deposition of Peter Lockwood. *E.g., id.* at 9 (citing Lockwood Deposition). The Plan Proponents do not waive their previously filed objections to such deposition testimony.

[274] PP Main Pre-Trial Br. at 71 [Dkt. No. 22733].

[275] CNA Post-Trial Br. at 1-5 [Dkt. No. 23644].

[276] PP Ex. 277.04 Rev. (Asbestos PI TDP § 5.6).

[277] *See* CNA Post-Trial Br. at 3 ("*Were* these 'Libby Claimants' to continue to pursue their claims against CNA . . . CNA would have a right to pursue third party claims against the Debtors for contribution or indemnity. . . .") (emphasis added); *see also id.* at 4 ("CNA possesses a claim for indemnity against the Debtors *in the event* that BNSF successfully recovers from CNA. . . .") (emphasis added) [Dkt. No. 23644]. It should also be noted that BNSF no longer contends that it has claims against Seaton, OneBeacon or CNA. *See infra*, n.322.

73

with the Plan.  OneBeacon's post-trial submission likewise offers no record evidence in support of its claim that it has standing to complain about the TAC.[278]  The Court should therefore find that the insurers have no standing to complain about the TAC.

### 9.2     The TAC Is Based on Established Precedents and Serves Important Purposes.

Even assuming insurers like CNA have standing to raise TAC issues, the TAC is an appropriate feature of the Trust.  The TAC proposed here is based on, and similar to, TACs created and approved in numerous prior asbestos personal injury trusts.[279]  The TAC serves three principal functions.  First, it provides the Trustees with knowledge of asbestos personal injury litigation and the process of asbestos claims administration.[280]  Second, the TAC provides a spokesperson for the present asbestos claimants and helps preserve the intention of the Asbestos PI Trust Agreement in the event that the Trust has to make changes in the future.[281]  Third, the TAC serves as a means of communication with the present claimant constituency and a mechanism through which the claims process can be made more efficient.  The TAC has no role in the processing of individual claims.[282]

### 9.3     The TAC's Powers Are Limited and Subject to Judicial Review.

---

[278]  Seaton/OneBeacon Post-Trial Br. at 35 [Dkt. No. 23637].

[279]  9/14/2009 Tr. 34-35, 39 (Inselbuch).

[280]  *Id.* at 35.

[281]  *Id.*

[282]  *Id.*

74

The TAC has limited powers. The TAC is consulted, along with the Futures

Representative, on the general administration and implementation of the Trust and the TDP.[283]

On certain enumerated issues critical to preserving the settlement embodied in the Trust itself,

the TAC has the right to consent.[284] Even these limited powers, however, are subject to further

constraint:

- The Futures Representative has equivalent consent rights, making it impossible for the TAC to unilaterally impose changes to benefit current claimants at the expense of future claimants.[285]

- The TAC may not withhold its consent unreasonably.[286]

- The TAC must also explain in detail its objections to any course of action in writing within 30 days, or its consent is deemed given.[287]

- If the TAC withholds its consent and the Trustees disagree, the trustees can seek recourse in this Court and have the proposed course of action approved over the TAC's objection.[288]

In light of these built-in limitations on the TAC, the insurers' contention that there is a

"significant" risk that TAC members "will use their powers under the Trust Agreement to

enhance the recoveries of their own clients"[289] is simply unrealistic.

---

[283] PP Ex. 277.02 Rev. (Asbestos PI Trust Agreement § 2.2(e)).

[284] *Id.* at § 2.2(f).

[285] *Id.*

[286] *Id.* at § 5.7(b)(ii).

[287] *Id.*

[288] *Id.* at § 7.13. Specifically, any dispute resulting from the withholding of consent is submitted to alternative dispute resolution with recourse to the Bankruptcy Court within 30 days. *Id.* In exigent circumstances, the Trustees can bypass ADR altogether and go straight to the Bankruptcy Court. *Id.*

[289] CNA Post-Trial Br. at 17 [Dkt. No. 23644].

### 9.4    The Insurers Have Offered no Evidence to Support Their Hypothetical "Conflicts."

At the Confirmation Hearing, the insurers withdrew their proposed experts and presented no other testimony to show the TAC would obstruct the Trustees or otherwise act inappropriately.  The only evidence they cite in their post-trial briefs, the testimony of Mr. Inselbuch, undercuts their unsupported theory.  Mr. Inselbuch testified that he knew of no occasion when a TAC in an existing asbestos personal injury trust had withheld its consent.[290] The insurers' argument that this goes to show that trustees are so in thrall to TACs that they never propose anything TACs would object to is completely devoid of any record evidence.  In light of this total lack of evidence, the Court should reject the insurers' speculation that the TAC will act inappropriately.[291]

---

[290] 9/14/2009 Tr. 74 (Inselbuch).

[291] CNA's post-trial brief makes passing reference to alleged "conflicts" among trust claimants, in particular raising the prospect that an indirect claimant, perhaps even an insurer, could theoretically be making claims alongside asbestos claimants.  CNA Post-Trial Br. at 16 [Dkt. No. 23644].  As noted above, CNA has not established that it is, or is likely to be, an Indirect Claimant.  Even assuming it becomes one, however, there is no meaningful "conflict" between a direct claimant seeking recovery of damages and an indirect claimant -- standing in the shoes of a direct claimant it has paid -- seeking reimbursement from the Trust.  And there is certainly no evidence in the record of the existence of such a conflict or how the TAC would be involved.

DOCS_DE:155067.1

**9.5    Courts Have Rejected the "Conflict of Interest" Argument.**

Courts have considered and rejected this same "conflict of interest" argument before.  In a previous asbestos bankruptcy, *In re Eagle-Picher Indus., Inc.*, 203 B.R. 256 (S.D. Ohio 1996), an objector argued that members of the TAC who were personal injury lawyers with obligations to their personal injury clients had a conflict of interest when they exercised powers as members of the TAC, and contended that the conflict violated the requirement under 11 U.S.C. § 1129(a)(5) that the appointment of certain individuals be "consistent with the interest of creditors and equity security holders and with public policy."[292]  The court found first that section 1129(a)(5) did not apply to the TAC, but held alternatively that, even if it did, the TAC would be consistent with the interest of creditors and equity security holders and with public policy.[293]  The court cited specifically the requirement that the TAC's consent not be "unreasonably withh[e]ld" and the trustees' ability to seek court approval over any TAC objection.[294]  In the present case, the proposed TAC is subject to the same limitations as those noted by the court in *Eagle Picher*.  For the same reasons, therefore, this Court should reject the insurers' "conflict of interest" argument.

---

[292]  *Eagle Picher*, 203 B.R. at 267.

[293]  *Id.* at 267-268.

[294]  *Id.* at 268.

## X.  THE JOINT PLAN DOES NOT IMPLICATE THE ABSOLUTE PRIORITY RULE.

Because each class of interests has either voted to accept the Joint Plan or will not be impaired under the Joint Plan,[295] the Joint Plan satisfies section 1129(a)(8), and the absolute priority rule, section 1129(b), is not implicated.  Nonetheless, several parties argue that the Joint Plan violates the absolute priority rule because equity is retaining value while not all creditors are paid in full.[296]  This argument fails as a matter of elementary bankruptcy law -- as explained, each class has either voted for the Joint Plan or is unimpaired under the Joint Plan, and, thus, the absolute priority rule has no application to any creditor or class of creditors in this case.

## XI.  THE JOINT PLAN COMPLIES WITH ALL REMAINING PROVISIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE.

### 11.1  Pursuit of Asbestos PD Demands Outside the Procedures Described By the Joint Plan is Likely to Threaten the Joint Plan's Purpose to Deal Equitably With Such Claims.

AMH, in its post-trial feasibility brief, mistakenly argues that if Grace's estimate of $37 million to resolve all pending and future traditional Asbestos PD Claims were correct, then the Joint Plan would violate section 524(g) because "the Debtors ought to have little trouble dealing with such claims outside of the constructs of the Plan and PD Trust . . . ."[297]  This argument simply ignores the circumstances of the traditional Asbestos PD Claims asserted against Grace.  At the Confirmation Hearing, the Debtors' expert, Dr. Denise Martin, testified that Grace would

---

[295]  The objections made under this section by the Bank Lender Group and the Official Committee of Unsecured Creditors are addressed in the Plan Proponents' Response Brief on Bank Lender Issues.

[296]  *See* BNSF Post-Trial Br. at 10-11 [Dkt. No. 23648]; MCC Post-Trial Br. at 11-12 [Dkt No. 23645]; Montana Post-Trial Br. at 5-6 [Dkt. No. 23654]; Phase II Post-Trial Brief of Garlock Sealing Technologies, LLC ("Garlock Post-Trial Br.") at 6 [Dkt. No. 23656].

[297]  AMH Post-Trial Br. at 9, n.5 [Dkt. No. 23650].

be subject to substantial future traditional Asbestos PD Claims.[298]  As explained in Part
3.1.1.2(3) *supra*, Dr. Martin's testimony did not concern the merit of these claims, only whether
such claims would be made.  Thus, the notion that the Debtors will be subject to substantial
future claims is not inconsistent with the notion that few of such claims will have any merit,
particularly given the numerous defenses that the Debtors have asserted to such claims.[299]

In fact, these exact circumstances -- numerous similar claims that are subject to similar
meritorious defenses -- create the necessity for the Asbestos PD Channeling Injunction and
accompanying claim resolution procedures.  Without the Asbestos PD Channeling Injunction,
future Asbestos PD Claims "would not be subject to uniform procedures designed to determine
whether they have been discharged by the Plan and the Asbestos PD Claims Bar Date."[300]  These
procedures will allow the Debtors to efficiently dispose of traditional Asbestos PD Claims that
are subject to meritorious defenses, thereby avoiding the excessive defense costs that would be
associated with piecemeal litigation of such claims.  Thus, these procedures will prevent the
assets of the Reorganized Debtors from being consumed by excessive legal fees, which will
ensure that the Debtors' contributions to the Asbestos PI and PD Trusts will be largely used to
pay claims, not legal expenses.  This result is the precise objective of section 524(g).

---

[298]  10/13/2009 Tr. 224-25 (Martin) ("it's my opinion that . . . substantial [PD] claims will be made").

[299]  *See* Part 3.1.1.2(3) *supra* (explaining Debtors' defenses to traditional Asbestos PD Claims).

[300]  PP Ex. 381 (Proffer of Richard C. Finke at 5, ¶ 21).

**11.2    The Asbestos PI Trust Is Properly Funded Under the Joint Plan.**

CNA incorrectly claims that the Asbestos PI Trust does not satisfy the funding

requirements of section 524(g), making three arguments to this effect: 1) the Asbestos PI Trust is

not funded by "securities"; 2) the Asbestos PI and PD Trusts do not have the power to obtain a

controlling share of the Reorganized Debtors before the "financial point of no return"; and 3)

section 524(g) requires that the Asbestos PI Trust have undivided majority control over the

Reorganized Debtors under specified contingencies.  All of these arguments lack merit.

11.2.1 The Asbestos PI Trust will be funded by securities.

The Asbestos PI Trust complies with section 524(g) because it will be funded in part by

securities of the Reorganized Debtors, and it will have the right, in conjunction with the Asbestos

PD Trust, to own a majority of the voting shares of the Reorganized Parent under specified

contingencies.[301]  As explained in the Main Post-Trial Brief, the Asbestos PI Trust will be

funded by warrants, which are "securities" under the applicable definition in the Code.[302]  Also,

under numerous "specified contingencies," the Asbestos PI and PD Trusts will own a majority of

the voting shares of the Reorganized Parent.[303]

Despite these unambiguous provisions, CNA objects to the funding of the Asbestos PI

Trust.  CNA's argument that a section 524(g) trust must be funded with equity securities is

expressly contradicted by the plain language of the Code: section 101(49)(A)(xv) states that the

definition of "security" includes a warrant to purchase a security.

---

[301] *See* 11 U.S.C. § 524(g)(2)(B)(i)(II), (III) .

[302] PP Main Post-Trial Br. at 110-11 [Dkt. No. 23662].

[303] *See* PP Main Pre-Trial Br. at 121-23 [Dkt. No. 22733].

80

       11.2.2  The Joint Plan satisfies the requirement that the Trusts are to own, under specified contingencies, a majority of the voting shares of the Reorganized Debtors.

The Joint Plan complies with section 524(g)(2)(B)(i)(III) by granting the Asbestos PI and PD Trusts the right to majority ownership of the Reorganized Parent's voting stock upon any Event of Default.[304] As explained in the Plan Proponents' Main Pre-Trial Brief, the contingencies under which the Trusts would hold majority ownership of the Reorganized Parent are broadly defined, giving substantial leverage to the Trusts to ensure Grace's continued dedication to meeting its obligations under the Deferred Payment Agreements.[305]

CNA nonetheless objects to Joint Plan, arguing that the Events of Default defined in the Deferred Payment Agreements do not comply with section 524(g). First, the *Congoleum* decision cited by CNA, requiring that the specified contingencies under section 524(g) occur before the financial "point of no return," is an outlier and has not been adopted by any other court.[306] Instead, section 524(g) is widely understood to "ensure that, if there are not sufficient funds in the trust otherwise, the trust may obtain control of the debtor company."[307] Contrary to

---

[304] *See* PP Ex. 277.20 Rev. (Share Issuance Agreement § 2) (setting forth Debtors' obligation to issue the Section 524(g) Shares, which are defined in the agreement to include 50.1% of the total number of shares of Common Stock issued and outstanding as of the Effective Date); PP Ex. 277.11 Rev. (Asbestos PI Deferred Payment Agreement § 8)(defining Events of Default); PP Ex. 277.27 Rev. (Deferred Payment Agreement (Class 7A PD) § 8) (same); PP Ex. 277.28 Rev. (Deferred Payment Agreement (Class 7B ZAI) § 8 (same)); PP Ex. 277.26 Rev. (Asbestos PI/PD Inter-Creditor Agreement § 4A(c)) (setting forth default terms by which PI and PD trusts will share the section 524(g) Shares *pro rata* according to each Trust's proportionate share of Total Obligations unless the parties reach a different agreement before the one-year anniversary of the Issuance Date of the 524(g) Shares).

[305] *See* PP Main Pre-Trial Br. at 121-23 [Dkt. No. 22733].

[306] *See In re Congoleum Corp.*, 362 B.R. 167, 176 (Bankr. D.N.J. 2007).

[307] 4 *Collier on Bankruptcy* ¶ 524.07[2] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. 2005) (citing 140 Cong. Rec. H10, 765 (daily ed. Oct. 4, 1994) (remarks of Rep. Jack Brooks)).

CNA's assertion,[308] the Plan Proponents have *not* conceded that *Congoleum* states the proper standard, which it does not. In the Plan Proponents' Main Pre-Trial Brief, the Plan Proponents merely acknowledged that *Congoleum* applied this standard and explained that the Joint Plan would satisfy that test.[309]

Even if the stricter *Congoleum* standard were applied, the Joint Plan would comply with section 524(g) because none of the specified Events of Default would signal the "point of no return" for the Reorganized Debtors. CNA argues, without any support, that upon occurrence of any of the defined Events of Default the Debtors would be "*in extremis*." This is simply not correct. As explained in the Plan Proponents' Main Pre-Trial Brief, the events that would trigger an Event of Default are defined broadly, and would allow the Asbestos PI and PD Trusts to obtain control of the Reorganized Debtors well before the financial point of no return.[310]

> 11.2.3 Section 524(g) permits multiple trusts, and therefore allows two trusts to share control of the Reorganized Debtors.

CNA next argues that section 524(g) does not permit multiple trusts because the rule of construction that the singular includes the plural somehow does not apply to section 524(g).[311] CNA cites the Supreme Court's recent decision in *United States v. Haynes* for the proposition that this rule does not apply when Congress' intent is that the singular means singular. *Haynes* interpreted 1 U.S.C. § 1, which states a general rule of interpretation for all of the United States

---

[308] CNA Post-Trial Br. at 25-26 [Dkt. No. 23644].

[309] *See* PP Main Pre-Trial Br. at 122-23 [Dkt. No. 22733].

[310] *See id.*

[311] *See* 11 U.S.C. § 102(7) ("In this title -- the singular includes the plural").

82

Code that "***unless the context indicates otherwise*** . . . words importing the singular include and apply to several persons, parties, or things . . . ."[312] By contrast, the rule of construction stated in 11 U.S.C. § 102(7) simply states that: "In this title . . . the singular includes the plural . . . ." Thus, this section differs from the provision interpreted in *Haynes*, which is explicitly limited by the clause "unless the context indicates otherwise."[313] Section 102(7) therefore applies to section 524(g), which plainly allows multiple trusts, and CNA's argument to the contrary should be rejected.

CNA also argues that if section 524(g) allows multiple trusts, "this does not change the fact that section 524(g) requires that each trust separately have the right . . . to obtain a majority of voting shares . . . ."[314] This argument ignores both the language of section 524(g), which permits more than one trust, and the significant practical benefits of a two-trust structure. As used in this case, the two-trust structure permits the procedures for paying Asbestos PD Claims and Asbestos PI Claims to be tailored to suit each type of claim. And, the individuals charged with responsibility under the Joint Plan to assist the respective trustees of each trust (the Asbestos PI FCR and the Asbestos PI TAC in the case of Asbestos PI Claims, and the Asbestos PD FCR and Asbestos PD TAC in the case of Asbestos PD Claims) represent different interests and have expertise in different areas. Moreover, CNA's argument simply defies logic -- if section 524(g) permits "trusts," as it surely does, then the statute cannot be read to require that

---

[312] *See United States v. Haynes*, 129 S. Ct. 1079, 1085 n.5 (2009) (emphasis added).

[313] *Compare* 1 U.S.C. § 1 *and* 11 U.S.C. § 102(7).

[314] CNA Post-Trial Br. at 26 [Dkt. No. 23644].

83

each trust hold majority voting control of the debtor. Thus, CNA's objections to the funding of the Asbestos PI Trust based on the Joint Plan's two-trust structure are entirely without merit.

### 11.3    The Asbestos PI Trust's Operation Assures That Similar Present and Future Claims Will Be Treated in Substantially the Same Manner.

As explained in detail in the Main Post-Trial Brief, the Asbestos PI TDP scrupulously complies with the requirement that the Trust provide reasonable assurance that similar present and future claims will be valued and paid in substantially the same manner.[315] Yet Montana argues otherwise, complaining that the Asbestos PI TDP violates sections 524(g)(2)(B)(ii)(V) and 1123(a)(4). For the reasons stated in Part VII *supra*, this argument fails, and the Joint Plan also complies with section 524(g).

### 11.4    Contrary to the Assertion of Seaton/OneBeacon, the Fresenius Indemnified Parties Are Appropriately Included in the Asbestos PI Channeling Injunction.

The inclusion of Fresenius as a protected party under the Asbestos PI Channeling Injunction is wholly appropriate because, as explained in the PP Main Pre-Trial Brief, Fresenius is alleged to be liable for the conduct of the Debtors due to its "ownership of a financial interest in the debtor."[316] Moreover, as explained in the Plan Proponents' Main Post-Trial Brief and as further explained in Part 5.2 *supra*, the Fresenius Settlement Agreement, which was approved by this Court "in all respects" and is *res judicata* to all parties in interest, calls for Fresenius to receive the full benefit of a section 524(g) injunction.[317]

---

[315] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V); PP Main Post-Trial Br. at 121-22 [Dkt. No. 23662].

[316] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I); PP Main Post-Trial Br. at 126-31 [Dkt. No. 23662].

[317] *See* PP Main Post-Trial Br. at 131-33 [Dkt. No. 23662].

Nonetheless, Seaton and OneBeacon erroneously argue that section 524(g) does not

permit channeling of their purported indemnification claims against Fresenius under agreements

settling their coverage for asbestos claims. This argument fails for several reasons. First, as

explained in the Main Post-Trial Brief, these claims clearly arise due to Fresenius' ownership of

a financial interest in Grace-Conn.[318]  In fact, the agreements under which Fresenius has

allegedly indemnified Seaton and OneBeacon settle policies for a coverage period that ended

*before Fresenius was even incorporated*.[319] Also, only Grace-Conn., not Fresenius, ever held

the alleged asbestos liabilities covered by these settled policies.[320]  Thus, there is simply no

reason why Fresenius would have been a party to these settlement agreements other than its

ownership of an interest in Grace-Conn.

Moreover, as explained in the Plan Proponents' Main Post-Trial Brief, section 524(g)

protection of Fresenius is required by the Fresenius Settlement Agreement. The Fresenius

Settlement Order, which is a final order, is *res judicata* and is binding on all parties in interest.

For the reasons explained in the Plan Proponents' Main Post-Trial Brief and in Part 5.2 *supra*,

Seaton and OneBeacon's arguments to the contrary are without merit.[321]

---

[318] *See id.* at 133-35.

[319] *See* PP Ex. 385 (Entity Information Regarding Fresenius Medical Care Holdings, Inc.) (demonstrating that the corporation now known as Fresenius was incorporated on March 23, 1988); OneBeacon/Seaton Ex. 05 Rev. (5/15/1995 Settlement Agreement Between W. R. Grace & Co. -- Conn., W. R. Grace & Co., and Unigard Security Insurance Company at 1) (stating that the policy period for the policy covered by the settlement agreement ended in 1975); OneBeacon/Seaton Ex. 01 Rev. (5/10/1993 Settlement Agreement Between W. R. Grace & Co., W. R. Grace & Co. -- Conn., Commercial Union Insurance Co., and American Employers' Insurance Co., at Ex. A) (stating that the coverage period for the settled policies ended in 1974).

[320] *See* 9/15/2009 Tr. 95 (Shelnitz) ("Q. At any point in time did any Grace entity hold the asbestos liabilities other than the operating entity? A. No.").

[321] *See* PP Main Post-Trial Br. at 59-62, 131-32 [Dkt. No. 23662].

Finally, Seaton and OneBeacon have not identified any asbestos-related claims that could be asserted against the settled policies once the Joint Plan becomes effective. Seaton and OneBeacon identify Scotts as allegedly seeking "vendor" coverage, but Scotts has agreed to drop all claims against Grace's insurance policies as part of a settlement agreement with the Debtors.[322] Moreover, under the Joint Plan, Seaton and OneBeacon will receive protection for their settled policies under the Asbestos PI Channeling Injunction. Thus, it is unclear how any entity could assert an asbestos-related claim against Seaton or OneBeacon that would trigger their purported indemnities against Fresenius.

For these reasons, protection of Fresenius under the Asbestos PI Channeling Injunction is appropriate, and the arguments to the contrary should be rejected.[323]

---

[322] *See* Settlement Agreement Between Scotts Co. and W. R. Grace & Co., dated 8/8/2009, at § 2.01 [Dkt. No. 22735]. To the extent that Seaton, OneBeacon, or CNA argue that Scotts or BNSF have potential claims against them for which they would seek indemnification from Sealed Air or Fresenius, the argument is moot. Under the Settlement Agreement between Scotts and the Debtors, filed Aug. 8, 2009 [Dkt. No. 22735], at § 2.01, Scotts released all of its claims against insurers such as Seaton, OneBeacon and CNA. Regarding attorneys' fees, Seaton and OneBeacon have already filed proofs of claim against Grace in which they seek attorneys' fees related to the Scotts and Kaneb claims. *See* OneBeacon/Seaton Ex. 48 (Amended Proof of Claim No. 18529, filed Aug. 25, 2009, amending Proof of Claim No. 15531, filed by Seaton Insurance Company); and OneBeacon/Seaton Ex. 49 (Amended Proof of Claim No. 18530, filed Aug. 25, 2009, amending Proof of Claim No. 15593, filed by OneBeacon America Insurance Company). Similarly, in exchange for certain plan modifications which the Plan Proponents filed on October 12, 2009, BNSF has withdrawn its objections to the scope of the Successor Claims Injunction, such that BNSF no longer contends that it has claims against Seaton, OneBeacon or CNA. *See* Notice of Second Set of Modifications to Joint Plan of Reorganization, dated 10/12/2009 [Dkt. 23474]; *see* 9/16/2009 Tr. at 85-87.

[323] Seaton and OneBeacon have previously argued that section 524(g) cannot enjoin their claims against Sealed Air, but do not assert this objection in their post-trial brief. To the extent that Seaton and OneBeacon maintain this objection, the Plan Proponents submit that Sealed Air is properly protected by the Asbestos PI Channeling Injunction and direct the Court to the arguments to that effect in their Main Post-Trial Brief, at 136-40 [Dkt. No. 23662].

**11.5    The Objections by BNSF and CNA that They Must Be Fully Protected Under Section 524(g) Are Without Merit.**

11.5.1 The Asbestos PI Channeling Injunction cannot extend to claims asserted against BNSF.

BNSF argues that the Asbestos PI Channeling Injunction should extend to "derivative" claims asserted against BNSF.[324] This argument ignores the plain statutory requirements of section 524(g).[325] Under section 524(g)(4)(A)(ii), a channeling injunction can only bar actions directed against a third party "to the extent [the] alleged liability of such third party arises by reason of – (I) the third party's ownership of a financial interest in the debtor . . . ; (II) the third party's involvement in the management of the debtor . . . ; (III) the third party's provision of insurance to the debtor or a related party; or (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . . ."  BNSF has never so much as alleged that it owned a financial interest in, was involved in the management of, provided insurance to, or was involved in a transaction changing the corporate structure of Grace or any of the other debtor-related entities described in subsections (I) through (IV).  Absent proof that BNSF's liability arises "by reason of" one or more of the relationships specified in section 524(g), the Asbestos PI Channeling Injunction cannot be extended to claims asserted against BNSF.

---

[324]  BNSF Post-Trial Br. § II.A [Dkt. No. 23648].

[325]  As previously stated in the PP Main Post-Trial Brief at 138, BNSF's argument also ignores the fact that protection of third parties under a section 524(g) injunction is permissive, not mandatory. *See* 11 U.S.C. § 524(g)(4)(A)(ii) ("such an injunction *may* bar any action directed against a third party . . .") (emphasis added).

87

11.5.2  CNA's objections to the scope of section 524(g) protection are unfounded.

CNA continues to argue that the Joint Plan should provide for a section 524(g) injunction in favor of insurance companies that settle their coverage obligations more than 10 days after confirmation.[326]  But CNA fails to respond to the showings by the Plan Proponents in the PP Main Pre-Trial Brief that this argument is not a valid objection to a plan.[327]  Among other things, (1) there is no precedent for imposing such a request, and the very case CNA cited, *In re Western Asbestos Co.*,[328] contained an equivalent restriction; (2) such an injunction is merely permissive, not required, in any event; and (3) the fact that objectors to a plan wish it contained different provisions is not a valid objection to confirmation.[329]

CNA also fails to recognize that, because protection under a section 524(g) injunction is permissive, it has no grounds to complain about the scope of such protection.  CNA claims, at pages 29-32 of its post-trial brief, that it is entitled to greater protection under section 524(g) than it has received, but it completely fails to support that assertion with any legal analysis.  There is no requirement that the Plan Proponents extend such protection.  Moreover, CNA makes no showing that, under the August 1990 agreement,[330] any claims other than "products" claims are resolved, and CNA likewise makes no showing that the scope of the injunction should be greater than the scope of the resolved coverage.  CNA also fails to demonstrate that the May 1997

---

[326]  CNA Post-Trial Br. at 20-22 [Dkt. No. 23644].

[327]  PP Main Pre-Trial Br. at 135-136 [Dkt. No. 22733].

[328]  313 B.R. 456, 458 (Bankr. N.D. Cal. 2004).

[329]  *Id.*

[330]  CNA Ex. 32(A) (CNA Settlement Agreement Between W. R. Grace & Co.-Conn., a Connecticut Corporation and Continental Casualty Company).

88

agreement,[331] which is an Asbestos Insurance Reimbursement Agreement under the Joint Plan, should be treated as an Asbestos Insurance Settlement Agreement. The Plan Proponents are not obligated to extend 524(g) protection to policies that are subject to reimbursement agreements where the insurer has not agreed to honor its obligations under those agreements following assignment to the Asbestos PI Trust, just as they are not obligated to extend such protection to unsettled policies as to which the insurer has not agreed to provide coverage to the Trust. With respect to the February 1997 agreement,[332] CNA and the Plan Proponents have reached an agreement that the three policies at issue will be added to Plan Exhibit 5, the Schedule of Settled Asbestos Insurers Entitled to 524(g) Protection. This will resolve CNA's objection with respect to the scope of the protection provided by the Joint Plan with respect to the February 1997 agreement.

CNA also asserts that it may be subject to coverage claims from Scotts for asbestos claims against Scotts.[333] CNA acknowledges that Scotts released all purported rights to the Debtors' insurance policies in the August 2009 settlement agreement between the Debtors and Scotts that has been approved by this Court,[334] but it asserts that the settlement agreement also "expressly states that it provides no rights to CNA and other persons not expressly protected by

---

[331] CNA Ex. 32(C) (CNA Settlement Agreement Between W. R. Grace & Co., a Delaware Corporation, W. R. Grace & Co.-Conn., a Connecticut Corporation, Fresenius National Medical Care Holdings, Inc., and Continental Casualty Company).

[332] CNA Ex. 32(B) (CNA Settlement Agreement Between W. R. Grace & Co, a Delaware Corporation, W. R. Grace & Co.-Conn., a Connecticut Corporation, Fresenius National Medical Care Holdings, Inc., and Continental Casualty Company).

[333] CNA Post-Trial Br. at 4 [Dkt. No.23644].

[334] *Id.* at 4 (citing Approval Order, Dkt. No. 23203).

it."[335] This argument is nonsensical. Scotts' release of any alleged rights to the Debtors'

insurance is crystal clear and expressly includes a release of all claims against the Debtors'

insurers for such coverage:

> Effective upon Scotts' receipt of the Settlement Payment and subject to the terms
> and conditions of this Agreement, Scotts, on behalf of itself and its Affiliates . . .
> hereby forever terminates, waives, releases and otherwise relinquishes: (i) any
> and all right, title or interest of Scotts or any of its Affiliates in or to (a) any
> Asbestos Insurance Policy or any other insurance policy under which any
> Insurance Contributor has or had insurance coverage, (b) any Asbestos In-Place
> Insurance Coverage, (c) any Asbestos Insurance Reimbursement Agreement, and
> (d) any Asbestos Insurance Settlement Agreement, and including the proceeds of
> the foregoing (a)-(d) (the "Released Coverage"), and (ii) all past, present and
> future claims, demands, and causes of action of any nature whatsoever, including
> past, present or future claims or demands for defense costs and expenses
> (including attorneys' fees), whether based on contract, tort, statutory or other legal
> or equitable theory of recovery, whether known or unknown, suspected or
> claimed, under, related to or based upon the Released Coverage against any
> insurer under the Released Coverage (but only with respect to such Released
> Coverage).[336]

### 11.6    Identifying Each of the Entities In the Asbestos PI Channeling Injunction Is Fair and Equitable, With Respect to the Parties That Might Subsequently Assert Demands, In Light of the Benefits to Be Provided to the Asbestos PI Trust on Behalf of Such Entities.

Section 524(g) requires the Court to determine that identifying the Debtors and any third

parties in the section 524(g) injunctions is "fair and equitable, with respect to the persons that

might subsequently assert [] demands, in light of the benefits provided, or to be provided, to such

trust on behalf of such debtor or debtors or third party."[337] The meaning of this provision is clear

and unambiguous -- the injunction must be fair and equitable in light of the contributions made

---

[335]  *Id.* at 4-5.

[336]  Settlement Agreement Between Scotts Co. and W. R. Grace & Co., dated 8/8/2009, at § 2.01 [Dkt. No. 22735]

[337]  11 U.S.C. § 524(g)(4)(B)(ii).

90

on behalf of the parties to be protected by the injunction. And at the Confirmation Hearing, the

Plan Proponents presented substantial and unrebutted evidence that sizable contributions will be

made to the Asbestos PI Trust on behalf of the Asbestos Protected Parties.[338]

In a misguided effort to read additional, unrelated requirements into section 524(g),

Garlock Sealing Technologies, LLC ("Garlock") fabricates a theory that the "fair and equitable"

provision of section 524(g) incorporates an absolute priority rule. What's more is that according

to Garlock, this imagined version of the absolute priority rule is not the absolute priority rule

encompassed by section 1129(b), but is actually the stricter, pre-Code version of the rule that

Congress explicitly rejected when adopting section 1129.[339] This theory appears to be rooted in

Garlock's erroneous interpretation of section 524(g), for which Garlock improperly relies on the

legislative history of section 1129(b) and not section 524(g).[340] The Plan Proponents explained

the flaws of this analysis at length in their Main Pre-Trial Brief.[341] The proper interpretation,

universally adopted by courts, is that an injunction is "fair and equitable" under section 524(g) if

contributions to a plan by or on behalf of a party are sufficient to merit enjoining claims against

---

[338] *See* PP Main Post-Trial Br. at 140-41 [Dkt. No. 23662].

[339] Garlock acknowledges that in *In re Western Asbestos Company*, 313 B.R. 832, 850, n.25 (Bankr. N.D. Cal. 2003), the Court ruled as a matter of law that section 524(g)(4)(B)(ii) does not have the same meaning as in section 1129(b). Although the Court's decision offers no support for Garlock's theory, Garlock improperly relies on this decision for the proposition that "§ 524(g) requires strict absolute priority, from which § 1129(b) retreated." Phase II Trial Br. of Garlock Sealing Tech.'s ("Garlock Pre-Trial Br."), LLC, dated 7/13/2009 at 13, n. 5 [Dkt. No. 22428].

[340] Garlock argues that "[t]he history shows that Congress understood that 'fair and equitable' was a term of art with a precise meaning under long-standing Pre-Code practice." Garlock Pre-Trial Br. at 14 [Dkt. No. 22428]. However, the quote provided by Garlock from the House Report had nothing to with section 524(g) and was provided in the context of a discussion of impairment and section 1129(b). H.R. Rep. No. 103-835, at 214 (1984).

[341] PP Main Pre-Trial Br. at 128-130 [Dkt. No. 22733].

91

that party.[342] Here, the substantial contributions made to the Asbestos PI Trust by the Asbestos

Protected Parties are more than sufficient to establish that the Asbestos PI Channeling Injunction

is fair and equitable.

Garlock's interpretation of section 524(g) is also flawed because it would preclude any

settlement between asbestos claimants and equity in a section 524(g) case. As Garlock admits,

its interpretation would "not allow shareholders in a debtor with asbestos liabilities to retain *any*

property, if that debtor is not going to pay asbestos Demands in full."[343] Thus, under Garlock's

theory, the settlement between the Debtors, the Asbestos PI Committee, the Asbestos PI FCR,

and the Equity Committee, which forms the "foundation" of the Joint Plan, would not be

possible, and highly expensive and protracted litigation would be the only alternative to resolve

Grace's asbestos liability.[344] While this result might benefit Garlock, it would serve the interests

---

[342] *In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 Bankr. LEXIS 3945, at *57-*58 (Bankr. D. Del. Feb. 6, 2006) (finding entry of the Asbestos PI Channeling Injunction is fair and equitable in light of the substantial contributions to be made to the Asbestos PI Trust); *In re Federal-Mogul Global Inc.*, No. 01-10578, 2007 Bankr. LEXIS 3940, at *97 (Bankr. D. Del. Nov. 8, 2007) ("In light of the substantial contributions to be made to the Trust by or on behalf of the Protected Parties, entry of the Third Party Injunction, and the naming of the Protected Parties therein, respectively, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands."); *In re ABB Lummus Global*, No. 06-10401, 2006 Bankr. LEXIS 1462, at *44-*45 (Bankr. D. Del. June 29, 2006) ("[I]n light of the benefits provided, or to be provided, to the Lummus Asbestos PI Trust by or on behalf of each Asbestos Protected Party and Settling Lummus Asbestos Insurance Company, the Lummus Asbestos PI Channeling Injunction and the Lummus Asbestos Insurance Entity Injunction are fair and equitable . . . ."); *In re Combustion Eng'g, Inc.*, No. 03-10495, 2005 Bankr. LEXIS 2623, at *94 (Bankr. D. Del. Dec. 19, 2005) ("In accordance with section 524(g)(4)(B)(ii) of the Bankruptcy Code, in light of the benefits provided, or to be provided, to the Asbestos PI Trust . . . the Channeling Injunction is fair and equitable . . . ."); *In re Mid-Valley, Inc.*, No. 03-35592, 2004 Bankr. LEXIS 1553, at *22 (Bankr. W.D. Pa. July 21, 2004) ("The evidence has shown that with the contribution being made by Halliburton the Asbestos and Silica PI Trusts are funded sufficiently to provide 100% payment for all claims liquidated under the Trusts. In these circumstances, the Court finds it is fair and equitable for Halliburton to receive the benefit of the Permanent Channeling Injunction."); *In re J T Thorpe Co.*, 308 B.R. 782, 790-91 (Bankr. S.D. Tex. 2003) (holding that various injunctions were fair and equitable in light of the contributions made to the trust).

[343] Garlock Post-Trial Br. at 11 [Dkt. No. 23656].

[344] *See* PP Ex. 276 Rev. (Disclosure Statement at 1).

92

of no other creditor or party in interest, and it is clearly inconsistent with the objectives of section 524(g).

For these reasons, extension of the Asbestos PI Channeling Injunction to the Asbestos Protected Parties is consistent with the "fair and equitable" standard of section 524(g), and Garlock's arguments to the contrary are without merit.

## XII.   GARLOCK'S ASSERTION THAT IT WILL RECEIVE NOTHING FROM THE ASBESTOS PI TRUST BECAUSE PLAINTIFFS WILL "CONCEAL AND DEFER" CLAIMS IS CONTRADICTED BY THE FACTS AND THE LAW.

### 12.1   Co-Defendants Like Garlock Can Obtain Contribution from the Asbestos PI Trust, as the Evidence Shows They Have from Other Asbestos Trusts.

Garlock claims in its brief that "the Plan is an overt attempt to transfer 100% of Grace's asbestos liability to defendants surviving in the tort system,"[345] that its anticipated contribution claims against the Asbestos PI Trust will be "valueless," and that Garlock will receive "no benefit" from the Asbestos PI Trust.[346] The evidence introduced by Garlock, however, contradicts these claims.

Garlock has obtained contribution from other asbestos personal injury trusts in just such circumstances. Garlock has sought and obtained, for example, contribution for the judgment it suffered in *Puller v. ACandS, Inc.* from the Armstrong World Industries Asbestos Personal Injury Trust, the USG Asbestos Personal Injury Trust, two Owens Corning Trusts, and the Babcock and Wilcox Trust.[347] It has still other contribution claims pending at other asbestos

---

[345]  Garlock Post-Trial Br. at 5 [Dkt. No. 23656].

[346]  *Id.* at 12.

[347]  Garlock Ex. 73 (Payments to Garlock on Indirect Claims as of July 31, 2009).

93

trusts.[348] It has likewise obtained contribution from numerous trusts in the *Snyder* and *Wilson* cases, with more contribution claims still outstanding.[349] Contribution payments to Garlock for these three cases alone exceeded $600,000 as of July 31, 2009.[350] Despite the evidence of these recoveries, Garlock inexplicably claims that "[c]o-defendants have received ***no benefit*** from the Trusts established to compensate them for the enjoining of their contribution claims."[351] That is clearly incorrect. Moreover, Garlock does not claim, and offers no evidence whatsoever, that the contribution payments associated with those particular cases were too small, or that, as a whole, contribution payments obtained from asbestos trusts by Garlock did not appropriately reimburse Garlock for those instances in which it paid the liability of bankrupt asbestos defendants.

As has been discussed extensively in pre-trial briefing and at the Confirmation Hearing, the proposed Grace TDP, like those of other asbestos personal injury trusts before it, specifically permits third parties who have paid part or all of Grace's asbestos liabilities to make a contribution claim against the Asbestos PI Trust.[352] Thus, an asbestos defendant like Garlock who decides to take a case to trial and loses, and who believes that the judgment it paid reflects

---

[348] *Id.*

[349] *Id.*

[350] *Id.*

[351] Garlock Post-Trial Br. at 12 [Dkt. No. 23656].

[352] PP Ex. 277.04 Rev. (Asbestos PI TDP § 5.6); 9/14/2009 Tr. 42-45 (Inselbuch).

in whole or in part a payment of Grace's liability, can make a claim for contribution against the Asbestos PI Trust.[353]

Garlock's proven ability to obtain satisfactory contribution from other asbestos personal injury trusts, and the evidence that the Asbestos PI Trust will be similar in this respect, demonstrates that Garlock's dire predictions that it will receive nothing are mere hyperbole.

**12.2    Garlock Has Successfully Subpoenaed Other Asbestos Trusts for Claimant Information and Fails to Explain How Similar Provisions in the Grace TDP Would Result in an "Impenetrable Veil of Secrecy."**

Garlock goes on to claim that the TDP "erects an impenetrable veil of secrecy" over claims to the Trust and "shroud[s] them in perfect secrecy."[354] As the evidence amply demonstrates, this is simply wrong.

The TDP does not relieve the Trust from the obligation to respond to a properly issued subpoena.[355] Nor does the TDP affect co-defendants' right to obtain materials submitted to the Trust by claimants from the claimants themselves.[356] Moreover, as a legal matter, requiring a

---

[353] As the evidence shows, parties settling, rather than trying, asbestos personal injury cases generally settle only their several share. 9/15/2009 Tr. 239-240 (Peterson). Thus, a contribution claim is unlikely to arise from a party settling a claim. Nevertheless, contrary to Garlock's argument, there is no absolute prohibition in the TDP against a co-defendant filing an indirect claim arising from a settlement payment if the requirements of state law and the TDP are otherwise met. Indeed, the TDP expressly states that if an Indirect Claimant can establish that, under applicable state law, it has paid all or part of a liability that the Trust had to a Direct Claimant, the Trust shall reimburse the Indirect Claimant the amount of the liability, times the then-applicable Payment Percentage. PP Ex. Rev. 277.04 (Asbestos PI TDP § 5.6).

[354] Garlock Post-Trial Br. at 21, 28 [Dkt. No. 23656].

[355] PP Ex. 277.04 Rev. (Asbestos PI TDP § 6.5); 9/15/2009 Tr. 91 (Inselbuch).

[356] 9/15/2009 Tr. 91 (Inselbuch).

95

subpoena does not affect Garlock's pre-petition legal rights, as it had no pre-petition legal right to obtain such materials from the non-party Debtors' hands without a subpoena.[357]

In fact, Garlock's own exhibits reveal that it has successfully obtained claim materials from other asbestos personal injury trusts using subpoenas.[358]  Garlock's demonstrated capacity to obtain claim information through subpoenas reveals its allegations that the TDP "erects an impenetrable veil of secrecy" to be yet more hyperbole.

### 12.3    Garlock Offers No Evidence that the Confidentiality Provisions or the Ability to Defer Claims Will Affect Garlock's Liability or That of Other Non-Bankrupt Asbestos Defendants.

Garlock offers no evidence that its own settlement values have been impacted by confidentiality provisions or the ability to defer claims associated with existing asbestos trusts, or that similar features of the Asbestos PI Trust will have the same impacts on its settlement values.[359]  Garlock speculates that confidentiality provisions and deferral of trust claims have resulted generally in increases in settlement value for non-bankrupt defendants, but offers no evidence of that causal link.  Indeed, the only testimony on the subject Garlock cites was that of Dr. Peterson, who explained why the emergence of asbestos personal injury trusts over the past several years would *not* reduce settlement values:

---

[357] *See* Fed. R. Civ. P. 34(c) & 45; Del. Super. Ct. Civ. R. 34(c) & 45.

[358] *See, e.g.*, Garlock Ex. 56 (letter from NGC trust producing material in response to Garlock's subpoena); *see also* Garlock Exs. 52-55, 57-64 (copies of claims obtained by Garlock from various asbestos personal injury trusts).

[359] At page 26 of its post-trial brief, Garlock appears to cite Dr. Peterson's testimony for the proposition that the "conceal and defer" strategy "explains why billions of dollars in Trust payments have had no discernable effect on tort system settlement values."  The citation is misleading.  The cited testimony of Dr. Peterson says no such thing; rather, it says the opposite, as shown below.

96

Q    Okay. Is it true that many of these defendants who went into bankruptcy have since emerged from bankruptcy with trusts established to process and pay their claims?

A    Yes, that's true.

Q    And wouldn't the same principles that pushed settlement values up result in at least some downward pressure on settlement values where the defendant's coming -- with these trusts having emerged and begun to pay claims?

A    I don't think so for three reasons. One is that the once a share of your client's company or any company -- once it goes up it's hard to pull it back down. Plaintiff's lawyers are reluctant to reduce their demands. And so it's like paying for gas prices. I mean they tend to move in one direction and sometimes they'll go back down, but they're sticky. Secondly, is that the empirical evidence is that it doesn't happen. When Manville went into bankruptcy in 1982, the obligations and payments by other defendants went up greatly, but when Manville came out of bankruptcy in 1988, even though it was paying a hundred cents on the dollar, the values didn't go up. Whatever those other companies were paying, they continued to pay. And so that's an example of the first point I made.

The third point I make is that these companies are paying very modest percentages and so, if a company was paying a hundred percent of its then market share when it went into bankruptcy and now it's paying 20 percent, it isn't nearly significant of an event.[360]

Having no testimony to support its theory that features of other asbestos trusts raise settlement values, Garlock resorts to calling Dr. Peterson's analysis not "credible."[361] The Court need not entertain such unsupported speculation, and should disregard Garlock's unproven theories.[362]

---

[360] 9/15/2009 Tr. 250-251 (Peterson).

[361] Garlock Post-Trial Br. at 26-28 [Dkt. No. 23656].

[362] Garlock invites the Court to take judicial notice of a chart prepared by Garlock's counsel purporting to show payments a hypothetical claimant might expect from various asbestos trusts. Garlock Post-Trial Brief at 17 n.15[Dkt. No. 23656]. The Court has already ruled that the chart, or one that was substantially identical, was not admissible evidence. 10/14/2009 Tr. at 200. The Plan Proponents object to the request to take judicial notice of the chart on the grounds that the chart is not the proper subject of judicial notice, and that it is instead another attempt to present expert testimony without a witness, proper disclosure, or the opportunity for discovery and cross examination. *See, e.g., Evans v. BV Shipping Co. Lombok Strait*, No. 07-3139, 2009 WL 3233524, at *1-2 (D.N.J. Oct. 5, 2009) (denying request to take judicial notice of table of calculations where no expert foundation had been laid). Here, while certain of the displayed figures may be derived from public sources, there is neither foundational testimony nor any prior agreement of the parties that the information is current and accurate, that the information selected is appropriate for the purpose Garlock intends, or that the calculations displayed have any significance whatsoever.

97

### 12.4    The TDP's Confidentiality Provisions and the Ability to Defer Claims Serve Valid Purposes.

Garlock claims the Grace TDP's confidentiality provisions and the ability of claimants to

defer claims serve no legitimate purpose.[363]  In fact, both serve important, proper purposes.  The

confidentiality provisions of the TDP serve to protect sensitive claimant information, including

medical information, and also provide the Trust the same rights to confidentiality of settlement

discussions enjoyed by other defendants in the tort system.[364]  Claim deferral also benefits the

trust,[365] because deferring claims preserves the assets of the trust.

### 12.5    Garlock Applies the Wrong Legal Standard to the TDP.

Finally, Garlock again frames its complaints about the TDP in terms of the "fair and

equitable" language in 11 U.S.C. § 524(g)(4)(B)(ii).  For the reasons stated in the PP Main Pre-

Trial Brief at 132-133, application of that language to the provisions of the TDP is incorrect.

## XIII.   THE COMMITTEE'S AND MORGAN STANLEY'S NON-LENDER IMPAIRMENT ARGUMENTS LACK MERIT.

In addition to supporting the Lenders' impairment arguments, the Unsecured Creditors'

Committee (the "Committee") objects to confirmation on the ground that the Non-Lenders in

Class 9 are impaired by the Joint Plan as a consequence of the operations of the procedures in the

---

[363]  Garlock Post-Trial Br. at 28-32 [Dkt. No. 23656].

[364]  PP Ex. 277.04 Rev. (Asbestos PI TDP § 6.5); 9/15/2009 Tr. 254 (Peterson); 9/14/2009 Tr. 89 (Inselbuch). Garlock's simplistic invocation of the "ancient principle" that "the public has a right to every man's evidence" fails to acknowledge that the exceptions to that principle are legion.  Indeed, in very case that Garlock cites, *Jaffee v. Redmond*, 518 U.S. 1 (1996), the Supreme Court decided against applying it, recognizing yet another exception – the psychotherapist-patient privilege.  *Id.* at 9.  Moreover, this principle applies to evidence adduced in a court in a trial.  The Trust is not a court.  It is, rather, a successor to a litigant in the tort system, Grace, and is as entitled as Grace or any such litigant to settle cases on a confidential basis.

[365]  9/14/2009 Tr. 86 (Inselbuch).

Joint Plan for calculation of post-petition interest. Morgan Stanley has also argued that they are

impaired under the Joint Plan by the same provisions. Neither objection has merit.

### 13.1    The Interest Dispute Procedures for Class 9 Are Not Ambiguous and Only Apply to Morgan Stanley.

The Joint Plan very clearly sets forth how the Reorganized Debtors propose to pay

holders of General Unsecured Claims. If a holder of a General Unsecured Claim (other than the

Lenders or certain holders of Environmental Claims) asserts such Claim pursuant to an existing

contract that specifies a non-default rate of interest, the Joint Plan states that the Reorganized

Debtors will pay the Allowed amount of the Claim along with the non-default rate of interest.[366]

If the Claim of a General Unsecured Creditor is not based on a contract, then the Joint Plan

proposes to pay the Allowed amount of the Claim along with interest at the rate of 4.19%, which

is the same rate of interest proposed for holders of Environmental Claims.[367] And, if any Non-

Lender Claimants[368] disagreed with the foregoing rate of interest that is provided for under

§ 3.1.9(b), then that Claimant was not compelled to accept the rate that was offered. Rather, the

Joint Plan provides very simple instructions to such Non-Lender Claimants who sought a

different rate.[369] These procedures (which were recommended to the Plan Proponents by the

---

[366] PP Ex. 277.01 Rev. (Plan § 3.1.9(b)(C)).

[367] *Id.* at § 3.1.9(b)(D). In addition and as discussed in prior briefs, the Joint Plan proposes to pay the Lenders interest at a rate of 6.09%, however, if the Court concludes that the rate of interest being offered to the Lenders is somehow discriminatory against other creditors in Class 9 because the Lenders are receiving more than their contractual rate of interest under the Plan (*i.e.*, 6.09% represents a rate previously negotiated with the Creditors' Committee), then the Plan Proponents will have no objection to lowering the rate of post-petition interest paid to the Lenders to the stated non-default rate.

[368] These provisions are limited to Non-Lender Claimants since the Lenders have separate and ongoing litigation regarding the rate of interest applicable to their Claims.

[369] PP 277.01 Rev. (Plan § 3.1.9(d)).

99

Committee, and were adopted from the confirmed plan in the *USG* case),[370]authorized Non-

Lender Claimants in Class 9 to challenge the interest provided under the Joint Plan to the extent

a Holder "believes that it is entitled to post-petition interest at a rate or calculation other than the

treatment set forth in Section 3.1.9(b) of the Plan."[371]  Such Holder was required to "(a) identify

the Claim and the requested rate of post-petition interest applicable to such Claim and (b) attach

documentation supporting the payment of such rate of interest for the Claim."[372]  Notice of these

procedures was sent to all Non-Lender Claimants in Class 9 as part of the Court-approved

solicitation package, and the deadline for making an interest challenge was May 20, 2009.[373]

Only Morgan Stanley came forward with an interest calculation challenge.

Notwithstanding these facts, the Committee argues that the procedures set forth in the

Joint Plan that allowed for Class 9 Claimants to challenge the Debtors' calculation of interest on

individual Class 9 claims are "ambiguous whether such creditors could raise other post-petition

interest related matters, including entitlements to other late or default payment amounts, interest

on interest, or entitlements to state statutory rates of interest . . . ."[374] However, the Committee

fails to mention that these procedures are the very procedures that *they* recommended: "it is true

---

[370] *In re USG Corp.*, Case No. 01-2094 (JFK) (Bankr. D. Del. Mar 27, 2006) (Order Confirming Plan). The general unsecured creditors in *USG* were deemed unimpaired by such procedures.

[371] PP Ex. 277.01(rev) (Plan § 3.1.9(d)(i)).

[372] *Id.*

[373] Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief, dated March 9, 2009 [Dkt. No. 20944].

[374] Joint Post-Trial Memorandum of the Official Committee of Unsecured Creditors and Bank Lender Group in Opposition to Confirmation of First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 2, 2009 [Dkt. No. 23657] ("Lender/Committee Post-Tr. Br. ") at 41.

the provisions in the plan were suggested by the committee and negotiated with the debtors."[375]

More importantly, the Committee fails to mention the fact that the only Class 9 creditor who

came forward to challenge the amount of interest was Morgan Stanley, and as the Plan

Proponents have explicitly stated in prior pleadings and reiterate *infra* in Part 13.2, the Debtors

will pay whatever the Court determines that the Debtors must pay on account of Morgan

Stanley's claims. Accordingly, there is no ambiguity as to what Morgan Stanley may raise to the

Court -- they can raise whatever arguments they want to the Court, and the Court will decide

whether the arguments are appropriate and what post-petition interest rate will apply.

It is, therefore, disingenuous for the Committee to imply the existence of a group of

confused Class 9 Non-Lender Claimants who are not clear on what they can argue as part of their

interest challenge. The fact is that there was one interest challenge made by the Court-approved

deadline -- a deadline that was made known to all Non-Lender Claimants and not objected to by

the Committee. In addition, if the Committee now raises "ambiguity" as a back-door way

around this Court's order approving the procedures and setting the deadline for objecting to the

interest offered by the Debtors, such efforts are inappropriate and should not be countenanced.

*Second,* the Committee argues that § 3.1.9 of the Joint Plan, as modified, impairs Class 9.

The Committee requested that language be added to make clear that the Joint Plan leaves the

Class 9 creditors' rights unaltered to reflect that the Claims were unimpaired. Accordingly, the

Plan Proponents amended § 3.1.9(b) of the Joint Plan to add the following language: "The Plan

leaves unaltered the legal, equitable, and contractual rights to which each such general

---

[375] 6/22/2009 Hrg. Tr. 127 (Comments from K. Pasquale, counsel to Committee).

101

Unsecured Claim entitled the Holder of each such General Claims subject to the preemptory effect of bankruptcy law."[376]

The Committee asserts that the clarifying phrase "subject to the preemptory effect of bankruptcy law" does not comport with the language of section 1124(1).[377] It does. As this Court is well aware, the Debtors on the one hand, and the Lenders and the Committee on the other hand are engaged in a dispute over whether a limitation on post-petition interest in accordance with section 502(b) of Bankruptcy Code constitutes plan impairment under section 1124(1). *PPIE* makes clear that a limitation on post-petition interest as set forth in section 502(b) of the Bankruptcy Code does not constitute plan impairment under section 1124(1).[378] Accordingly, when the Plan Proponents amended the Joint Plan to add the language requested by the Committee, the Plan Proponents added the clarifying language regarding the effect of bankruptcy law to be consistent with the law of impairment and to make sure that by acceding to the amendment, no rights will be waived. The clarifying language simply incorporates *PPIE's* holding that statutory impairment is not plan impairment.

### 13.2    Morgan Stanley Is Not Impaired Under the Joint Plan, and Cannot Raise Any Of Its Interest-Related Arguments to the Court Under § 3.1.9(d) of the Joint Plan.

Morgan Stanley repeatedly has raised various objections to confirmation of the Joint Plan, including that it is impaired under the Joint Plan in violation of section 1124(1), and that

---

[376]  Notice of Second Set of Modifications to Joint Plan of Reorganization, dated October 12, 2009 [Dkt. No. 23474].

[377]  Lender/Committee Post-Trial Br. at 42-43 [Dkt. No. 23657].

[378]  *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.) ("PPIE")*, 324 F.3d 197, 204-05 (3d Cir. 2003).

102

the different rates of interest proposed for different Non-Lender Claimants in Class 9 violates

section 1123(a)(4) of the Bankruptcy Code for failure to provide equal treatment to all holders in

the class. The Plan Proponents have already addressed Morgan Stanley's arguments and why

such arguments are incorrect, and will not repeat themselves here. The Plan Proponents

incorporate by reference their responses to Morgan Stanley's arguments in the Plan Proponents'

Phase II Pretrial Brief at 111 and the Plan Proponents' Supplemental Brief in Support of the

Plan's Designation of Morgan Stanley Senior Funding, Inc. as Not Impaired, dated July 17, 2009

[Dkt. No. 22509] ("PP Supp. Br.").

However, the Plan Proponents wish to respond here to one allegation Morgan Stanley

made in its post-trial brief. Like the Committee's "ambiguity" argument discussed above,

Morgan Stanley claims that "[a]lthough the Debtors have informally indicated that Morgan

Stanley is free to seek whatever it wants in the litigation over post-petition interest, despite

numerous amendments to the Plan, it still does not provide that such a litigant can recover its

attorneys' fees and costs to the extent its contract so provides."[379] As noted above, Morgan

Stanley was the *only* creditor to file a notice pursuant to § 3.1.9(d) of the Joint Plan disputing the

interest rate that was offered by the Plan Proponents, and, by doing so, it has elected to engage in

the procedures set forth in the Joint Plan whereby this Court will decide the amount of Morgan

Stanley's claim. There is no reason to amend the Joint Plan in efforts to list every possible

argument that Morgan Stanley may make before this Court. Furthermore, the Plan Proponents

---

[379] Post-Trial Brief of Morgan Stanley Senior Funding, Inc. in Opposition to Confirmation of the First Amended
Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the
Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative,
and the Official Committee of Equity Security Holders, dated February 27, 2009, filed November 2, 2009, at 6
[Dkt. No. 23636].

did not "informally" indicate to Morgan Stanley what it may argue -- rather, the Plan Proponents *explicitly* stated in a pleading that "the Debtors will pay whatever the Court determines that the Debtors must pay on account of an interest dispute with Morgan Stanley, and the Plan is not intended to change that result."[380] Accordingly, the Plan Proponents believe it is clear, without requiring further plan amendments, that Morgan Stanley can raise whatever arguments it wants to raise to the Court regarding the amount of its claim, and the Debtors will pay them whatever the Court decides. Clearly, this process is not impairing Morgan Stanley, but rather, is part of the claims allowance and disallowance process that is contemplated by the Bankruptcy Code.

## XIV. THE PLAN'S DISSOLUTION OF THE CREDITORS' COMMITTEE DOES NOT VIOLATE ANY PROVISION OF THE BANKRUPTCY CODE.

The Committee argues that it should not be dissolved after the Effective Date because it allegedly needs to take an active role in the Lenders' default interest litigation that is currently on appeal involving this Court's May 19, 2009 Post-Petition Interest Decision[381] The Committee argues that this is the case because the Debtors have made "the Creditors' Committee's conduct relating to the 2005 Letter Agreement and 2006 Letter Agreement a centerpiece of the Debtors' fair and equitable arguments to the Court against the payment of default interest to the Bank Lenders."[382] However, these issues involving the Committee's conduct were factual issues for which the evidence has already been presented and the record is now closed. In addition, although the Lenders are members of the Committee and an appeal is pending in which those

---

[380]  PP Supp. Br. at 5 [Dkt. No. 22509].

[381]  Memorandum Opinion, dated 5/19/2009 [Dkt. No. 21747]. The Committee argues that its existence must continue so that it can participate in the appeal of this decision. *See* Lender/Committee Post-Trial Br. at 43-44 [Dkt. No. 23657].

[382]  Lender/Committee Post-Trial Br. at 43-44 [Dkt. No. 23657].

members are participating, the Lenders have been very ably represented by Mr. Cobb and his

firm, Landis Rath & Cobb LLP, along with the international firm, Paul Weiss Rifkind Wharton

& Garrison LLP throughout these proceedings.  There is no further need, on that basis, for the

Committee to remain constituted incurring additional fees simply to shadow the Lenders'

sophisticated counsel.  Accordingly, the Committee should be disbanded on the Effective Date.

## CONCLUSION

For all of the foregoing reasons, the Joint Plan should be confirmed over all objections.

Dated:  November 20, 2009          Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Deanna D. Boll
Nathaniel J. Kritzer
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800


Lisa G. Esayian
Elli Leibenstein
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000


and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison St.
Suite 2100
Chicago, IL 60602
Telephone:  (312) 641-2162
Facsimile:  (312) 641-2165

and

PACHULSKI STANG ZIEHL & JONES LLP

/s/  James E. O'Neill
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
joneill@pszjlaw.com
kmakowski@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC

/s/ Mark T. Hurford
Mark T. Hurford (Bar No. 3299)
Marla R. Eskin (Bar No. 2989)
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
mhurford@camlev.com

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Kevin Maclay
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P .A.

/s/ John C. Philips
John C. Philips (Bar No.110)
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200
Facsimile: (302) 655-4210
jcp@pgslaw.com

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T Austern, Asbestos PI Future*
*Claimants' Representative*

SAUL EWING LLP

/s/ Teresa K.D. Currier
Teresa K.D. Currier (Bar No. (3080)
222 Delaware Avenue, 12th Fllor
Wilmington, DE  19801
Telephone: (302) 421-6800
Facsimile: (302) 421-6813
tcurrier@saul.com

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
David Blabey
1177 Avenue Of The Americas
New York, NY 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee of Equity Security Holders*