IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et. al.[1] | ) | Case No. 01-01 139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: January 4-5, 2010 at 9:00 a.m.** |

**GRACE'S POST-TRIAL RESPONSE BRIEF REGARDING BANK LENDER ISSUES IN
SUPPORT OF CONFIRMATION OF JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/Ma Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (fMa Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace 11, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (fMa Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (fMa Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (fMa Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B I1 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G I1 Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (Wa Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal 11, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (fMa GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (fMa Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (Wa British Nursing Association, Inc.), Remedium Group, Inc. (Wa Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (flk/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ..................................................................................1

**ARGUMENT** ...........................................................................................................1

**I.    THERE HAS BEEN NO DEFAULT UNDER THE CREDIT
        AGREEMENTS.** ..............................................................................................1

**II.   THE LENDERS ARE NOT AN IMPAIRED CLASS BECAUSE THEY
        FAILED TO COME FORWARD WITH ANY EVIDENCE OF A
        POSTPETITION DEFAULT THAT IS "NOT TIED UP IN THE
        BANKRUPTCY CODE."** ...................................................................................3

**III.  THERE IS LITERALLY NO EVIDENCE THAT THIS IS A "SOLVENT
        DEBTOR" CASE WITHIN THE MEANING OF THE CODE.** ...................................6

        A.    The Committee and the Lenders boldly advocate an absurd test for
              determining whether Grace is solvent for purposes of requiring payment of
              default interest..........................................................................................6

              1.    The Committee's and the Lenders' measure of solvency wrongly
                    assumes that the Plan is effective and the case is over. ............................7

              2.    The Committee and the Lenders also try to displace the very
                    definition of solvency. ...........................................................................13

        B.    Mr. Frezza's analysis does not prove that Grace is solvent...................................15

        C.    Grace's market capitalization does not establish solvency....................................17

**IV.   APPLICATION OF THE FAIR AND EQUITABLE TEST ONLY SERVES
        TO CONFIRM THE PROPRIETY OF THE PLAN'S PROVISION FOR
        POSTPETITION INTEREST.** ..............................................................................18

        A.    Under the facts and circumstances of this case, the Plan rate of
              postpetition interest is more than fair and equitable. ...........................................18

              1.    There is no credible response to the fact that the history of arms-
                    length negotiations demonstrates the Plan rate of postpetition
                    interest was expressly agreed to and is fair.............................................19

              2.    There is no response at all to the fact that the Plan rate is
                    appropriately tailored to the facts here, where there has been no
                    showing of impairment and solvency is still in dispute...........................26

i

3. The Plan rate of postpetition interest is appropriate and generous given how close it comes to providing the Lenders with the maximum amount they could recoup in a non-bankruptcy context..........27

4. The Lenders are the only constituency that has not significantly compromised its claims against Grace's estate.........................................29

B. The absolute priority rule does not prevent equity from retaining value because the Lenders' allowed claim is paid in full. ...............................................31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Beverly Bancorp v. R.W. Hine,
  649 F.2d 1329 (9th Cir. 1981) ...................................................................................................10, 11

In re Adelphia Commc'ns Corp.,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)..............................................................................................23

In re Beverly Hills Bancorp,
  752 F.2d 1334 (9th Cir. 1984) ...................................................................................................10, 11

In re Chateaugay Corp.,
  156 B.R. 391 (S.D.N.Y. 1993)........................................................................................................8

In re Coram Healthcare Corp.,
  315 B.R. 321 (Bankr. D. Del. 2004)...........................................................................................19, 24

In re Dana Corp.,
  No. 06-10354(BRL), 2007 WL 4589331 (Bankr. S.D.N.Y. Dec. 26, 2007).............................................11

In re Duval Manor Assocs.,
  191 B.R. 622 (Bankr. E.D. Pa. 1996) ...............................................................................................9

In re Envirodyne Indus., Inc.,
  No. 93 B 310-319, 1993 WL 566566 (Bankr. N.D. Ill. Dec. 13, 1993) ....................................................12

In re Ferch,
  333 B.R. 781 (Bankr. W.D. Tex. 2005) ...........................................................................................19

In re Gosman,
  282 B.R. 45 (Bankr. S.D. Fla. 2002)...............................................................................................32

In re Heilig-Meyers Co.,
  319 B.R. 447 (Bankr. E.D. Va. 2004) .............................................................................................13

In re Kentucky Lumber Co.,
  860 F.2d 674 (6th Cir. 1988) .......................................................................................................12

In re Liberty Warehouse Assocs. v. Ltd. P'ship,
  220 B.R. 546 (Bankr. S.D.N.Y. 1998)..............................................................................................13

In re Magnatrax Corp.,
  No. 03-11402(PJW), 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003).............................................8

In re Manchester Gas Storage, Inc.,
  309 B.R. 354 (Bankr. N.D. Okla. 2004) .......................................................................................30, 31

**Page(s)**

In re Resorts Int'l, Inc.,
372 F.3d 154 (3d Cir. 2004)........................................................................................7

In re Seven Fields Dev. Corp.,
505 F.3d 237 (3d Cir. 2007)........................................................................................7

In re Spanish Lake Assocs.,
92 B.R. 875 (Bankr. E.D. Mo. 1988)..........................................................................19

In re Titus & McConomy, LLP,
375 B.R. 165 (Bankr. W.D. Pa. 2007).........................................................................31

In re Valley View Shopping Center, L.P.,
260 B.R. 10 (Bankr. D. Kan. 2001) ..............................................................................5

In re Western Farmers Ass'n,
6 B.R. 432 (Bankr. Wash. 1980) ..................................................................................8

Solow v. PPI Enter. (U.S.), Inc.,
324 F.3d 197 (3d Cir. 2003).........................................................................................2

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.,
484 U.S. 365 (1988) .....................................................................................................8


**STATUTES**

11 U.S.C. § 101(10) ............................................................................................................7

11 U.S.C. § 101(32)(A).................................................................................................6, 13

11 U.S.C. § 1101(1) ............................................................................................................7

11 U.S.C. § 1124(1) ............................................................................................................5

11 U.S.C. § 1129(a) ............................................................................................................9

11 U.S.C. § 1129(b)(2)(B) ................................................................................................32

11 U.S.C. § 1141(b) ............................................................................................................7

11 U.S.C. § 502(b) ..............................................................................................................4

11 U.S.C. § 502(b)(2) .........................................................................................................8

12 U.S.C. § 201..................................................................................................................10


**RULES**

Fed. R. Bankr. P. 9023......................................................................................................23

Fed. R. Civ. P. 59(2)(e)......................................................................................................23

**Page(s)**

## PRELIMINARY STATEMENT

The step-by-step analytical path which the Code says should be followed in deciding entitlement to default interest now has been traveled from beginning to end: from examining whether there has been a default, to the allowability of default interest under section 502, to solvency, and finally, to the fair and equitable test under section 1129.  At each step, insuperable legal and factual obstacles have arisen to the Lenders' demand for default interest.  The Lenders have been nothing if not consistent in their response that none of these issues should cause the Court concern because the Lenders need only show (1) that the payments provided for in the loan documents have not been made and (2) that equity is expected to have some value post-confirmation.  Nothing else matters.  In the bright glare of the absolute priority rule (as construed by the Lenders), the clear architecture of the Code, indeed the entire bankruptcy process, shrinks into a dark corner and is of no consequence.  Not only does this approach do irremediable violence to the Code, it blinds the Lenders themselves both to the palpable and undisputed facts that are this case and to the ultimate issue that needs to be decided.  Those facts are that the proposed Plan *does* provide for postpetition interest and at a rate that is both drawn straight from a long history of arms-length dealings between the parties and mirrors the fact that solvency simply cannot be determined.  The issue is whether the Lenders are entitled to *more* interest.  Neither the facts of this case nor the legal framework for decision make entitlement to default interest here a binary equation.  It is multi-factorial.  The Lenders never come to grips with the relevant *bankruptcy* factors and the balance struck by the Plan.

## ARGUMENT

## I.    THERE HAS BEEN NO DEFAULT UNDER THE CREDIT AGREEMENTS.

The Committee and the Lenders continue to cling to the position that Grace defaulted under the Credit Agreements first by filing for bankruptcy and then by failing to pay principal

and interest under the Credit Agreements while the bankruptcy was pending.[2]    And in the process, the Committee and the Lenders continue to ignore the fact that these so-called defaults were solely a function of Grace's bankruptcy filing.    Once Grace filed for bankruptcy, the goal of providing Grace with a "fresh start" rendered unenforceable the *ipso facto* clauses in the Credit Agreements.[3]    And once Grace filed for bankruptcy, interest stopped accruing under the Credit Agreements and Grace was no longer required -- or even permitted -- to pay principal or interest under the Credit Agreements.[4]    Thus, these alleged defaults are, in fact, not defaults at all.

The Committee and the Lender want to simply deny the fact of Grace's bankruptcy filing, and this they cannot do.    The bankruptcy filing changed everything.    After Grace filed, the Lenders no longer had the same rights under the Credit Agreements that they enjoyed outside of the bankruptcy context.    While the Third Circuit made the following observation in the context of limitations imposed by section 502, the overriding concept is a broad one:    "Solow might have received considerably more if he had recovered on his leasehold claims before PPIE filed for bankruptcy.    But once PPIE filed for Chapter 11 protection, that hypothetical recovery became irrelevant."    Solow v. PPI Enter. (U.S.), Inc. ("PPIE"), 324 F.3d 197 (3d Cir. 2003).

Similarly, in this case, if Grace had failed to pay principal or interest to the Lenders before the bankruptcy filing, the Credit Agreements would control and the Lenders might very

---

[2]    Joint Post-Trial Memorandum of the Official Committee of Unsecured Creditors and Bank Lender Group in Opposition to Confirmation of First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code ("Committee and Lenders' Post-Trial Brief"), filed November 2, 2009 at 9-12 [Dkt. 23657].

[3]    Plan Proponents' Phase II Brief Regarding Bank Lender Issues in Support of Confirmation of Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code ("Plan Proponents' Pre-Trial Brief"), filed August 8, 2009 at 19-29 [Dkt. 22732].

[4]    See Plan Proponents' Phase II Brief Regarding Bank Lender Issues in Support of Confirmation of Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code ("Plan Proponents' Pre-Trial Brief on Lender Issues"), filed August 8, 2009 at 15-18, 30-35 [Dkt. 22732].

2

well have been able to recover default interest.  But once Grace filed for bankruptcy protection, "that hypothetical recovery became irrelevant." Id.

## II.    THE LENDERS ARE NOT AN IMPAIRED CLASS BECAUSE THEY FAILED TO COME FORWARD WITH ANY EVIDENCE OF A POSTPETITION DEFAULT THAT IS "NOT TIED UP IN THE BANKRUPTCY CODE."

It was roughly five months ago, on June 22, 2009, that the Court informed the Lenders and the Committee that they would have to present evidence of a default that was "not tied up in the Bankruptcy Code."[5]   No such evidence was ever presented, and that is because no such evidence exists.

The fact that the Lenders have no right to default interest has nothing to do with Grace and its Plan, and everything to do with the Bankruptcy Code.  If the Lenders' rights under the Credit Agreements are "impaired" at all, it is solely because of section 502(b)(2)'s prohibition on the payment of "unmatured interest" and the unenforceability of contractual rights where the enforcement of such rights would conflict with the policies underpinning the Code.  Under the express holding of PPIE, this means that the Lenders are not impaired as a matter of law.  While there is dicta in PPIE to the effect that, in a solvent debtor case, a claim will not qualify as unimpaired unless the claim is also paid postpetition interest, id. at 207, this dicta does nothing to advance the Lenders' demand for default interest.  First, this dicta is just that, dicta, and not part of the express holding of PPIE.  Moreover, at most, it stands for the proposition that a claim must receive some postpetition interest to qualify as unimpaired.  Nothing in PPIE even remotely suggests that the postpetition interest must be paid at the default rate.  To the contrary, PPIE specifically states that "a creditor's rights must be ascertained with regard to applicable statutes,"

---

5    See Transcript of Proceedings Before The Honorable Judith K. Fitzgerald United States Bankruptcy Court Judge, dated June 22, 2009 ("6/22/09 Hrg. Tr.") at 51:9-12.

id. at 204, and there is nothing in the Bankruptcy Code or any other applicable statute that entitles the Lenders to default interest.

Here, Grace's Plan will pay the Lenders postpetition interest.  In fact, it will pay them postpetition interest at a rate higher than the federal judgment rate and higher than the contract non-default rate.  Under such circumstances, neither PPIE nor any other authority supports the Lenders' contention that they are impaired under section 1124(1).[6]

In their post-trial brief, the Lenders and Committee, for the first time, argue that they are somehow impaired because they will not receive postpetition interest until their demand for default interest "has been resolved by a Final Order."[7]  This argument fails for at least two reasons.

*First*, this "impairment" is solely a function of the Bankruptcy Code and thus does not qualify as impairment under section 1124(1) and PPIE.  The Bankruptcy Code specifically calls for the litigation of a claim before any liability can be imposed on the debtor.  In particular, section 502(b) of the Bankruptcy Code provides that where, as here, a debtor objects to a claim, in whole or in part, the Court shall determine the amount of such claim after notice and a hearing.  11 U.S.C. § 502(b).  And section 502(b)(1) expressly disallows claims that are "unenforceable against the debtor and property of the debtor under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  Here, Grace is doing exactly what the Code says -- litigating the Lenders' claim for postpetition interest on the ground that this claim is unenforceable under applicable law, namely section 502(b)(2).

---

[6]   See Plan Proponents' Pre-Trial Brief at 35-41 [Dkt. 23732].

[7]   Committee and Lenders' Post-Trial Brief at 11-12 [Dkt. 23657].

**Second**, the Lenders' new argument fails because it assumes the very right that is at issue. Under section 1124(1) of the Bankruptcy Code, a claim is only impaired if there is some alteration of the "legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Here, the whole question is whether the Lenders have a "legal, equitable, [or] contractual right[]" to postpetition interest in the first place. Until this question has been "resolved by a Final Order," the Lenders have no right to any postpetition interest, and thus they cannot claim to be impaired by the non-payment of such interest.

Nor does In re Valley View Shopping Center, L.P., 260 B.R. 10 (Bankr. D. Kan. 2001), help the Lenders here.[8]  As highlighted in Grace's Opening Post-Trial Brief, the court there determined that the unsecured creditors were **not entitled** to postpetition interest. Valley View, 260 B.R. at 29-30. The court did find impairment, but neither because the creditors were entitled to postpetition interest, nor because their allowed claim was being litigated (it was not). Rather, there was impairment because the plan provided that the creditors would not receive payment of their allowed claim until 90 days after the Effective Date. Id. at 20, 32. Thus, the delay in payment was caused by the plan only, not by the operation of the Bankruptcy Code. This case is entirely different. Here, the Lenders' allowed claim will be paid in full on the Effective Date in accordance with the Plan. See PP Ex. 277.01 Rev. at § 3.1.9(d)(iii). The fact that the Lenders will not also receive postpetition interest on that date is solely a function of the Bankruptcy Code, which expressly calls for litigation of claims and does not allow for payment of the

---

[8]  See Committee and Lenders' Post-Trial Brief at 11-12 [Dkt. 23657] (arguing that Valley View stands for the proposition that they must receive postpetition interest on the Effective Date).

Lenders' claim for interest until the Court determines that the claim is valid and determines the appropriate rate of interest

## III.    THERE IS LITERALLY NO EVIDENCE THAT THIS IS A "SOLVENT DEBTOR" CASE WITHIN THE MEANING OF THE CODE.

Hoping to circumvent section 502(b)'s prohibition on the allowance of unmatured postpetition interest, the Committee and the Lenders argue that in the context of a solvent debtor case the absolute priority rule automatically entitles the Lenders to an award of postpetition interest at the default rate.[9]  The evidence is closed and we can now say with finality that there is no evidence that this is a solvent debtor case.  At the Confirmation Hearing, the Committee and the Lenders did ***nothing*** more than nail a fact that, far from disputing, Grace itself has sought to prove: if the current Plan goes into effect, Grace will emerge from bankruptcy in a solvent condition.  This means that the Plan is feasible, not that Grace is solvent.

### A.    The Committee and the Lenders boldly advocate an absurd test for determining whether Grace is solvent for purposes of requiring payment of default interest.

The Committee and the Lenders cannot escape the fact that Grace's asbestos liabilities have never been resolved and are still in dispute.  This fact makes it impossible to conclude that Grace is a solvent debtor under the Bankruptcy Code's test for solvency -- whether the fair value of a debtor's assets exceeds the value of its liabilities.  <u>See</u> 11 U.S.C. § 101(32)(A).  The Committee and the Lenders do the only thing left -- try to change how solvency is measured. The first and central change is to advocate that solvency should be measured after giving effect

---

[9]    <u>See</u> Committee and Lenders' Post-Trial Brief at 24 [Dkt. 23657]; Joint Pre-Trial Memorandum of the Official Committee of Unsecured Creditors and Bank Lender Group in Opposition to Confirmation of First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("Committee and Lenders' Pre-Trial Brief"), filed July 13, 2009 at ¶¶ 99-108 [Dkt. 22441].

to a plan of reorganization.  This gambit countermands not one but several Code provisions and finds no support in the case law.

> **1.    The Committee's and the Lenders' measure of solvency wrongly assumes that the Plan is effective and the case is over.**

Far from supporting the Committee's and Lenders' position, the Bankruptcy Code itself makes clear that Grace's "solvency" turns solely upon its financial condition as a Chapter 11 debtor, not on its financial condition as a reorganized entity after giving effect to the Plan.  To conclude otherwise would contravene a series of provisions in the Bankruptcy Code.

Sections 101(10)(A) and 101(10)(B).  Under the Code, the claims of all unsecured creditors, including those of the Lenders, are claims against Grace as a Chapter 11 "debtor."  See 11 U.S.C. §§ 101(10)(A) and (10)(B) (defining "creditor" to mean an entity that has a claim against the "debtor" or the "estate"); 11 U.S.C. § 1101(1) ("debtor in possession" means the "debtor").  If the Lenders' claims are against Grace as a Chapter 11 "debtor," then it is the solvency of this Chapter 11 debtor that should determine whether the Lenders are entitled to postpetition interest on their claims.

In the same vein, it is well settled that Grace's chapter 11 estate -- the entity that the Lenders claim should be paying default interest -- will no longer exist the moment that confirmation of Grace's Plan becomes effective.  See In re Seven Fields Dev. Corp., 505 F.3d 237, 258 (3d Cir. 2007) ("post-confirmation the debtor's estate will not exist"); In re Resorts Int'l, Inc., 372 F.3d 154, 165 (3d Cir. 2004) ("the debtor's estate ceases to exist once confirmation has occurred").  That is because "the confirmation of a plan vests all of the property of the estate" in a brand new entity -- the reorganized debtor.  11 U.S.C. § 1141(b).  The fact that the reorganized debtor will emerge as a solvent entity has no bearing on the question of whether the chapter 11 debtor is currently a solvent entity.

7

Section 502(b)(2).   Measuring solvency after giving effect to the Plan also would effectively eviscerate section 502(b) of the Code in all successful chapter 11 reorganization cases.   As previously (and extensively) briefed, section 502(b) broadly prohibits any claim for "unmatured interest," including claims for interest after the petition date that would otherwise accrue pursuant to the terms of a written loan agreement.   11 U.S.C. § 502(b)(2); see also In re Chateaugay Corp., 156 B.R. 391, 403 (S.D.N.Y. 1993) ("502(b)(2) bars postpetition interest on a pre-petition unsecured claim").

While some courts have recognized a judicially-created exception to section 502(b) in solvent chapter 11 cases, this judicial gloss is rarely given effect.   See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd., 484 U.S. 365, 379 (1988) (in the "admittedly rare" case when the debtor proves solvent, both undersecured and wholly unsecured creditors can recover interest); In re Western Farmers Ass'n, 6 B.R. 432, 437 (Bankr. D. Wash. 1980) ("Section 726(a)(5) provides for the payment of interest on claims in the rare case of a solvent estate.").

This "admittedly rare" exception is *not* what the Lenders have proposed here.   Their proposal is to change how solvency is measured with the effect, not of creating an exception, but rather with judicially rewriting section 502(b)'s prohibition on postpetition interest so that *it* is the exception.   Their measure of solvency would swallow the rule prohibiting postpetition interest on unsecured claims because every successfully reorganized chapter 11 debtor will be "solvent" (the only exception being a liquidating chapter 11).   Indeed, that must be so if a plan is to satisfy the feasibility requirement.   See In re Magnatrax Corp., No. 03-11402(PJW), 2003 WL 22807541, at *7 (Bankr. D. Del. Nov. 17, 2003) ("after giving effect to the Plan and the Exit Credit Facility, the Reorganized Magnatrax Debtors will be solvent, *i.e.*, the value of their assets

8

will exceed their liabilities and will be adequately capitalized, thus satisfying the [feasibility] requirements of section 1129(a)(11) of the Bankruptcy Code"); <u>In re Duval Manor Assocs.</u>, 191 B.R. 622, 632 (Bankr. E.D. Pa. 1996) ("[F]easibility involves the question of emergence of the reorganized Debtor in a solvent condition and with reasonable prospects of financial stability and success."). Section 502(b) would be "read" to state an exception rather than a rule.

<u>Section 1129.</u> Under the Code, the whole point of the solvency inquiry is to decide what additional tests, specifically the best interests of creditors test of section 1129(a)(7) and the fair and equitable test of section 1129(b), will be applied *at the confirmation*. Solvency is thus a *predicate* inquiry for the Confirmation Hearing. As the preamble to section 1129 states, both 1129(a)(7) and 1129(b) are intended to be applied when the court is being asked to enter the confirmation order. 11 U.S.C. § 1129(a) ("The court shall *confirm* a plan only if all of the following requirements are met …..") (emphasis added). If the tests of section 1129 must be applied in *deciding confirmation*, simple logic tells us that that the predicate question of the debtor's solvency likewise must be addressed at the time of confirmation. It would make no sense for the Court to have to look to a post-confirmation point in time to decide whether two pre-confirmation requirements had been triggered.

<u>Section 1129(b).</u> The Committee's and the Lenders' approach to solvency would do nothing less than displace the fair and equitable test of section 1129(b) with the feasibility requirement of section 1129(a)(11). Under the terms of the Code, if unsecured creditors are impaired in a solvent debtor case, the court is *required* to carefully balance all equitable considerations under section 1129(b) to determine what rate of postpetition interest, if any, is fair and equitable. In the Lenders' world, there would be no reason for a court to ever engage in a true balancing of the equities under section 1129(b). In that world, if a plan is feasible under

section 1129(a)(11), the debtor necessarily is solvent, and if the debtor is solvent, unsecured creditors are entitled to postpetition interest at the default rate without further inquiry.[10]  Equity is out the window, replaced by application of contract terms without regard to bankruptcy, **precisely** what the equitable powers created centuries ago and vested by the Code in the Bankruptcy Courts are intended to protect **against**.

Not surprisingly, none of the cases cited by the Committee and the Lenders supports the equity-abolishing assertion that solvency should be measured after giving effect to a plan of reorganization.  In re Beverly Hills Bancorp, 752 F.2d 1334 (9th Cir. 1984), for example, was decided under the Bankruptcy Act, not the Bankruptcy Code.  As just discussed, the language of the Code -- specifically, section 1129 -- makes clear that the Lenders' demand for default interest must be determined based on the solvency of Grace as a chapter 11 debtor without giving effect to the Plan.  Beverly Hills Bancorp also is distinguishable on its facts.  That case did not involve liabilities that were in dispute and unresolved at confirmation.  There, the debtor's liabilities had been resolved  through a settlement agreement executed years before its Chapter X plan was even proposed.  See Beverly Bancorp v. R.W. Hine, 649 F.2d 1329, 1332-33 (9th Cir. 1981).  Critically, this settlement agreement was executed **outside** the debtor's bankruptcy in a separate proceeding under the Bank Conservation Act, a federal statute that appoints the Comptroller of Currency as Conservator of all national banks suspected to be insolvent.  Id. at 1332; see also 12 U.S.C. § 201.  The Ninth Circuit ultimately decided that the debtor was solvent because its assets exceeded liabilities that previously had been fixed independently from the plan of

---

[10]    See Committee and Lenders' Post-Trial Brief at 4 [Dkt. 23657] ("as a solvent debtor, the law provides that 'full payment' to the Bank Lenders includes postpetition interest at the contract rate").

reorganization.[11]   Based on this finding, as well as its finding that the equities of the case warranted an award of post-petition interest, the Ninth Circuit found that holders of commercial paper were entitled to an award of postpetition interest at the "legal rate."   See In re Beverly Hills Bancorp, 752 F.2d at 1339.

This case is totally different.   Here, there is no pre-existing settlement agreement or adjudication that fixes Grace's asbestos liabilities.   *To the contrary*, there is only a negotiated compromise that (1) does not even purport to determine those liabilities, and (2) is entirely subject to approval of the Plan that the Lenders ask the Court to reject.   Without the Plan, there is no way to determine the value of Grace's liabilities absent estimation, and even that process would lead to further litigation, as the claimants will object that estimation cannot bind individual creditors.   Also, without the Plan, the assets available to the estate, largely comprised of contributions from Fresenius and Sealed Air, would be far less.[12]

The other cases cited by the Committee and the Lenders do not salvage their arguments. In In re Dana Corp., No. 06-10354(BRL), 2007 WL 4589331 at *9 (Bankr. S.D.N.Y. Dec. 26, 2007), for example, the court never even determined solvency.   All it found was that the plan of reorganization was feasible, and thus confirmable under section 1129(a)(11), because the reorganized debtor would emerge from bankruptcy as a solvent entity.[13]   Similarly, the court in

---

[11]   The liabilities were fixed in 1976.   In 1976, the Conservator liquidated and distributed the "Bank Fund," which was comprised of the assets of a former subsidiary of Bancorp.   After the commercial paper holders received their share of this distribution ($9 million), this fixed Bancorp's liabilities to holders of commercial paper at $1 million under the terms of the settlement agreement.   See Beverly Bancorp v. R.W. Hine, 649 F.2d at 1332-33.

[12]   See 9/17/09 Tr. 131:9-132:1; 134:20-136:7 (Zilly); PP Ex. 511-11 (Zilly Demonstrative); see also Plan Proponents' Main Post-Trial Brief in Support of Confirmation of Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code ("Plan Proponents' Main Post-Trial Brief"), filed November 3, 2009 at 27-28, 53-56 [Dkt. 23662].

[13]   As previously briefed, the court in Valley View made this same determination and still concluded that unsecured creditors were not entitled to postpetition interest because there was no evidence that the debtor was

Continued on the next page…

Envirodyne Industries never actually measured the debtor's solvency. It simply found that the plan in question did not violate the absolute priority rule because the enterprise value of a reorganized Envirodyne would not result in the senior claimants receiving a surplus on their allowed claims.[14]  In re Envirodyne Indus., Inc., No. 93 B 310-319, 1993 WL 566566, at *3, *6 n.7 (Bankr. N.D. Ill. Dec. 13, 1993).

In re Kentucky Lumber Co., 860 F.2d 674 (6th Cir. 1988), actually undermines the contention that solvency should be measured by giving effect to a plan. At confirmation in that case, the debtor clearly "was not solvent." Id. at 678. Its "sole unsecured asset of any substance" was a contingent, unliquidated claim against Ralston-Purina. Id. at 675. Accordingly, the court confirmed a plan which did **not** provide postpetition interest to the unsecured creditors. A year and a half after confirmation, the Ralston-Purina claim settled, resulting in a solvent debtor with sufficient funds to pay all unsecured creditors in full. Id. at 676. The Sixth Circuit agreed with the bankruptcy court that the unsecured creditors still were not entitled to postpetition interest because "the facts reveal that the debtor was truly insolvent at the time of confirmation." Id. at 679. There is absolutely nothing in the opinion to suggest that the court measured solvency after giving effect to the plan.

In re Liberty was a single-asset real estate case. The debtor owned a single, mortgaged building and filed for chapter 11 after it had defaulted on its mortgage payments. In re Liberty

---

solvent as of the effective date. See Grace's Post-Trial Brief Regarding Bank Lender Issues ("Grace's Opening Post-Trial Brief on Lender Issues"), filed November 3, 2009 at ¶¶ 61-65 [Dkt. 23664].

[14]   The importance of the enterprise valuation is made clear in a companion case. There, the court explained that, under the Plan, senior claims were receiving stock in the Reorganized Envirodyne. If the total value of the Reorganized Envirodyne exceeded $729 million after confirmation, the value of this stock would have exceeded the amount of their allowed claim in violation of the absolute priority rule. In re Envirodyne Indus., Inc., No. 93 B 310-319, 1993 WL 566565, at *24, *27, *37 (Bankr. N.D. Ill. Dec. 20, 1993).

Warehouse Assocs. v. Ltd. P'ship, 220 B.R. 546, 547 (Bankr. S.D.N.Y. 1998).  While the court determined that the debtor was solvent, id. at 547, 551, there is nothing to support the Committee's and Lenders' contention that the court reached this determination "[b]ased on the value recovered" from the sale of the building pursuant to the plan.[15]  Indeed, the court just as easily could have reached a determination of solvency prior to the sale of the building.  That is because real property is always an asset of a debtor and does not need to be sold pursuant to a plan of reorganization to qualify as an asset.  See, e.g., In re Heilig-Meyers Co., 319 B.R. 447, 465 (Bankr. E.D. Va. 2004) (finding, as part of its solvency analysis, that the fair value of a debtor's real property was $75,000,000 where it had a book value of $142,521,000).  Had the fair value of the debtor's building in In re Liberty exceeded its liabilities at the time of confirmation -- that is, prior to the sale -- the debtor would still have been solvent.  Because the In re Liberty court never explained the basis for its solvency determination, and because the asset in question had a definite value independent of the plan, there is no basis to read In re Liberty to stand for the proposition that solvency must be measured after giving effect to a plan.

> **2.    The Committee and the Lenders also try to displace the very definition of solvency.**

The Committee and the Lenders are not only wrong in how they measure solvency, they are also wrong in how they define solvency.  According to the express terms of the Bankruptcy Code, the test for solvency is whether the fair value of the debtor's assets exceeds the value of the debtor's liabilities.  See 11 U.S.C. § 101(32)(A).  The Committee and the Lenders substitute their own definition of solvency -- "whether, after paying creditors in full, there is excess value

---

[15]   Committee and Lenders' Post-Trial Brief at 15-16 [Dkt. 23657].

available to be retained by equity under the Plan."[16]    This definition is fundamentally inconsistent with the language of the Bankruptcy Code and should be rejected out of hand.  Nor does application of this test to the facts of this case yield the result for which the Lenders strive. The first part of the definition focuses on whether Grace is "paying creditors in full."  As the Court previously recognized, the answer is plainly no.  See May 19, 2009 Memorandum Opinion ("Claims Objection Op.") [Dkt. 21747] at 2-3.   The Asbestos PI Claimants, for example, certainly would not agree that receiving only 25-35% is "payment in full."[17]

The second part of their substitute definition asks whether "there is excess value available to be retained by equity under the Plan." Again, the answer is no.  There is no such thing as "excess value" under the Plan.  It is not as though Grace simply paid in full all of the Asbestos PI Claimants and had money left over to give to equity.  To the contrary, the Plan represents a heavily negotiated compromise between equity and the Asbestos PI Claimants pursuant to which both of these constituencies made substantial concessions.  The value going to equity under the Plan results solely from this negotiated compromise, not from there being any type of "excess value" in Grace's estate.

Thus, even under the Committee's and Lenders' new legal standard for solvency, there is no basis to conclude that Grace is a solvent debtor.  And there certainly is no evidence that Grace is solvent under the Code's actual test for solvency -- whether the fair value of Grace's assets exceeds the value of its liabilities.

---

[16]    Committee and Lenders' Post-Trial Brief at 14 [Dkt. 23657].

[17]    See e.g., 10/13/09 Tr. 57:3-8 (Zilly) (explaining that, under the Plan, the Asbestos PI Claimants will receive roughly 25-35% of the total recovery for which they could argue).

**B.**    **Mr. Frezza's analysis does not prove that Grace is solvent.**

As discussed in Grace's Opening Post-Trial Brief Regarding Lender Issues, Mr. Frezza's testimony has no bearing on the question of whether Grace is solvent within the meaning of the Code.  His so-called solvency tests involved nothing more than looking at Grace's pro forma financial statements under the Plan and opining that, if the Plan is approved and goes effective, Grace then will be solvent.  But this only shows that the Plan is feasible.  It does not show that Grace is solvent.

In their post-trial brief, the Committee and the Lenders try to resuscitate Mr. Frezza's analysis by stating that "Grace's own financial expert, Pamela Zilly of Blackstone, affirmed the methodology applied by Mr. Frezza is the accepted methodology for performing a solvency analysis" and that Ms. Zilly offered no solvency opinion to dispute Mr. Frezza's analysis.[18]  Nothing could be further from the truth.

First, while Ms. Zilly said that the three tests typically used in determining solvency are "a balance sheet test, an adequate capital test and whether or not the debtor has the ability to pay its debts as they come due,"[19] she certainly never testified that Mr. Frezza had properly applied these tests.  To the contrary, Ms. Zilly specifically testified that Mr. Frezza's application of these tests was hopelessly flawed.[20]

More specifically, in response to questions posed during cross examination, Ms. Zilly testified that simply adopting Grace's pro forma financial statements (assuming the Plan was

---

[18]    See Committee and Lenders' Post-Trial Brief at 18, 21-22 [Dkt. 23657].

[19]    9/16/09 Tr. 105:7-11 (Zilly).

[20]    9/16/09 Tr. 140:10-141:23 (Zilly).

effective), as Mr. Frezza had done, was ***not*** a balance sheet test for solvency.  Her testimony on

this point could not be clearer:

> Q.    Ms. Zilly, let me try it this way.  Could you -- isn't it true
> that you have issued an opinion that Mr. Frezza has
> incorrectly applied the expert methodology of the balance
> sheet test for solvency in issuing his opinion regarding
> Grace's solvency?
>
> A.    Yes.  My opinion stated that I thought there were flaws in
> Mr. Frezza's "balance sheet test" one of which was that I
> didn't think it was a balance sheet test.
>
> Q.    Did you -- do you have a belief or an opinion that Mr.
> Frezza did not correctly calculate the value of Grace's
> liabilities when he performed that test?
>
> A.    The reason I'm having trouble with this line of questioning
> is because my understanding is that Mr. Frezza simply took
> Grace's balance sheet, assuming the plan had gone
> effective.  So to the extent that you say value or not value,
> he simply adopted Grace's balance sheet on a pro forma
> basis assuming the plan had gone effective.[21]

The same criticism applies with equal force to Mr. Frezza's adequate capital test and his test of

whether or not the debtor has the ability to pay its debts as they come due.

Ms. Zilly's testimony highlights just how thoroughly Mr. Frezza has blurred the critical

distinction between solvency and feasibility.  In concluding that Grace's Plan is feasible, Ms.

Zilly, like most restructuring experts, relied on Grace's pro forma financial statements assuming

the Plan had gone effective.  Mr. Frezza, for his part, did exactly the same thing in concluding

that Grace is solvent.  If all it takes to establish solvency is evidence that a plan is feasible, then,

as discussed above, every debtor to emerge from chapter 11 would be a solvent debtor.

---

[21]    9/16/09 Tr. 141:6-25.

Second, the Committee and the Lenders are also wrong in their contention that Mr. Frezza was the only one to opine on Grace's solvency.  Ms. Zilly did opine on solvency.  She opined that Grace's solvency **could not be determined**.  More specifically, Ms. Zilly testified that Grace's asbestos personal injury liabilities have never been "fixed" and there is no methodology that can be used to even begin to approximate these liabilities.[22]  Thus, as Ms. Zilly testified, it is not possible to render a formal opinion regarding Grace's solvency.[23]

   C.     **Grace's market capitalization does not establish solvency.**

The Committee and the Lenders also recycle their contention that Grace's market capitalization serves as a proxy for solvency.[24]  The market capitalization argument is really just derivative of the contention that solvency should be measured after giving effect to Grace's Plan.  There is no evidence that Grace's market capitalization reflects the market's view that Grace **currently** is solvent.  Instead, Grace's market capitalization can only reflect the market's speculation that Grace will emerge in solvent condition **after giving effect to the Plan**.  History bears this out, as the evidence shows that Grace's market capitalization has fluctuated wildly over the past few years in response to traders' speculation as to the most likely outcome of Grace's total liabilities, most notably its Asbestos PI Claims.[25]  Even the Committee's and the Lenders' former expert, Mr. Ordway, long ago conceded that the Grace's market capitalization cannot be deemed a proxy for solvency.  In that regard, he testified that Grace's market

---

[22]   9/16/09 Tr. 106:15-107:1 (Zilly).

[23]   9/16/09 Tr. 107:2-6 (Zilly)**.**

[24]   See Committee and Lenders' Post-Trial Brief at 22-23 [Dkt. 23657].

[25]   See Plan Proponents' Pre-Trial Brief on Lender Issues at 44-45 [Dkt. 22732]; see also Declaration of Pamela D. Zilly in Support of Debtors' Objection to the Unsecured Claims Asserted Under the Debtors' Credit Agreements Dates as of May 14, 1998 and May 5, 1999  at 4, 8-9, dated Aug. 14, 2008 [Dkt. 19325].

capitalization, at any particular time, may reflect a variety of factors having nothing to do with the company's performance.[26]

## IV.    APPLICATION OF THE FAIR AND EQUITABLE TEST ONLY SERVES TO CONFIRM THE PROPRIETY OF THE PLAN'S PROVISION FOR POSTPETITION INTEREST.

On its face, section 1129 of the Bankruptcy Code does not contain any exceptions to Section 502(b)'s prohibition on the allowance of postpetition interest.  Nevertheless, in solvent debtor cases (which this is not), some courts have fashioned exceptions to this broad prohibition based on the "best interests" test of section 1129(a)(7) and the "fair and equitable" requirement of section 1129(b).  Critically, however, these exceptions are limited to those creditors whose claims are impaired.  As discussed above, the Lenders are not impaired as a matter of law, and thus the exceptions grounded in section 1129 do not apply.  And even if those exceptions did apply, the Lenders still would have no entitlement to default interest.  Payment of default interest certainly is not required under the best interests test or the fair and equitable test.  Nor is an award of such interest warranted under the absolute priority rule, which, as discussed below, is concerned only with the payment of an allowed claim and has nothing whatsoever to do with postpetition interest.

### A.    Under the facts and circumstances of this case, the Plan rate of postpetition interest is more than fair and equitable.

The Committee and the Lenders plainly assert that, if they can demonstrate impairment and solvency, the Lenders are *automatically entitled* to postpetition interest at the default rate (absent proof that they have impeded these bankruptcy cases).[27]  Once again, such an approach

---

[26]   Ordway 8/29/08 Dep. Tr. 31:7-15.

[27]   See Committee and Lenders' Post-Trial Brief at 4, 24-26 [Dkt. 23657]; Committee and Lenders' Pre-Trial Brief at ¶¶ 99-108 [Dkt. 22441].

would mock the Code itself, which calls for the Court to exercise its equitable powers -- the opposite of action by formula.  Nor has any court ever adopted such a rigid, formulaic approach. Instead, courts have agreed that the determination of what rate of postpetition interest is "fair and equitable" under section 1129(b) entails a discretionary analysis of ***any and all*** equitable factors that touch upon the interest rate.  See <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321, 346 (Bankr. D. Del. 2004) ("[T]he specific facts of each case will determine what rate of [postpetition] interest is 'fair and equitable.'"); <u>In re Ferch</u>, 333 B.R. 781, 785 (Bankr. W.D. Tex. 2005) ("A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is '***fair and equitable***.'") (emphasis in the original); <u>In re Spanish Lake Assocs.</u>, 92 B.R. 875, 878 (Bankr. E.D. Mo. 1988) ("flexibility was legislated into the Bankruptcy Code by the very fact that terms such as 'fair and equitable' resist precise definition").

Here, consideration of the relevant equitable factors demonstrates the rate of postpetition interest provided for in the Plan is more than fair and equitable.

> ***1.    There is no credible response to the fact that the history of arms-length negotiations demonstrates that the Plan rate of postpetition interest was expressly agreed to and is fair.***

The Committee and the Lenders have long had no answer to a factual record which shows (1) that they specifically negotiated for, and agreed to, the rate of postpetition interest set forth in the Plan; (2) that Grace regularly relied upon that rate in its financial statements and monthly operating reports, all with no objection from the Committee or the Lenders; and (3) that the Committee never withdrew from its agreement on postpetition interest during all the years

that Grace was litigating the estimation proceedings and negotiating the Asbestos Term Sheet.[28]

Grace has also previously demonstrated that neither the Committee nor the Lenders have done

anything to support Grace in its efforts to emerge from chapter 11.[29]    But during the

Confirmation Hearing, it became clear for the first time that the Committee and the Lenders had

actually taken affirmative steps to ***impede*** Grace's reorganization efforts through a pattern of

conduct that has all the hallmarks of a classic "bait and switch."[30]

As Lewis Kruger candidly admitted during the Confirmation Hearing, the Committee and

the Lenders developed a strategy whereby, at the eleventh hour, the Lenders hoped to profit at

the expense of the other constituencies.    For years the Committee and the Lenders led Grace to

believe that they would stand by their prior agreements on postpetition interest.    But as we now

know, that was never their intention.    The Committee and the Lenders knew that they were going

to renege on their agreements, but they made the calculated decision to remain quiet throughout

the estimation proceedings and the Proposed Asbestos Settlement negotiations for fear of

undermining the process and thereby putting their own recovery at risk.    And of course, once the

other constituencies had agreed to the Proposed Asbestos Settlement and there was no longer any

threat to the Lenders' principal, the Committee and Lenders quickly reversed course and

demanded default interest.    This scheme, if successful, could threaten the very viability of

Grace's Plan.    Indeed, if the Plan rate of postpetition interest is changed as a result of the

Lenders' scheme, the equity holders would be well within their rights to reject the Plan and force

---

[28]    See Grace's Post-Trial Opening Brief on Lender Issues at ¶¶ 77-84 [Dkt. 23664].

[29]    See Debtors' Trial Brief In Support of Objection To the Unsecured Claims Assert Under The Debtors' Credit Agreements Dated As of May 14, 1998 And May 5, 1999, at ¶¶ 66-77 [Dkt. 19476].

[30]    See Grace's Post-Trial Opening Brief on Lender Issues at ¶¶ 16-21 [Dkt. 23664].

Grace to resume the estimation litigation over the asbestos claims.[31]   That being the case, it strains credulity for the Lenders to argue that they have done nothing to impede the administration of these Chapter 11 Cases.[32]

In their post-trial brief, the most that the Committee and the Lenders can say in defense of their conduct is that Mr. Kruger "began to tell Mr. Shelnitz no later than the spring of 2007 that the bank debt was trading in the marketplace at a price that indicated that many if not most holders were expecting to receive default interest."[33]  But even that is not true.  Mr. Kruger did not tell Mr. Shelnitz that "many if not most holders" were expecting default interest.  In fact, Mr. Kruger could not possibly have made such a statement, because he had no idea whether a majority of the Lenders would oppose a plan that did not provide for default interest.[34]  All he told Mr. Shelnitz was that "holders" were expecting to receive default interest, without ever indicating whether this meant a majority of the holders.[35]

Nor is there any truth to the Committee's and Lenders' assertion that Grace made the strategic decision to exclude the Committee from negotiations over the Asbestos Term Sheet because Grace "knew that it did not have the support of the Creditors' Committee or its constituency."[36]  Instead, the real reason that Grace did not include the Committee in these negotiations was because Mr. Shelnitz and Mr. Kruger had already reached an understanding that

---

[31]   See PP Ex. 277.01 Rev. (Plan § 7.7(xx)).

[32]   Committee and Lenders' Post-Trial Brief at 27-29 [Dkt. 23657].

[33]   Id. at 37.

[34]   9/16/09 Tr. 228:13-229:6 (Kruger).

[35]   9/16/09 Tr. 226:24-227:3 (Kruger).

[36]   Committee and Lenders' Post-Trial Brief at 40 [Dkt. 23657].

in "any negotiations with the personal injury committee we [Grace] were going to fight for, negotiate for the rate agreed upon in the 2006 letter agreement, and the committee and committee counsel were quite content to let the debtors negotiate on their behalf."[37]  Mr. Shelnitz and Mr. Kruger also recognized that involving the Committee in the Asbestos Term Sheet negotiations likely would prompt the Asbestos PI Claimants to request that the Lenders "take a cut in their -- in recovery of the amount of their principal."[38]

Mr. Kruger, for his part, admitted that if he had any concerns about whether the view of the Committee's constituency was being represented in the Asbestos Term Sheet negotiations, he simply could have informed the Asbestos PI Claimants that the Lenders were going to insist upon default interest.  But he never did so.[39]  The reason, as we now know, is clear -- the Committee and the Lenders surreptitiously delayed making any demand for default interest until after all of the other constituencies had agreed to the Asbestos Term Sheet so as not to jeopardize the recovery of their principal.[40]  To reward such opportunistic behavior would hardly be equitable.

In an effort to downplay their conduct during these chapter 11 cases, the Committee and the Lenders resort to the hyper-technical argument that the agreements on postpetition interest were executed only by the Committee, while "no Bank Lender was a party to any postpetition

---

[37]  9/16/09 Tr. 64:4-16 (Shelnitz).

[38]  9/16/09 Tr. 76:9-23 (Shelnitz).

[39]  9/16/09 Tr. 205:23-206:7 (Kruger).

[40]  See 9/16/09 Tr. 232:10-233:1; 233:15-18; 234:4-9 (Kruger); see also Grace's Opening Post-Trial Brief on Lender Issues at ¶¶ 19-20 [Dkt. 23664].

agreement with Grace."[41]  This argument is wrong as a matter of law and immaterial as a matter of fact.

In its Claims Objection Opinion dated May 19, 2009, the Court already determined that Mr. Thomas Maher, former Chairperson of the Creditors' Committee and Administrative Agent for the Bank Lenders, entered in the agreements on postpetition interest as the authorized representative of the entire Committee, including the Lenders.  See Claims Objection Op. at 2 n.3.  Remarkably, some six months later, the Lenders and Committee now try to dismiss the Court's determination as a "drafting issue," arguing that what the Court really meant to say was that the Committee entered into those agreement on its own behalf and not as authorized representative of other Committee members, such as the Lenders.[42]  This belated attack on the Court's ruling is not well-taken.  If the Committee and the Lenders truly believed that the Court had made a drafting error, as they now claim, the proper procedure was to file a motion to alter or amend the Court's judgment within 10 days after that judgment was handed down.  See Fed. R. Bankr. P. 9023; Fed. R. Civ. P. 59(2)(e).  It is far too late in the day for the Committee and the Lenders to now complain about alleged drafting errors.

Moreover, the Court's May 19, 2009 Opinion makes clear that there was no drafting error.   In its Opinion, the Court specifically distinguished this case from In re Adelphia Commc'ns Corp., 368 B.R. 140, 232 (Bankr. S.D.N.Y. 2007), a case where two members of the ACC Senior Noteholders Committee executed the plan agreement in their individual capacity, rather than in their capacity as authorized representatives of other ACC senior bondholders.  See

---

[41]   Committee and Lenders' Post-Trial Brief at 30 [Dkt. 23657].

[42]   Id. at 30 n.49.

23

Claims Objection Op. at 2 n.3.  Thus, it seems that the Court meant exactly what it said -- that the Committee entered into the agreements on postpetition interest as the authorized representative of all its members, including the Lenders.  And the record clearly supports this conclusion.  In particular, when the Committee renegotiated the agreement on postpetition interest in February 2006, it sought to change the rate of postpetition interest only for the Lenders, and not for any of the other unsecured creditors.[43]  This fact amply demonstrates that, as a matter of law, the Committee was acting as the authorized representative of the Lenders in entering into the agreements on postpetition interest.

And in the end, whether the Lenders are legally bound by the letter agreements on postpetition interest is really beside the point.  Whether the Lenders have a contractual obligation under those agreements to vote for this Plan does not matter.  What matters is that the undisputed evidence shows that the Committee and the Lenders were anything but equitable in their dealings with Grace.  They intentionally misled Grace into believing that they would stand by their agreements on postpetition interest, only to renege on those agreements when they saw the opportunity to reap a windfall.  This is precisely the type of inequitable conduct that warrants the denial of their demand for default interest.  See In re Coram Healthcare Corp., 315 B.R. 321, 346-47 (Bankr. D. Del. 2004) (finding that the equities did not warrant payment of post-petition default interest in large part because the "[n]oteholders have consistently acted as a group in this case in advancing their interests and opposing the Equity Committee").

Despite this undisputed record, the Committee and the Lenders actually have the temerity to argue that they "have made the administration of these cases possible" because Grace has had

---

[43]    See 9/16/09 Tr. 33:10-34:2 (Tarola); PP Ex. 286 at 1; see also Grace's Opening Post-Trial Brief on Lender Issues at ¶¶ 7-10 [Dkt. 23664].

the use of the Lenders' money for over seven years.[44]  In support of this misguided contention, the Committee and the Lenders point to the Declaration of their prior expert, Edwin Ordway. But both Mr. Ordway and the Lenders overlook one very salient point -- it was not these Lenders' money.   Indeed, throughout these bankruptcy cases, the Lenders have struggled to distance themselves from the January 2005 and February 2006 agreements on postpetition interest by trumpeting the fact that these agreements were reached by a different set of lenders. As the Lenders previously proclaimed:  "We do not believe that any of these holders remain Bank Lenders today."[45]  If that is true, Mr. Ordway and these Lenders cannot, at the same time, credibly argue for postpetition interest at the contract default rate on the ground that Grace had the use of these Lenders' money for over seven years.

Moreover, as Mr. Ordway admitted during his deposition, he had no idea how much, if any, of the unpaid interest under the Credit Agreements was actually used in Grace's operations.[46]  Mr. Ordway acknowledged that Grace had substantial cash balances, and thus he could not say that Grace in fact used any of the unpaid interest in operations.[47]  Thus, even if Grace did in fact have the use of the money of these Lenders for over seven years, which is not the case, the Committee and the Lenders have no basis to say that any of the unpaid interest on these funds was actually used in Grace's operations.

---

[44]   Committee and Lenders' Post-Trial Brief at 27 [Dkt. 23657].

[45]   See Response of the Bank Lender Group in Opposition to the Debtors' Objection to Claims Asserted Under the Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999, filed July 11, 2008 at ¶ 23 [Dkt. 19073].

[46]   Ordway 8/29/08 Dep. Tr. 59:4-8.

[47]   Id. at 59:9-20, 60:14-61:11.

**2.      *There is no response at all to the fact that the Plan rate is appropriately tailored to the facts here, where there has been no showing of impairment and solvency is still in dispute.***

The undisputed record shows that, in 2005, when Grace and the Committee reached their first agreement on postpetition interest, Grace's solvency was very much in doubt and there had been no allegation, let alone any proof, of a default under the Credit Agreements.  And in 2006, when Grace and the Committee renegotiated their agreement, Grace's solvency was still very much in doubt, and there still had been no allegation, let alone any proof, of a default under the Credit Agreements.  Under those circumstances, the Committee and the Lenders took the position that a rate of postpetition interest that was higher than the contract rate, but slightly lower than the default rate, was fair and equitable.  Today, these circumstances are largely unchanged.  Grace's solvency is still in dispute, and, while the Lenders have now made allegations of defaults under the Credit Agreements, there is still no proof of any default entitling them to default interest.  Thus, the same reasons that originally prompted the parties to agree to the rate of postpetition interest in the Plan now compel the conclusion that this rate is fair and equitable under section 1129(b).

The Committee and the Lenders argue that a default rate of 2% above the contract rate is "reasonable."[48]   This argument is a red herring.  Whether a particular rate of interest is commercially reasonable in a vacuum is completely beside the point.  The issue is whether the rate of postpetition interest set forth in the Plan is reasonable as an equitable matter in ***bankruptcy*** under ***bankruptcy*** law.  The answer is clearly yes.  Where the Lenders cannot demonstrate a postpetition default entitling them to default interest, where Grace's solvency is

---

[48]    See Committee and Lenders' Post-Trial Brief at 29 [Dkt. 23657].

still in dispute, and where the Committee and the Lenders have confessed to intentionally misleading Grace to further their own financial interests, a Plan that pays the Lenders postpetition interest at a rate higher than the federal judgment rate and higher than the non-default contract rate is plainly fair and equitable.  Indeed, the Plan pays postpetition interest at the exact rate that the Committee and the Lenders bargained for and agreed to.

>>>  ***3.    The Plan rate of postpetition interest is appropriate and generous given how close it comes to providing the Lenders with the maximum amount they could recoup in a non-bankruptcy context.***

At the hearing held on October 26, 2009, the Court requested that counsel for Grace and the Committee provide information concerning the comparative "return to the shareholders as opposed to the banks."[49]  In their post-trial brief, the Committee and the Lenders dance around this issue without ever actually showing how the return to the Lenders compares to the return to the other constituencies on a percentage basis.[50]  Instead, the Committee and the Lenders compare the change in value of the interest on their unsecured debt to the change in value of Grace's equity as if these are comparable securities.[51]  They are not.  Grace stock and the unsecured debt are two totally different kinds of securities.[52]  Indeed, it is a matter of basic economics that debt accretes value based solely upon interest, whereas equity's value depends upon a whole host of factors having nothing to do with interest.[53]

---

[49]  See Transcript of Proceedings Before The Honorable Judith K. Fitzgerald United States Bankruptcy Court Judge, dated October 26, 2009 ("10/26/09 Hrg. Tr.") at 58:10-15.

[50]  See Committee and Lenders' Post-Trial Brief at 5-6 [Dkt. 23657].

[51]  Id.

[52]  Ordway 8/29/08 Dep. Tr. 31:16-21.

[53]  Ordway 8/29/08 Dep. Tr. 31:22-24; 33:22-34:2.

Moreover, it makes no sense to characterize fluctuations in Grace's stock price during the bankruptcy as "return" on equity. As discussed above, because of Grace's potentially massive and unresolved asbestos liabilities, Grace's stock price during bankruptcy reflects speculation about the outcome of this case, *i.e.* the post-confirmation stock value. And if the Committee and the Lenders want to talk about the "return" on equity, they have to take into account the fact that, under the Plan, equity value will include roughly $1.632 billion less than the Equity Holders believe they are entitled to receive. Nor will Equity Holders retain $1.58 billion of value under the Plan (as of October 30, 2009) as the Committee and Lenders assert.[54]

After accounting for its other obligations, primarily obligations under (a) the Asbestos PI Deferred Payment Agreement, (b) the Class 7A Asbestos PD Deferred Payment Agreement, (c) the Class 7B Asbestos PD Deferred Payment Agreement, and (d) the Black-Scholes value of the warrants issued to the Asbestos PI Trust, Grace estimates that its shareholders will only retain $431 million to $821 million in reorganized Grace.[55] That is substantially less than the value that Grace's equity holders enjoyed when the Credit Agreements were executed. For example, Grace's equity value (that is, its market capitalization) was $ 1.49 billion when the May 14, 1998 Credit Agreement was executed. Thus, the value that Grace's equity holders will receive under the Plan is 44.9% to 71.1% lower than it was when the 1998 Credit Agreement was executed. Similarly, when the May 5, 1999 Credit Agreement was executed, Grace's equity value was $1.12 billion. Equity will receive 26.7% to 61.52% less than this under the Plan. Even today, Grace's current market capitalization, before payment of asbestos liabilities under the Plan dilutes equity, is roughly $1.7 billion, which is only a 14.1% increase since the first Credit

---

[54]  Id. at 2, 6, 8-9, 15, 17, 23, 25-36

[55]  See PP Ex. 276 Rev. (Disclosure Statement § 2.11.1.- §2.11.2.6 at 47-49).

Agreement was executed well over 10 years ago.  And as noted above, even this market capitalization is based on speculation as to the outcome of the bankruptcy.

The Lenders, by contrast, are doing far better under the Plan.  Under the Plan, the Lenders will receive $347.6 million in post-petition interest, which, when added to the $500 million of principal and approximately $2.23 million in accrued prepetition interest that they will receive, translates into a total recovery of approximately $849.83 million.  By comparison, awarding the Lenders postpetition interest at a compounded default rate would yield $445.4 million in postpetition interest, with a total recovery of $947.73 million.  This is the most that the Lenders could ever recoup under the Credit Agreements in a non-bankruptcy context.  Thus, the Plan provides the Lenders with roughly 90% of the absolute maximum yield under the Credit Agreements.[56]  It is 69.5% more than their principal investment

### 4.    The Lenders are the only constituency that has not significantly compromised its claims against Grace's estate.

Every major constituency, with the exception of the Lenders, has made significant concessions to facilitate the Plan.  Indeed, the only reason that the Lenders stand to receive their principal and any postpetition interest whatsoever is because all of the other constituencies have agreed to significantly compromise their claims against Grace's estate.  The Lenders are more than happy to accept the concessions of the other constituencies, yet they are unwilling to make any concessions of their own.  This equitable factor, standing alone, is sufficient to warrant a denial of the Lender's demand for default interest.

---

[56]    The calculations provided in Grace's Opening Post-Trial Brief were accurate as of December 31, 2008.  These updated calculations are accurate as of November 20, 2009.

The case of <u>In re Manchester Gas Storage, Inc.</u>, 309 B.R. 354 (Bankr. N.D. Okla. 2004), is directly on point. The debtors in that case, Manchester Gas Storage, Inc. and MSL, Inc., owned and operated an underground gas storage facility. <u>Id</u>. at 362. Shortly after the debtors filed for bankruptcy, the court approved the sale of this facility to a third party for $42.2 million. <u>Id</u>. at 363. The court then confirmed a plan of reorganization pursuant to which the debtors appointed a Plan Agent to serve as the representative of the debtors' estate. <u>Id</u>. at 365. It was the job of the Plan Agent to administer the proceeds of the sale among the competing claims of the secured lender, the equity holder, and the "gas claimants," who claimed an interest in the gas that was sold with the underground facility or had claims for damages for fraudulent representations that gas they purchased was stored at the facility. The claims of these gas claimants exceeded $200 million, well more than the assets of the estate. <u>Id</u>. at 363. For more than a year, the Plan Agent engaged in negotiations to resolve the majority of the outstanding claims against the debtors. These efforts culminated in the "Global Settlement" between and among the gas claimants, the secured lenders, and the equity holder. <u>Id</u>. at 367. The Global Settlement resulted in a surplus for the debtors' estate. <u>Id</u>. at 385.

The Global Settlement, however, did not resolve claims asserted against the debtors by an unsecured creditor. After the Global Settlement was in place, the unsecured creditor added a demand for postpetition interest to his claims, arguing that an award of such interest was warranted because the estate was solvent. <u>Id</u>. at 381. The court rejected this argument in the first instance because the unsecured creditor previously had accepted the plan, which did not provide for postpetition interest. <u>Id</u>. at 382. But the court also found that, even had this not been the case, the unsecured creditor still was not entitled to an award of postpetition interest because the equities did not favor such an award. <u>Id</u>. at 385. That was because, as the court stated, "the

surplus resulted from the Global Settlement in which all other claimants not only foreswore any claim to post-petition interest, ***but also significantly compromised their sizable claims.***" Id. (emphasis added).

This case is indistinguishable from In re Manchester Gas. The only reason that the Committee and the Lenders can even begin to argue that Grace is solvent is because all of the major constituencies, including equity and the Asbestos PI Claimants, "significantly compromised their sizable claims" to facilitate the Plan; all major constituencies that is, except the Lenders. Under identical circumstances, the court in In re Manchester Gas found that that the equities did not favor awarding unsecured creditors any postpetition interest whatsoever. See also In re Titus & McConomy, LLP, 375 B.R. 165, 177-79 (Bankr. W.D. Pa. 2007) (where debtor's general partners retained all residual value under the plan after paying all allowed clams in full, the court refused to provide postpetition interest to one group of unsecured creditors where another group of unsecured creditors would not receive postpetition interest because that would "*unfair* to these other creditors") (emphasis in the original).[57] So even if the Committee and the Lenders could establish impairment and solvency, the discretionary analysis of what is fair and equitable counsels in favor of a rate of postpetition interest that is at most equal to, and quite possibly less than, what is already provided for in the Plan.

### B. The absolute priority rule does not prevent equity from retaining value because the Lenders' allowed claim is paid in full.

The Lenders and the Committee continue to mischaracterize the absolute priority rule, arguing that it is "black-letter law that shareholders are not entitled to recovery from an insolvent

---

[57]    Here, of course, the Asbestos PI Claimants fall far short the total recovery for which they could argue pursuant to a compromise that enables the Lenders to receive ***their*** full claim.

estate."[58]  From this erroneous premise, the Committee and Lenders deduce that because Grace's shareholders will retain equity under the Plan, Grace is solvent and default interest must be paid. This argument is wrong as a matter of law.

The absolute priority rule is tied to payment of the allowed claim, not solvency.  All that rule requires is payment in full of the "allowed amount" of the unsecured creditors' claims before equity can retain value (when a class of unsecured creditors is impaired and does not accept the Plan by the required majority).  See 11 U.S.C. § 1129(b)(2)(B); see also In re Gosman, 282 B.R. 45, 48 (Bankr. S.D. Fla. 2002) (the absolute priority rule provides that "if unsecured creditors do not receive payment in full on their allowed claims, then no holder of a claim or interest junior to those of the unsecured creditors may retain any property under the plan"). Here, the Lenders' "allowed claims" under section 502(b) are comprised solely of the principal and interest that was due and owing under the Credit Agreements as of the petition date, and do ***not*** include postpetition interest.  Because the Lenders will receive the full amount of their allowed claims under the Plan, the absolute priority rule does not in any way prevent equity from retaining value in the reorganized debtors.[59]

## **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in Grace's Opening Post-Trial Brief Regarding Lender Issues, Grace respectfully requests that the Plan be confirmed over the objection of the Creditors' Committee and the Lenders.[60]

---

[58]  Committee and Lenders' Post-Trial Brief at 23 [Dkt. 23657].

[59]  See Plan Proponents' Pre-Trial Brief on Lender Issues at 51-53 [Dkt. 22732]; Grace's Post-Trial Opening Brief on Lender Issues at ¶¶ 89-92 [Dkt. 23664].

[60]  The Committee's and Lenders' good faith objection and the Committee's additional objections are meritless and are not obstacles to Plan confirmation.  These issues are addressed in Plan Proponents' Main Response Brief.

Continued on the next page…

Dated: November 20, 2009       Respectfully submitted,
Wilmington, Delaware

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Eric Leon
Justin S. Brooks
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and

   /s/  James E. O'Neill
PACHULSKI, STANG, ZIEHL & JONES LLP
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

---

See Plan Proponents' Main Post-Trial Response Brief in Support of Confirmation of the Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code at 1-4, 98-104.  .