## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

### FEE AUDITOR'S FINAL REPORT REGARDING
### FEE APPLICATION OF KIRKLAND & ELLIS LLP
### FOR THE THIRTY-THIRD INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Fee Application of Kirkland & Ellis LLP for the Thirty-Third Interim Period (the "Application").

## BACKGROUND

1.      Kirkland & Ellis LLP ("K&E") was retained as counsel to the Debtors.  In the Application, K&E seeks approval of fees totaling $6,993,800.50 and expenses totaling $2,316,977.21 for its services from April 1, 2009 through June 30, 2009 (the "Application Period").

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time and expense entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2009, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, Issued January 30, 1996 (the "U.S. Trustee Guidelines"), as well as for

consistency with precedent established in the United States Bankruptcy Court for the District

of Delaware, the United States District Court for the District of Delaware, and the Third

Circuit Court of Appeals. We served an initial report on K&E based on our review, and

received a response from K&E, portions of which response are quoted herein.

### DISCUSSION

3.      We note that with respect to the fees for the previous application period (the Thirty-Second

Interim Period), K&E had agreed with the debtors to voluntarily reduce the amount of its

fees by $906,426.30. Thus, in our initial report, we asked K&E to advise us of any reductions

or adjustments to which it agreed for the current Application Period. K&E responded as

follows:

> K&E and the Debtors agreed to an effective fee reduction of $378,686.00 for the Fee
> Period. K&E and Grace agreed to a cap of $2,000,000 for K&E's criminal defense
> legal fees for the month of April 2009. The actual amount billed by K&E's criminal
> defense team for its work during the month of April was $2,378,686.00. Of the
> $378,686.00, Grace has deducted 80%, or $302,940.80, from amounts it has already
> paid K&E, and Grace will deduct the remaining 20% (or $75,737.20) when it pays
> K&E the holdback amount after the Fee Application is approved.

We appreciate K&E's response and note that K&E's voluntary fee reduction of $378,686.00 is

reflected in our fee recommendation in Paragraph 17, *infra*.

4.      In our initial report, we noted two instances in which several K&E professionals and

paraprofessionals attended the same hearing. However, it was unclear from the time entries

why all attendees needed to be present. See Exhibit "A." Paragraph II.D.5. of the U.S.

Trustee Guidelines provides: "If more than one professional from the applicant firm attends

a hearing or conference, the applicant should explain the need for multiple attendees." Thus,

for each hearing listed, we asked K&E to explain why it was necessary for each attorney and

legal assistant to be present, as well as the role of each attendee.  K&E provided a response

which we have included as Response Exhibit "1."  We accept K&E's response and have no

objection to these fees.

5.      In our initial report, we noted certain instances in which multiple K&E attorneys and

paralegals attended the same deposition.  See Exhibit "B."  Thus, for each deposition listed,

we asked K&E to explain why it was necessary for each attorney and paralegal to be present,

as well as the role of each attendee.  K&E provided a response which we have included as

Response Exhibit "2."  We appreciate K&E's willingness to deduct $1,870.50 in fees for the

time spent at deposition by law clerk Jamie Crown.  We accept the remainder of K&E's

response, except with respect to the telephonic attendance by associate Karen Lee at the

Whitehouse and Molgaard depositions.  Although K&E has explained Ms. Lee's role in

deposition preparation, the response does not carry K&E's burden of proving the necessity

of Ms. Lee's attendance at the depositions.  Thus, we recommend disallowance of Ms. Lee's

time at the Whitehouse and Molgaard depositions, for a reduction of $3,680.00 in fees.  This

reduction, combined with the reduction for the fees billed by Jamie Crown, totals $5,550.50

in fees.

6.      In our initial report, we noted that on May 7, 2009, attorneys Tyler D Mace ($535) and Scott

A McMillin ($645) assisted in the breakdown of the Montana criminal trial site and the

packing and organization of materials.  The total time spent was 14.50 hours for total fees

of $8,527.50.

| 5/7/2009 | Tyler D Mace | 7.50 | 4,012.50 | Assist D. Bernick with trial and assist with breakdown of trial site. |

| 5/7/2009 | Scott A McMillin | 3.80 | 2,451.00 | Pack and organize trial materials (3.8);....... |
| 5/11/2009 | Scott A McMillin | 3.20 | 2,064.00 | Organize, pack and archive trial materials and confer with team members re same. |

We note that the bulk of this work, which spanned several days, was performed by project assistants billing at much lower hourly rates. There is authority in this district for adjusting rates downward for certain tasks. "Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983). Similarly, "[w]hen an experienced attorney does clerk's work, he or she should be paid clerk's wages." *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 855 n.34 (3rd Cir. 1994). Thus, we asked K&E to explain why this time should be compensated at the attorneys' full hourly rates. K&E provided the following response:

    (a) Tyler Mace's Time:

        May 7th was the day after closing arguments in the criminal trial. Not knowing the verdict, Tyler Mace spent the day breaking down the trial site with a view to preserving issues for possible sentencing and appeal. If the verdict had come back guilty, K&E would have had a limited amount of time in which to lodge an appeal, and it was important that the defense be ready to file an appeal promptly in that event. Additionally, many of the issues the defense developed for trial on the merits would be relevant to any sentencing hearing. Accordingly, Tyler spent May 7th reviewing the initial steps the defense would need to take in the event of a guilty verdict and isolating the materials at the trial site that should be given priority treatment after the verdict. He did not bill any time for breaking down the trial site after Grace received the not guilty verdict. Instead, that work was performed by defense team members with lower billing rates.

    (b) Scott McMillin's Time:

        Of particular importance in this case was the fact that the Libby Claimants

were one of the major Plan objectors.  There was a great deal of overlap between the expert issues in the criminal case and in the bankruptcy case.  Scott's primary role on the defense team was the preparation of Grace's expert case -- the part that had the most overlap with the bankruptcy case -- and K&E's defense team had developed and refined its expert case on those issues during the criminal trial.  In addition, K&E defense team attorneys learned a great deal about the strengths and weaknesses of the Libby Claimants' expert case, and wanted to preserve that knowledge and material for the Plan Confirmation Hearing.  Scott spent a good deal of time separating the useful from the not useful for bankruptcy case purposes.  His time spent conferring with team members meant that he talked with bankruptcy team attorneys to discuss whether certain criminal trial materials might be useful in the bankruptcy proceedings.  Scott then organized and labeled those potentially useful materials for use in the bankruptcy case.

K&E respectfully requests payment in full for Tyler Mace's and Scott McMillin's time described above.

We understand K&E's response, as well as the importance of the work performed.  Nevertheless, we do not believe that K&E has carried its burden of proof that tasks such as these justify these attorneys' full hourly rates.  We therefore recommend that the time entries listed above be compensated at an hourly rate of $250.00, which we note is the rate of a senior paralegal at K&E, for a reduction of $4,902.50 in fees.

7.      In our initial report, we also noted that legal assistant Daniel T Rooney ($250) billed 51.9 hours for total fees of $12,975.00 on activities related to the packing and moving of the items at the Montana trial site:

| | | | |
|---|---|---|---|
| 5/7/2009 | Daniel T Rooney | 6.00 | Break down trial site infrastructure and organize work product files. |
| 5/12/2009 | Daniel T Rooney | 6.00 | Break down trial site infrastructure and organize work product files. |
| 5/13/2009 | Daniel T Rooney | 7.00 | Break down trial site infrastructure and organize work product files. |
| 5/14/2009 | Daniel T Rooney | 8.00 | Break down trial site infrastructure and organize work product files. |
| 5/19/2009 | Daniel T Rooney | 7.00 | Break down trial site infrastructure and organize work product files. |

| 5/20/2009 | Daniel T Rooney | 7.00 | Break down trial site infrastructure and organize work product files. |
| 5/21/2009 | Daniel T Rooney | 7.00 | Break down trial site infrastructure and organize work product files. |
| 6/26/2009 | Daniel T Rooney | 3.90 | ......; remove remaining client furniture and secure storage for same (3.9). |

Thus, we asked K&E to explain why this work should be charged at the legal assistant's full hourly rate.  K&E responded:

> Dan's time "breaking down trial site infrastructure" and his time spent "organizing work product files" are really two distinct sets of tasks.

> (a) Trial Site Breakdown

> Trial site breakdown refers to work such as: obtaining bids for the removal and storage of furniture owned by Grace; setting up schedules for the computer systems to be taken down; and working with the landlords of the trial sites regarding final move-out and inspection processes so that security deposits could be returned. Dan also finalized agreements with vendors for cleaning, catering, and trash removal so that final billing cycles could be set.  (Since there was no way of knowing when the trial would end, many of these agreements had notice provisions.)  Given the scope of the trial site infrastructure (more fully described in the 32nd Period Response), Dan's trial site infrastructure breakdown tasks were akin to managing the dissolution of a small law firm.

> (b) Organization of Work Product

> During big, complex trials such as the Grace criminal trial, there are so many witnesses that the trial attorney team generates a huge amount of work product, mainly files that summarize the key facts and/or science related to specific topics and individual witnesses.  Huge numbers of attorney hours go into the development of these files, and it is extremely important to organize them so that the client isn't billed for the re-creation of the work.  This was particularly important for Grace, as many of the witnesses who testified in the criminal matter were also potential witnesses in the Plan Confirmation Hearing.  During the course of the criminal trial, many of these files were developed, used, and set aside.  Once the criminal trial ended, K&E defense team members needed to review the files and isolate them by topic and individual so that they could be recalled quickly.  Dan conducted much of this review and organization.  Once back at K&E, many of these files were immediately requested by the Grace bankruptcy team to use in their confirmation hearing preparation.

For these reasons, K&E respectfully requests payment in full for Daniel Rooney's time described above.

We accept K&E's response and have no objection to these fees.

8.    In our initial report, we noted that technical services personnel Derek J. Bremer ($240) and

Marvin R. Gibbons ($235) spent 120.00 hours for 28,397.50 in fees disassembling the

equipment at the Montana trial site and packing it for transport back to Chicago and

Washington, DC.  See Exhibit "C."  These activities appeared to be in the nature of packing.

Thus, we asked K&E to explain why this work should be charged at the employees' full

hourly rates.  K&E responded as follows:

> The Initial Report requests that we explain why 120 hours spent, collectively, by firmwide trial site coordinator Marvin Gibbons and Chicago trial technology specialist Derek Bremer should be charged to the Debtors at Marvin's and Derek's regular hourly rates.

> The time at issue represents far more than packing up the Missoula trial site. Some of the many trial site breakdown tasks performed by Marvin and Derek included:

> - determining whether every item to be removed belonged to Grace, K&E, an outside vendor, a joint defense firm, or some other party;

> - selecting the appropriate shipping containers for the huge variety of different electronics utilized at the trial site;

> - arranging for delivery of fragile and/or difficult-to-package electronic and other materials back to K&E and/or other joint defense firms;

> - properly shutting down and securely packaging servers in order that data could be restored once the servers arrived back at K&E;

> - accounting for every item of inventory so that Grace would not be charged for missing inventory;

> - removing office infrastructure, per the terms of the office leases' provisions that the sites had to be returned to their original condition;

and

- managing hired movers and drivers.

In the 32nd Period Response, we described in detail the scope and size of the Missoula trial offices. Marvin's and Derek's specialized skills and knowledge and familiarity with the trial offices and their specific technological issues made them the most logical and efficient choices to complete the trial site take-down.

For these reasons, K&E respectfully requests payment in full for Marvin's and Derek's time listed on Exhibit "C" to the Initial Report.

We understand the importance of the work performed by Mr. Bremer and Mr. Gibbons. Nevertheless, the skills required for the tasks described in the foregoing response do not appear to justify the full hourly rates of these technical personnel. Thus, we recommend that the fees for this work be reduced to $155.00 per hour, the rate which K&E charges for its project assistants, for a reduction of $9,797.50 in fees.

9.          In our initial report, we noted the following time entry in which the total time billed exceeded the time recorded within the entry:

| | | | |
|---|---|---|---|
| 5/6/2009 | David M Boutrous | 7.00 | Compile certain 30(b)(6) deposition notices served by Libby claimants (2.0); prepare chart of Libby-related expert reports filed by Debtors and PI Committee (1.5); cite-check response in support of motion to strike A. Whitehouse expert report (3.3). |

The total time billed was 7.00 hours for fees of $1,085.00. However, the recorded time totaled only 6.80 hours for fees of $1,054.00. In response to our inquiry, K&E stated: "The time entry contains an editing error, and K&E agrees to a $31.00 reduction (0.2 hous x $155/hour) as suggested in the Initial Report." We appreciate K&E's response and recommend a reduction of $31.00 in fees.

10.          In our initial report, we noted the following air fare charges for which more information was needed:

| 3/27/2009 | 2,568.55 | Tyler Mace, Airfare, Washington, DC/Missoula, MT, 03/27/09 to 04/06/09 (Trial) |
| 4/4/2009 | 1,056.20 | Sandra Fiore, Airfare, Missoula, MT, 04/04/09 to 04/04/09 (Trial) |
| 3/4/2009 | 2,017.90 | Walter Lancaster, Airfare, Missoula, MT - Seattle, WA - Atlanta, GA, 03/04/09 (Trial) |

In response to our inquiry, K&E provided the following information concerning these charges:

The Initial Report identifies three airfare charges with respect to which you request additional information. Each such airfare, followed by the requested information, is set forth below.

(a) Tyler Mace Airfare:

| 3/27/2009 | 2,568.55 | Tyler Mace, Airfare, Washington, DC/Missoula, MT, 03/27/09 to 04/06/09 (Trial) |

This airfare relates to Tyler trying to fly out of Missoula during a one-week break in the criminal trial. Because all counsel were trying to leave the trial site at the same time, most flights out of Missoula were booked. Therefore, Tyler initially booked a flight out of Helena (a 90-minute drive from Missoula). He then got onto a flight out of Missoula by flying standby. His date of return to Missoula was moved up one day in order to provide him an extra day to prepare for an unexpected development in the case. The original ticket, purchased on March 20, 2009, was for a roundtrip ticket from Helena to Washington, D.C. via Denver and return. It was booked at the lowest refundable coach fare of $1,602.53. The change of departure city from Helena to Missoula resulted in an additional fee of $476.98. Moving his return trip to Missoula up one day added an additional $489.04, bringing the total to $2,568.55.

(b) Sandra Fiore airfare:

| 4/4/2009 | 1,056.20 | Sandra Fiore, Airfare, Missoula, MT, 04/04/09 to 04/04/09 (Trial) |

This airfare expense, for the same travel date as Tyler Mace's above, is for the cost of a one-way ticket from Missoula to New York via Minneapolis. Sandra's trip also related to the weeklong Court break that started April 4th. It was more cost-effective to fly Sandra home to the New York office to work there for the week than to have her remain in Missoula, and so the decision was made to fly her to New

York.  The ticket was purchased on April 3rd and was booked at the lowest refundable coach fare.  The team did not know until April 3rd whether Sandra would need to stay on in Missoula during the Court break, and so the ticket was not purchased earlier.

      (c) Walter Lancaster airfare:

3/4/2009   2,017.90   Walter Lancaster, Airfare, Missoula, MT - Seattle, WA - Atlanta, GA, 03/04/09 (Trial)

      This airfare expense is for Walter Lancaster's round trip travel from Missoula to Atlanta via Seattle, with return travel from Atlanta to Missoula via Salt Lake City. The ticket was purchased on March 4, 2009, and booked at the lowest refundable coach fare.  The flight was scheduled at the last minute because it was not clear until that day (which was the end of a trial week) that Walter would be able to take a weekend off.[1]

      Because each of these airfares was booked at the lowest available coach rate and was properly billed to the Debtors, K&E respectfully requests full reimbursement for these flights.

We accept K&E's response and have no objection to these expenses.

11.     In our initial report, we noted the following air fare charge for which more information was

needed:

5/1/2009   591.48    David Bernick, Airfare, Iowa - Chicago, 05/01/09 to 05/01/09 (Trial)

As we were unaware of any hearings or depositions taking place in Iowa, we asked K&E to confirm

that the foregoing charge was not billed to the WR Grace case in error.  K&E responded:

      ... The questioned airfare is for David's flight from Des Moines, Iowa to O'Hare Airport in Chicago, and is properly chargeable to Grace.  David had a meeting in Iowa on another matter, and had flown to Des Moines directly from the criminal trial in Montana.  That flight was not charged to Grace.  Because he was due to fly back

---

[1]Walter's travel was for a personal weekend off, which occurred very rarely during the course of the criminal trial.  Walter, for example, left Missoula only two or three times during the course of the pre-trial and trial.

to Chicago from Montana at that time, he would have charged Grace the cost of the Montana-Chicago flight (which would have been significantly higher than the cost of the Des Moines-Chicago flight). As such, the Iowa-Chicago flight is properly chargeable to the Debtors, and K&E respectfully requests full reimbursement for such flight.

We accept K&E's response and have no objection to this expense.

12.    In our initial report, we noted the following ground transportation charge which appeared excessive:

6/9/2009    437.58    Brian Stansbury, Cabfare, Morgantown, WV, 06/09/09 (Attend Deposition)

In response to our inquiry, K&E provided the following information:

The ... (charge) is a June 9, 2009, $437.58 Boston Coach charge for Brian Stansbury's car service from Morgantown, West Virginia, where he was attending a deposition on behalf of the Debtors, to the Pittsburgh International Airport. As explained in prior fee applications, car service companies routinely charge for time spent starting when the car leaves the company's hub until the car returns to the hub. The total hub-to-hub time for the trip totaled 5 hours and 10 minutes at a rate of $78.00 per hour with a $30.03 fuel surcharge. K&E passed along to the Debtors its frequent-use discount of $21.45.

It appears to us that the use of a Pittsburgh-based car service for the June 9, 2009 trip from Morgantown, West Virginia, to Pittsburgh International Airport was uneconomical. The distance between Morgantown and Pittsburgh is 80 miles and takes about 90 minutes to drive. We understand that there are currently no direct commercial airline flights from Morgantown to Pittsburgh.[2] Nevertheless, it seems to us that renting a car for the trip would have been the obvious practical choice. A full-size rental car could have been delivered to Mr. Stansbury at the

---

[2]All of the flights we found for this trip had one or two stops and were 7 to 9 hours in length.

Morgantown Airport and dropped off by Mr. Stansbury at the Pittsburgh Airport the next day for less than $300.00. Thus, for the June 9 charge, we recommend a reduction of $137.58 in expenses.

13.    In our initial report, we noted the following meal charges for which more information was needed:

| | | |
|---|---|---|
| 2/20/2009 | 206.25 | Khalid Osman, Travel Meal with Others, Missoula, MT, 02/20/09, (Trial), Lunch for joint defense team |
| 1/14/2009 | 196.00 | EUREST DINING SERVICES (CAFÉ 200), Catering Expenses, Scott McMillin, 1/14/2009 (Expert Witness Conference), Lunch for 4 people |

It appears to us that one can dine satisfactorily at lunch for $35 in most locales. In response to our inquiry, K&E provided the following information:

<u>February 20th, 2009 Joint Defense Team Lunch Charge...</u>

This was a working lunch held for the entire joint defense team, and was attended by approximately twenty-five individuals from K&E and other joint defense law firms. No K&E defense team members submitted lunch expense receipts on this day. Since the per-person lunch expense was well under the recommended cap, K&E respectfully requests full reimbursement.

<u>January 14th, 2009 Expert Witness Conference Lunch...</u>

This luncheon was held in Chicago, and, in accord with the recommended meal expense caps, K&E agrees that the charge should be reduced by $56.00 ($196.00 - $140.00 recommended cap on lunch expense for four people).

We appreciate K&E's response and recommend a reduction of $56.00 in expenses.

14.    In our initial report, we noted the following catering expenses for which more information was needed:

| | | |
|---|---|---|
| 4/7/2009 | 52,098.20 | HILTON GARDEN INN - Travel Catering Services for the WR Grace Trial Sites from 3/15/09 to 3/26/09 |

4/15/2009 30,562.00 BRAVO CATERING LLC - Travel Catering Services rendered for Breakfast, Lunch and Dinner from 4/6/09 through 4/15/09

4/30/2009 34,975.64 BRAVO CATERING LLC - Travel Office Expenses Catering, Services rendered for Breakfast, Lunch & Dinner from 4/16/09 through 4/30/09

5/14/2009 71,844.74 ALL EVENTS CATERING - Travel Meals, Catering Services, January 22, 2009 - February 11, 2009

5/15/2009 17,857.53 BRAVO CATERING LLC - Trial Office Expenses, Catering Services rendered for Breakfast, Lunch and Dinner from 5/1/09 through 5/15/09

In response to our inquiry, K&E provided us with copies of the itemized invoices for these expenses, which we reviewed, and, in addition stated as follows:

The requested invoices are attached . . . . [I]ncluded in each Exhibit is a detailed breakdown of the meals provided each day by each caterer, as well as a calculation of per-meal, per-person cost. Also, to help explain these charges, below we provide an explanation of the way in which catering services were set up.

K&E assumed responsibility, with Grace's approval, of providing meals for the entire joint defense for the duration of the time significant numbers of joint defense personnel were in Missoula (for both the pre-trial and the trial period). This was done in order to save money, on behalf of Grace, since meals were purchased in bulk, and to save time, on behalf of defense team members, since the meals were brought into the office. Generally, K&E contracted with the three listed catering services for enough food to feed the entire joint defense team three meals per day on court days. On non-court days, two meals were usually catered. The Exhibits detail exactly how many meals were ordered each day. K&E used three different catering services (each for a period of several weeks) in order to provide some meal variety to the team members.

Because all of these catering expenses were properly chargeable to the Debtors, and because the price of all of the ordered meals fell beneath the recommended per-meal caps, K&E respectfully requests full reimbursement for these catering expenses.

We accept K&E's response and have no objection to any of the expenses, with the exception of the $34,975.64 invoice from Bravo Catering. In the course of totaling the charges on the invoice, we found an overcharge of $1,350.00 on the meals purchased for April 30, 2009.[3] This overcharge, plus the 18% surcharge thereon, resulted in a total overcharge of $1,593.00. Thus, in order to correct this error, we recommend a reduction of $1,593.00 in expenses.

15.    In our initial report, we noted the following charges for which more information was needed:

| 4/8/2009 | 80,256.50 | NERA - Professional Fees, Services for the period 2/24/09 to 3/23/09 |
| 3/1/2009 | 47,600.85 | TELEMED INC - Professional Fees, Analysis of Libby Issues, Fees and Expenses, January 2009 |
| 3/9/2009 | 46,437.50 | TELEMED INC - Professional Fees, Analysis of Libby Issues, Fees and Expenses, February 2009 |
| 4/1/2009 | 27,750.00 | TELEMED INC - Professional Fees, Analysis of Libby Issues, Fees and Expenses, March 2009 |

Thus, we asked K&E to explain the nature of these charges, and K&E responded as follows:

NERA Economic Consulting

The NERA expense listed above is for its analysis of ZAI asbestos property damage ("ZAI") claims made against the Debtors. Dr. Denise Martin of NERA served as an expert witness for the Debtors regarding ZAI issues, and NERA's work described in this invoice was done to support Dr. Martin's expert opinion regarding future ZAI demands. With regard to the specific time frame covered by the questioned invoice, NERA reviewed and analyzed ZAI claims data and prepared summary analysis tables; researched and reviewed articles regarding estimates of the number of homes with ZAI installed; researched data on steel frame building construction and construction of buildings potentially using acoustical tiles; reviewed relevant information from trusts set up in other asbestos bankruptcy proceedings; and

---

[3]Although the cost of the meals for April 30, 2009 totaled $1,813.00, Bravo billed $3,163.00 for the meals on that date. The difference ($1,350) plus the 18% surcharge ($243) thereon equals $1,593.00.

reviewed other companies' pleadings, financial documents and other materials regarding property damage claims, and various issues respecting the risk of future ZAI claims. NERA also drafted reports, prepared trial exhibits, and consulted with K&E on the ZAI issues.

Telemed Inc.

The other three questioned expenses are for expert work performed by Telemed, Inc. We refer you to the 32nd Period Response for a detailed description of Telemed and its head, Dr. Henry Glindmeyer.

Telemed was charged with: assigning exposure categories to all of the patients whose records were produced by Dr. Alan Whitehouse; developing pulmonary lung function slopes for the same individuals; and answering a litany of different questions about that population including when they were first diagnosed and by whom. Telemed also developed a comprehensive study based on the 6,000+ person ATSDR database that correlated pulmonary function test results with various x-ray findings and exposure categories. Telemed's work was reflected in the expert reports of Dr. David Weill, who was scheduled to testify about Telemed's work in the Confirmation Hearing, and Telemed worked with K&E during this period to address issues involving the ATSDR database that may have arisen during the Confirmation Hearing.

Because all of these professional expenses are properly chargeable to the Debtors' estate, K&E respectfully requests reimbursement in full.

We accept K&E's response and have no objection to these expenses.[4]

16.     In our initial report, we noted the following charge for books or articles:

4/15/2009        307.70        David Boutrous - Information Broker/Doc Svcs, Book/Articles

Pursuant to Paragraph II.E.7. of the U. S. Trustee Guidelines, library and publication charges are considered noncompensable overhead. Thus, we asked K&E to explain why the estate should reimburse this expense. K&E responded as follows:

---

[4]We further note that pursuant to the Order Authorizing the Retention of Experts filed herein on June 22, 2001 (Docket No. 564), the fees and expenses of experts are not subject to our review.

This charge is for 24 articles K&E ordered for use in its preparations for depositions of expert witnesses scheduled to testify at the Plan Confirmation Hearing. All of the articles were cited in or relied upon by those expert witnesses. As such, K&E respectfully requests reimbursement in full for these article charges.

We accept K&E's response and have no objection to these expenses.

## CONCLUSION

17.    Thus, we recommend approval of $6,594,833.00 in fees ($6,993,800.50 minus $398,967.50[5])

and $2,315,190.63 in expenses ($2,316,977.21 minus $1,786.58) for K&E's services for the

Application Period.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By: _____
        Warren H. Smith
        Texas State Bar No. 18757050

Republic Center
325 N. St. Paul Street, Suite 1250
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

---

[5]This reduction includes K&E's voluntary fee reduction of $378,686.00.  *See* Paragraph 3, *supra.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served by First Class United States mail to the attached service list on this 3rd day of December, 2009.


_____
Warren H. Smith

**SERVICE LIST**
Notice Parties

**The Applicant**
Deanna Boll
David M. Bernick, P.C.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

dboll@kirkland.com
dbernick@kirkland.com

**The Debtor**
William Sparks
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044
william.sparks@grace.com

**Counsel for the Debtors**
James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
James R. O'Neill
Pachulski, Stang, Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**
Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**
Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**
Elihu Inselbuch, Esq.
Caplin & Drysdale
375 Park Avenue, 35th Floor
New York, NY 10152-3500

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE 19801

**Official Committee of Equity Holders**
Gary M. Becker
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

**United States Trustee**
David Klauder
Office of the United States Trustee
844 King Street, Suite 2311
Wilmington, DE 19801

# EXHIBIT "A"

a.      We noted that on June 22-23, 2009, eight[6] K&E professionals and paraprofessionals attended

Phase I of the confirmation hearing.  The total time spent, including non-working travel, was

136.60 hours for total fees of $82,214.00.

| | | | | |
|---|---|---|---|---|
| 6/22/2009 | David M Bernick, P.C. | 12.50 | 11,937.50 | Prepare for and attend Phase I hearing. |
| 6/23/2009 | David M Bernick, P.C. | 7.00 | 6,685.00 | Prepare and attend Phase I hearing. |
| 6/22/2009 | Kimberly K Love | 8.50 | 2,125.00 | .........; attend hearing and assist with various requests during hearing (8.5). |
| 6/22/2009 | Maria D Gaytan | 8.50 | 1,232.50 | .........; attend and provide assistance at confirmation hearing (8.5). |
| 6/22/2009 | Deanna D Boll | 10.80 | 7,290.00 | Prepare for confirmation hearing and assist D. Bernick at same. |
| 6/22/2009 | Justin S Brooks | 3.50 | 1,242.50 | Attend and assist at confirmation hearing. |
| 6/22/2009 | Lisa G Esayian | 6.50 | 4,777.50 | .........; attend portion of hearing re insurance neutrality issues (6.5). |
| 6/22/2009 | Theodore L Freedman | 15.00 | 13,725.00 | Prepare for and participate in Phase I hearing and conduct follow up from hearing. |
| 6/22/2009 | Barbara M Harding | 8.60 | 5,461.00 | ......; represent client at Phase I hearing and confer with team and plan proponents re same (8.6);...... |
| 6/23/2009 | Kimberly K Love | 5.50 | 1,375.00 | ......; attend and assist at hearing (5.5). |

---

[6]The hourly rates of these timekeepers are as follows: David M. Bernick ($955), Theodore L Freedman ($915), Lisa G Esayian ($735), Deanna D Boll ($675), Barbara M Harding ($635), Justin S Brooks ($355), Kimberly K Love ($250), and Maria D Gaytan ($145).

| 6/23/2009 | Maria D Gaytan | 5.40 | 783.00 | .......; attend and assist at confirmation hearing (5.4). |
| 6/23/2009 | Justin S Brooks | 6.00 | 2,130.00 | Prepare D. Bernick for hearing on lender impairment and attend and assist at hearing. |
| 6/23/2009 | Lisa G Esayian | 5.50 | 4,042.50 | .......; participate in hearing re insurance neutrality (5.5). |
| 6/23/2009 | Theodore L Freedman | 10.00 | 9,150.00 | Prepare for and participate in Phase I hearing. |
| 6/23/2009 | Barbara M Harding | 5.00 | 3,175.00 | Represent client at Phase I evidentiary hearing. |
| 6/20/2009 | Kimberly K Love | 3.20 | 800.00 | Travel from Chicago, IL to Pittsburgh, PA to assist with hearings (billed at half time). |
| 6/20/2009 | Maria D Gaytan | 3.20 | 464.00 | Travel from Chicago, IL to Pittsburgh, PA for hearings (billed at half time). |
| 6/21/2009 | Deanna D Boll | 1.20 | 810.00 | Travel from Newark, NJ to Pittsburgh, PA for confirmation hearing (billed at half time). |
| 6/21/2009 | Justin S Brooks | 1.50 | 532.50 | Travel from New York, NY to Pittsburgh, PA for Phase I confirmation hearing on insurance neutrality and impairment (flight delay) (billed at half time). |
| 6/21/2009 | David M Bernick, P.C. | 2.00 | 1,910.00 | Travel from Chicago, IL to Pittsburgh, PA for Phase I hearing (billed at half time). |
| 6/23/2009 | Kimberly K Love | 2.00 | 500.00 | Return travel to Chicago, IL from Pittsburgh, PA after hearing (billed at half time). |

| | | | | |
|---|---|---|---|---|
| 6/23/2009 | Maria D Gaytan | 2.00 | 290.00 | Return travel to Chicago, IL from Pittsburgh, PA (billed at half time). |
| 6/23/2009 | Deanna D Boll | 2.00 | 1,350.00 | Return travel to Newark, NJ from confirmation hearing in Pittsburgh, PA (travel delays) (billed at half time). |
| 6/23/2009 | Justin S Brooks | 1.20 | 426.00 | Return travel to New York, NY from Pittsburgh, PA after Phase I confirmation hearing on insurance neutrality and impairment (billed at half time). |
| | | 136.60 | $82,214.00 | |

b.      We note that on June 18, 2009, attorneys Theodore L Freedman ($915), Lisa G Esayian ($735), Barbara M Harding ($635), and Justin S Brooks ($355), as well as legal assistant Kimberly K Love ($250), attended a pretrial conference. The total time spent, including non-working travel, was 45.40 hours for total fees of $25,351.00.

| | | | | |
|---|---|---|---|---|
| 6/18/2009 | Kimberly K Love | 5.00 | 1,250.00 | ........; attend hearing and assist with various attorney requests arising during hearing (5.0). |
| 6/18/2009 | Justin S Brooks | 9.20 | 3,266.00 | Prepare for June 18 hearing re motion to amend CMO and motions to strike experts Priest and Shein and attend and assist in hearing. |
| 6/18/2009 | Lisa G Esayian | 4.00 | 2,940.00 | Work on issues re admissibility of certain insurers' policies for Phase I hearing (1.1); participate telephonically in insurance portions of Phase I pre-trial hearing (2.9). |
| 6/18/2009 | Theodore L Freedman | 10.00 | 9,150.00 | Prepare for and participate in pre-trial hearing. |

| 6/18/2009 | Barbara M Harding | 11.00 | 6,985.00 | Prepare for pre-trial conference (6.2); represent client at pre-trial conference (4.8);.... |
|---|---|---|---|---|
| 6/17/2009 | Kimberly K Love | 2.00 | 500.00 | Travel from Chicago, IL to Pittsburgh, PA to assist at hearing (billed at half time). |
| 6/18/2009 | Kimberly K Love | 2.20 | 550.00 | Return travel to Chicago, IL from Pittsburgh, PA after hearing (billed at half time). |
| 6/18/2009 | Justin S Brooks | 1.00 | 355.00 | Travel from New York, NY to Pittsburgh, PA for hearing on motions to strike experts and jurisdictional motion (billed at half time). |
| 6/19/2009 | Justin S Brooks | 1.00 | 355.00 | Return travel to New York, NY from Pittsburgh, PA after hearing (billed at half time). |
| | | 45.40 | $25,351.00 | |

### EXHIBIT "B"

a.      We note that on May 1, 2009, attorneys Theodore L Freedman ($915), Lisa G Esayian ($735), and Barbara M Harding ($635) attended the deposition of Peter Lockwood.  The total time spent was 24.00 hours for total fees of $18,440.00.

| | | | | |
|---|---|---|---|---|
| 5/1/2009 | Lisa G Esayian | 4.00 | 2,940.00 | ......; participate in insurance-related portions of Lockwood 30(b)(6) deposition (4.0);... |
| 5/1/2009 | Theodore L Freedman | 10.00 | 9,150.00 | Participate in Lockwood deposition. |
| 5/1/2009 | Barbara M Harding | 10.00 | 6,350.00 | .......; defend client at P. Lockwood deposition and confer with plan proponents re same (10.0). |
| | | 24.00 | $18,440.00 | |

b.      We note that on June 5, 2009, attorneys David M Bernick ($955), Brian T Stansbury ($550), and Heather Bloom ($320), as well as law clerk Jamie A Crown ($215), attended the deposition of Dr. Frank.  The total time spent, including non-working travel, was 38.90 hours for total fees of $20,069.50.

| | | | | |
|---|---|---|---|---|
| 6/5/2009 | Jamie A Crown | 6.50 | 1,397.50 | Attend deposition of A. Frank. |
| 6/5/2009 | Brian T Stansbury | 7.50 | 4,125.00 | Prepare for and second-chair deposition of A. Frank. |
| 6/5/2009 | Heather Bloom | 9.70 | 3,104.00 | Prepare for and attend Dr. Frank deposition. |
| 6/5/2009 | David M Bernick PC | 10.00 | 9,550.00 | Prepare and attend deposition of A. Frank. |

| | | | | |
|---|---|---|---|---|
| 6/4/2009 | Jamie A Crown | 1.00 | 215.00 | Travel from Washington, DC to Philadelphia, PA for deposition (billed at half time). |
| 6/4/2009 | Brian T Stansbury | 1.00 | 550.00 | Travel from Washington, DC to Philadelphia, PA for deposition (billed at half time). |
| 6/4/2009 | Heather Bloom | 1.00 | 320.00 | Travel from Washington, DC to Philadelphia, PA for Dr. Frank deposition (billed at half time). |
| 6/5/2009 | Jamie A Crown | 1.20 | 258.00 | Return travel to Washington, DC from Philadelphia, PA after deposition (billed at half time). |
| 6/5/2009 | Brian T Stansbury | 1.00 | 550.00 | Return travel to Washington, DC from deposition in Philadelphia, PA (billed at half time). |
| | | 38.90 | $20,069.50 | |

c.      We note that on June 16, 2009, attorneys David M Bernick ($955), Brian T Stansbury ($550), Karen F Lee ($320), and Heather Bloom ($320) attended the deposition of Dr. Whitehouse.  The total time spent, including non-working travel, was 40.40 hours for total fees of $22,871.00.

| | | | | |
|---|---|---|---|---|
| 6/16/2009 | Brian T Stansbury | 4.30 | 2,365.00 | .....; attend Whitehouse deposition (4.3);..... |
| 6/16/2009 | Karen F Lee | 6.40 | 2,048.00 | Telephonically attend A. Whitehouse deposition (6.4);............. |
| 6/16/2009 | Heather Bloom | 8.70 | 2,784.00 | .....; assist D. Bernick with A. Whitehouse deposition (8.7);.............. |
| 6/16/2009 | David M Bernick PC | 12.00 | 11,460.00 | Prepare for, attend and depose Whitehouse. |

| | | | | |
|---|---|---|---|---|
| 6/15/2009 | Brian T Stansbury | 3.00 | 1,650.00 | Travel from Washington, DC to Seattle, WA for Dr. Whitehouse deposition (billed at half time). |
| 6/15/2009 | Heather Bloom | 3.20 | 1,024.00 | Travel from Washington, DC to Seattle, WA for Dr. Whitehouse deposition (billed at half time). |
| 6/16/2009 | Brian T Stansbury | 2.80 | 1,540.00 | Return travel to Washington, DC from Seattle, WA after Whitehouse deposition (billed at half time). |
| | | 40.40 | $22,871.00 | |

d.      We note that on June 25, 2009, attorneys Barbara M Harding ($635), Brian T Stansbury ($550), Heather Bloom ($320), and Karen F Lee ($320), as well as legal assistant Britton R Giroux ($190), attended the deposition of C. Molgaard.  The total time spent, including non-working travel, was 49.60 hours for total fees of $19,257.00.

| | | | | |
|---|---|---|---|---|
| 6/25/2009 | Brian T Stansbury | 4.50 | 2,475.00 | Prepare B. Harding for C. Molgaard deposition (2.0); participate in portions of C. Molgaard deposition (2.5);............. |
| 6/25/2009 | Britton R Giroux | 11.00 | 2,090.00 | Assist in deposition of C. Molgaard. |
| 6/25/2009 | Karen F Lee | 5.10 | 1,632.00 | Telephonically attend expert deposition of C. Molgaard (5.1);....... |
| 6/25/2009 | Heather Bloom | 9.10 | 2,912.00 | Finish preparation for Dr. Molgaard deposition (2.8); attend and assist at Dr. Molgaard deposition (6.3);.......... |
| 6/25/2009 | Barbara M Harding | 12.00 | 7,620.00 | Prepare for deposition of Dr. Molgaard (6.0); conduct deposition of Dr. Molgaard (6.0);.......... |

| Date | Name | Hours | Amount | Description |
|------|------|-------|--------|-------------|
| 6/24/2009 | Heather Bloom | 4.10 | 1,312.00 | Travel from Washington, DC to Missoula, MT for Dr. Molgaard deposition (billed at half time). |
| 6/26/2009 | Heather Bloom | 3.80 | 1,216.00 | Return travel to Washington, DC from Missoula, MT after deposition (billed at half time). |
| | | 49.60 | $19,257.00 | |

**EXHIBIT "C"**

| 5/11/2009 | Derek J Bremer | 7.00 | 1,680.00 | Break down and prepare remote trial site materials for shipment. |
|---|---|---|---|---|
| 5/12/2009 | Marvin R Gibbons, Jr. | 2.00 | 470.00 | Begin break down of remote trial office and access needs and procedures for efficient tear down. |
| 5/12/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down remote trial site in Missoula, MT. |
| 5/13/2009 | Marvin R Gibbons, Jr. | 7.00 | 1,645.00 | Take down remote trial office and prepare for transfer. |
| 5/13/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down remote trial site in Missoula, MT for transfer. |
| 5/14/2009 | Marvin R Gibbons, Jr. | 8.00 | 1,880.00 | Take down remote trial office and prepare equipment for shipment. |
| 5/14/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down and prepare remote trial site equipment in Missoula, MT for shipment. |
| 5/15/2009 | Marvin R Gibbons, Jr. | 7.00 | 1,645.00 | Take down remote trial office and prepare equipment for shipment. |
| 5/15/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down and prepare remote trial site equipment in Missoula, MT. |
| 5/18/2009 | Marvin R Gibbons, Jr. | 7.00 | 1,645.00 | Take down remote trial office and prepare equipment for shipment. |
| 5/18/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down and prepare remote trial site materials for transfer. |
| 5/19/2009 | Marvin R Gibbons, Jr. | 9.00 | 2,115.00 | Take down remote trial office and prepare equipment for shipment. |
| 5/19/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down and prepare remote trial site materials for transfer. |
| 5/20/2009 | Marvin R Gibbons, Jr. | 9.00 | 2,115.00 | Take down remote trial office and prepare equipment for shipment. |

| 5/20/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down and prepare remote trial site equipment in Missoula, MT for shipment. |
| 5/21/2009 | Marvin R Gibbons, Jr. | 7.50 | 1,762.50 | Take down remote trial office and prepare equipment for shipment. |
| 5/21/2009 | Derek J Bremer | 7.00 | 1,680.00 | Tear down and prepare remote trial site materials for transfer. |
| | | 120.00 | 28,397.50 | |

## RESPONSE EXHIBIT "1"

<u>Multiple K&E Professionals' and/or Paraprofessionals' Attendance at Hearings (¶ 4 and Exhibit "A")</u>

The Initial Report requests that we explain the necessity of multiple K&E professionals' and paraprofessionals' attendance at two hearings: the June 22nd-23rd Phase I Confirmation Hearing relating to the Debtors' plan of reorganization (the "<u>Plan</u>")[7], and the related June 18th pretrial hearing. We address each hearing, and each such professional's or paraprofessional's respective responsibilities, in the lettered paragraphs below.

    (a)    June 22nd-June 23rd Phase I Confirmation Hearing

*Bernick, Freedman, Harding, Esayian, Boll, Brooks, Love, Gaytan*

Phase I of the Plan Confirmation Hearing took place on June 22-23, 2009.[8] The Confirmation Hearing was divided into two phases. Phase I dealt with three issues: insurance neutrality; insurer standing; and lender impairment. "Insurance neutrality" refers to the issue of whether the Plan treats insurers (in their capacity as insurers, but not creditors) in a neutral fashion (*i.e*, whether the Plan affects insurers' rights under their policies and their pre-petition settlement agreements with the Debtors). "Insurer standing" refers to the issue of whether Grace's insurers have standing to litigate Plan confirmation objections that do not involve insurance issues covered by the "insurance neutrality" concept if they were not also creditors of the Debtors. "Lender impairment" refers to Plan confirmation objections raised by and on behalf of the lenders under the Debtors' pre-bankruptcy petition credit facilities.

Throughout the Plan confirmation proceedings, the degree of involvement of any particular K&E attorney in any particular confirmation hearing date has depended upon that attorney's role and responsibilities with regard to both the given phase of the hearings and the specific items on the hearing agenda for that particular date.

Specific items up at the June 22 - 23rd hearings included:

---

[7]Though we refer to the "Debtor's Plan," in actuality, the Plan is a joint plan, with the Debtors' co-Plan proponents being the Equity Committee, the ACC, and the Asbestos PI FCR. The General Unsecured Creditors' Committee, the Asbestos PD Committee and the Asbestos PD FCR are not co-proponents of the Plan.

[8]As we discussed in the prior Fee Reply, the Court approved the Debtors' disclosure statement and solicitation materials on March 9, 2009. On March 31st, the Debtors distributed the Plan, Plan exhibits, disclosure statement, and voting materials to all creditors entitled to vote on the Plan. Objections to the Plan were due by May 20th, and unresolved Plan objections relating to Phase I issues were addressed at these June hearings.

-- Hearing on impairment issues re claims of bank lenders and similar issues related to Morgan Stanley's objections;

-- Hearing re insurance neutrality and issues related to insurer standing; and

-- Status conference on motion of General Unsecured Creditors' Committee and Lenders to modify the case management order regarding the Plan.

*Bernick, Freedman, Harding, Esayian, Boll, Brooks, Love, Gaytan*

As you know, senior litigation partner, David Bernick, is the lead attorney on the Debtors' cases, and, as such, conducted the June 22nd-23rd hearings on behalf of Grace.

Ted Freedman, as described in prior responses, is a senior restructuring partner who has been responsible for developing much of the Plan and confirmation strategy from a restructuring attorney's perspective. Ted consulted with K&E litigators, as well as counsel for the ACC and Asbestos PI FCR, on various bankruptcy-related issues that arose related to both the Lender issues and the insurance neutrality arguments. He also participated in negotiations with various counsel for the insurers and the Lenders prior to and during Phase I of the Confirmation Hearing.

Barbara Harding, a D.C. litigation partner, primarily handled litigation strategy issues respecting the Lenders, although she also assisted David Bernick and Lisa Esayian with matters related to insurance neutrality. Chicago litigation partner, Lisa Esayian, handles all insurance issues in connection with Plan confirmation. She attended the hearing in order to address the insurance neutrality issues described above, and to be able to follow up on additional insurance-related issues that arose from the hearing.

New York-based litigation associate, Justin Brooks, attended the hearing to fulfill his responsibilities with regard to the lender impairment issues. He prepared various hearing materials on issues regarding whether the Lenders were impaired, whether there were defaults under the relevant credit facilities, and related issues. Justin assisted both David Bernick and Barbara Harding on these issues prior to and during the Phase I Confirmation Hearing on these issues.

As for my responsibilities at the Phase I Confirmation Hearing, I have been responsible for drafting the Plan, coordinating with the Debtors' co-proponents regarding the Plan, and negotiating with adverse parties regarding Plan modifications. I attended the hearings in order to fulfill those duties and to assist Ted Freedman from the restructuring, rather than litigation, side of the team.

Chicago legal assistant, Kimberly Love, and Chicago case assistant, Maria Gaytan, assisted at the hearings in their ongoing bankruptcy team roles of providing hearing support. Prior to the hearings, Kim and Maria assisted the attorney team with the preparation of hearing materials. Kim's and Maria's real-time hearing assistance included providing the presenting attorneys with requested documents and demonstrative materials, as well as keeping track of all exhibits and relevant dates

mentioned. (As we have discussed in prior fee responses, generally only one legal or case assistant attends bankruptcy hearings in the Debtors' cases, but, as with the disclosure statement hearings, the complexity and document-intensiveness of the Plan confirmation hearings required assistance of two support staff team members.) Often, during the hearing, Kim or Maria would be asked to leave the courtroom and go to local counsel's office to locate a particular document; when that happened, the remaining assistant would provide all the needed assistance to the trial team. Finally, Kim and Maria split the work of coordinating certain document and non-hearing assistance for all of the attending Plan Proponents' counsel, as well as the set-up and take-down of the courtroom on behalf of the Plan Proponents.

      (b)      June 18th, 2009 Pretrial Hearing

        *Freedman, Harding, Esayian, Brooks, Love*

The June 18th pretrial hearing topics included:

-- Plan Proponents' *Daubert* motion to strike the expert reports and testimony of insurers' experts George Priest and James Shein;

-- Motions of the General Unsecured Creditors' Committee and the Lenders to modify the case management order regarding the Plan and divest the Court of jurisdiction on certain issues allegedly the subject of a pending appeal; and

-- Pre-trial conference on Plan confirmation Phase I issues.

Ted Freedman conducted the hearing on behalf of the Debtors with respect to the issues related to the upcoming Phase I Confirmation Hearing and coordinated with former partner, Janet Baer, on issues related to the motions to modify the case management order.

Barbara Harding was primarily responsible on behalf of the Debtors for the arguments addressing the *Daubert* motion, and she coordinated with the ACC and Asbestos PI FCR on issues related to same. Barb also coordinated with Lisa Esayian, on some of the insurance issues that were related to the *Daubert* issues.

Lisa Esayian attended, via telephone, the portions of the hearing related to the admissibility of certain insurance policies for the June 22nd - June 23rd hearings described in Paragraph 2(a). The Debtors had concerns over the admissibility of certain insurance policies the insurers wanted admitted into evidence, and Lisa analyzed and addressed these issues.

Justin Brooks, under the supervision of Ted, Lisa and Barbara, did a large part of the drafting of the motion to strike the insurers' experts. Justin attended the hearing to assist Ted and Barb with any related issues. He also helped draft the Debtors' response to the Lender's motion to divest the Court of jurisdiction pending appeal of the Court's denial of post-petition interest. With regard to

both motions, Justin had key cases ready to be offered in support of the Debtors' arguments, and Ted consulted with him during Court regarding key case law relevant to the same.

Kimberly Love attended the June 18th hearing in her hearing role described under Paragraph 2(a) above.

K&E respectfully requests payment in full for the June 18th and June 22nd - 23rd hearing-related fees for these professionals and paraprofessionals.

## RESPONSE EXHIBIT "2"

<u>Multiple K&E Professionals' and/or Paraprofessionals' Attendance at Depositions (Paragraph 5 and Exhibit "B")</u>

(a)      May 1, 2009 Deposition of Peter Van Lockwood

*Freedman, Harding, Esayian*

Peter Lockwood (counsel for the ACC) was a 30(b)(6)[9] witness for certain plan confirmation issues. Mr. Lockwood's deposition dealt with myriad plan-related issues raised by twenty or more plan objectors, and covered so many topics that it lasted for several days.

As explained in Paragraph 2 above and in prior fee responses, Ted is the senior restructuring partner on the Debtors' cases and has borne the primary responsibility for strategy related to confirmation of the Plan. Ted attended Mr. Lockwood's deposition to ensure that the Debtors' views on the terms of the Plan be properly represented. Barbara Harding was the lead litigator for the Debtors during the deposition, and was there to defend the deposition in terms of the Debtors' interests from an overall litigation perspective. Lisa Esayian participated, by telephone, in the four hours of the deposition that related directly to the insurance issues on which she was working, including Plan treatment of certain types of insurance policies and insurance settlement agreements, and the Plan's treatment of claims by certain parties who claimed to share rights to the Debtors' insurance policies.

K&E respectfully requests payment in full for its fees related to Mr. Lockwood's deposition.

(b)      June 5, 2009 Deposition of Dr. Arthur Frank

*Bernick, Stansbury, Bloom, Crown*

---

[9]Federal Rule of Civil Procedure 30(b)(6) permits a party to compel a corporate entity to designate an agent to testify on behalf of the entity regarding topics outlined in a deposition notice or subpoena issued pursuant to FRCP 30(b)(6). Rule 30(b)(6) shifts the burden of determining the person best suited to answer questions on behalf of the corporate entity from the requesting party to the corporate entity being deposed.

As the Bankruptcy Court began to limit the scope of Dr. Whitehouse's testimony,[10] the Libby Claimants made Dr. Frank a more central witness at the Confirmation Hearing.  Dr. Frank is a physician with a specialty in preventative medicine, and has testified in over a thousand depositions. He offered testimony about specific aspects of medical criteria and why he thought they were discriminatory toward the Libby Claimants (which supported the Libby Claimants' theory that they should be treated differently from other claimants under the Plan).  He also opined that pleural disease in Libby was different from pleural disease in other geographic areas.

David Bernick first-chaired the deposition, while D.C. litigation partner, Brian Stansbury, second-chaired it.  Assisted by Heather Bloom, Brian drafted and revised the deposition outline. Throughout the night before and morning of the deposition, David made numerous requests for markups of additional studies, and for additional exhibits to be prepared.  During the deposition itself, Brian responded to various requests from David that arose based on Dr. Whitehouse's answers. Brian also provided David with additional questions throughout the deposition when more follow up questions were needed.  Heather Bloom and summer associate, Jamie Crown, also prepared folders of voluminous materials for David's use during the deposition.  Brian then reviewed the contents of each folder, highlighting key items and drafting notes for David.  During the deposition, Heather and Jamie were on call to provide needed exhibits and other materials.  Heather also took notes and prepared a deposition summary.

K&E agrees to write off $1,870.50, representing the fees for this deposition for the time of summer associate Jamie Crown (8.7 hours x $215/hour).  K&E respectfully requests full reimbursement for the time of the other deposition participants.

(c)     June 16, 2009 Deposition of Dr. Alan Whitehouse

*Bernick, Stansbury, Lee, Bloom*

The Initial Report requests that we explain why K&E attorneys David Bernick, Brian Stansbury, Karen Lee and Heather Bloom attended the deposition of Dr. Alan Whitehouse on June 16, 2009.

Dr. Whitehouse is a pulmonologist who was one of the Libby Claimants' primary experts in the Plan confirmation proceedings.  This deposition was a continuation of the truncated March 19, 2009 deposition described in the 32nd Period Fee Response, and was again held in Spokane, Washington, where Dr. Whitehouse's office is located.  This deposition was particularly important given Dr. Whitehouse's central role in the case, and the fact that he came out with an updated expert

---

[10]In our response to the fee auditor's initial report regarding the 32nd interim period (the "32nd Period Response"), we discussed the fact that some damaging admissions made by Dr. Whitehouse in his March 19th deposition lessened his effectiveness as a witness for the Libby Claimants.

report in May 2009.  The report included updates of spreadsheets making up the CARD mortality study.[11]  Many of K&E's questions addressed issues relating to the updated report.  As was the case with his March deposition, the deposition files were voluminous, with numerous boxes of exhibits. David Bernick conducted the deposition on behalf of Grace, and worked with Brian, Karen, and Heather to prepare.  Brian Stansbury attended the deposition because of his extensive knowledge and experience in dealing with Dr. Whitehouse and his knowledge of the records Dr. Whitehouse produced for hundreds of patients.  Brian's presence at the deposition ensured that he would be able to assist David in responding to or following up on issues that required Brian's detailed level of factual knowledge with respect to Dr. Whitehouse's patients.  He also reviewed and edited the folders of materials that Heather Bloom prepared for David (described below).

Karen Lee drafted portions of the deposition outline, and she telephonically attended the deposition in order to be able to answer any questions or address any issues that arose related to her sections of the outline.  Heather Bloom went to the deposition site a day ahead to set up the deposition materials and files for David Bernick.  She gathered and organized several last- minute documents that David wanted to review.  She also coordinated logistics with the Asbestos Creditors' Committee, which had its own representatives attend the deposition.  On the deposition day, she ensured that the court reporter and videographer were set up, and assisted David with other last- minute document and information requests.  During the deposition, Heather was charged with providing documents for David to offer as exhibits.

K&E respectfully requests full payment for its fees related to Dr. Whitehouse's deposition.

(d)      June 25, 2009 Deposition of Craig Molgaard

*Harding, Stansbury, Lee, Bloom, Giroux*

Craig Molgaard was an important epidemiology expert witness for the Libby Claimants, who testified extensively at various Grace hearings.  Dr. Molgaard opined that Dr. Whitehouse's CARD Mortality Study was proper epidemiologically, which opinion was at the core of the Libby Claimants' argument.

Barbara Harding conducted the deposition on behalf of the Debtors.  Brian Stansbury assisted Barb by reviewing the studies on which Dr. Molgaard relied, and by drafting questions Barb could use in conducting the deposition.  Brian telephonically attended portions of the deposition in order to be able to consult with Barb on specific areas of questioning with respect to which Brian had intensively prepared.  Heather Bloom assisted Barb by preparing the deposition folders and other materials, particularly scientific articles. During the deposition, Heather provided exhibits and materials as needed.  Former K&E legal assistant, Britton Giroux, helped prepare deposition

---

[11]*See* the 32nd Period Response for additional detail on Dr. Whitehouse and his March 19th deposition.

exhibits, many of which were updated and revised in the hours leading up to the deposition. Britton also printed and provided last-minute materials needed immediately prior to and during the deposition.

*(K&E subsequently advised that Karen Lee's role at the deposition was as follows:)*

Karen Lee is an associate who works with Barbara Harding and Brian Stansbury in Kirkland's D.C. office. She prepared portions of the Molgaard deposition outline, conducted background research on Dr. Molgaard, and attended a portion of the deposition telephonically to assist in the event questions arose related to her areas of preparation.

K&E respectfully requests full payment for its fees related to Dr. Molgaard's deposition.