**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |

**ANDERSON MEMORIAL HOSPITAL'S POST-TRIAL BRIEF
ON ITS OBJECTIONS TO CONFIRMATION
OF DEBTORS' FIRST AMENDED JOINT PLAN**

Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:    (302) 654-0248
Facsimile:    (302) 654-0728
Email:        loizides@loizides.com

Daniel A. Speights
C. Alan Runyan
SPEIGHTS & RUNYAN
200 Jackson Avenue East
Post Office Box 685
Hampton, SC 29924
Telephone:    (803) 943-4444
Facsimile:    (803) 943-4599
Email:        dspeights@speightsrunyan.com

-    and-

John W. Kozyak
David L. Rosendorf
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, FL  33134
Telephone:    (305) 372-1800
Facsimile:    (305) 372-3508
Email:        drosendorf@kttlaw.com

Anderson Memorial Hospital ("Anderson"), by and through its counsel, Speights & Runyan, f/k/a Law Office of Daniel A. Speights (collectively "S&R") and Kozyak Tropin & Throckmorton, P.A., hereby files it Post Trial Brief on Its Confirmation Issues.[1]  Although the Plan Proponents, including the Debtors ("Grace"), have the burden of proof on all issues relating to confirmation, Grace's lead counsel, David Bernick of Kirkland & Ellis ("K&E"), announced at the end of the confirmation hearing that it was "kind of pointless" for the Plan Proponents to file an initial brief on Anderson's objections. [10/14/09 Tr. at 233].  Thus, with respect to Anderson, unlike all other objectors, Mr. Bernick will get the last word before oral argument.

## PRELIMINARY STATEMENT

The Debtors' Plan cannot be confirmed because it violates the fundamental tenet of "equality of treatment" required of any bankruptcy plan, it fails to afford creditors in the same class the same treatment, it improperly classifies creditors who are subjected to disparate treatment in the same class, it is not proposed in good faith, and it does not comply with the requirements of the Bankruptcy Code.  The Plan is the culmination of the Debtors' strategy to disenfranchise unresolved property damage claimants and undermine efforts to deal with property damage claims globally through an appropriate class mechanism by marginalizing and smearing S&R, the law firm that has endeavored to represent such claimants, and by subjecting Anderson to treatment prejudicially different from that afforded to other claimants.

---

[1] This Brief is in supplement to Anderson Memorial Hospital's Post-Trial Brief Regarding Feasibility, and Reply Brief in support thereof, previously filed with the Court, as well as Anderson's already-filed Objections to Confirmation and Trial Briefs in support thereof. Anderson reincorporates all arguments made in all of its prior briefs and objections.

## STATEMENT OF FACTS

### I.    Introduction

Seventeen years ago, Anderson filed an asbestos property damage class action in the South Carolina Circuit Court.    Anderson Memorial Hospital v. W.R. Grace, C/A No. 92-CP-25-279 (S.C.C.P. Hampton County, filed December 23, 1992). [DI 7221]   Anderson sought the recovery of costs associated with the abatement of asbestos-containing material ("ACM") from a proposed class consisting essentially of owners of private commercial and local government buildings which "have suffered or will suffer asbestos contamination."

According to a conservative pre-bankruptcy report prepared by Grace's own longtime estimation expert – a report which Anderson introduced at the Confirmation Hearing and which contradicts much of what Grace has said about traditional property damage claims over the past eight plus years – Grace's Surface Treatment products were placed in 122,473 buildings in this country which fall within the definition of Anderson's putative class:  114,444 private buildings (excluding single family homes and small apartment buildings); and 8,029 local government buildings. [AMH Exhibit 56 (H) at 4215.176, 4215.177, 4215.181].[2]  By  way of comparison, there were only 14,000 public and private school buildings in the nation with all types of ACM (not just Surface Treatment) produced by some fifty companies.   In re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984), *aff'd in part and vacated in part*, 789 F.2d 996 (3d Cir. 1986).

Grace filed its Petition for Reorganization ("Petition") on April 3, 2001.  Over the next several months and years, Grace proceeded to file at least four papers in which it stated that Anderson would be able to return to the tort system. [DI 586 at pp. 47-48; DI 688 at pp. 1-5; DI

---

[2]  The 1995 study does not include Grace's loose filled Vermiculite asbestos-containing Vermiculite products, Zonolite Attic Insulation ("ZAI") and Zonolite Masonry Fill ("ZMF").

688 Ex. A at p. 3; DI 1665 at p. 12].  The last of these representations was set forth in Grace's revised motion which produced an Order ("Bar Order") establishing a March 31, 2003 deadline to file present traditional asbestos property damage claims ("Bar Date") [DI 1665].

With respect to traditional property damage claimants, however, notice of the Bar Date was in large part not effectuated by actual service upon the potential claimants.  Rather, with limited exceptions, the Debtors served the Bar Date Notice on "all counsel of record for holders of Asbestos Property Damage Claims," who were directed to provide the Debtors with information about "their clients' who may have claims or provide a "certification" that counsel had "contacted or attempted to contact all of their clients whom they represent," provided them with the Bar Date Package and advised them of their right to file a claim. [DI 1963, p. 5].[3]  It has now become clear – Anderson's earlier efforts to obtain discovery on the issue were stymied – that the Debtors in fact had the ability to identify and provide notice to building owners of the Bar Date, but refused to do so. [Finke 3/30/09 at 140; Hughes 6/11/09 at 400-406, 412-413].

In response to the Bar Date Notice, Anderson did exactly what it understood the Court to have suggested in earlier hearings regarding class claims. [*See generally* DI 19987] First, in accordance with the Court's observations that most courts held that all that was necessary was to file a class proof of claim [DI 1793, 2/25/05 Hearing Tr., p. 98], Anderson filed three proofs of claim: a "worldwide" class proof of claim; a statewide class proof of claim; and an individual proof of claim. [DI 19987, Claim # 9911, 9914, 11008].  Second, Anderson did what this Court has observed would avoid any questions by following the procedure adopted in In re Interregional Equity Corp., 227 B.R. 358 (D.N.J. 1998) (a case managed by Judge Gambardella which this Court indicated it would follow), to wit: Anderson attached a list over 3,000 putative

---

[3] According to Grace, there were only seven active cases at the time of the bankruptcy, one of which was Anderson.  [DI 6]

claimants, including South Carolina claimants, to its worldwide class proof of claim form. [Id.] Third, consistent with the Court's statement that it was "not sure in every given case that you don't also need either an individual claim form or an identification," S&R took another (unnecessary) step and also filed individual claims which identified the same putative members listed in its class claims. [Id.]

No objections were filed to the claims for over two years. In November 2004, the Debtors filed a Plan together with a Motion seeking estimation of all asbestos claims [DI 6895, 6899]. Shortly thereafter, in early 2005, S&R and the Debtor's General Counsel, Robert Beber, and his longtime assistant Richard Finke, commenced discussions on the resolution of certain of the claims filed by S&R. Those discussion led to a draft stipulation which would have resulted in the disposition of many of the claims filed by S&R; however, only weeks later, Grace terminated those discussions. [Finke 3/30/09 at 143-145]

The following months instead saw the commencement of a vicious smear campaign against S&R, conducted by means of *ex parte* attacks at hearings for which there were no matters involving S&R on the agenda and which S&R had no reason to attend. The Debtors needlessly prosecuted objections to S&R claims, many of which had already been resolved by stipulation and others being discussed with Grace's former General Counsel, making spurious assertions all along the way. After previously representing that they had reached an impasse with the personal injury constituency, all of a sudden the Debtors now claimed that it was the S&R claims that were the "number one reason" the bankruptcy case could not be resolved. [DI 9349, 8/29/05 Hearing Tr., pp. 77-78]

Why the sudden shift? Mr. Bernick's comments at an earlier hearing relating to the ZAI class claim (before the Debtors successfully undermined that claim through the "Science Trial,"

from which S&R was excluded and which was litigated against claimants selected by the Debtors) provide some insight.    Back in 2002, when the Court suggested that the class mechanism might be appropriate to resolve common issues associated with ZAI claims,  Mr. Bernick expressed his concern that it would "create an enormous economic dynamic to the case" and that "given the magnitude of this potential claim, this case is going to become extraordinarily difficult to resolve." [DI 1912, 3/18/02 Hearing Tr., pp. 58, 64-65]. The issue was leverage, pure and simple.

The Debtors' newly minted strategy with regard to Anderson was unfair and unfounded, but effective.  Having succeeded in limiting the direct notice provided to traditional asbestos property damage claimants, the filed claims came in substantially below the amounts which should have been anticipated based upon the pre-bankruptcy analysis Grace's own expert had conducted.  Now, Grace needed to embark on a scorched-earth approach with respect to the one claim in particular that could undermine that result – the Anderson class claim, for which S&R served as counsel.    Having been vilified and marginalized, S&R found itself fighting unsuccessfully over class certification in this Court, which effectively found that the claims bar date obviated the need for a class action for traditional property damage claims and that numerosity was lacking (a ruling that is presently on appeal).  [DI 18995, 21409].  As part of that proceeding, Grace convinced the Court that it had provided actual notice to "over 8,700 property damage claimants" and "approximately 200,000 known asbestos claimants." [DI 18821, p. 5], notwithstanding its earlier admission that "We did not give individual property damage claimants notice." [DI 13077, 8/21/06 Hearing Tr., p. 250].

At the certification hearing, the Court declined to consider the prospect of future property damage claims as part of the class, even when Anderson sought to have the Court consider the

U.S. Minerals plan approved by this Court, which had created a trust to deal with asbestos property future demands, and the issue was not addressed in the Certification Order [DI 16422, 7/5/07 Hearing Tr., pp. 109-11]  Yet only four months later, Grace – as preview to a new Plan which called for a 524(g) injunction against property damage claims and future "demands" – sought the appointment of a property damage future claimants representative ("PDFCR") to serve as the "legal representative for future asbestos-related property damage claimants or holders of demands as the term is included in section 524(g)," which this Court did in October 2008. [DI 19818].

In support of that 524(g) injunction, the Plan Proponents presented evidence at the Confirmation Hearing from an expert, Dr. Denise Martin, that Grace will likely be subject to "substantial future property damage demands." [PP 206].  It appears that the Debtors raised this prospect more for the purposes of securing the Seared Air / Fresenius settlement funds than any genuine concerns with dealing with future PD claims. But regardless of the Debtors' intentions, the concern has been magnified by the District Court's recent decision – which is now law of the case[4] – holding that in the majority of jurisdictions, including California and Delaware, property damage claims do not accrue, at the earliest, until *Grace proves* that their products have caused injury.  State of California v. W.R. Grace and Co., Case No. 08-863 (D. Del. 9/29/09).  Yet nobody knows how many of these claims will accrue in the future and be subject to proceedings in this Court and the tort system in the future, because the Plan Proponents have not provided the Court with any estimate of this exposure.

---

[4] Grace announced at the November 23, 2009 omnibus hearing that it had determined not to appeal the ruling [DI 23875, 11/23/09 Hearing Tr. at 22].

What does all this mean to Anderson's issues?   At a minimum, it provides context. Given the opinion of the Plan Proponents' expert that there will be substantial future claims, coupled with the District Court's recent decision that Grace has the burden to prove that its products caused injury, there is no question that reorganized Grace (through its obligation to fund the PD Trust) will face a large number of traditional property damage claims that are not even arguably extinguished by the Bar Order.   When Anderson made this exact point at the certification hearing Mr. Bernick summarily dismissed Anderson's contention with the comment that "There's no such thing in our jurisprudence as we sit here today as a certifiable class when peoples whose claims don't yet exist.   That's a fundamental issue in our jurisprudence."   [DI 16422, 7/5/07 Hearing Tr. at 155].   In light of these subsequent developments, does Grace really want to take the position that the parties and the presiding Courts in previous class actions had no authority to release Grace from future claims?   Does Judge Sanders also represent schools, colleges, states, and other building owners with respect to buildings which had not been injured as of the time of settlements going back 25 years?   If so, at some point, these buildings must be considered with respect to numerosity (and feasibility).   Small wonder that the Plan Proponents have proposed that Future Claimants cannot join together in a class action, despite the fact that the Third Circuit and other Courts have recognized that asbestos property damage cases, unlike asbestos personal injury cases, are appropriate for class treatment.

On May 29, 2008, the Court denied Anderson's Motion for Class Certification, finding that "the Property Damage Claim Creditor Universe is known because the Notice of the Bar Date was so extensive (over 8,700 property damage claimants were served and international publication notice was made), there are not enough claims left to constitute a numerous base in the first place."   [DI 18821] Subsequently, however, in response to Anderson's appeal to the

District Court, Grace admitted that the class could include claimants who did not file individual claims:

> Anderson has pointed out the very reason why Judge Gambardella rendered that decision, as the Bankruptcy Court here found: 'In her case she did not need to get into the individual proof of claim form because attached to the class group was a list of all the putative claim holders. And she found that that was sufficient.'

[District Ct. Case no. 08-118, DI 13 at 11] Apparently Grace did not realize at that time that Anderson had done just like the class representative in Judge Gambardella's case had done. [DI 19987].

The combination of the report of Grace's estimation expert that there are 122,473 buildings within the definition of Anderson's class, the District Court's recent accrual decision, recent discovery demonstrating that Grace could have given direct notice of the Bar Order to building owners (as other manufacturers have done), and Grace's admission to the District Court that a class may contain members who did not file individual claims, is equally troubling. If Anderson is right, all of these claimants are members of its class. Even if the appellate court affirms this Court's Certification Order, they must be given notice. In re Standard Metals Corp., 817 F.2d 625 (10th Circuit 1987), vacated in part on rehearing and decided on other grounds under the name Sheftelman v. Standard Metals Corp., 839 F.2d 1383 (1987).[5] Other property damage claimants may file motions to file late filed claims. The average claim of one public or commercial building owner averages millions of dollars.[6]

---

[5] Grace has cited Standard with approval. [DI 16540 at 15-16].

[6] The Court excluded Anderson's exhibit demonstrating that in the Celotex bankruptcy, the claims facility allowed a total of more than $250 million in claims for removal Surface Treatment from 52 buildings within the Anderson class (without even considering consequential damages), an average of $5 million dollars per building. [AMH EX. 40; 9/14/09 Tr. at 144-145, 150-153]. Anderson's counsel has recovered an average of $8 million in the four cases it has tried to verdict against Grace. City of Greenville v. W.R. Grace & Co., 640 F.Supp. 559 (D.S.C.

The Plan Proponents' proposed treatment of Anderson in the Plan is the latest blow in their effort to suppress Anderson's individual and class claims. In multiple pleadings, Grace had represented that pre-filed cases could return to the tort system. By the time of the Confirmation Hearing, Anderson and Solow were the only pre-filed cases (or at least Anderson thought that), and the Plan provided that Anderson must be tried in the bankruptcy Court while Solow and all future claims would be returned to the tort system.[7] Why did Grace reverse its position as to Anderson? Obviously, it is of little consequence to the Plan Proponents if one relatively small claimant was returned to the tort system. The reason for the Plan Proponents' reversal as to Anderson is that they are unwilling to take the risk that this Court's Certification Order will be reversed and the reorganized debtor will then face a jury trial in a large class action.

In summary, the Plan Proponents have recognized the validity of what their 524(g) expert has testified are substantial future property damage demands, but they have rejected disposition of property damage claims on a collective basis in favor of individual trials. At the same time, despite the overwhelming precedent in favor of class treatment of asbestos property damage claims, including the Third Circuit's landmark decision in In re Asbestos School Litigation, 789

---

1986), aff'd, 827 F.2d 975 (4th Cir. 1987); Clayton Center Associates v. W.R. Grace & Co., 861 S.W.2d 686, 690 (E.D.Mo.App. 1993); Northridge Co. v. W.R. Grace & Co., 556 N.W.2d 345 (Wis.App. 1996); Blue Cross and Blue Shield of South Carolina v. W.R. Grace & Company, 781 F.Supp. 420 (D.S.C. 1991); see also New Hampshire-Vermont Health Service Corporation, d/b/a Blue Cross and Blue Shield of New Hampshire v. U.S. Mineral Products Company, C/A No. C-87-207-L (U.S.D.C., District of New Hampshire (March 27, 1991, July 29, 1991), aff'd, 10 F.3d 805 (1st Cir. 1993); and Kansas City v. W.R. Grace & Co., et al., 778 S.W.2d 264 (W.D. Mo. App. 1989), aff'd sub. nom. 855 S.W.2d 360 (Mo. 1993). Additionally, Grace recently settled the Solow claim for $35 million [DI 23725].

[7] Recently, Grace revealed that it had settled with Solow before the Confirmation Hearing ever began, pursuant to a settlement agreement entered into on August 12, 2009. [DI 23725] Obviously Grace waited to reveal that settlement because it would have to explain the relationship of that settlement to the famous $37.3 million figure, if any, discussed throughout the feasibility portion of the trial.

F.2d 996 (3d Cir. 1986), the proposed Plan not only purports to confer exclusive jurisdiction over the trial of future asbestos property damage claims in federal District Courts, even where Congress has not done so (a dubious proposition), but, more importantly, to strip the federal District Courts of the use of Rule 23, which Congress provided to deal with common issues such as the so-called "hazard" issue identified by Grace when it was headed down another track in this bankruptcy. Consequently, *unless Anderson is certified*, a large number of individual future property damage claims are going to be dumped into this court and the tort system for individual trials. Despite a nine year bankruptcy interlude, individual litigation will resume, defended by Grace's attorneys, who will raise the same issues over and over again as they try one multi-million dollar claim after another.

At the lower end of the spectrum, according to the Plan Proponents, a homeowner with a $10,000 claim for the abatement of ZMF – a product almost identical to ZAI[8] - after first hiring a Delaware lawyer to apply for a ticket to go to a federal District Court, must then litigate its individual claim in a federal District Court, which will be surprised, to say the least, to learn that it is a small claims court. Of course, such small claimants, without the benefit of being in a class, may not go through this process, which is just what Grace is counting on.

Not only are valid future asbestos property damage claims going to be individually tried in the tort system, but these claimants will be entitled to individual trials. Moreover, if Anderson does not succeed in its efforts to certify the class, building owners within the class have the right

---

[8]   ZMF is a loose fill vermiculite product placed in concrete cavities as opposed to attics. Rarely would a building owner know asbestos is there before demolition activities, and in the absence of notification by Grace – which it has never given – often not then. ZMF, unlike ZAI, was covered by the Traditional Bar Date, which did not have any television component or instructions for locating and testing the product. The only difference between ZAI and ZMF is the size of the vermiculite. [Finke 3/30/09 at 46].

to file late claims, including the thousands identified in Anderson's class claims, which again will lead to individual trials.

Grace's strategy to marginalize and disenfranchise the property damage claims of Anderson and the class it seeks to represent has found its culmination in the Plan Proponents' current Plan, which subjects the Anderson claim to treatment that is disparate from all other claims that are dealt with under the Plan, a violation of the fundamental promise of equality of treatment.

## I.     The Anderson Pre-Petition Litigation

The magnitude of the potential exposure from public and private buildings has been on Grace's radar screen for at least twenty-five years.  In 1984, Grace and several other companies formed the Safe Buildings Alliance ("SBA") – which the Third Circuit later determined was the alter-ego of its members – with offices then and now located at the Washington, D.C. offices of its counsel, K&E. The catalyst for the SBA was an EPA notice scheduling a public meeting and seeking comments on whether it should expand its 1982 school regulation and establish certain standards not only relating to ACM in schools but also to require inspection and abatement of friable ACM in public and commercial buildings." 40 C.F.R. 8450; *see* In re School Asbestos Litigation, 842 F.2d 671 (3d Cir. 1987).  While the focus at that time was on school buildings, the SBA/Grace undoubtedly knew that the real financial risk it faced was from commercial buildings.  By 1990, SBA, having spent millions of dollars on a highly sophisticated media campaign to convince building owners to leave ACM in place, had dissuaded EPA from giving any notice to public and private building owners like that contained in the 1982 schools regulation, which had triggered the nationwide schools class action. In Re Asbestos School

Litigation, 104 F.R.D. 422, 425  (E.D. Pa. 1984), aff'd in part and vacated in part, 789 F.2d 996 (3d Cir. 1986).

SBA's goal was to protect its members' pecuniary interests in the underlying litigation by convincing building owners to forego the removal of asbestos in their buildings, until after Grace erroneously believed the statutes of limitations would run. In re: School Asbestos Litigation, 842 F.2d 671, 674 (3d Cir. 1987) at 682-3].  As later cases would develop, including the District Court's recent California decision, the reality is that Grace shot itself in the foot because the Courts correctly found that the statute of limitations could not accrue until there had been an injury.

In early 1991, S&R successfully tried the first three asbestos property damage cases on behalf of commercial building owners.  New Hampshire-Vermont Health Service Corp. v. U. S. Mineral Products Co., 10 F.3d 805 (1st Cir.1993); Clayton Center Associates v. W.R. Grace & Co., 861 S.W.2d 686 (Mo.App. 1993); Blue Cross & Blue Shield of South Carolina v. W. R. Grace & Co., 781 F.Supp. 420 (D.S.C.1991).  These three cases resulted in a total recovery of more than $24 million for just three buildings (an average of $8 million per building).

The following year, however, Grace obtained a verdict in a North Dakota case in which the District Court charged that the statute of limitations began when the building should have known that Grace's product contained asbestos and might be hazardous.  See Montana-Dakota Utilities Co. v. W.R. Grace & Co., 14 F.3d 1274, 1277 (8th Cir. 1994).  Before the case was reversed by the Eighth Circuit, S&R decided to bring another asbestos property damage class action on behalf of commercial and local government building owners.

S&R and co-counsel earlier had filed nationwide class actions on behalf of the owners of properties leased to the federal government and on behalf of the nation's colleges and

universities.  Both classes were certified in 1992.  <u>Prince George Center v. U.S. Gypsum, et al.</u>,

Court of Common Pleas of Philadelphia County, May Term, l986 No. 5388, filed May 30, l986;

<u>Central Wesleyan College v. W.R. Grace & Co.</u>, 143 F.R.D. 628 (D.S.C. 1992).  Particularly

important to Anderson was the <u>Central Wesleyan</u> decision where the South Carolina District

Court, after first finding that the South Carolina door closing statute does not preclude a

nationwide class action where the named plaintiff is a South Carolina resident, followed Fourth

Circuit precedent recognizing that "the class action ... is the manifest fair and expeditious

procedure for disposing of the mass tort litigation."  <u>Central Wesleyan</u>, *supra* at 143 F.R.D.  The

Fourth Circuit later affirmed the <u>Central Wesleyan</u> certification decision, including the District

Court's finding that the door closing statute imposed no impediment to certification of a

nationwide class in South Carolina.  <u>Central Wesleyan College v. W.R. Grace & Co.</u>, 6 F.3d 177,

187 at n. 3 (4th Cir. 1993).

    With the 1992 certification of the <u>Prince George</u> and <u>Central Wesleyan</u> nationwide class

actions, every type of building with Grace's Surface Treatment, *save one*, was covered in whole

or part by a nationwide class action or a statewide action.  The sole exception was that no class

action had been filed on behalf of the owners of commercial buildings.  In addition, no

nationwide or statewide action outside of Texas covered the owners of local government

buildings.  Anderson's December 1992 lawsuit attempted to fill these gaps.

    On December 23, 1992, Anderson filed its class action lawsuit in the South Carolina

Circuit Court.  [DI 7221].  Anderson's lawsuit was filed while the MDU case was on appeal in

an effort to deal with present and future cases which had been placed in limbo by the District

Court's jury charge.  When the Anderson complaint reached the desks of Grace's in-house legal

team, they recognized that it was "not just another case;" it generated discussion which included

Mr. Robert Beber, who by then was also Grace's Vice President and General Counsel.  [Finke 3/30/09 at 14].

The parties litigated the putative class action in State and Federal Court for over eight years prior to Grace's Chapter 11 Petition. [DI 10001, Ex. J].  Among the contested issues were federal removal jurisdiction, proper venue over the action, numerous discovery matters, and several motions to dismiss and/or motions for summary judgment.  Included in these matters was a motion by the defendants to strike all reference to non-South Carolina class members from the complaint based upon the South Carolina "Door Closing Statute." (S.C.Code Anno. Section 15-5-150).  [Id.] After a hearing on this motion, the South Carolina court issued an order striking out-of-state class members from the Anderson Complaint. [Id.] In 1995, the Court denied reconsideration of that order.  [Id.] Because that order did not conclude the case, it was not immediately appealable under South Carolina law. [Id.] Anderson could only reserve its position for appeal at the conclusion of the case before the circuit court. [Id.].

After the South Carolina court entered its door-closing order, Anderson amended its Complaint as required by the lower Court to exclude non-South Carolina buildings (with the Court's acknowledgment that its appeal rights were preserved), and expanded the products in the putative statewide class to include all surfacing material, as opposed to judge Surface Treatment. The South Carolina Court later defined asbestos-containing Surfacing Material as "material that is sprayed, troweled-on or otherwise applied to surfaces, such as acoustical plaster, ceiling texture, fireproofing materials, attic insulation, and masonry fill." [Id.]  Grace sold a wide variety of Surfacing Materials.

The South Carolina circuit court (based upon Grace's bankruptcy threat) entered an *ex parte* order conditionally certifying a state-wide asbestos property-damage action against Grace

on February 9, 2001.  [Id. at Exhibit H].  At the time the February 9, 2001 Order was entered, Anderson's class certification motion had been pending for over three years and the parties were five months removed from a two day evidentiary hearing on class certification.  [Id. at 7-10]. Resolution of the certification motion had been substantially delayed by Grace's repeated requests to amend the class certification scheduling order and its requests for briefing after the hearing.  [Id. at p. 9].  Grace was subsequently provided the opportunity to fully brief the propriety of the certification order and were given a hearing as well.  [Id.].  At the close of briefing and after the hearing, the South Carolina circuit court kept the certification order in effect.  [Id.]  Grace filed its Chapter 11 petition on April 2, 2001 before any notice to the class could issue.

## II.      Bankruptcy, Bar Date and Notice Orders

On May 3, 2001, District Judge Farnan, who was then supervising the case, told Grace "to outline the debtors' proposals for the management and scheduling of the asbestos claims litigation in these Chapter 11 cases." [DI 688, Ex. A]  Grace then proceeded to file four separate papers in which it stated that Anderson would be able to return to the tort system.  [DI 586 at pp. 47-48; DI 688 at pp. 1-5; DI 688 Ex. A at p. 3; DI 1665 at p. 12].  The last of these representations was set forth in Grace's revised motion seeking, *inter alia*, the establishment of a property damage "Bar Date." [DI 1664].  Anderson later filed its class and individual claims in response to this pleading.  As discussed herein, after Anderson filed its claims, however, Grace reneged on its representation that it would be permitted to litigate its claim in the tort system.

On November 16, 2001, counsel representing certain ZAI Claimants ("ZAI Counsel") filed a class action complaint ("ZAI Adversary") seeking relief on behalf of a class of owners or

occupants of property in which ZAI has been installed. The class definition expressly excluded

two other pending class actions, including the Anderson case.  [Adv. No. 01-08810, DI 1, p. 23].

The Court conducted an omnibus hearing on January 29, 2002, at which the question of

class claims came up in connection with the ZAI Claims.  Consistent with its proposed Bar Date

Notice, Grace argued that In re American Reserve Corp., 840 F.2d 487 (7th Cir.1988) – the

landmark Seventh Circuit decision allowing class proofs of claim in bankruptcy, even on behalf

of persons who did not file individual proof of claims – had not been adopted by the Third

Circuit. [DI 1650, 1/29/02 Hearing Tr., p. 27].  Grace went on to say, however, that "even if you

follow American Reserve," the process is to file class of proof of claims in response to a bar date

and take up class certification after there is a contested matter ("Even American Reserve didn't

say that you can take up class certification before you had the proofs of claim on file.") [Id. at 27,

36].  Additionally, Grace told the Court that, "I don't even know if that it requires the permission

of the court to file a class proof of claim." [Id. at 64].

The Court directed Grace to file its proposal for dealing with property damage claims as a

separate document, and on February 12, 2002, Grace filed its Revised Case Management Motion

providing for the disposition of all asbestos property damage claims ("Revised CMO Motion").

[DI 1664]  As a foundation to its proposed resolution of Property Damage Claims, Grace asked

this Court to establish a "Bar Date" for the filing of present claims for damage caused by

products manufactured by Grace.  Grace proposed the most comprehensive "Proof of Claim"

("POC") ever used in an asbestos bankruptcy, seeking information which it could use to attack

claims on the common issues of constructive notice and hazard (regrettably, Grace rejected the

PD Committee's suggestion that it seek the most basic information required in other

bankruptcies and class actions -- square footage of Grace material -- which always forms the basis of settlement discussions and estimation exercises).

Grace also proposed a "Notice Program," which essentially provided for notice by publication without any direct notice to unrepresented building owners who could be reasonably identified through Grace's records (as required by Judge Newsome in other bankruptcies later assigned to this Court). [AMH Ex. 34A, Ex. 36A]  Finally, Grace asked the Court to approve its proposed Bar Date Notice – which proposed to prohibit class proofs of claim and inform claimants that they could not rely on class actions to protect their rights. [DI 1664]

Three days later, Grace filed its "Brief Regarding Bar Date and Class Notice." [DI 1677] Consistent with its statements at the January hearing, Grace argued that "class certification can and should be dealt with down the road, after the claims have come in."  [Id. at 1] Grace also argued that the Third Circuit had not had the opportunity to address and should not adopt American Reserve. [Id. at 6] Finally, Grace argued that even if the Court should follow American Reserve, "a bar date would still need to be set and a class proof of claim filed." [Id. at 4] Grace did not argue at the time that Court permission was required in order to file a class proof of claim.

On February 25, 2002, the Court conducted its first hearing on Grace's Revised CMO Motion. [DI 1793, 2/25/02 Hearing Tr.] The Court told the parties early on that it wanted to send out a PD Bar Notice, but after entertaining extensive arguments on Grace's proposed POC and Notice Program, the Court sent the parties back to the drawing board to work out their differences and report back at the March omnibus hearing.  [Id. at 60-61] Near the end of the February hearing, however, the PD Committee's counsel (Mr. Baena) pointed out that Grace's proposed POC was not designed to be used for a class proof of claim (of course, at that time,

Grace's proposed Bar Date Notice prohibited class proofs of claim altogether) [Id. at 96]. The Court agreed and told everyone that "it seems to me that the process that Judge Gambardella followed" in First Interregional "makes good sense" and is a "very efficient process". [Id. at 97-98]. The Court explained that – without "making rulings," and "just talking in general terms" – "I think there is some benefit to using that class process," and it "may be appropriate in this case." [Id. at 97-98]. The Court then addressed issues which would later be presented in the Anderson certification battle as follows:

> **The issue that she addressed, and in fact other Courts have addressed, is whether you need to file an individual proof of claim either in addition to or in lieu of the class claim. She, and most of the other Courts that looked at this issue, decided you do not need the individual claims if you permit the class proof of claim, because in some senses it's duplicative. In other senses it essentially wipes out the class action aspects of the proof of claim form. I'm inclined to think that's probably right. But I'm not sure in every given case that you don't also need either an individual claim form or an identification of the Claimant.** In her case she did not need to get into the individual proof of claim form because attached to the class group was a list of all the putative claim holders. And she found that that was sufficient.
>
> So that's what I think we need to do. We need to figure out how to get appropriate notices out. Then we need to figure out who the putative class members are. And then we need a list. **Somewhere or other the Debtor needs a list of who the putative class members are. And it's gonna be important for both estimation and actual damage issues if we get that far.**

[Id. at 97-99]

Earlier during the hearing, Mr. Speights briefly had explained that Anderson was the representative of a certified class action on behalf of Traditional Property Damage and ZAI Claimants (contrary to Grace's later misrepresentations, Anderson was repeatedly discussed in briefs and at hearings before the Bar Date). [Id. at 53-55]. During its discussion of Interregional, the Court asked about the Anderson class, and the following exchange occurred.

THE COURT:  But who are the Claimants?  I don't care about the number of buildings.  Who are the Claimants?  In that case, for example, are they all public buildings owned by the State of South Carolina?

MR. SPEIGHTS:  No.  They are all private buildings, commercial buildings, houses, churches, schools who opted out of the schools class, and colleges who opted out.  It's every type of building except Government buildings.

MR. BERNICK:  There's an issue there about how many of them were settled.  But Mr. Speights just made my case, which is that even if you had a large group of claims, you'd still have to know all about all those -- how many of those people have what type of buildings, and are they really gonna step forward at the end of the day and seek to have their particular claims recovered out of the class.

* * * *

THE COURT:  **I think you can do it in several ways.  But the way that Judge Gambardella looked at this issue was to say that attach -- at some point, yes.  Somebody has the burden of coming forward to identify the Claimants and, in this instance I think, the building involved in the damages asserted.  I agree with that.  The question is, do you do it by individual proof of claim forms?  Do you permit a class proof of claim form and have the representatives of the class adopt the burden of identifying the class members?**

MR. BERNICK:  No, that's what's very, very different.

THE COURT:  That's what she did.

MR. BERNICK:  But, no, what she did was a little bit different.  What she did was to say, "I'm gonna let this case proceed as a class."  And it actually had it defined under a people.  And we're going to have them identify the Claimants.  **We're gonna go through class discovery** --

THE COURT:  **Right**.

[Id. at 102].

At the end of day, Mr. Speights left the Courtroom having heard the Court say it would follow the Interregional case, which adopted American Reserve in all respects; it permitted class proofs of claim; and it permitted a putative class representative to seek certification of a class that included persons who did not file individual claims by the Bar Date.  He heard the Court say that it was "probably right" that you do not need the individual claims if you permit the class

proof of claim, but that it was "not sure in every given case that you don't also need either an individual claim form or an identification of the claimant." He heard the Court say that Grace "needs a list of who the putative class members are." He heard the Court say that he probably needed to supply a list either as part of class claim or individual claim. Finally, Mr. Speights heard the Court agree with Grace that the building owner identify the claimants through discovery after the claims had been filed.

On the other hand, Mr. Speights was also there when the Court said that it wanted a motion filed to determine whether a class proof of claim is appropriate. The Court also agreed with Mr. Baena that the class representatives needed notice if the Court imposed this requirement. Although Grace disagreed,[9] had matters remained unchanged after the February 25, 2002 hearing, Anderson may have filed such a motion rather than arguing to the Court that the issue of whether a claimant needed to permission to file a class proof of claim had not been teed up for hearing at that time, and was not supported by American Reserve or Interregional.

After the February 25, 2002 hearing, the ZAI Claimants, perhaps in an abundance of caution, filed a motion seeking permission to file a class proof of claim. Unknown to Anderson at the time, Grace immediately and strongly reacted with a letter to the Court in which it urged the Court to follow American Reserve and Interregional. [DI 1795]. Grace also took the absolute position that "Rule 23 is not even applicable until claims are filed and objected to."

---

[9] As Grace suggested then and made even clearer at subsequent hearings, the last thing in the world it wanted was for a Traditional Property Damage or ZAI Claimant to obtain the blessing of the Court to file a class proof of claim before the Bar Date, which in Grace's view, not only would afford it an enhanced status (e.g. the class could litigate common issues), but such a ruling might well obviate the need of a large number of unknowing or somnolent building owners to file individual claims. Stated differently, Grace saw it as a threat to sabotage its desire to limit the number of Traditional Property Damage and ZAI claims and then pick off the Property Damage and ZAI claims through individual litigation. Mr. Baena saw through Mr. Bernick's charade and called it an ambush [Id. at 109], but he was a voice in the wilderness.

[Id.]. Significantly, unlike ZAI, where no case had been tried before the bankruptcy, the traditional property damage litigation was undisputably mature.

At a subsequent hearing on March 18, 2002, the Court suggested that "it may make more sense" if the parties could "agree to a process to have a class proof of claim filed on behalf of all Zonolite plaintiffs," and then "litigate the common issues." [DI 1912, 3/18/02 Hearing Tr., p. 56]. When Grace responded that such a process could not work unless "you certify the class," the Court agreed and said "I'm assuming for the moment that we're passed those issues in discussing this." [Id. at 57-58]. Grace, faced with the prospect of all ZAI Claimants being united in a certified class action, responded that the consequences of such a decision would "create an enormous economic dynamic to the case" and instead pushed for a bar date. [Id. at 58]. The Court rejected that approach because of notice issues and suggested using the two already existing state court classes – "State of Washington [Barbanti], and the other in South Carolina [Anderson]" – which could file class proofs of claim. [Id. at 61]. Grace acknowledged that Barbanti was a ZAI class and that Anderson "went through a long briefing process" and was "certified on an *ex parte* basis in the weeks just before we filed for Chapter 11," and that it dealt with property damage issues generally and may include Zonolite." [Id. at 61].

The Court's suggestion of the use of those pending class actions to facilitate a "Rule 42 type trial" on science issues produced some rare candor from Mr. Bernick when he confessed, producing what is noted as "laughter" in the transcript, that "I would love to be able to tee-up the issue of the science without any notice, you know." [Id. at 62]. After the laughter subsided, Mr. Bernick made clear that Grace's position had nothing to do with bankruptcy or class action law, but it had everything to do with leverage: "How do you negotiate a resolution with people who

are sitting on top of a class that's got 45 million people?"  [Id. at 63].[10]  Even after the Court

pointed out that the claims would be gone if the Court ruled against the class on the scientific

issues, Grace argued that, "even if we were to win, you can be assured that given the magnitude

of this potential claim, this case is going to become extraordinarily difficult to resolve." [Id. at

64-65].

Boxed into a corner, Mr. Bernick then made a proposal that led to the "ZAI Science

Trial" – to try a few individual "test" claims on the science issues, in proceedings for which the

"outcome would not be binding on those entities who have not yet filed proofs of claim." [Id. at

73-74, 80]. There followed an exchange which further confirmed that a claimant did not need to

obtain court permission to file a class proof of claim, in which Mr. Lockwood acknowledged that

"I don't think you need permission to file a proof of claim," Mr. Bernick agreed that the proper

process was that "They're going to file a class proof of claim, the debtor will object to it, they

move for certification and approval of litigating or processing or allowing or disallowing the

class proof of claim on a class basis," and the Court concurred, stating "If you simply would

prefer that somebody file the class proof of claim and then the issues come up, I think it's okay."

[Id. at 103-113].

The Court's approval of this process was ratified at a subsequent hearing to approve

Grace's revised Bar Date Notice and related forms, wherein it was again acknowledged that no

---

[10] Grace returned to this theme later, citing Judge Posner for the proposition that this would be
"economic leverage," and still later stating that: "Why do they want to do it?  Because they want
influence in the case.  They want influence in the case."  Id. at 70, 74.  Still later, Mr. Bernick
stated that if the Court proceeded with the class issues first, "[E]ffectively in one stroke, we've
now taken a Chapter 11 where there was no litigation history in this area, a tremendous amount
of litigation history courtesy of Mr. Lockwood, and you've now created a totally different
situation where he's no longer the big guy in town because there's an even bigger guy in town."
Id. at 75-76.

permission was required to file a class proof of claim. [DI 2057 4/22/02 Hearing Tr., pp. 54-55, 70]. The Bar Date Notice which the Court ultimately approved omitted the language prohibiting class proofs of claim, and omitted the language stating that property damage claimants could not rely on a class proof of claim. [DI 1926]. The Bar Date Order [DI 1963] set a March 31, 2003 deadline for filing traditional property damage claims.

The Debtors' Notice Plan, as eventually approved by the Court, did not contemplate that the Debtors would provide direct notice to buildings or building owners with asbestos property damage claims who could be identified through the Debtors' sales records and other documents. The Notice Plan contained a provision that "all counsel of record for holders of Asbestos Property Damage Claims" were required to provide the Debtors with certain information about "their clients" who have or may have claims against the Debtors, "so that the Debtors will be able to provide their clients with the Bar Date Package" or a "certification" that counsel "has contacted or attempted to contact all of their clients whom they represent, provided them with the Bar Date Package and advised them regarding their rights to assert a claim against the Debtors and their need to file their proofs of claim on the court-approved Proof of Claim forms by the deadlines set forth herein." [DI 1963]. The Property Damage Committee sought to appeal the Bar Date Order [DI 2019], but the appeal was rejected as interlocutory [DI 2254].

Contrary to what the Debtors then represented to this Court, during the confirmation discovery proceedings, Grace has admitted that it had the ability to identify buildings where its product had been placed.   [Finke 3/30/09 at 140; Hughes 6/11/09 at 400-406, 412-413]. Nevertheless, for almost forty years since Grace was first served with proposed regulations, its lobbying efforts with the EPA both directly and through its alter ego, the SBA, through and

including its failure to serve the Bar Date Notice on easily identified building owners, Grace has resisted every effort to inform building owners of the hazards they face from its ACM products.

On March 31, 2003, the Court directed Grace to file a status report "with respect to all matters pending and ready for decision. [DI 3594]. In response, Grace filed its report on April 21, 2003, in which it stated that prior to the Bar Date "the Debtors established a claims review process and began to review the filed claims" and "are diligently continuing the process of review and are ready to review claims as expeditiously as possible upon availability of claim form information." [DI 3688].   Contrary to the relief it obtained, the Debtors did not file a Claims Report within sixty days of the Bar Date identifying what cases would be returned to the tort system. The reality is that for whenever reason -- pursuing personal injury issues before Judge Wolin, trying to pass legislation, or other priorities, the Debtors simply chose to abandon that process.

## III.    Anderson's Claims

In accordance with the requirements imposed in this case, Anderson did what is directed by most courts, by timely filing a class proof of claim.  In fact, Anderson filed three proofs of claim: a "worldwide" class proof of claim (#9911); a statewide class proof of claim (#9914); and an individual proof of claim (#11008) [DI 19987, TAB A, TAB B, TAB C].  Anderson also did what this Court indicated class representatives should do, as referenced in Interregional: it attached a list of over 3,000 putative claimants (including 121 South Carolina claimants) to its worldwide class proof of claim form. [Id., TAB A].  It also attached an affidavit to its statewide class proof of claim identifying hundreds of shipments of Grace's asbestos products to South Carolina. [Id., TAB B].  Anderson later supplemented both class claims with extensive additional information: the index alone for the supplement to the worldwide class was 835 pages, and the

index for the supplement to the statewide class was 104 pages. [Id., TABS D and E; DI 11267, 10293]. In addition, in an abundance of caution, Speights & Runyan also filed Proof of Claim forms for each claimant/class member it could identify through the Debtors' sales records. Each of those claims referenced Anderson in their proof of claim, and their reliance on the Anderson class action was not concealed.

## IV.   **Post-Claims Bar Date Developments**

After the PD claims bar date passed, the Court began applying increasing pressure on the Debtors to negotiate a consensual resolution of their issues. At an August 25, 2003 hearing on the Debtors' motion to extend exclusivity, the Court coupled its order granting an extension "with a directive to the debtor to start meeting independently with the different constituent groups to find out what it is they want and how on earth the debtor may be able to come to some accommodation." [DI 4384, 8/25/03 Hearing Tr. p. 24]. Again at a February 23, 2004 hearing, the Court pushed Grace as to when it was going to file a plan and expressed concern as to whether it was necessary to replace the debtor as a debtor-in-possession. [DI 5381, 2/23/04 Hearing Tr., p. ___]. At no point during this time period did the Debtors suggest in any of their status reports to the Court that traditional property damage claims in general, or Anderson or S&R's claims in particular, were a significant problem delaying the case's resolution, and indeed in June 2004, the Debtors hailed "the progress that has been made in the evaluation of asbestos property damage claims following the Bar Date." [DI 5858, pp. 15-16]. On April 19, 2004, the Debtors filed a motion for the appointment of a "legal representative for future asbestos [personal injury] claimants [DI 5460] – something the Court had directed them to do nearly two years earlier, which the Court approved at a May 24, 2004 hearing and appointed Mr. David Austern. [DI 5645]

In October 2004, Mr. Speights participated in a "principals only" meeting in Washington, D.C.[11]  While the meeting was conducted at K&E's law office, Mr. Bernick and his group, as well as all other professionals, were kept out of the room, while Grace's officers and in-house counsel met with Mr. Austern and members of the Asbestos Committees. [9/17/09 Tr. at 78-79 (Austern)].  Within six hours, the principals accomplished more than had occurred over the previous three years (or would occur over the next three and a half years).  The parties emerged from that meeting with a meeting of the minds as to how to resolve this bankruptcy case once and for all.  Robert H. Beber, Grace's former General Counsel, filed an affidavit with this Court in which he averred that "At that meeting, I believe that the parties came very close to agreement on the important economic terms of a consensual plan." Mr. Beber averred that those discussions "ultimately broke down" but acknowledged, "I was not sure why they broke down." [DI 11756, Ex. A]. Indeed, nobody, including Mr. Bernick, has ever offered any explanation for why that deal fell apart after it was turned over to the lawyers to document and implement it.

In November 2004, Grace filed its Plan of Reorganization [DI 6895] and related pleadings including a motion for entry of a case management order regarding litigation of asbestos claims [DI 6898] and a motion for estimation of asbestos claims [DI 6899].  The Plan was conditioned upon a finding that the aggregate amount of all asbestos claims was not greater

---

[11] Mr. Speights had credibility in participating in this settlement meeting because the Eleventh Circuit had recognized that Mr. Speights was instrumental in negotiating the Celotex Plan of Reorganization in a decision awarding him a substantial contribution fee:

> In sum, the evidence accepted as true by the bankruptcy judge was that [Speights & Runyan], and Speights in particular, played a significant role in the successful negotiation of a consensual plan, and that **a large portion of the credit for achievement of the plan was attributable to Speights because of his credibility and the experience in asbestos related bankruptcy that he brought to the process.**

In re Celotex Corp., 227 F.3d 1336, 1340 (11th Cir.2000) (emphasis supplied).

than $1,613,000,000. Grace's proposal with respect to PD claims was that the claims would first be culled by prosecution of "Gateway Objections" (an idea which Grace had initiated but not pursued for several months prior); then Grace and the PD Committee would file expert reports on the value of all remaining PD Claims in light of Grace's liability defenses; and finally, an estimation hearing would be conducted. The proposal to resolve matters through "common issues" trials was, ironically, largely consistent with Anderson's efforts for the prior 12 years to proceed on a class basis to resolve PD Claims asserted against Grace.

On December 20, 2004, in accordance with a Court order [DI 6715], S&R filed a Fed.R.Bankr.P. 2019 statement setting forth, *inter alia*, the basis of the firm's authority to file multiple claims [DI 7221]. The Rule 2019 Statement was filed consistent with S&R's right and, indeed, fiduciary duty, to preserve claims on behalf of absent members of the putative Anderson class, other than those who, after the filing of the claims, advised S&R that they did not want to proceed with such claims. The Rule 2019 Statement provided authority for the filing of the claims including: a copy of the retainer agreement for the 100 Pine claim; a copy of the retainer agreement for Board of Regents; a copy of the retainer agreement for California State Universities; copies of retainer agreements, written authorizations or other written authority for several claims included in the Anderson class; a copy of the Anderson complaint for the Anderson South Carolina certified class; and a copy of the original Anderson complaint on behalf of members of the putative class which S&R identified primarily from Grace's own records. [Id.]. All of the individual claims reference Anderson as the basis of authority. The filing of such claims was consistent with the suggested course of action following the February 25, 2002 bar date hearing to provide identification of the claimant by means of a claim form or

list of the putative claim holders.  In reviewing the claims, S&R discovered some claims that needed to be withdrawn, and therefore did not list them in the Rule 2019 Statement.

Shortly after filing the Rule 2019 Statement, S&R was contacted by Mr. Beber, which led to a meeting on February 16, 2005 at Grace's offices in Boca Raton, and discussions regarding the potential withdrawal or resolution of certain claims filed by S&R. [DI 9307] In fact, S&R had already reviewed the filed claims and had its own list of claims that it was prepared to withdraw.  The parties also discussed a stipulation to "put on the shelf" claims for conspiracy filed by S&R.  Following the meeting, through February and early March, Mr. Speights and Mr. Finke exchanged further correspondence and drafts of stipulations addressing the agreed withdrawal of certain claims. [Id.]  However, communication from Grace abruptly ceased in mid-March 2005 despite repeated follow-up inquiries from Mr. Speights to Mr. Finke. [Finke 3/30/09 at 143-145; AMH Ex. 50, 51, 52].

Meanwhile, discussions continued regarding a proposed case management order for the estimation process for PD claims.  In January 2005, Grace had argued that certain objections could be handled on a "common issue basis," that "if the estimate is done to create an overall aggregate amount, you don't have to have claimant participation, because it's not dispositive of their particular claims," and that the amount of work needed to prepare for an aggregate value estimation was "very modest."  [DI 7680, 1/21/05 Hearing Tr., p. 199-202]. By March 25, 2005, after consultation among counsel for the Debtors and the PD Committee, Grace filed a Certification of Counsel attached a proposed Case Management Order for the estimation of property damage claims [DI 8123].

## V.     **The Debtors Declare War on S&R**

By all appearances, things seemed to be on track.  The Bar Date for property damage claims had been established and had passed, the claims had been analyzed, the Court had granted Grace's motion to file "Gateway Objections," the Court had ruled that those Gateway Objections could proceed separately from the estimation process, Grace had sent out notice of its intent to proceed with the "Gateway Objections," and the parties had presented a proposed Case Management Order for the estimation process.

But some time around April 2005 – the same time that Grace replaced its general counsel with Mark Shelnitz [Finke 3/30/09 at 5] – Grace's strategy made a marked change.  In retrospect, for Property Damage Claimants, this bankruptcy got off track on April 25, 2005.  At an omnibus hearing that day, Grace pointed out that the Court had never signed the Estimation Order the parties had submitted under a Certificate of Counsel on March 25, 2005. [DI 8364, 4/25/05 Hearing Tr., p. 110].  As the Court started to sign the Order, Mr. Baena told the Court that he had some concern about meeting the deadlines because several days earlier, Grace announced its intention, as part of an estimation hearing, "to challenge the notion that any of their products are harmful." [Id. at 111].  After Grace explained that the issue as "whether or not MK3 in a building is harmful and therefore needs to be removed" [Id. at 112-13], the Court correctly identified and placed into context the estimation issue in the following exchange with Grace:

> THE COURT:  So, you're going to value the likelihood that you're going to either win or lose that issue in litigation?  You're not really going to determine the science behind the MK3 product?

> MS. BAER:  Your Honor, I think that's right, although I'm not an expert on evaluation, and I have not been the one dealing on a day-to-day basis with our experts ...

[Id. at 113].

The Court was spot-on when it recognized that the harmfulness of Grace's products was just one factor in estimating the likelihood of success in litigation.   Nevertheless, the Court agreed not to sign the Order so the parties could talk and consider changing the dates in the Order. [Id. at 114-16].   Importantly, no one suggested that the substantive provisions of the Order itself should be changed, but only that the possible dates might have to be modified; if fact, the parties proceeded with discovery in the property damage estimation proceeding. [Id. at 11-16].   Over the next three months, there was no question that the parties were proceeding under an agreed upon property damage estimation proceeding with only a disagreement about dates.   However, Grace would later use the delay in the actual execution of the agreed upon Order as an opening to sabotage the entire property damage estimation procedure which the parties had worked over so many months to achieve.

On May 23, 2005, Grace filed a Motion to Extend Exclusivity with a notation that it was scheduled for hearing on June 27, 2005. [DI 8486].  Significantly, while Grace was secretly arming for battle against S&R, it relied upon the progress it was making with respect to property damage claims in support of its request to extend exclusivity, informing the Court that Grace and the PD Committee were "negotiating a case management order to govern the estimation of asbestos property damage liabilities (the "PD CMO"), and discovery is progressing.  The PD CMO will set forth a schedule for discovery and pre-trial briefing in connection with the estimation of asbestos property damage liabilities. The schedule currently being discussed extends through at least February 16, 2006." [Id. at 2-3]. In contrast, Grace pointed out that negotiations with the BI constituency had been "unsuccessful."

In summary, as of May 23, 2005, Grace told the Court that everything was on track with respect to PD claims, which would be resolved in early 2006, and that it was the Personal Injury

constituency that was presenting problems.  Unfortunately for Anderson, on June 10, 2005, Mr.

Baena filed an unusually strong objection on behalf of the PD Committee [DI 8600] to the

Debtors' request to further extend exclusivity, which may have added fuel to the fire that started

when Mr. Shelnitz assumed control.[12]  Shortly thereafter, it became clear that the Debtors'

strategy had changed, and that their new mission was to aggressively smear Anderson's claims in

particular, and property damage claims generally, through an underhanded campaign against

Anderson's counsel, S&R.  Despite prior negotiations, the Debtors' new game plan was to go to

war with property damage claims and to use S&R as their scapegoat.

In the spring of 2005, Mr. Bernick met with some members of the ACC and their

counsel, and suggested "getting rid of this guy [Mr. Speights] so Grace could make a deal with

the PI constituency. Mr. Bernick later explained this meeting in trying to get another extension of

exclusivity:

> I attended a meeting in New York and I don't believe that anybody here was
> present at that meeting, but it was no secret.  I said -- this was with Parry White
> and Peter's partner, Elihu Inselbuch, and Russell Budd and we all sat around and
> say well, should the debtor and the personal injury people do their own deal first?
> I said, "Gee, that makes a lot of sense.  If I can get rid of this guy, you know,
> maybe we'll make some progress here.  And he can, you know, take whatever it is
> that is necessary to get a consensual plan."

[DI 11473, 12/19/05 Hearing Tr. at 68]. The guy Mr. Bernick was referring to – and he looked at

when he said that at the December hearing – was Mr. Speights.  As he would make abundantly

clear over the following several weeks, Mr. Bernick, with the support of Grace's new

---

[12]  Among other things, the counsel for the PD Committee asserted that "the PD
Committee is unaware of a single attempt by the Debtors to forge a consensual plan of
reorganization;" that "the Debtors are utilizing the Estimations as yet another tool to create
discord and to squelch any consensual resolution of these cases;" and that, "These Debtors in
particular should not be allowed to abuse the chapter 11 process or the gift of exclusivity"
because the Debtors "and several of its senior employees were indicted on charges of
intentionally misleading the Federal Government, industrial customers, workers and the public
of the asbestos dangers associated with Grace's Libby, Montana, vermiculite mine."

management team, now wanted to negotiate a Plan with the PI Claimants and exclude PD Claimants from the negotiations.  As part of this strategy, Grace declared war on Anderson and its counsel *and* unilaterally abandoned property damage estimation in favor of litigation.

## A.    Grace's 12th Omnibus Objection

On June 17, 2005, Grace filed its 12th Omnibus Objection, challenging S&R's authority to file ten claims [DI 8640].  Instead of limiting its discussion to those ten claims, however, Grace asserted that "on information and belief, S&R filed hundreds of similarly unauthorized claims against the Debtors," claimed that "S&R has a pattern and practice of filing these sort of claims in other bankruptcies," citing in support of that assertion an Order approving a stipulation in the Mogul bankruptcy case. [Id. at 1-2, Ex. L]. But Grace did not attach any of the underlying pleadings which would have undermined that assertion.

Grace also asserted that it had "provided S&R with ample opportunities to withdraw the Unauthorized Claims," citing three attached emails of Mr. Finke, and asserted that "Mr. Speights never responded to any of these communications." [Id.].  This assertion was also demonstrably false.  In fact, Mr. Speights responded to each of Mr. Finke's emails, followed up again in April 2005, but Mr. Finke, apparently acting upon new instructions from Grace's new general counsel, Mr. Shelnitz, reneged on the proposal Grace had made and refused to communicate with Mr. Speights [Finke 3/30/09 at 143-45].

Grace also repeatedly represented that the ten claims had been selected "randomly" [DI 9207, 8/19/05 Hearing Tr. at 1; DI 9349, 8/29/05 Hearing Tr. at 17-19; DI 11025, 10/31/05 Hearing Tr. at 7], but in fact seven of the ten claims were not listed on S&R's Rule 2019 Statement, though they were on the list that Mr. Speights had with him at his meeting with

Messrs. Beber and Finke, and they were in fact withdrawn within days after the objection was filed. [DI 8710-8715, 8724, 8778]

Grace also specifically represented that the claim of the AMA was included in S&R's Rule 2019 Statement. [DI 8640, p. 4]. Grace repeatedly represented that the AMA told S&R not to file a claim before the Bar Date, even though there was no evidence presented in support of that representation. When Mr. Speights finally had the opportunity to respond to K&E's misrepresentations regarding the AMA claim, even though the Court had ruled it was a non-issue because the claim had been withdrawn, Mr. Speights set the record straight on what had occurred. [DI 11025, 10/31/05 Tr. at 31-39] Grace never again refuted Mr. Speights' explanation.

The Notice accompanying the Objection indicated that S&R had until July 28, 2005 to file a response and that the hearing on the Objection would be conducted on August 29, 2005. [DI 8640] Well before S&R had an opportunity to respond to the Objection, however, and indeed only a week after S&R received the objection, Grace relied on the objection to promote its charges against S&R in a series of *ex parte* arguments and additional pleadings that did not involve Anderson or S&R. By the time S&R finally had an opportunity to be heard, it was in the unfortunate position of having to try to convince the Court that what it had already repeatedly been told – without objection or opposition—was not accurate, even though many of Grace's accusations were disingenuous at best and false at worst.

### B.     The June 27, 2005 Hearing

At an omnibus hearing on June 27, 2005 (the day before a response to the 12th Objection was even due, and without Mr. Speights present), Grace used the pretext of exclusivity as an illogical pretext for attacking the absent S&R. There was nothing in the Amended Agenda served

by Grace in advance of the hearing to suggest that there was anything related to Anderson or S&R to be heard [DI 8643, 8678]; indeed, the only matter relating to property damage claims at all was a status conference on the estimation CMO. Mr. Bernick's extensive comments about Anderson's counsel directly violated the rules set forth in the Court's Order Establishing Case Management Procedures and Hearing Schedule then in effect. [DI 7709].

Mr. Bernick said that he was going to spend "a couple of minutes with respect to the property damage claims," whereupon he handed up to the Court a number of demonstrative exhibits that he had not disclosed beforehand [DI 8961 6/27/05 Hearing Tr., pp. 45-46] to lambast S&R in its absence. Mr. Bernick first stated that:

> Remember, at the time that this case was filed, there were only seven property damage cases left in the entire United States. We now see over 4,000. That does tend to raise a question about what's going on. We know what's going on now. Mr. Speights has been called on this now in several different cases, Federal Mogul; In Re: Owens Corning; In Re: Celotex; In Re: U.S. Mineral Product Company; and also in Armstrong …

[Id. at 47-48]  The assertion was demonstrably false − S&R had not been "called on this" or anything else in those other bankruptcies. Counsel for the PD Committee immediately objected as follows:

> This is outrageous. Mr. Speights isn't here. There's no motion that regards Mr. Speights' claims. There's nothing on this agenda today about the liquidation or the discussion about property damage claims except the status conference in regard to a case management order. All we're here about is whether or not this debtor should have six more months of exclusivity. That's what we're here about.

[Id. at 48]

Mr. Bernick then made a startling accusation about the PD claimants, against whom he had not filed the Gateway Objections that the Court authorized more than a year earlier, and about whom he had said very little before the PD Committee had the temerity to oppose exclusivity:

> [I]t is our assessment that they [PD Claimants] are today the principal reasons
> why this case cannot be settled.  That's not to say that we're not going to have a lot
> of issues with the personal injury folks, but we believe that there's so much swing
> here and the argued for value of these property claims versus what we believe the
> reality is, that that is where the principal obstacle to settle them currently lies.

[Id. at 50-51]

Despite the Court's earlier admonition to Mr. Bernick that he move on to something else, he then returned and intensified his attack against S&R, stating, *inter alia*, that the PD Committee, in opposing exclusivity, was trying "to avoid the Speights & Runyan issues.  They want to avoid the objections and they want more time. . ." [Id. at 52].  What "Speights & Runyan issues"?  What objections?  At that point, Grace had only ten days earlier served S&R with unnecessary objections to **ten** claims, which were not scheduled to be heard, at the earliest, for another two months.

Finally, Mr. Bernick said, again without any evidence, that, "some of these people are now calling us saying, this guy [Mr. Speights] doesn't represent us." [Id. at 52].  Once again, the statement was unsupported by any evidence, but Anderson's counsel was not present to refute it.  In fact, as discussed below, Grace had served eight of the ten claimants subject to its Twelfth Omnibus Objection with Subpoenas -- which S&R received one hour before the hearing – and, at that point, according to Grace, only **one claimant**, the AMA, had contacted Grace's local counsel that very day.  At this point, it served Mr. Bernick's interest to contend that the AMA had never heard of S&R; later, it would be convenient for K&E to suggest that the AMA had told S&R not to file a claim to begin with, which was not only without evidentiary support, but absolutely untrue.

Why did Mr. Bernick launch this *ex parte* attack before filing any motion during a hearing on its request for an extension of exclusivity?  Perhaps Mr. Bernick's next statement provided a clue:

> I can tell the Court I apologize for having not having been present at some of the hearings in the last nine months.  I was on trial.  God bless, I'm done with that trial, and I'm totally focused on this case, and we would ask for six months' extension.

[Id. at 53].

At this point, Mr. Bernick directed his attention to the PD CMO and used the authority objections it would not file for more than two months as a basis to renege on the agreed upon CMO that K&E had submitted under a Certificate of Counsel three months earlier, which led to the abandonment of the PD Estimation the Court had approved months earlier.  By the end of this hearing, the Court was so convinced there were major problems between Grace and the PD Committee that it directed the parties to reconvene the next week and either agree upon a schedule for the PD CMO or submit competing orders and the Court would enter its own order [Id.].

## C.    The July 13, 2005 Meet and Confer and Aftermath

One hour before the June 27, 2005 omnibus hearing started, S&R received Notices of Deposition by regular mail of eight of the then ten PD Claimants subject to its Twelfth Objections. [DI 8645-8652]. The depositions were scheduled to commence in Chicago three days later and continue all over the country on consecutive days. Mr. Speights suggested a meet and confer which occurred on June 29, 2005; following the meet and confer, Grace agreed to suspend the depositions for seven days and stated that Grace would suspend the depositions permanently if S&R would sign a stipulation that neither S&R nor any of its attorneys "presently represents, or at any time has represented, the entities listed in Exhibit A hereto," and that S&R had not had

any communications with a number of the claimants, including the AMA. [DI 8947]. Obviously the Proposed Stipulation was unacceptable because the essence of the dispute was that S&R did represent the absent members of the Anderson class, plus S&R had communicated with putative class members. S&R proposed an immediate face to face meeting, but K&E said it was not available until July 13, 2005. Counsel agreed to meet on that date at K&E's office in Washington, D.C.

The next working day, July 5, 2005, K&E served amended notices of the same deponents to commence in Chicago two days later and again proceeding around the country including one deposition on July 13, 2005, the day of the agreed upon meet and confer. S&R had no choice to do what it told K&E it would do in its initial letter -- it filed a Motion for Protective Order on July 6, 2005, which was scheduled for a hearing on August 29, 2005, and which automatically stayed the depositions in the interim. [DI 8947] S&R pointed out, as it had in its discussions with K&E, that "**the factual basis upon which Anderson through Speights & Runyan claims authority as a putative or certified class representative to file the claims subject to the notices of deposition is undisputed. It is the legal implications of the facts that are the subject of Grace's objections**." [Id. at p. 4 (emphasis supplied)] Then on July 11, 2005, two days before the scheduled meet and confer, Grace served a subpoena on S&R demanding that it produce documentation on more than 2,900 claims within three business days; S&R filed a Motion to Quash. [DI 9002]

On July 13, 2005, S&R (Messrs. Speights, Runyan, and Solomons) met in Washington with Grace's counsel (Mr. Bernick and Ms. Browdy) regarding S&R's Motion for Protective Order regarding the eight depositions. There was no matter involving S&R on the agenda for the July hearing (S&R's Motion for Protective Order was not scheduled until the August hearing).

By that time, Grace only cared about taking four depositions (apparently because it had obtained written statements from the other deponents). S&R offered to stipulate the basis of its authority for each of the three claims, and Grace accepted that proposal. K&E then prepared a document which it entitled "Speights & Runyan's Statement of Facts Relating to its Authorization to File Certain Claims in This Chapter 11, which the parties have referred to as a stipulation ("Authority Stipulation"), and which was then executed. [DI 9002, Ex. 2, DI 9141]

The Authority Stipulation provided that as to each claimant, "Speights & Runyan believed it had authority to file this claim based on *Anderson Memorial Hospital*." [Id.]. That is exactly the basis S&R had provided for hundreds of claims in its Rule 2019 Statement; it was also the position S&R was prepared to take with all other Anderson claimants who had individually retained S&R, but Grace had other things in mind.

Promptly after the meet and confer meeting ended, K&E, knowing that there were no matters on the agenda for the July hearing dealing with S&R's clients and that Mr. Speights would be in California [DI 8974, 8999], quickly filed a "brief" in connection with a hearing specially set the following week dealing with the Grace's Estimation Motion filed the preceding November. [DI 8990] In this brief, Mr. Bernick and Ms. Browdy included an entire section attacking Mr. Speights and his law firm. Grace filed the brief at 5:55 p.m that day, almost six hours after the Court's deadline, which clearly indicates that Mr. Bernick and Ms. Browdy added their *ad hominem* attack in a matter in which S&R was not involved after they resolved their only outstanding dispute with S&R and after Mr. Speights told them that he would not be attending the hearing. [DI 8993]

Grace wanted to smear Anderson before Anderson ever appeared before the Court because Grace fully realized the magnitude of Anderson's claims. Grace also wanted the Court

to modify or abandon altogether the estimation procedure it had convinced the Court to adopt and approve an objections process as a means of substantively attacking all property damage claims.  Rather than just coming out and explicitly saying that, Mr. Bernick and Ms. Browdy used this brief to subtly shift the Court from a proposed estimation proceeding aided by gateway objections -- a process which had been agreed upon by the parties and approved by the Court months earlier -- to both an estimation proceeding and a full scale war against all PD Claimants. They did this by not only attaching a revised "PD Estimation CMO" to its brief, which the Court had requested, but also by slipping in a proposed  "PD Objection CMO" for the "**adjudication**" of Traditional PD Claims, which Grace had represented would not take place until after resolution of estimation and the Gateway Objections. [Id.]

Grace's proposed Objection CMO first proposed that "the Debtors shall file all" of its objections to the Asbestos PD Claims filed by S&R for which the Debtors asset that lacked authority (the "No-Authority Objections") and a "Motion for Limited Waiver" of the local rule limiting the number and manner of such objections by July 18, 2005. [Id.] In other words, Grace proposed in a proceeding not involving  S&R that the Court should enter an unserved Order that it would file (but not serve) the day before an estimation hearing five days later.  As it turned out, Grace filed (but did not serve) its Motion the night before the hearing, and urged that the Court enter it, but did not file the objections themselves as it said it would.

Grace's proposed Objection CMO provided that no later than September 1, 2005, "the Debtors shall make a good faith effort to have on file all of their other objections to Asbestos PD Claims (the "PD Objections"), Grace added a critical sentence: "**These PD Objections shall "include, but not be limited to, the Gateway Objections, as provided for in the Gateway Order**.  Thus without any motion, without any objection, and in the absence of the affected

parties, Grace reversed its position as set forth in the very motion then before the Court that individual claim adjudication would follow after the gateway objections and estimation process.

That was not all.  The night before the July 19, 2005 hearing, that is, on July 18, 2005, at **9:36 p.m.**, Grace filed a Motion for Limited Waiver challenging S&R's authority to file 2938 claims. [DI 9008]. The Motion consisted of ten pages attacking S&R.  Attached to the Motion was Grace's proposed Thirteenth Omnibus Objection consisting of another 38 pages attacking S&R.  Again, Mr. Bernick repeated the same allegations the next day and will be dealt with below.

Grace also filed a Notice in which it explicitly represented that S&R's response deadline was August 12, 2005, and that the hearing on the Motion would be held on August 29, 2005. [Id.]  Again, Grace did not seek the consent of S&R to its Motion -- as this Court knows, S&R was perfectly willing to consent to a Motion to have all of the issues tried at once. Grace's mission, however, was to use this pleading to smear S&R and all PD Claimants.

On July 11, 2005, Grace had filed its Notice of Agenda of Matters Scheduled for Hearing on July 19, 2005. [DI 8999]  The only property damage matter on the agenda was the Property Damage Case Management Order. Grace noted that the deadline for responses and replies was July 13, 2005, at 12 p.m.  There were no matters listed relating to S&R, or any PD claims objections. Grace later filed an Amended Agenda on July 14, 2005, which again provided that the PD CMO was the only PD matter in dispute, with the same noon deadline on July 13, 2005. [DI 8998].  Later, Grace filed a Second Amended Agenda on July 15, 2005, which still only listed the PD CMO as the only PD matter to be heard, with the same noon deadline, although it did list the replies from the PD Committee (8990) and Grace's brief (8993). [DI 8999].

### D.      The July 19, 2005 Hearing

S&R did not attend the July 19, 2005 hearing for a plethora of reasons:  First, there was no contested proceeding in existence between Grace and any S&R client.  Second, Grace had not filed any motion as to any S&R client, except that which it filed the night before, which Mr. Speights had not even seen yet, and which in any event indicated it would be heard on August 29, 2005.  Third, Grace had not served S&R with any notice that any of its claims would be addressed.

Nevertheless, Mr. Bernick used the Limited Waiver Motion he filed the night before as a platform for attacking Mr. Speights in his absence.  Mr. Bernick made an all out attack on S&R for approximately an hour, asking the Court to allow it to challenge the authority of S&R to file all of its claims (including some which had been in litigation for years before the bankruptcy). [DI 9105, 7/19/05 Hearing Tr., at 13-31] Many of Mr. Bernick's statements were demonstrably false, but the Court expressed grave concern over the charges without Mr. Speights there to speak the truth.

One of the lowlights of Mr. Bernick's presentation was his implication that S&R had filed a proof of claim on behalf of the AMA after having been instructed not to file it:

> MR. BERNICK: And you'll see that there are some issues that do have to be adjudicated. But what we found out was that, take this particular claim on behalf of the AMA, we started to test this. We subpoenaed ten different buildings, and this is going to get back to the question of timing, which is very deep. We subpoenaed ten actual claimants that were listed to have them talk about, tell us where is the authority that they gave to Mr. Speights. And what we found out is that it was represented that in the case -- this one right here, actually, signed by Ms. Steinmeyer, that the AMA actually had authorized them to proofs of the claim. But we have now obtained an affidavit that actually says that the people from the AMA actually spoke with the Speights and Runyan firm on discussions whether S&R would represent the AMA in this proceeding. I informed S&R that the AMA did not wish S&R to represent them in this proceeding.

> THE COURT: Well, I mean, **this is going to be a major litigation issue**, because frankly, if that law firm, in fact, **filed a claim after getting notice that they were not to**

**file it, that's cause for disbarment.** I mean, that's not just a proof of claim issue. There's a real problem. So, why don't we just file it and get to it. If it's not true, then it's not true. If it is, then --

MR. BERNICK: **That's exactly right**. We then turn out -- I won't bore the Court, but we've got other communications from other people saying that it's not been authorized...

[Id. at 19-20] (emphasis added).  The Court now knows that implication was a false one.

Mr. Bernick also attempted to undermine the Anderson case which Grace had been fighting since 1992, for example, falsely telling the Court in Mr. Speights' absence that the Anderson "certification was denied. Flatly denied"; [Id. at 21] that when "rumors started to fly around that Grace was going to go into bankruptcy . . . a new class action is filed . . .;" [Id. at 21] and that Anderson's certification motion "was not acted on until after the bankruptcy case was filed and the stay was put in place. [Id. at 21]  Mr Bernick also represented that after Grace objected to ten claims and served discovery, Mr. Speights executed a stipulation that for "virtually all the cases there's absolutely no authority for them to proceed." [Id. at 21]  In fact, the Stipulation specifically asserted that S&R relied on the authority of Anderson, as this Court suggested it should do during the 2002 hearing on the bar date.

Mr. Bernick also used the hearing as a platform to promote the newly formulated strategy, proposed without any motion and without any notice to the affected claimants, to proceed with substantive property damage claim objections before the estimation process was concluded. [Id. at 12].

In the ensuing three years of litigation, that part of the July 19, 2005 hearing attacking S&R's authority has received a lot of air time.  In reality, regardless of how deplorable this inaccurate and misleading this *ex parte* attack was, equally disturbing was the objections road map K&E persuaded this Court to adopt in the absence of S&R and all other property damage

claimants.  As a result this Court never conducted an estimation of property damage claims, which Anderson believes was required as set forth in its feasibility brief.

### H.    The August 29, 2005 Hearing

Anderson responded to the 12th Omnibus Objections on July 28, 2005, setting forth in detail the basis of S&R's authority for the ten claims at issue, explaining that eight of the ten claims were subject to a notice of withdrawal to which the Debtors had not objected, that Anderson had oral authority for one claimant prior to the Bar Date that was subsequently ratified, and finally, that Anderson as class representative of both a putative and actual class had the authority, under American Reserve and its progeny [DI 9106].  On August 19, 2005, Grace moved for leave to file a Reply in support of the 12th Omnibus Objections, further carrying on its attack on S&R.  Grace also filed on August 12, 2005 a motion for limited waiver of Local Rules in order to permit the filing of omnibus objections to 2,938 claims filed by S&R. [DI 9186]

At the hearing, the attack on Anderson and S&R continued relentlessly.  Even though the ten claims at issue in the 12th Objection were no longer subject to any further dispute, Grace's counsel claimed that "we worked for months trying to resolve this without Court intervention, and it just became impossible."  [DI 9349, 8/29/05 Hearing Tr., p. 17].   After the Court ruled on Grace's uncontested waiver motion, and established a Scheduling Order, Grace now posited Mr. Speights as the "number one reason" the bankruptcy case could not get resolved:

> MR. BERNICK: . . . a lot of people have talked and the number one reason we can't make progress in resolving this case consensually, is Mr. Speights.  Every single constituency has told us that, and Mr. Speights is in this position because he's got all of these claims, and we can't even get to the bottom of.  This is a matter of vital importance and the clock is ticking against us.  Nobody is standing to defend him.  Mr. Austern isn't standing up through his representing him and saying, Yeah, Dan Speights is a great guy and he's got a lot of great clients.

[Id. at 77-78]

Within days after the hearing, Grace filed its 13th and 15th Objections [DI 9311, 9315]. The 13th Objection challenged S&R's authority to file all but one of its claims, even those for which S&R had attached written retainer agreements to its Rule 2019 Statement, and even though the Court had already told Grace at the last hearing that "if he produces a written document that says he has the authority, that's the end of the issue." [DI 9349, 8/29/05 Hearing Tr., p. 73]. Shortly thereafter, Grace filed its 15th Objection to all of the PD claims. [DI 9315]

## I.        The October 31, 2005 Hearing

The Court heard Grace's Authority Objections on October 31, 2005, less than two months after they were filed. In its Reply, Grace argued that S&R failed to disclose that in the Celotex bankruptcy, Anderson was the subject of a pending adversary proceeding challenging its authority to file claims on behalf of building owners [DI 10837, p. 6]. Ironically, at the confirmation hearing, the Court sustained Grace's objection to Anderson's effort to put into evidence the Order in the Celotex case resolving that issue in Anderson's favor [9/14/09 Tr. at 149-50, 156-59; AMH Ex. 40].

With the conspiracy claims already having been resolved by stipulation, Ms. Browdy acknowledged that the purpose of the hearing was to address the legal issue of Anderson's authority to file 600 individual proofs of claim [DI 11025, 10/31/05 Hearing Tr., pp. 6-7] – an issue Anderson was ready to have dealt with months ago, before Grace's smear campaign was commenced. Once again, Grace's counsel advised the court that the S&R claims were the primary roadblock to resolving the case: "we believe that the Speights case – the Speights claims are really holding up the resolution of the Chapter 11," and then proceeded with a slide show of the same spurious accusations and misrepresentations that had been made at the earlier hearings [Id. at 7-8].

Regardless of one's views on the propriety of the resolution, however, the reality is that by the end of the hearing, the issue of S&R's authority was resolved and essentially over. Yet it would be years before the Debtors reached any agreement to resolve the bankruptcy with other creditor constituencies, and then only after contentious litigation with the PI constituency. S&R was never the impediment to resolving this bankruptcy.

With the stage already having been set by Grace's counsel, mostly in circumstances in which there was no opportunity for response from S&R, the next several years would be spent in litigation over Anderson and other S&R claims.

## VI.    Subsequent Proceedings on Anderson's Claims.

On September 1, 2005 the Debtors objected to Anderson's class proofs of claim. [DI 9315] In response, on October 21, 2005 Anderson filed a Motion for Class Certification, consistent with case law recognized by the Debtors holding that a class claimant cannot seek certification until there is a contested matter commenced by the filing of an objection. In re Charter Co., 876 F.2d 866 (11th Cir. 1989).

On October 31, 2005, the Court, on the Debtors' objection, determined that 535 individual proofs of claim filed by S&R should be stricken on the basis that Anderson did not provide the law firm with the authority to file individual claims. [DI 11080]. Because the Court made it clear that its ruling was without prejudice to the rights of these claimants to seek recovery through Anderson if it later certified a class action, these claimants did not appeal this ruling. On April 17, 2007, the Court, on the Debtors' objection, determined that several individual proofs of claim filed by S&R on behalf of claimants who retained S&R shortly after the Bar Date should be stricken on the basis that the law firm failed to establish authority to file as of the March 31, 2003 Proof of Claims Bar Date. [DI 15209] That ruling was upheld by the

Third Circuit Court of Appeals. Again, this ruling was without prejudice to the right of these claimants to seek recovery through Anderson if later certified as a class.

On May 29, 2008, the Court denied Anderson's motion for class certification, holding that only claimants who filed individual proofs of claim could be considered for numerosity purposes. [DI 18821] Anderson attempted to appeal the class certification order and was rebuffed on jurisdictional grounds by the District Court, which is now on appeal to the Third Circuit.  On April 13, 2009, the Court *sua sponte* entered an order which "reduced to zero" the Anderson worldwide class proof of claim and Anderson statewide class proof of claim. [DI 21257] Anderson has filed a notice of appeal of that order which will permit review of the class certification ruling.

## VII.    Grace's Plan

Despite its many complexities, the Debtors' Plan with respect to the treatment of property damage claims is, theoretically at least, fairly simple.  All property damage claims are included in Class 7.  However, Class 7 is sub-divided into Class 7A for "traditional" property damage claims, and Class 7B for "US ZAI PD Claims" asserted by United States claimants arising from Zonalite Attic Insulation product.  The Plan purports to provide for the payment of allowed "traditional" property damage claims (classified as Class 7A claims) in full, but without interest, through the Asbestos PD Trust.  Class 7B ZAI claims are to be paid in accordance with the terms of a class action settlement negotiated by one group of ZAI claimants, pursuant to which the claimants will received a compromised amount on account of their ZAI claims.  Although the class action settlement purported to preserve the opportunity for ZAI claimants to opt out of the ZAI settlement, the treatment of ZAI claims is identical regardless of whether or not the claimant opts out – the claims are to be paid in accordance with the ZAI Trust Distribution Procedures.

As a precursor to the filing of this Plan, the Debtors sought the appointment of a legal representative for future property damage claimants ("PDFCR"), and by an October 21, 2008 Order the Court authorized the appointment of Alex M. Sanders, Jr. as the PDFCR [DI 19818]. The appointment of such a representative is a precondition to obtaining a § 524(g) injunction, as was sought in the Plan and as was a condition of certain settlements incorporated into the Plan.

Grace has settled virtually all filed property damage claimants other than the claims of Anderson.  Indeed, at the time the Plan was filed, the only other unresolved property damage claims other than Anderson, and two Canadian claimants asserting claims through the Anderson class action, were the claims of Sheldon H. Solow and Solow Development Corp. (the "Solow Claim"), and the claims of the State of California.  After the confirmation hearing was concluded, the Debtors disclosed that the Solow Claim was settled for $35 million, although the settlement agreement was reached prior to the commencement of the confirmation hearing [DI 23725].

Although not included in the Plan itself, the Plan documents contain other provisions that effectively control how unresolved PD claims will be resolved.  Specifically, the Plan references the proposed Class 7A Case Management Order which is Exhibit 25 to the Plan.  The Class 7A CMO, in turn, sets forth certain procedures that are directed – either expressly or implicitly – exclusively to Anderson.

In Paragraph 1B of the CMO, the Debtors propose that for any PD claims which have been disallowed and are subject to pending appeals, or for which class certification has been denied and an appeal of which is pending, (1) the appeals shall proceed to completion; (2) the "Anderson Memorial class claims (Nos. 09911 and 09914) shall remain inactive unless and until there is a final, appealable order with respect to the Anderson Memorial individual claim (No.

011008)"; and (3) any such claims which are reversed on appeal "shall be remanded to the Bankruptcy Court for proceeding[s] consistent with this PD CMO".

The Plan provided for the Solow Claim to return to state court for resolution. The Debtors' proposed "Amended Order Setting Various Deadlines Regarding Asbestos Property Damage Claims" (an exhibit to the Class 7A CMO) in Paragraph 7 sets forth that for that claim, "the Court hereby lifts the stay so that the parties may proceed with the pre-petition appeal that was filed in the New York Supreme Court, Appellate Division – First Department".  For other claims, including future PD claims that may be asserted, the claimants, subject to certain procedures set forth in the Class 7A CMO, are permitted to prosecute such claims in the United States District Court for the District of Delaware or any other United States District Court that has jurisdiction over the action.  (Class 7A CMO Paragraph II.C.1.).

Mr. Sanders, the PDFCR, testified as to the difference in treatment between present and future property damage claims at the confirmation hearing.  He acknowledged that there are different procedures that apply to present and future claims; that under prior iterations, the Plan had proposed for both present and future claims to be litigated in the Bankruptcy Court; that through his counsel, he was able to negotiate provisions that permitted future claimants to have trials in any federal District Court that had jurisdiction, rather than only in the Bankruptcy Court; and was candid in acknowledging that the treatment of future claims was "more fair" and that his constituency "got a better deal" than present unresolved property damage claims:

> Q      Based on you review of those documents and your familiarity with the procedures in that document, do you perceive any differences in the way future and current claimants are to receive payment from the PD Trust?
> A      No substantial differences.  I address that to the way they receive payments, which is what I understand 524(g) requires.  There are different procedures, it seems to me those are outside the requirements of 524(g).
>
> ***

Q       Is it fair to say that you had your counsel negotiate with the debtors to change some of the terms of that proposal that was originally made for the treatment of PD?

A       That's correct.

<div align="center">***</div>

Q       But isn't it correct that through the good services of Mr. Rich, you thought that it would be better than – rather than going to trial – I'm talking about the future PD claimants – rather than going to trial or restricted in going to trial in the District Court of Delaware, you negotiated a provision which allowed future PD claimants trials if they are conducted to be conducted in any district court that had jurisdiction?

A       That's right.  **I thought that was a better deal and more fair for the future PD claimants.**

<div align="center">***</div>

Q       And as a result of your negotiations, which you've described, your clients can, if they go through all the hoops, go back to a state such as South Carolina and proceed in the District Court in South Carolina if there's jurisdiction.

A       That is correct.

Q       And I'm asking you to assume that my clients cannot do that, that they must now be tried in the Bankruptcy Court.

A       I agree with that.

Q       So if that's the case, after your negotiations with somebody, presumably the plan proponents, you got to head south and I got to head west.  Not because you did it, but that's the bottom line of what happened after your negotiations.

A       **My clients got a better deal than yours.**

[9/17/09 Tr. at 98, 101-102, 105] (emphasis added).

The treatment of PI Claims is quite different from the treatment of PD Claims.  The Plan establishes a separate Asbestos PI Trust.  The Asbestos PI Trust is presided over by Trustees selected by the personal injury constituency, it is funded by specified initial and subsequent cash contributions from the Debtors, it observes procedures for simplified resolution of claims that provide for lessened standards of proof and evidentiary burdens.

Anderson is effectively the only asbestos-related pre-existing claim which, if the denial of class certification is reversed on appeal, will be required to return to the Bankruptcy Court for disposition, notwithstanding that Anderson's action, in which it would be entitled to a trial by

jury, had been pending in state court for nearly a decade in South Carolina prior to the petition date.

<u>**ARGUMENT**</u>

The plan proponents bear the burden of establishing that the Plan complies with each of the requirements set forth in 11 U.S.C. § 1129(a).  In addition, if an impaired class does not vote to accept the Plan, the plan proponents also bear the burden of demonstrating that the Plan satisfies the additional requirements of 11 U.S.C. § 1129(b), including that the Plan does not unfairly discriminate and is fair and equitable with respect to dissenting classes.  <u>In re Exide Technologies</u>, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

**I.      <u>The Plan Does Not Provide Equality of Treatment.</u>**

The promise of "equality among creditors" is among the most fundamental tenets of bankruptcy.  This promise is explained in detail by the Third Circuit Court of Appeals in <u>In re Combustion Engineering, Inc.</u>, 391 F.3d 190 (3d Cir. 2004).  In <u>Combustion Engineering</u>, the debtor asked the court to approve a "two-trust structure" by which it intended to deal with asbestos claims.  Prior to bankruptcy, the debtor had reached settlements with several asbestos claimants, and had funded $400 million into the CE Settlement Trust to pay their claims.  Payments from the Trust were based on the length of time the creditor's claim had been pending.  Creditors who had settled and were awaiting payment would be paid 95% of the full liquidated value of their claim; creditors who had settled or agreed to dispute resolution but were not yet due payment would be paid 85%; and all other creditors would receive an initial payment of 37.5%, with a promise of up to 75% depending on what funds were available.  Another group of creditors who were late to the game agreed to receive a lesser sum.  The "stub claim" held by the creditors enabled them to participate in voting on the debtor's plan.

Certain asbestos creditors who had been excluded from the settlement objected that this "two-trust" structure violated the Bankruptcy Code's "equality among creditors" principle, and also that the creation of the "stub claims" violated the Code by "artificially impairing" the claims of the participants in order to manipulate the voting process.  The Third Circuit vacated and remanded the order confirming the Combustion Engineering Plan on both grounds.

As to the first issue, the Court in <u>Combustion Engineering</u> explained that the promise of "equality among creditors" is inherent in several provisions of the Bankruptcy Code:

> "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). … The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly situated claims.  Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed.  Section 1122(a) provides that only "substantially similar" claims may be classified together under a plan of reorganization.  Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class."  And § 524(g) states that "present claims and future demands that involve similar claims" must be paid "in substantially the same manner."

391 F.3d at 239.

Moreover, in evaluating whether a plan provides "equality among creditors," the Court must consider the "bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted."  <u>Id.</u> at 241.  This analysis includes consideration of "the totality of circumstances surrounding a reorganization plan" in order to exercise the "informed, independent judgment which is an essential prerequisite for confirmation of a plan."  <u>Id.</u>, fn. 55, *citing* <u>Am. United Mut. Life Ins. Co. v. Avon Park</u>, 311 U.S. 138, 146 (1940):

> Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few, or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need.

Id.  In Combustion Engineering, the Third Circuit remanded out of concern that the plan structure did not ensure equality among creditors because of the risk that the creditors who were not favored under the pre-petition settlement would unfairly suffer by receiving an unequal share of the settlement fund.

The requirement of equality of treatment is more specifically mandated by 11 U.S.C. § 1123(a)(4), which requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The District Court explained in In re Finova Group, Inc., 304 B.R. 630 (D. Del. 2004) that § 1123(a)(4) guarantees not "equality of payment" but rather "equality of treatment."  In Finova, the debtors' plan provided for the payment provided for the payment of "utilization fees" as a component of interest to certain creditors, but not to all creditors.  The Bankruptcy Court ruled that the debtors were required to pay such fees to all lenders as a condition of confirmation under § 1123(a)(4), and the District Court affirmed. Upon finding that the excluded creditors were similarly situated to the ones who the debtors had agreed to pay, the District Court held: "To treat [appellees] differently would be to ignore the economic realities of their Credit Agreements, elevate form over substance and violate the equal treatment mandate of Section 1123(a)(4)."  Finova, 304 B.R. at 637.

The extension of the "equality of treatment" requirement not merely to payment provisions but to procedural treatment is further demonstrated by In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002).  In Dow Corning, the Sixth Circuit found that a plan which put governmental subrogation claims together in one class, and purported to pay that class in full in order to satisfy the "cram down" requirements of 11 U.S.C. § 1129(b)(2)(B), did not demonstrate adequate protection of the full payment requirement and did not comply with § 1123(a)(4) where

different governmental units were afforded different procedures to protect their interests under

the plan.  In Dow Corning, the plan incorporated a settlement with Canadian governmental units

that provided for notice to the governmental authority before payment would be made to a

beneficiary so that the government could determine if it had a subrogation claim; the payment

would not be released until the payee and the governmental unit confirmed they had agreed upon

an appropriate allocation.  The plan provided no similar mechanism or protections to the United

States.  The Court held that the failure to do so precluded approval unless the plan afforded the

United States with "recovery rights sufficiently similar to the Canadian governmental payers to

ensure equal treatment of Class 15 claimants as required by section 1123(a)(4)."  Id. at 661. *See*

*also* In re Dow Corning Corp., 255 B.R. 445, 500-01 (E.D. Mich. 2000) ("As to whether the

claim is being treated fairly within the class, the inquiry is whether the claim is subject to the

same process in satisfying the claim as the other claims within the class. … The requirement

under 11 U.S.C. § 1123(a)(4) that all claims be treated equally is satisfied when the class

members are subject 'to the *same process* for claim satisfaction.'"  Id. (citations omitted,

emphasis in original).

Here, the Debtors' Plan singles out Anderson for a treatment not afforded to any other

asbestos creditor.  Every other asbestos claim either: (1) has been settled and will be paid on the

effective date; (2) is subject to alternative resolution procedures with lowered proof thresholds;

or (3) is permitted to litigate in its chosen forum.  Only Anderson, of all the asbestos claims filed

against the Debtors, is required to litigate its claims in order to be entitled to payment, but is

precluded from doing so in the forum it chose nearly a decade before this bankruptcy case was

commenced. The disparate treatment of Anderson's claims – which reflects a continuation of the

Debtors' intentional and ongoing efforts to undermine Anderson's claims – violates the

fundamental principle of "equality of treatment" mandated by the Bankruptcy Code and expressly recognized by the Third Circuit Court of Appeals in <u>Combustion Engineering</u>.  As such, the Debtors' Plan can not be confirmed.

## II.    The Plan Treats Creditors in the Same Class Disparately.

Aside from the general requirement of "equality of treatment" recognized in <u>Combustion Engineering</u>, the Bankruptcy Code specifically requires that a Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4). The Debtors' Plan, for the reasons explained above, clearly does not do so, and accordingly does not satisfy the requirements for confirmation.  Moreover, since the Plan provides disparate treatment for Anderson's claims as distinguished from every other property damage claimant, both present and future, the Plan's classification scheme violates the Bankruptcy Code and cannot be confirmed.

The flaws in the Debtors' classification scheme also render meaningless any vote that is made on the Plan.  The Debtors purport to solicit Class 7 only for purposes of the requirement in 11 U.S.C. § 524(g) that to obtain a § 524(g) injunction the Plan must be approved by a 75% vote of "a separate class or classes of the claimants whose claims are to be addressed by a trust." Since the classification of disparately treated claims together is improper – to say nothing of the improper lumping together of Class 7A (which is supposedly "unimpaired") with Class 7B (the ZAI Claims, which are impaired) for voting purposes – the Debtors cannot establish that they have satisfied the requirements for confirmation. [13]

---

[13] Anderson notes as well that the entire solicitation process with respect to Class 6 Personal Injury Claims is fundamentally flawed.  The Debtors have never sought to establish a claims bar date for Personal Injury Claims.  As a result, any vote by the Class 6 claimants is solely by those

**III.**     **The Plan Does Not Comply With 11 U.S.C. § 524(g).**

For the same reasons that the Plan violates the requirement of "equality of treatment," the Plan also fails to satisfy the requirements of 11 U.S.C. § 524(g), pursuant to which the Debtors seek an injunction protecting various settling third parties.  Specifically, § 524(g) requires that "present claims and future demands that involve similar claims" must be paid "in substantially the same manner."  Since the Plan mandates disparate treatment for similarly situated property damage claims, it does not satisfy the requirements of § 524(g).

Moreover, for purposes of Class 7A claimants, the Asbestos PD Trust is not a genuine "trust" in any meaningful sense.  Rather, the "Trust" is simply a conduit for the payment of funds by the Debtors or Reorganized Debtors, inserted primarily if not exclusively to obtain the benefits of the § 524(g) injunction.  Under the Plan, the Asbestos PD Trust will be funded on the Effective Date with enough money to pay the settled Property Damage Claims.  If additional unresolved PD Claims are subsequently allowed, or if future PD Claims are successfully asserted, once again the Trust simply looks to the Reorganized Debtors to fund the Trust with a sufficient amount to pay the claims as they are subsequently determined.

It is effectively the Reorganized Debtors and not the Trust that are assuming the liabilities, without any meaningful trust mechanisms or procedures for determining or valuing

---

claimants who have voluntarily elected to file proofs of claim despite the absence of a deadline for doing so.  It is unfair and inappropriate to bind an entire class of creditors in this manner where the universe of claimants has not been defined through the establishment of a claims bar date. *See, e.g.*, In re Amster Yard Assocs., 214 B.R. 122, 125 (Bankr. S.D.N.Y. 1997) ("Debtor has not identified any emergent circumstances that warrant expedited action, and as a practical matter, it could not obtain approval of the disclosure statement, solicit votes or confirm a plan until it has determined the outer universe of potentially allowable claims.").  Moreover, to the extent the Debtors intend to rely on Class 6 as an impaired, accepting class for purposes of satisfying 11 U.S.C. § 1129(a)(10), Anderson would object because of the flaws in the solicitation process for Class 6.

claims. Instead, unresolved claims and future claims are simply re-directed back into litigation (pursuant to the Class 7A CMO, in whatever forum the Debtors may have designated for the particular claim), the defense of which is controlled by the Reorganized Debtors.  The Asbestos PD Trust effectively operates as nothing other than a check-writing facility for Class 7A Claimants.  Even worse, the structure of the Plan and Trust and related agreements actually make it harder for the claimants to recover than if Reorganized Grace simply assumed liability for the unresolved PD claims.

Indeed, there is a fundamental illogic to extending § 524(g) to claims which are supposedly "unimpaired" under the Plan.  If indeed PD Claims are unimpaired and are to be paid 100% upon successfully prosecuting their claims in litigation with the Reorganized Debtors, what is the purpose of channeling such claims to a trust?  *See, e.g.*, Barliant, Karcazes & Sherry, "From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankrupticies," 12 Amer. Bankr. Inst. L. Rev. 441, 453 (Winter 2004):

> But there is no such justification for channeling future claims to a limited trust when a company can afford to pay 100 cents on the dollar to all future claimants as their claims arise.  Exchanging the right to pursue all of a company's assets (and the right to take ownership of the company, since creditor claims have absolute priority over equity interests) for the right to pursue a thinly-capitalized trust could be detrimental to future claimants, if the trust assets later prove to be insufficient. … Given this critical divergence from the facts of the Johns-Manville on which section 524(g) was based, that statute should be narrowly construed to apply only to situations where a company demonstrates that it cannot continue to pay asbestos-related claims.  Indeed, the fact that the channeling injunction is available only in the context of a chapter 11 bankruptcy plan signifies this relief should be limited to companies with a legitimate need for bankruptcy protection and reorganization.  Otherwise, the good faith of the debtor must be seriously questioned.

This disconnect is further evidenced by the Debtors' waffling on the question of whether there will be future PD claims.  On the one hand, the Debtors have produced an expert to testify that the Debtors are likely to be subject to substantial future property damage demands, and that

the amounts, numbers, and timing of such demands are indeterminate [PP 206]; but on the other hand, the Debtors' Plan and Disclosure Statement presumes for purposes of estimating the amounts due for distribution to Class 7 claims that there will be **no** additional allowed PD claims or future demands, and the evidence at trial confirms that effectively no provision whatsoever has been made for the payment of unresolved or future PD claims.  The Debtors' Plan represents an impermissible misuse of § 524(g) as applied to the Class 7A Claims.

IV.    **The Plan Impairs Class 7A Claimants.**

A claim is unimpaired under a plan if the plan "leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1).  Contrary to the Debtors' assertion that Class 7A is unimpaired, however, Class 7A claims are impaired in at least two ways.

First, as explained in the Disclosure Statement, Class 7A claimants are not entitled to recover interest: "No interest shall be payable on account of Asbestos PD Claims Allowed as of the Effective Date except to the extent provided in a PD Settlement Agreement."  (Disclosure Statement, p. 8).  Since the Debtors' Plan provides for equity holders to retain their interests, in order for Class 7A to be unimpaired, claimants must be entitled to receive interest on their claims.  In analyzing the 1994 amendments to § 1124, this Court noted that the amendments clarified that "to be unimpaired, the claim must receive postpetition interest."  In re PPI Enterprises (U.S.), Inc., 228 B.R. 339, 352 (Bankr. D. Del. 1998), citing In re Rocha, 179 B.R. 305, 307 n. 1 (Bankr. M.D. Fla. 1995) ("[A] solvent debtor must now pay post-petition and pre-confirmation interest on a claim to have a class considered 'unimpaired.'"); In re Coram Healthcare Corp., 315 B.R. 321 (Bankr. D. Del. 2004).  While settling Class 7A claimants may have agreed to waive any assertion of a right to interest, Anderson has not done so.  Second,

Anderson's claims in particular are impaired as a result of the Class 7A CMO's denial of Anderson's ability to pursue its claim in its chosen forum, which among other things has the effect of denying Anderson a right to trial by jury.  Coram Healthcare, 315 B.R. at 351 ("if the proposed plan of reorganization does not leave the creditor's rights entirely unaltered, the creditor's claim is impaired.").

Since Class 7A Claims are in fact impaired (at least those that have not waived a right to interest or are being denied substantive rights by virtue of the Plan or the Class 7A CMO), this raises the issue of the manner in which Class 7A should be permitted to vote on the Plan. However, the Plan Proponents did not solicit Class 7 for purposes of voting on the Plan and erroneously represented that Class 7A was unimpaired. Anderson submits that it is fundamentally unfair to permit the settling Class 7A Claimants, who will be paid exactly what they settled for under the Plan, to determine the fate of unresolved Class 7A claims – which almost exclusively refers to the Anderson claims.

The issue is comparable to the concerns with "artificial impairment" that have previously been recognized by this Court.  As explained in Combustion Engineering, "artificial impairment" occurs when a plan imposes "an insignificant or de minimus impairment on a class of claims to qualify those claims as impaired under § 1124."  Combustion Engineering, 391 F.3d at 243.  The Third Circuit recognized that "The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors."  Id.  This concern was heightened because "a disfavored group of asbestos claimants, including the future claimants and the Certain Cancer Claimants, were not involved in the first phase of this

integrated settlement." Id. at 245.  As a result, the Third Circuit remanded the confirmation order for further consideration on the issue of "artificial impairment."

## V.    The Plan Is Not Filed in Good Faith.

In Combustion Engineering, the disparate treatment of similarly situated asbestos creditors, and the risk of artificial impairment in order to control voting on the plan, caused the court to express concern that the plan did not comply with the "good faith" requirement of 11 U.S.C. § 1129(a)(3) and remand for further consideration.  The "good faith" requirement was further explained in In re ACandS, Inc., 311 B.R. 36 (Bankr. D. Del. 2004).  In ACandS, the debtors sought approval of a plan which memorialized a prepetition settlement between the debtors and certain asbestos claimants who were part of a "prepetition committee".  The settlement provided for payment of asbestos claims in a descending order of priority, with "Category A" having been paid pre-bankruptcy, "Category B" and "Category C" being fully secured by assets of the debtors, "Category D" claims being partially secured up to 75% of their claims, and entitled to recover up to 50% of available insurance proceeds, and the remaining 50% of the insurance proceeds reserved for future claims. Anyone not in one of those categories was treated as unsecured.  The court noted that "members of the prepetition committee appear prominently in all of the secured categories." Id. at 40.

The Court found that the disparate treatment of similar asbestos claims based on the election to afford preferential treatment to certain claimants violated the requirements of § 524(g) and § 1129(a)(1).  Further, the Court found that even if the requirements of §524(g) and § 1129(a)(1) were met, the court would deny confirmation of the plan "as not having been proposed in good faith under § 1129(a)(3)." Id.  The standard enunciated by the Court was that "the plan be proposed with honesty, good intentions and a basis for expecting that a

reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code … with the most important feature being an inquiry into the fundamental fairness of the plan." Id. at 43 (internal citations omitted).

In so finding, the Court noted that the plan was, by and large, drafted by and for the benefit of the prepetition committee to the exclusion of other claimants, which subsequently exercised "continued influence" from its majority status on the post-petition creditors committee. As a result, the Court held that "it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code." Id. at 43.  The Court went further and said "It is also impossible to conclude that this plan is imbued with fundamental fairness."  Although the plan might satisfy the "technical classification requirements of § 1122 and § 1129(b)," the Court found it to be "fundamentally unfair" that similarly situated creditors might be treated differently under the plan's structures:  "Both should be compensated based on the nature of their injuries, not based on the influence and cunning of their lawyers."

The Plan here is likewise imbued with the same lack of good faith.  The Plan's proposed treatment of the Anderson claims represents the culmination of the Debtors' efforts to suppress Anderson's ability to pursue class claims on behalf of property damage claimants, and to disenfranchise the class Anderson seeks to represent.  The Debtors' singling out of Anderson for disparate treatment, coupled with the Debtors' conduct during the course of the case, evidence that the Plan is not proposed in good faith.  Indeed, Anderson submits that the Plan's disparate and inequitable treatment of its claim is the culmination of a bad faith effort to undermine and disenfranchise property damage claimants, and more particularly, S&R's efforts to deal with such claims on a class-wide basis.  Accordingly, the Plan violates § 1129(a)(3) and cannot be confirmed.

**VI.**   **The Plan Does Not Comply With the Bankruptcy Code.**

For the reasons described herein, the Debtors' Plan does not comply with the provisions

of the Bankruptcy Code and accordingly cannot be confirmed under 11 U.S.C. § 1129(a)(1).

## CONCLUSION

For all of the foregoing reasons, the Court should deny confirmation of the Debtors' Plan.

DATED:  December 8, 2009

<div style="margin-left:45%">

/s/ Christopher D. Loizides

Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:    (302) 654-0248
Facsimile:    (302) 654-0728
Email:        loizides@loizides.com

-    and –

Daniel A. Speights
C. Alan Runyan
SPEIGHTS & RUNYAN
200 Jackson Avenue East
Post Office Box 685
Hampton, SC 29924
Telephone:    (803) 943-4444
Facsimile:    (803) 943-4599

-    and-

John W. Kozyak
David L. Rosendorf
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, FL  33134
Telephone:    (305) 372-1800
Facsimile:    (305) 372-3508

</div>