IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: January 4-5, 2010 9:00 a.m.** |

## DEBTORS' RESPONSE TO ANDERSON MEMORIAL HOSPITAL'S POST-TRIAL BRIEF ON ITS OBJECTIONS TO CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT PLAN

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................................................1

II.     BACKGROUND -- A TALE OF TWO PROCESSES -- LITIGATION AND
        SETTLEMENT...................................................................................................2

        A.      PRE-CHAPTER 11:  LONG HISTORY OF PD LITIGATION.............................2

        B.      METHODICAL PD LITIGATION IN THE CHAPTER 11....................................3
                1.      Sequenced Litigation Begins. ........................................................4
                2.      The Court Addresses the Traditional Property Damage Litigation
                        and, in Stages, Administers Litigation of the Current PD Claims..............4
                        a)      The Court Sets a Bar Date for PD Claims. ........................4
                        b)      Discovery Yields Evidence of Thousands of Unauthorized
                                S&R Claims. ........................................................................5
                        c)      Issues Litigation Successfully Resolves Virtually All of the
                                Remaining Traditional PD Claims.......................................9
                        d)      The Courts Reject Anderson's Class Claims.....................10
                3.      The Successful Litigation Process Creates the Backdrop for
                        Settlement. .....................................................................................12
                4.      Massive PI Estimation Litigation Leads to Resolution of This
                        Central Issue..................................................................................15
                5.      Plan Formulation Leads to Resolution of the ZAI Litigation, the
                        Appointment of an FCR for Property Damage, and Resolution of the
                        Plan's PD Claims Treatment...........................................................16
                6.      The Plan, Including PD Terms, Is Finalized.....................................19

III.    ARGUMENT.....................................................................................................21

        A.      MUCH OF ANDERSON'S EVIDENCE IS INADMISSIBLE UNDER
                RULES 403 AND 408. .........................................................................21
                1.      Federal Rule of Evidence 408 Precludes Use of Statements that
                        Grace Made in Settlement Negotiations. .........................................21
                2.      Federal Rule of Evidence 403 Independently Precludes Anderson
                        from Using Statements that Grace Made in Settlement Negotiations. ......23

        B.      ANDERSON'S OBJECTIONS HAVE NO MERIT...........................................24
                1.      The Plan Complies with the Bankruptcy Code's Policy of Equal
                        Treatment. .....................................................................................24
                2.      The Plan does Not Impair Class 7A Claims. ....................................27
                        a)      Class 7A Is Unimpaired. ....................................................27
                        b)      The Concept of "Artificial Impairment" Has No Application
                                to these Cases. ..................................................................30
                3.      Anderson's Objections to Classification and Solicitation Lack Merit.......30
                4.      The Plan Complies with Section 524(g). ..........................................33

i

          5.      The Plan Was Proposed in Good Faith. ....................................................34

IV.    CONCLUSION ............................................................................................................36

K&E 16060907

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Mfrs., Inc. v. Aluminum Co. of Am.,*
    56 F.3d 521 (3d Cir. 1995)...................................................................................... 21

*Am. United Mut. Life Ins. Co. v. City of Avon Park,*
    311 U.S. 138 (1940).......................................................................................... 27

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (No. 1997)...................................................................................... 3

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) ................................................................................ 3

*Central Wesleyan College  v. W. R. Grace & Co.,*
    6 F.3d 177 (4th Cir. 1993) ................................................................................ 2

*Chemetron Corp. v. Jones,*
    72 F.3d 341 (3d Cir. 1995)................................................................................... 5

*Cheshire Medical Center v. W. R. Grace & Co.,*
    853 F. Supp. 564 (D.N.H. 1994), *aff'd,* 49 F.3d 26 (1st Cir. 1995), *cert. denied,* 516 U.S.
    915 (1995)..................................................................................................... 12

*Dayton Indep. Sch. Dist. v. U.S. Mineral Prods., et al,*
    Nos. B-87-00507-CA, B-88-00429-CA, 1989 WL 237732 (E.D. Tex. Feb. 14, 1989) ..... 2

*Ernst v. Child & Youth Servs.,*
    108 F.3d 486 (3d Cir. 1997)................................................................................ 12

*Fiberglass Insulators, Inc. v. Dupuy,*
    856 F.2d 652 (4th Cir. 1988) ................................................................... 21, 22, 23

*Granfinanciera, S.A. v. Nordberg,*
    492 U.S. 33 (1989)........................................................................................... 30

*Hanna v. Plumer,*
    380 U.S. 460 (1965).......................................................................................... 27

*In re Am. Medical Sys. Inc.,*
    75 F.3d 1069 (6th Cir. 1996) .............................................................................. 3

*In re Amster Yard Assocs.,*
    214 B.R. 122 (Bankr. S.D.N.Y. 1997).................................................................. 32

*In re Century Glove, Inc.,*
Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993).................... 35

*In re Combustion Eng'g,*
391 F.3d 190 (3d Cir. 2004)....................................................................................... 26, 34

*In re Dow Corning Corp.,*
255 B.R. 455 (E.D. Mich. 2000)................................................................................ 24, 27

*In re Federal-Mogul Global Inc.,*
No. 01-10578 (AMW)(Bankr. D. Del., March 8, 2005)..................................................... 8

*In re Finova Group, Inc.,*
304 B.R. 630 (D. Del. 2004)............................................................................................ 26

*In re Home Health Corp. of Am., Inc.,*
268 B.R. 74 (Bankr. D. Del. 2001) .................................................................................. 22

*In re Orlando Investors, L.P.,*
103 B.R. 593 (Bankr. E.D. Pa. 1989) .............................................................................. 32

*In re PPIE Enter.'s, Inc.,*
324 F.3d 197 (3d Cir. 2003)............................................................................................. 29

*In re Pransky,*
318 F.3d 536 (3d Cir. 2003)............................................................................................. 12

*In re PWS Holding Corp.,*
228 F.3d 224 (3d Cir. 2000)............................................................................................. 34

*In re Rhone-Poulenc Rorer, Inc.,*
51 F.3d 1293 (7th Cir. 1995) ............................................................................................. 3

*In re Sentinel Mgmt. Group, Inc.,*
398 B.R. 281 (Bankr. N.D. Ill. 2008) .............................................................................. 24

*In re United States Mineral Prod.,*
No. 01-2471 (JKF) (Bankr. D. Del. Apr. 7, 2005).............................................................. 8

*In re W. R. Grace & Co., et al.,*
No. 08-4829 (3d Cir. Dec. 14, 2009) ............................................................................... 10

*In re W.R. Grace & Co.,*
389 B.R. 373 (Bankr. D. Del. 2008) ................................................................................ 10

*In re W.R. Grace & Co.,*
398 B.R. 368 (D. Del. Nov. 13, 2008) ............................................................................. 10

iv

*In re W.R. Grace & Co., et al.*,
  366 B.R. 302 (Bankr. D. Del. 2007) ................................................................................ 9

*In re W.R. Grace & Co.*,
  No. 08-118, 2008 WL 4234339 (D. Del. Sept. 4, 2008) ................................................. 10

*In re Winstar Commc'ns, Inc.*,
  554 F.3d 382 (3d Cir. 2009) .......................................................................... 1, 26, 29, 30

*Katchen v. Landy*,
  382 U.S. 323 (1966) .................................................................................................. 25, 27

*Langenkamp v. Culp*,
  498 U.S. 42 (1991) ......................................................................................... 1, 26, 29, 30

*Marshall v. Lansing*,
  839 F.2d 933 (3d Cir. 1988) ........................................................................................... 12

*Mission Towers v. W. R. Grace, et al.*,
  Civ. A. No. 07-287, 2007 WL 4333817 (D. Del. Dec. 6, 2007) .................................... 5, 9

*Mission Towers v. W.R. Grace & Co., et al.*,
  No. 08-1044, 2009 WL 648651 (3d Cir. Mar. 11, 2009) ............................................... 5, 9

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ......................................................................................................... 3

*Outlook Hotel Co. v. St. John*,
  287 F. 115 (3d Cir. 1923) ............................................................................................... 22

*Ramada Dev. Co. v. Rauch*,
  644 F.2d 1097 (5th Cir. 1981) ........................................................................................ 22

*Reichenbach v. Smith*,
  528 F.2d 1072 (5th Cir. 1976) ........................................................................................ 21

*Stacey v. Bangor Punta Corp.*,
  620 F. Supp. 636 (D. Me. 1985) ..................................................................................... 23

*Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*,
  865 F.2d 506 (2d Cir. 1989) ........................................................................................... 22

*West v. Smith*,
  101 U.S. 263 (1879) ........................................................................................................ 22

*Young v. Verson Allsteel Press Co.*,
  539 F. Supp. 193 (E.D. Pa. 1982) .................................................................................. 21

**Statutes**

11 U.S.C. § 1123(a)(4) ............................................................................................................... 24

11 U.S.C. § 1124(1) .................................................................................................................... 27

11 U.S.C. § 1126(f) ..................................................................................................................... 28

11 U.S.C. § 524(g)(2)(B)(ii)(V) .................................................................................................. 24

28 U.S.C. § 158(d)(1) ................................................................................................................. 12

**Rules**

Fed. R. Bankr. P. 9017 ........................................................................................................... 22, 23

Fed. R. Evid. 403 ........................................................................................................................ 23

Fed. R. Evid. 408 ............................................................................................................... 21, 22, 23

**Other Authorities**

Barliant, Karcazes, & Sherry, "From Free Fall to Free-For-All: The Rise of Pre-Packaged
    Asbestos Bankruptcies,"
    12 Amer. Bankr. Inst. L. Rev. 441 (Winter 2004) ............................................................. 33

K&E 16060907

## I.    **INTRODUCTION**

The vast majority of Anderson's post-trial brief is irrelevant.  To the end of its 50-page

introduction re-writing the history of these Chapter 11 Cases, Anderson pastes ten pages of legal

argument copied from its pre-trial briefing.  All of Anderson's objections lack merit.  Under the

Plan, Anderson will receive the most favorable treatment afforded to any asbestos claimant in

Grace's Chapter 11 Cases: it will be paid 100% of the allowed amount of its claim.  Why, then,

is Anderson objecting to the Plan?  Apparently, Anderson wants the right to shop for the most

favorable forum to litigate its claim.  But the Bankruptcy Code affords Anderson no such right --

by filing a proof of claim against Grace, Anderson submitted to the jurisdiction of the

Bankruptcy Court and triggered "the 'process of allowance and disallowance' of claims, thereby

subjecting [itself] to the [B]ankruptcy [C]ourt's equitable power."[2]  Thus, the Plan's proposed

treatment of Anderson's claim, requiring it to litigate in the Bankruptcy Court, is appropriate,

and the Plan should be confirmed over Anderson's objections.

The first 50 pages of Anderson's Post-Trial Brief consist of bitterness and invective

regarding Grace's supposed motives and strategies, unsupported by any record evidence that

Grace pursued a strategy to "smear" and victimize Anderson's counsel Speights & Runyan

("S&R") and which are wholly irrelevant to its Plan objections.  At the close of the confirmation

hearing, it was made clear that while the parties may ask the Court to take judicial notice of

pleadings in this bankruptcy case, they are not admissible for the truth of the matter asserted.[3]

---

[2]  *Langenkamp v. Culp*, 498 U.S. 42, 44 (1991)(citation omitted); *accord In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 406 (3d Cir. 2009) ("The Supreme Court has held that when a creditor files a proof of claim, the creditor brings itself 'within the equitable jurisdiction of the Bankruptcy Court'") (citing *Langenkamp*, 498 U.S. at 42).

[3]  10/14/09 Tr. 171 (Court).  In addition, all parties had the opportunity to supplement their exhibit lists, *id.* at 175-76; Anderson did not do so.  Grace objects to all materials cited in Anderson's Post-Trial Brief (and not

(Continued...)

Anderson ignored this directive.  While Grace need not respond to all of Anderson's accusations, the true story of Grace's good faith efforts to bring about a consensual resolution of this enormously complex Chapter 11 proceeding is far different from the revisionist history invented by Anderson.  Thus, in this brief Grace responds to Anderson's accusations as necessary.

## II.    BACKGROUND -- A TALE OF TWO PROCESSES -- LITIGATION AND SETTLEMENT

### A.    PRE-CHAPTER 11: LONG HISTORY OF PD LITIGATION

Prior to its April 2, 2001 chapter 11 filing, Grace had an extensive asbestos property damage litigation history, beginning in the 1980s, with approximately 370 cases filed.[4]  The class actions were litigated in the 1980s and mid-1990s -- the state court cases in 1985, 1989 and 1992; the federal cases in 1989 and 1993.[5]  However, well before the filing of the Chapter 11 -- indeed, by 1995 or 1996 -- property damage litigation was no longer a significant threat.[6]  As of the Petition Date, there were only eight pending asbestos property damage lawsuits (not including nine ZAI lawsuits).[7]  As Grace's counsel explained at Anderson's class hearing:

> [T]here were a whole rash of class certifications in the late 1980's and the early 1990's, which is precisely what precipitated a backlash from the Courts of Appeal, appeals all over the country in 1999, and ultimately the decisions in Georgine, and again in Amchem, that took place in the back end of the 1990's.  By 1995 you had . . . [a] whole series of cases, all of which denied class

---

previously identified on Anderson's exhibit list) on the basis of relevance, hearsay, Rules 403 and 408, best evidence and privilege.

[4]    10/13/09 Tr. 220 (Martin).

[5]    *Central Wesleyan College v. W. R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993); *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods., et al,* Nos. B-87-00507-CA, B-88-00429-CA, 1989 WL 237732 (E.D. Tex. Feb. 14, 1989).

[6]    Beber 7/30/02 Dep. at 33-34.

[7]    PP Ex. 276 rev. (Disclosure Statement to First Amended Joint Plan, at 22).

2

certification, and specifically in the context of -- Fiberboard was
asbestos, Toscano [sic] was smoking, American Medical Systems
was medical devices, and Rhone-Poulenc was a hemophiliac case.
They then converged on what the Supreme Court did itself, now
specifically in the context of asbestos, at the back end of the
1990's, which was to reverse class certification.

So by the time we come into 2001, which is when Grace filed for
Chapter 11, the whole idea that mass torts equals class action was a
dead idea, and everybody knows that. And that's why you don't
get massive class certifications thereafter.[8]

Class certification as a device for resolving mass tort claims thus had a long history and

had been largely discredited by the time when Grace filed for chapter 11.

## B.    METHODICAL PD LITIGATION IN THE CHAPTER 11

As detailed in the Plan Proponents' Main Brief, when Grace filed this case, it decided to

advocate a structured, systematic approach to defining its asbestos liability. Shortly after the

Petition Date, Grace filed a motion for establishment of a bar date for all of the various claims

anticipated to be asserted against it, approval of proof of claim forms, and a series of litigation

tracks.[9] The various constituencies, including the PD Committee -- of which Anderson fought

hard to become a member -- responded with their own proposals, including a proposed

estimation process, for how to address Grace's liabilities.[10]

---

[8]    7/5/07 Hr. Tr. at 122-23 [Dkt. 16422], citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *Amchem Prods.,
Inc. v. Windsor*, 521 U.S. 591 (1997); *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996); *In re Am.
Medical Sys. Inc.*, 75 F.3d 1069 (6th Cir. 1996); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995).

[9]    Debtors' Motion in Support of Motion for Entry of Case Management Order, Motion to Establish Bar Date,
Motion to Approve Claim Forms, and Motion to Approve Notice Program, June 27, 2001 [Dkt. 536, 537].

[10]   *See, e.g.*, Motion of the Official Committee of Asbestos PD Claimants to Continue the Hearing on Debtors'
Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of the Proof of Claim
Forms and Approval of the Notice Program, July 12, 2001 [Dkt. 665]; Zonolite Plaintiffs' Objection to Debtors'
Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of Proof of Claim Forms
and Approval of Notice Program (Dkt. 536), Motion to Extend the Time to Object or Respond to Such Motions,
Joinder in Motion for Continuance by Official Committee of Asbestos Property Damage Claimants,
Independent Motion to Continue the Hearing on Debtors' Motion, July 13, 2001 [Dkt. 674].

3

1.    **Sequenced Litigation Begins.**

As detailed in Plan Proponents' Main Brief in Support of Plan Confirmation, after the

Grace case was assigned to Judge Wolin, litigation of various claims began, including the

fraudulent conveyance litigation, in which the PD constituency was actively involved.[11]  After

Judge Wolin issued his initial opinion, settlement negotiations concerning the fraudulent

conveyance claims began.  The negotiations were intense and completely at arm's-length; and

both the PI and PD Committees, assisted by their special litigation counsel, acted for the estate.

The settlement discussions ultimately produced the agreement by Sealed Air and Fresenius to

pay over $1 billion in consideration to the Debtors' estates.[12]

2.    **The Court Addresses the Traditional Property Damage Litigation and, in Stages, Administers Litigation of the Current PD Claims.**

a)    **The Court Sets a Bar Date for PD Claims.**

Traditional Asbestos PD Claims followed a much longer, but equally successful,

litigation and settlement track.  After receiving competing proposals, the Court set a March 31,

2003 bar date.  Over 4,000 PD claims were filed,[13] among them the Anderson class claims.

As it has attempted unsuccessfully to do for several years, Anderson tries yet again to

unwind the Bar Date, by asserting that "the Debtors in fact had the ability to identify and provide

notice to building owners of the Bar Date, but refused to do so."[14]  But there is absolutely

---

[11]  Dkt. 22733 at 6-13, 8/9/09; *See, e.g.*, Mem. in Support of The Official Committee of Asbestos Personal Injury Claimants and The Official Committee of Asbestos PD Claimants' Motions to Determine (i) the Choice of Law and (ii) the Standard of Insolvency, 6/13/02 [Dkt. 81].

[12]  *See* PP Main Br. at 8-9 [Dkt. 22733].

[13]  PP Ex. 633 (Sanders Proffer ¶ 7).

[14]  Anderson Post-Trial Br. at 4 [Dkt. 23972], citing Finke Dep. 3/30/09 at 140; Hughes Dep. 6/11/09 at 400-406, 412-413.

4

nothing new about this information.  With full knowledge that Grace has records of sales to

buildings and job sites, this Court, the District Court and the Third Circuit rejected Anderson's

notion that the Notice Program was insufficient because Grace did not ascertain the names and

addresses of thousands of current and former building owners.  As the District Court noted:

> Debtors' records of buildings and building owners to whom their products
> were sold to decades ago does little to assist in identifying claimants with
> reasonably diligent effort . . . As Debtors point out, they 'would have been
> required to conduct searches for thousands of buildings where Grace
> asbestos containing building materials might have been installed.'  The
> Court finds such a search to far exceed what constitutes reasonable
> diligence, and thus Appellants were not entitled to actual notice.[15]

The Third Circuit affirmed, holding that Grace had no due process obligation to search out the

owners of all buildings where Grace asbestos-containing product was installed:

> For Grace to notify claimants, it would have to (1) conduct searches for thousands
> of buildings where Grace asbestos-containing product was installed and (2) search
> those title records to locate the current owners of those buildings.  We have held
> that debtors are not required to conduct title searches to locate prospective
> claimants because it is beyond the reasonably ascertainable standard.[16]

And, in any event, Anderson's rejected quest to undermine the Bar Date bears no

connection to its Plan objection.

### b)    Discovery Yields Evidence of Thousands of Unauthorized S&R Claims.

After the Bar Date, the Court ordered sequenced PD claim objection litigation.[17]  The

initial focus was on the authority to file claims.  S&R filed almost 75% of the pending traditional

---

[15]  *Mission Towers v. W. R. Grace, et al.*, Civ. A. No. 07-287, 2007 WL 4333817, *8 (D. Del. Dec. 6, 2007).

[16]  *Mission Towers v. W.R. Grace & Co., et al.*, No. 08-1044, 2009 WL 648651, *2 (3d Cir. Mar. 11, 2009), citing *Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d Cir. 1995).

[17]  *See* Case Management Order for the Adjudication of Asbestos PD Claims Objection, 8/29/05 [Dkt. 9300]; Order, 9/19/05 [Dkt. 9473]; Scheduling Order Regarding Debtors' Fifteenth Omnibus Objections to Claims (Substantive), 11/10/05 [Dkt. 11035].

Asbestos PD claims (approximately 3,000 out of 4,000 total claims). Of the S&R-filed claims, 1,862 were signed by Daniel Speights and 1,076 were signed by another S&R attorney.[18] Not a single S&R-filed claim was personally signed by an actual claimant.[19]

Contrary to Anderson's unsupported assertion that in April, 2005, Grace "declared war" and made a "marked change" with respect to pursuing authority objections against S&R,[20] since late 2003 Grace had made explicit its intent to vigorously pursue objections to the facially flawed S&R proofs of claim, including those lacking any evidence of authority from the claimant to the lawyer who signed the proof of claim.[21] As a result of Debtors' December 2003 motion for a waiver of local rules in order to file streamlined PD Claims objections,[22] on July 19, 2004, the Court entered an Order pursuant to which the Debtors, prior to asserting claim objections based on materially insufficient supporting information, must serve written notice of their intent to object on, among others, the claimant, its counsel and counsel for the PD Committee.[23] Grace's December 2004 Notice of Intent to Object included a 198-page list of 3,212 S&R claims to which the Debtors intended to object because of materially insufficient supporting information.[24]

---

[18]   Debtors' Thirteenth Omnibus Objection to 2,937 Unauthorized Claims Filed by the Law Firm Speights & Runyan (Substantive), 9/1/05 [Dkt. 9311].

[19]   *Id.* ¶¶ 5-6.

[20]   Anderson Post-Trial Br. at 30 [Dkt. 23972].

[21]   *See, e.g.,* March 22, 2004 Tr. at 5 [Dkt. 5374].

[22]   Motion of Debtors for Limited Waiver of Del. Bankr. LR 3007-1 for the Purpose of Steamlining Objections to Certain Claims, December 22, 2003 [Dkt. 4853].

[23]   Order Granting Limited Waiver of Del. Bankr. LR 3007-1 for the Purpose of Steamlining Objections to Certain Claims, July 19, 2004 [Dkt. 6009].

[24]   Notice of Intent to Object to Claims on the Basis of Materially Insufficient Supporting Information and Opportunity to Supplement Claims, December 6, 2004 [Dkt. 7104] and Ex. B thereto.

While some of the flaws with S&R's claims were evident on the face of the claim forms, the sheer magnitude of the authority problem did not begin to come to light until two events occurred. *First*, in December 2004 S&R filed a Verified Statement of Multiple Representation Pursuant to Fed. R. Bankr. P. 2019.[25] The 2019 statement contained no entries corresponding to more than 200 S&R claims; hundreds of entries on the 2019 statement reflected filings on behalf of "buildings" and "job sites" with no indication that any underlying client existed or authorized the claim; and the 2019 statement contained numerous entries for paint stores, building supply companies and the like -- entities more likely to have purchased Grace product for use in other job sites than to have used any Grace product in a manner giving rise to a proper PD Claim.

*Second*, after the Debtors filed the Notice of Intent to Object, counsel for PD Claimants began to contact the Debtors. Grace's counsel received a letter sent on behalf of a labor union, in which their counsel wrote that S&R-filed claim "had been *filed on behalf of my client without authorization*."[26] He had filed a proper PD Claim, No. 2785, on the union's behalf; S&R's competing claim No. 11591 for the same building was unauthorized.[27] Other claimants followed suit. In early July 2005, the American Medical Association, Harvard Vanguard Medical Associates, Maryland Casualty Company, Jefferson Pilot and Employers Insurance of Wausau submitted letters and/or affidavits stating that they had never retained S&R to represent them in this bankruptcy and had not authorized S&R to file claims on their behalf.[28]

---

[25]    December 20, 2004 [Dkt. 7221].

[26]    Thirteenth Omnibus Objection ¶¶ 9-10 and Exhibit Q thereto [Dkt. 9311].

[27]    *Id.*

[28]    *Id.* ¶ 28 and Exhibits A, C, F, T and U thereto.

7

Thus, Grace was not "secretly arming for battle against S&R," as Anderson shrilly asserts.[29]  Rather, Grace was just starting to receive information regarding the magnitude of the flaws with the S&R claims, and needed to resolve these claims in order to understand the actual magnitude of the PD claims.  And, right at this time -- the spring of 2005 -- the Debtors learned that S&R withdrew thousands of flawed PD Claims in *Federal-Mogul* and *U.S. Minerals*,[30] bolstering Grace's belief that pursuit of authority objections was essential.

Remarkably, Anderson's brief portrays S&R as willing to withdraw these claims and Grace's objections as unnecessary.[31]  As detailed in Grace's 13th Omnibus Objection, this is not true; rather, "[a]s the problems described above became apparent, the Debtors attempted unsuccessfully to address them directly with Daniel Speights of the Speights firm, including through telephone calls, in-person meeting, and e-mail correspondence."[32]  In 2005, Grace communicated repeatedly with S&R, providing lists of claims and seeking consensual withdrawal.[33]  S&R obstructed Grace's discovery efforts,[34] and neither withdrew the questionable claims nor provided proof that the firm actually represented the "clients" on whose

---

[29]  Anderson Post-Trial Br. at 31 [Dkt. 23972].

[30]  Order Approving Stipulation Withdrawing (i) Certain Claims Filed by the Law Firm of Speights & Runyan and (ii) Debtors' Procedural Objections to Certain Other Claims Filed by Speights & Runyan, *In re Federal-Mogul Global Inc.*, No. 01-10578 (AMW)(Bankr. D. Del., Mar. 8, 2005)[Dkt. 7097]; and (First) Omnibus Objection to Claims Filed Against the Debtor (Substantive) Filed by Walter J. Taggart and withdrawals of S&R claims, *see generally In re United States Mineral Prod.*, No. 01-2471 (JKF) (Bankr. D. Del. Apr. 7, 2005) [Dkt. 2612, 2613, 2615-2746].

[31]  Anderson Post-Trial Br. at 37-46 [Dkt. 23972].

[32]  Thirteenth Omnibus Objection ¶ 13 [Dkt. 9311].

[33]  *Id.* ¶¶ 13-14.

[34]  *Id.* ¶¶ 20-26.

8

behalf S&R had signed and filed claims.[35]  Despite repeated efforts to resolve these claims

without court intervention, the Debtors and S&R were not able to reach a stipulation.[36]

Grace's diligent efforts with respect to S&R's claims yielded evidence that the great

majority of S&R's claims were filed with no claimant authority.  Litigation led to reduction of

the pending PD claims to approximately 1,670, including 586 claims withdrawn as improperly

filed on behalf of the alleged Anderson class claimants.  Approximately 550 additional PD

claims were withdrawn for various reasons or disallowed by stipulation, on default or as

duplicates.  After full-blown litigation regarding seventy-one claims for which S&R refused to

concede it lacked authority, including multiple rounds of briefing and argument, this Court, the

District Court and the Third Circuit concluded that S&R lacked such authority.[37]

With the authority issues finally resolved, Grace turned its efforts to resolving the

approximately 900 PD claims that remained.

**c)    Issues Litigation Successfully Resolves Virtually All of the
Remaining Traditional PD Claims.**

Starting in the fall of 2006, pursuant to carefully negotiated case management procedures,

the Debtors and PD Claimants engaged in consolidated litigation of statutes of limitations in

various jurisdictions, Canadian ultimate limitations, no product identification for certain claims

and stigma as a basis for certain claims.[38]  The Debtors won summary judgment on all of these

---

[35]  *Id.*

[36]  *Id.* ¶ 13.

[37]  *In re W.R. Grace & Co., et al.*, 366 B.R. 302 (Bankr. D. Del. 2007); Mission Towers et al. v. W.R. Grace, et al., No. 07-287, 2007 WL 4333817 (D. Del. Dec. 6, 2007); *In re W.R. Grace & Co., et al.*, No. 08-1044, 2009 WL 648651 (3d Cir. Mar. 11, 2009).

[38]  Order Setting Various Deadlines Regarding Objections To Asbestos PD Claims, 8/31/2006 [Dkt. 13120].

9

issues. Multiple appeals were pursued, but only one (with respect to the State of California's claims) has been successful to date. As a result of this process, by February 2009, all but 90 of the Traditional Asbestos PD Claims were disallowed or settled.[39]

### d) The Courts Reject Anderson's Class Claims.

At the Bar Date, Anderson filed two classwide claims and a claim on its own behalf. In October 2005, Anderson filed its motion for certification of a class of property owners whose buildings were, are or will be contaminated with asbestos fibers released from Grace asbestos-containing surface materials.[40] Anderson extensively litigated its class motion in the Bankruptcy Court, with multiple rounds of discovery requests, hearings on discovery motions, and a full-blown certification hearing in July 2007.[41] This Court and the District Court denied certification.[42] Last week, the Third Circuit denied Anderson's attempt to appeal.[43]

Confronted with repeated rejections of its class claims, Anderson resorts to scare tactics, threatening that "unless Anderson is certified, a large number of individual future property

---

[39]   PP Ex. 633 (Sanders Proffer ¶ 8).

[40]   Motion of Anderson Memorial Hospital for Class Certification, 10/21/05 [Dkt. 10014]. The class explicitly excluded claimants represented by other counsel in the bankruptcy case. *Id.* at 2.

[41]   Contrary to Anderson's assertions, at no time did Grace state that Anderson would be able to return to the tort system. The four Grace filings from 2001 and 2002 cited by Anderson for this proposition (*see* Anderson Post-Trial Br. at 3-4) simply state that Grace would consider which pending cases could, at that time, continue to be litigated in other courts: "As part of its preliminary report to the Court, Grace will identify: (1) pending cases that could continue to be litigated in other courts . . ." In no way is this statement an agreement that any specific case -- Anderson's class claim or any other -- should be litigated in the tort system. And, after these filings by Grace, Anderson submitted to bankruptcy court jurisdiction by filing its proofs of claim in March 2003 and then extensively litigated its October 2005 class motion.

[42]   *In re W.R. Grace & Co.*, 389 B.R. 373 (Bankr. D. Del. 2008); *In re W.R. Grace & Co.*, No. 08-118, 2008 WL 4234339 (D. Del. Sept. 4, 2008); *In re W.R. Grace & Co.*, 398 B.R. 368 (D. Del. 2008).

[43]   *In re W. R. Grace & Co., et al.*, No. 08-4829 (3d Cir. Dec. 14, 2009).

damage claims are going to be dumped into this court and the tort system for individual trials."[44]
Aside from the fact that this threat is wholly irrelevant to any of its Plan objections, Anderson's
transparent scare tactic should be rejected outright. But even when examined, these assertions
amount to nothing. Anderson is not the representative of future claimants -- that is the PD FCR's
responsibility; and Anderson's predictions of a mammoth number of meritorious future PD
claims are baseless. There is no evidence that 122,000 claimants[45] will file meritorious future
claims, or even that 122,000 buildings contain Grace product.[46]

Nor does the District Court's recent remand of the State of California's claims
"magnify"[47] the concern that there will be a large number of future *meritorious* PD claims. As
detailed in the Plan Proponents' Main Post-Trial Brief,[48] Grace and S&R settled California State
University and University of California claims respectively for $9,375 and $22,000 per claim --
hardly sums that cause concern given the evidence of Grace's ability to pay future claims. And,
Anderson's insinuation that Grace has waived its right to appeal[49] is clearly incorrect. As an
initial matter, it is far from clear that Grace even could have appealed the order under 28 U.S.C.

---

[44]    Anderson Post-Trial Br. at 11 [Dkt. 23972](emphasis in original).

[45]    *Id.* at 9.

[46]    As Grace's former general counsel explained, this estimate did not remotely state the number of potential
claims against Grace, because it did not take into account that of the three types of buildings included in the
estimate -- cinder block, poured concrete and steel frame -- only steel frame buildings could have spray-on fire
proofing product. Beber Dep. 7/30/02 at 66.

[47]    Anderson Post-Trial Br. at 8 [Dkt. 23972].

[48]    PP Main Post-Trial Br at 25 n.84, 11/29/09 [Dkt. 23833].

[49]    Anderson Post-Trial Br. at 7 n.4 [Dkt. 23972].

11

§ 158(d)(1).[50] Even if Grace had the option of appealing, by not exercising this right it did not waive its right to appeal following confirmation.[51] Grace maintains the right to challenge this decision on appeal following entry of final judgment.

Nor does Anderson's late attempt to give value to its now-three-times rejected Anderson class claim -- by pointing to the results in four previous S&R cases against Grace[52] -- deserve any credence. The four cherry-picked cases represent a very small sample of buildings and do not prove anything regarding the average claim value, especially in the face of actual S&R settlement values in this bankruptcy case. And, Anderson conveniently ignores a 1994 jury verdict in Grace's favor.[53] Given that this Court already denied admission of information regarding recoveries in *Celotex*, Anderson's even more half-baked attempt to put in an estimate of per-building damages without expert testimony must also be rejected.

### 3. The Successful Litigation Process Creates the Backdrop for Settlement.

With progress being made through the PD Claims litigation, settlement discussions also progressed on a parallel track, sometimes focusing on a global resolution, at other times focusing on individual cases. The global efforts were a topic of preeminent concern for this Court and the

---

[50] *See, e.g., In re Pransky*, 318 F.3d 536, 540-41 (3d Cir. 2003) (setting forth a multi-factor balancing test for determining whether a district court remand to bankruptcy court is immediately appealable).

[51] *See Ernst v. Child & Youth Servs.*, 108 F.3d 486, 492-93 (3d Cir. 1997) (holding that a party that failed to appeal an immediately appealable interlocutory order within 30 days did not waive the right to appeal the issue following entry of final judgment); *Marshall v. Lansing*, 839 F.2d 933, 941 (3d Cir. 1988) (holding that it would be "inappropriate to find waiver in this case because the finality of the order was not clearly established at the time of the order, and the [party] may reasonably have believed at that time that it was not appealable").

[52] Anderson Post-Trial Br. at 9 n.6 [Dkt. 23872].

[53] *Cheshire Medical Center v. W. R. Grace & Co.*, 853 F. Supp. 564 (D.N.H. 1994), *aff'd*, 49 F.3d 26 (1st Cir. 1995), *cert. denied*, 516 U.S. 915 (1995).

12

subject of extensive discussion at omnibus hearings.  At the December 19, 2005 hearing, Grace's

counsel reported that the PD constituency was leading the effort to find a global resolution, and:

> If there's anybody who deserves credit for having advanced the ball in this
> case since that time, it's Mr. Dies and the lawyer from the personal injury
> group that he was dealing with which is Russell Budd.  They've had a lot
> of very productive discussions . . . We have taken at face value the idea of
> letting the property damage people and the personal injury people talk and
> see if they can make progress.  And the signs that I understand, my client
> understands, are positive signs.[54]

At the same hearing, Mr. Speights reported to the Court that he was involved in, and

pleased with, these efforts:

> [I]t was started in September and Mr. Dies has done a wonderful job, and I
> appreciate Mr. Budd's efforts as well.
>
> We have a four-member committee.  Mr. Scott and I are co-chair of the
> Grace property damage committee, so we have ZAI and Traditional and
> Mr. Westbrook and Mr. Dies are the other two members, and we all let
> Mr. Dies talk to Mr. Budd and we've all worked with great enthusiasm on
> trying to see if some deal could be together and we've all made
> concessions intramurally within our two groups to get to this point.  So I
> would endorse everything Mr. Dies said and I will continue to work with
> Mr. Dies to try to find some consensual plan.[55]

In February 2006, when these discussions appeared to be stalled, a Plan mediator was

appointed to address all pending matters, including PD and PI claims.[56]  Anderson's counsel

participated in this mediation.  Later, a mediator was appointed solely for S&R PD Claims.[57]

---

[54]  12/19/05 Tr. (Bernick) at 68-70.

[55]  12/19/05 Tr. (Speights) at 126.

[56]  Order Extending Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon and Appointing a Plan Mediator, 3/9/06 [Dkt. 12031].

[57]  *See* Order Authorizing Appointment of Diane Welsh as Mediator for the S&R Claims, 4/21/08 [Dkt. 18580].

13

The global mediations failed.  However, as a direct result of the Debtors' pursuit of sequenced litigation of PD claims objections, virtually all still-pending PD claims were settled in 2007 and 2008 through a series of separately negotiated settlements between the various PD claimants' counsel and the Debtors.[58]  All of these resolutions are subject to Court-approved settlement agreements that are contingent upon approval of a § 524(g) plan.  The negotiations included extensive discussions between Grace's counsel and S&R,[59] and the Debtors and S&R settled all S&R claims except Anderson and two claims for buildings in Canada:[60]

| S&R PD Claims | Settlement Amount | Approval Date(s) |
|---|---|---|
| 36 California State University and 56 University of California Claims[61] | $ 1.4 million | 10/15/08 |
| 1 Pacific Freeholds Claim[62] | $ 9,043,375 | 10/15/08 |
| 3 Hospital Claims[63] | $ 576,250 | 10/1/08, 10/15/08, 11/18/08 |
| 16 U.S. Claims[64] | $ 16 million | 10/26/09, 10/28/09 |

---

[58]   In 2007 and 2008, Debtors settled 287 PD claims.  *See* Approvals Orders, Dkt. 16103, 16104, 16369, 16689, 17184, 17185, 17186, 17433-17441, 17642.

[59]   *See, e.g.*, 6/2/08 Tr. at 45-47 [Dkt. 18913] (Restivo)(Grace and S&R resolved remaining S&R U.S. cases and were continuing to discuss resolution of S&R's Canadian claims).

[60]   Dkt. 19754, 19755, 19672, 19752, 20080, 23561, 23582-23591, 23597.  In addition, Grace and S&R have settled in principle 21 claims for buildings in Canada.

[61]   Motions for Approval of Settlement of Asbestos PD Claims with California State University, 9/1/08 [Dkt. 19515] and University of California, 9/16/08 [Dkt. 19551].

[62]   Motion Authorizing Settlement of Asbestos PD Claim filed by Pacific Freeholds, 10/15/08 [Dkt. 19755].

[63]   Motions for Orders Authorizing Settlements of Asbestos PD Claims filed by Jameson Memorial Hospital (8/25/08, Dkt. 19372), Bayshore Community Hospital (9/2/08, Dkt. 19428) and Children's Hospital of Pittsburgh (9/18/08, Dkt. 19562).

[64]   Motions for Orders authorizing settlements of 16 Asbestos PD Claims, Dkt. 22993, 22994, 23111, 23112, 23113, 23151, 23152, 23174- 23176, 23196, 23197, 23452, 23453.

14

All of these S&R settled claims voted in favor of the Plan.[65]  Grace's willingness to enter into multiple settlements with S&R worth tens of millions of dollars puts the lie to S&R's entirely fabricated tale of a smear campaign against it.

### 4.    Massive PI Estimation Litigation Leads to Resolution of This Central Issue.

Notwithstanding Anderson's statements to the contrary,[66] asbestos personal injury liability remained at all times the dominant issue in the case.  Just as asbestos personal injury litigation drove Grace into Chapter 11, resolution of that litigation was the vital driving force behind Grace's efforts to develop a plan and exit Chapter 11.  Nonetheless, the PD constituency was fully involved in the settlement process.

The parties made many attempts to reach a global resolution.  In the fall of 2004, following negotiations that included members of the PD Committee including Mr. Speights,[67] it appeared that a settlement-in-principle was imminent.  However, that effort failed.  In 2006, Mr. Speights and the PD Committee were fully involved in the series of meetings and mediation led by Judge Pointer.[68]  Those discussions led to an allocation of liability between the PI and PD constituencies, but global settlement was not achieved.[69]

---

[65]  PP Ex. 281 (Amended Declaration of Kevin C. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization) at PP 015720, Ballot Tabulation Report showing 121 S&R claims voting in favor and 3 S&R claims (Anderson and two non-settled Canadian claims) voting against the Plan.

[66]  *See* Anderson Post-Trial Br. at 5 [Dkt. 23972]

[67]  9/17/09 Tr. 79-90 (Austern).

[68]  *Id.* at 80.

[69]  *Id.* at 81, 85.

15

Ultimately, both sides agreed that an estimation of the PI liability was the necessary next step in order to advance toward confirmation. The estimation trial began in January 2008, and settlement negotiations accelerated. In April 2008, an agreement-in-principle was reached. Once again, the negotiations were arm's-length and, prior to the final phase of the negotiations, the PD Committee was represented in "seemingly endless numbers of meetings that took place before the last four or five meetings that led to settlement."[70] While that agreement spelled out the essential features of a 524(g) plan that would resolve both personal injury and traditional PD liability, it did not resolve the intricacies of how the PD claims would be handled. The personal injury compromise thus did not resolve the issues of core interest to the PD constituencies.

5.    **Plan Formulation Leads to Resolution of the ZAI Litigation, the Appointment of an FCR for Property Damage, and Resolution of the Plan's PD Claims Treatment.**

At the time of its Chapter 11 filing, several purported class actions were pending against Grace in various jurisdictions on behalf of owners of homes allegedly containing a loose-fill attic insulation product manufactured by Grace known as Zonolite Attic Insulation ("ZAI").[71] After the Debtors asked the Court to set a bar date and litigation track for ZAI claims,[72] the Court decided that it first needed to understand what these claims represented and directed litigation aimed at determining "whether ZAI posed an unreasonable risk of harm."[73] The litigation that

---

[70]    *Id.* at 77-78.

[71]    PP Ex. 633 (Sanders Proffer ¶ 9).

[72]    *Id.* ¶ 10.

[73]    *Id.*; *see also* Amended Order, November 25, 2002 [Dkt. 3093].

16

ensued, referred to as the "Science Trial," was vigorously pursued by all parties.[74] Ultimately,

on December 14, 2006, the Court issued an Opinion holding that, although ZAI was

contaminated with asbestos and could release asbestos fibers when disturbed, there is no

unreasonable risk of harm from ZAI.[75]

Issues remained with respect to the ZAI claims, and the parties offered various

proposals. The parties also agreed to a ZAI mediation, with Bankruptcy Judge Kevin Gross as a

ZAI Mediator.[76] The ZAI mediation failed, but by this time in 2008, the Debtors, the PI

Committee, the PI FCR, and the Equity Committee were developing a proposed Joint Plan. This

process brought home the importance of resolving the PD Claims,[77] and in particular providing a

524(g) channeling injunction for PD Claims, including both traditional and ZAI claims.

Accordingly, the Plan Proponents turned to the task of obtaining the appointment of a PD

FCR. Judge Alexander Sanders was appointed in October 2008, with the agreement of the PD

---

[74] PP Ex. 633 (Sanders Proffer ¶ 10); ZAI Claimants' Motion for Partial Summary Judgment, July 7, 2003 [Dkt. 4007]; W. R. Grace's Motion for Summary Judgment, July 8, 2003 [Dkt. 4009]; Debtors' Motion to Consolidate the Actions of ZAI Claimants, July 7, 2003 [Dkt. 4010]; ZAI Claimants' Motion for Summary Judgment, July 8, 2003 [Dkt. 4018]; Grace's Memorandum in Opposition to ZAI Claimants' Motion for Partial Summary Judgment Regarding Consumer Protection Act Claims, August 7, 2003 [Dkt. 4175]; Claimants' Response to Debtors' Motion to Consolidate the Actions of ZAI Claimants, August 8, 2003 [Dkt. 4203]; Claimants' Response to W. R. Grace's Motion for Summary Judgment, August 8, 2003 [Dkt. 4204]; Opposition of W.R. Grace to Claimants' Motion for Summary Judgment, August 8, 2003 [Dkt. 4205]; ZAI Claimants' Reply to Grace's Memorandum in Opposition to ZAI Claimants' Motion for Partial Summary Judgment re W.R. Grace's Consumer Protection Liability, August 18, 2003 [Dkt. 4291]; Claimants' Reply to W.R. Grace's Response to Claimants' Motion for Summary Judgment, August 18, 2003 [Dkt. 4294]; Reply of W.R. Grace to ZAI Claimants' Response to Grace's Motion for Summary Judgment, August 18, 2003 [Dkt. 4298].

[75] PP Ex. 633 (Sanders Proffer ¶ 10); Memorandum Opinion, December 14, 2006 [Dkt. 14014].

[76] PP Ex. 633 (Sanders Proffer ¶ 11); Stipulation for the Appointment of the Honorable Kevin Gross as Mediator for the ZAI Property Damage Claims, May 7, 2008 [Dkt. 18678].

[77] 9/17/09 Tr. 90 (Austern).

Committee.[78]  The express purpose of seeking the appointment of a PD FCR was to address the

interests of holders of future Asbestos PD Claims as required by section 524(g).[79]

At the time of the PD FCR's appointment, the treatment of PD Claims under the Plan had

not been finalized.[80]  Negotiations ensued in late 2008 and early 2009 with the PD FCR over the

terms of treatment of PD Claims under the Joint Plan.  So that he could effectively and

vigorously represent the interests of future PD Claimants, Judge Alexander Sanders, with support

from his counsel, thoroughly examined the PD Claims, certain key settlements (including the

Fresenius and Sealed Air agreements) and the nature of the Debtors' discontinued Zonolite and

Monokote businesses, and met with the Debtors' key officers and advisors.  His counsel

participated in all discovery concerning Plan confirmation matters.[81]

The parties reached agreement on a form of Case Management Order for PD Claims,

filed in late February 2009.[82]  Agreement also was reached with the PD FCR on how to treat

future PD claims under the Plan.  And in the late fall of 2008, an agreement was reached for a

class settlement for US ZAI PD Claims, whereby such claims will be channeled to the Asbestos

PD Trust.  The Debtors also settled the Canadian ZAI Claims.[83]

---

[78]   *See* Order Granting Application of the Debtors, Pursuant to 11 U.S.C. §§ 105, 524 (g)(4)(B)(i) and 1109, For
      Entry of an Order Appointing Alexander M. Sanders, Jr. as Legal Representative for Future Asbestos-Related
      Property Damage Claimants, 10/21/08 [Dkt. 19818].

[79]   PP Ex. 633 (Sanders Proffer ¶ 13).

[80]   *Id.* ¶ 14.

[81]   *Id.*

[82]   *See* PP 277.25 rev (Case Management Order for Class 7A Asbestos PD Claims, February 27, 2009, Exhibit 25
      of the Exhibit Book to the Joint Plan).

[83]   ZAI Class Certification Order, 4/1/09 [Dkt. 21174]; Plan Ex. 9, Modified Canadian ZAI Minutes, Ex. B to Plan
      Proponents' Third Set of Modifications, 12/16/09 [Dkt. 24016].

18

### 6.    The Plan, Including PD Terms, Is Finalized.

Between November 2008 and February 2009, the terms of the Joint Plan respecting Class

7 (the Asbestos PD Claims against the Debtors other than ZAI claims) and various Plan

Documents relating to the treatment of Class 7 were extensively negotiated among the Debtors,

the PD FCR, and representatives of PD creditors.  Successive drafts of these documents were

circulated, filed and served to all interested counsel, including Anderson's, and comments were

invited.[84]  Under the Plan, all Class 7 Claims are channeled to an Asbestos PD Trust pursuant to

section 524(g).

Class 7A current and future claims are unimpaired and will be paid the full amount of

their allowed claims, and Class 7A Claims that are not settled or allowed as of the Effective Date

will be litigated, if at all, pursuant to the claims allowance procedures presently in effect and paid

in full the allowed amount of their claims by the Asbestos PD Trust.[85]  For Class 7A Claims, this

Trust initially will receive approximately $112 million, and Reorganized Grace will have

continuing funding obligations.[86]  Class 7B (all US ZAI PD Claims) will be paid pursuant to the

ZAI TDP.  Initially the PD Trust will receive $30 million, plus accrued interest, for US ZAI PD

claims.  The Reorganized Debtors will pay another $30 million to the PD Trust for US ZAI PD

Claims on the third anniversary of the Effective Date and additional contingent payments shall

---

[84]  *See, e.g.*, Further Amendments to the Disclosure Statement and Plan of Reorganization, and the Filing of the Property Damage Case Management Order (Exhibit 25), 12/19/08 [Dkt. 20304]; Exhibit Book to (1) First Amended Chapter 11 Plan and (2) Amended Disclosure Statement for the First Amended Joint Plan of Reorganization, 2/3/09 [Dkt. 20668]; Blacklines of First Amended Plan of Reorganization Dated February 27, 2009, Disclosure Statement and Exhibit Book, including PD Trust Agreement (Exhibit 3) and Property Damage Case Management Order (Exhibit 25), 2/27/09 [Dkt. 20876].

[85]  PP Ex. 633 (Sanders Proffer ¶ 16).

[86]  *Id.* ¶ 21.

be due in the event the PD Trust's assets dedicated to US ZAI PD Claims fall below certain

levels.[87]  Class 8 claims (CDN ZAI PD Claims) will be channeled to the CDN ZAI PD Claims

Fund, funded with more than CAD $8 million from the Debtors, and resolved in accordance with

the terms of the CDN ZAI Minutes of Settlement.[88]

Based on these claims procedures and funding, and his due diligence, the PD FCR -- the

true representative of future PD Claimants -- concluded that "the Joint Plan treats future holders

of Traditional PD Claims or demands and future holders of US ZAI claims or demands fairly and

equitably and on terms substantially similar to the current Traditional PD Claims and current

U.S. ZAI Claims, respectively, by providing mechanisms by which all valid current and future

claims shall be treated and paid on substantially similar terms."[89]  As he has explained, the

mechanisms of uniform procedures under the Federal Rules of Civil Procedure and Evidence

"are essential to the goal of treating future claimants fairly and avoiding giving certain future

claimants unfair advantages over other future claimants, or even to the extent relevant, over

current PD claimants."[90]  Moreover, the future claimants about which Anderson purports to be so

concerned will be "better off under the Plan than if there were never any bankruptcy filing at

all."[91]  That is because "[u]nder the Plan, not only will they be entitled to be paid 100% of their

allowed claims, but they will thereafter be quasi-*secured* creditors, given the combination of the

---

[87]  *Id.* ¶ 22.

[88]  *See* PP Ex. 277.01 rev. (Plan § 3.1.8(b)(i)("All CDN ZAI PD Claims shall be resolved in accordance with the terms, provisions, and procedures outlined in the CDN ZAI Minutes of Settlement."); Plan Ex. 9, Modified Canadian ZAI Minutes, Ex. B to Plan Proponents' Third Set of Modifications, 12/16/09 [Dkt. 24016].

[89]  PP Ex. 633 (Sanders Proffer ¶ 26).

[90]  PD FCR's Post-Trial Br at 3, 11/1/09 [Dkt. 23634]; *see also* PP Ex. 381 (Proffer of Richard C. Finke ¶ 21).

[91]  *Id.* at 4.

20

Debtors' obligation to pay, the guaranty of those payments, and most importantly, the Stock

Issuance Agreement which provides the security of 50.1% of the Reorganized Debtors' stock in

the event of a payment default."[92]  The PD FCR expressed the opinion, based on his due

diligence, that future PD claimants are reasonably assured of receiving the payments

contemplated by the Plan.

As with all elements of the Joint Plan, the treatment of PD Claims is the culmination of

good faith efforts to resolve all disputes for the purpose of allowing the Debtors to exit chapter

11 as a going concern free from any asbestos liability.

## III.   ARGUMENT

### A.   MUCH OF ANDERSON'S EVIDENCE IS INADMISSIBLE UNDER RULES 403 AND 408.

#### 1.   Federal Rule of Evidence 408 Precludes Use of Statements that Grace Made in Settlement Negotiations.

To promote settlement of disputes, Federal Rule of Evidence 408 bars litigants from

using settlement offers and statements made in settlement negotiations to obtain unfair advantage

in litigation.  Rule 408 provides that "[e]vidence of conduct or statements made in compromise

negotiations" is inadmissible.[93]  Exclusion promotes the public policy favoring the compromise

and settlement of disputes by encouraging "freedom of discussion."[94]  The Supreme Court and

---

[92]  *Id.*

[93]  *See* Fed. R. Evid. 408; *see also Young v. Verson Allsteel Press Co.*, 539 F. Supp. 193, 195-96 (E.D. Pa. 1982) ("It is well established that statements made for purposes of settlement negotiations are inadmissible.").

[94]  *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir. 1995); *see also Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir. 1988) ("The public policy of favoring and encouraging settlement makes necessary the inadmissibility of settlement negotiations in order to foster frank discussions."); *Reichenbach v. Smith*, 528 F.2d 1072, 1074 (5th Cir. 1976) ("A primary reason for excluding evidence of a compromise is to encourage non-litigious solutions to disputes.").

21

the Third Circuit Court of Appeals recognized long ago that allowing a party's settlement offer

to be used against it in litigation would chill settlement negotiations and undermine the policy

favoring settlement of disputes.[95]  Rule 408 therefore excludes from evidence "all statements

made in the course of settlement negotiations."[96]

Rule 408 applies in this bankruptcy, *see* Fed. R. Bankr. P. 9017, and precludes Anderson

from attempting to support its Plan objections by using statements that Grace purportedly made

during negotiations to settle PD Claims.  Neither of the two "exceptions" to Rule 408 apply here.

*First*, Grace is not claiming that "otherwise discoverable" evidence should be excluded "merely

because it is presented in the course of compromise negotiations."[97]  Anderson's brief is replete

with statements made and positions taken by Grace representatives during efforts to resolve

S&R's claims in this bankruptcy case, not pre-existing facts originating outside of such

negotiations.  *Second*, Anderson cannot point to a legitimate purpose -- such as "proving bias or

prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a

criminal investigation or prosecution" -- for introducing evidence of settlement negotiations.[98]

---

[95]  *See West v. Smith*, 101 U.S. 263, 273 (1879) (noting that offers of compromise "as a general rule, are not admissible against the party making the offer"); *Outlook Hotel Co. v. St. John*, 287 F. 115, 117 (3d Cir. 1923) ("If every offer to buy peace could be used as evidence against him who presents it, then the policy of the law which favors the settlement of disputes would never be attained.").

[96]  *See Fiberglass Insulators*, 856 F.2d at 654; *see also Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1107 (5th Cir. 1981) (excluding settlement evidence offered to prove notice of alleged construction defects because "notice could be effectively proved by means less in conflict with the policy behind Rule 408."); *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (excluding evidence of settlement offered to satisfy the statute of frauds in light of "the public policy considerations which favor settlement negotiations and which underlie Rule 408."); *In re Home Health Corp. of Am., Inc.*, 268 B.R. 74, 77 (Bankr. D. Del. 2001) (excluding mediation statement from evidence).

[97]  *See* Fed. R. Evid. 408.

[98]  *Id.*  The "another purpose" exception is narrow and does not swallow the general rule against admission of settlement evidence.  *See Ramada*, 644 F.2d at 1106-07 (noting that the exception "was not intended to completely undercut the policy behind the rule").

## 2. Federal Rule of Evidence 403 Independently Precludes Anderson from Using Statements that Grace Made in Settlement Negotiations.

Finally, while Rule 408 is the starting point for determining whether settlement evidence is admissible, it is not the last word on the issue.[99] Federal Rule of Evidence 403 also applies in this bankruptcy, *see* Fed. R. Bankr. P. 9017, and presents another reason why Anderson cannot bolster its objections with settlement statements: "It is well recognized, and rightly so, that the risks of prejudice and confusion entailed in receiving settlement evidence are such that often Rule 403 and the underlying policy of Rule 408 [to encourage settlement] require exclusion even when a permissible purpose can be discerned."[100] Allowing Anderson to capitalize on such statements to obtain a litigation advantage would completely undermine the policy rationale behind Rule 408.

Moreover, the prejudice here would be palpable. During the confirmation hearing, Anderson had the opportunity to present live witness testimony concerning its "smear" allegations. Grace therefore sought to present testimony from Richard Finke, its assistant general counsel responsible for PD Claims and for negotiations with Mr. Speights. The Court accurately noted that discovery into the settlement process and plan negotiations had not been permitted and admonished the Debtor not to present testimony from Mr. Finke regarding settlement negotiation matters that would otherwise be protected by Rule 408.[101] Anderson's attempt to rely on precisely such evidence should not be permitted.

---

[99] *See, e.g., Fiberglass Insulators*, 856 F.2d at 655 (noting that "the fact that offering an item of evidence is not in terms barred by Rule 408 does not make it otherwise admissible").

[100] *Stacey v. Bangor Punta Corp.*, 620 F. Supp. 636, 637 (D. Me. 1985).

[101] 10/14/09 Tr. (Court) at 208, 210, 214.

23

**B.     ANDERSON'S OBJECTIONS HAVE NO MERIT.**

    **1.     The Plan Complies with the Bankruptcy Code's Policy of Equal Treatment.**

The Plan treats Anderson's claim fairly and complies with the Bankruptcy Code's policy of equal treatment. The Bankruptcy Code contains two specific provisions requiring some form of equality of treatment. As a general matter, a plan must "provide the same treatment" for each claim or interest in a class.[102] And when a plan seeks to implement a section 524(g) injunction, the accompanying trust must deploy mechanisms that provide reasonable assurance that the trust will value and pay similar present and future claims in substantially the same manner.[103] Neither of these provisions require identical treatment of claims. Courts have held that section 1123(a)(4) "does not require precise equality, only approximate equality."[104] And by its own terms, section 524(g) requires only "reasonable assurance" of "substantially similar" valuation and payment of similar present and future claims.[105]

Applying these standards, it is abundantly clear that the Plan's treatment of Class 7A Claims complies with applicable law -- all Class 7A Claims will be resolved in federal court, under the Federal Rules of Civil Procedure, and will be paid 100% of their allowed amount.[106]

---

[102]  11 U.S.C. § 1123(a)(4).

[103]  11 U.S.C. § 524(g)(2)(B)(ii)(V).

[104]  *In re Sentinel Mgmt. Group, Inc.*, 398 B.R. 281, 305 (Bankr. N.D. Ill. 2008) (citing *In re Dow Corning Corp.*, 255 B.R. 455, 497 (E.D. Mich. 2000)).

[105]  11 U.S.C. § 524(g)(2)(B)(ii)(V).

[106]  PP Ex. 277.25 rev (Class 7A CMO § II.C.4) (stating that the Asbestos PD Trust shall "pay in Cash the Allowed Amount of such Asbestos PD Claim"); 9/17/2009 Tr. at 99 (Sanders) ("Q. In that way, in the fact that they're receiving 100% of the allotted amount of their claims, is that what you mean by being treated in substantially the same manner?  A. Yes.").

24

The Plan merely requires certain claimants to litigate in this forum where they have already

submitted to the Bankruptcy Court's jurisdiction -- which Anderson plainly has done by not only

filing its individual and class proofs of claim, but also by extensively litigating the motion for

class certification that it elected to file. This process violates no provision of the Bankruptcy

Code, and it is wholly consistent with principles of judicial economy and efficient claims

allowance.[107] The promise of equal payment of claims, to be liquidated under the same

procedural rules, easily exceeds the Bankruptcy Code's requirements.

Nonetheless, Anderson objects to the Plan, arguing that the Plan "singles out Anderson

for treatment not afforded any other asbestos creditor."[108] As a preliminary matter, this assertion

is simply false. All other pending Asbestos PD Claims, all of which have a significant litigation

history in the Bankruptcy Court, will be subject to the same treatment as Anderson's claim.

Following the District Court's order in *State of California Dep't of Gen. Serv.'s.*,[109] these claims

include Anderson's claims, the State of California's claims, and several Canadian claims.

Moreover, none of the three factors that Anderson identifies as purportedly giving superior

treatment to other asbestos claims supports Anderson's objection. Anderson argues that every

other asbestos claim either: "1) has been settled and will be paid on the [E]ffective [D]ate; 2) is

---

[107] *See Katchen v. Landy*, 382 U.S. 323, 328-39 (1966) ("[T]his Court has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period,' and that provision for summary disposition, 'without regard to usual modes of trial attended by some necessary delay,' is one of the means chosen by Congress to effectuate that purpose.") (citation omitted).

[108] Anderson Post-Trial Br. at 54 [Dkt. 23972].

[109] No. 08-863, 9/29/2009 [Dist. Ct. Dkt. 31].

25

subject to alternative resolution procedures with lowered proof thresholds; or 3) is permitted to litigate in its chosen forum."[110]

**First**, the fact that certain other claimants have settled is simply immaterial to Anderson's objection, as this says nothing about the treatment of their claims. **Second**, Anderson utterly fails to explain how the Class 7A ZAI TDP or the Asbestos PI TDP constitute "lowered proof thresholds" and how such procedures, were they applied to Anderson's claim, would lead to more favorable treatment. **Third**, in arguing that other claimants can "litigate in their chosen forum," Anderson overlooks the fact that it submitted to the Court's jurisdiction by filing three proofs of claim against Grace,[111] and that future traditional Asbestos PD Claims will still be subject to uniform allowance and disallowance procedures in federal District Courts.[112]

Nor do any of the cases cited by Anderson support its position. In turn, each case cited by Anderson either involved issues regarding the amounts of distributions to claimants,[113] rejected arguments asserted by claimants who alleged that their claims were not treated

---

[110]  Anderson Post-Trial Br. at 54.

[111]  *See Langenkamp*, 498 U.S. at 44 ("[B]y filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power.")(citation omitted); *accord Winstar*, 554 F.3d at 406.

[112]  PP Ex. 277.26 rev. (CMO for Class 7A Asbestos PD Claims at §§ II(A), (B)) (requiring future claimants to file proof of claim with Asbestos PD Trust, and allowing Grace to file a motion in the Bankruptcy Court to enjoin such claim on the ground that it is has been discharged); PP Ex. 381 (Proffer of Richard C. Finke at 5, ¶ 21).

[113]  *See In re Combustion Eng'g*, 391 F.3d 190, 242 (3rd Cir. 2004) (remanding for consideration of plan's satisfaction of equal treatment requirements in light of plan's payment of greater distributions to claimants that had settled with the debtor); *In re Finova Group, Inc.*, 304 B.R. 630, 637-38 (D. Del. 2004) (affirming bankruptcy court's ruling that lenders must be paid utilization fees, which were found to be a component of interest to be paid under their agreements, to be treated equally to other claimants in their class who would receive interest under the plan).

equally,[114] or did not base its ruling on principles of "discrimination."[115] Anderson has identified no risk of prejudice under the procedures to be implemented by the Plan, and its desire to shop for a different forum cannot support a finding of discrimination. Indeed, forum shopping is universally disfavored by federal courts.[116] And even if Anderson were able to litigate its claim in a different forum, it would not escape this Court's ruling on class certification because this ruling would be *res judicata* as against all parties to that proceeding.[117]

### 2.    The Plan does Not Impair Class 7A Claims.

#### a)    Class 7A Is Unimpaired.

Anderson's argument that its claim is impaired clearly lacks merit. Because the Plan "leaves unaltered the legal, equitable, and contractual rights" of all claims in Class 7A, Class 7A is unimpaired.[118] All Class 7A Claims will be paid 100% of the allowed amount of their claims, and the Plan does not purport to limit or otherwise alter these claimants' substantive rights.[119] Thus, Class 7A is unimpaired under section 1124(1), and Class 7A and each member thereof are

---

[114] *In re Dow Corning Corp.*, 255 B.R. 445, 500-01 (E.D. Mich. 2000) (rejecting argument by certain claimants that their alleged rights of "collateral estoppel" against the debtor required separate classification of their claims to satisfy equal treatment requirement).

[115] *See Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 146-48 (1940) (reversing confirmation of a plan where bondholders could sell their debt to the fiscal agent of the debtor in exchange for a discount on the agent's otherwise-applicable fees, and the agent's status as a creditor of the debtor and its intention to vote in favor of the plan were not disclosed).

[116] *See Hanna v. Plumer*, 380 U.S. 460, 468 (1965) (finding that a primary goal of the Supreme Court's seminal decision in *Erie* was the discouragement of "forum shopping").

[117] *See Katchen*, 382 U.S. at 334 ("The normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts.").

[118] *See* 11 U.S.C. § 1124(1).

[119] *See* PP Ex. 277.25 rev. (CMO for Class 7A Asbestos PD Claims § II(C)(4)).

27

"conclusively presumed to have accepted the [P]lan, and solicitation of acceptances . . . from [members of Class 7A] . . . is not required."[120]

Anderson argues that the Plan impairs Class 7A claims in two ways: by denying payment of interest on such claims and by "denial of Anderson's ability to pursue its claim in its chosen forum."[121] In support of its argument regarding payment of interest, Anderson points to a provision in the Disclosure Statement stating that "[n]o interest shall be payable on account of Asbestos PD Claims allowed as of the Effective Date except to the extent provided in a PD Settlement Agreement."[122] Given an accurate reading, this provision says nothing about whether such claims are impaired. Litigation of pending traditional Asbestos PD Claims is subject to allowance procedures set forth in the Class 7A PD CMO. That document provides that the PD Trust will pay in full the Allowed Amount of each Asbestos PD Claim subject to the procedures therein.[123] Thus, if the Court determines that interest is due on Anderson's claim, the Asbestos PD Trust will pay such interest. The language in the Disclosure Statement quoted by Anderson simply describes a default term for settlements that no interest will be allowed on settled claims except to the extent agreed by the parties. Anderson did not object to this language during the proceedings to approve the Disclosure Statement, and it has no basis to do so now.

Nor does requiring pending traditional Asbestos PD Claims to be litigated in the Bankruptcy Court constitute "impairment" within the meaning of section 1124(1). Specifically,

---

[120] *See* 11 U.S.C. § 1126(f).

[121] *See* Anderson Post-Trial Br. at 58-59 [Dkt. 23972].

[122] *Id.* at 58.

[123] PP Ex. 277.25 rev (Class 7A CMO § II.C.4) (stating that the Asbestos PD Trust shall "pay in Cash the Allowed Amount of such Asbestos PD Claim").

28

the Plan does nothing to alter Anderson's "legal, equitable, or contractual rights." The mere fact that Anderson's claim must be litigated in the Bankruptcy Court does not limit any of its rights against Grace, and Anderson has cited no case holding that merely subjecting a party to the Bankruptcy Court's jurisdiction to allow or disallow its claim when that party has filed -- and litigated -- a proof of claim against a debtor constitutes impairment. Nor would this result be logical, as classifying all claims subject to the Bankruptcy Court's jurisdiction for claims allowance as impaired would render virtually all claims impaired.

Moreover, even if requiring Anderson to litigate in the Bankruptcy Court somehow alters Anderson's rights, such alteration does not constitute impairment. In the Third Circuit, it is settled law that a party is not impaired when alteration of its rights "is a consequence not of the plan but of the bankruptcy filing itself."[124] By filing a proof of claim against Grace, Anderson has triggered "the process of allowance and disallowance of claims, thereby subjecting [itself] to the [B]ankruptcy [C]ourt's equitable power."[125] The allowance or disallowance of Anderson's claim in the Bankruptcy Court clearly results from the operation of the Bankruptcy Code, not the Plan, and therefore Anderson's claim is not impaired by the Plan.[126]

Finally, Anderson's argument that the Plan effectively denies it the right to a jury trial also fails.[127] It is settled law that when a party files a proof of claim against a debtor, any right to

---

[124] *In re PPIE Enter.'s, Inc.*, 324 F.3d 197, 204 (3d Cir. 2003).

[125] *Langenkamp*, 498 U.S. at 44; *accord Winstar*, 554 F.3d at 406.

[126] *See PPIE*, 324 F.3d at 204.

[127] *See* Anderson Post-Trial Br. at 59 [Dkt. 23972].

29

trial by jury is waived.[128]  As Anderson admits in its post-trial brief, Anderson has filed multiple

individual and class proofs of claim against the Debtors.[129]

> b)  **The Concept of "Artificial Impairment" Has No Application to these Cases.**

Anderson also argues that the alleged impairment of Class 7A Claims "is comparable to

the concerns with 'artificial impairment' that have previously been recognized by this Court."[130]

This argument reflects a fundamental misunderstanding of the concept of "artificial impairment."

As *Combustion Engineering* explained, "artificial impairment" involves subjecting a class of

claims to *de minimus* impairment to fulfill section 1129(a)(10)'s requirement that a plan include

an impaired accepting class in certain cases.  Here, this is simply not an issue.  Classes 6, 7B, and

8 are all impaired,[131] and they have all voted overwhelmingly to accept the Plan.[132]

> 3.  **Anderson's Objections to Classification and Solicitation Lack Merit.**

Anderson also argues that because the Plan discriminates against its claim, the Plan's

classification scheme violates the Bankruptcy Code and "render[s] meaningless any vote that is

---

[128] *See Langenkamp*, 498 U.S. at 44 ("Accordingly, 'a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate.' Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court. Consequently, they were not entitled to a jury trial on the trustee's preference action.") (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58 (1989)); *accord Winstar*, 554 F.3d at 406-07 ("Lucent filed a proof of claim against Winstar's estate and therefore was not constitutionally entitled to a jury trial on the Trustee's related breach of contract claim.").

[129] *See* Anderson Post-Trial Br. at 4 [Dkt. 23972].

[130] *Id.* at 59.

[131] *See* PP Ex. 277.01 rev. (Plan §§ 3.1.6, 3.1.7, 3.1.8).

[132] PP Ex. 281 (Amended Declaration of Kevin C. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization) (Classes 6, 7B, and 8 voted to accept the Plan by 99.51%, 88.42%, and 100%, respectively).

30

made on the Plan."[133] As explained in Part III.B.1 *supra*, the Plan does not discriminate against

Anderson's claim, and therefore this objection lacks merit. Anderson also objects to the

"improper lumping together of Class 7A . . . with Class 7B . . . for voting purposes . . . ."[134] This

objection misconstrues the purposes for which Classes 7A and 7B voted as one class and also

ignores that these classes both voted in favor of the Plan.[135] As explained in Part III(B)(2)(a)

*supra*, Class 7A is unimpaired, and therefore it is not entitled to vote for purposes of Plan

confirmation under section 1126.[136] But because the Plan includes a section 524(g) injunction

that channels Asbestos PD Claims to the Asbestos PD Trust, the Plan Proponents were required

to solicit Class 7A for the limited purpose of obtaining a 75% vote from that class.[137] Since both

Class 7A and Class 7B will be channeled to the Asbestos PD Trust, section 524(g) requires that

the votes of these sub-classes be counted together. In any case, even if Class 7A were counted

separately, this would make no difference: Class 7A, independent of Class 7B, voted

overwhelmingly in favor of the Plan.[138]

    Lastly, Anderson argues that the "entire solicitation process with respect to Class 6

Personal Injury Claims is fundamentally flawed" because "the Debtors have never sought to

---

[133] Anderson Post-Trial Br. at 55 [Dkt. 23972].

[134] *Id.*

[135] PP Ex. 281 (Amended Declaration of Kevin C. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization) (Classes 6, 7A, 7B, and 8 voted to accept the Plan by 99.51%, 98.99%, 88.42%, and 100%, respectively).

[136] *See* 11 U.S.C. § 1126(f) ("[A] class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.").

[137] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

[138] *See id.*

establish a claims bar date for Personal Injury Claims."[139]  Anderson is not a Class 6 Claimant

and thus lacks standing to make this argument.[140]  Even if Anderson had standing to object on

this ground, which it does not, Anderson cannot be heard to object to the Plan's voting and

solicitation procedures at this late date.  These extensive procedures, which were detailed in a

Motion filed by the Debtors,[141] contained specific requirements for providing ballots and notice

to Class 6 and all other classes entitled to vote on the Plan, and they were approved after notice

and hearing without objection from Anderson.[142]  Nor has Anderson provided any evidence to

prove that the vote was defective.

Finally, Anderson's argument has no substantive merit.  The sole case cited by Anderson

fails to support its argument: *In re Amster Yard Assocs.* involved only the narrow question of

whether a court can "preliminarily approve the disclosure statement, and thereby authorize [the

debtor] to solicit acceptances to its plan prior to the actual hearing on the approval of the

disclosure statement."[143]  *Amster Yard* says nothing that even implies that a bar date must be set

before soliciting a class of claims, and the Bankruptcy Code contains no such requirement.

Thus, all of Anderson's objections to classification and solicitation lack merit.

---

[139]  Anderson Post-Trial Br. at 55 [Dkt. 23972].

[140]  *See In re Orlando Investors, L.P.*, 103 B.R. 593, 596 (Bankr. E.D. Pa. 1989) (holding that "parties 'have standing only to challenge those parts of a reorganization plan that affect their direct interests'").

[141]  Motion of the Debtors for an Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief, 9/25/08 [Dkt. 19620] at p. 15, 17 and Exhibit C

[142]  Order Approving Disclosure Statement, Solicitation and Confirmation Procedures, Confirmation Schedule and Related Relief, 3/9/09 [Dkt. 20944].  Counsel for Anderson made several objections at the hearing approving the Disclosure Statement and Solicitation Procedures, but raised no issue regarding the propriety of Class 6 voting procedures, including that a bar date for all Class 6 Claims was required as a precondition to Class 6 voting.  *See* 3/9/2009 Hearing Tr., entered 3/25/2009 [Dkt. 21104].

[143]  *In re Amster Yard Assocs.*, 214 B.R. 122, 125 (Bankr. S.D.N.Y. 1997).

32

### 4.    The Plan Complies with Section 524(g).

The purpose of section 524(g) is to permit a confirmed Plan to include a channeling injunction respecting current and future asbestos claims that supplements the debtor's discharge. As explained in the Plan Proponents' Main Pre-Trial Brief, a 524(g) injunction has three unique objectives: it is permitted to channel all current <u>and future</u> direct and indirect asbestos-related claims to a trust, it can be used to protect third parties under proper circumstances, and, following exhaustion of appeals, it is permanent.[144]  To obtain this unique injunctive relief, section 524(g) requires the Court to find that certain specific conditions have been satisfied.  The Debtors have clearly demonstrated that the Plan meets all of section 524(g)'s conditions, and that issuance of the Asbestos PI and PD Injunctions under section 524(g) is appropriate.[145]  Anderson now seeks to write an additional requirement into section 524(g).  And it is a curious one. Anderson argues that where a Plan proposes to pay asbestos claimants one-hundred cents on the dollar, a section 524(g) injunction should not issue.[146]  There is simply no basis for this new condition, and Anderson's objection based on this new test should be rejected.

---

[144]  *See* Plan Proponents' Main Brief in Support of Plan Confirmation, 8/8/09, at 23 [Dkt. 22733].

[145]  *See* Plan Proponents' Main Post-Trial Brief in Support of Confirmation, 11/3/09, at 107-44 [Dkt. 23662].

[146]  The sole authority cited by Anderson in support of its contentions -- a law review article -- argues that where a Debtor can afford to pay *all* future claimants in full, a section 524(g) injunction should not issue.  Barliant, Karcazes, & Sherry, "From Free Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies," 12 Amer. Bankr. Inst. L. Rev. 441, 453 (Winter 2004) ("[T]here is no such justification for channeling future claims to a limited trust when a company can afford to pay 100 cents on the dollar to *all* future claimants as their claims arise.") (emphasis added).  This argument says nothing about the propriety of issuing a 524(g) injunction where, as here, the debtor proposes to pay one narrow class of asbestos claimants in full as part of a global compromise of all of its asbestos liabilities.  Moreover, Anderson entirely ignores the fact that section 524(g) provides no basis for arguing that a plan which contemplates paying a discrete segment, but not all, of the debtor's asbestos liability in full to accomplish a reorganization that is confirmable is disqualified from access to the benefits of that statute.  Thus, Anderson's argument is entirely without legal support.

Moreover, the Asbestos PD Channeling Injunction is vital to the very foundation of the

Plan -- if Anderson and other holders of traditional Asbestos PD Claims remained free to assert

their claims against Grace and third parties such as Fresenius and Sealed Air, then the Sealed Air

and Fresenius Settlement Agreements, which provide critical funding to the Plan,[147] simply

would not have been possible.[148] Thus, Anderson's arguments that the Plan violates

section 524(g) should be rejected.[149]

### 5.    The Plan Was Proposed in Good Faith.

The Third Circuit has held that "'[f]or purposes of determining good faith under section

1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"[150]

Despite the insinuations in Anderson's 50-page introduction that Grace has acted in bad faith,

Grace has extensively demonstrated that the Plan was developed and proposed in good faith.  As

explained at length in the Plan Proponents' Main Pre-Trial and Post-Trial Briefs,[151] the Plan has

been proposed in good faith because it is the product of arm's-length negotiations and litigated

compromises between numerous competing interests.  As a result of these compromises, the Plan

---

[147] 9/17/2009 Tr. 59 (Austern) (testifying that the Sealed Air and Fresenius contributions will provide "enormous benefit to the [Asbestos PI] Trust. $1.1 billion is a very significant portion of what will be the Trust assets," that such contribution "is a condition of this Plan," that without such contribution there would not have been "an understanding with the Debtors to settle this matter").

[148] *Id.* at 60 (testifying that a condition precedent to the settlements with Fresenius and Sealed Air is that "they have to receive 524(g) protection.").

[149] For the reasons stated in the Plan Proponents' Main Pre-Trial Brief, at 116-17 [Dkt. 22733], Anderson's argument that the Asbestos PD Trust is not a "genuine" trust also fails.

[150] *Combustion Eng'g,* 391 F.3d at 247 (citing *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)).

[151] PP Main Pre-Trial Br. at 34-37, 8/8/09 [Dkt. 22733]; PP Main Post-Trial Br. at 2-9, 11/3/09 [Dkt. 23662].

34

Proponents have proposed a Plan that will pay unsecured creditors, including Anderson, one-hundred percent of their allowed claims.  In the context of Grace's Chapter 11 Cases, which have involved numerous high-stakes, complex disputes, the Plan is a significant achievement and is a model of good faith.

Despite the Plan's promise to pay its claim in full, Anderson argues that the "singling out of Anderson for disparate treatment, coupled with the Debtors' conduct during the case, evidence that the Plan is not proposed in good faith."[152]  Anderson's argument fails as a matter of law because objections to the treatment of a particular claim are not properly treated as "good faith" objections.  In *In re Century Glove,* a creditor argued that a plan was not proposed in good faith because it would have paid unsecured creditors from the proceeds of a "speculative" adversary proceeding.[153]  The court rejected the objection, holding that it had no bearing on the relevant inquiry for good faith, namely whether "the purpose of [the] proposed plan is to reorganize or whether the plan has a reasonable hope of success."[154]  Here, as in *Century Glove,* Anderson's objection has no bearing on the relevant inquiry for good faith, and it should be rejected.

Moreover, as explained in Part III.B.1 *supra,* the Plan does not discriminate against Anderson's claim.  Rather, the Plan proposes to pay the full amount of Anderson's allowed claim, and Anderson's assertions that the Plan somehow "singles out" its claim for disparate treatment are simply false.  Thus, even if Anderson's objection were read to properly state a

---

[152]  Anderson Post-Trial Br. at 61 [Dkt. 23972].

[153]  *In re Century Glove, Inc.*, Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489, at *4-5 (D. Del. Feb. 10, 1993).

[154]  *Id.* at *4 (citation omitted).

good faith objection, that objection should be overruled because the facts do not support Anderson's argument.

## IV.    <u>CONCLUSION</u>

For the reasons stated herein, Anderson's objections to confirmation of the Joint Plan should be overruled, and the Joint Plan should be confirmed.

Dated: December 23, 2009                    Respectfully submitted,


KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Lisa G. Esayian
Nathaniel Kritzer
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

PACHULSKI STANG ZIEHL & JONES LLP


Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*

36