IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

Objection Deadline: February 16, 2010 at 10:30 a.m.
Hearing Date: February 5, 2010 at 4:00 p.m.

# DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) ENTER INTO EXIT FINANCING ENGAGEMENT LETTERS; (B) PAY CERTAIN FEES AND EXPENSES IN CONNECTION THEREWITH; AND (C) FILE THE ENGAGEMENT LETTERS UNDER SEAL

W. R. Grace & Co. and W. R. Grace & Co.-Conn. ("Grace-Conn.") (jointly and severally, "Grace," and together with the other above-captioned debtors, the "Debtors"), hereby file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, authorizing the Debtors to (a) enter into two engagement letters providing for a "best

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

efforts" engagement to provide exit financing (the "Engagement Letters") by Goldman, Sachs & Co. ("GS&Co."), Goldman Sachs Lending Partners LLC ("GS Lending Partners") and Deutsche Bank Securities Inc. ("DBSI," and together with GS&Co. and GS Lending Partners, the "Exit Lenders"); (b) pay certain fees and expenses in connection therewith; and (c) file the Engagement Letters under seal. Copies of the Engagement Letters are attached hereto as <u>Exhibit B-1</u> and <u>Exhibit B-2</u>, which, due to the confidential nature thereof, the Debtors are seeking to file under seal, as discussed in greater detail below. In support of this motion, the Debtors respectfully submit the Declaration of John James O'Connell III (the "O'Connell Declaration"), a Managing Director of Blackstone Advisory Partners L.P. ("Blackstone"), an affiliate of The Blackstone Group L.P., the Debtors' financial advisor, a copy of which is attached hereto as <u>Exhibit C</u>. In further support of this motion, the Debtors respectfully represent as follows:

### Jurisdiction

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 107(b) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Relief Requested

4. By this Motion, the Debtors seek entry of an order: (a) authorizing and approving the Debtors' entry into, and performance under, the Engagement Letters; (b) authorizing the use of estate funds to pay the fees and expenses set forth in the Engagement Letters, including the Bank Alternate Transaction Fee and Permanent Debt Alternate Transaction Fee (collectively, the "Break-up Fees," as defined herein), if applicable; (c) authorizing the Debtors' indemnification

2

DOCS_DE:156665.1

of the Exit Lenders and their affiliates in accordance with the terms and conditions set forth in Annex A to the Engagement Letters; (d) authorizing the Debtors to file copies of the Engagement Letters under seal pursuant to section 107(b) of the Bankruptcy Code; and (e) directing that the Engagement Letters remain under seal and confidential and not be made available to anyone other than the Limited Notice Parties (as defined herein) without the written consent of the Debtors and the Exit Lenders, respectively.

### A. The Process to Obtain Exit Financing

5. On February 27, 2009, the Debtors filed their First Amended Joint Plan of Reorganization (Dkt. 20872) (as amended, modified or supplemented, the "Plan"), and related Disclosure Statement (Dkt. 20873) (the "Disclosure Statement").[2] The Debtors must secure exit financing in order to consummate the Plan and to successfully emerge from these chapter 11 cases.

6. To that end, over the last two years the Debtors and Blackstone have maintained a dialogue with prospective lenders concerning the terms and structuring of a potential exit financing package. Based on their analysis of the requirements of the Plan and the Debtors' post-emergence working capital and liquidity needs, the Debtors and Blackstone have concluded that the appropriate exit financing package is likely to include the following components: (a) one or more senior secured term loan facilities (the "Term Facility"); (b) a senior secured revolving credit facility (the "Revolving Facility," and together with the Term Facility, the "Facilities");

---

[2] On March 9, 2009, the Court entered an *Order (A) Approving The Disclosure Statement, (B) Establishing the Record Date, Voting Deadline, and Other Dates, (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Forms of Notice and Other Related Documents* (Dkt. 20944). The Debtors subsequently solicited votes to accept or reject the Plan. In June 2009, the Court held Phase I of the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), and Phase II of the Confirmation Hearing occurred September 8-17, 2009 and October 13-14, 2009. On October 26, 2009, the Court entered an order scheduling post-trial briefing due in November and December 2009. The Court established January 4-5, 2010 as the dates for closing oral arguments with respect to confirmation of the Plan (Dkt. 23618), and on January 4-5, 2010, the Court heard closing oral arguments with respect to confirmation of the Plan.

3

and (c) debt securities in the form of notes issued pursuant to a registered public offering or a private placement under Rule 144A or otherwise (together with the Term Facility and the Revolving Facilities, the "Exit Facilities").

7. In May 2009, the Debtors and Blackstone launched a formal competitive process to solicit exit financing proposals from leading financial institutions. This process included management meetings, due diligence sessions and other activities to enable prospective lenders to submit preliminary indications of interest in leading or participating in an exit financing for the Debtors. Certain prospective lenders were then invited to a "second round" of discussions based on the terms of their initial proposals. After additional due diligence, second-round lenders submitted new proposals. The Debtors and their advisors then began negotiating the terms and conditions of a potential exit financing commitment.

8. Despite the progress in obtaining exit financing commitments, the Debtors, in consultation with Blackstone, decided not to enter into a commitment. Instead, in October 2009, the Debtors decided to consider engaging certain of the second-round prospective lenders to act as lead bookrunners, arrangers, and/or underwriters, lead initial purchasers and/or lead placement agents for the eventual exit financing on a "best efforts" basis.

9. The decision to forgo a full commitment and instead engage certain lenders in connection with a "best efforts" financing was based on: (1) the relatively high costs associated with banks having to commit capital for an uncertain period of time; and (2) the Debtors' determination that it would be in the best interests of the estates to have greater flexibility on a "best efforts" basis than the Debtors would otherwise have in a committed facility. *See* O'Connell Declaration at ¶ 6.

10. For these reasons, after further review and analysis and consultation with their financial advisors, the Debtors decided to engage the Exit Lenders to act as lead bookrunners, arrangers and/or underwriters, lead initial purchasers and/or placement agents of the Exit Facilities. The exact terms and conditions of the engagements are contained in the two Engagement Letters, and relate to an exit financing transaction (the "Transaction") substantially on the terms set forth in the Plan and in a manner reasonably satisfactory to the parties.

**B.     Summary of the Engagement Letters**

11. The Engagement Letters include detailed outlines of the terms and conditions pursuant to which the Exit Lenders have proposed to use their commercially reasonable efforts to arrange or otherwise secure exit financing for the Debtors.[3] The salient terms of the Engagement Letters are as follows:

- Exit Lenders:

    (i)     The first Engagement Letter, which relates to the Facilities (the "Loan Engagement Letter"), is between the Debtors, DBSI and GS Lending Partners (DBSI and GS Lending Partners, collectively, the "Arrangers").

    (ii)    The second Engagement Letter (the "Bond Engagement Letter"), which relates to any underwritten offering or private placement of debt securities issued in connection with the Transaction ("Permanent Securities"), and to any bank loan or similar debt financing (other than the Facilities and the Permanent Securities) incurred in connection with the Transactions (the "Permanent Loans" and together with the Permanent Securities, the "Permanent Debt"), is between the Debtors, DBSI and GS&Co. (DBSI and GS&Co., collectively, the "Investment Banks").[4]

- Confidentiality: The Exit Lenders have requested that the Engagement Letters be filed under seal and that the amount of the fees attributable to the individual Exit Lenders thereunder not be revealed in open court. The Exit Lenders have

---

[3] Capitalized terms used in the summary of the Engagement Letters that are not defined herein shall have the meaning given in the Engagement Letters. To the extent of any inconsistency between the summary of the Engagement Letters set forth herein and the Engagement Letters, the terms and conditions of the Engagement Letters shall govern.

[4] The terms "Arrangers" and "Investment Banks" are different terms that are used in the Loan Engagement Letter and the Bond Engagement Letter, respectively, to refer to the same Exit Lenders or certain of their affiliates.

consented to the Engagement Letters being shared on a confidential basis with the office of the U.S. Trustee, any ad-hoc or statutorily appointed committees of creditors or equity holders, the future claimants' representative for the asbestos personal injury claimants, the future claimants' representative for the asbestos property damage claimants, and to their respective representatives and professional advisors on a confidential basis (collectively, the "Limited Notice Parties").

- Loan Engagement Letter Fees: The Loan Engagement Letter provides that, subject to certain conditions being met, the Debtors will pay a fee equal to a percentage of the maximum face amount of the Facilities (the "Arrangement Fee"), which Arrangement Fee will be payable on the date of first funding under the Facilities. Each Arranger will also be entitled to a fee from the Debtors in a specified amount (the "Bank Alternate Transaction Fee") in the event that, at any time prior to one year after the execution of the Loan Engagement Letter, the Debtors (i) complete any Exit Financing that is a bank financing, loan, credit facility or similar financing in which such Arranger or any of its affiliates does not act as a joint lead arranger and/or joint lead bookrunner or (ii) complete any Exit Financing that is a bank financing, loan, credit facility or similar financing in which such Arranger or any of its affiliates has less than 30% of the total economics; *provided* that the Bank Alternate Transaction Fee shall not be payable as to any Arranger in the event that such Arranger does not elect to provide at least a certain portion of commitments in respect of the Revolving Facility on or prior to the launch of syndication of the Facilities and does not consummate or declines to consummate such commitments following a customary syndication period, or if such Arranger or its affiliates terminates its engagement under either of the Engagement Letters without cause. The Bank Alternate Transaction Fees plus the Permanent Debt Alternate Transaction Fees (as defined below) shall not exceed a specified aggregate amount. Pursuant to the Debtors' request to file the Engagement Letters under seal and to maintain the confidentiality of the Engagement Letters, the Bank Alternate Transaction Fee and the Permanent Debt Alternate Transaction Fee are not disclosed herein. However, the Bank Alternate Transaction Fee and the Permanent Debt Alternate Transaction Fee are comprised in the total aggregate fees disclosed below.

- Bond Engagement Letter Fees: The Bond Engagement Letter provides that the compensation for underwriting, purchasing or privately placing any debt securities will be equal to a specified percentage of the aggregate principal amount of such debt securities, to be paid as a discount from the purchase price of such debt securities. If prior to the one-year anniversary of the execution of the Bond Engagement Letter, the Debtors (i) complete any offering or placement of Permanent Securities in which the Investment Banks did not act as joint lead underwriters, joint lead initial purchasers and/or joint lead placement agents, or any Permanent Loans are arranged with respect to which the Investment Banks (or their respective designated affiliates) did not act as joint lead arrangers and/or joint bookrunners, or (ii) completes any offering or placement of Permanent Securities or any arrangement of Permanent Loans with each Investment Bank (or

its respective designated affiliates) being allocated less than 30% of the total economics of any such Permanent Securities or Permanent Loans, then, in each case, the Debtors, as a result of entering into any transaction described in clauses (i) or (ii), agree that each such Investment Bank that is not allocated the roles and/or economics set forth above will be entitled to a payment from the Debtors in a specified amount (the "Permanent Debt Alternate Transaction Fee" and together with the Bank Alternate Transaction Fee, the "Break-up Fees"). Such Permanent Debt Alternate Transaction Fee shall not be payable to any Investment Bank in the event that (i) such Investment Bank or its respective designated affiliate does not elect to provide at least a certain portion of commitments in respect of any revolving credit facility included in any Permanent Loans on or prior to the launch of syndication of the Permanent Loans and/or does not consummate such commitment, or declines to consummate such commitment following a customary syndication period or such Investment Bank or its affiliates terminates its engagement under the Bond Engagement Letter or such Investment Bank or its affiliates terminates its engagement under the Loan Engagement Letter, in each case, without cause. The Bank Alternate Transaction Fees plus the Bond Alternate Transaction Fees are in addition to and are not creditable against any other fee payable to any Arranger or Investment Bank and/or any of their respective affiliates.

- Expense Reimbursement:

    (i) <u>Loan-Related Expense Reimbursement</u>: Under the Loan Engagement Letter, whether or not the Facilities are consummated, the Debtors agree to reimburse each Arranger for its reasonable and documented out of pocket expenses related to any matter referred to in the Loan Engagement Letter, including the reasonable fees and disbursements of counsel, and any advisors approved by the Debtors, plus any sales, use or similar taxes (including additions to such taxes, if any) incurred on or after the date of entry of the order authorizing the Loan Engagement Letter (the "Loan Authorization Order"), payable upon the earlier of the date of the closing of the Facilities or the termination of the Loan Engagement Letter. In addition, the Debtors agree to reimburse GS Lending Partners or its affiliates for the reasonable and documented out of pocket costs and expenses set forth in Section 2(ii) of the Bond Engagement Letter.

    (ii) <u>Bond-Related Expense Reimbursement</u>: Under the Bond Engagement Letter, whether or not the Transaction are consummated, the Debtors agree to reimburse each Investment Bank and their respective affiliates for its reasonable and documented out of pocket costs and expenses related to any matter referred to in the Bond Engagement Letter, including the reasonable fees and disbursements of counsel, and any advisors approved by the Debtors, plus any sales, use or similar taxes (including additions to such taxes, if any) incurred after the date of entry of the order authorizing the Bond Engagement Letter (the "Bond Authorization Order"), payable upon the earlier of the date of the issuance of any Permanent Debt or the termination of the Bond Engagement Letter. In addition, the Debtors agree to reimburse GS&Co. or its affiliates, promptly after the date of

7

entry of the Bond Authorization Order, for all reasonable and documented out of pocket costs and expenses, including the reasonable fees and disbursements of counsel, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in the Bond Engagement Letter, or the previously proposed committed financing for the exit financing transactions, in each case that have been incurred prior to the date of entry of the Bond Authorization Order. In the event that the Debtors enter into an underwriting or purchase agreement for the sale of Permanent Securities in an underwritten offering, the Investment Banks will bear the fees and disbursements of their counsel, other than the customary Blue Sky and Financial Industry Regulatory Association, Inc. fees and expenses, and expenses related to the preparation and production of underwriting or similar transaction documents, which fees and expenses will be borne by the Debtors.

- Administrative Priority of Fees and Expenses: The Engagement Letters provide that the payment obligations of the Debtors arising under the Engagement Letters shall be entitled to priority as administrative claims under sections 503(b) and 507(a)(1) of the Bankruptcy Code, whether or not the Loan Documents are executed or any of the Exit Facilities are funded.

- Indemnification: Each of the Engagement Letters requires the Debtors to provide indemnification in accordance with Annex A of such Engagement Letter. Specifically, the Debtors are required to indemnify and hold harmless the Exit Lenders (each, an "Indemnified Party") against any and all claims, damages, losses, liabilities and expenses to any such person in connection with or as a result of either the Indemnified Parties' engagements or any other matter referred to in the Engagement Letter. No indemnification shall apply to the extent that an Indemnified Party is found in a final judgment by a court of competent jurisdiction to have liability resulting from such Indemnified Party's gross negligence, bad faith or willful misconduct in performing the services that are the subject of the Engagement Letters.

- Exclusivity: The Loan Engagement Letter provides that the Arrangers are exclusively authorized by the Debtors to act as joint lead arrangers and joint bookrunners in connection with the Facilities. The Bond Engagement Letter provides that the Debtors will not offer or sell any Permanent Securities to, or incur any Permanent Loans or borrow any similar debt from, any third party during the term of the engagement without the prior consent of the Investment Banks, other than (i) the Facilities, the Permanent Debt and any intercompany indebtedness, (ii) the extension or replacement of the Debtors' debtor-in-possession credit facility[5] in consultation and coordination with the Investment Banks and (iii) any extension or replacement of any line of credit or other credit facility of any foreign subsidiary set forth in a schedule to the Bond Engagement Letter.

---

[5] Concurrently herewith the Debtors are filing a motion seeking to terminate their existing DIP financing and replace the existing DIP financing with an alternative financing arrangement.

- Engagement Letters Contain No Commitment: The Debtors acknowledge that neither the Loan Engagement Letter nor the Bond Engagement Letter is an expressed or implied commitment by the Arrangers or the Investment Banks or any of their respective affiliates to provide or arrange any financing or to provide or purchase or place any securities or loans or act in any roles in connection with the Exit Facilities, or to enter into any foreign exchange or commodities transaction, currency or interest rate swap, or other hedging or deritvative transaction, and that such commitment, if any, will only be set forth in a separate commitment letter or other definitive documentation entered into in connection with the Transactions.

- Termination of Engagement Letters: The Loan Engagement Letter will terminate upon the earliest of: (a) at any time by any Arranger (in each case, only with respect to itself) with or without cause effective upon receipt by the Debtors of notice to that effect from such Arranger, (b) at any time by the Debtors effective upon receipt by the Arrangers of notice to that effect from the Debtors, (c) one year after the execution of the Loan Engagement Letter or (d) upon the emergence of the Debtors from their bankruptcy cases, unless the closing of the Facilities, on the terms and subject to the conditions contained herein, has been consummated on or before such date. Under the Bond Engagement Letter, the Investment Banks' services will terminate upon the earliest of: (a) at any time by any Investment Bank (in each case, only with respect to itself) with or without cause effective upon receipt by the Debtors of notice to that effect from such Investment Bank, (b) at any time by the Debtors with or without cause effective upon receipt by the Investment Banks of notice to that effect from the Debtors, (c) one year after the execution of the Bond Engagement Letter or (d) upon the emergence of the Debtors from their bankruptcy cases, unless the closing of the Permanent Debt, on the terms and subject to the conditions contained in the Bond Engagement Letter, has been consummated on or before such date.

12. As noted above, due to confidentiality concerns, the Exit Lenders have requested that the Debtors file the Engagement Letters under seal because the Engagement Letters contain sensitive commercial information. However, the Exit Lenders have agreed to disclose herein the total aggregate fees, without any breakdown in calculation of the fees attributable to the Exit Lenders potentially due and owing to the Exit Lenders or their affiliates in connection with the Engagement Letters. At this time, the Debtors estimate that the total aggregate fees potentially due and owing to the Exit Lenders on account of the Engagement Letters for a financing of up to $1.2 billion is up to approximately $30 million, which includes the amount of the Break-up Fees,

if applicable.⁶ With this disclosure, and with the disclosure of the Engagement Letters to the Limited Notice Parties, the Debtors believe that the office of the U.S. Trustee does not object to the filing of the Engagement Letters under seal.

## Basis For Relief

**A. The Debtors' Entry Into the Engagement Letters is Warranted Under These Circumstances.**

13. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b)(1) of the Bankruptcy Code, a court generally should approve a non-ordinary course transaction if the proposed use of estate assets is within the debtor's reasonable business judgment. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175 76 (D. Del. 1991) (same).

14. Once the Debtors have articulated a valid business purpose for use of estate property, a presumption arises that the Debtors' decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of

---

⁶ The Debtors note that the total aggregate fees stated herein include a combination of the Break-up Fees and the other fees associated with the Exit Facilities. The total aggregate fees will be lower than stated herein because (i) if the Exit Facilities are provided, the Break-up Fees would not be paid and (ii) if the Exit Facilities are not provided, the Break-up Fees would be paid, but certain of the other fees associated with the Exit Facilities would not be paid.

10

validity."); *In re Johns Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

15. It is customary for debtors in large chapter 11 cases to seek and obtain approval to enter into exit financing agreements and to pay related fees and expenses. Such relief is routinely granted by this Court. *See, e.g., In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) (Dkt. 732) (order authorizing the debtors to enter into exit financing commitment letters and pay certain fees and expenses associated therewith); *In re Flying J Inc.*, Case No. 08-13384 (MFW) (Bankr. D. Del. Oct. 15, 2009) (Dkt. 2100) (order authorizing the debtors to enter into exit financing engagement letters and pay certain fees and expenses associated therewith); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Mar. 4, 2009) (Dkt. 2181) (same); *In re Pierre Foods, Inc.*, Case No. 08-11480 (KG) (Bankr. D. Del. Nov. 28, 2008) (Dkt. 465) (order authorizing the debtors to enter into exit financing commitment letters and pay certain fees and expenses associated therewith); *In re Sea Containers Ltd.*, Case No. 06-11156 (KJC) (Bankr. D. Del. Nov. 6, 2008) (Dkt. 2315) (same); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 8, 2007) (Dkt. 2229) (order authorizing the debtors to enter into exit financing engagement letter and related fee letter); *In re Owens Corning*, Case No. 00-03837 (JKF) (Bankr. D. Del. Jul. 14, 2006) (Dkt. 18476) (order authorizing the debtors to enter into senior credit facilities commitment letter and engagement letter and to pay certain fees and expenses associated therewith); *In re Meridian Auto. Sys.-Composites Operations, Inc.*, Case No. 05-11168 (MFW) (Bankr. D. Del. June 14, 2006) (Dkt. 1155) (order authorizing debtors to enter into fee letters in connection with securing

exit financing and pay certain fees and expenses associated therewith); *In re Pliant Corp.*, Case No. 06-10001 (MFW) (Bankr. D. Del. May 9, 2006) (Dkt. 666) (same).

16. The Debtors believe there is ample justification for their entry into the Engagement Letters. First, an exit financing facility is necessary in order for the Debtors to effect the terms of the Plan and successfully emerge from chapter 11. The Exit Facilities will supply the reorganized Debtors with the necessary capital to make payments under the Plan and to fund the reorganized Debtors' day-to-day operations and working capital needs after the effective date of the Plan.

17. Second, the Debtors and representatives of the Arrangers and the Investment Banks conducted extensive arm's-length negotiations in good faith regarding the terms of the original engagement proposals that resulted in modifications favorable to the Debtors. *See* O'Connell Declaration at ¶ 7. In view of the positive outcome of these negotiations, the Debtors, in their business judgment and on the advice of their financial advisors and counsel, concluded that the Arrangers' and the Investment Banks' proposals as set forth in the Engagement Letters represent reasonable terms. *See* O'Connell Declaration at ¶ 8.

18. Third, given the volatility of the credit markets and the uncertainty regarding when the Plan might go effective, engaging the Arrangers and Investment Banks now, in anticipation of confirmation of the Plan, is in the best interests of the Debtors. The expertise of the Arrangers and the Investment Banks is particularly important to a successful exit financing in the current climate - the depth and breadth of market knowledge, experience and contacts they can provide will be critical to dealing with evolving, unpredictable credit markets and successfully presenting the Debtors' creditworthiness to those markets. *See* O'Connell Declaration at ¶ 9. The Engagement Letters will allow the Debtors, their financial advisors and

counsel, in conjunction with and with the assistance of the Arrangers and Investment Banks, to begin planning and carrying out the exit financing process including, among other things, conducting lender meetings, drafting confidential memoranda, completing due diligence, preparing rating agency presentations, conducting road shows, completing documentation and taking other necessary steps. It is of critical importance that the Debtors begin this work now so that the Debtors can emerge from bankruptcy as soon as the legal process allows.

19. Thus, the Debtors respectfully submit that it is in the best interest of the Debtors' estates, their creditors and other parties in interest for the Court to authorize entry into the Engagement Letters. *See* O'Connell Declaration at ¶ 13.

**B.     The Fees and Expenses are Necessary to Preserve the Value of the Estate.**

20. The legal standard governing the award of break-up fees and expenses has been set forth by the United States Court of Appeals for the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir.1999); *see also In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009) (citing *O'Brien* as outlining relevant legal standard governing break-up fees in the Third Circuit).

21. In *O'Brien*, the Third Circuit surveyed different approaches to break-up fees and expenses and concluded that none of the different approaches taken by other courts "offer[ed] a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." *Id.* at 535. The Third Circuit went on to state:

> We therefore conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees ***were actually necessary to preserve the value of the estate.*** Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context. Nonetheless, the considerations that underlie the

13

debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.

*Id.* (emphasis added).

22. The inquiry into whether a break-up fee is necessary to preserve the value of the estate "stems directly from § 503(b)(1)(A), which requires that the expense provide some benefit to the debtor's estate." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536-37. Notably, the United States Bankruptcy Court for the District of Delaware recently permitted a debtor to enter into an exit facility commitment letter that provided for a break-up fee. *In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) (Dkt. 732) (order authorizing the debtors to enter into exit financing commitment letters and pay certain fees and expenses associated therewith); *see also In re Solutia, Inc.*, No. 03-17949, (Bankr. S.D.N.Y. Nov. 21, 2007) [Docket No. 4352] (order approving an undisclosed break-up fee in connection with an exit financing commitment letter).

23. The Debtors have determined that the proposal from the Exit Lenders contains reasonable market terms and would meet the Debtors' anticipated working capital needs when they emerge from chapter 11. *See* O'Connell Declaration at ¶ 11. Moreover, the Break-up Fees are a necessary condition to the Exit Lenders' willingness to enter into the Engagement Letters and to seek to provide necessary exit financing to the Debtors. *Id.* at ¶ 12.

24. During the course of the engagement set forth in the Engagement Letters, the Exit Lenders will use their commercially reasonable efforts to arrange or otherwise secure substantial capital for the Debtors. This tremendous effort will require the Exit Lenders to be in constant contact with the Debtors and to maintain up-to-date information regarding the Debtors' emergence from chapter 11. The Exit Lenders would not have agreed to enter into the Engagement Letters without the required conditions stated in the Engagement Letters including,

14

among other things, the Break-up Fees, expense reimbursement and indemnification obligations. *Id.*

25. Finally, the percentage of the total Exit Facilities represented by the proposed Break-up Fees, while not specifically disclosed herein, is *well below* the range of acceptable percentages for break-up fees in committed financings. For example, in the context of an exit financing commitment letter, the United States Bankruptcy Court for the District of Delaware recently approved a break-up fee comprising 3.5% of the total exit financing commitment. *See In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) (Dkt. 732). As stated in the O'Connell Declaration, the Debtors specifically decided not to enter into a committed facility because the costs associated with banks having to commit capital for an uncertain period of time was relatively high. *See* O'Connell Declaration at ¶ 6. The Debtors believe that the Break-up Fees represent an appropriately low percentage of the total Exit Facilities, in light of the "best efforts" arrangement, while also adequately compensating the Exit Lenders for their time and effort spent in procuring the Exit Facilities in accordance with the Engagement Letters in the event that the Debtors seek an alternative (and necessarily more attractive) exit financing package.

26. Thus, because the Exit Lenders require the Break-up Fees to enter into the Engagement Letters and because such financing is essential to the Debtors' ability to exit chapter 11, the Break-up Fees are "necessary to preserve the value of the estate" and the Debtors should be authorized to effectuate the Engagement Letters. Based on the foregoing, the Debtors respectfully submit that it is in the best interest of the Debtors' estates, their creditors and other parties in interest for the Court to authorize the Debtors to enter into the Engagement Letters.

15
DOCS_DE:156665.1

C.  **Filing the Engagement Letters Under Seal is Warranted.**

27.  Section 107(b) of the Bankruptcy Code authorizes courts to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information. This section provides, in relevant part:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may: (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information....

11 U.S.C. § 107(b). Bankruptcy Rule 9018 defines the procedure by which a party may move for relief under section 107(b) of the Bankruptcy Code, and provides, in part:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information....

Fed. R. Bankr. P. 9018.

28.  Commercial information is information which would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information, however, need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code. *Orion Pictures*, 21 F.3d at 28 (holding that a license agreement authorizing a licensee to "reproduce, manufacture, distribute, and sell videocassettes of three films" contained confidential commercial information); *In re Barney's, Inc.*, 201 B.R. 703, 708-09 (Bankr. S.D.N.Y. 1996) (concluding that for a retailer, confidential commercial "information might include, without limitation, pricing formulae, short and long term marketing strategies and the terms of agreements with suppliers).

16

29. Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure, section 107(b) of the Bankruptcy Code does not require an entity seeking such protection to demonstrate "good cause." *See, e.g.*, Orion Pictures, 21 F.3d at 28; *Phar Mor, Inc. v. Defendants Named Under Seal (In re Phar Mor, Inc.)*, 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995). Rather, once the bankruptcy court determines that a party in interest is seeking protection of information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting interested party and has no discretion to deny the application." *Orion Pictures*, 21 F.3d at 27.

30. Granting a sealing order is well within this Court's discretion. Under the plain language of section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, and in light of the Court's broad equitable powers under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," the requested relief should be granted.

31. Notably, *In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) (Dkt. 732), the Court implemented the protection afforded by sections 107(b) of the Bankruptcy Code to authorize a chapter 11 debtor to file fee letters under seal in connection with the debtor's motion for approval of the debtor's entry into exit financing commitment letters. *See also In re Northwest Airlines Corp.*, Case No. 05-17930 [Docket No. 6511] (Bankr. S.D.N.Y. May 2, 2007) (same); *In re Calpine Corporation*, Case No. 05-60200 [Docket No. 3494] (Bankr. S.D.N.Y. January 29, 2007) (authorizing Debtors to file fee letter with respect to Debtors' refinancing effort under seal); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 [Docket No. 13092] (Bankr. S.D.N.Y. Jan. 25, 2007) (authorizing the debtor to file documentation of fee structure for underwriting agreement under seal); *see The Air Line Pilots*

*Ass'n Int'l v. American Nat'l Bank and Trust Co. of Chicago (In re Ionosphere Clubs)*, 156 B.R. 414, at 434 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

32. In light of the foregoing, the Debtors submit that good cause exists to authorize the Debtors to file the Engagement Letters under seal and to limit notice of the same. The Engagement Letters contain detailed proprietary information describing the fees, which is customarily considered by the Arrangers and the Investment Banks, as well as the finance lending industry in general, to be highly sensitive and confidential information not typically disclosed to the public or made available to other competing financial institutions. Given the highly competitive nature of the investment banking and finance lending industries, it is of the utmost importance to the Arrangers and the Investment Banks that the details of the fee structures and allocations set forth in the Engagement Letters be kept confidential so that their competitors may not use the information contained therein to gain a strategic advantage over the Arrangers and the Investment Banks in the marketplace.

33. The Debtors also submit that notice of the Engagement Letters, and service of such exhibit, should be limited to the Limited Notice Parties, unless otherwise agreed to by the Debtors and the Arrangers and the Investment Banks. The Limited Notice Parties have the greatest interest in the Engagement Letters, and so limiting notice to these entities will subject the Engagement Letters to sufficient scrutiny on their merits.

34. Moreover, despite the Exit Lenders' request to file the Engagement Letters under seal, as noted above, the Exit Lenders have agreed to disclose herein the total aggregate fees due and owing to the Exit Lenders or their affiliates in connection with the Engagement Letters. The Debtors believe that this disclosure has resolved any objection that the office of the U.S. Trustee would have had to the filing of the Engagement Letters under seal.

## Notice

35. The Debtors have provided notice of this Motion either by electronic mail or facsimile and by overnight mail to: (i) the office of the U.S. Trustee, (ii) counsel to the DIP Lender, (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders, (iv) counsel to each of the official committees appointed in these chapter 11 cases, (v) counsel to the asbestos personal injury and asbestos property damage future claimants' representatives; (vi) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (vii) counsel to each of the Exit Lenders. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## No Prior Request

36. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A: (a) authorizing and approving the Debtors' entry into, and performance under, the Engagement Letters; (b) authorizing the use of estate funds to pay the fees and expenses as set forth in the Engagement Letters, including the Break-up Fees, if applicable; (c) authorizing the Debtors' indemnification of the Exit Lenders and their affiliates in accordance with the terms set forth in Annex A of the Engagement Letters; (d) authorizing the Debtors to file copies of the Engagement Letters under seal pursuant to section 107(b) of the Bankruptcy Code; and (e) directing that the Engagement Letters remain under seal

and confidential not be made available to anyone other than the Limited Notice Parties (as defined herein) without the written consent of the Debtors and the Exit Lenders, respectively; and (f) granting such other and further relief as is just and proper.

Dated: January 15, 2010

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Theodore L. Freedman
Christopher T. Greco
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900


THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession