# **EXHIBIT C**

O'Connell Declaration

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**DECLARATION OF JOHN JAMES O'CONNELL III IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) ENTER INTO EXIT FINANCING ENGAGEMENT LETTERS; (B) PAY CERTAIN FEES AND EXPENSES IN CONNECTION THEREWITH; AND (C) FILE THE ENGAGEMENT LETTERS UNDER SEAL**

I, John James O'Connell III, declare as follows:

1. I am over the age of 18 and competent to testify. I am a Managing Director of Blackstone Advisory Partners L.P. ("Blackstone"), an affiliate of The Blackstone Group L.P., the Debtors' financial advisor, which has offices at 345 Park Avenue, New York, New York 10154.

2. I am generally familiar with the Debtors' business affairs and restructuring negotiations. Blackstone has served as financial advisor to the Debtors since April 2001 and I

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

have been personally involved in advising the Debtors since July 2004. This declaration is based on my personal knowledge, relevant documents that I have reviewed, information that has been supplied to me by employees of the Debtors or by other professionals retained by the Debtors, and my expert opinions. If called upon to testify, I could and would testify competently to the facts and opinions contained in this declaration.

3. I submit this declaration in support of the Debtors' motion (the "Motion") for entry of an order authorizing the Debtors to (a) enter into two engagement letters providing for a "best efforts" engagement to provide exit financing (the "Engagement Letters") by Goldman, Sachs & Co. ("GS&Co."), Goldman Sachs Lending Partners LLC ("GS Lending Partners") and Deutsche Bank Securities Inc. ("DBSI") (together with GS&Co. and GS Lending Partners, the "Exit Lenders"); (b) pay certain fees and expenses in connection therewith; and (c) file the Engagement Letters under seal.[2]

4. Over the last two years, the Debtors and Blackstone have maintained a dialogue with prospective lenders concerning the terms and structuring of an exit financing package. In May 2009, the Debtors and Blackstone launched a formal competitive process to solicit exit financing proposals from leading financial institutions. This process included management meetings, due diligence sessions and other activities to enable prospective lenders to submit preliminary indications of interest in leading or participating in an exit financing for the Debtors. Certain prospective lenders were then invited to a second round of discussions based on the terms of their initial proposals. After additional due diligence, second-round lenders submitted new proposals. The Debtors and their advisors then began negotiating the terms and conditions of a potential exit financing commitment.

---

[2] Capitalized terms used herein and that are not otherwise defined herein shall have the meaning given to them in the Motion.

5. Despite the progress in obtaining exit financing commitments, the Debtors, in consultation with Blackstone, decided not to enter into a commitment. Instead, in October 2009, the Debtors decided to consider engaging certain of the second-round prospective lenders to act as lead bookrunners, lead arrangers, and/or lead underwriters, lead initial purchasers and lead placement agents for the eventual exit financing on a "best efforts" basis.

6. The decision to forgo a full commitment and instead engage certain lenders in connection with a "best efforts" financing was based on: (1) the relatively high costs associated with banks having to commit capital for an uncertain period of time; and (2) the Debtors' determination that it would be in the best interests of their estates to have greater flexibility on a "best efforts" basis than the Debtors would otherwise have in a committed facility.

7. After deliberation and discussion with their advisors, the Debtors ultimately determined that the Engagement Letters embodied the most appropriate proposal. The Debtors, Blackstone and representatives of the Arrangers and the Investment Banks conducted arm's-length negotiations in good faith that resulted in modifications to the terms of the original engagement proposals that were favorable to the Debtors.

8. I believe the fees and expenses associated with the Exit Facilities are reasonable market terms for the Debtors under these circumstances.

9. Notably, the expertise of the Arrangers and the Investment Banks is particularly important to a successful exit financing in light of the volatility experienced in the credit markets in recent years. While the credit markets have improved during the course of 2009, they remain difficult to forecast. The depth and breadth of market knowledge, experience and contacts provided by the Arrangers and Investment Banks will be helpful in dealing with evolving credit markets. Moreover, the Debtors will benefit by having the Arrangers and Investment Banks

involved in financing-related activities at this stage in order to avoid any potential delays in consummating the exit financing after legal issues in the reorganization process have been resolved. The Debtors expect that the Arrangers and Investment Banks will assist in a number of important endeavors including, among others, drafting confidential memoranda, assisting in the preparation of rating agency presentations, conducting lender meetings and conducting road shows.

10.  I believe the Exit Lenders would not have agreed to provide the Exit Facilities without the required conditions stated in the Engagement Letters including, among other things, the Break-up Fees, expense reimbursement obligations and indemnification obligations. In my opinion, it is in the Debtors' best interest to agree to such fees and expenses in order to secure the Exit Lenders' "best efforts" financing.

11.  I understand that effectuating the transactions contemplated by the Plan depends, in large part, on securing exit financing. To that end, I believe that the proceeds expected to be obtained from the Exit Facilities will allow the Debtors to consummate the transactions under the Plan.

12.  Thus, because I believe that the Exit Lenders would not have agreed to provide the Exit Facilities without the required Break-up Fees, expense reimbursement obligations and indemnification obligations, and because I believe that the Exit Facilities are necessary to consummate the Plan and to the Debtors' ultimate emergence from chapter 11 and future success, I believe that the fees and expenses outlined in the Engagement Letters are necessary to preserve the value of the Debtors' estates.

13.  For all of the reasons set forth above, I believe that the Debtors' entry into the Engagement Letters and corresponding payment of fees and expenses set forth therein is in the

Debtors' sound business judgment and is in the best interest of the Debtors' estates and their creditors. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United Sates of America that the foregoing is true and correct.

January 15, 2010

                                        */s/ John James O'Connell III*
                                        John James O'Connell III
                                        Managing Director
                                        Blackstone Advisory Partners L.P.

                                        *Financial Advisor for the Debtors and Debtors in Possession*