IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Hearing Date: February 16, 2010, at 10:30 a.m. |
| | ) | Objection Deadline: February 5, 2010 |

## MOTION OF DEBTORS FOR AUTHORITY TO ENTER INTO LETTER OF CREDIT AND HEDGING AGREEMENTS AND TERMINATE CURRENT DIP FACILITIES

The Debtors file this motion (the "Motion") requesting entry of an order, in substantially the form attached hereto as **Exhibit 1** (the "Facility Order"), authorizing the Debtors to enter into the following transactions (collectively, the "Transactions"), which will permit the Debtors to terminate their existing debtor-in-possession financing facility, which is documented by the *Post-Petition Loan and Security Agreement* dated April 1, 2001 (as heretofore amended and modified, the "DIP Facility"):[2]

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc., "Grace"), W. R. Grace & Co. Conn. ("Grace"), A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms not defined in this Motion shall have the meaning ascribed to them in, as the case may be, the New Finance Agreements (as that term is defined in this Motion) or the *First Amended Joint Plan of Reorganization* (the "Plan") in these Chapter 11 Cases, as amended, Docket nos. 19579, 20666, 20872, 20873 and 21594. To the extent of any inconsistency between the summary of the Transactions set forth herein and the New Finance Agreements (as defined below), the terms and conditions of the New Finance Agreements shall govern.

- *New Letter of Credit Facility.* The Debtors propose to enter into a letter of credit facility (the "L/C Facility"), as documented by the *Post-Petition Letter of Credit Facility Agreement* among the financial institutions party thereto from time to time and defined therein as Letter of Credit Issuers, Bank of America, N.A., as Agent, and W.R. Grace & Co. - Conn., as Account Party (as amended, extended, supplemented or otherwise modified in writing from time to time) (the "LOC Agreement"), substantially in the form attached to the form of L/C Facility Order as **Exhibit A**. The proposed L/C Facility is a one-year cash collateralized letter of credit facility with $100 million of committed availability (the "Commitment"), which will be secured by a cash collateral account. Included within the Commitment will be currently existing letters of credit (the "Existing Letters of Credit") issued by Bank of America N.A. ("BANA") under the DIP Facility, which as of December 31, 2009, were approximately $71 million, as well as additional letter of credit availability.

- *Amendment of Hedging Arrangements.* The Debtors propose to enter into a new *ISDA 2002 Master Agreement* and *Schedule to the 2002 Master Agreement* (collectively, the "2010 ISDA Master Agreement"), between Grace and BANA in the form attached to the form of Facility Order as **Exhibit B**, governing Grace's current and future hedging arrangements in the ordinary course of its risk management activities (the "Hedging Transactions"), which will be secured through the LOC Agreement by two dedicated cash collateral accounts separate from the cash collateral account securing the L/C Facility transactions. The 2010 ISDA Master Agreement will replace an existing ISDA Master Agreement whose credit support arrangements are provided by the DIP Facility.

- *Control Agreements.* In connection with the L/C Facility, the Debtors propose to enter into certain cash collateral control agreements with BANA (the "Control Agreements"), substantially in the form attached to the form of Facility Order as **Exhibit C**, which will provide for the handling and disposition of funds in the three separate cash collateral accounts.[3]

The Debtors also request authority pursuant to section 363(b)(1) of the Bankruptcy Code to pay certain fees as part of the Transactions (the "Agreement Fees"). Finally, Debtors propose to enter into an agreement with BANA as agent and BANA and the other lenders under the DIP Facility (collectively, the "Postpetition Lenders"), substantially in the form attached hereto as **Exhibit D** (the "Termination Agreement") terminating the DIP Facility.

The Debtors submit that entry into these Transactions will permit the Debtors to exit their DIP Facility, which expires on April 1, 2010, and replace it with a more cost-effective form of

---

[3] Collectively, the LOC Agreement, the ISDA Master Agreement and the Control Agreements are the "New Finance Agreements".

post-petition financing that takes advantage of the Debtors' substantial cash reserves, and which will provide a financing bridge to the Debtors' anticipated exit from chapter 11. The Debtors further submit that the Agreement Fees are reasonable and necessary under the circumstances.

In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O).

2. The statutory predicates for the relief requested herein are sections 363(b) and 364 of the Bankruptcy Code.

## Background

3. On April 2, 2001, the Debtors filed a motion requesting authority to obtain debtor-in-possession financing of an aggregate principal amount of up to $250,000,000 as provided in the DIP Facility. On May 3, 2001, the Court entered an order approving the DIP Facility (the "Final DIP Order") [Docket No. 192]. Since then, the Court has modified or amended the Final DIP Order several times:

| Date | Docket No. | Order |
|---|---|---|
| 03/14/2003 | 3512 | Order authorizing First DIP Facility Amendment |
| 01/22/2004 | 4965 | Order authorizing Third DIP Facility Amendment |
| 03/24/2006 | 12118 | Order authorizing Fourth DIP Facility Amendment |
| 03/18/2008 | 18315 | Order authorizing Sixth DIP Facility Amendment |

The second and fifth amendments to the DIP Facility did not require this Court's approval.

4. The DIP Facility currently provides for a financing commitment of up to $165 million, including a letter of credit sub-commitment of $150 million. As of December 31, 2009,

3

the DIP Facility had: (a) no outstanding draws or other loans; and (b) Existing Letters of Credit in the aggregate face amount of $71 million.

5. Grace engages in risk management activities, pursuant to which it enters into foreign currency exchange rate forward and/or option contracts to mitigate the effects of exchange rate fluctuations. In addition, from time to time, Grace enters into commodity derivatives with financial institutions to mitigate the risk of volatility of natural gas prices and other commodities. These transactions are documented by an ISDA master agreement, dated May 12, 2003 (the "2003 ISDA Master Agreement"). The credit support for these transactions is provided through the DIP Facility, and will need to be replaced upon the DIP Facility's expiry to the extent that Hedging Transactions remain outstanding under the 2003 ISDA Master Agreement at that time.

6. Closing arguments in the confirmation hearing for the Debtors' chapter 11 cases are expected to conclude on January 25, 2010. In view of the complicated nature of the chapter 11 cases, the Debtors do not believe that they will be able to consummate the Plan prior to the DIP Facility's expiration on April 1, 2010.

7. Grace and its consolidated subsidiary and affiliate Debtors currently have a substantial positive cash position (approximately $894 million as of December 31, 2009), and expect to maintain a substantial cash position until emergence. But the Debtors will continue to need the Existing Letters of Credit as well as additional letter of credit availability in the ordinary course of their business. They propose to satisfy those needs until then with the L/C Facility on the terms and conditions set forth in the LOC Agreement. The Debtors also intend to maintain as part of their ordinary course business operations their ongoing risk management activities, along with the concomitant Hedging Transactions. The collateral arrangements set forth in the DIP

Facility that secure the Debtors' obligations under the 2003 ISDA Master Agreement, will be replaced by collateral arrangements set forth in the LOC Agreement that will secure the Debtors' obligations under the LOC Agreement and the 2010 ISDA Master Agreement for Hedging Transactions.

8. The Debtors intend to replace the current collateral arrangements documented in the DIP Facility with three separate Cash Collateral Accounts as set forth in the LOC Agreement, the balances of which will secure the Obligations arising from the L/C Facility and the Hedging Transactions. Pursuant to the terms of the L/C Facility, and as provided for by section 364(c) of the Bankruptcy Code, there will be liens on the three Cash Collateral Accounts and the assets contained therein. Once the DIP Facility's liens have been released (which will occur when that facility is terminated and the L/C Facility closes), there will not be any liens on the assets that will fund the Cash Collateral. The Debtor therefore will not be seeking to prime any existing liens pursuant to section 364(d) of the Bankruptcy Code.

9. The L/C Cash Collateral Account will secure L/C Facility Obligations and two separate Cash Collateral Accounts will secure the Hedging Transactions: the F/X Hedge Cash Collateral Account will secure the Debtors' F/X transactions; and the Commodity Hedge Cash Collateral Account will secure the commodities transactions. In addition, the LOC Agreement permits funds in each of the three Cash Collateral Accounts to be made available to secure all Obligations, provided that the Obligations secured by a particular Cash Collateral Account have been first satisfied from that account. For example, funds in the L/C Facility Cash Collateral Account will secure Obligations arising pursuant to the Hedging Transactions once the Obligations arising from the L/C Facility (including fees and expenses) have been satisfied.

10. The Debtors have analyzed their financing and business needs and the available sources of credit. In so doing, they have determined that the New Finance Agreements and the transactions to be consummated thereby will be more cost-effective and less of an administrative burden than the current secured financing arrangements existing under the DIP Facility. The Debtors therefore have concluded that their best course of action is to enter into the New Finance Agreements.

11. The principal terms and conditions of the New Finance Agreements and the Facility Order include:

| Term | Description |
|---|---|
| **L/C Facility & Facility Order** | |
| Parties | BANA as Agent and Letter of Credit Issuer (any assignee of part of Commitment becomes an additional Letter of Credit Issuer). Grace as Account Party |
| Termination Date | LOC terminates on the earlier of the first anniversary of date of execution or the Plan's effective date |
| Termination | Grace may terminate facility upon 10 days' notice |
| Commitments | $100,000,000, subject to Availability |
| Availability | At any time, (a) the lesser of (i) an amount equal to 95.24% of the L/C Cash Collateral Account Balance or (ii) $100,000,000, minus (b) the aggregate outstanding face amount of all Letters of Credit |
| Fees | • *Facility Fee*: $250,000<br>• *Administration Fee*: $75,000<br>• *Letter of Credit Fee*: for each month, equal to one percent (1.00%) per annum, multiplied by the average daily maximum aggregate amount from time to time available to be drawn under all outstanding Letters of Credit during such month, plus a "fronting fee" of one-quarter of one percent (0.25%) per annum multiplied by the average daily maximum aggregate amount from time to time available to be drawn under all outstanding standby Letters of Credit during such month<br>• *Unused Line Fee*: on the first day of each month and on the Termination Date, the Applicable Percentage times the amount by which the Commitments exceeded the average daily undrawn face amount of outstanding Letters of Credit during the immediately preceding month (or shorter period if calculated for the first month or on the Termination Date) |
| Applicable Percentage | With respect to the payment of the Unused Line Fee, for each month (or lesser period as applicable, if the average daily Availability during such month (or such lesser period) is (i) less than or equal to $50,000,000, 0.50% per annum, or (ii) greater than $50,000,000, 0.75% per annum |
| Indemnification | Grace indemnifies Agent and Letter of Credit Issuers, with a carve-out for gross |

| Term | Description |
|---|---|
| | **L/C Facility & Facility Order** |
| | negligence and willful misconduct |
| Obligations | Obligations to BANA arising under the L/C Facility and the Hedging Transactions. |
| Collateral | Cash held in the L/C Cash Collateral Account, equal to 105% of aggregate amount of outstanding LOCs; subject to Control Agreements |
| Super-Priority Administrative Claims | Section 364(c)(1) super-priority claims for Obligations to the extent of funds in the Cash Collateral Accounts |
| Liens | Senior liens on the Cash Collateral Accounts pursuant to section 364(c)(2) and junior liens pursuant to section 364(c)(3). Cash Collateral Accounts include L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account and the Commodity Hedge Cash Collateral Account |
| Section 506(c) | Debtors and their estates waive right to assert claims against the Letter of Credit Issuers and the Agent. |
| Interest Rate | Base Rate plus 2.5% per annum on due but unpaid Obligations |
| Base Rate | For any day, a per annum rate equal to the greatest of (a) the Prime Rate for such day; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) LIBOR for a 30-day interest period as determined on such day |
| Default Interest Rate | Applicable interest rate *plus* 2.0% per annum on due but unpaid Obligations upon occurrence of a continuing Event of Default |
| Maximum Interest | Maximum rate legally chargeable by any Letter of Credit Issuer under applicable law |
| Events of Default | • Nonpayment of Obligations<br>• Breach of certain affirmative or negative covenants<br>• Failure to fund Cash Collateral Accounts<br>• Judgment against the Debtors in excess of $10 million<br>• ERISA Event greater than $25 million<br>• Conversion of chapter 11 cases to chapter 7<br>• Plan of Reorganization does not provide for payment of Obligations |
| Remedies Upon Event of Default | Without further order of the Court, remedies include: (i) termination of L/C Facility; (ii) immediate payment of Obligations; (iii) application of Cash Collateral Accounts proceeds to unpaid Obligations; and (iv) lifting of the section 362 automatic stay to accomplish any of the foregoing |
| Governing Law | New York, without regard for conflicts of laws, and except as New York law may conflict with applicable Bankruptcy Code provisions |

| Term | Description |
|---|---|
| | **2010 ISDA Master Agreement** |
| Parties | BANA and Grace |
| Types of Transactions | F/X and Commodities Hedging Transactions |
| Credit Support | Specified in the LOC Agreement |
| Collateral | • *Accounts*. Cash held in two separate Cash Collateral Accounts (the F/X Hedge |

| | 2010 ISDA Master Agreement |
|---|---|
| **Term** | **Description** |
| | Cash Collateral Account and the Commodity Hedge Cash Collateral Account), subject to the Control Agreements |
| | • *Cash Balance Calculation.* Cash balances in each Cash Collateral Account to be separately adjusted up or down on a daily basis to equal 115% of BANA's mark-to-market exposure with respect to the exposure to the F/X and Commodities Hedging Transactions, respectively |
| **Netting** | As specified by 2010 ISDA Master Agreement § 1(c) |
| **Events of Default** | As specified by 2010 ISDA Master Agreement § 5 |
| **Cross Default** | An Event of Default under the LOC Agreement will constitute an Event of Default under the 2010 ISDA Master Agreement, which would permit BANA to terminate outstanding Hedging Transactions and satisfy unpaid Obligations pursuant to the LOC Agreement's terms |
| **Governing Law** | New York (without reference to New York conflicts of law doctrine) |

## RELIEF REQUESTED

12. By this Motion, the Debtors seek authority pursuant to sections 363(b) and 364 of the Bankruptcy Code to enter into the New Finance Agreements, consummate the Transactions contemplated thereby and pay the Agreement Fees.

*The New Finance Agreements Are Proper Under Section 364.*

13. Courts have articulated a three-part test to determine whether a debtor is entitled to obtain secured financing under section 364(c) of the Bankruptcy Code:

> (i) The debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
> (ii) The credit transaction is necessary to preserve the assets of the estate; and
> (iii) The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D. N.Y. 1990).

14. The Debtors propose to replace the DIP Facility with a standalone L/C Facility. Collateral support for Hedging Transactions currently provided for under the DIP Facility will be replaced with collateral support arrangements on the terms set forth in the LOC Agreement. This

will allow the Debtors to continue their ordinary course business operations on a cost-effective basis until exit from chapter 11.

15. BANA is not willing to provide the proposed L/C Facility without the security arrangements for L/C Facility Obligations set forth in the LOC Agreement. The Debtors do not believe that they would be able to obtain an equivalent letter of credit facility on an unsecured basis from another lender, particularly as such a facility, like the proposed L/C Facility, would be a relatively short term financing arrangement pending the Debtors' exit from chapter 11. In addition, the Debtors cannot obtain equivalent financing arrangements on an unsecured basis. It is likely that any counterparty would require the Debtors to enter into some form of credit support for the Hedging Transactions on terms substantially similar to those set forth in the LOC Agreement. The security interests arising in the LOC Agreement have been tailored to provide BANA with sufficient security for Obligations arising in connection therewith, without encumbering the rest of the Debtors' estates, as is the case with the current DIP Facility, which provides for liens on substantially all the Debtors' property.

16. The Debtors will benefit from the reduced fees and expenses and reduced administrative burdens associated with the L/C Facility as compared to the fees and expenses associated with the current DIP Facility. This Court has also previously found that the Debtors had established the need for the DIP Facility pursuant to section 364 when it entered the final order respecting the initial DIP Facility as well as when it approved the subsequent amendments. The Debtors submit that this Court's findings should also apply to the New Finance Agreements and the Transactions contemplated thereby.

17. The Debtors have negotiated the New Finance Agreements with BANA at arm's length and in "good faith" (as that term is defined in section 364(e) of the Bankruptcy Code),

with all parties represented by experienced counsel. Entry of an order authorizing the New Finance Agreements will eliminate potential disruption of the Debtors' businesses and operations that would otherwise result from termination of the DIP Facility. The New Finance Agreements thus are critical to avoid immediate and irreparable harm to, and entry into them is in the best interests of the Debtors' estates.

*The Payment of the Agreement Fees Is Proper Use of Estate Property Under 363(b).*

18. Section 363(b) of the Bankruptcy Code permits bankruptcy courts to authorize debtors to use estate property to pay fees such as the Agreement Fees. See, e.g., In re Delphi Corporation, et al., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2007) (delay in exiting bankruptcy due to deteriorating commercial credit markets; secured lenders required extension fees and increase in applicable interest rates); and In re Tower Automotive, Inc., et al., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Jan. 31, 2007) (delay in exiting bankruptcy due to deteriorating domestic automobile manufacturing output; secured lenders required extension fees and increase in applicable interest rates); see also In re Global Home Products, Inc., Case No. 06-10340 (KG) (Bankr. D. Del. October 30, 2006); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. June 28, 2007); In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. March 5, 2007). Bankruptcy courts have generally approved such use of estate property out of the ordinary course of business when there is a sound business justification for the proposed transaction. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under § 363(b) when there is a legitimate business justification); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (acknowledging the use of the "articulated business justification" for the use of property under § 363).

19. A debtor has the burden of establishing that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See In re Lionel Corp., 722 F.2d at 1071. Once a debtor articulates a valid business justification, however, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule therefore shields a debtor's management from judicial second-guessing. A court should approve a debtor's business decision unless that decision is a product of bad faith or gross abuse of discretion. See id.; see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

20. The Debtors must pay the Agreement Fees in order to consummate the Transactions contemplated by the New Finance Agreements. Those Transactions, including but not limited to, rolling over the Existing Letters of Credit, future issuance of new letters of credit, maintaining the existing Hedging Transactions and entering into future Hedging Transactions. Each of these financing Transactions is critical to the Debtors being able to continue their business operations in the ordinary course.

21. In view of their substantial cash reserves, which have been generated by their profitable businesses, the Debtors no longer need the DIP Facility, and so have no reason to incur the expense of renewing that facility. The Debtors have determined in their business judgment that they need a far more limited scope of financing between now and emergence, which will be met by the proposed L/C Facility and Hedging Transaction credit support documented in the LOC Agreement.

22. The L/C Facility will terminate upon emergence, and will be replaced by longer term financing. The Debtors are engaged in securing such emergence financing. In light of these circumstances, the Debtors believe that it would be overly time-consuming and not cost-effective to attempt to replace BANA with alternative hedging credit support and letter of credit facility arrangements that likely would require the payment of fees equal to or greater than the proposed Agreement Fees. Even if the Debtors were to secure such alternative financing arrangements on equivalent terms with marginally lower fees and expenses, any potential savings would likely be subsumed by the additional costs associated with negotiating and implementing agreements with another financial institution.

23. The Debtors submit that the Agreement Fees, which the Debtors and BANA negotiated at arm's length, are fair and reasonable and reflect current conditions in the credit market. The Debtors submit that the relief requested herein is an appropriate exercise of their business judgment and will inure to the benefit of the Debtors' estates. The Debtors therefore further submit that the Court should approve the New Finance Agreements and authorize the Debtors to pay the Agreement Fees.

### No Previous Motion

24. No previous motion for the relief sought herein has been made to this or any other court.

### No Briefing Schedule

25. The Debtors respectfully submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local District Court Rules"), incorporated by reference in Del. Bankr. L.R. 1001-1(b), the

Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Rules.

## Notice

26. Notice of this Motion has been given to: (i) the office of the United States Trustee; (ii) counsel to the DIP Lender; (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (iv) counsel to each of the official committees appointed in these Chapter 11 Cases; (v) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (vi) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; (vii) counsel to the Agent; and (viii) all known domestic secured creditors of the Debtor and holders of claims pursuant to section 364(c)(2) not otherwise named in this notice provision. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

**[Nothing Further on this Page]**

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order approving the New Finance Agreements; or, in the alternative, if the Court is unable to enter an order approving the New Finance Agreements prior to April 1, 2010, enter an order approving the Interim Extension; and (b) grant such other and further relief as is just and proper.

Dated: January 15, 2010

KIRKLAND & ELLIS LLP
Theodore L. Freedman
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
Roger J. Higgins
70 W. Madison St., Suite 2100
Chicago, IL 60602-4253
(312) 641-2162

and

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(302) 652-4100
(302) 652-4400
Co-Counsel for the Debtors and Debtors-in-Possession