## EXHIBIT 1

## Form of Facility Order

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W.R. GRACE & CO., et al[1],** | ) | **Case No. 01-01139** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |

## FINAL ORDER AUTHORIZING SECURED POST-PETITION LETTER OF CREDIT FACILITY AND HEDGING AND SWAP ARRANGEMENTS ON A SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, AND GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362

The above-captioned debtors and debtors in possession (collectively, the

"**Debtors**") filed a motion (the "**Motion**") dated January _____, 2010 seeking this Court's

authorization pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code,

---

[1]  The Debtors are the following entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey & Almy, LLC (f/k/a Dewey & Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

11 U. S. C. §§ 101-1330 (the "**Bankruptcy Code**") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for W. R. Grace & Co.-Conn. ("**Grace**"), inter alia, (i) to obtain post-petition financing in the form of a letter of credit facility (the "**Post-Petition Facility**") in an amount not to exceed $100,000,000 (the "**Commitment**"), under the Post-Petition Letter of Credit Facility Agreement among Grace, as the Account Party, Bank of America, N.A. ("**BofA**"), as the Agent for the Letter of Credit Issuers (the "**Agent**"), (ii) to enter into hedging and swap arrangements (the "**Hedging Arrangements**") as set forth in the Swap Documents, (iii) to execute the Post-Petition Letter of Credit Facility Agreement (as amended, supplemented or otherwise modified from time to time, the "**Facility Agreement**;" terms not otherwise defined herein shall have the meaning ascribed to them in the Facility Agreement), (iv) to execute the Swap Documents, including but not limited to the ISDA Master Agreement, dated as of _____ between Bank of America, N.A. and Grace, (v) to execute all related documents contemplated by the Facility Agreement, together with the Facility Agreement, and all ancillary documents at any time executed in connection therewith, including but not limited to the Letter of Credit Documents and the Swap Documents, collectively, the "**Facility Documents**"); (vi) to grant pursuant to section 364 of the Bankruptcy Code, first priority liens and security interests, senior to any and all other liens and security interests as follows: (a) as security for all L/C Obligations, to the Agent, for the benefit of the Agent, the Letter of Credit Issuers and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the L/C Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section

2

3.3(b) of the Facility Agreement, a continuing security interest in, lien on, and right of set-off against the F/X Hedge Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; (b) as security for all F/X Hedge Obligations, to the Agent, for the benefit of the Agent, the holders of the F/X Hedge Obligations and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the F/X Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; and (c) as security for all Commodity Hedge Obligations, to the Agent, for the benefit of the Agent, the holders of the Commodity Hedge Obligations and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the Commodity Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other

3

property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; (vii) to grant the Agent, the Letter of Credit Issuers and the other holders of Obligations administrative super-priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in sections 503(b), 507(b) and 546(c) of the Bankruptcy Code; and (viii) to set a hearing on the Motion (the "**Final Hearing**"). Due and proper notice of the Motion pursuant to Bankruptcy Rule 4001 has been given as set forth below. The Court having further considered the Motion and any objections thereto, and upon the entire record made at the Final Hearing, and this Court having found good and sufficient cause,

## IT IS HEREBY FOUND AND CONCLUDED that:

A.    On April 2, 2001 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. The Motion presents a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.    The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses in their current state without the financial accommodations provided for in the Facility Agreement and the Swap Documents. The Debtors' access to letters of credit as contemplated by the Facility Agreement and to Hedging Arrangements as contemplated by the Swap Documents is essential to the Debtors' continued

4

viability. In addition, the Debtors' need for access to these financial accommodations is immediate. Without the financial accommodations contemplated herein and in the Facility Documents, the continued operation of the Debtors' businesses in their current state would not be possible, and serious and irreparable harm to the Debtors and their estates would occur. The preservation, maintenance and enhancement of the going concern value of the Debtors, as well as the protection of the interests of others as described herein, are of the utmost significance and importance to a successful reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

        D.     Given the Debtors' current financial condition and capital structure, the Debtors are unable to sustain their current operations with the use of cash otherwise available and are unable to obtain sufficient unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code as an administrative expense. The post-petition credit accommodations contemplated herein and in the Facility Documents is not otherwise available without the Debtors' granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b), 507(b), and 546(c) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to sections 364(c)(2) and (c)(3).

        E.     Notice of the relief requested in the Motion, the Final Hearing and the proposed form of this Order has been given to: (a) the office of the United States Trustee; (b) counsel to the Agent; (c) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (d) counsel to each of the official committees appointed in these Chapter 11 Cases (the "**Committees**"); (e) counsel to the Asbestos Personal Injury and Asbestos Property

5

Damage Future Claimants' Representatives (the "**Asbestos Representatives**"); (f) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (h) all known domestic secured creditors of the Debtor and holders of Prior Claims (defined below). Based upon all of the foregoing, sufficient and adequate notice under the circumstances of the Motion, the Interim Order, and this Order has been given pursuant to sections 102(l), 364(c), and 364(d) of the Bankruptcy Code, and Bankruptcy Rules 2002 and 4001(c).

      F.    The Post-Petition Facility has been negotiated in good faith and at arms-length among the Debtors and BofA (as Agent and as a Letter of Credit Issuer), and any credit accommodations (including Bank Products) extended and letters of credit issued for the account of the Debtors pursuant to the Facility Agreement ("**Letters of Credit**") or financial accommodations provided pursuant to the Facility Documents shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of section 364(e) of the Bankruptcy Code, and the Agent and the Letter of Credit Issuers are entitled to the protections of section 364(e) of the Bankruptcy Code.

      G.    The terms of the Post-Petition Facility and the Facility Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

      H.    This Court concludes that entry of this Order is in the best interests of the Debtors' estates and creditors because its implementation, among other things, will allow for the availability to the Debtors of a letter of credit facility and other financial accommodations that are necessary to sustain the operations of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

6

I.    Each of the foregoing findings by the Court will be deemed a finding of fact if and to the full extent that it makes and contains factual findings and a conclusion of law if and to the full extent that it makes legal conclusions.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    The Motion is granted, subject to the terms and conditions set forth in this Order and any objections to the entry of this Order are resolved hereby or, to the extent not resolved, are overruled.

2.    The Debtors are each authorized and obligated on a final basis to comply with and perform, and are bound by, all of the terms, conditions and waivers contained in the Facility Documents, and the Debtors are each authorized and obligated to repay amounts owed, with interest and any other allowed charges, to the Agent and Letter of Credit Issuers and holders of other Obligations in accordance with and subject to the terms and conditions set forth in the Facility Documents and this Order. None of the Facility Documents nor this Order, nor any provision of any thereof, nor any right arising under any thereof, shall be voidable or avoidable under section 548 of the Bankruptcy Code or under any applicable State Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law. The Debtors are further authorized and obligated to pay all facility, commitment, letter of credit, unused line and other fees and expenses in accordance with the terms of the Facility Documents, including, without limitation, a $250,000 Facility Fee due and payable upon entry of this Order, an Administration Fee of $75,000 due and payable upon entry of this Order, and all reasonable

7

fees and expenses of professionals engaged by the Agent or the Letter of Credit Issuers, in accordance with the terms of the Facility Agreement.

3. Grace is expressly authorized to obtain financial accommodations from the Agent, the Letter of Credit Issuers and the other holders of the Obligations, on the terms and subject to the conditions and limitations in availability set forth in the Facility Documents and this Order, of up to $100 million in the form of Letters of Credit, to enter into Hedging Arrangements as contemplated by the Swap Documents and to obtain Bank Products from the Bank or the Bank's Affiliates. Grace is authorized to request the issuance of Letters of Credit, to enter into Hedging Arrangements and to request Bank Products, for the purposes permitted under the Facility Documents.

4. Effective immediately, the automatic stay pursuant to section 362(a) of the Bankruptcy Code, and any and all other stays and injunctions which are or may be applicable, shall be and hereby are modified and vacated as to the Agent, the Letter of Credit Issuers and the other holders of the Obligations and all of their Collateral (as defined below), so that (i) if an Event of Default (as defined in the Facility Documents) occurs, subject to Paragraph 10 of this Order, the Agent and the Letter of Credit Issuers shall be entitled to terminate the Post-Petition Facility and the Agent, the Letter of Credit Issuers and the other holders of the Obligations shall be entitled to exercise any and all of their rights and remedies under the Facility Agreement, the other Facility Documents and this Order, and (ii) prior to an Event of Default, the Agent, the Letter of Credit Issuers and the other holders of the Obligations may take such actions with respect to the Collateral and proceeds thereof as are authorized in the Facility Agreement, the other Facility Documents and this Order, including without limitation the application of amounts in and proceeds of Cash Collateral Accounts and other Collateral to the Obligations as permitted

8

by the Facility Agreement, the establishment of Cash Collateral Accounts, and the taking of steps to perfect Agent's Liens on the Collateral. Notwithstanding anything herein to the contrary, no Letters of Credit, or Collateral or proceeds thereof may be used to object to or contest in any manner, or raise any defenses to, the validity, perfection, priority or enforceability of the Obligations owing to the Letter of Credit Issuers or Agent or the other holders of the Obligations, or the liens in favor of the Agent securing such Obligations, or to assert any claims or causes of action against the Letter of Credit Issuers or Agent or the other holders of the Obligations in their respective capacities under the Facility Documents.

5.      In accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code, the Obligations shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 546(c) of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code. No cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b) of the Bankruptcy Code or otherwise, shall be senior to or equal to the claim of the Agent, the Letter of Credit Issues or any other holder of the Obligations, arising out of the Obligations.

6.      As security for all L/C Obligations, and as provided in the Facility Documents, Grace hereby grants to the Agent, for the benefit of the Agent, the Letter of Credit Issuers and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations (effective upon the date of the Order and without the necessity of the execution, filing and/or recordation by the Debtors of mortgages, security agreements, patent security

9

agreements, trademark security agreements, pledge agreements, financing statements or otherwise), valid, perfected and continuing security interests in, liens on, and rights of set-off against ("**Liens**") the L/C Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the L/C Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, Liens against the F/X Hedge Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing. As security for all F/X Hedge Obligations, Grace hereby grants to the Agent, for the benefit of the Agent, the holders of the F/X Hedge Obligations and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations, Liens against the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the F/X Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, Liens against the L/C Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing. As security for all Commodity Hedge Obligations, Grace hereby grants to the Agent, for the benefit of the Agent, the holders of the Commodity Hedge Obligations and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations, Liens against the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the Commodity Hedge Cash Collateral Account, and all accessions to, substitutions for and

10

replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, Liens against the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing. Collectively, the property and assets against which Liens are granted in this section of this Order, all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing, are referred to herein as the "**Collateral**." The Liens granted herein against the Collateral shall be Liens with the following priority:

(a)     pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected Lien upon all of Grace's right, title and interest in, to and under all Collateral that is not otherwise encumbered by a valid and unavoidable liens or security interests to the extent and in the amounts existing as of the commencement of the Chapter 11 Cases ("**Prior Claims**"); and

(b)     pursuant to section 364(c)(3) of the Bankruptcy Code, a junior priority, perfected Lien upon all of Grace's right, title and interest in, to and under the Collateral that is subject to a Prior Claim (subject only to such Prior Claims).

The Collateral shall not include (a) claims of the Debtors arising under sections 544, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code ("**Avoidance Actions**"), (b) stock or other equity interests of the Debtors in any foreign subsidiary, and (c) life insurance policies owned by, or assigned to, any of the Debtors. "Prior Claims" shall not include any lien or security interest that is avoidable pursuant to any provision of the Bankruptcy Code.

7.     Neither the Debtors, the Debtors' estates nor the Debtors' professionals shall assert a claim under section 506(c) of the Bankruptcy Code against Agent or any Letter of Credit Issuers or any holders of Obligations for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Agent, any Letter of Credit Issuers or any other holders of the Obligations upon the Collateral. The Agent, the Letter

11

of Credit Issuers and the other holders of the Obligations shall not be subject to the equitable doctrine of marshaling or any other similar doctrine with respect to any Collateral. None of the Agent or the Letter of Credit Issuers or any other holders of Obligations shall be required to file or serve financing statements, mortgages, patent and trademark security agreements and similar instruments which are used to perfect liens and security interests in intellectual property, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect the Liens. If, however, the Agent, any Letter of Credit Issuers, or any other holders of any Obligations, in their sole discretion, shall determine to file any such financing statements, mortgages, agreements, notices of lien or similar instruments, or to otherwise confirm perfection of such Liens, the Debtors are obligated to cooperate with and assist in such process, and all such documents shall be deemed to have been perfected at the time of and on the date of this Order, and shall be and hereby are deemed and adjudicated senior to any other post-petition filing by any other person or entity with respect to the same collateral.

8.     A copy of this Order may be used by Agent, any Letter of Credit Issues or any holder of any Obligations as a financing statement, mortgage, deed of trust or similar instrument for purposes of any public filing made by such parties for the perfection of the Liens. All state, federal, and county recording officers are authorized and directed to accept a copy of this Order for filing for such purposes.

9.     As long as any portion of the Obligations remains unpaid, or any Facility Document remains in effect (without prejudice to other Events of Default set forth in the Facility Agreement), in addition to the other Events of Default set out in the Facility Documents it shall constitute an Event of Default if there shall be entered in any of the Chapter 11 Cases or any

12

subsequent chapter 7 case any order which authorizes under any section of the Bankruptcy Code, including sections 105, 363, or 364 of the Bankruptcy Code, (i) the granting of any lien or security interest in the Collateral in favor of any party other than the Agent, the Letter of Credit Issuers and the other holders of the Obligations, (ii) the obtaining of credit or the incurring of indebtedness that is entitled to super-priority administrative status, in either case equal or superior to that granted to the Agent, the Letter of Credit Issuers and the other holders of the Obligations pursuant to this Order, or (iii) the use of Cash Collateral or the Debtors seek any of the foregoing relief; unless, in connection with any transaction cited in clause (i), (ii), or (iii) of this paragraph, such order requires that the Obligations shall first be indefeasibly paid in full in cash (including cash collateralization or backstopping of all then outstanding Letters of Credit). Otherwise, and in addition to creating an Event of Default, the Debtors, on behalf of their estates, expressly waive any right to request, without the prior written consent of Agent, any relief of the type described in the preceding sentence.

10.     Upon the occurrence of and during the continuance of any Event of Default, including the Events of Default identified in Section 9.1 of the Facility Agreement, the Agent and the Letter of Credit Issuers and the other holders of the Obligations may, acting pursuant to the Facility Documents, exercise rights and remedies and take all or any of the following actions without further relief from the automatic stay pursuant to section 362(a) Bankruptcy Code or any other applicable stay or injunction (which have been modified and vacated, as heretofore ordered, to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate or suspend the Commitment and thereafter cease to issue Letters of Credit to the Debtors; (b) declare the principal of and accrued interest, fees and other liabilities constituting

13

the Obligations to be due and payable; (c) set-off amounts in any of the Debtors' accounts maintained with the Agent or any Letter of Credit Issuer or any other holder of the Obligations or otherwise enforce rights against any other Collateral in the possession of the Agent or any Letter of Credit Issuers or any other holders of Obligations; (d) charge the default rate of interest as set forth in the Facility Documents; and/or (e) take any other action or exercise any other right or remedy permitted to the Agent or the Letter of Credit Issuers or any other holders of the Obligations under the Facility Documents, this Order or applicable law. The Debtors waive any right to seek relief under the Bankruptcy Code, including, without limitation, under section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of the Agent or the Letter of Credit Issuers or any other holders of the Obligations set forth in this Order or in the Facility Documents. If the Agent or Letter of Credit Issuers or any other holders of the Obligations elect to exercise any rights or remedies with respect to the Collateral that are predicated upon an Event of Default having occurred, before taking such action, the Agent shall provide the Debtors' counsel, and counsel to the Committees and counsel to the Asbestos Representatives at least five (5) business days prior written notice, provided that no prior notice of a termination or suspension of the Commitment shall be required. If any of the Debtors or any other person challenges the occurrence of an Event of Default, any such objector's remedy shall be limited to requesting a hearing before this Court at least on five business days' written notice (a "Hearing Notice") to the Agent. If a hearing is requested in accordance with the preceding sentence, then subsequent to receipt by Agent of a Hearing Notice, unless the Court orders otherwise, the Agent, the Letter of Credit Issuers and the other holders of the Obligations shall not take the actions described in clauses (c) or (e) above (or shall suspend such actions if commenced prior to Agent's receipt of a Hearing Notice) for at least five business days after

14

Agent's receipt of a Hearing Notice. In any such hearing, the sole issue before the Court shall be whether an Event of Default exists.

11. The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Facility Documents, as the Agent or the Letter of Credit Issuers or any other holders of the Obligations may reasonably require, as evidence of and for the protection of the Obligations or the Liens in favor of Agent, or which otherwise may be deemed reasonably necessary by the Agent or the Letter of Credit Issuers or the other holders of the Obligations to effectuate the terms and conditions of this Order and the Facility Documents. The Debtors, the Agent, the Letter of Credit Issuers and the other holders of the Obligations are hereby authorized to implement, in accordance with the terms of the Facility Documents, any non-material modifications (including, without limitation, any change in the number or composition of the Letter of Credit Issuers) of the Facility Documents without further notice or order of this Court.

12. Without limiting the rights of access and information afforded the Agent and the Letter of Credit Issuers and the other holders of the Obligations under the Facility Documents, the Debtors shall afford representatives, agents and/or employees of the Agent and the Letter of Credit Issuers and the other holders of the Obligations reasonable access to the Debtors' premises and their records in accordance with the Facility Documents and shall cooperate, consult with, and provide to such persons all such non-privileged information and information not subject to a binding confidentiality agreement, as they may reasonably request.

13. Having been found to be extending credit accommodations and issuing Letters of Credit to Grace in good faith, based on the record before this Court, the Agent and the Letter of Credit Issuers and the other holders of the Obligations shall be entitled to the full

15

protection of section 364(e) of the Bankruptcy Code with respect to the Obligations and the Liens created, adjudicated or authorized by this Order in the event that this Order or any finding, adjudication, or authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal or vacation of this Order shall not affect the validity of any Obligations of the Debtors to the Agent or the Letter of Credit Issuers or the other holders of the Obligations incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all Letters of Credit issued and financial accommodations provided pursuant to this Order and the Facility Documents and all Obligations incurred by the Debtors pursuant hereto prior to the effective date of any such stay, modification, reversal or vacation shall be governed in all respects by the original provisions hereof, and the Agent and the Letter of Credit Issuers and the other holders of the Obligations shall be entitled to all the rights, privileges and benefits, including without limitation, the liens, security interests and first priorities granted herein with respect to all such Obligations.

14.     Neither the Agent nor any Letter of Credit Issuers nor any other holders of the Obligations shall be deemed to be in "control" of the operations of any Debtor, to be acting as a "responsible person" or "owner" or "operator" with respect to the operation or management of any Debtor (as such terms or similar terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any similar federal or state statute) by reason of any credit or financial accommodations extended to the Debtors under the Facility Documents or the exercise by the Agent or any Letter of Credit Issuers or any other holders of the Obligations of any rights or remedies hereunder or thereunder, except that this paragraph shall apply to environmental liabilities to the United States only so long as the actions of the Agent and the Letter of Credit Issuers and the other holders of the Obligations do not

16

constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by the Debtors, or otherwise cause lender liability to arise or the status of control, responsible person, owner, or operator to exist under applicable law.

15.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order (a) confirming any plan of reorganization in the Chapter 11 Cases, and, to the extent not satisfied in full in cash, (or, with respect to the Letters of Credit, with cash collateralization or supporting Letters of Credit) the Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors having hereby waived such discharge; (b) converting any of the Chapter 11 Cases to a chapter 7 case; or (c) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Order as well as the claims and liens granted pursuant to this Order and the Facility Documents shall continue in full force and effect notwithstanding the entry of such order, and such claims and liens shall maintain their priority as provided by this Order until all of the Obligations are indefeasibly paid in full in cash and discharged.

16.     Pursuant to Section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, is not and shall not be subject to any lien of any entity resulting from any Prior Claim except to the extent that such property constitutes proceeds of property encumbered by a Prior Claim.

17.     To the fullest extent permitted by law, the provisions of this Order and the Facility Documents shall be binding upon and inure to the benefit of the Agent, the Letter of Credit Issuers, the other holders of the Obligations, the Debtors, and their respective successors

and permitted assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases or in subsequent chapter 7 cases as a legal representative of the Debtors or their estates.

18.     The Debtors shall provide counsel to each of the Committees and counsel to the Asbestos Representatives with copies of any notices, amendments, financial data or similar information that Debtors provide to the Agent or the Letter of Credit Issuers pursuant to this Order or the Facility Documents, substantially contemporaneously with delivery of such information to the Agent or the Letter of Credit Issuers.

19.     In the event of any conflict between any term, covenant or condition of this Order and any term, covenant or condition of any Facility Document, the provisions of this Order shall control and govern.

20.     The Court has and will retain jurisdiction to enforce this Order according to its terms.

Dated: _____ __, 2010
              Wilmington, Delaware

                              _____
                              UNITED STATES DISTRICT JUDGE

CH\1141003.3

## EXHIBIT A

### Form of LOC Agreement

**POST-PETITION LETTER OF CREDIT FACILITY AGREEMENT**

dated as of

[_____], 2010

among

**THE FINANCIAL INSTITUTIONS FROM TIME TO TIME PARTY HERETO,**
as Letter of Credit Issuers

**BANK OF AMERICA, N.A.**
as the Agent

and

**W. R. GRACE & CO.–CONN.,**
as the Account Party

# TABLE OF CONTENTS

**Article**                                                                                                          **Page**

**ARTICLE 1 LETTER OF CREDIT FACILITY** ...................................................................... 1

1.1    Total Facility ........................................................................................................... 1
1.2    Letters of Credit. ..................................................................................................... 2
1.3    Section 364(c)(1) Superpriority Administrative Claim and Sections 364(c)(2) and Section 364(c)(3) Liens and Security Interests ......................................................................... 4
1.4    Grant of Lien in Cash Collateral Accounts. ........................................................... 5
1.5    Bank Products .......................................................................................................... 6

**ARTICLE 2 INTEREST AND FEES** ............................................................................... 6

2.1    Interest. .................................................................................................................... 6
2.2    Maximum Interest Rate ........................................................................................... 6
2.3    Facility Fee; Administration Fee ............................................................................ 7
2.4    Unused Line Fee ...................................................................................................... 7
2.5    Letter of Credit Fee ................................................................................................. 7

**ARTICLE 3 TERMINATION AND PAYMENTS** ............................................................. 8

3.1    Termination of Facility ........................................................................................... 8
3.2    Payments by the Account Party. ............................................................................. 8
3.3    Apportionment, Application and Reversal of Payments ......................................... 8
3.4    Indemnity for Returned Payments .......................................................................... 9
3.5    Agent's and Letter of Credit Issuers' Books and Records; Monthly Statements ..... 9

**ARTICLE 4 TAXES, YIELD PROTECTION AND ILLEGALITY** ..................................... 10

4.1    Taxes. ..................................................................................................................... 10
4.2    Increased Costs. ...................................................................................................... 11
4.3    Certificates of Agent .............................................................................................. 11
4.4    Withholding Tax. .................................................................................................... 11
4.5    Survival .................................................................................................................. 12

**ARTICLE 5** ..................................................................................................................... 12

5.1    Financial Information .............................................................................................. 12
5.2    Notices to the Letter of Credit Issuers ................................................................... 13
5.3    Bankruptcy Case ..................................................................................................... 14

**ARTICLE 6 GENERAL WARRANTIES AND REPRESENTATIONS** ............................... 14

6.1    Authorization, Validity, and Enforceability of this Agreement and the Letter of Credit Documents ................................................................................................................. 14
6.2    Validity and Priority of Security Interest ............................................................... 14
6.3    Account Party's Organization and Qualification ................................................... 14
6.4    Litigation ................................................................................................................ 15
6.5    Regulated Entities .................................................................................................. 15
6.6    Use of Proceeds; Margin Regulations ................................................................... 15
6.7    Full Disclosure ....................................................................................................... 15
6.8    Governmental Authorization .................................................................................. 15

**ARTICLE 7 AFFIRMATIVE AND NEGATIVE COVENANTS** ......................................... 15

| | | |
|---|---|---|
| 7.1 | Legal Existence and Good Standing | 15 |
| 7.2 | Compliance with Law and Agreements | 15 |
| 7.3 | Mergers and Consolidations | 16 |
| 7.4 | Use of Proceeds | 16 |
| 7.5 | Funding of Cash Collateral Accounts. | 16 |
| 7.6 | Further Assurances | 17 |

**ARTICLE 8 CONDITIONS TO ISSUANCE** ........................................................... **17**

| | | |
|---|---|---|
| 8.1 | Conditions Precedent to Issuance of Initial Letter of Credit | 17 |
| 8.2 | Conditions Precedent to Each Issuance | 18 |

**ARTICLE 9 DEFAULT; REMEDIES** ..................................................................... **19**

| | | |
|---|---|---|
| 9.1 | Events of Default | 19 |
| 9.2 | Remedies. | 21 |

**ARTICLE 10 TERM AND TERMINATION** ............................................................ **22**

| | | |
|---|---|---|
| 10.1 | Term and Termination | 22 |

**ARTICLE 11 AMENDMENTS; WAIVERs; ASSIGNMENTS; SUCCESSORS** ............... **22**

| | | |
|---|---|---|
| 11.1 | Amendments and Waivers. | 22 |
| 11.2 | Assignments. | 23 |

**ARTICLE 12 THE AGENT** ..................................................................................... **25**

| | | |
|---|---|---|
| 12.1 | Appointment and Authorization | 25 |
| 12.2 | Delegation of Duties | 25 |
| 12.3 | Liability of Agent | 26 |
| 12.4 | Reliance by Agent | 26 |
| 12.5 | Notice of Default | 26 |
| 12.6 | Credit Decision | 27 |
| 12.7 | Indemnification | 27 |
| 12.8 | Agent in Individual Capacity | 27 |
| 12.9 | Successor Agent | 27 |
| 12.10 | Withholding Tax. | 28 |
| 12.11 | Restrictions on Actions by Letter of Credit Issuers; Sharing of Payments. | 28 |
| 12.12 | Payments by Agent to Letter of Credit Issuers | 29 |
| 12.13 | Letter of Credit Issuers' Failure to Perform | 29 |
| 12.14 | Relation Among Letter of Credit Issuers | 29 |

**ARTICLE 13 MISCELLANEOUS** ............................................................................ **29**

| | | |
|---|---|---|
| 13.1 | No Waivers; Cumulative Remedies | 29 |
| 13.2 | Severability | 29 |
| 13.3 | Governing Law; Choice of Forum; Service of Process | 29 |
| 13.4 | WAIVER OF JURY TRIAL | 30 |
| 13.5 | Survival of Representations and Warranties | 31 |
| 13.6 | Other Security and Guaranties | 31 |
| 13.7 | Fees and Expenses | 31 |
| 13.8 | Notices | 31 |
| 13.9 | Waiver of Notices | 32 |
| 13.10 | Binding Effect | 32 |
| 13.11 | Indemnity of the Agent and the Letter of Credit Issuers by the Account Party. | 32 |
| 13.12 | Limitation of Liability | 33 |

CH\1135197.12

029123-0013

13.13   Final Agreement..................................................................................................................... 33
13.14   Counterparts.......................................................................................................................... 33
13.15   Captions ................................................................................................................................. 34
13.16   Right of Setoff....................................................................................................................... 34
13.17   Confidentiality. ..................................................................................................................... 34
13.18   Conflicts with Other Letter of Credit Documents ...................................................... 35

<u>ANNEXES, EXHIBITS AND SCHEDULES</u>

ANNEX A             -        DEFINED TERMS

EXHIBIT A           -        FORM OF FACILITY ORDER

EXHIBIT B           -        FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

EXHIBIT C           -        EXISTING LETTERS OF CREDIT

SCHEDULE 1.1        -        LETTER OF CREDIT ISSUERS' COMMITMENTS

SCHEDULE 6.4        -        LITIGATION; JUDGMENTS

CH\1135197.12
029123-0013

# POST-PETITION LETTER OF CREDIT FACILITY AGREEMENT

This Post-Petition Letter of Credit Facility Agreement, dated as of [_____], 2010, among the financial institutions from time to time parties hereto (such financial institutions, together with their respective successors and assigns, are referred to hereinafter each individually as a "Letter of Credit Issuer" and collectively as the "Letter of Credit Issuers"), Bank of America, N.A., as agent for the Letter of Credit Issuers and the other holders of Obligations (in its capacity as agent, the "Agent"), W. R. Grace & Co.-Conn., a Connecticut corporation, a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined below) (the "Account Party").

## W I T N E S S E T H:

WHEREAS, the Account Party is a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"), has requested the Letter of Credit Issuers to make available to the Account Party a letter of credit facility in an amount not to exceed $100,000,000, and which extensions of credit the Account Party will use for the purposes permitted hereunder;

WHEREAS, capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed thereto in Annex A, which is attached hereto and incorporated herein; the rules of construction contained therein shall govern the interpretation of this Agreement, and all Annexes, Exhibits and Schedules attached hereto are incorporated herein by reference;

WHEREAS, the Letter of Credit Issuers have agreed to make available to the Account Party a letter of credit facility upon the terms and conditions set forth in this Agreement;

WHEREAS, the Account Party has continued in possession of its assets and in the management of its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, to provide security for the repayment of the letters of credit made available pursuant hereto and payment of the other obligations of the Account Party under the Letter of Credit Documents and the Swap Documents, the Account Party has agreed to provide the Agent, for the benefit of the Agent, the Letter of Credit Issuers and the Bank and its Affiliates (upon and after the entry of the Facility Order) with respect to the obligations of the Account Party hereunder and under the other Letter of Credit Documents and the Swap Documents, an allowed superpriority administrative expense claim in the Bankruptcy Case pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in, or arising or ordered under, any sections of the Bankruptcy Code, including without limitation, sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b), 546(c), 726 or 1112 of the Bankruptcy Code and liens and security interests with priority under section 364(c)(2) and section 364(c)(3) of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the Letter of Credit Issuers, the Agent, and the Account Party hereby agree as follows:

## ARTICLE 1

## LETTER OF CREDIT FACILITY

1.1     Total Facility. Subject to all of the terms and conditions of this Agreement, the Letter of Credit Issuers agree to make available a total letter of credit facility of up to $100,000,000 (the "Total Facility") to the Account Party from time to time prior to the Termination Date.

1.2 Letters of Credit.

(a) Agreement to Issue or Cause To Issue. Subject to the terms and conditions of this Agreement, the Agent agrees to cause a Letter of Credit Issuer to issue, and each Letter of Credit Issuer hereby severally agrees to issue for the account of the Account Party, in an aggregate amount not to exceed such Letter of Credit Issuer's Commitment, for the account of the Account Party one or more commercial/documentary or standby letters of credit ("Letter of Credit"). Letters of Credit may be requested for the benefit of Other Subsidiaries; provided that the Account Party shall be the account party with respect thereto (and the fact that such Letters of Credit may be for the benefit of Other Subsidiaries shall not affect the Account Party's reimbursement Obligations with respect to such Letters of Credit); provided further, that the sum of the undrawn face amount of all such Letters of Credit plus all amounts drawn thereunder for which the Account Party has not been repaid by the Other Subsidiaries shall not exceed $25,000,000. As of the Closing Date, each of the Existing Letters of Credit shall be deemed to be Letters of Credit issued pursuant to this Agreement.

(b) Amounts; Outside Expiration Date. The Agent shall not have any obligation to cause any Letter of Credit to be issued, and no Letter of Credit Issuer shall have any obligation to issue any Letter of Credit, at any time if: (i) the maximum face amount of the requested Letter of Credit is greater than the Unused Letter of Credit Amount at such time; (ii) the sum of (x) the maximum amount of the requested Letter of Credit plus (y) all commissions, fees, and charges due from the Account Party in connection with the opening thereof would in the aggregate exceed Availability at such time; or (iii) such Letter of Credit has an expiration date (1) in the case of standby letters of credit, of more than forty-eight (48) months after the date of issuance (although any such Letter of Credit may provide for automatic extensions of its expiration date for one or more successive twelve (12)-month periods; provided that the Letter of Credit Issuer has the right to terminate such Letter of Credit on each such annual expiration date) and (2) in the case of documentary letters of credit, such Letter of Credit has an expiration date of more than 180 days from the date of issuance. With respect to any Letter of Credit that contains any "evergreen" or automatic renewal provision, each applicable Letter of Credit Issuer shall be deemed to have consented to any such extension or renewal unless any such Letter of Credit Issuer shall have provided to the Agent written notice that it declines to consent to any such extension or renewal at least thirty (30) days prior to the date on which the Letter of Credit Issuer is entitled to decline to extend or renew the Letter of Credit. If all of the requirements of this Section 1.2 are met and no Default or Event of Default has occurred and is continuing, no Letter of Credit Issuer shall decline to consent to any such extension or renewal.

(c) Other Conditions. In addition to the conditions precedent contained in Article 8, the obligation of the Agent to cause any Letter of Credit to be issued or any Letter of Credit Issuer to issue any Letter of Credit is subject to the following conditions precedent having been satisfied in a manner reasonably satisfactory to the Agent:

(1) The Account Party shall have delivered to the applicable Letter of Credit Issuer, at such times and in such manner as such Letter of Credit Issuer may prescribe, an application in form and substance satisfactory to such Letter of Credit Issuer and reasonably satisfactory to the Agent for the issuance of the Letter of Credit and such other documents as may be required pursuant to the terms thereof, and the form, terms and purpose of the proposed Letter of Credit shall be reasonably satisfactory to the Agent and such Letter of Credit Issuer; and

(2) As of the date of issuance, no order of any court, arbitrator or Governmental Authority shall purport by its terms to enjoin or restrain money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request

2

or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks generally shall prohibit, or request that the proposed Letter of Credit Issuer refrain from, the issuance of letters of credit generally or the issuance of such Letters of Credit.

(d) <u>Issuance of Letters of Credit</u>.

(1) <u>Request for Issuance</u>. The Account Party must notify the Agent of a requested Letter of Credit at least two (2) Business Days prior to the proposed issuance date. Such notice must specify the original face amount of the Letter of Credit requested, the Business Day of issuance of such requested Letter of Credit, whether such Letter of Credit may be drawn in a single or in partial draws, the Business Day on which the requested Letter of Credit is to expire, the purpose for which such Letter of Credit is to be issued, and the beneficiary of the requested Letter of Credit. The Account Party shall attach to such notice the proposed form of the Letter of Credit.

(2) <u>Responsibilities of the Agent; Issuance</u>. As of the Business Day immediately preceding the requested issuance date of the Letter of Credit, the Agent shall determine the Unused Letter of Credit Amount and Availability. If (i) the face amount of the requested Letter of Credit is less than the Unused Letter of Credit Amount and (ii) the sum of (x) the amount of such requested Letter of Credit <u>plus</u> (y) all commissions, fees, and charges due from the Account Party in connection with the opening thereof would not in the aggregate exceed Availability, the Agent shall cause the applicable Letter of Credit Issuer to issue the requested Letter of Credit on the requested issuance date so long as the other conditions hereof are met.

(3) <u>No Extensions or Amendment</u>. Subject to <u>Section 1.2(b)</u>, the Agent shall not be obligated to cause a Letter of Credit Issuer to extend or amend any Letter of Credit issued pursuant hereto, and no Letter of Credit Issuer shall be obligated to amend or extend any Letter of Credit issued pursuant hereto, unless the requirements of <u>Section 1.2(c)(2)</u> are met as though a new Letter of Credit were being requested and issued.

(e) <u>Payments Pursuant to Letters of Credit</u>. The Account Party agrees to reimburse the applicable Letter of Credit Issuer immediately for any draw under any Letter of Credit and to pay such Letter of Credit Issuer the amount of all other charges and fees payable to such Letter of Credit Issuer in connection with such draw immediately when due, irrespective of any claim, setoff, defense or other right which the Account Party may have at any time against such Letter of Credit Issuer or any other Person. Except as otherwise agreed by the Agent, if any drawing under any Letter of Credit shall not have been reimbursed by the Account Party in accordance with the foregoing sentence on the date of such drawing, then the Agent shall, and the Account Party hereby authorizes and directs the Agent to, apply funds on deposit in the L/C Cash Collateral Account to repay the amount of such drawing plus interest thereon at the *per annum* rate set forth in <u>Section 2.1</u>.

(f) <u>Indemnification; Exoneration; Power of Attorney</u>

(1) <u>Indemnification</u>. In addition to amounts payable as elsewhere provided in this <u>Section 1.2</u>, the Account Party agrees to protect, indemnify, pay and save the Letter of Credit Issuers and the Agent harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable attorneys' fees) which any Letter of Credit Issuer or the Agent (other than any Letter of Credit Issuer in its capacity as Letter of Credit Issuer) may incur or be subject to as a consequence, direct or indirect, of the issuance of

any Letter of Credit; <u>provided, however,</u> that the Account Party's obligations to the Agent or any Letter of Credit Issuer under this clause (1) shall not apply to matters resulting solely from its gross negligence or willful misconduct. The Account Party's obligations under this Section shall survive payment of all other Obligations.

(2)     <u>Assumption of Risk by the Account Party.</u>  As among the Account Party, the Letter of Credit Issuers, and the Agent, the Account Party assumes all risks of the acts and omissions of, or misuse of any of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, the Letter of Credit Issuers and the Agent shall not be responsible for: (A) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any Person in connection with the application for and issuance of and presentation of drafts with respect to any of the Letters of Credit, even if it should prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (C) the failure of the beneficiary of any Letter of Credit to comply duly with conditions required in order to draw upon such Letter of Credit; (D) errors, omissions, interruptions, or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any Letter of Credit or of the proceeds thereof; (G) the misapplication by the beneficiary of any Letter of Credit of the proceeds of any drawing under such Letter of Credit; (H) any consequences arising from causes beyond the control of the Letter of Credit Issuers or the Agent, including any act or omission, whether rightful or wrongful, of any present or future *de jure* or *de facto* Governmental Authority or (I) the Letter of Credit Issuer's honor of a draw for which the draw or any certificate fails to comply in any respect with the terms of the Letter of Credit. None of the foregoing shall affect, impair or prevent the vesting of any rights or powers of the Agent or any Letter of Credit Issuer under this <u>Section 1.2(f)</u>.

(3)     <u>Exoneration.</u>  Without limiting the foregoing, no action or omission whatsoever by Agent or any Letter of Credit Issuer (excluding any Letter of Credit Issuer in its capacity as a Letter of Credit Issuer) shall result in any liability of Agent or any Letter of Credit Issuer to the Account Party, or relieve the Account Party of any of its obligations hereunder to any such Person.

(4)     <u>Rights Against Letter of Credit Issuer.</u>  Nothing contained in this Agreement is intended to limit the Account Party's rights, if any, with respect to any Letter of Credit which arise as a result of the letter of credit application and related documents executed by and between such Account Party and such Letter of Credit Issuer.

(5)     <u>Account Party.</u>  The Account Party hereby authorizes and directs any Letter of Credit Issuer to name such Account Party as the "Account Party" therein and to deliver to the Agent all instruments, documents and other writings and property received by the Letter of Credit Issuer pursuant to the Letter of Credit, and to accept and rely upon the Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the application therefor.

1.3     <u>Section 364(c)(1) Superpriority Administrative Claim.</u>  It is the intent of the parties hereto that, effective on and after the date of the entry by the Bankruptcy Court of the Facility Order, notwithstanding any term to the contrary herein, in accordance with section 364(c)(1) of the Bankruptcy

Code, the Obligations shall constitute claims with priority in payment from funds on deposit in or credited to the Cash Collateral Accounts, whether now existing or hereafter acquired, over any and all unsecured pre-petition claims, all post-petition claims and all administrative expenses of the kinds specified in, or arising or ordered under any sections of the Bankruptcy Code, including, without limitation, sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b), 546(c), 726 and 1112 of the Bankruptcy Code, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment, and such claims, shall at all times be senior to the rights of the Account Party, any Chapter 11 trustee, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition vendors and other post-petition creditors) in the Bankruptcy Case or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 case of the Account Party if the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code. No cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b) of the Bankruptcy Code, any other section of the Bankruptcy Code, or pursuant to any order of the Bankruptcy Court, shall be senior to, equal to, or *pari passu* with, the superpriority administrative claim of the Letter of Credit Issuers arising out of the Obligations, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

1.4 <u>Grant of Lien in Cash Collateral Accounts pursuant to Sections 364(c)(2) and Section 364(c)(3)</u>. (a) As security for all L/C Obligations, the Account Party hereby grants to the Agent, for the benefit of the Agent, the Letter of Credit Issuers and, subject to Section 3.3(b), the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the L/C Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b), a continuing security interest in, lien on, and right of set-off against the F/X Hedge Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; (b) as security for all F/X Hedge Obligations, the Account Party hereby grants to the Agent, for the benefit of the Agent, holders of the F/X Hedge Obligations and, subject to Section 3.3(b), the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the F/X Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b), a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; and (c) as security for all Commodity Hedge Obligations, the Account Party hereby grants to the Agent, for the benefit of the Agent, the holders of the Commodity Hedge Obligations and, subject to Section 3.3(b), the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the Commodity Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b), a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing. It is the intent of the parties hereto that, effective on and after the date of the entry by the Bankruptcy Court of the Facility Order, notwithstanding any term to the contrary herein, in accordance with sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the Liens of the Agent granted pursuant to this <u>Section 1.4</u> shall constitute Liens that are senior in priority to all other Liens, whether now existing or hereafter acquired, over any and all unsecured pre-petition claims, all post-petition claims and all administrative expenses of the kinds specified in, or arising or ordered under any sections of the

5

Bankruptcy Code, including, without limitation, sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b), 546(c), 726 and 1112 of the Bankruptcy Code, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment, and such Liens, in accordance with sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, shall at all times be senior to the rights of the Account Party, any Chapter 11 trustee, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition vendors and other post-petition creditors) in the Bankruptcy Case or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 case of the Account Party if the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, other than valid and unvoidable liens or security interests to the extent and in the amounts existing as of the commencement of the Bankruptcy Case and Liens permitted by the Facility Order.

1.5     <u>Bank Products</u>.  The Account Party may request, and the Agent may, in its sole and absolute discretion, arrange for Account Party to obtain Bank Products from the Bank or the Bank's Affiliates, although Account Party is not required to do so.  With respect to any Bank Products provided by an Affiliate of the Bank, Account Party agrees to indemnify and hold the Agent, the Bank and the Letter of Credit Issuers harmless from any and all costs and obligations now or hereafter incurred by the Agent, the Bank or any of the Letter of Credit Issuers that arise from any indemnity given by the Agent to its Affiliates related to such Bank Products; <u>provided</u>, <u>however</u>, nothing contained herein is intended to limit the Account Party's rights with respect to the Bank or its Affiliates, if any, that arise as a result of the execution of documents by and between the Account Party and the Bank that relate to Bank Products. The agreement contained in this Section shall survive termination of this Agreement.  The Account Party acknowledges and agrees that the obtaining of Bank Products from the Bank or the Bank's Affiliates (a) is in the sole and absolute discretion of the Bank or the Bank's Affiliates, and (b) is subject to all rules and regulations of the Bank or the Bank's Affiliates.

## ARTICLE 2

## INTEREST AND FEES

2.1     <u>Interest</u>.

(a)     <u>Interest Rates</u>.  All outstanding Obligations shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on interest thereon not paid when due) from the date due until paid in full in cash at a rate *per annum* equal to the Base Rate plus 2.50%, but in any event not to exceed the Maximum Rate.  All interest charges shall be computed on the basis of a year of 360 days and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year).  Subject to prior payment, the Account Party shall pay to the Agent, for the benefit of the applicable Letter of Credit Issuers, interest accrued on outstanding Obligations owing to such Letter of Credit Issuers in arrears on the first day of each month hereafter and on the Termination Date.

(b)     <u>Default Rate</u>.  If any Event of Default occurs and is continuing and the Agent or the Majority Letter of Credit Issuers in their discretion so elect, then, while any such Event of Default is continuing, all of the Obligations shall bear interest at the Default Rate.

2.2     <u>Maximum Interest Rate</u>.  In no event shall any interest rate provided for hereunder exceed the maximum rate legally chargeable by any Letter of Credit Issuer under applicable law for such Letter of Credit Issuer with respect to obligations of the type incurred hereunder (the "<u>Maximum Rate</u>"). If, in any month, any interest rate, absent such limitation, would have exceeded the Maximum Rate, then the interest rate for that month shall be the Maximum Rate, and, if in future months, that interest rate

would otherwise be less than the Maximum Rate, then that interest rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of the Obligations, the total amount of interest paid or accrued under the terms of this Agreement is less than the total amount of interest which would, but for this Section 2.2, have been paid or accrued if the interest rate otherwise set forth in this Agreement had at all times been in effect, then the Account Party shall, to the extent permitted by applicable law, pay the Agent, for the account of the Letter of Credit Issuers, an amount equal to the excess of (a) the lesser of (i) the amount of interest which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of interest which would have accrued had the interest rate otherwise set forth in this Agreement, at all times, been in effect over (b) the amount of interest actually paid or accrued under this Agreement. If a court of competent jurisdiction determines that the Agent and/or any Letter of Credit Issuer has received interest and other charges hereunder in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the Obligations other than interest, in the inverse order of maturity, and if there are no Obligations outstanding, the Agent and/or such Letter of Credit Issuer shall refund to the Account Party, on behalf of the Account Party, such excess.

2.3    Facility Fee; Administration Fee. The Account Party agrees to pay the Agent, for the Agent's sole account, on the date that the Facility Order is entered:

(a)    a facility fee (the "Facility Fee") in the amount $250,000; and

(b)    an administration fee (the "Administration Fee") in the amount of $75,000.

2.4    Unused Line Fee. On the first day of each month and on the Termination Date, the Account Party agrees to pay to the Agent, for the account of the Letter of Credit Issuers, in accordance with their respective Pro Rata Shares, an unused line fee (the "Unused Line Fee") equal to the Applicable Percentage times the amount by which the aggregate Commitments exceeded the average daily undrawn face amount of outstanding Letters of Credit during the immediately preceding month or shorter period if calculated for the first month hereafter or on the Termination Date. The Unused Line Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

2.5    Letter of Credit Fee. With respect to any month during which a Letter of Credit is outstanding, the Account Party agrees to pay to the Agent, for the account of the applicable Letter of Credit Issuers, in accordance with their respective Pro Rata Shares, for Letters of Credit, a fee (the "Letter of Credit Fee") equal to 1.00% *per annum*, multiplied by the average daily maximum aggregate amount from time to time available to be drawn under all outstanding Letters of Credit during such month, and to each applicable Letter of Credit Issuer, all out-of-pocket costs, fees and expenses incurred by such Letter of Credit Issuer in connection with the application for, processing of, issuance of, or amendment to any Letter of Credit, which costs, fees and expenses shall include a "fronting fee" of one-quarter of one percent (0.25%) *per annum* of the average daily maximum aggregate amount from time to time available to be drawn under all outstanding standby Letters of Credit during such month, payable to the Letter of Credit Issuer. The Letter of Credit Fee and such "fronting fee" shall be payable monthly in arrears on the first of each month following any month in which a Letter of Credit is outstanding and on the Termination Date. The Letter of Credit Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

CH\1135197.12

029123-0013

ARTICLE 3

TERMINATION AND PAYMENTS

3.1    Termination of Facility.  The Account Party may terminate this Agreement upon at least ten (10) Business Days' notice to the Agent and the Letter of Credit Issuers upon the payment in full in cash of all reimbursable expenses and other Obligations.  The Agent and the Letter of Credit Issuers shall be entitled to assume (without any investigation) that any notice required to be delivered hereunder by the Account Party to the Committee has been so delivered.

3.2    Payments by the Account Party.

(a)    All payments to be made by the Account Party shall be made without set-off, recoupment or counterclaim.  Except as otherwise expressly provided herein, all payments by the Account Party shall be made to the Agent for the account of the Agent or the applicable Letter of Credit Issuers, as applicable, at the account designated by the Agent and shall be made in Dollars and in immediately available funds, no later than 12:00 noon (New York time) on the date specified herein.  Any payment received by the Agent after such time shall be deemed (for purposes of calculating interest only) to have been received on the following Business Day and any applicable interest or fee shall continue to accrue.

(b)    Whenever any payment is due on a day other than a Business Day, such payment shall be due on the following Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c)    Subject to Section 3.3(b), in addition to the right of the Agent to withdraw funds from the Cash Collateral Accounts for the payment of reimbursement obligations and interest thereon as contemplated in Section 1.2(e), the Agent shall be entitled, without the need for further action or consent of the Account Party, to withdraw funds on deposit in the Cash Collateral Accounts to pay any other Obligations that have not been paid by the Account Party within 5 Business Days after delivery by the Agent to the Account Party of an invoice for such Obligations as due in accordance with their terms.

3.3    Apportionment, Application and Reversal of Payments.

(a)    Generally.  Payments of the Obligations shall be apportioned ratably among the Letter of Credit Issuers (according to the aggregate unpaid Obligations owing to each Letter of Credit Issuer) and payments of the fees shall, as applicable, be apportioned ratably among the Letter of Credit Issuers, except for fees payable solely to Agent and except as provided in Section 11.1(b).  All payments shall be remitted to the Agent and all such payments not constituting payment of specific fees shall be applied, ratably, subject to the provisions of this Agreement, first, to pay any fees, indemnities or expense reimbursements then due to the Agent from the Account Party; second, to pay any fees or expense reimbursements then due to the Letter of Credit Issuers from the Account Party; third, to pay unpaid reimbursement obligations in respect of Letters of Credit; and fourth, to the payment of any other Obligation.  Subject to Section 3.3(b), after the occurrence and during the continuance of an Event of Default, the Agent and the Letter of Credit Issuers shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

(b)    Application of Amounts on Deposit in Cash Collateral Accounts.  Notwithstanding anything to the contrary set forth herein, in any other Letter of Credit Document or in any Swap Document: (i)(A) until the Commitments are terminated, no Letters of Credit remain outstanding and the L/C Obligations are indefeasibly paid in full in cash, the Agent shall only apply amounts on deposit in the L/C Cash Collateral Account, in accordance with this Agreement and the

priorities set forth in <u>clause (a)</u> above, to the L/C Obligations, and, (B) thereafter, the Agent shall apply amounts on deposit in the L/C Cash Collateral Account, in accordance with the Swap Documents, *pro rata* to the F/X Hedge Obligations and the Commodity Hedge Obligations then outstanding, if any; (ii)(A) until the F/X Hedge Obligations are indefeasibly paid in full in cash and all transactions in connection therewith under the Swap Documents have terminated, the Agent shall only apply amounts on deposit in the F/X Hedge Cash Collateral Account, in accordance with the Swap Documents, to the F/X Hedge Obligations, and, (B) thereafter, the Agent shall apply amounts on deposit in the F/X Cash Collateral Account, in accordance with this Agreement and the priorities set forth in <u>clause (a)</u> above (with respect to the L/C Obligations) or the Swap Documents (with respect to the Commodity Hedge Obligations), *pro rata* to the L/C Obligations and the Commodity Hedge Obligations then outstanding, if any; and (iii)(A) until the Commodity Hedge Obligations are indefeasibly paid in full in cash and all transactions in connection therewith under the Swap Documents have terminated, the Agent shall only apply amounts on deposit in the Commodity Hedge Cash Collateral Account, in accordance with the Swap Documents, to the Commodity Hedge Obligations, and, (B) thereafter, the Agent shall apply amounts on deposit in the Commodity Hedge Cash Collateral Account, in accordance with this Agreement and the priorities set forth in <u>clause (a)</u> above (with respect to the L/C Obligations) or the Swap Documents (with respect to the F/X Hedge Obligations), *pro rata* to the L/C Obligations and the F/X Hedge Obligations then outstanding, if any.

3.4    <u>Indemnity for Returned Payments</u>. If after receipt of any payment that is applied to the payment of all or any part of the Obligations, the Agent or any Letter of Credit Issuer, the Bank or any Affiliate of the Bank is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Agent or such Letter of Credit Issuer and the Account Party shall be liable to pay to the Agent and the Letter of Credit Issuers, and hereby do indemnify the Agent and the Letter of Credit Issuers and hold the Agent and the Letter of Credit Issuers harmless for the amount of such payment or proceeds surrendered. The provisions of this <u>Section 3.4</u> shall be and remain effective notwithstanding any contrary action which may have been taken by the Agent or any Letter of Credit Issuer in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Agent's and the Letter of Credit Issuers' rights under this Agreement and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable. The provisions of this <u>Section 3.4</u> shall survive the termination of this Agreement.

3.5    <u>Agent's and Letter of Credit Issuers' Books and Records; Monthly Statements</u>. The Agent shall record the undrawn face amount of all outstanding Letters of Credit and the aggregate amount of unpaid reimbursement obligations outstanding with respect to the Letters of Credit from time to time on its books. In addition, each Letter of Credit Issuer may note the date and amount of each payment such reimbursement obligations in its books and records. Failure by Agent or any Letter of Credit Issuer to make such notation shall not affect the obligations of the Account Party with respect to Letters of Credit. The Account Party agree that the Agent's and each Letter of Credit Issuer's books and records showing the Obligations and the transactions pursuant to this Agreement and the other Letter of Credit Documents shall be admissible in any action or proceeding arising therefrom and shall constitute rebuttably presumptive proof thereof, irrespective of whether any Obligation is also evidenced by a promissory note or other instrument. The Agent will provide to the Account Party a monthly statement of payments and other transactions pursuant to this Agreement. Such statement shall be deemed correct, accurate, and binding on the Account Party and an account stated (except for reversals and reapplications of payments made as provided in <u>Section 3.3</u> and corrections of errors discovered by the Agent) unless the Account Party notifies the Agent in writing to the contrary within thirty (30) days after such statement

9

is rendered. In the event a timely written notice of objections is given by the Account Party, only the items to which exception is expressly made will be considered to be disputed by the Account Party.

## ARTICLE 4

## TAXES, YIELD PROTECTION AND ILLEGALITY

4.1     Taxes.

(a)     Any and all payments by the Account Party to each Letter of Credit Issuer or the Agent under this Agreement and any other Letter of Credit Document shall be made free and clear of, and without deduction or withholding for any Taxes. In addition, the Account Party shall pay all Other Taxes.

(b)     The Account Party jointly and severally agree to indemnify and hold harmless each Letter of Credit Issuer and the Agent for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section) paid by any Letter of Credit Issuer or the Agent and any liability (including penalties, interest, additions to tax and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted (and the Agent and each Letter of Credit Issuer agrees to use good faith efforts to notify the Account Party of an assertion of an amount which the Account Party is liable for pursuant to this Section 4.1(b)). Payment under this indemnification shall be made within thirty (30) days after the date such Letter of Credit Issuer or the Agent makes written demand therefor to the Account Party.

(c)     If the Account Party shall be required by law to deduct or withhold any Taxes or Other Taxes from or in respect of any sum payable hereunder to any Letter of Credit Issuer or the Agent, then:

(i)     the sum payable shall be increased as necessary so that, after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section), such Letter of Credit Issuer or the Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made;

(ii)     such Account Party shall make such deductions and withholdings;

(iii)     such Account Party shall pay the full amount deducted or withheld to the relevant taxing authority or other authority in accordance with applicable law; and

(iv)     without duplication of the amounts paid pursuant to clause (i) above, such Account Party shall also pay to each Letter of Credit Issuer or the Agent for the account of such Letter of Credit Issuer, at the time interest is paid, all additional amounts which the respective Letter of Credit Issuer specifies as necessary to preserve the after-tax yield such Letter of Credit Issuer would have received if such Taxes or Other Taxes had not been imposed.

(d)     At the Agent's request, within thirty (30) days after the date of any payment by the Account Party of Taxes or Other Taxes, the Account Party shall furnish the Agent the original or a certified copy of a receipt evidencing payment thereof, or other appropriate evidence of payment.

(e)     If the Account Party is required to pay additional amounts to any Letter of Credit Issuer or the Agent pursuant to subsection (c) of this Section 4.1, then such Letter of Credit Issuer shall

use reasonable efforts (consistent with legal and regulatory restrictions) to change the jurisdiction of its lending office so as to eliminate any such additional payment by such Account Party which may thereafter accrue, if such change in the judgment of such Letter of Credit Issuer is not otherwise disadvantageous to such Letter of Credit Issuer.

4.2     Increased Costs.  If any Letter of Credit Issuer shall have determined that (i) the introduction of any Capital Adequacy Regulation, (ii) any change in any Capital Adequacy Regulation, (iii) any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof, or (iv) compliance by such Letter of Credit Issuer or any corporation or other entity controlling such Letter of Credit Issuer with any Capital Adequacy Regulation, affects or would affect the amount of capital required or expected to be maintained by such Letter of Credit Issuer or any corporation or other entity controlling such Letter of Credit Issuer and (taking into consideration such Letter of Credit Issuer's or such corporation's or other entity's policies with respect to capital adequacy and such Letter of Credit Issuer's desired return on capital) determines that the amount of such capital is increased as a consequence of its commitments, credits or obligations under this Agreement, then, upon demand of such Letter of Credit Issuer to the Account Party through the Agent, the Account Party shall pay to such Letter of Credit Issuer, from time to time as specified by such Letter of Credit Issuer, additional amounts sufficient to compensate such Letter of Credit Issuer for such increase.

4.3     Certificates of Agent.  If any Letter of Credit Issuer claims reimbursement or compensation under this Article 4, Agent shall determine the amount thereof and shall deliver to the Account Party (with a copy to the affected Letter of Credit Issuer) a certificate setting forth in reasonable detail the amount payable to the affected Letter of Credit Issuer, and such certificate shall be conclusive and binding on the Account Party in the absence of manifest error.

4.4     Withholding Tax.

(a)     If any Letter of Credit Issuer is a "foreign corporation, partnership or trust" within the meaning of the Code, such Letter of Credit Issuer shall be entitled to claim exemption from, or a reduction of, U.S. withholding tax under Sections 1441 or 1442 of the Code or otherwise, and such Letter of Credit Issuer agrees with and in favor of the Account Party, to deliver to the Account Party:

(i)     if such Letter of Credit Issuer is entitled to claim an exemption from, or a reduction of, withholding tax under a United States of America tax treaty, properly completed IRS Forms W-8BEN and W-8ECI before the payment of any interest in the first calendar year and before the payment of any interest in each third succeeding calendar year during which interest may be paid under this Agreement;

(ii)     if such Letter of Credit Issuer is entitled to claim that interest paid under this Agreement is exempt from United States of America withholding tax because it is effectively connected with a United States of America trade or business of such Letter of Credit Issuer, two properly completed and executed copies of IRS Form W-8ECI before the payment of any interest is due in the first taxable year of such Letter of Credit Issuer and in each succeeding taxable year of such Letter of Credit Issuer during which interest may be paid under this Agreement, and IRS Form W-9; and

(iii)     such other form or forms as may be required under the Code or other laws of the United States of America as a condition to exemption from, or reduction of, United States of America withholding tax.

11

Such Letter of Credit Issuer agrees to promptly notify the Account Party of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

4.5    Survival. The agreements and obligations of the Account Party in this Article 4 shall survive the payment of all other Obligations.

## ARTICLE 5

## BOOKS AND RECORDS; FINANCIAL INFORMATION; NOTICES; BANKRUPTCY CASE

5.1    Financial Information. The Account Party shall promptly furnish to each Letter of Credit Issuer all such financial information as the Agent shall reasonably request. Without limiting the foregoing, if and when the Company is no longer required to file Forms 10-K and 10-Q with the SEC, the Account Party will furnish to the Agent, in such detail as the Agent or the Letter of Credit Issuers shall request, the following:

(a)    As soon as available, but in any event not later than one hundred five (105) days after the close of each Fiscal Year, consolidated audited balance sheets, and related consolidated income statements, cash flow statements and changes in stockholders' equity for the Company and its consolidated Subsidiaries for such Fiscal Year, together with the accompanying notes thereto, setting forth in each case in comparative form figures for the previous Fiscal Year, all in reasonable detail, fairly presenting in all material respects the financial position and the results of operations of the Company and its consolidated Subsidiaries or the Account Party on a consolidated basis, as applicable as at the date thereof and for the Fiscal Year then ended, and prepared in accordance with GAAP. The audited statements required to be delivered pursuant to the immediately preceding sentence shall be examined in accordance with generally accepted auditing standards by PricewaterhouseCoopers or other independent certified public accountants selected by the Company and reasonably satisfactory to the Agent, and accompanied by a report of such accountants on such statements, which report shall be unqualified as to scope of audit. The Company hereby authorizes the Agent to communicate directly with its certified public accountants and, by this provision, authorizes those accountants to disclose to the Agent any and all financial statements and other supporting financial documents and schedules relating to the Company and its consolidated Subsidiaries and to discuss directly with the Agent the finances and affairs of the Company and its consolidated Subsidiaries.

(b)    As soon as available, but in any event not later than thirty (30) days after the end of each month (other than any month that is also the last month of a fiscal quarter), (i) unaudited balance sheets of the Company and its consolidated Subsidiaries on a consolidated basis as at the end of such month and as at the end of the prior Fiscal Year, (ii) consolidated unaudited income statements for the Company and its consolidated Subsidiaries on a consolidated basis for such month and for the period from the beginning of the Fiscal Year to the end of such month, and (iii) unaudited cash flow statements for the Company and its consolidated Subsidiaries on a consolidated basis for such month and for the period from the beginning of the Fiscal Year to the end of such month, all in reasonable detail, fairly presenting the financial position and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis as at the date thereof and for such periods, and prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) applied consistently with the audited Financial Statements required to be delivered pursuant to Section 5.2(a). The Account Party shall certify by a certificate signed by its chief financial officer that all such statements have been prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) and present fairly the financial position of the Company and its consolidated Subsidiaries on a consolidated basis as at the dates thereof

and the results of operations of the Company and its consolidated Subsidiaries on a consolidated basis for the periods then ended.

(c)     As soon as available, but in any event not later than forty-five (45) days after the end of each of the first three fiscal quarters of each Fiscal Year, unaudited balance sheets of the Company and its consolidated Subsidiaries on a consolidated basis as at the end of such fiscal quarter, and consolidated unaudited income statements and cash flow statements for the Company and its consolidated Subsidiaries on a consolidated basis for such fiscal quarter and for the period from the beginning of the Fiscal Year to the end of such fiscal quarter, all in reasonable detail, fairly presenting the financial position and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis as at the date thereof and for such periods, and, in each case, in comparable form, figures for the corresponding period in the prior Fiscal Year, and prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) applied consistently with the audited Financial Statements required to be delivered pursuant to <u>Section 5.1(a)</u>. The Account Party shall certify by a certificate signed by its chief financial officer that all such statements have been prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) and present fairly the financial position of the Company and its consolidated Subsidiaries on a consolidated basis as at the dates thereof and the results of operations of the Company and its consolidated Subsidiaries on a consolidated basis for the periods then ended.

(d)     Within sixty (60) days after the end of each fiscal quarter a certificate of the Account Party signed by its chief financial officer stating that, except as explained in reasonable detail in such certificate, (A) all of the representations and warranties of the Account Party contained in this Agreement and the other Letter of Credit Documents are correct and complete in all material respects as at the last day of such quarter as if made at such time, except for those that speak as of a particular date, (B) the Account Party is, at the date of such certificate, in compliance in all material respects with all of its covenants and agreements in this Agreement and the other Letter of Credit Documents, and (C) no Default or Event of Default then exists or existed during the period covered by the Financial Statements for such month.  If such quarterly certificate discloses that a representation or warranty is not correct or complete, or that a covenant has not been complied with, or that a Default or Event of Default existed or exists, such certificate shall set forth what action the Account Party has taken or propose to take with respect thereto.

(e)     Such additional information as the Agent and/or any Letter of Credit Issuer may from time to time reasonably request regarding the financial and business affairs of the Company or any Subsidiary.

5.2     <u>Notices to the Letter of Credit Issuers</u>.  Promptly upon a Responsible Officer becoming aware thereof, the Account Party shall notify the Agent and the Letter of Credit Issuers in writing of the following matters:

(a)     any Default or Event of Default;

(b)     any pending or threatened action, suit, or proceeding, by any Person, or any pending or threatened investigation by a Governmental Authority; or the rendering of any judgment against the Account Party in any action, suit or proceeding awarding damages, which would reasonably be expected to have a Material Adverse Effect;

Each notice given under this Section shall describe the subject matter thereof in reasonable detail, and shall set forth the action that the Account Party, any Other Subsidiary, or any ERISA Affiliate, as applicable, has taken or proposes to take with respect thereto.

CH\1135197.12

029123-0013

5.3     Bankruptcy Case. Promptly upon the filing of each motion, application or similar filing relating to the Bankruptcy Case and promptly upon the entry of each order, decree or judgment relating to one or more of the Bankruptcy Case, the Account Party shall provide to, or cause to be provided to, the Agent's counsel a copy of each such motion, application, filing, order, decree or judgment; provided, however, that this provision shall be deemed satisfied by inclusion of the Agent's counsel on the list maintained in the Bankruptcy Case pursuant to Fed.R.Bankr.P. 2002 and actual service of the Agent's counsel by the Account Party of all filings made by the Account Party in the Bankruptcy Case and all orders, decrees or judgments relating to all such filings by the Account Party.

## ARTICLE 6

## GENERAL WARRANTIES AND REPRESENTATIONS

The Account Party warrants and represents to the Agent and the Letter of Credit Issuers that, except as hereafter disclosed to and accepted by the Agent and the Majority Letter of Credit Issuers in writing and subject to the entry by the Bankruptcy Court of the Facility Order:

6.1     Authorization, Validity, and Enforceability of this Agreement and the Letter of Credit Documents. The Account Party has the corporate or other legal power and authority to execute, deliver and perform this Agreement and the other Letter of Credit Documents to which it is a party and to incur the Obligations. The Account Party has taken all necessary action (including obtaining approval of its stockholders if necessary) to authorize its execution, delivery, and performance of this Agreement and the other Letter of Credit Documents to which it is a party. This Agreement and the other Letter of Credit Documents to which it is a party have been duly executed and delivered by the Account Party, and constitute the legal, valid and binding obligations of the Account Party, enforceable against it in accordance with their respective terms. The Account Party's execution, delivery, and performance of this Agreement and the other Letter of Credit Documents to which it is a party do not and will not (i) result in the imposition of any Lien (other than the Liens granted under the Letter of Credit Documents) upon the property of the Account Party, by reason of the terms of (1) any contract, mortgage, lease, agreement, indenture, or instrument to which the Account Party is a party or which is binding upon it (including any of the foregoing entered into after the Petition Date), (2) any Requirement of Law applicable to the Account Party, or (3) the certificate of incorporation or by-laws of the Account Party or (ii) conflict with, or constitute a violation of (1) any contract, mortgage, lease, agreement, indenture, or instrument to which the Account Party is a party or which is binding upon it and that was entered into after the Petition Date, except where such conflict, violation or breach would not reasonably be expected to have a Material Adverse Effect, (2) any Requirement of Law applicable to the Account Party, except where such conflict, violation or breach would not reasonably be expected to have a Material Adverse Effect or (3) the certificate of incorporation or by-laws of the Account Party.

6.2     Validity and Priority of Security Interest. The provisions of this Agreement and the other Letter of Credit Documents create legal and valid Liens on the Cash Collateral Accounts and all amounts deposited therein or credited thereto in favor of the Agent, for the ratable benefit of the Agent and the Letter of Credit Issuers, and such Liens constitute perfected and continuing Liens on such accounts and amounts, having the priority set forth in the Facility Order.

6.3     Account Party's Organization and Qualification. The Account Party (a) is duly organized or incorporated and validly existing in good standing under the laws of the state of Connecticut, (b) is qualified to do business and is in good standing in all jurisdictions in which the failure to so qualify or be in good standing would reasonably be expected to have a Material Adverse Effect and (c) has all requisite power and authority to conduct its business and to own its property, except where the failure to have such power and authority could not reasonably be expected to have a Material Adverse Effect.

14

6.4    Litigation. Except as set forth on Schedule 6.4, there is no pending, or to the best of the Account Party's knowledge threatened, action, suit, proceeding, or counterclaim against the Company or any of its consolidated Subsidiaries before any Governmental Authority or arbitrator or panels of arbitrators that (i) may not be stayed as a result of the Bankruptcy Case and (ii) would reasonably be expected to have a Material Adverse Effect.

6.5    Regulated Entities. The Account Party and no Person controlling the Account Party, is an "Investment Company" within the meaning of the Investment Company Act of 1940. The Account Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act, any state public utilities code or law, or any other federal or state statute or regulation limiting its ability to incur indebtedness.

6.6    Use of Proceeds; Margin Regulations. The proceeds of the Letters of Credit are to be used solely for general corporate purposes arising after the date hereof. Neither the Account Party or any Other Subsidiary is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock. No part of the proceeds of any Letter of Credit will be used in violation of Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

6.7    Full Disclosure. None of the representations or warranties made by the Account Party in the Letter of Credit Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in any exhibit, report, statement or certificate furnished by or on behalf of the Account Party or any Subsidiary in connection with the Letter of Credit Documents (including the offering and disclosure materials delivered by or on behalf of the Account Party to the Letter of Credit Issuers prior to the Closing Date), contains any untrue statement of a material fact as of the date of any such exhibit, report, statement or certificate.

6.8    Governmental Authorization. No approval, consent, exemption, authorization, or other action by, or notice to (other than notices of default hereunder), or filing with, any Governmental Authority or other Person (other than the Bankruptcy Court) is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Account Party of this Agreement or any other Letter of Credit Document, except the Bankruptcy Court and notices to creditors and stockholders required by the Bankruptcy Code.

ARTICLE 7

AFFIRMATIVE AND NEGATIVE COVENANTS

The Account Party covenants to the Agent and each Letter of Credit Issuer that so long as any of the Obligations remain outstanding (other than not yet asserted indemnification obligations) or this Agreement is in effect:

7.1    Legal Existence and Good Standing. The Account Party shall maintain its legal existence, and shall maintain its qualification and good standing in all jurisdictions in which the failure to maintain such existence and qualification or good standing would reasonably be expected to have a Material Adverse Effect.

7.2    Compliance with Law and Agreements. The Account Party shall comply, in all material respects, with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business (including the Federal Fair Labor Standards Act and all Environmental Laws), except where the failure to do so could not reasonably be expected to have a Material Adverse Effect. The Account Party

shall not modify, amend or alter its certificate of incorporation other than in a manner which does not adversely affect the rights of the Letter of Credit Issuers or the Agent in any material respect.

7.3 <u>Mergers and Consolidations</u>. Except for the plan of reorganization in the Bankruptcy Case, the Account Party shall not enter into any transaction of merger, reorganization, or consolidation or agree to do any of the foregoing (or apply to the Bankruptcy Court for authority to do so) except for any merger or consolidation of any Subsidiary of the Company with and into the Account Party or providing its consent to or approval of any merger or consolidation of any Subsidiary of the Company with and into another Subsidiary of the Company.

7.4 <u>Use of Proceeds</u>. The Account Party shall not, nor shall the Account Party cause or permit any Other Subsidiary to, use any portion of the Letter of Credit proceeds, directly or indirectly, (i) to purchase or carry Margin Stock, (ii) to repay or otherwise refinance indebtedness of the Account Party or others incurred to purchase or carry Margin Stock, (iii) to extend credit for the purpose of purchasing or carrying any Margin Stock, (iv) to acquire any security in any transaction that is subject to Section 13 or 14 of the Exchange Act, or (v) for any purpose other than general corporate purposes.

7.5 <u>Funding of Cash Collateral Accounts</u>.

(a) <u>F/X Hedge Cash Collateral Account</u>. After notice (i) by the Agent to the Account Party not later than 10:00 AM (New York time) on any Business Day, the Account Party shall deposit, or cause to be deposited, not later than 4:00 PM on such Business Day, in the F/X Hedge Cash Collateral Account, cash in the amount specified in such notice, which shall be the amount determined by the Agent to be necessary to cause the aggregate balance of cash on deposit in the F/X Hedge Cash Collateral Account to be equal to at least 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded upwards to the nearest $250,000, and (ii) by the Account Party to the Agent not later than 10:00 AM (New York time) on any Business Day, the Bank shall deposit, or cause to be deposited, not later than the close of such Business Day, in the account designated by the Account Party in such notice, cash in the amount specified in such notice, which shall be the amount agreed by the Account Party and the Agent to be the amount by which the balance of the F/X Hedge Cash Collateral Account exceeds an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded up to the nearest $100,000 (but in any event such amount shall not cause the balance of the F/X Hedge Cash Collateral Account to be less than an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations on such Business Day).

(b) <u>Commodity Cash Collateral Account</u>. After notice (i) by the Agent to the Account Party not later than 10:00 AM (New York time) on any Business Day, the Account Party shall deposit, or cause to be deposited, not later than 4:00 PM on such Business Day, in the Commodity Hedge Cash Collateral Account, cash in the amount specified in such notice, which shall be the amount determined by the Agent to be necessary to cause the aggregate balance of cash on deposit in the Commodity Hedge Cash Collateral Account to be equal to at least 115% of the mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded upwards to the nearest $250,000, and (ii) by the Account Party to the Agent not later than 10:00 AM (New York time) on any Business Day, the Bank shall deposit, or cause to be deposited, not later than the close of such Business Day, in the account designated by the Account Party in such notice, cash in the amount specified in such notice, which shall be the amount agreed by the Account Party and the Agent to be the amount by which the balance of the Commodity Hedge Cash Collateral Account exceeds an amount equal to 115% of the

mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded up to the nearest $100,000 but in any event such amount shall not cause the balance of the Commodity Hedge Cash Collateral Account to be less than an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations on such Business Day).

7.6    Further Assurances.  The Account Party shall execute and deliver, or cause to be executed or delivered, to the Agent and/or the Letter of Credit Issuers such documents and agreements, and shall take or cause to be taken such actions, as the Agent or any Letter of Credit Issuer may, from time to time, request to carry out the terms and conditions of this Agreement and the other Letter of Credit Documents.

ARTICLE 8

CONDITIONS TO ISSUANCE

8.1    Conditions Precedent to Issuance of Initial Letter of Credit.  The obligation of the Agent to cause the Letter of Credit Issuer to issue the initial Letter of Credit (excluding the Existing Letters of Credit), and the obligation of a Letter of Credit Issuer to issue the initial Letter of Credit, are subject to the following conditions precedent having been satisfied in a manner satisfactory to the Agent and each Letter of Credit Issuer (or waived in writing by the Agent and each Letter of Credit Issuer):

(a)    This Agreement and the other Letter of Credit Documents shall have been executed by each party thereto and the Account Party shall have performed and complied with all covenants, agreements and conditions contained herein and the other Letter of Credit Documents which are required to be performed or complied with by the Account Party before or on such date.

(b)    All representations and warranties made hereunder and in the other Letter of Credit Documents shall be true and correct as if made on such date.

(c)    No Default or Event of Default shall have occurred and be continuing after giving effect to the Letters of Credit to be issued on such date.

(d)    The Agent shall have received copies of (i) the certificate of incorporation , (ii) the bylaws or other similar agreement and all amendments thereto, (iii) resolutions of the Board of Directors of the Account Party approving and adopting the Letter of Credit Documents to which it is a party, the transactions contemplated therein and authorizing execution and delivery thereof, in each case, of the Account Party and certified by a secretary or assistant secretary of the Account Party to be true and correct and in force and effect as of such date and (iv) a certificate of the Secretary or Assistant Secretary (or equivalent thereof) of the Account Party certifying as to the incumbency of the officers of the Account Party executing one or more Letter of Credit Documents.

(e)    The Account Party shall have paid all fees and expenses of the Agent and the Attorney Costs incurred in connection with any of the Letter of Credit Documents and the transactions contemplated thereby to the extent invoiced.

(f)    All proceedings taken in connection with the execution of this Agreement, all other Letter of Credit Documents and all documents and papers relating thereto shall be satisfactory in form, scope, and substance to the Agent and the Letter of Credit Issuers.

17

(g)   All orders entered in the Bankruptcy Case shall be in form and substance reasonably satisfactory to the Agent and its counsel.

(h)   Without limiting the generality of the items described above, the Account Party shall have delivered or caused to be delivered to the Agent (in form and substance reasonably satisfactory to the Agent), the resolutions, documents, agreements, certificates and other items required by this Section 8.1.

(i)   The Agent shall have received a signed copy of the order (the "Facility Order") of the Bankruptcy Court in substantially the form of Exhibit A authorizing and approving the transactions contemplated hereby and the Letter of Credit Documents and the granting of the superpriority claim status and liens as described in Section 1.3 and the Facility Order. The Facility Order (i) shall be in form and substance satisfactory to the Agent, (ii) shall be certified by the Clerk of the Bankruptcy Court as having been duly entered, (iii) shall have authorized extensions of credit by the Letter of Credit Issuers in amounts up to $100,000,000, (iv) shall approve the payment by the Account Party of all of the fees set forth in Sections 2.3, 2.4 and 2.5, and (v) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.

(j)   The Account Party shall have (i) established each of the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account and the Commodity Hedge Cash Collateral Account, (ii) deposited in the F/X Hedge Collateral Account cash collateral in an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations as of the Closing Date as determined by the Agent, (iii) deposited in the Commodity Hedge Collateral Account cash collateral in an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations as of the Closing Date as determined by the Agent and (iv) entered into account control agreements, in form and substance satisfactory to the Agent, with respect to each of the Cash Collateral Accounts.

The acceptance by the Account Party of any Letters of Credit issued on any date shall be deemed to be a representation and warranty made by the Account Party to the effect that all of the conditions precedent to the issuance of such Letters of Credit have been satisfied, with the same effect as delivery to the Agent and the Letter of Credit Issuers of a certificate signed by a Responsible Officer of the Account Party, dated such date, to such effect.

Execution and delivery to the Agent by a Letter of Credit Issuer of a counterpart of this Agreement shall be deemed confirmation by such Letter of Credit Issuer that (i) the decision of such Letter of Credit Issuer to execute and deliver to the Agent an executed counterpart of this Agreement was made by such Letter of Credit Issuer independently and without reliance on the Agent or any other Letter of Credit Issuer as to the satisfaction of any condition precedent set forth in this Section 8.1, and (ii) all documents sent to such Letter of Credit Issuer for approval consent, or satisfaction were acceptable to such Letter of Credit Issuer.

8.2   Conditions Precedent to Each Issuance. The obligation of the Agent to cause a Letter of Credit Issuer to issue any Letter of Credit and the obligation of any Letter of Credit Issuer to issue any Letter of Credit shall be subject to the further conditions precedent that on and as of the date of any such extension of credit (provided, however, that such conditions precedent are not conditions for any drawing under a Letter of Credit):

(a)   The following statements shall be true, and the acceptance by the Account Party of any extension of credit shall be deemed to be a statement to the effect set forth in clauses (i) and (ii)

with the same effect as the delivery to the Agent and the Letter of Credit Issuers of a certificate signed by a Responsible Officer of the Account Party, dated the date of such extension of credit, stating that:

(i)     The representations and warranties contained in this Agreement and the other Letter of Credit Documents are correct in all material respects on and as of the date of such extension of credit as though made on and as of such date, other than any such representation or warranty which relates to a specified prior date and except to the extent the Agent and the Letter of Credit Issuers have been notified in writing by the Account Party that any representation or warranty is not correct and the Majority Letter of Credit Issuers have explicitly waived in writing compliance with such representation or warranty; and

(ii)     No event has occurred and is continuing, or would result from such extension of credit, which constitutes a Default or an Event of Default; and

(iii)     No event has occurred and is continuing, or would result from such extension of credit, which has had or would reasonably be expected to have a Material Adverse Effect.

(b)     The aggregate face amount of the requested Letters of Credit shall not exceed Availability.

(c)     The Bankruptcy Case shall not have been dismissed or converted to chapter 7 of the Bankruptcy Code, the Account Party shall not have filed an application for an order dismissing the Bankruptcy Case or converting its or any other Account Party's Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, and no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Bankruptcy Case.  No application shall have been filed by the Account Party for the approval of any other superpriority administrative claim in the Bankruptcy Case which is *pari passu* with or senior to the claims of the Agent and/or any Letter of Credit Issuer arising under this Agreement against the Account Party and the Facility Order shall not have been stayed, modified, amended, reversed, rescinded or vacated.

ARTICLE 9

DEFAULT; REMEDIES

9.1     Events of Default. It shall constitute an event of default ("Event of Default") if any one or more of the following shall occur for any reason:

(a)     (i) any failure by the Account Party to pay any reimbursement obligations relating to Letters of Credit when due, whether upon demand or otherwise, or (ii) any failure by the Account Party to pay any interest on any of the Obligations or any fees or other Obligations or other amount owing hereunder within three (3) Business Days of the applicable due date, whether upon demand or otherwise;

(b)     any representation or warranty made or deemed made by the Account Party in this Agreement or in any of the other Letter of Credit Documents, any Financial Statement, or any certificate furnished by the Account Party or any Other Subsidiary at any time to the Agent or any Letter of Credit Issuer pursuant to any Letter of Credit Document shall prove to be untrue in any material respect as of the date on which made, deemed made, or furnished;

19

(c)     (i) any default shall occur in the observance or performance of any of the covenants and agreements contained in Sections 7.1 or 7.3, (ii) any default shall occur in the observance or performance of any of the covenants and agreements contained in Section 7.5, and such default shall continue for two (2) Business Days or more, (iii) any default shall occur in the observance or performance of any of the covenants and agreements contained in Sections 5.1 or 5.2, and such default shall continue for five (5) Business Days or more; or (iv) any default shall occur in the observance or performance of any of the other covenants or agreements contained in any other Section of this Agreement, any other Letter of Credit Document or any Swap Document, and such default described in this clause (iv) shall continue for fifteen (15) days or more;

(d)     the Account Party shall file a certificate of dissolution under applicable state law or shall be liquidated, dissolved or wound-up or shall commence any action or proceeding for dissolution, winding-up or liquidation, or shall take any corporate action in furtherance thereof;

(e)     all or any material part of the property of the Account Party and its Subsidiaries, taken as a whole, shall be nationalized, expropriated or condemned, seized or otherwise appropriated, or custody or control of such property or of the Account Party shall be assumed by any Governmental Authority or any court of competent jurisdiction at the instance of any Governmental Authority, except where contested in good faith by proper proceedings diligently pursued where a stay of enforcement is in effect;

(f)     other than in accordance with its terms or by agreement of its parties, any Letter of Credit Document shall be terminated, revoked or declared void or invalid or unenforceable or challenged by the Account Party or any other obligor;

(g)     one or more judgments, orders, decrees or arbitration awards is entered against the Account Party involving in the aggregate liability (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage) as to any single or related or unrelated series of transactions, incidents or conditions, of $10,000,000 or more, and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof;

(h)     there is filed against the Account Party or any Other Subsidiary any action, suit or proceeding under any federal or state racketeering statute (including the Racketeer Influenced and Corrupt Organization Act of 1970), which action, suit or proceeding (i) is not dismissed within one hundred twenty (120) days, and (ii) would reasonably be expected to result in the confiscation or forfeiture of any material portion of the assets of the Account Party;

(i)     for any reason any Letter of Credit Document ceases to be in full force and effect;

(j)     (i) an ERISA Event shall occur with respect to a Pension Plan or Multi-employer Plan which has resulted or would reasonably be expected to result in liability of the Account Party under Title IV of ERISA to the Pension Plan, Multi-employer Plan or the PBGC and such liability would reasonably be expected to cause a Material Adverse Effect; or (ii) the Account Party or any ERISA Affiliate shall fail to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multi-employer Plan in an aggregate amount in excess of $25,000,000;

(k)     the Bankruptcy Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or the Account Party shall file an application for an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code; or

20