an application shall be filed by the Account Party for the approval of any other superpriority administrative claim or lien in the Bankruptcy Case which is *pari passu* with or senior to the claims or liens of the Agent and/or any Letter of Credit Issuer against the Account Party under this Agreement, or there shall arise any such *pari passu* or senior superpriority administrative claim or lien;

      (l)     the Account Party shall propose a confirmation order for the Account Party's plan of reorganization currently pending in the Bankruptcy Case, or an order by the Bankruptcy Court shall be entered confirming the Account Party's plan of reorganization currently pending in the Bankruptcy Case, or the Account Party shall propose another plan of reorganization in the Bankruptcy Case which, in any of the above cases, does not include a provision for termination of the Commitment and indefeasible payment in full in cash of all L/C Obligations of the Account Party hereunder and under the other Letter of Credit Documents (including the cancellation and return of all Letters of Credit and/or maintenance of cash collateral in the L/C Cash Collateral Account with respect to such Letters of Credit in an amount equal to the aggregate undrawn amount of such Letters of Credit) on or before the effective date of such plan of reorganization;

      (m)    an order by the Bankruptcy Court shall be entered, or the Account Party shall file an application for an order, dismissing the Bankruptcy Case which does not require a provision for termination of the Commitments and indefeasible payment in full in cash of all Obligations of the Account Party hereunder and under the other Letter of Credit Documents (including the cancellation and return of all Letters of Credit and/or maintenance of cash collateral in the L/C Cash Collateral Account with respect to such Letters of Credit in an amount equal to the aggregate undrawn amount of such Letters of Credit) prior to any such dismissal;

      (n)    an order by the Bankruptcy Court shall be entered in or with respect to the Bankruptcy Case or the Account Party shall file an application for an order with respect to the Bankruptcy Case (i) to revoke, reverse, stay, rescind, modify, vacate, supplement or amend the Facility Order or (ii) to permit any material administrative expense or any material claim (now existing or hereafter arising, of any kind or nature whatsoever) to have an administrative priority as to the Account Party equal or superior to the priority of the claims of the Agent and the Letter of Credit Issuers in respect of the Obligations;

      (o)    an application for any of the orders described in any or all of clauses (j), (k), (l), or (m) above shall be made by a Person other than the Account Party and such application is not contested by the applicable Account Party in good faith and the relief requested is granted in an order that is not vacated, reversed, rescinded or stayed pending appeal; or

      (p)    (i) from and after the date of entry thereof, the Facility Order shall cease to be in full force and effect, or (ii) the Account Party shall fail to comply with the terms of the Facility Order in any material respect, or (iii) the Facility Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or the Account Party shall apply for authority to do so); or

      (q)    The Bankruptcy Court shall enter an order appointing a trustee in the Case or appointing a responsible officer or an examiner with powers beyond the duty to investigate and report, as set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, in the Bankruptcy Case.

9.2    Remedies.

      (a)    If a Default or an Event of Default exists, the Agent may, in its discretion, and shall, at the direction of the Majority Letter of Credit Issuers, without further order of or application to the Bankruptcy Court as permitted by the Facility Order, do one or more of the following at any time or times

and in any order, without notice to or demand on the Account Party restrict or refuse to provide Letters of Credit. If an Event of Default exists, the Agent shall, at the direction of the Majority Letter of Credit Issuers, do one or more of the following, in addition to the actions described in the preceding sentence, at any time or times and in any order, without notice to or demand on the Account Party: (A) terminate the Commitments and this Agreement; (B) declare any or all Obligations to be immediately due and payable; provided, however, that upon the occurrence of any Event of Default described in Sections 9.1(m), (n), (o), (p), (q), (s), or (t), the Commitments shall automatically and immediately expire and all Obligations shall automatically become immediately due and payable without notice or demand of any kind; and (C) pursue its other rights and remedies under the Letter of Credit Documents and applicable law.

(b)     If an Event of Default has occurred and is continuing, the Agent may, subject to Section 3.3(b) and any notice requirements set forth in the Facility Order, at any time, apply all amounts on deposit in the Cash Collateral Accounts to the satisfaction of the Obligations then outstanding. The Agent will return any excess to the Account Party and the Account Party shall remain liable for any deficiency.

(c)     If an Event of Default occurs, the Account Party hereby waives all rights to notice and hearing prior to the exercise by the Agent of the Agent's rights to apply amounts on deposit in the Cash Collateral Accounts without judicial process.

(d)     If an Event of Default has occurred and is continuing, subject only to any notice requirements set forth in the Facility Order, all stays and injunctions, including the automatic stay pursuant to Bankruptcy Code section 362, shall be vacated and terminated to the extent necessary to permit the Agent and the Letter of Credit Issuers full exercise of all of their rights and remedies under all applicable bankruptcy and non-bankruptcy law.

## ARTICLE 10

### TERM AND TERMINATION

10.1    Term and Termination. The term of this Agreement shall end on the Stated Termination Date unless sooner terminated in accordance with the terms hereof. The Agent, upon direction from the Majority Letter of Credit Issuers, may terminate this Agreement without notice upon the occurrence of an Event of Default. Upon the effective date of termination of this Agreement for any reason whatsoever, all Obligations (including all unpaid principal, accrued and unpaid interest and any early termination or prepayment fees or penalties, but excluding any not yet asserted indemnification obligations) shall become immediately due and payable and the Account Party shall immediately arrange for the cancellation and return of Letters of Credit then outstanding (or maintenance of cash collateral in the Cash Collateral Account with respect to such Letters of Credit in an amount equal to the aggregate undrawn amount of such Letters of Credit). Notwithstanding the termination of this Agreement, until all Obligations are indefeasibly paid and performed in full in cash, the Account Party shall remain bound by the terms of this Agreement and shall not be relieved of any of its Obligations hereunder or under any other Letter of Credit Document, and the Agent and the Letter of Credit Issuers shall retain all their rights and remedies hereunder.

## ARTICLE 11

### AMENDMENTS; WAIVERS; ASSIGNMENTS; SUCCESSORS

11.1    Amendments and Waivers.

22

(a)    No amendment or waiver of any provision of this Agreement or any other Letter of Credit Document, and no consent with respect to any departure by the Account Party therefrom, shall be effective unless the same shall be in writing and signed by the Majority Letter of Credit Issuers (or by the Agent at the written request of the Majority Letter of Credit Issuers) and the Account Party (or the Account Party) and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Letter of Credit Issuers and the Account Party (or the Account Party) and acknowledged by the Agent, do any of the following:

(i)    increase or extend the Commitment of any Letter of Credit Issuer;

(ii)    postpone or delay any date fixed by this Agreement or any other Letter of Credit Document for any payment of interest, fees or other amounts due to the Letter of Credit Issuers (or any of them) hereunder or under any other Letter of Credit Document;

(iii)    reduce the principal of, or the rate of interest specified herein on any Obligation, or any fees or other amounts payable hereunder or under any other Letter of Credit Document;

(iv)    change the percentage of the Commitments or of the aggregate unpaid amount of the Obligations which is required for the Letter of Credit Issuers or any of them to take any action hereunder;

(v)    amend this Section or any provision of this Agreement providing for consent or other action by all Letter of Credit Issuers;

(vi)    change the definition of "Majority Letter of Credit Issuers"; or

(vii)    increase the Total Facility;

provided, however, that no amendment, waiver or consent shall, unless in writing and signed by the Agent, affect the rights or duties of the Agent under this Agreement or any other Letter of Credit Document; provided, further, that Schedule 1.1 hereto (Commitments) may be amended from time to time by the Agent alone to reflect assignments of Commitments in accordance herewith.

(b)    If any fees are paid to the Letter of Credit Issuers as consideration for amendments, waivers or consents with respect to this Agreement, at Agent's election, such fees may be paid only to those Letter of Credit Issuers that agree to such amendments, waivers or consents within the time specified for submission thereof.

11.2    Assignments.

(a)    Any Letter of Credit Issuer may, with the written consent of the Agent (which consents shall not be unreasonably withheld or delayed), assign and delegate to one or more Eligible Assignees (provided that no consent of the Agent or the Account Party shall be required in connection with any assignment and delegation by a Letter of Credit Issuer to an Affiliate of such Letter of Credit Issuer) (each an "Assignee") all, or any ratable part of all of the Commitments and the other rights and obligations of such Letter of Credit Issuer hereunder, in a minimum amount of $5,000,000 (provided that, unless an assignor Letter of Credit Issuer has assigned and delegated all of its Commitments, no such assignment and/or delegation shall be permitted unless, after giving effect thereto, such assignor Letter of Credit Issuer retains a Commitment in a minimum amount of $5,000,000); provided, however, that the

23

Account Party and the Agent may continue to deal solely and directly with such Letter of Credit Issuer in connection with the interest so assigned to an Assignee until (i) written notice of such assignment, together with payment instructions, addresses and related information with respect to the Assignee, shall have been given to the Account Party and the Agent by such Letter of Credit Issuer and the Assignee; (ii) such Letter of Credit Issuer and its Assignee shall have delivered to the Account Party and the Agent an Assignment and Acceptance in the form of <u>Exhibit B</u> ("<u>Assignment and Acceptance</u>") duly executed by such Letter of Credit Issuer and its Assignee, and such Assignment and Acceptance shall have been acknowledged by the Agent; and (iii) the assignor Letter of Credit Issuer or Assignee has paid to the Agent a processing fee in the amount of $3,500. The Account Party agree to promptly execute and deliver new promissory notes and replacement promissory notes as reasonably requested by the Agent to evidence assignments of the Commitments in accordance herewith.

(b)     From and after the date that the Agent notifies the assignor Letter of Credit Issuer that it has received an executed Assignment and Acceptance and payment of the above-referenced processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations shall have the rights and obligations of a Letter of Credit Issuer under the Letter of Credit Documents, and (ii) the assignor Letter of Credit Issuer shall, to the extent that rights and obligations hereunder and under the other Letter of Credit Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Letter of Credit Issuer's rights and obligations under this Agreement, such Letter of Credit Issuer shall cease to be a party hereto).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Letter of Credit Issuer thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Letter of Credit Issuer makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Letter of Credit Document furnished pursuant hereto; (ii) such assigning Letter of Credit Issuer makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Account Party or the performance or observance by the Account Party of any of its obligations under this Agreement or any other Letter of Credit Document furnished pursuant hereto; (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such Assignee will, independently and without reliance upon the Agent, such assigning Letter of Credit Issuer or any other Letter of Credit Issuer, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such Assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Agent by the terms hereof, together with such powers, including the discretionary rights and incidental power, as are reasonably incidental thereto; and (vi) such Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Letter of Credit Issuer.

(d)     Immediately upon satisfaction of the requirements of <u>Section 11.2(a)</u>, this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom. The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Letter of Credit Issuer *pro tanto*.

029123-0013

(e)     Notwithstanding any other provision in this Agreement, any Letter of Credit Issuer may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the FRB or U.S. Treasury Regulation 31 CFR §203.14, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

## ARTICLE 12

## THE AGENT

12.1    Appointment and Authorization. Each Letter of Credit Issuer hereby designates and appoints Bank as its Agent under this Agreement and the other Letter of Credit Documents, and each Letter of Credit Issuer hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and each other Letter of Credit Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Letter of Credit Document, together with such powers as are reasonably incidental thereto. The Agent agrees to act as such on the express conditions contained in this Article 12. The provisions of this Article 12 are solely for the benefit of the Agent and the Letter of Credit Issuers and none of the Account Party shall have any rights as a third party beneficiary of any of the provisions contained herein. Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Letter of Credit Document, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with any Letter of Credit Issuer, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Letter of Credit Document or otherwise exist against the Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Agreement with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Except as expressly otherwise provided in this Agreement, the Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which the Agent is expressly entitled to take or assert under this Agreement and the other Letter of Credit Documents, including the exercise of remedies pursuant to Section 9.2, and any action so taken or not taken shall be deemed consented to by the Letter of Credit Issuers.

12.2    Delegation of Duties. The Agent may execute any of its duties under this Agreement or any other Letter of Credit Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct.

12.3    Liability of Agent. None of the Agent-Related Persons shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Letter of Credit Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (ii) be responsible in any manner to any of the Letter of Credit Issuers for any recital, statement, representation or warranty made by the Account Party or any Other Subsidiary or Affiliate of the Account Party, or any officer thereof, contained in this Agreement or in any other Letter of Credit Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Letter of Credit Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Letter of Credit Document, or for any failure of the Account Party or any other party to any

Letter of Credit Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Letter of Credit Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Letter of Credit Document, or to inspect the properties, books or records of the Account Party or any Other Subsidiaries or Affiliates.

12.4    Reliance by Agent. The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Account Party), independent accountants and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Letter of Credit Document unless it shall first receive such advice or concurrence of the Majority Letter of Credit Issuers as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Letter of Credit Issuers against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Letter of Credit Document in accordance with a request or consent of the Majority Letter of Credit Issuers (or all Letter of Credit Issuers if so required by Section 11.1) and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Letter of Credit Issuers.

12.5    Notice of Default. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Agent shall have received written notice from a Letter of Credit Issuer or the Account Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Agent will notify the Letter of Credit Issuers of its receipt of any such notice. The Agent shall take such action with respect to such Default or Event of Default as may be requested by the Majority Letter of Credit Issuers in accordance with Section 9; provided, however, that unless and until the Agent has received any such request, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

12.6    Credit Decision. Each Letter of Credit Issuer acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by the Agent hereinafter taken, including any review of the affairs of the Account Party and its Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Letter of Credit Issuer. Each Letter of Credit Issuer represents to the Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Account Party and its Affiliates, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Account Party. Each Letter of Credit Issuer also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Letter of Credit Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Account Party. Except for notices, reports and other documents expressly herein required to be furnished to the Letter of Credit Issuers by the Agent, the Agent shall not have any duty or responsibility to provide any Letter of Credit Issuer with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Account Party which may come into the possession of any of the Agent-Related Persons.

26

029123-0013

12.7    Indemnification. Whether or not the transactions contemplated hereby are consummated, the Letter of Credit Issuers shall indemnify upon demand the Agent-Related Persons (to the extent not reimbursed by or on behalf of the Account Party and without limiting the obligation of the Account Party to do so), in accordance with their Pro Rata Shares, from and against any and all Indemnified Liabilities as such term is defined in Section 13.11; provided, however, that no Letter of Credit Issuer shall be liable for the payment to the Agent-Related Persons of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct. Without limitation of the foregoing, each Letter of Credit Issuer shall reimburse the Agent upon demand for its Pro Rata Share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Letter of Credit Document, or any document contemplated by or referred to herein, to the extent that the Agent is not reimbursed for such expenses by or on behalf of the Account Party. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of the Agent.

12.8    Agent in Individual Capacity. The Bank and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Account Party and its Subsidiaries and Affiliates as though the Bank were not the Agent hereunder and without notice to or consent of the Letter of Credit Issuers. The Bank or its Affiliates may receive information regarding the Account Party and its Affiliates (including information that may be subject to confidentiality obligations in favor of such Account Party or such Subsidiary) and acknowledge that the Agent and the Bank shall be under no obligation to provide such information to them.

12.9    Successor Agent. The Agent may resign as Agent upon at least thirty (30) days' prior notice to the Letter of Credit Issuers and the Account Party, such resignation to be effective upon the acceptance of a successor agent to its appointment as Agent. In the event the Bank sells all of its Commitment as part of a sale, transfer or other disposition by the Bank of substantially all of its letter of credit portfolio, the Bank shall resign as Agent and such purchaser or transferee shall become the successor Agent hereunder. Subject to the foregoing, if the Agent resigns under this Agreement, the Majority Letter of Credit Issuers shall appoint from among the Letter of Credit Issuers a successor agent for the Letter of Credit Issuers. If no successor agent is appointed prior to the effective date of the resignation of the Agent, the Agent may appoint, after consulting with the Letter of Credit Issuers and the Account Party, a successor agent from among the Letter of Credit Issuers. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent" shall mean such successor agent and the retiring Agent's appointment, powers and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Article 12 shall continue to inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

12.10    Withholding Tax.

(a)    If any Letter of Credit Issuer claims exemption from, or reduction of, withholding tax under a United States of America tax treaty by providing IRS Form W-8BEN and such Letter of Credit Issuer sells, assigns, or otherwise transfers all or part of the Obligations owing to such Letter of Credit Issuer, such Letter of Credit Issuer agrees to notify the Agent of the percentage amount in which it is no longer the beneficial owner of Obligations of the Account Party to such Letter of Credit Issuer. To the extent of such percentage amount, the Agent will treat such Letter of Credit Issuer's IRS Form W-8BEN as no longer valid.

CH\1135197.12                                                                029123-0013

(b)　　If any Letter of Credit Issuer claiming exemption from United States of America withholding tax by filing IRS Form W-8ECI with the Agent sells, assigns, or otherwise transfers all or part of the Obligations owing to such Letter of Credit Issuer, such Letter of Credit Issuer agrees to undertake sole responsibility for complying with the withholding tax requirements imposed by Sections 1441 and 1442 of the Code.

(c)　　If any Letter of Credit Issuer is entitled to a reduction in the applicable withholding tax, the Agent may withhold from any interest payment to such Letter of Credit Issuer an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by Section 4.1(a) are not delivered to the Agent, then the Agent may withhold from any interest payment to such Letter of Credit Issuer not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(d)　　If the IRS or any other Governmental Authority of the United States of America or other jurisdiction asserts a claim that the Agent did not properly withhold tax from amounts paid to or for the account of any Letter of Credit Issuer (because the appropriate form was not delivered, was not properly executed, or because such Letter of Credit Issuer failed to notify the Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Letter of Credit Issuer shall indemnify the Agent fully for all amounts paid, directly or indirectly, by the Agent as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to the Agent under this Section, together with all costs and expenses (including Attorney Costs). The obligation of the Letter of Credit Issuers under this subsection shall survive the payment of all Obligations and the resignation or replacement of the Agent.

12.11　Restrictions on Actions by Letter of Credit Issuers; Sharing of Payments.

(a)　　Each of the Letter of Credit Issuers agrees that it shall not, without the express consent of all Letter of Credit Issuers, and that it shall, to the extent it is lawfully entitled to do so, upon the request of all Letter of Credit Issuers, set off against the Obligations, any amounts owing by such Letter of Credit Issuer to the Account Party or any accounts of the Account Party now or hereafter maintained with such Letter of Credit Issuer. Each of the Letter of Credit Issuers further agrees that it shall not, unless specifically requested to do so by the Agent, take or cause to be taken any action to enforce its rights under this Agreement or against the Account Party.

(b)　　If at any time or times any Letter of Credit Issuer shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of Collateral or any payments with respect to the Obligations of the Account Party to such Letter of Credit Issuer arising under, or relating to, this Agreement or the other Letter of Credit Documents, except for any such proceeds or payments received by such Letter of Credit Issuer from the Agent pursuant to the terms of this Agreement, or (ii) payments from the Agent in excess of such Letter of Credit Issuer's ratable portion of all such distributions by the Agent, such Letter of Credit Issuer shall promptly turn the same over to the Agent, in kind, and with such endorsements as may be required to negotiate the same to the Agent, or in same day funds, as applicable, for the account of all of the Letter of Credit Issuers and for application to the Obligations in accordance with the applicable provisions of this Agreement.

12.12　Payments by Agent to Letter of Credit Issuers. All payments to be made by the Agent to the Letter of Credit Issuers shall be made by bank wire transfer or internal transfer of immediately available funds to each Letter of Credit Issuer pursuant to wire transfer instructions delivered in writing to the Agent on or prior to the Closing Date (or if such Letter of Credit Issuer is an Assignee, on the applicable Assignment and Acceptance), or pursuant to such other wire transfer instructions as each party may designate for itself by written notice to the Agent. Concurrently with each such payment, the Agent

28

shall identify whether such payment (or any portion thereof) represents repayment of a reimbursement obligation, interest thereon or other amounts payable hereunder. Unless the Agent receives notice from the Account Party prior to the date on which any payment is due to the Letter of Credit Issuers that the Account Party will not make such payment in full as and when required, the Agent may assume that the Account Party has made such payment in full to the Agent on such date in immediately available funds and the Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Letter of Credit Issuer on such due date an amount equal to the amount then due such Letter of Credit Issuer. If and to the extent the Account Party has not made such payment in full to the Agent, each Letter of Credit Issuer shall repay to the Agent on demand such amount distributed to such Letter of Credit Issuer, together with interest thereon at the Federal Funds Rate for each day from the date such amount is distributed to such Letter of Credit Issuer until the date repaid.

12.13    Letter of Credit Issuers' Failure to Perform.  It is understood that (i) no Letter of Credit Issuer shall be responsible for any failure by any other Letter of Credit Issuer to perform its obligation to issue any Letter of Credit hereunder; nor shall any Commitment of any Letter of Credit Issuer be increased or decreased as a result of any failure by any other Letter of Credit Issuer to perform its obligation to issue any Letter of Credit hereunder, (ii) no failure by any Letter of Credit Issuer to perform its obligation to issue any Letter of Credit hereunder shall excuse any other Letter of Credit Issuer from its obligation to issue any Letter of Credit hereunder, and (iii) the obligations of each Letter of Credit Issuer hereunder shall be several, not joint and several.

12.14    Relation Among Letter of Credit Issuers.  The Letter of Credit Issuers are not partners or co-venturers, and no Letter of Credit Issuer shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Letter of Credit Issuer.

ARTICLE 13

MISCELLANEOUS

13.1    No Waivers; Cumulative Remedies.  No failure by the Agent or any Letter of Credit Issuer to exercise any right, remedy, or option under this Agreement or any present or future supplement thereto, or in any other agreement between or among the Account Party and the Agent and/or any Letter of Credit Issuer, or delay by the Agent or any Letter of Credit Issuer in exercising the same, will operate as a waiver thereof. No waiver by the Agent or any Letter of Credit Issuer will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by the Agent or the Letter of Credit Issuers on any occasion shall affect or diminish the Agent's and each Letter of Credit Issuer's rights thereafter to require strict performance by the Account Party of any provision of this Agreement. The Agent and the Letter of Credit Issuers may proceed directly to collect the Obligations without any prior recourse to the Collateral. The Agent's and each Letter of Credit Issuer's rights under this Agreement will be cumulative and not exclusive of any other right or remedy which the Agent or any Letter of Credit Issuer may have.

13.2    Severability.  The illegality or unenforceability of any provision of this Agreement or any Letter of Credit Document or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

13.3    Governing Law; Choice of Forum; Service of Process.

(a)    IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND THE FACILITY ORDER, THE FACILITY ORDER SHALL CONTROL.  THIS

AGREEMENT SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO THE CONFLICT OF LAWS PROVISIONS PROVIDED THAT PERFECTION ISSUES WITH RESPECT TO ARTICLE 9 OF THE UCC MAY GIVE EFFECT TO APPLICABLE CHOICE OR CONFLICT OF LAW RULES SET FORTH IN ARTICLE 9 OF THE UCC) OF THE STATE OF NEW YORK TO THE EXTENT NOT PREEMPTED BY FEDERAL BANKRUPTCY LAWS; PROVIDED THAT THE AGENT AND THE LETTER OF CREDIT ISSUERS SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LETTER OF CREDIT DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY CASE IS DISMISSED, OR WITH RESPECT TO ANY APPLICANT WHICH IS NO LONGER SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, IN THE FEDERAL, DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE ACCOUNT PARTY, THE AGENT AND THE LETTER OF CREDIT ISSUERS CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE JURISDICTION OF SUCH COURTS. EACH OF THE ACCOUNT PARTY, THE AGENT AND THE LETTER OF CREDIT ISSUERS IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO.

(c)    EACH APPLICANT HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY FACSIMILE OR BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO THE APPLICANT REPRESENTATIVE AT ITS ADDRESS SET FORTH IN SECTION 13.8 AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON THE EARLIER OF RECEIPT OR FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE U.S. MAILS POSTAGE PREPAID. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF THE AGENT OR THE LETTER OF CREDIT ISSUERS TO SERVE LEGAL PROCESS BY ANY OTHER MANNER PERMITTED BY LAW.

13.4    WAIVER OF JURY TRIAL. THE ACCOUNT PARTY, THE LETTER OF CREDIT ISSUERS AND THE AGENT EACH IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LETTER OF CREDIT DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AGENT-RELATED PERSON, PARTICIPANT OR ASSIGNEE, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. THE ACCOUNT PARTY, THE LETTER OF CREDIT ISSUERS AND THE AGENT EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LETTER OF CREDIT DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LETTER OF CREDIT DOCUMENTS.

CH\1135197.12                                                                                029123-0013

13.5    Survival of Representations and Warranties. All of the Account Party's representations and warranties contained in this Agreement shall survive the execution, delivery, and acceptance thereof by the parties, notwithstanding any investigation by the Agent or the Letter of Credit Issuers or their respective agents.

13.6    Other Security and Guaranties. The Agent, may, without notice or demand and without affecting the Account Party' obligations hereunder, from time to time:  (a) take from any Person and hold collateral (other than funds on deposit in the Cash Collateral Accounts) for the payment of all or any part of the Obligations and exchange, enforce or release such collateral or any part thereof; and (b) accept and hold any endorsement or guaranty of payment of all or any part of the Obligations and release or substitute any such endorser or guarantor, or any Person who has given any Lien in any other collateral as security for the payment of all or any part of the Obligations, or any other Person in any way obligated to pay all or any part of the Obligations

13.7    Fees and Expenses. The Account Party agrees to pay to the Agent, for its benefit, on demand, all costs and expenses that Agent pays or incurs in connection with the negotiation, preparation, syndication, consummation, administration, enforcement, and termination of this Agreement or any of the other Letter of Credit Documents, including: (a) Attorney Costs; (b) costs and expenses (including attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with the Letter of Credit Documents and the transactions contemplated thereby; and (c) sums paid or incurred to pay any amount or take any action required of the Account Party under the Letter of Credit Documents that the Account Party fails to pay or take. In addition, the Account Party agree to pay costs and expenses incurred by the Agent (including Attorneys' Costs) to the Agent, for its benefit, on demand, and to the other Letter of Credit Issuers for their benefit, on demand, and all reasonable fees, expenses and disbursements incurred by such other Letter of Credit Issuers for one law firm retained by such other Letter of Credit Issuers, in each case Attorneys' Costs) paid or incurred to obtain payment of the Obligations and otherwise enforce the provisions of the Letter of Credit Documents, or to defend any claims made or threatened against the Agent or any Letter of Credit Issuer arising out of the transactions contemplated hereby (including preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the Letter of Credit Documents regarding costs and expenses to be paid by the Account Party.

13.8    Notices. Except as otherwise provided herein, all notices, demands and requests that any party is required or elects to give to any other shall be in writing, or by a telecommunications device capable of creating a written record, and any such notice shall become effective (a) upon personal delivery thereof, including, but not limited to, delivery by overnight mail and courier service, (b) four (4) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid, or (c) in the case of notice by such a telecommunications device, when properly transmitted, in each case addressed to the party to be notified as follows:

If to the Agent or to the Bank:

> Bank of America, N.A.
> 335 Madison Avenue
> New York, New York  10017
> Attention: Allan Juleus
> and
> Ed Kahn
> Facsimile No.:  (312) 453-3977

31

with copies to:

Latham & Watkins
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606
Attention: David S. Heller
and
Jeffrey G. Moran
Facsimile No.: (312) 993-9767

If to the Account Party, to the Account Party:

W. R. Grace & Co.-Conn.
7500 Grace Drive
Columbia, Maryland 21044
Attention: Asif Arshad
Facsimile No.: (410) 531-4461

with a copy to:

Kirkland & Ellis
601 Lexington Avenue
New York, New York 10022
Attention: Theodore L. Freedman
Facsimile No.: (212) 446-4900

or to such other address as each party may designate for itself by like notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to the persons designated above to receive copies shall not adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

13.9    Waiver of Notices. Unless otherwise expressly provided herein, the Account Party waive presentment, and notice of demand or dishonor and protest as to any instrument, notice of intent to accelerate the Obligations and notice of acceleration of the Obligations, as well as any and all other notices to which the Account Party might otherwise be entitled. No notice to or demand on the Account Party which the Agent or any Letter of Credit Issuer may elect to give shall entitle the Account Party to any or further notice or demand in the same, similar or other circumstances.

13.10    Binding Effect. The provisions of this Agreement shall be binding upon and inure to the benefit of the respective representatives, successors, and permitted assigns of the parties hereto; provided, however, that no interest herein may be assigned by the Account Party without prior written consent of the Agent and each Letter of Credit Issuer. The rights and benefits of the Agent and the Letter of Credit Issuers hereunder shall, if such Persons so agree, inure to any party acquiring any interest in the Obligations or any part thereof.

13.11    Indemnity of the Agent and the Letter of Credit Issuers by the Account Party.

(a)    The Account Party agrees to defend, indemnify and hold the Agent-Related Persons, and each Letter of Credit Issuer and each of its respective officers, directors, employees, counsel, representatives, agents and attorneys-in-fact (each, an "Indemnified Person") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges,

32

expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time (including at any time following repayment of the Obligations and the termination, resignation or replacement of the Agent or replacement of any Letter of Credit Issuer) be imposed on, incurred by or asserted against any such Person in any way relating to or arising out of this Agreement or any document contemplated by or referred to herein, or the transactions contemplated hereby, or any action taken or omitted by any such Person under or in connection with any of the foregoing, including with respect to any investigation, litigation or proceeding (including any insolvency proceeding or appellate proceeding) related to or arising out of this Agreement, any other Letter of Credit Document, or the Letters of Credit or the use of the proceeds thereof, whether or not any Indemnified Person is a party thereto (all the foregoing, collectively, the "Indemnified Liabilities"); provided, that the Account Party shall not have any obligation hereunder to any Indemnified Person with respect to Indemnified Liabilities resulting solely from the gross negligence or willful misconduct of such Indemnified Person. The agreements in this Section shall survive payment of all other Obligations.

(b)    The Account Party agrees to indemnify, defend and hold harmless the Agent and the Letter of Credit Issuers from any loss or liability imposed upon or incurred by any such Person directly or indirectly arising out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance relating to the Account Party's operations, business or property. This indemnity will apply whether the hazardous substance is on, under or about the Account Party's property or operations or property leased to the Account Party. The indemnity includes but is not limited to Attorneys Costs. The indemnity extends to the Agent and the Letter of Credit Issuers, their parents, affiliates, Subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns. "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including petroleum or natural gas. This indemnity will survive repayment of all other Obligations.

13.12    Limitation of Liability. NO CLAIM MAY BE MADE BY ANY APPLICANT, ANY LETTER OF CREDIT ISSUER OR OTHER PERSON AGAINST THE AGENT, ANY LETTER OF CREDIT ISSUER OR THE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, COUNSEL, REPRESENTATIVES, AGENTS OR ATTORNEYS IN FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LETTER OF CREDIT DOCUMENT, OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH, AND ANY APPLICANT AND EACH LETTER OF CREDIT ISSUER HEREBY WAIVE, RELEASE AND AGREE NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

13.13    Final Agreement. This Agreement and the other Letter of Credit Documents are intended by the Account Party, the Agent and the Letter of Credit Issuers to be the final, complete, and exclusive expression of the agreement between them. This Agreement supersedes any and all prior oral or written agreements relating to the subject matter hereof.    No modification, rescission, waiver, release, or amendment of any provision of this Agreement or any other Letter of Credit Document shall be made, except by a written agreement signed by the Account Party and a duly authorized officer of each of the Agent and the requisite Letter of Credit Issuers.

13.14    Counterparts. This Agreement may be executed in any number of counterparts, and by the Agent, each Letter of Credit Issuer and the Account Party in separate counterparts, each of which shall

be an original, but all of which shall together constitute one and the same agreement; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

13.15    Captions. The captions contained in this Agreement are for convenience of reference only, are without substantive meaning and should not be construed to modify, enlarge, or restrict any provision.

13.16    Right of Setoff. In addition to any rights and remedies of the Letter of Credit Issuers provided by law, if an Event of Default exists, subject to Section 3.3(b), each Letter of Credit Issuer is authorized at any time and from time to time, without prior notice to the Account Party, any such notice being waived by the Account Party to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other indebtedness at any time owing by, such Letter of Credit Issuer or any Affiliate of such Letter of Credit Issuer to or for the credit or the account of the Account Party against any and all Obligations owing to such Letter of Credit Issuer, now or hereafter existing, irrespective of whether or not the Agent or such Letter of Credit Issuer shall have made demand under this Agreement or any Letter of Credit Document and although such Obligations may be contingent or unmatured. Each Letter of Credit Issuer agrees promptly to notify the Account Party and the Agent after any such set-off and application made by such Letter of Credit Issuer; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application. NOTWITHSTANDING THE FOREGOING, NO LETTER OF CREDIT ISSUER SHALL EXERCISE ANY RIGHT OF SET-OFF, BANKER'S LIEN, OR THE LIKE AGAINST ANY DEPOSIT ACCOUNT OR PROPERTY OF ANY APPLICANT HELD OR MAINTAINED BY SUCH LETTER OF CREDIT ISSUER WITHOUT THE PRIOR WRITTEN UNANIMOUS CONSENT OF THE LETTER OF CREDIT ISSUERS.

13.17    Confidentiality.

(a)    The Account Party hereby consent that the Agent and each Letter of Credit Issuer may issue and disseminate to the public general information describing the credit accommodation entered into pursuant to this Agreement, including the names and addresses of the Account Party and a general description of the Account Party's business and may use the Account Party' names in advertising and other promotional material.

(b)    Each Letter of Credit Issuer severally agrees to take normal and reasonable precautions and exercise due care to maintain the confidentiality of all information identified as "confidential" or "secret" by the Account Party and provided to the Agent or such Letter of Credit Issuer by or on behalf of the Account Party, under this Agreement or any other Letter of Credit Document, except to the extent that such information (i) was or becomes generally available to the public other than as a result of disclosure by the Agent or such Letter of Credit Issuer, or (ii) was or becomes available on a non-confidential basis from a source other than the Account Party; provided that such source is not bound by a confidentiality agreement with the Account Party known to the Agent or such Letter of Credit Issuer; provided, however, that the Agent and any Letter of Credit Issuer may disclose such information (1) at the request or pursuant to any requirement of any Governmental Authority to which the Agent or such Letter of Credit Issuer is subject or in connection with an examination of the Agent or such Letter of Credit Issuer by any such Governmental Authority; (2) pursuant to subpoena or other court process; (3) when required to do so in accordance with the provisions of any applicable Requirement of Law; (4) to the extent reasonably required in connection with any litigation or proceeding (including, but not limited to, any bankruptcy proceeding) to which the Agent, any Letter of Credit Issuer or their respective Affiliates may be party; (5) to the extent reasonably required in connection with the exercise of any remedy hereunder or under any other Letter of Credit Document; (6) to the Agent's or such Letter of Credit

Issuer's independent auditors, accountants, attorneys and other professional advisors; (7) to any prospective Assignee under any Assignment and Acceptance, actual or potential; provided that such prospective Assignee agrees to keep such information confidential to the same extent required of the Agent and the Letter of Credit Issuers hereunder; (8) as expressly permitted under the terms of any other document or agreement regarding confidentiality to which the Account Party is party or is deemed party with the Agent or such Letter of Credit Issuer, and (9) to its Affiliates.

13.18   <u>Conflicts with Other Letter of Credit Documents</u>.  Unless otherwise expressly provided in this Agreement (or in another Letter of Credit Document by specific reference to the applicable provision contained in this Agreement), if any provision contained in this Agreement conflicts with any provision of any other Letter of Credit Document, the provision contained in this Agreement shall govern and control.

*[signature page follows]*

CH\1135197.12    029123-0013

IN WITNESS WHEREOF, the parties have entered into this Agreement on the date first above written.

**ACCOUNT PARTY:**

W. R. Grace & Co.-Conn., as Account Party

By:_____
Its Senior Vice President or Vice President

**AGENT:**

**BANK OF AMERICA, N.A.**, as the Agent

By: _____
Title: _____

**LETTER OF CREDIT ISSUER:**

**BANK OF AMERICA, N.A.**, as a Letter of Credit Issuer

By: _____

    Title: _____

36

029123-0013

**ANNEX A**
to
**Credit Agreement**

**Definitions**

Capitalized terms used in the Letter of Credit Documents shall have the following respective meanings (unless otherwise defined therein), and all section references in the following definitions shall refer to sections of the Agreement:

"ACH Transactions" means any cash management or related services including the automatic clearing house transfer of funds by the Bank for the account of the Account Party pursuant to agreement or overdrafts.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person or which owns, directly or indirectly, ten percent (10%) or more of the outstanding equity interest of such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise.

"Administration Fee" has the meaning specified in Section 2.3(b).

"Agent" has the meaning set forth in the Preamble to the Agreement.

"Agent-Related Persons" means the Agent, together with its Affiliates, and the officers, directors, employees, counsel, representatives, agents and attorneys-in-fact of the Agent and such Affiliates.

"Agreement" means the Post-Petition Letter of Credit Facility Agreement to which this Annex A is attached, as from time to time amended, modified or restated.

"Account Party" has the meaning set forth in the Preamble to the Agreement.

"Applicable Percentage" means, with respect to the payment of the Unused Line Fee, for each month (or lesser period as applicable), if the average daily Availability during such month (or such lesser period) is (i) less than or equal to $50,000,000, 0.50% *per annum*, or (ii) greater than $50,000,000, 0.75% *per annum*.

"Assignee" has the meaning specified in Section 11.2(a).

"Assignment and Acceptance" has the meaning specified in Section 11.2(a).

"Attorney Costs" means and includes all reasonable documented fees, expenses and disbursements of any law firm or other counsel engaged by the Agent, the reasonably allocated costs and expenses of internal legal services of the Agent.

"Availability" means, at any time (a) the lesser of (i) an amount equal to 95.24% of the L/C Cash Collateral Account Balance at such time or (ii) $100,000,000, minus, (b) in each case, the aggregate outstanding face amount of all Letters of Credit.

1

"Bank" means Bank of America, N.A., a national banking association, or any successor entity thereto.

"Bank Products" means any one or more of the following types of services or facilities extended to the Account Party by the Bank or any affiliate of the Bank in reliance on the Bank's agreement to indemnify such affiliate: (i) credit cards; (ii) ACH Transactions; (iii) cash management, including controlled disbursement services; and (iv) Hedge Agreements.

"Bankruptcy Case" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Bankruptcy Case from time to time, including, without limitation, the United States District Court for the District of Delaware if and to the extent it withdraws the reference with respect to the Bankruptcy Case, any part thereof, or any matter or proceeding therein.

"Base Rate" means, for any day, a *per annum* rate equal to the greatest of (a) the Prime Rate for such day; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) LIBOR for a 30-day interest period as determined on such day.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banks in New York, New York or Charlotte, North Carolina are required or permitted to be closed.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any bank or of any corporation controlling a bank.

"Cash Collateral Accounts" means, collectively, the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account and the Commodity Hedge Cash Collateral Account.

"Cash Equivalents" means (a) direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof, (b) commercial paper issued in the United States of America and rated at least A-1 or P-1 by at least one nationally recognized rating organization and money market funds rated at least AAA, Aaa or other equivalent of highest rating by at least one nationally recognized rating organization, (c) certificates of deposit issued by or eurodollar deposits made with any Letter of Credit Issuer, any Affiliate of any Letter of Credit Issuer, or any bank or trust company which has (or the parent of which has) capital, surplus and undivided profits aggregating at least $100,000,000 (or the equivalent amount in another currency), (d) drafts accepted by any bank or trust company referred to in clause (c) above or any other negotiable instrument guaranteed or endorsed with full recourse by any such bank or trust company, (e) repurchase agreements with respect to any of the foregoing types of securities described in clauses (a) and (b) above, and (f) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clause (a) through (e) above; provided that (i) each such obligation, certificate of deposit, draft, investment, security and instrument (including those subject to repurchase agreements) matures within one year after it is acquired and (ii) each item of such commercial paper (including those subject to repurchase agreements) matures within ninety (90) days after it is acquired by the applicable Account Party or any Other Subsidiary.

2

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986.

"Committee" means any official committee(s) appointed in the Bankruptcy Case.

"Commitment" means, at any time with respect to a Letter of Credit Issuer, the amount set forth beside such Letter of Credit Issuer's name under the heading "Commitment" on Schedule 1.1 attached to the Agreement or on the signature page of the Assignment and Acceptance pursuant to which such Letter of Credit Issuer became a Letter of Credit Issuer hereunder in accordance with the provisions of Section 11.2, as such Commitment may be adjusted from time to time in accordance with the provisions of Section 11.2, and "Commitments" means, collectively, the aggregate amount of the commitments of all of the Letter of Credit Issuers.

"Commodity Hedge Cash Collateral Account" means a cash collateral account with the Bank securing the Commodity Hedge Obligations under the sole dominion and control of the Agent, for the ratable benefit of the Agent and the holders of the Commodity Hedge Obligations (and, subject to Section 3.3(b), for the benefit of the holders of the L/C Obligations and the F/X Hedge Obligations) pursuant to a control agreement in form and substance satisfactory to the Agent.

"Commodity Hedge Obligations" means the obligations arising under the Swap Documents in connection with any transactions, agreements or documents thereunder that provide for commodity, cap, floor, or collar transactions (or any combination thereof) related to or for the purpose of hedging exposure to, fluctuations in commodity prices.

"Company" means W. R. Grace & Co., a Delaware corporation and the sole parent company of the Account Party.

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured, waived, or otherwise remedied during such time) constitute an Event of Default.

"Default Rate" means a *per annum* interest rate at all times equal to the sum of (a) the otherwise applicable interest rate pursuant to Section 2.1(a) plus (b) two percent (2%) *per annum*.

"Dollar" and "$" means the lawful currency of the United States. Unless otherwise specified, all payments under the Agreement shall be made in Dollars.

"Eligible Assignee" means (a) a commercial bank, commercial finance company or other asset based lender, having total assets in excess of $1,000,000,000; (b) any Letter of Credit Issuer listed on the signature page of this Agreement; (c) any Affiliate of any Letter of Credit Issuer; and (d) if an Event of Default has occurred and is continuing, any Person reasonably acceptable to the Agent.

"Environmental Laws" means all federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case relating to environmental, health, safety and land use matters.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and regulations promulgated thereunder.

3

029123-0013

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Account Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, (b) a withdrawal by the Account Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations which is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by the Account Party or any ERISA Affiliate from a Multi-employer Plan or notification that a Multi-employer Plan is in reorganization, (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multi-employer Plan, (e) the occurrence of an event (other than the act of the filing of the Bankruptcy Case) which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multi-employer Plan, or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Account Party or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 9.1.

"Exchange Act" means the Securities Exchange Act of 1934, and regulations promulgated thereunder.

"Existing Letters of Credit" means the letters of credit identified on Exhibit C.

"Facility Fee" has the meaning specified in Section 2.3(b).

"Facility Order" has the meaning specified in Section 8.1(i).

"Federal Funds Rate" means, for any day, the rate *per annum* (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Bank on such day on such transactions as determined by the Agent.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"Financial Statements" means, according to the context in which it is used, the financial statements referred to in Section 5.1 or any other financial statements required to be given to the Letter of Credit Issuers pursuant to this Agreement.

"Fiscal Year" means the Account Party fiscal year for financial accounting purposes. The current Fiscal Year of the Account Party will end on December 31, 2010.

"F/X Hedge Cash Collateral Account" means a cash collateral account with the Bank securing the F/X Hedge Obligations under the sole dominion and control of the Agent, for the ratable

benefit of the Agent and the holders of the F/X Hedge Obligations (and, subject to <u>Section 3.3(b)</u>, for the benefit of the holders of the L/C Obligations and the Commodity Hedge Obligations) pursuant to a control agreement in form and substance satisfactory to the Agent.

"<u>F/X Hedge Obligations</u>" means the obligations arising under the Swap Documents in connection with any transactions, agreements or documents thereunder that provide for forward foreign exchange transactions, currency swaps or currency options (or any combination of the foregoing) related to or for the purpose of hedging exposure to, fluctuations in exchange rates or currency valuations.

"<u>GAAP</u>" means generally accepted accounting principles and practices set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession).

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"<u>Hedge Agreement</u>" means, with respect to any Person, any and all transactions, agreements or documents now existing or hereafter entered into, that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging any Person's exposure to fluctuations in interest or exchange rates, loan, credit exchange, security or currency valuations or commodity prices.

"<u>IRS</u>" means the Internal Revenue Service and any Governmental Authority succeeding to any of its principal functions under the Code.

"<u>L/C Cash Collateral Account</u>" means a cash collateral account with the Bank securing the L/C Obligations under the sole dominion and control of the Agent, for the ratable benefit of the Agent and the Letter of Credit Issuers (and, subject to <u>Section 3.3(b)</u>, for the benefit of the holders of the F/X Hedge Obligations and the Commodity Hedge Obligations) pursuant to a control agreement in form and substance satisfactory to the Agent.

"<u>L/C Cash Collateral Account Balance</u>" means, at any time, the aggregate amount on deposit in the Cash Collateral Account at such time.

"<u>L/C Obligations</u>" means, collectively, the obligations of the Account Party arising under this Agreement and each of the other Letter of Credit Documents.

"<u>Letter of Credit</u>" has the meaning specified in <u>Section 1.2(a)</u>.

"<u>Letter of Credit Documents</u>" means this Agreement, each control agreement entered into pursuant hereto, the Facility Order and any other agreements, instruments, and documents heretofore, now or hereafter evidencing, guaranteeing or otherwise relating to the Obligations or any other aspect of the transactions contemplated by this Agreement.

"<u>Letter of Credit Fee</u>" has the meaning specified in <u>Section 2.5</u>.

5

"Letter of Credit Issuer" means the Bank, any affiliate of the Bank or any other financial institution that issues any Letter of Credit pursuant to this Agreement; provided however that the Agent shall not cause any Letter of Credit to be issued by a Person which is not a Letter of Credit Issuer and which is not reasonably acceptable to the Account Party.

"LIBOR" means, for any date of determination, the per annum rate of interest (rounded up, if necessary, to the nearest 1/8th of 1%), determined by the Agent at approximately 11:00 a.m. (London time) two Business Days prior to such date of determination equal to the greater of (a) 1.00% per annum and (b)(i) the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source designated by the Agent); or (ii) if BBA LIBOR is not available for any reason, the per annum interest rate at which Dollar deposits would be offered by the Bank's London branch to major banks in the London interbank eurodollar market. If the Federal Reserve Board imposes a Reserve Percentage with respect to LIBOR deposits, then LIBOR shall be the foregoing rate, divided by 1, minus the Reserve Percentage.

"Lien" means: (a) any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute, or contract, and including a security interest, charge, claim, or lien arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes; (b) to the extent not included under clause (a), any reservation, exception, encroachment, easement, right-of-way, covenant, condition, restriction, lease or other title exception or encumbrance affecting property; and (c) any contingent or other agreement to provide any of the foregoing.

"Majority Letter of Credit Issuers" means at any date of determination Letter of Credit Issuers whose Pro Rata Shares aggregate more than 50%.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U  or X of the Federal Reserve Board.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, condition (financial or otherwise) of the Account Party and its Subsidiaries taken as a whole; (b) a material impairment of the Account Party's ability to pay any of the Obligations or pay or perform any of its other obligations in accordance with the terms of this Agreement or any other Letter of Credit Document; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Account Party of any Letter of Credit Document to which it is a party; or (d) a material impairment of the validity, extent or priority of the Agent's Liens on the Cash Collateral Accounts and the amounts on deposit therein or credit thereto.

"Multi-employer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by the Account Party or any ERISA Affiliate.

"Obligations" means all present and future liabilities, obligations, covenants, duties, and debts owing by the Account Party to the Agent, any Letter of Credit Issuer, the Bank or any Affiliate of the Bank, arising under or pursuant to this Agreement, any of the other Letter of Credit Documents or any of the Swap Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to the Account Party hereunder or under

any of the other Letter of Credit Documents. "Obligations" includes, without limitation, (a) all debts, liabilities, and obligations now or hereafter arising from or in connection with the Letters of Credit and (b) all debts, liabilities and obligations now or hereafter arising from or in connection with the Swap Documents.

"Other Subsidiary" means any Subsidiary of the Company other than the Account Party.

"Other Taxes" means any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Letter of Credit Documents.

"PBGC" means the Pension Benefit Guaranty Corporation or any Governmental Authority succeeding to the functions thereof.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA and Code Section 412 which the Account Party or ERISA Affiliate of the Account Party sponsors or maintains.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, Governmental Authority, or any other entity.

"Petition Date" means April 2, 2001.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) which the Account Party or any ERISA Affiliate of Account Party sponsors or maintains or to which the Account Party or any ERISA Affiliate of Account Party makes, is making, or is obligated to make contributions and includes any Pension Plan and Multi-employer Plan.

"Prime Rate" means the rate of interest announced by the Bank from time to time as its prime rate. Such rate is set by the Bank on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate. Any change in such rate announced by the Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"Pro Rata Share" means, with respect to a Letter of Credit Issuer, a fraction (expressed as a percentage), the numerator of which is the amount of such Letter of Credit Issuer's Commitment and the denominator of which is the sum of the amounts of all of the Letter of Credit Issuers' Commitments, or if no Commitments are outstanding, a fraction (expressed as a percentage), the numerator of which is the amount of Obligations owed to such Letter of Credit Issuer and the denominator of which is the aggregate amount of the Obligations owed to the Letter of Credit Issuers.

"Reportable Event" means, any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, other than any such event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the PBGC.

"Requirement of Law" means, as to any Person, any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or of a Governmental Authority, in each case

CH\1135197.12

029123-0013

applicable to or binding upon the Person or any of its property or to which the Person or any of its property is subject.

"Reserve Percentage" the reserve percentage (expressed as a decimal, rounded up to the nearest 1/8th of 1%) applicable to member banks under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to eurocurrency funding.

"Responsible Officer" means the chief executive officer, chief financial officer, any vice president or the president of the Company, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants and the preparation of the Borrowing Base Certificate, the chief financial officer or an assistant treasurer of the Company, or any other officer having substantially the same authority and responsibility.

"Stated Termination Date" means [_____]¹, 2011.

"Subsidiary" of a Person means any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than fifty percent (50%) of the voting stock or other equity interests (in the case of Persons other than corporations), is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of the Company.

"Swap Documents" means, collectively, that certain ISDA Master Agreement, dated as of _____, 2010, between the Account Party and the Bank, together with the Schedule thereto, each Annex to such Schedule, each Confirmation thereunder and each other document or instrument issued pursuant thereto or in connection therewith.

"Taxes" means any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of each Letter of Credit Issuer and the Agent, such taxes (including income taxes or franchise taxes) as are imposed on or measured by the Agent's or each Letter of Credit Issuer's net income in any jurisdiction (whether federal, state or local and including any political subdivision thereof) under the laws of which such Letter of Credit Issuer or the Agent, as the case may be, is organized or maintains a lending office.

"Termination Date" means the earliest to occur of (i) the Stated Termination Date, (ii) the date the Total Facility is terminated either by the Account Party pursuant to Section 3.1 or by the Majority Letter of Credit Issuers pursuant to Section 9.2, (iii) the date this Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of this Agreement and (iv) the Effective Date (as such term will be defined in the approved plan of reorganization in the Bankruptcy Case).

"Total Facility" has the meaning specified in Section 1.1.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in

---

¹ *This will be the date that is 365 days after the Closing Date.*

accordance with the assumptions used under Section 412(c) of the Code for determining whether the Pension Plan meets the minimum funding standards of Section 412 of the Code for the applicable plan year.

"Unused Letter of Credit Amount" means an amount equal to $100,000,000 minus the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit, plus, without duplication, (b) the aggregate unpaid reimbursement obligations due with respect to all Letters of Credit.

"Unused Line Fee" has the meaning specified in Section 2.4.

Accounting Terms. Any accounting term used in the Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the Financial Statements. If any change in generally accepted accounting principles subsequent to the date of this Agreement is material to either the Account Party or the Letter of Credit Issuers for the purpose of determining the Account Party' compliance with any covenant contained in this Agreement, then (A) such change shall not, without the consent of the Majority Letter of Credit Issuers, if such change makes such covenant less restrictive, or the Account Party, if such change makes such covenant more restrictive, be effective for the calculation of such covenant unless and until an amendment pursuant to clause (B) below with respect to such change and such covenant becomes effective, and (B) the Account Party and the Agent and the Letter of Credit Issuers agree to enter into negotiations, at the request of the Account Party or the Representative Letter of Credit Issuers, in order to amend such covenant so as equitably to reflect such change with the desired result that the criteria for evaluating the consolidated financial condition of the Company and its consolidated Subsidiaries shall be the same after such change as before such change.

Interpretive Provisions. (a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to the Agreement as a whole and not to any particular provision of this Agreement; and Subsection, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)    (i)    The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.

(ii)    The term "including" is not limiting and means "including without limitation."

(iii)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

(iv)    The word "or" is not exclusive.

(d)    Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of any Letter of Credit Document, and (ii) references to any

9

statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(e)     The captions and headings of the Agreement and other Letter of Credit Documents are for convenience of reference only and shall not affect the interpretation of this Agreement.

(f)     The Agreement and other Letter of Credit Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(g)     The Agreement and the other Letter of Credit Documents are the result of negotiations among and have been reviewed by counsel to the Agent, the Account Party and the other parties, and are the products of all parties.  Accordingly, they shall not be construed against the Letter of Credit Issuers or the Agent merely because of the Agent's or Letter of Credit Issuers' involvement in their preparation.

CH\1135197.12

029123-0013

EXHIBIT B

FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

This ASSIGNMENT AND ACCEPTANCE AGREEMENT (this "Assignment and Acceptance") dated as of _____, 201\_ is made between _____ (the "Assignor") and _____ (the "Assignee").

RECITALS

WHEREAS, the Assignor is party to that certain Post-Petition Letter of Credit Facility Agreement dated as of [_____], 2010 (as amended, amended and restated, modified, supplemented or renewed, the "Agreement") among W. R. Grace & Co., a Delaware corporation (the "Company"), and certain Subsidiaries of the Company which are signatory thereto (together with the Company, each a "Account Party" and collectively "Account Party"), the several financial institutions from time to time party thereto (including the Assignor, the "Letter of Credit Issuers"), and Bank of America, N. A., as agent for the Letter of Credit Issuers (the "Agent"). Any terms defined in the Agreement and not defined in this Assignment and Acceptance are used herein as defined in the Agreement;

WHEREAS, as provided under the Agreement, the Assignor has committed to issuing letters of credit for the account of the Account Party in an aggregate amount not to exceed $_____ (the "Commitment"); and

WHEREAS, the Assignor wishes to assign to the Assignee [part of the] [all] rights and obligations of the Assignor under the Agreement in respect of its Commitment in an amount equal to $_____ (the "Assigned Amount") on the terms and subject to the conditions set forth herein and the Assignee wishes to accept assignment of such rights and to assume such obligations from the Assignor on such terms and subject to such conditions;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

1.    Assignment and Acceptance.

(a)    Subject to the terms and conditions of this Assignment and Acceptance, (i) the Assignor hereby sells, transfers and assigns to the Assignee, and (ii) the Assignee hereby purchases, assumes and undertakes from the Assignor, without recourse and without representation or warranty (except as provided in this Assignment and Acceptance) \_\_% (the "Assignee's Percentage Share") of (A) the Commitment of the Assignor and (B) all related rights, benefits, obligations, liabilities and indemnities of the Assignor under and in connection with the Agreement and the Letter of Credit Documents.

(b)    With effect on and after the Effective Date (as defined in Section 5 hereof), the Assignee shall be a party to the Agreement and succeed to all of the rights and be obligated to perform all of the obligations of a Letter of Credit Issuer under the Agreement, including the requirements concerning confidentiality and the payment of indemnification, with a Commitment in an amount equal to the Assigned Amount. The Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Agreement are required to be performed by it as a Letter of Credit Issuer. It is the intent of the parties hereto that the Commitment of the Assignor shall, as of the Effective Date, be reduced by an amount equal to the Assigned Amount and the Assignor shall relinquish its rights

029123-0013

and be released from its obligations under the Agreement to the extent such obligations have been assumed by the Assignee; provided, however, the Assignor shall not relinquish its rights under Sections __ and __ of the Agreement to the extent such rights relate to the time prior to the Effective Date.

(c)    After giving effect to the assignment and assumption set forth herein, on the Effective Date the Assignee's Commitment will be $_____.

(d)    After giving effect to the assignment and assumption set forth herein, on the Effective Date the Assignor's Commitment will be $_____.

2.    Payments.

The Assignee agrees to pay to the Agent a processing fee in the amount specified in Section 11.2(a) of the Agreement.

3.    Reallocation of Payments.

Any fees and other payments accrued to the Effective Date with respect to the Commitment shall be for the account of the Assignor. Any fees and other payments accrued on and after the Effective Date with respect to the Assigned Amount shall be for the account of the Assignee. Each of the Assignor and the Assignee agrees that it will hold in trust for the other party any interest, fees and other amounts which it may receive to which the other party is entitled pursuant to the preceding sentence and pay to the other party any such amounts which it may receive promptly upon receipt.

4.    Independent Credit Decision.

The Assignee (a) acknowledges that it has received a copy of the Agreement and the Schedules and Exhibits thereto, together with copies of the most recent financial statements of the Company and its Subsidiaries, all applicable materials filed with the Bankruptcy Court and all applicable orders relating to the Bankruptcy Case as it has deemed appropriate, and such other documents and information as it has deemed appropriate to make its own credit and legal analysis and decision to enter into this Assignment and Acceptance; and (b) agrees that it will, independently and without reliance upon the Assignor, the Agent or any other Letter of Credit Issuer and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit and legal decisions in taking or not taking action under the Agreement.

5.    Effective Date; Notices.

(a)    As between the Assignor and the Assignee, the effective date for this Assignment and Acceptance shall be _____, 200_ (the "Effective Date"); provided that the following conditions precedent have been satisfied on or before the Effective Date:

(i)    this Assignment and Acceptance shall be executed and delivered by the Assignor and the Assignee;

[(ii)    the consent of the Agent required for an effective assignment of the Assigned Amount by the Assignor to the Assignee shall have been duly obtained and shall be in full force and effect as of the Effective Date;]

(iii)    the Assignee shall pay to the Assignor all amounts due to the Assignor under this Assignment and Acceptance;

[(iv)    the Assignee shall have complied with <u>Section 11.2</u> of the Agreement (if applicable);]

(v)    the processing fee referred to in <u>Section 2(b)</u> hereof and in <u>Section 11.2(a)</u> of the Agreement shall have been paid to the Agent; and

(b)    Promptly following the execution of this Assignment and Acceptance, the Assignor shall deliver to the Account Party and the Agent for acknowledgment by the Agent, a Notice of Assignment in the form attached hereto as <u>Schedule 1</u>.

6.    [<u>Agent</u>.  [INCLUDE ONLY IF ASSIGNOR IS AGENT]

(a)    The Assignee hereby appoints and authorizes the Assignor to take such action as agent on its behalf and to exercise such powers under the Agreement as are delegated to the Agent by the Letter of Credit Issuers pursuant to the terms of the Agreement.

(b)    The Assignee shall assume no duties or obligations held by the Assignor in its capacity as Agent under the Agreement.]

7.    <u>Withholding Tax.</u>

The Assignee (a) represents and warrants to the Letter of Credit Issuer, the Agent and the Account Party that under applicable law and treaties no tax will be required to be withheld by the Letter of Credit Issuer with respect to any payments to be made to the Assignee hereunder, (b) agrees to furnish (if it is organized under the laws of any jurisdiction other than the United States or any State thereof) to the Agent and the Account Party prior to the time that the Agent or Account Party is required to make any payment of principal, interest or fees hereunder, duplicate executed originals of either U.S. Internal Revenue Service Form W-8ECI or U.S. Internal Revenue Service Form W-8BEN (wherein the Assignee claims entitlement to the benefits of a tax treaty that provides for a complete exemption from U.S. federal income withholding tax on all payments hereunder) and agrees to provide new Forms W-8ECI or W-8BEN upon the expiration of any previously delivered form or comparable statements in accordance with applicable U.S. law and regulations and amendments thereto, duly executed and completed by the Assignee, and (c) agrees to comply with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

8.    <u>Representations and Warranties.</u>

(a)    The Assignor represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any Lien or other adverse claim; (ii) it is duly organized and existing and it has the full power and authority to take, and has taken, all action necessary to execute and deliver this Assignment and Acceptance and any other documents required or permitted to be executed or delivered by it in connection with this Assignment and Acceptance and to fulfill its obligations hereunder; (iii) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution, delivery and performance of this Assignment and Acceptance, and apart from any agreements or undertakings or filings required by the Agreement, no further action by, or notice to, or filing with, any Person is required of it for such execution, delivery or performance; and (iv) this Assignment and Acceptance has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignor, enforceable against the Assignor in accordance with the terms hereof, subject, as to enforcement, to bankruptcy, insolvency, moratorium, reorganization and other laws of general application relating to or affecting creditors' rights and to general equitable principles.

3

(b)    The Assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Agreement or any other instrument or document furnished pursuant thereto.  The Assignor makes no representation or warranty in connection with, and assumes no responsibility with respect to, the solvency, financial condition or statements of the Account Party, or the performance or observance by the Account Party, of any of its respective obligations under the Agreement or any other instrument or document furnished in connection therewith.

(c)    The Assignee represents and warrants that (i) it is duly organized and existing and it has full power and authority to take, and has taken, all action necessary to execute and deliver this Assignment and Acceptance and any other documents required or permitted to be executed or delivered by it in connection with this Assignment and Acceptance, and to fulfill its obligations hereunder; (ii) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution, delivery and performance of this Assignment and Acceptance; and apart from any agreements or undertakings or filings required by the Agreement, no further action by, or notice to, or filing with, any Person is required of it for such execution, delivery or performance; (iii) this Assignment and Acceptance has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignee, enforceable against the Assignee in accordance with the terms hereof, subject, as to enforcement, to bankruptcy, insolvency, moratorium, reorganization and other laws of general application relating to or affecting creditors' rights and to general equitable principles; [and (iv) it is an Eligible Assignee.]

9.    Further Assurances.

The Assignor and the Assignee each hereby agree to execute and deliver such other instruments, and take such other action, as either party may reasonably request in connection with the transactions contemplated by this Assignment and Acceptance, including the delivery of any notices or other documents or instruments to the Account Party or the Agent, which may be required in connection with the assignment and assumption contemplated hereby.

10.    Miscellaneous.

(a)    Any amendment or waiver of any provision of this Assignment and Acceptance shall be in writing and signed by the parties hereto.  No failure or delay by either party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof and any waiver of any breach of the provisions of this Assignment and Acceptance shall be without prejudice to any rights with respect to any other or further breach thereof.

(b)    All payments made hereunder shall be made without any set-off or counterclaim.

(c)    The Assignor and the Assignee shall each pay its own costs and expenses incurred in connection with the negotiation, preparation, execution and performance of this Assignment and Acceptance.

(d)    This Assignment and Acceptance may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

(e)    THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.  The Assignor and the Assignee each irrevocably submits to the non-exclusive jurisdiction of any State or

4

Federal court sitting in [New York, New York] over any suit, action or proceeding arising out of or relating to this Assignment and Acceptance and irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such State or Federal court. Each party to this Assignment and Acceptance hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.

(f)     THE ASSIGNOR AND THE ASSIGNEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS ASSIGNMENT AND ACCEPTANCE, THE CREDIT AGREEMENT, ANY RELATED DOCUMENTS AND AGREEMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALING, OR STATEMENTS (WHETHER ORAL OR WRITTEN).

IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Assignment and Acceptance to be executed and delivered by their duly authorized officers as of the date first above written.

**[ASSIGNOR]**

By: _____
Title: _____
Address: _____

**[ASSIGNEE]**

By: _____
Title: _____
Address: _____

CH\1135197.12                                                                029123-0013

SCHEDULE 1
to
ASSIGNMENT AND ACCEPTANCE

NOTICE OF ASSIGNMENT AND ACCEPTANCE

_____, 200_

Bank of America, N.A.
_____
_____
Attn: _____

Re:  [Name and Address of Account Party]

Ladies and Gentlemen:

            We refer to the Post-Petition Letter of Credit Facility Agreement dated as of [_____],
2010 (as amended, amended and restated, modified, supplemented or renewed from time to time the
"Agreement") among W. R. Grace & Co. and certain of its Subsidiaries (collectively, the "Account
Party"), the Letter of Credit Issuers referred to therein and Bank of America, N. A., as agent for the Letter
of Credit Issuers (the "Agent").  Terms defined in the Agreement are used herein as therein defined.

            1.      We hereby give you notice of, and request your consent to, the assignment by
_____ (the "Assignor") to _____ (the "Assignee") of _____% of the right,
title and interest of the Assignor in and to the Agreement (including the right, title and interest of the
Assignor in and to the Commitments of the Assignor and all outstanding Letters of Credit) pursuant to the
Assignment and Acceptance Agreement attached hereto (the "Assignment and Acceptance").  We
understand and agree that the Assignor's Commitment, as of _____, 200_, is $_____, the
aggregate amount of its outstanding reimbursement obligations with respect to Letters of Credit is
$_____.

            2.      The Assignee agrees that, upon receiving the consent of the Agent to such
assignment, the Assignee will be bound by the terms of the Agreement as fully and to the same extent as
if the Assignee were the Letter of Credit Issuer originally holding such interest in the Agreement.

            3.      The following administrative details apply to the Assignee:

            (A)      Notice Address:

                        Assignee name: _____
                        Address: _____
                                      _____
                                      _____
                        Attention:_____
                        Telephone: (___) _____
                        Facsimile: (___) _____

(B)    Payment Instructions:

Account No.:    _____
At:    _____
    _____
    _____
Reference:    _____
Attention:    _____

4.    You are entitled to rely upon the representations, warranties and covenants of each of the Assignor and Assignee contained in the Assignment and Acceptance.

IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Notice of Assignment and Acceptance to be executed by their respective duly authorized officials, officers or agents as of the date first above mentioned.

Very truly yours,

**[NAME OF ASSIGNOR]**

By:    _____

Title:    _____

**[NAME OF ASSIGNEE]**

By:    _____

Title:    _____

ACKNOWLEDGED AND ASSIGNMENT
CONSENTED TO:

Bank of America, N. A.
as Agent

By:    _____
Title:    _____

029123-0013

## SCHEDULE 1.1

## COMMITMENTS

| Letter of Credit Issuer | Commitment | Pro Rata Share (3 decimals) |
|---|---|---|
| Bank of America, N.A. | $100,000,000 | 100.000% |

## Exhibit B

**Form of 2010 ISDA Master Agreement**

# ISDA

**International Swaps and Derivatives Association, Inc.**

# 2002 MASTER AGREEMENT

dated as of     <u>December 22, 2009</u>

---

<u>**Bank of America, N.A.**</u>     and   <u>**W.R. Grace & Co. – Conn.**</u>

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting of Payments.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

2                                                                              **ISDA® 2002**

(4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)     *Liability.* If:—

(1)     X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)     X does not so deduct or withhold; and

(3)     a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

## 3.     Representations

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)     *Basic Representations.*

(i)     *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)     *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

ISDA® 2002

     (iii)     ***No Violation or Conflict.*** Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

     (iv)     ***Consents.*** All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

     (v)     ***Obligations Binding.*** Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    ***Absence of Certain Events.*** No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    ***Absence of Litigation.*** There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    ***Accuracy of Specified Information.*** All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    ***Payer Tax Representation.*** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    ***Payee Tax Representations.*** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)    ***No Agency.*** It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

**4.**     **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    ***Furnish Specified Information.*** It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

     (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

     (ii)     any other documents specified in the Schedule or any Confirmation; and

ISDA® 2002

(iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply With Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.     Events of Default and Termination Events

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)     *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)     *Breach of Agreement; Repudiation of Agreement.*

(1)     Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)     the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

5                                          **ISDA® 2002**

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)     *Credit Support Default.*

(1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)     the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)     *Misrepresentation.* A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)     *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)     defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)     defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)     defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)     disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

6                                                                                      **ISDA® 2002**

(vi)    *Cross-Default.* If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

    (1)    a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

    (2)    a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)    *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

    (1)    is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

ISDA® 2002

(viii)    *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

    (1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

    (2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

    (i)    *Illegality.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

        (1)    for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)    for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

    (ii)    *Force Majeure Event.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

        (1)    the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

ISDA® 2002

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)     such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)     *Tax Event.* Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)     *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)     *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)     X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

ISDA® 2002