```
                     UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

IN RE:                    .     Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .     USX Tower - 54th Floor
                          .     600 Grant Street
                          .     Pittsburgh, PA 15219
              Debtors.    .
                          .     January 4, 2010
. . . . . . . . . . . ..         9:01 a.m.
```

               TRANSCRIPT OF PLAN CONFIRMATION HEARING
                BEFORE HONORABLE JUDITH K. FITZGERALD
                UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               LISA G. ESAYIAN, ESQ.
                               JANET BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               DEANNA D. BOLL, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  PETER LOCKWOOD, ESQ.
                               NATHAN FINCH, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C. 20005


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

                    **J&J COURT TRANSCRIBERS, INC.**
                        **268 Evergreen Avenue**
                      **Hamilton, New Jersey 08619**
                    **E-mail:  jjcourt@optonline.net**

              **(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For W.R. Grace: | W.R. Grace & Co.<br>By: MARK SHELNITZ, ESQ.<br>      JAY HUGHES, ESQ.<br>7500 Grace Drive<br>Columbia, MD 21044 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By: ROGER FRANKEL, ESQ.<br>      JONATHAN GUY, ESQ.<br>      DEBRA FELDER, ESQ.<br>      PERI MAHALEY, ESQ.<br>      RICHARD WYRON, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C. 20007 |
| For Ford, Marrin,<br>Esposito, Witmeyer<br>& Gleser, LLP: | Ford, Marrin, Esposito, Witmeyer &<br>  Gleser, LLP<br>By: ELIZABETH M. DeCRISTOFARO, ESQ.<br>Wall Street Plaza, 23rd Floor<br>New York, NY 10005-1875 |
| For Arrowwood: | Wilson, Elser, Moskowitz, Edelman,<br>  & Dicker, LLP<br>By: CARL J. PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY 10017 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By: MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE 19701 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By: ANDREW K. CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ 07054 |
| For Morgan Stanley<br>Senior Funding, Inc.: | Katten Muchin Rosenman, LLP<br>By: JEFF FRIEDMAN, ESQ.<br>575 Madison Avenue<br>New York, NY 10022-2585 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Kaneb Pipe Line Operating Partnership, LP: | Gilbert & Renton, LLC<br>By:  ROBERT J. GILBERT, ESQ.<br>344 North Main Street<br>Andover, MA 01810 |
| For CNA: | Goodwin Procter, LLP<br>By:  MICHAEL GIANNOTTO, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For Libby: | Cohn Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom, LLP<br>By:  DAVID TURETSKY, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For Libby: | McGarvey, Heberling, Sullivan and McGarvey, P.C.<br>By:  JON HEBERLING, ESQ.<br>745 South Main<br>Kalispell, MT  59901 |
| For Garlock Sealing Technologies: | Robinson, Bradshaw & Hinson, P.A.<br>By:  GARLAND CASSADA, ESQ.<br>        RICHARD WORF, ESQ.<br>101 North Tryon Street<br>Suite 1900<br>Charlotte, NC  28246 |
| For the Unsecured Creditors' Committee: | Strook & Strook & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>        KENNETH PASQUALE, ESQ.<br>        LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For Andersen Memorial Hospital: | Kozyak, Tropin, Throckmorton<br>By:  DAVID L. ROSENDORF, ESQ.<br>2525 Ponce de Leon, 9th Floor<br>Miami, FL  33134 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For BNSF Railway:            Pepper Hamilton, LLP
                            By:  LINDA CASEY, ESQ.
                            3000 Two Logan Square
                            Philadelphia, PA  19103

For Maryland Casualty:      Connelly Bove Lodge & Hutz, LLP
                            By:  JEFFREY WISLER, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19899

For MCC & Zurich:           Eckert Seamans
                            By:  EDWARD D. LONGOSZ, ESQ.
                            1747 Pennsylvania Avenue, NW
                            Suite 1200
                            Washington, DC 20006

                            Wiley Rein, LLP
                            By:  RICHARD A. IFFT, ESQ.
                            1776 K Street NW
                            Washington, DC 20006

For Continental            Goodwin Procter, LLP
Casualty Co.:               By:  DANIEL GLOSBAND, ESQ.
                                 FREDERICK C. SCHAFRICK, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

For Long Acre Master       Pepper Hamilton
Fund:                       By:  DAVID FOURNIER, ESQ.
                            Hercules Plaza, Suite 5100
                            1313 Market Street
                            Wilmington, DE  19899

For the Equity             Kramer Levin Naftalis & Frankel
Committee:                  By:  DAVID E. BLABEY, JR., ESQ.
                            919 Third Avenue
                            New York, NY  10022

For One Beacon             Drinker Biddle & Reath LLP
Ins. Co., Geico,            By:  MICHAEL F. BROWN, ESQ.
Seaton Ins. Co.             One Logan Square
& Republic Ins. Co:         18th and Cherry Streets
                            Philadelphia, PA  19103

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For the PD FCR:             By:  ALEXANDER SANDERS


For State of Montana       Womble Carlyle Sandridge & Rice
Dept. of Environmental     By:  FRANCIS MONACO, ESQ.
Quality:                   222 Delaware Avenue, Suite 1501
                           Wilmington, DE 19801

For National Union Fire    Zeichner Ellman & Krause, LLP
Insurance Co.:             By:  MICHAEL DAVIS, ESQ.
                           575 Lexington Avenue
                           New York, NY  10022

For the Property           Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                           By:  MATTHEW KRAMER, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

For AXA Belgium:           Tucker Arensberg, P.C.
                           By:  MICHAEL A. SHINER, ESQ.
                           1500 One PPG Place
                           Pittsburgh, PA  15222

For the PD FCR:            Law Office of Alan B. Rich
                           By:  ALAN B. RICH, ESQ.
                           1401 Elm Street, Suite 4620
                           Dallas, TX  75202

TELEPHONIC APPEARANCES:

For the Debtors:           Kirkland & Ellis, LLP
                           By:  LISA G. ESAYIAN, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For the PD Committee:      Speights & Runyan
                           By:  DANIEL SPEIGHTS, ESQ.
                                MARION FAIREY, ESQ.
                                ALAN RUNYAN, ESQ.
                           200 Jackson Avenue, East
                           Hampton, SC  29924


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Fireman's Fund/     Stevens & Lee
Allianz:                By:  JOHN D. DEMMY, ESQ.
                        1105 North Market Street, 7th Floor
                        Wilmington, DE  19801

For Travelers:          Simpson Thacher & Bartlett LLP
                        By:  ELISA ALCABES, ESQ.
                             MARY BETH FORSHAW, ESQ.
                        425 Lexington Avenue
                        New York, NY  10017

For the Property        Bilzin Sumberg Baena Price &
Damage Committee:         Axelrod LLP
                        By:  SCOTT BAENA, ESQ.
                             JAY SAKALO, ESQ.
                        200 South Biscayne Boulevard
                        Suite 2500
                        Miami, FL  33131

For Serengeti:          Vinson & Elkins, LLP
                        By:  ARI BERMAN, ESQ.
                        Trammell Crow Center
                        2001 Ross Avenue, Suite 3700
                        Dallas, TX  75201

For Scott Company:      Vorys, Sater, Seymour & Pease, LLP
                        By:  TIFFANY COBB, ESQ.
                        52 East Gay Street
                        Columbus, OH  43216

For Official Committee  Brandi Law Firm
of Asbestos Property    By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:       44 Montgomery St., Suite 1050
                        San Francisco, CA  94104

For Official Committee  Bilzin Sumberg Baena Price &
of Asbestos Property      Axelrod LLP
Damage Claimants:       By:  TERRANCE EDWARDS, ESQ.
                        200 South Biscayne Boulevard
                        Suite 2500
                        Miami, FL  33131 For Official

For Official Committee  Lieff, Cabraser, Heimann & Bernstein
of Asbestos Property    By:  ELIZABETH J. CABRASER, ESQ.
Damage Claimants:       Embarcadero Center West
                        275 Battery Street, Suite 3000
                        San Francisco, CA  94111
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Dow Jones              Dow Jones News Wires
News Wires:                By:  PEG BRICKLEY

For the Debtors:           Kirkland & Ellis, LLP
                           By:  JUSTIN BROOKS, ESQ.
                                NATHANIEL KRITZER, ESQ.
                           Citigroup Center, 153 East 53rd St.
                           New York, NY  10022

For the Libby Claimants:   Cohn, Whitesell & Goldberg, LLP
                           By:  CHRISTOPHER M. CANDON, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For the Libby Claimants:   Landis, Rath & Cobb, LLP
                           By:  KERRI K. MUMFORD, ESQ.
                           919 Market Street, Suite 1800
                           Wilmington, DE  19899

For Normandy Hill          Normandy Hill Capital, LLP
Capital, LLP:              By:  MATTHEW CANTOR

For Long Acre Master       Pepper Hamilton
Fund:                      By:  JAMES C. CARIGNAN, ESQ.
                           Hercules Plaza, Suite 5100
                           1313 Market Street
                           Wilmington, DE  19899

For Federal Insurance      Cozen O'Connor
Company:                   By:  JACOB C. COHN, ESQ.
                           1900 Market Street
                           Philadelphia, PA  19103

For David T. Austern:      Lincoln International, LLC
                           By:  GEORGE COLES

For Firemen's Fund         Crowell & Moring LLP
Insurance Co.:             By:  LESLIE A. DAVIS, ESQ.
                                MARK PLEVIN, ESQ.
                           1001 Pennsylvania Avenue, N.W.
                           Washington, DC  20004

For Official Committee     Dies & Hile, LLP
of Asbestos Property       By:  MARTIN DIES, ESQ.
Damage Claimants:          1601 Rio Grande, Suite 330
                           Austin, TX  78701

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee      LECG
of Asbestos Property        By:  ELIZABETH DEVINE, ESQ.
Damage Claimants:           1725 Eye Street NW, Ste 800
                            Washington, DC,  20006

For Hartford Financial      Wilmer Wilmer Cutler Pickering Hale &
Service Group:               Dorr, LLP
                            By:  MELANIE R. DRITZ, ESQ.
                            399 Park Avenue
                            New York, NY  10022

For Garlock Sealing         Morris James LLP
Technologies:               By:  BRETT FALLON, ESQ.
                            500 Delaware Avenue, Suite 1500
                            Wilmington, DE  19801

For Halcyon Asset           Halcyon Asset Management
Management:                 By:  JOHN GREENE

For the Future              Orrick, Herrington & Sutcliffe,
Claimants                    LLP
Representatives:            By:  DEBRA FELDER, ESQ.
                                 KATE ORR, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007

For the Debtors:            Kirkland & Ellis, LLP
                            By:  ELLI LEIBENSTEIN, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Debtors:            Kirkland & Ellis, LLP
                            By:  CHRISTOPHER GRECO, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  10022

For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  ROBERT GUTTMANN, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022

For Federal Insurance       Cozen O'Connor
Company:                    By:  ILAN ROSENBERG, ESQ.
                            1900 Market Street
                            Philadelphia, PA  19103


                    **J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Debtors:            Kirkland & Ellis
                            By:  BARBARA HARDING, ESQ.
                            655 Fifteenth Street, N.W.
                            Washington, D.C.  20005

For the Bank Lender         Paul Weiss Rifkind Wharton &
Group:                         Garrison, LLP
                            By:  SARAH HARNETT, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019

For ZAI Claimants           Hogan Firm Attorneys at Law
& various law firms:        By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801

For Official Committee      Anderson Kill & Olick
of Asbestos Personal        By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:           1251 Avenue of the Americas
                            New York, NY  10020-1186

For Everest Reinsurance     Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:            By:  BRIAN L. KASPRZAK, ESQ.
                                 JOHN D. MATTEY, ESQ.
                            913 North Market Street
                            Suite 800
                            Wilmington, DE  19801

For W.R. Grace:             Onex Credit Partners
                            By:  STUART KOVENSKY

For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:        By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser
& Gleser:                   By:  SHAYNE SPENCER, ESQ.
                            Wall Street Plaza
                            New York, NY  10005

For Asbestos Property       Pryor Cashman, LLP
Damage Claimants:           By:  RICHARD LEVY, ESQ.
                            410 Park Avenue
                            New York, NY  10022

TELEPHONIC APPEARANCES (CONT'D):

For David T. Austern,        Lincoln International, LLC
Future Claimants'            By:  JOSEPH RADECKI
Representative:

For the Asbestos             Caplin & Drysdale, Chartered
Creditors Committee:         By:  JEFFREY A. LIESEMER, ESQ.
                                  WALTER SLOCOMBE, ESQ.
                             One Thomas Circle, NW
                             Washington, D.C. 20005

For Arrowwood                Bifferato Gentilotti LLC
Indemnity Co.:               By:  GARVAN McDANIEL, ESQ.
                             800 North King Street
                             Wilmington, DE  19801

For Official Committee:      Riker, Danzig, Scherer, Hyland &
of Asbestos Property          Perretti, LLP
Damage Claimants:            By:  TARA MONDELLI, ESQ.
                             Headquarters Plaza
                             One Speedwell Avenue
                             Morristown, NJ  07962

For W.R. Grace:              Pachulski, Stang, Ziehl & Jones
                             By:  JAMES E. O'NEILL, ESQ.
                             919 North Market Street, 17th Floor
                             Wilmington, DE  19899

For Various Claimant         Stutzman, Bromberg, Esserman & Plifka
Firms:                       By:  DAVID J. PARSONS, ESQ.
                             2323 Bryan Street,  Suite 2200
                             Dallas, TX  75201

For the Bank Lenders:        Paul Weiss Rifkind Wharton &
                              Garrison, LLP
                             By:  MARGARET PHILLIPS, ESQ.
                                  REBECCA ZUBATY, ESQ.
                                  ANDREW N. ROSENBERG, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019

For Grace Certain            Montgomery, McCracken, Walker &
Cancer Claimants:             Rhoads, LLP
                             By:  NATALIE D. RAMSEY, ESQ.
                             300 Delaware Avenue, Ste. 750
                             Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801-1246 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For the Official Committee of Asbestos Property Damage Claimants: | Hamilton, Rabinovitz & Alshuler<br>By:  FRANCINE RABINOVITZ<br>26384 Carmel Rancho Lane, Suite 202<br>Carmel, CA  92923 |
| For Asbestos Property Damage Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>1001 East Main Street, Suite 500<br>Sevierville, TN  37864 |
| For the U.S. Department of Agriculture: | U.S. Department of Justice<br>By:  MICHAEL SEW HOY |
| For Robert Siegel: | Traub, Lieberman, Strauss & Shrewsberry, P.C.<br>By:  ROBERT SIEGEL, ESQ.<br>Mid-Westchester Executive Park<br>Seven Skyline Drive<br>Hawthorne, NY  10532 |
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |

1          THE COURT:  This is the matter of W.R. Grace,

2   Bankruptcy Number 01-1139.  I have a list of participants by

3   phone.  Elisa Alcabes, Scott Baena, Janet Baer, Ari Berman,

4   David Bernick, David Blabey, Deanna Boll, Thomas Brandi, Peg

5   Brickley, Justin Brooks, Elizabeth Cabraser, Christopher

6   Candon, Matthew Cantor, James Carignan, Tiffany Cobb, Jacob

7   Cohn, George Coles, Andrew Craig, Leslie Davis, Michael Davis,

8   Elizabeth DeCristofaro, John Demmy, Elizabeth Devine, Martin

9   Dies, Melanie Dritz, Terrance Edwards, Lisa Esayian, Marion

10  Fairey, Brett Fallon, Debra Felder, Mary Beth Forshaw, David

11  Fournier, Theodore Freedman, Christopher Greco, John Greene,

12  Robert Guttmann, Barbara Harding, Sarah Harnett, Daniel Hogan,

13  Robert Horkovich, Brian Kasprzak, Stuart Kovensky, Matthew

14  Kramer, Nathaniel Kritzer, Lewis Kruger, Michael Lastowski,

15  Elli Leibenstein, Richard Levy, Jeffrey Liesemer, John Mattey,

16  Garvan McDaniel, Tara Mondelli, Kerri Mumford, James O'Neill,

17  Kate Orr, David Parsons, Margaret Phillips, John Phillips, Mark

18  Plevin, Francine Rabinovitz, Joseph Radecki, Natalie Ramsey,

19  Andrew Rosenberg, Ilan Rosenberg, Alan Runyan, Jay Sakalo,

20  Darrel Scott, Michael Hoy, Robert Siegel, Walter Slocombe,

21  Daniel Speights, Shayne Spencer, Theodore Tacconelli, Edward

22  Westbrook and Rebecca Zubaty.  Okay.  Now I'll take entries in

23  Court, please.

24          MR. BERNICK:  David Bernick for Grace.

25          MR. FINCH:  Nathan Finch for the ACC.

1          MR. GUY:  Good morning, Your Honor.  Happy New Year

2  to you and your staff.

3          THE COURT:  I'm sorry.  One second, please.

4                      (Pause)

5          THE COURT:  I'm sorry, Mr. Guy.  Go ahead.

6          MR. GUY:  Good morning, Your Honor.  Happy New Year.

7          THE COURT:  Thank you.

8          MR. GUY:  Jonathan Guy for the FCR.

9          MR. FRANKEL:  Good morning, Your Honor.  Roger

10 Frankel, also for the FCR.

11         MR. COHN:  Daniel Cohn for the Libby claimants.

12         MR. HEBERLING:  Jon Heberling for the Libby

13 claimants.

14         MR. ROSENDORF:  David Rosendorf for Anderson Memorial

15 Hospital.

16         MR. FREEDMAN:  Theodore Freedman, Your Honor, for

17 Grace.

18         THE COURT:  You need to use a microphone.  I'm sorry.

19         MR. FREEDMAN:  Theodore Freedman for Grace.

20         THE COURT:  Good morning.

21         MR. CASSADA:  Good morning, Your Honor.  Garland

22 Cassada here for Garlock Sealing Technologies.  With me is Rich

23 Worf.

24         THE COURT:  Thank you.

25         MR. MONACO:  Good morning, Your Honor.  Frank Monaco

**J&J COURT TRANSCRIBERS, INC.**

1  of Womble Carlyle for the State of Montana.

2          MR. PERNICONE:  Good morning, Your Honor.  Happy New

3  Year.

4          THE COURT:  Thank you.  Same to you.

5          MR. PERNICONE:  Carl Pernicone for Arrowwood.  And my

6  co-counsel, Mr. Schiavoni, is in transit.  He had some travel

7  problems.  He should be here around midday.

8          THE COURT:  All right.  Thank you.

9          MR. PERNICONE:  Thank you.

10          MR. DAVIS:  Good morning, Your Honor.  Michael Davis

11  for National Union Fire Insurance Company.

12          THE COURT:  Good morning.

13          MR. FOURNIER:  Good morning, Your Honor.  David

14  Fournier on behalf of Long Acre Master Fund.

15          MR. FRIEDMAN:  Good morning, Your Honor.  Jeff

16  Friedman on behalf of Morgan Stanley Senior Funding.

17          MR. SHINER:  Happy New Year, Your Honor.

18          THE COURT:  Thank you.

19          MR. SHINER:  Michael Shiner for AXA Belgium,

20  successor to Royale Belge.

21          MR. BROWN:  Good morning, Your Honor.  Michael Brown

22  on behalf of One Beacon America Insurance Company, Seaton

23  Insurance Company, Geico, and Republic Insurance Company.

24          THE COURT:  Good morning.

25          MS. DeCRISTOFARO:  Good morning, Your Honor.

1    Elizabeth DeCristofaro for Continental Casualty Company and

2    Continental Insurance Company and related companies.

3              THE COURT:  Good morning.

4              MR. GIANNOTTO:  Good morning, Your Honor.  Michael

5    Giannotto for Continental Casualty Companies and the other CNA

6    Companies.

7              THE COURT:  Good morning.

8              MR. GLOSBAND:  Good morning, Your Honor.  Dan

9    Glosband, also for Continental Casualty Company and related

10   companies.

11             MR. SCHAFRICK:  Good morning, Your Honor.  Frederick

12   Schafrick for Continental Casualty Company and related

13   companies.

14             MS. CASEY:  Good morning, Your Honor.  Linda Casey on

15   behalf of BNSF Railroad Company.

16             THE COURT:  Good morning.

17             MR. TURETSKY:  Good morning, Your Honor, and Happy

18   New Year.

19             THE COURT:  Thank you.

20             MR. TURETSKY:  David Turetsky of Skadden, Arps for

21   Sealed Air Corporation.

22             THE COURT:  Good morning.

23             MR. LEVY:  Good morning.  David Levy for the equity

24   committee.

25             MS. KRIEGER:  Good morning, Your Honor, and Happy New

1  Year.  Arlene Krieger from Strook & Strook & Lavan on behalf of

2  the unsecured creditors' committee.  Also in transit is my

3  colleague, Ken Pasquale.  He'll be here a little bit later.

4          THE COURT:  All right.  Thank you.  Good morning.

5          MR. CRAIG:  Good morning.  Andrew Craig for Allstate

6  Insurance Company.

7          THE COURT:  Good morning.

8          MR. SANDERS:  Good morning.  Alex Sanders, PD FCR.

9          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer,

10 Bilzin Sumberg, on behalf of the property damage committee.

11         MR. IFFT:  Good morning, Your Honor.  Richard Ifft on

12 behalf of Maryland Casualty Company.

13         MR. WISLER:  Good morning, Your Honor.  Jeffrey

14 Wisler on behalf of Maryland Casualty Company and Zurich.

15         MR. LONGOSZ:  Good morning, Your Honor.  Edward

16 Longosz on behalf of Maryland Casualty.

17         MR. GILBERT:  Good morning, Your Honor.  Robert

18 Gilbert on behalf of Kaneb.

19         THE COURT:  Mr. Lockwood, I'm just getting entries of

20 appearance.  Do you want to make yours while I've got you here?

21         MR. LOCKWOOD:  You caught me, Your Honor.  Peter

22 Lockwood for the ACC, Your Honor.

23         THE COURT:  Good morning.

24         MS. BAER:  Good morning, Your Honor.  Janet Baer on

25 behalf of Grace.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Any other people just walking in?  Good

2 morning.

3          MR. RICH:  Good morning.  Alan Rich for the Property

4 Damage FCR, Your Honor.

5          THE COURT:  Mr. Bernick?

6          MR. BERNICK:  Thank you, Your Honor, and Happy New

7 Years to the Court and --

8          THE COURT:  Thank you.

9          MR. BERNICK:  -- everybody here that supports the

10 Court's on-going efforts of this long but interesting case.  I

11 think that we can begin with the Libby segment of the closing

12 argument here this morning, which will probably, at least as

13 its scheduled, take the bulk of the morning.  Beyond that we're

14 still trying to work through how the next couple segments will

15 proceed.  And there have been some discussions.  I don't want

16 to get into it because it will just prompt more discussion

17 before it's really ripe for bringing before the Court, but

18 we're trying to make the process of talking through and arguing

19 the insurance and indirect claims part of the process here,

20 tried to make that more efficient.  After that we would deal

21 with Anderson Memorial, and then finally the lenders would go

22 last.

23          The idea is to, with respect to Libby, Anderson, and

24 the lenders, those are relatively easy categories to make out.

25 The fact that Libby doesn't say something -- has the

1 opportunity to speak at the outset, of course, doesn't preclude

2 them from speaking later on as to another issue that comes up,

3 but the idea is that all of Libby's specific issues would be

4 handled in the first segment, and so on and so forth.

5          So, unless there's some other matter that the Court

6 would like to raise with us, we're happy to start out with the

7 Libby segment of the argument, and proceed accordingly, and

8 then when it comes to the next segment we may have need for

9 some colloquy with the Court about how best to organize that

10 process.

11          THE COURT:  Okay.  I am not clear how the

12 modifications that were filed are -- except on the chart, the

13 chart that was filed by the debtor, the one I'm looking at was

14 dated December 16 --

15          MR. BERNICK:  Right.

16          THE COURT:  -- if there's a more recent one I haven't

17 seen it.

18          MR. BERNICK:  Right.

19          THE COURT:  Okay.  As to this one, sometimes the

20 response to the objections indicates that there has been an

21 amendment.  Sometimes it says it's going to be amended.

22          MR. BERNICK:  Yes.

23          THE COURT:  And then I did get the modifications.

24 But I'm not clear how those amendments will either fit into

25 this chart or change the nature of the objections.

1              MR. BERNICK:  Okay.

2              THE COURT:  So, as people are going through, I need

3   that clarification.

4              MR. BERNICK:  Yes.  We understand that, and indeed we

5   had thought maybe to start out with that, but it kind of gets a

6   little bit ahead of the process --

7              THE COURT:  I'm sure it does.

8              MR. BERNICK:  -- so we'll be sure to pick that up as

9   we proceed.  And if there are things that are left over that

10  really haven't been touched on during the course of argument,

11  then on a break or at an appropriate point in time during the

12  argument we can take them up, as is appropriate --

13             THE COURT:  All right.

14             MR. BERNICK:  -- from the Court's point of view.

15             THE COURT:  That's fine.

16             MR. BERNICK:  So, with that said, I think we're going

17  to start out with the Libby segment, and I think we're going to

18  try to do this, at least from the plan proponent's point of

19  view, try to do this throughout the course of the day.  We

20  understand that Your Honor has received mountains of paper, and

21  I know from my prior experience with the Court that as usual

22  you have devoured huge chunks of it, and already have a lot of

23  thoughts in your mind.  And our thinking, from the plan

24  proponents' point of view, is that in each segment we're going

25  to have very, very little to say at the outset, and allow the

1  objectors to stand and lay out their objections, which they've

2  already laid out in paper, but presumably we'll be able to

3  highlight and focus before the Court.  I'm sure that that will

4  provoke some degree of dialogue with the Court.  And then we're

5  going to try to save the bulk of our comments, to the extent

6  that we have comments, for a response.  That way we're not

7  simply covering the same ground twice.

8          Consistently with that, we only have a very brief

9  point to make about the Libby segment of this case at this

10  point in time, and I'm going to make those remarks, albeit when

11  we get to the substantive issues Mr. Finch is probably going to

12  be spending more time up here than will I.

13          But as a preliminary matter I think it's very

14  important to point out where the Libby issue now sits in the

15  broader context of the case, and how it's changed.  Your Honor

16  obviously knows that the Libby claimants represent a minuscule

17  portion of the principal constituency of creditors in this case

18  who are the bodily injury or personal injury claimants.  They

19  are a vanishingly small portion of that group.  And that

20  constituency, the larger constituency, as the principal

21  creditor constituency, after many, many years and a tremendous

22  amount of work, has now brought itself to the point that it's

23  satisfied with this plan, and has overwhelmingly voted in favor

24  of it.  And because it's satisfied and has voted overwhelmingly

25  in favor, their principal agenda at this point in time is to

1 see the integrity of the plan preserved and to get paid, to get

2 compensated.  So, the constituency of which Libby is a very,

3 very small part has spoken and expressed its will in this

4 matter.

5 The Libby claimants, as a small part of that

6 constituency, have, nonetheless, rights to say that the

7 majority is wrong, and the will of the majority should not be

8 dispositive.

9 And in service of making their arguments they've

10 basically committed to a position for a long time, which is

11 that they've been treated less favorably than they should be

12 vis-a-vis all of the other parts of the constituency who are

13 satisfied with the plan.  They are less favorably or unequally

14 treated.  And there are two essential prongs to that

15 contention.  One is that the medical criteria pursuant to which

16 the TDP is applied don't really capture and treat them fairly,

17 and treat them on an equal basis, and secondly, the scheduled

18 values in the TDP, again for severe pleural disease, are

19 unfavorable to them as opposed to everybody else.  That has

20 been their central contention throughout this case is that

21 they're -- notwithstanding the fact that they are a very small

22 group, they're not being treated appropriately.

23 We've now gone through literally thousands of hours

24 of litigation in order to explore what that contention is and

25 the predicates for that contention, and what we've seen during

1 the course, indeed of the trial in a very stark fashion, is

2 that contention has been completely debunked.  And I know that

3 we'll go through this again here today, but there is nothing

4 left of that contention after a tremendous amount of medical

5 work, a tremendous amount of scientific work, and exhaustive

6 and exhausting testimony.

7          One of the reasons that that effort, that contention

8 has failed has really nothing to do with the litigation

9 process.  It has to do with a fundamental effort that was

10 undertaken and has been persistently pursued by the asbestos

11 claimants creditors' committee throughout the course of dealing

12 with Libby.  And that effort has been, notwithstanding

13 differences of view about many of the contentions that the

14 Libby claimants have made, to try to accommodate the concerns

15 of the Libby constituency so long as it does not threaten the

16 integrity of the overall TDP process, which is now central to

17 scores of trusts all over the country.  And the ACC has been at

18 pains to respond to these concerns while balancing out the need

19 to preserve the integrity of the TD process at its core.

20          The efforts that have been pursued by the ACC were

21 undertaken before this plan was filed.  Your Honor has heard

22 about that.  They were undertaken and continued between the

23 time the plan was filed and the time the confirmation trial has

24 taken place.  And as Your Honor would imagine, those efforts to

25 try to respond to the concerns of the Libby constituency with

1  respect to the fairness of their treatment have continued

2  during the course of this trial, even indeed during the break

3  that's taken place.  But we're still here today.  The Libby

4  claimants are still here today, and their action by appearing

5  here today says it all, that they still want to pursue this

6  matter as a litigation matter notwithstanding the dialogue

7  that's taken place and the efforts that have been made to

8  respond to their concerns.

9          But the litigation now that they're still prepared to

10  commit to and to pursue is a very far advanced piece of

11  litigation, and their posture, the posture of the Libby

12  claimants, now has fundamentally changed.  The absence of a

13  discrimination case that has been borne out means that the

14  Libby claimants are no longer an abused minority that is

15  seeking to outweigh the will of the majority.  They are no

16  longer able to say we are the small constituency that has been

17  unfairly treated vis-a-vis all the tens of thousands of people

18  who are satisfied and want to get paid.

19          They are no longer able to say that the same

20  treatment is not being afforded, so why are they here?  They

21  are here now raising, and we'll see it with best interests, and

22  we'll see it with other contentions that they make, they have

23  their eye set on how the plan affects their leverage in the

24  post-confirmation litigation world that they want to pursue

25  against other people who are parties to this case.  This is not

1  a question of them versus the majority.  This is a question of

2  what are they going to do with respect to their own particular

3  agenda in pursuing insurance carriers and pursuing other people

4  that they want to continue to litigate against?

5          Now, that agenda may be totally legitimate, but it's

6  not the agenda of an abused minority anymore.  It is the agenda

7  of people who are basically prepared to say, well, we got kind

8  of what we wanted, but now -- when it comes to the other people

9  in the constituency, but now we kind of -- we have our eye now

10 set on a different world, a post-confirmation world, and this

11 now justifies their going after the plan even in ways, and

12 you'll see with the best interest argument, where they're

13 prepared even to denigrate the posture of future Libby demand

14 holders themselves in service of getting in the way of this

15 plan.  A very, very different enterprise.  And we feel very

16 strongly that what once appeared to be in a sense a noble quest

17 of a minority for fair recognition, they've gotten the fair

18 recognition, and they're now here with a theme that has to be

19 viewed in a very different kind of light.

20         With that we'll -- the plan proponents will rest our

21 argument and give the Libby claimants the chance to be heard.

22 Mr. Cohn is here, Mr. Heberling in a particularly snazzy tie,

23 and --

24         THE COURT:  It is.  Yes.

25         MR. BERNICK:  It's good.  It's good.  I don't know

1 whether that's lettuce, or melons, or cabbages, but they've got

2 great colors.

3          THE COURT:  Well, it sort of looked like Steeler

4 colors from here, but maybe that's not a word we want to say

5 until next year.

6                    (Laughter)

7          THE COURT:  Mr. Cohn?

8          MR. COHN:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10          MR. COHN:  Happy New Year.

11          THE COURT:  Thank you.  Same to you.

12          MR. COHN:  In presenting our case this morning, Your

13 Honor, we are not going to try to be comprehensive.  You've

14 received, obviously, hundreds of pages of briefs, and so we

15 refer you to the objections, we refer you to the briefs.  We

16 certainly do not, by omitting to address a particular point

17 this morning mean to waive it in any way.  What we're going to

18 do is to present you what we consider to be the points that

19 would most benefit from discussion with the Court.

20          The first point we want to address, Your Honor, is a

21 purely legal matter having to do with jury trial rights.

22 Obviously the right to a trial by jury is about as fundamental

23 a right as you can get.  And consistent with that, in Title 28

24 of the Judicial Code there appears Section 1411(a), whereby

25 Congress has decreed that nothing in Title 11 shall affect the

1  right to a trial by jury under non-bankruptcy law with regard

2  to a personal injury or a wrongful death tort claim.

3          Now, non-bankruptcy law in this case at the federal

4  level consists of, of course, the Seventh Amendment to the

5  United States Constitution, and at the state level the

6  claimants, the Libby claimants, have a similar right under the

7  Montana Constitution, Article 2, Section 26.  And the Supreme

8  Court has expressly recognized in the <u>Grand Financier</u> case that

9  Congress has explicitly provided for jury trials of personal

10  injury and wrongful death claims.

11          Now, the plan proponents do not deny that the right

12  to a jury trial exists with respect to personal injury and

13  wrongful death claims when the claim is being adjudicated for

14  purposes of distribution as it is, of course, in connection

15  with the trust distribution procedures.  Rather they argue,

16  first of all, that the Libby claimants have waived that right.

17          Now, the -- and the waiver argument, Your Honor, is

18  based on the fact that we are part of a constituency.  We were

19  placed in a class with other asbestos personal injury

20  claimants, and that class did indeed vote to accept the plan,

21  and the thesis is, well, but the trust distribution procedures

22  in effect contain limitations or waivers on the right to a

23  trial by jury, and we, by being part of that class, have waived

24  the jury trial right.  That contention, Your Honor, cannot

25  stand, first of all because of the statute itself.  Remember,

1  there's a provision of 28 U.S.C., the Section 1411, which says

2  that nothing in Title 11 shall affect the right to a trial by a

3  jury.  So, how can it be that trust distribution procedures

4  under Title 11 can affect the right to trial by a jury?

5        And second, how can it be that the voting procedures

6  under a plan can result in a group waiver of those rights?

7  Remember, this whole idea that the class has accepted the plan

8  arises under provisions of Chapter 11.  You have a disclosure

9  statement.  You have a plan.  It's put out for vote.  And the

10  -- and the voting process, of course, takes place under Title

11  11, Chapter 11, and the rights that are being waived are

12  actually very specific rights under the statute.  It's

13  basically the rights under 1129(b) that the class could

14  otherwise invoke by way of -- in a cram down situation you can,

15  under Section 1129(a)(8), waive those rights by voting in favor

16  of the plan.  But that's a limited series of rights.  There's

17  no mention of jury trials.  And even if there were, Your Honor,

18  of course, it would be superceded by Section 1411(a), which

19  says nothing in Chapter 11 could affect the right to a trial by

20  jury.

21        So, the waiver argument fails, first of all, as a

22  matter of statutory construction, but more broadly, Your Honor,

23  there is a whole series of cases out there that say -- that

24  deal with waivers of Constitutional rights such as the right to

25  trial by jury.  And those cases, which are cited in our brief,

1 establish that any waiver would have to be knowing and

2 voluntary.  The Libby claimants have not voted in favor of the

3 plan.  As you know we have been here objecting consistently

4 from the outset.  So, there would simply be no basis for this

5 Court to find that there was a voluntary waiver by the

6 individuals whose rights are purportedly being waived.

7        Now, the second argument, besides waiver, that the

8 plan proponents have advanced is that Section 524(g) in effect

9 requires that jury trial rights be overridden.  Now, first of

10 all, once again that is wrong as a matter of statutory

11 construction.  You have Section 1411(a) which says nothing in

12 Title 11 can affect the right to trial by jury.  So, Section

13 524(g) is part of Title 11, it therefore cannot affect the

14 right to trial by a jury.  So, it wouldn't matter what Section

15 524(g) says.  It cannot serve as a basis to limit jury trial

16 rights.  But there's also nothing in Section 524(g) that says

17 anything about jury trial rights.  What the plan proponents

18 pointed to is the mandate that does appear at Section 524(g)

19 whereby the -- any trust established under an asbestos plan

20 must value and pay present and future claims on as similar a

21 basis as possible.  And the plan proponents have argued,

22 although they haven't really explained why, but they've argued

23 that that provision somehow justifies overriding claimants'

24 jury trial rights.

25        Now, the first problem that that argument runs into

**J&J COURT TRANSCRIBERS, INC.**

1  is that it would be very simple to treat present and future

2  claims exactly the same by providing each group, for that

3  matter by providing all claimants individually, whether present

4  or future, with the right to elect a jury trial if they cannot,

5  after going through the elaborate procedures of the TDP, reach

6  agreement with the trust on the value of their claim.  So --

7          THE COURT:  Well, that would take the whole guts out

8  of 524(g).  I mean, what's the purpose if what you're going to

9  do is put everybody back into the jury trial system without

10 going through some trust distribution process?  What's the

11 purpose of 524 or the bankruptcy at all?

12         MR. COHN:  Well, the purpose, Your Honor -- the

13 purpose of Section 524(g) and the trust distribution procedures

14 is that if they are properly and fairly designed they will

15 presumably result in all claims, or almost all claims, being

16 resolved under the TDP.  There's nothing inherently more

17 attractive about a jury trial.  The trust -- remember, you have

18 a trust distribution procedures which say that what they're

19 trying to do is they're trying to measure the tort system value

20 of the claim, and then they're trying to value the claim

21 accordingly.  So, if the TDP serves that purpose and in fact

22 values a claim in its tort system value, why wouldn't a

23 claimant simply say okay, I'll take that without the time, and

24 the effort, and the expense of going to an actual jury trial?

25 This is actually paying me what the value of my claim is.

1        The problem for the Libby claimants is, of course,

2   and I'll get to this in detail in a moment, is that we believe

3   that the trust distribution procedures do not provide us with

4   the tort system value of our claims.  And for that reason we

5   do, indeed, care passionately about the fact that the TDP also

6   purports to take away our ultimate right as a backstop to be

7   able to go to the tort system itself to determine the tort

8   system value of our claims.

9        THE COURT:  So, your complaint isn't really that

10  you're being -- your clients are being deprived of a right to a

11  jury trial, because they can go get their jury trial in the

12  District Court, wherever the District Court determines, in the

13  event that the TDP processes aren't successful?  Your complaint

14  is that having gone through a jury trial the trust distribution

15  procedures limit the value that your clients will be paid?

16       MR. COHN:  That is correct, Your Honor.

17       THE COURT:  So, it isn't really that there's a jury

18  trial waiver.  It's that the cap -- the cap is the issue?

19       MR. COHN:  Well, Your Honor, that cap, what the cap

20  basically is is it says that whatever you would get under the

21  TDP serves as a cap of whatever you could be awarded by the

22  jury.  So, it would be --

23       THE COURT:  Well, no.  It says that's the cap on what

24  you're going to get paid.

25       MR. COHN:  Well, yes, Your Honor, but the point is

1  you've rendered the jury verdict meaningless if whatever amount

2  the jury awards, which is different from -- excuse me -- which

3  is greater than what the TDP awards you, simply gets ignored.

4          THE COURT:  But that's the only way that the trust,

5  or the debtor, or anyone else can assure some fairness to all

6  creditors, otherwise you might as well just be in the tort

7  system with a first come, first serve, drive the debtor into a

8  liquidation, and have whatever current claimants get their jury

9  trial awards paid first, and there won't be anything left for

10  anyone else.  It doesn't -- that -- the philosophy that you're

11  arguing runs contrary to the philosophy of 524.

12          MR. COHN:  Well, Your Honor, we disagree.  But let me

13  first start with the economic assumption that you're making,

14  which is that if everybody went to the tort system, then what

15  they would get are awards that cumulatively, I think you're

16  assuming, would exceed the amount that is being projected to be

17  paid by the trust in any event.  Remember, on a non-present

18  value basis the trust is projected to pay, like, nine or ten

19  billion dollars out to personal injury claimants over its

20  lifetime.

21          THE COURT:  Yes.  I'm not making the assumption that

22  there would be cumulative awards that would continually be

23  greater, award after award.  What I think the issue is is there

24  are hundreds of thousands of claims, and this jury trial right,

25  if it were granted the way you propose, wouldn't just enure to

1  Libby, it would enure to all personal injury claimants, and so

2  it would be back to the first come, first serve.  Whoever got

3  through the jury trial system first, that whatever awards they

4  had would be paid, and when the debtor ran out of money and

5  assets -- let me just say assets, then that would be the end.

6  The debtor would go out of business and nobody else would get

7  paid.

8          MR. COHN:  I'm sorry, Your Honor.  There would be a

9  personal injury trust.  We're not saying that there can't be a

10 trust.  We're simply saying that if a claimant didn't reach

11 agreement with the trust he would have the right to go have a

12 jury determine the value of his claim.  The value --

13          THE COURT:  He still has that right.

14          MR. COHN:  I'm sorry?

15          THE COURT:  The jury can determine the value of the

16 claim.  The issue is the fact that the trust isn't going to pay

17 it --

18          MR. COHN:  And then the trust --

19          THE COURT:  -- if it exceeds the distribution scheme.

20          MR. COHN:  And then the trust would be required to

21 pay the amount of the claim --

22          THE COURT:  But then it won't --

23          MR. COHN:  -- as determined by the jury.

24          THE COURT:  But then it won't be an equal

25 distribution for both the presents and the futures.  There is

1  no way that you could fund the trust that would determine, with

2  the vagaries of the Trial Court system, and project out how

3  many claimants would get what jury awards.  I mean, there can

4  be runaway juries, just like there can be juries that will

5  determine that a particular claimant doesn't have any right to

6  payment.

7         MR. COHN:  But what the TDP -- what all the

8  projections under the TDP are based on, purportedly, but this

9  was the testimony, Your Honor, is the tort system value of the

10 claims.  It's just that the TDP is purporting to pay that out

11 in an administratively --

12        THE COURT:  That's not the evidence exactly, the way

13 I heard it.  What I heard was that there were an estimate of a

14 number of claims.  There was an estimate of the maximum

15 liability.  There was a projection as to what initial

16 percentage would essentially apply.  There was, therefore, a

17 funding requirement for the trust, and the trust has an

18 obligation at various times to reassess whether that payment

19 percentage will continue to be applicable, or to adjust it to

20 make sure that entities who can claim through the trust will be

21 paid as equally as possible.  So --

22        MR. COHN:  Well, that's --

23        THE COURT:  -- you're talking tort system value, but

24 it's really based on settlement value.  Now, if you want to

25 talk about the tort system as the settlement value, okay, but

1  that's what the majority of the plan funding is based on.

2       MR. COHN:  Oh.  Your Honor, I think that's exactly

3  what tort system value is --

4       THE COURT:  Okay.

5       MR. COHN:  -- is the settlement value of claims in

6  the tort system, because if you think about it, Your Honor,

7  obviously anybody can go roll the dice and try and get a -- you

8  know, try and get a jury verdict.  If they've got a -- you know

9  -- if they've got a -- to just make it really simple, you know,

10 supposing they've got a claim which, if they succeed, is worth

11 $200,000, is likely to get a jury verdict of two hundred, but

12 if it fails they'll get a jury verdict of zero, and they've got

13 a 50 percent chance of success.  What the TDP has theoretically

14 done is said, okay, you can have $100,000, that's the

15 settlement value, and it did that by taking the pre-bankruptcy

16 settlement values --

17      THE COURT:  Right.

18      MR. COHN:  -- at least as a starting point, and

19 saying since this is what Grace did pre-bankruptcy, we're just

20 going to adjust that for various factors, bring it forward to

21 the present, and that's going to be what we do under the TDP.

22 And that's all well and good if they did it correctly, Your

23 Honor, if they did it fairly as to each group of claimants.

24 And our contention, which I'm going to discuss in a moment, is

25 that it was not done fairly as to Libby, but a more basic

1  contention, Your Honor, is that for all claimants they are

2  entitled to the safety valve of if they don't think it was done

3  fairly as to them they should -- and I say them, but really

4  it's individual rights, so any claimant who says it wasn't done

5  fairly as to me, the value that you're offering me under the

6  TDP is not what I think is the tort system value of my claim,

7  taking account of what I could get from a jury, but also the

8  risk that I might lose.  You haven't given me a fair settlement

9  here.

10         Any such claimant should have the right to go get a

11  jury verdict that is not capped by the terms of the TDP,

12  because remember, he's going out to the jury system.  He might

13  get a verdict of zero.  Well, that's fine.  That saves the

14  trust money.  So, some claimants, presumably, would do that.

15  Other claimants would go to the jury and they would actually

16  get a verdict.  And the average of those should, again, if the

17  trust has done its job right, or rather if the constituencies

18  here have done their job right in setting up and funding this

19  trust, the aggregate average of all those verdicts ought to be

20  no different from the settlement values that are projected in

21  the funding of the trust.

22         THE COURT:  Well, how would anyone know that?  I

23  mean, you settle for all kinds of reasons.  How would anyone

24  ever know that the settlement values, in fact, are mid-point

25  between zero verdicts and huge verdicts?

1           MR. COHN:  Well, Grace -- let me put it this way,

2   Grace had experience settling --

3           THE COURT:  Sure.

4           MR. COHN:  -- thousands and thousands of claims pre-

5   bankruptcy, and did so on the basis of what it certainly

6   believes -- and it did, of course, try some to a verdict.  And

7   by the way, got -- Grace got zero verdicts in about two-thirds

8   of the cases.  You heard that as part of the evidence, Your

9   Honor.  So, it's not as though there isn't, in fact, a great

10  deal of data having to do with this whole issue, which

11  supposedly was factored into the funding of the trust.

12          And we can accept that maybe it was factored in and

13  that the trust has been correctly, you know, funded in the

14  aggregate sense.  It's just that, as we're going to get to in a

15  moment, as to the Libby claimants we think it's unfair, and

16  therefore many Libby claimants will need to resort to a jury

17  trial.  And the point that we're making right here is that

18  regardless of the philosophy of 524(g), or regardless really of

19  anything else that has to do with Chapter 11 and Title 11,

20  there is an unequivocal right under 28 U.S.C. Section 1411(a)

21  for us to be able to have jury trials and have those jury

22  trials be meaningful, in other words, not capped.  Remember,

23  the words of the statute are -- 1411(a) says you can't affect

24  the right to a jury trial.  Well, it certainly affects the

25  right to a jury trial to say that if you get a verdict that

1 exceeds some amount determined under the TDP we're going to

2 ignore that in determining value of your claim.  That affects

3 the right to jury trial.

4           THE COURT:  This argument simply cannot be justified

5 in light of 524 and a trust distribution process because there

6 is no way to factor in, if you're going to send everybody back

7 into the tort system, who would choose a jury trial with no cap

8 and who wouldn't.  Why would anybody take a cap unless they

9 felt that for some reason their case was worth so little that

10 the cap was actually more than they would recover in a jury

11 trial.  And as to virtually everyone with some indication of

12 illness, and in the past even those without an indication of

13 illness, there would not be a reason to go to the trust.

14 There's no way you could fund the trust.  How could you

15 possibly estimate the amount that the trust would need in those

16 circumstances?  And if you could, I don't have any evidence of

17 it, so that's the big problem, because the only evidence I have

18 is the way this trust was funded.  I don't have anything that

19 tells me what the procedures could be like or whether the trust

20 is funded in the event that everybody were once again left to

21 the jury trial system.

22           MR. COHN:  Well, I'm going to take your multiple

23 questions a little bit out of order if I may, Your Honor?

24           THE COURT:  Okay.

25           MR. COHN:  But the answer to the last one is that

1  since the plan proponents have the burden of proof here, that

2  if there's been a failure of proof to establish that some

3  requirement which does exist under 28 U.S.C. Section 1411(a),

4  there hasn't been proof that this trust can meet its

5  obligations when that statutory requirement is factored in,

6  then that's a failure of proof by the plan proponents.

7  THE COURT:  Well, let me assume for a moment that

8  somehow or other they could prove a negative, and I don't know

9  how they do, but let me assume they can, which is that

10  everybody has the right to a jury trial, that the juries are

11  going to come back in some fashion with verdicts that would be

12  "X" dollars, so now we're looking at a different tort system

13  measure than settlements.  We're looking at jury verdicts,

14  because that's what the trust would have to assume.  It would

15  have to assume that every person may opt for a jury trial and

16  that the jury trial would result in some maximum verdict for

17  everyone in order to adequately fund the trust.

18  MR. COHN:  Well --

19  THE COURT:  That takes the whole purpose of 524(g)

20  and the ability of the debtor to deal with its asbestos

21  liabilities away.

22  MR. COHN:  If Grace got defense verdicts in two out

23  of three cases, why would you assume that now the world is

24  going to change and that now they're going to be plaintiffs'

25  verdicts?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Fine.  I'll assume that they're only

2  going to be a third verdict for -- for plaintiffs as opposed to

3  not.  The -- it doesn't matter -- the numbers don't matter.

4  The estimation is what matters.  And I'm trying to get to how

5  to come to grips with the estimations.

6          MR. COHN:  Well, but just -- if I could just stay

7  with the numbers for a second, then I'll come back to your

8  point about how you would manage a trust under those

9  circumstances --

10          THE COURT:  How you fund it.

11          MR. COHN:  No -- I understand, Your Honor.  I

12  understand that that's the question.  But as to the numbers,

13  given Grace's experience in settling, you know, tens of

14  thousands of claims pre-bankruptcy, the reason that people

15  settled pre-bankruptcy, remember when they had no trust

16  distribution procedure that, you know, that even set forth this

17  elaborate process, which is designed to facilitate settlements,

18  but even without the benefit of that formal structure, Your

19  Honor, the vast majority of the claims against Grace settled.

20  Why did they settle?  Because it's advantageous to all sides to

21  settle and save the cost of litigation if the settlement

22  reflects the genuine tort system value, settlement value, as

23  you said earlier, of the claims.  And statistically we know

24  what those settlement values are because of Grace's experience

25  in settling those tens of thousands in claims, and you can --

1  and so therefore we have a very good idea what the aggregate

2  funding is needed for the trust.  Your point I think is, yeah,

3  but how do you know -- how do you plan for the contingency that

4  maybe it turns out that there are more high verdicts than you

5  would otherwise have projected based on Grace's pre-bankruptcy

6  experience?  And the answer there is that you do what is done

7  in so many other contexts in this life.  It may be that when

8  the trust projects that it's going to pay 25 to 35 cents, it

9  may be that it's only able to pay 25 cents now, and have to

10 reserve for the possibility of a supplemental distribution when

11 it becomes clear, based on the actual performance of the trust

12 and the actual payment of claims, that the additional five or

13 ten cents is going to be there.  It may be that that's how a

14 trust wouldn't have to be set up.  I'm not even sure that it

15 would have to be that way, Your Honor, but --

16         THE COURT:  But you're telling me there wouldn't be a

17 cap.  Under your view of the world the jury verdict would be

18 paid, whatever the jury verdict is.

19         MR. COHN:  Correct.

20         THE COURT:  Without a cap.  So, the trust can't

21 anticipate that it's going to pay a 25 percent distribution

22 because it's going to have to pay a hundred percent

23 distribution, which -- even Chapter 11 allows the debtor,

24 without the benefit of 524, to figure out what its liquidation

25 value is --

1          MR. COHN:  Well --

2          THE COURT:  -- and only commit that amount to pay all

3  creditors in a class.  What you're really arguing is that Libby

4  belongs in a separate class and should be treated entirely

5  differently with different rights and better benefits than the

6  rest of the unsecured personal injury claimants.  That's really

7  what your fundamental argument is.

8          MR. COHN:  Well, when you say that's our fundamental

9  argument, Your Honor, that would be a solution that would

10 enable us to accept the plan even with limitations on jury

11 trial rights.

12         THE COURT:  Well, it may enable Libby to accept the

13 plan if its claims are all going to go to jury trials and be

14 paid a hundred cents on the dollar, but what about the other

15 150,000 claimants?

16         MR. COHN:  Well, wait.  Wait, Your Honor.  First of

17 all, there's a distinction between going to a jury to determine

18 the value of your claim and getting paid a hundred cents on the

19 dollar.  No one is suggesting that when you say that you have a

20 right to a jury trial and you have a right to an uncapped

21 verdict, no one is saying that that uncapped verdict gets paid

22 in hundred cent dollars by the P.I. trust.  It gets paid at the

23 same pay rate that everybody else is being paid.  And that's --

24 the going to the jury is simply a way to liquidate the value of

25 the claim.

1          THE COURT:  I don't --

2          MR. COHN:  It's not a way -- it doesn't define what

3  you have --

4          THE COURT:  Then I'm missing the argument because

5  this trust already -- assuming that all the settlement

6  mechanisms in the trust fail, and the Libby -- a Libby claimant

7  wants a jury trial, that Libby claimant would go to the

8  District Court.  Let's assume there's a jury trial.  There

9  would be a verdict of whatever dollars.  And the trust would

10  then look at the level of the claim and pay according to the

11  TDP.  So, if what you're saying is that you'd get a jury

12  verdict but you'd only get paid according to what the trust

13  distribution process would provide for other claimants, that's

14  already in here.

15          MR. COHN:  No, Your Honor.  Let me --

16          THE COURT:  Then I'm lost.  I'm sorry.

17          MR. COHN:  Okay.  Then -- the trust -- there are

18  basically two key numbers for any particular claimant under the

19  trust.  One is the liquidated value of his claim, and the other

20  is the payment percentage that is established under the trust

21  for all --

22          THE COURT:  Oh.  I see.  Instead --

23          MR. COHN:  -- for all claimants.

24          THE COURT:  -- of the cap you'd expect -- let's say

25  the verdict is $2 million, you'd expect that if the trust

1    estimated a 25 percent distribution, they would be paid 25

2    percent of their $2 million verdict rather than the cap --

3            MR. COHN:  Yes.

4            THE COURT:  I see.

5            MR. COHN:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MR. COHN:  Because the right to a jury trial in this

8    context is solely to be able to determine the value of the

9    claim, but not to permit you to get any more favorable payment

10   percentage than the rest of the group is getting.

11           THE COURT:  All right.  I understand now.  I

12   apologize for missing the point before.

13           MR. COHN:  Okay.  In that case, Your Honor, let's

14   turn to the issue of discrimination against the Libby

15   claimants.  And here, Your Honor, we need to start off talking

16   about the Combustion Engineering case, and that's obviously a

17   hugely important case for a number of different holdings, so I

18   want to focus right now on the aspect of the case that we were

19   talking about when we used it as the basis for our

20   discrimination argument.

21           What the Court said -- and this discussion, by the

22   way, takes place, mercifully, Your Honor, over five pages.

23   It's Pages 239 to 242 of the decision.  All the other stuff

24   about injunctions that we've dealt with in the past and various

25   other issues is just not pertinent to the anti-discrimination

1  argument.  What the Court said is that equality of distribution

2  among creditors is a central policy of the Bankruptcy Code.

3  And it said of a plan that even though it complies with the

4  literal terms of the Bankruptcy Code, a plan may impermissibly

5  discriminate against certain asbestos personal injury

6  claimants, and that that's the inquiry that the Court must make

7  is whether, notwithstanding compliance with the literal

8  requirements of the Bankruptcy Code, there is impermissible

9  discrimination against a minority, really, of asbestos personal

10  injury claimants.  It goes without saying if the majority were

11  being adversely affected they would vote against the plan and

12  that would solve the problem.  So, what you're looking out for,

13  Your Honor, are the rights of just such a minuscule, in Mr.

14  Bernick's word, minority, like the Libby claimants.

15         And I would point out, Your Honor, as you know from

16  our briefs, we have argued that this plan doesn't even meet the

17  literal requirements of the Bankruptcy Code, namely Sections

18  1122(a) concerning classification and Section 1123(a)(4)

19  concerning equality of treatment of claims within a particular

20  class.  But that's not the standard set by Combustion

21  Engineering.  Combustion Engineering says you could even meet

22  the standards of 1122(a) and 1123(a)(4) in an asbestos case but

23  you would still have to look at discrimination within the

24  asbestos class.  And I think implicit in that, Your Honor,

25  might be some notion that asbestos claims don't fit neatly into

1 the statutory scheme of 1122(a) and 1123(a)(4) because there

2 are such a wide breadth of different characteristics of such

3 claims, so when they get thrown into a class it's the Court's

4 job to see that there's no group within that class that's being

5 discriminated against.

6        Now, another -- now, the analysis in <u>Combustion</u>

7 <u>Engineering</u>, by the way, took place in this context, Your

8 Honor.  You might recall one of the major features of the case

9 was that two-tier structure whereby certain claims had been

10 settled pre-bankruptcy and then were also going to participate

11 in the distribution under the trust, and that was one of the

12 two things the Court was talking about in this section of its

13 opinion and which prompted that -- those pronouncements that I

14 just described, but there was another contention, as well, and

15 I want to make sure that we're clear that this was also what

16 the Court was dealing with, and this was also the basis for the

17 remand that was the punch line, if you will, in <u>Combustion</u>

18 <u>Engineering</u>.  The Court was inquiring, and it was considering

19 whether -- this is a quote -- "whether the most seriously

20 injured asbestos claimants received fair treatment under the

21 plan."  So, the cancer claimants were making the argument not

22 just that the two-tiered structure was unfair, but that they --

23        MR. BERNICK:  Could we have just a page cite for

24 those two quotes?

25        MR. COHN:  The page cite would be 239 for both of

1  them.

2          MR. BERNICK:  F.R.D. -- 239?

3          MR. COHN:  Excuse me.  The first -- when I was

4  talking about equality of distribution and that even though it

5  complied with literal terms, that's at Page 239.  What I just

6  read about whether the most seriously injured asbestos

7  claimants received fair treatment under the plan, that's at

8  Page 242.

9          MR. BERNICK:  Got it.  Thank you.

10          MR. COHN:  And so here too, really, the Libby

11  claimants are raising what is effectively an identical issue,

12  which is whether they, as holders of claims, that for reasons

13  that I'm about to discuss have a higher value than the vast

14  majority of the claims that are in the P.I. class, the issue is

15  whether our claims are being discriminated against by reason of

16  the provisions of the TDP.

17          Now, another preliminary observation about Combustion

18  Engineering.  It could have been argued -- it could have been

19  argued, somebody could have said to the cancer claimants, hey,

20  wait a second, what are you complaining about?  You've got a

21  TDP that sets up these disease categories, and it says

22  everybody in a particular disease category is being treated the

23  same way.  And to the extent that they elect individual review,

24  or do whatever else they do, everybody is governed by the same

25  provisions.  In fact, we've heard that argument here.  It's the

1  argument that seems to get raised every time the Libby

2  claimants talked about discrimination the plan proponents

3  respond, wait a second, we're treating everybody that way.  In

4  Combustion Engineering that argument, you know, obviously was

5  not sufficient to keep the Court from saying, no, you have to

6  examine the actual issue of whether it discriminates against

7  this particular group of people.  So, it's not as simple as

8  just saying that since the same provisions of the same TDP

9  govern all claims, you know, by definition there's no

10  discrimination.

11          Now, with that, Your Honor, I'd like to turn to the

12  first respect in which we assert that the plan discriminates

13  against Libby claimants, namely by undervaluing their claims in

14  relation to their established tort system value.  In that

15  regard, Your Honor, if I might hand you a sort of crib sheet

16  for the TDP values?  It's just an easy way to see them all on

17  one page.

18          THE COURT:  All right.

19                  (Pause)

20          THE COURT:  Thank you.

21          MR. COHN:  As you see from the crib sheet, Your

22  Honor, there are three disease categories that are relevant

23  here.  When I say relevant, it's because what we're talking

24  about are non-malignant claims, and so I've excluded all of the

25  cancer categories.  And also I excluded that administrative

1  convenience category for a very small value of claims.

2        And you'll see that for each of those three levels,

3  severe, moderate and mild, you have a scheduled value.  That's

4  the value that anybody can elect under expedited review if they

5  meet the expedited review criteria for the particular disease

6  level.  Then, if they elect individual review they can get the

7  figure -- up to the figure that's in the next column, which is

8  the maximum value.  And then, finally, if they meet the

9  criteria for treatment as an extraordinary claim, Your Honor,

10 they can get up to eight times the scheduled value.  So, when

11 you multiply the figure in the far left hand column by eight,

12 you get what's there in that final right hand column.

13       And you cannot, under the TDP, ever get more than the

14 figure in the far right hand column.  Indeed, if you don't meet

15 the very specific criteria for extraordinary claim treatment,

16 then you cannot get more than the maximum value that's in the

17 middle column.

18       Now, what the evidence showed, Your Honor, was that

19 Grace settled nearly 200,000 asbestos P.I. claims pre-petition,

20 and the average settlement of those claims was approximately

21 400 -- was about $4,000.  4,000.  Libby non-malignant claims --

22 for Libby non-malignant claims what LC Exhibit 270 indicates is

23 that the average settlement value was $234,000.  Average for

24 Libby non-malignant claim.  Now, there's other evidence that

25 would indicate that that figure is low.  For today, Your Honor,

1  I'm going to argue based on the $234,000 figure because as

2  you'll see when you look at that exhibit it's a Grace document,

3  and we assume that there's no -- there will be no contest about

4  the figure, so we might as well not have an argument about that

5  because the $234,000 figure frankly makes the point well enough

6  for today's purposes.

7          Now, even mesothelioma claims in the pre-bankruptcy

8  period settled for less than half the average value of the

9  Libby non-malignant claims, to give you an idea of how high

10  value the Libby claims were in the pre-bankruptcy process.

11          Now, at our request Dr. Whitehouse took a look at the

12  medical records for 19 of those pre-petition settlements.

13  Those are patients for whom we had medical records of their

14  condition at the time of settlement.

15          MR. BERNICK:  Could we have the exhibit that's being

16  referenced?

17          MR. COHN:  Yes.  It's 16.  LC Exhibit 16.  And those

18  claimants settled for an average of $450,000.

19          MR. BERNICK:  Your Honor, we object to this.  The

20  evidence of the settlement values on that exhibit I believe was

21  redacted and stricken.  It's an improper use of the exhibit.

22  There wasn't a foundation for that comparison.  We went through

23  this ad nauseam.  So, there's now a citation to something that

24  I don't think is in Evidence in the case.

25          MR. COHN:  And by the way, I believe that while that

1  is, I think, literally correct in the sense that that exhibit

2  was not permitted to include the settlement values, you can

3  match the names of the settling parties against Libby Exhibit

4  -- LC Exhibit 270, which I just referred to, which has all the

5  pre-bankruptcy settlements.  And when you match the name

6  against the settlement amount you get that information in a way

7  that has been admitted into Evidence.

8          MR. BERNICK:  Well, no.  That's the whole reason that

9  that portion of the exhibit was not admitted into Evidence is

10 that that comparison, that is a comparison purported to link

11 that chart, which had medical information, to settlement values

12 had no foundation, and the chart itself was a lawyer-created

13 document.  Remember?  That's the one that was just the chart?

14 So, Dr. Whitehouse said the names on it were picked by the

15 lawyers.  All that we have now is an argument from counsel as

16 to which there is no evidence in the case that says that those

17 settlement numbers can properly be linked to the selection of

18 those particular cases.  This is counsel offering expert

19 opinion that was not permitted, and he's just recognized the

20 fact the document was not admitted for that very reason.

21         MR. COHN:  And, Your Honor, let me ask you this,

22 which is that if indeed -- obviously when you go back and

23 examine the record, if you conclude that Mr. Bernick's

24 contention is correct, then I suppose what you should just do

25 is ignore what I'm going to say for the next 120 seconds.  But

1  maybe what we should do right now is at least have --

2        THE COURT:  I'll hear it, Mr. Cohn, but my

3  recollection is, as Mr. Bernick is relating it now, that it was

4  not permitted into Evidence because there was no evidence

5  before me that indicated at the time that those particular 19

6  individuals were representative of the entire group of

7  settlements, and as a result I thought it was picking and -- it

8  appears that it's picking and choosing.  I don't know how that

9  19 links up with everybody else.  I'll hear your argument

10  because this is the time to do it, but I think, in the long

11  run, I'm not going to pay attention.

12        MR. COHN:  But -- let me acknowledge, by the way,

13  Your Honor, that because of limitations on who we could get

14  records for, and so on and so forth, that exhibit does not

15  purport to be representative in the sense of some kind of a --

16  you know, a sample that if you multiplied it by three, let's

17  say -- let's say that's the total number of settlements, that

18  you would find that all that I'm about to say is true of the

19  entire group.  We're not saying that it is, Your Honor, so you

20  should take this simply as observations about those particular

21  individuals, and as I say, all the pieces of evidence are in

22  place as to those individuals.  What is simply not in place

23  from an evidentiary standpoint is any kind of an overall, you

24  know, kind of representative statement.

25        THE COURT:  But it has to be linked to a

1  representative statement to figure out the average value.  I

2  mean, taking the average of 19 people and saying that it's

3  representative of the whole, you know, 700 claims, is different

4  from saying that it's representative of those 19 but not linked

5  to the other 700 claims.

6        MR. COHN:  Let's just say it's representative to the

7  19.  It's not linked to the others.  And here's the important

8  point, Your Honor.  These are people, if you even say, well,

9  they're at the high end of what the evidence would show because

10  the evidence is showing an average settlement of 234,000, these

11  19 people got settlements of $450,000, and let's just take them

12  as a group of people who, by definition, are at the high end of

13  the settlement range, and just say nothing more about them than

14  that, not representative of anything else other than

15  themselves.

16        MR. BERNICK:  You can't even make that statement.

17  All that they are are people who were picked, so they're just

18  nothing in terms of high, medium, low.  They're just nothing.

19  This is, again, an argument from counsel that essentially

20  should have been in the form of an admissible expert opinion.

21  We went through this God knows how many times in connection

22  with the pre-trial process of whether they were going to have

23  such an expert.  Originally they were going to call the lawyers

24  to do it.  They decided not to do that.  So, this is just

25  purely -- this goes down the very road where they made a

1  decision not to go.

2         MR. COHN:  Well, Your Honor, whether or not you take

3  this argument as being based upon the fact that that exhibit

4  shows that of those 19, 14 of them were mild to moderate, even

5  by their own physician's diagnosis.  Okay?  So, you can take it

6  for that as to these 14, or -- or, if you're not comfortable

7  doing that, based on -- you know, based on the evidentiary

8  record, then all we need to say is there are such people.

9  There are people who have mild cases, and there are people who

10 have moderate cases, and those people are capped under the

11 chart that we just showed you.  They are capped at, at most,

12 even with the extraordinary claims status, at $20,000 or

13 $60,000, respectively, whether they're at Level 2 or Level 3,

14 under the TDP.  They're capped even though -- even though they

15 got pre-bankruptcy settlements of these much larger amounts.

16 And so --

17        THE COURT:  Yes.  I understand that argument.  I

18 think the disconnect that I'm having, I believe, is as I recall

19 the evidence, Grace's settlement history, non-Libby, excluding

20 Libby, was based on the fact that there were other sources for

21 those particular individuals to claim against, and that Grace's

22 liability was essentially not a hundred percent liability.

23        MR. COHN:  Yes, Your Honor.

24        THE COURT:  So, the settlement value that Grace would

25 reflect wasn't the overall settlement value that the claimant

1  would have accepted from all contributing tortfeasors.

2          MR. COHN:  Yes, Your Honor.

3          THE COURT:  In Libby's case, in most instances the

4  evidence would show that the work at the Libby mine, I don't

5  mean by individuals, I just mean the product coming out of the

6  Libby mine, was largely the cause of whatever asbestos disease

7  is out there.  And so, the settlement values for those

8  individuals against Grace would necessarily be higher than the

9  settlement values for other non-Libby claimants against Grace

10 because they had other sources to look to, and these folks

11 didn't.  That's the reason the extraordinary factor, claims

12 treatment factor, has been added to the TDP to allow for the

13 fact that there will be circumstances, such as the one I've

14 just articulated, by which claimants will be able to say to

15 Grace, if we were in the tort system you would be the only man

16 standing.

17         MR. COHN:  Right.  It's --

18         THE COURT:  And so we should get a higher value.

19         MR. COHN:  Your Honor, that's -- what you've said I

20 agree with, except for there are two points that I need to add.

21         THE COURT:  All right.

22         MR. COHN:  One is it was not for the other claimants,

23 the vast majority of claimants, who were people who were

24 exposed to Grace's products.  The issue is not simply that they

25 had other sources of recovery.  The issue was that in a

1 fundamental, you know, tort system value sense, they had low

2 value claims because they had a huge problem in proving that

3 they were exposed to Grace's products.  Indeed, the reason that

4 Grace got -- when you look at Jeffrey Posner's testimony --

5 remember, he was Grace's director of risk management for many

6 years?  When you look at his testimony, Your Honor, you know,

7 he describes that the Libby exposure evidence was fundamentally

8 different.  Libby had no problem proving exposure to Grace's

9 asbestos.  But the typical products claimant had a terrific

10 problem, and that's why Grace was getting those -- when cases

11 went to trial that's why two thirds of the verdicts were for

12 Grace is because people could not prove --

13          MR. BERNICK:  Objection, Your Honor.  There's no

14 testimony that -- why Grace won two thirds of those cases.

15 He's just making this up.

16          MR. COHN:  I think when you read Mr. Posner's

17 testimony, Your Honor, and we do cite it in our briefs, the

18 relevant pages, that that's -- that what Mr. Posner was talking

19 about was, yes, a number of factors, and one of those factors

20 was in Grace's, both the lower settlement values and the jury

21 verdicts was weakness of exposure evidence by non-Libby

22 claimants.

23          So -- you know, and in fairness, Your Honor, he lists

24 some other factors, as well, and so it's not -- you know, the

25 tort system value of a claim is never a simple matter of coming

1    down to a mere one, you know, or two factors.  But as I say, I

2    think a fair reading of that testimony is that exposure

3    evidence was a very important factor, and that non-Libby

4    claimants had an uphill battle to show that Grace was

5    responsible for their illness at all, whereas Libby claimants

6    were always able to show that, and the claims were settled on

7    that basis.

8            The second observation I'd like to come back to,

9    remember you said that you have extraordinary value created for

10   just these Libby type of cases --

11           THE COURT:  Well, I said that's one type of analysis.

12   I don't think that's the only reason why the extraordinary

13   value claim is in there.  Anybody who could show -- not just

14   Libby, anybody who could show some of the extraordinary

15   criteria would be entitled to the higher distribution.  But

16   we're limiting this discussion to Libby, I thought.

17           MR. COHN:  Right.

18           THE COURT:  Okay.

19           MR. COHN:  And so -- right.  Yes, Your Honor.  And

20   so, remember the two extraordinary criteria are, one, you have

21   to show that your exposure was predominantly -- in fact, in

22   order to be eligible for the eight times multiplier you'd have

23   to show 95 percent of your exposure was to Grace asbestos, not

24   somebody else's.  And then the second thing you'd have to show

25   is little likelihood of substantial recovery elsewhere.  And

1  that second factor, given the fact that as you've heard some of

2  the Libby claimants have causes of action against some other

3  parties, it's by no means clear that Libby claimants can even

4  make use of those extraordinary claim provisions at all, which

5  was supposedly designed to bring their claims -- to enable them

6  to get the true tort system value of their claims.  But when

7  you consider how that works for people at Level 2 and Level 3

8  -- remember, that's -- Level 2 is the milds, and Level 3 is the

9  moderates, if you look at your crib sheet, Your Honor, the

10  maximum they could get, even if they qualify for extraordinary

11  claims treatment, and even if they get that maximum eight times

12  multiplier, which is within the discretion of the trust to

13  award, their claims are still capped at $20,000 and $60,000

14  respectively, and, you know, you contrast that with those 14

15  claimants that I was referring to before whose diagnosis was

16  mild or moderate, they couldn't even get their physician to say

17  to the trust, if there had been a trust at that time and they

18  were operating under the TDP, their physician couldn't even

19  have said this is a severe case.  They would have had to say

20  it's a mild case or a moderate case.

21          And so, in those cases people who were getting -- you

22  know, getting these very high settlements would have the

23  liquidated value of their claims capped at, as I said, $20,000

24  or $60,000, respectively.  And that situation is so

25  dramatically below the tort system value of their claims that

1  it is a form of discrimination against the Libby claimants,

2  and, you know, and it feeds into that whole jury trial argument

3  that we were just making a moment ago, Your Honor, which is

4  that's -- the Libby claimants are among the small number of

5  people who need that jury trial right because that's their only

6  escape valve to get the tort system value of their claim.

7  Since the TDP was designed to provide the tort system value of

8  everybody else's claim, one could anticipate that there would

9  be very few of the non-Libby claimants who would actually need

10 to resort to the --

11          THE COURT:  Well, I thought the evidence was that all

12 of the settled values, pre-petition, were included, including

13 the Libby values.

14          MR. COHN:  Yes.  And yet, the design of the TDP has

15 created this situation where many -- in fact, indeed, most of

16 the Libby claimants who would just have severe -- I'm sorry --

17 who would have mild or moderate symptoms, would be capped at

18 20,000 or $60,000, whereas -- capped at a maximum of those

19 figures, whereas in the tort system they were regularly

20 receiving verdicts many times that amount.  And so, this TDP

21 was just not -- was not designed with enough sensitivity, if

22 you will, to the existence of these Libby claims to permit

23 these claims to be adjudicated -- or to be determined and

24 liquidated under the TDP at their tort system value.

25          THE COURT:  Do I have some evidence in the record

1  that indicates where all of these settlements were coming from

2  and who had the highs and the lows?  I mean, there's an

3  assumption that you're making that all of the Libby claims have

4  higher either jury verdict or settlement, whatever happens to

5  be the case, than all non-Libby claims.  And I don't know that

6  I have any evidence in the record that supports that view.

7           MR. COHN:  Well, you have -- remember, the tort

8  system -- the values under the TDP uses their starting point,

9  Grace's pre-petition experience --

10          THE COURT:  Yes.

11          MR. COHN:  -- for the verdicts and settlements.  You

12  have the evidence of pre-petition verdicts and settlements.

13  The figure I quoted you before, the $234,000, average amount

14  for a Libby non-malignant claim, that's a Grace figure, when

15  you look at that document in Evidence, that's a Grace figure.

16  And when you average all that out, $234,000.

17          THE COURT:  Yes.

18          MR. COHN:  So, you have that in Evidence.

19          THE COURT:  Yes, I do, but what I don't have in

20  Evidence, I think, is the fact that the averages are obviously

21  composed of a whole series of individual settlements, so I

22  don't know the distribution of the settlements to be able, I

23  think, to give weight to the concept that Libby is

24  discriminated against because Libby is always at the high end

25  and nobody else is.  I mean, an average is composed of putting

1  the whole ball of wax, put all the numbers together and average

2  the numbers, so there are obviously some highs, and there are

3  obviously some lows.  I don't know whether there are Libby

4  plaintiffs, for example, who settled at nothing, or who got no

5  verdicts, or whose cases, if tried, would in fact not result in

6  a verdict in favor of the debtor --

7          MR. COHN:  Pre-bankruptcy, Your Honor --

8          THE COURT:  -- or, of the claimant.

9          MR. COHN:  I'm sorry.  Pre-bankruptcy, Your Honor,

10 what that LC 270 purports to be is a list of all Libby

11 verdicts.

12         THE COURT:  Yes.

13         MR. COHN:  It's Grace's version of what -- I

14 shouldn't say verdicts.  I'm sorry, Your Honor.  All --

15         THE COURT:  Settlements?

16         MR. COHN:  -- Libby -- yes.  So, we think it's over-

17 inclusive, Your Honor, but not having introduced evidence on

18 the point, you know, we are accepting for today's purposes that

19 270 would be a list of the pre-bankruptcy settlements.  So,

20 those are all Libby settlements.  Those are the bad ones -- and

21 when you look at them, Your Honor, you'll see there are some

22 that are pretty low.  But they're -- you know, they're a whole

23 range, and the average is $234,000.  That's certainly enough

24 for you to determine that there's something different about

25 Libby.  And when we tried to bring that forward, and we tried

1  to provide you with evidence about individuals -- the

2  individual Libby claimants, remember, there are only 1,000,

3  which is, of course, a lot -- you know, it would be a lot of

4  evidence to handle, but it would not be unmanageable.  You

5  know, you consistently excluded our -- at all stages of this

6  case our ability to put in individualized evidence about

7  individual Libby claimants.

8          THE COURT:  Actually, I think I said that you could

9  present the treating physician, to the extent that that's

10 relevant, but I don't think it is relevant.  I'm not looking at

11 individual claims.  I'm looking at the ball of claims.  But

12 your argument is based on a segment of what goes into that mix

13 without comparing it, I think, to the rest of the mix.  And I

14 don't think I have any -- maybe it's there, Mr. Cohn, and I've

15 just not -- I'm not focused on it, but I don't think I have any

16 evidence that substantiates that the highest of the Libby

17 claims, for example, just to pick one, is higher by an

18 exponential factor than the highest of the non-Libby claims.

19         MR. COHN:  But when you talk about highest, you know,

20 first of all, Your Honor, you are talking about individuals,

21 not groups.  With groups you --

22         THE COURT:  Well, any claim.

23         MR. COHN:  Well, but with groups you have to talk

24 about averages, Your Honor.

25         THE COURT:  Well --

1          MR. COHN:  And what we presented you was the

2    comparison between the pre-bankruptcy Libby average and the

3    pre-bankruptcy non-Libby average.

4          THE COURT:  Okay.

5          MR. COHN:  I don't know how much better one can do.

6    It's an area where, you know, the ability to perform these

7    analyses, totally apart from the limitations on the Libby

8    claimants' resources, there are just plain limitations on the

9    available data, and, you know, and what you can do with it.  I

10   mean, for example, we would have loved to have presented you

11   with data on all of the -- medical data on all of those pre-

12   bankruptcy settlements so you would have had a total, but

13   instead we had the 19.  I mean, I'm sorry, but that was what we

14   had.  We gave it to you.

15         MR. BERNICK:  Your Honor, we'd really object.  The

16   Court has previously ruled on all of these different things,

17   and the limitations that were imposed upon the ability of the

18   Libby claimants to present medical evidence had almost nothing

19   to do with the statement that was just made and everything to

20   do with the fact that they didn't have an epidemiologist who

21   actually had gone ahead and done the work.  They wanted to do

22   it through a treating physician who didn't have the

23   qualifications of the epidemiologist to make any broad

24   statement.  That's with respect to the medical.  On the

25   question of the numbers, there are any number of people that

1  they could have called to deal with the settlements in terms of

2  numbers.  They decided not to do it.  Dr. Peterson, however,

3  did go through this whole thing, and they had the ability to

4  cross examine Dr. Peterson, have Dr. Peterson, if they wanted,

5  do additional work at their request in order to illustrate

6  their point, and they never did it.  So, the idea that somehow

7  they have been hampered in their ability to address any of

8  these issues is just false.  The Court never limited their

9  ability to deal with numbers, and only limited their ability to

10  provide testimony through people who weren't qualified to offer

11  it.

12          MR. COHN:  Well, Your Honor, the way we'll leave it

13  is that I think Mr. Bernick is rewriting history.  But apart

14  from that, Your Honor, you actually do have, when you -- if you

15  go back and you look at what was either introduced, or sought

16  to be introduced, you actually have a great deal of data, and

17  so to the extent that you as a finder of fact are interested in

18  actually -- in actually ascertaining how the Libby claimants

19  look, you will find that they are -- that even the mild and

20  moderately diseased Libby claimants received high verdicts in

21  the pre-bankruptcy period, and yet they're capped at way below

22  the amount of those verdicts.  And there's really no more that

23  I can say.

24          THE COURT:  All right.

25          MR. COHN:  If you think there's been a failure to

1  prove --

2         MR. BERNICK:  We again object to that statement, as

3  well, as not being supported by any expert comparison.  I

4  understand Your Honor will hear it, but let the record be clear

5  we don't believe that that's permissible in light of the record

6  that was created.

7         THE COURT:  Well, if the evidence is in there -- I

8  mean, if the evidence is there that shows it I can certainly

9  take cognizance of what the evidence is.  I don't think I have

10  an expert who has made that comparison.  If that's the

11  objection, I don't think an expert did make that kind of

12  comparison.

13         MR. BERNICK:  Right.  And because it's a comparison,

14  inevitably it requires expert testimony because it has to be --

15  it has to be representative, it has to stand for something.

16  And that's the problem.

17         MR. COHN:  And if -- and if, Your Honor, when you

18  look at the entire record, bearing in mind that the plan

19  proponents have the burden of proof on the fairness of the TDP,

20  if you conclude that there's a failure of proof, I mean, that's

21  -- this is obviously what -- you know, what your job is, and

22  ours is to agree or disagree.  So, it's really -- I'm just

23  really not sure that we can say anything more than that --

24         THE COURT:  Okay.

25         MR. COHN:  -- on that issue.  Your Honor, right now

1  I'd like to turn the podium over to Mr. Heberling because the

2  next ground for discrimination has to do with the medical

3  criteria --

4             THE COURT:  All right.

5             MR. COHN:  -- and he will address that point.

6             THE COURT:  Mr. Heberling?

7             MR. BERNICK:  Can we get from counsel a sense of

8  time?  Jon, about how much time are you going to take?

9             MR. HEBERLING:  I'll take 15, 20 minutes.

10            MR. BERNICK:  Is that then it?

11            UNIDENTIFIED ATTORNEY:  No.

12            MR. FINCH:  Your Honor, the Libby claimants have an

13  hour and a half.  By my count they've been going an hour and

14  five minutes.  Can we -- is the Court going to adhere strictly

15  to the time deadlines here?  We certainly have prepared our

16  arguments and response --

17            THE COURT:  I'm going to have to stick to the time

18  deadlines or we won't get through this process.  Yes.  But I

19  may have sidetracked Mr. Cohn.  To the extent that it's going

20  to take five extra minutes, that's fine.  I'll award five extra

21  minutes for that purpose.  Go ahead, Mr. Heberling.

22            MR. FINCH:  Thank you, Your Honor.

23            MR. HEBERLING:  Your Honor, Jon Heberling for the

24  Libby claimants.  I'll try to proceed as quickly as possible.

25  I am to discuss the medical criteria.  Our arguments are that

1 they're discriminatory and that Libby is not substantially

2 similar.  We introduced proof on this, and the Court has

3 already refused certain evidence as irrelevant on the basis

4 that the discrimination, if any, is cured by individual review.

5 And Dan Cohn will discuss that after I finish, so I won't be

6 discussing individual review here.  I'll go straight to the

7 discrimination.

8        The first discrimination is against severe pleurals.

9 This is severe pleurals in general, and Libby in particular.

10 Level 4B is called severe and disabling pleural disease.  Dr.

11 Welch testified that she designed this with Libby in mind.  The

12 TDPs in other asbestos bankruptcies have not had a severe

13 pleural category before.  Unfortunately, we viewed this

14 category 4B as a failed experiment.  Dr. Welch testified that

15 she did not contact the doctors at The Center for Asbestos

16 Related Disease in Libby, and did not obtain data.  She didn't

17 obtain data on Libby severe pleurals, or severe pleurals

18 elsewhere, for that matter, so they did no trial run on Level

19 4B and its criteria as to how it would operate on true severe

20 pleurals.  So, essentially they had no idea how this would work

21 out.

22        Admittedly, the medical criteria depart from standard

23 medical criteria, and Dr. Welch admitted that the three

24 millimeter thickness requirement for diffuse pleural thickening

25 and the greater than 25 percent extent of the chest wall

1  requirement are not standard diagnostic criteria, and are not

2  part of standard evaluation for severity of asbestos disease.

3  These are just add ons, and they have the effect of

4  disqualifying people.

5         For a definition of true severe pleurals we use the

6  American Thoracic Society 2004 definitions.  That's a document

7  that is in Evidence.  And the TDP medical criteria depart from

8  this and thereby discriminate against true severe pleurals.

9  Grace never did a test of Level 4B, but we did in this -- in

10  the mortality study, in the analysis of those who had died.  We

11  are defining a severe pleural in that study as Libby claimants

12  with pleural disease who died of non-malignant asbestos-related

13  disease.  Death is considered severe -- a severe pleural.  And

14  the net result was 86 percent of the Libby claimants' severe

15  pleurals were excluded from expedited review.  The three

16  millimeter requirement excluded 16 percent.  The extent greater

17  than 25 percent requirement excluded 20 percent.  The blunting

18  requirement excluded 43 percent.  And the omission to use

19  diffusion capacity for severity excluded 48 percent.  There are

20  overlaps in these various categories, but the net result was 86

21  percent exclusion, and from the -- for expedited review, and we

22  consider that to be an unacceptable discrimination that 86

23  percent of these severe pleurals be shunted off to individual

24  review, which we consider to be a form of no man's land where

25  there is -- determinations are entirely discretionary.  There

1  are no standards, no medical guidelines, no requirement of
2  participation of a physician.

3        The three millimeter thickness requirement is not
4  part of the diagnosis, not part of the standard measures of
5  severity, and that's undisputed in the record.  Likewise, the
6  extent greater than 25 percent, it's undisputed in the record
7  that it's not part of the diagnosis, it's not part of the
8  standard measure of severity.  These two add ons exclude 16
9  percent and 20 percent of Libby claimants, and that alone, we
10 feel, is sufficient to establish a discrimination claim.

11        As to blunting, the TDPs rely on the ILO 2000
12 document, which is also in Evidence, and it's a classification
13 system.  It's not diagnostic.  The ILO 2000 doesn't say what
14 the various classifications mean in terms of severity.  The ILO
15 document on blunting redefines pleural plaques as any kind of
16 pleural thickening that doesn't involve blunting, and the ATS
17 2004 standard definitions don't do that.  They use the standard
18 definition of pleural plaques as meaning these islands, the
19 white islands on the pleura.  So, this definition of blunting
20 as being required simply doesn't match reality.

21        When you look at the Libby claimants, many of them
22 had the measurable thickness and extent of pleural thickening,
23 but 43 percent are excluded for lack of blunting.  The McLoud
24 study, which we discussed, is in Evidence also, similarly
25 showed that about 50 percent of people with pleural thickening

1   don't have blunting, so we believe that sets up a

2   discrimination.  There's no reasonable basis for it.

3          As to the omission of diffusion capacity in the TDP

4   medical criteria under the American Thoracic Society 2004

5   document, there are three measures for severity of asbestos

6   disease.  Diffusion capacity is one of them, and that's

7   undisputed in the record.  Likewise, the American Medical

8   Association Guides for Permanent Impairment, they use diffusion

9   capacity as a measure of severity.  That's also undisputed.

10  It's also undisputed that under standard practice for patient

11  care diffusion capacity is used as a measure of severity.

12  That, too, sets up an unreasonable discrimination.

13         Dr. Welch testified that, well, there are other

14  things that cause DLCO to drop.  Well, that's true of forced

15  vital capacity, as well.  Other things cause it to drop as

16  well, and mainly the DLCO should be used as a measure of

17  severity.  It should not be used as a measure of sorting out

18  whether a patient has smoking disease or not.  Dr. Welch

19  testified about smoking disease causing DLCO to drop, but there

20  are other ways in the TDPs where smoking disease cases are

21  sorted out.  That's mainly through this FEV1/FVC ratio.  So,

22  DLCO should not be omitted as a measure of severity simply

23  because some people with smoking disease have lower DLCOs.

24         So, the bottom line is there's a discrimination

25  against true cases of severe pleural disease, both inside

1  Libby, as we demonstrated, and Dr. Welch testified that there

2  are some outside of Libby, as well, that it's rare.

3      Grace argues that we did no study on the Libby

4  claimants versus people elsewhere, but that misses the point.

5  The discrimination is against severe pleurals in general, and

6  Libby claimants in particular.  Then, on CT scans the medical

7  criteria allow use of CT scans in Levels 1, 2, 3 and 5, but not

8  in Level 4, where they're needed most.  It was undisputed in

9  the testimony that CT scans better visualize pleural disease

10 than do chest x-rays.  It was undisputed that chest x-rays miss

11 20 to 50 percent of the cases of pleural disease, and there's

12 medical consensus on this point.

13     Grace responds that there's no accepted system for

14 classifying CT's, but in this case there's -- that is not a

15 problem because you can measure three millimeters thickness on

16 a CT.  You can measure whether there's over 25 percent extent

17 of the chest wall by CT.  And you can identify blunting also.

18 This is Dr. Frank's testimony, and that, likewise, is

19 undisputed.

20     The other discrimination, the other large

21 discrimination, Item 2 here, is what I call a categorical

22 discrimination.  Level 4B has these three add ons to the

23 standard diagnosis -- the three millimeters, the 25 percent

24 extent, and the blunting which results in a definition of

25 plaques different than normal.  Other levels outside Level 4

1  use a standard diagnosis for all the cancers -- mesothelioma,

2  lung cancer, other cancer.  They have a standard diagnosis in

3  asbestos disease and no add ons.  So this, we believe, results

4  in a discrimination against Level 4B severes.

5        The defense on this one is that the purpose of the

6  TDP, they say now, is to capture clear cases, so it's proper to

7  have these add ons.  The plan proponents' reply brief post-

8  trial, at Page 13, admits that these add ons are in service of

9  compensation objectives, not for medical diagnosis.  So,

10  they're admitting that they didn't follow standard practice on

11  these medical criteria.  And we also point out that the idea of

12  capturing clear cases is not stated in the TDP, doesn't appear

13  at any of the other levels.  So, the add ons constitute a

14  categorical discrimination against severe pleurals in Level 4B.

15        Then, as to the not substantially similar argument

16  under 1122(a), we recognize again that the Court has ruled this

17  irrelevant, that a claimant can still go to the trust

18  regardless of what classification has been made and obtain

19  proper compensation.

20        We contend that Libby should be a special class and

21  should have some special provisions.  The TDP already has

22  special provisions specific to Libby.  There is the six months

23  under the exposure requirements.  Only six months' residency is

24  required in Lincoln County for qualification.  And that means

25  six months of just breathing the air in Libby is sufficient to

1  cause disease.  This has been recognized in the TDP.  And

2  indeed, there are some people who have even less than six

3  months who have disease.  This is unheard of elsewhere.  It is

4  a factor in the Libby -- it is different and it has been

5  recognized in the TDPs.  Also, the TDPs recognize community

6  disease in Libby, whereas for other areas significant

7  occupational exposure is required.

8         So, Libby is different in the sense of the severity

9  and prognosis of pleural disease.  Libby is different in the

10  sense of pure pleural deaths.  Dr. Frank testified that there

11  were only four in the literature generally, whereas he

12  identified 20 in Libby.  Libby is different in the probability

13  of death.  Libby is different in the sense that Libby is number

14  one among all counties in the United States, number one in

15  asbestosis deaths and number three in mesothelioma.  Libby is

16  the only place where a public health emergency has ever been

17  declared by the EPA.  And we believe that using the probability

18  of death as a distinguishing factor a separate class should be

19  established, and as a practical matter it's the probability of

20  death which has generated the large verdicts for Libby.  And I

21  think I'll reserve the rest of my time for response later on,

22  after we hear the plan proponents' argument.

23         MR. FINCH:  Your Honor, we have the right to close.

24  As the party with the burden of proof we have the right to

25  close and go last.  I don't think it's appropriate for counsel

1  for a party who doesn't have the burden of proof to reserve

2  time in a closing argument.

3        THE COURT:  You can reserve time, Mr. Heberling.

4  They'll have the last opportunity.  If you've got any comments

5  I'll give them an opportunity to comment to your comments.

6        MR. HEBERLING:  Okay.  Thank you very much.

7        THE COURT:  Okay.  Mr. Cohn?

8        MR. COHN:  All right.  As Mr. Heberling said, the

9  next point that I'm going to be talking about, but only for a

10  moment, is the -- that the availability of individual review

11  doesn't cure the discriminations that he's just identified.

12  When you look at individual review, Your Honor, it conveys --

13  confers, rather, unfettered discretion, really, on the trustees

14  or whoever they decide to hire to administer the claims

15  process.  The TDP does not specify any medical criteria to be

16  considered as part of individual review.  It doesn't provide

17  even any general medical guidelines.  It does not provide for

18  any physician involvement to deal with medical issues that are

19  presented on individual review.  And then most broadly, Your

20  Honor, once these claims are turned over to the trust there's

21  no judicial oversight.  This is a classic judicial function,

22  determining the value of a claim.  You do it all the time in

23  other non-asbestos cases.

24        THE COURT:  Oh, but so do arbitrators and mediators

25  who are not Judges.  And yes, it's a function of a fact finder

1  making some fact, but it's not necessarily judicial.

2         MR. COHN:  And in this case, Your Honor, the process

3  takes place not only without your doing it, if you will, Your

4  Honor, but without your having any say so even in the process

5  or the procedures.  Either there are going to be no procedures,

6  or whatever procedures they do follow are going to just take

7  place totally beyond your purview.

8         And we cited the G-I Holdings case.  I realize -- or,

9  G-1.  I'm not sure which it is.  And we acknowledge that that

10  case is not directly on point in the sense that it dealt with

11  an estimation process in which the -- one of the parties had

12  proposed to delegate it essentially to a very TDP-like process.

13  But the Judge's criticisms of that process are very much on

14  point and ought to be applicable here, as well.  And the

15  criticism was that there were no standards, no criteria, and

16  also that there was no judicial oversight.

17         And we understand that Section 524(g) of course

18  permits the establishment of a trust, but we would respectfully

19  submit that it's still not allowed to just be the Wild West in

20  terms of individual review, or rather, if you're going to have

21  an individual review process which amounts to the Wild West,

22  don't come in here and tell the Libby claimants that that cures

23  the problem that only so-called clear cases are going to be --

24  are going to have a right under the terms of the TDP to be

25  determined to be Level 4B claims.  Don't say that the fact that

1  --

2         THE COURT:  Wait.  I'm sorry.  I apologize.  I just

3  need to get the facts straight.  I thought that the testimony

4  was that the add ons, as Mr. Heberling calls them, were to make

5  it clear that in the individual review process those folks

6  qualified for individual review without the need for anybody

7  else to make a determination as to whether they do or don't,

8  that if you still -- you can still qualify for individual

9  review, but it's a more discretionary issue if you don't have

10  all of those add ons.

11         MR. COHN:  Yes.  The only thing, and I don't think

12  maybe you meant anything by it, but I just wanted to make sure.

13  The criteria, including the add ons, if you will, those

14  criteria are for expedited review.  That's to have your claim

15  be determined to be a Level 4B claim upon expedited review.

16         THE COURT:  Right.  That's correct.

17         MR. COHN:  Which has those very specific medical

18  criteria.

19         THE COURT:  That's right.

20         MR. COHN:  Right.  And then, yes, the plan proponents

21  would defend the whole system by saying, but wait a second.

22  You can -- if you have a not clear case -- we tried to get the

23  clear cases for expedited review, if you don't have a clear

24  case then you move over to --

25         THE COURT:  Right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. COHN:  -- individual review, and there you can

2     have a Level 4B claim even if you don't meet the specific add

3     on medical criteria for expedited review.

4          THE COURT:  Right.

5          MR. COHN:  That's their defense.  And what we're

6     saying is the reason that defense doesn't hold up is because

7     individual review is the Wild West.  It's the total discretion

8     of the trustees.  No physician involvement is required by the

9     terms of the TDP.  There's no judicial oversight to make sure

10    that whatever process is adopted for individual review is a

11    fair process.  And so therefore there is really -- there is no

12    guarantee that justice will be done, and that's what we're

13    talking about here ultimately, Your Honor, is justice.  Justice

14    -- there's no guarantee that justice will be done in the

15    individual review process, and so therefore individual review

16    -- the availability of individual review is not a defense to

17    the discriminatory add ons that Mr. Heberling just talked

18    about.

19         THE COURT:  So, your concern about the individual

20    review process.  I thought you folks were going to talk at the

21    end of the plan confirmation process about the individual

22    review, and some -- I'll call them guidelines -- for

23    establishing that process.  Did that discussion take place?

24         MR. COHN:  Well, there have been settlement

25    discussions, Your Honor, but no, that issue has not been a part

1    of them.

2            THE COURT:  Well, it will take place, folks.  You're

3    ordered to make it take place.

4            MR. LOCKWOOD:  Your Honor, Mr. -- I hate to break in.

5    Mr. Cohn has misrepresented grossly what the trust does.  He's

6    ignoring the ADR process and the jury trial, which he was

7    talking about earlier, which is part of individual review.  He

8    talks about unfettered discretion.  If he doesn't like how the

9    trustees are running, it he goes to arbitration.  If he doesn't

10   like that, if it's not binding arbitration, he goes to trial,

11   just like the tort system.  He spent an hour earlier talking

12   about the glories of the tort system and how it protects his

13   clients' rights, and now you're telling us we have to negotiate

14   with him about an individual review process that already gives

15   him the very rights to determine what -- the issues he wants

16   decided.

17           THE COURT:  Yes.  What I'm saying is this TDP doesn't

18   set out the parameters by which this new process, which isn't

19   like any other TDP, and therefore those processes have not been

20   established.

21           MR. LOCKWOOD:  Your Honor, Mr. Inselbuch testified

22   that this is exactly like every other process.  All he did was

23   point out that the categories in individual review under the

24   TDP permit the trustees to take evidence and show that some --

25   any category, whether it's Level 4B or anything else, that

1  doesn't meet the scheduled review category, can, on individual

2  review, in this trust and every other trust that Your Honor has

3  confirmed, under the TDP the trustees can award a higher level

4  in individual review, and up to the maximum amount.  That was

5  his testimony under oath.  And there's nothing unique about the

6  Grace individual review process that differentiates it in one

7  iota from the Federal Mogul process, the Kaiser process, the

8  Armstrong process, or the Owens Corning process.

9          THE COURT:  All right.  I'll take a look at his

10  testimony again.  I haven't reviewed the testimony since the

11  trial, so I don't know.  My understanding, and maybe it's

12  incorrect, and I'll check, is that this particular

13  individualized review process is not similar to anything that

14  has happened before, that it is a separate category in Level 4B

15  that has been added to the trust --

16          MR. LOCKWOOD:  Level 4B --

17          THE COURT:  Yes.

18          MR. LOCKWOOD:  -- is a new category for scheduled

19  review.

20          THE COURT:  Yes.

21          MR. LOCKWOOD:  What happened was the Libby claimants

22  said that there was no Level 4 category similar to severe

23  asbestosis for severe pleural disease.  And Dr. Welch and Mr.

24  Inselbuch both testified that the committee and the futures rep

25  examined that and concluded to add for scheduled review new

1  Category 4B for severe pleural disease.  That's the part that's

2  unique, but that has nothing to do with individual review.

3       THE COURT:  All right.  That's maybe where I'm

4  confusing the testimony.  I'll double check.  Go ahead, Mr.

5  Cohn.  Sorry for the interruption.

6       MR. COHN:  All right.  And by the way, Your Honor,

7  just to make it easy, Your Honor, I actually agree with Mr.

8  Lockwood's characterization.  It is Level 4B that is new.

9  Individual review has existed in other TDPs.  I would point out

10  about Mr. Inselbuch's testimony the key word in what he just

11  described and in the testimony itself is the word can.

12       THE COURT:  Is the word what?

13       MR. COHN:  The word can.

14       THE COURT:  Can?

15       MR. COHN:  An individual review of the trust can do a

16  whole bunch of things, essentially do justice.  But our

17  contention is that there's no requirement on the terms of the

18  TDP and no assurance in the way that it works that it's going

19  to do justice.

20       THE COURT:  All right.

21       MR. COHN:  All right.  Next, Your Honor, is the issue

22  of insurance rights and discrimination relating to those.  Here

23  I'm going to rest mostly on my -- on our brief, Your Honor, but

24  I do want to particularly focus your attention on the AOV case.

25  That's the D.C. Circuit decision which we cited in our briefs,

1  and which has been cited with favor by the Court of Appeals for

2  the Third Circuit in the <u>Combustion Engineering</u> decision.

3          In <u>AOV</u> the issue was that claims were placed in the

4  same class, but certain of the claimants -- and I'm sorry --

5  and one of the terms of the plan was that all claimants of that

6  class would give up their rights against a certain third party,

7  and the plan proponents argued that's a non-discriminatory

8  plan.  It says everybody is giving up their rights against the

9  third party.  And the D.C. Circuit said, well, wait a second.

10 You can't just look at it that way.  You have to look at what

11 claims are being given up.  And there were certain people who

12 had stronger claims against the third party, and the D.C.

13 Circuit said those people are not being treated the same.

14 There's an actual violation in that case of Section 1123(a)(4)

15 because the strength of what they were being required to give

16 up was greater than the other claimants who were supposedly,

17 you know, governed by that equal provision that applied to

18 everybody.  And so, we're in the same position vis-a-vis our

19 insurance rights.  We have stronger insurance rights.  It's

20 extensively discussed in our briefs.  We now have in the record

21 the insurance policies themselves.  And those insurance

22 policies establish the availability of these non-products

23 claims without being subject to any aggregate limits, so in

24 contrast to products claims which are subject to aggregate

25 limits, which effectively mean that there isn't nearly enough

1  insurance, unfortunately.  I wish there were, Your Honor.  But

2  unfortunately there isn't nearly enough insurance for the

3  products claims.  But for non-products claims such as the Libby

4  claimants have there is no restriction of aggregate limits on

5  the claims that we can assert.  And of course, insurers always

6  assert defenses.  Nobody wanted to turn this into a coverage

7  litigation, I don't think -- and from previous comments of the

8  Court there was indication that you would not be particularly

9  favorable toward turning the confirmation hearing into a

10  coverage litigation.

11         THE COURT:  No.

12         MR. COHN:  So, really, what you do have in the record

13  is the policies themselves, which establish the basic

14  availability of these claims under the policy, and we can take

15  it for granted that the insurers will fight quite a bit before

16  they allow any claims.  But that's true of products and non-

17  products claims alike.

18         So, turning -- that ends discrimination, Your Honor.

19  Turning to the releases and the injunctions under the plan, let

20  me make some brief observations.  One is, Your Honor, the plan

21  channeling injunction is unclear about whether it would enjoin

22  our independent claims that we have alleged that we have

23  against parties such as Maryland Casualty Company for their own

24  allegedly tortious conduct in relation to the Libby claimants.

25  The injunction is unclear as to whether those claims are within

1    its ambit.   The <u>Travelers</u> decision that was handed down by the

2    Supreme Court has basically just had the effect of putting us

3    all on notice.   And if there's any ambiguity in an injunction

4    we'd darn well better straighten it out at this level, Your

5    Honor, and not find out 20 years from now that it means

6    something different than at least some people in the courtroom

7    think it means.   And so, we would ask you to include a

8    clarification that says that.   To the extent that there's any

9    independent tortious conduct as opposed to, you know, the

10   issuance of insurance policies which obviously is enjoined, but

11   if there's any independent tortious conduct by any party,

12   including an insurer, it is not -- the pursuit of those claims

13   are not enjoined by the channeling injunction.

14           All right.   The next issue also -- unfortunately I

15   seem to picking on Maryland Casualty Company a lot, but the

16   next issue relates to Maryland Casualty again, which is that

17   Maryland Casualty is not making any post-petition financial

18   contribution under this plan and yet is being -- it is a so-

19   called asbestos protected party which is getting the benefit of

20   the channeling injunction.   And this is a violation of the fair

21   and equitable requirement of Section 524(g), which has been

22   held in the <u>Congoleum</u> case, for example, to require that there

23   has to be a financial contribution by an insurer in order to --

24   really it's by any party in order to be the beneficiary of an

25   injunction under Section 524(g).   The fact that Maryland

1  Casualty paid quite a lot of money to the estate pre-bankruptcy

2  doesn't entitle them or require anybody to give them the

3  benefit of the channeling injunction.

4       THE COURT:  Does 524(g) require the contribution to

5  come from the party, or just that a contribution be made on

6  behalf of the party?

7       MR. COHN:  Well, it, I think, must require that it be

8  made -- that it's either made by the party or, you know, it

9  could be made on behalf of the party as opposed to by an

10  affiliate of a party, by its parent or by some other party that

11  has an interest in -- some other non-bankrupt party that has an

12  interest in attaining an injunction for them.  I mean, I

13  suppose the estate doesn't care where the money comes from so

14  long as it comes from outside the estate.  Here, what's being

15  argued by the debtors, or by the plan proponents, is that Grace

16  can somehow designate its contribution as being on behalf of

17  Maryland Casualty and that, of course, is just not -- I mean,

18  what that would do is simply destroy the requirement.  It's

19  like the requirement would not exist because any plan proponent

20  who ever wanted to give an injunction to someone who wasn't

21  entitled to it by reason of not making a financial

22  contribution, the debtor would just say, well, oh, hey, we're

23  making the financial contribution, so you get the injunction.

24  So, if that requirement is to have any meaning, Your Honor, the

25  -- I'm sorry, the new consideration for the injunction has to

1  come from outside the bankruptcy estate.

2         And, Your Honor, we didn't even have -- the plan

3  doesn't say this is being done.  This was something, a legal

4  thing that got made up by the plan proponents after the fact.

5  There's no designation how much of a financial contribution is

6  being made by the debtors.  You have no evidence before you on

7  which you could find that that contribution was sufficient in

8  the case of Maryland Casualty to provide it with the benefit of

9  the injunction.  There's simply none of that in the record,

10  Your Honor.  This is a legal fiction that the plan proponents

11  are trying to create to skirt a requirement of the Bankruptcy

12  Code.

13         I wanted you not to lose sight of -- I'm now changing

14  topics, Your Honor.  I wanted you not to lose sight of the fact

15  that we have objected to Section 8.8.7 of the plan, which says

16  that simply by virtue of receiving a distribution we're deemed

17  to have released Fresenius.  I think that the -- well, we had

18  earlier colloquy about this.  It's clear that Zenith -- the

19  Zenith case, and I think even if Zenith hadn't been decided it

20  would be clear that you can't say that people release third

21  parties just by reason of receiving a distribution.  And so,

22  the only defense to that, the only way around this would be if

23  the issue was already decided by reason of this Court's

24  approval of the settlement.  And I think that that issue is

25  being litigated by somebody else, and so in order to help Mr.

1  Bernick in terms of the organization of things, I think we'll

2  wait until that issue gets discussed later on by one of the

3  insurers.  And at that point I may or may not, depending on

4  what they say, have something to add about law of the case.

5          THE COURT:  All right.

6          MR. COHN:  All right.  One more brief point about

7  injunctions, Your Honor.  I don't want you, again, to lose

8  sight of the objection that we've made to Section 8.7.1 of the

9  plan.  That provision freezes in place whatever injunctions

10  exist upon confirmation and says that those will stay in effect

11  until the effective date, and thus they really usurped your

12  power to change an injunction if it's warranted.  And this is

13  not just a matter of, you know, kind of, it would be nice if

14  the Judge could have the power to do this.  We would

15  respectfully submit it's a requirement of law.  They can't --

16  for example, this also purports to require the automatic stay

17  to remain in effect.  In other words, nobody could come before

18  you with a lift stay motion if they had some valid claim, you

19  know, under the Bankruptcy Code, they should get relief from

20  the stay.  So, if anybody wants to get relief from the stay or

21  relief from the preliminary injunction that exists in the

22  companion adversary proceeding in this case, we would

23  respectfully submit they should have a right to do that

24  notwithstanding the fact that we're in this period between

25  confirmation and the effective date.

1          THE COURT:  So, you're happy with an order that would

2    say that 8.7.1 is confirmed; however, in the event that parties

3    have cause to seek relief in that interim period that they

4    could come before the Court for relief so that the injunction

5    can --

6          MR. COHN:  That would be fine.

7          THE COURT:  -- stay in place unless somebody shows

8    cause why it should be modified?

9          MR. COHN:  Yes.  We are not saying the injunction has

10   to go away on confirmation.  That's right.  Much as we would

11   like it to, Your Honor.  But, no.  All right.  And that brings

12   me to best interest, and here I'm going to defer to you, Your

13   Honor.  On best interest we do have an argument to make.  It's

14   an issue on which the plan proponents have the burden.  It

15   might make sense for them to go first, but -- and in any event

16   I have -- I have indeed exhausted the time that's been allotted

17   for us, so I will either -- I can make the argument briefly

18   now, or I can just sit down and --

19         MR. BERNICK:  Well --

20         MR. COHN:  I think Mr. Bernick wants --

21         MR. BERNICK:  I think if you -- if the argument is

22   going to be a brief argument, I think our response will be

23   brief.  That's fine with --

24         THE CLERK:  Speak into a mike, please.

25         THE COURT:  All right, Mr. Cohn.  Mr. Bernick is

1 agreeing that if you're comfortable, to have you go first on

2 your objection.  That's fine with me.

3        MR. COHN:  That would be just fine, Your Honor.  But

4 for the best interest argument there is a lot -- there has been

5 a lot of back and forth, a huge mumbo-jumbo, really, of

6 evidence and briefing, and what I wanted to suggest on the

7 issue of whether the best interest test has been met in

8 relation to asbestos claimants as a whole, Your Honor, I wanted

9 to suggest that you focus on three particular figures and the

10 evidence relating thereto, because we would respectfully assert

11 that the plan proponents have failed to meet their burden of

12 proof as to the best interest standard by reason of having --

13 primarily by reason of having failed to provide credible

14 evidence on these three figures.  One is the issue of what a

15 Chapter 7 trustee would recover in the <u>Sealed Air</u> and <u>Fresenius</u>

16 litigation.

17        THE COURT:  Chapter 7 trustee?

18        MR. COHN:  A Chapter 7 trustee, because remember, you

19 know, obviously there has to be a comparison of what you would

20 get in Chapter 7 with Chapter 11, and in trying to drive down

21 the value that a Chapter 7 trustee would supposedly realize the

22 plan proponents have offered all sorts of conflicting

23 testimony.  And they started off with a best interest analysis

24 that said that it was uncertain what the trustee would recover.

25 Then Ms. Zilly really hardened her testimony to say that she

1 thought that a trustee would recover nothing, and might not

2 even try, might not even bring the litigation.  And so here we

3 have litigation which has resulted in a $1.3 billion settlement

4 in the Chapter 11, and the suggestion is being made, and you're

5 being asked to believe that a Chapter 7 trustee would not even

6 bring the lawsuit.

7 　　　　　THE COURT:  But the settlement is conditioned on a

8 plan being confirmed.  It doesn't say, if I recall correctly,

9 that it is conditioned on a Chapter -- any trustee being

10 appointed or recovering.

11 　　　　　MR. COHN:  It is absolutely non-binding in the sense

12 that a Chapter 7 trustee could not enforce the settlement, and

13 the plan proponents actually make a legitimate point when they

14 point out that part of what <u>Sealed Air</u> and <u>Fresenius</u> are

15 getting under the settlement in the context of Chapter 11 is

16 protection from successor liability and that a Chapter 7

17 trustee would be unable to confirm that protection.  That's a

18 fair point.  However, the suggestion that when you have this

19 massive fraudulent transfer litigation, it's classic avoidance

20 litigation, Your Honor.  The suggestion that a Chapter 7

21 trustee would abandon a $1.3 billion, or actually the alleged

22 transfer is more than that, you know, would abandon this multi-

23 billion dollar fraudulent transfer lawsuit and not even try to

24 pursue it, and if he did pursue it would not be able to get

25 some kind of substantial settlement, albeit, you know, probably

1  less than $1.3 billion, is absurd.  It just is not the way that

2  any Chapter 7 case could possibly work.

3          A second figure, Your Honor, that I would ask you to

4  focus on is the amount of non-ZAI property damage claims.  Here

5  the testimony that's being offered by the plan proponents is

6  that those claims would be allowed at the billion dollar level

7  even though those claims have been settled in Chapter 11 for

8  $200 million.  Now, once again, Your Honor, those settlements

9  are not enforceable by a Chapter 7 trustee, or at least they're

10 not enforceable by the Chapter 7 trustee unless he wants to

11 write checks for a hundred cents on the dollar to these

12 claimants, because that's what they would get under the Chapter

13 11 plan.  However, those settlements took place in the context

14 of litigation.  You know, the debtor objected to the claim said

15 your asserted amount is too high.  The holder of the claim

16 obviously was saying no, you know, it's even higher than you're

17 saying it is.  And the result of all that were settlements that

18 in the aggregate amounted to $200 million.  Well, that's got to

19 be pretty close to the actual correct allowable amount of those

20 claims.  There's no reason for the debtor to have settled too

21 high.  There's no reason for the holders of the claims to have

22 settled too low.  So, presumably $200 million is what they

23 fixed as the value of those claims, and even though there might

24 be some variation in a Chapter 7 case, the idea that a Chapter

25 7 trustee would allow these claims for five times what they

1  settled for in a Chapter 11 case is, again, not credible, and

2  there was no actual evidence introduced on the merits of these.

3  They just -- Ms. Zilly just pointed to some earlier allocation

4  deal between the P.I. Committee and the P.D. Committee which

5  never went into effect, and said that's where she gets the

6  billion dollars from.  It's not credible, Your Honor.  There's

7  been a failure of proof by the plan proponents.

8          The other figure that we would particularly like you

9  to focus on is the figure for asbestos P.I. claims.  Here, as

10 you know, throughout this case you've had a range of estimates

11 for what's the aggregate personal injury claim liability of

12 this estate.  The debtor has started off with a plan that had

13 less than a billion dollars.  Even the future claims

14 representative whose, you know, financial interest, if you

15 will, would be to drive up the value of claims, submitted in

16 the estimation proceeding a figure of $3.7 billion as being the

17 aggregate liability.  And then at the top was Dr. Peterson.

18 Well, so whose -- whose figures are they now exclusively

19 relying upon for purposes of saying that in Chapter 7 there's

20 going to be this huge personal injury liability?  Well, it's

21 Dr. Peterson.  And we respectfully submit that the one thing

22 that is unlikely to happen is that -- is for the worst case,

23 which is Dr. Peterson's forecast to occur, and that you can't

24 just ignore other credible forecasts of the aggregate personal

25 injury liability.

1        And then finally, one legal point, you know, Your

2  Honor, that in a Chapter 7 case, future demands would not be

3  paid.  And while that may be unfortunate as a matter of social

4  policy, Section 726 is very clear what the Chapter 7 Trustee

5  pays is allowed claims.

6        So that, what I've -- all that I've just said applies

7  to the best interest test as it relates to asbestos personal

8  injury claimants as a group.  We'd like you to keep in mind two

9  additional points that pertain to the Libby claimants.  One of

10  those is those insurance rights, again, extensively briefed,

11  Your Honor.  But, what happens when insurance rights exist that

12  do not deplete -- where the claimants' pursuit of those

13  insurance rights would not deplete the estate and would not

14  deplete any other claimants' access to insurance is, the

15  claimant gets relief from the automatic stay.  And the reason

16  we know this is Hornbook law is you can look at the best

17  Hornbook of them of all --

18        MR. LOCKWOOD:  Your Honor, I object to this.  He said

19  he was going to argue best interest and he admitted he'd used

20  up his time and now he's back here arguing insurance rights

21  which is part of his earlier argument, and he's out of time.

22        MR. COHN:  Well, I am out of time, Your Honor.  This

23  does relate to best interest.

24        THE COURT:  All right.  Five minutes, Mr. Cohn, wrap

25  up.

1            MR. COHN:  Okay.  Thank you.  So, in a Chapter 7

2    case, Your Honor -- in a Chapter 7 case, the Libby claimants

3    would have the right to pursue their coverage where they're not

4    competing with other claimants and they're not depleting assets

5    of the estate.  And we know this is Hornbook law because you

6    can read about it in the best Hornbook of them all which is

7    Colliers, who says that, "When the Court is reasonably

8    confident that the policy proceeds would be sufficient to

9    satisfy all creditors with claims that may be paid under the

10   policy," and that does apply to these non-products claims, "the

11   Court should grant relief from the stay to permit the action to

12   go forward."

13           So, in Chapter 7, Libby Claimants would have not only

14   the recovery from the estate, which even the plan proponents

15   have, they put out figures, like one of their charts says 30 to

16   36 percent might be the dividend in a Chapter 7, but it's

17   subject to some uncertainties and question marks which the plan

18   proponents say mean you're never going to actually achieve

19   that.  All right, fine, so it's 25 percent, it's 20 percent.

20   That plus the insurance rights is a better deal for the Libby

21   claimants than what they're being offered under the TDP.

22           And then, finally, Your Honor, we can't come away

23   from the fact that in Chapter 7, Libby claimants would be able

24   to have resort to the tort system to determine the value of

25   their claims.  There is no argument, this whole 524(g) argument

1  that says, you know, you can tamper with jury trial rights in a

2  Chapter 11 case using an asbestos trust would not apply in a

3  Chapter 7 case.  So, the Libby claimants' claims would be

4  allowed at their true value and if they're allowed at their

5  true value, then even if the dividend is 20 percent, if the

6  claim that's allowed in its true tort system value, which is,

7  let's say $400,000 and, you know, you get 20 percent of

8  $400,000 is a lot better deal for the Libby claimants than to

9  have their claims be capped at 20,000 or 60,000.  Remember,

10  Your Honor, those capped amounts were the liquidated value of

11  the claim, and then you just get payment percentage of that,

12  which is perhaps a third of that.

13        So, you know, rather than take a few thousand dollars

14  or you know, or $20,000, it's a better deal for the Libby

15  claimants in Chapter 7.  And for that reason, Your Honor, even

16  if you were to find that the plan, in general, meets the best

17  interest standard as to asbestos claimants as a whole, the

18  point is that these particular claimants who are objecting on

19  best interest grounds, you need to be able to find that Chapter

20  7 is actually as good for them as Chapter 7 would be.  I'm

21  sorry I said that wrong.  You would need to find that the

22  Chapter 7 would be --

23        THE COURT:  Would return them an equal dividend, at

24  least.

25        MR. COHN:  Yes, thank you, Your Honor.  And in the

1  case of these individual claimants, that is simply not the

2  case.  Accordingly, the debtors have failed to meet the best

3  interest test as to the creditors who are objecting on that

4  basis.

5             THE COURT:  All right.

6             MR. COHN:  Thank you, Your Honor.

7             THE COURT:  Thank you.  Let's take a five-minute

8  recess and then we'll start with responses.

9                      (Recess)

10            THE COURT:  Please be seated.  Mr. Finch?

11            MR. FINCH:  Nathan Finch for the Asbestos Claimants'

12 Committee and for the Plan Proponents as a whole, Your Honor.

13            Your Honor, the way we are going to proceed, I am

14 going to address the Libby claimants' arguments concerning the

15 TDP values and the alleged discrimination there, the individual

16 review process, the jury trial rights and their discussion of

17 the -- finally, their discussion of the insurance rights in the

18 AOV case.

19            Mr. Bernick is going to address the alleged

20 discrimination in the medical criteria and the best interest of

21 creditors issue, and Mr. Lockwood, I believe, will discuss, to

22 the extent that we need to get into it, the discussion of the

23 scope of the injunctions and the releases.

24            Before I begin though, I think it's important to step

25 back and put the Libby claimants' claims here in perspective.

1  Historically, Grace settled 84 cases from in and around Libby,

2  Montana, that's it.  And they settled those cases for a total

3  of $22 million, as compared to over 150,000 cases settled from

4  elsewhere in the country for an aggregate price of well over

5  $600 million.  And that record evidence is -- can I have

6  Graphic PPCL-200, Chris?  Those statistics were taken from

7  Libby claimants' Exhibit 63, which was one of Grace's final

8  asbestos litigation summary documents.

9       THE COURT:  Wait, I'm sorry, Mr. Finch.  I want to

10  follow what you're saying, but the slides that I've been given

11  don't match that.

12       MR. FINCH:  Sure.  I can hand up a set of slides that

13  I'm going to use.  I think you'll find it further back in your

14  book.

15       THE COURT:  Thank you.

16       MR. FINCH:  The point, Your Honor, is -- could we

17  have Graphic 200, Chris?  The point I'm making, Your Honor, is

18  -- and again, this is in evidence of record of Libby claimants'

19  Exhibit 63 -- is that historically Grace paid about $22 million

20  total to resolve the 84 Libby cases that it settled before it

21  went into bankruptcy.  Dr. Peterson testified that based on his

22  best projections, Grace would pay -- would receive and

23  ultimately pay something like 22,000 mesothelioma claims, a

24  little over 30,000, not pay a third of them, pay two-thirds of

25  them.  Even if you count all of the pending Libby claims, which

1    is 1,000 approximately in number, there is still 22 times as

2    many mesothelioma claimants around the country as there are for

3    all the claimants in Libby.

4        And, ultimately, when you heard Mr. Cohn make his

5    arguments, the vast majority of them were basically special

6    pleadings.  Libby doesn't want to be treated equally within the

7    meaning of 1123(a)(4) with everyone else.  They want to be

8    treated better than everyone else.  They want to have -- I

9    think Your Honor hit it right on the head when you suggested to

10   Mr. Cohn is that they want their own class, and their own TDP

11   and their own set of money in there that they can do whatever

12   they want.  And if you extrapolate their arguments out,

13   basically what they're asking for is, they want an absolute

14   guarantee for every one of their thousand people of at least

15   $400,000 per case and maybe more.  Which if you did the math,

16   that's $400 million, which is well over six times -- it's well

17   over 15 percent of what's available or likely to be available

18   in the trust.

19       Their entire argument is a series of why we should be

20   treated better than everything else, or conversely, they're

21   making arguments to try to defeat confirmation of the plan that

22   any asbestos personal injury claimant could make, and yet the

23   class in which the asbestos personal injury claimants have been

24   put have voted overwhelmingly in favor of this plan.  So, I

25   think it's important to keep that in mind.

1          The first thing I said I would talk to you about is

2   the TDP values and why they absolutely comply with Combustion

3   Engineering and the requirements of 1123(a)(4).  The Libby

4   Claimants are just basically, in our view, I think as the Court

5   will -- we read the Combustion Engineering decision, they are

6   horribly overstating the holding of that case.  That case, the

7   Third Circuit said, look, the two-trust system, where you had

8   prepetition settlement claimants getting basically a higher

9   percentage of the value of their claim versus everybody else,

10  that violates the Bankruptcy Code.

11         And then they go on to what's basically dicta to say,

12  on remand you should also determine whether or not the most

13  seriously injured asbestos claimants receive fair treatment

14  under the plan.  And here I submit to you, Your Honor, the most

15  seriously injured asbestos claimants are the people with

16  mesothelioma from all around the country.  Yes, there are some

17  people in Libby who are very sick and dying, but they are a

18  tiny, tiny fraction of the people who are very sick and dying

19  or dead from all around the country.  And I think the TDP as a

20  whole does treat the more severely injured people better than

21  the less severely injured people and it treats everybody, as a

22  whole, in a way that is fair and complies with 1123(a)(4).

23         We cited cases in our pretrial and post-trial brief

24  to the effect that when the Bankruptcy Code talks about same

25  treatment or equal treatment within the meaning of Section

1   1123(a)(4), what that means is that everybody's entitled to the
2   same process for resolving their claims, that everybody gets
3   the same payment percentage.  And clearly there's no dispute
4   that the plan and the TDP, in fact, does that.

5          The Libby claimants say, well, the TDP and the plan
6   don't give us our "true value" or our tort system value for our
7   claims.  Now, what do they mean by that?  None of the Libby
8   claimants has a judgment against Grace, none of them has a
9   settlement agreement with a fixed sum certain that says your
10  case is worth "X" amount of dollars.  If they did, they would
11  get whatever that liquidated value is times the payment
12  percentage and we'd be done with them.

13         Under the Bankruptcy Code, and indeed even under
14  general principles of state law, tort system value doesn't
15  allow you, as a claimant, to come in, in terms of proving up
16  your case.  If the Libby claimants were going to come and prove
17  the value each of their individual cases in front of a jury in
18  the District of Delaware or in front of a jury in the District
19  of Montana, Federal Courts, or in front of a state court jury
20  in any state in the country, they couldn't come in and say, oh,
21  ladies and gentlemen of the jury, you should give Mr. Snetter
22  here or Mr. Smith there as much money as what some other person
23  got who settled their case with Grace ten years ago.  That's
24  not a legal -- there's no legal entitlement to that, you
25  couldn't even put on that evidence, it's inadmissible.  There

1 is no legal entitlement of any asbestos personal injury

2 claimant under the law to some kind of "tort system value" as

3 the Libby claimants are using that term.

4        Each Libby claimant's claim, like every other

5 claimant in Class 6 is -- every other asbestos PI claimant in

6 Class 6 -- is an unliquidated personal injury or wrongful death

7 claim arising under state law which has no fixed value unless

8 and until it's either settled, dismissed on a motion to serve

9 summary judgment or tried to judgment and affirmed on appeal.

10 So, their whole argument that their cases are more valuable or

11 that they've got a higher "tort system value" is not based on

12 any kind of legal entitlement to that, it's based on the fact

13 that 84 people represented by Mr. Heberling and Mr. Lewis, for

14 the most part, were able to get a fair amount of money from

15 Grace on a case-by-case basis in circumstances that existed ten

16 years ago.

17        So, I would just note for the record, Your Honor,

18 that there is actually a fair bit of record evidence about what

19 cases outside of Libby were both, what they're worth,

20 successful cases that went to verdict and also Mr. Hughes had

21 some testimony about other high verdict jurisdictions.  And --

22 can I have the ELMO, Chris?  The ELMO, please?

23        THE COURT:  Mr. Finch, over what period of time is

24 the evidence that shows me what Grace's historical settlement

25 values were?  What period is encompassed in that settlement

1  stream?

2          MR. FINCH:  It depends on what you are -- the entire

3  database was put into evidence.  The values that Dr. Peterson

4  used when he put, recommended to the Committee what the

5  historical averages should be for the TDP values, he was

6  looking at the slice of time basically from the end of 1997

7  until Grace went into bankruptcy.  Remember he said there were

8  various trends that affected those values on a nationwide basis

9  like the fact that other defendants were going into bankruptcy

10 and the fact that Grace was becoming more of a target

11 defendant.  He extrapolated those trends, and that's where the

12 value -- but the starting point was about the 1997 to 2001 time

13 frame.

14         But, all the settlements are in evidence as Exhibit

15 7, which is a database, and the monthly asbestos litigation

16 report, the last one, which is the Libby claimants' Exhibit 63,

17 has the average of all the settlements nationwide, as well as

18 what they call the Grace employees' category, which is where

19 the $234,000 figure for Libby comes from.

20         But, just as a matter of record evidence, Dr.

21 Peterson also testified that -- and this is just in

22 nonmalignant cases -- that the verdicts outside of Libby, which

23 is if the ultimate arbiter of tort system of value is what

24 would you get if you won your case and you got a jury verdict

25 were substantially higher outside of Libby than in Libby.  And

1  if you put the -- as you can see there's some that are still

2  under appeal, which is mostly the Edwards' judgment, but,

3  they're, you know, eight, nine, $10 million.  Also of evidence,

4  there is an exhibit that shows Grace's entire history, which

5  includes Mesothelioma verdicts, which are substantially in

6  excess of anything ever achieved in Libby.  And Dr. Peterson

7  has also testified on a nationwide basis, verdicts in

8  mesothelioma cases are continuing to rise.

9        And I'll get to the concept of verdicts in a minute

10  when I deal with the Libby claimants' jury trial arguments,

11  because there's a very important reason why there's a cap and a

12  governor on what you can get paid by the trust, which I will

13  deal with in a minute.

14        But, going back to this argument about tort system

15  value, the Libby claimants aren't talking about what their

16  cases would be worth if it got tried to a jury and affirmed on

17  appeal.  They're saying their cases are more valuable based on

18  the fact that 84 people historically got more money from Grace

19  than the average of 150,000 people across the whole country.

20  And Mr. Hughes, in fact, testified that there were many other

21  sort of high verdict, high value jurisdictions around the

22  country that were comparable if not, exceeding Libby.  And he

23  testified about places like Beaumont, Texas and Madison County,

24  Illinois, and how the meso values for some law firms exceeded

25  the Libby claimants' meso values.  There is of record, the

1   settlement agreement with -- the settlement value for Dayton

2   Prouty who is a Waters and Kraus, a Texas firm case where they

3   settled the case for almost $4 million in circumstances that

4   were similar to Libby, but was not in Libby, Montana.

5          So, there's absolutely no evidence that the Libby

6   claimants that all their 84 settlements are orders of magnitude

7   bigger than everybody else.  And I think their evidence is very

8   clear that, yes, they have those 84 on the average are bigger

9   than the 150,000, but there are other high value jurisdictions,

10  as well.

11         So, what are they talking about with tort system

12  value?  They're talking about the settlement amounts achieved

13  by other people.  And even if that were a valid metric of

14  value, they've completely ignored all the record evidence that

15  shows that there's no basis for this Court to say that what

16  those people got ten years ago would be anything close to what

17  -- excuse me -- the people today could get anything close to

18  what the people got ten years ago.

19         Chris, can I have -- can you switch back to the piano

20  player, and can I have Graphic 201?  This is the second, maybe

21  the third slide in the deck that I handed up, Judge Fitzgerald.

22         THE COURT:  I have it.  Thanks.

23         MR. FINCH:  This is a graphical way to compare the

24  apples, which are the Libby claimants' 84 settlements over the

25  14 years before Grace went into bankruptcy with the factors

1  that exist now.  And there's testimony both from Dr. Peterson,

2  who was recognized by this Court as an expert in valuing

3  asbestos personal injury claims, and Jay Hughes, who has as

4  much experience in settling asbestos personal injury claims

5  maybe as anybody in the country, because he did it for Grace

6  for 15 years and he did a very good job at minimizing the

7  values.  And you've had -- both of them testified extensively

8  about the various factors that affect the value of the claims

9  and how those factors -- Mr. Hughes at least testified in great

10 detail about how the factors that existed historically in Libby

11 prior to the bankruptcy have changed now.  And you can't just

12 mindlessly say that just because something existed before it

13 would go on in the future.

14        Even if you're trying to estimate the value of Libby

15 claims, which is not what you're trying to do, you would still

16 have to -- maybe you would start with what the history was, but

17 you would have to take into account all these changed

18 circumstances.  So, you know, what are we talking about here?

19 We're talking about historically the Libby claimants were only

20 Grace workers or their family where there was no real dispute

21 about the level of exposure.  There was no real dispute about

22 the seriousness of their diseases.  The Libby claimants only

23 sued one company, W.R. Grace by and large.  Now, they have

24 claims against BNSF Railroad, the State of Montana, they want

25 to go after insurance companies.  And as both Mr. Hughes and

1  Dr. Peterson testified, when you start adding other defendants

2  to the mix, it lowers the cost per case of each defendant.  The

3  whole case might be worth the same, or less or more, but if

4  you've got five people you can collect money from, you're less

5  likely that any one of them would pay as much as if you only

6  were suing one.

7       Mr. Hughes testified that whereas pre-bankruptcy Dr.

8  Whitehouse's theories that the Libby pleural disease would have

9  inevitably progressed to death or that these people were, even

10 if they had minimal lung function decline currently, would get

11 sicker and sicker and sicker, Grace had a limited ability to

12 challenge that through the combination of the screening done by

13 the federal government and the discovery done by W.R. Grace in

14 connection with both the bankruptcy case and the criminal case,

15 they now have extensive data that I think completely undermines

16 and destroys Dr. Whitehouse's testimony on that point.  And you

17 heard some of it from Dr. David Weill.

18      Finally, there's a big difference between what you

19 can achieve in 84 courthouse step settlements, one of which, or

20 a couple of which settled in the middle of trial, where the

21 parties can aggressively work up the case, they can get a trial

22 date, they know they got a trial date.  Grace knows, they're

23 looking a jury in the eye versus a thousand cases -- how in the

24 world -- if Your Honor got asked, you've got a thousand

25 individual cases you've got to try, how long would it take you

1   to do that?  How long would it take a state court judge in

2   Libby Montana to do that?  Clearly, people discount cases based

3   on docket congestion.  That was one of the factors identified

4   by Dr. Peterson.

5          So, I think this whole concept of tort system value,

6   that their cases are so much more valuable to everyone else.

7   There's no record evidence that what 84 people received

8   prepetition is what, you know, a group of claimants from Libby

9   could get now, and there's clearly not evidence that they're

10  legally entitled to that.

11         But, be that as it may, the Libby claimants are

12  completely distorting how the TDP values were set and what you

13  can do in the TDP process.  Dr. Peterson testified that in

14  general, the TDP values were set based on nationwide averages,

15  except with respect to Category 4(b) where there was an attempt

16  for the most severely injured Libby Claimants to put them in

17  the same position, roughly, that that 84 people got

18  historically.  It's actually higher than what the 84 people got

19  historically, because if they can prove extraordinary exposure

20  and if they are severe pleural disease, either in expedited

21  review or the trust determines that's basically what they have,

22  they're entitled to that $400,000.

23         Mr. Cohn spent quite a lot of time complaining about

24  the Categories 2 and 3, the maximum available under Categories

25  2 and 3, through the extraordinary claims process.  If you

1    recall, he handed up a sheet that showed the TDP value for

2    Category 2 was $20,000 and for Category 3 was $60,000 if you

3    got extraordinary claims treatment.  What that entire argument

4    ignores, and we pointed this out both in our post-trial reply

5    brief -- and I want to spend a little bit of time on it today

6    -- it ignores both the plain language in the TDP and Mr.

7    Inselbuch's uncontradicted testimony about how that process

8    works in the individual review process and ultimately what a

9    jury can value the case at.

10          If you could put up the next slide?  I believe it's

11   202.  It's this one.  Yes.

12          TDP Section 2.2 says quite clearly that

13   notwithstanding that the claim does not meet the presumptive

14   medical and exposure criteria for the relevant disease level,

15   the trust can offer the claimant an amount up to the scheduled

16   value of that disease level if the PI Trust is satisfied that a

17   claimant has presented a claim that will be recognizable and

18   valid in the tort system.  And there was quite a bit of

19   testimony from Mr. Inselbuch about that.  And I'll just excerpt

20   one of the highlights of it here on transcript Page 54 from the

21   September 8th hearing.  I asked him, "In the individual review

22   process, is there anything in a TDP that would prevent a

23   claimant who doesn't meet the medical criteria for severe

24   disabling pleural disease to nonetheless receive a $400,000

25   settlement offer from the trust if they can prove extraordinary

1    exposure?"  The answer to that is, "No."  "That would be just

2    the same as the individual process we talked about before?"

3    "Correct."  And he testified to that extent in several

4    different places.

5           So, this argument that people who have minimal lung

6    function decline on a pulmonary function test score, if they're

7    in Libby, would nonetheless be stuck with a $20,000 or $60,000

8    value is just belied by the record.  In the individual review

9    process, they could come in and put the same evidence that Dr.

10   Whitehouse has been testifying about for years, that this

11   person really does have a more severe form of pleural disease

12   even though they currently don't have a lung function decline.

13   The trust in the individual review process can take that

14   testimony into account.

15          Mr. Cohn -- and this leads to my next point, just

16   talking about the individual review process -- Mr. Cohn said

17   there's no standards for what the individual review process

18   does.  In fact, again, they are misreading the TDP.

19          If I could have the ELMO again, please?

20          Section 5.3b(2) of the TDP talks about valuation

21   factors to be considered in the individual review process.  And

22   they include things like the degree to which the

23   characteristics of a claim differ from the presumptive medical

24   exposure criteria.  Factors such as the claimant's age,

25   disability, employment status, special damages, pain and

1  suffering, settlement and verdict histories and other law firms

2  experience in the claimant's jurisdiction, that means in and

3  around Libby, Montana, for similarly situated claims.

4  Settlement and verdict histories for the claimant's law firm

5  for similarly situated claims.

6          So, clearly in an individual review process there is

7  the right and there are things the trustees are supposed to

8  look at that allow a Category 2 on the face of the paper's

9  claim to come and say, no, wait a minute, I'm a claimant that's

10 really sick, I've got severe pleural disease, I'm represented

11 by Mr. Heberling, people in my situation got $300,000 before,

12 you should value me at the severe disabling pleural disease

13 value.  And the trust, in applying those factors, should do

14 that.  But, guess what?  If they don't, they can go and have an

15 arbitrator decide that, and if they don't like that, who gets

16 to decide what the value of the claim is?  Ultimately, a jury

17 in and around Libby, Montana, because the exit to the tort

18 system isn't to a Federal District Court in Delaware, it's to

19 the claimant's home jurisdiction.  So, whether it's a Federal

20 Court in Montana or a State Court in Montana, they get to have

21 a jury say, is this person a severe disabled pleural disease,

22 really, even though he might have normal lung function tests,

23 and what's the verdict value of the case?

24         So, I don't think there is a lack of standards in the

25 individual review process.  I think the G-1 case, Mr. Cohn

1  quite candidly admitted that really has nothing to do with the
2  issues Your Honor has before it.   That was a dispute about
3  whether or not a debtor could unilaterally, over the objections
4  of the entire Asbestos PI constituency and the FCR, impose a
5  set of claims allowance procedures in the context of estimating
6  the claims for purposes of allowance.   That was not a 524(g)
7  plan.   There was no overwhelming vote in favor of those
8  procedures as we have here.   There was no, there was no attempt
9  to say that this was a plan that was attempting to comply with
10  524(g).   The G-1 case was all about an allowance process.   It
11  was an estimation for purposes of allowances what the debtor
12  there was attempting to do, and ultimately neither approach
13  went forward.   After several more years of litigation, that
14  case is resolved now, thankfully, and so there's -- whatever
15  Judge Gambardella said in that decision has nothing to do with
16  the issues before you in the context of approving a 524(g) plan
17  that the PI constituency has overwhelmingly decided to accept.

18          THE COURT:  Mr. Cohn's correct, is he not, that
19  assuming that the Libby claimant, a Libby claimant, after
20  individual review is unhappy with whatever the trustees decide
21  and goes to a jury trial and gets a verdict, and let me just
22  assume for purposes of this discussion, it's a large verdict,
23  let's say 3 million, $4 million, how would the payment
24  percentage be applied?   Is it still limited to the cap?
25          MR. FINCH:  It's still limited to the cap.

1              THE COURT:  All right.

2              MR. FINCH:  And that gets me to my next -- I said I

3    was going to talk to you about four things before I ceded the

4    podium to Mr. Bernick.  That gets me to my next point, which is

5    the jury verdict caps.  I think Your Honor hit it right on the

6    head when you said, absent some kind of cap on what the trust

7    would pay, the whole 524(g) concept becomes unworkable.

8              There are two important reasons that Mr. Inselbuch

9    testified about why the jury verdict capped this.  One is to

10   basically provide horizontal equity between similarly situated

11   plaintiffs, you know, some guy might get a home run verdict of

12   $20 million who has mesothelioma in California, same person

13   just as sick with mesothelioma in Pittsburgh either gets a

14   verdict of $100,000, or a quarter million dollars or takes the

15   TDP settlement offer of $180,000.  That's sort of what I call a

16   horizontal inequity.

17             The more important problem is what Your Honor, I

18   think, also hit the head on -- and I'll cite you to some record

19   evidence in support of that in a minute -- is that if you don't

20   have some kind of way to put a lid on what people can get if

21   they go out and try their cases to a jury, it inevitably

22   endangers the trust's ability to continue to pay claims at the

23   same payment percentage.

24             And I'll give you the evidence that supports that in

25   general form, and if you want more specifics, I can give you

1  more specifics.  But, basically Dr. Peterson testified about

2  the factors that influence claim values.  And you see in

3  Grace's history, the values kept going up, and up and up.  One

4  of the things that really drives claim values is if somebody

5  goes and gets a home run verdict some place, every other

6  plaintiff's lawyer in the same place or even all around the

7  country says, hey, I want more money.  And that kind of upward

8  pressure on the values eventually, you know, drove Grace into

9  bankruptcy.

10        The other thing is, if you're trying to estimate what

11  a trust will pay out, and Dr. Peterson testified to two

12  different sets of estimated liabilities.  Mr. Cohn is incorrect

13  when he says there wasn't record evidence about what the trust

14  would pay out versus the tort system.  If you use -- this is a

15  slide from Dr. Peterson's demonstrative exhibits.  There's

16  record testimony, the demonstrative exhibit was Plan

17  Proponents' 178-b, his testimony was on September the 8th --

18  no, excuse me -- the testimony about this was on September the

19  14th when he was testifying about his overall estimate.  But,

20  basically, he testified that with the TDP values and having the

21  caps in place, the liability of the trust is somewhere between

22  6 and $9 billion.  If there is no cap, the tort liability

23  ranges anywhere -- it tends to be about a billion dollars

24  higher across all of his models.  But, that also doesn't take

25  into account that if people are able to go out and get home run

1  verdicts, the values would keep going up even farther than what

2  Dr. Peterson projected.  Remember, even his tort system

3  forecast he projected the value to go up to a certain point

4  then they'd stop.  There wouldn't be any more increase in the

5  values.

6         Well, I don't know if Your Honor -- Dr. Peterson did

7  testify the mesothelioma values have gone up substantially in

8  the decade since Grace went into bankruptcy.  I don't know if

9  you can take judicial notice of the fact, but there are

10 definitely reported decisions where mesothelioma verdicts in

11 the range of ten to $20 million are becoming, you know,

12 increasingly less rare.  If you allow any claimant -- and

13 ultimately Libby's jury rights argument isn't specific to

14 Libby, every single asbestos claimant all around the country

15 has the right to a jury trial, absent a bankruptcy.  If you

16 take that -- if you let them go out and -- everyone go out and

17 get home run values, there's no way to put a governor on both

18 the lot -- the trust liability, and ultimately it's going to

19 just lead to a decrease in the payment percentage and could

20 cause the trust to run out of money, ala what happened to the

21 Manville Trust when it originally was set up.

22        In terms of Mr. Cohn's argument that the jury trial

23 rights are a constitutional right that you can't take away from

24 individuals, I want to remind Your Honor of what I consider to

25 be several black letter points.  First of all, in the context

1  of seeking a distribution from a bankruptcy estate, the cause

2  that is ultimately an equitable proceeding, there is no Seventh

3  Amendment right to a jury trial.   In the <u>Granfinanciera v.</u>

4  <u>Nordberg</u> case was not a personal injury case.  It involved a

5  situation where an entity that hadn't sought to seek money from

6  a bankruptcy estate was sued.  They asserted their jury trial

7  rights.  The Court said in that context, because it was an

8  action at law, not an action -- the creditor wasn't trying to

9  get anything out of the bankruptcy estate, it wasn't an

10  equitable action, there's no constitutional -- there is a

11  constitutional right to a trial in an action at law.  But,

12  there's a whole series of cases going back, literally over a

13  hundred years that talk about the fact that there's no right to

14  a jury trial in an equitable proceeding.  And I'll just cite

15  <u>Katchen v. Landy</u>, it's a Supreme Court from 1966, <u>Langenkamp v.</u>

16  <u>Culp</u> a more recent case, 498 U.S. 42 (1990).

17          So, the jury trial right that is available in the

18  Bankruptcy Code comes there as a result of 28 U.S.C. 1411 which

19  says that nothing in Title 11 shall affect the jury trial

20  rights.  And that statute was enacted in 1984.  Basically,

21  because the tort claim lawyers, people like Fred Baron didn't

22  like the idea they wouldn't have a jury trial right if they

23  wanted to prove up a case in bankruptcy and they got Congress

24  to pass 28 U.S.C. 1411.

25          Now, there is two canons of statutory construction

1 that say that the 524(g)'s discussion of valuing and paying

2 claims trumps 28 U.S.C. 1411.  Number one, it's later enacted,

3 and there's a lot of case law and principles of statutory

4 instruction that say later enacted statutes trump earlier

5 enacted statutes to the extent that they're in conflict.  And

6 number two, it's a much more specific statute.  It deals with

7 how you value and pay asbestos personal injury claims.

8         And remember, Mr. Cohn finally, in connection with

9 his argument about 28 U.S.C. 1411, if you can reduce what

10 people pay by the payment percentage, Title 11 clearly does

11 that.  If it's constitutional to do that, why isn't it also

12 constitutional to reduce what they pay not just by what the

13 trust pays out and not just by the payment percentage, but also

14 by some other element that puts a ceiling on what they can

15 recover?  I think there's no way to distinguish those two

16 situations.  It's clearly constitutional for people to get a

17 payment percentage on the value of their claim, and I believe,

18 Your Honor, that 524(g) basically is a modification of a

19 statutory right and makes it clear that you can -- that the

20 trust can -- that there will be limits on what the trust pays

21 out, and that's why the jury trial rights that he asserts

22 exist, really don't.

23         Finally, with respect to the treatment of insurance,

24 he cited to the AOV case.  I would just remind Your Honor that

25 the AOV case was not a mass tort case.  It is -- it's a basic

1  principle of the law in the Third Circuit, at least, that

2  proceeds of insurance policies are property of the bankruptcy

3  estate.  In connection with the Arrowwood settlement approval

4  motion, Libby made the exact same arguments that they had

5  direct actions, invested rights in the debtors' policies.  Your

6  Honor rejected those arguments then.  We cited to you in our

7  post-trial briefs the Ulrigg case from Montana, which makes

8  clear that you don't have a vested right in insurance policies

9  unless you already have a judgment or a settlement that's

10 consented to by the insurance carrier.  It's clear that CNA is

11 not consenting to any settlements of Libby claims.  I mean,

12 they're disputing the very existence of this non-products'

13 coverage.  But, even if they did have a direct action right,

14 which they don't, and I think Your Honor has already in the

15 context of the Arrowwood settlement overruled that argument,

16 the AOV case was a case where there was a guarantee, a fixed

17 guarantee, no dispute other than what the -- there was a

18 dispute about the guarantee, but there wasn't really a dispute

19 about what the guarantee was worth.

20          First, in the context of a mass tort where

21 everybody's claim triggers a different amount of insurance for

22 Grace.  Mr. Posner's testimony was pretty clear that how much

23 insurance Grace could get from insurance carriers could be

24 anything from nothing to a hundred cents on the dollar, and it

25 depended on the exposure facts of each individual claimant's

1  claim.  The AOV case was heavily criticized in two other mass

2  tort cases, one of them is an asbestos case, for basically

3  saying, you can't say that it's a violation of 1123(a)(4) just

4  because somebody might be able to recover something from a

5  third party, because there's no way in a mass tort context to

6  value what each creditor might get from the third party or what

7  the trust might get from the third party.

8          There's essentially no evidence as to any particular

9  Libby claimant how much recovery they could get in their

10  particular facts and circumstances, how much they could cause

11  the trust to recover.  I just would cite to you the Quigley

12  case, which we cited in our papers, and the Dow Corning case

13  which we cited in our papers, which make it clear that AOV

14  doesn't prevent the plan's treatment of the insurance rights

15  here.

16          So, basically, Your Honor, there's a lot of other

17  things I could say.  I think we have covered the waterfront in

18  our papers.  I don't think there's any basis for denying

19  confirmation of the plan based on the arguments raised by

20  Libby.  Mr. Bernick is going to address the best interest

21  argument and Mr. Heberling's points about the medical criteria,

22  and Mr. Lockwood will say whatever Mr. Lockwood will say, and

23  so I will sit down and cede the podium.

24                      (Laughter)

25          THE COURT:  I guess, Mr. Bernick, we better start

1 with you.

2        MR. BERNICK:  Well, I don't know.  I don't know if I

3 want to be subject to whatever it is that Mr. Lockwood is going

4 to say.

5                       (Pause)

6        MR. BERNICK:  Actually, with that note of caution,

7 I'm going to see if I can preempt what Mr. Lockwood has to say.

8        So, let me begin with the discrimination point then

9 deal with best interest, Your Honor.  I think it's fair to say

10 that with complete respect for the significant track record

11 that Mr. Heberling and his colleagues have had in litigating

12 the Libby claimants' claims over the years, that effectively

13 their approach still hasn't gotten away from their experience

14 with the civil litigation in Montana, and they haven't come to

15 grips with the particular measures and tests that are

16 applicable in this court.  And that's the very evident

17 connection with the claims of discrimination and with the TDP.

18        Those -- the TDP and what really drives the TDP of

19 its purpose, those matters have been fundamentally

20 misapprehended by the theories that have been brought and the

21 arguments that have been made by Libby claimants before this

22 Court.  The TDP is not about a diagnostic process, it's about a

23 compensation process.  Not only a compensation process, but a

24 compensation process that is specifically driven by the

25 mandates and requirements of 524(g) applied in the real world

**J&J COURT TRANSCRIBERS, INC.**

1  context of having to deal with tens of thousands of claims.

2  And in a way, when viewed in this context, there's no choice

3  but to do exactly what the TDP has done.

4       I want to show the Court what we marked as proposing

5  Plan Proponents' CL-019.  That designation is just designed to

6  make reference to the fact that this is a closing argument

7  demonstrative.  It's not been offered in evidence, we're not

8  purporting to say that it has been.  But, this is the logic

9  flow behind the TDP process that was laid out by Mr. Inselbuch

10  and it's really relatively simple.  524(g) says you have to

11  have a trust.  It says you have to treat currents the same way

12  as futures.  And the reality is that you're dealing with huge

13  volume.  So, if you've got a huge volume of claims, you've got

14  to make sure that everybody's treated as much the same way as

15  possible beginning now and going forever.  And you're going to

16  have to do that within the confines of an overall asset pool

17  and with requirements that everybody basically be treated in

18  the very high equitable fashion that trustees are required to

19  pursue.  There's no question but that you have to settle the

20  overwhelming number of cases, otherwise you're just -- I mean,

21  Manville experience, day one tells us, if all you do is open up

22  a trust that then tries to settle but then you have to go ahead

23  and litigate all over again, you have exactly the phenomenon

24  that Your Honor referred to which is a mad rush to refuse to

25  settle, take cases back to the courts, the whole process

1  completely disappears.

2      And what's really in the context or with the backdrop

3  of the Manville experience that Dr. Peterson principally, and

4  others, worked to create the TDP, and this was -- you know,

5  this was 20 years ago.  So, all of this process is basically,

6  and all this period of time has recognized the reality in the

7  context first of non-524(g) trust, but then through 524(g) of

8  exactly the process that's been described.  And the role of the

9  TDP is to really accomplish the laboring -- the major work that

10  has to be done which is to process all of these claims.

11      What is the approach of the TDP?  It's to settle the

12  clear cases on the basis of objective criteria so that you

13  don't have to have individual review, and also so that you are

14  not overpaying.  If you overpay on TDP, you can't recover

15  later.  If you slightly underpay on TDP, you can recover later.

16  So, it's the clear cases objective criteria and, and this is

17  critical to the issue that's been raised in connection by the

18  Libby claimants with regard to the scheduled values, you have

19  to have fairness on a nationwide basis.  This is unrebutted

20  testimony and it is as if the Libby claimants simply haven't

21  heard.

22      They say, well, we want fairness on our own terms.

23  When it comes to the dollars and when it comes to the medical

24  criteria, you can't get to fairness on the basis of each law

25  firm's own terms, each geographical region's own terms, on the

1 basis of individuals, to say nothing of law firms or

2 geographical locations, through a TDP.  Can't get there.

3 That's an impossibility.

4        So, the idea that we should somehow measure the TDP's

5 scheduled values, the diagnostic criteria by looking for, well,

6 is it fair to this individual or fair to this law firm?

7 Completely and utterly misses the point of 524(g) and

8 completely and utterly ignores what is now an undisputed record

9 of what is necessary to make a 524(g) trust work, and that

10 record was put in by Dr. Peterson.

11        So, the Libby claimants have failed to recognize this

12 fundamental process.  They've also failed to recognize what

13 actually has been done and the significance of what's been

14 done, specifically to accommodate their concerns; that is, you

15 have this huge national process that's been under way for 20

16 years, it's processing hundreds of thousands of claims, and

17 these folks come into this court and say, oh, well, gee, we

18 need to be treated differently.  Well, you know what?  Of all

19 the different claimants that are out there everywhere,

20 notwithstanding all of this experience, the ACC specifically

21 reached out to them and said, hey, we're going to listen to

22 you.  And, you know, I can speculate about all their different

23 motivations of doing it, but the fact of the matter is, that's

24 exactly what they did, they listened to the Libby claimants.

25 Well, as they say, no good deed goes unpunished.

1          So, what happened?  What happened was that because of

2 the focus of the Libby claimants on pleural disease, the ACC

3 said, well, let's look into this, and they consulted with the

4 scientists, and you heard this from Dr. Welch who said, well,

5 is there something to this idea of severe pleural disease?  And

6 lo and behold, there was.  It wasn't something that was unique

7 to Libby.  It's called diffuse pleural thickening, it's been

8 observed for the better part of 30, 40 years outside of Libby,

9 I think it's been the subject of publications outside of Libby.

10 You say, oh, well, if there's a diagnostic category that's

11 recognized by the literature, we can take that nationwide and

12 accommodate the concerns of the Libby claimants.  I mean, talk

13 about spot on.  That is spot on.  And they took it one step

14 further, which is to say, well, if we're going to create the

15 category, we want to make sure that we are doing so based upon

16 science.  So, they look to the science.

17          Now, here again, there's just a parting of the ways,

18 and a misapprehension about how the science was used.  The

19 Libby claimants' experts came in and said, well, you didn't do

20 a reasonable job of following the science.  Well, reasonable as

21 compared to what standard?  If the standard is diagnostic,

22 clinical diagnostics, and you could say, well, gee, the

23 standard that was, that's the standard, the criteria adopted

24 were too tough.  That's not the test.  It was reasonableness as

25 part of, again, an overall compensation system.

1           So, if you want to capture the clear cases with

2 objective criteria on a nationwide basis, you use the science

3 to inform.  This is PPCL-020.  Inform the criteria for

4 compensation.  And that's exactly that was done.  They used the

5 science, Dr. Welch and others used the science to say if we

6 want to capture those clear cases for compensation, how do we

7 do it?  This is how we do it.

8           The attack that's been made is all focused on

9 reasonableness by reference to a standard that is not at issue.

10 That is how the doctors go ahead and diagnose and treat their

11 patients.  Clinical diagnostic criteria, Dr. Whitehouse's

12 experience -- I'm sorry, Dr. Whitehouse's experience doesn't

13 serve to create a basis for a national approach, or a maximum

14 compensation.  They'd like to see more people get compensated

15 up front.  Unfortunately, that's an issue -- that is an issue

16 of how you run the overall compensation scheme, and on that

17 question, majority will rules.  That is if you have a

18 compensation scheme, it's up to the claimants to vote with

19 their feet whether they like the compensation scheme.  That's

20 not specific to Libby.  That's a general issue, which is how do

21 you run a compensation scheme.  Well, Libby people can't invoke

22 science to say, well, we want more compensation.  Sorry, there

23 it is majority rule, because the majority is -- in fact, all

24 claimants in the constituency are in fact focused on

25 compensation, that's the whole deal.

1          So, we now have a structure and a reason -- an
2  overall structure, a structure that's specific to the Libby
3  claimants.  Is there any question but that the criteria that
4  were developed for severe pleural disease were done with that
5  specific point in mind; that is, to capture the clear-cut
6  cases?  The answer is, no.  This is the testimony on September
7  8th, Page 123, by Dr. Welch said, the criteria says so that
8  it's in a way those are very clear cut cases, that is the whole
9  approach.

10          So, now we come to the attack that's been made --
11 challenge I'll say more generally that's been made.  What's
12 happened?  And this is Plan Proponents' CL-021.  First
13 question, "Do the Section 4(b) medical criteria, in fact,
14 capture, capture clear cases of severe pleural disease?"  That
15 is given the purpose as part of the overall structure and the
16 way that 4(b) was developed, does it in fact work to achieve
17 its stated purposes?  And the answer is, undisputedly, yes, it
18 does.  This came from Dr. Whitehouse, September 11th testimony
19 at Page 130 and from Dr. Frank, September 10 testimony at Page
20 286.

21          I asked Dr. Frank, "If I were to tell you that his
22 testimony, this Dr. Whitehouse, is that, yes, based upon the
23 science, the TDP will pick up clear cases of pleural disease
24 resulting in serious impairment, would you disagree with that?"
25 The answer, "I would agree.  They are restrictive enough, but

1 the cases are unlikely to be anything but clear, and it's a

2 question of where you set the bar, and that is an issue where

3 you set the bar, not of diagnosis for clinical purposes, but

4 rather processing claims for compensation purposes."

5         What about Dr. Whitehouse whom I quoted?  And this

6 was a more extended colloquy at Pages 130 and 131 where he had

7 to be confronted with his deposition, and I ultimately did

8 that.  I said, at his deposition he said in responding to this

9 question, "That as the tests that are imposed by the TDP for

10 severe disabling pleural disease for the diagnosis of it, those

11 are tests that science says if they're satisfied, a claimant

12 will be a pretty clear case of having severe disabling pleural

13 disease." And your answer was a simple, "Yes, isn't that what

14 you said?"  And after some kind of jawboning he says -- I said,

15 "You answered it simply and clearly correctly."  He answered

16 that that was true.  So there's no question in this case but

17 that the actual purpose of the TDP Section 4(b) in fact has

18 been served to capture the clear case.

19         Well, do those criteria then discriminate against

20 Libby as compared to non-Libby?  And I say there's no evidence

21 of this.  Why do I say that there is no evidence of it?  What

22 they would have to show is what the capture rate is for Libby;

23 that is, how does the TDP capture the people with severe

24 pleural disease at Libby caused by exposure to asbestos at

25 Libby versus non-Libby?  You'd have to do the same thing, have

1 a capture rate for both, and then -- now, there are two basic

2 problems that the Libby people had.  One was they couldn't

3 figure out their own capture rate.  Even today, Mr. Heberling

4 is still talking about 86 percent.  Eighty-six percent was an

5 irrelevant number as a beginning stage for actually the work

6 that was done.

7          This was all brought out on the cross examination of

8 Dr. Frank.  Remember we had this, this is LC-274, which is the

9 stepwise process for the CARD mortality population.  And it

10 finally took you down to 76 non-male asbestos-related disease

11 cases to 76.  Well, the 76 is non-male.  It's not the severe

12 pleurals.  You've got to isolate the pleurals.  So we then

13 went through and confronted Dr. Frank with the counting sheet.

14 The counting sheet was LC-109.  And the 76 came down to 37

15 people who had moderate or extensive pleural disease, but some

16 of those people also had interstitial disease.  So, if you want

17 to isolate the pure pleural diseases, which are 4(b), you've

18 got to take out the people who also have asbestosis.  Well, it

19 turns out that 20 of the 37 had minimal or no interstitial

20 fibrosis, so that gets you to 20 people.

21          So, we're now going to test the proposition of the

22 capture rate with respect to the CARD data on 20

23 (indiscernible).  The question is, okay, we've now got the 20

24 by virtue of your own admission, how many of those people, (a)

25 have severe and how many of those were captured?  Right?  It

1 was remarkable but that the Libby expert himself could not

2 answer that question, and this was very clear in the testimony.

3 This is a just beautiful, beautiful clear --

4                              (Laughter)

5              MR. BERNICK:  This was the flip chart.  Not quite as

6 clear, I'm getting better, today's a little better.  But, this

7 isolated the 37 and then the 20.  And then I asked him, I would

8 say, okay, how many of these people are serious; that is, are

9 serious pleurals?  And the answer is that he hadn't looked at

10 that question.

11             First of all, he didn't know what their cause

12 -- he said that they had died and that he didn't know what the

13 cause of death was, he just got it from Dr. Whitehouse.  That's

14 September 10 at Pages 283 and 284.  So, he couldn't say really

15 what the cause of death was because he didn't know, he was just

16 taking it from Dr. Whitehouse.

17             So, then is, here is the question, this is Page 266.

18 Of the 20 people, how many people had serious lung function

19 impairment at the time that they were being diagnosed?  Lung

20 function impairment, severe.  I'd have to go through the chart

21 and figure that out.  I can't tell you what the number of that

22 20 is without doing the calculations.  Is that in your counting

23 memo?  I don't see that, the answer to your question in this

24 memo.  And he never was able to tell us what it was.

25             How many of those people even had diffuse pleural

1  thickening as defined by anything, the literature, any
2  definition?  This is same day cross examination, Page 269.  How
3  many people who have pure pleural disease had diffused pleural
4  thickening?  By whose definition?  Anybody's definition, your
5  definition.  My definition would not include the necessity for
6  blunting so I can't tell you that.  I said, well, even if you
7  included the blunting.  How many people either blunting?  I
8  can't tell you the exact number.

9        So, as this chart then reflected, he couldn't tell us
10 who had serious lung function impairment, he couldn't tell us
11 who it is that had diffuse pleural thickening.  So can you even
12 tell us with respect to the 20 what the capture rate is, how
13 many actually pass or fail the 4(b) criteria?  I don't know.
14 He says, question -- this is at Page 270; How many people
15 within the 20 people who had pure pleural disease of moderate
16 or extensive nature failed -- would have failed to pass, on
17 your view would have failed to pass the medical criteria for
18 Section 4(b) of the TDP, how would it have failed?  Eight-six
19 percent.  So he wants to go back to that 86 percent which
20 doesn't relate to the severes -- it doesn't relate to the pure
21 pleurals, I'm sorry.

22       I said, no, no, no, I said, how many people, I'm
23 talking about the 20, I'm not talking about the entire group,
24 the 20 pure pleurals.  He says, I don't know.  So, with respect
25 to his own population of pure pleurals, he can't tell us

1 whether they had severe impairment lung function, he can't tell

2 us if they have TDP and he can't tell us what the capture rate

3 would have been.

4          Now, that's just one prong of the discrimination.

5 The other prong of the discrimination is that there has to be a

6 comparator.  What happens outside of Libby?  What became very

7 apparent is that they hadn't done that work either.  It was

8 absolutely totally clear.  This is Page 271 of the cross.  He

9 says -- I asked him, "You haven't analyzed the impact of the

10 TDP outside of Libby?"  He says, "The data to do that analysis

11 outside Libby doesn't exist."  That's Page 271.  Page 288,

12 there's never even been adjusted -- never been to his knowledge

13 and reading -- scientific underpinnings in the peer weekly

14 literature  as to the justification to plan to do this study.

15          Whitehouse, Page 134, "Is it accurate you've not done

16 any scientific analysis of diffused pleural thickening in any

17 patient population outside of Libby?"  The answer, "That's

18 true."

19          It got to be so bad that Mr. Heberling at Page 132 of

20 the cross examination started to say this is irrelevant.  We're

21 only talking about discriminations against the Libby people.

22 We have not presented anything related to studies on other

23 people.  Well, that's right.  That's the problem.  That's the

24 problem.

25          So, we have with respect to the issue of

1 discrimination, the unequal treatment, the fundamental fact --

2 I'm going back to our little chart here if I can find it.  We

3 have a situation where the undisputed record evidence is that

4 they don't have a discrimination claim.  They've all tolled --

5 this is back to PPCL-021 -- it does -- the 4(b) criteria

6 undisputedly captured pure cases, no discrimination has been

7 shown.

8          Before I get to the other contention, I want to note

9 a matter of law which says -- well maybe I'll wait.  What are

10 the other contentions?  They say there's greater mortality in

11 Libby.  Well, there's unquestionably mortality in Libby.  The

12 question is, what's the relevance of it?  The answer is that

13 there is no relevance of it, and Your Honor already has so

14 ruled.  They say there's greater progression in Libby, and with

15 respect to the greater progression point, they have Dr.

16 Whitehouse's work and they were in pains to bring in with

17 respect to Dr. Whitehouse's work, all of the work that was done

18 by Dr. Molgaard.

19          Dr. Molgaard came in to bless and, you know, sprinkle

20 holy water over Dr. Whitehouse's work on this whole question of

21 progression, and I say unproven and irrelevance.  Irrelevant

22 because the TDP provides for the possibility of progression.

23 So how is that relevant to discrimination of the TDP?  But,

24 it's also unproven because these experts couldn't even bring

25 themselves onto the playing field of science when it came to

1 this whole area.

2         MR. HEBERLING:  Your Honor, we object.  This is

3 outside the scope of the record.  The Whitehouse progression

4 study 2004, was not entered into evidence.  There were no

5 opinions based upon it, so this is outside the record.  We used

6 the mortality figure.

7         MR. BERNICK:  That's just completely false.  You

8 actually have a whole chart that was done.  Molgaard came to

9 sprinkle holy water on the whole nine yards, including -- this

10 is the chart, LC-273.  Dr. Molgaard, what does he have?

11 Whitehouse --

12         MR. HEBERLING:  Your Honor, Dr. Molgaard testified

13 before Dr. Frank --

14         MR. BERNICK:  -- Whitehouse, 2004.

15         THE COURT:  Wait, Mr. Bernick, I can't hear the

16 objection.  I'm sorry.

17         MR. HEBERLING:  Dr. Molgaard testified as to the

18 procedural epidemiology of the 2004 study.  After that, Dr.

19 Frank testified and the Court ruled that the mortality, the

20 probability of death was irrelevant, and so that made

21 progression irrelevant, also, and we didn't introduce any

22 testimony on the Whitehouse 2004 study for that reason.  So,

23 that's why I objected.  This is beyond the scope of the record.

24         THE COURT:  All right.

25         MR. BERNICK:  That's actually untrue.  Dr. Weill,

1 after all, did testify in this case, and it is further untrue

2 because Dr. Whitehouse's study was, in fact, blessed by Dr.

3 Molgaard and as Mr. Heberling just referred to was the

4 mortality issue, not the progression issues.  Progression is in

5 the case because the absence, they used the progression study

6 in the '90s to get their higher settlement values.  What we

7 want to demonstrate was that once we finally got the data and

8 analyzed the data and were able to cross examine their experts,

9 the progression theory wasn't worth anything.  And therefore

10 going forward under the TDP, it makes no sense to use the old

11 historical settlement values, because they're inflated by data

12 that no longer is untouched.  It's now been demonstrated to be

13 disputed.

14         But, the fact of the matter is that Dr. Molgaard came

15 in and he purported to say, basically, Dr. Whitehouse is right

16 when he says that there's a problem with Libby, that the

17 disease is different, that the mortality is different, that

18 there's progression.  And the fact of the matter is, that Dr.

19 Molgaard, in LC-273, it turns out, wasn't talking about

20 established science, he was talking about public health policy.

21 And remember the exchange that took place when it became clear

22 that says this -- this is at Page 111 of the cross examination

23 of Molgaard.  "Therefore the only way that you can get to the

24 statement" -- which is in his final report -- "like without a

25 doubt causation's been shown in this case, the only way you can

1 get there is based upon public health policy, correct?"  The

2 answer was, "Right."  And then it says, "Is there even a

3 protocol that's been established for your public health

4 review?"  This is at Page 116, he says, "I don't know if

5 there's such a protocol in existence."

6         So, we have just a -- when you get to this, these

7 other contentions, greater mortality, greater progression, it

8 ought to be out on <u>Daubert</u>, it doesn't add to their causes.

9 What about the idea of 4(b) criteria add-ons excludes diagnosed

10 cases?  It's irrelevant because the whole question of what is

11 excluded as a diagnostic case doesn't get to the issue of

12 compensation.  Yes, there are some cases diagnosed that will be

13 excluded.  That's the whole purpose of the TDP is to provide a

14 benchmark.

15         So, we finally then get to what I call the eleventh

16 hour discrimination theories, which don't say that Libby is

17 being treated differently from non-Libby.  It says, gee, the

18 4(b) criteria produced too much individual review.  That's not

19 a discrimination claim, and there's no evidence of it.  That is

20 a compensation issue, that is a matter of compensation policy,

21 and that is for the constituency as a whole to vote on.  4(b)

22 criteria are more exclusionary than criteria for other disease.

23 Not a discrimination, and it's totally reasonable.  On this

24 record, where you have a meso case, the only question is, is it

25 a meso case or not?  If it's a meso case, it's caused by

1 exposure to asbestos, according to many scientists, and that's
2 certainly the basis of the TDP.  Lung cancer, same thing,
3 except that you now have the issue of cigarette smoking as a
4 complication.

5          When you get to nonmalignant disease, whether the
6 nonmalignant disease is related to asbestos is much more
7 problematic, and that is precisely why the criteria are more
8 stringent when you get to nonmalignant disease, and this was
9 the subject of testimony on cross examination of Dr. Frank and
10 Dr. Whitehouse.

11          So, as we sit here today there is no discrimination
12 case.  What about the CE decision?  CE decision was completely
13 mischaracterized by counsel.  CE decision, with which I think
14 that Your Honor has some significant -- we have to look back on
15 these things to see the role that they served at the time.

16          So in CE -- what was CE?  Well, you had a two-trust
17 structure.  That was one of the defining elements of that deal.
18 And that is where the Court in CE said, what was quoted by
19 counsel, which is, "Because the certain cancer claimants
20 contend the plan violates this principle as well as the
21 specific requirements of Section 524(g), 547(b), because the
22 two-trust structure provides the CE settlement trust
23 participants with preferential treatment over nonparticipant
24 asbestos personal injury claimants.  Plan Proponents maintain
25 this framework complies with the literal terms of the code.

1          Now, they don't say we agree.  They don't say that,
2   at all.  What they say is that, nonetheless, we believe that
3   the <u>Combustion</u> bankruptcy plan may impermissibly discriminate,
4   da, da, da, da.  Because the record is inadequate, we will
5   remand for fact-finding.  Their basic deal was that we said
6   that the Plan Proponents in the case, two-trust structure, if
7   you buy that, the requirements are met.  The problem is the
8   Third Circuit didn't buy it.  It says, okay, what if we ignored
9   the distinction?  You've considered everybody in a sense on the
10  same plate.  That was the purpose of the reading.  The Court
11  didn't say what the answer would be, but said we're going to
12  remand.        In that process, did they say either the two-
13  trust structure met the code, or did they define a new
14  provision or test that nobody had thought of?  They just kind
15  of said, oh, well, in an asbestos case things are always
16  different.  So you know what, even though you meet the code,
17  that's not enough.  That's completely and utterly fallacious.
18          In fact, what they did, if you take a look at the
19  text that then follows, they go through all of the requirements
20  of the code.  They go through equality of distribution among
21  creditors.  They go through the Equal Treatment Provision.
22  They talk about the provisions that deal with transfers in
23  advance of the bankruptcy.  They also talk about the
24  requirement for equality of distribution.  These are all very,
25  very well-established provisions of the code.  They're laid out

1  in black and white.  They don't say, oh, we've now thought of a

2  new one for asbestos.  And they then finished with the idea

3  that there has to be a fairness in the treatment of more

4  seriously and less seriously injured asbestos claimants and

5  there they do cite the <u>Ortiz</u> decision dealing with the limited

6  fund asbestos settlement, which comes under Rule 23 rather than

7  under the code.  But, they say, the heart of <u>Ortiz</u> was an

8  equitable principle that's also very much part of the

9  bankruptcy process, which of course is an equitable process.

10        So, all these things are black and white.  They were

11  all not new law, they were old law.  There's no such thing as a

12  new test or a new provision.  That's ridiculous.  And, in fact,

13  to the extent that the equitable ruling of <u>Ortiz</u> was discussed,

14  that is discussed by a reference to a proposition which is very

15  interesting.  The proposition is, gee, is this a situation

16  where the most seriously injured people are not being treated

17  fairly?        The argument that's being made for

18  discrimination in this case now is not the most seriously --

19  the serious, severe pleural disease people.  They're getting

20  actually a really good deal.  They're not raising the question

21  of the people who are not seriously nonmalignant and that they

22  ought to be getting more than people who are similarly situated

23  outside the (indiscernible).  So, the problem that they're

24  raising is not that the sick people are not getting enough

25  money, it's that the non-sick people are not getting enough

1 money.   Sorry, that is not what the _CE_ says.

2         The only thing I'll add with respect to

3 discrimination is on the quantity point, which is Libby, non-

4 Libby and TDP.   For the serious nonmalignant disease, the

5 serious cases, in Libby, the TDP with the multiplier because of

6 sole exposure takes you up to around $400,000.   The testimony

7 from Dr. Peterson is that's pretty much what the Libby people

8 have received, historically.   Even though non-Libby national,

9 as opposed to selected jurisdiction, even though the national

10 perspective which ordinarily is followed, the TDP for the

11 serious pleural disease matched historical experience at Libby,

12 even though it wasn't clear that the national average would

13 have been so high.   So, they got really good.   There's no issue

14 that somehow they didn't get enough money versus their own

15 history or versus the national average, because they got their

16 national average, they got their own average.   So, they did

17 real well on the thing.

18         I'll take a look at the non-serious.   They say, uh

19 oh, well, our history was for high dollars because of the

20 progression of the non-serious to the serious.   The TDP only

21 provides for whatever it was, like 60,000.   They say, well,

22 that's not good enough compared to our history.   Now this one,

23 Dr. Peterson said, now wait a minute.   We felt that we couldn't

24 so substantially depart from national averages.   This already

25 is high as the current national averages.   But, to go all the

1  way up, we can't justify by comparison to national averages,

2  that would violate our fundamental principle of having

3  something that's nationwide.

4          Now, they can argue with that judgment again, but

5  that's not a discriminatory judgment.  That's a principle that

6  says everybody is getting treated the same way.  If they really

7  wanted to say that they're not getting as much as they should.

8  They would have to show that there aren't any jurisdictions

9  that are like Libby that are getting -- that are like them not

10 only in terms of the nature of the disease, but also in terms

11 of the money that's been received.  That is to say, they would

12 have to establish that 60,000 is discriminatory against them,

13 because 60,000 is -- because they're not getting paid as much

14 as people outside of Libby who are in comparable jurisdictions.

15 How about Madison County?

16         So, the only evidence that's out there says that

17 their number at Libby is higher than the national average.  It

18 doesn't say -- there's no evidence that says that what the

19 Libby people are getting for non-serious disease, i.e. $60,000,

20 is outside the range or it's not good in relationship to the

21 national average, much less that it's not good in relationship

22 to other select jurisdictions.  They haven't made out a

23 discrimination case on that ground either.

24         So, for all those reasons, Your Honor, we don't

25 believe that there's a discrimination case and we go back to

1 remarks that I made at the outset, and Mr. Finch echoed, which

2 is, what are we doing here now with Libby?  It's no longer a

3 minority that's being abused, it's a minority that's coming in

4 asking for some things that attack as a whole, and that brings

5 us to best interest, and I'll try to be brief with best

6 interest.

7          This is an argument.  Best interest is not obviously

8 assigned to assure fairness for Libby, specifically.  And two

9 facts highlight how perverse the use of the best interest test

10 by the Libby claimants really is in the case.  First fact, no

11 other current personal injury plaintiff constituency makes this

12 objection.  All the other current claimants, PI claimants and

13 say, does anybody else believe that they're not being dealt

14 with fairly because they could do better in a Chapter 7?

15 Nobody else is coming forward and making these arguments.

16 Indeed, no other -- I don't believe that there's any other

17 current creditor constituency, at all, who has actually pressed

18 this issue.  They may have raised it as an objection at some

19 point, but nobody's in there arguing as the Libby claimants are

20 arguing today about best interest.

21          Second fact.  This argument actually seeks to

22 denigrate the interest of future demand holders at Libby.

23 These are the current Libby claimants saying, let's go to

24 Chapter 7, the current claimants will run like a bull through

25 buckwheat, and what about the future demand holders at Libby?

1 Well, you know what, they'll be around later on, they can do

2 with what they want.  I don't understand how Mr. Heberling and

3 Mr. Cohn, with all of their righteous indignation about the way

4 that people in Libby are being treated, are prepared to throw

5 the future demand holders under the bus.  I just don't

6 understand it.  But, it's certainly nothing to do with the

7 interest of the personal injury creditor constituency as a

8 whole.

9        The application of the rule to the facts of this case

10 also is perverse.  I say that for the following reason.  This

11 is Plan Proponent CL-010.  We have to look at the facts of this

12 case and say whatever we want about the basic language of the

13 rule, but the rule has to be applied.  And the rule has to be

14 applied in this case recognizing facts that we have.

15        Now, in a more cookie-cutter oriented Chapter 7

16 process or case, Chapter 7 would be an easy thing to figure

17 out.  If you had liquidated claims, the claims were liquidated

18 amounts, if you didn't have disputed liabilities, things like

19 that, it might be very easy to lay out the path of what Chapter

20 7 is going to bring.  And, in fact, in that kind of case if you

21 can lay out clearly what Chapter 7 was going to bring, you then

22 might be able to make out the proposition that Chapter 7 really

23 was -- Chapter 11 really was abusive, because you could see the

24 clear case in 7, and you can say Chapter 11 is not as good.

25 This case would involve a Chapter 7 that is anything but clear.

1          Indeed, it would be highly uncertain -- and this all
2  came in through testimony by Ms. Zilly -- highly uncertain in
3  all respects.  The very Chapter 7 liquidation process is
4  uncertain.  You'd have multiple litigation tracts, huge volume
5  and complexity of claims and limited litigation and settlement
6  tools.

7          So, the process itself, we can sit here and speculate
8  about, indeed the case law says you've got to speculate about
9  it because the tests require that you do that, and our
10 speculation right now is the only speculation that's in the
11 record.  Nobody else speculated through testimony about what
12 Chapter 7 would bring.  And Ms. Zilly laid out, this is a very,
13 very difficult and uncertain process.

14         Number two, the outcome for each element is
15 uncertain.  That is when you've got litigated claims, what's
16 the result going to be, either in litigation or settlement?
17 Mr. Cohn states blithely, oh, we would do so well in Chapter 7.
18 Why do you think you're going to do well in Chapter 7?  Just
19 kind of think about Chapter 7, the Libby claimants come in and
20 they say, oh, we've got severe pleural disease.  That's
21 interesting, how many are you?  Some subsection of 20 people.
22 Then the Chapter 7 Trustee says, will all mesothelioma
23 claimants please raise their hands.  And you have in any one
24 year, 2,500 people all raising their hands.  Now why are, what
25 we would say are the very dubious claims of severe pleural

1 disease coming out of Libby, why are they going to do better in
2 Chapter 7 when they've got thousands upon thousands upon
3 thousands of clear mesothelioma cases?  I don't know, but it's
4 not a matter of record in this case.

5          Three, latency means that the creditor pool will
6 change constantly and continue into the future.  That's
7 unquestionably true.  You can never really say we have figured
8 out who the claimant pool is at any one time, it's always going
9 to be changing.

10          If you just took those three facts, what would that
11 say?  That would say that the whole idea of best interest being
12 applied in a formulaic way in this case is completely
13 disconnected from the real purpose of the best interest test.
14 Real purpose of the best interest test is to say, 11 is abusive
15 because there's a clear and better path than seven.  If you
16 don't have a clear and better path then seven, how do you even
17 get to the idea that you can even inquire into abusiveness, and
18 it gets worse because the fourth fact is that here a Chapter 11
19 is a bird in the hand.

20          So, this is a situation where the best interest test
21 is being invoked in order to press for a liquidating settlement
22 which where nobody knows the outcome on the idea that it's
23 going to be better than a Chapter 11 where the outcome is
24 already known and involves a huge payment of money and
25 certainty.  It's exactly backwards.  This is the last case

1 where you have an 11 that's mature and provides for all of this

2 relief and everybody has said, this is the last case where you

3 say, oh well, gee, let's go over and do a Chapter 7 where we

4 have no idea, no clue of what's going to happen because somehow

5 we think that it's going to be better off for current claimants

6 and help us basically minimize the impact of the futures.

7 Absolutely no sense, whatsoever.

8        What is the answer to what to do about these various

9 problems that accrue to this case?  And this is Plan Proponents

10 CL-011.  Three things.  First, treat uncertain outcomes

11 conservative; that is, yes, take a look at the Chapter 7

12 scenario, but recognize its uncertainty and then instead of

13 saying, oh, well, gee, let's take the high end of what might

14 happen in seven, you go exactly the other way around because

15 the whole idea of a true test is to see if 11 is being abusive

16 because 7 is a clear path.  For the only way it can be clear at

17 all, and arguably clear, is if you're taking the low end of the

18 spectrum instead of the high end of the spectrum?  So what is

19 the outcome?  Asset values in Chapter 7 have to be regarded as

20 shrinking dramatically.  The Sealed Air Fresenius settlement,

21 the value of Grace in a sale, the insurance recoveries,

22 everybody here in this courtroom is insisting upon 524(g)

23 treatment.  There's no reason for that.  It's a huge thing.

24 And the idea -- and this is amazing -- Sealed Air and Fresenius

25 in a 7 would say, oh yes, we would love to pay an unbelievably

1  disputed fraudulent conveyance claim so we can pay all of that

2  money out only then so that we can come back later and be sued

3  forever in the tort system because we don't get closure in

4  Chapter 7.  Why would anybody get the incentive to go down that

5  road?  You can't say that Sealed Air and Fresenius are really

6  in the business of beating themselves, and let's pay out once a

7  week and continue to pay out in the future.  What about the

8  poor souls that are going to buy W.R. Grace out of Chapter 7

9  with no closure?  Where do these people believe -- I mean, you

10 take a look at the marketplace for the last ten years, nobody

11 will touch an asbestos tainted company, nobody.  And if you

12 can't even provide closure, who is going to buy those assets?

13 What soul would be so naive as to hear the word "asbestos" and

14 say, well, you know, let me cut a check for W.R. Grace with no

15 closure.

16         Number 2, we should be looking for a clear or major

17 disparity versus Chapter 7.  Nothing has been shown like that.

18 All of the analyses that have been done show that recognizing

19 the uncertain dates, you're kind of coming out in a similar --

20 with a similar result, before you get to the big thing, which

21 is the future demand holders.  But, even if you don't include

22 the futures, all the analyses come out roughly in the same

23 area, again that testimony has been unrebutted.

24         And Number 3, what should happen to the futures?

25 Unquestionably they should be included.  This is the Eagle

1  <u>Picher</u> case.  <u>Eagle Picher</u> has the analysis in black and white.

2  It says very simple, in a Chapter 7 -- this is

3  pre-524(g) -- in a Chapter 7, <u>Eagle Picher</u> at page whatever it

4  is -- 275, <u>Eagle Picher</u> pre-524(g) says, "A claim under Section

5  1015 will include futures."  Will include futures.  And

6  therefore it has to be included in the Chapter 7 analysis.

7        What is it that the Libby Claimants do?  They say,

8  well, you know, what, under 524(g), those people are not

9  currents, they are demand holders and they don't get to vote.

10  Well, it may be that for purposes of the voting process, yes,

11  you only have current claimants that can vote because what do

12  they say?  They hold up their hand and they vote.  And you then

13  have a futures representative who speaks for the future demand

14  holders.  That's for voting purposes under 524(g).  It doesn't

15  then say, oh, by the way, when it comes to best interest, we're

16  now going to redefine the term "claim" to exclude future

17  contingent unknown claims.

18        It doesn't say that at all.  And in fact, the

19  argument that they're making would actually take and say,

20  524(g) came on the scene, and what it means, when construed

21  with the best interest test, is that you should almost never

22  have 524(g), because you have to do the best interest test,

23  that then means that you have to exclude the futures which have

24  to be included under 11, which means that very few cases will

25  pass the best interest test unless, as is exceptional in our

1 case, you have a whole bunch of money that's coming in from

2 people who really do want closure from future demand holders.

3 So, their argument would essentially construe 524(g) in

4 connection with the best interest test to undercut the utility,

5 scope and the viability of 524(g) itself.

6        What happens if you do include the futures?  This is

7 PP-CL-003, this is one of the tables from the brief.  These are

8 all tables from the brief.  What this demonstrates is, you

9 construe the whole best interest analysis, all their way, give

10 them everything that they're saying, the 200 million, et

11 cetera, et cetera.  If all you do is to include the futures,

12 again this result is less favorable than what you would have in

13 a Chapter 11 case.

14        What about the other issues and have a

15 (indiscernible) -- that value of Fresenius/Sealed Air, absent

16 524(g), you've already heard about that.  Marketability of

17 Grace, absent 524(g), Ms. Zilly said it well.  It would take a

18 very brave soul to offer a billion dollars for Grace given the

19 possibility of over 300,000 personal injury claims.  That's an

20 understatement.

21        What about the point about $200 million?  The $200

22 million in settled claims in Chapter 11 is apples and oranges

23 versus a Chapter 7, because a Chapter 7 wouldn't have brought

24 about -- wouldn't have been able to bring to bear all of the

25 different constraints, and rules and procedures that by law

1 were applicable in this case with respect to traditional PD

2 claims.  But, even if you took it, the 200 million is a hundred

3 cent dollars of payout in Chapter 11.  What you're trying to

4 calculate is what the claim, what the liability claim would be

5 in 7.  If what you assume is 25 or 35 percent of a payout in 7,

6 the actual liability for Chapter 7 would be 600 to $800

7 million, even as indicated by the Chapter 11 settlement

8 agreement.  So again, another piece here.

9        The last three things are not best interest.  There

10 was an invitation by Mr. Cohn to say -- remember we talked

11 about how their agenda now is not just Libby versus the rest of

12 the world in terms of fairness of the vote and discrimination.

13 They now want -- and they've told us before, they really want

14 to go after the insureds.  They really want to go after all of

15 these other people, that's why they're here.  And this says,

16 well, gee, would you please put in the plan something that

17 says, tortious conduct?  It's just not picked up by 524(g).

18 You can't include that.  And it can't be in the injunctions.

19 You just can't include that.

20        Well, why are they doing that?  They're doing that

21 because they want in a very easy fashion to say, geez, we

22 really want these insurance companies to be open to lawsuits

23 and we really want them because we want to make sure that we

24 get their coverage, their non-products coverage, which is what

25 they want to say, without any impediment.  We're not here to

1 resolve coverage issues, we should not be here to simply accept

2 language changes that are solely designed to foster future

3 litigation, indeed litigation that inevitably under the plan

4 creates then issues of coming back against the estate.

5    Libby can't do anything in the context of this plan

6 without ultimately coming back and imposing a burden on the

7 estate by imposing a burden on asbestos protected parties.

8        With respect to Maryland Casualty Company, it says no

9 contribution has been made.  The contribution has been made on

10 behalf of American Maryland Casualty.  And the testimony by Mr.

11 Finke on this score is in Mr. Finke's testimony at Page 183, it

12 specifically described the contribution that's being made by

13 the carriers, it's pretty easy to see, which is that the

14 carriers have contributed a lot of value to Grace over the

15 years and will continue to do so, and that contributes to

16 524(g) trust which in turn recounts to benefit the claimants of

17 the trust and all kinds of claimants of the trust.

18        There is another very easy request that was made

19 that's also wrong.  It says Plan Provision 8.7.1 which is a

20 preliminary injunction that stays in place by the terms of the

21 plan as well, why shouldn't we just kind of have in there that

22 be lifted, or whatever?  And the answer is, the Sealed Air

23 settlement order requires this.  So, we have an issue.  It's

24 not quite so easy to say, oh well, lift stay, lift stay, lift

25 stay, because then you know what's going to happen.  They'll

1 seek to lift stay, lift stay with respect to Sealed Air and

2 with Fresenius.  And the Sealed Air settlement order

3 (indiscernible) --

4          THE COURT:  Mr. Bernick, with respect to Maryland

5 Casualty's contribution, I'm sorry, I do recall Mr. Finke

6 making statements about the contributions made in the past.  I

7 don't recall any testimony about contributions, Maryland

8 Casualty specifically, since that's the objection it's going to

9 make --

10          MR. BERNICK:  It's not --

11          THE COURT:  -- in the future.

12          MR. BERNICK:  It's not specifically broken up by

13 carrier.  It is simply a statement with regard to the insurers.

14 The insurers made a contribution to the extent that they still

15 have coverage that's out there or, (b) they provided coverage

16 in the past, thereby contributing to the liquidity of resources

17 of Grace.  And they have the indemnities which, you know, if we

18 don't have them protected would mean that those contributions

19 then become diminished.  So, effectively what you're doing is

20 you're saying we're getting all of what we've gotten from the

21 carriers in the past, continued forward and into the future,

22 wherever it is, fully protected.  Otherwise they would, in

23 fact, have the ability to the indemnities to come back and

24 diminish the assets that are available through a 524(g) trust.

25          So, it really is -- that's the whole idea of 524(g),

1 is that it enables people who are potential claimants, as well,

2 to give up on claims that they might otherwise make in order

3 then to make sure that the purpose of the trust is preserved.

4 Carriers aren't different that way from other parties that have

5 gotten benefits.

6       THE COURT:  So, Maryland Casualty is giving up any

7 indemnity claim it may have against the estate?

8       MR. BERNICK:  Maryland Casualty has no choice but

9 with respect to asbestos and set aside non-asbestos for --

10       THE COURT:  I'm sorry, I don't think your microphone

11 is working, right?  I'm having trouble hearing you.

12       MR. BERNICK:  That could well be.  I'm looking around

13 nervously because I know that Mr. Lockwood is going to pounce

14 if I get this wrong.

15       MR. LOCKWOOD:  I'll pounce anyway.

16       MR. BERNICK:  With respect to the asbestos claims,

17 that is claims that are made against Maryland Casualty by

18 virtue of its providing insurance that are made by asbestos

19 claimants, any indemnity rights that Maryland Casualty or any

20 other settled carrier would have over and against Grace are in

21 fact channeled under 524(g).  So, to the extent that 524(g)

22 would be applicable, they wouldn't have the ability to pursue

23 those indemnity claims.

24       So, they become -- and that's just the purpose of

25 524(g) is to make that available.  To the extent that they --

1 so I guess that's really what I'm saying is that they made a

2 contribution in the past, and under 524(g), we are then

3 protected from the prosecution of the indemnity claims and, in

4 effect, they are thereby making a contribution to the ongoing

5 viability.  Maybe something they don't have a choice but to

6 make, but Grace is on their behalf saying that to the extent

7 that the plan goes forward and it's got the corpus and the

8 trust, that that does represent an economic contribution by the

9 (indiscernible).  Otherwise, you'd have to have people

10 independently paying again for what they've already paid for in

11 the past, which is if the policy has been bought out, they've

12 already paid out the policy, they shouldn't have to pay it out

13 again.  That's the reason for the indemnity.

14          So, if the force of 524(g) would be, yes, insurers

15 get protection, but they have to pay again to make sure that

16 the indemnity holds that they get that protection, then in a

17 sense they're having to pay for what they've already paid for.

18 But, it's still a contribution that is the fact of their being

19 insurers who are part of the plan process represents a

20 contribution to the process.

21          THE COURT:  Okay.  But, I think the issue -- well,

22 I'm not sure I want to state the issue as other parties think

23 about it, I'm not sure I know specifically how.  But, I think

24 the focus is, to the extent that the Libby claimants have some

25 direct action that could be prosecuted against Maryland

1 Casualty -- I'm just speaking on Maryland Casualty because

2 that's where the objection was raised, okay -- and this

3 preliminary injunction would stop that action from going

4 forward until the effective date.  What happens after the

5 effective date as to those claims?

6       MR. BERNICK:  Well, to the extent that those claims -

7 - you then get into the question of what the -- how to

8 interpret the injunction that is in the plan, vis-a-vis

9 Maryland Casualty, given the nature of claims that are made

10 against it.  And there may well be an issue about what that

11 actually means.

12       THE COURT:  Right.  Which is what Mr. Cohn is saying

13 Traveler's requires me to figure out now.  And, frankly, if

14 there's going to be that kind of an issue, Travelers does

15 require me to figure it out now.  So, what is the meaning of

16 the injunction?

17       MR. BERNICK:  Well, I don't know that Travelers --

18                 (Laughter)

19       MR. LOCKWOOD:  Sorry, Your Honor.  I'm pouncing.

20       Your Honor, the starting point of this issue is the

21 plan itself, and the definition in the plan from Section 1.201

22 of settled asbestos insurance company, because that's what the

23 capacity in which Maryland Casualty is being protected by the

24 injunction.  And, in particular, the language of that says at

25 the end of it, "and further provided for the avoidance of

1 doubt, that an asbestos insurance entity is a settled asbestos

2 insurance company to the fullest extent, but only to the extent

3 provided by Section 524(g) in respect of any claim that arises

4 by reason of one of the activities enumerated in Section

5 524(g)(4)(a)(2)," that being the four by reason ofs, one of

6 which is by reason of provision of insurance to the debtor or

7 predecessor.

8        Now, the Libby claimants have filed lawsuits against

9 Maryland Casualty in the State of Montana.  What Mr. Cohn is

10 talking about is that lawsuit which charges, in effect,

11 Maryland Casualty of reaching an independent duty arising out

12 of its undertaking to perform industrial hygiene services, vis-

13 a-vis Grace and its employees.  Maryland Casualty also and

14 separately settled with Grace its insurance policy obligations,

15 and Mr. Cohn is not talking about the settlement of the policy

16 obligations --

17        THE COURT:  Right, I understand.

18        MR. LOCKWOOD:  -- in the point he was making.  He was

19 talking about the so-called independent tort action.

20        THE COURT:  Right.  That's what I thought I asked

21 about.

22        MR. LOCKWOOD:  Right.  This Court is being asked, as

23 I hear it, by Mr. Cohn, to look at the allegations of the

24 complaint, to look at his versions of what Montana law does or

25 does not say about the viability of those allegations as a

**J&J COURT TRANSCRIBERS, INC.**

1 cause of action, and to determine whether or not, depending on

2 what facts they might or might not be able to prove, the Libby

3 claimants could get a verdict against Maryland Casualty Company

4 which would be -- which they could argue did not arise by

5 reason of Maryland Casualty's provision of insurance to the

6 debtor, because if it did it could be channeled, but rather

7 arose out of this independent duty, negligence.

8          The plan says, it will be whatever it will be when it

9 gets litigated.  In other words, we're not going to have a

10 trial as part of the confirmation process as to what

11 allegations Libby can prove and how they would fit under

12 524(g).  Instead, once the effective date occurs, and the

13 injunction is in place, Libby can say, okay, we want to crank

14 up our suit in Montana against Maryland Casualty.  Maryland

15 Casualty Company at that point could say, wait a minute, that

16 suit's enjoined under the plan and come to this Court and ask

17 for some kind of a ruling on that point.

18          At that point this Court will be in a position, at

19 its leisure, to determine whether or not the claim does arise

20 by reason of the provision of insurance under 524(g) and is

21 therefore enjoined, or it doesn't.  And the plan accommodates

22 either result.  The plan is agnostic as to whether Libby

23 claimants are correct in their view or Maryland Casualty is

24 correct in its view.  And reserves for a later date, just like

25 any other person who would come in after the effective date and

1 try and sue an asbestos-protected party on some theory of facts

2 of law that says my claim isn't covered by the injunction.

3        One could hypothesize, you know, enumerable instances

4 of people trying to somehow or another get around the

5 injunction.  And in each and every case where that occurred,

6 this Court would look at the language in the plan, and the

7 language in the injunction and the facts of the law associated

8 with the claim being pressed, and would determine, is it

9 covered by the injunction or isn't it?

10        But, the idea that Your Honor is in a position

11 sitting here today -- let me back up one step.  In the

12 confirmation hearing process, other than putting in the

13 complaint, which is just a piece of paper with allegations in

14 it and doesn't really establish either the facts or the law,

15 it's just allegations, the Libby claimants have not herefore

16 put on their case against Maryland Casualty.  So, they're

17 basically asking you to sort of make a decision on the basis of

18 allegations of a complaint that's sitting in a court file in

19 Montana as to whether or not this plan properly does or doesn't

20 enjoin that case if and when the plan becomes effective.  And

21 there's no reason that Your Honor should have to do that

22 anymore than Your Honor should have to decide coverage issues

23 or any other dispute involving claims or scopes of injunction

24 or anything else.

25        The critical point, as I said before, is the plan

1 itself accommodates either outcome.  It doesn't purport to say

2 Maryland Casualty wins, and it doesn't purport to say Libby

3 claimants win.

4          THE COURT:  Okay, that's fine.  What I'm trying to

5 find -- that's what I was trying to find out, what the effect

6 is under the plan.  Because to the extent the plan has some

7 provision of which I'm not aware -- but I'm not sure I'm aware

8 of them all -- that says that there is some reference back to

9 the tort system of any direct, alleged direct action, then I

10 wanted to know what the consequence is.

11          MR. LOCKWOOD:  If Your Honor decides that the Libby

12 claimants are right and Maryland Casualty Company is wrong,

13 then the plan permits the Libby claimants to continue that

14 lawsuit in the State Court in Montana.

15          THE COURT:  Okay.  So, that the injunction is only

16 intended to cover Maryland Casualty to the extent that its

17 provision of insurance to the debtor would somehow or other

18 prohibit this claim from going forward, and I guess the theory

19 is because of the indemnity rights that Maryland then may have

20 back against the estate.

21          MR. LOCKWOOD:  Well, just to illustrate the point

22 hypothetically, Your Honor.  Maryland Casualty Company could

23 come in and argue and say, look, we don't hire ourselves out as

24 industrial hygiene consultants.  We're an insurance company.

25 Why were we doing this industrial hygiene activity up here?

1 Well, we were the workers' compensation employer for Grace.

2 One of the things we do for our insureds is try and help them

3 avoid workplace injuries.  That's part of what we do.  But, we

4 only do it as an adjunct of our providing insurance and we have

5 a common interest with the insured because if the industrial

6 hygiene is better, we have fewer claims.

7           THE COURT:  Okay, Mr. Lockwood --

8           MR. LOCKWOOD:  That could very well -- do you see the

9 point?

10           THE COURT:  Yes.  I heard that argument once before,

11 as I recall, already.

12           MR. LOCKWOOD:  Right, right.

13           THE COURT:  So, yes, okay.

14           MR. LOCKWOOD:  So the bottom line is, it's for a

15 later day.

16           The other part of the argument that you are hearing

17 that's related to that doesn't involve independent torts, it

18 involves the protection of Maryland Casualty as a settlement

19 insurer on its settled policies.  Mr. Cohn wants to say we

20 should be permitted to go and sue on settled policies on some

21 theory that the settlement is invalid or it doesn't cover

22 direct action, claims for non-products or whatever theory.  And

23 he says, giving Maryland Casualty Company protection from my

24 claims, my client's claims against that settled insurance, is a

25 violation of 524(g), not because the statute doesn't permit

1  such a claim, but because the money that Maryland Casualty

2  Company paid to that settlement, that payment took place prior

3  to the petition date and is not being paid as fresh money today

4  -- or rather on the effective date.

5          And he says that he reads the statute when it says

6  that party X can pay on behalf of -- that's the literal

7  language as Your Honor pointed out earlier -- on behalf of an

8  asbestos protected party.  He reads that to apply only to non-

9  debtor affiliates of the debtor.

10          And with respect to other non-debtor relationships,

11  such as insurance companies, he says you've got to have fresh

12  money or you've got to be able to allocate in some way or

13  another the insured, the debtor insurance payment on behalf of

14  that to some specific dollar amount.  And the answer to that

15  is, (a) the statute doesn't say that, (b) no cases ever said

16  that, and (c) from Grace's perspective, as Mr. Finke testified

17  on his direct testimony -- what's the date?  It's Page 183?

18          MR. BERNICK:  I don't have it, so I just said Mr.

19  Finke's testimony.

20          UNIDENTIFIED ATTORNEY:  It's the 14th of September,

21  actually.

22          MR. LOCKWOOD:  He said in answer to this question,

23  "So then with respect to these insurance companies that have

24  those prepetition settlement agreements with Grace that include

25  indemnities from Grace to the insurers, are any contributions

**J&J COURT TRANSCRIBERS, INC.**

1  being made in the proposed plan to the trust on behalf of those

2  settled prepetition insurers?"  Answer, "Yes.  I mean, Grace is

3  making -- when Grace makes its contribution to the 524(g)

4  trust, it will do so at least in part on behalf of those

5  settlement agreements which had prepetition settlements with

6  Grace."

7          Now as Mr. Bernick pointed out, the reason for -- I

8  mean, Grace isn't just sort of gratuitously saying, gee, we

9  really like Maryland Casualty, it's a fine group of fellows and

10 we'll sort of give them a 524(g) injunction because it's nice.

11 They're doing that because, as Mr. Bernick pointed out,

12 Maryland Casualty has indemnity rights against Grace, and those

13 indemnity rights, if Maryland Casualty is sued on those

14 policies, Maryland Casualty can then turn around and say to

15 Grace, you've got to pay us.

16         Well, Grace is channeling those claims to the trust

17 so instead it would be Maryland Casualty would turn to the

18 trust and say, you've got to pay us for that.  Well, the trust

19 and Grace want to give the trust the full value of Grace's

20 contribution unreduced by contingent liabilities from settled

21 insurers who by reason of their provision of insurance to the

22 debtor are eligible for 524(g) protection.

23         So, there was a lot of complicated discussion with

24 Mr. Bernick about future value associated with that, and I'm

25 not sure I followed all of it, but the bottom line here is,

1 this is -- the protection is being paid by Grace to the trust

2 on behalf of Maryland Casualty to eliminate the possibility

3 that the trust will wind up having, in effect, give some of

4 that contribution back by way of an indemnity payment to

5 Maryland Casualty Company if somebody who seeks to bring a

6 direct action, who is otherwise a trust beneficiary.  Remember

7 the Libby claimants here are trust beneficiaries, so they would

8 be, in effect, taking away from the trust a value, in addition

9 to whatever the trust was paying them on the value of their own

10 claims.

11        And we submit that, respectfully, there's no policy

12 reason or any other reason why you should read the statute so

13 narrowly as to say that either you have to have fresh money

14 coming in here as opposed to simply saving money for the trust

15 and for Grace, or that you should go the metaphysical route of

16 arbitrarily attempting to figure out, well, okay, Grace is

17 paying 2.2, $2.4 billion, how much is the protection here

18 worth?  And we'll just say that piece of the 2.24, which is

19 fungible assets, I mean, it's not -- it buys protection for a

20 whole host of entities, none of which other than Fresenius and

21 Sealed Air, you've quantified their share of it.  There's just

22 no reason to need to do it.

23        THE COURT:  Well, I think the issue comes down to the

24 concept that this injunction somehow is being equated to a

25 release, and it's not.

1          MR. LOCKWOOD:  It's not.

2          THE COURT:  So, I think maybe that's the issue about

3 the consideration.  But, that's how I seem to be framing it

4 anyway.  Mr. Cohn can straighten me out if I'm wrong.

5          MR. LOCKWOOD:  A final couple of points, Your Honor.

6 First, you had asked me earlier about whether or not the

7 individual review process in this case is different from other

8 cases.  There's actually some record testimony on that that I

9 would like to refer you to.  It's the testimony of Mr.

10 Inselbuch on September the 8th at Lines -- at Pages 38 to 39,

11 Lines 22 to -- Page 3 on 39, and I'll just read it quickly.  It

12 says, "Mr. Inselbuch, you mentioned the expedited review

13 criteria in the W.R. Grace plan.  There's also the process of

14 individual review that you described, is that something that is

15 new to the Grace TDP as compared to other places?"  Answer,

16 "No, that's been the two processes, expedited review and

17 individual review began in the 1995 Manville plan and have been

18 in every plan I've worked on since then."

19          THE COURT:  I think I was just getting confused about

20 the 4(b) issue in this, Mr. Lockwood, so --

21          MR. LOCKWOOD:  I just wanted to nail that down.

22          THE COURT:  Okay.  Thank you.

23          MR. LOCKWOOD:  Final point on the best interests'

24 analysis having to do with some of the statements about Mr.

25 Cohn -- by Mr. Cohn about what his clients would or wouldn't be

1 able to do.  He said two things which I don't believe there's

2 any support in the record for, if there is I'm unaware of it,

3 and which I believe are demonstrably incorrect.

4       First he said in a Chapter 7 the Libby claimants

5 would have the unfettered rights to pursue unsettled insurance

6 and

7 non-products and what have you.  I don't know where he comes up

8 with that.  I mean, if something's property of the debtors'

9 estate in an 11, it's property of the debtors' estate in a 7.

10       THE COURT:  Well, I think what he was --

11       MR. LOCKWOOD:  And a Chapter 7 Trustee would want to

12 maximize the assets available to the estate to pay all

13 claimants just the way a Chapter 11 debtor would, and so a

14 Chapter 7 trustee could start having settlement negotiations

15 with insurers and could try and enter into supplement

16 agreements with insurers under which the insurers would pay

17 their policy limits or some negotiated amount into the

18 trustee's accounts in a Chapter 7 case for distribution under a

19 Chapter 7 plan to all of the creditors.  And there's nothing

20 that I'm aware of in Chapter 7 that gives the Libby claimants

21 presumptively rights vis-a-vis the Chapter 7 Trustee that are

22 greater than the Libby claimants have in a Chapter 11.  And

23 Your Honor's already ruled that they don't have any direct,

24 specific, unique rights to the debtors' insurance in connection

25 with, as Mr. Finch pointed out, the Arrowwood agreement.  So, I

1 just don't think there's any basis for saying, oh, well, we'll

2 do better.

3          Secondly, he said that in Chapter 7, the claimants

4 would have jury trial rights which would maximize the value of

5 their claims and thus they would have a "better deal."  Well,

6 what he has failed to mention or discuss is exactly how those

7 jury trial rights would work in a Chapter 7.  In a Chapter 7,

8 instead of a plan, a trust where -- that had settlement

9 criteria and individual review and everybody's voting for it,

10 et cetera, you'd have I don't know what, 200,000 claims that

11 the Trustee would be facing.  And if you assume that Section

12 1411 applies -- 28 USC 1411, every one of those claims 200,000

13 would have jury trial rights, and they could all bring these

14 jury trials in every one of the 50 states where the claimants

15 resided and the trustee would have the ineffable pleasure of

16 defending 200,000 cases and would only under 1411 be able to

17 determine the, quote, tort system value, close quote, of those

18 cases by a judgment or individual settlements of the 200,000

19 cases with the lawyers.  And the Libby claimants have a

20 thousand of those 200,000 cases, and they got, you know, a

21 couple of law firms, and they haven't introduced any evidence

22 as to how a Chapter 7 Trustee would sort of decide that, boy,

23 those Libby claimants really have some great claims, so I'm

24 going to settle them out for the tort system values that they

25 got in the past, and in the meantime, I'll ignore the other --

1 the claims I've got.

2        And they don't even mention the cost of defense.   I

3 mean if you look at Libby Claimant Exhibit 63 on attachment --

4 Page 91-1633 is the Bates number, which is the final asbestos

5 litigation report for the month of March, 2001 that you've

6 heard of before, they have a summary on that page of defense

7 costs that Grace incurred on a cumulative basis for personal

8 injury claims, which is a hair under $200 million.  And if you

9 look elsewhere in the report, on Page 91-1625, you compare that

10 with the cumulative -- Grace's share of settlements and

11 judgments of $624 million -- 645 if you include judgments that

12 haven't been paid yet -- you're looking at a ratio of roughly 3

13 to 1.  So at a rock bottom minimum, assuming that the Chapter 7

14 Trustee was as efficient as Grace was in resolving the 200,000

15 claims, which, by the way, Grace got the result over a --

16 resolved over a multi-year period, as they accumulated

17 annually, whereas, this Trustee is going to have ten years

18 worth of new claims plus the claims that were pending, which

19 were I think, what, 125,000 as of the date of the position.  So

20 200,000 is probably a very conservative estimate.  It could be

21 300,000 claims.  And they're all going to do this, and it's

22 only going to be 25 percent of the total cost of doing that.

23        And I mean so the notion to go back to Bernick's

24 point about Chapter -- the best interest test requires you to

25 make informed speculation about what would happen in a

1 hypothetical Chapter 7, I suggest to you that Mr. Cohn's

2 speculation that his clients would, quote, do better, close

3 quote, in a Chapter 7 is a lot less plausible than the

4 speculation that a Chapter 7 would be a complete meltdown and

5 that nobody would have any idea what the outcome of it would be

6 other than he'd waste a whole of money and he'd spend the rest

7 of the Chapter 7 Trustee's and this Court's useful lives in

8 attempting to sort it out.

9            THE COURT:  That's the day I retire, Mr. Lockwood.  I

10 think there's a bigger issue if -- to be addressed with respect

11 to this issue about the conversion, frankly, and that is even

12 assuming that the Trustee could recover what Grace will pay

13 through the 11 or more, whatever the assumption is, how long is

14 it going to take and when will the pay outs be, because the

15 interim distribution possibilities would not exist given

16 200,000 unliquidated claims.  So the concept of returning back

17 to a jury trial for anyone who chose to or whatever mechanism

18 the Trustee was able to work out to litigate or liquidate --

19 pardon me -- liquidate those claims would be very time

20 consuming.  It took nine years in the 11 with parties working

21 together to do it.  I can only imagine what it would take in

22 the 7 --

23            MR. LOCKWOOD:  Well --

24            THE COURT:  -- and I think that is an issue.

25            MR. LOCKWOOD:  That ties -- that actually ties to the

1 future claimants' role in all of this, which Mr. Cohn blew off

2 by saying it was sort of unfortunate as a matter of policy that

3 they wouldn't be able to participate in the 7.  Keep in mind

4 that while this claims process was going on over these multiple

5 years, people would be getting sick all the time and having

6 claims against the estate.  So you -- you'd wind up with a

7 whole lot of future claims becoming present claims.  So that

8 would further confound the calculation.

9            THE COURT:  Okay.  Mr. Wisler.

10           MR. WISLER:  Good afternoon, Your Honor.  Jeffrey

11 Wisler on behalf of Maryland Casualty Companies.  Your Honor,

12 as you know, Maryland Casualty is a settled asbestos insurance

13 company, and under the terms of the plan, which are not

14 ambiguous, certain claims are going to be enjoined as against

15 Maryland Casualty.  That's the way the plan's written.  It's

16 based primarily on the definition of asbestos P.I. claim, and

17 that is not an ambiguous term.  It is very precise.  It is very

18 long.  It is very detailed, and it has not changed since this

19 plan was filed.

20           What the Libby claimants are asking for is a

21 clarification that their independent claims somehow are

22 covered, but, Your Honor, that begs the question as to what's

23 an independent claim.  What are they talking about?

24           THE COURT:  Do you need the overhead turned on?

25           MR. WISLER:  I do, please.

**J&J COURT TRANSCRIBERS, INC.**

1                           (Pause)

2          MR. WISLER:  Mr. Lockwood actually helped us with

3 this during his deposition.

4          MR. LOCKWOOD:  As opposed to my argument, Your Honor.

5                          (Laughter)

6          MR. BERNICK:  Yes, which is now being remedied.

7                          (Laughter)

8          MR. WISLER:  During his deposition on May 4th, and he

9 said if somebody in Libby, Montana is run over by an insurer's

10 truck on the way to work, of course, the injunction doesn't bar

11 the claimant from suing that insurer.  That's an independent

12 tort claim.

13          Now, Libby hasn't suggested, alleged, or otherwise

14 argued that Maryland Casualty's truck ran over one of their

15 Libby residents.  More importantly, the Libby claimants haven't

16 put on any evidence at all about what these independent claims

17 are that they want Your Honor to clarify.  There was no

18 evidence whatsoever put in in the confirmation hearing about

19 what these are, what's their nature, what makes them

20 independent, why they should be clarified or carved out.

21          Now, there are complaints that they filed, and I

22 think, as either Mr. Lockwood or Mr. Finch pointed out, they're

23 just complaints.  They're not evidence.  As the plan proponents

24 correctly stated in their brief, there's no evidence to even

25 suggest that the claimants -- the Libby claimants hold any

1 claims that shouldn't be enjoined.

2        Now, those complaints are the same one -- complaints

3 that Your Honor looked at in 2002.  In fact, I have the

4 transcript of the August 26th, 2002 hearing before Your Honor

5 where Your Honor reminded us that not only had you looked at

6 all of these complaints that the Libby claimants had attached

7 to their papers trying to undo the preliminary injunction but

8 had sent you several binders of documents supporting these

9 alleged independent claims.

10        These binders were not evidence, and they are not

11 evidence.  Nevertheless, Your Honor, as you said, read every

12 word of those documents, and based on those documents, you

13 found no basis for independent liability of Maryland Casualty

14 that wasn't derivative or arising from Grace, its conduct, and

15 its products.

16        Libby can and will continue to suggest that they have

17 some independent claims, and we have little doubt that they'll

18 go to Montana and try to bring new ones, newly created creative

19 claims, not just the aiding and abetting and the other claims

20 that they brought -- have brought already.  Maybe they'll come

21 up with new ones.  But right now there is no basis on this

22 record upon which the Court could find that the Libby claims

23 had any claims beyond the scope of the asbestos PI injunction.

24        But, more importantly, there's no ambiguity that Your

25 Honor needs to clarify.  The injunction is what it is, an

1 asbestos claim -- an asbestos PI claim is what it is, and the

2 plan will so control.  So any request for clarification should

3 be denied.

4         THE COURT:  Now and in the future, Mr. Wisler?

5                 (Laughter)

6         MR. WISLER:  In the future it might -- it wouldn't be

7 a question of clarification, Your Honor.  It would be a

8 question of enforcement.  Libby will bring a claim for civil

9 conspiracy against Maryland Casualty as it does -- as it has in

10 the past and say we conspired with Grace to make people sink.

11 We'll say that's an enjoined asbestos PI claim.  We'll come in

12 here.  We'll ask Your Honor -- we'll say, Your Honor, you don't

13 need to clarify the plan.  The plan is here.  Compare the claim

14 that they've brought to the language of the plan.  Is it

15 enjoined or isn't it?  It doesn't require clarification.  It

16 just requires interpretation of Your Honor's order that will

17 presumably confirm this plan as it's written.

18         THE COURT:  Okay.

19         MR. WISLER:  Now, in their brief Libby didn't really

20 address consideration issues with regard to Maryland Casualty

21 specifically, but they've now suggested that, because Maryland

22 Casualty has not paid anything more than what it already paid,

23 it should not get the benefit of 524(g).  And, of course, as

24 Mr. Lockwood pointed out, that's not how 524(g) is written.

25 That's how Your Honor -- Your Honor pointed that out as well.

1          But the unrebutted testimony in evidence of Al

2 McComas through his declaration, through Jeffrey Posner,

3 through David Austern, Richard Finke, and the deposition

4 testimony of Mr. Lockwood, all of which we referenced in our

5 brief, all demonstrate that consideration has been given on

6 behalf of Maryland Casualty, thus meeting the requirements of

7 524.  The theory that this consideration must be new, fresh,

8 somehow not come from the estate has no support in the law,

9 wasn't raised in Libby's briefs.  There's no case law to back

10 it up.  It's just Mr. Cohn's argument, and it has no basis in

11 fact or in law.

12          Lastly, I think that Mr. Finch and Mr. Lockwood have

13 addressed the insurance rights issue.  Your Honor has already

14 ruled that the insured has the right to settle its own

15 policies.  Whatever rights existed under the Maryland Casualty

16 -- under the Maryland Casualty policies belong to Grace.  Grace

17 settled those.  The unrebutted evidence in Mr. McComas'

18 declaration shows that all of Maryland Casualty's obligations

19 under those policies were terminated.  There is no evidence

20 that there are any remaining rights under those policies

21 whether Libby would have rights to them or not.  So not only do

22 they have no support for having any special rights in them,

23 there are no rights left to give.

24          Your Honor, we have other issues that we raise in our

25 brief but none are Libby specific, so that's all I have for

1 now.

2          THE COURT:  All right.  All right.  Mr. --

3          MS. DeCRISTOFARO:  Your Honor, I have a few minutes,

4 and I'd be perfectly happy if you --

5          THE COURT:  I can't hear you.

6          MS. DeCRISTOFARO:  All right.  I was going to suggest

7 that if Your Honor was about to propose a lunch break, I could

8 wait until after lunch.

9          MR. BERNICK:  Could we get then an estimate of how

10 long people are going to take?

11          THE COURT:  Is this related to a Libby issue, Ms. --

12          MS. DeCRISTOFARO:  Yes, just --

13          THE COURT:  -- DeCristofaro?

14          MS. DeCRISTOFARO:  -- just a few minutes.

15          THE COURT:  How long are you going to be?

16          MS. DeCRISTOFARO:  Just about five minutes.

17          THE COURT:  Go ahead.

18          MS. DeCRISTOFARO:  Okay.

19          THE COURT:  Let's do yours, and then I'll see whether

20 -- who else.

21          MS. DeCRISTOFARO:  I just --

22          THE COURT:  Well, let me just inquire.  Is -- are

23 there any other parties who haven't been heard from yet who

24 have argument to make on the Libby issues?

25                    (No verbal response)

1          THE COURT:  Okay.  I'll hear yours first and then

2 we'll figure out whether there's any response.

3          MS. DeCRISTOFARO:  I just didn't want to cut you off

4 if you were about to say we were breaking.  Good afternoon,

5 Your Honor.  Elizabeth DeCristofaro for Continental Casualty

6 Company and related companies.  I'm only going to respond to

7 one particular point that we addressed in our brief and

8 highlight for Your Honor, the question of supposed insurance

9 rights.

10          The Libby claimants are not insured under any

11 Continental Casualty policies.  They are not an additional

12 insured, a named insured.  They're not anything under our

13 policies.  Our insured is W.R. Grace & Co.  The only thing that

14 the Libby claimants have is a claim not yet resolved or

15 determined against W.R. Grace.  We think the idea that they

16 will ultimately have any rights is not correct and highly

17 speculative.

18          In our reply brief at Pages 12 and 13 -- I am sure

19 Your Honor does not want to hear coverage issues from me, but

20 we do highlight a number of issues which will show that any

21 recovery is highly, beyond disputed, we think very unlikely.

22 The Libby claimants base a number of their arguments regarding

23 so-called insurance rights.  Their rights are not yet there.

24 If they have -- if a claimant -- to use a very simple example,

25 putting aside all the legal arguments that we highlight in our

1  brief, if a Libby claimant moved to Libby, our -- my client is
2  alleged to have coverage from '73 to '85.  If a Libby claimant
3  moved to Libby in 1986.  Those policies aren't implicated, yet
4  Libby claimants -- and that's putting aside lots of exclusions
5  and -- but that's an easy example.  There's no evidence anyone
6  has any rights under those policies presently.

7          Then we also go to the fact that the Libby claimants
8  -- and we also highlight for Your Honor the fact that the whole
9  claim is that they have non-products coverage, and we included
10 in our brief the law in which several courts have discussed the
11 claims in which they have been alleged to be, quote, non-
12 products and have determined that they're not.  That they're
13 products claims.  And we also highlighted for you the testimony
14 of Grace itself.  That once the Libby vermiculite came down the
15 mountain, it became a product, and we cited to Your Honor the
16 Seventh Circuit decision in a tax matter in which the Court
17 held that the concentrate became a commercially, marketable
18 mineral product when it started on the journey to Libby.
19 There's going to be all kinds of things that we are going to be
20 litigating regarding this with trusts.  In the meanwhile, the
21 Libby claimants will be paid.  In fact, it's more than likely
22 that the Libby claimants will recover and deplete the assets of
23 the trusts before we even resolve the threshold issues in the
24 coverage action.

25          As Your Honor's heard me mention, we have a pending

1 coverage action that we brought that has been stayed and under

2 the plan what is contemplated is the trusts will resume

3 coverage disputes with us and litigate with us.  We intend to

4 litigate those, and we think the outcome will be not great for

5 the trusts.  Meanwhile, the trusts will be paying out Libby.

6 Libby will be taking other assets from the trusts while that's

7 being litigated.  There is no guarantee that the trusts will

8 ever recover from this.  So the idea that they're in a special

9 category that doesn't touch around the -- or that all of this

10 is in some little box, it's not true.  They will be depleting

11 the overall assets of the trusts.

12          And the remainder of our points I think that we make

13 and we will not subject the Court to, but I wanted to highlight

14 Pages 12 and 13, which I will not subject to Your Honor, but

15 that illustrate for the Court why it's highly speculative there

16 will ever be any, quote, insurance rights for the Libby claims

17 under my client's policies.

18          THE COURT:  Okay.  Thank you.  Mr. Cohn, Mr.

19 Heberling, is there anything you wanted to say in response to

20 any of these arguments?

21          MR. COHN:  We do, Your Honor.  If we could just --

22 can we just have a second to confer amongst ourselves?

23          THE COURT:  Yes.  I have to give my staff a break, so

24 is this -- I was hoping we could get through this part

25 beforehand, but maybe this would be a better time just to take

1 a break.

2          MR. COHN:  We promise to be just as brief as we

3 otherwise would if we do it right after lunch, Your Honor.

4          THE COURT:  Okay.  How much time do you need for

5 lunch?

6          MR. BERNICK:  Well, if we could get some kind of -- I

7 mean I --

8          THE COURT:  Well, I'm only going -- let me do this.

9 I'm not going to hear from either side for more than ten more

10 minutes, because you're already past -- both sides are past

11 your times.  Some of it's because of questions I asked.  Some

12 of it isn't.  So ten more minutes each.  That's all.

13          MR. BERNICK:  Fine.

14          THE COURT:  So how much time do you want for lunch?

15          MR. BERNICK:  Our preference is whatever is

16 convenient and prompt for the Court.  We'll need I think, what,

17 45 minutes, 50 minutes?

18          THE COURT:  That's fine.  How about until 1:20?

19          MR. BERNICK:  That's fine.

20          THE COURT:  Okay.

21          UNIDENTIFIED ATTORNEY:  2:20.

22          THE COURT:  2:20.  I'm sorry.  Blind here.  2:20.

23 All right.  We'll be in recess until 2:20.

24          MR. COHN:  Thank you, Your Honor.

25                    (Recess)


**J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Mr. Heberling.

3          MR. HEBERLING:  Thank you, Your Honor.  I will be

4 brief.  I'll address a few medical points.  Mr. Bernick talked

5 again about the selection of clear cases, and it didn't seem to

6 disturb the plan proponents that our study showed that 86

7 percent were excluded and 14 percent are included, meaning that

8 only 14 percent are these clear cases.  And the rationale they

9 have for this is that they believe that the discrimination

10 under 1123(a)(4) in Combustion Engineering is limited to --

11 well, there is no discrimination if everyone gets the same

12 process  and if everyone gets the same payout percentage.

13          Well, here we think that Combustion Engineering is

14 broader than that, and that a substantive discrimination,

15 especially a discrimination against a whole group such as

16 severe pleurals, as we believe we've demonstrated, does

17 constitute an improper discrimination.

18          Then Mr. Bernick focused on 20 pure pleurals as if

19 the study should've been done on pure pleurals.  I remind that

20 this -- that the Category 4B is severe pleurals, severe and

21 disabling pleural disease, not pure pleurals.  Category 4B

22 allows for people with pleural disease mixed in with some

23 degree of interstitial disease.  Our study of 76 dead included

24 76 with pleural disease, all of whom died of asbestos-related

25 disease.  And so our study was on everyone with pleural

1 disease, and sometimes it gets even more complicated, that, you

2 know, there are some who have mild pleural disease on chest x-

3 ray, but then on CT scan it turns out to be much more.  So the

4 focus on the 20 pure pleurals is not proper here.  And again

5 our analysis was on the discreet population of severe pleurals.

6 We had no duty to do a nationwide study on how pleural disease

7 elsewhere is treated.

8          There was mention of the Dr. Weill study on

9 progression.  And first on -- Dr. Weill allowed the dead to

10 drop out of his study.  Obviously, after a person is dead

11 there's no more lung function tests, so they would drop to

12 zero, and there's no carrying forward of zeros after that --

13          MR. BERNICK:  Your Honor, I object.  (A) that goes

14 beyond the scope of my argument, and we can go back into it,

15 but (B) there is no evidence in the record, read it, none, that

16 Dr. Weill, quote, excluded dead people.  There was an assertion

17 to the effect that Dr. Whitehouse believed that that might be

18 the case, but then it turned out that there was no data to

19 support that proposition, and indeed the data showed that Dr.

20 Weill had included every -- included everybody who had two or

21 more data points.  And so the statement is just another

22 argument of counsel that is not -- had no basis in the

23 evidence.

24          MR. HEBERLING:  And the second problem with the Weill

25 study is that even under the numbers he showed for diffusion

1  capacity over 15 years, there would be a loss of 24 percent,

2  which would -- could take someone from mild to a severe

3  category.  Those are -- that's the extent of my comments on the

4  medical issues.

5           THE COURT:  Mr. Cohn.

6           MR. COHN:  Yes, Your Honor.  I wanted to start off

7  with Mr. Finch's pie chart here.  This one perhaps should've

8  had the wonderful graphic of the apples and the oranges,

9  because you'll notice that in the what Libby wants what he has

10 identified there is that Libby wants is $400 million in cash.

11 And I'm not saying we would turn that down, Your Honor, but as

12 I think we've made clear, if you take $400,000 per claim and

13 you multiply that times our thousand clients, it is -- it's

14 $400 million in claims, and we have acknowledged that we should

15 be paid the same payment percentage as everybody else.  And if

16 you did the pie chart, it would obviously be this not so much

17 Libby taking such a big bite of the pie as Mr. Finch has

18 suggested.

19          The second comment of Mr. Finch that I'd like to

20 address is when he was talking about the Combustion Engineering

21 decision he said that the discussion of how the cancers were

22 treated in a discriminatory fashion under the TDP -- he

23 described that as dicta, but, of course, it's not -- it is not

24 dicta when a Court remands for -- specifically on the basis of

25 that, and I think when you read --

1        THE COURT:  No, I --

2        MR. COHN:  -- the decision --

3        THE COURT:  Well, I'll have to look at these

4 decisions again, but my recollection is it was remanded,

5 because there was an issue as to whether or not they were.  I

6 didn't think the Court found that they were.  The issue was --

7        MR. COHN:  Correct.

8        THE COURT:  -- the certain cancer claimants had been

9 arguing all along that there was this form of discrimination.

10 The error I think I made in the two trust structure frankly was

11 I didn't delve into it enough perhaps to give the Court the --

12 the Appellate Court the satisfaction of the findings that it

13 wanted.  And so in taking a look at those issues, it remanded

14 for a discussion, and then it was settled.  So --

15        MR. COHN:  Well, first of all, that -- I agree that's

16 absolutely correct that the Court -- all the Court was saying

17 was we're remanding for further findings on this issue, but one

18 of the issues that it did remand for further findings on was

19 the issue of how cancer claimants were treated in relation to

20 other categories of claims under the TDP.  And it -- that was

21 not -- it was not dicta.  That's the only point that I'm making

22 here, is that calling it dicta was a mis-characterization.

23        The -- all right.  We were pointed -- Mr. Finch

24 pointed us to -- to testimony indicating that even someone who

25 let's say satisfied only the Level 2 criteria under the TDP,

1  Level 2 medical criteria, could, in fact, be awarded a claim of
2  up to $400,000, which is the extraordinary claim amount for a
3  Level 4 claim, Level 4B, and, Your Honor, we would -- we don't
4  find that in the -- anywhere in the TDP.  We're delighted it
5  can be interpreted that way and that indeed it is being
6  interpreted that way by those who are proposing it.

7         And we would respectfully suggest that to the extent
8  that you -- to the extent that you in your decision on
9  confirmation were to accept any of these -- any of these
10 proffered interpretations of the TDP, that you make it clear in
11 such a way that the Trustees will feel like they're bound to
12 follow these interpretations, because, frankly, we just can't
13 draw those from the language of the TDP.

14        Concerning -- Mr. Finch pointed out that Section
15 5.3B(2) provides criteria for use on individual review, and
16 he's absolutely correct.  I probably should've been more
17 cautious in my phrasing.  I hope you understood I was saying
18 there was no medical criteria in Section --

19        THE COURT:  Yes, I did understand that.

20        MR. COHN:  -- 5.3B(2).  All right.  Good.  Mr. Finch
21 was arguing that in effect Section 524(g) trumps 28 USC Section
22 1411(a).  That's on that -- on the jury trial rights, and he
23 gave two reasons.

24        One of those is that Section 524(g) is the later-
25 enacted statute.  The problem with that though is that it was

1 plugged into a preexisting statutory scheme, and the

2 preexisting statutory scheme says Section -- under 1411(a) says

3 nothing in Title 11 shall affect the right to trial by jury,

4 and under those circumstances the fact that something was later

5 put into Chapter 11 without amending Section 1411(a) is not a

6 basis for saying that a later-enacted provision of Chapter 11

7 would trump this thing that says -- that says nothing in Title

8 11 may do -- may affect the right to trial by jury.

9        And his other reason 524(g) would trump 1411(a) is

10 that -- is that 524(g) is the more specific statute, and I

11 would respectfully submit that on the issue of jury trial

12 rights, which is what we're talking about here, Section 1411(a)

13 is the more specific of the statutes.

14        Your Honor, there was a suggestion -- now that we're

15 on -- now that we're still with Section 524(g), there was a

16 suggestion that if our best interest argument were to be

17 accepted, it basically is the death knell for using 524(g),

18 because 524(g) requires that you pay futures, and so if you

19 didn't have to pay them in Chapter 7, then somehow nobody could

20 ever do a Chapter 11 plan.

21        First of all, of course, people have done any number

22 of Chapter 11 plans utilizing Section 524(g).  But the reason

23 that this plan is running into such difficulty on the best

24 interest issue is threefold, Your Honor.  First of all, Grace

25 is including the shareholders for value that could turn out to

1 be in -- a billion dollars or more.

2        Second, Your Honor, Grace is paying non-asbestos

3 creditors at 100 cents on the dollar plus interest.  And, in

4 fact -- and you've heard a number of arguments about what that

5 rate of interest should be, but the rate of interest is the

6 smallest part of it, Your Honor.  The fact is what they're

7 doing is they're taking general unsecured claims, which would

8 be paid on the same level as -- of -- as asbestos claims in a

9 Chapter 7 case --

10        MR. BERNICK:  Your Honor, I --

11        MR. COHN:  -- interpreting those commercial claims --

12        MR. BERNICK:  I -- Your Honor, I object.  This isn't

13 argument by counsel.  There is no evidence in the record of any

14 alternative calculation regarding satisfaction of the best

15 interest test other than the evidence that's come in through

16 Ms. Zilly.  Nobody else has testified.  So we're now --

17        MR. COHN:  All right.

18        MR. BERNICK:  Counsel's now -- excuse me.  Counsel's

19 now arguing how the best interest might apply under various

20 unspecified, hypothetical circumstances.  There is no record

21 evidence to support those contentions.

22        THE COURT:  I think this is a legal argument.  Isn't

23 it?  I mean the evidence is in that the debtor's --

24        MR. COHN:  Yes.

25        THE COURT:  -- going to be paying interest on the

1 other unsecured claims and that the asbestos claims won't be

2 receiving --

3          MR. BERNICK:  Yes.

4          THE COURT:  -- 100 cents on the dollar.  I'm -- I

5 don't think that's contested.

6          MR. BERNICK:  No, he's -- no, I think what he's

7 suggesting is it doesn't -- it's not so much the question of

8 interest specifically.  What he's saying is that we argued that

9 their interpretation of 524(g) in connection with the best

10 interest test would mean -- would have the effect of limiting

11 access to 524(g), because you have your thumb on the scale --

12          THE COURT:  No.

13          MR. BERNICK:  -- in favor of Chapter 7, because you

14 don't have the futures.  He then made the statement as an

15 empirical statement, well, we know that there have been plenty

16 of 524(g) cases that have been approved, hasn't addressed

17 whether they raise this issue or involve this issue, but that's

18 an unsupported statement empirically as to why that is so.

19          He then went on to say it's no surprise, because in

20 this particular case we're paying the creditors principal and

21 interest.  We're paying equity a certain amount of money.  This

22 is now an argument that says that if we had done the plan

23 differently, we could've satisfied the best interest test

24 differently.  That is a factual statement about whether it

25 would make a difference if we did certain things differently.

1          There's no record evidence of any such calculation of

2     any such hypothetical.  It is simply an argument of counsel

3     without evidentiary support.

4          THE COURT:  Well, okay.  I think there's evidentiary

5     support for the argument that he's made so far, because it's

6     not even contested how the plan is going to work.  Whether the

7     conclusion that's to be drawn from that is correct or not, I

8     guess you folks can argue.  You can go ahead, Mr. Cohn.

9          MR. COHN:  Thank you, Your Honor.  And -- and, Your

10    Honor, the third reason why this particular plan is running

11    into trouble on best interest is, because there's been an

12    objection, and the reason it drew an objection is, because the

13    Libby claims are being treated in a way that pays them so far

14    less than their value.  You know, according to us, that we've

15    objected on any number of bases.  And what has happened in

16    other cases and what we expect will happen in future cases that

17    are perhaps less contentious than this one is that creditors

18    will continue to reach agreement amongst each other.  We still

19    hope it will happen here, and objections like this will not be

20    made or will be withdrawn.

21         Finally, Your Honor, turning to the subject of

22    injunctions, Ms. DeCristofaro said that there was no evidence

23    in the record concerning the entitlement of Libby claimants to

24    coverage under the CNA policies, and I would refer the Court to

25    the stipulation concerning Libby claimant affidavits filed on

1 September 4th, 2009, Docket Number 23172.  And basically what
2 that does is it --

3          THE COURT:  I'm sorry.  23172?

4          MR. COHN:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. COHN:  And basically what that does is it
7 provides data concerning names of Libby claimants, dates of
8 residence in Libby, status as a worker or a community person or
9 whatever, and it indeed provides the evidentiary basis for who
10 is entitled to coverage under the CNA policies.

11          And then finally, Your Honor, on the subject of
12 clarifying the injunction, the asbestos channeling injunction,
13 I hope you did not understand me to ask you to review the
14 particular complaint against Maryland Casualty and make some
15 judgment or include something in the confirmation order
16 relating to that particular complaint, because that's not what
17 we were seeking, and the whole response that I drew seems to be
18 somewhat of an overreaction.

19          We were raising a legal matter, Your Honor, which is
20 that -- and the clarification that we seek is really a very
21 simple legal clarification, which is that claims based on the
22 alleged tortious conduct of a third party, that is to say a
23 party other than the debtor, are not barred by the asbestos PI
24 channeling injunction.  That's what the Second Circuit held at
25 the Second Circuit level in <u>Travelers</u>, and all would've been

1 well and good, of course, except that then it goes up to the

2 Supreme Court, and they say, well, maybe you're right, maybe

3 you're wrong about that particular injunction, but this was all

4 decided 20 years ago.

5          And so what we're asking to do is to just make -- not

6 leave us in the same position, Your Honor, where there's some

7 lack of clarity on that particular issue, which the Second

8 Circuit, as I say, has already decided in favor of that

9 injunction's -- the scope of an injunction may not enjoin the

10 claims against third parties for their own tortious conduct.

11 Thank you, Your Honor.

12          THE COURT:  Mr. Finch.

13          MR. FINCH:  Nathan Finch for the ACC.  With respect

14 to Mr. Cohn's argument that they don't read the TDP as

15 permitting people who only meet the criteria of Category 2 or

16 Category 3 nonetheless proved to the trusts in the individual

17 review process that they, in fact, have a claim to be valued in

18 the tort system as a severe disabling pleural disease.  I

19 showed you in my argument Section 2.2 of the TDP there's also

20 Section 5.3B(1)(a) of the TDP which allows the trusts in the

21 individual review process -- allows a claimant an opp -- can I

22 have the ELMO?  The claimant has the opportunity for individual

23 consideration and valuation of a PI trust claim that fails to

24 meet the presumptive medical exposure criteria for disease

25 Levels 1 through 5, 7, or 8.  In such a case the PI trust shall

1 either deny the claim, or if the PI trust is satisfied that the

2 claimant has presented a claim that will be cognizable and

3 valid in the tort system, the PI trust can offer the claim in a

4 liquidated value amount up to the scheduled value for that

5 disease level.  And I think the only fair reading of that

6 disease level is the disease level the claimant is claiming

7 notwithstanding the fact that they don't meet the criteria.

8       So I think in that provision at Section 2.2 it's

9 pretty plain from the language of the document that, in fact,

10 people can get up to $400,000 even if they don't meet the

11 presumptive medical criteria.  I don't think the plan documents

12 are ambiguous.  To the extent some court some day might decide

13 that they are, you've got Mr. Inselbuch's testimony as one of

14 the drafters of the plan document, who testified quite clearly

15 and unequivocally exactly how that provision is supposed to

16 work.  I don't think the Libby claimants really have any basis

17 to complain that the way we read the TDP is the proper way to

18 do it.

19       With respect to the jury trial argument, 524(g) is

20 specific on the question of a how a trust is to value and pay

21 claims.  This plan doesn't completely take away jury trial

22 rights.  I mean, there is a jury trial right to, for example,

23 put a value on the claim.  It's just 524(g) limits what the

24 trust will pay out.  And so in that sense it is more specific

25 than 28 USC 1411, and it is later enacted.

1          And finally, if Mr. Cohn's argument that there is --

2   that the jury trial right is inviolate in the context of a

3   bankruptcy, 28 USC 1411 would mean in effect that you couldn't

4   have a payment percentage on any case that's a personal injury

5   case that has a jury trial right.  And clearly, it can't do

6   that, and there are cases all the time where a group of

7   creditors, as the PI constituency is here, voted overwhelmingly

8   to take a plan that has a certain way to distribute the assets

9   and a payment percentage, even though other creditor classes

10  and different classes may get higher payment percentage.

11  That's permissible under the Bankruptcy Code, and it doesn't

12  violate people's jury trial rights to do that.

13          With that, Your Honor, I will sit down.  I guess

14  finally on the piece of the pie argument, the only way the

15  Libby claimants get to their $400 million is to assume that

16  every case in the future has all the same characteristics as

17  the cases in the past.  There's absolutely no record evidence

18  of that.  They don't have a legal entitlement to what people

19  represented by Mr. Heberling and Mr. Lewis settled for

20  historically.  The circumstances have changed significantly,

21  and there is no discrimination in the way the TDP operates as

22  against the Libby claimants.

23          MR. BERNICK:  Mr. Heberling said that 4B criteria

24  that are at issue excludes 86 percent.  We're now back to 86.

25  The 86 percent translates -- is a reference to the 76 total

1 non-mals they say don't make the criteria.  The non-mals

2 include people who have asbestosis only, people who have

3 asbestosis plus pleural disease, people who have pleural

4 disease.  Asbestosis would be -- I think the number is 39.  The

5 total of asbestotics and pleurals plus pleural only is that 37

6 number.  That divides between -- up to the 17 and 20.  That's

7 why the 20 corresponds to the ones who have pure pleural

8 disease which is what the counting memo says and what Dr.

9 Frank's testimony is.

10       The reason that Mr. Heberling once again is not

11 focusing on the evidence and what is his own expert said is

12 that 4B doesn't purport to address the problem of asbestosis.

13 There are other criteria.  So if you have asbestosis and you

14 have pleural disease, in fact, you can seek to recover under

15 either one of these provisions or other provisions.  The sole

16 intendment of 4B on its face is to get a pure pleural disease -

17 - severe or pure pleural disease.  That's why it was set up,

18 and that's, in fact, why the counting memo goes through the

19 process of getting to the 20 and why Dr. Frank admitted that

20 the 20 is the number that you have to be working with.  It's

21 the 37 less the 17.

22       The second thing that Mr. Heberling said is he said

23 that the discrimination being claimed is against -- these were

24 his words -- people with severe pleural disease.  That's what

25 he said.  So now it's not discrimination against the unsevere

1  pleurals.  It's now back to the severe pleurals.  But it's

2  precisely the severe pleurals where they can't demonstrate

3  either the capture rate at Libby or the comparable capture rate

4  outside of Libby.  It's precisely with respect to this theory

5  that they have not shown discrimination against people with

6  severe pleural disease.

7        The third problem Mr. Cohn says, best interest

8  problem here is that we made a choice of how to treat Libby.

9  That's why they're making the best interest case.  That is

10  totally false.  The best interest -- first of all, the only

11  best interest evidence came in through our expert.  They don't

12  have any competing best interest analysis.  And (b) it was

13  attacked and is still attacked on grounds that have no

14  specificity to Libby whatsoever.  We're still talking about

15  what's the aggregate amount of personal injury liability.  What

16  kind of assets would be recovered in Chapter 7?  How to value

17  the traditional property damage claims.  There's not one word

18  that's been said today that says that the problem with the plan

19  and the reason we have a problem with best interest is because

20  how Libby specifically is treated.  And that goes back to the

21  point.  They're here making an argument against the plan as a

22  whole to serve their other purposes.  It's not a question of

23  how the Libby claimants in particular are treated.

24        THE COURT:  Mr. Lockwood.

25        MR. LOCKWOOD:  One point, Your Honor.  In his

1 presentation at the very end Mr. Cohn said he's not asking you

2 to rule on the independent tort claims issue.  He sort of

3 nonchalantly says all we're asking you to do is tell them

4 they've got to rewrite the channeling injunction to exclude,

5 quote, independent tort claims, close quote, from its scope.

6        As Your Honor has heard in at least one other case,

7 Pittsburgh Corning, and I think also in Federal Mogul, the

8 language of the statute in question in 524(g)(4)(A)(2) in

9 describing who can be a protected party says that "An action

10 is directed against a third party," dot, dot, dot, "who is

11 alleged to be directly or indirectly liable by reason of a

12 relationship."  The term directly implies -- states

13 unequivocally that you can have a direct lawsuit against

14 somebody.  It's not just an indirect lawsuit, which would be

15 the classic form of, quote, derivative liability.

16        There -- in the CE case, which they're talking about,

17 used the term independent to describe claims against separate

18 companies for their own conduct that had no relationship to the

19 conduct of the debtor, Basic and Lummus.  Here there's no

20 question that the claims against Maryland Casualty Company have

21 the potential for arising out of the relationship even if in

22 some way or another there -- Maryland Casualty could have some

23 sort of liability of its own in addition to being derivative --

24 instead of being only sort of derivatively liable for something

25 that Grace did.  That's the whole distinction between directly

1 and indirectly.

2        And so moreover, what does an, quote, independent

3 tort, close quote, even mean?  I mean independent of what?  So

4 I mean this sort of offhand suggestion that this is really a

5 simple fix required by CE is -- ignores the language of the

6 statute and ignores the fact that the definition proposed to be

7 changed in the plan would not clarify what you're talking about

8 in the first place.  Whereas, right now the plan makes clear in

9 the excerpt that I read you about the definition of a settling

10 asbestos insurer, which is the only basis on which Maryland

11 Casualty is named as a protected party in the first place,

12 expressly limits it to the types of claims that are authorized

13 to be enjoined under the statute.  Thank you.

14        THE COURT:  Ms. DeCristofaro.

15        MS. DeCRISTOFARO:  Yes, Your Honor, I was a little

16 taken aback to hearing Mr. Cohn cite to that stipulation in the

17 record as proof of -- that there was coverage under the CNA

18 policies.  You will recall, Your Honor, that stipulation went

19 in saying it would not be used against the insurance companies,

20 and Mr. Cohn stood up here and agreed and said that.  So that

21 was not introduced to establish coverage, and it was agreed by

22 the Libby claimants that it would not be used against the

23 insurance companies.

24        Beyond that, there's no way again if you compare that

25 stipulation against the issues that we -- sample issues that we

1 put in our reply brief that you could ever determine that there

2 would be coverage under our policies.  That's all, Your Honor.

3 Thank you.

4         THE COURT:  Mr. Bernick.

5         MR. BERNICK:  I think this brings us to the next

6 segment and --

7         MR. FINCH:  Your Honor, if that's the case, may I be

8 excused?

9         THE COURT:  Yes.

10         MR. FINCH:  Thank you.

11         MR. BERNICK:  I think --

12                    (Pause)

13         MR. BERNICK:  So we're now into the Phase 2, and I'm

14 just going to make a very brief statement, and then if others

15 who are objectors want to stand and make their own -- state

16 their own positions, I can't report that there's any particular

17 consensus.  Our concern -- we know -- we came up originally

18 with the idea of phasing the arguments in a way that would

19 essentially match the phasing that took place during the course

20 of the confirmation trial, and that kind of works on the far

21 end.  It works with Libby, as you've seen.  Everybody basically

22 has stood up and talked about Libby and, you know, taken too

23 long, but at least we're kind of on the right track.  It works

24 for the lenders.  We think it'll work for Anderson Memorial,

25 who will be just before the lenders.

1        It's with respect to the insurers and the indirect

2 claimants, third party issues, that there -- that we had some

3 real misgivings about how this thing was organized, and that if

4 you actually proceeded by party, we start talking about parties

5 by way of getting an allocation of time, but the allocation of

6 time developed problems, and then beyond the allocation of time

7 there's an awful lot of overlap, in our view, between the

8 insurance companies, on the one hand, and the other third party

9 claimants on the other.

10        So we introduced -- we didn't interrupt anybody's

11 Christmas vacations, and perhaps it was somewhat belated, and

12 we'll take responsibility for that.  But we introduced the idea

13 that what we really ought to be doing is proceeding by issue,

14 and then anybody who wants to speak to an issue can speak to

15 that issue and then we go on to the next issue.

16        So we circulated by e-mail a version of what Your

17 Honor now has before you is this little kind of set of slides

18 that we have not even marked with an exhibit number, because it

19 doesn't need it.  We tried to isolate the major issues first

20 under A.

21        We had some subsequent discussions with Mr. Monaco

22 from Montana.  There have been some discussions with the

23 carriers, also, and I think we're actually relatively close.

24 If Your Honor takes a look at the list, we start out with

25 neutrality and with the proper -- alleged improper treatment of

1  asbestos reimbursement agreements and assignment of unsettled

2  policies.  If you would then add into that conflicts of

3  interest regarding the TAC, I think you'd have three issues

4  that are pretty much insurance specific issues, and we would

5  propose that they go first.  My impression is that they'll go

6  relatively quickly.

7          We can then take Classification 6 versus 9, and the

8  next item, which is discriminatory treatment of indirect PI

9  claims and PI TDP, and combine them.  And in combining them the

10 -- I think some of the carriers at least have told us that they

11 don't have a problem if the other third parties go first.  And

12 so that would be the State of Montana.  It would be BNSF, and

13 it would be Garlock, if that's when that want to speak to that

14 issue.  But if they go first and then the carriers go after

15 that, we think that that would be the second traunch to deal

16 with.

17         And then successor claims injunction is too broad.

18 That relates to Sealed Air and Fresenius.  I think that's just

19 the carriers.  Other exculpation and release objections I'm

20 less clear about as well as the other three, and maybe we can

21 take them as they go, and people can think about them.  If

22 there are then remaining issues that Garlock, who we don't have

23 an agreement with, wants to take out -- take up that are unique

24 to it, we have no quarrel with that at all.  Indeed if anybody

25 wants to then take up other issues that are unique to them or

1 haven't been addressed, we have no quarrel with that.

2         What we want to avoid is having a whole discussion,

3 for example, on the two that we suggest would be combined,

4 which is classification of 6 versus 9 and discriminatory

5 treatment then go through a whole bunch of people, then we

6 respond, and then somebody else decides that, well, they would

7 like to make that argument as part of another argument, and

8 then they go later, and then we have to respond later, which

9 makes absolutely no sense to us.

10         So what we would suggest is at least beginning with

11 those three insurance-related issues, neutrality, improper

12 treatment, and TAC, get them done, and then start out with

13 classification and discrimination with Montana, BNSF, perhaps

14 Garlock, then the carriers, get done with that, and then we'll

15 see where we are on the list.

16         THE COURT:  All right.  That's fine.

17                 (Pause)

18         MR. LOCKWOOD:  Your Honor, the first item on the

19 agenda that Mr. Bernick just described was neutrality.  I

20 believe I can report that this is going to be a very short

21 topic, because on Friday we filed a notice of a motion for

22 approval of a stipulation which with a number of insurers that

23 had raised Phase 1 objections to neutrality, which contained,

24 as in Exhibit A, a proposed set of revisions to Section 7.15 of

25 the plan labeled Insurance Neutrality, and I believe that all

1 of the parties that had objected to the absence of insurance

2 neutrality are parties to the stipulation, and, therefore, I

3 believe that particular issue is resolved.  The stipulation

4 itself sets forth in Section -- the stipulation and agreed

5 order sets forth in Section 2 what objections -- 2B -- what

6 objections the insurers will continue to litigate and in what

7 capacities they'll continue to litigate with -- on them and

8 also has a paragraph, 2C, reserving the right of the plan

9 proponents to challenge on an item-by-item basis the standing

10 with insurer to be litigating one or more of those objections.

11      So unless anybody on this side of the courtroom has a

12 difference of opinion with that, I believe we don't need to

13 discuss insurance neutrality anymore.

14      THE COURT:  Okay.  I did see that document.  I

15 haven't had a chance to finish reading it, though I had some

16 trouble accessing it over the weekend, and I just didn't get it

17 done this morning.  So I did see the list of items that were

18 reserved.  It made me wonder what was settled, so I'm not sure

19 what's actually been settled.

20      MR. LOCKWOOD:  You mean in terms of the actual

21 objections?

22      THE COURT:  Yes.

23      MR. LOCKWOOD:  Not a whole lot --

24                    (Laughter)

25      MR. LOCKWOOD:  -- because many -- well, there are

1 some items which we are -- two of which are the next two items

2 on the agenda, namely, the assignment issue and the Provision

3 7.2.2(d)(4) of the plan dealing with reimbursement agreements

4 that were always exclusions from the agreement.  And the

5 insurers and we had an extended discussion of some of the

6 others like the exculpation and release issues that depended

7 upon whether or not -- whether the insurers had -- we're going

8 to have standing depending on whether or not they were

9 creditors, and we all interpreted insurance neutrality as

10 dealing with insurers qua insurers, providers of coverage, and

11 not as somebody claiming to hold a claim against the debtor.

12        And so we went ahead with it, however, in part to be

13 honest with you, Your Honor, because you had told us you wanted

14 this plan to be insurance neutral.  And so we figured even if

15 it didn't get rid of a whole lot of objections -- and I think

16 it did get rid of a few.  I mean they're not really of enough

17 consequence to warrant trying to go back and ferret out what

18 they are, but you'll be able to ascertain when you don't hear

19 the insurers arguing them that they're not being pressed

20 anymore.

21        But we devoted all that much time and energy, and we

22 want to comply with the Court's command, so we went ahead and

23 finished it up and filed it.

24        THE COURT:  Okay.  I'll take a look at it after

25 today's hearings.  Let's bypass neutrality for now.  I -- if

1 you folks have settled something, in all probability you're not

2 going to get much grief from me about that fact, but I still

3 need to see what it is that the stipulation says, because I

4 haven't had a chance to finish reading it yet.

5            MR. LOCKWOOD:  Well, we're not asking for you to do

6 anything about it today, Your Honor.  It's set, was noticed for

7 the February 22 --

8            THE COURT:  Oh.

9            MR. LOCKWOOD:  -- omnibus hearing date.

10            THE COURT:  Okay.

11            MR. LOCKWOOD:  The parties I believe posted -- act as

12 though Your Honor had approved it.  But, as you noted and we

13 just discussed, they're not going to eliminate a lot of their

14 objections anyway, so they will continue to argue.  If somebody

15 argues an objection that I think they've agreed not to press,

16 I'll pop up and object.  How about that?

17            THE COURT:  All right.

18            MR. LOCKWOOD:  The next order -- the next item on the

19 agenda for the insurers has to do with the assignment of the

20 policy rights, and I don't know whether all the insurers agree

21 with this or not, but it is -- it is my view that Your Honor

22 has decided the preemption issue in at least three different

23 cases, at least three different district courts have affirmed

24 your rulings on that subject, and two of --

25            THE COURT:  Oh, is that right?  I didn't know that.

1          MR. LOCKWOOD:  <u>Kaiser</u>, <u>Federal Mogul</u>, and <u>GIT</u>.

2          THE COURT:  Oh, okay.

3          MR. LOCKWOOD:  And two of them -- the District Court

4  affirmances are now sitting before the Court of Appeals.  One

5  of them has been briefed and argued in the <u>GIT</u> case and is

6  awaiting decision.  The other one, the <u>Federal Mogul</u> case, has

7  been briefed and is awaiting an argument date.  So it seems to

8  me that it is a waste of time, frankly, of Your Honor's

9  valuable court time and the energies of the litigants to sit

10  here and have an extensive debate on something that's been

11  resolved.  And so as far as the plan proponents are concerned,

12  we're prepared to rest on the papers on this subject.

13          THE COURT:  All right.  Mr. Glosband.

14          MR. GLOSBAND:  Thank you, Your Honor.  I spoke

15  previously with Mr. Lockwood, and we also agree to rely on the

16  papers in this situation.  Thank you.

17          THE COURT:  All right.  Is there anyone who is not --

18  Mr. Brown.

19          MR. BROWN:  Your Honor, we agree with Mr. Lockwood's

20  approach as well.  Hopefully, we'll have some guidance from the

21  Third Circuit on the issue shortly.

22          THE COURT:  Anyone who is not relying on their papers

23  based on the fact that I don't think there's anything different

24  in this issue than I've decided in the other three cases?  The

25  language, of course, is a little different, but the issue is

1 the same.

2                    (No verbal response)

3            THE COURT:  All right.  That's fine.  Then you can be

4 assured that unless the Circuit tells me that I'm wrong, then

5 I'm going to have the same ruling in the fourth case as well.

6 So okay.

7            MR. LOCKWOOD:  That takes us, Your Honor, to the

8 issue of the so-called asbestos PI reimbursement -- insurance

9 reimbursement agreements.  And there's essentially two issues

10 that have been raised in this with regard to this matter.  One

11 of them raised both -- well, there's -- let me back up one

12 second.  There are two objectors remaining.  Most of the

13 asbestos reinsurers have settled with us.  The two remaining

14 are CNA and Hartford.  CNA and Hartford both argue that despite

15 repeated answers to requests for admission, interrogatories,

16 statements in briefs, statements in open court, that the

17 provisions of Section 7.2.2(d)(4) purport to release the trust

18 from all obligations that Grace had under those asbestos

19 reimbursement agreements that are being assigned to the trust.

20 And we have repeatedly said -- well, let me back up.

21            First, I -- if you read the language of Section

22 7.2.2(d)(4), you'll see that it says, "The asbestos PI trust

23 shall be the successor to all rights of the debtors and non-

24 debtor affiliates --" successor "-- under each asbestos

25 reimbursement agreement.  The asbestos PI trust payment of an

1  asbestos PI claim under the PI TDP shall be deemed to

2  constitute settlement and payment of such claim by or on behalf

3  of the debtors or non-debtor affiliates within the meaning of

4  and in full compliance with each asbestos insurance

5  reimbursement agreement."

6          The purpose of this provision was to deal with the

7  problem which is a little different from the one that we face

8  in the assignment issue, which is that the reimbursement

9  agreements identify Grace as the party that's going to be

10 settling the cases on its own behalf and getting reimbursement

11 from the insurers for those settlements.  And maybe we were out

12 of an excess of caution, I don't know, but we did not want to

13 have an assignment -- a simple assignment of those agreements

14 to the trust and then be faced with insurers that were arguing

15 that, well, wait a minute, the trust isn't Grace.  This

16 agreement says Grace is going to do this.  You're not Grace,

17 therefore, we don't have any obligations under this.  And so we

18 drafted this provision to make it clear that the trust was

19 going to be the one that was performing Grace's obligations

20 under these.

21          The insurers -- the objecting insurers have seized on

22 the language in there, "and in full compliance with each

23 asbestos insurance reimbursement agreement," to suggest that

24 the only obligation that the trust is undertaking under that

25 agreement and the only rights it proposes to assert are simply

1 paying the claims and getting the money without regard for any

2 of the other terms and conditions of the agreement.  We submit

3 that that is a ill-founded, to be polite about it, reading of

4 that provision, particularly in light of the fact that we have

5 repeatedly stated that we do not read it as avoiding that.

6        And we have also made the point that these agreements

7 are contracts.  They're either executory contracts or they're

8 non-executory contracts.  If they're an executory contract,

9 they're being assigned and assumed -- assumed and assigned.  If

10 they're a non-executory contract, they're being transferred

11 under -- and under the Cum Onere Doctrine, which is a well-

12 known bankruptcy law principle, the trust -- the assignee, here

13 the trust, would not have the right to assert the benefits of

14 the assigned contract while repudiating the obligations of the

15 assigned contract.

16        So we feel that an objection that's based on this is

17 simply groundless at this point.  That there's no reasonable

18 interpretation of this provision that would lend itself

19 particularly in light of the new rule statements that we made

20 to the contrary.

21        THE COURT:  Well, perhaps a statement in an order,

22 assuming we get to plan confirmation -- perhaps a statement in

23 an order that confirms the plan that simply says that this

24 provision means the trust is the successor to all rights and

25 obligations under that document would do it.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LOCKWOOD:  Well, that's certainly -- CNA has

2  suggested in its papers that that would be one possibility, and

3  we don't really have any principal objection to doing something

4  like that.  So that if Your Honor feels that that's necessary,

5  we'll certainly undertake to try and come up with some mutually

6  acceptable language that would achieve that goal.

7          THE COURT:  I -- it -- I'm not -- I think without

8  having to address this particular objection, if the parties

9  agree that that would cure the problem, it's an easy thing to

10  cure.

11         MR. LOCKWOOD:  Well, we're not -- we've got a

12  temporal problem, which is that the confirmation order is not

13  being presented to Your Honor today, so we haven't been in a

14  position in which we could draft a provision I mean, but we can

15  certainly undertake to figure out some -- maybe, you know, a

16  stipulation -- another stipulation that would somehow or

17  another deal with this issue if Your Honor feels that we need

18  to.

19         THE COURT:  Well, I -- there are a number of

20  stipulations that have been filed that are dependent on the

21  Court making specific findings.  I can guarantee I'm not going

22  to be able to find them all, so somebody in this process is

23  going to have to say the Court is requested, you know, to find

24  X, Y, Z pursuant to this stipulation, so that I include them

25  all.  Because if we get the plan confirmation and the

1 stipulations have been approved, I certainly want to honor the

2 obligation to put them into the confirmation order, but I just

3 can't attest that with all the paper that has been filed and

4 all the document changes that have gone on that I will catch

5 them.  So if that's a cure, I think somebody can put that into

6 one of the drafts or into a draft of the confirmation order,

7 and I certainly don't have any problem putting that as a

8 finding in the confirmation order.  Mr. -- did you want to

9 address these one at a time?

10        MS. DeCRISTOFARO:  No, I just wanted to -- well,

11 obviously, Mr. Lockwood and I have been speaking regarding this

12 issue.  I don't think it's worth -- we're not in a position to

13 withdraw our objection.  Mr. Lockwood did indicate -- our

14 problem is it seems that we agree that he agrees that the

15 trusts will honor all of the obligations under our agreement,

16 but we don't think the language or anywhere is that made clear.

17 Mr. Lockwood has indicated he'd be willing to speak with us

18 some more on that issue, and we don't want to waste the time to

19 argue this.  We -- if we are -- reach an agreement, we will

20 notify the Court.  If we think there is language that, as Your

21 Honor suggested, should be added to make it clearer, we will

22 submit that to the Court.  But I don't think we're -- need to

23 argue this any further at this point.

24        THE COURT:  Okay.  That's fine.  I don't -- I think

25 this issue is one that can truly be cured by a sentence in a

1  confirmation order that interprets this provision, which,

2  clearly, I have the jurisdiction to do.

3          MR. LOCKWOOD:  I don't whether Hartford is here

4  today.  They were the other insurer that had raised an

5  objection on this point.  I don't know if they're on the phone.

6  Maybe they could let us know whether this procedure is

7  acceptable.

8          THE COURT:  Is Hartford represented?

9          MS. DRITZ:  Yes.  This is Melanie Dritz for The

10 Hartford on the phone.

11         THE COURT:  Yes, Ms. Dritz.

12         MS. DRITZ:  We will speak with Mr. Lockwood as well,

13 and that seems acceptable for the time being.

14         THE COURT:  All right.

15         MR. LOCKWOOD:  Hartford has raised several other

16 objections of a procedural nature to this provision of the

17 plan.  They've argued that in order for the Court to issue a

18 ruling on this, it has to be presiding over an adversary

19 proceeding.  It then basically says, as best I can tell, that

20 even if there were an adversary proceeding, the Court couldn't

21 rule on it, because it seeks a declaratory judgment, which is

22 not a core issue under the Court's jurisdiction, and,

23 therefore, there's no jurisdiction to issue that.

24         THE COURT:  Wait.  Is the reimbursement agreement

25 property of the debtor's estate?

1        MR. LOCKWOOD:  Yes.

2        THE COURT:  Then I don't need an adversary action to

3 determine whether property of the estate is appropriately

4 disposed of pursuant to the terms of the plan.  That's what the

5 plan is supposed to do.

6        MR. LOCKWOOD:  Well, I obviously agree with that.

7                    (Laughter)

8        MR. LOCKWOOD:  I would suggest that it is possible

9 that Hartford's objection was based on its premise that we've

10 attempted to just agree to get rid of that what we were asking

11 for was a ruling in essence that we didn't have to comply --

12 the trust didn't have to comply with the obligations, because

13 the only thing that's left really, if we are agreeing to comply

14 with the obligation, is the simple question of can this

15 agreement be assigned to the trust, and if it is, does the

16 trust as the successor of Grace have the ability to perform it

17 in accordance with its terms?  If that's the only issue, number

18 one, it strikes me that it's become basically identical to the

19 assignment issue and would be subject to the same kind of

20 preemption issue if there was something that needed to be

21 preempted.  And in this connection I might add that none of --

22 neither CNA nor Hartford asserted that there was some sort of

23 anti-assignment prohibition in these agreement -- in their

24 agreements.

25        So it -- I am hopeful that by limiting the scope of

1 the provision in the manner that we've been discussing here I

2 will sort of obviate it, if you will, or moot it, the

3 procedural objections that Hartford has raised, but -- which I

4 don't think, and I'm prepared to argue, if necessary, are not

5 well founded in any event, but I'm hopeful they're mooted.  And

6 with that, I would turn the microphone over to Hartford's

7 counsel.

8          THE COURT:  Ms. Dritz.

9          MS. DRITZ:  We would have to confirm with our client

10 whether that would be the case.  I'm not in a position right

11 now -- we think that the arguments and cases cited in the brief

12 are clear and want to rest on the paper.

13          THE COURT:  All right.  With respect to that, I

14 absolutely do not see why an adversary action in order to

15 interpret a provision of the plan is necessary.  That's the

16 whole purpose for a contested proceeding.  The discovery rules

17 have been applied to this proceeding.  It's clearly been

18 contested, probably contested more than any other case I've

19 ever dealt with in my entire career on the bench and maybe

20 before then, too.  So I think that the issue has been fully

21 framed, fully litigated, and this proceeding has provided

22 appropriate due process rights to everybody to raise this

23 issue.  So I don't see the need for an adversary in this

24 regard.

25          To the extent that it's asking for a declaratory

J&J COURT TRANSCRIBERS, INC.

1  judgment, I don't think that's the case either.  This Court is

2  called upon to confirm a plan.  In doing that I have to

3  interpret certain provisions sometimes to figure out whether

4  the plan is confirmable.  This provision, it seems to me, to

5  the extent that it -- there is a transfer of the assets to the

6  trust will require the trust to comply with the contract in

7  full, and I have no hesitance in making that finding.

8  Otherwise, I don't think the assignment would be -- transfer --

9  I'm not sure it's an assignment.  Whatever it is, transfer or

10  assignment would be valid.  So I think you folks ought to work

11  on language that will simply specify that fact and those

12  findings and those conclusions in the confirmation order.

13      To the extent that Hartford wants to rely on the

14  brief as to necessity for an adversary or the fact that the

15  Court cannot declare the rights of the parties in context with

16  plan confirmation, those objections are overruled.  Okay.

17      MR. LOCKWOOD:  Thank you, Your Honor.

18      MS. DRITZ:  Thank you.

19      THE COURT:  Ms. DeCristofaro.

20      MS. DeCRISTOFARO:  Just to go back one step further,

21  I think in delivering the good news about insurer neutrality

22  Mr. Lockwood failed to give you also the good news that we have

23  pending evidentiary motions from Phase 1 and a lot of issues in

24  Phase 1 that will all be mooted by the stipulation, and we'll

25  provide you with the exact -- but you can consider all of Phase

1 related motions to be mooted by that stipulation.

2        THE COURT:  Oh, well, that's a help.  Thank you.

3        MS. DeCRISTOFARO:  I thought that would be helpful.

4        MR. LOCKWOOD:  I'm on a roll, Your Honor.  Mr.

5 Bernick is goading me on here.  The next item, which is under

6 the rubric of insurer-related items, is an issue that has been

7 raised by CNA, One Beacon, and Geico concerning the TAC, and

8 basically, their position is that the --

9        MR. BROWN:  Your Honor, can I just interrupt to

10 clarify on that point.  Geico is no longer pressing the issue.

11 It's --

12        THE COURT:  I'm sorry.  Seaton.

13        MR. BROWN:  One Beacon and Seaton are pressing the

14 issue.

15        THE COURT:  Okay.  Thank you.

16        MR. LOCKWOOD:  Geico and Seaton filed the same

17 papers, and I have a tendency to go with one name rather than

18 two, but Mr. Brown is correct.

19        THE COURT:  All right.

20        MR. LOCKWOOD:  I have not had a chance to discuss

21 with counsel for the insurers exactly how they want to proceed

22 on this.  It's been thoroughly briefed.  As Your Honor knows,

23 the TAC's role in this case is similar to what it's been in a

24 number of other cases.  This is sort of a brand new objection.

25 The insurers originally proposed to put on a witness, Professor

1  Shein, to give opinion testimony about this from the standpoint

2  of, I don't know, public policy or something.  We objected by

3  way of a motion in limine.  Professor Shein was withdrawn.

4         There's now no real evidence of record addressing the

5  existence, nature, and substantiality of the alleged conflicts

6  or any other evidence that purports to have demonstrated

7  they've occurred elsewhere or are likely to occur here and what

8  their results would be if they occurred, et cetera.  So it's

9  pure issue of law.

10        As far as I'm concerned, our papers more than

11 adequately set forth our position on this.  I don't really have

12 anything new to say on the subject at this point, unless the

13 Court has some particular questions about some of our

14 submissions, and I would be happy to pass the podium -- the

15 lectern over to the insurers for them to decide to tell us what

16 they want to talk about today.

17        THE COURT:  Well, I don't really have a question

18 about the papers.  I've read them all, and I think I understand

19 the arguments.  I guess my question is whether this issue

20 simply can't be addressed and settled.

21        MR. LOCKWOOD:  It --

22        THE COURT:  The nature of the TAC -- there's been

23 testimony on this record as to why having law firms that have

24 sizeable client bases that would have claims against the trust

25 are appropriate to help advise the trustees under some -- of

1 some of the circumstances that the trustee would need advice

2 about.  So there is some evidence in the record that supports

3 why that type of person should sit on the TAC.

4            Whether the specific people who are chosen have to

5 sit on this TAC may be a different issue, and these particular

6 people seem to sit on an awful lot of asbestos trusts

7 somewhere, either as trustees, as TACs, as FCRs, as something.

8 And I guess the question is why can't that largesse be spread

9 around.

10           MR. LOCKWOOD:  Well, Your Honor, at least as an

11 opening observation, the objections made by the insurers here

12 are not focused on some sort of perceived personal failings of

13 the individual TAC members in this case.

14           THE COURT:  No, it's based on the fact --

15           MR. LOCKWOOD:  They are based on the proposition that

16 these TAC members are --

17           THE COURT:  Will double dip.

18           MR. LOCKWOOD:  Well --

19           THE COURT:  And that's what will happen.  They will

20 double dip.

21           MR. LOCKWOOD:  Well --

22           THE COURT:  They will be paid by the trust for their

23 services in the fashion that's compensable, and they'll be paid

24 by the clients who then get a distribution through the trusts.

25           MR. LOCKWOOD:  And that -- first, I don't think

1  that's double dipping, because the services they perform for

2  the trusts are, as we have set forth in great detail, involve

3  nothing to do with claims processing.

4          THE COURT:  That's so.

5          MR. LOCKWOOD:  So they are totally different type of

6  services.  So they're getting paid by their clients for getting

7  their claims allowed.  They're getting paid for the trust by

8  being advisors to the trust on a number of generalized matters,

9  which I'd be happy to walk the Court through --

10         THE COURT:  No, I don't need -- I --

11         MR. LOCKWOOD:  -- again.

12         THE COURT:  I don't need that bible.  Thank you.

13         MR. LOCKWOOD:  I even have a demonstrative prepared,

14 Your Honor.  I want to emulate my good friend, Mr. Bernick.  I

15 have it right over there.

16         THE COURT:  Well, I'll be happy to look at it, but --

17         MR. LOCKWOOD:  I can go get it.

18         THE COURT:  -- but I don't think I need the chapter

19 and verse on that specific issue.

20         MR. LOCKWOOD:  Well, since we went ahead and prepared

21 it, let me give you my -- I don't want to be the lone

22 technophobe.

23         THE COURT:  But the issue addressing --

24         MR. LOCKWOOD:  May I approach, Your Honor?

25         THE COURT:  Yes, sir.  I'm sorry.  Thank you.

1           MR. COURT:  The issue addressing the compensation not

2 just of the TAC members but of the fact that they also have

3 some -- some say in the change in the Trustee's compensation I

4 think is some of the issue that is addressed.  There is control

5 whether it is subtle or not subtle, and I think that's what the

6 insurers are raising and concerned about in addition to the

7 fact that they make the argument that their indirect claim

8 interests are not necessarily represented by these entities,

9 but that's a different issue.

10           MR. LOCKWOOD:  Well, let me speak to those, Your

11 Honor.  First, the exhibit that I've handed you, PPCL-204 --

12 it's actually 204, 205, and 206.  They're all -- is a summary

13 of the provisions in the trust agreement where the TAC has some

14 sort of consent rights, which is the thing that the insurer's

15 objecting to, and the insurer's basic theory here is that not

16 the four individuals per se, but any plaintiff's lawyer who

17 would be a TAC member, on the one hand, and who would

18 simultaneously have clients that presented claims to the trust,

19 on the other hand, would have the conflicts of interest that

20 they allege.

21           And so it's not just these four people, and there's

22 no way to -- the only, quote, compromise, close quote, that one

23 could have on their objection as stated would be to make sure

24 that the TAC consisted of people who didn't have asbestos

25 personal injury claimants as clients, and that's just not

1 acceptable to the ACC from the perspective of the role that Mr.

2 Inselbuch testified about at some length that the TAC was

3 supposed to have.  These are people that are supposed to know

4 what the original deal was that's embodied in the plan, and

5 their consent rights, if you look at these slides, all involve

6 situations where there are changes in some manner or another

7 that the trustees are proposing.  Not that the TAC is proposing

8 and trying to get the trustees to agree to but the trustees are

9 proposing and trying to get the TAC to agree to.  And the TAC

10 also -- the Futures Representative, who doesn't represent

11 clients has the same consent rights.

12         And then as we set forth on the second and third

13 slides here, there are a series of restrictions on the TAC's

14 power to withhold its consent.  They cannot withhold their

15 consent unreasonably.  They must explain in detail their

16 objections to any course of action within 30 days or their

17 consent is deemed to be given.  Any dispute arising from the

18 withholding of the TAC is submitted to ADR with a right to seek

19 de novo judicial review from this Court.  The burden of proof

20 is on the TAC to show that the objection was valid, and if a

21 dispute is not resolved by ADR within 30 days, the dispute may

22 be directed -- submitted directly again to this Court.  And if

23 the trustees determine that the matter is exigent, they may opt

24 out of the ADR process at any time and go directly to the

25 Bankruptcy Court.

1           So the -- if you look at that and you also look at

2   the first line which sets forth the limited types of functions

3   all involving changes that the TAC has, we submit that there's

4   simply no basis for arguments that the trustees, on the one

5   hand, will be under the control of the TAC, and that the TAC,

6   on the other hand, will have any ability to favor their own

7   clients.

8           Remember, Your Honor, this plan was put out for a

9   vote.  The TAC members are four law firms.  There were at least

10  200 law firms that submitted client votes on this plan.  So the

11  overwhelming majority of the claimants that were represented in

12  this case were represented by people that were not TAC members,

13  and their lawyers, who were the ones that either voted for them

14  in a master ballot or advised them how to vote on individual

15  ballots could see --

16          THE COURT:  Well, I --

17          MR. LOCKWOOD:  -- who those people were, could read

18  the trust agreement, and could make up their own minds as to

19  whether or not they thought that the -- their interests and

20  their clients' interests were likely to be harmed by the role

21  provided for by -- for the TAC.

22          THE COURT:  I don't -- I can't disagree with --

23  except perhaps with one thing.  I don't know how many

24  individual clients the TAC members versus any other law firm

25  that may have been submitted --

1        MR. LOCKWOOD:  Well, they hold a lot, but they sure

2 don't hold anywhere near, you know, some sort of 75 percent or

3 even 50 or even 25 percent.

4        THE COURT:  Yeah, I'm sure they were not compelling

5 the vote on the plan or driving the entire vote on this class

6 on the plan.  If that was the point, okay, I agree with that.

7        MR. LOCKWOOD:  That's the point, Your Honor.

8        THE COURT:  All right.

9        MR. LOCKWOOD:  That they -- I mean who knows better

10 about the integrity of a plaintiff's lawyer than other

11 plaintiffs' lawyers who are keeping an eye on the competition,

12 Your Honor.  I mean this is not --

13        THE COURT:  Let's ask Judge Jack, and then we'll have

14 an answer to that question.

15                        (Laughter)

16        MR. LOCKWOOD:  Oh, that's hard to --

17        THE COURT:  That's part of the problem.

18        MR. BERNICK:  I would imagine that Mr. Lockwood's

19 proposition would be an awful lot more palatable if it were --

20 if it were phrased slightly differently like --

21        MR. LOCKWOOD:  Well, let me put it this way, Your

22 Honor.

23        MR. BERNICK:  Who do you send -- who do you send to

24 catch a thief?  It's another thief.  Right?

25        MR. LOCKWOOD:  No, I don't think --

**J&J COURT TRANSCRIBERS, INC.**

1                    (Laughter)

2          MR. LOCKWOOD:  I don't think I intended to phrase it

3 that way --

4          THE COURT:  No.

5          MR. LOCKWOOD:  -- or imply it.  But no, I mean the

6 other lawyers are looking out for their own clients' interests.

7 Their own initial dip depends upon the trusts being

8 administered in a manner that they conceive to be fair and in

9 the interest of their clients.  And so they're not going to

10 look kindly upon the nomination of four people who they think

11 have some reason, as the insurers argue, to favor those four

12 law firms' clients at the expense of everybody else, which is

13 what this conflict argument all boils down to with a couple

14 minor exceptions.

15          The minor exceptions are an argument that the TAC

16 members don't represent the insurers, and they cite at one

17 point from a filing we made which made the observation that the

18 insurers are adversaries of the trust.  I find that somewhat

19 ironic in light of the fact that the only basis that the

20 insurers could even claim to have standing to complain about

21 the TAC, since the TAC doesn't have anything to do with the

22 insurers' obligations, and the trust is adversarial to the

23 insurers to the extent that there's disputes about coverage is

24 that the insurers claim to be creditors.  They say we have

25 indirect asbestos PI claims that are being champed in the

1 trust, and then -- and, therefore, we're prospective trust

2 beneficiaries, and, therefore, we have a right to concern

3 ourselves with whether the TAC is looking out for our

4 interests.

5          Well, first, the FCR is not any -- doesn't have any

6 of this double dipping issue.  Secondly, the claims -- the

7 trust is not adversarial to the insurers as claimants any more

8 than it's adversarial to any other trust beneficiary as a

9 claimant.  I mean they have to look at the claim.  The trustees

10 have to decide in good faith whether or not it's a valid claim.

11 If they decide that it isn't, this will be individual review,

12 because there's a special provision in the plan -- the TDP for

13 so-called indemnified insurer claims, which is the nature of

14 the claims being asserted by both Seaton and CNA.  And if they

15 don't like the results of the individual review, they go

16 through ADR.  I mean they're just like the Libby claims in that

17 regard.  There's nothing different about them, and there's

18 nothing in the plan or the TDP that they can point to that

19 somehow or another gives the TAC some ability to, you know, go

20 after their claims in some manner that would be different from

21 anybody -- their role with respect to anybody else's claims,

22 which is zero.  I mean they don't have any role in the direct

23 claimants' claims processing, and they don't have any role in

24 the insurers' claims processing.

25          So -- and, moreover, to be honest about it, this

1 argument that they have a contingent claim against the trust,

2 which would be a future claim, which would mean the Futures

3 Representative that would really be looking after their

4 interests rather than the TAC, because they don't have the

5 claim yet or --

6          THE COURT:  Well, I don't think that makes it a

7 futures claim.  A futures claim is --

8          MR. LOCKWOOD:  Well --

9          THE COURT:  -- a known -- is a claim that exists, but

10 you don't know about it.

11          MR. LOCKWOOD:  Okay.  I accept that.  The fact of the

12 matter is that this is coming from insurers whose claims

13 hypothetically are going to arise out of settled insurance

14 policies which all the other claimants are enjoined from suing

15 them on, because these insurers -- these trust beneficiaries

16 are also asbestos protected parties, and their claim arises out

17 of some notion that they've never explained in this court at

18 any time, in writing or orally, that notwithstanding they're a

19 beneficiary of a 524(g) injunction that says thou shalt not sue

20 this insurer on their policy obligations.  Somehow somebody is

21 going to persuade you, Your Honor, that that injunction is

22 invalid.

23          And putting aside the fact that under the statute,

24 once the time for appeal of the injunction expires or is

25 otherwise run, the Court doesn't have the power to modify it

1  under the statute.  It -- they -- if there was ever a case

2  where somebody could be said not to be a legitimate creditor

3  interest by reciting -- because of the number of ifs associated

4  with the contingency of the claim, if the claim ensues in the

5  light of the injunction, if the Court holds the injunction is

6  invalid, if the -- some other court holds that the settlement

7  agreement didn't bind the claimant that's doing the situation,

8  then and only then -- and I'm sure there are more ifs that I

9  could figure out to add to that three -- then and only then

10  would they have a claim.  So this is not a legitimate exercise.

11  These people have -- really don't have standing to make these

12  arguments.

13         Now, the only one -- and interestingly enough, the

14  only one that purports to have a claim at all I think is

15  Seaton, who has actually filed a proof of claim, which, for

16  some strange reason, they haven't relied on in their post-trial

17  briefing as giving them standing.  It's about $30,000 for

18  alleged lawyer's fees incurred in defending the Scotts

19  adversary proceeding at the very beginning of the case, before

20  that was put on ice, and then subsequently, Scotts has settled

21  and given up its rights against Seaton and One Beacon and

22  others -- other insurers.  Even if you assume that that $30,000

23  claim is a valid claim, to say that they have a creditor issue

24  -- interest in a TAC arising out of that liquidated amount,

25  that you're going to get paid at the payment percentage at the

1 front end of the case if it's valid at all in which the TAC

2 will have no role in evaluating, gives them standing, that's

3 just a pretext, Your Honor.  That's all that is.  That's just a

4 pretext.  They don't have any legitimate creditor issue in

5 this.

6 And the business about the right to pass on the

7 trustees' compensation, somehow or another putting the trustees

8 at the risk of control by the TAC, remember, if you look at

9 Slide 1, the -- number one, it's only -- raises in excess of

10 annual cost of living adjustments that the TAC's consent if

11 required for.  And two, it's other than changes approved by the

12 Bankruptcy Court.  And again all of the litany of things that

13 happen if they -- if the trustees say we're entitled to more

14 money than our annual cost of living increase, all of the

15 requirements of the remaining two slides here about they can't

16 withhold consent unreasonably, they've got to explain in

17 detail, they got to go through ADR, they -- the burden of proof

18 is on the TAC, and it ultimately is decided by Your Honor, if

19 the trustees -- first the trustees have to be presumed to be

20 people of integrity.  Nobody has made any showing that they're

21 not.  If the trustees thought that the TAC members were trying

22 to control them by unfairly or unreasonably objecting to

23 increases in their own compensation, isn't it highly likely

24 that they would bring that conduct to the attention of the

25 Court in seeking this?

1          THE COURT:  Well, I don't know, because --

2          MR. LOCKWOOD:  I mean --

3          THE COURT:  -- the way that -- the way the procedure

4 is set up, to the extent that a TAC member is disqualified,

5 that TAC member can introduce another -- isn't it the TAC, or

6 do I have that confused with the Trustee?  I'm sorry -- can

7 introduce another entity from its own law firm to replace it.

8 So to the extent that there is that kind of bad conduct,

9 bringing it to the attention of somebody doesn't really help.

10 You just take out one person from the firm and put somebody

11 else in.

12          MR. LOCKWOOD:  Well, but that person would then

13 presumably either change their vote to consent, or they would

14 be motivated by the same wrongful notion of putting pressure,

15 and they would deny their consent, and they'd be back in front

16 of the Court on exactly the same grounds, A.

17          B, if the Court really thought that a law firm and

18 its representatives were attempting to breach their fiduciary

19 obligations to the trust -- and remember, the whole notion of

20 the conflict here is that this -- this denial of consent, this

21 control of the trustees is aimed at preferring the individual

22 clients of that law firm over all the direct claimants that

23 that law firm does not represent.  If this Court -- that would

24 clearly be a breach of the fiduciary obligation in that

25 capacity.

1          And all the nonsense about zealous representation of

2 clients that somehow or another creates a conflicting

3 obligation we've addressed in our papers.  I don't want to

4 belabor it here, but the fact is that there is no such

5 obligation to try and take your individual claimant interest

6 and use it as a mechanism for improperly victimizing people who

7 aren't your clients for the expense of your clients.  There's

8 nothing in the cannons of ethics about zealous representation

9 that says that somebody's got a claim against a limited fund is

10 in some manner or another required by its clients' interests to

11 improperly -- improperly favor that client for the benefit --

12 at the expense of other claimants against that fund.

13          So this is all lawyer argument.  You would think if

14 this was really a problem, that somebody in the 20 years that

15 the Manville trust and then subsequent trusts coming on line

16 over time that had exactly this type of TAC -- in the case of

17 Manville it's called the Select Committee for the -- Select

18 Counsel for the Beneficiaries or SCB -- something would've

19 surfaced, and we would be hearing about it from the insurers

20 who are, after all, involved in one way or another with all of

21 these trusts either as insurers directly or as insurers of co-

22 defendants that are making claims against the trust.  We

23 haven't heard one iota of evidence that anybody has ever

24 misbehaved in this capacity in any of these TACs.

25          And so I would submit to Your Honor that this is just

1 in -- it's creative lawyering.  I'll grant you that.  But it's

2 at the end of the day that's all it is.  It's some lawyer

3 sitting around figuring out can they dream up a hypothetical

4 stick to beat this plan with, and they have failed to carry --

5 to adduce any evidence in support of their objections to the

6 TAC on the grounds that there are any real conflicts of

7 interest, that are -- have any remote possibility of actually

8 being acted upon to the detriment of other people.  So we would

9 urge Your Honor to overrule this objection to the plan.

10          THE COURT:  Good afternoon.

11          MR. GIANNOTTO:  Good afternoon.  Michael Giannotto

12 for the CNA companies.  Your Honor, we believe we've briefed

13 this issue very diligently in our briefs as well, and if you

14 think I'm going on too long or you don't want to hear anything

15 I have to say, just please tell me.  You're not going to hurt

16 my feelings.

17          I'd like to address the points that -- Mr. Lockwood

18 already called me creative.  That's the best compliment he's

19 ever given me.  I guess I'll go through the points in the order

20 that Mr. Lockwood raised them.

21          The first one is Mr. Lockwood said that there's no

22 evidence in this record there's -- that there's a substantial

23 risk that these TAC members would put the interests of their

24 clients ahead of their fiduciary duties to all the present PI

25 trust claimants, and I submit to you that there is evidence in

1 the record.  And the evidence shows that they have the power to

2 do so, that they have a monetary incentive to do so, and, in

3 fact, that in the past they have abused powers like this that

4 these same TAC members have had in other contexts.

5        I mean turning to the powers, it's more than a

6 consent power.  This document -- the trust agreement and the

7 TDP were drafted so that the TAC members, the AC -- which were

8 part of the ACC, would have the power to influence how this

9 trust is administered going into the future.  They have to

10 consent to any change in the trust agreement or the TDP.  They

11 also get to consult with the trustee.  They have a right to

12 consult with the trustee on any matter involving the

13 administration or implementation of the trust.  In fact, the

14 trustee has to meet with them, has to consider their needs.

15       The result of that is that if the trustees proposed a

16 change in the procedures, a change in values, a change in the

17 order of processing in the existing TDP that might impact their

18 clients adversely compared to say my client, CNA, which is an

19 indirect PI trust claimant -- we've briefed that.  I might add

20 on that just so I don't forget that in the last brief that the

21 plan proponents filed they indicated that CNA had not filed a

22 proof of claim covering its indirect PI trust claims.  That is

23 incorrect.  We did file a proof of claim, and it is CNA Exhibit

24 5, and it's been admitted into evidence.

25       But, in any event, the TAC members, if -- for

1 instance, say the TAC members want to decide -- they think

2 indirect PI trust claims are paying -- are being paid too much

3 or they're being paid too fast, they could propose to the

4 trustee to change the procedures, change the order in the

5 queue, change the values for indirect claims versus direct

6 claims.  Or the trustee might come in and think that the

7 indirect PI trust claimants are getting a raw deal and want to

8 change things to better their lives.  In those instances the

9 TAC members might believe or they have the power to veto

10 changes that would benefit indirect PI trust claimants at the

11 expense of their own clients.

12         They also have power, as you say.  They have to

13 approve changes in pay of the trustees other than cost of

14 living increases, and again the trustees can go to the Court.

15 They can go to the Court on any of this stuff.  But if going to

16 the Court to get things done is the test, then you don't need

17 even neutral trustees, because a beneficiary could sue in

18 court.  The whole idea here is to put people in a decision

19 making -- to tap people who are decision makers who set up a

20 system where you don't have the risk of having to go to court

21 very often.

22         And again, other powers they have, they can change

23 schedule values, they can change disease levels, and it may be

24 that indirect PI trust claimants, we're going to be coming in

25 to get money for what we believe are the most serious claims,

**J&J COURT TRANSCRIBERS, INC.**

1 because we'll have to pay off on them and want it from the

2 trust.   And it may be that we would want higher values for the

3 more serious claims and the TDP changed for lower values for

4 the less serious claims.   But the TAC members can block all

5 that.   They -- by not consenting to it.

6          And, in addition, they can seek the removal of the

7 trustee for good cause, so they have power over the trustees

8 that way.   And also, as we pointed out in our brief, these same

9 TAC members and these same trustees are involved in a lot of

10 different trusts, and so there is an incentive for the trustees

11 to play ball with the TAC.   If they want to be appointed to

12 future TAC -- future trusts as trustees, they have an incentive

13 to not upset -- not upset the TAC.   So the TAC has the power to

14 do things under this.

15          And I submit that the evidence is that they have a

16 monetary incentive to do so, because to the extent that their

17 clients recover more money, it'll be more money from them --

18 for them in the form of contingency fees.   Also, they have an

19 incentive, the incentive provided by the Rules of Professional

20 Responsibility, to put their clients first.   If there is a

21 proposed amendment that says let's increase the amount of money

22 paid to indirect PI trust claimants but decrease the amount of

23 money paid to certain direct PI trust claimants, maybe that is

24 in the overall interest of everyone when you balance everyone's

25 needs, but the TAC members have to say to themselves can I

1 support this given that I'm going to in effect take money away

2 from my own client.  I'm supposed to put my clients' interests

3 first as part of the Rules of Professional Responsibility.  So

4 there you have -- you have this conflict.  It's built into the

5 system.

6          THE COURT:  But Mr. Lockwood raises a good point.  If

7 this is such an issue, why hasn't it come up in the 20-year

8 history -- 20-year plus -- almost 30-year history at this point

9 in time since these trusts started?  And I know I've confirmed,

10 I don't know the number, 15, 18, something like that of these

11 cases, and I haven't heard one word in any of these cases about

12 any of these.  I've only ever, that I can recall at least, had

13 two issues come up where trustees have come in and they have

14 absolutely nothing to do with anything like this.  So if that's

15 the case and it's not just a concept that there could be this

16 parade of horribles which doesn't really exist, where is the

17 evidence of it.

18          MR. GIANNOTTO:  Okay.  I'll -- three ways.  One is

19 that I don't think that in a lot of these trusts or maybe any

20 of them you have insurance companies that have been indirect PI

21 trust claimants that are creditors as well as insurers.  And so

22 here we are creditors, so we have an interest in this.  But I

23 can cite you to two instances where something like this has

24 happened, and we cite this in our brief.

25          In the AC&S bankruptcy, which was in Delaware but not

1 before you, there was an instance where these same four

2 individuals who are proposed for the TAC here were part of a

3 pre-petition negotiating committee.  They were supposed to

4 represent all asbestos claimants and negotiate a plan with the

5 debtor that, you know, would be a confirmable plan.  Judge

6 Newsome refused to confirm the plan.  When he looked at the

7 plan, he said that it was basically the product of self-

8 dealing.  The members of this pre-petition negotiating

9 committee, which was not just these four people, but it was

10 other plaintiffs' attorneys, other prominent plaintiffs'

11 attorneys plus these four people, had engaged in self-dealing

12 benefitting their own clients over providing a fair system for

13 everyone.

14          They had -- they were supposed to get a claims

15 handling facility, which, by the way, they have ability to veto

16 here or approve whatever claims handling facility is going to

17 be hired, to look through the claims, and they ended up hiring

18 a claims handling facility which was associated with the

19 Gilbert Heintz law firm, which in turn subcontracted the work

20 to an outfit that was owned by a former paralegal of Mr.

21 Rice's.  And as a result of all that, the Judge refused to

22 confirm the plan saying that again it was the product of abuse

23 and self-dealing.  So that's one instance.  It wasn't a TAC and

24 a trust, but it was these same people where they were

25 supposedly being disinterested.

1              A second example is in the <u>Combustion Engineering</u>

2 case.  Your Honor, you ruled that Mr. Rice and Mr. Budd could

3 not serve on the TAC in that case.  That was not an objection

4 raised at the behest of the insurers.  It was raised at the

5 behest of certain cancer claimants.  But they objected to Mr.

6 Rice because of various conflicts of interest.  It wasn't the

7 same situation as here.

8              THE COURT:  No, it wasn't.

9              MR. GIANNOTTO:  It was a different -- it was -- he

10 had different -- but it is an instance where you, you know,

11 invoking your powers as a court of equity said that Mr. Rice

12 and Mr. Budd couldn't serve on the TAC.  So our view is they

13 have the power, and they have the incentive, and they have

14 abused it in the past in <u>AC&S</u>.

15              And I guess more fundamentally, we don't see why you

16 need to have these people or interested PI lawyers at all as

17 members of the TAC.  It's supposed to be an advisory committee.

18 That's what it's called, Trust Advisory Committee.  And, you

19 know, I assume that insurance companies could call up the

20 trustees and say, hey, we think you should do this.  We would

21 have the right to give our views just as Mr. Rice would and Mr.

22 Budd would if they were just advisers.

23              The FCR is not a plaintiffs' attorney.  He's not

24 going to be representing anyone.  He's not going to getting any

25 contingency fees, and he is wholly adequate in this and other

1 cases to represent the interest of futures.  There's simply no

2 need that you would have to have -- you could have another

3 lawyer like a Mr. Austern represent the interests of the

4 present claimants, and they would not have this potential

5 conflict.

6        And we don't think it's taken care of by the fact

7 that they have to put their stuff in writing, and they can

8 appeal to the Court for the same reason I said the trustees are

9 going to play ball.  They're not going to do that.  And I take

10 -- I understand your point, Your Honor, that it hasn't surfaced

11 before, but I guess CNA has never been in this position as a

12 creditor before.  We have raised it -- I wasn't counsel of

13 record -- in another case, but it was just never decided.  The

14 case went away on other grounds.  We resolved -- we resolved --

15 we settled with the plan proponents in that case.

16        But it is very much a concern of ours, and there --

17 you have no need for it.  Again, I guess turning back to

18 standing, because Mr. Lockwood talked about standing, we cite

19 in our brief the Congoleum case.  We cite from your decision in

20 the Pittsburgh Corning case that any attorney and then any

21 insurer does have the right to raise ethical conflicts of

22 interest issues, because attorneys have a duty under the Rules

23 of Professional Responsibility to --

24        THE COURT:  Well, they do, but the problem is you

25 have to show me that there is a conflict, and I think what

1 you're -- this can't yet be a conflict.  There isn't even yet a

2 trust let alone a TAC.

3            MR. GIANNOTTO:  Right.

4            THE COURT:  So that is substantially different from

5 what happened at least in <u>Pittsburgh Corning</u>, and I don't

6 recall what -- which -- oh, <u>Congoleum</u> you cited.  I thought you

7 were citing <u>CE</u>.  You said <u>Congoleum</u>.  Obviously, I read the

8 opinion in <u>Congoleum</u>, but I don't think that was the equivalent

9 of this issue either.

10           MR. GIANNOTTO:  Well, Your Honor, it was for standing

11 purposes.  In both those cases it was whether certain counsel

12 could be appointed to represent in the one case the debtor as

13 insurance counsel and in the other case the ACC and maybe the

14 FCR as well as insurance counsel.  He had not been appointed

15 yet.  The issue is whether he should be appointed, and the

16 insurance companies raised the issues, and in both cases the

17 debtor or the plan proponents or the ACC -- I guess there

18 wasn't a confirmed -- there wasn't a plan at issue at those

19 times -- said no, they don't have any standing to do this.  The

20 person had not been appointed yet, just like these people have

21 not been appointed now.

22           But the courts in both instances on the standing

23 issue -- I'm not talking about the sub -- whether there is a

24 conflict, I'm not talking about the substantive holding of <u>CE</u>.

25 Just on the standing issue, both courts, you in <u>Pittsburgh</u>

1  Corning and the Third Circuit in Combustion -- in Congoleum --

2  I'm sorry.  I'm stating the wrong case -- in Congoleum said

3  there was standing to raise the ethical conflict.

4          But we believe we're indirect PI trust claimants as

5  well, and we've briefed that.  We've put it in our brief we

6  have indemnity rights.  I'm not going to go through that.  I

7  just -- as I said before, we did file a proof of claim.  It's

8  Exhibit 5.  And so we believe we will be adversely impacted by

9  this, and that's why we think it is a very important issue.

10         And I guess one final thing.  There were earlier

11 proceedings in this case.  You had asked when we were arguing

12 some motion do I, meaning the Court -- does the Court have the

13 power to do anything about this, and we've briefed that, and

14 the Court does have the power.  In fact, when you decided that

15 Mr. Budd and Mr. Rice could not be TAC members in Combustion

16 Engineering, you invoked your powers as a court of equity under

17 the Bankruptcy Code -- a court of equity in bankruptcy to

18 preclude injustices and unfairness.  And the Third Circuit has,

19 and we quoted it in our brief from the Kaiser Aluminum case,

20 said, and the Supreme Court has said many times bankruptcy

21 courts are courts of equity, and they have the power to see

22 that injustice isn't done.

23         So you do have the power to do this, and you have

24 done it in the past where you thought that there was

25 inappropriate conflict of interest.  Also, we do believe that

1 this will be a violation of ethical -- we do believe there is a

2 conflict, because the standard under Rule 1.7 of the Delaware

3 rules and the model rules is whether there's a substantial risk

4 that their representation of either their clients or the trust

5 will be materially limited by their other duties as a fiduciary

6 to the trust.

7        And again, as I said, we believe they will be.  They

8 have the power, and they have the monetary incentive, and

9 they've abused it in the past, similar powers, in AC&S, and we

10 believe that that is enough to show that there is a substantial

11 risk and, in particular, where there is no need to have

12 interested people be members of the TAC.  That you could have

13 someone the equivalent of Mr. Austern serving in that role.

14        THE COURT:  Okay.  The -- with respect to the issue

15 about the model rules, how do they apply to the TAC, because

16 the TAC is not acting in the capacity of counsel to the trust?

17 It's simply acting as individual people being advisors to

18 trustees.  They're not appointed as counsel.

19        MR. GIANNOTTO:  No, but they're counsel to their

20 individual clients who are making claims against the trust.

21        THE COURT:  Yes.

22        MR. GIANNOTTO:  And so the question is whether their

23 duties to their clients will be material -- there's a

24 substantial risk that their duties to their clients will be

25 materially limited by their duties to the trust or vice versa.

1 And so in this case they have duties to their clients to put

2 their clients' interests --

3          THE COURT:  But the trust isn't their client.

4          MR. GIANNOTTO:  No, the individual people are their

5 clients.

6          THE COURT:  Right, so how does --

7          MR. GIANNOTTO:  And so the question is whether their

8 duties to their clients will be limited by their duties to the

9 trust.  If they were true -- all right.  I'll argue it the

10 opposite way.  If they were true fiduciaries to the trust and

11 are considering the interests of all trust beneficiaries or all

12 present trust beneficiaries, okay, that is -- there is a

13 substantial risk that's going to limit their ability to put

14 their clients' interests first for the same reason I mentioned.

15 They have to -- if they have an issue arise as to whether, you

16 know, they should change the indirect PI trust claimant

17 procedures, they have to decide is that in the best interest of

18 all beneficiaries, and they have to consent to it if they were

19 true fiduciaries even if it hurt their clients.  So in that

20 sense it would impact their ability to represent their clients

21 if they were going to comply with their fiduciary duties.

22          Now, the opposite, the converse is that -- and I

23 agree with you they're not -- the trust is not their clients,

24 but under Delaware trust law they are fiduciaries to the trust.

25 And so there's a substantial risk that if they do comply with

1  their duties to their clients and put their clients first that

2  they will be violating Delaware trust law.  So if you look at

3  it one way, there's a substantial risk they're going to violate

4  the Rules of Professional Responsibility.  That is if they --

5  they're fair fiduciaries to the trust, but it might hurt their

6  clients.  And if you look at it the other way, they violate the

7  Delaware law of trusts, because if they put their clients'

8  interests first, and they don't put the interests of all

9  beneficiaries as a whole first, they're violating Delaware

10  trust laws.

11          THE COURT:  Okay.  Well, I understand the argument

12  you're making.  I'm having a little bit of difficulty getting

13  my hands around it, simply because it is so hypothetical I'm

14  not sure that in exercising the duties to the trust and in --

15  the fiduciary duties to the trust and in exercising their legal

16  responsibility to their clients that they're not, in fact,

17  operating the same way for the benefit of all those entities,

18  because I would think under those circumstances, given where

19  the trustees must consult with the TAC, that the trustees are

20  going to do it at a certain point in time if the trustees feel

21  that -- I'll just make up a hypothetical.  For example, the

22  trust distribution percentage has to be altered, for whatever

23  reason.  Let's say that more claims came in than can -- than

24  were anticipated in a certain time, and I know there are

25  methods by which only certain amounts of claims will be paid up

1 to a maximum within certain times.  I understand that.  But

2 hypothetically, let's say that the trustees have determined

3 that there is need to change that distribution percentage and

4 they consult with the TAC about that.  It's only in the best

5 interests of all creditors, including their clients to

6 determine fairly whether the trustees are correct, and if the

7 percentage has to be changed, at what level, because the

8 obligation of the trust and their fiduciary duties, to the

9 extent they exist to the trust, mean that the trust has to

10 essentially be evergreen until the end of the time of the

11 trust.  So all clients have to benefit from that.  It wouldn't

12 be a matter of picking and choosing between one or the other.

13 You've got to make that determination in light of all the facts

14 and circumstances that would apply equally to everyone.  So I'm

15 just having -- I'm having some difficulty seeing where the

16 conflict comes up.

17          MR. GIANNOTTO:  Okay.  That might be true in that

18 hypothetical, but take another hypothetical.  The trust wants

19 to hire a claims handling facility to process claims and under

20 the plan, 2.2(f) -- under the trust agreement, I'm sorry,

21 Section 2.2(f), that requires the consent of the TAC members,

22 in order to hire an outside claims handling facility.  It says

23 that in the plan, Mr. Inselbuch testified to that.

24          THE COURT:  Right.

25          MR. GIANNOTTO:  In deciding what claims handling

1 facility to hire, and the TAC members can recommend things to

2 the trustee, it's not just a consent, they can recommend

3 things, they may recommend a claims processing facility similar

4 to what happened in <u>AC&S</u>, one that's, in effect, controlled by

5 someone who was a former associate, former paralegal of one of

6 the TAC members, on the theory that, well, they'll benefit my

7 client's claim first, or there are procedures that have to be

8 set up for indirect PI trust claims under the plan.  The

9 procedures are supposed to be set up.  Or procedures for

10 indirect PI trust claims can be amended under the plan.

11       The question is, if amendments are going to be done

12 and there are indirect PI trust claims at issue, does the

13 member of the TAC say, well, maybe it is right, the indirect

14 claimant, this is a raw deal for them, they should be getting

15 more, even though that may mean that their clients get less.

16 They're put in that position where they have to go one way or

17 the other and, again, I submit to you, based on the incentive

18 and the conduct in the past, that they'll do that.

19       THE COURT:  Once again, I'm having some difficulty.

20 The indirect trust claims can't get either more or less than

21 the direct trust claims, they're going to be evaluated within

22 the category, under the trust distribution procedures.

23       So, to the extent that, for example, the indirect

24 trust claim paid a Level 1 claim, and a direct claimant had a

25 Level 1 claim, they're going to be paid the same way under

1 Level 1.  So, I've lost --

2         MR. GIANNOTTO:  That's under the current procedures,

3 but the procedures can be amended and that's the problem.  The

4 TAC members have to consent to amendments and they can

5 recommend that amendments be made and try to use their

6 influence to get amendments made.

7         THE COURT:  All right.  If that's the case, I truly,

8 I have some doubt in understanding how the trustees could ever

9 agree and it is up to the trustees, ultimately, to make the

10 determination, the TAC is an advisory body, it is not the

11 determining body, I can't understand how the trustees, without

12 subjecting themselves to some suit from somebody, would agree

13 to a procedure that would do what you're implicitly suggesting,

14 which is, change the procedure in such a way that the indirect

15 claimants would benefit more, that they would get a higher

16 percentage, that their claims would be treated in a different

17 level, that something other than the basic plan structure that

18 currently exists, would inure to the benefit of any one

19 particular group within the current existing structure as

20 opposed to another.  The trustees couldn't possibly agree to do

21 something like that, regardless of how ridiculous a request

22 would be made.

23         MR. GIANNOTTO:  I guess, Your Honor, what I'd say to

24 that is, this trust is going to last for a long time --

25         THE COURT:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GIANNOTTO:  -- and we don't know what's going to

2   happen.  And I understand a lot of this is hypothetical, we're

3   concerned with what might happen, what could happen.  All I can

4   look to is what these four individuals did in the past.  And,

5   you know, they do have the right, if the trustees want to make

6   an amendment, they do have the right to, in effect, veto it,

7   and I know they don't like the word veto.  They have to consent

8   to it, okay?  But this trust is going to last a long time,

9   there are going to be a lot of things that happen to it.

10          Sure, if they do something that really, we thought

11  was in bad faith and hurt our rights, we could come to

12  bankruptcy court, but we'd have to show that it was in bad

13  faith, it would be expensive to do so, it would sort of take a

14  lot of time.  You know, our view is that when you don't need

15  this kind of potential conflict in the TAC, like you don't have

16  with the Futures Rep., then you don't have it.

17          THE COURT:  But actually, the testimony that I have

18  is that -- because this trust isn't formed, the only testimony

19  I have from a former trustee is that this TAC advisory

20  committee is necessary.  A TAC is necessary.  That's the only

21  testimony I have and it really, I don't -- I'll have to go back

22  and look, but I don't think it was really contested that a TAC

23  is a good idea, I thought the issue was, who should serve on

24  it, not whether there should be one.

25          MR. GIANNOTTO:  No, I agree with you, Your Honor, and

**J&J COURT TRANSCRIBERS, INC.**

1 I think you could have someone who -- I agree with that.  Mr.

2 Inselbuch testified that he believed a TAC was necessary.  I

3 don't take issue with whether a TAC is necessary.  The question

4 is whether you have to have people on the TAC who are

5 interested in the sense that they represent claimants who will

6 be making claims to the trust, it's just not a matter of

7 whether you need a TAC.  I don't think you need a TAC, but it's

8 okay.  We don't take issue with that, it's who should be on the

9 TAC.

10          THE COURT:  All right.

11          MR. GIANNOTTO:  Thank you, Your Honor,

12          THE COURT:  Mr. Brown.

13          MR. BROWN:  Your Honor, I will be very brief.  On

14 behalf of Seaton and OneBeacon, we join in the argument that

15 was made by Mr. Giannotto on behalf of CNA.

16          I want to respond to a comment that Mr. Lockwood made

17 about -- I don't recall which he said, he said Seaton or

18 OneBeacon has a claim.  Actually both of them have partially

19 liquidated claims which under this plan are classified either

20 as indirect PI trust claims or as "indemnified insured TDP

21 claims under the TDP.  And he belittled those and said that was

22 a pretext for making an argument for standing with respect to

23 challenging the TAC.

24          He can solve that problem and one way he can solve

25 that problem is by properly classifying the claims to begin

1  with.  We're going to get to that issue shortly.

2          It's our position that those claims actually should

3  be Class 9 claims, not Class 6 claims.  But that would be one

4  way he could solve that problem.

5          He also suggested that there would be no

6  circumstances under which the insurers that have indemnity

7  agreements with Grace, would ever actually have to pay out.

8  Well, that's, obviously, not true.  My clients, Seaton and

9  OneBeacon, have already incurred costs dealing with the Scotts

10 claim.  It's since been resolved but, in fact, they did incur

11 costs.

12          We know that the Libby claimants, and it's not clear

13 to me but, perhaps BNSF as well, are challenging the rights of

14 the insurers to 524(g) protection, absent new value.  So, that

15 risk is out there, we don't know how Your Honor is going to

16 rule on that issue, but we know that the issue is out there.

17          THE COURT:  Well, I missed the second issue, Mr.

18 Brown, because I was still stuck on the first one, so let me

19 get to the first one and then if you'd kindly restate the

20 second.

21          MR. BROWN:  Sure.

22          THE COURT:  With respect to the first one, which is

23 that the insurers have already incurred costs, yes, but you're

24 not yet subject to the 524(g) injunction which will prohibit

25 actions against the insures for, to the extent that the

1 insurers are insurers of the debtor.  So, the Scotts issue, had

2 it arisen, post confirmation, post effective date, when the

3 524(g) injunction is in place, would have an entirely different

4 outcome from your clients' perspective.  There wouldn't be

5 costs because there couldn't be a suit against you, based on

6 those types of claims.

7        MR. BROWN: Well, that's what we hope, that's what

8 we're being told.

9        THE COURT:  Yes.

10       MR. BROWN:  But in point of fact, they've already

11 incurred the costs and there is a proof of claim on file and

12 those claims, each of those claims, the one for Seaton and one

13 for OneBeacon, will be channeled to the trust.  They are

14 indirect PI trust claims or indemnified insured TDP claims.

15 They're $30,000 each, I'm not here to argue that that's, you

16 know, an enormous sum of money, but it's not insignificant.

17 And the point is, and the concern that we have is that there

18 will be other parties coming out of the woodwork and we don't

19 have the faith that Mr. Lockwood has, necessarily, in the

20 524(g) protection and, therefore, we think that -- getting back

21 to the earlier argument, that these should be Class 9 claims,

22 not Class 6 claims.  We're going to get to that in a moment.

23       The second point that I've raised, Your Honor, was

24 this notion that Libby, and perhaps, BNSF, it's unclear to me,

25 are challenging the right of settled insurers to asbestos

1 protected party status.  And to the extent that they succeed in

2 those challenges and I'm not submitting that they should, but

3 to the extent that they do, that will give rise to indemnity

4 claims and those indemnity claims, as the plan has been

5 crafted, will be channeled to the trust.  So that's where the

6 standing comes from.

7 　　　　　The problem, and, Your Honor, I was fumbling around

8 over there looking for one of our earlier filings, but Your

9 Honor, I think, had raised a question with Mr. Giannotto

10 concerning where the conflict was because the TAC members would

11 not be acting as attorneys in their capacity as TAC members.

12 And I'd like to just refer you to Page 26 of the Phase 1 trial

13 brief, filed by Geico and Republic and Seaton.  Now, Geico and

14 Republic are no longer pressing this issue, but Seaton is.

15 It's Docket Index 21 943, and, again, on Page --

16 　　　　　THE COURT:  I'm sorry, 21 943?

17 　　　　　MR. BROWN:  2-1-9-4-3, yes.

18 　　　　　THE COURT:  All right.

19 　　　　　MR. BROWN:  And on Page 26 of that brief, Your Honor,

20 we cite to Model Rule 1.7, which I won't read again, I think

21 Mr. Giannotto, at least, summarized it, but we also cite to an

22 explanatory comment to Rule 1.7 and it says, quote:  "In

23 addition to conflicts with other current clients, a lawyer's

24 duties of loyalty and independence may be materially limited by

25 the lawyer's responsibilities to other persons, such as

1 fiduciary duties arising from a lawyer's service as a trustee."

2 And that's similar to the role that the TAC members are going

3 to have.  They're not called trustees here, they're called

4 Trust Advisory Committee members.

5          THE COURT:  Well, there's a horse of a different

6 color, being a trustee versus the TAC member.

7          MR. BROWN:  The language says such as, Your Honor.

8 The TDP and the trust agreement make clear that the TAC members

9 have fiduciary duties, it's explicit in the terms of the

10 documents.  So, the fiduciary duties are there, and we submit

11 that the problem here is a structural problem and the

12 structural problem is is that the TAC members, in their

13 capacity as lawyers, have one set of loyalties to their clients

14 as well as their own financial interest, because of the

15 contingency fees they have, and in their capacity as TAC

16 members, they have a different set of loyalties.  There may be

17 some overlap, but unless they're identical there is room there

18 for mischief and that's what the problem is, that's the

19 structural defect.

20          Now, the other point, and I don't think we can really

21 ignore this, is the way the consent provisions in the TDP are

22 structured, is that it presumes that the trustees will have an

23 idea about some change they want to make, whether it's to the

24 TDP values, the payment percentage or whatever, and that they

25 will then go and seek the consent of the TAC members.  And that

1 is the way it's structured.  But the reality is, that if the

2 TAC members or any one of them, would like to see a change in

3 the trust agreement or the TDPs, they might just whisper in the

4 ear or suggest that they'd like to see that change and they do

5 have an enormous amount of control over the trustees by virtue

6 of their ability to remove the trustees and to control

7 compensation and as Mr. Giannotto said, the fact that there's

8 influence simply because these trustees will want to be

9 trustees in other trusts as well.  So, there's an opportunity

10 for, in essence a two-way street, it's not simply TAC members

11 giving consent, they can also make suggestions about the way

12 they would like things to work that then become requests from

13 the trustees to TAC members, for which consent is then needed.

14       Mr. Lockwood also pointed out that, and I'm just

15 paraphrasing, but I believe he said that Mr. Inselbuch had

16 testified that the reason you want TAC members who are asbestos

17 lawyers is because they understand the original deal.  And I

18 would submit, Your Honor, that this is one of those examples

19 where they ought to listen to their own arguments.

20       The original deal is reflected in the papers, in the

21 plan documents.  That's the original deal and it speaks for

22 itself.  We hear that argument all the time from the other

23 side, anybody can read the documents and figure out what the

24 original deal is.  We don't need these individuals to tell us

25 what that deal is, it'll be on paper.   Thank you.

1          THE COURT:  Anyone else?  Good afternoon.

2          MR. CASSADA:  Good afternoon, Your Honor, Garland

3 Cassada, I represent Garlock Sealing Technologies.  We raised

4 this issue, as well, in our brief and we will stand by our

5 brief.  I just want to make a couple of comments about the

6 nature of the conflict that concerns us and in our objection we

7 proposed a resolution that I'd like to suggest to the Court

8 now.

9          Your Honor, the trust agreement makes it clear that

10 these TAC members are to be fiduciaries and they're to consult

11 with the trustees regarding procedures for the trust.  The

12 problem is that the constituents of the trust include both

13 direct and indirect claimants and these are parties that have

14 overwhelming conflicts between one another, and Garlock

15 believes that it is inappropriate to have only representatives

16 for bodily injury claimants serving on a TAC, because for a lot

17 of the reasons that you've heard today, the procedures can

18 change TAC members can suggest to trustees changes that they'd

19 like to see, that they believe would be in the interest of

20 their clients.  Those changes might not be in the interest of

21 indirect claimants.  For example, TAC members might want to see

22 the statute of limitations be extended.  They might want to see

23 hurdles be thrown up to providing defendants with access to

24 claims information.  There are a number of different types of

25 changes that might be considered.  And those might be,

1 obviously, agreeable to bodily injury claimants, but on the one

2 hand they might undercut the rights of indirect claimants.  And

3 the trustees might not be in a position to really understand

4 how these changes affect the rights of indirect claimants in

5 the tort system.

6         As a result, Your Honor, we think it's inappropriate

7 to have a TAC that's comprised wholly of lawyers who represent

8 direct bodily injury claimants and our resolution was to have

9 at least one TAC member who represented indirect claimants.

10 Thank you.

11         THE COURT:  Mr. Monaco.

12         MR. MONACO:  Good afternoon, Your Honor, for the

13 record Frank Monaco, Womble Carlyle, for the State of Montana.

14         Your Honor, as you are aware, the State of Montana is

15 also a proposed indirect asbestos PI claimant.  We had joined

16 in the briefs by the insurers, and Garlock, with respect to

17 this issue and we just wanted to note for the record that we

18 join in their arguments again.  I think they stated it very

19 eloquently, I have really nothing to add.

20         THE COURT:  All right.

21         MR. MONACO:  Thank you.

22         THE COURT:  Thank you.  Anyone else?  Mr. Lockwood.

23 Well, let me just, I guess bite the bullet here, Mr. Lockwood.

24 What's the harm in putting three TAC members who are personal

25 injury lawyers and one who represents indirect trust claimants,

1  of some type, whoever it is?  It doesn't have to be an insurer.

2          MR. LOCKWOOD:  I don't know that there's necessarily

3  any "harm", but I would make the following observations.

4          If you're representing present claimants, at least

5  you're talking about a group of disparate interests seeking to

6  share in the common fund, and advising trustees, who are

7  presumed to be independent persons of integrity notwithstanding

8  various insinuations and slurs concerning the, I believe Mr.

9  Giannotto referred to it as the trustees would "play ball", at

10 some point in his remarks.

11         The record is devoid, utterly devoid, of any showing

12 of the magnitude of indirect trust claims that will ever be

13 brought against this trust.  What we've got here is a couple of

14 proofs of claim by Seaton and OneBeacon, for Seaton's claim is

15 for $30,246.02, that's OS -- Exhibit OS-48.  OneBeacon's claim

16 is for $30,466.52, both of which are identified as, by Mr.

17 Brown and in colloquy with Your Honor, as having derived from

18 an action that was brought at the beginning of this case,

19 before there was any 524(g) protection even proposed for those

20 insurers.

21         CNA apparently has filed some proof of claim, Mr.

22 Giannotto did not choose to share with us what it was for, but

23 I had said that they were raising contingent claims against the

24 possibility that the 524(g) injunction wouldn't protect them.

25 I didn't hear Mr. Giannotto disagree with that

1 characterization, so I think it's fair, without rooting around

2 in the files to find that claim, to assume that it's either

3 some sort of prepetition legal expense ala Seaton in minuscule

4 amounts or totally unliquidated and contingent and gee, the

5 524(g) injunction might not protect me.

6        Mr. Brown's comments on the 524(g) protection were,

7 well, we don't have the same level of confidence as Mr.

8 Lockwood has.  Well, bully for him.  That's not a proof that

9 he's not going to get protected by it and it's certainly not

10 evidence of anything and he doesn't even speculate to the Court

11 as to what about the 524(g) injunction he doesn't think is

12 going to protect him.

13        But let's assume, hypothetically, since we are awash

14 in a sea of hypotheticals on this issue, that somebody

15 unsuccessfully attempts to sue Mr. Brown's or Mr. Giannotto's

16 clients and they incur some attorney' fees in successfully

17 defending the injunction against them and they seek to claim

18 the indemnification based on those.  What's that going to be

19 another $30,000, maybe $100,000?

20        Montana and Garlock have gotten up and said oh, well,

21 we're indirect claimants, too, and we need protection by this

22 trust.  If you read Garlock's papers, Garlock has gotten, I

23 think, from other claims, the total amount from all trusts that

24 it's gotten in the past, are based on the only three claims

25 that they've talked about which aren't indemnity claims, was

1 about $600,000, 625,000 if memory serves.

2        Montana has a claim for zero as of right now,
3 although Mr. Monaco, as you will hear later on when we get to
4 feasibility, wants us to speculate that they're going to have
5 $750 million worth of claims and, therefore, the plan isn't
6 going to be feasible.

7        I think it's fair to say that that speculation is
8 ludicrous, but in any event, if you look at the actual trusts
9 in existence, they pay an infinitesimal percentage of their
10 assets out in claims and nobody has come in here, more to the
11 point, you don't have to take my word for it, nobody -- none of
12 these indirect claimants or insurers indemnified, have actually
13 come in here and attempted to prove that in any of these other
14 cases where you would supposedly generate the type of
15 information that you could come into this Court and put on as
16 evidence that the indirect claims amount to an appreciable
17 fraction of the total claims that are dealt with by the trust.

18        So, let's assume for the sake of discussion that the
19 indirect claimant claims amount to 2 percent of the total
20 claims that are allowed and paid, there's four TAC members, so
21 98 percent of the claimants should get three of them, and 2
22 percent of them should get one of them.  It seems to me if
23 you're talking about a limited number of people representing
24 present claimants and you're asserting that there's some need
25 to protect some minuscule subset of this group of claimants on

1 the ground that they have divergent interests that need

2 protection, you ought to have to substantiate a burden to show

3 (a) that their claims are, in fact, substantial or,

4 alternatively, that in other trusts which have identical

5 provisions to this one, indirect claimants have been subjected

6 to unfair treatment and that the unfair treatment has been at

7 the behest of the TAC, which is the same type of TAC as we have

8 here.  Again, total absence of proof.  All we have is lawyers

9 marching into this courtroom making stuff up by way of

10 hypotheticals and waving the so-called bloody flag.

11        If you look at, just by way of illustration, the

12 Delaware Rule of Professional Conduct, which as Your Honor

13 pointed out, only applies to lawyers with clients and all this

14 argument about service as a trustee would mean that they should

15 be disqualified for representing their present clients because

16 of their service as a TAC member, not disqualified from serving

17 as a TAC member, because the rule doesn't apply to them in

18 their service as a TAC member.

19        These people just sort of -- the rule talks about a

20 substantial risk, not a minuscule, remote, hypothetical,

21 speculative risk which is all we're hearing here today, and as

22 for the conflicts of interest that somehow or another,

23 involving their individual clients that these people really

24 don't have standing to raise, if they wanted to -- if they

25 thought it was a big problem, you know where conflict of

1 interest charges are made and evaluated in the state court

2 systems, local bar associations, state bar associations.  These

3 people know where to call up.  I don't mention that simply

4 because Your Honor somehow couldn't pass on it, you could

5 decide that there was a conflict of interest, but these trusts

6 have been going on for 20 years, and if there's a problem out

7 there with respect to the individual clients of these people,

8 why hasn't this issue been raised by a complaint to a bar

9 association?  Again, no evidence.

10        THE COURT:  Well, some states don't do it by bar

11 association, they do it by court, and whether they've raised

12 these issues or not, I don't know, I'm not familiar with any

13 and I've been presented with no evidence of any and that, I

14 think, is the point.

15        MR. LOCKWOOD:  That is the point I'm trying to make.

16 There is ample opportunity over the United States and the court

17 systems and the bar associations, if these types of TAC

18 representations have given rise to problems that are anything

19 other than lawyer's imagination, they would have surfaced,

20 somebody would have dealt with them and there would have been

21 evidence of them that could have been adduced in this thing.

22        What do we have in the way of evidence in this case?

23 According to Mr. Giannotto, two cases.  AC&S and Congoleum.

24 AC&S, Your Honor confirmed the plan with a TAC just like this,

25 notwithstanding what Judge Newsome said.  Why did that happen?

1 Because the pre -- it involved creation of a prepetition trust,

2 prior to <u>Combustion Engineering</u>, people -- most bankruptcy

3 lawyers, certainly I, thought that you didn't compare

4 prepetition settlements with post petition trust arrangements.

5          The prepetition rules were governed either by

6 fraudulent transfers or preferences, but other than -- if you

7 didn't have a fraudulent transfer or you didn't have a

8 preference, a debtor could pretty much favor whoever he wanted

9 to, prepetition.

10          Now, the Third Circuit changed that rule.  Okay.  But

11 the idea that Mr. Rice and Mr. Weitz, who were operating in an

12 environment which as far as they and the lawyers that

13 represented the Committees in that -- the prepetition

14 Committee in that case, in a perfectly transparent way.  I

15 mean, it wasn't any secret to this Court what the prepetition

16 structure was, there wasn't a lot of malevolent people hiding

17 and sneaking around in the background that somehow or another

18 gave rise to the two trust structure, it was negotiated in the

19 open, presented for confirmation, the court decided you

20 couldn't do it.  Mr. Giannotto would have you infer from that

21 because Messrs. Rice and Budd, somehow or another got that

22 wrong, in that case, that that means that they're dishonest

23 people whose motives should be suspect in any role that they

24 play in any case and that's outrageous, actually.  I mean --

25 and it's certainly not an inference for the kind of -- they

1 haven't moved to disqualify Mr. Rice as a TAC member in this

2 case.  They could've.  He's been on the TAC, if you read the

3 trust agreement, since it's been filed for a long time, the

4 names of the four TAC members are right on the signature line.

5 If somebody had an individualized beef about one or more of

6 these TAC members, that they thought they were unqualified,

7 they could have brought it on, we could have had a fight about

8 it at the confirmation hearing with some evidence and proof.

9 Instead, what we get now is a generalized saying you shouldn't

10 have plaintiffs' lawyers on it, and when somebody says, well,

11 there's no evidence that plaintiffs' lawyers, as a group

12 serving as TACs are going to abuse their positions, we haul out

13 an attack on an individual person for something they did in

14 front of this Court, in full view, in another case, that the

15 Third Circuit ultimately decided you shouldn't have done.

16 Okay, you shouldn't have done it.  Does that mean every lawyer

17 that ever drafts a plan that's determined to be unconfirmable,

18 is unworthy of employment in any subsequent representation of a

19 committee or a debtor?  I don't think so.  I hope not.

20          THE COURT:  No, obviously not.

21          MR. LOCKWOOD:  And, again, the Kenesis representation

22 was not a TAC, it was something that -- the problem had to do

23 with whether the debtor could employ Kenesis as the claims

24 operating, it didn't have anything to do with trustees, and it

25 was -- they decided that they couldn't employ Kenesis.  So, I

1 mean, again, that was Mr. Rice, that wasn't the TAC.

2        So, again, if you want to go on and attack Mr. Rice,

3 there was a time and place to do it, you didn't do it.

4        <u>Congoleum</u>, the poster child for insurance companies,

5 on all issues, on all -- in all courts.  There, another

6 prepetition two trust deal that the courts said you can't do

7 and the attack on the conflicts issue was not on -- not only

8 wasn't on the TAC, it was on a plaintiffs' lawyer.  It was on

9 Scott Gilbert, who was the company's insurance counsel that had

10 a relationship with the Weitz & Luxenberg firm, on a bunch of

11 other cases that the court ultimately decided that there was a

12 conflict of interest and he wound up having to forfeit

13 something like $9 million in attorneys' fees for that.

14        Since Mr. Gilbert would be eligible for the TAC in

15 this case, because he's not a plaintiffs lawyer, although I

16 guess they would decide since he was doing work in the Keesby

17 litigation in conjunction with Mr. Weitz, maybe he would be a

18 plaintiff lawyer, I don't know.  But, again, it's sort of a

19 trial by anecdote.  You pull one incident out of somewhere else

20 and you say, I could generalize from this about the behavior of

21 these plaintiffs' lawyers in their role as a TAC, where they

22 have, at best, the most tenuous ability to influence and that

23 gets us to the questions of how is this influence going to be

24 exercised?

25        As Your Honor questioned counsel, how can you

1 victimize the indirect claimants?  Now, we're shifting by the

2 way, when we start focusing on indirect claimants, we're no

3 longer talking about conflicts between the TAC members,

4 individual clients, and all the other individuals clients of

5 the non-TAC members, that's been jettisoned and we now move to

6 conflicts with indirect claimants.  And, there's no evidence

7 that any plan has ever been changed, any TDP, any trust

8 agreement to victimize indirect claimants, there's no

9 indication, as I said earlier, that the magnitude of indirect

10 claims are such that anybody would go to the trouble of trying

11 to make such a change, there's no evidence that the whispering

12 in the ear of the trustee that Mr. Brown posits, has ever

13 resulted in the trustees ever attempting to do anything to the

14 disadvantage of indirect claimants and all of a sudden we're

15 supposed to say, ooh, there's a real risk here that out of, I

16 don't know, disinterested malevolence, I guess that TAC members

17 are going to decide to go out and propose changes which they

18 will compel through their control of the trustees' compensation

19 and their right to seek removal of a trustee for cause which

20 would require the concurrence of the bankruptcy court, i.e.,

21 Your Honor, that all of a sudden we're going to have this

22 campaign out there to victimize indirect claimants.  I mean,

23 it's just -- it's a total house of cards, made out of nothing.

24 And the idea that this is a basis for sort of -- either getting

25 -- not having a TAC with any plaintiffs lawyers on it, which

1 would basically be somebody who didn't know anything about

2 asbestos personal injury litigation, and Lord knows what

3 they've advised the trustees, and I don't know why you'd even

4 want them there.  I mean, Mr. Giannotto, I think it was at some

5 point said, well, yeah, you know, I don't see the need for a

6 TAC, and he'd be right.  I mean, if you had a bunch of people

7 who didn't know anything about asbestos litigation, it'd be

8 hard to figure out what role they really would have.  The

9 Futures Rep always needs to be there to make sure money doesn't

10 run out the front end, but the present claimants are more

11 concerned about how the TAC is being run on a day-to-day basis,

12 how the trust is, and they would need to have some knowledge

13 about the system and how it works, for them to be any use as

14 advisors to the trustees.

15          So, at the end of the day, Your Honor, I mean, this

16 really is bogus, this is pretextual, I really don't know why,

17 other than, perhaps, leverage for, as Mr. Brown so candidly

18 admitted, if you get his clients from Class 6 to Class 9, he

19 doesn't care about this any more.  Other than leverage, I don't

20 know why we're here.  This is just -- there's absolutely no

21 evidence or proof suggesting that there's anything improper in

22 having a system that's been working for 20 years, with no

23 problems, changed for purposes of this case.  Thank you.

24          THE COURT:  Mr. Frankel.

25          MR. FRANKEL:  Good afternoon, Your Honor, Roger

1 Frankel for David Austern, the Future Claimants Representative.

2       I just wanted to say a couple of things after Mr.

3 Lockwood.  Mr. Austern was appointed in this case as the

4 Futures Rep in 2004.  So the case, I guess was already three

5 years old.  At the time that he was appointed, the TAC, or

6 rather the ACC, did not support Mr. Austern's appointment.

7 There was three Futures reps that were recommended, the Court

8 determined to appoint Mr. Austern.

9       We've come a long way since then, we've gone through

10 a plan process, we've gone through litigation.  The structure

11 that is before this Court is a structure that Mr. Austern has

12 looked at very carefully, we've looked at very carefully, the

13 structure of the TAC, the Futures rep, and the trustees for the

14 trust is one that's been used in other cases.  Mr. Austern is a

15 Futures Rep in one other case where this Court has confirmed

16 it, and he is working with the trustees in that case.  The TAC

17 has no greater rights than the FCR in these post confirmation

18 trusts.

19       So, the idea that somehow the TAC is going to do

20 something that is counter to either the interests of the

21 Futures, or counter to what the trustees want, is just -- it

22 does not happen that way.  It just doesn't work that way.  The

23 trustees call the shots, the trustees had the ultimate

24 responsibility and decision making authority.  If they want to

25 make a change that requires the consent, then it requires the

1 consent of both the TAC and the FCR.  So, if it's something
2 that the Futures Rep considers to be too favorable to the
3 presents, such as a substantial increase in the payment
4 percentage, for instance, where as Mr. Lockwood said, the money
5 might go out the door and nothing's left, the Futures Rep will
6 not agree to that, the Futures Rep's consent is required, the
7 TAC cannot overturn that unless the Court decides otherwise.
8          So, the structure works, it's worked in many other
9 cases.  This one is no different and the idea that there's
10 something wrong with these TAC members versus other TAC
11 members, it just doesn't work that way, and Mr. Austern
12 carefully reviewed the list of both the trustees that were
13 proposed and the TAC members and had no problem at all with it.
14 So, I just wanted that background to be here.  This is
15 something that is not taken lightly by Mr. Austern and the
16 procedures and the structure that's set up is critical to how
17 this is going to work over the next ten years plus.  Thank you,
18 Your Honor.
19          THE COURT:  Anyone else?  I don't intend to rule on
20 these issues one at a time for the most part, but I want you to
21 know what my thinking is because as we get -- to the ones that
22 I can address.  With respect to this issue, there have been
23 objections, not quite like this, to either the TAC composition
24 or certain portions of the TDP concerning the TAC in other
25 cases.   They've never, as far as I can recall anyway as I sit

1 here now, required me to actually make findings because they've

2 been resolved before we got to that point.

3        With respect to this case, and this trust

4 distribution procedure, concerning only the TAC, I don't think

5 there's anything improper, I don't see a conflict of interest

6 on the record, at this point.  If one develops, at that point,

7 someone can always bring it to the attention of the trustees,

8 and eventually to the Court if that's necessary.

9        So, to the extent that either a trustee or a TAC

10 member should, can, would be removed for cause, that ability is

11 always there.  I don't think the trust distribution process

12 itself has to build that specifically in because the

13 beneficiaries of the trust would always have the opportunity to

14 raise issues concerning conflicts.

15        I don't -- so as a result, I don't see merit to these

16 objections and although I intend to put everything in one

17 order, I'm not going to do bifurcated orders on this issue.  I

18 will accept proposed findings that will overrule this objection

19 by all parties who have raised it.  I don't see merit to it for

20 those reasons.

21        The trustees have the ultimate determination and the

22 trustees have no interest in taking the interests of the direct

23 versus indirect claimants or the Futures at hand, one over

24 another.  Their fiduciary responsibility is to carry out the

25 provisions of the trust and also, in this instance, 524(g) as

1 it will apply in the plan as it affects the trust because that

2 is how the trust is being set up.  So, to the extent that it is

3 the trustees with the ultimate responsibility and the TAC

4 members are just advisory, and I say just, I don't mean to

5 belittle that role, I'm certain that the role is a large one in

6 some respects but I'm saying just because the ultimate

7 responsibility rises with the trustee, not the TAC members.  So

8 I will be overruling this objection when we get that far in the

9 process.

10         Okay.  Mr. Bernick.

11         MR. BERNICK:  I think everybody is looking a little

12 woozy at this point during the day, except Your Honor doesn't

13 look woozy until hunger sets in at around 6:30, but I know

14 we're not going to press that far today.

15         I guess the question that I'm standing to address is

16 how Your Honor wants to proceed.  We have -- I know we arranged

17 -- Your Honor was good enough to make room for this case on the

18 morning only of Wednesday, and I think that at least in our

19 informal conversations, the parties here have thought that the

20 lender section of the argument would fit neatly into that slot.

21 I haven't discussed with counsel for Morgan Stanley how much

22 time they intend to take, but we are proceeding with the

23 guidance of the Court, that time is evenly divided between

24 proponents and opponents, and I guess that if the opponents

25 stand by that principle or that guidance, there's no reason why

1 we can't get everything done that day.  It's probably more

2 convenient, at least, for the people involved in that segment

3 of the case to do it pretty much then.

4          Backing up we have Anderson Memorial.  I don't know,

5 Mr Speights has been waiting very patiently over here, as he

6 always does, except that he has his arms crossed, it must mean

7 that either he always disagrees or about to disagree with what

8 I have to say, when I stand or else he's got some other thing

9 -- or maybe he's just cold sitting next to the windows.  But I

10 don't think that Anderson Memorial Hospital is going to take

11 more than an hour.  I know that our own remarks would be

12 significantly less than half that, probably in the order of 20

13 or 25 minutes.  I don't know if Mr. Speights has a sense of

14 that.

15          MR. SPEIGHTS:  I believe it'll be less than an hour

16 and a half.

17          MR. BERNICK:  Less than an hour and a half?

18          MR. SPEIGHTS:  Yes.  Total, for both sides.

19          MR. BERNICK:  Okay.

20          MR. SPEIGHTS:  And maybe less than an hour.

21          MR. BERNICK:  Right, okay.

22          MR. SPEIGHTS:  Mr. Rosendorf is not here right now,

23 so I can't confer with him.

24          MR. BERNICK:  He's over there.  He's been even more

25 patient.

**J&J COURT TRANSCRIBERS, INC.**

1    MR. ROSENDORF:  I've been even more patient and more
2 quiet and I concur.

3    MR. BERNICK:  Okay.  So, that then leaves the
4 question of the remaining arguments and they're pretty much
5 what you all see on this page here.  We've been through the
6 first two and the last, so we have about five, six issues.  I
7 know that many of them are related.

8    I guess my sense is that we can get them done if we
9 start at eight o'clock tomorrow morning without any real
10 difficulty, but we do have time yet today and from that point
11 of view, it may make sense to take a short break and at least
12 start in with the combination, as I've indicated, of Class 6
13 versus Class 9, the discriminatory treatment.  I know that
14 Montana and BNSF --

15    UNIDENTIFIED MALE SPEAKER:  Longacre.

16    MR. BERNICK:  What?

17    UNIDENTIFIED MALE SPEAKER:  Longacre.

18    THE COURT:  Longacre.

19    MR. BERNICK:  Longacre, and BNSF?

20    UNIDENTIFIED MALE SPEAKER:  (indiscernible).

21    MR. BERNICK:  Okay.  Well, I know that Mr. Monaco's
22 client is anxious, we'll speak to that issue first.  I thought
23 it was the State of Montana.

24    THE COURT:  Well, let me ask, if the Anderson
25 Memorial issue is basically going to take between an hour and

1 an hour and a half, why don't we do that today?

2          MR. BERNICK:  Today?

3          THE COURT:  Yes.

4          MR. BERNICK:  I suppose we can, except that we have

5 not had the opportunity to furnish our final graphics a day in

6 advance because we were thinking we'd do that tonight.  Maybe

7 if Mr. Speights wants to go and -- I think we can probably get

8 our stuff here and do it, I'd be prepared to do that.

9          THE COURT:  Mr. Speights, I don't know, are you

10 prepared to do it today?

11          MR. SPEIGHTS:  May I confer Your Honor?

12          THE COURT:  Yes.  Why don't we take a ten minute

13 recess, I'll let you folks confer, whatever you want to do is

14 fine, but we will terminate, at least, by 6:30 today.

15                         (Recess)

16          COURT CLERK:  All rise.

17          THE COURT:  Be seated.  Before we begin, Ms. Baer, do

18 you have any idea yet what the schedule will be like for the

19 February omnibus hearing?

20          MS. BAER:  Your Honor, obviously, the time to file

21 things has not yet passed, but I do know that from the debtors'

22 perspective we had anticipated filing two things.  One we had

23 anticipated filing a motion for summary judgment with respect

24 to a pending claim.  There's no difference if it's heard in

25 February or March, it's not a big deal.  And secondly, we had

1 anticipated filing a motion for the Court's approval of a

2 procedure by which we would approach getting -- dealing with

3 our 7,000 employee claims.  And on that one, I know our clients

4 are anxious for us to get that on file.

5          THE COURT:  I wasn't trying to cancel the hearing, my

6 staff was asking me about a scheduling issue and I need to have

7 some estimate of what time you think Grace will take that day.

8 That's all I was trying to find out.

9          MS. BAER:  Okay.

10          THE COURT:  So, a couple hours?

11          MS. BAER:  I would say a couple hours.  In fact, I

12 would be shocked if on the motion for summary judgment the

13 other side didn't want more time once we file it.  On the

14 employee claims procedure, I don't think that'll take very long

15 and then the insurance neutrality is up for February and that

16 certainly won't take very long.

17          THE COURT:  Okay.  Anyone else at the moment who is

18 present or on the phone planning to file anything that may take

19 a substantial period of time for the February omnibus?

20                    (No audible response)

21          THE COURT:  Okay.  Thank you.  Mr. Bernick.

22          MR. BERNICK:  Well, we've discussed Anderson Memorial

23 and the plan proponents, and much as we are champing at the bit

24 to once again talk about Anderson and its history, we think

25 that the best idea is to defer that to tomorrow, in part,

1 because the graphics aren't done.

2        THE COURT:  All right.

3        MR. BERNICK:  So, we're agreeable to that.  But

4 others are prepared to champ instead, and so going back to our

5 agenda, we indicated that we thought it would be wise to

6 combine the issue of classification in 6 versus 9 with

7 discriminatory treatment and from that point, and to begin with

8 certain of the third party issues, indirect claimant issues,

9 and so, that's what we're going to do.

10        So, I think that we're going to begin with BNSF and

11 then go to the State of Montana, then Longacre and then maybe

12 we'll get to Garlock.  There may be some other issues that get

13 raised in the course of this presentation, so this is not the

14 -- this is kind of an opportunity for people to stand up and do

15 their thing, unless there's another issue that's listed further

16 down here.  So, I think it's going to take up more time than we

17 have today, and so, it's really a question of when Your Honor

18 wants to break for the evening.  I know that you'll be able to

19 inquire of people and find out what the appropriate point is,

20 but this, then, would carry over till tomorrow and then after

21 that's done, we're going to save our response to the

22 individuals and do it once.  I say we, very generously, because

23 Mr. Lockwood is going to be handling all of these issues.

24 Don't look at me surprised because I haven't done any work to

25 prepare for them.  And then we'll go -- then we'll go through

1  the rest of the list and I think we will have no problem

2  getting through the rest of the list and getting to Anderson

3  and then we would do the lenders Wednesday.

4          Now, Mr. Pasquale properly suggested on the break

5  that if, in fact, we're going to start Wednesday morning on

6  that, for sure, there's no point in having Mr. Cobb, for

7  instance, come out here to observe, although we always

8  appreciate Mr. Cobb's company.  So I think that unless Your

9  Honor has a desire to start lenders, with any remaining time

10 tomorrow afternoon --

11          THE COURT:  No, Wednesday morning is fine.

12          MR. BERNICK:  Wednesday morning is fine.

13          THE COURT:  Sure.

14          MR. BERNICK:  So, I think that, then, provides Mr.

15 Pasquale with the guidance that he needs.  And with all that

16 said, I guess we'll start with BNSF and see how far we get.

17          THE COURT:  All right.

18          MS. CASEY:  Good afternoon, Your Honor, Linda Casey

19 on behalf of BNSF.  As a preliminary matter, BNSF had filed

20 numerous objections that we had resolved at the initial

21 confirmation hearing regarding the Section 524(g) trust.  The

22 plan has been amended to reflect the agreed upon language

23 change and we're not pressing those objections.  Of course, we

24 reserve the right to pursue those objections again should the

25 plan be modified in a way that takes away the rights that we

1 have agreed upon.

2         THE COURT:  Okay.  Ms. Casey, I'm not sure which

3 microphone you're using, but I can't hear you very well.  So, I

4 think maybe it's not turned on?

5         MS. CASEY:  Is it -- the green light is on.

6         THE COURT:  Okay.  That's better, I think your voice

7 must just not have been focusing in it.  Okay, thank you.

8         MS. CASEY:  Okay.  Right now I going to be discussing

9 the discriminatory treatment of BNSF's claims, both its

10 contractual claims and its contribution claims in Class 6 of

11 the plan, presuming that the claims are appropriately

12 classified as asbestos claims that can be channeled to the

13 trust.

14         There are four types of claims in Class 6 that are

15 channeled to the asbestos trust.  The first claims are direct

16 asbestos claims.

17         The record is replete with evidence from the plan

18 proponents that the direct asbestos claims will be entitled to

19 an award that's the rough justice equivalent of 100 percent of

20 its claim in the prepetition, non-bankruptcy litigation world.

21 It is just the rough justice, it's subject to a cap and subject

22 to a 25 to 35 payment percentage.

23         The second class of claims that are being treated in

24 Class 6 are insurance indemnity claims.  These insurance

25 indemnity claims are being given the full value of their claims

1 as determined not by the medical criteria, not by any other

2 criteria, other than their contract.  So, they are getting 100

3 percent of their claim as an award, based on their own

4 contract, subject to the 25 to 35 percent payment ratio.

5 　　　　　The third type of claim under the Class 6 is

6 insurance related claims.  Insurance related claims are claims

7 of claimants who say that they have direct actions against

8 insurance policies that have been settled.  They're channeled

9 to the trust, but they are entitled to prove to the trust

10 without the medical criteria, without the caps, the scheduled

11 value, the maximum value or the extraordinary value, whatever

12 their claims are, under those insurance policies.  They will

13 get 100 percent of their claim, subject to the 25 to 35 percent

14 payment ratio.

15 　　　　　And then there's BNSF.  BNSF has two potential claims

16 against the estate.  The first claim they have against the

17 estate is their contractual indemnity claim.

18 　　　　　The second type of claim they have is state law

19 contribution or reimbursement.

20 　　　　　Under their contractual indemnity agreement, BNSF

21 bargained for and received, the contractual right to full

22 indemnity from Grace for any liability resulting from the

23 operation of Grace on BNSF's leased property.

24 　　　　　However, the TDP through various procedures

25 eliminates BNSF's right to full indemnity, and rather, BNSF's

1 several liability, based on inapposite cases.

2         The way that this works is, there's plenty of

3 testimony in the plan to demonstrate that the scheduled value,

4 which is the lowest value in the plan, is the rough justice

5 equivalent of 100 percent of the prepetition tort value in

6 cases in which Grace and several other asbestos manufacturers

7 are co-defendants and that value, the scheduled value, is equal

8 to Grace's several share of liability.

9         Claimants can demonstrate additional and --

10 independent review process, that they have some unique factors

11 that make their claim worth more than the scheduled value, up

12 to the maximum value.  And, again, there's plenty of testimony

13 in the record that demonstrates that that maximum value is

14 intended to be 100 percent -- the rough justice, 100 percent

15 value that those claimants would have received in the tort

16 system.

17         In those cases where Grace is but one of the asbestos

18 actors, there's also testimony in the record that there are

19 those cases where the claimant was injured, solely through, or

20 predominately through exposure to Grace asbestos and that has

21 the extraordinary value multiplier.  Five times if there was 75

22 percent exposure, up to eight times if there was 95 percent

23 exposure.  And there's testimony specifically relating to the

24 Libby claimants and, in fact, Grace has stated -- excuse me,

25 the plan proponents have stated in their brief, that that eight

1  times multiplier was provided so that any claimant whose

2  injuries were caused almost entirely by exposure to Grace

3  asbestos, would receive compensation in line with what severely

4  injured prepetition claimants from Libby had received in

5  settlement of their claims.

6      So, they specifically have evidence and that they've

7  relied upon in their briefing, that the eight times multiplier

8  is the equivalent to what the Libby claimants would have

9  received outside of bankruptcy.

10     TDP, however, provides that if any claimant has the

11 likelihood of substantial recovery from any other claimants --

12 excuse me, from any other defendant, they will not be allowed

13 to get that eight times multiplier.  It then says that if an

14 indirect claimant, such as BNSF, when they assert their claim

15 against the trust, they are limited to the amount that the

16 direct payment would have been able to receive.

17     Mr. Inselbuch testified in cross examination that if

18 a Libby claimant recovers against BNSF, that Libby claimant

19 would not have been entitled to the eight times multiplier and,

20 therefore, BNSF would not be entitled to the eight times

21 multiplier, will rather be limited to either a scheduled value

22 or if the Libby claimant could have proven facts that would

23 have allowed it to get up to the maximum value, the maximum

24 value, thereby limiting BNSF's contractual claim against the

25 estate, not to the full indemnity that the contract provides,

1  but to several liability based upon inapposite facts where

2  Grace has other defendants to share the liability.

3        This rewriting of the contract, basically would say,

4  Grace agrees to hold you harmless, BNSF, up to an amount equal

5  to a small percentage of the value of a claim on the basis that

6  there's other manufacturers.  That's not the case here.

7        Second, the contract specifically provides that Grace

8  is liable to BNSF for indemnification, even if the court below

9  finds that BNSF was negligent.  BNSF is, of course, not

10 admitting that it was, in fact, negligent, but the complaints

11 that have been introduced into the record here allege that BNSF

12 negligently supervised Grace's operations at their location.

13 The TDP provides, however, that in order to get an award

14 against the estate, the indirect trust claimant must show that

15 it paid the liability of the trust to the claimant.  A claim

16 for negligence against BNSF would not fall within that and,

17 therefore, BNSF is not entitled to its contractual right to

18 indemnification for any negligence.

19        THE COURT:  Wait, I'm sorry, I didn't follow that

20 issue.  If BNSF is found liable for some negligent conduct --

21        MS. CASEY:  Correct.

22        THE COURT:  -- then because the TDP provides that an

23 indirect claimant has to have paid the liability of another.

24        MS. CASEY:  Of the trust, under the TDP.  Let me find

25 the exact language.  The indirect claimant must establish that

**J&J COURT TRANSCRIBERS, INC.**

1 it has paid --

2          THE COURT:   The liability to an asbestos tort

3 plaintiff.

4          MS. CASEY:   Correct.   But not just to an asbestos

5 tort claimant, but on behalf of the trust.   That the indirect

6 claimant has paid in full the liability and obligation of the

7 PI trust to the individual claimant, to whom the PI Trust would

8 otherwise have had a liability or obligation under this TDP.

9          If the judgment below was, for example, for negligent

10 supervision, the dollars paid by BNSF would have been for

11 BNSF's own negligence and not necessarily that of the trust.

12          THE COURT:   But then you'd be a direct claimant, but

13 you're not defined as a direct claimant because you're not an

14 individual tortfeasor.

15          MS. CASEY:   Correct.   And so, it eliminates the

16 ability for us to get the indemnification -- the contractual

17 indemnification for the negligence claims, specifically in our

18 prepetition contract.

19          In addition, the indemnity agreements provide that

20 Grace must provide a defense for BNSF and, therefore, pay all

21 of BNSF's defense costs.   The TDP completely eliminates the

22 ability of BNSF to receive any defense costs -- an award of

23 defense costs, not just the payment of them, but the award of

24 the defense costs.   This is accomplished in two ways.   The

25 first is, as previously discussed, we're limited to an award

1 where we can establish that we have paid the liability of the

2 trust to the direct claimant.  The trust does not have a

3 liability to the direct claimant to pay BNSF's defense costs.

4 So that, right there, eliminates off the top any ability to

5 collect defense costs.

6        The second provision of the TDP that prevents us from

7 obtaining an award of defense costs, that we are limited to the

8 amount that the direct claimant would have been able to

9 recover.  Of course, the direct claimant did not suffer the

10 loss of the defense costs of BNSF and, therefore, the direct

11 claimant would not have been able to pay them.  So, the TDP

12 completely eliminates the right to recover defense costs.  And

13 this is both in the cases where the claimant had a viable claim

14 against BNSF and where it didn't, and BNSF got a defense

15 verdict but, nevertheless, had to pay defense costs.

16        Fourth, BNSF has the ability under its contract to

17 recover against Grace if BNSF is found liable for the conduct

18 under that paragraph, even if Grace had previously paid the

19 claimant.  Under the TDP, the trust has already made a payment

20 to claimant, BNSF is absolutely prohibited from obtaining an

21 award against the trust.

22        Five, BNSF is subject to the cap.  In our particular

23 case, according to the TDP, that cap would be the maximum

24 value, unlike claimants who hold insurance indemnity claims, or

25 who hold insurance related claims, who have no cap asserted

1  against their contractual claims.  They get the award equal to

2  the full value of their contractual claims.  BNSF, however,

3  does not get an award equal to the full value of its

4  contractual claims but is rather subject to the cap.

5          So, as you can see, the TDP establishes that BNSF

6  will get a mere fraction of what the prepetition contract says

7  that BNSF is potentially entitled to.  All it will be entitled

8  to get is what plan proponents' own experts say, which is

9  several liability in cases where Grace is one of many asbestos

10 manufacturers who are directly liable to the claimant.

11         Now, the plan proponents have said, BNSF's objection

12 should be overruled, first because they haven't proven, and

13 there's been no determination, that there are any valid claims

14 under that contract.  Of course, this is not a claims objection

15 hearing.  It's a plan confirmation hearing.  We have a

16 prepetition contract that's says that BNSF gets indemnification

17 for any claims arising out of the operation of the loading dock

18 on BNSF's land.  We have a prepetition contract that says that

19 that indemnification obligation extends to any claims that

20 BNSF, itself, was negligent, and says that we get defense

21 costs.  We have complaints that we have entered into the record

22 that assert claims against BNSF for vicarious strict liability

23 for Grace's operations on BNSF's land, and that assert

24 negligent supervision of Grace.  We don't need to prove any

25 more to establish that we have a potential right that must be

1 protected by the plan and is simply (indiscernible).

2       Second they say, well, this indemnification agreement

3 appears very narrow, and therefore, there would be very few

4 claims that come through.  The first response to that is

5 whether there's one, ten, a hundred, or a hundred percent of

6 our claims that are entitled to indemnification, they still

7 must be protected.

8       Second, it's not true, necessarily, that this is a

9 narrow indemnification and specifically the law in Montana is

10 that a construction of an indemnification agreement, is

11 construed broadly in favor of indemnification, and against the

12 indemnifier.  Specifically, that's In Re: Kmart Corporation,

13 362 BR 361 (BR N.D. ILL. 2007).

14       BNSF's contribution rights.  Testimony in the record,

15 scheduled value, and the maximum value, as I said, is designed

16 to protect -- to only require an award equal to the several

17 share of Grace's liability where there are other manufacturers

18 who are directly liable to plaintiff.

19       As we know in Libby, prior to the petition date,

20 Grace was, in most cases, the only defendant.  The Libby

21 claimants have now asserted claims against BNSF, the State of

22 Montana and MCC.  These claims, for the most part, assert

23 derivative liability, none of these defendants engaged in any

24 asbestos manufacturing of their own, or any asbestos

25 processing.

**J&J COURT TRANSCRIBERS, INC.**

1          Now, to use the severe pleural category, the TDP

2 provides scheduled value of 50,000, maximum value 100,000 and

3 an extraordinary claim value of 400,000.  There's testimony

4 that that $400,000 was specifically derived equal to the result

5 that the Libby claimants were receiving prior to the petition

6 date.  But under the TDP, because the Libby claimants have now

7 asserted claims against the State of Montana, BNSF, and MCC,

8 they are no longer entitled to this 400,000 if they have a

9 substantial -- if they have a likelihood of recovering against

10 those three entities.

11          THE COURT:  I thought it was a substantial

12 likelihood?

13          MS. CASEY: I think it's a likelihood of a substantial

14 recovery

15          THE COURT:  Oh.  All right.

16          MS. CASEY:  And, so, in most cases they'll get this

17 and BNSF, MCC and Montana, are not entitled to recover more

18 than what they would have recovered.  So, they'll also be

19 recovering between 50,000 and 100,000.

20          Through the TDP process, because of the requirement

21 that the Libby claimants not have claims against third parties,

22 the plan proponents are being able to create a situation where

23 the awards against the trust will likely be one-eighth to

24 one-quarter what their own experts say the Libby claimants

25 claims were worth in the non-bankruptcy world.  They will have

1 eliminated as much as seven-eighths, three-quarters to

2 seven-eighths of their liability before application of the

3 payment percentage.  And these are in situations where the

4 claimants are not co-defendant manufacturers, but are being

5 held derivatively liable for Grace's conduct.

6        But the contributions rights under the TDP are being

7 substantially reduced, we're being put in a position of a

8 co-defendant manufacturer rather than an entity who has been

9 held derivatively liable for Grace's conduct.

10        Now, we have hundreds, thousands, tens of thousands

11 of creditors that are receiving either the rough justice 100

12 percent value of the claim, or the actual 100 percent value of

13 their claims, and you have BNSF who is receiving a tiny

14 fraction of its contractual claim and a very limited version of

15 its contribution claims, and contractual indemnity claims do

16 not apply.

17        This violates Section 1122 of the plan in that it

18 puts in a class dissimilar claims, it violates Section 1123 of

19 the plan, in that it treats the claims substantially different

20 -- the treatment is substantially different and it violates

21 Section 524(g) in two respects.

22        First, it treats BNSF's future claims in a manner

23 that is not fair and equitable compared to the present claims

24 and second, it channels to the trust, claims that the trust is

25 not going to be obligated to treat.

1          In other words, it channels BNSF's full contractual

2 indemnity claims, but the trust only needs to give an award for

3 a partial amount of that, and it channels to the trust, BNSF's

4 full contribution claims, but the trust is only required to pay

5 a substantial -- excuse me, a small portion of that.

6 Therefore, this, in and of itself, violates the bankruptcy code

7 and renders the plan unconfirmable.  But there's an even bigger

8 issue here.

9          In this case we have equity retaining an enormous

10 amount of value.  It is a fundamental tenet of bankruptcy law

11 that you cannot have equity retain value on behalf of equity

12 interests if superior creditors are not being paid in full, or

13 agree to less favorable treatment.  By classifying BNSF, whose

14 claims are being so severely restricted under the TDP, in the

15 same class for voting purposes, as all of the claimants who are

16 receiving a claim roughly equal to 100 percent or actually

17 equal to 100 percent, they have disenfranchised BNSF here

18 resulting in a case where equity is able to retain significant

19 value by eliminating BNSF's voting rights in any meaningful

20 way.  Therefore, the plan does violate the absolute priority

21 rule and is also not confirmable.

22          The situation also demonstrates why BNSF should be

23 entitled to 524(g) protection.  Unlike what the plan proponents

24 have said in their brief, BNSF is not coming to the trust

25 standing in the shoes of the asbestos creditor.  Grace has

1 contractually obligated itself to stand in the shoes of BNSF.

2 Grace has contractually obligated itself to hold BNSF harmless

3 for all of these asbestos related claims that are being

4 asserted against BNSF, solely in its capacity as a landlord --

5 not solely, partially in capacity as its landlord, for both

6 strict liability and negligence.

7         These claims against BNSF are the equivalent of

8 claims against Grace and should be channeled.  This is

9 especially true where the plan limits BNSF's claims so severely

10 when the claims are, in fact, claims against Grace.

11         BNSF has joined in the objection of other parties to

12 the plan, including on their discriminatory treatment analysis,

13 such as the placement of indirect claims in the FIFO queue,

14 we're going to rest on our papers on that and not raise that.

15 So, unless Your Honor has any questions.

16         THE COURT:  No, thank you.

17         MS. CASEY:  Thank you.

18         MR. MONACO:  Good afternoon, again, Your Honor.  For

19 the record, Frank Monaco, Womble Carlyle for the State of

20 Montana.  Your Honor, I apologize in advance for my voice.

21 I've been fighting a cold and my short stay in Steelertown

22 isn't helping my recovery any.

23         THE COURT:  Didn't help theirs either.

24         MR. MONACO:  Your Honor, the State of Montana,

25 really, has two main legal arguments.  One, that we should not

1 be part of the 524(g) trust at all, whether we ride through as

2 a  non-dischargeable claim pursuant to <u>Frenville</u>, and we

3 reserve our rights against reorganized debtor, whether we

4 should be put in Class 9, or as Ms. Casey has so eloquently

5 argued, we should have a separate class to ourselves for

6 indirect claimants, for  Montana, BNSF and similarly situated

7 proposed indirect claimants.

8        Our other argument is -- main argument is that if we

9 are, in fact, going to be put in this Class 6 and it is related

10 to our 524(g) argument, is that it's discriminatory, unfair and

11 inequitable.

12        Your Honor, I believe you're pretty familiar with the

13 background of what has occurred in Montana.  The State of

14 Montana has been sued in 148 actions brought by the Libby

15 claimants, on the basis that the State of Montana failed to

16 warn the Libby claimants of the dangers at the Libby mine.

17        It's our position that we have contribution

18 indemnification rights against Grace for any purported

19 liability we may incur as a result of the Libby claimants'

20 actions against us.  We take the position that the debtors were

21 the intervening, superseding and proximate cause of any such

22 liability.

23        And I believe that Your Honor is very familiar with

24 this, I'm not going to recite any more, it's been the subject

25 of numerous hearings before Your Honor, and I don't think the

1 facts are in dispute.

2        One thing I would like to stress, and I cannot stress

3 enough, is that our claims are unique.  These are claims for

4 contribution indemnification based on purported liability for

5 failure to warn.  We are not part of the -- we were never part

6 of the production, distribution or transportation of

7 vermiculite.  So, we really are different than even some of the

8 indirect claimants, for that matter.  And I think this is going

9 to be important when looking at the statute and 524, in

10 particular.

11        THE COURT:  But where does the contribution right

12 arise?  Grace doesn't have a contract with the State of

13 Montana, I think, that indemnifies Montana for its own parens

14 patriae liability to the extent there is any, and I'm not aware

15 of a statute in Montana that provides that type of indemnity

16 for the State's own -- I'm looking for a word that's not

17 pejorative because I'm not trying to be pejorative, but

18 malfeasance, I guess.  It's breach of its parens patriae duty.

19        MR. MONACO:  Well, Your Honor, it's my understanding

20 under Montana law, that we have the right to assert, as a

21 defense, or an affirmative direct action against the debtors

22 for contribution indemnification, that they were, in fact, the

23 intervening, superseding or proximate cause of our own

24 independent liability.

25        THE COURT:  Well, how -- okay.  I'm having a little

1 difficulty understanding how there is a supervening,

2 intervening, proximate cause for a parens patriae duty other

3 than on behalf of the State.  I mean, the debtor operated a

4 mine, as I understand it, the State was required to inspect the

5 mine and if it found something wrong, it had an obligation

6 under the state statutes to advise the citizens that there was

7 something wrong.  I know I'm over simplifying, but, in essence.

8 So, where in that chain can anybody else be liable?  And the

9 reason I'm asking, Mr. Monaco, is, I don't understand where the

10 concept of an indemnification claim for the State of Montana

11 arises at all.

12         MR. MONACO:  Well, Your Honor, I think you're -- in

13 fairness to my position, you're prejudging my position, with

14 all due respect.

15         THE COURT:  No, I'm trying to get to how you think

16 your client fits within the indemnity claims.

17         MR. MONACO:  Well, Your Honor, if you recall, when we

18 filed the motion for relief, we had asked to file a third party

19 complaint against Montana.

20         THE COURT:  Against the debtor.

21         MR. MONACO:  If you want, I can go back and look at

22 my brief.

23         THE COURT:  No, I recall.

24         MR. MONACO:  Well, I'm talking about my opening brief

25 opposing confirmation.  We basically said that it was Grace

1 that caused the unsafe conditions, that caused the unsafe

2 environment for workers.  They didn't follow the state

3 regulations and do what they were supposed to do.  That's

4 really the basis of our contribution indemnification claims

5 against Grace.  They were -- if anyone is culpable, it is them.

6          THE COURT:  Okay.  I'm still having some problem

7 because I don't see how the statute that I had to take a look

8 at in terms of analyzing this issue before, imposes any

9 liability on any actor, other that the State, but okay.  I just

10 wanted to see how you think your client's claims get into that

11 class.

12          MR. MONACO:  Your Honor, just -- and this is

13 hypothetical.  We do not admit to any liability.

14          THE COURT:  Right.

15          MR. MONACO:  But let's assume that the Libby

16 claimants are successful and they assert -- in their assertion

17 of a cause of action against the State of Montana for failure

18 to warn.  We then have the right, under Montana law, to say,

19 Grace, because you -- it was your bad acts that caused this in

20 the first place, you should contribute or indemnify us.  That

21 is my understanding of the law, in the State of Montana.

22          THE COURT:  Okay.

23          MR. MONACO:  You know, I -- a lot of that law was

24 cited in our brief and the motion, in our brief in support of

25 our motion for relief, but it's my understanding that we have

1  that right either to assert as an affirmative defense in any

2  action brought against the Libby claimants, or as a third party

3  defendant.

4           THE COURT:  Okay.

5           MR. MONACO:  And there is also, and Your Honor, I

6  think this is going to be important later on, there is a direct

7  -- a statute that permits direct right action of contribution

8  indemnification against Grace directly, without first having to

9  be found liable by the Libby claimants.

10          THE COURT:  All right, that one I don't recall.

11 Okay.

12          MR. MONACO:  Your Honor, it's our position that our

13 contribution indemnification claims are not subject to 524(g)

14 because they are of a different nature than asbestos, the

15 direct asbestos claims generally.  I think the starting point

16 is, and Your Honor is well aware the Third Circuit has a plain

17 meaning interpretation when constructing -- when analyzing the

18 statutory provisions.

19          Your Honor, I'm going to have to refer to my notes

20 because these are very technical arguments in terms of the

21 words employed by the statute.

22          524(g)(2)(b) requires the imposition of an

23 injunction, only when the trust is to assume liability of a

24 debtor which at the time of entry of the order for relief has

25 been named as a defendant in a personal injury, wrongful death,

1 or property damage action.

2       Your Honor, by the express language in this statute,

3 it deals with personal injury claims not failure to warn

4 claims.  Now, the debtor's response to this is similar to what

5 Your Honor posited at the beginning that, well, if that's the

6 case, and you are outside the scope of Section 524(g), then by

7 definition, you can't have any contribution indemnification

8 claims.  And then if you do, you must, ipso facto, be in

9 524(g).  That's not the law.  The debtor has cited no case law

10 for this proposition, and I don't think it's the law.  We have

11 direct rights of action against them and based on the plain

12 meaning of the statute, we do not think we fit within 524(g).

13       Now, one of the other debtor's response in terms of

14 the interpretation of 524(g) is, well, this is the way it's

15 always been.  They cite to you a couple of orders from other

16 asbestos debtor confirmation orders, indirect claimants have

17 just automatically been part of TDPs.

18       Your Honor, there really has been no case law or

19 legislative history that really deals with this issue and with

20 that I'd like to turn to whether we are a claim or demand

21 within the meaning of Section 524(g).

22       We also assert common law contribution

23 indemnification claims which, under the Third Circuit's

24 decision in _Frenville_, are not deemed to be claims within the

25 meaning of the bankruptcy code.  The debtor, in its papers,

1  does not really dispute this, they don't even cite to

2  _Frenville_, so I think they have tacitly, if not expressly,

3  conceded that Montana's claims are not claims within the

4  meaning of the bankruptcy code.  So that really relegates us to

5  looking at, are we a demand.

6      THE COURT:  Wait, I'm sorry.  _Frenville_ involved a

7  contract and a relief from stay hearing.  So how does it apply

8  to a contingent claim on behalf of the State?  I mean why --

9  the claims definition section of the bankruptcy code provides

10  that contingent claims, if that's what your client is asserting

11  it has, are claims.

12      MR. MONACO:  Your Honor, to back up, what happened in

13  _Frenville_ was, the debtor -- it was a bankruptcy filing by the

14  debtor, the lender sued the accountant on the basis that the

15  accountant provided bad information and that induced them to

16  making the loan.  The accountant tried to third party the

17  debtor in, filed a motion for relief from the automatic stay

18  and, essentially, what -- and this is, again, this was based on

19  New York law on contribution indemnification, which is

20  essentially the same as Montana and every other state in the

21  country, and what the court, the Third Circuit held was, if you

22  have a contractual claim for contribution indemnification, it

23  is, in essence, a prepetition claim.   If it's a common law

24  claim for contribution indemnification, then it's not a claim

25  within the meaning of the bankruptcy code.  It's a post

1 petition claim that's not dischargeable, and you don't need
2 relief from the automatic stay.

3        So, if it's not a claim within the meaning of the
4 bankruptcy code, you're really relegated to whether it's a
5 demand under 524(g).  And if you look at the definition of
6 demand under 524(g)(5), unfortunately, it's circular.  It
7 states that the term demand means a demand for payment, present
8 or future that meets certain enumerated criteria, which I won't
9 get into right this second.  Again, there's no case law or
10 legislative history on this point.  So, what is meant by a
11 demand?  So, it's an undefined term.  And when you have an
12 undefined term, courts must look to secondary sources.  Black's
13 Law Dictionary defines a demand as a request for payment of a
14 debt or amount due.  Well, there's nothing due because the
15 State of Montana's claim doesn't arise until it incurs a loss,
16 until it makes a payment.  That hasn't happened yet.

17        So, when you parse through the technical provisions
18 of the statute, it does not appear that Montana's claims, for
19 lack of a better term, would fall within the definition of a
20 524(g).

21        In addition, Your Honor, 524(g)(5) requires that a
22 demand must arise out of the same or similar conduct, or events
23 that give rise to claims under paragraph one, which, in turn,
24 applies to any claim or demand that arises under 524(g)(1)(b)
25 and this gets back to my argument earlier that given the nature

1  of our claims, failure to warn, as opposed to personal injury,

2  it doesn't fall within 524(g).

3          So, interpreting the statute this way doesn't really

4  create any injustice.

5          THE COURT:  But it has to arise out of the same or

6  similar conduct.  It's not the nature of the claim that

7  controls, it's the nature of the conduct and if your client's

8  view is that Grace is liable, let's assume the State suffers

9  some adverse judgment, and pays it and that Grace is then

10 liable for reimbursing the State because of Grace's conduct,

11 it's clearly based on the same conduct, because the State had a

12 duty to inspect Grace and it was Grace's conduct that the State

13 is now saying caused the State to do whatever it did wrong that

14 led to the judgment.  So, I don't see how it does anything but

15 fall within that definition.

16         MR. MONACO:  Well, Your Honor, that may be, and I can

17 respect Your Honor's position on that, but you have to go back

18 to what I said earlier as to whether it was a demand or not.

19 This was just another alternative argument that even to get

20 past the demand or nature of the suit, you go back to my prior

21 argument.

22         THE COURT:  Well, I'm going to have to take a look at

23 Frenville in this concept because -- or construct, I mean,

24 because I'm having some difficulty understanding how a claim is

25 not a claim, forget the demand aspect, if the State, which has

1 currently been sued, and thinks it then has, at some point, a

2 liability overaction against the debtor, assuming that the

3 State suffers a liability itself, that is clearly a contingent

4 claim.  It's unliquidated, it may be disputed, but it's clearly

5 a contingent claim and I don't know how you have a contingent

6 claim that's not a claim.

7        MR. MONACO:  Well, Your Honor, under -- I'm trying to

8 recall the section -- 502(e), if you have a contingent

9 unliquidated claim, it's not allowable under the bankruptcy

10 code.  So, it sort of confirms what <u>Frenville</u> is saying.

11        THE COURT:  But well -- I'm not sure because the

12 trust issues, I think the 524(g) provisions somewhat -- I don't

13 want to say they modify 502, they obviously don't do that, but

14 they have a different application in an asbestos mass tort case

15 than they do elsewhere and Frenville's footnote, I think it's

16 footnote five, recognizes that its ruling may not apply in

17 asbestos -- in mass tort cases for a variety of reasons, and

18 this may be one.

19        MR. MONACO:  Well, Your Honor, again, I think the

20 response to that is, I don't know there's any overwhelming

21 federal policy for this.  We're in a unique situation, we're

22 not going to create any kind of unusual precedent for this.  I

23 just think given the type of claim we have, we don't fit neatly

24 within this 524(g) construct if you start parsing through the

25 language.  And that's, essentially, our position.

1        THE COURT:  Okay.

2        MR. MONACO:  Your Honor, I think Ms. Casey did a

3  fabulous job of walking Your Honor through why the plan

4  violates Section 1122(a), which requires all claims within a

5  class be similarly situated.  One of the alternatives, if we're

6  not going to be in 524(g), we should have been put in a

7  separate class.  Recognizing the absolute priority rule only

8  applies in a cram down regime, had we been put in a separate

9  class, we would have rejected and the equity interests, which

10  are receiving distributions under the plan, would have clearly

11  violated -- that would have clearly caused this plan to

12  violate, and it does cause the plan to violate the absolute

13  priority rule.

14        Your Honor, again, I think that Ms. Casey stole a lot

15  of my thunder with respect to how the -- if we are going to be

16  classified as Class 6, why indirect claimants such as BNSF and

17  Montana really don't fit within the construct of the TDP.

18        If you start parsing through it, it is

19  discriminatory, unfair, inequitable, it throws a lot of hurdles

20  at claimants such as Montana, and that causes it, I think, to

21  violate Section 1123(a)(4), as well as 524(g)(2).

22        In fact, at one point, if I could just go through

23  some of these very briefly, if you look at Section 5.6, and

24  some of the wording, because Montana's liability could be based

25  on the failure to warn, and the trust doesn't have any

1 liability under failure to warn, they could deny liability on

2 that basis alone.  And, again, it's a hyper-technical argument

3 but it's unfair to us to have to defend that.

4      Again, Your Honor, the first in -- as we said in our

5 papers, the first in, first out mechanism favors direct

6 asbestos claimants.  Indirect claimants have to go out and

7 first establish their liability.  The direct claimants have a

8 leg up in getting distributions first, and when I cross

9 examined Mr. Austern at the confirmation hearing, he

10 acknowledged that there was a possibility that indirect

11 claimants might be left holding the bag, there was a

12 possibility the trust could run out of money because of the

13 first in, first out feature.

14      There are also a lot of other restrictions on

15 indirect personal injury trust claims.  Again, it's limited,

16 the amounts, as Ms. Casey indicated, to amounts paid to the

17 underlying asbestos claims, without inclusion of attorneys'

18 fees and costs.  You have to, in order to get a presumptively

19 valid claim, you have to obtain a full release and pay that

20 claim even though Montana state law and other state laws

21 provide for a direct right of action before contribution

22 indemnification.

23      Section 4.1 of the TDP, by its own admission states

24 that the TDP needs to clarify procedures for payments to Class

25 6 claimants and the percentage they will receive on their

1 claims.

2        And, finally, Your Honor, I will end on this note.

3 In an issue that's unique to Montana, our constitution

4 prohibits holding stock in corporations and to the extent that

5 we receive any payment, assuming we're a Class 6 claimant, that

6 puts us in a position of violating our own constitution.  So, I

7 am interested to see how the plan proponents are going to deal

8 with that issue.

9        With that, Your Honor, I'll sit down, unless you have

10 any other further questions.

11        THE COURT:  I'm sorry, you're saying that the TDP

12 provides that payments can be in stock?

13        MR. MONACO:  Well, I thought that distribution was to

14 be in stock, of the reorganized debtor.

15        THE COURT:  I missed something.

16        MR. LOCKWOOD:  No, you didn't.  There's nothing in

17 the plan that says that one share of stock is ever going to be

18 distributed by the trust to a claimant.  It's never happened

19 before, and it's not happening now.

20        MR. MONACO:  All right, well, then I was under the

21 understanding that the stock of the reorganized debtor was

22 going to be distributed.

23        MR. LOCKWOOD:  Under some circumstances, the trust

24 will receive stock, but the trust sells it for cash and

25 distributes cash, like every other trust that's ever gotten

1 stock.

2          MR. MONACO:  Okay.  That answers my question then.

3          THE COURT:  Okay.  Mr. Fournier.

4          MR. FOURNIER:  Good evening, Your Honor.

5          THE COURT:  Good evening.

6          MR. FOURNIER:  David Fournier on behalf of Longacre

7 Master Fund and Longacre Capital Partners.

8          Your Honor, Longacre is the assignee of a claim,

9 Claim Number 9553, originally held by National Union.  That

10 claim arose out of a surety bond posted by National Union with

11 respect to a -- two, actually, prepetition settlement

12 agreements entered into by the debtor with --

13          THE COURT:  Post petition?

14          MR. FOURNIER:  Prepetition, I'm sorry.

15          THE COURT:  Okay.

16          MR. FOURNIER:  It's late in the day, Your Honor,

17 prepetition settlement agreements entered into by the debtor.

18          There ensued, Your Honor, post petition litigation

19 with respect to that, as the Court may recall, and the claim of

20 National Union was allowed pursuant to a stipulation, settling

21 that post petition litigation among the debtors, the claimants

22 at issue, and National Union.  Therefore, the nature of the

23 claim, if you will, held by National Union and assigned to

24 Longacre, was essentially a contractual obligation of the

25 debtor to pay National Union on account of its surety bond to

1 guarantee a contractual obligation of the debtor to a party

2 that originally had asserted personal injury claims against the

3 debtor.

4          Your Honor, I would submit that given the distance

5 nature of that contractual claim held by National Union, those

6 claims are not substantially similar to the claims that are

7 being treated within the 524(g) trust and can't properly be

8 included within that class.

9          Your Honor, I would note in allowing the --

10 stipulating to the allowance of the National Union unsecured

11 claim, that there are actually three components of the claim.

12 One component was the amounts actually paid out, pursuant to

13 the surety bond.  Additional material components of the claim,

14 however, were the unpaid bond premium associated with the

15 surety bond, and the litigation expenses incurred by National

16 Union in connection with litigation for which the debtor

17 contractually indemnified it.

18          The debtors' position with respect to the National

19 Union claim is that it is essentially one claim treated in its

20 entirety as an indirect PI claim.

21          So, Your Honor, I would take the claim, really, in

22 two parts.  First, with respect to the components of the claim

23 comprised of the reimbursement of the debtors' contractual

24 obligations to the original PI claimants.  Your Honor, with

25 respect to that, I would note two things.  First, that the

1 debtor has already recognized in a similar capacity that claims

2 that are analogous to this claim are not properly treated

3 within Class 6, but should be treated within Class 9.  And that

4 instance, Your Honor, was the debtors' stipulation with Morgan

5 Stanley that its letter of credit reimbursement obligations

6 should be treated within Class 9 and not Class 6.

7 Your Honor, in the settlement that's referenced in

8 the overhead, the structure of the settlement was that National

9 Union, pursuant to the surety bond (indiscernible) a given

10 amount.  That the letters of credit held by National Union

11 would be netted out of that payment and that the balance would

12 be allowed as an unsecured claim with the claimants waiving any

13 remaining claims that they may have had against the debtors.

14 Your Honor, in allowing the Morgan Stanley

15 stipulation on account of its letter of credit reimbursement

16 obligations, essentially what the debtor was doing was allowing

17 an unsecured claim on account of the portion of the global

18 settlement that I just referenced that was attributable to the

19 letter of credit secured obligations.  If Your Honor follows

20 me.

21 THE COURT:  Yes.

22 MR. FOURNIER:  Okay.  The debtor, effectively, is

23 taking the position that because the surety bond that was

24 posted by National Union, paid a claim that was in settlement

25 of a personal injury trust claim that is, is itself,

1 sufficiently connected to a PI trust or 524(g) type claim to be

2 included within Class 6.

3        Your Honor, I would submit that there is no

4 functional difference between the letter of credit

5 reimbursement obligation that the debtor has acknowledged is

6 properly included within Class 9 and National Union's

7 obligation pursuant to the surety bond, to pay the debtor's

8 contractual obligations to a third party pursuant to a

9 prepetition settlement agreement.

10        Additionally, Your Honor, you'll note in the

11 settlement stipulation the debtor entered into, that there is a

12 material component of the settlement that related to the

13 treatment of the claim that was allowed.  The claim as allowed

14 was allowed as a general unsecured claim.  In dictating the

15 interest component of that general unsecured claim, the debtor

16 agreed that in the event that any plan or plans of

17 reorganization that the debtors or any of them may confirm in

18 their bankruptcy cases, provides for payment of interest on

19 unsecured, prepetition, non-priority claims, a claim of the

20 nature that the debtors stipulated to here with National Union.

21 The National Union claim, in the amount allowed herein, shall

22 bear interest at the rate provided in such a plan or plans,

23 from or after the day of closing, without regard to the date

24 from which interest accrues under the terms of such plan of

25 reorganization with respect to any other creditor.

1          Your Honor, essentially the debtor has stipulated
2 here that if it confirms a plan that provides for interest on
3 account of any general unsecured claim, and it didn't dictate
4 that the general unsecured claim had to be a claim of the type
5 that it ultimately would have included in Class 9 here, any
6 general unsecured claim that interest will be payable on this
7 claim as well.

8          Your Honor, the debtor has recognized and effectively
9 bound itself, in that stipulation, to treating this claim as a
10 Class 9 claim.  The debtor has agreed that if any creditor is
11 to receive interest on claim, this claim is to receive interest
12 as well.  That is a functional impossibility under this plan
13 unless this debtor treats this claim as a Class 9 claim.

14          Your Honor, with respect to the disparate treatment
15 issues, I think that those have adequately been addressed both
16 in our papers and in arguments, I won't further belabor the
17 record on that.  I do incorporate, however, the arguments of
18 prior counsel with respect to those issues.

19          THE COURT:  All right.

20          MR. BERNICK:  Your Honor, if I can make a suggestion
21 in light of the -- oh, I'm sorry, I didn't mean to --

22          MR. DAVIS:  I'll be brief, if I may.

23          THE COURT:  Mr. Davis.

24          MR. DAVIS:  National Union still holds a piece of the
25 claim that Mr. Fournier was referring to.  At the time the

1 stipulation was entered into, it was necessary to carve out a

2 part that wasn't fully tabulated yet.  It was -- we were

3 running up against a deadline, certain parts of the tabulations

4 weren't, in fact, compiled and we agreed that we would get the

5 claim approved for the amount that Mr. Fournier's client

6 accepted and we would file the rest later.  So, National Union

7 still owns a piece of this and that's why I stand here today.

8          I'd like to underscore Mr. Fournier's point about the

9 fact that we have a claim for a premium, bond premium, I don't

10 see how that could possibly be an indirect asbestos claim.  And

11 we also have a claim for reimbursement of legal fees and I

12 don't see how that, either, could be an indirect asbestos claim

13 and that's part of his claim and it's really the substance of

14 the remaining claim.

15          But that being said, there's something very

16 troublesome about this whole situation and I stand here just to

17 point this out.  Two things.  First, no good deed goes

18 unpunished.  We were available to provide a service much as a

19 lawyer, a court reporter or any other person who provides a

20 service to a defendant in litigation and in this case, it was a

21 surety bond.  The lawyers got paid in full, the court reporters

22 got paid in full and we are being relegated to Class 6, and we

23 submit that that's just not appropriate.  But quite apart from

24 that, this is a case not only where equity is keeping equity,

25 but at the lunch break I took at look at the stock price, $26 a

1  share, market cap, about almost $1.9 billion is being left in

2  Grace's hands while my client and Mr. Fournier's client are

3  being asked to take a haircut.  And we're being asked to take a

4  huge haircut because of classification and that classification

5  is wrong.  Why is it wrong?

6  　　　Remember when Mr. Inselbuch was on the witness stand

7  and I asked him, do you represent my client's interests and it

8  was like a deer in the headlights, he didn't know what I was

9  talking about.

10  　　　This deal is -- everybody gets paid in full, except

11  the asbestos contingency, who got something really quite

12  important to them other than money, and Mr. Bernick underscored

13  it when he opened up his remarks the first thing today.  I

14  wrote it down.  The overall TDP process, Mr. Bernick said, is

15  central.  The asbestos claimants are materially benefitted by

16  the overall TDP process.  That was Mr. Bernick's remark at the

17  opening of the day and that's what we've heard about all day

18  long.  All day long we've been hearing about how they want to

19  protect and defend and keep the TDP because that benefits them.

20  Doesn't benefit National Union at all.  It doesn't benefit

21  Longacre at all.  We're in the wrong class.  The class should

22  be the people who are benefitted by the TDP because that was

23  the deal that was made.  99 percent, or whatever the percentage

24  is who voted for this plan, who are in this Class 6, are

25  benefitted by the TDP and they belong there, and God bless

1  them, but we're in the wrong class.  Thank you.

2          MR. BERNICK:  I think that the next in line were the

3  folks for Garlock and I know that counsel for Garlock had an

4  extensive presentation that I think he was going to take a look

5  at to see how much of it was still unique to Garlock, maybe all

6  of it is, but I know that the hour is now getting to around

7  6:15 and I suspect that his presentation would take longer than

8  that, maybe now would be an appropriate time to break so that

9  there can be -- he can take a look at what he wants to do and

10 then we can continue on tomorrow morning.  It's up the Court,

11 obviously.

12         THE COURT:  All right.  Mr. Brown?

13         MR. BROWN:  Your Honor, I was -- I thought there was

14 no one else going to go.  This is an issue for us.  We may or

15 may not have some argument on it tomorrow, but it'll be brief

16 if we do.

17         THE COURT:  Okay.  What time would you like to start?

18 Cathy, are you with me tomorrow, too?

19         MS. YOUNKER:  Yes.

20         THE COURT:  Can you be in by 8:30?

21         MS. YOUNKER:  Yeah, I'm always in.

22         THE COURT:  8:30.  Can we start at 8:30 tomorrow?

23 No?  9 o'clock?

24         MR. BERNICK:  I'm sorry, we're happy to start at

25 8:30.

1        THE COURT:  Anybody object to starting at 8:30?

2 Okay, we'll be in recess until 8:30 tomorrow morning.  If the

3 Court Call operator, please, could be sure to be available at

4 8:30, rather than nine o'clock.  Okay, we're in recess.

5                        * * * * *

### CERTIFICATION

     We, TAMMY DeRISI, RITA BERGEN, PATRICIA REPKO & ELAINE

HOWELL, court approved transcribers, certify that the foregoing

is a correct transcript from the official electronic sound

recording of the proceedings in the above-entitled matter and

to the best of our ability.


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Rita Bergen

RITA BERGEN


/s/ Patricia Repko

PATRICIA REPKO


/s/ Elaine Howell              Date:   January 11, 2010

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**