UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower – 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
              Debtors.    .
                          .    January 5, 2010
. . . . . . . . . . . . ..    8:36 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID M. BERNICK, ESQ.
                               JANET BAER, ESQ.
                               LISA G. ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022

For Sealed Air:           Skadden, Arps, Slate, Meagher &
                            Flom, LLP
                          By:  DAVID M. TURETSKY, ESQ.
                               J. GREGORY ST. CLAIR, ESQ.
                          Four Times Square
                          New York, NY 10036


Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For Garlock Sealing          Robinson, Bradshaw & Hinson
Technologies:                By:  RICHARD WORF, ESQ.
                                  GARLAND S. CASSADA, ESQ.
                             101 North Tryon Street, Suite 1900
                             Charlotte, NC 28246


For the Asbestos             Caplin & Drysdale, Chartered
Creditors Committee:         By:  PETER LOCKWOOD, ESQ.
                             One Thomas Circle, NW
                             Washington, D.C. 20005


For the Future              Orrick, Herrington & Sutcliffe, LLP
Claimants                    By:  ROGER FRANKEL, ESQ.
Representatives:                  DEBRA FELDER, ESQ.
                                  PERI N. MAHALEY, ESQ.
                                  RICHARD H. WYRON, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007


For the UCC:                 Stroock & Stroock & Lavan, LLP
                             By:  KENNETH PASQUALE, ESQ.
                                  ARLENE G. KRIEGER, ESQ.
                             180 Maiden Lane
                             New York, NY 10038-4982


For Arrowwood:               Wilson, Elser, Moskowitz, Edelman,
                               & Dicker, LLP
                             By:  CARL J. PERNICONE, ESQ.
                             150 East 42nd Street
                             New York, NY 10017

                             O'Melveney & Myers, LLP
                             By:  TANCRED SCHIAVONI, ESQ.
                             Times Square Tower
                             7 Times Square
                             New York, NY 10038


For BNSF Railway:            Pepper Hamilton, LLP
                             By:  LINDA CASEY, ESQ.
                             3000 Two Logan Square
                             Philadelphia, PA  19103


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For CNA:                    Goodwin Procter, LLP
                            By:  MICHAEL GIANNOTTO, ESQ.
                                 DANIEL M. GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

                            Goodwin Proctor, LLP
                            By:  FREDERICK SCHAFRICK, ESQ.
                            901 New York Avenue, NW
                            Washington, DC 20001

For Maryland Casualty:      Connelly Bove Lodge & Hutz, LLP
                            By:  JEFFREY WISLER, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19899

For PDFCR:                  By:  ALEX SANDERS, ESQ.
                                 ALAN RICH, ESQ.

For the Equity              Kramer Levin Naftalis & Frankel
Committee:                  By:  DAVID E. BLABEY, JR., ESQ.
                            919 Third Avenue
                            New York, NY  10022

For Kneb Pipe Line          Gilbert & Renton, LLC
Operating Partnership,      By:  ROBERT J. GILBERT, ESQ.
LP:                         344 North Main Street
                            Andover, MA 01810

For AXA Belgium:            Tucker Arensberg, P.C.
                            By:  MICHAEL A. SHINER, ESQ.
                            1500 One PPG Place
                            Pittsburgh, PA  15222

For OneBeacon &             Drinker, Biddle & Reath, LLP
Seaton Insurance:           By:  MICHAEL F. BROWN, ESQ.
                            1 Logan Square, 18th & Cherry Sts.
                            Philadelphia, PA 19103

For the Libby Claimants:    Cohn Whitesell & Goldberg, LLP
                            By:  DANIEL C. COHN, ESQ.
                            101 Arch Street
                            Boston, MA  02110

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (CONT'D):

For Longacre                    Pepper Hamilton, LLP
Masterfund:                     By:  DAVID M. FOURNIER, ESQ.
                                3000 Two Logan Square
                                Philadelphia, PA 19103

For Fresenius:                  McDermott, Will & Emery
                                By:  NATHAN F. COCO, ESQ.
                                     DAVID S. ROSENBLOOM, ESQ.
                                227 West Monroe Street
                                Chicago, IL 60606-5096

For State of Montana            Womble Carlyle Sandridge & Rice
Dept. of Environmental          By:  FRANCIS MONACO, ESQ.
Quality:                        222 Delaware Avenue, Suite 1501
                                Wilmington, DE 19801

For Allstate Insurance:         Cuyler Burke, LLP
                                By:  ANDREW K. CRAIG, ESQ.
                                Parsippany Corporate Center
                                Four Century Drive
                                Parsippany, NJ   07054

For OCAPIC:                     Campbell & Levine
                                By:  MARK HURFORD, ESQ.
                                800 North King Street, Suite 300
                                Wilmington, DE 19701

For Anderson Memorial           Kozyak, Tropin, Throckmorton
Hospital:                       By:  DAVID L. ROSENDORF, ESQ.
                                2525 Ponce de Leon, 9th Floor
                                Miami, FL  33134

TELEPHONIC APPEARANCES:

For Robert Siegel:              Traub, Lieberman, Straus
                                By:  ROBERT SIEGEL, ESQ.
                                Seven Skyline Drive
                                Hawthorne, NY 10532

For the Asbestos                Caplin & Drysdale, Chartered
Creditors Committee:            By:  JEFFREY A. LIESEMER, ESQ.
                                     WALTER SLOCOMBE, ESQ.
                                One Thomas Circle, NW
                                Washington, D.C. 20005

For the UCC:                    Stroock & Stroock & Lavan, LLP
                                By:  LEWIS KRUGER, ESQ.
                                180 Maiden Lane
                                New York, NY 10038-4982

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Debtors:            Kirkland & Ellis, LLP
                            By:  CHRISTOPHER GRECO, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  10022

For the Debtors:            Pachulski, Stang, Ziehl &Jones
                            By:  JAMES E. O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DEANNA BOLL, ESQ.
                                 JUSTIN BROOKS, ESQ.
                                 BARBARA HARDING, ESQ.
                                 NATHANIEL KRITZER, ESQ.
                                 ELLI LEIBENSTEIN, ESQ.
                            200 East Randolph Drive
                            Chicago, IL 60601

For Longacre                Pepper Hamilton, LLP
Masterfund:                 By:  JAMES C. CARIGNAN, ESQ.
                            3000 Two Logan Square
                            Philadelphia, PA 19103

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:              Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Libby Claimants: Landis, Rath & Cobb, LLP
                            By:  KERRI K. MUMFORD, ESQ.
                                 JAMES S. GREEN, JR., ESQ.
                                 RICHARD S. COBB, ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE  19899

For Travelers:              Simpson Thacher
                            By:  MARY BETH FORSHAW, ESQ.
                                 ELISA ALCABES, ESQ.
                            425 Lexington Avenue
                            New York, NY  10017

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Serengeti:                Vinson & Elkins, LLP
                              By:  ARI BERMAN, ESQ.
                              Trammell Crow Center
                              2001 Ross Avenue, Suite 3700
                              Dallas, TX  75201


For The Hartford:             Wilmer Cutler Pickering Hale & Dorr,
                               LLP
                              By:  MELANIE DRITZ, ESQ.
                                   NANCY MANZER, ESQ.
                              1875 Pennsylvania Avenue, NW
                              Washington, D.C. 20006


For Various Claimant          Stutzman, Bromberg, Esserman & Plifka
Firms:                        By:  DAVID J. PARSONS, ESQ.
                              2323 Bryan Street
                              Suite 2200
                              Dallas, TX  75201


For Asbestos Property         Scott Law Group
Damage Claimants:             By:  DARREL SCOTT, ESQ.
                              1001 East Main Street, Suite 500
                              Sevierville, TN  37864


For Official Committee        Dies & Hile, LLP
of Asbestos Property          By:  MARTIN DIES, ESQ.
Damage Claimants:             1601 Rio Grande, Suite 330
                              Austin, TX  78701

                              LECG
                              By:  ELIZABETH DEVINE, ESQ.
                              1725 Eye Street NW, Ste 800
                              Washington, DC,  20006


For the Property              Bilzin Sumberg Baena Price &
Damage Committee:               Axelrod LLP
                              By:  SCOTT L. BAENA, ESQ.
                                   TERRANCE EDWARDS, ESQ.
                                   JAY SAKALO, ESQ.
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, FL  33131

TELEPHONIC APPEARANCES (CONT'D):

For the Future              Orrick, Herrington & Sutcliffe,
Claimants                     LLP
Representatives:            By:  KATE ORR, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:             Rhoads, LLP
                           By:  NATALIE D. RAMSEY, ESQ.
                           300 Delaware Avenue, Ste. 750
                           Wilmington, DE  19801

For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806

For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:       By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street, Suite 19899
                           Wilmington, DE  19899

For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                                ELIZABETH M. DeCRISTOFARO, ESQ.
                           Wall Street Plaza
                           New York, NY  10005

For Official Committee      Duane Morris, LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246

For Official Committee      Brandi Law Firm
of Asbestos Property       By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:          44 Montgomery St., Suite 1050
                           San Francisco, CA  94104

                           Lieff, Cabraser, Heimann & Bernstein
                           By:  ELIZABETH J. CABRASER, ESQ.
                           Embarcadero Center West
                           275 Battery Street, Suite 3000
                           San Francisco, CA  94111

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
                              Riker, Danzig, Scherer, Hyland &
                               Perretti, LLP
                              By:  TARA MONDELLI, ESQ.
                              Headquarters Plaza
                              One Speedwell Avenue
                              Morristown, NJ  07962

For the Libby Claimants: Cohn, Whitesell & Goldberg, LLP
                              By:  CHRISTOPHER M. CANDON, ESQ.
                              101 Arch Street
                              Boston, MA  02110

For the PD Committee:         Speights & Runyan
                              By:  DANIEL SPEIGHTS, ESQ.
                                   MARION FAIREY, ESQ.
                                   ALAN RUNYAN, ESQ.
                              200 Jackson Avenue, East
                              Hampton, SC  29924

For Garlock Sealing           Morris James, LLP
Technologies:                 By:  BRETT FALLON, ESQ.
                              500 Delaware Avenue
                              Suite 1500
                              Wilmington, DE  19801

For ZAI Claimants             Hogan Firm Attorneys at Law
& various law firms:          By:  DANIEL K. HOGAN, ESQ.
                              1311 Delaware Avenue
                              Wilmington, DE  19801

For Official Committee        Richardson Patrick Westbrook &
of Asbestos Property            Brickman, P.C.
Claimants:                    By:  EDWARD J. WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, SC  29401

For Dow Jones                 Dow Jones News Wires
News Wires:                   By:  PEG BRICKLEY, ESQ.

For David T. Austern:         Lincoln International, LLC
                              By:  GEORGE COLES, ESQ.
                                   JOSEPH RADECKI, ESQ.

For APDC:                     Pryor, Cashman, LLP
                              By:  RICHARD LEVY, ESQ.
                              410 Park Avenue
                              New York, NY 10022
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For OCAPDC:                  Hamilton, Rabinovitz & Alshuler
                             By:  FRANCINE RABINOVITZ, ESQ.
                             26384 Carmel Rancho Lane, Suite 202
                             Carmel, CA 93923

For Scotts Co.:              Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY S. COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH 43215

For Federal Insurance:       Cozen O'Connor
                             By:  JACOB C. COHN, ESQ.
                                  ILAN ROSENBERG, ESQ.
                             1900 Market Street
                             Philadelphia, PA 19103

For Everest Reinsurance:     Crowell & Moring, LLP
                             By:  LESLIE A. DAVIS, ESQ.
                                  MARK PLEVIN, ESQ.
                                  ANDREW N. ROSENBERG, ESQ.
                             1001 Pennsylvania Avenue, N.W.
                             Washington, DC 20004-2595

                             Marks, O'Neill, O'Brien & Courtney
                             By:  BRIAN L. KASPRZAK, ESQ.
                                  JOHN D. MATTEY, ESQ.
                             913 North Market Street, Suite 800
                             Wilmington, DE 19801

For AIG:                     Zeichner, Ellman & Krause, LLP
                             By:  MICHAEL S. DAVIS, ESQ.
                                  ROBERT GUTTMANN, ESQ.
                             575 Lexington Avenue
                             New York, NY 10022

For Fireman's Fund           Stevens & Lee, PC
Insurance Company:           By:  JOHN D. DEMMY, ESQ.
                             1105 North Market Street, 7th Floor
                             Wilmington, DE 19801

For John W. Greene:          By:  JOHN W. GREENE, Pro se

TELEPHONIC APPEARANCES (CONT'D):

For Bank Lender Group:    Paul, Weiss, Rifkind, Wharton &
                            Garrison
                          By:  SARAH HARNETT, ESQ.
                               MARGARET A. PHILLIPS, ESQ.
                               REBECCA ZUBATY, ESQ.
                          1285 Avenue of the Americas
                          New York, NY 10019-6064

For OCAPIC:               Anderson, Kill & Olick
                          By:  ROBERT M. HORKOVICH, ESQ.
                          1251 Avenue of the Americas
                          New York, NY 10020

For Arrowwood:            Bifferato Gentilotti, LLC
                          By:  GARVAN F. McDANIEL, ESQ.
                          800 North King Street, Plaza Level
                          Wilmington, DE 19801

For Normandy Hill         Normandy Hill Capital, LP
Capital:                  By:  MATTHEW CANTOR, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good morning.  Please be seated.  We're

2  back on the record in the matter of W.R. Grace with respect to

3  the closing arguments concerning plan confirmation.  One second

4  until I get into the proceeding memo here please.

5          I have a list of participants by phone today.  Elisa

6  Alcabes, Scott Baena, Janet Baer, Ari Berman, David Bernick,

7  David Blabey, Deanna Boll, Thomas Brandi, Peg Brickley, Justin

8  Brooks, Elizabeth Cabraser, Christopher Candon, Matthew Cantor,

9  James Carignan, Richard Cobb, Tiffany Cobb, Jacob Cohn, George

10  Coles, Andrew Craig, Leslie Davis, Michael Davis, Elizabeth

11  DeCristofaro, John Demmy, Elizabeth Devine, Martin Dies,

12  Melanie Dritz, Terrance Edwards, Lisa Esayian, Marion Fairey,

13  Brett Fallon, Debra Felder, Mary Beth Forshaw, David Fournier,

14  Theodore Freedman, Christopher Greco, James Green, John Greene,

15  Robert Guttmann, Barbara Harding, Sarah Harnett, Daniel Hogan,

16  Robert Horkovich, Brian Kasprzak, Stuart Kovensky, Matthew

17  Kramer, Nathaniel Kritzer, Lewis Kruger, Michael Lastowski,

18  Elli Leibenstein, Richard Levy, Jeffrey Liesemer, Nancy Manzer,

19  John Mattey, Garvan McDaniel, Tara Mondelli, Kerri Mumford,

20  James O'Neill, Kate Orr, David Parsons, Margaret Phillips, John

21  Phillips, Mark Pleven, Francine Rabinovitz, Joseph Radecki,

22  Natalie Ramsey, Andrew Rosenberg, Ilan Rosenberg, Alan Runyan,

23  Jay Sakalo, Jennifer Schilling, Darrel Scott, Michael Hoy,

24  Robert Siegel, Walter Slocombe, Daniel Speights, Shayne

25  Spencer, Theodore Tacconelli, Edward Westbrook and Rebecca

1  Zubotti.

2           Are there any changes in court for entries of

3  appearances?  If not I'll just go with yesterday's record.

4  Anyone additional wish to enter an appearance?

5           Okay.  Folks, just as a housekeeping matter, I have

6  to remind you that we're taking a lunch recess at 12:30 and

7  also I am expecting two calls which if they come in I'm going

8  to have to take a brief recess.  It will be brief but I will

9  have to handle two phone calls.

10          I had a chance, Mr. Monaco, to take a look at

11  Frenville last night and I don't think it applies.  So I would

12  like to address that issue before we get into anything new this

13  morning.

14          First of all it's talking about the fact that in a

15  Chapter 7 proceeding the discharge can only be for pre-petition

16  claims.  Of course that's not applicable in a Chapter 11

17  because 1121(D)(1)(a) provides that the discharge can be for

18  claims that accrue up to the date of confirmation and (D), I'm

19  not sure what section, little two in any event, under 1121(D)

20  also states that the claims that can be discharged include

21  claims that are not allowed under Section 502.

22          And it's Footnote 8, not Footnote 5, that also talks

23  about the fact that there may be a federal policy that would

24  apply a different result in mass tort cases.

25          So overall I don't think Frenville governs this

1 particular definition of when Montana's claim accrues.  The

2 lawsuit has clearly been filed.  I don't know under Montana law

3 when, if at all, the state can join additional parties.  But it

4 seems to me that the rationale for those reasons isn't going to

5 govern whether or not Montana's claim can be treated as a

6 claim.  I don't think it's a demand.

7         MR. MONACO:  Your Honor, if I could address Your

8 Honor's comments.  Your Honor, I would respectfully disagree

9 with the Court.  I think that the Frenville analysis really

10 goes to when a claim for contribution indemnification, common

11 law claim for contribution indemnification, is a claim within

12 the meaning of the Bankruptcy Code.

13         And the Court's analysis focuses on the right to

14 payment and all the verbiage after the clause right to payment

15 really rises and falls on whether the right to payment, there

16 is a right to payment which in turn leads to a claim.

17         And I, in my estimation and it's our position, that

18 the facts of Frenville and the facts with respect to the State

19 of Montana and its situation in Montana are identical.  There's

20 no reason I can see to distinguish the two and that if you

21 apply the Frenville analysis which is still good law, I think

22 it's pretty clear from the Court's decision that it's not a

23 claim within the meaning of the Bankruptcy Code.

24         THE COURT:  Well I know that the Circuit has once

25 again examined Frenville in a different context and I didn't

1  have a chance this morning to take a look at that case.  But I

2  think for purposes of mass tort cases the Circuit recognized

3  that there is a problem with its analysis.

4          MR. MONACO:  Okay.

5          THE COURT:  Mr. Monaco, one of my phone calls just

6  came in so pardon me but I --

7          MR. MONACO:  Okay.

8          THE COURT:  -- need to take a very brief recess.

9                      (Recess)

10          THE COURT:  Please be seated.  I'm sorry, Mr. Monaco,

11  but the good news is that my second call came in while I was

12  there so now I'm set.

13          MR. MONACO:  That's good, Your Honor.  Your Honor, if

14  I could address your second point which is the infamous

15  Footnote Number 8 in the Frenville decision.

16          Well first of all this is dicta.  I don't believe

17  it's precedent.  It says it leaves open this issue.

18          THE COURT:  Right.

19          MR. MONACO:  So I just point that out to the Court.

20  But assuming Your Honor wants to be guided by Footnote 8, I

21  have a couple responses.

22          First of all as I stated yesterday in my argument, I

23  think Montana is in a unique situation given the claims that

24  have been made against it.

25          I don't see this as setting some type of precedent

J&J COURT TRANSCRIBERS, INC.

1  that could jeopardize mass tort cases and the application of

2  524(g).  The nature of our claims are different than the

3  typical asbestos claim.

4         And just in a pure analytical sense, again <u>Frenville</u>

5  is limited to what is a claim.  I think maybe what the Court

6  was leaving open in Footnote 8 is what is a demand and that's

7  really what my analysis went to and my argument went to

8  yesterday.

9         So I know Your Honor has a different view of the

10  world and maybe a higher court is going to have to resolve this

11  issue, but that's what our response is to Footnote 8.

12         THE COURT:  Now I think what it's saying where the

13  footnote lies in the test is after thus while federal law

14  controls which claims are cognizable under the Code, the

15  threshold question of when a right to payment arises absent

16  overriding federal law is to be determined by reference to

17  state law -- I'm omitting the case cites -- and then Footnote

18  8.

19         If there were some overriding federal policy, we

20  might have the power to develop federal law citing cases of

21  bankruptcy proceedings stemming from a mass tort such as

22  exposure to asbestos may be a case in which the application of

23  federal law is indicated.

24         And on top of that the third section talks about the

25  fact that they're bearing in mind the fact that only those

1 claims that arise pre-petition can be discharged in a Chapter 7

2 proceeding.  That's clearly not applicable in a Chapter 11.

3 The Code specifies the claims up to the date of confirmation

4 can be discharged.

5          And this claim that the opinion talks about the fact

6 that the claim can't arise until suit's filed.  The suit's been

7 filed.  So I think on the facts it's different.

8          Now I'm not getting to the issue that you raised as

9 to whether 524 is the right place for Montana to be and whether

10 that's applicable.  I'm just taking a look at the concept of

11 when a claim arises and how <u>Frenville</u> applies and that's what I

12 -- I think it's distinguishable.

13          MR. MONACO:  Well, Your Honor, New York law appears

14 to be the same as Montana law as to when a right of payment

15 arises and it's at the time of the loss.  It's true that these

16 lawsuits have been filed, but that's all that's happened to

17 date, they've been filed.

18          Unless and until we either settle with the Libby

19 claimants or there's an adjudication that we are liable, that

20 really fixes when our right of payment is and I don't know why

21 federal law would be any different than state law.

22          THE COURT:  Actually this case says the right to

23 payment doesn't arise until payment's made on the judgment so.

24          MR. MONACO:  Right.  So that's going to happen I

25 assume probably long after Your Honor renders an opinion and

1  order in this case.  So, you know, I hear what Your Honor is

2  saying but I still respectfully disagree and my argument is

3  stated for the record.

4          THE COURT:  Okay.

5          MR. MONACO:  Thank you.

6          THE COURT:  Mr. Monaco, I understand you wanted to

7  appear by phone tomorrow.  That's fine.

8          MR. MONACO:  Yes.  I understand that it's going to be

9  a universal rule for everybody today.

10         THE COURT:  All right.

11         MR. MONACO:  So I appreciate that, Your Honor.

12         THE COURT:  Okay.  Thank you.  Okay, Mr. Bernick,

13 where are we?

14         MR. BERNICK:  I think we're going to continue with

15 what is a combination of the classification issues six versus

16 nine and the discrimination and on the fairness claims.  So

17 we've been through National Union and related parties, we've

18 been through the State of Montana, BNSF.

19         I think next up is Garlock and I see Garlock's

20 counsel ready and prepared to go and so I think we're going to

21 keep on going through people who are addressing this issue

22 including insurers before we respond.

23         THE COURT:  All right.  Mr. Cassada.

24         MR. CASSADA:  Thank you, Your Honor.  I'm Garland

25 Cassada here for Garlock Sealing Technologies.  With me is Rich

1 Worf.  And before I begin I would like to note that Mr. Worf

2 and I would probably like to participate tomorrow by telephone

3 as well.

4          THE COURT:  Anybody who wants to participate by phone

5 tomorrow unless you're going to be showing me documents or

6 slides or something that I don't already have, in which case

7 you need to give them to me tonight before you leave, may

8 participate by phone.

9          THE CLERK:  Judge, I sent an email to Court Call

10 saying that everyone sign up until five p.m. eastern today.

11          THE COURT:  All right.  So you've got until 5:00

12 tonight to sign up so you may have to do it before you're out

13 of here.  But in any event you can participate by phone.  Okay.

14          MR. CASSADA:  Okay.  Your Honor, Garlock's arguments

15 don't fit neatly within the same arguments raised by people

16 during this part of the hearing, but we've agreed they're close

17 enough that we'll present our arguments now.

18          Your Honor, the evidence in this case shows that up

19 until 2008 the debtor and the asbestos constituency was in a

20 heated dispute regarding the amount of Grace's asbestos

21 liabilities.

22          According to the debtor Grace was solvent and it was

23 going to seek estimated liabilities that Grace would be able to

24 pay its liabilities in full.  According to the asbestos

25 constituencies Grace was hopelessly insolvent.

1          In the middle of the trial in 2008 the parties

2    reached a deal that has become the plan that's before the Court

3    today.  I want to go over the essential components of that

4    deal.

5          First of all the plan proponents agreed to base their

6    plan on the liability estimate that would be provided by the

7    asbestos committee and the futures rep and that liability was,

8    that range was that Grace's liability was and on a net present

9    value basis was six billion to 9 billion.

10          Second, Grace only had to pay 1.1 billion of this

11    liability and then Grace would combine to this a 1.15 or so

12    billion that constituted the funds of the Sealed Air

13    settlement.  And this would permit Grace to pay, the Grace

14    trust to pay 25 percent to 35 percent of the projected

15    liability.

16          But an essential part of the deal was that asbestos

17    creditors didn't have to worry at all about that 25 to 35

18    percent of the liability because they could simply turn around

19    and they could collect the 65 to 75 percent unpaid share from

20    Garlock and other codefendants left in the court system.

21          But it really was better than that under the deal

22    because they got, the asbestos claimants would get to write the

23    TDP and the TDP would be written in such a way that the

24    claimants could essentially hide the Grace share from

25    defendants in the tort system.

1        As a result they'd be able to file claims that

2 defendants wouldn't even know about.  They'd go in the tort

3 system, they would seek 100 percent recovery of their damages,

4 and under the TDP they don't have to identify the Grace

5 exposure, and then they can later --

6        THE COURT:  But the TDP does identify the Grace

7 exposure.  It tells you it's going to be 25 to 35 percent of

8 the share.

9        MR. CASSADA:  Yes, for any individual claim.  They

10 don't have to identify it until late in the game after they've

11 resolved their claim in the tort system.

12        THE COURT:  But that's how things generally work.

13 You don't necessarily have access to what any other settling

14 parties settled for.

15        MR. CASSADA:  We will demonstrate to Your Honor that

16 under state law Garlock has fundamental rights that allows it

17 to flush out all exposures in the tort system and that's the --

18        THE COURT:  Well then you'll issue subpoenas to the

19 trust.

20        MR. CASSADA:  -- that's consistent with the only

21 evidence that was offered in this case.

22        THE COURT:  And then you'll issue subpoenas to the

23 trust and the trust will either comply or battle it out in the

24 state tort system.

25        MR. CASSADA:  As the evidence shows that is not an

1  adequate remedy.  The remedy requires --

2          THE COURT:  Well I don't know why.  I've been getting

3  all kinds of orders in various cases that I've been signing

4  allowing access to documents.  So why is that not an adequate

5  remedy?  That's what you'd have for discovery purposes in any

6  other litigation anyway.

7          MR. CASSADA:  Yeah, because, Your Honor, the TDP

8  allowed the claimants to defer their claims so they can take

9  the position today that they either don't have a claim against

10 Grace or they haven't found the evidence of Grace exposure yet.

11         So if I've subpoenaed the trust during the pendency

12 of my case, I come up with nothing.  And then once the state

13 law case is settled they can file their claim against the Grace

14 trust, they can then provide their Grace exposure, and they can

15 collect a second time from the trust, from all of the trusts.

16         THE COURT:  Well to the extent that there's a statute

17 of limitations that applies, does this process, the trust

18 process waive the statute of limitations?

19         MR. CASSADA:  Yes, it does.

20         THE COURT:  Okay.  And that statute is still existing

21 in the state courts as to defendants who haven't been stayed by

22 the orders of this Court?

23         MR. CASSADA:  Yes, the plaintiffs have to comply with

24 the statute of limitations in state court against non-debtor

25 entities, surviving codefendants like Garlock.


**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Right.  But the issue I'm asking is

2    whether that statute is still extant, is it still running,

3    because if so then I'm not quite sure where there is --

4              MR. CASSADA:  No, it's not.  It wouldn't still be

5    running.

6              THE COURT:  All right.  So then you already know who

7    sued Garlock.  If the statute expired then new suits can't be

8    filed.

9              MR. CASSADA:  I'm not following the Court.  There is

10   a statute of limitations in the tort system that claimants have

11   to comply with.

12             THE COURT:  Right.

13             MR. CASSADA:  Okay.  They sue Garlock.

14             THE COURT:  Yes.

15             MR. CASSADA:  Yes, we know the plaintiffs that sue

16   Garlock, that's correct.

17             THE COURT:  Okay.

18             MR. CASSADA:  Okay.  That's not the problem.  The

19   problem is that that statute doesn't apply to claimants who

20   file against the trust.  They get an extended statute of

21   limitations and then that statute of limitations really doesn't

22   amount to anything because they get the right to defer their

23   claims on an unlimited basis.  We'll go through the provisions,

24   Your Honor.

25             But, Your Honor, Garlock objects to the deal and

1  under 524(g)(2)(b) Garlock -- a channeling order that channels

2  Garlock to the trust proposed by the plan proponents can only

3  be valid and enforceable if the two conditions of that section

4  are met.

5       That is that the channeling injunction has to be fair

6  and equitable to Garlock and Garlock or persons in the class

7  that Garlock occupies have to have been appointed a legal

8  representative to protect their rights in the bankruptcy case.

9       Neither of those two things happened here.  As a

10  result there's a failure of both conditions and the injunction

11  proposed on the plan cannot be enforceable against Garlock or

12  any other --

13       THE COURT:  Wait.  Wait.  I'm sorry.  Give me a

14  chance to look at this.  I thought the statute was talking

15  about demands, not about entities that already know that they

16  have claims because they can represent themselves.

17       The only entity I thought that required some future

18  representative were the entities that would have demands that

19  they didn't know about.  So you're looking at 524(g)(2)(b).

20       MR. CASSADA:  Correct, Your Honor.  Your Honor, I

21  believe you misstated the rule.  Garlock is a person who might

22  hold demands against the trust.  Those are contribution demands

23  by codefendants.

24       THE COURT:  No, those are claims.  Contribution

25  rights are claims, they are not demands.  Demands mean, as I

1 understand the concept, that somebody exists, a person exists

2 who actually has a claim against the debtor but the symptoms of

3 the disease haven't manifested themselves and so because they

4 don't know that they have the disease at the moment they can't

5 prosecute the claim that they otherwise hold and therefore they

6 have a future demand when the symptoms arise and when they then

7 know that the exposure actually led to a disease, then they

8 have a claim that's ripened in other civil language, into a

9 claim.

10          MR. CASSADA:  Yes.

11          THE COURT:  That's what a demand is.  If you've got a

12 right to contribution --

13          MR. CASSADA:  But the same analysis applies for

14 Garlock.

15          THE COURT:  No, it doesn't.

16          MR. CASSADA:  Garlock would have rights that spring

17 from those demands.  If none of those --

18          THE COURT:  All right.  You're saying that in the

19 future demand holders can sue Garlock because they'll know they

20 have claims against Garlock right now and so there's no statute

21 of limitations that bars those claims as to Garlock and once

22 Garlock is responsible for making the payment then it can make

23 the same claim against the debtor.

24          MR. CASSADA:  That's correct, Your Honor.

25          THE COURT:  All right.  Okay.

1          MR. CASSADA:  We will have demands.

2          THE COURT:  All right.

3          MR. CASSADA:  We are persons who will hold demands

4   and this is not --

5          THE COURT:  But it's hypothetical as to Garlock right

6   now.

7          MR. CASSADA:  Well that's the statute anticipates

8   that it will be hypothetical.  They are persons --

9          THE COURT:  But then if there is --

10         MR. CASSADA:  -- persons who might subsequently hold

11  demands get a legal rep.  Persons who might --

12         THE COURT:  Well then they have a legal rep.

13         MR. CASSADA:  No, we don't have a legal rep.

14         THE COURT:  Why not?  There's a futures rep here.

15         MR. CASSADA:  Your Honor, the record is clear that

16  the futures rep was not appointed to protect the rights of

17  codefendant contribution claimants.  You said it when you

18  appointed him in your bench ruling, you said this legal rep is

19  for purpose of protecting the rights of bodily injury claims

20  period.  You said that repeatedly in this case.

21         THE COURT:  All right.  So your contention is because

22  you have an indirect claim because you'd pay the person with

23  the liability, you don't have a direct claim against the

24  debtor, your client isn't an entity injured by a personal

25  injury.

1          MR. CASSADA:  That's correct.

2          THE COURT:  Because it's an indirect liability as to

3 --

4          MR. CASSADA:  That's correct.

5          THE COURT:  -- the debtor's estate.

6          MR. CASSADA:  That's correct.

7          THE COURT:  All right.

8          MR. CASSADA:  And there's a stipulation in this case

9 between Garlock and the plan proponents that Garlock indeed is

10 likely to hold demands against the trust and that puts Garlock

11 squarely within the protections of 524(g)(2)(b).

12          And it's clear that no legal representative has been

13 appointed to represent persons who hold such demands and as a

14 result that's why codefendant contribution demand holders got

15 the raw deal that this plan reflects.

16          Before I go into the specifics of how this plan

17 doesn't meet the fair and equitable standard, it's important

18 for the Court to understand what rights codefendants have in

19 the tort system under state law.

20          I need to turn the Elmo on, Your Honor.  I'm not sure

21 how to do that.

22          THE COURT:  He wants the Elmo, Cathy, the overhead.

23          MR. CASSADA:  Your Honor will recall the testimony of

24 Dr. Peterson in this case.  Dr. Peterson testified in the tort

25 system defendants strive to pay only their several shares and

1  defendants in doing that almost always succeed.

2         This testimony shows that the contribution rights

3  that defendants have in state court work.  They work to limit

4  the state court's defendant to payment of only its several

5  share.

6         Essentially under state law a defendant has a right

7  to be free from paying the several share of other defendants.

8  There's two different essentially allocation rules under state

9  law.

10         There's joint and several liability.  Under joint and

11  several liability each defendant is responsible for its own

12  share, however, the plaintiff can look to any defendant to

13  collect the shares of other parties.

14         And if Garlock in that case is forced to pay Grace's

15  share, then Garlock simply looks to Grace and requires Grace to

16  reimburse Garlock for payment of that share.  That's the way it

17  works in the tort system.

18         And, Your Honor, the timing of Garlock's rights are

19  key.  The right to a contribution claim arises at the moment

20  Garlock is sued.  At that moment Garlock can filed a cross

21  claim against Grace if Grace has been sued in the action.

22         If Grace hasn't been sued in the action and Garlock

23  believes that there's a basis for Grace liability, Garlock can

24  join Grace to the litigation and in that way Garlock and

25  Grace's liability are adjudicated side by side.

1          And if the plaintiff in that case has credible and

2    meaningful evidence of Grace exposure, Garlock has access to

3    that evidence and it's put before the jury.

4          The important point here is that plaintiffs in the

5    tort system cannot hide, cannot benefit from hiding the fact

6    that Grace has a share of their liability.

7          Dr. Peterson also testified --

8          THE COURT:  But nothing in this system prevents

9    Garlock or any other defendant from attempting to show that any

10   other defendant in the tort system has a share of the

11   liability.  You just can't add Grace to the suit.  That doesn't

12   prevent you from presenting evidence.

13         MR. CASSADA:  The evidence is to the contrary, Your

14   Honor, and I will get to that.  But I think it's important to

15   note that most cases in the tort system settle and in the

16   settlement, as Dr. Peterson said, defendants are almost always

17   successful in limiting settlement to their several share and

18   there's a reason for that.

19         And that's because as parties they're sitting at the

20   settlement table, they're looking down to what might happen at

21   trial.  And at trial plaintiffs know and Garlock knows who all

22   the defendants are and that Garlock at the end of the day is

23   only going to be required to pay its several share.

24         If Grace settles before the judgment Garlock will get

25   credit for that against the judgment.  If Grace doesn't settle

1  and Garlock gets hit with Grace's share, then Garlock and the

2  plaintiff both know that it's Garlock who's going to have the

3  right to recover Grace's share from Grace, not the plaintiff.

4          THE COURT:  But the plan doesn't change that.

5          MR. CASSADA:  It does change that, Your Honor.

6          THE COURT:  How?

7          MR. CASSADA:  We'll show that.  Because it allows the

8  claimants to delay and hide the Grace share.  There are

9  provisions in the plan that serve no legitimate purpose, the

10 sole purpose is to allow the claimants to make the claim twice.

11 And the evidence shows that that is exactly what has been

12 happening.

13         But Dr. Peterson's testimony showed that when a

14 defendant's state law contribution rights are respected they

15 work.  The plaintiff only pays its several share.

16         The treatment given by the plan to Garlock does not

17 meet the fair and equitable standard under Section

18 524(g)(4)(b).

19         The injunction channeling Garlock to the trust

20 proposed here and naming the defendant, essentially giving the

21 defendant a discharge, has to be fair and equitable with

22 respect to persons like Garlock that might subsequently assert

23 demands in light of the benefits to be provided to such trust

24 on behalf of such debtor or debtors or such third party.

25         Now when Congress enacted the bankruptcy amendments

1  in 1994 the very Congress that did that noted that the words

2  fair and equitable are terms of art that have a well

3  established meaning under the case law of the Bankruptcy Act as

4  well as the Bankruptcy Code.

5          And the house report cited to a case, that case is

6  the Case case, Case v. Los Angeles Lumber Products.  And in

7  that case the Supreme Court in interpreting the words fair and

8  equitable under the Bankruptcy Act said that the fact that the

9  vast majority of security holders have approved the plan is not

10 the test of whether the plan is fair and equitable.

11         Any arrangement of the parties by which the

12 subordinate rights and interest of the stockholders are

13 attempted to be secured at the expense of prior rights of

14 secured or unsecured creditors comes within judicial

15 renunciation.

16         Your Honor, this was the Supreme Court's enunciation

17 of a standard that it had first ruled on in the late 1800's.

18 This is a standard that's over 100 years old.  As Congress

19 said, these are words that at their core have a long understood

20 meaning.

21         When Congress amended the Act for the Code it carried

22 over fair and equitable.  Fair and equitable continued to have

23 the same meaning, absolute priority.  The only difference

24 between 1129(b) and the Bankruptcy Act was a trigger and that

25 the trigger was that the fair and equitable standard under

1    1129(b) doesn't occur unless a class votes to reject -- doesn't

2    accept the plan and then the plan has to be fair and equitable

3    with respect to that class.

4         When 524(g) was enacted Congress used the words fair

5    and equitable, not by accident.  And again Congress knew what

6    these words meant.  And fair and equitable here is on a claim

7    by claim basis, it's not on a class basis.  There's nothing in

8    524(g) that allows the vote of current claimants or anyone else

9    to waive the fair and equitable standard for any particular

10   creditor.

11        In this case it's clear that not all demand holders

12   will be paid in full.  If Garlock has a future demand against

13   the trust and if it goes to judgment, then Garlock's judgment

14   -- its payment will be limited to no more than 35 percent.  But

15   not only that there are all kinds of other Draconian provisions

16   that will limit its judgment to some maximum amount.  That's

17   not payment in full, Your Honor.

18        At the same time the shareholders are going to keep

19   their stock.  You heard a statement about this yesterday but on

20   December 31 the value of Grace's equity was 1.86 million and

21   this is taking into account the plan and any uncertainty that

22   the plan might not be confirmed.

23        Now the plan proponents claim that fair and equitable

24   doesn't mean absolute priority.  They want you to essentially

25   jettison the Supreme Court's decision out the window and to

1 find that fair and equitable, it's not a term of art.  It

2 doesn't mean what the Supreme Court said it meant.  It doesn't

3 mean what Congress said it meant when it passed the Bankruptcy

4 Reform Act.  Instead it means substantial contribution.

5         There is nothing in the language of the Code or in

6 legislative history to support that.  Not only that, they don't

7 tell you what a substantial contribution is.  They seem to

8 think that they can throw out a number in this case with a

9 billion behind it and that's enough, that means that shows it's

10 substantial.

11         The reason they don't offer a measuring stick is that

12 any reasonable -- by any reasonable measuring stick the

13 contribution that Grace is making here is not substantial

14 particular when you consider that what the shareholders will

15 walk away from the confirmation of this plan with.

16         We would submit there's two possible reasonable

17 measuring sticks for what a substantial contribution would be

18 and one would be to compare the debtor's contribution to the

19 amount of the liability.

20         The amount of the liability in this case is 6.3 to

21 9.3 billion according to Dr. Peterson.  Grace's contribution is

22 at 1.1 billion according to Dr. Peterson would pay about far

23 less than 20 percent of that liability.

24         So when you measure their contribution against the

25 liability there's no way you can conclude it's substantial

1  particularly when the shareholders are going to walk away with

2  $2 billion or perhaps more.

3       Another possible yardstick for substantial

4  contribution is to measure it against the assets that Grace had

5  that were available to put into the trust and that would be the

6  remaining value of Grace after the contribution of the trust.

7       Again the market said that that was, on December 31,

8  that was $1.86 billion.  So Grace is putting in about 37

9  percent of what it could put in.

10       Your Honor, I have not heard the proponents describe

11  exactly what standard you should apply under their substantial

12  contribution test.  I don't think they have one.

13       But whatever the standard is, whether it's absolute

14  priority or it's whether they're making a fair contribution to

15  the trust, there's no route to them to meet the fair and

16  equitable standard.  Their contribution is simply not

17  substantial.

18       Now they've also suggested that the contribution is

19  substantial because it was negotiated among the parties in

20  interest.  But I think it's key to note here that this claimant

21  and the people in the class of this claimant weren't at the

22  table when the negotiation took place and it's those parties

23  that the Court has to determine are treated fairly and

24  equitably under the injunction.

25       And they're not.  They're stuck with the bill.  We

1  are stuck with whatever payment that Grace doesn't make.  And

2  we didn't have a representative at the table to negotiate for

3  us and this plan is the result.

4       So if it's to be judged by the fact that there has

5  been an agreement among parties and that makes it a substantial

6  contribution, that doesn't work either.

7       The treatment that Garlock would receive under the

8  channeling injunction and trust is also not fair and equitable

9  because the TDP had been carefully designed to frustrate

10  Garlock's contribution demands.

11       Now recall the testimony we heard from Dr. Peterson

12  and Mr. Hughes.  The number of defendants in a particular case

13  is the single most important factor in determining the amount

14  of a claim.  Now you may recall that the value of Garlock's

15  claims was profoundly affected beginning in the year 2000 when

16  there was a wave of bankruptcy cases in 2001, 2000 and 2001.

17  And that wave took the nine largest sources of payment of

18  asbestos claims out of the tort system when they were treated

19  to bankruptcy.

20       And then over the next several years other smaller

21  defendants dropped one at a time until there were a large

22  number of bankruptcies.

23       As a result Grace's -- before this wave of

24  bankruptcies, in 1999 Grace's average payment on a mesothelioma

25  claim was $50,000.  And you can see from the diagram here we

1 have the pie.  The pie represents the plaintiff's total damages

2 recovered and the slices of the pie represent several shares.

3        And you'll see that when all of those nine

4 defendants, the largest payers in the system were in, everyone

5 had a smaller piece of the pie.

6        MR. LOCKWOOD:  Your Honor, I object to the use of

7 this slide.  There is absolutely no record support for the

8 shares represented in this slide as being an accurate

9 representation of anything.  He's just making this up and

10 testifying about it.

11        MR. CASSADA:  That's plainly wrong, Your Honor.  Dr.

12 Peterson spent two days on the stand describing how --

13        MR. LOCKWOOD:  Dr. Peterson discussed generally how

14 the system worked, he did not create a pie chart showing what

15 the relative shares of Grace, Garlock, Owens Corning, USG were.

16        And the only effort that Garlock made to introduce

17 evidence on this subject was a handmade lawyer chart purporting

18 to show some distributions by some of the trusts which we

19 objected to and the Court didn't permit to be into evidence.

20        And that chart didn't bear any relationship to this

21 graphic in any event.

22        THE COURT:  Okay.  Where in the record can I find who

23 all these nine defendants are, the amounts of their shares to

24 know that this pie chart is an accurate representation?

25        MR. CASSADA:  Your Honor, you can find -- in Dr.

1 Peterson's testimony you can find that all of these defendant's

2 were in the tort system and that their exit from the tort

3 system profoundly affected the liabilities of the surviving

4 defendants.

5        This pie chart here is not supposed to indicate the

6 specific accurate shares of anyone, it's just a demonstrative

7 demonstrating Dr. Peterson's undisputed testimony that the

8 number of defendants in a case affects the shared liability of

9 any single defendant.

10        THE COURT:  Okay.  Well his testimony may be that but

11 this pie chart that shows increasing shares of liability on

12 behalf of any one entity, Garlock is highlighted here, unless

13 there's some record evidence that bears this out I can't accept

14 the pie chart as an accurate demonstrative but I can accept the

15 representation that that's what Dr. Peterson testified to.

16        MR. CASSADA:  That's what Dr. Peterson testified.

17 Dr. Peterson testified that from 1999 to 2009 that Grace, had

18 it remained in the tort system, would have suffered larger and

19 larger settlement amounts.

20        And at the conclusion of that testimony Dr. Peterson

21 said any defendant remaining in the tort system had the same

22 experience.  That's the testimony we're relying on.

23        THE COURT:  All right.

24        MR. CASSADA:  It's in the record.  Now when Grace and

25 the eight other large defendants who Dr. Peterson again

1  testified were the largest sources of payment in the tort

2  system, when they left the tort system the settlement values of

3  those remaining in the tort system increased dramatically.

4      Recall Dr. Peterson's testimony for Grace, which was

5  paying 50,000 in 1999, by 2009 at the date of the confirmation

6  hearing Dr. Peterson's testimony was that the average value of

7  a mesothelioma claim would have been 225,000.  Therefore Grace

8  would have experienced an increase of almost five fold of claim

9  values against it.

10     THE COURT:  Well that's the claim value, that's not

11 the payment share.  I mean, look, at the risks of inflation

12 over a ten year period, that alone factors into something.  I

13 don't know about five fold but.

14     MR. CASSADA:  Yes, and Dr. Peterson testified that

15 the single most important factor in increasing claim values was

16 the bankruptcies of codefendants.  It's in the record, we cite

17 it in our brief, we cite it at the bottom of this slide.  And

18 that's because before --

19     MR. LOCKWOOD:  I object to the slide again on the

20 ground that it misrepresents the state of the evidence as to

21 what the respective shares of anybody were and leaves out lots

22 of defendants and as such I mean if he wants to rely on Dr.

23 Peterson's testimony he can cite Dr. Peterson's testimony.  He

24 doesn't need to put misleading slides on the screen --

25     THE COURT:  Well --

1         MR. LOCKWOOD:  -- showing inaccurate information

2    about the relative shares of defendants, most of whom are

3    unnamed and for which there's no support in the record as to

4    what those relative shares were.

5         THE COURT:  -- well I've agreed that the charts are

6    not going to be used as demonstratives.  I don't have copies of

7    them anyway so they're not --

8         MR. LOCKWOOD:  Well the other thing is that Garlock

9    has put on no evidence of what Garlock's share was.  For all we

10   know Garlock's share was one one-hundredth.  They show Garlock

11   as a huge major player in the tort system in this share at the

12   beginning and an even huger major share at the end.

13        To look at this chart you would think that after the

14   tort system Garlock is responsible for something like 20 or 25

15   percent of the total share of all claims brought by plaintiffs.

16   There's not -- Dr. Peterson didn't say that, nobody cited in

17   the bottom of the slides said that.  Mr. Cassada --

18        THE COURT:  I've already sustained the objection, Mr.

19   Lockwood.  Let's move on to something else.

20        MR. CASSADA:  Your Honor, would you like copies of

21   these so you can follow during my argument?

22        THE COURT:  So far I don't think there's anything

23   that I'm going to rely on because I don't think they're

24   accurate depictions of the testimony.  So not so far.  If

25   something is permitted to be used as a demonstrative I'll take

1  those.

2          MR. CASSADA:  Okay.

3          THE COURT:  But the one before this and this slide

4  that you currently have up, I can't see identification so I

5  don't know what to call them, this one is captioned Wave of

6  Bankruptcies I don't think have accurate pie chart segments.

7          So, again, I don't dispute what Dr. Peterson's

8  testimony is.  I'm happy to review his testimony.  But I don't

9  think this slide is an accurate depiction of that evidence.

10          MR. CASSADA:  Your Honor, the slide is to show the

11  general principle that when companies retreat to tort system

12  for bankruptcy that surviving defendants pick up their shares.

13  That's all it's supposed to -- it's not supposed to --

14          THE COURT:  I can visualize that without the pie

15  chart.

16          MR. CASSADA:  Okay.  Well I'm going to keep putting

17  them up just in case it makes it easier for you to follow my

18  argument.

19          THE COURT:  All right.

20          MR. CASSADA:  Hopefully Mr. Lockwood won't cause --

21          MR. LOCKWOOD:  Can I have a standing objection, Your

22  Honor, so that I don't have to keep interjecting the lack of

23  foundation for the share?

24          THE COURT:  Well I'm not going to use any of these

25  charts so the objection is sustained so far.  If I see one that

1 I think is accurate or anyone else has no objection to it, then

2 please state that on the record so I understand that the

3 objection is not continuing.  Go ahead, Mr. Cassada.

4        MR. CASSADA:  Thank you, Your Honor.  Your Honor, in

5 recent years trusts have emerged from the various bankruptcy

6 cases.  They were part of the wave in 2000 and 2001 and indeed

7 it appears that Grace itself may have merged in the next couple

8 of years.

9        But when these new trusts arise it should represent

10 -- if the state law rights of defendants are respected then the

11 defendants should get substantial relief from these new trusts.

12        In the tort system if Garlock is able to identify

13 Grace exposure in a particular case then Garlock should be able

14 to reduce any amount of Grace's share that a plaintiff may seek

15 to recover against Garlock.  So if --

16        MR. LOCKWOOD:  Objection again, Your Honor.  No

17 foundation for this testimony by Mr. Cassada.  None of the

18 sources --

19        MR. CASSADA:  This is totally consistent --

20        MR. LOCKWOOD:  -- none of the sources that are cited

21 in this chart said what he just said.

22        MR. CASSADA:  This is legal argument, Your Honor, and

23 it's totally consistent with what Dr. Peterson and the plan

24 proponents presented as the basis for the claim.

25        MR. LOCKWOOD:  Your Honor, it's not legal argument

1  for him to testify.

2          THE COURT:  Gentlemen, you need to wait until one

3  another finish.  I can't even hear let alone can the record

4  take this duplicate statement.  So, Mr. Cassada, I'm sorry,

5  what was your response?

6          MR. CASSADA:  This is legal argument, Your Honor, and

7  it's also consistent with the evidence that the simple

8  proposition is that when an insolvent defendant can pay a

9  portion of its share of liability then Garlock shouldn't have

10 to pay that portion.

11         MR. LOCKWOOD:  That may be a statement of law

12 expressed as sort of an aspirational.

13         THE COURT:  I can't hear you, Mr. Lockwood.

14         MR. LOCKWOOD:  But the --

15         THE COURT:  I can't hear you, Mr. Lockwood.

16         MR. LOCKWOOD:  I'm sorry.  That may be a statement of

17 law aspirationally but what he's showing you and what he said

18 is quote, if codefendant rights are respected then when trusts

19 fund part of bankrupt share settlement values should decrease.

20 That is a statement either of fact or of expert testimony, it

21 is not a statement of law.

22         And there is no foundation in this record from an

23 expert or from anybody representing Garlock that supports this

24 statement of fact.

25         THE COURT:  I don't recall any evidence in the record

**J&J COURT TRANSCRIBERS, INC.**

1 that would support that statement.  The legal argument that

2 Garlock or any other defendant ought to not have to pay the

3 share of another defendant who could pay their own share, I'm

4 willing to accept.

5         But I don't have any expert opinion in the record

6 that I'm aware of, if I'm incorrect you can file something that

7 tells me where it is, that goes so far as to say that

8 settlement values will decrease.

9         MR. CASSADA:  Yes, you don't have any.  In fact Dr.

10 Peterson testified just the opposite.  He said that when these

11 new trusts have emerged that the defendant, the surviving

12 defendant's shares inflated by the bankruptcies of these

13 defendants have not come down.  There's no evidence of that.

14         And in fact what now exists is a two market system

15 and that is the plaintiffs can pursue the surviving defendants

16 in the tort system collecting the values inflated by the

17 bankruptcies and then subsequently go to the trust and pick up

18 a whole new recovery.

19         THE COURT:  All right.  I don't recall any evidence

20 that said the values in the tort system were inflated as the

21 result of recoveries against trusts.  I just don't recall it.

22 If it's there can you please cite it to me?

23         MR. CASSADA:  Your Honor, it's not as a result of

24 recoveries in the trust, that is values in the tort system have

25 been inflated as a result of the exit from the tort system of

43

1   the defendants forcing these trust to have been established.

2          THE COURT:  You're talking values.  What you really

3   mean is the portion of liability attributed to the defendants

4   who are left in the tort system I think.  I don't understand

5   the use of the word value.  What value?

6          MR. CASSADA:  The value of a claim against a

7   particular defendant in the tort system.  Each defendant in the

8   tort system is responsible for its several share.

9          THE COURT:  Yes.

10          MR. CASSADA:  Now when Grace filed for bankruptcy the

11  plaintiffs looked to the surviving defendants to pick up not

12  only their several shares but also a portion or all of Grace's

13  several share and it's that principle that would have raised

14  the value of a Grace claim from 50,000 in 1999 to 225,000 in

15  2009.

16          That principle is really the basis of the plan

17  proponent's plan.  They relied on it countless times.  They

18  relied on it to establish what the scheduled values should be

19  in the plan, they relied on it to show why Grace's several

20  share outside of Libby would have gone up, why the Libby share

21  would have stayed the same.  They relied on it to justify the

22  extraordinary payment procedure.  That is a principle that

23  cannot be denied.

24          MR. BERNICK:  I have an objection at this point, Your

25  Honor, because I think counsel is referring to statements that

1   we made in testimony that we elicited in connection with Libby

2   and I think the fundamental problem is that counsel is assuming

3   without foundation in the record that there is a neat

4   definition that says the settlement value of a claim in the

5   tort system is only several share.

6          Obviously one of the purposes of joint and several

7   liability is that each and every defendant who is joint and

8   severally liable potentially becomes responsible for, to a

9   certain extent, for the claims that are made against others but

10  not collected.

11         To the extent that you have increasing settlement

12  values because people are exiting the tort system, it may or

13  may not be because the several share has increased.  It may or

14  may not be because there is now joint and several liability

15  which specifically contemplates that they may have a defendant

16  that's no longer paying.

17         All of these things are things that Mr. Cassada's

18  simply asserting.

19         What we talked about in connection with Libby is

20  that, yes, as companies exit the tort system settlement amounts

21  go up, but why they go up and whether they go up neatly as

22  counsel's suggesting because the several share is increased, I

23  don't believe he's got a foundation for in the record.

24         MR. CASSADA:  The foundation for that is just

25  pervaded in the evidence.  Dr. Peterson testified about it, Mr.

1  Hughes testified about it.

2          The reason the several share or the value of the

3  claim against Grace increased five fold was principally because

4  of codefendant bankruptcies.  That was it.  That was the number

5  one driver of settlement values and there's no way anyone can

6  look at this record and conclude otherwise.

7          THE COURT:  All right.  Well Dr. Peterson was

8  provided an estimate as I recall because Grace filed bankruptcy

9  nine years ago and so estimating the value in 2009 is an

10  estimate, it's not something that Grace actually incurs because

11  Grace hasn't been subject to settlements for nine years.

12          So and he did testify as to the period in which he

13  had used the numbers to value and make that estimate.  So his

14  testimony is that a driver of increase in settlement values is

15  the fact that some defendants can't pay and sometimes bankrupt

16  defendants don't pay.  I don't think there's a dispute about

17  that.

18          I think the issue is whether or not the foundation

19  for what you're arguing is pervasive in this record.  You're

20  just going to have to show me where it is, Mr. Cassada.

21          MR. LOCKWOOD:  Your Honor, the other thing that Mr.

22  Cassada keeps saying is that the testimony in the record is

23  that -- he's trying to say that the absence of other defendants

24  from the tort system is essentially the only significant reason

25  why tort system values went up in the nine year period that

1 Grace was in bankruptcy.

2         And Dr. Peterson testified that there was, as you

3 noted earlier to Mr. Cassada, that there was inflation across

4 the board on all claims with or without bankrupt defendants in

5 the value of claims such as mesothelioma claims.

6         And what Mr. Cassada is attempting to do is to tell

7 us, tell you, that the record says essentially that that

8 inflation was an insignificant factor in the increase of the

9 value of a Grace claim for 50,000 to 225,000 in Dr. Peterson's

10 testimony and that's simply unsupported by the record and

11 mischaracterizes the testimony.

12         MR. CASSADA:  Your Honor, a lot of these objections

13 or statements strike me as something that comes in response to

14 an argument once it's made particularly --

15         THE COURT:  Well it --

16         MR. CASSADA:  -- particularly that one.

17         THE COURT:  -- it may be but I need to know where the

18 foundation is in the record.  I've asked repeatedly that I get

19 a statement of the witness that supports the legal argument.

20 And I need to --

21         MR. CASSADA:  Okay.  Your Honor --

22         THE COURT:  -- to know where that's going to arise.

23         MR. CASSADA:  -- if you will read our brief these

24 issues are thoroughly addressed --

25         THE COURT:  Well --

1          MR. CASSADA:  -- in the brief with meticulous cites
2  to the record.
3          THE COURT:  -- there are cites to the record, whether
4  they support all of this argument I'm not sure.  Some of it it
5  clearly does support.
6          MR. CASSADA:  Okay.  Well --
7          THE COURT:  Anyway go ahead.
8          MR. CASSADA:  -- well, you know, we can just argue
9  about that and you'll do what you do with it.  I don't mean
10  argue with you, I mean argue with the plan proponents.
11          Your Honor, the failure of the defendants to get any
12  relief from trust can be explained by the TDP that the plan
13  proponents propose to foist on Garlock and other codefendants
14  in this case and you'll see those TDP do not respect the
15  defendant's state law rights, in fact just the opposite.
16  They're designed to undercut those rights.
17          First, Your Honor, the codefendants may not initiate
18  a claim against the trust until after they pay Grace's share of
19  a judgment.  This is under the TDP under Section 5.6.  Recall
20  that a very important right that defendant's have is to
21  initiate a claim when they are sued and that draws all the
22  evidence and the adjudication of the claim to be done
23  simultaneously with the plaintiff's claim against Garlock.
24          THE COURT:  But that's not going to happen as to the
25  debtor no matter what.  I mean assuming the debtor is able to

1 liquidate in a 7 or confirm a plan in an 11, no matter what,

2 when the debtor receives a discharge or goes out of business,

3 you're not going to join that debtor in the tort system.

4          MR. CASSADA:  And we're not --

5          THE COURT:  That doesn't prohibit you from presenting

6 evidence.  You just can't sue the debtor.

7          MR. CASSADA:  We're not proposing that we should be

8 able to sue the debtor, Your Honor.  We are proposing that on

9 the day that plaintiff sues us in the tort system we ought to

10 be able to file a claim against the trust and then it would be

11 up to the plaintiff to come forward and say whether the trust

12 is responsible for any of the plaintiff's injuries.  That's the

13 way it works in the tort system.

14          This would basically trigger the defendant's right to

15 have that evidence drawn out and to have that liability

16 adjudicated side by side with the defendants.

17          THE COURT:  I think I've lost the concept.  In the

18 state court system the trust isn't going to be a named

19 defendant with respect to asbestos liability.  It's going to

20 pay claims on behalf of the debtor due to the debtor's

21 discharge and the function of Section 524.

22          So until the trust incurs some liability or until --

23 I'm sorry, I said that backwards -- until the claimant incurs a

24 liability that it can then present to the trust and the trust

25 can then look for payment, I'm missing why it's significant to

1 Garlock to file a claim before you know what your claim is.

2          MR. CASSADA:  Because that's the way it's done in the

3 tort system.  That's the way Garlock --

4          THE COURT:  But this isn't the tort system.

5          MR. CASSADA:  That's right but this -- but the --

6          THE COURT:  The whole purpose of 524(g) is to avoid

7 the tort system.  Why would we want to go back to the tort

8 system?

9          MR. CASSADA:  We're not going back to the tort

10 system.  Our argument is that Garlock is entitled to have its

11 state law rights respected under the trust system and that

12 would give Garlock the right to initiate a claim in the trust

13 that requires the plaintiff to come forward and to specify

14 whether the plaintiff has a claim against the trust or not.

15          There's nothing burdensome about that.  It's simply a

16 matter of timing.  It respects Garlock's timing rights in state

17 court.  Because without that, Your Honor, the other TDP

18 provisions work to totally undercut Garlock's ability to have

19 that issue adjudicated and to get any discovery on whether

20 Grace is responsible for a particular plaintiff's claim.

21          THE COURT:  I guess I'm still missing the point.  To

22 the extent that you think that there is liability that can be

23 pushed to a different defendant --

24          MR. CASSADA:  Right.

25          THE COURT:  -- whether or not in the tort system and

1 that the plaintiff hasn't joined that entity, you've got

2 defenses that you can raise in the tort system.  So if you

3 think you've got a liability over against the plaintiff because

4 they haven't filed claims against everybody that they think is

5 liable, why do you need to file a claim specifically against

6 this or any other trust at that time?  You can still present

7 your evidence.

8          MR. CASSADA:  But the evidence is within the control

9 of the plaintiff.  The plaintiff knows whether he suffered or

10 she suffered exposure to Grace products that caused the injury.

11          THE COURT:  So you do discovery.  You're going to

12 have to do discovery anyway in order to have some view that

13 when you're paying a share of a liability on behalf of Grace

14 that Grace actually had a liability.

15          MR. CASSADA:  Okay.  So I do discovery and the

16 plaintiff says I don't know or no, okay?  Does that --

17          THE COURT:  All right.

18          MR. CASSADA:  Okay.  That does not --

19          THE COURT:  Plaintiff says no, I don't have a claim

20 against Grace.

21          MR. CASSADA:  Right.

22          THE COURT:  And then turns around and sues the trust

23 and the trust is going to pay that claim?

24          MR. CASSADA:  Precisely.  Precisely.

25          THE COURT:  Why would the trust pay a claim when the

1  plaintiff has first said that there is no claim against the

2  trust?

3        MR. CASSADA:  Because the trust never knows that the

4  plaintiff said that.  The claim filed against the trust, it's

5  filed under a veil of privacy, secrecy, because somehow

6  plaintiffs against the trust have privacy rights that don't

7  exist in state court.

8        So after they resolve their claim in the state court

9  system they can go file against the trust and the defendants

10 don't know it.  The public feature of filing in civil court is

11 not present here and it's that public feature that keeps the

12 system honest.

13       So they file against --

14       THE COURT:  The trust can ask the plaintiff where

15 it's recovered and for what shares in the past.  In fact that's

16 part of the typical process by which the trust claim forms are

17 submitted to identify --

18       MR. CASSADA:  No, it's not, Your Honor.  That's the

19 problem.  The trust doesn't ask that question.  The trust --

20       MR. LOCKWOOD:  Objection, Your Honor.  He is now

21 testifying.  There is no evidence in this record that says what

22 the trust does or doesn't do in the way of asking questions

23 other than two individual cases which he'll get to later and

24 you'll see won't support it.

25       But the general statement that he just made that

1 trusts don't do x, y or z is unsupported by the record.

2          THE COURT:  In the PDQ's that were part of the

3 discovery in this process at least as to pre-petition claims --

4          MR. CASSADA:  I'm sorry.  The what?

5          THE COURT:  The PDQ's that were issued in this case

6 as part of the discovery initially for the pre-petition claim

7 holders, as I recall, required the plaintiffs to identify where

8 their exposure was to Grace product.

9          So that's not even information that's part of the

10 trust process, that's already available --

11          MR. CASSADA:  Sure.  Okay.

12          THE COURT:  -- as part of the record here.

13          MR. CASSADA:  Yeah, let's look at the TDP on this

14 particular point.

15          MR. LOCKWOOD:  Your Honor, I just --

16          MR. CASSADA:  And I'm looking at Section 5.7.

17 Please, Mr. Lockwood, you'll get a chance later.

18          MR. LOCKWOOD:  But, Your Honor --

19          MR. CASSADA:  You're in mass conspiracy with Mr.

20 Bernick.

21          MR. LOCKWOOD:  That's plausible.

22                     (Laughter)

23          MR. BERNICK:  Your Honor, I know that counsel's

24 anxious to get on and of course we want to encourage that.  But

25 even under their allocation for all the time they were supposed

1  to take they were going to -- the indirect claimants were to

2  get a total of three hours and we're now well into the -- we're

3  over two hours when we consider yesterday.  Now I know that

4  Your Honor --

5          THE COURT:  Mr. Bernick, I need to understand this

6  argument and so far I don't.  So I'm going to allow him to

7  proceed because I'm lost.

8          MR. BERNICK:  Yeah.

9          THE COURT:  So that's the purpose of oral argument.

10  I'm controlling the schedule.  I'm sorry, but I need to hear

11  this.  So go ahead, Mr. Cassada.

12          MR. CASSADA:  Okay.  So in my case where you asked we

13  asked the plaintiff whether there was Grace exposure the

14  plaintiff said no or the plaintiff said I don't know.  I don't

15  know that yet.  And then your point was that the trust gets

16  that information.

17          THE COURT:  The trust can get it.

18          MR. CASSADA:  Okay.  Well let's look at Page 43 of

19  the TDP.  I'll read it to you.  The last paragraph of Section

20  7.  It says evidence submitted to establish proof of Grace

21  exposure is for the sole benefit of the PI trust, not third

22  parties or defendants in the tort system.

23          The PI trust has no need for and therefore claimants

24  are not required to furnish the PI trust with evidence of

25  exposure to specific asbestos or asbestos containing products

1 other than those for which Grace has legal responsibility

2 except to the extent such evidence is required elsewhere in the

3 TDP.

4       Similarly failure to identify Grace products in the

5 claimant's underlying tort action or to other bankruptcy trusts

6 does not preclude the claimant from recovering from the PI

7 trust provided the claimant otherwise satisfies the medical and

8 exposure requirements of this TDP.

9       The trustees they don't get that information.  They

10 don't have time to look at the information.

11       THE COURT:  They have 50 years probably, maybe more.

12 That's how long this trust will probably operate.

13       MR. CASSADA:  Well I don't understand that.  I mean

14 are you suggesting that the trustees will come back and look at

15 each specific claim and see if the position --

16       THE COURT:  I don't know whether the trustee will or

17 not.  What I'm saying is that to the extent that a lawsuit's

18 been filed in the tort system the trustees have the capability

19 of asking the plaintiff whether they filed a tort system, who

20 they sued, and what they recovered.

21       They have that capability in discovery just like in a

22 lawsuit your client would have that same discovery capability

23 in the civil suit.  That's all.  The evidence is out there.

24 What people choose to do with it, I don't know what they're

25 going to do with it.

1          MR. CASSADA:  Well they're not I mean they don't as a

2    matter of course they get a claim form and they review the

3    claim form and they make a settlement offer based on that and

4    they have no need for and they don't ask what other exposures

5    the plaintiff had or what evidence or position that the

6    plaintiff took --

7          MR. LOCKWOOD:  Objection, Your Honor.  Once again

8    he's saying what they do and what they don't do referring to

9    the trusts that at least in this case aren't in existence and

10   that in other case there's no evidence about what the trusts do

11   and don't do and he's asserting as a fact to you, he's trying

12   to testify again, about what trusts do and don't do and there's

13   no support in this record for that.

14         MR. CASSADA:  Well that's plainly wrong.  I'm arguing

15   about what the evidence shows, Your Honor, and there was a

16   description about how the TDP were supposed to work.  There's

17   the expedited procedure and there's an individualized review

18   procedure.

19         Garlock also offered into evidence claim forms that

20   were filed by claimants who had sued Garlock and it's clear in

21   those cases that the NGC settlement trust, the Owens Corning

22   trust, and all the other trusts that got these claim forms,

23   they did not check into whether the claimants had brought a

24   suit in the tort system.

25         And in fact after the plaintiffs had, one particular

1 plaintiff had obtained a judgment against Garlock and totally

2 failed to identify trust exposure, that plaintiff within weeks

3 filed a trust claim and got a payment there and the trustees

4 are saying, oh, we're not going to pay you Garlock because we

5 didn't know about this judgment and what you were required to

6 pay.

7 Your Honor, each one of these provisions of the TDP

8 enumerated here, they serve no legitimate purpose.  There was

9 no evidence offered by the plan proponents regarding any

10 purpose served by these provisions and it's clear that these

11 provisions facilitate the ability of a plaintiff to go in the

12 tort system and hide the trust share and then subsequently file

13 the claim, the claim against the trust and recover against the

14 trust.

15 It would be very easy to fix these provisions.  It

16 wouldn't undercut any claimant right nor would it undercut any

17 legitimate purpose of the trust.

18 THE COURT:  I don't have all the sections.  Could I

19 have a copy of that slide please?  The one you just took down.

20 Thank you.

21 MR. CASSADA:  The fundamental problem with a trust,

22 Your Honor, is not only the ability to defer, but the notion

23 that the trust is based on that the claimants who file claims

24 against it are entitled to some privacy right and that those

25 claims shouldn't be available to the public like claims would

J&J COURT TRANSCRIBERS, INC.

1  be available if they were to proceed in the tort system and in

2  fact shouldn't be available to defendants in the tort system.

3       If that were the case then the trustees wouldn't have

4  to worry about needing to protect the trust corpus from

5  claimants who took the position in the tort system that they

6  didn't suffer injuries as a result of Grace.  It would be

7  self- policing.  That's the benefit of a public filing in civil

8  courts.

9       Yeah, essentially, Your Honor, the TDP sets up a two

10 market system.  One is that the trust, the plaintiffs first can

11 pursue their claim in the tort system and while they're

12 pursuing their claim they can keep the evidence of Grace

13 exposure in their pocket, they can never disclose it.

14      They can recover from Garlock and other tort system

15 defendants on that basis.  They present a claim against them.

16 You ask them were you exposed to Grace.  They say no or they

17 say we have no evidence of that.  You run down the list with

18 respect to all the trusts and they say no and they say we have

19 no evidence to all of that.

20      And then once they resolve their claims on the basis

21 that they weren't injured by trust exposures, then they go to

22 the trust and they get a whole new recovery.  And that's

23 fundamentally wrong and it violates the codefendant's rights

24 under state law.

25      And in fact, Your Honor, we've shown evidence to this

1  Court that this is precisely what happens.  When Garlock

2  suffered several judgments a few years ago it got a rare

3  opportunity to look into the trust procedures.

4       So Garlock suffered judgments to two plaintiffs, one

5  Puller, Reggie Puller, and the other Gary Snyder.  Paid those

6  judgments in full and then one had to wonder, does this really

7  go on?  Do claimants really hold their share during their tort

8  claim and then file it against the trust?

9       So you'll see in the record that Garlock sent letters

10 blanketing the trust and saying that if any of these claimants

11 filed a claim against the trust it belongs to us.  And lo and

12 behold we discovered many claims.

13      And in particular with respect to Mr. Puller we

14 discovered that he had filed claims against the NGC settlement

15 trust, the USG trust, and the Owens Corning Fiber Board trust.

16 And the record is clear, we've got a declaration of the

17 attorney who supervised that case, that there was thorough

18 discovery in this case before trial and that discovery was

19 designed to have the plaintiff identify all of the products to

20 which the plaintiff was exposed and plaintiff --

21      MR. LOCKWOOD:  Objection, Your Honor, misstates the

22 declaration.  There's no such statement about thorough

23 discovery.  All the declaration says is that there was nothing

24 discovered.  It doesn't say what discovery efforts were made

25 much less that they were thorough.  It's the Turlik declaration

1 that he's referring to.

2         MR. CASSADA:  Your Honor, we cite the Turlik

3 declaration and Your Honor can review that and see what it

4 says.

5         But in any event the subsequent filings by Puller

6 against the trust and including the NGC trust were inconsistent

7 with the discovery that was provided during the case.

8         For the NGC trust it meant that Mr. Puller collected

9 the payment from the trust before Garlock could get it.  In

10 fact for several trusts they haven't paid anyone yet and

11 Garlock collected the payment from several other trusts.

12         But Garlock was injured by the provisions.  I mean

13 first of all if Mr. Fuller had provided evidence during the

14 trial that he was injured by these particular defendants who

15 had particularly dangerous products, then Garlock might not

16 have been found liable at all.  There would be a better chance

17 that Garlock's products would not have been found to be a

18 substantial contributing cost.

19         MR. LOCKWOOD:  Objection.

20         MR. CASSADA:  But even if Garlock --

21         MR. LOCKWOOD:  Lack of foundation in the record.

22         MR. CASSADA:  I'm describing to Your Honor how --

23         THE COURT:  I accept this as argument.

24         MR. CASSADA:  -- how it could have been.

25         THE COURT:  Go ahead.

1           MR. CASSADA:  Thank you, Your Honor.  But in any

2  event if Garlock had been found liable with these other

3  claimants who Mr. Fuller said were also liable for his claim,

4  then Garlock would have gotten credit for the payments and

5  Garlock wouldn't have had to front the money and then later

6  file the claim against the trust and then file lawsuits against

7  the trust to compel these payments.

8           THE COURT:  Well what about criminal actions from

9  lying under oath?  I mean maybe a few criminal actions would

10 set this straight if that's the case, Mr. Cassada.

11          MR. CASSADA:  I don't know that we have the power to

12 initiate a criminal action.

13          THE COURT:  Well you've got the right to go to the

14 District Attorney under your state law rights and the U.S.

15 Attorney to provide evidence of a crime and certainly filing

16 false affidavits as I understand it is evidence of a crime.

17          MR. CASSADA:  Yeah.  Well, yeah, I agree with all of

18 that, Your Honor, but I'm also here to tell you that there can

19 be some changes made to these TDPs that undercut no legitimate

20 trust purpose, that undercut no legitimate right of the

21 plaintiffs that could fix this problem.

22          First, Your Honor, the TDPs should -- we should

23 delete the provision that allows the plaintiffs to defer their

24 claims indefinitely.  That provision serves no purpose at all.

25 There's no testimony about why that provision would even be

1 necessary.

2          Secondly we should narrowly tailor the

3 confidentiality provision to protect only truly sensitive

4 information such as medical records or social security numbers.

5          In the plan proponent's briefs when we talked about

6 confidentiality they said, well, we've got to protect medical

7 records.  Well that's fine.  You don't have to keep the fact

8 that a claimant has filed a claim and the disease, the injury

9 that they are suffering and the evidence of their exposure to

10 Grace, that doesn't have to be confidential.  That's not

11 confidential information, in fact that's information if they

12 were in the tort system.  That's information that they provide

13 and is made public every day.

14          We should provide a limitations period, Your Honor,

15 that mirrors the tort system.  We should allow codefendants to

16 initiate a binding resolution of the trust claim.  Again, Your

17 Honor, this is that the codefendants file a claim against the

18 trust and then it would be up to the plaintiff to come forward

19 with a specified period of time and to confirm whether or not

20 they have a claim against the trust, whether or not they have

21 evidence of Grace exposure.

22          Plaintiff should be bound to positions they take in

23 the tort system.  We shouldn't have this provision in here that

24 says that the evidence of Grace exposure doesn't count for

25 anyone except for the trust in determining Grace's liability.

1  That's not a right that exists under state law and it's

2  surprising that it's even in here.

3         And it shows, Your Honor, why Garlock and other

4  defendants needed a legal rep to protect their rights under the

5  TDP.

6         Your Honor, if these provisions of the TDP were fixed

7  so that the Grace exposure was put on the table during the time

8  period when the claimant was pursuing their rights in state

9  court, then we can fix this part of the plan and what makes it

10 unfair and inequitable.

11        And in fact this would allow plaintiff's claims to be

12 adjudicated and the evidence to come out on the table at the

13 same time that the evidence is coming out on the table in the

14 tort system and tort system judgments and settlements will

15 reflect the fact that Grace has liability and the Grace trust

16 will be in a position to pay a claim.

17        Your Honor, the only way that these TDPs were

18 possible and the only way that defendants could have gotten the

19 raw deal that they got in this case is because there was no

20 representative to protect them when the deal was cut.

21        And that's the second way in which the channeling

22 injunction here violates 524(g)(2)(b) and that is a legal

23 representative was required to represent the class of

24 contribution holders of the kind that Garlock occupies and that

25 is codefendant bankruptcies.

1           Without the legal representative, Your Honor, this is

2   the deal we got and 524(g) says that the injunction will not be

3   valid and enforceable against any person who might assert

4   demands of such a kind unless a legal representative was

5   appointed to represent persons who might assert such demands.

6           Could not be more clear, Your Honor.  There's no

7   provision in there that says that this is a constitutional

8   requirement, that this only applies to unknown claimants.  This

9   is a requirement under the statute that applies to all persons

10  who might assert a demand of any kind.

11          In this case there was no legal representative

12  appointed, there was no protection for codefendant's rights and

13  that's why we're here today, Your Honor, and we respectfully

14  submit that the Court should not attempt to enter an injunction

15  without appointing a legal representative to look at the plan

16  and to re-negotiate these trust distribution provisions.

17          THE COURT:  Mr. Brown.

18          MR. BROWN:  Your Honor, I had a conversation with Mr.

19  Freedman yesterday about our classification and discriminatory

20  treatment argument and we have an understanding that if we

21  don't have a closing argument on that my understanding is the

22  plan proponents will not either and we're prepared to rest on

23  the papers.

24          MR. FREEDMAN:  Your Honor, that's correct as the

25  situation appeared prior to the commencement of this package of

1  arguments.  A lot of stuff has been said that will address some

2  of the issues that Mr. Brown raised and therefore when we

3  discuss the classification issues we will be touching on some

4  issues related to Mr. Brown's client of necessity because it

5  has to be brought together in order to address things that

6  other people said so.

7         THE COURT:  Do you want to wait until this argument

8  is done, Mr. Brown?

9         MR. BROWN:  Yeah, I think that would make sense, Your

10  Honor.  What I would like to do is refer you to where we make

11  the arguments in the papers and then if I have to respond to

12  anything the plan proponents say I will.

13         THE COURT:  All right.  One second.  Okay, Mr. Brown,

14  go ahead.

15         MR. BROWN:  Your Honor, this is the Seaton and

16  OneBeacon classification and treatment arguments and they

17  appear at Pages 13 to 22 of docket entry 22433 that is

18  incorporated, that argument is incorporated by reference at

19  Pages 32 to 33 of docket entry 23637.

20         THE COURT:  I'm sorry.  Your voice faded out.  At

21  docket entry what?

22         MR. BROWN:  It is incorporated by reference in our

23  brief that was filed on November 2nd, 2009 at Pages 32 to 33

24  and that's docket index 23637 and then it was again briefly

25  dealt with at Pages 19 and 20 of our reply brief, docket index

1 23825.

2         THE COURT:  I'm sorry.  Your voice fades out with

3 docket numbers, 23?

4         MR. BROWN:  23825.

5         THE COURT:  Okay.  Thank you.

6         MR. BROWN:  Thank you.

7         MR. WISLER:  Good morning, Your Honor.  Jeffrey

8 Wisler on behalf of Maryland Casualty Company.

9         Your Honor, we also have a classification objection

10 but subject to whatever the plan proponents are going to

11 present themselves, we're at this point willing to rest on our

12 briefs for that argument.

13         THE COURT:  All right.

14         MR. SCHIAVONI:  Your Honor, Tanc Schiavoni.  We join

15 the very limited point where we have a subrogation right to

16 BNSF.  Ms. Casey argued that and I join that argument that she

17 made.  I don't need to say anything else about that.

18         I do need seven minutes on just Arrowwood's issues.

19 They don't deal with classification.  I can do that any time.

20 I fell off the schedule, the agenda somehow, and I'm happy to

21 do it after we do this.  I just want to make sure I don't lose

22 my seven minute spot.

23         THE COURT:  All right.

24         MR. SCHIAVONI:  All right.  So after the

25 classification perhaps I can --

1            UNIDENTIFIED SPEAKER:  Go now.

2            UNIDENTIFIED SPEAKER:  Would now be fine?

3            MR. SCHIAVONI:  Okay.

4            UNIDENTIFIED SPEAKER:  We always love to hear you so

5    far.

6                        (Laughter)

7            MR. SCHIAVONI:  No, I only have nice things to say

8    today.  If you remember, Your Honor, we represent Arrowwood

9    Indemnity which is formerly known as Royal Indemnity Company.

10   That was the original insurer and the holding company/parent

11   company of those is Arrowwood Capital.

12           We appeared before Your Honor on a settlement

13   approval motion.  There was a fairly extensive hearing if you

14   recall in connection with that.

15           There was a large amount of evidence submitted in

16   connection with the settlement approval hearing.  There was no

17   counter evidence offered, there were no affidavits offered in

18   opposition, there was no testimony offered in opposition and

19   Your Honor approved the settlement.

20           And in connection with approving the settlement made

21   a series of findings in connection with approving the

22   settlement.

23           The one open issue that I had, if you recall, was

24   that Your Honor said I'm approving the settlement but with

25   respect to the aspect of the settlement where you're promised

1  to get the benefit of the channeling injunction, I'm holding

2  that open to confirmation.

3          And on that limited issue is what I come to the

4  podium on for my remaining six minutes and what I really want

5  to emphasize, Your Honor, in that time is that we presented in

6  connection with that settlement approval hearing I believe a

7  lot of evidence and we got -- and findings that support the

8  issuance of the channeling injunction here.

9          We also in connection with the confirmation hearing

10 represented some of that evidence and even more evidence on top

11 of it.

12         There is a very large body of testimony and exhibits

13 that support the relief that Arrowwood is seeking.  I know Your

14 Honor throughout the confirmation hearing it is your practice

15 to take very detailed notes and because we cooperated in

16 submitting our testimony on consent it was not featured so to

17 speak in the hearing itself.

18         There were a total of almost, let's see, seven

19 declarations that were submitted.  They were substantive

20 declarations, they weren't just putting in exhibits.

21         If you recall we had a prior settlement, this was the

22 1995 settlement.  We submitted a declaration from a Mr. Ken

23 Cooper and Carl Pernicone.  Those were the Arrowwood

24 representatives that negotiated that settlement in 1995.

25         We also submitted the extensive testimony from Jeff

1  Posner and Jay Hughes that was taken during in the form of

2  consented to deposition designations.

3         So we had the testimony from the people on both sides

4  of the settlement.  That testimony went in without objection in

5  its entirety and what that went in to stand for the proposition

6  for was that the settlement was negotiated at arm's length, in

7  good faith, the consideration was substantial, and it also --

8  there was also testimony that went in to establish that

9  Arrowwood was in runoff at that time and is in runoff now.

10        We also submitted in connection with the or during

11 the confirmation hearing it was accepted into evidence a

12 declaration from myself, I negotiated the settlement in

13 connection with the confirmation proceedings, a declaration

14 from Ken Cooper an Arrowwood official who was involved in those

15 negotiations, and a declaration from Mr. Finke who was a senior

16 official with the debtor.

17        In addition to that there was testimony from Mr.

18 Austern the FCR in support of the settlement and there was the

19 general support given by both the ACC, the asbestos creditors

20 committee, and the FCR in support of the settlement.

21        What we're seeking is simple.  We want simply a

22 finding, Your Honor, and I think in connection with the

23 totality of the evidence that we put in which shows that unlike

24 Maryland Casualty, and I'm all in favor of Maryland Casualty

25 getting the benefit of the injunction, but unlike them we came

1  forward and not only provided $100 million pre-petition, but we

2  did the incredible and we came back and we provided additional

3  cash consideration in connection with an overall package

4  settlement in the bankruptcy.

5         Not only was there additional cash that went in, but

6  there were additional exchanges of releases that resolved

7  claims between us and the estate and helped resolve issues

8  concerning the indemnity that we had with the estate.

9         In addition to that we also put in this evidence

10 about the financial status of Arrowwood being in runoff and if

11 you recall, Your Honor, that, you know, that means that

12 Arrowwood is not writing policies anymore.  It's not in

13 liquidation, it's being monitored by the Delaware Insurance

14 Commissioner on a periodic basis and in essence, you know, our

15 charge is to try to pay out claims in a fair way so that

16 there's money left for everyone without us having to go into a

17 formal liquidation proceeding.

18        There is not money for us to pay folks twice.  We

19 paid the $100 million pre-petition.  We think we went above and

20 beyond the call of duty in coming in and reaching a separate

21 deal later.

22        We'd ask Your Honor because we face these continuing

23 threats from our friends in Montana here for finding in

24 connection with the plan that in light of the benefits that

25 Arrowwood has provided or will provide to the trust under our

1  settlement agreement, that it's fair and equitable to the

2  current and future asbestos claimants for Royal indemnity and

3  for Arrowwood indemnity.

4         And for its parent company, I want to come back to

5  the parent company for a second, to receive the benefits and

6  protections of the injunction.

7         The parent company, you know, we got some flack from

8  Libby about, oh, you can't have a parent company in here.

9  We're not seeking protections for Arrowwood capital in any

10 other capacity other than that, you know, God forbid someone in

11 Montana comes up with some crafty pleading that the holding

12 company is somehow an alter ego or in some other capacity

13 acting as an insurer.

14        If it is we think it's entitled to the protection if

15 there's a pierce in the corporate veil or alter ego claim, we

16 think it's entitled to the protections of the injunction just

17 as Arrowwood indemnity or Royal indemnity would be subject to

18 the protections of the injunction.

19        We submitted a post-trial brief and a reply brief.  I

20 went out of my way to not follow my normal practice by keeping

21 the brief as short as possible and in particular, Your Honor,

22 we tried to give you something that would be useful in the

23 reply brief which doesn't include really any argument at all.

24        What we did was we set out sort of six findings that

25 we think sort of encapsulate what the relief that Arrowwood

1  would like.  The most important one is the one I just in

2  essence read to you.  But you can look there to see what we're

3  looking for.

4       I don't know whether you're going to make findings or

5  you're just going to issue a decision.  Whether you look at

6  that and encapsulate it in a paragraph or whether you pick up

7  some of those findings, either way that is our sort of wish

8  list of things we'd like you to look at.

9       And what we did is we had what those findings were

10 and then we had right below it we have quotes of what Your

11 Honor said on the record during our approval hearing with

12 regard to our case.

13      And we're not holding you to anything that you said,

14 Your Honor.  I thought it would be helpful for you to see that

15 because it would sort of refresh your memory on what your

16 thoughts were at the time.

17      But those statements are offered in connection with

18 those findings as support for those and then immediately below

19 that because we didn't put everyone through having to hear our

20 witnesses, as much as I wanted to testify and Mr. Pernicone

21 did, but we put excepts in parentheticals of what folks said

22 right below that.

23      So it's all sort of encapsulated.  Here are some of

24 our six findings and here are our -- here's the direct support

25 for it all in I think ten pages which was sort of for me an

1 amazing thing to get it in that small package.

2        Very quickly two points of just rebuttal, you know,

3 what we heard back from the Libby claimants in connection with

4 our filing was sort of that, well, geez, they're not really

5 entitled to an injunction because we the Libby claimants

6 somehow have rights under those policies or somehow may have

7 claims directly against Arrowwood.

8        And I'm not going to belabor those points because I

9 think both of those points were thoroughly addressed and I

10 would submit Your Honor ruled on those in connection with the

11 original approval hearing.

12        Libby is not named as an insured, they are not

13 separately listed as additional insureds in any of our

14 policies.

15        In addition to that, Your Honor, the arguments about

16 them sort of having vested rights here, we brief in our papers,

17 Your Honor heard those arguments.  I think they're the only

18 papers, although you heard a little argument from Mr. Finch on

19 this and it's addressed in the committee's post-trial papers

20 and Grace's, our paper sort of is the one that encapsulates the

21 legal argument so to speak on this point and if there's one

22 place to look for it that is probably the helpful place to look

23 for it.  It's in four or five pages in our moving brief, not in

24 our reply brief.

25        That is sort of the vested rights issue, the issue of

1  whether they're named insureds or not.

2          With regard to this issue, you heard some stuff about

3  claims against Maryland Casualty.  There were complaints served

4  against Maryland Casualty and there may or may not be something

5  in the record on that.

6          But there is absolutely nothing either in connection

7  with the approval hearing or in connection with the

8  confirmation hearing, nothing period to suggest that there are

9  any possible claims directly against Royal, Arrowwood or its

10 holding company that, you know, we did inspections or anything

11 along these lines.

12         No complaints have ever been brought against us in

13 Montana and I would submit that the time for them to have put

14 in evidence if there was an objection about the over breadth of

15 the injunction that we were seeking, they should have -- Libby

16 should have come in and offered that evidence in connection

17 with the approval hearing or in connection with the

18 confirmation hearing or they should have objected to our

19 affidavits which contest the whole notion that there's any

20 possibility of any claims at all.

21         The fact is no one's ever asserted, suggested there

22 was such a claim.

23         And if you remember for us there may be a little bit

24 of extra significance for this because Royal, Arrowwood, its

25 coverage was issued very, very long ago.  I think Kennedy might

1  have been president when it was issued.  But it was so long ago

2  I can't remember events, you know, anything about that.

3        So it's like a lot of time has passed.  If someone

4  had any suggestion that we did anything that would give rise to

5  a direct action claim, one would have thought that those facts

6  should have come to the surface long before now.

7        Those things all go to the proposition that we think

8  the injunction is fair, it's equitable to the claimants, it

9  should be issued.  We'd ask Your Honor to give consideration to

10 making the findings or some of the findings that we suggest

11 specifically in connection with or we set out in our reply

12 papers, specifically so that we're not faced with a sort of

13 tail chasing litigation in Montana for the rest of our lives.

14 End this with some finality.  It's why after all folks are

15 interested in coming forward and reaching resolution.

16       The last point I would make here, Judge, is that I

17 had a partner who once told me, Tanc, maybe you shouldn't argue

18 anything.  Just tell the judge one case you want read and what

19 part of your brief you want read.

20       And maybe I should have done that first, you'll think

21 that when I'm done, but the one case, the one case I'd ask you

22 to read in connection with where we are is In Re Dow Corning.

23 It's cited in our papers but it's 198 B.R. 214.  This is a

24 bankruptcy decision out of the Eastern District of Michigan in

25 1996.

1         It is one of those cases that lawyers look for that

2    you never find.  It's dead on point on this issue of vested

3    rights.  It involves an insurer that or it involves a set of

4    claims where someone settled and then there was a claim of

5    vested rights afterwards and the Bankruptcy Court deals with

6    exactly the issues, exactly head on that are dealt with here

7    and finds that the claimants don't have claims in the policies.

8         Even better although it examines the issues under

9    Michigan law, the statute and the case law is identical to

10   Montana.  We point that in our briefs.

11        So that's the one, that's the one case I'd ask you to

12   look at if you have a moment.  And the one brief I would ask

13   you to look at is our reply brief which sets up those findings

14   of fact.

15        Otherwise, Your Honor, thank you very much for your

16   time.

17        THE COURT:  Okay.  Thank you.  Mr. Cohn.

18        MR. COHN:  Good morning, Your Honor.  Daniel Cohn on

19   behalf of the Libby claimants.  It was Eisenhower who was

20   president when these policies were first issued.  But that's

21   not why I've come to the podium here.

22        I'm not going to reargue the issues of vested rights

23   and so on and so forth, the broader issues concerning the Royal

24   settlement.

25        I simply wanted to direct you to our post-trial

1  briefs relating to specific issues arising under Section

2  524(g), namely that the scope of the injunction that's being

3  sought is too broad.

4            As you know Section 524(g) limits the scope of an

5  injunction or limits the protected parties to those who have

6  provided insurance and that would just be the actual insurance

7  company.

8            And then in addition there's the requirement under

9  the statute that anybody who's the beneficiary of an injunction

10  has to either be identified by name or be reasonably

11  identifiable by the terms of the injunction.

12            And here again there are, as we stated in our briefs,

13  there are parties for whom injunctive protection is being

14  requested who it would be impossible for us to identify from

15  the terms of the injunction.  Thank you.

16            THE COURT:  Ms. Casey.

17            MS. CASEY:  Good morning, Your Honor.  Linda Casey on

18  behalf of BNSF.  I have just a real brief statement regarding

19  Arrowwood's argument.

20            BNSF filed an objection to the plan as it was drafted

21  in February of 2009.  Its objections included objections to the

22  scope of the 524(g) injunction and the propriety of entering

23  the injunction on behalf of the entities who were getting the

24  protection.

25            In October at the initial confirmation hearing BNSF

1    and the plan proponents and the insurers entered into a

2    settlement that provided for modifications to the plan.  Those

3    plan modifications I believe were filed in October of 2009.

4          BNSF does not object to the plan as modified in

5    October of 2009 with relation to the 524(g) injunction.  BNSF

6    does reserve the right to object to a plan if there are any

7    further modifications that abrogate the rights that BNSF got in

8    that settlement.

9          MR. FREEDMAN:  Your Honor, could we have a five

10   minute break before we start responding?

11         THE COURT:  Yes.  Is anyone else intending to argue

12   before I start the responses?  Yes, we'll take a ten minute

13   recess.  Thank you.

14                     (Recess)

15         THE COURT:  Mr. Freedman.

16         MR. FREEDMAN:  Good morning, Your Honor.  Theodore

17   Freedman for the debtors.

18         Your Honor, I'm going to talk about a number of

19   fundamental issues that have been raised by the arguments that

20   we've just heard and then Mr. Lockwood and Mr. Frankel are also

21   going to discuss related points of that.

22         And I think that it's helpful to kind of step back

23   and think about why we're here and what are the core principles

24   that are affecting why we're here.

25         W.R. Grace is a Chapter 11 debtor.  As a Chapter 11

1  debtor it's entitled to a discharge.  It's entitled to the

2  injunction that flows from that discharge.

3          It has an asbestos problem and because it has an

4  asbestos problem that requires something more than a discharge

5  and Congress through 524(g) has provided a mechanism that was

6  specifically intended to allow for a global, universal

7  resolution of W.R. Grace's asbestos problem.

8          That's apparent from the statutory history, we've

9  briefed that.  But it's also particularly apparent from 524(g)

10 on its face because what 524(g) does is it provides at least

11 three specific and unique in terms of this specificity

12 statutory mandates that are addressed to provide this global

13 relief.

14         First off it allows the injunction to reach third

15 parties.  105 permits that under certain circumstances, we'll

16 hear more about that later.  But in 524(g) you have a specific

17 statutory design, a mandate to reach third parties.

18         Secondly it provides for a way to protect against

19 demands.  We entirely agree with the Court's interpretation of

20 what a demand is.  The important point for now is that not only

21 can you address claims under Section 524(g), you can address

22 demands.

23         And again that's because 524(g) is intended to

24 provide a global resolution of the debtor's asbestos

25 liabilities.

1        And finally, and very importantly, the injunction is

2   permanent.  Unlike a 105 injunction where there's some question

3   about the application of the equitable concept that equity

4   could take away what it gives, in a 524(g) injunction, after

5   the appeals are over it can never disappear -- again, providing

6   global, universal, permanent relief of the asbestos overhang.

7        In order for the plan proponents to get 524(g), we

8   obviously have to satisfy some very specific requirements in

9   the statute.  Most importantly, it has to address all of the

10  debtors' asbestos liabilities, and it must contemplate a scheme

11  whereby present claims and future demands that involve similar

12  claims are treated in substantially the same manner.  The Third

13  Circuit, in Combustion Engineering, really zeroed in on this.

14  And I think it's important to talk a little bit about what the

15  Third Circuit actually said in Combustion Engineering because

16  what it said is that there's that principle that futures and

17  currents be treated in substantially the same manner, and there

18  is a similar concept, or at least one that invokes the same

19  kind of equitable concerns in the Bankruptcy Code generally

20  that among current claimants there be consistent treatment.

21  And what the Third Circuit said in Combustion Engineering is

22  because the two trust structure that was part of the Combustion

23  Engineering plan raised some issues about whether or not there

24  would be consistent treatment among current claimants that were

25  in the pre-petition trust and current claimants that were in

1  the post-petition trust, and there was an issue about whether

2  there was adequate evidence as to whether future demands were

3  going to have the same treatment as the pre-petition trust,

4  that under those circumstances there needed to be more

5  evidence.  That's what really the Court held in <u>Combustion</u>

6  <u>Engineering</u>.  But the point is that these principles of

7  equality of the treatment are inherent in Section 524(g), and

8  as the Court specifically said, and very accurately said, what

9  that really means is that you have to have a 524(g) trust that

10 is evergreen, and that is set up in a way that will allow for

11 this fair and similar treatment among similar types of claims.

12        For purposes of today, then, that really raises two

13 issues.  What are the principles that drive the identification

14 claims that are going to be sent to the trust?  And secondly,

15 how will the trust provide compensation to the claimants that

16 are sent to the trust in order to meet those statutory

17 objectives?  Those are the two matters that we need to be

18 discussing today.  I'm going to talk about the first one, the

19 principles that relate to what is the population of claimants

20 that go to the trust.  Mr. Frankel and Mr. Lockwood will talk

21 about the second issue.

22        In terms of identifying how you classify claims in

23 the right way, how you identify the population of claims that

24 go to the trust, it's easy with respect to direct claims.  But

25 the problem obviously has to do with indirect claims.  And

1  actually, we're fortunate being here, because this Court, in

2  the Armstrong case, provided us with precisely the articulation

3  of the overriding principle that will guide how this is done

4  properly.  And that overriding principle, as the Court said in

5  Armstrong, has to do with asbestos liability of the debtor,

6  that the claims need to relate to the asbestos liability of the

7  debtor, and that claims that relate to the asbestos liability

8  of the debtor, in order to meet these statutory objectives,

9  must go to the trust.  The Court said, consequently it is

10 appropriate to classify asbestos personal injury claims

11 including indirect PI trust claims in a separate class from

12 unsecured claims because all asbestos personal injury claims in

13 Class 7 of the Armstrong trust, including indirect PI trust

14 claims, relate directly or indirectly to AWI's liability for

15 asbestos-related personal injury and wrongful death claims,

16 whether arising under the tort law, or as in the case with

17 direct asbestos personal injury claims, and may be the case

18 that indirect personal injury claims are under contract as may

19 be the case with certain direct asbestos personal injury claims

20 and certain indirect PI trust claims.  And then the Court went

21 on subsequently to say because indirect PI trust claims,

22 including those arising under contract, relate to direct

23 asbestos personal injury claims, they are appropriately

24 channeled to the asbestos PI trust, and have historically been

25 channeled to trusts established in connection with asbestos or

1 related Chapter 11 cases.  And the Court was right about the

2 fact that <u>Armstrong</u> wasn't the only case where that happened.

3 As we point out in our post-trial brief at Footnote 137, there

4 are numerous instances where indirect claims have been found by

5 the Courts to be properly channeled to the trust.

6        So, with that overriding principle in mind, what I'd

7 like to do is walk through the claims of some of the parties

8 that have gotten up to speak so far, and address whether or not

9 they are claims that relate to the debtors' asbestos liability

10 and therefore have to go to the trust.  And, of course, the

11 easy answer on that is that where you have a situation where,

12 through a contractual exposure or a contribution claim, the

13 debtors will find themselves having back door liability because

14 the claimant, the indirect claimant has to pay the claim, and

15 then will seek compensation from the debtor for some amount of

16 that payment, unless that claim goes to the trust, the debtor,

17 W.R. Grace, will not achieve a resolution of its asbestos

18 liabilities and the statutory purpose will not be served.

19        We have abundant testimony in the record that goes to

20 the fact that the claims that we've heard from so far all

21 involve those kinds of situations.  And if you think back to

22 Mr. Hughes's testimony on September 14th, and I've got the

23 pages of that testimony to refer the Court to, the basic

24 concept here -- the central fact here has to do with the Libby

25 mine in most circumstances, and the fact that all of these

1  claims are claims of third parties who had exposure to asbestos

2  related to the debtors' operations at the Libby mine, and

3  either through contract or through contribution are seeking to

4  recover from the debtors to the extent that they have to pay on

5  account of that exposure, those liabilities.

6          So, with respect to Maryland Casualty, on September

7  14th, and I'm not going to burden the Court with reading all of

8  his testimony, but Mr. Hughes was expressly asked are you

9  familiar with what happened at the Libby mine and Maryland

10 Casualty's involvement in that?  And the gist of Mr. Hughes's

11 testimony is that Maryland Casualty was there at the Libby

12 mine, was doing certain things in connection with its being

13 there at the Libby mine, and that as a consequence of what it

14 was doing there it is being sued, and that it is claiming that

15 the debtors have to reimburse it for its liability on account

16 of certain indemnification obligations that the debtors made to

17 Maryland Casualty because of certain settlement agreements that

18 the debtors entered into with Maryland Casualty.  Maryland

19 Casualty also has some contribution claims that flow from the

20 same facts.

21         With respect to BNSF, Mr. Hughes explained that BNSF

22 had a carting operation related to the asbestos that came out

23 of the Libby mine that actually originated at a loading dock

24 which was proximate to the Libby mine, and that BNSF is being

25 sued as a consequence of asbestos exposure through its

1  operations in connection with that carting operation, and it is

2  claiming that the debtors have liability to it to the extent

3  that it has to pay any of those claims related to the Libby

4  mine.  Again, if the debtors are liable to BNSF because BNSF

5  has liability to claimants, and the debtors actually end up

6  having to pay those liabilities a hundred cent dollars, then

7  the purposes of 524(g) would not be served.  Now, it's

8  important to note with respect to BNSF that BNSF did not file a

9  proof of claim in this case, so if BNSF has a problem with its

10  treatment that has to do with its being channeled to the trust

11  with respect to any claims that it may assert based on some

12  future liabilities that it pays.  Actually, I want to modify it

13  slightly.  It did not file a general unsecured proof of claim

14  in the case.  What it did file is a claim in connection with

15  the asbestos bar date, but it did not file a general unsecured

16  proof of claim.

17          We've heard already a lot of discussion about the

18  State of Montana, and Mr. Hughes's testimony discusses the same

19  points, that the State of Montana is being sued under some

20  theory generally explained as failure to warn, and that, as Mr.

21  Monaco explained to the Court, to the extent that the State of

22  Montana has liability, it's saying that the direct or proximate

23  cause of that liability was W.R. Grace, and it has contribution

24  claims against W.R. Grace because of that.

25          There are a number of settled insurers that are also

1  raising issues with respect to classification, and Maryland

2  Casualty being one of them, Mr. Brown's clients are also in

3  that category.  And a couple things about that are noteworthy.

4  Number one, to the extent that these settled insurers are

5  asserting claims against the debtor, they are all based on

6  indemnification rights that flow from settlement agreements

7  entered into pre-petition with respect to specific policies

8  that were issued to W.R. Grace.  Those policies are the

9  policies that are listed on Exhibit 5 to the plan, and it is

10  with respect to the coverage set forth in those policies that

11  all of these settled insurers, pre-petition settled insurers,

12  are being provided Section 524(g) protection.  The point being

13  that if Grace has indemnification exposure to these insurers,

14  then that exposure has to do with these insurers providing

15  insurance coverage and the settlement agreements that resolve

16  that insurance coverage, and it is in the interest of closure

17  to the estate that -- and in the interest of all the parties

18  that lawsuits against these settled insurers be foreclosed with

19  respect to the coverage that's identified on Exhibit 5.  So, by

20  way of example with respect to Mr. Brown's clients, there are

21  four policies that are identified, two with respect to

22  Uniguard, now known as Seaton, and two with respect to

23  Commercial Union, now known as One Beacon.  And the 524(g)

24  injunction will preclude any suits against those policies.

25          It's also worth noting, and it was very helpful of

1  Ms. Casey to stand up and explain that BNSF is not challenging

2  the scope of the injunction because what that means is that, in

3  point of fact, BNSF is not going to seek to pierce the

4  injunction against these settled insurers.  So, these settled

5  insurers should have no concern about being sued on account of

6  these policies under some theory that BNSF has a right to some

7  of that coverage.

8          Similarly, we settled with Scotts, and as part of

9  that settlement Scotts gave up all of its claims against all of

10  these policies.  So, in point of fact you've got the 524(g)

11  injunction protecting the settled insurers, and you have

12  successful settlements in this Chapter 11 case which remove any

13  doubt about whether or not somebody will attempt to pierce the

14  injunction.  So, any further claims against these policies are

15  entirely speculative.  And given the notoriety of this case and

16  the fact that you can be sure that if there is one contingency

17  that would seek to examine this case closely, it's people who

18  have claims against Grace's insurance.  You would think that

19  somebody else would have surfaced if there was a real threat

20  here.  But the real important point, Your Honor, is that to the

21  extent that somebody does surface, and somehow they are able to

22  pierce the injunction and establish a claim against one of

23  these policies, it's necessary for this case to work, that

24  those claims all be channeled to the trust.

25          And that, then, brings us to the Longacre/National

1  Union situation.  Now, with respect to the Longacre/National

2  Union situation, again, the overriding principle here for

3  purposes of whether or not a claim should be channeled to the

4  trust is whether or not it relates to the debtors' asbestos

5  liability.  And it was actually very helpful for the attorneys

6  for both Long Acre and National Union to point the Court to the

7  Bank of America settlement, which, as the Court will recall,

8  had to do with some letters of credit issued in connection with

9  the same transaction that related to the issuance of the

10  National Union bond.  But the key difference is that with

11  respect to the National Union bond it is uncontested that that

12  bond was issued for the express purpose of paying asbestos

13  claims, or standing behind, at least, the debtors' liability to

14  pay asbestos claims.  Mr. Hughes testified to that on September

15  9th.  Ms. -- excuse me -- it was Mr. Bernick, asked Mr. Hughes

16  factually what was your understanding of the relationship that

17  National Union entered into in connection with these tort

18  claims?  National Union agreed if for any reason that Grace was

19  unable to make its obligations to the tort claimants, that it

20  would make the payments.  So, it's uncontested, the evidence is

21  clear, National Union gave the bond to pay asbestos claims.

22       With respect to the Bank of America there is no

23  evidence about that, and there is no evidence because frankly

24  the debtors looked to see what the facts were with respect to

25  Bank of America and we could not establish that the Bank of

1 America letters of credit were issued under the same

2 circumstances.  In point of fact, it appeared that they were

3 issued for other reasons, and somehow found their way to

4 National Union to be drawn upon in this connection.  But that

5 distinction is critical here for purposes of the classification

6 and the channeling of the National Union claim to the trust.

7 So, that's really it, Your Honor, with respect to these

8 indirect claims.  Each and every one of them implicates a

9 situation where the debtors will have either contractual or

10 tort liability through contribution theories, not from a direct

11 claimant, but because those third parties pay direct claimants,

12 and the case law is clear, this Court has recognized that's

13 precisely within the scope of claims that should go to a 524(g)

14 trust.

15          I'd like to make a couple of quick points about the

16 discussion that Mr. Monaco raised with respect to demands, and

17 I'll make it short because I think the Court zeroed in on

18 exactly the right facts, and articulated the theory.  The way I

19 would put it is that a demand is a package of rights which has

20 not yet given rise to a claim at the time of the bankruptcy

21 though that package of rights may exist.  It may, in the case

22 of a bodily injury claimant, have to do with the fact that

23 there is asbestos sitting there that could become a claim, and

24 with respect to third parties it may have to do with some

25 contractual package of rights that would be implicated if they

1  have liability to a bodily injury claimant.  And what 524(g)

2  does is it says that with respect to that package of rights the

3  claims are channeled to the trust.  It's important to note that

4  the section of Section 524(g), the provision of 524(g) which

5  deals with the requirements for how to treat claims and

6  demands, where it says that substantially similar claims and

7  demands, uses the word future.  It talks about future demands.

8  And that's really the whole point here because it's looking

9  forward to the fact that at some point in time these things,

10  which aren't claims, but which are demands, may have to be

11  paid, or may give rise to an obligation that has to be paid,

12  and the trust has to take into account that, and therefore it's

13  necessary to have a statutory scheme and a trust distribution

14  procedure which is set up to address that purpose.  But for

15  purposes of what Mr. Monaco was talking about, it's either a

16  claim or a demand.  There's no such thing as some third

17  category to which these things fall.

18      Garlock also raised an issue about this in a slightly

19  different context.  Garlock talked about the fact that within

20  Section 524(g), and that slide isn't here so I'll just discuss

21  it with the Court, there is a requirement that certain things

22  be found to be fair and equitable.  What's critical about that,

23  and Mr. Lockwood is going to discuss this also, but what is

24  critical about that is that the use of the term fair and

25  equitable appears in the provision of Section 524(g) where the

1  Court is examining whether third parties or the debtors should

2  be protected by the channeling injunction against demand

3  holders, and the Court has to find that the contributions made

4  are fair and equitable with respect to demand holders.  That

5  clearly must mean something different from the use of the term

6  fair and equitable in the cram down context because demand

7  holders have no rights by definition in a cram down context.

8  So, when Congress was using the phrase fair and equitable, it

9  must have meant something different from whether or not the

10 debtors' equity holders are going to survive with some rights,

11 even if there was an impaired class that didn't accept the plan

12 and was somehow involved.  The use of fair and equitable for

13 those cram down purposes cannot mean the same thing for

14 purposes of that provision of 524(g).  And we've briefed what

15 it should mean in our papers.  We don't need to get into that,

16 but it does not implicate the principles of 1129 of the strict

17 priority rule or anything of that sort.

18        THE COURT:  I think Montana is -- if I understand Mr.

19 Monaco correctly, I think what Montana is saying is that it

20 doesn't have, for purposes of 524(g), either a claim or a

21 demand.  It doesn't have anything yet.  What's the debtors'

22 response to that?

23        MR. FREEDMAN:  Well, I mean, number one they say they

24 don't have anything except that they also say that if they're

25 being sued the debtors are the proximate cause of that.  The

1 definition of claim is very broadly stated, and it's well

2 within the terms of the definition of a claim, including

3 contingent rights, unliquidated rights, to label what Montana

4 says it has as against the debtors now.  It says it has now the

5 right to implead the debtors because of all this.  That's

6 claimed.  That's simply a claim.  To the extent that at some

7 future date Montana may get sued by somebody and be able to

8 show that that gives rise to some future right to make the same

9 complaint, that it was the debtors' fault, not Montana's fault,

10 that would be a demand, if that happens at some future point in

11 time.  But the definition of claim comes close to sucking all

12 the oxygen out of the room and taking care of everything.

13 Congress clearly wrote the definition of demand to take care of

14 that little bit that was not covered by a claim.  And there

15 can't be anything else in between.

16        MR. LOCKWOOD:  Ted, could I interject a comment?

17 Your Honor, you pointed out in your earlier colloquy with Mr.

18 Monaco about 1141(d) and claims prior to confirmation.  Mr.

19 Monaco, in his own presentation, pointed -- made two points --

20 one, that Montana had been already sued by the Libby claimants;

21 and number two, that this case -- that Montana, under state law

22 rights, according to him, would have had the right to implead

23 Grace in that lawsuit but for the automatic stay.  If you

24 hypothesize that Montana had actually filed the cross claim

25 before the petition date, could Montana be here saying I've got

1  a pending litigation against Grace on behalf of these if I'm

2  held liable type claims, but that's not a claim?  It would be

3  ridiculous.  And so, the only difference between that scenario

4  and the one that we're in was that Montana got headed off at

5  the pass from bringing the impleader action that it could have

6  done at any time in the last nine years.  And so, to argue that

7  it doesn't have a claim under those circumstances is ludicrous.

8        MR. FREEDMAN:  So, Your Honor, in closing it's really

9  quite simple.  Section 524(g) applies to the debtors' liability

10 that's both direct and indirect.  Indirect has to mean that it

11 is a liability of the debtors that arises because somebody is

12 saying that a direct liability should also be paid by that

13 third party.  If we can't channel these indirect liabilities to

14 the trust, and they cannot be resolved by the trust, then as

15 has been said, the debtors' -- it would create a whole category

16 of liability that's under the water line and the purposes of

17 the statute would simply not work, and therefore it's proper to

18 channel indirect claims to the trust.  It's specifically proper

19 to channel these indirect claims to the trust.  And the Court

20 should stick with the scheme that's in the plan and permit that

21 to happen.

22        MR. BERNICK:  Your Honor, I can't resist from

23 pitching in, so if you'll indulge me?  You know, as a non-

24 bankruptcy lawyer looking at a statute that was designed to

25 deal with a mass tort problem, you see those words indirect,

1  it's -- I mean, and particularly when you look at 524(g) in the

2  context of the litigation over the Manville Trust, the Manville

3  Trust specifically had to wrestle with this problem, and indeed

4  it was raised in connection with the class action resolution of

5  the Manville Trust in 1995.  But if you have mass tort

6  litigation, the contribution claims, or the actions over are

7  every bit as important to obtaining closure for the company

8  that's at issue as the direct claims, because if you resolve

9  the direct claims but then the tort claimants can simply go sue

10 somebody else who then is able to recover, in the tort system

11 was then able to recover against you outside the confines of a

12 resolution, you don't have a resolution.  I mean, that's just

13 -- we don't even need to talk about mass tort.  It's basic tort

14 law.  You've got to have a way of solving the actions over.

15 The actions over are simply another channel to get at the same

16 defendant, the same company for exactly the same liability.

17 So, if you didn't have direct -- indirect, 524(g) means

18 absolutely nothing.  If the Libby claimants can go sue Montana

19 and then Montana can have an action over against us that's not

20 solved under 524(g), we may as well forget about 524(g), which

21 then also solves Mr. Monaco's problem about demands.  What's an

22 action over?  An action over usually will happen in

23 contribution at a later point in time because in order to have

24 a claim in contribution you have to pay the underlying

25 liability.  So, there's always a lag.  It's always future

1  oriented.  You always have a situation that Mr. Monaco has,

2  which is he's being sued and then he has an action over, which

3  may or may not be ripe, depending upon whether he's actually

4  made a payment.  But the idea that somehow because he hasn't

5  actually made the payment the action over is not an indirect

6  claim within the meaning of the statute, whether or not you

7  believe the claim includes demand or does not include demand,

8  again, it would simply have the effect of saying 524(g) doesn't

9  do what it was designed to do with respect to a bread and

10  butter issue in all tort litigation, which are the actions

11  over.  It's like saying 524(g) is designed to deal with mass

12  tort but it didn't really come to grips with what anybody who

13  deals with a slip and fall case or a car accident case knows,

14  which is that you've got to have resolution of the actions over

15  if you want to have resolution of the case.

16          THE COURT:  Mr. Frankel?

17          MR. FRANKEL:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. FRANKEL:  Roger Frankel on behalf of the PI FCR,

20  Mr. Austern.  Your Honor, as Mr. Freedman indicated, I'm going

21  to address the treatment of certain indirect claims, primarily

22  the claims of Montana and BNSF.  Before I do that, I just want

23  to make sure that we have a general understanding of the

24  structure of the TDP and how it deals with indirect claims.

25  5.6 of the TDP deals with common law indirect claims such as

1  contribution claims.  One of the significant factors of 5.6,

2  just as with direct claimants, is certain restrictions on the

3  amount of money that can be received from the trust, such as

4  the maximum amount cap, such as not permitting attorneys fees.

5  In this respect common law indirect claims such as contribution

6  claims are treated no differently than direct claims.  The

7  process for getting indirect claims liquidated is different

8  because by definition they're indirect claims and they're

9  different than the claims of those that have been directly

10 exposed to the asbestos.

11          We then have a Section 5.13, which is for insurer

12 indemnity claims.  And this section is different, and I only --

13 I bring it up not because I'm going to deal with insurer

14 indemnity claims, but because it's important to recognize the

15 difference between common law claims and how they're treated

16 and indemnity claims by contract and how they're treated.  So,

17 each of these insurers that would be covered under 5.13 has a

18 contractual indemnity from Grace.  If they were to get sued,

19 that claim over against Grace is channeled to the trust, and

20 those claims that are channeled to the trust are under 5.13,

21 and they do not have the same limitations because they're by

22 contract as the common law claims.  Thus, we don't have the

23 maximum amount cap, for instance, as an example.

24          One of the objections and arguments that has been

25 made in these proceedings is the BNSF argument that its claim

1 is being treated -- its indirect claim is being treated

2 unfairly.  And part of the complication of the BNSF situation

3 is that it potentially, at least, has two types of clients.

4 One is it does have a contractual indemnity from Grace.  It's

5 not unlimited by any means, but it is a contract, and they

6 could have claims over against Grace which would be channeled

7 to the trust, and they also may have contribution claims under

8 common law.

9          So, what we have done, and I just wanted to introduce

10 this early, and this has been seen by Ms. Casey a few days ago,

11 is we are going to introduce a Section 5.14 of the TDP, which

12 is essentially identical to the insurer indemnity section,

13 5.13.  May I approach, Your Honor?

14          THE COURT:  Yes.

15                    (Pause)

16          THE COURT:  Thank you.

17          MR. FRANKEL:  We have copies for those that want

18 them.  But this is a BNSF-specific provision, and the purpose

19 of it is to put BNSF as to its contractual indemnity in the

20 same place as the insurers as to their contractual indemnity.

21 And the main point of that is that one of the arguments that

22 BNSF made that frankly had some resonance with us was that why

23 shouldn't they get their attorneys' fees covered if their

24 contract permits their attorneys' fees?  And why should there

25 be a maximum amount cap if their contract doesn't provide for

1 that?  We think there are other issues with their contracts,

2 but if they get beyond those, then 5.14 deals with treating

3 their claim differently.

4        Now, Your Honor, what I'm going to do, with having

5 said that, is just briefly go through some of the specific

6 arguments that have been made.  I'm not going to try to cover

7 every one.  Our briefs are fairly full on this.  There are some

8 new arguments, however, that were raised in the post-trial

9 reply briefs by some of the parties.  I want to make sure that

10 I address those.  Montana has raised an equal treatment

11 argument, essentially saying that the TDP fails to provide for

12 any payment on account of Montana's contribution and

13 indemnification claims.  This may be part of the same argument

14 that Mr. Freedman was addressing and the colloquy with the

15 Court earlier with Mr. Monaco, but just so we're clear, the PI

16 TDP treats all Class 6 claims the same.  to the extent Montana

17 has a valid Class 6 claim for contribution, it will be treated

18 like all other similarly situated Class 6 claims.  This gets to

19 5.6 of the TDP.  The way that 5.6 is structured is there's

20 certain factors that if you meet them you're presumptively

21 determined to be valid.  If you don't meet them, then you go to

22 individual review.  You can establish the validity of your

23 indirect claim through individual review, and then it's treated

24 the same as a liquidated claim under any other section of the

25 TDP subject to the payment percentage.  So, the PI TDP has

1  exactly the features that 524(g)(2)(B)(ii)(V) that are designed

2  to provide reasonable assurance that the PI trust shall value

3  and be in a financial position to pay all asbestos PI claims

4  and demands substantially in the same manner.  And that was the

5  concern that Montana had raised.

6          Another concern they had raised was what is the fair

7  and equitable test under 524(g)(4)(B), that the PI TDP fails to

8  clarify the payment amount and the payout percentage.  I think

9  -- I'm not going to spend much time on this.  The PI TDP is as

10 specific as it can be on this.  There is, in the disclosure

11 statement, an indication that the initial payment percentage

12 will be 25 to 35 percent.  In fact, the trustees, after

13 consultation with their advisors, consultation with the TAC and

14 the FCR, will set the payment percentage, but it is a very

15 complicated process, as this Court well knows.  It depends on

16 the asset side, which change daily.  It depends on the claims

17 side, which are being studied.  And it's something that, again,

18 is what is required under the Bankruptcy Code, which is that

19 the trust operate through mechanisms that provide reasonable

20 assurance that the trust will value and be in a financial

21 position to pay present claims, future demands that involve

22 similar claims in substantially the same manner.  So, that's

23 why the payment percentage has to be set in a way that both the

24 present claimants and the futures are treated the same way, and

25 why the payment percentage is so carefully negotiated and

1 worked on by the trust.

2      The next argument that's made is actually an argument

3 of both BNSF and Montana, although it is slightly different

4 because Montana does not have a contractual indemnity claim,

5 only BNSF does.  But the argument is that the PI TDP fails to

6 protect the rights of the PI -- of the indirect trust claimants

7 as they include too many different restrictions.  The fact is,

8 as I've just gone through, because there are indirect claims,

9 by definition they are going to be treated differently than

10 direct claims.  Every one is going to be different.  It's

11 essentially going to be an individual review for an indirect

12 claim.

13      The contractual claims of BNSF I do want to spend a

14 moment because their argument is that the plan and the TDP

15 wrongly strips BNSF of its rights by limiting the liquidated

16 values of the indirect PI trust claims, and I believe this

17 argument would still be made by BNSF as to its common law

18 contribution claims.  BNSF theorizes it could be forced to pay

19 a hundred percent of the value of certain asbestos-related

20 claims that had been filed in State Court, yet recover from the

21 PI trust a fraction of that.

22      And I just want to walk through briefly why that

23 argument is without merit.  And some of this assumes that their

24 claim is under their contract, but it would be the same if they

25 made it under their common law rights.  BNSF wrongly assumes

1  that it would be entitled to indemnification from the PI trust

2  on account of asbestos-related claims that had been filed

3  against BNSF in State Court.  The fact is that there's been no

4  judicial determination yet in the State Courts that the

5  indemnification obligations are triggered.  In fact, the

6  indemnity clause on which BNSF relies is not unlimited in

7  scope.  So, for example, if BNSF is found to have engaged in

8  abnormally dangerous activities when transporting Grace's

9  products through locations outside of the BNSF premises in

10  Libby that were leased to Grace, BNSF will not be indemnified.

11  Secondly, BNSF wrongly assumes that even if the asbestos-

12  related claims filed against BNSF were to fit within the scope

13  of their rights, they would automatically be entitled to an

14  indirect claim for a hundred percent of the claim value.

15        The complaints filed against BNSF actually include a

16  number of additional parties including the State of Montana.

17  BNSF would have a contribution claim against other co-

18  defendants and ultimately pay significantly less than a hundred

19  percent of the total claim value.

20        And finally, Your Honor, BNSF wrongly assumes that

21  its indirect PI trust claims against the trust would be capped

22  at the scheduled values.  Again, on the contract

23  indemnification we've now dealt with that issue, but even on

24  the -- on the contribution claim there would be individual

25  review.  It would still be subject to the maximum value, but it

1  would not be subject to the scheduled values.

2         Some of the arguments that Montana raises are

3  similar, Your Honor, and the only one that I'm going to deal

4  with that's slightly different is that somehow the first in-

5  first out payment process is unfair to indirect claimants.  And

6  I think there's some confusion here on Montana's part with the

7  difference between the processing queue and the payment queue,

8  so that when a claim is filed it goes into the processing

9  queue.  When it becomes liquidated it goes into the payment

10  queue.  This is the same whether it's an indirect claim or a

11  direct claim.  All claims that are filed initially are

12  unliquidated unless there's been a settlement, or a judgment,

13  or something like that, which is rare since they are so far

14  beyond the time when that would have happened.  So, for the

15  most part what we have here is you go into the processing

16  queue.  Your claim is processed, whether through individual

17  review or whatever.  Once that claim is liquidated you're in

18  the payment queue, and payment takes however long it takes for

19  the trust to process.  And again, that process is no different

20  for indirect claimants as it is for direct claimants.

21         The other argument that BNSF makes is that it's not

22  covered by the channeling injunction but somehow it should be.

23  And there's two answers to this issue.  First, 524(g) and who

24  gets channeling injunction protection is permissive, so the

25  Code is 524(g)(4)(A)(ii) says such injunction may bar any

1  action directed against a third party.  It's plan proponents

2  who decide subject to this Court's approval who gets 524(g)

3  protection.

4          The problem is, though, even greater, and that is

5  that even if we were to want BNSF to have 524(g) protection, we

6  don't believe it's eligible because under 524(g)(4)(A)(ii)

7  there are four by reasons of that this Court is familiar with

8  for a third party to get protection, and those four reasons are

9  ownership of a financial interest in the debtor, involvement in

10  the management of the debtor, provision of insurance to the

11  debtor, and the third parties' involvement in a transaction

12  changing the corporate structure.  None of those apply to BNSF.

13  We don't see any basis that they could get 524(g) protection

14  even if we wanted to give it to them.

15          Finally, Your Honor, I just want to deal very briefly

16  with a portion of Garlock's arguments on the role of the FCR

17  that has been appointed in this case.  Garlock raised, I

18  believe for the first time in its post-trial reply brief, the

19  idea that Mr. Austern was not appointed to represent all demand

20  -- all PI demand holders, and that's just not the case.  The

21  FCR has been consistent and clear and defining his constituency

22  to include all holders of future asbestos personal injury

23  related demands.  In his deposition on May 15th, 2009, Page 208

24  --

25          MR. CASSADA:  Excuse me, Your Honor.  I object to

1  this.  I don't believe that deposition is part of the record.

2           MR. FRANKEL:  I believe it is, but I don't have a

3  cite to the record, Your Honor.  And I'll skip that.  It's --

4  we do have confirmation hearing testimony that's even better.

5  And that's on September 17th, 2009, Page 2638 of the

6  transcript, Lines 11 through 13.  Mr. Guy asked Mr. Austern,

7  "Does your constituency include indirect asbestos claimants?"

8  Mr. Austern answered, "Yes."  Even if Mr. Austern did not --

9           MR. CASSADA:  Excuse me, Your Honor.  I'd point out

10 that that testimony came right after --

11          THE CLERK:  I'm not picking you up.

12          MR. CASSADA:  Garland Cassada here for Garlock

13 Sealing.

14          THE CLERK:  The microphone --

15          THE COURT:  We can't hear you from the microphone.

16          MR. CASSADA:  Oh.  Is it not on?  Yes.  The testimony

17 cited came right after Your Honor's statement that Mr. Austern

18 did not represent people who would hold demands that were not

19 bodily injury demands.

20          MR. FRANKEL:  Your Honor, he can argue -- it seems

21 like -- there's no question that this was the question and

22 answer at the confirmation hearing.

23          Your Honor, I think that the more important issue is

24 not what Mr. Austern's testimony was, whether at his deposition

25 or at the confirmation hearing, but in fact what the statutory

1  requirements are for the appointment of a future claimants'

2  representative.  And this is found in 524(g)(4)(B)(i).  And it

3  says if under a plan of reorganization a kind of demand

4  described in such plan is to be paid in whole or in part by a

5  trust described in (2)(B)(i), and all of these are issues that

6  apply to Grace, then it says as part of those proceedings

7  leading to the issuance of such injunction the Court appoints a

8  legal representative for the purpose of protecting the rights

9  of persons that might subsequently assert demands of such kind.

10        Now, Garlock has said, well, our demands are

11 different.  Our demands are different kinds of demands and

12 should be in a different class.  But when you look at the

13 definition of demand that came out of what I just read, it says

14 in this subsection the term demand means a demand for payment,

15 present or future, that, one, was not a claim during the

16 proceedings leading to the confirmation of a plan of

17 reorganization; B, arises out of the same or similar conducts

18 or events that gave rise to the claims addressed by the

19 injunction.  So, when Garlock says it has an indirect claim

20 against Grace, it only could be because of this same conduct or

21 events that gave rise to the claims that are addressed by the

22 injunction.  There can be no real question that Mr. Austern

23 represented the interests of all demand holders, including

24 indirect demand holders.  Now, it's easy to second guess at

25 this point that Mr. Austern and the ACC should have gotten more

1  money for the trust, but the fact of the matter is, as this

2  Court well knows, there was a very hotly contested estimation

3  hearing.   There was a real question what the estimation

4  liability of this company is, and this was as hard fought

5  negotiation.   Nobody can honestly say the FCR and the ACC did

6  not get as much as they could get in this trust at this time.

7  Thank you, Your Honor.

8         MR. BERNICK:   Your Honor, if I could?   First of all,

9  there was an objection made to citing the deposition of Mr.

10  Austern on the grounds that it might not be -- I think we would

11  need to proffer that to the Court.   The representation that was

12  made by counsel for Garlock is that Mr. Austern did not, in

13  fact, represent his client, and we'll see what he says about

14  his client here in a minute.   Mr. Austern has historically been

15  appointed in this case -- in fact, representation made by Mr.

16  Cassada is actually that he was never appointed for that

17  purpose.

18         Now, that representation pertains to a whole history

19  of time, and he's saying that during that whole period of time

20  his client was not within Mr. Austern's purview.   That's the

21  representation that was made to the Court.   If, in fact, he's

22  already aware of deposition testimony where Mr. Austern

23  specifically said I do have my eyes including on these people,

24  and that was a misrepresentation to the Court, and of course we

25  should see the deposition testimony.   The issue is not how he

1   construes, how counsel construes a dialogue or a colloquy in

2   the confirmation hearing.  The question is whether the

3   representation he made to the Court that his client was never

4   represented by Mr. Austern in historical fact is true or not.

5   If Mr. Austern believes he was representing these people, then

6   he can quarrel about whether Mr. Austern's activities were

7   within the purview of the order that appointed him, but

8   certainly it's factually inaccurate to say that Mr. Austern

9   was, in fact, attuned to the interests of his client.

10          And as to the confirmation hearing transcript, I

11  think that the only real problem here doesn't lie with Mr.

12  Frankel, it lies with Mr. Cassada's interpretation of this

13  colloquy because the question that is being asked, this is the

14  dialogue that precedes the section that Mr. Frankel was

15  referring to, but the dialogue, as Mr. Cassada -- this is at

16  Page 67 of the September 17th, 2009 transcript.  Your Honor,

17  just to be clear on the record, there are future demand holders

18  here who have objected and appeared.  And Your Honor says, and

19  properly so, well, wait a minute, that doesn't make an awful

20  lot of sense.  If the demand holders can stand up and object,

21  they're not demand holders that are actually here in Court.

22  The whole idea of the demand holder concept was they didn't

23  know who they were and therefore would never stand up and

24  object.  So, you say properly so there can't be.  We don't --

25  we don't know who they are.  And here's the problem.  Mr.

1 Cassada says Garlock would be a future demand holder.  Well,

2 that's just wrong.  Garlock, if it is a future demand holder,

3 is not a future demand holder because they already know that

4 they have a claim.

5        This fundamental confusion is the claim includes

6 people who have an unmatured and contingent right of action.

7 If you have an unmatured and contingent right of action you

8 know who you are.  You can come in and assert your rights, as

9 in fact they have.  The very fact that they've asserted their

10 rights means that they're not demand holders where we have this

11 significant problem.  And as a consequence we're now in a

12 situation where he says we would be -- no.  These people may,

13 in fact, turn out to be future demand holders with respect to

14 personal injury demands that have not yet been asserted in the

15 future, but insofar as Mr. Cassada is representing Garlock

16 today, he's there because his client is, in fact, being sued.

17 And to the extent that they are, in fact, being sued, he has a

18 right of action, or potential right of action.  He has a

19 contingent claim depending upon whether they actually pay in

20 response to that suit to make a contribution claim.  So, the

21 only confusion here is in Mr. Cassada's mind.  It's not in the

22 mind of the Court.  So, the Court says no, you may be an

23 indirect claimant, but you're not a future asbestos personal

24 injury demand holder.  Well, that's unquestionably true

25 because, again, those are folks who don't know who they are,

1   and they're in the distance.

2          Now, Mr. Cassada, well, when you say future asbestos

3   personal injury, are you referring just to bodily injury

4   claims?  The Court says, yes, that's who he represents.  That's

5   correct.  He doesn't represent property damage.  It's personal

6   bodily injury claims.  Okay.  Thanks.  Well, Mr. Guy, can you

7   restate the question?  So, everybody is reading off the same

8   page.  We're talking personal injury, not property damage.

9   We're not talking about demand holders in the sense of people

10  who don't even know who they are.  We're talking about people

11  who do know who they are and know that they've been sued.  So,

12  Mr. Guy then says, Line 23:  "Do you represent future asbestos

13  claimants?"  "Yes."  "Does that constituency include tort

14  claimants?"  "Yes."  "Does that constituency include indirect

15  asbestos claimants?"  "Yes."  Indirect asbestos claimants are

16  those people, as we've just got done talking about, who have

17  got the action over.  And the action over may not yet be ripe,

18  but that is exactly what indirect claims means.  So, Mr.

19  Cassada is wrong as an historical fact about what Mr. Austern

20  in fact do, and the interests that, in fact, he sought to

21  acquit.  And he's wrong when he construes indirect claims under

22  524(g) as only reflecting claims that actually are ripe in

23  being asserted as opposed to claimed in the broader sense,

24  including contingent claims, which, if it's not construed that

25  way, as Mr. Freedman indicates is, in fact, the hole below the

1    water line.

2               THE COURT:  Mr. Lockwood?

3               MR. BERNICK:  Just for the record, the deposition

4    testimony and -- this is Austern deposition --

5               MR. CASSADA:  Your Honor, it's not in the -- it's

6    never been offered --

7               MR. BERNICK:  Well, we're proffering it at this point

8    in time.  Your Honor can later --

9               MR. CASSADA:  We object.  It's way too late for that.

10              MR. BERNICK:  Well, we're proffering it.  Your Honor

11   can later determine --

12              THE COURT:  I don't need it.  Mr. Austern has already

13   testified at trial that he represents the indirect claimants --

14              MR. BERNICK:  Thank you.  Okay.

15              THE COURT:  -- and it's a matter, I think, of

16   determination whether he's correct or not correct.  Mr.

17   Lockwood?

18              MR. LOCKWOOD:  I'm here principally to be talking

19   about Garlock, Your Honor.  I have one small comment about BNSF

20   that I don't think Mr. Frankel mentioned.  Assuming that my

21   recollection of yesterday is accurate, one of the arguments

22   that BNSF counsel made, Ms. Casey, was that she argued that

23   under the TDP and the plan if BNSF were held liable for its own

24   negligence, then under the Section 5.6 of the TDP would not

25   apply, and therefore BNSF would not have any right of recovery

1  against the trust for contribution, or common law indemnity.

2      That's simply just -- that's not true.  I mean, the

3  -- any asbestos indirect PI defendant is going to be held

4  liable for the most part for its own negligence.  I mean,

5  Garlock, or Montana, or somebody, or whoever.  The cause of

6  action by a plaintiff against somebody other than Grace is that

7  they have committed some kind of tort on their own.  It's not

8  limited to people who have derivative liability for Grace's

9  torts.  It's the creation of, as Mr. Cassada has referred to

10  earlier, the joint and several liability regime that's

11  prevalent in a lot of states.  I might add, by the way, it's

12  not prevalent in all states, but it's in a lot of states.  And

13  it's that regime that gives rise to these kind of indirect

14  claims for the most part, the overwhelming majority of them,

15  and so, even though it may well be that BNSF's underlying

16  liability is associated with Grace because it's transporting

17  Grace vermiculite, the notion that somehow or another it has

18  primary liability goes back to what to what we were talking

19  about yesterday.  The statute talks about directly or

20  indirectly liable.  If the debtor is directly or indirectly

21  liable claims can be channeled to the trust.  So, I think

22  that's just a mistake.  The claim will be channeled.

23      Turning to Garlock for a moment, the first thing I

24  want to mention is the argument that basically the fair and

25  equitable language of Section 524(g) imports the absolute

1  priority rule into 524(g), and in that connection I wold like

2  to use one of Mr. Cassada's slides, not a pie chart.

3         The -- and this is also -- this also appears in the

4  brief filed by Garlock.  In their effort to import the fair and

5  equitable language from 524(g) into -- or equate it with the

6  1129(b) language, Garlock asserts that the legislative history

7  of the 1994 amendments contains the phrase that appears at the

8  bottom of the chart here, which is true, it does appear there.

9  But if the Court reads the actual citation of this quote, the

10  two paragraphs that precede it show what the context is.  The

11  context is -- and I will -- I'll briefly read them to the

12  Court.  "The principal change in this section," referring to

13  the section in this act, "is set forth in subsection D and

14  relates to the award of post-petition interest.  In a recent

15  Bankruptcy Court decision in In Re New Valley Corp.," etcetera,

16  etcetera.  And they go on in the next paragraph to say, "As a

17  result of this change if a plan proposed to pay a class of

18  claims in cash in the full amount -- allowed amount of the

19  claims, the class would be impaired, entitling the creditors to

20  vote for or against the plan of reorganization."

21         That has nothing to do with 524(g).  They're taking

22  this quote completely out of context.  Okay.  Well, what --

23  that gets us, then, to what does fair and equitable mean in the

24  statute?  Well, the notion that the term fair and equitable, or

25  the terms fair, the term equitable, and the term and are

1 somehow uniquely confined to Section 1129(b) of the Bankruptcy

2 Code is preposterous.  I mean, the Court decisions are legion

3 in the Bankruptcy Courts, which are Courts of Equity, as Your

4 Honor is well aware, and which Bankruptcy Courts all the time

5 make judgments about whether various plan provisions are in

6 some sense fair or in some sense equitable, and indeed the

7 Combustion Engineering two trust issue, terms like fair and

8 equitable, or unfair and inequitable, get thrown around all the

9 time.  So, by combining the word fair and the word equitable

10 with the conjunction and, that somehow or another you import a

11 provision from an entirely different section of the Bankruptcy

12 Code that deals with an entirely different problem into 524(g)

13 just doesn't -- cannot withstand examination.

14          So, what does it mean, then?  Well, if you go back to

15 another slide of Mr. Cassada's -- pardon me, Your Honor.

16                    (Pause)

17          MR. LOCKWOOD:  The first one, which is a quotation of

18 the statute as a whole, you'll see that at the beginning of the

19 provision they talk about if under a plan of reorganization the

20 kind of demand described in such plan is to be paid in whole or

21 in part by a trust, in other words, the claim and demand is

22 going to be paid by a trust, then the injunction, barring

23 claims against the debtor and other protected parties, shall be

24 valid and enforceable with respect to a demand of such kind if

25 -- and then we go down to the Court in romanette ii at the

1  bottom.   The Court determines before entering the order

2  confirming the plan that identifying such debtor or debtors, or

3  such third party in such injunction is fair and equitable with

4  respect to the persons that might subsequently assert such

5  demands, i.e., what the statute requires the Court to do is to

6  say to -- is to analyze this from the perspective, okay, the

7  debtor is getting a supplemental injunction that allows it to

8  get a protection from claims by future demand holders that

9  might not otherwise be dischargeable under the bankruptcy law.

10       And what does it have to do to get that protection?

11 It has to make a contribution.   It has to provide benefits, to

12 be more precise in this portion of it, that are to the trust.

13 That's what it says.   To such trust on behalf of such debtor or

14 third party that are commensurate with the protection that's

15 being afforded the debtor against the future demands that are

16 being channeled to the trust.

17       So, what this is is a mechanism for comparing what

18 the trust is getting to what -- to what the debtor in this

19 case, which is what we're talking about, protection of the

20 debtor, from demands.   And that has nothing to do with what

21 Garlock is talking about, because what Garlock is talking about

22 is how Garlock is being treated by the trust.   I mean, other

23 than a somewhat feeble attempt to argue through yet another

24 slide --

25                      (Pause)

1           MR. LOCKWOOD:  -- that the Grace contribution to the

2   trust is not substantial, which is actually not even the test.

3   The question is whether or not the contributions made on behalf

4   of Grace and others are fair and equitable.  Garlock doesn't

5   really talk about what the trust is getting.  And the fact is

6   that under Garlock's approach to this, as Mr. Cassada both

7   orally and in his papers candidly admitted, in his view it's

8   not fair and equitable for any debtor, including Grace, to pay

9   anything less than one hundred percent of its equity to a

10  trust, and anything less than that is either insubstantial,

11  even though it's $1.1 billion under his calculation.  I might

12  add, by the way, that that's a little bit misleading, because

13  while it's true that the Sealed Air and Fresenius billion plus

14  dollars are coming in on behalf of the protection afforded to

15  Sealed Air and Fresenius, the Court should be reminded that one

16  of the two sets of causes of action being asserted in the

17  litigation that gave rise -- the settlement of which gave rise

18  to that contribution was a fraudulent transfer claim on behalf

19  of the Grace estate.  And since there's no way of allocating

20  the Sealed Air money between fraudulent transfer and successor

21  liability, as has been pointed out in other contexts, and it's

22  not -- and it's also pretty clear that the contributions

23  wouldn't have been made if they didn't cover both components of

24  that action.  At the same time, to the extent that there was

25  validity in the fraudulent transfer claims, those monies were

1 in effect on behalf of Grace because they're coming out of the

2 notional Grace estate.  But put that aside for the moment.

3         This Court sat and listened to an inordinate amount

4 of testimony before we settled with the debtors, we being the

5 ACC and the FCR.  Essentially what Garlock's position would

6 mean was that we couldn't -- that it would be impossible to

7 settle in either this case or any other case with a debtor

8 unless the trust got everything.  And it's also arguable, we've

9 certainly argued it.  My good friend, Mr. Bernick, wouldn't

10 concede it, I'm sure, even at this late date, that if you can't

11 voluntarily make a deal between the asbestos interests and the

12 debtor, that you also can't get a 524(g) plan because even if

13 the Court were to estimate the liabilities at a number that was

14 -- left room for equity, the asbestos claimants wouldn't vote

15 for it, and the futures rep wouldn't approve it, and so then

16 the question would be could you cram down a 524(g) plan, which

17 Your Honor may recall we had some briefing on at one point

18 which was -- fortunately never had to be resolved.  So, all

19 things in, the notion that Garlock is here championing of the

20 rights of itself as this prospective future creditor, and

21 disclaimed, I might add, presently a creditor -- I mean, I find

22 it -- Mr. Bernick's point was pretty interesting when you think

23 about it.  Garlock clearly has present claims that are

24 identical to the ones that it says are going to arise in the

25 future.  But for tactical reasons Garlock has chosen to come in

1 here and portray itself as a future demand holder and to

2 disclaim any interest of being a present creditor I guess

3 because if it acknowledged that it was a present creditor it

4 would have to be acknowledging that the plan, its claims were

5 channeled to the trust and it should be -- its role as a

6 creditor should be taken into account, and the question is is

7 it being treated fairly?

8            Which leads me to my next point, which is what is

9 Garlock's beef with the TDP about fundamentally?  Garlock is

10 either a present, a future creditor, or both.  Its claims are

11 being channeled to the trust.  The question is is the trust's

12 treatment of its claims as the successor to Grace, whose

13 liability the trust is valuing and paying, somehow or another a

14 violation of some applicable bankruptcy law?  Whether you say

15 it's fair and equitable, which I don't believe actually applies

16 to the TDP, or whether there's some notional note that there's

17 a principle that all of the trust beneficiaries ought to be

18 treated substantially the same, and you -- and you somehow

19 equate that to fair and equitable.

20            Does Garlock say that its contribution claims are not

21 going to get processed and paid in some manner commensurate

22 with their value?  No.  Does Garlock say that its contribution

23 claims against Grace can't be channeled to and paid by the

24 trust?  No.  What does Garlock complain about?  Well, we'll go

25 through it item by item.  But basically what Garlock is

1  complaining about here is it's got all this other litigation

2  with the people who happen to also be claimants against Grace,

3  and what it wants the Court to do is to rearrange the rules in

4  the tort system, which Grace is fighting with these other

5  claimants with respect to -- excuse me, I said Grace -- which

6  Garlock is fighting with these other claimants with respect to

7  Garlock's own liability to those claims, that those rules

8  should be fixed and made to work better for Garlock, and

9  Garlock says --

10         MR. CASSADA:  Your Honor?  Excuse me.  I'm going to

11 have to object to this.  There's nothing in the record that

12 shows that Garlock has ever sought any relief asking the Court

13 to change anything in the tort system.  We've only asked for

14 relief from te trust distribution procedure.

15         THE COURT:  Right.  That's what he's arguing, that by

16 asking for the changes to the trust distribution procedure what

17 in essence is you're asking me to do is fix the problems with

18 the discovery and joint liability theory in the tort system.

19 That's what the argument is.

20         MR. LOCKWOOD:  I'll get to the specifics of how what

21 they claim is bad about the TDP and how they've proposed to fix

22 it as I proceed, and I will attempt to provide a foundation, if

23 you will, for the general comment.  But the point I'm making is

24 that the -- what they don't like here is how the TDPs impact

25 what's going on in this other litigation in the tort system,

1  whether you call that fixing the tort system, or fixing the

2  TDPs to somehow or another deal with the tort system is a

3  matter of, you know, nomenclature.

4  So, what is it specifically that Garlock is

5  complaining about?  Well, they're complaining about a whole lot

6  of things in general.  They make all sorts of assertions that

7  have absolutely no foundation in this record about the impact

8  of the TDPs on their -- the amounts that they have to pay in

9  the tort system.  And if you look at their brief, and look at

10  their charts, you will see that the totality of the evidence

11  that they cite in this case consists of snippets of testimony

12  from Mr. Inselbuch, Mr. Hughes, Dr. Peterson, and a declaration

13  from one of Garlock's own lawyers, Mr. Turlik.  That's it.

14  None of that testimony says how much money Garlock

15  has had to pay in the tort system at any point in time over the

16  last 20 years, whether the money has increased, decreased.

17  There's no -- other than attempted testimony by Mr. Cassada

18  from the lectern, there's no evidence about why, if there, in

19  fact, have been increases in Garlock's payments, or if there

20  have failed to be decreases in Garlock's payments, it can be

21  tied to any particular disability created for Garlock by

22  bankruptcies, or the inflation of claims values against Garlock

23  for reasons having to do that are unrelated to companies going

24  into bankruptcy, and tort -- and trusts coming out of

25  bankruptcy.  There's absolutely nothing of that.  And there's a

1  reason that there's nothing for that because when Garlock in

2  this case originally filed a witness list it had four Garlock

3  lawyers on it that were going to testify about all of the bad

4  things that were happening to Garlock in the tort system as a

5  result of other trusts which they would then extrapolate to be

6  happening -- would happen as a result of the Grace trust.  When

7  the plan proponents started informing Garlock that they were

8  going to take the depositions of those people --

9          MR. CASSADA:  Whoa.  Your Honor, this is way off the

10 record.  We negotiated a stipulation with these folks about

11 what we would include in the record, and we waived the right to

12 present certain witnesses, and he's gone into things that are

13 just totally out of order.

14         MR. LOCKWOOD:  It's a matter of record that they

15 listed the witnesses.  It's a matter of record that they

16 withdrew the references.

17         MR. CASSADA:  I object --

18         MR. LOCKWOOD:  And if Mr. Cassada can get up here and

19 speculate about the behavior of trustees and the behavior of

20 anybody else I can ask the Court to draw an inference as to why

21 Garlock withdrew four witnesses and got a one-page declaration

22 --

23         THE COURT:  I'm going -- look, let's get back to the

24 point.  I'm not going to consider anything that's not based on

25 the evidence of the record.  I've told Mr. Cassada that I don't

1 recall some of the information that he has testified from. I

2 understand his legal argument, but I need to know where the

3 facts are that back it up. So --

4 　　　　MR. LOCKWOOD: Okay. Your Honor, I will withdraw

5 that comment and content myself with just simply noting that

6 like any litigant, Garlock had an opportunity at this hearing

7 to put on expert testimony, and fact testimony, and introduce

8 documents to prove its contentions, and what it has done has

9 consisted of one couple of page declaration from Mr. Turlik,

10 which we'll look at in a minute, and some documents, most of

11 which tend to contradict a number of the claims that have been

12 made by Mr. Cassada.

13 　　　　But in any event, the first complaint that Mr.

14 Cassada made, both in his oral arguments and that had been made

15 in an earlier set of briefs was that the indirect claimants

16 were wrongfully being prevented from impleading the Grace or

17 the trust in their State Court actions. And apart from the

18 fact that impleading Grace in the State Court actions would be,

19 as Mr. Freedman had pointed out, inconsistent with the

20 protections that 524(g) was supposed to be awarding to Grace in

21 the first instance, at a later stage in the briefing Garlock

22 specifically withdrew in a footnote to -- in one of its post-

23 trial briefs, any contention or objection that was based on the

24 failure to have the ability to implead the trust in the State

25 Court, and that appears at Garlock's post-trial brief at Page

1  30, Note 23.  So, that's out of the case by Garlock's own

2  statement.

3        So, what remains?  What remains is what we will call

4  the conceal and defer strategy which the TDPs supposedly

5  implement.  And what does the conceal and defer strategy

6  entail, according to Garlock?  Well, at its heart it focuses on

7  two provisions of the TDP, one of them that allows a claimant

8  who has filed a claim against the trust to request that the

9  trust defer processing that claim for an indefinite period of

10 time for whatever reason, and the second is the trust

11 provisions in Section 6.5 under which the trust agrees to treat

12 the submissions to the trust as confidential, and provides for

13 procedures under which trust records can be subpoenaed.

14        Mr. Cassada has helpfully summarized in one of his

15 slides the elements that Garlock claims appear in the TDP that

16 reflect and implement the conceal and defer strategy.  The

17 first one is that co-defendants may not initiate a claim until

18 after paying Grace's share of a judgment, citing Section 5.6 of

19 the TDP.  That's actually not quite accurate.  What Section 5.6

20 provides is the requirements for such a claim to be paid by the

21 trust.  There's nothing that would prevent Garlock from when it

22 gets sued by a claimant in the tort system actually filing a

23 contingent cross claim for contribution with the trust.  The

24 trust probably wouldn't process it, but Garlock itself, as Mr.

25 Cassada's brief pointed out, one of the ways of which it in

1  fact got information from some of the existing trusts was to

2  make these blanket filings of notices that it was -- that it

3  had been sued in the tort system, and in accordance with that

4  mechanism, as we will see, got claims information from the

5  trusts.

6      He then -- the next point is that there's no

7  limitations period for the plaintiff to file claims, citing

8  Grace TDP Section 6.3.  As became apparent later in his

9  remarks, that's not really true.  Section 5.1(a)(2) of the TDP

10  in fact has statute of limitations provisions in it.  What

11  Section 6.3 does is permit the deferral of a claim once it's

12  been filed, and it's this deferral possibility that is

13  supposedly -- is the and defer part of the conceal and defer

14  strategy.

15      And why -- how does -- why is -- two questions.  Why

16  is it bad?  And how does it affect Garlock as an indirect

17  claimant against the trust?  The way it's supposed to be bad is

18  that because the claimant isn't completing the processing of

19  the claim and getting money for it, or I guess getting it

20  denied, he doesn't discuss the ones that get denied.  He's more

21  focused on the ones that get money.  Garlock won't have the

22  ability in the tort system to show how much money they should

23  get as a credit or offset under some contribution claim against

24  Grace, and through Grace, the trust.

25      Well, that doesn't really have anything to do with

1 Garlock actually, when it pays -- when and if it pays a Grace

2 claim, bringing the claim against the trust and getting paid on

3 Garlock's claims.  What it has to do with is Garlock's ability

4 to litigate in the tort system.  While Garlock might very well

5 like that to be different, there's nothing in the Bankruptcy

6 Code or state law that says that a co-defendant -- forget the

7 TDP for the moment, and let's think about the tort system.  And

8 this has actually come up in some of the cases, like in the

9 Babcock case where Babcock & Wilcox, the record and the

10 opinions of the Court in that case will reflect that Babcock

11 had continuing moratoria with all plaintiffs.  It was never

12 sued at all by anybody in any case.  In this very case the

13 record indicates that there were -- in connection with some

14 large inventory settlements of which Baron & Budd is an example

15 that the Court may recall, there were -- as part of the deal

16 for settling a large number of cases at the same time in what,

17 I might add, was a confidential settlement in the tort system,

18 the Baron & Budd firm agreed to a moratorium that they wouldn't

19 file claims for a while, and Grace in return agreed that they

20 wouldn't assert a statute of limitations defense against that.

21        There's nothing -- Garlock has cited nothing in its

22 supposed state law rights that would prevent a co-defendant in

23 the tort system from engaging in moratoria and deferrals of

24 claims outside of Court.  And Garlock's entire presentation in

25 this case is based on the premise that no claims can be

1  resolved by defendants in the tort system except through a

2  lawsuit.  And that's just demonstrably not true.  And as I

3  said, the Baron & Budd example in this case is an illustration

4  of that point.

5       So, number one, the deferral is not a deferral of

6  Garlock's own claim for contribution, which is what the trust

7  is supposed to be treating.  It's a treatment of somebody

8  else's claim which Garlock doesn't like the effects of in the

9  tort system, where Garlock is dealing with claims against it,

10 not claims against Grace.

11      And secondly, Garlock hasn't shown by any record

12 evidence at all that that sort of deferral arrangement is

13 illegal, never happens, etcetera, in the tort system, and even

14 though Mr. Cassada repeatedly asserts that Garlock's state law

15 rights are being violated here.

16      So then we get to the conceal part, which is actually

17 the only part that, as best I can figure out, Garlock has

18 introduced any evidence at all, and that has to do with the

19 proposition that because Garlock doesn't have access to claims,

20 which by the way the defer part it wouldn't have if the claims

21 didn't have to be put in in the first place, if they could be

22 deferred, and the statute of limitations didn't apply,

23 etcetera, then there wouldn't be any confidential information

24 that could be concealed from Garlock.  But ignoring that slight

25 inconsistency in the package of conceal and defer, the

1  proposition that Garlock says is we've got a big problem in the

2  tort system because since we can't get access through some

3  transparent public litigation forum to the claims information

4  filed by -- filed with the prospective Grace trust and all of

5  the existing trusts that Garlock never objected to before, and

6  all of which have gone into operation, as the Court pointed out

7  earlier with the identical type of TDP provisions that we see

8  here, that Garlock is being deprived of the ability to show

9  that people who deny exposure to a Grace product in Garlock's

10 litigation in the tort system are lying, or mistaken, and that

11 subsequently they will turn around, having mulcted Garlock in

12 some joint and several liability which normally would arise

13 only on a judgment, but which Garlock correctly acknowledges

14 they almost never get judgments, so it's mostly through

15 settlements, so Garlock is being deprived of this as part of

16 its settlement negotiations, but of course there's no evidence

17 in the record about how Garlock actually ever settled a single

18 case, much less lots of cases.

19         There's a lot of statements from Mr. Cassada about

20 what Garlock supposedly does and doesn't do, but with all due

21 respect to Mr. Cassada, he's not here to testify, and what he

22 says isn't evidence.  So, what's the evidence that we have that

23 this is a big problem?  Two cases.  The Polar (phonetic) case

24 and the Snyder (phonetic) case.

25         And what happened in those two cases?  According to

1 Mr. Turlik's declaration in those two cases, Garlock  -- the

2 plaintiffs and Garlock in discovery did not come up with some

3 disclosure about alleged exposure of those two plaintiffs to

4 the products of other defendants represented who had claims

5 against bankruptcy trusts.  And the record is clear, at least,

6 that there was no such disclosure and then there was a filing

7 of a subsequent claim with many of those trusts.

8         What we don't know from the record is how did that

9 happen?  Mr. Cassada made some comment about the thorough

10 discovery efforts that were undertaken in those two cases, but

11 as I objected at the time, there's absolutely no evidence of

12 that.  The only thing that Mr. Turlik's evidence says --

13         MR. CASSADA:  Your Honor, I object to that.  He's

14 characterizing a declaration that's in the record, and it's

15 very clear that --

16         MR. LOCKWOOD:  I can argue what the declaration does

17 and doesn't say, Your Honor.  I don't --

18         MR. CASSADA:  Well, you ought to read it before you

19 say --

20         MR. LOCKWOOD:  I've read it.  It says that there --

21 it doesn't say anything about -- I --

22         THE COURT:  Gentlemen, would you argue before me, not

23 with each other, please?  And, Mr. Lockwood, you need to start

24 wrapping up.  We're taking lunch recess in 15 minutes.

25         MR. LOCKWOOD:  Okay.  Your Honor, read the

1  declaration.  I will argue to you that you will -- when you

2  read it you will see that it does not describe at all what

3  discovery efforts Garlock undertook to find out this.  It

4  simply describes that there was nothing discovered.  It doesn't

5  say what document requests were made, what interrogatories were

6  served, what depositions were taken.  Point two, it doesn't --

7  Garlock, with respect to the so-called concealment,

8  acknowledges that it found out that subsequently claims had

9  been made to a bunch of these trusts.  And indeed, and Mr.

10  Cassada referred to these in his remarks, Garlock -- in Garlock

11  Exhibits 52 through 64, got something like two inches of

12  responses from trusts, either by subpoena or requests, the

13  precise mechanism is not disclosed, showing the filing of these

14  very claims.  These are the <u>Polar</u> and <u>Snyder</u> claims.

15          And so, whatever concealment was attempted wasn't

16  very successful, and there's no evidence with respect to the

17  alleged concealers, plaintiffs Polar and Snyder as to, assuming

18  that they had been subjected to discovery that was adequate to

19  determine whether they had the exposure represented by these

20  claims, why it was that they went ahead and filed and didn't

21  disclose it.  Was it inadvertence?  Was it after discovered

22  evidence?  We don't even really know, if you look at the

23  evidence, exactly when the claims were filed with the trust in

24  comparison with when Garlock's discovery took place.  I mean,

25  Mr. Cassada told us that it followed, and I don't believe that

1 there's anything in the record that gives you the actual

2 chronological sequence of events -- but in any event, what

3 happened next?

4                        (Pause)

5              MR. LOCKWOOD:  I thought I had them here.  I won't

6 waste the Court's time.  There's an exhibit, Garlock 73, Your

7 Honor, and it shows that, in fact, Garlock made claims against

8 the trusts that had handled the Polar and Snyder claims and got

9 paid and the totality of the payments that it made on the three

10 clients that identified, which were Polar and Snyder, and I

11 think the third name was Wilson, was over $600,000, which

12 obviously represents the payment percentage amount, so you'd

13 have to gross up using whatever the applicable payment

14 percentage was to determine what the gross amount of the claim

15 was.

16              But the bottom line is, A, they weren't concealed

17 very successfully.  B, you don't know why they were supposedly

18 concealed.  C, Garlock found out about them and successfully

19 made claims against the trusts involved.  And from that -- from

20 those two incidents Garlock would have this Court conclude that

21 there is this widespread problem of fraudulent claims filings

22 -- excuse me, fraudulent testimony and fraudulent evidence in

23 the tort system -- again, this is all conduct in the tort

24 system, in Garlock litigation, that it's complaining about

25 here, that would -- that were somehow or another attributable

1 to the lack of transparency of the trust distribution

2 procedures.

3        And so, what do they want -- and that's just

4 ridiculous.  You can't extrapolate from two cases about which

5 you have virtually no evidence of what happened and why it

6 happened to a universe that this is a huge problem that needs

7 to be fixed.  So, what are the fixes?  Well, Garlock says it's

8 not a problem because what we want to have done are in there

9 gratuitously and have no purpose.

10                (Pause)

11        MR. LOCKWOOD:  The first thing Garlock wants done is

12 to delete the provision that allows plaintiffs to defer claims

13 indefinitely.  Well, we've already seen that that refers to --

14 not to Garlock's treatment by the trust, but to other people's

15 treatment.  And secondly, that there's no showing that

16 eliminating this provision would solve any problem that Garlock

17 has in the tort system.  And thirdly, Mr. Inselbuch testified,

18 contrary to Garlock's assertion that there's no evidence as to

19 the benefit for this, that actually allowing the deferral

20 provision was beneficial to the trust because it slowed the

21 dollars out the door, and tended to -- if you remember Dr.

22 Peterson's projections, most of the claims come into the

23 earlier years, so to the extent that the claims get deferred,

24 you reduce the processing demands on the trust.  So, the only

25 evidence in the record is that there is a purpose for this.

1          Second, narrowly tailored confidentiality provision

2 to protect only sensitive information such a medical records

3 and social security numbers.  Number one, Garlock has

4 demonstrated that it can get claims files through subpoenas in

5 its tort system litigation despite the confidentiality

6 protections.  So, the need to reduce them is nonexistent.

7          Secondly, as we noted in our papers, confidentiality

8 is standard practice in the tort system.  Garlock doesn't make

9 its confidential settlement negotiation materials available to

10 codefendants, absent a discovery demand that would enable --

11 that would allow it.  And if confidential discovery materials

12 are available in the tort system to non-bankrupts, then Garlock

13 can subpoena the trust and get the same result, and there's

14 nothing in the TDP in Section 6.5 that prevents that, and

15 indeed there's a recognition that it can happen and this Court

16 is familiar with the process.

17          Third, provide the limitations period mirrors the

18 tort system.  There's no explanation at all of what's defective

19 about the present limitations provision in the section of the

20 TDP that I quoted earlier, much less that there's whatever

21 extinction might be built into that limitation period is

22 someway or another hurting either Garlock's prosecution of its

23 own contribution claims, which again is what 524(g) is all

24 about, or hurting Garlock's position in tort system litigation,

25 which is what 524(g) is not about.

1        Allow codefendants to initiate binding resolution to
2   the trust claim.  I mean, where does that come from?  I mean,
3   they'd like it, I understand it, but there's just no basis for
4   them to come in here and say, I want to compel other claimants
5   who are equal beneficiaries under the trust as me to have some
6   sort of a debate with me in the tort system under which their
7   claim would be resolved in some manner that would benefit me in
8   an unrelated litigation.

9        Bind plaintiffs to the positions that they take in
10  the tort system.  Well, number one, there are -- you can use
11  admissions against people in the tort system, and the trust can
12  do that.  The binding of the positions that they take in the
13  tort system, if the position they take in the tort system is
14  something that Garlock doesn't like, binding it would only
15  affect the trust.  Because what they're basically saying here
16  is, if you deny exposure to Grace products in the tort system,
17  you shouldn't be able to allege that you had it with the trust.
18  Well, the trust can already find that out as Your Honor had a
19  colloquy, they could find that out in discovery.  Garlock says,
20  oh, no, that's not going to happen.

21       If you look at Section 5.8 of the TDP entitled Claims
22  Audit Program, one of the provisions is, "Further, in the event
23  that an audit reveals that fraudulent information has been
24  provided to the PI Trust, the PI Trust may penalize any
25  claimant or claimant's attorney by rejecting the PI Trust

1  claims or by other means including, but not limited to

2  requiring the source of the fraudulent information to pay the

3  costs associated with the audit and any future audit or audits,

4  reordering the priority of payment of all affected claimants'

5  PI trust claims, raising the level of scrutiny of additional

6  information submitted from the same source or sources, i.e.,

7  the law firm that filed, that was involved in this, refusing to

8  accept additional evidence from the same -- I mean, there's a

9  panoply of mechanisms by which the trust can protect itself.

10          And Garlock has introduced no evidence, at all, that

11  those remedies provided in Section 5.8 are ineffective in

12  preventing the double dipping, which was the second part of

13  Garlock's conceal and defer objection.

14          Finally, they want to provide that evidence of Grace

15  exposure is for the benefit of all trust beneficiaries,

16  including codefendants, citing the provision in the TDP that

17  says that the information you're giving for the trust is for

18  the benefit of the trust.  Well, the reason it's for the

19  benefit of the trust is, the trust is conducting --

20          MR. CASSADA:  Your Honor, there's no foundation for

21  this.  There's no testimony in the record, that I recall, about

22  the focus of this (indiscernible).

23          MR. LOCKWOOD:  Mr. Inselbuch testified that the

24  purpose of the TDP provisions was that they were determining

25  the trust's several share of liability, and therefore they

1 didn't need to know what exposure claimants had to other

2 products, because they weren't dealing with joint and several

3 liability.  That testimony is in the record, and it's evidence

4 of Grace exposure that that testimony would affect.

5          So, I realize I'm about to run out of time, so I'll

6 just finish by saying, at the end of the day what Garlock wants

7 to do is to rewrite the TDPs to facilitate its litigation

8 posture in State Court litigations in ways that the state laws

9 and rules don't presently afford it rights that are to its

10 satisfaction.  Under the guise of coming in here and saying

11 that as a claimant against the trust, it's being unfairly

12 treated, and (a) there's a failure of proof as to what happens

13 in the State Court system, and (b) there's a disconnect between

14 how the trust is treating it as a claimant and how the trust

15 procedures affect it as a litigant in other forums.  Thank you.

16          THE COURT:  All right.  We're going to be in lunch

17 recess from now until 1:30.

18                        (Recess)

19          THE COURT:  Mr. Bernick?

20          MR. BERNICK:  Just briefly, Your Honor.  On a

21 logistical matter, and I raised this with Mr. Speights because

22 I know he has a special interest in venturing back out into the

23 snowstorm here and making his way to another engagement where

24 he has to appear on Thursday before a Court, but we also share

25 a concern about finishing up this afternoon.  And I think in

1  service of that it really is of critical importance that we

2  move with alacrity through the balance of any comments that

3  people might have with respect to what we've now spent the

4  better part of I don't know how many hours dealing with, and

5  for reasons that are well understood by us.

6        So, I'm not once again trying to push Your Honor on

7  any particular individual's delivery, but we really are running

8  out of time.  We have Anderson Memorial, which is going to take

9  an hour anyhow, and then we have two other segments left to

10  argue with respect to the insurers and the third party

11  claimants.  We've got a lot of work yet to do.

12        So, I suggested to counsel just now, I asked, you

13  know, how many -- how much longer they were going to be, and I

14  started to get estimates and started to make it sound like in

15  the aggregate --

16        THE COURT:  I'll make it easy, five minutes apiece.

17  I've heard the arguments, this is pure rebuttal and nothing

18  more.  So, that's it.  Five minutes is plenty.  Mr. Speights?

19        MR. SPEIGHTS:  Dan Speights on behalf of Anderson

20  Memorial.  Mr. Bernick was accurate in what he stated.  I

21  understand that the banks are going to have tomorrow anyway, so

22  I don't see a problem.  And Mr. Rosendorf and I will be happy

23  to stay here as long as we need to tonight to hear Anderson, if

24  we can hear it.  We had just expressed concern whether we would

25  reach it.  So, if at any time somebody learns that we're not

1 going to reach it, let us escape the snow, please.

2        THE COURT:  Well, what time are your flights?

3        MR. SPEIGHTS:  Well, I've got -- the flight home

4 would be a five something.  I doubt I could get that, but I do

5 have a flight at seven something to go into Columbia where my

6 Supreme Court argument is going to be on Thursday.

7        THE COURT:  I don't see any reason why we can't do

8 this argument now and get to it.  I've got one, two, three,

9 four, five -- five, 25 minutes, plus save ten for the debtor,

10 35 minutes to wrap up this segment.  If you think we can get

11 your argument finished if I continue this one first, I'll do

12 it, if not, I'll take yours next.

13        MR. SPEIGHTS:  We're happy to go now.  Whatever suits

14 Your Honor.

15        MR. BERNICK:  Well, what I would suggest is that we

16 finish up this segment so that it's just done.  That is not

17 Phase 2, but just what we've just been arguing --

18        THE COURT:  Yes.

19        MR. BERNICK:  -- I think that's what Your Honor was

20 saying.

21        THE COURT:  Well, I was, except if he's got a five

22 o'clock flight, you've got to be out of here by 3:30.  I think

23 we should do Mr. Speights first.  I don't want to hold you up,

24 and with the snow I'm concerned if you don't get out today, you

25 may not get out.  So, let's start with yours, Mr. Speights, and

1  then we'll return.  Mr. Cohn?

2           MR. COHN:  If I may, I've actually got a four o'clock

3  flight.

4                         (Laughter)

5           THE COURT:  Do you have a Supreme Court argument?

6           MR. SPEIGHTS:  No, no, no.  But, Your Honor, I really

7  wanted to simply speak -- it will be less than five minutes --

8  in support, believe it or not, of the Plan Proponents'

9  positions.

10          THE COURT:  Oh, I have to hear this.

11          MR. SPEIGHTS:  Mr. Bernick was somewhat amazed, also.

12 But, there's one aspect of the statutory scheme which I think

13 is very important to highlight here.  Mr. Bernick has pointed

14 out that the second 524(g) would be meaningless if you couldn't

15 protect reorganized Grace from indirect asbestos PI claims.  If

16 somebody -- if a Libby claimant comes along and gets a judgment

17 in five years from BNSF, you cannot have a situation in which

18 BNSF could pursue reorganized Grace.  That claim has to go to

19 the trust, and that is an absolutely essential part of the

20 statutory scheme.

21          On the other hand, Your Honor, a separate issue under

22 Section 524(g) has to do with who is entitled, which third

23 parties?  Grace obviously is entitled to the protection of a

24 524(g) injunction, but the question is, what third parties are

25 entitled to the benefit of a 524(g) injunction?  And there you

1  have the statute that Mr. Frankel, of course, pointed out to

2  you, but -- of which you were already well-aware, which creates

3  those four categories of people who can be the subject of a

4  Section 524(g) injunction, or rather who can be the

5  beneficiaries of the Section 524(g) injunction.

6         And I just wanted to make it clear that it is an

7  absolutely necessary part of the statutory scheme and follows

8  the words of the statute and its purposes that those are two

9  separate sets of people.  There is no -- they, of course, may

10 and do overlap, but two completely separate definitions of

11 claims that are channeled to the trust, which as you held in

12 Armstrong, is anything related to asbestos personal injury

13 claims.  And the smaller set of third parties who have indirect

14 claims who can be protected by a Section 524(g) injunction.  It

15 is a non-sequitur and would be a non-sequitur for anybody to

16 argue that because I have an indirect PI claim, which is being

17 channeled to the trust, that therefore I am entitled to the

18 protection of a Section 524(g) injunction.  And that's my only

19 point, Your Honor.

20         THE COURT:  All right.

21         MR. COHN:  Thank you.

22         THE COURT:  Anyone else have earlier than five

23 o'clock flights and have to be heard?  Okay, Mr. Speights?  Oh,

24 I'm sorry.

25         MR. ROSENDORF:  Your Honor, it will be myself doing

1  the argument, but I defer to the Plan Proponents to bear the

2  burden to present their argument.

3         MR. BERNICK:  Well, I think what we'll do here is

4  what we did in connection with the first argument with regard

5  to Libby, which is, we have a very short -- indeed, what I'll

6  do in the interest of hastening Mr. Speights' departure for his

7  five o'clock flight, we'll defer our argument until you all

8  speak to the objection and then to the extent that we have

9  comments, we'll comment.  That might enable us to actually

10 expedite the process.

11        MR. ROSENDORF:  If it would expedite it, I would

12 support that.  My concern, particularly based upon what was

13 circulated last night, is that I'm actually not sure what the

14 scope of the Plan Proponents' argument is going to be and what

15 issues that's going to raise.  And so I'd like to understand

16 that before we proceed.

17        MR. BERNICK:  It's everything that's in our brief.

18 It's very narrow.  I'm just going to bing being through the

19 issues.  If you're concerned that we're going to revisit the

20 entirety of the history of Anderson Memorial, that is not the

21 intent, but we want to leave -- we recently got those

22 demonstratives is that we don't know to what extent you're

23 going to get into the history and therefore we were prepared to

24 address it.

25        THE COURT:  Mr. Rosendorf, how do you want to do it?

1 Do you want to go first?  Fine.

2          MR. ROSENDORF:  Very well.  If that is the case, Your

3 Honor, obviously I would like to reserve some time for

4 rebuttal.

5          THE COURT:  All right.

6          MR. ROSENDORF:  Your Honor, I do want to be brief

7 here.  I know that there's been a lot of briefing already in

8 this case.  You've had a lot to read.  You've heard a lot at a

9 confirmation hearing.  There's already a lot of material before

10 you.  I'm going to focus my argument here on three primary

11 issues and they're the ones that we have spent the most time

12 dealing with at the confirmation hearing and otherwise;

13 feasibility, good faith and disparate treatment.

14          Your Honor, let me start with feasibility.

15 Feasibility is really a very simple test, Your Honor.  The

16 fundamental question is how much is the debtor going to have to

17 pay under a plan and how is it going to do so?  The problem in

18 this case is that the debtors have had a failure of proof on

19 both of those elements, Your Honor.

20          Let's start with the first, the question of what's to

21 be paid under the plan.  There are a number of liabilities

22 which the debtors have fixed under this plan.  They know what

23 they're supposed to pay to the PI claimants, they know what

24 they're supposed to pay to unsecured creditors, they have fixed

25 amounts that they are due to pay to the ZAI -- to the trust for

1  the ZAI claims.  What is not fixed under the plan, and which

2  their own expert, Ms. Zilly, described as a pass through

3  liability are the liabilities for unresolved property damage

4  claims and future property damage demands.  Those obviously are

5  of paramount concern to my client, Anderson Memorial, because

6  the ability of the debtors to pay those directly impacts on the

7  ability to satisfy our claims.

8         The problem, Your Honor, is that the debtors have not

9  attempted to quantify the amount or even the range of those

10  pass through liabilities.  Their sole witness at the

11  confirmation hearing on feasibility was Ms. Zilly.  Ms. Zilly

12  clearly testified that she did not attempt to estimate or

13  quantify those liabilities.  All that she did was rely upon a

14  number that was given to her by the debtors, a number which no

15  representative of the debtors ever came forward to testify to,

16  to explain, to support or substantiate.

17         There is not a single witness that came forward for

18  the debtors to say that that $37 million reserve, which she

19  said that she relied upon, to explain how that number was

20  calculated, to explain the assumptions and underlying basis for

21  it.  In fact, we are repeatedly precluded from even inquiring

22  as to what the contents and makeup of that number were, even at

23  the confirmation hearing.

24         Now, Your Honor, the problem is that when an expert

25  renders an opinion that is not based upon evidence that is in

1  the record, that opinion is excludable.  Basic law.  An expert

2  cannot base an opinion on a matter that has not been

3  substantiated in the record and have that opinion stand up.

4        We've sited in our briefs the Elcon v. Kmart Corp.

5  case, that is a Third Circuit case from 2000, that expert

6  testimony that is based upon assumptions that are not supported

7  by the record should be excluded.  There is no evidence in this

8  record to support the "reserve" which the expert relied upon

9  and which was the sole effort to quantify these pass through

10 liabilities.

11       Now, I have reviewed the debtors' reply with respect

12 to the feasibility briefs that we filed post-trial.  They made

13 a belated effort to remedy this failure of proof in a couple of

14 ways.  First, they claimed that they don't need to estimate

15 claims because they have substantive objections to any

16 potential claims, including statute of limitations and lack of

17 hazard.  And in support of that, they cite to their 15th

18 omnibus objection.

19       Well, there are a number of problems with that.

20 First, the objection was not part of the confirmation record.

21 Secondly, and most obviously, any objection is just lawyer

22 talk.  It's not evidence.  It's not a record basis for making

23 any particular finding.  But, perhaps most egregious, Your

24 Honor, is that what the debtors did by attempting to inject

25 that post-confirmation hearing in their reply brief, not even

1  in their initial brief, is that it violated an agreement that

2  they had reached with Anderson before the confirmation hearing.

3        Your Honor, we marked as part of our exhibits, this

4  is AMH-41.  This is an e-mail from Mr. Restivo to Mr. Speights,

5  July 14th, confirming that at the confirmation hearing, Grace

6  will not be introducing evidence seeking to prove that all

7  future property damage claims or demands are worthless due to

8  lack of hazard, nor that all future property damage claims or

9  demands are barred by constructive notice.

10        What they attempt to do in their reply brief is

11  directly contrary to what they said that they were going to do

12  in advance of the confirmation hearing.  And, Your Honor, in

13  reliance on that representation, there is all sorts of evidence

14  that we elected not to put on.

15        This is an issue that had been taken off the table in

16  advance of the confirmation hearing which we made decisions as

17  to how we were going to approach that hearing based upon what

18  they told us.  That argument should be excluded.  It should not

19  be considered and it should not be a basis for them to say that

20  they don't need to determine those pass through liabilities.

21        The other thing, Your Honor, that they attempted to

22  do is to point to the written answers to discovery that Mr.

23  Shelnitz provided in response to our motion to compel.  You'll

24  recall there was an extended debate over discovery regarding

25  this, among many other issues, the debtors consistently

1  resisted any discovery as to the basis for this reserve or how

2  it was calculated or anything else.  The Court directed that

3  Mr. Shelnitz provide limited answers to particular questions

4  that we had raised in the motion to compel, and they provided

5  those.

6        What they did not do, however, they did not produce

7  Mr. Shelnitz as a witness at the confirmation hearing, and as

8  best as I can tell, despite reviewing the charts of both the

9  admitted and the not yet admitted exhibits that were submitted

10 after the conclusion of the confirmation hearing, they did not

11 put these written answers into evidence.

12       In fact, Your Honor, it's fairly clear, if they had

13 attempted to do so, it should come as no surprise that we would

14 have sought to obtain further discovery from Mr. Shelnitz, we

15 would have sought to cross examine him, but he was not

16 identified as a witness.  And even though their brief refers to

17 this PP-368, I can find no evidence that that document was part

18 of the record for the confirmation hearing.

19       Once again, needless to say, if we had had the

20 opportunity, if that had presented itself, we would have been

21 in a position to do something about it.  Once again, Your

22 Honor, not part of the record, there is nothing in the record

23 to substantiate this basis for Ms. Zilly's opinion.

24       Now, our concerns with respect to this "reserve" were

25 highlighted even further when after the conclusion of the

confirmation hearing we learned another piece of information.
On November 9th, the debtors filed a motion to approve a
settlement.  The settlement was with the Solow claimants.  That
settlement was for $35 million.  It is not part of the record,
because it wasn't filed until post-confirmation.

MR. BERNICK:  I have no quarrel with the idea that
counsel can make mention of this, because it's part of the
record in the case, even though it was not brought out during
the confirmation hearing.  But, I don't want then to be
precluded from responding to these things either.  So, sauce
for the goose, sauce for the gander.

MR. ROSENDORF:  Well, Your Honor, there's a good
reason why this, in particular, is not part of the record for
the confirmation hearing.  It's because the debtors didn't file
the motion to approve the settlement until November 9th, weeks
after the confirmation hearing had concluded.

MR. BERNICK:  I'm not opposing the ability to refer
to it.  I just want to be able to respond.

MR. ROSENDORF:  Your Honor, what is interesting and
notable among that -- about that settlement are a couple of
things.  First of all, that $35 million number consumes all but
$2.3 million of the "reserve" for all unresolved and future PD
claims and litigation expenses that were the subject matter of
Ms. Zilly's reliance.  But, again -- and this goes to how the
confirmation hearing was conducted --

1          THE COURT:  Mr. Rosendorf?

2          MR. ROSENDORF:  Yes.

3          THE COURT:  I haven't looked at Ms. Zilly's

4  testimony, so maybe I'm not recollecting correctly, but I

5  thought her testimony was as of the effective date, that the

6  debtor would establish the reserve as of the effective date.

7  Am I incorrect?  I know there were a series of documents, but

8  --

9          MR. ROSENDORF:  I believe that what she relied upon

10  was $112 million in resolved PD claims, plus a $37 million

11  reserve for unresolved claims.  When I say unresolved claims, a

12  reserve, which she did not testify as to what the basis for

13  that was.

14          THE COURT:  But, then she testifies to the time

15  frame.  I thought her estimates were based as of the effective

16  date of confirmation.  So, I would assume if that's the case,

17  that the debtor still has to establish a $37 million reserve.

18          MR. ROSENDORF:  Based upon the numbers that I

19  reviewed, Your Honor, everything that I have seen projects $112

20  million in resolved PD claims and a $37 million reserve.  And

21  certainly at the time that we were all here during the

22  confirmation hearing, the assumption, at least on our part, I

23  believe on everybody else's part was that the Solow claim was

24  an unresolved claim.  Because at the time of the confirmation

25  hearing, there was no record evidence that the claim in fact

1  had been resolved while there were approximately $112 million

2  of resolved PD claims.  So, the $35 million Solow settlement,

3  to my understanding, was not part of the $112 million in

4  resolved PD claims, it was, if it was anything, part of this

5  reserve.

6         The additional problem, Your Honor, and part of why

7  we feel somewhat hamstrung here, is that the settlement

8  agreement with Solow, although it was not filed with the Court

9  until November 9th, dated August 12th, 2009.  So, for whatever

10 reason, the debtors elected not to file that settlement

11 agreement in advance of the confirmation hearing so that we did

12 not have the opportunity to even explore whether or not it is

13 part of this reserve or not.

14        Your Honor, based upon the debtors' failure of proof,

15 we don't believe that there is any obligation on the part of an

16 objecting party to come up with some other number.  It is the

17 debtors' burden of proof on feasibility.  It is their

18 obligation to show, once again, very simple terms, how much do

19 you expect to have to pay, how are you going to pay it?  But,

20 Your Honor, our concern is further magnified by the evidence

21 that is established in the record.  We have the debtors' own

22 pre-bankruptcy expert, Dr. Rourke, who opined that they were in

23 excess of 100,000 buildings that may be subject to property

24 damage claims.  We have their current expert, Denise Martin,

25 and Dr. Martin likewise opined that there are over 140,000

1 buildings that may contain Grace Monokote product, and over

2 300,000 in which acoustical plaster products would have been

3 used.

4        Interestingly, in their reply they objected to our

5 reference to Dr. Martin's own report in support of those

6 figures.  Dr. Martin's report is one of the exhibits that the

7 Plan Proponents identified in their schedules and we referred

8 to it in our briefing as PP, Plan Proponents' 206.  Dr. Martin

9 also opined that the filed claims are just a fraction of the

10 potential future demands.

11        There is a disconnect in this case, Your Honor.  A

12 fundamental disconnect between a debtor saying that we don't

13 need to worry about the unresolved claims and we don't need to

14 worry about the future property damage claims and we can only

15 set aside a reserve of 37 million of which it now appears all

16 but $2 million has been accounted for to resolve all of those.

17 The unresolved Anderson claim, the Anderson class claim, which

18 is still on appeal, the State of California claims which are in

19 the asserted amount of $150 million plus all of the potential

20 future claims which they produced their own expert to say that

21 they expect they're going to be substantial.  There's a

22 disconnect between what they say for purposes of feasibility

23 and what they say for purposes of 524(g).

24        Your Honor, there should be little doubt, speaking of

25 State of California, that that decision opens the door more

1 broadly to the prospect of future property damage claims.  The

2 fact that that Court has now held that the statute does not

3 begin to be triggered until the debtor approves that there is

4 injury means that there is a much greater likelihood that there

5 are going to be successful future property damage claims.  But,

6 there is nothing in the debtors' feasibility analysis that

7 accounts for that.  And, indeed, Ms. Zilly said, I didn't

8 change my analysis, at all.

9        The other thing that's interesting on this point with

10 the debtor now saying that they don't need to estimate or

11 determine the range of these potential claims, is that it's

12 inconsistent with what they said throughout this case before

13 they filed this claim.  We've directed the Court in our

14 briefing to this multiple times, including as recently as 2004

15 in this case where the debtors themselves insisted that

16 estimation should be completed before you get to confirmation,

17 that it is an essential prior to a hearing on confirmation and

18 that it's necessary to determine feasibility.

19        THE COURT:  Well, they were talking about the

20 personal injury claims.

21        MR. ROSENDORF:  They were talking about both, Your

22 Honor.  There is motions to estimate directed to both PI and PD

23 claims.

24        MR. BERNICK:  That motion to estimate at the time was

25 for traditional property damage claims that had already been

1 paid out.  The Committee opposed that, including Mr. Speights,

2 saying that estimation was not appropriate for the property

3 damage claims and therefore we went forward to litigate those

4 claims.  It was never future property demands.

5          MR. ROSENDORF:  Well, I'm not even sure at that time

6 that the debtor acknowledged that future property demands

7 existed.

8          THE COURT:  I'm not sure they do.

9          MR. BERNICK:  That's exactly right.

10          MR. ROSENDORF:  Your Honor, we believe that there has

11 been a failure of proof on the first element of feasibility,

12 which is what do you expect to have to pay.  But, in addition

13 to that, Your Honor, there has been a failure of proof on the

14 second clause, which is, how are you going to pay it.  The only

15 evidence that they submitted on this point was Ms. Zilly's

16 testimony that the reorganized debtors could pay as much as

17 $1.6 billion over 25 years.  That testimony does nothing to

18 establish what would be necessary to prove feasibility because

19 it has nothing to do with how the plan is structured.  The plan

20 doesn't say that the reorganized Grace can pay claims over 25

21 years.  What the plan says is that property damage claims are

22 to be paid every six months as those claims are allowed.  The

23 way that the plan is structured is that reorganized Grace is

24 obligated to fund the property damage trust every six months

25 with the claims that are allowed over that six-month period.

1          It is undisputed that Ms. Zilly did not conduct the

2    estimate needed to determine both how much the debtor could

3    afford to pay and whether it could do so.  Once again, there is

4    a complete failure of proof.  Absent that evidence, there is no

5    way to find feasibility and there is no way to confirm this

6    plan.

7          Your Honor, we have already expressed our concerns

8    with the quantum of evidence that has been put forward on the

9    exit financing.  What we have, in essence, is nothing more than

10   a financial advisor's say so.  We had that months ago.  They

11   went out; negotiated for commitment letters  Made a decision

12   that they didn't want to obtain them at this time.  And, in

13   essence, we are being asked by Ms. Zilly to just trust me that

14   we're going to be able to obtain them.  That's it.  That is the

15   sole quantum of evidence that we have that this debtor is going

16   to be able to obtain $1 billion in financing that it requires

17   to exit.

18         But, perhaps even more troubling about that, and this

19   circles back to the issue that I was discussing earlier, is

20   that Ms. Zilly testified that the financial projections, which

21   were presented to those lenders incorporated this $37 million

22   reserve, a number which is highly suspect and highly subject to

23   question based upon what we now know with respect to Solow and

24   with respect to the complete failure to quantify any of these

25   other outstanding claims.  And that, as well, raises a serious

1  concern that whatever platform or projection upon which these

2  finance commitments were sought is an untenable and it's an

3  unsupportable one.  And if that is the basis by which they

4  obtain these commitment letters, that raises serious concerns

5  as to whether her testimony and her confidence can be relied

6  upon.

7          Your Honor, we don't believe that the evidence that

8  has been presented in this case by the Plan Proponents goes

9  anywhere near what would be necessary to demonstrate the

10 feasibility of this plan.

11         Let me move now to the issue of good faith and to the

12 issue of disparate treatment, Your Honor.  We contend, and we

13 have discussed this in our brief, that the history of this case

14 and the treatment of Anderson's claims under this plan are

15 reflective of a bad faith effort to disenfranchise and

16 undermine property damage claims, and in particular, Anderson's

17 effort to assert those claims in a manner that would bring them

18 under a class action.

19         MR. BERNICK:  Your Honor, I object at this point.  If

20 the question -- it's just ambiguous -- is the question that

21 it's bad faith with respect to the current claims or future

22 demands?  He doesn't represent the future demand holders.  He

23 only represents the current claims, and the only current claim

24 that is represented is the Anderson claim.  There is no class

25 that's been certified.

1          So, if the claim is that we're not being -- we're

2    being in bad faith with respect to Anderson, I can respond to

3    that and that's an appropriate argument to at least raise.  If

4    the question is, we're being in bad faith with respect to other

5    current claimants, he has no standing to make that argument,

6    nor does he have standing to make the argument with respect to

7    future demand holders.

8          MR. ROSENDORF:  Your Honor, I don't believe that this

9    Court could confirm this plan if it made a finding that the

10   plan was filed in bad faith with respect to future PD demands.

11   And I think that any party is entitled to raise that issue.

12         THE COURT:  Well, there is a Property Damage Futures

13   representative in the case.  That party is entitled to raise

14   it.  Anderson doesn't represent Future Demand Holders, we don't

15   even know who they are.  So, I don't see how any party except

16   someone with an interest can raise the issue, and Anderson has

17   not identified itself as a Future Demand Holder and so I don't

18   think Anderson has standing with respect to the Future Demand

19   Holders.

20         MR. ROSENDORF:  And, Your Honor, I don't think it

21   necessarily makes a difference to the argument, because the

22   argument really does relate to the treatment and the dealings

23   and the negotiations or failure to negotiate with Anderson and

24   its counsel.  So, I don't know that it really makes a

25   difference, Your Honor.

1        MR. BERNICK:  Does that mean that the argument is now

2    being made with respect to Anderson, specifically?

3        MR. ROSENDORF:  I'm making the same arguments that I

4    made in my brief, Your Honor.

5        MR. BERNICK:  Your Honor, I'd object.  And counsel

6    ought to answer the question, a standing objection to any

7    argument that purports to be made on behalf of other claimants.

8        THE COURT:  Yes.  Anderson does not have standing to

9    raise this issue on behalf of other claimants.  There's a

10   Property Damage Committee that can raise it as to other

11   presents.  There are counsel for other presents, i.e. at least

12   the California actions which are present claims.

13       There is Canadian counsel to the extent any property

14   damage claims are left there, who could raise on behalf of

15   those entities.  And then there is the Future's rep who could

16   raise them on behalf of the Futures Property Damage claims.  So

17   I don't think Anderson can raise it, except on its own behalf.

18       MR. ROSENDORF:  The Court has made its finding on

19   standing and I accept that finding.

20       Your Honor, we have recounted the history of the

21   debtors' dealings with Anderson, largely through transcripts of

22   matters that were argued in this court, pleadings filed with

23   this court, arguments that often occurred without response or

24   opposition from Grace, because they were made against an empty

25   chair at times, that the debtor's counsel knew that Anderson's

1  counsel was not present.  We have shown how, in our briefs and

2  in the exhibits that we attached to it, despite the debtor's

3  reliance upon their good faith, arm's length negotiations as a

4  basis for a good faith finding here, they basically cut off

5  negotiations and communications with Anderson's counsel in

6  early 2005 --

7       MR. BERNICK:  Your Honor, I object to this statement.

8  This statement violates Rule 408.  Rule 408 precludes any

9  discussion, much less admission into evidence regarding

10 settlement negotiations.  The settlement negotiations that

11 counsel referred -- negotiations that counsel referred to were

12 settlement negotiations during that period of time.

13      There is no relevance to good faith because good

14 faith is a test that applies to the plan that's proposed.  The

15 plan that's proposed and it's now before the Court wasn't

16 proposed until years after that.  And I would further add that

17 the dealings with Mr. Speights in 2004/2005, whenever it was,

18 were not specific to the Anderson Memorial case.  Mr. Speights

19 at that time purported to represent thousands of claimants.  We

20 were specifically enjoined by Your Honor when it got to this

21 very issue at the tail end of the confirmation hearing to

22 proceed at our peril and we declined to call Mr. Finke on the

23 grounds that it would open the door to something that Your

24 Honor was saying at the time was not a fair subject for

25 inquiry.  And now all that counsel's doing -- and they decided

1 not to call their witnesses in that regard, as well, so we can

2 have Mr. Finke get into it.

3         So, counsel is now basically testifying to matters

4 that they decided not to put into evidence and that we decided

5 not to put into evidence because we were guided by the Court

6 that to do so would violate the rules of evidence that thus far

7 had been applied.

8         MR. ROSENDORF:  Your Honor, respectfully, I think

9 that there's a bit of revisionist history there.  What happened

10 at the confirmation hearing during the Plan Proponents'

11 presentation on the issue of good faith is that they circulated

12 a demonstrative exhibit that notwithstanding their repeated

13 efforts to oppose discovery as to settlement discussions and

14 negotiations that gave an extensive and detailed history of

15 those negotiations, which was part of a proffer for what they

16 intended to have Mr. Finke testify to, notwithstanding their

17 repeated efforts to prevent discovery of that during the

18 depositions that led up to the confirmation hearing.

19         The Court did not tell them not to do so.  The Court

20 said, if you're going to do so, we're entitled to our

21 discovery.  And at that point, they elected not to put that

22 evidence forward.

23         MR. BERNICK:  That's really not even accurate by

24 itself.  What actually happened was that, yes, we had resisted

25 all of this and we had resisted it repeatedly, Your Honor,

1 because they were mounting what purported to be a whole new

2 discovery effort.  We resisted that on the grounds it was

3 impermissible, but Your Honor determined that they would be

4 permitted to call Mr. Solomons, and that Your Honor also

5 determined that you weren't going to shut off this discovery.

6 In anticipation of the fact that they might call that

7 individual and others, we brought Mr. Finke.  Because remember,

8 we had the burden of proof.  We didn't want to be in a position

9 of hearing Mr. Solomons testify and then all of a sudden now

10 have allowed the door to open and then have Mr. Finke called in

11 response.  So we showed up preemptively with Mr. Finke.  We

12 said we are prepared to call him, and this issue came up about

13 whether this entire area was appropriate for inquiry.

14        And, yes, under Your Honor's guidance, we decided not

15 to call Mr. Finke, they decided not to call Mr. Solomons or to

16 put in any of this stuff into evidence.  So, the shoe is

17 actually on the other foot.  We tried to follow the rules of

18 evidence, it was they who decided not to.  And also at the last

19 moment decided not to put in any of the evidence that they are

20 now going to recite.  And this is completely irrelevant.

21        THE COURT:  Well, if I don't have any evidence, I

22 don't have any argument based on the fact that I don't have any

23 evidence, except that I don't have any evidence.  So, okay, if

24 I don't have any evidence, I don't have any evidence, let's

25 move on.  I don't know what else I can say, except if there's

1 no evidence, there's no evidence.

2        MR. ROSENDORF:  Well, but there is evidence, Your

3 Honor.  There are witnesses that we elected not to call at the

4 confirmation hearing, but there are also witnesses that we put

5 in through deposition and there are documents that we put in

6 and marked as exhibits which do go to this very issue.

7        THE COURT:  Okay.

8        MR. ROSENDORF:  Your Honor, we deposed Mr. Finke, and

9 we asked him about this and he acknowledged that the

10 negotiations were cut off.

11        MR. BERNICK:  Actually we went through all this.  It

12 took about an hour to go through it.  And that deposition says

13 nothing, nothing at all.  If you read the deposition, Mr. Finke

14 doesn't testify to any such meeting or any such direction,

15 which is what they said, that was a misrepresentation of Mr.

16 Finke's testimony.  So, this is now a recycle of the argument

17 that's been made eight times that they have never been able to

18 support.  It violates Rule 408 that we sought to shut down on

19 that basis with respect to matters that don't relate to good

20 bad faith against Anderson Memorial, because Anderson Memorial

21 was one of thousands of claims at the time, and it doesn't

22 relate to this plan because this plan was a glimmer, not even a

23 glimmer in our eyes, because we couldn't agree on anything with

24 the PI Claimants.  So, this is the typical thing.

25        And, Your Honor, I'll tell you another thing that

1  happened the last time they made these arguments is, lo and

2  behold, they get a little smear article that comes out in the

3  press, you know, maybe they like the idea that Grace is accused

4  of playing hardball, which is exactly how it was carried in the

5  press, and they're doing it again.

6          THE COURT:  I don't care what the press says, I don't

7  read the press for those things.  If I do read it, I ignore it.

8  So, I don't care what the press says.  What I care about is the

9  evidence.  How about arguing the evidence to me, please?

10          MR. ROSENDORF:  Your Honor, again, we have given

11  cites to the testimony of Mr. Finke and Mr. Hughes, as well as

12  Anderson Memorial's Exhibits 50, 51 and 52, which are

13  reflective of this very issue.

14          THE COURT:  All right.

15          MR. ROSENDORF:  And, Your Honor, the reason we

16  believe that it ties into the question of this plan, ties into

17  the issue of disparate treatment, which is a separate, but in

18  our mind, very related issue to the good faith issue.  Because

19  we believe, and we've said it, we've made this clear in our

20  briefs and in our pleadings, that the treatment of the Anderson

21  claims under this plan and under the PD CMO is the final

22  manifestation of the strategy that the debtors have adopted

23  with respect to the Anderson claims.  So, it is part and parcel

24  of this plan and it is part and parcel of how Anderson is

25  treated under this plan.  And so to suggest that because these

1 negotiations occurred in 2005 and the plan wasn't filed until

2 years later and therefore they have nothing to do with each

3 other, we don't accept that, we believe that this is part and

4 parcel of the same strategy, Your Honor.

5         Your Honor, there are a number of points that have

6 been made in the debtors' response brief that I'm really not

7 sure how to respond to, because on the one hand Mr. Bernick is

8 telling us that we can't talk about settlement negotiations at

9 all and all this is irrelevant, and on the other hand, they

10 spend a lot of time, even in the response brief that they filed

11 dealing with these very same issues.  And so I feel compelled,

12 in particular, to respond to a number of things that were

13 raised in that response brief, because that response brief is

14 going to be of record, and it is clear that in any appeal that

15 comes out of this, those arguments are going to be made.  So, I

16 feel that I need to address those regardless of what position

17 they're taking here today.

18         Your Honor, there are a number of just disconnects in

19 what they have to say.  As an example, at Page 6 of their

20 brief, they suggest that since late 2003 they had made clear

21 that they intended to pursue objections to Anderson claims for

22 lack of authority.  I've looked at the transcript and the

23 motions that they refer to and they say nothing about authority

24 objections.  And, in fact, it's inconsistent with their own

25 argument that they started thinking about the authority

1  objections after December 2004 when they saw the Rule 2019

2  statements that Speights and Runyon had filed.

3      MR. BERNICK:  Your Honor, we object.  Counsel is now

4  violating the undertaking that he made, which is to make an

5  argument that's specific to Anderson.  We're going back over

6  the deep history, and the deep history that he's now reciting

7  is 2003 dealing with the issue of authority.  The issue of

8  authority was a very broad issue.  This is not an argument

9  about Anderson.  This is an argument about Mr. Speights

10 believing that somehow he wasn't dealt with fairly as his firm

11 representing all of these different claimants and purported

12 claimants and people who didn't turn out to be claimants, at

13 all.  That is not a basis for a good faith claim, certainly has

14 no relationship to the plan.  So, I thought we were going to

15 hear about Anderson, and thus far I've heard nothing about

16 Anderson.  This is all a good faith argument that goes to

17 something that is not at issue and he doesn't have standing to

18 raise.

19     MR. ROSENDORF:  Your Honor, I'm responding to matters

20 that are raised in the debtors' own brief.  The debtor can't

21 make an argument and then say I can't respond to it because

22 they think it's irrelevant.

23     MR. BERNICK:  We objected and we've nonetheless had

24 to state our -- our brief sets out in detail right at the

25 outset that we object to this whole thing.  It's all barred by

**J&J COURT TRANSCRIBERS, INC.**

1  Rule 408.  It's right in our brief.  We're not going to let go

2  unresponded to these false claims about the history just like

3  we are not prepared to let them go unresponded during the

4  confirmation hearing.

5       Your Honor, if they were precluded from getting to

6  all of this stuff to begin with and our objections were upheld

7  to the point that they couldn't, we wouldn't have written that

8  section of the brief.  So he's now saying, well, I said what

9  you thought that I didn't have the right to say and because I

10  did it you now can't respond to it without waiving your

11  position?  That's ridiculous.

12       THE COURT:  All right.  I think the purpose today is

13  to tell me how the issues that Anderson has raised, which are

14  equal treatment -- and I'm not sure which you choose to argue

15  -- classification, feasibility, good faith and if you're going

16  to argue the need for the 524(g) injunction, that's how they're

17  classified.  I'm reading from the debtors' exhibit.  And

18  Anderson may classify them differently, but those are, in

19  essence, the arguments that Anderson has made.  So, let's get

20  it to Anderson.  I've already addressed the authority issues.

21  There's nothing more I can do with respect to the authority

22  issue, but that's not an Anderson related issue.

23       MR. ROSENDORF:  Well, Your Honor, I have to

24  respectfully disagree, because the authority issue is part and

25  parcel of the Anderson class action.  The whole reason that the

1  proofs of claim were filed was because of Speights and Runyon's

2  understanding that based upon your Court's prior explanations

3  of its position with respect to bankruptcy class actions that

4  that was the appropriate means of proceeding to preserve those

5  claims.

6        THE COURT:  Regardless, that's not part of Anderson.

7  I've addressed that, it's been up on appeal.  There's nothing

8  more with respect to that.  It's not part of a good faith in

9  this plan negotiation process.  Those claims are over.  What

10 isn't over is Anderson's individual claim, and in the event

11 that my opinion on the class action's reversed, then there may

12 be a class action claim, but right now there's not one of

13 those.

14       MR. ROSENDORF:  Your Honor, based upon the Court's

15 ruling, I will proceed as you've directed.  I will note,

16 obviously, there are matters that we dispute in their brief.

17 There are matters that we do believe are relevant to this that

18 go to the history of the plan and how we got to where we are

19 today.  But, based upon your ruling, I will not address those

20 issues here.

21       THE COURT:  Well, state for me, without argument,

22 what they are and how they relate to Anderson.  Because to the

23 extent the debtor was responding to something that is not

24 related to Anderson in Anderson's brief, then frankly I don't

25 care whether Anderson or the debtor raised it, I'm not going to

1  consider it as to anybody because that's not the issue that's

2  before me.

3       MR. ROSENDORF:  Understood.  And I think we -- as

4  I've already expressed, I think we have a difference of

5  perspective on what relates to Anderson and not from our

6  perspective the claims that were filed relate to Anderson

7  because that was the basis for authority for those claims, but

8  I understand that the Court has directed me and I will follow

9  that direction.

10      Your Honor, let me move to the issue of disparity of

11 treatment and in particular as to the treatment of Anderson's

12 claims.  The debtors, in effect, argue that Anderson should

13 have nothing to complain about because, as they say, Anderson

14 gets the most favorable treatment of any claim under the plan,

15 because it's getting paid a hundred cents on the dollar.  But,

16 the fact is, Your Honor, that the plan actually proposes any

17 number of different processes for dealing with property damage

18 claims.

19      Unresolved property damage claims, including prefiled

20 claims that were pending in State Court for years before this

21 bankruptcy, as Anderson's claim was in South Carolina State

22 Court, nonetheless must stay in the Bankruptcy Court for

23 resolution.  Under the plan, as it was filed, however, the

24 Solow claims were not subject to that provision, and they were

25 permitted to return to the pending State Court proceedings.

1          Future Property Damage demands are treated in yet a

2 different way.  They may be litigated in any Federal District

3 Court where they'll be entitled, to among other things, to a

4 trial by jury, and ZAI Property Damage claims, which are

5 included under the big Class 7, although subclassified

6 separately within there, are subject to simplified claims

7 resolution procedures that are under the supervision of the

8 property damage trustee.

9          Now, the problem is that this violates basic

10 principles of equality among creditors under the Bankruptcy

11 Code, and that fundamental tentative equality is embodied among

12 other provisions in 1123(a)(4).  Now, the debtor says, all that

13 that refers to is a quality of payment, and if you're getting

14 paid the same as others you have nothing to complain about.

15 But, that is not necessary true, Your Honor.

16          The Dow Corning case, which we have cited in our

17 briefs out of the Sixth Circuit, 280 F.3d at 648, makes clear

18 that equality under 1123(a)(4) refers not just to payment, but

19 refers to process.  In that case -- and I understand there's a

20 lot of Dow Corning cases out there, there's a lot of published

21 decisions, and part of the disconnect here is that when the

22 debtors, in their reply, argue against this, they're relying on

23 the wrong case.  The Dow Corning case at 280 F.3d 648 dealt

24 with governmental subrogation claims.  And the plan had

25 different processes and procedures for how U.S. and foreign

1  subrogation claims were to be treated.  While the Canadian

2  claims had certain mechanisms to ensure that they didn't have

3  to make payment in order to assert their claims and had certain

4  protections, the United States Government claims did not have

5  those same processes and procedures.

6        And the Sixth Circuit in Dow Corning said that the

7  disparate mechanisms and protections under that plan failed to

8  provide, "Recovery rights sufficiently similar to ensure equal

9  treatment, and therefore violated 1123(a)(4)."

10       That principle is consistent with the language in one

11 of the lower court decisions from Dow Corning, 255 B.R.  445,

12 where the Court said, again, referring to 1123(a)(4), that as

13 to whether the claim is being treated fairly within the class,

14 the inquiry is whether the claim is subject to the same process

15 in satisfying the claim as the other claims within the class.

16 And that to be treated equally, that requirement is satisfied

17 where all claimants are subject to the same process for claim

18 satisfaction.

19       Now, obviously, that's not the case here.  Now, in

20 part, the debtors argue that that's okay and that is justified

21 because Anderson, by filing a proof of claim, submitted to the

22 jurisdiction of this Court.  Now, we believe that that

23 "submission to jurisdiction" has to be viewed in context.  And

24 in particular, the context is that a number of times prior to

25 this Court's imposition of a bar date, including in the very

1 motion that led to the entry of the bar date order, the debtors

2 represented that as part of this process, what they were going

3 to do was going to be to review the cases that were already

4 pending to see which ones could be sent back to State Court.

5 And so parties that are filing proof of claims in reliance upon

6 -- in response to this motion or order, had the right to

7 believe that this was going to be part of the process is that

8 those prefiled claims could be sent back to State Court.

9          But, more importantly, Your Honor, there's a real

10 disconnect, once again, between that justification and what

11 they actually do, because one of the things that they do, and

12 this is part of the PD CMO, is that they claim that the reason

13 for difference in treatment between property damage claims that

14 are already pending and the future property damage claims is

15 that the future demands have not submitted to the jurisdiction

16 of the Bankruptcy Court.

17          That raises a real dilemma, Your Honor, with respect

18 to the PD CMO, because if that's the case, how do these plan

19 provisions, and how does the PD CMO require future demands to

20 pass through the gatekeeping function that they propose for

21 this Court to implement?  That justification does not make any

22 sense in light of the very structure of the plan that these

23 debtors have crafted.

24          More importantly, whether or not the Court has

25 jurisdiction over those claims, it is clear that the Court

1  doesn't have to exercise it. And, in fact, once again, the PD

2  CMO that they drafted makes clear that that's the case, because

3  what they proposed to do for Solow, which was another prefiled,

4  pending claim before the bankruptcy was filed was to send it

5  back to State Court.

6          Your Honor, the best evidence that there is disparate

7  treatment under this plan came from one of the debtors and Plan

8  Proponents' own witnesses. That was Judge Sanders. He was

9  asked about the difference in treatment. He was very clear in

10 what he said.

11         THE COURT: What's the date, do you know?

12         MR. ROSENDORF: This is the October 13th transcript,

13 Your Honor.

14         THE COURT: All right.

15         MR. ROSENDORF: Page 105.

16         THE COURT: Thank you.

17         MR. ROSENDORF: Judge Sanders said, "My clients got a

18 better deal than yours." That's exactly the problem here, Your

19 Honor, is that Anderson, despite having a prefiled claim that

20 had been pending in the State Court of South Carolina for seven

21 years and was ready for trial at that time --

22         MR. BERNICK: Can we have a cite to that page where

23 you quoted Judge Sanders?

24         MR. ROSENDORF: Page 105.

25         MR. BERNICK: Do you have it there? If you'd just

1  hand it to me, it would make life easier.  Thank you.

2          THE COURT:  Was that in response to Anderson's

3  questions?

4          MR. ROSENDORF:  Yes.

5          THE COURT:  All right.

6          MR. ROSENDORF:  Despite the Anderson claim having

7  been pending in South Carolina State Court for seven years,

8  prior to this bankruptcy and being ready for trial is being

9  brought back here to have to try its claim in Bankruptcy Court,

10  provisions that are not the same as those that are being

11  afforded to other creditors --

12          THE COURT:  I'm sorry.  It was ready to try its

13  claim?  I thought a class action had not even yet been

14  certified and I wasn't aware that there was any litigation with

15  respect to an individual claim as to Anderson in State Court.

16          MR. ROSENDORF:  Well, there had been a conditional

17  certification order entered, and I'm sure that Mr. Speights can

18  further address the status and position of that claim when the

19  bankruptcy was filed.

20          MR. BERNICK:  That is a misrepresentation.  We went

21  through this ad nauseam.  The conditional certification was

22  with respect to other, did not include Grace.  And we clarified

23  through this and went back through the transcripts and Grace

24  was specifically excluded because the bankruptcy already was in

25  process.

1          There was ultimately a certification of a class that

2    did not include Grace.  Nothing has happened to the litigation

3    of the class claim in the context of the Grace case, in the

4    context of South Carolina since the stay, and I don't believe

5    there's been any merits proceeding as to Anderson,

6    individually, at least not with respect to Grace.

7          MR. ROSENDORF:  Your Honor, I'll let Mr. Speights

8    respond to that in our rebuttal, if necessary.

9          THE COURT:  All right.

10          MR. ROSENDORF:  Your Honor, we don't believe that

11    these plan provisions as embodied in the PD CMO provide fair or

12    equal treatment to Anderson.  Let me finally, move, Your Honor,

13    to the issue of the 524 injunction.  The debtors need to prove

14    the propriety of the injunction as to every class that they

15    seek to enjoin.  So, the question is not for purposes of this

16    whether it makes sense in light of the personal injury claims

17    to have a 524(g) injunction.  The question is not whether it

18    makes sense with respect to the ZAI claims, because they are

19    seeking to put not only those claims into the 524(g) trust, but

20    also the traditional property damage claims and the future

21    property damage demands.  And the problem is that under the

22    plan structure and under the evidence that's been presented

23    here, there's no explanation or basis for why that should be

24    true with respect to the traditional PD claims.

25          One of the most interesting things that I heard this

1  morning as we were listening in on the confirmation hearing was

2  you saying the whole point of the 524 injunction is to avoid

3  the tort system.

4           THE COURT:  Well, for the personal injury claimants.

5  I wasn't talking about property damage.  That wasn't an issue

6  that was raised.

7           MR. ROSENDORF:  Well, but that is one of the primary

8  purposes.

9           THE COURT:  But, it wasn't when I was talking this

10  morning with whoever was arguing at that time.  We were talking

11  about personal injury claims.

12          MR. ROSENDORF:  I understand.  I understand what you

13  were talking about.  But, I think that it's the same injunction

14  and it's the same statute.  And it's supposed to serve the same

15  purpose.

16          THE COURT:  But, the statute specifically authorizes

17  property damage injunctions.

18          MR. ROSENDORF:  I'm not questioning whether in

19  appropriate circumstances there could be a plan that sends

20  property damage claims to a 524 trust.  Absolutely not, and I

21  know it's been done.  That's not the issue.  The issue is

22  whether there's any justification for it here, where this is a

23  pass through plan that is proposing to pay these claimants a

24  hundred cents on the dollar, where it is proposing no claims

25  resolution procedures to provide a means for a simplified

1  resolution of the claims to reduce litigation expenses or

2  anything like that.  They are sending the unresolved PD claims

3  back to you and they are sending the Future Property Damage

4  claims back into the tort system.

5          MR. BERNICK:  Your Honor, this is now an argument

6  that is not related to Anderson.  Anderson stays here.

7          MR. ROSENDORF:  Anderson's subject to the 524

8  injunction.  The question is whether it's justified or not.

9          THE COURT:  I think that's a legitimate concern that

10 Anderson may raise.  Go ahead.

11         MR. BERNICK:  Whether Anderson is subject to 524(g)

12 injunction?

13         THE COURT:  Anderson is subject to the 524(g)

14 injunction.

15         MR. BERNICK:  Anderson just stays here.

16         THE COURT:  Yes.

17         MR. BERNICK:  So, they're raising the issue about

18 whether Anderson should stay here.

19         THE COURT:  They're raising the issue as to whether

20 the 524(g) injunction is necessary as to either present or

21 future claimants as to which Anderson is a present claimant.

22         MR. BERNICK:  That's why I'm making the distinction

23 is between Anderson present versus futures.  He's met standing.

24         THE COURT:  But it's one property damage trust.

25 They're all in it.  Whether it's a present or a future, they're

1 all in the trust.  So, if the 524(g) injunction isn't proper as

2 to any, either the presents or the futures, then it's not

3 proper.  They're all part of the same trust.  You can go ahead,

4 Mr. Rosendorf.

5          MR. ROSENDORF:  Thank, Your Honor.

6          The claims are going to be paid a hundred cents on

7 the dollar.  The claims are not subject to any simplified

8 claims resolution procedures.  The Anderson claim is going to

9 be litigated here, the futures are going to be sent back into

10 the tort system and one of the problems with that, Your Honor,

11 is that 524(g), there's a long list of things that you need to

12 prove.  One of the things that you need to prove is that the

13 pursuit of such demands outside the procedures prescribed by

14 the plan is likely to threaten the plan's purpose to deal

15 equitably with claims in future demands.

16          Now the only justification that they have attempted

17 to put forward with respect to traditional PD claims for this

18 provision are that they want the Court to serve as the

19 gatekeeper for the future demands to determine whether or not

20 they're barred by the claims' bar date or not.  Something

21 which, as we just discussed, it's questionable based upon other

22 rationales that they've annunciated whether it is even

23 appropriate for that Court to exercise that role whereas

24 they've said themselves those future demands have been

25 submitted to the Court's jurisdiction.  And secondly, so that

1  the claims can be brought in a Federal District Court.  There's

2  been no evidence whatsoever as to why the latter is in any way

3  necessary to protect the function of the trust or the ability

4  of the debtors to fulfill their obligations under the plan.

5        There has been no evidence, in fact, as to why the

6  Court has to serve as the gatekeeper for these future PD

7  demands.  Something that clearly any other Court would be

8  entitled to determine.  The simple fact is, Your Honor, backing

9  up to one of the other 524(g) elements, that the debtor's going

10  to be subject to substantial claims or demands of this type,

11  even on that issue, Your Honor, the debtor is all over the map.

12        They brought in an expert to testify to fulfill the

13  statute, but at the same time that they do that, they pooh pooh

14  the very notion that they're going to be subject to those

15  demands and have, by all the evidence that's now before us,

16  apparently set aside only $2 million to deal not only with all

17  those claims and all those litigation expenses, but the State

18  of California claims, the Anderson claim, which set aside the

19  class claim, the Anderson claim itself is asserted in an amount

20  in excess of that $2 million.

21        So, how is it possible that there is such a

22  substantial threat from these property damage claims that they

23  need the relief of 524(g), yet they're going to deal with all

24  these claims with $2 million?  A drop in the bucket of what's

25  to be funded under this plan.

1          There's a fundamental disconnect between the evidence

2    that the debtors have put on here on the feasibility side of

3    the equation and on the 524(g) side of the equation.   The

4    reality, I believe, is that they want this in order to fulfill

5    their obligations under the Fresenius and Sealed Air

6    settlements.   And I understand that, but that's not a

7    justification for issuing the 524(g) injunction.   They have not

8    proven what they need to prove in order to get that relief with

9    respect to the traditional PD claims and demands, and we

10   believe for that reason, as well, that the plan cannot be

11   confirmed, Your Honor.

12          THE COURT:   Well, I'm sorry, I missed -- since I

13   wasn't involved in the Fresenius and Sealed Air issue, I'm

14   missing why the property damage trust is required to satisfy

15   the conditions of settlement.

16          MR. ROSENDORF:   It is my understanding of the

17   conditions of settlement, I cannot tell you why.

18          THE COURT:   That there is a property damage trust

19   required as well as a personal injury trust required, or that

20   the injunctions are required?

21          MR. ROSENDORF:   That the claims are that there is an

22   injunction and that the claims are channeled to the trust.

23          THE COURT:   Well, do property damage claimants have

24   access to Fresenius and Sealed Air?   I mean, again, I

25   apologize, Mr. Rosendorf, since I wasn't involved --

1          MR. ROSENDORF:  I'm not in a position to answer that

2     either.  But, all that I can say is that it does not make sense

3     that they would need this injunction, that they would need this

4     relief for liabilities that they believe, according to them,

5     can be resolved for $2 million, and it is the only other

6     explanation that I can posit.

7          THE COURT:  All right, thank you.  Mr. Speights, did

8     you have something you wanted to say now?

9          MR. SPEIGHTS:  No, Your Honor.  (Indiscernible)

10          THE COURT:  All right.  Mr. Bernick?

11          MR. BERNICK:  Allow me a moment here.

12                         (Pause)

13          MR. BERNICK:  Your Honor, I want to begin with the

14     discrimination or unequal treatment issue -- three issues.

15     That's one.  Then we have feasibility, and then last of all we

16     have a question of 524(g) which ties into the discrimination

17     claim (indiscernible) -- the discrimination claim, in part,

18     because in an ironic kind of way, it goes in full circle.  It

19     gets us back to the principal reason why there's no

20     discrimination here, which as I'm understanding is a matter of

21     law.  And that understanding was actually recited by none other

22     than the Future PD claimants' representative Judge Sanders and,

23     indeed, was recited by way of the complete answer to the

24     question that was only partly quoted by counsel for Anderson

25     Memorial.  This is at Page 105, the cross of Mr. Sanders, which

1 I note begins with the statement from the Court, because this

2 was, as the transcript indicates, a moment of levity in the

3 proceeding and maybe we can re-achieve that moment of levity

4 here this afternoon, but I doubt it, because Your Honor has the

5 grim determination to finish us here this afternoon.  So,

6 that's what we will do.

7          But, to begin with, you're not winning here, Mr

8 Speights, and Mr. Speights responded in a very gracious fashion

9 to that process, but the examination continued.  And the quote

10 that was made here by counsel for Anderson was further on in

11 Line 18.  So if that's the case, after your negotiations with

12 somebody, presumably the plan proponents, you've got to head

13 south and I've got to head west, not because you did it,

14 because that's the bottom line of what had happened after the

15 negotiations.  And then the statement that Judge Sanders

16 graciously made was, my client got a better deal than yours,

17 but that wasn't the end of his answer.

18          He says further on, now, let me say about what a

19 better deal amounts to.  524(g), as I read it, says the two

20 categories of claimants have to paid in the same manner or in a

21 similar way; same or similar.  I'm not sure it says they have

22 to be treated in every respect the same or similar, but

23 whatever it says, it says, and I'm not here as an expert on the

24 law.  He had offered his guidance on his understanding but was

25 carefully deferential to say that he wasn't an expert and,

1 thereby, couldn't be cross examined as an expert appropriately.

2        Well, in point of fact, he got it right.  In the Dow

3 Corning case, in a section of the decision that was not read by

4 counsel for Anderson, the Dow Corning court, district court,

5 said as follow, after reciting the statute.  The plan is

6 required to "provide the same treatment for each claim or

7 interest of a particular class unless the holder of a

8 particular class or interest agrees to a less favorable

9 treatment of such particular claim or interest."  The section

10 "is not to be interpreted as requiring precise equality of

11 treatment, but rather some approximate measure of equality."

12        So, the judge had it right.  That is what the

13 standard is, it's not a tit-for-tat, dot-for-dot, it is --

14 there's supposed to be approximately -- there has to be a

15 rationale for any differentiations that are made so that the

16 real purpose and intendment of the statute is implemented,

17 which is to prevent discrimination, where somebody really is in

18 an abusive and unfair fashion, singled out and not given the

19 same treatment as people who are similarly situated.

20        And that most certainly did not happen in connection

21 with this plan.  I mean, this is a situation where the plan,

22 the property damage part of the plan, just like all other parts

23 of the plan, were vetted by the PD Property Committee, they

24 were vetted by the PD FCR, they were vetted by every single

25 constituency in this case, and they were gone over with a fine

1  tooth comb, including also Fresenius and Sealed Air who had

2  basically been assured in the agreements, that they would get

3  524(g) protection.  If there were an issue about 524(g) and

4  somebody came slipping out and was not under 524(g), which is

5  now exactly what they urge, what are Sealed Air and Fresenius

6  concerned about?  They're concerned about whether they then

7  have an exposure because they're now making this huge

8  contribution, they're supposed to get 524(g), and although the

9  plan says 524(g) in its detail, the plan doesn't give them

10  524(g) closure.

11          So, all of this was gone over in painful detail.

12  Nobody was "singled out" for some treatment, and we have a

13  rational basis.  And, in fact, that there was a rational basis

14  for exactly how things were handled on the issue that is the

15  focal point of the claim of discrimination.  This is Plan

16  Proponents CL024.  PD CMO says with respect to existing claims,

17  which is Anderson, they've submitted to the jurisdiction which

18  Anderson most certainly has done, there is litigation underway

19  which has mostly certainly been the case with respect to

20  Anderson, got those, but we've gone over everything in

21  connection with Anderson, including what the status was of the

22  class action at this time, that time or the other, ad nauseam.

23  I think that we've probably spent thousands of hours

24  litigating these issues.

25          As a consequence, it's efficient to keep those cases

1 here.  And that just doesn't cover Anderson, that covers two

2 other claims that Mr. Speights is representing, and 16

3 California claims.  They are all mature before this Court,

4 they've all been subject to a lot of process before the Court.

5 We are -- we got claim forms, we got lots of information.  We

6 got litigation on specific issues.  They've had the opportunity

7 to conduct discovery with respect to Grace.  It is a mature

8 process.

9       Now, while they may quarrel with how mature it was,

10 they are most certainly differently positioned from people who

11 have future demands only.  Those people have never submitted to

12 the jurisdiction of the court, those people have never been

13 involved in the litigation.  There is no pending litigation

14 and, therefore, they're given the opportunity to, in the first

15 instance, choose their venue in federal court.  Their paper

16 still argues state court.  I don't know where they're getting

17 state court for Anderson Memorial.  Anderson Memorial purports

18 to file a class action.  That can only take place in federal

19 court under the Class Action Reform Act, even if was filed

20 before that Act.  That Act takes any class that's not been

21 certified and says it's got to be in federal court.  So, we're

22 talking about federal court under any set of circumstances.

23       Those people get the opportunity to choose a venue

24 that's a federal venue.  As has been pointed out, they don't

25 get to choose to bypass the questions of whether they're picked

1  up by the bar date.  So, yes, they have to come here for

2  purposes of resolving any issues about whether they're abiding

3  by the bar date.  But, that is not something of their own

4  election, that's something that has to happen by operation of

5  the bankruptcy code.

6          So, yes, they've got to come here on that issue, but

7  on all of their issues their choice of venue is respected.  Is

8  there a difference?  Yes.  Is it a significant difference, is

9  it a substantial difference, is it a difference that is

10 something other than approximate?  Absolutely not.  Is there

11 any element of this that is abusive and discriminatory with

12 respect to Anderson Memorial in particular?  Answer, absolutely

13 no.  Indeed, Anderson Memorial is one of the worst cases for

14 the proposition that they ought to be able to go back and

15 basically go some place else for litigation that is

16 substantially advanced in this court.

17         Now, counsel then mixed into this whole process two

18 other groups, actually three other groups.  There were the

19 future, traditional PD claimants, if there are such people,

20 there are the ZAI futures and then there are the currents, both

21 traditional and future.

22         And the fact of the matter is that they are all

23 different.  Traditional PD is actually up here.  Everybody else

24 that we just talked about, everybody else, the traditional

25 other people here are all settled.  Yes.  Traditional -- there

1  are traditional PD claimants whose claims have been settled.

2  They're part of the trust, but they don't have to go through

3  the PBC MO because they're not litigating any more.

4       We then have the ZAI currents.  The ZAI currents are

5  settled, they're not treated in the same way as future demand

6  holders who are traditional because they have settled and we

7  don't take people who have settled, be they people who have

8  traditional PD claims, or future or ZAI current claims, we

9  don't take current claimants, ZAI or traditional, who have

10 settled and process them through some process that is

11 litigation related.  They settled.

12      With respect to ZAI future demand holders, yes,

13 they're different because they are part of a settlement.  The

14 settlement with respect to ZAI includes both currents and

15 futures, it is all part of exactly the same kind of process.

16 So, yes, we do make differentiations, we don't confuse people

17 who are litigating with people who are settled.  We don't

18 confuse people who are existing claimants, who are litigating

19 with future demand holders who may litigate.  We, in fact,

20 could be accused of discriminating and not treating them

21 appropriately if we didn't make these distinctions.  The code

22 doesn't say, by saying equal treatment you have to put, you

23 know, square pegs into round holes and then triangles into

24 round holes, each one can have its own separately tailored

25 hole, so long as the basic process, the basis process is, in

1  fact, an appropriate and similar treatment within the meaning

2  of the code.   That's discrimination.

3          Now, one feature of the discrimination that they then

4  played into a separate point was the point about 524(g) and

5  whether 524(g) really is necessary if you have people who are

6  getting hundred cent dollars.  This basically played into the

7  -- back to the notion that, well, why are we being singled out

8  in this way?  And what they fundamentally misapprehend is that

9  524(g) and the need for 524(g) is decided on an anatomical

10  basis; that is, that you first of all decide whether this group

11  of claimants really needs 524(g) and whether this group of

12  claimants really needs 524(g).  524(g) is a holistic solution.

13  It's what is necessary to make a trust work, and in this case,

14  we've got a couple trusts.  We've got PI trust and a PD trust,

15  and to make both of those work, they have to be funded and

16  where are they getting funded from?  They're getting funded

17  from the same basic, financial set of resources.  It's unitary,

18  it's Grace's, it's insurance, it's contributions from Fresenius

19  and Sealed Air, and there's the future earning power of Grace

20  and there's insurance that is still there.  It all comes,

21  basically, in one door, but it gets split up between a couple

22  of trusts.  You can take any one group of claimants and say,

23  for example, with respect to the unsecured creditors, Grace is

24  going to pay them hundred cent dollars.  They disagree with

25  whether that should include default interest or not, we don't

1 need 524(g) in order to deal with the unsecured creditors and

2 the unsecured creditors are not part of that.

3      We could then take in like fashion some group of

4 people who are asbestos claimants and say, well, if we can't

5 let them out, do we need 524(g) in order to pay the settled

6 traditional property damage claims? They're asbestos, so

7 they're within the terms of 524(g), but you can take out the

8 traditional settleds and say, hey, you know, Grace can fund

9 that settlement, why don't we just send them off on their merry

10 way?  The problem is, that as soon as you take pieces of this

11 puzzle and you segregate them out, outside of the trust, you

12 thereby eliminate all of the structure that assures the

13 financial viability, predictability, assurance are going to be

14 there.  Because the money for all these different activities is

15 effectively being channeled through the trust, we have the

16 ability in 524(g) to have a unified organization that takes

17 care of all of these issues, does so on a consistent basis, and

18 we can take advantage of the fact that we've got a future

19 claimant representative who will put the interest of people who

20 are also part and parcel of this process.  So, we don't have to

21 demonstrate when it comes to each and every constituency who

22 has an asbestos claim, that somehow there is no other way to

23 handle their particular claims, other than through a trust.

24      What we have to demonstrate is that the trust

25 structure is necessary as a whole, under 524(g), and it's being

1  properly applied under the bankruptcy code, to all of the

2  different constituencies who form part of the trust.  I'm not

3  aware of any case where somehow asbestos claims, because a

4  particular group of asbestos claims can be funded without the

5  need for a trust or litigated without the need for a trust,

6  thereby, is excluded from 524(g).

7        We'd then have had massive litigations all the time.

8  Everybody comes in here and say, gee, I don't really want to be

9  part of the trust.  I don't really want to do this, or don't

10  really want to do that.  524(g) does not give them the

11  opportunity to make those kinds of arguments.

12        Finally, with respect to feasibility.  We have in

13  Anderson Memorial, and feasibility brings this to mind, we have

14  another instance of a very significant constituency in the

15  case.  In the case of Libby, it was the PI constituency which

16  is the dominant constituency of creditors.  With respect to PD,

17  or with respect to property damage, that's another major

18  constituency.  And this constituency had a ZAI segment to it

19  and it had a traditional property damage segment to it.  The

20  ZAI folks, reached a resolution, the votes all there,

21  everything is fine with respect to ZAI.

22        With respect to the traditional property damage

23  claims, the current claims, major constituency, and with

24  respect to those we have an overwhelming vote in favor of this

25  plan; overwhelming vote.  And we have now one claim that is --

1  or maybe it's three, as a total.  Mr. Speights, I'm sure, will

2  stand up and say that there are even more.  But, with respect

3  to Anderson Memorial, which is what we're here to talk about,

4  if Anderson Memorial is now saying, the will of Anderson

5  Memorial, when it comes to feasibility, which goes to the plan

6  as a whole, the will of Anderson Memorial should overwhelm and

7  outweigh the will of the majority, and he's prepared to come in

8  on behalf of Anderson Memorial to say, the entire plan doesn't

9  meet the requirements of the code because feasibility has not

10 been established and, thereby, not only overturn the will of

11 the majority, but even the will of scores of other clients that

12 Mr. Speights, in fact, has who have decided to settle and are

13 voting in favor of the plan.

14         So, for Anderson Memorial, we're now here, hearing

15 arguments that are directly contrary to the committed interests

16 and votes of not only the majority of the class, but also the

17 overwhelming majority of Mr. Speights' own clients.  And so we

18 have feasibility.

19         Now, on feasibility -- this is Plan Proponent CL027

20 -- and I just use this as a way of going through feasibility,

21 promptly.  Basically, this is, again, an area of the plan where

22 everybody in the world was focused on whether we have

23 feasibility or not.  Why?  Because nobody wants to go through

24 and implement the plan or have approval of a plan, or for that

25 matter commit to a plan which can't even be accomplished after

1 it's put into effect.  So, it's not as if we have a situation

2 where feasibility somehow is slipped under the rug.  Everybody

3 has (indiscernible) feasibility that counsel for Anderson has

4 something to say.

5          MR. ROSENDORF:  Yes, Your Honor.  There are portions

6 of this demonstrative to which we object.  I can either make

7 those now or when counsel gets to those in whatever

8 presentation he makes.

9          THE COURT:  But, just tell me now.  Maybe we can deal

10 with them now.

11          MR. ROSENDORF:  Your Honor, there's a reference, if

12 you look at bullet point Number 4, to a 7/30/02 deposition of

13 Mr. Beber.  That deposition was not identified as an exhibit.

14          MR. BERNICK:  I'll take it out.

15          MR. ROSENDORF:  Was not designated.  Thank you.

16          MR. BERNICK:  What else?

17          MR. ROSENDORF:  The rest I'll have to hear, but that

18 one I know.

19          MR. BERNICK:  Okay.  Let's let us know.  So, we have

20 feasibility as being an issue that everybody is focused on and

21 we had then, because it's a technical matter, we had experts

22 testify and it turns out we ended up having not one expert, but

23 two experts.  We had Ms. Zilly, but then in the context of

24 dealing with what he purported to describe as an issue of

25 solvency, he basically got -- Mr. Frezza applied the test of

1  feasibility to say that --

2          THE COURT:  Where are these slides coming from?

3          MR. BERNICK:  This is on --

4          THE COURT:  Yes.

5          MR. BERNICK:  Yes, that's the last thing in your

6  package.

7          UNIDENTIFIED FEMALE SPEAKER:  Your Honor, no, it's

8  actually separate.  I just found it myself.

9          THE COURT:  I just wanted to make the same correction

10 before you got too far and I couldn't find the slide.

11         MR. LOCKWOOD:  Gotcha, David.

12         THE COURT:  Okay. I'm sorry.

13         MR. BERNICK:  I made a mistake by making it a --

14         MR. LOCKWOOD:  No, I'm going to pounce on you.

15         MR. BERNICK:  Okay.  So, yes, not just one but two

16 experts.  We had Ms. Zilly, but we also had Mr. Frezza, who

17 purported to replicate Ms. Zilly's analysis by way of saying,

18 gee, that establishes solvency for purposes of default

19 interest.  Obviously, if we had an argument on whether that

20 nexus is proper tomorrow, but he actually went back in and

21 basically endorsed exactly the same proposition.

22         MR. ROSENDORF:  Your Honor, I'd object to any attempt

23 to use Mr. Frezza for purposes of feasibility.  He was never

24 identified as an expert, as such.  When we conducted this

25 confirmation hearing, it was segmented into pieces.  We relied

1 upon that representation by the debtors, that the evidence that
2 was to be presented on our issues, would be for that purpose.
3 We don't think that there's any testimony of Mr. Frezza that
4 can or should be used for feasibility purposes.

5          MR. BERNICK:  Well, that's not correct.  There was no
6 -- there weren't Chinese walls between the different parts of
7 this proceeding and, in fact, there were many instances in
8 which people who had different interests in the case had
9 participated for different purposes.  So, there was no
10 objection that was made at the time.

11          THE COURT:  I thought Ms. Frezza (sic) was the only
12 witness designated with respect to feasibility.

13          MR. BERNICK:  Ms. Zilly.

14          THE COURT:  I'm sorry.

15          MR. BERNICK:  Ms. Zilly --

16          THE COURT:  Ms. Zilly, yes.

17          MR. BERNICK:   Ms. Zilly was the only one who was
18 designated to address the issue of feasibility.  Mr. Frezza was
19 designated to address the issue of solvency, but in the context
20 of doing his solvency analysis, in his report, which was
21 presented and which was presented in open court -- I mean, all
22 this is totally transparent, there wasn't a single objection
23 -- he replicated, in order to do solvency, he did feasibility
24 and he said, Ms. Zilly got it right.  So, I don't know what,
25 you know, it doesn't -- no one is privileged, you can only use

1 ceratin evidence for certain purposes, that evidence came in on

2 the question of what the feasibility standard is and what the

3 approach is taken in determining whether a plan is feasible.

4 And it's exactly the same test that he looked at.

5          THE COURT:  All right.  The evidence is the evidence.

6 If he testified -- I do recall that he indicated that he had

7 replicated some of Ms. Zilly's work, maybe all of it, I don't

8 remember the specifics, but I do remember that subject having

9 come up.

10          MR. SPEIGHTS:  Your Honor, may I respond to what Mr.

11 Bernick said, just briefly?

12          THE COURT:  Yes.

13          MR. BERNICK:  Well, you know, I -- that's fine but --

14          MR. SPEIGHTS:  It is absolutely --

15          MR. BERNICK:  -- it's not even worth it.  I'll

16 withdraw my remark.

17          MR. SPEIGHTS:  I could have said what I wanted in the

18 time you've objected to it.

19          THE COURT:  Yes.  I really do wish that both of you,

20 all of you, not specifically the two of you, would address

21 comments to me, not to each other.  It would make life a lot

22 easier and get us out of here a lot more quickly.  Mr.

23 Speights, go ahead.

24          MR. SPEIGHTS:  I just want to make it clear, and Mr.

25 Bernick and Mr. Rosendorf can keep on arguing the merits, that

1 when Your Honor set the rules at the pretrial of this

2 confirmation hearing, I specifically asked whether -- when we

3 adopted the debtor's proposal for segments, that the evidence

4 on one would apply to the other and whether I had to attend

5 all, and I got assurances at that time, and I can give you

6 chapter and verse, no, each one is a separate, in effect, trial

7 and that evidence applies to that subject matter.  We don't

8 need to decide that at this minute, but that will be our

9 position and I can cite chapter and verse on that, Your Honor,

10 because we weren't here during much of this trial.

11          THE COURT:  This issue, though, as to feasibility,

12 was one of the issues that was segregated as to feasibility.

13          MR. SPEIGHTS:  No question we were here during

14 feasibility.

15          THE COURT:  Okay.  All right.  Well, that's -- I

16 think that's what we're --

17          MR. SPEIGHTS:  But, I think he's going outside of the

18 feasibility arena and pulling things in, but I'm through.

19          THE COURT:  All right.

20          MR. BERNICK:  The last part of his sentence says, no

21 expert disputes this.  That was Mr. Speights' part of the case,

22 to dispute the feasibility analysis.  There is zero expert

23 testimony offering any opinion that the plan is not feasible.

24 So, we now have one expert, at least, Ms. Zilly saying the plan

25 is feasible, no contrary expert opinion.  The methodology that

1  she applied is also not disputed.  I won't say agreed, even

2  though Mr. Frezza said it was ripe, because they have an issue

3  about Mr. Frezza.  So, I'll simply say for purposes of

4  simplicity, the methodology she follows was uncontroverted

5  which then leaves as the sole question, did she, in applying a

6  methodology that's not disputed, an expertise that's not

7  disputed, to an opinion -- the expert foundation for which is

8  not -- did she do something where the analysis was facially

9  flawed, and the answer is that she did not.

10         Now, if you want to go through these quickly, because

11  Your Honor already knows them well.  First, with respect to the

12  37 million, there's first of all, a sense that somehow the 37

13  million was some kind of secret, kabuki kind of thing where

14  nobody really had the opportunity to explore and the answer is,

15  that's just false.  We spent briefs arguing about whether they

16  were entitled to conduct discovery of the 37 million, because

17  as a litigation reserve, ordinarily it's protected by work

18  product, it's not discoverable.  And Your Honor determined as a

19  result of a contested and disputed proceeding that, in fact,

20  they would be able to get answers to the questions about what

21  went into these without disclosing work product.

22         So, when counsel says, well, here are the written

23  answers to the questions like, well, this is all, you know,

24  this is what Grace decided to tell us, it's what Your Honor

25  said was information that should be provided, we complied.  We

didn't have to offer it into evidence, we created that, not as

a substitution for Ms. Zilly's opinion, but because we were

asked to create it, nor to obviate the necessity for more

extended discovery.

So, we had the 37 million.  Now, the question is,

that counsel says, gosh, well, you have the 37 million, but

it's just Ms. Zilly talking about 37 million, we never put in

the underlying declaration by Mr. Shelnitz.  Well, we could

never have put in the underlying declaration by Mr. Shelnitz,

because it would be hearsay.  It's a self-serving document,

it's a document answering certain questions, we couldn't get it

into evidence.  But, there's a rule, it's called Rule 702, 703,

and it's a pretty basic rule and we've had this -- I think, in

all segments of the proceeding, we have talked about this rule.

The rule says that you have an expert opinion that can be based

upon evidence that is of a character that's sufficiently

reliable for people within the field to use in relying on and

making an expert opinion, and it doesn't have to come into

evidence by itself.  It's just an absolutely basic rule.  So,

we didn't have to put in the Shelnitz declaration, which

shouldn't have come in anyhow.  But, we could put in the 37

million figure which after all was also in evidence, the 37

million was also in evidence in connection with the pro forma

balance sheet.

So, the 37 million was in evidence, and the key thing

1  from Ms. Zilly was, gee, is it appropriate within her

2  profession to use this as a source as being reliable, and she

3  said absolutely it is, indeed, it's probably one of the best

4  sources.   This is October the 13th, redirect examination of Ms.

5  Zilly, Line 21 carrying over to 184, specifically asked her,

6  well, why was it that it was okay to rely upon the company?

7  And the answer was, the company was in the best position to

8  know what the number was.   Again, completely unrebutted, not a

9  single expert came in.   God knows Mr. Speights has got access

10  to all kinds of experts when it comes to property damage and

11  property damage claims, not a one of them came in to testify in

12  response to that testimony.

13         Now, it was pointed out that the Solow case was

14  settled.   It was settled for $35 million.   The question then

15  is, well, gee, the reserve has now been depleted and it's only

16  $2 million.   But, Your Honor properly pointed out, well, wait,

17  we're not yet at the effective date.   Well, in fact, that's a

18  very important point because Plan Proponents 277.12, which is

19  Exhibit 12 to the exhibit book and financial information, has

20  the pro forma and, indeed, the 37 million, lo and behold,

21  appears in the pro forma.   That's the only place it appears.

22  The actual as reported balance sheets for prior periods of

23  time, '06, '07, '08 simply has a 1.7 billion figure, it's not

24  the 37 million.   The 37 million appears in the projected pro

25  forma as of '09.   And that is, if you take a look at the note,

1  assumes plan of reorganization effective as of December 31,

2  2009.

3       So, the reserve is a pro forma reserve, assuming that

4  the plan goes effective.  There's not a little cash pot sitting

5  over here some place, and that reserve, in fact, will be a

6  reserve, should be a reserve, as Mr. Shelnitz described that it

7  was, for unresolved and future demands.  Well, Solow is no

8  longer unresolved, it's resolved.  So, we have, still, the pro

9  forma balance sheet, indicating 37 million.  Now, that can

10  always change, but there's no indication that somehow we've now

11  depleted the cash reserve down to $2 million and that's all

12  that's left over.

13       Is an estimate required?  An estimate is not

14  required.  In the <u>Manville</u> case which they cite an estimate was

15  used by <u>Manville</u> to demonstrate the feasibility of their plan

16  of reorganization, that was their choice, they felt that, (a)

17  they could do an estimate, and (b) they did the estimate and

18  the estimate was for personal injury claims which is a totally

19  different kettle of fish.  There you're talking about

20  epidemiology, establishing a flow of disease cases into the

21  future.  So, you have a scientific backbone that takes you

22  forward.  You don't have any such thing with respect to PD.

23  They're never said that you could do it with respect to PD, not

24  a single expert has testified that you could ever have PD

25  demand projection, much less a PD demand projection in the face

1  of a bar date that's already applied, much less the statute of

2  limitations which would not apply, necessarily, in personal

3  injury because they accrue, it's just completely apples and

4  oranges.

5       Where is the rule of feasibility that says, you've

6  got to do an estimate you don't believe can be done, you don't

7  believe should be done because you don't believe the claims are

8  meritorious?  There's no such principle of law.  <u>Manville</u>

9  certainly doesn't say it.  This is simply their argument not

10  supported by any testimony, by any expert.

11       Ms. Martin -- Ms. Martin did estimate demands, not

12  liability.  She had to for purposes of 524(g), nothing there

13  says there should be an estimate.  Work, we deal with the

14  Anderson class.  They say in their brief, well, you know, don't

15  we have to account for the Anderson class and they cite a

16  decision in, I think it was the <u>Harvin</u> (phonetic) case, that's

17  a case where you had -- <u>Harvin</u> -- <u>Harvin</u>, yes, Ninth Circuit

18  case, which  said, well, gee, if you know the Anderson class

19  might be certified, don't you have to include that in your

20  feasibility analysis?  The answer in the <u>Harvin</u> case is that

21  you actually had a $53,000 funded plan of reorganization, so

22  you're not talking about a big case there.

23       You had an existing state court liability proceeding

24  that already had resulted in a judgment of $400,000, the

25  verdict.  The verdict had been set aside and then had been

1 reinstated on appeal, and if that verdict held, obviously, that

2 would have an enormous effect on the $53,000 plan.

3          So, you have an existing case.  You have at least

4 something like the liquidated sum of money.  It's known right

5 here, right now, today, yeah, you've got to include that in the

6 estimate.  It doesn't say go and project the outcome of a class

7 action that's not even been certified, and the content of which

8 is completely disputed.  So, you don't have a case that says

9 that somehow we've got to do a feasibility analysis, given the

10 Anderson class.  California we've responded to.  Montana's

11 theory, which is in the briefs, we won't deal with here because

12 it's not necessary to deal with here.

13          Finally, on the issue of financing --

14          THE COURT:  I'm sorry, what's the response with

15 respect to California?

16          MR. BERNICK:  California is that -- you're talking

17 -- they say, well, gee, now that we have a feasibility issue

18 because the California case is where the district court

19 reversed on the statute of limitations and, obviously, they're

20 still completely disputed, so our position is that they don't

21 have merit.  But, beyond that, similar California cases have

22 already been settled, and the settlements are not for major

23 dollars.  So, California doesn't change the equation.

24          Montana -- that is Montana's theory that says that if

25 you take a thousand cases in Montana that they believe might

1  occur and you multiply them by the statutory maximum of

2  $750,000, you get to $750 million.  Again, we don't believe

3  that that's correct.  I don't want to re-raise the merits of

4  that but all these then are bracketed by the fact, as Ms. Zilly

5  testified, you have the $1.5 billion buffer, that's not day

6  one, but it's over time, but all these things you're talking

7  about are all matters that take place over time.

8          Finally, on financing.  Financing -- the financing

9  letter, the financing commitments were not obtained, they were

10 not obtained for reasons that were described before the Court

11 under oath, having to do with being unnecessary to spend that

12 money and also to be limiting in terms of where we would get

13 the financing.  That's why it was not done.  Ms. Zilly

14 testified that there were many options out there that the

15 company had.  Indeed, the whole request that we not have to

16 have a signed letter, was based on the idea that, you know, in

17 a sense it was a buyer's market, at least with respect to

18 Grace.  And we had a variety of options, so the ability to get

19 financing was not at issue and, again, not one soul took the

20 stand to say that that testimony was correct and

21 (indiscernible).  That's all I have.

22         THE COURT:  Mr. Speights or Mr. Rosendorf?

23         MR. ROSENDORF:  Thank you, Your Honor.  I'm going to

24 turn my attention, primarily, to the feasibility arguments that

25 have just been made on behalf of the plan proponents.  And let

1 me start with one that is just a complete red herring, which is

2 this notion that somehow because the majority of the property

3 damage claimants support this plan and Anderson opposes

4 feasibility that this Court should dismiss or disregard

5 Anderson's feasibility objections.

6 　　　　Mr. Bernick surely knows that that is not a legally

7 tenable argument.  While there are some things that you can

8 accomplish by consent under a plan, it is unquestioned that a

9 debtor must prove feasibility, it is one of the components that

10 they need to prove, in addition to getting the vote and consent

11 of creditors.  So, the fact that the majority of PD claimants

12 support this plan has absolutely nothing to do with whether a

13 feasibility objection is viable or not.

14 　　　　And, indeed, it should come as no great surprise that

15 the majority of property damage claimants do not raise this

16 objection because it is of absolutely no concern to them given

17 that the plan proposes to pay them on the effective date.  They

18 don't have to worry about what Anderson has to worry about,

19 which is that this plan is not going to have enough money in

20 the future to pay the unresolved claims, as well as future

21 demands, because they're getting paid on the effective date.

22 It has nothing to do with anything.

23 　　　　Mr. Bernick also makes an argument that I think is

24 contrary to law with respect to what an expert can rely upon

25 and whether the expert's opinion is viable or not.  There is no

1 question that an expert can consider matters that are not in

2 evidence, but if the underlying assumptions that are the basis

3 for an expert's opinion are not supported by the record, that

4 expert's opinion in excludable.  That is the lesson of Elcon.

5 And the simple fact remains, no witness for the debtors stepped

6 forward and supported, substantiated, explained or did anything

7 to support this number.

8         Ms. Zilly acknowledged that it was the debtor's

9 number, but there was not a single debtor witness that did

10 anything to support it.  The question of whether the Solow

11 claim is included or not --

12         THE COURT:  But, Ms. Zilly supported it.  I mean, she

13 testified that she's been the financial advisor for the debtor

14 since at least the beginning of the bankruptcy, I don't recall

15 specifically when, and so she was the witness for the debtor

16 who would have supported, in part, that number because she's,

17 in part, part of the debtor's financial management team.

18         MR. ROSENDORF:  But, she was explicit, Your Honor, in

19 saying that she did not determine the number and she --

20         THE COURT:  That's right.

21         MR. ROSENDORF:  And she relied upon debtor's

22 management.

23         THE COURT:  That's right.

24         MR. ROSENDORF:  The problem is that the hole was

25 never filled.  Debtor's management never substantiated that

1  reliance, never put forward a witness to support that number.

2        THE COURT:  But, experts never do that.  You never

3  have a witness who comes in and says, I took this number here

4  and then you have another witness come in and say, yes, and I

5  took this number from there, and you back-up the chain for how

6  every component to every part of an expert's testimony is put

7  together, provided that the back-up information is -- the

8  information on which the expert relied, is disclosed and there

9  is an opportunity to discover that information, I think that's

10 what the test is.  I'll look at Elcorn, but I'm pretty sure

11 that -- or Elcon -- but I think that's the test.

12       MR. ROSENDORF:  Well, at any rate, yet another issue

13 that is -- as you know and I won't belabor it here, has been

14 problematic for us, which is that discovery has been extremely

15 limited with respect to that.  And, in fact, Mr. Bernick's

16 presentation with respect to --

17       THE COURT:  But, it wasn't limited with respect to

18 that.  I gave -- I went through in painful detail every request

19 that Anderson made and addressed every one, and said that

20 Anderson could essentially have everything that was calculated

21 to lead to admissible evidence as long as it didn't violate the

22 work product privilege.

23       MR. ROSENDORF:  Well, and our position, just so that

24 it's understood, is that when an expert relies upon something,

25 the information can no longer be privileged.  And, again,

1 we're not going to revisit the issue here, and I don't want to.

2 I just wanted to state my position on it.

3     Your Honor, and part of the -- the reason this is an

4 issue to us, goes to this question of Solow.  Is that when we

5 were here before Your Honor, what we were told is that there

6 was a $37 million reserve to deal with unresolved and future

7 claims.  And at that time, as everybody believed, Solow was an

8 unresolved claim.  Now, we're being told that the reserve

9 hasn't change, but Solow is a resolved claim.

10     THE COURT:  Well, I don't know whether the reserve

11 will or won't change by the time the plan actually goes

12 effective.  The evidence before me is that as of the expected

13 effective date of December 31, 2009, which obviously has gone

14 by the boards and this plan isn't effective as of that date,

15 but on that assumption, there would be a $37 million reserve.

16 That's the testimony.

17     And so if there are different projections, then I

18 guess at some point there will be different projections, but

19 the evidence before me now is that when this plan goes

20 effective, the debtor will have a $37 million litigation

21 reserve.

22     MR. ROSENDORF:  And that goes, in part, to the

23 question of what that number really means, is because as

24 they've been ever so careful and diligent about pointing out, a

25 reserve is not the same thing as an estimate.

1          THE COURT:  No.

2          MR. ROSENDORF:  And so the fact that they have that

3  reserve, to us, is neither here nor there, as to what their

4  burden is with respect to feasibility.

5          Your Honor --

6          THE COURT:  But, it's for future and unresolved

7  demands.  So, I'm not sure how Anderson, since it's not a

8  future demand holder is concerned about that number anyway.  I

9  mean, from --

10          MR. ROSENDORF:  Well, that goes, again, to confusion

11  as to what the number is.  Our understanding is that that was

12  intended to encompass all of unresolved claims, future demands

13  and litigation expenses.

14          THE COURT:  We'll have to look at the record for

15  that, Mr. Rosendorf.

16          MR. ROSENDORF:  Right.  Your Honor -- let me grab one

17  thing, if I may.

18          The debtors dismissed consideration of the $150

19  million unresolved California cases on the unsubstantiated

20  basis for which no evidence was presented.

21          MR. BERNICK:  Million dollar?

22          MR. ROSENDORF:  That's what the claims were asserted

23  as.  That's what --

24          MR. BERNICK:  Oh, this is just what's asserted as.

25  Okay.

1          MR. ROSENDORF:  Correct.  They have not substantiated

2   or put forward any evidence as to their belief that those

3   claims have no merit, or why they believe that they could be

4   valued at zero or any nominal basis.  They refer to similar

5   California cases which settled for lesser amounts.  If I may,

6   I'll use one of the charts that they prepared here, because

7   they are selective in what they refer to.

8          Because while some of those claims were resolved for

9   small amounts, because there were statute issues with respect

10  to them.

11         MR. BERNICK:  Well, all of California claims that

12  remain have a big, big statutory issue associated with them.

13         MR. ROSENDORF:  Well, again, Your Honor, lawyer

14  argument, not the subject of any evidence presented at the

15  confirmation hearing.

16         MR. BERNICK:  No, that's a matter of record.  Sixteen

17  cases are the cases that are subject on remand to the statute

18  of limitations.

19         THE COURT:  Yes.  Go ahead.

20         MR. ROSENDORF:  Very well, Your Honor.  But, one of

21  those cases, as their own demonstrative reflects, was resolved

22  for $9 million.  So, the fact that they're seeking to rely upon

23  some of those claims for nominal amounts is simply not

24  supported, to say nothing of the fact that they didn't put

25  forward any of this as evidence of the confirmation hearing,

1  Your Honor.

2          It is, frankly, astonishing to me how blithely we

3  roll over the other feasibility issue which we raised, which is

4  with respect to the debtor's ability to fund the obligations to

5  the PD trust.

6          The number and the evidence that they put forward is

7  completely meaningless on that front.  What they can pay over

8  25 years has nothing to do with what they can pay under their

9  obligations under the plan.

10          I have nothing further, Your Honor.  Mr. Speights may

11  have something to add.

12          THE COURT:  Mr. Speights.

13          MR. SPEIGHTS:  Your Honor, I rise solely for the

14  purpose of responding to a question you asked, as the Anderson

15  historian.

16          You ask about was there a motion for a PD estimation,

17  and there was in connection with the 2004 plan.  That's when we

18  almost got a deal and didn't get a deal and they filed a plan

19  in 2004.  There was a motion to estimate PD claims filed by the

20  debtors and in March 2005, there was a consent order between

21  the PD Committee and the debtors, filed under a certificate of

22  service with Your Honor.

23          Then later, that unraveled -- and I'm not going down

24  that trail today, or I won't get my plane back to South

25  Carolina -- but there was such a thing.  And in connection with

1 that the issue came up, well, I believe, Mr. Bernick said,

2 well, we decided we had all these settlements and objections,

3 et cetera, why go through all that?  In fact, the objections

4 to all PD claims, Anderson and everybody else, those objections

5 were filed on September 1, 2005.  And later on, beginning in

6 2007, there were the settlements.

7    Lastly, you asked about the certification.  The

8 question came up when Mr. Rosendorf was arguing, and he said,

9 well Anderson was ready for trial, and there was a question

10 about, well, was it certified, and Mr. Bernick denied it.

11 We've had this argument a thousand times.  There was a

12 conditional order in February 2001 which they disparage.  The

13 point is that Anderson had a case filed on behalf of itself,

14 and those similarly situated.  It wanted to go to trial.  If

15 the case had not been certified, it was ready for trial and had

16 it been certified, it was ready for trial.  That was the point.

17 We believe it was certified, it certainly was certified in

18 June,  as to everybody else.  And, lastly, you ask something

19 about, well what's happening down there, and I'm pleased to

20 report to you that the Circuit Court of South Carolina is

21 proceeding to deal with, and process -- approve and process the

22 US Gypsum and the Federal Mogul settlements, which, thank you,

23 Your Honor, you did approve in those bankruptcies.

24    THE COURT:  Okay.  Mr. Bernick?

25    MR. BERNICK:  I don't see the materiality of any of

1  that, so I'm not going to respond to it.

2         THE COURT:  All right.  Okay.  We'll take a -- oh,

3  Mr. Rosendorf?

4         MR. ROSENDORF:  No, I'm just letting Mr. Speights in.

5         THE COURT:  Oh, all right.  We'll take a ten minute

6  recess and then we'll reconvene with the arguments that we left

7  off this morning.

8         MR. BERNICK:  Thank you.

9                    (Recess)

10        THE COURT:  Ms. Casey?

11        MS. CASEY:  Good afternoon, Your Honor.  As a

12 preliminary matter, I'd like to correct a statement that Mr.

13 Freedman made concerning BNSF's support of the 524(g)

14 injunction.  He stated that our support results in BNSF somehow

15 agreeing that we have no claims against settled asbestos

16 insurers.  If the plan, as modified, is confirmed, BNSF will be

17 precluded from pursuing settled insurers on settled policies,

18 but will not be precluded from asserting claims against settled

19 insurers on other policies.  So, to the extent that affects the

20 insurers' objections, I just want to make sure that the record

21 was clear on that point.

22        THE COURT:  Okay.  Yes, that's what I interpreted it

23 to mean.  Mr. Freedman, if it was beyond that --

24        MR. FREEDMAN:  I intended nothing else.

25        MS. CASEY:  Okay.

1           THE COURT:  Okay, all right.  Thank you.

2           MS. CASEY:  Second, Mr. Frankel handed up a proposed

3  amendment to the TDP.  I want to make the record clear that

4  this amendment is not the result of a settlement and it does

5  not resolve BNSF's objections.  I did receive it late in the

6  day on New Year's Eve, but I have not had the opportunity to

7  look over it with my client and have my client's thoughts on

8  that.

9           It only purports to resolve BNSF's objections as it

10 relates to the contract -- treatment of the contract claims

11 under the TDP.  Because the plan proponents have asserted that

12 it is intended to allow BNSF to assert its contract claims in

13 full with no cap, we reserve our right to take a look at the

14 amendments and determine our position, but because that's been

15 the representation, we will rest on yesterday's arguments

16 regarding the contract claims, with the only caveat being that

17 we do, of course, dispute their interpretation of the scope of

18 the contractual provisions.

19          As to BNSF's contribution claim, the argument that

20 the TDPs discriminate against BNSF's contribution claims, their

21 reply was pretty much two-fold.  First, BNSF might have

22 contribution claims against other parties, such as Montana and

23 MCC and, of course, the reply to that is, well, we also might

24 not.  This not the claims objection hearing, this is to

25 determine whether the plan preserves BNSF's prepetition rights

1  or whether it fundamentally alters it in a manner inconsistent

2  with either the code, or in a discriminatory manner, under the

3  TDP.

4        The second point they made, was, well, BNSF can get

5  the maximum value.  They're not necessarily limited to the

6  scheduled value on its contribution claims.

7        Well, putting aside the fact that we're not

8  guaranteed to get the maximum value, we can only get the

9  maximum value if we can demonstrate factors that the underlying

10  asbestos claimant had that would have entitled them to the

11  maximum value, that still does not resolve the discriminatory

12  treatment or the other 524(g) objection.  The testimony is

13  clear that the scheduled value and the maximum value, that some

14  point in between the scheduled value and the maximum value, is

15  the rough justice, 100 percent several liability of Grace where

16  the underlying claimant had been exposed to asbestos

17  manufactured by other co-defendants, as well.

18        The extraordinary value is, under their testimony,

19  the rough justice equivalent of 100 percent of the value of the

20  claims where Grace is the sole asbestos -- well, not sole,

21  excuse me -- where the underlying claimant was exposed to -- 95

22  percent of its exposure was to Grace asbestos.

23        In Montana, and specifically in Libby, under the Plan

24  Proponents' experts witness and statements to this Court, the

25  extraordinary value is the value needed to bring the Libby

1  claimants to their prepetition settlement value.  Take an

2  example.

3          Under the TDP Class 4(b) for severe pleural disease,

4  the scheduled value is $50,000, the maximum value is $100,000,

5  the extraordinary value is $400,000.  Let's assume that the

6  trust successfully argues that the contract should be narrowly

7  construed and that we don't have a contractual indemnity claim.

8  We dispute that, but let's assume that.  Let's assume that the

9  Libby claimants are successful in Montana State Court,

10  asserting a derivative claim, such as vicarious liability

11  against BNSF, and they get a judgment for $400,000.  Again, we

12  dispute that, but let's assume that.

13          Under the TDP, when we come, when BNSF comes to the

14  trust and say, we have been held vicariously liable for your

15  bad conduct and we have a claim for $400,000, and your expert

16  has testified that your several liability under these

17  circumstances is $400,000, we will be limited to a claim no

18  greater than $100,000.  And the --

19          THE COURT:  You mean to a payment.

20          MS. CASEY:  No, to an allowed claim, then subject to

21  the 25 to 35 percent.  So, we get 25 to 35 percent on a maximum

22  allowed claim of 100,000.  We wouldn't be entitled to an

23  allowed claim of 400,000, we'd be limited to an allowed claim

24  of 100,000.

25          THE COURT:  I --

1             MS. CASEY:  And the reason this is --

2             THE COURT:  I think you're -- the hypothetical you're

3    asking me to assume, unfortunately, doesn't get me into whether

4    or not you'd be entitled to extraordinary settlement values or

5    not.  If the underlying claimant substantiated all of the

6    conditions for extraordinary relief, and BNSF pays that claim,

7    why would BNSF not be subrogated in that same position?

8             MS. CASEY:  This is the exact problem with the TDP.

9    Because one of the requirements to have the underlying claimant

10   get an extraordinary claim is that they establish they have no

11   likelihood of substantial recovery from a third party.  There's

12   no restriction, no likelihood of a substantial recovery from a

13   co-wrongdoer.  There's no restriction that it not be somebody

14   who is derivatively liable.  So, the fact that they could

15   assert the claim against us and they got a judgment against us

16   for $400,000, automatically precludes them from getting the

17   extraordinary claim treatment and then we, standing in their

18   shoes, are precluded from getting extraordinary claims

19   treatment.  So, we get the $100,000.

20            Now, not only did that violate the discriminatory

21   treatment because Garlock and people like Garlock, who are

22   co-defendant manufacturers are getting the 100 percent rough

23   justice value of the several liability of Grace in the

24   circumstances where there are other manufacturing defendants,

25   but we are not, we're being relegated to a smaller role.  It

1 also just basically violates the bankruptcy code.  The

2 bankruptcy code cannot be used as a sword to cut down to

3 three-quarters to seven-eights of the value of the claim simply

4 because there are other claimants who would only have been

5 entitled to that small amount.

6        MR. BERNICK:  Your Honor, I object.  This is totally

7 cumulative and we are really running out of time.  The

8 seven-eights argument she wrote on the board yesterday.

9        MS. CASEY:  And my point is, Your Honor, that capping

10 us to the maximum value is not sufficient to protect our claims

11 that we would have been allowed to.  If a cap is appropriate,

12 the cap should be the extraordinary value.

13        THE COURT:  Next?  Mr. Cassada.

14        MR. CASSADA:  Thank you, Your Honor.  Your Honor, I'm

15 going to try to address as many points as I can because there

16 are many problems with the responses that were made to our

17 arguments.  First I'll focus on the legal rep.

18        There was a suggestion that Mr. Austern was appointed

19 to be a legal rep not only for bodily injury claimants, but

20 also for persons who might in the future, assert contribution

21 claims and that is just patently wrong, Your Honor.

22        When you appointed Mr. Austern as legal rep, during

23 your bench ruling you said my definition of the FCR's

24 constituency up front is all future demand holders, period, who

25 have some asbestos related disease, period, end of story.  In

terms of who his constituents are, everybody and anybody who contends they have an asbestos related injury, that has not yet manifested itself, is his constituency.  And then you said later in the same bench ruling, I have answered it.  This constituency for the FCR will be all future demand holders who claim exposure or asbestos injury just like that's what the ACC has for presence.

So, it's quite clear when Your Honor appointed Mr. Austern as legal rep you limited his constituency to bodily injury claimants only.  Now, Mr. Austern is saying, well, no problems there because at some point I considered myself to be a legal rep, not only for bodily injury claimants, but also for persons who might hold contribution claims.  Well, that's just not tenable, Your Honor.  Mr. Austern cannot appoint himself to be the legal rep.  The statute requires that the court appoint a legal representative for all persons who have some type of contribution claim that's addressed by the trust.  Mr. Austern can't appoint himself.

In fact, Your Honor, you could not have appointed Mr. Austern to be a legal rep for future contribution claimants because Mr. Austern represented the health claimant and there is a conflict between health claimants and co-defendants.  In fact, the conflicts are overwhelming.  That's the word used by the Second Circuit in the Manville case in 1994 when it rejected a finding by Judge Weinstein, that healthcare

1 claimants and co-defendants could be represented by the same

2 representative in negotiating co-defendants' contribution

3 rights under the plan.  The precise issue here, you cannot have

4 the same legal representative negotiating the rights.  There

5 are "overwhelming conflicts".

6        THE COURT:  Okay.  Have I been asked to appoint a

7 legal rep for the indirect claimants?

8        MR. CASSADA:  Well, I don't --

9        THE COURT:  I mean, I don't do it on my own, somebody

10 has to tell me that there's a need for it.  Have I been asked

11 to do that?

12        MR. CASSADA:  Well, if the plan proponents wanted to

13 have a channeling injunction that was binding and enforceable

14 against a person who might assert a contribution claim, then

15 they needed to ask you to appoint a legal rep.  In the absence

16 of the legal rep, the injunction will not be binding and

17 enforceable.

18        MR. BERNICK:  Your Honor, the need -- we'll go back

19 -- Your Honor has the testimony of Mr. Austern.  Your Honor has

20 that testimony, it's black and white, this is again, rehashing

21 the same old ground.  But, Mr. --

22        MR. CASSADA:  Cassada.

23        MR. BERNICK:  -- Cassada, Mr. Cassada is here

24 representing Garlock.  Garlock has current claims.  The source

25 of this whole problem is that for some reason Mr. Cassada is

1  now purporting to represent future demand holders with

2  contingent contribution claims.  He can't -- does not represent

3  them.  He has no standing to make any argument on their behalf.

4          To the extent he's here representing Garlock, he's

5  not representing future demand holders, he's representing a

6  current contingent claimant.  And the misunderstanding that he

7  has is right there in black and white, where he says, no, I'm

8  representing a demand holder, he's not.  He can't.  His client

9  isn't that.  So, the question about whether he's right or wrong

10 about the scope of Mr. Austern's appointment, or whether there

11 could, or should, or is or has been, a futures representative

12 is not only completely cumulative at this late hour, he has no

13 standing to raise the issue; period, end of statement.

14         MR. CASSADA:  Your Honor, Mr. Bernick needs to read

15 the statute.  In representing Garlock, the plan proponents

16 stipulated that Garlock would hold demands.  So, I'm here in my

17 -- representing Garlock in its capacity as a person who would

18 like --

19         MR. BERNICK:  Which stipulation?  What do you mean,

20 stipulated that you would represent --

21         MR. LOCKWOOD:  What we stipulated was that Garlock

22 might assert claims in the future.  We did not stipulate that

23 because of that, those claims would be demands --

24         MR. BERNICK:  But, all that he --

25         MR. LOCKWOOD:  -- or that Garlock held --

**J&J COURT TRANSCRIBERS, INC.**

1         MR. CASSADA:  They --

2         MR. LOCKWOOD:  -- Garlock was a representative of

3 people.

4         THE COURT:  All right.  Somebody give me this

5 stipulation, folks, please.  All right.  Go ahead with your

6 argument while someone is getting it, Mr. Cassada.

7         MR. CASSADA:  Your Honor, and I'm not here making an

8 argument for anyone other than Garlock and the statute is quite

9 clear that if an injunction is to be valid and enforceable,

10 with respect to a demand of such a kind, then as part of the

11 proceedings leading to the issuance of the injunction, the

12 Court appoints a legal representative for the purpose of

13 protecting the rights of persons, then it might subsequently

14 assert demands of such kind.  It's quite clear, Your Honor.

15         Your Honor, I want to speak now about the fair and

16 equitable test and the absolute priority rule.  Mr Freedman

17 came up and he devoted very little time to that issue.  He

18 said, he forgot the statute, but he said that the statute

19 required that the contribution must be fair and equitable.

20 That's wrong, that's not what the statute says.  The statute

21 says that an injunction has to be fair and -- an injunction

22 issued related to this subparagraph, has to be fair and

23 equitable with respect to persons that might subsequently

24 assert demands, in light of the benefits provided or to be

25 provided to the trust, on behalf of such persons.

1          An injunction asserted in connection with this

2   paragraph is defined in the first part of the subparagraph, and

3   that's an injunction that identifies the kind of demand

4   described in a plan that is going to be paid in whole or in

5   part by a trust.  So, the question is whether the injunction

6   that channels a demand holder to a trust is fair and equitable

7   to that particular demand holder, it's not a question of

8   whether the contribution is "fair and equitable".

9          It's notable that Mr. Freedman said that he was

10  wasn't going to address what fair and equitable meant because

11  he covered that in his brief.  That's where they mentioned the

12  -- has to be a "substantial contribution test", it's clear that

13  they want this to be treated as a rubber stamp requirement with

14  no meaning, at all.

15         THE COURT:  Well, I thought Mr. Lockwood actually

16  addressed that issue.

17         MR. CASSADA:  Yes.  Mr. Lockwood, later, said, no, it

18  has nothing to do with substantial, he denied that.  He said

19  that it means what it says, it means fair and equitable, but

20  that fair and equitable was being used by Congress "casually",

21  that it wasn't using fair and equitable as a term of art that

22  has a meaning understood over a century.

23         In fact, we pointed to language in the House Report

24  for the Bankruptcy Reform Act of 1994 which was the Reform Act

25  that included 524(g).  And we told you in our brief that that

particular quote was not addressing 524(g), but it was included

within the report which makes clear that Congress knew exactly

what fair and equitable meant.  It's not a casual term, it's a

term of art with an understood core meaning, at its core it

means that a debtor cannot confirm a plan of reorganization or

participate in a plan of reorganization when senior creditors

are not paid in full.

MR. BERNICK:  Your Honor -- Your Honor, I'm sorry.

Again, this is completely cumulative, and not only is it

cumulative but it's a misrepresentation.  The Congressional

report relates to the New Valley decision.  The New Valley

decision relates to post-petition pendency interests and it may

incorporate the question of fair and equitable for purposes of

getting to the award of pendency interest.  This is apples and

oranges.  We're talking about 524(g), we're not talking about

--

THE COURT:  You've made that objection before and

you've made this argument before.  This is rebuttal, your five

minutes are nearly up.  Let's get to what is relevant, please.

MR. CASSADA:  Okay.  I want to identify a couple of

remarks that Mr. Lockwood made about the TDP.  First, Your

Honor, he said that in the tort system defendants and

plaintiffs can agree to defer claims and to keep them

confidential and that these agreements happen all the time and

that there's nothing wrong with it.

1          The key difference here, Your Honor, is that this

2    isn't a private agreement in the tort system.  This is a

3    requirement under 524(g) which does something that they don't

4    do in the tort system, it ties Garlock's hands.  It says

5    Garlock --

6          THE COURT:  That doesn't make it a public proceeding.

7    It's still a settlement proceeding.  I mean, this is still the

8    way the debtor is resolving its liability, through the outset

9    of a trust.  It's still a private agreement between the

10   successor to the debtors' liability in the entity that holds

11   that claim.  It doesn't make it a public --

12         MR. CASSADA:  No, it doesn't --  I mean, to the

13   extent that all plans of reorganization are agreements, fine,

14   but it's not a private agreement because Garlock is to be bound

15   by it.  Garlock has got to be an involuntary participant to the

16   agreement.  Garlock --

17         THE COURT:  No, I'm talking about the settlements

18   that the parties would negotiate and whether or not they would

19   be kept confidential.  Those settlements are still private

20   agreements.

21         MR. CASSADA:  I've got no objection to that, Your

22   Honor.  The question is whether the claim that they filed, and

23   the exposure evidence they filed with the claim is

24   confidential, and that it certainly is not.

25         THE COURT:  I don't know why not, it's not a public

1  proceeding.

2         MR. CASSADA:  It's the proceeding set up under the

3  plan --

4         THE COURT:  Yes.

5         MR. CASSADA:  -- which is the only way to assert a

6  claim.

7         THE COURT:  They're not asserting claims.  They're

8  resolving their issues with the debtor, through the format of a

9  trust.  There is no claims bar date with respect to the

10  personal injury entities.

11         MR. CASSADA:  But, that's the way that -- it's an

12  involuntary way that the claim is resolved.  Before they can go

13  to the tort system, they've got to file a claim with the trust.

14         THE COURT:  But, they don't have to -- in the tort

15  system, they don't have to institute a lawsuit.  They could

16  contact somebody and say, you injured me and the parties could

17  agree to settle outside of court.

18         MR. CASSADA:  Right.  And Garlock could sue that

19  person and Garlock would be able to take discovery and that

20  person would be compelled to come forward and say, yes, there

21  was evidence of exposure and you get credit for this

22  settlement.

23         THE COURT:  And Garlock can still sue that person,

24  not the debtor, the individual, to Garlock's content and

25  Garlock can still request the information from the trust,

1  pursuant to the trust procedures.  There is nothing in this

2  process that bars Garlock from discovery or from presenting

3  evidence in its defense; nothing.

4          MR. CASSADA:  There is, Your Honor, there's the fact

5  that the claimant doesn't file the lawsuit, the claim against

6  the trust, until after the tort system is resolved.

7          THE COURT:  They don't have to.  They don't ever have

8  to file a claim against the trust.

9          MR. CASSADA:  I know they don't, but that means that

10 there's no -- that means, there's no evidence there.  There's

11 no evidence that Garlock can pursue it.

12         THE COURT:  I can't force people to file claims.  I

13 mean, they --

14         MR. CASSADA:  Yes, you can, Your Honor.

15         THE COURT:  No, I can't.

16         MR. CASSADA:  That's what a fair and equitable

17 distribution proceeding would do.

18         THE COURT:  This isn't a -- this is not a bankruptcy

19 process.  A fair and equitable proceeding in the trust doesn't

20 require somebody who has a claim ever to bring it.  Those folks

21 may not ever want to sue.

22         Now, if what you're saying is that they have to sue

23 by a certain date, there is a limitations period in this trust

24 distribution procedure that says, if they want to file, then

25 there is a limitation, which is not the same as the tort

1  limitation, as to when it has to be brought.  But, that's not

2  to compel everybody who has a claim to come forward to file it,

3  that's not required.

4          MR. CASSADA:  Well, Your Honor, if they're -- okay.

5  If that's not required, the defendant's right to compel the

6  claim should be preserved.  The defendant should be able to go

7  to the trust and to file the claim against the trust and to get

8  an adjudication of the claim.

9          THE COURT:  All right.  That's a different issue.

10          MR. CASSADA:  Yes.

11          THE COURT:  Okay.

12          MR. CASSADA:  That would preserve the defendants'

13  right under state law to bring -- the analog to its right to

14  bring a claim in the tort system.

15          THE COURT:  All right.

16          MR. CASSADA:  Finally, Your Honor, with respect to

17  the Puller case, Mr. Lockwood said that the Turlik declaration

18  did not make any statement to the effect that there was

19  discovery sought at trying to identify all of the companies

20  that Mr. Puller claimed to have had exposure and that's just

21  absolutely wrong, Your Honor.  That's Paragraph 6.

22          THE COURT:  Can you give me a docket reference?

23          MR. CASSADA:  Yes.  Let me read the entry --

24          THE COURT:  All right.

25          MR. CASSADA:  -- and then we can talk -- I can look

1  for the docket reference.  It's Paragraph 6, Mr. Turlik said,

2  "Discovery was extensive in both cases and through a

3  combination of interrogatories, document requests, depositions

4  and requests for admission, Garlock requested the plaintiffs

5  and their witnesses to identify every company that they

6  contended contributed to their asbestos related injuries and to

7  provide Garlock with all evidence of exposure to the products

8  or operations of any such company."  That was in there and, of

9  course, the statement is also in there, that the plaintiff did

10 not provide exposure -- evidence of exposure to a number of

11 trusts that the plaintiff pursued shortly after he got the

12 judgment from Garlock.  And I'll have to provide you with a

13 docket number, Your Honor.

14          THE COURT:  All right.  Okay.  With respect to the

15 stipulation, if this is part of the Phase 2 stipulation -- is

16 that what we're talking about?

17          MR. BERNICK:  Yes.  I have the stipulation as well,

18 Your Honor.  Do you have it?

19          THE COURT:  I have what is referred to as 23219 in

20 the bottom right-hand corner.  I don't have a --

21          MR. LOCKWOOD:  That's the stipulation, the Phase 2

22 stipulation.

23          MR. BERNICK:  Yes, yes.

24          THE COURT:  Yes, it does, okay.

25          MR. BERNICK:  Paragraph 4, yes.

1          THE COURT:  Paragraph 4?

2          MR. BERNICK:  Yes.  Paragraph -- where it says, if

3 the plan is confirmed and consummated -- Garlock and plan

4 proponents also stipulate to the following.  If the plan is

5 confirmed and consummated, and there are basically three

6 statements that are factual statements about what may happen,

7 what Garlock may do and what claims it may hold, that's all it

8 says.  It doesn't say that they're here because they actually

9 do, (a) have those demands, indeed, that's a contradiction of

10 the terms, and (b) if they're here with standing to speak to

11 those demands because there is, in fact, a futures rep.  So,

12 this is simply a statement, it does not confer standing, it's

13 not a recognition of standing.  They have counsel come in and

14 basically secondguess the work of the futures' representative.

15          THE COURT:  No, I think the representation, as I'm

16 looking at it is, that there was a stipulation that Garlock

17 might assert claims in the future, but not that they are demand

18 holders.  That was Mr. Lockwood speaking, and that appears to

19 be what the stipulation says.  It says, as a result of such

20 claims and demands, i.e., those that may be asserted against

21 Garlock by the asbestos PI claimants, Garlock itself may assert

22 claims and demands in the future against the asbestos PI trust.

23          MR. BERNICK:  Yes, that's true of anybody who is a

24 defendant in the tort system today.  That they might well

25 receive such claims in the future.  That does not give them

1 standing to say, we now have the ability to speak to how those

2 demands will be handled.  That's the whole point of the futures

3 representative.  That's the whole point of <u>AmChem</u> and <u>Ortiz</u>, is

4 that then current claimants, Garlock is a current claimant, was

5 fundamentally conflicted when it comes to speaking to anything

6 that has to do with the demand holders in the future.  That's

7 exactly why you have a futures representative, that's exactly

8 -- and why is Garlock here?  Garlock is here not because all

9 they're concerned about is what might happen in the future,

10 they're here to make a bunch of statements that basically ask

11 the Court, right now, to change the system, tort system, right

12 now.  They are here as current claim holders, people who are in

13 the tort system today, and the only reason that they're making

14 this business about demands is to posture themselves

15 strategically so as to be --

16            THE COURT:  All right.  I heard this argument, too.

17            MR. BERNICK:  Okay.

18            THE COURT:  Okay.

19            MR. BERNICK:  So, then on the futures representative

20 appointment, we have the futures representative appointment, it

21 was filed --

22            UNIDENTIFIED ATTORNEY:  I'd be happy to --

23            MR. BERNICK:  Yes.  Well, that's fine, but does it

24 say anything of relevance?

25            UNIDENTIFIED ATTORNEY:  Yes.

1          MR. BERNICK:  Where?  Show me where.

2          So, we have the order that grants it and David

3   Austern, and ths is appointment of legal representatives for

4   future asbestos claimants.  There is no limitation, whatsoever,

5   that is that it's not only direct claims versus indirect

6   claims.  And then, Your Honor, the reason that you made the

7   statement that's been quoted by counsel for Garlock, I

8   remember, which is that the property damage committee was very

9   focused on the fact that Mr. Austern was not going to be

10  representing demand holders who had property damage claims.

11  And part of the reason, probably for that, was that Anderson

12  Memorial also, as a class, was saying, gee, if you certify the

13  class, we can handle the futures, same thing with ZAI.

14          So, what Your Honor was doing was drawing a bright

15  sharp line between personal injury and property, not meaning

16  somehow to cut off the need, or right or appropriateness of

17  having the FCR for personal injury handle what falls properly

18  within the scope of 524(g), which is direct and indirect

19  claims.

20          THE COURT:  Frankly, I don't recall the discussion of

21  direct or indirect claims coming up at that time, at all.

22          MR. BERNICK:  I don't think it did, at all.

23          THE COURT:  If it did, I don't recall it.

24          MR. FREEDMAN:  Your Honor, just to supplement that.

25  It's also absolutely clear that the order that you entered was

1  intended to appoint a futures representative to the fullest

2  extent required, and that's evidenced by the application, which

3  seeks to have a futures representative appointed to act as the

4  futures representative and represent interests of any and all

5  persons described in Section 524(g)(4)(B)(1) of the Bankruptcy

6  Code, who may assert demands against one or more of the

7  debtors.  That's precisely the section that has been shown to

8  the Court by Garlock's attorney.

9      THE COURT:  What's the -- do you have docket

10  references?

11      MR. FREEDMAN:  The docket reference to the

12  application --

13      COURT CLERK:  Use the mic please.

14      MR. FREEDMAN:  The docket reference to the

15  application is 5460.  And we don't have the docket, but the

16  order is entered -- bench filed on 5/24/04.

17      THE COURT:  Okay, thank you.

18      MR. LOCKWOOD:  Couple points, Your Honor.  First, I

19  apologize to Mr. Cassada and to the Court about my

20  mis-recollection of the Turlik affidavit.  But, I will point

21  out that in the Turlik affidavit there was no explanation

22  provided as to why the discovery had not turned up the exposure

23  to other claims, so that one of two things happened.  Either

24  the plaintiffs Snyder and Core lied, which we've discussed

25  already, and I don't need to go back as to how you can

1  extrapolate from that, or they were either mistaken in their

2  recollections or there was later developed evidence, or

3  whatever.  But, the main point is, it was two cases out of tens

4  of thousands and you can't generalize from that.

5        You had an exchange with Mr. Cassada in which he said

6  that what he was arguing is that the co-defendant, the indirect

7  claimant, should be able to bring a claim against the trust and

8  enforce an adjudication and Your Honor sort of nodded as

9  though, yeah, that's right.

10       What he's trying to do -- and we need to focus on

11 this -- is, he wants to bring a case against the trust without

12 knowing whether a claimant has filed a claim with the trust --

13       THE COURT:  I'm nodding because I understand that's

14 his argument.  I don't necessarily agree that the adjudication

15 can be forced if somebody files a claim with the trust anyway.

16       MR. LOCKWOOD:  Right.  I mean, the trust isn't a

17 court that you can bring cross claims against, which is

18 effectively what he's saying.  He should be -- he wants the

19 TDPs -- this goes back to his distinction between private and

20 public -- he wants the trust -- the Court to determine that the

21 trust should be deemed to be, in effect, a court and that the

22 interplay between claimants and defendants that exist in the

23 tort system should be transported into the trust and that his

24 client as an indirect claimant, should be able to, in effect,

25 bring a cross claim against a direct claimant to find out

1  information that would be useful to it in another case.  And

2  that simply isn't the way that 524(g) is setup to work, and the

3  Court should not buy that argument.

4           THE COURT:  Is there something in the tort system

5  that prohibits a defendant, in a personal injury asbestos

6  claim, who feels that there is a cross claim or counterclaim

7  against the plaintiff for not disclosing all the information

8  from filing it?  Why does the claim have to brought against --

9  I mean, why is the plaintiff in the tort system and the trust

10 relationship so significant?  Why can't -- the parties are

11 before a Court, why isn't the Court sufficient to adjudicate

12 the interest?

13          MR. LOCKWOOD:  Your Honor, I think that -- I believe,

14 I mean this is, you know, non-expert testimony and argument,

15 but it's similar to what Mr. Cassada does, so I'll try and ask

16 you to answer the question, I believe that if a defendant such

17 as Garlock found that plaintiffs had obtained money from it by

18 lying, under oath, it could sue those plaintiffs for return of

19 that money, on the ground that the judgment the plaintiff had

20 obtained had been obtained by fraud.

21          THE COURT:  Fraud, that's what it would seem to me.

22 So, what does this have to do with the trust?

23          MR. LOCKWOOD:  It wanted to turn the trust into a

24 court.  That's what it has to do and that's not proper.

25          MR. BERNICK:  Your Honor, I would add there that

1    you're really talking about something that gets into the

2    inner-workings of, you know, litigation that takes place every

3    day in state court, in a whole bunch of different

4    jurisdictions.  It is very ordinary kind of litigation, very

5    routine kind of litigation.

6         The very fact that Your Honor has to ask that

7    question, and properly so, is exactly the problem that we have

8    here.  We can't sit there and have a bankruptcy proceeding

9    that's supposed to be outside of the tort system, somehow

10   address the world of what's happening in the tort system, much

11   as we have made the arguments from the point of view of policy

12   and where is the bankruptcy going, that intersection is really

13   up to the state courts and the state legislatures about how to

14   mind their business.  We can't fix that problem if it exists.

15        MR. LOCKWOOD:  One other point about the futures rep.

16   What Mr. Cassada is arguing is --

17        MR. CASSADA:  Cassada.

18        MR. LOCKWOOD:  Cassada, I'm sorry, I apologize.  Mr.

19   Cassada -- I don't spend too much time in Italy, Your Honor --

20   is arguing, is substantively the equivalent of what Your Honor

21   may recall the creditors' committee in Owens-Corning argued,

22   which is that if a claimant can say they have an interest that

23   is different from some other group of claimants, that they

24   should have a separate futures representative appointed for

25   them.

1           You may remember that in Owens-Corning they wanted a

2   futures rep for the mesothelioma claimants, they wanted a

3   futures rep for the non-malignancy claimants, they wanted to

4   distinguish between the severe non-malignancy and the not

5   severe.  They wanted a futures rep for the people with settled

6   claims so they could negotiate a separate deal with the settled

7   claimants who weren't in the same position as people who had

8   unsettled claims.

9           I mean, once you go down this road of adopting Mr.

10  Cassada's analysis which says that the statute in talking about

11  such claim has to be viewed on an individual claimant basis to

12  distinguish whether a claimant might have a difference of

13  opinion or interest in how the trust that might ultimately be

14  created, might ultimately resolve the claims, there's no

15  stopping (a).  (b) Garlock has been in the tort system and

16  aware of bankruptcies of all of these companies for at least

17  ten years.  They have waited until now to anoint themselves a

18  de facto futures representative and come in here and argue that

19  this plan, who appointed the future representative almost,

20  what, five years ago, should have appointed more than one,

21  almost five years ago.  Even if we appointed a futures

22  representative today, the futures representative would take the

23  position, oh, I have to reopen up everything and negotiate

24  because it's too late to appoint a futures rep.

25          Garlock is here.  Garlock is asserting its own

1 interests, whether it labels them present interest or future

2 interest.  As Your Honor pointed out in an earlier stage in

3 dealing with Garlock, Garlock doesn't need a futures

4 representative to represent its interests, it's here, it's

5 asserting them.  And what I would respectfully submit is that

6 given that, this futures rep issue is not only impractical for

7 the reasons I've stated, but unnecessary because Garlock's --

8 the absence of it hasn't prejudiced Garlock, it's raised too

9 late and ultimately Garlock's complaints about what it thinks

10 the futures representative might have done in this TDP, for its

11 benefit, are all groundless.  If there had been a futures rep,

12 this TDP wouldn't have been any different because we wouldn't

13 have agreed to anything different because what Garlock wants

14 done has nothing to do with this trust.

15        THE COURT:  Let -- you know what, we're well, well

16 beyond anything.  These hypotheticals simply have no basis in

17 the record.  Please, let's just stick to the evidence.  Okay.

18        MR. LOCKWOOD:  I'm -- I'm sorry.  BNSF, one point.

19 Ms. Casey's example about there would have been a $400,000

20 claim, by the Libby claimant, that's only because the Libby

21 claimants hadn't started suing BNSF.  At the time, if this

22 bankruptcy hadn't existed --

23        THE COURT:  No.  Her hypothetical was that they

24 recovered a $400,000 judgment against BNSF, and as a result of

25 that judgment, that's a substantial contribution that wouldn't

1  entitle them to the extraordinary dividend in the trust.

2         MR. LOCKWOOD:  Your Honor, the Edwards claimants got

3  judgments of $20 million against Grace.  That's a lot more than

4  $400,000.  Any co-defendant that takes a case to a jury verdict

5  and gets a judgment, runs the risk that their bell is going to

6  get rung and that's true.  And the Edwards claimants are

7  getting a lot -- or people like the Edwards claimants who can't

8  sue Grace in the tort system to a jury, are losing all of the

9  same value that Ms. Casey is arguing that her client is being

10 exposed to.  But, the critical point -- what she was trying to

11 suggest is this.  That because the Libby claimants could get

12 from the trust $400,000 on an extraordinary claim that,

13 therefore, BNSF should be able to get $400,000.

14        THE COURT:  Right.

15        MR. LOCKWOOD:  And the fallacy with that is that once

16 BNSF -- if the Libby claimant could sue BNSF and get a $400,000

17 judgment, they wouldn't be entitled to $400,000 from the trust

18 because the extraordinary claim had two components.  One of

19 them was exposure --

20        THE COURT:  That's her point.

21        MR. LOCKWOOD:  -- the other was no likelihood of a

22 substantial recovery.

23        THE COURT:  That's exactly her point.  That the

24 person who then gets the $400,000 judgment on a vicarious

25 liability theory against BNSF that would have brought that suit

1  against Grace, had Grace been available to be sued in the tort

2  system has now sued BNSF in place of Grace, recovered against

3  BNSF and BNSF isn't subrogated to that claim at that level.

4  That's her point.

5          MR. LOCKWOOD:  Well, but BNSF is subrogated -- if the

6  claimant sues BNSF and recovers its judgment from BNSF, BNSF is

7  subrogated to the plaintiffs' claim.  What BNSF is saying is,

8  it should have an extraordinary claim because the claimant

9  would have had an extraordinary claim if BNSF didn't exist.

10          THE COURT:  Right.

11          MR. LOCKWOOD:  But, BNSF did exist, they're arguing

12  something that's counter factual.  Any judgments that --

13  remember, people -- defendants that to go trial are,

14  frequently, the last ones standing.  To go back to the Edwards

15  case again, why did Grace suffer a $20 million judgment?

16  Because it and Pittsburgh Corning were the only two people that

17  went to trial.  Everybody else had settled.

18          It's going to trial that produces the large verdict

19  and judgment potential.  If BNSF wants to avoid having

20  blockbuster verdicts and judgments entered against it, it can

21  do what the direct claimants are directed to do in this trust,

22  which is settle with the claimants against it.  But, there's

23  nothing about the TDP that somehow or other requires the trust

24  to say, we're going to treat BNSF as though it wasn't a

25  defendant in addition to Grace and, therefore, so it stepped

1  into the hypothetical shoes of somebody who could only sue

2  Grace, even though the actual shoes of that person was somebody

3  who could also sue BNSF, and Montana, and maybe Maryland

4  Casualty, depending on how the post-consummation debate about

5  whether the independent tort liability claims could be.  BNSF

6  has made no showing that it couldn't bring a contribution claim

7  against Montana or Maryland Casualty.  If it could, it wouldn't

8  be subject to extraordinary claims treatment.

9          So, the comparison that they're making is completely

10  artificial and based on false premises and is certainly --

11  they're getting treated the same as the direct claimants.  If

12  there are other people around that can be sued and held liable,

13  then they're not going to get extraordinary claims treatment.

14  The only people that get extraordinary claims treatment are

15  people whose only right of suit is effectively against Grace,

16  and that's not true of BNSF and it's not true of the person in

17  whose shoes BNSF stands because that person was able to sue

18  both the trust, or Grace, and BNSF, as well as Montana and

19  maybe Maryland Casualty.

20          THE COURT:  All right.

21          MR. BERNICK:  Wait, wait, wait, wait.  Mr. Cassada is

22  standing again.

23          THE COURT:  Yes.  Do you have the docket reference?

24  All right.

25          MR. CASSADA:  The docket number, Your Honor, is

1  23219.

2           THE COURT:  That's the affidavit?

3           MR. CASSADA:  That is -- that includes the

4  declaration.  That's the stipulation, and the declaration is an

5  exhibit to the stipulation

6           THE COURT:  Okay.  Thank you.

7           MR. BERNICK:  I think, Your Honor, that where we --

8  did you all have something?  I didn't want to ignore you again.

9           MR. FOURNIER:  Your Honor --

10          THE COURT:  Good afternoon.

11          MR. FOURNIER:  Good afternoon, David Fournier on

12 behalf of Longacre.

13          Your Honor, ten minutes ago when the Court said let's

14 get back to the evidence, I thought Your Honor provided me with

15 a perfect segue, I didn't count on Mr. Lockwood.

16          Your Honor, Mr. Bernick in speaking the Longacre

17 position, quoted testimony of Mr. Hughes and he noted that the

18 testimony of Mr. Hughes was the only evidence in the record of

19 the surety bond underlying the National Union claim and the

20 quote was that National Union agreed if for any reason Grace

21 was unable to meet its obligations to the tort claimants, that

22 it would make the payments.

23          What Mr. Bernick did not say was that that was the

24 only evidence in the record with respect to the National Union

25 claim because, of course, in the record we have of evidence,

1 the stipulation settling the adversary proceeding commenced by

2 Grace against both National Union and the parties to the

3 prepetition settlement agreement that enjoyed the benefits of

4 the National Union surety bond.  We also have in evidence the

5 surety bond itself.  Both of those documents made clear that

6 the purposes, the surety bond that was posted by National Union

7 was, in fact, a contractual obligation on the part of National

8 Union to guarantee within a very limited parameter; that is, to

9 the dollar amount to the bond, obligations of the debtor,

10 contractual obligations under those underlying settlement

11 agreements.

12          So, Your Honor, the question with respect to the

13 National Union claim, now held by Longacre, is exactly how far

14 out does the Court extend the concept of an indirect claim?  We

15 have here a claim that was allowed, pursuant to a stipulation,

16 settling an adversary proceeding that surrounded a contractual

17 obligation between National Union and the debtor that, in turn,

18 related to a contractual obligation between the debtor and

19 underlying tort claimants.

20          THE COURT:  So, your theory is that because the

21 debtor settled and the settlement was a contract and the bond

22 was issued to enforce the debtor -- or assure, pardon me, the

23 debtors' obligation under the contract, that this is a contract

24 claim regardless of the fact that the contract, the settlement

25 that the debtors negotiated in the first place dealt with

1 asbestos liabilities, and that it's too attenuated.

2        MR. FOURNIER:  Your Honor -- well, that's exactly

3 right because it is, it's a contract to guarantee a contractual

4 obligation.  At that point I submit it is too attenuated.

5 Beyond that, Your Honor, I'd submit that the fact that the

6 debtor agreed in the settlement stipulation in the adversary to

7 allow this as a general unsecured claim and specifically

8 provided for the payment of interest, effectively means that

9 the debtor has waived the right to argue that this should be in

10 Class 6 as opposed to Class 9.

11        THE COURT:  Yes.  I don't think the debtor addressed

12 that actually.  I think I'm going to have to ask the debtor to

13 address the payment of interest issue.

14        MR. FOURNIER:  Very well.

15        THE COURT:  Okay.  Mr. Davis -- you may want to wait

16 Mr. Freedman, until I hear from Mr. Davis if he has something

17 to add here.

18        MR. DAVIS:  Not only do we submit it's too attenuated

19 and support that position, but I would point out that in a

20 case where the debtor is keeping substantial, substantial

21 equity, that if there's a close call between treating a

22 creditor payment in full or not, that the benefit of that doubt

23 should go to the creditor, while the debtor is keeping this

24 huge equity.

25        And, moreover, the TDPs which were identified by Mr.

1 Bernick yesterday as central, and we've heard so much in the
2 last two days about just how central these TDPs are, are an
3 additional element of consideration, an additional element of
4 consideration that goes to people with unliquidated claims but
5 provides no consideration and, indeed, a detriment, to what
6 appears to be the only two parties in the room with liquidated,
7 indirect claims.  Liquidated indirect claims are no threat to
8 this reorganization, none at all, because they in no way impair
9 the ability of Grace to emerge, get a fresh start.  It's one
10 fixed sum of money and it's either payable over here, or it's
11 payable over there.

12      And there's no reason why you need this
13 classification to get to a result.  And it is attenuated, as Mr
14 Fournier said, and the debtor is keeping all this substantial
15 value and we are not getting the benefit of the TDPs and
16 everyone else who is being put into the status of an indirect
17 claim, has an unliquidated claim that will benefit in some way
18 or other from the TDP.

19      And, moreover, there is an artificiality to the TDP
20 that really should not be overlooked.  The amount of the
21 numerator and the amount of the denominator were agreed to.
22 They could have set the denominator, instead of at six billion,
23 they could have set it at five billion, by agreement.  All of a
24 sudden my claim would be worth more.  They could have set the
25 numerator at four million, by agreement, and my claim would be

1  worth even more.  It was the TDP which was an agreement for the

2  benefit of the asbestos constituencies, and no one represented

3  our interest in that negotiation.  We were precluded.

4       MR. BERNICK:  Your Honor, before Mr. Freedman

5  addresses the issue of interest, which pertains to a historical

6  fact, I think that counsel for National Union, again, has

7  forgotten completely the 524(g) context in which we're looking

8  at all these different things.  He likened the surety bond to,

9  you know, the court reporter getting paid or the lawyers

10 getting paid, and that's just not true.  The surety bond still

11 represents a risk, and in this case, a risk that was knowingly

12 undertaken with respect to an underlying tort claim.

13      So, this is not sitting out over here, as some clean

14 commercial contractual matter, it's inexorably tied to the

15 underlying tort claim.  Is it too attenuated?  That really is a

16 question of, again, what is going to happen under -- I haven't

17 finished yet.

18      THE COURT:  Gentlemen.

19      MR. BERNICK:  What is going to happen under 524(g)?

20 And, again, we have exactly the same problem.  If you have a

21 settlement, or for that matter if you have an appeal that's a

22 bonded appeal, you have a bond in place, the settlement is not

23 final, the claim is not gone, it can be revived.  The appeal

24 could pertain to an, as yet, unfiled claim and you still have a

25 bond in the picture.  The difficulty --

1           THE COURT:  But, look, I think the difference here,

2    though, Mr. Bernick is, this was an agreement that the debtor

3    came to, as I recall the settlement, was in the bankruptcy

4    court.  So, isn't that correct?  I believe the settlement that

5    ended the adversary and by which National Union's claims were

6    eventually treated in this stipulation, was in this court,

7    wasn't it?

8           MR. BERNICK:  No, that's with respect to the

9    settlement of the --

10          THE COURT:  So, how does the debtor then, or how do

11   the Plan Proponents then back out of the settlement agreement

12   that they have negotiated before this Court?  That's my

13   concern.

14          MR. BERNICK:  Well, Mr. Freedman will -- I would like

15   to speak to the attenuation point, but that's a prior point,

16   so.

17          MR. FREEDMAN:  Your Honor, we're not backing out of

18   the settlement by any means.  The settlement simply says that

19   these claims will be treated as unsecured claims and it does

20   make mention the right to accrue interest.  But, the settlement

21   also is very clear that this whole thing is about making

22   payments to asbestos claimants and the timing on when those

23   payments were going to be made and adversary proceedings

24   related to the making of those payments, and because of the

25   unique circumstances of that appeal, it was all before this

1 Court.

2       So, in November of 2007, approximately a year -- no,

3 two years, actually, before the plan -- no, excuse me, back up

4 -- a year before this plan was filed, and even before the term

5 sheet on this plan had been formulated a claim was determined.

6 But, there is nothing in this settlement that talks about how

7 that claim would be paid.  It just simply seeks to liquidate

8 the amount of that claim and specify certain rights with

9 respect to interest.

10       It's ambivalent.  It just leaves unresolved how that

11 claim is going to be ultimately resolved.

12       THE COURT:  Well, maybe, but what I don't think the

13 debtor can do, as a -- I hate to use these words -- fair and

14 equitable matter, is treat one claimant as getting interest in

15 the same class, under the 524(g) plan that no other creditor is

16 entitled to interest in, and this plan, this TDP, as I

17 understand it, doesn't provide for attorneys' fees and interest

18 and the other types of claims that might otherwise be

19 disallowed under Section 502.  That's, in general construct,

20 what the TDP is doing.

21       So, I just don't understand how National Union and

22 Longacre are appropriately classified in the same class with

23 other entities that are not entitled to interest because they

24 are.  And that is a material difference.

25       MR. FREEDMAN:  Well, Your Honor --

1          MR. BERNICK:  Your Honor, I think, again, that gets

2   back to the classification issue and while --

3                    (Telephone interference)

4          MR. FREEDMAN:  There's a specific response.

5          THE COURT:  Pardon me, whoever is on the phone

6   speaking, would you please put your phone on mute?  I'm sorry,

7   Mr. Freedman.

8          MR. FREEDMAN:  As Mr. Frankel explained this morning,

9   and just to make it clear, the amendment to the TDP that Mr.

10  Frankel described, with respect to BNSF, will also apply to

11  National Union, which will mean that National Union will not be

12  subject to a cap and National Union will not be subject to any

13  limitation on attorneys' fees with respect to the valuation of

14  the claim.

15          It will be subject to the payment percentage and will

16  be subject to the limitations on the amount of payment that the

17  trust can make in any particular year, but it will not be

18  subject to other kinds of limitations that apply to individual

19  claimants and that applies to the contractual rights of the

20  settled insurers, it applies to BNSF's contractual contribution

21  claim and it applies, now, to National Union who has come

22  forward with a contract claim that appropriately falls in that

23  category.  So, similarly situated asbestos PI claimants,

24  indirect asbestos PI claimants, are going to be treated the

25  same way under the trust.

1           THE COURT:  So, National Union's claim will include

2    its interest component, but subject to whatever the payment

3    percentage is going to be?

4           MR. FREEDMAN:  Yes, in the same way that other

5    creditors that go to the trust will be subject to the payment

6    percentage.

7           MR. BERNICK:  Your Honor, again, I wanted -- well, I

8    understand it's settled.  But, the difficulty is that what

9    hangs in the balance on the classification issue is big time

10   and the characterization issue is being used by National Union

11   to say, in the argument that's been made, separate and

12   completely apart from whatever terms might have been agreed in

13   connection with the settlement, is the classification issue

14   that is the issue of concern because the classification issue,

15   again, threatens to open the hole --

16          THE COURT:  It can't.

17          MR. BERNICK:  -- and here's why.

18          THE COURT:  This is liquidated claim, this cannot

19   threaten that purpose.  It is a liquidated claim.

20          MR. BERNICK:  To the -- no, but that's -- I'm sorry,

21   Your Honor, if the liquidated claim has not yet been paid out,

22   you always have the risk -- what if the settlement, what if the

23   plan falls apart?

24          THE COURT:  Oh, well, that's a feasibility question.

25   I'm not -- that's not a classification issue.

1           MR. BERNICK:  No, I talking -- I'm sorry.  I just can

2    finish for just a minute and I really will shut up, and I know,

3    Your Honor, it's late and all the rest, and counsel is now back

4    up at the podium, again.

5           But, whatever happens with classification states that

6    you can have a claim that arises from a personal injury claim

7    that is not subject to the 524(g) trust and that is an

8    extremely dangerous and delicate problem to create because as

9    much as they say, oh, well, we're clean, it's all purely

10   contractual, as soon as the plaintiff has the ability to go

11   after the bondholder without being subject to the 524(g) trust,

12   because the claim is no longer in Class 6, then what happens?

13   The claimant can go after that bond and going after that bond

14   can get a recovery that's no longer subject to the trust at

15   all.  So, if you have Class 9, it's the same basic problem.  If

16   the plaintiff can go after the bond and collect on the bond,

17   they don't care about anything else.

18          THE COURT:  I'm missing the point.  I thought these

19   bonds were already paid out.

20          MR. DAVIS:  They are.

21          THE COURT:  I thought that was the whole purpose for

22   the settlement, post-petition.

23          MR. BERNICK:  No, but the problem is that that's not

24   a question --

25          THE COURT:  No, it hasn't been paid out.

1           MR. BERNICK:  No.

2           MR. LOCKWOOD:  Yes, it has.  Sorry.

3           THE COURT:  Has National Union paid out the full

4   amount --

5           MR. DAVIS:  The bond is fully paid, discharged, fully

6   liquidated.  This is done.  There will never be a claim --

7           MR. BERNICK:  I'm sorry, I was misinformed about what

8   the bond was for.

9           MR. LOCKWOOD:  I apologize, Your Honor.  Mr. Bernick

10   asked me a question and I confused --

11           COURT CLERK:  Talk into the mic, please.

12           MR. LOCKWOOD:  I apologize.  It's my fault, it's

13   late.  Mr. Bernick asked me a question about whether this was

14   part of the Edwards settlement and I said, yes.  It's not.  It

15   was a prepetition deal to settle claims, the bond was drawn

16   down on and so --

17           MR. BERNICK:  I'm sorry, too.

18           UNIDENTIFIED MALE SPEAKER:  I thought you were done?

19           MR. FREEDMAN:  I was allowing Mr. Bernick to finish.

20           I just want to finalize with the point that the Court

21   should not have a concern about discriminatory treatment among

22   claimants because of the fact that all contractual claims that

23   have come forward are being treated in precisely the same way.

24           THE COURT:  Well, I don't know.  Look, it just seems

25   to me that there's a difference with the bond claim.  Now, I'm

1  not making findings, I guess I'm either thinking out loud or

2  asking questions in the event that this takes some further

3  research or argument.

4          My understanding of the way this developed, through

5  this court, and I don't have a perfect recollection so you can

6  straighten me out.  There was an adversary, there were claims

7  by Baron and Budd.  The debtor, I thought, paid the first --

8          MR. DAVIS:  No, Your Honor.

9          THE COURT:  -- missed the first installment on the

10 bond.  Missed it, okay.  And then National Union wanted to pay,

11 there was some litigation about whether National Union could,

12 should, had to pay.  Eventually, there was a determination, and

13 I think I ruled, that National Union had to pay and National

14 Union did.  Then there was a settlement that was approved as to

15 the second and third, if I recall correctly, payments that were

16 due.

17         You're telling me National Union has paid all of

18 those.  The issue as it developed was that Baron and Budd,

19 prepetition, had entered into --

20         MR. DAVIS:  It's a different law firm, Your Honor.

21         THE COURT:  I'm sorry.  I'm saying Baron and Budd, I

22 got the wrong law firm, okay.  The law firm, whatever it was,

23 prepetition, settled a large number of claims with the debtor,

24 the debtor purchased this bond because it was a condition of

25 the settlement that the debtor have a backstop and the bond was

1   the backstop for that settlement agreement.

2          So, the debtor -- when the debtor didn't pay,

3   National Union, exercising the obligations under the contract,

4   made the payments to the law firm who, in turn, paid their

5   clients in whatever percentages they were entitled to be paid,

6   presumably.  National Union then files a claim against this

7   estate on the contract saying that the debtor hasn't paid and

8   it's simply an issue of defaulting on a payment bond.

9          MR. DAVIS:  Exactly.  And there was a contract on a

10  contract and then it became a stipulation order in this court.

11  There were three contracts that separate us from the tort

12  claim.

13         THE COURT:  Okay.  I think it's different.  Whether

14  it's satisfied by putting it into this newly created section, I

15  don't know.  Have you seen the newly created section, Mr.

16  Fournier and Mr. Davis?

17         MR. FOURNIER:  David Fournier on behalf of Longacre.

18  The section that we saw earlier, I believe, purported to deal

19  only with BNSF --

20         THE COURT:  BNSF, yes.

21         MR. FOURNIER:  -- so I don't believe I've seen

22  anything further.

23         MR. FREEDMAN:  It did, but Mr. Frankel made clear and

24  it's --

25         THE COURT:  Gentlemen --

1          MR. BERNICK:  Your Honor, if you could give us a
2   minute.  There's a fundamental problem that we have with this,
3   that I still have with this, and this may mean a lot of money.
4   If we could put a hiatus here, and maybe come back to it and go
5   onto something else, otherwise, I think we're going to continue
6   to have confusion on whether this is a matter of consequence,
7   at all, and what the precedent would be if Your Honor were to
8   decide that this should be in a different class.  That is my
9   concern.  There are big differences between 6 and 9, I'm
10  getting different information now on what is at issue and as
11  counsel for Grace, or counsel for the debtors, and as a plan
12  proponent, I'm not comfortable right now that we have a grasp
13  of this issue, much as we're going to be educated yet again by
14  counsel for National Union.

15          So, if we could have this issue put over for a
16  minute, so we can figure out, at least on this side, what the
17  predicates for it are and the significance is, we would
18  appreciate it.

19          THE COURT:  Gentlemen, I think you all need to talk
20  because this one, frankly, I think, ought to get resolved in
21  some fashion.  Okay.  You want a ten minute recess or do you
22  want to keep going?

23          MR. BERNICK:  No, we can just go onto some other
24  issue.

25          THE COURT:  Fine.  But, don't speak into the

1  microphone so that I hear you and not the person at the podium.

2  　　　　MR. BERNICK:  We're not going to talk about it here,

3  we're going to talk about it at some point when we get an

4  opportunity because we don't want to have this --

5  　　　　MR. DAVIS:  If I may make a suggestion, Your Honor,

6  this is a completely unique issue, it involves a single

7  contract.

8  　　　　MR. BERNICK:  Your Honor, I object to this continuing

9  argument --

10  　　　　MR. DAVIS:  Let me finish.

11  　　　　THE COURT:  Mr. Bernick, please stop, please.

12  　　　　MR. BERNICK:  I can't --

13  　　　　THE COURT:  Please.  We're taking a five minute

14  recess.  I need away from you folks for a few minutes.  We're

15  in recess for five minutes.

16  　　　　　　　　　　(Recess)

17  　　　　THE COURT:  Okay.  After the pause that refreshed.

18  　　　　MR. BERNICK:  Very refreshed.  Disappointed, but

19  refreshed.  First of all as a process point, I know that Mr.

20  Monaco was hovering and getting antsy behind me because of his

21  plane, as I imagine others are, as well.

22  　　　　Counsel for National Union -- I forget what the

23  gentleman's name was in the back.

24  　　　　THE COURT:  Mr. Davis.

25  　　　　MR. DAVIS:  Yes.

1          MR. BERNICK:  Yes.  Was going to propose that this

2    issue be put over for another day.  It is way too important.

3    Your Honor, without arguing it, the difference between 6 and 9

4    is major, major money.

5          THE COURT:  Yes, I understand that.

6          MR. BERNICK:  And it's major money in a way that

7    requires that we go back over the history of how it came to

8    pass, in this case, that the National Union bond was paid out.

9    That was all paid out as a result of the settlement dynamic

10   that actually raises the Class 6 issue very, very prominently.

11   So, I'm not going to argue that now, I'm not going to lay out

12   the history now, but this is a very important matter.

13          I think that people who really have one-line,

14   two-minute things and they want to disappear should in fact

15   have the opportunity to do their one or two-minute lines and

16   disappear.  And for the Plan Proponents, we would propose so

17   that Mr. Monaco can get out and others can get out, that we do

18   that.  I think that after that we ought to return to this

19   issue, talk further about it and get Your Honor's guidance on

20   how you want to proceed.  But, right now, there is a lot of

21   unclarity and I think that there needs to be more factual

22   clarity before Your Honor can determine even what to do going

23   forward, and it's a very important matter.

24          Beyond that, we're then going to have the question of

25   what to do in order to finish up the list of issues.  My

1  suspicion is that many of them will be shorter, but I do know

2  that we will at least have one significant one, which is the

3  successor claims injunction, and then, of course, we've got

4  lenders.  So, I think we need to have after all the dust

5  settles with the individual things and after we have a brief

6  discussion on National Union, we're then going to need to take

7  cognizance of where we are and figure out what the schedule

8  should be.  This issue is very alive.  It's important the Court

9  have some perspective on it now.  It's way too important.

10  These are dollar for dollar recognized Grace dollars and

11  they're in the millions, so we need to have a further

12  discussion about it.

13        THE COURT:  Mr. Davis, can put this off for until, I

14  don't know, later today, tomorrow, whatever is -- when it comes

15  up, and Mr. Fournier?

16        MR. DAVIS:  I don't mind putting it off, but I don't

17  understand why it has to be put off today in particular.  I had

18  thought I'd be getting home tonight.  I don't have a hotel room

19  anymore.

20        UNIDENTIFIED SPEAKER:  We agree.  We should do it --

21        THE COURT:  All right, we'll do it today.  Let me get

22  the few people --

23        MR. DAVIS:  Later today.

24        UNIDENTIFIED SPEAKER:  Yes.

25        MR. DAVIS:  Well, all right.

1          MR. CASSADA:  Your Honor, is it okay -- this is

2   Garland Cassada.  Is it okay for me to assume that I can be

3   excused if you're finished with the Garlock issue?

4          THE COURT:  Anybody can be excused but I can't tell

5   you what's going to come up in the context of this record, Mr.

6   Cassada.  If I had that presence, I probably wouldn't be

7   sitting here, so.

8          MR. CASSADA:  I appreciate that.  That's exactly why

9   I'm asking.

10          THE COURT:  All right.  Mr. Monaco?

11          MR. LOCKWOOD:  Well, Your Honor, if it will help him,

12   I promise I won't raise anymore Garlock issues in his absence.

13          THE COURT:  All right.

14          MR. CASSADA:  There's too many of them to rely on.

15          THE COURT:  Mr. Monaco?

16          MR. MONACO:  Thank you, Your Honor.  Again, Frank

17   Monaco on behalf of Montana.  Your Honor, I would just like to

18   very briefly respond to several of the Plan Proponents'

19   comments.  With respect to Mr. Freedman's 524(g) argument, it

20   seems to me that they relied primarily on public policy.  This

21   is the way it's always been.  I would just implore the Court

22   that it should analyze 524(g), look at the plain meaning of the

23   statute and how it applies to the unique nature of Montana's

24   rights and the timing of those rights.  And, again, I

25   understand the Court has a difficult job.  It also reconciled

1  _Frenville_ in relation to the statute.

2          Despite what Mr. Lockwood wants the law to be, the

3  Third Circuit is very clear that the definition of claimant

4  within the meaning of the Bankruptcy Code, does have its

5  limits, and that when you look at a claim you need to look at

6  underlying state law.  He also made the point about the

7  existence of the suits and the procedural posture.  That's

8  really not determinative.  What _Frenville_ is very clear about

9  and what Montana law is very clear about is the right to

10 payment.  The loss -- the claim arises -- the loss arises when

11 the payment is made.

12         With respect to a few comments that Mr. Frankel made

13 with respect to equal treatment and the first in, first out

14 argument, the problem that we have raised in our papers and

15 argument earlier is that with all the roadblocks that have

16 thrown in front of indirect claimants, we could be stuck in the

17 processing queue for quite some time.  By the time we get to

18 the payment queue, if we ever get there, there's not going to

19 be anything left.  And, finally, Mr. Lockwood made reference to

20 an argument I think he attributed to Ms. Casey but I think he

21 meant -- he was referring to me.  And that's the wording of the

22 TDP at 5.6 about when an indirect claimant has -- claim is

23 presumptively valid if the way it's worded is if the trust does

24 not have any obligation for the underlying obligation, then it

25 could deny liability.  And I think he recognized that this

1 really wasn't what was intended for the TDP, but he didn't

2 really offer a solution to that particular problem with the

3 wording.

4        Your Honor, I have two other arguments I haven't

5 gotten to.  But, one was one that Mr. Bernick mentioned was the

6 feasibility, the other one is good faith.  I can take care of

7 those in literally one minute while I'm at the podium if Your

8 Honor would indulge me.

9        THE COURT:  Go ahead.

10        MR. MONACO:  With respect to the feasibility

11 argument, I think we're going to rely on our papers.  And,

12 again, this particular argument only would apply if Your Honor

13 finds that our claim is non-dischargeable and rides through the

14 plan.  The only other point I would emphasize is that my

15 partner, Mr. Mangan, did cross-examine Ms. Zilly at the

16 confirmation hearing, and I thought the testimony that was

17 elicited was that if in the event of a catastrophic judgment

18 she was not certain that Grace would have the ability to pay.

19        Now, with respect to our final argument, which is

20 good faith, again, we would rely on our papers.  The only point

21 I would make is it's not just the fact that we weren't included

22 in settlement negotiations.  It's what resulted from that lack

23 of inclusion in settlement negotiations.  From our standpoint,

24 we're now being misclassified.  And also, if we are going to be

25 including Class 6, we are receiving unfair treatment.  So,

1 that's what we base our good faith -- lack of good faith

2 argument on.  With that, Your Honor, I have nothing further and

3 would ask to be excused.

4         THE COURT:  That's fine.

5         MR. BERNICK:  Before you're excused or before counsel

6 is excused I should say, the only thing I would say in response

7 to that last point brought -- and this obviously is Montana and

8 we talked a little about feasibility in connection with the

9 issue from Anderson Memorial.  But counsel just said that under

10 Ms. Zilly's testimony, the 1.6 would not necessarily

11 contemplate a catastrophic judgment.  Ms. Zilly's testimony

12 actually was the 1.6 or 1.5 is over time.  But, when we're

13 talking about a threat of a judgment in Libby, we're not

14 talking about $1.5 billion.  Indeed, I think even by statute

15 the limitation is to $750,000.  So, the liability that Montana

16 says will be phased over time in connection with Libby, is over

17 time and, therefore, it's apples and apples with the 1.5 or 1.6

18 buffer, which is over time.

19         MR. LOCKWOOD:  Your Honor, before he leaves I have

20 two comments.  First, it cannot be a test of feasibility

21 whether a debtor -- a reorganized debtor could survive a

22 catastrophic liability.  By definition, a catastrophic

23 liability is unlikely.  The test is, is the debtor likely to be

24 back in Chapter 11?  So, hypothesizing that something really

25 bad might happen cannot possibly be a basis for saying that the

1  plan isn't feasible.

2          Secondly, with respect to the 524(g) argument and the

3  right to payment, essentially what Mr. Monaco is saying is that

4  Frenville stands for the proposition that a disputed claim is

5  not a claim, because until the dispute is resolved you don't

6  have a right to payment under his analysis.  Again, that cannot

7  possibly be the law no matter how you read Frenville.

8          MR. MONACO:  Your Honor, I would recommend Mr.

9  Lockwood read Frenville.  Thank you.  That's all I have, Your

10  Honor.

11          THE COURT:  Okay.

12          MR. BERNICK:  Any other one or two-minute deals?

13          THE COURT:  Mr. Glosband?

14          MR. GLOSBAND:  Good afternoon, Your Honor, Dan

15  Glosband for the CNA Companies with a brief, peaceful

16  interlude.  We had two components of our objections that I

17  believe have been resolved and I just wanted to identify those.

18  We had objected in the discriminatory treatment section on the

19  -- based on our concern that the plan in the TDP might

20  improperly allow CNA's contingent claims under either Section

21  502(e) or in the TDP under the concept behind 502.  Either of

22  those claims were contingent at the time they came up for

23  allowance or disallowance.  The Plan Proponents, in their

24  briefs, say that our rights are in fact not so effective and

25  that there is no mechanism in either the plan or the TDP for

1 such a disallowance.  We are in the process of negotiating

2 stipulation language to clarify that point, and I assume we're

3 going to be successful.

4            MR. FREEDMAN:  We will be successful.

5            MR. GLOSBAND:  Okay.  So, that's one that I think is

6 going to go away quietly.  Our second concern was that the

7 definitions that are relied upon in the release and injunctive

8 provisions with respect to Sealed Air might have either

9 released or enjoined rights that CNA has under three 1997

10 settlement agreements with the Grace entity that now is Sealed

11 Air.  Again, the Plan Proponents have said in their papers that

12 our rights are not either released or enjoined, and again we're

13 working on a stipulation and again I assume we'll be

14 successful.  So, I believe those two objections will be

15 resolved and I just wanted to report that.

16            THE COURT:  All right, thank you.

17            MR. BROWN:  Your Honor, just very briefly on the

18 classification and treatment issue.  We had waived oral

19 arguments and Your Honor may recall earlier today we might have

20 a response.  I don't have a response at this point.  But, since

21 I understand that the discussion may continue with respect to

22 National Union, I may have a response depending on what

23 transpires with respect to the rest of the argument, but I

24 don't at this point.

25            THE COURT:  All right, okay.

1          MR. RICH:  Good evening, Your Honor.

2          THE COURT:  Good evening.

3          MR. RICH:  Alan Rich for the Property Damage FCR.  I

4 have some very brief remarks.  As you know from the testimony

5 of Judge Sanders, he supports this plan.  He thinks it's the

6 best plan that could have been arrived at under the

7 circumstances and is satisfied with it.  I want to make sure

8 that the Court understands that both Judge Sanders and I agree

9 with Mr. Bernick's recitation of the context in which Judge

10 Sanders remarked that the Futures got a "better deal" than some

11 others.  I believe he was speaking about, for instance, the

12 right to jury trial which the Futures will get but Anderson

13 will not.  But, I will point out to the Court that that was a

14 situation of Anderson's making not a result of the plan.

15 Anderson submitted itself to the jurisdiction of this Court

16 thus waiving its right to a jury trial.

17          Judge Sanders focuses on the big pictures.  I mean,

18 there's statutes that are very complicated.  They have a lot of

19 subsections and some very complicated language, but he's a big

20 picture kind of guy.  And he sees a plan that is going to pay

21 the Futures 100 percent of their allowed claims.  It's going to

22 allow them to litigate it in any federal form of their choice.

23 This is a good deal for the Futures, for the traditional

24 property damage futures.  This is an excellent deal.  This is

25 almost -- in fact, in many ways, as we pointed out in our

1  paper, it's better than had there been no bankruptcy at all for

2  the Futures.

3         We're in a position where the only thing we're really

4  giving up is the possibility of litigation in a state court.

5  And I say the possibility because a lot of these cases would be

6  removed, but yet the possibility that there would be some state

7  court litigation.  And in exchange for giving that up, we are

8  getting our claims essentially secured by the stock of W.R.

9  Grace even before we bring them.  So, it's quite a good deal

10 for the traditional Futures.

11        With respect to ZAI, it's also an excellent deal.  I

12 mean, this is -- and not -- certainly not even close to solely

13 the result of anything Judge Sanders did.  I give the special

14 counsel and the class counsel for ZAI a tremendous amount of

15 the credit and there should be, because they snatched a

16 significant victory from the jaws of a devastating defeat.  The

17 Science trial was a devastating loss for ZAI claimants, both

18 current and future.  Armed with this Court's decision, if

19 assuming it were upheld -- most decisions are upheld -- it was

20 -- the fate for most of the Futures would have been summary

21 judgment.  And so, instead of going home with nothing, there is

22 a fund that was created that if things go the way we think

23 they're going to go is approaching $200 million.  That is a lot

24 of money versus nothing.  And so, we think that the ZAI folks

25 are getting an excellent deal under this plan as well.

1          Now, of course, Judge Sanders was concerned about

2   whether the plan was feasible.  I mean, you could promise the

3   moon and the stars, but the question is, can you deliver even

4   the moon?  And we looked at it and we talked to people and we

5   examined documents and we saw the testimony.  In fact, the $1.6

6   billion figure that has been discussed quite a bit during these

7   proceedings actually came out during part of the Judge Sanders'

8   question is where that came from.  And I heard Anderson sort of

9   pooh-pooh that figure because it was over 25 years, but that's

10  65, $70 million a year each and every year.  That, again, is a

11  lot of money.  And we're talking about the potential of tens of

12  thousands of claims.  I know the debtor doesn't think there are

13  going to be any, but there's the potential for tens of

14  thousands of claims.  And, you know, that's sort of a built in

15  governor on payments.

16          If there are tens of thousands of valid claims,

17  unfortunately it's going to take a very long time to get those

18  claims resolved and queued up and paid.  So, we're not the

19  least bit concerned over the fact that the $1.6 billion figure

20  is something -- even if it had to be satisfied over a long

21  period of time, that that presents any problem at all to the

22  Future claimants.

23          That's -- the $37 million figure on the reserve, I

24  found that figure fascinating.  I was fascinated by it during

25  the depositions.  I was wondering where it was coming from and

1 how they got there and what supported it.  But, ultimately, I

2 said to myself, who cares frankly, because if there's $1.6

3 billion available it makes absolutely no difference to me, and

4 it shouldn't make any difference to anybody else, even if that

5 $37 million figure wasn't there at all.

6          So, it's sort of a sideline that really consumed a

7 lot of unnecessary time and effort.  But, the judge is not

8 concerned about the 37 million given all the testimony from not

9 only Ms. Zilly, but from the CFO that there would be this at

10 least billion and a half available over this period of time.

11 So, again, after extensive discovery and search and thought,

12 Judge Sanders decided to support this plan.  He still supports

13 it and he respectfully requests that it be approved by this

14 Court.  Thank you.

15          THE COURT:  Thank you.  Anybody else before I get

16 back to the National Union issue?

17          MR. FREEDMAN:  I have an issue before the National --

18          THE COURT:  All right, Mr. Freedman.

19          MR. FREEDMAN:  Your Honor, it's ten minutes after

20 five and there's snow in Pittsburgh, which has caused all sides

21 to agree that with many of the issues that are open we're going

22 to rest on our briefs.  There's one issue, however, that I do

23 think the debtors and Plan Proponents need to respond to

24 because it was frankly left unaddressed in the Plan Proponents'

25 reply briefs.  And that is the issue that's identified in the

1  charts as the second box under entry line item Category 21,

2  which is funding by securities and future obligations.

3        First off, in the chart, the Plan Proponents -- the

4  issue itself is an objection raised by Seaton and OneBeacon.

5  And what they say is that when the Plan Proponents talk about

6  the trust being funded by the obligation to make future

7  payments -- and I'll now quote -- they leave out, however, an

8  important part of 524(g)(2)(b)(i)(11), namely, the part that

9  says, "including dividends" rights after future payments.  Of

10  course, they have a reason for this glaring omission.  In order

11  for the Asbestos PI Trust to receive dividends, it must first

12  have stock.  Under the plan, however, the Asbestos PI Trust is

13  not funded with any stock and, therefore, it will receive no

14  dividend.  This violates the statute.

15        Well, we -- when we prepared the chart were of the

16  conclusion -- reached the conclusion that that was a new

17  argument.  And, therefore, since we didn't want to use the

18  chart as a brief because we thought that would be

19  inappropriate, we just simply said that this was a new argument

20  and we'll respond to it in oral argument.  It turns out that,

21  in fact, it's not a new argument.  Mr. Brown pointed out where

22  he had made the identical point in other briefs.  So, we'll

23  concede that to the extent that the Plan Proponents don't

24  address it in their papers, it was simply not addressed.  It's

25  not a new argument.  Having said that, it is a point that we

1  didn't want to leave unresponded to.

2          And, frankly, while it may have been something that
3  was said before as opposed to a new argument, it's a silly
4  point.  First off, it's absolutely clear and undisputed that on
5  the effective date the plan will be funded with ten million
6  warrants with a strike price of $17.  The Court may take
7  judicial notice I suppose of where Grace's stock is today, but
8  it's well above $17 a share.  But, the point is that when the
9  trust gets that stock should it decide to exercise it -- and
10 why wouldn't it -- it has two options.  They can sell the
11 stock, if that's in its business judgment, or it can keep the
12 stock and receive dividends.  What the objectors seem to be
13 arguing is that somehow the trust needs to have some kind of
14 stock which is permanently in the trust possession and which it
15 cannot dispose of so that it receives dividends on a permanent
16 basis, and the statute cannot mean that.

17         And, in fact, it doesn't mean that because the rule
18 of construction -- well, first off, let me -- let's read the
19 statutory language.  The statutory language is that the trust
20 is to be funded in whole or in part by the securities of one or
21 more debtors involved in such plan and by the obligation of
22 such debtor or debtors to make future payments including
23 dividends.  So, does that mean that there has to be stock so
24 that -- which a trust has to hold forever so that it receives
25 dividends, or does it mean what the Bankruptcy Code otherwise

1 says as a rule of construction that includes and including are

2 not limiting.  And, of course, it means that includes and

3 including are not limiting.  In other words, it's appropriate

4 in satisfying Section 524(g) if the trust is funded with stock.

5         But, why would you ever want to limit a trust to take

6 stock an inferior instrument in the capital structure of W.R.

7 Grace as opposed to the very robust payment obligations that

8 this plan provides for, which are ahead of equity and which

9 indeed are secured by 50.1 percent of the stock of the debtor.

10 The statute can't simply -- cannot require that the trust be

11 forced into that kind of a bad economic position.  So, as a

12 result, the Court should not construe the statute as requiring

13 that there be something more than the warrants which are being

14 provided.  And we believe that we've satisfied the plan funding

15 mechanism, satisfies the particular provision.

16         THE COURT:  Mr. Brown?

17         MR. BROWN:  Michael Brown on behalf of Seaton and

18 OneBeacon.  Your Honor, Mr. Freedman is correct.  We've agreed

19 to sort of cut this argument short.  I think that this is

20 purely a legal issue.  I would like to point out that the

21 securities requirement is purportedly being satisfied by the

22 deferred payment note and by the warrants.  And the support for

23 that proposition is the definition of security in the

24 Bankruptcy Code.  I think that the Third Circuit, at least with

25 the  deferred payment note, indicated in the Congoleum decision

1  that it's not likely that a promissory note would satisfy the

2  securities requirement.  There was a -- Your Honor I'm sure is

3  familiar with the opinion, but there's a quote in there about

4  notably the --

5          MR. FREEDMAN:  Your Honor, Mr. Brown is arguing a

6  different point.

7          THE COURT:  He is.

8          MR. BROWN:  I'm just trying to put the two in

9  context, Your Honor, that -- and I'll finish the point and then

10 go directly to what Mr. Freedman was arguing.  They made an

11 argument that there are two types of securities.  One is the

12 note.  I think that the Third Circuit has cast doubt on that.

13 Again, that's a strict, you know, interpretation of the

14 statute.  In terms of the including dividends language, it is

15 our position that dividends are required and that that phrase

16 is -- in essence is modifying what precedes it.  And that in

17 order -- and for that reason you should interpret securities to

18 mean stock, not some other type of security.  The fundamental

19 point, however, is though -- is simply that the including

20 dividends -- our argument is that that is not optional and the

21 Plan Proponents' argument is that it is optional.

22         Yes, the warrants could be exercised.  And yes, the

23 trust could be funded with stock at some point.  And yes, that

24 stock might generate dividends at some point, but there's no

25 guarantee that it's going to happen.  When the plan was

1   originally negotiated back in April of '08, I think, the

2   warrant price -- the strike price was 17.  The stock was in the

3   twenties, I think at that point.  In March of '09, the stock

4   was down at $3 a share.  It's now back up to $26 a share, and

5   God knows where it's going to be when the plan goes effective.

6   So, the suggestion that there will be stock because there are

7   warrants is just not -- it's not sustainable.  And if there is

8   no stock in the trust, then there will be no dividends and it

9   is our position that dividends are required.

10          THE COURT:  Okay.  Mr. Giannotto?

11          MR. GIANNOTTO:  Your Honor, Michael Giannotto for the

12   CNA companies, very briefly.  We also made an argument that the

13   warrants and the promissory notes did not satisfy this

14   requirement of 524(g).

15          MR. FREEDMAN:  Your Honor, this is not the --

16          MR. GIANNOTTO:  It is the -- it's the dividends

17   argument.  Your Honor, I would also point out in interpreting

18   the words including dividends, you would look to what the Third

19   Circuit itself in Combustion Engineering has said is the

20   purpose of that funding with securities and an obligation to

21   make future payments including dividends what the purpose is.

22   And what the Third Circuit said in Combustion Engineering --

23   and we cited this in our briefs at 391 F.3rd 190 -- I'm sorry,

24   391 F.3rd at 248 -- is that the purpose is to provide an

25   evergreen source of funding.  And so, with stock if you own

1 stock and you have stock in the reorganized debtor, you prosper

2 as the debtor prospers.  And the debtor, you keep getting

3 dividends.  You keep getting an evergreen source of funding.

4 If you don't have equity stock, you don't have that evergreen

5 that is forever source of funding to pay new claims as they

6 emerge.

7         THE COURT:  Well, I understand that argument but I

8 don't think _Combustion_ went so far as to require dividends.  It

9 does require that the trust has to be adequately funded

10 because, first of all, the Court couldn't confirm the plan if

11 it found that the plan was not feasible.  And if the plan can't

12 be funded on a basis sufficient to pay both the present and

13 future claims on a comparable basis, then it wouldn't be

14 feasible and the Court couldn't confirm the plan.  So, it has

15 to be evergreen in that sense.  It's got to be -- there has to

16 be sufficient information for the Court to determine that the

17 calculations are likely to lead to a trust that will be funded

18 for the term of the -- for as long as there are claims that

19 have to be litigated.  But, I don't see that that requires --

20 for that purpose, I don't see that that requires dividends.

21         MR. GIANNOTTI:  I guess -- I respectfully disagree.

22 I agree with you that the _Combustion Engineering_ court did not

23 say you need dividends.  They didn't say that.  They said the

24 purpose of this requirement is to -- the requirement that says

25 you have to have securities of the debtor and an obligation to

1  make future payments including dividends, that that statutory

2  phrase is meant to provide an evergreen source.  And evergreen

3  -- I guess the way I interpret the Combustion Engineering case

4  and the legislative history that they cite in that case on that

5  same page I cited is that as the reorganized debtor prospers,

6  the trust gets the benefit of that.  And the way you get that

7  benefit is from stock, because the stock price increases and

8  you get dividends.

9           THE COURT:  All right.  Well, I understand that view.

10  I don't think I agree with it, but I'll take a look at it again

11  later in the proceedings.

12           MR. GIANNOTTI:  Okay.

13           MR. LOCKWOOD:  Your Honor, could I -- oh, I'm sorry.

14           MR. GIANNOTTI:  I just -- so then I can sit down and

15  Mr. Lockwood could speak, my good friend, Mr. Lockwood, as I

16  told him yesterday.  As Mr. Freedman said, I think both we and

17  Mr. Brown's clients made other arguments on funding, but we're

18  all agreed we're just going to leave those to the briefs.  And

19  we all think we've made oral argument as best we're going to

20  make them, so we won't speak to them today.  Thank you.

21           THE COURT:  All right.

22           MR. LOCKWOOD:  Your Honor, two points.  Under Mr.

23  Giannotto's and Mr. Brown's arguments, a trust that was funded

24  with stock would have -- if it couldn't sell the stock would

25  have no means of paying claims.  I mean, every trust has to

1   convert non-cash assets into cash in order to pay claims.

2          THE COURT:  You mean Grace isn't going to shelf off

3   enough dividends that it will fund the trust over the next 50

4   years or so?

5          MR. LOCKWOOD:  And we will never need to use any of

6   the other funds that go -- I mean, the argument proves too

7   much.  Secondly, it would prevent the trust from selling the

8   stock immediately.  And just to mention one incident of a case

9   Your Honor confirmed, in <u>Federal Mogul</u> -- the stock in <u>Federal</u>

10  <u>Mogul</u> was sold by the trust almost the day after or the day of

11  the effective date.  And that plan under this analysis would

12  have been unconfirmable for no reason at all.  As I said to Mr.

13  Monaco earlier in his concern that the State of Montana was

14  going to wind up owning stock in violation of its constitution,

15  trusts don't pay claims with shares of stock.

16         THE COURT:  Okay.  Any other arguments before we get

17  back to National Union?

18                      (No verbal response)

19         THE COURT:  Okay.  Where do we stand on the National

20  Union argument then?

21         MR. BERNICK:  I'll say something very briefly and

22  maybe just an inadequacy of the briefing, but I don't really

23  think so.  I think that what we have here is Your Honor is

24  recalling the litigation that actually took place with respect

25  to National Union during the course of the case.

1            THE COURT:  Yes.

2            MR. BERNICK:  Okay.  And that is important.  It's

3   actually of vital importance because it ultimately bears upon

4   the question of whether this is six or nine.  And just so this

5   is not an academic issue, the trust pays for six.  Reorganized

6   Grace pays for nine with pendency interest under the plan and

7   people are asking for even more.  So, this is a major dollar

8   item that we're talking about here.  And not only is it a major

9   dollar item, but it's a major dollar item in a way that makes a

10  very significant difference for classification and brings home

11  the purpose of classification.  The purpose of classification

12  includes both the direct and the indirect claims.  And one of

13  the reasons as we've seen that indirect claims are important,

14  particularly when they are of a contractual indemnification

15  type of nature, is that they are fast access and plaintiff has

16  the ability to sue the party with the contract to get right to

17  the debtor without passing go or collecting $200 and without

18  having to worry about a stay.

19            THE COURT:  But, that doesn't apply here.

20            MR. BERNICK:  Yes, it absolutely does apply here and

21  here's why.  Here's why.  And this is the, I think, the point

22  where Your Honor and I have perhaps a difference of view but

23  it's of critical importance.  The case was settled pre-

24  confirmation, but the settlement involved a payout, right?  And

25  the settlement payout -- and if there was a breach of that

1  payout, obviously original liability would come back to bear.

2  So, you still have a personal injury liability.  It's just that

3  the settlement takes place over a period of time.  It was the

4  settlement that then is bonding.  Now, that bond is not like

5  the court reporter.  Indeed, that bond was obtained at the

6  insistence of the law firm that was -- represented the

7  plaintiffs precisely because of the prospect of bankruptcy.

8          So, this is not something where like Bank of America,

9  we're all sitting here with a letter of credit or a security

10 was obtained to provide insurance of payment without any

11 specificity to a underlying tort claim and simply deployed for

12 that purpose.  This is a bond where there was a specific risk

13 of bankruptcy including all that bankruptcy entails.

14          THE COURT:  Yes, I understand that.

15          MR. BERNICK:  That's a fundamentally different thing.

16 Now, as this case goes through the bankruptcy, what happens?

17 And this now illustrates why it's so important to have these

18 grouped as Class 6.  What happens to them in Class 6?  How they

19 are treated in Class 6 totally different proposition.  And I'm

20 not arguing that any particular treatment of this claim under

21 Class 6 is or is not appropriate.  And Mr. Freedman and Mr.

22 Lockwood and Mr. Frankel all got up to say that the Plan

23 Proponents are responding to the question of how these claims

24 get treated in Class 6 and whether, in fact, they get paid in

25 full under Class 6, not just this particular thing but to be

1  paid in full, allowed in full under Class 6, not just because

2  of this bond, but also true with respect to indemnity claims

3  and also with respect to indemnities that are associated with

4  settled insurance policies.  That's all a treatment in Class 6

5  issue recognizes a treatment in Class 6 issue.

6          The question is whether it belongs in Class 6 to

7  begin with.  And the reason it belongs in Class 6 to begin with

8  is that these are contracts that are absolutely and

9  specifically tied to underlying tort claims.  They are

10  indistinguishable from being indirect claims.  They arise out

11  of an underlying tort liability.  And, most importantly, they

12  are a vehicle, a continuing vehicle for a tort plaintiff to do

13  an end run around the trust and to do an end run -- and to get

14  full payment of their underlying claim without regard to

15  whatever happens in the trust, because they have got access to

16  another source of money and that's --

17          THE COURT:  But, they were already paid.  That's the

18  problem.  These bonds have already been paid.

19          MR. BERNICK:  No, that's not -- no, no, no, these

20  were to be paid out in a series of payments.

21          THE COURT:  And all those payments have been made.

22          MR. BERNICK:  The reason that they were ultimately

23  paid though, Your Honor, is what happened.  What happened was

24  that when the case started, only some of the payments had been

25  made.  So, there was a big stub that was left over.

1       THE COURT:  I think none of them had been made, but

2  okay.

3       MR. BERNICK:  No, I think one had been paid.  At

4  least there had been a payment made to the environmental law

5  firm.  And, as a result, the principal amount or the full

6  amount of exposure in the bond had declined.  But, after the

7  bankruptcy was filed, more payments were due to be paid and an

8  adversary proceeding was filed by the debtor to prevent the law

9  firm, the plaintiff's firm, from unilaterally seeking to draw

10  down on the bond.  So, that dynamic is absolutely of the

11  essence that is -- that you now have a plaintiff who has a

12  direct claim that can't be pursued tapping into an indirect

13  source of funding in order to force the draw-down without any

14  intercession by the debtor.  This is a classic case where you

15  sue the person whose got the indemnity.  And you could do it

16  completely outside the supervision of the Court.

17       So, what did we have to do?  We had to file the

18  adversary proceeding to prevent it from taking place.  And Your

19  Honor ultimately heard the adversary proceeding, made some

20  remarks from the bench.  And on the basis of the remarks from

21  the bench without any order, the agreement was made to actually

22  go down and pay the rest.

23       THE COURT:  Yes.

24       MR. BERNICK:  That's what happened.  Now, the reason

25  that this is critical, Your Honor, is that we're not contesting

1  the fact that the settlements took place.  What we're

2  contesting is that the settlement took place in the context

3  where the only reason it took place was that they were able to

4  pressure through the plaintiffs still outside of court going

5  after a third party on the bond.  If you --

6          THE COURT:  The problem was that this wasn't property

7  of the estate to start with because of the bond nature as I

8  recall.  I mean, this is going way back.  And so, maybe my

9  recollection is in error, but I think that was the finding.

10          MR. BERNICK:  That --

11          THE COURT:  This is a different situation, Mr.

12  Bernick.

13          MR. BERNICK:  Your Honor, I'm sorry.  This is exactly

14  -- Your Honor, it's a different situation.  There's no question

15  but that it is was difficult for the estate to say, this is

16  property of the estate --

17          THE COURT:  Yes.

18          MR. BERNICK:  -- and, therefore, it can't be

19  protected.  That's not my point.  My point is that we're now in

20  the context of a plan, and the plan has to -- the plan has to

21  -- it was their decision that they wanted to take this bond on

22  to begin with.  The question is, how do you characterize the

23  contractual liability that is the bond?  How do you

24  characterize it?  And the answer is that the reason that it

25  must be characterized, that the indemnity must be characterized

1 as an indirect claim under Class 6 as opposed to under Class 9,

2 the reason that it must be characterized as being indirect in

3 relationship to a direct claim, is precisely the linkage that

4 was illustrated in this case when they were able to threaten

5 pulling down -- the plaintiff was able to threaten pulling down

6 on this indemnity when they couldn't get after Grace directly.

7 They had leverage.  That means --

8          THE COURT:  That was the whole purpose for posting

9 the bond.

10          MR. BERNICK:  I understand that, Your Honor.  I'm not

11 saying that they shouldn't be able to do it.

12          THE COURT:  Okay.

13          MR. BERNICK:  What I'm saying is that when you ask

14 about what is an indirect claim for classification purposes,

15 this is not a claim that exists independently of the underlying

16 tort claim.  This is a claim that depends intimately on the

17 underlying tort claim.  And if you say that these types of

18 bonds are not indirect claims, so they go off to Class 9, what

19 that means is that there is no control in the context of a

20 plan.  What if you had a bond that hadn't been drawn down?  If

21 you had a --

22          THE COURT:  If it's security for a claim, the

23 creditor is secured.

24          MR. BERNICK:  It's not --

25          THE COURT:  I mean, then the creditor gets paid.

J&J COURT TRANSCRIBERS, INC.

1          MR. BERNICK:  No, that is exactly the -- you could

2     say exactly the same thing about the indemnities.  If you have

3     a third party that is -- that has the -- has the intuition the

4     debtor has, the indemnity, this case is a surety company.  You

5     could have any other kind of indemnity.  Well, they say the

6     purpose of the indemnity was to make sure that they be

7     protected.

8          THE COURT:  No, it's --

9          MR. BERNICK:  Sure, that's true.

10          THE COURT:  That's the opposite situation.  Here,

11     National Union essentially indemnified the debtor.  The debtor

12     wasn't indemnifying National Union.  It's the flip side of the

13     coin.

14          MR. BERNICK:  Not with -- this is surety bond.  It

15     goes both ways.  This -- yes, that is --

16          THE COURT:  I'm sorry.

17          MR. BERNICK:  The plaintiff is able to get the bond

18     --

19          THE COURT:  Yes.

20          MR. BERNICK:  -- which protects it.  So, they're able

21     to drawn down on that bond.  But, Grace has the obligation to

22     pay the surety company.

23          THE COURT:  Yes.

24          MR. BERNICK:  That's the indemnity that goes exactly

25     the other way.  That's the same thing.  As any other indemnity,

1  Grace has to indemnify the surety company.  And it's that

2  indemnity obligation that's the contractual obligation just

3  like any other obligation.  If you say that this is Class 9,

4  what you're saying is that an indemnity, a contractual

5  obligation pursuant to which Grace must hold harmless a third

6  party, is not an indirect claim.  That's what you're saying.

7  And in this case, it is absolutely an indirect claim.  The only

8  distinction is that the amount of the direct claim is

9  liquidated.  That's the only difference, and it's a difference

10  that does not make a difference.

11       And the reason it doesn't make a difference is that

12  if you fail to recognize this as an indirect claim, you

13  threaten to take any indemnity relationship, including a bond

14  that has not been satisfied, it means the underlying

15  plaintiffs' obligation.  This plaintiff now has a privileged

16  position.  They're no longer a Class 6 plaintiff really.

17  You're saying they're now a Class 9 plaintiff.  Well, they're

18  not.  This is a Class 6 plaintiff.  They have a personal injury

19  claim.  It hasn't been paid but it's a personal injury claim

20  within the meaning of 524(g).  And if they have the ability to

21  draw down an indemnity and we have to pay it, they are doing an

22  end run around 524(g) and the indirect claim.

23       THE COURT:  That's what happens when the debtors post

24  bond?

25       MR. BERNICK:  Well, no, but that's what the whole

1 problem is.  If the bond -- it cannot make a difference.  The

2 bond is at risk.  These are people who take a risk of

3 bankruptcy and whatever they get from the bankruptcy.  Now,

4 Your Honor --

5            THE COURT:  Those are smart people who get the debtor

6 to post the bond knowing that there's a risk of bankruptcy.

7            MR. BERNICK:  That's exactly --

8            THE COURT:  And so, they have a preferred position to

9 those who don't do it, and that's what happened here.

10            MR. BERNICK:  Well, that's the problem is that they

11 don't.

12            THE COURT:  But, they did.

13            MR. BERNICK:  This plaintiff has no preferred

14 position.

15            THE COURT:  It did.  It got paid.

16            MR. BERNICK:  No, they only got paid because they

17 were able to make the threat that they did.  The fact that they

18 made that threat is all the reason why -- in the context of a

19 trust, that's what we're talking about now.  We're not talking

20 about an adversary proceeding that takes place before the

21 trust.  We're talking about the trust.

22            THE COURT:  No, there's an entire difference.  Even

23 absent the bankruptcy, forget the bankruptcy, pre-petition.

24            MR. BERNICK:  Right.

25            THE COURT:  Those plaintiffs could have drawn against

1  this bond.

2          MR. BERNICK:  Correct.

3          THE COURT:  The other asbestos claimants who have no

4  bond couldn't recover necessarily against the debtor without

5  undertaking some suit or some action against the debtor.  These

6  plaintiffs could have drawn on that bond.  That was the whole

7  purpose for posting it.

8          MR. BERNICK:  No, but the issue is not whether this

9  is indirect.  It's not.

10         THE COURT:  Well, what's the this?

11         MR. BERNICK:  The issue is whether this is indirect.

12         THE COURT:  I'm sorry, I don't know what the this's

13 are.

14         MR. BERNICK:  The issue -- the plaintiff certainly

15 can collect.  That's not the question about whether further

16 action has to be taken.  It's whether this indemnity represents

17 further action or not.  And, in fact, the plaintiff can't

18 collect against the debtor.  The plaintiff is collecting

19 against the surety company.

20         THE COURT:  Exactly.

21         MR. BERNICK:  Okay.  So, yes, before the bankruptcy

22 proceeding starts, no question that they can go down this road.

23 There's also no question that they can go down this road after

24 the bankruptcy starts in the context of an adversary

25 proceeding.  I'm not taking issue with what Your Honor ruled.

1  But, now we're in the context of 524(g), which has nothing to

2  do with the adversary proceeding.   524(g) requires that we take

3  a look at claims and we put them into buckets.   And the bucket

4  that deals with indirect and direct claims is 524(g).   And

5  indirect claims include claims that are actions over that arise

6  out of tort liability.   And this is no different just because

7  it happens to be paid.   That's the whole point.

8            Now, how it gets treated, do they get paid, et

9  cetera, et cetera?   Sure, we've got to treat this somewhat

10  differently than we treat the actions over our contribution

11  claim.   And that's exactly why Mr. Frankel and Mr. Lockwood,

12  who is now upset with me for some reason, is what they say,

13  well, we're going to have to treat the indemnity claims

14  differently.   But, this claim is no different.   It's no better.

15  It's nowhere -- it's no more non-asbestos personal injury than

16  any other indemnity claim.   All it is is an indemnity.   And

17  it's not secured by assets of the estate.   It's not a secured

18  claim.

19            THE COURT:   That's right.

20            MR. BERNICK:   So, it's an unsecured indemnity claim

21  totally attached to an underlying personal injury claim.   And

22  the only reason this claim is different is that these people

23  threatened to do -- make the threat that is the absolute gold

24  standard proof for why this is in fact tied to a tort claim,

25  because they got a tort claimant who couldn't get paid from

1  Grace to drawn down on the thing.  They took the risk that they

2  would be in a Chapter 11.  They took the risk that they might

3  not get paid.  They took the risk that they might be part of a

4  524(g) plan and this is part of that risk.  It says, you may

5  have to be part of the class where you get treated specially

6  but you do not get treated the same way as non-asbestos

7  unsecured creditors.  These people are not non-asbestos

8  unsecured creditors.  They are asbestos unsecured creditors.

9        MR. DAVIS:  Not quite.  Mr. Bernick doesn't have the

10 facts straight.  And all of that testimony that we just heard

11 without benefit of oath isn't accurate quite.  This is

12 attenuated very much like a letter of credit would be

13 attenuated.  There are in fact five contracts that separate us

14 from the tort claim and they're in the red.  First, there was

15 the settlement of the claim that changed it from a tort claim

16 to a contract claim.  That happened with the law firm.  That

17 was dumped, Attenuation Number 1.  Attenuation Number 2, the

18 bond, a contractual obligation.

19       Attenuation Number 3 is an agreement called a general

20 agreement of indemnity, a general agreement of indemnity not

21 specific to asbestos and it's attached to our proof of claim.

22 And that general agreement of indemnity applies not only to

23 asbestos bonds but to other bonds.  The next attenuation is

24 Your Honor's approval of our settlement agreement.  And when

25 you look at that settlement agreement and you look at what it

1  really says, it couldn't be clearer that the context and the
2  wording intended this to be a general unsecured claim arising
3  from this series of contracts.  There is no one else -- this is
4  -- there is no one else with a claim against this estate that
5  has that set of facts.

6       The closest thing to it is the letter of credit,
7  which also provides provided funding in the manner Mr. Bernick
8  described.  The closet thing to it is the letter of credit that
9  got put in Class 9.  And surety bonds and letters of credit are
10 competitive instruments.  They serve the same purpose in
11 commerce.  And in this case with a series of contractual
12 attenuations -- and I would point out the only authority that's
13 been cited about the definition of what is direct and what's
14 indirect and what's further attenuated than that, is Your
15 Honor's own opinion and --

16       THE COURT:  That's a good source.

17       MR. DAVIS:  It is a good source.  But, let me deal
18 with this exact fact.  You're on a clean slate here and in
19 deciding whether this is official attenuated to be beyond an
20 indirect claim.  And there are so many things that -- I mean,
21 for example, suppose a settlement check was going through the
22 banking process on the day of the filing, and the bank -- and
23 this happened to me in a case I've got in another jurisdiction.
24 The bank paid the check when they shouldn't have done so.

25       MR. BERNICK:  But, you're not testifying, right?

1       MR. DAVIS:  The fact that it happened it's -- is it a

2  hypothetical?  It just happens to have occurred, okay.

3                        (Laughter)

4       MR. DAVIS:  The bank paid the check when they ought

5  not have done so and they had a claim against the estate.

6  Would that bank's claim be an asbestos --

7       THE COURT:  I don't know.

8       MR. DAVIS:  Yes.  And we have more attenuation than

9  that one.

10      THE COURT:  I have enough trouble trying to figure

11 out what I'm doing in this case, Mr. Davis, without worrying

12 about that one, too.

13      MR. DAVIS:  So, I submit to you that for this debtor

14 -- and I keep coming back to this -- which is keeping $1.9

15 billion of equity to tell us to go take a hike where we are

16 really and truly a commercial creditor with a contract to a

17 contract to a contract is just wrong.  And this is a court of

18 equity --

19      THE COURT:  Well, every creditor could make that

20 argument potentially.

21      MR. DAVIS:  No, that's not true.  In this case every

22 creditor is getting paid in full except for a class that voted

23 99 percent to accept a haircut.  This --

24      THE COURT:  Well, every class is getting paid in full

25 except -- well --

1          MR. DAVIS:  In this case --

2          THE COURT:  Claims going through the trust are not

3   being paid in full, let's put it that way.

4          MR. DAVIS:  Right, but the trust -- 99 percent or

5   whatever that number is that Mr. Lockwood likes to point to

6   accepted that arrangement.  And what did they get that we

7   didn't get?  They got their TDP which they put so much value

8   on.  We've heard two days of argument about why the TDP is

9   sacred, important, central, critical.  We get no benefit from

10  that.  We also know that the 30 percent payout from this trust

11  is --

12         THE COURT:  I don't think the TDP is necessarily to

13  benefit the financial interests of the creditors.  It's to

14  resolve the debtor's asbestos liabilities.

15         MR. DAVIS:  No, it's --

16         THE COURT:  And if creditors have to take a haircut

17  in that process, they have to take a haircut just like they do

18  in other Chapter 11 cases without that trust.  The purpose --

19  the administrative convenience may benefit the tortfeasors, but

20  that is not the sole purpose of 524(g).  It's to resolve the

21  asbestos liabilities.

22         MR. DAVIS:  Of course it's not the sole purpose, but

23  it was a benefit that they very much wanted.  But, moreover,

24  moreover, as I was pointing out before, this 30 percent number,

25  which is the 25 to 30 percent number that the trust is going to

1 pay out, is a settlement itself.  It's a numerator and

2 denominator that we --

3        THE COURT:  Yes.

4        MR. DAVIS:  And that denominator could have been set

5 by settlement at five billion.  It could have been set by

6 settlement at four billion.  It's not an adjudicated fact.

7        THE COURT:  Well, it will be adjudicated to the

8 extent that that -- whatever the funding is has to result in a

9 feasible plan and a debtor --

10        MR. DAVIS:  Right.

11        THE COURT:  -- who is going to have the capability of

12 carrying it out.  So, changing the numerator and the

13 denominator may very well change the outcome of the case.  The

14 parties are not necessarily that free to negotiate.  They can't

15 just pick, you know, hypothetical numbers without some

16 meaningful relationship to the asset base and the liability

17 base --

18        MR. DAVIS:  Actually --

19        THE COURT:  -- and decide that that's going to be the

20 plan.

21        MR. DAVIS:  Actually, they could have because if the

22 --

23        THE COURT:  Well, it wouldn't get confirmed.

24        MR. DAVIS:  No, but it would.  If the denominator

25 were five billion, if the agreed value against which payments

1 | were made were lower, this plan would still be confirmed.

2 |        THE COURT:  If the -- I'm sorry, if the --

3 |        MR. DAVIS:  And I would get paid more money and they

4 | would all get paid the same.

5 |        THE COURT:  I'm tired.  I just didn't follow what you

6 | said.  If the agreed value what?

7 |        MR. DAVIS:  If -- there are two parts to what was

8 | negotiated into the TDP numerically, the dollar and cents, the

9 | value of claims one by one by one and making a matrix.  And the

10 | newer -- the denominator, which is the total value against

11 | which they are measured, both of those numbers were negotiated.

12 | If you bring both of those numbers down by negotiation, you end

13 | up with the identical dollar payout as long as they're in

14 | proportion, and the only one affected is me, the only one.

15 |        THE COURT:  I've been hearing two days of argument

16 | from other people who would disagree with that statement, Mr.

17 | Davis.

18 |        MR. DAVIS:  No, but everyone else has an unliquidated

19 | claim.  We're the only fixed claim.  In any event, to get back

20 | to where we were, we are a commercial creditor and we should be

21 | treated as such.  And, Your Honor, I commend to you the order

22 | that you signed and the stipulation that's attached to it and

23 | you'll see that it telegraphs quite clearly to us, and

24 | certainly Longacre saw it that way --

25 |        THE COURT:  Do you have the docket number?  Do you

1  know the docket number?  I'm going to have to go back and

2  review it.

3          MR. BERNICK:  Which docket number?

4          THE COURT:  The settlement and with the stipulation.

5          MR. BERNICK:  We'll provide that here in a minute.

6          THE COURT:  All right.

7          MR. BERNICK:  I don't want to hold things up.  Mr.

8  Davis, were you done?  I just have one short thing to add in

9  response.

10          MR. DAVIS:  I'm done subject to what Mr. Bernick

11  might say.

12          MR. BERNICK:  Okay.  This actually was very useful to

13  hear Mr. Davis speak here on what's different and what's not.

14  And I'll agree with him on a lot of what he said.  You have a

15  plaintiff, you have the defendant, who is Grace, and then you

16  have the indemnitee.  In the case of a surety, it's an

17  indemnitee from Grace and an indemnitor with respect to the

18  plaintiff.  So, it's both.  The underlying liability is the

19  same.  Let's assume the liability -- and I know Mr. Davis wants

20  to take issue with whether in fact the liability in -- that the

21  TDP states is real, and I don't think anybody actually has

22  established that it's not real.  But, you have a plaintiff with

23  a personal injury claim now against Grace.

24          Let's assume that that personal injury claim is worth

25  $100,000.  The $100,000 is part of the TDP.  The TDP is -- this

1 is the allowed amount of $100,000. And then, there's a payout

2 of 25 to 35 percent, whatever. The basic problem that we have

3 always when we have an indemnity, an indirect claim, is this,

4 that the plaintiff, instead of being able to sue Grace, goes

5 after the indemnitor, the indemnitee of Grace, whether that

6 also is an indemnitor in the case of a surety or some other

7 third party. That the plaintiff goes after that third party

8 and then it's the indirect claim that becomes the source of

9 exposure to Grace or the trust.

10        The whole idea that is now being executed through

11 what Mr. Frankel talked about is that the indemnitees, people

12 who have this kind of contractual indemnity claim, will now

13 essentially be put in the same position as this plaintiff in

14 terms of their ability to pursue a claim. They get the full

15 board subject to the payout percentage. So, you have other

16 indemnities that stand on the same footing as the plaintiff.

17 And that makes sense because you are -- essentially all of them

18 are unsecured in the claim that arise out of the same personal

19 injury, and they all get treated in exactly the same way.

20        Now, the only difference that we really have here --

21 actually, there are two differences that have been pointed out.

22 The difference that's been pointed out, number one, that makes

23 this unique says Mr. Davis, is in this case this is a

24 settlement agreement, right? That's not a difference that

25 makes a difference. Settled personal injury claims are still

1  Class 6.  They enjoy no greater rights than an unsettled

2  personal injury claim as a Class 6.  So, that distinction goes

3  absolutely nowhere, and the indemnity that's associated with

4  that again would be no different.

5          What makes this different actually underscores the

6  importance of holding to this rubric of direct claims when it

7  comes to surety bonds, because the other difference is that in

8  the case of a surety, the asurety (sic) is also an indemnitor

9  of the plaintiff.  And because they're an indemnitor of the

10 plaintiff, the plaintiff always is going to want instead of

11 going down this road to get at Grace to go lickety split down

12 this road to go to the surety company.  And by going to the

13 surety company, what happens?  The whole system falls apart if

14 the surety company gets hundred cent dollars because then this

15 plaintiff knows that they don't have to play ball even though

16 their claim is absolutely no different vis-a-vis Grace.  It's

17 still an unsecured claim.  It's still a claim that's subject to

18 524(g).

19         This plaintiff is able to make the end round, get

20 hundred cent dollars from the surety company, who now comes in

21 and says, it's not fair.  I'm basically commercial, even though

22 they all knew exactly what they were getting into, particularly

23 if they did this in 2000 when they did because a lot of other

24 companies were going into Chapter 11 in 2000.  The idea that

25 Rio, Morgan and Quinn, or the environmental law firm was facing

1  risk and was going to National Union saying, please help me

2  with my risk, that was not an idle threat.  Companies were

3  going into Chapter 11 like it was going out of style.  So, if

4  these people now get hundred cent dollars and then continue to

5  get hundred cent dollars after the bankruptcy filing and then

6  get hundred cent dollars from Grace, you see now that they have

7  succeeded in the very end run that 524(g) was specifically

8  designed to avoid.

9       And what we're saying is whatever happened happened

10  in terms of they made this threat, the very threat that they

11  made that we filed the adversary to stop them from doing it.

12  We couldn't stop them from doing it.  But, now that we're part

13  of 524(g), 524(g) gives the debtor and gives the estate powers

14  that do not exist before 524(g).  Whatever Your Honor decided

15  before we're not questioning.  But, the fact of the matter is

16  that these are people whose position has not changed under

17  524(g).  They are still indirect claimants taking from an

18  underlying personal injury claim.  And to the extent that they

19  are rewarded with hundred cent dollars, they rise above

20  everybody else, and then they get interest.

21       All that we're saying is keep them in Class 6.  Class

22  6 is where they belong under 524(g).  Their treatment in Class

23  6, I'm prepared to agree with Mr. Davis.  That's a fair item

24  for a discussion just as we have had discussion with the other

25  people who have indemnity claims like BNSF.  But, it's got to

1  be a discussion that takes place in Class 6.

2           THE COURT:  Mr. Fournier?

3           MR. FOURNIER:  Your Honor, Dave Fournier on behalf of

4  Longacre.  I leave it to Mr. Davis to respond to other points

5  raised.  But, with respect to the 524(g) treatment point that

6  was raised last, Your Honor, 524(g) -- 524 in general does not

7  abrogate the obligation of the debtor to comply with 1122.

8  They still have the obligation to classify claims, like claims

9  together.  We've heard twice now in rebuttal, surrebuttal,

10 whatever sur we're up to at this point, Your Honor, that the

11 treatment that needs to be afforded BNSF and National Union and

12 Longacre on their claims, okay, we agree -- we're the debtors.

13 We agree that treatment needs to be different but it needs to

14 be in 524(g).

15          Your Honor, this is a plan under which equity is

16 retaining value.  So, normally, you classify claims separately.

17 It's the claims in that class get to vote.  We're going to

18 accept the plan.  We're not going to accept the plan.  If they

19 don't accept the plan, then there are absolute priority

20 consequences for the debtor.  The debtor chose not to go down

21 that road.  They negotiated a settlement with the ACC here that

22 protected the vast majority of creditors within Class 6.  They

23 then, I think, overreached, and they took this small group of

24 what they're characterizing as indirect claimants and they

25 lumped them into Class 6.

1          Mr. Bernick had a fit when the suggestion was raised

2     that our claims might ultimately end up in Class 9 because he

3     said to Your Honor, that involves millions of dollars.  Well,

4     Your Honor, it does.  It does involve millions of dollars.

5     There is a significant dollar distinction between being in

6     Class 6 and being in Class 9.  We wouldn't be here if there

7     weren't.  But, had they properly classified the universe of

8     what they're characterizing as indirect claims separately,

9     indirect claims could have voted on accepting the plan or

10    rejecting the plan.  And had they voted on rejecting the plan,

11    then the debtor would have had to deal with the absolute

12    priority consequences.  They don't have to deal with that here.

13         We don't properly belong with the group of claimants

14    that the ACC negotiated for here.  The claim is a claim that

15    has been determined pursuant to a settlement of litigation.  It

16    involved claims by the debtor, the conditions to draws from the

17    surety hadn't been met.  I'm not going to get into the details

18    of that.  Mr. Davis dealt with that directly.  But, Your Honor,

19    this claim arose through a settlement agreement.  The debtor

20    now is trying to escape the consequences of that settlement.

21         THE COURT:  Well, the debtor -- I mean, the debtor

22    may be trying to escape the consequences I think to the -- if

23    in fact this turns out to be an indirect claim, it's properly

24    classified.  If it's not an indirect claim, it's not properly

25    classified and I think that's how it's going to have to come

1  out.  My concern here -- and I want to read it -- is what the

2  settlement agreement that I approved post-petition said because

3  I will not allow the debtor to get out of something that the

4  debtor advocated before this Court.  And if it says it's got to

5  be in Class -- I mean, I know it's not going to put into

6  classes because the classes didn't exist at the time.  But, if

7  the language suggests that it should be in Class 9, that's

8  where it's going.  If it doesn't suggest that it should be in

9  Class 9, it's not going there and I need to read it to see.

10 So, if somebody could tell me the docket number?

11          MR. FOURNIER:  Your Honor, I have the docket number.

12 Your Honor, that's at Docket Number 115 and adversary number is

13 02-01657.

14          THE COURT:  02-01657?

15          MR. FOURNIER:  02-1657.

16          THE COURT:  Okay, thank you.  All right.  I'll have

17 to --

18          MR. DAVIS:  I have nothing to add, Your Honor.  I

19 just want to --

20          THE COURT:  I'm sorry?

21          MR. DAVIS:  I have nothing to add --

22          THE COURT:  Okay.

23          MR. DAVIS:  -- at this point.

24          THE COURT:  All right.  I'll have to take a look at

25 this and see.  You know, it seems to me that the pre-petition

1 understanding of the parties as to what this fund would be used

2 for ties it to an asbestos claim.  But, whether that is the

3 case based on the debtor's agreement as to how to treat this

4 claim post-petition, I don't know.  And I think that's

5 controlling, so I'm going to look.

6         MR. BERNICK:  I appreciate Your Honor taking the time

7 and having the patience to listen to all this.  It kind of came

8 out -- I can't say it came out of the blue.  It was always

9 there.  It turned out to be more complicated and more time

10 consuming than we thought.

11         Your Honor, I -- maybe the best thing to do now, the

12 hour is growing late, is to talk about the schedule for what

13 remains.  I know that we have a significant discussion on the

14 successor claims injunction.  We should probably try to get an

15 estimate on that and then figure out if there are any other

16 issues beyond that before we get to lenders, so, I think, I

17 mean, essentially the rest of the agenda for Phase 2.  So, I'll

18 maybe ask Mr. Brown, if I could, what he thinks about that.

19         MR. BROWN:  Your Honor, Mr. Bernick referred to the

20 successor claims injunction issue which is, one, two, three,

21 four -- maybe I can -- Your Honor, has this little chart I

22 gather?

23         THE COURT:  I did but I've misplaced it, Mr. Brown.

24         MR. BROWN:  All right, let me --

25         THE COURT:  I'm sorry.  I shuffled too many papers

1  today.

2          MR. BROWN:  That's the fifth bullet point.

3          THE COURT:  Oh, here, I have it, okay.

4          MR. BROWN:  He's referring to the fifth bullet point,

5  which is the successor claims injunction issue.  I'm not sure I

6  agree with the characterization.

7          COURT CLERK:  Please speak into the microphone.

8          MR. BROWN:  I'm not sure I agree with the

9  characterization, but it's the fifth bullet point.  I have not

10 had a discussion with the Plan Proponents on this, but the

11 reason I have the line there is because I think those three

12 bullet points are, at least to a certain degree, interrelated.

13 I think that the successor claims injunction is intertwined

14 with the release issues, and I think the release issues in turn

15 are intertwined with some of the 524(g) issues.  And I don't

16 really know how Mr. Bernick is proposing to deal with these,

17 that is whether he wants to --

18         MR. BERNICK:  We would be happy to have everybody

19 address all three and then we'll respond.

20         MR. BROWN:  Well, let me -- I think the better way to

21 do this, Your Honor, is that there are a couple of issues, the

22 res judicata issue that has been raised that are applicable to

23 all three of those bullet points.  But, I do think that there's

24 a big distinction between the issues of the successor claims

25 injunction and the limited objections we have to the scope of

1 the 524(g) injunction.  And I do think they should be separated

2 in terms of the argument.  Otherwise, it will become I think

3 quite confusing.  So, that's the way I would propose that we

4 proceed.

5          MR. BERNICK:  Can we get an estimate on time?

6          THE COURT:  Do the exculpation -- I'm sorry.  Do the

7 res judicata issue first, then turn to the 524(g) and then

8 we'll get successor claims?

9          MR. BROWN:  We could do it that way, Your Honor, or

10 we could go with the successor claims injunction issue first.

11 Mr. Bernick is asking me for an estimate and I'm really a

12 little bit at a, I guess, a disadvantage in determining what

13 the estimated time should be.  I don't know how much time he's

14 -- I don't know whether he's planning to argue any of this

15 first or whether he's planning to have me argue and then have

16 the Plan Proponents argue.  And the reason I raise the issue,

17 Your Honor, is over the course of the last day, I have been

18 given a number of different slides from Mr. Bernick and his

19 team dealing with these various issues.  I mean, they're

20 voluminous.

21          In addition, this morning I was handed three

22 documents.  These are not demonstratives.  These are documents

23 that were never admitted into evidence.  And I was advised that

24 Mr. Bernick was going to use these documents, notwithstanding

25 the fact that they're not in evidence in his closing argument,

1  which seems perhaps not to be proper.  And so, I don't -- I

2  can't really judge how long this is going to take in light of

3  those.  I mean, it might be helpful if we got a ruling from

4  Your Honor that if it's not in the record it's not going to be

5  part of the closing arguments, which is what I think the issue

6  really should be.

7          THE COURT:  Well, if it's not a demonstrative and

8  it's not part of the evidence, I can't consider it.

9          MR. BERNICK:  Well, I understand that generally

10  that's the rule.  And what Mr. Brown is now saying is, gee, I

11  can't really tell you about scheduling, therefore, we can't

12  really go forward here unless we have a ruling in the abstract.

13  I'm aware of Your Honor's rule with respect to evidence this

14  does present, although you've now heard a lot of people say it

15  and have said it, a rather extraordinary situation of

16  representations that have been made to the Court under oath.

17  And whether or not it comes into evidence, I think Your Honor

18  ought to be aware of it because it's highly germane.  But, I do

19  not want to address it in the abstract because we'll take (a)

20  more time to do it and (b) it's not the way it should be

21  addressed.

22          THE COURT:  Okay.

23          MR. BERNICK:  It should be addressed in context.  And

24  if he wants me to go first for that purpose, I don't have any

25  problem going first on the issue.

1          MR. BROWN:  That's fine, Your Honor.

2          MR. BERNICK:  But, I still would like to get if it's

3  -- I mean, it's not my business, Your Honor.

4          THE COURT:  Well, how long do you think your argument

5  will be, Mr. Bernick?

6          MR. BERNICK:  I'm sorry, what?

7          THE COURT:  How long do you think your argument will

8  be?

9          MR. BERNICK:  My argument I think will be probably

10  about 25 minutes.

11          THE COURT:  Is anybody else on the Plan Proponents'

12  side arguing on these three issues:  the successor claims,

13  other exculpation or release or Fresenius and Sealed Air?

14          MR. FOURNIER:  Not unless something pops up but no

15  prepared argument.

16          THE COURT:  All right.  And your 25-minute estimate

17  is as to all three?

18          MR. BERNICK:  I'm only going to speak to the

19  successor liability claims injunction issue.  I don't know do

20  we -- are we going to rest on our papers with respect to the

21  others?

22          MR. FREEDMAN:  If Mr. Brown intends to argue the

23  524(g) points that are in his briefs then we will respond, but

24  we would rest on our papers with respect to that otherwise.

25          THE COURT:  All right.  So, 25 minutes plus rebuttal

1  if it's necessary to whatever Mr. Brown has.  How long do you

2  think you'll be, Mr. Brown?

3          MR. BROWN:  Your Honor, I think it may depend on the

4  Court's rulings on this material that's not in evidence and

5  what Mr. Bernick plans to say about it, because I don't know

6  what he plans to say about it.

7          MR. BERNICK:  It's very obvious what I plan to say.

8          THE COURT:  Well, just what your argument -- forget

9  that issue.  What about the rest of it?

10          MR. BROWN:  I would say an hour, Your Honor.

11          THE COURT:  All right.  So, if I say two and a half

12  hours, that should cover everything.

13          MR. BERNICK:  Right.

14          THE COURT:  All right.

15          MR. BERNICK:  So -- I'm sorry.  So, that I think

16  leaves us in something of quandary because of lenders tomorrow

17  morning.  So, I guess the question is, what would be Your

18  Honor's preference?

19          THE COURT:  What kind of time do we have on the

20  omnibus agenda to finish?

21          MR. BERNICK:  I frankly don't -- I know that there's

22  one -- I know that the issue on the -- one of the issues on the

23  omnibus is Canada, but I don't know what else.  I think Canada

24  is it.

25          THE COURT:  Okay.  So, do we have time on the omnibus

1  to finish the rest of these issues then?

2         MR. BERNICK:  You mean do --

3         THE COURT:  I believe we can start early.  I'd have

4  to confirm that.  My staff people in Delaware were not in

5  today.  So, I was not able to find out what the schedule

6  currently is as to other cases.  So, I'd have to find that out

7  first.  If I can contact anybody tomorrow, I can let you know

8  tomorrow whether we might be able to start earlier than the

9  normal start time but without double-checking first.  Do you

10 know?

11        MR. BERNICK:  And you end tomorrow at noon?

12        THE COURT:  Yes.

13        MR. BERNICK:  Yes.

14        COURT CLERK:  I mean, there are other things on the

15 schedule, but as far as I know nothing is going forward.  The

16 next case is pretty much done.

17        THE COURT:  When's the --

18        COURT CLERK:  We just have time slots --

19        THE COURT:  When are the binders due?

20        COURT CLERK:  The 11th.

21        THE COURT:  11th.

22         (Discussion between Court and Court Clerk)

23        THE COURT:  Okay.  So, perhaps maybe -- this is

24 normally scheduled to start at 10:30.  At least we may be able

25 to start at ten.

1          MR. BERNICK:  For the omnibus?

2          THE COURT:  Omnibus hearing.

3          MR. BERNICK:  Tomorrow morning is -- tomorrow morning

4    you don't know if people -- what about starting early tomorrow

5    morning?

6          THE COURT:  Well, I can start as early as 8:30.  I

7    can't get my -- Cathy, are you with me tomorrow?

8          COURT CLERK:  No.

9          THE COURT:  No.  I don't even know who's going to be

10   -- don't be so gleeful.  I don't even know who is here.  So, I

11   can start as early as 8:30 tomorrow but that's probably all.

12         MR. BERNICK:  Maybe what we should try to do is to

13   have these issues -- my only concern is if the issues carry

14   forward to the omnibus, I don't have a problem with that but I

15   really -- there is some utility in just getting it done rather

16   than having the agony be prolonged in having more time

17   allocated to us.  What I would suggest is that we try to start

18   at 8:30.  You know, and my hope is that we can just finish

19   lenders in two and a half hours.  I don't really think it

20   should take all that long.

21         THE COURT:  Well, the briefs don't really address

22   much more on the lender issues than the argument that I've

23   already had on the lender issues.  There's a little bit of

24   difference.  And perhaps if we can limit it to what hasn't been

25   argued before, that may expedite --

1          MR. BERNICK:  Well, that's true except that what's

2    are -- there are a couple of issues.  Well, I just tell the

3    Court what my plan was.  You know, there are issues that Your

4    Honor already has decided.  And it was decided in an opinion

5    that where you've already said that you're still open to what

6    the record shows.  So, it's not like the decisions are carved

7    in stone, but we don't intend to reargue what you've already

8    decided.  There are some matters, some issues that are not the

9    subject of that opinion but were raised in subsequent

10   arguments, subsequent discussions that relate back to, for

11   example, is there a default, you know, is there impairment,

12   this kind of thing.

13         So, my plan was to cover those to kind of have a map

14   of where we're going, because the order of operations here is

15   very important.  The most confusing thing in the whole deal is

16   what do you have to decide and what order do you have to decide

17   it.  But, really the focal point for most of my time was going

18   to be on the last issue, which is solvency and when is it

19   determined and fair and equitable, which I think are the last

20   issues that you really have to resolve.  So, my hope was -- I

21   know my argument wasn't going to take more than probably around

22   45 minutes to an hour, max.  And I know that debtor's side has

23   two people.  Morgan Stanley wants to argue and I know the

24   committee wants -- the committee and the lenders want to argue,

25   but their time is limited to being the same as mine.  So, I

1  still believe we can get it done in two and a half hours, but

2  that's just my opinion.

3       THE COURT:  Okay.  Well, that's fine.  I mean, I

4  think that should be an adequate amount of time for the lender

5  issues, but that still leaves us with the other successor --

6       MR. BERNICK:  They have to get the other issues done

7  in an hour, and that's successor.  I don't know if anybody else

8  has anything else to say on any other issues.  I really just

9  don't know.

10       MR. DAVIS:  If I can just ask, my issue is done.  I

11  can be excused?

12       THE COURT:  Anybody is free to leave at any point in

13  time that you choose at your own risk.

14       MR. FOURNIER:  Is there any chance we could get

15  started on some of the issues tonight?  I mean, how late are we

16  going --

17       THE COURT:  Well, I have to let my staff go around

18  6:30.  So, we could get started for 20 minutes, 25 minutes.

19       MR. BERNICK:  Sure, I'd be happy to --

20       MR. FOURNIER:  Well, is there some short issue like,

21  I don't know, 524(g) issue or something that --

22       MR. BERNICK:  I think that the main issue that we

23  have to get done is the successor liability issue, and I'm

24  happy to start with successor liability.  I don't think I'm

25  going to get to Mr. Brown's favorite part but I'm happy to

1 start.

2       THE COURT:  Well, maybe we should start and, you

3 know, we'll go for half an hour.

4       MR. FOURNIER:  Well, I mean frankly, the thing that

5 concerns me, Your Honor, is that if I'm going to -- it looks

6 like I'm going to have to spend the night here.  If we don't

7 get started and if the lenders have primacy over all these

8 other issues, he says two and a half hours.  We've got -- if we

9 start at 8:30, three and a half hours.  Very few of the

10 arguments today have lasted their allotted time.  It doesn't

11 take much slippage to get up to three and a half hours.  So, I

12 wind up spending an entire morning listening with great

13 interest to an issue that I have no role in and then get to get

14 on a plane and do it on the 21st.  So, if there's any way,

15 shape or form that we can try and move the ball along, that

16 would be nice.

17       THE COURT:  I think the way to move the ball with

18 respect to the lender issues is not to reargue what has been

19 argued.  But, I am interested in knowing about the evidence

20 concerning defaults and the evidence concerning impairment and

21 the solvency.  I think those are the three issues that I have

22 to address.  And I'm encompassing within that the concept of

23 fair and equitable because that's the whole point of taking a

24 look at the default or any interest rate at this point.  So,

25 I'm encompassing that in it.  With respect to Mr. Brown's

1  arguments, I don't have a clue how long that is going to take.

2  If the primary thrust is on the successor claims injunction and

3  that's going to include the argument concerning Fresenius, I

4  doubt that the exculpation and release objections are going to

5  take very long, that's my sense, so --

6       MR. BERNICK:  Our thinking was that -- Mr. Freedman

7  indicated -- we're prepared to rest on our papers with respect

8  to that.  If they argue, we'll obviously want to respond.  But,

9  I am only going to address -- maybe in the naive hope that we

10 don't get to exculpation and the other because no one wants to

11 argue it, I'm only going to address the successor claims

12 injunction.  I'm happy to go from now to 6:30, which will take

13 us probably up to the point of controversy but not into it, and

14 then we can take that up tomorrow morning when I start up and

15 Mr. Brown will then have the benefit, for whatever it's worth,

16 of an evening to ponder the weighty and novel arguments that

17 I've made before 6:30 which he will not find weighty and novel

18 because they're already in the briefs.

19      THE COURT:  All right.  Well, let's get started.

20 With respect to tomorrow and the lenders' issue, if it's

21 possible for Morgan Stanley and the creditors committee to not

22 duplicate the arguments?  If you two can have a discussion if

23 you haven't already, that may advance the ball a little too

24 because you do have slightly different positions in some

25 matters but not on all.

1          MR. FREEDMAN:  Jeff Freedman, Your Honor, for Morgan

2    Stanley.  I have discussed with Mr. Pasquale his approach and I

3    don't think there's going to be much overlap.  I've got maybe

4    20 minutes depending on questions Your Honor may have of me.

5          THE COURT:  Okay.

6          MR. BERNICK:  Okay.  Your Honor, this issue of the

7    successor claims injunction takes us back to a pretty simple

8    diagram.  And it's kind of -- it's like the mouse that roared.

9    There is a single underlying economic claim, a claim that's

10   being made by a company called Kaneb, and I know Your Honor is

11   familiar with Kaneb.  And Kaneb has an environmental exposure

12   in the State of Texas.  It's been out there for a period of

13   time.  And Kaneb has threatened to make a claim and/or has

14   stated their intent to make a claim with respect to Seaton as

15   successor to Unigard, which issued policies back during the

16   period of time that is implicated by the environmental claim.

17         THE COURT:  May I ask a question?

18         MR. BERNICK:  Sure.

19         THE COURT:  I saw a document -- and I apologize.  I

20   thought perhaps it was a stipulation, but I'm not sure, between

21   the Plan Proponents and Kaneb that essentially I thought said

22   that it was going to resolve those issues.  Is that not the

23   case?

24         MR. BERNICK:  There are settlement discussions that

25   are ongoing with Kaneb.  But, this issue that I'm going to talk

1  about is the ability of Seaton to claim over against Fresenius

2  as a successor --

3        THE COURT:  All right.

4        MR. BERNICK:  -- to some businesses of Grace.  And

5  Mr. -- I'm certain that Mr. --

6        MR. GILBERT:  Would you like me to explain the

7  stipulation in about 30 seconds?

8        THE COURT:  I guess so.

9        MR. GILBERT:  All right, okay.  My name is Robert

10  Gilbert.  I represent Kaneb.  And the stipulation in short --

11  it's a very narrow stipulation.  It provides in exchange for us

12  withdrawing our objection, we stipulate to the inclusion in the

13  order proving the plan of confirmation that Kaneb may bring

14  claims under policies in which it owns property rights under

15  the premises and operation section of the policy, the ones with

16  no aggregate limits, and only with respect to non-asbestos

17  claims, and that nothing in the plan would prevent that from

18  happening.  And then, there's some for avoidance of doubt

19  sentences at the end to clarify a couple of specific

20  situations.  It would leave intact our ability to bring claims

21  pursuant to the Otis Pipeline and the Macon Pipeline, among

22  others.  There could be things that arise in the future.  As

23  long as they're not asbestos claims, we could bring them

24  against any insurers, even settled insurers if we have property

25  rights in those policies.  Whether we have such property rights

1   is not for this Court to determine.  That would be a coverage

2   issue.

3          THE COURT:  All right.

4          MR. FREEDMAN:  Your Honor, just to be very clear

5   about this, what this stipulation does is it agrees on the

6   interpretation of what the plan already says.  And I simply

7   refer the Court to Definition 201 under the plan, definition of

8   settled asbestos insurance company, which makes clear -- Mr.

9   Lockwood talked about this yesterday -- that a settled asbestos

10  insurance company is only settled to the extent that the 524(g)

11  coverage that's provided, that is relating to asbestos issues.

12  So, of the Kaneb claims are not asbestos claims not covered

13  under that definition.  That definition is incorporated in the

14  successor claims injunction as identifying some of the parties'

15  beneficiaries of that injunction.  And it makes clear that to

16  the extent that we're not talking about asbestos coverage, the

17  successor claims injunction doesn't apply.

18         THE COURT:  All right, thank you.

19         MR. BERNICK:  So, we have -- I'm sorry.

20         THE COURT:  Go ahead.

21         MR. BERNICK:  We have -- is it Kaneb or Kaneb or --

22         MR. GILBERT:  No, that -- now that we own the

23  company, we call it Kaneb.

24         MR. BERNICK:  Kaneb?

25         MR. GILBERT:  If you want to call it Kaneb --

1           MR. BERNICK:  It's Texas, so it has to be Kaneb,

2   right?  So, Kaneb.  Kaneb's got an underlying environmental

3   problem, not asbestos.  There's reference to Macon, Georgia.

4   There's reference to an Otis facility or the Otis Pipeline

5   facility in Texas.  They want to make a claim against Seaton,

6   the successor to Unigard.  Unigard then wants to be able to

7   bring an action over against Fresenius that they've talked

8   about and that would be a fraud action.  And it basically says

9   that back at the time that Seaton settled out -- agreed to

10  settle out certain of its insurance, it did so, and they say,

11  based upon a representation of where the exposure was, and that

12  there was a knowing misrepresentation because there was a

13  failure to disclose these sites.  That's the essence of what

14  they want to do.  And, obviously, that's of huge importance to

15  the Grace case because Fresenius has an indemnity from Grace

16  way back when with respect to these matters, and also gotten an

17  indemnity again as part of its settlement in this case, which

18  indemnity in turn has been incorporated into orders of the

19  Court.  So, that basically frames the issue.

20          The first issue is, what provisions of the plan are

21  implicated and can these various actions be brought under the

22  plan?  The second issue is, ultimately what we're going to --

23  and it's like the mouse that roared -- is if and to the extent

24  that the plan says this can't take place, which we say, yes, it

25  says it can't take place, is that within the subject matter

1  jurisdiction of the Court, and is it a power that can be

2  exercised properly under Section 105?  And, of course, the

3  reason it's the mouse that roared is out of this thing here,

4  which incidently you will hear Grace has now agreed to take

5  responsibility for.  We now have these big, broad issues about

6  the conflict in the Circuit on Section 105 with respect to

7  third parties and what should be the test and the whole raft of

8  legal issues and jurisdictional angst associated with third

9  party injunctions.  So, out of this claim which Grace now has

10 agreed to take responsibility for, we have this growing legal

11 issue.

12         So, the first issue is, what does the plan say with

13 respect to the prosecution of the claim?  I'm showing the Court

14 Plan Proponents' CL018.  And what this essentially does, it was

15 designed to be kind of a clear road map.  I'm not sure that

16 this succeeds in achieving that goal.  But, basically, we first

17 of all have asbestos claims.  Asbestos claims are channeled to

18 the PD and PI trusts, as we've talked about at some length.

19 This has nothing to do with that.  This is non-asbestos.

20 Within non-asbestos, we then get a series of provisions which

21 you see listed here where again as a non-bankruptcy lawyer, I

22 look at them and my eyes cross because they are -- they tend to

23 be very turgent.

24         So, what we've tried to do is to break out here the

25 different kinds of releases -- release and injunction

1 provisions that the plan provides and then highlight which

2 particular release and injunction provision actually is

3 implicated by these various claims.  So, just ticking down to

4 ones that we don't think are applicable, there are first of all

5 release and injunction provisions with respect to Chapter 5

6 claims, and that is fraudulent transfer, alter ego, et cetera.

7 We then have release and injunction provisions with respect to

8 successor liability claims.  We're not dealing with successor

9 liability claims here.  We have claims of creditors who voted

10 for the plan, claims of creditors who take under the plan.  We

11 have post-petition claims and exculpation.  We don't believe

12 that any of that is particularly germane.

13        What we really believe are the operative provisions

14 come out of Section 8.5, which is the successor claims

15 injunction.  And we have to distinguish between Fresenius and

16 Sealed Air because they are different.  And the only reason

17 they are different is that their settlement agreements that

18 result in their contributions to the estate read out somewhat

19 differently.  So, those differences between Fresenius and

20 Sealed Air translate into differences with respect to the

21 language of the plan.  And to be brief about it, we therefore

22 have the successor claims injunction.  Section 8.5.1 you see

23 injunction.  It says, "All entities that have filed assertive

24 or that hold or assert or that may in the future hold or assert

25 any successor claim other than asbestos claims against any

1 asbestos protected parties shall be stayed, restrained and

2 joined," blah, blah, blah, blah, blah.

3          So, the question then becomes, what is a successor

4 claim other than an asbestos successor claim?  So, we go to the

5 definition of successor claims, which is Definition 205.  It

6 says, shall mean any of as a successor claims reads Sealed Air

7 and/or the Grace related claims which turns out to be

8 Fresenius.  And this is where the distinction then ends up

9 coming to bear.  So, Definition 136 says, "Grace related claims

10 shall have the same meaning as defined in the Fresenius

11 settlement agreement."  So, this is F only.  And you'll see

12 that basically these provisions, that is Fresenius and Sealed

13 Air, read out pretty much the same except that the Fresenius

14 definition says, "or are based upon or arise out of the

15 Fresenius deposition -- transaction or the conduct or

16 operations of any business or operations of any of Gracecon and

17 its parents' -- of any of Gracecon and its parents'

18 subsidiaries at any time other than the NMC business, including

19 without limitation any claims based on or arising out of

20 environmental law, but not included.  So, essentially, I think

21 that's the operative language.  If it's not, I'll get horns

22 waggled here by Mr. Freedman.  But, that then means that the

23 ability as this chart indicates to pursue pre-petition, non-

24 successor, non-asbestos claims against Fresenius is barred, and

25 that's why there's a little block there.  You can't do it.

1       The same thing is not true with respect to Sealed

2  Air.  The language of Sealed Air occurs in the SA claims, which

3  is 182.  And 182 basically has the operative language which

4  carries over, again talks about Chapter 5 successor liability,

5  fraudulent conveyance, et cetera, et cetera, arising out of the

6  SA transaction, but does not include that same magical language

7  that I quoted to the Court with respect to Grace related claims

8  which are relevant to Fresenius.  So, what does that mean?  It

9  means as follows: the good news first in terms of simplifying

10  matters for the Court -- and this is PPCL016.  Kaneb, which has

11  indicated the desire -- the same Kaneb to sue CNA with respect

12  to the Sealed Air aspect of Kaneb.  CNA then has a possible

13  Sealed Air -- a possible claim against Sealed Air as a

14  successor.  Kaneb is not barred, neither is CNA barred from

15  prosecuting those claims.  So that, when it comes to the Kaneb

16  claims, we don't believe that's there's an impediment to the

17  action against CNA.  And nor do we believe that there's an

18  impediment to the action by CNA against Sealed Air as

19  successor, and I think we have so stated in our briefs.  And

20  that's why at the bottom of PPCL018 we say, yes, that can, in

21  fact, go forward.

22       The same is not true with respect to Kaneb and

23  Fresenius.  And the way that Kaneb and Fresenius works -- and

24  this is CL014 -- Kaneb sues Unigard as -- or Seaton as

25  Unigard's successor.  Unigard is barred from suing Fresenius as

1 a successor, barred by the language of 8.5.1 prominently and

2 then also arguably by the language of 8.8.7 second sentence.

3 So, number one, is not barred, Kaneb versus Unigard Seaton.

4 Number three, which is Seaton's fraud claim against Fresenius

5 is barred by the successor claims injunction.  But, all is not

6 lost because there's another aspect to this, which is the

7 ability of Unigard to seek recovery against Grace.

8      And this is now a new part of Section 8.5.  It's

9 8.5.2.  And it says, "As used in the Section 8.5.2 i, GR claim

10 means a Grace related claim" -- that's very broad -- "against

11 Fresenius that is not an asbestos PI claim, a claim that arises

12 out of the Fresenius transaction, a claim under Chapter 5."  In

13 other words, the GR claim is defined to track and scope that

14 special language that I read to the Court out of the definition

15 the Grace related claim, which is 136, that deals with the

16 conduct or operations of any business.  So, essentially, the

17 definition of GR claims under 8.5.2 tracks the scope of the

18 blockage that exists under the successor claims injunction in

19 the ability of Unigard Seaton to sue Fresenius as a successor,

20 that is GR claims pick up in scope what is blocked.

21      Unigard can't sue Fresenius for the same scope of

22 claims that it is now permitted as GR claims to bring against

23 Grace, and that's (b).  "Any holder of a GR claim who has not

24 on or before the effective date filed proof of claim against

25 the debtors with respect to the same claims as are contemplated

1 by such GR claim may file a GR proof of claim asserting such GR

2 claim against the debtors on or before the 60th day subsequent

3 to the effective date.  (c), and this is key, "The reorganized

4 debtors from after the effective date shall assume all

5 liability of Fresenius and be entitled to assert and have the

6 benefit of all defenses of Fresenius with respect to all of GR

7 claims timely filed by the GR claims bar date."

8          So, effectively, going back to PPCL014, Kaneb can sue

9 Unigard Seaton.  Unigard Seaton is barred from suing Fresenius.

10 But, they are permitted to recover against Grace.  Grace

11 assumes the liability.  So, going back to the basic chart,

12 Grace is now on the hook for the claim, if there is a claim,

13 that Seaton would seek to bring based upon the transactions --

14 based upon the particular transactions or claims that they have

15 asserted arising out of the Kaneb situation.  That is where the

16 plan comes up.

17          So, the remaining issue then is under these

18 circumstances where Kaneb can sue, Grace picks up the

19 liability, if there is any, for the Seaton claim.  Can Seaton

20 nonetheless prosecute a claim against Fresenius which would

21 violate or be otherwise barred by the successor claims

22 injunction?  The successor claims injunction is designed to

23 say, you can't get it from Fresenius.  8.5.2 says, you can get

24 it from Grace.  Why are we so solicitous about Fresenius?  I

25 don't know if Mr. Rosenbloom is still here or gone back to

1  Chicago, because Fresenius has the indemnity and is protected

2  under the settlement agreement from having these claims.  And

3  we, above all things, do not want to lose the Fresenius

4  contribution for a variety of reasons, including that it

5  affects the Sealed Air deal, as you will see.  Sealed Air and

6  Fresenius actually have linkage with respect to the protection

7  against Fresenius.  So, that's the basic problem is the

8  successor claims injunction 8.5.2.

9       Showing Your Honor -- this is will be the last slide

10  I'll show -- PPCL015, I've now got actually the same diagram.

11  The question is again, even though we're picking up the tab

12  when they go after Fresenius, what's the rationale for the

13  successor claims injunction?  The rationale for the successor

14  claims injunction appears in the righthand column.  (a) Is

15  there jurisdiction related to jurisdiction?  The answer is yes,

16  it's related to jurisdiction.  Why?  Because Grace has

17  indemnity obligations to Fresenius both under the original

18  transaction with Fresenius and under the current settlement

19  with Fresenius and under the order approving that settlement.

20  So, it's clearly related to jurisdiction as the Third Circuit

21  has repeatedly defined it.

22       (b) Can the Court exercise that related to

23  jurisdiction using Section 105A and is it justified?  And what

24  I want to highlight here for the Court before we break up is

25  that the -- what I've got as (b) is  fully complete

1  justification in our view that satisfies Section 105A with

2  respect to this kind of injunction.  And the way that it works

3  is actually kind of unique.  Your Honor has heard a lot about

4  the Continental case.  In Continental, you had a Section 105

5  injunction that was designed to handle third party claims.  And

6  the Court said, we don't think it's appropriate here and we're

7  not going to reach the question about under what circumstances

8  it might well be appropriate.  In the CE case, this was not a

9  524(g) case because it wasn't asbestos.  In the CE case, you

10 had a 105 -- a 540 --

11           THE COURT:  524.

12           MR. BERNICK:  -- 524(g) trust for CE.  And then, you

13 had a 105 injunction that was designed to resolve a related

14 problem with Lummus.  And what the Court said is you can't

15 accomplish with 105 what you should be accomplishing with

16 524(g).  That is, you can't bypass 524(g) using Section 105.

17 Now, the difference, of course, is that CE is asbestos.  So, CE

18 was a 524(g) trust under asbestos.  And instead of having a

19 separate Lummus case under 524, we used 105 instead and the

20 Court says, you can't do it because 524 preempts the area.

21 They were wrong but, nonetheless, that's what they decided and

22 as a result 105 is not available.

23           Our case is a different case and a much simpler and

24 much stronger case.  In our case here, Grace, we do have a

25 524(g) trust and it covers Grace.  And we then have -- because

1  it's asbestos, so this is a stronger case than Continental.

2  It's a stronger case than Continental because the anchor of

3  this case is in fact 524.  And all that we're saying is that

4  with respect to a non-asbestos claim that is an environmental

5  claim, we need 105 to help us out with this environmental risk.

6  Now, why is that critical?  It's critical because the easiest

7  way to see that this 105 injunction is necessary is that it's

8  ancillary to a 524(g) trust.  That is, we have an anchor in

9  524.  If 524 is designed to provide overall closure, this is an

10  anchor that didn't even exist in the Continental case.

11          And instead of using that as an anchor to solve

12  another asbestos problem, which is what we did in the CE, we

13  have a non-asbestos problem.  So, this is much stronger than

14  Continental.  Continental was only a 105A case.  There's no

15  anchor with 524 that says global solution.  Our need is

16  demonstrated purely and simply by the fact that we do need a

17  global solution.  524(g) says you've got to have a global

18  solution, and to get that global solution we need 105.  Why?

19  Because Fresenius is critical to 524(g).  The criticality of

20  Fresenius as a settlement, as an asbestos settlement is what

21  drives the criticality of 105 to solve the environmental

22  problem.  Put simply, if we want 524(g) with Fresenius, which

23  we do and we need for asbestos purposes, Fresenius needs to be

24  protected from collateral environmental liability.  They've

25  insisted on that.  So, the justification for 105 in part comes

1  from 524(g).  That's what one is.

2          Two, the successor claims injunction is also critical

3  to the Fresenius settlement.  In a sense, that's just what I

4  said, which is that this is one.  It's necessary to 524(g).

5  Two, it's necessary to the settlement with Fresenius.  They're

6  not going to go forward unless they really have total peace.

7  And, three, any valid Seaton claim gets paid in full by Grace.

8  So, with belt and suspenders, we say not only do we have 524(g)

9  as a justification, and not only do we have a need for complete

10  closure for Fresenius, but these people actually have

11  protection because Grace is standing behind the obligation

12  that's at issue here.

13          THE COURT:  All right.  Well, I think the big issue

14  with respect to that as I understand the pleadings is that

15  there maybe some concern as to Grace's ability to comply versus

16  Fresenius'.  So, does the plan provide for any protection such

17  as some security that could be offered?  A bond that National

18  Union may be willing to write comes to mind.  That would be

19  someone might stand for to be sure that Grace can honor

20  whatever obligation is there, because that I think is what the

21  issue may come down to in analyzing both Continental and

22  Combustion.  And I agree there are differences, and I do agree

23  that the Circuit was concerned about the fact that Lummus could

24  file its own bankruptcy to deal with its own asbestos problems.

25          But, nonetheless, you've got a settlement.  And I'm

1  really not familiar with the settlement.  I had nothing to do

2  with its negotiation or approval.  So, I don't know what all is

3  encompassed within that settlement.

4           MR. BERNICK:  Well, but in fairness, the settlement

5  -- again, all we have to do is demonstrate that 105 is that (a)

6  there's power and (b) that 105 is an appropriate vehicle.  If

7  Your Honor is now raising, again without going back to a prior

8  argument, the question about whether the terms associated with

9  the 105 are satisfactory --

10          THE COURT:  Yes.

11          MR. BERNICK:  -- we'll address that tomorrow.

12          THE COURT:  All right.

13          MR. BERNICK:  But, on the fundamental question of is

14  there jurisdiction, is there power, is the power being

15  appropriately deployed, I think it's very, very clear.  There's

16  actually a very strong case for the use of 105.  And tomorrow

17  when we come back, we'll begin with that question and then get

18  to the other additional factors that are here that say that

19  this is really a pretty overwhelming case.  Remember where I

20  began, which is we're talking a little bit about the mouse that

21  roared.  That is, you've got this one Kaneb issue that's now

22  purporting to threaten the entire case.  And you then, under

23  these circumstances, you have to look to the question of,

24  what's this claim really all about?  I mean, is it even a

25  worthwhile claim?  And that's an important consideration when

1 that claim is now really the only reason why we're talking

2 about threatening a deal that's very central to the case as a

3 whole.  It's kind of an imbalance situation.  We'll talk about

4 that tomorrow morning.  I am probably eight minutes from being

5 done.

6             THE COURT:  All right.  Ms. Krieger?

7             MS. KRIEGER:  Just a clarification, Your Honor.

8 We're starting with the lender argument tomorrow morning at

9 8:30?

10            THE COURT:  I don't know what we're starting with.

11            MR. BERNICK:  No, I think we're going to try to

12 finish this and start at 9:30 -- or 9:00.

13            MS. KRIEGER:  That's what I'm asking just so I know.

14            MR. BERNICK:  9:00 or 9:15, yes, that's what my --

15            THE COURT:  All right, that's fine.

16            MR. BERNICK:  Is that right?

17            MS. KRIEGER:  9:00 or 9:15?

18            MR. BERNICK:  You'll be here promptly I'm sure.

19            THE COURT:  Okay.  Cathy, can we get somebody here at

20 8:30?  Somebody will be here?

21            COURT CLERK:  Well, I'll be here.

22            THE COURT:  Okay, that's fine, even if we have to

23 change you later.

24            COURT CLERK:  Yes.

25            THE COURT:  Okay.  We'll start at 8:30 tomorrow

1  morning then.  We'll be in recess until 8:30.  Good night,

2  everyone.

3              UNIDENTIFIED SPEAKER:  Thank you.

4                        *  *  *  *  *

**CERTIFICATION**

We, JANET PERSONS, TAMMY DeRISI, RITA BERGEN, ELAINE HOWELL and CARLA OAKLEY, certify that the foregoing is a correct transcript to the best of our ability, from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Janet Persons

JANET PERSONS


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Rita Bergen

RITA BERGEN


/s/ Elaine Howell

ELAINE HOWELL


/s/ Carla Oakley                         Date:  January 13, 2010

CARLA OAKLEY

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**