UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .     Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .     USX Tower – 54th Floor
                            .     600 Grant Street
                            .     Pittsburgh, PA 15219
                 Debtors.   .
                            .     January 6, 2010
. . . . . . . . . . . . . ..      8:27 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID M. BERNICK, ESQ.
                                 JANET BAER, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601


For the Debtors:            Kirkland & Ellis, LLP
                            By:  THEODORE FREEDMAN, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  10022


For Sealed Air:             Skadden, Arps, Slate, Meagher &
                              Flom, LLP
                            By:  DAVID M. TURETSKY, ESQ.
                                 J. GREGORY ST. CLAIR, ESQ.
                            Four Times Square
                            New York, NY 10036



Audio Operator:             Cathy Younker

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  JEFFREY LOCKWOOD, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C. 20005 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  ROGER FRANKEL, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For the UCC: | Stroock & Stroock & Lavan, LLP<br>By:  KENNETH PASQUALE, ESQ.<br>      ARLENE G. KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY 10038-4982 |
| For Arrowwood: | Wilson, Elser, Moskowitz, Edelman,<br> & Dicker, LLP<br>By:  CARL J. PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY 10017 |
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  LINDA CASEY, ESQ.<br>3000 Two Logan Square<br>Philadelphia, PA  19103 |
| For CNA: | Goodwin Procter, LLP<br>By:  MICHAEL GIANNOTTO, ESQ.<br>      DANIEL M. GLOSBAND, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For MCC & Zurich: | Eckert Seamans<br>By:  EDWARD D. LONGOSZ, ESQ.<br>1747 Pennsylvania Avenue, NW<br>Suite 1200<br>Washington, DC 20006 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer              Gleser, LLP
& Gleser, LLP:               By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                             Wall Street Plaza, 23rd Floor
                             New York, NY  10005-1875

For the Equity               Kramer Levin Naftalis & Frankel
Committee:                   By:  DAVID E. BLABEY, JR., ESQ.
                             919 Third Avenue
                             New York, NY  10022

For Kaneb Pipe Line          Gilbert & Renton, LLC
Operating Partnership,       By:  ROBERT J. GILBERT, ESQ.
LP:                          344 North Main Street
                             Andover, MA 01810

For Morgan Stanley           Katten Muchin Roseenman, LLP
Senior Funding, Inc.:        By:  JEFF FRIEDMAN, ESQ.
                             575 Madison Avenue
                             New York, NY  10022-2585

For the Property             Bilzin Sumberg Baena Price &
Damage Committee:               Axelrod LLP
                             By:  MATTHEW KRAMER, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For the Libby Claimants:     Landis, Rath & Cobb, LLP
                             By:  JAMES S. GREEN, JR., ESQ.
                                  RICHARD S. COBB, ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899

For AXA Belgium:             Tucker Arensberg, P.C.
                             By:  ERIC ROSENFELD, ESQ.
                             1500 One PPG Place
                             Pittsburgh, PA  15222

For OneBeacon &              Drinker, Biddle & Reath, LLP
Seaton Insurance:            By:  MICHAEL F. BROWN, ESQ.
                             1 Logan Square, 18th & Cherry Sts.
                             Philadelphia, PA 19103

4

TELEPHONIC APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                           By:  LISA G. ESAYIAN, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For the Asbestos           Caplin & Drysdale, Chartered
Creditors Committee:       By:  JEFFREY A. LIESEMER, ESQ.
                                WALTER SLOCOMBE, ESQ.
                           One Thomas Circle, NW
                           Washington, D.C. 20005

For the UCC:               Stroock & Stroock & Lavan, LLP
                           By:  LEWIS KRUGER, ESQ.
                           180 Maiden Lane
                           New York, NY 10038-4982

For the Libby Claimants:   Cohn Whitesell & Goldberg, LLP
                           By:  DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For the Debtors:           Kirkland & Ellis, LLP
                           By:  CHRISTOPHER GRECO, ESQ.
                           Citigroup Center, 153 East 53rd St.
                           New York, NY  10022

For the Debtors:           Pachulski, Stang, Ziehl &Jones
                           By:  JAMES O'NEILL, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705

For the Debtors:           Kirkland & Ellis, LLP
                           By:  DEANNA BOLL, ESQ.
                                JUSTIN BROOKS, ESQ.
                                BARBARA HARDING, ESQ.
                                NATHANIEL KRITZER, ESQ.
                                ELLI LEIBENSTEIN, ESQ.
                           200 East Randolph Drive
                           Chicago, IL 60601

For OneBeacon &            Drinker, Biddle & Reath, LLP
Seaton Insurance:          By:  JEFFREY BOERGER, ESQ.
                           1 Logan Square, 18th & Cherry Sts.
                           Philadelphia, PA 19103


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Longacre                 Pepper Hamilton, LLP
Masterfund:                  By:  JAMES C. CARIGNAN, ESQ.
                                  DAVID M. FOURNIER, ESQ.
                             3000 Two Logan Square
                             Philadelphia, PA 19103


For Fresenius:               McDermott, Will & Emery
                             By:  NATHAN F. COCO, ESQ.
                                  DAVID S. ROSENBLOOM, ESQ.
                             227 West Monroe Street
                             Chicago, IL 60606-5096


For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                             By:  MATTHEW KRAMER, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131


For the Libby Claimants: Landis, Rath & Cobb, LLP
                             By:  KERRI K. MUMFORD, ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899


For Travelers:               Simpson Thacher
                             By:  MARY BETH FORSHAW, ESQ.
                                  ELISA ALCABES, ESQ.
                             425 Lexington Avenue
                             New York, NY  10017


For Serengeti:               Vinson & Elkins, LLP
                             By:  ARI BERMAN, ESQ.
                             Trammell Crow Center
                             2001 Ross Avenue, Suite 3700
                             Dallas, TX  75201


For The Hartford:            Wilmer Cutler Pickering Hale & Dorr,
                              LLP
                             By:  MELANIE DRITZ, ESQ.
                             1875 Pennsylvania Avenue, NW
                             Washington, D.C. 20006


For Various Claimant         Stutzman, Bromberg, Esserman & Plifka
Firms:                       By:  DAVID J. PARSONS, ESQ.
                             2323 Bryan Street
                             Suite 2200
                             Dallas, TX  75201


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana        Womble Carlyle Sandridge & Rice
Dept. of Environmental      By:  FRANCIS MONACO, ESQ.
Quality:                    222 Delaware Avenue, Suite 1501
                            Wilmington, DE 19801

For Allstate Insurance:     Cuyler Burke, LLP
                            By:  ANDREW K. CRAIG, ESQ.
                            Parsippany Corporate Center
                            Four Century Drive
                            Parsippany, NJ  07054

For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN 37864

For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            LECG
                            By:  ELIZABETH DEVINE, ESQ.
                            1725 Eye Street NW, Ste 800
                            Washington, DC,  20006

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  SCOTT L. BAENA, ESQ.
                                 TERRANCE EDWARDS, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Future             Orrick, Herrington & Sutcliffe,
Claimants                     LLP
Representatives:            By:  DEBRA FELDER, ESQ.
                                 KATE ORR, ESQ.
                                 JOSHUA CUTLER, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007

J&J COURT TRANSCRIBERS, INC.

TELEPHONIC APPEARANCES (CONT'D):

For Grace Certain         Montgomery, McCracken, Walker &
Cancer Claimants:           Rhoads, LLP
                          By:  NATALIE D. RAMSEY, ESQ.
                          300 Delaware Avenue, Ste. 750
                          Wilmington, DE  19801


For David T. Austern,     Phillips, Goldman & Spence, P.A.
the Future Claimants'     By:  JOHN C. PHILLIPS, ESQ.
Representative:           1200 North Broom Street
                          Wilmington, DE  19806


For the Asbestos          Ferry Joseph & Pearce, P.A.
Creditors Committee:      By:  THEODORE TACCONELLI, ESQ.
                          824 Market Street, Suite 19899
                          Wilmington, DE  19899


For Ford, Marrin,         Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer          Gleser
& Gleser:                 By:  SHAYNE SPENCER, ESQ.
                          Wall Street Plaza
                          New York, NY  10005


For Official Committee    Duane Morris, LLP
of Unsecured Creditors:   By:  MICHAEL LASTOWSKI, ESQ.
                          1100 North Market Street, Suite 1200
                          Wilmington, DE  19801-1246


For Official Committee    Brandi Law Firm
of Asbestos Property      By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:              TERENCE D. EDWARDS, ESQ.
                          44 Montgomery St., Suite 1050
                          San Francisco, CA  94104


                          Lieff, Cabraser, Heimann & Bernstein
                          By:  ELIZABETH J. CABRASER, ESQ.
                          Embarcadero Center West
                          275 Battery Street, Suite 3000
                          San Francisco, CA  94111


                          Riker, Danzig, Scherer, Hyland &
                           Perretti, LLP
                          By:  TARA MONDELLI, ESQ.
                               CURTIS PLAZA, ESQ.
                          Headquarters Plaza
                          One Speedwell Avenue
                          Morristown, NJ  07962


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Libby Claimants:    Cohn, Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For the PD Committee:       Speights & Runyan
                            By:  DANIEL SPEIGHTS, ESQ.
                                 MARION FAIREY, ESQ.
                                 ALAN RUNYAN, ESQ.
                            200 Jackson Avenue, East
                            Hampton, SC  29924

For Garlock Sealing         Morris James, LLP
Technologies:               By:  BRETT FALLON, ESQ.
                            500 Delaware Avenue
                            Suite 1500
                            Wilmington, DE  19801

For ZAI Claimants           Hogan Firm Attorneys at Law
& various law firms:        By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801

For Official Committee      Richardson Patrick Westbrook &
of Asbestos Property          Brickman, P.C.
Claimants:                  By:  EDWARD J. WESTBROOK, ESQ.
                            174 East Bay Street
                            Charleston, SC  29401

For Dow Jones               Dow Jones News Wires
News Wires:                 By:  PEG BRICKLEY

For David T. Austern:       Lincoln International, LLC
                            By:  GEORGE COLES, ESQ.
                                 JOSEPH RADECKI, ESQ.

For OCAPIC:                 Campbell & Levine
                            By:  MARK HURFORD, ESQ.
                            800 North King Street, Suite 300
                            Wilmington, DE 19701

For APDC:                   Pryor, Cashman, LLP
                            By:  RICHARD LEVY, ESQ.
                            410 Park Avenue
                            New York, NY 10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For OCAPDC:                  Hamilton, Rabinovitz & Alshuler
                             By:  FRANCINE RABINOVITZ, ESQ.
                             26384 Carmel Rancho Lane, Suite 202
                             Carmel, CA 93923

For Robert Siegel:          Traub, Lieberman, Straus
                             By:  ROBERT SIEGEL, ESQ.
                             Seven Skyline Drive
                             Hawthorne, NY 10532

For Garlock Sealing:        Robinson, Bradshaw & Hinson
                             By:  RICHARD WORF, ESQ.
                             101 North Tryon Street, Suite 1900
                             Charlotte, NC 28246

1          THE COURT:  This is the continuation of the argument,

2    post-confirmation hearing argument in W.R. Grace, 01-1139.  The

3    participants I have listed by phone are Elisa Alcabes, Scott

4    Baena, Janet Baer, Ari Berman, David Bernick, Jeffrey Boerger,

5    Deanna Boll, Thomas Brandi, Peg Brickley, Justin Brooks,

6    Michael Brown, Elizabeth Cabraser, Christopher Candon, James

7    Carignan, Nathan Coco, Daniel Cohn, George Coles, Andrew Craig,

8    Elizabeth DeCristofaro, Elizabeth Devine, Martin Dies, Melanie

9    Dritz, Terrance Edwards -- thank you -- Lisa Esayian, Marion

10   Fairey, Brett Fallon, Debra Felder, Mary Beth Forshaw, David

11   Fournier, Theodore Freedman, Michael Giannotto, Robert Gilbert,

12   Christopher Greco, Barbara Harding, Daniel Hogan, Mark Hurford,

13   Matthew Kramer, Nathaniel Kritzer, Lewis Kruger, Michael

14   Lastowski, Elli Leibenstein, Richard Levy, Jeffrey Liesemer,

15   Francis Monaco, Tara Mondelli, Kerri Mumford, James O'Neill,

16   Kate Orr, David Parsons, John Phillips, Francine Rabinovitz,

17   Joseph Radecki, Natalie Ramsey, David Rosenbloom, Alan Runyan,

18   Jay Sakalo, Darrel Scott, Robert Siegel, Walter Slocombe,

19   Daniel Speights, Shayne Spencer, Theodore Tacconelli, Edward

20   Westbrook, Richard Worf, and Richard Wyron.

21          Here, Cathy, I'll give you those lists back.  Thank

22   you.  Are there any additions to the entries in court?  Good

23   morning.

24          MR. PASQUALE:  Good morning.  Ken Pasquale from

25   Stroock for the unsecured creditors committee.

**J&J COURT TRANSCRIBERS, INC.**

1      THE COURT:  Any other additions this morning?  Okay.

2  Oh.

3      MR. FRIEDMAN:  Your Honor, Jeff Friedman for Morgan

4  Stanley.

5      THE COURT:  I'm sorry.  I don't think your microphone

6  is on.

7      MR. FRIEDMAN:  Jeff Friedman for Morgan Stanley.

8  Jeff Friedman for Morgan Stanley.

9      THE COURT:  Okay.  I could hear you this time.  Thank

10  you.  Could you get it, Cathy?  Okay.  Thank you.  Any others?

11  Okay.  Thank you.  Mr. Bernick.

12      MR. BERNICK:  Yes, Your Honor.  Thank you.  Good

13  morning.

14      THE COURT:  Good morning.

15      MR. BERNICK:  Where we left off on the slide that we

16  had and going through the rationale for the approval of issuing

17  or the issuance of a channeling or a successor claims

18  injunction as to 105, we were at PPCL015.  We had gone through

19  the fact that there was related to jurisdiction --

20      UNIDENTIFIED SPEAKER:  Your Honor, just if I could

21  interrupt for one second.  Could we have this on the overhead

22  so we could all see it?

23      THE COURT:  Oh, sure.

24      MR. BERNICK:  Oh, sorry.  There is related to

25  jurisdiction that is subject matter jurisdiction due to the

1  indemnity.

2         THE COURT:  No, I think he is asking for the slide to

3  be on the overhead.  We can get the system turned on.

4         MR. BERNICK:  It's not there yet.  I think counsel's

5  already got the slides actually.

6         THE COURT:  Okay.  There we go.  Thank you.

7         MR. BERNICK:  Sorry, again.  We already got A, B, the

8  105 injunction itself we went through yesterday the fact that

9  this case involves a very powerful set of facts for the

10 application of 105 by reason of the fact that the 105 is in

11 fact ancillary to 524(g) whose purpose is to produce global

12 resolution and global closure so that the assets available to

13 the trust can be maximized.

14         That was a factor that was not present in

15 Continental, it was present in CE.  The problem with CE was

16 that instead of -- the 524(g) also was available to cover

17 though that same matter that 105 was used to cover, that is the

18 Lummus asbestos liabilities, and therefore was improper.

19         So in a sense what's happened in Grace, is we have

20 precisely the correct configuration which is 524(g) handling

21 the asbestos liabilities and in service of, indeed it's the

22 only way it can happen, producing the closure of the 524(g)

23 requires in order to maximize assets, but produce that closure

24 for

25 non-asbestos claims you need 105.

**J&J COURT TRANSCRIBERS, INC.**

1        So all of the predicates, all of the stars aligned,

2  all of the predicates are there.  There's no question but the

3  successor claims injunction is critical to the Fresenius

4  settlement.  It was bargain for, obtained, nor is there any

5  question that there was a precedent for it which is the

6  indemnity that already existed in the historical agreement.

7        And then the other unique feature that again warrants

8  105 as a matter of law is that any valid Seaton claim gets paid

9  in full by Grace.  Grace is basically through 8.5.2 picking up

10 the slack.

11       And Your Honor then said, well, why can't there be a

12 letter of credit or some other aspect of the 105 injunction to

13 provide some further level of assurance to Seaton that in fact

14 Grace will successfully stand behind the obligation.

15       And there are a couple answers to that.  First of all

16 that's an issue at the end of the day of treatment, it's not an

17 issue about the Court's power and the suitability of employing

18 that power under 105.  That really is in a sense a further

19 engraftment or assurance.

20       I would say though two things, and really it's the

21 second one that's more important but the first one I suppose

22 logically is that it's already been established, and we believe

23 that the Court can well find, that this plan is in fact an

24 overwhelmingly feasible plan.

25       So this is not a question about whether the

1  wherewithal is there to in fact pay this claim that ultimately

2  is found to be a valid claim.

3          But there's a further point which is the point of law

4  and that is that the fact that there is indeed a second fund

5  that's available through Grace, in fact as a matter of law

6  under the doctrine of marshaling assets, constitutes an

7  additional justification for the 105.

8          THE COURT:  What do you mean a second fund?

9          MR. BERNICK:  That is the first fund that Seaton

10  would like to go after is Fresenius's.

11          THE COURT:  Right.

12          MR. BERNICK:  A second fund is now available which is

13  Grace.

14          THE COURT:  It's not a second fund, it's substituting

15  for the first fund.

16          MR. BERNICK:  Well --

17          THE COURT:  You're taking the ability of Seaton to

18  pursue Fresenius away --

19          MR. BERNICK:  Correct.

20          THE COURT:  -- so it's substituting a fund --

21          MR. BERNICK:  It is substituting.

22          THE COURT:  -- it's not a second fund.

23          MR. BERNICK:  There is a second fund that's now

24  available to take the place of the first.  Again under the

25  doctrine of marshaling of assets a creditor can't say, well, I

1 would like to go after the first even though the second is

2 available.

3          THE COURT:  This is an unsecured claim.

4          MR. BERNICK:  Yes.

5          THE COURT:  Okay.  And you're taking away the ability

6 of the creditor to go after the first.  You're not marshaling,

7 you're doing the substitution of fund.

8          MR. BERNICK:  Well but it is under the doctrine of

9 marshaling of assets it is making this available as a fund

10 against which the claim can be satisfied.

11          THE COURT:  But it's taking the other one away.

12          MR. BERNICK:  I understand that.  But under the

13 doctrine of marshaling of assets and, Your Honor, I'm going to

14 get to the law here in a second, both the --

15          THE COURT:  You have to have two funds to marshal,

16 you're taking the one fund away.  There is no marshaling,

17 you're transferring the obligation from Fresenius to the

18 debtor.  It's a substitution of the entity that's liable.

19          MR. FREEDMAN:  Your Honor, if I could just interject.

20 Grace was under contract, the same contract that Mr. Brown's

21 client is saying is the basis for this claim.  That is he had a

22 claim against Grace, he had a claim against Fresenius under the

23 same contract.

24          He failed to file a proof of claim.  All that's

25 happening here is that we're permitting him to reinstate a

1  claim that he has.

2          So it is two funds, Grace and Fresenius.  We're not

3  substituting, we're reinstating --

4          THE COURT:  Okay.

5          MR. FREEDMAN:  -- at worst.

6          THE COURT:  All right.  Thank you.

7          MR. BERNICK:  Thank you.

8          THE COURT:  You have to explain the terms of the

9  settlement and the contracts.  I was not involved in any part

10  of this Fresenius so I do not understand the Fresenius details.

11  Thank you.

12          MR. BERNICK:  The precedent or the cases that so find

13  under 105 are principle cases that have applied 105 and been

14  upheld which is the A H Robbins decision out of the Fourth

15  Circuit where the marshaling of assets is analogous to the

16  situation that's been found, and also Dow Corning the Sixth

17  Circuit which cited that in the course of approving the 105.

18          So the fact of what Grace has done in Section 8.5.2

19  is completely supported by the most important precedent to the

20  area with respect to the application of 105, it's not just kind

21  of a novel move, it's a well established move.

22          And that's why we list as a third justification for

23  the 105 injunction basic justification that any valid Seaton

24  claim gets paid in full by Grace.

25          We then get to the plus factors, what I call the plus

1  factors.  The plus factors are very important because they're

2  facts of this case that make it all the more compelling that

3  the 105 injunction issue -- and if I have the right slide here

4  which I do.

5         There are basically three points.  The first point is

6  that not only does the Grace agreement under 8.5.2 have legal

7  justification as a matter of bankruptcy law, but it actually

8  has the effect of mooting the underlying claim.

9         The underlying claim is a claim of (indiscernible).

10  Seaton basically says that we reached the settlement and under

11  the settlement we were only going to have to deal with a

12  certain number of disclosed claims.

13         It now appears that there is an additional disclosed

14  claim that you didn't tell us about and we have to deal with it

15  and therefore we have not gotten the benefit of the bargain.

16         And in fact Mr. Brown in testifying in this case at

17  Page 174 stated exactly this principle.  This is their own

18  characterization of the claim.  He's asked, well why did you

19  send these letters that were sent essentially making a demand

20  in 2008.  And his answer was, well, I pointed out that what we

21  had discovered in our factual analysis and demanded that

22  Fresenius and Sealed Air defend and indemnify Seaton in order

23  to put it into the position it would have been in had the

24  representation been true, that is the benefit of the bargain.

25         So the whole purpose of the fraud claim is not to say

1  oh, well, we get money back.  The purpose of the fraud claim is

2  to give execution to what they felt were the correct terms of

3  the deal.

4          The Grace undertaking at 8.5.2 has exactly the same

5  effect.  Basically what Grace is saying is we're going to make

6  good by the original agreement.  We're going to give you the

7  benefit of the bargain by taking on the additional liability

8  that has now emerged according to you.

9          So that in effect by doing this we make right what

10 they say was the misrepresentation.  We say, okay, that

11 additional liability that you say wasn't disclosed, you don't

12 have to take it.  So that the representation then remains true,

13 that you are only going to have to take care of the ones that

14 you were told about.

15         So this is not a separate fraud claim as to which

16 they are seeking some kind of damage or some kind of

17 consequential loss.  This is kind of like a fraudulent

18 inducement claim but it's not designed to unwind the contract,

19 it's designed to give effect to the contract.  Well 8.5.2 does

20 exactly the same thing.

21         The next plus factor -- and, again, with the

22 marshaling of assets these two things work completely in tandem

23 -- the next plus factor is to take a look actually at the claim

24 itself.  Beyond the fact that the claim is now moot, it's a

25 very, very problematic claim.

**J&J COURT TRANSCRIBERS, INC.**

1          And the reason for that has to do with the essential
2    timing of the settlement that is at issue.  This is PPCL017.
3    PPCL017 gives the basic timing sequence.

4          The Fresenius transaction took place, it was
5    consummated in September of 1996.  At that point, and this is
6    the only giggle that we could think of in working into the
7    graphic, Fresenius goes flying off into the sunset.

8          What does that mean?  It means it's not around at the
9    time that the settlement takes place with Unigard in March of
10   1997.  That's the settlement where they say that there was a
11   misrepresentation.

12         So where is Unigard -- where is Fresenius?  Fresenius
13   isn't even around when the settlement's being reached when the
14   alleged fraud took place.

15         MR. BROWN:  Your Honor, objection.  There's no
16   support for that in the record.  In fact the record reflects in
17   OS7 revised that Fresenius is a party to the contract.

18         MR. BERNICK:  I've got it right here.  You can see
19   how it became a party to the contract.  OS7 is in fact the
20   agreement March 5, 1997.  OS7 indicates that, yes, Fresenius is
21   a party to the contract, but this is a fraud claim, it's not a
22   contract claim.

23         MR. BROWN:  Objection, Your Honor.  I'd like to know
24   where he gets the idea this is a fraud claim.  It has not been
25   characterized in any particular way other than

**J&J COURT TRANSCRIBERS, INC.**

1 misrepresentation or some similar claim.

2          MR. BERNICK:  Okay, misrepresentation.

3 Misrepresentation, fraud, whatever you want to say.

4 Misrepresentation.  That we lied intentionally or

5 unintentionally.  We misrepresented the fact.

6          The question is who engaged in the misrepresentation.

7 This is simply a settlement agreement and Fresenius is a

8 contracting party to the settlement agreement and why, how,

9 because it's W.R. Grace and Co., a New York Corporation which

10 changed its name to Fresenius, that's the one that went like

11 this, by it's attorney in fact Grace Conn.

12          There is a power of attorney.  So Grace executed this

13 agreement as attorney in fact, power in fact -- through the

14 power of attorney for Fresenius.  There's zero indication from

15 this document, there's nothing they've ever been able to muster

16 that says Fresenius somehow came back into the picture after it

17 was gone on its happy way and decided to make a

18 misrepresentation to Unigard.  This is nothing.

19          MR. BROWN:  Objection, Your Honor.  What Mr. Bernick

20 is trying to do here in his closing arguments is to argue the

21 merits of the claim that's been asserted.

22          It's not proper for a confirmation hearing.  We're

23 not here to litigate the merits of it.  The point is is that we

24 established a prima facie case against Fresenius --

25          MR. BERNICK:  Your Honor, this is just an argument.

1      MR. BROWN:  -- and we've established that that claim

2  is being enjoined and the question is whether the successor

3  claims injunction is legal.  We're not here to decide whether

4  we win the claim.

5      MR. BERNICK:  I'm sorry.  Are you done?

6      MR. BROWN:  Yes.

7      MR. BERNICK:  Apologize.  The answer to that is very

8  simple.  The 105 injunction is an exercise of the Court's

9  equitable powers and the Court in exercising its equitable

10  powers has to weigh and balance what are the benefits from the

11  successor claims injunction in preserving the Fresenius deal

12  which presumes this protection and preserves this plan as a

13  whole, that's what's on this side, pretty heavy, against the --

14      THE CLERK:  I'm sorry, Judge.  Court Call is on the

15  phone, they said they have attorneys holding for Court Call.

16          (Pause - problems with Court Call)

17      THE COURT:  Mr. Bernick, you were telling me that as

18  a court of equity I have to balance factors, I should balance

19  the Fresenius preservation of the funds that they're going to

20  create for this estate and 105 allows me to do that under 8.5.2

21  and that's when we lost them.

22      MR. BERNICK:  Right.  And on the other --

23      MR. BROWN:  Your Honor, Mr. Bernick had mentioned to

24  me during the break that there was a pending objection.

25      THE COURT:  That there was?

1          MR. BROWN:  That there was a pending objection but I

2    must confess with all the confusion with Court Call I don't

3    remember what the objection was.

4          THE COURT:  There was an objection about the fact

5    that he was arguing the merits of the claim.

6          MR. BROWN:  Okay.

7          THE COURT:  But I think he then moved on to something

8    else.  I didn't rule on that.

9          MR. BERNICK:  Well I was getting back to that.

10          THE COURT:  Okay.  This isn't the time to argue the

11    merits of the claim.

12          MR. BERNICK:  Right.

13          THE COURT:  All right.

14          MR. BROWN:  Thank you, Your Honor.

15          MR. BERNICK:  Well we're not arguing the merits of

16    the claim so that the Court will resolve the claim, we're

17    arguing that you have to weigh against the benefits to the

18    successor claims injunction under 105 against the detriment.

19          The detriment inevitably takes you to at least a look

20    at the significance of the claim.  And this is a claim that is

21    only one claim that's been made and it's a claim that they

22    themselves introduced the merits of the claim.

23          Remember the letter that they wanted to get into

24    evidence that laid out in a self-serving fashion their whole

25    theory and we objected to it.  It came into evidence and it

1  came into evidence because they wanted to be able to have the

2  Court understand the nature of their claim.

3         If you take a look at what they submitted into

4  evidence it was based upon the idea that they were not told of

5  these things and if in fact it turns out that Fresenius wasn't

6  even there to make a representation then, you know, there's not

7  really much of this claim that's there so --

8         MR. BROWN:  Objection, Your Honor.  There's nothing

9  in the record to suggest that Fresenius wasn't there.

10        MR. BERNICK:  Yes, there is.

11        MR. BROWN:  Fresenius is a signatory to the

12  agreement.  Mr. Bernick is --

13        MR. BERNICK:  It is not a signatory to the -- I'm

14  sorry, Your Honor, it's not a signatory to the agreement.  We

15  have the agreement which they put into evidence right here.

16  It's not a signatory.  The signatory is Grace Conn acting as

17  attorney in fact for Fresenius.

18        MR. BROWN:  Does Mr. Bernick mean to be suggesting,

19  Your Honor, that Grace was not authorized as the attorney in

20  fact?

21        MR. BERNICK:  No, that's not the -- I'm sorry --

22  that's not the point, Your Honor.  The point is not whether

23  Fresenius is bound by the contract, the question is whether

24  Fresenius made a misrepresentation/fraud.  And if Fresenius is

25  simply signing the contract through somebody else, there's no

1  indication whatsoever that they're a party --

2          MR. BROWN:  Your Honor --

3          MR. BERNICK:  -- to the fraud.

4          MR. BROWN:  -- Your Honor, he's arguing the merits of

5  the claim.  It's clear he's -- we have not had any discovery on

6  this claim.  We don't know what Fresenius knew or didn't know.

7          MR. BERNICK:  Oh, oh.

8          MR. BROWN:  We haven't deposed Mr. Posner who signed

9  on behalf of Fresenius through Grace Conn.  We haven't had any

10 of this discovery.  He wants to now make an argument about what

11 Fresenius did or didn't know.  Now is not the time for that.

12         MR. BERNICK:  What?

13         THE COURT:  Okay.  Well I think the issue is, as I

14 understand what the debtor is attempting to argue, the point is

15 there is a very valuable contribution that Fresenius is making.

16 That contribution is conditioned on some things.

17         One of the things it's conditioned on is the fact

18 that it's going to be free from certain types of lawsuits, one

19 of which is going to be this one by Seaton to the extent that

20 the suit has any merit.

21         And the issue, one of the issues that this Court has

22 to figure out is whether in reinstating the obligation of Grace

23 under the original contract as opposed to permitting Seaton to

24 sue either Grace and/or Fresenius, or I should say and/or

25 Fresenius, whether that substantially and materially affects

1 Seaton balanced against the benefit to the estate.  That's what

2 I think the debtor is telling me to argue.

3        So the issue as to whether or not there is merit to

4 this underlying agreement is a factor in the balancing.  I

5 don't know whether the discovery is going to show that there

6 was in fact a representation that was materially false or not.

7 I don't think this is the time to make that determination.

8        The issue I think is whether in substituting Grace or

9 Fresenius in this obligation, balanced against the likelihood

10 that Seaton may actually be able to prove that there was a

11 misrepresentation at all, that the deal that was approved by

12 the District Court in the settlement should be set aside and

13 not incorporated into the plan.  And that's what I think the

14 balancing factor is.

15        MR. BROWN:  Well, Your Honor, if I may I think it

16 highly unfair to be judging the merits of this claim in a

17 context where my client has had no discovery on the claim.  We

18 --

19        THE COURT:  I can't judge the merits, Mr. Brown,

20 that's not before me.  But I do have to take a look at whether

21 the balancing factors here at the stage of confirmation how

22 they play out.  And this claim at best is a contingent,

23 disputed, it may be unmature, I don't know whether it's

24 unmatured or not, it's unliquidated.

25        So looking at the type of claim that is held, that's

1 what I think I have to do compared to whether or not there is a

2 source that would provide a recovery in the event that the

3 claim is eventually proven.

4         MR. BROWN:  All right.  Well, Your Honor, just we'll

5 get to this point but I believe that the first issue ought to

6 be an analysis as to whether the Section 105 injunction is

7 appropriate at all.  We'll get to the merits of that argument.

8         But to the extent that Mr. Bernick wants to argue

9 facts that are not in the record and wants to argue about the

10 merits of this particular claim, my objection stands.  I don't

11 think it's appropriate.

12         THE COURT:  And I agree.  This isn't the time to make

13 rulings on the merits of the claim.

14         MR. LOCKWOOD:  Your Honor, they did take the

15 deposition of Jeffrey Posner or at least they had the

16 opportunity to do so.  So he's making a representation that's

17 not -- that as though he were testifying.

18         MR. BERNICK:  I really, I appreciate that and I'll

19 only say that when the statement was made this is not a fact of

20 -- these facts are not of record, OS7 is their own exhibit,

21 it's in evidence.  But I don't want to prolong this agony.

22         I think Your Honor has exactly stated the balancing

23 that has to take place.  We have provided a reference in the

24 record to a very important issue regarding what is it that

25 we're really preserving when we're questioning the validity and

J&J COURT TRANSCRIBERS, INC.

1  the importance of the successor claims injunction and I'll move
2  on.

3          And I'll move on to the last point.  And the last
4  point is that with respect to this very contention, this very
5  contention, that somehow this successor claims injunction is
6  not appropriate.  Seaton is estopped to make that contention.

7          This is not estoppel with respect to the underlying
8  claim.  There could well be estoppel with respect to the
9  underlying claim as well, but this is estoppel with respect to
10 their even raising the argument concerning the successor claims
11 injunction.

12         And why are they estopped?  I am sensitive to the
13 fact that maybe I should -- I think that's what's picking up
14 the feedback, Your Honor.

15         What's really critical here is the timing.  The
16 critical point in time to focus on is June of 2005.

17         THE COURT:  I don't know what it is.  Cathy, can you
18 turn that microphone down?  Something or other got unbalanced
19 in this process.  Okay.  Thank you.  June of 2005?

20         MR. BERNICK:  Yeah, June of 2005 is the critical
21 point in time.  As indicated on this time line it's at that
22 point in time, and this is PPCL017A which also provides the
23 cites, the order was approved for the Sealed Air settlement.

24         There had been -- the Sealed Air settlement was
25 entered into earlier but Grace was not a party to it.  So in

1  order to make it effective in the case as a whole Grace had to

2  become a party to it.  So that motion was filed and came on for

3  hearing and the order was issued as of June of 2005 proving the

4  settlement and ordering the approval of the settlement with

5  Sealed Air.

6         That approval of the order of settlement with Sealed

7  Air in turn incorporated a provision in the Sealed Air

8  agreement of 2003 that said the plaintiffs who are the

9  plaintiffs in the underlying adversary shall deliver the

10 Fresenius release.

11        So as of 2005 we now have an order approved on motion

12 that incorporates by reference that it is a order approving an

13 agreement one term of which is the delivery of the Fresenius

14 release.

15        And that's not the only thing that was up that year.

16 The Fresenius, the motions that were brought on and indeed they

17 were brought on repeatedly that sought to give execution and

18 implementation to the Fresenius settlement because the

19 Fresenius settlement also had certain tax issues that were

20 raised with respect to Grace.  Essentially Grace and Fresenius

21 had to cooperate with respect to the resolution of certain tax

22 issues.

23        Well that started to happen in 2005 as well and those

24 tax matters, and again CL017A has the citations, that's docket

25 7779, the implementation stages of the Fresenius settlement

1  with respect to tax came before the Court.

2         Well as of 2005 Mr. Brown's firm had made an

3  appearance in this case.  Indeed they themselves indicated that

4  Scotts claim again OneBeacon Seaton September of '04 is what

5  triggered their interest.  They were in the case as of January

6  of '05 and of course as counsel in the case it becomes

7  incumbent upon them to see what the case involves and become

8  familiar with it.

9         But while they're there these events start to happen

10 in court that are implementation matters with respect to the

11 Fresenius settlement as well as with respect to the Sealed Air

12 settlement.  Indeed motions are being decided and the motion

13 that was decided in June was the motion to approve the Sealed

14 Air agreement and thereby also to approve the fact that the

15 Fresenius release was going to be obtained and that couldn't

16 happen without the Fresenius settlement.  So the whole thing is

17 right there in black and white.

18        Now in this case Mr. Brown testified under oath and

19 they elected to call Mr. Brown instead of calling people from

20 Seaton and OneBeacon.  Your Honor will recall that Mr. Brown

21 kind of took to the stand and caught me a little bit by

22 surprise but there he was and he said -- the question that was

23 asked of him by Mr. Pratt (phonetic), have you ever heard of

24 Kaneb Pipeline Operating Partnership now known as NuStar.

25 That's this whole issue here.

1           And Mr. Brown kind of goes on under direct

2    examination from Mr. Pratt and says yes.  When did you first

3    learn of that entity.  December 2008.  So we're now way over on

4    the time line, way over here, long after these different

5    matters have been taken up.

6           And said what were the circumstances.  I received a

7    copy -- this is at Page 168 -- of a letter that had been sent

8    to my clients OneBeacon and Seaton from Kaneb's counsel.  That

9    again is at the end of 2008, that's indicated on our

10   demonstrative here.  So that was his testimony.

11          He goes on to say, well, when did you ever review the

12   March 1997 settlement which takes us back here to our time

13   line.  He said I don't know the precise time frame is his

14   answer Line 11 at Page 169.  I got the letter that had been

15   sent to my client some time in mid-December, it was either late

16   December or early January.  So he says I just didn't take a

17   look at any of this until much, much later on.  And there's a

18   lot of --

19          MR. BROWN:  Objection, Your Honor.  That is not the

20   testimony.

21          MR. BERNICK:  Well it's right here in black and

22   white.  When did you review that settlement agreement.  I don't

23   know the precise time frame, it was either late December or

24   early January and we're talking about 2008, 2009.

25          MR. BROWN:  Your Honor, that doesn't mean that the

1  settlement agreement was never reviewed prior to that.  It was

2  in conjunction with the issues that had come up.  And the --

3        MR. BERNICK:  Oh, but that's not the question.

4        MR. BROWN:  He's mischaracterizing the testimony.

5        MR. BERNICK:  No, let's go back.  169 at the top.

6  What did you look at.  This is the same period of time.

7  Answer, I looked at the settlement agreement in particular.

8  The one I focused on most was March 1997.  And they said, Mr.

9  Brown, when did you review that settlement agreement.  I don't

10 know the precise time frame.  And this is what the testimony

11 is.  It's pretty much in black and white.

12       And then remember what then happened.  We then had

13 the letter that came in, over our objection, the letter from

14 Mr. Brown on behalf of his client to Skadden Arps this one is.

15 This is plan proponent's Exhibit 240.  But I'm not sure that

16 the -- there were three different letters that came through.

17 These were the ones that were offered into evidence and

18 received over our objection through Mr. Brown's testimony.

19 Remember how we went back and forth and back and forth.

20       Mr. Brown recites in this letter July 2009 it has

21 recently come to our attention through discovery in the Grace

22 bankruptcy that one of the three parties to the settlement

23 agreement at the time of the execution of the agreement, dah,

24 dah, dah, dah, now known as Sealed Air Corporation.

25       Thus Sealed Air like the other Grace entities that

1  executed the settlement agreement is responsible for any
2  misrepresentations contained therein.
3          And obviously, you know, these -- all that's being
4  said and indeed there is rather extensive testimony from Mr.
5  Brown, all was to the proposition that only recently did these
6  -- did this event or did these events come to light and prompt
7  his interest.
8          And indeed we have a brief that was filed November
9  20, 2009, this is the post-trial reply brief of the creditors
10  OneBeacon, American, and Seaton to this Court.  And it says at
11  Page 19 the plan proponents argue that since counsel for
12  OneBeacon and Seaton was unaware of the Otis Pipeline claim
13  until late 2008 and since he did not raise that claim with the
14  debtors until July of 2009, their brief picks up on a very
15  important thing and this is really what got us kind of saying
16  what in the world is going on because this is all about counsel
17  for OneBeacon and Mr. Brown is talking about what he did, he
18  did, he did.
19          Well what about Seaton, Unigard itself, what do they
20  know?  And the suggestion of course is that they didn't know
21  anything, that this was all totally new to them and my gosh
22  we've got to do something about it, we learned about it in
23  2008, 2009.  And incidentally Mr. Brown --
24          MR. BROWN:  Your Honor, objection.  Mr. Bernick is
25  mischaracterizing the testimony that I provided at the

1  confirmation hearing.  I was asked about when I got involved,

2  about when I first learned of Kaneb, and what I did.

3           MR. BERNICK:  Yes.

4           MR. BROWN:  And the reason that I testified was

5  simply so that we could get the letters into evidence so that

6  Your Honor would understand the nature of the claim that was

7  being asserted.

8           He's now mischaracterizing my testimony and

9  suggesting that I was testifying to what my client may have

10 known or what at any point in the past.

11          MR. BERNICK:  Well, no, I don't mischaracterize the

12 testimony at all.  I agree that that is exactly what Mr. Brown

13 did.  Mr. Brown called and talked about what it is that he

14 knew, he knew, he knew, he knew.  And I'm not suggesting that

15 Mr. Brown misrepresented anything to the Court about his state

16 of knowledge.  That may or may not be the case.  But I'm not

17 leveling that charge and I won't level that charge.

18          This is about his client and indeed they're very

19 careful because they called him instead of his client, in their

20 brief they talk about counsel instead of the client.  So where

21 is the client?

22          And we got focused on this and said well what in the

23 world is going on particularly because they now put this letter

24 in that again is all about our attention.  That is not Seaton,

25 OneBeacon's attention, but the attention of Drinker, Biddle &

**J&J COURT TRANSCRIBERS, INC.**

1  Reath.

2          Well it turns out, and I will now get into the issue

3  that Mr. Brown wanted to raise, it is our view that as of 1998,

4  years before the matters as to which there was approval in June

5  of '05 came about, Unigard had been given written notice that

6  Kaneb asserted an environmental claim regarding Macon and Otis.

7          MR. BROWN:  Your Honor --

8          MR. BERNICK:  If Mr. Brown will agree that that is

9  true and that that was something that was not disclosed to the

10  Court during the course of his testimony or in any of the

11  briefs, then I have no need to put in the letters that we now

12  have before the Court to demonstrate that in fact when Mr.

13  Brown testified he was not testifying in a way that reflected

14  what his client actually knew.

15          I don't have to put these letters in, but we can't

16  sit by and have this sworn testimony come before the Court,

17  have it be in briefs, have it be a basis for raising an issue

18  that not only was raised, it could have been raised and

19  therefore is res judicata under these orders when the Court --

20  when we know that as a fact Unigard did know, they could have

21  raised this whole issue and they decided not to.

22          Whether or not Mr. Brown knew it or not, Unigard knew

23  it, Seaton knew it, and there's been a misrepresentation, maybe

24  not by Mr. Brown, but by his client staying silent when all of

25  this happens, that the issue that we've now spent hours, days,

1  and hundreds of hours dealing with has already been resolved

2  and should not be raised again.

3          MR. BROWN:  Your Honor, I don't know where to begin

4  with this.  First of all we object to PPCL42.

5          THE COURT:  I don't know what it is you're objecting

6  to.  I'm sorry.

7          MR. BROWN:  It was what Mr. Bernick had on the screen

8  a few moments ago.

9          MR. BERNICK:  It's this right here.  We're not

10  offering it, we're asking for you to sign on that it's correct.

11          MR. BROWN:  Your Honor, this statement is drawn from

12  apparently three letters that Grace wants to introduce into

13  evidence in terms of what Unigard knew in 1998 about the claims

14  that he presumably is going to tell you about even though

15  they're not in the evidence.

16          I don't know is the answer to that.  I don't have a

17  clue.  But I can agree to the statement it may very well be

18  true.  But I'm not in a position to agree with it or not agree

19  with it.

20          MR. BERNICK:  That's fine and I --

21          MR. BROWN:  And it's going to be very important, Your

22  Honor, when we talk about environmental claim what exactly is

23  meant and I will get to that.

24          THE COURT:  Well okay, look, this is not claims

25  adjudication but the reality is that if your client had written

1  notice of an event and the testimony that as I understood it

2  was that your client, not just you, but your client knew

3  nothing about it ten years ago because it came to your

4  attention and therefore that's how your client found out, then

5  that is in my view a mischaracterization of the facts.

6          So if there are documents that substantiate that your

7  client had knowledge and allowed you to testify to something

8  contrary to that, I'm going to permit it to be introduced

9  because I don't know how else I can get the record straight.

10          MR. BERNICK:  That exhibit is PPCL302 and Your Honor

11  actually has a copy of it there it's --

12          MR. BROWN:  All right.  Well, Your Honor --

13          MR. BERNICK:  Excuse me.

14          MR. BROWN:  We're going to get to this so if I can

15  just lodge objections and then we can move on.

16          THE COURT:  All right.  I don't know what I have and

17  what I don't have.

18          MR. BROWN:  Okay.

19          THE COURT:  I don't have that document and I don't

20  have the one before it either.

21          MR. BERNICK:  Yeah, it was attached to the

22  demonstratives.  Here's another copy for you, Your Honor.

23          MR. BROWN:  Your Honor, Mr. Bernick will correct me

24  if I'm wrong.  You have PPCL042 which is --

25          MR. BERNICK:  No, 30 --

1            THE COURT:  I do not.

2            MR. BERNICK:  -- no, 302.  PPCL302.

3            THE COURT:  Oh, here they are, okay, yes, I have 302,

4  I don't have the other one.

5            MR. BERNICK:  302 is the letter dated February 26th,

6  1998 from Kaneb Pipeline Company to Grace Energy who was the

7  subsidiary at the time who was in this business and

8  specifically --

9            MR. BROWN:  Your Honor, can I -- I don't mean to

10  interrupt Mr. Bernick but I would like to put my objection on

11  the record and move on.

12            THE COURT:  Yes, go ahead.

13            MR. BROWN:  I believe, and Mr. Bernick will correct

14  me if I'm wrong, that he is going to show you three documents

15  because they're the three he handed to me.  It looks like he's

16  starting with PPCL302, I presume from there he's going to go to

17  PPCL301, and then I presume from there he's going to go to

18  PPCL300 and --

19            MR. BERNICK:  That's correct.

20            MR. BROWN:  Okay.  These documents are not in

21  evidence, they were never requested to be in evidence.  There's

22  been no discovery with respect to them.  They are hearsay.

23  They have not been authenticated.  But perhaps most importantly

24  they are irrelevant.

25            And I object to their admission for any purpose but

1  if the Court is going to indulge Mr. Bernick and go through it,

2  I just want it to be known that those are objections on the

3  record and to the extent that PPCL042 is meant to be a summary

4  by the debtors as to what can be gleaned from these three

5  documents, I object to that as well.

6          MR. BERNICK:  Well I --

7          THE COURT:  Okay.  Well with respect to 042, somebody

8  apparently put exhibits on the bench when I wasn't here so I

9  have a stack of exhibits, I don't know what they are, but I

10 don't think I have 042 in them.

11         MR. BERNICK:  That's correct.  We apologize, Your

12 Honor.  All the other things have been shown or are being

13 shown.  PPCL042 we're not offering into evidence.  We are

14 simply -- my request to Mr. Brown was to stipulate on behalf of

15 his client that it was factually correct in which case we don't

16 need to go through the letters.  He's not prepared to do that

17 and I understand he's not prepared to do that.  We're not

18 offering it into evidence.

19         PPCL302 is a letter dated February 26, 1998 on Kaneb

20 Pipeline Company's stationery.  Mr. Brown says it's hearsay.

21 It's not hearsay.  This is a Grace business record.  A copy of

22 it is indicated with a checkmark W.R. Grace & Company.  This

23 was maintained in the ordinary course of business by W.R. Grace

24 and this is our copy of the letter.

25         And the letter very plainly provides notice from

1    Kaneb Pipeline Company regarding Macon, Georgia, which is one

2    of the claims that's at issue and where is the other one.

3    There is Otis Air Force Base.  So both of the claims that we're

4    talking about here they gave notice of and it's very important

5    --

6              THE COURT:  Wait.  But this letter PPCL032 appears to

7    be a letter from Kaneb to Grace --

8              MR. BERNICK:  Right.

9              THE COURT:  -- not to Seaton.

10             MR. BERNICK:  Right.  So then the next letter is

11   what's happened here is that there has been a prior dialogue

12   between Grace and Kaneb because there was a spill at the

13   facility.  Actually this all came in.

14             There was an adversary complaint or a declaratory

15   judgment action that was filed in 1997 by Grace and it sought

16   to adjudicate who was responsible for the spill at the Otis

17   Pipeline site in Texas because it was Grace's view that Kaneb

18   was responsible for it, it was Kaneb's view that Grace was

19   responsible for it.

20             So that lawsuit was filed by Grace and after that

21   lawsuit was filed by Grace Kaneb in turn gave notice to Grace

22   about the fact that it was making a claim under the merger

23   agreement.  So this is part of this ongoing battle.

24             The lawsuit gets filed for a declaratory judgment,

25   people are saying whose fault is it, whose problem is it and

1  Kaneb basically sends this letter to Grace.

2        Well once the letter gets sent to Grace we then have

3  301 and 301 is a business record, it's on Grace stationery,

4  it's dated a couple weeks thereafter March 9, 1998, and this

5  provides notice to CNA regarding potential environmental

6  claims, Grace reference EIL98-178.

7        Enclosed please find a letter we received --

8        MS. DeCRISTOFARO:  Objection, Your Honor.  I haven't

9  even seen that and it's directed to my client.

10        THE COURT:  I'm not sure what we're doing because

11  that's not Seaton either.

12        MR. BERNICK:  Well we're getting to the last one's

13  Seaton.

14        MS. DeCRISTOFARO:  Your Honor, if I may?

15        MR. BERNICK:  Well I don't even need to do it here.

16  Take a look at it.  It's just really -- excuse me.  So we then

17  have the letter which is --

18        THE COURT:  Wait.  I'm sorry.  Wait.

19        MR. BERNICK:  I'll withdraw the proffer.  This is,

20  Your Honor, I'm sorry, go ahead.  Say what you want to say.

21        MS. DeCRISTOFARO:  Your Honor, first this is the

22  first time I've seen this.  I find it utterly -- first of all I

23  want to say something here.

24        All of the evidence that Mr. Bernick is relating to

25  relates to a claim by Grace.  Now first of all with my client,

1 and you've seen me get very exercised about this, my client has

2 two settlement agreements including one approved by Your Honor.

3          This relates to a claim by Grace against CNA --

4          MR. BERNICK:  No, it doesn't.

5          MS. DeCRISTOFARO:  It does too.

6          MR. BERNICK:  It does not.

7          MS. DeCRISTOFARO:  And Grace released us from these

8 claims --

9          MR. BERNICK:  We're not --

10          MS. DeCRISTOFARO:  -- in a motion before this Court

11 in a settlement agreement.

12          THE COURT:  Yes but, Ms. DeCristofaro, at the moment

13 the debtor is not offering this to substantiate that it has

14 some claim against CNA.  I don't think that's the point.

15          The point I think is to show the chain of evidence

16 but Seaton isn't copied on this document.

17          MR. BERNICK:  That's correct.  That's exactly right.

18 So we don't have to offer it.  Can I have it back or is that --

19 I think that's my copy.  So that's no longer even being shown

20 to the Court.

21          So then we get plan proponent's CL300 and this now

22 because CNA or another company was the primary carrier and

23 Seaton was excess.  The agent J&H Marsh McLennan writes a

24 letter to Unigard Security March 25, 1998.

25          THE COURT:  Whose agent?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  This is presumably the agent, actually

2  what it is as it's indicated here, on the March 9, 1998 letter,

3  the letter from Grace to CNA, a copy gets sent to Mr.

4  Considine.  Mr. Considine is with J&H Marsh McLennan.  Exactly

5  who they got the relationship with, I don't know, it doesn't

6  really make too much difference to this proposition.

7          He is casualty claim department Joan Considine and

8  she writes --

9          MR. BROWN:  Your Honor, could we swear Mr. Bernick

10 in?

11         THE COURT:  I can't accept all of this as evidence,

12 Mr. Bernick, I have nothing.  If you want to put a witness on

13 to substantiate all this that's fine.  I understand your

14 argument that these are all business records, but I don't have

15 a clue who these entities are.

16         This letter does appear to be directed to Unigard and

17 it is dated March 25th of 1998 and it does indicate that Grace

18 is establishing various dates of loss concerning a claim at

19 Kaneb Pipeline for a location in Texas.  That's what this

20 letter states and it identifies some insurance policies that

21 may be involved.

22         MR. BERNICK:  Right.

23         THE COURT:  So this letter in and of itself without

24 the chain that otherwise is established that doesn't appear to

25 have gone to Unigard, doesn't substantiate specifically what

1  these charges are.

2          It does say the claimant is Kaneb Pipeline.  It does

3  identify that.

4          MR. BERNICK:  Yeah, Your Honor, it's not just that.

5  This is why I wanted to get to the letter.  This is the letter

6  that went from Grace, because Grace has now received a letter

7  from Kaneb, that's very clear.

8          THE COURT:  Which letter?  I'm sorry.

9          MR. BERNICK:  Letter goes from Kaneb to Grace,

10 February 26, 1998.  Grace in turn writes a few weeks later or a

11 few days later March 9, 1998 Mr. Guzzi writes with a copy to

12 Considine regarding Grace reference number EIL98-178, 1998,

13 number 178.

14         Immediately Ms. Considine then picks up and writes a

15 letter.  This came from Grace files.  Considine writes a letter

16 to Unigard and it references Kaneb Pipeline and Grace

17 reference, exactly the same Grace reference.

18         THE COURT:  Yes.

19         MR. BERNICK:  So if we need to call somebody from

20 Grace to say these are Grace business records which they

21 clearly are to say, yeah, gee, you know, these are all Grace

22 records, they establish --

23         THE COURT:  No.  You need to substantiate that

24 somehow or other where the letter that is dated PP -- that is

25 identified as PPCL300, which is the one addressed to Unigard --

1          MR. BERNICK:  Right.

2          THE COURT:  -- that says enclosed is a complete copy

3 of our file concerning the above captioned claim which will

4 serve as first notice of loss, that in fact that has something

5 to do with the issues that you are now attempting to testify

6 about.

7          I am not accepting these documents at this time for

8 any purpose.  If you need to re-open the evidence, you may

9 re-open the evidence.  But I am not taking them on assertions

10 of counsel.

11          MR. BERNICK:  Well I understand that, Your Honor,

12 but, you know, we can all say that somehow there's not a

13 linkage, but the fact of the matter is it is exactly the same

14 Grace reference file number, 100 percent identical.  And it's

15 identical on 301 and 301 says please find a letter we received

16 from the Kaneb Pipeline Company dated February 26, 1998.

17          THE COURT:  That's to CNA, Mr. Bernick.

18          MR. BERNICK:  But --

19          THE COURT:  This chain does not work.  I don't have a

20 clue --

21          MR. BERNICK:  Well --

22          THE COURT:  -- what the complete copy of the file

23 from somebody named J&H Marsh McLennon who has no connection --

24          MR. BERNICK:  That's not --

25          THE COURT:  -- in this record to the debtor that I

1  know of --

2          MR. BERNICK:  It's right here.

3          THE COURT:  -- is identified.

4          MR. BERNICK:  It's right here, Your Honor.

5          THE COURT:  I see it's right there.

6          MR. BERNICK:  No, no, no.  Not on this letter.

7          THE COURT:  The complete copy of the file isn't

8  there.

9          MR. BERNICK:  You don't have to send the entire file.

10  You've got the Kaneb --

11          THE COURT:  You have to prove that there was notice.

12  Mr. Bernick, this is not proper.  Call a witness if you want a

13  witness unless you wish to testify and substantiate all the

14  pieces in the chain, otherwise let's move on.

15          MR. BERNICK:  Your Honor, I'd like to make a

16  statement.  We will make a proffer.  If Your Honor doesn't want

17  to accept it and we have to call a witness, so be it.  But I

18  want to make the proffer and the proffer says February 26, 1998

19  is the letter from Kaneb to Grace Energy Corporation that

20  specifically recites the two claims that we have at issue here.

21          We then have less than two weeks later a letter from

22  Grace and the letter from Grace actually says it contains a

23  Grace file reference number, it specifically references please

24  enclosed find a letter we received from the Kaneb Pipeline

25  Company February 26, 1998 wherein they identify numerous

1 facilities which they purchased from Grace on dah, dah, dah,

2 which could be -- this is absolutely and completely a response

3 to CL302 which is the February 26 letter.

4       Mr. Guzzi signs that letter.  A copy, a cc goes to a

5 J. Considine with enclosure.  We then have Ms. Considine

6 writing two weeks later.  Ms. Considine with a cc to Mr. Guzzi

7 who signed the March 9 letter and she gives notice to Unigard

8 Security regarding Kaneb Pipeline, lo and behold the same claim

9 that's on the original letter from Kaneb and exactly the same

10 claim number.  You can't have a clearer paper trail of exactly

11 related correspondence where notice is being passed on.

12       THE COURT:  Then you may call a witness to

13 substantiate it.  Let's move on.

14       MR. BERNICK:  That's our proffer, Your Honor.  These

15 are Grace business records.  We seek to put them in evidence.

16 And what counsel for Seaton has now said is what?  It may be

17 true.  Well where were they?  They've had these documents for

18 the better part of 24 hours.  All you do is make a telephone

19 call and find out.  And why didn't they know before Mr. Brown

20 was put on the stand to offer his testimony?  So our proffer at

21 this point --

22       THE COURT:  I've heard it.  I've said let's move on.

23       MR. BERNICK:  We would argue, Your Honor, that the

24 testimony of Mr. Brown suggesting that there was no prior

25 notice should be stricken at this time.  The burden is on them

1 to demonstrate that Mr. Brown's testimony is accurate and

2 truthful representation of what his client knew.

3          THE COURT:  And nobody has had any discovery.  I

4 cannot do this on the representations of counsel.  I will re-

5 open the record.  You may take appropriate discovery and if in

6 fact it turns out that Unigard had this notice, then it seems

7 to me that I will at that point accept these documents.

8          But I'm not going to accept it from a proffer of

9 counsel without the documents attached when I have no clue who

10 these people are, what the files were, and what was sent to

11 Unigard.

12          MR. BERNICK:  So we come back to our argument on

13 PPCL015 which is that we have an overwhelming case for a 105

14 injunction to protect an essential feature of this plan and not

15 only is the case clear as a matter of law based upon the

16 precedence and not only is it clear from the nature of the

17 prior settlement, from the nature of the criticality of that

18 settlement to the plan from the fact that Grace has made itself

19 available to pay the claim under the marshaling of assets

20 concept that we see adopted by both the Sixth Circuit and the

21 Fourth Circuit, and not only does Grace's undertaking provide

22 the hook to that legal doctrine, it undercuts the merit of the

23 Seaton claim because the benefit of the bargain has now been

24 reinstated.  And at the end we believe that Seaton is estopped.

25          So for all of those different reasons there's an

1  overwhelming case for a 105 injunction.  That's all I have.

2         THE COURT:  Anybody else speaking to this issue

3  before I turn to Mr. Brown?  All right.  Mr. Brown.  How much

4  time will you need for discovery?  Perhaps I should ask that

5  question.  Are you going to pursue it?

6         MR. BERNICK:  Well I think we need very little time

7  for discovery, but I would urge that Seaton, OneBeacon obviate

8  the need for all of this by simply telling Mr. Brown about

9  these documents and that might just say we don't need to do

10 anything.  Otherwise I'll ask Seaton, OneBeacon right now to

11 produce their files relating to this correspondence.  It's

12 pretty simple.

13        THE COURT:  All right.  Mr. Brown.

14        MR. BROWN:  Your Honor, I think I may be able to cut

15 through all of this because Mr. Bernick very carefully

16 conflated the two issues but let me --

17        THE COURT:  Cathy, will you turn that microphone back

18 up please?  The podium mic.

19        MR. BROWN:  Your Honor, just so that we don't sort of

20 lose track of where we are with the issues.  I'd like to just

21 outline very briefly where I'd like to go in my argument.

22        I do wish to respond to Mr. Bernick and to these

23 letters on the relevance issue because I'm hopeful that we can

24 cut through some of what I think is a bunch of nonsense.

25        After I do that, Your Honor, I'm going to just give a

1 brief overview of sort of a big picture as to some facts that

2 bear on all of the release and injunction related issues that

3 we are raising.

4          THE COURT:  Cathy, can you turn that up a little

5 please?

6          MR. BROWN:  From that point, Your Honor, I'd like to

7 address the res judicata argument which has been gotten a lot

8 of fanfare in the plan proponent's briefs, again with respect

9 to all three of these release and injunction issues.

10          At that point, Your Honor, I then want to turn to the

11 illegal Section 105 successor claims injunction and its

12 accompanying releases because there's some releases that relate

13 to that as well.

14          From there, Your Honor, I'd like to go to the limited

15 objection that Seaton and OneBeacon have to the 524(g)

16 protection that's being afforded to Fresenius.

17          And then finally, Your Honor, what I'd like to go to

18 is Seaton and OneBeacon's objections to the non-consensual

19 third party releases insofar as they augment the protections

20 that are being afforded to Fresenius under the Section 524(g)

21 injunction.

22          At the outset, Your Honor, I indicated that Mr.

23 Bernick was conflating two issues.  Let me explain that.  His

24 smoking gun document that he wants in evidence is PPCL300 which

25 I put on the overhead.

1          Your Honor, that document is dated March 25th, 1998.

2     Let me start off by saying I haven't -- before yesterday I

3     hadn't seen this document nor had I seen the other two.

4          MR. BERNICK:  Your Honor, that is an improper

5     statement.  If he's going to testify now from the podium he

6     ought to be put under oath because he's now testifying.  He's a

7     witness in the case, he's commenting on his own testimony.

8     That is impermissible.

9          And he's now displaying a document that he objected

10    to even being received by the Court.

11         MR. BROWN:  Your Honor, Mr. Bernick has suggested

12    that we were aware of these documents.  I just want to let you

13    know that I wasn't aware of this document or any other.

14         MR. BERNICK:  Same objection, Your Honor.

15         MR. BROWN:  But it --

16         MR. BERNICK:  Let him say it under oath.

17         THE COURT:  Mr. Brown, Mr. Bernick, as an officer of

18    the court I will expect that Mr. Brown is not required to be

19    under oath for this purpose.  If there is some discovery that

20    you wish to take and it turns out not to be true I'm sure I'll

21    hear from you and I'm sure I will have appropriate authority to

22    deal with that falsehood.

23         MR. BERNICK:  Okay.

24         THE COURT:  Go ahead, Mr. Brown.

25         MR. BROWN:  Thank you, Your Honor.  Here's the point.

1 The claim about which I testified and the claim that is the

2 subject of the letters that were sent to Fresenius's counsel

3 and Sealed Air's counsel is a claim by Kaneb against Unigard.

4       This letter is about claims by Kaneb against Grace.

5 Yes, they relate to the Otis Pipeline and the Macon, Georgia

6 site and presumably others if Mr. Bernick's theory with respect

7 to the other letters is (indiscernible).  As I said I don't

8 know whether it is or it isn't.

9       But the point here is that on March 25th, 1998 Marsh

10 Mc apparently is sending notice to Unigard Security care of a

11 law firm.  And it's sending notice about a claim.

12       If you look on the letter, Your Honor, you will see

13 the insured is listed as W.R. Grace and the claimant is issued

14 as Kaneb Pipeline.

15       The claim about which I testified was a claim by

16 Kaneb as, purportedly as a co-insured directly against Unigard.

17 And there's a big distinction between the two.

18       MR. BERNICK:  Objection.  That again is commentary on

19 his own testimony and he's now referring to and characterizing

20 a letter that he refused to have the Court take into evidence

21 and he's now testifying about something that he didn't want the

22 Court to consider.

23       THE COURT:  Yes.  That I have to agree with.  If this

24 letter is going to be used by one it's going to be used by all.

25 I've opened the discovery for purposes of looking at this issue

1  and that's what I think is appropriate.  Then I'll know whether

2  or not Unigard had some knowledge or didn't have some

3  knowledge.  Without that I don't know.

4           And it's only relevant to the extent that there is

5  some estoppel argument that's being made.  It's not relevant to

6  anything else at this point anyway.

7           MR. BROWN:  All right.  Your Honor, I was really just

8  trying to be helpful to the Court because I think that we're

9  being taken off on a tangent.

10          THE COURT:  We've been going off on tangents for two

11  days, but okay.

12                        (Laughter)

13          MR. BROWN:  I just want to point out that the claims

14  that are purportedly asserted in this letter in March of 1998

15  were released by Grace in March of 1997 pursuant to Exhibit OS7

16  revised I believe it's Section 5.

17          The claims that Unigard has against Fresenius and

18  Sealed Air are claims that were generated by the fact that

19  Kaneb asserted a claim against Unigard as a co-insured.  This

20  is irrelevant to that issue.  That's my only point.

21          All right.  Your Honor, I said that I wanted to give

22  a brief overview and I want to put some of our objections in

23  perspective for the Court because I think some of this gets

24  lost in all the colloquy.

25          Seaton and OneBeacon -- and this argument I'm about

**J&J COURT TRANSCRIBERS, INC.**

1  to make or overview relates to all of our issues, not just the

2  successor claims issue -- Seaton and OneBeacon, Your Honor, are

3  creditors of Grace and they became creditors of Grace because

4  they settled pre-petition with Grace and depending on the

5  settlement agreement with Sealed Air and Fresenius as well.

6         Between the two of those carriers they paid $197.3

7  million to resolve Grace asbestos and environmental

8  liabilities.  They negotiated seven settlement agreements with

9  the various parties.

10        Six of those settlement agreements have contractual

11 indemnity provisions, some of those run against Grace, some of

12 them run against Grace and Fresenius, some of them run against

13 Grace, Fresenius, and Sealed Air.

14        And the reason they did that was because they were

15 paying a lot of money and they wanted to be protected in the

16 event that third parties came out of the woodwork at any point

17 in the future and asserted claims against the policies that

18 were the subject of these settlements.

19        They also had numerous parties and in some of these

20 settlement agreements signed the settlement agreement.  Some of

21 them were signed by Grace alone, some by Fresenius, some by

22 Grace and Fresenius, some by Grace, Fresenius, and Sealed Air.

23        So they got extra protection because they had extra

24 signatories to the agreement because in many of those

25 agreements, as I said there's indemnity, in the last one, the

1 one that's been the subject of Mr. Bernick's presentation the

2 March '97, there is no indemnity provision in that, but there

3 was an environmental representation made by the signatories to

4 that document.

5          Now I want to put that in perspective in dollar

6 terms.  We hear an awful lot about what Fresenius is putting

7 into this plan.  Fresenius is putting in $115 million at some

8 point if the plan goes effective.

9          If you compare 1990 dollars with 2010 dollars,

10 collectively Seaton and OneBeacon put in about twice as much to

11 resolve the asbestos and environmental liabilities of Grace.

12 And in exchange for that they got some limited protections.

13          And what they're here today trying to do is to

14 protect themselves and this isn't theoretical.  Your Honor has

15 already seen these claims being asserted in the context of this

16 bankruptcy.

17          You saw the Scotts case.  It's been resolved.  It may

18 not, you know, it shouldn't be a problem in the future.  But

19 both of my clients were targeted and both of my clients had

20 indemnities against Grace and in some cases Fresenius for that

21 claim.

22          We've seen the Kaneb claim come out of the woodwork.

23 My clients have a claim.  OneBeacon has a claim against Grace

24 for that which is a Class 9 claim.  And Seaton which did not

25 have an indemnity agreement at least had an environmental

1 representation and we presented a prima facie case that there

2 was some doubt as to whether that representation was true given

3 the time line of events.

4       So what they're here trying to do is to protect the

5 rights that they negotiated pre-petition in exchange for a

6 huge, huge sum of money.  And, you know, the Court, Your Honor,

7 is always -- Courts are always anxious to have parties settle

8 for obvious reasons.

9       It's important when parties settle that the other

10 parties live up to their obligations and that's what we're here

11 talking about.

12      You've heard from several people that equity is

13 walking away with quite a bit in this plan and it is and it's

14 leaving a lot of creditors like my clients hanging.

15      MR. BERNICK:  Objection.  There's no relevance to the

16 issue of the successor claims injunction.

17      MR. BROWN:  All right.  Your Honor, I'd now like to

18 turn to the res judicata argument and in Mr. Bernick's

19 presentation there was not a great deal of discussion about

20 that.  There was a reference to res judicata in one of the

21 charts that he showed Your Honor.

22      I'm sure Your Honor's read the briefs.  There are a

23 number of places in the brief where the issue of res judicata

24 is brought up and it is brought up insofar as it relates to any

25 of the injunctions or releases that protect Fresenius and

1 Sealed Air.

2          And so this portion of my argument really again

3 applies to all of those issues.  And I just wanted to run down

4 for Your Honor why we believe that is not applicable.

5          The principle case that the plan proponents cite is

6 the recent <u>Travelers v. Bailey</u> decision from the Supreme Court.

7 That's an inapposite case, Your Honor, and the reason it is is

8 because in that case the Supreme Court was looking at a

9 confirmed plan that had gone effective and been consummated

10 decades earlier.

11          We don't have a confirmed plan here.  It certainly

12 hasn't gone effective or been consummated.  All we have here is

13 some settlement agreements.  And I would submit to Your Honor

14 that that doesn't constitute res judicata.

15          The settlement agreements and the orders approving

16 the settlement agreements for Sealed Air and Fresenius don't

17 contain any injunctions nor do they contain any releases.  They

18 have terms of a settlement between various constituencies and

19 the Fresenius and Sealed Air parties.  That's what they have.

20 That was their deal.

21          And the deal, Your Honor, required the plan

22 proponents to use their best efforts.  And I'd like Your Honor

23 to -- Your Honor, what I want to put on the overhead is Page 27

24 of our initial post-trial brief and the reason I want to do

25 that, Your Honor, is that there's a block quote.

1          The quote, Your Honor, is from the Fresenius

2   settlement order and it's very lengthy.  I'm not sure Your

3   Honor wants me to read through it.  But in the order, in the

4   Fresenius settlement order what this provision states is that

5   the debtors and the other plan proponents throughout, and it's

6   been italicized, are to use their best efforts to get the

7   injunctions and to get the releases for Fresenius.

8          I would submit to you that they are certainly doing

9   that.  But the fact that the order says they are to use their

10  best efforts obviously indicates that the injunctions and

11  releases were not issued.  The settlement was approved, but the

12  injunctions and the releases were not issued when those orders

13  were signed.  The orders said go use your best efforts to get

14  them and they're doing that.

15         The next point, Your Honor, is and this relates to

16  the 524(g) injunction.  There's been a suggestion, indeed there

17  was testimony from Mr. Austern and Ms. Zilly that the 524(g)

18  injunction was required by the settlement agreements.  And on

19  that issue, Your Honor, I am going to refer you to our reply

20  brief at Pages 16 and 17.

21         Well actually, Your Honor, what I can refer you to on

22  the order is what's already on the screen.  And this relates to

23  the 524(g) injunction in favor of Fresenius and it says in

24  addition if the debtors and the estate parties in their

25  discretion choose to seek the protections of an injunction

1   under Bankruptcy Code Section 524(g), the debtors and the

2   estate parties are authorized, empowered, and directed to seek

3   the benefit of the injunctions and releases under Bankruptcy

4   Code Section 524(g) for the NMC defendants.

5          You can read that Fresenius to the extent such

6   injunctions are available under the law and to the extent that

7   they seek the injunction and releases for the debtors and the

8   estate parties.

9          When the Fresenius order, Your Honor, was signed in

10  2003 the debtors had not even committed to submitting a plan

11  that had a 524(g) injunction.  The suggestion that my clients

12  were obliged then to come in and to challenge the propriety of

13  a Section 524(g) injunction that might or might not ever get

14  into a plan that might or might not ever be filed I submit is

15  absurd.

16         There's a related point.  What if we had?  What if we

17  had come in, Your Honor, and said we don't like this injunction

18  for the following reasons.  We would have been asking Your

19  Honor at that point to issue an advisory ruling because you

20  didn't have a 524(g) injunction in front of you, you didn't

21  have a plan with a 524(g) injunction in front of you.

22         You would not have been able to judge whether it was

23  appropriate or inappropriate.  There simply would have been no

24  way that the Court could have judged that.

25         Now one of the prongs of the test on the successor

1    claims injunction is whether it's fair.  That is whether it's

2    fair under the plan.

3            Well, Your Honor, in 2003 and in 2005 you didn't have

4    a plan in front of you.  Claims hadn't been classified.  You

5    didn't have any of that.

6            If you had wanted to judge whether it was appropriate

7    you would have been ill equipped to do so because you would not

8    have had an integrated plan in which to determine whether it

9    was appropriate to issue a 105 or not.

10           We submit it's not under any of the circumstances,

11   but in any event you would have been trying to make a ruling in

12   a factual vacuum.  I submit that if we had asked you for a

13   ruling we'd have been asking for an advisory opinion.  If you

14   had given one it would have been an advisory opinion.

15           The issue was not ripe, there was no justiciable

16   controversy, and my client's frankly weren't harmed one way or

17   the other by that settlement agreement and they're not by any

18   of the settlement agreements unless there's a plan confirmed

19   because those settlement agreements would become a nullity.

20           The next point on the res judicata, Your Honor, is

21   the issue of what standard of review was undertaken.  It was a

22   9019 motion that was submitted and therefore the Court in

23   looking at both of these settlement agreements was judging

24   whether they were appropriate under Rule 9019.  The Court was

25   not judging whether they were appropriate under 1129.

1          THE COURT:  Pardon me.  Can you folks please put your
2   mute buttons on?  We're getting a lot of scratching.  Okay, Mr.
3   Brown, thank you.
4          MR. BROWN:  The point is, Your Honor, you would have
5   been asked to make a determination as to the propriety of these
6   injunctions and releases in a factual vacuum and that would
7   have been inappropriate.
8          And then on the next point I was making, Your Honor,
9   is that the standard that was applied in approving the
10  settlement agreements was a standard under 9019, it was not a
11  standard under 1129.
12         The Court cannot be in a position of deciding in a
13  piecemeal fashion that I, you know, the plan proponents come in
14  before they even have a plan, before they even have a deal.
15  Let's remember that back in 2005 and 2003 Mr. Bernick was over
16  on this side of the courtroom and Mr. Lockwood was comfortably
17  seated on this one and they were fighting for years while most
18  of us were on the sidelines.
19         There was no plan.  Yes, there might be a plan.  Yes,
20  it might be a 524(g) plan.  But at that point, Your Honor, it
21  was something that might happen in the future and the Court was
22  not in a position on a 9019 issue to judge the propriety of the
23  injunctions or releases.  It simply wasn't the requisite
24  information available and it would have been absolutely
25  inappropriate to pre-approve portions of a plan.

1          But there's other reasons, Your Honor.  The plan

2  proponents have taken the position that the injunctions and

3  releases in the plan are res judicata as to my clients.

4  Obviously we disagree with that issue.  But if they were res

5  judicata as to my clients they would have been res judicata as

6  to everyone.

7          Notwithstanding that they keep getting modified.  The

8  successor claims injunction, Your Honor, was made more broad.

9  I'd refer Your Honor to PP352 at Page PP017962.

10          THE COURT:  I'm sorry.  At page what?

11          MR. BROWN:  PP01962.

12          THE COURT:  Okay.

13          MR. BROWN:  There was a qualifying phrase that was in

14  the successor claims injunction as originally filed in the

15  plan.  It was deleted thereby making it broader.

16          There were also changes Your Honor made to the

17  non-consensual third party releases of non-debtors.  Those are

18  Sections 7.13 and 8.8.7 of the plan and I believe those, Your

19  Honor, are also reflected in PP352 which if memory serves me

20  correctly is the second modifications to the plan and the page

21  numbers for those, Your Honor, are PP017959 to 60 and PP017962

22  to 63.

23          THE COURT:  Mr. Brown, I'm sorry.

24          MR. BROWN:  I'm sorry.

25          THE COURT:  Your voice fades out with those page

1 numbers and I can't get them.

2          MR. BROWN:  Did you get the first one?

3          THE COURT:  I didn't.

4          MR. BROWN:  Okay.  PP017959 to 60.

5          THE COURT:  All right.

6          MR. BROWN:  And PP017962 to 63.  So, Your Honor, if

7 in fact the plan's injunctions and releases had been

8 pre-approved by the Court in the context of the settlement

9 agreements then it certainly would have been inappropriate and

10 is inappropriate for them to keep modifying them including in

11 response I believe one of the modifications was made to it in

12 response to an objection raised by the U.S. Trustee.

13          We would all be bound by res judicata, not just

14 Seaton and OneBeacon.

15          The last point I wanted to raise, Your Honor, relates

16 to the Fresenius settlement and Mr. Bernick in his presentation

17 gave you a time line with respect to when my firm got involved

18 in the case.  I'm not going to quarrel with that time line.

19          The Fresenius settlement agreement and the order

20 approving that, the agreement was signed in March and April of

21 2003, it was approved in June of 2003, and we first appeared in

22 the case in January of '05.  We did have some information

23 concerning the case in '04, our formal appearance was in '05.

24          And we didn't get notice of the Fresenius settlement

25 agreement or the order, we did with Sealed Air.  Mr. Bernick

1  correctly stated that.  We were involved in the case.  I'm not

2  sure what any of us had a clue what that was all about at the

3  time, but we can't say that we didn't have notice of it.

4          Now in terms of evidence in the record on the

5  subject, Your Honor, there is a stipulation and it was the

6  stipulation that was entered into between the debtors and both

7  of my clients, Seaton and OneBeacon, with respect to the proofs

8  of claim that we filed shortly after we got involved, and

9  that's Mr. Shelnitz's -- well it's a stipulation that was

10 signed by Grace or by Mr. Shelnitz on behalf of Grace.

11         And he acknowledges -- let me actually get that, Your

12 Honor -- it's at Page 30 of our post-trial brief.  In the

13 stipulation, the stipulations are essentially identical for

14 Seaton and OneBeacon, Your Honor.

15         But it provides that the debtors listed Unigard on

16 their Schedule G, executory contracts and unexpired leases,

17 filed on June 8th, 2001, but Unigard and claimant, i.e. Seaton,

18 were not provided with actual notice of the commencement of the

19 debtor's cases nor the bar date order and were not

20 independently aware of the bar data order or the commencement

21 of the debtor's cases.  There was a similar one that was signed

22 for OneBeacon, essentially says the same thing, and it's cited

23 in the brief.

24         So, Your Honor, and the other point on the Fresenius

25 settlement agreement was that it was accompanied by a

1 certificate of service and we were not on that.  And, Your

2 Honor, the reference for that is docket index 16 for adversary

3 number 022211.

4        The debtors have submitted in their papers that we

5 were unknown creditors and, Your Honor, I would submit that the

6 debtors certainly had sufficient information to know that we

7 were creditors.  In the 1990's as I said at the outset we had

8 paid an awful lot of money to them and we had gotten in several

9 of the agreements contractual indemnity rights.

10        We were clearly parties in interest that were known.

11 We were scheduled on Schedule G.  The debtors either knew or

12 should have known of us and we certainly would have been

13 entitled to notice of the Fresenius settlement motion.

14        Having said that, I don't think it really matters for

15 all the prior reasons that I said.  I don't think res judicata

16 applies.  I don't think if you looked at the language from the

17 Fresenius settlement order it wasn't issuing the releases, it

18 wasn't issuing the injunctions.  There was no commitment that

19 there was going to be a 524(g) plan.  It was entirely premature

20 for an objection to any of these provisions.

21        So, Your Honor, that's in sum the several reasons why

22 we believe that the doctrines of res judicata as I believe

23 they're referred to in the plan proponent's papers are not

24 applicable here.  And so our position is is that Your Honor

25 ought to be consistent with the decision in Traveler's v.

1  <u>Bailey</u> analyzing the propriety of the injunctions and the

2  non-consensual third party releases of non-debtors in the

3  process of plan confirmation and that's why we're raising them

4  here.

5          I don't know if Your Honor has any questions on that

6  but if not I'd like to move on.

7          THE COURT:  No, I don't.

8          MR. BROWN:  Okay.  All right, Your Honor, I'd like to

9  move at this point to the actual successor claims injunction

10  and related releases.

11         I'm not sure where the plan -- it's a little unclear

12  to me where the plan proponents are.  I think that we have

13  adequately established that both Sealed Air and Fresenius are

14  parties to the March 1997 Unigard settlement agreement.

15         We've cited to numerous places in the record where

16  that's been established and I don't think there's really any

17  contest over that particular issue now.

18         There has been a suggestion, and I'm not necessarily

19  quarreling with this, and Mr. Glosband I think had briefly

20  addressed it yesterday, that the successor claims injunction

21  does not bar claims.  There was a slide from Mr. Bernick, the

22  CNA claims, and there has been a suggestion made to us that it

23  wouldn't bar the type of claim that Seaton has asserted against

24  Sealed Air which is essentially the same claim as against

25  Fresenius.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  We don't have to argue this.  We've

2  represented that to the Court.

3          THE COURT:  All right.

4          MR. BROWN:  I'm just trying to frame the issues, Your

5  Honor, if I can.  I'll just finish by saying Mr. Freedman has

6  approached me about that subject.  There has been some

7  stipulations that have been circulated.  It's an issue that's

8  up in the air but I'd prefer not to spend any time dealing with

9  it.

10          So we can focus on the Fresenius issue.  I think the

11  most important thing that Your Honor needs to consider when

12  considering the propriety of the successor claims injunction

13  and the related releases is what the law is on the subject.

14          And in the Third Circuit the guidance we have, the

15  principle guidance we have is in the Continental Airlines

16  decision.  I'm sure Your Honor is familiar with that decision.

17          In that decision, Your Honor, the Third Circuit

18  addressed permanent injunctions in favor of non-debtors and

19  also non-debtor releases, non-consensual non-debtor releases.

20  And it did so as a package.

21          The opinion doesn't really tell you why, but I'd like

22  to provide a reason why I think they should be addressed as a

23  package and the reason is this.  A non-consensual third party

24  release essentially operates just like an injunction.

25          If in other words we normally think of releases as

1  being something that one party gives to another party.  If one

2  party is giving it involuntarily to another party because

3  that's what's in a plan of reorganization, then that provision

4  is really operating in the identical fashion to an injunction.

5      And so Section 7.13 of the plan which has a broad

6  non-consensual release of non-debtors fits into that category.

7  And the second sentence of Section 8.8.7 of the plan also does.

8      So those two releases and the successor claims

9  injunction really ought to be dealt with together and indeed

10  that's what the Third Circuit did in <u>Continental Airlines</u>.

11      Now the starting point I think for this analysis is

12  what are we dealing with?  We're dealing with two non-debtors.

13  They haven't gone through the rigors of bankruptcy, they're not

14  going through the rigors of bankruptcy.

15      The starting point, Your Honor, is 524(e) and in at

16  least a couple of circuits in the country that's also the

17  ending point.

18      THE COURT:  I don't think that's true here.

19      MR. BROWN:  I understand.  But the point is this,

20  Your Honor, that in those courts they simply say -- with one

21  exception because 524(g) does provide, as the Third Circuit

22  acknowledged, does provide some limited relief.  But other than

23  that exception, in other circuits the starting point and the

24  ending point is 524(e).

25      Now in the Third Circuit's <u>Continental Airlines</u>

1 decision it went through and compared what different circuits

2 are doing.  It talked about the Ninth and Tenth Circuit, it

3 talked about two cases or at least I think Mr. Bernick

4 mentioned these, the <u>Drexel Burnham</u> case in the Second Circuit,

5 the <u>A.H. Robins</u> case in the Fourth Circuit.  It did not discuss

6 the <u>Dow Corning</u> case because that came subsequently.

7        But we would submit, Your Honor, that the rule ought

8 to be that you don't get them if you're a non-debtor other than

9 --

10        THE COURT:  Well you don't get a discharge.  But

11 there's no reason why parties at least can't bargain for

12 releases.  I think the issue for releases is whether or not (a)

13 there's notice, (b) people do or don't consent, (3) there's

14 consideration just like any other contract provision.

15        MR. BROWN:  Let me be clear, Your Honor.  We're not

16 contesting the right of the debtor to give releases.

17        THE COURT:  Yes, I understand.

18        MR. BROWN:  Except insofar as they're giving releases

19 on our behalf involuntarily, that's what we're contesting.

20 That's the point.  They can give as many releases as they want.

21 We just don't want them releasing our claims which is what

22 their plan does.

23        So what the plan proponents have done in their brief

24 is they've essentially said that they've looked at the Third

25 Circuit's <u>Continental Airlines</u> case and they've essentially

1  said, I think incorrectly, that here's the standard.

2          THE COURT:  Wait, I'm sorry.  Which Court looked at

3  which cite?  I missed that.  I apologize.

4          MR. BROWN:  The plan proponents, Your Honor, in their

5  briefs cite to the <u>Continental Airlines</u> case --

6          THE COURT:  Yes.

7          MR. BROWN:  -- for the proposition of here's the

8  test.

9          THE COURT:  Yes.

10         MR. BROWN:  Okay.  And we'll get to the test in a

11 moment, but my point is simply this.  I think the Third Circuit

12 made it explicitly clear in that opinion that it was not

13 establishing a test.

14         Indeed what it was saying in that case was that it

15 didn't have to, nor did it think it was appropriate to, because

16 even if you looked at this under the lowest standard that's

17 been applied by any other circuit it falls woefully short.

18 That was what the Third Circuit said in <u>Continental Airlines</u>.

19 And thereby left a blank slate in the Third Circuit on this

20 issue.

21         Now the plan proponents cite the opinion and they

22 then go through I don't know whether you want to consider it a

23 three part test or a four part test, I think it depends on how

24 you address it.  But I'll list the four parts, whether you

25 consider it three or four I don't know.

**J&J COURT TRANSCRIBERS, INC.**

1          The first thing that the Court said was that, at

2   least in those -- the Third Circuit said is in those other

3   circuits when they've done this it has been for extraordinary

4   cases, unusual cases.

5          The second thing it said is it has to be necessary to

6   the reorganization.  The third thing it said is it has to be

7   fair.  And then if there's a fourth thing, the Court has to

8   make specific findings.

9          The Court, Third Circuit again didn't embrace that

10  standard, simply said that's what the Courts that have allowed

11  105 injunctions for non-debtors and non-consensual releases,

12  that's what they've looked at.

13         Subsequently in <u>Dow Corning</u> other issues, another

14  standard was applied.  Plan proponents in their brief

15  specifically state that's not applicable.

16         Now again our position is that 524(e) is the starting

17  point and the ending point.  But I now want to address whether

18  the plan proponents actually can meet the test that their

19  advocating is the Third Circuit test.

20         Is this an extraordinary or unusual case?  It is in

21  some respects I will give you that, Your Honor.  But not in the

22  ways that are discussed by the circuit courts that have

23  permitted these 105 injunctions.

24         MR. BERNICK:  Before Mr. Brown gets into that

25  recitation, can we -- this is a process point.  I know that

1  counsel for the unsecured creditors committee and lenders and

2  Morgan Stanley are watching the clock and I understand Mr.

3  Brown, although it seems like this is all really just reading

4  what's in the papers, wants to make the argument.  But the real

5  question is where are we going with this?

6          THE COURT:  Mr. Brown stated yesterday how long he

7  thought his argument would take.  He's still within that time

8  frame.  Go ahead, Mr. Brown.

9          MR. BROWN:  Thank you, Your Honor.  In the <u>Drexel</u>

10 case and the <u>A.H. Robins</u> case and actually in the <u>Manville</u>

11 case, those involved a massive non-asbestos, well, <u>Manville</u> was

12 asbestos.  Let's start with <u>Drexel</u> and <u>A.H. Robins</u>.

13          <u>Drexel</u> and <u>A.H. Robins</u> dealt with massive liabilities

14 that were non-asbestos liabilities.  Section 524(g) wasn't

15 available and even if it had -- because of the timing -- but

16 even if it had been available it wouldn't have been

17 appropriate.  The <u>Manville</u> case involved asbestos liabilities

18 but it was pre-524(g).

19          And the Court found in the context of having these

20 massive liabilities, those Courts found, that a 105 injunction

21 was appropriate.

22          There is a case and, Your Honor, you're obviously

23 more familiar with this case than I am, I'm not involved in it,

24 but the <u>Narco</u>, <u>GIT</u> set of cases.  And that is a case where Your

25 Honor issued a 105 injunction.  We respectfully disagree with

1  that, but that's not the point.

2          The point is is that the 105 injunction as I

3  understand it in that case was to address silica liabilities.

4  And there was an extensive record and there were extensive

5  findings by Your Honor that there were massive silica

6  liabilities and therefore the unusual circumstances presented

7  by that case were the silica liabilities.  There was no need to

8  deal with the asbestos liabilities because you had 524(g)

9  available to do that.

10          Here in their briefing the plan proponents are trying

11  to bootstrap, they're trying to say because they have massive

12  asbestos liabilities, which by the way are being addressed by

13  524(g), they have the right to also have an ancillary 105

14  injunction and we submit that that's not appropriate.

15          The debtor can't use its asbestos liabilities to

16  justify a 105 injunction to address other liabilities.  That's

17  the point.

18          Now is it necessary?  Well we don't believe it's

19  necessary, Your Honor.  It's certainly something that they

20  want.  It's certainly something that Fresenius and Sealed Air

21  want.  But the question is whether it is necessary.

22          And, Your Honor, I would like to -- this is from the

23  Continental Airlines case.  Let me pull it out.

24                              (Pause)

25          MR. BROWN:  Your Honor, the necessity that the plan

**J&J COURT TRANSCRIBERS, INC.**

1 proponents have suggested justifies the 105 injunction is

2 really the issue that Mr. Finke testified to, this so called

3 identity of interest argument by virtue of the indemnity

4 relationships.

5          And that issue was addressed in <u>Continental Airlines</u>

6 and it's at Pages 216 and 217, 203 F.3d 216, 217.  And in order

7 to save time I won't read the lengthy quote there, but it is on

8 Page 9 of our brief, Your Honor.

9          The point was that the Court said in that case that

10 the possibility for indemnity claims in the future ain't

11 enough.  It doesn't justify it.  And we would submit that it

12 doesn't justify it here and that it's not necessary to this

13 plan of reorganization because the 524(g) liabilities of the

14 debtors and the Fresenius and Sealed Air are being adequately

15 covered by 524(g).

16          Now the next issue, the next prong of the test that

17 they advocate is the fairness prong.  And the fairness prong,

18 Your Honor, I believe they're trying to meet the fairness

19 prong.  I think that's most of what Mr. Bernick's presentation

20 was about, was about the change that they've made to the

21 successor claims injunction.  That was a recent plan, it was

22 the most recent set of plan amendments.

23          And, Your Honor, that's at 8.5.2.  It's a new

24 provision in the plan and this is the band aid that the plan

25 proponents have suggested Seaton should be willing to live with

**J&J COURT TRANSCRIBERS, INC.**

1 and I want to point a few things out about it.

2 The title of this provision says reservation from the

3 injunction for the benefit of holders of Grace related claims.

4 That is a misnomer.  And you can tell that it's a misnomer if

5 you read (e) because (e) says nothing in Section 8.5.2 shall be

6 construed to limit the scope or effect of the injunction

7 afforded to the Fresenius indemnified parties or any other

8 asbestos protected parties pursuant to Section 8.5.1 above nor

9 any of the other injunctions, releases, indemnifications or

10 protections afforded to Fresenius indemnified parties or any

11 other asbestos protected parties under the plan.  So it's not

12 really a reservation.

13 What it is, Your Honor, what this plan change amounts

14 to is an assumption by the reorganized debtors of the

15 liabilities of Fresenius.  In essence a channeling of the

16 claims that Seaton has against Fresenius to the reorganized

17 debtors.  It's not a novation.  We haven't agreed to it.  It's

18 simply an assumption and we submit that it's inadequate.

19 Now when we signed the agreement, the March 1997

20 agreement, there were three signatories to it, it was Grace, it

21 was Fresenius, and it was Sealed Air.  Mr. Bernick rightly

22 noted that we don't have a proof of claim on file with respect

23 to the Kaneb related claims as against Grace.  It wasn't on our

24 radar screen.  Didn't see it.  He's correct about that.

25 Now what they're proposing to do in order to protect

1 Fresenius is to say injunction remains, Section 105 injunction

2 remains intact but you can go against the reorganized debtors.

3      Well that wasn't satisfactory to us when we signed

4 the original agreement and it's not satisfactory to us now

5 either.

6      The important thing to note also, Your Honor, is that

7 this provision that they've added, 8.5.2, is limited in time.

8 Basically 60, I think it says 60 days after the effective date

9 you can file your proof of claim and we go through some sort of

10 I guess claims allowance process in the Bankruptcy Court.  I

11 presume that that's what this is contemplating.  After 60 days

12 that's gone.

13      There's no limitation on when we might be able to

14 bring claims against Fresenius and we don't know what is out

15 there in terms of environmental claims.  We don't know.  It may

16 be there's nothing.  I hope there's nothing.

17      But again getting back to the pre-petition bargain.

18 The pre-petition bargain, Your Honor, was that these folks made

19 a representation to us and we believe that representation was

20 not accurate.

21      And we have a claim over and we don't think under

22 these circumstances that our claim should be cut off to protect

23 Fresenius.  And there's a key point.  You won't hear me if I

24 move over but this little diagram that Mr. Bernick sketched up

25 on the notepad there, if you look at the top of it he has Grace

1  and then he has two indemnities going down.  And if I recall

2  what he said about that yesterday, one of those indemnities is

3  a pre-petition indemnity obligation that Grace owes to

4  Fresenius.  The other is an indemnity obligation that Grace

5  owes to Fresenius under the settlement agreement.

6        It's no skin off of Fresenius's back if the claim

7  that Seaton has isn't enjoined because Grace indemnifies them.

8  What they're asking for us rather than -- what they're asking

9  us to do is to accept Grace's indemnity alone while Fresenius

10  enjoys the injunction.

11        But the fact of the matter is is that Fresenius

12  itself has a claim against Grace.  So why -- they say that this

13  successor claims injunction is absolutely necessary to the

14  bankruptcy, you've got to cut off this claim.  In point of fact

15  Fresenius has an indemnity against Grace for that.  There's no

16  reason to cut off the claim.

17        Again this is just the plan proponents overreaching,

18  and Fresenius frankly, overreaching and they're trying to use

19  the debtor's 524(g) plan not only to buy some asbestos related

20  protections to which they are rightly entitled, but also other

21  protections to which they are not.

22        And we submit, Your Honor, that there is absolutely

23  no basis for the successor claims injunction or the related

24  releases that enjoin our claims.  And if our claims as they

25  undoubtedly say lack merit, don't go anywhere, are theoretical,

1 then there's no need to enjoin them because there's no risk to

2 anyone.  It's simply our agreement that we had pre-petition

3 remains intact.

4        All right.  Your Honor, with that I'd like to move

5 from the successor claims injunction to the 524(g) issue.

6 These other two issues I think, Your Honor, are fairly

7 straightforward.  I don't think there's a great deal of need to

8 spend a bunch of time on them, but they are distinct and that's

9 why I wanted to make sure that Your Honor is looking at the

10 successor claims injunction issue separately from the 524(g)

11 injunction.

12        I'll add, Your Honor, that on the issue of the

13 successor claims injunction, although I don't intend to argue

14 it, we have also raised a jurisdictional question as to whether

15 the Court has jurisdiction to issue it.  It's set forth in our

16 brief and I won't repeat that here.

17        All right.  As I mentioned, Your Honor, there's no

18 question that Fresenius and Sealed Air are entitled to some

19 level of 524(g) protection and OneBeacon and Seaton are not in

20 here contesting that.

21        The question is how much.  That is you can craft a

22 524(g) injunction, you can call it a 524(g) injunction, you can

23 chalk all sorts of things in there that may or may not be

24 appropriately covered by the statute.

25        And among the claims that are enjoined are

**J&J COURT TRANSCRIBERS, INC.**

1 contractual indemnity claims that both OneBeacon and Seaton

2 have against Fresenius, not against Sealed Air, and they're

3 enjoined.

4        So for example to the -- Scotts sued us, we incurred

5 some costs, we have claims over against Fresenius, those are

6 enjoined and channeled to the trust subject to the payment

7 percentage.  To the extent that any other claims out there

8 escape the 524(g) injunction the same thing would happen.

9        Now 524(g), well let me back up, in the settlement

10 agreements that Seaton and OneBeacon have on which Fresenius

11 also is a party, what Fresenius agreed to do was to defend and

12 indemnify OneBeacon and Seaton in the event that third party

13 claims were brought against Seaton and OneBeacon with respect

14 to the policies that were the subject of the settlement

15 agreements, asbestos related.

16        There's a direct contractual obligation and

17 undertaking by Fresenius in those agreements.  It's not

18 indirect, it's direct.  They signed them and they agreed.  So

19 the question is whether that type of claim is appropriately

20 enjoined under 524(g).

21        And, Your Honor, the relevant section of 524(g) is

22 524(g)(4)(a)(ii).  And I'm having some trouble finding it.

23 Just give me a second.

24                         (Pause)

25        MR. FREEDMAN:  Would Mr. Brown like to use my copy

1  that I've already marked for rebuttal?

2         MR. BROWN:  Yeah, if you've got it handy that would

3  be fine.  Thank you.

4         Your Honor, the relevant Section 524(g)(4)(a)(ii).

5  And it says notwithstanding the provisions of Section 524(e),

6  so that's the exception to 524(e), such an injunction may bar

7  any action directed against a third party who is identifiable

8  from the terms of such injunction (by name or as part of an

9  identifiable group) and is alleged to be directly or indirectly

10  liable for the conduct of, claims against or demands on the

11  debtor to the extent such alleged liability of such third party

12  arises from and then there's the four categories.

13         You don't get to the four categories unless you first

14  qualify under the language that I just read.  And, Your Honor,

15  when Seaton and OneBeacon assert a contractual indemnity claim

16  against Fresenius under the settlement agreements, they're not

17  asserting a claim for the conduct of, claims against or demands

18  on the debtor.

19         They are asserting a claim directly against Fresenius

20  as a signatory to the agreement and as an indemnitor under the

21  agreement.  And we submit therefore that they do not qualify,

22  that the type of claim that Seaton and OneBeacon have against

23  Fresenius under their asbestos related contractual indemnity

24  agreements is not the sort of claim that could properly be

25  channeled, enjoined or channeled to a 524(g) trust.

**J&J COURT TRANSCRIBERS, INC.**

1          All right.  Final issue, Your Honor, and this issue

2   relates to the non-consensual third party releases in the plan

3   and specifically 7.13 and also 8.8.7.

4          Now Mr. Finke at the confirmation hearing testified

5   that Section 7.13 operates to enjoin both asbestos related and

6   non-asbestos related claims.  Now I say enjoin, it's really

7   release because the term is release.  That's at trial

8   transcript September 14th, 2009, Pages 210 to 211.

9          If you look at 8.8.7 in the plan it's clear on its

10  face that it applies to all sorts of claims including asbestos

11  claims because it uses the term, broad term claims.

12         Now as I said in one of my earlier segments, a

13  non-consensual third party release is effectively an injunction

14  because it operates and does exactly the same thing.  The party

15  that's giving the release is not doing so voluntarily then it's

16  effectively an injunction and it's effectively a 105

17  injunction.

18         And the point here, Your Honor, is because we don't

19  believe that our claims can be enjoined with 524(g).  We also

20  do not believe that the plan proponents can use the non-

21  consensual non-debtor releases that appear in 7.13 and 8.8.7 to

22  effectively circumvent the requirements of 524(g).

23         And the support for that argument, I'm sure Your

24  Honor is quite familiar with, is of course Combustion

25  Engineering in which the Third Circuit said that you can't use

**J&J COURT TRANSCRIBERS, INC.**

1  a 105 injunction to accomplish something that you couldn't

2  accomplish under 524(g).

3         And there's really no colorable distinction between

4  the 105 and non-consensual third party releases.  So under the

5  CE decision it is our position that the 524(g) doesn't get you

6  there because of the statutory language is not --

7         THE COURT:  Are these releases -- I thought you said

8  these releases are not limited to asbestos claims.  If that's

9  the case, 524(g) clearly in that sense is only looking at an

10 injunction dealing with asbestos claims.  So I've lost the

11 transition.

12        MR. BROWN:  Let me see if I can -- the releases, Your

13 Honor, at least according to 7.1.3 according to Mr. Finke's

14 testimony and 8.8.7 on its face, on their face they relate or

15 the latter on their face and the other is a little less clear

16 but Mr. Finke testified, they relate to both.

17        Okay.  The point is this is that if our claims,

18 Seaton and OneBeacon's claims against Fresenius cannot be

19 channeled to the trust under 524(g) because of this language

20 that I read in 524(g)(a)(ii), then they cannot be released,

21 okay, under 7.13 or 8.8.7 because if they were then effectively

22 what they would be doing is using releases to accomplish what

23 they cannot accomplish under 524(g).

24        THE COURT:  I don't think Combustion is directly on

25 point with respect to this issue.  It seems to me that I mean

1  it may constitute an impairment of a claim that may be a

2  classification issue that the debtors could do through the

3  Chapter 11 Section 1100 series as opposed to 524(g).  I don't

4  know.  I wasn't really looking at this as a 524(g) release.

5         MR. BROWN:  Well, Your Honor, I'm actually focused

6  not on the claims as against the debtor, I'm focused on the

7  claims as against Fresenius.

8         THE COURT:  Third parties.  Yes.

9         MR. BROWN:  Yes.  And the point is this.  I mean

10  you've heard my argument on why we don't believe our claims fit

11  within 524(g).  I don't know whether you buy it or you don't,

12  but in any event that's our argument.

13         The plan, the point here is is that the plan also

14  attempts to release those claims.

15         THE COURT:  Yes.

16         MR. BROWN:  And non-consensual release of those

17  claims.  And the point is is that if 524(g) does not permit it

18  then under Combustion Engineering they shouldn't be able to

19  circumvent the requirements of 524(g) by effectively releasing

20  the claims on a non-consensual basis.

21         THE COURT:  Well, okay, I don't see the issue as

22  quite that circular.  I mean your basic premise is the claim

23  doesn't fit within 524 therefore the debtor can't make use of

24  any other provision of the Bankruptcy Code that might authorize

25  it because they can't use 524 for that purpose.  I don't think

1 that's correct.

2        MR. BROWN:  Well, Your Honor --

3        THE COURT:  I can't accept that as a proposition of

4 law.

5        MR. BROWN:  -- I'm not sure where the support in the

6 Bankruptcy Code comes for a non-consensual --

7        THE COURT:  Well that's a different issue.

8        MR. BROWN:  -- third party release.

9        THE COURT:  That's a different issue and there may

10 not be that support in the Bankruptcy Code for a non-debtor

11 release.

12        What I'm saying though is just because the non-debtor

13 release -- and I'm not making findings, I'm just hypothetically

14 stating maybe it's not there at all -- but if it is there, the

15 fact that it isn't in 524 or that the claim can't be channeled

16 to 524 doesn't mean the debtor can't make use of some other

17 provision that authorizes it just because 524 doesn't cover it.

18 That's a circular argument that simply doesn't fit.

19        MR. BROWN:  Well, Your Honor, perhaps with respect

20 to, well, I'm not even sure with respect to non-asbestos

21 related claims.

22        I'm simply saying what the Third Circuit said in

23 Combustion Engineering was Congress gave us 524(g), it says

24 what it says, its requirements are what they are, and you

25 either fit within 524(g) or you don't.

1          In CE they said Lummus doesn't fit, okay, so we're

2     not going to permit the use of 105 to enjoin the claims against

3     Lummus in order to augment the protections that are available

4     statutorily under 524(g).

5          THE COURT:  Well, yes, but that doesn't fit the facts

6     here at all because Fresenius is in the chain of organizations

7     that the debtor represents and Lummus wasn't.

8          MR. BERNICK:  The asbestos liability of Lummus was a

9     separate liability, different asbestos exposure, different

10    products.

11         THE COURT:  That's a better way to say it.  Thank

12    you.

13         MR. BROWN:  But, Your Honor, I think that misses the

14    point.  I think respectfully that's not the issue.  The

15    question is whether if Fresenius is not entitled, again,

16    narrowly focused.  I'm not saying that Fresenius is not

17    entitled to 524(g) relief.  That's not my argument.  Clearly

18    entitled to a level of 524(g) relief.

19         I'm focused on the contractual indemnity claims by

20    Seaton and OneBeacon against Fresenius and whether 524(g) may

21    appropriately be used to enjoin that subset of claims.

22         THE COURT:  Yes, I understand that but the indemnity

23    that you would be exercising in that circumstance as I

24    understand your argument is one that would be based on an

25    asbestos liability of the debtor for which Fresenius because of

1   its chain in the title of the debtor also has an indemnity.  I

2   don't see any problem with 524 in that context frankly but --

3            MR. BROWN:  Well --

4            THE COURT:  -- but even if you can't use 524, to the

5   extent that there is a significant relationship established on

6   the record in the chain of organization, the organizational

7   structure of the debtor, between the debtor and Fresenius, I

8   don't see any problem with 524.

9            If you can't use it there I don't know why 105

10  wouldn't be acceptable under those circumstances.  The

11  underlying liability is still the asbestos liability of the

12  debtor.

13           MR. BROWN:  Well I'm not sure -- I don't want to get

14  too far afield in the argument -- I'm not sure that's actually

15  the case, Your Honor.

16           The underlying liability for example in Scotts was

17  the fact that Scotts was getting sued.  The fact that Scotts

18  was --

19           THE COURT:  I don't know that Scotts had any

20  underlying liability.  I mean that issue's been settled.

21           MR. BROWN:  I'm just using that as an example because

22  that's one I'm, you know, Your Honor is familiar with.  It was

23  the claims against Scotts that triggered Scotts to claim under

24  our policies --

25           THE COURT:  Yes.

1          MR. BROWN:  -- which in turn gives rise to the

2    contractual indemnity claims by Seaton and OneBeacon against,

3    among others, Fresenius.

4          THE COURT:  Yes.  And the reason for that was because

5    Scotts's contention was that but for the debtor's bad act in

6    selling it vermiculite that had asbestos in it, it would never

7    have distributed its own product that people then spread on

8    their yards or whatever happens to the product, and therefore

9    the underlying liability was based on the conduct of the

10   debtor.  I have no problem with 524 in that context.

11         MR. BROWN:  All right.  Well --

12         THE COURT:  That's what 524 is designed to do.

13         MR. BROWN:  -- I just -- so we can keep the argument

14   straight, Your Honor, there is the 524(g) argument --

15         THE COURT:  Yes.

16         MR. BROWN:  -- which you may or may not agree with,

17   and then there's the separate argument is if it's not

18   permissible under 524(g) -- you may believe that it is, Your

19   Honor, respectfully we disagree with that -- the point is is

20   that if you cannot fit it within 524(g), our position is that

21   under Combustion Engineering's rationale you may not use some

22   other vehicle to accomplish what you couldn't accomplish under

23   524(g).

24         THE COURT:  Well I understand the argument but I

25   think Combustion is more narrowly tailored to particular types

**J&J COURT TRANSCRIBERS, INC.**

1  of liability and I'm not certain what this specific liability

2  is.  You're basing it on a contractual indemnity against a

3  third party, but it seems to me that that third party's

4  liability only arises at the outset because of conduct or

5  claims against the debtor.

6          So 524 seems absolutely appropriate under these

7  circumstances.  I don't think I need to go beyond 524.

8          MR. BROWN:  All right.  Well, Your Honor, we

9  respectfully disagree but I just wanted to make sure you

10 understood the argument.  I believe that's it, Your Honor.

11         THE COURT:  Okay.  Mr. Wisler.

12         MR. WISLER:  Good morning, Your Honor.  Jeffrey

13 Wisler on behalf of Maryland Casualty.

14         Your Honor, Mr. Brown went just beyond a successor

15 claims injunction and it sort of ended up being a catchall so I

16 just wanted to say for the record that Maryland Casualty relies

17 on its briefs for the balance of any arguments it didn't make

18 from the podium.

19         Our briefs in total are less than 30 pages.  I hope

20 Your Honor looks at them carefully and kind of playing off of

21 what Mr. Monaco did the other day, asking Your Honor if you

22 don't focus on anything else in our opening post-trial brief,

23 please focus on the evidence we cited to in footnotes 13, 17,

24 and 28.  Thank you, Your Honor.

25         THE COURT:  I'm sorry.  13, 17, and 28?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. WISLER:  Yes, ma'am.

2          THE COURT:  Okay.  Thank you.

3          MR. WISLER:  Thank you.

4          MR. BERNICK:  I just have a very, very brief

5   argument, Your Honor, to close this out.

6          With respect to res judicata Mr. Brown said that it's

7   not apposite.  In fact res judicata -- that <u>Traveler's</u> is not

8   apposite.  In fact it is.  And in the <u>Traveler's</u> case while

9   it's true that there ultimately was a confirmation order in the

10  case that incorporated by reference the prior insurance

11  settlement order, the prior insurance settlement order preceded

12  the confirmation order.

13         And the Court's statement regarding res judicata

14  applied to both of them including the insurance settlement

15  agreement.

16         So the fact that you have a prior agreement before

17  the plan of confirmation doesn't mean that res judicata can't

18  apply to that prior agreement.

19         And in this particular case essentially what is being

20  said is that well, gee, the settlement of the Fresenius case or

21  the settlement of Sealed Air was advisory and not ripe with

22  respect to the findings that the Court made and that can't be

23  right.

24         There was an adversary proceeding.  The adversary

25  proceeding resulted in a settlement.  The settlement resulted

1 in the closure of the adversary proceeding.  The matter was

2 completely and utterly ripe.

3          What made it ripe was that there were a whole series

4 of relationships between the claimants in this case on behalf

5 of the estate on the one hand and Fresenius and Sealed Air on

6 the other.

7          THE COURT:  I don't think the two of you are arguing

8 the same thing.  Mr. Brown's suggestion I think is that the

9 settlement agreement itself did not impose an injunction.  The

10 terms of an injunction were not incorporated into the

11 settlement and therefore --

12          MR. BERNICK:  That's correct.

13          THE COURT:  -- there can't be res judicata to the

14 terms of an injunction that had never been issued and frankly I

15 don't have any problem with that argument, I think it's

16 correct.

17          MR. BERNICK:  That's correct but it's just therefore

18 -- but it's not apposite to the argument that's being made.

19          The argument that's being made is not that in

20 approving the Fresenius and Sealed Air agreements that Judge

21 Wolin actually -- or Fresenius in the case is Judge Wolin -- he

22 actually authorized the issuance of the injunction.

23          That's not the argument.  We're not saying that Your

24 Honor has already been -- it's already been decided to issue a

25 105 injunction.

1           What happened was that the predicates for the

2    injunction, the predicates for the injunction, the necessity of

3    the injunction, the fairness of the injunction, the benefit

4    supporting the injunction, all of those matters were matters

5    that were decided on a final basis in connection with those

6    settlements.  They were ripe issues because they were part of

7    the settlement, they were decided on the merits, they were

8    decided at that time and in connection with an adversary

9    proceeding that was dismissed.

10          So while the approval of the settlement is not the

11   same thing as the issuance of the injunction, the issuance of

12   the injunction didn't take place because there was not a plan.

13          The findings that would support the issuance of the

14   injunction were absolutely before the Court and were actually

15   found and those in fact are final.  So that when you go through

16   the order approving the settlement, the order approving the

17   settlement had to consider the injunctions because the

18   injunctions, the agreement to issue the injunctions or to

19   support the injunctions, to have the injunctions in the plan,

20   were actually part of the settlement.

21          So the approval of the settlement agreement goes

22   ahead and specifically talks about this being in the best

23   interest of the bankruptcy estates and then makes specific

24   findings necessary to the reorganization, substantial

25   contribution being made, fairness.  These are paragraphs xx,

1  yy, zz with respect to Fresenius.

2          So the very tests for the issuance of the successor

3  claims injunction were in fact before the Court, the matter was

4  ripe, there was litigation that was being resolved, and in fact

5  they were further ripe because one of the reasons why this

6  whole thing was approved was to facilitate the continued

7  reorganization of W.R. Grace and all of those findings were

8  made.  All of those findings are what's res judicata.

9          THE COURT:  That's fine.  I'm willing to accept that

10  fact.  I think the issue though is whether the injunction as

11  it's crafted itself carries out the provisions of the

12  Bankruptcy Code.

13          The fact that one should issue, I think you're right,

14  Judge Wolin determined that an injunction, not that it should,

15  but that it could be issued because he made the findings that

16  say that the settlement that says that the debtors will make

17  their best effort to get an injunction are appropriate.

18          So the debtors clearly have to make that effort and

19  the findings that say that that effort should be made and if

20  successful the facts are there, they're adjudicated.  But the

21  specific terms of the injunction were not before Judge Wolin --

22          MR. BERNICK:  That's correct.

23          THE COURT:  -- he made no findings about that and

24  it's not res judicata.

25          MR. BERNICK:  Well but again I think it probably gets

**J&J COURT TRANSCRIBERS, INC.**

1  back to the discussion that we had yesterday which is that

2  we're talking about a successor claims injunction, that is an

3  injunction that has the effect of producing closure for

4  Fresenius including with respect to its non-asbestos

5  liabilities, it covers both asbestos and non-asbestos.  The

6  injunction should issue.

7         If there's some feature of the successor claims

8  injunction in terms of the details of it, though the details

9  were not in fact before Judge Wolin and they're not res

10  judicata.

11         THE COURT:  Right.

12         MR. BERNICK:  And to the extent that there is some

13  particular feature of the successor injunction is how it

14  actually works, yes, that's before Your Honor and we're not

15  saying that the details of the injunction, I mean the terms of

16  the successor claimants and the injunction itself are in the

17  plan.

18         THE COURT:  All right.  You --

19         MR. BERNICK:  Now I will say that the terms track I

20  think almost verbatim exactly what's in the settlement

21  agreement.  So it's pretty hard to say that somehow our

22  successor claims injunction by its terms has deviated from

23  what's in the agreement.

24         It's identical and yet at the same time if Your Honor

25  believes as a matter of exercising your equitable powers

1  something further is necessary, I suppose we have to address

2  that.  But at a minimum we have to maintain the current terms

3  of the injunction because if we fail to maintain the current

4  terms of the injunction then we've got a problem because the

5  settlement terms have not been executed.

6          So what I would say is that, Your Honor, that to the

7  extent that the successor claims injunction tracks the

8  settlement agreement, I believe that those have been decided as

9  a minimum have to be there.  Either both appropriate, it has

10 been decided, and if it's not maintained we got one big problem

11 in going forward.

12         But if there is something further that has to be

13 added to it, I would recognize that the fact that we meet the

14 minimum doesn't necessarily take us to the end.  And if there's

15 something else that Your Honor believes is appropriate, we can

16 certainly deal with that.

17         But I think just to be clear, the predicates under

18 105 have been found.  The terms of the injunction that we have

19 crafted track exactly the language of the agreement that was

20 proved.  And so to the extent that we have done that I think

21 that we're all the way down to that point.  If we end up with

22 something less than that protection then we've got a problem

23 with Fresenius we've got a problem with the deal.

24         If we end up with something more, I don't think

25 Fresenius is going to complain because there's even further

1 protection.

2           THE COURT:  Well I have to take a look at the

3 agreements.  As I said if the only obligation on behalf of the

4 plan proponents or the debtor, the parties to the settlement

5 agreement, is to make a best effort, then the terms haven't

6 been negotiated.

7           I mean the debtor is required if the obligation is on

8 behalf of the debtor to make the effort to get the injunction

9 in place in a, as you call them the minimum language that's in

10 that agreement, then I don't think anybody doubts that the

11 debtor is making that best effort.

12           MR. BERNICK:  Yes, I understand that, Your Honor.

13 But it's not only best effort, the language actually is take

14 all necessary acts so, you know.

15           THE COURT:  The debtor is taking every act available.

16           MR. BERNICK:  I think it's safe to say, Your Honor,

17 that we don't want to be in a position where we're even really

18 creating an issue and that really brings me back to another

19 point that really does have to be made.

20           There's much been made by Mr. Brown on behalf of his

21 clients that, well, I know these Fresenius people, they're

22 cheap, you know, $115 million is not that big of deal compared

23 to Seaton and OneBeacon, my God, there were hundreds of

24 millions of dollars that were put on the table.

25           That doesn't begin to capture the real importance of

**J&J COURT TRANSCRIBERS, INC.**

1  to the estate and the benefit to the estate of the 105.  The

2  105 is ancillary to and critical to being able to get a

3  settlement that produces an agreement by Fresenius to make a

4  contribution to support 524(g) and 524(g) is absolutely

5  critical with respect to Fresenius.  Why?

6        Because we know exactly what would happen if

7  Fresenius didn't have 524(g) protection.  Not only would it

8  unwind Fresenius, it would unwind Sealed Air.  Remember that

9  provision that links these two things so that Fresenius

10 basically is in the position such that if we don't have that

11 deal it unwinds Sealed Air.  And even if it didn't unwind

12 Sealed Air, which it would, Fresenius becomes exposed to all

13 the asbestos claims.

14       This is the critical thing that I think has been

15 missed in the argument that Mr. Brown has made.  The issue is

16 not just what Mr. Finke said which is that there's a common

17 interest, that's not just the thing.

18       The thing is that it's 524(g).  This is 105 is not --

19 doesn't have to be independently supported by the need to bring

20 closure on the environmental claims.  That's certainly a

21 justification, but that's not the real gig.  105 is ancillary

22 to 524(g).

23       The real necessity is getting closure in 524(g) on

24 asbestos and that's what makes the need, the fairness, the

25 necessity overwhelming as to why it's not Continental.  It's

1  524(g) in all of the importance of getting closure to asbestos

2  that justifies and mandates 105.

3       Well, gee, well why don't they just agree to 524(g)

4  without 105?  And the answer is they don't have to.  Now you

5  may say well, geez, then let's expose them to the tort system

6  and have them make the indemnity claims and they could elect to

7  do that.  They may be able to afford to do that.  They may not

8  really care.  They may be prepared to have the indemnities be

9  their answer, the original indemnity.

10       There's only one problem.  Sealed Air goes away as a

11  deal and then Grace is in the crosshairs because everybody goes

12  after Fresenius, Fresenius uses the indemnity, and Grace is

13  back in the drink.

14       So the critical thing here is that you can't look at

15  environmental alone, you can't look at 105 along, you can't

16  look at really Seaton, OneBeacon alone.  You've got to look at

17  it in the context of the necessity of bringing complete closure

18  to asbestos under 524(g).  That is what rolls, makes this thing

19  roll is the 524(g) as being the anchor for the 105.

20       The only two other points and then I'll just, well

21  three points very quickly.  8.5.2 he says, well, we're not

22  really protected under 8.5.2 because it just seems to be kind

23  of a claims allowance process you file.  You file, there's a

24  bar date, you file a claim and he says well, gee, that doesn't

25  really help me because who knows what might happen in the

1 future.  Completely mistook the purpose and intendment of that

2 provision.

3      The purpose and intendment of that provision is to

4 enable them to do what they didn't do before, file a proof of

5 claim.  And the proof of claim doesn't have to be solely with

6 respect to ripe claims, it can be with respect to contingent

7 claims.

8      So all this does is to get them back in the picture

9 so they aren't barred by the bar date from even asserting this,

10 that they can actually make the proof of claim that they say

11 that they weren't aware of at the time.

12      So we solved the bar date problem.  It's not a

13 limitation, it's an implementation feature of allowing the full

14 force of 8.5.2 to be brought to bear.  And we would note that

15 8.5.2 in draft form was sent to these folks for comment.  We

16 never heard the argument they're making here today.

17      With respect to the issue of 524(g), I don't know

18 that there's anything really left of that, but basically it's

19 really the same kind of issue that we had on for all these

20 indemnity claims all along which is if you don't have 524(g)

21 channeling the contract action over Sealed Air and Fresenius,

22 then you actually incentivize claimants against the insurer,

23 against Seaton, OneBeacon to go after them because there's a

24 shot if they got through the channeling injunction with respect

25 to them they'd be able to recover against Seaton, OneBeacon and

1 then Seaton, OneBeacon would have the action over.  So, you

2 know, they're protected.

3     So the whole idea again of 524(g) by picking up

4 indirect claims, it's another indirect claim issue, is to

5 achieve full closure.

6     There's another consequence of not including this

7 under 524(g) which is not only does it create the direct,

8 indirect problem, but once again it would violate the terms of

9 the Sealed Air and Fresenius deals.

10     So in order to preserve this option, not only does it

11 undercut 524(g) direct and indirect, but it also undercuts the

12 settlements thereby it causes the risk of unwinding the

13 settlements and we're back in the drink again.

14     So for all those reasons, Your Honor, we believe the

15 successor claims injunction should issue and we believe that

16 the contractual, so called direct contractual right of action

17 should be channeled, should be covered I should say, by 524(g).

18         THE COURT:  Mr. Brown.

19         MR. BROWN:  Thank you, Your Honor.  I'll be very

20 brief.  Mr. Bernick's initial argument was that the Section

21 105(a) successor claims injunction -- his argument was that the

22 Section 105(a) successor claims injunction is necessary to a

23 524(g) deal.  He also described the Section 105 injunction as

24 being ancillary to 524(g).

25         I think it's important to take a step back and look

1  at what 524(g) is for.  524(g) is for dealing with asbestos

2  liabilities and it allows the debtor and certain third parties

3  to get relief from their asbestos liabilities.  That's what

4  Congress intended.

5       What Mr. Bernick is now arguing is that in order for

6  them to be able to get that, they have to give some other

7  goodies out.  They have to give a 105 injunction out.

8       If Congress had intended that so called ancillary

9  environmental liabilities, whatever that means, should fit

10  within a 524(g) injunction, they certainly could have provided

11  for that, but they didn't.

12       In the CE case that went to the Third Circuit, the

13  105 injunction for Lummus was also ancillary to the 524(g)

14  injunction that was issued in that case and we all know where

15  the Third Circuit came out on that issue, it said you can't do

16  it.

17       Here is what happened if you just take a step back.

18  They negotiated a deal with Fresenius and they negotiated a

19  deal with Sealed Air.  The statute gives them the ability to

20  protect themselves from certain types, most types, of asbestos

21  claims.

22       In order to get a deal Sealed Air and Fresenius said

23  we want more.  We want our ancillary environmental liabilities

24  taken care of.  We want God knows what fits within the

25  definitions that are in these injunctions.  They wanted it.

1        If I were representing them, I would want to get that

2   for my client as well.  It doesn't make it right.  It doesn't

3   make it legal.  And the fact that it's ancillary, whatever that

4   means to the 524(g) protection, is absolutely irrelevant.

5        Again I come back, the test should be 524(e).  But

6   even if it's not, they don't meet the requirements here for a

7   105.  And what they're trying to do is simply get an illegal

8   Section 105 injunction for some non-debtors because that's a

9   deal that they have with them.  That's all this is about.

10        And they want to shift that, the burden of that, onto

11  parties like my clients.  And what they're doing in doing that,

12  Your Honor, is that they're shifting back risk to my clients

13  that my clients negotiated pre-petition to put on those other

14  folks.  And there is no justified reason, the chart that was up

15  here earlier, that indicates that there's indemnification both

16  pre-petition and post-petition.

17        Those parties are fine.  They're covered.  What

18  they're asking my clients to do is to assume the risk that we

19  shifted to them pre-petition and it's not appropriate.  Thank

20  you.

21        THE COURT:  Anybody else?  Okay.  We'll take a ten

22  minute recess and then start with the lender issues.

23        MR. PASQUALE:  Well, Your Honor, before we do.

24        THE COURT:  I'm sorry.

25        MR. PASQUALE:  May I?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          MR. PASQUALE:  Maybe we should talk scheduling if I

3 may.  Ken Pasquale for the committee.  I mean it's 11:15.  My

4 understanding was the Court had a firm 12:00 stop today.

5          We had three hours.  There's absolutely no way we can

6 squeeze it into that time.  I was going to suggest, and Mr.

7 Bernick had not agreed, that maybe Morgan Stanley could go.

8 But even in this time period I'm not sure that can work.

9          THE COURT:  Well let's take a ten minute recess and

10 let me see what I can do.

11          MR. PASQUALE:  Thank you, Your Honor.

12                    (Recess)

13          THE COURT:  Please be seated.  Folks, I can stay

14 until 1:30 and that's it.  If you can get done in that time,

15 fine.  If not, we'll have to continue wherever we leave off.

16 So all I can do I guess is ask you to do your best and we'll

17 see how it goes.

18          MR. LOCKWOOD:  Your Honor, one procedural question.

19 Is the lender -- the lender arguments were the last things on

20 the agenda originally and that presupposes that everything

21 before the lenders has now been done.

22          I would just like to inquire on the record since I

23 may with fond farewells not stay for the lender piece of this

24 if we're through.

25          THE COURT:  I thought that was the case.  Is there

1  something else to be done?

2          MR. BERNICK:  I certainly thought that was the case

3  as well.  The only thing that is a housekeeping matter is that

4  we do have a clip of the demonstratives and the things that

5  were displayed on the Elmo.

6          THE COURT:  Yes.

7          MR. BERNICK:  And we just want to give them to the

8  Court in a notebook form and want to make sure I alerted people

9  to that before we close this off.

10          THE COURT:  That's fine.

11          MR. LOCKWOOD:  Could we just canvas the objectors to

12  make sure that anything that hasn't been argued is being

13  submitted on the papers at this point?  We're happy to do that.

14  I just want to make sure we're all on the same page.

15          THE COURT:  Anybody other than on the lender issues

16  have any other argument to be made?  If so this is the time to

17  speak.  All right.  Nobody's asking for additional argument.

18          MR. LOCKWOOD:  In that event, Your Honor, may I be

19  excused?

20          THE COURT:  Happy new year.

21                    (Laughter)

22          MR. LOCKWOOD:  Same to you, Your Honor.

23          THE COURT:  Mr. Pasquale.

24          MR. PASQUALE:  Thank you, Your Honor.  And I

25  appreciate you finding some more time in your schedule for us

1  today, but I am still concerned.

2          THE COURT:  Then if we don't get done I'll adjourn

3  it.  Let's get started.

4          MR. PASQUALE:  But that's what I'm concerned about.

5  I'm not sure, and I think we're going to start but -- which

6  would mean Mr. Bernick stops halfway or some part through his

7  presentation and then picks up at some later time.  I don't

8  think, to be honest, that that's fair.  I mean I think if we

9  start we should finish and have a commitment that we'll each do

10 an hour.

11         THE COURT:  Then get started.  You're now limited to

12 two hours.  Fine.  Let's go.

13         MR. BERNICK:  Well I think it's actually our, we have

14 the burden, it's our plan, so I think we actually go first and

15 I'll try to set the tone of speed.  So I think we're going to

16 be able to do it.

17         MR. COBB:  Oh, Your Honor, we were under the

18 impression that we were going first.  Your Honor, Richard Cobb

19 on behalf of the bank lenders.  So now things have changed.

20         Our concern was that we would go and then Mr. Bernick

21 would have two weeks or three weeks to prepare a reply and Your

22 Honor then would have missed, you know, obviously the overlap,

23 the intertwining of each side's arguments.

24         It makes no sense given that there are no immediate

25 time pressures to have this closing argument.  But if that's

1  what Mr. Bernick would like to do, the concern is, Your Honor,

2  now that it's going to get to 1:30 --

3          THE COURT:  Well look.

4          MR. COBB:  -- and I am the last to speak.

5          THE COURT:  Folks, look.  I offered yesterday to

6  defer this, to defer something, one of the arguments until the

7  omnibus.  Nobody seemed interested in that.  There's plenty of

8  time to do it on the omnibus.  It's alright with me if we take

9  this issue up at that point in time.

10         MR. FRIEDMAN:  Your Honor, Jeff Friedman.  I am not

11  available.  I am going to be out of the country during the next

12  omnibus.  I can't do it then.

13         I asked Mr. Bernick yesterday whether he wanted to go

14  first or he wanted us to go first.  He said he was indifferent.

15  So I was prepared to go first and --

16         THE COURT:  I'm happy to hear your argument.  What I

17  cannot do is stay beyond 1:30 and the longer we fight about it

18  the less time you have to argue.  So I would suggest that we

19  get started.

20         MR. FRIEDMAN:  So but if Mr. Bernick is going to go

21  first that really kind of messes up the time schedule.

22         MR. BERNICK:  Just let me get going.  I think I'm

23  going to be done in significantly less than an hour and you

24  people can, you know, use up an hour, then we'll have just a

25  very short period of time.  We're spending all this time

1  talking about it instead of making it happen.

2        I'm the one that's at risk as Mr. Cobb indicates

3  because I'm going to go for everything that I'm going to be

4  saying is there so, you know.

5        MR. COBB:  Right, Your Honor, and then at 1:15 when I

6  stand up to talk, Your Honor, then I'm stuck.  Then I'm put in

7  the box short of my 90 minutes that I have to speak.  It

8  doesn't make any sense, Your Honor.  It just doesn't.

9        If Mr. Friedman can't make it, let's pick a date that

10  works for Mr. Friedman and let's get it done in one shot and

11  get it done then.

12        THE COURT:  We are either doing it today or we are

13  doing it at the omnibus or we're doing it a combination of

14  both.  I will take a five minute recess.  You folks work this

15  out.  This is ridiculous.  You're like little kids who have a

16  football and don't know where to throw it.  We're in recess for

17  five minutes.

18                    (Recess)

19        THE COURT:  Please be seated.  Mr. Bernick.

20        MR. BERNICK:  Well we've struggled mightily in the 20

21  minutes that we've devoted to this.  I'm not sure we have an

22  ideal solution but I suppose it will suffice to get us through

23  the day which is counsel for Morgan Stanley is going to make

24  his argument today, I'll respond to it.

25        There is then a preference that people have to not

1  have us limited to the two hours but to reserve the opportunity

2  to go further.  And nobody really wants to be the one who goes

3  first and then has somebody else respond later.

4          If Your Honor tells me to start, you know what --

5          THE COURT:  You folks do realize I've read the

6  briefs.

7                         (Laughter)

8          MR. BERNICK:  I understand.  I will now say, Your

9  Honor, if you tell me to start, I'll start today.

10         THE COURT:  Let's do --

11         MR. BERNICK:  And then we'll just --

12         THE COURT:  -- let's do Morgan --

13         MR. BERNICK:  -- do the rest of it at the omnibus.

14         THE COURT:  All right.  Let's do Morgan Stanley and

15  see how far we go.

16         MR. BERNICK:  Okay.

17         THE COURT:  And what time it is and how much time we

18  have left.

19         MR. BERNICK:  But I'm prepared to, because you

20  changed your schedule, I'm prepared to go forward and use up

21  the time if Your Honor believes that's appropriate.

22         THE COURT:  It doesn't matter.  If we have to adjourn

23  it I'm not uncomfortable adjourning it so that all sides can

24  argue on one day if that makes you feel better.  So let's do

25  Morgan Stanley.

1          MR. BERNICK:  I might actually feel better doing it

2     today, but we'll see.

3          THE COURT:  Good morning.

4          MR. FRIEDMAN:  Good morning, Your Honor.  Something

5     other than asbestos and 524(g) and injunctions.  Jeff Friedman,

6     Katten Muchin Rosenman for Morgan Stanley senior funding.

7     Forgive my voice, Your Honor, I'm getting over a cold.

8          Your Honor, there is no question that the treatment

9     afforded to Class 9 claimants under the plan is a traditional

10    cash out.  The plan pays any Class 9 claimant with an allowed

11    claim in full on the effective date plus post-petition interest

12    with the exception of one claimant that I know of and that's

13    Morgan Stanley.

14         Morgan Stanley despite having a Court approved

15    allowed claim will not be paid any post-petition interests on

16    the effective date.  Morgan Stanley will receive no

17    post-petition interest on its allowed claim unless and until it

18    prevails in post-effective date litigation, it could take years

19    to complete.

20         THE COURT:  Why would it take years to complete --

21         MR. FRIEDMAN:  Well, Your Honor --

22         THE COURT:  -- litigation on the interest?

23         MR. FRIEDMAN:  -- because there's two levels of

24    appeal above Your Honor potentially.

25         THE COURT:  Well, look, if you folks need to

1  negotiate an interest rate, why don't you go negotiate an

2  interest rate?  Everybody's been settling, the plan has been

3  modified several times since confirmation.  I don't know what

4  the big deal is.

5        If Morgan Stanley's entitled to some interest there's

6  a minimum rate that's already established in this class and I

7  understand there's a dispute with respect to the lenders, but

8  at the moment there's a maximum rate.  This isn't rocket

9  science, folks.

10        MR. FRIEDMAN:  Your Honor, Morgan Stanley and the

11  debtor have so far been unable to come to terms on a

12  compromise.

13        MR. BERNICK:  Well just so the Court is familiar and

14  I will not go very far down this road, but Your Honor can be

15  assured that both sides, and I'm indicating Mr. Cobb and his

16  clients and Mr. Pasquale on behalf of the committee, have

17  understood Your Honor to have that view and we've had that view

18  ourselves for a long, long time.

19        And there have been recent efforts, very vigorous

20  recent efforts to also come to conclusion and, you know, it's

21  just they have not produced a result and there's a lot of money

22  that's at issue unfortunately.

23        So it's just not been possible to get there.  We

24  would not be taking up Your Honor's time if there was any

25  prospect that people are getting close to being on the same --

1          THE COURT:  Well I understand that as to the other

2     issues that are I'll call it ripe because the plan does state

3     an interest rate.  Morgan Stanley made this election to go this

4     route and if it wants to back out what difference does it make

5     to the debtor if you can come to some negotiated agreement?  I

6     mean --

7          MR. BERNICK:  I would also agree with that but

8     they've not been interested in doing anything but to say that

9     they're not prepared to stand by their election period.  They

10    want everything that everybody else has and, you know, it's

11    kind of like they have already gotten more than the benefit of

12    the bargain.  They've gotten the opportunity to stay on the

13    sidelines and now they're asking for the opportunity to come

14    back in.  That was not the deal.

15         We're not saying we're not going to negotiate with

16    them, we're prepared to, but that's not --

17         THE COURT:  I understand it wasn't the deal, but

18    there have been plan modifications and so the exact terms of

19    deals are not necessarily as they were when this process

20    started.  I don't see why you folks can't come to some

21    agreement.

22         If you want to, if Morgan Stanley that is, wants to

23    eliminate the possibility of years of appeals.  Otherwise

24    present your argument if you don't want to negotiate and you'll

25    have to live with the bargain you made.

1           MR. FRIEDMAN:  Your Honor, two points.  First we are

2     prepared to negotiate.  My client and the debtor have not come

3     to terms and I'm not sure how to deal with it.  I think there's

4     no question that had we agreed on terms there would have been

5     no need for the post-effective date litigation.

6           We opted into that for the simple reason, Your Honor,

7     that just as you wouldn't want to hear 1,000 asbestos cases, we

8     didn't think in connection with confirmation you would want to

9     hear potentially hundreds of creditors litigating over their

10    interest rates.

11          So it made perfect sense to us that there was a

12    process to deal with these disputes outside of the confirmation

13    hearing so our election wasn't, well, we're going to waive all

14    of our plan objections for the privilege of having this.  We

15    just thought it made sense not to try to litigate one on, one

16    off issues before Your Honor in the context of a confirmation

17    hearing and I'm not trying to do that today.

18          MR. BERNICK:  But --

19          MR. FRIEDMAN:  I do have problems with the plan as

20    it's written insofar as it applies to Morgan Stanley --

21          THE COURT:  Okay.

22          MR. FRIEDMAN:  -- and I would like to address those.

23          MR. BERNICK:  Well let me be clear.  We're not asking

24    that Morgan Stanley waive anything and the plan says that this

25    issue under their election gets litigated later on.  We're

1  prepared to stand by that and not argue that somehow Morgan

2  Stanley has waived anything whatsoever.

3          So our only issue with Morgan Stanley is that it's an

4  issue for another day.  And I don't know why they can't -- if

5  we go ahead and litigate with the other folks to conclusion,

6  Your Honor resolves this issue one way or another, Morgan

7  Stanley can take a look at the results of all of that and

8  decide essentially, well, do they want to piggyback on it.

9          If they want to piggyback I don't think Your Honor is

10 going to change your mind on the fundamental common interests

11 just because Morgan Stanley wasn't involved to begin with.  So

12 we are completely prepared to say that they haven't waived

13 anything of substance with respect to this issue and all that

14 we're suggesting is that they stand aside as they agreed to do

15 before and let us duke it out with the people who are proper

16 objectors at this point in time.

17         If they've got some other issue specific to Morgan

18 Stanley that they want to resolve under, you know, detail or

19 whatever like that, we're also happy to do that.

20         But what we're not happy to do is to simply have

21 people who made an election now decide, well, they don't like

22 the election so they want to get back in the action.  We don't

23 think that that's appropriate.  We're prepared to settle that

24 too.

25         MR. FRIEDMAN:  Your Honor --


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  But to have Morgan Stanley come in and

2     make what are effectively identical arguments to all the

3     arguments that these folks are making and taking up frankly the

4     Court's time and our time doing it when they made the election,

5     makes absolutely no sense at all.

6          THE COURT:  Okay.  That's beyond what I was saying.

7     I think you folks need an opportunity to try to settle this

8     interest rate issue.  There are a number of interest rates out

9     there.  The Court's going to have to determine in connection

10    with the post-petition default rate under a contract perhaps

11    yet another one.  Who knows how that's going to come out.  I

12    don't know how that's going to come out.  Morgan Stanley

13    certainly could elect into any of those or negotiate a

14    different one with the debtor.

15         I'm ordering you folks to mediation on this issue.

16    I'll hear your argument, but I'm ordering you to mediation on

17    this issue.

18         MR. FRIEDMAN:  Understood, Your Honor.

19         THE COURT:  What's the amount of Morgan Stanley's

20    claim?

21         MR. FRIEDMAN:  The amount of Morgan Stanley's claim

22    is in the $16 million area.  Just so you know, Your Honor, the

23    interest spread, the difference between the 4.19 rate that

24    would otherwise be applicable if the debtor's position is

25    correct and the one single contract rate that is in Morgan

1  Stanley's contract.

2          Morgan Stanley doesn't have a default and a

3  non-default rate.  It simply has one rate in its contract,

4  prime plus three.  That differential over the time period we're

5  talking about is about $6 million.  So it's real money and

6  that's, you know, we've been unable to come to terms.

7          THE COURT:  This case has settled billions of dollars

8  let alone $6 million.  I'm sorry, I don't mean to be jaded

9  about it but, you know, the extra three zeros at the end really

10  are not going to make a difference in whether or not the claim

11  can be settled.  Okay.  Go ahead.

12          MR. FRIEDMAN:  Okay.  Well, Your Honor, we don't

13  think that by making this election we waived plan objections

14  and we think that the plan has got defects that render it

15  unconfirmable and that's what I'm prepared to take the Court

16  through and I think that I have roughly 20 minutes subject to

17  any questions and comments Your Honor may have.

18          MR. BERNICK:  Okay.  Twenty minutes?  Okay.

19          MR. FRIEDMAN:  So as I was saying, Your Honor, under

20  the plan as written Morgan Stanley because of this election

21  bearing in mind that the actual plan provision isn't effective

22  unless Your Honor confirms it, but Morgan Stanley gets no post-

23  petition interest on its allowed claim until the litigation is

24  over.

25          It's the only creditor that gets no post-petition

1  interest.

2           THE COURT:  It's the only one that made that

3  election.  That's Morgan Stanley's issue.  The plan was written

4  that way.  The plan is appropriately written that way.  I don't

5  see a basis to deny confirmation on that basis.  Morgan Stanley

6  made the election, the plan provided for it.  The plan can

7  provide for elections for creditors.

8           MR. FRIEDMAN:  But that's not unimpairment, Your

9  Honor, and that's what they're arguing.  That does not leave

10  Morgan Stanley unimpaired and that's their --

11          THE COURT:  So your client wasn't permitted to vote?

12          MR. FRIEDMAN:  Our client voted.

13          THE COURT:  Okay.

14          MR. FRIEDMAN:  Okay.  And then it's a question of

15  what that provides under Class 9 which I'm prepared to talk

16  about as well which is that I think that to the extent that

17  Class 9 is impaired then Morgan Stanley and every creditor in

18  Class 9 is required to be tested against the cramdown standards

19  in Section 1129(b) and we think post-petition interest on

20  allowed claims on the effective date is going to be required

21  because equity is walking away with between 400 and $800

22  million according to the disclosure statement that the debtors

23  and the plan proponents signed.

24          Your Honor knows I think that 1124-3 was eliminated

25  from the code as a result of the New Jersey Bankruptcy Court's

1  decision in the New Valley case where the Court denied

2  post-petition interest to creditors who were being cashed out

3  despite substantial value being retained by the equity holders

4  in that case.

5          And as a result the class that was going to be cashed

6  out on the effective date of a plan was deemed impaired, had

7  the right to vote, and if it rejected that treatment had the

8  right to have that treatment tested under 1129(b).

9          Since the elimination, Your Honor, of 1124-3, the

10  Third Circuit in PPI Enterprises has said that a cash out that

11  constitutes unimpairment is nevertheless possible under 1124-1

12  so long as post-petition interest is paid.

13          And it has nothing to do with solvency, it has

14  nothing to do with insolvency, 1124-1 requires post-petition

15  interest to be paid.

16          The Third Circuit in that decision said it agreed

17  with Judge Walsh who rendered the Bankruptcy Court's decision

18  in that case.  And that is found at 324 F.3d 197, 207.  The

19  Third Circuit adopted Judge Walsh's conclusion that Congress

20  was really concerned when it repealed 1124-3 with the payment

21  of post-petition interest on these cashed out claims and that

22  so long as post-petition interest is paid 1124-1 can be used to

23  cash out creditors.

24          Judge Walsh earlier that year in the Ace-Texas case

25  had already held that under Section 1124-1 post-petition

1  interest is payable in accordance with the terms of the

2  underlying agreement and unless it was the claim was impaired.

3  And Judge Walsh in the <u>Ace-Texas</u> case cited with approval Judge

4  Queenan's treatise.

5       The decision goes on to say that when the agreement

6  requires a higher post-default rate of interest, the higher

7  rate must be paid and that any other treatment would alter the

8  creditor's rights in violation of 1124-1.  And that's

9  <u>Ace- Texas</u>, Your Honor, found at 217 B.R. 719, 727.

10      Though Congress in repealing 1124-3 understood that

11  if the <u>New Valley</u> facts were measured against the cramdown

12  standards in 1129(b), absolute priority which is codified in

13  1129(b) by the fair and equitable requirements, would require

14  the payment of post-petition interest where equity holders were

15  receiving and retaining value on account of their equity

16  interests.  This is undisputedly the case here.

17      So one thing is clear, Your Honor, that where equity

18  holders are retaining their valuable equity interests,

19  unimpairment of a class of unsecured claims or the cramdown of

20  a class of unsecured claims, both require the payment of

21  post-petition interest in order for the plan to be confirmable.

22      Now we submit and I think <u>PPI</u> stands for the

23  proposition that 1124-1 requires the payment of post-petition

24  interest irrespective of solvency.  We don't think you need to

25  reach that issue in this case.

1          So the underlying predicate's in place.  Equity

2   holders are getting between 400 and $800 million in value

3   according to the disclosure statement and the payment of

4   post-petition 9 interest -- excuse me -- post-petition interest

5   to claimants in Class 9 either because they're unimpaired or

6   because they're not and Class 9 has voted to reject the plan

7   and is entitled to cramdown treatment.  Either way a

8   post-petition interest is payable.

9          So the only question then becomes, Your Honor, what

10  post-petition interest rate should apply?  And I will not

11  belabor here a point that's been made numerous times to the

12  Court.  It's in our briefs, it's in the committee's briefs,

13  it's in the lender's briefs.

14         Merely to preserve it for the record, we urge the

15  Court to adopt a plain meaning of the language found in 1124-1

16  and find that for our legal, equitable, and contractual rights

17  to be left unaltered, that whatever interest rate is in the

18  contract has to control.

19         In Morgan Stanley's case there is only one interest

20  rate.  It's not before the Court today.  The debtor is arguing

21  that because that rate looks a little like a default rate they

22  don't have to pay it to leave Morgan Stanley unimpaired.

23         We think cases like Dow Corning in the Sixth Circuit

24  are correct and hold that for creditors to be unimpaired under

25  1124-1 where equity is retaining their equity interests, the

1  debtors have to simply comply with the underlying contracts

2  including whatever rate of interest is provided for in that

3  contract.

4         Moreover, Your Honor, we think the cramdown rate of

5  interest, should the Court determine that Class 9 is in fact

6  impaired, should be the rate provided for in the underlying

7  contract consistent with the absolute priority rule and

8  irrespective of the label put on that interest rate.

9         Nevertheless, Your Honor, if creditors are found to

10  be unimpaired and disenfranchised because they don't get to

11  vote, then we think it would be highly inequitable and really

12  offensive to Congress's intent in repealing 1124-3 if the

13  post-petition interest payable under 1124-1 was not at least

14  equal to the post-petition interest that would be required to

15  be paid under the cramdown provisions of 1129(b) where equity

16  is retaining value.

17         Now the plan proponents, Your Honor, seem to sort of

18  halfheartedly argue that 502(b)(2) dealing with claims for

19  unmatured interest is somehow controlling or relevant to the

20  facts here and that any post-petition interest being given to

21  Class 9 here is sort of a gift everyone in Class 9 should be

22  grateful for even though equity is retaining 400 to $800

23  million.

24         In PPI Enterprises, Your Honor, the Third Circuit

25  held that a landlord's claim is capped by statute and that

1  doesn't constitute unimpairment for 1124 purposes.

2          Yet in that very same decision agreeing with Judge

3  Walsh the Third Circuit found that Section 1124-1 mandated the

4  payment of post-petition interest on an unimpaired creditor's

5  allowed claim presumably notwithstanding 502(b)(2).

6          Morgan Stanley submits that post-petition interest

7  payable by solvent debtors is a very different issue from the

8  landlord cap issue that PPI was addressing in the Third

9  Circuit.

10          It has been well established in the context of

11  absolute priority case law and has really been the law for

12  close to 60 or 70 years.

13          In our post-trial reply brief, Your Honor, we covered

14  the history of the provision in Section 502(b)(2) disallowing

15  claims for unmatured interest.  It's been recognized by

16  numerous Courts including the Supreme Court that it was

17  intended both as an administrative convenience to avoid

18  constant recomputation of interest and to prevent disparate

19  treatment among otherwise similarly situated creditors, some of

20  whom might have better contractual interest rates than others.

21          It was not intended to benefit equity holders at the

22  expense of creditors.  And our post-trial brief at Pages 3

23  through 6 discusses this case law.

24          We also know that in addition to the long line of

25  cases requiring post-petition interest to be paid where a

1 solvent debtor is involved the Bankruptcy Code itself makes

2 clear that 502(b)(2) isn't an absolute bar to post-petition

3 interest as I think the debtors acknowledge.  It's found in

4 726(a)(5) made applicable by the best interest test, it's found

5 in 506(b), you know, we respectfully refer the Court to Judge

6 Walrath's decision in the Coram Healthcare case at 315 B.R. 321

7 which we think covers this law pretty well.

8      As our post-trial reply brief makes clear, Your

9 Honor, absolute priority stems from the well established

10 principle that equity holders are last in line.  And if I can

11 convince the Court to do anything as it goes through these

12 issues it's to analyze whether the Bankruptcy Code changes that

13 fundamental precept that equity holders have signed up to be

14 last in line.

15      Clearly outside of bankruptcy Morgan Stanley, the

16 lenders, everyone would get whatever their contract provided in

17 terms of interest.  So the question that the Court has to ask

18 itself is whether the Bankruptcy Code has altered that and we

19 submit it has not where equity holders are receiving 400 to

20 $800 million value.

21      So it's clear from PPI Enterprises and the other

22 cases we cite in our briefs that post-petition interest is

23 payable on allowed claims on the effective date and that's

24 mandatory for unimpairment to exist.  Yet, Your Honor,

25 supposedly because of the election somehow the debtor gets to

1  avoid paying Morgan Stanley anything on the effective date with

2  regard to interest, and that's just wrong as a matter of law.

3        They're free to argue, according to them, that Morgan

4  Stanley is entitled to no post-petition interest, and that

5  can't be, if Your Honor decides, as we think you must, that the

6  post-petition interest is required either under unimpairment

7  under 1124(1), or under 1129(b) under cram down standards where

8  equity is retaining this kind of value.  So, if everyone is

9  entitled to post-petition interest on an allowed claim on the

10 effective date for the plan to be confirmable, they can't put a

11 provision in the plan that says merely because they dispute the

12 ultimate rate that may be payable to Morgan Stanley we can pay

13 zero on the effective date.  That's not a question of an

14 election, Your Honor.  It's something, again, Morgan Stanley

15 just didn't see burdening the Court with potentially hundreds

16 of litigations that frankly the Court wouldn't have heard as

17 part of a confirmation hearing.  So, we do think that whatever

18 happens here, some minimum amount of interest, if the Court

19 doesn't determine that the contract controls, period, some

20 minimum amount of interest is going to have to be determined by

21 the Court to be due to every claimant in Class 9, including

22 Morgan Stanley, on the effective date of the plan, with the

23 only requirement that there be an allowed underlying claim, not

24 an issue with respect to Morgan Stanley, which has an allowed

25 underlying claim.

1            I want to touch very briefly, Your Honor, on the

2    issue of solvency, because I know the lenders are going to deal

3    with it at great length.  Morgan Stanley's position remains

4    that the issue of solvency does not have to be reached, that

5    1124(1) requires post-petition interest to be paid irrespective

6    of solvency, and that in a cram down context Morgan Stanley

7    submits that the only issue under 1129(b) is whether equity is

8    retaining property on account of its equity interests, and once

9    that's the case, then a rejecting class of unsecured claims has

10   to be paid its allowed claim plus post-petition interest.  We

11   cite numerous cases where this has been viewed colloquially as

12   solvency.

13           Now, there is no case that we could find explicitly

14   saying that because equity holders retain property they're

15   solvent; we do believe, however, it's a fairly elemental

16   accounting principal that where equity is retaining four

17   hundred to $800 million of value, by their own admission, that

18   the debtors' assets necessarily exceed its liabilities.

19           It's important to note, however, Your Honor, that

20   nobody in this case is claiming that the debtors are insolvent.

21   Nobody is claiming that the debtors are insolvent, and there is

22   no basis in the record for a finding of insolvency.  The bank

23   lenders, the committee, Morgan Stanley all contend that the

24   debtors are solvent.  It's in the briefs.  I'm not going to --

25   I'm going to let the lenders carry that water.  And the

1  effective date is the date on which it must be tested.

2         The plan proponents contend that it's impossible to

3  state whether the debtors are solvent or insolvent prior to the

4  effective date but they concede that as of the effective date

5  the debtors will be solvent.  The problem with the plan

6  proponents' argument, Your Honor, is that in order to confirm

7  the plan they undeniably have the burden of satisfying each and

8  every element in Section 1129, and what they're suggesting is

9  that equity holders are free to retain between four hundred and

10 $800 million in value even if the plan proponents cannot

11 satisfy their burden to demonstrate solvency, and that's simply

12 wrong as a matter of absolute priority and the case law that we

13 cite in our briefs.  There is nothing, and we could find no

14 case suggesting that this bizarre middle ground staked out by

15 the debtor that we can't tell whether we're insolvent or

16 solvent, which we think is sort of the equivalent of flipping a

17 coin and having it land on the edge.

18        There's no case law that justifies allowing equity

19 holders to retain four hundred to $800 million on account of

20 their equity interest without paying post-petition interest to

21 unsecured creditors, either under 1124(1) or under 1129(b).

22        They have the burden to prove solvency.  As the

23 Bankruptcy Court said in the Toy & Sports Warehouse case in the

24 Southern District of New York, and I'm quoting, "Implicit in

25 the absolute priority rule is that stockholders cannot

**J&J COURT TRANSCRIBERS, INC.**

1 participate in a reorganization unless it is established that

2 the debtor is solvent." That case is found at 37 BR 141.

3 While there is clearly a dispute over the quantum of a post-

4 petition interest payable under these circumstances, Morgan

5 Stanley submits that the payment of zero in respect of its

6 allowed claim on the effective date is simply impermissible.

7 The last issue, Your Honor, I'm going to touch upon

8 is, very quickly, is Section 1123(a)(4), and that simply

9 requires that in order for classification of claims to be

10 proper, all claims within a given class must be provided with

11 the same treatment.  Morgan Stanley submits that it's

12 impossible to look at the interest treatments in Class 9, in

13 3.1.9 of the plan, and the treatment of post-petition interest

14 that varies from the banks, to environmental claimants, to

15 claimants who have a contract that has a non-default rate,

16 claimants with contracts having no non-default rate, to the

17 Morgan Stanleys, who have opted to elect to litigate this issue

18 after the effective date.  There are five, or maybe six

19 different treatments of interest.

20 To put it another way, if every one of those

21 different treatments had a claimant with a hundred dollar

22 allowed claim, what the debtors say is on the effective date

23 you guys get a hundred eight, this group gets a hundred and

24 four, you get a hundred and five, Morgan Stanley, you get a

25 hundred.  And that can't possibly be the same treatment.

1  There's no definitional support for such disparate treatment of

2  the interest rates in those six mechanisms to meet 1123(a)(4),

3  and the plan needs to meet 1123(a)(4), whether it's

4  unimpairment or impairment.

5          Your Honor, unless you have questions, I have nothing

6  else.

7          THE COURT:  I don't.  Thank you.

8                      (Pause)

9          MR. BERNICK:  Your Honor, I'm going to respond to

10 Morgan Stanley's argument very briefly, and then I will, in

11 fact, if Your Honor is inclined to hear the argument in

12 principle, I'll give the argument in principle.  I have about

13 two minutes on Morgan Stanley with respect to Morgan Stanley's

14 specific matters, but I'm prepared to go forward and give the

15 rest of the argument, and these gentlemen then can spend all of

16 their waking moments between now and the omnibus thinking about

17 what to say, although I think they'll probably -- they've

18 already decided what to say.  So --

19         THE COURT:  Gentlemen?

20         MR. COBB:  Your Honor, Richard Cobb.  If he's

21 prepared to go forward this afternoon, he can certainly start.

22         THE COURT:  Mr. Pasquale?

23         MR. PASQUALE:  Of course, Your Honor.  That's fine.

24         THE COURT:  Okay.  That's fine.

25         MR. BERNICK:  First, with respect to Morgan Stanley

1  I'm not going to respond to much of what Morgan Stanley has to

2  say specifically on the merits of the default interest issue

3  because it's really no different from what the lenders and what

4  the unsecured creditors' committee are saying.  But with

5  respect to Morgan Stanley specifically, they did make an

6  election.  That election is binding.  And not only should the

7  election -- not only is the election binding, which then means

8  that their issue is not really up for determination, but it

9  also means that the plan itself does not impair them.  Why?

10 Because whatever the rate of interest is that Your Honor

11 determines, if there is any rate of interest that is owing to

12 Morgan Stanley with respect to their claim is to be paid.  So,

13 because they are getting hundred cent dollars with respect to

14 whatever the outcome of that litigation is, they are completely

15 unimpaired.  The plan provides interest with respect to those

16 who elect to opt into the plan.  With respect to those who

17 choose to litigate and don't want to litigate now, they

18 litigate later.  And then whatever the outcome is, it is.  So,

19 they are getting hundred cent dollars.  They are not impaired.

20 We have no real need to take up any matter with respect to

21 Morgan Stanley, and therefore our position is that they don't

22 have the ability to object to the plan.  They don't have the

23 ability to not only object to the plan, they don't have the

24 ability to invoke any of what they seek to invoke in objecting

25 to the plan because they're not impaired to begin with.

1              What I'd like to do is to make the overall argument,

2    and in service of that I've tried to capture what I'll call a

3    road map here.  And, Your Honor, we'll furnish this in slide

4    form to the Court, as well.  And the reason that I thought this

5    was appropriate is that originally we were kind of at pains to

6    set up a sequence of issues to present to Your Honor, and in an

7    order such that if Your Honor resolves some of the earlier

8    issues they could be dispositive of the entire matter.  And so,

9    we proceeded first with default and the issue of allowability.

10   The issue of allowability was taken up in connection with our

11   claim objection, or the -- our objection to their claim, and

12   the briefing that took place then.  We then had impairment,

13   which was phase one, and then fair and equitable, which was to

14   be phase two.

15             Now, as it happens, the matters are still pending

16   before the Court, and the Court obviously is still free to

17   follow that same sequence.  Indeed, we urge the Court to follow

18   that sequence and find that if at any step they fail to clear a

19   hurdle, it's time to stop and the matter is over.  But the

20   other reason -- so, for that reason we want to preserve this

21   basic sequence, or order of operations.

22             The order of operations is also important because

23   it's often very difficult to keep track of exactly where you

24   are in the Code as you take a look at the cases and take a look

25   at the precedents because there are linkages between these

1 different elements, particularly with respect to impairment.

2 You don't get to fair and equitable unless there's impairment

3 under the plan.  So, I'm going to proceed in accordance with

4 the same basic sequence, from default, to allowability, to

5 impairment, and to the fair and equitable requirement.

6        We did, however, try to also incorporate in this

7 chart the fact that Your Honor already has addressed certain of

8 these issues.  So, what we've indicated here with these red

9 boxes and answers are those issues as to which Your Honor

10 already has spoken, whereas the yellow items, the yellow items

11 are items where we think that the issue perhaps has been

12 addressed in some fashion, but actually has not been decided by

13 Your Honor in Your Honor's opinion.

14        Now, I say decided by Your Honor in Your Honor's

15 opinion.  We understand that Your Honor, having issued that

16 opinion, said, look, this is my opinion, but I'm still -- the

17 record is still evolving, and therefore in a sense nothing is

18 final.  Indeed, that was our view, as well, is that there are

19 other matters that had to be decided.  So, when we say that

20 Your Honor already has addressed and decided these things,

21 we're not being presumptuous.  We're simply saying in the

22 opinion it is actually addressed.  So, for all those reasons

23 we're not going to -- I'm not going to talk at any length about

24 any of the matters that are actually decided by the opinion,

25 but rather focus on the yellow squares on your chart and simply

1  move through those.  And I think that that will enable us to

2  move pretty quickly.

3          First, beginning with default, was there a default?

4  There have obviously been several theories that have been

5  proposed on the basis of which argument is made that there was

6  a default.  Your Honor has addressed the question of whether

7  the Chapter 11 filing itself constitutes an enforceable event

8  of default.  Your Honor has addressed the question of whether

9  there was a non-monetary default.  Your Honor has also

10 addressed the question about whether the failure to pay post-

11 petition interest is a default.  In all cases the answer is no.

12         The only remaining issue was, well, what about the

13 failure to pay post-petition principle -- principle post-

14 petition?  And Your Honor didn't actually address that, because

15 as you indicated after the opinion was issued, you were under

16 the impression that those payments were, in fact, made.  And it

17 turns out that they were not.  And so, we spent some time

18 talking about whether the failure to pay principal post-

19 petition was an event of default.  And the answer is that this

20 is a relatively easy contention to deal with, and the fact is

21 in the case that Your Honor has cited in your opinion.

22         Showing you PL -- PPCL030, the basic question that

23 we're addressing here is whether failure to pay principal post-

24 petition is a default, and essentially what we've done is to

25 aggregate here what the Code says in numerous places and the

1  case law says really is the overall principle that drives all

2  the answers that you've already given.  Chapter 11 filings, not

3  in event of default, non-monetary defaults, no post-petition

4  interest, they all really reflect the same principal, which is

5  that once the Chapter 11 is filed the obligations to make

6  payment are suspended, period.  That's the force of 363(a),

7  automatic stay.  It's the force of 363(b), payments outside the

8  ordinary course.  It's also the force of the case law.  And the

9  In Re Nextwave decision is, in fact, the decision that Your

10 Honor cited, as well as the ipso facto clauses.

11         So, the concept is that there really is a safe haven.

12 The assets of the estate need to be preserved.  If you allowed

13 interest to accrue, if you allowed payments to have to be made,

14 or if you allowed the failure to make payments in principal to

15 trigger an obligation to pay greater interest, what you're

16 essentially saying is that, well, you ought to pay the

17 principal.  In other words, if you're going to be penalized for

18 not paying principal, then you've got to pay the principal.

19 The whole idea is that you shouldn't have to do any of that

20 because that's the whole purpose of Chapter 11.  And in fact,

21 the opinion -- there is an opinion that deals specifically with

22 the question of post-petition payments of principal.  Your

23 Honor, in your opinion, and this is an excerpt from the May

24 19th, 2009 opinion, says, "Furthermore, non-payment of post-

25 petition interest is not a default," and you're citing the age

1  old rule in bankruptcy, but you're also citing <u>In Re Nextwave</u>

2  <u>Personal Communications</u>.  We have a parenthetical that says

3  failure to make post-petition payments cannot be deemed a

4  default.  Well, in point of fact, <u>Nextwave Personal</u>

5  <u>Communications</u> involved not simply the payment of post-petition

6  interest, but also principal.  So, the square holding of <u>In Re</u>

7  <u>Nextwave Personal Communications</u> is completely consistent with

8  our construction of both the Code and the philosophy behind the

9  Code, which is that everything becomes suspended, the

10 obligation becomes suspended, including the obligation to make

11 post-petition payments of principal.

12        THE COURT:  I just think the record should be clear

13 that these are unsecured claims.

14        MR. BERNICK:  Yes.

15        THE COURT:  Okay.

16        MR. BERNICK:  All of them are unsecured claims.  Now,

17 what does that mean?  It means that if that is all true, we

18 come to a point where the analysis can stop.  We don't need to

19 proceed any further.  That is a dispositive issue, and it's

20 very, very easy to resolve.  It's the first of the stops.

21        If we go to the next step, which asked the question,

22 well, is interest allowable -- post-petition interest allowable

23 at the default rate?  Which presumes that there has been a

24 default.  The question then becomes, well, what about post-

25 petition interest?  Is it allowable?  And is it allowable at

1 the default rate?  Because the plan actually does provide for

2 post-petition interest.  It just doesn't provide at the level

3 that would be provided -- that would be required under the

4 default provisions of the contract.  That's where we had a very

5 extended briefing process in connection with the objection

6 briefs, and Your Honor again has resolved these matters really

7 in their totality.  Does 502 -- is post-petition interest,

8 allowable under 502 the plain language of 502 says absolutely

9 not.

10         Are there exceptions to 502?  And the answer is that

11 there are exceptions to 502, and there are two exceptions that

12 are specifically identified, and Your Honor's opinion is very

13 clear about this.  You have two exceptions.  One is Section

14 506(b), which is the oversecured creditor.  And the other is

15 under Section 726(a)(5).  Those are the two basic exceptions.

16 The over secured creditor provision, 506(b), does not apply.

17 For a Section 726 exception you have to have two things.  One

18 is solvency, and the other, then, is to then determine, well,

19 if there is solvency what's the rate of post-petition interest

20 that needs to be paid?  And the answer to that is the federal

21 judgment rate.  So, even if you go to Section 726 and you

22 assume that solvency has been shown, which has not been, you

23 still don't get to the default rate of interest.  The answer to

24 that question is no.  And your opinion was very clear in so

25 stating that Section 502, this is at Page 6 carried over to 7.

1  Section 502(b) prohibits allowance of unmatured interest as

2  included within an allowed claim.

3        There are two exceptions to 502(b).  One is under

4  506(b).  The other is under 726(a).  Lenders are unsecured, not

5  oversecured, and therefore 506 does not apply.  That takes care

6  of the first one.  The second one -- "Section 726," this is now

7  reading from Page 9 and 10 of your opinion, "provides that if a

8  debtor is solvent, interest is to be paid at the legal rate,

9  not at the contract default rate.  There are three approaches

10 to the definition of legal rate.  Regardless of which would be

11 selected here, none would be a default rate."  That's what you

12 already decided, which then means that once again we get to the

13 analysis of allowability, and there is a stop sign.  We are

14 over and done with the analysis.

15       Things then get a little bit interesting, at least

16 apparently, when it comes to impairment.  Again, we don't need

17 to get to that, but if we do get to that what about impairment?

18 Is there impairment by the plan by reason of not providing for

19 default interest?  And the answer to that question is no, and

20 it's actually a fairly simple analysis that's been made very

21 complicated by various exercises with respect to the PPI

22 decision.

23       The only reason to analyze impairment, of course, is

24 that it's a gateway issue to the fair and equitable analysis,

25 which is the only analysis on the basis of which the lenders

1  and the unsecured creditors can get above the federal judgment

2  rate, which we already exceed in the plan.  So, they've got to

3  clear the hurdle of impairment.  If you ask about whether there

4  is impairment by the plan, <u>PPIE</u> clearly says that there has to

5  be impairment by the plan.  It can't then simply be impairment

6  by reason of operation of law.  The analysis really ought to be

7  very simple, and ought to be driven by 502 and the exceptions

8  to 502.  That is to say if you look at <u>PPIE</u>, there is no

9  question, everybody agrees that you have to have impairment by

10  the plan, that limitations imposed by the Code do not equal

11  impairment.  That is <u>PPIE</u>, plain vanilla reading.  I know my

12  colleagues will not disagree with that part of <u>PPIE</u>.  So, the

13  question then becomes, well, what about default interest?  Is

14  default interest limited or foreclosed only by the plan?  Or is

15  it also limited and foreclosed by the Code?  It ought to be

16  pretty simple.

17        So, the question then becomes under the Code do you

18  get default interest?  And the answer is, under the Code, see

19  where we were just now, you don't get default interest.  You

20  generally don't get interest at all, and even if you fall

21  within an exception all you get is the federal judgment rate.

22  And the fact that <u>PPIE</u> says to answer the question is the

23  limitation imposed by the Code, you go to the applicable

24  statute, and the applicable statute, which is the Code, is

25  Section 502, and the exception to 502.  So if, in fact, default

1  interest is not allowed by Code, then we know -- it follows

2  like from night -- as night does from day, you don't have

3  impairment.  It's a very, very simple equation.  It is kind of

4  a syllogism.

5          So, what does that mean?  It means that the analysis

6  that we went through for purposes of determining whether

7  default interest was allowable under 502 and the exceptions of

8  502, that is the Code, and the answer is no, is not only

9  dispositive of allowability, it also means that there is no

10  impairment by virtue of the plan.  It's a limitation imposed by

11  law.  The analysis is absolutely plain and simple, and you get

12  a stop sign.  And that actually makes a lot of sense because

13  if, in fact, the Code does not allow post-petition interest at

14  the default rate, then the fact of post-petition interest being

15  limited by a plan should not give rise to greater rights under

16  the fair and equitable standard because then effectively the

17  fair and equitable standard becomes available when the Code has

18  basically said there's nothing there.  Or put differently, that

19  the fair and equitable standard would then become -- would then

20  supercede the limitations that are actually imposed by the

21  Code, which means why do we have those limitations to begin

22  with?

23          So, impairment is not a ticket to undercutting what

24  the Code itself says, which is no default interest.  Impairment

25  should only give access to the right to get more if there is

1 something else in the Code that is being compromised, and

2 there's not.  You can't get to fair and equitable and the

3 greater value that might be there through impairment, because

4 the effect of that would be to basically say we ignore the

5 Code.  And PPIE says of all things no, no, no.  If the

6 limitation is imposed by the Code, that's it.  This is -- PPIE

7 in essence says this is dispositive, that the no answers under

8 502 and the exceptions are dispositive of the impairment

9 question.  That's what PPIE says.  So you can't do an end run

10 around 502 by saying, oh, well, there is an impairment.

11          So, now the interesting question that's been posed,

12 and everybody gets all excited about is that there is somehow

13 the ability to read into PPIE an actual exception.  Let me just

14 pause by saying Your Honor already has recognized that this is

15 true.  Your Honor, in the opinion, says PPIE cannot be read to

16 require a default rate to be paid.  They still want to go back

17 and read it that way.  They say you can have impairment where

18 there is no right, there is no right to default interest under

19 502 and its exceptions.  In other words, they're saying that

20 PPIE creates an impairment argument even where there is, in

21 fact, the limitation on the ability to get default interest.

22 You can't get it under 502, which would be a remarkable thing.

23 Indeed, counsel went so far this morning as to say that PPIE

24 actually creates a right to post-petition default interest.

25          THE COURT:  No, he didn't say default.  He said to

1 post-petition interest.  He said in his contract it doesn't

2 matter if there is only one rate.

3       MR. BERNICK:  Well, but that's also -- let me just

4 deal with that.  That's kind of a false distinction.  When we

5 say default interest what we're talking about is interest above

6 the level that falls within the exception to 502, which is the

7 federal judgment rate.

8       THE COURT:  Oh, no.  I was talking about default

9 interest as the rate set in a contract as the default interest

10 rate.

11       MR. BERNICK:  Okay.  Well, either way the only thing

12 that you get, the contract doesn't matter.  The contract is

13 superceded by the restrictions imposed by the Code.  So, if you

14 have a contract that says, well, you get post-petition interest

15 at a rate that's less than the federal judgment rate, well, you

16 clearly can get that if you have a solvent debtor.  The

17 contract can be completely enforced.  Indeed, you might be able

18 to get more under the federal judgment rate.  But if you have a

19 contract, for whatever reason, whether it's called default or

20 not called default, it doesn't make a difference if it gives a

21 rate that is higher than the federal judgment rate you can't

22 get it under the exception to 502.  It's barred.  So, while

23 their contract may not say, quote, default, it's just got the

24 contract rate.  You go back to a 502 analysis.  502 says no

25 post-petition interest, period.  The exception says, yes, post-

1  petition interest in the event of solvency, but only to the

2  extent of the federal judgment rate.  That's what it says.

3       So, under these circumstances the Bankruptcy Code is

4  displacing the contract to the extent that the contract calls

5  for post-petition interest in excess of that level.  It doesn't

6  make a difference if it's called default, or whatever

7  circumstances might be involved.  This is part of a basic,

8  basic fallacy, which is the contract -- the contract in

9  bankruptcy doesn't control the outcome.  If the contract

10  controlled the outcome, hey, filing bankruptcy is a default

11  because that's what the contract says.  So, there's a huge,

12  huge (indiscernible), which is that somehow you have to have

13  respect for these state rights, contract claims, and the like.

14  Give me a break.  That's not true.

15       The Code imposes limitations, and those limitations

16  are real, and they trump the contract.  That's the whole idea

17  of equity.  That's the whole idea of Chapter 11 being a safe

18  haven, is that the contracts are suspended and do not govern.

19  That's the difference between proceeding in a Court of law

20  based upon a contract for damages on one hand, on the other

21  saying in equity we go before an equity Court to get relief

22  from the contract.  That's what bankruptcy is all about.  It's

23  relief from the contract.  So, all these arguments that are

24  being made by counsel to the effect of, well, the contract's, a

25  contract's a contract, completely pretend and blink away the

1 reality of equity and the whole purpose of the bankruptcy

2 process.

3       So, if we take Morgan Stanley in particular, and

4 their contract in particular, albeit the issue is not ripe for

5 determination now, and you go back through the same analysis,

6 A, the default provisions, if there are default provisions,

7 have no application; B, the contract rate is not enforced, it

8 does not govern because there -- it's post-petition interest,

9 it's not allowable; and C, if they're arguing exception, that

10 exception would only get them post-petition interest to the

11 level of the federal judgment rate, not the rate in their

12 contract.  And that's just plain and simple.

13      So, going back to where we were, which was

14 impairment, if we're now talking about impairment, again, 502

15 controls.  It's the stop sign.  The argument that they're

16 making under PPIE is actually completely contrary to the front

17 end of PPIE.  They're saying that the discussion that took

18 place regarding the repeal of the other impairment sections of

19 the Code did two things.  One is it says we are impaired if we

20 don't get fair and equitable.  And, two, we not only are

21 impaired, but PPIE actually says we're entitled to post-

22 petition interest, in the case of Morgan Stanley, the default

23 part.  So, PPIE would, on the one hand, be saying, ah, ah, ah,

24 there's no impairment unless if the limitations are by Code.

25 Here the Code does impose the limitation.  It says you don't

1 get the default interest.  And that's the first part of PPIE.

2 But in the case of default interest, in the case of post-

3 petition interest and 502 there's an exception to the first

4 part of PPIE for interest under 502, that that's how they would

5 be reading it is that the first part of PPIE is abrogated when

6 it comes to the post-petition interest part of the analysis in

7 the second part of PPIE.  And that is completely wrong.

8        And why is it completely wrong?  Because they are

9 assuming that when PPIE said that there was impairment because

10 there was no payment of post-petition interest, that the Court

11 was discussing post-petition interest at a rate that exceeded

12 the federal judgment rate which would be applicable under

13 Section 726.  They're assuming that PPIE was talking about

14 post-petition interest at a default rate that they might be

15 able to get under fair and equitable.  That's the problem with

16 their analysis.

17        Yes, it's true New Valley was effectively -- was

18 effectively washed away by the repeal of the other provision of

19 the impairment, the impairment portion of the Code.  That's

20 correct.  But that doesn't mean that Congress says, oh, well,

21 guess what?  We're now not only saying you get post-petition

22 interest, but you get post-petition interest at the fair and

23 equitable rate.  That's not what PPIE says.  That's not even

24 what Congress actually said.  All they said was post-petition

25 interest.  So, the way to read the second part of PPIE, the

1  only way to read it is being consistent with the first part of

2  PPIE is to say, okay, yes, because there's an exception to 502

3  that enables you to get post-petition interest if you have a

4  plan that says you can't get any post-petition interest even in

5  the case of a solvent debtor, that's impairment.  Why?  Because

6  under the exceptions to 502 you can get post-petition interest

7  all the way up to the federal judgment rate.  That contract --

8  I'm sorry -- that Code provision, strike that, that plan

9  provision would be impairing.  But a plan provision that

10 doesn't do that, the plan provision that says, no, we're going

11 to give you all that interest but you can't get any more than

12 the federal judgment rate, that is completely consistent with

13 502, the exceptions to 502, and that is completely consistent

14 with PPIE.

15         So, this theory that says that somehow PPIE in the

16 second part took away what it said in the first part and

17 contradicted it is a complete misreading of PPIE, and that is

18 exactly what Your Honor already has recognized, that the case

19 cannot be read to require the default rate be actually applied.

20 Instead, the very simple analysis is what's reflected in

21 PPCL033, impairment turns on the rights derived from applicable

22 statutes.  This is in the front end of PPIE.  That takes you to

23 502(b)(2), no post-petition interest.  And it takes you to 726,

24 which is the solvent debtor exception, and that takes you to

25 the federal judgment rate.  If you preclude all post-petition

1 interest in a solvent debtor case, then it is impairment.  If,

2 however, as we have in this case, we've permitted post-petition

3 interest at a level that exceeds the federal judgment rate,

4 there is no impairment.

5       PPIE simply recognizes long-standing solvency

6 exceptions of Section 502(b)(2).  It does not thereby replace

7 502 and its exceptions with the fair and equitable rules under

8 the guise that there's somehow been impairment.  A total

9 misreading of PPIE.

10       Counsel for Morgan Stanley stood up and gave a long

11 speech that was all to the effect that really what PPIE did was

12 to take the fair and equitable standard and say under

13 impairment you can forget about, you know, 502, and all of what

14 it says and what its exceptions are.  And that's just flat

15 wrong.

16       We then go to -- you know, one of the -- I can't

17 resist pointing this out.  The other way that that would be

18 bizarre is what it would do to the fair and -- the linkage

19 between impairment and the fair and equitable requirement.  It

20 would say, well, was there impairment, question mark?  Answer

21 is, well, in order to find out whether there is impairment we

22 go to 1129 to ask whether it provides for default interest.  If

23 1129 provides for default interest, then there's impairment.

24 But the problem is you can't get to 1129 without having

25 impairment.  So, their argument basically assumes that 1129

1    establishes relevant -- provides the test for whether there is

2    impairment, which then creates the impairment that allows

3    application of 1129, a completely circular argument.  That is

4    exactly the position that they're articulating in the case.

5    So, they say that the Third Circuit, A, contradicted itself in

6    its own opinion, and B, created a circle within the Bankruptcy

7    Code.  I don't think so.

8            If we then get, finally -- that's another -- we've

9    got a hard stop there, of course I put there on there already.

10   We get to the last step, which is to look at fair and equitable

11   anyhow, and the last step has got two -- has got two parts to

12   it.  One is is there solvency?  And, two, what is -- what would

13   be fair and equitable?  Because it's recognized that if you

14   don't have a solvent debtor you don't get to the fair and

15   equitable analysis under 1129.

16           Now, many of the theories that have been -- there are

17   a whole bunch of theories that have been advanced in order to

18   prove or attempt to prove solvency in the case.  The Court has

19   addressed some of those.  The presumption of solvency.  No.

20   There's no presumption of solvency.  Your Honor already has

21   decided that.  If any equity -- if equity retains any interest,

22   any value, is that solvency?  Does that -- there's a

23   presumption of solvency there?  The answer to that was no.

24           There's a further one, actually, that counsel raised

25   this morning, or implicated this morning, even though I think

1  it probably is -- kind of goes hand in hand with what I've just

2  talked about as concerns the contract.  Counsel said, well, the

3  contract controls, and because the contract controls, we get to

4  the fair and equitable requirement.  And the answer to that is

5  no.  The contract can't get you to the fair and equitable

6  requirement.  The contract is off the table all together.  Why

7  is it off the table all together?  Because that is exactly why

8  you are in a Court of Equity.  And fair and equitable is not a

9  question of the contract rate.  Fair and equitable is a

10 question of what is fair and equitable under the circumstances.

11 There is no -- as Your Honor put it, payment of the default

12 rate depends on the equities of the case, and it's not an

13 entitlement.

14          But the three or four yellow markers that we've got

15 here to pick up relating to solvency are as follows.  One,

16 should the market capitalization or stock price performance of

17 Grace post-petition during the bankruptcy case, can that be

18 used to establish solvency?  That is -- you've heard counsel

19 about how Grace stock is trading at certain levels, so if Grace

20 stock is worth a certain amount of money there's a market --

21 positive market cap, doesn't that establish solvency?  That's

22 the essential contention.  That theory was pursued earlier in

23 the case, and actually there was an expert report that was

24 filed by a Mr. Ordway (phonetic), he was the predecessor to Mr.

25 Frezza.  And Mr. Ordway's expert report talked all about the

1  stock performance of W.R. Grace as establishing post-petition

2  that there was value in market cap.  And, of course, market

3  capitalization, this is now on PPCL038, is very problematic as

4  an indicator of solvency, and indeed, I took Mr. Ordway's

5  deposition, and he admitted that the stock price may reflect

6  many things having nothing to do with the company's

7  performance.  And he was not able, in his deposition, to

8  actually tease out or establish a methodology that actually

9  related stock price to actual company performance, and

10 certainly in the case of Grace, where Grace is in Chapter 11

11 and the stock price, as Ms. Zilly testified, the stock price is

12 an indication of not whether Grace is solvent today, but

13 whether Grace is going to be solvent on emergence.  So, Mr.

14 Ordway gave it away.  "It's true that equity value, that a

15 stock price can reflect many, many things other than company

16 performance, true?"  "Answer:  Correct."  This is his

17 deposition, Page 31, and it has been designated in the record

18 in this case.  "Question:  And in fact you provide no

19 methodology in your declaration here that enables us to relate

20 stock price to actual company performance, correct?"  And the

21 answer is, "Correct."

22         And Ms. Zilly brought out the fact that it's

23 unquestionably true, which is that the stock price today and

24 during the course of the post-petition, pre-emergence period of

25 time, all that market capitalization reflects is the

1  expectation that on emergence the stock will have X, Y or Z

2  value.  So, that is not a good indicator.  It's not a reliable

3  indicator.  There's nobody who as an expert says that market

4  capitalization of Grace post-petition actually establishes

5  Grace's solvency.  There is not a single expert opinion in this

6  case to the effect, not one.  Indeed, their own expert, Mr.

7  Ordway, has testified to the contrary.

8       We then go to some of the other theories, and there

9  are really two basic theories that have now been advanced in

10  service of demonstrating solvency are linked.  One is solvent

11  giving effect to the plan, and that really is Mr. Frezza.  And

12  the other is kind of related, and it also is Mr. Frezza, which

13  is you can actually determine solvency by looking to the exact

14  same tests that apply to feasibility.  Remember, Mr. Frezza

15  said I adopt the Zilly analysis.  She -- her approach.  She

16  properly determined that the company was solvent.  Now, she

17  didn't actually say the company was solvent.  She says you

18  couldn't decide solvency because she's looking at effective

19  date without giving effect to the plan.  But the fact that he

20  is saying that the Zilly feasibility analysis equals solvency

21  is conflating solvency with feasibility.  And the essence of

22  that problem is what we've now written down here, which is that

23  Mr. Frezza, and the lenders who he speaks for, and the

24  unsecured creditors' committee believe that solvency should be

25  measured on the effective date giving effect to the plan.  The

1   way that I've tried to illustrate that here is with PPCL029.

2          What's the issue?  The issue is not only when you

3   measure solvency, that doesn't resolve it.  It is what do you

4   assume as of that date with regard to solvency?  So, everybody

5   agrees that you measure solvency as of the effective date.

6   That's kind of the bankruptcy convention.  It probably makes it

7   easier to make determinations with regard to accrual of

8   interest or other obligations, but the issue is not when.  It

9   is what is assumed as of that date?  That's the issue.  So,

10  there are two alternatives, and they are the last two that we

11  have down here.  Solvent giving effect to the plan?  Or solvent

12  without giving effect to the plan?  That's the debate.  So,

13  they say it should be solvent giving effect to the plan.  We

14  say that makes no sense.  And we say that it not only makes no

15  sense because it would have the effect -- any time a plan is

16  feasible there's default interest, but it would also do

17  violence to the actual text of the Code.

18          And in our response brief we were at pains to

19  demonstrate all of the different ways in which, assuming that

20  the plan has gone into effect in making this determination

21  actually rewrites the Code, rewrites four different parts of

22  the Code.  The first part of the Code that it rewrites most

23  squarely is that 1129(b), which is fair and equitable, requires

24  that the Court must carefully balance all equitable

25  considerations to determine the appropriate rate of post-

1  petition interest.  So, it's the fair and equitable requirement

2  itself that is rewritten if solvency can be demonstrated on the

3  basis of the plan actually going into effect because

4  feasibility becomes the determinant of solvency rather than

5  fairness and equity.

6       Two, 1129(a).  The test of 1129(a) are applied not

7  post-confirmation, but as of or at the confirmation hearing,

8  and the parties have to negotiate in connection with the

9  confirmation hearing.  So, you've got to know in the sense of

10  what the answer is before you actually go forward and confirm

11  the plan or not confirm the plan.  In a more focused way it

12  also renders completely meaningless 502(b)(2).  What it says is

13  that all the prohibitions against the payment of post-petition

14  interest, and all the limitations that are imposed on that, all

15  of those go by the way because in point of fact in every single

16  case where the plan is thought to be a successful plan and the

17  company will emerge in a solvent condition, you're always going

18  to get default interest, which can't be the rule.  That's a

19  rule that swallows up 502, and it's also a rule that swallows

20  up fair and equitable.  All of those go by the wayside.

21       And then there's an important technical aspect of

22  this, which is Sections 101(10A) and 101(10)(B), and this is a

23  very, very important point.  This has to do with the entity

24  that's involved.  When you're measuring solvency of the post --

25  giving effect to the plan, you're measuring solvency not of the

1  debtor.  The debtor doesn't exist anymore.  You have a new

2  entity.  So, if you're talking about the debtor or the estate

3  being solvent, that is a different entity.  That is an entity

4  that disappears upon the effectiveness of the plan.  So, if

5  you're going to measure solvency giving effect to the plan,

6  you're not measuring solvency of the estate anymore.  You're

7  not measuring solvency of the debtor anymore.  You're measuring

8  solvency of a new entity that did not exist previously.  So,

9  for all of those different reasons the test that says solvent

10 giving effect to the plan does violence to the Code, cannot be

11 given effect here, and basically has never been recognized by a

12 Court.

13        There's actually a decision here that's very helpful,

14 actually two decisions.  One has been cited but it's not

15 apposite.  The one that's most helpful is In Re Manchester Gas

16 Storage.  And In Re Manchester Gas Storage pre-petition, or

17 pre-confirmation there are a lot of different disputes.  And

18 people, different constituencies all took haircuts.  After the

19 thing is all over, the plan then is agreed, and obviously

20 because everybody has taken a haircut the plan is now feasible.

21 That's what makes it feasible.  And the reorganized debtor is

22 solvent.  And so, the issue that came up was all of a sudden

23 after the fact somebody comes in and says, oh, I'd like to have

24 my default interest now that we're solvent.  The Court says,

25 no, no, no.  The only reason that you are -- that this plan is

1  feasible, and the only reason that the reorganized debtor is

2  going to be solvent is that everybody agreed to take a haircut.

3  Until they agreed to take a haircut in connection with the plan

4  this was an insolvent estate, and denied default interest and

5  denied that it was proper to apply the fair and equitable

6  requirement.  That's this case.

7         This is a case where the PI constituency took a

8  haircut.  This is a case where the -- obviously equity took a

9  haircut.  This is a case where there was a highly disputed

10 issue, and by virtue of the plan alone the company became

11 solvent.  Absolutely on all fours with Manchester.  You don't

12 take the fact that people have agreed to make the plan feasible

13 and then say, well now we're going to award post-petition

14 interest to everybody that's entitled to interest because all

15 of the sudden the debtor has become solvent.  I'm sorry.

16 That's an ultimate piggy-back, and in fact that's exactly what

17 these folks are doing.  They're getting paid their entire

18 principal.  They're not taking a haircut, one dollar's worth of

19 haircut on their principal, and yet because other

20 constituencies did take a haircut on their claims and agreed to

21 make the company solvent assuming the plan comes forward,

22 they're now saying, oh, well, give me mine.  Give me even more.

23 And Manchester says no, you're not permitted to do that.

24         So, the question then becomes, if it's solvent

25 without giving effect to the plan, that's the appropriate test,

**J&J COURT TRANSCRIBERS, INC.**

1  what does that test mean here?  And the answer is there is not

2  one expert, there is no expert opinion that's been rendered

3  saying that Grace was in fact solvent, the estate was solvent

4  before giving effect to the plan.  Nobody.  Mr. Frezza

5  acknowledged under oath, and you have the citation that's in

6  the brief, acknowledged that as of the time of the -- prior to

7  the time that -- or without giving effect to the plan, as pre-

8  plan, there was an enormous dispute about personal injury

9  liability that was unresolved.  And because of that nobody

10 could say what the personal injury liability was, and because

11 of that nobody could say that Grace was solvent.  Now, Mr. --

12            UNIDENTIFIED SPEAKER:  Friedman.

13            MR. BERNICK:  -- Friedman -- I'm sorry -- Mr.

14 Friedman says, oh, well, we have kind of this very apt metaphor

15 from his point of view that we're balanced on the edge of the

16 coin, the fact of the matter is the case was balanced on the

17 edge of a coin.  You couldn't say which way the coin was going

18 to fall, and that means that you couldn't say solvency, and if

19 you can't say solvency, it's their burden, you can't -- they

20 don't get the fair and equitable analysis, and they don't get

21 default interest.  It is a stop sign all over again.  That is

22 their problem.  It is not our problem.

23            So, if you have a dispute about solvency, you haven't

24 established solvency, that is their burden for establishing

25 that under the fair and equitable test they get default

1  interest.  The case is over.  Not one expert -- it would have

2  to be an expert -- not one expert opinion says you can render

3  an opinion regarding solvency before giving effect to the plan.

4          So, we then go, finally, to -- we go through that

5  stop sign.  We've now gone through four stop signs.  We haven't

6  gotten a ticket yet, I guess.  But we go to fair and equitable

7  and say, well, let's get to the fair and equitable analysis.

8  Let's assume that there's solvency.  The first argument they

9  make is that the whole analysis is trumped by the absolute

10  priority rule.  The absolute priority rule actually precludes

11  the weighing and balancing of the equities.  And the answer is

12  no, it does not.  The absolute priority rule is in black and

13  white and says that it comes into existence, and this is the

14  language, unsecured class -- the plan provides that each holder

15  of a claim of such class receive or retain on account of such

16  claim property of a value as of the effective date equal to the

17  allowed amount of such claim.  The allowed amount of such

18  claim.

19          So, the absolute priority rule is not whether equity

20  gets a dollar.  The absolute priority rule has to do with

21  whether the creditors who are invoking the absolute priority

22  rule, the more senior creditors, whether their claims are being

23  paid in full at their allowed amount, their allowed amount.

24  And what's the allowed amount?  It is the amount that is under

25  502, and the various exceptions to 502.  So, this is a plan

1  that by its very terms satisfies the absolute priority rule

2  because it pays these creditors the allowed amount.  If you're

3  paying the allowed amount the absolute priority rule does not

4  apply.  It is not in the picture, and you get back to the

5  weighing of the equities that's fair and equitable, which is,

6  again, another way of saying there is no entitlement to default

7  interest.

8         So, we now come to fair and equitable as fair and

9  equitable.  It is the weighing and balancing what are the

10  merits there.  And, Your Honor, I think that there's an

11  overwhelming case here that says that the plan is fair and

12  equitable, even if we get to that point in the analysis.  And I

13  want to remind the Court what I'm sure the Court won't forget,

14  which is that we did have a very extensive negotiation, and we

15  also -- with respect to constituencies other than the unsecured

16  creditors, and we then, after the plan was filed and the

17  unsecured creditors then voiced their objections.  There was

18  the question about, well, can we resolve -- we can resolve it?

19  And the answer was no, we were not able to reach a resolution

20  to the issue.  Even -- we -- we could have done, if we wanted

21  to play hardball, is we said what -- we haven't reached

22  resolution with you, and what we're going to do is we're going

23  to retreat to the minimum that we have to pay, which is the

24  federal judgment rate, because you can't argue anything more

25  than that.

1           We could have said you don't get any post-petition

2    interest whatsoever under 502 because you can't establish

3    solvency.  We could have played that game and gone all the way

4    back to baseline and put zero into the plan, zero into the

5    plan, and we would have been completely within our rights, and

6    we would litigate and we would say all of the things that have

7    now been said, and we would have one, two, three different stop

8    signs to talk about, because they don't get anything until they

9    pass those stop signs.  We didn't do it.  We said if we have

10   taken a position in negotiation we should take the position in

11   the plan because that is, after all, what we're prepared to do.

12   And maybe we're creating a floor that we don't have to create.

13   So be it.  It's appropriate.  So, that's what we did.  We came

14   up with a plan that says we recognize that we can take a much

15   harder line position, but we think that this is fair and

16   appropriate, and we're not going to say that the fact that this

17   matter is now in litigation means that we're not -- we're not

18   taking money off the table.

19           So, effectively what they're doing here is they're

20   saying, well, that compromise was still not even enough.  We

21   want our litigation position, and nothing else will do, and

22   that, I think, is the essence of what the problem is, which is

23   that they are basically asking for everything that they could

24   possibly hope for, and they have to demonstrate not only that

25   all the stop signs can be gone through, but that fairness and

1  equity takes them all the way up to their contract, all the way

2  up to the top level, and that's not fair and it's not

3  equitable.  So, showing you PPCL026, is the plan rate fair and

4  equitable?  The answer is as follows.  One, solvency obviously

5  has not been proven.  That's the first step in the fair and

6  equitable analysis.  I'm not going to go back over that.  The

7  plan rate accords with history.

8          This is a plan rate -- we didn't just pull the number

9  out of the air.  The record now completely establishes that

10 actually this particular rate was suggested by one of the

11 lenders.  Indeed, the lead -- J.P. Morgan, who was acting as

12 agent for the other creditors on -- that were involved at the

13 time, they suggested this rate, and we said, okay, we can go

14 with that rate, and it was then maintained throughout the

15 history of the case, until this thing fell apart towards the

16 very end.

17         I'm not going to back over that history except to

18 point out a couple things.  Remember, Mr. Shelnitz went through

19 the slide that demonstrated -- this is Plan Proponents' 507-10,

20 a demonstrative that was put into Evidence as a demonstrative.

21 He went through this whole story about basically how the

22 negotiations had gone.  There was really no issue that was

23 created about this story at all, including the famous

24 conversation between Mr. Kruger and Mr. Shelnitz where Mr.

25 Kruger allegedly gave Mr. Shelnitz a head's up that there might

1  be an issue about whether default interest would be necessary.

2  Mr. Shelnitz acknowledged the conversation took place and said,

3  yes, he did give me a head's up, but he never told me that

4  somehow the committee was going to fight the plan, or that even

5  the creditors as a majority were going to fight the plan.  And

6  in fact, Mr. Kruger was not able to rebut that testimony.  He

7  admitted -- and this was Kruger cross at Page 226, that the

8  discussion was holders, holders, not a majority of holders, not

9  most holders, not all holders, just that there were holders of

10  debt that had called Mr. Kruger.

11          So, we then take a look at the post-trial brief

12  that's been filed before Your Honor at Page 37, and all of a

13  sudden we find out that the record has now changed.  The

14  statements made in the post-trial briefs, "Mr. Kruger likewise

15  testified that he began to tell Mr. Shelnitz no later than the

16  spring of 2007 that the bank debt was trading in the

17  marketplace at a price that indicated that many, if not most

18  holders, were expecting to receive default interest."  Whoa.

19  Where did that one come from?  I don't recall that in the

20  testimony at all.  And in fact, if you take a look at Page 199,

21  Line 8 through 22, it doesn't say that at all.  "Mr. Kruger, do

22  you remember any specific conversations?"  This is the direct

23  examination by Mr. Pasquale.  "Yes, I certainly do.  I don't

24  know that I can give you the dates of them, but I certainly do

25  recall having conversations with Mr. Shelnitz individually, one

1  on one, in which I informed him that as a result of phone calls

2  I was receiving from holders of the bank debt that they were

3  anticipating receiving interest, and that they also informed me

4  the bank debt was trading in marketplace at a price which

5  reflected the understanding and expectation of the persons

6  holding the debt that they would receive default interest in

7  these proceedings." So, it's not that he got calls from all of

8  these different people in this majority that's reported here,

9  but that you've got basically -- or even most holders. It's

10 just that you've got a call from holders indicating a price.

11 So, this is an overstatement of what the record shows. All

12 that Mr. Kruger was able to say is that he had gotten calls

13 from holders, and that the calls from holders reflected on a

14 market price. There wasn't any indication -- there wasn't any

15 statement that somehow most holders were expecting to receive

16 default interest.

17         The other thing that happened in the examination of

18 Mr. Kruger is that it turns out that the reason that nobody

19 spoke out and sought to terminate the letter agreement that was

20 outstanding, the reason for that was that basically they had

21 decided just to remain silent and to have this whole thing go

22 forward. Why? Because they wanted to be able to piggy back.

23 They wanted everybody to take the hair cut. They wanted us to

24 reach peace with the PI constituency. The PI constituency

25 takes a hair cut, equity takes a hair cut. And then they can

1  come on the scene and ask for more.  That's not equitable.

2          And finally we have the e-mail from Ms. Krieger right

3  after they got the term sheet, never saying that somehow the

4  deal is off, simply asking for the inclusion of a proviso.

5          So, where are we at the end of the day?  And I'll

6  wind up here.  At the end of the day the plan rate accords with

7  history, and the plan rate is at the high end of post-petition

8  interest.  What we have on PPCL026 is a bar, and what this

9  indicates from no post-petition interest all the way up to what

10  it is that they ask for, which is at the top.  We have a range

11  from zero through $414 million.  As of today, and this is

12  reflected in another slide, which is PPCL028.  The numbers have

13  risen, but the proportions are roughly the same.  So, you've

14  got zero all the way to 414.  The federal judgment rate is at

15  189.  The plan rate is now -- yields $323.7 million, so

16  effectively they are at the very high end of what they can ever

17  possibly hope to get.  That's fair and equitable.  The plan

18  rate here, the 323.7, above that you get simple default,

19  compound default, annual compound default quarterly.

20  Incidently, if you look at the loan documents you don't see

21  that default is specified as being, A, compound as opposed to

22  simple, and B, quarterly.  That's all an inference that they've

23  drawn from the plan documents.  Nobody says that.  The plan

24  documents don't say that.  But you can equally well argue it's

25  just simple default.  But they want to pile on, and pile on,

1 and pile on.

2          So, in any event, the plan rate gives them almost all

3 of that.  So, they're saying fair and equitable is a balancing

4 standard.  They're saying, whoa, take us to the top.  And that

5 really -- the argument that says take us to the top is not

6 based on fair and equitable.  It's based upon saying simply

7 give us the contract.  Fair and equitable is exactly not the

8 contract.  Equity says the contract is not dispositive.

9          Finally, Your Honor, I would point out that in

10 talking about the plan rate is at the high end of post-petition

11 interest Your Honor asked for an indication of what the -- in a

12 sense, who is getting what, because that could be an equitable

13 factor.  We have PPCL040, and I want to put a caveat here,

14 because we have to fill in some of the lines, really, certainly

15 the red dashes, and we prepared this kind of in a time crunch,

16 and so as the others get ready to rebut me, we'll also take

17 another look at this candidly.  But the concept is the right

18 concept.  The way to determine what the recoveries are is not

19 what's happening to the stock.  That's the stock market making

20 all kinds of projections about all kinds of things.  We have

21 seen that the stock even this year has gone down to four, which

22 is a level that it was at, you know, shortly after the

23 bankruptcy, as well.  Now it's all the way up to 26.  The

24 better way to do it is to say, well, look, what happened?

25 People had claims in this case, litigated claims.  Where does

1  the plan leave them versus what they have been asking for?  If

2  you take a look at that, and that's determinable by taking a

3  look at the plan, the lenders get all of their principal, which

4  at many points has been at risk.  They get interest.  And they

5  get a total of $850 million out of $959 million.  They get all

6  but a $108 million.  That is a recovery vis-a-vis what they

7  would hope to get of 88.1 percent.

8          What about asbestos PI?  Asbestos PI, through Dr.

9  Peterson, wanted 6.3 to 9.3 billion.  They now have, and this

10  is our discount, not necessarily theirs, our discounted present

11  value of what it is that the plan is worth to them, they get

12  2.214 billion, or 25 to 35 percent of what they claim in the

13  litigation they were entitled to get.  Of course, that would

14  have produced a huge insolvency.

15          What about equity?  Well, equity basically is

16  getting, if you calculate under the plan and you work, and

17  these numbers are in their brief, if you work with the

18  enterprise value of Grace post-confirmation with the effect of

19  the plan, because that's what Your Honor has been asking, and

20  you work with the enterprise value of Grace pro forma, and you

21  subtract out all of the things that the plan says now have to

22  be paid out, you end up with a net -- and this is in the

23  disclosure statement, of between 431 to 812 million left to

24  equity.  That's kind of an enterprise value -- net enterprise

25  value number.  But remember, equity's position was that the

1   asbestos liabilities were not worth 2.21 billion, but were only

2   worth, that was the median Florence estimated value of about

3   400 million.  So, vis-a-vis their litigation claim, they gave

4   up 1.7 billion, which means that their recovery is in the order

5   of 20 to 33 percent, depending upon which ones of those numbers

6   you use.

7           So, you can see, as the plan actually has played out

8   -- what does the plan do vis-a-vis what people claim that they

9   were entitled to get?  We see that, you know, the lenders,

10  while they are no different in seniority to the asbestos PI

11  folks, they're doing pretty well, pretty well.  Indeed, they're

12  doing quite well.  Nobody has ever wanted to touch -- no one

13  has ever come close to touching their principal through any

14  kind of plan.  It hasn't been filed.  And the plan that's been

15  actually filed has given them principal, post-petition

16  interest, and indeed interest above the federal judgment rate.

17          So, for all those reasons, Your Honor -- we could

18  also talk about the fact that the plan rate is a precondition

19  of a global plan, it is therefore important from that point of

20  view, but beyond that this is a right answer.  When you go

21  through all of these different exercises it is a right answer.

22  It's a very, very fair, indeed we might argue generous balance,

23  and they certainly don't have the right as a matter of law to

24  go after -- maybe they're going to invoke Your Honor's

25  equitable powers, although we don't think that they should even

1  be entitled to do that, but we tried to develop a number that

2  really was fair and equitable, that hit the thing right on the

3  nose, and all that's come about here is that they have said not

4  enough, we want everything.  We want everything.  It's in our

5  contract, even though the contracts no longer govern this case.

6  And I'll reserve whatever little time I have left for rebuttal.

7         THE COURT:  Mr. Friedman?

8         MR. FRIEDMAN:  Yes.  Briefly, Your Honor.  First I

9  want to clarify, because apparently there's some confusion, at

10  least on Mr. Bernick's part, that I've somehow conflated fair

11  and equitable and unimpairment.  And what I said to Your Honor

12  when I argued is that to the extent that 1124(1), like any

13  provision of 1124, disenfranchises the creditors who are

14  subject to it, apprized them of the vote.  To the extent

15  Congress couldn't have been clearer than saying when you get

16  cashed out you should have the right to reject that treatment

17  and be tested against 1129(b)'s cram down provisions.  All I've

18  said was that the post-petition interest under 1124(1)

19  equitably shouldn't be any worse than that group of creditors

20  would do had they had the right to vote and rejected that

21  treatment and been tested under 1129(b).  That's all I said.

22  So, in that respect I do believe that they are related, and I

23  don't believe that impairment can ever result, or should ever

24  result in a worse post-petition interest rate than would be

25  achievable under 1129(b).

1           Solvency.  Again, ultimately I'll let the lenders and

2    the committee carry most of the water, but just so we're not

3    confused and suggesting something else because what I've argued

4    to Your Honor both here and in our brief is that 1129(b)

5    doesn't look at solvency in the manner that the debtors would

6    have you look at it with this elaborate issue of whether or not

7    it's before the effective date, just before the plan goes into

8    effect, after the plan goes into effect.  1129(b) is much more

9    straightforward, and the case law that surrounds it is much

10   more straightforward.  It simply asks do the existing equity

11   holders retain or receive property?  And if so and there's a

12   rejecting senior class, they have the right to post-petition

13   interest under a huge body of case law.  And that's really the

14   bottom line.  And you don't have to worry about solvency and

15   when it occurs, or did it occur, because if they're retaining

16   value, Congress said payment in full.  Payment in full has been

17   uniformly construed by every Court in this scenario to require

18   the payment of post-petition interest.

19           Turning to their argument that the post-petition

20   interest rates are capped, as it were, by the exceptions in

21   502.  This issue was raised squarely before Judge Walrath in

22   the Coram Healthcare case.  The equity committee argued the

23   exact same thing and argued that 1129(a)(7) effectively serves

24   to bring in 726(a)(5), and that's the maximum interest rate,

25   the legal rate that can be paid, and that's what Mr. Bernick's

1  argued that anybody who gets above the legal rate is doing

2  great.   Right here Judge Walrath said we're not persuaded by

3  the equity committee that Section 1129(b) requires the use of

4  the federal judgment rate for post-petition interest.   In the

5  prior paragraph she said that 1129(a)(7) merely sets the

6  minimum that creditors must receive.   Instead we conclude that

7  the specific facts of each case will determine what rate of

8  interest is fair and equitable.   So, there is no cap imposed by

9  the exceptions to 502, and the Courts have been sort of all

10  over the map.

11          Coming back to PPI, because again it's ironic that

12  Mr. Bernick is relying on PPI to establish that same concept

13  because PPI, the very case where the landlord cap was found not

14  to constitute causing impairment, in that very same case the

15  Third Circuit analyzed and reviewed Judge Walsh's decision

16  below, and said that the Bankruptcy Court also held that

17  Sections 1124(1) and 1124(3) offered different tests for non-

18  impairment.   Section 1124(3) created non-impairment status by a

19  cash payment equal to the allowed amount of the claim, but

20  without post-petition interest.   Such treatment could not

21  qualify for non-impairment under Section 1124(1) because the

22  failure to pay post-petition interest does not leave unauthored

23  the contractual or legal rights of the claim.   In other words,

24  Section 1124(1) and 1124(3) were different exceptions to the

25  presumption of impairment, and the repeal of one should not

1  effect the other.  We agree with the Bankruptcy Court's

2  analysis.

3        So, any notion that this somehow caps the interest

4  rate simply has no basis whatsoever in PPI.  PPI said you could

5  have post-petition interest.  502(b)(2) says you can't have

6  post-petition interest.

7        THE COURT:  No.  502(b)(2) says you can't have it as

8  part of an allowed claim.  PPI, looking at the fair and

9  equitable standard, is a different standard.  Now, whether

10 there is an implied cap because of 502 and the exceptions to

11 502, that's a different issue than whether or not the standards

12 ought to be the same.  But the allowed claim portion you cannot

13 get interest.  In fact, you can't have any unmatured interest

14 let alone the default interest rate as part of the allowed

15 claim.  And the facts that would allow you to get into the

16 exceptions of 502 don't apply in this case.  That's, I think,

17 as much as I've been able to determine so far.  That's why I

18 left open the fair and equitable issues.

19       MR. FRIEDMAN:  Your Honor, I agree that the

20 definition of an allowed claim under the Bankruptcy Code for an

21 unsecured creditor does not include interest.  There is a huge

22 body of case law holding that where equity is walking away with

23 the kind of value that equity is walking away with here, that

24 the fair and equitable requirements for a class that -- senior

25 class that rejects the plan require the payment of post-

1  petition interest, and at rates that aren't necessarily, as

2  Judge Walrath found, necessarily limited to the legal rate of

3  interest.

4          THE COURT:  Right.  They're not limited at all.  It

5  could be lower than the legal rate of interest, not -- it

6  doesn't have to be higher.  That's what, I think, the fair and

7  equitable test and the discretion of the Court permits you to

8  look to.

9          MR. FRIEDMAN:  And, Your Honor, we would simply point

10  out that whatever allegations, and we're not saying we agree

11  with them, they're making about the committee's conduct and the

12  lenders' conduct, Morgan Stanley had no input in the

13  negotiation of this plan.  Morgan Stanley, relatively speaking,

14  is an innocent creditor.  It didn't cut any deal with the

15  debtor.  It didn't go back on any deal with the debtor.  Again,

16  I'm not saying that the lenders did either, but the point is

17  that in terms of the fairness, what is fair and equitable about

18  denying contract rate interest as negotiated by the people that

19  the equity holders here elected to negotiate for them, and

20  leaving equity holders with $400 to $800 million of value?

21          My final point, Your Honor, is -- and you've said

22  this a couple of times, that somehow the burden of proof on

23  solvency is on this side.

24          THE COURT:  It is with respect to the impairment

25  issue if you're going to rely on impairment as a measure for

1  why you're entitled to some type of interest.  That is your

2  burden.  The debtor doesn't have to prove the entitlement to a

3  different rate other than what it's proposed.  I think, under

4  the plan, it is your burden.

5          MR. FRIEDMAN:  Your Honor, I respectfully disagree,

6  and I cited to Your Honor earlier the Toy & Sports Warehouse

7  case which said that in order for shareholders to share in a

8  reorganized -- in the value of a reorganized debtor they must

9  prove solvency.

10         THE COURT:  Well, okay.  That -- I -- maybe we're

11 talking about things for different purposes, and who has the

12 burden on specific issues may be -- may change.

13         MR. FRIEDMAN:  We simply say that unless the debtors

14 prove that they're solvent they should not be allowed to take

15 away 400 to $800 million.  It is the debtors' burden --

16         THE COURT:  Okay.  Then you don't get interest.

17         MR. FRIEDMAN:  That may be, but then the debtors

18 don't get 400 to $800 million, and that equity value would

19 presumably be redistributed --

20         THE COURT:  Yes.

21         MR. FRIEDMAN:  -- among creditors.

22         THE COURT:  Yes.  Probably to the tort creditors who

23 have taken the large hair cut, whereas no one else has.  So,

24 yes, you're quite correct.  It may very well go back into the

25 plan, but it's not likely that it's going to go to anybody else

**J&J COURT TRANSCRIBERS, INC.**

1  because you folks are already getting the value of your claim

2  without interest.  So, how you're maxed out.  So, you have even

3  standing to raise that, that specific issue, when you're maxed

4  out with respect to the maximum amount of the claim, I don't

5  know.  With respect to the interest rate, I think the fair and

6  equitable standard affords a great deal of discretion to the

7  Court based on the facts and circumstances of the case.  That's

8  what all the cases that I was able to find that permit interest

9  post-petition essentially rely on, and I think I need to do

10  what the cases say I have to do.

11          MR. FRIEDMAN:  Thank you, Your Honor.

12          MR. BERNICK:  Your Honor, I again will save further

13  rebuttal to hearing from my friends across the aisle here, but

14  just a couple things in response to Morgan Stanley in

15  particular.

16          One is that he says that Morgan Stanley didn't

17  participate in the negotiations.  Morgan Stanley didn't have to

18  do anything because they had already made an election to defer

19  this issue for litigation post-confirmation, so their standing

20  on the sidelines actually is further evidence of their

21  understanding of the election that they made.

22          Secondly, with respect to Judge Walrath's decision we

23  can come back and visit on that, but I still didn't hear any

24  explanation of how the Third Circuit in PPI managed to

25  simultaneously in the same opinion take back and completely

1 contradict in the second part of the opinion the principal

2 matter that it resolved, which is that limitation by law rather

3 than by the plan is not impairment.  And if the law thereby

4 under 502 and 502 exceptions limits default interest, that

5 can't be impairment.  And then at the second part of the

6 opinion they say -- says exactly the opposite.  That says the

7 Third Circuit can't read two parts of its opinion to be

8 consistent with one another.  And he still hasn't explained the

9 circle, the circle that says to figure out impairment you go to

10 fair and equitable, which you don't get to unless you already

11 have found impairment.  That, again, is a tautology that is

12 completely inexplicable.

13        So, all this stands in service of what you keep on

14 hearing.  Oh, there are all kinds of cases out there that say

15 that the absolute priority rule means payment in full.  You get

16 every last dime, including whatever your contract says.  That's

17 not what the absolute priority rule says by its own terms.  It

18 says allowed.  And all they're doing is basically wishing that

19 the world ignores bankruptcy, that their contract controls,

20 controls, controls.  The big lesson here is the contract does

21 not control.

22        THE COURT:  I have to take another look at 1124

23 because 1124 -- well, let me double check.  I don't think the

24 section is cited -- no, it's not -- for my purposes right now

25 it's not relevant.  1124(1) states that a class of claims or

1  interest is impaired under a plan unless with respect to each

2  claim or interest of such class the plan leaves unaltered the

3  legal, equitable and contractual rights to which such claim or

4  interest entitles the holder of such claim or interest, or --

5  and I think the focus is on 1124(1).  The cases seem to suggest

6  that leaving unaltered legal equitable and contractual rights

7  means that if there is a contract and the creditor doesn't

8  agree to less favorable treatment, which it can certainly do

9  through voting on a plan, that there is a contract rate of

10  interest that applies because otherwise you are leaving -- you

11  are altering the right of the creditor to receive interest.

12  I'm not saying it's default interest.  I have to hear from the

13  other side about how it gets to default interest.  I'm not --

14  at the moment I can't reconcile the case law that way.  Fair

15  and equitable is different.  I'm not looking at the fair and

16  equitable standard.  I'm just looking at the issue of

17  impairment.

18          MR. BERNICK:  Yes.  Your Honor, I think that the

19  simple answer to that is exactly what PPI decided.  PPI said

20  that because the position taken was that the -- was that the --

21  and I don't want to get into the facts of Mr. Solow's world as

22  a landlord, but the question was whether the plan, because the

23  plan contained a limitation on a contract right, whether the

24  plan thereby created impairment.  And what the Third Circuit

25  said is if the limitation, including the limitation on the

1    contract, comes from the law, it doesn't count.  That's not

2    impairment.  It has to come from the plan only.  So, yes, you

3    look to see whether there is an effect, and that's a very

4    sensitive test, an effect on any kind of legal right.  And here

5    it would be the contract.  No question about it.  But then you

6    have to ask was the effect the result of the plan, or is the

7    effect the result of the operation of the law?  And that's why,

8    as I indicated in the quote that we had, as well as in the

9    little demonstrative, that to determine whether the effect

10   comes from the law as opposed to the plan, the Third Circuit

11   says you go to the applicable statute.

12          THE COURT:  I understand that argument.  I'm not sure

13   I agree with it simply because 1124(a)(1) defines impairment as

14   the plan leaves unaltered the legal, equitable and contractual

15   rights to which such claim or interest --

16          MR. BERNICK:  Right.

17          THE COURT:  -- entitles the holder of the claim or

18   interest.  So, you have to, in looking at the plan

19   confirmation, and the concept of impairment, look to the

20   contract, not to the applicable law, I think.  But I'll go back

21   and look at --

22          MR. BERNICK:  That is --

23          THE COURT:  -- at PPI again.

24          MR. BERNICK:  That is exactly what the Third Circuit

25   decided.  The Third Circuit -- I mean, let's be plain about it

1  -- the Third Circuit was construing exactly that language.

2  Right?  And the Third Circuit, in construing that language said

3  that means that if it's the law that limits as opposed to the

4  plan that limits, that's not impairment.  That's the whole

5  force of the first part of the PPI decision.

6          THE COURT:  But the law, post-confirmation --

7          MR. BERNICK:  Post --

8          THE COURT:  Post --

9          MR. BERNICK:  -- petition?

10          THE COURT:  No.  In looking at the plan --

11          MR. BERNICK:  Yes.

12          THE COURT:  -- and what the plan is going to do.  If

13  the plan changes the contractual rights, because 1129 permits

14  the debtor to reinstate contractual rights, so 1124, I think,

15  in conjunction with 1129 is simply saying if the debtor chooses

16  not to, it has impaired through the plan the contract rights.

17  I don't think that's an interest issue.  That's an issue as to

18  what -- whether or not the contract is going to be, I'll use

19  the word reinstated, through the plan.  And if it is going to

20  be reinstated, then the creditor who holds that claim is not

21  impaired.  And if it isn't going to be reinstated, or if it's

22  going to be modified in any way that would change the legal,

23  equitable or contractual rights of the holder of that claim,

24  then there's impairment.

25          MR. BERNICK:  But the difficulty then becomes, Your

**J&J COURT TRANSCRIBERS, INC.**

1 Honor, that -- many difficulties, but that's not a -- that's

2 where it's up to the -- the debtor to accept or reject the

3 contract.  And they say, well, we're going to accept or reject,

4 and then there's the ability to say impairment.  But where the

5 applicable statute says, as it does here, that the claim under

6 the contract is not allowable, then it's not the plan that is

7 the only source of the limitation, it is the law that's the

8 source of the limitation.  It's the bankruptcy law.  And that

9 would have to -- it has to be recognized.  The reason it has to

10 be recognized is that otherwise all of these different

11 provisions of law in the Code, including post-petition

12 interest, including all these other things which the Code says

13 you don't have to do, you don't have to do, you don't have to

14 do, including you don't have to make payments, all of these

15 provisions would immediately give rise to impairment.

16         THE COURT:  No, I don't think so.  I think the fact

17 that the debtor, for example, filed bankruptcy, by all of the

18 cases I could find, has been determined to be not a default

19 under a contract.  So, the debtor, by operation of law, has not

20 defaulted.

21         MR. BERNICK:  That's why I said that --

22         THE COURT:  And as a result of the fact that there is

23 no default, the default by itself doesn't constitute an

24 impairment because there's no default.  So, by not paying post-

25 petition interest during the course of the case, or even the

1 principal during the course of the case, the debtor isn't

2 bootstrapped into a default that didn't exist pre-petition.

3 That's the effect, essentially, it's like the automatic stay in

4 favor of the debtor.

5          MR. BERNICK:  But if that's true -- if that's true,

6 again, that's the first stop sign --

7          THE COURT:  Yes.

8          MR. BERNICK:  If all that's true, there's no default

9 at all, we don't even go down this road at all.  It's all over.

10 There's no default.  There's no right -- there's no impairment

11 whatsoever.

12          THE COURT:  Well, that's where I'm not sure I agree,

13 because what I think 1124(1) is saying is that the plan can

14 reinstate the contract.  So, you're not charged with any

15 defaults.  They're essentially waived.  1129 lets you do that.

16 So, you can reinstate the contract as of the plan provision.

17          MR. BERNICK:  Right.

18          THE COURT:  And when you reinstate it you have to

19 reinstate it essentially in full.

20          MR. BERNICK:  That is exactly what the Third Circuit

21 said is not so.

22          THE COURT:  Well, I'll look at PPI --

23          MR. BERNICK:  The Third Circuit says if the

24 applicable statute, in this case it is 502, says it's not

25 recoverable, and these things say it's not recoverable --

1           THE COURT:  It's not recoverable as part of the

2  allowed claim.

3           MR. BERNICK:  Correct.  But that means exactly what

4  it says.  It's not recoverable as part of the allowed claim.

5           THE COURT:  All right.

6           MR. BERNICK:  If that's the statute that says that,

7  then the fact that the plan tracks that means that there is no

8  impairment.  It's a limitation that's imposed as a matter of

9  law.  And if you didn't do that, Your Honor, then we would be

10  totally at risk for not having made all these payments.

11          THE COURT:  Well, I understand the argument.  I think

12  it's a timing question, perhaps, that, you know, maybe to use a

13  waiver analogy that's the closest thing I can think of at the

14  moment, that any default that would have existed pursuant to

15  the contract term is essentially waived by operation of the

16  fact that the debtor is in the bankruptcy construct and

17  therefore the rules apply and the statutes apply at that time.

18  But when you get to 1124(a)(1) and you're getting the

19  reorganized debtor out of the case and looking at what its

20  obligations are going to be post-confirmation --

21          MR. BERNICK:  Oh.  I see.  Post-confirmation, I would

22  acknowledge that.  But the problem is that you're talking about

23  pendency interest during the course of the case.  And the

24  effect would be that if Your Honor is saying now that we have

25  the opportunity to file the plan, the plan must leave these

1   rights intact.  If that means that it includes a pendency

2   interest, then effectively what you're saying is if you don't

3   make the payments here, all that interest is going to have to

4   accrue, and then you're going to have to make up time at the

5   back end.  That can't be right.  502 says no.  All these

6   different provisions say no.  When you have a safe haven during

7   the course of the bankruptcy, you have a safe haven.  You're

8   not being penalized for the fact of being there or for the

9   passage of time in being there.  If you are required, as now

10  part of the plan as you've construed it, Your Honor, which I

11  agree to the extent it's post-petition, yeah, you've got to pay

12  interest, but if, as of the plan you then have to make up --

13          THE COURT:  Post --

14          MR. BERNICK:  -- for the lost time --

15          THE COURT:  Post-confirmation.

16          MR. BERNICK:  Post-confirmation.  If now in the plan

17  you've got to make up for eight years of time by paying all of

18  this extra interest, then effectively you have now, de facto in

19  the plan, reinstated the very obligations, and all that you've

20  done is you've given a safe haven that's now penalized you.

21  You'd be better off, in many cases, to simply never go into

22  default.  You'd be better off continuing to make the contract

23  payments all along because the effect over here is that once

24  you make up and have to reinstate the contract, including the

25  three percent, you are then penalized from not having done so.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Except you can't make those payments

2     during the course of the case because it's an unsecured claim.

3          MR. BERNICK:  That's exactly my point, Your Honor, is

4     that effectively -- if we had made the payments during the

5     course of the case we'd be violating the terms of the statute.

6     But if we made them we would be making them on a simple

7     contract rate basis without default.  You're now saying that at

8     the end, under this construction of the impairment provision,

9     which is not even a substantive law provision, it's just

10    impairment, that effectively it then mandates that you make up

11    for lost time for all the things that you've not done --

12         THE COURT:  No, no, no, no.  The concept of

13    impairment that I'm looking at is whether or not a class is

14    deemed to be impaired so that, A, it can vote, and B, you have

15    to get into the fair and equitable analysis.  That's all.  I'm

16    not suggesting that the debtor has to make up for what the law

17    said it didn't have to pay.

18         MR. BERNICK:  Well, but then -- but, see, you've got

19    an inevitable conflict because --

20         THE COURT:  Well, maybe.

21         MR. BERNICK: -- because what does fair and equitable

22    mean?  If fair and equitable means that you now judge with the

23    benefit of eight years of hindsight, whether it was a smart

24    idea for the company to use the safe haven of bankruptcy, that

25    basically again puts you in a total penalty position.  I've got

1 to tell you, I think my client probably wouldn't -- if they had

2 known that at the end of the day they're going to be facing

3 default interest, $100 million of default interest in excess --

4 not even a hundred, it's even more than that, it's $200 million

5 worth of default interest that they would not have had to pay

6 under the terms of the contract if they had simply gone ahead

7 and paid principal, they'd probably be pounding down the door

8 to do it.  But the Code says you don't have to do it.  And it

9 says that not only here, it says it here.  So --

10        THE COURT:  I don't want to conflate the concept of

11 default interest, which I haven't gotten to yet, with the

12 concept of how impairment may impact on the voting rights and

13 whether or not there is an issue that the Court has to look at

14 for fair and equitable.  I'm not attempting in this discussion

15 to look at anything to do with default.  I'm just trying to

16 figure out whether there is an impairment that requires a vote

17 and gets me to have to look at any of this.  That's all.

18        MR. BERNICK:  I understand.  And I think it's a very

19 fair point, and all that I would say, and I know my colleague,

20 of course, will say a little more, but all that I would say is

21 that if you go back to PPI, PPI could not be clearer that you

22 have to -- A, this is impairment, it doesn't give rise to in a

23 sense a substantive right, and B, that it says that the

24 measure, the metric for impairment is whether the law imposes

25 the limitation.  And I think that's the issue that Your Honor

1  is going to have to deal with.

2         THE COURT:  Yes.  I understand your argument, and I'm

3  going to have to go back and re-read PPI.  Mr. Friedman?

4         MR. FRIEDMAN:  Thank you, Your Honor.  Your Honor,

5  you are clearly on the right track in -- I'm sorry -- you're

6  clearly on the right track, and a plain reading of 1124(1) is

7  just exactly what Your Honor said.  If you alter the interest

8  rate that's set forth in the contract you're changing the

9  rights.  This is Judge Walsh from the Ace Texas case that I

10  cited to Your Honor.  He says, "I side with the author of this

11  view."  This author being Judge Queenan, who was a Judge in the

12  District of Massachusetts.  In Re Entz-White Lumber & Supply,

13  Inc., which was a Ninth Circuit case dealing with 1124(2),

14  reinstatement of a claim where, as Your Honor, knows -- I

15  should say, in Entz-White the issue was, oh, do I have to pay

16  the default rate of interest, or the non-default rate of

17  interest for the pendency of the case?  And what the Court held

18  in Entz-White is because deceleration is supposed to undo the

19  effects of default.  That's the reinstatement.  That's the

20  cure.  You get to pay the non-default rate of interest under

21  the contract.  But at no point did Entz-White, which is still

22  good law in the Ninth Circuit, suggest that you can pay some

23  lesser rate and still satisfy 1124(2).  It looks to the

24  contract.  1124(1) also looks to the contract.  The only

25  difference is there's no deceleration because in the Ace Texas

1  case for example the debt had matured.  In Morgan Stanley's

2  case the debt effectively is matured.  And so, what the Court

3  said was that _Entz-White_ appears to be in error, Section

4  1124(2) applies only to the curing of defaults that have

5  accelerated the debt.  There was no issue of cure before the

6  Court in _Entz-White_.  The entire debt was due without

7  acceleration.  The impairment rule applicable to unaccelerated

8  debt should therefore apply.  Under that rule impairment can be

9  avoided only if the plan proposes cash payment in the full

10  amount of the claim in accordance with the parties' agreement.

11  When the agreement requires a higher post-default rate of

12  interest this means the higher rate must be paid.  Any other

13  treatment would alter the creditors' rights.

14          THE COURT:  Well, the problem is, looking at the

15  language about the post-default rate, and I don't know the

16  facts of that case.  I don't know if there was a default, and

17  as a result there was a default rate established --

18          MR. FRIEDMAN:  There was a -- it went to two percent

19  higher once the debt matured.  Not uncommon.  It's not so much

20  a -- you know, a default.  I mean, the debt matured and you

21  didn't pay it.  And --

22          THE COURT:  Okay.

23          MR. BERNICK:  There was a pre-petition default in

24  that case, and an oversecured creditor case.

25          MR. FRIEDMAN:  There was an oversecured creditor

**J&J COURT TRANSCRIBERS, INC.**

1  here.

2         THE COURT:  Oh.  Well --

3         MR. FRIEDMAN:  But nevertheless, this was 1124(1),

4  this was not a fair and equitable analysis.  This was 1124.

5         THE COURT:  Yes, but the -- well, okay.  It's -- I

6  think at this point -- I remember reading that case in

7  connection with taking a look at the underlying opinion in the

8  first place, but I'll look at it again in connection with this.

9         All right, gentlemen.  I guess we're ready go to at

10 the omnibus hearing.

11        MR. COBB:  Yes, Your Honor.  Your Honor, I think this

12 is actually going to be quite beneficial.  We're going to have

13 a lot of fun, intellectually, I think, at this hearing.  I'm

14 looking forward to it --

15        THE COURT:  I hope you --

16        MR. COBB:  -- which I rarely do in this practice.

17        THE COURT:  I wish you folks would spend some time

18 trying to resolve this issue in the meantime.  I like the

19 intellectual challenges, Mr. Cobb, but I've got enough in this

20 case.  All right.

21        MR. COBB:  Your Honor, can we get an idea of timing

22 at the omnibus, how much time we will have?  Or is that too

23 much to ask at this stage?

24        THE COURT:  I tried to find out from my Delaware

25 staff, and I don't have any staff in, so I don't know, Mr.

1  Cobb.  If you can call Monday?

2                      (Clerk and Court confer)

3          THE COURT:  Okay.  I can give you a better idea on

4  Wednesday next week.

5          MR. COBB:  Wednesday.  Okay.

6          THE COURT:  So, if somebody can contact my staff

7  Wednesday, and then -- Ms. Baer -- and then pass the word

8  around?

9          MR. COBB:  Okay.

10          THE COURT:  I can give you a better idea then.

11          MR. COBB:  Thank you very much, Your Honor.

12          THE COURT:  And if we can start earlier, I think I

13  already indicated we could start at ten, I believe.  That's

14  assuming that everything else has fallen off the calendar, that

15  -- you know, there's nothing that I'm not aware of that's

16  sitting out there.

17          MR. BERNICK:  I won't talk about Morgan Stanley at

18  the omnibus, if that's what you're going to ask.

19          MR. FRIEDMAN:  Well, actually -- what I was going to

20  ask is Your Honor indicated earlier that she wanted to compel

21  mediation between Morgan Stanley and the debtor.  Is Your Honor

22  going to prepare an order?  Do you want us to submit an order?

23  Or do you just want us to work it out?  I mean, I'm not sure

24  what you -- how you --

25          THE COURT:  I think there's an order in this case

1 already that when the parties agree to go to mediation unless

2 you needs the terms of that order set out I don't think you

3 need anything more from me.  I would like you to go to

4 mediation over this issue.  If you want an order, prepare one.

5 I'm happy to sign it.  You may need -- in this instance you may

6 need to appoint a mediator.  I'm not sure you've got one.  So,

7 you may need an order for that purpose.

8          MR. FRIEDMAN:  We certainly don't have one, because

9 until about an hour ago I didn't know we needed one.

10          THE COURT:  I think maybe you folks need a mediator.

11          MR. BERNICK:  Thank you very much, Your Honor, and

12 thank you for all the time that you made available today.

13          THE COURT:  Okay.  We'll see you at the end of the

14 month.  Happy New Year, everyone.

15          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

16                        *  *  *  *  *

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T I O N

We, JANET PERSONS and TAMMY DeRISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of our abilities.


/s/ Janet Persons

JANET PERSONS


/s/ Tammy DeRisi            Date:  January 13, 2010

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**