UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                     . Case No.  01-1139 (JKF)
                           .
W.R. GRACE & CO.,          .
et al.,                    .
                           . 824 Market Street
                           . Wilmington, DE 19801
                           .
            Debtors.  .
                           . January 25, 2010
. . . . . . . . . . . . . . 9:39 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               JANET BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Pachulski, Stang, Ziehl &Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street, 17th Floor
                          Wilmington, DE  19899-8705


For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  NATHAN FINCH, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C. 20005


For the Future            Orrick, Herrington & Sutcliffe, LLP
Claimants                 By:  ROGER FRANKEL, ESQ.
Representatives:               RICHARD WYRON, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants:        Lewis, Slovak & Kovacich, P.C.
                                By:  TOM L. LEWIS, ESQ.
                                725 Third Avenue North
                                Great Falls, MT 59401

                                McGarvey, Heberling, Sullivan and
                                 McGarvey, P.C.
                                By:  JON HEBERLING, ESQ.
                                     JOHN LACEY, ESQ.
                                725 Third Avenue North
                                Great Falls, MT  59401

                                Cohn Whitesell & Goldberg, LLP
                                By:  DANIEL C. COHN, ESQ.
                                101 Arch Street
                                Boston, MA  02110

For Arrowood:                   Wilson, Elser, Moskowitz, Edelman,
                                 & Dicker, LLP
                                By:  CARL J. PERNICONE, ESQ.
                                150 East 42nd Street
                                New York, NY 10017

                                O'Melveny & Myers, LLP
                                By:  TANCRED SCHIAVONI, ESQ.
                                Times Square Tower
                                Seven Times Square
                                New York, NY 10036

For BNSF Railway:               Pepper Hamilton, LLP
                                By:  LINDA CASEY, ESQ.
                                     BOB PHILLIPS, ESQ.
                                     JAMES CARIGNAN, ESQ.
                                3000 Two Logan Square
                                Philadelphia, PA  19103

For CNA:                        Goodwin Procter, LLP
                                By:  MICHAEL GIANNOTTO, ESQ.
                                Exchange Place
                                Boston, MA  02109-2881

For Fireman's Fund:             Stevens & Lee
                                By:  MARNIE SIMON, ESQ.
                                600 College Road East, Suite 4400
                                Princeton, NJ 08540

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Maryland Casualty:          Connelly Bove Lodge & Hutz, LLP
                                By:  JEFFREY WISLER, ESQ.
                                The Nemours Building
                                1007 North Orange Street
                                Wilmington, DE  19899

For MCC & Zurich:               Eckert Seamans
                                By:  EDWARD D. LONGOSZ, ESQ.
                                1747 Pennsylvania Avenue, NW
                                Suite 1200
                                Washington, DC 20006

                                Wiley Rein, LLP
                                By:  RICHARD A. IFFT, ESQ.
                                1776 K Street NW
                                Washington, DC 20006

For Ford, Marrin,               Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer              Gleser, LLP
& Gleser, LLP:                  By: SHAYNE SPENCER, ESQ.
                                    ELIZABETH M. DeCRISTOFARO, ESQ.
                                Wall Street Plaza, 23rd Floor
                                New York, NY  10005-1875

For Kaneb Pipe Line             Fulbright & Jaworski
Operating Partnership,          By:  STEVE PEIRCE, ESQ.
LP:                             300 Convent Street, Suite 2200
                                San Antonio, TX 78205-3792

For Travelers:                  Simpson Thacher
                                By:  ELISA ALCABES, ESQ.
                                425 Lexington Avenue
                                New York, NY  10017

For AXA Belgium:                Tucker Arensberg, P.C.
                                By:  MICHAEL A. SHINER, ESQ.
                                1500 One PPG Place
                                Pittsburgh, PA  15222

                                Mendes & Mount
                                By:  EILEEN McCABE, ESQ.
                                750 Seventh Avenue
                                New York, NY  10019

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Committee of            Campbell & Levine
Asbestos Personal           By:  MARK T. HURFORD, ESQ.
Injury Claimants:           800 North King Street
                            Suite 300
                            Wilmington, DE  19701

For Kneb Pipe Line          Gilbert & Renton, LLC
Operating Partnership,      By:  ROBERT GILBERT, ESQ.
LP:                         344 North Main Street
                            Andover, MA 01810

For Garlock Sealing         Robinson, Bradshaw & Hinson, P.A.
Technologies:               By:  GARLAND CASSADA, ESQ.
                                 RICHARD WORF, ESQ.
                            101 North Tryon Street
                            Suite 1900
                            Charlotte, NC  28246

For Federal Insurance       Cozen O'Connor
Company:                    By:  JACOB C. COHN, ESQ.
                            1900 Market Street
                            Philadelphia, PA  19103

For Sealed Air:             Skadden, Arps, Slate, Meagher &
                            Flom, LLP
                            By:  DAVID TURETSKY, ESQ.
                                 J. GREGORY ST. CLAIR, ESQ.
                            One Rodney Square
                            Wilmington, DE  19801

For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022

For the Unsecured           Strook & Strook & Lavan
Creditors' Committee:       By:  ARLENE KRIEGER, ESQ.
                                 KENNETH PASQUALE, ESQ.
                            180 Maiden Lane
                            New York, NY 10038

For Continental             Goodwin Procter, LLP
Casualty Co.:               By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Fireman's Fund          Crowell & Moring LLP
Insurance Co.:              By:  LESLIE A. DAVIS, ESQ.
                                 MARK PLEVIN, ESQ.
                           1001 Pennsylvania Avenue, N.W.
                           Washington, DC  20004

For OneBeacon Ins. Co.,     Drinker Biddle & Reath LLP
Geico, Seaton Ins. Co.,     By:  MICHAEL F. BROWN, ESQ.
& Republic Ins. Co.:             JEFFREY M. BOERGER, ESQ.
                           One Logan Square
                           18th and Cherry Streets
                           Philadelphia, PA  19103

                           Drinker Biddle
                           By:  WARREN PRATT, ESQ.
                           1100 N. Market Street
                           Wilmington, DE 19801-1254

For the Bank Lenders:       Landis, Rath & Cobb, LLP
                           By:  RICHARD COBB, ESQ.
                           919 Market Street, Suite 1800
                           Wilmington, DE  19899

For the Bank Lenders:       Paul Weiss Rifkind Wharton &
                            Garrison, LLP
                           By:  MARGARET PHILLIPS, ESQ.
                                REBECCA ZUBATY, ESQ.
                                ANDREW N. ROSENBERG, ESQ.
                           1285 Avenue of the Americas
                           New York, NY  10019

For the U.S. Trustee:       Office of the U.S. Trustee
                           By:  DAVID KLAUDER, ESQ.
                           844 King Street, Suite 2313
                           Wilmington, DE  19801

For Arrowood                Bifferato Gentilotti LLC
Indemnity Co.:              By:  GARVAN McDANIEL, ESQ.
                           800 North King Street
                           Wilmington, DE  19801

For Travelers Casualty      Morris Nichols Arsht & Tunnell, LLP
Surety Company:             By:  MATTHEW B. HARVEY
                           1201 N. Market Street
                           PO Box 1347
                           Wilmington, DE 19899-1347

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel<br>By:  DAVID E. BLABEY, JR., ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For ZAI Claimants<br>& various law firms: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the Libby Claimants: | Landis, Rath & Cobb, LLP<br>By:  RICHARD COBB, ESQ.<br>     JAMES S. GREEN, JR., ESQ.<br>919 Market Street, Suite 1800<br>Wilmington, DE  19899 |
| For the Asbestos<br>Creditors Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For State of Montana<br>Dept. of Environmental<br>Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE 19801 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  ELLI LEIBENSTEIN, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  THEODORE FREEDMAN, ESQ.<br>     CHRISTOPHER GRECO, ESQ.<br>     DEANNA BOLL, ESQ.<br>Citigroup Center, 153 East 53rd St.<br>New York, NY  10022 |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman &<br> Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, TX  75201 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Morgan Stanley          Katten Muchin Roseenman, LLP
Senior Funding, Inc.:       By:  JEFF FRIEDMAN, ESQ.
                                 MERRITT PARDINI, ESQ.
                            575 Madison Avenue
                            New York, NY  10022-2585


For Morgan Stanley          Edwards Angell Palmer Dodge, LLP
Senior Funding, Inc.:       By:  ROBERT CRAIG MARTIN, ESQ.
                            919 N Market St.
                            Wilmington, DE 19801-3023


For Serengeti:              Vinson & Elkins, LLP
                            By:  ARI BERMAN, ESQ.
                            Trammell Crow Center
                            2001 Ross Avenue, Suite 3700
                            Dallas, TX  75201


For Scott Company:          Vorys, Sater, Seymour & Pease, LLP
                            By:  TIFFANY COBB, ESQ.
                            52 East Gay Street
                            Columbus, OH  43216


For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            LECG
                            By:  ELIZABETH DEVINE, ESQ.
                            1725 Eye Street NW, Ste 800
                            Washington, DC,  20006


For the Property            Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                                 SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131


For the Bank Lenders:       Paul Weiss Rifkind Wharton &
                             Garrison, LLP
                            By:  MARGARET PHILLIPS, ESQ.
                                 REBECCA ZUBATY, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Bank Lenders:          Crowell & Moring LLP
                               By:  TACIE YOON, ESQ.
                               1001 Pennsylvania Avenue, N.W.
                               Washington, DC  20004

For Asbestos Property          Scott Law Group
Damage Claimants:              By:  DARRELL SCOTT, ESQ.
                               1001 East Main Street, Suite 500
                               Sevierville, TN  37864

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  ROBERT GUTTMANN, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For the Future                 Orrick, Herrington & Sutcliffe,
Claimants                      LLP
Representatives:               By:  DEBRA FELDER, ESQ.
                                    JOSHUA CUTLER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007

For Federal Insurance          Cozen O'Connor
Company:                       By:  ILAN ROSENBERG, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For Official Committee         Anderson Kill & Olick
of Asbestos Personal           By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:              1251 Avenue of the Americas
                               New York, NY  10020-1186

For Grace Certain              Montgomery, McCracken, Walker &
Cancer Claimants:               Rhoads, LLP
                               By:  NATALIE D. RAMSEY, ESQ.
                               300 Delaware Avenue, Ste. 750
                               Wilmington, DE  19801

For David T. Austern,          Phillips, Goldman & Spence, P.A.
the Future Claimants'          By:  JOHN C. PHILLIPS, ESQ.
Representative:                 1200 North Broom Street
                               Wilmington, DE  19806

                               Lincoln International, LLC
                               By: GEORGE COLES

                               By: DAVID T. AUSTERN

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Allstate Insurance:       Cuyler Burk, LLP
                              By:  STEFANO CALOGERO, ESQ.
                                   ANDREW K. CRAIG, ESQ.
                              Parsippany Corporate Center
                              Four Century Drive
                              Parsippany, NJ  07054

For Official Committee        Duane Morris, LLP
of Unsecured Creditors:       By:  MICHAEL LASTOWSKI, ESQ.
                              1100 North Market Street
                              Suite 1200
                              Wilmington, DE  19801-1246

For Official Committee        Brandi Law Firm
of Asbestos Property          By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                  TERENCE D. EDWARDS, ESQ.
                              44 Montgomery St., Suite 1050
                              San Francisco, CA  94104

                              Lieff, Cabraser, Heimann &
                              Bernstein
                              By:  ELIZABETH J. CABRASER, ESQ.
                              Embarcadero Center West
                              275 Battery Street, Suite 3000
                              San Francisco, CA  94111

For Official Committee:       Riker, Danzig, Scherer, Hyland &
of Asbestos Property           Perretti, LLP
Damage Claimants:             By:  TARA MONDELLI, ESQ.
                                   CURTIS PLAZA, ESQ.
                              Headquarters Plaza
                              One Speedwell Avenue
                              Morristown, NJ  07962

For the Libby Claimants:      Cohn, Whitesell & Goldberg, LLP
                              By:  CHRISTOPHER M. CANDON, ESQ.
                              101 Arch Street
                              Boston, MA  02110

For the PD Committee:         Speights & Runyan
                              By:  DANIEL SPEIGHTS, ESQ.
                                   MARION FAIREY, ESQ.
                                   ALAN RUNYAN, ESQ.
                              200 Jackson Avenue, East
                              Hampton, SC  29924
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Everest Reinsurance Company, et al.: | Marks, O'Neill, O'Brien & Courtney LLP<br>By:  BRIAN L. KASPRZAK, ESQ.<br>     JOHN D. MATTEY, ESQ.<br>913 North Market Street<br>Suite 800<br>Wilmington, DE  19801 |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Normandy Hill Capital, LLP: | Normandy Hill Capital, LLP<br>By:  MATTHEW CANTOR |
| For Anderson Memorial Hospital: | Kozyak, Tropin & Throckmorton, PA<br>By:  JOHN W. KOZYAK, ESQ.<br>2525 Ponce de Leon, 9th Floor<br>Miami, FL 33134 |
| For AXA Belgium: | Mendes & Mount<br>By:  ANNA NEWSOM, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019 |
| For Royal Insurance: | Wilson Elser Moskowitz Edelman & Dicker, LLP<br>By:  CARL PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY  10017 |
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY |
| For Hartford Financial Service Group: | Wilmer Wilmer Cutler Pickering Hale & Dorr, LLP<br>By:  MELANIE R. DRITZ, ESQ.<br>399 Park Avenue<br>New York, NY  10022 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Asbestos Property          Pryor Cashman, LLP
Damage Claimants:              By:  RICHARD LEVY, ESQ.
                               410 Park Avenue
                               New York, NY  10022

For David T. Austern,          Lincoln International, LLC
Future Claimants'              By:  JOSEPH RADECKI
Representative:

For the Creditor               Scarfone Hawkins, LLP
The Canadian ZAI               By: MATTHEW G. MOLOCI, ESQ.
Claimants:                     1 James Street South, 14th Floor,
                               P.O. Box 926, Depot #1
                               Hamilton, Ontario, Canada

For Official Committee of      Caplin & Drysdale
Asbestos Personal              By: PETER LOCKWOOD, ESQ.
Injury Claimants:                  WALTER B. SLOCOMBE, ESQ.
                               One Thomas Circle, N.W., Suite 1100
                               Washington, DC  20005

For the U.S. Department        United States Department of Justice
of Agriculture:                By: MICHAEL SEW HOY, ESQ.

For Creditor:                  RBS Greenwich Capital
                               By:  JEFFREY FARKAS

For Interested Party           Caspian Capital
Caspian Capital:               By: TERESA BEST

For Interested Party           JP Morgan Chase & Co.
Oliver Butt                    By: OLIVER BUTT

For Interested Party           Pentwater Capital Management
Pentwater Capital              By: JORDAN FISHER
Management:

For Interested Party           Halcyon Asset Management
Halcyon Asset                  By: JOHN GREENE
Management:

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONE APPEARANCES (CONT'D):

For Interested Party          Hahn & Hessen
State of California:          By: CHRISTINA J. KANG
                             488 Madison Avenue
                             14th and 15th Floor
                             New York, NY 10022

For Farallon Capital:        Farallon Capital Management
                             By: MICHAEL LINN

For Interested Party          Archer Capital
Archer Capital:              By: ROBERT B. SALES

For Interested Party          Traub, Lieberman, Straus
Robert Siegel:               By: ROBERT SIEGEL, ESQ.
                             Mid-Westchester Executive Park,
                             Seven Skyline Drive
                             Hawthorne, NY  10532

For Travelers:               Simpson Thacher
                             By: SAMUEL J. RUBIN, ESQ.
                             425 Lexington Avenue
                             New York, NY  10017


                          -  -  -

1       THE COURT:   This is the matter of W.R. Grace,

2    Bankruptcy Number 01-1139.   The list of participants by phone

3    is Scott Baena, Janet Baer, Ari Berman, David Bernick, Terese

4    Best, David Blabey, Deanna Boll, Thomas Brandi, Peg Brickley,

5    Justin Brooks, Oliver Butt, Elizabeth Cabraser, Douglas

6    Cameron, Christopher Candon, Matthew Cantor, Richard Cobb,

7    Tiffany Cobb, Jacob Cohn, George Coles -- I apologize, there

8    are two lines that are not printed here, I believe they are Mr.

9    Craig and Ms. Davis, but it's difficult to see, so if that is

10   not the case and I miss anyone, when I'm finished, I'll take

11   entries from those people.

12       Michael Davis, Elizabeth DeCristofaro, Martin Dies,

13   Christopher Dombroski, Melanie Dritz, Terrance Edwards, Marion

14   Fairey, Jeffrey Farkas, Debra Felder, Jordan Fisher, Theodore

15   Freedman, Jeff Friedman, Michael Giannotto, Daniel Glosband,

16   Christopher Greco, James Green, John Greene, Robert Guttmann,

17   Sarah Harnett, Robert Horkovich, Christina Kang, Brian

18   Kasprzak, Stuart Kovensky, Matthew Kramer, Lewis Kruger, Elli

19   Leibenstein, Eric Leon, Michael Linn, Peter Lockwood.   Would

20   you folks please put your lines on mute, I'm getting noise in

21   the background that sounds like children playing.

22       Alan Madian, Peri Mahaley, John Mattey, Matthew

23   Moloci, Tara Mondelli, Kate Orr, Merritt Pardini, David

24   Parsons, Margaret Phillips, John Phillips, Mark Plevin,

25   Francine Rabinovitz, Joseph Radecki, Natalie Ramsey, Traci Rea,

1   James Restivo, Andrew Rosenberg, Ilan Rosenberg, Samuel Rubin,

2   Alan Runyan, Jay Sakalo, Robert Sales, Darrel Scott, Michael

3   Hoy, Michael Shiner, Robert Siegel, Walter Slocombe, Daniel

4   Speights, Shayne Spencer, David Turetsky, Edward Westbrook,

5   Richard Worf, Robert Wyron, Rebecca Zubaty and -- well, this

6   John Lhota is on the wrong call.

7           Did I miss anyone on the phone?

8                   (No audible response)

9           THE COURT:  Okay.  Operator, are you able to put

10  those lines on mute until people speak?  I'm getting feedback.

11          COURT CALL OPERATOR:  Yes, Your Honor, I'm doing that

12  right now.

13          THE COURT:  Thank you.  I'll take entries in court,

14  please.

15          MR. BERNICK:  David Bernick for Grace, Your Honor.

16          MR. FREEDMAN:  Theodore Freedman for Grace, Your

17  Honor.

18          MS. BAER:  Janet Baer for Grace, Your Honor.

19          MR. O'NEILL:  Good morning, Your Honor, James O'Neill

20  for Grace.

21          MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

22  from Orrick Herrington on behalf of David Austern, the PI FCR.

23          MR. FINCH:  Good morning, Your Honor, Nathan Finch

24  for the ACC.

25          MR. MONACO:  Good morning, Your Honor, Frank Monaco

**J&J COURT TRANSCRIBERS, INC.**

1  on behalf of the Crown.

2          MR. HOGAN:  Good morning, Your Honor, Daniel Hogan on

3  behalf of the Canadian Zonolite Claimants and representative

4  counsel before the CCAA.

5          MR. McDANIEL:  Good morning, Your Honor, Garvan

6  McDaniel and Carl Pernicone for Arrowood.

7          MR. TACCONELLI:  Good morning, Your Honor, Theodore

8  Tacconelli for the Property Damage Committee.

9          MR. SANDERS:  Good morning, Your Honor, Alex Sanders

10  PD FCR.

11          MR. BROWN:  Good morning, Your Honor, Michael Brown

12  and Warren Pratt for OneBeacon, Seaton, Geico and Republic.

13          MR. HARVEY:  Good morning, Your Honor, Matthew Harvey

14  for Travelers Insurance.

15          MR. RICH:  Good morning, Your Honor, Alan Rich for

16  the PD FCR.

17          MR. ROSENBERG:  Good morning, Your Honor, Andrew

18  Rosenberg for the Bank Lenders.

19          MR. COBB:  Good morning, Your Honor, Richard Cobb for

20  the Bank Lenders.

21          MR. WISLER:  Good morning, Your Honor, Jeffrey Wisler

22  on behalf of Maryland Casualty Company.

23          MS. CASHMAN:  Good morning, Your Honor, Megan Cashman

24  for Fireman's Fund.

25          MR. PASQUALE:  Good morning, Your Honor, Ken Pasquale

1  from Strook, for the Creditors Committee.  And, with me is my

2  colleague Arlene Krieger.

3          THE COURT:  Is that everyone?  Ms. Baer, good

4  morning.

5          MS. BAER:  Good morning, Your Honor.  Your Honor, on

6  the agenda, item number one is the continued Massachusetts

7  Department of Revenue objection.  I'm pleased to say we have

8  resolved that matter.

9          THE COURT:  Oh.

10          MS. BAER:  We're now working on the documentation and

11  we know that the final notes and the like are not supposed to

12  come until February, so we'd like to just kick this over to

13  March.  Hopefully, we'll have it done in March, if not, it'll

14  be April, but we've finally gotten there.

15          THE COURT:  All right.

16          MS. BAER:  Your Honor, agenda item number two is the

17  25th omnibus objection.  We've resolved a few more, but there's

18  still a few left that we're working on, and so we'd like to

19  just continue that again to the February hearing in the hope

20  that we can resolve some more of them.

21          THE COURT:  Okay.

22          MS. BAER:  Your Honor, agenda item number three was

23  Fireman's Fund lift stay motion.  The Fireman's Fund settlement

24  has now been -- is now a final order and, therefore, the lift

25  stay motion is moot.  I don't know if Your Honor needs

1  anything.

2           THE COURT:  I do.  I either need it withdrawn or an

3  order that indicates that it's moot, so that I can close it on

4  the record.

5           MS. BAER:  We'll prepare something and work with

6  Fireman's Fund to get that to you.

7           THE COURT:  All right.

8           MS. BAER:  Your Honor, agenda item number four was

9  General Insurance Company's motion to file a late proof of

10 claim.  Your Honor has entered an order, an agreed upon order,

11 on that matter, so that is over and resolved.

12          Your Honor, agenda items number five and six relate

13 to Canadian special counsel application.  We've had some, I

14 think, very productive discussions this morning and I will turn

15 the podium over to Mr. Freedman, who can discuss that and where

16 we stand.

17          THE COURT:  All right.  Thank you.

18          MR. FREEDMAN:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. FREEDMAN:  There were two objections to this

21 application and we have resolved them both.

22          With respect to the objections that go -- that were

23 filed by the Crown, the Crown has agreed that with respect to

24 the matter that's before the Court today, which is the

25 appointment of the CCAA representative counsel, as special

1  counsel in this case, to Canadian ZAI claimants, the Crown will

2  withdraw its objection to that appointment.

3        But to be clear, the Crown and their counsel will

4  speak for itself, but they will reserve all of their objections

5  to any subsequent fee application and whether or not it would

6  be appropriate to make a payment or to award any fees in that

7  representative counsel capacity.

8        The matter before the Court today was simply for the

9  appointment, that I will remind the Court is one of the

10  conditions to the new Canadian settlement agreement that the

11  CCAA representative counsel be appointed as special counsel in

12  this proceeding, as special counsel for purposes of

13  representing Canadian ZAI claimants.  The Crown is, as I said,

14  withdrawing its objection to that appointment, but preserving

15  all of its objections to any subsequent fee application.

16        THE COURT:  But the settlement sets out the fees.  It

17  says --

18        MR. FREEDMAN:  No.  The settlement -- that is a

19  matter of some confusion from the settlement.  There is -- on

20  this appointment, there is absolutely no reward of fees.  What

21  there is, both the prior settlement, as to which there was no

22  objection, and this settlement, does provide that under the

23  fund that will be established in Canada, a portion of that fund

24  will be made available to the Canadian representative counsel

25  with respect to their work in connection with the ZAI PD

1 distributions, and management of that fund.  And, those monies,

2 therefore, will be available in that Canadian fund.  That's

3 different from what we presume will be sought by the Canadian

4 counsel following this appointment.  That is, following this

5 appointment, they will subsequently come to the Court and ask

6 for authority to be paid in their capacity as special counsel,

7 presumably for contributions to the case.  The Court will then

8 be able to evaluate all the facts, including what the prior --

9 what the settlement actually requires by way of establishing a

10 fund and other relevant facts, in order to determine whether an

11 award is appropriate.

12      But there's nothing in what is being sought today,

13 which would provide for the approval of a payment to the

14 Canadian counsel at this time.

15      THE COURT:  Okay.  I think I'm looking at the right

16 -- I'm looking at Exhibit A to the CCAA representative

17 counsel's reply, which is attached to Docket Number 24158,

18 which is the terms of the settlement and it says, "On the

19 effective date as defined in the first amendment, plan, et

20 cetera, the asbestos PD Trust shall immediately transfer to the

21 ZAI PD claims fund, the following..." and then it lays out what

22 that is.  Wait, I think I'm looking at the right -- I must be

23 looking at the wrong -- I apologize.  I'm looking at the wrong

24 place.

25      I thought there was a $2 million fee and then a

1   $250,000 fee and then other fees that were to be paid, but I'm

2   looking at the wrong --

3   　　　　　MR. FREEDMAN:  Your Honor, there are fees of that

4   nature that are baked into the ZAI PD settlement, which is part

5   of the plan.  And those fees, actually, were there in the prior

6   settlement.

7   　　　　　THE COURT:  Yes.

8   　　　　　MR. FREEDMAN:  It's the same provision that is what

9   was negotiated, was that there would be certain fees made

10  available pursuant to those Canadian settlements with respect

11  to ZAI PD that would be part of the fund that was administered

12  and, frankly, which the Canadian Court, by approving that

13  settlement, has effectively approved.

14  　　　　　That is not --

15  　　　　　THE COURT:  Wait.  The Canadian Court approved the

16  fees?

17  　　　　　MR. FREEDMAN:  The Canadian Court approved the

18  settlement and the settlement contemplates that those fees

19  would be paid.  So, should the plan go effective, should the

20  Class A treatment, which is this particular treatment, be

21  approved by the Court as part of the whole confirmation of the

22  plan, then we will implement the Canadian settlement and those

23  fees will be paid as part of that settlement.

24  　　　　　THE COURT:  Right.

25  　　　　　MR. FREEDMAN:  And, I wanted --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  And there are going to be more fees

2  sought, other than this?  I mean, isn't this a settlement?  I

3  apologize, Mr. Freedman, I'm just confused.  It says they're

4  going to be paid $2 million and it says in respect of legal

5  fees and disbursements, that's in the past.  The next paragraph

6  then says, that another $250,000 Canadian are to be set aside

7  for future legal fees and disbursements.  So, you're telling me

8  there are going to be more fees?

9          MR. FREEDMAN:  To the extent that they can come in

10 and justify it.  I believe what they probably have in mind is

11 that there is going to work related to PI claims, that they're

12 going to be responsible for prosecuting and that is outside the

13 ZAI PD settlement.  And, what they're going to seek to ask the

14 Court for approval is fees that arise from their services in

15 that regard.

16          THE COURT:  Okay.

17          MR. FREEDMAN:  Totally different set of services.

18          THE COURT:  All right.

19          MR. FREEDMAN:  But, again, by approving this

20 application, the Court is not in any way approving any payment

21 of fees.  If the Court decides to confirm the plan with the

22 settlement as negotiated, intact, then that will have the

23 effect of approving this package of fees that have already been

24 approved, but it's not -- this application has no bearing on

25 that.

1          THE COURT:  Okay.

2          MR. FREEDMAN:  And as I said, Crown has made clear

3    that it will be preserving its rights to object to any

4    subsequent application to this Court and with respect to the

5    special counsel fees that might flow from the order that the

6    Court would enter today, hopefully, approving that application.

7          THE COURT:  Okay.  I guess that's still what's

8    confusing me.  It seems to me if the settlement is approved,

9    the fees are already determined, on the property damage side.

10   I appreciate the distinction and thank you for that

11   clarification.  But on the property damage side, it seems as

12   though the fees will already be approved, they're part of the

13   settlement.

14         MR. FREEDMAN:  Right.  And I don't believe that the

15   Crown would be objecting to that piece of the settlement.

16         THE COURT:  Okay.

17         MR. FREEDMAN:  What they would be preserving the

18   right to object to, is if there is a subsequent application

19   under 503 or, by virtue of this Court's approval, of the

20   special counsel status, for additional fees, then they would

21   object if they feel that that's warranted.

22         THE COURT:  All right.  I understand, thank you.

23         MR. FREEDMAN:  Okay.  So, that's the first objection

24   and it's been resolved as I've described.

25         The second has to do with a concern of the future

*J&J COURT TRANSCRIBERS, INC.*

1  claimants representative for PI claims as to the potential

2  confusion as to who's representing whom, and I'll let Mr.

3  Frankel describe the language that's been worked out on that,

4  but I understand that there has been a resolution of language

5  on that.

6         THE COURT:  All right.  Mr. Frankel.

7         MR. FRANKEL:  Good morning, again, Your Honor.

8         THE COURT:  Good morning,

9         MR. FRANKEL:  May I hand up an order?

10         THE COURT:  Yes.

11         MR. FRANKEL:  Thank you.

12         THE COURT:  Thank you.

13         MR. FRANKEL:  Your Honor, I think that we filed a

14  response, not an objection, because we were concerned that

15  there might be some confusion over the role of Mr. Austern as

16  the FCR in this case, for PI, and the role of CCAA counsel

17  because the order appointing them in Canada is broad and

18  appears to include future claimants, also.

19         What this clarification -- and this order is actually

20  the same order that was submitted, except for the proviso in

21  paragraph one of the submitted order.  What this clarifies is

22  that Mr. Austern will continue to represent all PI demand

23  holders, future claims, in this case, including ZAI personal

24  injury demand holders, from Canada or anywhere else and that

25  really is not a change in his role as the PI FCR.

**J&J COURT TRANSCRIBERS, INC.**

1          What we've been asked to clarify, and we can clarify,

2   is we have no intention of representing demand holders in the

3   Canadian proceedings.  Mr. Austern was appointed as the FCR

4   under 524(g) of the code, in this case.  That is his role, to

5   represent demand holders in this case and not to represent them

6   in connection with other proceedings that may go on somewhere

7   else.  So, we think this language clarifies it, we've shared

8   this with Canadian counsel and Mr. Hogan and we think this

9   resolves our response to the application.

10          THE COURT:  Okay.  May I hear from Mr. Hogan first,

11   and then I'll get back to the Crown, Mr. Monaco?  Is this

12   language acceptable, Mr. Hogan?

13          MR. HOGAN:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. HOGAN:  David Hogan, on behalf of the Canadian

16   Zonolite claimants and rep counsel.

17          Yes, Your Honor, it is, subject to those provisos

18   that we asked Mr. Frankel to enter on the record, so that it

19   was clear from the Canadian rep counsel's perspective, that the

20   future claims rep would not be appearing before the CCAA court

21   for the purpose of representing holders of claims in that

22   proceeding.

23          Your Honor, I'm sort of the last wheel here, even

24   though these are my applications.  For the record, Your Honor,

25   I'd just like to note that in court today are two of the rep

1  counsel, David Thompson and Matt Moloci of the Scarfone Hawkins

2  firm and they're here today to the extent the Court had any

3  questions.  I doubt you will.

4          THE COURT:  I have one.

5          MR. HOGAN:  Which is?

6          THE COURT:  Why I have an application a year, almost

7  two years, 18 months after the fact, to have this appointment

8  go nunc pro tunc.  I don't see any basis for doing that in the

9  Third Circuit under the case law.

10         MR. HOGAN:  Well, Your Honor, you'll recall that the

11 Court has already entered a substantial contribution order for

12 these same counsels, up to the point of September 1st, 2008,

13 and pursuant to the negotiations which resulted in the creation

14 of the amended and restated minutes of settlement, it was

15 negotiated that the fees would be captured much the way they

16 were with regard to the 503(b), I guess the (b)(4) motion that

17 we filed for those claims.  And so, the intent of both the

18 debtor, Grace, Canada and rep counsel, was to effectively

19 capture the fees for the assistance that rep counsel gave to

20 the confirmation process and the creation of the first amended

21 plan of reorganization.

22         THE COURT:  That may be the case.  Tell me how this

23 application meets In Re Arkansas and F.S. AirLease because

24 that's a problem.  I have bankruptcy counsel from Delaware and

25 if anybody in the world ought to know how to get themselves

**J&J COURT TRANSCRIBERS, INC.**

1  appointed timely in a case, it's Delaware counsel and I don't

2  have a timely application.  I just don't see how I do this,

3  nunc pro tunc, to September of 2008.

4        MR. HOGAN:  Well, Your Honor, the problem that

5  creates for us is that as you know, I'm sure from reading the

6  amended restated minutes of settlement, is that what was

7  negotiated by rep counsel and Grace Canada, and then the

8  debtors, provides for this and absent the Court's approval, it

9  blows up the minutes of settlement.

10        THE COURT:  You're going to have to tell that to the

11  Third Circuit.  They wrote those cases, I only apply that law.

12        MR. HOGAN:  Your Honor, I understand that.  It's just

13  more of a practical concern.  I've read those cases and I

14  understand the dilemma.  In fact, Your Honor, in preparing

15  these motions to file with the Court, I realized, and even

16  spoke with the U.S. Trustee's Office about the nature of these

17  applications and the fact that we're, effectively, trying to

18  put a square peg in a round hole, because the code doesn't

19  specifically provide for the creation of special counsel in

20  this context.

21        So, what we did, Your Honor, is we went back and

22  looked at how special counsel was appointed for the U.S. ZAI

23  claimants in this case, wherein the Court agreed to approve the

24  payment of the fees for special counsel for the U.S. ZAI

25  claimants with regard to the Science trial and we used that as

1  a template in order to create this application.

2          THE COURT:  But that was timely.  They got approval

3  before the Science trial happened, not after they had done all

4  the work.

5          (Conversation between Mr. Hogan and Bernick)

6          MR. HOGAN:  I understand.  Well, I'm going to let Mr.

7  Bernick speak to that issue, Your Honor, instead of --

8          MR. BERNICK:  I'm going to let Mr. Freedman speak.

9                    (Laughter)

10         THE COURT:  There was a nunc pro tunc aspect to that

11 order, if that's what you're going to remind me about.  And,

12 yes, I understand that that's the case, but the reason for it

13 was because those counsel had already been appearing on behalf

14 of the ZAI claims, the issue was whether or not they could be

15 adequately compensated to do a representative trial and that

16 was worked out in that fashion.  So, the circumstances just

17 aren't the same.

18         MR. FREEDMAN:  Your Honor, the circumstances may be

19 different in that case, but I think that the circumstances here

20 are still compelling and they are compelling because this

21 represents a renegotiation of a deal that expired in October.

22 And it's absolutely essential that the Canadian situation be

23 resolved fully and completely under Section 524(g).

24         As events transpired, that renegotiation required

25 certain changes and did require work by the representative

1  counsel to further the proceedings and get us to a point where

2  we could have a deal that we could bring to the Court and bake

3  into the plan that's currently before the Court.

4          So, what exactly is the right point in time for that

5  nunc pro tunc to compel a further award of fees is a question,

6  but the issue is that there is a substantial contribution that

7  will effectively be the standard that this Court is going to

8  apply when an ultimate fee application is brought before the

9  Court and all that this does is to recognize that this counsel

10 has been acting on behalf of a constituency which it is

11 authorized to act on behalf of, under Canadian law, in these

12 proceedings and it's appropriate to make clear for the record

13 that their activities relate back to that last date that the

14 Court awarded a fee application.

15         There is an overlapping jurisdiction here.  They have

16 been serving their clients in connection with the Grace case

17 and, ultimately, it would be appropriate for them, particularly

18 given the fact that they had to renegotiate the deal, to come

19 forward and seek further status and clarification of their

20 status in this court.

21         THE COURT:  Well, that's all well and good.  I don't

22 hear a word that tells me how I get around the Third Circuit

23 law when I've got experienced bankruptcy counsel, who know that

24 they have to get approved by the Court before they can be paid

25 as professionals in the case.  They don't need to be appointed

1  in order to seek a special contribution award, they weren't

2  appointed the last time in order to seek that award.  So, if

3  that's what it's going to be and that's the standard to apply,

4  I don't even want them appointed as special counsel because

5  then the standards are different.   So, I'm hearing two

6  separate things, neither of which I can reconcile with Third

7  Circuit case law.

8          MR. FREEDMAN:  Well, it's important to remember that

9  they are representing a group of claimants and not seeking

10  appointment under Section 327.

11          THE COURT:  Yes.

12          MR. FREEDMAN:  And to the extent that the Third

13  Circuit case law that you're talking about has to do with

14  debtor representation, this is a different situation.

15          THE COURT:  You think the Third Circuit is going to

16  apply it differently to creditors' counsel as opposed to

17  debtors' counsel, Mr. Freedman?

18          MR. FREEDMAN:  I think that it would be appropriate

19  to look at the fact that these are Canadian counsel that are

20  dealing in a 524(g) case, where we're trying to resolve a huge

21  block of Canadian claims that because of the expiration of the

22  deal that was made, because of circumstances related to just

23  getting the plan confirmation process completed.  They were

24  required to provide additional services and what they're simply

25  asking for, again, is just simply have their status confirmed

**J&J COURT TRANSCRIBERS, INC.**

1  for purposes of what they have already been doing.

2         THE COURT:  Well, I can confirm that status, as of

3  the date the application was filed.  I still don't see a basis

4  for nunc pro tuncing this application.  They have local

5  counsel, they've appeared in almost every proceeding in this

6  case that has anything to do with Canadian issues that are

7  relevant to their -- in fact, I think they have appeared in

8  everyone that's been relevant to Canadian issues and I simply

9  don't see a basis for a nunc pro tunc approval under this

10 circuit.  But I also don't see why it's needed if the issue is

11 a substantial contribution.

12         MR. FREEDMAN:  So, as I understand it, the Court is

13 indicating that it would be comfortable making the appointment

14 nunc pro tunc to the date of the application and that that

15 would not preclude them from seeking substantial contribution,

16 going back to whenever they can demonstrate that they made that

17 contribution and haven't yet been confirmed.

18         THE COURT:  Right.  Mr. Hogan?

19         MR. HOGAN:  Your Honor, first and foremost, I was

20 going to ask that the Court acknowledge our involvement, and we

21 entered our appearance in June of 2006 and as the Court has

22 indicated, we have appeared for every hearing as it relates to

23 Canadian Zonolite claims.

24         The application that we filed provided, as a basis,

25 again, because of the statutory predicate, 503, and so based on

1  what I'm hearing the Court tell us, you're agreeable to

2  appointing representative counsel as special counsel within the

3  context of this case and will leave, effectively, for another

4  day, the application for the reimbursement of fees, pursuant to

5  a 503 motion based on substantial contribution.

6         THE COURT:  Right.  It seems to me that if the

7  Canadian representatives wish to have some formal recognized

8  status hearing, that it's appropriate to do it as of the date

9  of the application now that the objections to that have been

10 resolved.  The problem I still face is the nunc pro tunc

11 aspect, but to the extent that there's a substantial

12 contribution award that's going to be requested, you don't have

13 to be appointed in any capacity by this Court for making the

14 substantial contribution anyway.  So, I don't think having the

15 appointment going forward, as opposed to nunc pro tunc to

16 September of 2008, prejudices the ability of the

17 representatives to apply for a substantial contribution award,

18 up to the date of appointment.  After the date of appointment,

19 I'm not so sure it's a substantial contribution issue any

20 longer.

21         I mean, if you're going to have a recognized formal

22 status, you get yourselves into the fee application process.

23         MR. HOGAN:  Of course, Your Honor.  Your Honor, if I

24 could,  I want to redirect your attention back to the amended

25 restated minutes of settlement because you had some questions

**J&J COURT TRANSCRIBERS, INC.**

1  early on and as this was my application, I wanted to just

2  clarify a couple of thing for the record.

3             THE COURT:  Okay.

4             MR. HOGAN:  If you would, Your Honor, turn to

5  paragraph 16 of that agreement.  And that provides, Your Honor,

6  as you can read, that Grace shall consent and support CC rep

7  counsel's application seeking appointment of special counsel

8  for Canadian ZAI claimants in the U.S. proceeding,

9  retroactively, to September 1, 2008 and going forward to the

10  date of the U.S. confirmation order.  Just because I knew you

11  were having some difficulty finding some of these provisions.

12            And then 17 provides that the CC rep counsel should

13  make application for approval or payment of CC rep counsel's

14  reasonable fees and expenses, including matters relating to the

15  original settlement, Canadian settlement approval, the Canadian

16  ZAI PD claims notice program, all of which we went through,

17  Your Honor, the amended and restated minutes of settlement

18  communication with Canadian ZAI claimants, the U.S.

19  confirmation order and all of the matters relating to the

20  interests of Canadian ZAI claimants and contribution and

21  support of the first amended joint plan.

22            So, I just wanted to make sure that that was on the

23  record, Your Honor.  And then finally --

24            THE COURT:  But, I thought those were the substantial

25  contribution awards that were already approved by this Court?

**J&J COURT TRANSCRIBERS, INC.**

1  What did I already approve?

2          MR. HOGAN:  You -- a substantial contribution order

3  was entered up to August 31st, 2008.

4          THE COURT:  Right.  Which was the original

5  settlement, the Canadian settlement approval --

6          MR. HOGAN:  It wasn't the notice program, however.

7  Everything -- the notice program, the amended and restated

8  minutes of settlement.

9          THE COURT:  Right.  It included some but not all of

10 these.  I am not going to reopen that issue of something that

11 I've already ordered.  So, if this settlement is part of it,

12 you'd better go rewrite the settlement.  I'm not approving that

13 paragraph.

14         MR. HOGAN:  What I'm saying, Your Honor, is that we

15 were approved for substantial contribution up to August 31st of

16 2008.

17         THE COURT:  Right.

18         MR. HOGAN:  And some of which, what has transpired

19 with regard to negotiations on behalf of the Canadian Zonolite

20 claimants, occurred post that.

21         THE COURT:  I understand that.

22         MR. HOGAN:  Okay.

23         THE COURT:  And as to matters that --

24         MR. HOGAN:  And we're not looking to open anything

25 prior to that date.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  As of anything that happened from

2    September 1 of 2008, to the date the application for special

3    counsel approval was filed, because I'm willing to make this

4    application nunc pro tunc to that date, I think there's

5    precedent for that.

6          MR. HOGAN:  Okay.

7          THE COURT:  And that was in December, I think, 2009.

8          MR. HOGAN:  It was, Your Honor.

9          THE COURT:  Okay.  So, from September 1st of 2008, to

10   December, whatever the date is, 2009, a substantial

11   contribution award can be sought for any items that weren't

12   already compensated by this Court.

13         MR. HOGAN:  Of course.

14         THE COURT:  I'm not going back and reopening the

15   issue that it was already awarded, I'm not entering additional

16   fees, that's over and done with, that's the end.  So, from

17   September 1st to December whatever, 2009, you can make a

18   substantial contribution fee request.

19         As of the date that the application was filed, you're

20   then into the fee management order that's approved in this case

21   because you're now special counsel and I'm not going to be

22   judging things by substantial contribution, I'm going to be

23   looking at the fees as I do for everybody else's fees.

24         MR. HOGAN:  Understood, Your Honor.

25         THE COURT:  Is that acceptable?  That's the question.

**J&J COURT TRANSCRIBERS, INC.**

1  I don't think that's what this --

2          MR. HOGAN:  Well, I've got to talk to my counsel and

3  the import of your decision, Your Honor, is that it appears

4  that the minutes are going to have to be revised, yet again.

5          MR. BERNICK:  Can I make a suggestion?

6          THE COURT:  Yes.

7          MR. BERNICK:  Maybe they ought to confer and figure

8  --

9          THE COURT:  Yes.

10          MR. BERNICK:  -- and see what really needs to be

11  nailed down so we can get on with the next issue which is item

12  seven.

13          THE COURT:  Yes, I think it gets you to the same

14  place, but I need to make sure that it doesn't violate the

15  terms of the settlement.

16          MR. HOGAN:  That's fine, Your Honor.  The last point

17  I wanted to make, just for the Court's edification, relates to

18  paragraph 22.  That's the paragraph that you were having some

19  difficulty finding earlier, as it relates to the breakdown of

20  how fees were going to be paid.  Remember, you were looking for

21  it?

22          THE COURT:  Yes.

23          MR. HOGAN:  It's paragraph 22 in the revised,

24  restated minutes of settlement.

25          THE COURT:  I did find it when Mr. Freedman was

**J&J COURT TRANSCRIBERS, INC.**

1  speaking.

2              MR. HOGAN:  Fine.

3              THE COURT:  Thank you, Mr. Hogan.

4              MR. HOGAN:  Thank you, Your Honor.  We'll report back

5  to the Court after we confer.

6              THE COURT:  All right.  Let me make one note.

7  September 1st to -- is it December 21?  I'm not sure I know the

8  specific date.

9              MR. HOGAN:  It is, Your Honor.  December 21st.

10             THE COURT:  Thank you.

11             MR. MONACO:  Good morning, again, Your Honor.

12             THE COURT:  Just a minute, Mr. Monaco.

13             MR. MONACO:  I'm sorry.

14                        (Pause)

15             THE COURT:  Okay.  Thank you.

16             MR. MONACO:  Okay.  Sorry, Your Honor.  Again, for

17  the record, Frank Monaco on behalf of the Crown.  Your Honor, I

18  have here with me today my co-counsel, Jacqueline Dais-Visca.

19  I think Your Honor is familiar with Ms. Dais-Visca.

20             THE COURT:  Yes.

21             MR. MONACO:  She's appeared in front of the Court

22  before.  She would like to address the retention applications

23  as well as the plan objections, which are the next item on the

24  agenda.

25             THE COURT:  Okay.  Well, let's limit it, at the

**J&J COURT TRANSCRIBERS, INC.**

1 moment, to the retention application.

2          MR. MONACO:  Okay.

3          THE COURT:  Okay.  Thank you.  Good morning.

4          MS. DAIS-VISCA:  Good morning, Your Honor.  It's

5 Jacqueline Dais-Visca for the record.

6          Counsel have properly characterized how we're

7 appearing today and the status of our objection to the extent

8 that I want, just on the record, that the clarification that's

9 now been provided as to the role of future claims

10 representative counsel, that was one of the things that we were

11 seeking clarification of.  We support that clarification being

12 made and that's before the Court, that concern, as far as the

13 Crown is concerned is taken care of.

14          The second aspect was, we take no position on the

15 case law governing the appointment of special counsel in these

16 proceedings, but we do reserve our right for any future motion

17 that will be brought for applying for fees for substantial

18 contribution and we will renew our objections at that point.

19 All this is against the backdrop that in Canada we have leave

20 to appeal motion which is in the hands of the Ontario Court of

21 Appeal.  The court is going to deal with the leave to appeal

22 from the approval of this restated minutes of settlement on

23 February 19th, on an expedited basis.  If leave is granted on

24 that date, they will also hear the appeal.  So, it's our

25 submission to the Court that any decisions being made with

1  respect to approval of fees that relate back to those minutes

2  that are the subject of the appeal, should await a

3  determination by the Court of Appeal in Ontario which,

4  hopefully, will be in and around February 19th.  Thank you.

5       THE COURT:  So, back to what Mr. Hogan was talking

6  about, paragraph 22, that lays out how the PD claims fund would

7  be allocated for fees for counsel, the Crown is still objecting

8  or reserving an objection to that or only to the PI side?

9       MS. DAIS-VISCA:  We haven't interpreted those minutes

10  as being -- that the fees are only with respect to one aspect

11  of the claim, PD or PI.  The --

12       THE COURT:  It says PD claims fund.

13       MS. DAIS-VISCA:  Right.  And in the settlement, in

14  the minutes of settlement, they also purport to resolve

15  treatment of Canadian PI claims and as you know, and that's one

16  of the grounds that will be raised -- that has been raised in

17  our objection to the modifications that are being sought to

18  incorporate into the plan, this restated minutes of settlement,

19  that they have done treatment to, they have negotiated

20  treatment to PI claims as a part of both the first settlement

21  and this settlement.  What's notable about these restated

22  minutes is, instead of releasing the Crown in respect of all

23  liability, joint and several with Grace and just preserving

24  several liability, they have inserted back in from liability

25  for the Crown, joint and several in respect to the PI claims.

**J&J COURT TRANSCRIBERS, INC.**

1  So, the minutes have been negotiated with the view to resolving

2  all Canadian claims, and not just focused on the property

3  damage claims.

4         So, I'm hearing, really, for the first time that the

5  fees are being allocated specifically for work on the PD side.

6  That's where the monies are flowing but I certainly haven't

7  understood that those funds were being earmarked specifically

8  for just PD work because throughout, they've been trying to

9  resolve all Canadian ZAI claims.

10        THE COURT:  Okay.  Well, the document itself, I think

11 is pretty clear, that it's resolving the PD fee issues because

12 the caption is, use of funds in the Canadian ZAI PD claims

13 funds, which clearly doesn't include payment for the PI ZAI

14 Canadian claims and then it talks about how the fees will be

15 awarded for past and future work and I don't think there's

16 anything here that talks about fees for the PI, at least I

17 don't recall it.  If there is, somebody point it out to me.

18 No.

19        MS. DAIS-VISCA:  My understanding is, that the only

20 fees are being paid out of the PD fund, but I haven't been

21 interpreting that provision as being an allocation of fees on

22 account of just the PD work that they've done.  Their work

23 throughout has been representing Canadian claimants on PI and

24 ZAI.

25        THE COURT:  Oh.  Well, I wouldn't be able approve a

**J&J COURT TRANSCRIBERS, INC.**

1  distribution for PI work out of the PD fund as the allocation

2  under the plan as provided, I don't think.  So, if the Crown

3  has a different view, you're going to have to show me how.

4          My understanding of this settlement and the plan, in

5  conjunction, is that this would resolve the property damage

6  work, but not the PI work.

7          MS. DAIS-VISCA:  Right.  And I think when we get the

8  actual application for payment of fees and they identify

9  exactly how they're planning, or how they've earned these fees,

10  I think we'll have more clarity, so we'll reserve any

11  objections until we understand more fully what they're applying

12  for, in what respect, for when that substantial contribution

13  application comes forward.

14          THE COURT:  Okay.  Well, that gets back to my

15  approval of the settlement because if the settlement is

16  approved, I'm not going to get an application for fees on the

17  property damage side, this approves it.  And that's why I'm

18  confused about the Crown's position.

19          MS. DAIS-VISCA:  Well, the Crown's position is,

20  simply put, and this morphs us now into, unfortunately, the

21  objections to the plan proper and the Crown's position is,

22  essentially, that the restated minutes are materially different

23  than the original minutes, they have caused particular

24  prejudice to the Crown, and as you will see from the notice of

25  motion for leave that was appended to our materials, those are

1  -- the live issues for the Court of Appeal are whether or not

2  the plan was capable of being approved, given our allegations

3  of conflict of interest with representative counsel and our

4  allegations about whether or not the requirements for approving

5  in advance of plan confirmation, a material settlement, have

6  met the requirements of Canadian law.

7        So, our issue throughout these proceedings and our

8  concerns, and the genesis for our raising these objections, is

9  the difference in treatment to the Crown and I'm happy to step

10 back and if you want to proceed with the plan objection by the

11 Crown, I'll defer to my friends and then just respond with two

12 quick points on those issues, if you want.

13        THE COURT:  All right.  Well, I want to finish the

14 fee issue first.  Is there anyone else who wants to be heard on

15 the fee issue?

16        MR. BERNICK:  Your Honor, if we could just ask

17 whether the Crown has an objection to the application with

18 respect to counsel.  We understand that they have an objection

19 to the plan.  By having heard all of what counsel has said, I

20 didn't hear an objection to the appointment that's being sought

21 in item five on the agenda, and six on the agenda.

22        THE COURT:  I don't think there's an objection to the

23 application.  The issue with respect to the FCR clarification

24 has resolved the Crown's objection to the application.

25        MS. DAIS-VISCA:  Well, our objection to the

1  application was twofold.  First, our concern about continued

2  representation of the Crown's claims over in the proceedings

3  against the trust.  The Crown's claims over have now been

4  channeled, whereas before they had all been released.

5         The other aspect of the claims -- the Crown's

6  objection, was this issue of conflict of interest.  Canadian

7  case law, in the class action context teaches that you are in a

8  conflict of interest if you, as counsel, tie the payment of

9  your fee and make conditional settlement upon your being paid

10 your fees or your clients get nothing, and the teachings of our

11 Canadian courts is that is not something that's capable of

12 approval by the court.  And so, it's an issue that the Canadian

13 Court of Appeal will be dealing with on the appeal and I'm sure

14 my friends will have arguments to say that we're not tying our

15 fees as a precondition to the payment, but it doesn't come

16 clearly from the record or the reasons of Justice Morowitz, if

17 that's the case.

18        So, in terms of can they -- are they in a conflict of

19 interest when they say there's no deal for my clients unless I

20 get exactly what I'm asking for, and usurping the Court's

21 discretion on a particular fee application.

22        If that issue is being deferred to another day, those

23 arguments do not need to be made here today.  If there's going

24 to be a separate application from them to come forward and

25 demonstrate that they should be paid, if it's going to be dealt

1  with today as a part of the objection to the plan, then I'm not

2  sure that I'm in any position to articulate anymore than it has

3  already been provided in the papers and I would just ask the

4  Court to defer any findings until the Court of Appeal in Canada

5  has exhausted our appeal rights.

6         THE COURT:  All right.  Well, I guess the issue is,

7  although this document says that the funds will be used to pay

8  $2 million, do I get a fee application that will justify the

9  payments of $2 million?   If I do, it will defer the -- or

10  resolve, I should say, the objection.  If I don't, then --

11         MR. BERNICK:  Your Honor, I think with respect to

12  anything relating to the fees that will be sought, that is for

13  another day, I think is what Your Honor has heard and if I'm

14  wrong about that, I'm sure somebody will stand up and tell me.

15  We're not -- I don't believe that there's any request for Your

16  Honor to approve any fees going forward.  The fee application

17  will be made in whatever form is appropriate, and I guess

18  there's going to be a request for a substantial contribution

19  and there are going to be fee applications made in connection

20  with the retention as a representative going -- special counsel

21  representative going forward.

22         But I think it is important today, provided that we

23  can get the applicant's counsel to caucus and then report back

24  to the Court, that the Court resolve and, in our view, grant

25  the motion for the appointment as special counsel.  That is

1  something that should be decided today.  And I've now heard the

2  Crown indicate that there are certain objections that are being

3  withdrawn.  There are others that are being reserved, i.e., the

4  allocation of fees and I think that that is properly reserved

5  and the only objection that I've now heard as to the

6  appointment itself, is that there's a conflict of interest,

7  there's an ethical issue.  And, I think that the simple answer

8  with respect to that comes from counsel's own lips, which is

9  that that is an issue that was specifically litigated in

10 Canada.

11         Indeed, it is an issue that pertains to Canadian

12 counsel, and whether they have a conflict of interest.  It was

13 disposed of at the trial court level, that argument was flatly

14 and completely rejected.  Apparently, the Crown intends to take

15 an appeal of that.  That's appropriate.  But having decided to

16 litigate that issue, in that forum, because it relates to the

17 agreement for which they have sought approval in Canada, I

18 think that they're bound by their choice.  They can't litigate

19 the issue both in Canada and here.  They sought to get Canadian

20 Court -- there was a request to get Canadian Court approval of

21 the agreement, the minutes of agreement.  That contemplated the

22 very motion to appoint counsel that Your Honor has taken up

23 today.  Objections were made by the Crown at that time, based

24 upon the alleged conflicts of interest.  And once they made

25 that objection, rather than asking that it be reserved for

1  determination here, in connection with this motion, they made a
2  choice and they're collaterally estopped by virtue of whatever
3  decision comes out of there.

4        Now, collateral estoppel doesn't set in until the
5  matter is final.  We now know that the matter is going to
6  become final, sometime in the middle of February.  But under
7  any set of circumstances, we should not have litigation in this
8  court over exactly the same issue.  So, having heard that
9  objection, I think that that object should be rejected on its
10  face because they have made the choice and they continue to
11  make the choice to pursue that issue in Canada.

12        THE COURT:  Well, I think that's what the Canadian
13  counsel is saying.  They're asking you to do nothing until the
14  Canadian Court determines whether the trial court in Canada was
15  or wasn't correct, and if the trial court is correct, then
16  there's no issue here.  If the trial court wasn't correct, then
17  there's a conflict and the question is, how can I appoint them
18  as special counsel here, if there's a conflict.

19        MR. BERNICK:  Well, because the fact of the matter
20  is, that if, in fact, the Canadian Court reverses and says that
21  there is a conflict, then the approval of the settlement itself
22  is unwound and if the approval of the settlement itself it
23  unwound, then people are going to have to report back to the
24  Court on whether there's going to be some kind of new
25  settlement or new arrangement, but with respect to the issue

**J&J COURT TRANSCRIBERS, INC.**

1  that we now have, which is this settlement with this

2  appointment, that matter -- the question about whether there is

3  a conflict has been reserved to the Canadian Court.  We're not

4  asking that they waive their objection, what we're saying, the

5  objection --

6          THE COURT:  But, why am I approving a -- but why am I

7  taking on a settlement that may be undone if there's a

8  reversal?  That really wastes court time.  It wastes the

9  Canadian Court Appeals time and it wastes mine, because if I

10  approve it and the Canadian Court reverses, we've done a whole

11  lot of work for nothing.

12          MR. BERNICK:  That is, I'm sure, something we're

13  going to get into in connection with the plan objection.  But

14  there's a little bit of a chicken and the egg.  We have to go

15  forward and get approval, or I shouldn't say we, it's important

16  to go forward and get approval of the minutes of settlement

17  that takes place in the Canadian Court, that is in process.  At

18  the same time, that settlement, as one of its terms, calls for

19  the appointment of counsel through the motion that is taking

20  place now.

21          It is true, Your Honor, that we could simply wait

22  until all the dust has settled in the Canadian Court and take

23  up incremental issues.  But the fact of the matter is that

24  because that settlement does call for this to take place, it

25  was our judgment that because we're trying to move this case

**J&J COURT TRANSCRIBERS, INC.**

1  forward, and get it done, that we would raise the motion at

2  this point in time.  The worst that can happen is that it

3  becomes moot because the settlement is unwound by the Court of

4  Appeals in Canada.

5          THE COURT:  Well, the worse that can happen is I'll

6  spend two hours listening to objections to the settlement and

7  plan objections, based on the approval of that settlement, that

8  will be reversed by one word in the Canadian Court.  Now, that

9  doesn't seem to me, to be a good use of anybody's time.

10          MR. BERNICK:  Well, I'm -- one at a time, Your Honor.

11  We've had the argument on the motion. I think that it has taken

12  place, I think it's a fairly straightforward matter.  If Your

13  Honor wants and what maybe would be the most prudent thing to

14  do, is to grant the motion but subject to the outcome of the

15  appeal.  That is as a condition subsequent.

16          But it is important for us to get this thing done,

17  because the Canadian settlement is an important part of the

18  overall confirmation process for this plan and there are many,

19  many, many constituencies who are now, after many, many years,

20  and we can have a discussion for another day about all the

21  circumstances that led to that period of time, they are anxious

22  to get this plan confirmed.  Certainly, the debtor is and the

23  debtor has got a lot of business reasons that are now important

24  to all constituencies to get this plan confirmed.  So, that

25  anything that can be done and be done reasonably, without

**J&J COURT TRANSCRIBERS, INC.**

1   actually waiting for the pen to strike the paper sometime later

2   on in February, is time well spent.  This is a small issue, we

3   think it's been properly dealt with.  We now hear where the

4   Crown is.  It doesn't seem to me that they have a substantive

5   objection to the motion, they have an ethical issue that's now

6   being raised in Canada.

7          With respect to the second issue, which is the plan

8   confirmation, and I know that we're now -- that is the next

9   item on the agenda, but that also is a very important process

10  to get underway, notwithstanding the fact that, you know, maybe

11  in two or three weeks lightening will strike and the Court of

12  Appeals will reverse in Canada.  And, the reason that that is

13  so, is that there's no real incremental work at all that's

14  required to address the one basic plan objection that is there,

15  which is the same plan objection that's being made by the State

16  of Montana through the same counsel, in the same court, on the

17  basis of the same record.

18         So, all that we really have to do is to simply move

19  forward by having that objection become on the same timetable,

20  subject to the same basic process that's already occurred with

21  respect to the State of Montana.  It's nothing new.  So, no one

22  is asking that Your Honor roll up your sleeves and engage in

23  any substantive work at this point.  We've got an

24  administrative matter, which is the appointment of counsel, and

25  we have the plan objection which is really a question of

1  process, which is, are they, or are they not included in the

2  same process that applies to everybody else.  That's it.

3       And, given the fact that the trial court in Canada

4  has come out not only with the order, but also with the

5  endorsement.  It has in very, very strong and unequivocal

6  terms, said this agreement is fine and should go forward and is

7  in the best interest of all concerned and has also resolved the

8  issue that the Crown has made.  And, I might say, Your Honor,

9  the Crown has not been very prompt in this matter, as the

10 District Court in Canada observed.  That counsel has known

11 about this matter -- and basically, this is the problem we've

12 faced with Canada all along.  It just takes time for the Crown

13 to get things done.

14       I understand that, that's fine, but we've got a lot

15 of other things that hinge upon getting this thing done

16 promptly.

17       So, Your Honor, we would urge that Your Honor take up

18 (a) grant the motion subject to a condition subsequent, which

19 is that, obviously, this plan is still on appeal, the agreement

20 is still on appeal, and with respect to the plan, which is item

21 eight, I think it is on the agenda, that the State of Montana

22 has already raised the issue, Your Honor, already is going to

23 engage that issue and we should simply have -- and there's no

24 evidence that's been identified.  Remember, the Crown was

25 supposed to identify any evidence in connection with the

1  submission that they made, that they would want to proffer.

2  They've identified no such evidence.  So, we have, essentially,

3  an admission that this matter can be resolved on the basis of

4  the same record, and we would ask that now having heard the

5  objections, seen the briefs on the objections, the Court should

6  simply consider those same objections as part of the plan

7  confirmation process as Your Honor writes the order.

8              THE COURT:  Okay.  Mr. Hogan.

9              MR. HOGAN:  Not to belabor the point any more, Your

10 Honor, but I did hear one comment made earlier that I wanted to

11 address for the Court and that relates to the $2 million.

12 Again, we're on paragraph 22.  And, I believe I heard the Court

13 indicate that as to that $2 million, that there was going to

14 need to be a fee application with regard to that.

15             That money is money that's being paid by the debtors

16 to the PD Trust and immediately from the PD Trust, pursuant to

17 the plan, to rep counsel.  There wasn't ever contemplated, at

18 least by rep counsel's perspective, that there be a fee

19 application associated with that payment.

20             THE COURT:  That's the problem, I think, that the

21 Crown is addressing and also, perhaps, a problem for

22 confirmation, if the Court hasn't approved all the fees that

23 are to be paid to counsel anyway.  So, that's my issue with

24 this settlement.  It provides for a fee, I have no -- I doubt

25 very much, based on the fees that this Court has already

1  approved for other professionals, the $2 million won't be

2  justified for the circumstances, nonetheless, I haven't seen

3  the fee application and I don't know that for a fact.  If, in

4  fact, there's a conflict, that's a different issue.

5          So, you know --

6          MR. HOGAN:  I understand, Your Honor, I do.  I just -

7  - I didn't want the Court to be left with an incorrect

8  impression about what rep counsel's expectation is with regard

9  to the minutes of settlement and their effectuation.

10         THE COURT:  Yes.  I didn't think, from reading this,

11 that rep counsel thought they'd be filing a fee app, but I am

12 questioning whether, maybe, I don't need one.  If I need one in

13 order to resolve this objection, get to confirmation and pass

14 what I think is a pretty technical issue in this overall

15 settlement, it may be worth it.

16         MR. HOGAN:  Thank you, Your Honor.

17         THE COURT:  Could you consult with your counsel?

18         MR. HOGAN:  I was attempting to do so before, but

19 there was argument still ongoing, Your Honor.

20         THE COURT:  Okay.

21         MR. HOGAN:  So, we'll undertake to do that once -- at

22 least these matters are set aside for temporarily, so I can

23 step outside.

24         THE COURT:  All right.  Sure.

25         MR. HOGAN:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. DAIS-VISCA:  I just want to clarify the Crown's

2   appearance here today and our position.  It is the Crown's

3   position that it is premature to be dealing with either of

4   these objections.  My friends use the analogy of the chicken

5   and the egg, my analogy is cart before the horse.  And these

6   aspects of the Canadian ZAI claimants was carved off to the

7   Canadian courts to be resolved.  We've got an expedited appeal.

8   It's my position here that I'm urging this Court to await

9   determination by that court.  Either it will be -- the appeal

10  will be upheld and then the approval of the settlement will be

11  overturned, or it will be affirmed.  And we should have that

12  decision in fairly short order.

13          And I agree with my friend, it would be of no use to

14  this Court's time for me to be up here, re-articulating the

15  arguments that have already been made as to the particular

16  treatment that the Crown's contribution indemnity claims will

17  receive in the TDP.  I would just draw Your Honor's attention

18  to the fact that Justice Morowitz declined to look at all at

19  how the Crown claims would be treated in the TDP and referred

20  us to come to the U.S. Court to determine those issues,

21  alongside all the other similarly.  So, when he approved the

22  settlement, he didn't even turn his mind to what the

23  consequences for the Crown were.  And that is one of the ground

24  of appeal.

25          In terms of my friends' indication that the Crown has

1  not been prompt in this matter, I would like to please refer

2  the Court to the transcript of the hearing of this Court, it

3  was October 27, 2008, and this appears in the materials that we

4  filed.  The submissions by myself at that hearing are at Page

5  85 and this hearing was the report to the Court following the

6  approval in Canada of the first settlement, the settlement that

7  included a release against the Crown, in favor of the Crown for

8  all Canadian claims for which they would have claims over

9  against Grace.

10       And beginning at Line 19, on Page 85, I said the

11 following:  "The Crown filed an objection in these proceedings.

12 Subsequent to filing that objection, Justice Morowitz of the

13 Ontario Superior Court, acting under the CCAA, released his

14 reasons for decision, as well as the order approving the

15 Canadian settlement.  In the context of his reasons, he did two

16 things that are of import for the purposes of the outstanding

17 objection from the Crown.  At that time, we had filed an

18 objection to the disclosure statement concerning contribution

19 indemnity claims treatment.  The first was, he approved the

20 settlement and in so doing, he recognized that Canadian

21 representative counsel have the authority to negotiate on

22 behalf of the Crown, and the second thing he did was recognize

23 the CCAA release in favor of the Crown, for any of the Crown

24 claims seeking contribution indemnity from Grace.  As a result

25 of that, I said, our objection is effectively moot now.  We are

1  no longer able to appear before you as we are now represented

2  by Canadian representative counsel."

3        So, on the record, back in October of 2008, with all

4  counsel for Grace and counsel -- CCAA rep counsel in

5  attendance, we put on the record that our understanding was

6  that we were no longer in a position to represent ourselves in

7  these proceedings, that the Canadian court had ordered all

8  representation had to be done by CCAA rep counsel.

9        So, to the extent that my friends are suggesting we

10  should have, throughout, been continued to file objections and

11  do whatever we could to preserve the Crown's interest in these

12  proceedings, it's my submission that's without merit, given

13  that they are, effectively estopped from asserting that

14  position, given that nobody took a contrary position to our

15  interpretation that we had no standing to do so.

16        THE COURT:  Well, I've never been asked to address

17  that issue, so it hasn't been -- I acknowledge that that

18  statement was made, I don't know where it's coming from, based

19  on the order that the judge entered in 2006, but I'm not

20  familiar with the order that you're referring to in the

21  statement that you made.  So, if there is --

22        MS. DAIS-VISCA:  It's the approval order form October

23  17, 2008 and it appears in the materials, and in his reasons he

24  specifically finds, because our objection, we supported the

25  settlement but we wanted clarification that we were still in a

1 position to defend our own interests in respect to the claims

2 over because our claims over arise wholly from the claims of

3 the other PI claimants.  We're the defendant.

4        So, if they're successful, then suddenly we have

5 claims.  If they're unsuccessful, there was an irreparable

6 conflict of interest, in our view.  And Justice Morowitz

7 disagreed and said that the original representation order

8 authorized them to go ahead and represent the Crown,

9 particularly in the first settlement because there was no

10 prejudice to the Crown.

11        THE COURT:  Right.

12        MS. DAID-VISCA:  There was nothing left.  But then he

13 has now renewed that position when there's clear prejudice to

14 the Crown and that's the basis in forming our objections going

15 forward.  So, as soon as we caught wind of this, we became

16 active again and we have tried to accede to the Court's time

17 lines to deliver these materials.  So, we are trying not to

18 delay things unnecessarily.  And we've got the Canadian appeal

19 expedited.

20        THE COURT:  Okay.  I think Mr. Bernick's suggestion

21 that in the event that the issues I've raised on this record

22 can be successfully resolved by the applicants, that approval

23 of this application, with the condition that the appeal upholds

24 the trial court's order in Canada, is probably the best way to

25 go.  Now, that's not an approval of the settlement, that's an

1  approval of the application of Canadian counsel, but I need to

2  hear from them.  So, Mr. Hogan, until you get back to me, I'm

3  deferring this issue and moving onto something else.

4          MR. HOGAN:  Thank you, Your Honor.

5          MR. BERNICK:  Your Honor, with respect to the next --

6  we'll follow through on that.  With respect to the next item,

7  which is the treatment of the plan objections, I think that

8  we've just now been talking about that.  And I don't know if

9  there's going to be any further argument from the Crown with

10  respect to that.  I see counsel kind of shaking her head, but

11  if there's something else that you wanted to address --

12          MS. DAIS-VISCA:  No.  We will rest on our papers on

13  the formal plan objections, and again, it's our position that a

14  determination on those plan objections should await

15  determination by the Court of Appeal.  We have no further

16  argument in that regard.

17          THE COURT:  All right.

18          MR. BERNICK:  Okay.  And, I would only observe,

19  there, that this is something which is like the application

20  that Your Honor just heard, but it's an even stronger situation

21  where Your Honor should, in fact, in our view, basically

22  proceed.

23          Counsel is correct, as she observes, that the trial

24  court in Canada did not take up the issue, did not take up the

25  issue of the plan objections that they've made, which is that

**J&J COURT TRANSCRIBERS, INC.**

1    they should not have -- they should have been able to get the

2    same protection in the second, or amended agreement, that they

3    got in the first.  The trial court specifically carved that

4    issue out and said it's Your Honor's issue, it's a plan

5    confirmation issue.  And therefore, by virtue of even the trial

6    court's decision in Canada, that matter is ripe for Your Honor.

7              Now, of course, if, in fact, the Court of Appeals

8    overturns the settlement itself, once, again, it's moot.  But,

9    clearly, this is not something that has vested in the Canadian

10   court.  The plan objection itself.  That is that they should

11   have the same treatment that they had the first time around.

12   That is, in fact, before Your Honor.  And as to the timeliness

13   of counsel, you know, this is not a question of pointing

14   fingers, but the timeliness of counsel in raising all of this,

15   was specifically litigated by the Crown, and the trial court

16   said, no.  Basically said the reliance placed on the original

17   settlement by the Crown, which is exactly what counsel has done

18   again this morning, is to talk about the original settlement,

19   was in my view, unreasonable in the circumstances and does not

20   alter the fact that the merits of the amended plan should be

21   considered in light of the reality that the original settlement

22   no longer exists.  As all parties involved were all

23   sophisticated and they knew the consequences of failure to

24   obtain the U.S. confirmation order by October 31, 2009.

25             Your Honor doesn't need to reach that issue, but it

1  is a backdrop for the fact that we're here, we're now -- we've

2  got an issue that's ripe and we think that Your Honor should

3  proceed and if, in fact, we learn in the next few weeks that

4  the Court of Appeals is reversing in Canada, obviously, we'll

5  have work to do.  But, we believe -- we agree with counsel for

6  the Crown that the matter is on the papers and can be taken up

7  by the Court.

8          MS. DAIS-VISCA:  Thank you.  The only wrinkle to add

9  to what my friend has just stated, is that the treatment of the

10  Canadian contribution indemnity claims over, once we hit the

11  fund is the same treatment that anybody else is receiving in

12  the U.S., and so, our plan objections line up with Garlock and

13  Montana's and other objectors.

14          The different treatment that we have as a result of

15  the Canadian settlement is that unlike PI ZAI claimants in the

16  U.S., Canadian ZAI PI claimants have provided a release to

17  Grace.  To my friend -- and his material has commented on the

18  gratuitous gift to the Crown of having provided a release.  In

19  this new restated settlement, it's the Crown's position that

20  the CCAA rep counsel gave a gratuitous gift to Grace in giving

21  a release in respect of all the claims against them in Canada,

22  leaving Canada to hold the bag for all joint and several

23  liability, which is a condition that is not currently in play

24  for any of the similarly situated claimants in the U.S.  And

25  there was no additional consideration for that.  It was just

1  given.  And the mechanism then is that they can sue the Crown

2  in Canada for all joint and several liability, and leave Canada

3  holding the bag and going down for a claim against the fund.

4  And that's the differential treatment that we're saying to the

5  Court of Appeal, that Justice Morowitz had to consider as a

6  relevant factor before approving that and the settlement is

7  fair and reasonable, because that is different treatment for

8  Canadian PI claimants that adversely affects the Crown.

9          THE COURT:  The U.S. ZAI claims are providing -- are

10  you talking of personal injury?  You're talking personal

11  injury.

12          MS. DAIS-VISCA:  Personal injury, right.

13          THE COURT:  Okay.  The U.S. ZAI claims provide a

14  release to the debtor when they're paid through the trust.

15          MS. DAIS-VISCA:  Right.

16          THE COURT:   Yes.

17          MS. DAIS-VISCA:  The different mechanism in Canada is

18  that the Canadian ZAI plaintiffs don't even have to come to the

19  fund, they just sue Canada and Canada has to come down and as a

20  contribution indemnity claimant, receive, as BNSF has

21  submitted, just pennies on the dollar from the amount they pay

22  out on account of Grace's several liability.  So, we won't be

23  defending just our own liability, we'll have to approve payment

24  of Grace's liability, they release Grace, so they won't even

25  come to the trust, Canada is left holding the bag and

1 effectively indemnifying Grace for all their liability in

2 Canada.

3        THE COURT:  They're releasing the debtor without

4 making a claim against the fund.

5        MS. DAIS-VISCA:  They released the debtor of all

6 claims in Canada and they've channeled the Crown contribution

7 indemnity claim.

8        MR. BERNICK:  With all due respect, that is -- the

9 fact that the Crown is a joint tortfeasor, may even be a sole

10 tortfeasor, because of its sovereign obligations as Your Honor

11 has indicated with respect to Montana.  The fact that they're

12 exposed to claims in the tort system, then have to come down,

13 as counsel indicates, to make claims against the trust, means

14 that they're in an absolutely identical condition as everybody

15 else in the tort system who is a joint tortfeasor.

16        They apparently -- what they're really taking issue

17 with is that the ZAI personal injury claimants have decided

18 that they're not going to go ahead and sue Grace.  Well, that's

19 their decision, but the Crown has no right that arises by

20 virtue of the ZAI claimants' decision not to pursue claims

21 against Grace, but to resolve them, the Crown has no right that

22 arises by virtue of that, to somehow get protection, or

23 different treatment, of their contribution claims than any

24 other joint tortfeasor anywhere who has contribution claims.

25        In other words, the Crown is saying that because the

**J&J COURT TRANSCRIBERS, INC.**

1  ZAI personal injury claimants have decided not to go after

2  Grace, that they should get the benefit that accrues to that in

3  some fashion and should not have to be sued themselves, or that

4  their contribution claims should be treated differently, but

5  they have no right that arises by virtue of the decision by ZAI

6  personal injury claimants not to pursue Grace.

7          MR. FREEDMAN:  But, Your Honor, to be fair, what they

8  agreed to is what all the other PI claimants have agreed to,

9  namely, be channeled to the trust, as opposed to Grace.  In

10 that sense, they're not suing Grace, they're going against the

11 trust, but there's no waiver of their claims in this deal at

12 all.  They're going to go to the trust like all of the ZAI --

13 like all of the personal injury claimants related to Grace

14 asbestos.

15         THE COURT:  All right.  So, the issue isn't that

16 they've agreed not to sue the debtor and not to present claims

17 to the trust --

18         MR. FREEDMAN:  Right.

19         THE COURT:  -- it's that they're not suing the debtor

20 because they can present claims to the trust.

21         MR. BERNICK:  And the question then is, does that

22 give rise to a right in the Crown to get some special treatment

23 vis-a-vis its liability to the personal injury claimants or its

24 ability to claim against Grace.

25         THE COURT:  But that's not what I'm hearing the Crown

*J&J COURT TRANSCRIBERS, INC.*

1  arguing.  What I'm hearing the Crown arguing is that the

2  Canadian ZAI PI claims have agreed not to present claims to the

3  trust, but only to sue Canada and let Canada present the claims

4  to the trust for contribution and indemnity.

5          MR. FREEDMAN:  Your Honor, paragraph 13 of the

6  agreement, the last sentence --

7          THE COURT:  Of the settlement?

8          MR. FREEDMAN:  Of the settlement agreement.  Canadian

9  ZAI PI claimants shall be entitled to the same rights as all

10  other asbestos PI claimants.

11          THE COURT:  Okay.  So, they can present their claim

12  to the trust, they haven't waived that issue.

13          MR. FREEDMAN:  Right.

14          MR. BERNICK:  Right.

15          THE COURT:  I think that must be -- what you've just

16  argued, I think, is a misreading of this language.  The

17  Canadian ZAI personal injury claims still will go against the

18  trust if they choose to do it.  They have not waived that

19  ability, and yes, if they have some right to sue the Crown as

20  a co-defendant in the tort system, just like if they have that

21  right to sue any other co-defendant in the tort system, that's

22  preserved, I'm not sure where there's -- I'm missing the issue.

23          MS. DAIS-VISCA:  Yes.  Right, well, the mechanism --

24  the way it will play out, and the Crown's interpretation of

25  this is that they will pursue their claims against Crown

**J&J COURT TRANSCRIBERS, INC.**

1 without naming Grace in Canada, get the full payout from the

2 Crown in Canada and never have to pursue the trust because it

3 will have been paid in full for the joint and several liability

4 of Grace to their action against the Crown alone and the Crown

5 is incapable of going to the TDP as a contribution indemnity

6 claimant until all the 11 class actions are resolved in Canada.

7      THE COURT:  Well, you wouldn't have a claim until

8 then.  A claim that could be paid until then.

9      MS. DAIS-VISCA:  That's right.  Right.  And, we will

10 be defending these actions without any procedural orders in

11 order to get Grace's evidence in respect of the product.

12      THE COURT:  Oh, well, the procedural order discovery

13 issue is a whole different issue.  You're entitled to get

14 whatever discovery from any party, just because Grace isn't a

15 party doesn't mean you don't have discovery from Grace.

16      MS. DAIS-VISCA:  Right.  And this is part of the case

17 law for the Court of Appeal on how we treat procedural orders

18 and in approving class settlements and they're usually a form

19 of one of the terms of the settlement includes procedural

20 protections for the non-settling defendants and that's not a

21 part of this settlement.

22      THE COURT:  All right.

23      MR. BERNICK:  (a) there's no difference -- we now

24 know that there's no difference between the Crown's position

25 under the joint tortfeasor, such as the State of Montana.  It's

1 just remarkable to me that all of these same arguments are

2 being made in Canada, they're going to be resolved in Canada,

3 and collateral estoppel somehow is not going to set in and

4 we're going to re-litigate them here.

5          THE COURT:  Well, I don't know how the Canadian court

6 is going to either approve or not approve this plan.

7          MR. BERNICK:  Well, it's in connection with the

8 settlement.  They're making exactly the same arguments against

9 the settlement that they now want to come back and say well,

10 it's not fair in the settlement, they get turned down on that.

11 Then they say it's not fair in the plan.  Again, I don't think

12 that there's any merit to their plan arguments, for the same

13 reasons that have been indicated which is they're no

14 differently situated than the State of Montana.

15          But be that as it -- and maybe I should just rest

16 there.  It is not a novel argument.

17          MS. DAIS-VISCA:  And, I'll just, for clarification,

18 we do not intend to re-litigate all these issues.  Whatever

19 decision the Court of Appeal makes on the fairness and

20 reasonableness of this plan and its approval -- sorry, of the

21 settlement and its approval in Canada, the only arguments I see

22 that we'll have remaining will be the same arguments as the

23 Garlock and the BNSF and we will rest on our papers for that.

24          Our fight, we agree, is in Canada, that's why we came

25 here today to say, please defer, please adjourn, whatever,

1  until the Canadian courts have exhausted our appeal rights.

2  We'll be bound by that decision, we don't plan to come back and

3  re-litigate those issues here.

4       MR. BERNICK:  And so, Your Honor, I'm told by

5  Canadian counsel that although the Court of Appeals may hear

6  this matter promptly, it may not be an immediate decision,

7  which then, again, I understand, it means that it is

8  particularly on matters that are carved out by the Canadian

9  proceeding for resolution here, i.e., the plan, Your Honor

10  should then just proceed with those because they are before

11  Your Honor in the first instance.

12       THE COURT:  Well, I think I can go forward with the

13  plan.  The only problem is, what happens in the event that I

14  approve the plan and then the Canadian court says, oh, no, the

15  settlement is reversed?  What have I done?

16       MR. BERNICK:  Yes.  Well, first of all, you've

17  approved the plan, so that in the event that the Canadian court

18  says it's okay, we can, in fact, go forward and get out of

19  bankruptcy and we don't have to wait for the Canadian court, in

20  order to even begin this process.  That's basically the idea,

21  is to get it out of the way now.

22       If, in fact, the Canadian court is still considering

23  this matter, can the plan go effective, that there may be an

24  issue there.  Again --

25       MR. FREEDMAN:   There is an issue, Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

1  because of the condition of the effective date of the plan.

2  That we have an order in Canada implementing the 524(g)

3  injunction, which could not happen if this matter was reversed

4  in the Canadian court.  So, precisely, as Mr. Bernick is

5  saying, it makes sense to move forward on all of the plan

6  confirmation issues and let that get resolved.  We will still

7  need to resolve matters in Canada to go effective, but the

8  process will have moved that much farther down the road.

9          THE COURT:  Well, maybe.  I mean, if I have a plan

10  confirmation order and the plan can't go effective, then the

11  plan has to be at least modified, if not withdrawn, and who

12  knows what the consequence of that is going to be.  And, folks,

13  this is one complicated case. I really don't want to get into

14  this and then find out that because I've approved something,

15  another court that has more slashes after its name than I have,

16  decides that I can't have approved it, that I have to redo it

17  all.  It doesn't make sense to me.

18          MR. BERNICK:  Well, we would agree with that and all

19  that we can deal with is where we are today, which is that thus

20  far, the Canadian courts have squarely come out in favor of

21  this arrangement.  We do have a prompt hearing and I think all

22  that we can do is to get things done.

23          Now, to say -- it's not to say that there aren't

24  efforts to expedite the resolution of this particular issue and

25  there are discussions that are taking place and we're anxious

**J&J COURT TRANSCRIBERS, INC.**

1  to see if we can't obviate that.  And I think that Your Honor,

2  we understand what Your Honor is saying about the need to

3  reduce the burden of this case and focus the issues that is

4  taking place and I have some happy news to report in just a

5  moment, but another issue has been --

6          THE COURT:  That might be good, because so far it

7  hasn't been really positive today.

8          MR. BERNICK:  Well, I know and we're sensitive to

9  that.

10         THE COURT:  Okay.  Well, to the extent that the issue

11  is, essentially, the same between the Crown and Montana and the

12  other indirect claimants, I think that, in fact, the issue

13  really is, the legal issue really is stated pretty much the

14  same way by those parties.  And I am going to undertake that

15  issue with respect to parties other than the Crown, anyway, so

16  I'm not so sure that there's going to be a different ruling.

17  It seems to me that the classification issues and the fair and

18  equitable treatment issues and the absolute priority issues and

19  the other things that the parties have raised are all the same.

20  So, I think the ruling is going to end up the same, unless

21  there's something peculiar about Canadian law that would

22  separate the Crown out and I really don't think the papers have

23  articulated that.  So, let me just ask, is there something that

24  I need to focus on that's different?

25         MS. DAIS-VISCA:  No.  The Crown's position is that we

1  will be treated in accordance with whatever ruling you make in

2  respect to the other contribution indemnity claimants and their

3  objections.  We make no new arguments on that.

4          THE COURT:  All right.  So, I think the issue with

5  respect to number six, is that the Canadian --

6          MS. DAIS-VISCA:  Number seven.

7          THE COURT:  Seven.  One minute.

8          MR. BERNICK:  The objection is seven.  The plan

9  objection is seven.  Five and six are the retention matters.

10          THE COURT:  Okay.  One second.  Let me correct my

11  note here, please.

12                        (Pause)

13          THE COURT:  All right.  I think with -- the outcome

14  with respect to item seven is, it's simply part of the plan

15  confirmation process and probably by the time I get an order

16  out with respect to this, those rulings will have come down

17  from the Canadian Appeals Court anyway.  So, frankly, I'm not

18  going to worry too much about when I can adjudicate it because

19  I can put this last on the list, then it will still take me a

20  while to get there.  Mr. Hogan?

21          MR. HOGAN:  I just wanted to have a word with Mr.

22  Bernick.  I didn't want to offend Your Honor.

23          THE COURT:  All right.

24          MR. BERNICK:  In fact, while that's happening, we can

25  take up -- I think item eight is going to be very quick and

1 then we have a short report and then we have lenders.

2        MS. BAER:  Your Honor, I apologize to the Reed Smith

3 folks who may or may not still be on the phone.  Item number

4 eight, Your Honor, was a status on those two Canadian property

5 damage claims that were remanded back from the district court

6 and I know that Mr. Speights' firm and the Reed Smith firm have

7 been working on a pretrial statement to submit to the Court.

8 That's the matter that's then going to be tried on issues with

9 respect to statute of limitations.

10        I did not receive anything from them, I don't know if

11 they're still on the phone, but I do know they're working on

12 that.

13        MR. RESTIVO:  Jim Restivo, Your Honor.  I am still on

14 the phone.  We do have -- we did confer and consult with Mr.

15 Speights.  We do have a joint pretrial statement that both

16 sides have signed off on, that's very short, looks to be three,

17 four pages.  We do not believe there will be any witnesses at

18 the trial of this matter.  We believe there will only be two

19 exhibits, the two claim forms and supplemental data to the

20 claim forms.  We don't believe we need to call anyone to

21 authenticate this, so I don't think there will be any

22 witnesses.

23        Our estimate is, we need about a half hour to put

24 into evidence the two exhibits and to make -- both sides make

25 their argument and we will be filing the joint pretrial,

1  probably today or tomorrow.

2          THE COURT:  Okay.  With respect to -- you're telling

3  me you need a half an hour for the entire proceeding?

4          MR. RESTIVO:  Yes, Your Honor.  You remember, this is

5  bifurcated and at this point, what we are trying is only the

6  liability question of the ultimate statute of limitations.

7          THE COURT:  Yes.  Is it possible to do it on one of

8  the omnibus hearing dates, after the conclusion of the Grace

9  matters that day then?

10          MR. RESTIVO:  I believe it is, Your Honor.  I believe

11  Mr. Speights is available both for the February 22nd and March

12  22nd omnibus, but I'm in trial in Tampa Federal Court in

13  February, that week.  And so, our request would be, if the

14  Court has the time, a half hour at the March 22 omnibus.

15          THE COURT:  I think that makes sense, Ms. Baer.  Do

16  you know what will be on that agenda yet?

17          MS. BAER:  Your Honor, we're actually hoping to keep

18  that very light.  Some of us may be on spring break.  So, I

19  think that's fine.  We have a lot up in February.

20          THE COURT:  Okay.  I think doing it at the March 22nd

21  date is fine, Mr. Restivo, but I'd like to get that pretrial

22  order filed so that I can get that entered before the trial.

23          MR. RESTIVO:  The joint pretrial statement, Your

24  Honor, again, will be filed either today or in the morning.

25          THE COURT:  Okay.  I believe that March hearing is

1  here in Delaware, correct?

2         MR. BAER:  Yes, yes, it is.

3         THE COURT:  All right.  So, that will be in Delaware,

4  Mr. Restivo.

5         MR. RESTIVO:  Okay.  Thank you, Your Honor.

6         THE COURT:  And I guess I'll reserve an hour just in

7  case that's necessary, at the end of the omnibus hearing.

8         I don't think Mr. Speights was on the phone.  Is

9  anybody on for the --

10         MR. SPEIGHTS:  Your Honor, I'm on the phone.  Can

11  you hear me?

12         THE COURT:  Oh, yes, sir.  I'm sorry.  Is this

13  agreeable --

14         MR. SPEIGHTS:  And, I agree with everything Mr.

15  Restivo said and March suits me fine.

16         THE COURT:  All right, that's fine.  I'll get the

17  order when I -- or I'll sign the order when I get it from you

18  and we'll do the trial in March then.

19         MS. BAER:  Thank you, Your Honor.

20         MR. SPEIGHTS:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         MR. BERNICK:  There are two other matters I'd like to

23  report on to the Court.

24         THE COURT:  Mr. Bernick, just give me one second

25  while I finish this.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. BERNICK:  I'm sorry, sure.

2                        (Pause)

3              THE COURT:  Mr. Speights, could you mute your line,

4    please?  We're hearing your conversation.

5              Okay, Mr. Bernick, thank you.

6              MR. BERNICK:  I have two matters to report on before,

7    I think the last item on the agenda is the lenders, the default

8    interest rate issue, or post petition interest rate issue, and

9    then we're going to have continued argument on that.  But the

10   two miscellaneous matters that will be of interest to other

11   people in the court, or may not be of interest, as the case may

12   be.

13             First of all, with respect to Morgan Stanley, we do

14   have a settlement with Morgan Stanley, with respect to their

15   post petition interest issue.  Essentially, they'll be paid

16   the same interest rate that is provided for in the plan, with

17   respect to prepetition bank lenders.  So, they're agreeable to

18   that rate and that will resolve the matter with Morgan Stanley.

19             As to one other miscellaneous matter that I wanted to

20   make sure was flagged, in connection with, or at the time of

21   the omnibus hearing on February 22, Your Honor will take up a

22   joint motion by the plan proponents, for entry of an order

23   approving a stipulation and an agreed order resolving

24   neutrality objections with respect to the plan.  So, we do have

25   the language of that resolved and we want to present that for

**J&J COURT TRANSCRIBERS, INC.**

1  approval by the Court.

2       During the course of discussing and, indeed,

3  litigating some other issues, it has occurred to the plan

4  proponents that it's really pretty critical to make clear one

5  of the provisions, and we wanted to do that on the record today

6  and it's very, very brief.

7       There is a retention of rights by the insurers in

8  connection with this stipulation.  And that retention of rights

9  says that -- it's at Romanette -- stipulation paragraph 10(b),

10 which deals with insurer plan objections, Romanette I, says

11 "The following Phase 1 and Phase 2 objections are not being

12 withdrawn by the insurers and the insurers retain their right

13 to continue to litigate these objections before the court and

14 the district court and in any appellate court and sub (a) is,

15 each insurer retains the right to litigate the issues below, as

16 applicable to itself."

17      Now, the reason for my standing up is that we want to

18 make sure that when the stipulation refers to as applicable to

19 itself, the intendment is to reflect the agreement among the

20 plan proponents and we believe with the carriers, that that

21 provision simply preserves objections, the objections to the

22 extent that they fall within the scope of this provision, to

23 the extent that those objections were timely made.  That is,

24 that the intendment is not in some fashion to have objections

25 that would otherwise fall within the scope of what follows in

1 this provision, spring back to life if they were not timely

2 made.

3          So, it's objections that have been timely made and

4 otherwise fall within the scope of the language of the

5 stipulation.  That's what, as applicable to them means.  And we

6 wanted to state that on the record that to the extent that

7 people have issues about that or questions, they should contact

8 us in advance of the omnibus, but we wanted to make sure that

9 that was stated on the record.

10          THE COURT:  Okay.  I'm not sure most of the insurers

11 are represented, so you may have to get in touch with the

12 insurers somehow to make sure that they understand it, because

13 to the extent they don't either participate today or get a

14 transcript, they're not going to hear that.

15          MR. BERNICK:  I understand that and we will circulate

16 the transcript.  I note that at least some of the major players

17 are here today, but we understand that, Your Honor.

18          THE COURT:  All right.

19          MR. BERNICK:  And with that, we're done with, at

20 least from the debtor's points of view, we're done with the

21 agenda, with the exception of the lenders' issue.  I don't know

22 if Your Honor wants to take a break before that argument starts

23 or whether we should just start in with it.

24          THE COURT:  Well, I do want to take a break, but has

25 the issue with respect to items five and six been resolved yet?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I think that they're out there now

2  conferring.

3          THE COURT:  All right.  Then let's take a ten minutes

4  recess and we'll reconvene.  Thank you.

5                    (Recess)

6          COURT CLERK:  All rise.

7          THE COURT:  Please be seated.  Just a second, Mr.

8  Hogan.  I asked Mr. Hogan to wait a minute until I get to where

9  I need to be on my proceeding memo here.  Okay.

10         MR. HOGAN:  Thank you, Your Honor.  Daniel Hogan,

11  again, on behalf of the Canadian Zonolite claimants and

12  representative counsel.

13         Your Honor, we've been asked to consider the Court's

14  recommendations with how to pursue our applications and we've

15  had discussions with debtors' counsel, as well as with the

16  Crown, towards fashioning a form of order.  And, it may be

17  possible that we can do that, Your Honor, but we want to

18  explore a couple issues and some discussions that we've had and

19  in light of that, Your Honor, I would ask that we adjourn this

20  over to the 16th of February and to the extent that we can

21  arrive at a form of order in the pendency of time between now

22  and then, we file it under certification of counsel.  But I'd

23  ask that they be just moved over to the 16th for the purposes

24  of allowing us to explore those options.

25         THE COURT:  All right.  Anybody object?

**J&J COURT TRANSCRIBERS, INC.**

1                    (No audible response)

2          THE COURT:  Okay.  It's continued till the February

3  omnibus then.  Thank you.

4          MR. BERNICK:  It will be items -- Your Honor, items

5  five and six.

6          THE COURT:  Yes.  Thank you.

7          MR. BERNICK:  Thank you.

8          MR. HOGAN:  Thank you.

9          THE COURT:  Okay.  Is there anything else before I

10  get to the argument on the interest issue?

11                    (No audible response)

12          THE COURT:  Okay.  Mr. Pasquale?

13          MR. PASQUALE:  Thank you, Your Honor.  Ken Pasquale

14  from Strook for the Creditors' Committee.

15          Your Honor, Mr. Cobb for the lenders and I are going

16  to break this up, we're not going to repeat things.  I'm going

17  to focus on what is now a purely legal issue and that's

18  solvency.  As to the other issues, obviously, I join in what

19  Mr. Cobb will say and rest on our briefs and I'll just reserve

20  some time to respond to what Mr. Bernick may say.

21          Your Honor, some time ago we, you know -- these

22  issues have been before the Court for a while, as you know, and

23  some months ago, we stood -- I stood here and we talked about

24  solvency and what might or might not have to be proven at the

25  confirmation hearing.  And I stood here and said, a bit

1  flabbergasted, why are we doing this, this doesn't seem to be

2  an issue that should be factually disputed.  And as we stand

3  here now, after the proof being presented at the confirmation

4  hearing, briefs being done post hearing, Mr. Bernick doing his

5  opening argument on these issues, that's exactly where are.

6  It's purely a legal issue.  So, let me try to narrow and

7  discuss where we are.

8      There is now no dispute that the test date is the

9  effective date.  It's in Grace's briefs, Mr. Bernick said it

10  during his opening, which makes perfect sense because unlike

11  the fraudulent transfer context, when we talk about solvency,

12  where it's very clear the transfer date is going to be the test

13  date.  We're here on a confirmation standard of 1129(b),

14  talking about the fair and equitable test.  And, again, Mr.

15  Cobb will focus more on the details of that, but just focus on

16  solvency.

17      The Court is now addressing confirmation of the plan.

18  And in addressing confirmation of the plan, you need to look at

19  the plan and you need to look at the terms of the plan.  And

20  that's the remaining legal issue that's now before the Court.

21  So, we know we're going to look at the plan -- well, let me

22  back up.

23      We know we're going to look at the test date for

24  purposes of solvency as of the effective date and now the

25  question is, for purposes of solvency, should the Court

1  consider the terms of that plan.

2           Grace hasn't come forth with a single case that says

3  you should ignore the terms of the plan as of that date.

4  They've pieced together some code provisions but they have no

5  case that says that.

6           And, Your Honor, if you think about what an effective

7  date is, the effective date defines itself with the term, it's

8  the effectiveness of the plan and I can show you, and maybe I

9  will put it up on the ELMO.

10          On the very bottom of the page is this plan's

11  definition of effective date, no surprise.  It talks about the

12  effectiveness of the Plan, capital P, which means the terms of

13  this plan.

14          We've heard Mr. Bernick say that, well, here you

15  can't determine solvency as of the effective date, because the

16  asbestos liabilities will never be resolved.  Well, that's just

17  not true.  The plan purports to resolve the asbestos

18  liabilities.  There is a deal and the asbestos constituencies

19  have accepted contribution to the trust under the terms now

20  provided in the plan, but importantly, through a settlement

21  reached prior to the plan.

22          But to say that those issues -- excuse me, that those

23  claims, those liabilities, are not resolved, is just not right.

24  And, in fact, Grace's own expert admitted at the trial that

25  they would be resolved.

1      This is Ms. Zilly's testimony, she was asked a

2 question and Mr. Bernick wanted to clarify that we were talking

3 about the plan before the Court and you see the colloquy above

4 and we're talking about when the plan goes effective, Mr. Cobb

5 said yes, and Ms. Zilly said, "If the amended plan is confirmed

6 by the Court, and goes effective, then I believe that pursuant

7 to the settlement set forth in the plan, that relates to the

8 amount of assets that Grace and others will contribute to the

9 PI trust, then the asbestos claims will be resolved."

10      Again, we all know as a matter of law, if the Court

11 confirms the plan, that's going to be the effect.  The claims

12 are resolved.  Asbestos claimants will not be able to pursue

13 Grace for those claims.  It's done, it's over.  Their rights

14 are against the trust.

15      And, so, hello, again, as we now stand here, it seems

16 to have been unnecessary, our expert, Mr. Frezza, did an

17 analysis, which is really undisputed now.  I mean, Grace has

18 never disputed the numbers and the approach and we'll talk

19 about the feasibility issue in a moment.

20      Looking at the numbers and the resolution of the PI

21 claims taken from the plan, those are the numbers we have to

22 look at for purposes of confirmation.  But to put this issue

23 in, I think, in the most illustrative light, how can we ignore

24 what's now before the Court?  It's simply a matter of process

25 now that Grace is able to argue, these claims aren't resolved.

**J&J COURT TRANSCRIBERS, INC.**

1  Because, Your Honor, as we know, these claims were resolved in

2  early 2008, and a term sheet was agreed to in April, and it's

3  at least conceivable that a 9019 settlement motion could have

4  been brought in May or June, in advance of a plan.

5      Parties would have come in, we could have said here

6  are the terms, this is what we want to do and, yes, it'll be

7  subject to a plan later.  Sounds similar to the Sealed Air and

8  Fresenius transactions which Mr. Bernick has now said, res

9  judicata.  But let's assume that that happened, Your Honor, and

10 I don't want to get caught up into, well, there's reasons we

11 couldn't do it that way, that's not my point.  My point is, had

12 it been done earlier, preplan, and the Court entered an order

13 approving the settlement of the asbestos claims they would have

14 been resolved before the plan, and we wouldn't be having this

15 argument today about can we determine solvency under the plan?

16 Just by process.

17     The numbers are the same, everything is the same.

18 It's just a matter of when, in what format is this settlement

19 taking place.  The mere fact that it's taking place in a plan

20 can't change the analysis of whether or not this is a solvent

21 debtor case.

22     Your Honor, I mentioned a moment ago that Grace, in

23 its briefing and in Mr. Bernick's argument, didn't have a

24 single case that said, look at solvency for purposes of post

25 petition interest, as of the effective date of a plan, but

**J&J COURT TRANSCRIBERS, INC.**

1  ignore the plan terms.

2          Well, there is a case right on point, Your Honor,

3  and it's a case both sides have cited and that's the Coram

4  Healthcare case, 315 B.R. 321, decided by Judge Walrath in this

5  court.  And there were a lot of things going on in the Coram

6  case, Your Honor, but it was a case very similar to this case.

7  It was a post petition interest case.  And one of the things

8  Judge Walrath had to decide was whether it was a solvent debtor

9  case.

10          I'd like to just take a minute and talk about Coram,

11  because I think it puts to rest the debtors' argument that this

12  Court should be ignoring the terms of the plan and ignoring the

13  asbestos personal injury settlement.

14          Coram involved a couple of competing plans.  There

15  was a plan advanced by the Chapter 11 Trustee with unsecured

16  noteholders and a separate plan advanced by the Equity

17  Committee.

18          For purposes of determining the confirmability of the

19  trustee's plan, that plan provided for a settlement with the

20  debtor's noteholders and the estate had some significant claims

21  against the noteholders, by which the noteholders contributed

22  $56 million to the estate, they released the remaining $9

23  million due on their claims and that was in exchange for a

24  release of the estates' claims against them and 100 percent of

25  the equity in the reorganized entity.

**J&J COURT TRANSCRIBERS, INC.**

1          Old Equity received a recovery under that plan.  They

2    received cash.  In determining -- in making the determination,

3    excuse me, on whether or not the unsecured creditors would be

4    entitled to post petition interest under 1129(b), the fair and

5    equitable test, the court engaged in all of the wonderful

6    confirmation exercises that Your Honor has to do, including a

7    contested valuation.

8          And expert testimony was presented on the going

9    concern value of those estates.  And then of particular

10   interest here, the Court did an analysis of what it titled

11   confirmation value and that begins on Page 341 of the decision.

12         In discussing the confirmation value, Your Honor,

13   Judge Walrath took into account elements of the plan before the

14   court, including a calculation of NOLs, net operating losses

15   and most importantly for us as we stand here today, took into

16   account the value of the noteholders' settlement with the

17   estate and the court said this is something, this is a value

18   that the noteholders who are -- will end up being the owners of

19   this company are getting and when I determine confirmation

20   value, the $56 million has to be taken into account.

21         This is from Page 343 of the -- I'm sorry, I realized

22   I wasn't by the mic.  This is Page 343 of the decision and in

23   the highlighted portion at the top, the Court takes into

24   account as I just said, the $56 million that the noteholders

25   would pay for a release.  And then in the lower portion that

1  I've highlighted for the convenience of the Court, the Court

2  says, after considering the competing valuations, the competing

3  incentives of the parties, and the divergent evidence offered

4  in support of the valuations, we conclude the value of the

5  debtors is less than 317 million.  In and of itself, that

6  doesn't tell us anything, but I wanted to raise the foundation

7  for the next portion of the decision, which is on Page 345.

8          And this is where the <u>Coram</u> court turns to the post

9  petition interest issue itself.  And in the left hand column,

10 the court specifically holds and finds that unsecured creditors

11 can receive post petition interest.  I'm going to paraphrase,

12 Your Honor, insolvent debtor cases and the court cites cases,

13 and then most importantly, up on the upper right, the court

14 finds in this case -- well, sorry, Your Honor, let me go back a

15 step.  The court first -- an argument was presented that the

16 court should look at the liquidation value and compare the

17 liquidation value of the estate to the liabilities and Judge

18 Walrath said, no.  We're going to look at the confirmation

19 value, because it's a confirmation test and that's what the

20 noteholders are getting under the plan, under the terms of the

21 plan before the court.  And the court then finds, "In this

22 case, though, it is relevant to compare the amount of debt to

23 the confirmation value, 317 million, because the debtors are

24 reorganizing instead of liquidating.  Under that scenario, the

25 debtors are solvent and post petition interest should be paid

1 before shareholders get a distribution."

2          Your Honor, it's our position that this resolves the

3 issue now before this Court.

4          THE COURT:  But, no one is disputing that there

5 should be post petition interest.  The issue is, what kind.

6          MR. PASQUALE:  Yes, Your Honor, and that's -- and as

7 to rate, Mr. Cobb will discuss that, it is disputed.  Mr.

8 Bernick and Grace are disputing that the terms of the plan

9 should be considered in the solvency analysis.  And all I'm

10 trying to address for the Court is that this is a solvent

11 debtor case.  We've proved it, the plan proves it, the plan

12 terms need to be taken into account.  And that's what <u>Coram</u>

13 supports, Your Honor.

14          THE COURT:  Okay.  Well, the debtors' evidence, as I

15 recall, was that if the plan goes effective, then the debtors

16 are solvent, they will be able to pay their bills as the bills

17 come due, if you want to use that test of solvency, they will

18 have access to capital to the extent that debts have to be paid

19 in the future and that that access to the markets will provide

20 them with the necessary capital to pay debts that will accrue

21 in the future, including those to the asbestos committee.

22 That's how I -- at least, what I recall the basic evidence to

23 be, but the issue still is that the plan has to go effective to

24 make all that happen.  And, I don't understand why, even if I'm

25 looking at a confirmation value, a term, frankly, which is, I

**J&J COURT TRANSCRIBERS, INC.**

85

1  think, undefined except in <u>Coram Healthcare,</u> although having
2  said that, I recognize that the purpose for valuation means
3  that the Court can consider all sort of things in determining
4  value because you have to look at the particular purpose in
5  mind.  Okay.

6          Aside from that, if I look at whatever this
7  confirmation value is, that still assumes that the plan has
8  gone effective.  And, generally speaking, the Court isn't
9  involved in post effective matters, the Court is involved in
10 pre-effective matters, and so, there is a split second at which
11 those two come together, I don't know how you judge when that
12 split second actually happens, but it seems to me there is a
13 significant difference in valuation before that split second
14 and after that split second.  So --

15         MR. PASQUALE:  Well -- sorry.

16         THE COURT:  -- I think what you're saying is, <u>Coram</u>
17 says that the confirmation value is post effective, but the
18 liabilities, somehow or other, are pre-effective.

19         MR. PASQUALE:  No.  No, Your Honor.  What <u>Coram</u> does
20 is take the plan and apply the terms of the plan, liabilities
21 and confirmation value --

22         THE COURT:  All right.

23         MR. PASQUALE:  -- and concludes, this is a solvent
24 debtor case.  That's the language that I've highlighted on the
25 right.  And that's the point I'm trying to make to the Court.

**J&J COURT TRANSCRIBERS, INC.**

1   It's a solvent debtor case.  This, too, is a solvent debtor

2   case.

3        There are, frankly, Your Honor, other issues that Mr.

4   Cobb will address and we've briefed, that go to the issues Your

5   Honor is raising now.  I'm trying to focus on the very narrow

6   issue of that threshold inquiry, is this, this, the Grace case,

7   a solvent debtor case.  <u>Coram</u> supports the argument that we've

8   made which is that the terms of the plan which, of course,

9   assume effectiveness, I agree, Your Honor, but that the terms

10  of the plan get applied in determining whether it is a solvent

11  debtor case for 1129(b).  That's the point I'm raising, Your

12  Honor.

13       THE COURT:  Okay.  1129(b) is a confirmation

14  standard.  The Court has to make a determination that the case

15  isn't likely to be followed by additional reorganization or

16  liquidation.  And, so, in that respect, yes, I think you do

17  have to look a whether or not the plan, and I'll use the word

18  feasible, is feasible for that purpose.  But, that's a

19  different issue from whether or not the debtor, because we're

20  not talking about the reorganized debtor, we're talking about

21  the debtor, is solvent.  And I don't know how you do a post

22  effective date when there is no debtor anymore, it's a

23  reorganized debtor, and apply solvency nunc pro tunc.  It's

24  kind of like, you know, filing your application backwards.

25       MR. PASQUALE:  That's not our position, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1 And, again, the debtors have agreed, look at the effective

2 date, right?

3          THE COURT:  Well, but the effective date has multiple

4 meanings, that's what I was trying to say about that split

5 second.

6          MR. PASQUALE:  Understood, Your Honor.

7          THE COURT:  Okay.

8          MR. PASQUALE:  And, our position is, the effective

9 date means nothing if it doesn't mean, include the terms of the

10 plan in analyzing solvency.

11          THE COURT:  But, doesn't the statute talk about the

12 debtor?  I mean, aren't we talking about the solvency of the

13 debtor?

14          MR. PASQUALE:  Yes, Your Honor.

15          THE COURT:  Okay.  If we are, then how do I do

16 anything post effective date, because I don't have a debtor

17 anymore, I have a reorganized debtor and they are not the same.

18 The one thing that the Third Circuit is clear about is, they

19 are not the same.

20          MR. PASQUALE:  Agreed.  But it's not post, it's as

21 of.  It's that moment in time, Your Honor, not before not

22 after, of.

23          THE COURT:  But, as of, that was the issue that I was

24 trying to address.  As of, I can't take something that happens

25 after that split second, and apply it beforehand, just like I

**J&J COURT TRANSCRIBERS, INC.**

1  can't take what happens before and apply it later.  It's like

2  mixing apples and oranges in the same bucket.

3         MR. PASQUALE:  Well, again, Your Honor, understood,

4  Your Honor.  Again, that's what I tried to make the point

5  earlier, that we're falling into this trap, frankly, of

6  thinking about, well, because the settlement of the asbestos

7  claims is raised in the plan, you can't look at that.  You

8  can't look at that for determining insolvency.  And that just

9  can't be right.  And I used the example earlier that this, you

10  know, if this was a 9019 earlier, these liabilities would be

11  decided.  And then what, Your Honor, do you have to go before

12  that date?  When do you test -- you just get down the slippery

13  slope that makes no sense under the confirmation standards,

14  which we're not arguing is inapplicable.  Certainly, 1129 is

15  applicable and the threshold, in all of the cases that we rely

16  on, is only in a solvent debtor case.

17         THE COURT:  But I think this is the issue.  Let me

18  assume, for purposes of this discussion, that the appropriate

19  way to look at the asbestos personal injury liability is to

20  take the number that's in the plan, that the parties have

21  essentially agreed on is the settlement value.  All right.  So,

22  I have that number.

23         The problem is that pre-effective date, I may still

24  have that number, but I don't know how it's going to be paid?

25  Post effective date, yes, there is a methodology in the plan to

1  figure out how it will be paid and that's the feasibility

2  analysis.  And I think everybody has agreed that -- well, no, I

3  don't know if everybody has agreed, but on the plan proponents'

4  side, I think everybody has agreed that if the plan goes

5  effective, the debtor can meet the terms of the plan, that it

6  is feasible, but that doesn't mean that without that second

7  piece having been finalized, that the debtor is solvent.

8          Even if I take the asbestos liabilities that exist,

9  and that the plan projects, I still don't know how, without the

10 plan and the funding in the plan, they're going to be paid and

11 whether the debtors' assets are sufficient to pay them.  And I

12 think that's the issue that has to be looked at.

13         MR. PASQUALE:  Well, then, Your Honor, if you follow

14 that to the logical conclusion, there could never be a solvent

15 debtor case where there is a disputed liability at any point in

16 the case and that can't --

17         THE COURT:  Oh, no.  Because --

18         MR. PASQUALE:  I'm sorry, Your Honor,

19         THE COURT:  -- you're just assuming that the

20 liability isn't disputed.  I'm assuming that you're correct on

21 the liability side, for purposes of this discussion, that the

22 number that the parties agreed to and put in the plan, is the

23 liability.  But without the plan, the issue is, can that

24 liability be met?  It's a huge liability.

25         MR. PASQUALE:  But that is a -- I agree, Your Honor.

1   That is a different issue.  That is feasibility.  That's not

2   solvency.

3           THE COURT:  I think it's solvency.  I don't think

4   it's feasibility.  Feasibility says, that the way that the

5   debtor proposes to pay those liabilities is fixed in the plan

6   and that the plan will work.  That's the feasibility analysis.

7           MR. PASQUALE:  Yes.

8           THE COURT:  That has nothing to do with the solvency

9   analysis that we're talking about.

10          MR. PASQUALE:  Okay.  Then let's remember what Mr.

11  Frezza did with the various tests which, again, not disputed.

12  The balance sheet, the cost approach, the adequate capital.  I

13  should know this by now.

14          Looking at those tests, Your Honor, and you're

15  assuming now, as you said, a fixed number for asbestos

16  liabilities, that's what Mr. Frezza did.  He took the fixed

17  number from the plan and said, solvent.  There is no evidence

18  presented by the plan proponents to the contrary.  So, we're

19  back again, I think, to the legal issue and I think Coram

20  resolves it, which is, you do look at the plan, you do look at

21  the effective date.  I understand the questions Your Honor is

22  raising.

23          THE COURT:  I thought Mr. Frezza -- I'm sorry, I'm

24  going to have to review his testimony.

25          MR. PASQUALE:  He took -- well, I don't think it's

**J&J COURT TRANSCRIBERS, INC.**

1 really disputed, Your Honor, and I frankly, think --

2          THE COURT:  Okay.

3          MR. PASQUALE:  -- I don't know that -- I'd like you

4 to, but, you know, again, we're agreed, at this stage, I think

5 it is the legal issue that we're now discussing.

6          THE COURT:  Yes.  I just meant, I don't think I

7 recall his testimony in the context in which you're putting it.

8 I thought when he was doing the adequate capitalization and the

9 other tests, that he was assuming that there would be a fixed

10 liability and a whole lot of other assumptions that are not

11 necessarily, borne out, like that the Fresenius settlement

12 would come in and the funds would still be there.

13          MR. PASQUALE:  Absolutely, Your Honor.  He took the

14 terms of the plan and used them --

15          THE COURT:  Right.

16          MR. PASQUALE:  -- that's right.

17          THE COURT:  Okay.  Well, what I think I'm saying is,

18 if I take the first part of your argument which is that if this

19 settlement had been done in the context of a 9019 settlement,

20 and for purposes of this discussion, I'll just assume it could

21 be that it was approved and that that number is fixed, okay.

22 As of the date of the effective date of the plan, I have that

23 number fixed, but I don't have the plan effective.  I can look

24 at the date of the effectiveness of the plan without assuming

25 that the plan has gone effective.  So, if I take the

                    **J&J COURT TRANSCRIBERS, INC.**

1 liabilities, that still doesn't show me where the assets are to

2 pay the liabilities, but for the plan.

3          MR. PASQUALE:  Right.  And what I'm trying to say,

4 Your Honor is, we gave you that information.  We gave you the

5 assets, the liabilities, through Mr. Frezza's undisputed

6 testimony.  Assuming that number for the asbestos claims is the

7 number in the plan.  He looked at assets, he looked at

8 liabilities, and concluded solvency.  That is in the record.

9          THE COURT:  Okay.  I'll have to look at it.  That's

10 not how I understood what his testimony was.  I thought he was

11 making a whole host of assumptions that --

12          MR. PASQUALE:  Premised in the plan

13          THE COURT:  Premised on the plan --

14          MR. PASQUALE:  Correct.

15          THE COURT:  But what I'm suggesting is that the plan

16 isn't the thing to look at.  The issue is, what does the debtor

17 look like right now?  Well, let me assume today is the

18 effective date.  What does the debtor look like right now,

19 before the plan goes effective?

20          MR. PASQUALE:  Well, and I --

21          THE COURT:  Here are the liabilities --

22          MR. PASQUALE:  -- sorry, Your Honor.

23          THE COURT:  -- and here are the assets.  How do those

24 assets match up against the liabilities, forget the plan for a

25 moment, just whether -- if this were in a liquidation, for

1  example, would the debtor be solvent?

2      MR. PASQUALE:  And what I'm trying to argue, Your

3  Honor, and our position is that there is no authority to do

4  anything but take the plan, call them presumptions,

5  assumptions, to take the provisions of the plan, that the

6  debtor is trying to confirm, in determining solvency for these

7  purposes.

8      We've presented other cases in our briefs and <u>Coram</u>

9  speaks to the point.  There is no other authority to support

10 the debtors' argument to do something other than that.

11     THE COURT:  All right.

12     MR. PASQUALE:  Your Honor, just quickly, the

13 remaining issue is the feasibility issue.  And Grace and Mr.

14 Bernick argue that, well, if feasibility means solvency, then

15 every case would be a solvent debtor case and unsecured

16 creditors -- well -- that argument goes nowhere, Your Honor,

17 because there is a really big difference between this case and

18 other cases.

19     As Your Honor knows better than all of us here, most

20 cases are cases in which unsecured creditors are not receiving

21 a hundred percent on their allowed claim.  You know, we'll get

22 into arguments of what does it mean to be paid in full, but

23 let's just talk about allowed claim for simplicity.

24     We know that under most confirmed plans, unsecured

25 creditors are not getting a complete recovery.  They're getting

**J&J COURT TRANSCRIBERS, INC.**

1  pennies on the dollar, especially these days.  So, this issue

2  doesn't arise in every case.  An unsecured creditor can only

3  argue, as we are here, on behalf of the lender group, that post

4  petition interest can be paid in cases where they are getting

5  paid in full, and Equity is getting a recovery.  Things that

6  are happening, of course, in this case.

7         THE COURT:  But they're not happening in this case.

8         MR. PASQUALE:  Of course, Your Honor.  Equity is

9  retaining all of their interest.

10        THE COURT:  Equity is retaining some interests --

11        MR. PASQUALE:  All of their interest.

12        THE COURT:  -- but unsecured creditors are not being

13  paid in full.  The ZAI claimants aren't, the personal injury

14  claimants aren't.

15        MR. PASQUALE:  No, Your Honor.

16        THE COURT:  Even on their allowed claims, if you want

17  to use the word claims, they're getting a percentage under the

18  trust.

19        MR. PASQUALE:  By agreement.

20        THE COURT:  Well, yes.

21        MR. PASQUALE:  By agreement.  And that's a tremendous

22  difference.  They are willing to --

23        THE COURT:  But if this were solvent --

24        MR. PASQUALE:  -- they didn't have to do -- well,

25  Your Honor --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  They didn't have to do it.

2          MR. PASQUALE:  They didn't have to.  They could have

3 litigated and we would have had a fixed number and, again --

4          THE COURT:  That's true.

5          MR. PASQUALE:  -- that is not the same as cases in

6 which -- I mean, you can do anything by agreement.  We, as

7 unsecured creditors in any case, representing unsecured

8 creditors can say, we'll take 50 cents, we'll let Equity have

9 their interest, we all want to get out of bankruptcy.  There

10 are a host of reasons, as Your Honor well knows.

11          I think it is not correct to say that unsecured

12 creditors are not getting paid in full in this case.  Those who

13 have agreed to take something less have voluntarily done that

14 for their own reasons because of the contentiousness of those

15 issues.

16          Your Honor --

17          THE COURT:  Well, the indirect claimants, certainly

18 haven't agreed.

19          MR. PASQUALE:  Excuse me?

20          THE COURT:  The indirect claimants certainly haven't

21 agreed.

22          MR. PASQUALE:  Well, and they have objections to

23 confirmation on that basis.

24          THE COURT:  They do.

25          MR. PASQUALE:  So -- and Your Honor will have to

1  resolve those.

2          THE COURT:  So, what happens in the event that I say

3  they're correct, to the solvency analysis?

4          MR. PASQUALE:  I'm not following the question, Your

5  Honor.

6          THE COURT:  If the indirect claimants are correct,

7  that their claim should be paid at some level that's different

8  from what the plan currently provides, and that objection is

9  sustained, what happens to your solvency analysis?

10          MR. PASQUALE:  That they are unsecured creditors --

11  I'm --

12          THE COURT:  Sure.  They want paid in full, as opposed

13  to the percentage under the trust.

14          MR. PASQUALE:  If they are properly in our class,

15  Your Honor, of unsecured creditors, they would get post

16  petition interest, that's correct.  That would be our argument.

17          THE COURT:  I -- okay.

18          MR. PASQUALE:  That anyone in that class gets because

19  we're getting -- that's the terms of the plan.  They're getting

20  paid in full.  The asbestos claimants, in particular, Your

21  Honor, having agreed to what they agreed, we all know what that

22  litigation was like.  And I can show you the numbers, you'll

23  recall them from the debtors' expert, which are far under what

24  the claimants are receiving today.  That would argue that

25  they're getting paid more than what they're entitled.  I don't

1 believe that to be the case, nor do I believe -- I mean, it's a

2 settlement, I think it's an appropriate settlement of those

3 liabilities because it is such a contentious issue, but I don't

4 think it's correct to say they're not getting paid in full.

5　　　　　THE COURT:  I think the issue with the indirect

6 claimants is much different, and that is, there isn't even an

7 estimate, at this point in time, as to what those claims will

8 be, and they could be --

9　　　　　MR. PASQUALE:  Well, because they're not ripe yet.

10 That's right.  They haven't accrued yet.

11　　　　　THE COURT:  They're not.

12　　　　　MR. PASQUALE:  They're contribution claims, as I

13 understand them.

14　　　　　THE COURT:  They're contribution and indemnity claims

15 --

16　　　　　MR. PASQUALE:  Yes, right.

17　　　　　THE COURT:  -- but they could be huge.  So, the

18 solvency issue is what I'm trying to get to.

19　　　　　MR. PASQUALE:  Well, and on those, Your Honor,

20 though, there is case law and we've cited it as have the

21 debtors, and I don't think we disagree, the determination isn't

22 made -- when circumstances change later on, there are cases, I

23 think Mr. Bernick even talked about one in his argument, and

24 I'm sorry, Your Honor, I just don't remember the names, they

25 are cited in our briefs, where there were litigation trusts who

1  pursued a claim post confirmation, ended up with a big recovery

2  and then, after the fact, after the conclusion of that

3  litigation, an unsecured creditor came back and said, pay my

4  interest, because the debtor is now solvent and the cases have

5  said no, that's not right, although there is a split, there are

6  some cases that have allowed it.

7         I don't think that's where we are today, Your Honor.

8  You haven't decided confirmation yet.  But I do think that's

9  the distinction here between solvency and feasibility, in that

10 in most cases unsecured creditors are not getting paid in full.

11 All unsecured creditors, in any form, whatsoever.

12        Your Honor, just a couple of quick points, and for

13 these last I really just want to rely mostly on the briefs, but

14 I would like to hand up to the Court, if I may, a revised

15 couple of pages from our brief, which we promised to do.

16        THE COURT:  All right.

17        MR. PASQUALE:  May I approach?

18        THE COURT:  Yes.  Keep them, Mona, because -- all

19 right.

20        MR. PASQUALE:  Your Honor, what these are and I've

21 just handwritten, marked them as BLG UCC Closing 1 and Closing

22 2.  This is a redline and a clean markup of the couple of pages

23 of our pretrial brief, the joint brief, with the lenders, which

24 provided information as to the market capitalization and

25 closing price of Grace's stock.  And this just updates the

1  information to the putative, effective date of December 31st,

2  2009.  And the closing price that day was $25.35, which would

3  mean a market capitalization of Grace as of --

4          UNIDENTIFIED MALE ATTORNEY:  What date --

5          MR. PASQUALE:  Excuse me?

6          UNIDENTIFIED MALE ATTORNEY:  What date was that?

7          MR. PASQUALE:  December 31st.  And, Mr Bernick's

8  charts have very similar numbers.  I don't think there's

9  disagreement.  The market capitalization is over 1.8 billion,

10 as of that date.

11         We do think the Third Circuit's ruling in the <u>VFB</u>

12 decision carries some weight.  Mr. Bernick has tried to

13 distinguish the case by relying on our financial advisor's

14 deposition testimony, but the important thing is the market in

15 establishing Grace's share price as of that date.  Has all of

16 the information that everyone else has.  It knows the terms of

17 the plan, it knows the risks, it knows the arguments.  And that

18 was what the Third Circuit said in <u>VFB</u>.  It's better to look at

19 the market price than to look at opinions of experts.

20         Your Honor, Mr. Friedman, for Morgan Stanley, made

21 some arguments.  I'm not going to repeat them here, I would

22 like to adopt them.  I know they've now settled, we heard

23 today.  But rather than repeat them, with respect to the

24 history behind the solvent debtor rule and the like, I would

25 like to just adopt that argument.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That's fine.

2          MR. PASQUALE:  And, I think at this point, Your

3 Honor, I'll just reserve to respond to Mr. Bernick.  Thank you.

4          THE COURT:  All right.

5          MR. BERNICK:  Would Your Honor prefer to hear the

6 response to this before we go with Mr. Cobb?

7          THE COURT:  No.  Actually, I'd just as soon hear all

8 of it, if you don't mind.

9          MR. BERNICK:  Okay.

10          THE COURT:  Mr. Cobb.

11          MR. COBB:  Thank you, Your Honor, Richard Cobb on

12 behalf of the bank lender group.

13          I want to address quickly on a solvency point.  Your

14 Honor, had a question in your mind -- in her mind.  You had a

15 question in your mind, Your Honor, as to whether when Mr.

16 Frezza testified he made certain assumptions that settlements

17 would take place.  Recall, but let me try to help refresh your

18 memory.  Mr. Frezza testified under one scenario the bank

19 lenders believed that there was solvency established and that

20 scenario was taking the debtors' estimate of asbestos

21 liabilities and under that scenario, the debtors immediately

22 said, well, if you take our estimate, that's not the settlement

23 and that could trigger other settlements falling apart.  And,

24 so, you can't rely on those other settlements in trying to

25 establish the liabilities that Grace may face, or would face,

**J&J COURT TRANSCRIBERS, INC.**

1  on the effective date.  And, so, that was one scenario.

2          Then the other scenario, he said, well, I'm going to

3  assume everything in the plan stays as it is, that we take all

4  of the liability -- we lift the liabilities out of the plan as

5  Grace has stated them.  So, there was no hinging or dependency

6  on one settlement versus another under that scenario, in which

7  he found, or he opined that there was solvency as of the

8  effective date.

9          So, maybe that helps Your Honor.  There were two

10 separate analysis.  One was interdependent, the other was not.

11         THE COURT:  All right, thank you.

12         MR. COBB:  Your Honor, we have briefed, exhaustively,

13 the issues, I think, that I'm about to address.  I know I'm

14 about to address them.

15         First impairment, and then we also have talked about

16 and discussed and briefed, default.

17         There have been evidentiary presentations at trial

18 with regard to solvency, of course, and also under 1129, fair

19 and equitable standard.  I would like to try to distill,

20 quickly, what remains in dispute, both factually and legally,

21 to help the Court understand what's left to be decided, in

22 order to resolve our objections to the plan.

23         Mr. Pasquale has just addressed solvency.  I think

24 there are three issues that the Court has reserved for this

25 stage of the proceeding other than solvency, and that is

1  whether the bank lenders have a contract right to interest

2  higher that the rate offered in the plan, characterized by

3  Grace's default rate.   Number two, are the bank lenders

4  impaired, and number three, has Grace satisfied the fair and

5  equitable standard?

6          The first two involve pure legal issues.  Facts are

7  not in dispute, that is whether a default -- or whether the

8  bank lenders have a right to receive a rate of interest higher

9  than that, that exists in the plan now.  And impairment.

10 There's no issues of fact that remain between the parties on

11 those.

12         On default, what must first be examined is under

13 impairment, do the debtors have a legal defense to the effect

14 of their failure to pay principle and interest, post petition?

15 And the effect of the filing of the bankruptcy.

16         Next, on impairment, the Court must decide what Grace

17 must do to overcome the presumption of impairment.  And,

18 specifically, and has been underscored by Mr. Bernick, is this

19 plan impairment or is it code impairment?  The bank lenders

20 don't disagree that if the code impairs their claim, then they

21 are not impaired.

22         Lastly, the Court must decide if the plan meets the

23 fair and equitable test and in doing so, the Court must first

24 decide here, what is the test to be applied under these facts,

25 where an unsecured creditor is claiming pendency interest and

1  the debtor is solvent.  There is a dispute among the parties as

2  to what's the test.  Is there a presumption that the contract

3  default rate should be paid, and you come down from there,

4  based on negative or bad equitable factors, or is there a floor

5  of the federal judgment rate and you can go up from that rate

6  or come down from it.

7       We submit the test, as is outlined in _Dow_, and as

8  identified by Judge Walrath in _Coram_, there is a presumption

9  that the contract default rate applies unless compelling

10  equitable circumstances exist.  Meaning, primarily, was there

11  some bad conduct engaged in by the objecting creditors that

12  merits a reduction in the contract default rate?

13       Grace disagrees, says you can look at every fact, the

14  Court has wide discretion, there is no polestar.  There's

15  nothing for the Court to rely on, perhaps, the federal judgment

16  rate, but otherwise, toss it all in a basket, stir it around

17  and if it feels good, that's the rate that you should choose,

18  Your Honor.

19       These are critical legal issues for the Court to

20  decide and, again, the disputed issues of fact remain only the

21  factors which we suggest lean heavily towards what conduct was

22  engaged in by the creditors, that are seeking to recover the

23  interest.

24       Briefly, on impairment and default issues, let's

25  understand that impairment, can we vote, are we going to be

1  disenfranchised as a result of Grace's arguments?  That's what

2  we're talking about the first step.  It's not necessarily we

3  are entitled to interest at a rate higher than the plan, but do

4  we have the right to even vote, to even stand here right now

5  and object?  Congress has demonstrated a strong belief in favor

6  of creating creditor voting rights, so strong there is a

7  presumption of impairment.  Grace must overcome that

8  presumption.  Different than 1129, there's no presumption that

9  the plan is fair and equitable or that it's not fair and

10 equitable.  Grace has to prove the 1129 factors.  But, for

11 impairment, there is a presumption.

12        Are the bank lenders legal, equitable or contract

13 rights altered in some sense?  Stated differently, Grace must

14 leave those rights entirely unaltered for us, that is the bank

15 lenders, to be unimpaired.  How does Grace attempt to overcome

16 this heavy presumption?

17        First, there is no contract right to default

18 interest, Grace says.  Second, the plan doesn't impair, the

19 code does, that's permissible; 502, 726, et cetera.  Of course,

20 we disagree.

21        Let's focus on, and I'm mindful here of the Court's

22 May 19th opinion.  I'll talk about that in a few minutes and

23 some thoughts and I think, hopefully, the Court will agree with

24 me and that they are good thoughts.

25        But let's start first with some, what I think are,

**J&J COURT TRANSCRIBERS, INC.**

1  real issues with Grace's arguments on default.  First, they

2  have now presented to the Court what I'll call the freeze

3  argument.  Bankruptcy is filed, the contract and the rights of

4  the creditor under the contract, are frozen.  They cease to

5  exist.  The fundamental problem with that issue, Your Honor, is

6  is that that would have the same effect with regard to

7  prepetition defaults.  Bankruptcy is filed, freeze.  You would

8  never get to -- you could never award pendency interest, Your

9  Honor, because (a) rights that would be available to that

10  creditor, this plays into the fresh start concept, you would --

11        THE COURT:  I missed the -- I'm sorry, Mr. Cobb.

12        MR. COBB:  Sure, that's okay.

13        THE COURT:  -- I just missed the fundamental premise

14  because there is a freeze on prepetition claims and prepetition

15  defaults with the filing.  So, I'm -- I got stuck on that.  It

16  does accelerate the liability, but the prepetition, unpaid

17  accrued interest is part of the claim, up to the date of

18  filing.  The problem here is, there isn't any.

19        MR. COBB:  Well, Your Honor, the freeze argument, the

20  way Mr. Bernick has characterized it, is that there should be

21  no effect during the pendency period with regard to the

22  debtors' obligations to pay interest.  And if we're willing to

23  accept that that would -- if we're willing to accept that that

24  would accelerate the obligations, and so we talk about interest

25  on the allowed claim, which is not what we have here, and we

1 agree with that, then that would change the analogy.  I agree

2 with Your Honor.

3         But, Your Honor, the freeze concept ignores other

4 sections of the code that specifically give effect to post

5 petition defaults, 365, you must cure a post petition default;

6 1124, where you're looking to --

7         THE COURT:  But you don't have a 365 claim.  I mean,

8 you have to make -- the arguments at least have to be relevant,

9 this isn't a lease and the issue that Congress was addressing

10 in the executory context is much different from the financial

11 covenants that you have here.

12         MR. COBB:  I agree, Your Honor.

13         THE COURT:  Okay.

14         MR. COBB:  And, I'll get to the <u>Next Wave</u> in a few

15 minutes because I think that is the issue.

16         THE COURT:  All right.

17         MR. COBB:  But let's understand the philosophy, then.

18 If there is not a specific prohibition in the code, with regard

19 to the effect of a post petition default, and what effect that

20 has with regard to pendency interest --

21         THE COURT:  What post petition default do I have?

22         MR. COBB:  Well, Your Honor, the loans matured in

23 2001 and 2003.

24         THE COURT:  And the debtor couldn't pay them because

25 they're unsecured claims.  So, if there is any impairment in

1  that fact, it is clearly created by the code.

2          MR. COBB:  Well, let's talk about that for a moment,

3  Your Honor.  What in the code specifically prohibits the

4  debtors from making that payment?

5          THE COURT:  From paying unsecured creditors?  The

6  absolute priority rule.  This Court would --

7          MR. COBB:  What happens on the first -- yes, Your

8  Honor?

9          THE COURT:  -- this Court would absolutely, under no

10  circumstances, permit the debtor to be paying unsecured claims

11  at that time, when I have no way of knowing whether the plan is

12  going to be confirmed or whether unsecured creditors would be

13  called on to return funds because the case converts and is

14  liquidated.  So, there is no basis for paying unsecured claims,

15  absent some -- and you want to talk about first day orders type

16  of circumstances, where the court's have found extraordinary

17  circumstances on motion.  But, here, none of that has happened.

18          MR. COBB:  Your Honor, in June of 2008, there was a

19  settlement reached with the EPA and the creditors, upon

20  application to the Court, they satisfied that.

21          THE COURT:  Yes, they did, on a motion.

22          MR. COBB:  That's correct.  But -- that's correct,

23  Your Honor, but that doesn't mean that the debtors are

24  prohibited, it simply means that on motion -- on motion, they

25  can pay that claim.

1          THE COURT:  Well, I -- in some circumstances they can
2     pay that claim.  Allowing the debtor to simply pay an ordinary,
3     and this is an ordinary financial claim, I think is a whole lot
4     different from saying that there's a peculiar reason that
5     authorizes the debtor to make a specific payment to a specific
6     creditor because, and then you can add whatever the
7     extraordinary reasons are.  But, I don't have any of that here.
8     So, I go back to my questions, what post petition default?
9     Yes, this obligation matured and, yes, it's going to be paid,
10    in full, with interest, on the effective date.

11          So, the --
12          MR. COBB:  Your Honor, I -- and I understand Your
13    Honor.  You leaned this way in your May 19 opinion, there was
14    an appeal filed from that, we disagree with regard to the
15    effect of that default, and that's okay, Your Honor, that
16    happens all the time.

17          THE COURT:  Oh, no, no, no.  No.  Mr. Cobb, you said
18    this before and I tried to straighten this out before,
19    apparently, I didn't succeed.  That opinion was talking about
20    allowed claims and whether interest is an allowed component of
21    an allowed prepetition claim.  It had nothing to do with the
22    impairment and fair and equitable standards.  I tried to make
23    that clear.  Apparently, I didn't succeed, but, I tried to make
24    that clear in that opinion.

25          So, if you want to go back and talk about interest on

1 allowed claims, as part of the prepetition analysis, we can re-

2 discuss that.  You're not going to get me to change my mind

3 about that.

4        MR. COBB:  No, I'm not going to do that, Your Honor.

5 That's inappropriate.

6        THE COURT:  But, that's a different issue from fair

7 and equitable and impairment.

8        MR. COBB:  Sure.  Well, Your Honor, let's move then

9 to the concept of was there a default or not a default?  Let's

10 understand that once the loan is matured, there was no other

11 interest rate that applies under the loans.  The credit

12 agreements provide that upon maturity, the rate that applies is

13 a rate that is 2 percentage points above the base rate, the

14 adjusted base rate.  And that is not the rate that is being

15 paid in the plan.

16        In our -- I'm a little ELMO challenged, Your Honor,

17 particularly because of the distance that I have to travel, but

18 --

19        MR. BERNICK:  If you want I'll be your assistant.

20        MR. COBB:  No, please, don't.  You and I have had

21 that discussion before.

22                    (Laughter)

23        MR. COBB:  Your Honor, if we take a look at the

24 credit agreements, you'll see that there's a section, Section

25 5, that talks about what the interest rates shall be.  And,

1 you'll note, Your Honor, there that it says, if the interest

2 and principle is not paid, whether at the stated maturity or

3 otherwise, once the loan is mature, the interest rate is the

4 rate that we have been propounding to the Court is the

5 appropriate rate in the plan.

6      THE COURT:  Yes.  And this agreement is essentially

7 -- I don't know whether the right word is delayed, deferred,

8 not relevant, because of the fact that the debtor was not

9 permitted to pay the loan on maturity.  That's the problem with

10 the concept of bankruptcy code impairment.  This debtor could

11 not comply with that obligation in the normal run of the mill

12 circumstance and I wasn't presented with anything other than

13 that.  No one, not the bank lenders, not the debtor, no one

14 raised that issue.

15      MR. COBB:  That's correct, Your Honor.  And so I

16 think the question then, on a finer point is, in the context of

17 what interest rate would be appropriate to award in the

18 pendency period, that's the agreement of the parties.  That is

19 the contractual agreement between the parties and is not the --

20 we are -- Your Honor, it seems to be mixing a 362 concept here,

21 that there's an automatic stay from our ability to enforce

22 rights, our ability to enforce -- to come in and try to collect

23 this payment.  362 does not have anything to do with the effect

24 of non-payment during the bankruptcy, in regard to pendency

25 interest.  It only prevents us from taking action.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That's right.  You're not allowed to have

2   pendency interest, but for certain circumstances, (a) a solvent

3   debtor, you know, the other types of things.  There is no

4   entitlement to pendency interest.  So, the automatic stay

5   doesn't have to do anything to stop the collection, because

6   you're not entitled to it.

7          MR. COBB:  That's right, Your Honor.  Grace cites

8   that as the authority for this no effect, or the freeze concept

9   that obliterates any reference to the contract rate of interest

10  that will be applicable during the period.

11         THE COURT:  Pardon -- Mr. -- folks, please.  Mr.

12  Bernick, take your discussions elsewhere if you're going to

13  have them, please.

14         MR. BERNICK:  Yeah, yeah, yeah, no that's fine.

15         THE COURT:  Mr. Cobb, go ahead.

16         MR. COBB:  Your Honor, I think that this issue is

17  underscored by the fact that the only authority that Grace

18  cites is the Next Wave case and Your Honor did cite that in

19  your May 19 opinion.  I want to try to gently ask the Court to

20  take another look at Next Wave.

21         THE COURT:  I will.

22         MR. COBB:  And, Your Honor, let me raise some

23  specific points, because that is the only, the only authority,

24  that Grace cites, case law that says for this proposition, that

25  it's a nullity, it's -- meaning it would be useless to describe

**J&J COURT TRANSCRIBERS, INC.**

1 the debtors' inability to make -- to fail to pay something post

2 petition, because they are unable to pay it.

3          In Next Wave, first, the opinion was vacated, the

4 court lacked jurisdiction to issue it.  Second, that is dicta.

5 the court reaches it's holding before it gets to this wonderful

6 quote that Grace lifts, that seems to serve their purpose here

7 and then the quote sits by itself.  There's no reference to the

8 code, there's no reference to any case authority, it just sits

9 there.  It's entirely unsupported in law.  Simply meaning that

10 there is no other authority -- there's no other -- there's no

11 Third Circuit authority, there's nothing binding on the Court

12 that requires you to follow that, nor is there anything

13 persuasive, and Next Wave is far from persuasive.  That comment

14 is made in the context of the FCC seeking to terminate and then

15 the result being a forfeiture of the debtors' principle asset

16 in the case that would have absolutely cratered the debtors

17 ability to operate post bankruptcy.

18          In fact, the United States Supreme Court agreeing

19 with the district of -- the circuit court of the District of

20 Columbia.  The United States Supreme Court says that that case

21 turned entirely on 525.  There was a specific prohibition in

22 the code preventing the federal government from attempting to

23 do what -- that is terminate the license and effect that

24 forfeiture.

25          In other words, Next Wave is not only factually

1  distinguishable, it is clearly, legally distinguishable.  And

2  if this entire argument, that our entire position were to fall

3  on Next Wave, that would be, in our view, a miscarriage of

4  justice.  It just isn't --

5          THE COURT:  I'm sorry, are you telling me to re-look

6  at -- asking me, I didn't mean --

7          MR. COBB:  No, I'm not telling you anything, Your

8  Honor.

9          THE COURT:  Okay.

10          MR. COBB:  Believe me.

11          THE COURT:  Are you asking me to re-look at Next Wave

12  for the purpose of determining whether there is some

13  entitlement to post petition interest or require the debtor to

14  pay off the loan at its maturity, even though it's an unsecured

15  claim and the debtor -- the absolute priority rule wouldn't

16  allow it?  What are you asking me to --

17          MR. COBB:  Your Honor, we're talking about pendency

18  interest.

19          THE COURT:  Yes.

20          MR. COBB:  And we are talking about a default that

21  could give -- what is the appropriate rate of interest under

22  the contract, and Next Wave is talking about an entirely

23  different issue.

24          THE COURT:  Okay.

25          MR. COBB:  An entirely different issue.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right

2          MR. COBB:  As are -- as I do believe, Your Honor, as

3 Your Honor has stated, that the debtor is unable -- without a

4 court order, to pay unsecured claims during the course of the

5 bankruptcy.  And, therefore, that gives -- the Court should

6 give no effect to a default where the debtor is unable to pay.

7 And, we know the court gives effect to defaults where the

8 debtor is unable to pay, on a regular basis.  Leases.  A

9 default post petition, they have to pay it, in order to stay in

10 the property.

11          You said -- and your response is, Your Honor --

12          THE COURT:  Actually, they have to pay --

13          MR. COBB:  -- Mr. Cobb, this isn't a 365 case, it's

14 not a lease case.

15          THE COURT:  No, it's not.  They have to pay the

16 defaults' prepetition in order to stay in the property if they

17 want to assume the lease.  It's entirely different.  They don't

18 have to do anything here, except pay whatever the law requires

19 them to pay to satisfy this claim.  And it's not -- I'm still

20 failing to follow why there is a default that is created by

21 anything other than operation of law.  That's where I'm missing

22 this argument.

23          The debtors -- I'm not aware of -- well, I'm aware of

24 one case, I'm not sure it was recorded, in which the debtor was

25 permitted to make a payment to an unsecured creditor before the

*J&J COURT TRANSCRIBERS, INC.*

1 end of the case, and I think it was a mistake.  Other than

2 those circumstances where -- that I've just analogized, where

3 there are unusual circumstances that would permit a payment to

4 a specific creditor for some odd reason.  If you can cite me to

5 some cases that say that in a Chapter 11, debtors are just

6 generally allowed to make payments, willy-nilly to whomever

7 they please, without a plan confirmed by this court, I'd be

8 happy to read it, but I'm not aware of one.

9         MR. COBB:  Your Honor, I wouldn't do that, I'm not

10 trying to be facetious in any sense.  Those cases don't exist,

11 because the debtor cannot willy-nilly make payments.  But the

12 debtor can make payments upon a showing to the court, either

13 under the necessity doctrine --

14         THE COURT:  Right.

15         MR. COBB:  -- or, as Grace did here, which I assume

16 was under the necessity doctrine or some version, thereof, the

17 EPA settlement, where they paid --

18         THE COURT:  But that's the problem.  I don't have

19 that issue with respect to this claim that you're now talking

20 about and the post petition interest issue that's before me.

21 No one approached the Court to say why, I'm not sure you could,

22 frankly, why this particular claim had to be paid ahead of

23 schedule, i.e., ahead of the effective date.  And I'm still not

24 hearing any reason why the debtor would have to pay it ahead of

25 the effective date, frankly, but let -- so I don't have that

1 issue.  I don't have a circumstance where a motion was filed

2 and debtor was ordered to make a payment and then the debtor

3 didn't, so that there was a default.  This is -- if there's a

4 default at all and I'm not convinced there, but if there's a

5 default at all, it's created by the fact that the debtor is not

6 permitted to make an unsecured payment during the course of the

7 case until -- in our case, the confirmation of the plan.

8          So, I'm still losing why, if this is an impairment

9 issue, it's not driven by the code, and if it's a default

10 issue, why, when the debtor is not permitted to make the

11 payment, the debtor is then charged with having created a

12 default.

13          MR. COBB:  Your Honor, for the simple -- and _Dow_ --

14 _Dow_ didn't struggle with this point, because there was no

15 prepetition default in _Dow_.  The court said, look at the

16 contract between the parties.  When allowed claims -- allowed

17 claims settled or otherwise are paid in full, and Equity is

18 retaining an interest and the debtor is solvent, then you turn

19 to the contract between the parties.  You turn to the contract

20 between the parties and you say, what does that contract

21 dictate with regard to the legal rights between the parties?

22 What's the benefit of the bargain that the debtors achieved and

23 in this case, as it was in _Dow_, there's higher rate of interest

24 provided for under the contract.  And there was a default, Your

25 Honor.

**J&J COURT TRANSCRIBERS, INC.**

1     I appreciate we're jousting about the legal affect of

2   that default, but there was a default.  I mean, they didn't

3   pass back a half a billion dollars over a period of time, when

4   it came due.

5          THE COURT:  And, they're going to, with interest,

6   which is what the law requires them to do.  So, to the extent

7   that there is a default, and again, I'm not convinced that this

8   can be treated as a default under the contract, when the

9   contract can't operate by virtue of the operation of the

10  bankruptcy code.  I don't know how you can charge somebody with

11  a default when they have no ability not to default, if that's

12  the way you want to put it.

13         MR. COBB:  Your Honor, it is simply in the context of

14  how do we assess the rate of interest to be applied.  That's

15  it.  It's not stripping away, coming in and taking the half a

16  billion dollars back, they got -- they enjoyed the use of that

17  principle during the case.  They certainly didn't have to pay

18  it back.  Whether they had already spent it or not, they didn't

19  have to pay it back.

20         THE COURT:  That's true.

21         MR. COBB:  But, in this context, Dow instructs us

22  that you take a look at the contract rights between the

23  parties.  That's -- the -- so, let's move on from Next Wave.

24  You've taken me a little afield, Your Honor.

25         Let's talk about code impairment, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:   All right.

2          MR. COBB:   Let's move from default into impairment.

3 Grace has spent a great deal of time, I think, arguing that the

4 plan doesn't impair, the code impairs.

5          Their code impairment argument, Your Honor, is driven

6 off of your definition of what the legal rate of interest is.

7 That is -- and that flows right from the precise language of

8 726.  Grace says, 502(d) prohibits the recovery of unmatured

9 interest as part of an allowed claim, except in two exceptions.

10 Your Honor mentioned this in the May 19 opinion.  And, those

11 two exceptions, one of which doesn't apply here, the other is,

12 where the debtor is solvent, but even that exception Grace

13 submits, the rate of interest to be applied is only the federal

14 judgment rate.  That's not what 726 says on its face.  So, we

15 can't just assume that, can't just blithely throw it out there.

16          THE COURT:   No, it says the legal rate.

17          MR. COBB:   It says the legal rate.  And, in fact,

18 when the bankruptcy code was enacted, the federal judgment rate

19 didn't even exist.  That came to be as a part of an amendment

20 to Title 28 of the U.S. Code in 1980 -- excuse me, in 1982.

21 And, so, at the time the code was enacted, Congress didn't even

22 contemplate that the federal judgment rate would apply.

23          And, so, based on, as we have submitted in our

24 papers, based on Dow and based on Coram, there's a rate above

25 the federal judgment rate, the courts have found, that a party

1 may be entitled to in a solvent debtor case.  And, in fact, <u>Dow</u>

2 instructs that there is a presumption, a starting point of the

3 contract default rate.  And so, because we are not being paid

4 our contract default rate, we are impaired.  And that's not

5 solved because the code impairs us under 502 and 726, because

6 726 does not limit your recovery to the federal judgment rate.

7        Your Honor, I want to make sure Your Honor

8 understands that.

9        THE COURT:  I understand.

10        MR. COBB:  Okay.  And, so the debate there is, what

11 does the legal rate mean?  They cite <u>Cardalucci</u> (phonetic), I

12 believe, Your Honor.  <u>Cardalucci</u>, that's a perfect case to

13 apply the federal judgment rate because the over which the

14 parties are fighting was a state court judgment.  So, there was

15 no contract.

16        THE COURT:  Folks, please.  I've asked you before,

17 I'm going to tell you to leave the courtroom if you do it

18 again.  I really want to concentrate and the whispering -- and

19 I can hear your discussion, is really not what I want to do and

20 I don't think you want me to.  So, please, let me concentrate

21 on Mr. Cobb.  If you need to speak, either pass notes or leave

22 the courtroom, please.

23        I'm sorry, Mr. Cobb.  Would you back up to

24 <u>Cardalucci</u>?

25        MR. COBB:  Sure, Your Honor.  Your Honor, the primary

**J&J COURT TRANSCRIBERS, INC.**

1  authority that the debtors cite is the <u>Cardalucci</u> case, in

2  attempting to persuade the Court that the federal judgment rate

3  should be applied.  If the federal judgment rate is what is

4  meant under 726 and traces to 503 and, therefore, we have code

5  impairment here and not plan impairment.  The plan does not

6  provide that the bank lenders are to be paid the contract

7  default rate, and thus, we submit that that impairs us, because

8  it alters our legal or contract rights.

9       We are entitled to vote, we're entitled to be here

10 and stand here and object.  We are entitled to have a say.  We

11 are not disenfranchised.  And that's a presumption that the

12 debtors must overcome.  It's interesting that they go to 726

13 and claim, oh, well, that provides code impairment, because 726

14 also assumes solvency.  And because impairment is presumed and

15 because the debtors must demonstrate that there is a code

16 limitation, that there is not a plan impairment or limitation.

17 The debtors have to, in order to successfully prove this

18 argument before the Court, I don't know how the debtors get

19 away with not having to prove solvency.

20      I mean, I don't know what argument the debtors are

21 hanging their hat on here.  I mean is the -- if they're going

22 to rely on plan impairment, then they would have to demonstrate

23 that, yeah, we're solvent, but you only have to pay the federal

24 judgment rate.

25      Solvency has been established, we believe, and we

**J&J COURT TRANSCRIBERS, INC.**

1    therefore would submit that under their primary argument it

2    seems now, and it was the emphasis placed certainly in their

3    opening argument, there is no plan impairment because that's

4    not what the legal rate means.

5            That's all I have, Your Honor, on default and

6    impairment.  If the Court has any other questions, I'd be happy

7    to answer them.  I would just like to -- I'd like to make

8    certain that we're clear on -- Your Honor seems to be stuck on

9    this contract default and the code.  There is a legal defense

10   so-to-speak, to having the rate apply.

11           There is a default, if Your Honor has any questions

12   about it, I'm happy to address that, but there has been a

13   default.  The effect of the default, I think, is where Your

14   Honor is concerned.  Your Honor seems to have not moved passed

15   that.

16           THE COURT:  No, I'm still not to the point where I

17   think there is a default.  You're arguing that there's a

18   default because this contract that was in existence,

19   prepetition, says that it the loan matured on a certain date

20   and, therefore, as of that date, but for the bankruptcy, the

21   debtor would have had to have satisfied that loan obligation

22   and if the debtor didn't, as of that, but for the bankruptcy,

23   then that provision that you've cited, Section 5, I think, you

24   said, indicates that a default rate of interest would apply.  I

25   don't have any problem with that interpretation, but for the

**J&J COURT TRANSCRIBERS, INC.**

1  bankruptcy.

2       Where I'm getting hung up is the fact that the

3  bankruptcy changes the rights of the parties.  It simply does.

4  It does it by operation of law.  The lenders no longer have the

5  right to say to the debtor, you've got to satisfy this loan on

6  its maturity date because the bankruptcy code says to the

7  debtor, you can't satisfy this loan on the maturity date and

8  the court can't require the debtor to do an impossible task.

9  And it would be impossible, in the legal sense, for the debtor

10 to satisfy the contract obligation during the course of this

11 case without a confirmed plan.

12      So, I don't think, if that's the case, where the code

13 itself imposes on the debtor an obligation not to pay what the

14 debtor otherwise would have had to have paid, that the debtor

15 can be treated as in default, because the code lifts that

16 obligation from the debtor to make that payment and defers it

17 to a different date.

18      So, the problem, I think, is that the lenders' view

19 is that the contract should govern, even though there's a

20 bankruptcy, but the contract doesn't govern while there's a

21 bankruptcy and the issue is, how does it get reinstated?  Here,

22 the debtors essentially are reinstating the contract by paying

23 it off, in full, on the effective date.  That's basically what

24 they're doing and the issue that the lenders raise is whether

25 in reinstating you have to ignore the fact that there was a

1 bankruptcy. And so, the default that would have been in

2 existence but for the bankruptcy, suddenly springs back to life

3 and now the debtors are obligated to make this default rate of

4 interest payment, because the contract is now back in effect

5 and that's what the contract required.

6          But that, I think, Mr. Bernick's argument, that that

7 penalizes the debtor for obeying the law, is correct. That

8 penalizes the debtor for not making the payment that the law

9 says the debtor couldn't make. And it's a conundrum, it truly

10 is a conundrum. The resolution, it seems to me is, that you go

11 back to what the code says and you look at 726 and I'm back to

12 the question of legal rate which, I did not decide in the 502

13 issue, I did cite the Ninth Circuit opinion, it seems to me

14 it's pretty well reasoned, but I was looking at the issue of

15 what's the legal rate for an allowed claim, under 502, not for

16 this purpose.

17          MR. COBB: Sure.

18          THE COURT: So, I wasn't attempting to make a

19 definitive assessment of what the legal rate ought to be. It

20 seems to me that there are choices. The case law provides you

21 with choices. The federal judgment rate, whether it was within

22 Congress' contemplation at the time the statute was enacted or

23 not, is a rate that is pretty much universally applied. There

24 are some exceptions. The contract rate is another rate that

25 from time to time is applied. The state judgment rate is from

1 time to time applied, given certain circumstances.  The default

2 rate is rarely applied.  It is applied in very, very highly

3 unusual circumstances, generally where you have a solvent

4 debtor, where all claims are being paid in full and there is a

5 return to some form of equity.

6        Here, those factors are, in my view, not necessarily

7 satisfied.  I still don't know how this debtor is solvent.

8 Now, if I adopt Mr. Pasquale's argument, I understand how the

9 debtor is solvent, but it seems to me that the test can't be to

10 mix the standards of the debtors' solvency with the reorganized

11 debtors' solvency.   That's not what the code requires.  And

12 this debtor, but for the plan going effective, isn't a

13 reorganized debtor and probably isn't solvent.  And that's

14 where, I think, the rubber meets the road and where I have to

15 think through this analysis.

16        MR. COBB:  Well, Your Honor, that's very helpful to

17 hear that, because that's, of course, that's what lawyers like

18 to hear, is what is the judge thinking, where is she -- where

19 is he or she, you know, where is she concerned, how can we help

20 address those concerns so that our client prevails.  It's a

21 little self-serving.  But it is helpful to hear that.  There's

22 a lot there.

23        But there's a couple of things that I wanted to lift

24 from that, and I think the first point is, is that Your Honor

25 has recognized that in some circumstances, unusual

1  circumstances, very unusual to have a return to Equity in a

2  bankruptcy case.  Very unusual to pay allowed claims in full,

3  whether that it by settlement, or otherwise.

4          THE COURT:  Actually, Mr. Cobb, I haven't recognized

5  that it's unusual to return to Equity, that was Mr. Pasquale's

6  argument.  In the cases in which I've been adjudicating

7  matters, generally there is a return to Equity.  Now, it's

8  usually negotiated, and it's not in full, but there is usually

9  a return to Equity and the former company owners, in almost

10 every mom and pop grocery store, I haven't seen anything but a

11 return to Equity.  So, I think the rule of thumb, generally is,

12 that there is a return to Equity, not that there isn't a return

13 to Equity.  I think that stands the cases on its head.  Whether

14 there is a return to Equity in the huge cases, that may be a

15 somewhat different issue, but in terms of the run of the mill,

16 average case coming down the pike, there usually is a return to

17 Equity.  So, I don't agree with that analysis.  Let me just

18 interrupt to that extent.

19         MR. COBB:  Your Honor, let's accept that then.  I

20 fully accept it because the Court said it.  Assume that the

21 ordinary case is that there is a return to Equity, then I think

22 that we have to -- I would suggest to the Court, we believe

23 that _Dow_ is persuasive here.  And, I'm going to speak to it a

24 few minutes because Your Honor seemed to raise some concerns

25 about _Dow_, towing the line with Grace that, perhaps, _Dow_ is

1 different than what we have here, but I'll talk about that in a

2 minute.  And, I think <u>Dow</u> instructs us in a careful reading,

3 that based on a great body of case law that's developed pre-

4 code, that in a situation where there is a return to Equity,

5 where Equity is now receiving the recovery, that means that all

6 of the debt, all of those parties who have a different

7 relationship with the debtor, they are creditors, there's a

8 creditor/borrower relationship in some sense.  They have been

9 paid in full.  And what <u>Dow</u> says is, in that instance is it

10 fair, is it appropriate, based on this body of law that we have

11 watched develop over the decades, to do anything other than

12 start from a presumption that the contract default rate should

13 apply because, yes, the debtors have defaulted.  They are

14 protected from the effect of that default during the course of

15 the bankruptcy, but when we get to confirmation and now the

16 question is, what is the correct rate of interest to apply, we

17 now take a look at what is the rate under the contract that

18 should apply in those circumstances, before Equity receives a

19 recovery.  You've got to satisfy the benefit of the bargain

20 before Equity gets a return.  That's what <u>Dow</u>, I believe,

21 instructs us.  And let me talk for a minute about <u>Dow</u> because I

22 want to dissuade any belief in the Court's mind that <u>Dow</u> is

23 different.

24          The dispute in <u>Dow</u> was about the recovery of pendency

25 interest at the contract default rate.  There was no post

**J&J COURT TRANSCRIBERS, INC.**

1  petition default.  And the courts --

2          THE COURT:  But, was there a prepetition default?

3          MR. COBB:  Excuse me.  There was no -- excuse me,

4  there was no prepetition default.

5          THE COURT:  All right.

6          MR. COBB:  And I can give Your Honor -- I even wrote

7  down the cite, 456 F.3d. 673 in the Sixth Circuit's opinion

8  where they acknowledge that.  Now, I also will note that Mr.

9  Bernick's law firm and Mr. Bernick had been very active in that

10 case and that case has not been resolved yet.  And so, I don't

11 fault Mr. Bernick, if on the issue he takes a consistent line

12 that he's taken in that case, he has to.

13         Your Honor pointed out in the May 19 opinion that the

14 cases Dow relied on have no factual similarity to the cases

15 here.  There was a comment made to that effect, and cited the

16 Southland and the Terry case and the Casablanca case.  That's

17 right, Dow distinguished those cases because those cases are

18 different than where you have -- they were insolvent debtor

19 cases and Dow said this isn't an insolvent debtor case, we have

20 a solvent debtor case.  An insolvent debtor case, you're

21 talking about, what's the right rate of interest.  When I have

22 to figure out which of the creditor body on this side of the

23 line, not on the Equity side, which of the creditor body is

24 going to recover what?  To what extent on their allowed claim

25 should they then recover interest?  It's an insolvent debtor,

**J&J COURT TRANSCRIBERS, INC.**

1  Equity is not receiving anything.  No recovery.

2          So, those cases are actually -- you would agree with

3  _Dow_ and I think _Dow_ would agree with you, that those cases are

4  distinguished.  _Dow_ didn't rely on those case, but to say that

5  when you have a solvent debtor, it's different.  Now, you're

6  talking about apportioning value between Equity, who comes

7  last in line under the code, they are the caboose, no offense,

8  Mr. Frankel, they are the caboose.  And so, we think that _Dow_

9  is persuasive and that it controls here.

10          There was a comment made in the opinion in footnote

11 eight that the issue in _Dow_ was different.  I'm not sure what's

12 meant by that statement, I'll reiterate, the issue in _Dow_ was,

13 there was no prepetition default, attempt to collect pendency

14 interest at the default rate.  There was some reference that

15 the contracts in _Dow_ provided interest at a non-default rate

16 that was higher or lower than the federal judgment rate --

17          THE COURT:  Which is different from here.

18          MR. COBB:  -- but that's --

19          THE COURT:  It was the obverse in _Dow_.  They were

20 getting paid under the plan -- I've forgotten now, something

21 that was higher than the contract and the federal judgment

22 rate, I think, and here -- I've forgotten the facts now, but,

23 anyway, it was different from here.  Here, the bank lenders are

24 getting more than the contract rate, more than the federal

25 judgment rate, less than the default rate and there was

1  something different in <u>Dow</u>, but I don't recall now what it was.

2          MR. COBB:  I don't think so, Your Honor.  And, I know

3  Mr. Rosenberg has been pretty active in that case as well.

4          THE COURT:  Okay.

5          MR. COBB:  You can see him shaking his head

6  vigorously.

7          MR. BERNICK:  I'll -- I litigated that case and I'll

8  be happy to clarify that.

9          THE COURT:  All right.

10          MR. COBB:  Can't wait to hear, Mr. Bernick.  So, Your

11  Honor, those are our thoughts on <u>Dow</u>.  We don't think that it's

12  distinguishable, we think that it is very instructive here.  In

13  fact, we think it is persuasive.

14          So, I think that is the best I can do on my feet,

15  responding to Your Honor's concerns and I think at this point,

16  what that leaves us with is then, a discussion as to -- we'll

17  actually talk about some evidence, and let's talk about fair

18  and equitable and the test.

19          Grace has to satisfy every element of 1129 as it

20  knows it does, in order for confirmation to be approved.

21  Again, referencing <u>Dow</u>, the history of fair and equitable is

22  best described in Judge Specter's lower court opinion in <u>Dow</u>,

23  in which he demonstrates, the concept has long existed in law,

24  and develop -- and then ultimately the Court of Appeals in <u>Dow</u>

25  says, well, now, there's a presumption in favor of awarding

1 contract default rate and there may be compelling equitable

2 considerations to suggest we should come down from that rate,

3 but that's the test.  That's what I, Your Honor, I alluded to

4 earlier.  There's a debate here on which is the appropriate

5 test to apply.

6       The point is, Your Honor, <u>Dow</u> instructs us and we'll

7 talk about <u>Coram</u> in a minute, the bank lenders do not have to

8 earn their interest.  Don't have to earn their interest by

9 proving positive equitable factors.  It's from a higher rate

10 down.  It's a top down analysis, it is not bottom up.  We don't

11 need to prove anything, other than what is the applicable rate

12 in the contract and we have done that, post maturity.  They

13 don't need to earn it.

14       Let's talk about <u>Coram</u> for a moment, Your Honor.  And

15 I'll cite at 315 B.R. 347.  Judge Walrath says, "As a result of

16 the peculiar facts in <u>Coram</u>, we conclude that allowing the

17 noteholders to accrue post petition interest at their contract

18 default rate would not be fair and equitable."  Top down.

19       And <u>Coram</u> is pre-<u>Dow</u>, pre-Sixth Circuit Court of

20 Appeal decision and Judge Mary Walrath found that we should

21 start at a rate that is higher than the federal judgment rate.

22 And, then <u>Dow</u> confirms that.

23       Let's talk about <u>Coram</u> in a little more depth, from a

24 different angle than Mr. Pasquale referenced it.  Bad conduct

25 in <u>Coram</u>.  I don't know if Your Honor has read the opinion

**J&J COURT TRANSCRIBERS, INC.**

1  recently, but Your Honor may recall that -- I was, frankly,

2  openmouthed when I read the opinion, that the debtors would

3  dare to come back in again and try to present the same witness

4  and Judge Walrath says, essentially, that that resulted in

5  gross delay during the case, dramatic delay, where there was a

6  real conflict of interest that she had identified, I think, on

7  the record, at the first confirmation hearing.   The debtors

8  then, between the debtors' CRO and, I think, one of the

9  noteholders that was claiming it was deserved a higher rate of

10 default interest.

11        Just prior to the petition date there, that CRO, with

12 the -- I think he held the CEO title, as well, that

13 representative of the debtors who was conflicted, caused $6.3

14 million in payments to go out the door to the noteholders who

15 were then seeking the contract default rate.

16        The trustee put on evidence that it cost the estate

17 12 to $15 million, because of this delay, multiple confirmation

18 proceeding because of the conflict.

19        Judge Walrath rejects an argument that Grace has

20 advanced here, Pages 343 and 344 of the opinion, and adopts

21 Dow's reasoning.  Paying in full the value of the allowed claim

22 does not satisfy the absolute priority rule in a solvent debtor

23 case.  And she cites Dow with approval.  She also cites San

24 Joaquin State and Gaines with approval, to not award interest

25 in a solvent debtor case is abuse of discretion.  I'm not sure

1  we have a debate on that at this point.  I think Your Honor

2  said, some rate of interest needs to be provided.

3          The federal judgment rate is not the required rate.

4  Even the most egregious conduct, which is pretty stunning,

5  brought that rate down from the contract default rate lower, to

6  the federal judgment rate.

7          Now, let's turn to what -- the conduct of the bank

8  lenders, that Grace has introduced or cite into evidence.  It

9  doesn't appear in its reply brief, I read that many times in

10  this interim period, just to be sure I hadn't missed anything,

11  but there was no conduct cited.  There's a lot of allegations,

12  there's a lot of lawyer argument, but there's no evidence of

13  any scheme.  And I think Grace, feeling the pressure of Coram,

14  has now, at this eleventh hour, tried to present a scheme,

15  where the bank lenders did something bad, that they somehow hid

16  in the weeds and allowed these settlements to go forward.  The

17  bank lenders, not the Committee, but the bank lenders hid in

18  the weeds.

19          We know that the Committee, at one time, supported a

20  different plan and Your Honor also discussed this in your May

21  19 opinion, a different plan some time ago that either has

22  expired or very likely the conclusion will be it has expired,

23  under its very terms.  It's not the plan that's been presented

24  to the Court at this confirmation hearing.  It was cash plus

25  equity, was the return to unsecured creditors.

**J&J COURT TRANSCRIBERS, INC.**

1          Sure, the 6.09 percent interest rate appeared in that
2  plan, but they also -- part of the recovery was there would be
3  an equitable piece you could share in the upside.

4          The plan support letters that we've seen many times
5  in the course of the confirmation hearing and otherwise, that
6  were signed by counsel to the Committee, there has never been
7  an allegation by Grace that there was some sort of improper or
8  unlawful participation by the bank lenders and their role in
9  the Committee.  There's never been an allegation that the
10  Committee was improperly controlled by the bank lenders.  There
11  has never been any evidence or proof of that.  The Committee
12  acted as the Committee.  So, Committee, qua Committee, executed
13  both of these letters.

14          (Attorney occasionally walks away from microphone)

15          Let's take a moment and review them.  Your Honor, I
16  don't think there could be any serious dispute, although there
17  attempts to be some shading by Grace here, that the letter is
18  addressed to counsel for the debtors and it is presented by Mr.
19  Kruger, counsel for the Committee.  It's never been alleged
20  that Mr. Kruger is not counsel to the Committee.  There are
21  several events, as I think the Court has already recognized,
22  that failed to occur in the context of the 2005 letter
23  agreement.  Of course the disclosure statement that was
24  submitted in that context was never approved, certainly was not
25  approved by November 30th of 2005, and a joint plan, a plan

1  submitted both the Committee's behalf and the debtor's behalf,

2  that never became effective.

3      Again, under that plan, Your Honor, there was a

4  different recovery, not just interest at the 6.09 percent, paid

5  in cash, but there was a recovery of cash, as well as equity,

6  that the Committee supported.

7      Your Honor, we can move on then to the 2006 letter

8  and, Your Honor, it looks remarkably the same.  There's an

9  adjustment with regard to the rate of interest that is to be

10 paid with regard to the prepetition bank credit facilities

11 you'll see, Your Honor, but, again, this is submitted by Mr.

12 Kruger, on behalf of the Committee, acting as a fiduciary for

13 all of these petitions.

14     As Your Honor knows, well knows, the Committee cannot

15 vote, the Committee cannot bind any single member as to how

16 they would vote their claim, up or down, it's the Committee as

17 a political voice, that's it.  The Committee has the ability to

18 try to persuade others that this rate of interest is, by way of

19 example, is the appropriate rate, you should vote in favor of

20 this plan.  The Committee doesn't vote and it can't bind its

21 members.  I don't think there any serious contention from Grace

22 in that regard.

23     And I don't think, Your Honor, that your May 19

24 opinion says that the Committee bound individual members.  I

25 think you were pretty clear in your footnote, one little, maybe

**J&J COURT TRANSCRIBERS, INC.**

1 wrinkle on the former and latter, but I think if you read that

2 in any light, and any interpretation that's reasonable suggests

3 that the Court decided exactly that.  That the Committee was

4 acting on behalf of the Committee and its members, as a

5 fiduciary, but didn't bind any members.  And wasn't -- that

6 these letters were never submitted and these rates agreed to by

7 a particular creditor.

8       Let's look for a moment, if you will, in the same

9 theme, regarding testimony that Mr. Tarola provided.  He was

10 the CFO of Grace up until October of 2008.  (Indiscernible),

11 Your Honor, because we've got the slide up.  You'll note that

12 Mr. Pasquale is conducting cross examination here and he says,

13 "Mr. Tarola, you said in response to Mr. Bernick's questions

14 that Mr. Maher was negotiating with you on behalf of not simply

15 the bank holders, but all (indiscernible) creditors."  In fact,

16 leading up to the January 12, '05 agreement, you mention Mr.

17 Maher specifically requested and it was agreed to, a specific

18 rate for non-bank lender creditors.  And that wasn't surprising

19 to you because you understood, did you not, that Mr. Maher was

20 negotiating as Chair in the Creditors' Committee.

21       And then it talks about Mr. Tarola admits there was

22 -- the letter agreement was not signed by anyone other than

23 counsel for the Creditors' Committee and counsel for Grace.

24       Further down the page, it says that there's certain

25 termination events, Your Honor, and then it also discusses the

1  expiration period of those dates, that became an issue as to

2  whether or not the Committee would renew the agreement.  Mr.

3  Tarola says, "Objection."  "Isn't it true, Mr. Tarola, the

4  disclosure statement was never approved and a joint plan was

5  never approved?"  And so Mr. Tarola appreciated the effect of

6  those conditions in the 2005 letter agreement, which also

7  appeared, again, in the 2006 agreement and those events never

8  took place.  He appreciated that the Committee was presenting

9  -- the Committee has been bound to those agreements, not the

10  bank lenders, not any particular creditor.

11          Later on, Mr. Pasquale -- now, we turn to -- Mr.

12  Pasquale asked, "Did you obtain the signature of any bank debt

13  holder on any document obligating that holder for the joint

14  plan?"  Mr. Tarola says, "Not to my knowledge."  "Did Grace

15  ever obtain the signature of the bank agent, the bank lender's

16  agent, JP Morgan?"  "Not to my knowledge."

17          Grace calls this a hyper-technical argument, or

18  technical argument.  You can't bind a creditor unless you have,

19  in fact, bound the creditor, and that never occurred here.

20          And, again, more on the signature at the bottom of

21  this page, Your Honor, and, again, it was clear concession by

22  Grace that they never obtained a signature binding any debt

23  holder and did not bind the bank lender's agent.

24          Now, let's talk about -- Mr. Tarola recalls, the

25  interest rates that you recite in response to Mr. Bernick's

1  questions, those interest rates referenced in the joint plan

2  filed in 2005, do you recall the form of consideration that the

3  joint plan provided?  He says, "I don't recall off the of my

4  head."  And then Mr. Pasquale prompts him, "Was it all cash?"

5  "You mention, I think, it was part cash, part equity."  Mr.

6  Tarola recalls now, 85 percent cash, 15 percent other

7  consideration.  A different plan that the Committee was

8  supporting, Your Honor.

9        I don't want to belabor the point, Your Honor, I'm

10 afraid I have with my -- with the use of this testimony, but I

11 want to make it perfectly clear that Grace knew that it was a

12 different plan.  Grace knew that the Committee, at one time,

13 supported a different plan, a different context, that provided

14 different consideration for some of its constituents.

15       Grace -- I don't think there's any serious dispute,

16 Your Honor, again, based on Kensington, based on Revko, that

17 the Committee cannot bind a single constituent.  But, then

18 Grace makes the unsupported argument in its papers that the

19 Committee was acting as the authorized representative of the

20 bank lender.  I don't know what that means, Your Honor.  They

21 have a fiduciary, a fiduciary obligation to represent all of

22 their constituents.  I don't know what authorized

23 representative means.  It certainly didn't bind the bank

24 lenders, they can't bind the bank lenders.  And Grace goes on

25 to say that as such, the bank lenders and the Committee agreed

1  to accept a rate of interest that's different than the default

2  rate, as a matter of law, they go on to say.

3        Your Honor, there's no authority provided in Grace's

4  brief and particularly the most recent brief, the reply brief,

5  for that kind of bold statement.  And, Your Honor -- it's very

6  clever, Your Honor, they start there and then that morphs into

7  a scheme whereby the bank lenders, the bank lenders as

8  creditors, were lying in the weeds and are now taking advantage

9  of this settlement.

10       Once you establish the relationship, as Grace would

11 like you to do, way back in 2005, that relationship, they say,

12 continues and now there's a scheme.  We'll talk for a minute

13 about that scheme, if it was a scheme and, in fact, who

14 proposed the scheme.

15       Curiously, Your Honor, as I noted before, there's no

16 law supported, that supports or a cited in support of the

17 dramatic statement that we were the -- that the Committee was

18 the authorized representative of the bank lenders.  No law that

19 supports a finding that the Committee was the bank lender's

20 agent.  There's no law that even the bank -- that the

21 administrative agent, JP Morgan Chase and Mr. Maher, had the

22 legal authority to reduce the legal interest rate recoverable

23 under the credit agreement.  And, most certainly, Your Honor

24 has never ruled that the Committee was the bank lender's agent

25 and thus bound the bank lenders to accept any reduction.

1          So, what do we know?  We know that under the 2005,
2    2006 letter agreements, we know that the Committee at one time,
3    may have been obligated to support a political voice, a
4    different plan that paid less than the default rate, but that
5    included an equity component.

6          Your Honor, I'll note for the record that the stock
7    price of Grace in December and January of 2005, December 2005,
8    January 2006, was trading at about 10 to $12 a share, and Mr.
9    Pasquale just updated the Court with regard to the December
10   31st trading price at $25 a share.  The equity piece had value
11   and that underscores the differences in those proposals.

12         So, we move forward from the 2005, 2006 letter
13   agreements, different plan, joint plan.  Committees had said
14   they would be a vocal supporter of that, no bank lender is
15   bound, the Committee is not acting as the bank lender's agent.

16         The debtors propose a term sheet and that term sheet
17   is then circulated to the world and within a matter of days,
18   the bank lenders object.  There's a letter submitted by Mr.
19   Rosenberg, on behalf of the bank lenders and they object to
20   rate of default interest.  Before that time, there was no
21   vehicle or medium for the bank lenders, as creditors, to object
22   to the rate of interest that was being offered.  Grace says,
23   well, we put the 6.09 percent in our public filings, we put it
24   in our financial reports.  Your Honor, a creditor doesn't have
25   an obligation to come forward and respond to everything the

1   debtor says about what would be the recovery under a particular

2   creditor's claim.  It has an obligation to come forward when

3   that claim is objected to.  It has an obligation to come

4   forward when there is a medium and a forum in which to do that.

5   And here, it was the Court, there was the exchange by Mr.

6   Rosenberg, but then there was the claim objection that brought

7   us -- that began this long travail.  And when the claim

8   objection was filed, the lenders responded and have vigorously

9   continued to assert, as they have all along, that what they

10  believe was their entitlement to the contract default rate.

11          Grace knew that it hadn't bound any individual bank

12  lender and, you know, I hesitate, Your Honor, to spend a lot of

13  time on this, but I feel I have to because there's -- Grace is

14  saying that the bank lenders and the Committee acted in a

15  certain way, when we know that Grace knew that they had never

16  bound any bank lender.  I don't think they seriously dispute --

17  they may, I'll hear from Mr. Bernick -- but I don't think they

18  seriously dispute that any bank lender was legally obligated,

19  in any sense, to accept a rate other than the rate they had

20  asserted in their proof of claim.

21          Let's take a look at some of the evidence that shows

22  that Grace knew that not a single bank lender was obligated to

23  support or accept anything less than the rate they were

24  claiming in the proof of claim.

25          Cross examination by Mr. Pasquale --


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Who is this, I'm sorry?

2          MR. COBB:  This is Mr. Tarola, again, on the stand.

3          THE COURT:  All right.

4          MR. COBB:  We talk about, did he obtain a signature,

5   and, again, Grace concedes, at least through October of 2008,

6   under Mr. Tarola's tenure with Grace, never was there a

7   signature obtained with the bank agent.  Mr. Pasquale continues

8   and says -- asks the question, "Did Grace obtain the signature

9   of any bank debt holder on any document by which the bank debt

10  holder agreed to the post-petition interest rate negotiated

11  between you and Mr. Maher on behalf of the Committee?"  Again,

12  "Not to my knowledge."  Again, no signature from JP Morgan

13  Chase.

14          The questions continue.  "At any point in time, from

15  February of 2006 until, I believe it was October of 2008, did

16  Grace ever obtain a signature?"  "No."  Then he says, Mr.

17  Tarola says -- it's a remarkable comment, actually -- says,

18  "But I would like to say my understanding of the bankruptcy

19  process was that if individual creditors objected to a proposed

20  plan, that would come out at the time the plan was voted upon,

21  not in some interim period."  And Mr. Pasquale moved to strike.

22  I like that answer, Your Honor, because that's exactly what

23  happened here.  That's exactly what happened.  When the time

24  came for the bank lenders to make certain that they would not

25  lose their rights, they stood up and they objected.

1          Now, we get into an interesting question that's

2 asked, "Did Grace ever request a separate agreement with JP

3 Morgan Chase to support a plan of reorganization in these

4 cases?"  I know Your Honor was very, very, very aware of what a

5 plan support agreement is and Your Honor is aware of what a lot

6 of agreements are, and not once, not once, did Grace approach

7 the bank lenders in an attempt to lock them up.  To get a plan

8 support agreement.

9          There was a draft plan support agreement circulated

10 between Grace and the Committee, it never was executed.  They

11 had express carve out, that any individual creditor could,

12 indeed object, if it felt it should, or otherwise needed to

13 object.  There never once, in this sophisticated bankruptcy

14 where millions and millions of dollars are at stake, with any,

15 you know, with any delay in the case, with a lengthy

16 confirmation process, that Your Honor knows is an incredible

17 financial commitment, not once did Grace attempt to legally

18 bind the bank lenders, as Your Honor knows that they can do,

19 they didn't even make the attempt.  There's no evidence in the

20 record that they did, and you're not going to hear that there

21 was an attempt to that.

22          Your Honor, the disclosure statement of the plan that

23 was filed in 2005, there's again an acknowledgment, even under

24 2005, which may be the closest Grace has come to binding anyone

25 with regard to a rate, but we, of course, don't concede that

1  point, but let's look at -- this is in the footnote, on Page 59

2  of the 2005 plan disclosure statement, says, "This agreement

3  does not commit any member of the Unsecured Creditors'

4  Committee, or any creditor, to vote for the plan."

5          Lastly, Your Honor, after the term sheet was issued

6  in 2008, there was a conference call that Grace participated

7  in, a regular conference call, as Your Honor is aware that

8  these exist, where a publicly traded company will have a

9  conference, particularly in bankruptcy, they will update their

10 investors, update their equity holders, update their creditors

11 with regard to what's going on in the company.  And here, a

12 conference call is held April 7th, 2008.  And we kind of work

13 our way down through the transcript, some of which is redacted

14 at Grace's request, get down to the transcript, and we see Mr.

15 Festa, an officer of Grace at the time, has this to say in

16 response to -- it appears to something that's redacted.

17         This is Fred, "As you know, our unsecured creditors

18 have been supportive of our plan, as well as co-proponents of

19 our plan, since the last the last three years" -- must be

20 referring to the 2005 plan -- "or over three years, just based

21 on the urgency of getting these documents done.  They have

22 really not had a complete chance to look at all the documents

23 and make a recommendation to all of their members."

24         Okay.  So, the term sheet has been issued, the

25 Committee has not voiced its support yet, according to Mr.

1  Festa, because the Committee has not had a chance to look at

2  it.  We anticipate, and more than anticipate, working with

3  them, educating them, the Committee, and hopefully, they'll

4  continue to support us as they have done for the past three

5  years, as we've worked together very closely together as one,

6  the Committee and Grace.  No mention of the bank lenders.  And,

7  in fact, the Committee has objected.  The Committee is standing

8  here before you as a supporter of the bank lender's objection.

9       So, Grace knew that it hadn't obtained -- that it had

10  not obtained, according to Mr. Festa, they haven't had a chance

11  to look at it yet, they haven't had a chance to make a

12  recommendation, they hadn't obtained the Committee's support

13  when the term sheet was issued for the plan that's before this

14  Court in early 2008.

15      And Grace knew that the bank lenders were seeking to

16  recover interest at the contract default rate, in order to vote

17  in favor of this plan that's before the Court.  How did they

18  know that, Mr. Kruger told them.  Mr. Kruger, as counsel for

19  the Committee, communicated to Grace that he was aware that

20  there were bank holders that were looking to recover more than

21  the 6.09 percent interest rate.

22      Let's start first with Mr. Kruger's testimony on

23  direct.  "Did there come a time when Mr. Shelnitz advised you"

24  -- let's step back, I want to make sure the context is correct

25  for the Court.  These questions are asked and the setting here

1  is, and specifically, Your Honor, who suggested, who came up

2  with the idea that the Committee should not participate in the

3  2008 plan negotiations?  Remember now, this is the underpinning

4  of the scheme, that the bank lenders and the Committee talk

5  about a separation there between the Committee and the bank

6  lenders.  This is the scheme that the Committee laid in wait,

7  and the bank lenders laid in wait, and then the term sheet

8  comes out and they pounce on it and they file these objections.

9          Now, Mr. Kruger, there's a question asked by -- on

10  direct by Mr. Pasquale, "Did there come a time when Mr.

11  Shelnitz advised you that the debtors were engaging in

12  settlement discussions with other constituencies in these cases

13  to resolve the personal injury asbestos liability?"  "Yes, he

14  did so advise."  "If you recall."  "He did so advise.  Probably

15  the early part of 2008."  "Did the Creditors' Committee

16  participate in those negotiations?"  "No, we did not."  No

17  disagreement there.  Grace agrees with that fact.

18          "We suggested -- I suggested to Mr. Shelnitz, that we

19  should participate in those negotiations and I wanted to be

20  present for them, to set forth a claim for the holders of bank

21  debt, as well as the other claimants in the unsecured creditor

22  community.  Mr. Shelnitz thought that he would be able to carry

23  our work, so-to-speak, and that he was going to negotiate a

24  plan with the PI Committee, so we were not invited."

25          All right.  Now, we get into the next scheme, which

1  is, Mr. Shelnitz knew at the time that he was negotiating with

2  the other constituencies, that the bank debt holders didn't

3  want to receive or recover at the higher rate, the default

4  rate.  "During that period of time what, if anything, did you

5  tell Mr. Shelnitz about what you believed to be the expectation

6  of holders of bank debt?"  Receive (indiscernible).  "I told

7  Mr. -- specific conversation, without date, Mr. Kruger says,

8  "Yes, I can recall a specific conversation in which I informed

9  Mr. Shelnitz, Grace expected to have the bank debt holders vote

10 in favor of any reorganization plan that they might offer, that

11 the plan would need to provide the default interest for the

12 bank debt holders and that in addition to that, but regardless

13 of the view the Committee might hold, the Committee doesn't

14 vote, it would be the bank debt holders that ultimately voted

15 on the plan."  "Did you ever tell Mr. Shelnitz that the

16 Committee would support the plan as documented in the April

17 2008 term sheet?" "No, I did not."  Again, the principal

18 communicator between the Committee and Grace.

19        Not even the Committee had committed to support the

20 2008 term sheet and, in fact, the Committee was communicating

21 to Grace directly, while negotiations were occurring, that the

22 bank debt holders expected to receive default interest.

23        Building on that, Your Honor, further questions are

24 asked about what did Grace know.  "Now, Mr. Bernick asked you a

25 number of questions,"  Mr. Pasquale cross examining Mr.

1  Shelnitz.  Let's understand the setting.  There's a lot of

2  discussion about separate agreements, let's focus on Line 9,

3  which says, "Mr. Bernick asked you a number of questions," you,

4  being Mr. Shelnitz, "that Mr. Kruger did not tell you.  Did Mr.

5  Kruger or anyone at Strook ever tell you that the Committee

6  would support the term sheet or the plan presently before this

7  Court?"  "No, but the question was never asked."  "Never asked

8  by you in any of the discussions with Mr. Kruger?", Mr.

9  Pasquale asked.  "Well, we had discussions," plural, "when he

10  indicated to me that the trading price of the debt indicated

11  there, maybe some bank holders that had an expectation of a

12  higher rate of interest.  I recognize that that could be an

13  issue, but that the Committee support would be very powerful in

14  getting the plan confirmed."

15       Again, bank lenders, Committee, two separate

16  entities.  The Committee in only a political voice.  "What was

17  your expectation as to the effect of the the Committee's -- oh,

18  excuse me -- "that was your expectation as to the effect of the

19  Committee's support, correct?"  And the answer by Mr. Shelnitz

20  was, "Mr. Kruger never took issue with that statement,

21  correct."

22       Now, Mr. Pasquale says, "Let's stay in the range of

23  April 2008," et cetera, et cetera, and he references April 4,

24  2008 as the relevant date.  And Mr. Pasquale asks, "You were

25  told during the discussions with Strook, during that period of

1  time, early April 2008, that certain bank debt holders were not

2  agreeable to the rate provided in the term sheet, weren't you?"

3  "I believe so."  "So, you knew that before the term sheet was

4  signed?"  Mr. Shelnitz, "Yes."  "Now with respect to the

5  negotiations that led to the term sheet, Mr. Bernick asked you

6  some questions about the Creditors' Committee.  That the

7  Creditors' Committee did not participate in those negotiations.

8  Do you recall the questions?"  Back to the issue of the scheme,

9  Your Honor.  Answer, "Correct."  Question by Mr. Pasquale,

10  "That was actually your decision, wasn't it?"  "Well," Mr.

11  Shelnitz says, "it was my position and suggestion to Mr.

12  Kruger, that that would be the best way to get a deal done on

13  that, a more intimate discussion without the general unsecured

14  committee being there.  That would be more productive and it

15  would enable the Committee to avoid having to address the

16  asbestos claimants committee directly, with an expectation that

17  the ACC would be requested to take a cut in their recovery in

18  the amount of principal."  Okay?  But, this is Mr. Shelnitz's

19  suggestion to Mr. Kruger when Mr. Shelnitz knows that there are

20  bank lenders out there that expect a higher rate of interest.

21         "So it was your, Mr. Shelnitz, strategic decision to

22  which we agreed, isn't that" -- on the next page -- "isn't that

23  right?"  "Correct."  He knows that the bank lenders weren't

24  going to support it.  At least some-- he said, at least on

25  those, that some are not going to support it and it's his

1 suggestion that the Committee stays home, that the Committee

2 doesn't participate.

3          Let's look at the bottom of the page, question by Mr.

4 Pasquale, "You mention in response to Mr. Bernick's questions,

5 again it's Mr. Shelnitz, "At least a conversation with Mr.

6 Kruger with respect to trading price of the debt."  Again,

7 trading price reflecting that they want more than the rate of

8 6.09 percent.  "In fact, there was more than one conversation

9 wasn't there?" Mr. Pasquale asked Mr. Shelnitz.  What does Mr.

10 Shelnitz say?  "He did mention it in more than one

11 conversation, yes."  Mr. Pasquale says, "Well, it was at least

12 five conversations that you can recall."  "That would be a

13 ballpark.  It wasn't one time, it wasn't one mention, there

14 were at least five conversations.  That's the ballpark.  It

15 could have been six or seven, maybe there were three or four,

16 but it was more than once.  It was multiple occasions, at least

17 during the course of these negotiations."  There was no

18 (indiscernible), they were on notice.

19          And the effect of the 2008 plan and term sheet on the

20 bank holders.  "I believe you have," -- Mr. Shelnitz -- this is

21 the question of Mr. Shelnitz on redirect by Mr. Pasquale, "that

22 Mr. Maher is negotiating this back in 2005, the bank agent

23 would would be binding upon individual bank debt holders."

24 Objection, (indiscernible).  "As I said," Mr. Shelnitz

25 responds, "I didn't.  I wasn't really focusing on the extent to

1 which individual bank debt holders may or may not have been

2 bound.  Not being a bankruptcy law expert, I really wasn't

3 quite sure to what extent they would or would not be bound."

4       They have the best bankruptcy law firm in the world

5 working for them.  Certainly not my firm.  It's in competition

6 with Kirkland Ellis.  He had a question, he wasn't really

7 focusing on, he wasn't sure.  He could have asked, is there any

8 way we can bind the bank lenders, any one or all of them?  He

9 could have asked that question.  He's an attorney himself.  And

10 working in a sophisticated environment, for a sophisticated

11 client in a very critical time period, where the debtors are

12 about to invest millions and millions and attempt to recover on

13 the millions and millions they've invested in the bankruptcy

14 process, and confirm a plan that hopefully sails through

15 without objection, and he never asks.  He never even asked the

16 question and that -- I don't mean to assess blame here, but

17 when they're saying that my clients did something wrong, that

18 our conduct here should somehow be used to detract from the

19 contract default rate which is the correct rate to be recovered

20 here.  Let's look at their conduct, what they knew and what

21 they did.

22       It gets worse, Your Honor.  Grace knew also that the

23 bank credit agreements did not allow the bank lender agent to

24 reduce the interest rate, and thus, even Mr. Maher had no

25 authority, on his own, to reduce the interest rate.  Let's take

1  a look at the credit agreement.  Section 11.1.  Notwithstanding

2  any provision contrary, elsewhere in this agreement, the

3  administrative agent shall not have any duties or

4  responsibilities except those expressly set forth in the

5  agreement.  That's 11.1, Your Honor, followed by Section 13.1

6  which says, "In this agreement?"  "No, we have the loan

7  document the terms hereof, they are making measures

8  supplemented and modified, except in accordance with this

9  subsection.  With the written consent of the majority banks" --

10 remember, Grace is a part of this document they know what this

11 document says, or they should.  They have a billion dollar

12 loan.  I think it's fair to say they can be charge with having

13 responsibility to read it and understand it.  "The written

14 consent of the majority banks' administrative agent, the

15 parent, and the company may from time to time enter into

16 written amendments, supplements to modifications hereto in

17 (indiscernible), if any," et cetera, et cetera, et cetera,

18 "provided, however, that no such waiver and no such amendment,

19 supplement or modification shall," Romanette (i), "reduce the

20 amount or extend the maturity of any loan or note, or any

21 installment thereof, or reduce the rate or extend the time of

22 payment of interest thereon.  Reduce the rate or extend the

23 time of payment of interest thereon; Credit agreement, Section

24 13.

25          They knew that even Mr. Maher himself had he written

1 on a cocktail napkin, at one of these Committee Grace meetings

2 and said, oh, by the way, we'll take something less.  He

3 couldn't bind anyone, he couldn't do it.

4        Grace knew that the bank debt was trading at a level

5 that demonstrated an expectation that bank debt holders

6 expected to recover default interest.  I think that's very

7 clear now.

8        What I talked about, I think, was Mr. Shelnitz's

9 knowledge in 2008, at around the critical plan negotiation time

10 for this plan, Shelnitz also told on direct from Mr. Bernick

11 that we had discussions on various issue related to bankruptcy,

12 and in one of those discussions somewhere in the spring of 2007

13 time frame, Mr, Kruger happened to mention that we need to

14 solve the bank debt.  Well, he had been advised that the bank

15 debt was trading at a level that indicated some expectation of

16 interest above the accrual rate in the 2006 letter agreement.

17        Well, there then is -- okay, is there anything else

18 that you recall Mr. Kruger saying?  Well, we talked about that

19 and we talked about how thinly the debt was traded, it may not

20 be indicative of anyone's expectations and we really don't know

21 what to make of it.

22        The question becomes, what does Mr. Shelnitz do in

23 response?  Did he pick up a phone and call Mr. Maher?  Did he

24 pick up a phone call the agent?  Did he pick up a phone any

25 call any individual bank lender?  There's no evidence in the

1 record that he did anything, and that's 2007.  And we know that

2 there was ballpark, five discussions about the debt trading at

3 a different level with regard to the interest rate, in 2008.

4 And, again, there's no evidence in the record that Mr. Shelnitz

5 ever attempted to understand where the bank lenders were at, by

6 speaking to a bank lender, who could be bound, who could be

7 bound, legally, to support that interest rate.

8         Again, I think we've covered -- I think I've made the

9 point, Your Honor.  It's throughout the evidence, and I know,

10 Your Honor has been carefully reading the confirmation

11 transcript, but I think that at this point it's fairly clear.

12 And Grace knew in the end that any individual bank lender could

13 object.  So, what is the most that Grace really can say about

14 all this?

15         At some point, under an earlier plan, the Committee

16 thought that 6.09 percent recovery, in a plan where they're

17 paid cash plus an equity kicker, okay, on the recovery of their

18 claim, that that -- the Committee would advocate on behalf of

19 the Committee and all of its constituents that that rate, that

20 recovery, should be accepted by the creditors.

21         So, Grace knowing all these and let me run down the

22 bullet points, knowing it hadn't bound any bank lender to

23 accept or agree to, or accept less than default rate, knowing

24 that the bank lenders in early 2008 would require default

25 interest at the contract rate, to vote in support of a plan,

1  knowing that the credit agreements do not allow the bank

2  lenders agent to reduce the interest rate, knowing that at

3  least some Grace bank debt was trading at a level that expected

4  that a higher rate of interest be recovered, knowing that any

5  bank lender could object and represented by Kirkland & Ellis, a

6  very sophisticated restructuring professionals who know exactly

7  how to bind the creditor constituency, they never make the

8  attempt.  They just sit there.  They don't make the attempt to

9  bind anyone.

10        In response, Grace plows ahead with this plan and

11 makes a variety of legal arguments and here we are at

12 confirmation, Your Honor.  But they have absolutely no right to

13 stand here and say, Your Honor, that we relied on something the

14 bank lenders said or did, we relied on some prior rate of

15 interest in formulating this plan.

16        They said to Mr. Kruger, no, you know what, Lou,

17 we'll take care of it, we'll carry the water.  That was Mr.

18 Shelnitz's suggestion.

19        Let's close, then, Your Honor, the fair and equitable

20 discussion with, what are the equitable considerations that

21 Grace says this Court should look at in deciding what's the

22 correct rate of interest.

23        You've heard from me, Your Honor, I believe firmly,

24 and, of course, my clients do, is that we should look to Coram

25 and we should look at the contract default rate and it comes

1 down from there if you did something bad, to earn yourself less

2 than that rate.  Coram, very bad conduct.  There's some other

3 factors we point to in our papers.  The 2 percent default rate.

4 We don't have to prove that that's reasonable, but, of course,

5 we do.  Your Honor has seen a number of facilities where 2

6 percent is the standard default rate.  This isn't 2 percent on

7 top of 16 percent that take it to 18 percent, it's 7.7 percent.

8 That is not usurious on its face.  And Grace has apparently --

9 they appreciate that and that hasn't been a point of emphasis,

10 at least to date, in their papers.  There's a risk of

11 non-payment, it's an unsecured obligation, look where we are,

12 there's no better evidence than we're nine, ten years out,

13 excuse me, seven and nine years out, from when the loans

14 matured and we haven't been repaid.  There was massive asbestos

15 liabilities on this debtor.  The risk of non-payment is

16 self-evident, but Grace focuses on four factors, four

17 considerations that they say, Judge, they shouldn't get their

18 contract default rate.

19        Now, I'm not sure what argument Grace is positing

20 here.  I'm not sure if this is justifying a rate higher than

21 the federal judgment rate, or justifying a rate lower than the

22 contract default rate, but there are four considerations that

23 they put before the Court.

24        First is the scheme, lots about the scheme.  We've

25 been around that.  It's a lawyer's argument, it's invented.

1  Your Honor, they knew what Grace's perception was with regard

2  to what the bank lenders and the Committee were doing or not

3  doing before they entered into those April 2008 negotiations,

4  before they certainly signed the term sheet.

5          This argument first appears, this bad faith scheme,

6  appears in their reply brief.  It was invented, Your Honor, it

7  doesn't exist, Your Honor.  Grace suggested that the Committee

8  stay home, never even talked to the bank lenders.  I think that

9  argument has been disposed of.

10          Equitable consideration number two.  No default

11 interest should be awarded because impairment has not been

12 proved and solvency has not been established.  Interesting.  I

13 call this the bootstrapper of all bootstrappers.  If we get to

14 this stage, Your Honor, I think you have to determine that they

15 were solvent, I do believe that there needs to be some

16 entitlement under the contract to the rate, I think we've

17 established that, I think there's a little debate remaining in

18 Your Honor's mind, but I think we've established that clearly,

19 but I don't understand that argument in the fair and equitable

20 context.  It doesn't make sense.  You haven't proven this, but

21 then they should get this.  It carries no weight and should be

22 given no consideration by the Court.

23          Other constituents have compromised their claims.  I

24 like this one.  This is the bomb that they lobbed way back in

25 the spring of -- in the summer of 2008, where they say, Your

1  Honor, ohhh, don't do this, it's going to blow it up.  And you

2  know what that means, Your Honor, three months, or some lengthy

3  period of time, sitting through an asbestos -- a fight over

4  what the asbestos personal injury liabilities are.  And then

5  they rely on two cases, and they talk, really discuss at length

6  one, <u>Manchester Gas</u>, for this proposition.  That as other

7  creditors took a haircut, these guys should have to take a

8  haircut, too, Your Honor.  <u>Manchester Gas</u>, entirely inapposite.

9  They claim it's square, it's on all fours, it's directly

10 applicable.

11         Your Honor, the creditor that was complaining about

12 the recovery of interest at a higher rate, the creditor that

13 was complaining failed to object at the confirmation hearing

14 that the solvent debtor was not paying post petition interest,

15 they waived it.  They waived the ability to make this argument,

16 Of course, we can't come back in six years -- you know, a year

17 from now or six months from now, post confirmation and say,

18 although the plan didn't provide it, Your Honor, pay us now.

19 That's not what we have here, Your Honor, at all.  We have

20 asserted our rights appropriately, we have not waived them and

21 we are asserting them at the correct time, before confirmation.

22         And, guess what, Your Honor, in Manchester, the

23 debtor was insolvent, the court found, on the effective date.

24 That's not what we submit is occurring here.

25         And, lastly, the other creditors weren't receiving

1  any post petition interest.  It's not the case here.  There is

2  post petition interest, we happen to be the creditor who is

3  standing up and making a stink about it.  It doesn't apply at

4  all, Your Honor.

5        The Titus case was a discussion under 502(b)(2), it

6  was the New Valley issue and they actually -- the court finds

7  it's just entirely inapplicable.

8        Look, this is hard, Your Honor.  I'm -- you know, to

9  look Your Honor in the face and say, Your Honor, if the

10 consequence that occurs is, we got to go all the way back and

11 begin that trial anew, it's going to take up a lot of court

12 time, it's going to cost a lot of money, but the Third Circuit

13 doesn't shy away from overturning decisions that have the

14 effect of disrupting settlements in complex bankruptcy cases.

15 Doesn't shy away from that.  It's done it, as we know, we have

16 Armstrong, we've got Combustion Engineering and we've got

17 Owens-Corning.  They all teach us that you can't settle around

18 the code.

19       And, what's happening here, Your Honor, at bottom,

20 Your Honor, is settlement and attempt to avoid the absolute

21 priority rule.  That's what -- everybody else has settled Your

22 Honor, they haven't.  Everyone one else has taken a discount.

23 At one point, under a different plan, the Committee thought

24 this was a great rate.  So, therefore, they should have to

25 settle, you should force them to settle under this plan.  It's

1  not appropriate under the law, Your Honor.

2       And then lastly, what I'll call the horseshoe and

3  hand grenade argument, it's really close, they're really,

4  really close.  Your Honor, they're either entitled to the

5  default rate and then they did something bad, or there's

6  something wrong in what they have done, that suggests that they

7  should receive less it this court of equity, but that's not

8  what happened here, there is no bad conduct, there was no

9  contract they broke, there was no agreement, there was no, even

10  a reasonable right for Grace to rely on anything that the bank

11  lenders did or didn't do.

12       What's the test, then?  If it's close enough?  Do we

13  take a dartboard and we line up, I don't know, brake it down in

14  5 percent increments and we throw the darts at the board and

15  go, hum, that's pretty close.  I think that's good enough.

16  That's why Dow and Coram make sense, Your Honor.  You have to

17  have a polestar, there has to be touchstone in this examination

18  and we submit that touchstone, when they borrowed our money and

19  have failed to pay it back, maybe they're right under the code,

20  but now when we get to confirmation, what's the correct

21  interest rate?  The touchstone has to be something, it's not

22  the federal judgment rate.  Didn't exist when the  code came

23  into existence, it is not appropriate here.  Judge Mary Walrath

24  has found, you only get there if you do something really,

25  really bad.  It's the default interest rate under the code,

1  under the contract.  If the contract has no default rate, it's

2  the contract rate, but here we have a default rate and that

3  rate should be applied.

4       THE COURT:  Will you make the same argument if the

5  default rate is less than the federal judgment rate?

6       MR. COBB:  Will I make the same argument if the

7  default rate -- no, Your Honor, I'd make the argument that it's

8  the federal judgment rate.  Come on, I'm a lawyer, Your Honor.

9       THE COURT:  I just want to know how --

10      MR. COBB:  I understand, I understand.  It's not what

11 we have here, but --

12      THE COURT:  Well, no, you're asking me for an

13 absolute determination that says it's not the federal judgment

14 rate, it's the contract default rate, so I just want to know if

15 that's the argument you really want to advance, that it's

16 always the contract default rate?

17      MR. COBB:  Your Honor, in this situation and in other

18 cases, where the contract default rate -- that's what's brought

19 the issue before the Court, where the contract default rate is

20 higher, federal judgment rate is lower, and there's a debate as

21 to which should apply and does it fall somewhere in between.

22      Your Honor, you did ask the question some hearings

23 ago about whether Equity is retaining all of its interests,

24 excuse me.  How do bank lenders compare, in capacity to other

25 creditors and Equity in this case, how are they fairing?  I'm

1  not so sure, I don't necessarily believe that that is an

2  equitable consideration that should be taken into account here,

3  but, but, if Your Honor is going to do that, Equity is

4  retaining all of its interests here.  They not getting less.

5  They're retaining their shares of stock and they've enjoyed a

6  17 hundred and 43 percent return as of December 31st, since the

7  commencement of these cases.  That's a pretty good benefit of

8  the bargain.  They bought a share of stock and they got an

9  almost 1800 percent return in that period of time.  I know not

10  all of us have been so fortunate in our --

11          THE COURT:  You're saying got a return.  You mean

12  their stock has allegedly appreciated in value, not that

13  dividends were paid?  What does the turn mean?

14          MR. COBB:  Your Honor, it's an inchoate return, so to

15  speak.  They're holding the share in their pocket.

16          THE COURT:  All right.

17          MR. COBB:  But they can pull it out of their pocket

18  and they can sell it, at any time.

19          THE COURT:  Yes, but now it's going to be subject to

20  certain warrants that didn't exist prepetition, too.

21          MR. COBB:  Your Honor, the Equity has done quite well

22  over the course of this bankruptcy, it can't be denied.

23          And, Your Honor, there was some, you know, reference

24  to, there was a debate over, have the bank lenders hinder this

25  process.  Others have objected in the plan context, we have

1  objected, we're not the sole objector throughout the

2  confirmation, we have done nothing during the course of the

3  cases to slow things down here.  They haven't had to pay back

4  the principle.  They had the full benefit of the bankruptcy

5  code.  They haven't had to pay a cent of interest all along.

6  They've enjoyed that benefit in order to figure out how they

7  want to get out of bankruptcy.  They are able to do that now

8  and now is the time to assess the correct rate that should

9  apply.

10        They haven't had to write a check for half a billion

11 dollars and there's no doubt that that has a tremendous value

12 to an operating company.

13        In summary, Your Honor, Grace has produced no

14 evidence of any meritorious equitable considerations, let alone

15 compelling ones that justify a reduction in the default rate.

16        Grace makes one final argument, leaves us with this

17 pithy argument.  And I know Mr. Bernick is impatient to get up

18 here.  I'm impatient to sit down.  But let me close with this,

19 Your Honor.  Grace posits its road wary proposition last, that

20 Section 502(d) impairment argument -- it comes back to us in

21 different clothes.  Read the last argument in the reply brief,

22 Your Honor.  The absolute priority rule is satisfied because

23 Grace is paying the bank lenders allowed claims in full, which

24 need not include any interest, but we're throwing some interest

25 in, Your Honor, so, it has to be fair.  The cite the face of

1  the statute and a single Florida bankruptcy case.  I'm not

2  making this up, it's in their papers.

3          We know, we know that this is <u>New Valley</u>, this is <u>New</u>

4  <u>Valley</u>, it's a <u>New Valley</u> argument.  And we know that that

5  argument is absolutely meritless based on the repeal of the

6  amendment to the statute.

7          It's interesting that they would close their papers

8  with that.  I find that the Equity Committee and <u>Coram</u> raised

9  this very argument using 529(d) and they actually cite <u>Coram</u>

10 and they say the Equity Committee asserts that denying post

11 petition interest to the notedholders does not offend the

12 absolutely priority rule because the note requires only payment

13 of the allowed claims.

14         Judge Walrath says we disagree, she's beyond that and

15 we know that that's not the law any longer, Your Honor.  You

16 can't just pay the allowed claim and throw some interest on top

17 of it and say, we've met the fair and equitable test.

18         There's little dispute at this point, the bank

19 lenders rely on all of the arguments raised in the many, many

20 pleadings filed on their behalf in these cases.  By my not

21 mentioning one argument, by my not emphasizing a particular

22 argument doesn't mean we've waived anything, Your Honor.  We

23 believe that by offering 6.09 percent interest on the bank

24 debt, Grace concedes that a legally cognizable default occurred

25 post petition and the bank lenders are impaired.  So, really

1 the dispute is, what's the fair and equitable test and how

2 should that be applied here.

3          We submit the Court should adopt the reasoning in

4 Dow, as given by the Sixth Circuit and the Court should follow

5 Judge Walrath.  That is the correct test.  We start at a higher

6 rate, at the contract rate and we come down.  Confirmation of

7 the plan, unfortunately, should be denied unless it is modified

8 to provide for the correct rate of interest as asserted by the

9 bank lenders.  Thank you, Your Honor.  Thank you, Mr. Brown.

10          THE COURT:  Anyone else on behalf of the lenders or

11 the Committee?  Anyone else on that side of the issue?  Okay.

12 Mr. Bernick.

13          MR. BERNICK:  It's 1:20 and I'm just asking the Court

14 whether you want to hear it all now, or --

15          THE COURT:  You want a quick recess?

16          MR. BERNICK:  I could -- I need a very recess, but

17 beyond that, I'm more inquiring about whether --

18          THE COURT:  I figure we'll be done by three.  So, I

19 have a cab at three, we'll be finished by three.  So, yes, I

20 want --

21          MR. BERNICK:  So, you want to work through and get it

22 done.

23          THE COURT:  Yes.

24          MR. BERNICK:  Okay.

25          THE COURT:  All right.

1     MR. BERNICK:  Just give me five minutes, then.

2     THE COURT:  Yes, we'll take a five minute recess.

3                    (Recess)

4     COURT CLERK:  All rise.

5     THE COURT:  Thank you.  Please be seated.  Mr.

6  Bernick?

7     MR. BERNICK:  Thank you, Your Honor.  I'm going to

8  try to focus as much as I can on the particular points that

9  have been made this morning and not go back over the entire

10  argument that we had last time.  Your Honor has now been

11  through this many, many times, albeit, there are many parts of

12  it that probably warrant a lot of examination because they're

13  tricky.

14     Last time we set up a rubric or a sequence or order

15  of operations for analyzing the various issues that have been

16  raised and I put that back up before Your Honor, that's

17  PPCLO-25, I believe, squinting over there, and we still believe

18  that that is the right order of operations, so I'm going to

19  follow it here this morning.

20     Beginning with the first step, has there been a

21  default, some significant discussion of that issues here today

22  and the concept of whether, in fact, there is a freeze and

23  whether the freeze does, in fact, still leave some latitude for

24  the debtor to emerge from the freezer compartment and pay post

25  petition interest.  And, effectively, the argument that's been

1 made is that the debtor should have done precisely that, that

2 we should have come forward and paid post petition interest so

3 that we would have remained in compliance with the lenders'

4 view of what the documents required and, therefore, not have

5 been in a position where we had to pay default interest.

6      Your Honor properly observed that, in fact, the

7 debtor -- the lenders themselves, never asked for that to take

8 place.  If they were intent upon getting that money, they

9 certainly could have come forward, but even more right on, as

10 Your Honor's observation, that that request would never have

11 been granted in the context of this case.  And the reason it

12 would not have been granted, it's been the position of both the

13 property damage constituency and the personal injury

14 constituency in this case from the very get go, that Grace in

15 going to Chapter 11 was, in fact, insolvent by virtue of the

16 outstanding tort liabilities.

17      That has been the position of those constituencies,

18 at least the PI constituency in almost every case that has come

19 before Your Honor.  They've been at pains to go down that road

20 in every single case and they did so with equal vigor here.

21 So, the idea that somehow we would have been given the ability

22 to come in and actually pay principle to the lenders so as to

23 avoid what they believe would be a default is not just

24 revisionist history, you kind of have to wear the blinders and

25 say, it never, ever happened.

1          The only example that they've provided where, in

2   fact, principle dollars were paid out, was the EPA and there's

3   a very good reason for that, which is, the matter first was

4   brought before the Court and approval was obtained and it was

5   brought before the Court and approval was obtained with the

6   concurrence of all constituencies, including the personal

7   injury constituency.  And why were they focused on doing that?

8   And the answer is, that they thought that the settlement was a

9   favorable settlement and they recognized that Grace could not

10  get a discharge from the environmental liabilities in this

11  case.  So, that effectively, the EPA's request for money, which

12  was going to be an ongoing request, their claim extended into

13  the future, as they had to -- or they would assert that they

14  had to do cleanups of various kinds and they would seek

15  reimbursement from the company, it could create a cloud over

16  the reorganized Grace and a cloud over the reorganized Grace

17  would have been contrary to the interests of all of the

18  creditors who were going to be relying, to some extent, on the

19  reorganized Grace to continue to discharge the obligations to

20  the creditors.

21          So, the EPA was a very unique situation, it was given

22  by the nature of the settlement and by the limitations on the

23  ability under the law to get a complete discharge of the

24  environmental liabilities.  Everybody signed on and it was done

25  and that was the only one that was done.  So, no way could we

1 have come forward and done this and as Your Honor properly has

2 recognized, there is not a default when we don't have the

3 ability to go ahead and make the payment.

4      There are two cases that were discussed by Mr. Cobb,

5 one was the Next Wave case, it had nothing to do with this

6 case. It is true that Next Wave is not a post petition

7 interest case, but that's not the reason that's cited, it's

8 cited for a different proposition. It's cited for the

9 proposition of whether there's a default by virtue of failure

10 to make payments post petition. That's what it's cited for.

11      In that case, the issue was whether the debtor was

12 going to be subject to a penalty, due to the failure to make

13 post petition payments. The court found no, because the court

14 found that, in fact, there was a freeze, both of principle and

15 interest. It is precisely on point for the principle for which

16 it's cited and the fact that it didn't deal with post petition

17 interest is irrelevant because the issue that we're talking

18 about here, is whether there's been a default.

19      THE COURT: Well, I mean, Mr. Cobb does make a point,

20 I think, which is that there is still a default, but whether or

21 not there are consequences that should be attributed to that

22 default, may be the analysis that should be applied. The

23 debtor didn't make the payment but, again, I'm sort of stuck

24 between -- with the fact that the debtor couldn't make the

25 payment, so if by operation of law, the debtor is charged with

1 an impossibility, I'm not sure how that's attributed to a

2 default.

3          MR. BERNICK:  Well, I understand that, but I think

4 that default here is important because default carries with it

5 their argument that says that under the contract they're owed

6 certain things.  I think what the bankruptcy code -- this is

7 not a prepetition default situation.  The very fact of filing

8 bankruptcy is not a default.  The provision in the contract

9 that say that the filing of bankruptcy is a default, is an ipso

10 facto clause that's not enforceable, by virtue of exactly the

11 same act, which is the filing of the bankruptcy, you lose the

12 ability to pay.  You also lose, therefore, and this is what

13 Next Wave says, Next Wave says that, essentially, the case

14 comes to a close.

15          If, in fact, the standard to make payments post

16 petition constituted a default, then the fact that the debtor

17 is in bankruptcy means that it's now taken a step backwards,

18 it's lost a right, or it's incurred an additional liability and

19 that is just as inconsistent with the policies that drive the

20 ipso facto rule, as the ipso facto clauses themselves.

21          The second case that's been cited is the Dow Corning

22 case.  It says, you've got to look to the contract between the

23 parties, you've got to look to the contract between the

24 parties.  I'm going to have a significant discussion of the Dow

25 Corning case with respect to why it was that the Dow Corning

1  case focused on the contract between the parties in a few

2  minutes, so I'll defer that argument.

3         Next issue was allowability.  Again, as we've

4  indicated, if Your Honor were to conclude that there is no

5  default, there's a stop sign there which says that the analysis

6  is over.  But going onto the next step in the order of

7  operations, what about allowability?

8         As we argued to the Court last time, default interest

9  is not allowable under 502, or the exceptions to 503 and we

10  took on both issues, that is whether both the language of 502

11  and the gloss on 502 that's been provided by the courts, that

12  says that there are a couple of exceptions for the preclusion

13  of post petition interest, we showed that none of those

14  exceptions provide an entitlement to default interest and as

15  you can see on the chart, there are two exceptions.  One is the

16  over secured creditor, which doesn't apply and the other is the

17  Section 726 solvency exception which is basically read in by

18  the courts, even outside of the context of Chapter 7.  That

19  exception applies where there is, (a) a demonstration of

20  solvency and (b) the federal judgment rate the applies.  And

21  what we've demonstrated is, that under no circumstances does

22  that exception extend to the default interest rate.

23         So, because we've already agreed to pay at least the

24  federal judgment rate, we've complied with 502 and with the

25  exceptions of 502, that doesn't get them to default rate full

1  stop.  The only argument that was made this morning is, and

2  maybe I've been confused and Mr. Cobb will correct me when he

3  stands to respond, is that somehow we can't make that argument

4  unless we demonstrate solvency.

5        Well, no, what we're saying is that the -- we're not

6  going to require a demonstration of solvency because we're

7  already prepared to pay the federal judgment rate and because

8  of that, the exception is satisfied and as a result, allowed

9  the full amount of the allowed claim or an allowable claim, in

10 fact, will be paid under the plan.

11       THE COURT:  I think the issue is whether the legal

12 rate, which is what 726 says, those are the words, the legal

13 rate, is the federal judgment rate.

14       MR. BERNICK:  I understand that.

15       THE COURT:  And Mr. Cobb argues not, you argue it is.

16       MR. BERNICK:  Right.  And I'm not addressing that,

17 it's addressed in the papers and we'll rest on the papers in

18 that regard.

19       We then go to the next step which is, is there

20 impairment and this is a difficult area, in part because the

21 impairment concept is a difficult one to understand and, in

22 part, because the cases don't necessarily grapple with the

23 issue of impairment before they waltz off to 1129 land.  And, I

24 want to spend a little bit of time on it here.

25       What we argued before and we're still arguing today,

172

1 is that there's a logic to the structure of the code and that

2 to the extent that the code says, here is what is allowable and

3 sets limitations, that there are limitations on what's

4 allowable, it would be illogical to have the code then say,

5 well, if you apply those limitations and follow them, that is

6 the limitations that come out in the code, there's still

7 impairment.  And so, people then get to argue, based upon the

8 fact that they'll vote against the plan, that they're entitled

9 to the broader entitlements or their entitled to invoke the

10 broader standards of 1129.

11          If you actually said that impairment is tailored not

12 to 502 and allowability, but instead to 1129 and the tests

13 under 1129, you're effectively saying that in any case where

14 the debtor actually follows the limitations that are imposed by

15 allowability, it is inevitable that the plan is going to be --

16 that there's going to be a dissent in class and it's

17 inevitable, therefore, that the 1129 standards will apply.  And

18 if that's true, what's the point of having the limitations

19 under 502?  And that basic recognition that there has to be

20 harmony within the structure of the code is at the heart of the

21 PPIE decision.

22          It says that if the right, and that's the language

23 that 1124(1) uses, if there is a right that is compromised, but

24 not by virtue of the law, instead by virtue of the plan, then

25 there's impairment.  It recognizes that the law can, in fact,

1  impose limitations and one principle of that law is, in fact,

2  the bankruptcy code itself.  The bankruptcy code is a statutory

3  authority, is a statutory limitation, just like any other

4  statutory limitation and, indeed, the PPIE court was explicit

5  in pointing this out.  That there are environmental laws that

6  still govern, there are the laws against usury that still

7  govern and to the extent that those laws impose limitations,

8  they do not create impairment.

9       In here, it is very important that the law that

10 imposes limitation is the code itself.  So, that the analysis

11 in PPIE recognizes and harmonizes these two different parts of

12 the code and it says that to the extent that 502, including its

13 exceptions, create a limitation, that is not impairment as a

14 function of the plan, it's impairment as a function of the law.

15      The analysis is then set forth in the second part of

16 PPIE, which deals with default interest, is totally in harmony

17 with the first part of PPIE.  That is to say, the second takes

18 up the question of whether when it comes to default interest

19 -- not default interest, but post petition interest, it asks

20 the question, well, has Congress acted with respect to the code

21 in a way that says that post petition interest must be paid.

22 And the answer is yes.  It repealed 1124(3) and it repealed

23 that provision in order to basically deal with the problem that

24 arose as a result of the New Valley decision.

25      The reason I focus on that is that it's an act of

1  Congress, it is a change to the statute by virtue of an act of

2  Congress.  And that is totally germane with the structure and

3  approach that the court follows in the first part of PPIE.  The

4  first part of PPIE says, it's the limitation of function of

5  law.  If it's function of law rather than the plan, it's not

6  impairment.

7       The second part of PPIE says, with respect to post

8  petition interest, what is Congress -- has Congress acted in a

9  way that says that post petition interest should or should not

10 be paid and it says that it has acted in a way that says post

11 petition interest should be paid.  So, to that extent, it cuts

12 back somewhat on 502 and the exceptions to 502 as Congress had

13 the right to do.

14      The issue then is, in the second part of PPIE, was

15 Congress' action construed to somehow say not only are we

16 allowing post petition interest, but we're allowing default

17 interest and the answer is, of course, not.  Congress didn't

18 speak to default interest, the Third Circuit in PPIE did not

19 say that Congress had spoken to default interest.  So, there is

20 no language, there's no holding, there's no finding in the

21 second part of PPIE that somehow says that Congress has pulled

22 back under 502, to the extent of default interest.  Can't find

23 it there.

24      Mr. Cobb then raises the argument that's yet a little

25 bit layer lower, it's a little bit more refined and I'll deal

1 with that as well.  Did Congress in the repeal of 1124(3),

2 engage in an action, take action that extended 502, that is,

3 the exceptions to 502, because the exceptions to 502 are built

4 into allowability.  And, just so that at least I can be clear

5 on some of these distinctions, I'll write it right upon the

6 board.

7        Congress, in repealing 1124(3) says that there is

8 effectively going to be impairment, if there is not the ability

9 to recover post petition interest.  And that is the analysis

10 that PPIE goes through.

11        The question then is, does that actually change,

12 insofar as allowability of post petition interest is concerned.

13 The scope of allowability.  Mr. Cobb says, yes, it changed the

14 scope of allowability.  He did this in the context of the

15 absolute priority rule argument that he made at the end, and

16 says, we used allowability under the absolute priority rule to

17 effectively accomplish what New Valley did and what Congress

18 says we couldn't do.  And the answer to that is, that's

19 completely wrong, because already built into allowability,

20 under 502, are the exceptions to 502, and those exceptions

21 include post petition interest, under 726.

22        So, that if there's solvency, yes, under the

23 exception to 502, recognized by the courts and saying there is

24 allowability for post petition interest, in that exception,

25 post petition interest comes in.

1    When Congress comes out and says, 1124(3) is
2  repealed, in order to respond to <u>New Valley</u>, it does no damage
3  to, does not limit allowability at all, because allowability of
4  post petition interest already was permitted as an exception to
5  502.

6    So, the mesh of 502 and its exceptions, with the
7  limitations imposed by law and, therefore, non-impairment, and
8  with the <u>PPIE</u> decision, are entirely consistent.  And the only
9  consequence that would accrue to an argument that somehow we've
10  misconstrued <u>PPIE</u>, is to say that the Third Circuit itself
11  misconstrued <u>PPIE</u>, that what it did in the second section of
12  <u>PPIE</u>, was different from the rule that it adopted in the first
13  provision of <u>PPIE</u>.

14    So, the only way to reconcile the analysis of
15  impairment by law in <u>PPIE</u>, with the second section of <u>PPIE</u>, and
16  with 502, is to recognize that post petition interest was
17  always allowable under the 726 exception to 502 and because it
18  was always allowable, if it was not provided for in the plan,
19  it would be impairment under the plan.  If it is provided for
20  in the plan, it is not a limitation, the failure -- to provide
21  for default interest is not an impairment to the plan, is an
22  impairment by law and, therefore, there's no impairment.  So,
23  there's a complete consistency between allowability under the
24  exception to 502, <u>PPIE</u> first section, <u>PPIE</u> second section, and
25  the repeal by Congress.  All of them contemplate that there

1  will be post petition interest, none of the contemplate that

2  there will be post petition interest at the default rate.

3          And so, we get all the way across the board,

4  allowability of post petition interest, we've satisfied that,

5  is there impairment under PPIE, no, there is not.  Is there any

6  inconsistency with the repeal of 1124(3), no, there is not.

7          Now, the only way that counsel for the lenders say

8  that, well, that's just not right, that there has to be an

9  ability to get beyond the federal judgment rate.  The only way

10 that they say to get beyond the federal judgment rate, there

11 has to be a default rate, is to argue that, well, we can't

12 regard the federal judgment rate as an absolute cap.  And that

13 idea was rejected in the Coram case, rejected in the Coram

14 case.  Because, effectively, taking a step back, it is true

15 that if 502 and its exceptions only get you to the federal

16 judgment rate and we're correct that PPIE says that the

17 limitation to the federal judgment rate, if it occurs by

18 statute as it does, is not impairment then, in fact, you can't

19 get a higher rate under 1129 in the fair and equitable test

20 because if you're not impaired, you don't get to vote and if

21 you don't get to vote, you're not in 1129.

22          So, Mr. Cobb says, well, that's just not right.  The

23 federal judgment rate is not a cap, that we have to be able to

24 get beyond the federal judgment rate and to the fair and

25 equitable test.  So, he puts the issue out on the table by

1  saying, gosh, there's got to be a way to break the cap, even

2  though the cap is simply a function of 502 and its exceptions,

3  plus the impairment analysis under 1124(1) and PPIE.  So, he

4  comes to the Coram case.

5           Now, what I want to observe about, and come to the

6  Coram case on its terms in just a moment, but I just want to

7  emphasize to the Court effectively, what all this means.

8                          (Pause)

9           So, we have allowability, including its exceptions

10 and that takes you up to the federal judgment rate.  We have

11 impairment and under PPIE, PPIE says that this limitation

12 that's imposed by allowability, carries forward and is not

13 impairment.  This part here is not impairment, if you stay

14 within its bounds.

15          In order to get above the federal judgment rate and

16 into default, the lenders want to be able to invoke fair and

17 equitable.  And they say that they should be entitled to invoke

18 fair and equitable, and their first argument was the repeal.

19 And we've now demonstrated that the repeal was actually

20 completely consistent, because it permits the payment of post

21 petition interest which is what New Valley (indiscernible).

22          The problem, of course, is then if they now go to

23 fair and equitable, how can they go to fair and equitable if

24 there's no impairment?  And the answer is, that they can't.

25 And in fact, to even argue that they can does two things.

1    First of all, it's entirely circular.  If, in fact,

2  there was impairment under PPIE or any of the precedents,

3  unless the fair and equitable test was met, then that's a --

4  it's a totally circular argument.  That is, you can't find out

5  whether there's impairment until you determine that there's

6  fair -- that the treatment is fair and equitable or not fair

7  and equitable, in which case you then find out that there is or

8  is not impairment, so that you get to that test.  And that's

9  the argument that we made last time and it's just basic -- it's

10  basic circularity and there's no way around it.

11    More profoundly, what is the other affect of adopting

12  this argument?  If you adopt this argument, Your Honor, what

13  they're basically asking you to do, is to find that in order to

14  say that the federal judgment rate is not a cap, fair and

15  equitable, they're entitled to get fair and equitable, even

16  absent a demonstration that the claim is allowable, even absent

17  a demonstration that there is plan impairment, the effect of

18  allowing them to invoke the fair and equitable test

19  (indiscernible) that you simultaneously wipe out PPIE and the

20  entire impairment doctrine, and you wipe out the limitations of

21  allowability.  Because as soon as you let them get to fair and

22  equitable, without the impairment analysis, it's kind of -- you

23  never stop.  You just -- you forget about allowability and 502,

24  forget about the exceptions to 502, forget about legal versus

25  plan impairment, forget about all that.  Forget about PPIE,

1  they simply say, well, get us fair and equitable, it is a

2  dramatic, dramatic move.  It says, basically what -- I think

3  that they always wanted to say, but can't reconcile with the

4  code, they say, gee, you know, we're different.  That Equity

5  can't get a dime unless we're paid default interest, which

6  effectively means that the entirety of the bankruptcy is

7  ignored and you go to the pre-bankruptcy contract.  It is as if

8  this never happened.  The whoel bankruptcy never happened.  We

9  just ignore the fact that it ever occurred.

10        And, what's very interesting is, you can't do that.

11  We're still here and we're bound to follow the terms of the

12  bankruptcy and, in fact, it's very apt because the PPIE court,

13  the Third Circuit, observed, said, well, Mr. Solo might have

14  been entitled to more if he had managed to recover on his

15  claims before the bankruptcy was filed.  And that's what the

16  Third Circuit says, in black and white.  If we weren't in

17  bankruptcy, maybe he would have done better, but we're in

18  bankruptcy so, you don't do as well and you don't wipe away the

19  bankruptcy and return to the pre-bankruptcy contract.

20        Well, in service of these dramatic moves, to escape

21  the cap, they cite one case which is the Coram case.  And Coram

22  is interesting because the totality of the discussion in the

23  Coram decision, of this cap concept, appears at 3 -- I'm not

24  sure exactly, but that's 346.

25        It says, let's zoom it, it says the Equity Committee

1  suggests that our analysis end at this point and if we conclude

2  that the noteholders are entitled to post petition interest,

3  that it be allowed only at the federal judgment rate.  This is

4  rejected -- Judge Walrath says "However we are not convinced

5  that Congress had intended to supplant a party's contractual

6  right, to interest in all circumstances under Chapter 11."

7          Now, that is a very broad proposition.  All

8  circumstances under Chapter 11.  And, the citations are to Dow,

9  and for Schoenberg (phonetic).  Actually, the Dow case is a

10 bankruptcy court decision, and not a Court of Appeals decision

11 and we have Schoenberg.  Neither one of those cases goes

12 through the impairments.  (Indiscernible) what we're talking

13 about here is do you get to fair and equitable if there is

14 impairment only as a function of law.  That's the issue.  And

15 that issue is not addressed by any of these cases.

16         So, this is a situation where Judge Walrath,

17 basically -- she doesn't address the impairment issue either.

18 She says, oh well, there ought to e circumstances under which

19 you should be able to do better.  She doesn't take a look at

20 impairment, Dow Corning doesn't take a look at impairment and

21 Schoenberg doesn't look at impairment.

22         Now, I'll explain to the Court why Dow Corning didn't

23 look at impairment in a little bit, but this case and

24 (indiscernible) they want this huge proposition that deals away

25 with this careful tailoring of impairment to allowability, and

1  then ultimately, to the ability to invoke fair and equitable.

2  They want to trash it all and serve as the proposition, that

3  the federal judgment rate is not a cap on the basis of Coram

4  and Coram doesn't even address the very principle that stands

5  in their way.  Neither does Dow Corning, neither does

6  Schoenberg.

7         So, the only law that actually exists with respect to

8  this issue is the law of impairment and the law of impairment

9  in PPIE, that is the law.  It is that that articulated the

10  principle that we're talking about here.  And Judge Walrath

11  didn't address it.  I don't even know if PPIE had been decided

12  by the time of Judge Walrath's decision, although I'm sure that

13  somebody here will tell me, in half a heartbeat, whether that

14  is true.

15         So, we believe, Your Honor, that today, as we sit

16  here, that impairment is a critical, critical step, along the

17  logical path, the architecture of the code.  The impairment

18  matter has to be taken very seriously, and the lenders are

19  arguing to the end of the road here, without actually going

20  through the steps of showing that they're entitled to get to

21  the end of the road, to the fair and equitable requirement.

22         Let me talk a little bit, then, about the default

23  interest -- I'm sorry, the fair and equitable test, and touch

24  on solvency and then I'll talk about the factors that we

25  believe should drive the fair and equitable analysis.

1          Again, there's a big stop sign before you get there.

2   If Your Honor doesn't find default, stop sign.  If you don't

3   find that there is allowability of default interest, stop sign,

4   another one with respect to impairment.  But let's get through

5   that and talk about solvency itself and these are Mr.

6   Pasquale's very thoughtful remarks to the Court.

7          First I want to dispose -- address a few preliminary

8   matters that I think are not the central issue that he raised,

9   but that should be responded to.

10          The issue that he raised is, you know, the legal

11  issue of, as of what point in time you determine whether

12  there's solvency.  It's not just a point in time, it is on the

13  basis of what facts you determine solvency.  Everybody says

14  effective date, but that's always the ambiguity, is that yes,

15  the effective date, but is it with or without giving

16  effectiveness to the plan.  Your Honor talks about it as a

17  millisecond, but it's really a matter of principle, which is,

18  are you measuring solvency without considering that the plan is

19  going to be effectuated, or do you measure it after giving

20  effect to the plan.

21          Mr. Pasquale says, well, we're asking the Court to

22  ignore the terms of the plan.  We're not asking the Court to do

23  any such thing. In fact, we're asking the Court to approve the

24  rate of post petition interest that's actually provided for by

25  the plan.  The issue is not ignoring the plan, the issue is

**J&J COURT TRANSCRIBERS, INC.**

1 whether in determining a predicate fact, which is solvency, to

2 a legal issue, that the Court must address in approving the

3 plan, whether you give effect to the plan. It's not -- you

4 don't read the plan and say, oh, the plan tells me the answer

5 to an issue of law.  It's not going to tell you an answer to

6 the issue of law because the issue of law stands over the plan

7 and says, do you consider the affect of the plan in determining

8 whether the plan is in compliance with the law.  The idea of

9 the looking at the plan or not is not the issue at all.

10         He then says, well, Grace has taken the position that

11 the asbestos liabilities were not, in fact, resolved, and he

12 says, well, that's just not -- this is Mr. Pasquale -- he says,

13 that's not true, they were resolve and there's a citation to

14 the testimony of Ms. Zilly where she uses the word resolved.

15 And that's kind of a little bit curious about how out of the

16 middle of nowhere in that answer, did Ms. Zilly happen to use

17 the word resolve.  And then I realized, Mr. Cobb used that word

18 in asking the question of Ms. Zilly.  So, Mr. Cobb asked the

19 question saying, resolve, very deliberately, and very

20 skillfully, in order to bring out on cross examination

21 testimony that these claims were resolved, so he could make

22 exactly the argument here that he made.

23         THE COURT:  But she said yes.

24         MR. BERNICK:  She said yes.  She said yes to an

25 ambiguous question.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well --

2          MR. BERNICK:  Well, it is an ambiguous question.

3   Sure they're resolved in the sense that after the company,

4   under the plan, under the plan goes effective, there aren't

5   going to be any asbestos tort liabilities, they don't exist.

6   There is, rather, a contractual obligation called the plan of

7   reorganization which supplants all the asbestos liabilities.

8          So, if you're asking the question of solvency, before

9   giving effect to the plan, that all the liabilities that we're

10  talking about here are tort liabilities.  Those tort

11  liabilities were never resolved in the sense that anything was

12  done to quantify how big they were, which is the issue if

13  you're determining solvency is, how big is the liability.  It's

14  all tort liability and the amount of that liability was

15  precisely what was at issue and that was never resolved, the

16  whole purpose of the settlement was to forestall the necessity

17  of actually getting a determination about what the scope of the

18  asbestos tort liability was.  It's a settlement.  A settlement

19  is not evidentiary of the scope of the liability.  It displaces

20  the liability.  That's true in tort litigation of any kind.

21  That's what we went through in connection with the estimation

22  process, Your Honor.  Is that a settlement under 408 is not an

23  indicator, under Rule 408, is not an indicator of the scope of

24  the tort liability, it's just the opposite.  It's an agreement

25  that says, here's what we're going to agree to do instead of

1  getting a resolution on what the actual asbestos liability is.

2  The competing estimates that Your Honor got, dramatically

3  different.  Those weren't competing estimates that says, here's

4  what that plan is going to provide, they were competing

5  estimates about what the tort liability was.

6          So, Ms. Zilly did answer the question, but the

7  question did not inform her, wasn't accurately put to her,

8  saying, does the settlement actually determine the scope of the

9  tort liability, resolve the estimation in favor of an estimate

10 of the tort liability.  Of course, the answer to that is no, we

11 decided not to do that.

12         The next preliminary point that was made, or I won't

13 say preliminary, but not central, but important, he says, well,

14 you know why -- this whole issue could have been obviated if we

15 simply had done -- come to court and asked for approval of the

16 personal injury settlement sooner.  So, why didn't we do it

17 sooner?  And, the answer is, because the personal injury

18 settlement was this huge, huge, the dominant piece in the case,

19 we couldn't reach resolution of that without attaching to that

20 settlement, all the other financial burdens and obligations

21 that the company would have.  That was dropped in as a critical

22 last piece on the assumption that everything else was going to

23 work out so that there was enough money to pay the piper and

24 still have a strong <u>Dow Corning</u> post confirmation.  And that's

25 why it had to be saved to the end, we failed on the global

1  efforts to resolve the whole case, we then went non-global,

2  step by step, put them all in place, dropped this one in with a

3  very important hook which said that the post petition interest

4  cannot exceed the amount that was set forth, in fact, in the

5  plan which was derived from the history.

6        So, there's a very, very good reason why it was

7  dropped in the beginning, only could be obtained if we had that

8  drop-in at the end.  But as Mr Freedman ably pointed out to me,

9  and we apologize for the sidebar discussions, there's a further

10 fundamental problem, which is, you couldn't do a settlement of

11 the personal injury liability under 9019, you need 524(g).  It

12 happens at the end of the day, as a matter of law, in asbestos

13 cases.

14       THE COURT:  Mr. Bernick, you really don't need to

15 spend any time on this issue.  The only thing I was suggesting,

16 I think, is that even if I accepted that proposition for

17 purposes of that argument, I was still trying to figure out how

18 the debtor, without the plan, would pay that liability.

19       MR. BERNICK:  Yes, fair enough.  So, we then come to

20 the main argument, which is that Grace takes the position that

21 solvency should be determined without giving affect to the plan

22 and in doing that, cites no law, no law.

23       Now, the first thing is that, to be fair to Mr.

24 Pasquale, he kind of said, when he said that, other than the

25 code, or something about the architecture of the code, well,

1   that's a pretty deep caveat, because point in fact, that's the

2   whole deal.  The only treatment of this issue that can be

3   reconciled with the structure of the code, Congress' intent

4   here and Congress' actual provision, and this is PPCL-029, is,

5   in fact, exactly what we're arguing here.  That giving effect

6   to the plan is completely inconsistent with all of these other

7   code provisions and Your Honor referred to them yourself in

8   some of the remarks that you had to make, I'm not going to go

9   back over them, but to say, well other than the code, the

10  debtor doesn't cite anything, well, that's, you know, the

11  question is what does the code say?

12          Next, there's a citation to the <u>Coram Healthcare</u> case

13  again, and Mr. Pasquale says, well, very important that the

14  court there did a valuation and in considering the value of the

15  debtor, did bring to bear, in the valuation, the value of

16  claims that were settled through the plan.  And, therefore, the

17  argument is made that the <u>Coram</u> court, by looking at asset

18  value, by considering in part the settlement that was

19  effectuated by the plan, in a sense blessed, looking at the

20  solvency issue with the benefit of the plan.  And, there are

21  two critical, critical things.

22          First of all, that valuation was done, really, for a

23  totally different purpose.  In that plan, the noteholders were

24  going to get all the equity and the question was then, is their

25  claim -- are they getting too much for their claim.  And, as

1  consequence, the court had to value the estate in order to

2  determine whether by giving them all the equity, they were

3  being overpaid.  So, the original purpose for this valuation

4  was totally different.

5          But more critically, or as critically, in <u>Coram</u>

6  <u>Healthcare</u>, the court was careful to say that in connection

7  with the valuation itself, there was no evidence that was

8  provided by anybody else that disputed -- on the basis of which

9  the court could make a determination at all.  And this was

10 actually the language that was on the screen but not indicated

11 by Mr. Pasquale.  It says, in the absence of credible proof of

12 damages by the Equity, we are left with the value that the

13 trustee and noteholders had put on the claims.  The 56 million

14 the noteholders will pay to get release of the claim.

15         So, it was really, the court was having to address

16 and issue about whether the noteholders were being overpaid,

17 had to then do a valuation, and essentially had nothing to go

18 on, other than the resolution through the plan.  This case is

19 exactly the opposite.  In this case, the pre-effective date,

20 solvency determination, hinges upon the -- not only the value

21 of Grace pre-plan, but on the quantification of the asbestos

22 liabilities.

23         With respect to those liabilities, there is enormous

24 record of evidence about what those liabilities were.  So, this

25 is not a situation where the Court only had a settlement taking

1  place in the plan to indicate what the solvency analysis would

2  look like, this is a case, our case is one where in contrast to

3  Coram, there's an abundance of evidence, unfortunately,

4  disputed evidence about what the scope of the liability was.

5  So, Coram stands for the proposition only under the particular

6  facts, where there simply was no proof about what the value of

7  this claim was, other than what was set forth in the plan.  So,

8  Coram does not help the analysis.

9      We then have the code, we don't have Coram, we have

10 other case that's very instructive and it's in our briefs, and

11 that is the Valley View decision.  In Valley View, in Valley

12 View, effective date without give effect to the plan, there was

13 insolvency.  Court awards no post petition interest.

14     Now, if the plaintiffs were -- I'm sorry, if the

15 lenders were correct, this -- you'd have to say, oh, wait a

16 minute, what about after the plan?  After the plan was there

17 solvency?  And the answer was, yes.  And on the basis of that,

18 the evidence of that is that the court determined that the plan

19 was feasible.  This is exactly right.  Instead of having the

20 same test for solvency, for interest purpose, as feasibility,

21 you have a different test.  For feasibility, look to solvency

22 and the ability to pay, given the plan.  For purposes of

23 determining whether there is solvency for interest purposes,

24 you look to without giving effect to the plan.  That's exactly

25 what the court did, found that there was insolvency and no post

Case 01-01139-AMC   Doc 24232   Filed 02/03/10   Page 191 of 214

1  petition interest.  Valley View got it right.  But separate and

2  apart from Valley View, it all comes back to the code.

3          Mr. Pasquale talked about certain factual matters,

4  very limited, so my remarks here will also be very limited.

5  Say, well, really, the facts are completely undisputed when it

6  comes to solvency and we would essentially agree with that,

7  that the issue, the only issue that's been raised is an issue

8  of law about whether you give affect to the plan or not in

9  determining where to go.

10          But once that issue is resolved, if it's without plan

11  versus with plan, Mr. Frezza was over here.  He only talked

12  about -- all of his analyses, asset value, liabilities were all

13  done on a pro forma basis.  And pro forma gave effect to the

14  plan.  Mr. Frezza has no analysis that he submitted as part of

15  his testimony, on behalf of the lenders, that says without

16  giving effect to the plan, that there was solvency.

17          Indeed, on cross examination, he says, I don't know

18  how anyone could say that there was solvency because of the

19  dispute.  And that is exactly what Ms. Zilly said, as part of

20  her examination, no way to determine solvency, you can't say

21  solvency because of the disputed liabilities.  And, therefore,

22  as we sit here, yes, the undisputed record is, that without

23  giving effect to the plan, there is no proof of solvency.  That

24  is exactly where we are.

25          The only further piece of information that Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Pasquale pointed out and I think is probably for purposes of,

2  basically, underscoring that, gee, Equity is doing well in this

3  case, according to the lenders, is talk about the market cap of

4  W.R. Grace as of the end of last year.  That's a throwaway, we

5  know it's a throwaway, why is it a throwaway, because the

6  market cap is what the stock is trading for.  Obviously, the

7  big elephant in the room is, what happens with the plan.

8          And so, maybe the stock market is betting that the

9  plan will be approved.  If the stock market is not betting that

10 the plan will be approved, it's kind of strange to see that

11 people are willing to pay all this money for stock.  That stock

12 is being priced in the marketplace, on the basis of

13 expectations, just like all stock transactions and the big

14 expectation that's at issue here is with respect to the plan.

15 And we all know that Mr. Ordway testified that -- he couldn't

16 even determine, he says -- "Equity value that a stock price can

17 reflect many, many things other than company performance."

18 Answer:  "Correct."  Question: "And, in fact, you provide no

19 methodology in your declaration here that enables us to relate

20 stock price to actual company performance."  Boy, is that true

21 here, he certainly admitted it there.  The truth

22 (indiscernible) the eve of being able to emerge.  This is

23 Ordway's deposition, August 29, '08, Page 31. It is in our

24 brief.

25          That then brings me to the last issue, Your Honor,

1 which is, well, what happens with respect to the balance of the

2 analysis under 1129.  And, again, we don't reach that if there

3 isn't a demonstration of solvency, without giving effect to the

4 plan, but we hit another stop sign there, but we addressed that

5 anyhow.

6         And I want to review just to be clear on exactly what

7 our factors are that says that what we have here in this plan

8 is fair and equitable.  And I want to underscore to Your Honor,

9 the fact that in the plan that we ultimately did file, we filed

10 this plan long after the agreement in principle was reached and

11 long after we were told that the lenders were not agreeable to

12 that rate of interest.

13         We, instead of taking that rats of interest off the

14 table, in litigating, you know, all the way down to the edge

15 and saying, they don't get any post petition interest and then

16 leaving it up to Your Honor to say, well, I don't know how --we

17 didn't step back from where we were.  We specifically filed the

18 plan because we thought that was a fair rate of interest and

19 because we thought it was a fair rate of interest, we weren't

20 going to ask Your Honor to somehow give us the benefit of what

21 we thought the law provided us, which is simply paying zero in

22 the way of post petition interest.

23         So, now, what's happened, of course, is that we put

24 in the plan, and it's never enough, they want more.  Their

25 argument with respect to fair and equitable, I think, are

1 pretty easy to determine here, but the factors that we're

2 reciting in support of the idea that it's fair and equitable,

3 are first of all these.  That the rate that's in the plan is

4 the same, is that that was endorsed by the lenders prepetition.

5 Not prepetition, pre-plan.

6          They make a big deal about the fact that somehow the

7 letter agreements that picked that rate initially, or led up to

8 that rate, are somehow not binding on all the lenders, it's not

9 a contract and this, that and the other, et cetera, et cetera.

10          We, in fact, thought we were dealing with the

11 Committee, and that the Committee represented the lenders.

12 That's what Grace thought during this period of time.  But in

13 connection with the fair and equitable analysis, we don't have

14 to prove that it was a binding contract.  We're simply saying,

15 where did the rate come from?  It was actually selected by the

16 lenders, came from Mr. Maher and it was endorsed by their

17 Committee and that is evidentiary of fairness and equity and I

18 don't think that there is any doubt but that those facts are

19 true.  It was selected by him, it was endorsed by the

20 Committee.

21          Number two is, it recognizes the solvency problem.

22 Effectively, it's at a level, and this is PPCL-028, it says,

23 you know, it's not the bottom, it's not the top, indeed, it's

24 fairly close to the top but that is, it is somewhere in between

25 because solvency is, by far, is far from clear on this case.

1 So, again, it's a lock and key fit, in relationship to the

2 solvency problem.

3        Number three is, it produces for the lenders, high

4 return on their claim.  Now, what people negotiate in a

5 bankruptcy court is, or in any piece of litigation, really,

6 over a claim is, what are they claiming, what can they get and

7 what are they prepared -- what did they lose and where are they

8 prepared to settle in between?  They don't negotiate, you don't

9 say, well, gee, you know, I can get X, Y, Z in the market,

10 maybe right now, but although X, Y, Z in the market may change

11 tomorrow or the next day or the next day and, therefore, you

12 should settle with me on the basis of what the market says the

13 price is.  And, say, well, I'm sorry, you've got a claim in

14 court, you can win or lose the claim in court, regardless of

15 where the market it.  So, the market changes.  Enormous

16 fluctuation.  Stock has gone down to 4, that's right, it's gone

17 up to 26 whatever, and it's gone back down.

18        Interestingly, the bank debt also at a certain point

19 traded substantially below face value, that is, is a discount

20 to principle.  They also got a return, depending upon where

21 they invest in the marketplace.

22        But the issue is, what was the claim and what is the

23 recovery on the claim.  And, as we indicated last time,

24 PPCL-040, the banks, actually in relation to their claims, are

25 doing extremely well in this case.  People basically have

1 pretty much said, oh, well, you know, that's interesting, let's

2 try to do well by the lenders.  Again, that's not at issue in

3 this case, as opposed to the asbestos PI claimants, and for

4 that matter, Equity.  Equity was entitled to litigate the issue

5 and Grace did litigate the issue of, well, what was the

6 estimate really worth and we felt that the estimate of the

7 value of the PI claims was much lower than the PI constituency

8 did.  If that had been successful, Equity would have gotten an

9 awful lot more, but there was a compromise there as well.

10        And, that then brings me to this next point here.

11 Which is, that to get to where we are today, everyone has

12 sacrificed.  They've all taken a haircut.

13        And then there's the essence of the <u>Manchester</u> case.

14 The essence of the <u>Manchester</u> case is, it's a situation where

15 the court recognized the reason that you got to where you are,

16 is because of the fact that everybody took a hit.

17        THE COURT:  What did Equity take a hit -- how did

18 Equity take a hit?

19        MR. BERNICK:  Let's see.  I'm not sure that Equity

20 did take --

21        THE COURT:  Not in <u>Manchester</u>, here in this case.

22        MR. BERNICK:  Oh, in this case.  Well, is that Equity

23 gave up the right to continue to litigate.  It's what the claim

24 -- well, no, Your Honor, the estimation was hotly contested and

25 Equity -- the position of Equity was the $430 million to $821

million and where was PI?  They were at a much lower value.
That, effectively, if, in fact, the Equity would have realized
if that number had turned out to be true, then the total return
to Equity would have been over two, to two and a half billion
dollars.  And I have to tell Your Honor, that as you know,
there were huge legal reasons why -- as well as factual
reasons, why their position was the better position, including
very, very simply, that there was a complete crossing of the
ships at night.  The entirety of the PI asbestos estimate as
driven by settlements, which were subject to Rule 408.  How are
they ever, ever going to get around that issue?

        Now, Equity had a problem, too, which is how they get
out of Chapter 11 without the acquiescence of the PI asbestos
claimants and that's what the real give and take was.
Everybody ended up with a compromise because the dynamic was
that PI couldn't demonstrate the actual value of their claims
under 502 as allowable claims.  What they really had was as
leverage, was the ability to hold up the ability of Equity to
get out of Chapter 11.  Equity, by contrast, had the ability to
demonstrate what the value of the claims really was, but they
couldn't get out of Chapter 11 either.

        So, in point of fact, the negotiation was all about
the value of the estimate and who had the ability to
demonstrate what the estimate was, as well as closure to the
Chapter 11 case.  That's a position of enormous leverage on

**J&J COURT TRANSCRIBERS, INC.**

1  both sides.  Everybody stood down from their positions.

2          The asbestos claimants didn't come in and say, oh

3  well, gee, it's okay if walk away for 25 to 35 cents on the

4  dollar because they thought they were being good guys, they did

5  that because they were under circumstances where they had real,

6  real problems and they recognized that.  And, therefore, all

7  constituencies took a compromised position in order to get this

8  case done with.  And if that had not taken place, we'd still be

9  here wondering what the estimate would be and what the

10  ramifications of the estimate would be.  There's absolutely no

11  other way to get to the finish line.  So, this is a case where,

12  in fact, there has been a sacrifice by everybody and in the

13  Manchester case, Mr. Cobb made the argument that, well, there's

14  a waiver there, these people were way late.

15          Well, in point of fact, the analysis and the

16  argument, the analysis that takes place in Manchester, that

17  appears in the last paragraph, doesn't deal with waiver at all.

18  It says it's not equitable.  It says that the only reason that

19  there was solvency in this case, was that everybody was in the

20  -- everybody was pitching into a global settlement that, in

21  fact, resolved all the differences, just like as happened in

22  connection with this plan.

23          And then we come to the Titus case.  And the Titus

24  case is a powerful, powerful case.  And the Titus case also

25  deals with the issue of sacrifice, but it also deals with the

1 question of whether somehow the claimant wanted to do better

2 than everybody else.  And that's exactly what we have here.  We

3 have a claimant that wants to do better than everybody else.

4 And, in _Titus_ the court said, no, I'm sorry, the whole idea of

5 doing equity is not to create an element of unfairness.

6      (Indiscernible) claimant differently than all the

7 creditors having a lot of general unsecured claims would be

8 inequitable.  Equity, we believe, would not condone such

9 disparate treatment of creditors having a lot of general

10 unsecured claims.  The portion of (Indiscernible) claim for

11 post petition interest, therefore, must be denied.

12      Now, why is that, not only is it true that these

13 creditors would be doing even better, you then have to ask

14 well, why are the doing better and the answer is pretty simple.

15 And that is that they, in fact, were the squeaky wheel at the

16 end of the day.  They held back, they didn't come forward.  You

17 can say that, you know, Mr. Cobb can say, oh, well everybody,

18 did everything right, it was all above board, but the fact of

19 the matter is, that they did have a strategy that says, we're

20 not going to emerge, we're doing all right.  And, in fact, at

21 the time that all this happened, there was pressure.  The whole

22 idea of the global settlement was, that the asbestos claimants

23 wanted these people to take a haircut on principle.  They

24 wanted them to stay out of that fray, that was their strategy,

25 let's stay out of that fray.  When it came to the negotiations

1  themselves, they could easily have picked up the phone and

2  called Mr. Shelnitz and said, we want to be involved and they

3  decided not to do that.   That wasn't in their interest to

4  actually emerge. Even when the term sheet was produced and Ms.

5  Krieger's e-mail was sent.   This is Plan Proponents 284.

6  Again, they didn't say that they were waling away.   This

7  doesn't have be nefarious conduct, it doesn't have to be bad

8  conduct, but the fact of the matter is, that the bank lenders

9  want to do absolutely better than everybody else and their way

10 of doing it was to stay out of the ugly fighting and then come

11 in at the end and hold up this plan with their request for

12 interest.   That is very, very similar to the circumstances that

13 we have in the <u>Titus</u> case.

14        I then come to what is it on the other side.   What is

15 on the other side of the equation, what did they say?  Well,

16 first of all, we know, and there's no way around it, that there

17 will be a penalty.   They're essentially arguing for a penalty,

18 that is because we were in Chapter 11 there's default and

19 there's default interest and we have to pay that.   They say,

20 that is the rule of Dow Corning, and that is the absolute

21 priority rule.

22        Let me just deal with the last.   On the absolute

23 priority rule, they say well, all we've come up with is a

24 single case, some Florida case, and we're doing that to

25 basically invoke 502 and <u>New Valley</u>, now by way of the absolute

1  priority rule.  Well, the first thing is, is that as we've

2  already explored with the Court, <u>New Valley</u> and the repeal of

3  1124(3), is completely consistent with our analysis which shows

4  that you do get post petition interest, it is not a mandate for

5  default post petition interest.  So, all that argument we've

6  already dealt with.

7          But, there's a further point, which is that this

8  construction of the absolute priority rule which says, as the

9  code says, let's put it up here, couldn't be clearer, this is

10 the language of the code.  With respect to a class of unsecured

11 creditors, sub-one, or Romanette I, the plan provides that each

12 holder of a claim of such class receive or retain an amount of

13 such complained property or value as of the effective date of

14 the claim, equal to the allowed amount.  This is no our

15 invention, it's just the plain language of the code and there's

16 a citation to a Florida case.  Colliers, itself, just reads

17 this out in black and white, it's not complex.

18         But if you take a look, then, at what the effect is

19 of this reading of the code, once again, it is completely

20 consistent.  The absolute priority rule, which is applied in

21 confirmation.  Absolute priority rule.  Our reading of the

22 absolute priority rule puts it completely in harmony with all

23 the other provisions.  Allowability has limitations.  They are

24 not changed by impairment because impairment, by law, is not

25 impairment by a claimant.

1    Fair and equitable doesn't produce a different result

2    and the absolute priority rule doesn't produce a different

3    result but it's also pegged to the allowed amount.  The whole

4    code hangs together, completely, consistently with this reading

5    of the absolute priority rule.  A reading which actually comes

6    right from the face of the code itself.  And the absolute

7    priority rule then says, well, they say, well, gee, doesn't

8    that mean that, really, the banks are ending up being last in

9    line, whereas Equity should be last in line.  And I want to

10    take that on for half a second because that's the essence of

11    the problem.

12    There is somebody who is further down in line than

13    Equity and who is it?  It is people who have no legal right to

14    recover on their claim.  There are all kinds of people,

15    actually, that had no recovery on their claim in this case

16    because the Court has found it's not allowable.  And to the

17    extent that the lenders here are seeking something that the

18    code says they don't get, yes, they are even further last in

19    line than Equity.  That brings me, then, to the <u>Dow</u> case, which

20    is the other case that they've cited.  Another principle that

21    cite on this question of fair and equitable.

22    They say again and again, that the <u>Dow Corning</u>, Sixth

23    Circuit decision creates the right touchstone, which is the

24    contract.  And, again and again, the contract is what they

25    invoke.  What are they really saying?  Is that <u>Dow Corning</u>

1  somehow provides a justification for going back to the

2  pre-bankruptcy state of the contract and in that case, says

3  this bankruptcy never happened.   That's not true, that's not

4  something that comes out of the Dow Corning case, and for the

5  following reasons.

6          First of all, the linchpin of this whole thing, which

7  is impairment, the Dow Corning case, the Court of Appeals,

8  never address an impairment.  It wasn't address at the

9  bankruptcy court level, also wasn't addressed at the appellate

10  court level.  And, so, in terms of the structure that we've

11  laid out and the importance of maintaining that structure,

12  including impairment, the Court of Appeals decision in Dow

13  Corning provides zero justification for their construction of

14  impairment and, therefore, zero justification for blitzing

15  through impairment to get to fair and equitable.

16         Why is it that the court didn't consider impairment

17  in the Dow Corning case and why is it that Dow Corning so

18  carefully focuses on the contract?  And this is something that

19  you have to go and study the opinions very carefully, but this

20  is actually what occurred.

21         The original plan provided for the federal judgment

22  rate.  So, under the first plan, you had the federal judgment

23  rate.  That was the subject of the Dow 1, the bankruptcy

24  court's decision in Dow 1.  In Dow 2, the bankruptcy court came

25  back said, well, wait a minute, that's fair and equitable,

1 that's the federal judgment rate but you still have to have,

2 you still have to meet 1129.

3        And, in light of that, the plan was amended and the

4 plan was amended to read, that it would be the rate under the

5 contract.  That's what the plan actually provided.  And if you

6 take a look at the language in the opinion, it says, this is

7 reciting the district court's opinion below, it noted that the

8 amended plan provided for post petition interest at the

9 applicable contract rate, in effect, on May 15, 1995, the date

10 Dow Corning's bankruptcy case commenced.

11        So, as a result of the litigation, the plan was

12 amended and we got a new rate which was the contract rate.  The

13 question then was, well, which contract rate?  And in Dow

14 Corning 2, the court decided that it was the non-default

15 contract rate.

16        Now, what's very important here is to recognize --

17 and that's ultimately what came on appeal, is whether it was

18 the non-default rate or the default rate.  So, you have the

19 federal judgment rate which is here, it's lower, you have the

20 non-default rate that's above that and then you get to the

21 question of, well, should it be the default rate?

22        The key to the case is what actually was decided in

23 Dow, in approving the non-default contract rate.  And it's not

24 the subject of the big Dow Corning decision because, basically,

25 Judg Specter read it out in court and, therefore, when it came

1  on for approval by the district court, literally you had to get

2  the transcript and read what Judge Specter had to say.

3        So, the key was, that because the plan had been

4  amended and there was no appeal from the amended plan, this

5  plan became final in this respect.  That is the language that

6  says, right under the contract, as of May 15, or whatever it

7  was, became final.  And, therefore, the issue that had to be

8  taken up was not on a plan confirmation, it was an issue post

9  plan confirmation that had to do with the interpretation of the

10 plan.  And, in fact, our first argument to the Sixth Circuit on

11 behalf of Dow Corning was, you have go to with what the

12 language of the plan is and Judge Specter got it right, he

13 interpreted it right.  And, you don't go back to 1129 or

14 anything else because it's too late.  The plan is final, this

15 is all a question of contract interpretation, it's not a

16 question of bankruptcy law, it's not a question of 1129.  That

17 was our position to the appellate court.

18        Ultimately, the appellate court focused on this

19 question and took up the issue of interpretation.

20 Interpretation.  That was the whole issue.  Why did the Dow

21 Corning court in the Sixth Circuit keep on going back to the

22 contract, the contract, the contract?  It's not because oh, we

23 got to go back to pre-bankruptcy days, where everything was

24 rosy and terrific and ignore the bankruptcy, it's because the

25 plan referred to the contract.  And everybody was interpreting

1 the plan, therefore, interpreting what under the contract

2 meant.   That was the issue, totally interpretation, it was not

3 actually an 1129 holding, in confirmation.    It was post

4 confirmation.

5 　　　　　What the court of appeals then did was to say, we

6 want to interpret the plan and we need to do so consistent with

7 1129.   And we find that to interpret the contract consistent

8 with 1129, it's got to be the default rate.   That's what

9 happened in the case.

10 　　　　　Now, you say, well, what does that tell us?   It tells

11 us number one, that the reason that the court is so focused on

12 the contract is not because it's returning to the status quo

13 ante from a Chapter 11 filing, to the contrary, it's beginning

14 at the other end with the plan because the plan calls for the

15 contract.   That's why the contract is relevant.

16 　　　　　Number two, the analysis under 1129 interpreting the

17 contract does say that the better answer is default.   And,

18 obviously, we disagree with that for a whole variety of

19 circumstances but two things are very apparent.   First of all,

20 when 1129, when the Court looks at 1129, which is fair and

21 equitable, fairness and equity have to be determined hugely by

22 the contract because that's what the plan says.

23 　　　　　So, not only is this a question of interpretation of

24 the plan, and 1129 as an environment in which the plan is going

25 to be interpreted, but because this particular plan under 1129

1  refers to the contract, the fair and equitable analysis has to

2  focus on the contract.  So, it is a guarantee, both by virtue

3  of the issue that was post the court of appeals, as well as by

4  the plan read, that the dominant consideration was going to be

5  the language of the contract and not because they were adopted

6  and the Sixth Circuit was adopting the broad propositions that

7  are now being argued to the court.

8            But even more importantly, what about impairment?

9  The court never considered impairment because it wasn't really

10  going through the confirmation of the plan, it simply was

11  construing the plan in light of 1129.  So, it never engaged in

12  the step by step process of going through allowability, going

13  through impairment, before getting to 1129.  Never touched it.

14            So, when they argue here that somehow the Sixth

15  Circuit's decision is also critically important, then basically

16  says you look to the pre-bankruptcy world, really, in language

17  that is directly opposed to the Third Circuit in PPIE, they're

18  completely mischaracterizing, missing the boat on the Dow

19  Corning decision.  The contract was a focus because it was in

20  the plan, the contract was being interpreted in light of fair

21  and equitable, and fair and equitable had to come back to the

22  contract and fair and equitable was applied completely without

23  regard to the impairment analysis, because the impairment

24  analysis was really irrelevant.  They wanted to construe an

25  already existing agreement in light of 1129.

1        Again, we disagree, we didn't see how they could do

2   that, but that's what they decided to do.  It does not stand

3   for the proposition that they're venturing here today.

4        That's all I got.

5        THE COURT:  All right, gentlemen, we literally have

6   five minutes.

7        MR. PASQUALE:  But, Your Honor, Mr. Bernick took my

8   time.

9        THE COURT:  I know, but, you know, if we need to

10  adjourn it again, we'll do that.

11       MR. PASQUALE:  I don't need more -- I had five, I'll

12  make it two.

13       THE COURT:  All right.

14       MR. PASQUALE:  Your Honor, you've already heard from

15  me on Coram, I don't think Mr. Bernick really distinguished at

16  all the point I was raising from it, I know Your Honor will

17  read it in rendering a decision.

18       But let me talk for a minute about Valley View, which

19  is a case Grace did cite.  We have distinguished it in our

20  brief, but two quick points on Valley View.

21       It's not on point at all.  What one of the parties

22  tried to do in Valley View, for purposes of the best interest

23  test, at 1129(a)(7), is to argue that solvency was determined

24  based on a date earlier in the case, based on some unrelated

25  testimony, and the court concluded and this is on -- I'm sorry,

1 Your Honor, Page 30 of the decision, it's 260 B.R. 30.  The

2 court concludes that the party did not prove solvency because

3 it had not shown the debtor was solvent on the effective date

4 of the plan.  Well, we're right back to where we've been and

5 what we've been talking about.  It doesn't help at all there.

6         As to feasibility, the court doesn't find the debtor

7 is solvent, so feasible.  The court looks at the feasibility

8 test and 1129(a)(11) and says feasibility.  That's it.  You can

9 piece the two together as the debtor tries, but it doesn't

10 discuss anything in the manner in which we've been discussing

11 here and Coram does.

12         Mr. Bernick said Mr. Frezza only focused on giving

13 effect to the plan, for solvency and that's correct, no

14 argument there.  But we do have arguments other than that, if

15 the Court feels.  We think this is right for all the reasons I

16 said earlier.  And we have the Third Circuit in VFB, on the

17 market cap test, and Mr. Bernick keeps trying to distinguish

18 it.  It's a Third Circuit case that says, stock price isn't

19 important for these purposes.

20         And we also have the Toy Warehouse case which Mr.

21 Freedman mentioned last time in arguing, which I think I forgot

22 to bring up with me, which basically said that for Equity to

23 have a recovery, the debtor has to be solvent.  And that was

24 cited in the record by Mr. Freedman.

25         Just one last thing, Your Honor.  Mr. Bernick wanted

**J&J COURT TRANSCRIBERS, INC.**

1  to use, and used his chart again.  The number at the top for

2  the asbestos PI number, that's their high estimate, the ACC and

3  -- well, no I'm sorry, not the FCR, it's the ACC's high

4  estimate.  Grace's estimate, by Dr. Florence, is the line I

5  drew.  The high estimate, another chart, excuse me, another

6  chart that Grace presented at the confirmation hearing, the

7  Florence estimates are on the left, those were Grace's numbers.

8          If we're going to talk about who is taking a haircut

9  and who is not, there's a stark difference between the top

10 number that Grace used and the bottom number when we look at

11 that.  It's all relative, Your Honor.  Thank you.

12         THE COURT:  Mona, I think you'd better go, take my

13 phone, in case they call.  Tell them we're going to be a few

14 minutes late.  Mr. Cobb, can you do this in five minutes?

15         MR. COBB:  I'm going to try and do it in three

16 minutes, Your Honor.

17         THE COURT:  Okay, go ahead.

18         MR. COBB:  Very quickly.  Dow focuses on impairment,

19 now we see what he's trying to do. Federal judgment rate, Your

20 Honor.  If you buy that the federal judgment rate is the

21 maximum rate of interest that we can recover, this argument

22 makes sense.  But what he does is, he says, federal judgment

23 rate, and he builds this wonderful argument behind it.  You've

24 already identified that this is not the cap, it's not the only

1  recovery under 726, there's three possible recoveries.  State

2  rate, federal judgment rate, and also the contract rate. Don't

3  buy into his argument, until you've resolved that issue first

4  and you should resolve it in our favor.  That's critical, Your

5  Honor, as Mr. Bernick likes to say.

6       Your Honor, the second point that I'd like to make is

7  on default -- Your Honor, it's the effect of default during the

8  pendency of the bankruptcy that the bankruptcy code focuses on

9  and what the code says is that during the pendency of the

10  bankruptcy, in order to allow the debtors the opportunity to

11  have a fresh start at the other end, you can't give effect to a

12  default and then as a result take something away from the

13  debtors that hinders or, you know, prevents them from

14  reorganizing.  That's not what we have here.  We are at the end

15  of the bankruptcy, the debtors have reorganized, okay?  We're

16  not trying to take something from the debtors, we are only

17  trying to receive the contract right, okay?  Very different

18  situation, not Next Wave.  Next Wave said that under -- you

19  can't say that because the debtors have failed to pay, there's

20  a default and you can take the license back.  Very different.

21  That's not what we have here.  You're right, it's not a 365

22  case, it's interest to be paid at the confirmation stage.

23       Your Honor, the argument that I said was their final

24  argument and I was surprised they even continued to make it,

**J&J COURT TRANSCRIBERS, INC.**

1  Your Honor, 1129, 1129 -- Mr. Bernick put a quote up on the --

2  here's the problem, he didn't show you the whole section.

3         For purposes of this section, the condition of the

4  plan be fair and equitable with respect to a class includes,

5  what Mr. Bernick showed you was Part D, he tried to say, if you

6  pay the full amount of the allowed claim, then you have

7  satisfied the fair and equitable test.  No, no, the word

8  includes is critical, Your Honor.  The definition of includes,

9  it's not limiting.  And that's how the courts get to a rate

10 beyond -- that's how they get to interest on the allowed claim.

11 Well, what if you never get here, it's not part of the allowed

12 claims and that's just missing a significant part, a critical

13 point in the code.

14         You don't satisfy the absolute priority rule by just

15 paying the allowed claim.  You have to pay at least that, but

16 it could include more.

17         Your Honor, I encourage you to please read <u>Manchester</u>

18 and <u>Titus</u> carefully.  Titus never discusses 1129, never.  It's

19 a 502 case.  It has nothing to do with 1129 and everybody takes

20 a haircut, so you've got to take one, too.  Manchester waiver,

21 whatever.  Your Honor, it didn't provide for post petition

22 interest -- excuse me, it didn't provide for interest in the

23 plan and the court said, you didn't show up and object and,

24 therefore, you don't have the ability to object at this point.

**J&J COURT TRANSCRIBERS, INC.**

1  You can call it whatever you'd like.  The court throws in at

2  the end, without any supporting case law or statutory

3  authority, nothing, it just talks about everybody took a

4  haircut and you should, too.

5         Your Honor, there's much to be -- you seem to be

6  focused on the fact that everybody here is taking -- Equity is

7  getting less than what they think they should receive, that the

8  asbestos claimants are taking less, Mr. Bernick had some

9  wonderfully colored charts that demonstrate that, Your Honor,

10 we have a contract, the contract provides that when you don't

11 pay our money back, you've got to pay interest at a certain

12 rate.  The tort claimants don't have a contract, they didn't

13 reach a bargain or an agreement with the debtors before the

14 bankruptcy that said, you know, if you harm us or if our claim

15 arises based on our legal right to the claim, you have to pay

16 us interest at a certain rate.  We're different, we have that

17 contract rate.  And, Equity is at the end of the line, Your

18 Honor.  The debate is, what does Equity get that's left over

19 after everyone is paid in full and the touchstone of that, Your

20 Honor, is the contract.  At the end of the case, you go back

21 and look at, if Equity is getting something, if the debtors are

22 solvent, then what should the creditor receive under its

23 contract?  And here, when they haven't repaid us, they have to

24 pay the contract rate.  Thank you.


**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Okay, I understood that argument.

2        MR. COBB:  Got it.

3        THE COURT:  All right, folks, we're adjourned.  Thank

4  you.

5        MR. COBB:  Thank you, Your Honor.

6

7                        *  *  *  *  *

### CERTIFICATION


     I, ELAINE HOWELL, court approved transcriber, certify that

the foregoing is a correct transcript from the official

electronic sound recording of the proceedings in the

above-entitled matter and to the best of my ability.



/s/ Elaine Howell                    Date: February 2, 2010

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**