## EXHIBIT A

**Revised Form of Facility Order**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al[1], | ) | Case No. 01-01139 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## FINAL ORDER AUTHORIZING SECURED POST-PETITION LETTER OF CREDIT FACILITY AND HEDGING AND SWAP ARRANGEMENTS ON A SUPER-PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, AND GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362

The above-captioned debtors and debtors in possession (collectively, the

"**Debtors**") filed a motion (the "**Motion**") dated January 15, 2010, seeking this Court's

authorization pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code,

11 U. S. C. §§ 101-1330 (the "**Bankruptcy Code**") and Rules 2002, 4001(c) and 9014 of the

---

[1]  The Debtors are the following entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey & Almy, LLC (f/k/a Dewey & Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc., Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for W. R. Grace & Co.-

Conn. ("**Grace**"), inter alia, (i) to obtain post-petition financing in the form of a letter of credit

facility (the "**Post-Petition Facility**") in an amount not to exceed $100,000,000 (the

"**Commitment**"), under the Post-Petition Letter of Credit Facility Agreement among Grace, as

the Account Party, Bank of America, N.A. ("**BofA**"), as the Agent for the Letter of Credit Issuers

(the "**Agent**"), (ii) to enter into hedging and swap arrangements (the "**Hedging Arrangements**")

as set forth in the Swap Documents, (iii) to execute the Post-Petition Letter of Credit Facility

Agreement (as amended, supplemented or otherwise modified from time to time, the "**Facility**

**Agreement**;" terms not otherwise defined herein shall have the meaning ascribed to them in the

Facility Agreement, attached hereto as **Exhibit A**), (iv) to execute the Swap Documents,

including but not limited to the ISDA Master Agreement, dated as of _____

between Bank of America, N.A. and Grace (attached hereto as **Exhibit B**), (v) to execute all

related documents contemplated by the Facility Agreement, together with the Facility

Agreement, and all ancillary documents at any time executed in connection therewith, including

but not limited to the cash collateral control agreements with BANA (the "**Control**

**Agreements**", attached hereto as **Exhibit C**), the Letter of Credit Documents and the Swap

Documents, collectively, the "**Facility Documents**"); (vi) to grant pursuant to section 364 of the

Bankruptcy Code, first priority liens and security interests, senior to any and all other liens and

security interests as follows: (a) as security for all L/C Obligations, to the Agent, for the benefit

of the Agent, the Letter of Credit Issuers and, subject to Section 3.3(b) of the Facility Agreement,

the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off

against the L/C Cash Collateral Account, all money, cash, Cash Equivalents or other property

deposited in or credited to the L/C Cash Collateral Account, and all accessions to, substitutions

2

for and replacements, products and proceeds of any of the foregoing and, subject to Section

3.3(b) of the Facility Agreement, a continuing security interest in, lien on, and right of set-off

against the F/X Hedge Cash Collateral Account, the Commodity Hedge Cash Collateral Account,

all money, cash, Cash Equivalents or other property deposited in or credited thereto and all

accessions to, substitutions for and replacements, products and proceeds of any of the foregoing;

(b) as security for all F/X Hedge Obligations, to the Agent, for the benefit of the Agent, the

holders of the F/X Hedge Obligations and, subject to Section 3.3(b) of the Facility Agreement,

the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off

against the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other

property deposited in or credited to the F/X Hedge Cash Collateral Account, and all accessions

to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject

to Section 3.3(b) of the Facility Agreement, a continuing security interest in, lien on, and right of

set-off against the L/C Cash Collateral Account, the Commodity Hedge Cash Collateral Account,

all money, cash, Cash Equivalents or other property deposited in or credited thereto and all

accessions to, substitutions for and replacements, products and proceeds of any of the foregoing;

and (c) as security for all Commodity Hedge Obligations, to the Agent, for the benefit of the

Agent, the holders of the Commodity Hedge Obligations and, subject to Section 3.3(b) of the

Facility Agreement, the other holders of the Obligations, a continuing security interest in, lien

on, and right of set-off against the Commodity Hedge Cash Collateral Account, all money, cash,

Cash Equivalents or other property deposited in or credited to the Commodity Hedge Cash

Collateral Account, and all accessions to, substitutions for and replacements, products and

proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, a

continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral

3

Account, the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; (vii) to grant the Agent, the Letter of Credit Issuers and the other holders of Obligations administrative super-priority in payment with respect to such Obligations over any and all administrative expenses of the kinds specified in sections 503(b), 507(b) and 546(c) of the Bankruptcy Code; and (viii) to set a hearing on the Motion (the **"Final Hearing"**). Due and proper notice of the Motion pursuant to Bankruptcy Rule 4001 has been given as set forth below. The Court having further considered the Motion and any objections thereto, and upon the entire record made at the Final Hearing, and this Court having found good and sufficient cause,

### IT IS HEREBY FOUND AND CONCLUDED that:

A.      On April 2, 2001 (the **"Petition Date"**), the Debtors each filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.      This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. The Motion presents a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.      The Debtors require a facility of approximately $100 million of availability for the issuance of letters of credit (including, but not limited to, the Existing Letters of Credit) and collateral arrangements to secure certain Hedging Arrangements to carry on the operation of their businesses in their current state without the financial accommodations

provided for in the Facility Agreement and the Swap Documents. Without access to these post-petition credit accommodations, as contemplated herein and in the Facility Documents, serious and irreparable harm to the Debtors and their estates would occur. In addition, the Debtors' need for access to these post-petition credit accommodations, as contemplated herein and in the Facility Documents, is immediate. The preservation, maintenance and enhancement of the going concern value of the Debtors, as well as the protection of the interests of others as described herein, are of the utmost significance and importance to a successful reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

D.    Given the Debtors' current financial condition and capital structure, without access to the post-petition credit accommodations, as contemplated herein and in the Facility Documents,, the Debtors are unable to sustain their current operations and are unable to obtain sufficient unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code as an administrative expense. The post-petition credit accommodations, as contemplated herein and in the Facility Documents, are not otherwise available without the Debtors' granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b), 507(b), and 546(c) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the property described in the Facility Documents and below pursuant to sections 364(c)(2) and (c)(3).

E.    Notice of the relief requested in the Motion, the Final Hearing and the proposed form of this Order has been given to: (a) the office of the United States Trustee; (b) counsel to the Agent; (c) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (d) counsel to each of the official committees appointed in these Chapter 11

Cases (the "**Committees**"); (e) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives (the "**Asbestos Representatives**"); (f) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (h) all known domestic secured creditors of the Debtor and holders of Prior Claims (defined below). Based upon all of the foregoing, sufficient and adequate notice under the circumstances of the Motion, and this Order has been given pursuant to sections 102(l) and 364(c) of the Bankruptcy Code, and Bankruptcy Rules 2002 and 4001(c).

F.    The Post-Petition Facility has been negotiated in good faith and at arms-length among the Debtors and BofA (as Agent and as a Letter of Credit Issuer), and any credit accommodations (including Bank Products) extended and letters of credit issued for the account of the Debtors pursuant to the Facility Agreement ("**Letters of Credit**") or financial accommodations provided pursuant to the Facility Documents shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of section 364(e) of the Bankruptcy Code, and the Agent and the Letter of Credit Issuers are entitled to the protections of section 364(e) of the Bankruptcy Code.

G.    The terms of the Post-Petition Facility and the Facility Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.    This Court concludes that entry of this Order is in the best interests of the Debtors' estates and creditors because its implementation, among other things, will allow for the availability to the Debtors of a letter of credit facility and other financial accommodations that are necessary to sustain the operations of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

91100-001\DOCS_DE:157467.1

I.      Each of the foregoing findings by the Court will be deemed a finding of fact if and to the full extent that it makes and contains factual findings and a conclusion of law if and to the full extent that it makes legal conclusions.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      The Motion is granted, subject to the terms and conditions set forth in this Order and any objections to the entry of this Order are resolved hereby or, to the extent not resolved, are overruled.

2.      The Debtors are each authorized and obligated on a final basis to comply with and perform, and are bound by, all of the terms, conditions and waivers contained in the Facility Documents, and the Debtors are each authorized and obligated to repay amounts owed, with interest and any other allowed charges, to the Agent and Letter of Credit Issuers and holders of other Obligations in accordance with and subject to the terms and conditions set forth in the Facility Documents and this Order.  None of the Facility Documents nor this Order, nor any provision of any thereof, nor any right arising under any thereof, shall be voidable or avoidable under section 548 of the Bankruptcy Code or under any applicable State Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.  The Debtors are further authorized and obligated to pay all facility, commitment, letter of credit, unused line and other fees and expenses in accordance with the terms of the Facility Documents, including, without limitation, a $250,000 Facility Fee due and payable upon entry of this Order, an Administration Fee of $75,000 due and payable upon entry of this Order, and all reasonable

7

fees and expenses of professionals engaged by the Agent or the Letter of Credit Issuers, in accordance with the terms of the Facility Agreement.

3.      Grace is expressly authorized to obtain financial accommodations from the Agent, the Letter of Credit Issuers and the other holders of the Obligations, on the terms and subject to the conditions and limitations in availability set forth in the Facility Documents and this Order, of up to $100 million in the form of Letters of Credit, to enter into Hedging Arrangements as contemplated by the Swap Documents and to obtain Bank Products from the Bank or the Bank's Affiliates. Grace is authorized to request the issuance of Letters of Credit, to enter into Hedging Arrangements and to request Bank Products, for the purposes permitted under the Facility Documents.

4.      Effective immediately, the automatic stay pursuant to section 362(a) of the Bankruptcy Code, and any and all other stays and injunctions which are or may be applicable, shall be and hereby are modified and vacated as to the Agent, the Letter of Credit Issuers and the other holders of the Obligations and all of their Collateral (as defined below), so that (i) if an Event of Default (as defined in the Facility Documents) occurs, subject to Paragraph 10 of this Order, the Agent and the Letter of Credit Issuers shall be entitled to terminate the Post-Petition Facility and the Agent, the Letter of Credit Issuers and the other holders of the Obligations shall be entitled to exercise any and all of their rights and remedies under the Facility Agreement, the other Facility Documents and this Order, and (ii) prior to an Event of Default, the Agent, the Letter of Credit Issuers and the other holders of the Obligations may take such actions with respect to the Collateral and proceeds thereof as are authorized in the Facility Agreement, the other Facility Documents and this Order, including without limitation the application of amounts in and proceeds of Cash Collateral Accounts and other Collateral to the Obligations as permitted

by the Facility Agreement, the establishment of Cash Collateral Accounts, and the taking of steps to perfect Agent's Liens on the Collateral. Notwithstanding anything herein to the contrary, no Letters of Credit, or Collateral or proceeds thereof may be used to object to or contest in any manner, or raise any defenses to, the validity, perfection, priority or enforceability of the Obligations owing to the Letter of Credit Issuers or Agent or the other holders of the Obligations, or the liens in favor of the Agent securing such Obligations, or to assert any claims or causes of action against the Letter of Credit Issuers or Agent or the other holders of the Obligations in their respective capacities under the Facility Documents.

5.    In accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code, the Obligations shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 546(c) of the Bankruptcy Code and shall at all times be senior to the rights of the Debtors, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code. No cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b) of the Bankruptcy Code or otherwise, shall be senior to or equal to the claim of the Agent, the Letter of Credit Issuers or any other holder of the Obligations, arising out of the Obligations. Notwithstanding anything else in this Order, the super-priority claims of the Agent, the Letter of Credit Issuers and any other holders of the Obligations arising from the Obligations shall be solely to the extent of the Collateral, and not to any other property of the Debtors, on the terms and conditions provided for in section 1.3 of the Facility Agreement.

9

6.     As security for all L/C Obligations, and as provided in the Facility Documents, Grace hereby grants to the Agent, for the benefit of the Agent, the Letter of Credit Issuers and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations (effective upon the date of the Order and without the necessity of the execution, filing and/or recordation by the Debtors of mortgages, security agreements, patent security agreements, trademark security agreements, pledge agreements, financing statements or otherwise), valid, perfected and continuing security interests in, liens on, and rights of set-off against ("**Liens**") the L/C Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the L/C Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, Liens against the F/X Hedge Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing.  As security for all F/X Hedge Obligations, Grace hereby grants to the Agent, for the benefit of the Agent, the holders of the F/X Hedge Obligations and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations, Liens against the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the F/X Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, Liens against the L/C Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing.  As security for all

Commodity Hedge Obligations, Grace hereby grants to the Agent, for the benefit of the Agent, the holders of the Commodity Hedge Obligations and, subject to Section 3.3(b) of the Facility Agreement, the other holders of the Obligations, Liens against the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the Commodity Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b) of the Facility Agreement, Liens against the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing.  Collectively, the property and assets against which Liens are granted in this section of this Order, all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing, are referred to herein as the "**Collateral**."  The Liens granted herein against the Collateral shall be Liens with the following priority:

> (a)     pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected Lien upon all of Grace's right, title and interest in, to and under all Collateral that is not otherwise encumbered by a valid and unavoidable liens or security interests to the extent and in the amounts existing as of the commencement of the Chapter 11 Cases ("**Prior Claims**"); and

> (b)     pursuant to section 364(c)(3) of the Bankruptcy Code, a junior priority, perfected Lien upon all of Grace's right, title and interest in, to and under the Collateral that is subject to a Prior Claim (subject only to such Prior Claims).

The Collateral shall not include (a) claims of the Debtors arising under sections 544, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code ("**Avoidance Actions**"), (b) stock or other equity interests of the Debtors in any foreign subsidiary, and (c) life insurance policies owned by, or assigned to, any of the Debtors.  "Prior Claims" shall not include any lien or security interest that is avoidable pursuant to any provision of the Bankruptcy Code.

11

Notwithstanding anything else in this Order, the Liens of the Agent shall attach solely to the Collateral, and not to any other property of the Debtors, on the terms and conditions provided for in section 1.4 of the Facility Agreement.

7.    Neither the Debtors, the Debtors' estates nor the Debtors' professionals shall assert a claim under section 506(c) of the Bankruptcy Code against Agent or any Letter of Credit Issuers or any holders of Obligations for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Agent, any Letter of Credit Issuers or any other holders of the Obligations upon the Collateral. The Agent, the Letter of Credit Issuers and the other holders of the Obligations shall not be subject to the equitable doctrine of marshaling or any other similar doctrine with respect to any Collateral. None of the Agent or the Letter of Credit Issuers or any other holders of Obligations shall be required to file or serve financing statements, mortgages, patent and trademark security agreements and similar instruments which are used to perfect liens and security interests in intellectual property, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect the Liens. If, however, the Agent, any Letter of Credit Issuers, or any other holders of any Obligations, in their sole discretion, shall determine to file any such financing statements, mortgages, agreements, notices of lien or similar instruments, or to otherwise confirm perfection of such Liens, the Debtors are obligated to cooperate with and assist in such process, and all such documents shall be deemed to have been perfected at the time of and on the date of this Order, and shall be and hereby are deemed and adjudicated senior to any other post-petition filing by any other person or entity with respect to the same collateral.

12

8.    A copy of this Order may be used by Agent, any Letter of Credit Issuers or any holder of any Obligations as a financing statement, mortgage, deed of trust or similar instrument for purposes of any public filing made by such parties for the perfection of the Liens. All state, federal, and county recording officers are authorized and directed to accept a copy of this Order for filing for such purposes.

9.    As long as any portion of the Obligations remains unpaid, or any Facility Document remains in effect (without prejudice to other Events of Default set forth in the Facility Agreement), in addition to the other Events of Default set out in the Facility Documents it shall constitute an Event of Default if there shall be entered in any of the Chapter 11 Cases or any subsequent chapter 7 case any order which authorizes under any section of the Bankruptcy Code, including sections 105, 363, or 364 of the Bankruptcy Code, (i) the granting of any lien or security interest in the Collateral in favor of any party other than the Agent, the Letter of Credit Issuers and the other holders of the Obligations, (ii) the obtaining of credit or the incurring of indebtedness that is entitled to super-priority administrative status, in either case equal or superior to that granted to the Agent, the Letter of Credit Issuers and the other holders of the Obligations pursuant to this Order and Section 1.3 of the Facility Agreement, or (iii) the use of Collateral or the Debtors seek any of the foregoing relief; unless, in connection with any transaction cited in clause (i), (ii), or (iii) of this paragraph, such order requires that the Obligations shall first be indefeasibly paid in full in cash (including cash collateralization or backstopping of all then outstanding Letters of Credit). Otherwise, and in addition to creating an Event of Default, the Debtors, on behalf of their estates, expressly waive any right to request, without the prior written consent of Agent, any relief of the type described in the preceding sentence.

10.     Upon the occurrence of and during the continuance of any Event of Default, including the Events of Default identified in Section 9.1 of the Facility Agreement, the Agent and the Letter of Credit Issuers and the other holders of the Obligations may, acting pursuant to the Facility Documents, exercise rights and remedies and take all or any of the following actions without further relief from the automatic stay pursuant to section 362(a) Bankruptcy Code or any other applicable stay or injunction (which have been modified and vacated, as heretofore ordered, to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate or suspend the Commitment and thereafter cease to issue Letters of Credit to the Debtors; (b) declare the principal of and accrued interest, fees and other liabilities constituting the Obligations to be due and payable; (c) set-off amounts in any of the Debtors' accounts maintained with the Agent or any Letter of Credit Issuer or any other holder of the Obligations, or otherwise enforce rights against any of the Collateral in the possession of the Agent or any Letter of Credit Issuers or any other holders of Obligations; (d) charge the default rate of interest as set forth in the Facility Documents; and/or (e) take any other action or exercise any other right or remedy permitted to the Agent or the Letter of Credit Issuers or any other holders of the Obligations under the Facility Documents, this Order or applicable law. The Debtors waive any right to seek relief under the Bankruptcy Code, including, without limitation, under section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of the Agent or the Letter of Credit Issuers or any other holders of the Obligations set forth in this Order or in the Facility Documents. If the Agent or Letter of Credit Issuers or any other holders of the Obligations elect to exercise any rights or remedies with respect to the Collateral that are predicated upon an Event of Default having occurred, before taking such action, the Agent shall

14

provide the Debtors' counsel, and counsel to the Committees and counsel to the Asbestos

Representatives at least five (5) business days prior written notice, provided that no prior notice

of a termination or suspension of the Commitment shall be required. If any of the Debtors or any

other person challenges the occurrence of an Event of Default, any such objector's remedy shall

be limited to requesting a hearing before this Court at least on five business days' written notice

(a "**Hearing Notice**") to the Agent. If a hearing is requested in accordance with the preceding

sentence, then subsequent to receipt by Agent of a Hearing Notice, unless the Court orders

otherwise, the Agent, the Letter of Credit Issuers and the other holders of the Obligations shall

not take the actions described in clauses (c) or (e) above (or shall suspend such actions if

commenced prior to Agent's receipt of a Hearing Notice) for at least five business days after

Agent's receipt of a Hearing Notice. In any such hearing, the sole issue before the Court shall be

whether an Event of Default exists.

        11.    The Debtors are authorized to perform all acts, and execute and comply

with the terms of such other documents, instruments and agreements in addition to the Facility

Documents, as the Agent or the Letter of Credit Issuers or any other holders of the Obligations

may reasonably require, as evidence of and for the protection of the Obligations or the Liens in

favor of Agent, or which otherwise may be deemed reasonably necessary by the Agent or the

Letter of Credit Issuers or the other holders of the Obligations to effectuate the terms and

conditions of this Order and the Facility Documents. The Debtors, the Agent, the Letter of

Credit Issuers and the other holders of the Obligations are hereby authorized to implement, in

accordance with the terms of the Facility Documents, any non-material modifications (including,

without limitation, any change in the number or composition of the Letter of Credit Issuers) of

the Facility Documents without further notice or order of this Court.

12.    Without limiting the rights of access and information afforded the Agent and the Letter of Credit Issuers and the other holders of the Obligations under the Facility Documents, the Debtors shall afford representatives, agents and/or employees of the Agent and the Letter of Credit Issuers and the other holders of the Obligations reasonable access to the Debtors' premises and their records in accordance with the Facility Documents and shall cooperate, consult with, and provide to such persons all such non-privileged information and information not subject to a binding confidentiality agreement, as they may reasonably request.

13.    Having been found to be extending credit accommodations and issuing Letters of Credit to Grace in good faith, based on the record before this Court, the Agent and the Letter of Credit Issuers and the other holders of the Obligations shall be entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the Obligations and the Liens created, adjudicated or authorized by this Order in the event that this Order or any finding, adjudication, or authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal or vacation of this Order shall not affect the validity of any Obligations of the Debtors to the Agent or the Letter of Credit Issuers or the other holders of the Obligations incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all Letters of Credit issued and financial accommodations provided pursuant to this Order and the Facility Documents and all Obligations incurred by the Debtors pursuant hereto prior to the effective date of any such stay, modification, reversal or vacation shall be governed in all respects by the original provisions hereof, and the Agent and the Letter of Credit Issuers and the other holders of the Obligations shall be entitled to all the rights, privileges and benefits, including without limitation, the liens, security interests and first priorities granted herein with respect to all such Obligations.

16

14.     Neither the Agent nor any Letter of Credit Issuers nor any other holders of the Obligations shall be deemed to be in "control" of the operations of any Debtor, to be acting as a "responsible person" or "owner" or "operator" with respect to the operation or management of any Debtor (as such terms or similar terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any similar federal or state statute) by reason of any credit or financial accommodations extended to the Debtors under the Facility Documents or the exercise by the Agent or any Letter of Credit Issuers or any other holders of the Obligations of any rights or remedies hereunder or thereunder, except that this paragraph shall apply to environmental liabilities to the United States only so long as the actions of the Agent and the Letter of Credit Issuers and the other holders of the Obligations do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by the Debtors, or otherwise cause lender liability to arise or the status of control, responsible person, owner, or operator to exist under applicable law.

15.     The Post-Petition Loan and Security Agreement, dated as of April 1, 2001, as amended (the "**DIP Loan Agreement**"), among the financial institutions named therein (collectively, "**DIP Lenders**"), Bank of America, N.A. ("**BofA**"), as agent for such Lenders ("**DIP Agent**"), and W.R. Grace & Co. and the Subsidiaries of W.R. Grace & Co. named therein (collectively, "DIP Borrowers"), together with the credit facility documents and agreements executed in connection therewith (collectively, "**2001 Loan Documents**"), and the liens of the DIP Agent thereunder, shall, as, when, and to the extent provided in the Payoff Confirmation Letter attached hereto as **Exhibit D**, be terminated.

17

16.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order (a) confirming any plan of reorganization in the Chapter 11 Cases, and, to the extent not satisfied in full in cash, (or, with respect to the Letters of Credit, with cash collateralization or supporting Letters of Credit) the Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors having hereby waived such discharge; (b) converting any of the Chapter 11 Cases to a chapter 7 case; or (c) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Order as well as the claims and liens granted pursuant to this Order and the Facility Documents shall continue in full force and effect notwithstanding the entry of such order, and such claims and liens shall maintain their priority as provided by this Order until all of the Obligations are indefeasibly paid in full in cash and discharged.

17.     Pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, is not and shall not be subject to any lien of any entity resulting from any Prior Claim except to the extent that such property constitutes proceeds of property encumbered by a Prior Claim.

18.     To the fullest extent permitted by law, the provisions of this Order and the Facility Documents shall be binding upon and inure to the benefit of the Agent, the Letter of Credit Issuers, the other holders of the Obligations, the Debtors, and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases or in subsequent chapter 7 cases as a legal representative of the Debtors or their estates.

19.     The Debtors shall provide counsel to each of the Committees and counsel to the Asbestos Representatives with copies of any notices, amendments, financial data or similar information that Debtors provide to the Agent or the Letter of Credit Issuers pursuant to this

Order or the Facility Documents, substantially contemporaneously with delivery of such information to the Agent or the Letter of Credit Issuers.

20.    In the event of any conflict between any term, covenant or condition of this Order and any term, covenant or condition of any Facility Document, the provisions of this Order shall control and govern.

21.    The Court has and will retain jurisdiction to enforce this Order according to its terms.

Dated: _____, 2010

_____
Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

19

**EXHIBIT A**
**Form of Facility Agreement**

**EXHIBIT B**
**Form of 2010 ISDA Master Agreement**

# ISDA

### International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of     December 22, 2009

**Bank of America, N.A.**                    and    **W.R. Grace & Co. – Conn.**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions*. The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)       Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)      *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting of Payments.* If on any date amounts would otherwise be payable:—

      (i)       in the same currency; and

      (ii)      in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)      *Deduction or Withholding for Tax.*

      (i)       *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

            (1)       promptly notify the other party ("Y") of such requirement;

            (2)       pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

            (3)       promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

2

**ISDA® 2002**

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability.* If:—

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

## 3.    Representations

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

**ISDA® 2002**

(iii)    ***No Violation or Conflict.*** Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    ***Consents.*** All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    ***Obligations Binding.*** Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    ***Absence of Certain Events.*** No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    ***Absence of Litigation.*** There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    ***Accuracy of Specified Information.*** All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    ***Payer Tax Representation.*** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    ***Payee Tax Representations.*** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)    ***No Agency.*** It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    ***Furnish Specified Information.*** It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)      upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      **_Maintain Authorisations._** It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      **_Comply With Laws._** It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      **_Tax Agreement._** It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      **_Payment of Stamp Tax._** Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      **_Events of Default._** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)      **_Failure to Pay or Deliver._** Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)      **_Breach of Agreement; Repudiation of Agreement._**

(1)      Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)      the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)　*Credit Support Default.*

　　(1)　Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

　　(2)　the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

　　(3)　the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

　　(iv)　*Misrepresentation.* A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)　*Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

　　(1)　defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

　　(2)　defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

　　(3)　defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

　　(4)　disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

**ISDA® 2002**

(vi)     *Cross-Default.* If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

>     (1)     a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

>     (2)     a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)    *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

>     (1)     is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

ISDA® 2002

(viii)  *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

(1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

(2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

(i)  *Illegality.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

(1)  for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

(ii)  *Force Majeure Event.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

(1)  the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

**ISDA® 2002**

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)      such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)      **Tax Event.** Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)      **Tax Event Upon Merger.** The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)      **Credit Event Upon Merger.** If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)      X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

ISDA® 2002

date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)     any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)     X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)    ***Additional Termination Event.*** If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    ***Hierarchy of Events.***

(i)    An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)    Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

(iii)    If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)    ***Deferral of Payments and Deliveries During Waiting Period.*** If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:—

(i)    the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)    if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)    ***Inability of Head or Home Office to Perform Obligations of Branch.*** If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or

compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i)or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

**6.       Early Termination; Close-Out Netting**

(a)       *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)       *Right to Terminate Following Termination Event.*

(i)       *Notice.* If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)       *Transfer to Avoid Termination Event.* If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)       *Two Affected Parties.* If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

**ISDA® 2002**

(iv)    **_Right to Terminate._**

    (1)    If:—

        (A)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

        (B)    a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

    (2)    If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

        (A)    Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions. Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

        (B)    An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)    **_Effect of Designation._**

    (i)    If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

    (ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

                **ISDA® 2002**

(d)    *Calculations; Payment Date.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

(ii)    *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.* Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

(2)    *Two Affected Parties.* Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

13

(3)     *Mid-Market Events.* If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

    (A)     if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

    (B)     in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

(iii)     *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)     *Adjustment for Illegality or Force Majeure Event.* The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)     *Pre-Estimate.* The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)     **Set-Off.** Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

**ISDA® 2002**

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

## 7.    Transfer

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using

commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

## 9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)    *Amendments.* An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

    (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

    (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

ISDA® 2002

(h)     *Interest and Compensation.*

(i)     Prior to Early Termination. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

(1)     *Interest on Defaulted Payments.* If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)     *Compensation for Defaulted Deliveries.* If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)     *Interest on Deferred Payments.* If:—

(A)     a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

(B)     a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

(C)     a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event

continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)     *Compensation for Deferred Deliveries.* If:—

(A)     a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)     a delivery is deferred pursuant to Section 5(d); or

(C)     a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)     ***Early Termination.*** Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)     *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)     *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)     ***Interest Calculation.*** Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organisation, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred. This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)    If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)    The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office. Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction. Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

11.    **Expenses**

A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    **Notices**

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:—

          (i)      if in writing and delivered in person or by courier, on the date it is delivered;

          (ii)     if sent by telex, on the date the recipient's answerback is received;

          (iii)    if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

          (iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

          (v)      if sent by electronic messaging system, on the date it is received; or

ISDA® 2002

(vi)     if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Details.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

## 13.     Governing Law and Jurisdiction

(a)     *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

(i)     submits:—

(1)     if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

(2)     if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

(ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

(iii)     agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process.* Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv). Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

20

## 14.    Definitions

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)    in respect of the determination of an Unpaid Amount:—

    (i)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (ii)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

    (iii)    in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

    (iv)    in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)    in respect of an Early Termination Amount:—

    (i)    for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable:—

        (1)    if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

        (2)    if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

        (3)    in all other cases, the Applicable Deferral Rate; and

ISDA® 2002

      (ii)     for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

            (1)     if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

            (2)     if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

            (3)     if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

            (4)     in all other cases, the Termination Rate.

*"Applicable Deferral Rate"* means:—

(a)     for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)     for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)     for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

*"Automatic Early Termination"* has the meaning specified in Section 6(a).

*"Burdened Party"* has the meaning specified in Section 5(b)(iv).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

*"Close-out Amount"* means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in

**ISDA® 2002**

Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information: —

(i)      quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)      information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)      information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)      application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

ISDA® 2002

(2)    application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

**ISDA® 2002**

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognised principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

ISDA® 2002

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

26                                                                                         **ISDA® 2002**

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"Tax Event"** has the meaning specified in Section 5(b).

**"Tax Event Upon Merger"** has the meaning specified in Section 5(b).

**"Terminated Transactions"** means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

**"Termination Currency"** means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

**"Termination Currency Equivalent"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"Termination Event"** means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Threshold Amount"** means the amount, if any, specified as such in the Schedule.

**"Transaction"** has the meaning specified in the preamble.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

*"Waiting Period"* means:—

(a)    in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)    in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**Bank of America, N.A.** ....................................
(Name of Party)

**W.R. Grace & Co. - Conn.** ....................................
(Name of Party)

By: ....................................

Name:    Roger H. Heintzelman

Title:    Principal

By: ....................................

Name:

Title:

**Acknowledged and Agreed:**

**Grace International Holdings, Inc.**

_____

Name & Title:

ISDA® 2002

## EXHIBIT C
## Form of Control Agreements

**Final Draft**

**(Account - Without Activation)**

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Agreement is entered into as of _____, 2010, among **W.R. Grace & Co.-Conn.** ("*Company*"), **Bank of America, N.A.**, in its capacity as agent for the holders of the Obligations (as defined in the LC Agreement as defined below) (in such capacity, "*Agent*"), and **Bank of America, N.A.** ("*Bank*") with respect to the following:

A.    Bank has agreed to establish and maintain for Company deposit account number _____ (the "*Account*").

B.    Pursuant to that certain Post-Petition Letter of Credit Facility Agreement, dated as of _____, 2010, by and among Company, Agent and the Letter of Credit Issuers from time to time party thereto (the "*LC Agreement*"), Company has granted to Agent a security interest in the Account and all amounts on deposit in the Account (such amounts, the "*Account Funds*").

C.    Company, Agent and Bank are entering into this Agreement to evidence Agent's security interest in the Account and the Account Funds and to provide for the disposition of the Account Funds.

Accordingly, Company, Agent and Bank agree as follows:

1.    (a)    This Agreement evidences Agent's control over the Account. Notwithstanding anything to the contrary in the agreement between Bank and Company governing the Account, Bank will comply with instructions originated by Agent as set forth herein directing the disposition of the Account Funds without further consent of Company.

(b)    Company represents and warrants to Agent and Bank that it has not assigned or granted a security interest in the Account or Account Funds, except to Agent.

(c)    Company will not permit the Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Agent's security interest referred to herein.

(d)    Bank of America, N.A., in its capacity as Agent, agrees with Company that it will not withdraw or initiate transfers of Account Funds from the Account except as permitted by Sections 1.2(e) and 3.2(c) of the LC Agreement.

2.    Bank shall prevent Company from making any withdrawals from the Account. Company agrees that Agent may from time to time in its sole discretion instruct the Bank to initiate transfers of the Account Funds to Agent at its account specified below (the "*Agent's Account*") or to such other account as Agent may direct in writing:

Bank Name:   Bank of America, N.A.
ABA No. ACH transfers:
ABA No. Wire transfers:

Account Name:
Account No.:

3.    Notwithstanding anything to the contrary set forth herein, Bank shall not be permitted to charge the Account for the fees, charges and other amounts payable to Bank hereunder or otherwise.

4.    (a)    Bank will send information regarding the deposits to the Accounts to the address specified below for Company or as otherwise specified in writing by Company to Bank.

     (b)    In addition to the original Bank statement provided to Company, Bank will provide Agent with a duplicate of such statement.

5.    (a)    Bank will not be liable to Company or Agent for any expense, claim, loss, damage or cost ("*Damages*") arising out of or relating to its performance under this Agreement other than those Damages which result directly from its acts or omissions constituting gross negligence or intentional misconduct.

     (b)    In no event will Bank be liable for any special, indirect, exemplary or consequential damages, including but not limited to lost profits.

     (c)    Bank will be excused from failing to act or delay in acting, and no such failure or delay shall constitute a breach of this Agreement or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, flood, earthquake or other natural disaster, breakdown of public or private or common carrier communications or transmission facilities, equipment failure, or negligence or default of Company or Agent or (ii) such failure or delay resulted from Bank's reasonable belief that the action would have violated any guideline, rule or regulation of any governmental authority.

     (d)    Bank shall have no duty to inquire or determine whether Company's obligations to Agent are in default or whether Agent is entitled to provide the Notice to Bank. Bank may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

     (e)    Bank shall be permitted to comply with any writ, levy order or other similar judicial or regulatory order or process concerning the Account or any Account Funds and shall not be in violation of this Agreement for so doing.

6.    (a)    Company shall indemnify Bank against, and hold it harmless from, any and all liabilities, claims, costs, expenses and damages of any nature (including reasonable attorney's fees and expenses) in any way arising out of or relating to disputes or legal actions concerning Bank's provision of the services described in this Agreement. This section does not apply to any cost or damage attributable to the gross negligence or intentional misconduct of Bank. Company's obligations under this section shall survive termination of this Agreement.

     (b)    Agent hereby agrees to indemnify, defend and hold harmless Bank against any loss, liability or expense (including but not limited to allocated costs of staff counsel, other reasonable

attorney's fees and any fees and expenses) arising from Bank complying with any written instructions of Agent pursuant to this Agreement other than if related to Bank's gross negligence, bad faith, or willful misconduct. Agent's obligations under this section shall survive termination of this Agreement.

7.    (a)    Company shall pay to Bank, upon receipt of Bank's invoice, all costs, expenses and reasonable attorneys' fees incurred by Bank in connection with the enforcement of this Agreement and any instrument or agreement required hereunder, including but not limited to any such reasonable costs, expenses and fees arising out of the resolution of any conflict, dispute, motion regarding entitlement to rights or rights of action, or other action to enforce Bank's rights in a case arising under Title 11, United States Code. Company agrees to pay Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees incurred by Bank in the preparation and administration of this Agreement (including any amendments hereto or instruments or agreements required hereunder).

(b)    Agent shall pay to Bank, upon receipt of Bank's invoice, all reasonable costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in connection with the enforcement against Agent of this Agreement and any instrument or agreement required hereunder to the extent that Bank is the prevailing party in such enforcement action.

8.    Termination and Assignment of this Agreement shall be as follows:

(a)    Agent may terminate this Agreement by providing notice to Company and Bank that all of Company's obligations which are secured by Accounts Funds and the Account are paid in full. Agent may also terminate or assign this Agreement upon 30 day's prior written notice to Company and Bank; provided, however, that any such assignment shall only be to an affiliate or wholly-owned subsidiary of Agent. Bank may terminate this Agreement upon 30 days' prior written notice to Company and Agent. Company may not terminate this Agreement except with the written consent of Agent and upon prior written notice to Bank.

(b)    Notwithstanding subsection 8(a), Bank may terminate this Agreement at any time by written notice to Company and Agent if either Company or Agent breaches any of the terms of this Agreement, or any other agreement with Bank.

9.    (a)    Each party represents and warrants to the other parties that (i) this Agreement constitutes its duly authorized, legal, valid, binding and enforceable obligation; (ii) the performance of its obligations under this Agreement and the consummation of the transactions contemplated hereunder will not (A) constitute or result in a breach of its certificate or articles of incorporation, by-laws or partnership agreement, as applicable, or the provisions of any material contract to which it is a party or by which it is bound or (B) result in the violation of any law, regulation, judgment, decree or governmental order applicable to it; and (iii) all approvals and authorizations required to permit the execution, delivery, performance and consummation of this Agreement and the transactions contemplated hereunder have been obtained.

(b)    The parties each agree that they shall be deemed to make and renew each representation and warranty in subsection 9(a) on and as of each day on which Company uses the services set forth in this Agreement.

10.    (a)    This Agreement may be amended only by a writing signed by Company, Agent and Bank; except that Bank's charges are subject to change by Bank upon 30 days' prior written notice to Company. This Section shall survive the termination of this Agreement.

(b)    This Agreement may be executed in counterparts; all such counterparts shall constitute but one and the same agreement.

(c)    This Agreement controls in the event of any conflict between this Agreement and any other document or written or oral statement. This Agreement supersedes all prior understandings, writings, proposals, representations and communications, oral or written, of any party relating to the subject matter hereof. This Agreement may not be amended except by a written agreement executed and delivered by all parties hereto.

(d)    This Agreement shall be interpreted in accordance with New York law without reference to that state's principles of conflicts of law.

11.    Any written notice or other written communication to be given under this Agreement shall be addressed to each party at its address set forth on the signature page of this Agreement or to such other address as a party may specify in writing. Such notice shall be effective upon receipt.

12.    Nothing contained in the Agreement shall create any agency, fiduciary, joint venture or partnership relationship between Bank and Company or Agent.

[signature pages follow]

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

**W.R. Grace & Co.-Conn.**
**("Company")**

By: _____

Name: _____

Title: _____

Address for notices:

7500 Grace Drive
Columbia, Maryland  21044
Attention:  Asif Arshad
Fax: 410-531-4461

**Bank  of  America,  N.A.**
**("Agent")**

By: _____

Name: _____

Title: _____

Address for notices:

335 Madison Avenue
New York, New York  10017
Attention: Allan Juleus and Ed Kahn
Fax: 312-453-3977

**Bank of America, N.A. ("Bank")**

By: _____

Name: _____

Title: _____

Address for notices:

600 Peachtree Street, 10th Floor
Atlanta, GA 30308
Attn: Connie Warfield
Tel: 404-607-5375
Fax: 904-312-6756 and,

600 Peachtree Street, 10th Floor
Atlanta, GA 30308
Attn: Shanelle Dawson
Tel: 404-607-5493
Fax: 404-607-6281

**EXHIBIT D**
**Form of Payoff Confirmation Letter**

**Final Draft**

## PAYOFF CONFIRMATION LETTER

_____, 2010

W.R Grace & Co.
and the Subsidiaries thereof listed
on the signature pages hereto
c/o W.R. Grace & Co.-Conn.
7500 Grace Drive
Columbia, MD 21044
Attn:  Chief Financial Officer

Re:    Post-Petition Loan and Security Agreement, dated as of April 1, 2001, as amended (the "Loan
       Agreement"), among the financial institutions named therein (collectively, "Lenders"), Bank of
       America, N.A. ("BofA"), as agent for such Lenders ("Agent"), and W.R. Grace & Co. and the
       Subsidiaries of W.R. Grace & Co. named therein (collectively, "Borrowers"), together with the
       credit facility documents and agreements executed in connection therewith (collectively, "2001
       Loan Documents")

Ladies and Gentlemen:

       Agent has been informed that Borrowers intend to terminate the 2001 Loan Documents on
_____, 2010 (the "Payoff Date") and to satisfy in full all loans and other obligations of Borrowers
to Agent and the Lenders outstanding as of the Payoff Date (except Borrowers' obligations relating to the
Letters of Credit and Hedge Transactions described below), including all principal, interest, fees,
expenses and other amounts outstanding or payable under the 2001 Loan Documents (collectively, the
"Relevant Obligations").

       Notwithstanding such payment of the Relevant Obligations, however, Agent and the Borrowers
have agreed that, subject to satisfaction of the conditions set forth in this letter agreement:

       (a) the letters of credit listed on Attachment A issued pursuant to the Loan Agreement
(collectively, "Letters of Credit") shall remain outstanding and shall, on and after the Payoff
Date, become letters of credit under, and subject to the terms and conditions of, that certain Post-
Petition Letter of Credit Facility Agreement in the form attached hereto as Attachment B (the
"LC Agreement"), to be dated on or about the Payoff Date, among the financial institutions from
time to time party thereto, as letter of credit issuers, BofA, as the agent for the letter of credit
issuers (in such capacity, the "New Agent"), and W.R. Grace & Co.-Conn ("Grace Conn"), as the
account party; and

       (b) the outstanding Transactions (the "Hedge Transactions") under and as defined in that
certain ISDA Master Agreement, dated as of May 12, 2003, among BofA, Grace Conn and Grace
International Holdings, Inc. ("GIH"), shall remain outstanding and shall, on and after the Payoff
Date, become Transactions under and as defined in, and subject to the terms and conditions of,
the Swap Documents (as defined in the LC Agreement), the obligations in respect of which shall

constitute Obligations of Grace Conn under and as defined in the LC Agreement and shall be secured by the Cash Collateral Accounts defined in the LC Agreement.

Agent has agreed to accept the payoff, to allow the Letters of Credit and the Hedge Transactions to remain outstanding and become Letters of Credit and Hedge Transactions, respectively, under the LC Agreement, and to release its liens under the 2001 Loan Documents on Borrowers' assets ("Agent's Liens"), on the terms set forth in this letter agreement.

Agent agrees that, upon receipt by Agent no later than 3:00 PM on the Payoff Date, of (a) immediately available funds in an amount equal to $_____ (the "Payoff Amount"), which consists of $_____ of principal, $_____ of interest, and $_____ of fees and expenses, (b) notification from the New Agent that (i) each of the conditions set forth in Section 8.1 of the LC Agreement has been satisfied or waived in accordance with the terms thereof, and (ii) cash collateral has been deposited in the Cash Collateral Accounts (as defined in the LC Agreement) as follows: (A) in the L/C Cash Collateral Account (as defined in the LC Agreement), immediately available funds in an amount equal to $_____, (B) in the F/X Hedge Cash Collateral Account (as defined in the LC Agreement), immediately available funds in an amount equal to $_____ and (C) in the Commodity Hedge Cash Collateral Account (as defined in the LC Agreement), immediately available funds in an amount equal to $_____, and (c) a fully executed copy of this letter agreement:

1.     The Relevant Obligations will be satisfied and the 2001 Loan Documents will be terminated, other than (a) Borrowers' obligations relating to the Letters of Credit and the Hedge Transactions, which shall remain outstanding and shall become "Obligations" under and as defined in the LC Agreement, and (b) any indemnification and other provisions that survive under the express terms of the 2001 Loan Documents;

2.     Agent's Liens shall be released and shall be of no further force or effect; and

3.     Borrowers shall be authorized to file releases of all mortgages and financing statements filed by Agent showing a Borrower as mortgagor or debtor. Upon Borrowers' reasonable request from time to time, Agent will execute and deliver such additional lien releases as may be necessary to effectively terminate any and all Agent's Liens on the assets and properties of Borrowers on any public record.

If, for any reason, any of the Payoff Amount or any other amounts applied by Agent to payment of the Relevant Obligations are voided or rescinded or must otherwise be returned by Agent for any reason whatsoever, Borrowers acknowledge and agree that the 2001 Loan Documents, and Borrowers' obligations and liabilities thereunder, shall be reinstated to that extent.

By its signature below, each Borrower (a) confirms its consent to the foregoing, (b) releases Agent, Lenders, and their directors, officers, employees, affiliates, representatives and agents, from any and all claims, demands, debts, liabilities, actions and causes of action of every kind and character based upon, relating to or arising out of the Relevant Obligations and related transactions in any way, and (c) acknowledges that, upon Agent's receipt of the Payoff Amount, Agent (in its capacity as agent under the Loan Agreement) and Lenders have no further obligations or liabilities to Borrowers, and Bank of America, N.A. has no further obligations under the 2001 Loan Documents to Borrowers except in connection with the Letters of Credit and Hedge Transactions.

[Signature Pages Follow]

This letter agreement may be executed in counterparts and be delivered by facsimile. This letter agreement shall constitute an agreement made in, and governed by, the internal laws of the State of New York.

Very truly yours,

**BANK OF AMERICA, N.A.,**
as Agent


By_____
    Title:

CH\1140251.4                                                                          029123-0013

Acknowledged and agreed:

**W. R. Grace & Co.-Conn.,**
as Borrower and Borrower Representative
on behalf of each of the other Borrowers,
each as a Debtor and a Debtor-in-Possession


By:_____
Its Senior Vice President or Vice President

[Signature Page to Payoff Confirmation Letter]

Attachment A

**Letters of Credit**

| Letter of Credit Number | Face Amount | Expiration Date |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Attachment B

**Form of Post-Petition Letter of Credit Facility Agreement**