<u>EXHIBIT C</u>

**Comparison of Revised Form of Facility Agreement to Form Filed with Motion**

**Final Draft**

# POST-PETITION LETTER OF CREDIT FACILITY AGREEMENT

**dated as of**

**[_____], 2010**

**among**

**THE FINANCIAL INSTITUTIONS FROM TIME TO TIME PARTY HERETO,**
**as Letter of Credit Issuers**

**BANK OF AMERICA, N.A.**
**as the Agent**

**and**

**W. R. GRACE & CO.–CONN.,**
**as the Account Party**

## TABLE OF CONTENTS

**Article**              **Page**

**ARTICLE 1 LETTER OF CREDIT FACILITY** ...........................................................................1
1.1   Total Facility...............................................................................................................1
1.2   Letters of Credit. .......................................................................................................2
1.3   Section 364(c)(1) Superpriority Administrative Claim and Sections 364(c)(2) and Section 364(c)(3) Liens and Security Interests.........................................................................5
1.4   Grant of Lien in Cash Collateral Accounts.................................................................5
1.5   Bank Products ............................................................................................................6

**ARTICLE 2 INTEREST AND FEES** ...........................................................................................6
2.1   Interest. ......................................................................................................................6
2.2   Maximum Interest Rate..............................................................................................7
2.3   Facility Fee; Administration Fee ................................................................................7
2.4   Unused Line Fee ........................................................................................................7
2.5   Letter of Credit Fee....................................................................................................7

**ARTICLE 3 TERMINATION AND PAYMENTS** ......................................................................8
3.1   Termination of Facility ..............................................................................................8
3.2   Payments by the Account Party. .................................................................................8
3.3   Apportionment, Application and Reversal of Payments...............................................8
3.4   Indemnity for Returned Payments ..............................................................................9
3.5   Agent's and Letter of Credit Issuers' Books and Records; Monthly Statements.........9

**ARTICLE 4 TAXES, YIELD PROTECTION AND ILLEGALITY** .........................................10
4.1   Taxes........................................................................................................................10
4.2   Increased Costs. .......................................................................................................11
4.3   Certificates of Agent ................................................................................................11
4.4   Withholding Tax. .....................................................................................................11
4.5   Survival ...................................................................................................................12

**ARTICLE 5**..................................................................................................................................12
5.1   Financial Information................................................................................................12
5.2   Notices to the Letter of Credit Issuers .....................................................................14
5.3   Bankruptcy Case ......................................................................................................14

**ARTICLE 6 GENERAL WARRANTIES AND REPRESENTATIONS**...........................................14
6.1   Authorization, Validity, and Enforceability of this Agreement and the Letter of Credit Documents ...............................................................................................................14
6.2   Validity and Priority of Security Interest..................................................................15
6.3   Account Party's Organization and Qualification .......................................................15
6.4   Litigation..................................................................................................................15
6.5   Regulated Entities ....................................................................................................15
6.6   Use of Proceeds; Margin Regulations.......................................................................15
6.7   Full Disclosure .........................................................................................................16
6.8   Governmental Authorization ....................................................................................16

**ARTICLE 7 AFFIRMATIVE AND NEGATIVE COVENANTS** .............................................16

| | | |
|---|---|---|
| 7.1 | Legal Existence and Good Standing | 16 |
| 7.2 | Compliance with Law and Agreements | 16 |
| 7.3 | Mergers and Consolidations | 16 |
| 7.4 | Use of Proceeds | 17 |
| 7.5 | Funding of Cash Collateral Accounts. | 17 |
| 7.6 | Further Assurances. | 18 |

**ARTICLE 8 CONDITIONS TO ISSUANCE** .......................................................**18**

| | | |
|---|---|---|
| 8.1 | Conditions Precedent to Issuance of Initial Letter of Credit | 18 |
| 8.2 | Conditions Precedent to Each Issuance | 19 |

**ARTICLE 9 DEFAULT; REMEDIES** ..................................................................**20**

| | | |
|---|---|---|
| 9.1 | Events of Default | 20 |
| 9.2 | Remedies. | 22 |

**ARTICLE 10 TERM AND TERMINATION** ........................................................**23**

| | | |
|---|---|---|
| 10.1 | Term and Termination | 23 |

**ARTICLE 11 AMENDMENTS; WAIVERs; ASSIGNMENTS; SUCCESSORS** ...............**23**

| | | |
|---|---|---|
| 11.1 | Amendments and Waivers. | 23 |
| 11.2 | Assignments. | 24 |

**ARTICLE 12 THE AGENT** ...............................................................................**26**

| | | |
|---|---|---|
| 12.1 | Appointment and Authorization | 26 |
| 12.2 | Delegation of Duties | 26 |
| 12.3 | Liability of Agent | 26 |
| 12.4 | Reliance by Agent | 27 |
| 12.5 | Notice of Default | 27 |
| 12.6 | Credit Decision | 27 |
| 12.7 | Indemnification | 28 |
| 12.8 | Agent in Individual Capacity | 28 |
| 12.9 | Successor Agent | 28 |
| 12.10 | Withholding Tax. | 29 |
| 12.11 | Restrictions on Actions by Letter of Credit Issuers; Sharing of Payments. | 29 |
| 12.12 | Payments by Agent to Letter of Credit Issuers | 30 |
| 12.13 | Letter of Credit Issuers' Failure to Perform | 30 |
| 12.14 | Relation Among Letter of Credit Issuers | 30 |

**ARTICLE 13 MISCELLANEOUS** ......................................................................**30**

| | | |
|---|---|---|
| 13.1 | No Waivers; Cumulative Remedies | 30 |
| 13.2 | Severability | 31 |
| 13.3 | Governing Law; Choice of Forum; Service of Process. | 31 |
| 13.4 | WAIVER OF JURY TRIAL | 32 |
| 13.5 | Survival of Representations and Warranties | 32 |
| 13.6 | Other Security and Guaranties | 32 |
| 13.7 | Fees and Expenses | 32 |
| 13.8 | Notices | 33 |
| 13.9 | Waiver of Notices | 34 |
| 13.10 | Binding Effect | 34 |
| 13.11 | Indemnity of the Agent and the Letter of Credit Issuers by the Account Party. | 34 |
| 13.12 | Limitation of Liability | 35 |

CH\1135197.13                                                                029123-0013

13.13   Final Agreement ...................................................................................................35
13.14   Counterparts.........................................................................................................35
13.15   Captions ...............................................................................................................35
13.16   Right of Setoff .....................................................................................................36
13.17   Confidentiality. ....................................................................................................36
13.18   Conflicts with Other Letter of Credit Documents.................................................37

## ANNEXES, EXHIBITS AND SCHEDULES

ANNEX A            -       DEFINED TERMS

EXHIBIT A          -       FORM OF FACILITY ORDER

EXHIBIT B          -       FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

EXHIBIT C          -       EXISTING LETTERS OF CREDIT

SCHEDULE 1.1       -       LETTER OF CREDIT ISSUERS' COMMITMENTS

SCHEDULE 6.4       -       LITIGATION; JUDGMENTS

CH\1135197.13                                                                                            029123-0013

**POST-PETITION LETTER OF CREDIT FACILITY AGREEMENT**

This Post-Petition Letter of Credit Facility Agreement, dated as of [_____], 2010, among the financial institutions from time to time parties hereto (such financial institutions, together with their respective successors and assigns, are referred to hereinafter each individually as a "Letter of Credit Issuer" and collectively as the "Letter of Credit Issuers"), Bank of America, N.A., as agent for the Letter of Credit Issuers and the other holders of Obligations (in its capacity as agent, the "Agent"), W. R. Grace & Co.-Conn., a Connecticut corporation, a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined below) (the "Account Party").

## WITNESSETH:

WHEREAS, the Account Party is a debtor and debtor-in-possession in a case pending under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"), has requested the Letter of Credit Issuers to make available to the Account Party a letter of credit facility in an amount not to exceed $100,000,000, and which extensions of credit the Account Party will use for the purposes permitted hereunder;

WHEREAS, capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed thereto in Annex A, which is attached hereto and incorporated herein; the rules of construction contained therein shall govern the interpretation of this Agreement, and all Annexes, Exhibits and Schedules attached hereto are incorporated herein by reference;

WHEREAS, the Letter of Credit Issuers have agreed to make available to the Account Party a letter of credit facility upon the terms and conditions set forth in this Agreement;

WHEREAS, the Account Party has continued in possession of its assets and in the management of its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, to provide security for the repayment of the letters of credit made available pursuant hereto and payment of the other obligations of the Account Party under the Letter of Credit Documents and the Swap Documents, the Account Party has agreed to provide the Agent, for the benefit of the Agent, the Letter of Credit Issuers and the Bank and its Affiliates (upon and after the entry of the Facility Order) with respect to the obligations of the Account Party hereunder and under the other Letter of Credit Documents and the Swap Documents, an allowed superpriority administrative expense claim in the Bankruptcy Case pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in, or arising or ordered under, any sections of the Bankruptcy Code, including without limitation, sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b), 546(c), 726 or 1112 of the Bankruptcy Code and liens and security interests with priority under section 364(c)(2) and section 364(c)(3) of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the Letter of Credit Issuers, the Agent, and the Account Party hereby agree as follows.

ARTICLE 1

LETTER OF CREDIT FACILITY

1.1    Total Facility. Subject to all of the terms and conditions of this Agreement, the Letter of Credit Issuers agree to make available a total letter of credit facility of up to $100,000,000 (the "Total Facility") to the Account Party from time to time prior to the Termination Date.

1.2     Letters of Credit.

(a)     Agreement to Issue or Cause To Issue. Subject to the terms and conditions of this Agreement, the Agent agrees to cause a Letter of Credit Issuer to issue, and each Letter of Credit Issuer hereby severally agrees to issue for the account of the Account Party, in an aggregate amount not to exceed such Letter of Credit Issuer's Commitment, for the account of the Account Party one or more commercial/documentary or standby letters of credit ("Letter of Credit"). Letters of Credit may be requested for the benefit of Other Subsidiaries; provided that the Account Party shall be the account party with respect thereto (and the fact that such Letters of Credit may be for the benefit of Other Subsidiaries shall not affect the Account Party's reimbursement Obligations with respect to such Letters of Credit); provided further, that the sum of the undrawn face amount of all such Letters of Credit plus all amounts drawn thereunder for which the Account Party has not been repaid by the Other Subsidiaries shall not exceed $25,000,000. As of the Closing Date, each of the Existing Letters of Credit shall be deemed to be Letters of Credit issued pursuant to this Agreement.

(b)     Amounts; Outside Expiration Date. The Agent shall not have any obligation to cause any Letter of Credit to be issued, and no Letter of Credit Issuer shall have any obligation to issue any Letter of Credit, at any time if: (i) the maximum face amount of the requested Letter of Credit is greater than the Unused Letter of Credit Amount at such time; (ii) the sum of (x) the maximum amount of the requested Letter of Credit plus (y) all commissions, fees, and charges due from the Account Party in connection with the opening thereof would in the aggregate exceed Availability at such time; or (iii) such Letter of Credit has an expiration date (1) in the case of standby letters of credit, of more than forty-eight (48) months after the date of issuance (although any such Letter of Credit may provide for automatic extensions of its expiration date for one or more successive twelve (12)-month periods; provided that the Letter of Credit Issuer has the right to terminate such Letter of Credit on each such annual expiration date) and (2) in the case of documentary letters of credit, such Letter of Credit has an expiration date of more than 180 days from the date of issuance. With respect to any Letter of Credit that contains any "evergreen" or automatic renewal provision, each applicable Letter of Credit Issuer shall be deemed to have consented to any such extension or renewal unless any such Letter of Credit Issuer shall have provided to the Agent written notice that it declines to consent to any such extension or renewal at least thirty (30) days prior to the date on which the Letter of Credit Issuer is entitled to decline to extend or renew the Letter of Credit. If all of the requirements of this Section 1.2 are met and no Default or Event of Default has occurred and is continuing, no Letter of Credit Issuer shall decline to consent to any such extension or renewal.

(c)     Other Conditions. In addition to the conditions precedent contained in Article 8, the obligation of the Agent to cause any Letter of Credit to be issued or any Letter of Credit Issuer to issue any Letter of Credit is subject to the following conditions precedent having been satisfied in a manner reasonably satisfactory to the Agent:

(1)     The Account Party shall have delivered to the applicable Letter of Credit Issuer, at such times and in such manner as such Letter of Credit Issuer may prescribe, an application in form and substance satisfactory to such Letter of Credit Issuer and reasonably satisfactory to the Agent for the issuance of the Letter of Credit and such other documents as may be required pursuant to the terms thereof, and the form, terms and purpose of the proposed Letter of Credit shall be reasonably satisfactory to the Agent and such Letter of Credit Issuer; and

(2)     As of the date of issuance, no order of any court, arbitrator or Governmental Authority shall purport by its terms to enjoin or restrain money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request

2

or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks generally shall prohibit, or request that the proposed Letter of Credit Issuer refrain from, the issuance of letters of credit generally or the issuance of such Letters of Credit.

    (d)    <u>Issuance of Letters of Credit</u>.

    (1)    <u>Request for Issuance</u>. The Account Party must notify the Agent of a requested Letter of Credit at least two (2) Business Days prior to the proposed issuance date. Such notice must specify the original face amount of the Letter of Credit requested, the Business Day of issuance of such requested Letter of Credit, whether such Letter of Credit may be drawn in a single or in partial draws, the Business Day on which the requested Letter of Credit is to expire, the purpose for which such Letter of Credit is to be issued, and the beneficiary of the requested Letter of Credit. The Account Party shall attach to such notice the proposed form of the Letter of Credit.

    (2)    <u>Responsibilities of the Agent; Issuance</u>. As of the Business Day immediately preceding the requested issuance date of the Letter of Credit, the Agent shall determine the Unused Letter of Credit Amount and Availability. If (i) the face amount of the requested Letter of Credit is less than the Unused Letter of Credit Amount and (ii) the sum of (x) the amount of such requested Letter of Credit <u>plus</u> (y) all commissions, fees, and charges due from the Account Party in connection with the opening thereof would not in the aggregate exceed Availability, the Agent shall cause the applicable Letter of Credit Issuer to issue the requested Letter of Credit on the requested issuance date so long as the other conditions hereof are met.

    (3)    <u>No Extensions or Amendment</u>. Subject to <u>Section 1.2(b)</u>, the Agent shall not be obligated to cause a Letter of Credit Issuer to extend or amend any Letter of Credit issued pursuant hereto, and no Letter of Credit Issuer shall be obligated to amend or extend any Letter of Credit issued pursuant hereto, unless the requirements of <u>Section 1.2(c)(2)</u> are met as though a new Letter of Credit were being requested and issued.

    (e)    <u>Payments Pursuant to Letters of Credit</u>. The Account Party agrees to reimburse the applicable Letter of Credit Issuer immediately for any draw under any Letter of Credit and to pay such Letter of Credit Issuer the amount of all other charges and fees payable to such Letter of Credit Issuer in connection with such draw immediately when due, irrespective of any claim, setoff, defense or other right which the Account Party may have at any time against such Letter of Credit Issuer or any other Person. Except as otherwise agreed by the Agent, if any drawing under any Letter of Credit shall not have been reimbursed by the Account Party in accordance with the foregoing sentence on the date of such drawing, then the Agent shall, and the Account Party hereby authorizes and directs the Agent to, apply funds on deposit in the L/C Cash Collateral Account to repay the amount of such drawing plus interest thereon at the *per annum* rate set forth in <u>Section 2.1</u>.

    (f)    <u>Indemnification; Exoneration; Power of Attorney</u>

    (1)    <u>Indemnification</u>. In addition to amounts payable as elsewhere provided in this <u>Section 1.2</u>, the Account Party agrees to protect, indemnify, pay and save the Letter of Credit Issuers and the Agent harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable attorneys' fees) which any Letter of Credit Issuer or the Agent (other than any Letter of Credit Issuer in its capacity as Letter of Credit Issuer) may incur or be subject to as a consequence, direct or indirect, of the issuance of

3

    

any Letter of Credit; provided, however, that the Account Party's obligations to the Agent or any Letter of Credit Issuer under this clause (1) shall not apply to matters resulting solely from its gross negligence or willful misconduct. The Account Party's obligations under this Section shall survive payment of all other Obligations.

(2)    Assumption of Risk by the Account Party. As among the Account Party, the Letter of Credit Issuers, and the Agent, the Account Party assumes all risks of the acts and omissions of, or misuse of any of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, the Letter of Credit Issuers and the Agent shall not be responsible for: (A) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any Person in connection with the application for and issuance of and presentation of drafts with respect to any of the Letters of Credit, even if it should prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (C) the failure of the beneficiary of any Letter of Credit to comply duly with conditions required in order to draw upon such Letter of Credit; (D) errors, omissions, interruptions, or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any Letter of Credit or of the proceeds thereof; (G) the misapplication by the beneficiary of any Letter of Credit of the proceeds of any drawing under such Letter of Credit; (H) any consequences arising from causes beyond the control of the Letter of Credit Issuers or the Agent, including any act or omission, whether rightful or wrongful, of any present or future *de jure* or *de facto* Governmental Authority or (I) the Letter of Credit Issuer's honor of a draw for which the draw or any certificate fails to comply in any respect with the terms of the Letter of Credit. None of the foregoing shall affect, impair or prevent the vesting of any rights or powers of the Agent or any Letter of Credit Issuer under this Section 1.2(f).

(3)    Exoneration. Without limiting the foregoing, no action or omission whatsoever by Agent or any Letter of Credit Issuer (excluding any Letter of Credit Issuer in its capacity as a Letter of Credit Issuer) shall result in any liability of Agent or any Letter of Credit Issuer to the Account Party, or relieve the Account Party of any of its obligations hereunder to any such Person.

(4)    Rights Against Letter of Credit Issuer. Nothing contained in this Agreement is intended to limit the Account Party's rights, if any, with respect to any Letter of Credit Issuer which arise as a result of the letter of credit application and related documents executed by and between such Account Party and such Letter of Credit Issuer.

(5)    Account Party. The Account Party hereby authorizes and directs any Letter of Credit Issuer to name such Account Party as the "Account Party" therein and to deliver to the Agent all instruments, documents and other writings and property received by the Letter of Credit Issuer pursuant to the Letter of Credit, and to accept and rely upon the Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the application therefor.

1.3    Section 364(c)(1) Superpriority Administrative Claim. It is the intent of the parties hereto that, effective on and after the date of the entry by the Bankruptcy Court of the Facility Order, notwithstanding any term to the contrary herein, in accordance with section 364(c)(1) of the Bankruptcy

4

Code, the Obligations shall constitute claims with priority in payment from funds on deposit in or credited to the Cash Collateral Accounts, whether now existing or hereafter acquired, over any and all unsecured pre-petition claims, all post-petition claims and all administrative expenses of the kinds specified in, or arising or ordered under any sections of the Bankruptcy Code, including, without limitation, sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b), 546(c), 726 and 1112 of the Bankruptcy Code, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment, and such claims, shall at all times be senior to the rights of the Account Party, any Chapter 11 trustee, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition vendors and other post-petition creditors) in the Bankruptcy Case or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 case of the Account Party if the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code. No cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b) of the Bankruptcy Code, any other section of the Bankruptcy Code, or pursuant to any order of the Bankruptcy Court, shall be senior to, equal to, or *pari passu* with, the superpriority administrative claim of the Letter of Credit Issuers arising out of the Obligations, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

   1.4 <u>Grant of Lien in Cash Collateral Accounts pursuant to Sections 364(c)(2) and Section 364(c)(3)</u>. (a) As security for all L/C Obligations, the Account Party hereby grants to the Agent, for the benefit of the Agent, the Letter of Credit Issuers and, subject to Section 3.3(b), the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the L/C Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b), a continuing security interest in, lien on, and right of set-off against the F/X Hedge Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; (b) as security for all F/X Hedge Obligations, the Account Party hereby grants to the Agent, for the benefit of the Agent, the holders of the F/X Hedge Obligations and, subject to Section 3.3(b), the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the F/X Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b), a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing; and (c) as security for all Commodity Hedge Obligations, the Account Party hereby grants to the Agent, for the benefit of the Agent, the holders of the Commodity Hedge Obligations and, subject to Section 3.3(b), the other holders of the Obligations, a continuing security interest in, lien on, and right of set-off against the Commodity Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited to the Commodity Hedge Cash Collateral Account, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing and, subject to Section 3.3(b), a continuing security interest in, lien on, and right of set-off against the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account, all money, cash, Cash Equivalents or other property deposited in or credited thereto and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing. It is the intent of the parties hereto that, effective on and after the date of the entry by the Bankruptcy Court of the Facility Order, notwithstanding any term to the contrary herein, in accordance with sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the Liens of the Agent granted pursuant to this <u>Section 1.4</u> shall constitute Liens that are senior in priority to all other Liens, whether now existing or hereafter acquired, over any and all unsecured pre-petition claims, all post-petition claims and all administrative expenses of the kinds specified in, or arising or ordered under any sections of the

Bankruptcy Code, including, without limitation, sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b), 546(c), 726 and 1112 of the Bankruptcy Code, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment, and such Liens, in accordance with sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, shall at all times be senior to the rights of the Account Party, any Chapter 11 trustee, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition vendors and other post-petition creditors) in the Bankruptcy Case or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 case of the Account Party if the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, other than valid and unvoidable liens or security interests to the extent and in the amounts existing as of the commencement of the Bankruptcy Case and Liens permitted by the Facility Order.

1.5    Bank Products.  The Account Party may request, and the Agent may, in its sole and absolute discretion, arrange for Account Party to obtain Bank Products from the Bank or the Bank's Affiliates, although Account Party is not required to do so.  With respect to any Bank Products provided by an Affiliate of the Bank, Account Party agrees to indemnify and hold the Agent, the Bank and the Letter of Credit Issuers harmless from any and all costs and obligations now or hereafter incurred by the Agent, the Bank or any of the Letter of Credit Issuers that arise from any indemnity given by the Agent to its Affiliates related to such Bank Products; provided, however, nothing contained herein is intended to limit the Account Party's rights with respect to the Bank or its Affiliates, if any, that arise as a result of the execution of documents by and between the Account Party and the Bank that relate to Bank Products. The agreement contained in this Section shall survive termination of this Agreement.  The Account Party acknowledges and agrees that the obtaining of Bank Products from the Bank or the Bank's Affiliates (a) is in the sole and absolute discretion of the Bank or the Bank's Affiliates, and (b) is subject to all rules and regulations of the Bank or the Bank's Affiliates.

ARTICLE 2

INTEREST AND FEES

2.1    Interest.

(a)    Interest Rates.  All outstanding Obligations shall bear interest on the unpaid principal amount thereof  (including, to the extent permitted by law, on interest thereon not paid when due) from the date due until paid in full in cash at a rate *per annum* equal to the Base Rate plus 2.50%, but in any event not to exceed the Maximum Rate.  All interest charges shall be computed on the basis of a year of 360 days and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year).  Subject to prior payment, the Account Party shall pay to the Agent, for the benefit of the applicable Letter of Credit Issuers, interest accrued on outstanding Obligations owing to such Letter of Credit Issuers in arrears on the first day of each month hereafter and on the Termination Date.

(b)    Default Rate.  If any Event of Default occurs and is continuing and the Agent or the Majority Letter of Credit Issuers in their discretion so elect, then, while any such Event of Default is continuing, all of the Obligations shall bear interest at the Default Rate.

2.2    Maximum Interest Rate.  In no event shall any interest rate provided for hereunder exceed the maximum rate legally chargeable by any Letter of Credit Issuer under applicable law for such Letter of Credit Issuer with respect to obligations of the type incurred hereunder (the "Maximum Rate"). If, in any month, any interest rate, absent such limitation, would have exceeded the Maximum Rate, then the interest rate for that month shall be the Maximum Rate, and, if in future months, that interest rate

6

would otherwise be less than the Maximum Rate, then that interest rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of the Obligations, the total amount of interest paid or accrued under the terms of this Agreement is less than the total amount of interest which would, but for this <u>Section 2.2</u>, have been paid or accrued if the interest rate otherwise set forth in this Agreement had at all times been in effect, then the Account Party shall, to the extent permitted by applicable law, pay the Agent, for the account of the Letter of Credit Issuers, an amount equal to the excess of (a) the lesser of (i) the amount of interest which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of interest which would have accrued had the interest rate otherwise set forth in this Agreement, at all times, been in effect over (b) the amount of interest actually paid or accrued under this Agreement. If a court of competent jurisdiction determines that the Agent and/or any Letter of Credit Issuer has received interest and other charges hereunder in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the Obligations other than interest, in the inverse order of maturity, and if there are no Obligations outstanding, the Agent and/or such Letter of Credit Issuer shall refund to the Account Party, on behalf of the Account Party, such excess.

2.3    <u>Facility Fee; Administration Fee</u>. The Account Party agrees to pay the Agent, for the Agent's sole account, on the date that the Facility Order is entered:

(a)    a facility fee (the "<u>Facility Fee</u>") in the amount $250,000; and

(b)    an administration fee (the "<u>Administration Fee</u>") in the amount of $75,000.

2.4    <u>Unused Line Fee</u>. On the first day of each month and on the Termination Date, the Account Party agrees to pay to the Agent, for the account of the Letter of Credit Issuers, in accordance with their respective Pro Rata Shares, an unused line fee (the "<u>Unused Line Fee</u>") equal to the Applicable Percentage times the amount by which the aggregate Commitments exceeded the average daily undrawn face amount of outstanding Letters of Credit during the immediately preceding month or shorter period if calculated for the first month hereafter or on the Termination Date. The Unused Line Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

2.5    <u>Letter of Credit Fee</u>. With respect to any month during which a Letter of Credit is outstanding, the Account Party agrees to pay to the Agent, for the account of the applicable Letter of Credit Issuers, in accordance with their respective Pro Rata Shares, for Letters of Credit, a fee (the "<u>Letter of Credit Fee</u>") equal to 1.00% *per annum*, <u>multiplied by</u> the average daily maximum aggregate amount from time to time available to be drawn under all outstanding Letters of Credit during such month, and to each applicable Letter of Credit Issuer, all out-of-pocket costs, fees and expenses incurred by such Letter of Credit Issuer in connection with the application for, processing of, issuance of, or amendment to any Letter of Credit, which costs, fees and expenses shall include a "fronting fee" of one-quarter of one percent (0.25%) *per annum* of the average daily maximum aggregate amount from time to time available to be drawn under all outstanding standby Letters of Credit during such month, payable to the Letter of Credit Issuer. The Letter of Credit Fee and such "fronting fee" shall be payable monthly in arrears on the first of each month following any month in which a Letter of Credit is outstanding and on the Termination Date. The Letter of Credit Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

7

029123-0013

ARTICLE 3

TERMINATION AND PAYMENTS

3.1     Termination of Facility.  The Account Party may terminate this Agreement upon at least ten (10) Business Days' notice to the Agent and the Letter of Credit Issuers upon the payment in full in cash of all reimbursable expenses and other Obligations.  The Agent and the Letter of Credit Issuers shall be entitled to assume (without any investigation) that any notice required to be delivered hereunder by the Account Party to the Committee has been so delivered.

3.2     Payments by the Account Party.

(a)     All payments to be made by the Account Party shall be made without set-off, recoupment or counterclaim.  Except as otherwise expressly provided herein, all payments by the Account Party shall be made to the Agent for the account of the Agent or the applicable Letter of Credit Issuers, as applicable, at the account designated by the Agent and shall be made in Dollars and in immediately available funds, no later than 12:00 noon (New York time) on the date specified herein.  Any payment received by the Agent after such time shall be deemed (for purposes of calculating interest only) to have been received on the following Business Day and any applicable interest or fee shall continue to accrue.

(b)     Whenever any payment is due on a day other than a Business Day, such payment shall be due on the following Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c)     Subject to Section 3.3(b), in addition to the right of the Agent to withdraw funds from the Cash Collateral Accounts for the payment of reimbursement obligations and interest thereon as contemplated in Section 1.2(e), the Agent shall be entitled, without the need for further action or consent of the Account Party, to withdraw funds on deposit in the Cash Collateral Accounts to pay any other Obligations that have not been paid by the Account Party within 5 Business Days after delivery by the Agent to the Account Party of an invoice for such Obligations as due in accordance with their terms.

3.3     Apportionment, Application and Reversal of Payments.

(a)     Generally.  Payments of the Obligations shall be apportioned ratably among the Letter of Credit Issuers (according to the aggregate unpaid Obligations owing to each Letter of Credit Issuer) and payments of the fees shall, as applicable, be apportioned ratably among the Letter of Credit Issuers, except for fees payable solely to Agent and except as provided in Section 11.1(b).  All payments shall be remitted to the Agent and all such payments not constituting payment of specific fees shall be applied, ratably, subject to the provisions of this Agreement, first, to pay any fees, indemnities or expense reimbursements then due to the Agent from the Account Party; second, to pay any fees or expense reimbursements then due to the Letter of Credit Issuers from the Account Party; third, to pay unpaid reimbursement obligations in respect of Letters of Credit; and fourth, to the payment of any other Obligation.  Subject to Section 3.3(b), after the occurrence and during the continuance of an Event of Default, the Agent and the Letter of Credit Issuers shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

(b)     Application of Amounts on Deposit in Cash Collateral Accounts.  Notwithstanding anything to the contrary set forth herein, in any other Letter of Credit Document or in any Swap Document: (i)(A) until the Commitments are terminated, no Letters of Credit remain outstanding and the L/C Obligations are indefeasibly paid in full in cash, the Agent shall only apply amounts on deposit in the L/C Cash Collateral Account, in accordance with this Agreement and the

8

priorities set forth in <u>clause (a)</u> above, to the L/C Obligations, and, (B) thereafter, the Agent shall apply amounts on deposit in the L/C Cash Collateral Account, in accordance with the Swap Documents, *pro rata* to the F/X Hedge Obligations and the Commodity Hedge Obligations then outstanding, if any; (ii)(A) until the F/X Hedge Obligations are indefeasibly paid in full in cash and all transactions in connection therewith under the Swap Documents have terminated, the Agent shall only apply amounts on deposit in the F/X Hedge Cash Collateral Account, in accordance with the Swap Documents, to the F/X Hedge Obligations, and, (B) thereafter, the Agent shall apply amounts on deposit in the F/X Cash Collateral Account, in accordance with this Agreement and the priorities set forth in <u>clause (a)</u> above (with respect to the L/C Obligations) or the Swap Documents (with respect to the Commodity Hedge Obligations), *pro rata* to the L/C Obligations and the Commodity Hedge Obligations then outstanding, if any; and (iii)(A) until the Commodity Hedge Obligations are indefeasibly paid in full in cash and all transactions in connection therewith under the Swap Documents have terminated, the Agent shall only apply amounts on deposit in the Commodity Hedge Cash Collateral Account, in accordance with the Swap Documents, to the Commodity Hedge Obligations, and, (B) thereafter, the Agent shall apply amounts on deposit in the Commodity Hedge Cash Collateral Account, in accordance with this Agreement and the priorities set forth in <u>clause (a)</u> above (with respect to the L/C Obligations) or the Swap Documents (with respect to the F/X Hedge Obligations), *pro rata* to the L/C Obligations and the F/X Hedge Obligations then outstanding, if any.

    3.4    <u>Indemnity for Returned Payments</u>. If after receipt of any payment that is applied to the payment of all or any part of the Obligations, the Agent or any Letter of Credit Issuer, the Bank or any Affiliate of the Bank is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Agent or such Letter of Credit Issuer and the Account Party shall be liable to pay to the Agent and the Letter of Credit Issuers, and hereby do indemnify the Agent and the Letter of Credit Issuers and hold the Agent and the Letter of Credit Issuers harmless for the amount of such payment or proceeds surrendered. The provisions of this <u>Section 3.4</u> shall be and remain effective notwithstanding any contrary action which may have been taken by the Agent or any Letter of Credit Issuer in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Agent's and the Letter of Credit Issuers' rights under this Agreement and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable. The provisions of this <u>Section 3.4</u> shall survive the termination of this Agreement.

    3.5    <u>Agent's and Letter of Credit Issuers' Books and Records; Monthly Statements</u>. The Agent shall record the undrawn face amount of all outstanding Letters of Credit and the aggregate amount of unpaid reimbursement obligations outstanding with respect to the Letters of Credit from time to time on its books. In addition, each Letter of Credit Issuer may note the date and amount of each payment such reimbursement obligations in its books and records. Failure by Agent or any Letter of Credit Issuer to make such notation shall not affect the obligations of the Account Party with respect to Letters of Credit. The Account Party agree that the Agent's and each Letter of Credit Issuer's books and records showing the Obligations and the transactions pursuant to this Agreement and the other Letter of Credit Documents shall be admissible in any action or proceeding arising therefrom and shall constitute rebuttably presumptive proof thereof, irrespective of whether any Obligation is also evidenced by a promissory note or other instrument. The Agent will provide to the Account Party a monthly statement of payments and other transactions pursuant to this Agreement. Such statement shall be deemed correct, accurate, and binding on the Account Party and an account stated (except for reversals and reapplications of payments made as provided in <u>Section 3.3</u> and corrections of errors discovered by the Agent) unless the Account Party notifies the Agent in writing to the contrary within thirty (30) days after such statement

9

       029123-0013

is rendered.  In the event a timely written notice of objections is given by the Account Party, only the items to which exception is expressly made will be considered to be disputed by the Account Party.

## ARTICLE 4

### TAXES, YIELD PROTECTION AND ILLEGALITY

4.1    Taxes.

(a)    Any and all payments by the Account Party to each Letter of Credit Issuer or the Agent under this Agreement and any other Letter of Credit Document shall be made free and clear of, and without deduction or withholding for any Taxes.  In addition, the Account Party shall pay all Other Taxes.

(b)    The Account Party jointly and severally agree to indemnify and hold harmless each Letter of Credit Issuer and the Agent for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section) paid by any Letter of Credit Issuer or the Agent and any liability (including penalties, interest, additions to tax and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted (and the Agent and each Letter of Credit Issuer agrees to use good faith efforts to notify the Account Party of an assertion of an amount which the Account Party is liable for pursuant to this Section 4.1(b)).  Payment under this indemnification shall be made within thirty (30) days after the date such Letter of Credit Issuer or the Agent makes written demand therefor to the Account Party.

(c)    If the Account Party shall be required by law to deduct or withhold any Taxes or Other Taxes from or in respect of any sum payable hereunder to any Letter of Credit Issuer or the Agent, then:

(i)    the sum payable shall be increased as necessary so that, after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section), such Letter of Credit Issuer or the Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made;

(ii)    such Account Party shall make such deductions and withholdings;

(iii)    such Account Party shall pay the full amount deducted or withheld to the relevant taxing authority or other authority in accordance with applicable law; and

(iv)    without duplication of the amounts paid pursuant to clause (i) above, such Account Party shall also pay to each Letter of Credit Issuer or the Agent for the account of such Letter of Credit Issuer, at the time interest is paid, all additional amounts which the respective Letter of Credit Issuer specifies as necessary to preserve the after-tax yield such Letter of Credit Issuer would have received if such Taxes or Other Taxes had not been imposed.

(d)    At the Agent's request, within thirty (30) days after the date of any payment by the Account Party of Taxes or Other Taxes, the Account Party shall furnish the Agent the original or a certified copy of a receipt evidencing payment thereof, or other appropriate evidence of payment.

(e)    If the Account Party is required to pay additional amounts to any Letter of Credit Issuer or the Agent pursuant to subsection (c) of this Section 4.1, then such Letter of Credit Issuer shall

10

use reasonable efforts (consistent with legal and regulatory restrictions) to change the jurisdiction of its lending office so as to eliminate any such additional payment by such Account Party which may thereafter accrue, if such change in the judgment of such Letter of Credit Issuer is not otherwise disadvantageous to such Letter of Credit Issuer.

4.2 Increased Costs. If any Letter of Credit Issuer shall have determined that (i) the introduction of any Capital Adequacy Regulation, (ii) any change in any Capital Adequacy Regulation, (iii) any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof, or (iv) compliance by such Letter of Credit Issuer or any corporation or other entity controlling such Letter of Credit Issuer with any Capital Adequacy Regulation, affects or would affect the amount of capital required or expected to be maintained by such Letter of Credit Issuer or any corporation or other entity controlling such Letter of Credit Issuer and (taking into consideration such Letter of Credit Issuer's or such corporation's or other entity's policies with respect to capital adequacy and such Letter of Credit Issuer's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitments, credits or obligations under this Agreement, then, upon demand of such Letter of Credit Issuer to the Account Party through the Agent, the Account Party shall pay to such Letter of Credit Issuer, from time to time as specified by such Letter of Credit Issuer, additional amounts sufficient to compensate such Letter of Credit Issuer for such increase.

4.3 Certificates of Agent. If any Letter of Credit Issuer claims reimbursement or compensation under this Article 4, Agent shall determine the amount thereof and shall deliver to the Account Party (with a copy to the affected Letter of Credit Issuer) a certificate setting forth in reasonable detail the amount payable to the affected Letter of Credit Issuer, and such certificate shall be conclusive and binding on the Account Party in the absence of manifest error.

4.4 Withholding Tax.

(a) If any Letter of Credit Issuer is a "foreign corporation, partnership or trust" within the meaning of the Code, such Letter of Credit Issuer shall be entitled to claim exemption from, or a reduction of, U.S. withholding tax under Sections 1441 or 1442 of the Code or otherwise, and such Letter of Credit Issuer agrees with and in favor of the Account Party, to deliver to the Account Party:

(i) if such Letter of Credit Issuer is entitled to claim an exemption from, or a reduction of, withholding tax under a United States of America tax treaty, properly completed IRS Forms W-8BEN and W-8ECI before the payment of any interest in the first calendar year and before the payment of any interest in each third succeeding calendar year during which interest may be paid under this Agreement;

(ii) if such Letter of Credit Issuer is entitled to claim that interest paid under this Agreement is exempt from United States of America withholding tax because it is effectively connected with a United States of America trade or business of such Letter of Credit Issuer, two properly completed and executed copies of IRS Form W-8ECI before the payment of any interest is due in the first taxable year of such Letter of Credit Issuer and in each succeeding taxable year of such Letter of Credit Issuer during which interest may be paid under this Agreement, and IRS Form W-9; and

(iii) such other form or forms as may be required under the Code or other laws of the United States of America as a condition to exemption from, or reduction of, United States of America withholding tax.

Such Letter of Credit Issuer agrees to promptly notify the Account Party of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

    4.5    <u>Survival</u>. The agreements and obligations of the Account Party in this <u>Article 4</u> shall survive the payment of all other Obligations.

<div align="center">ARTICLE 5</div>

<div align="center">BOOKS AND RECORDS; FINANCIAL INFORMATION;<br>NOTICES; BANKRUPTCY CASE</div>

    5.1    <u>Financial Information</u>. The Account Party shall promptly furnish to each Letter of Credit Issuer all such financial information as the Agent shall reasonably request. Without limiting the foregoing, if and when the Company is no longer required to file Forms 10-K and 10-Q with the SEC, the Account Party will furnish to the Agent, in such detail as the Agent or the Letter of Credit Issuers shall request, the following:

    (a)    As soon as available, but in any event not later than one hundred five (105) days after the close of each Fiscal Year, consolidated audited balance sheets, and related consolidated income statements, cash flow statements and changes in stockholders' equity for the Company and its consolidated Subsidiaries for such Fiscal Year, together with the accompanying notes thereto, setting forth in each case in comparative form figures for the previous Fiscal Year, all in reasonable detail, fairly presenting in all material respects the financial position and the results of operations of the Company and its consolidated Subsidiaries or the Account Party on a consolidated basis, as applicable as at the date thereof and for the Fiscal Year then ended, and prepared in accordance with GAAP. The audited statements required to be delivered pursuant to the immediately preceding sentence shall be examined in accordance with generally accepted auditing standards by PricewaterhouseCoopers or other independent certified public accountants selected by the Company and reasonably satisfactory to the Agent, and accompanied by a report of such accountants on such statements, which report shall be unqualified as to scope of audit. The Company hereby authorizes the Agent to communicate directly with its certified public accountants and, by this provision, authorizes those accountants to disclose to the Agent any and all financial statements and other supporting financial documents and schedules relating to the Company and its consolidated Subsidiaries and to discuss directly with the Agent the finances and affairs of the Company and its consolidated Subsidiaries.

    (b)    As soon as available, but in any event not later than thirty (30) days after the end of each month (other than any month that is also the last month of a fiscal quarter), (i) unaudited balance sheets of the Company and its consolidated Subsidiaries on a consolidated basis as at the end of such month and as at the end of the prior Fiscal Year, (ii) consolidated unaudited income statements for the Company and its consolidated Subsidiaries on a consolidated basis for such month and for the period from the beginning of the Fiscal Year to the end of such month, and (iii) unaudited cash flow statements for the Company and its consolidated Subsidiaries on a consolidated basis for such month and for the period from the beginning of the Fiscal Year to the end of such month, all in reasonable detail, fairly presenting the financial position and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis as at the date thereof and for such periods, and prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) applied consistently with the audited Financial Statements required to be delivered pursuant to <u>Section 5.2(a)</u>. The Account Party shall certify by a certificate signed by its chief financial officer that all such statements have been prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) and present fairly the financial position of the Company and its consolidated Subsidiaries on a consolidated basis as at the dates thereof

<div align="center">12</div>

                                                              

and the results of operations of the Company and its consolidated Subsidiaries on a consolidated basis for the periods then ended.

(c)      As soon as available, but in any event not later than forty-five (45) days after the end of each of the first three fiscal quarters of each Fiscal Year, unaudited balance sheets of the Company and its consolidated Subsidiaries on a consolidated basis as at the end of such fiscal quarter, and consolidated unaudited income statements and cash flow statements for the Company and its consolidated Subsidiaries on a consolidated basis for such fiscal quarter and for the period from the beginning of the Fiscal Year to the end of such fiscal quarter, all in reasonable detail, fairly presenting the financial position and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis as at the date thereof and for such periods, and, in each case, in comparable form, figures for the corresponding period in the prior Fiscal Year, and prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) applied consistently with the audited Financial Statements required to be delivered pursuant to Section 5.1(a). The Account Party shall certify by a certificate signed by its chief financial officer that all such statements have been prepared in accordance with GAAP (except for the absence or abbreviation of footnotes and subject to normal year-end adjustments) and present fairly the financial position of the Company and its consolidated Subsidiaries on a consolidated basis as at the dates thereof and the results of operations of the Company and its consolidated Subsidiaries on a consolidated basis for the periods then ended.

(d)      Within sixty (60) days after the end of each fiscal quarter a certificate of the Account Party signed by its chief financial officer stating that, except as explained in reasonable detail in such certificate, (A) all of the representations and warranties of the Account Party contained in this Agreement and the other Letter of Credit Documents are correct and complete in all material respects as at the last day of such quarter as if made at such time, except for those that speak as of a particular date, (B) the Account Party is, at the date of such certificate, in compliance in all material respects with all of its covenants and agreements in this Agreement and the other Letter of Credit Documents, and (C) no Default or Event of Default then exists or existed during the period covered by the Financial Statements for such month. If such quarterly certificate discloses that a representation or warranty is not correct or complete, or that a covenant has not been complied with, or that a Default or Event of Default existed or exists, such certificate shall set forth what action the Account Party has taken or propose to take with respect thereto.

(e)      Such additional information as the Agent and/or any Letter of Credit Issuer may from time to time reasonably request regarding the financial and business affairs of the Company or any Subsidiary.

5.2      Notices to the Letter of Credit Issuers. Promptly upon a Responsible Officer becoming aware thereof, the Account Party shall notify the Agent and the Letter of Credit Issuers in writing of the following matters:

(a)      any Default or Event of Default;

(b)      any pending or threatened action, suit, or proceeding, by any Person, or any pending or threatened investigation by a Governmental Authority; or the rendering of any judgment against the Account Party in any action, suit or proceeding awarding damages, which would reasonably be expected to have a Material Adverse Effect;

Each notice given under this Section shall describe the subject matter thereof in reasonable detail, and shall set forth the action that the Account Party, any Other Subsidiary, or any ERISA Affiliate, as applicable, has taken or proposes to take with respect thereto.

CH\1135197.13                                                                                      029123-0013

5.3     Bankruptcy Case. Promptly upon the filing of each motion, application or similar filing relating to the Bankruptcy Case and promptly upon the entry of each order, decree or judgment relating to one or more of the Bankruptcy Case, the Account Party shall provide to, or cause to be provided to, the Agent's counsel a copy of each such motion, application, filing, order, decree or judgment; provided, however, that this provision shall be deemed satisfied by inclusion of the Agent's counsel on the list maintained in the Bankruptcy Case pursuant to Fed.R.Bankr.P. 2002 and actual service of the Agent's counsel by the Account Party of all filings made by the Account Party in the Bankruptcy Case and all orders, decrees or judgments relating to all such filings by the Account Party.

## ARTICLE 6

## GENERAL WARRANTIES AND REPRESENTATIONS

The Account Party warrants and represents to the Agent and the Letter of Credit Issuers that, except as hereafter disclosed to and accepted by the Agent and the Majority Letter of Credit Issuers in writing and subject to the entry by the Bankruptcy Court of the Facility Order:

6.1     Authorization, Validity, and Enforceability of this Agreement and the Letter of Credit Documents. The Account Party has the corporate or other legal power and authority to execute, deliver and perform this Agreement and the other Letter of Credit Documents to which it is a party and to incur the Obligations. The Account Party has taken all necessary action (including obtaining approval of its stockholders if necessary) to authorize its execution, delivery, and performance of this Agreement and the other Letter of Credit Documents to which it is a party. This Agreement and the other Letter of Credit Documents to which it is a party have been duly executed and delivered by the Account Party, and constitute the legal, valid and binding obligations of the Account Party, enforceable against it in accordance with their respective terms. The Account Party's execution, delivery, and performance of this Agreement and the other Letter of Credit Documents to which it is a party do not and will not (i) result in the imposition of any Lien (other than the Liens granted under the Letter of Credit Documents) upon the property of the Account Party, by reason of the terms of (1) any contract, mortgage, lease, agreement, indenture, or instrument to which the Account Party is a party or which is binding upon it (including any of the foregoing entered into after the Petition Date), (2) any Requirement of Law applicable to the Account Party, or (3) the certificate of incorporation or by-laws of the Account Party or (ii) conflict with, or constitute a violation of (1) any contract, mortgage, lease, agreement, indenture, or instrument to which the Account Party is a party or which is binding upon it and that was entered into after the Petition Date, except where such conflict, violation or breach would not reasonably be expected to have a Material Adverse Effect, (2) any Requirement of Law applicable to the Account Party, except where such conflict, violation or breach would not reasonably be expected to have a Material Adverse Effect or (3) the certificate of incorporation or by-laws of the Account Party.

6.2     Validity and Priority of Security Interest. The provisions of this Agreement and the other Letter of Credit Documents create legal and valid Liens on the Cash Collateral Accounts and all amounts deposited therein or credited thereto in favor of the Agent, for the ratable benefit of the Agent and the Letter of Credit Issuers, and such Liens constitute perfected and continuing Liens on such accounts and amounts, having the priority set forth in the Facility Order.

6.3     Account Party's Organization and Qualification. The Account Party (a) is duly organized or incorporated and validly existing in good standing under the laws of the state of Connecticut, (b) is qualified to do business and is in good standing in all jurisdictions in which the failure to so qualify or be in good standing would reasonably be expected to have a Material Adverse Effect and (c) has all requisite power and authority to conduct its business and to own its property, except where the failure to have such power and authority could not reasonably be expected to have a Material Adverse Effect.

14

6.4     Litigation. Except as set forth on Schedule 6.4, there is no pending, or to the best of the Account Party's knowledge threatened, action, suit, proceeding, or counterclaim against the Company or any of its consolidated Subsidiaries before any Governmental Authority or arbitrator or panels of arbitrators that (i) may not be stayed as a result of the Bankruptcy Case and (ii) would reasonably be expected to have a Material Adverse Effect.

6.5     Regulated Entities. The Account Party and no Person controlling the Account Party, is an "Investment Company" within the meaning of the Investment Company Act of 1940. The Account Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act, any state public utilities code or law, or any other federal or state statute or regulation limiting its ability to incur indebtedness.

6.6     Use of Proceeds; Margin Regulations. The proceeds of the Letters of Credit are to be used solely for general corporate purposes arising after the date hereof. Neither the Account Party or any Other Subsidiary is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock. No part of the proceeds of any Letter of Credit will be used in violation of Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

6.7     Full Disclosure. None of the representations or warranties made by the Account Party in the Letter of Credit Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in any exhibit, report, statement or certificate furnished by or on behalf of the Account Party or any Subsidiary in connection with the Letter of Credit Documents (including the offering and disclosure materials delivered by or on behalf of the Account Party to the Letter of Credit Issuers prior to the Closing Date), contains any untrue statement of a material fact as of the date of any such exhibit, report, statement or certificate.

6.8     Governmental Authorization. No approval, consent, exemption, authorization, or other action by, or notice to (other than notices of default hereunder), or filing with, any Governmental Authority or other Person (other than the Bankruptcy Court) is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Account Party of this Agreement or any other Letter of Credit Document, except the Bankruptcy Court and notices to creditors and stockholders required by the Bankruptcy Code.

ARTICLE 7

AFFIRMATIVE AND NEGATIVE COVENANTS

The Account Party covenants to the Agent and each Letter of Credit Issuer that so long as any of the Obligations remain outstanding (other than not yet asserted indemnification obligations) or this Agreement is in effect:

7.1     Legal Existence and Good Standing. The Account Party shall maintain its legal existence, and shall maintain its qualification and good standing in all jurisdictions in which the failure to maintain such existence and qualification or good standing would reasonably be expected to have a Material Adverse Effect.

7.2     Compliance with Law and Agreements. The Account Party shall comply, in all material respects, with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business (including the Federal Fair Labor Standards Act and all Environmental Laws), except where the failure to do so could not reasonably be expected to have a Material Adverse Effect. The Account Party

15

shall not modify, amend or alter its certificate of incorporation other than in a manner which does not adversely affect the rights of the Letter of Credit Issuers or the Agent in any material respect.

7.3     Mergers and Consolidations. Except for the plan of reorganization in the Bankruptcy Case, the Account Party shall not enter into any transaction of merger, reorganization, or consolidation or agree to do any of the foregoing (or apply to the Bankruptcy Court for authority to do so) except for any merger or consolidation of any Subsidiary of the Company with and into the Account Party or providing its consent to or approval of any merger or consolidation of any Subsidiary of the Company with and into another Subsidiary of the Company.

7.4     Use of Proceeds. The Account Party shall not, nor shall the Account Party cause or permit any Other Subsidiary to, use any portion of the Letter of Credit proceeds, directly or indirectly, (i) to purchase or carry Margin Stock, (ii) to repay or otherwise refinance indebtedness of the Account Party or others incurred to purchase or carry Margin Stock, (iii) to extend credit for the purpose of purchasing or carrying any Margin Stock, (iv) to acquire any security in any transaction that is subject to Section 13 or 14 of the Exchange Act, or (v) for any purpose other than general corporate purposes.

7.5     Funding of Cash Collateral Accounts.

        (a)     F/X Hedge Cash Collateral Account. After notice (i) by the Agent to the Account Party not later than 10:00 AM (New York time) on any Business Day, the Account Party shall deposit, or cause to be deposited, not later than 4:00 PM on such Business Day, in the F/X Hedge Cash Collateral Account, cash in the amount specified in such notice, which shall be the amount determined by the Agent to be necessary to cause the aggregate balance of cash on deposit in the F/X Hedge Cash Collateral Account to be equal to at least 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded upwards to the nearest $250,000, and (ii) by the Account Party to the Agent not later than 10:00 AM (New York time) on any Business Day, the Bank shall deposit, or cause to be deposited, not later than the close of such Business Day, in the account designated by the Account Party in such notice, cash in the amount specified in such notice, which shall be the amount agreed by the Account Party and the Agent to be the amount by which the balance of the F/X Hedge Cash Collateral Account exceeds an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded up to the nearest $100,000 (but in any event such amount shall not cause the balance of the F/X Hedge Cash Collateral Account to be less than an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations on such Business Day).

        (b)     Commodity Cash Collateral Account. After notice (i) by the Agent to the Account Party not later than 10:00 AM (New York time) on any Business Day, the Account Party shall deposit, or cause to be deposited, not later than 4:00 PM on such Business Day, in the Commodity Hedge Cash Collateral Account, cash in the amount specified in such notice, which shall be the amount determined by the Agent to be necessary to cause the aggregate balance of cash on deposit in the Commodity Hedge Cash Collateral Account to be equal to at least 115% of the mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded upwards to the nearest $250,000, and (ii) by the Account Party to the Agent not later than 10:00 AM (New York time) on any Business Day, the Bank shall deposit, or cause to be deposited, not later than the close of such Business Day, in the account designated by the Account Party in such notice, cash in the amount specified in such notice, which shall be the amount agreed by the Account Party and the Agent to be the amount by which the balance of the Commodity Hedge Cash Collateral Account exceeds an amount equal to 115% of the

16

mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations on such Business Day, it being understood and agreed that any amount required to be so deposited shall be rounded up to the nearest $100,000 but in any event such amount shall not cause the balance of the Commodity Hedge Cash Collateral Account to be less than an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations on such Business Day).

7.6    Further Assurances. The Account Party shall execute and deliver, or cause to be executed or delivered, to the Agent and/or the Letter of Credit Issuers such documents and agreements, and shall take or cause to be taken such actions, as the Agent or any Letter of Credit Issuer may, from time to time, request to carry out the terms and conditions of this Agreement and the other Letter of Credit Documents.

ARTICLE 8

CONDITIONS TO ISSUANCE

8.1    Conditions Precedent to Issuance of Initial Letter of Credit. The obligation of the Agent to cause the Letter of Credit Issuer to issue the initial Letter of Credit (excluding the Existing Letters of Credit), and the obligation of a Letter of Credit Issuer to issue the initial Letter of Credit, are subject to the following conditions precedent having been satisfied in a manner satisfactory to the Agent and each Letter of Credit Issuer (or waived in writing by the Agent and each Letter of Credit Issuer):

(a)    This Agreement and the other Letter of Credit Documents shall have been executed by each party thereto and the Account Party shall have performed and complied with all covenants, agreements and conditions contained herein and the other Letter of Credit Documents which are required to be performed or complied with by the Account Party before or on such date.

(b)    All representations and warranties made hereunder and in the other Letter of Credit Documents shall be true and correct as if made on such date.

(c)    No Default or Event of Default shall have occurred and be continuing after giving effect to the Letters of Credit to be issued on such date.

(d)    The Agent shall have received copies of (i) the certificate of incorporation , (ii) the bylaws or other similar agreement and all amendments thereto, (iii) resolutions of the Board of Directors of the Account Party approving and adopting the Letter of Credit Documents to which it is a party, the transactions contemplated therein and authorizing execution and delivery thereof, in each case, of the Account Party and certified by a secretary or assistant secretary of the Account Party to be true and correct and in force and effect as of such date and (iv) a certificate of the Secretary or Assistant Secretary (or equivalent thereof) of the Account Party certifying as to the incumbency of the officers of the Account Party executing one or more Letter of Credit Documents.

(e)    The Account Party shall have paid all fees and expenses of the Agent and the Attorney Costs incurred in connection with any of the Letter of Credit Documents and the transactions contemplated thereby to the extent invoiced.

(f)    All proceedings taken in connection with the execution of this Agreement, all other Letter of Credit Documents and all documents and papers relating thereto shall be satisfactory in form, scope, and substance to the Agent and the Letter of Credit Issuers.

17

(g)    All orders entered in the Bankruptcy Case shall be in form and substance reasonably satisfactory to the Agent and its counsel.

(h)    Without limiting the generality of the items described above, the Account Party shall have delivered or caused to be delivered to the Agent (in form and substance reasonably satisfactory to the Agent), the resolutions, documents, agreements, certificates and other items required by this Section 8.1.

(i)    The Agent shall have received a signed copy of the order (the "Facility Order") of the Bankruptcy Court in substantially the form of Exhibit A authorizing and approving the transactions contemplated hereby and the Letter of Credit Documents and the granting of the superpriority claim status and liens as described in Section 1.3 and the Facility Order. The Facility Order (i) shall be in form and substance satisfactory to the Agent, (ii) shall be certified by the Clerk of the Bankruptcy Court as having been duly entered, (iii) shall have authorized extensions of credit by the Letter of Credit Issuers in amounts up to $100,000,000, (iv) shall approve the payment by the Account Party of all of the fees set forth in Sections 2.3, 2.4 and 2.5, and (v) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.

(j)    The Account Party shall have (i) established each of the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account and the Commodity Hedge Cash Collateral Account, (ii) deposited in the F/X Hedge Collateral Account cash collateral in an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the F/X Hedge Obligations as of the Closing Date as determined by the Agent, (iii) deposited in the Commodity Hedge Collateral Account cash collateral in an amount equal to 115% of the mark-to-market exposure of the Bank with respect to the Commodity Hedge Obligations as of the Closing Date as determined by the Agent and (iv) entered into account control agreements, in form and substance satisfactory to the Agent, with respect to each of the Cash Collateral Accounts.

The acceptance by the Account Party of any Letters of Credit issued on any date shall be deemed to be a representation and warranty made by the Account Party to the effect that all of the conditions precedent to the issuance of such Letters of Credit have been satisfied, with the same effect as delivery to the Agent and the Letter of Credit Issuers of a certificate signed by a Responsible Officer of the Account Party, dated such date, to such effect.

Execution and delivery to the Agent by a Letter of Credit Issuer of a counterpart of this Agreement shall be deemed confirmation by such Letter of Credit Issuer that (i) the decision of such Letter of Credit Issuer to execute and deliver to the Agent an executed counterpart of this Agreement was made by such Letter of Credit Issuer independently and without reliance on the Agent or any other Letter of Credit Issuer as to the satisfaction of any condition precedent set forth in this Section 8.1, and (ii) all documents sent to such Letter of Credit Issuer for approval consent, or satisfaction were acceptable to such Letter of Credit Issuer.

8.2    Conditions Precedent to Each Issuance. The obligation of the Agent to cause a Letter of Credit Issuer to issue any Letter of Credit and the obligation of any Letter of Credit Issuer to issue any Letter of Credit shall be subject to the further conditions precedent that on and as of the date of any such extension of credit (provided, however, that such conditions precedent are not conditions for any drawing under a Letter of Credit):

(a)    The following statements shall be true, and the acceptance by the Account Party of any extension of credit shall be deemed to be a statement to the effect set forth in clauses (i) and (ii)

with the same effect as the delivery to the Agent and the Letter of Credit Issuers of a certificate signed by a Responsible Officer of the Account Party, dated the date of such extension of credit, stating that:

    (i)  The representations and warranties contained in this Agreement and the other Letter of Credit Documents are correct in all material respects on and as of the date of such extension of credit as though made on and as of such date, other than any such representation or warranty which relates to a specified prior date and except to the extent the Agent and the Letter of Credit Issuers have been notified in writing by the Account Party that any representation or warranty is not correct and the Majority Letter of Credit Issuers have explicitly waived in writing compliance with such representation or warranty; and

    (ii)  No event has occurred and is continuing, or would result from such extension of credit, which constitutes a Default or an Event of Default; and

    (iii)  No event has occurred and is continuing, or would result from such extension of credit, which has had or would reasonably be expected to have a Material Adverse Effect.

  (b)  The aggregate face amount of the requested Letters of Credit shall not exceed Availability.

  (c)  The Bankruptcy Case shall not have been dismissed or converted to chapter 7 of the Bankruptcy Code, the Account Party shall not have filed an application for an order dismissing the Bankruptcy Case or converting its or any other Account Party's Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, and no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Bankruptcy Case. No application shall have been filed by the Account Party for the approval of any other superpriority administrative claim in the Bankruptcy Case which is *pari passu* with or senior to the claims of the Agent and/or any Letter of Credit Issuer arising under this Agreement against the Account Party and the Facility Order shall not have been stayed, modified, amended, reversed, rescinded or vacated.

## ARTICLE 9

### DEFAULT; REMEDIES

  9.1  <u>Events of Default</u>. It shall constitute an event of default ("<u>Event of Default</u>") if any one or more of the following shall occur for any reason:

  (a)  (i) any failure by the Account Party to pay any reimbursement obligations relating to Letters of Credit when due, whether upon demand or otherwise, or (ii) any failure by the Account Party to pay any interest on any of the Obligations or any fees or other Obligations or other amount owing hereunder within three (3) Business Days of the applicable due date, whether upon demand or otherwise;

  (b)  any representation or warranty made or deemed made by the Account Party in this Agreement or in any of the other Letter of Credit Documents, any Financial Statement, or any certificate furnished by the Account Party or any Other Subsidiary at any time to the Agent or any Letter of Credit Issuer pursuant to any Letter of Credit Document shall prove to be untrue in any material respect as of the date on which made, deemed made, or furnished;

(c)     (i) any default shall occur in the observance or performance of any of the covenants and agreements contained in Sections 7.1 or 7.3, (ii) any default shall occur in the observance or performance of any of the covenants and agreements contained in Section 7.5, and such default shall continue for two (2) Business Days or more, (iii) any default shall occur in the observance or performance of any of the covenants and agreements contained in Sections 5.1 or 5.2, and such default shall continue for five (5) Business Days or more; or (iv) any default shall occur in the observance or performance of any of the other covenants or agreements contained in any other Section of this Agreement, any other Letter of Credit Document or any Swap Document, and such default described in this clause (iv) shall continue for fifteen (15) days or more;

(d)     the Account Party shall file a certificate of dissolution under applicable state law or shall be liquidated, dissolved or wound-up or shall commence any action or proceeding for dissolution, winding-up or liquidation, or shall take any corporate action in furtherance thereof;

(e)     all or any material part of the property of the Account Party and its Subsidiaries, taken as a whole, shall be nationalized, expropriated or condemned, seized or otherwise appropriated, or custody or control of such property or of the Account Party shall be assumed by any Governmental Authority or any court of competent jurisdiction at the instance of any Governmental Authority, except where contested in good faith by proper proceedings diligently pursued where a stay of enforcement is in effect;

(f)     other than in accordance with its terms or by agreement of its parties, any Letter of Credit Document shall be terminated, revoked or declared void or invalid or unenforceable or challenged by the Account Party or any other obligor;

(g)     one or more judgments, orders, decrees or arbitration awards is entered against the Account Party involving in the aggregate liability (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage) as to any single or related or unrelated series of transactions, incidents or conditions, of $10,000,000 or more, and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof;

(h)     there is filed against the Account Party or any Other Subsidiary any action, suit or proceeding under any federal or state racketeering statute (including the Racketeer Influenced and Corrupt Organization Act of 1970), which action, suit or proceeding (i) is not dismissed within one hundred twenty (120) days, and (ii) would reasonably be expected to result in the confiscation or forfeiture of any material portion of the assets of the Account Party;

(i)     for any reason any Letter of Credit Document ceases to be in full force and effect;

(j)     (i) an ERISA Event shall occur with respect to a Pension Plan or Multi-employer Plan which has resulted or would reasonably be expected to result in liability of the Account Party under Title IV of ERISA to the Pension Plan, Multi-employer Plan or the PBGC and such liability would reasonably be expected to cause a Material Adverse Effect; or (ii) the Account Party or any ERISA Affiliate shall fail to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multi-employer Plan in an aggregate amount in excess of $25,000,000;

(k)     the Bankruptcy Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or the Account Party shall file an application for an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code; or

029123-0013

an application shall be filed by the Account Party for the approval of any material superpriority administrative claim or lien in the Bankruptcy Case which is *pari passu* with or senior to the claims or liens of the Agent and/or any Letter of Credit Issuer against the Account Party contemplated in Sections 1.3 and 1.4 of this Agreement, or there shall arise any such material *pari passu* or senior superpriority administrative claim or lien;

(l)       the Account Party shall propose a confirmation order for the Account Party's plan of reorganization currently pending in the Bankruptcy Case, or an order by the Bankruptcy Court shall be entered confirming the Account Party's plan of reorganization currently pending in the Bankruptcy Case, or the Account Party shall propose another plan of reorganization in the Bankruptcy Case which, in any of the above cases, does not include a provision for termination of the Commitment and indefeasible payment in full in cash of all L/C Obligations of the Account Party hereunder and under the other Letter of Credit Documents (including the cancellation and return of all Letters of Credit and/or maintenance of cash collateral in the L/C Cash Collateral Account with respect to such Letters of Credit in an amount equal to the aggregate undrawn amount of such Letters of Credit) on or before the effective date of such plan of reorganization;

(m)       an order by the Bankruptcy Court shall be entered, or the Account Party shall file an application for an order, dismissing the Bankruptcy Case which does not require a provision for termination of the Commitments and indefeasible payment in full in cash of all Obligations of the Account Party hereunder and under the other Letter of Credit Documents (including the cancellation and return of all Letters of Credit and/or maintenance of cash collateral in the L/C Cash Collateral Account with respect to such Letters of Credit in an amount equal to the aggregate undrawn amount of such Letters of Credit) prior to any such dismissal;

(n)       an order by the Bankruptcy Court shall be entered in or with respect to the Bankruptcy Case or the Account Party shall file an application for an order with respect to the Bankruptcy Case (i) to revoke, reverse, stay, rescind, modify, vacate, supplement or amend the Facility Order or (ii) to permit any material administrative expense or any material claim (now existing or hereafter arising, of any kind or nature whatsoever) to have an administrative priority as to the Account Party equal or superior to the priority of the claims of the Agent and the Letter of Credit Issuers in respect of the Obligations;

(o)       an application for any of the orders described in any or all of clauses (j), (k), (l), or (m) above shall be made by a Person other than the Account Party and such application is not contested by the applicable Account Party in good faith and the relief requested is granted in an order that is not vacated, reversed, rescinded or stayed pending appeal; or

(p)       (i) from and after the date of entry thereof, the Facility Order shall cease to be in full force and effect, or (ii) the Account Party shall fail to comply with the terms of the Facility Order in any material respect, or (iii) the Facility Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or the Account Party shall apply for authority to do so); or

(q)       The Bankruptcy Court shall enter an order appointing a trustee in the Case or appointing a responsible officer or an examiner with powers beyond the duty to investigate and report, as set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, in the Bankruptcy Case.

9.2       Remedies.

(a)       If a Default or an Event of Default exists, the Agent may, in its discretion, and shall, at the direction of the Majority Letter of Credit Issuers, without further order of or application to the

21

Bankruptcy Court as permitted by the Facility Order, do one or more of the following at any time or times and in any order, without notice to or demand on the Account Party restrict or refuse to provide Letters of Credit. If an Event of Default exists, the Agent shall, at the direction of the Majority Letter of Credit Issuers, do one or more of the following, in addition to the actions described in the preceding sentence, at any time or times and in any order, without notice to or demand on the Account Party: (A) terminate the Commitments and this Agreement; (B) declare any or all Obligations to be immediately due and payable; provided, however, that upon the occurrence of any Event of Default described in Sections 9.1(m), (n), (o), (p), or (q), the Commitments shall automatically and immediately expire and all Obligations shall automatically become immediately due and payable without notice or demand of any kind; and (C) pursue its other rights and remedies under the Letter of Credit Documents and applicable law.

(b)     If an Event of Default has occurred and is continuing, the Agent may, subject to Section 3.3(b) and any notice requirements set forth in the Facility Order, at any time, apply all amounts on deposit in the Cash Collateral Accounts to the satisfaction of the Obligations then outstanding. The Agent will return any excess to the Account Party and the Account Party shall remain liable for any deficiency.

(c)     If an Event of Default occurs, the Account Party hereby waives all rights to notice and hearing prior to the exercise by the Agent of the Agent's rights to apply amounts on deposit in the Cash Collateral Accounts without judicial process.

(d)     If an Event of Default has occurred and is continuing, subject only to any notice requirements set forth in the Facility Order, all stays and injunctions, including the automatic stay pursuant to Bankruptcy Code section 362, shall be vacated and terminated to the extent necessary to permit the Agent and the Letter of Credit Issuers full exercise of all of their rights and remedies under all applicable bankruptcy and non-bankruptcy law.

ARTICLE 10

TERM AND TERMINATION

10.1     Term and Termination. The term of this Agreement shall end on the Stated Termination Date unless sooner terminated in accordance with the terms hereof. The Agent, upon direction from the Majority Letter of Credit Issuers, may terminate this Agreement without notice upon the occurrence of an Event of Default. Upon the effective date of termination of this Agreement for any reason whatsoever, all Obligations (including all unpaid principal, accrued and unpaid interest and any early termination or prepayment fees or penalties, but excluding not yet asserted indemnification obligations) shall become immediately due and payable and the Account Party shall immediately arrange for the cancellation and return of Letters of Credit then outstanding (or maintenance of cash collateral in the Cash Collateral Account with respect to such Letters of Credit in an amount equal to the aggregate undrawn amount of such Letters of Credit). Notwithstanding the termination of this Agreement, until all Obligations are indefeasibly paid and performed in full in cash, the Account Party shall remain bound by the terms of this Agreement and shall not be relieved of any of its Obligations hereunder or under any other Letter of Credit Document, and the Agent and the Letter of Credit Issuers shall retain all their rights and remedies hereunder.

ARTICLE 11

AMENDMENTS; WAIVERS; ASSIGNMENTS; SUCCESSORS

11.1     Amendments and Waivers.

22

(a)    No amendment or waiver of any provision of this Agreement or any other Letter of Credit Document, and no consent with respect to any departure by the Account Party therefrom, shall be effective unless the same shall be in writing and signed by the Majority Letter of Credit Issuers (or by the Agent at the written request of the Majority Letter of Credit Issuers) and the Account Party (or the Account Party) and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Letter of Credit Issuers and the Account Party (or the Account Party) and acknowledged by the Agent, do any of the following:

      (i)    increase or extend the Commitment of any Letter of Credit Issuer;

      (ii)    postpone or delay any date fixed by this Agreement or any other Letter of Credit Document for any payment of interest, fees or other amounts due to the Letter of Credit Issuers (or any of them) hereunder or under any other Letter of Credit Document;

      (iii)    reduce the principal of, or the rate of interest specified herein on any Obligation, or any fees or other amounts payable hereunder or under any other Letter of Credit Document;

      (iv)    change the percentage of the Commitments or of the aggregate unpaid amount of the Obligations which is required for the Letter of Credit Issuers or any of them to take any action hereunder;

      (v)    amend this Section or any provision of this Agreement providing for consent or other action by all Letter of Credit Issuers;

      (vi)    change the definition of "Majority Letter of Credit Issuers"; or

      (vii)    increase the Total Facility;

provided, however, that no amendment, waiver or consent shall, unless in writing and signed by the Agent, affect the rights or duties of the Agent under this Agreement or any other Letter of Credit Document; provided, further, that Schedule 1.1 hereto (Commitments) may be amended from time to time by the Agent alone to reflect assignments of Commitments in accordance herewith.

(b)    If any fees are paid to the Letter of Credit Issuers as consideration for amendments, waivers or consents with respect to this Agreement, at Agent's election, such fees may be paid only to those Letter of Credit Issuers that agree to such amendments, waivers or consents within the time specified for submission thereof.

11.2    Assignments.

(a)    Any Letter of Credit Issuer may, with the written consent of the Agent (which consents shall not be unreasonably withheld or delayed), assign and delegate to one or more Eligible Assignees (provided that no consent of the Agent or the Account Party shall be required in connection with any assignment and delegation by a Letter of Credit Issuer to an Affiliate of such Letter of Credit Issuer) (each an "Assignee") all, or any ratable part of all of the Commitments and the other rights and obligations of such Letter of Credit Issuer hereunder, in a minimum amount of $5,000,000 (provided that, unless an assignor Letter of Credit Issuer has assigned and delegated all of its Commitments, no such assignment and/or delegation shall be permitted unless, after giving effect thereto, such assignor Letter of

23

Credit Issuer retains a Commitment in a minimum amount of $5,000,000); provided, however, that the Account Party and the Agent may continue to deal solely and directly with such Letter of Credit Issuer in connection with the interest so assigned to an Assignee until (i) written notice of such assignment, together with payment instructions, addresses and related information with respect to the Assignee, shall have been given to the Account Party and the Agent by such Letter of Credit Issuer and the Assignee; (ii) such Letter of Credit Issuer and its Assignee shall have delivered to the Account Party and the Agent an Assignment and Acceptance in the form of Exhibit B ("Assignment and Acceptance") duly executed by such Letter of Credit Issuer and its Assignee, and such Assignment and Acceptance shall have been acknowledged by the Agent; and (iii) the assignor Letter of Credit Issuer or Assignee has paid to the Agent a processing fee in the amount of $3,500.  The Account Party agree to promptly execute and deliver new promissory notes and replacement promissory notes as reasonably requested by the Agent to evidence assignments of the Commitments in accordance herewith.

(b)     From and after the date that the Agent notifies the assignor Letter of Credit Issuer that it has received an executed Assignment and Acceptance and payment of the above-referenced processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations have been assigned to it pursuant to such Assignment and Acceptance, shall have the rights and obligations of a Letter of Credit Issuer under the Letter of Credit Documents, and (ii) the assignor Letter of Credit Issuer shall, to the extent that rights and obligations hereunder and under the other Letter of Credit Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Letter of Credit Issuer's rights and obligations under this Agreement, such Letter of Credit Issuer shall cease to be a party hereto).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Letter of Credit Issuer thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Letter of Credit Issuer makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Letter of Credit Document furnished pursuant hereto; (ii) such assigning Letter of Credit Issuer makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Account Party or the performance or observance by the Account Party of any of its obligations under this Agreement or any other Letter of Credit Document furnished pursuant hereto; (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such Assignee will, independently and without reliance upon the Agent, such assigning Letter of Credit Issuer or any other Letter of Credit Issuer, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such Assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Agent by the terms hereof, together with such powers, including the discretionary rights and incidental power, as are reasonably incidental thereto; and (vi) such Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Letter of Credit Issuer.

(d)     Immediately upon satisfaction of the requirements of Section 11.2(a), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom. The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Letter of Credit Issuer pro tanto.

24

(e)    Notwithstanding any other provision in this Agreement, any Letter of Credit Issuer may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the FRB or U.S. Treasury Regulation 31 CFR §203.14, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

ARTICLE 12

THE AGENT

12.1    Appointment and Authorization. Each Letter of Credit Issuer hereby designates and appoints Bank as its Agent under this Agreement and the other Letter of Credit Documents, and each Letter of Credit Issuer hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and each other Letter of Credit Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Letter of Credit Document, together with such powers as are reasonably incidental thereto. The Agent agrees to act as such on the express conditions contained in this Article 12. The provisions of this Article 12 are solely for the benefit of the Agent and the Letter of Credit Issuers and none of the Account Party shall have any rights as a third party beneficiary of any of the provisions contained herein. Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Letter of Credit Document, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with any Letter of Credit Issuer, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Letter of Credit Document or otherwise exist against the Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Agreement with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Except as expressly otherwise provided in this Agreement, the Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which the Agent is expressly entitled to take or assert under this Agreement and the other Letter of Credit Documents, including the exercise of remedies pursuant to Section 9.2, and any action so taken or not taken shall be deemed consented to by the Letter of Credit Issuers.

12.2    Delegation of Duties. The Agent may execute any of its duties under this Agreement or any other Letter of Credit Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct.

12.3    Liability of Agent. None of the Agent-Related Persons shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Letter of Credit Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (ii) be responsible in any manner to any of the Letter of Credit Issuers for any recital, statement, representation or warranty made by the Account Party or any Other Subsidiary or Affiliate of the Account Party, or any officer thereof, contained in this Agreement or in any other Letter of Credit Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Letter of Credit Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Letter of Credit Document, or for any failure of the Account Party or any other party to any

25

029123-0013

Letter of Credit Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Letter of Credit Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Letter of Credit Document, or to inspect the properties, books or records of the Account Party or any Other Subsidiaries or Affiliates.

12.4    Reliance by Agent. The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Account Party), independent accountants and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Letter of Credit Document unless it shall first receive such advice or concurrence of the Majority Letter of Credit Issuers as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Letter of Credit Issuers against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Letter of Credit Document in accordance with a request or consent of the Majority Letter of Credit Issuers (or all Letter of Credit Issuers if so required by Section 11.1) and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Letter of Credit Issuers.

12.5    Notice of Default. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Agent shall have received written notice from a Letter of Credit Issuer or the Account Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Agent will notify the Letter of Credit Issuers of its receipt of any such notice. The Agent shall take such action with respect to such Default or Event of Default as may be requested by the Majority Letter of Credit Issuers in accordance with Section 9; provided, however, that unless and until the Agent has received any such request, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

12.6    Credit Decision. Each Letter of Credit Issuer acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by the Agent hereinafter taken, including any review of the affairs of the Account Party and its Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Letter of Credit Issuer. Each Letter of Credit Issuer represents to the Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Account Party and its Affiliates, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Account Party. Each Letter of Credit Issuer also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Letter of Credit Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Account Party. Except for notices, reports and other documents expressly herein required to be furnished to the Letter of Credit Issuers by the Agent, the Agent shall not have any duty or responsibility to provide any Letter of Credit Issuer with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Account Party which may come into the possession of any of the Agent-Related Persons.

26

12.7    Indemnification. Whether or not the transactions contemplated hereby are consummated, the Letter of Credit Issuers shall indemnify upon demand the Agent-Related Persons (to the extent not reimbursed by or on behalf of the Account Party and without limiting the obligation of the Account Party to do so), in accordance with their Pro Rata Shares, from and against any and all Indemnified Liabilities as such term is defined in Section 13.11; provided, however, that no Letter of Credit Issuer shall be liable for the payment to the Agent-Related Persons of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct. Without limitation of the foregoing, each Letter of Credit Issuer shall reimburse the Agent upon demand for its Pro Rata Share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Letter of Credit Document, or any document contemplated by or referred to herein, to the extent that the Agent is not reimbursed for such expenses by or on behalf of the Account Party. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of the Agent.

12.8    Agent in Individual Capacity. The Bank and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Account Party and its Subsidiaries and Affiliates as though the Bank were not the Agent hereunder and without notice to or consent of the Letter of Credit Issuers. The Bank or its Affiliates may receive information regarding the Account Party and its Affiliates (including information that may be subject to confidentiality obligations in favor of such Account Party or such Subsidiary) and acknowledge that the Agent and the Bank shall be under no obligation to provide such information to them.

12.9    Successor Agent. The Agent may resign as Agent upon at least thirty (30) days' prior notice to the Letter of Credit Issuers and the Account Party, such resignation to be effective upon the acceptance of a successor agent to its appointment as Agent. In the event the Bank sells all of its Commitment as part of a sale, transfer or other disposition by the Bank of substantially all of its letter of credit portfolio, the Bank shall resign as Agent and such purchaser or transferee shall become the successor Agent hereunder. Subject to the foregoing, if the Agent resigns under this Agreement, the Majority Letter of Credit Issuers shall appoint from among the Letter of Credit Issuers a successor agent for the Letter of Credit Issuers. If no successor agent is appointed prior to the effective date of the resignation of the Agent, the Agent may appoint, after consulting with the Letter of Credit Issuers and the Account Party, a successor agent from among the Letter of Credit Issuers. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent" shall mean such successor agent and the retiring Agent's appointment, powers and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Article 12 shall continue to inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

12.10    Withholding Tax.

(a)    If any Letter of Credit Issuer claims exemption from, or reduction of, withholding tax under a United States of America tax treaty by providing IRS Form W-8BEN and such Letter of Credit Issuer sells, assigns, or otherwise transfers all or part of the Obligations owing to such Letter of Credit Issuer, such Letter of Credit Issuer agrees to notify the Agent of the percentage amount in which it is no longer the beneficial owner of Obligations of the Account Party to such Letter of Credit Issuer. To the extent of such percentage amount, the Agent will treat such Letter of Credit Issuer's IRS Form W-8BEN as no longer valid.

(b)    If any Letter of Credit Issuer claiming exemption from United States of America withholding tax by filing IRS Form W-8ECI with the Agent sells, assigns, or otherwise transfers all or part of the Obligations owing to such Letter of Credit Issuer, such Letter of Credit Issuer agrees to undertake sole responsibility for complying with the withholding tax requirements imposed by Sections 1441 and 1442 of the Code.

(c)    If any Letter of Credit Issuer is entitled to a reduction in the applicable withholding tax, the Agent may withhold from any interest payment to such Letter of Credit Issuer an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by Section 4.1(a) are not delivered to the Agent, then the Agent may withhold from any interest payment to such Letter of Credit Issuer not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(d)    If the IRS or any other Governmental Authority of the United States of America or other jurisdiction asserts a claim that the Agent did not properly withhold tax from amounts paid to or for the account of any Letter of Credit Issuer (because the appropriate form was not delivered, was not properly executed, or because such Letter of Credit Issuer failed to notify the Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Letter of Credit Issuer shall indemnify the Agent fully for all amounts paid, directly or indirectly, by the Agent as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to the Agent under this Section, together with all costs and expenses (including Attorney Costs). The obligation of the Letter of Credit Issuers under this subsection shall survive the payment of all Obligations and the resignation or replacement of the Agent.

12.11    Restrictions on Actions by Letter of Credit Issuers; Sharing of Payments.

(a)    Each of the Letter of Credit Issuers agrees that it shall not, without the express consent of all Letter of Credit Issuers, and that it shall, to the extent it is lawfully entitled to do so, upon the request of all Letter of Credit Issuers, set off against the Obligations, any amounts owing by such Letter of Credit Issuer to the Account Party or any accounts of the Account Party now or hereafter maintained with such Letter of Credit Issuer. Each of the Letter of Credit Issuers further agrees that it shall not, unless specifically requested to do so by the Agent, take or cause to be taken any action to enforce its rights under this Agreement or against the Account Party.

(b)    If at any time or times any Letter of Credit Issuer shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of Collateral or any payments with respect to the Obligations of the Account Party to such Letter of Credit Issuer arising under, or relating to, this Agreement or the other Letter of Credit Documents, except for any such proceeds or payments received by such Letter of Credit Issuer from the Agent pursuant to the terms of this Agreement, or (ii) payments from the Agent in excess of such Letter of Credit Issuer's ratable portion of all such distributions by the Agent, such Letter of Credit Issuer shall promptly turn the same over to the Agent, in kind, and with such endorsements as may be required to negotiate the same to the Agent, or in same day funds, as applicable, for the account of all of the Letter of Credit Issuers and for application to the Obligations in accordance with the applicable provisions of this Agreement.

12.12    Payments by Agent to Letter of Credit Issuers. All payments to be made by the Agent to the Letter of Credit Issuers shall be made by bank wire transfer or internal transfer of immediately available funds to each Letter of Credit Issuer pursuant to wire transfer instructions delivered in writing to the Agent on or prior to the Closing Date (or if such Letter of Credit Issuer is an Assignee, on the applicable Assignment and Acceptance), or pursuant to such other wire transfer instructions as each party may designate for itself by written notice to the Agent. Concurrently with each such payment, the Agent

28

shall identify whether such payment (or any portion thereof) represents repayment of a reimbursement obligation, interest thereon or other amounts payable hereunder.  Unless the Agent receives notice from the Account Party prior to the date on which any payment is due to the Letter of Credit Issuers that the Account Party will not make such payment in full as and when required, the Agent may assume that the Account Party has made such payment in full to the Agent on such date in immediately available funds and the Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Letter of Credit Issuer on such due date an amount equal to the amount then due such Letter of Credit Issuer. If and to the extent the Account Party has not made such payment in full to the Agent, each Letter of Credit Issuer shall repay to the Agent on demand such amount distributed to such Letter of Credit Issuer, together with interest thereon at the Federal Funds Rate for each day from the date such amount is distributed to such Letter of Credit Issuer until the date repaid.

       12.13    Letter of Credit Issuers' Failure to Perform.  It is understood that (i) no Letter of Credit Issuer shall be responsible for any failure by any other Letter of Credit Issuer to perform its obligation to issue any Letter of Credit hereunder; nor shall any Commitment of any Letter of Credit Issuer be increased or decreased as a result of any failure by any other Letter of Credit Issuer to perform its obligation to issue any Letter of Credit hereunder, (ii) no failure by any Letter of Credit Issuer to perform its obligation to issue any Letter of Credit hereunder shall excuse any other Letter of Credit Issuer from its obligation to issue any Letter of Credit hereunder, and (iii) the obligations of each Letter of Credit Issuer hereunder shall be several, not joint and several.

       12.14    Relation Among Letter of Credit Issuers.  The Letter of Credit Issuers are not partners or co-venturers, and no Letter of Credit Issuer shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Letter of Credit Issuer.

ARTICLE 13

MISCELLANEOUS

       13.1    No Waivers; Cumulative Remedies.  No failure by the Agent or any Letter of Credit Issuer to exercise any right, remedy, or option under this Agreement or any present or future supplement thereto, or in any other agreement between or among the Account Party and the Agent and/or any Letter of Credit Issuer, or delay by the Agent or any Letter of Credit Issuer in exercising the same, will operate as a waiver thereof.  No waiver by the Agent or any Letter of Credit Issuer will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by the Agent or the Letter of Credit Issuers on any occasion shall affect or diminish  the Agent's and each Letter of Credit Issuer's rights thereafter to require strict performance by the Account Party of any provision of this Agreement.  The Agent and the Letter of Credit Issuers may proceed directly to collect the Obligations without any prior recourse to the Collateral.  The Agent's and each Letter of Credit Issuer's rights under this Agreement will be cumulative and not exclusive of any other right or remedy which the Agent or any Letter of Credit Issuer may have.

       13.2    Severability.  The illegality or unenforceability of any provision of this Agreement or any Letter of Credit Document or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

       13.3    Governing Law; Choice of Forum; Service of Process.

       (a)    IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND THE FACILITY ORDER, THE FACILITY ORDER SHALL CONTROL.  THIS

AGREEMENT SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO THE CONFLICT OF LAWS PROVISIONS PROVIDED THAT PERFECTION ISSUES WITH RESPECT TO ARTICLE 9 OF THE UCC MAY GIVE EFFECT TO APPLICABLE CHOICE OR CONFLICT OF LAW RULES SET FORTH IN ARTICLE 9 OF THE UCC) OF THE STATE OF NEW YORK TO THE EXTENT NOT PREEMPTED BY FEDERAL BANKRUPTCY LAWS; PROVIDED THAT THE AGENT AND THE LETTER OF CREDIT ISSUERS SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

(b)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LETTER OF CREDIT DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY CASE IS DISMISSED, OR WITH RESPECT TO ANY APPLICANT WHICH IS NO LONGER SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, IN THE FEDERAL, DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE ACCOUNT PARTY, THE AGENT AND THE LETTER OF CREDIT ISSUERS CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE JURISDICTION OF SUCH COURTS. EACH OF THE ACCOUNT PARTY, THE AGENT AND THE LETTER OF CREDIT ISSUERS IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO.

(c)     EACH APPLICANT HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY FACSIMILE OR BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO THE APPLICANT REPRESENTATIVE AT ITS ADDRESS SET FORTH IN SECTION 13.8 AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON THE EARLIER OF RECEIPT OR FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE U.S. MAILS POSTAGE PREPAID. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF THE AGENT OR THE LETTER OF CREDIT ISSUERS TO SERVE LEGAL PROCESS BY ANY OTHER MANNER PERMITTED BY LAW.

13.4     WAIVER OF JURY TRIAL. THE ACCOUNT PARTY, THE LETTER OF CREDIT ISSUERS AND THE AGENT EACH IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LETTER OF CREDIT DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AGENT-RELATED PERSON, PARTICIPANT OR ASSIGNEE, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. THE ACCOUNT PARTY, THE LETTER OF CREDIT ISSUERS AND THE AGENT EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LETTER OF CREDIT DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LETTER OF CREDIT DOCUMENTS.

30

13.5     Survival of Representations and Warranties.  All of the Account Party's representations and warranties contained in this Agreement shall survive the execution, delivery, and acceptance thereof by the parties, notwithstanding any investigation by the Agent or the Letter of Credit Issuers or their respective agents.

13.6     Other Security and Guaranties.  The Agent, may, without notice or demand and without affecting the Account Party' obligations hereunder, from time to time:  (a) take from any Person and hold collateral (other than funds on deposit in the Cash Collateral Accounts) for the payment of all or any part of the Obligations and exchange, enforce or release such collateral or any part thereof; and (b) accept and hold any endorsement or guaranty of payment of all or any part of the Obligations and release or substitute any such endorser or guarantor, or any Person who has given any Lien in any other collateral as security for the payment of all or any part of the Obligations, or any other Person in any way obligated to pay all or any part of the Obligations

13.7     Fees and Expenses.  The Account Party agrees to pay to the Agent, for its benefit, on demand, all costs and expenses that Agent pays or incurs in connection with the negotiation, preparation, syndication, consummation, administration, enforcement, and termination of this Agreement or any of the other Letter of Credit Documents, including:  (a) Attorney Costs;  (b) costs and expenses (including reasonable, documented attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with the Letter of Credit Documents and the transactions contemplated thereby; and (c) sums paid or incurred to pay any amount or take any action required of the Account Party under the Letter of Credit Documents that the Account Party fails to pay or take.  In addition, the Account Party agree to pay costs and expenses incurred by the Agent (including Attorneys' Costs) to the Agent, for its benefit, on demand, and to the other Letter of Credit Issuers for their benefit, on demand, and all reasonable fees, expenses and disbursements incurred by such other Letter of Credit Issuers for one law firm retained by such other Letter of Credit Issuers, in each case Attorneys' Costs) paid or incurred to obtain payment of the Obligations and otherwise enforce the provisions of the Letter of Credit Documents, or to defend any claims made or threatened against the Agent or any Letter of Credit Issuer arising out of the transactions contemplated hereby (including preparations for and consultations concerning any such matters).  The foregoing shall not be construed to limit any other provisions of the Letter of Credit Documents regarding costs and expenses to be paid by the Account Party.

13.8     Notices.  Except as otherwise provided herein, all notices, demands and requests that any party is required or elects to give to any other shall be in writing, or by a telecommunications device capable of creating a written record, and any such notice shall become effective (a) upon personal delivery thereof, including, but not limited to, delivery by overnight mail and courier service, (b) four (4) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid, or (c) in the case of notice by such a telecommunications device, when properly transmitted, in each case addressed to the party to be notified as follows:

            If to the Agent or to the Bank:

                        Bank of America, N.A.
                        335 Madison Avenue
                        New York, New York  10017
                        Attention: Allan Juleus
                                   and
                                Ed Kahn
                        Facsimile No.:  (312) 453-3977

029123-0013

with copies to:

Latham & Watkins
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606
Attention:  David S. Heller
and
Jeffrey G. Moran
Facsimile No.:  (312) 993-9767

If to the Account Party, to the Account Party:

W. R. Grace & Co.-Conn.
7500 Grace Drive
Columbia, Maryland  21044
Attention:  Asif Arshad
Facsimile No.:  (410) 531-4461

with a copy to:

Kirkland & Ellis
601 Lexington Avenue
New York, New York  10022
Attention:  Theodore L. Freedman
Facsimile No.:  (212) 446-4900

or to such other address as each party may designate for itself by like notice.  Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to the persons designated above to receive copies shall not adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

13.9    Waiver of Notices.  Unless otherwise expressly provided herein, the Account Party waive presentment, and notice of demand or dishonor and protest as to any instrument, notice of intent to accelerate the Obligations and notice of acceleration of the Obligations, as well as any and all other notices to which the Account Party might otherwise be entitled.  No notice to or demand on the Account Party which the Agent or any Letter of Credit Issuer may elect to give shall entitle the Account Party to any or further notice or demand in the same, similar or other circumstances.

13.10    Binding Effect.  The provisions of this Agreement shall be binding upon and inure to the benefit of the respective representatives, successors, and permitted assigns of the parties hereto; provided, however, that no interest herein may be assigned by the Account Party without prior written consent of the Agent and each Letter of Credit Issuer.  The rights and benefits of the Agent and the Letter of Credit Issuers hereunder shall, if such Persons so agree, inure to any party acquiring any interest in the Obligations or any part thereof.

13.11    Indemnity of the Agent and the Letter of Credit Issuers by the Account Party.

(a)    The Account Party agrees to defend, indemnify and hold the Agent-Related Persons, and each Letter of Credit Issuer and each of its respective officers, directors, employees, counsel, representatives, agents and attorneys-in-fact (each, an "Indemnified Person") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges,

32

expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time (including at any time following repayment of the Obligations and the termination, resignation or replacement of the Agent or replacement of any Letter of Credit Issuer) be imposed on, incurred by or asserted against any such Person in any way relating to or arising out of this Agreement or any document contemplated by or referred to herein, or the transactions contemplated hereby, or any action taken or omitted by any such Person under or in connection with any of the foregoing, including with respect to any investigation, litigation or proceeding (including any insolvency proceeding or appellate proceeding) related to or arising out of this Agreement, any other Letter of Credit Document, or the Letters of Credit or the use of the proceeds thereof, whether or not any Indemnified Person is a party thereto (all the foregoing, collectively, the "Indemnified Liabilities"); provided, that the Account Party shall not have any obligation hereunder to any Indemnified Person with respect to Indemnified Liabilities resulting solely from the gross negligence or willful misconduct of such Indemnified Person. The agreements in this Section shall survive payment of all other Obligations.

(b)      The Account Party agrees to indemnify, defend and hold harmless the Agent and the Letter of Credit Issuers from any loss or liability imposed upon or incurred by any such Person directly or indirectly arising out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance relating to the Account Party's operations, business or property. This indemnity will apply whether the hazardous substance is on, under or about the Account Party's property or operations or property leased to the Account Party. The indemnity includes but is not limited to Attorneys Costs. The indemnity extends to the Agent and the Letter of Credit Issuers, their parents, affiliates, Subsidiaries and all of their directors, officers, employees, agents, successors, and assigns. "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including petroleum or natural gas. This indemnity will survive repayment of all other Obligations.

13.12   Limitation of Liability.  NO CLAIM MAY BE MADE BY ANY APPLICANT, ANY LETTER OF CREDIT ISSUER OR OTHER PERSON AGAINST THE AGENT, ANY LETTER OF CREDIT ISSUER OR THE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, COUNSEL, REPRESENTATIVES, AGENTS OR ATTORNEYS IN FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LETTER OF CREDIT DOCUMENT, OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH, AND ANY APPLICANT AND EACH LETTER OF CREDIT ISSUER HEREBY WAIVE, RELEASE AND AGREE NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

13.13   Final Agreement.  This Agreement and the other Letter of Credit Documents are intended by the Account Party, the Agent and the Letter of Credit Issuers to be the final, complete, and exclusive expression of the agreement between them.  This Agreement supersedes any and all prior oral or written agreements relating to the subject matter hereof.  No modification, rescission, waiver, release, or amendment of any provision of this Agreement or any other Letter of Credit Document shall be made, except by a written agreement signed by the Account Party and a duly authorized officer of each of the Agent and the requisite Letter of Credit Issuers.

13.14   Counterparts.  This Agreement may be executed in any number of counterparts, and by the Agent, each Letter of Credit Issuer and the Account Party in separate counterparts, each of which shall

33

029123-0013

be an original, but all of which shall together constitute one and the same agreement; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

     13.15  <u>Captions</u>. The captions contained in this Agreement are for convenience of reference only, are without substantive meaning and should not be construed to modify, enlarge, or restrict any provision.

     13.16  <u>Right of Setoff</u>. In addition to any rights and remedies of the Letter of Credit Issuers provided by law, if an Event of Default exists, subject to Section 3.3(b), each Letter of Credit Issuer is authorized at any time and from time to time, without prior notice to the Account Party, any such notice being waived by the Account Party to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other indebtedness at any time owing by, such Letter of Credit Issuer or any Affiliate of such Letter of Credit Issuer to or for the credit or the account of the Account Party against any and all Obligations owing to such Letter of Credit Issuer, now or hereafter existing, irrespective of whether or not the Agent or such Letter of Credit Issuer shall have made demand under this Agreement or any Letter of Credit Document and although such Obligations may be contingent or unmatured. Each Letter of Credit Issuer agrees promptly to notify the Account Party and the Agent after any such set-off and application made by such Letter of Credit Issuer; <u>provided</u>, <u>however</u>, that the failure to give such notice shall not affect the validity of such set-off and application. NOTWITHSTANDING THE FOREGOING, NO LETTER OF CREDIT ISSUER SHALL EXERCISE ANY RIGHT OF SET-OFF, BANKER'S LIEN, OR THE LIKE AGAINST ANY DEPOSIT ACCOUNT OR PROPERTY OF ANY APPLICANT HELD OR MAINTAINED BY SUCH LETTER OF CREDIT ISSUER WITHOUT THE PRIOR WRITTEN UNANIMOUS CONSENT OF THE LETTER OF CREDIT ISSUERS.

     13.17  <u>Confidentiality</u>.

     (a)    The Account Party hereby consent that the Agent and each Letter of Credit Issuer may issue and disseminate to the public general information describing the credit accommodation entered into pursuant to this Agreement, including the names and addresses of the Account Party and a general description of the Account Party's business and may use the Account Party' names in advertising and other promotional material.

     (b)    Each Letter of Credit Issuer severally agrees to take normal and reasonable precautions and exercise due care to maintain the confidentiality of all information identified as "confidential" or "secret" by the Account Party and provided to the Agent or such Letter of Credit Issuer by or on behalf of the Account Party, under this Agreement or any other Letter of Credit Document, except to the extent that such information (i) was or becomes generally available to the public other than as a result of disclosure by the Agent or such Letter of Credit Issuer, or (ii) was or becomes available on a non-confidential basis from a source other than the Account Party; <u>provided</u> that such source is not bound by a confidentiality agreement with the Account Party known to the Agent or such Letter of Credit Issuer; <u>provided</u>, <u>however</u>, that the Agent and any Letter of Credit Issuer may disclose such information (1) at the request or pursuant to any requirement of any Governmental Authority to which the Agent or such Letter of Credit Issuer is subject or in connection with an examination of the Agent or such Letter of Credit Issuer by any such Governmental Authority; (2) pursuant to subpoena or other court process; (3) when required to do so in accordance with the provisions of any applicable Requirement of Law; (4) to the extent reasonably required in connection with any litigation or proceeding (including, but not limited to, any bankruptcy proceeding) to which the Agent, any Letter of Credit Issuer or their respective Affiliates may be party; (5) to the extent reasonably required in connection with the exercise of any remedy hereunder or under any other Letter of Credit Document; (6) to the Agent's or such Letter of Credit

34

Issuer's independent auditors, accountants, attorneys and other professional advisors; (7) to any prospective Assignee under any Assignment and Acceptance, actual or potential; provided that such prospective Assignee agrees to keep such information confidential to the same extent required of the Agent and the Letter of Credit Issuers hereunder; (8) as expressly permitted under the terms of any other document or agreement regarding confidentiality to which the Account Party is party or is deemed party with the Agent or such Letter of Credit Issuer, and (9) to its Affiliates.

13.18  Conflicts with Other Letter of Credit Documents.  Unless otherwise expressly provided in this Agreement (or in another Letter of Credit Document by specific reference to the applicable provision contained in this Agreement), if any provision contained in this Agreement conflicts with any provision of any other Letter of Credit Document, the provision contained in this Agreement shall govern and control.

*[signature page follows]*

CH\1135197.13

029123-0013

IN WITNESS WHEREOF, the parties have entered into this Agreement on the date first above written.

**ACCOUNT PARTY:**

W. R. Grace & Co.-Conn., as Account Party

By:_____
Its Senior Vice President or Vice President

**AGENT:**

**BANK OF AMERICA, N.A.**, as the Agent

By:       _____
Title:   _____

**LETTER OF CREDIT ISSUER:**

**BANK OF AMERICA, N.A.**, as a Letter of Credit Issuer

By:       _____
      Title:   _____

36

<div align="center">

**ANNEX A**
to
**Credit Agreement**

**Definitions**

</div>

Capitalized terms used in the Letter of Credit Documents shall have the following respective meanings (unless otherwise defined therein), and all section references in the following definitions shall refer to sections of the Agreement:

"ACH Transactions" means any cash management or related services including the automatic clearing house transfer of funds by the Bank for the account of the Account Party pursuant to agreement or overdrafts.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person or which owns, directly or indirectly, ten percent (10%) or more of the outstanding equity interest of such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise.

"Administration Fee" has the meaning specified in Section 2.3(b).

"Agent" has the meaning set forth in the Preamble to the Agreement.

"Agent-Related Persons" means the Agent, together with its Affiliates, and the officers, directors, employees, counsel, representatives, agents and attorneys-in-fact of the Agent and such Affiliates.

"Agreement" means the Post-Petition Letter of Credit Facility Agreement to which this Annex A is attached, as from time to time amended, modified or restated.

"Account Party" has the meaning set forth in the Preamble to the Agreement.

"Applicable Percentage" means, with respect to the payment of the Unused Line Fee, for each month (or lesser period as applicable), if the average daily Availability during such month (or such lesser period) is (i) less than or equal to $50,000,000, 0.50% *per annum*, or (ii) greater than $50,000,000, 0.75% *per annum*.

"Assignee" has the meaning specified in Section 11.2(a).

"Assignment and Acceptance" has the meaning specified in Section 11.2(a).

"Attorney Costs" means and includes all reasonable documented fees, expenses and disbursements of any law firm or other counsel engaged by the Agent, the reasonably allocated costs and expenses of internal legal services of the Agent.

"Availability" means, at any time (a) the lesser of (i) an amount equal to 95.24% of the L/C Cash Collateral Account Balance at such time or (ii) $100,000,000, minus, (b) in each case, the aggregate outstanding face amount of all Letters of Credit.

<div align="center">1</div>

"Bank" means Bank of America, N.A., a national banking association, or any successor entity thereto.

"Bank Products" means any one or more of the following types of services or facilities extended to the Account Party by the Bank or any affiliate of the Bank in reliance on the Bank's agreement to indemnify such affiliate: (i) credit cards; (ii) ACH Transactions; (iii) cash management, including controlled disbursement services; and (iv) Hedge Agreements.

"Bankruptcy Case" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Bankruptcy Case from time to time, including, without limitation, the United States District Court for the District of Delaware if and to the extent it withdraws the reference with respect to the Bankruptcy Case, any part thereof, or any matter or proceeding therein.

"Base Rate" means, for any day, a *per annum* rate equal to the greatest of (a) the Prime Rate for such day; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) LIBOR for a 30-day interest period as determined on such day.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banks in New York, New York or Charlotte, North Carolina are required or permitted to be closed.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any bank or of any corporation controlling a bank.

"Cash Collateral Accounts" means, collectively, the L/C Cash Collateral Account, the F/X Hedge Cash Collateral Account and the Commodity Hedge Cash Collateral Account.

"Cash Equivalents" means (a) direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof, (b) commercial paper issued in the United States of America and rated at least A-1 or P-1 by at least one nationally recognized rating organization and money market funds rated at least AAA, Aaa or other equivalent of highest rating by at least one nationally recognized rating organization, (c) certificates of deposit issued by or eurodollar deposits made with any Letter of Credit Issuer, any Affiliate of any Letter of Credit Issuer, or any bank or trust company which has (or the parent of which has) capital, surplus and undivided profits aggregating at least $100,000,000 (or the equivalent amount in another currency), (d) drafts accepted by any bank or trust company referred to in clause (c) above or any other negotiable instrument guaranteed or endorsed with full recourse by any such bank or trust company, (e) repurchase agreements with respect to any of the foregoing types of securities described in clauses (a) and (b) above, and (f) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clause (a) through (e) above; provided that (i) each such obligation, certificate of deposit, draft, investment, security and instrument (including those subject to repurchase agreements) matures within one year after it is acquired and (ii) each item of such commercial paper (including those subject to repurchase agreements) matures within ninety (90) days after it is acquired by the applicable Account Party or any Other Subsidiary.

2

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986.

"Committee" means any official committee(s) appointed in the Bankruptcy Case.

"Commitment" means, at any time with respect to a Letter of Credit Issuer, the amount set forth beside such Letter of Credit Issuer's name under the heading "Commitment" on Schedule 1.1 attached to the Agreement or on the signature page of the Assignment and Acceptance pursuant to which such Letter of Credit Issuer became a Letter of Credit Issuer hereunder in accordance with the provisions of Section 11.2, as such Commitment may be adjusted from time to time in accordance with the provisions of Section 11.2, and "Commitments" means, collectively, the aggregate amount of the commitments of all of the Letter of Credit Issuers.

"Commodity Hedge Cash Collateral Account" means a cash collateral account with the Bank securing the Commodity Hedge Obligations under the sole dominion and control of the Agent, for the ratable benefit of the Agent and the holders of the Commodity Hedge Obligations (and, subject to Section 3.3(b), for the benefit of the holders of the L/C Obligations and the F/X Hedge Obligations) pursuant to a control agreement in form and substance satisfactory to the Agent.

"Commodity Hedge Obligations" means the obligations arising under the Swap Documents in connection with any transactions, agreements or documents thereunder that provide for commodity, cap, floor, or collar transactions (or any combination thereof) related to or for the purpose of hedging exposure to, fluctuations in commodity prices.

"Company" means W. R. Grace & Co., a Delaware corporation and the sole parent company of the Account Party.

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured, waived, or otherwise remedied during such time) constitute an Event of Default.

"Default Rate" means a *per annum* interest rate at all times equal to the sum of (a) the otherwise applicable interest rate pursuant to Section 2.1(a) plus (b) two percent (2%) *per annum*.

"Dollar" and "$" means the lawful currency of the United States.  Unless otherwise specified, all payments under the Agreement shall be made in Dollars.

"Eligible Assignee" means (a) a commercial bank, commercial finance company or other asset based lender, having total assets in excess of $1,000,000,000; (b) any Letter of Credit Issuer listed on the signature page of this Agreement; (c) any Affiliate of any Letter of Credit Issuer; and (d) if an Event of Default has occurred and is continuing, any Person reasonably acceptable to the Agent.

"Environmental Laws" means all federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case relating to environmental, health, safety and land use matters.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and regulations promulgated thereunder.

3

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Account Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, (b) a withdrawal by the Account Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations which is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by the Account Party or any ERISA Affiliate from a Multi-employer Plan or notification that a Multi-employer Plan is in reorganization, (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multi-employer Plan, (e) the occurrence of an event (other than the act of the filing of the Bankruptcy Case) which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multi-employer Plan, or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Account Party or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 9.1.

"Exchange Act" means the Securities Exchange Act of 1934, and regulations promulgated thereunder.

"Existing Letters of Credit" means the letters of credit identified on Exhibit C.

"Facility Fee" has the meaning specified in Section 2.3(b).

"Facility Order" has the meaning specified in Section 8.1(i).

"Federal Funds Rate" means, for any day, the rate *per annum* (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Bank on such day on such transactions as determined by the Agent.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"Financial Statements" means, according to the context in which it is used, the financial statements referred to in Section 5.1 or any other financial statements required to be given to the Letter of Credit Issuers pursuant to this Agreement.

"Fiscal Year" means the Account Party fiscal year for financial accounting purposes. The current Fiscal Year of the Account Party will end on December 31, 2010.

"F/X Hedge Cash Collateral Account" means a cash collateral account with the Bank securing the F/X Hedge Obligations under the sole dominion and control of the Agent, for the ratable

4

benefit of the Agent and the holders of the F/X Hedge Obligations (and, subject to <u>Section 3.3(b)</u>, for the benefit of the holders of the L/C Obligations and the Commodity Hedge Obligations) pursuant to a control agreement in form and substance satisfactory to the Agent.

"<u>F/X Hedge Obligations</u>" means the obligations arising under the Swap Documents in connection with any transactions, agreements or documents thereunder that provide for forward foreign exchange transactions, currency swaps or currency options (or any combination of the foregoing) related to or for the purpose of hedging exposure to, fluctuations in exchange rates or currency valuations.

"<u>GAAP</u>" means generally accepted accounting principles and practices set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession).

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"<u>Hedge Agreement</u>" means, with respect to any Person, any and all transactions, agreements or documents now existing or hereafter entered into, that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging any Person's exposure to fluctuations in interest or exchange rates, loan, credit exchange, security or currency valuations or commodity prices.

"<u>IRS</u>" means the Internal Revenue Service and any Governmental Authority succeeding to any of its principal functions under the Code.

"<u>L/C Cash Collateral Account</u>" means a cash collateral account with the Bank securing the L/C Obligations under the sole dominion and control of the Agent, for the ratable benefit of the Agent and the Letter of Credit Issuers (and, subject to <u>Section 3.3(b)</u>, for the benefit of the holders of the F/X Hedge Obligations and the Commodity Hedge Obligations) pursuant to a control agreement in form and substance satisfactory to the Agent.

"<u>L/C Cash Collateral Account Balance</u>" means, at any time, the aggregate amount on deposit in the Cash Collateral Account at such time.

"<u>L/C Obligations</u>" means, collectively, the obligations of the Account Party arising under this Agreement and each of the other Letter of Credit Documents.

"<u>Letter of Credit</u>" has the meaning specified in <u>Section 1.2(a)</u>.

"<u>Letter of Credit Documents</u>" means this Agreement, each control agreement entered into pursuant hereto, the Facility Order and any other agreements, instruments, and documents heretofore, now or hereafter evidencing, guaranteeing or otherwise relating to the Obligations or any other aspect of the transactions contemplated by this Agreement.

"<u>Letter of Credit Fee</u>" has the meaning specified in <u>Section 2.5</u>.

5

"Letter of Credit Issuer" means the Bank, any affiliate of the Bank or any other financial institution that issues any Letter of Credit pursuant to this Agreement; provided however that the Agent shall not cause any Letter of Credit to be issued by a Person which is not a Letter of Credit Issuer and which is not reasonably acceptable to the Account Party.

"LIBOR" means, for any date of determination, the per annum rate of interest (rounded up, if necessary, to the nearest 1/8th of 1%), determined by the Agent at approximately 11:00 a.m. (London time) two Business Days prior to such date of determination equal to the greater of (a) 1.00% per annum and (b)(i) the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source designated by the Agent); or (ii) if BBA LIBOR is not available for any reason, the per annum interest rate at which Dollar deposits would be offered by the Bank's London branch to major banks in the London interbank eurodollar market. If the Federal Reserve Board imposes a Reserve Percentage with respect to LIBOR deposits, then LIBOR shall be the foregoing rate, divided by 1, minus the Reserve Percentage.

"Lien" means: (a) any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute, or contract, and including a security interest, charge, claim, or lien arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes; (b) to the extent not included under clause (a), any reservation, exception, encroachment, easement, right-of-way, covenant, condition, restriction, lease or other title exception or encumbrance affecting property; and (c) any contingent or other agreement to provide any of the foregoing.

"Majority Letter of Credit Issuers" means at any date of determination Letter of Credit Issuers whose Pro Rata Shares aggregate more than 50%.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U  or X of the Federal Reserve Board.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, condition (financial or otherwise) of the Account Party and its Subsidiaries taken as a whole; (b) a material impairment of the Account Party's ability to pay any of the Obligations or pay or perform any of its other obligations in accordance with the terms of this Agreement or any other Letter of Credit Document; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Account Party of any Letter of Credit Document to which it is a party; or (d) a material impairment of the validity, extent or priority of the Agent's Liens on the Cash Collateral Accounts and the amounts on deposit therein or credit thereto.

"Multi-employer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by the Account Party or any ERISA Affiliate.

"Obligations" means all present and future liabilities, obligations, covenants, duties, and debts owing by the Account Party to the Agent, any Letter of Credit Issuer, the Bank or any Affiliate of the Bank, arising under or pursuant to this Agreement, any of the other Letter of Credit Documents or any of the Swap Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to the Account Party hereunder or under

6

any of the other Letter of Credit Documents. "Obligations" includes, without limitation, (a) all debts, liabilities, and obligations now or hereafter arising from or in connection with the Letters of Credit and (b) all debts, liabilities and obligations now or hereafter arising from or in connection with the Swap Documents.

"Other Subsidiary" means any Subsidiary of the Company other than the Account Party.

"Other Taxes" means any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Letter of Credit Documents.

"PBGC" means the Pension Benefit Guaranty Corporation or any Governmental Authority succeeding to the functions thereof.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA and Code Section 412 which the Account Party or ERISA Affiliate of the Account Party sponsors or maintains.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, Governmental Authority, or any other entity.

"Petition Date" means April 2, 2001.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) which the Account Party or any ERISA Affiliate of Account Party sponsors or maintains or to which the Account Party or any ERISA Affiliate of Account Party makes, is making, or is obligated to make contributions and includes any Pension Plan and Multi-employer Plan.

"Prime Rate" means the rate of interest announced by the Bank from time to time as its prime rate. Such rate is set by the Bank on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate. Any change in such rate announced by the Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"Pro Rata Share" means, with respect to a Letter of Credit Issuer, a fraction (expressed as a percentage), the numerator of which is the amount of such Letter of Credit Issuer's Commitment and the denominator of which is the sum of the amounts of all of the Letter of Credit Issuers' Commitments, or if no Commitments are outstanding, a fraction (expressed as a percentage), the numerator of which is the amount of Obligations owed to such Letter of Credit Issuer and the denominator of which is the aggregate amount of the Obligations owed to the Letter of Credit Issuers.

"Reportable Event" means, any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, other than any such event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the PBGC.

"Requirement of Law" means, as to any Person, any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or of a Governmental Authority, in each case

applicable to or binding upon the Person or any of its property or to which the Person or any of its property is subject.

"Reserve Percentage" the reserve percentage (expressed as a decimal, rounded up to the nearest 1/8th of 1%) applicable to member banks under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to eurocurrency funding.

"Responsible Officer" means the chief executive officer, chief financial officer, any vice president or the president of the Company, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants and the preparation of the Borrowing Base Certificate, the chief financial officer or an assistant treasurer of the Company, or any other officer having substantially the same authority and responsibility.

"Stated Termination Date" means [_____]¹, 2011.

"Subsidiary" of a Person means any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than fifty percent (50%) of the voting stock or other equity interests (in the case of Persons other than corporations), is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of the Company.

"Swap Documents" means, collectively, that certain ISDA Master Agreement, dated as of _____, 2010, between the Account Party and the Bank, together with the Schedule thereto, each Annex to such Schedule, each Confirmation thereunder and each other document or instrument issued pursuant thereto or in connection therewith.

"Taxes" means any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of each Letter of Credit Issuer and the Agent, such taxes (including income taxes or franchise taxes) as are imposed on or measured by the Agent's or each Letter of Credit Issuer's net income in any jurisdiction (whether federal, state or local and including any political subdivision thereof) under the laws of which such Letter of Credit Issuer or the Agent, as the case may be, is organized or maintains a lending office.

"Termination Date" means the earliest to occur of (i) the Stated Termination Date, (ii) the date the Total Facility is terminated either by the Account Party pursuant to Section 3.1 or by the Majority Letter of Credit Issuers pursuant to Section 9.2, (iii) the date this Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of this Agreement and (iv) the Effective Date (as such term will be defined in the approved plan of reorganization in the Bankruptcy Case).

"Total Facility" has the meaning specified in Section 1.1.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in

---

¹ *This will be the date that is 365 days after the Closing Date.*

accordance with the assumptions used under Section 412(c) of the Code for determining whether the Pension Plan meets the minimum funding standards of Section 412 of the Code for the applicable plan year.

"Unused Letter of Credit Amount" means an amount equal to $100,000,000 minus the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit, plus, without duplication, (b) the aggregate unpaid reimbursement obligations due with respect to all Letters of Credit.

"Unused Line Fee" has the meaning specified in Section 2.4.

Accounting Terms. Any accounting term used in the Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the Financial Statements. If any change in generally accepted accounting principles subsequent to the date of this Agreement is material to either the Account Party or the Letter of Credit Issuers for the purpose of determining the Account Party' compliance with any covenant contained in this Agreement, then (A) such change shall not, without the consent of the Majority Letter of Credit Issuers, if such change makes such covenant less restrictive, or the Account Party, if such change makes such covenant more restrictive, be effective for the calculation of such covenant unless and until an amendment pursuant to clause (B) below with respect to such change and such covenant becomes effective, and (B) the Account Party and the Agent and the Letter of Credit Issuers agree to enter into negotiations, at the request of the Account Party or the Representative Letter of Credit Issuers, in order to amend such covenant so as equitably to reflect such change with the desired result that the criteria for evaluating the consolidated financial condition of the Company and its consolidated Subsidiaries shall be the same after such change as before such change.

Interpretive Provisions. (a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to the Agreement as a whole and not to any particular provision of this Agreement; and Subsection, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)    (i)    The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.

(ii)    The term "including" is not limiting and means "including without limitation."

(iii)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

(iv)    The word "or" is not exclusive.

(d)    Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of any Letter of Credit Document, and (ii) references to any

9

statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(e)    The captions and headings of the Agreement and other Letter of Credit Documents are for convenience of reference only and shall not affect the interpretation of this Agreement.

(f)    The Agreement and other Letter of Credit Documents may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(g)    The Agreement and the other Letter of Credit Documents are the result of negotiations among and have been reviewed by counsel to the Agent, the Account Party and the other parties, and are the products of all parties. Accordingly, they shall not be construed against the Letter of Credit Issuers or the Agent merely because of the Agent's or Letter of Credit Issuers' involvement in their preparation.

CH\1135197.13

029123-0013

EXHIBIT B

FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

This ASSIGNMENT AND ACCEPTANCE AGREEMENT (this "Assignment and Acceptance") dated as of _____, 201_ is made between _____ (the "Assignor") and _____ (the "Assignee").

RECITALS

WHEREAS, the Assignor is party to that certain Post-Petition Letter of Credit Facility Agreement dated as of [_____], 2010 (as amended, amended and restated, modified, supplemented or renewed, the "Agreement") among W. R. Grace & Co., a Delaware corporation (the "Company"), and certain Subsidiaries of the Company which are signatory thereto (together with the Company, each a "Account Party" and collectively "Account Party"), the several financial institutions from time to time party thereto (including the Assignor, the "Letter of Credit Issuers"), and Bank of America, N. A., as agent for the Letter of Credit Issuers (the "Agent"). Any terms defined in the Agreement and not defined in this Assignment and Acceptance are used herein as defined in the Agreement;

WHEREAS, as provided under the Agreement, the Assignor has committed to issuing letters of credit for the account of the Account Party in an aggregate amount not to exceed $_____ (the "Commitment"); and

WHEREAS, the Assignor wishes to assign to the Assignee [part of the] [all] rights and obligations of the Assignor under the Agreement in respect of its Commitment in an amount equal to $_____ (the "Assigned Amount") on the terms and subject to the conditions set forth herein and the Assignee wishes to accept assignment of such rights and to assume such obligations from the Assignor on such terms and subject to such conditions;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

1.    Assignment and Acceptance.

(a)    Subject to the terms and conditions of this Assignment and Acceptance, (i) the Assignor hereby sells, transfers and assigns to the Assignee, and (ii) the Assignee hereby purchases, assumes and undertakes from the Assignor, without recourse and without representation or warranty (except as provided in this Assignment and Acceptance) __% (the "Assignee's Percentage Share") of (A) the Commitment of the Assignor and (B) all related rights, benefits, obligations, liabilities and indemnities of the Assignor under and in connection with the Agreement and the Letter of Credit Documents.

(b)    With effect on and after the Effective Date (as defined in Section 5 hereof), the Assignee shall be a party to the Agreement and succeed to all of the rights and be obligated to perform all of the obligations of a Letter of Credit Issuer under the Agreement, including the requirements concerning confidentiality and the payment of indemnification, with a Commitment in an amount equal to the Assigned Amount. The Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Agreement are required to be performed by it as a Letter of Credit Issuer. It is the intent of the parties hereto that the Commitment of the Assignor shall, as of the Effective Date, be reduced by an amount equal to the Assigned Amount and the Assignor shall relinquish its rights

1

and be released from its obligations under the Agreement to the extent such obligations have been assumed by the Assignee; provided, however, the Assignor shall not relinquish its rights under Sections __ and __ of the Agreement to the extent such rights relate to the time prior to the Effective Date.

(c)    After giving effect to the assignment and assumption set forth herein, on the Effective Date the Assignee's Commitment will be $_____.

(d)    After giving effect to the assignment and assumption set forth herein, on the Effective Date the Assignor's Commitment will be $_____.

2.    <u>Payments</u>.

The Assignee agrees to pay to the Agent a processing fee in the amount specified in <u>Section 11.2(a)</u> of the Agreement.

3.    <u>Reallocation of Payments</u>.

Any fees and other payments accrued to the Effective Date with respect to the Commitment shall be for the account of the Assignor. Any fees and other payments accrued on and after the Effective Date with respect to the Assigned Amount shall be for the account of the Assignee. Each of the Assignor and the Assignee agrees that it will hold in trust for the other party any interest, fees and other amounts which it may receive to which the other party is entitled pursuant to the preceding sentence and pay to the other party any such amounts which it may receive promptly upon receipt.

4.    <u>Independent Credit Decision</u>.

The Assignee (a) acknowledges that it has received a copy of the Agreement and the Schedules and Exhibits thereto, together with copies of the most recent financial statements of the Company and its Subsidiaries, all applicable materials filed with the Bankruptcy Court and all applicable orders relating to the Bankruptcy Case as it has deemed appropriate, and such other documents and information as it has deemed appropriate to make its own credit and legal analysis and decision to enter into this Assignment and Acceptance; and (b) agrees that it will, independently and without reliance upon the Assignor, the Agent or any other Letter of Credit Issuer and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit and legal decisions in taking or not taking action under the Agreement.

5.    <u>Effective Date; Notices</u>.

(a)    As between the Assignor and the Assignee, the effective date for this Assignment and Acceptance shall be _____, 200_ (the "<u>Effective Date</u>"); provided that the following conditions precedent have been satisfied on or before the Effective Date:

(i)    this Assignment and Acceptance shall be executed and delivered by the Assignor and the Assignee;

[(ii)    the consent of the Agent required for an effective assignment of the Assigned Amount by the Assignor to the Assignee shall have been duly obtained and shall be in full force and effect as of the Effective Date;]

(iii)    the Assignee shall pay to the Assignor all amounts due to the Assignor under this Assignment and Acceptance;

029123-0013

[(iv)    the Assignee shall have complied with <u>Section 11.2</u> of the Agreement (if applicable);]

(v)    the processing fee referred to in <u>Section 2(b)</u> hereof and in <u>Section 11.2(a)</u> of the Agreement shall have been paid to the Agent; and

(b)    Promptly following the execution of this Assignment and Acceptance, the Assignor shall deliver to the Account Party and the Agent for acknowledgment by the Agent, a Notice of Assignment in the form attached hereto as <u>Schedule 1</u>.

6.    [<u>Agent</u>.  [INCLUDE ONLY IF ASSIGNOR IS AGENT]

(a)    The Assignee hereby appoints and authorizes the Assignor to take such action as agent on its behalf and to exercise such powers under the Agreement as are delegated to the Agent by the Letter of Credit Issuers pursuant to the terms of the Agreement.

(b)    The Assignee shall assume no duties or obligations held by the Assignor in its capacity as Agent under the Agreement.]

7.    <u>Withholding Tax</u>.

The Assignee (a) represents and warrants to the Letter of Credit Issuer, the Agent and the Account Party that under applicable law and treaties no tax will be required to be withheld by the Letter of Credit Issuer with respect to any payments to be made to the Assignee hereunder, (b) agrees to furnish (if it is organized under the laws of any jurisdiction other than the United States or any State thereof) to the Agent and the Account Party prior to the time that the Agent or Account Party is required to make any payment of principal, interest or fees hereunder, duplicate executed originals of either U.S. Internal Revenue Service Form W-8ECI or U.S. Internal Revenue Service Form W-8BEN (wherein the Assignee claims entitlement to the benefits of a tax treaty that provides for a complete exemption from U.S. federal income withholding tax on all payments hereunder) and agrees to provide new Forms W-8ECI or W-8BEN upon the expiration of any previously delivered form or comparable statements in accordance with applicable U.S. law and regulations and amendments thereto, duly executed and completed by the Assignee, and (c) agrees to comply with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

8.    <u>Representations and Warranties</u>.

(a)    The Assignor represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any Lien or other adverse claim; (ii) it is duly organized and existing and it has the full power and authority to take, and has taken, all action necessary to execute and deliver this Assignment and Acceptance and any other documents required or permitted to be executed or delivered by it in connection with this Assignment and Acceptance and to fulfill its obligations hereunder; (iii) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution, delivery and performance of this Assignment and Acceptance, and apart from any agreements or undertakings or filings required by the Agreement, no further action by, or notice to, or filing with, any Person is required of it for such execution, delivery or performance; and (iv) this Assignment and Acceptance has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignor, enforceable against the Assignor in accordance with the terms hereof, subject, as to enforcement, to bankruptcy, insolvency, moratorium, reorganization and other laws of general application relating to or affecting creditors' rights and to general equitable principles.

3

(b)    The Assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Agreement or any other instrument or document furnished pursuant thereto. The Assignor makes no representation or warranty in connection with, and assumes no responsibility with respect to, the solvency, financial condition or statements of the Account Party, or the performance or observance by the Account Party, of any of its respective obligations under the Agreement or any other instrument or document furnished in connection therewith.

(c)    The Assignee represents and warrants that (i) it is duly organized and existing and it has full power and authority to take, and has taken, all action necessary to execute and deliver this Assignment and Acceptance and any other documents required or permitted to be executed or delivered by it in connection with this Assignment and Acceptance, and to fulfill its obligations hereunder; (ii) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution, delivery and performance of this Assignment and Acceptance; and apart from any agreements or undertakings or filings required by the Agreement, no further action by, or notice to, or filing with, any Person is required of it for such execution, delivery or performance; (iii) this Assignment and Acceptance has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignee, enforceable against the Assignee in accordance with the terms hereof, subject, as to enforcement, to bankruptcy, insolvency, moratorium, reorganization and other laws of general application relating to or affecting creditors' rights and to general equitable principles; [and (iv) it is an Eligible Assignee.]

9.    Further Assurances.

The Assignor and the Assignee each hereby agree to execute and deliver such other instruments, and take such other action, as either party may reasonably request in connection with the transactions contemplated by this Assignment and Acceptance, including the delivery of any notices or other documents or instruments to the Account Party or the Agent, which may be required in connection with the assignment and assumption contemplated hereby.

10.    Miscellaneous.

(a)    Any amendment or waiver of any provision of this Assignment and Acceptance shall be in writing and signed by the parties hereto. No failure or delay by either party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof and any waiver of any breach of the provisions of this Assignment and Acceptance shall be without prejudice to any rights with respect to any other or further breach thereof.

(b)    All payments made hereunder shall be made without any set-off or counterclaim.

(c)    The Assignor and the Assignee shall each pay its own costs and expenses incurred in connection with the negotiation, preparation, execution and performance of this Assignment and Acceptance.

(d)    This Assignment and Acceptance may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

(e)    THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK. The Assignor and the Assignee each irrevocably submits to the non-exclusive jurisdiction of any State or

CH\1135197.13                                                      029123-0013

Federal court sitting in [New York, New York] over any suit, action or proceeding arising out of or relating to this Assignment and Acceptance and irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such State or Federal court. Each party to this Assignment and Acceptance hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.

        (f)    THE ASSIGNOR AND THE ASSIGNEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS ASSIGNMENT AND ACCEPTANCE, THE CREDIT AGREEMENT, ANY RELATED DOCUMENTS AND AGREEMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALING, OR STATEMENTS (WHETHER ORAL OR WRITTEN).

        IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Assignment and Acceptance to be executed and delivered by their duly authorized officers as of the date first above written.

<div align="center"><strong>[ASSIGNOR]</strong></div>

By: _____

Title: _____

Address: _____

<div align="center"><strong>[ASSIGNEE]</strong></div>

By: _____

Title: _____

Address: _____

CH\1135197.13

029123-0013

SCHEDULE 1
to
ASSIGNMENT AND ACCEPTANCE

NOTICE OF ASSIGNMENT AND ACCEPTANCE

_____, 200_

Bank of America, N.A.

_____

_____

Attn: _____

Re:  [Name and Address of Account Party]

Ladies and Gentlemen:

We refer to the Post-Petition Letter of Credit Facility Agreement dated as of [_____],
2010 (as amended, amended and restated, modified, supplemented or renewed from time to time the
"Agreement") among W. R. Grace & Co. and certain of its Subsidiaries (collectively, the "Account
Party"), the Letter of Credit Issuers referred to therein and Bank of America, N. A., as agent for the Letter
of Credit Issuers (the "Agent").  Terms defined in the Agreement are used herein as therein defined.

1.    We hereby give you notice of, and request your consent to, the assignment by
_____ (the "Assignor") to _____ (the "Assignee") of _____% of the right,
title and interest of the Assignor in and to the Agreement (including the right, title and interest of the
Assignor in and to the Commitments of the Assignor and all outstanding Letters of Credit) pursuant to the
Assignment and Acceptance Agreement attached hereto (the "Assignment and Acceptance").  We
understand and agree that the Assignor's Commitment, as of _____, 200_, is $_____, the
aggregate amount of its outstanding reimbursement obligations with respect to Letters of Credit is
$_____.

2.    The Assignee agrees that, upon receiving the consent of the Agent to such
assignment, the Assignee will be bound by the terms of the Agreement as fully and to the same extent as
if the Assignee were the Letter of Credit Issuer originally holding such interest in the Agreement.

3.    The following administrative details apply to the Assignee:

(A)    Notice Address:

Assignee name: _____
Address: _____
_____
_____
Attention:_____
Telephone: (___) _____
Facsimile: (___) _____

(B)     Payment Instructions:

Account No.: _____
          At: _____
              _____
              _____
Reference:    _____
Attention:    _____

    4.     You are entitled to rely upon the representations, warranties and covenants of each of the Assignor and Assignee contained in the Assignment and Acceptance.

    IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Notice of Assignment and Acceptance to be executed by their respective duly authorized officials, officers or agents as of the date first above mentioned.

Very truly yours,

**[NAME OF ASSIGNOR]**

By:     _____

Title:  _____

**[NAME OF ASSIGNEE]**

By:     _____

Title:  _____

ACKNOWLEDGED AND ASSIGNMENT
CONSENTED TO:

Bank of America, N. A.
as Agent

By:     _____
Title:  _____

029123-0013

## SCHEDULE 1.1

## COMMITMENTS

| Letter of Credit Issuer | Commitment | Pro Rata Share (3 decimals) |
|---|---|---|
| Bank of America, N.A. | $100,000,000 | 100.000% |