# EXHIBIT H

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

2000 CarswellOnt 2174

Parsons v. Canadian Red Cross Society

Dianna Louise Parsons, Michael Herbert Cruickshanks, David Tull, Martin Henry Griffen, Anna Kardish, Elsie Kotyk, Executrix of the Estate of Harry Kotyk, deceased and Elsie Kotyk, personally, Plaintiffs and The Canadian Red Cross Society, Her Majesty the Queen in right of Ontario and The Attorney General of Canada, Defendants

James Kreppner, Barry Issac, Norman Landry, as Executor of the Estate of the late Serge Landry, Peter Felsing, Donald Milligan, Allan Gruhlke, Jim Love and Pauline Fournier, as Executrix of the Estate of the late Pierre Fournier, Plaintiffs and The Canadian Red Cross Society, The Attorney General of Canada and Her Majesty the Queen in right of Ontario, Defendants

Ontario Superior Court of Justice

Winkler J.

Heard: February 14-16, 1999
Judgment: June 22, 2000
Docket: 98-CV-141369 CP, 98-CV-146405

© Thomson Reuters Canada Limited or its Licensors. All rights reserved.

Counsel: *Harvey Strosberg, Q.C.*, *Heather Rumble Peterson* and *Patricia Speight*, for Plaintiffs, Dianna Louise Parsons, Michael Herbert Cruickshanks, David Tull, Martin Henry Griffen, Anna Kardish and Elsie Kotyk.

*R.F. Horak* and *Michèle Smith*, for Her Majesty the Queen in Right of Ontario.

*Michel Lapierre*, for Attorney General of Canada.

*Beth Symes*, for Friend of the Court, Thalassemia Foundation of Canada.

*William P. Dermody*, for Intervenors, Hubert Fullarton and Tracey Goegan.

*Terrence J. O'Sullivan* and *Vanessa Jolles*, for Plaintiffs, James Kreppner, Barry Issac, Norman Landry, as Executor of the Estate of the late Serge Landry, Peter Felsing, Donald Milligan, Allan Gruhlke, Jim Love and Pauline Fournier, as Executrix of the Estate of the late Pierre Fournier.

*Janice E. Blackburn*, for Canadian Hemophilia Society, Friend of the Court.

Subject: Civil Practice and Procedure; Insolvency

Practice --- Parties — Representative or class actions — General

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

Two companion class proceedings were brought against Red Cross and federal and provincial governments for damages arising from tainted blood — Settlement approved in actions against governments and stayed against Red Cross — Ontario class counsel groups brought motion for approval of counsel fees totalling $20 million — Ontario groups consisted of 60 lawyers and their supporting legal staff — All parties agreed that fair and reasonable fees appropriate and that counsel were skilful and effective — "Fair and reasonable" to be determined in light of risk undertaken by solicitor in conducting litigation and degree of success — Counsel found to have produced best possible result short of trial — Proceedings were largest personal injury case in Canadian legal history — High risk involved in taking on difficult and complex issues — Higher risk involved in class actions than in ordinary litigation because of requirement of court approval of any settlement — Motion granted.

**Cases considered by *Winkler J.*:**

*Crown Bay Hotel Ltd. Partnership v. Zurich Indemnity Co. of Canada* (1998), 160 D.L.R. (4th) 186, 40 O.R. (3d) 83, 21 C.P.C. (4th) 272 (Ont. Gen. Div.) — considered

*Doyer v. Dow Corning Corp.* ((September 1, 1999)), no C.S. Montrèal 500-06-000013-934 (Que. S.C.) — referred to

*Gagne v. Silcorp Ltd.* (1998), 113 O.A.C. 299, 167 D.L.R. (4th) 325, 39 C.C.E.L. (2d) 253, 41 O.R. (3d) 417, 27 C.P.C. (4th) 114 (Ont. C.A.) — applied

*Harrington v. Dow Corning Corp.* (1999), 29 C.P.C. (4th) 14, 64 B.C.L.R. (3d) 332 (B.C. S.C.) — referred to

*Maxwell v. MLG Ventures Ltd.* (1996), 30 O.R. (3d) 304, 3 C.P.C. (4th) 360, 11 O.T.C. 292 (Ont. Gen. Div. [Commercial List]) — referred to

*Nantais v. Telectronics Proprietary (Canada) Ltd.* (1996), 28 O.R. (3d) 523, *(sub nom. Nantais v. Telectronics Propriety (Canada) Ltd.)* 134 D.L.R. (4th) 470, 7 C.P.C. (4th) 189 (Ont. Gen. Div.) — considered

*Pelletier v. Baxter Health Care Co.* ((July 9, 1999)), no Montreal 500-06000005-95 (Que. S.C.) — referred to

*Serwaczek v. Medical Engineering Corp.* (1996), 3 C.P.C. (4th) 386, 13 O.T.C. 63 (Ont. Gen. Div.) — referred to

*Windisman v. Toronto College Park Ltd.* (1996), 3 C.P.C. (4th) 369, 10 O.T.C. 375 (Ont. Gen. Div.) — referred to

**Statutes considered:**

*Class Proceedings Act, 1992*, S.O. 1992, c. 6

Generally — referred to

s. 32(1) — referred to

s. 32(1)(c) — referred to

s. 32(2) — referred to

s. 32(4) — referred to

s. 33(1) — referred to

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

s. 33(2) — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

Generally — referred to

MOTION for approval of counsel fees in tainted blood class proceedings.

***Winkler J.***:

1      This is a motion for approval of the counsel fees in two companion class proceedings, *Parsons et al. v. The Canadian Red Cross Society et al.* (the "Transfused Action") and *Kreppner et al. v. The Canadian Red Cross Society et al.* (the "Hemophiliac Action") commenced under the *Class Proceedings Act 1992*, S.O. 1992, c. 6. These actions were brought on behalf of all individuals in Canada, except for those in the provinces of Quebec and British Columbia, who were infected with Hepatitis C from the Canadian blood supply during the period of January 1, 1986 to July 1, 1990. There are concurrent class proceedings before the courts of Quebec and British Columbia for individuals in those provinces. The parties in all of the class proceedings across Canada have entered into a pan-Canadian settlement of the litigation. In reasons released on September 22, 1999, I approved the settlement as it applied to the national classes in the Transfused Action and the Hemophiliac Action. The settlement has also been approved by the courts in Quebec and British Columbia as it relates to the actions in those provinces.

2      The Settlement Agreement was presented to the courts for approval by all of the parties to the litigation. It contemplated payment of total class counsel fees for all of the actions in the amount of $52,500,000.00. That figure was used in the actuarial calculations in order to permit the courts to assess the settlement and the sufficiency of the Trust Fund established for the payment of claims to the class members in the litigation. The Ontario class counsel groups in the Transfused Action and in the Hemophiliac Action now bring this motion for the approval of their fees specifically.

**Background**

3      The defendants in the Ontario class actions are the Canadian Red Cross Society ("CRCS"), Her Majesty the Queen in Right of Ontario and The Attorney General of Canada. In addition, all other provinces and territories of Canada, with the exception of British Columbia and Quebec, intervened for the purposes of joining the settlement. Only the governments participated in the settlement, the proceedings against the CRCS having been stayed as a result of an Order of Mr. Justice Blair in respect of ongoing proceedings concerning the CRCS under the *Companies Creditors Arrangement Act*, R.S.C. 1985, c. C-36.

4      The Transfused Action and the Hemophiliac Action were commenced as a result of the contamination of the Canadian blood supply with the Hepatitis C virus ("HCV") during the 1980s. The classes in the Actions, however, are described more narrowly as those persons infected by HCV from the blood supply between January 1, 1986 and July 1, 1990.

5      The classes are confined to the 1986-90 time period because of the basis of the claims asserted in the Actions. During the class periods, the CRCS was the sole supplier and distributor of whole blood and blood products in Canada. The federal, provincial and territorial governments ("FPT governments") provided funding to the CRCS and staffed an overseer committee known as the Canadian Blood Committee ("CBC") which was composed of their representatives. The claims in these Actions are founded on the decision by the CRCS, and its overseers the CBC, not to conduct testing of blood donations to the Canadian blood supply after "surrogate" testing for HCV became available and had been put into

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

widespread use in the United States. It was alleged by the plaintiffs in both Actions that had the defendants taken steps to implement the surrogate testing, the incidents of HCV infection from contaminated blood and blood products would have been reduced by as much as 75% during the class period. Consequently, the plaintiffs brought actions on behalf of the classes described above in which claims were asserted in negligence, breach of fiduciary duty and strict liability as against all of the defendants.

6       As a result of the pan-Canadian Settlement Agreement, these claims have been settled, although without any admission of liability on the part of any of the defendants. Pursuant to the terms of the Settlement Agreement the class counsel in each of the Actions now seek court approval of their fees. This motion is in respect of the fees in the class actions commenced in Ontario on behalf of the national classes. Similar motions have been brought in the actions in British Columbia and Quebec.

7       The motion was heard over a three day period during which submissions were made by or on behalf of the class counsel in both actions, by counsel for the federal and Ontario governments and by counsel for certain intervenors and friends of the court. In addition, the parties filed affidavit evidence, transcripts of the cross-examinations on the affidavits and, in the case of the federal and Ontario governments, a document which was purported to be an expert's report in respect of fees. The author of this report was cross-examined and a transcript of the cross-examinations was included in the record.

8       It was apparent at the conclusion of this extensive hearing that there is agreement among the all of the participants with respect to certain facts. These are as follows:

(1) The Settlement Agreement contemplates that total lawyers fees in the Ontario, Quebec and British Columbia actions may amount to $52,500,000. There will be no impact on the sufficiency of the Fund to provide the benefits to the claimants set out in the Agreement so long as the counsel fees do not exceed this amount.

(2) All participants are of the view that class counsel conducted the litigation in a skilful and effective manner and achieved an excellent result for the class members through the negotiated settlement.

(3) There is no issue with the total number of hours docketed by class counsel during the proceedings, nor is there any issue with respect to the number of law firms or lawyers engaged in negotiating this settlement on the part of the plaintiffs.

(4) The factual account of the conduct of the negotiations as set out in the affidavits of the class counsel group are accepted as being accurate.

(5) All participants acknowledge that the class counsel are entitled to a fair and reasonable fee.

9       Where the defendants and the intervenors part company with class counsel is in respect of the characterization of what, in principle and quantum, constitutes a "fair and reasonable fee."

**Law**

10       The fixing of fees in a class proceeding is governed by ss. 32 and 33 of the *CPA*. These sections provide in pertinent part:

32(1) An agreement respecting fees and disbursements between a solicitor and a representative party shall be in writing and shall,

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

(a) state the terms under which fees and disbursements shall be paid;

(b) give an estimate of the expected fee, whether contingent on success in the class proceeding or not; and

(c) state the method by which payment is to be made, whether by lump sum, salary or otherwise.

(2) An agreement respecting fees and disbursements between a solicitor and a representative party is not enforceable unless approved by the court, on the motion of the solicitor.

. . . . .

(4) If an agreement is not approved by the court, the court may,

(a) determine the amount owing to the solicitor in respect of the fees and disbursements;

(b) direct a reference under the rules of court to determine the amount owing; or

(c) direct that the amount owing be determined in any other manner.

33(1) Despite the *Solicitors Act* and *An Act Respecting Champerty*, being chapter 327 of Revised Statutes of Ontario, 1897, a solicitor and a representative party may enter into a written agreement providing for payment of fees and disbursements only in the event of success in a class proceeding.

(2) For the purpose of subsection (1), success in a class proceeding includes,

(a) a judgment on common issues in favour of some or all class members; and

(b) a settlement that benefits one or more class members.

11    The leading Ontario case on the quantification of appropriate fees in class proceedings is *Gagne v. Silcorp Ltd.* (1998), 41 O.R. (3d) 417 (Ont. C.A.). Goudge J.A., writing for the court, addressed the purpose of awarding premium fees in respect of successful class proceedings. He stated at 422-23:

[a] fundamental objective [of the *CPA*] is to provide enhanced access to justice to those with claims that would not otherwise be brought because to do so would be prohibitively uneconomic or inefficient. The provision of contingency fees where a multiplier is applied to the base fee is an important means to achieve this objective. The opportunity to achieve a multiple of the base fee if the class action succeeds gives the lawyer the necessary economic incentive to take the case in the first place and to do it well. *However, if the Act is to fulfill its promise, that opportunity must not be a false hope.* (Emphasis added.)

12    Although the issue before the Court of Appeal in *Gagne* involved a premium fee in the form of a multiplier of a base fee, it has been held that this is not the only acceptable form of premium fee arrangement in class proceedings conducted under the *CPA*. (See *Nantais v. Telectronics Proprietary (Canada) Ltd.* (1996), 28 O.R. (3d) 523 (Ont. Gen. Div.); *Crown Bay Hotel Ltd. Partnership v. Zurich Indemnity Co. of Canada* (1998), 40 O.R. (3d) 83 (Ont. Gen. Div.)).

13        Notwithstanding the different forms that a premium fee arrangement may take, the principle enunciated by Goudge J.A. regarding the purpose of awarding premium fees in a class proceeding has a general application. If the *CPA* is to achieve the legislative objective of providing enhanced access to justice then in large part it will be dependent upon the willingness of counsel to undertake litigation on the understanding that there is a risk that the expenses incurred in time and disbursements may never be recovered. It is in this context that a court, in approving a fee arrangement or in the exercise of fixing fees, must determine the fairness and reasonableness of the counsel fee. Accordingly, the case law that has developed in Ontario holds that the fairness and reasonableness of the fee awarded in respect of class proceedings is

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

to be determined in light of the risk undertaken by the solicitor in conducting the litigation and the degree of success or result achieved. (See *Maxwell v. MLG Ventures Ltd.* (1996), 3 C.P.C. (4th) 360 (Ont. Gen. Div. [Commercial List])); *Windisman v. Toronto College Park Ltd.* (1996), 3 C.P.C. (4th) 369 (Ont. Gen. Div.); *Serwaczek v. Medical Engineering Corp.* (1996), 3 C.P.C. (4th) 386 (Ont. Gen. Div.)). This approach was approved by Goudge J.A. in *Gagne* where he stated at 423:

> ... In my view, [it is correct to focus] on these two considerations. Section 33(7)(b) makes clear the relevance of "the risk incurred in undertaking and continuing the proceeding under an agreement for payment only in the event of success." Section 33(9) invites a consideration of the manner in which the solicitor conducted the proceedings.

**Analysis**

14      In my view, there are a variety of methods that may be untilized under the *CPA* to determine an acceptable premium on fees. It is appropriate to utilize this flexibility in fixing the fees in class proceedings where necessary. Here, class counsel seek to have their fees fixed on a lump sum basis pursuant to the retainer agreements with the representative plaintiffs and the provision in the Settlement Agreement. While this is acceptable in form, in my view, the court must still adhere to the principles discussed in *Gagne* in assessing the fairness and reasonableness of the counsel fee, whether that fee is calculated on a lump sum basis or otherwise.

*A. Result Achieved in the Litigation*

15      I will deal first with the success or result achieved in the instant litigation. I note in passing that one of the most striking aspects of the fee hearing was the number of issues upon which all participants expressed agreement. As stated above, it was common ground that an excellent result was obtained for the class members through the negotiated settlement of the litigation.

16      Nonetheless, the court, in fulfilling its role in the approval of fees, must form its own view of the success achieved. The characterization of the result by the parties and other participants is but one factor to be considered. The court's analysis must be objective. In this regard, I concluded in approving the settlement that class counsel have produced the best possible result short of trial. (See *Parsons v. Canadian Red Cross Society*, [1999] O.J. No. 3572 at para. 91). Moreover, the settlement provides for payments according to the degree of harm suffered by the class members, as well as for progressive increases in those payments to class members should their condition worsen. This avoidance of the "once and for all" lump sum payment approach commonly applied in personal injury tort litigation entails an overriding advantage for class members and consequently must augur favourably for class counsel in any considered analysis of the result.

17      From the perspective of the class members, however, the total compensation or nature of payment cannot be the only criteria on which to judge the result obtained through settlement. Significant weight must also be given to the relative ease or difficulty of access to the benefits achieved through the settlement by a class member. (See also *Gagne* at 425.) In this case, a procedure for claims administration has been wrought into the settlement that will see most class members able to obtain compensation without the need for further legal assistance or proceedings. This contrasts favourably with many class proceedings where, despite a global settlement, class members are still required to engage in extensive legal proceedings to obtain the benefits. The relative ease of access to compensation is an important feature. It provides some certainty as to the quantum of compensation that class members will receive at each level, but more so, it demonstrates the thoroughness of class counsel in fashioning a msatisfactory settlement.

*B. Risk Undertaken by Class Counsel*

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

18        I turn now to the risk factor. In the context of the *CPA*, the premium on fees for undertaking risk in litigation means that there should be a reward for taking on meritorious but difficult matters. Conversely, this does not mean that there should be a reward for bringing forward speculative cases of dubious merit. In my view, the instant matter falls squarely into the first category. Nonetheless, it was strongly contended by the defendants and intervenors that the extra-legal considerations at play in these actions mitigated the risk. The underlying premise for this submission was that this was not litigation in the ordinary sense because the government defendants were inclined to settle for policy and political reasons that had little or nothing to do with the merits of the litigation or the vigorous manner in which it was being pursued. Accordingly, the defendants and intervenors took the position that the risks attendant to litigation generally were not present here. I disagree.

19        It was common ground among the parties that there were political overtones to the litigation. Nonetheless, to accept the proposition that any extra-legal influence reduced the risk of the litigation would be to engage in a purely speculative, after the fact interpretation of the events that transpired during the course of this litigation. But, more to the point, this proposition is contradicted by the evidence. It is clear that this settlement was driven by the threat of litigation and not by political considerations. This is demonstrated by the chronology of the events, set out in the chart below, leading up to the announcement by the federal, provincial and territorial governments ("FPT governments") on March 27, 1998 that a fund of $1,100,000,000 would be set aside to satisfy the claims of those persons infected by HCV from the blood supply.

|  | DATE | EVENT |
|---|---|---|
| 1. | June 21, 1996 | Quebec Transfused Class Action is filed. |
| 2. | September 9 to 11, 1996 | The FPT governments announced their decision declining compensation to blood victims. |
| 3. | December 19, 1996 | The British Columbia Transfused Class Action is commenced. |
| 4. | October 24, 1996 | The FPT Health Ministers announce that they have decided against compensation. |
| 5. | May 22, 1997 | The British Columbia Transfused Class Action is certified. |
| 6. | July 7, 1997 | There is an agreement on lead counsel for the Ontario HCV Class Action. |
| 7. | September 16, 1997 | Notice of the Ontario Transfused Class Action is given to Ontario and the other provincial governments. |
| 8. | November 26, 1997 | The final report of the Krever Inquiry is released. |
| 9. | February 10, 1998 | The Statement of Claim in the Ontario Transfused Class Action is issued on behalf of a national class. |
| 10. | February 23, 1998 | The Quebec Transfused Class Action is certified. |
| 11. | March 27, 1998 | On behalf of the FPT Ministers of Health, the Honourable Allan Rock announces a financial assistance package to persons infected with HCV between 1986 to 1990 of up to $1,100,000,000.00. |

20        It can be seen from this sequence of events that the FPT governments did not make any overtures toward compensating defendants until class proceedings had been certified in British Columbia and Quebec and there was a potential for certification of a national class encompassing all those persons in the rest of Canada in the Ontario proceedings. It must also be noted that even though the announcement of March 27, 1998 could hardly be considered a formal binding offer of settlement, it was only intended to apply to those persons included in the class proceedings. The litigious nature of the settlement negotiations is further evidenced by the length of time and effort taken to reach a binding agreement.

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

Even then, there were still numerous conditions attached because of the desire of the FPT governments to have one pan-Canadian settlement for all of the actions. Furthermore, there has never been any admission of liability by the defendants. Indeed the final Settlement Agreement contains a specific disclaimer of liability.

21       The evidence of Douglas Elliot, a member of the class counsel group, is instructive. Mr. Elliot is a highly experienced lawyer in blood litigation in Canada. As a result of his involvement with the issues surrounding the Hepatitis C litigation and his participation at the Krever Commission inquiry, he attempted to assemble a counsel group to prosecute a class proceeding on behalf of those infected with HCV from the blood supply.

22       In his affidavit, Mr. Elliot chronicles three years of unsuccessful attempts to find counsel in Ontario willing to lead and participate in a class proceeding related to the HCV problems stemming from the contamination of the Canadian blood supply. He deposed that it was difficult to find any law firm, large or small, willing to take on the litigation, especially in the role of lead counsel. It is his evidence that none of the counsel he approached regarded the potential political considerations as altering the fundamentally litigious nature of these proceedings. Their rejections were based strictly on the legal problems which the case presented. He states in paragraph 41 of his affidavit:

> 41. I believe that there were few lawyers who were knowledgeable about the operation of the blood system in Canada to begin with, and many regarded tainted-blood cases on behalf of plaintiffs as unattractive owing to their complexity and their prohibitive costs. The trial in *Pittman*, which was by this time completed, had lasted almost one year. To put the matter simply and directly, the lawyers to whom I spoke well understood that, in relation to this class action and the complex issues of liability, there were simply much easier ways to earn a living. And so they declined to become involved.

His evidence in this respect was not challenged by the defendants or intervenors. In the result, I must conclude that any suggestion that the political implications of the issues made the litigation less risky, apart from being inaccurate, was not apparent to most of the lawyers in Ontario at the outset of the litigation.

23       In consideration of the chronology of the events in this litigation and the uncontested evidence of Mr. Elliott, I am unable to accept the contention that political considerations operated to either transform this litigation or diminish the risk associated with it in any material way.

24       This leads in turn to another argument that was advanced by the government defendants. They contended that, even if the proceedings were considered to be litigation in the ordinary sense, the inherent risks diminished with time as the negotiations progressed. In consequence, they submit that any premium on the fee should reflect this diminishing risk. In support of this proposition, these defendants filed the report of Michael Ross, a vice-president of the accounting firm KPMG. Mr. Ross, in accordance with his instructions, attempted in his report to apply mathematical parameters, including a factor for changing risk, to the determination of an appropriate counsel fee in a class proceeding. However, this report was less than helpful, in part because of the flaws in the underlying premise that the risk factor in litigation can be ascertained with mathematical precision, and in part because of his fundamental misconception of the nature of a class proceeding and the *CPA*.

25       That said, I realize that Mr. Ross was given an impossible task. His assignment was, in reality, to attempt to define a subject with more precision than the subject would bear. As Goudge J.A. stated in *Gagne*, the fixing of an appropriate fee in a class proceeding is "an art, not a science." As such, the court must be wary of attempts to measure appropriate fees by the application of psuedo-scientific or mathematical methods. Such an approach is inherently unreliable when a subject with as many variables as this litigation is considered.

26       Mr. Ross based his evidence on the premise that the premium on a fee should be reflective of the "judgmental

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

probability of success" in the litigation. In his opinion, the amount of the premium over the ordinary fees should be a re-ciprocal of the risk of the litigation. As a theoretical example, this would ensure that counsel taking on litigation with an estimated 50% probability of success would not suffer any economic prejudice if the fee earned in the successful actions was multiplied by a factor of 2. For every two actions, one unsuccessful, one successful, that counsel undertake, the fees would balance out and there would be no loss.

27      This mathematical approach is fundamentally flawed. The probability of success in any litigation cannot be fixed with mathematical precision at any stage of the proceeding. The vagaries of litigation simply do not permit it.

28      Mr. Ross also propounded the theory that the risk of the litigation changed as it progressed and that therefore, the premium should reflect the changing risk. While there may be some truth to the assertion that the risk of litigation changes over the course of the proceeding, it must be considered that changes can occur which both diminish and exacer-bate risk at different points in the litigation. There is no more prospect of assigning a precise mathematical value to the risk on a segmented, progressive basis than there is at the outset of the litigation.

29      Moreover, class action litigation introduces additional complications. Complex class actions subsume the pro-ductive time of counsel. The risk undertaken by counsel is not merely a function of the probability of winning or losing. Some consideration must also be given to the commitment of resources made by the class counsel and the impact that this will have in the event the litigation is unsuccessful. Winning one of two class actions may be a reasonable hallmark of success. However, for the lawyer who's first action turns out to be a loser, the complete exhaustion of resources may leave him or her unable to conduct another action. Thus the real risk undertaken by class counsel is not merely a simple reciprocal of the "judgmental probability of success" in the action, even if that calculation could be made with any degree of certitude. There is a point in complex class action litigation where, degree of risk notwithstanding, class counsel may truly be, as Mr. Strosberg put it in his submissions, "betting his or her law firm." This must be considered in assessing the "risk" factor in regard of the appropriate fee for counsel.

30      Equally troubling is the fact that Mr. Ross did not consider the unique features of the *CPA* in formulating his the-ory regarding the "judgmental probability of success." This was apparent from the transcript of his cross-examination. For example, it was clear that Mr. Ross did not appreciate the risk induced into class action litigation by the additional element of the requirement to attain certification. In the result, the probability of success or failure on the certification motion was not a factor that Mr. Ross considered. This is a significant omission if his fee theory is to be applied to class proceedings. More importantly, it is illustrative of the inherent unreliability of this evidence, and further, is indicative that Mr. Ross is offering an opinion to the court that is clearly outside his area of expertise.

31      In the result, I conclude that the report of Mr. Ross is of no value in determining either the risk assumed by class counsel or the reasonableness of the fee in these actions.

32      The government defendants chose to rely heavily on this report and did not offer any other evidence on the as-sessment of the risk involved in the litigation. They did not file affidavits from any member of the counsel group that were involved in the negotiations on behalf of the governments, nor did they provide any evidence from any person at a senior administrative level in the governmental departments responsible for the litigation. Instead, the government de-fendants conceded that the accounts of the negotiations proffered by the affiants deposed on behalf of the class counsel group were accurate. Interestingly in this regard, the government defendants chose to file as part of their evidence the af-fidavits of class counsel in the British Columbia and Quebec actions.

33      A picture emerges from the affidavits proferred by class counsel and the government defendants of negotiations that were logistically difficult, intense and time-consuming, adversarial and hard fought. There were obvious points at

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

which potential "deal-breaking" issues surfaced and the success of the negotiations hung in the balance. The various affiants cite examples.

34      Bonnie Tough, the lead counsel for the Hemophiliac Action, states in her affidavit:

107. There was throughout the negotiations and even following the Framework Agreement in December of 1998 the risk that one or more governments would not approve the settlement. It was never clear to me the extent to which the various provinces and territories were represented at the negotiating table. It was clear that to the extent they were represented by one or more lawyers, those lawyers were without authority to conclude a deal.

108. Even within the governments, it was not clear who was instructing the lawyers, i.e. Attorneys' General, Department of Justice, Ministries of Health, Cabinet, Treasury Boards, etc. I was concerned that the successful conclusion of any deal depended upon the attitudes and conduct of a phantom group with whom I was not directly speaking. I did not know the extent to which political differences might influence the acceptance or rejection of any settlement. Changes in governments throughout the time only exacerbated this concern.

35      Heather Peterson, a member of the class counsel group in the Transfused Action, states in her affidavit:

78. During [the] last stages of negotiations additional issues arose, some of which also threatened to undermine the negotiations. Two of the most serious examples come to mind:

(a) The Framework Agreement provides ... that the [Settlement] Fund would generate interest as if the amount had been notionally invested at the interest rate paid "from time to time on Long Term Government of Canada Bonds from April 1, 1998 fo the duration of the Plan." However during negotiations, the federal government took the position that only the T-bill rate should be paid. Class Action Counsel took the position that maintenance of this position by the FPT governments would be a "deal breaker."

(b) On or about May 9 and 10, 1999, at a negotiation meeting in Vancouver, the FPT Governments raised the prospect of including in the settlement persons who had contracted HCV from immune globulins. The Framework Agreement and all of the ensuing negotiations until that date had not included any reference at all to this group.

... [the Ontario government] took the position that [it] wished to be finished with all HCV blood litigation and thus wanted persons who contracted HCV from immune globulins in the Class Period included in the settlement. Strosberg's response was that there was simply no basis to include these persons in the plaintiffs' class. The end of these discussions came on May 13, 1999 at the Toronto offices of McCarthy Tetrault ... [when] Strosberg told counsel to the FPT Governments that their insistence upon including recipients of immune globulins in the class was a "deal breaker," that it was their choice, but under no circumstances would he accept this group in the class. Strosberg intended to break off negotiations if the FPT Governments did not yield on the issue. Strosberg and I left that session uncertain as to whether negotiations had broken down. Thankfully, the FPT Governments eventually relented.

36      It is apparent from the record that even though this litigation was conducted from the middle of 1998 forward as a negotiation toward a settlement, the risks assumed by class counsel were no less real at any point than if that time had been devoted to a disposition through a trial process.

37      In addition, the legislation enabling class proceedings introduces several features that distinguish these actions from ordinary litigation. One aspect that bears on the risk inherent in class actions is the requirement of court approval of any settlement reached. Protracted negotiations involve a commitment of the time and resources of counsel and the litigants. However, in a class proceeding, a court will not approve a settlement that it does not regard as being in the best in-

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

terests of the class, regardless of whether class counsel take a different view. Thus, class counsel may find themselves in the position of having committed time and resources to the negotiation of a settlement, that they believe is in the best interests of the class, only to find that the court will not approve the settlement achieved. While this creates a risk *simpliciter*, it also creates an advantage for a defendant who can successfully extend the negotiations to the point that class counsel's resources are exhausted before making a "final settlement offer" that may not ultimately receive court approval. In those cases, class counsel may have exhausted their resources attempting to obtain a reasonable settlement only to find themselves, as a consequence, unable to pursue the litigation. Accordingly, the risk in a class proceeding is not merely a function of whether or not litigation is anticipated and whether or not litigation will be successful. Rather, there are risks inherent in the adoption of, and commitment to, any particular strategy for achieving a resolution.

38      In view of the foregoing, I am unable to accept the contention that there was less risk in this proceeding merely because the parties chose to proceed down a negotiation route. Moreover, contrary to the submissions made by certain of the intervenors, it is apparent that the time and resources committed to the negotiations by the class counsel meant that the risk was increasing rather than decreasing as the negotiations continued. As the parties moved toward a settlement, the negotiations became more difficult as the issues narrowed with the result that the risk of an insurmountable impasse increased rather than diminished. This made the negotiations more perilous as they progressed. In that respect, one need look no further than to the actual settlement approval process which required a review of the settlement by this court. In order to obtain the approval of this court, modifications were required to the settlement agreement. Although the court took the view that these modifications were "non-material" as that term was set out in the agreement, the federal government took a different view, as related in the affidavit of Ms. Peterson. She deposed as follows:

> 92. After Mr. Justice Winkler's [sic] delivered his reasons on December 22, 1999 counsel for the federal government and counsel for Ontario asserted orally that the modifications he had suggested and the reasons were indeed "material differences."

> 93. After delivery of Mr. Justice Winkler's reasons, counsel for the federal government urged class action counsel to join with him in attempting to persuade Mr. Justice Winkler that his suggested modification relating to the surplus should be abandoned. He told us that if we did not agree he would recommend to the federal government to take issue at Mr. Justice Winkler's suggested modification. He said that, in his opinion, the modification was a "material difference" and that, therefore, there was not court approval of the settlement agreement. He urged class action counsel to make those fundamental choices before the telephone conference he was having with the FPT Deputy Ministers of Health to be held on October 14, 1999. Strosberg believed strongly that the FPT governments would ultimately accept the three modifications proposed by Mr. Justice Winkler. Class action counsel deferred to Strosberg's political judgement and did not agree with counsel for the federal government, and ultimately the FPT governments consented to the three modifications. *Even after the delivery of Mr. Justice Winkler's reasons, then, fundamental tactical decisions were required and considerable uncertainty remained over whether or not there was actually a settlement.* (Emphasis added).

Clearly the risk continued up until the final judgment was entered.

39      There was an additional submission by one of the intervenors that despite the fact that there may have been risk associated with the negotiations, there was a general cooperative tenor to the negotiations that lessened the risk. I cannot accede to this submission for several reasons. First, it is contrary to the evidence. J.J. Camp, lead counsel for the class in the British Columbia action, whose affidavit was filed on this motion by the federal government, deposed:

> 95. On July 9, 1998 I had an extensive telephone conference with [government counsel] during which they proposed a new counter offer. The tenor of the discussion at times became quite acrimonious with both sides alleging how dis-

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

appointed they were with the position of the other...

This is echoed in the affidavit of Bonnie Tough, lead counsel for the class in the Hemophiliac Action. She states:

> 79. Finally, in November of 1998, there was a meeting in Ottawa with Transfused Class Counsel, Hemophilia Class Counsel and counsel for the governments. The meeting was acrimonious and ended with all parties walking from the table in frustration.

40     But, in any event, risk is not synonymous with acrimony in a negotiation process. Even if the tenor of the negotiations changed somewhat for the better after certain points of contention were resolved, there is nothing in the record which would indicate that these negotiations were anything less than hard fought to the end. As such, they were capable of being derailed at any point, regardless of the level of acrimony between the participants. Indeed, the federal government chose to characterize the negotiations in exactly this manner in its submissions to the court on the settlement approval motion. As stated in the factum filed on that motion by counsel for the federal government:

> 106. It is common ground between the parties that the agreement was reached only after an excess of a year of hard fought negotiations between the Parties.

> 108. The March 1998 announcement expressly contemplated that:

>> "details of assistance will be determined through a negotiation process submitted to the courts for approval. This should ensure fairness. Victims and their legal representatives will be part of this process."

>> Apart from this direction, however, Ministers [sic] merely outlined certain "principles" and "suggestions" for what the final negotiated arrangement would look like...

> 111. *Further negotiations and an extensive drafting exercise took place subsequent to the Agreement in Principle which resulted in the Agreement before the court today. There can be no dispute but that the Agreement is the product of intense negotiations between counsel for the plaintiffs and FPT governments.* (Emphasis added).

41     Further evidence of the tone of the negotiations, or at least the position taken by the parties, can be found in the affidavit of Ms. Peterson. She stated:

> 79. During the negotiations, counsel for the federal government occasionally observed that the option always remained for the FPT governments, or one or some of them, to legislate a program in place of a court-approved negotiation settlement within the framework of the class actions. This option was always a real and substantial risk for class action counsel and our counsel group. ...

> 81. Settlement was always dependant upon formal cabinet approval by all 14 FPT governments. During the negotiations, tensions were palpable among the FPT governments. Counsel for the various FPT governments at times asserted differing, disconsolate positions; so also did class action counsel. Through it all, it became clear to me that, from the FPT government side of the negotiating table, political considerations were as important as legal issues. The concerns about political ramifications was a constant risk, because there were numerous provincial elections and changes in provincial governments (including the creation of a new territory) in the course of the negotiations from April 1998 to October 1999.

42     While I do not equate acrimony with risk, complexity, on the other hand, breeds risk in any proceeding. In this case, the logistical complexity was overwhelming. The insistence of the governments that there be one pan-Canadian settlement of all of the actions meant that any settlement attained required approval of 14 FPT governments, each with differing political agendas and policies. Although obtaining approval from this group alone was daunting enough, the class

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

counsel groups in the various actions on the other side of the bargaining table were by no means speaking in a unified voice at all times. In the Transfused and Hemophiliac Actions in Ontario, the combined class counsel groups were comprised of over 60 lawyers and supporting legal personnel. In addition, the negotiations were played out against the backdrop of changes in the provincial and territorial governments, changes in the Ministers of Health for all of the governments, and political activism directed at attaining a universal settlement for all persons infected with HCV by blood in Canada, regardless of the date of infection. The expenditures of class counsel in terms of time and money were at risk of loss if any politician in authority decided as a matter of expediency or policy not to settle the class proceedings or decided to unilaterally institute a no-fault compensation program and thereby bypass class counsel and the litigation. There was always the inherent danger that the pan-Canadian settlement would be impossible to achieve, either because of a reluctance on the part of a particular government or a class in a particular action to approve an agreement.

43    The evidence is compelling. This litigation, notwithstanding the fact that it was conducted as a protracted negotiation, was redolent with risk. Moreover, insofar as it is appropriate to assess the risk assumed by class counsel on a sliding scale or range depending on the nature of the action in comparison to other actions, I am satisfied that the risk enuring to class counsel in these actions should be considered to be at the high end of any such scale.

*C. Fair and Reasonable Fee*

44    A fair and reasonable fee must be reflective of the risk undertaken by class counsel and the result attained for the class in the action. My analysis of those factors is set out in the foregoing. The next step is to determine, through their application, whether the fees being sought by the class counsel groups, $15,000,000 in the Transfused Action and $5,000,000 in the Hemophiliac Action, constitute fair and reasonable fees in the circumstances.

45    In considering this, I cannot accede to the submissions of the various intervenors with respect to the fees. Taking their submissions as a group, the intervenors submitted that fees ranging between approximately $6,000,000 and $11,000,000 should be awarded in the Transfused Action. In the Hemophiliac Action, the range of the intervenors' submissions was from approximately $2,000,000 and $3,500,000. Although the intervenors did not seriously question the allocation of lawyers and legal staff, they did attack the hourly rates of certain counsel. This attack lacked any evidentiary basis however and thus must be rejected. The second, and main, submission of the intervenors was that there was a diminution of risk either because of the political considerations or the fact that these proceedings were conducted as a negotiation rather than as a completely adversarial trial process. Since I have rejected these underlying propositions as being unsupported by the evidence, it follows that the submission founded on them must be rejected as well.

46    I have considerable difficulty with the submission of the government defendants on different grounds. While I have rejected the intervenors' submissions as founded on erroneous assumptions, there was, to their credit, an implicit acknowledgement, and application, within those submissions of the dual factors of result and risk to be considered in determining a fair and reasonable fee. In contrast, the government defendants submitted figures in respect of the fees that represented less than the monetary value of the docketed time of the class counsel groups. This submission was made despite the acknowledgement by the government defendants of the "high degree of competence of the class counsel" and the recognition of the satisfactory result attained for the classes. Further they took no issue with the hours expended by the class counsel groups, the number of counsel within those groups, or the class counsel evidence with respect to the difficulty of the negotiations. The fee proposed by the governments was arrived at by combining an arbitrary reduction of the hourly rates of the class counsel group and an addition of a premium of approximately 10% of the reduced amount. If accepted, the net effect of the governments' submission would be to deprive class counsel of any premium, multiplier or reward of any nature reflecting risk or result.

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

47      The position taken by the government defendants is untenable. Considered in the context of these proceedings, the fees they propose are not reflective of either the result obtained or the risk undertaken even if just one of those factors were to be considered in isolation. More so however, the fees proposed by the government defendants are at variance with the apparent underlying policy of the *CPA* and the interpretation of that policy by the Court of Appeal in *Gagne*.

48      It was suggested by Mr. O'Sullivan, who appeared on behalf of the class counsel group in the Hemophiliac Action, that it was obvious that the government defendants' position was driven by political expediency rather than by a sincere effort to assist the court in determining an appropriate fee. In support of this analysis, he provided several press clippings, including some culled from newspaper editions published during the three days of this hearing, that were critical of the fees being sought by the class counsel group. He suggested that the government position, when compared to the positions taken by class counsel and the intervenors, was so far outside the range of reasonableness that it could only be inferred that political, rather than legal considerations must be at play.

49      Notwithstanding these submissions, it is not within the purview of the court's role on this motion to impute ulterior motives to any party and I make no finding in respect of the submissions of Mr. O'Sullivan. As I stated in my reasons regarding the settlement approval, "extra-legal concerns, even though they may be valid in a social or political context, remain extra-legal and outside the ambit of the court's review...."

50      Nonetheless, the concern expressed over extra-legal considerations may well be symptomatic of a general lack of understanding of the legal framework in which these proceedings evolved. The court was invited to address this issue in these reasons by Mr. Dermody, counsel for the intervenors. He expressed a concern that there was a general misunderstanding regarding the nature of these proceedings that had the potential to create animosity between the class members, their counsel and the FPT governments which might, in turn, erode the salutary benefits of the settlement and reflect negatively on the fair compensation of counsel. This point is well taken.

51      In addressing the issue, the starting point must be an understanding that the proceedings were litigious in nature and that the settlement offered by the FPT governments was driven by the prospect of an unfavourable determination, however probable or improbable, if the litigation proceeded to a conclusion. There is no evidence to support any assertion to the contrary. In the result, there was nothing untoward in the way that the government defendants or the class counsel groups conducted themselves in resolving the litigation. Hard bargaining is a fact of life in any high stakes negotiation. Outright capitulation from either side of the table is not a realistic expectation. There were arguable defences and a legitimate question as to the ultimate liability of the governments. While recognizing that the victims had suffered a tragedy, the governments, as litigants, always had to bear in mind that they were the representatives of all of the people and the keeper of the public purse. The tension created by these two concerns obviously complicated matters for the FPT governments and for the class counsel groups. Despite these complexities, the parties perservered through arduous negotiations and reached an agreement to settle the outstanding litigation within a legal framework.

52      In recognition of the legal framework within which the settlement was negotiated, the Agreement crafted speaks directly to the question of class counsel fees in that it stipulates a limit on those fees. All counsel agreed that the fees sought would not exceed $52,500,000 in total. The details of the background negotiations that led to this provision are contained in the affidavits of the British Columbia and Quebec class counsel. The government elicited an agreement from the class counsel groups that they would not seek fees on the basis of a percentage of the total settlement and further, that the counsel group would agree to a cap on the total amount of fees. In addition to the other concessions extracted by the governments, counsel were required to surrender any fee agreements that they may have executed with individual class members. Mr. Camp deposes to this at para.148:

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

148. Under my fee agreement, [the class counsel group] were entitled to charge up to one-third of the settlement amount attributed to the British Columbia class action. Quebec class counsel also had a percentage contingency fee agreement with their representative plaintiff. Class Counsel in both the Framework Agreement and the Settlement Agreement have waived their rights to seek recovery of class counsel fees based on a percentage of the settlement amount. Without doubt, in my opinion, the compromise by class counsel of their right to claim class counsel fees on the basis of percentage of any settlement or judgment, which in my case amounted to up to one-third, was a significant concession which assisted the parties in coming to an agreement.

Mr. Lavigne similarly stated in his affidavit:

145. It should be noted that 166 of the 450 victims who are on the M.M.M.F. lists have agreed, by giving a written mandate, a copy of which is attached hereto, to pay a sum amounting to 20% of any amount that was obtained by a judicial process or negotiation process or by government compensation;

146. The client's expectations in this respect have been clearly established since 1995 and have always comprised a clear, plain and precise working basis for all of the people who came into contact with our firm;

147. This percentage agreement, which is entirely proper and legal in Quebec, has been set aside as regards a claim of 20% in the total amount of the settlement;

148. In the final quibbling during the negotiations that led to the Agreement of June 15, 1999, the applicant solicitors agreed to this additional concession, which was demanded by the governments, and particularly by the federal government, so that the Agreement could be concluded;

149. However, consideration for this was provided: that an agreement would be negotiated and concluded after the Agreement was signed to avoid any question of conflict of interest. Those negotiations have never taken place, and so it is impossible for us to take a position jointly with the respondents regarding the amount of the fees;

53     A final agreement regarding fees was never negotiated. Nevertheless, in consideration of the negotiated surrender of the individual contingency fee agreements, the undertaking by class counsel not to seek a fee on a percentage basis and the express cap of $52,500,000 on total fees, there is no other reasonable conclusion than that there was a tacit understanding between class counsel and the governments that this amount represented a fair and reasonable fee for counsel in the circumstances.

54     To put this in its proper context, it must be remembered that over 400 of the then identified class members in British Columbia and Quebec had negotiated individual contingency fee arrangements whereby they would have paid between 20% and 33% of any compensation received. This arrangement would produce a counsel fee of over $220,000,000, at a minimum, if extrapolated against the total settlement and the estimated class size as a whole. In comparison, the cap on fees negotiated by the governments is very favourable indeed.

55     However, while this tacit agreement between the parties regarding fees is instructive, it is not in itself determinative. In order to arrive at the appropriate premium fee, "all the relevant factors must be weighed."

56     The fees being sought are substantial. However, the quantum of a counsel fee, in and of itself, does not provide a valid basis for attacking the fee. The test in law, as set out in *Gagne*, is whether the fees are fair and reasonable in the circumstances. The legislature has not seen fit to limit the amount of fees awarded in a class proceeding by incorporating a restrictive provision in the *CPA*. On the contrary, the policy of the *CPA*, as stated in *Gagne*, is to provide an incentive to counsel to pursue class proceedings where absent such an incentive the rights of victims would not be pursued. It has long been recognized that substantial counsel fees may accompany a class proceeding. To this effect, the authors of the

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

Ontario Law Reform Commission's *Report on Class Actions* (1982) stated at 135-138:

> Critics of class actions often compare the total amount of administrative costs and lawyer's fees with the amount of each class member's claim, and then suggest that these costs and fees have the effect of depriving class members of any significant recovery. However, a comparison of total costs and fees with an individual class member's claim gives a rather myopic view of the issue. A better sense of whether the costs and fees of a class action are reasonable can be achieved by determining the percentage of the class recovery consumed by such costs and fees.

> Empirical data also has been collected concerning the percentage of class recoveries consumed by lawyers' fees alone. [in the United States] the data collected ... indicates that, in slightly more than fifty percent of the cases for which such information was available, lawyers' fees represented twenty-five percent or less of the recovery, while in only 10.7 percent of the cases did such costs exceed fifty percent of the recovery.

> These percentages of class action awards consumed by lawyers' fees and administrative costs do not appear particularly unreasonable, given the complexity of class suits. Moreover, the figures revealed by the empirical studies do not appear to be out of line with the proportion of individual recoveries consumed by lawyers fees and disbursements in individual litigation in Ontario, if the Law Society of Upper Canada was correct in suggesting that Ontario clients tend to receive a "net recovery" reduced by fifteen to twenty-five percent.

> In evaluating the fairness of lawyers' fees documented by the empirical studies, it is important to remember that, at least in the case of individually non-recoverable claims, any attempt to assert the claim through an individual suit would, by definition, consume 100 percent of the claim. Measured by this standard, the proportion of an individual class member's recovery consumed by class lawyers' fees in the United States does not appear inherently unreasonable. Moreover, in some cases, the costs of individual litigation may consume a substantial proportion of even those claims that are individually recoverable and, in such situations, the class action will also result in cost savings, even if the share consumed by lawyers fees remains substantial.

57      The OLRC Report has been widely acknowledged to be the most sophisticated and extensive analysis of class actions undertaken in the world. (See the *Report of the Attorney General's Advisory Committee on Class Action Reform*, (Ontario, February 1990) at p. 20.) The pragmatic approach it displays towards counsel fees in class actions was based on careful study and analysis. It is significant that the authors of the report did not consider counsel fees representing 25% of the total recovery "inherently unreasonable."

58      However, the appropriateness of a premium fee, whether as a lump sum, as a percentage of the recovery or as a multiplier of a base fee must be assessed against the facts of each case. The adoption of any standard multiplier or percentage fee would undoubtedly result in fee awards that have little relation to the risk undertaken or the result achieved. This was recognized by Goudge J.A. in *Gagne*. To use these proceedings as an example, notwithstanding the OLRC Report and the typical awards in class proceedings, a fee based on 20% or more of the recovery would be clearly excessive and represent a windfall for the counsel groups.

**Disposition**

59      Class counsel in the Transfused Action and the Hemophiliac Action seek court approval of "lump sum fees" in the amounts of $15,000,000 and $5,000,000 respectively, and ask that the fees be fixed in those amounts, pursuant to written retainer agreements with the representative plaintiffs. This lump sum method of payment is expressly contemplated by s. 32(1)(c) of the *CPA* and by the Settlement Agreement, which provides at para. 13.03:

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

The fees, disbursements, costs GST and other applicable taxes of Class Action Counsel will be paid out of the Trust. Fees will be fixed by the Court in each Class Action on the basis of a **lump sum**, hourly rate, hourly rate increased by a multiplier or otherwise, but not on the basis of a percentage of the settlement amount. (Emphasis added.)

60      Moreover, it has been held that the contingency fee provisions of the *CPA* are not limited to a base fee and multiplier arrangement, but instead permit fee arrangements of various types, including lump sums and as percentages of recovery. In *Nantais v. Telectronics Proprietary (Canada) Ltd.* (1996), 28 O.R. (3d) 523 (Ont. Gen. Div.), Brockenshire J., in approving a lump sum fee, stated at 528:

The special provisions relating to "multipliers" for hourly rates [do not prevent], in any way, other arrangements as specifically authorized under s. 32(1)(c). I view s. 33(1) and (2) as permitting, despite other statutes, all kinds of fee arrangements contingent upon success, and not just hourly rate multipliers.

61       In *Crown Bay Hotel Ltd. Partnership v. Zurich Indemnity Co. of Canada* (1998), 40 O.R. (3d) 83 (Ont. Gen. Div.), this court stated at 87-88:

A contingency fee arrangement limited to the notion of a multiple of the time spent may, depending upon the circumstances, have the effect of encouraging counsel to prolong the proceeding unnecessarily and of hindering settlement, especially in those cases where the chance of some recovery at trial seems fairly certain. On the other hand, where a percentage fee, or some other arrangement such as that in *Nantais* ... is in place, such a fee arrangement encourages rather than discourages settlement. ... Fee arrangements which reward efficiency and results should not be discouraged.

62      However, regardless of the manner in which a premium fee is awarded in a class proceeding, whether by lump sum or otherwise, to adopt the words of Goudge J.A. in *Gagne*, the premium must be one that "results in fair and reasonable compensation to the solicitors" having regard for the risk undertaken and the result achieved.

63      In *Gagne*, Goudge J.A. set out a series of useful corroborating tests for analysing the fairness and reasonableness of the fee. These involve, variously, testing the fee as a percentage against recovery, as a multiple of base fees, as against the retainer agreement and whether, in the circumstances, the fee will provide sufficient incentive for counsel to take on difficult cases in the future. As he stated at 425:

In the end, [these considerations must result] in fair and reasonable compensation to the solicitors. One yardstick by which this can be tested is the percentage of gross recovery that would be represented by the multiplied base fee. If the base fee as multiplied constitutes an excessive proportion of the total recovery, the multiplier might will be too high. A second way of testing whether the ultimate compensation is fair and reasonable is to see whether the multiplier is appropriately placed in a range that might run from slightly greater than one to three or four in the most deserving case. Thirdly, regard can be had to the retainer agreement in determining what is fair and reasonable. Finally, fair and reasonable compensation must be sufficient to provide a real economic incentive to solicitors in the future to take on this sort of ease [sic] and to do it well.

64      The first of the corroborating factors is a test of the fee as a percentage of the class recovery. I note that the Settlement Agreement expressly prohibits class counsel from asking that their fees be fixed as a percentage of the settlement amount. Nevertheless, it remains a valid basis for comparison purposes. The fees sought in the Transfused Action represent 2.36% of the portion of the Settlement apportionable to the Ontario national class victims. The work in the Hemophiliac Action was for the benefit of all Hemophiliacs. The fees sought in the Hemophiliac Action equate to 3.33% of the total amount of the Settlement apportionable to the Hemophiliac class members. On this basis, the fees, although large, are more than reasonable.

65      Secondly, the fee should be tested as a multiple of the base fees docketed by class counsel. On this basis, the fees

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

sought are consistent with the suggested range set out in *Gagne* for "the most deserving case." I note that the calculation is made more complex by the fact that class counsel continued to do work necessary to ensure the implementation of the settlement after the date of the expiry of the period for appeal of the approval. The Settlement Agreement contemplates that additional fees will be paid to counsel for certain administrative work, over and above the class counsel fee, at an hourly rate. However, as stated above, an important consideration in measuring the result achieved is whether or not the job is complete. Accordingly, it is my view that the work that has been performed to date was properly required of class counsel to ensure that the settlement was implemented. Counsel have valued the additional work at approximately $675,000 for counsel in the Transfused Action and $148,000 for counsel in the Hemophiliac Action from the end of the appeal period on January 22, 2000 to May 14, 2000. They have made a written submission to the court that their work as class counsel was completed on May 14, 2000. I cannot accede to this submission. While the administration is functional and claims are now being received, processed and paid, some details must still be completed. Thus, there will be no further compensation to counsel for any additional time spent in attending to these matters. The premium fee being sought in these actions is being sought on the basis of a "job well done." The court will not approve an additional fee for this work, or any additional work remaining to be done in order to complete the implementation of the settlement and its administration.

66      Without considering the value of the "additional work," the lump sum fees constitute a multiplier of 3.57 in the Transfused Action and 4.29 in the Hemophiliac Action. When the fees for this additional work are included however, the multipliers are 3.07 and 3.80 respectively. For the Hemophiliac Action, the base fee and multiplier approach yields a figure at the high end of the range set out in *Gagne*, but the result obtained for the Hemophiliac class members justifies such an award. The qualifying threshold negotiated by class counsel eliminates a potentially insurmountable burden of proof that those class members would otherwise have faced.

67      Thirdly, the fees may also be measured by the expectation of the representative plaintiff as evidenced by the retainer agreement. Here, unlike the usual case, the specific amount of the fees were agreed to by reasonably informed representative plaintiffs. Moreover, the retainer agreements executed by the representative plaintiffs are a marked improvement over the individual fee agreements signed by the class members in Quebec and British Columbia.

68      The fee must also provide a sufficient economic incentive to attract counsel to cases of a similar nature in the future. The words of Goudge J.A. bear repeating. As he stated in *Gagne* at 422-23:

> The opportunity to achieve a multiple of the base fee if the class action succeeds gives the lawyer the necessary economic incentive to take the case in the first place and to do it well. *However, if the Act is to fulfill its promise, that opportunity must not be a false hope.*(Emphasis added.)

In the present circumstances, given the difficulty in securing counsel for the classes, let alone the experienced counsel that were ultimately retained, the incentive of a reasonable premium was necessary to ensure that these victims had counsel of the highest caliber without the benefit of whom this settlement could not have been achieved. The lump sum fees set out in the retainer agreements meet this test.

69      Additionally, the fees compare favourably with the fees awarded in other major class proceedings in Canada as shown by the following chart:

| Action | Total Class Recovery | Class Counsel Fees | Percentage of Recovery | Further Legal Fees Anticipated to be Incurred by Class Members |
|---|---|---|---|---|

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

| | | | |
|---|---|---|---|
| *Harrington v. Dow Corning Corp.* (1999), 29 C.P.C. (4th) 14 (B.C. S.C.) | $40,000,000 | $6,000,000 | 15% | Yes |
| *Doyer v. Dow Corning Corp.* ((September 1, 1999)), no C.S. Montrèal 500-06-000013-934 (Que. S.C.), Tingley J.S.C. | $52,000,000 | $10,400,000 | 20% | Yes |
| *Nantais v. Telectronics Proprietary (Canada) Ltd.* (1996), 28 O.R. (3d) 523 (Ont. Gen. Div.) | $23,140,000 | $6,000,000 | 26% | Yes |
| *Pelletier v. Baxter Health Care Co.* ((July 9, 1999)), no Montreal 500-06000005-95 (Que. S.C.) *combined with *Jones v. Baxter Health Care Corp.* in Ontario | $21,525,000 | $3,648,000 | 16.9% | Yes |

70      Finally, the fees, as set out in the retainer agreements, if approved, will not impair the sufficiency of the Trust Fund established to provide the benefits to the class members. The actuarial report prepared by Eckler and Partners specifically addresses this issue.

71      These class proceedings have been described throughout as the largest personal injury case in Canadian legal history. The global settlement amounts to over $1.5 billion dollars when all benefits are included. The settlement is Pan-Canadian in scope. The defendants include all of the federal, provincial and territorial governments in Canada. The prime defendant, CRCS, is under court protection pursuant to the *CCAA*. The benefits are to be paid out of Trust Fund established for the class members erather than out of the general revenue accounts of the governments. The nature of the benefits provided through the settlement is imaginative and incorporates some of the innovative measures regarding compensation in personal injury lawsuits that courts have been advocating for over 20 years.

72      The logistics of the litigation must also be considered. It took almost three years to find lawyers willing to undertake the case because of the size and complexity. The investment required of class counsel, and the inherent risk of non-recovery, were daunting. Over 60 lawyers and legal staff were involved in bringing this litigation to a successful conclusion. Neither the governments nor the intervenors challenged the number of people or the hours required of those people to finalize the settlement.

73      The evidence of class counsel regarding the negotiations was accepted. Indeed, the government defendants echoed the evidence of class counsel in their own submissions on the earlier motion for settlement approval. It was common ground that class counsel did an excellent job. There was unanimity as to the quality of the settlement. Further, in so far as there were arbitrary points of contention raised on this motion, the evidence of class counsel on those points stands unchallenged and uncontradicted. Simply put, neither the intervenors nor the government defendants have put forward any principled or evidentiary basis for reducing the proposed counsel fees. Accordingly, I cannot accept their submissions that the fees specified in the retainer agreements should be reduced.

74      To look back with the clarity of hindsight and re-evaluate the relevant factors in light of subsequent events when fixing fees is unfair. A court must, as best as it is able, consider the elements of the litigation as they would have appeared to the parties at the material times. To do otherwise would be inconsistent with the underlying policy of the *CPA*. Here, the fees sought as agreed to by the representative plaintiffs are large but so were the lawsuits and the settlement.

Copr. (c) West 2008 No Claim to Orig. Govt. Works

2000 CarswellOnt 2174, 49 O.R. (3d) 281, 46 C.P.C. (4th) 236, [2000] O.J. No. 2374

The Settlement Agreement evidences that the size of the fee was anticipated by the governments who now object. As Goudge J.A. stated, the opportunity for class counsel to receive a premium for taking on difficult litigation and doing it well must not be "a false hope" It is an essential ingredient of the *CPA* that counsel be provided with a significant incentive to take on meritorious class proceedings. This means that premium fee awards must reflect the reality of the risk and the success of the efforts of class counsel in a meaningful way. Without this, injured parties will be denied the services of the most experienced counsel.

75      This litigation was of the most difficult kind on a number of fronts. It epitomized risk as that term is used in the context of fee awards under the *CPA*. It is questionable whether any single member of the class would have had the financial resources to prosecute a lawsuit to a successful conclusion in consideration of the scope, the factual complexity of such a case, the myriad of legal issues that would have arisen and the countless years that such litigation would consume. In contrast, this settlement provides class members with access to immediate benefits without any further legal impediments to their claims. Given the risk undertaken and result achieved by class counsel in this litigation, the lump sum fees contemplated in the retainer agreements are "fair and reasonable."

76      Accordingly, the retainer agreements in the Transfused and the Hemophiliac Actions are approved. The lump sum fees set out therein are also approved and fixed. Counsel may attend before me to address the matter of disbursements. The final order will address the outstanding work to be done by class counsel.

77      In light of the magnitude of these Actions, and the issues involved, the court permitted and indeed, encouraged submissions from persons with a stake, in one form or another, in the litigation. The fees submitted by counsel for these stakeholders, identified variously as intervenors and friends of the court, are also approved.

*Motion granted.*

END OF DOCUMENT