IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: July 12, 2010 at 10:30 a.m.** |
| | ) | **Objection Deadline: June 25, 2010 at 4:00 p.m.** |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING ENTRY INTO A CONSENT DECREE WITH THE UNITED STATES REGARDING THE BLACKBURN AND UNION PRIVILEGES SUPERFUND SITE - WALPOLE, MA.

The Debtors respectfully request entry of an order authorizing their entry into a consent decree (the "Consent Decree," a copy of which is attached hereto as Exhibit 1 to the form of order attached hereto as Exhibit A) with the United States of America (the "United States") addressing the United States' claims with respect to the Blackburn and Union Privileges Superfund Site, in Walpole, Massachusetts (the "Site"). The Site is an Additional

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Site within the meaning of the *Settlement Agreement Resolving the United States' Proof of Claim Regarding Certain Environmental Matters* (the "Multi-Site Agreement"), entered by this court by Order dated June 2, 2008 ( Docket No. 18847).  In support of the Motion, the Debtors respectfully state as follows:

<u>JURISDICTION</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for this Motion are sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

<u>BACKGROUND</u>

3.      The Site is designated as a Superfund Site by the United States Environmental Protection Agency ("U.S. EPA"), which alleges that one of the Debtors is a former owner and operator of manufacturing operations at the Site, dating back to the early 20th century.

4.      The U.S. EPA has asserted a claim against the Debtors with respect to the Site (the "U.S. EPA Claim"). The U.S. EPA Claim is one of the sites included in the U.S.'s proof of claim filed in these chapter 11 cases and designated Claim No. 9634 by the claims agent. The U.S. EPA Claim alleges future oversight costs and cleanup obligations in a range of $12.6 million to $22.6 million with respect to the Site.

5.      On June 2, 2008, the Court approved the Multi-Site Agreement. (Docket No. 18847). While the Multi-Site Agreement resolved most of Claim No. 9634, it contained a reservation for the Debtors of certain limited rights to object to the U.S. EPA Claim in connection with the Site.

6.    On or about September 30, 2008, the U.S. EPA completed a remedial investigation and feasibility study with respect to the Site and issued a Record of Decision (the "ROD") selecting remedial alternatives to be performed at the Site.

7.    On December 10, 2008, this Court entered an *Order Approving Stipulation Resolving Proof of Claim No. 12789* ("the Stipulation") (Docket No. 20241).   The Stipulation provided for an allocation of certain costs with respect to the Site between the Debtors and Tyco Healthcare Group LP ("Tyco"), pursuant to which Debtors and Tyco would each pay 50% of Past Response Costs[2] and costs to implement the ROD remedy.

8.    On or about February 18, 2009, the United States sent letters to the Debtors, BIM Investment Corporation, Shaffer Realty Nominee Trust (collectively, the "Shaffers"), and Tyco (collectively, the "Settling Defendants") requesting that the Settling Defendants agree to perform the cleanup specified in the ROD and pay the U.S. EPA's past and future costs (including Past Response Costs, Future Response Costs, and Future Oversight Costs collectively the "Response Costs") with respect to the Site.

9.    On or about November 5, 2009, the United States sent letters to the Debtors, BIM Investment Corporation, Shaffer Realty Nominee Trust (collectively, the "Shaffers"), and Tyco (collectively, the "Settling Defendants") transmitting a natural resource damages claim ("NRD Claim") for consideration.   This NRD Claim included performance of the ROD remedy and a request for payment of alleged damages.   The NRD Claim is being negotiated separately from the Consent Decree.

---

[2] Capitalized terms not defined herein have the meaning set forth in the Consent Decree.

3

10.    During 2009, the U.S. EPA performed a removal action (the "Removal Action") at the Site to address alleged risks associated with the presence of asbestos and other hazardous materials in a former mill building at the Site.

11.    Since February 2009, the Settling Defendants, including the Debtors, have negotiated with the United States in an attempt to reach a settlement concerning the ROD remedy and Response Costs.    The Debtors and the United States now desire, together with the other Settling Defendants, and without any admission of fact, law or liability, to resolve the EPA's claims and demands relating to the Site on the terms set forth in the Consent Decree and described in more detail below.

SETTLEMENT

12.    The Consent Decree resolves: (a) the U.S. EPA Claim as outlined in Claim No. 9634 insofar as it relates to the Site, to the extent, if any, that the U.S. EPA Claim has not been resolved by the Multi-Site Agreement, and (b) the U.S. EPA's February 18, 2009, demands for performance of work and payment of costs. The Consent Decree does not resolve the NRD Claim described in paragraph 9 herein.

13.    The Consent Decree requires that the Settling Defendants implement the cleanup described in the ROD.  However, unlike other consent decrees typically entered into by the United States under CERCLA, the Debtors' obligations under the Consent Decree are not stated to be joint and several with the other Settling Defendants. (The obligations of the *other* Settling Defendants *are* stated to be joint and several *among* the other Settlement Defendants but exclude the Debtors).

14.    With respect to Past Response Costs, the Debtors' agree under the Consent Decree to pay $715,930, which is 50% of the total amount that the United States agreed to accept in payment of Past Response Costs from all of the Settling Defendants.   The

4

Debtors' obligation to pay the Past Response Costs is in the form of an allowed general unsecured claim against the Debtors' chapter 11 estates (the "Allowed Past Response Cost Claim"). The Allowed Past Response Cost Claim will be paid in the same manner as all other allowed general unsecured claims on the effective date of a confirmed chapter 11 plan of reorganization for the Debtors. Notwithstanding what the Debtors' plan may provide, however, Interest will not accrue on the Allowed Past Response Cost Claim until 30 days after the Effective Date of the Consent Decree, at which point, Interest will accrue on the Allowed Past Response Cost Claim at the rate established by 26 U.S.C. § 9507, which has historically and consistently been less than the interest rate provided for in  the Debtors' plan of 4.19%. The other 50% of the total Past Response Costs will be paid by Tyco.  The Consent Decree does not provide that the Debtors are jointly and severally responsible for Tyco's share of Response Costs.

15.    Under the Consent Decree, Grace also agrees that it will pay 50% of Future Oversight Costs and Future Response Costs.  These costs shall be payable within 30 days of Settling Defendants' receipt of each bill requiring payment or within 30 days of the effective date of the Debtors' plan of reorganization, whichever is later. Again, the Consent Decree does not provide that Grace is jointly and severally liable for payments of Future Response Costs or Future Oversight Costs. The Consent Decree further provides that the Settling Defendants' payment of Future Oversight Costs incurred by U.S. EPA shall be capped at the greater of $2,000,000 or 15% of the total costs incurred by the Settling Defendants to complete the ROD remedy (the estimate included in the feasibility study of these remedy costs is $13,000,000).

5

16.     In return for the obligations to be assumed by the Settling Defendants under the Consent Decree, the United States will provide to the Settling Defendants a covenant not to sue for matters addressed under the Consent Decree.   Those matters include implementation of the ROD remedy and payment of Response Costs, including costs incurred by U.S. EPA in performing the Removal Action.

17.     In entering the Consent Decree, the Settling Defendants anticipate that payments for Response Costs and implementation of the ROD remedy will be made by Debtors and Tyco, with each paying 50% of such costs.   That allocation is consistent with the cost allocation between Debtors and Tyco already approved by the Stipulation.

18.     The Consent Decree requires the Shaffers to provide access to property that they own as necessary to implement the ROD remedy and to agree to restrict future use of their property as necessary to implement the ROD remedy.   The Consent Decree does not provide that the Debtors have waived any claims that they have against the Shaffers for contribution towards the costs to be incurred by the Debtors in complying with the Consent Decree.

19.     In addition, the Debtors and Tyco have entered into a separate agreement (the "PRP Agreement") with the Shaffers, pursuant to which the Shaffers must pay to the Debtors and Tyco certain net proceeds of any sales of property owned by the Shaffers in Walpole, Massachusetts and must continue to perform certain maintenance activities required for the Site. The PRP Agreement also does not require that the Debtors waive any claims that they may have against the Shaffers for contribution towards the costs to be incurred by the Debtors in complying with the Consent Decree.

**RELIEF REQUESTED**

20.     By this Motion, the Debtors respectfully seek the entry of an order, pursuant to sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the Debtors' execution of the Consent Decree; (b) resolving Claim No. 9634 insofar as it related to the Site and to the extent, if any, that this Claim is not resolved by the Multi-Site Agreement; (c) granting the Debtors authority to consummate the transactions contemplated in the Consent Decree, including the use of the Debtors' estate property and resources necessary to undertake the performance of the work set forth in the Consent Decree; and (d) granting such other relief as may be appropriate.

**BASIS FOR RELIEF**

**Sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a)**

21.     This Court has the statutory authority to authorize and approve the Debtors' entry into the Consent Decree, and the incurrence of costs and expenses contemplated therein, pursuant to Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rule 9019.

22.     Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

23.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. §363(b)(1). This Court may authorize the Debtors to use or sell property of the estates pursuant to section 363(b)(1) of the Bankruptcy Code if such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175 (D.

7

Del. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by some "articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

24.     A settlement of claims and causes of action by a debtor in possession constitutes a use of the property of the estate. See Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 350 (3d Cir. 1999). If a settlement is outside the ordinary course of business of the debtor, it requires the approval of the bankruptcy court pursuant to Bankruptcy Code section 363(b).

25.     Bankruptcy Rule 9019(a) provides in pertinent part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Settlements and compromises are "a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (citations omitted). Indeed, compromises are favored in bankruptcy since they minimize litigation and expedite the administration of a bankruptcy case. See In re Martin, 91 F.3d 389, 393 (3d Cir. 1996); see also In re Key3Media Group, Inc., 2006 WL 2842462, at *3 (D. Del. 2006).

26.     Before approving a settlement under Bankruptcy Rule 9019, however, a court must determine that the proposed settlement is in the best interests of the debtor's estate. See Martin, 91 F.3d at 394; In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del.

1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (citation omitted). To reach this determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. See Martin, 91 F.3d at 393.

27.     The standard by which courts should evaluate the reasonableness of a proposed compromise and settlement is well established. This standard includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id.; see also In re Nutraquest, Inc., 434 F.3d 639, 644-45 (3d Cir. 2006).

28.     It is also well settled that a proposed settlement need not be the best result that the debtor could have achieved, but only must fall "within the reasonable range of litigation possibilities." Key3Media Group, 2006 WL 2842462, at *3; In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citing In re Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979)). Under this test, a proponent must simply demonstrate that a proposed settlement does not fall "below the lowest point in the range of reasonableness." World Health Alternatives, 344 B.R. at 296 (citations omitted); see also In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).

**Application of Standards for Approval of a Settlement to the Facts of This Case**

29.     The Debtors have determined that entry into the Consent Decree is in the best interests of the Debtors and their estates. The Consent Decree was the process of a rigorous negotiation process, is fair and reasonable, and is within the reasonable range of litigation possibilities.

30.     The Consent Decree is in the best interests of the estate for a number of reasons. First, the Consent Decree prevents the incurrence of significant transaction and litigation costs and cost-effectively allocates the responsibility for and resolves significant environmental liabilities of the Debtors. Approving the Consent Decree will resolve claims for more than $2 million in Past Response Costs, including the costs associated with the Removal Action, and more than $13 million in costs of implementing the ROD remedy and will provide assurance to the creditors that environmental liabilities, other than NRD,  associated with the Site are fully addressed and permanently resolved. The Debtors' shared responsibility for the Site has been a responsibility of the Debtors since before the commencement of these Chapter 11 cases, as recognized in the Multi-Site Agreement and the Stipulation between Debtors and Tyco.

31.     Second, the Consent Decree is consistent with CERCLA's goals and benefits the public interest because the Consent Decree will result in the implementation of the ROD remedy at the Site. Such approval benefits the public by allocating costs of performing the work amongst the parties and enabling the work to proceed.

32.     Third, the Consent Decree does not provide for any payment by Debtors prior to the effective date of Debtors' confirmed plan of reorganization.

33.     Fourth, the Consent Decree allocates the costs with respect to the Site in essentially the same manner as has already been approved by this Court in entering the Stipulation between Debtors and Tyco.

34.     Fifth, the Site is an "Additional Site" under the Multi-Site Agreement. This means that the Site has remained a potential liability for the Debtors and their estates. Resolution of the United States' claims as provided in the Consent Decree would be consistent

with the treatment for Additional Sites outlined in the Multi-Site Agreement and would resolve this otherwise outstanding liability of the Debtors.

35.    For the reasons stated above, the proposed Consent Decree is fair and equitable and in the best interests of the Debtors, their estates, and their creditors, and also in the public interest because it is the best settlement attainable given all the facts and circumstances. In the absence of a resolution by settlement, the Debtors will likely incur substantial legal fees and expenses litigating this matter to final judgment. Accordingly, the Debtors have demonstrated a sound business justification and best interest for the execution and consummation of the Consent Decree.

## NO PREVIOUS MOTION

36.    No previous motion for the relief sought herein has been made to this or any other court.

## NO BRIEFING SCHEDULE

37.    The Debtors respectfully submit that this Motion does not present any novel issues of law requiring briefing.  Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local District Court Rules"), incorporated by reference in Del. Bankr. L.R. 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Rules.

## NOTICE

38.    Notice of this Motion has been given to:  (i) the office of the United States Trustee; (ii) counsel to the L/C Facility Agent and L/C Issuers; (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (iv) counsel to each of the official committees appointed in these Chapter 11 Cases; (v) counsel to the

11

Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (vi) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (vii) counsel to the United States and the Settling Defendants. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached as Exhibit A hereto, (i) approving the Debtors' execution of the Consent Decree attached as Exhibit I to the form of order, (ii) resolving Claim No. 9634 as it related to the Site, to the extent not resolved by the Multi-Site Agreement; (iii) authorizing the Debtors to consummate the transactions contemplated in the Consent Decree, and (iv) granting such other relief as may be just or proper.

Dated: June 3, 2010

KIRKLAND & ELLIS LLP
Theodore L. Freedman
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
Roger J. Higgins
70 W. Madison St., Suite 2100
Chicago, IL 60602-4253
(312) 641-2162

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski ( Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705
(302) 652-4100
(302) 652-4400
Co-Counsel for the Debtors and Debtors-in-Possession

DOCS_DE:160572.1