# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |

Re Docket No.: 24919

Hearing Agenda Item No.: _____

# ORDER AUTHORIZING DEBTORS' ENTRY INTO (I) CONSENT ORDER WITH THE UNITED STATES REGARDING THE ZONOLITE/W.R. GRACE EASTHAMPTON, MA SUPERFUND SITE (II) STIPULATION RESOLVING CLAIM 11301 OF OLDON LIMITED PARTNERSHIP AND (III) STIPULATION RESOLVING CLAIM 7121 OF THE CITY OF EASTHAMPTON

Upon consideration of the *Motion of Debtors for Entry of an Order Authorizing Their Entry Into (i) Consent Order with the United States Regarding the Easthampton MA Superfund Site; (ii) Stipulation resolving Claim No. 11301 of Oldon Limited Partnership; and (iii) Stipulation resolving Claim No. 7121 of the City of Easthampton*

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

(the "Motion"); and due and proper notice of the Motion having been given; and it appearing that the relief requested in the Motion is in the best interests of the Debtors,[2] their estates and creditors, it is hereby ORDERED that:

- The Motion is granted in its entirety.

- The Debtors are authorized to enter into the Consent Order, which is attached to this Order as Exhibit I.

- Paragraph 87 of the Consent Order executed by the parties and attached hereto as Exhibit I is incomplete. The complete paragraph 87 of the Consent Order which has been agreed to and executed by the parties and is approved by this Order reads as follows:

> 87.    W.R. Grace has filed a petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Grace expects to emerge from bankruptcy during 2010. In order to receive authority to carry out its obligations under this Settlement Agreement including, but not limited to, carrying out the Work to be performed and paying EPA's Past and Future Response Costs, Grace shall file a motion for approval of this Settlement Agreement with the Bankruptcy Court within fourteen (14) days after signature by all Parties in order to obtain permission to perform its obligations under the Settlement Agreement and to allow and pay as an unsecured, pre-petition, non-priority claim against Grace's Chapter 11 estate the amount of Grace's share of EPA's response costs. The allowed payment of Grace's share of EPA's response costs and any other payments due under or made pursuant to this Settlement Agreement shall be made pursuant to and in accordance with the date specified in Grace's confirmed Plan of Reorganization for the payment of allowed claims. This Settlement Agreement shall not be effective and binding on Grace or Oldon unless and until the Bankruptcy Court enters an Order granting the relief contemplated in this Paragraph.

- The Debtors are authorized to enter into the Oldon Stipulation, which is attached to this Order as Exhibit II.

- The Debtors are authorized to enter into the City Stipulation, which is attached to this Order as Exhibit III.

---

[2] Capitalized terms not defined in this Order shall have the meaning ascribed to them in the Motion or the Consent Order.

2

- The Debtors are authorized to consummate the transactions contemplated in the Consent Order, the Oldon Stipulation and the City Stipulation, including the use of the Debtors' estate property and resources necessary to undertake the performance of the work set forth in the Consent Order.

- The USEPA shall have an allowed unsecured claim for Past Response Costs in the amount of $72,537. The Allowed Past Response Cost Claim will be paid within 30 days after the effective date of the Plan of Reorganization for the Debtors in the same manner as all other allowed general unsecured claims. Notwithstanding what the Plan of Reorganization may provide, however, Interest will not accrue on the Allowed Past Response Cost Claim until 30 days after the Effective Date of the Consent Order, at which point, Interest will accrue on the Allowed Past Response Cost Claim at the rate established by 26 U.S.C. § 9507.

- Grace is authorized to pay EPA's Future Response Costs. These costs shall be payable within 30 days of Grace's receipt of each bill requiring payment or within 30 days of the effective date of the Plan of Reorganization, whichever is later.

- Oldon Claim No. 11301, which for purposes of the Stipulation includes, but is not limited to, certain actual costs already incurred by Oldon for compliance fees to MassDEP, a site survey, environmental consulting, legal fees and other costs incurred by Oldon as Owner of the Site shall be allowed as a Class 7A Asbestos Property Damage Claim (the "Allowed Oldon Claim"), in the amount of $118,010. The Allowed Oldon Claim shall be paid in the same manner as all other similarly situated Allowed Class 7A Asbestos Property Damage Claims pursuant to the Plan of Reorganization. All other amounts outlined in or related to the Claim No. 11301 relating to the Property, including any

3

claims which would otherwise have qualified as Class 7B Asbestos Property Damage Claims, shall hereby be disallowed and expunged.

The Parties to the Oldon Stipulation, including upon its formation the WRG Asbestos Property Damage Trust, shall be forever barred, estopped, and enjoined from asserting against each other,  other than on the terms and conditions set forth in the Oldon Stipulation and in the Consent Order attached as Exhibit I to this Order, any other or additional claims, liabilities, or causes of action arising from or related to the Property of any nature, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise.

- City Claim No. 7121 shall be disallowed and expunged. However, in the event that Grace breaches its obligations under the Consent Order to remediate the Site as set forth in the Consent Order, the City shall have the right to re-assert its Claim against Grace.

- The Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order, the Consent Order, the Oldon Stipulation and/or the City Stipulation.

- This Order is effective immediately upon its entry, notwithstanding Fed. R. Bankr. P. 6004(h).

Dated: _____, 2010



_____
Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

4

# EXHIBIT I

**Consent Order**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 1

| | |
|---|---|
| IN THE MATTER OF<br>ZONOLITE/W.R. GRACE SUPERFUND SITE,<br>EASTHAMPTON, MASSACHUSETTS | U.S. EPA Region 1<br>CERCLA Docket No.01-2010-0019 |
| W.R. GRACE & CO. and<br>OLDON LIMITED PARTNERSHIP | ADMINISTRATIVE SETTLEMENT<br>AGREEMENT AND ORDER ON CONSENT<br>FOR REMOVAL ACTION |
| RESPONDENTS. | Proceeding Under Sections 104, 106(a), 107 and<br>122 of the Comprehensive Environmental<br>Response, Compensation, and Liability Act, as<br>amended, 42 U.S.C. §§ 9604, 9606(a), 9607 and<br>9622 |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | JURISDICTION AND GENERAL PROVISIONS | 1 |
| II. | PARTIES BOUND | 1 |
| III. | DEFINITIONS | 2 |
| IV. | FINDINGS OF FACT | 4 |
| V. | CONCLUSIONS OF LAW AND DETERMINATIONS | 6 |
| VI. | SETTLEMENT AGREEMENT AND ORDER | 7 |
| VII. | DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR | 7 |
| VIII. | WORK TO BE PERFORMED | 8 |
| IX. | SITE ACCESS | 13 |
| X. | ACCESS TO INFORMATION | 13 |
| XI. | RECORD RETENTION | 14 |
| XII. | COMPLIANCE WITH OTHER LAWS | 15 |
| XIII. | EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES | 15 |
| XIV. | AUTHORITY OF ON-SCENE COORDINATOR | 16 |
| XV. | PAYMENT OF RESPONSE COSTS | 16 |
| XVI | DISPUTE RESOLUTION | 18 |
| XVII. | FORCE MAJEURE | 19 |
| XVIII. | STIPULATED PENALTIES | 20 |
| XIX. | COVENANT NOT TO SUE BY EPA | 22 |
| XX. | RESERVATIONS OF RIGHTS BY EPA | 22 |
| XXI. | COVENANT NOT TO SUE BY RESPONDENTS | 23 |
| XXII. | OTHER CLAIMS | 24 |
| XXIII. | CONTRIBUTION | 24 |
| XXIV. | INDEMNIFICATION | 25 |
| XXV. | MODIFICATIONS | 26 |
| XXVI. | ADDITIONAL REMOVAL ACTIONS | 26 |
| XXVII. | NOTICE OF COMPLETION OF WORK | 27 |
| XXVIII. | INTEGRATION/APPENDICES | 27 |
| XXIX. | EFFECTIVE DATE | 27 |

Appendix A: Action Memorandum
Appendix B: EPA Cost Summary (March 15, 2010)
Appendix C: Site Map (Figure 1 Site Diagram) (January 22, 2010)
Appendix D: Scope of Work

## I. JURISDICTION AND GENERAL PROVISIONS

1. This Administrative Settlement Agreement and Order on Consent ("Settlement Agreement") is entered into voluntarily by the United States Environmental Protection Agency ("EPA"), W.R. Grace & Co. ("W.R. Grace") and Oldon Limited Partnership ("Oldon") (jointly, "Respondents"). This Settlement Agreement provides for the performance of a removal action by Respondents and the reimbursement of certain response costs incurred by the United States at or in connection with the Zonolite/W.R. Grace Superfund Site (the "Site") generally located at 19 Wemelco Way, and certain properties adjacent thereto, in Easthampton, Hampshire County, MA.

2. This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 106(a), 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9604, 9606(a), 9607 and 9622, as amended ("CERCLA").

3. EPA has notified the Commonwealth of Massachusetts (the "State") of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

4. EPA and Respondents recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Respondents in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, any liability on the part of any of the Respondents or any material facts relating to the Site, including but not limited to the validity of the findings of facts, conclusions of law, and determinations in Sections IV and V of this Settlement Agreement. Respondents agree to comply with and be bound by the terms of this Settlement Agreement and further agree that they will not contest the basis or validity of this Settlement Agreement or its terms.

5. Respondent W.R. Grace has filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), In re W.R. Grace & Co., et al., No. 01-01139 (JKF). In connection with its reorganization, Grace has entered into a Multi-Site Settlement Agreement with EPA. The Easthampton, MA Site is an "Additional Site" under that Agreement and, following completion of the Work required by this Order, this Site will be a liquidated site and subject to the terms and conditions pursuant to the Multi-Site Agreement. Respondent Oldon filed a proof of claim against Respondent W.R.Grace in the Bankruptcy Court in 2003. Nothing in this Agreement shall be deemed to modify or release any claims Oldon has against W.R.Grace. Oldon retains all its claims, rights, and defenses under applicable law and in equity against W.R. Grace (and affiliates of W.R.Grace, if any, that Oldon may have claims, rights, and/or defenses against) related to the Site.

## II. PARTIES BOUND

6. This Settlement Agreement applies to and is binding upon EPA and upon Respondents and their heirs, successors and assigns. Any change in ownership or corporate status of a

1

Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter such Respondent's responsibilities under this Settlement Agreement.

7.   Respondents are jointly and severally liable (to the extent authorized by applicable law as of the Effective Date of this Settlement Agreement) for carrying out all activities required by this Settlement Agreement.  In the event of the insolvency or other failure of a Respondent to implement the requirements of this Settlement Agreement, the remaining Respondent shall complete all such requirements.

8.   Respondents shall ensure that their contractors, subcontractors, and representatives receive a copy of this Settlement Agreement and comply with this Settlement Agreement. Respondents shall be responsible for any noncompliance with this Settlement Agreement.

## III. DEFINITIONS

9.   Unless otherwise expressly provided in this Settlement Agreement, terms used in this Settlement Agreement which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations.  Whenever terms listed below are used in this Settlement Agreement or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a.     "Action Memorandum" shall mean the EPA Action Memorandum relating to the Site signed on March 23, 2010 by the Director of the Office of Site Remediation & Restoration, and all attachments, thereto.  The Action Memorandum is attached as Appendix A.

b.     "Amphibole Asbestos Fibers" shall refer to the five classes of amphibole fibers regulated as asbestos by the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA).  The five classes include fibrous tremolite, actinolite, anthophyllite, crocidolite and amosite.

c.     "Asbestos–Containing Soil" shall mean the reproducible presence of Amphibole Asbestos Fibers in soil tests conducted in accordance with EPA Method 600/R-93/116 using the PLM visual estimation method, or the asbestos in soil characterizations set forth in map depicting the 2000-2001 sampling at the Site.  Weston Solutions Site Map dated 11 January 2010 was developed using the aforementioned 2000-2001 map and is attached as SOW Attachment 1.

d.     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

e.     "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq*.

2

f.      "Day" shall mean a calendar day.  In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

g.      "Effective Date" shall be the effective date of this Settlement Agreement as provided in Section XXIX.

h.      "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

i.      "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports and other items pursuant to this Settlement Agreement, verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement  These activities include, but are not limited to:  payroll costs; contractor costs; travel costs; laboratory costs;  and the costs incurred pursuant to Paragraph 36 (costs and attorneys fees and any monies paid to secure access, including the amount of just compensation), and Paragraph 46 (emergency response), and Paragraph 71 (work takeover).  Future Response Costs include all costs incurred and paid by the United States in connection with the Site, but not included in the Cost Summary, dated March 15, 2009 ("Cost Summary").  The Cost Summary is attached as Appendix B.

j.      "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).  The applicable rate of interest shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.

k.      "MassDEP" shall mean the Massachusetts Department of Environmental Protection and any successor departments or agencies of the State.

l.      "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

m.      "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent and all appendices attached hereto (listed in Section XXVIII).  In the event of conflict between this Settlement Agreement and any appendix, this Settlement Agreement shall control.

n.      "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

o.      "Parties" shall mean EPA and Respondents.

3

p.     "Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, included in the Cost Summary (Appendix B).    Interest on Past Response Costs shall begin to accrue thirty (30) days after the Effective Date.

q.     "Plan of Reorganization" shall mean any plan of reorganization under Chapter 11 of the United States Bankruptcy Code that is confirmed and becomes effective in the Grace bankruptcy cases.

r.     "RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, *et seq.* (also known as the Resource Conservation and Recovery Act).

s.     "Respondents" shall mean W.R. Grace and Oldon.

t.     "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

u.     "Site" shall mean the Zonolite/W.R. Grace Superfund Site, encompassing approximately 2.3 acres, located at 19 Wemelco Way, and certain properties adjacent thereto with detectable levels of a Asbestos-Containing Soil, in Easthampton, Hampshire County, MA, and depicted generally on the map attached as Appendix C. See Paragraph 10 below for additional information about the Site.

v.     "State" shall mean the Commonwealth of Massachusetts.

w.     "Scope of Work" or "SOW" shall mean the scope of work for implementation of the removal action, as set forth in Appendix D to this Settlement Agreement, and any modifications made thereto in accordance with this Settlement Agreement.

x.     "Waste Material" shall mean 1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); 2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); 3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and 4) any "hazardous material" under Mass. Gen. L. ch. 21E, § 2.

y.     "Work" shall mean all activities Respondents are required to perform under this Settlement Agreement.

## IV.    FINDINGS OF FACT

10.     The Site consists of the former W.R. Grace facility and several adjacent parcels in Easthampton, Hampshire County, MA.   The parcels which are included within the Site are:

4

      a.    the former W.R. Grace facility at 19 Wemelco Way (the "**Former Zonolite Facility**");

      b.    the former Pioneer Valley Rail Line (Tax Assessor's Map 155-14), (the "**Railroad Right-of-Way**");.

      c.    farmland located southeast of the Railroad Right of Way (Tax Assessor's Map 165-47) (the "**Cernak Parcel**").

      d.    the current D.O.S. Concrete Construction Company parcel located northwest of the Former Zonolite Facility (Tax Assessor's Map 164-1) (the "**DOS Parcel**"); and

      e.    wooded property located across Wemelco Way from the Former Zonolite Facility (Tax Assessor's Maps 164-3 and 164-4) (the "**Elastomerics Parcel**").

11.    The Site consists of 2.3 acres of land, and is located in a mixed residential/commercial/agricultural area. The nearest residences are located approximately 600 feet to the east along the north side of the Railroad Right-of-Way. Approximately 1,393 people live within one-half mile from the Site.

12.    Since at least 1963, Oldon has owned the Former Zonolite Facility parcel.

13.    From 1963 to 1993, W.R. Grace leased the Former Zonolite Facility from Oldon and operated a manufacturing plant there. During this period, W.R. Grace sent by rail asbestos-contaminated vermiculite concentrate from its Zonolite mine in Libby, Montana to the Former Zonolite Facility, and produced Zonolite attic insulation and Monokote fireproofing material at the Former Zonolite Facility. In 1992, W.R. Grace removed all equipment from the Former Zonolite Facility building, washed the building to remove residue asbestos material and collected indoor samples to support the effectiveness of the building clearance procedure.

14.    Since 1993, the Former Zonolite Facility has either been vacant or used by a lessee for storage. Currently, the Former Zonolite Facility is occupied by an adjacent business for use as a storage yard and warehouse.

15.    In May 2000, MassDEP and EPA conducted limited soil sampling at the Former Zonolite Facility and the Railroad Right-of-Way to evaluate the possible presence of remaining asbestos contamination resulting from W.R. Grace's former operations. Analytical results indicated asbestos materials in surface and subsurface soils ranging from 5% to 10%.

16.    In August of 2000, MassDEP issued a Notice of Responsibility/Notice of Response Action to W.R. Grace. W.R. Grace performed sampling which revealed asbestos materials in the surface soils at the Former Zonolite Facility, the Railroad Right-of-Way and on adjacent properties located north, west and south of its former facility.

17.    In an October 2008, Memorandum, EPA's Office of Solid Waste and Emergency Response ("OSWER") directed EPA Regional Removal Programs to reassess vermiculite sites that received asbestos-contaminated concentrate from Libby, Montana. OSWER's October 2008 Memorandum provided guidance and a detailed process for accomplishing this task. In January of 2009, EPA Region I's Emergency Planning & Response Branch ("EPRB") contacted MassDEP to discuss the status of the Site. At that time, EPA learned that no further action had been taken to address the remaining asbestos materials in the surface and sub-surface soils at the Site.

18.    On February 10, 2009, EPA conducted a preliminary assessment/site investigation ("PA/SI") based on the available sampling data and historical information for the Site.

19.    On July 15, 2009, EPA notified Oldon and W.R. Grace of their status as potential responsible parties for the Site.

20.    On March 23, 2010, EPA issued an Action Memorandum, authorizing the performance of the removal action to address contaminated soils at the Site.

## V. CONCLUSIONS OF LAW AND DETERMINATIONS

21.    Based on the Findings of Fact set forth above, and the Administrative Record supporting this removal action, EPA has determined that:

a.    The Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b.    The contamination found at the Site, as identified in the Findings of Fact above, includes a "hazardous substance" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c.    Each Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

d.    Each Respondent is a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is jointly and severally liable (to the extent authorized by applicable law as of the Effective Date of this Settlement Agreement) for performance of response action and for response costs incurred and to be incurred at the Site. Specifically,

i.    Respondent Oldon is the "owner", as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), of the Former Zonolite Facility as defined in Paragraph 10 above in this Settlement Agreement.

ii.    Respondents Oldon and W. R. Grace were the "owner" and "operator," respectively, of the Former Zonolite Facility at the time of disposal of

6

hazardous substances at the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C.
§ 9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C.
§ 9607(a)(2).

   iii.  Respondent W. R. Grace arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances at the Former Zonolite Facility, within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

  e.  The conditions described in Paragraphs 10-20 of the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the facility as defined by Section 101(22) of CERCLA, 42 U.S.C.§ 9601(22).

  f.  The removal action required by this Settlement Agreement is necessary to protect the public health, welfare, or the environment and, if carried out in compliance with the terms of this Settlement Agreement, will be consistent with the NCP, as provided in Section 300.700(c)(3)(ii) of the NCP.

## VI. SETTLEMENT AGREEMENT AND ORDER

  22.  Based upon the foregoing Findings of Fact, Conclusions of Law, Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Respondents shall comply with all provisions of this Settlement Agreement, including, but not limited to, all attachments to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

## VII. DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR

  23.  Respondents shall retain one or more contractors to perform the Work and shall notify EPA of the name(s) and qualifications of such contractor(s) within seven (7) days of the Effective Date. Respondents shall also notify EPA of the name(s) and qualification(s) of any other contractor(s) or subcontractor(s) retained to perform the Work at least seven (7) days prior to commencement of such Work. EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by Respondents. If EPA disapproves of a selected contractor, Respondents shall retain a different contractor and shall notify EPA of that contractor's name and qualifications within seven (7) days of EPA's disapproval.

  24.  Within seven (7) days after the Effective Date, Respondents shall designate a Project Coordinator who shall be responsible for administration of all actions by Respondents required by this Settlement Agreement and shall submit to EPA the designated Project Coordinator's name, address, telephone number, and qualifications. To the greatest extent reasonably possible, the Project Coordinator shall be present on Site or readily available during Site work. EPA retains the

7

right to disapprove of the designated Project Coordinator. If EPA disapproves of the designated Project Coordinator, Respondents shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number, and qualifications within seven (7) days following EPA's disapproval. Receipt by Respondents' Project Coordinator of any notice or communication from EPA relating to this Settlement Agreement shall constitute receipt by Respondents.

25.    EPA has designated John McKeown of the Emergency Planning and Response Branch, as its On-Scene Coordinator ("OSC"). Except as otherwise provided in this Settlement Agreement, Respondents shall direct all submissions required by this Settlement Agreement to the OSC at the following address:

John McKeown
U.S. Environmental Protection Agency
Office of Site Remediation & Restoration
Emergency Planning & Response Branch
Emergency Response & Removal Section I
5 Post Office Sq., Suite 100
OSRR02-2
Boston, MA 02109-3912
TEL (617) 918-1793
FAX (617) 918-0793

26.    EPA and Respondents shall have the right, subject to Paragraph 24, to change their respective designated OSC or Project Coordinator. Respondents shall notify EPA seven (7) days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notice.

## VIII.  WORK TO BE PERFORMED

27.    Respondents shall perform all actions necessary to implement the Scope of Work (Appendix D). The actions to be implemented generally include, but are not limited to, the following:

    a.    Coordinate with OSC to conduct an initial site reconnaissance visit to assess layout of Site, and determine required equipment, personnel and logistics;

    b.    Develop and implement a site-specific work plan;

    c.    Develop and implement a site-specific Quality Assurance Project Plan (QAPP);

    d.    Prepare and implement a site-specific air monitoring plan addressing asbestos specific issues and assuring protection of cleanup workers and surrounding

8

properties;

e.      Ensure all personnel working on the Site meet asbestos certification requirements of the HASP;

f.      Establish and maintain a command post at the Site;

g.      Mobilize personnel and equipment;

h.      Take required actions to remove Amphibole Asbestos Fibers and materials containing such Fibers from the building located on the Former Zonolite Facility. Dispose of such Fibers and materials in Area A or B of the Former Zonolite Facility. These actions shall be sufficient such that an Asbestos Project Monitor licensed by the Massachusetts Division of Occupational Safety confirms in a report that the building meets all applicable state and federal regulatory requirements for post asbestos abatement clearance in accordance with 40 CFR Part 763 Subpart 3 (AHERA).

i.      If necessary, install runoff control measures for containment during removal activities;

j.      Develop and implement a site-specific Health and Safety Plan (HASP), in accordance with Occupational Safety and Health Administration (OSHA) regulations;

k.      Delineate the work zones and decontamination area in compliance with the HASP;

l.      Coordinate with EPA and Tennessee Gas Pipeline prior to and during work within the Tennessee Gas Pipeline easement;

m.      Disposal of materials in accordance with *40 CFR Part 300.440 Procedures for Planning and Implementing Off-Site Response Actions*. Determine that all disposal facilities are in compliance with the *CERCLA Off-Site Rule (40 CFR Part 300.440)*. Obtain EPA approval prior to off-site disposal;

n.      Provide and affix all appropriate labels in accordance with state and federal regulations for storage, transportation, and/or disposal of waste streams, as appropriate;

o.      Demobilize all equipment and personnel.

28.     Work Plan and Implementation.

9

a.    Within thirty (30) days after the Effective Date, Respondents shall submit to EPA for approval a draft Work Plan for performing the removal action generally described in Paragraph 27 above. The draft Work Plan shall provide a description of, and an expeditious schedule for, the actions required by this Settlement Agreement.

b.    EPA may approve, disapprove, require revisions to, or modify the draft Work Plan in whole or in part. If EPA requires revisions, Respondents shall submit a revised draft Work Plan within seven (7) days of receipt of EPA's notification of the required revisions. Respondents shall implement the Work Plan as approved in writing by EPA in accordance with the schedule approved by EPA. Once approved, or approved with modifications, the Work Plan, the schedule, and any subsequent modifications shall be incorporated into and become fully enforceable under this Settlement Agreement.

c.    Respondents shall not commence any Work except in conformance with the terms of this Settlement Agreement. Respondents shall not commence implementation of the Work Plan developed hereunder until receiving written EPA approval pursuant to Paragraph 28.

29.    Health and Safety Plan. Within twenty-one (21) days after the Effective Date, Respondents shall submit for EPA review and comment a plan that ensures the protection of the public health and safety during performance of on-Site work under this Settlement Agreement. This plan shall be prepared in accordance with EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992). In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning. Respondents shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal action.

30.    Quality Assurance and Sampling.

a.    All sampling and analyses performed pursuant to this Settlement Agreement shall conform to EPA direction, approval, and guidance regarding sampling, quality assurance/quality control ("QA/QC"), data validation, and chain of custody procedures. Respondents shall ensure that the laboratory used to perform the analyses participates in a QA/QC program that complies with the appropriate EPA guidance. Respondents shall follow, as appropriate, "Quality Assurance/Quality Control Guidance for Removal Activities: Sampling QA/QC Plan and Data Validation Procedures" (OSWER Directive No. 9360.4-01, April 1, 1990), as guidance for QA/QC and sampling. Respondents shall only use laboratories that have a documented Quality System that complies with ANSI/ASQC E-4 1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2) (EPA/240/B-01/002, March 2001)," or equivalent documentation as determined by EPA. EPA may consider laboratories accredited under the National

10

Environmental Laboratory Accreditation Program ("NELAP") as meeting the Quality System requirements.

b.      Upon request by EPA, Respondents shall have such a laboratory analyze samples submitted by EPA for QA monitoring. Respondents shall provide to EPA the QA/QC procedures followed by all sampling teams and laboratories performing data collection and/or analysis.

c.      Upon request by EPA, Respondents shall allow EPA or its authorized representatives to take split and/or duplicate samples. Respondents shall notify EPA not less than five (5) days in advance of any sample collection activity, unless shorter notice is agreed to by EPA. EPA shall have the right to take any additional samples that EPA deems necessary. Upon request, EPA shall allow Respondents to take split or duplicate samples of any samples it takes as part of its oversight of Respondents' implementation of the Work.

31.     Post-Removal Site Control. In accordance with the Work Plan schedule, or as otherwise directed by EPA, Respondents shall submit a proposal for post-removal site control consistent with Section 300.415(*l*) of the NCP and OSWER Directive No. 9360.2-02. Upon EPA approval, Respondents shall implement such controls and shall provide EPA with documentation of all post-removal site control arrangements.

32.     Reporting.

a.      Respondents shall submit a written progress report to EPA concerning actions undertaken pursuant to this Settlement Agreement every two weeks after the date of receipt of EPA's approval of the Work Plan until termination of this Settlement Agreement, unless otherwise directed in writing by the OSC. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

b.      Respondents shall submit all plans, reports or other submissions required by this Settlement Agreement, the Scope of Work, or any approved work plan in electronic form. Upon request by EPA, Respondents shall submit paper copies.

c.      Respondents who own or control property at the Site shall, at least thirty (30) days prior to the conveyance of any interest in real property at the Site, give written notice to the transferee that the property is subject to this Settlement Agreement and written notice to EPA and the State of the proposed conveyance, including the name and address of the transferee. Respondents who own or control property at the Site also agree to require that their successors comply with the immediately proceeding sentence and

11

Sections IX (Site Access) and X (Access to Information).

33.    Final Report. Within forty-five (45) days after completion of all Work required by this Settlement Agreement, Respondents shall submit for EPA review and approval a final report summarizing the actions taken to comply with this Settlement Agreement. The final report shall conform, at a minimum, with the requirements set forth in Section 300.165 of the NCP entitled "OSC Reports." The final report shall include a good faith estimate of total costs or a statement of actual costs incurred in complying with the Settlement Agreement, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action (*e.g.*, manifests, invoices, bills, contracts, and permits). The final report shall also include the following certification signed by a person who supervised or directed the preparation of that report:

"Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of the report, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

34.    Off-Site Shipments.

a.    Respondents shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to the On-Scene Coordinator. However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

i.    Respondents shall include in the written notification the following information:  1) the name and location of the facility to which the Waste Material is to be shipped; 2) the type and quantity of the Waste Material to be shipped; 3) the expected schedule for the shipment of the Waste Material; and 4) the method of transportation. Respondents shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

ii.    The identity of the receiving facility and state will be determined by Respondents following the award of the contract for the removal action. Respondents shall provide the information required by Paragraphs 34(a) and 34(b) as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

12

b.      Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-site location, Respondents shall obtain EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440.  Respondents shall only send hazardous substances, pollutants, or contaminants from the Site to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

## IX.  SITE ACCESS

35.     If the Site, or any other property where access is needed to implement this Settlement Agreement, is owned or controlled by the Respondents, Respondents shall, commencing on the Effective Date, provide EPA, the State and their representatives, including contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Settlement Agreement.

36.     Where any action under this Settlement Agreement is to be performed in areas owned by or in possession of someone other than Respondents, Respondents shall use best efforts to obtain all necessary access agreements within seven (7) days after the Effective Date, or as otherwise specified in writing by the OSC.  Respondents shall immediately notify EPA if after using its best efforts it is unable to obtain such agreements.  For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access.  Respondents shall describe in writing their efforts to obtain access.  EPA may then assist Respondents in gaining access, to the extent necessary to effectuate the response actions described in this Settlement Agreement, using such means as EPA deems appropriate.  Respondents shall reimburse EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XV (Payment of Response Costs).

37.     Notwithstanding any provision of this Settlement Agreement, EPA retains all of its access authorities and rights as well as all of its rights to require land use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## X.  ACCESS TO INFORMATION

38.     Respondents shall provide to EPA and the State, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Settlement Agreement, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work.  Respondents shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

13

39.     Respondents may assert business confidentiality claims covering part or all of the documents or information submitted to EPA and the State under this Settlement Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b).  Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If no claim of confidentiality accompanies documents or information when they are submitted to EPA and the State, or if EPA has notified Respondents that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondents.

40.     Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If the Respondents assert such a privilege in lieu of providing documents, it shall provide EPA and the State with the following:  1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the contents of the document, record, or information; and 6) the privilege asserted by Respondents.  However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

41.     No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

## XI.  **RECORD RETENTION**

42.     Until ten (10) years after Respondents' receipt of EPA's notification pursuant to Section XXVII (Notice of Completion of Work), each Respondent shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary.  Until ten (10) years after Respondents' receipt of EPA's notification pursuant to Section XXVII (Notice of Completion of Work), Respondents shall also instruct their contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

43.     At the conclusion of this document retention period, Respondents shall notify EPA and the State at least ninety (90) days prior to the destruction of any such records or documents, and, upon request by EPA or the State, Respondents shall deliver any such records or documents to EPA or the State.  Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by

14

federal law. If Respondents assert such a privilege, they shall provide EPA or the State with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by Respondents. However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

44.    Each Respondent hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by EPA or the State or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XII.  COMPLIANCE WITH OTHER LAWS

45.    Respondents shall perform all actions required pursuant to this Settlement Agreement in accordance with all applicable state and federal laws and regulations except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 6921(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-Site actions required pursuant to this Settlement Agreement shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements ("ARARs") under federal environmental or state environmental or facility siting laws. Respondents shall identify ARARs in the Work Plan subject to EPA approval.

## XIII.  EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

46.    In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondents shall immediately take all appropriate action. Respondents shall take these actions in accordance with all applicable provisions of this Settlement Agreement, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondents shall also immediately notify the OSC or, in the event of his unavailability, the Regional Duty Officer, Emergency Planning and Response Branch, EPA Region 1, telephone number (617) 918-1236 and the EPA Regional Emergency 24-hour telephone number (617) 723-8928 of the incident or Site conditions. In the event that Respondents fail to take appropriate response action as required by this Paragraph, and EPA takes such action instead, Respondents shall reimburse EPA all costs of the response action not inconsistent with the NCP pursuant to Section XV (Payment of Response Costs).

47.    In addition, in the event of any release of a hazardous substance from the Site,

15

Respondents shall immediately notify the OSC at (617) 918-1236 and the National Response Center at (800) 424-8802. Respondents shall submit a written report to EPA within seven (7) days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq.*

## XIV. AUTHORITY OF ON-SCENE COORDINATOR

48.     The OSC shall be responsible for overseeing Respondents' implementation of this Settlement Agreement. The OSC shall have the authority vested in an OSC by the NCP, including the authority to halt, conduct, or direct any Work required by this Settlement Agreement, or to direct any other removal action undertaken at the Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless specifically directed by the OSC.

## XV. PAYMENT OF RESPONSE COSTS

49.     Payment for Past Response Costs.

a.      Subject to Paragraph 87 hereto, within thirty (30) days after the effective date of the Confirmation of the Plan of Reorganization, Respondents shall pay to EPA $72,537 for Past Response Costs. Payment shall be made to EPA by Electronic Funds Transfer ("EFT") to:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York, NY 10045
> Field Tag 4200 of the Fedwire message should read "D 68010727 Environmental Protection Agency"

The EFT shall be accompanied by a statement identifying the name and address of the party(ies) making payment, the Site name, the EPA Region and Site/Spill ID Number 01FK, and the EPA docket number for this action.

b.      At the time of payment, Respondents shall send notice that such payment has been made by email to acctsreceivable.cinwd@epa.gov, and to:

> U.S. Environmental Protection Agency
> Superfund Payments

16

Cincinnati Finance Center
P.O. Box 979076
St. Louis, MO 63197-9000

and

Tina Hennessy, Enforcement Coordinator
U.S. Environmental Protection Agency
Office of Site Remediation & Restoration
Emergency Planning & Response Branch
OSRR02-2
Five Post Office Square, Suite 100
Boston, MA 02114-2023
hennessy.tina@epa.gov

    c.     The total amount to be paid by Respondents pursuant to Paragraph 49(a) shall be deposited by EPA in the EPA Hazardous Substance Superfund.

50.    <u>Payments for Future Response Costs.</u>

    a.     Respondents shall pay EPA all Future Response Costs not inconsistent with the NCP. On a periodic basis after Confirmation of the Plan of Reorganization, EPA will send Respondents a bill requiring payment that consists of a Region 1 Cost Summary, which is a line item summary of costs in dollars by category of costs (including but not limited to payroll, travel, indirect costs, and contracts). Subject to Paragraph 87 hereto, Respondents shall make all payments within thirty (30) days of receipt of each bill requiring payment, except as otherwise provided in Paragraph 52 of this Settlement Agreement.

    b.     Respondents shall make all payments required by this Paragraph by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party(ies) making payment and EPA Site/Spill ID number 01FK. Respondents shall send the check(s) to:

U.S. Environmental Protection Agency
Superfund Payments
Cincinnati Finance Center
P.O. Box 979076
St. Louis, MO 63197-9000

Alternatively, Respondents may make all payments by EFT per the instructions outlined in Paragraph 49(a).

    c.     At the time of payment, Respondents shall send notice that payment has

been made to by email to acctsreceivable.cinwd@epa.gov, and to the two mailing addressees listed in Paragraph 49(b).

        d.     The total amount to be paid by Respondents pursuant to Paragraph 50(a) shall be deposited by EPA in the EPA Hazardous Substance Superfund.

51.    Subject to Paragraph 87 hereto, in the event that the payment for Past Response Costs is not made within thirty (30) days after the effective date of the Plan of Reorganization, or the payments for Future Response Costs are not made within (thirty) 30 days of Respondents' receipt of a bill, Respondents shall pay Interest on the unpaid balance. The Interest on Past Response Costs shall begin to accrue thirty (30) days after the Effective Date and shall continue to accrue until the date of payment. The Interest on Future Response Costs shall begin to accrue thirty (30) days after the effective date of the Plan of Reorganization or thirty (30) days from Respondents' receipt of a bill, whichever is later, and shall continue to accrue until the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondents' failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Section XVIII.

52.    Respondents may contest payment of any Future Response Costs billed under Paragraph 50 if it determines that EPA has made a mathematical error, or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with the NCP. Such objection shall be made in writing within thirty (30) days of receipt of the bill and must be sent to the OSC. Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, Respondents shall within the 30-day period pay all uncontested Future Response Costs to EPA in the manner described in Paragraph 50. Simultaneously, Respondents shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the Commonwealth of Massachusetts and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Respondents shall send to the EPA OSC a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Respondents shall initiate the Dispute Resolution procedures in Section XVI (Dispute Resolution). If EPA prevails in the dispute, within five (5) days of the resolution of the dispute, Respondents shall pay the sums due (with accrued interest) to EPA in the manner described in Paragraph 50. If Respondents prevail concerning any aspect of the contested costs, Respondents shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to EPA in the manner described in Paragraph 50. Respondents shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XVI (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Respondents' obligation to reimburse EPA for its Future Response Costs.

## XVI. DISPUTE RESOLUTION

53.    Unless otherwise expressly provided for in this Settlement Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement. The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally.

54.    If Respondents object to any EPA action taken pursuant to this Settlement Agreement, including billings for Future Response Costs, it shall notify EPA in writing of its objection(s) within fourteen (14) days of such action, unless the objection(s) has/have been resolved informally. EPA and Respondents shall have seven (7) days from EPA's receipt of Respondents' written objection(s) to resolve the dispute through formal negotiations (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of EPA.

55.    Any agreement reached by the parties pursuant to this Section shall be in writing and shall, upon signature by both parties, be incorporated into and become an enforceable part of this Settlement Agreement. If the Parties are unable to reach an agreement within the Negotiation Period, an EPA management official at the branch level or higher will issue a written decision on the dispute to Respondents. EPA's decision shall be incorporated into and become an enforceable part of this Settlement Agreement. Respondents' obligations under this Settlement Agreement shall not be tolled by submission of any objection for dispute resolution under this Section. Following resolution of the dispute, as provided by this Section, Respondents shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs.

## XVII. FORCE MAJEURE

56.    Respondents agree to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed by a *force majeure*. For purposes of this Settlement Agreement, a *force majeure* is defined as any event arising from causes beyond the control of Respondents, or of any entity controlled by Respondents, including but not limited to its contractors and subcontractors, which delays or prevents performance of any obligation under this Settlement Agreement despite Respondents' best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the Work, or increased cost of performance or a failure to attain performance standards/action levels set forth in the Action Memorandum.

57.    If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement, whether or not caused by a *force majeure* event, Respondents shall notify EPA orally within forty-eight (48) hours of when Respondents first knew that the event might cause a delay. Within three (3) days thereafter, Respondents shall provide to EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule

19

for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondents' rationale for attributing such delay to a *force majeure* event if it intends to assert such a claim; and a statement as to whether, in the opinion of Respondents, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall preclude Respondents from asserting any claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

58.    If EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Respondents in writing of its decision. If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify Respondents in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

## XVIII. STIPULATED PENALTIES

59.    Respondents shall be liable to EPA for stipulated penalties in the amounts set forth in this Paragraph for failure to comply with the requirements of this Settlement Agreement specified below, unless excused under Section XVII (*Force Majeure*). "Compliance" by Respondents shall include completion of the activities under this Settlement Agreement or any work plan or other plan approved under this Settlement Agreement identified below in accordance with all applicable requirements of law, this Settlement Agreement, the SOW, and any plans or other documents approved by EPA pursuant to this Settlement Agreement and within the specified time schedules established by and approved under this Settlement Agreement.

60.    Stipulated Penalty Amounts.

a. Stipulated Penalty Amounts - Work. The following stipulated penalties shall accrue per violation per day for any noncompliance other than that identified in Paragraph 60(b):

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $1000 | 1st through 14th day |
| $1500 | 15th through 30th day |
| $2000 | 31st day and beyond |

b.    Stipulated Penalty Amounts - Reports. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate reports pursuant to Paragraphs 32 and 33:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 750 | 1st through 14th day |
| $ 1000 | 15th through 30th day |
| $ 1500 | 31st day and beyond |

61.    In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 71 of Section XX, Respondents shall be liable for a stipulated penalty, in the amount of $300,000 if EPA performs a portion or in the amount of $500,000 if EPA assumes all the Work.

62.    All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue:  1) with respect to a deficient submission under Section VIII (Work to be Performed), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Respondents of any deficiency; and 2) with respect to a decision by the EPA Management Official at the branch level or higher, under Section XVI (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the EPA management official issues a final decision regarding such dispute.  Nothing in this Settlement Agreement shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

63.    Following EPA's determination that Respondents have failed to comply with a requirement of this Settlement Agreement, EPA may give Respondents written notification of the failure and describe the noncompliance.  EPA may send Respondents a written demand for payment of the penalties.  However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Respondents of a violation.

64.    All penalties accruing under this Section shall be due and payable to EPA after the later of thirty (30) days after the effective date of the Plan of Reorganization referenced in Paragraph 87 below or thirty (30) days of Respondents' receipt from EPA of a demand for payment of the penalties, unless Respondents invokes the dispute resolution procedures under Section XVI (Dispute Resolution).  All payments to EPA under this Section shall be paid by certified or cashier's check(s) made payable to "EPA Hazardous Substances Superfund," and shall be mailed to:

U.S. Environmental Protection Agency
Superfund Payments
Cincinnati Finance Center
P.O. Box 979076
St. Louis, MO 63197-9000

The certified or cashier's check shall indicate that the payment is for stipulated penalties, and shall reference the EPA Region and Site/Spill ID Number 01FK, the EPA Docket Number,

21

CERCLA Docket No. 01-2010-0019, and the name and address of the parties making payment. Copies of check(s) paid pursuant to this Section, and any accompanying transmittal letter(s), shall be sent to EPA as provided in Paragraph 50(b).

65.    The payment of penalties shall not alter in any way Respondents' obligation to complete performance of the Work required under this Settlement Agreement.

66.    Penalties shall continue to accrue during any dispute resolution period, but need not be paid until fifteen (15) days after the dispute is resolved by agreement or by receipt of EPA's decision.

67.    If Respondent fails to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest. Respondents shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 63. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Respondents' violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(*l*) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(*l*), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that EPA shall not seek civil penalties pursuant to Section 106(b) or 122(*l*) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided in this Section, except in the case of a willful violation of this Settlement Agreement or in the event that EPA assumes performance of a portion or all of the Work pursuant to Section XX, Paragraph 71. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.

## XIX.  COVENANT NOT TO SUE BY EPA

68.    In consideration of the actions that will be performed and the payments that will be made by Respondents under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, EPA covenants not to sue or to take administrative action against Respondents pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work, Past Response Costs, and Future Response Costs. This covenant not to sue shall take effect upon receipt by EPA of the Past Response Costs due under Section XV of this Settlement Agreement and any Interest or Stipulated Penalties due for failure to pay Past Response Costs as required by Sections XV and XVIII of this Settlement Agreement.  This covenant not to sue is conditioned upon the complete and satisfactory performance by Respondents of their obligations under this Settlement Agreement, including, but not limited to, payment of Future Response Costs pursuant to Section XV. This covenant not to sue extends only to Respondents and does not extend to any other person.

## XX.  RESERVATIONS OF RIGHTS BY EPA

22

69.    Except as specifically provided in this Settlement Agreement, nothing in this Settlement Agreement shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing in this Settlement Agreement shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondents in the future to perform additional activities pursuant to CERCLA or any other applicable law.

70.    The covenant not to sue set forth in Section XIX above does not pertain to any matters other than those expressly identified therein. EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Respondents with respect to all other matters, including, but not limited to:

　　　a.    claims based on a failure by Respondents to meet a requirement of this Settlement Agreement;

　　　b.    liability for costs not included within the definitions of Past Response Costs or Future Response Costs;

　　　c.    liability for performance of response action other than the Work;

　　　d.    criminal liability;

　　　e.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

　　　f.    liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

　　　g.    liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site.

71.    <u>Work Takeover</u>. In the event EPA determines that Respondents have ceased implementation of any portion of the Work, are seriously or repeatedly deficient or late in their performance of the Work, or are implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of all or any portion of the Work as EPA determines necessary. Respondents may invoke the procedures set forth in Section XVI (Dispute Resolution) to dispute EPA's determination that takeover of the Work is warranted under this Paragraph. Costs incurred by the United States in performing the Work pursuant to this Paragraph shall be considered Future Response Costs that Respondents shall pay pursuant to Section XV (Payment of Response Costs). Notwithstanding any other provision of this Settlement Agreement, EPA retains all authority and reserves all rights to take

23

any and all response actions authorized by law.

## XXI. COVENANT NOT TO SUE BY RESPONDENTS

72.     Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Past Response Costs, Future Response Costs, or this Settlement Agreement, including, but not limited to:

a.     any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b.     any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Massachusetts Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

c.     any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Work, Past Response Costs, or Future Response Costs.

These covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 70 (b), (c), and (e) - (g), but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

73.     Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

## XXII. OTHER CLAIMS

74.     By issuance of this Settlement Agreement, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondents. The United States or EPA shall not be deemed a party to any contract entered into by Respondents or their directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Settlement Agreement.

75.     Nothing in this Settlement Agreement constitutes a satisfaction of or release from any claim or cause of action against Respondents or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under

24

Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

76.    No action or decision by EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXIII. CONTRIBUTION

77.    a.    The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 122(h)(4), and that Respondents are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), or as may be otherwise provided by law, for "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are the Work, Past Response Costs, and Future Response Costs.

b.    The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), pursuant to which Respondents has, as of the Effective Date, resolved its liability to the United States for the Work, Past Response Costs, and Future Response Costs.

c.    Nothing in this Settlement Agreement shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Settlement Agreement. Each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613) defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this Settlement Agreement diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

## XXIV. INDEMNIFICATION

78.    Respondents shall indemnify, save and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition, Respondents agree to pay the United States all costs incurred by the United States, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Respondents, its officers,

directors, employees, agents, contractors, subcontractors and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondents in carrying out activities pursuant to this Settlement Agreement. Neither Respondents nor any such contractor shall be considered an agent of the United States.

79.    The United States shall give Respondents notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondents prior to settling such claim.

80.    Respondents waive all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Respondents shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

## XXV. MODIFICATIONS

81.    The OSC may make modifications in accordance with applicable law to any plan or schedule or Scope of Work in writing or by oral direction. Any oral modification will be memorialized in writing by EPA promptly, but shall have as its effective date the date of the OSC's oral direction. Any other requirements of this Settlement Agreement may be modified in writing by mutual agreement of the parties.

82.    If Respondents seek permission to deviate from any approved work plan or schedule or Scope of Work, Respondents' Project Coordinator shall submit a written request to EPA for approval outlining the proposed modification and its basis. Respondents may not proceed with the requested deviation until receiving oral or written approval from the OSC pursuant to the preceding Paragraph.

83.    No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondents shall relieve Respondents of their obligation to obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXVI. ADDITIONAL REMOVAL ACTION

84.    If EPA determines that additional removal actions not included in an approved plan are necessary under applicable law and in accordance with the Multi-Site Agreement between W.R.

Grace and EPA referenced in Paragraph 5, above, to protect public health, welfare, or the environment, EPA will notify Respondents of that determination.  Unless otherwise stated by EPA, within thirty (30) days of receipt of notice from EPA that additional removal actions are necessary to protect public health, welfare, or the environment, Respondents shall submit for approval by EPA a Work Plan for the additional removal actions.  The plan shall conform to the applicable requirements of Section VIII (Work to Be Performed) of this Settlement Agreement.  Upon EPA's approval of the plan pursuant to Section VIII, Respondents shall implement the plan for additional removal actions in accordance with the provisions and schedule contained therein.  This Section does not alter or diminish the OSC's authority to make oral modifications to any plan or schedule pursuant to Section XXV (Modifications).

## XXVII.  NOTICE OF COMPLETION OF WORK

85.  When EPA determines, after EPA's review of the Final Report, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including post-removal site controls, payment of Future Response Costs, or record retention, EPA will provide written notice to Respondents. If EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the Work Plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved Work Plan and shall submit a modified Final Report in accordance with the EPA notice.  Failure by Respondents to implement the approved modified Work Plan shall be a violation of this Settlement Agreement.

## XXVIII.  INTEGRATION/APPENDICES

86.    This Settlement Agreement and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement Agreement.  The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Settlement Agreement.  The following appendices are attached to and incorporated into this Settlement Agreement:

i.      Appendix A - Action Memorandum dated March 23, 2010
ii.     Appendix B - Cost Summary dated March 15, 2010
iii.    Appendix C - Site Map (Figure 1 Site Diagram) dated January 22, 2010
iv.     Appendix D - Scope of Work

## XXIX.  EFFECTIVE DATE

87.     W.R. Grace has filed a petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Grace expects to emerge from bankruptcy during 2010. In order to receive authority to carry out its obligations under this Settlement Agreement including, but not limited to, carrying out the Work to be performed and paying EPA's Past and Future Response Costs, Grace

claims. This Settlement Agreement shall not be effective and binding on Grace or Oldon unless and until the Bankruptcy Court enters an Order granting the relief contemplated in this Paragraph.

88.    Subject to, and in accordance with Paragraph 87, the Effective Date of this Settlement Agreement shall be three (3) business days after the Settlement Agreement is signed by the Parties and the Bankruptcy Court enters an Order approving this Settlement Agreement.


It is so ORDERED and Agreed this 25ᵗʰ day of _____May_____, 2010.


By: _____

James T. Owens, III, Director
Office of Site Remediation & Restoration
U.S. Environmental Protection Agency


28

The undersigned representative of Respondent certifies that it is fully authorized to enter into the terms and conditions of this Settlement Agreement and to bind the Respondent to this Settlement Agreement.

Agreed this _____20th_____ day of _____May_____, 2010.

For Respondent W.R. Grace & Co.

By: _____

Title _____Vice President, Public and Regulatory Affairs_____

29

The undersigned representative of Respondent certifies that it is fully authorized to enter into the terms and conditions of this Settlement Agreement and to bind the Respondent to this Settlement Agreement.

Agreed this _20th_ day of _May_____, 2010.


For Respondent Oldon Limited Partnership


By: _Eileen Mary Sullivan_

_Eileen Mary Sullivan_

Title _General Partner_____

30

# APPENDIX A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 1
5 POST OFFICE SQUARE, SUITE 100
BOSTON, MA 02109-3912

## CONTAINS ENFORCEMENT-SENSITIVE INFORMATION

### MEMORANDUM

**DATE:** March 22, 2010

**SUBJ:** Request for a Removal Action at the Zonolite/W.R. Grace Site, Easthampton, Hampshire County, Massachusetts - Action Memorandum

**FROM:** John McKeown, On-Scene Coordinator
Emergency Response and Removal Section

**THRU:** David McIntyre, Chief
Emergency Response and Removal Section I

Arthur V. Johnson III, Chief
Emergency Planning & Response Branch

**TO:** James T. Owens III, Director
Office of Site Remediation and Restoration

## I.    PURPOSE

The purpose of this Action Memorandum is to request and document approval of the proposed removal action at the former Zonolite/W.R. Grace Site (the Site), located in Easthampton, Massachusetts. Amphibole asbestos fibers present inside of the building and in soil at the Site, if not addressed by implementing the response actions selected in this Action Memorandum, will continue to pose a threat to human health and the environment. There has been no use of the OSC's $200,000 warrant authority. The potentially responsible parties (PRPs) have expressed interest in actively participating in the clean up action.

## II.    SITE CONDITIONS AND BACKGROUND

**CERCLIS ID# :**       MAD019335561
**SITE ID# :**       01FK
**CATEGORY :**       Time-Critical

### A.    Site Description

#### 1.    Removal site evaluation

Action Memorandum for Zonolite / W.R. Grace Site                              March 22, 2010
Easthampton, Massachusetts                                                   Page 2 of 13

In an October 2008 Memorandum, the U. S. Environmental Protection Agency (EPA) Office of Solid Waste and Emergency Response (OSWER) directed EPA Regional Removal Programs to reassess vermiculite sites that received asbestos-contaminated ore from Libby, Montana. The Memorandum provided guidance and a detailed process for accomplishing this task. In January of 2009, the On-Scene Coordinator (OSC) contacted Massachusetts Department of Environmental Protection (MassDEP) to obtain an update on the status of the Site.

After reviewing file material and previous sampling data indicating the presence of amphibole asbestos fibers in onsite soils (asbestos-containing soils), the OSC coordinated with MassDEP to set up a site meeting/visit. Other parties attending the meeting included representatives from Massachusetts Highway Department (Mass Highway), City of Easthampton and EPA Region I START. Following the meeting, the OSC tasked START to conduct a Preliminary Assessment/Site Investigation (PA/SI) using information gained from the site visit and the large volume of sampling data and historical information regarding the Site (See paragraph (II)(B)(1) below).

From 1963 to 1992, Zonolite/W.R. Grace leased the Former Zonolite Facility from Oldon in order to operate an exfoliation plant. Zonolite/W.R. Grace received asbestos-containing vermiculite concentrate (by rail) from the Zonolite mine in Libby, Montana, and produced Zonolite attic insulation and Monokote fireproofing material. In 1992, Zonolite/W.R. Grace removed all equipment from the building, washed down the building and conducted confirmation air sampling. The building was vacant from 1992 to 1997.

From sometime in the late 1990's through 2000, JPS Acquisition Elastomerics Company leased the building from Oldon for use as a warehouse. At present, Oldon continues to own the Former Zonolite Facility, which is used by a neighboring business, DOS Concrete Service, as a storage yard and warehouse. DOS Concrete Service plows a portion of the driveway and parking area and mows the lawn in front of the building at the Former Zonolite Facility in exchange for use of the parking lot and storage inside the building.

The Site consists of several properties with asbestos-containing soils, including the Former Zonolite Facility, and adjacent properties. Private parties own all site-related properties with the exception of the railroad right-of-way, which the City of Easthampton acquired through eminent domain.

START completed the PA/SI and submitted the final report to the OSC, who used it and the recommendations included in a 2006 site-related Health Consultation prepared by the Agency for Toxic Substances and Disease Registry (ATSDR)/Massachusetts Department of Public Health (MassDPH) to conclude that a CERCLA time-critical removal action is required to address the risks at the Site. The OSC documented this recommendation in a Site Investigation Closure Memorandum dated 22 May 2009.

### 2.  Physical location

Latitude:        42° 15′ 13.7″ North
Longitude:     72° 41′ 24.8″ West

The Former Zonolite/W.R. Grace Facility is located at 19 Wemelco Way in a mixed residential/commercial/agricultural area of Easthampton, Hampshire County, Massachusetts.

The former Zonolite/W.R. Grace Facility boundaries consist of:

- East – hayfield;
- South – rail right-of-way running northeast to southwest.  The rail right-of-way is currently thickly wooded;
- West – Wemelco Way;
- North – DOS Concrete Service, Inc.  parcel.

### 3.  Site characteristics

The Site is approximately 2.3 acres in size and consists of the Former Zonolite Facility and all adjacent properties with asbestos-containing soils.  These adjacent properties include (see attached Figure 1):

- the former Pioneer Valley Rail Line (Map 155-14), (the "Railroad Right-of Way);
- farmland located southeast of the rail line (Map 165-47) (the "Cernak Parcel");
- the current DOS Concrete Service, Inc. parcel located northwest of the Former Zonolite Facility (Map 164-1) (the "DOS Parcel"); and
- wooded property located across Wemelco Way from the Former Zonolite Facility (Maps 164-3 and 164-4) (the "Elastomerics Parcel").

The Site consists of a large vacant exfoliation plant (the building) located in the southwest corner, a parking lot located in the northwest corner and the wooded eastern portion. Tennessee Gas Pipeline has a 30-foot wide easement bisecting the property running north to south and located behind the east side of the building.  Amphibole asbestos fibers at the Former Zonolite Facility are present in surface and subsurface soils surrounding the building and inside the building.  Asbestos-containing soils on the Former Zonolite Facility can be divided into five separate distinct geographic and characteristic groups:

Area A (an area of asbestos-containing surface soils located east of area C);
Area B (an area of asbestos-containing surface and subsurface soils located east

of Area C;
Area C (an area of asbestos-containing surface and subsurface soils located within the Tennessee Gas Pipeline easement;
Area D (an area of asbestos-containing surface soils located west of Area C);
Area E (an area of asbestos-containing surface and subsurface soils located west of Area C.

The nearest residences are located approximately 600 feet east of the Site along the north side of the former rail line. Approximately 1,393 people live within ½ mile. The most likely current exposure pathway is for workers from DOS Concrete Service which occupies both the DOS Parcel and the Former Zonolite Facility, persons walking along the former rail trail and residents that live nearby who may traverse any areas within the Site. According to the EPA Region 1 Environmental Justice Mapping Tool, the Site is not in an environmental justice area.

**4.    Release or threatened release into the environment of a hazardous substance, or pollutant or contaminant**

The hazardous substance is amphibole asbestos, primarily asbestos-containing vermiculite originating from the Zonolite Mine in Libby, Montana. This is a "hazardous substance" as defined by Section 101(14) of CERCLA and 40 CFR § 302.4.

Asbestos is a general name applied to a group of silicate minerals consisting of thin, separable fibers arranged in parallel. Asbestos minerals fall into two classes, serpentine and amphibole. Serpentine asbestos has relatively long and flexible crystalline fibers and include chrysotile, the predominant type of asbestos used commercially. Amphibole asbestos minerals are brittle and have a rod- or needle-like shape. Amphibole minerals regulated as asbestos by the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) includes five classes: fibrous tremolite, actinolite, anthophyllite, crocidolite, and amosite.

Asbestos poses health risks when people breathe fibers present in the air. When inhaled in significant quantities, asbestos fibers can cause asbestosis (a scarring of the lungs, which makes breathing difficult), mesothelioma (a rare cancer of the lining of the chest or abdominal cavity) and lung cancer. The link between exposure to asbestos and other types of cancers is less clear.

**5.    NPL status**

The Site is not currently on the National Priorities List, and has not received a Hazardous Ranking System rating.

**B.**  **Other Actions to Date**

    **1.**  **Previous actions**

Following the closure of the facility in 1992, Zonolite/W.R. Grace removed equipment from the building and washed the building to remove residue asbestos material. Zonolite/W.R. Grace collected clearance indoor air samples to support the effectiveness of the building clearance procedure.

In May 2000, MassDEP and EPA Region I conducted limited soil sampling at the facility and along the rail line. EPA analyzed the samples using polarized light microscopy (PLM) and a contract laboratory analyzed them using transmission electron microscopy (TEM). The analytical results indicate amphibole asbestos fibers in surface and subsurface soils, ranging from 5% to 10%.

In August of 2000, MassDEP issued a Notice of Responsibility/Notice of Response Actions to Zonolite/W.R. Grace, which hired Woodward and Curran to characterize the Site and identify areas of amphibole asbestos contamination in soil. Sampling results indicated amphibole asbestos fibers in the surface and subsurface soils at the previous mentioned locations. EPA and MassDEP agreed that MassDEP take the lead on overseeing cleanup efforts financed by W.R. Grace. This effort continued until W.R. Grace declared bankruptcy in 2001.

Since 2005, the City of Easthampton, which owns the Railroad Right-of-Way, has been working with the Mass Highway to extend the Manhan Rail Trail to the Right-of-Way and lay an extension of sewer line in that area. The City recently obtained $1.1 million in federal funding through Mass Highway for use in 2010 to address asbestos-containing soils along the Right-of-Way and construct the portion of the Manhan Bike Path from South Street to Coleman Road (approximately ¾ miles of rail trail). However, the Mass Highway project would only address contamination at the railroad Right-of-Way portion of the Site and, as noted, work is not scheduled to begin until mid-2010.

From 2005–2008, MassDEP worked with Oldon and the City of Easthampton in planning for remediation at the Site. However, the parties never initiated any work to remediate the asbestos-containing soils.

    **2.**  **Current actions** - None

**C.**  **State and Local Authorities' Roles**

    **1.**  **State and local actions to date**

The Commonwealth of Massachusetts has been very active in this project. In May 2000, MassDEP and EPA worked together to assess the asbestos contamination at the Site. The MassDPH worked with ATSDR to develop the 2006 Health Consultation and remains actively involved in Site meetings and Site visits. Mass Highway and the City of Easthampton are involved in the former rail line/bike trail.

**2.    Potential for continued State/local response**

The OSC will continue to work and coordinate with MassDEP and MassDPH regarding site-related issues including surface impoundment construction and future operation and maintenance (O&M), and transportation and disposal options of contaminated soils. The OSC will coordinate with Mass Highway to ensure a smooth transition between this action and the construction phase of the bike trail.

## III.    THREATS TO PUBLIC HEALTH OR WELFARE OR THE ENVIRONMENT, AND STATUTORY AND REGULATORY AUTHORITIES

*Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants; [§300.415(b)(2)(i)];*

Amphibole asbestos fibers at concentrations ranging from trace to nearly 10% are present in surface and subsurface soils at the Site. ATSDR/MassDPH documented the adverse health effects posed by amphibole asbestos in the 2006 Health Consultation for this Site.

Human exposure via inhalation to amphibole asbestos fibers is the main threat posed by the contamination at the Site. The most likely current exposure pathway is for workers from DOS Concrete Service, which occupies the DOS Parcel and the Former Zonolite Facility, persons walking along the former rail trail, and residents that live nearby who may traverse the Site. The human inhalation exposure risk potentially increases in the future depending on the uses of the Facility, significant increased activity along and adjacent to the planned bike trail, and future use of the hayfield located adjacent to the site's eastern boundary.

In addition to the risk posed by asbestos-containing surface soil, a subsurface soil risk exists for Tennessee Gas Pipeline workers required to conduct maintenance on the pipeline located within the easement that bisects the Former Zonolite Facility.

*High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate [§300.415(b)(2)(iv)];*

Amphibole asbestos fibers are located inside the building and in soils at or near the surface. EPA has documented in previous studies and sampling events that amphibole asbestos fibers can migrate under the proper conditions.

Much of the asbestos-containing soil at the Site is vegetated to some degree. During the winter season, snow covers the Site for various periods. Amphibole asbestos fibers are less likely to migrate under these conditions. However, human activity and site use will likely increase with the construction and future use of the bike path on the railroad Right-of-Way.

Amphibole asbestos fibers located inside the building may migrate to other locations inside and outside of the building with increased foot traffic, open bay doors and the use of heavy equipment.

*Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released [§300.415(b)(2)(v)];*

Amphibole asbestos fibers can migrate easily in dry, windy conditions, which occur frequently during the summer. Weather conditions combined with increased human activities will increase the likelihood for human exposure and asbestos fiber migration.

*The availability of other appropriate Federal or State response mechanisms to respond to the release [§300.415(b)(2)(vii)];*

The City of Easthampton is the current owner of the railroad Right-of-Way. Mass Highway has budgeted money (obtained through federal funding) for use in 2010 to address asbestos-containing soils along the Right-of-Way and to construct approximately ¾ mile of the Manhan Bike Trail. The Mass Highway project only addresses the contamination on the Right-of-Way and is not scheduled to begin until mid 2010. [EPA believes that it will be able to begin necessary response work before the Mass Highway project would be underway, and that it can provide a comprehensive approach that addresses the entire Site.] The State does not have the funding to conduct the remainder of the removal action.

## IV.    ENDANGERMENT DETERMINATION

Actual or threatened releases of hazardous substances from this Site, if not addressed by implementing the response action selected in this Action Memorandum, may present an imminent and substantial endangerment to public health, or welfare, or the environment.[1]

---

[1]See Massachusetts Department of Public Health Environmental Toxicology Program Center for Environmental Health prepared under cooperative agreement with Agency for Toxic

## V.   PROPOSED ACTIONS AND ESTIMATED COSTS

### A.   Proposed Actions

#### 1.   Proposed action description

The proposed action will address amphibole asbestos fibers located inside the building and in surface and subsurface soils of the parcels identified above, and as shown in Figure 1.

In areas of the Site where amphibole asbestos fibers are only present in surface soils, all surface soils containing detectable levels of asbestos will be excavated and either disposed off-site or in a surface impoundment to be located in Areas A and B of the Former Zonolite Facility parcel.

In areas of the Site where amphibole asbestos fibers are found in surface and subsurface soils (i.e., Areas B and E of the Former Zonolite Facility parcel, as shown in Figure 1), EPA will excavate as needed and place such soils in a surface impoundment to be located in Areas A and B. In addition, in order to protect future site workers, asbestos-containing soil within the thirty-foot gas pipeline easement will be excavated and placed in a surface impoundment to be located in Areas A and B of the Former Zonolite Facility parcel.

Specific removal activities will include the following:

- Conduct a reconnaissance visit with contractor personnel to assess layout of the Site, and determine required equipment, personnel and utilities;
- Develop and implement an asbestos-specific health and safety plan;
- Prepare a work plan and air monitoring plan addressing asbestos-specific issues and assuring protection of cleanup workers and surrounding properties;
- Plan proper sampling, identification, and characterization of asbestos-containing soils and other hazardous materials;
- Mobilize personnel and equipment;
- Provide site security as determined necessary by the OSC based on Site conditions;
- Delineate work zones and decontamination area;
- Perform air monitoring as required;

Substances and Disease Registry, U.S. Department of Health and Human Services, *Health Consultation, Former Zonolite Facility, Wemelco Way, Easthampton, Hampshire County, Massachusetts, EPA Facility ID: MAD019335561, December 15, 2006.*

- Sample, identify and characterize all asbestos-containing soils and other hazardous materials;
- Excavate asbestos-containing surface soils located on the railroad Right-of-Way and prepare for either placement in a surface impoundment located in Areas A and B of the Former Zonolite Facility or at an EPA-approved disposal facility;
- Excavate asbestos-containing soils located in Areas A, C, D and E of the Former Zonolite Facility, the Cernak Parcel, the DOS Parcel and the Elastomerics Parcel, and place in a surface impoundment to be located in Areas A and B of the Former Zonolite Facility;
- Take all required actions as needed to facilitate vegetation cutting; surveying; site grading; excavation or grading of asbestos-containing soils in Areas A and B of the Former Zonolite Facility; relocation of asbestos-containing soil; installation of a minimum two-foot cover consisting of a demarcation (geotextile) layer covered with at least two feet of compacted non-asbestos-containing material and hydroseeded;
- Take required actions as needed to remove amphibole asbestos fibers from the building and dispose in a surface impoundment located in Areas A and B of the Former Zonolite Facility;
- Coordinate with Tennessee Gas Pipeline during excavation of asbestos-containing soil located within Area C of the Former Zonolite Facility and the railroad Right-of-Way;
- Coordinate transportation and disposal of hazardous substances to an EPA-approved disposal facility;
- Repair any response-related damage at the Site; and
- Demobilize all equipment and personnel.

## 2.    Community relations

The OSC will continue to coordinate with MassDEP, MassDPH, the City of Easthampton, and other involved entities. If necessary, the OSC will coordinate a public information session with the surrounding community, and will issue press releases and fact sheets as required.

## 3.    Contribution to remedial performance

EPA designed the cleanup proposed in this Action Memorandum to mitigate the threats to human health and the environment posed by the Site. The actions taken at the Site would be consistent with and will not impede any future responses.

## 4.    Description of alternative technologies

Action Memorandum for Zonolite / W.R. Grace Site
Easthampton, Massachusetts

March 22, 2010
Page 10 of 13

EPA does not plan to use alternative technology for this removal action.

## 5.    Applicable or relevant and appropriate requirements (ARARs)

Federal ARARs:

40 CFR Part 262  Standards Applicable to Generators of Hazardous Waste:

> Subpart B - The Manifest
> 262.20 : General requirements for manifesting
> 262.21 : Acquisition of manifests
> 262.22 : Number of copies of manifests
> 262.23 : Use of the manifest
>
> Subpart C - Pre-Transport Requirements
> 262.30 : Packaging
> 262.31 : Labeling
> 262.32 : Marking
>
> Subpart D - Recordkeeping and Reporting
> 262.40 : Recordkeeping

40 CFR Part 264  Standards for Owners and Operators of Hazardous waste Treatment, Storage, and Disposal Facilities:

> Subpart I - Use and Management of Containers
> 264.171 : Condition of containers
> 264.172 : Compatibility of waste with containers
> 264.173 : Management of containers
> 264.174 : Inspections
> 264.175 : Containment
> 264.176 : Special requirements for ignitable or reactive waste
> 264.177 : Special requirements for incompatible wastes

40 CFR Part 264  Hazardous Waste Regulations - RCRA Subtitle C:
> 268-270 : Hazardous and Solid Waste Amendments Land Disposal Restrictions Rule

40 CFR Part 61  Clean Air Act – National Emission Standards for Hazardous Air Pollutants (NESHAP) Subpart M – worker safety requirements.

The EPA OSC will meet Federal ARARs to the extent practicable considering the exigencies of the situation.  The following, while not ARARs, will be complied with during the removal action:

29 CFR Parts 1910, 1926, and 1904: OSHA Health and Safety Regulations.

State ARARs:

Massachusetts Contingency Plan  310 CMR Section 7.15; U Asbestos  Commonwealth of Massachusetts standards for handling, transporting and disposing asbestos.

The OSC will coordinate with State officials to identify additional State ARARs, if any. In accordance with the National Contingency Plan and EPA Guidance Documents, the OSC will determine the applicability and practicability of complying with each ARAR identified in a timely manner.

### 6. Project schedule

The PRPs have expressed interest in conducting the required work within this Action Memorandum under an Administrative Order on Consent (AOC). The PRPs will provide a detailed project schedule for this time-critical removal action within the project work plan developed as part of the AOC. EPA anticipates the removal action to be complete within six months of its commencement.

### B. Estimated Costs

The table below reflects EPA estimated costs if the aforementioned AOC is not in effect.

| COST CATEGORY | | CEILING |
|---|---|---|
| REGIONAL REMOVAL ALLOWANCE COSTS | | |
| ERRS Contractor | | $600,000.00 |
| Interagency Agreement | | $ 0.00 |
| OTHER EXTRAMURAL COSTS NOT FUNDED FROM THE REGIONAL ALLOWANCE | | |
| START Contractor | | $125,000.00 |
| Extramural Subtotal | | $725,000.00 |
| Extramural Contingency | 15% | $108,000.00 |
| TOTAL, REMOVAL ACTION CEILING | | $833,000.00 |

## VI. EXPECTED CHANGE IN THE SITUATION SHOULD ACTION BE DELAYED OR NOT TAKEN

In the absence of the response action described herein, conditions at the Site will continue to remain constant or deteriorate, and the threats associated with the presence of amphibole asbestos fibers in the building and on-site soils will persist. Delayed action will increase public health risks and environmental risks posed by the release or threat of release of amphibole asbestos fibers.

## VII. OUTSTANDING POLICY ISSUES

Action Memorandum for Zonolite / W.R. Grace Site
Easthampton, Massachusetts

March 22, 2010
Page 12 of 13

The proposed action is precedent setting because asbestos is the principal contaminant of concern.

## VIII.   ENFORCEMENT ... For Internal Distribution Only

See attached Enforcement Strategy.

The total EPA costs for this removal action based on full-time accounting practices that will be eligible for cost recovery are estimated to be $833,000 (extramural costs) + $100,000 (EPA intramural costs) = $933,000 X 1.4541 (regional indirect rate) = **$1,356,675** [2].

## IX.   RECOMMENDATION

This decision document represents the selected removal action for the Zonolite/W.R. Grace Site in Easthampton, Massachusetts, developed in accordance with CERCLA, as amended, and is not inconsistent with the National Contingency Plan.  EPA will document this decision in the administrative record for this Site.

Conditions at the Site meet the NCP Section 300.415 (b) (2) criteria for a removal action due to the following:

*Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants [§300.415(b)(2)(i)];*

*High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate [§300.415(b)(2)(iv)];*

*Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released [§300.415(b)(2)(v)];*

---

[2]Direct Costs include direct extramural costs $833,000 and direct intramural costs $100,000. Indirect costs are calculated based on an estimated indirect cost rate expressed as a percentage of site-specific costs [45.41% x $933,000, consistent with the full accounting methodology effective October 2, 2000. These estimates do not include pre-judgment interest, do not take into account other enforcement costs, including Department of Justice costs, and may be adjusted during the course of a removal action. The estimates are for illustrative purposes only and their use is not intended to create any rights for responsible parties. Neither the lack of a total cost estimate nor deviation of actual total costs from this estimate will affect the United States' right to cost recovery.

Action Memorandum for Zonolite / W.R. Grace Site
Easthampton, Massachusetts

March 23, 2010
Page 13 of 13

*The availability of other appropriate Federal or State response mechanisms to respond to the release [§300.415(b)(2)(vii)];*

I recommend that you approve the proposed removal action.  The total removal action project ceiling if approved will be $833,000.

APPROVAL: _____    DATE: _3-23-2010_

DISAPPROVAL:_____    DATE:_____

# APPENDIX B

Report Date: 03/15/2010                                                                 Page 1 of 1

IFMS Reconciliation Pending

Itemized Cost Summary

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

**REGIONAL PAYROLL COSTS** ........................................................................ $12,140.26

**HEADQUARTERS PAYROLL COSTS** ............................................................ $139.89

**ENVIRONMENTAL SERVICES ASSISTANCE TEAMS (ESAT) CONTRACT COSTS**
      TECHLAW, INC. (EPW06017) ............................................................ $81.63

**SUPERFUND TECHNICAL ASSISTANCE AND RESPONSE TEAM (START)
CONTRACT COSTS**
      WESTON SOLUTIONS, INC. (EPW05042) ........................................ $33,203.41

      SOVEREIGN CONSULTING, INC. (EPW06043) .............................. $4,319.56

**EPA INDIRECT COSTS** ................................................................................ $22,652.68

**Total Site Costs:**                                                                   $72,537.43

IFMS Reconciliation Pending

Regional Payroll Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| HENNESSY, TINA M. | 2009 | 08 | 7.00 | 459.37 |
| (CAVANAUGH), | | 09 | 5.00 | 328.13 |
| | | 10 | 11.50 | 754.68 |
| | | 11 | 0.50 | 32.82 |
| | | 12 | 2.25 | 147.66 |
| | | 13 | 1.00 | 65.62 |
| | | 14 | 2.00 | 131.25 |
| | | 15 | 1.50 | 100.24 |
| | | 16 | 2.00 | 131.25 |
| | | 17 | 1.75 | 114.85 |
| | | 18 | 7.50 | 492.17 |
| | | 20 | 15.75 | 1,033.58 |
| | | 21 | 14.25 | 935.14 |
| | | 22 | 8.00 | 525.00 |
| | | 23 | 15.75 | 1,039.53 |
| | | 24 | 1.75 | 114.86 |
| | | 25 | 4.00 | 262.51 |
| | | 26 | 8.25 | 541.40 |
| | | 27 | 4.00 | 262.51 |
| | 2010 | 01 | 6.00 | 393.74 |
| | | 02 | 0.25 | 16.42 |
| | | 03 | 0.25 | 16.39 |
| | | 04 | 2.00 | 131.25 |
| | | 05 | 3.50 | 229.68 |
| | | 06 | 5.50 | 357.57 |
| | | 07 | 1.25 | 82.04 |
| | | 08 | 5.00 | 335.73 |
| | | 09 | 5.50 | 369.30 |
| | | 10 | 1.50 | 100.72 |
| | | 11 | 2.50 | 167.88 |
| | | | 147.00 | $9,673.29 |
| MCKEOWN, JOHN A. | 2010 | 07 | 6.00 | 419.02 |
| | | | 6.00 | $419.02 |
| ZUCKER, AUDREY L. | 2009 | 10 | 1.00 | 93.28 |
| | | 18 | 2.00 | 186.54 |

IFMS Reconciliation Pending

Regional Payroll Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| ZUCKER, AUDREY L. | 2009 | 20 | 1.25 | 116.60 |
| | | 21 | 1.00 | 93.28 |
| | | 22 | 4.00 | 373.09 |
| | | 23 | 2.50 | 233.18 |
| | | 25 | 2.50 | 233.18 |
| | | 26 | 7.00 | 629.70 |
| | 2010 | 01 | 1.00 | 89.10 |
| | | | 22.25 | $2,047.95 |
| | | | | |
| Total Regional Payroll Costs | | | 175.25 | $12,140.26 |

Report Date: 03/15/2010                                                    Page 1 of 1

IFMS Reconciliation Pending

Headquarters Payroll Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| GILBERT, EDWARD J. | 2009 | 25 | 0.50 | 34.51 |
|  | 2010 | 05 | 0.25 | 16.93 |
|  |  | 09 | 1.25 | 88.45 |
|  |  |  | 2.00 | $139.89 |
| Total Headquarters Payroll Costs |  |  | 2.00 | $139.89 |

IFMS Reconciliation Pending

Contract Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

ENVIRONMENTAL SERVICES ASSISTANCE TEAMS (ESAT) CONTRACT COSTS

| | |
|---|---|
| Contractor Name: | TECHLAW, INC. |
| EPA Contract Number: | EPW06017 |

| Delivery Order Information | DO # | Start Date | End Date |
|---|---|---|---|
| | 44 | 01/23/2010 | 01/29/2010 |

| | |
|---|---|
| Project Officer(s): | DEPIERRO, DENISE |
| Dates of Service: | From: 01/23/2010    To: 01/29/2010 |
| Summary of Service: | ENVIRON SERVICES ASSIST TEAMS(SUB-REDI) |
| Total Costs: | $81.63 |

| Voucher Number | Voucher Date | Voucher Amount | Treasury Schedule Number | and Date | Site Amount | Annual Allocation |
|---|---|---|---|---|---|---|
| 3033.44-48 | 02/08/2010 | 830.53 | R0472 | 03/09/2010 | 36.10 | 45.53 |
| | | | | Total: | $36.10 | $45.53 |

Report Date: 03/15/2010

Page 2 of 2

## IFMS Reconciliation Pending

### Contract Costs

### ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

ENVIRONMENTAL SERVICES ASSISTANCE TEAMS (ESAT) CONTRACT COSTS

| | |
|---|---|
| Contractor Name: | TECHLAW, INC. |
| EPA Contract Number: | EPW06017 |

Delivery Order Information

| DO # | Start Date | End Date |
|---|---|---|
| 44 | 01/23/2010 | 01/29/2010 |

| | |
|---|---|
| Project Officer(s): | DEPIERRO, DENISE |
| Dates of Service: | From: 01/23/2010     To: 01/29/2010 |
| Summary of Service: | ENVIRON SERVICES ASSIST TEAMS(SUB-REDI) |
| Total Costs: | $81.63 |

| Voucher Number | Schedule Number | Rate Type | Annual Allocation Rate |
|---|---|---|---|
| 3033.44-48 | R0472 | Class | 1.261336 |

IFMS Reconciliation Pending

Contract Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

<u>SUPERFUND TECHNICAL ASSISTANCE AND RESPONSE TEAM (START) CONTRACT COSTS</u>

| | |
|---|---|
| Contractor Name: | WESTON SOLUTIONS, INC. |
| EPA Contract Number: | EPW05042 |
| Project Officer(s): | CARLSON, JOHN |
| Dates of Service: | From: 12/27/2008    To: 01/29/2010 |
| Summary of Service: | S/F TECH ASSESSMENT&RESPONSE TEAM (REDI) |
| Total Costs: | $33,203.41 |

| Voucher Number | Voucher Date | Voucher Amount | Treasury Schedule Number and Date | | Site Amount | Annual Allocation |
|---|---|---|---|---|---|---|
| 1-A47 | 02/02/2009 | 331,727.69 | R9844 | 02/27/2009 | 679.67 | 76.81 |
| 1-A48 | 03/03/2009 | 331,727.69 | R9914 | 03/27/2009 | 6,284.07 | 710.11 |
| 2-A48 | 03/03/2009 | 43,690.24 | R9914 | 03/27/2009 | 70.20 | 7.93 |
| 1-A49 | 04/07/2009 | 414,659.62 | R9A04 | 05/01/2009 | 2,401.73 | 271.40 |
| 1-A50 | 05/05/2009 | 331,727.69 | R9A83 | 06/02/2009 | 292.18 | 33.02 |
| 1-A51 | 06/02/2009 | 331,727.69 | R9B63 | 06/26/2009 | 275.63 | 31.15 |
| 1-A53 | 08/06/2009 | 337,948.77 | R9D46 | 08/31/2009 | 833.62 | 94.20 |
| 2-A53 | 08/06/2009 | 95,756.37 | R9D46 | 08/31/2009 | 93.79 | 10.60 |
| 1-A54 | 09/03/2009 | 337,948.77 | R9E32 | 09/29/2009 | 138.05 | 15.60 |
| 1-A55 | 10/08/2009 | 414,846.60 | R0090 | 11/03/2009 | 1,296.14 | 146.47 |
| 1-A56 | 11/04/2009 | 337,948.77 | R0171 | 12/01/2009 | 5,215.77 | 589.39 |
| 2-A56 | 11/04/2009 | 105,519.36 | R0171 | 12/01/2009 | 93.16 | 10.53 |
| 1-A57 | 11/30/2009 | 337,948.77 | R0252 | 12/23/2009 | 380.36 | 42.98 |
| 1-A58 | 01/12/2010 | 421,237.64 | R0379 | 02/05/2010 | 7,361.33 | 831.85 |
| 2-A58 | 01/12/2010 | 223,354.10 | R0379 | 02/05/2010 | 3.25 | 0.37 |
| 1-A59 | 02/09/2010 | 337,948.77 | R0463 | 03/04/2010 | 4,297.25 | 485.60 |
| 2-A59 | 02/09/2010 | 52,562.14 | R0463 | 03/04/2010 | 116.08 | 13.12 |
| | | | | Total: | $29,832.28 | $3,371.13 |

Report Date: 03/15/2010                                                                Page 2 of 2

IFMS Reconciliation Pending

Contract Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

SUPERFUND TECHNICAL ASSISTANCE AND RESPONSE TEAM (START) CONTRACT COSTS

| Contractor Name: | WESTON SOLUTIONS, INC. |
| EPA Contract Number: | EPW05042 |
| Project Officer(s): | CARLSON, JOHN |
| Dates of Service: | From: 12/27/2008    To: 01/29/2010 |
| Summary of Service: | S/F TECH ASSESSMENT&RESPONSE TEAM (REDI) |
| Total Costs: | $33,203.41 |

| Voucher Number | Schedule Number | Rate Type | Annual Allocation Rate |
|---|---|---|---|
| 1-A47 | R9844 | Provisional | 0.113002 |
| 1-A48 | R9914 | Provisional | 0.113002 |
| 2-A48 | R9914 | Provisional | 0.113002 |
| 1-A49 | R9A04 | Provisional | 0.113002 |
| 1-A50 | R9A83 | Provisional | 0.113002 |
| 1-A51 | R9B63 | Provisional | 0.113002 |
| 1-A53 | R9D46 | Provisional | 0.113002 |
| 2-A53 | R9D46 | Provisional | 0.113002 |
| 1-A54 | R9E32 | Provisional | 0.113002 |
| 1-A55 | R0090 | Provisional | 0.113002 |
| 1-A56 | R0171 | Provisional | 0.113002 |
| 2-A56 | R0171 | Provisional | 0.113002 |
| 1-A57 | R0252 | Provisional | 0.113002 |
| 1-A58 | R0379 | Provisional | 0.113002 |
| 2-A58 | R0379 | Provisional | 0.113002 |
| 1-A59 | R0463 | Provisional | 0.113002 |
| 2-A59 | R0463 | Provisional | 0.113002 |

IFMS Reconciliation Pending

Contract Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

SUPERFUND TECHNICAL ASSISTANCE AND RESPONSE TEAM (START) CONTRACT COSTS

| | |
|---|---|
| Contractor Name: | SOVEREIGN CONSULTING, INC. |
| EPA Contract Number: | EPW06043 |

Delivery Order Information

| DO # | Start Date | End Date |
|---|---|---|
| 4 | 06/01/2009 | 08/31/2009 |

| | |
|---|---|
| Project Officer(s): | CARLSON, JOHN |
| Dates of Service: | From: 06/01/2009    To: 08/31/2009 |
| Summary of Service: | S/F TECH ASSESSMENT&RESPONSE TEAM (REDI) |
| Total Costs: | $4,319.56 |

| Voucher Number | Voucher Date | Voucher Amount | Treasury Schedule Number | and | Date | Site Amount |
|---|---|---|---|---|---|---|
| EG100-A3-08 | 07/24/2009 | 4,424.80 | R9D15 | | 08/18/2009 | 614.90 |
| EG100-A3-09 | 08/23/2009 | 3,788.72 | R9D92 | | 09/16/2009 | 2,261.81 |
| EG100-A3-10 | 09/24/2009 | 5,522.58 | R0053 | | 10/20/2009 | 1,442.85 |
| | | | | | Total: | $4,319.56 |

IFMS Reconciliation Pending

EPA Indirect Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

| Fiscal Year | Direct Costs | Indirect Rate( %) | Indirect Costs |
|---|---|---|---|
| 2009 | 24,662.40 | 45.41% | 11,199.21 |
| 2010 | 25,222.35 | 45.41% | 11,453.47 |
| | 49,884.75 | | |

Total EPA Indirect Costs                                                $22,652.68

IFMS Reconciliation Pending

EPA Indirect Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

## PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| GILBERT, EDWARD J. | 2009 | 25 | 34.51 | 45.41% | 15.67 |
| | | | 34.51 | | $15.67 |
| | | | | | |
| HENNESSY, TINA M. | 2009 | 08 | 459.37 | 45.41% | 208.60 |
| | | 09 | 328.13 | 45.41% | 149.00 |
| | | 10 | 754.68 | 45.41% | 342.70 |
| | | 11 | 32.82 | 45.41% | 14.90 |
| | | 12 | 147.66 | 45.41% | 67.05 |
| | | 13 | 65.62 | 45.41% | 29.80 |
| | | 14 | 131.25 | 45.41% | 59.60 |
| | | 15 | 100.24 | 45.41% | 45.52 |
| | | 16 | 131.25 | 45.41% | 59.60 |
| | | 17 | 114.85 | 45.41% | 52.15 |
| | | 18 | 492.17 | 45.41% | 223.49 |
| | | 20 | 1,033.58 | 45.41% | 469.35 |
| | | 21 | 935.14 | 45.41% | 424.65 |
| | | 22 | 525.00 | 45.41% | 238.40 |
| | | 23 | 1,039.53 | 45.41% | 472.05 |
| | | 24 | 114.86 | 45.41% | 52.16 |
| | | 25 | 262.51 | 45.41% | 119.21 |
| | | 26 | 541.40 | 45.41% | 245.85 |
| | | 27 | 262.51 | 45.41% | 119.21 |
| | | | 7,472.57 | | $3,393.29 |
| | | | | | |
| ZUCKER, AUDREY L. | 2009 | 10 | 93.28 | 45.41% | 42.36 |
| | | 18 | 186.54 | 45.41% | 84.71 |
| | | 20 | 116.60 | 45.41% | 52.95 |
| | | 21 | 93.28 | 45.41% | 42.36 |
| | | 22 | 373.09 | 45.41% | 169.42 |
| | | 23 | 233.18 | 45.41% | 105.89 |
| | | 25 | 233.18 | 45.41% | 105.89 |

IFMS Reconciliation Pending

EPA Indirect Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

### PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| ZUCKER, AUDREY L. | 2009 | 26 | 629.70 | 45.41% | 285.95 |
| | | | 1,958.85 | | $889.53 |
| Total Fiscal Year 2009 Payroll Direct Costs: | | | 9,465.93 | | $4,298.49 |

### OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| EPW05042 | 1-A47 | 02/27/2009 | 143.78 | 16.25 | 45.41% | 72.67 |
| | | | 535.89 | 60.56 | 45.41% | 270.85 |
| | 2-A48 | 03/27/2009 | 70.20 | 7.93 | 45.41% | 35.48 |
| | 1-A48 | 03/27/2009 | 6,284.07 | 710.11 | 45.41% | 3,176.06 |
| | 1-A49 | 05/01/2009 | 2,401.73 | 271.40 | 45.41% | 1,213.87 |
| | 1-A50 | 06/02/2009 | 292.18 | 33.02 | 45.41% | 147.67 |
| | 1-A51 | 06/26/2009 | 275.63 | 31.15 | 45.41% | 139.31 |
| | 2-A53 | 08/31/2009 | 93.79 | 10.60 | 45.41% | 47.40 |
| | 1-A53 | 08/31/2009 | 833.62 | 94.20 | 45.41% | 421.32 |
| | 1-A54 | 09/29/2009 | 138.05 | 15.60 | 45.41% | 69.77 |
| | | | 11,068.94 | 1,250.82 | | $5,594.40 |
| EPW06043 | EG100-A3-08 | 08/18/2009 | 614.90 | 0.00 | 45.41% | 279.23 |
| | EG100-A3-09 | 09/16/2009 | 2,261.81 | 0.00 | 45.41% | 1,027.09 |
| | | | 2,876.71 | 0.00 | | $1,306.32 |
| Total Fiscal Year 2009 Other Direct Costs: | | | 13,945.65 | 1,250.82 | | $6,900.72 |
| Total Fiscal Year 2009: | | | 24,662.40 | | | $11,199.21 |

Report Date: 03/15/2010                                                         Page 3 of 4

IFMS Reconciliation Pending

EPA Indirect Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

## PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| GILBERT, EDWARD J. | 2010 | 05 | 16.93 | 45.41% | 7.69 |
| | | 09 | 88.45 | 45.41% | 40.17 |
| | | | 105.38 | | $47.86 |
| | | | | | |
| HENNESSY, TINA M. | 2010 | 01 | 393.74 | 45.41% | 178.80 |
| | | 02 | 16.42 | 45.41% | 7.46 |
| | | 03 | 16.39 | 45.41% | 7.44 |
| | | 04 | 131.25 | 45.41% | 59.60 |
| | | 05 | 229.68 | 45.41% | 104.30 |
| | | 06 | 357.57 | 45.41% | 162.37 |
| | | 07 | 82.04 | 45.41% | 37.25 |
| | | 08 | 335.73 | 45.41% | 152.45 |
| | | 09 | 369.30 | 45.41% | 167.70 |
| | | 10 | 100.72 | 45.41% | 45.74 |
| | | 11 | 167.88 | 45.41% | 76.23 |
| | | | 2,200.72 | | $999.34 |
| | | | | | |
| MCKEOWN, JOHN A. | 2010 | 07 | 419.02 | 45.41% | 190.28 |
| | | | 419.02 | | $190.28 |
| | | | | | |
| ZUCKER, AUDREY L. | 2010 | 01 | 89.10 | 45.41% | 40.46 |
| | | | 89.10 | | $40.46 |

Total Fiscal Year 2010 Payroll Direct Costs:   2,814.22   $1,277.94

## OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| EPW05042 | 1-A55 | 11/03/2009 | 1,296.14 | 146.47 | 45.41% | 655.09 |

IFMS Reconciliation Pending

EPA Indirect Costs

ZONOLITE/W.R. GRACE FACILITY, EASTHAMPTON, MA  SITE ID = 01 FK

Payroll Costs Through Pay Period 11 of Fiscal Year 2010 Ending February 27, 2010
Voucher Costs Through March 14, 2010

## OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| EPW05042 | 1-A56 | 12/01/2009 | 5,215.77 | 589.39 | 45.41% | 2,636.12 |
| | 2-A56 | 12/01/2009 | 93.16 | 10.53 | 45.41% | 47.09 |
| | 1-A57 | 12/23/2009 | 380.36 | 42.98 | 45.41% | 192.24 |
| | 1-A58 | 02/05/2010 | 7,361.33 | 831.85 | 45.41% | 3,720.52 |
| | 2-A58 | 02/05/2010 | 3.25 | 0.37 | 45.41% | 1.64 |
| | 1-A59 | 03/04/2010 | 4,297.25 | 485.60 | 45.41% | 2,171.89 |
| | 2-A59 | 03/04/2010 | 116.08 | 13.12 | 45.41% | 58.67 |
| | | | 18,763.34 | 2,120.31 | | $9,483.26 |
| | | | | | | |
| EPW06017 | 3033.44-48 | 03/09/2010 | 36.10 | 45.53 | 45.41% | 37.07 |
| | | | 36.10 | 45.53 | | $37.07 |
| | | | | | | |
| EPW06043 | EG100-A3-10 | 10/20/2009 | 1,442.85 | 0.00 | 45.41% | 655.20 |
| | | | 1,442.85 | 0.00 | | $655.20 |

| | | | | | |
|---|---|---|---|---|---|
| Total Fiscal Year 2010 Other Direct Costs: | | 20,242.29 | 2,165.84 | | $10,175.53 |
| Total Fiscal Year 2010: | | 25,222.35 | | | $11,453.47 |
| | | | | | |
| Total EPA Indirect Costs | | | | | $22,652.68 |

# **APPENDIX C**



# **APPENDIX D**

**APPENDIX D**

**SCOPE OF WORK**

**ZONOLITE/W.R. GRACE EASTHAMPTON SUPERFUND REMOVAL SITE**

**EASTHAMPTON, MASSACHUSETTS**

**Pursuant to the**

Administrative Settlement Agreement and Order on Consent
To Perform a Removal Action

**CERCLA Docket No.** 01-2010-0019

Preface

This scope of work ("SOW") identifies the activities required pursuant to the Administrative Order on Consent ("Settlement Agreement") (CERCLA Docket No. 01-2010-0019) for performance of a removal action at the Zonolite/W.R. Grace Easthampton Superfund Removal (the "Site") located in Easthampton, Massachusetts. Under this SOW, W.R. Grace & Co. and Oldon Limited Partnership ("Respondents") shall prepare and submit to the On-Scene Coordinator ("OSC") for approval the items identified below. The removal action conducted under this Settlement Agreement and SOW shall abate the potential danger to public health or welfare or the environment, which may otherwise result from the actual or threatened release of Amphibole Asbestos Fibers located in on-site soils (Asbestos-Containing Soils) and inside the former exfoliation plant structure (the building).

A.    General Requirements

1.    For communications between EPA and the Respondents related to the implementation of the SOW, the OSC shall be the point of contact for EPA. The point of contact for the Respondents shall be the Project Coordinator, as defined in paragraph 24 of the Settlement Agreement. . The Respondents shall communicate freely with the OSC prior to and during the development of plans and deliverables, and continually throughout the implementation of the work described in this SOW. Open and routine communication will result in the most effective, safest, and efficient cleanup. Where deliverables are required, draft documents may be submitted for consideration prior to the due date and submission of the final documents for OSC approval. EPA will notify Respondents of the identities of any OSC-designated representatives assigned during oversight of on-site removal activities.

2.    All work performed by the Respondents shall be conducted in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, ("CERCLA"), the National Contingency Plan ("NCP"), 40 CFR Part 300 and any applicable amendments thereto, applicable guidance documents provided by EPA, and the provisions of this Settlement Agreement including any standards, specifications, and time schedules contained in the SOW or as specified by the OSC.

3.    EPA must approve each plan generated pursuant to the requirements identified below prior to implementation.

4.    Unless otherwise allowed or approved by EPA in writing, the Respondents shall perform and complete all activities that have been authorized in accordance with this SOW and the Settlement Agreement.

2

5.      The Respondents may be required (if and to the extent authorized by applicable law) or may (at their discretion) request to alter or expand upon the plans after approval, based on new information, changes in Site conditions, or subsequently identified deficiencies.

6.      By telephone or otherwise, the Respondents shall inform the OSC of any disposal shipments no less than three (3) working days prior to the event.

B.    Definitions

The definitions provided in the Settlement Agreement are incorporated herein by reference. In addition, the following definitions shall apply to this SOW:

1.      "Amphibole Asbestos Fibers" shall refer to the five classes of amphibole fibers regulated as asbestos by the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA). The five classes include fibrous tremolite, actinolite, anthophyllite, crocidolite and amosite.

2.      "Asbestos–Containing Soil" shall mean the reproducible presence of Amphibole Asbestos Fibers in soil tests conducted in accordance with EPA Method 600/R-93/116 using the PLM visual estimation method, or the asbestos in soil characterizations set forth in map depicting the 2000-2001 sampling at the Site. Weston Solutions Site Map dated 11 January 2010 was developed using the aforementioned 2000-2001 map and is attached as SOW Attachment 1.

3.      "Cernak Parcel" shall mean an area of Asbestos-Containing Soil on farmland located within the Site, southeast of the Railroad Right-of-Way, as generally shown on the map attached to this SOW. (SOW Attachment 1)

4.      "DOS Parcel" shall mean an area of Asbestos-Containing Soil on the parcel of land located within the Site, northwest of the Former Zonolite Facility, as generally shown on SOW Attachment 1.

5.      "Elastomerics Parcel" shall mean an area of Asbestos-Containing Soil on the wooded property located within the Site, across Wemelco Way from the Former Zonolite Parcel, as generally shown on Appendix C (Figure 1 Site Diagram) to the Settlement Agreement.

6.      "Former Zonolite Facility" shall mean the former W.R. Grace facility located within the Site at 19 Wemelco Way. The Former Zonolite Facility shall include the former Zonolite exfoliation plant structure located on the property and the following areas shown on Appendix C (Figure 1 Site Diagram) to the Settlement Agreement:

3

Area A (an area of < 1% asbestos-containing surface soils located east of Area C);

Area B (an area of > 1 % asbestos-containing surface and subsurface soils located east of Area C);

Area C (an area of asbestos-containing surface and subsurface soils located within the Tennessee Gas Pipeline easement).

Area D (an area of < 1% asbestos-containing surface soils located west of Area C);

Area E (an area of > 1% asbestos-containing surface soils located west of Area C).

7.    "Railroad Right-of-Way" shall mean the former Pioneer Valley Rail Line located within the Site, adjacent to the Former Zonolite Facility, as shown on Appendix C (Figure 1 Site Diagram) to the Settlement Agreement.

C. ·    Work Tasks

The Respondents shall provide the technical experts, personnel, equipment and materials to perform and complete the following removal action tasks associated with this Site within the approved time schedule set forth in the Settlement Agreement:

1.    Consult with the local conservation commission, as appropriate, regarding the work to be conducted.

2.    Provide site security as necessary based on Site conditions and approved by EPA;

3.    If necessary, due to the presence of hazardous wastes determined by pre-testing, excavate Asbestos-Containing Soils located on the Railroad Right-of-Way and prepare for disposal at an EPA-approved disposal facility. If pre-testing determines that there are no hazardous wastes or that the hazardous wastes do not exceed regulatory limits, the Asbestos-Containing Soils shall be disposed within Area A or B of the Former Zonolite Facility;

4.    Excavate Asbestos-Containing Soils within the Cernak Parcel, the DOS Parcel and the Elastomerics Parcel, and prepare for disposal within Area A or Area B of the Former Zonolite Facility;

5.    Excavate Asbestos-Containing Soil located within Area C of the Former Zonolite Facility to limits mutually agreed by EPA, Respondents and Tennessee Gas Pipeline based on appropriate sampling data, likely exposure scenarios and pipeline-related engineering and structural

4

characteristics. Dispose excavated Asbestos-Containing Soils in Area A or Area B of the Former Zonolite Facility.

6.      Plan and implement confirmatory soil sampling (prior to or after excavations described above, with the timing based on engineering judgments) to provide reasonable documentation that:  (i) Asbestos-Containing Soil has been removed from the Railroad Right-of-Way, the Cernak Parcel, the DOS Parcel, the Elastomerics Parcel, and Areas A, D and E of the Former Zonolite Facility; (ii) Asbestos-Containing Soil has been removed to the level required by paragraph C.5 above.

7.      Take required actions as needed to facilitate vegetation cutting; surveying; site grading; excavation or grading of Asbestos-Containing Soils in Areas A and B of the Former Zonolite Facility; relocation of Asbestos-Containing Soil; installation of a minimum two foot cover consisting of a demarcation (geotextile) layer covered with at least two feet of compacted non-asbestos-containing material and hydroseeded;

8.      Take required actions to remove Amphibole Asbestos Fibers and materials containing such Fibers from the building located on the Former Zonolite Facility.  Dispose of such Fibers and materials in Area A or B of the Former Zonolite Facility.  These actions shall be sufficient such that an Asbestos Project Monitor licensed by the Massachusetts Division of Occupational Safety confirms in a report that the building meets all applicable state and federal regulatory requirements for post asbestos abatement clearance in accordance with 40 CFR Part 763 Subpart 3 (AHERA).

9.      To the extent feasible, avoid or limit disturbance of the existing vegetative mat and underlying Asbestos-Containing Soil in Area A and B;

10.     Coordinate transportation and disposal of waste streams related to Asbestos-Containing Soils, other hazardous substances (if any that are located on Respondents' property or caused by Respondents), railroad-specific hazardous wastes, if any, that fail federal or Massachusetts regulatory limits for hazardous wastes, decontamination waste and spent personal protective equipment ("PPE") at a disposal facility licensed to accept such waste, as agreed upon with EPA;

11.     Repair any response-related damage to the Site; and

12.     Implement institutional controls, as necessary.

D.    Time Schedule

The Respondents shall provide the required technical experts, personnel, equipment and materials to perform and complete the following removal action support tasks associated with this Site, within the approved time schedule:

1.    Coordinate with OSC to conduct an initial site reconnaissance visit to assess layout of Site, and determine required equipment, personnel and logistics;

2.    Develop and implement a site-specific work plan;

3.    Develop and implement a site-specific Quality Assurance Project Plan (QAPP);

4.    Prepare and implement a site-specific air monitoring plan addressing asbestos specific issues and assuring protection of cleanup workers and surrounding properties;

5.    Ensure all personnel working on the Site meet asbestos certification requirements of the HASP;

6.    Establish and maintain a command post at the Site;

7.    Mobilize personnel and equipment;

8.    If necessary, install runoff control measures for containment during removal activities;

9.    Develop and implement a site-specific Health and Safety Plan (HASP), in accordance with Occupational Safety and Health Administration (OSHA) regulations;

10.    Delineate the work zones and decontamination area in compliance with the HASP;

11.    Coordinate with EPA and Tennessee Gas Pipeline prior to and during work within the Tennessee Gas Pipeline easement;

12.    Disposal of materials in accordance with *40 CFR Part 300.440 Procedures for Planning and Implementing Off-Site Response Actions.* Determine that all disposal facilities are in compliance with the *CERCLA Off-Site Rule (40 CFR Part 300.440).* Obtain EPA approval prior to off-site disposal;

13.    Provide and affix all appropriate labels in accordance with state

and federal regulations for storage, transportation, and/or disposal of waste streams, as appropriate; and

14. Demobilize all equipment and personnel.

E.    Coordinating and Reporting Instructions

1.    **Designation of the Contractor and Project Coordinator**

The Respondents shall propose an environmental consulting services contractor or an environmental services cleanup contractor for the purpose of performing and/or supervising the work required by this Settlement Agreement in accordance with the terms and conditions of the Settlement Agreement and shall notify EPA of the name(s) and qualifications of such contractor(s) within seven (7) business days of the Effective Date. Respondents shall also notify EPA of the name(s) and qualification(s) of any other contractor(s) or subcontractor(s) retained to perform the Work under this Settlement Agreement at least seven (7) business days prior to commencement of such Work. The supervising contractor shall provide a written Removal Work Plan that outlines the work to be performed under this Settlement Agreement and SOW and the schedule for completing the work. EPA retains the right to disapprove of a selected contractor. If EPA disapproves of a selected contractor, Respondents shall retain a different contractor and shall notify EPA of that contractor's name and qualifications within seven (7) business days of EPA's disapproval.

Within seven (7) business days after the Effective Date, Respondents shall designate a Project Coordinator who shall be responsible for administration of all actions by Respondents required by this Settlement Agreement and shall submit to EPA the designated Project Coordinator's name, address, telephone number, and qualifications. The Project Coordinator shall be present on Site while Respondent's contractors are conducting removal activities, as required in the SOW. EPA retains the right to disapprove the designated Project Coordinator. If EPA disapproves the designated Project Coordinator, Respondents shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number, and qualifications within seven (7) business days following EPA's disapproval. Receipt by Respondents' Project Coordinator of any notice or communication from EPA relating to this Settlement Agreement shall constitute receipt by Respondents.

2.    **Site Security**

The Respondents shall take reasonable precautions, in consultation with EPA, to prevent unauthorized access onto the portion of the Site shown on Appendix C (Figure 1 Site Diagram) to the Settlement Agreement as the

7

"Oldon Property" for the duration of the removal action. If, in the judgment of the OSC, these precautions are not preventing unauthorized access to the Site, the Respondents shall institute additional security measures, which may include 24-hour security, until the removal action is completed.

3.    **Within 30 days of the Effective Date of this Settlement Agreement**

Site Specific Work Plan: Respondents shall submit a work plan that describes how the Respondents will complete the work in the SOW, including a proposed schedule for performing the work. The plan shall describe the methods that will be used including, but not limited to personnel and equipment that will be utilized and contingency plans including containment of Asbestos-Containing Soil. For the media characterization, the plan shall include a Sampling and Analysis Plan ("SAP") that will discuss, but not be limited to, sample methodology; the name, address, and point of contact of the laboratory that will be utilized; and quality assurance/quality control ("QA/QC") procedures. The proposed schedule shall require completion of all on-site activities (i.e., not including off-site transport and disposal, or implementation of institutional controls), within 180 days of EPA's approval of the work plan.

Site Specific Health and Safety Plan (HASP): Respondents shall submit for EPA review and comment a plan that ensures the protection of the public health and safety during performance of work under this Settlement Agreement. This plan shall be prepared in accordance with EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992). In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning. Respondents shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal action.

Respondents shall submit to EPA for approval the transport and disposal ("T&D") facilities where Respondents will transport any waste material away from the Site to an off-Site disposal facility, if any materials are disposed off-Site. Transporters and disposal facilities must have a proper license and permit for handling the constituents of the waste from the Site.

4. **During the Removal Action**

The Respondents shall submit to EPA a report every two weeks detailing Site activities, problems encountered, other important issues, and activities anticipated in the two weeks to follow.

5.    **Within 180 days of EPA approval of Respondents' Work Plan**

Respondents complete transportation and disposal of all waste-streams designated for off-site disposal to an EPA approved disposal facility.

6.    **Within 45 days of the final transportation**

Respondents shall submit to EPA for approval a Final Report. The final report shall conform to the requirements set forth in Section 300.165 of the NCP entitled "OSC Reports." The Final Report shall include all waste manifests (legible), signed by the disposal facility and any other disposal documents.

F.    <u>Removal Action Standards</u>

In conducting all activities under this SOW, Respondents shall:

1.    Institute practices during loading of Asbestos-Containing Soils and other waste-streams to ensure the safe transfer of materials from the Site to the transport vehicle;

2.    Identify and comply with all State and Federal Applicable or Relevant and Appropriate Requirements ("ARARs") including but not limited to: manifesting, packaging, labeling, marking, recordkeeping, use of containers, and land disposal restrictions. Respondents shall also comply with all applicable local, state, and federal laws and regulations, which include all Department of Transportation regulations regarding transportation of hazardous substances.

3.    Provide the On-Scene Coordinator, upon request, all sampling data and quality assurance/quality control procedures utilized by the supervising contractor and its laboratory pertaining to all sampling and analytical work performed pursuant to this Settlement Agreement.

4.    Provide five (5) days advance notification to the On-Scene Coordinator of any planned field activities related to this Settlement Agreement including restaging, sampling, bulking, and loading for transportation and disposal.

**EXHIBIT II**

**Oldon Stipulation**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) |

**STIPULATION RESOLVING CLAIM OF OLDON LIMITED PARTNERSHIP
(CLAIM NO. 11301)**

This stipulation ("Stipulation") is entered into this 27th day of May 2010, between

W. R. Grace & Co. and its affiliates (collectively, the "Debtors") and Oldon Limited Partnership (the

"Claimant") (collectively, "Parties").[2]

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2]    Capitalized terms not defined in this Stipulation shall have the meanings ascribed to them, as the case may be, in the *Amended Order Authorizing and Approving an Omnibus Procedure for Settling Certain Claims and Causes of Action Brought by or Against the Debtors in a Judicial, Administrative, Arbitral or Other Action or Proceeding*, [Docket no. 936] (the "Omnibus Settlement Procedures Order") or the *First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., Et Al., the Official Committee of Asbestos Personal Injury Claimant, the Asbestos PI Future Claimant' Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009*, as thereafter amended (the "Plan").

## STATEMENT OF FACTS

**WHEREAS,** on April 22, 2002, the Court entered its *Order as to all Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Date, (II) Approving Proof of Claim Forms and (III) Approving Notice Program,* which established March 31, 2003 as the Bar Date for the filing of certain pre petition (a) non asbestos, (b) asbestos property damage, and (c) medical monitoring claims. [Docket No. 1963];

**WHEREAS,** the Debtors leased real property located at 19 Wemelco Way in Easthampton, Massachusetts (the "Property") from the Claimant or its predecessor-in-interest, Mr. Edward J. O'Leary, from approximately 1963 to 1993;

**WHEREAS,** on or about March 27, 2003, Claimant filed proof of claim No. 11301 which is attached hereto as Exhibit A:

| Claim No. | Location | Amount | Priority | Basis |
|-----------|----------|--------|----------|-------|
| 11301 | Easthampton, Massachusetts | $2,151,000.00 | Unsecured | Asbestos property damage response costs |

**WHEREAS,** on or about May 20, 2010, W.R. Grace & Co. and the Claimant entered into an *Administrative Settlement Agreement and Order on Consent for Removal Action,* U.S. EPA Region 1 CERCLA Docket No. 01-2010-0019 (the "Agreement") in connection with the Property setting forth certain responsibilities for the Debtors and the Claimant with respect to asbestos remediation response actions at the Property to resolve claims and demands relating to the Property from the United States Environmental Protection Agency ("USEPA");

**WHEREAS,** the Debtors and Claimant have now agreed to settle Claim No. 11301 and all matters related to the Property on the terms and conditions set forth herein (the "Settlement") and in the Agreement;

2

NOW, **THEREFORE**, after a thorough review of the Proof of Claim, discussion and negotiations, for good and valuable consideration, the parties hereby stipulate and agree that, as of the date on which this Stipulation becomes effective:

### THE SETTLEMENT

1.      Claim No. 11301, which for purposes of this Stipulation includes, but is not limited to, the costs and fees to Oldon as owner of the Property as outlined in the letters to Grace from Oldon's counsel, Shatz, Schwartz and Fentin, P.C., dated February 18, 2010 and May 3, 2010,  shall be Allowed as a Class 7A Asbestos PD Claim (the "Allowed Claim"), as those terms are defined by the Plan, in the amount of $118,010.  Claim No. 11301 shall be paid in the same manner as all other similarly situated Class 7A Asbestos PD Claims pursuant to the Plan.  All other amounts outlined in or related to Claim No. 11301 relating to the Property shall hereby be disallowed and expunged.

2.      Except to the extent explicitly provided otherwise in paragraph 7 below, the Debtors shall perform all obligations, pay all costs, penalties, and interest, and otherwise fulfill the terms and conditions of the Agreement, which are incorporated into this Stipulation by reference, and the Agreement is attached hereto as Exhibit B, *provided that* the Claimant shall not be entitled to any recovery under Claim 11301 other than the Debtors' performance of their obligations set forth in this Stipulation and the Agreement.

3.      Claimant will provide Debtors with access to the Property for performance of obligations under the Agreement.

4.      Claimant will allow an "activity and use limitation" (AUL) to be placed on the capped portion of the Property.  The terms of the AUL shall be subject to Claimant's approval, which approval shall not be unreasonably withheld.  Debtors shall pay the costs for the AUL and the cap pursuant to paragraph 2 above.

5.      Debtors shall release, defend, indemnify and hold Claimant and its partners, agents, successors, heirs, and assigns harmless from and against (a) any performance of obligations under the Agreement, except to the extent explicitly provided otherwise in paragraph 7 below, and (b) all loss, cost, expense, or damage (including reasonable attorneys' and other professional fees)  arising as a result of the performance or non-performance of any obligations under the Agreement, except to the extent explicitly provided otherwise in paragraph 7 below.

6.      Debtors will provide and pay for appropriate insurance and site security while Debtors and or its contractors are present on the Property or otherwise still obligated for Work under the Agreement.

7.      Claimant will fund and be responsible in perpetuity for (a) maintenance of the "cap" at the Property once the installed cap has been approved by USEPA in the USEPA notice under paragraph 85 of the Agreement, except to the extent that maintenance may be required as a result of the Debtors' failure to meet its obligations under the Agreement, and (b) any monitoring required by USEPA at the Property after the effective date of USEPA's notice under paragraph 85 of the Agreement that all Work under the Agreement has been fully performed.

8.      (a) Debtors shall notify Oldon within 48 hours of any significant non-emergency development under the Agreement, and within 12 hours of an emergency development related to the Agreement.  Oldon shall have a reasonable opportunity to review and comment on such significant or emergency developments. (b) Debtors shall provide Oldon with reasonable advance notice of, and the right to observe, preparation for and execution of Work inside the building on the Property.  (c) Debtors shall provide Oldon with reasonable advance notice prior to contacting either Tennessee Gas Pipeline or any adjoining property owners regarding any matters under the Agreement.

9.      The Parties and their  agents, employees, contractors, subcontractors, consultants and authorized representatives  agree to use their respective good faith efforts to cooperate with each other

4

in connection with the Work under the Agreement, including but not limited to reasonable coordination of the scheduling. Debtors and their representatives shall have the right of reasonable ingress and egress across the Property for all purposes necessary to Debtor's completion of its responsibilities outlined in the Agreement. Claimant specifically grants to Debtors and their representatives a temporary right-of-way and temporary license to the Property to the extent necessary to perform the Work for the duration of the Work outlined in the Agreement. Debtors may at any time during performance of the Work place on or about the Property any necessary signage for the performance of its obligations under the Agreement. Claimant hereby waives any claim for rent of Claimant's Property for the necessary duration of Debtor's performance of its obligations hereunder.

### INJUNCTION

10.     The Parties shall be forever barred, estopped, and enjoined from asserting against each other, other than on the terms and conditions forth in this Stipulation and in the Agreement, any other or additional claims, liabilities, or causes of action arising from or related to the Property of any nature, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise.

### NECESSARY ACTIONS

11.     In order to receive authority to carry out its obligations under this Stipulation and the Agreement. W.R. Grace & Co. shall file a motion for approval of this Stipulation and the Agreement with the Bankruptcy Court within fourteen (14) days after signature by all parties of this Stipulation and the Agreement in order to obtain permission to perform its obligations under the Agreement and this Stipulation.

12.     Upon entry of the Order approving this Stipulation, the Debtors shall direct their claims agent Rust Consulting, Inc. to record Claim No. 11301 as an Allowed Class 7A Asbestos PD Claim as outlined in this Stipulation.

13.    The Parties shall take whatever additional action, if any, is necessary to make sure that the specified Claim No. 11301 is allowed as outlined herein.

**MISCELLANEOUS**

14.    **Integration**. This Stipulation and any other documents to be executed in connection herewith shall constitute the sole and complete agreement of the Parties hereto with respect to the matters addressed herein.

15.    **Amendment**. This Stipulation may not be amended except by a writing signed by all Parties to this Stipulation.

16.    **Counterparts**. This Stipulation may be executed in counterparts each of which shall constitute an original and all of which shall constitute one and the same agreement.

17.    **Full Power and Authority**. Each Party executing this Stipulation represents that such party has the full authority and legal power to do so. The Parties further agree that facsimile signatures hereon shall be deemed to be original signatures. This Stipulation shall be binding upon and inure to the benefit of each of the Parties, and upon their respective assignees, successors and/or partners, including, but not limited to any trustee(s) appointed in the Bankruptcy Cases.

18.    **No Admissions**. This Stipulation is being entered into solely as a settlement of issues and does not represent an admission by any of the Parties of the validity of any liability or defense with respect to the matters set forth herein.

19.    **Headings**. Headings in this Stipulation are descriptive only and shall have no legal force or effect.

20.    **Retention of Jurisdiction**. The Bankruptcy Court shall retain jurisdiction to enforce this Stipulation and all matters relating thereto for the duration of the performance of the terms and provisions of this Stipulation for the purpose of enabling any of the Parties to apply to the Court at any

time for such further order, direction, and relief as may be necessary or appropriate for the construction or interpretation of this Stipulation or to effectuate or enforce compliance with its terms.

21.    **Dispute Resolution and Governing Law**. (a) If there is any dispute related to this Stipulation, then the Parties shall use best efforts to resolve such dispute by good faith negotiation. If such negotiation does not resolve such dispute and if the Parties do not agree to pursue mediation or other alternative dispute resolution (or if a mediation or other alternative dispute resolution process does not resolve a dispute within 180 days of an initial notice from one Party to the other of such a dispute), then such dispute shall be resolved by litigation in the Bankruptcy Court. (b) This Stipulation shall be governed by the laws of the State of Delaware, except that any issues that arise under this Stipulation with regarding to environmental obligations shall be governed by the laws of the Commonwealth of Massachusetts and by the terms of the Agreement.

22.    **Notices**. Any notices under this Stipulation shall be sent by Federal Express or other confirmed delivery service (email or fax shall not be sufficient notice) to the following:

For W.R. Grace & Co:    Robert Emmett, W. R. Grace & Co., 7500 Grace Drive, Columbia, MD 21044; Phone 410-531-4751; Email Robert.Emmett@grace.com

For Oldon Limited Partnership:    Timothy P. Mulhern, Shatz, Schwartz and Fentin, P.C., 1441 Main St., Springfield, MA 01103-1450; Phone 412-737-1131; Email tmulhern@ssfpc.com

7

**The following Parties enter into this Stipulation on behalf of:**

**Oldon Limited Partnership**

By: _____

Timothy P. Mulhern, Esquire

**W. R. Grace & Co., et al., Debtors**

By: _____

William M. Corcoran
Vice President, Public and Regulatory Affairs
W.R. Grace & Co.
7500 Grace Drive
Columbia, Maryland 21044

Date: _MAy 27, 2010_____

Date: _June 1, 2010_____

8

EXHIBIT III

City Stipulation

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    ) Chapter 11
                                          )
W. R. GRACE & CO., et al.,[1]             )
                                          ) Case No. 01-01139 (JKF)
        Debtors.                          ) (Jointly Administered)
                                          )
                                          )
_____     )

STIPULATION RESOLVING CLAIM OF CITY OF EASTHAMPTON

(CLAIM NO. 7121)

This stipulation ("Stipulation") is entered into this 25th day of May 2010, between

W. R. Grace & Co. and its affiliates (collectively, the "Debtors") and the City of Easthampton,

Massachusetts (the "Claimant").[2]

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms not defined in this Stipulation shall have the meanings ascribed to them, as the case may be, in the *Amended Order Authorizing and Approving an Omnibus Procedure for Settling Certain Claims and Causes of Action Brought by or Against the Debtors in a Judicial, Administrative, Arbitral or Other Action or Proceeding*, [Docket no. 936] (the "Omnibus Settlement Procedures Order") or the *First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., Et Al., the Official Committee*

### STATEMENT OF FACTS

**WHEREAS**, on April 22, 2002, the Court entered its *Order as to all Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Date, (II) Approving Proof of Claim Forms and (III) Approving Notice Program,* which established March 31, 2003 as the Bar Date for the filing of certain pre petition (a) non asbestos, (b) asbestos property damage, and (c) medical monitoring claims. [Docket No. 1963];

**WHEREAS**, the Debtors operated a vermiculite expanding plant in Easthampton, Massachusetts (the "Property") from approximately 1963 to 1993;

**WHEREAS**, on or about March 27, 2003, Claimant filed proof of claim No. 7121 (the "Claim") which is attached hereto as Exhibit A :

| Claim No. | Location | Amount | Priority | Basis |
|---|---|---|---|---|
| 7121 | Easthampton, Massachusetts | Unspecified | Unsecured | Asbestos property damage response costs |

**WHEREAS**, on or about May 20, 2010, the Debtors, Oldon Limited Partnership, ("Oldon") and the United States Environmental Protection Agency ("USEPA") entered into an *Administrative Settlement Agreement and Order on Consent for Removal Action* (the "Agreement") in connection with the Property setting forth certain responsibilities for the Debtors and Oldon with respect to asbestos remediation response actions at the Property to resolve claims and demands relating to the Property from the USEPA;

---

*of Asbestos Personal Injury Claimant, the Asbestos PI Future Claimant' Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009,* as thereafter amended (the "Plan").

WHEREAS, the Debtors and the City have now agreed to settle Claim No. 7121 and all matters related to the City's claims against the Debtors relating to the Property on the terms and conditions set forth herein (the "Settlement") and in the Agreement;

NOW, THEREFORE, after a thorough review of the Proof of Claim, discussion and negotiations, for good and valuable consideration, the parties hereby stipulate and agree that, as of the date on which this Stipulation becomes effective:

## THE SETTLEMENT

1.     Claim No. 7121 shall be disallowed and expunged in its entirety.

2.     The disallowance and expungement of Claim No. 7121 is dependent upon the Debtors' performance of all of its obligations under and fulfillment of the terms and conditions of the Agreement.  The City shall not be entitled to any recovery under Claim 7121 other than the Debtors' performance of their obligations set forth in the Agreement.

3.     In the event that the Debtors do not complete their obligations under the Agreement to remediate the Property as set forth in the Agreement, the City shall have a right to re-assert its Claim against the Debtors.

## INJUNCTION

4.     The City shall be forever barred, estopped, and enjoined from asserting against the Debtors, other than on the terms and conditions forth in this Stipulation and in the Agreement, any other or additional claims, liabilities, or causes of action arising from or related to the Property of any nature whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise.

3

<u>NECESSARY ACTIONS</u>

5.      In order to receive authority to carry out its obligations under this Stipulation and the Agreement, Grace shall file a motion for approval of this Stipulation and the Agreement with the Bankruptcy Court within fourteen (14) days after signature by all parties of this Stipulation and the Agreement in order to obtain permission to perform its obligations under the Agreement and this Stipulation.

6.      Upon entry of the Order approving this Stipulation, the Debtors shall direct their claims agent Rust Consulting, Inc. to record Claim No. 7121 as disallowed and expunged as outlined in this Stipulation.

7.      The parties shall take whatever additional action, if any, is necessary to make sure that Claim No. 7121 is disallowed and expunged as outlined herein.

<u>MISCELLANEOUS</u>

8.      <u>Integration</u>.    This Stipulation and any other documents to be executed in connection herewith shall constitute the sole and complete agreement of the parties hereto with respect to the matters addressed herein.

9.      <u>Amendment</u>.    This Stipulation may not be amended except by a writing signed by all parties to this Stipulation.

10.     <u>Counterparts</u>.  This Stipulation may be executed in counterparts each of which shall constitute an original and all of which shall constitute one and the same agreement.

11.     <u>Full Power and Authority</u>.  Each party executing this Stipulation represents that such party has the full authority and legal power to do so.   The parties further agree that facsimile signatures hereon shall be deemed to be original signatures.  This Stipulation shall be

4

binding upon and inure to the benefit of each of the parties, and upon their respective assignees, successors and/or partners, including, but not limited to any trustee(s) appointed in the Bankruptcy Cases.

12.    **No Admissions.**  This Stipulation is being entered into solely as a settlement of issues and does not represent an admission by any of the parties of the validity of any liability or defense with respect to the matters set forth herein.

13.    **Headings.**  Headings in this Stipulation are descriptive only and shall have no legal force or effect.

14.    **Retention of Jurisdiction.**  The Bankruptcy Court shall retain jurisdiction to enforce this Stipulation and all matters relating thereto for the duration of the performance of the terms and provisions of this Stipulation for the purpose of enabling any of the parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or interpretation of this Stipulation or to effectuate or enforce compliance with its terms.

The following Parties enter into this Stipulation on behalf of:

The City of Easthampton, MA

By: _____

Mayor Michael A. Tautznik

W. R. Grace & Co., et al., Debtors

By: _____

William M. Corcoran
Vice President, Public and Regulatory Affairs
W.R. Grace & Co.
7500 Grace Drive
Columbia, Maryland 21044

Date: _____May 25, 2010_____

Date: _____May 27, 2010_____

5