Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $8.75 million to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to the environmental contamination at the site.

11. Zonolite/Grace Site (Ellwood City, Pa): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Zonolite/Grace Site in Ellwood City, Pennsylvania. From 1953 through 1969, a vermiculite expansion facility was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as surface soil is contaminated with asbestos. The Debtor is liable to the United States because it owned and operated a facility at the site at the time hazardous substances were disposed of at the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $50,953.23 as of October 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $200,000 to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to the environmental contamination at the site.

12. Zonolite/Grace Site (Prince George's County, Md) The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Zonolite/Grace Site, in Beltsville, Maryland. From 1966 through the early 1990s, a vermiculite expansion facility was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with

9

asbestos. The Debtor is liable to the United States because it owned and operated a facility at the site at the time hazardous substances were disposed of. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $54,109.41 as of October 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $50,000 to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to the environmental contamination at the facility.

13.    Zonolite/Grace Site (New Castle, Pa): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Zonolite/Grace Site in New Castle, Pennsylvania. From 1968 through 1992, a vermiculite expansion facility was located at the site. There has been a release or threatened release of a hazardous substance at the site, as soils at the site are contaminated with asbestos. The Debtor is liable to the United States because it owned and operated a facility at the site at the time hazardous substances were disposed of at the facility. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $28,764.86 as of October 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $500,000 to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to environmental contamination at the site.

14.    Aqua-Tech Environmental Site (Greer, South Carolina): The Debtor is liable to the United States pursuant to CERCLA and an administrative order issued under CERCLA in

10

connection with the cleanup of environmental contamination at the Aqua-Tech Environmental Site near Greer, South Carolina. A hazardous waste treatment, storage and disposal facility was located at the site. There have been releases or threatened releases of hazardous substances at the site, as soil, surface water and groundwater at the site are contaminated with various VOCs and metals, including cadmium, chromium, cobalt, lead, mercury, nickel, and zinc. The site is on the NPL. The Debtor is liable to the United States because it arranged for the disposal of hazardous substances at the site. In 1995, EPA entered into an administrative order with approximately 90 PRPs, including the Debtor, who agreed to perform the RI/FS for the site and to reimburse EPA for its oversight costs. Work under this order is not yet complete. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $1,625,813 as of November 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $12 million to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to the environmental contamination at the site.

15.    Green River Disposal Site (Maceo, Kentucy): The Debtor is liable to the United States pursuant to CERCLA and administrative orders issued under CERCLA in connection with the cleanup of environmental contamination at the Green River Disposal Site near Owensboro, Kentucky. From 1970 through 1984, an industrial and municipal landfill was located at the site. There have been releases or threatened releases of hazardous substances at the site, as groundwater at the site is contaminated with barium, beryllium, cadmium and manganese. The site is on the NPL. The Debtor is liable to the United States because it arranged for the disposal of hazardous substances at the site. The Debtor was a party to two administrative orders issued

11

by EPA in connection with this site. In 1990, EPA issued an order requiring four PRPs, including the Debtor, to initiate cleanup work at the site. Also in 1990, EPA entered into an administrative order whereby four PRPs, including the Debtor, agreed to perform the RI/FS for the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $453,315 as of March 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $3.5 million to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to environmental contamination at the site.

16.    W.R. Grace Site (Wilder, Kentucky): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the W.R. Grace Site in Wilder, Kentucky. From 1953 until the mid-1990s a vermiculite expansion facility was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with asbestos. The Debtor is liable to the United States because it owned and operated a facility on the site at the time hazardous substances were disposed of at the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $28,343.39 as of July 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $2.1 million to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to environmental contamination at the site.

17.    Reclamation Oil Site (Detroit, Michigan): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at

12

the Reclamation Oil Site in Detroit, Michigan. The site is an abandoned waste treatment, storage and disposal facility. There have been releases or threatened releases of hazardous substances at the site, as (among other things) sampling of abandoned storage containers indicated the presence of VOCs and semi-VOCs and at least one container had high levels of PCBs. The Debtor is liable to the United States because it arranged for the disposal of hazardous substances at the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $4,469,704 as of June 2002. The Debtor also is liable for any future cleanup obligations at the site. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to environmental contamination at the site.

18.    Western Minerals Products Site (Minneapolis, Minnesota): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Western Minerals Products Site in Minneapolis, Minnesota. From 1946 through 1989, a vermiculite expansion facility was located at the site. The site includes residential properties near the vermiculite expansion facility at which asbestos-containing materials were disposed of. There have been releases or threatened releases of a hazardous substance at the site, as soil and dust at the site are contaminated with asbestos. The Debtor is liable to the United States because it owned and operated a facility at the site at the time hazardous substances were disposed of at the site and arranged for the disposal of asbestos-contaminated material at portions of the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $6,907,445.90 as of January 31, 2003. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $1 million to complete. The United States' response actions at the site

13

are not inconsistent with the NCP. Other PRPs along with the Debtor may also be liable to the United States pursuant to CERCLA with respect to environmental contamination at portions of the site.

19.    R&H Oil/Tropicana (San Antonio, Texas): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the R&H Oil/Tropicana Site in San Antonio, Texas. The site was used as a refinery and gasoline blending facility, and spent oils were reprocessed on a portion of the site. There have been releases or threatened releases of hazardous substances at the site, as groundwater at the site is contaminated with benzene, toluene, ethylbenzene, naphthalene, xylenes, arsenic, barium and zinc. The site has been proposed for inclusion on the NPL. The Debtor is liable to the United States because it arranged for the disposal of hazardous substances at the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $1,556,174 as of November 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $11,640,000 to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to environmental contamination at the site.

20.    Intermountain Insulation Site (Salt Lake City, Utah): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Intermountain Insulation Site in Salt Lake City, Utah. From 1984 through 1988, a vermiculite expansion plant was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with

14

asbestos. The Debtor is liable to the United States because it was an operator of a facility at the

site at the time hazardous substances were disposed of at such facility. The Debtor is liable for

the United States' unreimbursed response costs relating to the site of at least $5,000 as of January

31, 2003. The Debtor also is liable for any future cleanup obligations at the site. The United

States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the

Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with

respect to environmental contamination at the site.

21.    Libby Asbestos Site (Libby, Montana): The Debtor is liable to the United States

pursuant to CERCLA, an administrative order issued pursuant to CERCLA, and a judicial

consent decree in connection with the cleanup of environmental contamination at the Libby

Asbestos Site in and near Libby, Montana. The site includes the Debtor's former vermiculite

mine and processing facilities in Libby and nearby properties on which asbestos-containing

materials were disposed. There have been releases or threatened releases of a hazardous

substance at the site, as soil and dust at the site are contaminated with asbestos. The Debtor is

liable to the United States because it owned and operated a facility at the site at the time

hazardous substances were disposed of at the site and arranged for the disposal of asbestos-

containing material at portions of the site. In addition, in May 2000, EPA issued an

administrative order to the Debtor whereby the Debtor was required to perform cleanup of a

former vermiculite processing facility known as the Export Plant. This work is ongoing. The

Debtor is liable for the United States' (through the EPA) unreimbursed response costs relating to

the site of at least $81,979,000 as of January 31, 2003. The Debtor also is liable for the response

costs that the United States (through the EPA) will incur in the future, which the United States

15

estimates will be at least $46 million. Finally, the Debtor is liable for the response costs that the United States (through the Forest Service) will incur in the future for cleanup of Forest Service roads on and near the Debtor's former vermiculite mine, which the United States estimates will be at least $2.2 million, and for the cleanup of asbestos-contaminated Forest Service property along the Kootenai River, which the United States estimates will be several million dollars. Some or all of the future response costs the United States claims on behalf of the Forest Service regarding the Libby Asbestos Site may overlap the future response costs the United States claims on behalf of EPA for the site. The United States' response actions at the site are not inconsistent with the NCP. The Debtor's liability for response costs incurred by the United States (through EPA) at the Libby Asbestos Site, and the amount of such costs, is the subject of a lawsuit styled United States v. W.R. Grace & Company-Conn., et al., Case No. 01-72-M-DWM (D. Mont.).

22.    Libby Asbestos Site (Access): The Debtor also is liable to the United States for its unlawful failure to provide EPA with requested access to certain Libby Asbestos Site properties in 2000 to effectuate cleanup activities. The United States' penalty claim related to the Debtor's failure to provide access has been resolved in a consent decree in the lawsuit styled United States v. W.R. Grace & Company et al., Case No. 00-167-M-DWM (D. Mont.), in which the Debtor (along with Debtor Kootenai Development Company) agreed that the United States would be allowed a general unsecured claim in the amount of $71,000 and agreed to perform a supplemental environmental project providing $2,750,000 for a Montana non-profit corporation to establish and administer a program to pay for medical care for certain asbestos related illnesses. The consent decree was approved by both the Montana District Court and the Bankruptcy Court.

16

23.    <u>Libby Asbestos Site Material Recipients (Nationwide Investigation)</u>:  The Debtor

also is liable for the Agency for Toxic Substance and Disease Registry's ("ATSDR")

investigations and health consultations at facilities throughout the country that received asbestos-

contaminated vermiculite from the Libby mine.  With respect to investigations and health

consultations at sites that are specifically addressed elsewhere in this Proof of Claim, the costs of

these activities are included in the unreimbursed response cost amount for those sites.

Nationwide investigatory costs and costs of investigations and health consultations at sites that

are not included elsewhere in this Proof of Claim total $1,791,164.

24.    <u>RAMP Industries Site (Denver, Colorado)</u>:  The Debtor is liable to the United

States pursuant to CERCLA and a judicial consent decree in connection with the cleanup of

environmental contamination at the RAMP Industries Site in Denver, Colorado.  The site was

formerly the location of a processing and disposal facility for low level radioactive wastes, mixed

wastes (a mixture of hazardous and radioactive waste), various items contaminated with

radioactive materials, and medical wastes.  There have been releases or threatened releases of

hazardous substances at the site, as approximately 5,000 fifty-five gallon drums containing

(among other things) trichloroethane, tetrachloroethylene, methylene chloride, acetone, ethyl

benzene, toluene, and methanol mixed with radioactive isotopes were abandoned at the site.  The

Debtor is liable to the United States because it arranged for the disposal of hazardous substances

at the site.  In a federal district court action styled <u>United States v. AAI Corporation</u>, Case No.

00-N-1909 (D. Colo.), the Debtor (and numerous other entities) executed a consent decree with

the United States that was entered by the court on April 4, 2001.  Under the terms of this consent

decree the Debtor agreed and was ordered by the Court to pay $7,203.73 to the United States.

17

EXHIBIT C

The Debtor has not complied with this order and is therefore liable to the United States for this amount.

25.    Robinson Insulation (Minot, North Dakota): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Robinson Insulation Site. From 1947 through 1993 a vermiculite expansion plant was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with asbestos. The Debtor is liable to the United States because it was an operator of a facility at the site at the time hazardous substances were disposed of at the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $1,416,000 as of December 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $50,000 to complete. The United States' response actions at the site are not inconsistent with the NCP.

26.    Vermiculite Intermountain Site (Salt Lake City, Utah): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Vermiculite Intermountain Site in Salt Lake City. From 1940 through at least the late 1980s, a vermiculite expansion plant was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with asbestos. The Debtor is liable to the United States because it was an operator of a facility at the site at the time hazardous substances were disposed of at such facility. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $5,000 as of January 31, 2003. The Debtor also is liable for future cleanup obligations at the site,

18

EXHIBIT C

which the United States estimates will cost at least $300,000 to complete. The United States' response actions at the site are not inconsistent with the NCP.

27.    Western Mineral Processing Site (Denver, Colorado): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Western Mineral Processing Site in Denver, Colorado. From 1967 through 1988, a vermiculate expansion plant was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with asbestos. The Debtor is liable to the United States because it owned and operated a facility at the site at the time hazardous substances were disposed of at such facility. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $296,863.07 as of December 2002. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $650,000 to complete. The United States' response actions at the site are not inconsistent with the NCP.

28.    Casmalia Resources (Santa Barbara, California): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Casmalia Resources Site in Santa Barbara County, California. The site is a former hazardous waste disposal facility. There have been releases or threatened releases of hazardous substances at the site, as landfills on the site have been found to contain industrial and commercial wastes including sludges, pesticides, solvents, acids, metals, caustics, cyanide and non-liquid polychlorinated biphenyls. The site is on the NPL. The Debtor is liable to the United States because it arranged for the disposal of hazardous substances at the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $38

19

million. The Debtor also is liable for future cleanup obligations at the site, which the United States estimates will cost at least $265 million to complete. The United States' response actions at the site are not inconsistent with the NCP. Other PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant to CERCLA with respect to the facility.

29. Harrington Tools Site (Glendale, Ca): The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Harrington Tools Site in Glendale, California. From at least 1966 through 1976, a vermiculite expansion plant was located at the site. There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with asbestos. The Debtor is liable to the United States because it owned and operated a facility at the site at the time hazardous substances were disposed of at the site. The Debtor is liable for the United States' unreimbursed response costs relating to the site of at least $29,825.82 as of October 2002. The Debtor also is liable for any future cleanup obligations at the site. The United States' response actions at the site are not inconsistent with the NCP.

30. Operating Industries Inc. Site (Monterey Park, California): The Debtor is liable to the United States pursuant to CERCLA and a judicially-approved consent decree in connection with the cleanup of environmental contamination at the Operating Industries Inc. Site in Monterey Park, California. From 1948 through 1984 a landfill was located at the site. There have been releases or threatened releases of hazardous substances at the site, as groundwater, soil, and leachate at the site are contaminated with various organic and inorganic compounds. The Debtor is liable to the United States because it arranged for the disposal of hazardous substances at the site. The major response actions to date at the site have been performed by

20

PRPs under a series of consent decrees and administrative orders, including the Third Partial

Consent Decree in which the Debtor and other PRPs agreed to participate as work defendants for

the site, which was entered by the District Court in 1992 in a case styled <u>United States v.</u>

<u>Chevron Chemical Company, et al.</u>, Case No. CV 91-6520 MRP (Kx) (C.D. Cal.). The Debtor is

liable for future cleanup obligations relating to the site, including work required under the Third

Partial Consent Decree. The Debtor also is liable to the United States for all unreimbursed

response costs incurred and to be incurred by the United States in connection with the site

(except to the extent the covenant not to sue in the Third Partial Consent Decree limits the

Debtor's liability for certain of the costs), which the United States currently estimates at $50

million. The United States' response actions at the site are not inconsistent with the NCP. Other

PRPs along with the Debtor may also be jointly and severally liable to the United States pursuant

to CERCLA with respect to the facility.

31.    <u>Vermiculite Northwest Site (Spokane)</u>: The Debtor is liable to the United States

pursuant to CERCLA in connection with the cleanup of environmental contamination at the

Vermiculite Northwest Site in Spokane, Washington. From 1951 through 1974, a vermiculite

expansion facility was located at the site. There have been releases or threatened releases of a

hazardous substance at the site, as soils at the site are contaminated with asbestos. The Debtor is

liable to the United States because it owned and operated a facility at the site at the time

hazardous substances were disposed of at such facility. The Debtor is liable for the United

States' unreimbursed response costs relating to the site of at least $77,285.52 as of March 2003.

The Debtor also is liable for any future cleanup obligations at the site. The United States'

response actions at the site are not inconsistent with the NCP.

EXHIBIT C

32.    <u>Curtis Bay Site (Baltimore, Maryland)</u>:  The Debtor is liable to the United States pursuant to CERCLA in connection with the cleanup of environmental contamination at the Curtis Bay Site in Baltimore, Maryland.  From approximately 1957 through 1960, radioactive materials were processed and disposed of at the site.  There have been releases or threatened releases of a hazardous substance at the site, as soils at the site are contaminated with radioactive material (including thorium and uranium compounds).  The Debtor is liable to the United States because it owned and operated a facility at the site at the time hazardous substances were disposed of at such facility and is the current owner and operator of the site.  The Debtor is liable for the United States' (through the Army Corps of Engineers) unreimbursed response costs relating to the site of approximately $6 million as of November 2002.  The Debtor also is liable for the response costs that the United States will incur in the future, which the United States estimates will be between $66 million and $96 million.  The United States' response actions at the site are not inconsistent with the NCP.

## INJUNCTIVE OBLIGATIONS UNDER ENVIRONMENTAL STATUTES

33.    The Debtor has injunctive obligations to comply with environmental requirements applicable to its facilities.  These obligations include but are not limited to obligations to perform environmental assessment and clean up work under the consent decrees and administrative orders issued pursuant to CERCLA and discussed above in connection with the following sites:  the Acton Plant Site, located in Acton, Massachusetts, and the Wells G&H Site, located in Woburn, Massachusetts.  Further, the Debtor is obligated to perform environmental assessment and remediation work under other consent decrees and administrative orders issued by the EPA under environmental laws and regulations other than CERCLA, including but not limited to the

22

following facilities: the Hatco Chemical facility in Fords, New Jersey; the W.R. Grace thorium

facility, located at 4000 North Hawthorne Street in Chattanooga, Tennessee; the W.R. Grace

Agricultural Chemical site in Charleston, South Carolina, and all other orders referenced in the

Debtor's response to Question 17 (c) in its Statement of Financial Affairs, as amended.  The

Debtor may have other injunctive obligations to remedy environmental violations and or releases

of hazardous materials at its facilities, including but not limited to the violations and release of

hazardous materials at sites owned by the Debtor as listed in its response to Questions 17(a) and

17(b) of its Statement of Financial Affairs, amended.

    34.    The Debtor also has injunctive obligations under consent decrees and

administrative orders issued pursuant to CERCLA to perform environmental assessment and

remediation work at certain sites not owned by Debtor including the following sites:  the Libby

Asbestos Site, located in Libby, Montana; the Blackburn & Union Privileges Site in Walpole,

Massachusetts; the Solvents Recovery Service of New England Site in Southington, Connecticut;

the Li Tungsten Site in Glen Cove, New York; the Aqua-Tech Environmental Site in Greer,

South Carolina; and the Operating Industries Inc. Site in Monterey Park, California.  The Debtor

is required to perform these obligations.

    35.    It is the United States' position that it is not required to file a proof of claim with

respect to the Debtor's injunctive obligations to comply with work requirements under consent

decrees and administrative orders, and to comply with other environmental requirements

imposed by law.  The Debtor and any reorganized debtor(s) must comply with the mandatory

injunctive requirements of any consent decrees and administrative orders, and must comply with

any other environmental requirements imposed by law.

23

EXHIBIT C

36.    Court ordered and regulatory obligations are mandatory injunctive obligations with which the Debtor must comply, and for which proofs of claim need not be filed under the Bankruptcy Code. Nevertheless, this claim is filed in a protective fashion only for the court ordered and regulatory obligations identified above to protect the United States' rights with respect to any such obligations of the Debtor. The United States reserves the right to take future actions to enforce any such obligations of the Debtor. Nothing in this Proof of Claim constitutes a waiver of any rights of the United States or an election of remedies.

## ADDITIONAL PROOF OF CLAIM TERMS

37.    This Proof of Claim asserts claims for the known liability of the Debtor to the United States on behalf of EPA, the Forest Service, and the Army Corps of Engineers. The United States reserves the right to amend this claim to assert subsequently discovered liabilities, or to update the amounts of the claims set forth above.

38.    The United States has not perfected any security interest on its claims against the Debtor, although the United States does reserve all rights to the extent it has a trust interest in insurance proceeds with respect to any matters covered by this Proof of Claim and to the extent of any rights provided in provisions of administrative orders or consent decrees issued to or with the Debtor relating to financial assurance. The United States is entitled to administrative expense priority, and may file an administrative expense application at the appropriate time, for the cost of post-petition response actions with respect to property of the estate, the cost of complying with the Debtor's injunctive obligations, and for any post-petition penalties. The remainder of the United States' claim is filed as a general unsecured claim.

24

EXHIBIT C

39.     This claim is without prejudice to any right under 11 U.S.C. § 553 to set off, against this claim, debts owed (if any) to the Debtor by the United States or any agency or instrumentality of the United States.

40.     No judgments have been rendered on the claims asserted herein, except that there have been administrative orders and consent decrees issued related to certain of the claims as indicated herein.

41.     No payments to the United States have been made by the Debtor on these claims, except as provided herein.

42.     This Proof of Claim includes claims for all prejudgment interest on all response costs incurred pursuant to CERCLA as allowed by law.

43.     References to actions taken by the Debtor include actions taken by predecessors-in-interest of the Debtor.

Dated this 27th day of March, 2003.

                                        Respectfully submitted,

                                        CATHERINE MCCABE
                                        Deputy Chief
                                        Environmental Enforcement Section
                                        Environment and Natural Resources Division
                                        U.S. Department of Justice


                                        JAMES FREEMAN
                                        Trial Attorney
                                        Environmental Enforcement Section
                                        Environment and Natural Resources Division
                                        U.S. Department of Justice
                                        999-18th Street, North Tower
                                        Denver, Colorado 80202
                                        (303) 312-7376

25

EXHIBIT C

COLM CONNELLY
United States Attorney
District of Delaware

ELLEN SLIGHTS
Assistant United States Attorney
Office of United States Attorney
1201 Market Street
Suite 1100
P.O. Box 2046
Wilmington, DE 19899-2046

OF COUNSEL

ANDREA MADIGAN
Enforcement Attorney
United States Environmental Protection Agency
999 Eighteenth Street, Suite 300
Denver, Colorado 80202

**SDMS Document ID**

**1061545**

2007 SEP 17  PM 2:07

# UNITED STATES
## ENVIRONMENTAL PROTECTION AGENCY
### REGION 8

EPA REGION VIII
HEARING CLERK

| | |
|---|---|
| IN THE MATTER OF:<br>Libby Asbestos Site, OU3<br>Libby, Montana<br><br>W.R. Grace & Co.- Conn.,<br>Kootenai Development Company,<br><br>Respondents | ADMINISTRATIVE SETTLEMENT<br>AGREEMENT AND ORDER ON<br>CONSENT FOR REMEDIAL<br>INVESTIGATION/FEASIBILITY STUDY<br><br>U.S. EPA Region 8<br>CERCLA Docket No. **CERCLA–08–2007–0012**<br><br>Proceeding Under Sections 104, 107 and<br>122 of the Comprehensive Environmental<br>Response, Compensation, and Liability Act,<br>as amended, 42 U.S.C. §§ 9604, 9607 and<br>9622. |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | JURISDICTION AND GENERAL PROVISIONS | 1 |
| II. | PARTIES BOUND | 1 |
| III. | STATEMENT OF PURPOSE | 2 |
| IV. | DEFINITIONS | 3 |
| V. | FINDINGS OF FACT | 5 |
| VI. | CONCLUSIONS OF LAW AND DETERMINATIONS | 7 |
| VII. | SETTLEMENT AGREEMENT AND ORDER | 8 |
| VIII. | DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS | 8 |
| IX. | WORK TO BE PERFORMED | 10 |
| X. | EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS | 13 |
| XI. | QUALITY ASSURANCE, SAMPLING, AND ACCESS TO INFORMATION | 15 |
| XII. | SITE ACCESS | 17 |
| XIII. | COMPLIANCE WITH OTHER LAWS | 17 |
| XIV. | RETENTION OF RECORDS | 18 |
| XV. | DISPUTE RESOLUTION | 19 |
| XVI. | STIPULATED PENALTIES | 19 |
| XVII. | FORCE MAJEURE | 21 |
| XVIII. | PAYMENT OF RESPONSE COSTS | 22 |
| XIX. | COVENANT NOT TO SUE BY EPA | 24 |
| XX. | RESERVATIONS OF RIGHTS BY EPA | 25 |
| XXI. | COVENANT NOT TO SUE BY RESPONDENTS | 26 |
| XXII. | OTHER CLAIMS | 26 |
| XXIII. | CONTRIBUTION | 27 |
| XXIV. | INDEMNIFICATION | 27 |
| XXV. | INSURANCE | 28 |
| XXVI. | INTEGRATION/APPENDICES | 28 |
| XXVII. | ADMINISTRATIVE RECORD | 29 |
| XXVIII. | EFFECTIVE DATE AND SUBSEQUENT MODIFICATION | 29 |
| XXIX. | NOTICE OF COMPLETION OF WORK | 29 |

ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
FOR REMEDIAL INVESTIGATION/FEASIBILITY STUDY
FOR OU3 OF THE LIBBY ASBESTOS SITE

## I. JURISDICTION AND GENERAL PROVISIONS

1.  This Administrative Settlement Agreement and Order on Consent ( "Settlement Agreement") is entered into voluntarily by the United States Environmental Protection Agency ("EPA") and W.R. Grace & Co.-Conn., and Kootenai Development Company ("Respondents"). The Settlement Agreement and Order concerns the preparation and performance of a remedial investigation and feasibility study ("RI/FS") for OU3 of the Libby Asbestos Site, encompassing an area at and around the former Zonolite Vermiculite Mine, located near Libby, Montana and the reimbursement for response costs incurred by EPA in connection with this Settlement Agreement and the RI/FS.

2.  This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9604, 9607 and 9622 ("CERCLA"). This authority was delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (Jan. 29, 1987), and further delegated to Regional Administrators on May 11, 1994, by EPA Delegation Nos. 14-14-C and 14-14-D. This authority has been ultimately redelegated to the Director of the Superfund Remedial Program.

3.  In accordance with Sections 104(b)(2) and 122(j)(1) of CERCLA, 42 U.S.C. §§ 9604(b)(2) and 9622(j)(1), EPA notified the Department of Interior, the Department of Agriculture and the State of Montana during February 2007, of negotiations with potentially responsible parties regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal and State trusteeship. EPA is in the process of noticing the Corps of Engineers.

4.  EPA and Respondents recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Respondents in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law and determinations in Sections V and VI of this Settlement Agreement. Respondents agree to comply with and be bound by the terms of this Settlement Agreement and further agree that they will not contest the basis or validity of this Settlement Agreement or its terms.

## II. PARTIES BOUND

5.  This Settlement Agreement applies to and is binding upon EPA and upon Respondents and their successors and assigns. Any change in ownership or corporate status of a

Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter such Respondent's responsibilities under this Settlement Agreement.

6. Respondents are jointly and severally liable for carrying out all activities required by this Settlement Agreement. In the event of a failure of any one or more Respondents to implement the requirements of this Settlement Agreement, the remaining Respondents shall complete all such requirements.

7. Respondents shall ensure that their contractors, subcontractors, and representatives receive a copy of this Settlement Agreement and comply with this Settlement Agreement. Respondents shall be responsible for any noncompliance with this Settlement Agreement.

8. Each undersigned representative of Respondents certifies that he or she is fully authorized to enter into the terms and conditions of this Settlement Agreement and to execute and legally bind Respondents to this Settlement Agreement.

## III. STATEMENT OF PURPOSE

9. In entering into this Settlement Agreement, the objectives of EPA and Respondents are: (a) to determine the nature and extent of contamination and any threat to the public health, welfare, or the environment caused by the release or threatened release of hazardous substances, pollutants or contaminants at or from OU 3 of the Site, by conducting a Remedial Investigation as more specifically set forth in the Statement of Work ("SOW") attached as Appendix A to this Settlement Agreement and EPA-prepared Sampling and Analysis Plans ("SAPs") which will be issued during the pendency of the RI/FS; (b) to identify and evaluate remedial alternatives to prevent, mitigate or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants at or from OU 3 of the Site, by conducting a Feasibility Study as more specifically set forth in the Statement of Work ("SOW") attached as Appendix A to this Settlement Agreement and EPA-prepared Sampling and Analysis Plans ("SAPs") which will be issued during the pendency of the RI/FS; and (c) to recover Future Response Costs (as defined below) incurred by EPA with respect to this Settlement Agreement.

10. The Work conducted under this Settlement Agreement is subject to approval by EPA and shall provide all appropriate and necessary information to assess OU3 conditions and evaluate alternatives to the extent necessary to select a remedy that will be consistent with CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 ("NCP"). Respondents shall conduct all Work under this Settlement Agreement in compliance with CERCLA, the NCP, and all applicable EPA guidances, policies, and procedures.

2

# IV. DEFINITIONS

11. Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Settlement Agreement or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.*

b. "Day" shall mean a calendar day. In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

c. "Effective Date" shall be the effective date of this Settlement Agreement as provided in Section XXVIII.

d. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

e. "Engineering Controls" shall mean constructed containment barriers or systems that control one or more of the following: downward migration, infiltration or seepage of surface runoff or rain; or natural leaching migration of contaminants through the subsurface over time. Examples include caps, engineered bottom barriers, immobilization processes, and vertical barriers.

f. "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports and other items pursuant to this Settlement Agreement, verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, Agency for Toxic Substances and Disease Registry ("ATSDR") costs, Paragraph 49 (Emergency Response), and Paragraph 90 (Work Takeover).

g. "Institutional controls" shall mean non-engineered instruments, such as administrative and/or legal controls, that help to minimize the potential for human exposure to contamination and/or protect the integrity of a remedy by limiting land and/or resource use. Examples of institutional controls include easements and covenants, zoning restrictions, special building permit requirements, and well drilling prohibitions.

h. "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded

3

annually, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

   i. "MDEQ" shall mean the Montana Department of Environmental Quality and any successor departments or agencies of the State.

   j. "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

   k. "Operable Unit 3" (OU3) shall mean property in and around the Zonolite Mine owned by W.R. Grace or Grace-owned subsidiaries (excluding OU2) and any area (including any structure, soil, air, water, sediment or receptor) impacted by the release and subsequent migration of hazardous substances and/or pollutants or contaminants from such property, including, but not limited to, the mine property, the Kootenai River and sediments therein, Rainy Creek, Rainy Creek Road and areas in which tree bark is contaminated with such hazardous substances and/or pollutants and contaminants. (Appendix B is a visual representation of the preliminary study area boundaries of OU3.)

   l. "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

   m. "Parties" shall mean EPA and Respondents.

   n "Property" shall mean all real property owned by Respondents at and around the Zonolite Vermiculite Mine. A property description is attached as Appendix C.

   o. "RCRA" shall mean the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, et seq.

   p. "Respondents" shall mean W.R. Grace & Co.-Conn., and Kootenai Development Company.

   q. "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

   r. "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent, the SOW, all appendices attached hereto (listed in Section XXVI) and all documents incorporated by reference into this document including without limitation EPA-approved submissions and EPA-prepared documents concerning OU3. EPA-approved submissions (other than progress reports) are incorporated into and become a part of the Settlement Agreement upon approval by EPA. In the event of conflict between this Settlement

4

Agreement and any appendix or other incorporated documents, this Settlement Agreement shall control.

s. "Site" shall mean the Libby Asbestos Superfund Site.

t. "State" shall mean the State of Montana.

u. "Statement of Work" shall mean the initial plan for development of a RI/FS for OU 3 of the Libby Asbestos Site, as set forth in Appendix A to this Settlement Agreement. The SOW shall be followed up during the RI/FS process with EPA-prepared SAPs, which shall further delineate the RI/FS process. The SOW is incorporated into this Settlement Agreement and is an enforceable part of this Settlement Agreement, as are the EPA-prepared SAPs and any modifications made to either the SOW or SAPs in accordance with this Settlement Agreement.

v. "Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

w. "Work" shall mean all activities Respondents are required to perform under this Settlement Agreement, except those required by Section XIV (Retention of Records).

## V. FINDINGS OF FACT

EPA hereby makes the following findings of fact:

12. In the late 1800s, gold miners discovered a significant body of vermiculite ore in an area located in the mountains about seven miles northeast of the town of Libby, Montana (the "Mine").

13. From 1963 to 1990 Grace-Conn. (known as W.R. Grace & Co. from 1963 to 1988) mined and beneficiated (through milling) vermiculite ore at the Mine, separating some non-vermiculite materials from the vermiculite ore. The beneficiated vermiculite ore was known as "vermiculite concentrate."

14. One of the minerals found in the vermiculite deposits near Libby is tremolite, which is a form of asbestos in the amphibole family. There is also non-asbestiform tremolite in the Libby vermiculite deposit.

15. Libby vermiculite ore deposits contain measurable quantities of amphibole asbestos.

5

16. While much of the asbestos in the Libby vermiculite deposit was removed from the vermiculite in the mining, milling and screening process, the vermiculite concentrate (processed but unexpanded vermiculite) that was transported to expanding plants had an asbestos content of from trace to 5%.

17. From 1963 until 1990, Grace-Conn. operated a Screening Plant, a processing plant at which vermiculite concentrate was separated into different grades through a mechanical screening process.

18. Prior to the mid-1970s, the Screening Plant was located at the Mine Site.

19. After the mid-1970s, the Screening Plant was located down Rainy Creek Road from the Mine Site, at the intersection of Highway 37 and Rainy Creek Road on the bank of the Kootenai River, about four miles from Libby, partially located on the Flyway.

20. Prior to the construction of the new Screening Plant at that location, the property at the intersection of Highway 37 and Rainy Creek Road was used as a holding point for vermiculite concentrate trucked from the Screening Plant at the mine.

21. From 1963 to 1990, W.R. Grace & Co.-Conn. transported, screened, and sized vermiculite concentrate from the property at the intersection of Highway 37 and Rainy Creek Road across the Kootenai River by conveyer belt to a rail loading station where it was placed in bulk in rail hopper cars for distribution to customers and processing facilities in other states.

22. In the operation of the Screening Plant, there were occasionally spills, processing errors, or lack of demand for certain size grades of vermiculite concentrate.

23. At various times between 1963 and 1990, the vermiculite concentrate that had spilled, vermiculite concentrate that was affected by processing errors, or vermiculite concentrate of a grade for which there was no immediate demand was placed in various outdoor locations on the grounds of the Screening Plant where it was open to the environment.

24. In 1990, Grace-Conn. ceased vermiculite mining and processing operations in Libby.

25. In the mid-1990s, Grace-Conn. sold several of the properties associated with its former vermiculite operations in and near Libby.

26. In 1994 Grace-Conn. sold to Kootenai Development Company ("KDC") an approximately 20-acre parcel which is the Flyway.

27. KDC was aware of the presence of asbestos at the Mine Site at the time it purchased that property in the mid-1990s.

6

28. In 2000 Grace purchased a controlling interest in KDC.

29. On April 2, 2001, Respondents each filed voluntary chapter 11 Bankruptcy cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entitled W. R. Grace & Co., et al, jointly administered under Case No. 01-01139 (the "Bankruptcy Cases") and have been operating their businesses as debtors in possession under chapter 11 of the Bankruptcy Code since that time.

30. EPA's investigations have shown that human activities which disturb soils contaminated with amphibole asbestos result in exposures to airborne asbestos fibers. Thus, people who have been, or may be in the future, involved in activities within OU 3 may be exposed to airborne asbestos fibers.

31. The State of Montana requested EPA to list the Libby Asbestos Site on the National Priorities List as Montana's top priority site pursuant to 42 U.S.C. § 9605(a)(8)(B) and 40 C.F.R. § 300.425(c)(2). See 67 Fed. Reg. 8836, 8839 (Feb. 26, 2002).

32. On October 24, 2002 EPA listed the Libby Asbestos Site on the National Priorities List. See 67 Fed. Reg. 65,315 (Oct. 24, 2002).

33. Test results indicated elevated levels of asbestos contamination at the Site. See Action Memoranda 5-23-00 and 8-17-01.

## VI. CONCLUSIONS OF LAW AND DETERMINATIONS

EPA hereby makes the following conclusions of law and determinations:

34. Based on the Findings of Fact set forth above, and the Administrative Record supporting response actions at the Site to date, EPA has determined that:

a. OU 3 of the Libby Asbestos Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b. The contamination found at OU 3, as identified in the Findings of Fact above, includes a "hazardous substance" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c. Each Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

d. Each Respondent is a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is jointly and severally liable for performance of response action and for response costs incurred and to be incurred at the Site.

    i.      Respondent KDC is the "owner" and/or "operator" of the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

    ii.     Respondent W.R. Grace-Conn., was the "owner" and/or "operator" of the facility at the time of disposal of hazardous substances at the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

e. The conditions described in the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the facility as defined by Section 101(22) of CERCLA, 42 U.S.C.§ 9601(22).

35. The actions required by this Order are necessary to protect the public health, welfare or the environment, are in the public interest, 42 U.S.C. § 9622(a), are consistent with CERCLA and the NCP, 42 U.S.C. §§ 9604(a)(1), 9622(a), and will expedite effective remedial action and minimize litigation, 42 U.S.C. § 9622(a).

36. EPA has determined that Respondents are qualified to conduct the RI/FS within the meaning of Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), and will carry out the Work properly and promptly, in accordance with Sections 104(a) and 122(a) of CERCLA, 42 U.S.C. §§ 9604(a) and 9622(a), if Respondents comply with the terms of this Order.

## VII. SETTLEMENT AGREEMENT AND ORDER

37. Based upon the foregoing Findings of Fact and Conclusions of Law and Determinations, it is hereby Ordered and Agreed that Respondents shall comply with all provisions of this Settlement Agreement, including, but not limited to, all appendices to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

## VIII. DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS

38. Selection of Contractors, Personnel. All Work performed under this Settlement Agreement shall be under the direction and supervision of qualified personnel. Within 30 days

8

of the Effective Date of this Settlement Agreement, and before the Work outlined below begins, Respondents shall notify EPA in writing of the names, titles, and qualifications of the personnel, including contractors, subcontractors, consultants and laboratories to be used in carrying out such Work. With respect to any proposed contractor, Respondents shall demonstrate that the proposed contractor has a quality system which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995, or most recent version), by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001 or subsequently issued guidance) or equivalent documentation as determined by EPA. The qualifications of the persons undertaking the Work for Respondents shall be subject to EPA's review, for verification that such persons meet minimum technical background and experience requirements. This Settlement Agreement is contingent on Respondents' demonstration to EPA's satisfaction that Respondents are qualified to perform properly and promptly the actions set forth in this Settlement Agreement. If EPA disapproves in writing of any person's technical qualifications, Respondents shall notify EPA of the identity and qualifications of the replacements within 30 days of the written notice. If EPA subsequently disapproves of the replacement, EPA reserves the right to terminate this Settlement Agreement and to conduct a complete RI/FS, and to seek reimbursement for costs and penalties from Respondents. During the course of the RI/FS, Respondents shall notify EPA in writing of any changes or additions in the personnel used to carry out such Work, providing their names, titles, and qualifications. EPA shall have the same right to disapprove changes and additions to personnel as it has hereunder regarding the initial notification.

39. Within 5 days after the Effective Date, Respondents shall designate a Project Coordinator who shall be responsible for administration of all actions by Respondents required by this Settlement Agreement and shall submit to EPA the designated Project Coordinator's name, address, telephone number, and qualifications. To the greatest extent possible, the Project Coordinator shall be present on OU3 or readily available during OU3 Work. EPA retains the right to disapprove of the designated Project Coordinator. If EPA disapproves of the designated Project Coordinator, Respondents shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number and qualifications within 14 days following EPA's disapproval. Respondents shall have the right to change their Project Coordinator, subject to EPA's right to disapprove. Respondents shall notify EPA 5 days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notification. Receipt by Respondents' Project Coordinator of any notice or communication from EPA relating to this Settlement Agreement shall constitute receipt by Respondents. Documents to be submitted to the Respondents shall be sent to Robert Medler, Remedium Group, Inc., 6401 Poplar Ave., Suite 301, Memphis, TN 38119.

40. EPA has designated Bonita Lavelle of the Remedial Response Branch, Region 8, as its Project Coordinator. EPA will notify Respondents of a change of its designated Project

Coordinator. Except as otherwise provided in this Settlement Agreement, Respondents shall direct all submissions required by this Settlement Agreement to the Project Coordinator at EPA, EPR-SR, 1595 Wynkoop Street, Denver, CO, 80202.

41. EPA's Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and On-Scene Coordinator ("OSC") by the NCP. In addition, EPA's Project Coordinator shall have the authority consistent with the NCP, to halt any Work required by this Settlement Agreement, and to take any necessary response action when s/he determines that conditions at the Site may present an immediate endangerment to public health or welfare or the environment. The absence of the EPA Project Coordinator from the area under study pursuant to this Settlement Agreement shall not be cause for the stoppage or delay of Work.

42. EPA shall arrange for a qualified person to assist in its oversight and review of the conduct of the RI/FS, as required by Section 104(a) of CERCLA, 42 U.S.C. Section 9604(a). Such person shall have the authority to observe Work and make inquiries in the absence of EPA, but not to modify the SOW or SAPs.

## IX. WORK TO BE PERFORMED

43. Respondents shall conduct the RI/FS in accordance with the provisions of this Settlement Agreement, the SOW, EPA-prepared SAPs, CERCLA, the NCP and EPA guidance, including, but not limited to the "Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA" (OSWER Directive # 9355.3-01, October 1988 or subsequently issued guidance), "Guidance for Data Useability in Risk Assessment" (OSWER Directive #9285.7-05, October 1990 or subsequently issued guidance), and guidance referenced therein, and guidances referenced in the SOW and EPA-prepared SAPs, as may be amended or modified by EPA. The Remedial Investigation ("RI") shall consist of collecting data to characterize site conditions at OU3, determining the nature and extent of the contamination at or from OU3 and incorporating EPA's Baseline Risk Assessment. The Feasibility Study ("FS") shall determine and evaluate alternatives for remedial action to prevent, mitigate or otherwise respond to or remedy the release or threatened release of hazardous substances, pollutants, or contaminants at or from OU3. The alternatives evaluated must include, but shall not be limited to, the range of alternatives described in the NCP, and shall include remedial actions that utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. In evaluating the alternatives, Respondents shall address the factors required to be taken into account by Section 121 of CERCLA, 42 U.S.C. § 9621, and Section 300.430(e) of the NCP, 40 C.F.R. § 300.430(e). All Work performed under this Settlement Agreement shall be in accordance with the schedules herein or established in the SOW, and in full accordance with the standards, specifications, and other requirements of the SOW and EPA-prepared SAPs, as initially approved, prepared or modified by EPA, and as may be amended or modified by EPA from time to time. In accordance with the schedules established in this Settlement Agreement or in the SOW, Respondents shall submit to EPA and the State 3 copies of all plans, reports and other

10

deliverables required under this Settlement Agreement, the SOW and EPA-prepared SAPs. All plans, reports and other deliverables will be reviewed and approved by EPA pursuant to Section X (EPA Approval of Plans and Other Submissions). Upon request by EPA, Respondents shall submit in electronic form all portions of any plan, report or other deliverable Respondents are required to submit pursuant to provisions of this Settlement Agreement.

44. The SOW attached to this Settlement Agreement as Appendix A allocates between EPA and Respondents activities leading up to the RI/FS Report. Respondents shall perform all of the tasks for which they have responsibility under the SOW.

45. Modification of the SOW and EPA-prepared SAPs.

a. If at any time during the RI/FS process, Respondents identify a need for additional data, Respondents shall submit a memorandum documenting the need for additional data to the EPA Project Coordinator within 30 days of identification. EPA in its discretion will determine whether the additional data will be collected by Respondents and whether it will be incorporated into plans, reports and other deliverables.

b. In the event of unanticipated or changed circumstances at the OU3, Respondents shall notify the EPA Project Coordinator by telephone within 24 hours of discovery of the unanticipated or changed circumstances. In the event that EPA determines that the immediate threat or the unanticipated or changed circumstances warrant changes in the SOW and/or EPA-prepared SAPs, EPA shall modify or amend the SOW and/or EPA-prepared SAPs in writing accordingly. Respondents shall perform the requirements of the SOW and EPA-prepared SAPs as modified or amended.

c. EPA may determine that in addition to tasks defined in the initially approved SOW, other additional Work may be necessary to accomplish the objectives of the RI/FS. Respondents agree to perform these response actions in addition to those required by the initially approved SOW, including any approved modifications, if EPA determines that such actions are necessary to accomplish the objectives of the RI/FS in accordance with CERCLA and the NCP.

d. Respondents shall confirm their willingness to perform the additional Work in writing to EPA within 7 days of receipt of the EPA request. If Respondents object to any modification determined by EPA to be necessary pursuant to this Paragraph, Respondents may seek dispute resolution pursuant to Section XV (Dispute Resolution). The Work Plan shall be modified in accordance with the final resolution of the dispute.

e. Respondents shall complete the additional Work according to the standards, specifications, and schedule set forth or approved by EPA in a written modification to the SOW or written SOW and EPA-prepared SAPs amendments. EPA reserves the right to conduct the

11

Work itself at any point, to seek reimbursement from Respondents, and/or to seek any other appropriate relief.

f. Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions at the Site.

46. <u>Off-Site Shipment of Waste Material</u>. Respondents shall, prior to any off-site shipment of Waste Material from the OU3 to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to EPA's Designated Project Coordinator. However, this notification requirement shall not apply to any off-site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

a. Respondents shall include in the written notification the following information: (1) the name and location of the facility to which the Waste Material is to be shipped: (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Respondents shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

b. The identity of the receiving facility and state will be determined by Respondents following the award of the contract for the remedial investigation and feasibility study. Respondents shall provide the information required by Subparagraph 46.a and 46.c as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

c. Before shipping any hazardous substances, pollutants, or contaminants from OU3 to an off-site location, Respondents shall obtain EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondents shall only send hazardous substances, pollutants, or contaminants from OU3 to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

47. <u>Meetings</u>. Respondents shall make presentations at, and participate in, meetings at the request of EPA during the initiation, conduct, and completion of the RI/FS. In addition to discussion of the technical aspects of the RI/FS, topics will include anticipated problems or new issues. Meetings will be scheduled at EPA's discretion.

48. <u>Progress Reports</u>. In addition to the plans, reports and other deliverables set forth in this Settlement Agreement, Respondents shall provide to EPA monthly progress reports by the 15th day of the following month. At a minimum, with respect to the preceding month, these progress reports shall (1) describe the actions which have been taken to comply with this

Settlement Agreement during that month, (2) include all results of sampling and tests and all other data received by Respondents, (3) describe Work planned for the next two months with schedules relating such Work to the overall project schedule for RI/FS completion, and (4) describe all problems encountered and any anticipated problems, any actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays. Progress reports shall be sent to Bonita Lavelle at EPA, EPR-SR, 1595 Wynkoop Street, Denver, CO, 80202.

49. Emergency Response and Notification of Releases.

a. In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondents shall immediately take all appropriate action. Respondents shall take these actions in accordance with all applicable provisions of this Settlement Agreement, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondents shall also immediately notify the EPA Project Coordinator or, in the event of his/her unavailability, the On Scene Coordinator ("OSC") or the National Response Center at (800) 424-8802 of the incident or Site conditions. In the event that Respondents fail to take appropriate response action as required by this Paragraph, and EPA takes such action instead, Respondents shall reimburse EPA all costs of the response action not inconsistent with the NCP pursuant to Section XVIII (Payment of Response Costs).

b. In addition, in the event of any release of a hazardous substance from OU3, Respondents shall immediately notify the EPA Project Coordinator, the OSC and the National Response Center at (800) 424-8802. Respondents shall submit a written report to EPA within 7 days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq.*

## X. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

50. After review of any plan, report or other item that is required to be submitted for approval pursuant to this Settlement Agreement, in a notice to Respondents EPA shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that Respondents modify the submission; or (e) any combination of the above. However, EPA shall not modify a submission without first providing Respondents at least one notice of deficiency and an opportunity to cure within 15 days, except where to do so would cause serious disruption to the Work or where previous submission(s) have been

disapproved due to material defects.

51.  In the event of approval, approval upon conditions, or modification by EPA, pursuant to Paragraph 50, Respondents shall proceed to take any action required by the plan, report or other deliverable, as approved or modified by EPA subject only to their right to invoke the Dispute Resolution procedures set forth in Section XV (Dispute Resolution) with respect to the modifications or conditions made by EPA.  Following EPA approval or modification of a submission or portion thereof, Respondents shall not thereafter alter or amend such submission or portion thereof unless directed by EPA.  In the event that EPA modifies the submission to cure the deficiencies pursuant to Subparagraph 50(c) and the submission had a material defect, EPA retains the right to seek stipulated penalties, as provided in Section XVI (Stipulated Penalties).

52.  Resubmission.

a.  Upon receipt of a notice of disapproval, Respondents shall, within 15 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other deliverable for approval.  Any stipulated penalties applicable to the submission, as provided in Section XVI, shall accrue during the 15-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 53 and 54.

b.  Notwithstanding the receipt of a notice of disapproval, Respondents shall proceed to take any action required by any non-deficient portion of the submission, unless otherwise directed by EPA.  Implementation of any non-deficient portion of a submission shall not relieve Respondents of any liability for stipulated penalties under Section XVI (Stipulated Penalties).

c.  Respondents shall not proceed further with any subsequent activities or tasks until receiving EPA approval, approval on condition or modification of the following deliverables:  Draft Remedial Investigation Report and Draft Feasibility Study Report.  While awaiting EPA approval, approval on condition or modification of these deliverables, Respondents shall proceed with all other tasks and activities which may be conducted independently of these deliverables, in accordance with the schedule set forth under this Settlement Agreement.

d.  For all remaining deliverables not listed above in subparagraph 52.c., Respondents shall proceed with all subsequent tasks, activities and deliverables without awaiting EPA approval on the submitted deliverable.  EPA reserves the right to stop Respondents from proceeding further, either temporarily or permanently, on any task, activity or deliverable at any point during the RI/FS.

53.  If EPA disapproves a resubmitted plan, report or other deliverable, or portion

14

thereof, EPA may again direct Respondents to correct the deficiencies. EPA shall also retain the right to modify or develop the plan, report or other deliverable. Respondents shall implement any such plan, report, or deliverable as corrected, modified or developed by EPA, subject only to Respondents' right to invoke the procedures set forth in Section XV (Dispute Resolution).

54. If upon resubmission, a plan, report, or other deliverable is disapproved or modified by EPA due to a material defect, Respondents shall be deemed to have failed to submit such plan, report, or other deliverable timely and adequately unless Respondents invoke the dispute resolution procedures in accordance with Section XV (Dispute Resolution) and EPA's action is revoked or substantially modified pursuant to a Dispute Resolution decision issued by EPA or superceded by an agreement reached pursuant to that Section. The provisions of Section XV (Dispute Resolution) and Section XVI (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during Dispute Resolution. If EPA's disapproval or modification is not otherwise revoked, substantially modified or superceded as a result of a decision or agreement reached pursuant to the Dispute Resolution process set forth in Section XV, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section XVI.

55. In the event that EPA takes over some of the tasks, but not the preparation of the RI Report or the FS Report, Respondents shall incorporate and integrate information supplied by EPA into the final reports.

56. All plans, reports, and other deliverables submitted to EPA under this Settlement Agreement shall, upon approval or modification by EPA, be incorporated into and enforceable under this Settlement Agreement. In the event EPA approves or modifies a portion of a plan, report, or other deliverable submitted to EPA under this Settlement Agreement, the approved or modified portion shall be incorporated into and enforceable under this Settlement Agreement.

57. Neither failure of EPA to expressly approve or disapprove of Respondents' submissions within a specified time period, nor the absence of comments, shall be construed as approval by EPA. Whether or not EPA gives express approval for Respondents' deliverables, Respondents are responsible for preparing deliverables acceptable to EPA.

## XI. QUALITY ASSURANCE, SAMPLING, AND ACCESS TO INFORMATION

58. Quality Assurance. Respondents shall assure that Work performed, samples taken and analyses conducted conform to the requirements of the SOW and EPA-prepared SAPs, the QAPP and guidances identified therein. Respondents will assure that field personnel used by Respondents are properly trained in the use of field equipment and in chain of custody procedures. Respondents shall only use laboratories which have a documented quality system that complies with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA.

15

EXHIBIT B

59. Sampling.

     a. All results of sampling, tests, modeling or other data (including raw data) generated by Respondents, or on Respondents' behalf, during the period that this Settlement Agreement is effective, shall be submitted to EPA in the next monthly progress report as described in Paragraph 48 of this Settlement Agreement. EPA will make available to Respondents validated data generated by EPA unless it is exempt from disclosure by any federal or state law or regulation.

     b. Respondents shall verbally notify EPA and the State at least 7 days prior to conducting significant field events as described in the SOW and EPA-prepared SAPs. At EPA's verbal or written request, copies of the request of EPA's oversight assistant, Respondents shall allow split or duplicate samples to be taken by EPA (and its authorized representatives) or the State of any samples collected in implementing this Settlement Agreement. All split samples of Respondents shall be analyzed by the methods identified in the QAPP.

60. Access to Information.

     a. Respondents shall, subject to subparagraph c. below, provide to EPA and the State, upon request, copies of all documents and information within their possession or control or that of their contractors or agents relating to activities at OU3 of the Site or to the implementation of this Settlement Agreement, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work. Respondents shall also make available to EPA and the State, at reasonable times and with reasonable notice, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

     b. Respondents may assert business confidentiality claims covering part or all of the documents or information submitted to EPA and the State under this Settlement Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when it is submitted to EPA and the State, or if EPA has notified Respondents that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondents. Respondents shall segregate and clearly identify all documents or information submitted under this Settlement Agreement for which Respondents assert business confidentiality claims.

c. Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Respondents assert such a privilege in lieu of providing documents, they shall provide EPA and the State with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the contents of the document, record, or information; and 6) the privilege asserted by Respondents. However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

d. No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

61. In entering into this Settlement Agreement, Respondents, only for purposes of response actions at OU3, agree not to object to any data gathered, generated, or evaluated by EPA, the State or Respondents in the performance or oversight of the Work that has been verified according to the quality assurance/quality control ("QA/QC") procedures required by the Settlement Agreement, the SOW, any EPA-approved Workplans or EPA-prepared SAPs. If Respondents object to any other data relating to the RI/FS, Respondents shall submit to EPA a report that specifically identifies and explains its objections, describes the acceptable uses of the data, if any, and identifies any limitations to the use of the data. The report must be submitted to EPA within 15 days of the monthly progress report containing the data.

## XII. SITE ACCESS

62. If the Site, or any other property where access is needed to implement this Settlement Agreement, is owned or controlled by any of Respondents, such Respondents shall, commencing on the Effective Date, provide EPA, the State and their representatives, including contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Settlement Agreement.

63. Notwithstanding any provision of this Settlement Agreement, EPA and the State retain all of their access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIII. COMPLIANCE WITH OTHER LAWS

64. Respondents shall comply with all applicable local, state and federal laws and regulations when performing the RI/FS. No local, state, or federal permit shall be required for any portion of any action conducted entirely on-site, including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621. Where any

17

portion of the Work is to be conducted off-site and requires a federal or state permit or approval, Respondents shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals. This Settlement Agreement is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XIV. RETENTION OF RECORDS

65. During the pendency of this Settlement Agreement and for a minimum of 10 years after commencement of construction of any remedial action, each Respondent shall preserve and retain all non-identical copies of documents, records, and other information (including documents, records, or other information in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary. Until 10 years after commencement of construction of any remedial action, Respondents shall also instruct their contractors and agents to preserve all documents, records, and other information of whatever kind, nature or description relating to performance of the Work.

66. At the conclusion of this document retention period, Respondents shall notify EPA at least 90 days prior to the destruction of any such documents, records or other information, and, upon request by EPA, Respondents shall deliver any such documents, records, or other information to EPA. Respondents may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Respondents assert such a privilege, they shall provide EPA with the following: 1) the title of the document, record, or other information; 2) the date of the document, record, or other information; 3) the name and title of the author of the document, record, or other information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or other information; and 6) the privilege asserted by Respondents. However, no documents, records or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

67. Each Respondent hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by EPA or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

EXHIBIT B

## XV. DISPUTE RESOLUTION

68. Unless otherwise expressly provided for in this Settlement Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement. The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally.

69. If Respondents object to any EPA action taken pursuant to this Settlement Agreement, including billings for Future Response Costs, they shall notify EPA in writing of their objection(s) within 5 days of such action, unless the objection(s) has/have been resolved informally. EPA and Respondents shall have 20 days from EPA's receipt of Respondents' written objection(s) to resolve the dispute (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of EPA. Such extension may be granted verbally but must be confirmed in writing.

70. Any agreement reached by the Parties pursuant to this Section shall be in writing and shall, upon signature by the Parties, be incorporated into and become an enforceable part of this Settlement Agreement. If the Parties are unable to reach an agreement within the Negotiation Period, Respondents shall be afforded the opportunity to present their position to an EPA management official at the Assistant Regional Administrator level or higher, who will then issue a written decision, which will be provided to Respondents. EPA's decision shall be incorporated into and become an enforceable part of this Settlement Agreement. Respondents' obligations under this Settlement Agreement shall not be tolled by submission of any objection for dispute resolution under this Section, unless EPA determines pursuant to the dispute resolution process that the obligation was inappropriate. Following resolution of the dispute, as provided by this Section, Respondents shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs, and regardless of whether Respondents agree with the decision.

## XVI. STIPULATED PENALTIES

71. Respondents shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraph 72 for failure to comply with any of the requirements of this Settlement Agreement specified below unless excused under Section XVII (Force Majeure). "Compliance" by Respondents shall include completion of the Work under this Settlement Agreement or any activities contemplated under any SOW and EPA-prepared SAPs or other plan approved under this Settlement Agreement identified below, in accordance with all applicable requirements of law, this Settlement Agreement, the SOW, and any plans or other documents approved by EPA pursuant to this Settlement Agreement and within the specified time schedules established by and approved under this Settlement Agreement.

19

72. Stipulated Penalty Amounts

The following stipulated penalties shall accrue per day for any noncompliance with this Settlement Agreement or the SOW and EPA-prepared SAPs:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 50 | 1st through 14th day |
| $ 100 | 15th through 30th day |
| $ 32,500 | 31st day and beyond |

73. In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 90 of Section XX (Reservation of Rights by EPA), Respondents shall be liable for a stipulated penalty in the amount of $250,000.

74. All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (1) with respect to a deficient submission under Section X (EPA Approval of Plans and Other Submissions), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Respondents of any deficiency; and (2) with respect to a decision by the EPA Management Official designated in Paragraph 70 of Section XV (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the EPA Management Official issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

75. Following EPA's determination that Respondents have failed to comply with a requirement of this Settlement Agreement, EPA may give Respondents written notification of the same and describe the noncompliance. EPA may send Respondents a written demand for the payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Respondents of a violation.

76. All penalties accruing under this Section shall be due and payable to EPA within 30 days of Respondents' receipt from EPA of a demand for payment of the penalties, unless Respondents invoke the dispute resolution procedures under Section XV (Dispute Resolution). Payment and notice of payment shall be made in accordance with the requirements of Paragraphs 84b. and c.

77. The payment of penalties shall not alter in any way Respondents' obligation to complete performance of the Work required under this Settlement Agreement.

78. Penalties shall continue to accrue as provided in Paragraph 74 during any dispute resolution period, but need not be paid until 15 days after the dispute is resolved by agreement or by receipt of EPA's decision.

79. If Respondents fail to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest. Respondents shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 76.

80. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Respondents' violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of CERCLA, 42 U.S.C. § 9622(l), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that EPA shall not seek civil penalties pursuant to Section 122(l) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of willful violation of this Settlement Agreement or in the event that EPA assumes performance of a portion or all of the Work pursuant to Section XX (Reservation of Rights by EPA), Paragraph 90. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.

## XVII. FORCE MAJEURE

81. Respondents agree to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed by a *force majeure*. For purposes of this Settlement Agreement, *force majeure* is defined as any event arising from causes beyond the control of Respondents or of any entity controlled by Respondents, including but not limited to their contractors and subcontractors, which delays or prevents performance of any obligation under this Settlement Agreement despite Respondents' best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the Work or increased cost of performance.

82. If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement, whether or not caused by a *force majeure* event, Respondents shall notify EPA orally within two days of when Respondents first knew that the event might cause a delay. Within three days thereafter, Respondents shall provide to EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondents' rationale for attributing such delay to a *force majeure* event if they intend to assert such a claim; and a statement as to whether, in the opinion of Respondents, such event may

21

cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall preclude Respondents from asserting any claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

83.  If EPA agrees that the delay or anticipated delay is attributable to *a force majeure* event, the time for performance of the obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation.  If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Respondents in writing of its decision.  If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify Respondents in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

## XVIII.  PAYMENT OF RESPONSE COSTS

84.  Payments of Future Response Costs.

a.  Respondents shall pay EPA all Future Response Costs that are not inconsistent with the NCP that are incurred by EPA in performing RI/FS activities either on or with respect to OU3.  On a periodic basis, EPA will send Respondents a bill requiring payment that includes a standard Regionally-prepared cost summary, which includes direct and indirect costs incurred by EPA and its contractors.  Respondents shall make all payments within 30 days of receipt of each bill requiring payment, except as otherwise provided in Paragraph 86 of this Settlement Agreement.

b.  Respondents shall make all payments required by this Paragraph by a certified or cashier's check or checks or by wire transfer(s) made payable to "EPA Hazardous Substance Superfund" and shall include their name and address and the EPA Site/Spill ID number 08BC. Respondents shall send the payment(s) as indicated below:

For certified or cashier's checks, payment must be received by 11:00 AM Eastern Time for same day credit and should be forwarded to one of the following addresses:

Regular Mail:

        Mellon Bank
        Attn: Superfund Accounting
        Lockbox 360859
        Pittsburgh, PA 15251-6859

Express Mail:

    Environmental Protection Agency 360859
    Mellon Client Service Center Rm 154-0670
    500 Ross Street
    Pittsburgh, PA 15262-0001

For wire transfers, payment must be sent directly to the Federal Reserve Bank in New York City with the following information:

    Federal Reserve Bank of New York
    ABA = 021030004
    Account = 68010727
    SWIFT address = FRNYUS33
    33 Liberty Street
    New York NY 10045
    Field Tag 4200 of the Fedwire message should read "D 68010727
        Environmental Protection Agency"

ACH (also known as REX or remittance express)

    Automated Clearinghouse (ACH) for receiving US currency
    PNC Bank
    ABA = 051036706
    Environmental Protection Agency
    Account 310006
    CTX Format
    Transaction Code 22 - checking
    808 17th Street NW
    Washington DC 20074
    Contact = Jessie White 301-887-6548

    c. At the time of payment, Respondents shall send notice that payment has been made to Kelcey Land, Cost Recovery Program Manager, ENF-RC, 1595 Wynkoop Street, Denver, CO 80202 and to Dana Anderson, U.S. EPA, 26 W. Martin Luther King Drive, Attention: FINANCE, MS: NWD, Cincinnati, Ohio 45268 (E-mail (to both): anderson.dana@epa.gov and AcctsReceivable.CINWD@epa.gov).

    d. The total amount to be paid by Respondents pursuant to Paragraph 84 shall be deposited in the Libby Asbestos Site - OU3 Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with OU3 of the Site, or to be transferred by EPA to a sitewide special account or the EPA Hazardous Substance Superfund.

23

85. If Respondents do not pay Future Response Costs within 30 days of Respondents' · receipt of a bill, Respondents shall pay Interest on the unpaid balance of Future Response Costs, respectively. The Interest on unpaid Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. If EPA receives a partial payment, Interest shall accrue on any unpaid balance. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondents' failure to make timely payments under this Section, including but not limited to, payments of stipulated penalties pursuant to Section XVI. Respondents shall make all payments required by this Paragraph in the manner described in Paragraph 84.

86.   Respondents may contest payment of any Future Response Costs under Paragraph 84 if they determine that EPA has made an accounting error or if they believe EPA incurred excess costs as a direct result of an EPA action that was inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the EPA Project Coordinator. Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, Respondents shall within the 30 day period pay all uncontested Future Response Costs to EPA in the manner described in Paragraph 84. Simultaneously, Respondents shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of Montana and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Respondents shall send to the EPA Project Coordinator a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Respondents shall initiate the Dispute Resolution procedures in Section XV (Dispute Resolution). If EPA prevails in the dispute, within 5 days of the resolution of the dispute, Respondents shall pay the sums due (with accrued interest) to EPA in the manner described in Paragraph 84. If Respondents prevail concerning any aspect of the contested costs, Respondents shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to EPA in the manner described in Paragraph 84. Respondents shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Respondents' obligation to reimburse EPA for its Future Response Costs.

## XIX. COVENANT NOT TO SUE BY EPA

87. In consideration of the actions that will be performed and the payments that will be made by Respondents under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, EPA covenants not to sue or to take administrative action against Respondents pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work performed under this Settlement Agreement and Future Response Costs. This covenant not to sue shall take effect upon the Effective Date and is

conditioned upon the complete and satisfactory performance by Respondents of all obligations under this Settlement Agreement, including, but not limited to, payment of Future Response Costs pursuant to Section XVIII. This covenant not to sue extends only to Respondents and does not extend to any other person.

## XX. RESERVATIONS OF RIGHTS BY EPA

88. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from OU3. Further, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondents in the future to perform additional activities pursuant to CERCLA or any other applicable law.

89. The covenant not to sue set forth in Section XIX above does not pertain to any matters other than those expressly identified therein. EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Respondents with respect to all other matters, including, but not limited to:

a. claims based on a failure by Respondents to meet a requirement of this Settlement Agreement;

b. liability for costs not included within the definition of Future Response Costs;

c. liability for performance of response actions other than the Work;

d. criminal liability;

e. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

f. liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of OU3 of the Site; and

g. liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site.

90. Work Takeover. In the event EPA determines that Respondents have ceased implementation of any portion of the Work, are seriously or repeatedly deficient or late in their performance of the Work, or are implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of all or

25

any portion of the Work as EPA determines necessary. Respondents may invoke the procedures set forth in Section XV (Dispute Resolution) to dispute EPA's determination that takeover of the Work is warranted under this Paragraph. Costs incurred by EPA in performing the Work pursuant to this Paragraph shall be considered Future Response Costs that Respondents shall pay pursuant to Section XVIII (Payment of Response Costs). Notwithstanding any other provision of this Settlement Agreement, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXI. COVENANT NOT TO SUE BY RESPONDENTS

91. Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Future Response Costs, or this Settlement Agreement, including, but not limited to:

a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b. any claim arising out of the Work or arising out of the response actions for which the Future Response Costs have or will be incurred, including any claim under the United States Constitution, the [State] Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Work or payment of Future Response Costs.

92. These covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 89 (b), (c), and (e) - (g), but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

93. Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

## XXII. OTHER CLAIMS

94. By issuance of this Settlement Agreement, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondents.

26

95. Except as expressly provided in Section XIX (Covenant Not to Sue by EPA), nothing in this Settlement Agreement constitutes a satisfaction of or release from any claim or cause of action against Respondents or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

96. No action or decision by EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXIII. CONTRIBUTION

97.    a. The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that Respondents are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are the Work, Past Response Costs, and Future Response Costs.

b. The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), pursuant to which Respondents have, as of the Effective Date, resolved their liability to the United States for the Work and Future Response Costs.

c. Nothing in this Settlement Agreement precludes the United States or Respondents from asserting any claims, causes of action, or demands for indemnification, contribution, or cost recovery against any person not parties to this Settlement Agreement. Nothing herein diminishes the right of the United States, pursuant to Sections 113(f)(2) and (3) of CERCLA, 42 U.S.C. 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

## XXIV. INDEMNIFICATION

98. Respondents shall indemnify, save and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition, Respondents agree to pay the United States all costs incurred by the United States, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, subcontractors and any

27

persons acting on their behalf or under their control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondents in carrying out activities pursuant to this Settlement Agreement. Neither Respondents nor any such contractor shall be considered an agent of the United States.

99. The United States shall give Respondents notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondents prior to settling such claim.

100. Respondents waive all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to OU3. In addition, Respondents shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to OU3.

## XXV. INSURANCE

101. At least 7 days prior to commencing any OU3 Work under this Settlement Agreement, Respondents shall secure, and shall maintain for the duration of this Settlement Agreement, comprehensive general liability insurance and automobile insurance with limits of one million dollars, combined single limit, naming the EPA as an additional insured. Within the same period, Respondents shall provide EPA with certificates of such insurance and a copy of each insurance policy. Respondents shall submit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of the Settlement Agreement, Respondents shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondents in furtherance of this Settlement Agreement. If Respondents demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Respondents need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## XXVI. INTEGRATION/APPENDICES

102. This Settlement Agreement and its appendices and any deliverables, technical memoranda, specifications, schedules, documents, plans, reports (other than progress reports), etc. that will be developed pursuant to this Settlement Agreement and become incorporated into and enforceable under this Settlement Agreement constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this

Settlement Agreement. The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The following appendices are attached to and incorporated into this Settlement Agreement:

"Appendix A" is the SOW.

"Appendix B is the preliminary OU3 study area map.

"Appendix C" is the property description of KDC-owned property at the Zonolite Mine.

## XXVII. ADMINISTRATIVE RECORD

103. EPA will determine the contents of the administrative record file for selection of the remedial action. Respondents shall submit to EPA documents developed during the course of the RI/FS upon which selection of the response action may be based. Upon request of EPA, Respondents shall provide copies of plans, task memoranda for further action, quality assurance memoranda and audits, raw data, field notes, laboratory analytical reports and other reports. Upon request of EPA, Respondents shall additionally submit any previous studies conducted under state, local or other federal authorities relating to selection of the response action, and all communications between Respondents and state, local or other federal authorities concerning selection of the response action. At EPA's discretion, Respondents shall establish a community information repository at or near the Site, to house one copy of the administrative record.

## XXVIII. EFFECTIVE DATE AND SUBSEQUENT MODIFICATION

104. This Order shall be effective upon execution by EPA.

105. This Settlement Agreement may be amended by mutual agreement of EPA and Respondents. Amendments shall be in writing and shall be effective when signed by EPA. EPA Project Coordinators do not have the authority to sign amendments to the Settlement Agreement.

106. No informal advice, guidance, suggestion, or comment by the EPA Project Coordinator or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondents shall relieve Respondents of their obligation to obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXIX. NOTICE OF COMPLETION OF WORK

107. When EPA determines that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs or

record retention, EPA will provide written notice to Respondents.  If EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the SOW and EPA-prepared SAPs if appropriate in order to correct such deficiencies, in accordance with Paragraph 45 (Modification of the SOW and EPA-prepared SAPs).  Failure by Respondents to implement the approved modified SOW and/or EPA-prepared SAPs shall be a violation of this Settlement Agreement.

Agreed this 7th day of September, 2007.

For Respondent W.R. Grace & Co. - Conn.


By: _____

Name:   William M. Corcoran

Title:   Vice President


For Respondent Kootenai Development Company.


By: _____

Name:   William M. Corcoran

Title:   President

EXHIBIT P

It is so ORDERED and Agreed this _____ day of September, 2007.

BY: _____    DATE: _9/12/2007_
     Bill Murray, Director
     Superfund Remedial Program, EPR

BY: _____    DATE: _13 September 2007_
     Sharon Kercher, Director
     Technical Enforcement Program, ECEJ

BY: _____    DATE: _9/17/07_
     Supervisory Attorney
     Legal Enforcement Program, ECEJ

Region 8
U.S. Environmental Protection Agency

31

## STATEMENT OF WORK FOR
## REMEDIAL INVESTIGATION/FEASIBILITY STUDY
## LIBBY ASBESTOS SITE
## OPERABLE UNIT 3

### 1. INTRODUCTION

The purpose of the remedial investigation/feasibility study (RI/FS) for Operable Unit 3 (OU3) of the Libby Asbestos Site (the Site), is to investigate the nature and extent of contamination within the OU3 boundaries and to develop and evaluate potential remedial alternatives for OU3.

EPA established preliminary study area boundaries for the purpose of planning and developing the initial scope of the RI/FS for OU3. The preliminary boundaries include the former vermiculite mine and the surrounding geographic area that may have been impacted by current and/or historical releases from the mine. EPA will determine the final OU3 boundaries based on the information generated during the RI/FS.

### 2. PURPOSE OF THE STATEMENT OF WORK

This Statement of Work (SOW) sets forth requirements for conducting an RI/FS at OU3 of the Site. The Respondents shall conduct the RI/FS in accordance with this SOW and the requirements in the Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study (Administrative Order) and consistent with the National Contingency Plan (40 CFR Part 300) and "Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA" (OSWER Directive 9355.3-01, October 1988) and any other guidance documents that EPA identifies as relevant to any aspect of conducting an RI/FS for OU3. A list of the primary guidance documents is included as Attachment A to this SOW.

EPA will develop all Sampling and Analysis Plans (SAPs), perform all data validation, and conduct the baseline human health risk assessment and ecological risk assessment components of the RI. EPA will provide copies of draft SAPs and draft baseline human health and ecological risk assessment reports to the Respondents. Respondents shall provide written comments on these draft documents to EPA within 30 days of document receipt. EPA will take Respondents' comments into consideration when finalizing the document but is not obligated to provide written responses.

As specified in CERCLA Section 104(a) (1), as amended by SARA, EPA will provide oversight of the Respondents' activities throughout the RI/FS. The Respondents shall support EPA's initiation and conduct of oversight activities. EPA's determinations, approvals, and activities as provided for in the Administrative Order and in the SOW shall be conducted in consultation with the State as provided for by CERCLA, the National Contingency Plan, and applicable guidance.

Performance of the work described in this SOW by the Respondents and EPA's review and approval of documents and activities described in this SOW shall be performed in accordance with the procedures described in the Administrative Order. The Respondents shall furnish all necessary personnel, materials, and services needed or incidental to, performing the work described in this SOW, except as otherwise specified in the Administrative Order.

## 3. INITIAL PLANNING FOR THE REMEDIAL INVESTIGATION

### 3.1 Assemble Existing Information

The Respondents shall assemble existing information relevant to the RI/FS for OU3 including but not limited to:

- All documentation and reporting of historical operations activities and studies concerning the former vermiculite mine and contaminants associated therewith,
- All mine reclamation plans and reports,
- All environmental sampling and analysis plans,
- All environmental and other data, maps and photos, and
- All reports describing data summaries, data evaluations, or interpretations of data.

This shall include available data relating to the types and quantities of hazardous substances, pollutants, or contaminants within OU3 and past material management and disposal practices at the former vermiculite mine.

The Respondents shall provide the information to EPA and the State in accordance with the schedule contained in Section 10 of this SOW.

### 3.2 Conduct Field Visit

The Respondents shall conduct a field visit of OU3 during the project scoping phase to assist in developing a conceptual understanding of sources and areas of contamination as well as potential exposure pathways and receptors at OU3. The Respondents shall invite EPA and the State to participate in the field visit and shall provide at least two weeks notice of the proposed date. EPA may invite other interested agencies to participate in the field visit.

### 3.3 Project Scoping Summary

Based on review of the existing information and the field visit, EPA will develop preliminary problem statements, conceptual site models of potential exposure pathways and potential human health and ecological receptors, preliminary remedial action objectives, and a preliminary list of potential State and federal ARARs in a project scoping summary document.

4. COMMUNITY RELATIONS

EPA will develop and implement community relations activities for OU3. The Respondents shall, as requested by EPA, assist EPA by providing information regarding the Site and/or OU3 history, participating in public meetings, developing graphics, placing newspaper ads developed by EPA, or distributing fact sheets developed by EPA. All Respondents-conducted community relations activities will be subject to oversight by EPA.

5. SITE CHARACTERIZATION

The overall objective of site characterization is to describe the nature and extent of contamination within OU3 and to describe areas of OU3 that may pose a threat to human health or the environment.  The Respondents shall perform the activities described in this section including:

- Implement EPA-prepared SAPs;
- Document field activities;
- Arrange for the laboratory analysis of samples at laboratories specified by EPA and in accordance with the EPA-prepared SAPs;
- Deliver laboratory data to EPA in the format specified in the SAPs;
- Prepare summary reports for each phase of investigation; and
- Prepare a draft and final RI report.

The Respondents shall notify EPA at least two weeks in advance of field work starting for each phase of the RI and shall provide a monthly progress report and participate in meetings at EPA's request. The Respondents shall notify EPA in writing upon completion of field activities for each phase of the RI.

5.1 Development and Implementation of Sampling and Analysis Plans

EPA will develop a SAP for each phase of the RI.  It is anticipated that there will be multiple phases of the RI, the number of phases required will be determined by EPA. The SAP for each phase of the RI will include a description of the goals for the specific phase, a list of key personnel and responsibilities, Data Quality Objectives (DQOs), a Field Sampling Plan (FSP), a Quality Assurance Project Plan (QAPP), a data management plan and a schedule. Each FSP will describe the sampling program including the rationale, number, type, and location of samples; the sample collection, handling and custody procedures; the required field documentation and the required analytical methods. Each QAPP will describe the measures necessary to generate data of sufficient quality to achieve the DQOs.  The QAPP will contain details of any special training requirements and certifications, quality control requirements for field activities and analytical processes, and data validation requirements.

The Respondents shall prepare a Health and Safety Plan (HSP) specific to the activities in OU3 and submit it to EPA and the State. The Respondents are solely responsible for

ensuring the health and safety of their employees or contractors performing any of the work described in this SOW. The Respondents shall obtain access to properties for sampling and shall implement each final EPA-prepared SAP in accordance with the schedule described in the SAP. The Respondents shall arrange for analytical data from laboratories to be reported directly to EPA in the format specified by EPA in the SAP. EPA will perform all required data validation described in the SAP.

The Respondents shall consistently document and adequately record in well maintained field logs and laboratory reports, information gathered during site characterization. The method(s) of documentation shall be consistent with that specified in the SAP. The Respondents shall use field logs to document observations, measurements, and significant events that occur during field activities. The Respondents shall ensure that laboratory reports document sample custody, analytical responsibility, analytical results, adherence to prescribed protocols, nonconformity events, corrective measures, and/or data deficiencies.

The Respondents shall maintain field reports and sample shipment records. Analytical results developed under the SAPs shall not be included in any site characterization summary reports or RI reports unless accompanied by or cross-referenced to a corresponding QA/QC report. In addition, the Respondents shall establish a data security system to safeguard field logs, field data sheets, laboratory reports, chain of custody forms and other project records to prevent loss, damage, or alteration of project documentation. The Respondents shall submit a written description of the data security system to EPA and the State for review and EPA approval in accordance with Section X of the Administrative Order.

5.2 Summary Reports

For each phase of the RI, the Respondents shall prepare a summary report describing the implementation of the SAP. Each summary report shall include the field documentation specified in the SAP, a description of the physical characteristics of the study area, results of all required field quality control procedures, and results of all field and laboratory audits performed by the Respondents as specified in the SAP. The Respondents shall submit a summary report for each phase of sampling to EPA and the State for review in accordance with Section X of the Administrative Order and the schedule established in the EPA-prepared final SAP for that phase.

5.3 RI Report

After the SAP for the final phase of the RI has been implemented, the Respondents shall prepare and submit a draft RI report to EPA and the State for review and EPA approval in accordance with Section X of the Administrative Order and the schedule contained in Section 10 of this SOW. The RI report shall summarize results of field activities to characterize OU3, the sources of contamination, the nature and extent of contamination and the fate and transport of contaminants. The Respondents shall refer to Table 3-13 in "Guidance for Conducting Remedial Investigations and Feasibility Studies under

4

CERCLA", OSWER Directive 9355.3-01, October 1988 for a suggested RI report format with the exception that EPA will prepare the baseline human health risk assessment and the baseline ecological risk assessment.

Within the RI report, the Respondents shall analyze and evaluate the data to describe the following:

- Physical and biological characteristics of OU3,
- Contaminant source characteristics,
- Nature and extent of contamination, and
- Contaminant fate and transport.

The RI report will include the actual and potential magnitude of releases from the sources, and horizontal and vertical spread of contamination as well as mobility and persistence of contaminants. Where modeling is appropriate, such models shall be identified in a letter submitted to EPA and the State for review and EPA approval prior to their use. All data and programming, including any proprietary programs, shall be made available to EPA and the State. Also, this evaluation shall provide any information relevant to OU3 characteristics necessary for the development and evaluation of remedial alternatives.

5.4 Remedial Action Objectives

EPA, in consultation with the State, will develop remedial action objectives and a refined list of potential State and federal ARARs based on the information provided in the final EPA-approved RI report and the baseline human health risk assessment and ecological risk assessment prepared by EPA.

6. DEVELOPMENT AND SCREENING OF REMEDIAL ALTERNATIVES

The Respondents shall perform the following activities to complete the development and screening of remedial alternatives.

6.1 Develop General Response Actions

The Respondents shall develop general response actions that will satisfy the remedial action objectives developed by EPA in consultation with the State. General response actions may include treatment, containment, excavation, extraction, disposal, institutional controls, or a combination of these.

For each environmental medium for which remedial action objectives have been developed by EPA in consultation with the State, the Respondents shall make an initial determination of areas or volumes to which general response actions may apply, taking into account OU3 conditions, the nature and extent of contamination, and acceptable exposure levels and potential exposure routes identified in the remedial action objectives.

6.2 Identify and Screen Remedial Technology Types and Process Options

The Respondents shall identify and evaluate remedial technology types and process options applicable to each general response action. The term "technology types" refers to general categories of technologies. The term "process options" refers to specific processes within each technology type. Several broad technology types may be identified for each general response action and numerous technology process options may exist within each technology type.

The Respondents shall use information from the RI on contaminant types and concentrations and OU3 characteristics to screen out technologies and process options that cannot be effectively implemented at OU3. The Respondents shall document the results of the initial screening of technology types and process options. The Respondents shall refer to Figures 4-4 and 4-5 in the "Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA", OSWER Directive 9355.3-01, October 1988 for examples of figures that may be used to summarize the initial screening of technologies and process options and the evaluation of process options.

6.3 Assemble and Document Alternatives

The Respondents shall assemble selected representative technologies into alternatives that represent a range of treatment and containment combinations that will address the remedial action objectives for OU3. The Respondents shall specify the reasons for eliminating alternatives during the preliminary screening process.

6.4 Alternative Screening and Selection of Alternatives for Detailed Analysis

The Respondents shall perform a screening of each remedial alternative based on effectiveness, implementability, and cost. As appropriate, the screening will preserve the range of treatment and containment alternatives that was initially developed. The range of remaining alternatives will include options that use treatment technologies and permanent solutions to the maximum extent practicable.

6.5 Development and Screening of Alternatives Technical Memorandum

The Respondents shall prepare a technical memorandum summarizing the work performed in the development and screening of alternatives and the results of each subtask described in this section including:

- A description of the general response actions and the areas or volumes of contaminated media to which they apply,
- A description of the remedial technology types and process options applicable to each general response action,
- The results of the initial screening of remedial technology types and process options,
- A description of the remedial alternatives,

6

- The results of the screening of alternatives based on effectiveness, implementability, and cost,
- A description of the alternatives that remain after screening and the action-specific State and federal ARARs for each alternative.

The Respondents shall submit the technical memorandum to EPA and the State for review and EPA approval in accordance with Section X of the Administrative Order and in accordance with the schedule contained in Section 10 of this SOW.

## 7. TREATABILITY STUDIES

EPA may require the Respondents to perform treatability studies to provide sufficient data to allow treatment alternatives to be fully developed and evaluated during the feasibility study and/or to reduce the cost and performance uncertainties for treatment alternatives to levels sufficient to allow EPA to select a remedy.

### 7.1 Letter Report

The Respondents shall identify a range of candidate technologies for treatability studies based on the remedial action objectives and the list of potential State and federal ARARs and taking into consideration the final results of the development and screening of alternatives.   The Respondents shall describe the candidate technologies in a letter report submitted to EPA and the State for review and EPA approval in accordance with Section X of the Administrative Order and the schedule contained in Section 10 of this SOW.

Within the letter report, the Respondents shall present information on performance, relative costs, removal efficiencies, operation and maintenance requirements, and implementability of the identified candidate technologies.  If the existing data on OU3 and the available information on candidate technologies are not sufficient to evaluate alternatives in the detailed analysis of alternatives, EPA may require treatability studies to be performed by the Respondents.

### 7.2 Treatability Studies Work Plan

Where EPA has determined that treatability studies are required, and unless the Respondents can demonstrate to EPA's satisfaction that they are not needed, the Respondents shall submit a draft treatability study work plan to EPA and the State for review and EPA approval in accordance with Section X of the AOC and the schedule contained in Section of 10 of this SOW.  The work plan shall describe the type of treatability study to be performed (e.g., bench scale or pilot scale) and shall include:

- a discussion of background information on OU3;
- a list of key personnel and responsibilities;
- a description of the remedial technologies to be tested;
- DQOs for each test including measurements of performance;

7

- the experimental procedures for each test;
- a SAP which describes the samples to be collected, sample collection procedures, sampling handling and tracking procedures, a QAPP, and analytical methods;
- a data management plan;
- a health and safety plan; and
- a plan for management of waste generated during the treatability tests.

7.3 Treatability Studies Report

Upon EPA approval of the treatability study work plan, the Respondents shall implement the work plan. Following completion of the treatability study, the Respondents shall analyze and interpret the study results in a technical report submitted to EPA and the State for review and EPA approval in accordance with Section X of the AOC and the schedule contained in the final EPA-approved treatability study work plan. In the report the Respondents shall evaluate the effectiveness, implementability, and cost of each technology and compare test results with predicted results. The Respondents shall also evaluate full-scale application of the technology including a sensitivity analysis identifying key parameters affecting full-scale operation.

8. DETAILED ANALYSIS OF ALTERNATIVES

Upon EPA approval of the Development and Screening of Alternatives Technical Memorandum, the Respondents shall perform a detailed analysis of the remaining remedial alternatives. The detailed analysis shall be sufficient to allow EPA to adequately compare the alternatives, select a remedial action for OU3, and demonstrate satisfaction of the CERCLA statutory remedy selection requirements (§121(b)(1)(A) of the CERCLA).

The Respondents shall assess each alternative against the following seven of the nine evaluation criteria contained in the National Contingency Plan (40 CFR Part 300.430(e) (9) (iii)):

1. Overall protection of human health and the environment
2. Compliance with ARARs
3. Long term effectiveness and permanence
4. Reduction of toxicity, mobility, or volume through treatment
5. Short-term effectiveness
6. Implementability
7. Cost

The Respondents shall conduct the detailed analysis of alternatives by evaluating each alternative against the seven evaluation criteria above and then performing a comparative analysis between remedial alternatives. That is, each alternative shall be compared against the others using the evaluation criteria as a basis of comparison.

## 9. FEASIBILITY STUDY REPORT

The Respondents shall prepare a draft FS report that summarizes the development and screening of remedial alternatives and the detailed analysis of alternatives. Identification and selection of the preferred alternative are reserved by EPA in consultation with the State. The Respondents shall refer to the "Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA" (OSWER Directive 9355.3-01, October 1988) for an outline of the FS report and the required report content. The Respondents shall submit the draft FS report to EPA and the State for review and EPA approval in accordance with Section X of the AOC and the schedule contained in Section 10 of this SOW.

## 10. SCHEDULE OF DELIVERABLES

The Respondents shall deliver documents and perform activities described in this SOW in accordance with the following schedule:

| SOW REFERENCE | DOCUMENT OR ACTIVITY | DELIVERY DATE |
|---|---|---|
| Section 3.1 | Provide existing information | 30 days after signing AOC and thereafter, 2 weeks after becoming aware of new information |
| Section 3.2 | Conduct field visit | Not later than 45 days after signing AOC |
| Section 3.2 | Notification of field visit | 2 weeks prior to field visit |
| Section 4 | Community relations support | As requested by EPA |
| Section 5.1 | Health and Safety Plan | 2 weeks prior to field visit |
| Section 5.1 | Health and Safety Plan updates necessary for SAP implementation | 30 days prior to start of field work |
| Section 5.1 | Written description of data security system | 30 days prior to start of field work |
| Section 5.2 | Summary Reports for each phase of sampling | As specified in EPA-approved final SAP for that phase |
| Section 5.3 | Draft RI Report | 90 days after field work is complete for final phase of sampling |
| Section 5.3 | Final RI Report | 45 days after receiving EPA and State comments on draft RI Report |
| Section 6.5 | Draft Development and Screening of Alternatives Technical Memorandum | 60 days after receiving final remedial action objectives from EPA |

9

| SOW REFERENCE | DOCUMENT OR ACTIVITY | DELIVERY DATE |
|---|---|---|
| Section 6.5 | Final Development and Screening of Alternatives Technical Memorandum | 45 days after receiving EPA and State comments on draft Technical Memorandum |
| Section 7.1 | Draft Treatability Studies Letter Report | 30 days after receiving final remedial action objectives from EPA |
| Section 7.1 | Final Treatability Studies Letter Report | 30 days after receiving EPA and State comments on draft Letter Report |
| Section 7.2 | Draft Treatability Studies Work Plan | 30 days after receiving notice from EPA that treatability studies are required |
| Section 7.2 | Final Treatability Studies Work Plan | 30 days after receiving EPA and State comments on draft Work Plan |
| Section 7.3 | Draft Treatability Studies Technical Report | As specified in EPA-approved final Treatability Studies Work Plan |
| Section 7.3 | Final Treatability Studies Technical Report | 30 days after receiving EPA and State comments on draft Technical Report |
| Section 9 | Draft FS Report | 60 days after EPA approval of final Development and Screening of Alternatives Technical Memorandum or final Treatability Studies Technical Report, whichever is later |
| Section 9 | Final FS Report | 30 days after receiving EPA and State comments on draft FS report |

10