VII.    SUBMISSIONS REQUIRING AGENCY APPROVAL ........................................................ 19

Attachment A:  Project Operations Plan

Attachment B:  Performance Standard Tables from September 30, 2008 Record of Decision

Attachment C:  Figure SOW-1:  General Site Plan

## STATEMENT OF WORK
### Blackburn and Union Privileges Superfund Site

I.    INTRODUCTION AND PURPOSE

This Remedial Design/Remedial Action (RD/RA) Statement of Work (SOW) defines the response activities and deliverable obligations that the Settling Defendants are obligated to perform in order to implement the Work required under the Consent Decree at the Blackburn and Union Privileges Superfund Site in Walpole, Massachusetts (the "Site"). The activities described in this SOW are based upon the United States Environmental Protection Agency (EPA) Record of Decision (ROD) for the Site signed by the Director, Office of Site Remediation and Restoration, US EPA, Region I, on September 30, 2008.

II.   DEFINITIONS

The Site shall refer to the definition of "Site" as provided in the Consent Decree. Other definitions provided in the Consent Decree are incorporated herein by reference. In addition, the following definitions shall apply to this SOW.

   A.    "Remedial Design" shall mean an identification of the technology and its performance and operational specifications, in accordance with all applicable federal, state, and local laws, including, but not limited to:

      1.    all computations used to size units, determine the appropriateness of technologies, and the projected effectiveness of the system;

      2.    materials handling and system layouts for the excavation and dredging, if required, and treatment of contaminated soils and sediment, the extraction and treatment of groundwater, and the size and location of units, treatment rates, location of electrical equipment and pipelines, and the location of treatment effluent discharge area(s);

      3.    scale drawings of all system layouts identified above and including, but not limited to, excavation cross-sections, and well cross-sections;

      4.    quantitative analysis demonstrating the anticipated effectiveness of the Remedial Design to achieve the Performance Standards as defined in the ROD and Section IV of this SOW;

      5.    technical specifications which detail the following:

         a.    size and type of each major component; and

       b.     required performance criteria of each major component;

    6.    description of the extent of ambient air monitoring including equipment, monitor locations, and data handling procedures; and

    7.    description of access, land easements and/or other Institutional Controls required, to be supplied with the construction plans and specifications.

B.    Particular areas within the Site are generally defined as the areas identified in the ROD as follows and depicted on Figure SOW-1 (included as Attachment C):

    1.    East of South Street;
    2.    West of South Street;
    3.    Lewis Pond;
    4.    West Street Dam;
    5.    Former Mill Tailrace;
    6.    Settling Basin #2; and
    7.    Former Mill Building.

C.    "Area of Containment" or "AOC" shall mean the fenced area of the Site containing a soil and asphalt cover over asbestos-containing soils that were previously excavated from various areas of the Site. The size of the Area of Containment may be reduced in the event that contaminated soil from Settling Basin #2 is excavated and disposed of off-site as part of the Work. The AOC is shown on Figure SOW-1 and on Figure A-3 of the ROD.

D.    "Groundwater Compliance Boundary" shall mean the area depicted on Figure SOW-1 and delineated in Figure L-1 of the ROD.

E.    "Stetson Pond Dam" shall mean the dam impounding the Neponset River at the northeast end of Stetson Pond in Walpole, MA. Stetson Pond is generally depicted on Figure A-4 of the ROD.

III.    SELECTED REMEDY

The ROD describes the Remedial Action for the Site. The major components of the remedy are as follows:

    1.    Excavation and dredging with off-site disposal of contaminated soil and sediment West of South Street, East of South Street, in the Former Mill Tailrace, and in and along the Neponset River and Lewis Pond;

    2.    Extraction and treatment of contaminated groundwater posing a risk to surface waters and discharge of treated groundwater to the Former Mill Tailrace;

3.      Institutional Controls, including but not limited to environmental restrictions and easements, and the establishment of soil management practices on areas where contaminated soil will be left in place that will continue to pose a CERCLA risk, restrictions on the use of groundwater within the Groundwater Compliance Boundary, and at least yearly monitoring of compliance with all Institutional Controls; and

4.      Long term monitoring of all areas where contaminated soil will be left in place, as well as monitoring of groundwater to ensure that there are no exceedances of the Performance Standards for groundwater beyond the Groundwater Compliance Boundary.

IV.    PERFORMANCE STANDARDS

The Settling Defendants shall design, construct, operate, monitor, and maintain the Remedial Action in compliance with all statutes and regulations identified in Appendix D of the ROD and all requirements of the Consent Decree and this SOW.

In addition, the Settling Defendants shall achieve the following Performance Standards for the contaminated on-site soil, sediment, and groundwater. The Performance Standards for the Blackburn and Union Privileges Superfund Site are presented below:

A.      Groundwater Performance Standards

The Performance Standards for groundwater located outside of the Groundwater Compliance Boundary are specified by EPA in Table L-2 of the ROD and are included in Table B-2 of the SOW. The Settling Defendants shall monitor the groundwater at the Site to ensure that the concentration of each groundwater contaminant achieves compliance with the Performance Standard for the contaminant at any well that EPA requires for adequate verification that Performance Standards have been achieved outside the Groundwater Compliance Boundary.

The Performance Standards for groundwater shall be met outside the Groundwater Compliance Boundary (see Figure L-1 of the ROD) at all times.

B.      Soil Cleanup Levels

The cleanup levels for soil are specified by EPA in Table L-1 of the ROD and are included in Table B-1 of the SOW.

The Settling Defendants shall attain the Soil Cleanup Levels in soils beneath any currently existing buildings if the buildings and their foundations which are currently serving as a protective cover are removed, unless EPA approves an alternative approach with respect to such soils proposed by the Settling

3

Defendants.

C.    Sediment Cleanup Level

The cleanup level for sediment is specified by EPA in Table L-3 of the ROD and is included in Table B-3 of the SOW.

The Sediment Cleanup Level must be met at the completion of the Remedial Action for contaminated sediment in and along the Neponset River, Lewis Pond, and the Former Mill Tailrace.

D.    Surface Water Cleanup Levels

The cleanup levels for surface water are specified by EPA in Table L-4a and L-4b of the ROD, and are included in Tables B-4 and B-5 of the SOW. The point of compliance for surface waters shall be the Former Mill Tailrace.

E.    Additional Performance Standards

1. Wetlands and Floodplains Restoration

All work in wetlands and floodplains, including replication and restoration, shall be conducted in accordance with the Wetland and Floodplains Determination in the ROD, as well as all other ARARs identified for this component of the remedy. Best management practices will be used throughout the site to minimize adverse impacts on wetland and floodplain resources, including wildlife and its habitat. Damage to these resources will be mitigated through erosion control measures and proper re-grading and re-vegetation of the impacted area with indigenous species. Following excavation activities, wetlands will be restored or replicated consistent with the requirements of the federal and state wetlands protection laws. Any lost flood storage capacity from remedial activities within the 100-year floodplain will be restored.

The wetland and floodplain replication/restoration shall include at minimum: detailed plans illustrating all existing and proposed contour elevations; soil profiles for imported soils; a construction schedule; a planting plan including the number, size, and species of all plants; groundwater elevations; description of the replicated wetland function and values; physical features that replicate the habitat functions of the existing wetlands including coarse woody debris, snags and pit and mound topography; and a 5-year monitoring plan. The wetland and floodplain replication/restoration shall commence in the first growing season after the construction activity has been completed.

4

2.    Institutional Controls

Institutional Controls in the form of a Grant of Environmental Restriction and Easement that runs with the land and is enforceable under the laws of the Commonwealth of Massachusetts ("Commonwealth"), or in some other form acceptable to EPA after reasonable opportunity for review and comment by MA DEP, shall be implemented in order to prevent uses of the Site that may pose a risk to human health or have an adverse impact on the remedy. The Settling Defendants shall implement the Institutional Controls required pursuant to Section IX of the Consent Decree and the Institutional Controls Plan required under Section V.C of the SOW.

3.    Area of Containment

The Area of Containment and the fence surrounding the Area of Containment shall be monitored and maintained over the long-term in accordance with the ARARs in Table 12C-2 of the ROD. The Settling Defendants shall continue to perform all of the activities required by the September 1992 "Revised Draft Inspection and Maintenance Plan" for the Site, consistent with the schedules required by such Plan, until EPA approval or modification of the Operation and Maintenance Plan, required under Section VI.J of this SOW.

V.    REMEDIAL DESIGN

The Remedial Design activities required for the Blackburn and Union Privileges Superfund Site shall include, but are not limited to: (a) a Short Term Response Phase; and (b) a design phase. The Settling Defendants shall submit to EPA the required deliverables as stated herein for each of these Remedial Design activities. Except where expressly stated otherwise in this SOW, each deliverable shall be subject to review and approval or modification by EPA, after reasonable opportunity for review and comment by the Commonwealth, in accordance with Section XII of the Consent Decree (EPA Approval of Plans and Other Submissions).

It may be desirable for remedial design of the three major components of the Remedial Action – groundwater remediation, soil cleanup, and sediment cleanup – to proceed along separate timelines. Subject to EPA approval, the Settling Defendants may adopt such an approach, provided that the Settling Defendants submit a comprehensive project schedule that meets the overall deadlines specified in Sections V.C and V.D of the SOW, and that incorporates proposed schedules for the completion of each component.

A.    Short Term Response Phase

The Short Term Response Phase shall consist of developing and implementing a "Short-Term Response Plan" to immediately address contaminants in certain

areas and certain issues on an expedited basis:

Within 90 days after receipt of notice of the lodging of the Consent Decree, the Settling Defendants shall submit to EPA and the Commonwealth a "Short-Term Response Plan," outlining a comprehensive plan and schedule to:

1. Address the soil and sediment exceeding applicable Performance Standards located on Lot 33-257, as identified on the Walpole Tax Map, including, but not limited to, areas immediately adjacent to such lot in accordance with the Record of Decision.

2. implement a notification program and schedule for alerting the public not to contact Lewis Pond sediments or enter contaminated areas located adjacent to the Pond until the remediation of these areas is completed; and

3. begin coordination efforts with the operator of the Lewis Pond Dam to maintain water levels that limit exposure of contaminated sediments in Lewis Pond to the atmosphere until remediation of these areas is completed.

Within 7 days of notice of EPA's approval or modification of the "Short-Term Response Plan," the Settling Defendants shall begin to implement the activities contained therein. The Settling Defendants shall complete the activities in accordance with the approved schedule in the Short-Term Response Plan.

B. Remedial Design Work Plan, Project Operations Plan (POP), and Surface Water and Groundwater Monitoring Plan

The Settling Defendants shall develop a REMEDIAL DESIGN WORK PLAN, Project Operations Plan (POP), and SURFACE WATER AND GROUNDWATER MONITORING PLAN including any investigations necessary for developing the design, as well as implementing a long-term surface water and groundwater monitoring program.

Within 90 days after receipt of notice of lodging of the Consent Decree, the Settling Defendants shall submit a REMEDIAL DESIGN WORK PLAN, Project Operations Plan (POP), and SURFACE WATER AND GROUNDWATER MONITORING PLAN for review and approval or modification by EPA, after reasonable opportunity for review and comment by the Commonwealth. The deliverables shall contain a comprehensive schedule for completion of the tasks outlined therein for approval by EPA, after reasonable opportunity for review and comment by the Commonwealth.

1. The REMEDIAL DESIGN WORK PLAN shall include detailed descriptions of all activities to be undertaken in connection with

6

any investigations necessary for the design and implementation of the Remedial Action. The detailed descriptions shall contain a statement of purpose and objectives of the investigation, identification of the specific activities necessary to complete the investigation, and a detailed schedule for performance of the investigation. The REMEDIAL DESIGN WORK PLAN shall be consistent with Section VI of the Consent Decree (Performance of Work by Settling Defendants), and Section L of the ROD (Selected Remedy), the SOW, and EPA's current RD/RA guidance (OSWER Directive 9355.0-4a). The REMEDIAL DESIGN WORK PLAN shall describe in detail, at a minimum, the following activities to be undertaken during the Remedial Design Phase:

a.      Evaluation of sediment excavation and dewatering techniques in order to minimize the potential impacts to wetland areas that will be affected by the Remedial Action. The evaluation shall include a document which describes the comparative evaluation of techniques investigated based on the following minimum criteria:
1) implementability; 2) effectiveness in achieving the Cleanup Levels for sediment and soils; 3) costs; and 4) impacts to the affected wetlands;

b.      An investigation to establish an effective air monitoring program to be designed and implemented throughout the Remedial Action;

c.      A topographical or otherwise appropriate survey to delineate property boundaries, utilities, rights-of-way, and easements in order to establish the necessary Institutional Controls for the Site;

d.      Pre-design investigations focused on saturated zone hydrogeologic properties and groundwater treatability may be necessary to design the groundwater collection and treatment system, including:

i.      Saturated zone pumping test(s) to obtain data (e.g., hydraulic conductivity, specific yield, specific capacity, extent of groundwater capture) relevant to selection of extraction well or trench design parameters, such as the number of wells/trenches, their locations/depths, and the pumping rates necessary to achieve remedy objectives.

      ii.     Groundwater treatability testing to characterize extracted groundwater quality, evaluate the effectiveness of the proposed treatment processes, and assist in the final selection and sizing of treatment equipment.

      iii.    Review of effluent discharge options to determine whether options other than surface water discharge are more preferable (e.g., injection/infiltration of treated groundwater into the subsurface).

e.    Pre-design investigations to further delineate the areal and vertical extent of soils and sediments exceeding the relevant Cleanup Levels. As part of these investigations, the Settling Defendants shall perform testing to evaluate whether soils/sediments would be considered to be hazardous waste if removed for off-site disposal. In the event that such soils/sediments are determined to be hazardous waste once excavated or dredged, the Settling Defendants may perform treatability studies to develop a suitable mixture of stabilization agents to render the soils/sediments non-hazardous on-Site and thereby allow their disposal off-Site as non-hazardous waste. In addition, the Settling Defendants shall take borings and collect soil samples for laboratory analysis from the Settling Basin #2 area to evaluate whether stabilized soils that were placed in the Settling Basin #2 Containment Cell exhibit hazardous waste characteristics. Based on the results of these borings, EPA will determine whether the Settling Basin #2 area shall remain in place or must be shipped by the Settling Defendants to an appropriate off-site disposal facility in accordance with the ROD.

f.    Pre-design studies shall be conducted to assess the potential for contaminant transport downstream of Lewis Pond. These studies may include transport modeling or other evaluation methods to define potential depositional locations and shall include sampling in the Neponset River upstream of the Stetson Pond Dam.

g.    To supplement the analysis outlined in Appendix F to the ROD, pre-design studies shall include a re-evaluation of flood modeling to confirm the previous finding that the AOC/culvert can withstand a 100 year flood event. The stability of the culvert shall be re-evaluated with regard to

8

other modes of potential failure. In the event that any inadequacies are identified as determined by EPA, the Settling Defendants shall propose corrective measures to be performed as part of the Remedial Action portion of this SOW.  In addition, the September 1992 "Long-Term Inspection and Maintenance Plan, South Street Site, Walpole Massachusetts" shall be re-evaluated as to its adequacy and the findings incorporated into the O&M activities at the Site; and

h.      Any other investigations proposed by EPA or the Settling Defendants related to contamination at the Site and consistent with the ROD.

i.      Comprehensive schedule for completion of the tasks contained therein.

2.      The SURFACE WATER AND GROUNDWATER MONITORING PLAN shall consist of annual monitoring of select saturated overburden, and bedrock wells until implementation of the approved Project Operations Plan (POP) for the Remedial Action.  The SURFACE WATER AND GROUNDWATER MONITORING PLAN shall include the following:

a.      a detailed description of how field data will be interpreted and presented in subsequent annual monitoring reports including, but not limited to, statistical methods, iso-concentration contour plots, and groundwater potentiometric surface maps; and

b.      a well maintenance program which shall contain provisions for inspection, continued maintenance, repair, and prompt and proper abandonment, if necessary; and

c.      a schedule describing the surface water and groundwater monitoring activities.

In accordance with the approved SURFACE WATER AND GROUNDWATER MONITORING PLAN, the Settling Defendants shall submit to EPA and the Commonwealth the first annual SURFACE WATER AND GROUNDWATER MONITORING REPORT.  The Settling Defendants shall submit additional SURFACE WATER AND GROUNDWATER MONITORING REPORTS to EPA and the Commonwealth on an annual basis until approval or modification by EPA, after reasonable opportunity for review and comment by the Commonwealth, of the monitoring program developed under the

REVISED POP for the Remedial Action.

3.   A Project Operations Plan (POP) shall be prepared in support of all fieldwork to be conducted according to the REMEDIAL DESIGN WORK PLAN, as well as the SURFACE WATER AND GROUNDWATER MONITORING PLAN, and shall include, but not be limited to, the following:

   (1)   a Site Management Plan (SMP);

   (2)   a Sampling and Analysis Plan (SAP) which includes:

      (a)   a Quality Assurance Project Plan (QAPP); and

      (b)   a Field Sampling Plan (FSP)

   (3)   a site-specific Health and Safety Plan (HSP) submitted for review and comment; and

   (4)   a Community Relations Support Plan (CRSP).

The Settling Defendants shall prepare this POP in accordance with Attachment A.

C.   30% DESIGN SUBMISSION AND INSTITUTIONAL CONTROLS PLAN

Within 300 days of receiving EPA's approval or modification of the REMEDIAL DESIGN WORK PLAN and POP, the Settling Defendants shall submit to EPA the 30% REMEDIAL DESIGN for review and approval or modification by EPA, after reasonable opportunity for review and comment by the Commonwealth. The 30% submission shall include, at a minimum, the results of all field investigations, a discussion of how ARARs are being met by the design, the design criteria, the project delivery strategy, preliminary plans, drawings, sketches, and calculations, an outline of the required technical specifications, and a preliminary construction schedule and costs. The Settling Defendants and their contractor(s) shall meet twice with EPA prior to submission of the 30% REMEDIAL DESIGN to review the Settling Defendants' progress – once approximately 100 days after receiving EPA's approval or modification of the REMEDIAL DESIGN WORK PLAN and POP, and once approximately 200 days after receiving EPA's approval or modification of the REMEDIAL DESIGN WORK PLAN and POP.

Within 300 days of receiving EPA's approval or modification of the REMEDIAL DESIGN WORK PLAN and POP, the Settling Defendants shall submit to EPA an INSTITUTIONAL CONTROLS PLAN.

At a minimum, the INSTITUTIONAL CONTROLS PLAN shall include:

Plans and schedule for implementation of Institutional Controls for the Site including but not limited to: the form of the proposed restrictions, plans presenting the process by which any proposed Grants of Environmental Restriction and Easement will be recorded in the appropriate local land records office; plans for preparation of survey plans; plans identifying which parcels (or areas of parcels) are proposed for particular restrictions; title-related submittals; subordination agreements; evidence of authority; and responsibility for recordation.

Plans and schedule for compliance monitoring of implemented Institutional Controls by the Settling Defendants, including but not limited to: schedule for inspections; protocol for information to be gathered as part of the inspections (e.g. types of information to be discussed during interview); inspection checklist; list of evidence to be gathered during inspections; inspection reporting; and the identity of the person who will be performing compliance monitoring and reporting.

Where practicable, the Institutional Controls shall allow redevelopment of the Site, while still ensuring the effectiveness and integrity of the components of the Remedial Action and protecting human health and the environment.

At a minimum, the Institutional Controls shall prohibit the following activities:

1. Groundwater. In areas where groundwater contamination exceeds the Performance Standards provided in Table L-2 of the ROD (Table B-2 of this SOW), use of groundwater for drinking water, industrial process water, or other purposes shall be prohibited. Groundwater use restrictions shall be included in all Institutional Controls on parcels located within the Groundwater Compliance Boundary shown on Figure L-1 of the ROD.

Excavation or other activities that might result in exposure to groundwater that exceeds the Performance Standards provided in Table L-2 of the ROD (Table B-2 of this SOW) shall be prohibited, without EPA approval of such activities.

2. Surface Soils. In areas East and West of South Street and the Area of Containment where there are potential risks from exposure to surface and sub-surface soils, excavation and/or disturbance of such soils shall be prohibited, unless EPA approves such activities.

In the event activities that disturb such soils are approved by EPA, Institutional Controls shall further require adequate worker health and

11

safety precautions (e.g. engineering controls, personal protective equipment (PPE) and/or monitoring) to minimize or prevent direct contact with contaminated soil, and restrict potential on-site and off-site spread of contamination. In addition, such restrictions shall include a Soil Management Plan, to be approved by EPA, which would govern the performance of any approved activities at the Site that would disturb the soils.

For all parcels within the areas East and West of South Street and the Area of Containment that contain existing buildings, excavation or exposure of soils beneath such buildings shall be prohibited, unless performed in accordance with a Soil Management Plan approved by EPA. The Settling Defendants shall attain the Soil Cleanup Levels in soils beneath any currently existing buildings if the buildings and their foundations which are currently serving as a protective cover are removed, unless EPA approves an alternative approach with respect to such soils proposed by the Settling Defendants.

For all parcels within the areas East and West of South Street and the Area of Containment, Institutional Controls shall include a provision that prohibits any use that is inconsistent with the findings of the human health risk assessment in the ROD.

3. <u>Protection of Remedial Components</u>. Disturbance of any remedial components constructed or maintained as part of the Remedial Action, such as the Area of Containment, monitoring wells, or groundwater remediation components, shall be prohibited to the extent they interfere with the effectiveness of each of the remedial components.

4. <u>Other Restrictions</u>. Other restrictions necessary to protect human health and the environment and maintain the integrity of the Remedial Action may also be imposed, as required by EPA.

In addition, the Settling Defendants shall modify any existing environmental use restrictions on the Site property to ensure that they satisfy the requirements of the Consent Decree, the SOW and the ROD. Where practicable, the Settling Defendants shall incorporate flexibility into the existing restrictions to allow redevelopment of the Site, while still ensuring the effectiveness and integrity of the components of the Remedial Action and protecting human health and the environment.

Compliance with Institutional Controls shall be monitored and reported to regulators at least yearly. Compliance reports shall be incorporated into the Five-Year Reviews.

12

The Settling Defendants shall implement the Institutional Controls in accordance with the schedule outlined in the approved plan.  The Settling Defendants shall perform all components of the INSTITUTIONAL CONTROLS PLAN, with ongoing monitoring of the implemented Institutional Controls, continuing throughout the Remedial Design, Remedial Action and Operation and Maintenance phase.

D.    100% DESIGN SUBMISSION

Within 180 days of receiving EPA's approval or modification of the 30% REMEDIAL DESIGN from EPA, the Settling Defendants shall submit the 100% REMEDIAL DESIGN for review and approval.  This design submittal shall address 100% of the total Remedial Design for each component of the Remedial Action including, but not limited to:

1.    the final design plans and specifications in reproducible format;

2.    the final bid documents;

3.    drawings in a format acceptable to EPA;

4.    a Contingency Plan which shall address the on-site construction workers and the local affected population in the event of an accident or emergency;

5.    a Constructability Review report which evaluates the suitability of the project and its components in relation to the Site;

6.    a correlation of the design plans and specifications;

7.    a detailed statement of how ARARs are met, and a statement of all assumptions and all drawings and specifications necessary to support the analysis of compliance with ARARs;

8.    a schedule for implementation of the Remedial Action; and

9.    a summary of changes made to the 100% design based on EPA's and the Commonwealth's comments on the 30% design.

The Settling Defendants and their contractor(s) shall meet once with EPA prior to submission of the 100% REMEDIAL DESIGN to review the Settling Defendants' progress approximately 90 days after receiving EPA's approval or modification of the 30% REMEDIAL DESIGN.

VI.    REMEDIAL ACTION

The Remedial Action activities required for the Blackburn & Union Privileges Superfund Site shall include, but are not limited to: (a) remedial action work plan and REVISED POP; (b) initiation of construction; (c) pre-construction conference; (d) meetings during construction; and (e) operation and maintenance plan, environmental monitoring plan and REVISED POP. The Settling Defendants shall submit to EPA and the Commonwealth the required deliverables as stated herein for each of these Remedial Action activities. Each deliverable shall be subject to review and approval or modification by EPA, after reasonable opportunity for review and comment by the Commonwealth, in accordance with Section XII of the Consent Decree, EPA Approval of Plans and Other Submissions.

It may be desirable for performance of the three major components of the Remedial Action – groundwater remediation, soil cleanup, and sediment cleanup – to proceed along separate timelines. Subject to EPA approval, the Settling Defendants may adopt such an approach, provided that the Settling Defendants submit a comprehensive project schedule, incorporating proposed schedules for the completion of each component.

A.    Remedial Action Work Plan and Revised POP

After receiving EPA's approval or modification of the 100% REMEDIAL DESIGN, the Settling Defendants shall submit to EPA for review and approval or modification, after reasonable opportunity for review and comment by the Commonwealth, a REMEDIAL ACTION WORK PLAN and REVISED POP for implementing the Remedial Action and associated activities, consistent with the approved Remedial Design for the Site. The REMEDIAL ACTION WORK PLAN shall be submitted in accordance with the schedule contained in the approved 100% REMEDIAL DESIGN. The REMEDIAL ACTION WORK PLAN and REVISED POP shall contain, at a minimum:

1.    a description of all activities necessary to implement all components of the Remedial Action, in accordance with the Remedial Design, the SOW, the Consent Decree and the ROD, including but not limited to the following:

a.    award of project contracts, including all agreements with off-site treatment and/or disposal facilities;

b.    contractor mobilization/Site preparation, including construction of necessary utility hookups;

c.    construction, shake-down, and start-up of the groundwater extraction, treatment, and discharge system;

d.    demobilization of all treatment facilities; and

14

        e.     all other activities necessary to implement the Remedial Action as described in the Record of Decision.

    2.    a detailed schedule for the completion of all activities identified in Section VI.A.1, including the required deliverables identified therein and the Operation and Maintenance Plan and Environmental Monitoring Work Plan described in Section VI.E, and an identification of milestone events in the performance of the Remedial Action.

    3.    a REVISED POP shall be prepared in support of all fieldwork to be conducted according to the REMEDIAL DESIGN WORK PLAN. This REVISED POP shall be prepared in accordance with Section V.B.3 above.

B.    Pre-construction Conference

Within 30 days of receiving EPA's approval or modification of the REMEDIAL ACTION WORK PLAN, the Settling Defendants shall hold a PRE-CONSTRUCTION CONFERENCE. The participants shall include all parties involved in the Remedial Action, including but not limited to the Settling Defendants and their representatives, EPA, and the Commonwealth. The objective of this conference is to review roles and responsibilities and contact information, and to provide an overview of the construction schedule.

C.    Initiation of Construction

Within 30 days of receiving EPA's approval or modification of the REMEDIAL ACTION WORK PLAN AND REVISED POP, the Settling Defendants shall initiate all the Remedial Action activities specified in the approved schedule contained therein.

D.    Meetings During Construction

During the construction period, the Settling Defendants and their construction contractor(s) shall meet monthly with EPA and the Commonwealth regarding the progress and details of construction. If, during the construction of the Remedial Action for the Site, conditions warrant modifications of the design, construction, and/or schedules, the Settling Defendants may propose such design or construction or schedule modifications. Following approval by EPA, after reasonable opportunity for review and comment by Commonwealth, the Settling Defendants shall implement the design or construction modifications required.

E.    Operation and Maintenance Plan, Environmental Monitoring Work Plan, and Revised POP

In accordance with the schedule contained in the REMEDIAL ACTION WORK

15

PLAN, the Settling Defendants shall submit to EPA for review and approval or modification, after reasonable opportunity for review and comment by the Commonwealth, a) OPERATION AND MAINTENANCE PLAN to ensure the long-term, continued effectiveness of each component of the Remedial Action, b) an ENVIRONMENTAL MONITORING WORK PLAN to ensure conformance with the Performance Standards, and c) a REVISED POP. These plans shall include, at a minimum, the following:

1.      Operation and Maintenance Plan

      a.      a description of normal operations and maintenance;

      b.      a description of potential operational problems;

      c.      a description of routine process monitoring and analysis;

      d.      a description of contingency operation and monitoring;

      e.      an operational safety plan;

      f.      a description of equipment;

      g.      annual operation and maintenance budget;

      h.      recordkeeping and reporting requirements;

      i.      a well maintenance program including, at a minimum, the following:

            (1)      a provision for prompt and proper abandonment, as appropriate, of wells used during the RI/FS which are currently unusable or which become unusable during the Remedial Action activities;

            (2)      a provision for inspection, continued maintenance and repair, if necessary, of all wells used during the RI/FS and not abandoned;

            (3)      a provision for continued maintenance or abandonment of wells used during the RI/FS and additional wells used during the Remedial Design, Remedial Action and Operation and Maintenance phases.

      j.      a plan for site closure and post-closure monitoring, including but not limited to the Area of Containment (AOC), that includes the

16

following:

 (1) a cost estimate for post-closure care consistent with 40 C.F.R. Part 264;

 (2) a plan for establishment of a financial assurance mechanism for post-closure care consistent with 40 C.F.R. Part 264 and Section XIV of the Consent Decree (Performance Guarantee); and

 (3) a post-closure inspection schedule and provisions for implementing such activities consistent with 40 C.F.R. Part 264; and

 k. a description of all activities necessary to ensure that Performance Standards are maintained over the long term.

2. Environmental Monitoring Work Plan

The ENVIRONMENTAL MONITORING WORK PLAN shall involve monitoring to demonstrate conformance and compliance with the Performance Standards. At a minimum, this plan shall detail how the Settling Defendants will demonstrate that the Performance Standards listed in Section IV of this SOW have been or will be attained at the Site. This plan shall be developed in accordance with the requirements of 40 C.F.R. 264.97 and shall include at a minimum, the following:

 (1) sampling locations;

 (2) sampling frequency;

 (3) appropriate statistical modeling or other data interpretation techniques.

3. Revised POP

A REVISED POP shall be prepared in support of all fieldwork to be conducted according to the ENVIRONMENTAL MONITORING WORK PLAN. This REVISED POP shall be prepared in accordance with Section V.B.3 above. The previously prepared RD/RA POP may be updated/amended/revised as necessary to prepare this REVISED POP.

F. Final Construction Inspection

Within 30 days after the Settling Defendants conclude that the construction for

17

each major component (groundwater/surface water, soil, and sediment) has been fully (100% complete) performed, the Settling Defendants shall schedule and conduct FINAL CONSTRUCTION INSPECTION for each major component. This inspection shall include participants from all parties involved in the Remedial Action, including but not limited to the Settling Defendants and their contractors, EPA and the Commonwealth.

G.    Final Remedial Construction Reports

Within 90 days after the FINAL CONSTRUCTION INSPECTIONS, the Settling Defendants shall submit FINAL REMEDIAL CONSTRUCTION REPORTS for a) groundwater/surface water, (b) soil, and (c) sediment (entitled "Close-Out Reports") to EPA for approval or modification, after reasonable opportunity for review and comment by the Commonwealth. Each Close-Out Report shall include, at a minimum, the following documentation:

    a.    a summary of all procedures actually used (in chronological order).

    b.    tabulation of all analytical data and field notes prepared during the course of the Remedial Design and Remedial Action activities.

        (1)    QA/QC documentation of these results;

        (2)    presentation of these results in appropriate figures;

    c.    a description, with appropriate photographs, maps, and tables, of the disposition of the Site (including areas and volumes of soil, sediment, and fill placement and disturbance);

    d.    final, detailed cost breakdowns for each of the treatment process components;

    e.    conclusions regarding conformance of treatment processes with the Performance Standards; and

    f.    descriptions of actions taken and a schedule of any potential future actions to be taken.

H.    Demonstration of Compliance Report

At the completion of the period necessary to demonstrate compliance with the Performance Standards, the Settling Defendants shall submit to EPA for review and approval a DEMONSTRATION OF COMPLIANCE REPORT. The DEMONSTRATION OF COMPLIANCE REPORT shall contain all information necessary to demonstrate compliance with the Performance Standards.

I.    Operation and Maintenance

Within 30 days of receiving EPA's approval or modification of the Settling Defendants' final remedial construction reports for each component of the Remedial Action, the Settling Defendants shall implement all operation and maintenance activities in accordance with the terms and schedules set forth in the Operation and Maintenance Plan approved by EPA. If, during the implementation of operation and maintenance activities, conditions warrant modification or discontinuation of certain activities, the Settling Defendants may propose such modification or discontinuation to EPA, and may modify or discontinue such activities with EPA approval.

VII.    SUBMISSIONS REQUIRING AGENCY APPROVAL

A.    All plans, deliverables and reports identified in the SOW for submittal to EPA and the Commonwealth shall be delivered to EPA and Massachusetts Department of Environmental Protection in accordance with the Consent Decree and this SOW.

B.    Any plan, deliverable, or report submitted to EPA and the Commonwealth for approval shall be printed using two-sided printing and marked "Draft" on each page and shall include, in a prominent location in the document, the following disclaimer: "Disclaimer: This document is a DRAFT document prepared by the Settling Defendants under a government Consent Decree. This document has not undergone formal review by the EPA and the Massachusetts Department of Environmental Protection. The opinions, findings, and conclusions, expressed are those of the author and not those of the U.S. Environmental Protection Agency and the Massachusetts Department of Environmental Protection."

C.    Approval of a plan, deliverable or report does not constitute approval of any model or assumption used by the Settling Defendants in such plan, deliverable or report.

**ATTACHMENT A**
**PROJECT OPERATIONS PLAN**

Before any field activities commence, the Settling Defendants shall submit several site-specific plans to establish procedures to be followed by the Settling Defendants in performing field, laboratory, and analysis work. These site-specific plans include the:

    A.     Site Management Plan (SMP),
    B.     Sampling and Analysis Plan (SAP), and
    C.     Health and Safety Plan (HSP).
    D.     Community Relations Support Plan (CRSP)

These plans shall be combined to form the Project Operations Plan (POP). The existing RI/FS POP may serve as the basis for the RD/RA POP and will be updated/amended/revised as necessary in accordance with prevailing EPA guidance. The components of the POP are described in A. through D. herein.

The format and scope of each Plan shall be modified as needed to describe the sampling, analyses, and other activities that are clarified as the work progresses. EPA may modify the scopes of these activities at any time during work performed pursuant to this SOW at the discretion of EPA in response to the evaluation of sampling results, changes in sampling requirements, and other developments or circumstances.

A.     Site Management Plan (SMP)

    The Site Management Plan (SMP) shall describe how the Settling Defendants will manage the project to complete the Work required at the Site. The overall objective of the Site Management Plan is to provide EPA and MA DEP with a written understanding and commitment regarding how various project aspects such as access, security, contingency procedures, management responsibilities, waste disposal, budgeting, and data handling are being managed by the Settling Defendants. Specific objectives and provisions of the Site Management Plan shall include, but are not limited to the following:

        1.     Provide a map and a list of properties, the property owners, and addresses of owners to whose property access may be required.

        2.     Establish necessary procedures to delineate sampling areas and activities and ensure safety of workers.

        3.     Establish necessary procedures and provide sample letters to land owners to arrange field activities and to ensure EPA and MA DEP are informed of access-related problems and issues.

4.    Provide for the security of government and private property on the Site.

5.    Prevent unauthorized entry to the Site, which might result in exposure of persons to potentially hazardous conditions.

6.    Secure access agreements for all properties where field work is required.

7.    Communicate to EPA, Mass DEP, and the public the organization and management of all work activities, including key personnel and their responsibilities.

8.    Provide a list of contractors and subcontractors of the Settling Defendants for all work required under this SOW and a description of their activities and roles.

9.    Provide for the proper disposal of materials used and wastes generated during all work activities (e.g., drill cutting, extracted groundwater, protective clothing, disposable equipment). These provisions shall be consistent with the off-site disposal aspects of CERCLA, RCRA, and applicable state laws. The Settling Defendants, or their authorized representative(s), or another party acceptable to EPA, shall be identified as the generator of wastes for the purpose of regulatory or policy compliance.

10.   Provide plans and procedures for organizing and presenting the data generated and for verifying its quality before and during the RD/RA Sampling activities. These plans shall include a description of the computer database management systems that are compatible with hardware available to EPA Region I personnel for handling media-specific sampling results obtained before and during the RD/RA Sampling activities. The description shall include data input fields, examples of data base management output from the coding of all RD/RA Sampling data, appropriate quality assurance/quality control to ensure accuracy, and capabilities of data manipulation. To the degree possible, the data base management parameters shall be compatible with the EPA Region I data storage and analysis system.

B.    <u>Sampling and Analysis Plan (SAP)</u>

The Sampling and Analysis Plan (SAP) shall consist of both (1) a Quality Assurance Project Plan (QAPP) that describes the policy, organization, functional activities, and the quality assurance and quality control protocols necessary to achieve the data quality objectives dictated by the intended use of the data; and (2) the Field Sampling Plan (FSP) that provides guidance for all fieldwork by defining in detail the sampling and data-gathering methods to be used on a project. Components required by these two plans are described below.

The SAP shall be the framework of all anticipated field activities (e.g., sampling objectives,

evaluation of existing data, standard operating procedures) and contain specific information on all field work and analysis (e.g., sampling locations and rationale, sample numbers and rationale, analyses of samples). During the RD/RA Sampling activities, the SAP shall be revised as necessary to cover each round of field or laboratory activities. Revisions or a statement regarding the need for revisions shall be included in each deliverable describing all new field work.

The purpose of the SAP is to ensure that sampling data collection activities will be comparable to and compatible with previous data collection activities performed at the Site while providing a mechanism for planning and approving field activities. The overall objectives of the two documents comprising the SAP are as follows:

1.  to document specific objectives, procedures, and rationales for fieldwork and sample analytical work;

2.  to provide a mechanism for planning and approving Site and laboratory activities;

3.  to ensure that data of sufficient quality and quantity are obtained and used in a manner that satisfies the project objectives; and

4.  to provide a common point of reference to ensure the comparability and compatibility of all objectives and the sampling and analysis activities.

To achieve this last objective, the SAP shall document all field and sampling and analysis objectives as noted above, as well as all data quality objectives and specific procedures/protocols for field sampling, analysis, data validation, data evaluation, and project quality assessments.

The elements required for the SAP are identified in EPA Requirements for Quality Assurance Plans, QA/R-5. In addition, the following critical elements of the SAP shall be described for each sample medium (e.g., ground water, soil, and soil vapor) and for each sampling event:

1.  sampling objectives (e.g., engineering related, well yields, zone of influence, performance monitoring, demonstration of attainment, five year review, etc.);

2.  data quality objectives, including data uses and the rationale for the selection of analytical levels and detection limits (see Guidance on Systematic Planning using the Data Quality Objectives Process, EPA QA/G-4 (EPA/240-B-06/001), February 2006; Data Quality Objectives Decision Errors Feasibility Trials (DEFT) Software QA/G-4D (EPA/240/B-01/007, September 2001); and Final Guidance Data Usability in Risk Assessment (Part A) (publication 9285.7-09A, April 1992, PB92-963356); Guidance for Data Usability in Risk Assessment (Part B). (publication 9285.7-09B, May 1992, PB92-963362).

3.     site background update, including an evaluation of the validity, sufficiency, and sensitivity of existing data;

4.     sampling locations and rationale;

5.     sampling procedures and rationale and references;

6.     numbers of samples and justification;

7.     numbers of field blanks, trip blanks, and duplicates;

8.     sample media (e.g., ground water, surface water, soil, sediment, and air);

9.     sample equipment, containers, minimum sample quantities, sample preservation techniques, maximum holding times;

10.    instrumentation and procedures for the calibration and use of portable air, soil-, or water-monitoring equipment to be used in the field;

11.    chemical and physical parameters in the analysis of each sample;

12.    chain-of-custody procedures must be clearly stated (see <u>EPA NEIC Policies and Procedures Manual</u>, EPA 330/9-78 001-R May 1978, revised May 1986);

13.    procedures to eliminate cross-contamination of samples (such as dedicated equipment);

14.    sample types, including collection methods and if field and laboratory analyses will be conducted;

15.    analytical procedures, equipment, and detection limits;

16.    equipment decontamination procedures;

17.    consistency with the other parts of the Work Plan(s) by having identical objectives, procedures, and justification, or by cross-reference;

18.    analysis from each medium of selected analytes, as approved by EPA;

19.    for any limited field investigation (field screening technique), provisions for the collection and laboratory analysis of parallel samples and for the quantitative correlation analysis in which screening results are compared with laboratory results;

20.    data management, review, and validation procedures for field measurements,

field screening, field analyses, and laboratory analyses; and

21.    quality assessments to be performed for project activities (including but not limited to field activities, data management activities, and analytical activities).

The SAP and associated amendments shall allow for notifying EPA, at a minimum, three weeks before field sampling or monitoring activities commence.  The SAP shall also allow split, replicate, or duplicate samples to be taken by EPA (or their contractor personnel).  At the request of EPA, the Settling Defendants shall provide these samples in appropriately pre-cleaned containers to the government representatives.  Identical procedures shall be used to collect the Settling Defendants' and the parallel split samples unless otherwise specified by EPA.  Several references have been used to develop the existing SAP and shall be used to develop the SAP addenda.  These include:

1.    Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA (OSWER Directive 9355.3-01, EPA/540/G-89/004, October 1988);

2.    Test Methods for Evaluating Solid Waste, Physical/Chemical Methods (EPA Pub. SW-846, Third Edition, through Update IVB, February 2008 or most recent update);

3.    EPA Requirements for Quality Assurance Plans, QA/R-5 (EPA/240/B-01/003) March 2001, reissued May 2006;

4.    Region I, EPA-New England Quality Assurance Project Plan Program Guidance, Revision 1, April 2008;

5.    Guidance on Systematic Planning using the Data Quality Objectives Process, EPA QA/G-4 (EPA/240-B-06/001), February 2006;

6.    Uniform Federal Policy for Quality Assurance Project Plans (UFP), EPA-505-B-04-900C, March 2005;

7.    Systematic Planning: A Case Study for Hazardous Waste Site Investigations, EPA QA/CS-1 (EPA/240/B-06/004), February 2006;

8.    Guidance for Preparing Standard Operating Procedures (SOPs), EPA QA/G-6 (EPA/600/B-07/001), April 2007;

9.    Region I, EPA-New England Data Validation Functional Guidelines for Evaluating Environmental Analyses, Revised December 1996;

10.    Data Quality Assessment: A Reviewer's Guide, EPA QA/G-9R (EPA/240/B-06/002), February 2006;

11.  Data Quality Assessment: Statistical Methods for Practitioners, EPA QA/G-9S (EPA/240/B-06/003), February 2006;

12.  EPA Requirements for Quality Management Plans, QA/R-2 (EPA 240/B-01/002) March 2001 and reissued May 2006; and

13.  Guidance for Quality Assurance Project Plans, QA/G-5 (EPA/240/R-02/009) December 2002.

B.1.  Quality Assurance Project Plan (QAPP)

The existing RI/FS QAPP and its addenda will serve as the basis for the RD/RA QAPP. The QAPP shall document in writing the site-specific objectives, policies, organizations, functional activities, sampling and analysis activities, data evaluation activities, and specific quality assurance/quality control activities designed to achieve the data quality objectives (DQOs) of the RD/RA.

Project activities throughout the RD/RA shall comply with the QAPP. QAPP sampling and analysis objectives and procedures shall be consistent with EPA Requirements for Quality Assurance Plans (QA/R-5) and appropriate EPA handbooks, manuals, and guidelines including Guidance for Quality Assurance Project Plans, QA/G-5 (EPA/240/R-02/009) December 2002, Region I, EPA-New England Quality Assurance Project Plan Program Guidance, Revision 1, April 2008, and the Uniform Federal Policy for Quality Assurance Project Plans (EPA-UFP guidance, EPA-505-B-04-900C, March 2005).

All the QAPP elements identified in EPA QA/R-5 and EPA QA/G-5 must be addressed in the sum of the RD/RA QAPP and addenda.

As indicated in EPA QA/R-5 and EPA QA/G-5, a list of essential elements must be considered in the QAPP for the RD/RA. If a particular element is not relevant to a project and therefore excluded from the QAPP, specific and detailed reasons for exclusion must be provided.

Information in a plan other than the QAPP may be cross-referenced clearly in the QAPP provided that all objectives, procedures, and rationales in the documents are consistent, and the reference material fulfills requirements of EPA QA/R-5 and EPA QA/G-5. Examples of how this cross reference might be accomplished can be found in the Guidance for the Data Quality Objectives Process, QA/G-4 (EPA/600/R-96/055) and the Uniform Federal Policy for Quality Assurance Project Plans (EPA-UFP guidance, EPA-505-B-04-900C, March 2005). EPA-approved references, or equivalent, or alternative methods approved by EPA shall be used, and their corresponding EPA-approved guidelines should be applied when they are available and applicable.

A-6

<u>Laboratory QA/QC Procedures.</u>

The QA/QC procedures and Standard Operating Procedures ("SOPs") for any laboratory (both fixed and mobile) used during the RD/RA Sampling activities shall be included in the Settling Defendants' QAPP.  When this work is performed by a contractor to a private party, each laboratory performing chemical analyses shall meet the following requirements:

1.    be approved by the State Laboratory Evaluation Program, if available;

2.    have successful performance in one of EPA's National Proficiency Sample Programs (i.e., Water Supply or Water Pollution Studies or the Commonwealth's proficiency sampling program);

3.    be familiar with the requirements of 48 C.F.R. Part 1546 contract requirements for quality assurance; and

4.    have a QAPP for the laboratory including all relevant analysis.  This plan shall be referenced as part of the contractor's QAPP.

<u>Data Validation Procedures.</u>

The Settling Defendants are required to certify that a representative portion of the data has been validated by a person independent of the laboratory according to the <u>Region I, EPA-New England Data Validation Functional Guidelines for Evaluating Environmental Analyses</u>, Revised December 1996 (amended as necessary to account for the differences between the approved analytical methods for the project and the current Contract Laboratory Program Statements of Work (CLP SOW)).  A data validation reporting package as described in the guidelines cited above must be delivered at the request of the EPA project manager. Approved validation methods shall be contained in the QAPP.

The independent validator shall not be the laboratory conducting the analysis and should be a person with a working knowledge of or prior experience with EPA data validation procedures.  The independent validator shall certify that the data has been validated, discrepancies have been resolved if possible, and the appropriate qualifiers have been provided.

<u>Data Package Requirements.</u>

The Settling Defendants must require and keep the complete data package and make it available to EPA on request in order for EPA to conduct an independent validation of the data.  The complete data package shall consist of all results, the raw data, and all relevant QA/QC information. The forms contained in the data validation

A-7

functional guidelines must be utilized to report the data when applicable. Raw data includes the associated chromatograms and the instrument printouts with area and height peak results. The peaks in all standards and samples must be labeled. The concentration of all standards analyzed with the amount injected must be included. *All internal and external laboratory sample tracking information must be included in the data package.* An example data package deliverable is listed below:

1.  a summary of positive results and detection limits of non-detects with all raw data;

2.  tabulate surrogate recoveries and QC limits from methods 3500 and 8000 in SW-846 and all validation and sample raw data;

3.  tabulated matrix spike/matrix spike duplicate recoveries, relative percent differences, spike concentrations, and QC limits from methods 3500 and 8000 in SW-846 and all validation and sample raw data;

4.  associated blanks (trip, equipment, and method with accompanying raw data for tests);

5.  tabulated initial and continuing calibration results (concentrations, calibration factors or relative response factors and mean relative response factors, % differences and % relative standard deviations) with accompanying raw data;

6.  tabulated retention time windows for each column;

7.  a record of the daily analytical scheme (run logbook, instrument logbook) which includes samples and standards order of analysis;

8.  the chain of custody for the sample shipment groups, DAS packing slip, and DAS analytical specifications;

9.  a narrative summary of method and any problems encountered during extraction or analysis;

10.  tabulated sample weights, volumes, and % solids used in each sample calculation;

11.  example calculation for positive values and detection limits; and

12.  SW-846 method 3500 and 8000 validation data for all tests.

The forms contained in Chapter 1 of SW-846 (Second Edition 1982 as amended by Update I, April 1984, and Update II, April 1985) or the current CLP SOW forms must be utilized to report the data when applicable.

A-8

B.2    Field Sampling Plan (FSP)

The objective of the Field Sampling Plan is to provide EPA and all parties involved with the collection and use of field data with a common written understanding of all field work. The FSP should be written so that a field sampling team unfamiliar with the Site would be able to gather the samples and field information required. Guidance for the selection of field methods, sampling procedures, and custody can be acquired from the Compendium of Superfund Field Operations Methods (OSWER Directive 9355.0-14, EPA/540/P-87/001), December 1987, which is a compilation of demonstrated field techniques that have been used during remedial response activities at hazardous waste sites. The FSP shall be site-specific and shall include the following elements:

1.    Site Background. If the analysis of the existing Site details is not included in the Work Plan or in the QAPP, it must be included in the FSP. This analysis shall include a description of the Site and surrounding areas and a discussion of known and suspected contaminant sources, probable transport pathways, and other information about the Site. The analysis shall also include descriptions of specific data gaps and ways in which sampling is designed to fill those gaps. Including this discussion in the FSP will help orient the sampling team in the field.

2.    Sampling Objectives. Specific objectives of sampling effort that describe the intended uses of data must be clearly and succinctly stated.

3.    Sampling Location and Frequency. This section of the FSP identifies each matrix to be collected and the constituents to be analyzed. Tables shall be used to clearly identify the number of samples, the type of sample (water, soil, etc.), and the number of quality control samples (duplicates, trip blanks, equipment blanks, etc.). Figures shall be included to show the locations of existing or proposed sample points.

4.    Sample Designation. A sample numbering system shall be established for the project. The sample designation should include the sample or well number, the sample round, the sample matrix (e.g., surface soil, ground water, soil boring), and the name of the Site.

5.    Sampling Equipment and Procedures. Sampling procedures must be clearly written. Step-by-step instructions for each type of sampling that are necessary to enable the field team to gather data that will meet the Data Quality Objectives (DQOs). A list should include the equipment to be used and the material composition (e.g., Teflon, stainless steel) of equipment along with decontamination procedures.

A-9

6.    <u>Sampling Handling and Analysis.</u> A table shall be included that identifies sample preservation methods, types of sampling jars, shipping requirements, and holding times. Examples of paperwork such as traffic reports, chain-of-custody forms, packing slips, and sample tags filled out for each sample as well as instructions for filling out the paperwork must be included. Field documentation methods including field notebooks and photographs shall be described.

Each Field Sampling Plan submitted as a part of the Project Operations Plan for the RD/RA Sampling activities shall be sufficiently detailed to carry out the study, and shall provide data needed to address the objective of the study and to complete the study. Each study shall be designed to achieve a high performance on the first attempt. Each work plan shall be related (by cross-references) to the other requirements in the Project Operations Plan.

C.    <u>Health and Safety Plan (HSP)</u>

The objective of the site-specific Health and Safety Plan is to establish the procedures, personnel responsibilities and training necessary to protect the health and safety of all on-site personnel during all work activities. The plan shall provide procedures and plans for routine but hazardous field activities and for unexpected Site emergencies.

The site-specific health and safety requirements and procedures in the HSP shall be updated based on an ongoing assessment of Site conditions, including the most current information on each medium. For each field task during all work performed under this SOW, the HSP shall identify:

1.    possible problems and hazards and their solutions;

2.    environmental surveillance measures;

3.    specifications for protective clothing;

4.    the appropriate level of respiratory protection;

5.    the rationale for selecting that level; and

6.    criteria, procedures, and mechanisms for upgrading the level of protection and for suspending activity, if necessary.

The HSP shall also include the delineation of exclusion zones on a map and in the field. The HSP shall describe the on-site person responsible for implementing the HSP for the Settling Defendants' representatives at the Site, protective equipment personnel decontamination procedures, and medical surveillance. The following documents and resources shall be consulted:

1.  OSHA e-HASP Software – Version 1.0, September 2003
    (www.osha.gov/dep/etools/ehasp/index.html)

2.  Hazardous Waste Operations and Emergency Response (Department of
    Labor, Occupational Safety and Health Administration, (OSHA) 29 C.F.R.
    Part 1910.120); and

3.  Occupational Safety and Health Guidance Manual for Hazardous Waste Site
    Activities: Appendix B (NIOSH/OSHA/EPA 1986).

OSHA regulations at 40 C.F.R. Part 1910, which describe the routine emergency provisions
of a site-specific health and safety plan, and the OSHA e-HASP Software, shall be the
primary references used by the Settling Defendants in developing and implementing the
Health and Safety Plan.

The measures in the HSP shall be developed and implemented to ensure compliance with all
applicable state and Federal occupational health and safety regulations. The HSP shall be
updated at the request of EPA during the course of the RD/RA Sampling activities and as
necessary.

D.  Community Relations Support Plan (CRSP)

EPA shall develop a revised Community Relations Plan (CRP) to describe public information
and public involvement activities anticipated during the RD/RA and delisting. The Settling
Defendants shall also develop a CRSP, whose objective is to ensure and specify adequate
support from the Settling Defendants for the community relations efforts of EPA. This
support shall be at the request of EPA and may include:

1.  participation in public informational or technical meetings, including the provision of
    presentations, logistical support, visual aids and equipment;

2.  publication and copying of fact sheets or updates; and

3.  assistance in preparing a responsiveness summary after the public RD/RA comment
    period; and

4.  assistance in placing EPA public notices in print.

A-11

ATTACHMENT B:
PERFORMANCE STANDARD TABLES FROM THE
SEPTEMBER 30, 2008 RECORD OF DECISION

| Table B-1:  Soil Cleanup Levels for the Protection of Human Health | | | | |
|---|---|---|---|---|

**East of South Street On-Facility area (SB-09 area), Soil (0-10')**

| Carcinogenic Chemical of Concern | Cancer Classification | Interim Cleanup Level (mg/kg) | Basis | RME Risk [4] |
|---|---|---|---|---|
| Trichloroethene - vapor intrusion [1, 2] | B1 | 0.065 | risk [3] | 0.0000067 [5] |

| Non-Carcinogenic Chemical of Concern | Target Endpoint | Interim Cleanup Level (mg/kg) | Basis | RME Hazard Quotient |
|---|---|---|---|---|
| Trichloroethene - vapor intrusion [1, 2] | Neurological; Hepatic; Endocrine | 0.065 | risk [3] | 0.02 [6] |

**East of South Street On-Facility and the Old Railroad and Former Lower Mill Pond areas, Soil (0-10')**

| Carcinogenic Chemical of Concern | Cancer Classification | Interim Cleanup Level (mg/kg) | Basis | RME Risk |
|---|---|---|---|---|
| Benzo(a)anthracene | B2 | 5.1 | risk | 1E-05 |
| Benzo(a)pyrene | B2 | 2 | Background | 4E-05 |
| Benzo(b)fluoranthene | B2 | 5.1 | risk | 1E-05 |
| Dibenz(a,h)anthracene | B2 | 0.51 | risk | 1E-05 |
| Indeno(1,2,3-cd)pyrene | B2 | 5.1 | risk | 1E-05 |
| | | | | |
| Arsenic | A | 20 | Background | 2E-05 |
| Asbestos | A | Less than 1%; would not contribute to a cumulative ILCR > 1E-04 through dust inhalation pathway | ARAR and risk | 6E-06 |

| Non-Carcinogenic Chemical of Concern | Target Endpoint | Interim Cleanup Level (mg/kg) | Basis | RME Hazard Quotient |
|---|---|---|---|---|
| Arsenic | Integumental; Cardiovascular | 20 | Background | 0.41 |

**Residential Lot 33-257, Soil (0-10')**

| Non-Carcinogenic Chemical of Concern | Target Endpoint | Interim Cleanup Level (mg/kg) | Basis | RME Hazard Quotient |
|---|---|---|---|---|
| Lead | Developmental | 400 | IEUBK | N/A [7] |

**Key**

1. Based on inhalation of indoor air following modeling from soil gas data.  Soil gas concentrations were back-modeled to soil concentrations using the Johnson & Ettinger model and site-specific information.

2. Based on the upper range of the unit risk estimates proposed by EPA (1.1E-04 per ug/m$^3$).

3. Interim Cleanup Level for TCE based on an ILCR of 10$^{-5}$ for the site worker as the most sensitive receptor for indoor air exposures.

4. Risk and hazard quotients presented are for a future day care child, unless otherwise noted.

5. Risk presented is for a future day care child; risk for future site worker is 10$^{-5}$.

6. Hazard quotient presented is for a future day care child; the hazard quotient for a future site worker is also 0.02.

7. Interim Cleanup Level is protective of a young child (age < 2 years), based on residential use of Lot 33-257.

ARAR - Applicable and Relevant and Appropriate Requirements

IEUBK - Integrated Exposure Uptake Biokinetic Model for Lead in Children

N/A - Not Applicable

RME - Reasonable Maximum Exposure

Cancer Classification

A -  Human carcinogen

B1 - Probable human carcinogen - Indicates that limited human data are available

B2 - Probable human carcinogen - indicates sufficient evidence in animals and inadequate or no evidence in humans

B-1

| Table B-2:  Interim Groundwater Cleanup Levels - Residential Scenario | | | | |
|---|---|---|---|---|
| **Carcinogenic Chemical of Concern** | **Cancer Classification** | **Interim Cleanup Level** <br><br> **(ug/L)** | **Basis** | **RME Risk** |
| Benzene | A | 5 | MCL | 7E-06 |
| Ethylbenzene | Likely | 700 | MCL | 4E-05 |
| Methylene chloride | B2 | 5 | MCL | 6E-07 |
| Trichloroethene | B1 | 5 | MCL | 6E-05 |
| | | | | |
| Benzo(a)anthracene | B2 | 0.1 | PQL | 2E-06 |
| Benzo(a)pyrene | B2 | 0.2 | MCL | 4E-05 |
| Benzo(b)fluoranthene | B2 | 0.1 | PQL | 2E-06 |
| bis(2-Ethylhexyl)phthalate | B2 | 6 | MCL | 3E-06 |
| Carbazole | B2 | 1.8 | risk | 1E-06 |
| Dibenz(a,h)anthracene | B2 | 0.1 | PQL | 2E-05 |
| Indeno(1,2,3-cd)pyrene | B2 | 0.1 | PQL | 2E-06 |
| | | | | |
| Arsenic | A | 10 | MCL | 3E-04 |
| **Non-Carcinogenic Chemical of Concern** | **Target Endpoint** | **Interim Cleanup Level** <br><br> **(ug/L)** | **Basis** | **RME Hazard Quotient** |
| Benzene | Hematological; Immunological | 5 | MCL | 2E-01 |
| Ethylbenzene | Hepatic; Renal | 700 | MCL | 1E+00 |
| Toluene [1] | Renal; Hepatic | 1000 | MCL | 8E-01 |
| Trichloroethene | Hepatic; Renal; Developmental; Immunological | 5 | MCL | 2E+00 |
| Styrene [1] | Hematological; Hepatic; Renal | 100 | MCL | 6E-02 |
| | | | | |
| bis(2-Ethylhexyl)phthalate | Hepatic | 6 | MCL | 6E-02 |
| 2-Methylnaphthalene [2] | Respiratory | 5 | HQ | 1E+00 |
| 4-Methylphenol | Neurological; Respiratory; Developmental; Whole Body | 49 | HQ | 1E+00 |
| Naphthalene [2] | Whole Body | 6 | HQ | 1E+00 |
| | | | | |
| Antimony | Whole Body; Hepatic | 6 | MCL | 1E+00 |
| Arsenic | Integumental; Cardiovascular | 10 | MCL | 3E+00 |
| Chromium | None observed | 100 | MCL | 5E+00 |
| Lead | Developmental | 15 | MCL | N/A |
| Manganese | Neurological | 300 | Health Advisory | 1E+00 |
| Nickel | Whole Body; Hepatic | 210 | HQ | 1E+00 |
| Vanadium | Renal | 45 | HQ | 1E+00 |
| Zinc | Blood | 3100 | HQ | 1E+00 |
| | | | | |
| pH [3] | N/A | < 8.5 | MCL [3] | N/A |

**Key**

Health Advisory - Lifetime Health Advisory presented in EPA-822-R-04-005; Winter 2004

HQ - Hazard Quotient

MCL - Maximum Contaminant Level

NA - Not applicable

RME - Reasonable Maximum Exposure

1. This contaminant did not exceed a hazard quotient of 1 during calculations.  However, the maximum detected concentration exceeded its MCL.  Therefore, the interim cleanup level has been established as the MCL.

2. Interim Cleanup Level presented includes ingestion, dermal contact, and inhalation pathways.

3. Unit for pH is s.u.; Value is secondary MCL (6.5 - 8.5); Because elevated pH conditions are the concern at this site, the PRG is stated as <8.5.

Cancer Classification

A - Human carcinogen

B1 - Probable human carcinogen - Indicates that limited human data are available

B2 - Probable human carcinogen - indicates sufficient evidence in animals and inadequate or no evidence in humans

| Table B-3:  Sediment Cleanup Levels for the Protection of Human Receptors | | | | |
|---|---|---|---|---|
| **Lewis Pond and Former Mill Tailrace** | | | | |
| **Carcinogenic Chemical of Concern** | **Cancer Classification** | **Interim Cleanup Level (mg/kg)** | **Basis** | **RME Risk** |
| Asbestos | A | Less than 1%;  would not contribute to  a cumulative ILCR > 1E-04 through dust inhalation pathway | ARAR and risk | N/A |

**Key**

ARAR - Applicable and Relevant and Appropriate Requirements

RME - Reasonable Maximum Exposure

N/A - Not Applicable

ILCR - Incremental Lifetime Cancer Risk

Cancer Classification

A  -  Human carcinogen

| Table B-4:  Surface Water Cleanup Levels - Wader Scenario | | | | |
|---|---|---|---|---|
| **Non-Carcinogenic Chemical of Concern** | **Target Endpoint** | **Interim Cleanup Level (s.u.)** | **Basis** | **RME Hazard Quotient** |
| pH | N/A | 6.5 - 8.3 | Massachusetts Surface Water Quality Regulations | N/A |

**Key**

N/A - Not Applicable

| Table B-5:  Surface Water Cleanup Levels for the Protection of Ecological Receptors | | | | | | |
|---|---|---|---|---|---|---|
| **Habitat Type/Name** | **Exposure Medium** | **COC** | **Protective Level** | **Units** | **Basis** | **Assessment Endpoint** |
| Former Mill Tailrace and Lewis Pond | Surface Water | Aluminum | 87 [1] | ug/L | NRWQC - Freshwater Aquatic Life | Survival and growth of potential fish and invertebrate communities |
| | | Copper | 4.4 [2] | ug/L | NRWQC - Freshwater Aquatic Life | |
| | | Lead | 1 [2] | ug/L | NRWQC - Freshwater Aquatic Life | |
| | | pH | 6.5 - 8.3 | s.u. | Massachusetts Surface Water Quality Regulations | |

Notes:

COC – Chemical of Concern

NRWQC - National Recommended Water Quality Criterion

1. Expressed as total recoverable metal.

2. NRWQC is hardness dependent; a hardness of 44 mg/L for the Neponset River is assumed.

B-3

# APPENDIX C



**FIGURE SOW-1**
**GENERAL SITE PLAN**
**STATEMENT OF WORK**
**REMEDIAL DESIGN/REMEDIAL ACTION**
**BLACKBURN & UNION PRIVILEGES SUPERFUND SITE**

LEWIS POND AREA

LOT 33-360

LOT 33-257

LOWER FORMER MILL TAILRACE

WEST STREET DAM

GROUNDWATER COMPLIANCE BOUNDARY

UPPER FORMER MILL TAILRACE

WETLAND 7 (AS DESIGNATED IN THE BERA)

AREA OF CONTAINMENT

SETTLING BASIN NO. 2 CONTAINMENT CELL

FORMER MILL BUILDING

WEST OF SOUTH STREET AREA

EAST OF SOUTH STREET AREA

**Legend**

| | |
|---|---|
| | GROUNDWATER COMPLIANCE BOUNDARY |
| | WEST OF SOUTH STREET AREA |
| | EAST OF SOUTH STREET AREA |
| | LEWIS POND AREA |
| | LOT 33-257 AND LOT 33-360 |
| | NEPONSET RIVER |
| | LOWER FORMER MILL TAILRACE |
| | UPPER FORMER MILL TAILRACE |
| | WETLAND AREA 7 (AS DESIGNATED IN THE BERA) |
| | AREA OF CONTAINMENT AREA |
| | SETTLING BASIN NO. 2 CONTAINMENT CELL |

Notes:

1. The boundaries and areas depicted on this figure should be considered approximate only, and are based on site observations and designations defined in the Record of Decision, Remedial Investigation (RI) Report, RI Addendum Report, and/or Feasibility Study Report.

2. Property lines depicted on this figure are based on the Town of Walpole property tax maps.

3. The upper and lower portions of the Former Mill Tailrace are based on designations presented in the Baseline Ecological Risk Assessment (BERA), which is part of the 2007 RI Addendum Report.

N

**GRAPHICAL SCALE**
0    200    400
Feet

# APPENDIX D

# APPENDIX D

## Settling Defendants

BIM Investment Corporation

Shaffer Realty Nominee Trust

Tyco Healthcare Group LP

W.R. Grace & Co.-Conn., for itself and on behalf of W.R. Grace & Co. and Remedium Group, Inc. (the "Grace-Affiliated Entities"), but only to the extent that the Grace-Affiliated Entities' alleged liability with respect to the Site is based on their status as the parent or sister company of W.R. Grace & Co.-Conn., and not to the extent that the Grace-Affiliated Entities' alleged liability arose independently of such status

# APPENDIX E

[CERCLA Financial Assurance Sample Performance Bond:  Draft of July 2005]

[Letterhead of Bond Issuer]

## PERFORMANCE BOND

Surety's Performance Bond Number:  _____

Date of Execution of Performance Bond:  _____

Effective Date of Performance Bond:  _____

Total Dollar Amount of Performance Bond:  $13,000,000.00

Principal:

    Legal Name and Address:    Tyco Healthcare Group LP
    675 McDonnell Blvd.
    Hazelwood, MO  63042

    Type of Organization:    Limited Partnership

    State of Organization:    Delaware

Surety:

    Legal Name and Address:    TBD

    Type of Organization:

    State of Organization:

Beneficiary:

    Legal Name and Address:    EPA Regional Administrator or Regional Superfund
    Director for EPA Region [ I ] (or any of their
    designees)
    5 Post Office Square, Suite 100
    Boston, MA  02109

Site Information:

    Name and Location of Site:    Blackburn & Union Privileges Superfund Site
    Walpole, MA

    EPA Identification Number:    0101713

    Agreement Governing Site Work:    Consent Decree dated ___, 2010, by and among the
    United States of America, and BIM Investment
    Corporation, Shaffer Realty Nominee Trust, Tyco
    Healthcare Group LP, and W. R. Grace & Company
    – Conn (the Agreement)

1

KNOW ALL PERSONS BY THESE PRESENTS, THAT:

WHEREAS, said Principal is required, under the above-described Agreement entered pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), to perform the "Work" as defined in such Agreement (hereinafter, the "Work") and to fulfill its other obligations as set forth therein; and

WHEREAS, said Principal is required by the Agreement to provide financial assurance securing its full and final completion of the Work.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      The Principal and Surety hereto are firmly bound to the United States Environmental Protection Agency (hereinafter, "EPA"), $13,000,000. for the performance of the Work, which we, the Principal and Surety, bind ourselves, our heirs, executors, administrators, successors, and assigns, jointly and severally, subject to and in accordance with the terms and conditions hereof.

2.      The conditions of the Surety's obligation hereunder are such that if the Principal shall promptly, faithfully, fully, and finally complete the Work in accordance with the terms of the Agreement, the Surety's obligation hereunder shall be null and void; otherwise it is to remain in full force and effect.

3.      The Surety shall become liable on the obligation evidenced hereby only when the Principal fails to perform all or any part of the Work pursuant to and in accordance with the terms of the Agreement.  At any time and from time to time upon notification by the EPA Regional Administrator or Regional Superfund Director for EPA Region [1] (or any of their designees) that the Principal has failed to perform all or any part of the Work, the Surety shall promptly (and in any event within fifteen (15) days after receiving such notification):

(a)      Commence to complete the Work to be done under the Agreement in accordance with its terms and conditions; or

(b)      Pay funds up to the Total Dollar Amount  in such amounts and to such person(s), account(s), or otherwise as the EPA Regional Administrator or

Regional Superfund Direction (or their designee) may direct.

If the Surety does not render such performance set forth above within the specified 15-day period, the Surety shall be deemed to be in default of this Performance Bond and EPA shall be entitled to enforce any remedy available to it at law, in equity, or otherwise; provided, however, that if such default is susceptible of cure but cannot reasonably be cured within such fifteen (15) day period and provided further that Surety shall have commenced to cure such default within such fifteen (15) day period and thereafter diligently proceeds to perform the same, such fifteen (15) day period shall be extended for such time as is reasonably necessary for Surety in the exercise of due diligence to cure such default, such additional period not to exceed ninety (90) days.

4.    The liability of the Surety shall not be discharged by any payment or succession of payments hereunder, unless and until such payment or payments shall amount in the aggregate to the Total Dollar Amount of this Performance Bond, but in no event shall the aggregate obligation of the Surety hereunder exceed the amount of said sum.

5.    The Surety may cancel this Performance Bond only by sending notice of cancellation to the Principal and to the EPA Regional Administrator for EPA Region [ ], provided, however, that no such cancellation shall be effective during the 120-day period beginning on the date of receipt of the notice of cancellation by both the Principal and the EPA Regional Administrator. If after ninety (90) days of such 120-day period, the Principal has not established a replacement financial assurance mechanism pursuant to and in accordance with the terms of the Agreement, EPA shall have the right to enforce performance and/or draw upon the full amount of this Performance Bond.

6.    The Principal may terminate this Performance Bond only by sending written notice of termination to the Surety and to the EPA Regional Administrator for EPA Region [ ], provided, however, that no such termination shall become effective unless and until the Surety receives written authorization for termination of this Performance Bond by the EPA Regional Administrator (or his or her designee).

7.    Any modification, revision, or amendment which may be made in the terms of the Agreement or in the Work to be done thereunder, or any extension of the Agreement, or other forbearance on the part of either the Principal or EPA to the other, shall not in any way release the Principal and the Surety, or either of them, or their heirs, executors, administrators, successors or assigns from liability hereunder. The Surety hereby expressly waives notice of any change, revision, or amendment to the Agreement or to any related obligations between the Principal and EPA.

8.    The Surety will immediately notify EPA of any of the following events: (a) the filing by the Surety of a petition seeking to take advantage of any laws relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts; (b) the Surety's consent to (or failure to contest in a timely manner) any petition filed against it in an involuntary

3

case under such bankruptcy or other laws; (c) the Surety's application for (or consent to or failure to contest in a timely manner) the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator, or the like of itself or of all or a substantial part of its assets; (d) the Surety's making a general assignment for the benefit of creditors; or (e) the Surety's taking any corporate action for the purpose of effecting any of the foregoing.

9.      Any provision in this Performance Bond that conflicts with CERCLA or any other applicable statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or legal requirement shall be deemed incorporated herein.

10.    All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery,  to the address shown on this first page of this Performance Bond.

All notices, elections, requests and demands under this Performance Bond shall be effective and deemed received upon the earliest of (a) the actual receipt of the same by personal delivery or otherwise, (b) one (1) business day after being deposited with a nationally recognized overnight courier service as required above, or (c) three (3) business days after being deposited in the United States mail as required above. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, election, request, or demand sent.

11.    The Surety hereby agrees that the obligations of the Surety under this Performance Bond shall be in no way impaired or affected by any winding up, insolvency, bankruptcy or reorganization of the Principal or by any other arrangement or rearrangement of the Principal for the benefit of creditors.

12.    No right of action shall accrue on this Performance Bond to or for the use of any person other than EPA or the executors, administrators, successors or assigns of EPA.

**[SIGNATURES ON FOLLOWING PAGE]**

4

**IN WITNESS WHEREOF**, the Principal and Surety have executed this Performance Bond and have affixed their seals on the date set forth above.

The persons whose signatures appear below hereby represent, warrant, and certify that they are authorized to execute this Performance Bond on behalf of the Principal and Surety, respectively.

PRINCIPAL:    Tyco Healthcare Group LP, a limited partnership organized and in good standing in the State of Delaware

Attest: _____    By: _____

Name: _____    Name: _____

Title: _____

SURETY:    [_____],
A [corporation/partnership/limited liability company] organized and in good standing in the State of [_____]

Attest: _____    By: _____

Name: _____    Name: _____

Title: _____

5

## CORPORATE ACKNOWLEDGMENTS

STATE OF _____ )
                              SS:
COUNTY OF _____ )

    On _____, 200_, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STATE OF _____ )
                              SS:
COUNTY OF _____ )

    On _____, 200_, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

6

# APPENDIX F

(This form may be used for all federal Superfund Sites in the
Commonwealth of Massachusetts, except for federal facilities.)

## GRANT OF ENVIRONMENTAL RESTRICTION AND EASEMENT
### 42 U.S.C. § 9601, *et seq.* [, and M.G.L. c. 21E, § 6]
*[reference Chapter 21E only if MassDEP is a Grantee]*

*[Note: This instrument is established as an
institutional control for a federal Superfund site
pursuant to _____ [add reference
to Governing Agreement and any separate
agreement with the landowner], as set forth below,
and contains a GRANT OF ENVIRONMENTAL
RESTRICTION AND EASEMENT running to [the
UNITED STATES on behalf of its
ENVIRONMENTAL PROTECTION AGENCY]
[and/or] [the MASSACHUSETTS DEPARTMENT
of ENVIRONMENTAL PROTECTION]]*

Disposal Site Name: _____
Site Location: _____ [Town/City], MA
EPA Site Identification Number: _____
MassDEP Release Tracking No. ___-_____

    This GRANT OF ENVIRONMENTAL RESTRICTION AND EASEMENT (the
"Grant") is made as of this ____ day of _____, 20__, by _____, of
_____ [insert property owner's address] ("Grantor").

## W I T N E S S E T H:

    WHEREAS, Grantor is the owner in fee simple of that [those] certain parcel(s) of
[vacant] land located in _____ [insert Town/City], _____ County,
Massachusetts, [with the buildings and improvements thereon], pursuant to [a deed recorded with
the _____ Registry of Deeds in Book _____, Page _____]; [*or insert source
of title other than by deed*]; and/or [Certificate of Title No. _____ issued by the Land
Registration Office of the_____ Registry District];

    WHEREAS, said parcel(s) of land, known and/or numbered as
_____, which is [are] more particularly bounded and described in Exhibit A
("Legal Description of the Property"), attached hereto and made a part hereof (the "Property"), is
[are] subject to this Grant. The Property is shown on [a plan entitled "_____"
prepared by _____, dated _____, recorded with the
_____ Registry of Deeds in Plan Book _____, Plan _____], and/or on [Land Court Plan
No. _____] [shown as Lot _____];

Revised April 30, 2007

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
Page 2 of 16

[WHEREAS, that [those] certain portion(s) of the Property subject to restrictions has [have] been designated _____ [*list names of each type of restricted area, such as "Area A" or "the Cap Area"—this reference, legal descriptions and survey plan must use internally consistent terminology*] ([collectively, all of the foregoing restricted areas comprising the "Restricted Area");]

[WHEREAS, the Restricted Area is bounded and described in Exhibit A-1 ("Legal Description of the Restricted Area"), attached here to and made a part hereof;]

[WHEREAS, the Restricted Area is shown on a plan [*refers to a survey plan showing the restricted area and perimeter of each subdivided lot comprising the portion of the Property where the Restricted Area is located*] consisting of ____ sheet(s), entitled "Plan of Restricted Area" prepared by _____, dated _____, and recorded in the _____ Registry of Deeds in Plan Book ____, Plan ____; [and on a sketch plan attached hereto and filed herewith for registration]] [*note that a full-size plan must be recorded on the unregistered side, even for registered land*];

WHEREAS, the Property [and the Restricted Area] is [are] subject to covenants, restrictions, easements and other rights and obligations under the terms and conditions of this instrument;

WHEREAS, [a portion of] the Property [is part of] [contains] a federal Superfund Site, known as the _____ Superfund Site (the "Site"). The U.S. Environmental Protection Agency, an agency established under the laws of the United States, having its New England regional office at One Congress Street, Boston, Massachusetts 02114 ("EPA"), pursuant to Section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9605, placed the Site on the National Priorities List, set forth at 40.C.F.R. Part 300, Appendix B, by publication in the Federal Register on _____, ___ Fed. Reg. _____, due to a release of hazardous substances, as that term is defined by the Section 104 of CERCLA, 42 U.S.C. § 9604.

WHEREAS, the Massachusetts Department of Environmental Protection, a duly constituted agency organized under the laws of the Commonwealth of Massachusetts, having its principal office at One Winter Street, Boston, Massachusetts 02108 ("MassDEP"), as a result of the release of oil and/or hazardous materials at the Property, as those terms are defined in the Massachusetts Oil and Hazardous Materials Release, Prevention and Response Act, M.G.L. c. 21E, as amended ("Chapter 21E"), has placed [a portion of] the Property on the Massachusetts List of Confirmed Disposal Sites and Locations to be Investigated pursuant to Chapter 21E and the Massachusetts Contingency Plan, 310 CMR 40.0000 (the "MCP"), has classified [such portion of] the Property as a Tier IA disposal site and has assigned to thereto MassDEP Release Tracking Number(s) _____;

WHEREAS, in a document entitled, "Record of Decision, _____ Superfund Site," dated _____ [ *include in this definition any ROD Amendments or Explanations of Significant Differences*] (the "ROD"), said ROD being on file at the United States Environmental Protection Agency, Region I ("EPA") Record Center located at One Congress Street, Boston, Massachusetts, EPA, with the concurrence of MassDEP on

_____ *[fill in date of State concurrence letter]*, has selected one or more response actions (collectively, the "Selected Remedy") for the Site in accordance with CERCLA, 42 U.S.C. §§ 9601, *et seq.*, and the National Contingency Plan, 40 CFR §§ 300.1, *et seq.* (the "NCP");

WHEREAS, the Selected Remedy is based, in part, upon the restriction of human access to and contact with hazardous substances in soil and groundwater; and the restriction of certain uses and activities occurring in, on, through, over or under the Property;

*[Using one of the two sample paragraphs below as a model, identify the **Performing Party** (the person including a federal agency who developed the GERE and is applying to MassDEP to accept it) and the **Governing Agreement** (the agreement, in addition to the ROD, pursuant to which the Performing Party developed the GERE, such as a consent decree, administrative order on consent, or other agreement; for a fund-lead site, the ROD typically would serve as the Governing Agreement)]*

[WHEREAS, _____, a _____ corporation having a mailing address of _____ (the "Performing Party") is performing a portion of the Selected Remedy pursuant to a consent decree (the "Consent Decree" also referred to herein as the "Governing Agreement") entered into with the United States and the Commonwealth of Massachusetts in the [consolidated] actions captioned *U.S. v.* _____. and *Commonwealth of Massachusetts v.* _____, Docket Numbers _____ and _____ (D. Mass.), respectively;]

[WHEREAS, the United States of America, acting through EPA (the "Performing Party"), having entered into a Superfund State contract for _____ *[reference Site and Operable Unit]* with the Commonwealth of Massachusetts, acting through MassDEP, entitled, "_____" and dated _____" on file at each agency, and pursuant to the ROD (also referred to herein as the "Governing Agreement"), is performing the Selected Remedy;

[WHEREAS, MassDEP, pursuant to Sections 3(a) and 6 of Chapter 21E, is authorized to take all action appropriate to secure to the Commonwealth the benefits of CERCLA and to acquire an interest in real property if necessary to carry out the purposes of Chapter 21E, and is willing to accept this Grant as joint Grantee with the United States or as sole Grantee, as the case may be;]

WHEREAS, EPA has approved a plan entitled "_____," prepared on behalf of _____, by _____, and dated _____ (the "Compliance Inspection and Reporting Plan"), a copy of which is attached hereto as Exhibit B, and which is on file at the EPA Record Center located at One Congress Street, Boston, Massachusetts;

*[The following paragraph should only be included if Grantor is responsible in Section 5 ("Obligations and Conditions") for performing operations and maintenance described in the*

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
_____
Page 4 of 16

*operation and maintenance plan for the Selected Remedy. Also, this paragraph and the*
*preceding paragraph may be combined, if the ROD and/or SOW contemplate that the operation*
*and maintenance plan will incorporate the compliance inspection and reporting plan as a*
*component of it. In such cases, the compliance inspection and reporting plan should at a*
*minimum be separately noted in the combined paragraph.]*

    [WHEREAS, EPA has approved a plan entitled "_____,"
prepared on behalf of "_____, by _____," effective _____, and dated
_____ (the "Operation and Maintenance Plan"), a copy of which is attached hereto as
Exhibit B-1, and which is on file at the EPA Record Center located at One Congress Street,
Boston, Massachusetts;] [and]

    *[If EPA entered into a separate agreement with the landowner, add the following*
*paragraph.]*

    [WHEREAS, Grantor and the United States of America, acting through EPA, entered
into an agreement styled "_____," effective _____,
EPA Docket Number CERCLA _____ (the "Agreement"), a copy of which is on file at
the EPA Record Center located at One Congress Street, Boston, Massachusetts, in which Grantor
agreed to perform certain response actions at the Site, including without limitation to implement
environmental restrictions and an access easement such as the within Grant, pursuant to
Paragraph ___ ("Access and Institutional Controls") of the Agreement;]

    NOW, THEREFORE, pursuant to the terms and provisions of the Governing Agreement
[and _____] *[reference any separate agreement with the landowner]* identified
above, [the receipt and sufficiency of which consideration is hereby acknowledged,]
_____ ("Grantor"), hereby GIVES, GRANTS and CONVEYS to the [UNITED
STATES ON BEHALF OF ITS ENVIRONMENTAL PROTECTION AGENCY] [and the]
[MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION]
([collectively,] "Grantee"), as a gift, with QUITCLAIM COVENANTS, an
ENVIRONMENTAL RESTRICTION ("Restriction") in, on, through, over and under the
Property. Said Restriction is subject to the following terms and conditions:

    1. <u>Purpose</u>. It is the purpose of this Grant to establish covenants and restrictions and to
convey to Grantee real property rights involving access and enforcement, all of which shall run
with the land, to facilitate the remediation of environmental contamination, and to protect human
health and the environment by reducing the risk of exposure to contaminants.

    2. <u>Applicability</u>. The restrictions set forth in Paragraph 3 ("Restricted Uses and
Activities") shall not apply to:

        A.    any response action undertaken by EPA or MassDEP, or their respective
agents, representatives, contractors, subcontractors or employees, pursuant to CERCLA
or Chapter 21E, and their respective implementing regulations [; or]

        [B.    any response action undertaken by the Performing Party, or its agents,
representatives, contractors, subcontractors or employees, in accordance with and

pursuant to the Governing Agreement, and any approval by EPA and/or MassDEP required thereunder]; [*if the Performing Party has no obligation to perform response actions or operation and maintenance after this Grant has been recorded, or in the atypical circumstance where there is no Governing Agreement in a non-fund-lead response action, delete this paragraph*]

provided, however, that if any such response action results in a change in the areal extent or grade of any portion of the Property required to be restricted under this instrument to ensure that the Selected Remedy is protective of human health and the environment, or if Grantee otherwise determines that it is necessary to amend or partially release this instrument as a result of such response actions, then the person performing such response action shall, in accordance with the requirements of Paragraph 14 ("Amendment and Release"), (i) obtain Grantor's agreement to amend this instrument, including the Plan of Restricted Areas, and/or to partially release this instrument, as applicable, (ii) with Grantor's agreement submit an application to Grantee therefor, and (iii) ensure that all actions necessary to effectuate such an amendment and/or partial release are taken. Further provided, and that for response actions described in Paragraph 2.B., above, all costs of performing the foregoing obligations shall be at the Performing Party's sole cost and expense, notwithstanding the provisions of Paragraph 14 ("Amendment and Release").

3. <u>Restricted Uses and Activities</u>.  Except as provided in Paragraph 2 ("Applicability"), Paragraph 4 ("Permitted Uses and Activities") and Paragraph 6 ("Emergency Excavation"), Grantor shall not perform, suffer, allow or cause any person to perform any of the following activities in, on, upon, through, over or under [the Property] [the Restricted Area] [each Restricted Area identified below] or any portion thereof, or any of the following uses to be made of [the Property] [the Restricted Area] [each Restricted Area identified below] or any portion thereof:

[*if there are multiple restricted areas, identify each such area and list applicable restrictions for each*]

A.    excavation, removal or disposal of any loam, peat, gravel, sand, rock or other mineral or natural resource;

[*sample restrictions—site specific restrictions must satisfy the requirements of the Selected Remedy:*]

B.    [extraction, consumption or utilization of groundwater underlying the Property for any purpose, including without limitation extraction for potable, industrial, irrigation or agricultural use;]

C.    [agricultural use or activity];

D.    [residential use or activity;]

E.    [day care or, for children under eighteen (18) years of age, educational use or activity;]

F.      [recreational use or activity;]

G.      [hotel or motel use or activity;]

H.      [commercial use or activity;]

I.      [industrial use or activity;]

J.      _____ [*list any other restricted uses and/or activities;*] and

K.      any use or activity which would interfere with, or would be reasonably likely to interfere with, the implementation, effectiveness, integrity, operation, or maintenance of the Selected Remedy, including but not limited to cap(s), cover(s) or other ground covering features of response actions conducted to implement the Selected Remedy; [systems to collect, contain, treat, and discharge groundwater]; [systems or containment areas to excavate, store, treat, and dispose of soils and sediments]; and [systems and studies to monitor implementation of the Selected Remedy, to provide long-term environmental monitoring of on-site groundwater, soils, and sediments, and to ensure that the remedial action is effective in the long-term and protective of human health and the environment]. Reference is made to the Plan of Restricted Areas [and to the As-Built Records, on file on file at the EPA Record Center located at One Congress Street, Boston, Massachusetts], which provide(s) information about the location within the Property and engineering details, respectively, of certain of the foregoing components of the Selected Remedy. [*include references to important site-specific components of the Selected Remedy, including where detailed information about them may be found*]

4. <u>Permitted Uses and Activities</u>. Grantor expressly reserves the right to perform, suffer, or allow, or to cause any person to perform (i) any use or activity in, on, upon, through, over, or under the Property that is not listed in Paragraph 3 ("Restricted Uses and Activities") of this Grant; and (ii) any of the following activities in, on, upon, through, over or under the [the Property] [the Restricted Area] [each Restricted Area identified below], or any portion thereof, or any of the following uses to be made of the [the Property] [the Restricted Area] [each Restricted Area identified below], or any portion thereof:

[*if there are multiple restricted areas, each with its own set of permitted uses and activities, then identify each such area and list its permitted uses and activities* ]

[*sample permitted uses and activities:*]

[A. Notwithstanding the restriction on excavation set forth in Paragraph 3.A, above, excavation, unless such excavation would permanently modify the areal extent or grade of the [Property] [Restricted Area], is permitted, subject to the following:

[*identify any requirements including any applicable health and safety, soil management or ground water/surface water management protocols (attach protocols as appendices and incorporate by reference)*]

    (i)    _____;

    (ii)    _____; and

    (iii)    _____;]

[B.    Notwithstanding the restriction on _____ set forth in Paragraph 3__, above, such activities and uses as may be required to perform the requirements of the Operation and Maintenance Plan set forth in Paragraph 5.A;]

[C.    Notwithstanding the restriction on _____ set forth in Paragraph 3__, above, such activities and uses as may be required to perform the requirements of the Restriction Compliance Inspection Plan set forth in Paragraph 5.B;] and

[D.    *list any other permitted uses and/or activities*;]

E.    The provisions of this Paragraph 4 ("Permitted Uses and Activities") shall not release Grantor or any other party from liability for releases of oil or hazardous substances, nor shall this provision excuse Grantor or any other party from complying with CERCLA, Chapter 21E, or any other applicable federal, State or local laws, regulations or ordinances.

5.  Obligations and Conditions.  Grantor affirmatively agrees to perform the following activities [and][or] to maintain the following conditions at the Restricted Area in order to maintain the [Selected Remedy]:

A.    [The following requirements of the Operations and Maintenance Plan:

    (i)    _____;

    (ii)    _____; and

    (iii)    _____;]

B.    [The following requirements of the Restriction Compliance Inspection Plan:

    (i)    _____;

    (ii)    _____; and

    (iii)    _____;] and

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
Page 8 of 16

    C.    [insert other specific activities and conditions set forth in the Governing Agreement or other applicable document, if any]

    6.  Emergency Excavation. If it becomes necessary to excavate within the Restricted Area as part of a response to an emergency (e.g., repairing utility lines or responding to a fire or flood), and such excavation could result in a significant risk of harm from exposure to the hazardous substances located within the Restricted Area, the requirements of Paragraph 3.A of this Grant shall be suspended with respect to such excavation for the duration of such response, provided that Grantor:

    A.    orally notifies the following persons of such emergency as soon as possible but no later than two (2) hours after having learned of such emergency:

    i.    EPA Office of Site Remediation and Restoration, Emergency Planning and Response Branch; and

    ii.    MassDEP _____ Regional Office of Emergency Response Section;

or such other persons as [either] Grantee, [respectively], may identify in writing, from time to time, to Grantor for such emergency response notifications;

    B.    notifies [each] Grantee in writing of such emergency no later than five (5) days after having learned of such emergency [, with a copy to the Performing Party];

    C.    limits the actual disturbance involved in such excavation to the minimum reasonably necessary to adequately respond to the emergency;

    D.    implements all measures necessary to limit actual or potential risk to the public health and environment [, including the following:

    i.    _____;

    ii.    _____; and

    iii.    _____;]

    E.    engages a hazardous waste site cleanup professional, who is a "Licensed Site Professional" ("LSP") as defined in the MCP at 310 CMR 40.0006(12), to oversee the implementation of this Paragraph, and to prepare and oversee the implementation of a written plan which will restore the [Property] [Restricted Area] to a condition which meets or exceeds the performance standards established under the ROD for the Selected Remedy and which is consistent with this Restriction, and to review and evaluate response actions contained in said plan to ensure minimal disturbance of the contaminated soils; Grantor to implement said plan as soon as reasonably possible following such emergency; and a copy of said plan to be submitted to MassDEP and

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
Page 9 of 16

EPA, within ten (10) days of its performance, with a statement from the LSP confirming that the [Property] [Restricted Area] has been restored to the standard described above.

7. Easements. In establishing this Restriction, Grantor hereby grants the following easements for the term of this Grant to [each] Grantee, its [their] agents, contractors, subcontractors, and employees:

      A.     to pass and repass over the Property for purposes of inspecting the Property to insure compliance with the terms of this Restriction; and

      B.     in, on, through, over and under the Property for purposes of conducting subsurface investigations, installing groundwater monitoring wells, and conduct other investigations of the Property and/or response actions consistent with (i) CERCLA and the NCP and/or (ii) Chapter 21E and the MCP.

8. Construction. This instrument shall be liberally construed to effect its purpose and the policies and purposes of CERCLA and/or Chapter 21E. If any provision of this instrument is found to be ambiguous, an interpretation consistent with the purpose of this instrument that would render the provision valid shall be favored over any interpretation that would render it invalid. Any word or defined term contained in this instrument shall be read as singular, plural, masculine, feminine or neuter as the context so requires.

9. Severability. Grantor hereby agrees, in the event that a court or other tribunal determines that any provision of this instrument is invalid or unenforceable:

      A.     that any such provision shall be deemed automatically modified to conform to the requirements for validity and enforceability as determined by such court or tribunal; or

      B.     that any such provision that, by its nature, cannot be so modified, shall be deemed deleted from this instrument as though it had never been included.

In either case, the remaining provisions of this instrument shall remain in full force and effect.

10. Enforcement.

      A.     Grantor expressly acknowledges that a violation of the terms of this instrument could result in the following:

          i.     the assessment of penalties and other action by [each] Grantee, and its [their] respective successors and assigns, to enforce the terms of this instrument, pursuant to CERCLA and/or M.G.L. c. 21E , and their respective implementing regulations, and other law and regulations, as applicable; and

          ii.     upon a determination by a court of competent jurisdiction, the issuance of criminal and civil penalties, and/or equitable remedies which could

include the issuance of an order to modify or remove any improvements constructed in violation of the terms of this instrument at Grantor's sole cost and expense, and/or to reimburse [each] Grantee for any costs incurred in modifying or removing any improvement constructed in violation of the terms of this instrument.

B.    Notwithstanding any other provision of this instrument, all rights and remedies (including without limitation sanctions and penalties) available hereunder shall be in addition to, but not in lieu of, any and all rights and remedies (including without limitation sanctions and penalties) at law or in equity, including under CERCLA or Chapter 21E, [and/or pursuant to the Governing Agreement,] which rights and remedies [each] Grantee fully reserves. Enforcement of the terms of this instrument shall be at the discretion of [each] Grantee, and any forbearance, delay or omission to exercise its [their respective] rights under this instrument shall not be deemed to be a waiver by [either] Grantee of such term or any subsequent breach of the same or any other term, or of any of the rights of [either] Grantee under this instrument.

11.  Provisions to Run With the Land.  This Restriction establishes certain rights, liabilities, agreements and obligations for the Property that shall run with the Property for the term of this Restriction.  Grantor hereby covenants for himself/herself/itself and his/her/its executors, administrators, heirs, successors and assigns to stand seized and hold title to the Property subject to this Restriction.

The rights granted to [each] Grantee, its [their] successors and assigns, do not provide, however, that a violation of this Restriction shall result in a forfeiture or reversion of Grantor's title to the Property.

12.  Concurrence Presumed.  It is agreed that:

A.    Grantor and all parties claiming by, through or under Grantor shall be deemed to be in accord with the provisions of this document; and

B.    all such parties and any party claiming by, through, or under them, including, without limitation, lessees and sublessees, and their respective agents, contractors, sub-contractors and employees, also agree that the Restriction herein established shall not be violated and that their respective interests in the [Property] [Restricted Area] shall be subject to the provisions herein set forth.

13.  Incorporation Into Deeds, Mortgages, Leases, and Instruments of Transfer.  Grantor hereby agrees to incorporate this Restriction, in full or by reference, into all future deeds, easements, mortgages, leases, licenses, occupancy agreements or any other instrument of transfer, whereby an interest in and/or a right to use the Property, or any portion thereof, is conveyed.

14.  Amendment and Release.

A.    Amendment.  This instrument, including without limitation any of its Exhibits, or the Plan of Restricted Area, may be amended only with the prior, written approval of Grantee.  Grantor may propose to Grantee, with a copy to the Performing Party, an amendment of a use or activity restriction set forth in Paragraph 3 ("Restricted Uses and Activities"), or of a permitted use or activity set forth in Paragraph 4 ("Permitted Uses and Activities"), based upon changed circumstances including without limitation new analytic and engineering data.  In the event that Grantor requests such an amendment, Grantor shall comply with the provisions of the Amendment Protocol, set forth in Exhibit C ("Amendment Protocol") to this Grant.  Grantor agrees to cooperate with Grantee if it becomes necessary to modify this instrument in order to maintain the continued effectiveness of the Selected Remedy.  All amendments shall include [each] Grantee's signed approval and shall become effective upon recording and/or registration with the appropriate registry of deeds and/or land registration office.

B.    Release.  [Each] Grantee may release its [respective] interest in the Grant, in whole or in part, in its [respective] sole discretion.  MassDEP will provide notice to EPA prior releasing its interest in the Grant.  This Grant shall not be deemed released unless and until [each] Grantee has released its [respective] interest hereunder.  Any such release(s) shall become effective upon recording and/or registration with the appropriate registry of deeds and/or land registration office.

C.    Recordation and/or Registration.  Grantor hereby agrees to record and/or register with the appropriate registry of deeds and/or land registration office any amendment to and/or release of this instrument, or other document created pursuant to this instrument for which such recording and/or registration is required, within thirty (30) days of the date of having received from Grantee(s) any such amendment, release or other such document executed by [each] Grantee and/or evidencing [each] Grantee's approval, as appropriate, in recordable form.  No more than thirty (30) days from the date of such recording and/or registering of said amendment, release and/or other such document, Grantor shall provide a certified registry copy of the amendment, release and/or other such document to [each] Grantee, with a copy to the Performing Party.  At that time, or as soon thereafter as it becomes available, Grantor shall provide [each] Grantee with the final recording and/or registration information for the amendment, release, and/or other such document, certified by said registry.  Grantor shall pay any and all recording fees, land transfer taxes and other such transactional costs associated with any such amendment or release.

D.    Notice to Local Officials.  In accordance with the requirements set forth in 310 C.M.R. §40.1403(7), as amended, and within thirty (30) days after recording and/or Registering any such amendment, release, or other such document, Grantor shall:  (i) provide the [City] [Town] of _____ Chief Municipal Officer, Board of Health, Zoning Official and Building Code Enforcement Official with copies of such recorded and/or registered amendment, release or other such document; (ii) publish a legal notice indicating the recording and/or registering of such amendment, release or other such document, and including the information described in 310 C.M.R.

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
Page 12 of 16

§40.1403(7)(b)(1), in a newspaper which circulates in the [City] [Town] of
_____; and (iii) provide copies of said legal notice to [each] Grantee
within seven (7) days of its publication.

15. <u>Payment of Future Costs</u>.  Grantor shall pay all costs incurred by Grantee not
inconsistent with Chapter 21E, including attorneys fees and interest, in connection with any
request by Grantor for an approval, review or other action by Grantee pursuant to the terms of
this instrument, including without limitation (i) an approval, including any presumptive approval,
pursuant to Paragraph 4 ("Permitted Uses and Activities") of this instrument and (ii) for an
approval, pursuant to Paragraph 14 ("Amendment and Release") of this instrument.  Such costs
shall be due and payable upon demand.

16. <u>No Dedication Intended</u>.  Nothing herein shall be construed to be a gift or dedication
of the Property to [either] Grantee or to the general public for any purpose whatsoever.

17. <u>Term</u>.  This Restriction shall run [in perpetuity] [for a period of _____ years] and is
intended to conform to MG.L. c. 184, § 26, as amended.

18. <u>Notices</u>.

A. <u>General</u>.  Any notice, delivery or other communication permitted or required
under this instrument, unless otherwise provided in this instrument, shall be in writing
and sent by reliable overnight delivery service, delivered in hand or mailed by postage-
paid registered or certified mail, return receipt requested.  Notices or other
communications shall be deemed given, if by overnight delivery service, on the first
business day following deposit with such delivery service; if by hand, on the date of the
receipt evidencing the hand delivery thereof; or, if by registered or certified mail, three
(3) days after deposit in the United States mails; provided that notice of change of
address shall be deemed effective only upon receipt.

B. <u>EPA and MassDEP</u>.  Whenever, under the terms of this instrument, written
notice is required to be given or a document is required to be sent to Grantee, EPA and/or
MassDEP, as the case may be, it shall be directed to <u>both</u> EPA and MassDEP, to the
individuals at the addresses specified below, or as otherwise directed in writing by EPA
and/or MassDEP, respectively.

<u>As to EPA</u>:

EPA Remedial Project Manager
_____ Superfund Site
United States Environmental Protection Agency, Region I
One Congress Street, Suite 1100, Mailcode HBO
Boston, MA  02114

and to:

EPA Enforcement Counsel

_____ Superfund Site
United States Environmental Protection Agency, Region I
One Congress Street, Suite 1100, Mailcode SES
Boston, MA  02114

As to MassDEP:

Bureau of Waste Site Cleanup
Department of Environmental Protection
One Winter Street, ___th Floor
Boston, MA 02108
Attention: _____ Superfund Site Project Manager

     [C. Performing Party. Whenever, under the terms of this instrument, written notice is required to be given or a document is required to be sent to the Performing Party, it shall be directed to the individual at the address specified below, or as otherwise directed in writing by the Performing Party:

_____
_____
_____
_____

Attention:  Coordinator for _____ Superfund Site]

     19.  Assignment.  This Grant, including without limitation all easements, rights, covenants, obligations and restrictions inuring to the benefit of [either] Grantee, herein contained, shall be freely assignable by [either] Grantee, in whole or in part, at any time. MassDEP will provide notice to EPA prior assigning its interest in the Grant.

     20.  Rights Reserved.  [It is expressly agreed that acceptance of this Restriction by MassDEP shall not express nor imply MassDEP approval of the adequacy of this or any other response action affecting the Site.] [*if MassDEP is not a co-Grantee or the sole Grantee, then include the preceding sentence in the instrument of transfer, rather than in this instrument*] Acceptance of this Restriction shall not operate to bar, diminish, nor in any way affect any legal or equitable right of [either] Grantee to issue any future order with respect to the Site or in any way affect any other claim, action, suit, cause of action, or demand which [either] Grantee may have with respect to the Site.

     22.  Governing Law; Captions.  This instrument shall be governed by and interpreted in accordance with the laws of the United States and of the Commonwealth of Massachusetts, as applicable.  All captions and headings contained in this instrument are for convenience of reference only, and shall not be used to govern or interpret the meaning or intent of any provision of this document.

     23.  Effective Date.  This Restriction shall become effective upon its recordation with the appropriate registry of deeds and/or land registration office.

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
Page 14 of 16

No more than thirty (30) days from the date of recording and/or registration, Grantor shall provide [each] Grantee with a certified registry and/or land registration office copy of this instrument.  At that time, or as soon as practicable thereafter, Grantor shall provide [each] Grantee with a copy of this instrument, as recorded, certified by said registry and/or land registration office.

As this Restriction is a gift, no Massachusetts deed excise stamps are affixed hereto, none being required by law.

WITNESS the execution hereof under seal this ____ day of _____, 20___ .


_____


_____
[Name of Grantor]

GRANTOR


COMMONWEALTH OF MASSACHUSETTS

_____, ss


    On this ____ day of _____, 20__, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification, which were _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.


_____
Notary Public:
My Commission Expires:


[*if MassDEP is a co-Grantee or the sole Grantee, include the following statement:*]

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
Page 15 of 16

        In accordance with M.G.L. c. 21E, § 6, as amended, the Commissioner of the Department of Environmental Protection hereby approves this Grant of Environmental Restriction and Easement (as to form only).

        Date: _____

                                  _____
                                  Commissioner
                                  Department of Environmental Protection

*[if MassDEP is a co-Grantee or the sole Grantee, include the following:]*

Upon recording, return to:

Office of General Counsel
Department of Environmental Protection
Bureau of Waste Site Cleanup
One Winter Street, 3rd Floor
Boston, MA  02108

Attention:  NPL Site Coordinator

Grant of Environmental Restriction and Easement
Revised April 30, 2007
_____ Superfund Site
Page 16 of 16

<u>List of Exhibits</u>

| | |
|---|---|
| Exhibit A | Legal Description of the Property |
| [Exhibit A-1 | Legal Description of the Restricted Area] |
| Exhibit B | Compliance Inspection and Reporting Plan |
| [Exhibit B-1 | Operation and Maintenance Plan ] |
| Exhibit C | Amendment Protocol |