IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

W.R. GRACE & CO., *et al*.

Debtors.

Chapter 11

Civil Action No. 01-01139 (JKF)

Jointly Administered

---

**NEUTOCRETECLAIMANTS' RESPONSE IN
OPPOSITION TO W.R. GRACE'S OBJECTION TO CLAIMS**

Dated: <u>July 26, 2010</u>

STAMOULIS & WEINBLATT LLC
Stamatios Stamoulis  #4606
        stamoulis@swdelaw.com
Richard C. Weinblatt #5080
        weinblatt@swdelaw.com
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
(302) 999-1540

*Attorneys for Neutocrete, NSI and FTF*

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................2

III.    ARGUMENT .......................................................................................................13

       A.      The U.C.C. and the Debtor's Long Term Agreement
              Permit Neutocrete Products to Maintain an Action for
              Damages...............................................................................................13

       B.      The Agreement and Applicable Law Permit Neutocrete
              Products to Recover Incidental and Consequential
              Damages...............................................................................................15

       C.      FTF Has Standing to Sue Under its Oral Agreement and
              for Debtor's Breach of Warranty and Negligence. .............................18

       D.      FTF Has Standing to Sue For Damages Due to
              Defective and Deficient Products. ......................................................20

       E.      NSI Has Standing to Sue For Damages Due to Defective
              and Deficient Products. ......................................................................23

       F.      CUTPA Applies to Transactions Because to Find
              Otherwise Deprives Neutocrete Products' CUTPA
              Remedy in Violation of Fundamental Connecticut
              Public Policy. .....................................................................................25

       G.      Neutocrete Products May Recover CUTPA Damages,
              Including Legal Fees and Punitive Damages Due to
              Debtor's Unfair and Deceptive Conduct............................................27

       H.      Neutocrete Products May Recover CUTPA Damages
              Including Reasonable Attorneys Fees and Punitive
              Damages Due to Debtor's Aggravated Breach....................................28

       I.      FTF and Neutocrete Products May Recover for Debtor's
              Fraudulent Misrepresentation that its Products and
              Technical Services are Superior..........................................................30

       J.      Debtor Cannot Receive Payment for Unpaid Deliveries
              of Goods because, *inter alia*, the Applicable Statute of
              Limitations Ran...................................................................................31

       K.      Neutocrete Products Did Not Waive Its Rights Per the
              $15,000 Credit Issued by Debtor. ......................................................32

IV.     CONCLUSION ...................................................................................................33

## TABLE OF AUTHORITIES

<u>Cases</u>

*Alfred M. Best Co., Inc. v Goldstein*, 124 Conn. 597, 602 (Conn. 1938) ........................ 19

*Bailey Employment System, Inc. v. Hahn*, 545 F. Supp. 62, 73 (D. Conn. 1982)................................................................................. 16

*Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622 (1985) ........................................ 26

*Cambridge Plating Co., Inc. v. Napco., Inc.*, 85 F.3d 752, 768 (1st Cir. 1996) ....................................................................................... 17, 24

*Capitol City Personnel Services, Inc. v. Franklin*, 52 Conn. App. 783, 787-88, 727 A.2d 1284, 1286 (1999)...................................... 16

*Conaway v. Prestia*, 191 Conn. 484, 495 v. 12, 464 A.2d 847, 853 n. 12 (1983) .................................................................................. 16

*Colter v. Barber-Greene Co.*, 403 Mass. 50 (Mass. 1988) .............................................. 20

*Connecticut Inv. Casting Corp. v. Made-Rite Tool Qp Inc.*, 382 Mass. 603, 609, 416 N.E.2d 966, 970 (1981) .................. 13

*Custard Ins. Adjusters, Inc. v. Nardi*, C.A. No. CV9800619675, 2000 WL 562318 (Conn. Super. Apr. 20, 2000) .......................... 26

*Earls v. Condor Capital Corp.*, Superior Court, Docket No. CV 980491748S (Apr. 20, 2001, Santos, J.) (2001 WL 1188248) ........................... 17

*Eder Bros. v. Wine Merchs of Conn., Inc.*, 275 Conn. 363, 379 (2005).......................... 27

*Elliott v. Staron*, 46 Conn. Supp. 38, 50-51, 735 A.2d 902, 910 (1997) ........................ 16

*Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 41 Conn. Supp. 575, 580 (1991).......................................... 29

*Garthwait v. Burgio*, 153 Conn. 284, 289-90 (Conn. 1965)............................................ 22

*Gilbert v. City of Cambridge*, 932 F.2d 51 (1st Cir. 1991)............................................. 31

*Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 681 n. 3 (2d Cir. 1985)......................................... 16

*J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 793, 494 N.E.2d 374, 377 (1986)................................................ 31

*Journal Publ'g Co. v. Hartford Courant Co.*, 261 Conn. 673, 696 (2002)......................................................... 28

*Lees v. Middlesex Ins. Co.*, 219 Conn. 644, 654 (Conn. 1991) ........................................ 17

*Lester v Resort Camplands Int'l, Inc.*, 27 Conn. App. 59, 71 (1992) ............................... 28

*Lynn v. Haybuster Mfg.*, Inc., 226 Conn. 282, 292 (Conn. 1993)............................... 22, 23

*Mountain West Helicopter, LLC v. Kaman Aerospace Corp.*, 310 F.
    Supp. 2d 459, 465 (D. Conn. 2004) ...................................................................... 22

*Northeastern Telephone Co. v. American Telephone & Telegraph Co.*,
    651 F.2d 76, 95 n.20 (2d Cir. 1981), *cert denied*, 455 U.S. 943,
    102 S. Ct. 1438 (1982) ....................................................................................... 16

*Potter v. Chicago Pheumatic Tool Company*, 241 Conn. 199, 214
    (Conn. 1997) ....................................................................................................... 22

*Prishwalko v. Bob Thomas Ford, Inc.*, 33 Conn. App. 575, 636 A.2d
    1383 (1994)......................................................................................................... 16

*Reading v. Brown*, 391 U.S. 471, 483-84 (1968)............................................................. 12

*Reichhold Chemicals, Inc. v. Hartford Accident and Indem. Co.*, 243
    Conn. 401, 408 (Conn. 1997).............................................................................. 19

*Smith v. Snyder*, C.A. No. CV990362743S, 2001 WL 1734438 at *3-4
    (Conn. Super. Dec. 14, 2001) .............................................................................. 16

*SNET Info. Services, Inc. v. Tullock Fence, LLC*, C.A. No.
    CV054012642, 2005 Conn. Super. LEXIS 3499 at *2 (Conn.
    Super. Dec. 8, 2005) ........................................................................................... 30

*Staehle v. Michael's Garage, Inc.*, 35 Conn. App. 455, 463 (Conn.
    App. 1994) .......................................................................................................... 17

*Stelco Industries, Inc. v. Cohen*, 182 Conn. 561, 564 (Conn. 1980) ............................... 20

*Tessmann v. Tiger Lee Construction Co.*, 228 Conn. 42, 46-47, 634
    A.2d 870, 873 (1993) .......................................................................................... 16

*Vassallo v. Baxter Healthcare Corporation*, 428 Mass. 1, 19 (Mass.
    1998) ................................................................................................................... 21

*Westinghouse Elec. Corp*, 406 Mass. 369 (1990)............................................................. 25

*Westport Taxi Service, Inc. v. Westport Transit District*, Superior
    Court, Judicial District of Stamford-Norwalk at Stamford,
    Docket No. CV 79 0041301S (June 28, 1991, Katz, J.) (1991
    WL 126444)........................................................................................................ 16

*Williams v State Farm Mut. Auto. Ins. Co.*, 229 Conn. 359, 366 (Conn.
    1994) ................................................................................................................... 19

*Wyatt Energy, Inc. v. Motiva Enterprises LLC*, C.A. No.
    CV020467090S, 2002 Conn. Super. LEXIS 3186 (Conn. Super.
    Sept. 27, 2002) ................................................................................................... 26

## <u>Statutes</u>

11 U.S.C § 108(a) .............................................................................................. 32

11 U.S.C. §503(b)(1) .......................................................................................... 12

Conn. Gen. St. § 42a-2-715(2)(b) ...................................................................... 20

Conn. Gen. St. § 52-572m ................................................................................. 20

Conn. Gen. St. §42a-2-608 ............................................................................ 19, 20

Conn. Gen. Stat. § 42-110g(a) ........................................................................... 16

Conn. Sen. St. § 52-572m(b) .......................................................................... 22, 23

Conn. Sen. St. § 52-572n ................................................................................... 22

Conn. Sen. St. §52-240b ..................................................................................... 23

Mass. Gen. Laws Ch. 106, § 2-313 .................................................................... 14

Mass. Gen. Laws Ch. 106, § 2-608 .................................................................... 13

Mass. Gen. Laws Ch. 106, § 2-719(3) ............................................................... 17

Mass. Gen. Laws Ch. 106, § 2-725 .................................................................... 31

Claimants Neutocrete Products, Inc. ("Neutocrete Products"), Neutocrete Systems, Inc. ("NSI") and FTF Crawlspace Specialists, Inc. ("FTF," and collectively with Neutocrete and NSI, "Neutocrete" or "Claimants"), by and through their counsel, respond to the Objections of Debtor W.R. Grace & Co. ("Debtor" or "Grace") to Claims Nos. 8378, 8379 and 8380 (D.I. 22218) as follows:

## I.    INTRODUCTION

On April 2, 2001, Grace filed for bankruptcy under Chapter 11 of Title 11 of the United States Code (Case No. 0-11139 (JKF)).  On or about October 17, 2002, Grace filed a two count civil complaint against Neutocrete Products in the Superior Court of Connecticut, Judicial District of Litchfield (Docket No. CV-02-0088979S).  The complaint alleged Neutocrete Products breached a Long Term Agreement between Neutocrete Products and Grace dated December 14, 2000 (the "Long Term Agreement," attached hereto as Exh. 1) and was unjustly enriched.  Neutocrete Products subsequently filed a Motion for Stay as it intended to assert defenses and counterclaims in the action.  On or about March 3, 2004, Grace withdrew the Connecticut civil action.

On March 28, 2003, Claimants each filed a separate Proof of Claim against Grace.  On June 22, 2009, Grace filed an objection to certain claims filed by the Claimants.  (D.I. 22218.)  On August 25, 2009, in response to Grace's ADR Notice in the above captioned action, the Claimants filed their election to participate in the ADR program.  On September 16, 2009, the Claimants filed their Statement of Claims in that action.  Their Statements of Claims claimed damages as follows: Neutocrete Products, Inc.: $ 201,473; NIS:  $1,231,193; and FTF:  $673,433.  The parties were unable to reach a resolution for Claim Nos. 8378, 8379, and 8380 through the ADR process.

## II.   FACTUAL BACKGROUND

Neutocrete Products, NSI and FTF are related companies owned by the same principals, Frank Buonauto and Anthony Buonauto, father and son respectively.   The Debtor is a Connecticut corporation engaged in part in the business of selling concrete products.   Neutocrete Products, NSI, and NTF are Connecticut corporations.   Neutocrete Products is in the business of purchasing a formulated light-weight concrete that it resells under the trade name and trademark Neutocrete® to parties that use it in the installation of a sealant applied to residential and commercial basements and crawlspaces. Neutocrete Products is not an installer.   Both NSI and FTF are in the business of installing a sealant comprised of a mixture of Neutocrete® and water in residential and commercial basements and crawlspaces to reduce moisture, mold and pests.   NSI bought the Neutocrete® product from Neutocrete Products.

Although FTF at times purchased Neutocrete® from Neutocrete Products, it also purchased the same light-weight formula concrete directly from Grace.   However, prior to FTF and Debtor exploring a supply relationship, FTF, conducting business under the trade name Neutocrete, prepared its proprietary mixture by blending concrete and vermiculite from separate containers at the job site and then adding water prior to installation.   Indeed, this process is patented by FTF in U.S. Patent No. 5,890,845.   FTF and Debtor discussed having Debtor premix FTF's proprietary mixture of concrete and vermiculite at Debtor's manufacturing facility in order to provide FTF a complete pre-blended mixture that would only require adding water at the jobsite.

The Debtor on May 19, 1999 provided a written proposal in the form of a letter to the principals of FTF.  (Exh. 2, the "Proposal").  The Proposal offered Debtor's industry expertise and technical support to provide "a product that will be superior to the premix

2

that you are using now." (*Id*. at ¶ 2).  The Proposal offered to provide FTF's proprietary product mixture (without water) and to private label FTF's product.  (*Id*. at Items 5 and 6).  The Proposal stated that "[o]nce a final formula is set, [Debtor] can quote a 'toll' manufacturing the product for you in private label bags."  (*Id*. at Item 6).  Toll manufacturing is an arrangement whereby a firm with specialized equipment processes raw materials for another firm.

The Proposal also suggested FTF purchase a trial truckload of Debtor's Probase® premixed product that had a 1:4 mix ratio and was packaged in 42 pound bags.  (*Id*. at ¶ 2, Item 1).  As proposed, the yield on Debtor's Probase® product would be 5-6 square feet per bag and would be packaged in a 1.5 cubic foot bag. (*Id*. at ¶ 2, Item 2).  FTF decided not to accept the proposal and instead orally contracted with Debtor to initially provide less than a truckload of bags containing FTF's proprietary product mixture (without water) of 2.0 cubic feet of material per bag with a targeted yield of 8 square foot per bag.

Debtor's industry expertise, its representations that its technical support and product was superior, and its claimed national distribution network, all induced FTF to use Debtor as its sole supply source.  NSI and Neutocrete Products were formed later with the intention of launching a franchise-based business model, however the franchisor decided to refrain from selling franchises so NSI and Neutocrete Products instead provided the aforementioned services themselves.

FTF's proprietary mixture called for a specific volumetric and weight formula – 2 cubic feet of vermiculite, 30 pounds of cement and less than 2 ounces of a proprietary additive to be included in each bag.  Based upon each 2 cubic foot bag a 1:4 water mixture ratio, as set forth in FTF's patent, was confirmed by Debtor, which in a 2 cubic

foot bag would require adding 7-8 gallons of water per bag. The 1:4 water mixture ratio is set forth in FTF's patent. Neutocrete Products in particular made that mixture ratio known to the Debtor prior to entering the Long Term Agreement, as the patent is specifically referenced in Section 1 of the Long Term Agreement. (See Exh. 1). The targeted installation coverage was 8 square feet per bag at a 3 inch installation depth.

Starting in June 1999 and continuing until January 2001, FTF purchased product from Debtor pursuant to an oral agreement. FTF purchased product, by volume, as stated in the previous paragraph. That formula was identical to the one described in the Long Term Agreement discussed hereinafter, and virtually identical to the mixture FTF used before conducting business with the Debtor.

On August 8, 1999 Debtor sent FTF a letter (addressed to its principals) that attached Health and Safety wording that "Grace recommends be placed on your packaging" (*See* Exh. 3). Debtor's recommended wording was contained on a proposed Materials Safety Data Sheet ("MSDS"). On September 30, 1999 Debtor sent to FTF (addressed to Neutocrete) a letter that enclosed a revised MSDS for the product sold by Debtor. (*See* Exh. 4). Debtor's letter urged FTF to send the MSDS to its customers and contractors. The MSDS provided by Debtor in its September 30, 1999 letter contained the final package warning recommended by Debtor. That warning stated:

> Inhalation of Portland Cement Dust may cause severe coughing and sneezing and result in temporary breathing difficulties. May aggravate chronic respiratory conditions such as asthma or bronchitis. Repeated inhalation may cause long-term and/or delayed lung injury.

(Exh. 4 at p. 4, § 8).

4

Due to the inhalation and irritation dangers of the product mixture sold by Debtor, the above recommended warning was included on the bags of product sold by Debtor to FTF and Neutocrete Products.  (*See* Exh. 5).

The Long Term Agreement required a volumetric and weight purchase and specific mixture formula per bag.  (Exh. 1).  Debtor agreed to exclusively sell "Neutocrete® Product" to Claimant and defined "Neutocrete® Product" as the "formulated product as specified in Exhibit A (and as may be modified) and identified under the Trademark".  (Exh. 1, §§ 1, 2).  The Long Term Agreement per Exh. A specified the volume/weight purchase and per bag formula mixture as follows:

**Product Definition:**

Each bag of Neutocrete will consist of the following formulation, which may only be changed with written consent by both parties.

Neutocrete® Product Formulation:
| | |
|---|---|
| Zonolite® #4 Vermiculate | 2 cu ft |
| Type 1 or Type II Portland Cement | 30 lbs |
| Grace proprietary additive package | <2 oz |

Pursuant to the terms of the Long Term Agreement, Debtor "warrants to [Claimants] that at the time of delivery the Neutocrete product sold hereunder will conform substantially to the typical properties attached hereto as Exhibit A."  (Exh. 1 at § 7(a)).

However, Debtor deceptively undersized and under-filled the bags.  Because the product formulation specified in the Long Term Agreement was based upon a volume of 2.0 cubic feet, when Debtor undersized the bag the product formulation was changed without FTF's and Neutocrete Product's knowledge or consent.  In addition by under-sizing the bag size, Debtor also violated its express warranty pursuant to the Long Term Agreement because the undersized bags could not accommodate the mixture as specified.

5

Finally, because of the nature of the Zonolite #4 supplied by Debtor, the product was susceptible to damage during Debtor's packaging of the material, which resulted in a crushing of the material into a finer particulate size than optimal.  This crushing allowed Debtor to package material sold to Claimants in a smaller bag, and also resulted in significantly degraded performance for the material.  As a result, the instances where Claimants used the material supplied by Debtor were subject to very high failure rates that were the direct result of Debtor's actions.

The July 15, 2010 declaration of Robert M. Toedter, Claimants' materials expert in this matter has been contemporaneously filed in support of this response.  ("Toedter Decl.").  Based on his independent investigation, Mr. Toedter concluded that the weight ranges and bag sizes delivered by W.R. Grace were insufficient to deliver the formula specified in the agreements.  (Toedter Decl. at ¶ 11).  In particular, the specifications provided to Debtor and to which Debtor agreed called for two (2) cubic feet of Zonolite #4 vermiculite and thirty (30) pounds of Portland type I or II cement plus an additive mixture of less than two (2) ounces in every bag.  In Mr. Toedter's opinion, it is not possible to package two (2) cubic feet of Zonolite #4 vermiculite and 30 pounds of Portland cement into any bag with a size less than two (2) cubic feet.  (Toedter Decl. at ¶ 14).  Further, Grace's own specification sheet for Zonolite #4 says that this particle size weighs seven (7) pounds per cubic foot, therefore establishing that two (2) cubic feet of Zonolite #4 will weigh no less than fourteen (14) pounds.  (Toedter Decl. at ¶ 19).  This weight, combined with thirty (30) pounds of Portland type I or II cement (as per the NSI mixture specification outlined in the Long Term Agreement with Grace) result in a weight range for bagging this material of at least forty four (44) pounds (30 pounds of cement plus 14 pounds of Zonolite #4) plus the weight of the bag.  (Toedter Decl. at ¶

21).  Claimants maintain that the weight of the bags received from Grace were in the 42 pound range.  Mr. Toedter personally verified the bags supplied by Grace weighed approximately forty-two (42) pounds.  (Toedter Decl. at ¶ 18).  Mr. Toedter therefore attests in his declaration that there was a material shortage in the bags supplied by Grace and, thus, Grace's product did not conform to the mixture specifications of the Long Term Agreement (Toedter Decl. at ¶ 20).

In January 2001, in response to increasing complaints of cracking by FTF's and NSI's customers, an engineering meeting (CEDAC) with Grace was held.  A follow-up meeting was held February 16, 2001.  Debtor made a site visit to one of Claimant's customer's installations and Debtor tested several alternative variations of the contracted mixture formula.  In August 2001 in response to complaints by Neutocrete Products regarding the height of pallets of the product, Debtor admitted in an email dated August 15, 2001 that bags were normally filled by volume and not by weight.  (Exh. 6).

On April 2, 2001, Debtor filed for bankruptcy.  On November 1, 2001, Debtor and Neutocrete Products amended the Long Term Agreement.  (*See* Exh. 7).  The amendment to the Long Term Agreement did not change the volumetric requirements and specific mixture formula per bag.

During the period of September 1999 through May 2002 Debtor collectively provided FTF and Neutocrete Products 162,264 bags of product.  The Debtor's product did not conform to the agreed upon volumetric/weight mixture per bag for at two main reasons:  (1) Debtor supplied FTF and Neutocrete undersized bags and (2) Debtor incorrectly based its manufacturing process solely on weight without taking into account the volume.

First, the bags Debtor provided to FTF and Neutocrete Products were undersized. FTF and Neutocrete Products discovered at an April 2002 visit to Debtor's plant in Enoree, South Carolina that the bags Debtor provided were undersized by 0.25 cubic feet. It was later discovered that the dimensions of the bags ordered by Debtor measured 25 inches long by 20 inches wide by 6 inches deep. The corresponding volume of a bag having the above dimensions, if filled to capacity, would equal only 1.75 cubic feet. Therefore, despite the Debtor agreeing to provide 2 cubic feet of product, in its oral agreement with FTF and its Long Term Agreement with Neutocrete Products, Debtor's bags could only accommodate a maximum capacity of 1.75 cubic feet of product.

Second, Debtor's manufacturing process was incorrectly based on weight and ignored the volumetric requirements to which Debtor agreed. (*See* Exh. 8 and Exh. 9). The printed label on each bag measured the contents by weight rather than by volume. At the April 2002 visit, discussed in the above paragraph, FTF and Neutocrete Products discovered that Debtor's process under-filled the bags of product sold to FTF and Neutocrete Products. At the visit to Debtor's plant, FTF's and Neutocrete Products' principals, the Buonauitos, accompanied by Debtor's representatives, poured a bag of product, which visually appeared to be full, into a 1 cubic foot box. The box was filled once, emptied, and then the remainder of the bag contents were then poured into the box.

The box with the remaining contents was only half full. The principals of FTF and Neutocrete Products then realized, for the first time, that the Debtor had been selling FTF and Neutocrete Products in bags that could only hold 1.5 cubic feet of product per bag when the contract specifications required a bag that could accommodate 2.0 cubic feet of product.

Thus, even if the bags were filled to capacity, which they were not, because the bags were consistently undersized, the resulting volume (and weight) produced by Debtor was never in conformity with the contracted volume of material specified in the Long Term Agreement and FTF's oral agreement with Debtor.

From the time the Debtor began selling product to FTF and Neutocrete Products, and upon their first use of bags provided by Debtor, the volume of product sold was less than the volume orally agreed to by FTF and Debtor and, also less than the volume specified in the Long Term Agreement between Neutocrete Products and Debtor.[1] Because NSI's and FTF's installation process called for a specific volume of water to be mixed per bag of Neutocrete® product, the Debtor's under-sizing the bags and shorting the volume per bag resulted in too much water being mixed per bag.

Debtor's shortage of materials, and corresponding excess water mixed per bag due to that shortage, resulted in the installed product being subject to excessive cracking, moisture and crumbling which resulted in unsightly, unhealthy and defective installations at a substantial number of job sites.  Excess water in cementitious mixes causes loss of durability, loss of strength, and increased cracking, which are all symptoms of the failed applications noted by Claimants in their claims against Grace.  (Toedter Decl. at ¶ 25). Due to the shortages of material, NSI and FTF began to receive complaints from their customers of cracking, that material was weak and crumbly, that dust from materials circulated through the job sites by air convection, and that excessive moisture was retained in the application areas.

In response to complaints from Neutocrete Products to Debtor, Debtor recommended the use of its own additive to the product mixture, Darawald C. (Exh. 10). The Darawald C additive did not resolve the problem nor did it reduce the number of cracking, product disintegration, dust particulate circulation or moisture complaints received from NSI's and FTF's customers. But, NSI and FTF did receive additional complaints about the smell of the installations containing the Darawald C additive which generated an odor described as smelling like cat urine.

In addition, even though, based upon the formula (with or without the the Darawald C additive), the correct amount of water was added to the expected 2.0 cubic feet of product, the volume shortage of product produced a moisture that, when applied, created a deficient and defective installation resulting in the material cracking and crumbling. This situation created a substantial hazard of product dust particles being released into the air and migrating throughout FTF's and NSI's customers' properties. According to the product label, as recommended by Debtor, inhalation of the dust posed a health and safety risk. Taking these health and safety issues seriously, FTF and NSI were forced to make, and did make, extensive efforts to repair, or rip out and replace the defective and deficient installations in order to protect their customers' health and safety as well as to rectify the substandard installations.

As each 1.5 cubic foot bag, packaged by Grace, contained approximately 42 lbs of the mixed constituents, Claimants' expert has concluded that Grace altered the physical volumetric characteristics of the vermiculite during handling, mixing, blending,

---

[1] In addition to delivering a product that failed to conform to the agreed specifications, the consistent volume shortages also resulted in a significant overpayment to Debtor by Claimants because the pricing specified in the Long Term Agreement was based

conveying and/or packing, which resulted in an increase in bulk density from that which is stated in Grace's Zonolite #4 Vermiculite specifications. (Toedter Decl. at ¶ 26). By crushing the Zonolite #4 in order to package it into an undersized bag, Debtor not only increased the bulk density of the product being supplied, but increased the available surface are of the material which interacts with the water added to cementitious mixtures. (Toedter Decl. at ¶ 30). This has the effect of "locally" retaining excess water at or near the cement-vermiculite interface, which subsequently results in the formation of extraordinarily weak bonds between the cement and vermiculite. (Toedter Decl. at ¶ 31). This condition compounds the excessive presentation of weak aggregate surfaces in the mix, and further weakens the cured product. (*Id*.)The result is reflected in additional loss of strength and durability, and increased susceptibility to cracking. (*Id.* at ¶ 31).

To date, in response to customer quality complaints and concerns over their customers' health and safety, FTF arid NSI have repaired over 500 (27%) of the estimated 1800 installations where Debtor's product was installed. Approximately 20 of those repairs have resulted in FTF and NSI having to demolish the original installation and reinstall a new sealant. The above stated problems are ongoing and Claimants are still receiving complaints from FTF's and NSI's customers regarding installations where Debtor's product has been used.

While under different theories, FTF and NSI are claiming damages for their losses due to Debtor's deficient and defective products produced for FTF and Neutocrete Products which endangered Claimants' customers when the product cracked, crumbled and disintegrated over time to create a health hazard. Neutocrete Products also is

---

on the volume of product that was supposed to be delivered – a volume that was consistently under-delivered by Debtor.

11

claiming damages for (a) fraud and violation of the Connecticut Unfair Trade Practice Act ("CUTPA") and (b) additional freight costs and cost of bags.

Specifically, Claimants anticipate introducing evidence at trial supporting the following damages claims:

1.      $1.8 million for costs already spent repairing failed installs that used the Grace product, for over payments to Grace based on product shortages, and other cosequential damages;

2.      $6.9 million to replace all the remaining installs that used the Grace product;

3.      $600k for costs associated with raising the funds to pay for existing repair costs;

4.      Treble damages pursuant to the Connecticut Unfair Trade Practices Act.

Claimants also may have damages for lost business opportunity and loss of goodwill and reputation that are presently undetermined and for the purposes of this Response are not being claimed.  Claimants reserve all rights regarding amending their proofs of claims to include such damages prior to trial.  Finally, Claimants will seek to have their claims treated with administrative expense priority pursuant to 11 U.S.C. § 503(b)(1) because the claims arose out of Debtor's tortious conduct in intentionally shorting the amount of material supplied to Claimants while charging claimants for the full amount of material that was supposed to be delivered under the Long Term Agreement and by concealing from Claimants the true properties of the material being sold which properties – including but not limited to particulate grain size – did not conform the specifications set forth in the Long Term Agreement.  *See Reading v. Brown*, 391 U.S. 471, 483-84 (1968).

### III.   ARGUMENT

#### A.   The U.C.C. and the Debtor's Long Term Agreement Permit Neutocrete Products to Maintain an Action for Damages.

Contrary to Debtor's assertion in its objections, Neutocrete Products was not required to reject or revoke its acceptance of the defective products under the Uniform Commercial Code ("U.C.C.") and the Long Term Agreement.  Neutocrete Products is seeking damages for breaches of contract and warranty and is not pursuing its right to reject or revoke acceptance of the products.  The contract is to be interpreted under Massachusetts law.  (Exh. 1, Long Term Agreement at p. 5)

Mass. Gen. Laws Ch. 106, § 2-608 (U.C.C.) provides that "the buyer may revoke his acceptance" of the goods in certain cases whereby discovery of nonconformance was reasonably induced by seller's assurances or difficulty in discovering such nonconformity."  As a result, the buyer is not required to revoke acceptance.  In fact, the Official Comment to Mass. Gen. Laws Ch. 106, § 2-608 states:

> Although the prior basic policy is continued, the buyer is no longer required to elect between revocation of acceptance and recovery of damages for breach.  Both are now available to him.

In *Connecticut Inv. Casting Corp. v. Made-Rite Tool Qp Inc.*, 382 Mass. 603, 609, 416 N.E.2d 966, 970 (1981), the Supreme Judicial Court of Massachusetts held that the buyer can sue for damages resulting from a breach of contract by the seller even after the buyer accepts the goods.  The U.C.C. cases Debtor cites regarding Neutocrete Products' alleged inability to revoke its acceptance of the products are not on point.  Whether Neutocrete Products rejected the defective products is irrelevant to Neutocrete Products' right to maintain an action for damages based on Debtor's breach of the Long Term Agreement.

13

Debtor incorrectly claims that the Long Term Agreement precludes Neutocrete Products from recovering after its acceptance and use of the nonconforming products. Additionally, Debtor wrongly relies on its position that Neutocrete Products is precluded from recovering damages for breach of contract, fraud, and violation of CUTPA. Both of Debtor's erroneous assertions are without merit. The Long Term Agreement does not contain either preclusion. Under Paragraph 7(a) of the Long Term Agreement, Debtor warrants to Neutocrete Products that the goods conform to the description provided in Exh. A to the Agreement. Neutocrete Products' remedy for this particular breach of warranty is either (1) to return the defective products to the Debtor in exchange for replacement products or (2) to pursue its right to claim a refund or credit of the purchase price. *See* Mass. Gen. Laws Ch. 106, § 2-313.

The Long Term Agreement requires return of the defective products only when replacement is to be provided, not if a refund or a credit is to be given. Neutocrete Products is claiming damages based on the shorted product and not seeking replacement for the defective products. Even if Neutocrete Products accepted the defective goods supplied by Debtor, Neutocrete Products is not precluded from maintaining an action for damages based on breach of contract, CUTPA, and other theories which have been advanced. *See* Mass. Gen. Laws Ch. 106, § 2-313.

Neutocrete Products repeatedly questioned Debtor about shortage in coverage (6 square feet versus 8 square feet) that caused FTF and NSI to use more materials than projected, resulting in lost profit to the Claimants. As a result of these inquiries, Debtor analyzed batches of its product using flawed methodology. Debtor only ensured it provided a consistent bag weight, despite the Long Term Agreement's specification requiring sale of product to be made by ***volume*** and weight. In addition, from the start of

14

its Long Term Agreement, Debtor provided bags that, unknown to FTF and Neutocrete

Products, were undersized and therefore incapable of holding the contracted for 2.0 cubic

feet of volume per bag.

> **B.    The Agreement and Applicable Law Permit Neutocrete Products to Recover Incidental and Consequential Damages.**

Debtor incorrectly claims that Paragraph 7 of the Long Term Agreement limits

Neutocrete Products' damages to only replacement of defective goods or refund or credit

of the purchase price, at the Debtor's discretion.

Paragraph 7(a) of the Long Term Agreement provides in relevant part as follows:

> Grace warrants to Neutocrete that at the time of delivery the Neutocrete product sold hereunder will conform substantially to the typical properties attached hereto as Exhibit A.  [Debtor's] liability and Neutocrete's remedy under this warranty are limited in [Debtor's] discretion to replacement of Neutocrete® Product returned to [Debtor] which are shown to [Debtor's] reasonable satisfaction to have been non-conforming or to refund or credit of the purchase price.

Further, Paragraph 7(d) of the Long Term Agreement provides in relevant part as

follows:

> THE REMEDIES OF NEUTOCRETE FOR ANY BREACH OF WARRANTY SHALL BE LIMITED TO THOSE PROVIDED HEREIN AND FOR DELAY OR NONDELIVERY WHICH IS NOT EXCUSABLE TO THE PURCHASE PRICE OF THE NEUTOCRETE® PRODUCT IN RESPECT OF WHICH THE DELAY OR NONDELIVERY IS CLAIMED TO THE EXCLUSION OF ANY AND ALL REMEDIES INCLUDING, WITHOUT LIMITATION, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

Thus, the Long Term Agreement only limits damages for two specific categories

of claims: (1) claims based on breach of warranty, and (2) claims for inexcusable delay or

non-delivery.  Remedies for the former category are replacement, refund or credit, at the

Debtor's discretion.  The remedy for the latter category of claims is refund of the

purchase price.  The Long Term Agreement does not, however, limit Neutocrete

15

Products' remedies for its other asserted claims, which are breach of contract, fraud, and violation of CUTPA.   Therefore, Neutocrete Products may recover incidental and consequential damages for these claims.   Further, Neutocrete Products may, recover punitive damages and attorney's fees for its claims for violation of CUTPA and fraud.

Additionally, CUTPA, Conn. Gen. Stat. § 42-110g(a), provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action ... to recover *actual* damages."   CUTPA itself does not define what types of damages constitute "actual damages."   Connecticut courts have interpreted this CUTPA clause and have held that a variety of economic damages are recoverable as "actual damages," including lost profits,[2] the lost value of a business,[3] the lost benefit of a bargain,[4] restitution and out-of-pocket losses,[5] and punitive damages.[6]

---

[2]   *See, e.g.*, *Capitol City Personnel Services, Inc. v. Franklin*, 52 Conn. App. 783, 787-88, 727 A.2d 1284, 1286 (1999); *Elliott v. Staron*, 46 Conn. Supp. 38, 50-51, 735 A.2d 902, 910 (1997), *aff'd*, 54 Conn. App. 632, 736 A.2d 196, *appeal dismissed*, 255 Conn. 18, 761 A.2d 1291 (2000); *Westport Taxi Service, Inc. v. Westport Transit District*, Superior Court, Judicial District of Stamford-Norwalk at Stamford, Docket No. CV 79 0041301S (June 28, 1991, Katz, J.) (1991 WL 126444), *aff'd in part, rev'd in part on other grounds*, 235 Conn. 1, 664 A.2d 719 (1995).

[3]   *See, e.g.*, *Westport Taxi Service, Inc.*, 235 Conn. at 32-36, 664 A.2d at 737-38; *Tessmann v. Tiger Lee Construction Co.*, 228 Conn. 42, 46-47, 634 A.2d 870, 873 (1993); *Smith v. Snyder*, C.A. No. CV990362743S, 2001 WL 1734438 at *3-4 (Conn. Super. Dec. 14, 2001), *aff'd in part* 2001 Conn. Super. LEXIS 3639); *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 95 n.20 (2d Cir. 1981), *cert denied*, 455 U.S. 943, 102 S. Ct. 1438 (1982) (antitrust).

[4]   *See, e.g., Tessmann*, 228 Conn. at 46-47, 634 A.2d at 873.

[5]   *See, e.g.*, *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 681 n. 3 (2d Cir. 1985) (internal citations omitted); *Bailey Employment System, Inc. v. Hahn*, 545 F. Supp. 62, 73 (D. Conn. 1982), *aff'd*, 723 F.2d 895 (2d Cir. 1983); *Conaway v. Prestia*, 191 Conn. 484, 495 v. 12, 464 A.2d 847, 853 n. 12 (1983); *Prishwalko v. Bob Thomas Ford, Inc.*, 33 Conn. App. 575, 636 A.2d 1383 (1994) (finding that actual damages would include at least cost of repairs and alternative transportation as well as the balance of sum plaintiff spent out of pocket on car payments); *Earls v. Condor Capital Corp.*, Superior Court, Docket No. CV 980491748S (Apr. 20, 2001,

Debtor's disclaimer of liability for consequential damages is not enforceable under Massachusetts law if Debtor either willfully repudiated or was willfully dilatory in performing its warranty obligations.  *Cambridge Plating Co., Inc. v. Napco., Inc.*, 85 F.3d 752, 768 (1st Cir. 1996).   Under Mass. Gen. Laws Ch. 106, § 2-719(3), consequential damages may be limited or excluded unless limitation or exclusion is unconscionable.   In this case, Debtor's repeated and willful misconduct in providing Neutocrete Products with over 88,000 under-sized bags and under-filled bags satisfies the standard for unconscionablity.   Debtor's actions related to crushing the Zonolite #4  to package it into a smaller bag than called for by its own volumetric specification also demonstrate the unconscionability of enforcing the limitation clause.   Debtor willfully repudiated performance of its warranty obligations by undersizing and under-filing the bags and by concealing that conduct in its bag label, describing only weight and not disclosing the bag volume to be 1.75 cubic feet when filled to maximum capacity (which it never was), less than the required contracted volume purchased**.**

Here, the facts show that even if Debtor had tried to replace its failed product, the product it would have substituted also would have been in breach of its warranty obligations.   Not only did Debtor's manufacturing process – filling bags solely by weight and not volume – result in the bags being under-filled, but any replacement bag Debtor would have sent Neutocrete Products would have been under-filled by volume as Debtor

---

Santos, J.) (2001 WL 1188248) (awarding consequential damages including return of down payment, monthly payment, towing charges and amount paid to defendant for ineffectual repairs).

[6]   *See Lees v. Middlesex Ins. Co.*, 219 Conn. 644, 654 (Conn. 1991) (finding that pursuant to § 42-110g(a) and (d) the court may award punitive damages); *Staehle v. Michael's Garage, Inc.*, 35 Conn. App. 455, 463 (Conn. App. 1994) (awarding an amount equal  to the plaintiff's actual damages is a recognized method for determining punitive damages under CUPTA).

continued to under-size the bags and Neutocrete Products was unaware of Debtor's actions until April 2002.  In order for the product to conform to the agreed upon specification, Debtor would have had to change the bag size to accommodate the appropriate amount of product.  Debtor never changed the bag size to accommodate the contracted volume.

### C.    FTF Has Standing to Sue Under its Oral Agreement and for Debtor's Breach of Warranty and Negligence.

FTF had an oral agreement with Debtor and did not sign a Massachusetts choice of law provision.  Notwithstanding Debtor's argument to the contrary, the facts demonstrate that FTF had a direct contractual relationship with Debtor.  Debtor first invoiced FTF on June 9, 1999.  (*See* Exh. 11).  Even after entering the Long Term Agreement between Debtor and Neutocrete Products, dated December 14, 1999, Debtor continued to invoice FTF through January 3, 2001.  (*See* Exh. 12).

Under its agreement with FTF, Debtor breached its implied warranty obligation of merchantability and implied warranty of fitness under the U.C.C. by under-sizing and under-filling the bags of product sold to FTF.  In addition, Debtor fraudulently concealed that conduct because its bag label, describing only weight, did not disclose that the bag held a maximum product volume of 1.75 cubic feet, contrary to the agreed upon volume formula.  Debtor also was negligent by failing to warn FTF that its product was bagged in a 1.75 cubic foot bag, as opposed to at least a 2.0 cubic foot bag (as called for by Long Term Agreement Exhibit A), thereby resulting in too much water being added.  Further, Debtor was negligent for failing to warn FTF that Debtor's Darawald C additive was not tested and caused a cat-like urine smell when mixed with the product and installed in FTF's customers' property.

Connecticut Courts indicate that a "contract is to be construed according to the law of the place where the contract is made." *Williams v State Farm Mut. Auto. Ins. Co.*, 229 Conn. 359, 366 (Conn. 1994). A second, less traditional, approach to resolving that issue is the "most significant relationship" test of the Restatement (Second). *Reichhold Chemicals, Inc. v. Hartford Accident and Indem. Co.*, 243 Conn. 401, 408 (Conn. 1997). The Restatement (Second), § 188(2) lists five factors to be considered: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Reichold Chemicals*, 243 Conn. at 409-410. "[I]t is well established that a contract is considered made when and where the last thing is done which is necessary to create an effective agreement." *Centennial Helicopters, Inc. v. Sterling Corp.*, C.A. No. CV0504002666, 2005 WL 3508575 (Conn. Super. Nov. 22, 2005) (citing *Alfred M. Best Co., Inc. v Goldstein*, 124 Conn. 597, 602 (Conn. 1938)).

Because Debtor's sale of product to FTF (a Connecticut corporation) was transacted in Connecticut and was to be performed in Connecticut where the deliveries to FTF were exclusively made,[7] Connecticut law should apply to FTF's claims.

Like Massachusetts law, Connecticut law provides that "the buyer *may* revoke his acceptance" of the goods. Conn. Gen. St. §42a-2-608 (emphasis added). Accordingly, FTF, like Neutocrete Products, as a buyer, is not required to revoke acceptance and other remedies are available to FTF. The Commentary to the statute provides in part that "buyer is no longer required to elect between revocation of acceptance and recovery of

---

[7]    Debtor's first shipment to Massachusetts occurred July 2001 (See Exh. 15), 6 months after its last invoice to FTF (See Exh. 12).

damages for breach.  *Both* are now available to him."  Conn. Gen. St. §42a-2-608 (emphasis added).

"The buyer who elects to keep nonconforming goods has a remedy in damages." *Stelco Industries, Inc. v. Cohen*, 182 Conn. 561, 564 (Conn. 1980).  Whether FTF rejected the defective products is irrelevant to its right to maintain an action for damages based on Debtor's breach of its agreement with FTF.  Furthermore, Conn. Gen. St. § 42a-2-715(2)(b) states that consequential damages resulting from the seller's breach include "injury to person or property proximately resulting from any breach of warranty."  As previously stated, FTF had an agreement with Debtor to purchase product.  Debtor breached that agreement by failing to provide product in conformity with the contracted 2.0 cubic foot volume purchase of proprietary mixture.  This breach by Debtor caused FTF injury.

To the extent Massachusetts law applies to FTF's claims then, in the alternative, for the same reasons as stated above, Debtor breached its implied warranties of merchantability and fitness under Massachusetts law.

### D.    FTF Has Standing to Sue For Damages Due to Defective and Deficient Products.

FTF also has standing to sue for damages due to Debtor's sale of defective and deficient products pursuant to either Massachusetts or Connecticut law, whichever law is deemed applicable.  Conn. Gen. St. § 52-572m *et seq.*; *Colter v. Barber-Greene Co.*, 403 Mass. 50 (Mass. 1988).

FTF's standing under Connecticut law is governed by the Connecticut Product Liability Act.  Conn. Gen. St. § 52-572m *et seq.*  Massachusetts does not have a product liability statute, however, under Massachusetts common law, a manufacturer is held

liable for defective products because they are in the best position to recognize and eliminate design defects. *Colter*, 403 Mass. 50. Both claims under the theories of negligence and breach of warranty are available. The basic elements of a product liability action founded on negligence are duty, breach of duty, cause in fact and proximate cause. *Colter*, 403 Mass. at 61. "[Massachusetts courts] impose liability when a product's manufacturer or seller has failed to use reasonable care to eliminate foreseeable dangers which subject a user to unreasonable risk of injury." *Colter*, 403 Mass. at 61.

In this case, Debtor was negligent as it knew or should have known that under-sizing and under-filing the bags as well as impermissibly crushing the product would result in a defective mixture, which, when installed by FTF in a basement, would be likely to crack and crumble due to the lack of integrity of the installed product. Warranty liability, a strict liability offense, focuses on whether the product was defective and not the conduct of the recipient of the goods, so therefore a defendant may be liable on a theory of breach of warranty of merchantability even though it thought the product was properly designed and manufactured. *Colter*, 403 Mass. at 61-62. Accordingly, a defendant in a Massachusetts product liability case may be found to have breached its warranty of merchantability without ever having been negligent. *Colter*, 403 Mass. at 62. In addition, evidence of a failure to adequately test a product is relevant to claims of design and manufacturing defect claims, and is not a separate and independent basis for liability. *Vassallo v. Baxter Healthcare Corporation*, 428 Mass. 1, 19 (Mass. 1998).

Debtor breached its warranty obligations to FTF pursuant to its agreement with FTF. Debtor failed to inform FTF that its product was bagged in a 1.75 cubic foot bag, thereby causing a defective mixture when FTF mixed each bag with the correct amount

of water for a 2.0 cubic foot bag.  Had Debtor warned FTF that the bags it provided were

under-sized, then FTF could have adjusted the mixture's water content accordingly.

Connecticut has promulgated a product liability statute.  Connecticut Courts have

recognized that where liability is founded in tort, rather than contract, "there appears no

sound reason why the manufacturer should escape liability simply because the injured

user, a party in the normal chain of distribution, was not in privity with it by purchase and

sale."  *Potter v. Chicago Pheumatic Tool Company*, 241 Conn. 199, 214 (Conn. 1997)

(citing *Garthwait v. Burgio*, 153 Conn. 284, 289-90 (Conn. 1965).  Conn. Sen. St. § 52-

572m(b) defines a "[p]roduct liability claim" to include a claim for property damage

caused by the formula, assembly packaging and labeling of any product and includes all

actions based upon the theories including negligence, breach of warranty and

misrepresentation.

> An examination of the legislative history of the [product
> liability] act supports the plaintiff[']s claim that the
> legislature was merely recasting an existing cause of action
> and was not creating a wholly new right for claimants
> harmed by a product.  The intent of the legislature was to
> eliminate the complex pleading provided at common law:
> *breach of warranty*, strict liability and *negligence.*

*Lynn v. Haybuster Mfg.*, Inc., 226 Conn. 282, 292 (Conn. 1993) (holding loss of

consortium claim not barred by spouse's product liability claim) (emphasis added).

Even though, pursuant to Conn. Sen. St. § 52-572n, as between commercial

parties a "commercial loss" may not be recovered in a product liability claim, damage to

other people's property that a defective product causes is recoverable.  *See Mountain*

*West Helicopter, LLC v. Kaman Aerospace Corp.*, 310 F. Supp. 2d 459, 465 (D. Conn.

2004).  The court in *Mountain* concluded that where "damage to other property

implicates the safety concerns of tort law . . . the so-called commercial loss rule of the

22

[Connecticut Products Liability Act] does not bar a plaintiff from recovering damages to property other than the product itself."  310 F. Supp. 2d at 466.  Connecticut's product liability statute allows the award of punitive damages.  *See* Conn. Sen. St. §52-240b.

As stated above, Debtor was negligent.  Debtor also breached its warranty obligations to FTF by under-sizing and under-filing the bags, impermissibly crushing the product, and by concealing that conduct because its bag label, describing only weight, did not disclose the bag volume to be 1.75 cubic feet, contrary to the required contracted volume purchased.  The damages claimed by FTF are not for damages to the product itself, but rather FTF's repair costs to remedy the damages to property of other persons at which FTF installed Debtor's product.

Debtor's product when mixed with the correct amount of water specified in the agreement was defective, as the mixture was not as contractually required, and the defective product, when installed, was weak, crumbly and released into the air unhealthy dust and particulates that created a hazard to FTF's customers.

**E.     NSI Has Standing to Sue For Damages Due to Defective and Deficient Products.**

As stated above, NSI did not purchase product from Debtor.  However, for the same reasons as stated in the above section regarding FTF's claim for damages due to defective and deficient products, NSI has standing to sue for damages due to Debtor's negligent sale of defective and deficient products.  As stated above, under Massachusetts law a products liability claim may be founded on negligence. *See*, *Colter*, 403 Mass, at 61.  Under Connecticut law, a product liability claim may also be founded on the theory of negligence. *See*, Conn. Sen. St. §52-572m(b); *Lynn v. Haybuster Mfg., Inc.*, 226 Conn. at 292.

With regards to NSI, the Debtor was negligent as Debtor knew or should have known that under-sizing and under-filing the bags and crushing the product during packaging would result in a defective mixture, which when installed by NSI in a basement would be likely to crack and crumble due to the lack of integrity of the installed product. NSI was not provided with any warning or other indication on Debtor's bags that the contents were not the correct volume for the mixture of product and water that NSI used in accordance with the contract.

Debtor also misrepresented to NSI (and FTF), either negligently or intentionally, that including the additive Darawald C would reduce product cracking. There is no evidence that Debtor ever tested Darawald C with the product formulation to determine if it would be odor free. In the exercise of due care, if Debtor had tested Darawald C it would, or should, have known that Darawald C gave off a fowl odor. In actuality, Darawald C exacerbated NSI's damages as it emitted a cat-like urine smell about which many of NSI's customers complained.

Debtor's product when mixed with the correct amount of water, as specified in the the contract, was defective, as the resulting mixture was not as specified, and the defective product, when installed, was weak, crumbly and released into the air unhealthy dust and particulates that created a hazard to NSI's customers.

Furthermore, based upon *Cambridge v. Napco*, as cited *supra*, NSI likely has a warranty claim for consequential damages notwithstanding the exclusion contained in the Long Term Agreement. Massachusetts law provides that the damages limitation provision is not enforceable if the party making the warranty either willfully repudiated or was willfully dilatory in performing its warranty obligations. *Canal Elec. Co. vs.*

*Westinghouse Elec. Corp*, 406 Mass. 369 (1990).  As explained above, Debtor was at least willfully dilatory in performing its warranty obligations.

> **F.    CUTPA Applies to Transactions Because to Find Otherwise Deprives Neutocrete Products' CUTPA Remedy in Violation of Fundamental Connecticut Public Policy.**

Debtor solicited business from Neutocrete Products in Connecticut; its sales and field staff visited Neutocrete Products at its Connecticut headquarters and specific jobsites in Connecticut; and except for a small quantity of product delivered to a drop shipment location in Massachusetts and three shipments to other states,  the Debtor shipped all ordered product to Neutocrete Products' Connecticut facilities.  Under these circumstances, the Debtor's and Neutocrete Products' business dealings predominately occurred in Connecticut and Debtor's deceptive acts did not occur primarily and substantially in Massachusetts.  This distinction is important because to obtain relief pursuant to Massachusetts Unfair Trade Practices Act (G.L.c. 93A, Sec. 11), the unfair or deceptive act or practice must have occurred "primarily and substantially" within Massachusetts.[8]  Connecticut's legislation under CUTPA, and the Connecticut Courts' interpretation of it, is broader than Massachusetts's legislation.

In cases where a foreign choice of law provision bars a party from relief for unfair trade practices, Connecticut courts have applied Connecticut law and permitted the party to raise a CUTPA claim.  *Custard Ins. Adjusters, Inc. v. Nardi*, C.A. No. CV9800619675,

---

[8]    G.I. c. 93A, Paragraph 8:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice *occurred primarily and substantially within the commonwealth*.  For the purposes of this paragraph, the burden of proof shall be upon the person claiming htat such transactions and actions did not occur primarily and substantially within the commonwealth.

(emphasis added).

2000 WL 562318 (Conn. Super. Apr. 20, 2000); *Wyatt Energy, Inc. v. Motiva Enterprises LLC*, C.A. No. CV020467090S, 2002 Conn. Super. LEXIS 3186 (Conn. Super. Sept. 27, 2002).

In *Custard*, where application of a choice of law provision requiring application of Massachusetts law resulted in a party being barred from bringing an unfair trade practices claim, the Court ruled it would violate Connecticut's fundamental policy by giving effect to that choice of law provision and preventing suit under CUTPA. 2000 WL 562318 at *2. In *Wyatt* where an arbitration agreement's Texas choice of law provision left a corporate party without a remedy under the narrower Texas Deceptive Trade Practices Act, the Court instead applied Connecticut law so as to not deprive the party of Connecticut statutory remedies under CUTPA which were enacted to effectuate important public policies of the State of Connecticut.

While Massachusetts courts have not set specific criteria for what constitutes "primarily and substantially," in a case where deceptive acts were made by a Massachusetts defendant engaging in a telephone call with a New York plaintiff and where plaintiff received the telephone call in in New York and suffered a loss in New York, the court found such acts did not form the basis of the Chapter 93A claim because they did not occur "primarily and substantially" in Massachusetts. *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622 (1985).

Compared to the *Bushkin* case, the evidence in this case is even stronger that Debtor's deceptive acts substantially occurred in Connecticut and therefore would not qualify for protection under the Massachusetts Act. For example: 1) Neutocrete Products and Debtor are Connecticut corporations; 2) Debtor solicited business from Neutocrete Products in Connecticut by visiting Neutocrete Products in Connecticut, and

corresponding by phone, fax and mail to Neutocrete Products' Connecticut business office; 3) Debtor's sales personnel and technical personnel met with Neutocrete Products' principals at Neutocrete Products' Connecticut Offices; 4) Debtor's technical staff made visits to specific FTF and NSI Connecticut jobsites; and 5) except for a small quantity of product delivered to a drop shipment location in Massachusetts and three shipments to other states, the Debtor shipped the rest of its product, consisting of 71,484 bags (80% of the total shipments) to Neutocrete Products' Connecticut facilities.

As a result, in light of the unavailability of Neutocrete Products to claim unfair trade practice relief under Massachusetts law and the fundamental public policy of Connecticut to provide such relief, the Massachusetts choice of law provision in the contract does not preclude Neutocrete Products' right to claim relief pursuant to CUTPA.

### G. Neutocrete Products May Recover CUTPA Damages, Including Legal Fees and Punitive Damages Due to Debtor's Unfair and Deceptive Conduct

CUTPA is "remedial in character . . . and must be liberally construed in favor of those whom legislature intended to benefit." *Eder Bros. v. Wine Merchs of Conn., Inc.*, 275 Conn. 363, 379 (2005). "CUTPA was designed to provide *protection to businesses as well as consumers.*" *Id*. (emphasis added). "A violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Glazer v Dress Barn, Inc.*, 274 Conn. 33, 82-83 (2005).

> An act or practice is deceptive it three conditions are met.  First, there must be a representation, omission, or other practice likely to mislead consumers.  Second, the consumers must interpret the message reasonably under the circumstances.    Third, the misleading misrepresentation, omission, or practice must be material — that is, likely to affect consumer decisions or conduct.

*Smithfield Associates, LLC v Tolland Bank*, 86 Conn. App. 14, 28 (2004), *cert denied*, 273 Conn. 907 (2007) (internal quotations omitted). "A party need not prove intent to deceive to prevail under CUTPA". *Journal Publ'g Co. v. Hartford Courant Co.*, 261 Conn. 673, 696 (2002) (internal quotations omitted).

As previously discussed, when the contents of the under-filled bag were measured in April 2002, the contents only yielded 1.5 cubic feet of product, despite Debtor's contracting to provide a specific volumetric formula – 2 cubic feet of Zonolite® #4 Vermiculate, 30 pounds of Type I or Type II Portland Cement and less than 2 ounces of Debtor's proprietary additive – for each bag. Debtor repeatedly under-filled the bags so the formula was not adhered to. Debtor also provided bags, with Neutocrete Products' private label, that were undersized (1.75 cubic foot capacity versus bags that were large enough to contain the contracted 2 cubic foot per bag volume). Debtor's deceptive actions mislead Neutocrete Products to believe that it was receiving the proper volumetric mixture and density of Neutocrete® product per bag in light of the fact that the contract set forth a specific volume per bag. The shortage of material resulting from Debtor's deceptive acts was material in that, by Debtor's significantly shorting the volume of product and altering the expected bulk density of the product, Neutocrete Products' related entities – FTF and NSI – were unable to achieve the proper water mixture which resulted in a substantial number of substandard and deficient installations.

### H. Neutocrete Products May Recover CUTPA Damages Including Reasonable Attorneys Fees and Punitive Damages Due to Debtor's Aggravated Breach.

"[T]he same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation." *Lester v Resort Camplands Int'l, Inc.*, 27 Conn. App. 59, 71 (1992). "Breach of contract and substantial aggravating circumstances attending the

breach" violate CUTPA.  *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.,* 41 Conn. Supp. 575, 580 (1991), *rev'd on other grounds*, 31 Conn. App. 455 (1993).

Debtor's agreement with Neutocrete Products states that "[e]ach delivery shall stand and may be recovered for as a separate and independent contract."  (*See* Exh. 1 at § 10.)  As stated above, Debtor breached its contract repeatedly.  Debtor misrepresented that it provided "superior products" which induced Neutocrete Products to enter into the Long Term Agreement.  Debtor misrepresented the volume of product it produced.  Debtor misrepresented the volume of product to be produced in future shipments.  Debtor misrepresented the volume of product capable of being contained in the bags Debtor provided.  Debtor, despite its claims of being an industry leader with superior product, failed to identify that a significant percentage of material was being shorted by Debtor with each bag delivered and that Debtor was crushing the product beyond what specifications required (e.g., changing the density), each independently causing Neutocrete unknowingly to apply the improper water mixture.  Debtor misrepresented, either negligently or intentionally, that including the additive Darawald C would reduce product cracking.  There is no evidence that Debtor ever tested Darawald C with the product formulation to determine if it would be odor free.  In the exercise of due care, if Debtor had tested Darawald C, it would, or should, have known that Darawald C gave off a noxious odor.  In actuality, Darawald C exacerbated Neutocrete Products' injury as it emitted a cat-like urine smell about which NSI's and FTF's customers complained.

Neutocrete Products is entitled under CUTPA to claim legal fees and punitive damages.  *See* Conn. Gen. St. § 41-110g.

I.      **FTF and Neutocrete Products May Recover for Debtor's Fraudulent Misrepresentation that its Products and Technical Services are Superior.**

Despite Debtor's promise in its May 19, 1999 proposal that the goods and technical services it would supply Neutocrete were "superior," the goods proved to be defective. Debtor's claims that misrepresenting the goods and technical service as being "superior" to the premix used by Claimants is not recoverable "puffing" is without merit. *See* Objection at ¶ 45. Debtor's misrepresentations were not made in an advertisement or marketing materials. They were not part of a sales pitch. Instead, they were included in Debtor's written proposal to the Buonauitos on May 19, 1999 to sell a substantial quantity of Debtor's cement product. The proposal included terms and conditions, including a description of the product coverage, production capacity, pricing and delivery costs.

In *SNET Info. Services, Inc. v. Tullock Fence, LLC*, C.A. No. CV054012642, 2005 Conn. Super. LEXIS 3499 at *2 (Conn. Super. Dec. 8, 2005), the plaintiff offered the defendant "exclusive" ads and represented that its revenues would double as a result of the ads. None of plaintiff's promises occurred. The court denied plaintiff's motion to strike defendant's counterclaim for CUTPA, ruling that if proven, defendant's counterclaim allegations were not merely "puffing" and would substantiate a CUTPA violation by plaintiff. *Id.*

In the present case, despite Debtor's representations, none of the products it supplied to Claimants proved to be "superior." In fact, Debtor's products proved to be inferior. The facts of this case are very similar to the ones in *SNET* and accordingly would satisfy a CUTPA cause of action.

### J.    Debtor Cannot Receive Payment for Unpaid Deliveries of Goods because, *inter alia*, the Applicable Statute of Limitations Ran.

Debtor claims it is entitled to receive payment for unpaid deliveries of goods which were delivered to Neutocrete Products.  According to Debtor, it last supplied goods to Neutocrete Products in May 2002.  According to Mass. Gen. Laws Ch. 106, § 2-725, an action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.  In 2002, Debtor commenced a civil action in the Connecticut Superior Court, judicial district of Litchfield and known as *WR Grace & Co. v. Neutocrete Products*, Docket No. CV-02-0088979S.  The lawsuit claimed damages for non-payment of delivered goods.  However, Debtor voluntarily withdrew the lawsuit on March 3, 2004.  (*See* Exh. 13).  Clearly, all of Debtor's claims for payment are barred by the four-year statute of limitations in Mass. Sen. Laws Ch. 106, § 2-725.

Furthermore, the same four-year statute of limitations applies to Debtor's claim of breach of contract re-labeled as an equitable claim under a theory of *quantum meruit*. Under Massachusetts law, where legal and equitable claims coexist, courts must necessarily focus upon the substance of an asserted claim as opposed to its form, and equitable remedies will be withheld if an applicable statute of limitations bars the concurrent legal remedy.  *Gilbert v. City of Cambridge*, 932 F.2d 51 (1st Cir. 1991), *cert. denied*, 502 U.S. 866, 112 S. Ct. 192.  *Quantum meruit*, while not identical to a breach of contract claim, is related to a contract action and has as a "basis the contract itself." *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 793, 494 N.E.2d 374, 377 (1986). Therefore, the same four-year statute of limitations applicable to Debtor's contract claim applies to its claim under a theory of *quantum meruit*.  This statute precludes Debtor's recovery for unpaid goods.

Finally, Debtor's filing for Chapter 11 Bankruptcy protection does not extend the statutory periods stated above.  11 U.S.C § 108(a) states that a trustee may commence an action only before the later of (1) the end of the applicable nonbankruptcy law period, or occurring suspension of such period, and (2) two years after the order for relief.  As previously mentioned, Debtor is precluded from applying its claim against Neutocrete under the applicable four year statute of limitations in Massachusetts.  In addition, Debtor voluntarily withdrew its case filed in Connecticut Superior Court so no order for relief was entered in that case prior to the statutory period expiring.

### K.    Neutocrete Products Did Not Waive Its Rights Per the $15,000 Credit Issued by Debtor.

On April 12, 2001, Debtor issued a "Credit Memo" to Neutocrete Products for $15,000.  (*See* Exh. 14).  The credit memo is devoid of any language whereby Neutocrete Products waived its right to assert claims against Debtor for goods it purchased from Debtor prior to the credit memo, nor is there any evidence of a waiver.  The Long Term Agreement states:  "[N]either party shall claim any amendment, modification or release from any provisions hereto of mutual agreement, acknowledgement or acceptance of purchase order forms, or otherwise, unless such agreement is in writing signed by the other party and *specifically stating it is an amendment to this Agreement*."  (Exh. 1 at ¶ 15 (emphasis added).)  Yet, Debtor – in violation of the Long Term Agreement – claims that the credit memo, which does not state that it is an amendment to the Long Term Agreement, modifies the agreement.

A waiver is an intentional or voluntary relinquishment of a known right.  *See* Black's Law Dictionary (8th ed. 2004).  There is no proof – either in writing or by sworn declaration – that Neutocrete Products intentionally relinquished any remedial rights.

IV.    **CONCLUSION**

For all of the above reasons, and those set forth in the prior submitted proof of claims, Claimants are entitled to substantial damages as a result of Debtor's conduct.


Dated: <u>July 26, 2010</u>                        <u>   /s/ Stamatios Stamoulis          </u>
                                 Stamatios Stamoulis  #4606
                                      stamoulis@swdelaw.com
                                 Richard C. Weinblatt #5080
                                      weinblatt@swdelaw.com
                                 Stamoulis & Weinblatt LLC
                                 Two Fox Point Centre
                                 6 Denny Road, Suite 307
                                 Wilmington, DE 19809
                                 (302) 999-1540

                                 *Attorneys for Neutocrete, NSI and FTF*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

       W.R. GRACE & CO., *et al.*

             Debtors.

Chapter 11

Civil Action No. 01-01139 (JKF)

Jointly Administered

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2010, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing(s) to all registered counsel.  In addition, the following counsel also were served by email:

> The Law Offices of Janet S. Baer P.C.,
> Janet S. Baer, P.C.
> 70 W. Madison St., Suite 2100,
> Chicago, IL 60602.
> Phone: 312-641-2162.
> Fax: 312-641-2165
>
> PACHULSKI STANG ZIEHL & JONES LLP
> Laura Davis Jones (Bar. No. 2436)
> James E. O'Neill (Bar No. 4042)
> Kathleen P. Makowski (Bar No. 3648)
> Timothy P. Cairns (Bar No. 4228)
> 919 North Market St, 16th Floor
> P.O. Box 8705
> Wilmington, DE 19899-8705 (Courier 19801)

/s/ Stamatios Stamoulis
   Stamatios Stamoulis