## EXHIBIT A

*Agreement and Plan of Merger* among Mallard Acquisition Corp. Synthetech, Inc., an Oregon corporation, and W. R. Grace & Co.-Conn., dated as of September 13, 2010

**EXECUTION COPY**

# AGREEMENT AND PLAN OF MERGER

Among

## W. R. GRACE & CO.–CONN.,

## MALLARD ACQUISITION CORP.

and

## SYNTHETECH, INC.

**Dated as of September 13, 2010**

# Table of Contents

ARTICLE I

THE MERGER

| | | Page |
|---|---|---|
| Section 1.1 | The Merger | 1 |
| Section 1.2 | Closing | 2 |
| Section 1.3 | Effective Time | 2 |
| Section 1.4 | Effects of the Merger | 2 |
| Section 1.5 | Articles of Incorporation and Bylaws of the Surviving Corporation | 2 |
| Section 1.6 | Directors | 2 |
| Section 1.7 | Officers | 3 |

ARTICLE II

CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

| | | |
|---|---|---|
| Section 2.1 | Effect on Stock | 3 |
| Section 2.2 | Exchange of Certificates | 6 |

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

| | | |
|---|---|---|
| Section 3.1 | Qualification, Organization, Subsidiaries, etc | 9 |
| Section 3.2 | Capital Stock | 10 |
| Section 3.3 | Corporate Authority to this Agreement; No Violation | 11 |
| Section 3.4 | Reports and Financial Statements | 12 |
| Section 3.5 | Internal Controls and Procedures | 12 |
| Section 3.6 | No Undisclosed Liabilities | 13 |
| Section 3.7 | Compliance with Law; Permits | 13 |
| Section 3.8 | Environmental Laws and Regulations | 14 |
| Section 3.9 | Safety, Health and Product Stewardship Laws and Regulations | 17 |
| Section 3.10 | Employee Benefit Plans | 18 |
| Section 3.11 | Absence of Certain Changes or Events | 21 |
| Section 3.12 | Investigations; Litigation | 21 |
| Section 3.13 | Proxy Statement; Other Information | 21 |
| Section 3.14 | Rights Plan | 22 |
| Section 3.15 | Tax Matters | 22 |
| Section 3.16 | Labor Matters | 23 |
| Section 3.17 | Intellectual Property | 24 |
| Section 3.18 | Opinion of Financial Advisor | 25 |
| Section 3.19 | Required Vote of the Company Stockholders | 25 |
| Section 3.20 | Material Contracts | 25 |

Section 3.21  Real Property                                                    27
Section 3.22  Finders or Brokers                                               28
Section 3.23  Insurance                                                        28
Section 3.24  Certain Business Practices                                       29

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Section 4.1  Qualification; Organization                                       29
Section 4.2  Corporate Authority Relative to this Agreement; No Violation      29
Section 4.3  Reports and Financial Statements                                  30
Section 4.4  Proxy Statement; Other Information                                31
Section 4.5  Available Funds                                                   31
Section 4.6  No Vote of Parent Stockholders                                    31
Section 4.7  Investigation by Parent and Merger Sub                            31
Section 4.8  Merger Sub's Operations                                           32
Section 4.9  Acquiring Person                                                  32

## ARTICLE V

## COVENANTS AND AGREEMENTS

Section 5.1   Conduct of Business by the Company                               32
Section 5.2   Investigation                                                    35
Section 5.3   No Solicitation                                                  36
Section 5.4   Filings, Other Actions                                          39
Section 5.5   Stock Options; Employee Matters                                 40
Section 5.6   Reasonable Best Efforts                                          42
Section 5.7   Takeover Statute                                                42
Section 5.8   Public Announcements                                           43
Section 5.9   D&O Insurance                                                   43
Section 5.10  Section 16 Matters                                             43
Section 5.11  Control of Operations                                          43
Section 5.12  Certain Transfer Taxes                                         43
Section 5.13  Notification of Certain Matters                                44
Section 5.14  Balance Sheet and Transaction Express                         44

## ARTICLE VI

## CONDITIONS TO THE MERGER

Section 6.1  Conditions to Each Party's Obligation to Effect the Merger       44
Section 6.2  Conditions to Obligation of the Company to Effect the Merger     44
Section 6.3  Conditions to Obligation of Parent to Effect the Merger          45

ii

MCIDOCS - #307868/3

## ARTICLE VII

## TERMINATION

| Section 7.1 | Termination or Abandonment | 46 |
| Section 7.2 | Termination Fee | 48 |
| Section 7.3 | Amendment or Supplement | 49 |
| Section 7.4 | Extension of Time, Waiver, etc | 49 |

## ARTICLE VIII

## MISCELLANEOUS

| Section 8.1 | No Survival of Representations and Warranties | 49 |
| Section 8.2 | Expenses | 49 |
| Section 8.3 | Counterparts; Effectiveness | 50 |
| Section 8.4 | Governing Law | 50 |
| Section 8.5 | Jurisdiction; Enforcement | 50 |
| Section 8.6 | [Intentionally Omitted] | |
| Section 8.7 | Notices | 51 |
| Section 8.8 | Assignment; Binding Effect | 52 |
| Section 8.9 | Severability | 52 |
| Section 8.10 | Entire Agreement; Third-Party Beneficiaries | 52 |
| Section 8.11 | Headings | 53 |
| Section 8.12 | Interpretation | 53 |
| Section 8.13 | Bankruptcy Court Approval | 53 |
| Section 8.14 | Definitions | 54 |

## **EXHIBITS**

Exhibit A – Form of Director and Officer Release

MCIDOCS - #307868/3

**AGREEMENT AND PLAN OF MERGER,** dated as of September 13, 2010 (the "Agreement"), among W. R. Grace & Co.-Conn., a Connecticut corporation ("Parent"), Mallard Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub"), and Synthetech, Inc., an Oregon corporation (the "Company").

## W I T N E S S E T H:

WHEREAS, the respective Boards of Directors of Parent, Merger Sub and the Company have approved the merger of Merger Sub with and into the Company upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the respective Boards of Directors of Parent, Merger Sub and the Company have approved and declared advisable this Agreement and the merger of Merger Sub with and into the Company, as set forth below (the "Merger"), in accordance with the corporate law applicable to each corporation and upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Parent and Merger Sub have approved this Agreement and the consummation of the Merger and all of the covenants and agreements contained in this Agreement;

WHEREAS, as an inducement to Parent's willingness to enter into this Agreement, Parent and certain stockholders of the Company which beneficially or of record own an aggregate of approximately 9% of the outstanding Shares (as defined below) (the "Stockholders") have entered into voting agreements (the "Voting Agreements") relating to the Merger and the other transactions contemplated by this Agreement; and

NOW THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent, Merger Sub and the Company agree as follows:

### ARTICLE I

### THE MERGER

Section 1.1    The Merger. At the Effective Time (as defined in Section 1.3), upon the terms and subject to the conditions set forth in this Agreement and in accordance with the applicable provisions of the Oregon Business Corporation Act (the "OBCA") and the Delaware General Corporation Law (the "DGCL"), Merger Sub shall be merged with and into the Company, whereupon the separate corporate existence of Merger Sub shall cease, and the Company shall continue as the surviving company in the Merger (the "Surviving Corporation") and a wholly owned subsidiary of Parent.

1

Section 1.2    <u>Closing</u>.  The closing of the Merger (the "<u>Closing</u>") shall take place at the offices of Venable LLP, 575 7th Street NW, Washington, DC 20004, at 10:00 a.m., local time, on a date to be specified by the parties (the "<u>Closing Date</u>") which shall be no later than the second business day after the satisfaction or waiver (to the extent permitted by applicable Law (as defined in Section 3.7(a)) of the conditions set forth in ARTICLE VI (other than those conditions that by their nature are to be satisfied by action at the Closing, but subject to the satisfaction or written waiver of such conditions), or at such other place, date and time as the Company and Parent may agree in writing.

Section 1.3    <u>Effective Time</u>.  On the Closing Date, immediately after the Closing, the parties shall cause the Merger to be consummated by executing and filing articles of merger (the "<u>Articles of Merger</u>") with the Secretary of State of the State of Oregon and a certificate of merger with the Secretary of State of the State of Delaware and make all other filings or recordings required under the OBCA and DGCL in connection with the Merger. The Merger shall become effective at such time as the Articles of Merger are duly filed with the Secretary of State of the State of Oregon, or at such later time as the parties shall agree and as shall be set forth in the Articles of Merger (such time as the Merger becomes effective is referred to herein as the "<u>Effective Time</u>").

Section 1.4    <u>Effects of the Merger</u>.  The effects of the Merger shall be as provided in this Agreement and in the applicable provisions of the OBCA and of the DGCL. Without limiting the generality of the foregoing, at the Effective Time, all the property, rights, privileges, powers and franchises of the Company and Merger Sub shall vest in the Surviving Corporation, and all debts, liabilities and duties of the Company and Merger Sub shall become the debts, liabilities and duties of the Surviving Corporation, all as provided under the applicable laws of the State of Oregon and the State of Delaware.

Section 1.5    <u>Articles of Incorporation and Bylaws of the Surviving Corporation</u>.

(a)    Subject to Section 5.9 of this Agreement, at the Effective Time, the Articles of Incorporation of the Company, as in effect immediately prior to the Effective Time shall be the Articles of Incorporation of the Surviving Corporation, until thereafter amended in accordance with the provisions thereof and applicable Law.

(b)    At the Effective Time, subject to Section 5.9 of this Agreement, the by-laws of the Company, as in effect immediately prior to the Effective Time shall be the by-laws of the Surviving Corporation, until thereafter amended in accordance with the provisions thereof and applicable Law.

Section 1.6    <u>Directors</u>.  Subject to applicable Law, the directors of Merger Sub immediately prior to the Effective Time shall be the initial directors of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

Section 1.7    <u>Officers</u>. The officers of the Merger Sub immediately prior to the Effective Time shall be the initial officers of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

## ARTICLE II

## CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

Section 2.1    <u>Effect on Stock</u>. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Merger Sub or the holders of any securities of the Company or Merger Sub:

(a)    <u>Conversion of Company Common Stock</u>. Subject to Section 2.1(d) and Section 2.1(e), each issued and outstanding share of Common Stock, par value $0.001 per share, of the Company outstanding immediately prior to the Effective Time (such shares collectively, "<u>Company Common Stock</u>" or "<u>Shares</u>" and each, a "<u>Share</u>"), other than any Cancelled Shares (as defined, and to the extent provided in, Section 2.1(b)) and any Dissenting Shares (as defined, and to the extent provided in, Section 2.1(e)), shall thereupon be converted into and shall thereafter represent the right to receive an amount equal to the Merger Consideration in cash. The aggregate amount of cash each Company stockholder is entitled to receive for the total Shares held by such Company stockholder shall be rounded to the nearest cent and computed after aggregating cash amounts for all Shares held by such Company stockholder. All Shares that have been thus converted into the right to receive the Merger Consideration as provided in this Section 2.1 shall be automatically cancelled and shall cease to exist and the holders of certificates which immediately prior to the Effective Time represented such Shares ("<u>Certificates</u>") or holders of Shares represented by book entry ("<u>Book-Entry Shares</u>") shall cease to have any rights with respect to such Shares other than the right to receive the Merger Consideration, without interest thereon, upon surrender of such Certificates or Book-Entry Shares, as applicable, in accordance with this Article II.

(b)    <u>Parent and Merger Sub-Owned Shares</u>. Each Share that is owned, directly or indirectly, by Parent or Merger Sub immediately prior to the Effective Time or held by the Company as treasury stock (in each case, other than any such Shares held on behalf of third parties) (the "<u>Cancelled Shares</u>") shall, by virtue of the Merger and without any action on the part of the holder thereof, be cancelled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(c)    <u>Conversion of Merger Sub Common Stock</u>. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, par value $0.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation with the same rights, powers and privileges as the shares so converted and shall constitute the only outstanding shares of capital stock of the

3

Surviving Corporation. From and after the Effective Time, all certificates representing the common stock of Merger Sub shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Corporation into which they were converted in accordance with the immediately preceding sentence.

(d)     _Adjustments_. If at any time during the period between the date of this Agreement and the Effective Time, any change in the outstanding shares of capital stock of the Company shall occur as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend or stock distribution with a record date during such period, the Merger Consideration shall be equitably adjusted to reflect such change.

(e)     _Dissenting Shares_. (i) Notwithstanding anything contained in this Agreement to the contrary, no Shares issued and outstanding immediately prior to the Effective Time, the holder of which (A) has not voted in favor of the Merger or consented thereto in writing, (B) has delivered written notice of the holder's intent to dissent in accordance with Section 60.564 of the OBCA, and (C) has demanded payment in accordance with Section 60.571 of the OBCA (the "_Dissenting Shares_"), shall be converted into or represent a right to receive the Merger Consideration pursuant to Section 2.1(a). By virtue of the Merger, all Dissenting Shares shall be cancelled and shall cease to exist and shall represent the right to receive only those rights provided under the OBCA. From and after the Effective Time, a holder of Dissenting Shares shall not be entitled to exercise any of the voting rights or other rights of a member or equity owner of the Surviving Corporation or of a stockholder of Parent.

(ii)     Notwithstanding the provisions of this Section 2.1(e), if any holder of Shares who demands dissenters' rights shall effectively withdraw or lose (through failure to perfect or otherwise) the right to dissent or its rights of appraisal, then, as of the later of the Effective Time and the occurrence of such event, such holder's Shares shall no longer be Dissenting Shares and shall automatically be converted into and represent only the right to receive Merger Consideration, without any interest thereon.

(iii)     The Company shall give Parent (A) prompt notice of any written demands for dissenters' rights of any Shares, withdrawals of such demands, and any other instruments served pursuant to the OBCA and received by the Company which relate to any such demand for dissenters' rights and (B) the opportunity to participate in all negotiations and proceedings with respect to demands for dissenters' rights under the OBCA. The Company shall not, except with the prior written consent of Parent, make any payment with respect to any demands for dissenters' rights or offer to settle or settle any such demands.

(f)     The following shall have the meanings given:

(i)     "_Adjusted Total Merger Consideration_" means the Total Merger Consideration _plus_ the sum of the exercise price of all Company Stock Options

that are unexercised and outstanding immediately prior to the Closing (other than Out-of-the-Money Options).

        (ii)   "Debt" means, with respect to any person at any date of determination (without duplication):

       (A)     all debt of such Person for borrowed money,

       (B)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments,

       (C)     all obligations of such Person in respect of letters of credit or other similar instruments (including reimbursement obligations with respect thereto),

       (D)     all obligations of such Person to pay the deferred purchase price of property or services, which purchase price is due more than six months after the date of placing such property in service or taking delivery thereto or the completion of such services, except trade payables,

       (E)     all obligations of such Person as lessee under any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of such Person, as lessee, in conformity with GAAP, is required to be capitalized on the balance sheet of such Person,

       (F)     all Debt of Persons other than such Person secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person, and

       (G)     all Debt of Persons other than such Person guaranteed by such Person to the extent such Debt is guaranteed by such Person.

       The amount of Debt of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation.

       (iii)   "Fully Diluted Number" means the sum without duplication of (a) the total number of shares of Company Common Stock outstanding immediately prior to the Effective Time *plus* (b) the total number of shares of Company Common Stock that are issuable upon exercise of the Company Options outstanding immediately prior to the Effective Time, other than Out-of-the-Money Options.

       (iv)   "Merger Consideration" means the quotient obtained by dividing (a) the Adjusted Total Merger Consideration by (b) the Fully Diluted Number.

MCIDOCS - #307868/3

(v)    "<u>Out-of-the-Money Options</u>" means Company Stock Options that have an exercise price per share equal to or greater than the price per share as calculated using the Treasury Stock Method (as defined in accordance with GAAP) using as the inputs to the calculation the Total Merger Consideration immediately prior to the Effective Time as the equity value, the number of issued and outstanding Company Common Stock immediately prior to the Effective Time, and the expiration date, option price and shares outstanding for the Company Stock Options listed in Section 3.2(e) of the Company Disclosure Schedules and outstanding immediately prior to the Effective Time."

(vi)    "<u>Total Merger Consideration</u>" means (a) $19,176,573 *minus* (b)(i) the amount of any Transaction Expenses, (ii) Debt of the Company as of the close of business on the date immediately preceding the Closing Date, and (iii) the amount, if any, by which the Company's total cash and cash equivalents as of the close of business on the date immediately preceding the Closing Date is less than $600,000, *plus* (c) an amount, not to exceed $125,000, equal to the purchase price of the Run-Off Program, if any.

(vii)    "<u>Transaction Expenses</u>" means all out-of-pocket fees and expenses of the Company in connection with the Merger and this Agreement and the transactions contemplated hereby that are accrued and unpaid as of the Effective Time (including any fees and expenses of legal counsel and accountants, fees and expenses payable to financial advisors, investment bankers and brokers of the Company).

Section 2.2    <u>Exchange of Certificates</u>.

(a)    <u>Paying Agent</u>. Prior to the Effective Time, Parent shall deposit, or shall cause to be deposited, with a U.S. bank or trust company that shall be appointed to act as a paying agent hereunder and approved in advance by the Company in writing (the "<u>Paying Agent</u>"), in trust for the benefit of holders of the Shares, the Company Stock Options (as defined in Section 5.5(a)(i)) and cash sufficient to pay (i) the aggregate Merger Consideration in exchange for all of the Shares outstanding immediately prior to the Effective Time (other than the Cancelled Shares and the Dissenting Shares), payable upon due surrender of the Certificates (or effective affidavits of loss in lieu thereof) and Book-Entry Shares pursuant to the provisions of this Article II and (ii) the Option Consideration (as defined in Section 5.5(a)(ii)) payable pursuant to Section 5.5 (such cash referred to in sub-section 2.2(a)(i) and 2.2(a)(ii) being hereinafter referred to as the "<u>Exchange Fund</u>").

(b)    <u>Payment Procedures</u>. (i) As soon as reasonably practicable after the Effective Time and in any event not later than the second Business Day following the Effective Time, Parent shall cause the Paying Agent to mail to each holder of record of Shares whose Shares were converted into the Merger Consideration pursuant to Section 2.1, (x) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to Certificates or Book-Entry Shares shall pass, only upon delivery of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares to the

6

Paying Agent and shall be in such form and have such other provisions as Parent and the Company may reasonably specify), and (y) instructions for use in effecting the surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares in exchange for the Merger Consideration. On the Closing Date, Parent shall cause the Paying Agent also to deliver, or cause to be delivered, to each holder of a Company Stock Option by wire transfer the amount due and payable to such holder pursuant to Section 5.5 hereof in respect of such Company Stock Option.

(ii)    Upon surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares to the Paying Agent together with, in the case of Certificates, such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, or, in the case of Book-Entry Shares, receipt by the Paying Agent of an "agent's message," and such other documents as may customarily be required by the Paying Agent, the holder of such Certificates or Book-Entry Shares shall be entitled to receive in exchange therefor a check in an amount equal to the product of (x) the number of Shares represented by such holder's properly surrendered Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares multiplied by (y) the Merger Consideration. No interest will be paid or accrued on any amount payable upon due surrender of Certificates or Book-Entry Shares. In the event of a transfer of ownership of Shares that is not registered in the transfer records of the Company, a check for any cash to be paid upon due surrender of the Certificate or Book-Entry Share may be paid to such a transferee if the Certificate or Book-Entry Share formerly representing such Shares is presented to the Paying Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer Taxes (as defined in Section 3.15(b)) have been paid or are not applicable. Until surrendered as contemplated by this Section 2.2, each Certificate or Company Book-Entry Share shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the applicable Merger Consideration as contemplated by this Article II.

(iii)    For the avoidance of doubt, the Paying Agent, the Surviving Corporation and Parent shall each be entitled to deduct and withhold from the consideration otherwise payable under this Agreement to any holder of Shares or holder of Company Stock Options, such amounts as are required to be withheld or deducted under the Internal Revenue Code of 1986, as amended (the "Code"), or any provision of state, local or foreign Tax Law with respect to the making of such payment. To the extent that amounts are so withheld or deducted and paid over to the applicable Governmental Entity (as defined in Section 3.3(b)), such withheld or deducted amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Shares or holder of the Company Stock Options, in respect of which such deduction and withholding were made.

(c)    Closing of Transfer Books. At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time,

MCIDOCS - #307868/3

Certificates are presented to the Surviving Corporation or Parent for transfer, they shall be cancelled and exchanged for a check in the proper amount pursuant to this Article II.

(d)    Termination of Exchange Fund. Any portion of the Exchange Fund (including the proceeds of any investments thereof) that remains undistributed to the former holders of Shares or Company Stock Options for one (1) year after the Effective Time shall be delivered to the Surviving Corporation upon demand, and any former holders of Shares who have not theretofore complied with this Article II shall thereafter look only to Parent for payment of their claim for the Merger Consideration, without any interest thereon, upon due surrender of their Shares.

(e)    No Liability. Notwithstanding anything herein to the contrary, none of the Company, Parent, Merger Sub, the Surviving Corporation, the Paying Agent or any other person (as defined in Section 8.13(a)) shall be liable to any former holder of Shares for any amount properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate or Book-Entry Share shall not have been surrendered prior to such date on which any Merger Consideration payable to the holder of such Certificate or Book-Entry Share pursuant to this Article II would otherwise escheat to or become the property of any Governmental Entity, any such Merger Consideration in respect of such Certificate or Book-Entry Share shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, and any former holder of Shares who has not theretofore complied with this Article II shall thereafter look only to the Surviving Corporation for payment of their claim for Merger Consideration.

(f)    Investment of Exchange Fund. The Paying Agent shall invest all cash included in the Exchange Fund as directed by Parent. Any interest and other income resulting from such investments shall be paid to Parent.

(g)    Lost Certificates. In the case of any Certificate that has been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by the Paying Agent, the posting by such person of a bond in customary amount as indemnity against any claim that may be made against it with respect to such Certificate, the Paying Agent will issue in exchange for such lost, stolen or destroyed Certificate a check in the amount of the number of Shares represented by such lost, stolen or destroyed Certificate multiplied by the Merger Consideration.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company SEC Documents (as defined in Section 3.4(a)) filed or furnished with the SEC prior to the date hereof (and then (i) only to the extent reasonably apparent in the Company SEC Documents that such disclosed item is an event, item or occurrence relates to a matter covered by a representation or warranty

8

set forth in this Article III and (ii) other than in risk factors or other similar forward-looking statements or language in such filings) or in the Disclosure Schedule delivered by the Company to Parent immediately prior to the execution of this Agreement (the "Company Disclosure Schedule") (it being agreed that disclosure of any item in any section of the Company Disclosure Schedule shall be deemed disclosure with respect to any other section of this Agreement to which the relevance of such item is reasonably apparent), the Company represents and warrants to Parent and Merger Sub as follows:

Section 3.1   Qualification, Organization, Subsidiaries, etc. The Company is a corporation duly organized and validly existing under the Laws of the State of Oregon and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, has not had and would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. Except as set forth on Section 3.1 of the Company Disclosure Schedule, the Company has no, and has never had, any Subsidiaries (as defined in Section 8.13(a)). The Company has made available to Parent prior to the date of this Agreement a true and complete copy of the Company's Articles of Incorporation and by-laws, each as amended through the date hereof. Such Articles of Incorporation and by-laws are in full force and effect and the Company is not in violation of any provision of the Company's Articles of Incorporation and by-laws. As used in this Agreement, any reference to any state of facts, circumstances, event or change having a "Company Material Adverse Effect" means such state of facts, circumstances, event or change that has had a material adverse effect on the business, operations or financial condition of the Company but shall not include (a) facts, circumstances, events or changes (i) generally affecting the fine chemical industry or the segments thereof in which the Company operates (including changes to commodity prices) in the United States or elsewhere, (ii) generally affecting the economy or the financial, debt, credit or securities markets, in the United States or elsewhere, (iii) resulting from any political conditions or developments in general, (iv) resulting from any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism (other than any of the foregoing to the extent that it causes any direct damage or destruction to or renders physically unusable or inaccessible any facility or property of the Company), (v) reflecting or resulting from changes or proposed changes in Law (including rules and regulations) or interpretation thereof or GAAP (as defined in Section 3.4(b)) (or interpretations thereof), or (vi) resulting from actions of the Company which Parent has expressly requested in writing or to which Parent has expressly consented in writing; (b) any decline in the stock price of the Company Common Stock or any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period (provided that the underlying causes of such decline or failure may, to the extent applicable, be considered in determining whether there is a Company Material Adverse Effect); or (c) any facts, circumstances, events or changes resulting from the announcement or the existence of, or compliance (other than the obligation of the Company to comply with its obligations to

operate in the ordinary course of business) with, this Agreement and the transactions contemplated hereby; provided, however, that this clause (c) shall not diminish the effect of, and shall be disregarded for purposes of, the representations and warranties relating to required consents, approvals, change in control provisions or similar rights of acceleration, termination, modification or waiver based upon the entering into of this Agreement and the consummation of the Merger. For purposes of clarification, any actions required by any person to comply with Section 5.6 (and the impact thereof) shall be excluded from the determination of Company Material Adverse Effect. For avoidance of doubt any material damage to the Owned Real Property that is not fully restored by the Effective Time shall be a "Material Adverse Effect" under this agreement, whether or not insured.

Section 3.2    Capital Stock.

(a)    The authorized capital stock of the Company consists of 100,000,000 shares of Company Common Stock. As of the close of business on September 13, 2010, (i) 14,664,614 shares of Company Common Stock were issued and outstanding, (ii) no shares of Company Common Stock were held in treasury, (iii) 2,266,120 shares of Company Common Stock were reserved for issuance pursuant to currently outstanding Company Stock Options (as defined below), and (iv) 14,664,614 shares of Company Common Stock were reserved for issuance upon the exercise of rights granted under the Amended and Restated Rights Agreement, dated as of July 31, 2008 (the "Rights Plan"), between the Company and Computershare Trust Company, N.A. All the outstanding shares of Company Common Stock are, and all shares of Company Common Stock reserved for issuance as noted above shall be, when issued in accordance with the respective terms thereof, duly authorized, validly issued and fully paid and non-assessable and free of pre-emptive rights.

(b)    Except as set forth in subsection (a) above, as of the date hereof: (i) the Company does not have any shares of its capital stock issued or outstanding other than shares of Company Common Stock that have become outstanding after September 13, 2010, but were reserved for issuance as set forth in subsection (a) above, and (ii) there are no outstanding subscriptions, options, warrants, calls, convertible securities or other similar rights, agreements or commitments relating to the issuance of capital stock to which the Company is a party obligating the Company to (A) issue, transfer or sell any shares of capital stock or other equity interests of the Company or securities convertible into or exchangeable for such shares or equity interests; (B) grant, extend or enter into any such subscription, option, warrant, call, convertible securities or other similar right, agreement, arrangement or commitment to repurchase; (C) redeem or otherwise acquire any such shares of capital stock or other equity interests; or (D) provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in, any entity.

(c)    The Company has no outstanding bonds, debentures, notes or other obligations, the holders of which have the right to vote (or which are convertible into or

10

exercisable for securities having the right to vote) with the stockholders of the Company on any matter.

(d)    Except for the Voting Agreements, there are no voting trusts or other agreements or understandings to which the Company is a party with respect to the voting of the capital stock or other equity interest of the Company.

(e)    Section 3.2(e) of the Company Disclosure Schedule accurately and completely sets forth all options outstanding as of the date hereof, and the exercise price, expiration date and vesting schedule of all such options. None of the Company Stock Options shall survive the Effective Time.

Section 3.3    <u>Corporate Authority to this Agreement; No Violation.</u>

(a)    The Company has requisite corporate power and authority to enter into this Agreement and, subject to receipt of the Company Stockholder Approval (as defined in Section 3.19), to consummate the transactions contemplated hereby, including the Merger. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Company and, except for (i) the Company Stockholder Approval and (ii) the filing of the Articles of Merger with the Secretary of State of Oregon and a certificate of merger with the Secretary of State of Delaware, no other corporate proceedings on the part of the Company are necessary to authorize the consummation of the transactions contemplated hereby. The Board of Directors of the Company has taken all necessary action so that none of the restrictions set forth in Section 60.825 of the OBCA (the "<u>Interested Stockholder Statute</u>") or Section 60.801 <u>et</u> <u>seq</u> of the OBCA (the "<u>Control Share Statute</u>") applies to the Merger, this Agreement, the Voting Agreement, or the transactions contemplated hereby and thereby. The Board of Directors of the Company has determined that the transactions contemplated by this Agreement are fair to and in the best interest of the Company and its stockholders and to recommend to such stockholders that they approve and adopt this Agreement. This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement constitutes the valid and binding agreement of the Parent and Merger Sub, constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

(b)    Other than in connection with or in compliance with (i) the applicable provisions of the OBCA and the DGCL, (ii) the Exchange Act, and (iii) the approvals set forth on Section 3.3(b) of the Disclosure Schedule (collectively, the "<u>Company Approvals</u>"), no authorization, consent or approval of, or filing with, any United States or foreign governmental or regulatory agency, national securities exchange, commission, court, body, entity or authority (each, a "<u>Governmental Entity</u>") is necessary, under applicable Law, for the consummation by the Company of the transactions contemplated by this Agreement.

11

(c)    The execution and delivery by the Company of this Agreement does not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not (i) result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a material benefit under any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, instrument, permit, concession, franchise, right or license binding upon the Company or result in the creation of any liens, claims, mortgages, encumbrances, pledges, security interests, equities or charges of any kind (each, a "Lien") upon any of the properties or assets of the Company, (ii) conflict with or result in any violation of any provision of the Articles of Incorporation or by-laws of the Company, or (iii) conflict with or violate any Laws applicable to the Company or any of its properties or assets.

Section 3.4    Reports and Financial Statements.

(a)    The Company has filed or furnished all forms, documents and reports required to be filed or furnished prior to the date hereof by it with the Securities and Exchange Commission (the "SEC") since March 31, 2007 (the "Company SEC Documents"). As of their respective dates, or, if amended, as of the date of the last such amendment, the Company SEC Documents complied in all material respects, and all documents required to be filed or furnished by the Company with the SEC after the date hereof and prior to the Effective Time (the "Subsequent Company SEC Documents") will comply in all material respects, with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents contained, and none of the Subsequent Company SEC Documents will contain, any untrue statement of a material fact or omitted, or will omit, to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading.

(b)    The financial statements (including all related notes and schedules) of the Company included in the Company SEC Documents fairly present in all material respects, and when included in the Subsequent Company SEC Documents will fairly present in all material respects, the financial position of the Company as at the respective dates thereof and the results of operations and cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein including the notes thereto) in conformity with applicable generally accepted accounting principles ("GAAP") (except, in the case of the unaudited statements, as permitted by the applicable rules and forms promulgated by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto). Since March 31, 2010, the Company has not made any change in the accounting practices or policies applied in the preparation of its financial statements, except as required by GAAP, SEC rule or policy or applicable Law.

12

Section 3.5    Internal Controls and Procedures.

(a)    The Company has established and maintains disclosure controls and procedures and internal control over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively of Rules 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act. The Company's disclosure controls and procedures are reasonably designed to ensure that all material information required to be disclosed by the Company in the reports that it files or furnishes under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such material information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure and to make the certifications required pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act").

(b)    The Company maintains a standard system of accounting established and administered in accordance with GAAP in all material respects. The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Section 3.6    No Undisclosed Liabilities. Except (i) as disclosed, reflected or reserved against in the Company's balance sheets (or the notes thereto) included in the Company SEC Documents filed or furnished on or prior to the date hereof, (ii) for liabilities incurred in the ordinary course of business since March 31, 2010, and (iii) liabilities which have been discharged or paid in full in the ordinary course of business, as of the date hereof, the Company has no liabilities of any nature, whether or not accrued, contingent or otherwise, that would be required by GAAP to be reflected on a balance sheet of the Company (or in the notes thereto). For the avoidance of doubt, for purposes of this Section 3.6, the terms "liabilities" shall not include obligations of the Company to perform under or comply with any Law, action, judgment or contract (in each case, other than an obligation to pay money) but would include such obligations if there has been a default or failure to perform or comply by the Company with any such obligation if such default or failure would, with the giving of notice or passage of time or both, reasonably be expected to result in a monetary obligation.

Section 3.7    Compliance with Law; Permits.

(a)    The Company is in compliance in all material respects with and is not in material default under or in material violation of any federal, state, local or foreign Law, statute, ordinance, rule, regulation, judgment, order, injunction, decree, agency requirement, license or permit of any Governmental Entity (collectively, "Laws" and

each, a "<u>Law</u>"), applicable to the Company or any of its properties or assets. This Section 3.7(a) shall not apply to Environmental Laws, Safety, Health and Product Stewardship Laws, employee benefits, Tax matters and labor matters, which are the subject exclusively of the representations and warranties set forth in Section 3.8, Section 3.9, Section 3.10, Section 3.15 and Section 3.16, respectively.

(b)    The Company is in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity necessary for the Company to own, lease and operate its properties and assets or to carry on its business as it is now being conducted (the "<u>Company Permits</u>"). All Company Permits are in full force and effect.

Section 3.8    <u>Environmental Laws and Regulations</u>.

(a)    The Company is in compliance in all material respects with all applicable Environmental Laws (as defined below);

(b)    The Company has, and the Company and each of its Subsidiaries have complied in all material respects at all times with, all applicable Environmental Permits, and such permits are in full force and effect;

(c)    No property currently owned, leased or operated by the Company (including soils, groundwater, surface water, buildings or other structures) is contaminated with any Hazardous Substance (as defined below) in a manner:

(i)    that requires or is reasonably likely to require any material Removal, Remedial or Response Actions (as such terms are defined below),

(ii)    that is in material violation of any Environmental Law, or

(iii)    that is reasonably likely to give rise to any material Environmental Liability (as defined below).

(d)    During the period of the Company's or a Subsidiary's ownership, lease or operation thereof, there was no Release of any Hazardous Substance at, on, in, to or from any real property formerly owned, leased or operated by the Company:

(i)    that requires or is reasonably likely to require any material Removal, Remedial or Response Actions,

(ii)    that is in material violation of Environmental Law, or

(iii)    that is reasonably likely to give rise to any material Environmental Liability.

14

(e)    Neither the Company nor has any Subsidiary Released, or is responsible for any Release of, any Hazardous Substance:

(i)    that requires or is reasonably likely to require any material Removal, Remedial or Response Actions,

(ii)    that is in material violation of Environmental Law, or

(iii)    that is reasonably likely to give rise to any material Environmental Liability.

(f)    On or prior to the date of this Agreement, neither the Company nor any Subsidiary has received any notice, demand letter, claim or request for information alleging that the Company is or may be in violation of or subject to liability under any Environmental Law, including with respect to any Hazardous Substance sent offsite by or on behalf of the Company, or from any real property currently owned, leased or operated by the Company, and, to the knowledge of the Company, no such notice, demand letter, claim or request is threatened;

(g)    As of the Closing Date, the Company has not received any notice, demand letter, claim or request for information alleging that the Company is or may be in material violation of or subject to material liability under any Environmental Law, including with respect to any Hazardous Substance sent offsite by or on behalf of the Company, or from any real property currently owned, leased or operated by the Company, and, to the knowledge of the Company, no such notice, demand letter, claim or request is threatened;

(h)    As of the date of this Agreement, the Company is not subject to or, to the knowledge of the Company, threatened to be subject to, any order, decree, injunction or agreement with any Governmental Entity, or any indemnity or other agreement under any Environmental Law or otherwise relating to any Hazardous Substance;

(i)    As of the Closing Date, the Company will not be subject to or, to the knowledge of the Company, threatened to be subject to any material order, decree, injunction or agreement with any Governmental Entity, or any material indemnity or other agreement under any Environmental Law or otherwise relating to any Hazardous Substance;

(j)    No real property currently owned, leased or operated by the Company or any Subsidiary is listed or proposed for listing on the National Priorities List or the Comprehensive Environmental Response, Compensation and Liability Information System under the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") or any analogous list; and

MCIDOCS - #307868/3

(k)    There are no other circumstances or conditions involving the Company that are reasonably likely to result in any material Environmental Liability, including with respect to any Hazardous Substance sent offsite by or on behalf of the Company, or from any real property currently owned, leased or operated by the Company or any Subsidiary.

As used herein, the term "Environmental Laws" means all Laws (including any common law) relating to:

(A)    the protection, investigation or restoration of the environment or natural resources, (B) the handling, generation, transportation, storage, treatment, use, presence, disposal, Release (as defined below) or threatened Release of any Hazardous Substance (C) natural resource damage or (D) noise, odor, indoor air, employee exposure, electromagnetic fields, wetlands, pollution, contamination or any injury or threat of injury to persons or property relating to any Hazardous Substance.

As used herein, the term "Environmental Permit" means any permit, license or other authorization required under applicable Environmental Law.

As used herein, the term "Environmental Liability" means any obligations or liabilities (including any notices, claims, complaints, suits or other assertions of obligations or liabilities) that are: (i) related to the environment (including on-site or off-site contamination by, or exposure to, Hazardous Substances); including: (A) fines, penalties, judgments, awards, settlements, losses, damages, costs, fees (including attorneys' and consultants' fees), expenses and disbursements relating to environmental matters; (B) defense and other responses to any administrative or judicial action (including notices, claims, complaints, suits and other assertions of liability) relating to environmental matters; and (C) financial responsibility for (x) cleanup costs and injunctive relief, including any Removal, Remedial or Response actions, and (y) other Environmental Laws compliance or remedial measures.

As used herein, the term "Hazardous Substance" means any "hazardous substance," any "pollutant or contaminant" as those terms are defined in CERCLA, "pollutant" as defined under the federal Clean Water Act and any "hazardous waste" as that term is defined in the federal Resource Conservation and Recovery Act ("RCRA"); and any "hazardous material" as that term is defined in the federal Hazardous Materials Transportation Act, all as amended (including as those terms are further defined, construed, or otherwise used in court opinions, rules, regulations, standards, orders, guidelines, directives and publications issued pursuant to, or otherwise in implementation of, said Laws); and including, without limitation, any petroleum products or byproducts, solvent, flammable or explosive material, radioactive material, asbestos, lead paint, polychlorinated biphenyls, dioxins, dibenzofurans, heavy metals, radon gas, mold, mold spores, mycotoxins, and any other substances, materials or wastes that are present in such location and at such concentration that they are regulated under Environmental Law.

As used herein, the term "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, placing, discarding, abandonment, or disposing into the environment (including the placing, discarding or abandonment of any barrel, container or other receptacle containing any Hazardous Substance or other material).

As used herein, the term "Removal, Remedial or Response Actions" include the types of activities covered by CERCLA, The Clean Water Act, RCRA, and other comparable Environmental Laws to address a Release or threatened Release of a Hazardous Substance, whether such activities are those which might be taken by a Governmental Entity or those which a Governmental Entity might seek to require of waste generators, handlers, distributors, processors, users, storers, treaters, owners, operators, transporters, recyclers, reusers or disposers, including all actions to (A) clean up, remove, treat or handle in any other way Hazardous Substances in the environment; (B) restore or reclaim the environment or natural resources; (C) prevent the Release of Hazardous Substances so that they do not migrate, endanger or threaten to endanger public health or the environment; or (D) perform remedial investigations, feasibility studies, corrective actions, closures and post-remedial or post-closure studies, investigations, operations, maintenance and monitoring.

Section 3.9    Safety, Health and Product Stewardship Laws and Regulations

(a)    The Company and each of its Subsidiaries have conducted and are conducting their business and operations in compliance in all material respects with all applicable federal, state, local and foreign laws, regulations, standards, and orders relating to occupational safety and health or product stewardship, including, without limitation, the Occupational Safety and Health Act of 1971, Toxic Substance Control Act, Food Drug and Cosmetic Act and any comparable and applicable state or international laws ("Safety, Health and Product Stewardship Laws").

(b)    The Company has no material liability for failure to comply with any such Safety, Health and Product Stewardship Laws; and there is no act, omission, event or circumstance that would reasonably be expected to give rise to any material action under any such Safety, Health and Product Stewardship Laws against the Company.

(c)    On or prior to the date of this Agreement, neither the Company nor any of its Subsidiaries has breached or violated in any material respect any Safety, Health and Product Stewardship Laws; and no civil, criminal or administrative action, suit, demand, claim, complaint, hearing, investigation, demand letter, warning letter, proceeding, investigation or request for information is pending against the Company or, to the knowledge of the Company, threatened against the Company, with respect to such Safety, Health and Product Stewardship Laws, either by any private individual or by any Governmental Entity; and, on or prior to the Closing Date, the Company has not breached or violated in any material respect any Safety, Health and Product Stewardship Laws; and no criminal, material civil or material administrative action, suit, demand, claim,

17

complaint, hearing, investigation, demand letter, warning letter, proceeding, investigation or request for information is pending against the Company or, to the knowledge of the Company, threatened against the Company, with respect to such Safety, Health and Product Stewardship Laws, either by any private individual or by any Governmental Entity

(d)    On or prior to the date of this Agreement, neither the Company nor any of its Subsidiaries received notice from any Person, including any Governmental Entity, that:

(i)    the Company has violated or is alleged to have violated or is liable or may be liable for any violation, citation, or abatement requirement under any Safety, Health and Product Stewardship Laws; or

(ii)    the Company is or will be a named party to any claim, action, cause of action, complaint (contingent or otherwise), legal or administrative proceeding arising out of any violation or any Person's incurrence of costs, expenses, losses or damages of any kind whatsoever in connection with any past or present alleged or actual violation by the Company of any Safety, Health and Product Stewardship Laws.

(e)    As of the Closing Date, the Company has not received notice from any Person, including any Governmental Entity, that:

(i)    the Company or a Subsidiary has violated or is alleged to have violated in any material respect or is liable or may be liable for any material violation, citation, or abatement requirement under any Safety, Health and Product Stewardship Laws; or

(ii)    the Company or a Subsidiary is or will be a named party to any material claim, action, cause of action, complaint (contingent or otherwise), legal or administrative proceeding arising out of any violation or any Person's incurrence of costs, expenses, losses or damages of any kind whatsoever in connection with any past or present alleged or actual violation by the Company of any Safety, Health and Product Stewardship Laws.

Section 3.10    Employee Benefit Plans.

(a)    Section 3.10(a) of the Company Disclosure Schedule lists all Company Benefit Plans. "Company Benefit Plans" means all employee benefit plans, compensation arrangements (other than base salary or wages) and other benefit arrangements, whether or not "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA, providing cash- or equity-based incentives, health, medical, dental, disability, accident or life insurance benefits, change in control or retention payments, vacation, severance, retirement, deferred compensation, pension or savings benefits, that are sponsored, maintained or contributed to by the Company for the

18

benefit of employees, directors, consultants, former employees, former consultants and former directors of the Company or under which the Company has any liability and all employment or other agreements (other than at will offer letters that do not provide for any severance or termination benefits) providing compensation, vacation, severance or other benefits to any officer, employee, consultant or former employee of the Company to which the Company is a party.

(b)     Each Company Benefit Plan has been maintained and administered in compliance with its terms and to the extent applicable with ERISA and the Code, and with any other applicable law. The Company has not made any plan or commitment to establish any new Company Benefit Plan or to modify any Company Benefit Plan (except to the extent required by law, or as necessary to bring a Company Benefit Plan into compliance with applicable law or as required by this Agreement). Each Company Benefit Plan may be amended or terminated by the Company without liability or expense to the Company (other than benefits accrued through the date of amendment or termination and reasonable administrative expenses related to the amendment or termination of such Company Benefit Plan). Any Company Benefit Plan intended to be qualified under Section 401(a) or 401(k) of the Code has received a favorable determination, opinion or advisory letter from the Internal Revenue Service as to its qualified status and nothing has occurred that would reasonably be expected to cause a loss of such qualified status. The Company does not maintain or contribute to any plan or arrangement which provides, and no Company Benefit Plan provides or has any liability to provide, medical benefits to any employee or former employee following his retirement or termination of employment, except (i) to the extent required by applicable law, including, without limitation, Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and (ii) conversion rights.

(c)     All contributions to, and payments from, Company Benefit Plans that are required to have been made in accordance with such Company Benefit Plans have been timely made in accordance with such plan and applicable law and any required contributions or payments not yet due have been properly accounted for in accordance with GAAP.

(d)     Neither the Company nor any ERISA Affiliate has ever maintained, established, sponsored, participated in, or contributed to, any Company Benefit Plan that is an "employee pension benefit plan," within the meaning of Section 3(2) of ERISA subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code. The term "ERISA Affiliate" means any other entity or trade or business that is treated as a single employer with the Company under Code Section 414(b), (c) or (m) of the Code.

(e)     Neither the Company nor any ERISA Affiliate has ever maintained, established, sponsored, participated in or contributed to any self-insured "group health plan" (within the meaning of Section 5000(b)(1) of the Code) that provides benefits to employees (other than a medical flexible spending account, health reimbursement arrangement or other similar program), including any such plan pursuant to which a stop-loss policy or contract applies.(f)     At no time has the Company or any

19

MCIDOCS - #307868/3

ERISA Affiliate contributed to or been obligated to contribute to any multiemployer plan (as defined in Section 3(37) of ERISA). Neither the Company nor any ERISA Affiliate has at any time ever maintained, established, sponsored, participated in or contributed to any multiple employer plan or to any plan described in Section 413(c) of the Code.

(f)      There are (i) no investigations pending by any governmental authority involving the Company Benefit Plans, and (ii) no pending or, to the knowledge of the Company, threatened claims (other than routine claims for benefits, appeals of such claims and domestic relations orders), suits or proceedings against any Company Benefit Plan, against the assets of any of the trusts under any Company Benefit Plan or, to the knowledge of the Company,, against any fiduciary of any Company Benefit Plan, in each case, with respect to the operation of such plan or asserting any rights or claims under any Company Benefit Plan, nor to the knowledge of the Company are there any facts that could reasonably be expected to give rise to any such claims, suits or proceedings.

(g)      None of the Company, any employee of the Company, or, to the knowledge of the Company, any other Person has engaged in a "prohibited transaction" (as such term is defined in Section 4975 of the Code or Section 406 of ERISA) with respect to the Company Benefit Plans that would result in a tax or penalty on the Company under Section 4975 of the Code or Section 502(i) of ERISA.

(h)      With respect to each of the Company Benefit Plans, true, correct and complete copies of the following documents have been made available to Parent (to the extent applicable to such Company Benefit Plan): (i) the plan document and any related trust agreement, each as currently in effect, (ii) the most recent summary plan description, and any summaries of material modification related thereto, distributed to participants in such Company Benefit Plan, (iii) the two most recent Forms 5500, if applicable, and (iv) the most recent IRS determination or opinion letter.

(i)      The Company has complied with the "COBRA" notice and continuation requirements and the requirements of the Health Insurance Portability and Accountability Act with respect to any Company Benefit Plan that is a group health plan, to the extent such requirements are applicable to such Company Benefit Plan.

(j)      No liability under any Company Benefit Plan has been funded nor has any such obligation been satisfied with the purchase of a contract from an insurance company as to which the Company has received notice that such insurance company is in rehabilitation or a comparable proceeding.

(k)      Except as specifically identified on the Company Disclosure Schedule, the consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (A) entitle any current or former employee, consultant or officer of the Company to severance pay, unemployment compensation, change in control or retention payment or any other payment, except as expressly provided in this Agreement or as required by applicable Law, (B) accelerate the time of payment or vesting, or increase the amount of compensation due any such

employee, consultant or officer, except as expressly provided in this Agreement or (C) result in the payment of any amounts that are reasonably expected to, individually or in combination with any other such payment, constitute an "excess parachute payment", as defined in Section 280G(b)(1) of the Code.

(l)    No Company Benefit Plan is subject to foreign law.

(m)    Each Company Benefit Plan that is subject to the requirements of Section 409A of the Code complies (in both form and operation) with the applicable requirements of Section 409A of the Code and the regulations, rulings and notices thereunder. No payment has been made or will be made prior to Closing under any Company Benefit Plan that would be subject to the penalties of, or result in taxable income under, Section 409A(a)(1) of the Code.

(n)    The Company has complied with all applicable laws (i) regarding payment of wages, salaries and other compensation to employees, directors, agents and consultants (including, but not limited to, laws regarding the withholding of income taxes from the payment of compensation) and (ii) with respect to providing any employee, director, agent or consultant with coverage or benefits under any Company Benefit Plan or any other plan or program (including, but not limited to, workers' compensation laws).

Section 3.11    Absence of Certain Changes or Events. From March 31, 2010 through the date of this Agreement, other than the transactions contemplated by this Agreement, the business of the Company has been conducted in the ordinary course of business, and the Company has not taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in Section 5.1(a). Since March 31, 2010, there has not been any event, development or state of circumstances that has had, or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.12    Investigations; Litigation. (a) There is no investigation or review pending (or, to the knowledge of the Company, threatened) by any Governmental Entity with respect to the Company; and (b) there are no actions, suits, inquiries, investigations or proceedings pending (or, to the knowledge of the Company, threatened) against or affecting the Company, or any of its properties at law or in equity, and there are no orders, writs, judgments, injunctions, decrees, determinations or awards of any Governmental Entity or settlement agreements or similar written agreements.

Section 3.13    Proxy Statement; Other Information. None of the information with respect to the Company to be included in the Proxy Statement (as defined below) will, at the time of the mailing of the Proxy Statement or any amendments or supplements thereto, and at the time of the Company Meeting (as defined in Section 5.4(c)), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, except that no representation or warranty is made by the Company with respect to statements made or incorporated by

reference therein based on information supplied by or on behalf of Parent or Merger Sub for inclusion or incorporation by reference therein. The Proxy Statement will comply as to form in all material respects with the provisions of the Exchange Act and the rules and regulations promulgated thereunder. The letters to stockholders, notices of meeting, proxy statement and forms of proxies to be distributed to stockholders in connection with the Merger are collectively referred to herein as the "Proxy Statement."

Section 3.14    Rights Plan. The Board of Directors of the Company has resolved to, and the Company has taken all action necessary to, render the rights issued pursuant to the terms of the Rights Plan, inapplicable to the Merger and the execution, delivery and consummation of this Agreement and the Voting Agreements and the transactions contemplated hereby and thereby.

Section 3.15    Tax Matters.

(a)    (i)    The Company and each of its Subsidiaries have prepared and timely filed (taking into account any extension of time validly obtained within which to file) all Tax Returns required to be filed by any of them on or before the date of this Agreement and all such filed Tax Returns are true, complete and accurate in all material respects;

(ii)    the Company and each of its Subsidiaries have paid all material Taxes that are required to be paid by any of them, all Tax deficiencies and assessments of which notice has been received and all other material Taxes due and payable with respect to them, including any material Taxes required to be withheld from amounts owing to any employee, partner, independent contractor, creditor, stockholder or with respect to any payments of royalties, except, in the case of clause (i) or clause (ii) hereof, with respect to matters contested in good faith or for which adequate reserves have been established in accordance with GAAP and that are set forth in Section 3.15(a) of the Company Disclosure Schedule;

(iii)    the U.S. federal income Tax Returns of the Company have been examined by the Internal Revenue Service (or the period for assessment of the Taxes in respect of which such Tax Returns were required to be filed has expired) for all taxable years through March 31, 2006;

(iv)    as of the date of this Agreement, there are not pending or, to the knowledge of the Company, threatened, any audits, examinations, investigations, suits, inquiries or other proceedings in respect of any Taxes, including U.S. federal income Taxes or any matters under discussion with any Governmental Authority relating to Taxes or any claim for additional Taxes asserted by any such authority;

(v)    there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Liens for Taxes not yet due, being contested in good faith or for which adequate accruals or reserves have been established in accordance with GAAP;

22

(vi)    none of the Company or any of its Subsidiaries (A) has been a "controlled corporation" or a "distributing corporation" in any distribution occurring during the last two years that was intended to be governed by Section 355 of the Code, (B) is, or has been, a party to any Tax sharing or similar Tax agreement (other than an agreement exclusively between or among the Company and its Subsidiaries) pursuant to which it will have any obligation to make any payments for Taxes after the Closing Date or (C) has engaged in any transaction that has given rise to a disclosure obligation as a "listed transaction" under Section 6011 of the Code and the regulations promulgated thereunder during any open tax periods that has not been disclosed in the relevant Tax Returns of the Company or any Subsidiary;

(vii)    none of the Company nor any of its Subsidiaries are liable for Taxes of any person other than itself; and

(viii)    there are no agreements, waivers, or other arrangements presently in effect providing for any extension of time with respect to any statute of limitations or period of assessment with respect to Taxes.

(b)    For purposes of this Agreement:  (i) "Taxes" means any and all domestic or foreign, federal, state, local or other taxes, levies, duties and tariffs of any kind (including unclaimed property or escheat charges and together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Entity, including taxes on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, unemployment, social security, workers' compensation or net worth, and taxes in the nature of excise, withholding, ad valorem or value added; and (ii) "Tax Return" means any return, report or similar filing (including the attached schedules) required to be filed with respect to Taxes, including any information return, claim for refund, amended return, or declaration of estimated Taxes.

(c)    The Company and its Subsidiaries have delivered or made available to Buyer complete copies of all Tax Returns of the Company filed on or after January 1, 2006.  Section 3.15(c) of the Company Disclosure Schedule lists all Tax Returns that have been audited by a taxing authority since January 1, 2006 and a description of each audit report or other formal report submitted to the Company by any taxing authority in connection with any audit of any such Tax Return.  All Taxes affecting the Company for any period covered by any Tax Return that has been audited have been finally determined and paid.

Section 3.16    <u>Labor Matters</u>.  The Company is not a party to, or bound by, any collective bargaining agreement (or similar agreement or arrangement (other than any which is statutorily mandated) in any foreign country) with employees, a labor union or labor organization. (i) There are no strikes or lockouts with respect to any employees of the Company pending, or to the knowledge of the Company, threatened, (ii) to the knowledge of the Company, there is no union organizing effort pending or, to the