# EXHIBIT A

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made by and between W. R. Grace & Co. ("Grace"), on behalf of itself and the Grace Parties (as defined herein), on the one hand, and Continental Casualty Company ("CCC") and Continental Insurance Company ("CIC"), on their own behalf and on behalf of the CNA Companies (as defined herein), and in CIC's capacity as successor by merger to Pacific Insurance Company and Boston Old Colony Insurance Company, and as successor-in-interest to certain alleged policies issued by Harbor Insurance Company, Buffalo Insurance Company, Buffalo Reinsurance Company, and London Guarantee & Accident Company of New York, on the other hand. Grace and the CNA Companies shall be referred to collectively herein as the "Parties."

## RECITALS

WHEREAS, the CNA Companies issued certain policies of insurance that provide, or are alleged to provide, insurance coverage to certain Grace Parties; and

WHEREAS, Claims have been asserted and may in the future be asserted against the Grace Parties alleging injury due to exposure to asbestos and asbestos-containing materials, and the Grace Parties have incurred and may incur certain liabilities, expenses, and losses arising out of such Claims; and

WHEREAS, certain Grace Parties have asserted rights to insurance coverage pursuant to insurance policies issued by the CNA Companies with respect to Claims against the Grace Parties alleging injury due to exposure to asbestos and asbestos-containing materials, and disputes have arisen between the Grace Parties and the CNA Companies regarding the Parties' respective rights and obligations under those policies and otherwise; and

WHEREAS, certain Grace Parties have entered into Prior Agreements (as defined herein) with certain of the CNA Companies, resolving various disputes related to various Claims alleging injury due to exposure to asbestos and asbestos-containing materials and other Claims; and

WHEREAS, on or about April 2, 2001, W. R. Grace & Co., W. R. Grace & Co.-Conn., and certain other debtors filed reorganization cases pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, jointly administered as Case No. 01-01139 (JKF), et seq. (the "Bankruptcy Case"), and Grace and such other debtors continue to operate their businesses as debtors and debtors-in-possession; and

WHEREAS, Grace anticipates that a plan of reorganization will be confirmed by the Bankruptcy Court in the Bankruptcy Case, and that such plan will provide for the establishment of one or more trusts pursuant to Section 524(g) of the Bankruptcy Code to process and pay Asbestos PI Claims and Asbestos PD Claims involving Grace; and

WHEREAS, in consideration of certain monetary payments and other consideration as more fully set forth herein, the Parties intend to adopt, by way of compromise, and without (i) prejudice to or waiver of their respective positions in other matters, (ii) trial or adjudication of any issues of fact or law, or (iii) the CNA Companies' admission of liability or responsibility under insurance policies issued to the Grace Parties, a full and final settlement that releases and terminates all rights, obligations, and liabilities (if any) that the Parties may owe one another under the Subject Policies (as defined below) and regarding other matters as more fully set forth in this Agreement;

NOW, THEREFORE, for good and valuable consideration, the Parties agree as follows:

**AGREEMENT**

## I.    DEFINITIONS

The following definitions apply to the capitalized terms wherever those terms appear throughout this Agreement or in any attachments hereto.  Capitalized terms in the prefatory paragraph, recitals, this Definitions Section, and in the sections below have the meanings ascribed to them therein.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Joint Plan of Reorganization.  Each defined term stated in a singular form includes the plural form, each defined term stated in plural form includes the singular form, and each defined term stated in the masculine, feminine, or neuter form includes each of the masculine, feminine, and neuter forms.  The word "including" means "including but not limited to."

A.    1990 Agreement:  "1990 Agreement" means the Agreement entered into between certain Grace Parties and Continental Casualty Company on or about August 1, 1990 (CNA Confirmation Hearing Ex. 32A).

B.    2004 Agreement:  "2004 Agreement" means the Settlement Agreement and Release entered into between certain Grace Parties and Continental Casualty Company on or about December 14, 2004.

C.    Affiliate:  An "Affiliate" of an Entity means another Entity that directly or indirectly (through one or more intermediaries) controls or is controlled by the first Entity or that is controlled by the same Entity as controls the first Entity.

D.    Approval Order:  "Approval Order" means an order of the Court approving this Agreement and the compromise and settlement memorialized herein (1) in the form appended as Attachment B to this Agreement, or (2) in such other form as the Parties shall agree, with the consent of the Grace PI Committees.

E.      Asbestos PD Claim:  "Asbestos PD Claim" has the meaning set forth in the Joint Plan of Reorganization.

F.      Asbestos PI Claim:  "Asbestos PI Claim" has the meaning set forth in the Joint Plan of Reorganization.

G.      Asbestos PI Committee:  "Asbestos PI Committee" has the meaning set forth in the Joint Plan of Reorganization.

H.      Asbestos PI Future Claimants' Representative:  "Asbestos PI Future Claimants' Representative" has the meaning set forth in the Joint Plan of Reorganization.

I.      Asbestos-Related Claims:  "Asbestos-Related Claims" means Asbestos-Related Bodily Injury Claims and Asbestos-Related Property Damage Claims as defined herein.

J.      Asbestos-Related Bodily Injury Claims:  "Asbestos-Related Bodily Injury Claims" means (1) Claims against the Grace Parties or the Trust, or (2) Claims against the CNA Companies arising in whole or in part (directly or indirectly) by reason of the CNA Companies' having provided insurance or insurance services to one or more of the Grace Parties, and, in the case of either (1) or (2), seeking any type of relief (including compensatory, exemplary, or punitive damages, compensation for the costs of medical monitoring and screening, or any other financial loss, cost, or expense), pursuant to any legal theory (whether based on statute, common law, or otherwise, and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement, indemnity, failure to warn or inspect, failure to undertake protective measures, or any other theory of law, equity, or admiralty), and based upon, arising out of, or relating to alleged Bodily Injury caused or allegedly caused by, based on, arising or allegedly arising from, or attributable to, directly or indirectly, the presence of or exposure at any time to asbestos or asbestos-containing vermiculite

(including "Libby Vermiculite" as described in Section 2.6.2 of the Disclosure Statement), or

any products, materials, or wastes containing asbestos or asbestos-containing vermiculite, that

were mined, processed, consumed, used, stored, manufactured, designed, sold, assembled,

supplied, produced, specified, selected, distributed, packaged, disposed of, installed by,

dispersed, emitted, released, or in any way marketed by, or on behalf of, or otherwise managed

or handled by one or more of the Grace Parties.  For the avoidance of doubt, "Asbestos-Related

Bodily Injury Claims" includes Claims based on or arising out of the CNA Companies' alleged

undertakings or duties to provide industrial hygiene, medical, or other loss control services, to

conduct inspections, sampling, testing, or medical examinations, to provide warnings or

educational services, shower facilities, protective clothing or protective equipment, or otherwise

to undertake actions to educate, warn, or protect third parties about or from the dangers of

exposure to asbestos or asbestos-containing vermiculite.  "Asbestos-Related Bodily Injury

Claims" does not include Claims for insurance coverage and/or benefits under any insurance

policy issued by the CNA Companies to an Entity other than a Grace Party, or Claims that seek

to enforce any rights or obligations under this Agreement.  "Asbestos-Related Bodily Injury

Claims" also does not include Workers' Compensation Claims.

     K.    <u>Asbestos-Related Property Damage Claims</u>:  "Asbestos-Related Property Damage

Claims" means (1) Claims against the Grace Parties or the Asbestos PD Trust, or (2) Claims

against the CNA Companies arising in whole or in part (directly or indirectly) by reason of the

CNA Companies' having provided insurance or insurance services to one or more of the Grace

Parties, and, in the case of either (1) or (2), seeking any type of relief (including compensatory,

exemplary, or punitive damages), pursuant to any legal theory (whether based on statute,

common law, or otherwise), and based upon, arising out of, or relating to alleged Property

Damage caused or allegedly caused by, based on, arising or allegedly arising from, or attributable to, directly or indirectly, the installation, presence, or removal of asbestos or asbestos-containing vermiculite (including "Libby Vermiculite" as described in Section 2.6.2 of the Disclosure Statement), or any products, materials, or wastes containing asbestos or asbestos-containing vermiculite, mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, supplied, produced, specified, selected, distributed, packaged, disposed of, installed by, dispersed, emitted, released, or in any way marketed by, or on behalf of, one or more of the Grace Parties, or otherwise managed or handled by one or more of the Grace Parties. "Asbestos-Related Property Damage Claims" does not include Claims for insurance coverage and/or benefits under any insurance policy issued by the CNA Companies to an Entity other than a Grace Party, or Claims that seek to enforce any rights or obligations under this Agreement.

L.      Bankruptcy Court:  "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

M.      BNSF:  "BNSF" has the meaning set forth in the Joint Plan of Reorganization.

N.      Bodily Injury:  "Bodily Injury" means death, wrongful death, personal or bodily injury (whether physical, emotional, or otherwise), sickness, disease, loss of consortium, survivorship, medical monitoring, and other personal injuries (whether physical, emotional, or otherwise), and other damages (including medical, legal, and other expenses).

O.      Claim:  The term "Claim" means:

1.      "Claim" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. § 101(5);

2.      "Demand" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. § 524(g)(5); and

3.      Any claim (whether past, present, or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, matured or unmatured, liquidated or unliquidated, direct or consequential, and whether in law, equity, admiralty, or otherwise), assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, directive, obligation, suit, lawsuit, action, direct action, cause of action, administrative proceeding, governmental claim or action, order, judgment, settlement, mediation, arbitration, lien, and any other assertion of rights or liability of any kind or subject matter whatsoever (whether or not related to asbestos and whether asserted against the Grace Parties, the Trust, or the CNA Companies).

P.      CNA Companies:  "CNA Companies" means (1) CCC and CIC (in its own capacity and as successor by merger to Pacific Insurance Company and Boston Old Colony Insurance Company, and as successor-in-interest to certain alleged Harbor Insurance Company, Buffalo Insurance Company, Buffalo Reinsurance Company, and London Guarantee & Accident Company of New York policies) and (2) CIC's and CCC's parents, Subsidiaries, and Affiliates, and any of their predecessors, successors, directors, officers, employees, and agents, solely in their capacities as such.  Solely for purposes of the releases in Section III, the term "CNA Companies" also includes the Midwest Division of Resolute Management, Inc., in its capacity as the administrator on behalf of the above Entities for matters involved herein.

Q.      Confirmation Order:  "Confirmation Order" means an order entered by the Bankruptcy Court in the Bankruptcy Case confirming the Joint Plan of Reorganization, together with any order of the District Court issued pursuant to Section 524(g)(3)(A) of the Bankruptcy Code confirming or affirming such order, and that:

1.    has the effect of providing that the Asbestos PI Channeling Injunction applies to the CNA Companies with respect to Asbestos PI Claims and that the Asbestos PD Channeling Injunction applies to the CNA Companies with respect to Asbestos PD Claims;

2.    has the effect of providing that this Agreement is an Asbestos Insurance Settlement Agreement, and the CNA Companies are Settled Asbestos Insurance Companies, with respect to the Subject Policies;

3.    has the effect of providing that this Agreement shall inure to the benefit of the Trust and that the Trust shall become bound by the terms and conditions of this Agreement as provided herein; and

4.    is otherwise consistent with the material terms of this Agreement.

R.    <u>Court</u>: "Court" means the Bankruptcy Court or the District Court, as applicable.

S.    <u>Debtors</u>: "Debtors" has the meaning set forth in the Joint Plan of Reorganization.

T.    <u>District Court</u>: "District Court" means the United States District Court for the District of Delaware.

U.    <u>Effective Date</u>: "Effective Date" has the meaning set forth in the Joint Plan of Reorganization.

V.    <u>Entity</u>: "Entity" means any individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, federal, state, local, or foreign government or any political subdivision thereof, or other person or entity.

W.    <u>Escrow Account</u>: "Escrow Account" means the Escrow Account established pursuant to the Escrow Agreement to hold payments made by the CNA Companies pursuant to Section II.D.

X.    Escrow Agent: "Escrow Agent" means the Escrow Agent as defined in the Escrow Agreement. The Escrow Agent shall be a bank or other Entity mutually acceptable to the Parties and the Grace PI Committees.

Y.    Escrow Agreement: "Escrow Agreement" means an agreement mutually acceptable to the Parties and the Grace PI Committees establishing the Escrow Account to hold payments made by the CNA Companies pursuant to Section II.D.

Z.    Escrow Amount: "Escrow Amount" means all or any portion of the Settlement Amount paid into the Escrow Account pursuant to Section II.D, together with all interest and other income earned on the funds in the Escrow Account, less any amounts paid or withheld by the Escrow Agent pursuant to the terms of the Escrow Agreement.

AA.    Execution Date: "Execution Date" means the earliest date on which this Agreement has been signed by all of the Parties.

BB.    Extra-Contractual Claim: "Extra-Contractual Claim" means any Claim by a Grace Party or the Trust against any of the CNA Companies, or any Claim by any of the CNA Companies against a Grace Party or the Trust, seeking any type of relief, including compensatory, exemplary, or punitive damages, on account of alleged bad faith, failure to act in good faith, violation of any duty of good faith and fair dealing, violation of any unfair claims practices act, unfair trade practices act or similar statute, regulation, or code, or any other similar type of alleged misconduct or omission. "Extra-Contractual Claim" does not mean a Claim for insurance coverage and/or benefits under any insurance policy, or a Claim that seeks to enforce any rights or obligations under this Agreement.

CC.    February 1997 Agreement:  "February 1997 Agreement" means the Agreement and Release entered into between certain Grace Parties and Continental Casualty Company on or about February 13, 1997 (CNA Confirmation Hearing Ex. 32B).

DD.    Final Order:  "Final Order" means an order or judgment of the Bankruptcy Court, the District Court, or other court of competent jurisdiction, as entered on the docket in the Bankruptcy Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which the new trial, reargument, or rehearing has been denied or has resulted in no modification of such order; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

EE.    Grace PI Committees:  "Grace PI Committees" means the Asbestos PI Committee and the Asbestos PI Future Claimants' Representative in the Bankruptcy Case.

FF.    Grace Parties:  "Grace Parties" means:

1.    Grace;

2.    W. R. Grace & Co.-Conn., a Connecticut corporation;

3.    All other debtors and debtors-in-possession in the Bankruptcy Case;

4.      All Subsidiaries, divisions, and Affiliates of the foregoing Entities, including any such Entity in which any of the Debtors has an ownership interest of fifty percent (50%) or more as of the Execution Date;

5.      Any Entity, including any past Subsidiary, division, or Affiliate of the Entities identified in Subsections I.FF.1, .2, or .3, on whose behalf Grace or W. R. Grace & Co.-Conn. has the power to release Claims under the Subject Policies or under the other insurance policies or portions of insurance policies subject to the releases in Section III of this Agreement, but solely to the extent that Grace or W. R. Grace & Co.-Conn. has the power to release such Claims on such Entity's behalf; and

6.      The directors, officers, agents, and employees of the foregoing Entities, solely in their respective capacities as such.

GG.    Joint Plan of Reorganization:  "Joint Plan of Reorganization" means the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative and the Official Committee of Equity Security Holders as modified through March 19, 2010, including all exhibits thereto, as such plan may be modified from time to time.

HH.    London Agreement:  "London Agreement" means the Amended and Restated Settlement Agreement between W. R. Grace & Co. and Certain London Market Companies executed as of August 10, 2009.

II.    May 22, 1997 Agreement:  "May 22, 1997 Agreement" means the Settlement Agreement entered into between certain Grace Parties and Continental Casualty Company on or about May 22, 1997 (CNA Confirmation Hearing Ex. 32C).

JJ.    <u>May 30, 1997 Agreement:</u> "May 30, 1997 Agreement" means the Settlement Agreement and Release entered into between certain Grace Parties and Continental Casualty Company on or about May 30, 1997 (CNA Confirmation Hearing Ex. 38).

KK.    <u>Prime Rate:</u> "Prime Rate" means, as of each day, the per annum rate published as the daily "U.S. prime rate" by *The Wall Street Journal (National Edition)* for transactions in dollars, or, if *The Wall Street Journal (National Edition)* shall no longer publish such rate, the per annum rate published as the "prime rate" by such other source as the Trust may reasonably designate.

LL.    <u>Prior Agreements:</u> "Prior Agreements" means the 1990 Agreement; 2004 Agreement; February 1997 Agreement; May 22, 1997 Agreement; and May 30, 1997 Agreement.

MM.    <u>Proofs of Claim:</u> "Proofs of Claim" means the Proofs of Claim numbered 13966 - 14027 filed by the CNA Companies on or about March 30, 2003 in the Bankruptcy Case. "Proofs of Claim" does not include consolidated Proof of Claim No. 15720, and this Agreement does not apply to, or address, any issues raised therein, including any of the invoices and unpaid amounts listed on Attachment C to this Agreement, which issues, invoices and amounts shall be resolved in the ordinary course under the insurance program between the CNA Companies and the Grace Parties, consistent with the Joint Plan of Reorganization. The Parties agree that nothing in consolidated Proof of Claim No. 15720 gives rise to any Claim, directly or indirectly, against the Trust.

NN.    <u>Property Damage:</u> "Property Damage" means property damage, loss of use of property, cost of removal, abatement, operations and maintenance activities and programs, diminution of property value, environmental damage, economic loss, costs to repair, replace,

clean up or remediate property, or any other injury or damage to property or condition of property of any kind or sort whatsoever.

OO.    Settlement Amount:  "Settlement Amount" means the sum of Eighty-Four Million United States Dollars ($84,000,000.00) together with the interest payable in accordance with Section II.A.7.

PP.    Subject Policies:  "Subject Policies" means the insurance policies identified on Attachment A hereto and includes all known and unknown policies, or portions of policies, issued to a Grace Party by any of the CNA Companies, or issued to a Grace Party and subscribed to by any of the CNA Companies, with a policy period or term incepting prior to June 30, 1985 (including policies that terminated on June 30, 1985) and that actually or potentially provide insurance coverage for any Asbestos-Related Claims; *provided, however,* that "Subject Policies" does not include any rights or obligations under any insurance policy or settlement agreement to which any of the Grace Parties are a party to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for Workers' Compensation Claims.  For the avoidance of doubt, the term "Subject Policies" does not include the July 1, 1985 to June 30, 1988 portion of Policy No. CCP 2483440, and further does not include policies, or portions of policies, issued to BNSF by any of the CNA Companies, or issued to BNSF and subscribed to by any of the CNA Companies.  Further, with respect to policies subscribed to both by any CNA Companies and by other insurers, "Subject Policies" includes only the proportional share of those policies to which any CNA Companies subscribed.  Finally, "Subject Policies" does not include policies, or portions of policies, subscribed to by any of the Party Insurers listed on Attachment A to the London Agreement.

QQ.    <u>Subsidiary:</u>  A "Subsidiary" of an Entity means a corporation as to which the Entity owns shares of common stock and exercises control through the voting power of such stock.

RR.    <u>Trust:</u>  "Trust" means the "Asbestos PI Trust" as defined in the Joint Plan of Reorganization or such other trust as may be established under Section 524(g) of the Bankruptcy Code to process and pay Asbestos PI Claims pursuant to a plan of reorganization filed by Grace and the Grace PI Committees.

SS.    <u>Workers' Compensation Claims:</u>  "Workers' Compensation Claims" has the meaning set forth in the Joint Plan of Reorganization.

## II.    PAYMENT OF SETTLEMENT AMOUNT

A.    Subject to subsections B through I of this Section II and Section VII.G, the CNA Companies shall pay the Settlement Amount to the Trust in seven (7) installments as follows:

1.    Within thirty (30) days of the Effective Date, the CNA Companies shall pay to the Trust the sum of Four Million United States Dollars ($4,000,000.00) in immediately available funds (the "Initial Payment").

2.    On or before the first anniversary of the Effective Date, the CNA Companies shall pay the Trust the sum of Fourteen Million United States Dollars ($14,000,000.00) in immediately available funds.

3.    On or before the second anniversary of the Effective Date, the CNA Companies shall pay the Trust the sum of Fourteen Million United States Dollars ($14,000,000.00) in immediately available funds.

4.    On or before the third anniversary of the Effective Date, the CNA Companies shall pay the Trust the sum of Fourteen Million United States Dollars ($14,000,000.00) in immediately available funds.

5.      On or before the fourth anniversary of the Effective Date, the CNA Companies shall pay the Trust the sum of Fourteen Million United States Dollars ($14,000,000.00) in immediately available funds.

6.      On or before the fifth anniversary of the Effective Date, the CNA Companies shall pay the Trust the sum of Fourteen Million United States Dollars ($14,000,000.00) in immediately available funds.

7.      On or before the sixth anniversary of the Effective Date, the CNA Companies shall pay the Trust the sum of Ten Million United States Dollars ($10,000,000.00) in immediately available funds, together with interest on the sum of Ten Million United States Dollars ($10,000,000.00), calculated at four percent per annum, compounded annually, from the Effective Date until the date of payment (the "Seventh Payment"). The CNA Companies, at their sole option, may pre-pay the Seventh Payment, together with the prescribed interest accrued through the date of such pre-payment, at any time prior to the due date set forth in this Section II.A.7.

B.      The payments set forth in Section II.A shall be made in accordance with written instructions to be provided to the CNA Companies by the Trust (or by the Escrow Agent pursuant to Section II.D). The Trust (or the Escrow Agent) may modify such instructions from time to time by providing notice to the CNA Companies in accordance with the requirements of Section XIV.

C.      The settlement payments made by the CNA Companies as required by Section II.A or Section II.D shall not be reduced by any charge-backs, deductibles, or retrospective premiums. Nor shall said settlement payments be reduced by any other adjustments or any other form of reduction or offset, except as expressly provided in Section VII.G.

D.    In the event that, as of the date when any of the payments to be made by the CNA Companies become due under Section II.A, the Approval Order has not yet become a Final Order, the CNA Companies shall direct all such payments to the Escrow Agent for deposit into the Escrow Account in accordance with the Escrow Agreement. Such payments shall be made pursuant to instructions set forth in the Escrow Agreement or as the Escrow Agent later notifies the Parties in writing consistent with the Escrow Agreement.

E.    The Escrow Agent shall release the Escrow Amount: (1) to the Trust within five (5) days after receipt by the Escrow Agent of written certification from counsel or other authorized agent of the Trust (with notice to Grace, the Grace PI Committees, and the CNA Companies) that both the Approval Order and the Confirmation Order have become Final Orders; (2) to the CNA Companies within five (5) days after receipt by the Escrow Agent of written certification from authorized agents of both the CNA Companies and the Trust (or, if the Trust is not then in existence, of Grace, with the consent of the Grace PI Committees) that this Agreement has terminated and become void in accordance with Section VI; (3) pursuant to joint written instructions from authorized agents of both the CNA Companies and the Trust (or, if the Trust is not then in existence, of Grace, with the consent of the Grace PI Committees); or (4) pursuant to an order of the Bankruptcy Court, or, if the Bankruptcy Court declines to exercise jurisdiction, from any court of competent jurisdiction.

F.    The Parties agree that payment of the Settlement Amount fully and properly exhausts all coverage and limits of liability, including without limitation all per-occurrence and aggregate limits, of the Subject Policies. For avoidance of doubt, the Parties acknowledge that the receipt of the Initial Payment by the Trust satisfies all of the CNA Companies' remaining obligations to make payments pursuant to the May 22, 1997 Agreement.

G.    Time is of the essence with respect to each and every payment by the CNA Companies to the Trust (or to the Escrow Agent, as applicable). If the CNA Companies fail to make timely payment, the CNA Companies shall pay interest to the Trust (or to the Escrow Agent, as applicable, pursuant to Section II.D) on the unpaid amount, with interest commencing on the day that payment is due (or, if such payment is deferred pursuant to Section II.I, commencing on the 30th day after the date upon which the Confirmation Order becomes a Final Order) and ending on the date of payment, at the Prime Rate (as such rate may change from time to time) plus three percentage points ("Interest"). The Trust shall provide written notice of nonpayment and an opportunity to cure to the CNA Companies. In the event that the CNA Companies fail to cure the nonpayment by the latest of (1) forty-five (45) days after the payment was due, (2) ten (10) days after actual receipt of notice of nonpayment by the Trust, or (3) ten (10) days after a decision is rendered by the Arbitrator or by the Bankruptcy Court (if the issue is raised in that Court) or other court of competent jurisdiction pursuant to Section VIII below that the CNA Companies are obligated to make additional payments to the Trust, then the CNA Companies' entire remaining obligation to the Trust pursuant to Section II.A (or to the Escrow Agent, as applicable, pursuant to Section II.D) shall, at the sole discretion of the Trust, be accelerated and become immediately due and payable. All disputes between the Parties as to the amount and timing of payments that are due shall be resolved pursuant to the Dispute Resolution procedure set forth in Section VIII of this Agreement.

H.    CNA Companies' Ratings.

1.    The CNA Companies represent and warrant that, as of the Execution Date, the A.M. Best's ratings of Continental Insurance Company and Continental Casualty Company are B+ or better.

2.    If, as of the Effective Date, the A.M. Best's rating of either Continental Insurance Company or Continental Casualty Company is below B+, or falls below B+ at any time thereafter, the Trust may request in writing that the CNA Companies provide assurances that the amounts set forth in Section II.A will be paid at the times set forth in Section II.A, as qualified by Section II.I ("Demand for Assurances").

3.    Within forty-five (45) days of the CNA Companies' receipt of a Demand for Assurances, the CNA Companies shall comply with such Demand for Assurances by either (a) paying to the Trust (or to the Escrow Agent, as applicable) all installment payments then outstanding, in the amounts set forth in Section II.A, or (b) providing, for the benefit of the Trust and the Escrow Agent, one or more letters of credit, issued by a bank approved by the National Association of Insurance Commissioners, which provide assurance for payment of all remaining installments due, at the times and in the amounts set forth in Section II.A (as qualified by Section II.I).

4.    For the avoidance of doubt, but subject to Subsection II.H.7, Section II.H.3 specifies the exclusive means by which the CNA Companies may comply with any Demand for Assurance, but the CNA Companies may elect, at their sole option, the means of compliance as between Section II.H.3(a) and Section II.H.3(b).

5.    Nothing in this Section II.H shall limit or affect the rights of the CNA Companies to reimbursement from the Trust (including rights to set off settlements or judgments

against installments of the Settlement Amount that have not yet been paid) pursuant to Section VII.D and Section VII.G, or any rights of the CNA Companies or the Trust to payments from the Escrow Agent pursuant to Section II.E.

      6.    If the CNA Companies fail timely to comply with any Demand for Assurance in accordance with Section II.H.3, then the CNA Companies' entire remaining obligation to the Trust pursuant to Section II.A (or to the Escrow Agent, if applicable, pursuant to Section II.D) shall be immediately due and payable in full, without demand or notice, and such entire amount shall be paid to the Trust (or to the Escrow Agent, if applicable, pursuant to Section II.D).

      7.    The provisions of this Section II.H may be modified by agreement of the Trust and the CNA Companies only by a written instrument that specifically states that it modifies this Section II.H (or one or more specific provisions thereof) executed by the Trust and by or on behalf of the CNA Companies.

      I.    Notwithstanding the due dates for installments of the Settlement Amount set forth in Section II.A, if the Effective Date occurs prior to the date upon which the Confirmation Order becomes a Final Order, then the CNA Companies may defer making any payment until thirty (30) days after the date upon which the Confirmation Order becomes a Final Order. As of the date that is thirty (30) days after the date upon which the Confirmation Order becomes a Final Order, such deferral shall end, and all payments that were deferred under the first sentence of this section shall no longer be deferred and shall be due and payable in full, except as expressly provided in Section VI or Section VII.G. Nothing in this Section II.I shall limit or affect the CNA Companies' obligations to pay interest to the Trust on the Seventh Payment beginning on the Effective Date, as provided in Section II.A.7, or as otherwise provided in this Agreement.

## III.   RELEASES AND DISMISSAL OF ACTION

A.    <u>Release of the CNA Companies by the Grace Parties and the Trust.</u> Effective upon the Effective Date, subject to the condition subsequent of the Trust's receipt of the Initial Payment from the CNA Companies in accordance with Section II.A.1 of this Agreement (or from the Escrow Agent, as applicable, in accordance with Section II.E.1), Grace, on behalf of itself and, to the extent it has the power to bind them, the Grace Parties, and the Trust, remise, release, and forever discharge the CNA Companies with respect to:

1.    All Claims based on or arising out of Asbestos-Related Claims;

2.    All Claims for insurance coverage and/or other obligations under, based on, or arising out of the Subject Policies, including all Claims for insurance coverage and/or other obligations for Asbestos-Related Claims under, based on, or arising out of the Subject Policies;

3.    All Claims for insurance coverage for Asbestos-Related Claims and/or other obligations for Asbestos-Related Claims under, based on, or arising out of (i) Pacific Insurance Company Policy No. P133100 for the policy period June 30, 1984 to June 30, 1985; (ii) the July 1, 1985 to June 30, 1988 portion of Policy No. CCP 2483440; and (iii) any insurance policy, or portion of any insurance policy, issued to a Grace Party by any of the CNA Companies, or issued to a Grace Party and subscribed to by any of the CNA Companies, covering any policy period commencing on or after June 30, 1985; *provided, however,* that this release does not extend to any rights or obligations under any of the policies identified in this Subsection III.A.3 to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for Workers' Compensation Claims; and *provided further* that, with respect to any policies subscribed to both by any CNA Companies and by other insurers, the release extends only to obligations of the CNA Companies in connection with such policies;

4.      All Claims relating to all rights or obligations of the CNA Companies under, based on, or arising out of claims service agreements, cost cap agreements, or retrospective premium agreements (or similar agreements by any other name by which the foregoing may be called) to the extent, but only to the extent, that such Claims arise in connection with the Claims released pursuant to Subsections III.A.2 and III.A.3 above, or in connection with Claims for insurance coverage or payments based on, arising out of, or under policies of insurance, or portions thereof, of any kind whatsoever with a policy period incepting prior to June 30, 1985 (including policies that terminated on June 30, 1985), including but not limited to the Subject Policies; and

5.      All Extra-Contractual Claims arising in connection with the Claims released pursuant to subsections III.A.2, A.3, and A.4, above;

*provided, however,* that the releases provided for in this Section III.A shall not relieve the CNA Companies of any of their obligations under this Agreement.

For the avoidance of doubt, the releases provided for in this Section III.A shall not relieve the CNA Companies of insurance coverage and/or other obligations for Claims other than Asbestos-Related Claims under, based on, or arising out of (i) Pacific Insurance Company Policy No. P133100 for the policy period June 30, 1984 to June 30, 1985; (ii) Policy No. CCP 2483440 for the July 1, 1985 to June 30, 1988 portion of the policy period; and (iii) any insurance policy covering any policy period commencing on or after June 30, 1985; nor shall the releases provided for in this Section III.A relieve the CNA Companies from any obligations under, based on, or arising out of claim services agreements, cost cap agreements, or retrospective premium agreements (or similar agreements by any other name by which the foregoing may be called)

relating to such policies for Claims other than Asbestos-Related Claims released pursuant to Subsection III.A.3.

B.    <u>Release of Grace Parties and the Trust by the CNA Companies</u>.  Effective upon the Effective Date, subject to the condition subsequent of the Trust's receipt of the Initial Payment from the CNA Companies in accordance with Section II.A.1 of this Agreement (or from the Escrow Agent, as applicable, in accordance with Section II.E.1), the CNA Companies remise, release, and forever discharge the Trust, Grace, and the Grace Parties (but only to the extent that the Grace Parties are bound by Grace pursuant to Section III.A of this Agreement) with respect to:

1.    All Claims based on or arising out of Asbestos-Related Claims (including Indirect PI Trust Claims based on or arising out of Asbestos-Related Claims arising by reason of the CNA Companies' having provided insurance or insurance services to one or more of the Grace Parties);

2.    All obligations under, based on, or arising out of the Subject Policies, including (i) all obligations based on or arising out of Asbestos-Related Claims under, based on, or arising out of the Subject Policies; and (ii) notwithstanding anything to the contrary in the Prior Agreements, all obligations under, based on, or arising out of claims service agreements, cost cap agreements, or retrospective premium agreements (or similar agreements by any other name by which the foregoing may be called), including obligations to pay or satisfy any premiums, deductibles, self-insured retentions, retrospective premiums, or other similar charges to the extent, but only to the extent, that such obligations arise in connection with Claims for insurance coverage, or payments based on or arising out of or under policies of insurance (or portions thereof) of any kind whatsoever, with respect to policies with a policy period incepting

prior to June 30, 1985 (including policies that terminated on June 30, 1985), including but not limited to the Subject Policies;

3.    All obligations that relate to or arise from Asbestos-Related Claims under, based on, or arising out of (i) Pacific Insurance Company Policy No. P133100 for the policy period June 30, 1984 to June 30, 1985; (ii) the July 1, 1985 to June 30, 1988 portion of Policy No. CCP 2483440, including all obligations under claims service agreements, cost cap agreements, or retrospective premium agreements (or similar agreements by any other name by which the foregoing may be called), including obligations to pay or satisfy any premiums, deductibles, self-insured retentions, retrospective premiums, or other similar charges to the extent, but only to the extent, that such obligations arise in connection with Asbestos-Related Claims; and (iii) any insurance policies, or portions of policies, issued to a Grace Party by any of the CNA Companies, or issued to a Grace Party and subscribed to by any of the CNA Companies, covering any policy period commencing on or after June 30, 1985, including all obligations under claims service agreements, cost cap agreements, or retrospective premium agreements (or similar agreements by any other name by which the foregoing may be called), including obligations to pay or satisfy any premiums, deductibles, self-insured retentions, retrospective premiums, or other similar charges to the extent, but only to the extent, that such obligations arise in connection with Asbestos-Related Claims; *provided, however*, that this release does not extend to any rights or obligations under the policies identified in this Subsection III.B.3, to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for Workers' Compensation Claims; *and provided* that this Subsection III.B.3 does not release Grace or the Grace Parties from any obligations under, based on, or arising out of the retrospective premium, loss, and claim service fee billings listed on Attachment C hereto;

4.     All Extra-Contractual Claims arising in connection with the Claims released pursuant to subsections III.B.2 and B.3 above;

5.     All Claims based on or arising out of the action captioned *Continental Casualty Co. v. W. R. Grace & Co., et al.*, No. 00 Civ. 4524 (S.D.N.Y.); and

6.     All defense, indemnification, or hold harmless obligations owed to the CNA Companies by the Grace Parties, whether arising under the Prior Agreements or otherwise, with respect to Asbestos-Related Claims (as defined in Section I.I of this Agreement); *provided, however,* that the releases provided for in this Section III.B shall not relieve the Grace Parties or the Trust of any of their obligations under this Agreement; and *provided further* that the releases in this Section III.B shall not bar or prevent the CNA Companies from asserting, or otherwise affect any rights of the CNA Companies to assert, any term, condition, defense, or right under, based on, or arising out of the Subject Policies, or any other policies subject to the releases of this Section III.B, or related documents with respect to any Claim asserted against the CNA Companies by an Entity other than the Trust, Grace, or the Grace Parties that are bound by Grace pursuant to Section III.A of this Agreement; and *provided further,* for the avoidance of doubt, that the releases set forth in this Section III.B do not encompass, and do not affect, any issues raised in the CNA Companies' consolidated Proof of Claim No. 15720, including issues relating to any of the invoices or unpaid amounts listed in Attachment C to this Agreement, which issues, invoices, and amounts shall be resolved in the ordinary course under the insurance program between the CNA Companies and the Grace Parties, consistent with the Joint Plan of Reorganization.  Nothing herein is intended to, or shall operate to, provide any Entity not a party to or bound by this Agreement with rights hereunder, or limit or modify in any way the full and final release of the CNA Companies provided by this Agreement.

C.      The Parties acknowledge and confirm that, effective June 30, 1987, Policy No. CCP 2483440 and, thereafter, any primary, excess, or umbrella liability insurance policies issued by the CNA Companies to any Grace Party, or issued to a Grace Party and subscribed to by any of the CNA Companies, including Policy No. CCP 0016043964, contained exclusions barring coverage for Asbestos-Related Claims ("Asbestos Exclusions"), and that pursuant to such Asbestos Exclusions there is no coverage for Asbestos-Related Claims under CNA Policy Nos. CCP 2483440 and CCP 0016043964, and such other policies with a policy period incepting on or after June 30, 1987.  The Parties further acknowledge and confirm that Pacific Insurance Company Policy No. P133100 for the policy period June 30, 1984 to June 30, 1985 contains an Asbestos Exclusion and that, pursuant to such Asbestos Exclusion, there is no coverage for Asbestos-Related Claims under that policy.  The Parties further acknowledge that the limits of Policy No. CCP 2483440 were previously exhausted for all Products Personal Injury Claims and Products Property Damage Claims for the policy period of June 1, 1985 through June 1, 1987, as recited in the 1990 Agreement.

D.      Nothing in this Agreement shall affect any defense, indemnification, or hold harmless obligation owed to the CNA Companies by the Grace Parties, or other Entities, under the Prior Agreements based on or arising out of Claims other than Asbestos-Related Claims (as defined in Section I.I of this Agreement); *provided that* (i) any Claims by the CNA Companies based on or arising out of any such obligations shall be treated under the Joint Plan of Reorganization, and (ii) any such Claims by the CNA Companies shall be subject to any defenses, counterclaims, or other rights of the Grace Parties or other Entities, including, without limitation, under the Prior Agreements and the Joint Plan of Reorganization.  Further, nothing in this Agreement shall (iii) affect, modify, or change the exhaustion of any policy limits, or the

dates thereof, deemed exhausted in the Prior Agreements, or (iv) diminish the effectiveness or scope of the releases of or by any Party in the Prior Agreements.

E.      Effective upon the Effective Date but subject to the condition subsequent of the Trust's receipt of the Initial Payment from the CNA Companies in accordance with Section II.A.1 of this Agreement (or from the Escrow Agent, as applicable, pursuant to Section II.E.1), the Parties intend to reserve no rights or benefits whatsoever under, based on, or arising out of the Subject Policies, and any and all rights, duties, responsibilities, and obligations of the Parties under, based on, or arising out of the Subject Policies are terminated.  The releases contained in this Section III, together with the sale described in Section V.E, are intended to operate as if the Subject Policies had never been issued by the CNA Companies.

F.      Notwithstanding any of the foregoing to the contrary, this Agreement shall not: (i) affect any of the rights or obligations under the London Agreement of Grace, the Trust, or any CNA Companies that may be parties to the London Agreement; or (2) release Grace or the Grace Parties from any obligations under, based on, or arising out of the retrospective premium, loss, and claim service fee billings listed in Attachment C hereto.

G.      The Parties understand and acknowledge that (1) Claims that have been or may be asserted against the Grace Parties or the Trust, or against the CNA Companies, may increase or decrease in amount or in severity over time and may include progressive, cumulative, unknown, and/or unforeseen elements, and (2) there may be hidden, unknown, and unknowable damages, defense expenses, and other costs related to such Claims.  Each of the Parties acknowledges and agrees that it nevertheless willingly enters into this Agreement, including the releases set forth in this Section III.

H.    THE PARTIES ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED BY THEIR ATTORNEYS CONCERNING, AND ARE FAMILIAR WITH, CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT. THE PARTIES EXPRESSLY ASSUME THE RISK THAT ACTS, OMISSIONS, MATTERS, CAUSES, OR THINGS MAY HAVE OCCURRED THAT THEY DO NOT KNOW OR DO NOT SUSPECT TO EXIST.

I.    Within fourteen (14) business days of the date when both the Approval Order and the Confirmation Order become Final Orders, the CNA Companies and the Grace Parties will dismiss without prejudice the action in *Continental Casualty Co. v. W. R. Grace & Co., et al.*, No. 00 Civ. 4524 (S.D.N.Y.). Neither the CNA Companies nor the Grace Parties shall refile or otherwise renew that suit, or reassert the claims in that suit, unless this Agreement is terminated pursuant to Section VI, in which case either Party may refile the suit or reassert the claims in that suit in the United States District Court for the Southern District of New York or, if that court declines to exercise jurisdiction over the matter, in a court of competent jurisdiction. Notice shall be provided to Grace, the Grace PI Committees, and the Trust of the refiling of the suit or reassertion of the claims made therein.

## IV.    RELEASE OF SUBROGATION AND CONTRIBUTION CLAIMS AND JUDGMENT REDUCTION CLAUSE

A.    <u>Payments Made Under This Agreement.</u>  Except as provided in Sections VI.D.3,

VII.D, and VII.G, the CNA Companies shall not seek reimbursement of any payment made by

the CNA Companies under this Agreement, whether by way of a Claim for contribution,

subrogation, indemnification, or otherwise, from anyone other than the CNA Companies'

reinsurers or retrocessionaires in their capacities as such.  Notwithstanding the foregoing, if a

third party pursues a contribution, subrogation, indemnification, or similar Claim against the

CNA Companies relating to the subject matter of this Agreement, then the CNA Companies shall

be free to assert such a Claim against such third party, to the extent permitted by the Joint Plan of

Reorganization.  To the extent the CNA Companies recover any amount from such third party,

the net proceeds of such recovery (after any payment made by the CNA Companies to such third

party on its Claim and after the CNA Companies are reimbursed from such proceeds for their

fees, costs, and expenses incurred in prosecuting or defending such Claim) shall be paid by the

CNA Companies promptly to the Trust.  The Grace Parties and the Trust shall use reasonable

best efforts to obtain from all insurers with which they settle agreements similar to those

contained in this Section IV.A.

B.    <u>Payments Received From Other Insurers.</u>  Effective upon the Effective Date, but

subject to the condition subsequent of the Trust's receipt of the Initial Payment as provided in

Section II.A.1 of this Agreement (or pursuant to Section II.E.1, as applicable), in the event that:

1.    Grace or the Trust, as applicable, and/or any other Entity becomes entitled

to receive a payment from one or more of the insurers other than the CNA Companies for any

Claims that have been remised, released, and forever discharged as against any of the CNA

Companies pursuant to this Agreement; and

28 of 56

2.      As a result of such other insurer's obligation to pay described in Section IV.B.1 above, such insurer either:

(a)     enters into a settlement with the CNA Companies, which settlement has been consented to by Grace or the Trust, as applicable, or any other Entity (as applicable), requiring the CNA Companies to reimburse some or all of the payment made or to be made by such insurer; or

(b)     obtains a final, non-appealable judicial or quasi-judicial determination or award entitling such insurer to obtain a sum certain from the CNA Companies for contribution, subrogation, or indemnification or other similar Claim, for its alleged share or equitable share, or to enforce subrogation rights, if any, relating to such payment referenced in Section IV.B.1 above;

the Entity entitled to receive such payment shall voluntarily reduce the amount of payment to be received by it (referred to in Section IV.B.1 above) by the amount necessary to reduce or eliminate such settlement, determination, or award against the CNA Companies (referred to in Section IV.B.2 above).

To ensure that such a reduction is accomplished, the CNA Companies shall be entitled to assert this Section IV as a defense to any action against it for any such portion of the determination or award against the CNA Companies (referred to in Section IV.B.2 above) and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the CNA Companies from any liability for the determination or award.  Grace or the Trust, as applicable, agrees that in any proceeding against insurers other

than the CNA Companies in which Grace or the Trust, as applicable, and/or any other Entity

makes a Claim for insurance rights or benefits for any Claim that may give rise to the events

referenced in Section IV.B.1 above, it will provide notice to the CNA Companies of such Claim

within thirty (30) days of the time Grace or the Trust, as applicable, first becomes aware that

such Claim is reasonably likely to result in a Claim against the CNA Companies and shall

consent to the CNA Companies' intervention in any such proceeding to the extent that the CNA

Companies seek to intervene to effectuate the intent of this Section IV.

## V.    BANKRUPTCY OBLIGATIONS

A.    <u>Grace PI Committees' Approval.</u>  By executing this Agreement, the CNA

Companies acknowledge receipt of written consent to this Agreement from the Grace PI

Committees.

B.    <u>Approval Motion.</u>  Promptly following the Execution Date, Grace shall prepare

and file a motion seeking entry of the Approval Order with the Bankruptcy Court, which motion

shall be in form and substance satisfactory to the Parties.  Grace shall use its reasonable best

efforts promptly to obtain entry of the Approval Order, and promptly to have the Approval Order

become a Final Order.  The CNA Companies, at their own expense, shall cooperate with Grace

in obtaining the Approval Order and seeking to have the Approval Order become a Final Order.

C.    <u>Designation of the CNA Companies as Settled Asbestos Insurance Companies.</u>

Within thirty (30) days of entry of the Approval Order by the Bankruptcy Court, but subject to

the condition subsequent that the Approval Order becomes a Final Order, Grace shall designate

this Agreement as an Asbestos Insurance Settlement Agreement, and the CNA Companies as

Settled Asbestos Insurance Companies, with respect to the Subject Policies on Exhibit 5 of the

Exhibit Book to the Joint Plan of Reorganization.  Except as provided in Section V.D, so long as

this Agreement has not been terminated under Section VI, neither Grace nor the Trust shall

withdraw the designation under the Joint Plan of Reorganization of the CNA Companies as

Settled Asbestos Insurance Companies, and of this Agreement as an Asbestos Insurance

Settlement Agreement, with respect to the Subject Policies.

     D.    <u>Withdrawal of Settled Asbestos Insurance Company Designation.</u>  In the event

that the CNA Companies fail to make a payment required by Section II.A (as qualified by

Section II.I) or II.D and do not cure such default within the time period set forth in Section II.G,

or fail to make payment as required by Section II.H.6, the Trust in its sole discretion may, in lieu

of invoking the remedies specified in Section II.G or II.H.6, withdraw the designation of the

CNA Companies as Settled Asbestos Insurance Companies, and of this Agreement as an

Asbestos Insurance Settlement Agreement, as to the Subject Policies that were not listed in

Exhibit 5 to the Joint Plan of Reorganization prior to the Execution Date.  In the event that the

Trust withdraws such designation, then this Agreement shall be deemed terminated pursuant to

Section VI of this Agreement, and the CNA Companies shall have no further obligations to make

any additional payments of the Settlement Amount or interest that would otherwise have been

required by Section II.A, II.D, II.G, or II.H.

     E.    <u>Sale Pursuant to Section 363(f).</u>  Effective upon the Trust's receipt of the Initial

Payment of the Settlement Amount as provided in Section II.A.1 of this Agreement (or pursuant

to Section II.E.1, as applicable), and without need for further action, the Debtors shall be deemed

to have sold, conveyed, assigned, transferred, and delivered to the CNA Companies, and the

CNA Companies shall be deemed to have purchased from the Debtors, all rights, title, and

interests of the Debtors in and under the Subject Policies, free and clear of all liens,

encumbrances, and/or interests of any kind or nature whatsoever, to the extent permitted under

Section 363(f) of the Bankruptcy Code. The Parties agree that the Settlement Amount is at least equal to the fair value of the Subject Policies.

F.    <u>Trust as Party.</u> Upon the Effective Date, the Trust automatically and without need for further action shall become a Party to this Agreement.

G.    <u>Suspension of Bankruptcy-Related Activities.</u> Effective upon the Execution Date, the CNA Companies (1) shall suspend prosecution of all of their objections to the Joint Plan of Reorganization and plan-related documents, to confirmation of the Joint Plan of Reorganization, and/or to the Debtors' or Grace PI Committees' motions or applications pending in the Bankruptcy Case (including any appeals of the Confirmation Order and/or of any other decisions in the Bankruptcy Case); (2) shall suspend prosecution of the Proofs of Claim to the extent that they relate to Asbestos-Related Claims; (3) shall take no further actions of any nature (including filing new objections to the Joint Plan of Reorganization and initiating or taking discovery) that may hinder, delay, or oppose actions of the Debtors or the Grace PI Committees in the Bankruptcy Case, including any action to have the Confirmation Order become a Final Order and to satisfy all conditions to the occurrence of the Effective Date; and (4) shall not oppose the entry or affirmance of a Confirmation Order that confirms the Joint Plan of Reorganization; *provided, however,* that in the event this Agreement is terminated pursuant to Section VI below, the CNA Companies may renew prosecution of all of their objections and Proofs of Claim to the extent practical consistent with the Court's scheduling orders. For the avoidance of doubt, nothing in this Section V.G tolls or affects any deadline in the Bankruptcy Case (whether applicable to objections to confirmation, proofs of claim, or any other matter) that has already passed at the time this Agreement is terminated; further, nothing in this Agreement shall

preclude the CNA Companies from enforcing their Claims for payment of the billings reflected in Attachment C hereto.

H.    <u>Withdrawal of Objections and Partial Withdrawal of Proofs of Claim.</u>  Upon the Approval Order becoming a Final Order, the CNA Companies (1) shall withdraw all of their objections to the Joint Plan of Reorganization or plan-related documents, to confirmation of the Joint Plan of Reorganization, and to the Debtors' or Grace PI Committees' motions or applications pending in the Bankruptcy Case (including any appeals of decisions in the Bankruptcy Case), and (2) expressly consent to the assignment of Asbestos Insurance Rights as provided in the Asbestos Insurance Transfer Agreement, Exhibit 6 to the Joint Plan of Reorganization.  After the Approval Order and the Confirmation Order become Final Orders, the Proofs of Claim shall be deemed withdrawn with prejudice to the extent that they relate to Asbestos-Related Claims.

## VI.    TERMINATION

A.    After the Execution Date, this Agreement shall terminate upon the occurrence of any of the following events:

1.    The failure of the Court to enter the Approval Order or the Confirmation Order, or the failure of the Approval Order or the Confirmation Order to become Final Orders;

2.    The entry of an order dismissing the Bankruptcy Case prior to the Effective Date of the Joint Plan of Reorganization;

3.    The failure of the Effective Date to occur, coupled with circumstances that make it clear that the Effective Date will never occur;

4.    The entry of an order by the Bankruptcy Court dismissing the Bankruptcy Case or converting it into a Chapter 7 case; or

5.    The entry of an order confirming the Joint Plan of Reorganization that is not a Confirmation Order as defined herein and/or that confirms a Plan of Reorganization that does not have the effect of designating this Agreement as an Asbestos Insurance Settlement Agreement, and the CNA Companies as Settled Asbestos Insurance Companies, with respect to the Subject Policies.

B.    After the Execution Date, the CNA Companies shall have the option to terminate this Agreement by providing written notice of termination to Grace and the Grace PI Committees within thirty (30) days of the occurrence of any of the following events:

1.    The failure of Grace to designate this Agreement as an Asbestos Insurance Settlement Agreement, and the CNA Companies as Settled Asbestos Insurance Companies, with respect to the Subject Policies on Exhibit 5 of the Exhibit Book to the Joint Plan of Reorganization in accordance with and within the time period set forth in Section V.C;

2.    The Trust's withdrawal of the designation of the CNA Companies as Settled Asbestos Insurance Companies, and/or of this Agreement as an Asbestos Insurance Settlement Agreement, with respect to any of the Subject Policies; or

3.    The confirmation of a Chapter 11 plan of reorganization other than the Joint Plan of Reorganization that is inconsistent with the material terms of this Agreement.

Failure by the CNA Companies to give notice of the exercise of their option to terminate this Agreement in accordance with this Section VI.B within thirty (30) days following the occurrence of any of the foregoing events shall constitute a permanent waiver of the option to terminate with respect to that condition.

C.    After the Execution Date, any of (1) the CNA Companies, (2) Grace (which shall act at the direction of the Grace PI Committees), or (3) following the Effective Date, the Trust

shall have the option to terminate this Agreement by providing written notice to the other Parties and the Grace PI Committees within ten (10) days following the entry of an order of the Court approving this Agreement that is not the Approval Order.  Failure by any Party to give notice of the exercise of its option to terminate this Agreement in accordance with this Section VI.C within ten (10) days following the entry of such an order shall constitute a permanent waiver of the option to terminate this Agreement pursuant to this Section VI.C.

D.    In the event that this Agreement is terminated in accordance with this Section VI:

1.    This Agreement shall be of no further force and effect, and the Parties shall have no further obligations under this Agreement, except the obligations set forth in this Section VI.D, Section II.E, and Section XII, which shall survive termination;

2.    The releases set forth in Section III of this Agreement shall be of no force and effect;

3.    If, as of the date of termination, all or any portion of the Settlement Amount has been paid to the Escrow Agent in accordance with Section II.D, the Escrow Amount shall be returned to the CNA Companies pursuant to Section II.E.2, less any amount due to the Trust pursuant to the agreement described in the proviso at the end of the first sentence in Section VII.A, which amount shall be paid to the Trust by the Escrow Agent;

4.    If, as of the date of termination, all or any portion of the Settlement Amount has not been paid to the Trust or the Escrow Agent in accordance with Section II.A or II.D, that portion shall no longer be payable by the CNA Companies to the Trust or the Escrow Agent;

5.    If, as of the date of termination, all or any part of the Settlement Amount has been paid to the Trust, the CNA Companies and the Trust shall attempt to agree whether and

to what extent amounts paid may be applied against the limits of the Subject Policies. If no other issues remain in dispute between the Parties, then any disputes regarding the application of amounts paid to the limits of the Subject Policies shall be subject to the Dispute Resolution procedures of Section VIII, which shall survive termination of this Agreement for purposes of resolving any such disputes;

6.    The Subject Policies, shall have the same force and effect as if this Agreement had never existed, and the Parties shall have all of the rights, defenses, and obligations under or with respect to the Subject Policies, if any, that they would have had if this Agreement had never existed; and

7.    The Prior Agreements, and any other agreements between the Parties other than this Agreement that were in effect as of the Execution Date, shall remain in full force and effect.

## VII.    DEFENSE OF THE ASBESTOS PI CHANNELING INJUNCTION

Following the Effective Date:

A.    Unless and until this Agreement is terminated in accordance with Section VI, if any Entity asserts against any of the CNA Companies an Asbestos-Related Bodily Injury Claim, the Trust shall expend reasonable best efforts, at its own expense, to enforce the Asbestos PI Channeling Injunction with respect to such Claim and to obtain a ruling that such Claim is channeled to the Trust pursuant to the Asbestos PI Channeling Injunction and Bankruptcy Code Section 524(g); *provided, however,* that, if the Effective Date occurs before both the Confirmation Order and the Approval Order have become Final Orders, then the Trust's obligation under this Section VII.A is expressly conditioned upon the CNA Companies' agreement in writing to reimburse the Trust for all costs and expenses of such efforts in the event that the Agreement is terminated in accordance with Section VI prior to any payment having

been made to the Trust under Section II. The Trust shall not be required, in carrying out its

obligations under this Section VII.A, to expend an amount greater than One Million United

States Dollars ($1,000,000.00) to enforce the application of the Asbestos PI Channeling

Injunction. For the avoidance of doubt, this Section VII.A shall not obligate the Trust to retain

counsel to represent the CNA Companies or to pay the costs and expenses, including attorneys'

fees, associated with such legal, consulting, or expert representation as the CNA Companies may

choose to engage in connection with any Claim against the CNA Companies.

    B.    The CNA Companies shall reasonably promptly notify the Trust in writing of any

demand, notice, summons, or other process received by the CNA Companies that the CNA

Companies reasonably believe is an Asbestos-Related Bodily Injury Claim. If the Trust

determines that a Claim presented by the CNA Companies is not an Asbestos-Related Bodily

Injury Claim, the Trust shall promptly notify the CNA Companies and shall not be required to

undertake to defend the application of the Asbestos PI Channeling Injunction as to such Claim

during the pendency of the Parties' attempts to resolve any dispute with respect to such defense

obligation in accordance with this Section VII.B and Section VIII. In the event of a dispute as to

whether a Claim triggers the Trust's obligations under Section VII.A, the Trust and the CNA

Companies shall meet and confer to attempt to resolve any such dispute. If they are unable to

resolve such dispute through meeting and conferring, the dispute shall be resolved pursuant to

Section VIII below. If the Trust undertakes to defend the application of the Asbestos PI

Channeling Injunction to a Claim presented by the CNA Companies, but the Arbitrator, the

Bankruptcy Court, or other court of competent jurisdiction thereafter determines that the Claim is

not subject to the Asbestos PI Channeling Injunction and such order becomes a Final Order, or if

the Trust has spent $1,000,000.00 to enforce the Asbestos PI Channeling Injunction, then the

Trust shall have no further obligation to defend the application of the Asbestos PI Channeling Injunction to such Claim(s).

C.      In the event that the CNA Companies fail (1) to make any payment required by Section II.A (as qualified by Section II.I) or Section II.D, and do not cure such default within the time period set forth in Section II.G, or (2) to make the payment required by Section II.H.6, the Trust shall have no further obligation to enforce the Asbestos PI Channeling Injunction with respect to any Asbestos-Related Bodily Injury Claim asserted against any of the CNA Companies, or to reimburse the CNA Companies pursuant to Section VII.D.

D.      If, with respect to any Asbestos-Related Bodily Injury Claim asserted against any of the CNA Companies, either the Trust or the CNA Companies are unsuccessful in obtaining a ruling that the Claim is channeled to the Trust pursuant to the Asbestos PI Channeling Injunction, and/or if, as a result of the failure to obtain such a ruling or in the absence of such a ruling, the CNA Companies have paid any amount(s) to an Entity not a party to this Agreement by reason of a judgment(s) entered by a court of competent jurisdiction or a settlement(s) entered into by the CNA Companies with respect to an Asbestos-Related Bodily Injury Claim(s), the Trust shall reimburse the CNA Companies for such amount(s) as provided in Section VII.G below; *provided, however,* that in no event shall the total amount that the Trust shall be required to reimburse to the CNA Companies pursuant to this Section VII.D for all such judgments and settlements exceed the maximum sum of Thirteen Million United States Dollars ($13,000,000.00) less any amounts expended by the Trust in fulfilling its obligations under Section VII.A ("Maximum Indemnity").  For the avoidance of doubt, the Trust shall not be obligated to make any payment to the CNA Companies pursuant to this Section VII.D with respect to any settlement or judgment, or any portion thereof, until and unless the CNA

Companies have actually paid the settlement or judgment, or portion thereof, as to which the CNA Companies seek reimbursement in accordance with this Section VII.D. Further, in no event shall the Trust be obligated to reimburse the CNA Companies for the costs of defense incurred by CNA Companies in connection with any Claim subject to this Section VII.D.

E.      With respect to any Asbestos-Related Bodily Injury Claim for which the CNA Companies intend to seek reimbursement pursuant to Section VII.D, the CNA Companies shall reasonably promptly notify the Trust in writing of such Claim, and shall keep the Trust apprised of major developments with respect to any such Claim, including summary judgment motions made or trial dates set. The CNA Companies shall notify the Trust promptly in writing of any judgment against the CNA Companies with respect to which the CNA Companies intend to seek reimbursement pursuant to Section VII.D.

F.      The CNA Companies shall give written notice to the Trust reasonably in advance of any proposed settlement or compromise of any Claim, or any payment with respect to any judgment, for which the CNA Companies intend to seek reimbursement under Section VII.D of this Agreement. With respect to any such proposed settlement, compromise, or payment:

1.      For purposes of this Section VII.F,

(a)      "District Court Ruling" means an order or judgment (other than with respect to a request for a temporary restraining order or a preliminary injunction) to the effect that any Claim that the CNA Companies propose to settle or compromise, or any judgment that the CNA Companies propose to pay, is enjoined as to the CNA Companies, pursuant to the Joint Plan of Reorganization and any implementing orders, which order or judgment (i) has been entered

by the District Court and (ii) has not been reversed on appeal, set aside, vacated, or otherwise ceased to be effective and operative;

(b)    "Maximum Non-Consent Indemnity" means the Maximum Indemnity less $200,000.

2.    If (i) a District Court Ruling is not in effect at the time of any such proposed settlement, compromise, or payment by the CNA Companies, or (ii) the amount of any such proposed settlement, compromise, or payment by the CNA Companies, when added to any prior settlement(s), compromise(s), or payment(s) for which the CNA Companies have obtained reimbursement from the Trust pursuant to this Section VII, totals in the aggregate $10 million or less, or $14 million or more:

(a)    The CNA Companies (i) shall afford the Trust an opportunity to review such proposed settlement, compromise, or judgment and to present its views to the CNA Companies; and (ii) shall consider the views of the Trust before agreeing to any such settlement, compromise, or judgment.

(b)    The Trust shall be obligated to reimburse the CNA Companies, pursuant to the provisions of Section VII.D and VII.G, in an amount equal to the payment(s) made by the CNA Companies pursuant to such compromise, settlement, or judgment, up to the Maximum Indemnity.

3.    If (i) a District Court Ruling is in effect at the time of any such proposed settlement, compromise, or payment by the CNA Companies, and (ii) the amount of any such proposed settlement, compromise or payment, when added to any prior settlement(s),

compromise(s), or payment(s) for which the CNA Companies have obtained reimbursement from the Trust pursuant to this Section VII, totals in the aggregate between $10 million and $14 million:

    (a)    The CNA Companies shall:

        (i)    afford the Trust the opportunity to review the proposed settlement, compromise, or judgment and to present its views to the CNA Companies; and

        (ii)    shall seek the Trust's consent to such proposed settlement, compromise, or payment of judgment, which consent shall not be unreasonably withheld.

    (b)    If the Trust consents to the proposed settlement, compromise, or payment of the judgment amount, then the Trust shall reimburse the CNA Companies, pursuant to the provisions in Section VII.D and VII.G, in an amount equal to the payment(s) made by the CNA Companies pursuant to such compromise, settlement, or judgment, up to the Maximum Indemnity.

    (c)    If the Trust does not consent to the proposed settlement, compromise, or payment of judgment, then the Trust shall reimburse the CNA Companies, pursuant to the provisions of Section VII.D and VII.G, in an amount equal to (i) $10 million plus seventy-five (75) percent of the excess over $10 million of the total (1) settlement(s), compromise(s), and judgment(s) paid by CNA Companies for which the CNA Companies have already

obtained reimbursement from the Trust plus (2) the amounts of any proposed settlement(s), compromise(s) and judgment(s) for which the CNA Companies are seeking and are entitled to reimbursement pursuant to this Section VII less (ii) the amounts of any prior reimbursements received by the CNA Companies from the Trust pursuant to this Section VII; *provided that* the total amount of reimbursement paid by the Trust shall not exceed the Maximum Non-Consent Indemnity.  Notwithstanding such payments by the Trust, the CNA Companies shall remain free to invoke the Dispute Resolution procedures of Section VIII to contest any withholding of consent by the Trust.  If the Dispute Resolution procedures result in a final determination that the Trust unreasonably withheld its consent to the proposed settlement, compromise, or judgment, then the Trust shall pay, within forty-five (45) days of such final determination, any amount previously withheld up to the Maximum Indemnity.

(d)     If the Trust, pursuant to Section VII.F.3(c), has withheld reimbursement of any portion of any amount paid by the CNA Companies in connection with a settlement, compromise, or judgment, the Trust shall pay the withheld amount to the CNA Companies, up to the Maximum Indemnity, should the CNA Companies subsequently pay any settlements, compromises, or judgments for which the CNA Companies are entitled to

reimbursement which, when added to any prior settlement(s), compromise(s), or judgment(s) paid by the CNA Companies, total $14 million or more.

G.    Subject to Section VII.I, the Trust shall fulfill any reimbursement obligation to the CNA Companies pursuant to Section VII.D as follows:

1.    The CNA Companies shall notify the Trust (and, if any portion of the Settlement Amount is held by the Escrow Agent, the Escrow Agent) in writing of the amount to be reimbursed pursuant to Section VII.D. This notification shall be accompanied by a copy of the settlement agreement or judgment, as applicable, together with written evidence that the CNA Companies have paid the settlement or judgment.

2.    If, at the time of any such notification, one or more of the installments of the Settlement Amount have not yet been paid by the CNA Companies pursuant to Section II.A or Section II.D, the CNA Companies shall offset the total amount of the settlement(s) or judgment(s) for which they are entitled to reimbursement (not to exceed the Maximum Indemnity) against installments of the Settlement Amount not yet paid at the time of such notification; *provided, however,* that the amount of the offset against any installment payment shall not exceed an amount calculated by dividing the total amount of any settlements or judgments paid by the CNA Companies but not yet reimbursed by the Trust by the number of installment payments then remaining unpaid, including the installment against which an offset is to be taken.

3.    If, at the time of such notification, all of the installments of the Settlement Amount have been paid to the Trust pursuant to Section II.A or Section II.E, then the Trust shall reimburse the CNA Companies for the amount of any such settlement(s) or judgment(s) for

which they are entitled to reimbursement (not to exceed the Maximum Indemnity) within forty-five (45) days of such notification.

4.    If, at the time of any such notification, one or more (but not all) of the installments of the Settlement Amount have been paid to the Trust, but the aggregate amount of the unpaid installments is less than the amount for which the CNA Companies are entitled to be reimbursed, then the Trust shall pay to the CNA Companies the amount of such settlement(s) or judgment(s) for which they are entitled to reimbursement, less the remaining unpaid portion of the Settlement Amount, within forty-five (45) days of the date of such notification.

5.    If, at the time of such notification, the CNA Companies have paid one or more of the installments of the Settlement Amount to the Escrow Agent pursuant to Section II.D but the Escrow Agent has not paid all of the Settlement Amount in its possession to the Trust, and either (i) all installments of the Settlement Amount have been paid to the Escrow Agent, or (ii) the aggregate amount of the unpaid installments of the Settlement Amount is less than the amount the CNA Companies are entitled to be reimbursed, then, within forty-five (45) days of such notification, the Trust and the CNA Companies shall issue joint written instructions directing the Escrow Agent to reimburse the CNA Companies for the amount of any such settlement(s) or judgment(s) for which the CNA Companies are entitled to reimbursement, less the remaining unpaid portion of the Settlement Amount, if any.

6.    Reimbursement(s) pursuant to Sections VII.G.3 through VII.G.5 shall be made by the Trust or the Escrow Agent, as applicable, without regard to any payment percentages that might otherwise be applicable to other Claims made against the Trust.

7.    The sum of (i) the total amount actually paid by the Trust and the Escrow Agent to the CNA Companies for all settlement(s) and judgment(s) plus (ii) the amounts set off

by the CNA Companies against the unpaid portion of the Settlement Amount shall not exceed the Maximum Indemnity, as set forth in Section VII.D.

H.    Time is of the essence with respect to each and every reimbursement payment due under Section VII.G.3, Section VII.G.4, and Section VII.G.5. If the Trust or the Escrow Agent fails to make timely payment in accordance with Section VII.G.3, Section VII.G.4, or Section VII.G.5, the Trust shall pay, or with the CNA Companies jointly instruct the Escrow Agent to pay, interest to the CNA Companies on the unreimbursed amount that is due, with interest commencing on the day that the reimbursement is due and ending on the date of payment at the Prime Rate (as such rate may change from time to time) plus three percentage points.

I.    In the event of a dispute regarding the Trust's or the CNA Companies' obligations pursuant to Sections VII.D through H, the Trust and the CNA Companies shall meet and confer to attempt to resolve any such dispute. If they are unable to resolve such dispute through meeting and conferring, the dispute shall be resolved pursuant to Section VIII below.

## VIII.   DISPUTE RESOLUTION

A.    The Parties agree to resolve any dispute that arises regarding the terms of this Agreement or the implementation thereof (a "Dispute") by way of arbitration in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes (the "Rules") and the provisions of this Section VIII.

B.    In the event that any Dispute arises that the Parties are unable to resolve by agreement, any Party to such Dispute shall have the right to commence arbitration of such Dispute under this Section by sending written notice demanding such arbitration to the other Party in accordance with Section XIV. Such notice shall briefly describe the Dispute as well as the relief sought by the Party demanding arbitration. Promptly following any such notice, the Parties shall attempt to agree upon the selection of an arbitrator (the "Arbitrator") to resolve such

Dispute.  If the Parties have not agreed upon the selection of the Arbitrator by the fifteenth day

following delivery of the notice demanding arbitration, then any Party may request the Center for

Public Resources to select the Arbitrator, provided that any Arbitrator selected by the Center for

Public Resources shall be a retired federal or state court judge and shall not have any conflict of

interest.  Any such selection of the Arbitrator by the Center for Public Resources shall be

conclusive and binding on the Parties.

      C.     All arbitrations under this Section VIII shall be conducted in accordance with the

Rules and the Parties shall faithfully abide by the Rules and abide by and perform any award

rendered by the Arbitrator, except as provided in Section VIII.D.  Any such arbitration shall be

conducted in New York, New York.

      D.     Should any Party to the arbitration process be dissatisfied with the decision of the

Arbitrator, that Party may apply within thirty (30) days to the Bankruptcy Court for a judicial

determination of the matter.  In the event that the Bankruptcy Court declines to exercise

jurisdiction, the matter may be referred to any court of competent jurisdiction.  Any review

conducted by the Bankruptcy Court or other court of competent jurisdiction shall be *de novo*.

Should the Dispute not be resolved by the arbitration process within sixty (60) days after

submission to the Arbitrator, any Party is free to cease pursuing arbitration and may apply

directly to the Bankruptcy Court for relief, or, if the Bankruptcy Court declines to exercise

jurisdiction, to any court of competent jurisdiction.

      E.     With respect to disputes involving alleged failure of the CNA Companies to make

payments required by Section II, or of the Trust or Escrow Agent to make payments required by

Section VII, if it is finally determined through the arbitration process, or by the Bankruptcy

Court (should review be sought in the Bankruptcy Court) or other court of competent

jurisdiction, that the CNA Companies or the Trust or the Escrow Agent have failed to timely

make payment, the CNA Companies or the Trust promptly shall pay the amounts due, or the

Trust shall jointly with the CNA Companies direct the Escrow Agent to pay the amounts due,

including any interest due under Section II.G or Section VII.H, or any other provision of this

Agreement.

## IX.    ENTIRE AGREEMENT

This Agreement, along with its Attachments, constitutes a single integrated written

contract that expresses the entire agreement and understanding between the Parties regarding the

matters addressed by this Agreement.  Except as explicitly set forth in this Agreement and the

Escrow Agreement, there are no representations, warranties, promises, or inducements, whether

oral, written, expressed, or implied, that in any way affect or condition the validity of this

Agreement or alter or supplement its terms.  Any statements, promises, or inducements made by

any Party or any agents of any Party that are not contained in this Agreement or the Escrow

Agreement shall not be valid or binding.   For the avoidance of doubt, this Agreement does not

supersede, and does not affect of the obligations of any of the Parties under, the London

Agreement.

## X.    NON-PREJUDICE AND CONSTRUCTION OF AGREEMENT

A.    This Agreement is intended to be and is a commercial accommodation between

the Parties and shall not be construed as an admission of coverage under the Subject Policies or

any other policies issued by the CNA Companies.  Neither this Agreement nor any provision

hereof shall be construed as a waiver, modification, or retraction of the positions of the Parties

with respect to the interpretation and application of the Subject Policies or any other insurance

policies.

B.      This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions.  Accordingly, nothing contained in this Agreement or in any document exchanged by the Parties in the negotiation or furtherance of this Agreement shall be construed as an admission or concession by the CNA Companies, Grace, or the Trust that any particular theory with respect to coverage is valid.  This Agreement is without prejudice to the positions taken by the CNA Companies with regard to other insureds and without prejudice to positions taken by Grace or the Trust with regard to other insurers.  The CNA Companies, Grace, and the Trust specifically disavow any intention to create rights in third parties under or in relation to this Agreement, except as expressly provided herein.

C.      The CNA Companies, Grace, and the Trust, and their attorneys or agents, shall not invoke the terms of this Agreement, its negotiation, its execution, or any act in performance of the Agreement, in any proceeding for the purpose of attempting to establish or prove the acceptance by the CNA Companies, Grace, or the Trust of any particular interpretation of any insurance policy with respect to any Claim.

D.      The Parties agree, as an essential and integral part of this Agreement, that this Agreement and the matters contained in this Agreement are not intended to be, and shall not be, admissible or relevant in any case or proceeding to prove the acceptance by any Party hereto of any particular theory of coverage.

E.      This Agreement is the jointly drafted product of arm's-length negotiations between the Parties with the benefit of advice from counsel and the Parties agree that it shall be so construed.  In particular, with respect to interpretation of this Agreement, the Parties waive any benefits from the principle of *contra proferentem* or other principles that would result in the interpretation of any ambiguities against insurers.  No Party shall be deemed to be the drafter of

this Agreement or of any particular provision or provisions, and no part of this Agreement shall be construed against any Party on the basis of that Party's identity as an insurance company or as the drafter of any part of this Agreement.

## XI.    HEADINGS

The Section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

## XII.    CONFIDENTIALITY

A.    The Parties agree that all information relating to the negotiation of this Agreement (collectively referred to as "Information," except that such term does not include information that is or becomes available other than as a result of an act or omission of any of the Parties) shall be confidential and is not to be disclosed except as follows:

1.    The fact that the Parties have entered into this Agreement may be disclosed to any Entity;

2.    The Information may be disclosed as necessary to obtain an Approval Order from the Court;

3.    The Information may be disclosed by order of court, or pursuant to a written agreement of the Parties;

4.    The Information may be disclosed by the CNA Companies to their reinsurers and retrocessionaires, directly or through intermediaries;

5.    Grace or the Trust may disclose the Information to other insurers and their representatives;

6.    The Information may be disclosed to outside auditors or accountants of any Party or to the Internal Revenue Service;

7.    A Party may disclose the Information to its accountants, to its counsel, to regulators, to underwriters in connection with offerings of securities to be issued by such Party, and to counsel for such underwriters; and

8.    The Information may be disclosed in any action by any Party to enforce the terms of this Agreement;

*provided, however,* that a Party making disclosure of any of the Information pursuant to one of the exceptions set forth in subsections (3) through (7) above shall inform any Entity to which such disclosure is made of the confidential nature of the Information and of the understanding upon which it has been disclosed and shall use reasonable efforts to obtain the agreement of such Entity to hold the Information in confidence.

B.    A Party may describe and/or make reference to this Agreement to the extent that such disclosure is required to comply with any statute, rule, or other requirement of any government or governmental agency or other authority.

C.    In the event a court, litigant, or governmental body requests or requires disclosure of any Information protected by this paragraph, the Party from whom disclosure is sought shall immediately give written notice to the other Party in order to allow each Party to take such protective steps as may be appropriate.

D.    Information protected by this Section shall be deemed to fall within the protection afforded compromises and offers of compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

## XIII.  RIGHT OF REVIEW

A.    The CNA Companies shall have the right, at their own expense, upon reasonable notice, at a time and place convenient to the Trust, to review records relating to Asbestos PI Claims paid by the Trust solely for the purpose of obtaining reinsurance for any portion of the

Settlement Amount or of complying with applicable regulations. Notwithstanding the foregoing, the Trust shall not be obligated to provide the Social Security Identification Number of any Asbestos PI Claimant beyond the last four digits. The Trust shall have no obligation to create any new documents or to collect any information in connection with any such review beyond the documents or information ordinarily created or maintained by the Trust, and the CNA Companies shall not be permitted to challenge the review, determination, or payment of any Asbestos PI Claims by the Trust or the payment of any expenses or costs of the Trust; *provided, however,* that the determination or payment of any Asbestos PI Claim by the Trust shall have no collateral estoppel effect as to the CNA Companies with respect to Asbestos-Related Claims asserted against the CNA Companies by Entities not parties to this Agreement. This Section XIII, and any results of such a review, shall not affect the CNA Companies' payment obligations under this Agreement.

B.     The CNA Companies shall not provide any information, documents, notes, or other results of any review undertaken pursuant to Section XIII.A (the "Material") to any other Entity and shall keep any and all such Material confidential, except that the CNA Companies may provide such Material to any of their auditors, regulators, or reinsurers solely for the purpose of obtaining reinsurance for any portion of the Settlement Amount or of complying with applicable regulations, provided that the CNA Companies shall first obtain from such Entities a written agreement to maintain the confidentiality of the Material and not to disclose such Material to any other Entity. In the event that disclosure of any Material in the CNA Companies' possession is sought pursuant to subpoena or other legal process, the CNA Companies shall immediately notify the Trust of the request for disclosure and cooperate with the Trust in seeking

a protective order regarding the Material.  Upon resolution of all reinsurance issues, the CNA

Companies shall, at the Trust's option, return or destroy all Material.

## XIV.  NOTICES

A.    All notices, requests, demands, and other communications required or permitted

to be given under this Agreement shall be deemed to have been duly given if in writing and

delivered personally, mailed first-class postage prepaid, or by registered or certified mail, or

transmitted by facsimile, addressed as follows:

If to Grace:

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD  21044
Attn: General Counsel
Telephone:  (410) 531-4000
Facsimile:  (410) 531-4545

With a copy to:

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL  60654
Attn:  Lisa G. Esayian and John Donley
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

If to the CNA Companies:

CNA Insurance Companies
333 S. Wabash Ave., 23rd Floor
Chicago, IL  60604
Attn:  Brian A. Frankl, Vice President & Claims
Counsel, Environmental & Mass Tort Claims
Telephone:  (312) 822-3750
Facsimile:  (312) 894-3527

and

Resolute Management, Inc., Midwest Division
333 S. Wabash Ave., 19th Floor
Chicago, IL  60604
Attn:  Michael J. Sehr
Telephone:  (312) 822-1357
Facsimile:  (312) 894-3526

With a copy to:

Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC  20001
Attn:  Michael Giannotto
Telephone:  (202) 346-4124
Facsimile:  (202) 346-4444

and

Ford Marrin Esposito Witmeyer & Gleser, LLP
Wall Street Plaza, 23rd Floor
New York, NY  10005-1875
Attn:  Elizabeth DeCristofaro
Telephone:  (212) 269-4900
Facsimile:  (212) 344-4294

If to the Asbestos PI Committee:

Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC  20005
Attn:  Peter Lockwood
Telephone:  (202) 862-5000
Facsimile:  (202) 862-3301

and

Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY  10152
Attn:  Elihu Inselbuch
Telephone:  (212) 319-7125
Facsimile:  (212) 644-6755

With a copy to:

Anderson Kill & Olick, PC
1251 Avenue of the Americas
New York, NY  10020
Attn:  Robert M. Horkovich
Telephone:  (212) 278-1322
Facsimile:  (212) 278-1733

If to the Asbestos PI Future Claimants'
Representative:

David T. Austern
3110 Fairview Park Drive
Suite 200
Falls Church, VA 22042-0683
Telephone:  (703) 205-0835
Facsimile:  (703) 205-6249

With a copy to:                    Orrick, Herrington & Sutcliffe LLP
                                   1152 15th Street, N.W.
                                   Washington, D.C. 20005-1706
                                   Attn:  Roger Frankel
                                   Telephone:  (202) 339-8400
                                   Facsimile:  (202) 339-8500

B.      Any Party may change the address to which such communications are to be

directed to it by giving notice to the others, in the manner provided in this Section.

## XV.   MODIFICATION

This Agreement may be amended, modified, superseded, or canceled, and any of the

terms hereof may be waived, only by a written instrument that specifically states that it amends,

modifies, supersedes, or cancels this Agreement, executed by or on behalf of all of the Parties

with the consent of the Grace PI Committees, or, in the case of a waiver, by or on behalf of the

Party waiving compliance, and, in the case of a waiver by Grace, with the consent of the Grace

PI Committees.  The failure of a Party at any time or times to require performance of any

provision of this Agreement shall in no manner affect the right at a later time to enforce the

same.  No waiver by a Party of any condition, or of any breach of any term, covenant,

representation, or warranty contained in this Agreement, in any one or more instances, shall be

deemed to be or construed as a further or continuing waiver of any such condition or breach, or a

waiver of any other condition or of any breach of any other term, covenant, or warranty.

## XVI.  GOVERNING LAW

This Agreement shall be governed by, and shall be construed in accordance with, the

laws of the State of New York without regard to its choice of law rules.  Nothing in this Section

XVI shall affect what law would govern the interpretation or application of the Subject Policies.

## XVII. EXECUTION

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  This Agreement shall become effective as to each Party from and after the Execution Date, subject in the case of Grace to the Approval Order being entered by the Bankruptcy Court.  CCC and CIC represent and warrant that they have the authority to bind the CNA Companies.

[The remainder of this page intentionally has been left blank.]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement by their authorized officers.

Date: _11/18/2010_

W. R. GRACE & CO.

Signed: *Richard C. Finke*

Name:  Richard C. Finke

Title:   Assistant General Counsel - Litigation

Date: _____

CONTINENTAL CASUALTY COMPANY and
CONTINENTAL INSURANCE COMPANY

Signed: _____

Name:  Michael J. Sehr

Title:   President
         Resolute Management, Inc., Midwest
         Division, as Administrator on behalf of
         CONTINENTAL CASUALTY COMPANY
         and CONTINENTAL INSURANCE
         COMPANY

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their authorized officers.

Date: _____

    W. R. GRACE & CO.

    Signed: _____

    Name:  Richard C. Finke

    Title:   Assistant General Counsel - Litigation

Date: _NovemBer 18, 2010_

    CONTINENTAL CASUALTY COMPANY and
    CONTINENTAL INSURANCE COMPANY

    Signed: _Michael J Sehr_

    Name:  Michael J. Sehr

    Title:   President
           Resolute Management, Inc., Midwest
           Division, as Administrator on behalf of
           CONTINENTAL CASUALTY COMPANY
           and CONTINENTAL INSURANCE
           COMPANY

# ATTACHMENT A

# SUBJECT POLICIES

| Insurance Company Name | Policy Number | Policy Period |
|---|---|---|
| Continental Casualty Company | CCP9023670 | 06/30/1973-06/30/1976 |
| Continental Casualty Company | CCP2483440 | 06/30/1976-06/30/1983 |
| Continental Casualty Company | CCP2483440 | 06/30/1983-06/30/1985[1] |
| Continental Casualty Company | RDX8936833 | 08/09/1973-06/30/1974 |
| Continental Casualty Company | RDX9156645 | 06/30/1974-06/30/1977 |
| Continental Casualty Company | RDX1788117 | 06/30/1977-06/30/1978 |
| Continental Casualty Company | RDX1788118 | 06/30/1977-06/30/1978 |
| Continental Casualty Company | RDX1784282 | 06/30/1979-06/30/1980 |
| Continental Casualty Company | RDX1784981 | 06/30/1980-06/30/1982 |
| Continental Casualty Company | RDX1785056 | 06/30/1982-06/30/1983 |
| Continental Casualty Company | RDX1785096 | 06/30/1983-06/30/1984 |
| Continental Casualty Company | RDX1784529 | 06/30/1984-06/30/1985 |
| Continental Insurance Company | SRX3193093 | 06/30/1981-06/30/1982 |
| Continental Insurance Company | SRX1591702 | 06/30/1982-06/30/1983 |
| Continental Insurance Company | SRX1591976 | 06/30/1983-06/30/1984 |
| Boston Old Colony Insurance Company | LX2666569 | 07/17/1974-06/30/1977 |
| Buffalo Reinsurance Company | BR507551 | 06/30/1981-06/30/1982 |
| Buffalo Reinsurance Company | BR508040 | 06/30/1982-06/30/1983 |
| Harbor Insurance Company | 120346 | 07/17/1974-06/30/1977 |
| London Guarantee & Accident Company | LX3193640 | 06/30/1981-06/30/1982 |
| London Guarantee & Accident Company | LX1898010 | 06/30/1982-06/30/1983 |
| London Guarantee & Accident Company | LX2107836 | 06/30/1983-06/30/1984 |

In addition, Subject Policies includes all known and unknown policies, or portions of policies, issued to a Grace Party by any of the CNA Companies, or issued to a Grace Party and subscribed to by any of the CNA Companies, with a policy period incepting prior to June 30, 1985 (including policies that terminated on June 30, 1985) and that actually or potentially provide insurance coverage for any Asbestos-Related Bodily Injury Claim or Asbestos-Related Property Damage Claim; *provided, however,* that "Subject Policies" does not include any rights or obligations under any insurance policy or settlement agreement to which any of the Grace Parties are a party to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for Workers' Compensation Claims.

---

[1] Policy number CCP 2483440 is effective from 6/30/83 to 6/30/88. However, the term "Subject Policies" as used in this Agreement includes only the period through 6/30/85.

**ATTACHMENT B**

**FORM OF APPROVAL ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: January 10, 2011 at 10:00 a.m.** |
| | ) | **Objection Deadline: December 23, 2010 by 4:00 p.m.** |
| | ) | **Agenda No. _____** |
| | | **Re: Docket Nos. _____** |

**ORDER PURSUANT TO SECTIONS 105, 363, 1107, AND 1108 OF
THE BANKRUPTCY CODE AND RULES 2002, 6004, 9014, AND 9019 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
APPROVING THE SETTLEMENT AGREEMENT BETWEEN
W. R. GRACE & CO. AND THE CNA COMPANIES**

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

This matter having come before the court on the Debtors' Motion Pursuant to Sections 105, 363, 1107, and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Motion") requesting that the Court issue an Order approving a Settlement Agreement (the "Agreement") by and between W. R. Grace & Co., on its own behalf and on behalf of the Grace Parties[2] (collectively, "Grace"), and Continental Casualty Company and Continental Insurance Company ("CIC"), on their own behalf and on behalf of the CNA Companies, and in CIC's capacity as successor by merger to Pacific Insurance Company and Boston Old Colony Insurance Company, and as successor-in-interest to certain alleged policies issued by Harbor Insurance Company, Buffalo Insurance Company, Buffalo Reinsurance Company, and London Guarantee & Accident Company of New York (collectively, the "CNA Companies") and the compromise and settlement memorialized therein; and the Court having conducted a hearing on the Motion in open court on January 10, 2011 (the "Hearing"); and having noted the appearances of all interested parties and all responses and objections to the Motion (if any) in the record of the Hearing; and after due deliberation and sufficient cause appearing for the entry of this Order (the "Approval Order"); and the Grace PI Committees having appeared at the Hearing and supported the relief requested by the Motion; the Court hereby makes the following:

---

[2] Capitalized terms used but not defined herein shall having the meanings ascribed to them in the Agreement or, if not defined in the Agreement, in the First Amended Joint Plan of Reorganization, as modified through March 19, 2010 ("Joint Plan").

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Jurisdiction, Final Order, and Statutory Predicates

A.    The findings and conclusions set forth herein and on the record at the Hearing constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.    This Order constitutes a final and immediately appealable order within the meaning of 28 U.S.C. § 158(a).

E.    The statutory predicates for the relief sought in the Motion include sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.

### Notice of the Motion

F.    The Debtors have provided due and adequate notice of the Motion, the Agreement, and the subject matter thereof to all parties in interest pursuant to Bankruptcy Rules 2002 and 6004. Notice was sufficient and proper and complied with all applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and Local Rules of this Court. No additional notice of the Motion or this Order is required. A reasonable opportunity to object

3

or be heard with respect to the Motion and the relief requested therein has been afforded to all interested parties and entities. This Court hereby further finds that notice to an attorney for the holder of a Claim constitutes notice to such holder for purposes of notice of the Motion, the Hearing, the Agreement, and this Approval Order.

G.    To the extent that any Person (i) either (a) received proper notice of these matters (or is represented by a Person, including, without limitation, the Asbestos PI Future Claimants' Representative or counsel, that received such notice) or (b) having had notice of these Chapter 11 Cases, elected not to request notices regarding these Chapter 11 Cases, and (ii) failed to object to the Motion or the entry of this Approval Order, then such Persons, including without limitation, the Asbestos PI Trust (or, to the extent that it has not yet been formed or does not yet exist, its predecessor(s) in interest), the Asbestos PI Future Claimants' Representative, and the Asbestos PI Committee, hereby shall have no right to file or prosecute an appeal of this Approval Order.

## Sound Business Judgment and Reasonableness

H.    The relief requested in the Motion is in the best interests of the Debtors' bankruptcy estates, their creditors, and the holders of Asbestos-Related Claims against the bankruptcy estates and other parties-in-interest. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion. The settlement and compromise with the CNA Companies embodied in the Agreement are consistent with and within the reasonable range of litigation outcomes if the Debtors were to litigate the matters resolved pursuant to this Order. The releases to be made by Grace pursuant to the Agreement are appropriate and should be approved. The CNA Companies would not have entered into the Agreement or any of the compromises and settlements contained therein, or

4

agreed to withdraw their objections to the Joint Plan, suspend prosecution of proofs of claim, and pay the Settlement Amount, without the benefit of obtaining the releases contained in the Agreement and the protections of the injunctions contained in the Joint Plan and the Confirmation Order.

I.     The Debtors have due and proper corporate authority to enter into the Agreement and perform all of their obligations thereunder.  No consents or approvals, other than this Approval Order, are required for the Debtors to perform all of their obligations thereunder, including the releases of all insurance coverage or other benefits under the Subject Policies as provided in the Agreement.  The consummation of the Agreement by the Debtors does not conflict, contravene, or cause a breach, default, or violation of any law, rule, regulation, contractual obligation, or organizational or formation document.

## Good Faith and Substantial Contribution

J.     The compromise and settlement memorialized in the Agreement are the product of arm's-length, good faith negotiations by and between Grace and the CNA Companies, and are not the product of fraud or collusion.  The settlement meets the standard established by the United States Court of Appeals for the Third Circuit for approval of settlements, which requires consideration of the following factors: (1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and related expense and inconvenience; and (4) the interests of the creditors.  *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996); *see also Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.),* 283 F.3d 159, 165 (3d Cir. 2002).

K.    The consideration to be paid by the CNA Companies under the Agreement is fair, equitable, and reasonable to Grace and to all persons who hold Claims or Demands against Grace for all relevant purposes under the Bankruptcy Code, constitutes reasonably equivalent value, and is in the best interest of the bankruptcy estates.

L.    The transaction set forth in the Agreement pursuant to which the CNA Companies are to acquire all rights, title, and interests of the Debtors in and under the Subject Policies free and clear of all liens, encumbrances, and/or interests as provided in Section V.E. of the Agreement (the "363 Sale") constitutes a sale of property pursuant to Bankruptcy Code Sections 363(b) and 363(f); any interest of any entity other than Grace in the Subject Policies is in bona fide dispute and is not entitled to adequate protection under Section 363(e) of the Bankruptcy Code; and the CNA Companies are good faith buyers within the meaning of Section 363(m).

M.    The 363 Sale is at arm's length and in good faith, and the consideration to be paid by the CNA Companies is fair and adequate and constitutes reasonably equivalent value and fair consideration, such that the sale of the Subject Policies is not subject to avoidance under Bankruptcy Code Section 363(n), and the CNA Companies are entitled to the full protections of Section 363(m).

N.    The relief requested in the Motion is in the best interests of the bankruptcy estates; and

O.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.

## Retention of Jurisdiction

P.      It is necessary and appropriate for the Court to retain jurisdiction, among other things, to interpret and enforce the terms and provisions of this Order and the Agreement, and to adjudicate, if necessary, any and all disputes arising under or relating in any way to, or affecting any of the transactions contemplated under, the Agreement.

For all of the foregoing reasons and after due deliberation, pursuant to Bankruptcy Code Sections 105(a), 363, 1107, and 1108 and Bankruptcy Rules 2002, 6004, 9014, and 9019(a), it is

## ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED and APPROVED in all respects.

2.      For the reasons set forth herein and on the record at the hearing, all objections to the Motion and the relief requested therein and/or granted in this Order that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are overruled on the merits.  By this Order, however, the Court is not deciding at this time whether a Bankruptcy Code Section 524(g) injunction should be issued with respect to the CNA Companies, which question is reserved for the Court's ruling on confirmation.

3.      The terms of the Agreement, a copy of which is attached to the Motion as Exhibit A, are approved in their entirety.

4.      The Debtors are authorized to release the CNA Companies, effective on the Effective Date, subject to the condition subsequent of the Asbestos PI Trust's receipt of the Initial Payment, in accordance with the terms and subject only to the conditions specified herein and in the Agreement.

7

5.     The Debtors shall be, and hereby are, authorized to enter into the Agreement, and are authorized to execute, deliver, implement, and fully perform any and all obligations, to execute any instruments, documents, and papers, and to take any and all actions reasonably necessary or appropriate to consummate the Agreement and perform any and all obligations contemplated therein, including designating the Agreement as an Asbestos Insurance Settlement Agreement, and the CNA Companies as Settled Asbestos Insurance Companies, with respect to the Subject Policies on Exhibit 5 of the Exhibit Book to the Joint Plan of Reorganization.  If the Joint Plan is confirmed, following the Effective Date for the Joint Plan, the Asbestos PI Trust, upon its creation, will be bound to the terms of the Agreement as if it were a signatory to the Agreement as of the Execution Date.

6.     Upon receipt by the Asbestos PI Trust of the Initial Payment as provided in Section II.A.1 of the Agreement (or pursuant to Section II.E.1, as applicable), the Debtors shall be deemed to have sold, conveyed, assigned, transferred, and delivered, and the CNA Companies shall be deemed to have purchased from the Debtors, all rights, title, and interests of the Debtors in and under the Subject Policies, free and clear of all liens, encumbrances, and/or interests of any kind or nature whatsoever, pursuant to Section 363(f) of the Bankruptcy Code, and no person or entity is entitled to adequate protection with respect to the Subject Policies under Section 363(e) of the Bankruptcy Code.  The CNA Companies shall thereafter be entitled to the protections of Sections 363(m) of the Bankruptcy Code with respect to the Subject Policies.

7.     Pursuant to Bankruptcy Rule 9019, the settlement and mutual releases as set forth in the Agreement are hereby approved.  This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed under Bankruptcy Rule 6004(h).

8

8.      Upon the Approval Order becoming a Final Order, the CNA Companies shall withdraw all of their objections to the Joint Plan and any plan-related documents and to confirmation of the Joint Plan, and shall expressly consent to the assignment of Asbestos Insurance Rights as provided in the Asbestos Insurance Transfer Agreement, Exhibit 6 to the Joint Plan. After both the Approval Order and the Confirmation Order become Final Orders, the Proofs of Claim shall be deemed withdrawn with prejudice to the extent they relate to Asbestos-Related Claims.

9.      The CNA Companies are not, and shall not be deemed to be, successors to the bankruptcy estates by reason of any theory of law or equity or as a result of the consummation of the transaction contemplated in the Agreement or otherwise. The CNA Companies shall not assume any liabilities of the bankruptcy estates.

10.      The failure specifically to include or refer to any particular term or provision of the Settlement Agreement in this Approval Order, including without limitation the Termination provisions of Section VI, shall not diminish or impair the effectiveness of such term and provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

11.      This Court shall retain jurisdiction to interpret, implement, and enforce the provisions of this Order subject to the terms of the Agreement.

Dated: _____          _____

                                    The Honorable Judith K. Fitzgerald
                                    United States Bankruptcy Judge

9

**ATTACHMENT C**

**Unpaid Amounts for W. R. Grace**

**Dated November 5, 2010**

| Invoice Number | Evaluation / Invoice Date | Amounts Due | Comments |
|---|---|---|---|
| Retro Cover Letter dated 3/2/2001 | 1/1/2001 | $804,147.00 | Based on bankruptcy status of account, invoices not produced. Retro Cover Letter and details mailed to insured. |
| Retro Cover Letter dated 2/20/2002 | 1/1/2002 | $1,260,981.00 | |
| Retro Cover Letter dated 2/13/2003 | 1/1/2003 | $1,040,861.00 | |
| Retro Cover Letter dated 3/31/2004 | 1/1/2004 | $3,400,654.00 | |
| Retro Cover Letter dated 3/1/2005 | 1/1/2005 | $3,653,251.00 | |
| HO07643 | 3/1/2006 | $409,895.00 | Invoice produced and mailed for informational purposes only. |
| **Subtotal Retros 2001-2006** | | **$10,569,789.00** | |
| CS08112 | 2/1/2007 | $7,304.00 | |
| HO08438 | 2/15/2007 | $5,483.00 | |
| HO08467 | 3/8/2007 | $79,868.00 | |
| CS07025 | 2/1/2007 | $13,440.00 | |
| CS07027 | 8/6/2007 | $6,550.00 | |
| CS08114 | 8/6/2007 | $5,425.00 | |
| CS08113 | 4/30/2007 | $7,474.00 | |
| CS07026 | 4/30/2007 | $13,755.00 | |
| CS07028 | 11/1/2007 | $7,696.00 | |
| CS08115 | 11/1/2007 | $9,634.00 | |
| **2007 Subtotal** | | **$156,629.00** | |

| Invoice Number | Evaluation / Invoice Date | Amounts Due | Comments |
|---|---|---|---|
| CS08116 | 2/7/2008 | $7,888.00 | |
| HO09334 | 4/17/2008 | $674,343.00 | |
| CS07030 | 5/1/2008 | $1,860.00 | |
| CS08117 | 5/1/2008 | $9,895.00 | |
| CS08118 | 8/4/2008 | $3,520.00 | |
| CS07031 | 8/4/2008 | $12,491.00 | |
| CS08119 | 11/26/2008 | $6,676.00 | |
| **2008 Subtotal** | | **$716,673.00** | |
| | | | |
| CS07033 | 1/29/2009 | $42,996.00 | |
| CS08120 | 1/29/2009 | $3,488.00 | |
| Unapplied Cash | | -$35,424.00 | |
| HO09955 | 4/27/2009 | $415,882.00 | |
| HO09886 | 3/13/2009 | $186,476.00 | |
| CS07034 | 5/1/2009 | -$27,718.00 | |
| CS08122 | 5/1/2009 | $10,251.00 | |
| CS07035 | 8/3/2009 | $369.00 | |
| CS08123 | 8/3/2009 | $5,193.00 | |
| CS07036 | 11/2/2009 | $1,027.00 | |
| CS08124 | 11/2/2009 | $7,274.00 | |
| **2009 Subtotal** | | **$609,814.00** | |
| | | | |
| CS08125 | 2/1/2010 | $5,234.00 | |
| HO10510 | 3/31/2010 | $81,558.00 | |
| CS07038 | 6/29/2010 | $2,027.00 | |
| CS08126 | 6/29/2010 | $6,768.00 | |
| CS07039 | 8/4/2010 | $41,965.00 | |
| CS08127 | 8/4/2010 | $3,949.00 | |
| **2010 Subtotal** | | **$141,501.00** | |
| | | | |
| **Amount Due CNA @ 11/5/2010** | | **$12,194,406.00** | |