<u>**EXHIBIT A**</u>

**Sales Agreement**

## AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE

**THIS AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE** (the "Agreement") is made and entered into this 20ᵗʰ day of May , 2009 (the "Effective Date") by and between **W. R. GRACE & CO. – CONN.**, a Connecticut corporation ("Grace") and **THE FURMAN UNIVERSITY FOUNDATION, INC.**, a South Carolina nonprofit corporation (the "Foundation").

### RECITALS:

WHEREAS, Grace is the owner and holder of an approximately 40.80 acre tract of land located along U.S. Highway 25 Bypass (White Horse Road) and S. C. Road S-88 (Roe Ford Road) in the County of Greenville, State of South Carolina, which tract is more particularly depicted on Exhibit "A" attached hereto and incorporated herein (the "Property"); and

WHEREAS, Grace desires to sell and convey the Property to the Foundation and the Foundation desires to purchase and acquire the Property from Grace upon and subject to the terms and conditions set forth in this Agreement.

### AGREEMENTS:

**NOW, THEREFORE,** for and in consideration of the foregoing recitals and of the mutual terms, covenants and conditions set forth hereinafter, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grace and the Foundation hereby agree as follows:

1.    <u>PURCHASE AND SALE OF THE PROPERTY</u>.  Grace agrees to sell, convey and assign the Property unto the Foundation and the Foundation agrees to purchase, accept and acquire the Property from Grace, upon and subject to the terms and provisions of this Agreement. The purchase and sale of the Property shall be in its "AS IS – WHERE IS" condition.

2.    <u>PURCHASE PRICE</u>.  The Purchase Price for the Property shall be the sum of Five Hundred Fifty-Four Thousand and no/100 ($554,000.00) Dollars. The Foundation deposits with Grace herewith, as Earnest Monies, the sum of Ten Thousand and no/100 ($10,000.00) Dollars, which Earnest Monies shall be fully refundable in the event the transactions contemplated herein shall not close for any reason other than default by the Foundation, and which Earnest Monies shall be applied to the Purchase Price at Closing. The balance of the Purchase Price, subject to adjustments for prorata ad valorem property taxes, shall be paid by the Foundation to Grace in collected funds at Closing.

3.    <u>BANKRUPTCY COURT APPROVAL</u>. Pursuant to the <u>Order Establishing Procedures for the Sale or Abandonment of De Minimis Assets</u> (herein the "De Minimis Asset Order" or "DMAO", a copy of which has been furnished to the Foundation), dated August 2, 2001, issued by the Bankruptcy Court (as hereinafter defined), Grace is not authorized to dispose of assets until it has satisfied certain guidelines, and the appropriate guidelines are determined by

the price of the assets being sold.  Given the purchase price herein, the De Minimis Asset Order requires Grace to give certain third-parties (the "Notice Parties") notice of the transaction contemplated herein, along with the opportunity to (i) make an alternative offer or (ii) object to the within offer (collectively, "Notice Party Veto Rights").  Grace shall take reasonable steps to resolve any objections filed by the Notice Parties.  **If a Notice Party successfully exercise its Notice Party Veto Rights, the terms of this Agreement shall be rendered null and void.**  In the event that a Notice Party makes a superior offer, Grace shall promptly notify the Foundation of the existence and terms of such offer.  In the event that a Notice Party successfully objects to the sale contemplated herein, Grace shall notify the Foundation within five (5) business days of the Bankruptcy Court's order denying the sale contemplated herein.  If this Agreement is not consummated because of the Notice Party Veto Rights, then Grace shall return the Earnest Monies within five (5) business days of such event.

The perfection of full and final authorization for Grace to complete the sale of the Property pursuant to the foregoing De Minimis Asset Order, including without limitation the resolution of any appeals filed thereto or the expiration of any appeal periods without the filing of any appeals, shall be and constitute a condition precedent to the obligations of Grace under this Agreement.

Grace shall give prompt notice of the proposed sale under this Agreement to all parties entitled to notice thereof under the DMAO.  Grace shall furnish the Foundation with prompt notice of any objections to the proposed sale filed or served by any p rty under the DMAO.  If the Foundation has not received notice from Grace within sixty (60) days of the date of this Agreement that Grace is authorized under the DMAO to sell the Property to the Foundation pursuant to this Agreement, then the Foundation shall have the right to terminate the Agreement and receive a refund of its Earnest Monies.

4.    CONVEYANCE.  Grace shall convey the Property to t1e Foundation at Closing by general warranty deed, free and clear of all liens, encumbrances, claims, rights-of-way, easements, restrictions, and restrictive covenants, except current ad valorem property taxes applicable to the Property not yet due and payable as of the date of Closing and such other matters of record or survey as shall be acceptable to the Foundation in its sole discretion. Grace shall further convey to the Foundation by quitclaim deed at Closing all of Grace's rights, title and interest, if any, in and to the portions of the abandoned railroad right-of-way of the G & N Railroad that run through and abut the Property.

5.    REPRESENTATIONS AND WARRANTIES.   Grace makes the following representations and warranties to the Foundation, each of which shall remain true, complete and correct as of the date of Closing and shall survive Closing:

a.    Grace is a corporation duly organized, validly existing, in good standing under the laws of the State of Connecticut and duly authorized to transact business in the State of South Carolina, with full power and authority to execute, deliver and perform its obligations under this Agreement, subject to the provisions of Section 3 hereinabove;

b.    This Agreement is duly and properly executed and delivered by and on behalf of Grace for value received, is entered into pursuant to authority vested in Grace (but subject to the process described in Section 3 hereinabove) and, upon perfection of authorization to sell the Property pursuant to the process described in Section 3, will constitute the valid obligation of Grace, legally binding upon and enforceable against Grace in accordance with its respective terms;

c.    No actions, suits or proceedings are pending or, to the best of Grace's knowledge, threatened before any court, governmental agency or arbitrator against or affecting the Property or which may impair Grace's ability to perform hereunder;

d.    There are no condemnation, eminent domain, or re-zoning proceedings pending or, to the best of Grace's knowledge, threatened against or involving the Property or any portion thereof;

e.    No payments for work, materials or improvements furnished to the Property will be due or owing at Closing, and no mechanics' liens, materialmen's liens or other similar liens shall be of record against the Property at Closing;

f.    No other options or contracts have been granted or entered into by Grace which are still outstanding and which give any other party a right, option, or right of first refusal to purchase or lease any interest in the Property; and

(g)    Grace knows of no violations at or by the Property of any applicable governmental laws, regulations, rules, ordinances, codes, licenses or permits, including without limitation, zoning, building codes, safety codes, occupancy codes, and municipal regulations and those relating to environmental matters.

6.    **INSPECTION PERIOD.** Commencing on the Effective Date and extending for a period of ninety (90) days thereafter (the "Inspection Period"), the Foundation shall be entitled to make such surveys and investigations (including a Phase II environmental inspection which shall be limited in scope to the items set forth on the proposal attached hereto as Exhibit "B", unless such environmental inspection report shall reveal the existence of any further Hazardous Materials at or upon the Property or either party should otherwise become aware of any release of Hazardous Materials at or upon the Property subsequent to the date hereof) as it deems appropriate or necessary to determine the status of title to the Property, to conduct a current field survey of the Property, and to enter upon the Property or to authorize its agents and other representatives to enter upon, inspect and test the Property so long as the same does not result in any material adverse change to the physical characteristics of the Property. The Foundation shall give advance notice to Grace of all proposed Property inspections and shall schedule any entries upon the Property on the part of the Foundation, its agents or contractors, with Grace. The Foundation agrees to indemnify and hold Grace harmless from and against any and all claims, costs, expenses, damages and liabilities to the Property, including reasonable attorneys' fees, arising out of such investigations and testing by the Foundation or its agents prior to Closing; provided, however, that such indemnity and hold harmless obligations shall not extend to the

3

consequences of any existing matters or conditions disclosed by the Foundation's inspections. In the event that the Foundation's examinations or inspections disclose any objectionable condition of the Property, the Foundation shall be entitled to give to Grace written notice prior to expiration of the Inspection Period of (a) the Foundation's election not to acquire the Property, or (b) any curable objectionable condition, defect, or failure which Grace shall have the right, but not the obligation, to cure to the Foundation's satisfaction at or prior to the Closing. In the event that the Foundation notifies Grace of its election not to acquire the Property, this Agreement shall thereupon become null and void and of no further force or effect, and the Earnest Monies shall be promptly refunded to the Foundation.

7.    CLOSING. The sale and conveyance of the Property shall be closed at the offices of the Foundation's attorneys on or before (30) days following the expiration of the Inspection Period. At Closing, Grace shall deliver to the Foundation its fully and duly executed, recordable General Warranty Deed to the Property, its fully and duly executed quitclaim deed of all of Grace's rights, title and interest, if any, in and to the portions of the abandoned railroad right-of-way of the G & N Railroad that run through and/or abut the Property, together with the actual, exclusive, full and complete possession of the Property, and such Affidavits, resolutions and other documentation as shall be reasonably required by the Foundation's title insurance company to confirm that this transaction and the execution and delivery of Grace's deed are duly authorized, that no Mechanic's Liens or similar liens exist, that no amounts are due from any persons which could give rise to the same, that there are no parties other than Grace in possession of any portions of the Property, that the transaction contemplated by this Agreement will not constitute a sale of the majority of Grace's assets, and that shall address any other matters as shall be reasonably required by such title insurer. The Foundation shall deliver to Grace at Closing the balance of the Purchase Price in collected funds, subject to adjustments for prorata ad valorem property taxes and assessments.

8.    CLOSING COSTS AND PRORATIONS. Grace shall pay for the costs of deed preparation, deed recording fees pursuant to Title 12, Chapter 24, S.C. Code of Laws, and/or any other documentary stamps applicable to real estate transfers. Grace and the Foundation shall prorate at Closing all ad valorem property taxes and assessments applicable to the Property due or estimated to be due for the year of Closing. Grace shall be responsible for payment at Closing of all rollback taxes, if any, applicable to the Property. Each party shall be responsible for its own attorneys' fees. The Foundation shall pay for the cost of any survey that it requires, and for all other inspection fees and recording fees (excluding deed recording fees pursuant to Title 12, Chapter 24, S.C. Code of Laws, which shall be Grace's responsibility) associated with the transactions contemplated herein. All other closing costs of whatever nature and kind shall be payable by the party incurring the same.

9.    ENVIRONMENTAL MATTERS.

a.    Disclosures. Prior to the date hereof, pursuant to the terms of that certain Confidentiality Agreement dated June 19, 2008 between Grace and the Foundation, Grace has provided access to the Property to the Foundation and its consultants to inspect the Property and has furnished to the Foundation a copy of each of the documents and reports listed on Exhibit

4

"C" attached hereto and incorporated herein. In connection with the Foundation's review of those documents and reports, the Foundation acknowledges that it is aware of the following matters: (i) the Property was used for industrial purposes; (ii) the Property received shipments of vermiculite ore/concentrate from Grace's mine operations in Libby, Montana; and (iii) the Property contains a retention pond and dam/dike, and that Grace makes no representations as to the long-term stability of the dam. In fact, the Foundation acknowledges that it has had its own dam assessment conducted, the report of which is entitled Site Observation – W. R. Grace Pond at Roe Ford Road, prepared by Fant, Reichert & Fogleman, Inc. and dated March 12, 2009.

      b.   <u>Release and Indemnity</u>. The Foundation acknowledges and agrees that it is purchasing the Property in its present "AS IS" environmental condition and that, upon closing, the Foundation, its successors, assigns and guarantors, shall be deemed to have released Grace, its affiliates, officers, directors, shareholders, employees and agents, from all claims, losses, damages, liabilities and costs of any and every nature, known or unknown, which the Foundation might otherwise have asserted against such parties by reason of or arising out of the environmental condition of the Property. In addition, the Foundation, on behalf of itself, and its successors, assigns and guarantors, hereby agrees to indemnify, defend, reimburse, and hold Grace, its affiliates, officers, directors, shareholders, employees and agents, harmless from and against any and all Governmental Claims which may result from, relate to, or arise out of exposure, or potential exposure, to any hazardous substance or environmental condition that is or may be at, on or under the Property, which exposure or potential exposure results from the Foundation's use or intended use of the Property. As used herein, the term "Governmental Claims" means any and all claims, demands, suits, actions or proceedings by any federal, state or local agency having jurisdiction over the environmental condition of the Property, including, without limitation, the United States Environmental Protection Agency and/or the South Carolina Department of Health and Environmental Control (DHEC).

      10.   <u>CONDEMNATION</u>.  In the event prior to Closing that any action or proceeding is filed, or notice thereof is given to Grace under which any portion of the Property may be taken pursuant to any governmental law, ordinance or regulation, or by condemnation or the right of eminent domain, this Agreement shall remain in full force and effect and Grace, at the time of Closing, shall transfer and assign to the Foundation all of Grace's right, title and interest in and to any condemnation proceeds which may be received by reason of such taking. Alternatively, the Foundation shall have the right to elect by written notice to Grace not to close the transaction contemplated herein, in which case this Agreement shall become null and void and of no further force and effect.

      11.   <u>BROKERAGE</u>.  Neither Grace nor the Foundation has engaged or used the services of any broker or finder whomsoever in connection with this transaction. Grace agrees to indemnify and hold the Foundation harmless from and against any and all liabilities, costs and expenses or any commissions, finders' fees or other similar compensation arising out of any alleged contacts claimed through or by Grace with regard to the within transaction, and the Foundation likewise agrees to indemnify and hold Grace harmless from and against any and all liabilities, costs and expenses for any commissions, finders fees or other similar compensation allegedly arising out of any contacts initiated through or by the Foundation with regard to the

within transaction. The foregoing warranties and indemnities shall survive Closing.

12.   ASSIGNABILITY. The Foundation may assign its rights and obligations hereunder to any affiliate of the Foundation or with Furman University.

13.   NOTICES. All notices and other communications allowed, made or required to be made pursuant to the terms of this Agreement shall be in writing and shall be deemed to be given or made when personally delivered (including personal delivery by Federal Express or other nationally recognized overnight private courier service) or two (2) business days following the date of deposit in the United States mail, registered or certified, postage prepaid, return receipt requested, addressed in any such event to the party to whom such communication is directed at such address as is set forth for such party hereinafter or at such other address as may hereafter be designated in writing by the respective parties hereto.

AS TO THE FOUNDATION:       The Furman University Foundation, Inc.
                            550 South Main Street, Suite 400
                            Greenville, South Carolina 29601
                            ATTN: W. Lindsay Smith, President

AS TO GRACE:                W. R. Grace and Co. – Conn.
                            7500 Grace Drive
                            Columbia, Maryland  21044
                            ATTN:  Vicki B. Finkelstein, Esquire

14.   GRACE REORGANIZATION; JURISDICTION.       Grace represents to the Foundation that Grace filed a voluntary petition for reorganization relief pursuant to Title 11 of the United States Code, 11 U.S.C. 101, et. seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 2, 2001 (the "Filing Date"), Case #01-1139 (JKF), and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code) as authorized by Sections 1107 and 1108 of the Bankruptcy Code since the Filing Date. Grace and the Foundation acknowledge and agree that until the effective date and confirmation of Grace's Plan of Reorganization or the dismissal or closing of Grace's bankruptcy case, the Bankruptcy Court shall have exclusive jurisdiction over the arrangements herein and over any claims or disputes which may arise or result from or be connected with the subject matter hereof, or any breach or default hereunder.

15.   MISCELLANEOUS. This Agreement constitutes the entire agreement of the parties with respect to its subject matter and no representations, inducements, promises or agreements, oral or otherwise, not expressly set forth herein, shall be of any force or effect whatsoever. No amendments, conditions, deletions, modifications or changes to or of this Agreement, or purported or alleged waiver of any provision hereof, shall be of any force or effect whatsoever unless reduced to writing and signed by the parties hereto. This Agreement may be executed in multiple counterparts, each of which when fully executed shall be deemed an original, and all of said counterparts taken together shall be deemed to constitute one and the same Agreement. This Agreement is executed in, is performable under and shall be governed by

and construed in accordance with the laws of the State of South Carolina, to which jurisdiction the parties, by their execution hereof, hereby irrevocably consent. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, successors, legal representatives and assigns.

IN WITNESS WHEREOF, the Foundation and Grace have executed this Agreement For Purchase And Sale of Real Estate as of the day and year first written above.

WITNESSES:

THE FURMAN UNIVERSITY FOUNDATION, INC.

By: _W. Lindsay Smith_____
W. Lindsay Smith
Title: President

W. R. GRACE & CO. – CONN.

By: _William Corcoran_____
William Corcoran
Title: Vice President, Public and Regulatory Affairs

**EXHIBIT "A"**

ALL that certain piece, parcel or lot of land containing 40.80 acres, more or less, situate, lying and being in the County of Greenville, State of South Carolina, lying along U.S. Highway 25 Bypass (White Horse Road) and S. C. Road S-88 (Roe Ford Road), and depicted as follows:



8

EXHIBIT "B"



Corporate Headquarters
1425 Higham Street
Idaho Falls, ID 83402

October 8, 2008

Mr. W. Lindsay Smith, Esq.
President, Furman University Foundation, Inc.
c/o
Womble Carlyle Sandridge & Rice, PLLC
550 South Main Street
Suite 400
Greenville South Carolina 29601                          *VIA EMAIL*

RE:    Phase II ESA Testing Recommendations
       W.R. Grace Property, Travelers Rest, SC

Lindsay:

This letter report presents the findings of our review of environmental conditions at the W.R. Grace property and describes proposed testing needed to further screen the site for the potential presence of hazardous substances related to former manufacturing operations. Our review was based on the environmental reports provided in the CD sent to us by your office, as well as our visual assessment of general site conditions made during a walk though of the property held on September 12th. To assist our evaluation, we prepared a series of figures (Fig. 1 through Fig. 4, attached) showing site features and locations / findings of previous site environmental testing. Proposed Phase II Environmental Site Assessment test locations are shown in Figure 5.

**Findings**
Results of Rogers & Callcott's May 2005 Site Investigation Report did not find evidence of pervasive (site-wide) groundwater contamination at the property. Please note that because the strategy used by Rogers & Callcott in their study was to "determine the overall nature of potential site impacts instead of sampling at all potential areas of concern", localized undiscovered releases of hazardous constituents or petroleum to groundwater may be present at the site, however, I believe they would likely not have a significant impact on future development of the property (since future site users would not be in contact with groundwater and since no evidence of high levels of volatile organic compounds in site groundwater, which could pose vapor intrusion concerns, has been found). It is my understanding that Rogers & Callcott was scheduled to sample several monitoring wells on the site on September 12th as part of the closure process for the area known as the Settling Pond. Those test

North Wind, Inc.   •   535 N. Pleasantburg Drive, Suite 136•   Greenville, SC 29607
Phone 864.467.0811   •   Fax 864.467.9758   •   www.northwind-inc.com

9

results should be available as of this date. The Foundation should obtain a copy of the monitoring result to verify previous groundwater quality findings.

Areas at the property that we found to pose potential site environmental concerns are indicated on Figure 1 and include:

- Tailings Wash Pond
- Chemical Waste Reservoir / Drum Removal Area
- Septic Field
- Basement Area of the Old Plant-- Pesticide Mixing Lab
- Former Above Ground Storage Tanks and Former Underground Storage Tanks
- Site Surface Water Bodies and On-Site Ditches.

Our evaluation of each area of potential concern is presented below. I have qualitatively ranked them in order of potential greatest environmental concern to least concern.

Tailings Wash Pond

Site reports indicate the Tailings Wash Pond (identified as the Old Tailing Pond in Rogers & Callcott's May 2005 Site Investigation Report, and shown as an area shaded in light blue in Figure 1 of this letter report) received runoff from vermiculite storage and processing areas. WESTON's November 1993 Phase I ESA Report also noted this concern and listed the pond as a Recognized Environmental Condition.

Rogers & Callcott's Site Investigation Report states that the Tailings Wash Pond was closed and filled with site material of unknown composition. I am not aware of records that document the former depth of the Tailings Wash Pond, but considering its large footprint, even if the pond was only two to three feet deep, the fill material represents a significant volume of potentially contaminated soils that could be costly to remove if asbestos levels were determined to be above acceptable concentrations.

Much of the Tailings Wash Pond area is obscured by concrete paving, therefore we currently must rely upon Rogers & Callcott's test results to gauge potential concerns. Rogers & Callcott collected subsurface samples within the Tailings Wash Pond During from four soil borings as part of their 2005 Site Investigation (see Figure 3). Their report noted that the samples were collected from the depth intervals exhibiting the most visible vermiculite. Sample depth information therefore suggests the pond was as deep as six feet. Asbestos was not detected in the subsurface soil samples collected from any of the borings (SB-15 through SB-18). Subsurface soil samples collected from three of the borings (SB-16 through SB-18) were also tested for the presence of Volatile Organic Compounds (VOCs), Semi-Volatile Organic Compounds (SVOCs), Organochlorine Pesticides, Organophosphorus Pesticides, glycol, formaldehyde, barium, chromium and lead. Analytical results of those tests were either non-detect or below applicable US EPA Region 9 Residential Preliminary Remediation Goals (PRGs) and as such, currently indicate the fill material does not pose environmental concerns.

In my review of the Rogers & Callcott's November 2006 report on the former Surface Mound, I noticed that the test methods used to assess the Tailings Wash Pond (i.e., soil borings) were similar to the methods used to make their initial assessment of the volume of material within the former Surface

Mound containing asbestos.    As soil excavation work at the Surface Mound took place, Rogers & Callcott found occasional, very thin lenses of asbestos containing material that had been missed by the soil borings (this is because borings have a small diameter, a limited sample length, and the asbestos containing material was not uniformly distributed). As a result, the scope of the excavation work had to be greatly expanded.

A concern regarding the Tailings Wash Pond is that potential asbestos containing material in the fill may have been missed by the borings installed by Rogers & Callcott. Rogers & Callcott's November 2006 report indicates that vermiculite is present in the fill, although it is my understanding that of the vermiculite sources used by the plant, only vermiculite mined from W.R. Grace's Libby mine in Montana contained asbestos.

Only a small quantity of asbestos (1 percent) in the fill material would cause it to be managed as asbestos containing material (ACM). Since the Foundations site development plans may require the fill material to be disturbed, I recommend you conduct more invasive / complete testing of the fill material to further confirm it does not contain asbestos levels that would cause it to be managed as ACM. I therefore recommend we excavate three to four test pits in the fill material and collect additional soil samples for asbestos testing.

Chemical Waste Reservoir / Drum Removal Area
The Chemical Waste Reservoir / Drum Removal Area (shown as an area shaded in yellow in Figure 1 of this letter report) is an grass covered field located immediately east of a large concrete paved storage pad near the New Soil Mix Plant. This area is reported to have been the site where buried drums containing waste materials were removed by W.R. Grace in 1991, although the exact location, number and contents of the drums is unknown.

Rogers & Callcott collected subsurface soil samples from five of six borings installed within the Chemical Waste Reservoir / Drum Removal Area as part of their 2005 Site Investigation  Sample depth intervals ranged from four to six feet below grade (SB-10) to 10 feet below grade (SB-12). Results of this testing, which are summarized in Figure 3 of this letter report, detected the presence of several constituents at concentrations slightly above US EPA Region 9 Residential Preliminary Remediation Goals PRGs, including arsenic, chlordane, pentachlorophenol, and the dioxin compound 1,2,3,4,6,7,8-HpCDD (HpCDD). We noted that another dioxin compound, octachlorodibenzo-p-dioxin (OCDD) was also detected among the subsurface soil samples collected from the Chemical Waste Reservoir / Drum Removal Area, although at a concentration below US EPA Region 9 Residential Preliminary Remediation Goals PRGs.

The conclusions portion of Rogers & Callcott's Site Investigation report noted that the arsenic concentration observed in the soil sample obtained from boring SB-11 exceeded its respective US EPA Region 9 Industrial Preliminary Remediation Goals PRG, but ascribed its presence as a naturally occurring constituent of native soils. The report also noted that the presence of chlordane, pentachlorophenol and the two dioxin compounds (HpCDD and OCDD) are attributable to the Chemical Waste Reservoir / Drum Removal Area.  The report further notes that because of the method used by field personnel to select soil sample intervals for testing, it cannot be concluded that the samples containing these constituents represent the highest concentrations in the Chemical Waste Reservoir / Drum Removal Area.

Findings of Rogers & Calicott's Site Investigation were reported to SCDHEC in 2005. The results for the Chemical Waste Reservoir / Drum Removal Area did not appear to indicate residual levels of contaminants in subsurface soils have or will impact site groundwater quality. To our knowledge, SCDHEC has not required W.R. Grace to take corrective actions in response to these findings.

No surface soil samples (0 to 1 foot depth interval) have been collected from the Chemical Waste Reservoir / Drum Removal Area. Based on the above findings, and since future site workers and/or site users may come in contact with this portion of the property, we recommend that surface soil samples be collected within the footprint of the Chemical Waste Reservoir / Drum Removal Area to determine if they contain similar, or potentially higher, levels of the constituents detected in subsurface soils.

Septic Field
No direct environmental testing of the Septic Field has been conducted. The closest groundwater sample location, GP-2 (see Figure 4 of this letter report), does not appear to be located directly downgradient of the Septic Field. As a result, past releases of hazardous constituents, if any, from the Septic Field may have gone undetected.

The Septic Field presumably served as the disposal system for site-generated sanitary waste; however, since we do not have documentation to show that wastes from the site laboratory and/or processing areas were not routed to the Septic Field, we believe it is prudent to screen soils and groundwater at this portion of the property for the presence of hazardous constituents and petroleum compounds. WESTON's November 1993 Phase I ESA Report noted similar concerns and listed the septic system as a Recognized Environmental Condition. Recommended testing is presented at the end of this letter report.

Basement Area of the Old Plant – Pesticide Mixing Lab
WESTON's November 1993 Phase I ESA Report on the property noted that the basement area of the Old Plant building (western building) was used as a laboratory for the development and mixing of pesticides, specifically Ethoxyquin (note: the WESTON report lists this pesticide as Estoxylquine, but since we have not been able to find literature referencing Estoxylquine, we believe this was a spelling error). The basement contains a large concrete-lined basin of unknown volume that presently is flooded with storm water.

Demolition of the Old Plant building will require the removal of the storm water. Since the water may contain residual levels of pesticides, we recommend the Foundation test the water prior to disposal. It is our understanding the water was previously sampled and determined to be nonhazardous; however, since this volume of water could be an expensive line-item if found to be hazardous, and the additional testing represents a minimal cost, we recommend that you verify the earlier test results.

Former Above Ground Storage Tanks and Former Underground Storage Tanks
Figure 1 depicts the locations of a number of former above ground storage tanks (ASTs) and former underground storage tanks (USTs). WESTON's November 1993 Phase I ESA Report listed a number of these tanks as a Recognized Environmental Condition, in part based on observed incidental spillage and also because records documenting clean closure of the USTs were not available for review.

With the exception of a former UST located near the Settling Pond, and a large AST located at the northern portion of the site, soils and groundwater near the tanks do not appear to have been tested for evidence of releases. Petroleum release, if any, from the tanks need to be identified, which will allow the Foundation to reserve potential cleanup costs. Recommended testing is presented at the end of this letter report.

Site Surface Water Bodies and On-Site Ditches
Two storm water ditches (one of which is located in the center of the plant area) and a perennial stream traverse the property. The ditches and stream discharge their flow into the small pond located on the southern portion of the property, which appears to be used for recreational and/or subsistence fishing. WESTON's November 1993 Phase I ESA Report listed poor housekeeping practices with regard to chemicals management at the site as a concern, and as such, incidental spills may have resulted in releases of hazardous constituents to the on-site drainage ditches and the receiving pond.

No environmental testing of the storm water ditches, the on-site portion of the stream, or the pond has been conducted to our knowledge. It is unlikely that detectable concentrations of site-related constituents will be found in the surface water, but the sediments may act as an environmental sink for certain metals and compounds. Since the stream and the pond are potential exposure pathways, we recommend testing of these features to determine if they pose environmental concerns.

Recommended Phase II ESA Testing
Table 1 presents a summary of recommended environmental testing, by area of concern, needed to further evaluate site conditions. The majority of our proposed testing focuses on soil media, since available site groundwater data suggests no substantive impacts to site groundwater quality have occurred.

Table 2 presents a budgetary level estimate of costs to implement the proposed testing outlined in Table 1. Please note that the cost estimate does not presently include testing select samples for Ethoxyquin, or HpCDD and OCDD, as we will need to locate a suitable laboratory to run these analyses. I estimate that we could complete the work in approximately six weeks time from notice to proceed.

Considering the size, history and nature of materials handling operations at the site (pesticides, fuels, ACM), the previous finding of ACM in site soils, and the probability that the property redevelopment will not be an industrial use scenario, I believe that the scope of our proposed testing is in line with the Foundations risk management objectives. I am of course available to discuss options for reducing costs or the schedule should you foresee that need.


Sincerely,
North Wind, Inc.


Michael A. Sheehan











Table 1 - Proposed Sampling Matrix
WR Grace Property

| | Area | Location | Known Past Environmental Investigations performed | Proposed Phase II Investigation | Proposed Laboratory Analysis |
|---|---|---|---|---|---|
| **Surface Water Pathways** | | | | | |
| | Onsite Ditches | 2 ditches onsite - flows to pond | None | 1 surficial soil sample from each ditch | VOCs, TPH GRO/DRO |
| | Onsite Stream | Southern portion of site - crosses Rex Ford Street | None | Surface water samples | VOCs, SVOCs, TPH GRO/DRO, Metals, Pesticides |
| | Onsite Pond | Southern portion of site across of Rex Ford Street and flow to pond | None | 1 Sediment | Metals, Pesticides |
| | Onsite Pond | Southern portion of site across of Rex Ford Street and flow to pond | None | 1 Surface water | VOCs, SVOCs, TPH GRO/DRO, Metals, Pesticides |
| **Waste Handling Areas** | | | | | |
| | Septic Field | Eastern portion of site | GP-2 | 3 Geoprobe Soil samples | VOCs, TPH GRO/DRO |
| | Septic Field | Eastern portion of site | GP-2 | 3 Geoprobe Groundwater samples | VOCs, SVOCs, TPH GRO/DRO, Metals, Pesticides |
| | Former Basement Area of the Old Plant - Pesticide mixing lab | Old Plant Rd | Grab water sample from flooded basement | Grab water sample from flooded basement | VOCs, SVOCs, TPH GRO/DRO, Metals, Pesticides |
| | Former Tailings Wash Pond | Middle of site | Soil borings & GW sampling performed - area permitted with 3 MWs | Test pit observation & Sampling | Asbestos |
| | Former chemical waste reservoir / Drum removal area | mt portion of property | Drums removed and soil & GW sampling during 2005 activities | 3 Shallow Geoprobe Soil borings | VOCs, SVOCs, TPH GRO/DRO, Metals, Pesticides |
| **ASTs** | | | | | |
| | 500 Gallon Fuel-Oil AST (onsite) | Near (west) of Administration Bld (BLD #2) | None | 1 Shallow Geoprobe Soil borings | VOCs & TPH GRO/DRO |
| | Former 55-Gallon Oil drum storage area | Inside Hazardous Shop - northern portion of site | None | 1 Shallow Geoprobe Soil boring | VOCs & TPH GRO/DRO |
| | Former Unknown AST | North of BLD #6 | None | 2 Shallow Geoprobe Soil borings | VOCs & TPH GRO/DRO |
| | Former 10,000 Gallon AST & 2x500 (Waste & Gas) Gallon ASTs | South of Old Plant, along RA | None | 2 Shallow Geoprobe Soil borings | VOCs & TPH GRO/DRO |
| | Former Tank Farm (8x10,000 Gallon Unknown ASTs) | Southern portion of site, along RA | GP-3 (downgradient) | 2 Shallow Geoprobe Soil boring | VOCs & TPH GRO/DRO |
| | Former Elkonuyah AST | East of Pesticide mixing lab, along RA | None | 1 Shallow Geoprobe Soil boring | VOCs, SVOCs, Pesticides |
| **USTs** | | | | | |
| | Former 500 & 1000 Gallon Gas USTs | East & West of BLD #6 | Areas closed, 3 wells abandoned (cast) | 1 Shallow Geoprobe Soil boring in each location | VOCs & TPH GRO/DRO |

Table 2

PROJECT: Phase II Investigation & Report
CLIENT: Person University Foundation - VA Gross Property

| CATEGORY | FEE SCHEDULE UNIT | $/UNIT | 1. Field Coordination Qtr | 1. Field Coordination $ | 2. Field Investigation Qtr | 2. Field Investigation $ | 3. Report Preparation Qtr | 3. Report Preparation $ | TOTALS Qtr | TOTALS $ |
|---|---|---|---|---|---|---|---|---|---|---|
| **1. LABOR** | | | | | | | | | | |
| Principal / Senior Consultant | Hr | $175 | 2 | $270 | | $1,020 | | $1,020 | 10 | $2,130 |
| Senior Professional III | Hr | $125 | | $0 | | $0 | | $0 | | $0 |
| Senior Professional II | Hr | $115 | | $0 | | $0 | | $0 | | $0 |
| Senior Professional I | Hr | $105 | | $0 | | $0 | | $0 | | $0 |
| Project Professional II | Hr | $95 | | $680 | | $3,550 | | $1,760 | | $4,434 |
| Project Professional I | Hr | $85 | | $0 | | $0 | | $0 | | $0 |
| Staff Professional II | Hr | $75 | | $0 | $0 | $11,950 | | $11,260 | | $13,260 |
| Staff Professional I | Hr | $65 | | $0 | | $0 | | $5,780 | | $5,780 |
| GIS | Hr | $65 | | $0 | | $0 | | $0 | | $0 |
| Project Administrator II/Technician II | Hr | $55 | | $0 | | $0 | | $0 | | $0 |
| Project Administrator I/Technician I | Hr | $45 | | $0 | | $0 | | $0 | | $0 |
| **Total Labor** | | | | $950 | | $17,195 | | $4,440 | | $31,789 |
| **2. TRAVEL** | | | | | | | | | | |
| Vehicle | Day | $75 | | $0 | | $225 | | $0 | | $225 |
| Fuel | Estimate | $100 | | $0 | | $200 | | $0 | | $200 |
| Lodging | M.D. | $50 | | $0 | | $0 | | $0 | | $0 |
| Meals | M.D. | $50 | | $0 | | $180 | | $0 | | $180 |
| **Total Travel** | | | | $0 | | $495 | | $0 | | $605 |
| **3. LABORATORY SUBCONTRACTOR** | | | | | | | | | | |
| *Para Analytical* | | | | | | | | | | |
| VOCs (soil) | | $62 | | $0 | | $1,577 | | $0 | | $1,577 |
| GRO/DRO (soil) | | $65 | | $0 | | $1,300 | | $0 | | $1,300 |
| Pesticides (soil) | | $89 | | $0 | | $540 | | $0 | | $540 |
| VOCs (groundwater) | | $72 | | $0 | | $432 | | $0 | | $432 |
| GRO/DRO (groundwater) | | $160 | | $0 | | $960 | | $0 | | $960 |
| Pesticides (groundwater) | | $90 | | $0 | | $540 | | $0 | | $540 |
| RCRA Metals (groundwater) | | $61 | | $0 | | $378 | | $0 | | $378 |
| Meth/alk | Percent | 10% | | $0 | | $568 | | $0 | | $568 |
| **Total Subcontractor** | | | | $0 | | $6,343 | | $0 | | $6,603 |
| **4. DRILLING SUBCONTRACTOR** | | | | | | | | | | |
| *Earth-Cen* | | | | | | | | | | |
| Rig Mobilization | | $225 | | $0 | | $225 | | $0 | | $225 |
| Borehole (daily rate) | | $5,100 | | $0 | | $5,100 | | $0 | | $5,200 |
| Expendables | | $100 | | $0 | | $100 | | $0 | | $100 |
| Meth/alk | Percent | 10% | | $0 | | $363 | | $0 | | $363 |
| **Total Subcontractor** | | | | $0 | | $5,988 | | $0 | | $5,988 |
| **5. TEST PIT SUBCONTRACTOR** | | | | | | | | | | |
| *JBR* | | | | | | | | | | |
| Test Pit Activities (daily rate - crew of 2) | | $1,100 | | $0 | | $1,100 | | $0 | | $1,100 |
| Meth/alk | Percent | 10% | | $0 | | $110 | | $0 | | $110 |
| **Total Subcontractor** | | | | $0 | | $1,430 | | $0 | | $1,430 |
| **ASBESTOS LABORATORY SUBCONTRACTOR** | | | | | | | | | | |
| *Southeastern Labs* | | | | | | | | | | |
| Asbestos Analysis | | $6 | | $0 | | $18 | | $0 | | $18 |
| Meth/alk | Percent | 10% | | $0 | | $2 | | $0 | | $2 |
| **Total Subcontractor** | | | | $0 | | $20 | | $0 | | $20 |
| **6. OTHER DIRECT COSTS** | | $/day | | | | | | | | |
| Miscellaneous - All Cost | | $100 | | $0 | | $200 | | $0 | | $200 |
| PID | | $250 | | $0 | | $250 | | $0 | | $250 |
| Mile Easy Locator (rental) | | $75 | | $0 | | $75 | | $0 | | $75 |
| FMSO Supplies/Disposables | | $125 | | $0 | | $125 | | $0 | | $125 |
| GPS Unit | Estimate | $100 | | $0 | | $100 | | $0 | | $100 |
| Fed Ex/Shipping | Estimate | | | $0 | | $0 | | $0 | | $0 |
| Field Equipment/Supplies | Estimate | | | $0 | | $0 | | $0 | | $0 |
| Reproduction | | | | $0 | | $0 | | $0 | | $0 |
| **Total O.D.C.s** | | | | $0 | | $750 | | $0 | | $750 |
| **7. TOTAL COSTS** | SUBTOTAL | | | $950 | | $17,195 | | $4,860 | | $31,424 |

10% CONTINGENCY    $3,141

## EXHIBIT "C"

1.     Phase 1 Environmental Site Assessment and Limited Asbestos Sampling – Grace-Sierra - prepared by Roy F. Weston, Inc., dated November 1993.

2.     Executive Summary to Phase 1 Environmental Site Assessment and Limited Asbestos Sampling – Grace-Sierra – prepared by Roy F. Weston, Inc., dated November 1993.

3.     Letter dated December 29, 1999 from Rogers & Callcott Engineers, Inc. ("Rogers & Callcott") to South Carolina DHEC regarding the abandonment of three monitoring wells (MW-101, MW-102 and MW-103).

4.     Land Application Permit No. ND 0082309 issued by South Carolina DHEC on July 17, 2003.

5.     Asbestos and Lead-Based Paint Evaluation Report dated April 12, 2005 and prepared by The Pinnacle Consulting Group.

6.     Report prepared by Rogers & Callcott dated May 20, 2005 regarding Site Investigation Results.

7.     Figure 2 from May 20, 2005 Report.

8.     Letter dated June 15, 2005 from South Carolina DHEC to Rogers & Callcott regarding Site Investigation Results.

9.     Letter dated March 22, 2006 from Rogers & Callcott to South Carolina DHEC, and attachments thereto, regarding Ground Water Data Submittal for 2006.

10.     Report prepared by Rogers & Callcott dated November 9, 2006 regarding Summary of Asbestos-Containing Soil Removal Activities.

11.     Letter dated March 6, 2008 from Grace to South Carolina DHEC, accompanied by Report dated February 27, 2008 prepared by Rogers & Callcott, both regarding Ground Water Data Submittal for 2008.

12.     Following matters related to Code Violation:
   * Code Violation Notice dated April 14, 2008 issued by County of Greenville Code Enforcement Officer.
   * Demolition Application dated May 5, 2008 to Greenville County Construction Board of Adjustments and Appeals.
   * Letter dated May 8, 2008 from Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") to County of Greenville Code Enforcement Officer, accompanied by letter dated May 7, 2008 from Hillmann & Elmore Structural Engineering, LLC.
   * Letter dated May 27, 2008 from Nelson Mullins to County of Greenville Code Enforcement Officer.
   * E-mail dated May 19, 2008 from Mitch Obradovic, to which was attached updated Greenville County Code Enforcement Case History Report showing case closed.

13.     Letter dated March 10, 2009 from the Bureau of Water of South Carolina DHEC Regarding Settling Pond Closure at Grace-Sierra Facility, Travelers Rest, South Carolina, Greenville County.

## AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE

**THIS AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE** (the "Amendment") is made and entered into as of this 8ᵗʰ day of July , 2009, by and between **W. R. GRACE & CO. – CONN.**, a Connecticut corporation ("Grace"), and **THE FURMAN UNIVERSITY FOUNDATION, INC.**, a South Carolina nonprofit corporation (the "Foundation"), and amends and extends the Agreement for Purchase and Sale of Real Estate between the Foundation and Grace having an Effective Date of May 20, 2009 (the "Agreement") for and in consideration of the mutual covenants and provisions set forth herein. Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

RECITALS:

A.      Subsequent to the entry by the parties into the Agreement, Grace received notification that the United States Environmental Protection Agency Region IV ("EPA") intends to conduct testing and sampling for asbestos-containing materials at the Property during early October, 2009; and

B.      Grace has notified the Foundation of such plans by EPA, and the Foundation is unwilling to undertake any surveys or investigations of the Property or to proceed with its purchase of the Property pursuant to the Agreement pending the outcome of the testing and sampling of the Property by EPA; and

C.      Grace and the Foundation accordingly desire to amend the Agreement in order to extend the Inspection Period and to set forth the following further terms and conditions.

AGREEMENTS:

NOW, THEREFORE, in consideration of the foregoing and of the mutual terms and provisions set forth hereinafter, Grace and the Foundation hereby agree to amend and modify the Agreement as follows:

1.      Inspection Period. The Inspection Period is hereby extended so as to continue until the earlier of (a) ninety (90) days following the receipt by the Foundation of final testing and sampling reports and recommendations from EPA, or (b) December 31, 2009; provided, that the Foundation shall have the right to extend the Inspection Period thereafter for up to two (2) additional successive periods of ninety (90) days each in the event that final testing and sampling reports and recommendations have not been received by the parties from EPA within forty-five (45) days prior to the expiration of the Inspection Period (or any extension thereof). The Foundation shall exercise such rights to extend by written notice to Grace prior to the expiration of the Inspection Period (or any extension thereof), so long as the Foundation is not otherwise then in default under the Agreement.

2.      Cooperation. Grace agrees to cooperate with the Foundation to enable the Foundation to communicate with EPA with respect to its Property testing and sampling, and, to the extent that the Foundation may desire to do so and to the extent possible, to participate in parallel testing and/or the collection of parallel sampling.

3.      Bankruptcy Court Approval. The final paragraph of Section 3 of the Agreement is hereby deleted and replaced with the following paragraph:

Grace and the Foundation shall agree during the Inspection Period upon the approximate timing for which Grace shall give notice of the proposed sale under the Agreement to all parties entitled to notice thereof under the DMAO. Grace shall furnish the Foundation with prompt notice of any objections to the proposed sale filed or served by any party under the DMAO. If the Foundation has not received notice from Grace within sixty (60) days of the date that Grace issues its notice of the proposed sale to all parties entitled thereto under the DMAO that Grace is authorized under the DMAO to sell the Property to the Foundation pursuant to this Agreement, then the Foundation shall have the right to terminate the Agreement and receive a refund of its Earnest Monies.

4.     Environmental Disclosures.  Section 9(a) and Exhibit "C" of the Agreement are hereby amended to include the disclosure by Grace to the Foundation of all documents attached to the email of Vicki Finkelstein, for Grace, to Lindsay Smith, for the Foundation, dated Monday, June 8, 2009, captioned "Document Transfer – Travelers Rest".

5.     Miscellaneous.  This Amendment may be executed in counterparts originals, each of which when fully executed shall be deemed an original, and all of said counterparts taken together shall be deemed to constitute one and the same Amendment. This Amendment, together with the Agreement, shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns. Except as expressly herein modified and amended, all other terms, provisions, and agreements set forth in the Agreement remain unchanged and shall continue in full force and effect.

IN WITNESS WHEREOF, each party hereto has executed or caused this Amendment to be executed on its behalf as of the day and year first above written.

Witnesses:

**GRACE:**

**W. R. GRACE CO. – CONN.**

By: _____
        William Corcoran
Title:   V.P. - Public and Regulatory Affairs

**THE FOUNDATION:**

**THE  FURMAN  UNIVERSITY  FOUNDATION, INC.**

By: _____
        W. Lindsay Smith
Title:   President

## SECOND AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE

**THIS SECOND AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE** (the "Amendment") is made and entered into as of this 17ᵗʰ day of June, 2010, by and between **W. R. GRACE & CO. – CONN.**, a Connecticut corporation ("Grace"), and **THE FURMAN UNIVERSITY FOUNDATION, INC.**, a South Carolina nonprofit corporation (the "Foundation"), and amends and extends the Agreement for Purchase and Sale of Real Estate between the Foundation and Grace having an Effective Date of May 20, 2009, as heretofore amended by Amendment to Agreement for Purchase and Sale of Real Estate between the Foundation and Grace having an Effective Date of July 8, 2009 (collectively, the "Agreement") for and in consideration of the mutual covenants and provisions set forth herein. Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

RECITALS:

A.      Subsequent to the entry by the parties into the Agreement, Grace received notification that the United States Environmental Protection Agency Region IV ("EPA") of its intent to conduct testing and sampling for asbestos-containing materials at the Property; and

B.      EPA has conducted its testing and sampling activities at the Property, but has not yet released a report of its findings and conclusions with respect to such testing and sampling; and

C.      The Foundation remains unwilling to undertake its surveys or investigations of the Property or to proceed with its purchase of the Property pursuant to the Agreement in the absence of its receipt and evaluation of a report from EPA setting forth its findings and conclusions with respect to its testing and sampling of the Property; and

D.      Grace and the Foundation accordingly desire to further amend the Agreement in order to extend the Inspection Period and to set forth the following further terms and conditions.

AGREEMENTS:

NOW, THEREFORE, in consideration of the foregoing and of the mutual terms and provisions set forth hereinafter, Grace and the Foundation hereby agree to amend and modify the Agreement as follows:

1.      Inspection Period. The Inspection Period is hereby extended so as to continue until the earlier of (a) ninety (90) days following the receipt by the Foundation of final testing and sampling reports and recommendations from EPA with respect to the Property, or (b) December 31, 2010; provided, that the Foundation shall have the right to extend the Inspection Period thereafter for up to two (2) additional successive periods of ninety (90) days each in the event that final testing and sampling reports and recommendations have not been received by the parties from EPA within forty-five (45) days prior to the expiration of the Inspection Period (or any extension thereof). The Foundation shall exercise such rights to extend by written notice to Grace prior to the expiration of the Inspection Period (or any extension thereof), so long as the Foundation is not otherwise then in default under the Agreement.

2.      Miscellaneous.  This Amendment may be executed in counterparts originals, each of which when fully executed shall be deemed an original, and all of said counterparts taken together shall

WCSR 4143332v3

be deemed to constitute one and the same Amendment. This Amendment, together with the Agreement, shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns. Except as expressly herein modified and amended, all other terms, provisions, and agreements set forth in the Agreement remain unchanged and shall continue in full force and effect.

IN WITNESS WHEREOF, each party hereto has executed or caused this Amendment to be executed on its behalf as of the day and year first above written.

Witnesses:

**GRACE:**

**W. R. GRACE CO. – CONN.**

By: _____

William Corcoran

Title:    V.P. - Public and Regulatory Affairs

**THE FOUNDATION:**

**THE    FURMAN    UNIVERSITY    FOUNDATION, INC.**

By: _____

W. Lindsay Smith

Title:    President

## THIRD AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE

**THIS THIRD AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE** (the "Amendment") is made and entered into as of this 31 day of August, 2010, by and between **W. R. GRACE & CO. – CONN.**, a Connecticut corporation ("Grace"), and **THE FURMAN UNIVERSITY FOUNDATION, INC.**, a South Carolina nonprofit corporation (the "Foundation"), and amends and extends the Agreement for Purchase and Sale of Real Estate between the Foundation and Grace having an Effective Date of May 20, 2009, as heretofore amended by Amendment to Agreement for Purchase and Sale of Real Estate between the Foundation and Grace having an Effective Date of July 8, 2009, and by Second Amendment to Agreement for Purchase and Sale of Real Estate between the Foundation and Grace having an Effective Date of June 17, 2010 (collectively, the "Agreement") for and in consideration of the mutual covenants and provisions set forth herein. Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

RECITALS:

A.      Pursuant to the Agreement, the Foundation has agreed to purchase the Property in its "AS IS – WHERE IS" condition at a Purchase Price that took into account the projected cost to the Foundation to remove and demolish the existing improvements upon the Property subsequent to Closing; and

B.      Grace has experienced security concerns at the Property and now desires to undertake the removal and demolition of the improvements upon the Property prior to Closing, with appropriate adjustments to the Purchase Price; and

C.      The Foundation is willing to permit Grace to remove and demolish the improvements upon the Property prior to Closing and to adjust the Purchase Price, upon and subject to the terms and conditions set forth in this Amendment.

AGREEMENTS:

NOW, THEREFORE, in consideration of the foregoing and of the mutual terms and provisions set forth hereinafter, Grace and the Foundation hereby agree to amend and modify the Agreement as follows:

1.      <u>Demolition and Removal of Improvements</u>. Promptly upon the execution of this Amendment by Grace and the Foundation, Grace will at its sole cost and expense engage a qualified asbestos remediation contractor (the "Contractor") to forthwith demolish and remove from the Property all above-ground improvements thereon, including without limitation all buildings, silos, overhead steel structures, loading docks, sheds, utility poles and overhead lines (except as otherwise provided herein), other above-ground structures, all temporary fencing, and all foundations, building slabs and footings of all of the foregoing structures to a depth of three (3') feet below grade (collectively, the "Improvements"), in compliance with the following requirements of this Section 1. Grace shall cause Contractor to consult with and keep informed a designated representative of the Foundation with respect to any refinements or issues that may arise in the production of the Work plans and/or the conduct of the Work, as defined hereinafter. Contractor will demolish and remove the Improvements (collectively, the "Work") from the Property (i) in accordance and compliance with all applicable federal, state and local

environmental and building demolition codes, (ii) upon issuance to Contractor of all necessary governmental permits for the Work, (iii) upon Contractor's receipt of Work plan approvals from EPA (if required) and any other applicable regulatory agencies, and (iv) upon appropriate advance notification of the Work to the Greenville County Recreation District with respect to the "Swamp Rabbit" bike-and-foot trail. Contractor shall conduct the Work strictly in accordance with all applicable governmental permits and requirements (including without limitation "wet" asbestos removal requirements and all requirements relative to the removal of the asbestos-containing sheet-metal roofing paint) and with all of the foregoing requirements. Contractor shall remove and transport all asbestos-containing materials, debris and rubble to an appropriate licensed disposal facility and shall dispose of all other Improvements, materials, rubble and debris at appropriate landfill facilities, all in compliance with applicable laws, rules, regulations, and permits. Contractor shall rough-grade, fill and properly compact the footprints of all removed and demolished Improvements, along with any other pits, holes and other below-grade areas of the Property, with appropriate fill dirt to a condition in conformity with surrounding land surfaces, and will specifically drill drainage holes in the concrete flooring of the approximately 50' x 50' x 10' sub-basement (the "Sub-Basement") to insure adequate drainage therefrom, remove all below-grade Sub-Basement walls, and fill the Sub-Basement with crushed concrete and rubble derived from the demolition of other Improvements upon the Property that shall have a uniform diameter of six (6") inches or less. Upon completion of the Work and completion of all grading, fill and compaction, Contractor shall top-dress all disturbed areas of the Property with appropriate grass seed and straw. The Work shall expressly exclude all existing permanent perimeter fencing and all concrete and asphalt parking lots and roads upon the Property, and all Duke Energy power poles and overhead power lines lying within its existing 68' right-of-way transecting the Property on a north-south axis, all of which shall remain undisturbed following the completion of the Work. Grace shall cause the Work to be performed lien-free and shall indemnify and hold the Foundation harmless from and against all causes of action, damages, injuries, and claims of every other nature and kind whatsoever, including without limitation any environmental claims, on the part of any persons arising out of or resulting from the Work and the removal and demolition of the Improvements. Grace shall notify the Foundation at such time as the Work has been completed in compliance with all of the requirements of this Section 1, whereupon the Foundation shall have the right, at its sole cost, to cause appropriate environmental tests to be conducted by a licensed environmental testing service, which testing shall confirm that no adverse environmental concerns (including without limitation "recognized environmental conditions", as defined according to current ASTM-E1527-05 standards), remain at the Property as a result of the performance of the Work at the Property. Should such testing reveal that any such adverse environmental concerns remain at the Property following completion of the performance of the Work at the Property, then the Foundation shall give prompt written notice thereof to Grace, accompanied by a copy of such written report.

2.    Purchase Price. The first sentence of Section 2 of the Agreement is hereby amended to change the Purchase Price to Seven Hundred Seventy-Eight Thousand One Hundred and no/100 ($778,100.00) Dollars.

3.    Inspection Period. The Inspection Period set forth in Section 6 of the Agreement is hereby extended so as to continue until the earlier of (a) ninety (90) days following the later date of (i) completion of the Work, or (ii) the receipt by the Foundation of final testing and sampling reports and recommendations from EPA with respect to the Property, or (b) December 31, 2010; provided, that the Foundation shall have the right to extend the Inspection Period thereafter for up to two (2) additional successive periods of ninety (90) days each in the event that final testing and sampling reports and recommendations have not been received by the parties from EPA within forty-five (45) days prior to the expiration of the Inspection Period (or any extension thereof). The Foundation shall exercise such rights to extend by written notice to Grace prior to the expiration of the Inspection Period (or any extension thereof), so long as the Foundation is not otherwise then in default under the Agreement.

4.    <u>Miscellaneous</u>.  This Amendment may be executed in counterparts originals, each of which when fully executed shall be deemed an original, and all of said counterparts taken together shall be deemed to constitute one and the same Amendment. This Amendment, together with the Agreement, shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns. Except as expressly herein modified and amended, all other terms, provisions, and agreements set forth in the Agreement remain unchanged and shall continue in full force and effect.

IN WITNESS WHEREOF, each party hereto has executed or caused this Amendment to be executed on its behalf as of the day and year first above written.

Witnesses:

**GRACE:**

**W. R. GRACE CO. – CONN.**

By:   _____
     William Corcoran
Title:   V.P. - Public and Regulatory Affairs

**THE FOUNDATION:**

**THE FURMAN UNIVERSITY FOUNDATION, INC.**

By:   _____
     W. Lindsay Smith
Title:   President