# Exhibit C

# AGREEMENT FOR THE PURCHASE AND SALE
# OF THE STOCK OF
# GRACE PETROLEUM CORPORATION

# TABLE OF CONTENTS

ARTICLE 1.
Definitions .......... 1

ARTICLE 2.
Purchase and Sale of the Shares; Consideration .......... 4
2.01 Purchase and Sale .......... 5
2.02 Payment of Purchase Price .......... 5

ARTICLE 3.
Closing Date; Termination .......... 5
3.01 Scheduled Closing Date .......... 5
3.02 Termination .......... 5

ARTICLE 4.
Actions at Closing; Discharge of Certain Obligations; Further Assurances .......... 6
4.01 Closing .......... 6
4.02 Actions at the Closing .......... 6
4.03 Effectiveness of Closing .......... 7
4.04 Further Assurances .......... 7
4.05 Discharge of Certain Intercompany Accounts .......... 7

ARTICLE 5.
Purchase Price Adjustments .......... 8
5.01 Closing of the Books .......... 8
5.02 Purchase Price Adjustment for Net Realizable Assets .......... 9
5.03 Other Items to be Included in Net Realizable Assets .......... 11
5.04 Items Excluded from Net Realizable Assets .......... 16
5.05 Obligation to Fund Bank Accounts .......... 17
5.06 Proceeds of Lawsuit .......... 17

ARTICLE 6.
Representations and Warranties by Seller .......... 17
6.01 Incorporation .......... 17
6.02 Authorization .......... 18
6.03 No Conflict .......... 18
6.04 Capitalization .......... 19
6.05 Litigation and Claims .......... 19
6.06 Labor and Employment .......... 20
6.07 Insurance .......... 21
6.08 Employees; Benefit Plans .......... 23
6.09 Environmental Compliance .......... 23
6.10 Fees and Expenses .......... 24
6.11 Completeness of Disclosure .......... 24
6.12 Drilling Commitments .......... 24
6.13 Defensible Title .......... 24
6.14. Reserves Disclaimer .......... 28

ARTICLE 7.

Representations and Warranties by Purchaser .................. 28
7.01 Incorporation .................. 28
7.02 Authorization .................. 28
7.03 No Conflict .................. 28
7.04 Sufficient Funds .................. 29

ARTICLE 8.
Disclaimer of Additional and Implied Warranties .................. 29
8.01 Investigation and Evaluation .................. 29
8.02 Forecasts, Projections, etc. .................. 30
8.03 Effect of Transfer of Shares .................. 30

ARTICLE 9.
Covenants of Seller and Purchaser .................. 30
9.01 Access and Inquiry .................. 30
9.02 Hart-Scott-Rodino Act .................. 33
9.03 Permits and Licenses .................. 33
9.04 Notices to Third Parties .................. 34
9.05 Dividend of Certain Assets .................. 34
9.06 Post-Closing Covenants (Employees) .................. 34
(a) Transition Employees .................. 34
(b) Employee Benefits .................. 36
(c) Indemnification during Interim Period .................. 37
(d) Employee Services Agreement .................. 37
(e) Excluded Properties - Employee and Record Access .................. 37

9.07 Post Closing Covenants (Title) .................. 38
(a) Title Variances .................. 38
(b) Notice of Title Variances .................. 38
(c) Remedies for Title Variances .................. 39

ARTICLE 10.
Covenants Relating to Conduct of Business Prior to the Closing .................. 40
10.01 Operation in Ordinary Course .................. 40
10.02 Material Agreements .................. 40
10.03 Dividends .................. 41
10.04 Issuance of Securities .................. 41
10.05 Governing Documents .................. 41
10.06 No Acquisitions .................. 41
10.07 No Dispositions .................. 41
10.08 Indebtedness .................. 42
10.09 Employee Benefit Plans, Etc .................. 42
10.10 Compensation, Etc. .................. 42
10.11 Capital Expenditures; Purchase Orders .................. 42
10.12 Employee Notice .................. 42
10.13 Other Actions .................. 43
10.14 Advice of Changes .................. 43
10.15 Settlement, Release and Waiver of Claims .................. 43

ARTICLE 11.
Conditions Precedent to the Obligations of Purchaser .................. 43
11.01 Accuracy of Representations and Warranties .................. 43
11.02 Performance of Covenants and Agreements .................. 43

11.03 Release of Liens .................................. 44
11.04 Inspection of Properties .......................... 44
11.05 Hart-Scott-Rodino Act ............................ 45
11.06 Permits, Consents, etc. ........................... 46
11.07 Litigation ........................................ 46
11.08 Certificate of Seller ............................. 46
11.09 Opinion of Seller's Counsel ....................... 47
11.10 Tax Credits ....................................... 47
11.11 Board Approval .................................... 48

ARTICLE 12.
Conditions Precedent to the Obligations of Seller ................ 48
12.01 Accuracy of Representations and Warranties ...... 49
12.02 Performance of Covenants and Agreements ....... 49
12.03 Hart-Scott-Rodino Act ........................... 49
12.04 Permits, Consents, etc. ......................... 49
12.05 Litigation ...................................... 49
12.06 Certificate of Purchaser ........................ 50
12.07 Opinion of Purchaser's Counsel .................. 50
12.08 Board Approval .................................. 50

ARTICLE 13.
Indemnification ........................................ 50
13.01 Definitions ..................................... 50
13.02 General Indemnification by Purchaser ........... 52
13.03 General Indemnification by Seller and Grace ...... 53
13.04 Limitations ..................................... 55
13.05 Defense of Third Party Claims ................... 56
13.06 Specific Indemnities by Seller and Grace .......... 58
13.07 Consequential and Lost Profit Damages .......... 59

ARTICLE 14
Cooperation in Various Matters ................................ 59

14.01 Mutual Cooperation ............................ 59
14.02 Preservation of Purchaser's Files and Records
14.03 Preservation of Seller's Files and Records ......... 60
14.04 Preservation of Reports, etc. .................... 60
14.05 Amendment of Guaranteed Agreements, etc. ...... 60
14.06 Press Releases .................................. 60
14.07 Administration of Accounts Receivable ........... 61

ARTICLE 15.
Expenses; Termination of Services; Change of Name ............. 61
15.01 Expenses ........................................ 61
15.02 Termination of Seller Services .................. 62
15.03 Broker's Fees ................................... 62
15.04 Use of Grace Name ............................... 62

ARTICLE 16.
Notices ........................................ 62
16.01 Procedure and Addresses ......................... 62
16.02 Change of Notice Addresses ..................... 63

ARTICLE 17.
Tax Matters ........................................ 64
17.01 Certain Non-Income Tax Matters ................ 64
17.02 Income Taxes - Operations on or Before Closing Date ........................................ 64
17.03 Income Taxes - Operations Subsequent to Closing Date ........................................ 66
17.04 Income Taxes Resulting From This Transaction ... 67
17.05 Income Taxes on Divesture ...................... 68
17.06 Specific Tax Undertakings ...................... 68

ARTICLE 18
General ........................................ 68
18.01 Entire Agreement ................................ 68
18.02 No Other Representations, etc. .................. 68
18.03 Headings ........................................ 69
18.04 Governing Law ................................... 69
18.05 Counterparts .................................... 69
18.06 Binding Agreement; Assignment ................... 69
18.07 Amendment ....................................... 69
18.08 No Waiver ....................................... 69
18.09 U.S. Dollars .................................... 69

GPC STOCK PURCHASE AGREEMENT

Table of Contents
for
Exhibits and Schedules

| | |
|---|---|
| Exhibit A | |
| Part I | Surface Leases and Rights-of-way |
| Part II | Building Leases |
| Exhibit B | Wells for which Drilling, Completion and Connection Costs Will Not be Included as a Liability in the Calculation of Net Realizable Assets |
| Exhibit C | Non Devonian Shale Section 29 Tax Credit Wells |
| Exhibit D | Opinion letter of Grace General Counsel |
| Exhibit E | Opinion letter of Samson General Counsel |
| Schedule 5.01 | Unaudited Consolidated Balance Sheet and Income Statement for Grace as of 11-30-92 |
| Schedule 5.02(a) | Preliminary Balance Sheet as of 11-30-92 |
| Schedule 5.03(p) | Various Contingencies |
| Schedule 6.01 | Jurisdictions of Incorporation for the Grace Entities |
| Schedule 6.04 | Authorized, Issued and Outstanding Stock of the Grace Entities |
| Schedule 6.05 | Pending Actions, Suits or Proceedings |
| Schedule 6.06 | Collective Bargaining and Employment Agreements |
| Schedule 6.07(a) | Property, Casualty and Liability Insurance |
| Schedule 6.09 | Environmental Compliance |
| Schedule 6.12 | Drilling Commitments |
| Schedule 6.13(a) | Modifications to the Tape |
| Schedule 10.04 | Excluded Securities |
| Schedule 10.15 | Settlement, Release and Waiver of Claims |
| Schedule 13.02(c) | Purchaser's Indemnifications of Grace Guaranty |



## GPC STOCK PURCHASE AGREEMENT

## ("Agreement")

STOCK PURCHASE AGREEMENT dated December 30, 1992 by and between GRACE ENERGY CORPORATION, a Delaware corporation having executive offices at Two Galleria Tower, Suite 1500, 13455 Noel Road, Dallas, Texas 75240-6681, and SAMSON INVESTMENT COMPANY, a Nevada corporation having executive offices at Two West Second Street, Tulsa, Oklahoma 74103.

In consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

### ARTICLE 1.

### Definitions

As used in this Agreement, the following terms have the meanings set forth in this Article 1. All Article, Section, Exhibit and schedule numbers and references used herein refer to Articles and Sections of this Agreement and Exhibits and schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically described.

1.01 "Closing" means the consummation of the purchase and sale of the Shares as contemplated by this Agreement.

1.02 "Closing Date" means the date on which the Closing occurs.

1.03 "Confidentiality Agreement" means the Agreement dated as of August 31, 1992 between Merrill Lynch, Pierce, Fenner & Smith Incorporated as Representative of Grace and Seller and Samson Resources Company regarding the keeping confidential of certain information furnished to Purchaser in connection with its evaluation of an acquisition of GPC.



1.04 "Corporations" means GPC and the GPC Subsidiaries.

1.05 "DOJ" means the United States Department of Justice.

1.0 6 "Devonian Shale Wells" has the meaning set forth in Section 11.10.

1.07 'DT" means Deloitte Touche.

1.08 "Effective Time" means 7:00 a.m. local time at the location of the Producing Properties on December 1, 1992.

1.09 "Employee Benefit Plans" means any bonus, automobile, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, retirement, vacation, severance, disability, 401(K) Plan, change in control plans, death benefit, life insurance, hospitalization, health insurance or other plan or arrangement or understanding (whether or not legal binding) providing benefits to any present or former employee of the Corporations.

1.10 "Environmental Law" means any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, which relates to or otherwise imposes liability, obligations, or standards with respect to pollution or the protection of the environment in existence as of the date hereof.

1.11 "FTC" means the Federal Trade Commission.

1.12 "GPC" means Grace Petroleum Corporation, a Delaware corporation.

1.13 "GPC Subsidiaries" means Berry Gas Company, an Oklahoma corporation, GPC Marketing Company, a Delaware corporation, GPC Transporter, Inc., a Delaware corporation, and Petrodyne, Ltd., an Alberta corporation, each of which is a wholly-owned subsidiary of GPC.

1.14 "Defensible Title" has the meaning set forth in Section 6.13.

1.15 "Governmental Authority" means the governments of the United States of America and Canada, any state of the United States of America or



province of Canada, or any political subdivision thereof, or any agency, board, bureau, department or commission of any of the foregoing.

1.16 "Grace" means W. R. Grace & Co.-Conn., a Connecticut corporation.

1.17 "Grace Entity" means Grace or any of its subsidiaries or affiliates, except for the Corporations.

1.18 "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

1.19 "Inspection Report" has the meaning set forth in Section 11.04.

1.20 "Leased Properties" means real property leased by the Corporations as described in Exhibit A, other than Oil, Gas, and Mineral Leases.

1.21 Intentionally omitted.

1.22 "Material Adverse Effect" means an adverse effect upon the business, financial condition or results of operations of the Corporations taken as a whole and having a value greater than $250,000.

1.23 "Net Realizable Assets" has the meaning set forth in Section 5.02.

1.24 "Oil, Gas and Mineral Leases" means oil, gas and mineral leases in which the Corporations own an interest as lessee.

1.25 "Permitted Encumbrances" has the meaning set forth in Section 6.13.

1.26 "Producing Properties" means those assets of the Corporations which produce or are capable of producing oil, gas and other minerals including, but not limited to, oil and gas leasehold interests, working interests, overriding royalty interests, non-participating royalty interests, and other payments out of production.

1.27 "Properties" means real property owned and leased by the Corporations, other than real property interests created by Oil, Gas and Mineral Leases and the Producing Properties.



1.28 "Purchase Price" means $125,000,000, subject to adjustment as provided in Sections 5.02, 5.03, and 11.04.

1.29 "Purchaser" means Samson Investment Company, a Nevada corporation.

1.30 "Related Facilities" means all real property (other than the Leased Properties, the Oil, Gas and Mineral Leases, the Producing Properties and the Properties) and personal property and other rights of any nature whatsoever owned by the Corporations and used in connection with operations conducted at or incident or related to the Oil, Gas and Mineral Leases, Leased Properties, Producing Properties, and Properties whether located on or off of the Oil, Gas and Mineral Leases, Leased Properties, Producing Properties or Properties or on properties pooled or unitized therewith, including, but not limited to, all wells, fixtures, casing and tubing, production, gathering, treating, processing, compression, dehydration, salt water disposal and pipeline equipment and facilities, tanks, motor vehicles, machines, tools, dies, vessels and similar equipment and facilities, office equipment, reference materials, lease, business and other records and files, and all licenses, leases, easements, permits, actions and rights-of-way.

1.31 "Scheduled Closing Date" has the meaning specified in Section 3.01.

1.32 "Seller" means Grace Energy Corporation, a Delaware corporation.

1.33 "Seller Group" means Seller and its subsidiaries and affiliates.

1.34 "Shares" means all of the issued and outstanding capital stock of GPC which consists of 1,000 shares of common stock, par value $1.00 per share, all of which is being purchased and sold hereunder.

1.35 Intentionally omitted.

1.36 "Tape" has the meaning set forth in Section 6.13.

1.37 "Tight Sands Wells" has the meaning set forth in Section 11.10.

1.38 "Title Variance" has the meaning set forth in Section 9.07.

1.39 "Voting Debt" has the meaning set forth in Section 6.04(e).

ARTICLE 2.

Purchase and Sale of the Shares; Consideration

2.01 Purchase and Sale. Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell and transfer the Shares to Purchaser and Purchaser shall purchase and acquire the Shares from Seller.

2.02 Payment of Purchase Price. In consideration for the sale and purchase of the Shares as described in Section 2.01, Purchaser shall pay to Seller the Purchase Price in the manner described in Article 4.

ARTICLE 3.

Closing Date; Termination

3.01 Scheduled Closing Date. The "Scheduled Closing Date" shall be a date agreed upon by Seller and Purchaser in writing, which date shall be no later than the third business day following the fulfillment or waiver of the conditions set forth in Sections 11.05 and 12.03, unless Seller and Purchaser shall agree to a different Scheduled Closing Date in an amendment to this Agreement executed and delivered in accordance with Section 18.07. For purposes of this Article, "business day" shall mean a day which is not a Saturday or Sunday, nor a day on which banks are generally closed in the City of New York.

3.02 Termination.

(a) This Agreement may be terminated at any time prior to the Closing by mutual written agreement of the parties.

(b) If the conditions set forth in Sections 11.05 and 12.03 have not all been fulfilled or waived by the party entitled to waive such conditions on or before

February 15, 1993, unless the parties shall agree otherwise in an amendment to this Agreement executed and delivered in accordance with Section 18.07, then either Seller or Purchaser may terminate this Agreement, subject to the provisions of subsection (d) of this Section, by giving notice to the other, in the manner provided in Section 16.01, at any time prior to the fulfillment or waiver of all such conditions.

(c) If for any reason the Closing shall not have been consummated on or before the Scheduled Closing Date, either Seller or Purchaser shall have the right to terminate this Agreement, subject to the provisions of subsection (d) of this Section, at any time thereafter by giving at least three business days' advance notice of such termination to the other.

(d) The termination of this Agreement, whether in accordance with any of the preceding provisions of this Agreement or otherwise, shall not affect the rights of either Seller or Purchaser against the other for liability or damage caused by or arising out of the breach of any covenant or agreement contained in this Agreement; provided, however, that upon termination in accordance with the preceding provisions of this Section, the parties shall be released from any and all liability or damage for breach of any of the representations and warranties contained in Article 6 or Article 7.

## ARTICLE 4.

### Actions at Closing; Discharge of Certain Obligations; Further Assurances

4.01 Closing. The Closing shall take place at 9:00 a.m. local time at the offices of GPC at Oklahoma City, Oklahoma, or at such other time and place as the parties hereto shall agree in writing, on the Closing Date.

4.02 Actions at the Closing. At the Closing:



(a) Seller shall deliver to Purchaser certificates representing the Shares, together with executed stock powers.

(b) Purchaser shall deliver to Seller the Purchase Price, in immediately available United States funds by wire transfer to an account designated by Seller.

(c) Seller shall deliver to Purchaser (i) any minute books and stock transfer books of the Corporations that are not then in the possession of the Corporations, and (ii) legally effective resignations of such directors and officers of the Corporations as Purchaser has requested. Within a reasonable time after the Closing, Seller will deliver to Purchaser any records of the Corporations that are not then in the possession of the Corporations.

(d) Seller shall deliver to Purchaser the certificate described in Section 11.08, and opinion of counsel described in Section 11.09.

(e) Purchaser shall deliver to Seller the certificate described in Section 12.06, and opinion of counsel described in Section 12.07.

4.03 Effectiveness of Closing. No action to be taken or delivery to be made at the Closing shall be effective until all of the actions to be taken and deliveries to be made at the Closing are complete.

4.04 Further Assurances. At any time and from time to time from and after the Closing, Seller and Purchaser shall, at the request and expense of the requesting party, take all such actions as the requesting party shall reasonably request in order to fully and effectively conform to the intents and purposes of this Agreement.

4.05 Discharge of Certain Intercompany Accounts. Except for arms length transactions for goods or services otherwise included in accounts receivable or payable, any amounts owed by any Grace Entity to the Corporations, or by any of





the Corporations to any Grace Entity, shall be deemed paid and discharged, effective as of the Closing Date.

ARTICLE 5.

Purchase Price Adjustments

5.01 Closing of the Books. As of the close of business on December 31, 1992, GPC will close the books of the Corporations consistent with past practices. Purchaser shall be permitted to have its representatives and advisors observe the closing of the books. As soon as practicable after December 31, 1992, but in no event later than thirty days after closing of the books of the Corporations, GPC shall prepare a consolidated balance sheet of the Corporations as at December 31, 1992 ("December 31, 1992 Balance Sheet"). The December 31, 1992 Balance Sheet shall be prepared on a going concern basis using the accounting principles contained in Grace's Financial Accounting Policy Statements manual and the same levels of materiality, account classifications and procedures as used to prepare the unaudited consolidated balance sheet of the Corporations, as at November 30, 1992 (November 30, 1992 Balance Sheet - Column 1), a complete copy of which is attached as a Schedule to this Section. In addition, GPC will prepare an Adjusted December 31, 1992 Balance Sheet representing the December 31, 1992 Balance Sheet revised to exclude the assets and liabilities of the Thomasville Field and the East Texas Region included in the December 31, 1992 Balance Sheet (reference is made to the November 30, 1992 Balance Sheet - Column 4).





5.02 Purchase Price Adjustment for Net Realizable Assets.

(a) Not later than July 1, 1993, Purchaser shall deliver to Seller Purchaser's calculation of the (i) sum of the amounts reflected in the Adjusted December 31, 1992 Balance Sheet, as may be modified to conform to the provisions of this Agreement, of the Corporations', cash, accounts and notes receivable from all parties other than Seller and Grace and inventories which have been realized or are collectible, less accounts and notes payable, bank overdrafts, accrued liabilities, long-term and deferred income (but not including Income Tax liabilities retained by Seller as stated in Article 17 and accrued insurance and employee benefit obligations also being retained by Seller), (ii) plus or minus the items listed in Section 5.03 hereof, said sum being the "Net Realizable Assets". For purposes of determining the items included in (i) above the same detailed account compilation procedures as per the Schedule to this Section shall be used.

(b) Except as modified by Section 5.03 hereof, the values of all amounts included in Net Realizable Assets shall be determined on the basis of the accounting principles used to prepare the Adjusted December 31, 1992 Balance Sheet, provided that any amount shall not exceed its realizable and collectible value.

(c) Seller shall review Purchaser's calculation of Net Realizable Assets and will notify Purchaser not later than ninety (90) calendar days after the delivery of same to Seller of any objections Seller may have to the amount of or the failure of Purchaser to include any item in the calculation. Seller and Purchaser will, thereafter, negotiate in good faith to determine the amount of or whether any item or items should be included or not included in the calculation, and Purchaser will afford Seller and/or its representatives access to all of the books and records of the Corporations to allow Seller to make such determination. In the event that one hundred twenty (120) days after Purchaser delivers its calculation to Seller,





Seller and Purchaser are still unable to agree on the value or the inclusion of any item in such calculation, the following will apply as to each such item:

(i) With respect to any asset to be included in Net Realizable Assets, Seller will have an option to either (A) obtain an assignment of such asset from the Corporations, or (B) submit the matter to DT for a determination of the value thereof as prescribed in item (iii) below;

(ii) With respect to any liability to be included in Net Realizable Assets, Seller will have an option to either (A) assume such liability, or (B) submit the matter to DT for a determination of the value thereof as prescribed in item (iii) below;

(iii) Any item submitted to DT will be evaluated by DT and appropriately included, or not included, in the calculation of Net Realizable Assets based upon the criteria for such item set forth in the provisions of this Agreement. DT's determination with respect to any such item shall be completed as soon as possible after submission thereof to DT and will be final and binding on, and nonappealable by, Seller and Purchaser. Seller and Purchaser will each pay one-half of DT's fees and expenses.

(d) Subject to the foregoing, the calculation of Net Realizable Assets will, for the disputed items relating to the calculation of Net Realizable Assets, be adjusted as follows:

(i) Increased or decreased, as the case may be, for the difference (plus or minus) between the original valuation of such items and the valuation of such items as determined by DT.

(ii) Decreased by the original valuation of such items for any assets assigned to Seller.

(iii) Increased by the original valuation of such items for any liabilities assumed by Seller.





(e) In the event that the amount of the adjusted Net Realizable Assets is less than zero, then, no later than ten days following the later of either agreement of the parties or DT's determination of all items to be included in adjusted Net Realizable Assets, Seller will pay to Purchaser (by check) the difference between the amount of adjusted Net Realizable Assets and zero, together with 9 percent per annum simple interest thereon calculated from the Closing Date until the date of actual payment thereof. In the event that the adjusted Net Realizable Assets is greater than zero, then, no later than ten days following the later of either agreement of the parties or DT's determination of all items to be included in adjusted Net Realizable Assets, Purchaser will pay to Seller (by check) the difference between zero and the amount of adjusted Net Realizable Assets, together with 9 percent per annum simple interest thereon calculated from the Closing Date until the date of actual payment thereof.

5.03 <u>Other Items to be Included in Net Realizable Assets</u>. The amounts associated with the following items shall either modify the values to be included in Net Realizable Assets or shall be additional items to be included therein:

(a) With respect to all of the Corporations' bank accounts, the sum total of all of the following amounts shall be included as an asset or a liability, as appropriate, in the calculation of Net Realizable Assets:

(i) The net amount of all cash payments and transfers (cleared or outstanding) made out of and/or into the Corporations' bank accounts to or from Seller, Grace or any affiliate on and after January 1, 1993 and through the Closing Date; and

(ii) The total amount of all cash payments (cleared or outstanding) pertaining to any period prior to January 1, 1993 made by the Corporations on and after January 1, 1993 and through the Closing Date for the Corporations'





payment of any amount to entities other than those referred to in item (i) above not otherwise included as a liability in the calculation of Net Realizable Assets.

(b) In lieu of the valuation procedures otherwise applicable to such items pursuant to Section 5.02 hereof, Purchaser no later than April 1, 1993 may cause all or any portion (at Purchaser's sole discretion) of the Corporations' materials and supplies inventory to be designated for sale to and bidding by third parties. Upon receipt of the third-party offers, Purchaser will disclose all such third-party offers received to Seller. Seller will thereafter have ten (10) days to elect, for itself or its designee, to purchase said items included in the third-party offers for an amount equal to 100% of the highest third-party offer. In the event Seller so elects to purchase said items, then (i) Seller will immediately pay the purchase price to Purchaser (which amount of cash received shall not be considered in the calculation of Net Realizable Assets); (ii) the amount for such items to be included in the calculation of Net Realizable Assets will be equal to the highest third-party offer, less applicable sales taxes; and (iii) Seller will immediately take custody of all such items. In the event Seller does not so elect to purchase such items, then Purchaser will have ten (10) days to elect to require the Corporations to retain all such items, in which event the amount to be included in the calculation of Net Realizable Assets will be equal to 100% of the highest third-party offer. In the event neither Seller nor Purchaser make an election to purchase such items, then the amount for such items to be included in the calculation of Net Realizable Assets will be an amount equal to the highest third-party offer, less applicable sales taxes.

(c) Net Realizable Assets shall include or shall not include as liabilities (or as assets for refunds) amounts for Income Taxes (as defined in Article 17) as provided in Article 17 hereof.





(d) Net Realizable Assets shall include as liabilities all ad valorem, severance and production tax accruals (less $50,000) to the extent such accruals relate to the Producing Properties and Related Facilities but excluding from such calculation any such tax assessments arising out of contractual settlements by the Corporations of take-or-pay claims, gas purchase contract buy-downs, government pricing regulations or like occurrences, or relating to gas plants in which the Corporations own or have owned an interest, for which Seller and Grace have provided indemnification to Purchaser and the Corporations pursuant to Section 13.03.

(e) Any and all adjustments to the Purchase Price resulting from Purchaser's Title Variances as determined pursuant to Section 9.07 shall be included as either an asset or a liability as appropriate in the calculation of Net Realizable Assets.

(f) Purchaser shall determine the gas balancing position of all wells net to the Corporations' revenue interest. Any difference between (i) the aggregate volume so determined by Purchaser as of the Effective Time and (ii) 2,490,100 MCF overproduced gas balancing position as represented by Seller, shall be multiplied by $1.00 per MCF and the resulting amount included as either an asset or liability (as appropriate) in the calculation of Net Realizable Assets.

(g) The Corporations' estimated net revenues from oil, gas or other sales for the month of December, 1992 included in GPC's general ledger account #110-205 shall not be included as an asset in the calculation of Net Realizable Assets.

(h) The Corporations' estimated net working interest share of well operating expenses for the month of December, 1992 included in GPC's general ledger account #336-004 shall not be included as a liability in the calculation of Net Realizable Assets.



(i) Well costs (no matter when they are actually incurred or paid) shall be included in the calculation of Net Realizable Assets as follows:

(i) All drilling, completion and pipeline connection costs for the wells listed on Exhibit "B" attached hereto shall not be included as liabilities.

(ii) All acreage, drilling, completion and pipeline connection costs (pursuant to outstanding AFE's executed by GPC prior to the date hereof) not actually paid prior to January 1, 1993 and applicable to any well or wells not included on Exhibit "B" (including all Devonian Shale Wells) shall be included as liabilities, to the extent not already included as liabilities in the calculation of Net Realizable Assets.

(iii) All acreage, drilling, completion and pipeline connection costs for wells drilled pursuant to AFE's approved or executed by Purchaser subsequent to the date hereof shall not be included as liabilities.

(iv) All acreage, drilling, completion and pipeline connection costs attributable to the Manley No. 1-15 well shall be included as liabilities in the calculation of Net Realizable Assets to the extent not already included as a liability in the calculation of Net Realizable Assets. Purchaser shall cause Seller or Seller's designee to receive all pertinent well information available to Purchaser. Seller or Seller's designee shall be responsible for making any casing point or completion elections and shall have the option, to be exercised no later than sixty (60) days following completion, to require the Corporations to assign to Seller or Seller's designee the Corporations' interest in said well.

All prepayments of drilling, completion or pipeline connection costs made prior to January 1, 1993, shall be applied to reduce the liability set forth above.

(j) The reduction in the value of future Section 29 tax credits applicable to all Tight Sands Wells and the reduction in the value of future Section 29 tax credits applicable to and/or gas production from all Devonian Shale Wells, as



calculated pursuant to Section 11.10, shall be included as a liability in the calculation of Net Realizable Assets.

(k) The remaining amount of payments due for any and all building leases (other than the Oklahoma City Office Leases,), office equipment and vehicle leases or other similar commitment leases or rentals as of May 31, 1993 (which are not cancellable within 60 days without penalty) shall be discounted to present value at the then existing prime rate as published in the Wall Street Journal and the resulting amounts shall be included as liabilities in the calculation of Net Realizable Assets.

(l) The amount of $150,500 (Canadian) representing the Corporations' ownership interest in the Viking Kinsella package located in Alberta, Canada and the Hudson area package located in Alberta, Canada (which interests shall be retained by the Corporations) shall be included as an asset in the calculation of Net Realizable Assets, subject to adjustment for any Title Variances as provided herein.

(m) The amount of any termination and/or cancellation payments attributable to the cancellation of the Chautauqua drilling consultant contract in Alberta, Canada and actually paid by the Purchaser or the Corporations shall be included as a liability in the calculations of Net Realizable Assets.

(n) Purchaser and Corporations recognize that many items of expenditures for general and administrative expenses, taxes (other than income) and Income Taxes have been or will be actually paid by either Seller or Grace (but not by GPC or Purchaser) and charged to GPC through a non-cash accounting entry ("Non-Cash Charges"). With respect to such items, the parties agree as follows:

(i) No accrual for Non-Cash Charges will be recognized as a liability in the calculation of Net Realizable Assets.





(ii) No prepayment for Non-Cash Charges will be recognized as an asset in the calculation of Net Realizable Assets.

(o) Any cash amount for the payment of valid charges by the Corporations occurring during periods prior to January 1, 1993, and received by Purchaser subsequent to Closing for which an account receivable balance was not recorded as of December 31, 1992 shall be included as an asset in the calculation of Net Realizable Assets.

(p) Excluded from the calculation of Net Realizable Assets is the liability for the various contingencies set forth on the schedule to this Section for which Seller is indemnifying Purchaser.

5.04 <u>Items Excluded from Net Realizable Assets</u>. Specifically excluded from the calculation of Net Realizable Assets shall be the following liabilities and obligations, the responsibility for payment of which shall be retained by Seller (and which amounts shall not be paid by the Corporations):

(a) All severance payment and termination liabilities associated with the termination of the Corporations' employees, whether terminated before or after the Closing Date.

(b) Intentionally Omitted.

(c) All liabilities associated with the payroll of the Corporations for all periods through December 31, 1992 including, but not limited to, base payroll, incentive, bonus, commission or performance based payments, payroll taxes and related benefits payable pursuant to the Employee Benefit Plans. A Grace Entity shall make payment of such amounts directly to the Corporations' employees.

(d) Except for the adjustment provided for in Section 5.03(f) hereof, there shall (except for amounts of excess and overriding royalties related to overproduction included in account #316-002 "Accounts Payable - Oil and Gas Suspense", which at November 30, 1992 amounted to $196,264.62) be no assets or



liabilities related to the Corporations' gas balancing positions included in the calculation of Net Realizable Assets.

5.05 Obligation to Fund Bank Accounts. Effective at the Closing, Purchaser shall assume Seller's obligations to all banks at which the Corporations maintain disbursing accounts to fund all overdrafts on such accounts resulting from disbursements by the Corporations, regardless of whether such disbursements are made prior to or after the Closing, provided, however, that Seller shall use its best efforts to minimize account over drafts either by maintaining sufficient cash balances to cover outstanding checks and/or accelerate or delay payments during the week immediately preceding the anticipated closing.

5.06 Proceeds of Lawsuit. The parties acknowledge that GPC has an interest in the outcome of Miller Brothers, et al. v. State of Michigan, et al., Cause No. 88-11848-CM, as filed in the Court of Claims in the State of Michigan, pursuant to a letter agreement dated September 18, 1989 between Wolverine Gas and Oil Company, Inc. and GPC, as amended. Immediately prior to the Closing, GPC shall assign all rights under such agreement to Seller or its assignee and Seller or its assignee shall assume all of GPC's obligations thereunder, and shall bear all costs and expenses related thereto. Upon final disposition of such lawsuit, Seller or its assignee shall be entitled to receive all amounts to which GPC would be entitled under such agreement and GPC shall promptly remit to Seller or its assignee all monies received by GPC in respect of such agreement.

ARTICLE 6.

Representations and Warranties by Seller

Seller hereby represents and warrants to Purchaser as follows:

6.01 Incorporation.



(a) Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware with full corporate power to enter into this Agreement and perform its obligations hereunder and thereunder.

(b) Each of the Corporations is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power to operate its business as currently conducted and is a corporation duly qualified and in good standing to do business in each jurisdiction in which the nature of its business makes such qualification necessary, other than in such jurisdictions where the failure so to qualify would not have a Material Adverse Effect. The schedule to this Section sets forth (i) the jurisdiction of incorporation of each Corporation and (ii) the jurisdictions where each Corporation is authorized or otherwise qualified to do business as a foreign corporation.

6.02 Authorization. Subject to the approval of the boards of directors as provided in Article 12, Seller has all requisite corporate power and authority to enter into this Agreement. Upon such approval, the execution and delivery of this Agreement by Seller, and the performance by Seller of its obligations hereunder, will be duly and validly authorized by all necessary corporate action of Seller; and upon such approval, this Agreement will have been duly executed and validly delivered by Seller and be legally binding on Seller.

6.03 No Conflict. The execution and delivery of this Agreement by Seller, and the performance by Seller of its obligations hereunder, do not (a) conflict with the certificate of incorporation or by-laws of Seller, or (b) result in any breach of any of the provisions of, constitute a default under, or give rise to a right of acceleration of any material obligation or to loss of a material benefit under, any judgment, order, decree, writ, permit, concession, franchise, license or agreement to which Seller is a party or by which Seller is bound, which breach or default





would materially adversely affect the ability of Seller to execute, deliver or perform its obligations under this Agreement.

6.04 Capitalization.

(a) The schedule to this Section sets forth the authorized, issued and outstanding capital stock of each of the Corporations.

(b) Seller is the sole record and beneficial owner of the Shares, and GPC is the sole record and beneficial owner of all of the outstanding capital stock of the GPC Subsidiaries. The Shares and the outstanding capital stock of the GPC Subsidiaries are free and clear of all liens, security interests, pledges, options, encumbrances, charges, agreements, voting trusts and proxies.

(c) The Shares and the outstanding shares of the capital stock of the GPC Subsidiaries have been duly and validly issued and are fully paid and nonassessable and were not issued in violation of any preemptive rights.

(d) There are no rights, subscriptions, warrants, options, calls, commitments, conversion rights or agreements of any kind outstanding or in effect to purchase or otherwise acquire (i) the capital stock of any Corporation or (ii) any obligations of any kind convertible into or exchangeable for any shares of capital stock of any Corporation.

(e) There are no bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the shareholders of the Corporations may vote ("Voting Debt") issued or outstanding.

6.05 Litigation and Claims. Except as set forth in the schedule to this Section, there are no actions, suits or proceedings (including any which have been or may be asserted by any Governmental Authority), pending, or to the knowledge of Seller, which knowledge shall be either (i) the present personal knowledge of the Seller's vice president, F. L. Ryan, after consultation with the Corporations' officers or (ii) as reflected in the Corporations' files and records, threatened



against Seller or any Corporation or affecting Seller, any Corporation or their respective Leased Properties, Oil, Gas and Mineral Leases, Properties, Producing Properties and Related Facilities which would reasonably be expected to (i) materially adversely affect the ability of Seller to execute, deliver or perform its obligations under this Agreement, or (ii) individually or in the aggregate have a Material Adverse Effect.

6.06 Labor and Employment. The schedule to this Section sets forth a list of (a) all collective bargaining or other agreements with labor unions to which any Corporation is a party, and (b) all written employment agreements, policies or procedures not cancellable within sixty (60) days to which any Corporation is a party which may remain in effect after the Closing. Seller has delivered to Purchaser true and complete copies of any such agreements and documents. Except as set forth in the schedule to this Section, none of the Corporations are parties to any oral or written agreement, plan or arrangement with any officer, director or employee of any of the Corporations (i) the benefits of which are contingent, or the terms of which are altered, upon the occurrence of a transaction involving any of the Corporations of the nature of any of the transactions contemplated by this Agreement, (ii) requiring severance benefits or other benefits after the termination of employment regardless of the reason for such termination of employment, (iii) under which any person may receive payments subject to the tax imposed by Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code") or (iv) any of the benefits of which will be increased, or the vesting of benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement.





6.07 Insurance.

(a) The schedule to this Section describes the property, casualty and liability insurance coverage maintained by or on behalf of each Corporation.

(b) All insurance coverage for the Corporations under the Grace insurance programs shall terminate at 12:01 a.m. CST on the day following the day of the Closing (the "Cut-Off") with respect to events or occurrences following the Cut-Off.

Immediately upon execution of this Agreement, Seller shall provide to Purchaser all loss histories, revenue and well information, worker's compensation modifiers and other information required by Purchaser's insurance carriers.

(c) The Corporations shall be covered under the Grace insurance programs described in the Schedule to this Section, subject to the terms, conditions and limits of the applicable insurance policies, for events or occurrences preceding the Cut-Off only as specifically provided in this Agreement. No deductibles applicable to the insurance coverages described in the schedule to this Section shall be chargeable to the Corporations subsequent to the date hereof.

(d) Coverage for the Corporations under Grace's excess liability insurance, as described in the schedule to this Section and subject to the terms, conditions and limits of the applicable insurance policies, shall terminate on the expiration date of the current policy period with respect to events or occurrences preceding the Cut-Off.

(e) Blanket Crime and Fiduciary Liability insurance coverage for the Corporations shall terminate with respect to claims made after the Cut-Off.

(f) Neither Purchaser nor any Corporation shall be liable to any Grace Entity or any insurance carrier providing coverage under the Grace insurance programs for any charge or assessment for which such Corporation might otherwise be liable after the Cut-Off under the Grace insurance programs, nor



shall Purchaser or any Corporation be entitled to any credits or refunds which such Corporation might otherwise be entitled to receive from Grace or any such insurance carrier after the Cut-Off under the Grace insurance programs, except as otherwise provided in this Agreement.

(g) Purchaser and the Corporations shall give prompt notice to Grace of all claims which are covered by Grace insurance programs and which shall continue to be maintained by Grace for the Corporations after the Cut-Off as described in this Agreement. Upon notice of any claim, Grace shall notify the appropriate insurance carrier under the Grace insurance program and, in conjunction with such insurance carrier, shall have the right to direct the investigation, negotiation and, if applicable, the defense of such claim and to settle or otherwise dispose of such claim without the consent or approval of Purchaser or any of the Corporations unless such settlement or disposition adversely affects the ongoing operations of the Corporations in which event settlement or disposition shall not occur without the consent or approval of Purchaser. The parties shall cooperate with each other relative to the exchange of records and other information necessary for the reporting, investigation and, if applicable, defense of such claim. Purchaser shall cause the Corporations to make their employees available as may be necessary in connection with the investigation or defense of any such claim.

Grace, Seller, and GPC acknowledge that Grace or Seller has obtained on behalf of the Corporations certain performance bonds, bid bonds and other surety instruments relating to the Oil, Gas and Mineral Leases, Leased Properties, Producing Properties, Properties and Related Facilities ("Bonds") to secure certain obligations of the Corporations and that Grace and Seller are obligated to indemnify the sureties. As promptly as practicable after the Closing, Grace or Seller as the case may be, shall cancel all Bonds which are cancellable.

As soon as practicable following the Closing, Purchaser shall obtain, or cause GPC to obtain, replacements for those Bonds which are not cancellable. Upon obtaining each such replacement Bond, Purchaser shall promptly notify Grace and will use reasonable efforts to arrange for Grace or Seller, as the case may be, to be released from the Bonds which have been replaced. During the period between the Closing and the date Purchaser or GPC obtains such replacement Bond and release, Purchaser shall pay Grace or Seller, as the case may be, all premiums and other fees charged by the surety to Grace or Seller with respect to the prior Bond for such period. Purchaser shall also indemnify Grace and Seller and save and hold each of them harmless from and against any and all liabilities, costs, losses or damages (including reasonable attorneys' fees) suffered by Grace or Seller as a result of any act or omission by any of the Corporations which require the surety under a Bond to perform according to its terms.

6.08 Employees; Benefit Plans. The Corporations have no Employee Benefit Plans.

6.09 Environmental Compliance. Except as set forth in the schedule to this Section, to the knowledge of Seller (which knowledge shall be either (i) the present personal knowledge of Seller's vice president, F. L. Ryan, after consultation with the Corporations' officers, or (ii) as reflected in the Corporations' files and records), the operations of the Corporations on the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities are in substantial compliance with all Environmental Laws, except where the failure so to comply would not reasonably be expected to have a Material Adverse Effect. Except as set forth in the schedule to this Section, to the knowledge of Seller (which knowledge shall be either (i) the present personal knowledge of Seller's vice president, F. L. Ryan, after consultation with the Corporations' officers, or (ii) as reflected in the Corporations' files and records), said operations of the





Corporations on the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities are not subject to any existing, pending or threatened (i) action, suit or claim by a landowner or third party alleging damage to his property, underlying fresh water aquifers or mineral producing strata, or (ii) action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority under any Environmental Laws.

6.10 Fees and Expenses. All fees and expenses incurred by or on behalf of either the Seller or the Corporations in connection with this Agreement and the transactions contemplated hereby (other than any fees or expenses which are paid directly by Seller or which may be payable hereunder by the Purchaser to any of its counsel, investment bankers, lenders, other financing sources, or any of its other representatives, agents, associates or affiliates) will be considered a liability in the calculation of Net Realizable Assets.

6.11 Completeness of Disclosure. To the knowledge of Seller (which knowledge shall be either (i) the present personal knowledge of Seller's vice president, F. L. Ryan, after consultation with the Corporations' officers or (ii) as reflected in the Corporations' files and records' the evaluation material provided to Purchaser by the Seller in conjunction with Purchaser's acquisition of the Shares did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.

6.12 Drilling Commitments. Except as disclosed on the schedule to this Section, as of the Closing Date there are no ongoing drilling commitments remaining unperformed by or on behalf of the Corporations.

6.13 Defensible Title. The Corporations own Defensible Title (as hereinafter defined) in and to the Oil, Gas and Mineral Leases, the Properties, the Producing Properties and the Related Facilities (hereinafter the "Interests"). For





purposes of this Agreement, the term "Defensible Title" means that, subject to and except for the Permitted Encumbrances (as hereinafter defined):

(a) the Corporations are (i) entitled to receive the "net revenue interests" set forth on the OGRE input tape provided to Purchaser by GPC containing reserve information for the Interests as of July 1, 1992 as modified by information set forth in the Schedule to this Section (the "Tape") of all oil, gas and associated liquid and gaseous hydrocarbons produced, saved and marketed from the Interests, without increase, reduction, suspension or termination of such net revenue interest throughout the duration of the productive life of such Interests, except as shown on the Tape, and (ii) except as shown on the Tape, obligated to bear the percentage of the costs and expenses related to the maintenance, development and operation of the Interests in an amount equal to the "working interest" set forth on the Tape, without increase or decrease throughout the productive life of such Interests, except increases or decreases that also result in a proportionate increase or decrease in the Corporations' net revenue interest and increases that result from contribution requirements with respect to defaulting co-owners; and

(b) except for the Permitted Encumbrances, the title of the Corporations in each Interest is free and clear of all enforceable liens.

For the purposes of this Agreement, the term "Permitted Encumbrances" shall mean any of the following:

(i) Any liens for taxes and assessments not yet delinquent or, if delinquent, that are being contested in good faith in the ordinary course of business;

(ii) Any easements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations, pipelines, canals, ditches or the like, and easements for streets, alleys, highways, pipelines, power lines and



other similar rights-of-way, on, over or in respect of property owned or leased by any Corporation, or over which any Corporation owns rights-of-way, easements, permits or licenses, that do not unreasonably or materially interfere with the operation of any Interests for exploration and production of oil, gas and other minerals;

(iii) All lessors' royalties, overriding royalties, net profits interests, production payments, carried interests, reversionary interests and other burdens on or deductions from the proceeds of production that do not operate to (A) reduce the net revenue interest of the Corporations below that set forth on the Tape, (B) increase the proportionate share of costs and expenses of leasehold operations attributable to or to be borne by the working interest of the Corporations above that set forth on the Tape without a proportionate increase in the net revenue interest of the Corporations or (C) increase the working interest of the Corporations above that set forth on the Tape without a proportionate increase in the net revenue interest of the Corporations;

(iv) All rights to consent by, required notices to, and filings with or other actions by governmental or tribal entities, if any, in connection with the change of ownership or control of an interest in federal, state, tribal or other domestic governmental oil and gas leases, if the same are customarily obtained subsequent to such change of ownership or control, but only insofar as such consents, notices, filings and other actions related to the transactions contemplated by this Agreement;

(v) Conventional rights of reassignment prior to abandonment;

(vi) The terms and provisions of the leases, unit agreements, pooling agreements, communitization agreements and other documents creating interests comprising the Interests, insofar and only insofar as such terms and provisions do not operate to (A) reduce the net revenue interest of the



Corporations below that set forth on the Tape, (B) increase the proportionate share of costs and expenses of leasehold operations attributable to or to be borne by the working interest of the Corporations above that set forth on the Tape without a proportionate increase in the net revenue interest of the Corporations, or (C) increase the working interest of the Corporations above that set forth on the Tape without a proportionate increase in the net revenue of Interests;

(vii) Materialmen's, mechanics', repairmen's, employees', contractors', operators', tax and other similar liens or charges arising in the ordinary course of business incidental to construction, maintenance or operation of any of the Interests (A) if they have not been filed pursuant to law, (B) if filed, they have not yet become due and payable or payment is being withheld as provided by law or (C) if their validity is being contested in good faith in the ordinary course of business by appropriate action;

(viii) Liens arising under operating agreements, unitization and pooling agreements and production sales contracts securing amounts not yet delinquent or, if delinquent, being contested in good faith in the ordinary course of business by appropriate action;

(ix) Liens against the surface or mineral estates of the leases comprising the Interests that have been expressly subordinated to the Interests or that are subordinate to the Interests as a matter of law; provided, however, that liens against any fee simple, surface or mineral estates owned by any Corporation shall not be Permitted Encumbrances for purposes of this subsection (ix);

(x) Covenants, conditions and other terms subject to which the Interests were acquired by the Corporations;

(xi) Such title defects as Purchaser has expressly waived in writing;



(xii) Rights reserved to or vested in any municipality or governmental, tribal, statutory or public authority to control or regulate any of the Interests in any manner, and all applicable laws, rules and orders of any municipality or governmental or tribal authority; and

(xiii) any other encumbrance affecting any portion of the Interests that individually does not materially adversely affect the operation, value or use of any such Interests.

6.14 Reserves Disclaimer. Nothing contained herein shall in any manner imply that either Seller or Grace is warranting the quantum of reserves, which warranty is hereby expressly negated.

ARTICLE 7.

Representations and Warranties by Purchaser

Purchaser hereby represents and warrants to Seller as follows:

7.01 Incorporation. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada, with full corporate power to enter into this Agreement and to perform its obligations hereunder.

7.02 Authorization. Purchaser has all requisite authority to enter into this Agreement. The execution and delivery of this Agreement by Purchaser, and the performance by Purchaser of its obligations hereunder, have been duly and validly authorized by all necessary corporate action of Purchaser. This Agreement has been duly executed and validly delivered by Purchaser and is legally binding on Purchaser.

7.03 No Conflict. The execution and delivery of this Agreement by Purchaser, and the performance by Purchaser of its obligations hereunder, does not (a) conflict with the charter documents or by-laws of Purchaser or (b) result in



the breach of any of the provisions of, constitute a default under, or give rise to a right of acceleration of any material obligation or to loss of a material benefit under any judgment, writ, permit, concession, franchise, license, order, decree or agreement to which Purchaser is a party or by which Purchaser is bound, which breach or default would materially adversely affect the ability of Purchaser to execute, deliver or perform its obligations under this Agreement.

7.04 Sufficient Funds. Purchaser has, and on the Scheduled Closing Date will have, sufficient funds to consummate the transactions contemplated hereby.

ARTICLE 8.

Disclaimer of Additional and Implied Warranties

8.01 Investigation and Evaluation. Purchaser acknowledges that (a) Purchaser is experienced in the operation of the type of business conducted by the Corporations, (b) Purchaser and its directors, officers, attorneys, accountants and advisors have been given the opportunity to examine to the full extent deemed necessary and desirable by Purchaser all books, records and other information with respect to the Corporations and their assets, (c) Purchaser has taken full responsibility for determining the scope of its investigations of the Corporations and their assets, and for the manner in which such investigations have been conducted, and has examined the Corporations and their assets to Purchaser's full satisfaction, (d) Purchaser is fully capable of evaluating the adequacy and accuracy of the information and material obtained by Purchaser in the course of such investigations, and (e) Seller is making no representations or warranties, express or implied, of any nature whatever with respect to the Corporations and their assets, other than the representations and warranties of Seller specifically set forth in Article 6.



8.02 Forecasts, Projections, etc. Purchaser acknowledges that (a) Purchaser has taken full responsibility for evaluating the adequacy, completeness and accuracy of various forecasts, projections, opinions and similar material heretofore furnished by Seller, the Corporations or their representatives to Purchaser in connection with Purchaser's investigations of the Corporations and their assets, and (b) there are uncertainties inherent in attempting to make projections and forecasts and render opinions, that Purchaser is familiar with such uncertainties, and that Purchaser is not relying on any projections, forecasts or opinions furnished to it by Seller, the Corporations or any affiliates thereof or any of their representatives.

8.03 Effect of Transfer of Shares. Purchaser acknowledges that it has taken full responsibility for evaluating the effects on the assets, properties and rights of each of the Corporations of the transfer of the Shares from Seller to Purchaser, and Seller shall have no liability on account of any legal questions concerning the effects of such transfer on such assets, properties and rights; provided, however, that nothing in this Section shall diminish Seller's obligations under Section 4.04.

ARTICLE 9.

Covenants of Seller and Purchaser

9.01 Access and Inquiry. Between the date of this Agreement and the Closing Date, Purchaser shall have access to the Corporations' properties and assets and will, upon request, be permitted to contact and make reasonable inquiry of Seller's and the Corporations' personnel, accountants, counsel, bankers and other representatives regarding the business of the Corporations, specifically including, but not limited to, environmental audits and assessments of all Producing Properties and Related Facilities. Seller shall make available to



Purchaser, for examination at GPC's offices in Oklahoma City or elsewhere as



appropriately available, title and other information, including but not limited to the following, insofar as the same are in Seller's or the Corporations' possession, and will cooperate with Purchaser in Purchaser's efforts to obtain, at Purchaser's expense, such additional information relating thereto as Purchaser may reasonably desire, including all information which is in the possession of third parties:

(a) Title opinions and title status reports;

(b) Copies of leases, prior conveyances of interests created thereby, unitization, pooling and operating agreements, division and transfer orders, mortgages, deeds of trusts, security agreements, chattel mortgages, financing statements, and other encumbrances not discharged and affecting the title to or the value of the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities;

(c) Records relating to the payment of rentals, royalties, joint interest billings and other payments due under any Oil, Gas and Mineral Lease;

(d) Records relating to filing of returns for or the payment of ad valorem, property, production, severance, excise, and similar taxes and assessments based on or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom on the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities;

(e) Ownership maps and surveys relating to the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities;

(f) Copies of all purchase, sale, processing, and transportation agreements relating to the production from the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities;





(g) Copies of all agreements, leases, permits, easements, licenses, and orders relating to the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities;

(h) Production records relating to the Producing Properties;

(i) Inventories of personal property and fixtures included in the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities;

(j) Copies of all personnel and employee benefit records related to the Corporations' employees, to the extent access to such records is not a violation of law or the subject of an objection by the employee;

(k) Records related to the Corporations' bank and security accounts;

(l) Accounting records and records concerning (i) taxes, (ii) engineering and technical data and (iii) geological and geophysical data, relating to the Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties and Related Facilities.

Seller shall cause the Corporations to permit Purchaser, at Purchaser's expense, to inspect all of the Corporations' operated Producing Properties (and Seller shall use its best efforts to cause third party operators of such Producing Properties to permit such inspections of non-operated Producing Properties), and to inspect and photocopy the information and records identified in this Section 9.01 at any reasonable time. Seller shall not be obligated to furnish any updated abstracts, title opinions, or additional title information, but shall cooperate with Purchaser in Purchaser's efforts to obtain, at Purchaser's expense, such additional title information as Purchaser may reasonably deem prudent.

Purchaser agrees that the terms of the Confidentiality Agreement shall apply to information gained by Purchaser pursuant to the foregoing and/or

