

previously made available to Purchaser to the same extent as if Purchaser were a party thereto and bound by the confidentiality provisions thereof.

9.02 <u>Hart-Scott-Rodino Act</u>. As promptly as practicable following the date of this Agreement, Seller and Purchaser shall file appropriate Notification and Report Forms under the HSR Act with respect to this Agreement and the transactions contemplated hereby. Seller and Purchaser shall cooperate to coordinate such filings, and to make reasonable efforts to respond to any governmental request or inquiry with respect thereto; but neither Seller, Purchaser nor any of their respective affiliates shall be required to make any payment (other than for reasonable legal fees) that it is not presently contractually required to make, divest any assets (including but not limited to assets of any of the Corporations), make any change in the conduct of its business or that of any Corporation, accept any limitation on the future conduct of its business or that of any Corporation, enter into any other agreement or arrangement with any person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing. Seller and Purchaser shall request early termination of the waiting period under the HSR Act upon the filing of the Notification and Report Form.

9.03 <u>Permits and Licenses</u>. As soon as practicable after the date hereof, Purchaser shall prepare and file with the appropriate permitting and licensing authorities applications for the issuance to Purchaser of all federal, state and local permits and licenses, if any, required for the Corporations to continue their businesses under ownership of Purchaser, and Purchaser will use all reasonable efforts to secure such licenses and permits. Seller shall assist Purchaser in preparation of such applications.

9.04  <u>Notices to Third Parties</u>.  Seller and Purchaser shall cooperate to make all other filings and to give notice to all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement.

9.05  <u>Dividend of Certain Assets</u>.  Seller shall cause the Corporations to dividend or otherwise divest to a Grace Entity or other third party, prior to Closing, all of the Corporations' interests (real property, personal property, mixed property, or otherwise, and including, but not limited to, any royalties and overriding royalties in properties in which GPC owns a working interest, and the capital stock of Sourgasco II) in the Thomasville Field and the East Texas Region as more fully defined in the Grace Petroleum Corporation Confidential Brochure prepared by Merrill Lynch, but excluding any royalty or overriding royalty interests in properties in which GPC does not own a working interest within said East Texas Region.

9.06  <u>Post-Closing Covenants (Employees)</u>.

(a)   <u>Transition Employees</u>.  Prior to Closing, Seller will cause all employees of the Corporations  to be transferred to a Grace Entity, and shall provide the services of such employees to Purchaser at Closing ("Transition Employees").  At Closing, or as soon thereafter as practicable, but not later than May 31, 1993, Purchaser shall evaluate each of the Transition Employees  and  either  offer regular employment to each such employee or employees or release each such employee or employees from the status as Transition Employees.   Should Purchaser or the Corporations (i) offer continued employment to one or more of the Transition Employees under terms consistent with Seller's severance policy, and (ii) any such employee accepts Purchaser's offer, Seller shall have no obligation relating to severance payments or any termination payments (e.g., accrued vacation, etc.) due such employee. unless such employee is thereafter terminated by either the Corporations or Purchaser on a date which is the earlier of  six

-34-

months following the date of hire by Purchaser of such employee ("Date of Hire") or September 30, 1993, in which event Seller shall retain responsibility for any such severance or termination payments.

Should Purchaser elect to relocate any such employee, Seller shall reimburse Purchaser for the lesser of (i) one-half of the actual relocation costs ("Relocation Costs") attributable to each such employee or (ii) $10,000 per employee. Such Relocation Costs shall be determined in accordance with Purchaser's relocation policies, provided, however, that such costs shall not include payments related to any decrease in the value of such relocated employee's residence nor a requirement to purchase such employee's residence. In the event Seller subsequently is required, pursuant to this Agreement, to pay severance or termination payments to any relocated employee, Purchaser shall return to Seller the amount of any Relocation Costs previously paid by Seller to such relocated employee.

Should Purchaser or the Corporations not offer employment to one or more of the Transition Employees, Seller shall retain all liabilities relating to such employees, including, but not limited to, such severance, and termination payments, COBRA claims and ERISA claims which may arise pursuant to the Employee Benefit Plans. Seller shall bill Purchaser monthly for all of its actual employment-related costs, incurred on or after January 1, 1993, attributable to such Transition Employees, including, but not limited to, salaries, payroll taxes, travel and other expenses, and all expenses related to the Transition Employees participation in the Employee Benefit Plans, including, but not limited to, all medical claims for services rendered and supplies furnished on and after January 1, 1993, and Grace Entities' contribution to the 401(k) Plan falling due after January 1, 1993, (all such costs being calculated in accordance with Seller's practices and rates existing as of the date hereof). Purchaser shall pay Seller for

such costs within thirty days of receiving such bill. Prior to May 31, 1993, Purchaser shall have (i) hired any Transition Employees it desires and (ii) notified Seller that it no longer has a need for any or all other Transition Employees. The period of time between the Closing and May 31, 1993 shall hereafter be referred to as the "Interim Period". During the Interim Period, Purchaser shall have sole and complete control of such Transition Employees, including, but not limited to, assignment of job duties, supervision of work and termination of the assignment of such Transition Employees to Purchaser.

(b)    <u>Employee Benefits.</u>    Upon hiring by Purchaser, the Transition Employees shall (i) cease to participate in or be covered by the Employee Benefit Plans and policies and (ii) become entitled to participate in the employee benefit plans and policies maintained by Purchaser for their other similarly situated employees in accordance with the terms and provisions of such plans and policies; provided, however, that (A) coverage under Purchaser's group medical, dental and short-term disability plans shall waive any waiting period requirements and preexisting condition restrictions to the extent necessary to provided immediate coverage as of such employees' Date of Hire and shall credit employees for the year during which the Closing Date occurs with any deductibles already incurred during such year under the Purchaser's group medical and dental plans, (B) coverage under Purchaser's group long-term disability plan shall waive any waiting period requirements and preexisting condition restrictions to the extent necessary to provide immediate coverage as of the Date of Hire but only (1) with respect to employees covered under the Corporations' group long-term disability plan immediately prior to the Date of Hire and (2) to the extent coverage was provided for such condition under the Corporations' group long-term disability plan immediately prior to the Date of Hire, (C) Purchaser's vacation policy, short-term disability plan and education assistance program shall credit each employee





with prior service based upon his or her most recent period of continuous service with the Corporations as of the Date of Hire and Purchaser's Thrift and Retirement Plan shall credit the employees with service for eligibility and vesting purposes for the period prior to the Date of Hire with the service credited to the employees for such purposes as of the Date of Hire under the Corporations' 401(k) Plan and Trust.

(c) <u>Indemnification during Interim Period</u>. The Transition Employees will continue to be the employees of a Grace Entity during the Interim Period. Purchaser shall indemnify and hold the Grace Entities harmless from and against any and all claims, demands, damage, liability, loss, cost, or deficiency of every kind and character arising in favor of any person (including, but not limited, to reasonable attorney's fees and other costs and expenses incident to proceedings or investigations or the defense of any claim) ("Damages" for purposes of this paragraph only) caused directly or indirectly by acts or omissions (including, but not limited to, negligence in whole or in part, and criminal acts) of Transition Employees during the Interim Period; and for injury or death to any Transition Employee occurring during the Interim Period. Purchaser also agrees to hold the Grace Entities harmless and indemnify them from all Damages related to claims of employment discrimination made by such Transition Employees during the Interim Period as a result of Purchaser's decision not to hire Transition Employees.

(d) <u>Employee Services Agreement</u>. Seller and Purchaser, at the Closing, shall execute an employee services agreement that provides for the provision of services of Transition Employees to the Corporations or Purchaser after the Closing Date.

(e) <u>Excluded Properties - Employee and Record Access</u>: Purchaser shall cause the Corporations to allow the Seller and the buyer of the Corporations



former East Texas and Thomasville properties ("Excluded Properties") reasonable access to facilities, records and the Transition Employees in order to facilitate the prompt completion of the contractual obligation concerning the Excluded Properties which Seller may have with third parties, and/or Seller's completion of its administration of any Excluded Properties transferred to a Grace Entity and to turn over all applicable records concerning the Excluded Properties to Seller and/or purchaser. Seller and Purchaser shall, from time to time, designate a reasonable number of the Transition Employees to assist in such activities and Purchaser or the Corporations shall not be billed for said designated employees.

9.07 Post Closing Covenants (Title).

(a) Title Variances. Any lien, charge, obligation, encumbrance, defect, irregularity of title, incorrect calculation of, or differences in the dollar amounts remaining to be recouped until payout of back-in or other similar reversionary interests not reflected in the Tape, unobtained or refused consent to assign, call on production or any other circumstance or condition that alone or in the aggregate with other defects would cause the title of the Corporations in any Interests described in the Tape to be less or greater than Defensible Title shall be a title variance ("Title Variance").

(b) Notice of Title Variances. From time to time during the period from the date of execution of this Agreement to June 1, 1993 (the "Title Examination Period"), Purchaser shall have the right (but not the obligation) to notify Seller of any Title Variance of which Purchaser becomes aware which decreases the net revenues attributable to the interest affected; and Purchaser shall have the obligation to notify Seller of any Title Variance of which Purchaser becomes aware which increases the net revenue attributable to the interest affected. Purchaser shall in such notice provide a reasonably detailed description of such Title Variance. Failure of Purchaser to notify Seller of a Title Variance of





which Purchaser has notice prior to June 1, 1993, which Title Variance decreases the net revenue interest attributable to the affected interest, shall constitute a waiver thereof by Purchaser. With respect to each notice of a Title Variance given during such period, which decreases the affected net revenue, Seller may, but shall have no obligation to, attempt to cure such Title Variance prior to July 1, 1993.

(c)   <u>Remedies for Title Variances</u>.   In the event that any Title Variance which decreases a net revenue interest is not cured or waived on or before July 1, 1993, Purchaser may, at its sole discretion, waive such Title Variance, or Seller shall, at its sole discretion, either (i) include as either an asset or liability, as appropriate, in the calculation of Net Realizable Assets an amount equal to  the proportionate difference in net revenue interest, multiplied by the net cash flow from such Interest as set  forth in the Tape discounted to present value by a factor of 10% per annum, and further multiplied times 90% (ninety percent), or (ii) elect to indemnify  Purchaser for such Title Variance which decreases the affected net revenue interest pursuant to Section 13.03.  Such indemnification, if a Title Variance is finally adjudicated, shall be limited to the result of the formula set forth in Section 9.07(c)(i), plus Litigation Expenses.  In the event that Purchaser elects the remedy set forth in Section 9.07(c)(i), no Title Variance having an individual value equal to or less than $25,000 shall be submitted by Purchaser or considered in the calculation of Net Realizable Assets. Additionally, no Title Variances (after netting increases against decreases) having an individual value in excess of $25,000 will be considered in the calculation of Net Realizable Assets until such time that the aggregate of such individual Title Variances having a value in excess of $25,000, (after netting increases against decreases) exceeds $250,000, at which time all such individual Title Variances (after netting increases against decreases),  shall be submitted to

Seller and considered either an asset or a liability as appropriate in the calculation of Net Realizable Assets.

## ARTICLE 10.

### Covenants Relating to Conduct of Business Prior to the Closing

Except as otherwise consented to in writing by Purchaser, from the date of this Agreement until the Closing:

10.01     <u>Operation in Ordinary Course</u>.     Seller shall cause the Corporations to carry on their respective businesses in the usual, regular and ordinary course in substantially the same manner as heretofore conducted and, to the extent consistent with such businesses, use reasonable efforts to (a) preserve intact their present business organizations, (b) keep available the services of their present officers and employees, and (c) preserve their relationships with customers, suppliers and others having business dealings with them toward the end of preserving their goodwill and ongoing businesses . Specifically, Seller shall cause the Corporations (a) not to abandon any material part of the Producing Properties (except the abandonment of Oil, Gas and Mineral Leases upon the expiration of their respective terms or upon cessation of production in paying quantities or to the extent such abandonment occurs as a result of Purchaser's direction to the Corporations), or (b) not to commence any material operations on any single lease or unit which is a part of the Producing Properties, anticipated to cost the owner of such asset in excess of $25,000 except for emergency operations, operations required under contractual obligations in effect on the date hereof, operations to avoid any penalty provision of any applicable agreement or order, and except to the extent such operations are approved by Purchaser .

10.02     <u>Material Agreements</u>.     Seller shall not permit any of the Corporations to enter into any agreement with either third parties or the Grace

Entities, except in the ordinary course of business, which ordinary course of business shall be deemed to include execution of or cancellation of contracts for the sale of gas only to the extent the term of such contracts does not extend for a period in excess of thirty (30) days.

10.03    Dividends.   Except as set forth in Section 9.05, Seller shall not permit the declaration or payment of any dividend in respect of, or the repurchase or redemption of any of, the capital stock or assets of GPC or the Corporations; provided, however, that the foregoing shall not be construed to prevent the transfer of funds pursuant to Seller's cash management program.

10.04    Issuance of Securities.   Except as set forth in the schedule to this Section, Seller shall not permit any of the Corporations to issue, deliver or sell, or authorize or propose the issuance, or delivery or sale of, any shares of its capital stock of any class, any Voting Debt or any securities convertible into, or any rights, warrants or options to acquire, any such shares, Voting Debt or convertible securities.

10.05    Governing Documents.   Seller shall not permit any of the Corporations to amend or propose to amend its Certificate of Incorporation or By-laws.

10.06    No Acquisitions.   Seller shall not permit any of the Corporations to acquire, or agree to acquire, by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business, oil and gas properties or any corporation, partnership, association or other business organization or division thereof.

10.07    No Dispositions.   Seller shall not permit any of the Corporations to sell, lease or otherwise dispose of, or agree to sell, lease or otherwise dispose of, any of its assets, other than oil and gas production.



-41-



10.08    <u>Indebtedness</u>. Seller shall not permit any of the Corporations to incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities of the Corporations or guarantee any debt securities of others.

10.09    <u>Employee Benefit Plans, Etc.</u> Seller shall not permit any of the Corporations to adopt any collective bargaining agreement or Employee Benefit Plan.

10.10    <u>Compensation, Etc.</u>. Seller shall not, after the date hereof, permit any of the Corporations to grant to any employee any increase in compensation, including, but not limited to, salary, bonuses, insurance benefits, company cars, club memberships, expense and travel allowances, etc., or in severance or termination pay, or enter into any employment agreement with any employee, or hire or, except in the ordinary course of business, terminate any employee or independent contractor of the Corporations.



10.11    <u>Capital Expenditures; Purchase Orders</u>. Except for emergency actions taken at the field level, Seller shall not permit any of the Corporations to (i) make any capital expenditures or any commitments therefor in excess of $25,000 or (ii) enter into any purchase order in excess of $25,000.

10.12    <u>Employee Notice</u>. Upon execution of this Agreement by Seller, Purchaser, as agent for GPC, shall distribute to the Corporations' employees (i) any notices, as prepared by Purchaser, which Purchaser believes are required by the Worker Adjustment and Retraining Notification Act ("WARN") and (ii) any employment material related to Purchaser. Purchaser shall indemnify Seller and each Grace Entity and hold each of them harmless from and against any Damages caused by or arising out of any claims under the WARN that is the result of decisions made or actions taken by the Purchaser, or Seller at the direction of

-42-



Purchaser.  For the purposes of this Section 10.12 only, Damages shall mean only those liabilities arising from the legal deficiency of such WARN notices.

10.13    <u>Other Actions</u>.  Seller shall not permit any of the Corporations to take any action that would or might result in any of the representations and warranties of the Seller set forth in this Agreement becoming untrue.

10.14    <u>Advice of Changes</u>.  Seller shall promptly advise Purchaser orally and in writing of any change or event having, or which, insofar as can reasonably be foreseen, would have, a Material Adverse Effect.

10.15    <u>Settlement, Release and Waiver of Claims</u>.  Except as set forth on the Schedule to this Section, and except as set forth in Section 13.06(a), Seller shall not permit any of the Corporations to enter into any arrangement to settle or release any claim for damages or cause of action that the Corporations may have against any third party.



ARTICLE 11.

<u>Conditions Precedent to the Obligations of Purchaser</u>

All obligations of Purchaser under this Agreement are subject, at Purchaser's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01    <u>Accuracy of Representations and Warranties</u>.  Each and every representation and warranty of Seller under this Agreement shall be true and accurate in all material respects as of the date when made and as of the Closing, except for changes in the ordinary course of business between the date of this Agreement and the Closing, none of which alone or in the aggregate has a Material Adverse Effect.

11.02    <u>Performance of Covenants and Agreements</u>.  Seller shall have fully performed in all material respects at or prior to the Closing all of the

-43-



covenants and agreements required to be performed by Seller at or prior to the Closing in accordance with this Agreement.

11.03    Release of Liens.  Except for the Permitted Encumbrances, on or before the Closing Date, Seller shall have caused the recordation in the appropriate governmental offices of releases of any and all liens, mortgages, deeds of trust, security interests or similar instruments which encumber either the Shares or the Corporations' Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties or Related Facilities.

11.04    Inspection of Properties.  Purchaser shall have completed and delivered to Seller an environmental inspection (the "Inspection Report") of the Producing Properties and Related Facilities on or before the 15th day following the date of this Agreement.  Such Inspection Report shall set forth the results of Purchaser's inspection of the Producing Properties and Related Facilities and shall include Purchaser's estimate of the costs necessary to remedy, in the sole determination of Purchaser made in good faith after consultation with appropriate experts, any violations or potential violations of Environmental Laws or any potential or actual Third Party Claims (as defined in Section 13.01) (the "Remediation Costs").  Said Remediation Costs shall include, but shall not be limited to, investigation and assessment costs, remedial and clean-up costs, damages to third parties, fines and attorneys fees and expenses.  Subject to the limitations set forth below, the Purchase Price shall be adjusted downward in an amount equal to said Remediation Costs, provided, however, that in the event Seller disputes the amount of such Remediation Costs, Purchaser and Seller shall , on or before the Closing, negotiate a mutually acceptable adjustment to the Purchase Price and in such event the Purchaser shall accept and assume any continuing liability related thereto, or in lieu of such adjustment to the Purchase Price, Seller and Grace at their sole discretion, shall either (i) indemnify and hold

-44-



harmless Purchaser and the Corporations for such continuing liability; or (ii) cause the Corporations to assign, prior to Closing, the affected Producing Property or Related Facilities, to Seller or Seller's designee, in which event the Purchase Price shall be reduced by an amount equal to the product of the amount of net cash set forth in the Tape discounted to present value by a factor of 10% per annum, multiplied times 90 percent. Purchaser shall assume and hereby agrees to indemnify and hold Seller and Grace harmless for all liabilities for violations or potential violations of Environmental Laws or any potential Third Party Claims with respect to the Producing Properties which were not identified on the Inspection Report as being in violation or potential violation of Environmental Laws or the subject of potential Third Party Claims.

In the event that the Purchase Price is to be adjusted downward as set forth above, no Remediation Costs applicable to a single Producing Property or Related Facility and totaling less than $25,000 shall be included in such adjustment to the Purchase Price. Additionally, no Remediation Cost applicable to a single Producing Property or Related Facility and totaling $25,000 or more shall be included in such adjustment to the Purchase Price until such time that the aggregate of such individual Remediation Costs in excess of $25,000 exceeds $250,000, at which time all Remediation Costs relating to a single Producing Property or Related Facility and totaling $25,000 or more shall be included in the downward adjustment to the Purchase Price.

11.05    Hart-Scott-Rodino Act. All waiting periods under the HSR Act applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason; and no representative of either the FTC or the DOJ shall have requested a

-45-

delay of the Closing for a period which has not expired, which request has not been withdrawn.

11.06    <u>Permits, Consents, etc.</u>    There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the transactions contemplated by this Agreement which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing.

11.07    <u>Litigation.</u>    No action, suit, proceeding, investigation, inquiry or request for information by any third person (including but not limited to any Governmental Authority) shall have been instituted or threatened against Seller or Purchaser or any of their respective affiliates that questions or reasonably may be expected to lead to subsequent questioning of, the validity or legality of this Agreement, or the transactions contemplated hereby which; if successful, would materially adversely affect the right of Purchaser to consummate the transactions contemplated by this Agreement or to continue the businesses of the Corporations substantially as currently conducted.

11.08    <u>Certificate of Seller</u>.    Seller shall have delivered to Purchaser a certificate of Seller signed by the President or any Vice President of Seller certifying that (i) each and every representation and warranty of Seller under this Agreement was true and accurate in all material respects as of the date when made and is true and accurate in all material respects as of the Closing, except for changes in the ordinary course of business between the date of this Agreement and the Closing, none of which alone or in the aggregate has a Material Adverse Effect; and (ii) Seller has fully performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Seller at or prior to the Closing in accordance with this Agreement.



11.09    _Opinion of Seller's Counsel_.  Seller shall have delivered to Purchaser an opinion of its General Counsel, dated the Closing Date, in the form of Exhibit D.

11.10    _Tax Credits_.  Seller shall have afforded Purchaser access to all personnel, records, documentation and calculations necessary to permit Purchaser to verify and complete all required calculations, documentations and filings to preserve for the Corporations all Section 29 tax credits applicable to tight sands, coal seam and Devonian shale production.  Should Purchaser determine in good faith as a result of such verification that certain such expected tax credits are unavailable due to regulatory deficiencies or failure to drill, the Purchase Price shall be adjusted as follows:

(a)    In the event such verification reveals that the Corporations failed to spud prior to December 31, 1992 any coal seam or tight sands, Section 29 non-Devonian Shale wells identified in Exhibit C (the "Tight Sands Wells"), the value of future tax credits applicable to such wells shall be included as a liability in the calculation of Net Realizable Assets.  Such Tight Sands Wells tax credits will be valued as follows:

(i)  the estimated MCF production as shown on the Tape of each Tight Sands Well that is not spudded by December 31, 1992 shall be multiplied by $.52 and

(ii)  such product shall be discounted to present value at the rate of 10% per annum.

(b)    As of the date of this Agreement, the Corporations plan to have previously completed or to have spudded, prior to December 31, 1992, a total of 95 Devonian Shale wells located in the Antrium Field, Michigan (the "Devonian Shale Wells").  If the total number of Devonian Shale wells is different than 95, the following shall occur:



(i)   In the event the Corporations fail to spud one or more of such Devonian Shale Wells prior to December 31, 1992, the value of future tax credits applicable to and/or gas production attributable to such Devonian Shale Wells shall be included as a liability in the calculation of Net Realizable Assets. Such Devonian Shale Wells tax credits and/or gas production will be valued as follows:

(a)   the Net Realizable Assets shall be reduced by $60,000 for each Devonian Shale Well that is not spudded on or before December 31, 1992 and

(b)   the Net Realizable Assets shall be reduced by an additional $125,000 for each Devonian Shale Well that is not spudded by March 1, 1993.

(ii)   In the event the Corporations spud more than 95 Devonian Shale Wells prior to December 31, 1992, the value of future tax credits applicable to and/or gas production attributable to such additional Devonian Shale Wells shall be included as an asset in the calculation of Net Realizable Assets. Such additional Devonian Shale Wells' tax credits and/or gas production will be valued as follows:

(a)   the Net Realizable Assets shall be increased by $60,000 for each Devonian Shale Well in excess of the planned 95 Devonian Shale Wells that is spudded on or before December 31, 1992 and

(b)   the Net Realizable Assets shall be increased by an additional $125,000 for each Devonian Shale Well in excess of the planned 95 Devonian Shale Wells that is spudded by March 1, 1993.

11.11____ Board Approval.   W. R. Grace & Co.'s, Grace's, Seller's and Purchaser's boards of directors shall have approved the transactions contemplated hereby.

ARTICLE 12.





<u>Conditions Precedent to the Obligations of Seller</u>

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

12.01    <u>Accuracy of Representations and Warranties</u>.  Each and every representation and warranty of Purchaser under this Agreement shall be true and accurate in all material respects as of the date when made and as of the Closing.

12.02    <u>Performance of Covenants and Agreements</u>.  Purchaser shall have fully performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Purchaser at or prior to the Closing in accordance with this Agreement.

12.03    <u>Hart-Scott-Rodino Act</u>.  All waiting periods under the HSR Act applicable to the transactions contemplated by this Agreement shall have expired, by passage of time or by valid early termination by the FTC or the DOJ; no representative of either the FTC or the DOJ shall be taking the position that any of such waiting periods has not commenced to run or has not expired for any reason; and no representative of either the FTC or the DOJ shall have requested a delay of the Closing for a period which has not expired, which request has not been withdrawn.



12.04    <u>Permits, Consents, etc.</u>  There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the transactions contemplated by this Agreement which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing.·

12.05    <u>Litigation</u>.  No action, suit, proceeding, investigation, inquiry or request for information by any third person (including but not limited to any Governmental Authority) shall have been instituted or threatened against Seller or Purchaser or any of their respective affiliates that questions, or reasonably

-49-



could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, or the transactions contemplated hereby which, if successful, would affect the right of Seller to consummate the transactions contemplated hereby or might involve possible material liability on the part of the Seller or any of its subsidiaries or affiliates.

12.06    Certificate of Purchaser. Purchaser shall have delivered to Seller a certificate of Purchaser signed by the President or any Vice President of Purchaser certifying that: (i) each and every representation and warranty of Purchaser under this Agreement was true and accurate in all material respects as of the date hereof and is true and accurate in all material respects as of the Closing; and (ii) Purchaser has fully performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Purchaser at or prior to the Closing in accordance with this Agreement.

12.07    Opinion of Purchaser's Counsel. Purchaser shall have delivered to Seller an opinion of Purchaser's General Counsel dated the Closing Date in the form of Exhibit E.

12.08    Board Approval. Seller's, Purchaser's, Grace's and W. R. Grace & Co.'s boards of directors shall have approved the transactions contemplated hereby.

## ARTICLE 13.

### Indemnification

13.01    Definitions. As used in this Article:

(a)    "COBRA Claims" means any and all expenses incurred by Purchaser or the Corporations, net of COBRA insurance premiums received by Purchaser or its insurance carrier, as a result of the extension of health insurance benefits to the Corporations' employees, former employees, and such persons' dependents, by Seller or Purchaser, as the case may be, as required by COBRA



and the rules and regulations promulgated thereunder; provided, however, that COBRA Claims shall not include claims under COBRA by employees who were hired by Purchaser or any entity of Purchaser and who are still employed by Purchaser or any entity of Purchaser six months after the employee's Date of Hire or September 30, 1993, whichever is the earlier.

(b) "Damages" means any and all penalties, fines, damages, liabilities, interest, losses or costs (including, without limitation, Litigation Expenses incident to Indemnified Claims but in any event excluding consequential damages and damages for lost profits which may be awarded to Purchaser or the Corporations).

(c) "Direct Claims" means claims other than Third Party Claims.

(d) "Indemnified Claims" means all Purchaser Claims and all Seller Claims.



(e) "Litigation Expenses" means reasonable attorneys' fees and other costs and expenses (including actual cost of in-house counsel in a situation where Seller has allowed Purchaser to assume the defense of litigation and Purchaser's lead counsel is an employee of Purchaser) incident to proceedings or investigations respecting, or the prosecution or defense of, a claim.

(f) "Purchaser Claims" shall mean all claims indemnifiable by Seller and Grace pursuant to Sections 13.03 (as limited by Section 13.04) and 13.06.

(g) "Seller Claims" shall mean all claims indemnifiable by Purchaser pursuant to Section 13.02.

(h) "Third Party Claims" means any and all claims, demands, suits, actions or proceedings by any person or entity, other than Purchaser or Seller or their respective affiliates, arising prior to the Closing Date.

(i) "Post Closing Claims" means any and all claims, demands, suits, actions or proceedings by any person or entity, other than Purchaser or Seller or

-51-

their respective affiliates, arising after the Closing Date, to the extent such claim relates to post-closing activities of the Corporations and specifically excluding claims arising from the action or inaction of the Corporations prior to the Closing Date.

13.02    General Indemnification by Purchaser.

(a)    Subject to the terms, conditions and limitations of this Article, Purchaser shall indemnify Seller and save and hold Seller harmless from and against any Damages caused by or arising out of (i) the failure of Purchaser to perform or fulfill any agreement or covenant to be performed or fulfilled by it under this Agreement, (ii) any inaccuracy in any representation or breach of any warranty of Purchaser set forth in Article 7, (iii) any indemnifiable tax claims as set forth in Article 17, (iv) the matters set forth in Section 10.12 and (v) the matters set forth in Section 11.04.

(b)    The representations and warranties of Purchaser set forth in Article 7 shall survive the Closing.

(c)    Subject to the terms, conditions and limitations of this Article, Purchaser shall indemnify and hold harmless the Seller Group from and against any and all Damages caused by or arising out of those obligations or liabilities of the Corporations as set forth in the schedule to this Section for which any of the Seller Group has expressly provided a guaranty.

(d)    Subject to the terms, conditions and limitations of this Article, Purchaser shall indemnify Seller and save and hold Seller harmless from and against any Damages caused by or arising out of Post-Closing Claims.

(e)    Except as provided in Section 13.02(f), Purchaser's obligation to indemnify Seller and Grace under this Section 13.02 shall expire and be of no further force and effect on the third anniversary date of the Closing Date, except with respect to claims Seller or Grace have asserted against Purchaser in writing,

setting forth with reasonable specificity the nature of such claim, on or before such date.

(f)    Purchaser's obligation to indemnify Seller and Grace under Section 13.02(a)(iii) shall expire and be of no further force and effect on the tenth anniversary date of the Closing, except (i) to the extent Purchaser has tolled the funning of the statute of limitations by written agreement with a Governmental Authority, in which event Purchaser's obligation to indemnify will be extended by the period of tolling, and (ii) except with respect to claims Seller or Grace have asserted against Purchaser in writing, setting forth with reasonable specificity the nature of such claim, on or before such date.

13.03    <u>General Indemnification by Seller and Grace</u>.

(a)    Subject to the terms, conditions and limitations of this Article, Seller and Grace shall indemnify Purchaser and the Corporations and save and hold Purchaser and the Corporations harmless from and against any Damages caused by or arising out of (i) the failure of Seller to perform or fulfill any agreement or covenant to be performed and fulfilled by it under this Agreement, (ii) any inaccuracy in any representation or breach of any warranty of Seller set forth in Article 6, (iii) the environmental condition of any oil, gas and mineral leases and any other properties, including, but not limited to, gas plants and treatment facilities in which any of the Corporations or their respective predecessors previously owned an interest but in which the Corporations or any of their respective predecessors no longer own an interest as of the Closing Date, (iv) the environmental condition of any Leased Properties, Oil, Gas and Mineral Leases, Producing Properties, Properties or Related Facilities as set forth in the schedule to Section 6.09 or as assumed by Seller pursuant to Section 11.04, but excluding from this indemnification claims for violations of any environmental laws that would not have been a violation of the Environmental Laws, as defined:

(v) all Third Party Claims for unpaid royalties, revenue payments or tax payments attributable to periods or transactions which occurred prior to the Closing Date and including, but not limited to, such claims by mineral owners, working interest owners, or taxing authorities arising out of gas plant assessments, contractual settlements of take-or-pay claims, gas purchase contract buy-downs, government pricing regulations or like occurrences, (vi) all other Third Party Claims, except those arising out of the litigation listed in the schedule to Section 6.05 and not listed in Section 13.06 and except as otherwise provided in this Section and except for such as are assumed by Purchaser hereunder (vii) any employment related matters which have not been assumed by Purchaser pursuant to the terms and provisions of this Agreement, (viii) any claims relating to Title Variances as provided in Section 9.07(q)(ii), (ix) any indemnifiable tax claims as set forth in Article 17 and (x) the rents, costs, charges and expenses for leases covering office space of the Corporations located in Oklahoma City, Oklahoma (the"Oklahoma City Office").  It is agreed by the parties that the Corporations may continue to occupy said Oklahoma City Office through May 31, 1993 upon payment of the same rental rate as set forth in said leases (for which payments Seller shall not be liable) and thereafter on like terms if such Oklahoma City Office space remains available, it being recognized that Seller will attempt to renegotiate said lease and if successful, said space will not be available after May 31, 1992.  Purchaser will indemnify and hold Seller and Grace harmless from all liabilities in connection with said lease other than for rents, costs, charges and expenses.    Specifically excluded from the foregoing indemnities are claims relating to the environmental condition of any Oil, Gas and Mineral Leases and any other properties owned by the Corporations as of the Closing Date which were inspected by Purchaser and for which Purchaser assumed responsibility pursuant to Section 11.04.  Provided, however, that the immediately preceding sentence

shall not be deemed to affect the indemnity provided by Seller and Grace pursuant to Section 13.03(a)(iv).

(b)    Seller's and Grace's obligation to indemnify Purchaser under Section 13.03(a)(i),(ii),(vi),(vii),(viii) and (x) shall expire and be of no further force and effect on the third anniversary of the Closing Date, except with respect to claims Purchaser has  asserted against Seller in writing, setting forth with reasonable specificity the nature of such claim, on or before such date.

(c)    Seller's and Grace's obligation to indemnify Purchaser under Section 13.03(a)(v) shall expire and be of no further force and effect on the fifth anniversary of the Closing Date, except with respect to claims Purchaser has asserted against Seller in writing, setting forth with reasonable specificity the nature of such claim, on or before such date.

(d)    Seller's and Grace's obligation to indemnify Purchaser under Section 13.03(a)(ix) shall expire and be of no further force and effect on the tenth anniversary date of the Closing, except (i) to the extent Seller or Grace has tolled the running of the statute of limitations by written agreement with a Governmental Authority, in which event Seller's and Grace's obligation to indemnify will be extended by the period of tolling, and (ii) except with respect to claims Purchaser has asserted against Seller in writing, setting forth with reasonable specificity the nature of such claim, on or before such date.

(e)    Seller's and Grace's obligation to indemnify Purchaser under Section 13.03(a)(iii) and (iv) shall continue without limitation of time.

13.04    Limitations.

(a)    Notwithstanding the provisions contained herein and subject to the further provisions of Section 9.07 regarding Title Defects, Seller and Grace shall have no liability to indemnify Purchaser or the Corporations for any claim under Section 13.03 unless the  amount of such individual claim exceeds $25,000



and the aggregate of such individual claims in excess of $25,000 exceeds $250,000, at which point the aggregate of all such claims shall be subject to such indemnification.

(b)  The dollar threshold and limitations set forth in this Section have been negotiated for the special purposes of the provisions in which they appear, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the transactions contemplated by this Agreement under which a level of materiality might be an issue.

13.05    <u>Defense of Third Party Claims</u>.  Purchaser shall notify Seller in writing promptly after learning of any Third Party Claims or claim under Section 13.06.  It shall be a necessary condition of any claim by Purchaser for indemnification under this Article with respect to any Third Party Claims or claim under Section 13.06, that Purchaser tender the defense thereof (including control over all negotiation, trial, appeal or other proceedings) to Seller.  If Purchaser does not so tender such defense within 30 days of learning of such Third Party Claims or claim under Section 13.06, Purchaser shall be deemed to have waived all rights to indemnification or payment with respect to such Third Party Claims or claim under Section 13.06.  Seller may undertake such defense and assume responsibility for payment of all related Litigation Expenses by notice to Purchaser not later than 10 days after receipt of a notice that the defense is tendered to it.  Failure by Seller to so notify Purchaser that it will undertake such defense and assume all related Litigation Expenses shall be deemed to be a waiver of Seller's right to undertake such defense.  If Seller undertakes defense of any Third Party Claims or claim under Section 13.06, Purchaser shall cooperate with Seller and its counsel in the investigation and defense thereof, and may participate in such investigation and defense, but Seller shall retain control of the



negotiation, tactics, trial, appeals and other matters and proceedings related thereto, provided, however, that Seller shall not undertake the settlement of any Third Party Claims or claim under Section 13.06 that will adversely affect the ongoing operations of or revenues derived from any asset of the Corporations without the prior written consent of Purchaser. If Seller does not undertake the defense of any Third Party Claims or claim under Section 13.06, Purchaser may undertake such defense and Seller shall cooperate with Purchaser and its counsel in the investigation and defense thereof and Seller and Grace shall assume responsibility for payment of all related Litigation Expenses. Purchaser shall permit Seller, at Seller's own expense, to participate in the investigation and defense thereof, but Purchaser shall control such investigation and defense, as well as the negotiation, tactics, trial, appeals and other matters and proceedings related thereto. Purchaser and Seller agree to make available to each other, their



counsel and other representatives, all information and documents available to them which relate to any Third Party Claims or claim under Section 13.06, and to render to each other such assistance as may reasonably be required in order to ensure the proper and adequate defense of such Third Party Claims or claim under Section 13.06. Except pursuant to a final judgment rendered thereon, Purchaser shall not pay or settle any Third Party Claims or claim under Section 13.06, whether or not any action or proceeding has been commenced thereon, without the prior written consent of Seller. If Purchaser pays or settles any Third Party Claims or claim under Section 13.06 prior to a judgment thereon without such consent, Purchaser shall be deemed to have waived all rights to indemnification or payment with respect to such Third Party Claims or claim under Section 13.06.



13.06     Specific Indemnities by Seller and Grace.

(a)     Notwithstanding the provisions of Sections 13.03 and 13.04, Seller and Grace shall indemnify Purchaser and the Corporations and save and hold Purchaser and the Corporations harmless from and against any Damages suffered by the Corporations or Purchaser arising out of the following litigation:

(i) Slane, et al. v. Exxon Corp., et al. (including GPC) - Cause No. 92-C-241-B, filed in the United States District Court for the Northern District of Oklahoma.

(ii) Cole v. Phillips Petroleum Co., et al. (including GPC) - Cause No. 90-17868, filed in the 11th Judicial District Court of Harris County, Texas.

(iii) Alford, et al. v. Estate of Felton L. Leggett, et al. (including GPC).

(iv) Williamson, et al. v. Grace Petroleum Corp., et al. (including GPC).

(v) Blackburn, et al. v. Grace Petroleum Corp., et al.

(vi) Cheyenne-Arapaho Tribes of Oklahoma v. United States of America, et al.

(vii) HBOP, Ltd., v. W. R. Grace & Co, et al. (including GPC)

(viii) Schulte, et al. v. Apache Corporation

(ix) McCollum v. Apache Corp., et al. (including GPC).

each as more particularly described in the schedule to Section 6.05. Seller shall retain all responsibility for and shall have sole control over the settlement, negotiation, tactics, trial, appeals and other matters and proceedings related thereto. Purchaser and GPC shall make available to Seller all information, documents and personnel that Seller may reasonably request in order to assist Seller in and ensure the proper and adequate defense of such litigation.

(b)     Seller and Grace shall indemnify Purchaser and save and hold Purchaser harmless from and against any COBRA Claims.





(c)    Seller and Grace shall indemnify Purchaser and save and hold Purchaser harmless from and against any claims asserted by any employee, former employee or dependent or any Governmental Authority which arise out of the Employee Benefit Plans.

(d)    Seller and Grace shall indemnify Purchaser and save and hold Purchaser harmless from and against all liabilities set forth in Section 5.04.

13.07    Consequential and Lost Profit Damages.    Except to the extent awarded to a third party against either the Corporations, Seller or Purchaser, neither party shall seek consequential damages or damages for lost profits in any claim for indemnification under this Article, nor shall it accept payment of any award or judgment to the extent that such award or judgment rendered in favor of one party against the other party includes consequential damage or damages for lost profits.



### ARTICLE 14.

### Cooperation in Various Matters

14.01    Mutual Cooperation.    Each party to this Agreement shall cooperate with the other party, which cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees, as reasonably requested by such other party in connection with the prosecution or defense of any claims or other matters relating to the Corporations or their assets.

14.02    Preservation of Purchaser's Files and Records.    For a period of six years after the Closing, Purchaser shall preserve all files and records relating to the Corporations that are less than six years old, shall allow Seller or its designee access to such files and records and the right to make copies and extracts therefrom at any time during normal business hours and shall not dispose of any thereof; provided, that during the sixth year after the Closing, Purchaser shall





give Seller written notice of its intention to dispose of any part thereof upon expiration of said six (6) year period, and Seller may, within a period of sixty (60) days after receipt of said notice, notify Purchaser of Seller's desire to retain one or more of the items to be disposed of. Purchaser shall, upon receipt of such notice from Seller, at Seller's expense, deliver to Seller the items specified in Purchaser's notice to Seller which Seller has elected to retain..

14.03    Preservation of Seller's Files and Records. For a period of six years after the Closing, Seller shall preserve all files and records in Seller's possession relating to the Corporations that are less than six years old, shall allow Purchaser access to such files and records and the right to make copies and extracts therefrom at any time during normal business hours, and shall not dispose of any thereof.



14.04    Preparation of Reports, etc. Purchaser shall cooperate and cause its employees to cooperate with Seller in the preparation, in accordance with Seller's instructions, of financial and other reports and statements relating to the Corporations for periods ending on or prior to the Closing Date.

14.05    Amendment of Guaranteed Agreements, etc. Without the prior written consent of Seller, which consent may be granted or refused at Seller's discretion, Purchaser shall not, and shall not permit any of the Corporations, to amend, modify or extend the term of any agreement or other arrangement under which any of Seller Group has any liability, whether by guaranty or otherwise.

14.06    Press Releases. Either party shall use reasonable efforts to allow the other to review the proposed language of any press release or public announcement with respect to this Agreement or the transactions contemplated hereby, and shall cooperate with the other in resolving any disagreements that they may have regarding any such proposed language, provided, however, that in



no press release issued by either party will the identity of Purchaser or any of Purchaser's affiliates be disclosed.

    14.07    <u>Administration of Accounts Receivable.</u>

    (a)  No later than March 15, 1993, and upon reasonable request thereafter, Purchaser shall deliver to Seller a listing of any and all accounts receivable which Purchaser believes at that time may not be collectible, together with supporting detail.

    (b)  Cash payments received by Purchaser subsequent to Closing for accounts receivable as of December 31, 1992 which have not, or are not specifically identifiable as to what invoice or period payment is applicable shall be applied to the oldest outstanding accounts receivable balance.

    (c)  Purchaser shall not settle disputed accounts receivable balances as of November 30, 1992 for less than 95% of such balance without the prior consent of Seller.

ARTICLE 15.

<u>Expenses; Termination of Services; Change of Name</u>

    15.01    <u>Expenses.</u>  Each party to this Agreement shall pay all expenses incurred by it or on its behalf in connection with the preparation, authorization, execution and performance of this Agreement, including, but not limited to, all fees and expenses of agents, representatives, counsel and accountants engaged by it, except that Purchaser shall be solely responsible for (a) the cost of obtaining title insurance with respect to the Properties or Producing Properties; and (b) the costs and expenses incurred in connection with obtaining all permits and licenses required by Purchaser or any of the Corporations to continue their businesses after the Closing.

-61-



15.02    <u>Termination of Seller Services</u>.  All contracts, agreements, commitments or other arrangements, whether written or oral, and whether express or implied, pursuant to which Seller or any of its affiliates provides legal, financial, accounting, insurance or other services to the Corporations shall be terminated as of the Closing.  Purchaser shall execute and deliver to Seller, at Seller's request, documents necessary or desirable to release Seller and any such affiliate from any obligations with respect to such terminated contracts, agreements, commitments and arrangements and to otherwise confirm such termination.

15.03    <u>Broker's Fees</u>.  Each party to this Agreement shall hold the other party harmless with respect to any broker's, finder's or other similar agent's fee with respect to the transactions contemplated hereby claimed by any broker, finder or similar agent engaged, employed by or otherwise acting on behalf of the indemnifying party.



15.04    <u>Use of Grace Name</u>.  Immediately after the Closing, Purchaser shall take all necessary actions to cause (a) GPC to change its corporation name to exclude the name "Grace" or any variation thereof, and (b) the Corporations to cease using the "Grace" name on any of their assets or properties (including printed forms) or in connection with their operations.  Notwithstanding the foregoing, the Corporations shall be permitted to continue to use the "Grace" name on the Related Facilities for a period of six months after the Closing, but only to the extent it is not practicable to remove or cover-up the "Grace" name therefrom.

ARTICLE 16.

Notices

16.01    <u>Procedure and Addresses</u>.  All notices, requests, demands and other communications required or permitted to be given hereunder shall be

-62-

deemed to have been duly given if in writing and delivered personally or by facsimile transmission or courier service, at the following addresses:

If to Seller:

> Two Galleria Tower
> Suit 1500
> 13455 Noel Road
> Dallas, Texas 75240-6681
> Attention: Legal Division
> Facsimile number:       (214) 772-0215
> Confirmation number: (214) 770-0200

With a copy to:

> W. R. Grace & Co.
> One Town Center Road
> Boca Raton, Florida 33486-1010
> Attention: Secretary
> Facsimile number:       (407) 362-1635
> Confirmation number: (407) 362-1645

If to Purchaser:

> Samson Investment Company
> Two West Second Street
> Tulsa, Oklahoma 74103
> Attention: C. Philip Tholen
> Facsimile number:       (918) 583-0829
> Confirmation number: (918) 583-1791

With a copy to:

> Samson Investment Company
> Two West Second Street
> Tulsa, Oklahoma 74103
> Attention: Jack A. Canon
> Facsimile number:       (918) 587-6018
> Confirmation number: (918) 583-1791

16.02    <u>Change of Notice Address</u>. Any party may change the address to which such communications are to be directed to it by giving written notice to the other party in the manner provided in Section 16.01.



# ARTICLE 17.

## Tax Matters

**17.01**     <u>Certain Non-Income Tax Matters.</u>  (a)  Purchaser shall pay all sales, use, transfer, stamp, conveyance, value added or other similar taxes, duties, excises or governmental charges imposed by any taxing jurisdiction, domestic or foreign, and all recording or filing fees, notarial fees and other similar costs of Closing with respect to the transfer of the Shares pursuant to this Agreement. Purchaser, with respect to such taxes, shall timely prepare and file, or shall cause to be timely prepared and filed with the appropriate Governmental Authority all tax returns, reports and forms that are required and due to be filed after Closing Date and to pay, or cause to be paid all taxes due with respect to such returns, reports and forms.  This Section 17.01 has no application to the payment of any taxes on income or capital assessed by any Governmental Authority.

**17.02**     <u>Income Taxes - Operations on or Before Closing Date</u>.  Seller shall be liable for any and all federal, state and foreign income taxes and franchise taxes which in whole or in part are based on or measured by income ("Income Taxes") applicable to the Corporations' operations with respect to all periods occurring on or before Closing Date as follows:

(a)     With respect to any taxable period of the Corporations which ends on or before Closing Date, Seller shall timely prepare and file, or shall cause to be timely prepared and filed, with the appropriate Governmental Authority, any and all Income Tax returns, reports and forms that are required and due to be filed with respect to such taxable period (whether or not the filing date for any taxable period occurs on or after Closing Date), and to pay, or cause to be paid, any and all Income Taxes (including any interest and penalties thereon) due with respect to such Income Tax returns, reports and forms.  Purchaser shall provide or cause to be provided to Seller any data, reports, copies of prior Income Tax returns or other

-64-

information, shall make available to Seller such personnel of Purchaser or the Corporations, and shall cooperate and cause the Corporations to cooperate with Seller, in order to enable Seller to fulfill its obligations under the preceding sentence. Any Income Taxes (including any interest and penalties thereon) reflected in such Income Tax returns, reports and forms which were not actually paid by the Corporations or Seller prior to Closing Date and related to any time period prior to January 1, 1993 shall be paid by Seller directly to the appropriate Governmental Authority and there shall be no liability for such Income Taxes (or asset for a refund of such Income Taxes) utilized in determining Net Realizable Assets pursuant to Sections 5.02 and 5.03 hereof. Seller shall determine the amount of such Income Taxes (but excluding any interest and penalties thereon) related to the period of time from January 1, 1993 through the Closing Date, advise the Purchaser of the computation thereof, and such amount shall be included as an Asset in determining Net Realizable Assets pursuant to Sections 5.02 and 5.03.

(b)     With respect to any taxable period of the Corporations which ends after Closing Date and which taxable period encompasses time periods occurring both before and after Closing Date, Purchaser shall timely prepare and file, or shall cause to be timely prepared and filed, with the appropriate Governmental Authority, any and all Income Tax returns, reports and forms that are required and due to be filed with respect to such taxable period, and to pay, or cause to be paid, all Income Taxes (including any interest and penalties thereon) due with respect to such returns, reports and forms. For the purposes of determining Net Realizable Assets pursuant to Sections 5.02 and 5.03, Seller shall estimate the amount of such Income Taxes (but excluding any interest and penalties thereon) accruing during the time period occurring on or before the December 31, 1992, and

such amount shall be included as a liability in determining Net Realizable Assets pursuant to Sections 5.02 and 5.03.

(c)    Purchaser will pay or will cause to be paid to Seller any and all refunds of Income Taxes (including any interest thereon) received by Purchaser, or any affiliate of Purchaser, after Closing Date and attributable to Income Taxes described in Section 17.02(a) (including any interest thereon) previously paid to the appropriate Governmental Authority by either Seller or the Corporations (or any predecessor or affiliate of Seller or the Corporations) with respect to all taxable periods ending on or before Closing Date. Such payment will be made by check to Seller within ten days after Purchaser's receipt of any such Income Tax refund (including any interest thereon) from the appropriate Governmental Authority.

(d)    In the event of a proposed adjustment by any appropriate Governmental Authority to increase any Income Taxes described in Section 17.02(a) incurred (including any interest and penalties thereon) by the Corporations for any taxable period ending on or before Closing Date and for which Seller or the Corporations previously filed the related Income Tax return, Purchaser will promptly notify Seller of such proposed adjustment, and Seller, if it so elects, and at its own expense, may contest such adjustment with the appropriate Governmental Authority on behalf of the Corporations. Any additional Income Taxes (including any interest and penalties thereon) which become due and payable as a result of such adjustment will be indemnifiable pursuant to the provisions of Section 13.03 hereof.

17.03    Income Taxes - Operations Subsequent to Closing Date. Purchaser shall be liable for any and all Income Taxes applicable to the Corporations' operations with respect to all periods occurring subsequent to Closing Date as follows:

(a) With respect to any taxable period of the Corporations which commences subsequent to Closing Date, Purchaser shall timely prepare and file, or shall cause to be timely prepared and filed, with the appropriate Governmental Authority any and all Income Tax returns, reports and forms that are required and due to be filed with respect to such taxable periods, and to pay, or cause to be paid, any and all Income Taxes (including any interest and penalties thereon) with respect to such Income Tax returns, reports and forms. Any Income Taxes (including any interest and penalties thereon) due with respect to such Income Tax returns shall be paid by Purchaser directly to the appropriate Governmental Authority.

17.04    Income Taxes Resulting From This Transaction. (a) Purchaser is eligible to and shall make a timely and effective election under Section 338(g) of the Code, with respect to the purchase of the Shares hereunder. Further, both Seller and Purchaser are eligible to and shall make or shall cause to be made a timely and effective election under Section 338(h)(10) of the Code (the "Section 338(h)(10) Election"). Purchaser and Seller agree that neither of them will take, or permit their affiliates to take, any action to modify or revoke such elections without the express consent of the other.

(b) Not later than July 1, 1993, Purchaser will deliver to Seller a completed Internal Revenue Service Form 8023, and the required schedules thereto ("Form 8023"), providing for the Section 338(h)(10) Election. Provided that the information on said Form 8023 is, in the reasonable determination of Seller, correct and complete in all material respects, Seller will, within fifteen (15) days thereafter, execute and redeliver said Form 8023 to Purchaser. If any changes or supplements are required to the Form 8023, Seller and Purchaser will promptly agree upon and make such changes. Seller and Purchaser will each

-67-

timely file the Form 8023, and any required supplements thereto, and will provide assurance to each other that they have done so.

(c)    Any Income Tax liabilities incurred as a result of the Section 338(h)(10) Election will be the responsibility of Seller, and the provisions of Section 17.02(a) and Section 17.02(b) of this Agreement shall apply.

17.05    Income Taxes on Divestiture.    Any Income Tax liabilities incurred as a result of the divestiture of certain assets of the Corporations pursuant to Section 9.05 will be the responsibility of Seller, and the provisions of Section 17.02(a) and 17.02(b) shall apply.

17.06    Specific Tax Undertakings.    If Grace or any affiliate of Grace takes any "protective carryover basis election" under Section 338 of the Code with respect to any purchase of corporate stock of any entity other than GPC or the GPC subsidiaries which election, in order to be valid, must be joined in by such member, Purchaser shall cause GPC and the GPC subsidiaries to join in such election and execute such forms and take such other action as may be required therefor.

ARTICLE 18.

General

18.01    Entire Agreement.    This Agreement and the other agreements, documents and instruments being delivered at the Closing set forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings relating to the subject matter hereof, whether written or oral.

18.02    No Other Representations, etc.    No representations, promise, inducement or statement of intention relating to the transactions contemplated by this Agreement has been made by or on behalf of any party hereto which is not set forth in this Agreement.

-68-



18.03    Headings. The Article and Section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

18.04    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas, excluding the conflict of laws provisions thereof that would otherwise require the application of the law of any other jurisdiction, except that with respect to matters regarding title to real property, the same shall be governed by the laws of the state in which such property is located.

18.05    Counterparts. This Agreement may be executed in multiple counterparts (including counterparts executed by one party), each of which shall be an original, but all of which shall constitute a single agreement.

18.06    Binding Agreement; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but this Agreement shall not be assignable by either party without the prior written consent of the other party.

18.07    Amendment. This Agreement may be amended only in a writing executed by the parties hereto which specifically states that it amends this Agreement.

18.08    No Waiver. Failure of any party to insist upon strict observance of or compliance with any term of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such observance or compliance with the other terms hereof, or in the future.

18.09    U.S. Dollars. Except for the dollar amounts referenced in Sections 5.03(l) and 5.03(m), All dollar amounts set forth or referenced herein (including, but not limited to Sections 1.28, 5.02 and 5.03) are deemed to be

expressed in U.S. currency. All foreign currency equivalents shall be converted to U.S. currency utilizing official conversion rates as of December 31, 1992.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

GRACE ENERGY CORPORATION

By: _____

F. L. Ryan
Vice President


SAMSON INVESTMENT COMPANY

By: _____

C. Philip Thalen
Executive Vice President

W. R. GRACE & CO.-CONN.

By: _____
J. R. Wright, Jr.
Vice Chairman