# **Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **December 13. 2010 Agenda Item 5** |
| | ) | **Related to Docket No. 25726** |

## ORDER AUTHORIZING THE DEBTORS TO
## ACQUIRE ASSETS OF SELLER, INCLUDING
## LIMITED LIABILITY COMPANY INTEREST IN GR 2008 LLC

This matter coming before the Court on the Debtors' (i) *Motion For an Order Authorizing the Debtors to Acquire Assets of Seller, Including Limited Liability Company Interest in GC 2008 LLC.* (the "Motion") and (ii) the *Certificate of Counsel Regarding Order and Revised Asset Purchase Agreement Regarding Debtors' Motion to Acquire Assets of Seller, Including Limited Liability Company Interest in GR 2008 LLC* (the "Certificate") [2]; the Court having reviewed and considered the Motion and Certificate; the Court finding that: (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-I Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f7kla Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd, G C Limited Partners I, Inc. (Ok/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f7kla Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holding!;, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f7kla GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (Ok/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (Ok/a British Nursing Association, Inc.), Remedium Group, Inc. (Ok/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and  H-G Coal Company.

[2]    Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Motion or the Certificate, as applicable.

proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) the relief requested therein is in the best interest of the Debtors and their estates, (iv) the relief requested is proper under 28 U.S.C. §§ 105(a) and 363(b), and (v) no further notice or hearing on the Motion being required; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED, FOUND, AND DETERMINED THAT:

1.     The Motion is hereby granted in its entirety.

2.     The Debtors are authorized to enter into the Revised APA and the Transaction Documents described therein and acquire all or substantially all of the assets of Seller, including Seller's limited liability interest in GR 2008 LLC, on substantially the terms and conditions described in the Motion and the Revised APA attached hereto.

3.     The Debtors are authorized to take any additional reasonable actions that are necessary to consummate the transactions contemplated by the Motion and the Revised APA.

4     No further Bankruptcy Court approval is required for any consent requirements of the Debtors for the transactions specified in the Revised APA.

5.     The Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order, the Revised APA and all transactions contemplated thereunder.

6.     This Order shall be effective and enforceable immediately upon its entry and its provisions shall be self-executing and shall not be stayed under Bankruptcy Rule 6004(h).

Dated: _____, 2010

                                        _____
                                        Honorable Judith K. Fitzgerald
                                        U. S. Bankruptcy Judge

2

*THIS IS A <u>DRAFT AGREEMENT ONLY</u> AND DELIVERY OR DISCUSSION OF THIS DRAFT AGREEMENT SHOULD NOT BE CONSTRUED AS AN OFFER OR COMMITMENT WITH RESPECT TO THE PROPOSED TRANSACTION TO WHICH THIS DRAFT AGREEMENT PERTAINS. THE CONTENTS ARE <u>SUBJECT TO A FULL DUE DILIGENCE REVIEW</u> OF THE SUBJECT BUSINESS AND THE CONFIRMATION OF THE KEY ASSUMPTIONS MADE BY GRACE. NOTWITHSTANDING THE DELIVERY OF THIS DRAFT AGREEMENT OR ANY PAST, PRESENT OR FUTURE APPROVALS BY THE MANAGEMENTS, BOARDS OF DIRECTORS OR STOCKHOLDERS OF ANY PARTY TO THE PROPOSED TRANSACTION (OR ANY RELATED PERSON OR ENTITY) OR ANY OTHER PAST, PRESENT OR FUTURE WRITTEN OR ORAL INDICATIONS OF ASSENT OR AGREEMENT, OR INDICATIONS OF THE RESULTS OF NEGOTIATIONS, NO PARTY TO THE PROPOSED TRANSACTION (AND NO PERSON OR ENTITY RELATED TO ANY SUCH PARTY) WILL BE UNDER ANY LEGAL OBLIGATION WITH RESPECT TO THE PROPOSED TRANSACTION OR ANY SIMILAR TRANSACTION, AND NO OFFER OR BINDING COMMITMENT, UNDERTAKING, ESTOPPEL OR OBLIGATION OF ANY NATURE WHATSOEVER SHALL BE IMPLIED IN FACT, LAW OR EQUITY, UNLESS AND UNTIL THE FORMAL AGREEMENT PROVIDING FOR THE TRANSACTION HAS BEEN EXECUTED AND DELIVERED BY ALL PARTIES THERETO.*

# ASSET PURCHASE AGREEMENT

### Dated December __, 2010

### Between

## [NAME REDACTED] LLC

### and

## GR 2008 LLC

### and

## W. R. GRACE & CO.-CONN.

*DRAFTv1 11/22/2010*

**ASSET PURCHASE AGREEMENT**

ASSET PURCHASE AGREEMENT (the "Agreement") dated December ___, 2010, by and between [NAME REDACTED], LLC, an Ohio limited liability company (the "Seller"), and GR 2008 LLC, a Delaware limited liability company ("JV"), and W. R. GRACE & CO.-CONN., a Connecticut corporation ("Grace") (JV and Grace herein also jointly referred to as the "Buyers").

In consideration of the mutual representations, warranties, consideration, covenants and agreements herein contained, the parties hereto agree as follows:

1.     DEFINITIONS

1.01   Definitions.

For purposes of this Agreement the following defined terms have the meanings set forth in this Article.  All Article and Section numbers, and schedule and Exhibit references, used in this Agreement refer to Articles and Sections of this Agreement, and schedules and Exhibits annexed hereto or delivered simultaneously herewith, unless otherwise specifically described.

"Affiliate" of a specified Person means any other Person which directly or indirectly Controls, is Controlled by, or is under common Control with, the specified Person.

"Adjusted Closing Purchase Price" means the Closing Purchase Price, minus the amount by which the Closing Working Capital is negative,  payable as provided herein.

"Ancillary Agreements" means the following agreements:

- Non-Competition Agreements as further defined in Section 3.04 (d)

Assigned Patents shall mean all patent applications by Seller relative to the Subject Business, in particular without limitation the patent applications set forth in **Schedule 1C(i),** together with any and all rights arising out of and in relation to such patent applications.

"Assumed Liabilities" shall have the meaning set forth in Section 2.03.

"Buyers" has the meaning given such term in the initial paragraph of this Agreement.

2

"Buyers Entity" means each of Buyers and their Affiliates.

"Buyers Claim" has the meaning given such term in Section 10.05(a).

"Claim" has the meaning given such term in Section 10.02(b).

"Closing" means the actions to be carried out as described in Sections 3.03 and 3.04.

"Closing Date" means [].

"Closing Working Capital" has the meaning given such term in Section 4.02(b).

"Closing Purchase Price" has the meaning given such term in Section 2.02 (a)

"Closing Statement" has the meaning given such term in Section 4.04.

"Closing Transfer Documents" means the instruments and documents for the transfer of the Subject Assets described in Section 3.03.

"Competition" shall mean any activity, including but not limited to the setting up or management of, consulting to, participation in any way in enterprises that are active in the field of process control technology for the production and manufacturing in the concrete, aggregates and cement markets. Without prejudice to the generality of the foregoing, such activities shall include the development, manufacturing, sale and marketing of a System.

"Contract" means any contract, agreement, commitment or other obligation, whether or not in writing, including any amendment, modification or supplement thereof.

"Control" of a specified Person means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract, or otherwise, and in any event shall include ownership of voting securities of such Person having a majority of the voting power of the voting securities of such Person.

"Damages" has the meaning given such term in Section 10.02(a).

"Earn-Out Purchase Price" shall have the meaning given such term in Section 2.02 (c).

"Excluded Assets means Seller's: (i) minute book, (ii) Membership Interests records, and income tax returns, accounting records and related files pertaining to accounting periods prior to the Closing Date provided, however, that Buyers shall have received true and complete copies of all such documents as

they pertain to the Subject Business and/or are relevant for purposes of the transaction contemplated in this APA.

"Environmental Law" means any Law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, that relates to or otherwise imposes liability, obligations, or standards with respect to pollution, the protection of the environment, or the protection of human health or safety.

"Financial Schedules" has the meaning given such term in Section 5.03.

"Financial Schedule Date" has the meaning given such term in Section 5.03.

"Governmental Authority" means the government of the United States of America, any state of the United States of America, any other sovereign country, the European Union; any political subdivision of any of the foregoing; or any court or other tribunal, agency, board, bureau, department or commission of any of the foregoing.

"Governmental License" means a lease, license or permit granted by or obtained from a Governmental Authority.

"Holdback Amount" has the meaning given such term in Section 3.03(b).

"Indemnified Liabilities" means all debts, liabilities and obligations of Seller and the Subject Business including without limitation any debts, liabilities and obligations of [NAME REDACTED] Finance LLC, existing at the Closing Date or arising after the Closing Date other than the Assumed Liabilities, with respect to events occurring, or states of affairs existing, prior to or on the Closing Date, including, without limitation, product liability, infringement liability, or warranty liability and obligations for finished goods manufactured on or prior to the Closing Date, environmental liability and obligations (including natural resource damages) for releases or spills at any location of materials, substances or wastes associated with the Subject Business on or prior to the Closing Date, and liability and obligations for acts or omissions occurring, or states of affairs existing, on or prior to the Closing Date in violation of any Law.

"Key Employees" shall mean [NAMES REDACTED]

"Law" means any federal, state, local, municipal or other law, statute, constitution, principle of common law, ordinance, code, decree, directive, order, rule or regulation of any Governmental Authority.

"Lease" shall mean that certain Lease Agreement dated April 1, 2005 between Louis E. Moorman and Dorothy J. Moorman, as Lessors, the Seller, as Lessee and [NAMES REDACTED] as Guarantors, for premises located at 4992 Rialto Road, West Chester, Ohio, as extended by Agreement to Renew Lease dated October 22, 2007

4

"Liens" means any and all liens, security interests, mortgages, pledges, encumbrances, agreements or options to buy or sell, and other rights of third parties.

"Litigation Expenses" has the meaning given such term in Section 10.02(d).

"MSDS" shall mean Material Safety Data Sheet.

"Operating Agreement" shall be defined as that Operating Agreement of GR 2008 LLC by and between Seller and Grace dated as of October 6, 2008.

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Proprietary Name" means any trademark, servicemark, trade name, brand name or the like, whether registered or unregistered, and any applications therefor.

"[Name Redacted]" means [NAME REDACTED] Finance, LLC, an Ohio limited liability company wholly owned by the Seller.

"[NAME REDACTED] System" shall mean

(i)    a Slump Meter System including a Slump Meter plus hardware and/or software to enable adjustment of and control over concrete rheology by manual and/or automatic addition of water and/or chemical admixture into the mixing drum; and/or

(ii)    Any device which adjusts and controls concrete rheology the use of which would constitute an infringement of a patent claim granted in the USA or European Patent Offices based on a patent identified in **Schedule 1 C(i)** (the " [NAME REDACTED] Patents" and the "JV Patents"), regardless of the date of grant.

It is understood that the Buyers have sole discretion regarding decisions regarding the filing, prosecution, maintenance, support, enforcement, licensing, assignment, and disposition of patents and patent applications assigned to both or either of the Buyers hereunder.  If Buyers decide to abandon any of the patent applications or any resultant patents, Buyers will notify Seller at least 30 days before abandoning the patent case. Within 10 days of any such notice, Seller may offer advice or information that may be helpful to Buyers to confirm whether or not to allow the patent case to become abandoned.

"Secured Promissory Note" shall be defined as that Secured Promissory Note given to Grace by JV dated October 6, 2008.

"Seller" has the meaning given that term in the first paragraph of this Agreement.

"Seller Group" means Seller Major Equity Interest Holders, Seller and all Affiliates of Seller and any one of these may be referred to as a "Seller Group Member".

"Seller Major Equity Interest Holders" means [NAMES REDACTED].

"Services Agreement" shall be defined as that Services Agreement by and between Seller and Grace dated as of October 6, 2008.

"Shared Assets" means any assets of any Seller Major Equity Interest Holder or any other Person (other than Seller or JV) which are used or have been used in the Subject Business.

"Shared IP" means any patents, inventions, know-how, technology, design rights, database rights, Proprietary Names, and any other intellectual property rights, of Seller or any other Person (other than Seller) which are used or have been used in the Subject Business.

"Slump Meter" shall be defined as a device that measures the energy required for rotating the mixing drum, using hydraulic pressure values, and/or rotation speed values based on movement of the drum or mixing blades as a primary input to permit measurement of slump, DIN flow, slump flow, yield stress, plastic viscosity, and/or thixotropy.

"Software" shall mean sets of coded instructions that control the operation of a computer or similar electronic device and shall encompass the development environment, all product components and modules, as well as the completed product (all source codes as well as object codes) itself.

"Subject Assets" means all the assets, properties and rights of Seller and the Subject Business, including all assets, properties and rights held by [NAME REDACTED] Finance LLC, excluding the Excluded Assets, with respect to the Subject Business, including without limitation the following:

> (a) All cash balances and accounts, cash equivalents, marketable securities and investments, excluding the Closing Purchase Price.

6

(b)     All trade accounts receivable and other amounts due to Seller.

(c)     All deposits.

(d)     The LLC Interests further identified on **Schedule 1A** (the "LLC Interests")

(e)     raw materials, work in process, finished goods, supplies and other inventories, including without limitation those items identified on **Schedule 1B**;

(f)     production machinery and equipment (and related spare parts), laboratory equipment, computers and related hardware and software, furniture, fixtures, tools, supplies, office equipment, vehicles, and other tangible personal property, including without limitation those items identified on **Schedule 1C**;

(g)     (i) invention disclosures, patents and patent applications, the trade names, trademarks, service marks, domain names, design rights (whether registrable, registered or unregistered), database rights, copyrights, rights in software (including all object code and source code), data stored on computers, and any other intellectual property rights, and registrations and applications therefor, and related goodwill, and all records related thereto, including without limitation those items identified on **Schedule 1C(i)**, and related goodwill; (ii) trade secrets, unpatented technology, inventions, know-how and formulae, including without limitation those items identified on **Schedule 1C(ii)**; (iii) technology and trademark license agreements and joint development agreements, including without limitation those items identified on **Schedule 1C(iii)**; and (iv) designs, specifications, construction (e.g., machining, assembly, etc.) and operation methods and procedures, and data thereof, including without limitation those items identified on **Schedule 1C(iv)**; and (v) raw material and finished product formulas, recipes and specifications, customer lists, drawings, designs and models, laboratory records and the like, including without limitation those items listed on **Schedule 1C(v)**; (vi) software including all source codes and databases collected at customers pertaining to the System

(h)     rights under orders, and rights under the Contracts described in Section _____, whether pertaining to periods before or after the Closing Date;

(i)     CE certification documentation and protocols, files, accounting and sales records, marketing materials, including, but not limited to, website content, and general intangibles, including without limitation those items identified on **Schedule 1E;**

(j)     Seller's rights under the Lease; and

(k)     any rights and/or assets pertaining to the System as defined herein to the extent these are not covered by the above.

"Subject Business" means the development, manufacture, sale and marketing of the Systems.

"Subject Business Employees" has the meaning given such term in Section 7.01.

"Subject Intangible Assets" means the assets described in clauses (c) and (f) of the definition of Subject Assets.

"System" shall mean and refer to a system, or any component thereof, comprising hardware and/or software for effectuating, facilitating, implementing, or contributing to, the monitoring and/or control of one or more properties (such as slump or other rheological property) during the production or mixing phases of a cementitious composition and/or status or operation of an apparatus for delivering, monitoring, mixing, or transporting a cementitious composition, during the batching, monitoring, mixing, transportation, and/or placement phases of a cementitious composition delivery or production operation.  Hardware refers to mechanical equipment (including hydraulic), electrical equipment, and/or electro-mechanical equipment. Such equipment may include sensors, connectors, wiring, wireless transmission devices, actuators, pumps, meters and metering devices, pipelines, valves, switches, electronic control devices (e.g., computer processors), visual or audible warning or display devices, and other equipment. Software refers to source code, object code, formulae, algorithms, applications and/or programs for carrying out a mixing process or other function for measuring and/or controlling rheology.

"Tax" or "Taxes" shall mean all taxes, imposts, duties, withholding, charges, fees, levies, or other assessments imposed by any governmental or taxing authority, whether domestic or foreign, including but not limited to any federal, state, local or foreign income, gross receipts, net worth, equity, sales, use, turnover, ad valorem, value-added, excise, environmental, capital, unitary, intangible, franchise, profits, license, withholding, payroll, employment, social

security contribution, national insurance (or similar contributions or payments), excise, severance, stamp, transfer, conveyance, real estate transfer, occupation, premium or property tax, customs duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, fines, penalties and addition to tax or additional amount imposed with respect to such amounts and any obligations under any agreement or arrangements with any person with respect to such amounts.

"Technology" shall mean all Software, circuit board design, circuit board components, circuit board construction know how, sensors, valves, actuators, hoses, connectors, data, data structure, network components, installation know how, engineering change history, and other such knowledge and components required to make, sell and maintain current and future products.

"Third Party Claim" has the meaning given such term in Section 10.02(c).

"Transactions" means the transactions contemplated by this Agreement.

"Transaction Documents" means this Agreement, the Ancillary Agreements, the bills of sale and such other instruments of conveyance and transfer and , the assignment and assumption agreements to be executed and delivered by the respective Parties in accordance with Article 3 , and all other agreements, instruments and documents delivered pursuant to this Agreement.

"USD" means United States Dollars.

"Valuation Time" means [_____ p.m.] U.S. Eastern time on [the day before] the Closing Date.

1.02  <u>General</u>.   All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated.  Any of the terms defined in this Agreement may be used in the singular or the plural.  In this Agreement, unless otherwise specifically stated: "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement as a whole and not merely to the specific Section, paragraph or clause in which the word appears; words importing any gender include the other gender; the term "including" shall mean "including but not by way of limitation."

2.     PURCHASE AND SALE OF ASSETS

2.01   <u>Sale of Subject Business</u>.

9

In reliance on the representations and warranties of the Seller set forth in this Agreement, and on the terms and subject to the conditions of this Agreement, Seller shall sell to Buyers or either one of the Buyers as indicated by them prior to Closing, and the relevant Buyer shall purchase from Seller the Subject Assets, as follows:  At the Closing, Seller shall sell, assign, convey, transfer and deliver all of their right, title and interest in and to the Subject Assets to Buyers, free and clear of all Liens; and in exchange therefor, Buyers shall pay the Purchase Price to Seller in the manner provided in Articles 3 and 4 (subject to the holdback provided for in Article 3).

2.02    Purchase Price.

The Purchase Price shall consist of the Closing Purchase Price (subject to the Purchase Price Adjustment) and the Earn-Out Purchase Price, all as defined below.

(a)    The Closing Purchase Price shall be Seven Million Five Hundred Thousand US Dollars ($7,500,000) in cash.

(b)    The Closing Purchase Price is calculated based on the assumption of a positive Working Capital balance of the Seller at Closing (the "Closing Working Capital"), after the actions described in Clause 3.03 (a) and (b) have been taken. Therefore, the Closing Purchase Price is subject to a downward adjustment, if appropriate, after the review described under Section 4 and in the event that the Closing Working Capital  is negative (the "Purchase Price Adjustment"). The Closing Purchase Price after the Purchase Price Adjustment, if any, shall be referred to as the "Adjusted Closing Purchase Price".

(c)    In addition to the Adjusted Closing Purchase Price, the following additional purchase price shall be paid by Buyers to Seller subject to the terms and conditions described below (the "Earn-Out Purchase Price"):

(aa)    Commencing with the year ending December 31, 2011 and then annually thereafter through the year ending December 31, 2020 (the "Earnout Period") an annual payment equal to the sum of:  an amount, computed as of each December 31 during the Earnout Period, equal to (i) Two Hundred US Dollars ($200) multiplied times the number of [NAME REDACTED] Systems shipped by Buyers - less any [NAME REDACTED] Systems that were shipped after the Closing that have been returned and/or replaced - during each year for the calendar years ending

10

December 31, 2011 through December 31, 2015 and (ii) One Hundred US Dollars ($100) multiplied times the number of [NAME REDACTED] Systems shipped by Buyers - less any [NAME REDACTED] Systems that were shipped after the Closing that have been returned and/or replaced - during each year for the calendar years ending December 31, 2016 through December 31, 2020 and (b) an amount, computed as of each December 31 during the Earnout Period, equal to Twenty-five US Dollars ($25) multiplied times the cumulative number of [NAME REDACTED] Systems shipped by Buyers after December 31, 2011 but each year excluding (x) those [NAME REDACTED] Systems returned and replaced, (y) the [NAME REDACTED] Systems shipped during the most recent year just having ended and (z) any [NAME REDACTED] Systems that were uninstalled from the truck or otherwise were discontinued from use and (c) an amount, computed as of each December 31 during the Earnout Period, equal to Fifty US Dollars ($50) multiplied times the number of Slump Meters shipped during each year - less any Slump Meters that were shipped after the Closing that have been returned and/or replaced - to the extent that such Slump Meters are not sold as part of an [NAME REDACTED] System shipped by Buyers during each calendar year in which case they should not be accounted for twice for purposes of the Earn-Out Purchase Price (collectively, the "Earnout Payments").

(bb)    The Earnout Payments shall be paid by Buyers to Seller within forty-five (45) days of each calendar year-end; the deductions provided for under Section 3.04 (d) (Non-Compete Compensation) shall be made at such time; provided that, the cumulative Earnout Payments shall not exceed Twelve Million US Dollars ($12,000,000).

(cc)    Earnout Payments shall be due to Seller on any [NAME REDACTED] Systems or Slump Meters shipped by any licensee of Buyers or by Buyers, or by their designees if the manufacturing and shipment of such products are subcontracted to an Affiliate or to a third party, whether such products are sold, leased, rented, licensed or transferred to a third party or an Affiliate.

11

(dd)   (ee)  In the event that the Holdback Amount has been used up in its entirety for claims of the Buyers and/or the Holdback Period has expired, Buyers may deduct from the Earn-Out Payments any amount payable to Buyers under this Agreement or any of the ancillary Agreements; provided that once the Parties mutually agree on the amount of such claim to be settled or any such dispute relative to any such claim has been ultimately determined and resolved pursuant to this Agreement or any Ancillary Agreement, Buyers shall pay out any excess amount over the claim amount thus determined that has accumulated.

(ff)   The obligation of Buyers to pay Seller the Earnout Payments shall: (a) be assignable to an Affiliate of the Buyer or other third party and (b) be binding upon any successor or assignee of the relevant Buyer or any purchaser of the [NAME REDACTED] System or Slump Meter product lines; provided, however, that no such assignment shall relieve the Buyer of its obligations hereunder.

(gg)   Seller shall have the right, at its expense, to audit the relevant books and records of the relevant Buyer relating to the calculation of the Earnout Payments; provided that Seller provides the relevant Buyer with thirty (30) days written notice of its intention.  Upon receipt of such written notice,  the relevant Buyer agrees to fully cooperate with Seller during such audit process.

(hh)   Buyers acknowledge – without prejudice to the representations and warranties otherwise expressly given by Seller under this Agreement which shall come into and remain in full force and effect - that neither Seller nor any of the Seller Major Equity Interest Holders is making any representation or warranty to Buyers as to the revenues or profitability to be generated or achieved by the Subject Business after the Closing.

(ii) To the extent that the Earn-Out Obligation requires as part of the " [NAME REDACTED] System" definition that one or several of the [NAME REDACTED] Patents and/or the JV Patents have been granted, the following shall apply: In the event of a specific [NAME REDACTED]

12

Patent or JV Patent being granted at any time during the Earn-Out Period, the [NAME REDACTED] Systems that have been shipped since the Closing the uses and/or components of which are protected by such granted patent, shall be included in the next subsequent annual Earn-Out Payment, to the extent that they have not already been accounted for under the grant of a different patent or another [NAME REDACTED] Systems definition.

2.03    No Liabilities Assumed by Buyers; Exceptions

Buyers shall assume no liabilities of Seller, the Seller Group or the Subject Business, except for the following:

(a)    Trade Accounts Payable

(b)    Warranty obligations not exceeding an aggregate USD 20,000 in accordance with Seller's standard terms and conditions of sale relating to Seller's sales occurring prior to the Closing.

(c)    Lease obligations under the Lease

(d)    Accrued liabilities incurred in the ordinary course of business

all such liabilities listed in detail with description and amount in **Schedule 2.03** to be updated for the Closing as a reference for the post-Closing review and Purchase Price adjustment (the "Assumed Liabilities"). With respect to liabilities of [NAME REDACTED] Finance LLC, the Parties hereto acknowledge that in the event of liabilities  not disclosed in this Agreement including without limitation its schedules, exhibits and attachments, the Buyers' rights under the representations and warranties and indemnifications under this Agreement shall fully apply.

3.    CLOSING DATE; ACTIONS OF THE PARTIES AT THE CLOSING; FURTHER ASSURANCES.

3.01    Conditions to Closing

(a)    Buyers' obligations with respect to the transactions contemplated in this Agreement shall be subject to the fulfillment or waiver – by Buyers – of the following conditions precedent:

(i)    Grace shall have determined in its sole discretion that there are no intellectual property issues that could

13

have a material adverse effect on the Subject Business or prospects thereof.

(ii)    Buyer shall have obtained an extension of the Lease otherwise expiring on April 30, 2011 on a month-by-month basis and allowing for termination at 6 months' notice;

(iii)   Buyer shall have obtained an approval for assignment and assumption of the Lease and of any other agreement which is material to the Subject Business.

(iv)   The relevant boards of Buyers and Seller shall have approved the transaction contemplated in this Agreement.

(b)     Buyers' obligations with respect to the transaction contemplated in this Agreement shall be subject to the fulfillment or waiver by Buyers of the requirement that Seller deliver the documents required under Section 3.03(d) hereof at or prior to the Closing.

3.02    Closing.  The Closing is taking place on the date hereof at [] a.m. Eastern Standard time at the offices of _____.  All of the actions to be taken and documents to be executed or delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all such matters shall be completed.  The Closing shall be deemed effective as of _____ Eastern Standard time on the Closing Date.

3.03    Actions at the Closing.

At the Closing:

(a)     Seller shall deliver to Buyers or as directed by Buyers to either of the Buyers or an Affiliate of a Buyer, duly executed, a bill of sale, patent assignments and other instruments of sale, assignment, conveyance and transfer, in order to vest in Buyers all of Seller's right, title and interest in and to the Subject Assets.

(b)     Buyers shall pay to Seller, USD $7,000,000 (USD seven million) in respect of the Closing Purchase Price, being the Closing Purchase Price minus the Holdback Amount.

14

(c)     Buyers and Seller shall deliver to each other, duly executed, a contract assignment agreement, whereby Seller assigns to Buyers the Contracts and orders as to which such assignment is contemplated by this Agreement, and Buyers agree to perform and fulfill Seller's obligations under such Contract orders which arise with respect to the period after the Closing Date.

(d)     Seller shall deliver to Buyer an assignment and amendment of the Lease, in form and substance satisfactory to Buyer and duly executed by the Lessors thereunder, in which the Lessors (i) consent to the assignment of the Lease to Buyer, (ii) agree that the Lease can be terminated by either Party at any time on 6 months notice and (iii) certify that the Lease is in full force and effect, that there are no defaults by the Lessee, thereunder, that it is holding the security deposit and that the condition of the premises complies with the Lessee's surrender obligations thereunder.

(e)     <u>Holdback</u>.    Buyers shall deposit with a mutually agreed independent escrow agent USD $500,000 (USD five hundred thousand) of the Closing Purchase Price (the "Holdback Amount") at Closing.  The Holdback Amount shall be held and disbursed in accordance with the terms of an Escrow Agreement, in the form of **Exhibit A**.

3.04   <u>CERTAIN FURTHER ACTIONS AT OR PRIOR TO CLOSING:</u>

(a)     At or just prior to the Closing, Grace and Seller shall determine the amount of additional Capital Contributions (as defined in the Operating Agreement) pursuant to Section 7.2 of the Operating Agreement to adequately fund all bona fide liabilities  of the JV outstanding as of the Closing; provided however, such Capital Contributions shall be sufficient, pursuant to the Services Agreement, to fund the payment by the JV of: (a) all invoices for Services Fees (as defined in the Services Agreement) outstanding and payable as of the Closing to Seller or to Grace, (b) all invoices for Services Fees, which were invoiced to the JV after October 6, 2010, outstanding and payable as of the Closing to Grace (c) all third party payables and obligations of the JV, if any, outstanding and payable as of the Closing and (d) the Service Fees due to Grace as of October 6, 2010 under the terms of the Services Agreement and as secured by the Secured Promissory Note.   At or just prior to the Closing, JV shall provide an accounting of the JV, including such JV payables and obligations, in reasonable detail such that Grace and Seller can effectively determine the amount of such agreed upon Capital Contributions.

(b)     At the Closing, the existing agreements by and among Buyers, Grace and Seller, as listed in **Schedule   3.04 (b),** if not previously terminated, shall be terminated unless expressly agreed

otherwise by the Parties and the Parties agree to execute any and all documents to effect such terminations.

(c)     Just prior to the Closing, and as the only exception from the otherwise fully applying covenant not to make any payments outside the ordinary course of the Subject Business Seller shall be permitted to make all payments due under the [NAME REDACTED] LLC 2010 Class C Participation Rights Plan; provided that such payments do not exceed Five Hundred Seventy-one Thousand USD ($571,000) (the "Participation Rights Payments").

(d)     At the Closing, Buyers (as beneficiary) and Seller (and Seller Major Equity Interest Holders and Mr [NAME REDACTED]) shall enter into non-competition agreements (the "Non-Competition Agreements") conforming to the draft attached hereto as **Exhibit B**, whereby Seller and the other signatories agree not to engage in Competition with either of the Buyers for a period of five (5) years from the Closing (the "Non-compete Period").  Consideration for such non-competition agreements shall be an overall amount of Twenty-five Thousand US Dollars ($25,000) per year commencing on December 31, 2011 through December 31, 2015 (the "Non-compete Compensation") which is to be allocated to the signatories in accordance with **Schedule 3.04 (d)**. The payments of Non-Compete Compensation will be subtracted from the annual Earn-Out Payments of the corresponding year. . Non-compete Compensation and any Earnout Payments due will be forfeited, if Seller or any other signatory violates any covenant of the non-competition agreement during the Non-compete Period.

(e)     Prior to Closing, and not later than ten (10) days prior to the Closing Date, Buyers – with express permission by Seller hereby granted – shall submit offers for employment to the Key Employees and subsequently Seller shall negotiate on behalf of Buyers with Key Employees employment agreements between such Key Employees and the Buyers on terms and conditions acceptable to such Key Employees and the Buyers.

(f) After signing hereof, but prior to Closing, Buyers – with Seller's permission - shall offer those employees of Seller listed in **Schedule 3.04 (f)** - other than the Key Employees - employment upon terms and conditions defined by the Buyers, such offers being open for acceptance by the respective employees for three days after receipt.  Each Terminated Employee who accepts an offer of employment from Buyers in accordance with this Section shall become an employee of Buyers effective on the day after the Closing Date; and all such employees shall collectively be referred to herein as "Hired Employees".

(g) Prior to Closing and sufficiently in advance, Seller shall have notified [NAMES REDACTED] as the Holder as defined in that certain warrant issued by the Seller dated December 28, 2005 dated (the "Warrant") of this sale being a Liquidation Event as defined under the Warrant

3.05    Ancillary Agreements; Other Transaction Documents.

At the Closing:

(a)    The parties thereto shall execute and deliver to each other the Ancillary Agreements.

(b)    Seller shall deliver to Buyers the required third-party consents obtained by Seller in accordance with this Agreement.

(c)    Seller shall deliver to Buyers employment agreements of the Key Employees signed by such Key Employees and ready for signature by Buyers on terms mutually agreed by the Buyers and each of the Key Employees.

(d)    Buyers shall deliver to the Seller, and Seller shall deliver to Buyers, certificates signed by its [Secretary or Assistant Secretary] certifying as to (i) the authenticity of its attached [charter documents and (if applicable) by-laws], the due corporate authorization of its execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party (including copies of resolutions of its board of directors and  its  Equity Interest Holders if applicable), and (iii) the incumbency and signatures of the persons signing on its behalf this Agreement and the other Transaction Documents to which it is a party.

(e)    Seller shall deliver to Buyers (i) for each of the four categories of customers, distributors, suppliers and owners of currently installed [NAME REDACTED] Systems of the Subject Business, complete and correct lists, consisting of a list in descending order of revenue and a list in alphabetical order by name, each of which lists includes contact name(s), ship to and bill to addresses, e-mail addresses, and telephone and fax numbers, and also includes notations by _____ advising as to which customers, distributors and owners of currently installed [NAME REDACTED] Systems of the Subject Business that should be contacted immediately following Closing; and (ii) electronic customer master files in Excel format (including at least customer name, address, country of origin, and _____, and electronic vendor master files in Excel format (including at least vendor name, address and terms).

17

3.06    Apportionments.

All charges and other costs of a periodic nature payable in respect of the Subject Business or any of the Subject Assets and which are chargeable by reference to a period commencing before and ending after the Closing, and all sums receivable in respect of the Subject Business or any of the Subject Assets which relate to period commencing before and ending after the Closing Date, shall be apportioned on a time basis pro rata, or by such other means as is appropriate in the circumstances.

3.07    Further Assurances.

At any time and from time to time at and for two years after the Closing, each Party, at the request of any other Party, shall or shall cause its Affiliates to execute and deliver or cause to be executed and delivered all such documents and instruments and take or cause to be taken all such other action as the requesting Party may reasonably deem necessary or desirable in order to carry out the intents and purposes of this Agreement.  In the case of documents and actions that involve Persons other than the Parties or their Affiliates, the obligation of the Party whose action is requested shall be limited to making commercially reasonable efforts to meet the request.

3.08    Conditions of Holdback.

(a)    Seller shall be entitled to receive the Holdback Amount fifteen months after the Closing Date (the Holdback Period"), except that:

(i)    any amount payable to Buyers under this Agreement may be deducted from the Holdback Amount; and

(ii)    If Buyers make a Claim against the Seller under any part of this Agreement , the Escrow Agent may withhold from any Holdback Amount otherwise payable the reasonable value of such Claim, including Litigation Expenses, until such Claim is finally resolved; and if it is finally determined that such Claim is payable in whole or part by Seller, the amount so payable may be deducted from the Holdback Amount.

(b)    If (i) it is finally determined that Buyer is not entitled to any or all of the Holdback Amount in connection with a particular Claim, and (ii) such amount is then payable to Seller under Section 3.08(a), and (iii) the Holdback Amount net of any amounts withheld under Section 3.08(a)(ii) has a positive balance, then the Escrow Agent shall, no later than twenty (20) days after such final determination, pay over to Seller any such amount so withheld under Section 3.08(a)(ii).  Any amount otherwise payable under this subsection (b) that is not paid because of the absence of a positive Holdback Amount balance shall be paid promptly if, when and to the extent that the Holdback Amount balance becomes positive.  Payments under the

18

immediately preceding sentence shall be made in the order in which they would have been paid had there been sufficient positive Holdback Amount balances from which to pay them at the times they first became payable.

(c)     Any payment to Seller under this Section 3.08 shall be paid with interest from the Closing Date to the day before payment at a rate equal to six-month LIBOR for the Closing Date as reported in *The Wall Street Journal* minus 0.125% (12.5 basis points).

(d)     If the Holdback Amount is insufficient to pay any obligation of Seller under this Agreement, the relevant Buyer Claim shall remain in full force and effect and Buyers shall have the right to set off the amount of such obligation against the Earn-Out Payments in accordance with Section 2.02(c)(dd) hereof.

4.     POST-CLOSING ADJUSTMENTS; ADDITIONAL CONSIDERATION

4.01    Closing of Books.

Buyers shall, and representatives of the Seller shall cooperate to, close the books of the Subject Business as of the Valuation Time, all on a going concern basis, and within two weeks after the Closing Date (with such count being rolled back to the Valuation Time using the perpetual inventory records of the Subject Business) determine the Closing Working Capital. This exercise shall include a physical count of the inventories of the Subject Business. Such inventory count shall be taken in accordance with the procedures and principles set forth in the schedule to this Section, and may be observed by independent accountants of both the Buyers and the Seller.

4.02    Definitions.

(a)     The target for the Closing Working Capital shall be a positive balance (the "Target Working Capital")

(b)     "Closing Working Capital" means the balance of the value, as of the Valuation Time, of the following all stated in accordance with US generally accepted accounting principles, as consistently applied by Seller:

   a. All cash balances and accounts, cash equivalents, marketable securities and investments of the Subject Business, excluding the amount of the Closing Purchase Price.
   b. All trade and other accounts receivables of the Subject Business, plus
   c. All prepaid accounts and refundable deposits, plus

    **d.** All the raw materials, work-in-process, finished goods, supplies and other inventories of the Subject Business, computed in accordance with Section 4.03; minus

    **e.** The Assumed Liabilities.

4.03   <u>Computations</u>.

The Closing Working Capital shall be determined in accordance with US generally accepted accounting principles and, where applicable, consistently applied with the accounting principles consistently applied by Seller.

4.04   <u>Closing Statement</u>.

As soon as practicable after the Closing, Buyers shall deliver to Seller a statement (the "Closing Statement") setting forth Buyers' determination of the Closing Working Capital.  Following delivery to Seller of the Closing Statement, Buyers shall give Seller and its independent accountants access to Buyers' work papers to facilitate Seller's review of the Closing Statement.

4.05   <u>Acceptance</u>.

If Seller does not object to the Closing Working Capital Amount shown on the Closing Statement, by written notice of objection delivered to Buyers within 30 days after Seller's receipt of such statement, describing in reasonable detail each of its proposed adjustments to Buyers' determination thereof, then the Closing Working Capital shown on the Closing Statement shall be final and binding on Buyers and Seller.

4.06   <u>Non-Acceptance, Resolution of Disputes</u>.

If Seller objects to the Closing Working Capital shown on the Closing Statement, then Buyers and Seller shall promptly endeavor to agree upon the proper amount of the items in dispute.  If a written agreement determining any disputed item has not been reached within 30 days after the date of receipt by Buyers of Seller's notice of objection thereto, then Buyers or Seller may, by notice to the other, submit for determination by arbitration in accordance with this Section 4.06 the question of whether any adjustments thereto, if any, must be made to Buyers' determination (as such determination may be revised by Buyers) of such amount in order for it to be determined in accordance with the provisions of this Agreement.

    (a)    Any such determination by arbitration shall be made by [BIG FOUR ACCOUNTING FIRM OTHER THAN PARTIES' AUDITORS] (the "Arbitrator") and shall be final and binding on all parties to this Agreement.

    (b)    The fees and expenses of the Arbitrator for any determination under this Article shall be paid by the Party whose final

proposed Closing Working Capital is further off, on a net basis in absolute terms, from the Closing Working Capital as determined by the Arbitrator.

(c)    Nothing herein shall be construed to authorize or permit the Arbitrator to determine (i) any question or matter whatever under or in connection with this Agreement except the determination of what adjustments, if any, must be made in one or more of the items reflected in the Closing Working Capital as shown on the Closing Statement delivered by Buyers in order for the Closing Working Capital to be determined in accordance with the provisions of this Agreement and/or (ii) a final Closing Working Capital that is not in the range between and including the final proposals of Seller and Buyers.    Nothing herein shall be construed to require the Arbitrator to follow any rules or procedures of any arbitration association.

4.07    Payment of Adjustment.

If, after the final determination of the Closing Working Capital the Closing Working Capital is negative, then the Seller shall pay the amount of such deficiency to Buyers.  Any such adjusting payment shall be paid within five days after the final determination of the Closing Working Capital. Any payment to Buyers under this Section 4.07 shall be paid with interest from the Closing Date to the day before payment at a rate equal to six-month LIBOR as of Closing Date as reported in *The Wall Street Journal*]l minus 0.125% (12.5 basis points)..

5.    SELLER'S REPRESENTATIONS AND WARRANTIES

Seller hereby represents and warrants to Buyers as per the date hereof, as per the Closing and/or any date expressly referenced in any of the specific representations and warranties below as follows:

5.01    Corporate Organization.

Seller, JV and [NAME REDACTED] Finance LLC are Limited Liability Companies duly organized and validly existing in good standing under the Laws of Ohio, with full corporate power to carry on the Subject Business as presently conducted, and to own and operate its assets and business and to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is a party.

5.02    No Conflict; Authorization.

(a)    Except as set forth in Part (a) of the schedule to this Section, the execution and delivery by Seller of the Transaction Documents to which it is a party, and the performance of its obligations hereunder and thereunder, will not (i) result in the breach of any of the terms of, or constitute a default under, its constitutive documents or by-laws, or any Contract to which it is a party or by which it or any of its assets may be bound, or (ii)

violate any order, writ, injunction or decree of any court or Governmental Authority.

(b)　　Except as set forth in Part (b) of the schedule to this Section, no consent, approval, order or authorization of, or registration, declaration or filing with, any court or Governmental Authority is required as a prerequisite to the execution and delivery by Seller of the Transaction Documents to which it is a party, and the performance of its obligations hereunder and thereunder.

(c)　　The execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is a party, and the performance of its obligations hereunder and thereunder, have been duly and validly authorized by any and all necessary shareholder, board of directors and other corporate action.　This Agreement has been duly executed and delivered by Seller in accordance with its terms.

(d)　　The execution and delivery by Seller of the Closing Documents at the Closing will effectively convey to Buyers title to all the Subject Assets, free and clear of all Liens.

5.03　Financial.

The schedule to this Section presents certain financial documentation ("Financial Schedules") as described in more detail in (a) – (e) immediately below. Part I of the schedule to this Section presents the basis upon which the Financial Schedules have been prepared and describes the accounting principles and procedures that have been applied.　The Financial Schedules reflect - as regards the projections made as set forth under (e) immediately below, applying best knowledge and due inquiry -　all amounts and all adjustments that are necessary for a fair presentation of the Financial Schedules as of the date of presentation.　All such amounts and adjustments are of a normal recurring nature.

a)　　Part II of the schedule to this section contains (i) a schedule of Working Capital and (ii) a schedule of fixed assets of the Subject Business as of ____, 2010 (the "Financial Schedule Date").

b)　　Part III of the schedule to this Section presents statements of income or operations of the Subject Business for the year ended December 31, 2009 and for the 10 months ended October 31, 2010 as well as projections on the subsequent two months ending December 31, 2010 (the "Income Statements").

c)　　Part IV of **Schedule 5.03** presents the basis upon which the Income Statements have been prepared and describe the accounting principles and procedures that have been applied.　The Income Statements present fairly in all material respects the operating results

of the Subject Business for the year ended December 31, 2009, and for the eleven (11) months ended November 30, 2010 (subject to normal year-end adjustments).

d)      Part V of the schedule to this Section lists specifically each review submitted to Seller by independent accountants in connection with any annual or interim review of the Subject Business.  Seller has delivered to Grace complete copies of all such reports.

e)      Part VI of the schedule to this Section contains unaudited financial statements (balance sheet, profit and loss statement, notes) for [NAME REDACTED] Finance LLC for every full fiscal year since the formation of [NAME REDACTED] Finance LLC, as well as financial reports covering the 11 months between January 1 and November 30, 2010 as well as a projection for the remaining month until December 31, 2010.

f)      With respect to the Subject Business, the aggregate costs and expenses incurred by the Seller since January 1, 2008 in respect of product returns, warranty claims, replacement of defective product or other guaranties or warranties, given in connection with the generation of revenue has not exceeded one percent (1%) of aggregate gross revenues during such period.

5.04    Adequacy of Assets.

Except as set forth in the schedule to this Section, to the best knowledge of Seller, the Subject Assets, provide Buyers with all assets and services necessary to conduct the Subject Business in the manner conducted during the 12 months prior to the Closing, and as of the Closing.

5.05    Shared Assets.

Except as set forth in the schedule to this Section, there are no Shared Assets.

5.06    Absence of Certain Changes.

(a)     Except as specifically set forth in the schedule to this Section, there has not been since January 1, 2009 any occurrence, event or condition that adversely affects or may reasonably be expected to adversely affect the Subject Assets or the Subject Business.

(b)     Since January 1, 2009, there has not been any change in the relationship or course of dealing between the Subject

23

Business and any of its suppliers or customers that adversely affected or may reasonably be expected to adversely affect the Subject Business.

(c)     Since  October 31, 2010 to the Closing Date, with the exception of the permitted Participation Rights Payments, there have been no actions or omissions outside of the ordinary course of business and no dividends or similar payouts have been made to interest holders and their affiliated persons.

5.07    Personal Property.

(a)     Part I of the schedule to this Section sets forth a true and complete list of all machinery and equipment, vehicles and other tangible personal property which are used in the Subject Business.  Except as specifically set forth in the schedule to this Section, Seller has title to all personal property used by the Subject Business, free and clear of all Liens. Except as set forth in Part I of the schedule to this Section, Seller owns all of the fixed assets identified in the schedule to this Section.

(b)     Except as specifically set forth in Part II of the schedule to this Section, all fixed assets used in the Subject Business will be sold to Buyers at the Closing.

5.08    Condition of Property.

Except as set forth in the schedule to this Section, all buildings, offices, and other structures and improvements, and all fixtures, machinery, equipment, vehicles and other tangible personal property used by the Subject Business and that are being sold under this Agreement are in good operating condition and repair and are adequate and sufficient for all operations conducted by the Subject Business.  Seller has the right to use the properties of the Subject Business for all operations conducted by the Subject Business.

5.09    Inventories; Accounts Receivable; Accounts Payable.

(a)     Except as set forth in the schedule to this Section, the inventories of the Subject Business reflected in the Financial Schedule consist of items of a quality and quantity usable and salable in the normal and customary course of its business, and the values of items which are not of such quality or quantity or are obsolete or otherwise unmarketable have been written down in the Financial Schedule to net realizable value, or adequate reserves have been provided therefor.  The inventories of the Subject Business acquired subsequent to the Financial Schedule Date have been acquired in the ordinary course of business and the values of items which are not of such quality or quantity or are obsolete or otherwise unmarketable have been written down in its books of account to net realizable value, or adequate reserves have been provided therefor.

24

(b)    The Accounts Receivable reflected on the Financial Statements and the Accounts Receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) subject to a reserve for bad debts shown on the Financial Schedules or, with respect to Accounts Receivable arising after the Financial Schedule Date, on the accounting records of the Subject Business, are collectible in full within 90 days after billing. The reserve for bad debts shown on the Finanical Schedules or, with respect to Accounts Receivable arising after the date of the Financial Schedules, on the accounting records of the Business have been determined in accordance with GAAP, consistently applied, subject to normal year-end adjustments and the absence of disclosures normally made in footnotes.

(c)    None of the trade accounts payable of Seller to third parties in connection with the Assumed Liabilities are delinquent as of the Closing Date;.

5.10   Contracts; Customers, etc.

(a)    Part I of the schedule to this Section lists specifically all Contracts to which Seller is a party relating to the Subject Business, including but not limited to: (i) each Contract for (A) the sale of products or services, or (B) for the purchase of inventories, equipment, raw materials, supplies, services or utilities where such purchase is in excess of USD 2,000 per single invoice; (ii) each distributorship, sales agent, or sales representation Contract; (iii) each lease of real or personal property; (iv) each partnership, joint venture, joint development, joint operating or similar agreement; and (v) each Contract (other than those Contracts listed under other Sections of this Article 5) that (A) involves aggregate payments or receipts of the Subject Business of USD 10,000 or more in any calendar year, or (B) is not to be fully performed within six months from the date of this Agreement, or (C) otherwise materially affects the condition (financial or other), assets, business or prospects of the Subject Business.  Seller has delivered to Buyers complete copies of all such Contracts (or the schedule to this Section includes a description of any such item that is not in writing). All of such Contracts are legally valid and binding and in full force and effect, and there are no defaults under any such Contract that is material thereto.  Except as specifically set forth in the schedule to this Section, no leasehold or other Contract right of Seller relating to tangible personal property or any interest therein of the Subject Business, is subject or subordinate to any Lien.

25

(b)      Seller has delivered to Buyers consents to the assignment by Seller to Buyers of the Contracts identified in the schedule to this Section to the extent required under such Contracts.

(c)      Part II of the schedule to this Section contains, for each of the four categories of customers, distributors, currently installed Systems and OEM/private label customers of the Subject Business, complete and correct lists, consisting of a list in descending order of revenue and a list in alphabetical order by name, each of which lists includes contact name(s), ship to and bill to addresses, e-mail addresses, and telephone and fax numbers, and also includes notations advising as to which customers, distributors and OEM/private label Buyers that should be contacted immediately following Closing.

5.11    Patents, Technology.

(a)      The schedule to this Section sets forth (i) in Part I, a list of all Technology, trade secrets and know-how used by the Subject Business, including without limitation those items that are owned or controlled (in the sense of having the right to license others) by Seller, together with identification of the Person that owns or controls such item. Except as set forth in Part II of the schedule to this Section, neither Seller nor any other Person owns or controls (in the sense of having the right to license others) any patents or patent applications used by, under development for use by, or otherwise applicable to, the Subject Business. To the best of Seller's knowledge, the patent applications filed by Seller assert all possible claims which are patentable relating to the Technology used in the Subject Business.

(b)      Part III of the schedule to this Section sets forth a list of all licenses and other Contracts with respect to any patents, patent applications, inventions, know-how, technology or the like, and any other intellectual property rights, used by, under development for use by, or otherwise applicable to, the Subject Business.

(c)      for the conduct of the Subject Business as now conducted, no right, license, consent or other agreement is or will be required with respect to any patent, invention, know-how, technology or the like, other than those listed or described in the schedule to this Section.

(d)      no infringement (whether by Seller or any Seller Group Member) of any patent rights or other intellectual property rights has occurred or is involved in connection with the operations of the Subject Business, and no claim of any such infringement has been made or implied. All of the licenses and other Contracts listed or described in the schedule to this Section are legally valid and binding and in full force and effect, and there are no defaults thereunder.  There are no patents that would impede

Buyers' ability to utilize the Technology, trade secrets and know-how set forth in this Section.

5.12   Proprietary Names and Computer Software.

(a)   The schedule to this Section sets forth (i) in Part I, a list of all Proprietary Names, all registrations and applications for registration of such Proprietary Names, copyright and or design right registrations and applications for registration, and all proprietary computer software programs used by the Subject Business, including without limitation those items that are owned or controlled (in the sense of having the right to license others) by Seller, together with identification of the Person that owns or controls such item, and, (ii) in Part II, a list of all licenses and other Contracts relating to Proprietary Names, copyrights, design rights, or computer software used by the Subject Business.

(b)   All registrations for the Proprietary Names, copyrights and design rights listed in Part I of the schedule to this Section are valid and enforceable, and all applications for such registrations are pending and in good standing, all without challenge of any kind.  Seller has good title to all Proprietary Names, copyrights, design rights, and computer software programs used by the Subject Business, free and clear of all Liens.  Seller has delivered to Buyers complete copies of all applications and registrations for Proprietary Names, copyrights and design rights listed in Part I of the schedule to this Section, and of all licenses and other Contracts listed or described in Part II of the schedule to this Section (or the schedule to this Section includes a description of any such item that is not in writing).

(c)   For the conduct of the Subject Business as now conducted, no right, license, or other Contract is or will be required with respect to any Proprietary Name, copyright, design rights or proprietary computer software other than those listed or described in the schedule to this Section.

(d)   No infringement of any Proprietary Name, copyright, design rights, or proprietary computer software program has occurred or is involved in connection with the Subject Business, and no claim of any such infringement has been made or threatened.  None of the Proprietary Names or registrations or applications to register such Proprietary Names listed in Part I of the schedule to this Section is involved in any opposition, cancellation, nullification, interference, or concurrent use proceeding, and no such proceeding is threatened.  All of the licenses and other Contracts listed or described in Part II of the schedule to this Section are legally valid and binding and in full force and effect, and there are no defaults thereunder.

5.13   Secrecy and Noncompetition Agreements.

27

(a)     Except as specifically set forth in Part (a) to the schedule to this Section, each Subject Business Employee and consultant who has access to any proprietary technology or proprietary computer software owned or used by or applicable to the Subject Business has executed a written Contract obligating such Person to keep such material confidential, and each employee and consultant of the Subject Business whose duties include the development of proprietary technology or proprietary computer software has executed a written Contract assigning to Seller all rights thereto.  The schedule to this Section lists each such Contract that is not in a standard form.  The Seller has delivered to Buyers complete copies of all such Contracts that are not in standard form and of the standard forms used by any of the members of the Seller Group for such purposes.  All of such Contracts are in full force and effect, and there are no defaults thereunder.

(b)     Except as specifically set forth in Part (b) to the schedule to this Section, neither Seller, nor any of its officers or employees, is a party to any third party agreement now in effect requiring such member or officer or employee to assign any interest in any inventions, technology or trade secrets or to keep confidential any trade secrets used by or applicable to the Subject Business or containing any prohibition or restriction on competition or solicitation of customers with respect to the Subject Business.

(c)     Part (c)(I) of the schedule to this Section provides a list of all agreements, commitments or understandings (or such schedule includes a description of any such item that is not in writing) subject to which, or under which Seller has disclosed confidential or proprietary information to another Person relating to the Subject Business ("Nondisclosure Agreements").  Seller has delivered to Buyers complete copies of all Nondisclosure Agreements (or the schedule to this Section includes a description of any Nondisclosure Agreement that is not in writing), and all such Nondisclosure Agreements are legally valid and binding and in full force and effect, and there are no material defaults thereunder.  Part (c)(II) of the schedule to this Section (i) discloses the number of Nondisclosure Agreements that prohibit Seller from (x) disclosing to Buyers either the existence of such Nondisclosure Agreements or (y) describing or providing to Buyers one or more of the material terms of such Nondisclosure Agreements, and (ii) provides a description of each such Nondisclosure Agreement to the extent that such Seller is permitted to disclose such information.

5.14   Governmental Licenses and Permits.

(a)     Except as set forth in Part (a) of the schedule to this Section: (i) Seller has all Governmental Licenses necessary to conduct the Subject Business as currently conducted and to own and operate the Subject Assets, and such Governmental Licenses are valid and in full force

and effect; (ii) no defaults or violations exist or have been recorded in respect of any Governmental License of the Subject Business; and (iii) no proceeding is pending, or threatened, which seeks to revoke or limit any such Governmental License and there is no basis for any such revocation or limitation.

(b)  Seller has delivered to Buyers a complete copy of each such Governmental License, and each pending application for any Governmental License, including all amendments and supplements thereto and modifications thereof (or the schedule to this Section includes a description of any such item that is not in writing).  All of such pending applications are in good standing and without challenge of any kind.

(c)  Each statement, application and other document submitted or filed by Seller with any Governmental Authority, or any other Person, for purposes of obtaining a new or renewed Governmental License in connection with the acquisition by Buyers of the Subject Assets, or submitted by Seller to Buyers for such purpose, is, or when submitted or filed by Seller will be, complete and accurate.

5.15   Compliance with Laws.

Seller has complied in a timely manner with all Laws relating to (a) any of the property owned, leased or used by the Subject Business or (b) the products sold by the Subject Business or otherwise applicable to the Subject Business, including, but not limited to, the labor, equal employment opportunity, occupational safety and health, antitrust Laws and Environmental Law.  None of the real or personal property owned, leased, occupied or operated by the Subject Business, or the ownership, leasing, occupancy or operation thereof, is in violation of any applicable Law, including those related to building, zoning, or environmental matters or public or employee health and safety.  No notice from any Governmental Authority or other Person has been served upon Seller or upon any such property claiming any violation of any Law, or requiring, or calling attention to the need for, any work, repairs, alterations or installations on or in connection with such property, which has not been complied with.

5.16   Litigation and Claims.

There is (a) no suit, action or claim, (b) no investigation or inquiry by any Governmental Authority, and (c) no legal, administrative or arbitration proceeding pending or threatened, against Seller with respect to the Subject Business or any of the Subject Assets, and there is no basis for any such suit, action, claim, investigation, inquiry or proceeding, except as specifically set forth in the schedule to this Section, which schedule also specifies each suit, action, claim, investigation, inquiry or proceeding of a type referred to in this Section pending at any time since January 1, 2008.  Except as specifically set forth in the schedule to this Section, there is no outstanding order, writ, injunction or decree of any

court, Governmental Authority or arbitration tribunal against or binding on Seller or any other Seller Group Member with respect to the Subject Business or any of the Subject Assets.

     5.17   Environmental Matters.

          (a)     The schedule to this Section sets forth:

          (i)     a list of all studies or reports in the possession or control of Seller with respect to any effect on animals or Persons of exposure to (1) any waste material, effluent or atmospheric or other discharge (whether or not regulated under any Law having for its purpose the safety of Persons or the protection of health or the environment), that is or has been generated incident to the manufacture of any product now manufactured by the Subject Business, (2) any of the products manufactured or handled by the Subject Business since January 1, 2005, or (3) any material used by the Subject Business in the manufacture of any product since January 1, 2005;

          (ii)     a list of all reports or other documents concerning disposal of waste products in connection with the Subject Business, whether on-site or off-site, filed with or sent to any Governmental Authority by or on behalf of Seller since January 1, 2005;

          (iii)     a list of all inspection reports, other reports of monitoring, inquiries, notices of violations, and other correspondence received since January 1, 2005 from any Governmental Authority concerning compliance by the Subject Business with any Environmental Law, and each response thereto by or on behalf of the Subject Business;

          (iv)     a list of all documents submitted on or after January 1, 2005 by or on behalf of the Subject Business to relevant agencies and statutes and regulations relating to Environmental Law and/or environmental matters;

          (v)     for each product manufactured, imported or otherwise distributed by the Subject Business, a listing of [the inventory number assigned by the United States Environmental Protection Agency pursuant to the provisions of TSCA, and if no inventory number exists, an explanation as to the appropriate exemption of TSCA applicable to such product]; and

          (vi)     a list of MSDS for each product manufactured, imported or distributed by the Subject Business;

          (vii)     list of all facilities used for the disposal of solid or hazardous wastes, or the recycling or reclamation of materials handled by the Subject Business, including the time periods used and types of materials handled.

(b)        Seller has delivered to Buyers complete copies of all studies, reports and other documents listed or described in the schedule to this Section.

(c)        Since January 1, 2005, except as specified in the schedule to this Section, the Subject Business has not received any notice of any violation of, or liability incurred pursuant to, any Environmental Law affecting the Subject Business or any person employed therein, nor is Seller aware of any such violation or liability for which notice has not been received.  Since January 1, 2005, except as specified in the schedule to this Section, the Subject Business has not received any notice of existing or potential injuries to current or former employees of the Subject Business caused by exposure to chemical substances or other workplace conditions. Such notices include, but are not limited to workers' compensation claims.

(d)        The "second generation Verifi", also known as the integrated board design System is designed to be compliant with the European Reduction of Hazardous Substances directive (RoHS)

System complies with the European Waste of Electrical and Electronic Equipment directive (WEEE).  At a minimum, components will be marked with the crossed out wheelie bin as a label or permanent mark on the outside of the package.

5.18    Employee Compensation.

(a)        The schedule to this Section contains a list of all the employees of the Subject Business (the "Subject Employees"), and complete and accurate details of the terms and conditions of employment of all the Subject Business Employees, including their dates of birth and commencement of employment, their remuneration (including bonus, commission, profit sharing, share options, permanent health insurance, medical expenses insurance, life insurance and pension benefits), notice periods and any arrangements or assurances (whether or not legally binding) for the payment of compensation on termination of employment are provided in the schedule to this Section.  In addition, the schedule to this Section sets forth (i) the name and current annual salary (or rate of pay) and other compensation (including, but not limited to, anticipated bonus, profit sharing and other extra compensation) now payable by Seller or any other Seller Group Member to each Subject Business Employee, (ii) any increase since January 1, [2009] in the total compensation or in the rate of total compensation payable by Seller to each such person, (iii) any increase to become effective after the date of this Agreement in the total compensation or rate of compensation payable by Seller to each such person, (iv) any general increase since January 1, [2009] in the total compensation or rate of

31

compensation payable, including any increase to become payable after the date of this Agreement, by Seller to salaried employees or to hourly employees, and (v) the names of any Subject Business Employees on short- or long-term disability leave, layoff or any other leave of absence.   For purposes of this Section "general increase" means any increase generally applicable to a class or group of employees and not including increases granted to individual employees for merit, change in position or responsibility or other reasons applicable to specific employees and not generally to a class or group thereof.

(b)    Seller has maintained up-to-date, adequate and suitable records regarding the service and terms and conditions of employment of each of the Subject Business Employees.

(c)    There are no Contracts of employment relating to the employment of the Subject Business Employees which will be assumed by Buyers pursuant to this Agreement.

(d)    Since January 1, [2009], there has been no material alteration in the terms of employment or any material change in the number of employees employed in the Subject Business.

(e)    Other than salary for the current month and accrued holiday pay, no amount is owing to any Subject Business Employee or any former employee of the Subject Business.

(f)    No dispute has arisen between Seller and a material number or category of the Subject Business Employees nor are there any present circumstances  which are likely to give rise to any such dispute.

(g)    No claim or liability to make any payment of any kind to any Subject Business Employee has been received or incurred by Seller under any applicable Law or regulation. No liability has been incurred by Seller to, or with respect to, any current or former employee of Seller arising from any court order or other order or judgment of any governmental agency or department, including any federal, state or local agency or department and there are no present circumstances that are likely to give rise to such a liability.

(h)    Seller has maintained up-to-date, adequate and suitable records for the purposes of the working time regulations.  Seller has also complied with all other obligations to its workers and there are no claims capable of arising or pending or threatened by any officer, employee, former officer or former employee of Seller or by any trade union or employee representative or Governmental Authority related to any working time regulations.

5.19   Labor and Employment Matters.

Except as set forth in the schedule to this Section, none of the Subject Business Employees is a member of a labor union or is otherwise covered by a collective bargaining agreement or other contract, agreement or arrangement with any trade union or other body or organization representing any of the Subject Business Employees.  Since January 1, 2008, there has not been any matter under discussion by Seller with any labor union, or any strike, work stoppage or labor trouble relating to Subject Business Employees or former employees of the Subject Business.

5.20    <u>Employee Benefits</u>.

The schedule to this Section sets forth a list of all employee benefit plans and other profit sharing, deferred compensation, bonus, stock option, stock purchase, severance pay, and employee benefit plans and arrangements maintained or contributed to by Seller or any other Seller Group Member for the benefit of the employees of the Subject Business, including, but not limited to full details on the [NAME REDACTED] LLC 2010 Class C Participation Rights Plan (the "Benefit Plans").  Seller has delivered to Buyers a complete copy of each of the Benefit Plans and any related funding agreements, including all amendments, supplements thereto and modifications thereof (or the schedule to this Section includes a description of any such item that is not in writing), all of which are valid and binding and in full force and effect; and there are no defaults thereunder.

5.21    <u>Transactions with Related Parties</u>.

(a)    The schedule to this Section sets forth a complete list of (i) all Contracts between Seller and Seller Equity Interest Holders relating to the Subject Business, and (ii) any arrangements or services provided to the Subject Business by Seller, or provided by Seller as part of or in connection with the Subject Business.

(b)    Except as specifically set forth in the schedule to this Section, neither Seller nor any Seller Equity Interest Holder owns, directly or indirectly, any interest in, or is an advisor or consultant to, any business entity that is a competitor, potential competitor, supplier or customer of the Subject Business, or that is in any way associated with or involved in the operation of a business similar to the Subject Business; provided that ownership of not more than 2% of the capital stock of any company listed on a national securities exchange shall not be deemed to be ownership of an interest in such company for purposes of this Section.

(c)    Seller has delivered to Buyers complete copies of all documentation and statements (including, but not limited to, completed questionnaires received by the Seller from any Subject Business Employee) concerning conflicts of interest or improper payments related to the Subject Business.

5.22    No Impairment.

None of the rights of Seller under any lease, license, patent, patent application, Proprietary Name (or application therefor), secrecy agreement, employment agreement, Governmental License, or any other item or Contract that is part of the Subject Assets will be impaired by the consummation of the Transactions, and all of such rights will be enforceable by Buyers after the Closing, without the consent or agreement of any other Person, except consents and agreements specifically described in the schedule to this Section.

5.23    Seller Group and Subject Business.

Except as disclosed in the schedule to this Section, no Affiliate of Seller, Seller Group Member or Seller Equity Interest Holder: (i) has any right, title or interest in or to any of the assets, rights or records used in the Subject Business, including, without limitation, any Proprietary Names, intellectual property, know-how, inventory or machinery and equipment; or (ii) employs any employee who has participated in the Subject Business since January I, 2009.

5.24    Taxes.

(a)    All Taxes arising out of the operation of the Subject Business prior to the Closing have been paid or provision has been made for their payment and there is no basis for the assertion of a claim for Taxes in respect of the Subject Business or the Subject Assets prior to the Closing for which Buyers could be liable.

(b)    There are no Liens, charges or other encumbrance on any of the Subject Assets resulting from any failure (or alleged failure) to pay any Tax and there are (1) no suits, action or claims, (2) no investigations or inquiries by any Governmental Authority, and (3) no legal or administrative proceeding pending or threatened against Seller with respect to the Subject Business or any of the Subject Assets that could result in Liens, charges or other encumbrance on any of the Subject Assets for any failure (or alleged failure) to pay any Taxes, and there is no basis for any such suit action, claim, investigation, inquiry or proceeding, except as specifically set forth in the schedule to this Section.

(c)    Seller has filed or caused to be filed all Tax returns which have become due (taking into account valid extensions of time to file) prior to the date hereof and there is no basis for assertion of a Claim for failure to

34

file such returns for which either of or both Buyers could be held liable.

5.25   <u>LLC Interests</u>.

Each of the Seller, JV, and [NAME REDACTED] Finance (collectively, the "LLCs") is duly organized and validly existing under the Laws of its jurisdiction of organization and has all requisite limited liability company power and authority to own, lease or otherwise hold its properties and assets and to conduct its business as presently conducted. Each of the LLCs is duly qualified or licensed to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction where the nature of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary. The Seller has made available to the Buyers prior to the execution of this Agreement true and complete copies of the Constitutive Documents of the LLCs, in each case as in effect on the date of this Agreement. None of the LLCs has any subsidiaries except [NAME REDACTED] Finance is a wholly owned subsidiary of Seller.

There are no shares of capital stock, options, profits interests, phantom equity awards or other similar obligations related to equity interests or other rights in any of the LLCs issued, reserved for issuance or outstanding. All LLC Interests have been duly authorized, validly issued and are fully paid and nonassessable and are owned, directly or indirectly, by Seller  free and clear of all Liens. Seller, directly or indirectly, has good and valid title to the LLC Interests and, upon delivery by Seller of the LLC Interests at Closing, good and valid title to the LLC Interests will pass to the designated Buyer.  None of the LLC Interests has been conveyed in violation of, and none of the LLC Interests has been issued in violation of or will be subject to, (x) any preemptive or subscription rights, rights of first offer or first refusal or similar rights or (y) any voting trust, proxy or other agreement or understanding (including options or rights of first offer or first refusal) with respect to the voting, purchase, sale or other disposition thereof.

5.26   Software

(a)  The Software and any upgrades, updates and revisions will operate in substantial conformance with its specifications and accompanying documentation;

(b)  Seller has obtained licenses, and such licenses are valid at the time of closing, for all Software, hardware and other tools used in the development of its Technology.

(c)  Seller has not violated the terms of any licenses for Technology, Software or hardware used in the development of its technology, including licenses for open source software.

35

(d)  Seller has obtained valid  licenses for all Software included in its Technology that is sold as a product or service.

(e)  Seller has not violated the terms of any licenses for Software or hardware included in its technology that is sold as a product or service.

(f)  A true copy of all source code, including all previous versions, has been delivered to Buyers and that neither it nor any of its representatives has retained a copy of the source code.

(g)  A true copy of all instructions to compile source code, including previous versions, has been delivered to Buyers.

(h)  By virtue of this APA and the Transaction Documents , all existing licenses of the Subject Business shall be transferred from Seller to Buyers.

(i)  all information contained in the "Response to Technology Audit Checklist" as set forth in **Schedule 5.26 (i)** and referenced documents is true.

(j)  Seller's Bill of Materials for all products, past and present, has been provided and is accurate.

(k)  Software of the Seller shall not;

    (i)      Replicate, transmit or activate itself, or alter, damage or erase any data or computer programs, in each case, without the control of a person operating computing equipment upon which it resides;

    (ii)    Contain any undocumented key, lock, time-bomb or other disabling device or code that may ( or in fact does) restrict or interfere with the use of any programs or data based upon events (e.g. passage of time) or other limiting criteria; or

    (iii)   Contain any code that is subject to a GNU or other "open source" license, except as set forth in **Schedule 5.26 k (ii)** hereto (the "Disclosed OSS"). The Disclosed OSS has been utilized solely in compliance with its open source licenses.

6.      BUYERS' REPRESENTATIONS AND WARRANTIES.

 Buyers represent and warrant to Seller as follows:

6.01   Corporate Organization.

Grace is a corporation duly organized, validly existing and in good standing under the Laws of Connecticut, with full corporate power and authority to carry on its business as presently conducted and to own and operate its assets and business and to execute, deliver and perform its obligations under this Agreement and the other Transactions Documents to which it is a party.

JV is a limited liability company organized and validly existing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease or otherwise hold its properties and assets and to conduct its business as presently conducted.

6.02   No Conflict.

The execution and delivery by Buyers of this Agreement and the other Transaction Documents to which they are a party, and the performance by Buyers of their obligations hereunder and thereunder, will not (i) result in the breach of any of the terms of, or constitute a default under, either party's constitutive documents or by-laws, or any Contract to which it is a party or by which it or any of its assets are bound, or (ii) violate any order, writ, injunction or decree of any court or Governmental Authority.

6.03   Authorization.

(a)    The execution and delivery by Buyers of this Agreement and the other Transaction Documents to which it is a party, and the performance by it and its obligations hereunder and thereunder, have been, where applicable, duly and validly authorized by its board of directors, equity owners and all other necessary corporate action of Buyers.  This Agreement has been duly executed and delivered by Buyers, and is legally binding on Buyers.

(b)    Except as set forth in the schedule to this Section, no con-sent, approval, order or authorization of, or registration, declaration or filing with, any court or Governmental Authority is required as a prerequisite to the execution and delivery by Buyers of this Agreement and the other Transaction Documents to which it is a party, or its performance of its obligations hereunder and thereunder.

6.04   Bankruptcy Court Approval.

Buyers have, to the extent required, obtained approval of the Untied States Bankruptcy Court to complete the transactions contemplated hereby.

7.    EMPLOYEE MATTERS

7.01   Employment.

Effective on the day after the Closing Date, (i) each Seller employee listed on Part (a) of the schedule to this Section (the "Terminated Employees") shall cease to be an employee of Seller.   Buyers will not assume liabilities or obligations with respect to any of the Employees of the Seller with respect to anything accrued prior to and including the day after the Closing.

7.02   Positions Offered to Terminated Employees.  *[After signing hereof, but]* Prior to Closing, Buyers – with Seller's permission - shall offer those employees of Seller listed in **Schedule 7.02** - other than the Key Employees - employment upon terms and conditions defined by the Buyers , such offers being open for acceptance by the respective employees for three days after receipt. Each Terminated Employee who accepts an offer of employment from Buyers in accordance with Section 7.02 shall become an employee of Buyers effective on

the day after the Closing Date; and all such employees are referred to as "Hired Employees".

7.03  <u>Employment Related Indemnities</u>.  Seller shall indemnify Buyers from and against all Damages resulting from claims from any Seller employees (including Hired Employees) where such Claims are based on facts alleged to have occurred prior to the day after the Closing Date (the "Employee Closing Date"), including a Claim by any Terminated Employee who declines to accept employment with Buyers.

7.04  <u>Claim Procedure</u>.

Any claim for indemnity pursuant to this Article 7 shall be subject to the procedures of Section 10.

8.    EXPENSES.

8.01  <u>Seller's Expenses</u>.

Seller shall pay and discharge, and hold all Buyers Entities harmless against, all liabilities and expenses incurred by or on behalf of Seller and its Affiliates in connection with the preparation, authorization, execution and performance of this Agreement, whether paid or incurred before or after the date of this Agreement, including, but not limited to, all fees and expenses of agents, representatives, counsel and accountants, and all amounts payable with respect to any claim for broker's or finder's fees or other commissions in respect of the Transactions based in any way on any agreement, arrangement or understanding made by or on behalf of Seller.

8.02  <u>Buyers' Expenses</u>.

Buyers shall pay and discharge, and hold Seller harmless against, all liabilities and expenses incurred by or on behalf of the  Buyers in connection with the preparation, authorization, execution and performance of this Agreement, including, but not limited to, all fees and expenses of agents, representatives, counsel and accountants, and all amounts payable with respect to any claims for broker's or finder's fees or other commissions with respect to the Transactions based in any way on any agreement, arrangement or understanding made by any Buyers Entity.

9.    COVENANTS AND CERTAIN POST-CLOSING ACTIONS

9.01  <u>Termination of Intercompany Arrangements</u>.

Any amounts owed to Seller by any other Seller Group Member, or by Seller to any other Seller Group Member, shall be deemed paid and discharged as of the Closing; with the exception of trade accounts payable due any Seller Group Member incurred in the normal course of business or otherwise provided

for herein.   Except as otherwise specifically provided for herein or on the attached **Schedule 9.01,** all Contracts between Seller and any other Seller Group Member, whether express or implied, pursuant to which Seller provides management, administrative, legal, financial, accounting, data processing, insurance, technical support, or other services to the Subject Business, or the use of any assets of Seller, or pursuant to which rights, privileges or benefits are accorded to the Subject Business, shall terminate as of the Closing.

     9.02   <u>Records and Cooperation</u>.

     (a)   For a period of six years after the Closing with respect to Tax records, and five (5) years after the Closing with respect to other files and records, the Parties shall, and shall cause their respective Affiliates to, preserve all files and records in their possession relating to the Subject Business prior to the Closing, allow the other Parties reasonable access to such files and records and the right to make copies and extracts therefrom at such Party's expense at any time during normal business hours.  If at any time prior to the end of such period, any Party wishes to dispose of any such files and records, it shall notify the other Parties, which shall have 60 days from receipt of such notice to advise the first Party that it or they wish to obtain some or all of such files and records. If such advice is timely given, the disposing Party shall deliver the requested files and records to the requesting Party or Parties at their expense.

     (b)   After the Closing, each Party shall, and shall cause its Affiliates to, cooperate with each other Party and its Affiliates as reasonably requested by such other Party in connection with the prosecution or defense of any claims or other matters relating to the Subject Business; provided that the Party requesting such cooperation shall pay all reasonable out-of-pocket costs, charges and expenses related to such cooperation.

     9.03   <u>Noninterference</u>.

     For a period of two (2) years from the Closing Date, the Seller shall not request, induce, attempt to influence or advise any Person which has, within one (1) year prior to the Closing Date, previously distributed products of the Subject Business to refrain from entering into agreements or other arrangements to distribute such products for the Buyers.

     10.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

     10.01  <u>Survival of Representations</u>.

     (a)   All representations and warranties of Seller under this Agreement shall survive the Closing and the delivery of the Transaction Documents, shall survive any liquidation and dissolution of Seller, and shall remain effective regardless of any investigation at any time made by or on

behalf of Buyers or of any information that Buyers may have with respect thereto. The representations and warranties set forth in Sections 5.03 through 5.13 and 5.18 through 5.23 shall expire and be of no further force and effect on the second anniversary of the Closing Date; the representations and warranties set forth in Sections 5.14 through 5.16 shall expire and be of no further force on the third anniversary of the Closing Date; the representations and warranties set forth in Sections 5.17and 5.25, shall expire and be of no further force on the sixth anniversary of the Closing Date; the representation and warranty in Section 5.24 (Tax) shall expire and be of no further force upon the expiry of the applicable Tax statute of limitations including any extensions thereof; except in each case with respect to Claims that Buyers have asserted in writing, setting forth in reasonably specific detail the basis for such Claims, prior to such expiration. All survival periods mentioned in this paragraph shall also be referred to herein, individually, as a "Survival Period" or, collectively, as the "Survival Periods".

(b)     All representations and warranties of Buyers set forth in this Agreement shall survive the Closing and shall remain effective regardless of any investigation at any time made by or on behalf of Seller of any information Seller may have with respect thereto.

10.02 Definitions.

As used in this Article and elsewhere in this Agreement:

(a)     "Damages" means any and all penalties, fines, damages, liabilities, losses or costs including reasonable Litigation Expenses.

(b)     "Claim" means any claim, demand, suit, action or proceeding.

(c)     "Third Party Claim" means any Claim by any Person other than Seller, Buyers or their respective Affiliates, which could give rise to a right of indemnification under this Article.

(d)     "Litigation Expenses" means attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution, defense or settlement of, a Claim, whether or not an action, suit or proceeding is actually commenced.

10.03 Seller Indemnities.

Subject to the terms and limitations of this Article:

(a)     Seller shall indemnify Buyers and save and hold Buyers harmless from and against any Damages arising out of, resulting

40

from or related to (a) any inaccuracy in any representation or the breach of any warranty of Seller contained in this Agreement, (b) any failure of Seller to duly perform or observe any provision, covenant or agreement to be performed or observed by Seller pursuant to this Agreement or any Transaction Document, (c) any Indemnified Liabilities, and (d) any Damages arising out of or relating to environmental, health and safety Laws, regulations and other matters at the location of the Subject Business, whether before or after the Closing Date, except for (i) liabilities arising from Buyers' introduction of new production methods or new materials and substances in production or (ii) releases or spills of materials, substances or wastes occurring during Buyers' occupancy of the location of the Subject Business; and (e) Seller's indemnity obligations under Article 7.

(b)　　One of the Buyers shall be deemed to have suffered Damages indemnified by this Section 10.03 if the same shall have been suffered by any other Buyer or Buyers Entity, and the amount of Damages deemed to have been suffered by Buyers shall include the amount of Damages suffered by such Buyers Entity.

10.04  Buyers Indemnities.

Subject to the terms and limitations of this Article, Buyers, jointly and severally, shall indemnify the Seller and save and hold Seller p harmless from and against any Damages arising out of, resulting from or related to (a) any inaccuracy in any representation or the breach of any warranty of Buyers contained in this Agreement, or (b) any failure of Buyers to duly perform or observe any provision, covenant or agreement to be performed or observed by it pursuant to this Agreement or any other Transaction Document.

10.05  Procedures;  Defense of Third Party Claims.

(a)　　For purposes of this Section, the "Claimant" means a Person seeking indemnification under this Agreement with respect to a Claim, or seeking to have a Claim taken into account for purposes of the dollar threshold in Section 10.05;  and the "Potential Indemnitor" means the Person from which indemnity is sought (or from which indemnity would be sought but for the limitations of Section 10.05).

(b)　　Buyers shall notify Seller in writing promptly after learning of any Claim for which Buyers intends to seek indemnification under this Agreement, or to have taken into account for purposes of the dollar threshold in Section 10.05.  Seller shall notify Buyers in writing promptly after learning of any Claim for which it intends to seek indemnification under this Agreement.  It shall be a necessary condition for indemnifica-

41

tion under this Agreement with respect to any Claim, or for such Claim to be taken into account under Section 10.05, that the Claimant shall notify the Potential Indemnitor thereof prior to the time when the Potential Indemnitor's ability to contest the Claim would be materially impaired by lack of notice.

(c)     Except as otherwise provided in subsection (e) of this Section, the Potential Indemnitor (or an Affiliate of the Potential Indemnitor) may undertake the defense of a Third Party Claim that a Claimant has notified the Potential Indemnitor of, by notice to Seller or to Buyers (if the Claimant is a Buyer) at any time after receipt by the Potential Indemnitor of the notice of the Claim. If the Potential Indemnitor (or an Affiliate of the Potential Indemnitor) undertakes the defense of any Third Party Claim, it shall control the investigation and defense thereof, except that it shall not require the Claimant (or such Affiliate), without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity reasonably considers to be against its interest, nor shall the Potential Indemnitor (or any Affiliate), without the prior written consent of the Seller or of Buyers (if the Claimant is a Buyer), consent to any settlement that requires the Claimant (or any Affiliate of the Claimant) to make any payment that is not fully indemnified under this Agreement or taken into account under Section 10.05, or to submit to any non-monetary remedy. Subject to the control rights of the Potential Indemnitor and its Affiliates, the Claimant and its Affiliates may participate in such investigation and defense, at their own expense.

(d)     If the Potential Indemnitor and its Affiliates do not undertake the defense of a Third Party Claim, then the Claimant and its Affiliates shall control such investigation and defense, except that they shall not require the Potential Indemnitor (or any of its Affiliate), without its prior written consent, to take or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such party reasonably considers to be against its interest, nor shall the Claimant (or any Affiliate), without the prior written consent of Buyers (if Buyers are the Potential Indemnitors), or of Seller, consent to any settlement. Subject to the control rights of the Claimant and its Affiliates, the Potential Indemnitor and its Affiliates may participate in such investigation and defense, at their own expense.

(e)     If in the good faith judgment of a Claimant, its Third Party Claim potentially involves matters other than money damages, or if adversely determined could result in additional future Damages or other Claims for which the Claimant and its Affiliates would not be entitled to indemnity under this Agreement or which would not be taken into account under Section 10.05, then the Claimant and its Affiliates shall control such investigation and defense, except that they shall not require the Potential Indemnitor (or any of its Affiliates), without its prior written consent, to take

42

or refrain from taking any action in connection with such Third Party Claim, or make any public statement, which such entity reasonably considers to be against its interest.  Subject to the control rights of the Claimant and its Affiliates, the Potential Indemnitor and its Affiliates may participate in such investigation and defense, at their own expense.

(f)    Notwithstanding    any    other    provisions    in    this Agreement, Buyers shall have no right to assert any Claim against Seller hereunder or to deduct any amount from the Holdback Amount or the Earn-Out Payments until the Damages suffered by Buyers exceed – in the aggregate - One Hundred Thousand Dollars ($100,000) (The "Claim Threshold"), which shall not be a deductible from the Claims once the Threshold is reached or exceeded. Buyers shall nevertheless notify the Seller of any Claim even before the Claim Threshold is reached without undue delay and Seller shall have the opportunity to remedy the situation at such time to avoid an accrual of Damages.

11.    CONFIDENTIALITY

11.01 Confidential Information.

It is understood that the Seller and other Seller Group Member, possess confidential information concerning the Subject Business that, if known to competitors thereof, would damage the Subject Business.   Accordingly, the Seller agree not to divulge to anyone whatsoever (including any other Seller Group Member) any secret or confidential information or knowledge in its possession concerning the Subject Business, including, but not limited to, information pertaining to methods, processes, designs, equipment, customer lists and operating procedures.    This obligation of secrecy shall not apply to information that: (i) is or becomes part of the public domain other than through breach of this Agreement or through fault of Seller or any Seller Group Member; or (ii) is required to be disclosed by Law.

11.02 Use of Names.

Seller agrees not to use the names [TO BE DETERMINED] or any similar name or trademark, either as a company, trading or product name.

12.    NOTICES.

12.01 Addresses for Notices.

All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be effective only when re-ceived, in writing, and delivered by nationally recognized courier service, by

telephone facsimile transmission, or by certified mail (return receipt requested), to the following addresses:

If to Buyers:

> W. R. Grace & Co.-Conn.
> 62 Whittemore Avenue
> Cambridge, Massachusetts
> Attention:  Chief Counsel GCP
> Fax:

If to the JV:

> GR 2008 LLC,
> Attn. Larry Shapiro
> 4992 Rialto Road, West Chester, Ohio

If to Seller:

[SELLER PLEASE INDICATE "NEW" CONTACT ADDRESS AFTER CLOSING][]

> Attention:

Fax:

Any Party may change the address to which such communications are to be directed to it by giving notice to the other Parties in the manner provided above.

### 13.    TAX MATTERS

(a)    Tax Allocation.

Within 60  days after the Closing, the Buyers will provide the Seller with an appraisal of the fair market value of the Subject Assets of the Subject Business prepared by a professional appraisal firm (the "Appraisal").  Upon receipt of the Appraisal, the parties will negotiate in good faith to agree on an allocation among the Subject Assets.  All such

44

allocations shall be made in accordance with the rules set forth in Section 1060 of the Code and the treasury regulations promulgated thereunder. Each party agrees to prepare and timely file U.S. Internal Revenue Service Form 8594 (Asset Acquisition Statement) in accordance with section 1060 of the Code and to cooperate in every reasonable way with the other party in the preparation of such form.

(b)     Filing of Returns and Payment of Taxes.

Seller shall prepare and file, or cause to be prepared and filed, with the appropriate authorities all Tax returns, reports and forms ("Tax Returns") and shall pay, or cause to be paid, when due all Taxes relating to the Subject Assets attributable to any taxable period which ends on or prior to the date of this Agreement (the "Pre-Closing Tax Period"). Buyers shall prepare and file, or cause to be prepared and filed, with the appropriate authorities all Tax Returns, and shall pay, or cause to be paid, when due all Taxes relating to the Acquired Assets attributable to taxable periods which are not part of the Pre-Closing Tax Period. If, in order to properly prepare its Tax Returns or other documents required to be filed with governmental authorities, it is necessary that a party be furnished with additional information, documents or records relating to the Subject Assets, both Seller and Buyers agree to use reasonable efforts to furnish or make available such non-privileged information at the recipient's request, cost and expense provided, however, that no party shall be entitled to review or examine the Tax Returns of any other party.

(c)     Refunds and Credits.

Any refunds and credits attributable to the Pre-Closing Tax Period shall be for the account of the Seller and any refunds and credits attributable to the period which is not part of the Pre-Closing Tax Period shall be for the account of the Buyers.

(d)     Transaction Taxes and Fees.

All transfer, documentary, sales, use, registration, real estate transfer and any similar taxes and related fees incurred in connection with this Agreement, and the transactions contemplated hereby shall be borne by Seller and Buyers equally. To the extent permitted by applicable law, Buyers and Seller shall reasonably cooperate with each other to obtain exemptions from such taxes.

14.    GENERAL.

14.01  Governing Law; Venue.

(a)    This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, other than any conflict-of-laws provision thereof that would otherwise require the application of the Law of any other jurisdiction. The rights and obligations of the Parties under this Agreement shall not be governed by the provisions of The United Nations Convention on Contracts for the International Sale of Goods.

(b)    Each Party irrevocably and unconditionally submits to the non-exclusive jurisdiction of the courts of Delaware (the "Court") for any litigation arising out of or in connection with this Agreement and the Transactions.

14.02  Entire Agreement.

This Agreement, including the Exhibits and schedules hereto, and the other Transaction Documents set forth the entire agreement and understanding of the Parties in respect of the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating to such subject matter. No representation, promise, inducement or statement of intention with respect to the Transactions has been made by any Party, or any of its Affiliates, which is not embodied in this Agreement or in the documents referred to herein, and no Party nor any of its Affiliates shall be bound by or liable for any alleged representation, promise, inducement or statement of intention not so set forth.

14.03  Successors.

This Agreement may be assigned by Buyers only with the prior consent of Seller, and by Seller only with the prior consent of Buyers, except that each Party may assign this Agreement to an Affiliate of such Party, for so long as such assignee remains an Affiliate, without obtaining such consent; provided that such assignment to an Affiliate shall not relieve the respective assignor from its obligations under this Agreement   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing contained in this Agreement shall prohibit the dissolution of Seller after the final disposition of the Holdback Amount and the expiry of the later of (a) the latest Survival Period or (b) the settlement of any Claims asserted by Buyers pursuant to Clause 10.1. In the event that a dissolution prior to such expiry is contemplated, Buyers shall be notified in writing in advance and the dissolution shall be allowed upon approval by the Buyers, such approval not be to unduly withheld.  In the event of such dissolution, the right to receive the Earn-

Out Payment may be assigned by Seller prior to dissolution to its members or to a trust or paying agent to receive such funds on their behalf.

14.04 <u>Amendments and Waivers</u>.

This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived, only by a written instrument specifically stating that it amends, supersedes or cancels this Agreement or waives any of the terms hereof, executed by all the Parties or, in the case of a waiver, by the Party waiving compliance. The failure of any Party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

14.05 <u>No Third Party Beneficiaries</u>.

This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.06 <u>Headings</u>.

The Article and Section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

14.07 <u>Counterparts</u>.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one agreement.

IN WITNESS WHEREOF, Seller and Buyers have duly executed this instrument on the date first above written.

W. R. GRACE Co. - Conn.            GR 2008 LLC


By:_____    By:_____
Name:                                          Name:
Title:                                            Title:

                                                   [NAME REDACTED]  LLC


                                                   By:_____
                                                   Name:

Title:

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

Exhibits

Schedules