UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                     .    Case No.  01-1139 (JKF)
                           .    Adv. No.  02-2210/02-2211
W.R. GRACE & CO.,          .
et al.,                    .    824 North Market Street
                           .    Wilmington, DE 19801
                           .
          Debtors.  .
                           .    December 13, 2010
. . . . . . . . . . . ..        10:00 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP |
| | By:  JANET BAER, ESQ. |
| | JOHN DONLEY, ESQ. |
| | 200 East Randolph Drive |
| | Chicago, IL  60601 |
| | |
| For the Asbestos | Caplin & Drysdale, Chartered |
| Creditors Committee: | By:  PETER LOCKWOOD, ESQ. |
| | One Thomas Circle, NW |
| | Washington, D.C. 20005 |
| | |
| For Committee of | Campbell & Levine |
| Asbestos Personal | By:  MARK T. HURFORD, ESQ. |
| Injury Claimants: | 800 North King Street |
| | Suite 300 |
| | Wilmington, DE  19701 |
| | |
| Audio Operator: | Brandon J. McCarthy |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  ROGER FRANKEL, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For W.R. Grace: | Pachulski, Stang, Ziehl & Jones<br>By:  JAMES E. O'NEILL, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom, LLP<br>By:  DAVID TURETSKY, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  LINDA CASEY, ESQ.<br>3000 Two Logan Square<br>Philadelphia, PA  19103 |
| For MCC & Zurich: | Eckert Seamans<br>By:  EDWARD D. LONGOSZ, ESQ.<br>1747 Pennsylvania Avenue, NW<br>Suite 1200<br>Washington, DC 20006 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Libby: | Cohn Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For the Unsecured Creditors' Committee: | Strook & Strook & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |

APPEARANCES (CONT'D):

For the Bank Lenders:        Landis, Rath & Cobb, LLP
                             By:  RICHARD COBB, ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899

For the Bank Lenders:        Paul Weiss Rifkind Wharton &
                                Garrison, LLP
                             By:  MARGARET PHILLIPS, ESQ.
                                  REBECCA ZUBATY, ESQ.
                                  ANDREW N. ROSENBERG, ESQ.
                                  KELLI CAIRNS, ESQ.
                                  STEPHEN SHIMSHAK
                             1285 Avenue of the Americas
                             New York, NY  10019

For ZAI Claimants            Hogan Firm Attorneys at Law
& various law firms:         By:  DANIEL K. HOGAN, ESQ.
                             1311 Delaware Avenue
                             Wilmington, DE  19801

For Fresenius:               McDermott Will & Emery
                             By:  NATHAN COCO
                                  DAVID ROSENBLOOM
                             227 West Monroe Street
                             Chicago, IL  60606

For the U.S. Trustee:        Office of the U.S. Trustee
                             By:  DAVID KLAUDER, ESQ.
                             844 King Street, Suite 2313
                             Wilmington, DE  19801

The State of Montana         Womble Carlyle Sandridge & Rice, PLLC
and Canada:                  By:  KEVIN J. MANGAN, ESQ.
                             222 Delaware Avenue
                             Wilmington, DE  19801

For OneBeacon                Drinker Biddle & Reath LLP
Ins. Co., Geico,             By:  MICHAEL F. BROWN, ESQ.
Seaton Ins. Co.              One Logan Square
& Republic Ins. Co:          18th and Cherry Streets
                             Philadelphia, PA  19103

For the PD FCR:              Law Office of Alan B. Rich
                             By:  ALAN B. RICH, ESQ.
                             1401 Elm Street, Suite 4620
                             Dallas, TX  75202

APPEARANCES (CONT'D):

For Arrowwood              Bifferato Gentilotti LLC
Indemnity Co.:             By:  GARVAN McDANIEL, ESQ.
                           800 North King Street
                           Wilmington, DE  19801

TELEPHONIC APPEARANCES:

For CNA:                   Goodwin Procter, LLP
                           By:  MICHAEL GIANNOTTO, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For MCC & Zurich:          Wiley Rein, LLP
                           By:  RICHARD A. IFFT, ESQ.
                           1776 K Street NW
                           Washington, DC 20006

For Continental           Goodwin Procter, LLP
Casualty Co.:             By:  DANIEL GLOSBAND, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For the Equity            Kramer Levin Naftalis & Frankel
Committee:                 By:  DAVID E. BLABEY, JR., ESQ.
                           919 Third Avenue
                           New York, NY  10022

For the PD FCR:            By:  ALEXANDER SANDERS

For National Union Fire    Zeichner Ellman & Krause, LLP
Insurance Co.:             By:  MICHAEL DAVIS, ESQ.
                           575 Lexington Avenue
                           New York, NY  10022

For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                           By:  MATTHEW KRAMER, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

For the Debtors:          Kirkland & Ellis, LLP
                           By:  LISA G. ESAYIAN, ESQ.
                                DEANNA BOLL, ESQ.
                                ROGER HIGGINS, ESQ.
                                ADAM PAUL, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

**WWW.JJCOURT.COM**

TELEPHONIC APPEARANCES (CONT'D):

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                                  MARION FAIREY, ESQ.
                                  ALAN RUNYAN, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Travelers:               Simpson Thacher & Bartlett LLP
                             By:  ELISA ALCABES, ESQ.
                             425 Lexington Avenue
                             New York, NY  10017

For the Property             Bilzin Sumberg Baena Price &
Damage Committee:               Axelrod LLP
                             By:  SCOTT BAENA, ESQ.
                                  JAY SAKALO, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For Serengeti:               Vinson & Elkins, LLP
                             By:  ARI BERMAN, ESQ.
                             Trammell Crow Center
                             2001 Ross Avenue, Suite 3700
                             Dallas, TX  75201

For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For Official Committee       Brandi Law Firm
of Asbestos Property         By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:            44 Montgomery St., Suite 1050
                             San Francisco, CA  94104

For Official Committee       Bilzin Sumberg Baena Price &
of Asbestos Property            Axelrod LLP
Damage Claimants:            By:  TERENCE EDWARDS, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131 For Official

For Dow Jones                Dow Jones News Wires
News Wires:                  By:  PEG BRICKLEY

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee          Lieff, Cabraser, Heimann & Bernstein
of Asbestos Property            By:  ELIZABETH J. CABRASER, ESQ.
Damage Claimants:               Embarcadero Center West
                                275 Battery Street, Suite 3000
                                San Francisco, CA  94111


For Federal Insurance           Cozen O'Connor
Company:                        By:  JACOB C. COHN, ESQ.
                                1900 Market Street
                                Philadelphia, PA  19103


For David T. Austern:           Lincoln International, LLC
                                By:  GEORGE COLES
                                     CLAIRE BURKE


For Firemen's Fund              Crowell & Moring LLP
Insurance Co.:                  By:  LESLIE A. DAVIS, ESQ.
                                     MARK PLEVIN, ESQ.
                                1001 Pennsylvania Avenue, N.W.
                                Washington, DC  20004


For Hartford Financial          Wilmer Wilmer Cutler Pickering Hale &
Service Group:                   Dorr, LLP
                                By:  MELANIE R. DRITZ, ESQ.
                                399 Park Avenue
                                New York, NY  10022


For Halcyon Asset               Halcyon Asset Management
Management:                     By:  JOHN GREENE

For the Future                  Orrick, Herrington & Sutcliffe,
Claimants                        LLP
Representatives:                By:  DEBRA FELDER, ESQ.
                                Washington Harbour
                                3050 K Street, N.W.
                                Washington, D.C.  20007


For National Union Fire         Zeichner Ellman & Krause, LLP
Insurance Co.:                  By:  ROBERT GUTTMANN, ESQ.
                                575 Lexington Avenue
                                New York, NY  10022


For Federal Insurance           Cozen O'Connor
Company:                        By:  ILAN ROSENBERG, ESQ.
                                1900 Market Street
                                Philadelphia, PA  19103

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis<br>By:  BARBARA HARDING, ESQ.<br>655 Fifteenth Street, N.W.<br>Washington, D.C.  20005 |
| For the Bank Lender<br>Group: | Paul Weiss Rifkind Wharton &<br>  Garrison, LLP<br>By:  SARAH HARNETT, ESQ.<br>1285 Avenue of the Americas<br>New York, NY  10019 |
| For Everest Reinsurance<br>Company, et al.: | Marks, O'Neill, O'Brien & Courtney LLP<br>By:  BRIAN L. KASPRZAK, ESQ.<br>     MICHAEL F. DUGGAN, ESQ.<br>913 North Market Street<br>Suite 800<br>Wilmington, DE  19801 |
| For W.R. Grace: | Onex Credit Partners<br>By:  STUART KOVENSKY |
| For the Asbestos<br>Creditors Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For Ford, Marrin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>  Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For David T. Austern,<br>Future Claimants'<br>Representative: | Lincoln International, LLC<br>By:  JOSEPH RADECKI<br>     JASON SOLGANICK |
| For Official Committee:<br>of Asbestos Property<br>Damage Claimants: | Riker, Danzig, Scherer, Hyland &<br>  Perretti, LLP<br>By:  TARA MONDELLI, ESQ.<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, NJ  07962 |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street,  Suite 2200<br>Dallas, TX  75201 |

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A. By:  JOHN C. PHILLIPS, ESQ. 1200 North Broom Street Wilmington, DE  19806 |
| For Asbestos Property Damage Claimants: | Scott Law Group By:  DARRELL SCOTT, ESQ. 1001 East Main Street, Suite 500 Sevierville, TN  37864 |
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C. By:  EDWARD J. WESTBROOK, ESQ. 174 East Bay Street Charleston, SC  29401 |
| For the Debtors: | Reed Smith, LLP By:  JAMES RESTIVO, ESQ. DOUGLAS E. CAMERON, ESQ. 435 Sixth Avenue Pittsburgh, PA  15219 |
| For Maryland Casualty & Zurich Insurance: | Eckert Seamans Cherin & Mellott, LLC By:  GABRIELLE V. CELLOROSI, ESQ. 4 East 8th Street, Suite 200 Wilmington, DE  19801 |
| For Ford, Marrin, Esposito, Witmeyer & Gleser: | Ford, Marrin, Esposito, Witmeyer & Gleser By:  ELIZABETH DeCRISTOFARO, ESQ. Wall Street Plaza New York, NY  10005 |
| For Allstate Insurance: | Cuyler Burk, LLP By:  ANDREW K. CRAIG, ESQ. Parsippany Corporate Center Four Century Drive Parsippany, NJ  07054 |
| For the Bank Lender Group: | Landis, Rath & Cobb, LLP By:  JAMES S. GREEN, JR., ESQ. 919 Market Street, Suite 1800 Wilmington, DE  19899 |

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For the Unsecured Creditors' Committee: | Strook & Strook & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For the Debtors: | Onex Credit Partners<br>By:  LEWIS KRUGER, ESQ. |
| For Official Committee of Asbestos Property Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701 |
| | LECG<br>By:  ALAN MADIAN, ESQ.<br>1725 Eye Street NW, Ste 800<br>Washington, DC,  20006 |
| | Hamilton, Rabinovitz & Alshuler<br>By:  DR. FRANCINE RABINOVITZ<br>26384 Carmel Rancho Lane, Suite 202<br>Carmel, California 93923 |
| For Arrowwood: | Wilson, Elser, Moskowitz, Edelman,<br>  & Dicker, LLP<br>By:  CARL J. PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY 10017 |
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  RICHARD WYRON, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Serengeti: | Vinson & Elkins, LLP<br>By:  ARI BERMAN, ESQ.<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX  75201 |
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |

TELEPHONIC APPEARANCES (CONT'D):

For W.R. Grace:                 W.R. Grace
                                By:  MARK SHELNITZ, ESQ.
                                7500 Grace Drive
                                Columbia, MD  21044

For Oliver Butt:                J.P. Morgan Chase & Co.
                                By:  OLIVER BUTT, ESQ.
                                270 Park Avenue
                                New York, NY  10017

For Caspian Capital:            Caspian Capital
                                By:  TERESE BEST, ESQ.
                                745 5th Avenue, Floor 28
                                New York, NY  10151

For York Capital               York Capital Management
Management:                     By:  MATTHEW BONANNO, ESQ.
                                767 Fifth Avenue, 17th Floor
                                New York, NY  10153

For RBS Securities,            RBS Securities, Inc.
Inc:                            By:  JEFFREY FARKAS

For Farallon Capital           Farallon Capital Management, LLC
Management:                     By:  MICHAEL LINN, ESQ.
                                One Maritime Plaza, Suite 2100
                                San Francisco, CA 94111

For Restoration                Restoration Capital
Capital:                        By:  GILBERT NATHAN, ESQ.
                                325 Greenwich Avenue
                                Greenwich, CT  06830

For Robert B. Sales:            Archer Capital
                                By:  ROBERT SALES, ESQ.
                                570 Lexington Avenue, Fl. 40
                                New York, NY  10022

For Loeb Partners              Loeb Partners
Corporation:                    By:  JOE SAMLUK, ESQ.
                                61 Broadway
                                New York, NY  10006

- - -

WWW.JJCOURT.COM

1          THE COURT:  This is the matter of W.R. Grace and

2    Company, Bankruptcy Number 01-1139.  I have a list of

3    participants by phone, Oliver Butt, Elisa Alcabes, Scott Baena,

4    Janet Baer, Aro Berman, Terese Best, David Blabey, Deanna Boll,

5    Matthew Bonanno, Thomas Brandi, Peg Brickley, Claire Burke,

6    Elizabeth Cabraser, Kellie Cairns, Douglas Cameron, Matthew

7    Cantor, Linda Casey, Gabrielle Cellorosi, Richard Cobb, Tiffany

8    Cobb, Jacob Cohn, George Coles, Andrew Craig, Leslie Davis,

9    Michael Davis, Elizabeth DeCristofaro, Martin Dies, John

10   Donley, Melanie Dritz, Michael Duggan, Terence Edwards, Lisa

11   Esayian, Marion Fairey, Jeffrey Farkas, Debra Felder, Michael

12   Giannotto, Daniel Glosband, James Green, John Green, Robert

13   Guttmann, Barbara Harding, Sarah Harnett, Roger Higgins, Robert

14   Horkovich, Richard Ifft, Brian Kasprzak, Stuart Kovensky,

15   Matthew Kramer, Arlene Krieger, Lewis Kruger, Michael Linn,

16   Peter Lockwood, Edward Longosz, Alan Madian, Tara Mondelli,

17   Gilbert Nathan, David Parsons, Adam Paul, Carl Pernicone,

18   Margaret Phillips, John Phillips, Mark Plevin, Francine

19   Rabinovitz, Joseph Radecki, James Restivo, Alan Rich, Andrew

20   Rosenberg, Ilan Rosenberg, Alan Runyan, Jay Sakalo, Robert

21   Sales, Joe Samluk, Alexander Sanders, Darrell Scott, Mark

22   Shelnitz, Stephen Shimshak, Jason Solganick, Daniel Speights,

23   Shayne Spencer, Theodore Tacconelli, Edward Westbrook, Jeffrey

24   Wisler, Richard Wyron, and Rebecca Zubaty.

25          THE COURT:  I'll take entries in court please.  Good

1  morning.

2        MR. DONLEY:  John Donley on behalf of the debtors,

3  Your Honor.

4        MS. BAER:  Janet Baer on behalf of the debtors.

5        MR. FRANKEL:  Morning, Your Honor.  Roger Frankel on

6  behalf of David Austern, the future claims representative.

7        MR. LOCKWOOD:  Morning, Your Honor.  Peter Lockwood

8  on behalf of the ACC.

9        MR. COHN:  Good morning, Your Honor.  Dan Cohn on

10  behalf of the Libby claimants.

11        MR. O'NEILL:  Good morning, Your Honor.  James

12  O'Neill, Pachulski, Stang, Ziehl and Jones on behalf of the

13  debtors.

14        MR. PASQUALE:  Good morning, Your Honor.  Ken

15  Pasquale from Strook for the unsecured creditors committee.

16        MR. COBB:  Good morning, Your Honor.  Richard Cobb on

17  behalf of the bank lender group.

18        MR. ROSENBERG:  Good morning, Your Honor.  Andrew

19  Rosenberg on behalf of the bank lender group.

20        MR. HOGAN:  Morning, Your Honor.  Daniel Hogan on

21  behalf of the Canadian Zonolite claimants.

22        MR. TURETSKY:  Good morning, Your Honor.  David

23  Turetsky of Skadden on behalf of Sealed Air.

24        MR. COCO:  Good morning, Your Honor.  Nathan Coco on

25  behalf of Fresenius.  And also in the courtroom with me today

1  is my partner, David Rosenbloom.

2          MR. KLAUDER:  Good morning, Your Honor.  David

3  Klauder for the United States Trustee.

4          MS. CASEY:  Good morning, Your Honor.  Linda Casey on

5  BNSF Railway.

6          MR. HURFORD:  Good morning.  Mark Hurford, Campbell

7  Levine, on behalf of the ACC.

8          MR. MANGAN:  Good morning, Your Honor.  Kevin Mangan

9  on behalf of the State of Montana, as well as Canada.

10          MR. BROWN:  Good morning, Your Honor.  Michael Brown

11  on behalf of Geico and Republic.

12          MR. RICH:  Morning, Your Honor.  Alan Rich on behalf

13  of Judge Sanders the property damage FCR.

14          MR. McDANIEL:  Garvan McDaniel for Arrowwood.

15          MR. LONGOSZ:  Good morning, Your Honor.  Edward

16  Longosz on behalf of Maryland Casualty.

17          MR. WISLER:  Good morning, Your Honor.  Jeffrey

18  Wisler on behalf of Maryland Casualty Company.

19          THE COURT:  Okay.  Thank you, good morning.

20          MS. BAER:  Good morning, again, Your Honor.  Janet

21  Baer on behalf of the debtors.  Your Honor, I can take you very

22  quickly through most of the agenda.  Item Number 1, Your Honor,

23  the Massachusetts Department of Revenue objection to claim.

24  I'm happy to report we have settled that matter.  The

25  settlement agreement has been filed.  It's set for hearing at

1    the January 10th hearing so hopefully we will resolve that and

2    finally get it off the agenda.

3          Your Honor, Agenda Item Number 2 is the 25th Omnibus

4    objection.  There still are a few remaining tax claims there

5    that we're working on, so that's being continued to January

6    10th.

7          Your Honor, you have entered orders on Items 3, 4, 5

8    and 6, so I don't think we need to take up anything further on

9    those matters.

10          And that takes us, Your Honor, to Agenda Item Number

11    7.  That is the status on plan confirmation.  Your Honor

12    entered an order last week and my co-counsel, John Donley, will

13    address that for the debtors.

14          THE COURT:  All right.  I have added a couple of

15    items to my list since I issued that conference, Mr. Donley.

16    But, I'm happy to start with the two that are there.  Some, I

17    think, are probably not so troublesome.  It's more -- I'm a

18    little confused as to the effect of some of the settlements and

19    I need some clarification about some things.

20          MR. DONLEY:  All right.  Well, let me begin -- and

21    one thing I assure the Court I most definitely won't do since I

22    heard the tail end of the prior matter about reopening the

23    record, I assure the court most definitely we won't do that.

24    We want to be very precise responding to Your Honor's

25    questions.  And before I get in or ramble around, is there

1  anything specific on the 8.8.7 issue that Your Honor would like

2  me to be addressing?

3      THE COURT:  Well, yes.  This new release in the

4  newest plan indicates that people who are I think not voting

5  for the plan -- and I'm not clear whether it includes people

6  who do not take any money from the plan -- from the trust

7  -- will be bound by both the channeling injunction and the

8  release.  The release for Fresenius specifically seems to go

9  beyond what is required by the Fresenius settlement documents

10  and that seems to be the subject of an objection to 8.8.7.

11      So, I'm not clear how -- and I should note for the

12  record that the Fresenius settlement in the adversary action

13  was entered before the circuit decided Combustion Engineering.

14  So, it seems to include -- if not a channeling and I think it

15  does include a channeling for direct claims against Fresenius

16  which I think under Combustion simply cannot be done.  And it

17  also includes, it seems, these releases by people who have not

18  voted for the plan and I'm not clear how just taking money from

19  the trust is going to afford Fresenius a release of non-

20  asbestos related claims.  So, I am concerned by what 8.8.7 is

21  doing, how it's structured, and whether -- if that alone will

22  make this plan unconfirmable.

23      MR. DONLEY:  All right.  I understand the issues.

24      THE COURT:  And I'll just state for the record, the

25  reason I asked for this status conference is I had indicated at

1  a prior hearing that I would try to get this confirmation

2  opinion done by the end of the year.  And the reason I'm

3  setting this status conference is to help hopefully get that

4  process finalized.  So, I'm looking for some explanations and

5  if I can't satisfactorily address them to my own satisfaction,

6  then I don't know whether I'm going to meet my end of year

7  deadline.

8          MR. DONLEY:  Okay.  And let me start by just noting

9  one thing for the record.  I do believe the second last

10 sentence which I've put on the ELMO of 8.8.7 is in and is

11 required by the Fresenius settlement agreement.  I have a cite

12 on that but let me come to it when I proceed through stepwise,

13 Your Honor.

14          The first question is with regard to entities who

15 receive no distribution under the plan.  First of all, those

16 entities are unaffected by this second last sentence, the

17 release as to Fresenius --

18          THE COURT:  All right.

19          MR. DONLEY:  -- by definition.  And if they -- if

20 there is anyone in that category who voted for the plan -- I'm

21 not sure that there is, I've been trying to imagine who it

22 would be -- they're affected by the other consensual releases

23 and all the third circuit authorities approving consensual

24 releases.

25          THE COURT:  Yes.  I'm not concerned.  If they voted

1  for the plan, I'm not concerned --

2          MR. DONLEY:  Right.

3          THE COURT:  -- about the release.  I think they have

4  the right to release.  But, if they haven't voted for the plan,

5  that's a horse of a different color.

6          MR. DONLEY:  Yes.  And if they're not receiving any

7  distribution they're unaffected.  If their creditors in

8  contrast who receive or retain property under the plan and did

9  not vote to accept the plan with regard to this release and the

10 second last sentence of 8.8.7 deems that they have released the

11 Fresenius indemnified parties according to that language.

12          And we believe there's a very substantial record in

13 the case that satisfies the <u>Continental Airlines</u> factors and

14 the similar factors from the <u>Exide</u> opinion, as well.  And let

15 me just start by getting a -- giving a sense on the whiteboard

16 of what types of claims -- what the universe of claims we're

17 talking about are.

18          MS. BAER:  You need a mic?  John, you're going to

19 need a mic.

20          MR. DONLEY:  Oh, I'm sorry.

21          THE COURT:  Is there any way that that screen can be

22 put up on my monitor?  It's very difficult for me to read at

23 that angle.

24          MR. DONLEY:  I think I can just use this portable

25 mic, Your Honor, if that picks up because I'll just be a minute

1 at the flow chart.

2          THE COURT:  What's this monitor for if it's not for

3 that?

4          MS. BAER:  Your Honor, we have an extra copy -- hard

5 copy -- if that would help.

6          THE COURT:  It probably would.  Thanks.  I have it in

7 a -- somewhere here but -- thank you.

8          MR. DONLEY:  So --

9          THE COURT:  Just a minute, Mr. Donley, because I

10 thought that it was something to do with accepting property

11 from the trust.

12          MR. DONLEY:  What we're -- in the second last

13 sentence, we had various -- consensual release is talked about

14 at the start of 8.8.7 through a whole host of defined terms,

15 asbestos, protected parties, committees and we did, as Your

16 Honor may recall, we narrowed this release to address a concern

17 of the U.S. Trustee about representatives being protected only

18 if they actually served in the case.  So, this has been

19 modified and tailored.  And then when we get down to this last

20 sentence regarding Fresenius indemnities, this is the one where

21 there's a release deemed to be given --

22          THE COURT:  Right.

23          MR. DONLEY:  -- to the Fresenius indemnified parties

24 by persons who did not vote to accept the plan.  And when I

25 think about the categories of claims or creditors that that

1   affects, you start obviously with asbestos claimants, a big

2   part of the case.   And the asbestos claimants in the case we

3   know are already covered by the 524(g) injunctions by the

4   various substantial consideration in the plan and so forth so

5   that's already covered.   Nothing unfair that's added by this

6   release to asbestos claimants.

7           You then think about another category of claims which

8   are the successor claims, for example, claims related

9   -- arising out of the Fresenius transaction or successor

10  fraudulent claims relating in some respect to Fresenius.   And

11  those are covered along with other matters in the successor

12  claims injunction in Section 8.5.1 of the plan.   So, if those

13  are already addressed, there's no unfairness to persons who are

14  already enjoined -- creditors already being enjoined given a

15  release here.

16          What else is left then in the pie chart when we think

17  about the universe of affected claims.   And I think of kind of

18  other claims that aren't asbestos PI, aren't asbestos PD,

19  aren't going to arise up saying this transaction aren't

20  successor fraudulent transfer claims relating to Fresenius that

21  are other types of business claims predating the Fresenius

22  transaction.   Maybe there's alleged to be a

23  co-liability on a contract or an indemnity provision or

24  something.

25          THE COURT:   Well, it'd be every unsecured creditor in

1  the case.

2           MR. DONLEY:  Yes.

3           THE COURT:  Every other unsecured creditor --

4           MR. DONLEY:  Any other -- and there's a defined term

5  for that in the plan.  Those are called GR claims.  It's a

6  subset of the defined term Grace-related claims and this other

7  category is called GR claims.  And the critical part of this

8  argument is that those are assumed in Section 8.5.2 of the

9  plan.  And that's where the reorganized debtor assumes -- it's

10 8.5.2C.  And I have it on the ELMO but I guess Your Honor can't

11 --

12          THE COURT:  No, I can see it.

13          MR. DONLEY:  -- see that.

14          THE COURT:  Yes.  It's just a bad angle.

15          MR. DONLEY:  All right.  It's 8.5.2C and that's the

16 key.  The reorganized debtors from and after the effective date

17 shall assume all liability of Fresenius and be entitled to

18 assert and have the benefit of all defenses of Fresenius with

19 respect to all GR claims -- that's that other category, all

20 others -- timely filed by the GR claims.

21          THE COURT:  Well, if you're talking about GR claims

22 as Grace-related claims, the definition in the plan

23 incorporates the definition in the Fresenius settlement and

24 that includes essentially everything, every direct or indirect

25 claim against Fresenius.  And I don't think (A) those can be

1  channeled, nor do I think those can be released.  So, if the

2  debtor's assuming them and the creditors have voted for the

3  plan, that's a different issue with respect to the release.

4  But, I'm not sure how they're going to be channeled in anyway.

5       MR. DONLEY:  So, well, it's a release without a

6  channeling and it's an assumption by the debtor.  So, in terms

7  -- I'm focusing now on the first prong of Continental Airlines,

8  fairness to creditors, these things are already assumed and

9  there are findings.  I won't bore the Court with them.  We

10 could go through them but in Judge Wolin's opinion with those

11 broad releases included in the Fresenius -- Judge Wolin's,

12 rather, approval order for the Fresenius settlement.  He had

13 findings TT, YY and ZZ that specifically found that the

14 releases were fair to creditors, substantial contributions

15 beneficial to the estate, to the plaintiffs in the actions and

16 to the creditors specifically found.

17      Now, if we turn to are these -- I'm anticipating from

18 your last question, Your Honor, the next prong of Continental

19 Airlines.  Are these releases necessarily and essential to the

20 plan?  We believe so and -- because they were required by

21 Fresenius and embodied in Judge Wolin's order -- 115 --

22      THE COURT:  That's okay for the settlement with

23 respect to Fresenius.  The problem is putting them into the

24 plan as opposed to people and entities that had either no

25 notice, although I can't tell from having looked at the

1  Fresenius settlement who was noticed.  It seems that the quote

2  unquote noticed parties were all noticed, but I don't know who

3  they were because the district court docket and the bankruptcy

4  court docket are not the same and I simply don't know who they

5  were.

6        So, I don't know who had the opportunity to appear

7  and be heard on the Fresenius issue.  To the extent there was

8  that opportunity, it seems to me they're foreclosed from coming

9  in and objecting now because they had that opportunity to

10 object to those same issues at the settlement.  But, I don't

11 know who all those folks are.

12       MR. DONLEY:  We looked at that, Your Honor.  And the

13 only parties we could think of who raised a notice argument or

14 might have raised were Beacon and One Seaton (sic) who were

15 settled with last year.  That was one of the issues.  They said

16 we came in after Judge Wolin's settlement order approving the

17 settlement.

18       With regard to everybody else, they were noticed.

19 The record was made.  We believe they're bound.  We believe

20 it's res judicata and the essential -- the necessity to the

21 plan is -- has a couple of parts to it.  One is obviously the

22 $115 million contribution Fresenius is making.  Fresenius

23 -- and Fresenius's contribution according to the settlement

24 agreement, Section 2.02C and then it's memorialized in Judge

25 Wolin's order at KK B where he finds this is an essential part.

1  Fresenius's agreement at 2.02C requires that the plan for a

2  reorganization contain a release deeming that any person -- I'm

3  sorry -- any person has fully and finalized released each and

4  every of the NMC defendants from all Grace-related claims.

5         So, they bargained for it, they insisted on it, Judge

6  Wolin found at KK B and then I think it's finding AAA and just

7  to complete the cites of decretal Number 5, Paragraph Number 5

8  in the order, that this is essential to the settlement.

9  Fresenius isn't obligated to pay unless this is and shall be

10 included in the plan.

11        And it goes beyond that.  Fresenius gives a release

12 in Section 2.04 of their settlement agreement to Sealed Air.

13 And Sealed Air settlement is contingent on Fresenius

14 consummating a settlement, making the payment, giving Sealed

15 Air the release.  So, we think it's truly essential to the plan

16 and everybody got notice and should be bound by the order and

17 the findings.

18        THE COURT:  Well, I understand it says that it's

19 required but I think the plan confirmation issue and the

20 settlement issue are two different things.  And based on the

21 fact that the Grace-related claims include claims that are not

22 asbestos-related, and it was pre-Combustion, they clearly

23 cannot be channeled.  Whether they can be released may be a

24 different issue, but they clearly cannot be channeled.

25        And the settlement agreement also requires a

1 channeling either under a 524 or 105 and that can't happen.

2 So, I am at a loss as to how this is going to work.

3       MR. DONLEY:  Well, I guess, Your Honor, to me it all

4 comes back to 8.5.2 which was a plan amendment that was added

5 about a year ago and there, the debtors assume the liability.

6 So, I just don't see how any creditor is prejudiced and on the

7 other hand Fresenius, you know, demanded this provision.  We

8 need it to make the plan go.

9       THE COURT:  Whether a creditor is prejudiced or not,

10 the circuits told me I can't confirm a plan that has an

11 injunction for direct, non-related asbestos claims.  I can't do

12 it.  Combustion says I can't.  So --

13       MR. LOCKWOOD:  Your Honor, if I could interject.

14 Combustion Engineering says that you can't use 105 to enjoin

15 asbestos claims that fail to qualify under 524(g).  I don't

16 believe that there's anything in here that purports to do that.

17 As Mr. Donley pointed out, there's a 524(g) injunction that's

18 separate and apart from all of this that channels all the

19 asbestos PI and PD claims to their respective trusts.

20       THE COURT:  Well, I didn't bring that plan, Mr.

21 Lockwood, and I apologize.  I just don't remember that detail

22 whether it's channeling Grace-related claims or just the

23 asbestos --

24       MR. LOCKWOOD:  The only non-asbestos claims -- the

25 only claims that are being channeled under 105 as such are what

1  Mr. Donley referred to as the successor claims under 105.  But,

2  those are defined as non-asbestos claims.  They are, as Mr.

3  Donley pointed out earlier, fraudulent -- today, it's claims of

4  the sort that for example an unsecured creditor, non-asbestos

5  creditor, could conceivably raise.  And I don't believe that

6  Combustion Engineering says anything about that.  I think the

7  --

8           THE COURT:  No, I don't think Combustion --

9           MR. LOCKWOOD:  -- question is Continental Airlines

10  and --

11           THE COURT:  I don't think Combustion deals with 105

12  in a context other than asbestos claims.  I agree with that.

13           MR. DONLEY:  So, if, Your Honor -- yes, I think Mr.

14  Lockwood's exactly right.  When we talk about channeling, we

15  have the asbestos claims in this plan -- our current plan

16  channeled under 524(g).  Beyond that, just the successor type

17  claims we talked about channeled under 105.  And then when we

18  get down to the others, these GR claims, I don't believe

19  they're channeled.  And to me, that's just a classic release of

20  a nondebtor third party that then has to pass muster under

21  Continental Airlines and the record I think is very, very

22  strong on each of the points.

23           I'll just wrap up on how the Continental Airlines is

24  satisfied.  We talked about fairness to creditors and Judge

25  Wolin's findings and they were repeated in the confirmation

1  hearing record and several of these were in Mr. Fink's

2  testimony as well on behalf of Grace on September 14th.  Of

3  necessity, the reorganization we talked about how essential

4  they are.

5          And then the last -- the third factor in <u>Continental</u>

6  <u>Airlines</u> talks about specific findings and circumstances

7  relating to the specifics of this case.  There you have things

8  like identity of interest between the released party and the

9  debtor.  That record's made very fully that these are back

10  -- potentially back-door claims against the debtor, potentially

11  indemnity obligations, co-indemnitor obligations, that's in the

12  record many places.

13          Was there a substantial contribution or consideration

14  given?  Yes.  That's in many places, including Judge Wolin's

15  finding YY.  Did the -- did a substantial majority of the

16  creditors support this?  Yes, we know the vote totals.  And

17  does the plan pay substantially all of the claims affected by

18  the release?  Yes, the asbestos claims we know, the successor

19  type claims we know, the consideration and on the GR claims,

20  the other claims, that's why I think the whole thing comes back

21  to the 8.5.2 assumption of liability by the reorganized

22  debtors.

23          THE COURT:  All right.  I'll take a look at that.

24          MR. DONLEY:  Okay.  Those are all my comments on

25  that, Your Honor.  I assume we should pick up on the interest

1  question after any others have commented?

2          THE COURT:  Yes.  Anyone have any comments with

3  respect to this issue of the release?  Mr. Cohn?

4          MR. COHN:  Yes, Your Honor.  Let's start off please

5  with the issue of whether those who received notice of the

6  Fresenia settlement and did not object are bound when it comes

7  time to plan confirmation about provisions of a Chapter 11 plan

8  because I would respectfully assert that that proposition is

9  not sustainable, Your Honor.

10          And the first reason is that there is -- under the

11  bankruptcy code it's clear that only after receiving and having

12  the opportunity to review a plan and disclosure statement may a

13  creditor be bound as to any provision of a Chapter 11 plan, in

14  this case, at the time of the Fresenia settlement, simply

15  wasn't there.  There was of course included in the settlement

16  all sorts of stuff about what had to happen under a Chapter 11

17  plan.  And parties were bound by the Court's approval of a

18  settlement in the sense that no one could object that the

19  settlement itself had been approved with those conditions

20  contained in it.  But, as to that meaning that everybody had

21  signed off at that point to those provisions being included in

22  a Chapter 11 plan just is not correct.

23          And Your Honor, you yourself have followed that

24  process.  When it came time, for example, to approve the Rail

25  Insurance settlement, the Arrowwood settlement, there were

1  provisions of the settlement and some of those provisions said

2  okay, we're going to be the beneficiary of the 524(g)

3  injunction under the plan and you ruled very specifically that

4  while you were approving the settlement you were reserving on

5  the Section 524(g) issue until the plan.  And that was

6  completely proper, Your Honor.  The -- it's the confirmation

7  process that's designed to deal with plan issues.  So, whatever

8  the approval of the Fresenia settlement meant, it did not mean

9  that all plan provisions required to be included as conditions

10  to that settlement were approved as conforming to the

11  bankruptcy code and applicable law.

12        You, yourself, I believe just gave another reason

13  why.  The law could change and did change as -- with the

14  -- with handing down Combustion Engineering.  But, also the

15  parties' positions could change.  We had no idea, for example,

16  as the Libby claimants whether we were going to have objections

17  to the plan or not.  In fact, at that stage, we had high hopes

18  that we were going to be in a position to resolve all issues

19  that we had with respect to the plan.  And we certainly weren't

20  going to review every single settlement or motion that came

21  before the Court through the entire -- what's it been, nine

22  years of the case -- to seek --

23        THE COURT:  Well, if you don't though, you act at

24  your peril because then you've got notice and an opportunity to

25  be heard and you're bound by the order.

1          MR. DONLEY:  Your Honor, I'm sorry to jump up but I'm

2   not sure why Mr. Cohn's arguing because his clients had notice

3   of the original order and I think they are bound by res

4   judicata.  So, I think he's making an argument on behalf of

5   people --

6          THE COURT:  Look, this isn't --

7          MR. DONLEY:  -- who aren't here and probably don't

8   exist.

9          THE COURT:  Well, in any event, it's a narrow issue.

10  My concern is that it seems as though the releases include

11  things that are direct claims against Fresenius that have

12  nothing to do with the debtor.  Nothing.  In no way, related to

13  either the merger, fraudulent conveyances, asbestos, nothing.

14          It appears that they include anything and everything

15  that could happen against Fresenius from time and memorial and

16  I'm just simply not sure how this plan or any plan can force

17  that kind of release on anyone.  And I get that from the

18  definition in the settlement document of the Grace-related

19  claims which essentially is very broad and which I apologize I

20  don't have here but seems to include those claims.  And that's

21  the problem.  So --

22          MR. COHN:  Well, then I guess maybe I'm raising an

23  additional problem, Your Honor --

24          THE COURT:  All right.

25          MR. COHN:  -- but I just -- I'm raising that for the

1  record and if you disagree obviously you'll so rule.

2          THE COURT:  No.  I think the parties have the right

3  to object in the plan context, as well, because the issues

4  could be different.  And that's what I need to look at, Mr.

5  Cohn, and I am looking at, whether the issues are different.

6          MR. COHN:  Terrific.

7          THE COURT:  If they're not different, then I think

8  res judicata or collateral estoppel will prevent an objection.

9  But, if they are different for some reason then I don't think

10  they will.  Because obviously the settlement is designed to

11  affect and enhance the plan confirmation process.  But, the

12  plan still has to be confirmable on its own and that's what I'm

13  looking at now.

14          MR. COHN:  Well, yes, Your Honor.  And I would

15  acknowledge that except to the extent that any objection now

16  being made to Section 8.8.7 of the plan affects the

17  confirmability of the plan, then no such objection is properly

18  before the Court in the confirmation process.  So, maybe we are

19  on the same page.

20          But -- so let me move to my next point, Your Honor,

21  which is that Mr. Donley pointed out and he's absolutely

22  correct that asbestos claimants are enjoined, assuming the plan

23  is confirmed, by the Section 524(g) injunction.  And to the

24  extent that Section 8.8.7 simply were to replicate what was

25  already done in another section of the plan, it might not be

1   admirable drafting but it wouldn't be objectionable.

2          However, the injunction in 8.8.7 -- strike that, Your

3   Honor -- I meant the release, the enforced release on people

4   who voted against the plan contained in Section 8.8.7 is

5   broader.  And so, to the extent that you have asbestos claims,

6   call that A, Your Honor, and then you have a whole bunch of

7   other claims that are also included, call those B.  It's fine

8   if 8.8.7 duplicates A.  I mean, it's technically flawed because

9   you can't enforce -- you still can't force people to give a

10  release, but you can enjoin them.  So, that takes care of A.

11         But, as to B, which is that entire universe of claims

12  covered by 8.8.7 that are not picked up by the 524(g)

13  injunction, the only way that those claims get enjoined,

14  released or anything else under the plan is through 8.8.7 and,

15  Your Honor, it's well established that it is simply not

16  permission to say just because you receive or retain property

17  under a plan that therefore you're releasing a claim that is

18  your own separate independent claim.  And so, Section 8.8.7 I

19  would respectfully submit it does render the plan unconfirmable

20  for that reason.  Thank you.

21         THE COURT:  Okay.  Thank you.  Anyone else?

22         MR. DONLEY:  Could I just respond briefly on the plan

23  definitions, Your Honor, of the terms because I think the -- we

24  don't have it up there -- but the release in -- at the end of

25  8.5.2 doesn't release Fresenius for all claims by anybody at

1    any time.  And there's a couple of pieces of limiting language.

2          First, in 8.8.7, the consensual releases are

3    described above and at the end of that about eight lines from

4    the end it says there's a release there being given in any way

5    relating to or pertaining to the debtors or the reorganized

6    debtors, their operations on or before the effective date.

7    When you then come down to --

8          THE COURT:  Well, but it goes on.  Their respective

9    property Chapter 11 cases or the negotiation, formulation, and

10   preparation of the plan or any related agreements, instruments,

11   or other documents.  And that -- clearly includes the Fresenius

12   --

13         MR. DONLEY:  Correct.  But, that's not -- that

14   wouldn't be a claim -- a business claim arising today against

15   Fresenius with no connection to Grace.  That wouldn't be

16   covered because in the next paragraph, we say each holder who

17   receives or retains shall be deemed unconditionally released in

18   the Fresenius indemnified parties to the same extent as the

19   release in the preceding sentence.  So, there is a limitation

20   --

21         THE COURT:  Then, you folks need some clarity to

22   this, if that's the case.  If you're not attempting to release

23   direct claims against Fresenius, then you need a sentence that

24   says that.

25         MR. DONLEY:  And I think it does -- let me just

1  finish with two more cites, Your Honor.  The definition of

2  Grace-related claim of which these are a subset -- the GR

3  claims are a subset in the definitions -- includes as the third

4  item the claims based on the conduct or operations of any

5  business or operations of any of Grace Con and its parents or

6  subsidiaries at any time.  And then, when we go to 8.5.2A, GR

7  claim is defined there and it is limited in Section A Your

8  Honor.  It's not wide open, all claims for all time.

9             THE COURT:  Okay.  Then how does that fit in?

10            MR. LOCKWOOD:  Your Honor, one other --

11            THE COURT:  There is somewhere a definition -- and

12  I'm sorry, I don't know exactly where -- that indicates that to

13  the extent the releases incorporate Grace-related claims the

14  definition of Grace-related claims specifically refers to the

15  Fresenius settlement.  And the Fresenius settlement defines

16  Grace-related claims as virtually anything and everything that

17  could ever come up from the beginning of the world till the end

18  of the world against Fresenius.

19            Now, it's not that specific.  It doesn't use the

20  beginning of the world and end of the world terms.  But, it

21  does say essentially that it includes everything against

22  Fresenius.  And I simply don't see how this plan can do that.

23  Now, if I'm misunderstanding it, then maybe I should give you a

24  day or so to file something and put it in context for me

25  because I will take a look at 8.5.2.  I don't think the

1 definitional issue addresses this though, Mr. Donley.

2        MR. LOCKWOOD:  Your Honor, Mr. Cohn represents the

3 Libby claimants.  He acknowledged --

4        THE COURT:  I understand.

5        MR. LOCKWOOD:  -- he created this A and B.  I don't

6 understand how he professes to represent anybody with the

7 Category B claims that he was arguing are too broad.  So, it

8 seems to me that he lacks standing if he's asserting any

9 objection.

10        THE COURT:  Okay.  Mr. Lockwood, I'm not dealing with

11 standing issues today.  I have very limited time and a very

12 specific focus.  So, if somebody wants to address the focus,

13 I'm going to hear anybody and everybody who wants to address

14 the focus, because my intent is to try to get an order on this

15 confirmation process out by the end of the year.  So, could we

16 just get to the merits, please?  Yes?

17        MR. COCO:  Your Honor, Nathan Coco on behalf of

18 Fresenius.  I'll volunteer to address the focus and I'll try to

19 make it quick.

20        Your Honor, we don't read the definition of

21 Grace-related claim perhaps as broadly as you do, or at least

22 in your most recent reading.  The definition as set forth in

23 the settlement agreement which is in Section 1.21 goes through

24 the typical litany you see of a definition of a claim but then

25 it's qualified at the end by, that are based upon, arise out of

1  the NMC transaction which is referred to in the plan as the

2  Fresenius transaction or the conduct or operations of any Grace

3  Con business.

4        And so, the intent of this provision and I think also

5  its construction is that it captures claims that could be

6  brought against Fresenius based upon its relationship with the

7  Grace entities and also the Grace transaction.  And this

8  mirrors the definition in the plan which incorporates it by

9  reference but also I'd note for the sake of clarity and the

10  plan definition is in Section 141 --

11        THE COURT:  Well, here's the problem.  My clerk who's

12  on the phone has printed for me a copy of the definition.  It

13  says, Grace-related claim shall mean collectively all claims

14  including unknown claims demands, rights, liabilities and

15  causes of action of every nature and description whatsoever,

16  known or unknown, direct or indirect, whether concealed or

17  hidden from the beginning of time up to and including the

18  settlement effective date, asserted or that might have been

19  asserted including without limitation claims for fraudulent

20  conveyance, successor liability, piercing of the corporate

21  veil, negligence, gross negligence, professional negligence,

22  breach of duty of care, breach of duty of loyalty, breach of

23  duty of candor, fraud, breach of fiduciary duty, mismanagement,

24  corporate waste, breach of contract, negligent

25  misrepresentation, contribution -- something that I can't read

1   -- any other common law or equitable claims and violations of

2   any state or federal statutes, rules or regulations which are

3   either asbestos-related claims or that are based on or arise

4   out of the IMC transaction or the conduct or operations of any

5   Grace Con business including without limitation, any liability

6   or obligation of Grace Con business under environmental law but

7   not including any claims based on or arising out of the conduct

8   or operations of the NMC business or any after omission of the

9   NMC defendants in connection with the operation of the NMC

10  business.  That's the definition that I've been dealing with.

11  Okay.

12          MR. COCO:  Okay.

13          THE COURT:  Now that I have it again, please proceed.

14          MR. COCO:  Great.  Thank you, Your Honor.  And I

15  think it's the last clause that you read that is -- places a

16  limitation on all the things that precede it.  The clause which

17  starts which are either asbestos-related claims, which are

18  addressed in the 524(g) portion of the plan, or that are based

19  upon, arise out of the NMC transaction, or the conduct or

20  operations of the Grace Con business.  And included at the end

21  of the definition and also in the plan definition is the carve

22  out for any direct claims that a party could bring against

23  Fresenius based upon the NMC business, the business that

24  Fresenius took when it separated from the Grace entities.

25          And so, Your Honor, we don't read this release and

1  the definition of Grace-related claims to capture a direct

2  claim against Fresenius that has nothing to do with its

3  relationship with Grace, the Fresenius transaction, or claims

4  that could otherwise be brought against Fresenius because of

5  its prior relationship to Grace.

6        THE COURT:  All right.  Okay.

7        MR. COCO:  Thank you.

8        THE COURT:  Thank you.  Okay.  Let's move on to the

9  next one.

10        MR. DONLEY:  Your Honor, again, if there's specific

11  aspects of the interest rate issue, I have a lot.  I can ramble

12  on but that --

13        THE COURT:  Well, there is a specific aspect.

14        MR. DONLEY:  All right.

15        THE COURT:  I think the problem may be the

16  fluctuation in interest rates.  And because of that

17  fluctuation, I can't tell with the way the Class 9 interest

18  rates for the pre-petition lenders is calculated under the

19  plan, whether it at least provides the lenders on a go forward

20  basis with their contract rate of interest.

21        MR. DONLEY:  It does, and I can show it graphically

22  most easily.

23        THE COURT:  All right.

24        MR. DONLEY:  The exact number and calculation hasn't

25  been put in the record but the basis for this graph has been.

1  And I can show it on a time link.

2          So, you start with what's the non-default contract

3  rate under the contract.  And that's defined as something

4  called the alternate base rate, which both sides -- alternate

5  base rate which both sides stipulate means prime.  So, if we

6  look at prime on this chart -- and I need to zoom out a little

7  bit.  If you look at prime under this chart during dependency

8  of the case, it's a floating rate and it follows that pattern.

9  During the first couple of weeks before the first interest

10  reset date, there's a euro dollar rate that applies and that

11  doesn't -- that's noted in a different color at the start.

12  But, that doesn't have a material impact.

13          The plan rate then is for -- from January 1st, '06

14  forward is identical.  It's prime and I'll show that on the

15  next chart.  In fact, let me back up, Your Honor, to the period

16  from the petition date through the end of '05.  The plan rate

17  is the 6.09 percent fixed rate --

18          THE COURT:  Yes.  It's not that that I'm concerned

19  about.

20          MR. DONLEY:  Prime is below and the excess is

21  greater.  And so -- and then beginning on the 1st of '06, the

22  plan rate and the non-default contract rate are the same.

23  They're prime, except that the plan is slightly more generous,

24  Your Honor, because the plan provides quarterly compounding and

25  if you read the contracts and apply New York law, which

1 applies, they really don't provide for quarterly compounding.

2 It's really a simple interest.  That's never been addressed but

3 if it ever became a dispute we could brief that.

4        So, I hope that answers your first question about how

5 they -- in what respect the plan rate is equal to or greater

6 than the non-default contract rate.

7        THE COURT:  All right.  So that -- I thought the

8 non-default contract rate was a formula that started this time

9 that had some multiplier factor but again I apologize.

10       MR. DONLEY:  No.  Let me back up and do a very short

11 primer on the contract, Your Honor.  There are two defined

12 rates.  Under the credit agreements, there are two of them as

13 Your Honor knows.  They're identical in their wording and all

14 material respects.  And there are two defined rates.  Euro

15 dollar rate which is LIBOR-based, and it does add a margin, and

16 alternate base rate which is prime.

17       THE COURT:  Oh, okay.

18       MR. DONLEY:  The parties have both agreed that the

19 non-default rate that's applicable is this alternate base rate

20 or prime.  That's why we didn't show you any LIBOR-based rates.

21       THE COURT:  All right.

22       MR. DONLEY:  The default rate then isn't defined per

23 se as a separate rate.  It's just a contingent rate that's

24 defined by reference to either of those two underlying rates if

25 an event of default occurs.  And that's in Section 10, Section

1  5.1C, and it's in the definition.  It all says that the default

2  rate is contingent on an event of default, and the lenders have

3  agreed the failure to pay principal in their briefs when due is

4  an event of default, and so I won't go back to <u>NextWave</u> and all

5  that doctrine about how not making an interest payment when it

6  comes due legally can't constitute a default.  I know Your

7  Honor is extremely familiar, and has ruled on that.

8        But the reason I bring up this passage, Your Honor,

9  is in some of their arguments the lenders have made this

10 creative argument.  They've said, oh, well, when the calendar

11 page merely flips over to the date of maturity and you don't

12 repay principal, well, that's just an automatic event where you

13 bump to the prime plus two percent rate, so you don't really

14 call it a default.  You don't really have to call it the

15 default rate.  And it just isn't.  The contract says if any of

16 the events shall occur, and the first one they list is

17 borrower failing to pay any principal when due.  That's the

18 calendar page flipping to the maturity date in non-payment

19 because of the Bankruptcy Code restrictions.  That is, in the

20 contract, an event of default, which, of course, we believe is

21 not enforceable.  That takes us back to the non-default

22 contract rate, the rate that is otherwise applicable at that

23 time.

24        And I'll finish with 5.1C.  The default rate, if you

25 have maturity pass without payment of interest, the contract

1  says you pay the rate that would otherwise be applicable,

2  everybody agrees that's prime, plus two percent from the date

3  of such non-payment until such amount is paid in full.  That's

4  the default provision for non-payment of principal when due.

5  And their argument that, geez, you can't take any rate except

6  the default rate because it's the only rate in the contract,

7  they say, sometimes, no, prime --

8              THE COURT:  No.  I'm not rearguing the default rate.

9              MR. DONLEY:  Prime -- prime is --

10             THE COURT:  That's not the point.

11             MR. DONLEY:  Prime is the non-default.  That's

12  agreed.

13             THE COURT:  Okay.

14             MR. DONLEY:  And that's all I --

15             THE COURT:  The prime is the non-default rate.

16  That's what I was looking for.

17             MR. DONLEY:  Yes.  And that's all I have, unless Your

18  Honor has further questions.

19             THE COURT:  No, I don't.  Mr. Cobb?

20             MR. COBB:  Good morning, Your Honor.  Richard Cobb on

21  behalf of the bank lender group.  Your Honor, we do not

22  disagree with the particular statements that were made

23  regarding the prime rate-prime rate equivalent.  Post effective

24  date, Your Honor, there was a mention with regard to quarterly

25  compounding.  We strongly disagree with that characterization,

1   or that argument advanced on behalf of the debtors.  We do

2   believe that quarterly compounding is applicable under the

3   agreements, and is supported by any law that the Court would

4   choose to turn to.  Your Honor --

5          THE COURT:  I'm not even getting into the

6   compounding.

7          MR. COBB:  I understand.

8          THE COURT:  I just want to know whether or not this

9   plan will provide the lenders with a non-default contract rate.

10  That's what I couldn't tell, or didn't understand from the

11  evidence.  That's all I was trying to find out.  And I take it

12  that you agree that the plan does provide at least the contract

13  rate of interest, not the default rate?

14         MR. COBB:  Right, Your Honor, but that's a tricky way

15  to phrase the question because it's not only the rate, it's

16  when the interest is paid.  It's when we are satisfied.  We've

17  obviously argued, Your Honor, that we're impaired because

18  they're not paying the default rate.  Set that aside.  We've

19  also argued, however, that we are impaired because we are not

20  being paid any interest on the effective date, any interest

21  whatsoever in the event that we continue to assert our legal

22  rights, i.e., if we were to continue and appeal.  That, Your

23  Honor, is different -- it does not comport, obviously, with the

24  contract provisions.  Principal is to be paid on the effective

25  date.  We believe that interest is to be paid, as well.

1 Further, Your Honor, no interest is to be paid on the interest

2 that remains unpaid as of the effective rate, and we so, Your

3 Honor, for both of those reasons, and this is not an allowed

4 claim versus unallowed, or contested, or objected to claim.

5 This is an issue specifically with regard to impairment.  And

6 so, the non-default contract rate does not comport with the

7 plan's rate simply because of how they proposed to pay the

8 interest.  They proposed no interest at all on the effective

9 date.  They proposed that no interest will continue to accrue.

10 So, for that portion of our impairment argument, Your Honor, we

11 do believe that it doesn't comport and we are impaired because

12 of that provision.  Thank you.

13        THE COURT:  I suggested earlier that you folks should

14 attempt to resolve this issue.  I'm going to make that

15 suggestion again, and hopefully you will be able to provide me

16 with an order that resolves this interest rate issue, and when

17 it's to be paid under this plan before I come out with a

18 confirmation order.

19        Okay.  I think those were the only two issues that

20 asked in the order -- excuse me one second.  My clerk sent me a

21 note.

22                    (Pause)

23        THE COURT:  Okay.  In 8.5.2, based on the fact that

24 Seaton and OneBeacon have now settled, is 8.5.2 the embodiment

25 of that settlement with respect to, I guess it's Clause 3,

1  provided, however, that with respect to Seaton, a G.R. claim

2  may only be asserted, and a G.R. proof of claim may only be

3  filed with respect to a G.R. claim that's based on the 1996

4  Uniguard agreement and so forth, everything else that deals

5  with Uniguard and Seaton.  Is this the settlement?

6      MR. DONLEY:  Yes, Your Honor, it is.  And I think

7  what remains of the G.R. claim category is if -- we don't know

8  of any, but if potentially there were some other similar claims

9  out there that's what it's attempting to address and what

10  8.5.2C would pick up.

11      THE COURT:  Okay.  Recently the Commercial Union

12  Insurance also settled, but apparently it's become part of

13  OneBeacon.  I just want to make sure that the Commercial Union

14  Insurance settlement and the settlement with -- that was

15  embodied in 8.5.2 of the plan with OneBeacon and Seaton are not

16  somehow contradictory.  I guess I want to know whether

17  OneBeacon has settled all of its issues.  That's what I'm

18  really looking for.  Mr. Brown?

19      MR. BROWN:  Your Honor, the answer to that question

20  in terms of plan objections is, yes, both Seaton and OneBeacon

21  have resolved all of their plan objections.

22      THE COURT:  All right.  Thank you.  And that would

23  then include the Commercial Union Insurance aspect of this as

24  well, then, Mr. Brown?

25      MR. BROWN:  Yes, Your Honor.  The Commercial Union --

1 OneBeacon is a successor to the Commercial Union entities.

2         THE COURT:  Okay.  Thank you.  Okay.  There is a

3 provision in the plan that talks about the California claims

4 and the fact that they are no longer on appeal, and that the

5 same procedure is in place to resolve them, but I'm not sure I

6 know what that procedure is.  Is that 7A of the plan the same

7 as the Anderson Memorial Hospital claim?  It will be resolved

8 through the plan?  There's nothing pending that requires any

9 further adjudication by this Court?  Is that the intent of that

10 provision?

11         MR. DONLEY:  Yes, Your Honor.

12         THE COURT:  So, they're in Provision 7A of the plan,

13 Class 7A of the plan?

14         MR. DONLEY:  Yes, Your Honor.  That's correct.

15         THE COURT:  Okay.  There is a sentence that indicates

16 that the Anderson Memorial Hospital claim is still pending, but

17 inactive, and I'm not sure I know what to do with that.  I

18 don't know whether this provision was drafted before the appeal

19 was dismissed by the Circuit or whether that's material.  I

20 thought that all that was left was the Anderson Memorial

21 Hospital claim itself, not a class action claim, but I'm not

22 sure what this language means.

23         MR. DONLEY:  There was an appeal history, and I know

24 Lisa Esayian is very familiar with it.  If she is on the line

25 and can briefly walk us through it?  I'm not sure if she is,

1  but I'll ask her to un-mute if she is, because I know she knows

2  that history.

3          THE COURT:  Ms. Esayian, are you on?

4          MS. ESAYIAN:  Yes, Your Honor.  That's correct.

5  There was an appeal -- Your Honor issued an order denying

6  Anderson Memorial's motion for class certification.  That was

7  appealed by Anderson Memorial to the District Court.  The

8  District Court affirmed Your Honor's denial of certification of

9  the class.  Anderson Memorial then appealed to the Third

10  Circuit.  The Third Circuit ruled that it lacked jurisdiction

11  to hear the appeal because the denial of certification was not

12  a final adjudication.  Therefore, the Third Circuit did not

13  render a ruling on whether certification was appropriate or

14  not, or affirming or reversing Your Honor's order, but simply

15  ruled that it did not have jurisdiction, so that the class

16  portion of the Anderson claim, at least theoretically, could be

17  appealed at a later point in time.  The Third Circuit said that

18  in their order.  So, the individual claim remains.  The class

19  portion was denied by Your Honor, but could, in theory, be

20  appealed farther on down the line.

21          THE COURT:  Okay.  So, whatever is left with respect

22  to Anderson Memorial, whether it turns out to be just the

23  individual Anderson Memorial Hospital claim or a class claim is

24  in 7A, Class 7A?

25          MS. ESAYIAN:  Yes, Your Honor.

1          THE COURT:  Okay.  Thank you.  Anyone -- I'm not sure

2    if Mr. Speights or someone is on the line for Anderson.  Is

3    there any concern, or something you wish to express?  Okay.

4    I'm hearing no response.  Okay.  Section 5.6 of the TDP has

5    drawn some objections.  This is the section that requires any

6    indirect claimant who submits a claim to the trust,

7    particularly if the claim has been settled by an indirect

8    claimant, to obtain a release from the direct claimant of the

9    trust.  I think I'm a little confused as to what that process

10   is supposed to be and what the purpose of it is.  So, if I

11   could get some explanation of 5.6, I would appreciate it.

12         MR. LOCKWOOD:  Your Honor, Section 5.6 sets up two

13   classes of indirect claims, one of them which is the one -- is

14   the so-called presumptive requirements, and the other is the --

15   what happens if it doesn't meet the presumptive requirements.

16   And the -- I believe -- let me just check here -- yes.  The

17   requirement in Subparagraph 2 is the one I think you're

18   referring to in the first paragraph, where they talk about the

19   direct claimant and the indirect shall have released the PI

20   trust from the liability of the direct claimant.  Is that the

21   clause that you're referring to?

22         THE COURT:  Well, it's there.  It's also somewhere

23   below, I think, where it's talking about settlements, but --

24         MR. LOCKWOOD:  Well, there's also, in the second

25   paragraph, it says with an appropriate full release in favor of

1 --

2               THE COURT:  Yes.

3               MR. LOCKWOOD:  -- the PI trust.

4               THE COURT:  But essentially it's the same.

5               MR. LOCKWOOD:  Both of those are with respect to

6 presumptive trust, now -- claims, that you can have -- you can

7 still have an indirect claim if you don't meet the

8 requirements, and so for -- there's two categories one can

9 contemplate, or that this contemplates.  One is settlements,

10 the other is judgments.  If -- it's obviously in the context of

11 settlements that you're talking about getting releases, because

12 you don't necessarily get a release when you get a judgment.  I

13 believe maybe one of the objectors pointed that out.  But as I

14 believe that we articulated during the hearing, since the

15 single satisfaction rule applies, there's -- in the third

16 paragraph of 5.6 where it's talking about an indirect claimant

17 cannot meet the presumptive requirements set forth above,

18 including the requirement that the indirect claimant provide

19 the trust with a full release of the direct claimant's claim,

20 he can never -- they can nevertheless establish that they have

21 a valid indirect claim by showing that they have paid the

22 liability of the trust.  And if you had a judgment against you

23 and it was for the full joint and several liability, which is

24 the context in which indirect claims arise, then you would be

25 able to show that you didn't need a release because the

1  judgment itself was the thing that extinguished the liability

2  of the trust for that purpose because it's -- because as I said

3  before of the single satisfaction rule, you can't get --

4          THE COURT:  Okay.

5          MR. LOCKWOOD:  -- I hate to use the world double dip

6  because it has a lot of other connotations in these cases, but

7  you can't get the same money twice from two different people.

8          THE COURT:  Okay.  I understand that with respect to

9  the difference between the judgments and the settlements.  My

10 clerk was just pointing out with respect to Anderson Memorial

11 that Mr. Speights and Mr. Fairey are both supposedly on the

12 phone, but maybe when I'm done with this issue I'll turn back

13 to see whether perhaps they were on mute and I need to get them

14 un-muted, Mr. Lockwood.

15         Okay.  I appreciate the distinction between the

16 judgments and settlements.  I think in reading this I was not

17 appreciating that difference.  If the issue is getting a

18 release with respect to the settlement, that obviously makes

19 some sense.  It does not, necessarily, with respect to the

20 judgment.  So --

21         MR. LOCKWOOD:  In a settlement, if you're not -- the

22 normal rule is you're settling your several liabilities, so

23 normally a settlement wouldn't give rise to a contribution

24 claim, and if, somehow or another, you want to argue that you

25 -- that somehow you did settle the Grace liability assumed by

1  the trust, you'd need to prove it, and the way you prove it is

2  I got a release of Grace and/or the trust, and that's why that

3  requirement is in there for settlements.

4        THE COURT:  Okay.  Thank you.  Anyone wish to address

5  this issue with respect to the releases?

6        MS. CASEY:  Your Honor, Linda Casey on behalf of BNSF

7  Railway.  This issue with respect to the releases, as Mr.

8  Lockwood just addressed, does fit nicely with cases where

9  there's joint and several liability where a co-defendant is

10  paying for their several liability.  It dovetails with our

11  issue where the indirect claimant is being sued on a derivative

12  liability, or a strict liability, or vicarious liability, where

13  the claimant is asserting the full value of the claim against

14  BNSF on behalf of -- on the basis of Grace's conduct.  It is

15  theoretically possible that BNSF could obtain a settlement for

16  less than the full amount with the Libby claimants choosing to

17  continue to go after the trust.  The issue dovetails with the

18  objection that BNSF made where the extraordinary claims

19  treatment limits BNSF to be able to go after the trust on the

20  standard to maximum value and prevents them from being able to

21  come in at the extraordinary value despite the fact that BNSF

22  and some other claimants are not exactly the joint and several

23  liability claimants.  They are being -- have claims asserted

24  against them for derivative liability or strict liability, and

25  therefore this issue of, well, it works because there's a

1    single payment doesn't really work in the context of BNSF.

2             THE COURT:  Well, I think it should still, if I

3    understand Mr. Lockwood's position correctly, because to the

4    extent that BNSF asserts that it has a claim against the trust

5    and the trust is only there to pay the liabilities of Grace, so

6    to pay the liabilities of Grace, BNSF would have had to pay the

7    liability of Grace.  So, if you paid the liability of Grace and

8    you get a release for the fact that you paid the liability of

9    Grace, then you can assert that claim against the trust.

10            MS. CASEY:  Right.  But the issue that arises with

11   the BNSF claims where it is considered a strict liability or a

12   derivative liability claim is the difference between the

13   standard value claims and the extraordinary treatment.  And

14   under the plan the extraordinary claims value is between five

15   and eight times the value of a standard claim.  And what I'm

16   saying is, it is theoretically possible for BNSF to settle with

17   the Libby claimants for less than what they claim is their full

18   value and have the Libby claimants want to still come in and

19   get their standard value claim.  And because BNSF has paid more

20   than what the standard value claim is, it would not be double

21   dipping.

22            THE COURT:  If BNSF has paid more then the

23   extraordinary value --

24            MS. CASEY:  No.  More than the standard value.

25            THE COURT:  Oh.  More than the standard value but

1  less than the extraordinary value --

2          MS. CASEY:  Correct.

3          THE COURT:  -- then you'd get a release to the extent

4  that you paid the claim, but --

5          MS. CASEY:  Unless the Libby claimants feel that they

6  are entitled to the extraordinary value.  It's an issue where

7  the -- the reason I'm raising this is the plan values assume

8  that the indirect liable -- indirect co-defendants have joint

9  and several liability where they're going to pay their several

10 share and maybe be liable for a separate several share on the

11 part of the debtors.

12         THE COURT:  Right.

13         MS. CASEY:  However, where you have somebody who is

14 being asserted strict liability, vicarious liability, or any

15 other kind of derivative claims, it is not this joint and

16 several liability.  It's paying all of the value.  The

17 difficulty comes in where you have the extraordinary claims

18 value treatment, say, well, if you pay -- if the underlying

19 creditor received a substantial payment from a third party,

20 they're only entitled to the standard value claim, and

21 therefore, they are -- even though their claim would have been

22 an extraordinary value, because there is somebody who has

23 strict liability or derivative liability asserted against them,

24 they can't get that, and so then we have this issue with, well,

25 what are we asking the plaintiffs to release?  Are we asking

1 them to release their right to the single claim, to the full

2 claim?  How does that work when you're in the context of a

3 settlement where they're taking less than what they would like

4 to take and they want to preserve their rights to come against

5 the trust?

6             THE COURT:  All right.  Mr. Mangan?

7             MR. MANGAN:  Good morning, Your Honor.  Kevin Mangan

8 on behalf of the State of Montana.  Just so I'm clear, I

9 understand Mr. Lockwood's explanation of presumptive versus the

10 non-presumptive categories.  To the extent there is a release

11 or there is not a release, you still -- it would go into the

12 non-presumptive category.  Is that your explanation?

13            MR. LOCKWOOD:  If there was not a release, yes.

14            MR. MANGAN:  It would go to non --

15            MR. LOCKWOOD:  It would go to the non-presumptive.

16 Correct.

17            MR. MANGAN:  -- presumptive.  Okay.

18            MR. LOCKWOOD:  But if you establish that you have a

19 right under law, then you win.

20            MR. MANGAN:  As Your Honor is aware, the State of

21 Montana is pressing, and continues to press its objection with

22 regard to the plan.

23            THE COURT:  Okay.  So, what is it that the trust is

24 asking for to the extent that somehow the Libby claimants agree

25 to settle with an entity other than the trust for less than

1 what they contend is their full claim?

2          MR. LOCKWOOD:  Well, Your Honor, Ms. Casey's

3 hypothetical deals with two parties who are not in the trust,

4 namely the Libby claimants making a direct settlement not with

5 the trust but with BNSF, and BNSF making a settlement with the

6 Libby claimants not with the trust.  And she -- and when you're

7 talking about making settlements, it's within the control of

8 those two parties as to what terms they agree on.  She

9 hypothesizes that somehow BNSF makes a settlement for less than

10 the extraordinary value of the claim, but the Libby claimants

11 -- but part of the deal that they make with the Libby claimants

12 is that the Libby claimants get to ask the trust for, I guess,

13 the difference between what they got with BNSF and the

14 extraordinary claim value.  First, I mean, BNSF might take an

15 assignment from the Libby claimants of the standard -- or

16 whatever they got paid, and the two of them jointly could press

17 an extraordinary claim.

18          I really -- I don't quite know how to deal with this

19 level of hypothetical scenario.  All I know is that if you have

20 a non-presumptive claim and -- and you are entitled as a matter

21 of law, you've shown that you have paid a portion of the

22 trust's liability, which by hypothesis it sounded to me like

23 Ms. Casey was positing.  I mean, it sounded like she's saying,

24 well, the Libby claimants were going to get extraordinary

25 value, five to eight times the standard.  We've paid part, but

1 not all of that, so if that were the case, then if they could

2 -- they would be able to establish, assuming that the Libby

3 claimants didn't go for a hundred percent of the extraordinary

4 value, they would be entitled to establish that the part they

5 paid was part of the trust's liability, and make a claim under

6 the non-presumptive liability.  And if they didn't -- if they

7 just gave the Libby claimants the money and didn't get any kind

8 of a release of the trust at all, well, that would have been a

9 voluntary decision on their part to make that kind of a

10 settlement, and they might very well be unable to prove at that

11 point if they had left the Libby claimants with the right to go

12 for the full value of the extraordinary claim against the

13 trust, they wouldn't be able to prove that they paid any

14 portion of the trust liability.

15        THE COURT:  Well, I don't think the issue is as to

16 BNSF.  I think the assumption is --

17        MR. LOCKWOOD:  Well, I didn't think it was, either,

18 until Ms. Casey got up, but I mean --

19        THE COURT:  No.  I think the issue is if,

20 hypothetically, BNSF made a deal with the Libby claimants pay

21 some portion of what a Libby claimant contends is the ultimate

22 liability that would be owed, but the Libby claimant could

23 satisfy the extraordinary claims value portion of the TDP, the

24 settlement with BNSF doesn't rise to that level.  The issue is

25 can the Libby claimant who settled part but not all of the

1 liability come into the trust?  Is the trust demanding -- it

2 looks like the trust is demanding a release of all of its

3 liability, even if all of it --

4          MR. LOCKWOOD:  For the presumptive -- for the

5 presumptively valid claims.  It doesn't require that --

6          THE COURT:  Oh.  Because in a settlement, you're

7 saying, it would not be presumptively valid?

8          MR. LOCKWOOD:  Let's assume the Libby claim is eight

9 times value --

10          THE COURT:  Answer my question first.

11          MR. LOCKWOOD:  I'm sorry.

12          THE COURT:  Are you saying that the settlements would

13 not be presumptively valid claims?  Only judgments would be

14 presumptively valid claims?  So, every settlement --

15          MR. LOCKWOOD:  No.  A settlement that provides a

16 release from the trust --

17          THE COURT:  Right.

18          MR. LOCKWOOD:  -- is presumptively valid.

19          THE COURT:  Okay.  Then that's the issue.  What's the

20 extent of the release?  Only what they paid, or for the full

21 claim?  Because if it's --

22          MR. LOCKWOOD:  It depends on the terms of the

23 release.  In other words, if you -- if you hypothesize that --

24 I mean, we're -- a hundred thousand dollar value for an

25 extraordinary claim, I'm just pulling this number, or a million

1   -- let me make it a million dollars for an extraordinary claim,

2   and BNSF settles the claim against it for $500,000, and the

3   Libby claimant wants to get the remaining $500,000 from the

4   trust, there's -- if -- through either taking a partial

5   assignment of the Libby claimant's claim BNSF gets the right to

6   500,000 of the million, or through getting a release by the

7   Libby claimants of the trust of $500,000 worth of the claim, if

8   they can establish some way or another that they have paid a

9   liability that the trust would otherwise have had to pay, then

10   under the non-presumptive liability portion of this they would

11   -- both the Libby claimants and BNSF would be able to get money

12   from the trust.

13           THE COURT:  Okay.  I think that's the issue.

14           MR. LOCKWOOD:  That's what I'm attempting to

15   articulate.

16           THE COURT:  Okay.  So, in other words, the release --

17   the trust is not demanding a full release.  It's demanding a

18   release of the liability of the trust to the extent that

19   somebody says they paid it.  If the trust would still have

20   further liability the claimant, the direct claimant itself is

21   not prohibited from pursuing that direct claim?

22           MR. LOCKWOOD:  Right.  And the question of how the

23   relationship between -- I mean, when you settle in BNSF's

24   capacity with the Libby claimant, this hypothetical settlement,

25   they can negotiate whatever terms they want to, including

1 assignments of partial claims, or agreement that I'm paying

2 only a part of the claim, etcetera.  At the end of the day the

3 -- there's nothing in the non-presumptive liability portion of

4 5.6 that says that you couldn't show that you've paid -- it

5 says if the indirect claimant -- this is the third paragraph of

6 not meeting the presumptive requirements -- if the indirect

7 claimant can show that it has paid all or a portion of such

8 liability or obligation, the PI trust shall reimburse the

9 indirect claimant the amount of the liability or obligation so

10 paid times the payment percentage, etcetera.  So, those

11 provisions contemplate a less than hundred percent release, but

12 it's the hundred percent release that's presumptively liable.

13 And the reason it's set up this way is that you -- you wouldn't

14 know unless you really looked at whatever the terms of the

15 settlement agreement were, exactly what its legal effect was

16 vis-a-vis the trust.  It might be very clear, just says it

17 right on the face of it.  Or there might be a debate between

18 the indirect claimant as to whether or not it actually had paid

19 a portion of the trust liability or was somehow or another

20 paying its own liability that wasn't something from the trust.

21 So, that's the -- the non-presumptive liability picks up both

22 judgments, and sort of partial settlements or other -- you

23 know, any other assertion of liability on the part of the trust

24 for contribution or indemnity that isn't the result of a full

25 released presumptive settlement.

1          THE COURT:  All right.  Okay.  Thank you.  Anyone

2  wish to address this release issue before I turn back to the

3  AMH issue?  Okay.  Operator?  I'm sorry.  Is either Mr.

4  Speights or Mr. Fairey on the phone?

5          COURT CALL OPERATOR:  Mr. Speights' line is now open

6  for you, Your Honor.

7          THE COURT:  All right.  Thank you.  Mr. Speights, I'm

8  going to back up to the issue with respect to AMH for a moment.

9  What I was attempting to find out was whether whatever claims

10 are left with respect to AMH, whether it's an individual -- I'm

11 sorry -- the individual claim of the hospital, or whether it

12 turns out to be a class claim, they're all included in Class

13 7A, and I got a representation from the plan proponents that

14 the answer to that question is yes.  So, do you have anything

15 you wish to state?

16         MR. SPEIGHTS:  Your Honor, Mr. Rosendorf is also on

17 the line, and as to that question you asked, which is a

18 bankruptcy question, I would prefer he respond, and I'm not

19 sure whether he is on mute or not.

20         MR. ROSENDORF:  Unless you can hear me, I'm on a

21 listen only line.

22         THE COURT:  I can hear you, Mr. Rosendorf.

23         MR. ROSENDORF:  Oh.  I guess I'm not on a listen only

24 line, then.

25         THE COURT:  Okay.  Go ahead.

1      MR. ROSENDORF:  Good thing I had it on mute up until

2 now.

3                          (Laughter)

4      THE COURT:  Okay, Mr. Rosendorf, tell me what you'd

5 like the record to reflect.

6      MR. ROSENDORF:  That is our understanding, as well,

7 is that under the classification scheme of the plan that that

8 claim is a 7A claim.

9      THE COURT:  Okay.  Is there anything else that you

10 wish to address that has been identified on this record with

11 respect to the releases, or anything else, Mr. Rosendorf?

12      MR. ROSENDORF:  No.  Thank you, Your Honor.

13      THE COURT:  Okay.  Thank you.  At one point the issue

14 under 5.6 of the TDP that the trust may be doing a separate

15 proof of claim form for the indirect claimants was an issue,

16 but frankly I don't remember seeing that offhand as I was going

17 through these issues.  Is that an issue still, or is it not,

18 that there is not a form now?

19      MR. LOCKWOOD:  There is still not a form that I'm

20 aware of.  I don't believe there's an issue because, among

21 other things, as the colloquy that we had a few minutes ago,

22 when you get into the area of non-presumptive claims, it's a

23 little hard to articulate exactly what that form would look

24 like.  If there's a volume of indirect claims that the trustees

25 concluded would be efficient to create a form for, they would

1 do so.  But I don't believe that there's any pending objection

2 to the plan that somehow or another the form should have been

3 done as a plan document as opposed to being done by the

4 trustees after the fact.

5         THE COURT:  Okay.  I just want to make sure that

6 that's not an issue.  I don't remember seeing objections to

7 that fact in your briefing, but I know it came up at one of the

8 hearings, and so I just want to be sure I haven't missed

9 something.  Does someone have an objection on that score that

10 I've missed?  All right.  There's no response.  I believe that

11 covers everything that I was prepared to address today.

12                         (Pause)

13         THE COURT:  Let's take a very short recess, about ten

14 minutes, so that I can confer with my law clerk.  I want to

15 make sure that I haven't missed something since she's not here,

16 and then I'll call her and we'll be back.

17         MR. COBB:  Your Honor, before we break, just to

18 follow up.  Richard Cobb on behalf of the bank lender group,

19 two quick points.  Your Honor, it should come as no surprise to

20 the Court, the bank lender group is ready, willing, and able to

21 sit and meet with the debtors, with equity, more importantly,

22 to have a discussion about the interest rate issue.  We've been

23 willing to do that since prior to the extended confirmation

24 hearings.

25         Number two, Your Honor, with respect to the -- we

1  talked about this issue, impairment, because the -- we

2  bifurcate impairment, the one issue with regard to impairment

3  is we're not going to be paid interest on the effective date.

4  Your Honor, a simple way -- if Your Honor agrees with the

5  debtors that the non-default rate doesn't apply, but then

6  agrees with us that, in fact, we are impaired because we're not

7  being paid interest on the effective date, a simple way, of

8  course, to fix the latter is to require them to amend the plan

9  to provide for payment of that interest.  Your Honor, there's a

10 world in which the rate, although stated rate is equal, if the

11 appeal goes on long enough the effective rate means, because

12 we're not receiving any interest at all, and interest on

13 interest, it starts to diverge.  In other words, there's a big

14 gap in the amount of -- in the amount that we're compensated

15 for in the interest.

16       THE COURT:  Well, I understand that, and I get -- the

17 legal issue that I haven't resolved, Mr. Cobb, is as of what

18 date I have to make that determination.  I don't know whether

19 it's ongoing over the life of the plan because it's interest on

20 paid claims, or whether it's how the plan reads as of the

21 effective date.  I just don't know.  I think you folks should

22 eliminate this issue by fixing when the interest will be paid,

23 at least.  That much should be fixed.  Okay.

24       MR. COBB:  Thank you, Your Honor.

25       THE COURT:  Ten minute recess.

63

1                    (Recess)

2           COURT CLERK:  All rise.

3           THE COURT:  Please be seated.  Those were all of the

4    issues that I am prepared to address now.  Ms. Baer?

5           MS. BAER:  Thank you, Your Honor.  We just wanted to

6    point out, I think as you're aware from a couple of the

7    questions you asked, that we did file some technical amendments

8    to the plan on the eighth, and we'd be happy to walk through,

9    if you had any other questions on any them, otherwise I think

10   they're pretty straightforward and self-explanatory.

11          THE COURT:  I didn't see any difficulty with any of

12   them except the insurance issue, which I wanted to be sure

13   didn't somehow or other set aside what OneBeacon and Seaton did

14   because of the fact that OneBeacon was a successor.  That's

15   all.

16          MS. BAER:  Okay.  Then I think that's it, Your Honor.

17          THE COURT:  All right.  Any -- housekeeping, any

18   other matters?  Okay.  We're -- Grace is adjourned, then.  Than

19   you.

20          MS. BAER:  Thank you, Your Honor.

21          MR. LOCKWOOD:  Thank you, Your Honor.

22                    *  *  *  *  *

23

24

25

## C E R T I F I C A T I O N

We, STEPHANIE SCHMITTER and TAMMY DeRISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our abilities.


/s/ Stephanie Schmitter

STEPHANIE SCHMITTER


/s/ Tammy DeRisi

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.      DATE:   December 16, 2010