**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-1139(JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

**OBJECTION OF BNSF RAILWAY COMPANY TO DEBTORS' MOTION PURSUANT TO SECTIONS 105, 363, 1107 AND 1108 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 9014, AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR AN ORDER APPROVING THE SETTLEMENT BETWEEN W.R. GRACE & CO. AND THE CNA COMPANIES**

BNSF Railway Company ("BNSF") objects to the Debtors' Motion Pursuant To Sections 105, 363, 1107 And 1108 Of The Bankruptcy Code And Rules 2002, 6004, 9014, And 9019 Of The Federal Rules Of Bankruptcy Procedure For An Order Approving The Settlement Between W.R. Grace & Co. And The CNA Companies (the "Motion"), and states as follows:

**SUMMARY OF OBJECTIONS**

1. BNSF objects to the Motion on the following four grounds:

- The Settlement Agreement improperly eliminates BNSF's rights as a Named Insured to policy proceeds to which the Debtors and their estates have no rights. At a minimum, the order and the Joint Plan of Reorganization must be amended to eliminate any ambiguity.

- The Settlement Agreement seeks to extend the channeling injunction to the CNA Companies without meeting the requirements of Section 524(g).

- Rights of contribution and apportionment of fault among co-defendants accorded by state law are threatened.

- The Settlement Agreement improperly eliminates BNSF's rights under the vendor endorsements contained in the Grace policies.

## FACTUAL BACKGROUND

### A. General Background

2. Prior to 1963, Zonolite, a predecessor to Grace, mined and processed vermiculite from a mine near Libby Montana. The vermiculite mined by Zonolite contained asbestos.

3. Between 1938 and 1963, Zonolite and BNSF's predecessors, entered into various agreements relating to Zonolite's operations at the Libby mine, which granted Zonolite the authority to construct, maintain and operate a loading dock, suspension bridge and belt conveyor adjacent to BNSF's railway tracks.

4. In 1963, Grace's Dewey & Almy Division purchased the business and assets of Zonolite. From 1963 to 1990, Grace owned and operated the Libby mine that had previously been operated by Zonolite, and continued to mine vermiculite containing asbestos.

5. On April 16, 1963, Zonolite and Grace entered into an assignment agreement, whereby Grace accepted the assignment of the agreements between BNSF and Zonolite. On April 1, 1974, BNSF's predecessor and Grace entered into a lease for the maintenance and operation of a loading dock on the railway's right of way.

### B. Insurance Protecting BNSF

6. The April 20, 1950 agreement obligated Zonolite (and, as assignee, Grace) to purchase insurance policies for the benefit of BNSF's predecessor, the Great Northern Railway Company. Section 9 of the agreement states:

> [Grace] shall obtain and keep in full force and effect during the continuance of this agreement, at its own sole cost and expense, a



#13520788 v2

> policy of public liability and property damage insurance **protecting [BNSF]** against loss on account of injuries to or death of persons and loss of or damage to property arising out of the use of said premises or arising out of the construction, maintenance, use and removal of said suspension bridge and conveyor belt. Said policy of insurance shall be submitted to **[BNSF]** for approval as to the Insurance Company writing the same, the amount, and the form, and **shall protect [BNSF]** against loss on account of injuries to or death of one person in the sum of $100,000.00, and for injuries to or death of more than one person in any one accident in the sum of $500,000.00, and for damage to property in the minimum amount of $500,000.00. Said policy when approved by **[BNSF]** shall be delivered to it by[Grace].

Emphasis added.

7. Grace did in fact purchase such policies, which depict BNSF as the ***sole*** named insured.[1] The following policies were issued by a CNA Company:

CCP 906-04-56. Policy years 1974-1977.[2]

CCP 3327361. Policy years 1977 – 1981.[3]

CCP 2483440. Policy years 1981 – 1984.[4]

[1] Since these policies name BNSF as the insured, they constitute contracts between two non-debtors – BNSF and CNA. The policy proceeds do not constitute an asset of the estate. These policies (as well as others that may be discovered in future litigation) have been issued to BNSF and not to the Debtors. The coverage under these policies extends to some or all of the asbestos personal injury actions asserted against BNSF arising out of Grace's use and operation of the loading facilities where it loaded asbestos-containing vermiculite onto BNSF's railway cars. BNSF is not seeking a determination of the coverage issues, since they are not within the scope of this Court's jurisdiction. BNSF sets forth these facts solely to place its arguments in context and shall not constitute a waiver of the right to seek coverage under other policies not currently known to BNSF.

[2] BNSF has undertaken efforts to locate copies of all of its insurance policies. To date, BNSF has been unable to locate, through its own searches or through discovery, a copy of CNA policy number CCP 906-04-56. However, BNSF has located extrinsic evidence concerning this policy. Attached at Exhibit A is a Confirmation and a Certificate of Insurance – binding on the CNA Companies – concerning this policy.

[3] Attached at Exhibit B are copies of policy CCP 332 73 61, for the period 6/30/77 through 6/30/78, a Certificate of Insurance for policy expiring 6/30/79, and a Certificate of Insurance for policy expiring 6/30/81.

[4] Attached at Exhibit C is a copy of policy CCP 2483440, for the period 6/30/81 through 6/30/84.

**C. Grace's Indemnification Obligation and Insurance**

8. The terms of the contracts and leases obligate Grace to provide indemnity for claims asserted against BNSF.

9. Grace (and its predecessor Zonolite) obtained insurance to protect against losses arising out of its indemnification of BNSF via "endorsements" to its general liability policies. Grace obtained primary general liability insurance through Continental Casualty Company commencing in 1973. These policies included a generic endorsement, providing insurance for losses incurred relating to any contractual indemnification agreement entered into by Grace.

10. While BNSF is not specifically named as a contracting party to which the contractual indemnity endorsement to the CNA Company policies applies, as an entity with whom Grace entered into a contractual indemnity agreement, BNSF falls within the scope of this coverage.

**D. Pending and Threatened Lawsuits Against BNSF**

11. BNSF is defending suits (which are currently stayed by order of this Court) asserting personal injuries allegedly resulting from vermiculite mined in Libby, loaded by Grace and transported by BNSF. In addition, some cases were settled and funded by BNSF prior to the imposition of the stay, without formal litigation having been brought by the personal injury claimants. BNSF has been informed by various plaintiffs' counsel that there are a substantial number of additional employee and non-employee personal injury claims for which litigation has not yet been filed because of the injunctions entered by this Court.

12. All of the present and future claims asserted against BNSF arising from asbestos-related diseases in Libby, Montana, are subject to the Grace indemnification agreement,

with insurance provided by the endorsements to Grace's general liability policies, including those issued by the CNA Companies.

13. Furthermore, the preponderance of the claims are also insured by the policies which expressly name BNSF as the insured, including policies issued by the CNA Companies.

## OBJECTIONS

### A. BNSF's Rights as a Named Insured Are Improperly Eliminated

14. The Settlement Agreement requires that the Debtors designate the CNA Companies as "Settled Asbestos Insurance Companies" with respect to the Subject Policies, on Exhibit 5 of the Exhibit Book to the Joint Plan of Reorganization. *See* Settlement Agreement at page 30, ¶ V.C. This designation results in all claims against the CNA Companies under the Subject Policies being channeled to the Asbestos PI Trust.. If approved, any action against the CNA Companies under the Subject Policies will be enjoined.

15. The term "Subject Policies" is broadly defined, and includes the policies specifically listed in Attachment A as well as "all known and unknown policies, or portions of policies, issued to a Grace Party . . . ." The definition further provides that Subject Policies "does not include policies, or portions of policies, issued to BNSF by any of the CNA Companies, or issued to BNSF and subscribed to by any of the CNA Companies."

16. At best, this definition creates an ambiguity as to whether the policies under which BNSF claims rights as the named insured are covered by the channeling injunction. At worst, it could be interpreted as enjoining BNSF from pursuing its contractual rights against the CNA Companies. Because these policies constitute a contractual obligation owed by one non-debtor (CNA) to another non-debtor (BNSF), with no impact on the contractual rights of a

debtor, this Court does not have jurisdiction to affect BNSF's rights under the policies. As such, the Settlement Agreement, the order approving the Settlement Agreement, and the Joint Plan of Reorganization must be explicit in stating that they do not affect BNSF's right to such coverage.

POLICY NUMBER CCP 2483440

17. BNSF is the Named Insured under a policy issued by the CNA Companies that bears policy number CCP 2483440.

18. However, Grace is also the Named Insured under a policy issued by the CNA Companies that bears the identical policy number – CCP 2483440.

19. However, the Grace policy bearing number CCP 2483440 is listed as a "settled policy" that must be designated in the Plan and subject to the channeling injunction. Neither the Settlement Agreement, nor the proposed amendment to the Joint Plan of Reorganization explicitly clarifies that the BNSF Policy CCP 2483440 is unaffected by either the Settlement Agreement or the channeling injunction.

20. While these policies bear the same number, they are not the same policy.

(1) There are separate declaration pages for each policy;

(2) Only BNSF is listed as the Named Insured in one of the policies; Grace is listed as the Named Insured in the other policy;

(3) The policy periods are different: the BNSF policy term is from 6/30/81 through 6/30/84; however, the Grace policy commences five years before the BNSF policy – the term is from 6/30/76 through 6/30/85;

(4) The policy limits are different; and

(5) The scope of coverage is different.

21. The BNSF policy number CCP 2483440 has a notation that it is an "Attachment to Policy No. CCP 248 3440, ENDT. #1." However, the Grace policy number CCP 2483440 has a different 'endorsement number 1.'

22. Further, the BNSF policy number CCP 332 7361 also bears the notation that is an "Attachment to Policy No. CCP 332 7361, ENDT. # 1." However, there does not appear to be any Grace policy with this policy number. In fact, during the years covered by BNSF policy number CCP 332 7361, the Grace policy in effect bore the unrelated number CCP 248 3440. This indicates that the form utilized by the CNA Companies, designating these BNSF policies as "endorsements," was simply a mistake.

23. Thus, it is evident that BNSF policy number CCP 2483440 is separate from Grace policy CCP 2483440. The designation as a "settled policy" under the Plan, however, could be interpreted as resulting in the settlement of the BNSF policy with the same number, and could be interpreted as enjoining BNSF from pursuing its rights under its policy.

24. Even assuming, *arguendo*, that the BNSF policy number CCP 2483440 is an endorsement to the Grace policy number CCP 2483440, the "endorsement" names BNSF, and BNSF alone, as the Named Insured. Further, the policy limit under the "endorsement" is separate and distinct from the policy limit under the Grace policy. The "endorsement" thus creates a contractual obligation between two non-debtors that does not affect the assets of the estate. Assuming that this policy is simply an endorsement, BNSF should not be forced to litigate whether such an endorsement is a "polic[y], or portion[] of [a] policy, issued to BNSF," and face a risk that either a subsequent court will rule that the policy was issued to Grace, or that the designation of the policy as a settled policy under the Joint Plan of Reorganization enjoins BNSF from asserting its rights. Rather, the Settlement Agreement and related documents must

explicitly and unambiguously resolve this anomaly, and declare that BNSF's coverage rights are not being affected.

POLICIES NUMBER 3327361 AND 9060456

25. Policy Number 3327361 names BNSF as the sole Named Insured. It, however, also includes the notation that it is an endorsement. No policy with the same number has been identified by Grace as having been issued to it.

26. Policy Number 9060456 has not been located. Both a Confirmation and a Certificate of Insurance, however, clearly indicate that BNSF is the Named Insured.

27. The Settlement Agreement and proposed order do not sufficiently protect BNSF's interests in these policies. This Court does not have jurisdiction to eliminate BNSF's rights under these policies, whether they are stand-alone policies or endorsements to Grace policies.

28. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). "The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995).

29. The jurisdictional grant provides the courts with exclusive jurisdiction over the property of the debtor, and is "principally *in rem*." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 369 (2006). The bankruptcy courts have jurisdiction over the property of the estate and over the restructuring of the debtor-creditor relationship. *See* 1 Collier on Bankruptcy ¶ 1.01[1][a], p. 1-7 to 1-9 (15th ed. rev. 2006); *Zerand-Bernal Group, Inc. v. Cox*, 23 F. 3d 159, 161 (7th Cir. 1994).

30. "[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the debtor." *Celotex*, 514 U.S. at 308, n. 6; *Pacor,* 743 F. 2d at 994 (holding that determination of "related to" jurisdiction turns on "whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy"*) (emphasis in original).

31. Because BNSF, and BNSF alone, has the rights to the policy proceeds under the BNSF policies – whether separate policies or endorsements to policies issued to Grace – none of the proceeds of the policies constitute an asset of the estate. 11 U.S.C. § 541(a). Accordingly, this Court does not have jurisdiction to enjoin BNSF from asserting its contractual claims against the CNA Companies. *In re Johns-Manville Corp.,* 517 F. 3d 52 (2d Cir. 2008) (holding by the Court of Appeals that the bankruptcy court does not have "related to" jurisdiction over direct claims against insurers), *reversed and remanded Travelers Indem. Co. v. Bailey*, Case No. 08–295, 129 S. Ct. 2195 (June 18, 2009) (holding that the finality of orders prevents the courts from determining, other than on direct appeal, that the bankruptcy court did not have subject matter jurisdiction to enjoin certain claims); *Pacor, Inc. v. Higgins*, 743 F. 2d 984 (3d Cir. 1984); *Matter of Edwards,* 962 F. 2d 641, 643 (7th Cir. 1992) ("Since the property was no longer part of the bankrupt estate and since a determination of rights to it would not affect any dispute by creditors over property that was part of the bankrupt estate, the bankruptcy court had no jurisdiction to determine rights to the property.").

32. As such, absent clarification making explicit that neither the Settlement Agreement nor the Joint Plan of Reorganization affect the rights of BNSF as a Named Insured in Policy Numbers CCP 3327361, CCP 2483440 and CCP 9060456, the Motion must be denied as impermissibly altering the rights of non-debtors to assets to which the Debtors have no interest.

**THE PROPOSED ORDER INCLUDES IMPROPER AND INACCURATE ASSERTIONS RELATING TO THE CNA COMPANIES' ABILITY TO OBTAIN PROTECTION UNDER SECTION 524(g)**

33. Some (or all )of the Libby Claimants have asserted that they hold independent claims against the CNA Companies based upon the CNA Companies' *failure to warn* of the asbestos risks at the Libby mine. These claims are asserted ***not*** against the CNA policies, but rather against the CNA Companies themselves.[5]

34. The terms of the Settlement Agreement provide that the CNA Companies must receive the benefit of a channeling injunction under the Joint Plan of Reorganization that protects them from claims held by any Entity – including the Libby Claimants – if such claims arise out of Grace's asbestos activities. However, the channeling protections for the CNA Companies include the Libby Claimants' *failure to warn* claims, even though the theory of liability is separate, distinct and independent of Grace's allegedly tortuous activities. In fact, the Settlement Agreement automatically terminates if this Court enters an order confirming the Joint Plan of Reorganization that does not have the effect of channeling such third party, non-debtor claims against the CNA Companies to the Asbestos PI or PD Trusts – a blatant "strong-arm" attempt. *See* Settlement Agreement at pages 7-8, ¶ I.Q., and pages 33-34, ¶ VI.A. 1.& 5.

35. Cognizant of its questionable validity, the CNA Companies then seek to postpone the issue in the expectation that it will somehow be swept up in the confirmation proceeding. Specifically, the Proposed Order approving the Settlement Agreement provides that

[5] BNSF, as a party against whom the Libby Claimants have asserted claims has standing to raise these issues. To the extent that the Libby Claimants are entitled to recover against the CNA Companies for "failure to warn", a dilution of the funds available to the Libby Claimants may result in an increase in the claims against BNSF. The Libby Claimants are entitled to only one recovery for their damages. BNSF is entitled to a dollar-for-dollar reduction in the claims asserted against it by any recoveries received by third parties for essentially the same damages. Any dilution of the value of the claims against the CNA Companies thus increases BNSF's exposure to the Libby Claimants.

the Court is "not deciding at this time whether a Bankruptcy Code Section 524(g) injunction should be issued with respect to the CNA Companies, which question is reserved for the Court's ruling on confirmation." Proposed Order at page 7, ¶ 2. This ignores the fact that the record (and briefing) pertaining to confirmation has long since been closed.

36. This "preservation attempt" is problematic for two reasons.

(a) First, the CNA Companies were not "Settled Asbestos Insurance Companies" under the Joint Plan of Reorganization, to whom the channeling injunction arguably extended, at the time that BNSF, and other interested parties, could object to confirmation, or develop a record as to why the CNA Companies were not entitled to the protections of Section 524(g) on independent, non-debtor claims. The terms of the Settlement Agreement, upon which their rights are based, was not yet disclosed. Accordingly, this Settlement Agreement, if approved, results in an after-the-fact extension of the provisions of the channeling injunction contained in the Joint Plan of Reorganization to now benefit the CNA Companies.

(b) Second, the Proposed Order contains findings of fact that specifically relate to the 'right' of the CNA Companies to receive the protections of the channeling injunction against third party, non-debtor claims. Specifically, the only issue that is apparently *not* being decided by the approval of the Settlement Agreement is whether independent, third party claims against non-debtor insurers fall within the scope of claims against third parties that can be enjoined under Section 524(g)(4)(A)(II)(iii). It appears that the approval of the Settlement Agreement – which includes a finding that it is fair, equitable and reasonable – eliminates the ability of the holders of interested parties from asserting objections based on the numerous *other requirements of Section 524(g) and 1124* including objections that (a) the contribution is not fair and equitable in light of the benefits provided to the CNA

Companies; and (b) the contributions are being shared with numerous claimants –the vast majority – who do not hold independent claims against the CNA Companies, thereby diluting the recovery received by the only parties asserting such claims, and is therefore unfair, inequitable and discriminatory.

37. Assuming *arguendo* that Section 524(g) permits the entry of a channeling injunction prohibiting third parties from asserting independent claims against the Debtors' insurers, such as the Libby Claimants' alleged *failure to warn* claims, there is no basis to do so here, because of its failure to provide just compensation to the holders of such claims. This issue must be decided before the Settlement Agreement can be approved.

38. The fact that a claim simply "arises by reason of . . . [a] third party's provision of insurance to the debtor", and satisfies Section 524(g)(4)(A)(ii), is insufficient to extend the channeling injunction.

39. Rather, to enjoin a third party from asserting a claim against a non-debtor, the Court must make specific findings of fact that such an injunction is fair and equitable to the parties enjoined in light of the contribution provided. *See* 11 U.S.C. § 524(g)(4)(B)(ii); *In re Continental Airlines*, 203 F. 3d 203, 215 (3d Cir. 2000).

40. Before an injunction can extend to such third party claims, the Debtors must establish that the CNA Companies are contributing sufficient assets to compensate the third parties who are releasing their claims. *See Id.* ("Substantial financial contributions from nondebtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible;" noting that the claimants whose claims against non-Debtors received no compensation for their releases; the only compensation received was on behalf of their "creditor" status; thus the injunction was invalid).

41. Here, there is no evidence of the value of the third party claims against the CNA Companies, or that the settlement amount is fair and equitable. In fact, the parties responsible for negotiating the Settlement Agreement had no interest in such claims. The Debtors do not own the claims, while the CNA Companies clearly have an interest in minimizing the claims.

42. More importantly, the entire settlement amount is being contributed to the Trust, to be distributed to all asbestos bodily injury claimants, without regard to whether such creditors have direct claims against the CNA Companies, or the relative value of such claims.

43. Upon information and belief, to date, only the Libby Claimants (who, according to the testimony at the Plan confirmation hearings, are a small percentage of the entire personal injury claimant group) have asserted *failure to warn* claims against the CNA Companies. There is no evidence that the majority of the asbestos claimants (which include non-Libby claimants) also have asserted independent actions against the CNA Companies. Yet, the contribution allegedly being made by the CNA Companies to obtain protection from these independent claims is being shared with claimants who have not yet asserted "failure to warn" claims against the CNA Companies. This is not permitted under existing case law concerning non-consensual third party releases of non-debtor claims. *In re Continental Airlines*, 203 F. 3d 203, 215 (3d Cir. 2000).

**THE SETTLEMENT AGREEMENT NEGATIVELY IMPACTS BNSF'S STATE RIGHTS**

44. The failure to provide fair compensation to the Libby Claimants for the release of their claims against the CNA Companies is particularly damaging to BNSF in light of Montana state law.

45. Under applicable state law, if a co-liable party is immune from suit, the jury is unable to apportion any fault to the co-liable party. However, a non-immune co-liable party who has settled with the personal injury plaintiff, conversely, can be placed on the jury verdict for apportionment of fault.

46. Because the Settlement Agreement will result in the non-consensual imposition of an injunction preventing the Libby Claimants from suing the CNA Companies, BNSF may be unable to seek apportionment of fault to the CNA Companies in litigation commenced by the personal injury plaintiffs.[6] Further, since such claimants will not have received actual compensation for the release of these claims – or will, at best, receive only a miniscule fraction of the compensation being provided for the release of their claims (while the rest is shared with creditors not holding such claims), BNSF may not be able to reduce the judgment by the value of any such (non-existent) payment.

47. Thus, the plaintiffs will be forced to release the CNA Companies (by receiving payment from the Asbestos PI Trust, all claimants are deemed to have released all Asbestos Protected Parties, which will include the CNA Parties if the Settlement Agreement is approved) without receiving fair consideration for their claims. The non-reduced claims would then be asserted against non-debtor entities, who may be precluded from apportioning fault to the CNA Companies, thus becoming potentially liable for a greater share of the plaintiffs' claims.

[6] BNSF does not concede this point, and in fact asserts that the better argument is that the CNA Companies should be deemed to be a settling and released party.

**THE SETTLEMENT AGREEMENT IMPERMISSIBLY AFFECTS BNSF'S RIGHTS UNDER THE GRACE POLICIES**[7]

48. The insurance policies issued to Grace by the CNA Companies include contractual indemnity endorsements, which extend to the endorsements provided to BNSF by Grace.

49. The scope of the duty to indemnify or duty to defend will be governed by the law of the State of Montana. *Kemp v. Allstate Ins. Co.*, 193 Mont. 526, 601 P. 2d 20 (1979); *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, 315 Mont. 281, 68 P. 3d 703 (2003). The law of the state of performance of an insurance contract controls as to its legal construction and effect. *Id*. The place of performance of a contract is the place where the insured is entitled to receive benefits. *Id*.

50. As a result of the contractual indemnity endorsements, BNSF is an "additional insured" under the policies. *In Ring Power Corp. v. Amerisure Ins. Co.*, No. 08-16414, 2009 WL 1101381 (11th Cir. April 24, 2009) (holding where a lease requires an insured to indemnify third party, and an insurance policy provides coverage for the insured's contractual indemnification obligations, the third party is an additional insured under the policy).

51. In accordance with Montana law, the *duty to defend* an insured under a liability policy is independent from and broader than a duty to indemnify. *Farmers Union Mut. Ins. Co. v. Rumph*, 2007 MT 249 ¶ 14, 339 Mont. 251, 170 P. 3d 974. Each of the insurance

---

[7] BNSF raised similar objections in connection with the Joint Plan of Reorganization. BNSF settled those objections, via an amendment to the Joint Plan. At the time, the CNA Companies were not settled asbestos insurance companies with respect to the bodily injury portion of the Subject Policies. Accordingly, BNSF reasserts its objections.

Further, the Court has not yet approved the Joint Plan. BNSF received consideration in exchange for its withdrawal of its objections relating to the Grace policies; if the Joint Plan as modified is not finally confirmed, BNSF's objections to any future plan that eliminates its rights in the Grace policies would not be resolved.

policies includes a duty to defend. Montana Code Annotated § 28-11-316. The performance of this duty to defend will not affect the estate of the Debtors or reduce any benefits to which the Debtors are entitled under the terms of the policy. This duty to defend is independent of any duties owed to the Debtors and cannot be waived by any entity other than BNSF.

52. Because BNSF is the express beneficiary of endorsements to Grace's insurance policies and its enforcement of its rights would not diminish the assets of the estate, Section 524(g) cannot be used to eliminate BNSF's direct contractual rights against the insurers.[8] *See In re Johns-Manville Corp.*, 517 F. 3d 52, *reversed and remanded*, *Travelers Indem. Co. v. Baily*, Case No. 08–295, 129 S. Ct. 2195 (June 18, 2009) (ruling that party cannot collaterally attack order on subject matter jurisdictional grounds); *Celotex*, 514 U.S. at 308, n. 6; *Pacor,* 743 F. 2d at 994. Even if this Court were to rule that Section 524(g) can extend to protect *shared* proceeds under such policies, it cannot be used to protect *defense cost* obligations that do not erode the policy limits available to Grace.

53. The Settlement Agreement fails scrutiny, as it permits the Section 524(g) injunction to extend to BNSF without payment of any consideration to BNSF.

---

[8] Even if Section 524(g)(4) permitted the extension of the channeling injunction to BNSF for its separate contractual rights as an additional insured, the injunction is impermissible because it is not "fair and equitable" to BNSF. 11 U.S.C. §524(g)(4)(B)(ii); *In re Congoleum Corp*., 362 B.R. 167, 179 & 181 (Bankr. D.N.J. 2007). Because the defense costs do not erode the general policy proceeds under any of the policies, BNSF should not be required to share its coverage with general asbestos creditors. Nevertheless, no consideration is being provided to BNSF for the release of its separate rights.

WHEREFORE, BNSF respectfully requests that the Court deny the Motion.

Dated: December 23, 2010
Wilmington, Delaware

PEPPER HAMILTON LLP

/s/ Henry J. Jaffe

Henry J Jaffe (DE No. 2987)
Hercules Plaza, Suite 5100
1313 North Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(Courier No. 19801)
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

Counsel for BNSF Railway Company

Of Counsel:

Edward C. Toole, Jr.
Linda J. Casey
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
Tel: (215) 981-4000
Fax: (215) 981-4750

Counsel for BNSF Railway Company