UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                   *
                                   *    Chapter 11
                                   *
In re                              *
                                   *    Case No. 01-01139 (JKF)
W.R. GRACE & CO., et al.,          *    Jointly Administered
                                   *
        Debtor                     *    Objection Deadline:  December 23, 2010
                                   *      at 4:00 p.m.
                                   *    Hearing Date:  January 10, 2011 at 9:00 a.m.
                                   *    Related Docket No. 25776
* * * * * * * * * * * * * * * * * * * * * * * *
```

## LIBBY CLAIMANTS' OBJECTION TO DEBTORS' MOTION TO APPROVE SETTLEMENT WITH THE CNA COMPANIES

Adam G. Landis (DE No. 3407)
Kerri Mumford (DE No. 4186)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE  19801
(302) 467-4400

and

Daniel C. Cohn
Olga L. Gordon
Ryan M. MacDonald
Murtha Cullina, LLP
99 High Street, 20th Floor
Boston, MA 02110
(617) 457-4000

***Counsel to the Libby Claimants***

December 23, 2010

**Table of Contents**

I.   Background ........................................................................................ 3

II.  Summary of Argument.................................................................... 7

III. Argument........................................................................................ 9

    A.    The proposed Settlement is Impermissible Because it purports to Eliminate the Libby Claimants' Vested Rights in the Proceeds of the CNA Non-Products Coverage ................................................. 9

        1.    The Libby Claimants May Not be Deprived of a Property Interest without Due Process of Law ............................... 10

        2.    Under Applicable Non-Bankruptcy Law, the Libby Claimants have Vested Rights in the CNA Non-Products Coverage which Cannot be Destroyed by Agreement between the CNA Companies and Grace ......................................... 11

        3.    Proceeds of the CNA Non-Products Coverage Are Not Property of the Grace Bankruptcy Estate ......................... 14

        4.    The Self-Contradictory Attempt of the Settling parties to Characterize Their Settlement as a Sale Does not Permit Them to Eliminate the Libby Claimants' Rights in the CAN Non-Products Coverage ................................................. 18

    B.    The Section 524(g) Injunction to be Entered Pursuant to the Proposed Settlement and the Plan is not Fair and Equitable as to the Libby Claimants ................................................................... 20

    C.    The Proposed Settlement May Not be Approved Without this Court's Determination that the Section 524(g) Injunction in favor of the CNA Companies will not Bar Insurer Wrong-Doing Claims............ 24

        1.    Due Process of Law Entitles the Libby Claimants to a Clear Determination Whether the Asbestos PI Channeling Injunction will Bar Pursuit of Their Insurer Wrong-Doing Claims.................................................................. 25

        2.    Insurer Wrong-Doing Claims are Property of the Asbestos PI claimants and May Not be Confiscated under the Plan ............... 28

        3.    Section 524(g) Does Not Permit Insurer Wrong-Doing Claims to be Enjoined ................................................. 28

a.      Section 524(g) Protection Cannot Extend beyond Derivative Liability for conduct of the Debtor ...................... 28

b.      Section 524(g) Projection for an Insurer Cannot Extend to Breach of Legal Duties Apart form the Provisions of Insurance ......................................................... 30

c.      Section 524(g) Can Protect an Insurer from Liability for Insured Claims but not Breaches of Its Own Legal Duties ................................................................ 32

d.      This Court should Order that any Section 524(g) Injunction Entered in Favor of the CNA Companies Shall Not Extend to Breaches of Their Own Legal Duties ...................................................................... 34

D.      This Court Should Clarify that the Only Claims Released Pursuant to the Release Provisions of the Proposed Settlement are those of the Debtors and the Asbestos PI Trust ......................................................... 35

IV.     Conclusion .............................................................................................. 36

Claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Murtha Cullina LLP and Landis Rath & Cobb LLP, hereby object to the Debtors' Motion for an Order Approving the Settlement Agreement Between W.R. Grace & Co. and the CNA Companies[2] dated November 18, 2010 [Docket No. 25776] (the "Motion"). As more fully set forth below:

- The Proposed Settlement may not be approved because it purports to take away from the Libby Claimants insurance coverage in which they have vested rights under non-bankruptcy law and as to which they do not compete with any other creditors of the Debtors' estate. Because there is no aggregate limit to such coverage and thus no need for bankruptcy administration of the proceeds to assure a ratable distribution to insured claimants, proceeds of such coverage remain outside the bankruptcy estate and may not be affected by the Proposed Settlement.

- Any order approving the Proposed Settlement must repair the deliberate ambiguity in the terms of the Section 524(g) injunction that the CNA Companies are entitled to receive under the Proposed Settlement. The terms of the injunction leave open the possibility that the injunction might protect the CNA Companies not only from insured liabilities resulting from Grace's conduct but also from independent claims of the Libby Claimants against the CNA Companies' for their own misconduct. This Court must clarify that the injunction will not extend to insurer wrong-doing claims.

In support of this Objection, the Libby Claimants state:

## I. Background

1.      Nowhere have the effects of asbestos been so devastating as in Libby, Montana – a town of about 2,600 residents. On June 17, 2009, the EPA formally declared Libby a Public Health Emergency. This is the first ever such designation in the United States.

2.      From 1963 to 1990, Grace owned and operated mining and manufacturing facilities in the Libby area, at which Grace produced vermiculite. This ore was used to create zonolite, an insulating material. Grace's operations blanketed the town with asbestos-laden dust.

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 {Docket No. 21365}, as it may be amended and restated from time to time.

[2] Capitalized terms not otherwise defined herein are used with the same meaning as the capitalized terms defined in the Motion.

3.      Over 2,400 people from the Libby community have been diagnosed with asbestos

disease, over 1,200 of whom are Libby Claimants.  At least 295 people have died from Libby

asbestos disease and many more are on oxygen, or in severe condition.

4.      Before Grace's bankruptcy, certain of the Libby Claimants obtained verdicts and

settlements.  Grace's records show that the average prepetition settlement for Grace's Libby mine

and mill workers and their family members was $268,000 per asbestos diseased claimant, compared

to less than $2,500 per non-Libby claimant.

5.      On April 2, 2001, the Debtors filed voluntary petitions for relief under Chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  Pursuant

to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses

and manage their properties as debtors-in-possession.

6.      The request of the Debtors and other Plan Proponents for confirmation of the First

Amended Joint Plan of Reorganization, as modified through December 16, 2010 (the "Plan"), is

pending before this Court.  Among other things, the Plan provides that an insurer that enters into a

settlement of insurance coverage may be designated a Settled Asbestos Insurance Company with

respect to the coverage so settled, thus entitling the insurer to the protection of the Asbestos PI

Channeling Injunction—an injunction under Section 524(g) of the Bankruptcy Code that would

protect the insurer against lawsuits by holders of Asbestos PI Claims to collect on the settled

coverage.  Certain parties take the position that the Asbestos PI Channeling injunction would also

protect the insurer from claims based on its own wrongdoing, as more fully discussed below.

7.      On November 18, 2010, the Debtors filed the Motion seeking this Court's approval

of the Proposed Settlement, whereby:

•       The CNA Companies agree to pay, over time, $84 million to the Asbestos PI
Trust to be established under the Plan (the "Trust") and the CNA Companies, subject to a

4

commitment for the Trust to spend up to $13 million defending or paying claims against the CNA Companies that are not enjoined under the Plan;

- The Subject Policies will be cancelled, consisting primarily of (a) policies providing excess coverage of $158 million (the "Excess Policies"), and (b) the primary comprehensive general liability policies issued by CNA for the period 1973 to 1985,[3] under which the sole unsettled asbestos coverage is non-products coverage *without dollar limit* as explained below (the "Primary Policies");

- Paradoxically, the Subject Polices will not only be cancelled but also deemed sold to the CNA Companies free and clear of all interests pursuant to 11 U.S.C. § 363(f);

- The CNA Companies will be designated as Settled Asbestos Insurance Companies with respect to the Subject Policies, with the purpose and effect of bringing the CNA Companies within the protection of the Asbestos PI Channeling Injunction to be issued under the Plan; and

- Releases will be exchanged, including a release of CNA by the Debtors and the Trust not only of claims under the Subject Policies ("Insurance Coverage Claims") but also claims against CNA for failure to warn of the dangers of asbestos, failure to institute adequate industrial hygiene measures at Grace's facilities, and other claims of the type that certain Libby Claimants assert against certain insurers ("Insurer Wrong-Doing Claims").

8.    Like other comprehensive general liability policies of the same era, the Subject

Polices distinguish between "non-products" claims and "products" claims.  Products (a/k/a

completed-operations) coverage addresses liability arising from products that have been placed in

the stream of commerce either through sale/transfer of a product or completion of an operation or

service.  For example, a construction worker exposed to the Debtors' asbestos-containing products

would have a products/completed operations claim because the harmful material had been placed in

the stream of commence before the injury occurred.  In addition to being subject to per-claim and

per-occurrence limits, products coverage is subject to an aggregate coverage cap on claims.  By

contrast, non-products (a/k/a premises-operations) coverage addresses liability arising from

---

[3] The CNA Companies continued to insure Grace thereafter but since the policies excluded asbestos claims, they are irrelevant to this contested matter.

operations, including harmful materials that have not yet been placed in the stream of commerce.[4]
While subject to per-claim and per-occurrence limits, non-products coverage is *not* subject to any
aggregate coverage limit.  This means that even in a mass tort case, individuals with non-products
based claims do not compete with each other for liability insurance coverage.

      9.      The vast majority of Asbestos PI Claims in this Debtors' case are products claims
because they result from exposure to the Debtors' products.  However, the Libby Claims are non-
products claims because the Libby Claimants were injured by asbestos that was generated in the
course of the Debtors' operations.

      10.      The Primary Policies are a critical source of recovery for the Libby Claimants.
While the lack of aggregate limits for non-products coverage means that a non-product claimant can
recover in full from primary policies,[5] the flip side of this coin is that non-products claimants may
typically recover *only* from the primary policies and may not reach excess policies.  Grace's
primary liability insurers of the Libby operations were Royal Indemnity Company n/k/a Arrowood
Indemnity Company from 1954 to 1963, Maryland Casualty Company from 1963 to 1973, and the
CNA Companies for the period from 1973 to 1985.  This Court has ruled that Royal's non-products
coverage was settled before Grace's bankruptcy.[6]  Maryland Casualty Company similarly asserts
that its non-products coverage was settled pre-bankruptcy.  That leaves the CNA Companies as
Grace's only non-settled primary liability insurer.

---

[4] "The scope of coverage provided by a [comprehensive general liability] policy depends on whether the claim involves 'premises-operations' losses or a 'products-completed operations' loss. 'Premises-operations' losses arise out of the insured's ongoing operations, including its ownership of land, building, and other premises. 'Products-completed operations' losses arise out products that the insured manufactures, distributes or sells and [placed into the stream of commerce]." 3 Seth D. Lamden, New Appleman Law of Law of Liability Insurance, § 16.02 (2003).

[5] Subject to per-claim and per-occurrence limits, and in the case of a claim arising during multiple policy periods, to allocation of responsibility among policies for such periods.

[6] See Order dated August 19, 2009 (Docket Entry No. 22859).

11.    The Motion states that Subject Policies include three primary and 16 high level excess policies that provide or are alleged to provide insurance coverage for asbestos claims. The Motion discloses that the excess policies provide a total of $158 million in aggregate limits for products coverage which attaches at or above $75 million in excess of primary coverage. However, the Motion says nothing about the Primary Policies, and makes no reference whatsoever to the non-products coverage that they provide (the "CNA Non-Products Coverage"). The Motion does not explain why the $71 to $84 million in nominal payments by the CNA Companies (less in present value) is a reasonable settlement of even the $158 million of coverage under the Excess Policies. The Motion offers no mention, let alone explanation, of (a) why the CNA Non-Products Coverage, with no aggregate limits, may or should be settled at all, (b) why the terms of this particular settlement are fair to the Libby Claimants as beneficiaries of the CNA Non-Products Coverage, (c) why issuance of a Section 524(g) injunction to protect CNA from future direct actions by the Libby Claimants to obtain payment under the CNA Non-Products Coverage meets the "fair and equitable" standard required for such an injunction, and (d) why entry of a Section 524(g) injunction drafted so as to permit the CNA Companies to assert that it protects them from Insurer Wrong-Doing Claims as well as Insurance Coverage Claims is even permissible, let alone fair and equitable, as to the Libby Claimants.

## II. **Summary of Argument**

12.    Arguments A and B below concern the Libby Claimants' right to proceeds of CNA Non-Products Coverage. Due process requires that the Libby Claimants state-law property interests be respected, absent a specific override pursuant to bankruptcy law. Under state law, the Libby Claimants have a vested interest in the proceeds of CNA Non-Products Coverage, such that no settlement between Grace and the CNA Companies can eliminate coverage for their claims. In bankruptcy, the general rule is that proceeds of liability insurance are not property of the bankruptcy

estate, thus leaving insured claimants free to collect from the insurer. This general rule is

overridden, however, where the insurance is subject to aggregate limits that are less than the amount

of the insured claims. In that instance, the proceeds must be administered through the bankruptcy

estate so as to assure an orderly and ratable distribution. Because the CNA Non-Products Coverage

is not subject to any aggregate limit, the proceeds of CNA Non-Products Coverage must remain

outside the bankruptcy estate, subject to the rights of claimants insured by the coverage. The

Proposed Settlement must be rejected because it purports to cancel the CNA Non-Products

Coverage and enjoin the Libby Claimants' pursuit of such coverage against the CNA Companies.

13.     Arguments C and D below present limited objections, not requiring rejection of the

Proposed Settlement, but seeking important clarifications in connection therewith. Argument C

concerns Insurer Wrong-Doing Claims. The Plan Proponents have left the terms of the Plan

deliberately ambiguous as to whether the Asbestos PI Channeling Injunction protects settled

insurers from Insurer Wrong-Doing Claims based on their own wrongdoing. The ambiguity is

impermissible because the law requires injunctions to be clear. Accordingly, this Court must

determine whether the Asbestos PI Channeling Injunction will extend to Insurer Wrong-Doing

Claims against the CNA Companies. Such determination must be that it does not. Injunctions

under Section 524(g) are limited to derivative liability for claims against or conduct of the debtor.

Thus, if this Court approves the Proposed Settlement wherein the CNA Companies are to receive a

Section 524(g) injunction, the Court must clarify that the Asbestos PI Channeling Injunction will

not extend to Insurer Wrong-Doing Claims.[7]

---

[7] Since the Proposed Settlement presents issues in connection with confirmation of the Plan as well as approval of the Proposed Settlement, the Libby Claimants hereby incorporate by reference herein their objections, briefs and arguments in opposition to confirmation of the Plan, and they hereby incorporate this Objection into their arguments against confirmation of the Plan, which remains *sub judice*.

14.     Argument D seeks clarification that the release provisions of the Proposed

Settlement do not release Insurer Wrong-Doing Claims of the Libby Claimants.

<h2 style="text-align:center">III. <u>Argument</u></h2>

**A.    The Proposed Settlement is Impermissible Because It Purports to Eliminate the Libby Claimants' Vested Rights in the Proceeds of the CNA Non-Products Coverage**

15.     Under the Proposed Settlement, the CNA Companies would be designated Settled

Asbestos Insurance Companies for purposes of the Plan.  This designation would bring the CNA

Companies within the ambit of the Asbestos PI Channeling Injunction to be entered pursuant to

Section 8.2 of the Plan.  The Asbestos PI Channeling Injunction would then, among other things,

bar the Libby Claimants from suing the CNA Companies to pay their Asbestos PI Claims from

proceeds of CNA Non-Products Coverage.  The effect of these provisions would deprive the Libby

Claimants of vested rights, established and recognized by state law, in the proceeds of the CNA

Non-Products Coverage.

16.     Due process of law protects the Libby Claimants, like any other Americans, from

being deprived of property rights by arbitrary government action.  Bankruptcy courts may alter

state-law rights only when specifically authorized to do so.  Courts in mass tort cases (and expressly

in asbestos cases pursuant to Section 524(g) of the Bankruptcy Code) have the power to channel

claims covered by insurance to a trust fund containing proceeds of such insurance in situations

where the proceeds are insufficient to pay all covered claims.  However, the CNA Non-Products

Coverage does not present such a situation.  As will be demonstrated below, because there is no

aggregate limit on the CNA Non-Products Coverage, this Court may not deprive the Libby

Claimants of their vested rights in proceeds of the CNA Non-Products Coverage.  From the

perspective of the bankruptcy estate and other creditors including Asbestos PI Claimants, there is no

9

need—and therefore no authority—to interfere with the Libby Claimants' rights under state law to

obtain payment from the CNA Companies as Grace's insurer.

> ### 1.    The Libby Claimants May Not be Deprived of a Property Interest without Due Process of Law

17.    The due process clause of the United States Constitution "provides heightened

protection against government interference with certain fundamental rights and liberty interests."

Washington v. Glucksberg, 521 U.S. 702, 720 (1997).  Among these are property interests created

by state law.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39 (1985); see also Bd. of

Regents v. Roth, 408 U.S. 564, 577 (1972) (property interests "are defined by existing rules or

understandings that stem from an independent source such as state law-rules or understandings that

secure certain benefits and that support claims of entitlement to those benefits.").  "We have

emphasized time and again that 'the touchstone of due process is protection of the individual against

arbitrary action of government'."  County of Sacramento v. Lewis, 523 U.S. 833 (1998), quoting

Wolff v. McDonnell, 418 U.S. 539, 558 (1974).

18.    Approval of the Proposed Settlement—and, more specifically, entry of the injunction

requested in connection therewith barring the Libby Claimants from pursuing the CNA Companies

for proceeds of CNA Non-Products Coverage—would be an arbitrary action of government

depriving the Libby Claimants of their right to such proceeds because, as demonstrated below, (a)

the Libby Claimants have vested rights, established and recognized by state law, in the proceeds of

the CNA Non-Products Coverage, (b) under state law these vested rights cannot be destroyed by a

settlement between insurer and insured such as the Proposed Settlement, and (c) bankruptcy law

provides no authority for this Court to bar the beneficiary of a debtor's liability insurance from

obtaining insurance proceeds except in the situation—which is not the case with the CNA Non-

Products Coverage—where such proceeds are capped such that they must be administered through

the bankruptcy estate to provide a fair and ratable distribution to the beneficiaries.

> **2.**      **Under Applicable Non-Bankruptcy Law, the Libby Claimants have Vested Rights in the CNA Non-Products Coverage which Cannot be Destroyed by Agreement between the CNA Companies and Grace**

19.      It is well settled that when a party suffers injuries covered by liability insurance, the

injured party acquires vested rights in the proceeds of that insurance coverage, and that once vested,

such rights cannot abrogated by agreement between the insurer and the insured.  As a leading

insurance treatise states:

> Where the contract of insurance provides for liability to third persons, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested.

2 Lee R. Russ in consultation with Thomas F. Segalla, Couch On Insurance § 31:49 (3d ed. 1996).

Similarly, Corpus Juris Secundum sums up the law as follows:

> A loss payee's right to proceed against the insurance company may not be defeated by a settlement between the insured and the insurance company made without the knowledge and consent of the loss payee.  A settlement agreement between an insurance company and the insured without the participation of a third-party claimant does not bar the claimant's rights as such an agreement might readily be collusively entered into between the insurance company and its insured[8]

46A C.J.S. Insurance § 1884 (2007).  To like effect, see 8 John Appleman and Jean Appleman,

Insurance Law and Practice, § 5020 (1973) ("it is the general rule that an injured person's rights

cannot be defeated by a cancellation or settlement after an accident has occurred ... as the liability

of the [insurance] company to the third person is independent of its obligations to the insured, and

there is no way the company and its insured can destroy any vested rights of the injured party.");

and 1 Rowland H. Long, The Law of Liability Insurance, § 3.25 (1966) ("The liability of the insurer

---

[8] This Section of Corpus Juris Secundum uses the term "loss payee" generally to refer to injured third parties as in support of this statement of the law it cites to Smith & Wesson v. Birmingham Fire Ins. Co., 510 N.Y.S. 2d 606 (N.Y. App. Div. 1987), *supra*, which involved a injured third party claimant's claim to recover from the proceeds of an insured's general liability policy following a settlement between the insurer and the insured.

with respect to insurance ... becomes absolute whenever injury or damage covered by such policy

occurs. The policy may not be cancelled or annulled as to such liability by agreement between the

insurer and the insured after the occurrence of the injury or damage").

20.    These principles represent the law in Montana, New York and other jurisdictions. In

Montana this issue was the subject of a Montana Supreme Court decision addressing an insurer's

liability to an injured party following rescission of the insurance policy based on misrepresentations

by the insured. McLane v. Farmers Ins. Exchange, 150 Mont. 116, 118-119 (Mont. 1967). The

insurer obtained a judgment rescinding the policy and contended that the judgment determined the

rights of the injured third party claimant, arguing that "the [third party] plaintiff can have no more

rights in the policy than [the insured]." Id. at 119. The Montana Supreme Court rejected that

argument:

> [The insurance company's] judgment against [its insured] cannot affect the
> rights of the [third party] plaintiff for his rights vested prior to the attempted
> rescission. (45 C.J.S., Insurance, § 453) They vested at either the time of the
> accident or at the time of the implied waiver of the right to rescind. Exactly
> which of the two possible times this court need not decide. In either case [the
> insured] and the [insurer] cannot do anything either in concert or through the
> failure of [the insured] to defend to effect the rights of plaintiff after they
> vested. 45 C.J.S, Insurance, § 455a (2).

Id. at 120 (emphasis added). The rule is the same in New York, Smith & Wesson v. Birmingham

Fire Ins. Co., 510 N.Y.S. 2d 606 (N.Y. App. Div. 1987) (settlement agreement between the insurer

and insured did not divest the non-participating injured party's rights in the policy proceeds), and in

other jurisdictions. See, e.g., Bujol v. Entergy Servs., Inc., 833 So.2d 947, 978 (La. Ct. App. 2002);

Madar v. League Gen. Ins. Co., 394 N.W. 2d 90, 94 (Mich. Ct. App. 1986) ("where coverage

existed at the time of the accident, no subsequent acts by the parties could void that coverage");

Charter Bank of Boonville v. Shelter Gen. Ins., 664 S.W. 2d 44, 47 (Mo. Ct. App 1984); Link v.

Continental Casualty Co., 470 F.2d 1133, 1138 (9th Cir. 1973) (applying Montana law the Court

cited McLane favorably in ruling that injured party had vested interest in a liability policy

notwithstanding insurer's success in coverage dispute with insured); Spann v. Commercial Standard

Ins. Co., 82 F.2d 593, 599 (8th Cir. 1936) (applying Arkansas law the Court stated that "[t]he rights

of the injured party … cannot be destroyed by an attempted subsequent cancellation, release, or

compromise by the insured and insurer").

21.    Commencement of a bankruptcy case by the insured does not divest these vested

rights. Indeed, applying New York law, the Bankruptcy Court in Baez v. Medical Liab. Mutual Ins.

Co., 136 B.R. 65, 68 (Bankr. S.D.N.Y. 1992), held that the rights of tort claimants to liability

insurance proceeds vested upon the filing of the bankruptcy petition. Interpreting a New York

statute requiring liability policies to contain a provision that the insured's bankruptcy shall not

release the insurer from payment of damages for covered injuries, the court held that, upon filing of

the debtor's bankruptcy petition, the right to proceeds of its liability policies vested in the injured

parties covered by such policies. Id. at 67-68. See also In re Doug Baity Trucking, Inc., No. 04-

13537, 2005 Bankr. LEXIS 1099, at * 26 (Bankr. M.D.N.C. Apr. 21, 2005) (since proceeds from a

liability policy were not property of the bankruptcy estate "equitable title to the proceeds of the

[p]olicy are vested in the potential tort claimants…"); In re Allied Prods. Corp., 288 B.R. 533

(Bankr. N.D. Ill. 2003) (injured party's interest in proceeds of a debtor's general liability policies

was entitled to adequate protection).

22.    Prior to Grace's bankruptcy, the Libby Claimants suffered injuries covered by the

CNA Non-Products Coverage. Pursuant to McLane and the other authorities cited above, the Libby

Claimants' interest in the proceeds of that coverage vested at the time of their injuries. Here, the

Proposed Settlement seeks to eliminate their vested rights by cancelling the CNA Non-Products

Coverage. The Libby Claimants are not a party to the Proposed Settlement and do not consent to its

terms. Their vested property rights in the proceeds of the CNA Non-Products Coverage cannot be

terminated without their consent. Accordingly, the Proposed Settlement cannot be approved or, if

approved, the cancellation of the CNA Non-Products Coverage shall have no effect on the rights to

coverage that have already vested under state law.

23.    State law provides the foundation for determining the rights of the parties in a

bankruptcy case. Butner v. United States, 440 U.S. 48, 55 (1979). See also Travelers Casualty &

Surety Co. of America v. Pacific Gas and Electric Co., 549 U.S. 443, 450-51 (2007). Absent

bankruptcy law that expressly overrides the rights established by state law, such rights must be

respected in a bankruptcy case. Id. Here, the Libby Claimants' interest in the proceeds of the CNA

Non-Products Coverage is fully consistent with bankruptcy law. Indeed, as demonstrated in the

following section, such proceeds are not property of Grace's bankruptcy estate.

### 3.    Proceeds of the CNA Non-Products Coverage Are Not Property of the Grace Bankruptcy Estate

24.    Although liability insurance policies owned by a debtor are property of its

bankruptcy estate, as a general matter the *proceeds* of a liability policy are *not* property of the

debtor's estate. Houston v Edgeworth (In re Edgeworth), 993 F.2d 51, 55 (5th Cir. 1993). "The

question is not who owns the policies, but who owns the liability proceeds." In re Louisiana World

Exposition, 832 F.2d 1391, 1399 (5th Cir. 1987). When determining whether a debtor has an

equitable interest in the proceeds of a liability policy, the threshold question "is whether the debtor

would have a right to receive and keep those proceeds when the insurer paid on a claim."

Edgeworth, 993 F.2d at 55.

> [W]hen the debtor has no legally cognizable claim to the insurance proceeds; those
> proceeds are not property of the estate.
>
> Examples of insurance policies whose proceeds are property of the estate include
> casualty, collision, life, and fire insurance policies in which the debtor is a beneficiary.... .
> But under the typical liability policy, the debtor will not have a cognizable interest in the

proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.

Id. at 55-56.

25.    Courts recognize an exception to the rule that proceeds of a liability policy are not property of the estate in situations where excluding the policy proceeds from the estate will have a "secondary impact" on the administration of the bankruptcy estate. Edgeworth, 993 F.2d at 56. A "secondary impact" occurs when proceeds of the debtor's liability policies are insufficient to pay all claims covered by the policies, such that orderly administration of the estate requires channeling the proceeds *pro rata* to beneficiaries of the coverage. Id. In Edgeworth, the Court held that the debtor did not have an equitable interest in the proceeds of its liability insurance and that such proceeds were not property of the estate because "no secondary impact has been alleged upon [the debtor's] estate, which might have occurred, if for instance, the policy limit was insufficient to cover appellants' claims or competing claims." Id. By contrast, in an earlier case where proceeds of the debtor's liability insurance were insufficient to pay covered claims, the Court of Appeals for the First Circuit held that the liability insurance proceeds were property of the estate. Tringali v. Hathaway Mach. Co., 796 F.2d 553, 560 (1st Cir. 1986).

> Any contrary holding could start a race to the courthouse whenever a policy of insurance is too small to satisfy several potential plaintiffs. A race to the courthouse could frustrate a bankruptcy court from marshaling the insurance proceeds and from arranging their distribution to maximize legitimate creditor claims while preserving assets of the estate…

Id.

26.    The Court of Appeals for the Third Circuit will likely follow Edgeworth in holding that "secondary impact" determines whether proceeds of a liability insurance policy are property of the bankruptcy estate. Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Memorial Corp.), 382 B.R. 652, 688 (Bankr. D. Del. 2008), rev'd on other grounds, 400 B.R. 420 (D. Del. 2009). As Judge Gross explained:

> Neither the Third Circuit nor this Court appears to have squarely addressed the
> question of whether a debtor ordinarily has a property interest in the proceeds of
> liability insurance ... but the limited body of case law in this Circuit addressing
> analogous issues suggests that the Third Circuit will follow the reasoning of
> *Edgeworth* and its progeny....

Id. In Santa Fe Minerals this Court applied Edgeworth in allowing a lift-stay motion by tort

claimants seeking to proceed against the debtor and its liability insurers. In determining that the

liability insurance proceeds were not property of the debtor's estate, the Court stated that there was

no "reason to believe that the proceeds of the liability insurance policies will be insufficient to

satisfy all claims presented." Id. The Court held that there would be no prejudice to the debtors or

other creditors, given that:

> [t]he record of this case establishes that [the claimant's] recovery against available
> insurance proceeds will in no way negatively impact the rights of the handful of
> other creditors in these cases. The [subject policies], which are the primary source of
> coverage for the claims [the claimant] seeks to pursue, ***contain no aggregate
> coverage limits*** ...

Id. at 690 (emphasis added).

27.     The Court properly distinguished Santa Fe Minerals from cases where a debtor faces

mass tort liabilities in excess of aggregate coverage limits. Id. at 688-89. While the Grace

bankruptcy certainly involves products claims in excess of aggregate coverage limits, the Grace

bankruptcy is no different from Santa Fe Minerals or Edgeworth as it relates to non-products

claims. The Plan Proponents have pointed to no "secondary impact" that would, as to the CNA

Non-Products Coverage, overturn the general rule established in Edgeworth that proceeds of a

liability insurance policy are not property of the insured's bankruptcy estate. The Plan Proponents

have not alleged, nor could they, that non-product claims are subject to any aggregate coverage

limit under the Primary Policies. Consequently, there is no need to channel proceeds of the CNA

Non-Products Coverage into the Debtors' estate in order to avoid a race to the courthouse and

assure an orderly and ratable distribution to holders of non-products claims.

16

28.    It may well be the case that the CNA Companies would prefer to cancel the CNA

Non-Products Coverage, along with the other coverages that would be cancelled under the Proposed

Settlement. No doubt the Plan Proponents share that preference, because the Asbestos Claimants

Committee and the Future Claims Representative overwhelmingly represent products claimants.

On behalf of those claimants, they have taken the position (disputed by the Libby Claimants) that

proceeds of any insurance settlement, even a settlement of non-products coverage, may simply be

thrown into a single pot—the Asbestos PI Trust—for ratable distribution to all asbestos claimants

regardless of whether they are in fact the beneficiaries of such coverage.[9]

29.    The confluence of interest between the parties on both sides of the Proposed

Settlement may lead them to suggest that a settlement leaving the CNA Non-Products Coverage in

place would be difficult to achieve or would yield less money for the estate. This hypothesis does

not render proceeds of the CNA Non-Products Coverage property of the Grace estate for at least

three reasons. First, as the Third Circuit made clear in <u>Combustion Engineering</u>, parties cannot buy

the bankruptcy court's jurisdiction. <u>In re Combustion Eng'g, Inc.</u>, 391 F.3d 190, 224-30 (3rd Cir.

2004). Just as an agreement to contribute to the funding of the plan in exchange for an injunction

could not create jurisdiction to enter such injunction, so the amount an insurer might be willing to

pay cannot expand this court's jurisdiction to include liability insurance proceeds that are not part of

the bankruptcy estate. Second, the hypothesis that the CNA Companies will be unwilling to settle

on the same terms as the Proposed Settlement if the CNA Non-Products Coverage were excluded

from the settlement is tantamount to saying that if a debtor could settle other parties' rights as well

as its own, it could get more money. This may be true, but does not license the Debtors to dispose

---

[9] This position is incorrect. Even if proceeds of the CNA Non-Products Coverage were property of the bankruptcy estate or were administered by the estate with the beneficiaries' consent, the only creditors entitled to receive the proceeds would those whose claims were covered by the CNA Non-Products Coverage. See ¶ 40 below.

of property rights belonging to the Libby Claimants. Finally, the hypothesis that the CNA

Companies will not settle at all unless the settlement includes all coverages is belied by the terms of

the Proposed Settlement itself (which expressly excludes certain coverages from cancellation),[10] by

the history of the Grace-CNA relationship (the parties have previously signed settlements resolving

only certain coverages, including the settlement that resolved products coverage under the Primary

Policies while leaving the CNA Non-Products Coverage in place), and by the record in this case,

which indicates that the Debtors' insurers have repeatedly entered into settlements of less than all

coverage between the particular insurer and the Debtors.

30.      In sum, the proceeds of the CNA Non-Products Coverage are not property of the

Debtors' bankruptcy estate. Such coverage may not be settled without the consent of the Libby

Claimants as parties with vested rights in such coverage under applicable non-bankruptcy law. The

Proposed Settlement must be rejected insofar as the settlement, in combination with the provisions

of the Plan, purports to bar the Libby Claimants from pursuing directly against the CNA Companies

the payment of their claims from proceeds of CNA Non-Products Coverage.

        **4.**     **The Self-Contradictory Attempt of the Settling Parties to Characterize**
                    **Their Settlement as a Sale Does Not Permit Them to Eliminate the Libby**
                    **Claimants' Rights in the CNA Non-Products Coverage**

31.      In addition to seeking approval of the Proposed Settlement as a settlement, the

Motion seeks authority for the Subject Polices to be deemed sold to the CNA Companies free and

clear of all interests pursuant to 11 U.S.C. § 363(f) and for the CNA Companies to be deemed a

good faith purchaser pursuant to 11 U.S.C. § 363(m) upon the Trust's receipt of the first installment

payment for the Settlement Amount (the "Sale-Back Request"). The Sale-Back Request is a sham.

It is simply an additional device to strip the Libby Claimants of their vested property rights in the

---

[10] See Settlement Agreement, Section III(A)(3).

proceeds of the CNA Non-Products Coverage. Since the Libby Claimants cannot be stripped of those rights for the reasons set forth above, the Sale-Back Request should be rejected.

32.     The Sale-Back Request is a sham because it is completely inconsistent with the terms of the Proposed Settlement. The Proposed Settlement provides that in exchange for payment of the Settlement Amount, the Subject Policies will be cancelled. Once the policies are cancelled, there is nothing left to sell. Once the CNA Companies have received credit for the Settlement Amount as consideration for cancellation of the policies, the CNA Companies cannot also receive credit for the Settlement Amount as payment to purchase the policies. The parties cannot have it both ways. The Subject Policies must either be sold or cancelled, not both.

33.     That the Sale-Back Request is a sham is also demonstrated by the Debtors' complete failure to comply with the formalities and requirements for sale motions. The Motion recites no attempt whatsoever to market the Subject Policies to anyone other than the CNA Companies, even though, by the Debtor's own admission, negotiations with the CNA Companies dragged on for more than year.[11] The Motion makes no attempt to comply with the requirements of Del. Bankr. L.R. 6004-1. For example, the Motion fails to disclose whether "an auction is contemplated, and highlight any provision in which the debtor has agreed not to solicit competing offers for the property subject to the Sale Motion or to otherwise limit shopping of the property." See Del. L.R. 6004-1(b)(iv)(D). The Motion fails to disclose deadlines with respect to the closing of the sale and whether the proposed purchaser has submitted or will be required to submit a "good faith deposit" and the conditions upon which the proposed purchaser may lose its deposit. See Del. Bankr. L.R. 6004-1(b)(iv)(E) and (F). The Debtors' failure to comply with customary procedures and applicable rules for bankruptcy sales requires that the Sale-Back Request be denied. Furthermore, the CNA Companies, which were obviously aware of the Debtor's non-compliance and worked

---

[11] See Motion at ¶ 7.

with them to structure the Proposed Settlement so as to improperly eliminate the Libby Claimants'

interest in proceeds of the CNA Non-Products Coverage, cannot possibly be good faith purchasers.

34.    Even if the Sale-Back Request were allowed, the CNA Companies' obligations to the

Libby Claimants would remain unchanged.  Since the proceeds of the CNA Non-Products Coverage

are not property of the Debtors' bankruptcy estate, they cannot be sold under Section 363 of the

Bankruptcy Code.  Since the Libby Claimants' interest in the proceeds of the CNA Non-Products

Coverage vested at the time of their injuries, the authorities cited above demonstrate that such rights

cannot be abrogated by any transaction between insurer and insured, regardless of its

characterization as a settlement, sale or anything else.  Therefore, if the Court decides to grant the

Sale-Back Request, the Court should expressly determine that such sale shall not affect the CNA

Companies obligations to the Libby Claimants in respect of the CNA Non-Products Coverage.

**B.    The Section 524(g) Injunction to be Entered Pursuant to the Proposed
Settlement and the Plan is not Fair and Equitable as to the Libby Claimants**

35.    The Proposed Settlement provides for the CNA Companies to be protected by the

Asbestos PI Channeling Injunction—the Plan injunction in respect of personal injury claims to be

issued pursuant to Section 524(g) of the Bankruptcy Code.  Section 524(g) provides, among other

things, that a third party may be protected by an injunction only if "fair and equitable . . . in light of

the benefits provided, or to be provided, to [the asbestos] trust on behalf of such . . . third party."  11

U.S.C. § 524(g)(4)(B)(ii).

36.    The "fair and equitable" standard has generally been construed to include a

requirement that in order to be protected by an injunction, a third party must make a substantial

financial contribution to the plan.  In re Congoleum Corp., 362 B.R. 167, 179-80 (Bankr. D. N.J.

2007).  Where there is sufficient funding to pay 100% of all liquidated claims, it is fair and

equitable for the insurance company to receive the benefit of a permanent channeling injunction.  In

20

re Mid-Valley, Inc., No. 03-35592, 2004 Bankr. LEXIS 1553, at *22 (Bankr. W.D. Pa. July 21, 2004). But where, as here, the Plan will pay less than 100% of insured claims, the court should afford third parties the protection of an injunction only if they contribute to the trust in amounts that are consistent with their likely liability outside of bankruptcy. In re Quigley Co., Inc, 437 B.R. 102, 133-34 (Bankr. S.D. N.Y. 2010), citing 4 Collier On Bankruptcy ¶ 524.07[2], at 524-59 (16th ed. 2010).

37.    The contribution of the CNA Companies to the Plan is insufficient in two respects. First, the Motion includes no showing whatsoever that the amount paid by the CNA Companies bears any relationship to their likely liability outside of bankruptcy. The problem is compounded because, as noted above, the Plan Proponents have been deliberately ambiguous about whether Insurer Wrong-Doing Claims are within the scope of the injunction that the CNA Companies are to receive under Section 524(g). If Insurer Wrong-Doing Claims are included, then this Court needs evidence not only of the value of the Excess Coverage and the CNA Non-Products Coverage but also the value of the Insurer Wrong-Doing Claims.

38.    The second problem is even more fundamental. In the case of the Excess Coverage, it would at least be possible to explain—though the Motion does not even try—the relationship between the Settlement Amount and a starting point consisting of the maximum amount (the $158 million in aggregate limits of the Excess Coverage) that the bankruptcy estate could possibly recover absent settlement. In the case of the CNA Non-Products Coverage, there is no maximum amount recoverable under the terms of the Primary Policies. Instead the starting point is 100% of the tort system value of the Libby Claims (and any other non-products claims that might exist).[12] The same would be true for the Insurer Wrong-Doing Claims, if this Court were to conclude that

[12] Multiplying the per-claim limit under the Primary Policies times the number of years of CNA Non-Products Coverage would yield a figure in excess of what the Libby Claimants claim.

they will be barred by the Asbestos PI Channeling Injunction.  The Motion makes no attempt to estimate the tort system value of the Libby Claims.[13]

39.    In sum, the Plan Proponents have failed even to allege in the Motion facts that would permit this Court to determine that the Proposed Settlement meets the "appropriate financial contribution" branch of the fair and equitable standard.  But the requested injunction flunks the fair and equitable standard for another reason as well.  The terms of the Proposed Settlement, in combination with the terms of the Proposed Plan, serve to divert almost all of the proceeds of the CNA Non-Products Coverage from those who are beneficiaries of the coverage to those who are not.

40.    Even when proceeds of the debtor's liability insurance are distributed through the bankruptcy process, the only creditors entitled to receive them are those whose claims are covered by the insurance.  Landry v. Exxon Pipeline Co., 260 B.R. 769, 786 (Bankr. M.D. La. 2001) (liability insurance proceeds "could not be made available for distribution to the creditors other than those who have claims under the policies"); 3 Collier On Bankruptcy ¶ 362.07, at 362-85 (15th ed. rev. 2002) (policy proceeds are "available only to creditors with the type of claims covered by the policy"); David Gray Carlson, Indemnity, Liability, Insolvency, 25 Cardozo L. Rev. 1951, 1959 (2004) (interest of an injured third party in the proceeds of a debtor's liability policy is akin to statutory lien; to the extent deemed property of the debtor's estate, the proceeds should only be made available to the subset of the debtor's creditors covered by the debtor's policy); Barry L. Zaretsky, Insurance Proceeds in Bankruptcy, 55 Brook. L. Rev. 373, 388-390 (1989) (insurer is

---

[13] This Court is thoroughly familiar with how complex and contentious claim estimation can be.  In the course of the estimation trial, the parties stipulated that there would be no separate estimation of Libby Claims.  If such estimation were to be undertaken, the parties would have to start from scratch.  The difficulty of determining the reasonableness, in relation to the insurer's maximum exposure, of a settlement of insurance coverage that has no aggregate limit would provide a huge practical obstacle—even if, as demonstrated above, there were not already a legal bar—to court approval of any such settlement over the objection of the beneficiaries of the insurance.

analogous to guarantor, and "[a]s with the guaranty, which is available only to the creditor who is the beneficiary of the guaranty, a claim against an insurer is available only to the beneficiaries of the insurance"). See also In re Mahoney Hawkes, LLP, 289 B.R. 285, 295 (Bankr. D. Mass. 2002) (Chapter 11 plan provided for separate classification of claims covered by debtor's liability insurance as means for them to receive proceeds of such insurance).

41.    The Supreme Court has cautioned against treating claimants who have strong insurance rights ratably with claimants whose insurance rights are weaker. In the asbestos class-action context, the Court stated:

> [T]he class included those exposed to Fibreboard's asbestos products both before and after 1959. The date is significant, for that year saw the expiration of Fibreboard's insurance policy with Continental, the one that provided the bulk of the insurance funds for the settlement. Pre-1959 claimants accordingly had more valuable claims than post-1959 claimants . . . .
>
> It is no answer to say . . . that these conflicts may be ignored because the settlement makes no disparate allocation of resources as between the conflicting classes. . . . The settlement decides that . . . liability to indemnification is no different from liability with no indemnification. The very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that those with . . . claims of indemnified liability would have chosen.

Ortiz v. Fibreboard Corp., 527 U.S. 815, 857 (1999).

42.    This Court must reject the Proposed Settlement for the same reason that the Supreme Court rejected the class action settlement in Ortiz. The Proposed Settlement in combination with the Plan provides for the proceeds of the valuable CNA Non-Products Coverage to be distributed pro rata to Asbestos PI Claimants regardless of whether their claims are covered by the Subject Policies. In the case of the Excess Policies, and products coverage in general, commingling might be permissible because the existence of aggregate limits on each policy makes it impossible to determine that any particular Asbestos PI Claimant is the beneficiary of any particular policy. Not so in the case of non-products coverage. Non-products claimants are easy to identify; indeed, the

Trust Distribution Procedures for the Asbestos PI Trust require the trustees to determine, upon request, whether a claimant's exposure "occurred predominantly as a result of working in a manufacturing facility of Grace during a period in which Grace was manufacturing asbestos-containing products at that facility."[14] More to the point, non-products claimants (entirely, or almost entirely, consisting of the Libby Claimants) are a small percentage of Asbestos PI Claimants, certainly less than five percent. Their insurance rights are substantially more valuable than products claimants' by reason of not being subject to aggregate limits. It is not permissible, let alone fair and equitable to the Libby Claimants, for more than 95% of the proceeds of the CNA Non-Products Coverage to be distributed to claimants who are not covered by such insurance.

**C.    The Proposed Settlement May Not be Approved Without this Court's Determination that the Section 524(g) Injunction in favor of the CNA Companies will not Bar Insurer Wrong-Doing Claims**

43.    In addition to Insurance Coverage Claims, the Proposed Settlement affects Insurer Wrong-Doing Claims. As described above, Insurer Wrong-Doing Claims include claims for the CNA Companies' own misconduct—such as failure to warn of the dangers of asbestos exposure, the failure to provide an adequate industrial hygiene program for Grace workers or other loss control services and the failure to conduct proper inspections, sampling, and/or testing—as distinct from the CNA Companies' derivative liability, as insurers, for claims against Grace.

44.    The Proposed Settlement provides for the CNA Companies, as Settled Asbestos Insurance Companies, to have the protection of the Asbestos PI Channeling Injunction under the Plan.[15] The Plan Proponents have deliberately left the terms of such injunction ambiguous as to whether it covers Insurer Wrong-Doing Claims. If this Court approves the Proposed Settlement, (a) the Libby Claimants are entitled to a clear determination by this Court whether the Asbestos PI

---

[14] TDP § 5.4(a).
[15] Plan § 8.2.

Channeling Injunction includes a bar against their pursuit of Insurer Wrong-Doing Claims against

the CNA Companies, and (b) such determination must be that the Asbestos PI Channeling

Injunction will not bar the Libby Claimants' pursuit of Insurer Wrong-Doing Claims.  This

argument does not require rejection of the Proposed Settlement or any alteration in its terms.[16]

> 1.    **Due Process of Law Entitles the Libby Claimants to a Clear Determination Whether the Asbestos PI Channeling Injunction will Bar Pursuit of Their Insurer Wrong-Doing Claims**

45.    Rule 65(d) of the Federal Rules of Civil Procedure provides that any order granting

an injunction "shall be specific in terms; [and] shall describe in reasonable detail, and not by

reference to the complaint or other document, the act or acts sought to be restrained." Fed. R. Civ.

P. 65(d).  "The party constrained is entitled to 'fair and precisely drawn notice of what the

injunction actually prohibits' because serious consequences may befall those who do not comply

with court orders." Louis W. Epstein Family P'ship v. KMart Corp., 13 F.3d 762, 771 (3d Cir.

1994).  "Broad, non-specific language that merely enjoins a party to obey the law or comply with an

agreement, however, does not give the restrained party fair notice of what conduct will risk

contempt." Id.  Congress requires that a federal court frame its orders so that those who must obey

them will know what the court intends to require and what it intends to forbid. Gunn v. Univ.

Comm. to End War, 399 U.S. 383, 388 (1970).  While the requirement of specificity is imposed by

statute, it reflects a constitutional imperative:  Due process of law requires that parties be placed on

reasonable notice as to what conduct is permitted or forbidden by law. Dusenbery v. United States,

534 U.S. 161, 173-74 (2002).

---

[16] For avoidance of doubt, if this Court accepts Arguments A and B above, the required remedy is rejection of the Proposed Settlement in its current form.  Not so with this Argument C.  If this Court as part of its order approving the Proposed Settlement and as part of an order confirming the Plan were to make the determinations concerning the scope of the Asbestos PI Channeling Injunction that are required pursuant to this Argument C, the Proposed Settlement would take effect in accordance with its terms.

46.      In a case such as this one, where the issue of specificity concerns whether Insurer

Wrong-Doing Claims are barred by a Section 524(g) injunction, the recent Supreme Court decision

in Travelers Indem. Co. v. Bailey, -- U.S. -- , 129 S. Ct. 2195 (2009), highlights the peril of an

ambiguous injunction.  The injunction entered by the bankruptcy court in 1986 was construed by

certain parties to bar suits by asbestos claimants against insurers for insurance coverage but not

claims against insurers for their own wrong-doing (although the decision uses the label "Direct

Actions" for these Insurer Wrong-Doing Claims, these were not classic direct actions whereby an

injured party sues the insurer to pay the insured's liability).  Johns-Manville Corp. v. Chubb Indem.

Ins. Co. (In re Johns-Manville Corp.), 517 F.3d 52, 68 (2d Cir. 2008), rev'd on other grounds,

Travelers Indem. Company v. Bailey, -- U.S. -- , 129 S. Ct. 2195 (2009).  Decades later the

Supreme Court construed the injunction to bar the Insurer Wrong-Doing Claims, and ruled the

injunction enforceable on grounds of *res judicata* even though the Second Circuit had ruled that, so

construed, the injunction was impermissible.  Travelers, 129 S. Ct. at 2206.

47.      How should the injured parties in Travelers have protected themselves?  Apparently

they were required to object to the injunction at the time of plan confirmation and/or the time of the

specific insurer settlements giving rise to the injunction on the basis that *under its broadest possible

construction* the injunction would be impermissible.  And if the bankruptcy court nevertheless

entered an injunction sufficiently ambiguous that it would be impermissible under its broadest

possible construction, the appellate courts would have been required to reverse and remand with

instructions to enter an unambiguously permissible injunction.  When this point was argued at the

hearing on confirmation of the Plan, this Court stated:  "[F]rankly, if there's going to be that kind of

an issue, Travelers does require me to figure it out now."  Transcript of Plan Confirmation Hearing

(Hon. Judith K. Fitzgerald), p. 151.[17] Figuring it out now is the only way to avoid the likelihood of a remand on the basis that under the broadest possible construction permitted by the ambiguous terms of the Asbestos PI Injunction, it might be too broad. This Court would do a great service to the parties and the appellate courts "to figure it out now."

48.    The Plan Proponents acknowledge that the Asbestos PI Injunction is ambiguous—indeed, deliberately so—as it relates to Insurer Wrong-Doing Claims. As counsel to the ACC explained at the Plan confirmation hearing: "The plan is agnostic" as to whether Insurer Wrong-Doing Claims are covered by the Asbestos PI Channeling Injunction.[18] The Plan Proponents' stratagem of leaving the Asbestos PI Channeling Injunction deliberately ambiguous violates Fed. R. Civ. P. 65(d) and the requirements of due process. It also jeopardizes appellate affirmance of the confirmation order and any order approving the Proposed Settlement because, as just discussed, the ambiguity itself requires remand with an instruction to clarify.

49.    Finally, as will be shown below, a Section 524(g) injunction can be entered only if this Court determines that the beneficiary of the injunction is making a financial contribution to the Plan consonant with its liability outside bankruptcy for the claims from which it is receiving protection. Without specifying the claims from which the CNA Companies are receiving protection, this Court cannot determine the CNA Companies' liability outside bankruptcy. The Motion is silent on the value of Insurer Wrong-Doing Claims of the Libby Claimants against the CNA Companies.[19]

---

[17] Transcript of Plan Confirmation Hearing before Hon. Judith K. Fitzgerald, January 4, 2009, at 151. [Docket No. 20648] The Libby Claimants' argument that led to this remark appears at pages 81-82 of the Transcript. The Court's remark, along with the Plan Proponents' attempt to persuade this Court otherwise, appears at pages 151-156 of the Transcript. copies of these pages are attached to this Objection for the Court's convenience.

[18] Id. at 153 (Attorney Peter Lockwood).

[19] The Libby Claimants have served a Request for Production of Documents on this issue, but the response deadline has not yet arrived.

### 2. Insurer Wrong-Doing Claims are Property of the Asbestos PI Claimants and May Not be Confiscated under the Plan

50.     State law causes of action constitute property entitled to protection under the Fifth Amendment's due process clause.  See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950); Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982).  If Section 524(g) of the Bankruptcy Code were construed to permit Insurer Wrong-Doing Claims to be enjoined—claims by non-debtor parties against other non-debtor parties for their own misconduct, as opposed to their derivative liability for claims against the debtor—it would go beyond any possible scope of permissible bankruptcy power, and would be unconstitutional.

### 3. Section 524(g) Does Not Permit Insurer Wrong-Doing Claims to be Enjoined

51.     To the extent that the Asbestos PI Channeling Injunction were construed to bar the Libby Claimants from pursuing Insurer Wrong-Doing Claims, such injunction would violate two separate and distinct limitations of Section 524(g).  First, Section 524(g) injunctions may only protect parties against derivative liability for claims *based on the debtor's conduct*, not for their own liability based on their own conduct (the "Debtor Conduct Limitation").  Second, Section 524(g) injunctions may only protect parties from liability for four specified activities (here the relevant category is "provision of insurance") and not from breach of legal duties apart from the provision of insurance (the "Insurance Provision Limitation").

#### a. Section 524(g) Protection Cannot Extend beyond Derivative Liability for Conduct of the Debtor

52.     Section 524(g) provides, in pertinent part, that a channeling injunction may be entered to protect a third party

> alleged to be directly or indirectly liable *for the conduct of, claims against, or demands on the debtor* to the extent such alleged liability of such third party arises by reason of—

28

> (I)    the third party's ownership of a financial interest in the debtor, a past
> or present affiliate of the debtor, or a predecessor in interest of the debtor;
>        (II)   the third party's involvement in the management of the debtor or a
> predecessor in interest of the debtor, or service as an officer, director or employee
> of the debtor or a related party;
>        (III)  the third party's provision of insurance to the debtor or a related
> party; or
>        (IV)   the third party's involvement in a transaction changing the corporate
> structure, or in a loan or other financial transaction affecting the financial condition,
> of the debtor or a related party . . . .

11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added). The Debtor Conduct Limitation is established by

the words "for the conduct of, claims against, or demands on the debtor" emphasized above. A

third party (*i.e.*, a non-debtor) such as each of the CNA Companies may, if all other requirements

are met, be protected under Section 524(g) against liability that derives from the debtor's liability or

conduct but not against liability resulting from its own conduct. As the Third Circuit explained in

Combustion Engineering:

> The Bankruptcy Court entered a channeling injunction under § 524(g) in
> favor of Combustion Engineering and also in favor of Basic and Lummus for
> their derivative asbestos-related claims. The court correctly found that §
> 524(g) did not authorize a channeling injunction over the independent, non-
> derivative third-party actions against non-debtors Basic and Lummus.

In re Combustion Eng'g, 391 F.3d 190, 233-34 (3d Cir. 2004). An injunction against pursuit of

"independent non-derivative claims against non-debtor third parties in this case would violate §

524(g)(4)(A), would improperly extend bankruptcy relief to non-debtors, and would jeopardize the

interests of future Basic and Lummus claimants." Id.

53.    The Court of Appeals for the Second Circuit has construed Section 524(g)(4) exactly

the same as the Third, starting that "the provision was not intended to reach non-derivative claims.

Because the claims here are non-derivative and have no effect on the res, they are outside the limits

of § 524(g)." Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.), 517

F.3d 52 (2d Cir. 2008), rev'd on other grounds, Travelers Indemnity Company v. Bailey, -- U.S. -- , 129 S. Ct. 2195 (2009). The Second Circuit's holding remains intact.[20]

54.     The non-derivative claims in Manville were claims against the debtor's insurers for their own alleged misconduct, including unfair insurance practice and breach of a common-law duty to disclose the dangers of asbestos. Manville, 517 F.3d at 57-58. Like the Insurer Wrong-Doing Claims that potentially could be asserted against the CNA Companies, the claims against Manville's insurers included breach of an alleged duty to warn of the known dangers of asbestos. Id. What the claims in Manville and the Insurer Wrong-Doing Claims that could be asserted by the Libby Claimants have in common is that they stem from an insurer's breaches of its own legal duties, as distinct from derivative liability for breaches of duty by the debtor.

55.     In sum, Insurer Wrong-Doing Claims are, by definition, based on the CNA Companies' own conduct, not that of Grace. The Debtor Conduct Limitation precludes their being the subject of an injunction under Section 524(g).[21]

### b.    Section 524(g) Protection for an Insurer Cannot Extend to Breach of Legal Duties Apart from the Provision of Insurance

56.     An additional limitation on claims that may be enjoined under Section 524(g) is that such claims must arise by reason of one (or more) of the four specific relationships enumerated in the statute (the "Four Categories"). The only one pertinent to the CNA Companies is the "provision of insurance to the debtor or a related party." The Insurance Provision Limitation is established by the emphasized language below, whereby the statute protects a third party

---

[20] On remand, the Second Circuit explained that its holding was not affected by the Supreme Court's reversal on res judicata grounds: "In Bailey, the Supreme Court reversed [the Second Circuit's 2008 decision] on 'narrow' grounds. Bailey, 129 S. Ct. at 2207. The Bailey Court did not contradict the conclusion of our juridisctional inquiry." In re Johns-Manville Corp., 600 F.3d 135, 152 (2d Cir. 2010). As to parties not bound by res judicata under the Supreme Court's decision, the Second Circuit held that enjoining non-derivative claims was beyond the bankruptcy courts' jurisdiction. Id. at 153.

[21] And, of course, as Combustion Engineering held, Section 524(g) provides the sole basis on which a third party may be protected from asbestos-related claims. 391 F.2d at 233-34.

alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor *to the extent such alleged liability of such third party arises by reason of—*

    (I)   the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

    (II)   the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

    (III)  *the third party's provision of insurance to the debtor or a related party*; or

    (IV)   the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . . .

11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).  It is undisputed that CNA provided insurance to Grace. To the extent that CNA engaged in other conduct, such as designing and/or implementing an industrial hygiene program, the Insurance Provision Limitation precludes Section 524(g) injunctive protection for liabilities arising by reason of such conduct.

    57.    Insurers in CNA's position might wish to argue that *but for* providing liability insurance to Grace, CNA would never have gotten involved with industrial hygiene at the Libby operations or acquired knowledge of the dangers of asbestos giving rise to a duty to warn. Even if factually correct, this would not provide CNA with an end-around the Insurance Provision Limitation. The words of the statute permit protection against liability "by reason of . . . the provision of insurance," not, as the CNA Companies might wish, "by reason of the provision of industrial hygiene services by reason of the provision of insurance." The CNA Companies cannot double-dip by inserting an extra "by reason of" simply to suit their purposes. In addition to being insupportable under the statutory language, the double-dip approach would permit insurers to be shielded from liabilities that no one could reasonably argue are within the proper scope of a Section 524(g) injunction. For example, suppose CNA guaranteed Grace's lease of air-filtration equipment at the Libby mine—a guaranty that indisputably came to be issued because CNA provided Grace's

workers compensation insurance—or suppose a CNA official inspecting Grace's facilities as part of the insurance underwriting process negligently flicked the wrong switch on a vacuum fan so it sprayed asbestos dust into someone's face. No one could sensibly argue that the CNA Companies can be protected by a Section 524(g) injunction from liability on the guaranty or for the negligence of CNA's own employee.

58.     It should also be noted that the potential that the CNA Companies might, if they are held liable to the Libby Claimants, assert indemnity or contribution claims against the Asbestos PI Trust does not afford a basis for Section 524(g) protection. Having a right of indemnity or contribution is not one of the Four Categories. The provision of insurance involves the insurer standing liable for obligations of the insured, not the other way around. The Asbestos PI Trust contains provisions to address indemnity and contribution claims (defined as Indirect PI Claims). Section 524(g) is not intended to bar third parties from asserting claims against other third parties simply because the target may have a right of indemnity or contribution from the debtor.

c.     Section 524(g) Can Protect an Insurer from Liability for Insured Claims but not Breaches of Its Own Legal Duties

59.     As the Second Circuit determined in Manville, even where there is an extremely close *factual nexus* between the claims asserted against the insurer (there called Direct Actions) and the insurer's provision of insurance to the debtor, the question of whether such claims could be enjoined under Section 524(g) depended on whether the legal duty assertedly breached was the debtor's or the insurer's.[22] Johns-Manville Corp. v. Chubb Indem. Ins. Co., 517 F.3d at 67. Since the duty was that of the insurer, the claims could not be enjoined. Id. As the court explained:

---

[22] Of course, the injunction at issue in Manville antedates Section 524(g), such that the Second Circuit's decision was expressed in terms of bankruptcy jurisdiction. However, as the court pointed out, Section 524(g), having been "enacted in response to the bankruptcy court's actions in earlier proceedings in this case, must be interpreted in the same manner." 517 F.3d at 67.

32

The district court made particular note of the bankruptcy court's extensive factual findings regarding Manville's dominating presence in the asbestos industry, and its thirty-year involvement with Travelers. The court embraced the bankruptcy court's factual findings that "Travelers learned virtually everything it knew about asbestos from its relationship with Manville" and that "the Direct Action Claims against Travelers 'inescapably' relate to its insurance relationship with Manville." There is no doubt that these findings by the bankruptcy court document the *factual* origins of Travelers' alleged malfeasance. The factual findings are, however, only part of the liability equation. What remained was a legal determination: did Travelers owe a duty to the Direct Action Plaintiffs independent of its contractual obligations to indemnify those injured by the tortious conduct of Manville? If such a duty exists, then the fact that it arises from a common nucleus of operative facts involving Travelers and Manville (*e.g.*, the Manville / Travelers insurance relationship) is of little significance from a jurisdictional standpoint. As noted above, drawing the duty line is a function of state and not federal law.

There is little doubt that, in a literal sense, the instant claims against Travelers "arise out of" its provision of insurance coverage to Manville. The bankruptcy court's extensive factual findings regarding Manville's all-encompassing presence in the asbestos industry and its extensive relationship with Travelers support this notion. However, the 1986 orders must be read to conform with the bankruptcy court's jurisdiction over the *res* of the Manville estate. Interpreting the orders otherwise risks federal bankruptcy courts "displac[ing] state courts for large categories of disputes in which some[one] . . . may be bankrupt."

Id. (citations and footnotes deleted). The Second Circuit viewed its analysis as following, and completely consistent with, Combustion Engineering's construction of Section 524(g) as "limited to 'situations where . . . a third party has derivative liability for claims against the debtor.'" Id. at 68 (quoting Combustion Eng'g, 391 F.3d at 234).

60.    In sum, regardless of what the CNA Companies might claim to be the factual nexus between its provision of insurance to Grace and the Insurer Wrong-Doing Claims that could be asserted by the Libby Claimants, Section 524(g) does not permit entry of an injunction protecting the CNA Companies from liability for the Insurer Wrong-Doing Claims, *i.e.*, claims premised on the CNA Companies' breach of their own legal duties.

> **d.      This Court Should Order that any Section 524(g) Injunction Entered in Favor of the CNA Companies Shall Not Extend to Breaches of Their Own Legal Duties**

61.      The clarity of the distinction made by the Second and Third Circuits concerning what can and cannot be enjoined permits this Court to easily fix the problem created by the Plan Proponents in attempting to preserve the possibility (as Mr. Lockwood expressed it, "[t]he Plan is agnostic . . ."[23]) that the Asbestos PI Channeling Injunction protects the CNA Companies and other Asbestos Protected Parties from liability for their own misconduct.  As demonstrated above, this Court is required to enter an injunction whose scope is clear.  The Libby Claimants would consider this concern to have been fully addressed if this Court were to include the following language in any order confirming the Plan:

> For avoidance of doubt, the Asbestos PI Channeling Injunction shall not enjoin any Entity from commencing, conducting or continuing any suit, action or other proceeding against any Asbestos Protected Party based on any alleged breach by such Asbestos Protected Party of its own legal duties or obligations to such Entity.[24]

62.      In sum, the Federal Rules of Civil Procedure and considerations of due process require that injunctions be clear.  The deliberate ambiguity as to whether the Asbestos PI Channeling Injunction bars Insurer Wrong-Doing Claims must be rectified.  In accordance with caselaw of the Third Circuit, and also the Second, the clarification must state that the Asbestos PI Channeling Injunction does not bar the assertion of Insurer Wrong-Doing Claims.

---

[23] Transcript of Plan Confirmation Hearing before Hon. Judith K. Fitzgerald, January 4, 2009, at 153 (Attorney Peter Lockwood).

[24] This language mirrors Section 8.2.1(a) of the Plan.  In order to avoid technical difficulties arising from any difference in the timing of the confirmation order and any order approving the Proposed Settlement, the latter should contain similar language: "For avoidance of doubt, the Asbestos PI Channeling Injunction shall not enjoin any Entity from commencing, conducting or continuing any suit, action or other proceeding against any of the CNA Companies based on any alleged breach by any of the CNA Companies of its own legal duties or obligations to such Entity."

**D.    This Court Should Clarify that the Only Claims Released Pursuant to the Release Provisions of the Proposed Settlement are those of the Debtors and the Asbestos PI Trust**

63.    The Settlement Agreement contains a release of "Asbestos-Related Bodily Injury Claims,"[25] defined to include "Claims against the CNA Companies . . . pursuant to any legal theory . . . whether . . . failure to warn or inspect, failure to undertake protective measures, or any other theory of law . . . ."[26]  The release is to be given by Grace, the Grace Parties and the Asbestos PI Trust.[27]  None of these parties could possibly have any claim for "failure to warn or inspect" or "failure to undertake protective measures."  However, these causes of action most definitely form part of the Insurer Wrong-Doing Claims that could be asserted by certain Libby Claimants.  It appears that the release has been crafted to create an argument that Insurer Wrong-Doing Claims of the Libby Claimants are somehow being released pursuant to the Settlement Agreement.  This is nonsense.  Only the Libby Claimants themselves have the legal power to release their Insurer Wrong-Doing Claims.  For this reason, the Libby Claimants would ordinarily not be concerned with the release provisions of an agreement to which they are not a party.  In this instance, however, the Settlement Agreement has been submitted for approval of this Court.  The Libby Claimants are justifiably concerned that the CNA Companies may in the future, in a forum not familiar with bankruptcy law or the bankruptcy court process, cite an order of this Court approving the Settlement Agreement as evidence that Insurer Wrong-Doing Claims of the Libby Claimants have been released by order of this Court.

64.    In order to avoid the possibility that this Court's order might be misused in this way, the Libby Claimants respectfully request that this Court include in any order approving the

---

[25] Settlement Agreement at § III(A).

[26] Id. at § I(J).

[27] Id. at § III(A).

Proposed Settlement: "For avoidance of doubt, the claims released pursuant to Section III(A) of the Settlement Agreement are only those of Grace, the Grace Parties (to the extent that Grace has the power to bind them) and the Trust" as each of those parties is identified and defined in the Settlement Agreement."

## IV. Conclusion

65.    For the reasons specified in Arguments A and B above, the Motion should be denied. For the reasons specified in Arguments C and D, the Proposed Settlement should not be approved unless the clarifying orders requested by the Libby Claimants are entered.

Dated: December 23, 2010                **LANDIS RATH & COBB LLP**


                                        */s/ Kerri K. Mumford*_____
                                        Adam G. Landis (DE No. 3407)
                                        Kerri Mumford (DE No. 4186)
                                        919 Market Street, Suite 1800
                                        P.O. Box 2087
                                        Wilmington, DE  19801
                                        (302) 467-4400

                                        and

                                        Daniel C. Cohn
                                        **MURTHA CULLINA, LLP**
                                        99 High Street, 20th Floor
                                        Boston, MA 02110
                                        (617) 457-4000

                                        *Counsel to the Libby Claimants*