# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| W.R. GRACE & CO., et al., | * | Chapter 11 |
| | * | |
| Debtors. | * | Case No. 01-01139 (JKF) |
| | * | (Jointly Administered) |
| | * | |
| | * | Related Docket Nos. 25776, 25954, 25955 |
| | * | |
| | * | Hearing Date:  January 10, 2011 at 9:00 a.m. |

-------------------------------------------------------x

**REPLY MEMORANDUM OF THE CNA COMPANIES IN SUPPORT OF THE
DEBTORS' MOTION FOR AN ORDER APPROVING THE SETTLEMENT BETWEEN
W.R. GRACE & CO. AND THE CNA COMPANIES**

The CNA Companies submit this Reply in support of the Debtors' Motion to approve the

Settlement Agreement (the "Agreement") between W.R. Grace & Co. ("Grace") and the CNA

Companies (Dkt. 25776).[1]

## INTRODUCTION

The issue – and the only issue – before the Court is whether to approve the Settlement

Agreement between Grace and the CNA Companies and thereby resolve long-standing coverage

disputes between those parties, provide substantial benefits to the Debtors, and ensure a

substantial and timely recovery of funds for the Asbestos PI Trust to pay claims, including the

Libby Claims.

As set out in the Debtors' Motion, CNA issued to Grace three primary liability policies

and 16 unsettled high-level excess policies that provide, or are alleged to provide, coverage for

Asbestos-Related Claims (as defined in Agreement § I.I).  All 16 excess policies attach at levels

at or above $75 million in excess of primary coverage, and the great majority ($123 million of

---

[1] Capitalized terms used herein, but not defined herein, have the meanings ascribed to them in the Agreement, or if not in the Agreement, in the Plan.

the alleged $158 million in limits) attach at or above the $150 million level.  In contrast, at the time of Grace's bankruptcy, Grace calculated it had reached insurance at levels only excess of $20 million.

The Settlement Agreement is a fair and reasonable compromise, reached after extensive negotiations lasting well over a year between the CNA Companies and the Grace Parties, with the active participation of the Asbestos PI FCR ("FCR") and the Asbestos PI Committee ("ACC").  All parties were represented by experienced coverage and bankruptcy counsel who extensively reviewed the insurance coverage issues and considered the expense, delay, and potential outcomes of coverage litigation.  Substantial benefits will be received by the Trust (and, in turn by the Libby Claimants, as claimants against the Trust) by virtue of this settlement.

The terms of the Settlement Agreement are described in the Debtors' motion for approval.  In brief, CNA will furnish substantial consideration in return for the release by the Grace Parties and the Asbestos PI Trust of any claims for coverage under the Subject Policies. This consideration includes:  (1) payment of $84 million in seven annual installments; (2) release of the Grace Parties from their obligations under the Subject Policies, including their obligations to pay retrospective premiums with respect to all pre-1985 policies; (3) withdrawal of CNA's objections to the Plan and of its Proofs of Claim insofar as they relate to Asbestos-Related Claims; (4) relinquishment of CNA's many defenses to coverage under both the primary and excess policies; (5) relinquishment of CNA's rights under prior settlement agreements between Grace and CNA to defense and indemnity from Grace for Asbestos-Related Claims made against CNA; and (6) relinquishment of CNA's Indirect PI Trust Claims.

I.      **THE COURT SHOULD APPROVE THE SETTLEMENT AGREEMENT.**

The Third Circuit in *In re Martin*, 91 F.3d 389 (3d Cir. 1996), set forth the criteria for evaluating whether a compromise should be approved as "fair, reasonable, and in the interest of

the estate": "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id.* at 393. The record before the Court shows that these prerequisites are satisfied.[2]

### A.    The Settlement Agreement Resolves Long-Standing Complex Coverage Disputes Under the Primary Policies.

As described in more detail in the accompanying Declaration of Daniel P. Caswell, the CNA Companies and the Grace Parties have engaged in multiple coverage litigations for nearly three decades and entered into settlement agreements over the years that address discrete disputes relating to the three primary policies.[3]  Caswell Decl. ¶¶ 3-7, 10-12.  One of those agreements settled and exhausted all products coverage under the primary policies. *Id.* ¶ 5.  Just prior to Grace's bankruptcy, CNA had instituted suit to resolve Grace's additional claims for coverage under the "non-products" portions of the primary policies for claims by persons, including the Libby Claimants, asserting exposure to asbestos through Grace's mining and processing of vermiculite. *Continental Cas. Co. v. W.R. Grace & Co.*, No. 00 Civ. 4524 (S.D.N.Y.).  In the absence of the Settlement Agreement, that litigation, which would be governed by New York law,[4] would recommence when Grace emerges from bankruptcy.  This Court is not the forum to resolve the complex coverage questions that would be raised in the action, but, as Mr. Caswell's declaration demonstrates,  CNA has substantial defenses to coverage of such claims.  Among other issues, CNA contends that:

---

[2] The record also shows that the prerequisites for approving a sale under Section 363 are satisfied.  *See* pp. 15-16 *infra.*

[3] Four of these Agreements are CNA Phase II Trial Exhibits 32A, 32B, 32C, and 38.  Certain of the policies were resolved with Grace in these prior Agreements and the CNA Companies have previously been listed as Settled Asbestos Insurance Companies with respects to those settled policies on Exhibit 5 to the Plan's Exhibit Book.

[4] *See, e.g., Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 153 (2d Cir. 2003); *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 873 (5th Cir. 1990); *W.R. Grace & Co. v. Hartford Accident & Indem. Co.*, 407 Mass. 572, 585-86, 555 N.E.2d 214, 21-22 (1990).  For additional cites, *see* Caswell Decl. ¶ 28,

- Many of these claims, particularly those asserted by the Libby Claimants, fall within the policies' exclusions for bodily injury arising out of and in the course of employment by Grace (Caswell Decl. ¶ 28);

- The policies' exclusions for bodily injury arising from long-term pollution excludes claims arising from releases of asbestos from Grace's Libby, Montana, operations (Caswell Decl. ¶¶ 30-31);

- Coverage of the Libby Claims is precluded because the alleged bodily injuries did not arise as a result of an "accident" and were expected or intended by Grace (Caswell Decl. ¶ 32);

- The Libby Claims fall within the previously exhausted and settled products/completed operations hazard coverage (Caswell Decl. ¶ 33-34);

- Any applicable coverage for Libby Claims is precluded by Grace's failure to comply with the notice provisions of the CNA policies (Caswell Decl. ¶ 35);

- The "per occurrence" limits of the CNA primary policies are not annualized and limit coverage because the Libby Claims arise out of a single occurrence (Caswell Decl. ¶ 38); and

- Any coverage would be subject to claims by CNA against Grace for retrospective premiums (in the 1973 to 1978 period) and/or would be subject to the application of deductibles (in the 1978 to 1985 period), with the result that any coverage for claims like the Libby Claims, if not otherwise precluded, would give rise to a claim by CNA against Grace or the Trust or would be reduced or eliminated by the application of the deductible (Caswell Decl. ¶¶ 36-37).

The Settlement Agreement obviates the need for Asbestos PI Trust to overcome these and other difficult and complex insurance coverage issues in costly and drawn-out litigation. Instead, the Settlement Agreement ensures that the Asbestos PI Trust will receive funding from the CNA Companies that it might not otherwise receive.

**B.    The Settlement Agreement Provides Funding for the Asbestos PI Trust Without Establishing Coverage Under CNA's High-Level Excess Policies and Proof of Exhaustion of Underlying Limits.**

If a global settlement were not reached, CNA would also assert its available defenses on its high-level excess policies, including whether the Debtors had met the contractual consent requirements of the policies, *i.e.*, the "consent to settlement," "voluntary payment," and

4

"cooperation and assistance" provisions (Caswell Decl. ¶ 40), and whether the policies can be validly transferred to the Trust.  Even if these defenses were overcome, Grace and/or the Trust would face a substantial burden in establishing exhaustion of all underlying limits in order to reach such high-level policies.  Indeed, it would likely be years before the limits of such coverage were reached and available to the Trust to pay claims.  (Caswell Decl. ¶¶ 25-26).

      **C.**    **The Settlement Agreement Resolves CNA's Claims Against Grace and the Asbestos PI Trust.**

The Settlement Agreement also resolves, without litigation, claims CNA has or may have against Grace and/or the Trust.  As noted above, CNA has agreed to give up any claim associated with retrospective premiums under the primary policies and will make the $84 million available to the Trust free of any claim back for retrospective premiums or the application or fulfillment of deductibles.  In addition, CNA gives up its claims to contractual indemnity for Asbestos-Related Claims under prior settlements with Grace.  By releasing these claims, the Settlement Agreement ensures that Grace or the Asbestos PI Trust will not be required to pay these indemnification claims, and will be not required to bear the expense of adjudicating such claims.  Additionally, CNA withdraws its Proofs of Claim against the Debtor relating to Asbestos-Related Claims and forgoes all Indirect PI Trust claims, whether by reason of contractual, statutory, or common law contribution or indemnity.  CNA also agrees to withdraw its pending coverage action against Grace, eliminating the need for Grace or the Trust to undertake defense of that action.

      **D.**    **If the Settlement Agreement Is Approved, CNA Will Withdraw Its Confirmation Objections.**

A further consideration is that, if approval of the Settlement Agreement becomes final, CNA will withdraw its objections to the Confirmation of the Plan.  This is not the forum for CNA to repeat its Plan objections, which are set out and supported in detail in its Post-Trial Briefs (Dkt. 23644, 23811), and include objections to the composition of the proposed Asbestos

PI Trust Advisory Committee and failure to comply with the funding requirements of Bankruptcy Code Section 524(g). It is sufficient to say that those objections raise substantial issues, which, if accepted, could either derail the Plan or require substantial modification, with extensive delay resulting in any either event.

### E.     Creditors, *i.e.*, the Asbestos PI Claimants, Will Benefit from the Agreement.

Approval of the Settlement Agreement will serve the paramount interests of the interested creditors, *i.e.*, the Asbestos PI Claimants, including the Libby Claimants. The Agreement ensures that the Asbestos PI Trust will receive tens of millions of dollars in funding that it might not otherwise receive and, at the least, that it will receive those funds much earlier than it otherwise would have. Those responsible for the protection of the interests of Asbestos PI Claimants – the ACC and FCR – were actively involved in negotiating the Settlement Agreement and support it.

### F.     The Requirements for Approval Have Been Satisfied.

In sum, the record shows that the *In re Martin* factors are satisfied:

- The probability that the Grace Parties or the Asbestos PI Trust would ultimately prevail if the coverage litigation with CNA is resumed is highly uncertain (*Martin* factor no. 1);

- Any coverage litigation would involve complex issues, entail heavy burden and expense, and would delay payment to the Trust of funds from the policies (*Martin* factor no. 3);

- As a result of the first two factors, the Asbestos PI Trust will have great difficulty in recovering the proceeds of the policies if the Settlement Agreement is not approved (*Martin* factor no. 2);

- In light of the prior three points, and the additional benefits arising from CNA's waiver of its various claims, the paramount interests of the relevant creditors, the Asbestos PI Claimants, will be served by approval of the Settlement Agreement (*Martin* factor no. 4).

The settlement should, accordingly, be approved.

6

## II.    THE OBJECTIONS TO THE SETTLEMENT AGREEMENT SHOULD BE OVERRULED.

### A.    The Objections of the Libby Claimants Lack Merit.

#### 1.    The Consent of the Libby Claimants is Not Necessary for This Court to Approve the Settlement Agreement.

The Libby Claimants maintain that this Court may not approve a Settlement Agreement that encompasses the "non-products" coverage under the CNA primary policies, unless each and every one of the alleged 1,000 or so Libby Claimants consents. The Libby Claimants argue that they have "vested rights" to the proceeds of this non-products coverage; that they do not compete with other claimants for those proceeds; and consequently they – not the Debtors – own these policy proceeds. These contentions should be overruled for several independent reasons.

##### a.    This Court Has Already Rejected the Libby Claimants' Contentions.

The Libby Claimants' made these very same arguments in their objection to the Debtors' Settlement Agreement with Arrowood Indemnity Company in July 2009. After extensive briefing, and a lengthy hearing, this Court rejected the Libby Claimants' objections and held that there is no authority to support their assertion that "insured[]s are not permitted to settle policies with [their] insurance companies." Tr. (July 27, 2009) at 137. To the contrary, the Court ruled that, if insureds and insurers "want to settle their own liability, it seems to me they've got the right to do that. Particularly in a bankruptcy case, where the proceeds of those policies are property of the estate." *Id*. at 137-38. The Libby Claimants have proffered no reasons as to why the Court should depart from its previous decision.

##### b.    The Libby Claimants Do Not Satisfy the Threshold Predicate For Their "Vested Rights" Theory.

Even if the Libby Claimants' legal arguments had merit (which, as the Court has already found, they do not), the Libby Claimants have failed to satisfy a necessary predicate for their

"vested rights" position.  The Libby Claimants' "vested rights" theory is premised on their position that, because there is no "aggregate limit" for the non-products coverage under the CNA primary policies, those policies will provide an endless stream of money that will provide each Libby Claimant with full compensation for his or her injuries.  The Libby Claimants further argue that, as a result, there would be no adverse effect on the Debtors' estates if the proceeds of these policies were not settled by the Debtors.

The CNA primary policies do, however, contain limits that would result in the Libby Claimants competing with other asbestos claimants for the limited proceeds of these policies if the settlement is not approved.  First, as discussed in the Caswell Declaration, CNA has maintained, including in pre-petition litigation with Grace, that the claims asserted by the Libby Claimants against the Debtors are "products" claims which are subject to the aggregate limits that have already been exhausted.  Caswell Decl. ¶¶ 33-34.[5]  Moreover, even if the Libby Claims were ultimately found to fall within the "non-products" coverage, that coverage is still subject to "per occurrence" limits of $1 million.  The primary policies all provide that "[f]or the purpose of determining the limit of the Company's liability, all Personal Injury and Property Damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."[6]  If litigation were to recommence, CNA would contend that the Libby Claims arise out of a single occurrence because they involve a small group of personal injury claimants limited to a single location over the same period of time who allege personal injury arising out of continuous or repeated exposure to the same general

---

[5] For example, the Court previously heard testimony from Grace itself that once the vermiculite was transported down from the mine, it became Grace's "product."  *See* Confirmation Trial, Phase II, Tr. (Sept. 9, 2009) at 37:23-38:14; 43:6-45:7 (Mr. Hughes testifies that exposure to vermiculite concentrate, after processing on Zonolite Mountain, was exposure to a Grace commercial product). In addition, certain of the complaints filed by the Libby Claimants have expressly alleged exposure to Grace products.  *See* Complaints cited in Caswell Decl. ¶ 33.

[6] CNA Phase I Trial Exhibit 19A at 9; CNA Phase I Trial Exhibit 19B at 7; CNA Phase I Trial Exhibit 19C at 6.

conditions in the town of Libby.  Caswell Decl. ¶ 38.  To the extent that a court determines that the Libby Claims derive from one occurrence – a very real possibility here – the amount of monies available for Libby Claims under the CNA primary policies would be at most $3 million, and possibly as low as $1 million.

Moreover, the Libby Claimants' assertion of limitless coverage for their claims ignores CNA's other, significant defenses to Grace's claims for coverage for the Libby Claims, acceptance of which by a coverage court in post-bankruptcy litigation would injure the Grace estate by depriving it of funds that it would otherwise receive under the settlement.  As discussed at pages 3-4 above, CNA would, for example, have defenses based upon the employee exclusions in the policies, pollution exclusions, the failure of Grace to comply with notice requirements, and failure of the Libby Claimants' injuries to be caused by accidents (as opposed to exposure that was expected by Grace) (Caswell Decl. ¶¶ 27-35).  These defenses, and the others set forth in the Caswell Declaration, make it highly uncertain that in coverage litigation Grace (or the Trust) would be able to have any, or any significant, recovery with respect to Libby Claims – much less the unlimited full recovery claimed by the Libby Claimants.  As such, the very real prospect exists that, if this Settlement Agreement is not approved, the Debtors' estates, and the Trust, will be adversely affected, as they may be unable to recover any monies under the policies through litigation.  In that event, however, the Trust would still be obligated to pay out monies to the Libby Claimants in response to their Asbestos PI Claims without the benefit of the funds that would have been provided by CNA under the Agreement.

Even if Grace or the Trust were able to prevail in coverage litigation on CNA's defenses, CNA would assert that the Libby Claims would still be subject to the $500,000 per occurrence deductible contained in the CNA 1978-1985 policies.  Caswell Decl. ¶¶ 36-37 & n.1.  The

application of a deductible to a claim whose recovery was allocated over many years of injury would likely result in no recovery whatsoever under the CNA 1978-1985 policies because the amount of the claim would not exceed the deductible.  Furthermore, the first $200,000 of coverage provided for the 1973-1978 policy periods is subject to a retrospective premium arrangement, whereby CNA would make a claim that the Debtors (or potentially the Asbestos PI Trust under Section 7.15(i) of the Plan) would be responsible for reimbursing the CNA Companies.  Caswell Decl. ¶ 36.

The bottom line is that there are limits to the amount of proceeds available under the non-products coverage, there are numerous defenses that could be asserted by CNA, and any payments made by CNA would be subject to deductibles and retrospective premiums owed by Grace or the Trust.  For all of these reasons, the Libby Claimants would be competing with others for the limited proceeds of these policies, and failure to approve the Settlement Agreement could have a significant adverse effect upon the Debtors and the Asbestos PI Trust.[7]

### c.    The Libby Claimants' Arguments Fail as a Matter of Law.

Not only have the Libby Claimants failed to establish the necessary predicates for their arguments, but their objection must also be rejected as a matter of law because, if upheld, it would completely frustrate the ability of debtors to establish trusts under Section 524(g) of the Code for the payment of asbestos claims and demands, including the ability of debtors to funnel what will in many cases be their most valuable asset (insurance settlement proceeds) to such a

---

[7] The Libby Claimants' "vested rights" theory also fails as a factual matter because the Libby Claimants have failed to show – as they claim – that they even "suffered injuries covered by the CNA Non-Products Coverage . . . ."  Libby Claimants Objections at 13.  They have adduced no evidence in their objections that any particular Libby Claimant did in fact "suffer injury" during years 1973 through 1985 – much less that any such injury triggered CNA "non-products" coverage.  In objecting to the Arrowood settlement, the Libby Claimants similarly failed to provide evidence that any of the Libby Claimants were injured during the time frame covered by the Arrowood policies.  This Court correctly noted that the Libby Objection must fail for the independent reason that, even under their own theory, they failed to prove that specific claims could even arguably fall within coverage provided by the policies.  See Tr. (July 27, 2009) at 132, 137.

trust for the benefit for all asbestos claimants.  Tellingly, none of the authorities cited by the Libby Claimants in support of their position arise in an asbestos bankruptcy where Section 524(g) is involved.

Section 524(g) contemplates that debtors will marshal their assets and funnel them to the Section 524(g) trust so that they can be fairly distributed to present and future Asbestos PI Claimants.  Among the assets that Section 524(g) contemplates being funneled to the trust are the proceeds from settlements of the debtors' asbestos insurance policies.  In order to encourage settlements with insurers and the funneling of insurance policy proceeds to the trust, Section 524(g) gives this Court authority to issue an injunction precluding future suits by asbestos claimants against settled insurance companies.[8]  11 U.S.C. § 524(g)(4)(A)(i)(III).  The authority given courts in a Section 524(g) context is unique, and unlike many other Code provisions.  *See* 11 U.S.C. § 502(e).

Under the Libby Claimants' theory, before determining whether the settlement proceeds of any policy could be funneled to a Section 524(g) trust, the Court would have to determine which specific potential asbestos claimants could be covered by the policy and whether those policy proceeds are or are not sufficient to compensate the eligible claimants in full without competition from other claimants, and then give each and every one of the eligible claimants the right to veto the Settlement Agreement, all on the theory that such eligible claimants have "vested rights" in the policy proceeds in question.  Indeed, under the logical extension of the Libby Claimants' argument, the Trust would have to consider coverage in determining what to pay a claimant.  If a "products" claimant was, for instance, exposed only during the 1960s and

---

[8] The need to marshal limited policy settlement proceeds for the benefit all claimants in asbestos cases was recognized even before the enactment of Section 524(g).  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (finding that the debtor's insurance policies and proceeds were "substantial property of the [Debtor's] estate," and consequently enjoining actions against Debtor's insurers).

1970s, then the Trustees would have to make sure the claimant did not get any money from settled policies that covered only the 1950s.  Or, if particular policies contained exclusions for claims by employees – as do all of the CNA primary policies at issue here – then the Trust would have to make sure that Grace employees receive nothing from the proceeds from those policies. As such, in administering the Trust, the Trustees would in effect have to engage in a coverage determination for each and every claimant, and if a claimant objected, to engage in the equivalent of coverage litigation with the claimant, in order to determine how much each claimant should receive.

Such a scenario would be unworkable, and would completely frustrate the aim of Section 524(g) to pay "similar claims in substantially the same manner."  11 U.S.C § 524(g)(2)(B)(ii)(V). As the Plan Proponents established during the Confirmation Hearings, this requirement is satisfied if individuals with like injuries are compensated in the same manner.  Requiring the Trust (or this Court) to determine which of the potentially dozens, or even hundreds, of insurance policies apply to which of the tens of thousands, or even hundreds of thousands, of claims  would be a highly impractical, if not impossible, task.  The Libby Claimants, like all Asbestos PI Claimants, benefit from the fact that, under the settlement, such allocations of the CNA coverage are unnecessary.

The asbestos/mass tort context of this bankruptcy distinguishes the case at bar from the situations present in the cases, and other authorities, cited by the Libby claimants.  The Libby claimants primarily rely upon *In re Edgeworth*, 993 F.2d 51 (5th Cir. 1993), for the proposition that "as a general matter" the proceeds of liability insurance policies are not the property of the Debtors' estates and thus cannot be settled by Grace.  But *Edgeworth* did not involve an asbestos/mass tort bankruptcy situation, a distinction recognized by the *Edgeworth* court itself:

"In the mass tort context, the decisions by several courts to include the proceeds as property of the estate appear to be motivated by a concern that the court would not otherwise be able to prevent a free-for-all against the insurer outside the bankruptcy proceeding." *Id.* at 56 n.21.

Moreover, the Fifth Circuit has questioned the broad statement from *Edgeworth* that liability policies are not, as a general matter, property of the Debtor's estate. In *In re Vitek, Inc.*, 51 F.3d 530 (5th Cir. 1995), the court cautioned that the *Edgeworth* statement was "dicta" and "confutes the broad understanding," recognized by the Fifth Circuit in an earlier case, that "when a liability policy 'provides coverage for judgments against or losses of the bankrupt corporation itself,' the debtor *owns both the policy and the proceeds of that policy.*" 51 F.3d at 534 n.17 (emphasis added; citation omitted). Courts in this Circuit have similarly noted that, in mass tort contexts involving the Chapter 11 reorganization of a debtor, both insurance policies and their proceeds must be considered property of the estate.[9]

Similarly, the "vested rights" decisions relied upon by the Libby Claimants are simply inapposite to a situation, like the case at bar, where insurance policies are being settled in the context of an asbestos/mass tort bankruptcy, in which potential claimants (such as the Libby Claimants) have an opportunity to object and the settlement must be approved by the Court. The Libby Claimants principally rely on *McLane v. Farmers Insurance Exchange*, 432 P.2d 98

---

[9] *See ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (stating that "it has long been the rule in this Circuit that insurance policies are considered part of the property of bankruptcy estate," even if "all of the proceeds from any recovery will be exhausted in satisfaction of outstanding settlements."); *In re Nutraquest, Inc.*, 434 F.3d 639, 647 n.4 (3d Cir. 2006) ("Nutraquest's right to its insurance-policy proceeds is property of the estate under 11 U.S.C. § 541(a)."); *In re 15375 Mem'l Corp.*, 382 B.R. 652, 688 (Bankr. D. Del. 2008), *rev'd on other grounds*, 400 B.R. 420 (D. Del. 2009), *aff'd*, 589 F.3d 605 (3d Cir. 2009) ("'[The Chapter 11 debtor] has equitable interests in the proceeds of such policies because of its need to decrease liability from which third parties' claims derive, affect the outcome of suits against its insurers, and retain the ability to structure settlements of classes of claims.'") (citation omitted); *see also Tringali v. Hathaway Mach. Co.*, 796 F.2d 553, 560-61 (1st Cir. 1986) (Breyer, J.); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988). Moreover, even outside the context of a mass tort case, the courts in this Circuit have held that, "when an insurance policy provides coverage only to the debtor, courts almost uniformly hold that the proceeds are the property of the estate." *In re SN Liquid., Inc.*, 388 B.R. 579, 584 (Bankr. D. Del. 2008); *In re Allied Digital Tech. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004).

(Mont. 1967), a case involving an insurance company's rescission of an automobile insurance policy in a non-bankruptcy context. *McLane* is not on point here, even assuming that Montana law applies (which it does not).[10] The actual holding of that case is that the insurer "waived" its right to void a policy on ground of misrepresentation by not moving promptly to cancel after learning of the misrepresentation.[11] The court expressly did not decide whether the injured claimant's rights against the insurer "vested" at the time of the accident.[12]

But the most critical point is that *McLane* and the other authorities cited by the Libby Claimants all involved attempts by insurers to cancel, rescind, deny, or annul coverage after a claim arose (such that the injured party would receive nothing), or are based on concerns that the insured and insurer could collusively settle a claim for an unreasonably low amount.[13] None of them involved court-approved good faith settlements of coverage disputes in which the insurer has agreed to pay substantial amounts in which the injured party will share.[14] As the court in *In re Dow Corning Corp.*, 198 B.R. 214 (Bankr. E.D. Mich. 1996), explained, cases such as those

---

[10] Courts have ruled on multiple occasions that the construction of the CNA policies is governed by New York law. *See* cases cited in note 4 *supra* and Caswell Decl. ¶ 29.

[11] *See* 432 P.2d at 99 ("After acquiring this knowledge [of misrepresentation, the insurer] continued to act in a manner inconsistent with an election to rescind. It accepted premium payments and paid other claims arising out of the same accident.").

[12] *See* 432 P.2d at 100 (the claimant's rights "vested either at the time of the accident or at the time of the implied waiver of the right to rescind. *Exactly which of the two possible times this court need not decide*.") (emphasis added)).

[13] *See J.G. Link & Co. v. Cont'l Cas. Co.*, 470 F.2d 1133, 1138 (9th Cir. 1972); *Spann v. Commercial Standard Ins. Co.*, 82 F.2d 593, 596-97 (8th Cir. 1936); *Bujol v. Entergy Servs., Inc.*, 833 So.2d 947, 977-79 (La. Ct. App. 2002); *Madar v. League Gen. Ins. Co.*, 394 N.W.2d 90, 741-42 (Mich. Ct. App. 1986); *Charter Bank of Boonville v. Shelter Gen. Ins.*, 664 S.W.2d 44, 46-47 (Mo. Ct. App. 1984); *Smith & Wesson v. Birmingham Fire Ins. Co.*, 123 A.D.2d. 135, 138 (N.Y. App. Div. 1987).

[14] None of the bankruptcy cases cited by the Libby Claimants apply here because none involved judicially approved coverage settlements or Chapter 11 reorganization cases in the mass tort context. *See In re Doug Baity Trucking, Inc.*, 2005 Bankr. LEXIS 1099 (Bankr. M.D.N.C. Apr. 21, 2005) (court rejects trustee's attempt to divert liability insurance proceeds to benefit creditors other than accident victims); *In re Allied Prods. Corp.*, 288 B.R. 533 (Bank. N.D. Ill. 2003) (court rejects attempted buy-back of insurance policies when debtor intends to use proceeds to pay creditors other than those with claims covered by policies); *Baez v. Med. Liab. Mutual Ins. Co.*, 136 B.R. 65 (Bankr. S.D.N.Y. 1992) (court approves award of policy proceeds to plaintiff with pre-petition medical malpractice judgment against debtor).

14

cited by the Libby Claimants have an element of "fraudulent conveyance" in them in that "the insured had let the insurers off the hook while receiving little or no consideration in return." *Id.* at 240.  In a mass tort/bankruptcy context, however, "[t]o grant an injured party more than an expectation before receipt of judgment would inhibit legitimate settlements.  An insurer would never be able to settle a coverage suit with its insured without impleading the known injured party." *Id.* at 242.  "Therefore, it is not surprising that there appears to be no case where a fair and reasonable settlement entered into in good faith between an insurer and insured was subsequently undone by a court." *Id.*

> **d.    The Sale-Back Provision of the Settlement Agreement Is Appropriate.**

The Libby Claimants also maintain that the "sale back" provision of the Settlement Agreement is a "sham" aimed at depriving them of their "vested rights" under the policies.  As discussed above, however, the Libby Claimants have no "vested rights" in the first place.  But, in any event, there is nothing "sham" about a sale-back provision.

The sale-back contemplated by the Agreement is an alternative basis to ensure that no additional coverage claims are raised after implementation of the proposed Settlement. Bankruptcy Courts regularly approve issuance of such additional assurances in order to allow a debtor and insurer to settle a policy, free and clear of additional claims.[15]  In fact, many of the Settlement Agreements that have been entered into by Grace and other insurance companies and approved by this Court in this proceeding have included both full releases of coverage claims and sale-back provisions.[16]  Given the substantial consideration being provided by the CNA

---

[15] *See MacArthur Company v. Johns-Manville Corp.*, 837 F.2d at  93 (finding the "authority to issue [an] injunction is thus a corollary to the power [under Bankruptcy Code § 363(f)] to dispose of assets free and clear and to channel claims to the proceeds."); *In re Dow Corning Corp.*, 198 B.R. at 243-44 (same).

[16] *See*, *e.g.*, Zurich Settlement Agreement at 13 (Nov. 11, 2009) (Dkt. 23736); AG Insurance Settlement Agreement at 12 (Dec. 7, 2009) (Dkt. 23960); Northstar Settlement Agreement at 13-14 (April 26, 2010) (Dkt.

Companies, and the arms-length nature of the negotiations leading to the Settlement Agreement, the sale-back provision here plainly satisfies the "sound business standard" for sales under Section 363(b),[17] as well as the "good faith" requirement of Section 363(m).[18]

The Libby Claimants' argument that Grace failed to comply with the formalities for sale motions provided by Del. Bankr. L. R. 6004-1 is similarly misguided.  The items allegedly lacking in Debtor's motion – disclosure of whether an auction is contemplated, sale closing deadlines, and whether a deposit has been made or is required – are simply inapplicable to the transaction contemplated here because the only entities that could conceivably be interested in purchasing the policies are the CNA Companies.  Rule 6004-1(b)(iv) only requires disclosure of such terms where applicable to the contemplated sale ("The Sale Motion must highlight material terms . . . [of] any provision of the type set forth below.").

### 2.    The Proposed Settlement Is Fair and Reasonable.

The Libby Claimants' second objection is that the CNA Companies are not entitled to protection under the Asbestos PI Channeling Injunction because they have not shown that the settlement is "fair and equitable" to the Libby Claimants within the meaning of Section 524(g). But the issue of 524(g) protection is not presented by the Debtors' motion to approve.  Rather, the present motion seeks approval of the settlement as fair and reasonable, and consistent with

---

24667); Wausau Settlement Agreement at 14 (June 28, 2010) (Dkt. 24994); Hartford Parties Settlement Agreement at 16 (August 26, 2010) (Dkt. 25272); Federal Settlement Agreement at 16 (Sept. 29, 2010) (Dkt. 25508); Associated Settlement Agreement at 15 (Nov. 5, 2010) (Dkt. 25706); Swiss Reinsurance Settlement Agreement at 14 (Dec. 3, 2010) (Dkt. 25863).

[17] *See Travelers Cas. & Sur. Co. v. Future Claims Representative*, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008) (citations omitted).; *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'").

[18] *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) ("Courts applying section 363(m) … have … turned to traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value.' … 'Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'") (citations omitted).

the *In re Martin* factors.  The proposed Approval Order specifically states that no decision is being made on whether the CNA Companies will be afforded Section 524(g) protection.

But in any event, the proposed Settlement Agreement without question satisfies the "fair and equitable" standard of Section 524(g)(4)(B)(ii), because the CNA Companies will provide consideration to the Trust in amounts that are consistent with their likely liability as insurers in a coverage action outside of bankruptcy.[19]  As discussed in Section I and the Caswell Declaration, one very likely outcome of coverage litigation is that the Asbestos PI Trust would collect nothing, or at most collect one per-occurrence limit per primary policy and then also be required to reimburse part of those monies to CNA to pay retrospective premiums.  In these circumstances, and given the various defenses discussed in the Caswell Declaration, the settlement amount and all other terms of the proposed settlement represent a resolution of coverage issues in a manner that is both "fair and equitable" in light of the benefits provided, or to be provided, by the CNA Companies to the Trust.  11 U.S.C. § 524(g)(4)(B)(ii).

In this regard, the settlement must be looked at as a whole.  As discussed in Part I, there are many forms of consideration that are being given by the CNA Companies in return for releases of the Debtors' claims under both the primary and high-level excess policies.  These include:   (1) relinquishment of rights to collect deductibles and retrospective premiums; (2) withdrawal of valid objections to the Plan; (3) elimination of coverage defenses that CNA would otherwise have; (4) relinquishment of Indirect PI Trust claims; and (5) withdrawal of any Proofs of Claim relating to asbestos matters.  In addition, of course, the CNA Companies will be

---

[19] *See* 4 Collier on Bankruptcy ¶524.07[2] at 524-59 (16th ed. 2010) (in considering whether to extend the 524(g) channeling injunction to third parties, "such as insurers and officers, the court should afford them the protection of the injunction only if they contribute to the trust in amounts that are consistent with their likely liability as insurers or in damage actions outside of bankruptcy.")  The Libby Claimants cite *In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010), but the discussion in that case dealt with the potential liability of the debtor's parent outside of bankruptcy – not with the potential liability of an insurer in coverage litigation outside of bankruptcy.

paying $84 million into the Asbestos PI Trust.  When looked at as a whole, this consideration is more than fair and reasonable compensation to the Debtors under both the unsettled portion of the primary policies and the high-level excess policies – particularly since the high-level excess policies might never be triggered, or, if they are, would be triggered well into the future.  When CNA's consideration, and the various defenses available to it, are considered, there can be no doubt but that this Settlement Agreement satisfies the *In re Martin* factors, as well as the fair and equitable standard of Section 524(g).

The Libby Claimants' argument to the contrary is based upon several misconceptions. The first is that, absent settlement, the CNA primary policies will cover 100% of the Libby Claimants' claimed injuries, and that a settlement for anything less than the full amount of the Libby Claimants' claimed injuries would not be fair and equitable to them.  But as we discussed at pages 8-10 above, that is just plain wrong in light of CNA's coverage defenses.

The Libby Claimants also maintain that the settlement is not fair to them, because the settlement proceeds from the non-products policies will not be distributed solely to the Libby Claimants.  That is a Confirmation objection that the Libby Claimants raised during the Confirmation Hearing.  *See* Libby Claimants' Post-Trial Brief (Dkt. 23649) at 21-24.  In any event, and as discussed at pages 11-12 above, this contention has no merit.  The proceeds of all policies being settled by the Trust will be distributed to various claimants based upon the diseases they have manifested.

Finally, the Libby Claimants appear to complain that the value of the overall consideration being provided by CNA has not been compared to the value of the so-called "Insurer Wrong-Doer" claims that the Libby Claimants maintain that they possess against CNA and that they claim will not be barred by any Section 524(g) injunction in favor of the CNA

Companies that the Court might issue once the Plan is confirmed.  This, at best, is a confirmation objection.  As discussed at pages 19-21 below, it relates to what claims may, or may not, be included in any Asbestos PI Channeling Injunction that this Court might or might not issue in the future.  But, in any event, the key to determining whether CNA's consideration, when considered as a whole, is "fair and equitable" within the meaning of Section 524(g)(4)(b)(ii) is whether the amount being contributed is fair given CNA's likely liability, outside of the bankruptcy context, for coverage claims held by the Debtors or the Trust.[20]  If such a settlement is fair and reasonable to the Trust, and thus to those who will be making Asbestos PI Claims against the Trust, then it should not matter that a particular class of claimants maintain that they also possess other claims against the CNA Companies, not encompassed within Section 524(g), that they may assert post-bankruptcy.

> **3.    The Plan's Asbestos PI Channeling Injunction Provisions Are Sufficiently Clear and Should Not be Revised by this Court.**

The Libby Claimants also object that the language of the Asbestos PI Channeling Injunction is not sufficiently precise that the Libby Claimants can determine, at this time, each and every claim that might or might not be barred by that injunction (assuming that the Court does ultimately enter the Asbestos PI Channeling Injunction contained in the Plan).  This objection by the Libby Claimants is, again, an objection that should properly have been raised – and indeed, was raised – in connection with the Confirmation Hearings.  Libby Claimants' Post-Trial Brief at 4-5.  As they do in their objection here, during the Confirmation Hearings, the Libby Claimants maintained that the Court should clarify the Channeling Injunction as to an amorphous category of claims that the Libby Claimants now refer to as "Insurer Wrong-Doer"

---

[20] *See note* 19 *supra.*

Claims.  The Court should not use the occasion of the Motion to Approve CNA's Settlement Agreement to revisit this Confirmation issue.

In any event, as was pointed out to the Court during the Confirmation Hearings, the Asbestos PI Channeling Injunction in the proposed Plan does in fact appropriately define the claims against Settled Asbestos Insurance Companies that will be channeled to the Asbestos PI Trust.  Specifically, the Plan provides in Section 1.1 (209) that "for the avoidance of doubt: … an Asbestos Insurance Entity is a Settled Asbestos Insurance Company to the fullest extent, but only to the extent, provided by Section 524(g) in respect to any claim that arises by reason of one of the activities enumerated in Section 524(g)(4)(A)(ii)."  Thus, if a particular claim against a Settled Asbestos Insurance Company falls within Section 524(g), it will be channeled to the Trust and the Claimant will not be able to pursue that claim against the Settled Asbestos Insurance Company.  If a particular claim does not fall within Section 524(g), then it would not be channeled to the Trust, and a Claimant may seek to pursue the claim against the Settled Asbestos Insurance Company.

While the Libby Claimants maintain that this is not clear enough for them, the fact is that it incorporates a reasonable standard – the standard set forth in the statute itself.  This incorporation of Section 524(g) into the Channeling Injunction also distinguishes this case from the situation involved in the Supreme Court's decision in *Travelers Indemnity Company* v. *Bailey*, 129 S.Ct. 2195 (2009).  That case involved the scope of a channeling injunction issued by the Bankruptcy Court overseeing the *Manville* bankruptcy before Section 524(g) had been enacted.  That injunction did not define claims that were channeled to the Asbestos PI Trust by reference to whether the claims fell, or did not fall, within Section 524(g)'s protection.

What is more, the Libby Claimants' request that the Court specify whether "Insurer Wrong-Doer" claims fall within the ambit of the Asbestos PI Channeling Injunction arises in a factual vacuum. Whether, and the extent to which, particular claims made in the future against the CNA Companies may or may not fall within the Channeling Injunction will require an evaluation of their precise facts. The Libby Claimants seek a "clarification" from this Court that the Asbestos PI Channeling Injunction would not bar claims against an insurance company for breach of "legal duty," but States impose a variety of "legal duties" on insurers. For instance, in a given State, the CNA Companies might have a "legal duty" pursuant to a direct action statute to pay policy proceeds directly to injured Claimants. Under the Libby Claimants' formulation, CNA could be sued, notwithstanding contrary provisions in the Channeling Injunction, for those policy proceeds on the grounds that CNA has abridged a "legal duty" imposed by the State. That makes no sense. The fact is that terms such as "legal duty" and "insurer wrongdoing" can involve varied factual patterns, some of which may be, and others of which may not be, covered by Section 524(g). To go through every hypothetical fact pattern, and rule now whether or not the Asbestos PI Channeling Injunction encompasses them would likely be impossible, and in any event is unnecessary.

The better solution is to enter an Asbestos PI Channeling Injunction that protects Settled Asbestos Insurance Companies to the fullest extent allowable under Section 524(g). If, subsequent to confirmation, the Libby Claimants or anyone else seeks to sue a Settled Asbestos Insurance Company on the theory that their claims do not fall within Section 524(g), the issue can be brought before this Court at that time, and the Court can rule on the question, after an evaluation of the particular facts of that particular claim.

      **4.**    **The Settlement Agreement Only Releases Claims By or Against the CNA Companies, the Trust, and the Grace Parties.**

In their final objection, the Libby Claimants maintain that the Settlement Agreement could be construed to release claims the Libby Claimants might have against the CNA Companies. Again, the Libby Claimants are wrong. The Settlement Agreement specifically provides, in Section III.A and Section III.B, for releases only by or on behalf of the CNA Companies, Grace (on behalf of itself and to the extent that it has power to bind them, the Grace Parties) and the Trust. Nowhere are the Libby Claimants listed in the release provisions.

**B.**    **BNSF's Objections Are Without Merit.**

      **1.**    **The Settlement Agreement Does Not Affect Any Rights BNSF Might Have Under Policies In Which It Is the Named Insured.**

BNSF alleges that the agreement of April 20, 1950 between its predecessor and Grace's predecessor obligated Grace to purchase liability insurance protecting BNSF. It states that Grace purchased three policies in which BNSF is the named insured: CCP906-04-56 (policy years 1974-1977), CCP3327361 (policy years 1977-1981), and CCP2483440 (policy years 1981-1984). BNSF then contends, at length, that its rights under those policies are, or might be, "improperly eliminated" by the Settlement Agreement.

BNSF is incorrect. The Settlement Agreement expressly states: "For the avoidance of doubt, the term 'Subject Policies' does not include … policies, or portions of policies, issued to BNSF by any of the CNA Companies, or issued to BNSF and subscribed to by any of the CNA Companies." Settlement Agreement § I.PP. Nonetheless, to put the issue to rest, CNA would agree to an amendment to the Proposed Order approving the Settlement Agreement to state specifically that, to the extent that the alleged policies exist, any rights BNSF might have in them will not be eliminated by the Settlement Agreement.

### 2.    BNSF Is Not an Additional Insured Under the Grace Policies.

BNSF further argues that the Settlement Agreement impermissibly affects BNSF under the policies where Grace (and <u>not</u> BNSF) is the named insured.  BNSF claims to be an "additional insured" under those policies.  In other words, BNSF contends that Grace not only agreed to purchase insurance for BNSF in which BNSF is the named insured, but that Grace also agreed that BNSF would be an additional insured under Grace's own insurance coverage.  BNSF provides no sound reason why Grace would agree to provide BNSF with such redundant insurance coverage.

More importantly, BNSF's contention is at odds with the governing law.  BNSF claims to be an additional insured on the grounds that (a) Grace had allegedly agreed to indemnify it against liability and (b) the CNA policies state that the "Company will pay on behalf of the insured [i.e. Grace] all sums which the insured shall become legally obligated to pay as damages, including liability assumed under contract ...."  *See* CNA Phase I Trial Exhibit 19A at 2; CNA Phase I Trial Exhibit 19B at 3; CNA Phase I Trial Exhibit 19C at 1.

There is nothing in that policy language that makes BNSF an additional insured.  It merely provides that Grace will be indemnified against specified liabilities.  And this Court so ruled when rejecting BNSF's contentions that similar provisions in policies issued by Arrowood's predecessors to Grace or its predecessors made BNSF an "additional insured" under those policies.  *See* Tr. (July 27, 2009) at 82.

The applicable case law is, moreover, contrary to BNSF's assertions.  The issue of who is an insured is not (as BNSF claims) covered by Montana law, but as shown above, the law of New York.  The New York Court of Appeals has ruled that a claimant in the position of BNSF here is not an additional insured.  *Jefferson v. Sinclair Ref. Co.*, 10 N.Y.2d 422, 179 N.E.2d 706 (1961).  In that case, Lipsett agreed to indemnify Sinclair for personal injury claims arising out

23

of Lipsett's work.  Lipsett's insurance policy provided that it covered this contractually assumed liability,[21] but did not expressly name Sinclair as an insured.  The court rejected Sinclair's assertion that it was entitled as an insured to sue the insurer for failing to provide a defense.  *Id.* at 427, 179 N.E.2d at 708; *see also Madeira v. Affordable Housing Found.*, 469 F.3d 219, 251-52 (2nd Cir. 2006) ("[U]nder New York law, 'where the insurance contract does not name, describe, or otherwise refer to the entity or individual seeking the benefit thereof as an insured, there is no obligation to defend or indemnify.'") (citation omitted).[22]

Tellingly, BNSF agreed, during the Confirmation hearings, to revisions to the Joint Plain that effectively acknowledge that it is not an additional insured under the CNA primary policies.  Pursuant to an agreement between the Plan Proponents, Royal and BNSF, the Plan was revised to state that neither the Asbestos PI Channeling Injunction nor the Asbestos Insurance Entity Injunction shall preclude "BNSF from asserting any claim … for insurance coverage as an insured or an additional insured against a Settled Asbestos Insurance Company under and only under an insurance policy (or part of a policy) that is not identified as being the subject of an Asbestos Insurance Settlement Agreement in Exhibit 5 of the Exhibit Book."  Plan §§ 8.2.2(e), 8.4.1.3(b).  At the time this revision was incorporated to the Joint Plan, the CNA primary policies were identified (and they remain identified) in Exhibit 5 as Settled Asbestos Insurance

---

[21] The insurance contract in *Jefferson* stated that the insurer would "pay on behalf of the insured all sums which the insured, by reason of the liability assumed by him under any written contract designated in the Schedule, shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."  10 N.Y.2d at 426, 179 N.E.2d at 707.

[22] The only case BNSF cites is an unofficially reported Eleventh Circuit decision, decided apparently under Florida law, which that court does not treat as precedential under its Local Rule 36-2.  *Ring Power Corp. v. Amerisure Ins. Co.*, 326 Fed. Appx. 502, 2009 WL 1101381 (11th Cir. Apr. 24, 2009).  Moreover, the portion of *Ring Power* cited by BNSF is at odds with decisions from other States besides New York.  *See, e.g.*, *Sears, Roebuck & Co. v. Royal Surplus Lines Ins. Co.*, 61 Fed. Appx. 280, 2003, WL  1225691 at *4 (7th Cir. Mar. 14, 2003); *Alliance Syndicate, Inc. v. Porsec, Inc.*, 741 N.E.2d 1039 (Ill. App. Ct, 2000); *Alex Robertson Co., v. Imperial Cas. & Indem. Co.*, 10 Cal. Rptr. 2d 165 (Cal. Ct. App. 1992).

Policies with respect to products coverage.  BNSF thus acknowledged, through this agreed-to amendment to the Plan, that it had no rights to products coverage under the listed CNA primary policies.  Its attempt to now reverse course requires it to in effect argue that it is an additional insured under the non-products coverage of the CNA primary policies but not under the products coverage.  As shown above, BNSF is an insured under neither.

### 3.  BNSF's Other Objections Likewise Lack Merit.

BNSF's remaining two objections are based upon the incorrect premise that the Settlement Agreement between the Debtors and the CNA Companies requires this Court to issue an injunction precluding any entity from ever asserting any kind of claim against CNA that has anything to do with Grace asbestos.  Based upon that false premise, BNSF claims that any such injunction would harm the Libby Claimants, and, by extension, BNSF because the Libby Claimants would seek a greater recovery from BNSF.

The Settlement Agreement does not – nor could it legally – require this Court to issue a channeling injunction that protects the CNA Companies from any and all claims held by the Libby Claimants.  Rather, consummation of the Settlement Agreement is merely contingent upon the Debtor designating CNA as a Settled Asbestos Insurance Company with respect to the Subject Policies, and the Court issuing an injunction protecting Settled Asbestos Insurance Companies with respect to Asbestos PI Claims – as the term "Asbestos PI Claims" is defined in the Plan.  *See* Agreement §§ I.Q.1, VI.A.I.

If the Court approves the Settlement Agreement and confirms the Plan, CNA will be protected from Asbestos PI Claims to the extent allowed under Section 524(g) of the Code.  In that event, consequently, the Libby Claimants would not be able to pursue Asbestos PI Claims against the CNA Companies.  If the Libby Claimants were, as a result, able to collect more monies from BNSF, BNSF may have an Indirect PI Trust Claim against the Asbestos PI Trust to

recover all or part of what it paid the Libby Claimants. If, on the other hand, the Libby Claims against CNA do not fall within Section 524(g), then CNA would not be protected under the Asbestos PI Channeling Injunction, and BNSF's fears would not materialize.

Similarly, even if CNA's designation as a Settled Asbestos Insurance Company precludes BNSF from reducing its share of any verdict that might be obtained by the Libby Claimants in a state court lawsuit – a proposition for which BNSF provides no support and which BNSF itself asserts is incorrect – BNSF would again have the right to assert an Indirect PI Trust Claim against the Asbestos PI Trust to recover part or all of any damages it might have to pay to the Libby Claimants. That is simply how Section 524(g) and the Asbestos Channeling Injunction works in this and virtually every other Section 524(g) bankruptcy case.

Finally, BNSF claims that the settlement between the Debtors and the CNA Companies is not fair to the Libby Claimants themselves – both because, in BNSF's view, the settlement is not "fair and equitable" within the meaning of Section 524(g), and because any proceeds received by the Trust on account of settlement of the CNA primary policies will not be dedicated exclusively to the Libby Claimants. The Libby Claimants themselves have raised these objections, and we discussed in Section II.A.2 above why they have no merit.

## CONCLUSION

For the foregoing reasons, as well as those supplied by the Debtors, the motion to approve the Settlement Agreement should be granted.

*[Remainder of this page left intentionally blank]*

Respectfully submitted,

| | |
|---|---|
| FORD MARRIN ESPOSITO WITMEYER & GLESER, L.L.P. | ROSENTHAL, MONHAIT & GODDESS, P.A. |

| | |
|---|---|
| Elizabeth DeCristofaro (*pro hac vice*)<br>Wall Street Plaza, 23rd Floor<br>New York, New York 10005-1875<br>Telephone: (212) 269-4900<br>Facsimile: (212) 344-4294 | By: */s/ Edward B. Rosenthal*<br>Edward B. Rosenthal (*Bar No. 3131*)<br>P.O. Box 1070<br>Wilmington, Delaware 19899<br>Telephone: (302) 656-4433x6<br>Facsimile: (302) 658-7567 |

| | |
|---|---|
| WILDMAN, HARROLD, ALLEN & DIXON LLP<br>Jonathan W. Young<br>Jeff Chang<br>225 West Wacker Drive<br>Chicago, Illinois 60606-1229<br>Telephone: (312) 201-2662<br>Facsimile: (312) 416-4524 | GOODWIN PROCTER LLP<br>Daniel M. Glosband (*pro hac vice*)<br>Exchange Place<br>Boston, Massachusetts 02109<br>Telephone: (617) 570-1000<br>Facsimile: (617) 523-1231<br>– and –<br>Michael S. Giannotto (*pro hac vice*)<br>Frederick C. Schafrick (*pro hac vice*)<br>901 New York Avenue, N.W.<br>Washington, D.C. 20001<br>Telephone: (202) 346-4000<br>Facsimile: (202) 346-4444 |

*Counsel for Continental Casualty Company,*
*Transportation Insurance Company and their American insurance affiliates*

Dated: January 3, 2011