**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W. R. GRACE & CO., *et al.,* | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
| | Related Docket Nos. 25776, 25954, 25955 |
| | Hearing Date: January 10, 2010 |

**DECLARATION OF DANIEL P. CASWELL IN SUPPORT
OF THE CNA COMPANIES' REPLY ON DEBTORS' MOTION
FOR AN ORDER APPROVING SETTLEMENT
BETWEEN W. R. GRACE &CO. AND THE CNA COMPANIES**

Pursuant to 28 U.S.C. § 1746, the undersigned declarant hereby declares as follows, under penalty of perjury:

1.      I am Senior Counsel employed by Resolute Management Inc. Midwest Division ("Resolute Midwest"), as Administrator for the CNA Companies (as defined in the Settlement Agreement before the Court, hereinafter "CNA"). Prior to my employment by Resolute Midwest, I was employed by the Continental Casualty Company ("CCC"), one of the CNA Companies, for the past 10 years in the Strategic Claim Unit of the Environmental and Mass Tort Claims division of CCC. I have had supervision and oversight of the CNA Companies' handling of, and litigation arising out of, asbestos, environmental and other claims made by W. R. Grace & Co. ("Grace") for almost a decade.

2.      I submit this declaration in support of CNA's Reply on the Debtors' Motion for the Court's approval of the settlement reached between Grace and CNA, and in reply to the objections of BNSF Railway Company ("BNSF") and the Libby Claimants to such approval. I have personal knowledge of the extensive negotiations it took to reach this settlement agreement, and through my duties over the past 10 years, I have

1

knowledge and information regarding the past Grace coverage litigations, prior settlements CNA reached with Grace, and CNA's positions on current claims.

**BACKGROUND REGARDING THE SCOPE AND PURPOSE OF THE SETTLEMENT**

3. **The CNA Primary Policies and 1990 Settlement Agreement**: CCC succeeded Maryland Casualty Company ("MCC") as Grace's primary insurer in 1973. CCC issued three primary policies to Grace covering the time from 1973 to 1987. Claims for coverage of Grace's asbestos personal injury liabilities pertain to policy periods through 1985 without asbestos exclusions.

4. In the 1980s, when Grace began to face asbestos liabilities, Grace made claims against CNA and other Grace primary insurers. In 1983, MCC commenced a coverage litigation involving Grace's primary insurers. CCC disputed certain aspects of the claims made by Grace against the CNA primary policies but, as reported by the Second Circuit Court of Appeals, CNA paid Grace over $187 million in indemnity and defense costs on primary policies issued to Grace from 1973 to 1987. *See Maryland Cas. Co. v. W.R. Grace*, 23 F.3d 617, 621 (2d Cir. 1993).

5. In 1990, CCC and Grace reached a settlement that, for an additional payment by CNA of $22 million, released CNA from any further duties or obligations for any of Grace's products claims, including all asbestos-related Property Damage and Personal Injury Product Claims, under the Grace primary policies from 1973-1987 (the "1990 Settlement Agreement"). The 1990 Settlement Agreement was submitted to the Court as CNA Exh. 32(A) in Phase II of the Plan Confirmation trial. In addition, in the 1990 Agreement, CCC agreed to release its claim for retrospective premiums and claim service costs for those claims. Grace agreed to indemnify CCC for claims released under

2

the 1990 Agreement. In the Exhibits to Grace's Proposed Plan of Reorganization, CNA is already identified as an Asbestos Protected Party with respect to that agreement.

6.     **1975-1985 Excess Policies**: Various CNA companies also issued excess policies to Grace. For policy periods from 1975 to 1985, there were 20 policies issued either by CCC or its affiliates, or by Continental Insurance Company ("CIC"), which was acquired by a CNA entity in 1995. These policies were a subject of a separate coverage litigation instituted by MCC in New York in 1988 regarding coverage of Grace's asbestos liabilities. (Grace asbestos coverage litigation was also instituted and ongoing in other forums, including Minnesota, Massachusetts and Texas, with deferral to the New York forum or application of New York law.) Claims for coverage under all but four of the excess policies were dismissed by the court because the policies were at such high layers that they likely would not be reached, and as such, disputes regarding them were non-justiciable.

7.     After several more years of litigation in the Southern District of New York, in 1997 Grace and CCC reached a settlement of Grace's claims for coverage of its asbestos liabilities on the four second-layer excess policies for which coverage claims had not been dismissed. *See* May 22, 1997 Settlement Agreement submitted as CNA Exh. 32(C) in Phase II of the Plan Confirmation hearing. As more fully described in that Agreement, CCC agreed to make payments, subject to an agreed upon formula, to Grace on a "coverage in place" basis, whereby Grace would submit documentation of its asbestos expenditures and CNA would pay on a quarterly basis a share of those costs as against the limits of the policies. When Grace filed for bankruptcy, a substantial portion of those limits had been paid, leaving only a small percentage of the total limits left to

3

pay. A small portion of those limits was also exhausted by a settlement in connection with the Minnesota litigation. *See* Feb. 18, 1997 Settlement Agreement submitted to the Court as CNA Exh. 32(B) as part of the Phase II Plan Confirmation trial record.

8.    **Remaining CNA Coverage with Grace**:    After intense and lengthy litigation and subsequent settlements, at the time of Grace's April 2001 Chapter 11 Petition, there remained 16 unsettled CNA excess policies issued to Grace without asbestos exclusions at very high excess levels, as to which coverage claims had been dismissed out of the New York litigation. Grace and CNA have disputed whether the limits of such policies are annualized, but under Grace's calculation they would provide limits of $158 million. $141 million of that coverage is at levels *in excess of $100 million, with the bulk in layers in excess of $150 million*. The breakdown is as follows:

| Unsettled Limits | Attachment Point of CNA 1975-1985 Unsettled Excess Policies |
|---|---|
| $17 million | $75 million x/o primary |
| $18 million | $100 million x/o primary |
| $108 million | $150 million x/o primary |
| $15 million | $200 million x/o primary |

At the time of Grace's bankruptcy filing, CNA was still paying under the terms of the coverage-in-place agreement under policies attaching at levels in excess of only $20 million.

9.    There are later CNA primary and excess policies issued to Grace post-1985 that have asbestos exclusions.

10.    **Open Coverage Disputes Relating to Primary Policies**: A dispute arose in 2000 between Grace and CNA as to whether any coverage was available under the primary policies which were the subject of the 1990 Settlement Agreement for the claims asserted by persons alleging exposure to asbestos through Grace's mining and processing of vermiculite, including claims asserted by residents of Libby.    In 2000, CCC commenced litigation in the United States District Court for the Southern District of New York seeking, among other matters, a declaration that it owed no coverage to Grace for such claims. *See Continental Casualty Co. v. W. R. Grace & Co., et al.*, No. 00 Civ. 4524 (S.D.N.Y.) (complaint submitted by the Plan Proponents to the Court during Phase II of the Confirmation trial as Exh. PP 123).

11.    If the current settlement were not reached, upon confirmation, CCC would recommence such litigation (presently stayed as against Grace by the automatic stay) and seek a declaration as against Grace or the Trust, as appropriate.

12.    The declaration CCC would seek in the coverage litigation would not be restricted to coverage for just the Libby claims, but would also include other similar claims tendered by Grace under the primary policies.  As noted below, there are myriad reasons why in CNA's view the Libby Claims (or similar claims) are not covered under the 1973-1985 CCC primary policies.

13.    **The Settlement**: The ultimate settlement reached by the parties and now before the Court was intensely and extensively negotiated for well over a year.  CNA was (and remains) prepared to litigate all coverage issues on both the primary and excess policies, and maintains that there are substantial hurdles to coverage based on, among other things, prior court rulings in litigation between Grace and its insurers.

14.     CNA was not interested in piecemeal or partial settlements, and sought finality with respect to Grace asbestos liabilities. CNA was willing to enter into the Settlement Agreement and pay the Settlement Amount and the other consideration set forth in the Settlement Agreement *only* if it was given certainty that CNA and its affiliates would be released fully from all *asbestos-related claims* that may be based on, or derive from, the Grace policies and CNA's provision of insurance to Grace and the Grace Parties.

15.     The resulting settlement was intended to resolve, to the greatest extent possible, all remaining claims and disputes arising out of the pre-1985 policies and all claims against CNA for Grace asbestos liabilities based on any CNA Grace policy.

16.     In the Settlement Agreement, CNA agrees to provide consideration that includes: payments totaling $84 million to the Asbestos PI Trust; the withdrawal of CNA's objections to the Plan; resolution of CNA's Proofs of Claim Nos. 13966-14027 to the extent they relate to asbestos claims; release of all CNA claims of indemnification for asbestos liabilities based on prior settlement agreements, including those provided in the 1990 and February 20, 1997 Settlement Agreements; release of all Indirect PI Trust Claims; and release of all claims against Grace for retrospective premiums and deductibles arising from 1973-85 coverage. CNA also agrees to dismiss its pending coverage litigation.

17.     Under the agreement, the Trust and Grace Parties (and no other party) release CNA from all claims with respect to the 1973-1985 Grace primary policies, including all asbestos-related claims, and the parties resolve coverage under the 16 remaining unsettled excess policies. The parties agree that CNA's substantial payment also includes any amounts left to be paid under the CNA May 22, 1997 coverage-in-place

6

agreement. The Trust provides an indemnity to CNA to a maximum of $13 million under terms set forth in the Agreement.

18.    The settlement does not contain releases of policies that were allegedly issued to BNSF by CNA.

## THE SETTLEMENT SATISFIES ALL APPLICABLE CRITERIA

19.    As discussed further below, this Settlement plainly falls within the range of possible outcomes resulting from litigation among the parties. If in additional litigation CNA prevailed on its coverage defenses (described below) or if a Court found that the claims are barred by prior Settlement Agreements, Grace would receive virtually no recovery, and the current Settlement of $84 million falls well above that result. Consequently, from CNA's perspective, the Settlement well satisfies the factors that I understand that the Court will consider in assessing this settlement.

### A)    The Complexity of Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending It

20.    One overriding purpose of the Settlement is to put to bed further litigation relating to the CNA Grace policies arising from Grace's asbestos liabilities. As noted above, coverage litigation involving Grace has been ongoing since 1983, and there have been at least a half dozen coverage lawsuits involving Grace asbestos liabilities. *See, e.g., See Maryland Cas. Co. v. W.R. Grace*, 23 F.3d 617 (2d Cir. 1993) (primary action); *Maryland Cas. Co. v. W.R. Grace & Co.-Conn.*, 1994 U.S. Dist. LEXIS 15322 (S.D.N.Y. Oct. 26, 1994); *W.R. Grace & Co. v. Continental Cas. Co.*, 896 F.2d 865 (5th Cir. 1990) (Texas action); *W.R. Grace & Co. v. Hartford Acc. & Indem. Co.*, 407 Mass. 572 (1990); *W.R. Grace & Co. v. Home Ins. Co., 89-7976*

(Minn. D. Ct. Hennepin County Nov. 3, 1989); *W.R. Grace & Co. v. Maryland Cas. Co.*, No. 86-5622 (Mass. Super. Ct. Middlesex County July 13, 1990).

      21.     As recited above, prior to Grace's bankruptcy filing in 2001, CNA instituted an action in the Southern District of New York to resolve additional claims for coverage asserted by Grace with respect to environmental contamination and exposure to vermiculite, including the Libby Claims. (Certain of these claims were settled in an Agreement approved by this Court in 2004.) If the current settlement were not reached, Grace or the Trust (if the policies were validly assigned) would need to defend that litigation, which could take many years to resolve. As discussed below, CNA believes that it has meritorious defenses to all claims of coverage. At a minimum, resolution of such defenses and the complex legal issues they implicate would require expenditures of resources that could instead be used for claimants. Even if the Trust were ultimately successful, collection of any substantial reimbursement in regard to the Libby Claims or other claims would be delayed, whereas the current CNA settlement provides an influx of millions of dollars to the Trust in the near term, so that the Trust will have funds available to pay the claims of Libby Claimants and others.

      22.     Additionally, CNA would litigate with respect to the claims on the 16 very high-level excess policies in any post-bankruptcy litigation against Grace or the Trust because CNA also has meritorious defenses to Grace's claims of coverage of its asbestos claims under those policies. Among other things, CNA would maintain that Grace or the Trust may not obtain any proceeds from the excess policies until it proves that all underlying policies have been exhausted by valid and proper payments from the

8

Trust, requiring the Trust to incur the burden and expense of compiling and demonstrating such payments.

23.     The Settlement also eliminates the need for further litigation between the Parties over issues associated with CNA's Proofs of Claim to the extent that they relate to Asbestos Claims, and results in withdrawal of CNA's objections to the Plan. The Settlement additionally eliminates the cost and expense for the Trust of any Indirect PI Trust Claim by CNA against the Trust based on CNA's rights to contractual indemnity, statutory contribution and common law contribution and indemnity.

24.     The Settlement clearly eliminates complex, lengthy and expensive litigation for all parties involved.

**B)     The Likely Difficulties in Collection**

25.     Another factor that supports the CNA Settlement is consideration of the likely difficulties in collection. As set forth above, all of the CNA unsettled excess coverage sits in layers above $75 million, and $141 million sits in excess of $100 million, with $123 million of that at levels in excess of $150 million. Even if the Trust were successful in defeating CNA coverage defenses, it would have to demonstrate proper exhaustion of all the underlying coverage by proper payment and allocation, using individual claim information. CNA would require proper proof of exhaustion in order to make payments on these policies.

26.     It would take a tremendous number and amount of paid claims and processing to reach these levels, and is unlikely that the Trust would be able to prove such exhaustion for many years, if at all. Under the Settlement, CNA agrees to make payments without proof of exhaustion and the Trust begins collecting funds as soon as the orders

9

approving the settlement and confirming the Plan become final. The Settlement also eliminates any need for the Trust to demonstrate that any claim, such as a Libby Claim, is a covered claim under any primary or excess policy.

### C)   Probability of Success in Litigation

27.   As noted above, CNA's position has been that its coverage defenses would ultimately mean that Grace or the Trust would not recover under the policies, particularly with respect to the claim that the 1973-1985 policies would provide coverage for the Libby Claims. I mention certain of those defenses here to give the Court an overview of the breadth of the issues that would need to be litigated, and of the grounds CNA would assert as ultimately precluding any recovery.

28.   As a threshold matter, nearly a third of the Libby Claimants are Grace employees who assert that they were exposed to asbestos as a result of their work at or in connection with the Grace Libby Mine. The Court has heard such evidence in connection with the Confirmation hearing. The CNA 1973-1985 primary policies contain an express exclusion for "bodily injury *to any employee of the insured arising out of and in the course of his employment by the insured.*" Thus, CNA contends that the policies would not provide coverage for those claims.

29.   Furthermore, multiple courts (including the ones cited above) in one context or another have determined that New York is the proper forum for coverage disputes on the Grace policies (which were issued to Grace in New York) and that New York law should be applied to such disputes. *See Maryland Cas. Co. v. Continental Cas. Co.,* 332 F.3d 145, 149-56 (2d Cir. 2003). *See also W.R. Grace & Co. v. Continental Cas. Co.*, 896 F.2d 865, 873 (5th Cir. 1990) (Texas action) ("New York has a strong and

10

overriding interest in the outcome of insurance coverage disputes, such as this."); *W.R. Grace & Co. v. Hartford Acc. & Indem. Co.*, 407 Mass. 572, 585-86 (1990); *W.R. Grace & Co. v. Home Ins. Co., 89-7976, slip op. at 1-2* (Minn. D. Ct. Hennepin County Nov. 3, 1989) (New York law would apply to Grace policies, as Grace was "in reality a New York corporation" and relevant contacts all were with New York); *W.R. Grace & Co. v. Maryland Cas. Co.*, No. 86-5622, slip op. at 16-17 (Mass. Super. Ct. Middlesex County July 13, 1990) (New York has "most significant relationship" to the contract issue).

30.     CNA contends that it has multiple defenses to coverage in the New York litigation. For example, Grace and CNA litigated certain terms of the primary policies through appeal to the Second Circuit Court of Appeals. *Maryland Cas. Co. v. Continental Cas. Co.,* 332 F.3d 145, 156 (2d Cir. 2003). The policies contain pollution exclusions and beyond the policies' terms themselves, the Court of Appeals expressly held, notwithstanding any contrary arguments, that the 1973 -1983 CNA policies were subject to an exclusion for bodily injury arising from discharges or releases of pollutants, irritants or contaminants into the land, water and atmosphere – exactly the nature of the claims alleged by the Libby residents.

31.     Under New York law, asbestos is a pollutant and/or contaminant in the context of releases onto land or into the atmosphere. "*Asbestos could certainly be an irritant, contaminant or pollutant of the type encompassed by the clause (see, e.g.*, Labor Law § 900 [asbestos defined as 'known carcinogenic agent']; 42 USC § 7412; 40 CFR § 61.01 & Part 122, App D Table D [asbestos listed as 'air pollutant']; and 33 USC § 1317; 40 CFR § 401.15 [asbestos is 'toxic pollutant'])." *Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 653, 609 N.E.2d 506, 512, 593 N.Y.S.2d 966, 972

(1993). *See also Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.*, 295 A.D.2d 289, 744 N.Y.S.2d 395 (1st Dep't 2002). CNA's position is that, based on the Second Circuit's earlier ruling, coverage for the non-worker Libby Claims would also be found to be excluded from the primary policies.

32.     In CNA's view, even if these exclusions did not apply, there are other significant reasons why Grace or the Trust would have difficulty in recovering under the primary policies for the Libby Claims or other similar claims. Under New York Law, in order to obtain coverage Grace has the burden to demonstrate that the injuries arose as a result of "an accident," and were not expected or intended. *Consolidated Ed. Co. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 746 N.Y.S.2d 622 (2002). There is a substantial record compiled by the U.S. government in its criminal proceeding against Grace and by the Libby Claimants themselves regarding Grace's knowledge of the problems with Grace's vermiculite to support a defense that the alleged injuries did not arise out of an accident. *See also Lockwood v. W.R. Grace,* 272 Mont. 202 (1995) (Montana Supreme Court held that allegations against Grace constitute an allegation of "intentional harm specifically and maliciously directed" at claimant).

33.     There are also multiple legal issues that arise with the attempted characterization of the Libby claims as "non-product" claims not within the Products-Completed Operations Limits of the CNA Primary Policies that were settled and are fully exhausted pursuant to the terms of the 1990 Settlement Agreement. The Court heard testimony from Grace itself that once the vermiculite was transported down from the mine, it became Grace's "product." *See* Confirmation Trial, Phase II, Tr. 9/9/09 at 37:23-38:14; 43:6-45:7 (Mr. Hughes testifies that exposure to vermiculite concentrate,

after processing on Zonolite Mountain, was exposure to a Grace commercial product*). See also Zonolite Co. v. United States*, 211 F.2d 508, 512 (7th Cir. 1954) ("The vermiculite concentrate was already a commercially marketable mineral product when it started on the seven-mile journey to Libby."). Indeed, in some instances, the Libby Claimants have expressly alleged exposure to Grace Products. *See, e.g*., Confirmation Trial, Phase II, BNSF Exh. 118, Complaint, *Candee v. W.R. Grace & Co.*, No. BDV 01-153 at par. XXXII (Mont. 8th Jud. Dist. 2001); and Confirmation Trial, Phase II, BNSF Exh. 159, Complaint, *Grunerud v. W.R. Grace & Co.*, No. ADV 01-150 at par. XXXII (Mont. 8th Jud. Dist. 2001). (alleging exposure to Grace products). *See also* BNSF Exh. 268, Complaint, *Newmarch v. W.R. Grace & Co.*, No. BDV 01-059 at par. XXXI (Mont. 8th Jud. Dist. 2001) (alleging exposure to Grace's Zonolite insulation product.) If the Libby Claims are found to arise from exposure to Grace's product, then they would fall within the 1990 Settlement Agreement, and thus CNA would owe no coverage for those claims.

34.    Moreover, CNA contends that injuries that occur off of Grace's property from exposure to waste, residue, or dispersal from an earlier operation are within the exhausted and settled Products coverage.    *(See* Products definitions, Policies, Confirmation Trial, Phase I, CNA Exhs. 19(A)-19(C).) In short, there are myriad legal grounds as to why these claims should be deemed to come within the 1990 Settlement Agreement, and CNA would owe no further coverage under the primary policies. *See also In re Wallace & Gale Co.,* 385 F.3d 820, 834 (4th Cir. 2004); *Continental Cas. Co. v. Employers Ins. Co. of Wausau,* 60 A.D.3d 128, 871 N.Y.S.2d 48 (2008).

35.    CNA further contends that Grace or the Trust would have to overcome breach of conditions of the policy to obtain coverage. A condition to coverage under the

13

policies is "written notice as soon as practicable after an occurrence." Failure to comply with that condition is a defense to coverage under the policies. *See Briggs Ave. LLC v. Ins. Corp. of Hanover*, 11 N.Y.3d 377 (2008). Grace did not provide CNA with notice of the pendency of any Libby actions until late 1999-2000, though according to reports and decisions Grace has been sued in state court actions by Libby Claimants beginning at least as early as 1983. It appears that Grace had been sued in Lincoln County District Court for *sixteen years in hundreds of lawsuits* before it gave notice to CNA of any claim under the primary policies. Thus, in addition to the coverage defenses discussed above, CNA would assert a late notice defense, which under New York law would preclude coverage.

36.    The Libby Claimants completely ignore the terms of the 1973-1985 policies with respect to retrospective premiums and deductibles. Those provisions reflect an initial self-insured layer in Grace's coverage, through which Grace itself retained the first layer of risk, and was responsible to pay the first level of claims. In the 1973-1978 policies they give CNA a claim back against Grace for retrospective premiums for claims that fall with the first $200,000 of the policy.[1] Thus, a Libby Claim allocated over years of exposure or injury would in turn give rise to a claim by CNA back against Grace or the Trust to collect all or part of that claim.

---

[1] The 1973-1978 policy periods were subject to a retrospective premium arrangement whereby the first $200,000 of a claim was "self-insured" by Grace by virtue of a charge back of premium. In 1978, a $500,000 deductible was added to the 1976-1983 policy. Grace has contended that CNA had forfeited its right to charge that premium or apply the deductible on non-products claims by virtue of the 1990 Settlement Agreement. The parties litigated that issue and the Second Circuit Court of Appeals held that CNA had not given up its rights under the 1990 Settlement Agreement. *Maryland Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 162-63 (2d Cir. 2003).

14

37.    From 1978 through 1985, the policies had a $500,000 deductible provision, which provides that CCC's "obligation . . . shall be computed by subtracting from the amount of damages, or the "each occurrence" or "each claim" limit of liability, whichever is less, $500,000. . . .". *See, e.g.,* Policy CCP 2483440 ('83-'85), Confirmation Trial, Phase II, CNA Exh. 33(C) at 6. Even if there were a finding of coverage, the application of a deductible to a claim whose recovery was allocated over years of injury would likely result in no recovery whatsoever under the CNA 1978-1985 policies.

38.    Other policy provisions could similarly drastically limit any coverage available under the policies, even if Grace or the Trust prevailed on all of the other issues set forth above. The policies provide that "For the purpose of determining the limit of the Company's liability, all Personal Injury and Property Damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." CNA Phase I Confirmation Exhs. 19 (A) at 9; 19 (B) at 7; 19 (C) at 6. The Libby Claims involve a small group of personal injury claimants limited to a single location over the same period of time who allege personal injury arising out of continuous or repeated exposure to the same general conditions in the town of Libby. CNA would argue that under this provision, any recovery would be limited to the single "per occurrence" limit. If this single occurrence provision applies to the Libby Claims, the *maximum* recovery under the 3 primary policies in effect from 1973-1985 could be each policy's single per occurrence limit, less applicable deductibles. Thus, even if there were coverage, it is CNA's view that the provision would cap the total maximum recovery for Libby Claims *at most* at $2 million. A portion of even that amount in turn would be subject to a claim back against Grace, or the Trust.

15

39.     If any of these (and other) legal issues, which are extremely complex and will likely take significant time to resolve, were resolved in CNA's favor, Grace or the Trust would recover nothing or an insubstantial amount for the Libby and other similar claims. In addition, the Trust would not have the benefit of the $84 million and CNA would contest coverage under the excess policies as well.

40.     As noted by the insurers in connection with confirmation proceedings and in Arrowood's papers in support of approval of its settlement, in addition to exhaustion and other issues, the excess insurers also have defenses on the excess policies based on contractual consent requirements of its policies, *i.e.*, the "consent to settlement," "voluntary payment" and "cooperation and assistance" provisions of the policies. *See Vigilant Insurance Co. v. Bear Stearns Cos.*, 10 N.Y.3d 170, 174 (N.Y. 2008) (no coverage where insured settled without insurer's consent).

41.     In sum, there is, at a minimum, uncertainty of success in litigation should the parties not resolve these matters by compromise.

### D)     The Best Interests of the Debtors, Their Estates and Their Creditors

42.     The ACC and the FCR are not parties to the CNA Settlement Agreement, but have consented in writing to the Debtors' entry into the Agreement, which consent is a condition precedent to the effectiveness of the Agreement. Court approval of the CNA Settlement will result in a significant increase in the assets available to the Trust to pay asbestos claims, remove CNA as an objector to Plan confirmation, resolve CNA's asbestos claims against the estate, and eliminate CNA's future Indirect PI Trust Claims. The Trust will not have to await exhaustion of underlying coverage to obtain the benefit of high-level excess policies, and instead will have additional funds available to better

16

handle, and more expeditiously resolve, the influx of pending claims. The Debtors' estates and/or the Trust will not have to incur the expense of litigation with CNA, and risk the uncertainty of any recovery. CNA's payment of $84 million is substantial and will directly benefit those persons who may submit claims and demands to the Trust.

### E)   Due Diligence By The Parties

43.    As noted above, there is a long history of coverage litigation on both the primary and excess policies between Grace and CNA in multiple contexts, involving asbestos and other liabilities. Some of this litigation resulted in rulings by the courts which impact available coverage. In the course of such actions, the scope of coverage has been extensively reviewed and explored in depth.

44.    More recently, in the course of these negotiations, each party, whether negotiating or approving this Agreement, was represented by experienced coverage counsel who assisted bankruptcy counsel in the negotiations. It was a difficult process to reach a settlement, and as is reflected in the Agreement, there were numerous complex issues to resolve. The resulting settlement was a compromise reached based on a full and complete consideration of all aspects of the coverage issues, litigation costs, and benefits to be gained by compromise.

45.    The settlement, including the sale to CNA of the Subject Policies under §363 of the Bankruptcy Code, was the product of arm's length negotiations among the Debtors, CNA and the other Plan Proponents. There was no fraud or collusion between CNA and any of the parties nor were any of them in a position to take unfair advantage of

the others. CNA's conduct with respect to the settlement, as well as that of the Plan
Proponents, was entirely in good faith, with the goal of avoiding further expenditures of
resources on protracted litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of
my knowledge, information and belief.

_____

Daniel P. Caswell