UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                    .    Case No.  01-1139 (JKF)
                          .    Adv. No.  02-2210/02-2211
W.R. GRACE & CO.,         .
et al.,                   .    5414 U.S. Steel Tower
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
                          .
            Debtors.  .
                          .    January 10, 2011
. . . . . . . . . . . . ..     9:12 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  JANET BAER, ESQ.<br>      JOHN DONLEY, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| | Kirkland & Ellis, LLP<br>By:  LISA G. ESAYIAN, ESQ.<br>      ADAM PAUL, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For Ford, Marrin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>  Gleser<br>By:  ELIZABETH DeCRISTOFARO, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| Audio Operator: | Janet Heller |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For CNA Companies: | Goodwin Procter, LLP<br>By:  JOHN D. ALDOCK, ESQ.<br>901 New York Avenue, NW<br>Washington, DC 20001 |
| | Goodwin Procter, LLP<br>By:  MICHAEL GIANNOTTO, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C. 20005 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe,<br>  LLP<br>By:  ROGER FRANKEL, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For W.R. Grace: | Pachulski, Stang, Ziehl & Jones<br>By:  JAMES E. O'NEILL, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899 |
| For Libby: | Cohn Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  LINDA CASEY, ESQ.<br>3000 Two Logan Square<br>Philadelphia, PA  19103 |
| For MCC & Zurich: | Eckert Seamans<br>By:  EDWARD D. LONGOSZ, ESQ.<br>1747 Pennsylvania Avenue, NW<br>Suite 1200<br>Washington, DC 20006 |
| For the PD FCR: | Law Office of Alan B. Rich<br>By:  ALAN B. RICH, ESQ.<br>1401 Elm Street, Suite 4620<br>Dallas, TX  75202 |

APPEARANCES (Cont'd):

For Maryland Casualty:      Connelly Bove Lodge & Hutz, LLP
                            By:  JEFFREY WISLER, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19899

For Arrowwood               O'Melveny & Myers LLP
Indemnity:                  By:  TANCRED V. SCHIAVONI, III, ESQ.
                            Times Square Tower
                            7 Times Square
                            New York, NY 10036

For Continental            Goodwin Procter, LLP
Casualty Co.:               By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

TELEPHONIC APPEARANCES:

For Sealed Air:             Skadden, Arps, Slate, Meagher & Flom,
                              LLP
                            By:  DAVID TURETSKY, ESQ.
                                 DOUGLAS HERRMANN, ESQ.
                            One Rodney Square
                            Wilmington, DE  19801

For ZAI Claimants          Hogan Firm Attorneys at Law
& various law firms:        By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801

For the U.S. Trustee:       Office of the U.S. Trustee
                            By:  DAVID KLAUDER, ESQ.
                            844 King Street, Suite 2313
                            Wilmington, DE  19801

The State of Montana       Womble Carlyle Sandridge & Rice, PLLC
and Canada:                 By:  KEVIN J. MANGAN, ESQ.
                                 FRANCIS MONACO, ESQ.
                            222 Delaware Avenue
                            Wilmington, DE  19801

For Arrowwood               Bifferato Gentilotti LLC
Indemnity:                  By:  GARVAN McDANIEL, ESQ.
                            800 North King Street
                            Wilmington, DE  19801

**WWW.JJCOURT.COM**

TELEPHONIC APPEARANCES (Cont'd):

```
For OneBeacon            Drinker Biddle & Reath LLP
Ins. Co., Geico,         By:  MICHAEL F. BROWN, ESQ.
Seaton Ins. Co.          One Logan Square
& Republic Ins. Co:      18th and Cherry Streets
                         Philadelphia, PA  19103


For the Bank Lenders:    Landis, Rath & Cobb, LLP
                         By:  RICHARD COBB, ESQ.
                         919 Market Street, Suite 1800
                         Wilmington, DE  19899


                         Paul Weiss Rifkind Wharton &
                           Garrison, LLP
                         By:  MARGARET PHILLIPS, ESQ.
                              REBECCA ZUBATY, ESQ.
                              ANDREW N. ROSENBERG, ESQ.
                              KELLI CAIRNS, ESQ.
                              STEPHEN SHIMSHAK
                         1285 Avenue of the Americas
                         New York, NY  10019


For Committee of         Campbell & Levine
Asbestos Personal        By:  MARK T. HURFORD, ESQ.
Injury Claimants:        800 North King Street
                         Suite 300
                         Wilmington, DE  19701


For MCC & Zurich:        Wiley Rein, LLP
                         By:  RICHARD A. IFFT, ESQ.
                         1776 K Street NW
                         Washington, DC 20006


For the Equity           Kramer Levin Naftalis & Frankel
Committee:               By:  DAVID E. BLABEY, JR., ESQ.
                         919 Third Avenue
                         New York, NY  10022


For the Property         Bilzin Sumberg Baena Price &
Damage Committee:          Axelrod LLP
                         By:  MATTHEW KRAMER, ESQ.
                         200 South Biscayne Boulevard
                         Suite 2500
                         Miami, FL  33131


For Dow Jones            Dow Jones News Wires
News Wires:              By:  PEG BRICKLEY
```

**WWW.JJCOURT.COM**

```
TELEPHONIC APPEARANCES (Cont'd):

For the PD Committee:      Speights & Runyan
                           By:  DANIEL SPEIGHTS, ESQ.
                                MARION FAIREY, ESQ.
                                ALAN RUNYAN, ESQ.
                           200 Jackson Avenue, East
                           Hampton, SOMERSET COUNTY  29924

For the Debtors:           Kirkland & Ellis, LLP
                           By:  DEANNA BOLL, ESQ.
                                ROGER HIGGINS, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For Travelers:             Simpson Thacher & Bartlett LLP
                           By:  ELISA ALCABES, ESQ.
                           425 Lexington Avenue
                           New York, NY  10017

For the Property           Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                           By:  SCOTT BAENA, ESQ.
                                JAY SAKALO, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

For Serengeti:             Vinson & Elkins, LLP
                           By:  ARI BERMAN, ESQ.
                           Trammell Crow Center
                           2001 Ross Avenue, Suite 3700
                           Dallas, TX  75201

For David T. Austern:      Lincoln International, LLC
                           By:  GEORGE COLES
                                CLAIRE BURKE

Damage Claimants:          By:  TERENCE EDWARDS, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

For Firemen's Fund         Crowell & Moring LLP
Insurance Co.:             By:  LESLIE A. DAVIS, ESQ.
                                MARK PLEVIN, ESQ.
                           1001 Pennsylvania Avenue, N.W.
                           Washington, DC  20004
```

TELEPHONIC APPEARANCES (Cont'd):

For Official Committee        Lieff, Cabraser, Heimann & Bernstein
of Asbestos Property          By:  ELIZABETH J. CABRASER, ESQ.
Damage Claimants:             Embarcadero Center West
                              275 Battery Street, Suite 3000
                              San Francisco, CA  94111

                              Brandi Law Firm
                              By:  THOMAS J. BRANDI, ESQ.
                              44 Montgomery St., Suite 1050
                              San Francisco, CA  94104

                              Riker, Danzig, Scherer, Hyland &
                                Perretti, LLP
                              By:  TARA MONDELLI, ESQ.
                              Headquarters Plaza
                              One Speedwell Avenue
                              Morristown, NJ  07962

                              Richardson Patrick Westbrook &
                                Brickman, P.C.
                              By:  EDWARD J. WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, SOMERSET COUNTY  29401

                              Scott Law Group
                              By:  DARRELL SCOTT, ESQ.
                              1001 East Main Street, Suite 500
                              Sevierville, TN  37864

                              Dies & Hile, LLP
                              By:  MARTIN DIES, ESQ.
                              1601 Rio Grande, Suite 330
                              Austin, TX  78701

                              LECG
                              By:  ALAN MADIAN, ESQ.
                              1725 Eye Street NW, Ste 800
                              Washington, DC,  20006

                              Hamilton, Rabinovitz & Alshuler
                              By:  DR. FRANCINE RABINOVITZ
                              26384 Carmel Rancho Lane, Suite 202
                              Carmel, California 93923

TELEPHONIC APPEARANCES (Cont'd):

For Official Committee          Bilzin Sumberg Baena Price &
of Asbestos Property:              Axelrod LLP
                                By:  SCOTT L. BAENA, ESQ.
                                200 S. Biscayne Blvd.
                                Miami, FLA. 331310

For the Future                  Orrick, Herrington & Sutcliffe,
Claimants                          LLP
Representatives:                By:  DEBRA FELDER, ESQ.
                                Washington Harbour
                                3050 K Street, N.W.
                                Washington, D.C.  20007

For the Bank Lender             Paul Weiss Rifkind Wharton &
Group:                             Garrison, LLP
                                By:  SARAH HARNETT, ESQ.
                                1285 Avenue of the Americas
                                New York, NY  10019

For Everest Reinsurance         Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:                By:  BRIAN L. KASPRZAK, ESQ.
                                     MICHAEL F. DUGGAN, ESQ.
                                913 North Market Street
                                Suite 800
                                Wilmington, DE  19801

For W.R. Grace:                 Onex Credit Partners
                                By:  STUART KOVENSKY

For the Asbestos                Ferry Joseph & Pearce, P.A.
Creditors Committee:            By:  THEODORE TACCONELLI, ESQ.
                                824 Market Street, Suite 19899
                                Wilmington, DE  19899

For David T. Austern,           Lincoln International, LLC
Future Claimants'               By:  JOSEPH RADECKI
Representative:                       JASON SOLGANICK

For Ford, Marrin,               Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer                 Gleser
& Gleser:                       By:  SHAYNE SPENCER, ESQ.
                                Wall Street Plaza
                                New York, NY  10005

```
TELEPHONIC APPEARANCES (Cont'd):
For Various Claimant       Stutzman, Bromberg, Esserman & Plifka
Firms:                     By:  DAVID J. PARSONS, ESQ.
                           2323 Bryan Street,  Suite 2200
                           Dallas, TX  75201

For David T. Austern,      Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, JR., ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806

For Maryland Casualty      Eckert Seamans Cherin & Mellott, LLC
& Zurich Insurance:        By:  GABRIELLA CELLAROSI, ESQ.
                           4 East 8th Street, Suite 200
                           Wilmington, DE  19801

For the Unsecured          Strook & Strook & Lavan
Creditors' Committee:      By:  ARLENE KRIEGER, ESQ.
                           180 Maiden Lane
                           New York, NY 10038

                           Duane Morris
                           By:  MICHAEL R. LASTOWSKI, ESQ.
                           Suite 1200
                           1100 North Market Street
                           Wilmington, DE 19801

For RBS Securities,        RBS Securities, Inc.
Inc:                       By:  JEFFREY FARKAS

For the Future             Orrick, Herrington & Sutcliffe, LLP
Claimants                  By:  RICHARD WYRON, ESQ.
Representatives:           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For Allstate Insurance:    Cuyler Burk, LLP
                           By:  ANDREW K. CRAIG, ESQ.
                           Parsippany Corporate Center
                           Four Century Drive
                           Parsippany, NJ  07054

For the Bank Lender        Landis, Rath & Cobb, LLP
Group:                     By:  JAMES S. GREEN, JR., ESQ.
                                KERRI M. MUMFORD, ESQ.
                           919 Market Street, Suite 1800
                           Wilmington, DE  19899
```

TELEPHONIC APPEARANCES (Cont'd):

For Arrowwood:               Wilson, Elser, Moskowitz, Edelman,
                              & Dicker, LLP
                             By:  CARL J. PERNICONE, ESQ.
                             150 East 42nd Street
                             New York, NY 10017

For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                             New York, NY  10020-1186

For Oliver Butt:             J.P. Morgan Chase & Co.
                             By:  OLIVER BUTT, ESQ.
                             270 Park Avenue
                             New York, NY  10017

For York Capital             York Capital Management
Management:                  By:  MATTHEW BONANNO, ESQ.
                             767 Fifth Avenue, 17th Floor
                             New York, NY  10153

For Farallon Capital         Farallon Capital Management, LLC
Management:                  By:  MICHAEL LINN, ESQ.
                             One Maritime Plaza, Suite 2100
                             San Francisco, CA 94111

For Trustee Mark             Murtha Cullina LLP
DeGiacomo:                   By:  RYAN M. MacDONALD, ESQ.
                             99 High Street 20th Floor
                             Boston, MA 02110

For AXA Belgium:             Tucker Arensberg, P.C.
                             By:  MICHAEL A. SHINER, ESQ.
                             1500 One PPG Place
                             Pittsburgh, PA 15222

For Garlock Sealing:         Robinson, Bradshaw & Hinson, P.A.
                             By:  GARLAND S. CASSADA, ESQ.
                                  RICHARD C. WORF, ESQ.
                             101 North Tryon Street
                             Suite 1900
                             Charlotte, NC 28246

                             Morris James LLP
                             By:  BRETT D. FALLON, ESQ.
                             500 Delaware Avenue, Suite 1500
                             Wilmington, DE 19801

TELEPHONIC APPEARANCES (Cont'd):
Interested Party:          Archer Capital
                           By:  ROBERT SALES, ESQ.
                           570 Lexington Avenue, Fl. 40
                           New York, NY  10022

                           CHARLES JURGENS

                           Traub Lieberman Straus & Shrewsberry
                             LLP
                           By:  ROBERT P. SIEGEL, ESQ
                           Mid-Westchester Executive Park
                           Seven Skyline Drive
                           Hawthorne, NY 10532

                           Bank of America
                           By:  MICHAEL J. WALSH, ESQ.

                               - - -

1          THE COURT:  W.R. Grace, Bankruptcy Number 01-1139.

2 The list of participants I have by phone is Elisa Alcabes,

3 Scott Baena, Ari Berman, David Blabey, Deanna Boll, Matthew

4 Bonanno, Thomas Brandi, Peg Brickley, Michael Brown, Claire

5 Burke, Oliver Butt, Elizabeth Cabraser, Kelli Cairns, Linda

6 Casey, Garland Cassada, Gabriella Cellarosi, Richard Cobb,

7 George Coles, Andrew Craig, Leslie Davis, Elizabeth

8 DeCristofaro, Martin Dies, John Donley, Michael Duggan, Terence

9 Edwards, Lisa Esayian, Marion Fairey, Brett Fallon, Jeffrey

10 Farkas, Debra Felder, Michael Giannotto, James Green, Sarah

11 Harnett, Douglas Herrmann, Roger Higgins, Daniel Hogan, Robert

12 Horkovich, Mark Hurford, Richard Ifft, Charles Jurgens, Brian

13 Kasprzak, David Klauder, Stuart Kovensky, Matthew Kramer,

14 Arlene Krieger, Michael Lastowski, Michael Linn, Peter

15 Lockwood, but he's in court, Edward Longosz, Ryan MacDonald,

16 Alan Madian, Kevin Mangan, Garvan McDaniel, Francis Monaco,

17 Tara Mondelli, Kerri Mumford, David Parsons, Adam Paul, Carl

18 Pernicone, Margaret Phillips, John Phillips, Mark Plevin,

19 Francine Rabinovitz, Joseph Radecki, Andrew Rosenberg, Alan

20 Runyan, Jay Sakalo, Robert Sales, Tancred Schiavoni, Darrel

21 Scott, Mark Shelnitz, Stephen Shimshak, Michael Shiner, Robert

22 Siegel, Jason Solganick, Daniel Speights, Shayne Spencer,

23 Theodore Tacconelli, David Turetsky, Michael Walsh, Edward

24 Westbrook, Jeffrey Wisler, Richard Worf and Rebecca Zubaty.

25 I'll take entries in court, please.  Good morning.

1          MS. BAER:  Good morning, Your Honor.  Janet Baer on

2  behalf of the debtor.

3          MS. ESAYIAN:  Good morning, Your Honor.  Lisa Esayian

4  on behalf of the debtors.

5          MR. DONLEY:  John Donley for the debtors.

6          MR. PAUL:  Adam Paul for the debtors.

7          MR. WYRON:  Good morning, Your Honor.  Rick Wyron for

8  the PI FCR.

9          MR. FRANKEL:  Good morning, Your Honor.  Roger

10 Frankel also for the PI FCR.

11          MR. LOCKWOOD:  Good morning, Your Honor.  Peter

12 Lockwood for the ACC.

13          MR. COHN:  Good morning, Your Honor.  Daniel Cohn for

14 the Libby claimants.

15          MR. GIANNOTTO:  Good morning, Your Honor.  Michael

16 Giannotto for the CNA companies.

17          MS. DeCRISTOFARO:  Good morning, Your Honor.

18 Elizabeth DeCristofaro for the CNA Companies.

19          MR. GLOSBAND:  Good morning, Your Honor.  Daniel

20 Glosband also for the CNA companies.

21          MR. O'NEILL:  Good morning, Your Honor.  James

22 O'Neill for the debtors.

23          MR. ALDOCK:  John Aldock for the CNA companies.

24          MS. CASEY:  Good morning, Your Honor.  Linda Casey on

25 behalf of BNSF Railway Company.

1         MR. SCHIAVONI:  Tancred Schiavoni from O'Melveny for

2    Arrowwood.

3         MR. RICH:  Alan Rich for the PD FCR.

4         MR. WISLER:  Good morning, Your Honor.  Jeffrey

5    Wisler on behalf of Maryland Casualty Company.

6         MR. LONGOSZ:  Good morning, Your Honor.  Edward

7    Longosz on behalf of Maryland Casualty.

8         THE COURT:  Ms. Baer?

9         MS. BAER:  Thank you, Your Honor.  Good morning.

10   Your Honor, Agenda Item Number 1 is the debtors' continued

11   twenty-fifth omnibus objection to claims.  We still have a few

12   left and we're asking that that be continued to February 14th.

13        THE COURT:  Excuse me.  Okay, thank you.

14        MS. BAER:  Your Honor, matter Number 2 was the

15   debtors' objection to the claim of the Massachusetts Department

16   of Revenue.  Your Honor, by the motion we filed which was

17   matter Number 4, that matter has been settled and resolved and

18   you've entered and order, so that takes care of both Agenda

19   Items Number 2 and 4.

20        THE COURT:  All right.

21        MS. BAER:  Your Honor, Agenda Item Number 3, you had

22   entered an order on that.  That was an insurance settlement.

23   That takes us, Your Honor, to Agenda Item Number 5 which I'd

24   like to skip for a moment.  That's the CNA matter.  That's

25   going to take a little more time.  And I'd like to move on to

1  Agenda Item Number 6, Your Honor, which is the debtors'
2  objection to the claim of New York Hillside.

3  Your Honor, New York Hillside filed a claim for
4  $25,000.  It's an alleged environmental cleanup relating to
5  some property in Los Angeles.  This related to a former Grace
6  entity, Grace Petroleum Corporation, in 1989, and this is all
7  -- this is essentially uncontested, Your Honor, in terms of the
8  facts.  The documents are attached to the objection.  Grace
9  Petroleum sold all interest in the property and assigned all of
10  its lease rights to oil and gas properties in 1989.

11  In December of 1992, more than three years later,
12  Grace Energy Corporation, which is a debtor, sold all of the
13  stock and interest in Grace Petroleum to a company called
14  Samson Investment Company.  Samson Investment Company
15  subsequently changed the name of the company Grace Petroleum
16  Corporation to Samson Hydrocarbons Company.

17  Your Honor, when Grace filed bankruptcy in 2001 there
18  was pending a cross complaint filed by New York Hillside in a
19  litigation brought by Petro Resources, the actual company that
20  Grace Petroleum had sold and assigned its interest to in this
21  property, brought a lawsuit against Grace, Grace filed
22  bankruptcy, and at that point in time New York Hillside amended
23  its cross complaint in that lawsuit and named Samson
24  Hydrocarbons.

25  Your Honor, subsequently to that Samson Hydrocarbons

1  who had been named in that lawsuit settled all interest that it

2  had with respect to that lawsuit for $25,000.  And in that

3  settlement, Your Honor, there was a specific release that

4  released Samson who was the subsequent company to Grace

5  Petroleum Corporation all of its predecessors in interest, its

6  successors in interest, its partners, subsidiaries, affiliates.

7  It was a full and complete release, Your Honor.  Samson

8  essentially settled what would have been the Grace Petroleum

9  obligation.

10         Thereafter, Your Honor, Samson actually filed a proof

11 of claim against Grace here in the Chapter 11 case because when

12 Grace Energy sold Grace Petroleum to Samson Hydrocarbons there

13 was an indemnity.  And so, Samson Hydrocarbons here in the

14 bankruptcy case is pursuing Grace for the $25,000 it paid to

15 New York Hillside.

16         What we have here, Your Honor, is essentially New

17 York Hillside is trying to get a separate and an additional

18 $25,000 from Grace on an obligation that Samson settled for the

19 only entity that had any potential obligation in any

20 relationship to the property, Grace Energy -- I'm sorry, Grace

21 Petroleum Corporation.  And that has been paid.  Samson's made

22 its claim against Grace and New York Hillside's essentially

23 trying to double-dip here.

24         And, Your Honor, for those reasons we filed the

25 objection.  We filed all the documents which set forth the

1  various facts, and, Your Honor, last week we filed an affidavit

2  from Samson that made two specific points; Number 1, that

3  Sampson never operated on this property.  In fact, the

4  operations of the property to the extent Grace Petroleum was

5  involved ended more than three years before Samson bought Grace

6  Petroleum Corporation.

7          There was no independent operations by Samson, no

8  obligation whatsoever, no involvement with Samson in that

9  property.  And that the only settlement that was done here was

10  Samson settling Grace Petroleum Corporation's potential

11  obligation to New York Hillside.  Under those circumstances,

12  Your Honor, we would ask that the New York Hillside claim

13  against Grace be disallowed.

14          THE COURT:  All right.  Who's representing New York

15  Hillside, please?

16          MR. JURGENS:  I am.  Charles Jurgens, Your Honor.

17          THE COURT:  All right, go ahead, sir.

18          MR. JURGENS:  First we are -- it's not New York

19  Hillside, it's NY Hillside, Incorporated.

20          THE COURT:  I'm sorry.  Thank you.

21          MR. JURGENS:  In addition we're not really trying to

22  collect twice.  As you know on environmental issues anyone

23  associated with a property during its operating span is

24  obligated with respect towards cleanup of a property.  Now, the

25  settlement agreement that's referred to, I am also referring to

1  it now.  I don't know if you have it handy, but it is -- it had

2  provided plenty of opportunity for Samson to indicate that they

3  were covering all obligations, or any obligations of W.R.

4  Grace.

5        If you read the agreement it's referring to a Samson

6  Investment Company, collectively Samson.  It does not refer to

7  Grace in any way, manner or form, and in fact on the first page

8  of the settlement agreement you will notice that there's

9  another issue regarding another company, Berry Petroleum

10  (indiscernible) as successor for TEORCO, which was another

11  operator on the property.

12        If you read further in the settlement agreement on

13  Page 3 you'll notice that it says, "Whereas Grace Energy

14  Company and W.R. Grace are both presently in bankruptcy was a -

15  - so therefore they're not in this agreement because of the

16  bankruptcy issue."  And it goes on to also state that, "Whereas

17  all of the capital stock of Grace was sold to Samson, an

18  unrelated company, and after that time the name of it -- the

19  entity known as Grace Petroleum was ultimately changed to

20  Samson."  So, there's no question that Grace was obligated

21  under the agreement.

22        Now, with respect to the position that Samson is now

23  taking, I'm claiming first that they never indicated at this

24  time of the settlement agreement they were ever just sitting in

25  the place of W.R. Grace and Company.  And, in fact, if you read

1  the affidavit of the officer of Samson, particularly Paragraph

2  Number -- let me see if I can get this correct -- Number 7,

3  Samson states that December of '01 Samson entered into a

4  settlement agreement and a mutual release paying the 25,000 to

5  NY Hillside.

6          Samson's participation in the settlement agreement

7  was for the purpose of resolving any and all alleged liability

8  of Samson in a Petro suit, including any alleged liability that

9  Samson Investment Company, Samson Hydrocarbons, and now they

10 say NJTC.  At no time the settlement issue, and at no time did

11 any of the attorneys at that issue represent the fact that

12 Samson was covering or had any obligation with respect to

13 Grace's activities on the property.  Therefore, it clearly said

14 that Samson because of their ownership they decided that they

15 were a party of the agreement and that they were clearing

16 themselves of any liability in connection with this matter.

17         MS. BAER:  Your Honor, I don't mean to interrupt, but

18 I think at this point I need to point out that Mr. Jurgens is

19 now testifying.  I was sticking fully to the documents.  He is

20 now saying and putting in things into evidence theoretically

21 that have nothing to do with any of the documents.

22         THE COURT:  All right.  Well, I have a -- probably a

23 more preliminary issue.  Isn't Ny Hillside a corporation?  I

24 don't think the objection to claim has been signed by counsel.

25 And, Mr. Jurgens, are you a lawyer representing Ny Hillside?

1          MR. JURGENS:  I am -- at this point NY Hillside is a

2  defunct company.  I can't afford --

3          THE COURT:  Are you a lawyer, sir?

4          MR. JURGENS:  I am not a lawyer, no --

5          THE COURT:  Okay.  Then we can't --

6          MR. JURGENS:  -- therefore I am begging the Court  to

7  understand I'm not a lawyer and I don't -- I've never been

8  involved with a bankruptcy before.

9          THE COURT:  All right, Mr. Jurgens, we can't go

10  forward.  Corporations must appear in bankruptcy by counsel.

11  They cannot be represented by an individual.  So, in order to

12  pursue this any further you're going to have to get a counsel

13  for the company.  I simply can't --

14          MR. JURGENS:  Is this the judge speaking?

15          THE COURT:  Yes, I'm the judge.  I can't --

16          MR. JURGENS:  Okay.  I couldn't -- you have to please

17  excuse me.  I'm not a lawyer and Ny Hillside is not a

18  corporation anymore.  It has no -- in the State of California

19  it's been -- the company's been terminated.  I mean, I don't

20  know what the term is, so I don't know how I can get a lawyer.

21  I mean, I can't afford to pay a lawyer to represent me here in

22  this matter.

23          THE COURT:  Well, the objection that was filed

24  indicates that NY Hillside is a corporation.  It has an Inc.

25  after its name.

1      MR. JURGENS:  It was at that time.

2      THE COURT:  If it's a defunct --

3      MR. JURGENS:  It was at that time, yes.

4      THE COURT:  Well, sir, if it's not a corporation now

5  then I'm not sure what claim it has.  If there's a successor in

6  interest then that successor in interest has to file the claim.

7  But, in any event, to the extent that it's a corporation you

8  can't represent it.  It needs counsel.  So, I can't go any

9  further with this objection.

10      I'm going to deny it without prejudice to NY Hillside

11 actually finding counsel if it chooses to do so and come back

12 before this Court.  This objection actually should've been

13 stricken by the clerk since it wasn't filed by a lawyer at the

14 outset, but apparently that technicality was overlooked.  So, I

15 simply can't go forward with it any longer and I'm going to

16 deny the objection without prejudice for that reason.

17      MS. BAER:  Your Honor, I -- technically speaking, we

18 filed an objection to his proof of claims.

19      THE COURT:  Claim, I'm sorry.  It's the claim.

20      MS. BAER:  Are you -- you're disallowing the claim?

21      THE COURT:  I'm disallowing the claim but without

22 prejudice to reconsideration in the event that NY Hillside

23 obtains counsel.  It has not been filed.  The responses have

24 not been filed by a lawyer.  That's what I'm trying to get to.

25      MR. JURGENS:  Well, can I ask the judge a question?

1            THE COURT:  Yes, sir.

2            MR. JURGENS:  Now, if I understand this correctly

3   that if I do get a lawyer I can -- what should I do?  What

4   should he do?

5            THE COURT:  Well, he'll have to advise you, sir.  I'm

6   sorry, but I'm not permitted to give you legal advice.  But,

7   the -- but one thing he will have to do is file an appropriate

8   pleading with this court.  And I'm not suggesting that I am

9   saying that if you do file that pleading it's going to win,

10  okay?  I'm not in any way suggesting that.  I'm not considering

11  at all on the merits right now because I can't do that without

12  counsel representing the claimant.

13           And you're -- since you're not a lawyer representing

14  a claimant I can't go forward, so I'll have to redo the hearing

15  in the even that NY Hillside has counsel.  So, I'll disallow

16  this proof of claim, but again, without prejudice.  If the

17  company does, in fact, get counsel they can start this process

18  again and then I'll have the argument on the merits, but I

19  can't do it in this context.

20           MS. BAER:  Your Honor, if I might suggest too, we did

21  discover that NY Hillside had been dissolved, but Mr. Jurgens

22  was listed as the party to serve.  One thing very unclear and

23  that's whether Mr. Jurgens has any interest in this claim.  If

24  he is the successor to or took an assignment of, we have no

25  idea.

1          THE COURT:  Well, he'll have to explain all of that

2   in the event that there is counsel who's present because right

3   now the claim's filed by NY Hillside not by an successor, so I

4   don't know those facts either.  We'll have to determine that at

5   a later date.  If you will submit an order, Ms. Baer, that

6   simply disallows the proof of claim without prejudice to

7   reconsideration in the even that New York -- that NY Hillside

8   gets counsel then I will certainly reconsider in the

9   appropriate circumstances.

10          MS. BAER:  Thank you, Your Honor, I'll do that.

11          THE COURT:  All right.  Thank you.

12          MS. BAER:  Your Honor, that takes us to Agenda Item

13  Number 5 which is the motion of the debtors for approval of a

14  settlement with CNA, and I believe Ms. Esayian will address

15  that.

16          THE COURT:  Ms. Esayian.

17          MS. ESAYIAN:  Good morning, Your Honor.  Lisa Esayian

18  for the debtors.  And as Ms. Baer said, this is the debtors'

19  motion for approval of our settlement agreement with the CNA

20  Insurance Companies.

21          I'm going to try to be relatively brief so that we

22  allow time for whatever questions Your Honor has regarding this

23  motion and settlement, but some background facts, Grace had a

24  number of different insurance -- liability insurance companies

25  over the years.  CNA covered the period 1973 to 1985 for Grace.

1  Also later periods that are not at issue here, but for purposes

2  of this motion CNA was Grace's general liability and workers

3  compensation insurer starting in 1973 and going to at least

4  1985.

5       The motion is a settlement of remaining insurance

6  coverage under three primary policies, each covering a

7  multi-year period, and 16 excess policies, virtually all at

8  high levels and covering various periods from 1973 to '85.

9  Grace and CNA have a very extensive litigation history.  Prior

10 to the bankruptcy filing there was an almost 25-year litigation

11 history.

12      Some litigation even continued after the bankruptcy

13 filing.  It litigated about coverage under the primary

14 policies, under the excess policies, asbestos claims,

15 environmental claims.  It litigated about CNA's obligation,

16 they litigated about Grace's obligations.  There were a total

17 of four prepetition partial settlement agreements between Grace

18 and CNA that resolved some issues but not all issues, one

19 post-petition settlement agreement in 2004 that resolved one

20 narrow set of issues.

21      So, coming to the present we still had a number of

22 issues unresolved between Grace and CNA and this settlement

23 agreement attempts to resolve virtually all of them except

24 perhaps coverage under later years that has no bearing on

25 asbestos claims or the trust.

1          The key points of the settlement agreement are that,

2     first of all, the settlement amount to be paid by CNA is a

3     maximum of $84 million.  The settlement provides -- the

4     settlement resolves insurance coverage issues under all

5     policies issued by CNA to Grace that actually or potentially

6     provide coverage for asbestos claims.  The settlement agreement

7     also resolves all of Grace's obligations related to such

8     coverage.  These again were heavily disputed issues related to

9     retrospective premiums, deductibles and the like.

10          Settlement agreement -- in the settlement agreement

11    CNA also releases rights to make indirect PI trust claims

12    against the asbestos PI trust.  CNA also withdraws all of its

13    plan objections, and at this point in time despite various

14    stipulations and whatnot along the way CNA still has a number

15    of pending plan objections, including a number of objections

16    that are unique to CNA and not also brought by other parties.

17    And CNA also withdraws all proofs of claims that it has filed

18    in this case as related to asbestos-related claims.  So, the

19    settlement really accomplishes a great deal beyond just a

20    payment of funds to the estate or the trust.

21          As Your Honor is probably aware from the record two

22    objections have been filed, one by the Libby claimants, one by

23    BNSF.  I'm not going to go through and attempt to respond to

24    everything they've said in detail as we covered that in our

25    papers, and of course they will speak and hopefully we'll have

1  a chance to address anything new that they say, but I would

2  like to speak to a core point which is a number of objections

3  were raised regarding the channeling -- the asbestos PI

4  channeling injunction and the supposed impact of the settlement

5  agreement on the asbestos PI channel injunction.

6         I think the first key point is that the settlement

7  agreement does not change or alter or modify or affect the PI

8  channeling injunction in any way.  The injunction is set forth

9  in the plan.  It remains in the plan.  It was the subject of

10 much discussion, objections, et cetera during the confirmation

11 hearing.  The settlement agreement does not change that

12 language.

13        The only thing that the settlement agreement does

14 that is related to the channeling injunction is that it sets up

15 a mechanism whereby if certain claims in the future are held to

16 being not covered by the channeling injunction, certain claims

17 against CNA, then there is a mechanism for the trust to

18 indemnify CNA for a certain amount of those claims up to $13

19 million.

20        So, there is no -- in order for Your Honor to approve

21 the settlement it is not necessary for Your Honor to make any

22 findings with respect to the injunction or any changes with

23 respect to the injunction.  It simply remains as is.

24        THE COURT:  I'm sorry, the mechanism is that if it's

25 determined that the claims against CNA are not related to

1  asbestos claims then the trust is going to indemnify CNA?

2       MS. ESAYIAN:  If CNA is -- if the claims are held to

3  be outside the scope of the asbestos PI channeling injunction

4  such that they are not -- CNA is not protected for those

5  claims, then the trust will indemnify CNA up to an amount of

6  $13 million.  This is for a narrow set of claims that has been

7  termed in the Libby complaint's papers as insurer wrongdoing

8  claims, but it's really a narrow set of claims.  It's not all

9  claims that would be brought against CNA.  It's certain claims

10  that the Libby claimants and perhaps others might bring against

11  CNA.

12       So, for the vast majority of claims that would be

13  brought against CNA that would relate to Libby or asbestos or

14  Grace insurance policies, presumably they would be covered by

15  the channeling injunction.  If down the line there is some

16  ruling by this Court or the district court or some other court

17  that some subset of claims is not covered by the channeling

18  injunction then a portion of these settlement funds would be

19  used to indemnify CNA for those claims.

20       THE COURT:  All right.  Well, I mean you know that

21  the likelihood is that those issues are going to be raised

22  because they've been raised already here in this objection to

23  the settlement.  So, really this settlement isn't for 84

24  million, it's for 72 million.  So --

25       MS. ESAYIAN:  Well, Your Honor, it's for --

1          THE COURT:  I mean why is the trust indemnifying CNA

2    for a claim that the trust doesn't have that wouldn't come into

3    the trust?

4          MS. ESAYIAN:  Well, the settlement is for a minimum

5    of 71 and a maximum of 84.  The claims that are at issue first

6    have to be brought somewhere at some point, they have to be

7    litigated, and then there has to be a determination that

8    they're not covered by the channeling injunction.  So, I

9    understand Your Honor's concern that the claims may well be

10   brought because they've already been the subject of some

11   controversy, but there also has to be the determination that

12   they're not covered by the channeling injunction before there's

13   any indemnity obligation.

14         And, quite frankly, Your Honor, this was a way to

15   make this whole package work.  (Indiscernible) Grace, and the

16   trust and CNA wanted to find a way to resolve all these

17   complicated disputes among themselves, and rather than doing

18   anything that would require a modification of the injunction or

19   seek to require a modification of the injunction, this is the

20   mechanism that the parties came up with in order to spread the

21   risk if you will.

22         There are some -- if those claims are found not to be

23   channeled and if they are worth more than $13 million, CNA will

24   be paying for those claims.  If they're found to be worth less

25   than $13 million the trust will be indemnifying for them, and

1 if they're found to be channeled then they're channeled.

2        THE COURT:  Well, I understand the outcome.  What's

3 the difference between the minimum 71 and maximum 84 million

4 that's to be paid in?

5        MS. ESAYIAN:  The settlement agreement requires that

6 in the event that this certain narrow subset of what's been

7 termed insurer wrongdoing claims are not channeled the trust

8 will indemnify CNA for settlements or judgments that CNA may

9 have to pay for such claims.

10        So, it's not only that the claims are found not to be

11 channeled, but also there have to -- CNA has to either end up

12 having a judgment against it or end up paying a settlement of

13 those claims.  So, there's a number of hurdles that any

14 claimant pursuing one of those claims against CNA would have to

15 get past before there would be any obligation for the trust to

16 compensate CNA.

17        THE COURT:  So, the minimum is assuming that the

18 trust is honoring an indemnity and the maximum is assuming that

19 the trust is not honoring an indemnity?

20        MS. ESAYIAN:  I'm sorry, Your Honor.  Maybe I said

21 something confusing.  I'm not following.

22        THE COURT:  The minimum that CNA has to put in you

23 said is 71 million --

24        MS. ESAYIAN:  Yes.

25        THE COURT:  -- and the maximum is 84.

1          MS. ESAYIAN:  Yes.

2          THE COURT:  What's the delta?  What's in the middle?

3          MS. ESAYIAN:  If there are no claims, if this

4    category of so-called insurer wrongdoing claims, if there are

5    no such claims found to be valid against CNA, if no such claims

6    ripen to judgments or settlements against CNA, then CNA will

7    pay the maximum of 84 million.

8          THE COURT:  All right.  So, this -- the minimum, the

9    71 million assumes that the indemnity obligation is honored by

10   the trust.

11         MS. ESAYIAN:  Honored to the full amount of 13

12   million --

13         THE COURT:  All right.

14         MS. ESAYIAN:  -- that's correct.  And then, of

15   course, there's the possible middle ground which is maybe

16   there's a handful of settlements that CNA has to pay.  They

17   don't total 13 million and so the settlement amount could end

18   up being in between 71 million and 84 million.

19         THE COURT:  Okay.

20         MS. ESAYIAN:  Sticking with these issues regarding

21   the injunction, to the extent that the objections of the Libby

22   claimants and some of the objections of BNSF relate to issues

23   about the scope of the injunction or the application of the

24   injunction, it's the -- it's certainly the debtors' position

25   that those issues are not properly taken up on this motion for

1  approval of a settlement.

2           The injunction issues were dealt with on a

3  confirmation proceeding.  Issues about scope, et cetera, were

4  heavily litigated, and the settlement agreement doesn't require

5  any redetermination of those issues, and those issues should

6  not be reopened at this time.

7           Regarding the factors then for judging the

8  settlement, the factors really are the four-part test set out

9  by the Third Circuit in In re Martin.  It's really a

10  reasonableness determination, and we would submit that the

11  affidavit that CNA has submitted, it's the affidavit of their

12  representative Daniel Caswell (phonetic) recites a number of

13  reasons why this is a very reasonable settlement in the sense

14  that there are a large number of insurance coverage defenses

15  that CNA would intend to litigate and has litigated over the

16  years as to this coverage, and were they successful on any one

17  of those issues the coverage might be entirely eviscerated let

18  alone if they were successful on all of them.

19           So, from the debtors' perspective achieving a

20  settlement of either 71 million or 84 million is a very

21  substantial amount of funds considering all the issues that CNA

22  would be likely to inject along the way in litigation.  There

23  are other issues that are raised by the objections that we

24  dealt with in our papers that I'm inclined to just put aside

25  for now and see the extent to which the objectors raise them

1 again or new ways and then come back on reply.

2              THE COURT:  All right.

3              MS. ESAYIAN:  Thank you, Your Honor.

4              THE COURT:  Mr. Glosband?

5              MR. GIANNOTTO:  Giannotto.

6              THE COURT:  Oh, I'm sorry.  I apologize.

7              MR. GIANNOTTO:  Your Honor, Michael Giannotto for the

8 CNA companies.  I, like Ms. Esayian, just want to say a few

9 words and then wait to hear what Libby and BNSF say, but I do

10 want to clear a point of possible confusion.

11              When we settle, this settlement agreement settles all

12 asbestos claims in the broadest sense that asbestos claims

13 could be used between CNA and Grace.  We wanted to between

14 ourselves settle all of that.  For instance -- and that would

15 include everything that's an asbestos PI claim under the plan,

16 as well as possibly things that aren't asbestos PI claims under

17 the plan that would be enjoined but that relate to asbestos.

18              And so, part of the issue was that CNA, if we were

19 sued on a claim that wasn't an asbestos PI claim we would have

20 an indirect -- or on claims, we would have indirect PI trust

21 claims against the trust, but we settled that as part of this

22 agreement.  So, we knew there was this amorphous category of

23 Libby wrongdoer claims, what they call wrongdoer claims.

24              Now, there are other claims that might be out there,

25 but between us and Grace everything asbestos is settled.  And

1  we give up our indirect PI trust claims based on things that

2  are asbestos.  Now, in return there's this partial indemnity of

3  up to $13 million.  It's not aimed just at Libby or anything

4  else.  It's aimed at if we are liable -- if you went to the

5  asbestos PI injunction and there is an asbestos-type claim

6  we've settled with Grace that doesn't fall within the

7  injunctions if someone were to recover from us, then we'd get a

8  partial indemnity back from Grace.  That's all it was meant to

9  do.

10       The release doesn't bind Libby of all asbestos

11  claims.  So, if -- we've settled everything with Grace, we've

12  given up our indirect PI trust claims, we're going to pay the

13  $84 million, but if something slips through the cracks and

14  we've given up indirect PI trust claim on it we get back, you

15  know, up to $13 million.

16       The other thing I just want to emphasize is that this

17  settlement took a long time to negotiate.  There's been a lot

18  of litigation between the parties over the years.  We sat -- we

19  negotiated for over a year.  You know, the representatives of

20  the FCR and Grace and the ACC are experienced lawyers.  They're

21  not going to sell anybody short on these policies.

22       One of the things we emphasize in our papers because

23  the Libby claimants seem to believe that on the non-product

24  coverage on the primary policies, they can basically walk in

25  and get 100 cents on the dollar for their claims, and it's just

1  not true.  It's just not true.  There are a lot of exclusions

2  in those policies that'll apply to a lot of Libby people as we

3  set out on our paper; employee exclusions, pollution

4  exclusions, Grace's failure to give notice, expected or

5  intended injury.

6         In addition a lot of their claims may fall within the

7  already settled and aggregated products coverage, and also we

8  will argue in commerce litigation that all the Libby claims

9  constitute one occurrence for which there is a limit under the

10  policy.

11         And so, they're not going to be able to just waltz in

12  and get money.  And what their -- their basic position is that

13  they don't like the settlement that's been reached and they

14  want to be able to veto it.  They claim it doesn't affect the

15  estate at all because it's just sort of money to them, but it

16  does affect the estate because if this settlement doesn't go

17  through and in effect the trust or Libby is forced to litigate

18  this coverage and they don't win anything or they don't get

19  very much then the trust has suffered because the trust has

20  lost these settlement proceeds and it'll still have to pay the

21  Libby claimants on their claims.

22         So, there is an affect on the trust.  What their

23  basic complaint is, is they don't want these policies sent to

24  the trust and that is a confirmation issue.  But, if they've

25  gone to the trust then the trust is in the position, or here

1 the ACC and FCR and Grace are in a position to determine what a

2 good settlement is.  And they've determined what a good

3 settlement is given these defenses.

4          And, again, the consideration is not just the $84

5 million.  We're given up indirect PI trust claims.  We're

6 withdrawing our objections.  We're giving up indemnities we

7 have under prior settlement agreements we've reached with

8 Grace.  We're giving up those indemnities.  We're giving up our

9 proof of claim.  We're not going to require exhaustion before

10 all those very, very, very, very, very high level policies are

11 reached.  They'll be able to get the money, you know, once the

12 plan is confirmed and it's a final order they'll get the money

13 right away.

14          So, there's a lot of consideration going to them.

15 There is a lot of problems with recovery on these non-products

16 claims for the Libby people.  There's a problem of exhaustion

17 on the upper level policies, and this is a good settlement.

18 It's a good settlement; $71 million, $84 million, and it

19 resolves everything asbestos between Grace, the trust and CNA,

20 not just asbestos PI claims.  But, it doesn't change the

21 channeling injunction.  The channeling injunction would be for

22 asbestos PI claims as the plan provides in Section 8.2, and

23 that's what it will remain.

24          THE COURT:  All right.  What about the workers comp

25 issues?  CNA had some objections to the plan I think based on

1  its alleged creditor status as an employee -- providing

2  insurance to employees on coverage, not just on the asbestos

3  issues.  Are those objections to the plan also, I guess,

4  withdrawn if the settlement's approved?

5          MR. GIANNOTTO:  My understanding, Your Honor, is that

6  there's a -- and maybe Ms. Baer can speak to this.  There's a

7  proof of claim out there for certain money on retros on workers

8  comp policies, and that's carved out of this settlement

9  agreement, but I believe we're close to agreement on that.

10 There's a different attorney handling that for CNA, but I

11 believe we're basically close to agreement on that, aren't we?

12         MS. BAER:  Your Honor, that's correct.  And that was

13 not a plan objection.  There was a note at one point in time

14 about clarification as to whether workers comp was affected and

15 that was clarified.  It was not affected.  This settlement

16 doesn't affect it, the plan doesn't affect it.  The workers

17 comp insurance is still current and we are, in fact,

18 negotiating with CNA to resolve the dollars involved and who

19 owes who what.

20         THE COURT:  So, there were no objections to the plan

21 based on -- I thought I was just looking at --

22         MS. BAER:  Again, CNA raised an objection.  It was

23 more of a clarification as to whether or not the plan affected

24 workers comp claims and it did not.

25         THE COURT:  Okay.  And CNA agrees?

1          MS. BAER:  Yes.

2          THE COURT:  So, for my purposes in trying to get this

3 order done, everything I'm working on on the CNA issues I don't

4 have to work on anymore, is that what you're telling me?

5          MS. BAER:  If this settlement is approved, yes.

6          MR. GIANNOTTO:  Once you approve the settlement, yes,

7 Your Honor.

8          THE COURT:  If the settlement's approved, yes.

9          MR. GIANNOTTO:  They all go away.

10          THE COURT:  Okay.

11          MR. GIANNOTTO:  Okay.

12          THE COURT:  I just need that clarification because I

13 really would like to get this opinion done some time soon.  So,

14 with the changing landscape it sometimes gets a little

15 difficult to know what I should be and shouldn't be addressing

16 here, so --

17          MR. GIANNOTTO:  If you don't have any other questions

18 I'll just -- maybe Libby and BNSF can speak and we can come

19 back up and address their concerns.

20          THE COURT:  All right.

21          MR. GIANNOTTO:  Thank you.

22          THE COURT:  Thank you.

23          MR. COHN:  Your Honor, I don't know whether maybe you

24 want to hear from anybody else speaking in support of this

25 settlement before you hear from us.

1          THE COURT:  Anyone else wish to be heard in support?

2          MR. LOCKWOOD:  Your Honor, just for the record, the

3   ACC supports the settlement.  I don't think we have anything to

4   add to what's been said so far.  We'll reserve any comments

5   until we hear what the Libby claimants and BNSF have to say.

6          THE COURT:  All right.  Mr. Frankel?

7          MR. FRANKEL:  Yes, Your Honor.  We filed a joinder in

8   support of settlement also.

9          THE COURT:  Anyone else?  Okay.  Mr. Cohn?

10          MR. COHN:  Good morning again, Your Honor.

11          THE COURT:  Good morning.

12          MR. COHN:  And I'm sorry to see you're not feeling

13   well.

14          THE COURT:  Oh, I feel fine, thanks.  My daughter is

15   visiting with her cat.  Much as I love the cat it's causing me

16   some problems, so I apologize that I'm sitting up here

17   sniffling, but that's the issue, so sorry.

18          MR. COHN:  Oh, okay.  Well, let's start off with the

19   easy part, Your Honor, which is one of the issues that we did

20   raise in our objection was that we thought that the scope of

21   the release was unclear, a separate issue from the injunction.

22   And the debtors very graciously said that they were okay with

23   including the language that we proposed in our brief.  So,

24   that's on Page 36 of our objection, and I would ask that if the

25   CNA settlement were to be approved that that language be added

1  to the order.

2           THE COURT:  On Page 36 of your objection to the plan?

3           MR. COHN:  No, 36 of our --

4           THE COURT:  To the settlement.

5           MR. COHN:  -- objection to this settlement.

6           THE COURT:  Okay.

7           MR. COHN:  Yes.  So, our objection -- the three main

8  points of our objection are as follows, Your Honor.  The first

9  is -- concerns our right to proceeds of the CNA non-products

10 coverage.  Now, when you talk about rights of claimants to

11 proceeds of liability insurance coverage there are two almost

12 parallel universes out there among the cases.

13          On the one hand you have the garden variety cases,

14 I'm sure you've had many of your own where a claimant comes in

15 in the non-mass tort context, claimant comes in, says I'd like

16 relief from the stay to pursue the debtors' insurance coverage,

17 and that is routinely granted and the claimant goes off and

18 either succeeds or doesn't succeed in getting paid by the

19 insurance company, but certainly nobody thinks to object that

20 those proceeds would be property of the bankruptcy estate if

21 the claimant were able to realize them from the insurer.

22          And then on the other hand you have the other, you

23 know, parallel universe, is that in the mass tort context is

24 routinely often without discussion of this particular issue the

25 proceeds of liability insurance are taken into the bankruptcy

1  estate and they are administered through a trust for the

2  benefit of personal injury claimants as a whole.

3        And there is very little explanation in the case law.

4  These universes kind of exist side by side, but there's very

5  little explanation as to how you define whether any particular

6  insurance or coverage situation fits into one universe or the

7  other.  However, there is a guiding light on that subject, Your

8  Honor, and that is the Edgeworth decision in the Fifth Circuit

9  where the Court did try to explain why it is that in the normal

10  situation insurance proceeds or proceeds of liability coverage

11  are not property of the estate, but why in the mass tort

12  context it is permissible to administer them through the

13  bankruptcy estate.

14        And what the Fifth Circuit explains Edgeworth is,

15  it's a matter of what they labeled secondary impact.  Secondary

16  impact means that in some situations in the mass tort context

17  there will not be enough insurance coverage to go around.  And

18  the secondary impact consists of the problem of the race to the

19  courthouse, the need to order -- to have an orderly and fair

20  and ratable administration of those proceeds so that everyone

21  gets their fair share.

22        And that it will justify, Your Honor, the inclusion

23  of proceeds of insurance where there are aggregate limits on

24  the policies such that we know that there's just not enough

25  insurance to go around.  The way that products coverage has

40

1   been written historically, Your Honor, is that it's written

2   subject to aggregate coverage -- aggregate limits, I'm sorry,

3   Your Honor.  That's why you have all these excess policies

4   because you're going to go through the primary coverage when

5   you reach the aggregate limit of coverage and then you're going

6   to go up through layer after layer after layer of excess

7   coverage.

8          And even with all those layers in the typical

9   asbestos case there's not enough insurance to go around.  And

10  here it's undisputed.  There is not enough products coverage to

11  go around, and the Libby claimants, more to my knowledge than

12  anybody else, disputes that products coverage can be

13  administered through the asbestos PI trust.

14         So, the issue that we're raising here is really a

15  narrow one, and that is, well, how about the non-products

16  coverage.  Libby claimants assert that we have claims for

17  non-products coverage.  Non-products coverage historically and

18  in this particular instance, Your Honor, gets written without

19  aggregate limits.

20         And under those circumstances the secondary impact

21  identified by <u>Edgeworth</u> and discussed by Judge Gross in the

22  <u>Santa Fe Minerals</u> case does not exist.  And we would

23  respectfully submit that there is, therefore, no justification

24  to take those proceeds and administer them as an asset of the

25  bankruptcy estate.

41

1          So, the Libby -- now there had been a number of

2  comments that had been raised in response to this.  Most of

3  them, Your Honor, really have nothing to do with the issue at

4  hand.  Mr. Giannotto said today, and of course CNA points out

5  in its papers, that there are many, many coverage defenses that

6  CNA would assert to the non-products coverage.  Well, that's

7  true of all insurance companies.  They always assert coverage

8  defenses.

9          I don't think I've ever seen an insurance company

10  just arrive and just say, oh, yes, we'll cheerfully, you know,

11  pay this claim.  But, that doesn't -- the fact that we might or

12  might not be successful in obtaining this non-products coverage

13  doesn't make it property of the estate.  This is not a factor.

14  It doesn't have an affect on the bankruptcy estate.  It is not

15  a secondary impact in the words of the Fifth Circuit.

16          The other thing that we've heard -- you've heard said

17  is that there are retroactive premiums and deductibles and all

18  of this kind of stuff that will result from pursuit, or could

19  conceivably result from the Libby claimants pursuit of

20  non-products coverage.  And once again that's not a secondary

21  impact.  That's not something that the -- that any Court has

22  said a reason why these amounts can be included as an asset of

23  the bankruptcy estate because, Your Honor, as you know there

24  are many situations in which people will come back against the

25  asbestos PI trust based on claims that are pursued by one third

1    party against another.

2         To take this particular situation for example, Libby

3    claimants, if they recover from the State of Montana for

4    example, the State of Montana will surely come back against the

5    asbestos PI trust and those claims will just get resolved

6    through the mechanisms of the trust, but they are not -- the

7    existence of those is certainly not a reason to say, oh, the

8    proceeds of whatever the Libby claimants are able to recover

9    from the State of Montana are an asset of the bankruptcy

10   estate.  That's just not the way that it works.

11        So, the one thing that we've heard that would

12   constitute a secondary impact was, you noticed Mr. Giannotto

13   referred to CNA's position that the Libby claimants' exposure

14   to asbestos was a single occurrence.  And if it were a single

15   occurrence, Your Honor, the affect of that is -- there are per

16   occurrence limits under the policies, and the affect of that

17   would be that there would not be enough insurance to go around

18   for all the Libby claimants.

19        The problem with Mr. Giannotto's position is that it

20   is contrary -- directly contrary to New York law which is what

21   CNA says applies here.  You have a decision of the New York

22   Court of Appeals which is the highest court in the State of New

23   York, the Appalachian Insurance Company v. General Electric

24   case at 8 N.Y. 3rd 162, a 2007 decision directly on point.  So,

25   Your Honor, in order to find that there's a secondary impact in

1    this case you would need to really overrule the New York Court

2    of Appeals on this issue of insurance law.

3         So, we would respectfully submit there is no

4    secondary impact on the Grace bankruptcy estate from the Libby

5    claimants' pursuit of their non-products coverage, and

6    accordingly those proceeds may not be administered to the

7    bankruptcy estate and we simply must be allowed to pursue those

8    outside bankruptcy.  And for this reason, because the

9    settlement purports to be a settlement that will cover

10   non-products coverage as well as products coverage, for that

11   reason, Your Honor, the settlement cannot be approved.

12        Now, another objection that the Libby claimants have

13   to the sale is that the Section 524(g) injunction is not fair

14   and equitable as it relates to this particular settlement.  And

15   at this point, Your Honor, I should pause and address the point

16   that's been made by the plan proponents and by CNA that the

17   524(g) injunction is somehow not to be discussed in the context

18   of this objection.  Well, Your Honor, of course it's to be

19   discussed.

20        The settlement by its terms makes CNA a settled

21   asbestos insurance company which under the terms of the plan

22   would entitle it to the Section 524(g) injunction.  One of the

23   requirements of the 524(g) injunction is that you have to

24   determine that the injunction is fair and equitable as it

25   relates to the particular beneficiary of the injunction, here

1  CNA.

2        The CNA settlement did not exist at the time that

3  objections were filed and litigated to plan confirmation.  We

4  had never had the chance to address whether the 524(g)

5  injunction would be fair and equitable as it relates to CNA, so

6  this is the proper time to address the Section 524(g)

7  injunction.  And we are certainly not precluded from doing so

8  by the fact, which everybody agrees upon, Your Honor -- you

9  know the plan proponents said that we did raise the scope of

10 the 524(g) injunction in opposition to confirmation of the plan

11 and we litigated it at that time, and I agree, we did, but we

12 could also litigate it here in the specific context of the CNA

13 settlement.

14        And so, on the issue of the fair and equitable

15 standard, Your Honor, the first problem is that under the case

16 law interpreting fair and equitable one thing that -- nobody

17 says comprehensively what fair and equitable means, but one

18 requirement that courts have said is certainly part of the fair

19 and equitable standard is that what the insurer contributes

20 should be proportional to what could be collected from the

21 insurance company outside of a bankruptcy.

22        Now, apart from a whole bunch of -- a litany, really,

23 of the fact that CNA has litigated heavily for 25 years, CNA

24 raises all these coverage defenses, we've certainly heard a lot

25 about the difficulties that would be faced by someone in trying

1  to recover what they're entitled to under the insurance

2  policies.  But, what we have not heard, and nothing appears in

3  the record, is, okay, but what is it that would be recovered if

4  the claims were successful?

5       I didn't really even see figures on that, Your Honor,

6  for the products coverage, but we certainly don't see it for

7  the non-products coverage.  There's no attempt to say, well,

8  yes, if we succeeded we would get this amount, but we've only

9  got a -- and, you know, whatever it is, you know, 80 percent

10  chance, 50 percent chance, whatever the plan proponents believe

11  to be the case.  But, since we only have a fractional chance of

12  recovering on that, therefore the settlement is appropriate.

13  We see none of that kind of specificity that you would need,

14  Your Honor, to make a determination that what CNA is

15  contributing is truly proportional to what its liability would

16  be outside bankruptcy.

17       THE COURT:  Well, if it's taking 25 years to get to

18  this point and a court hasn't determined what that proportional

19  share of liability is, how can one use a proportional share?

20  It seems to me that that's -- that a factor to be considered

21  may be that, but the risks of recovery seem to be pretty high.

22  The parties have been at it for a very long time without

23  rulings that would determine what that liability may be, and it

24  seems to me that risk of litigation in the settlement side of

25  things is one primary factor the Court looks to.

1          And as to the fair and equitable side, the fact that
2    the amounts may not be known and that the risk is pretty
3    extreme either way is also a reason to adjudicate a fair and
4    equitable.  As to the raw dollars I agree.  I don't know what
5    the debtor's position is with respect to what the maximum
6    amount assuming that it could -- it won on everything could be.
7    I don't have that number.

8          MR. COHN:  Well, and here's the problem, Your Honor.
9    If the plan proponents were standing here and telling you that
10   obviously Mr. Giannotto is not to be believed, not because he's
11   not a wonderful person which he is, but because he's the
12   adverse party to the estate, so when he says it's a wonderful
13   settlement, you know, we all kind of take that with a grain of
14   salt.

15         When the plan proponents stand up here and tell you
16   that 84 million, or maybe it's really 71 million, you know, is
17   a good number, well how do you know -- if they stood up here
18   and said, well, Your Honor, ten million is a great settlement,
19   or if they came in and said, you know, 200 million is a great
20   settlement, I mean how do you know?  And the answer is they
21   have given you no -- they haven't given you enough specificity
22   for you even to know whether they're in the ball park.  And I
23   would respectfully submit that the record here is just
24   completely inadequate, especially on the issue of non-products
25   coverage.

1          On the issue of non-products coverage, Your Honor,

2   where the starting point is the total amount of Libby claims,

3   and I agree it's only a starting point, Your Honor.  If we were

4   settling this -- if we were pursuing this outside bankruptcy,

5   if we step back for a second, Your Honor, and say, okay, what

6   happens if you say, okay, I agree with you, Mr. Cohn, the

7   non-products coverage is yours, you go pursue it outside

8   bankruptcy.  Well, we all know what the likely result is.  The

9   likely result is we would do a settlement with CNA.  And the

10  one thing that that settlement would not consist of, it would

11  be recovering 100 cents on the dollar on Libby claims which is

12  not the way that it works.

13          So, we all understand that there is to be some kind

14  of a discount factor implied, but you've got to start off with

15  a starting point which would be the entire, you know, the

16  entire amount that the estate would recover or in this case the

17  Libby claimants would recover if successful, and then you do a

18  discount based on the fact that CNA asserts coverage defenses,

19  and you have none of that in this record.

20          Another aspect of the settlement that -- completely

21  apart from that makes this not fair and equitable as to the

22  Libby claimants is the fact that the settlement proceeds are

23  diverted to the asbestos -- the body of asbestos claimants as a

24  whole.  One thing that we know is that there is some amount of

25  this -- of any settlement that you would need to attribute to

1 non-products coverage.  Non-products coverage is purportedly

2 being settled under this settlement, and yet it's all getting

3 thrown together in one batch.

4         And the case law is very clear that even where the

5 bankruptcy estate can settle claims and can administer the

6 proceeds that those proceeds are to be distributed to those

7 claimants who are the beneficiaries of the coverage that's

8 being settled.  Now, I realize that when they -- you know, when

9 they kind of muddle everything together and say, well, we're

10 settling products coverage as well as non-products coverage it

11 may be hard to segregate.  And indeed in the process of

12 negotiating this settlement may be hard to segregate the one

13 from the other.

14         But, surely, Your Honor, if they, you know, instead

15 of doing a total of five previous settlements, if there had

16 been a sixth one which had gotten rid of the rest of this

17 products coverage and we were solely left with unsettled

18 coverage being the non-products coverage, and they stood up

19 here and said we're settling for 84, 71 or 60, or whatever the

20 number would be, we're settling the non-products coverage,

21 non-products coverage alone, and that's all that's left, surely

22 what you would do is you would -- is -- you would need to under

23 applicable law, you would need to provide for that -- whatever

24 proceeds they were to be distributed to the holders of

25 non-products claims which in this case for a small minority who

1  actually have better insurance rights than the rest of the

2  group because they're not capped by these aggregate limits, and

3  whatever all these coverage defenses are that CNA has, the one

4  starting point that they do not have is to say our starting

5  point is there's an aggregate limit and we're going to count

6  down from there.

7  　　　　　Here the starting point is, there's a claim, and the

8  full amount of the claim is payable subject to some discount to

9  take account of coverage defenses.  So, the non-products

10 claimants' position is stronger, Your Honor, and they are

11 entitled to a separate allocation of proceeds if indeed it is

12 permissible to take their rights away at all which we say it is

13 not.

14 　　　　　Our next point, Your Honor, has to do with clarifying

15 the injunction.  And to just be very clear, the argument that I

16 just made about the fair and equitable standard had to do with

17 settling the non-products coverage.  I'm now turning to what

18 our brief calls the insurer wrongdoing claims.  These are

19 claims against CNA based on its own alleged misconduct as

20 distinct from its insurance obligations to ensure claims of the

21 -- against claims that are liability to the debtor.

22 　　　　　Now, on this issue I need to start off by noting that

23 the plan proponents have acknowledged that the injunction is

24 ambiguous about whether it covers these insurer wrongdoing

25 claims or not, and that may -- I'm not going to comment, Your

1 Honor, on whether that's a reasonable position for the plan
2 proponents to take.  They may have strategy reasons why that
3 makes a lot of sense as a position for them to take, but as a
4 preliminary matter, Your Honor, I do want to make it clear that
5 a court has separate obligations when it comes to the entry of
6 injunctions.

7      Both the rules and the case law are clear that a
8 court has an obligation to be clear when it's entering an
9 injunction.  The parties are entitled to know what the
10 injunction permits and what it forbids.  They are not supposed
11 to discover when they go to litigate, in this case when the
12 Libby claimants where to go and sue CNA, you know, three years
13 from now, we're entitled to know whether that places us in
14 contempt of court and we're entitled to know by the very terms
15 of the injunction.

16      So, to build in a deliberate ambiguity into the
17 injunction, to let it rest upon some future determination of
18 this Court what the injunction covers or does not cover, would
19 be contrary to this Court's duties exercising the federal
20 injunctive power.

21      Now, the court of appeal's jurisprudence on the issue
22 of what a 524(g) injunction can cover has drawn a very clear
23 distinction between derivative liability on the one hand and
24 the liability for a party's own misconduct, what I sometimes
25 have called in this case independent claims or independent

1  liability.  The court in <u>Combustion Engineering</u> has said that a

2  Section 524(g) injunction can apply only to derivative

3  liability, the liability of an insurer in this case for claims

4  against Grace, not for the insurer's own liability.

5         THE COURT:  I agree with that, Mr. Cohn.  There is no

6  way that I'm going to be granting any injunction that covers

7  independent liability not derivative of the debtor.  Whether

8  something is derivative of the debtor, however, isn't at this

9  stage something that I can adjudicate.  That may be an issue

10 for a coverage court.  But, I agree that to the extent the

11 liability is determined not to be derivative it won't be

12 channeled.  I agree.

13        MR. COHN:  Then all we need to do is to clarify that,

14 Your Honor, and we have -- if you were to direct right now to

15 the parties to include the clarification that you just said I

16 believe I could agree on language with CNA's counsel and the

17 debtors' counsel to include that clarification and then this

18 objection would go away.  On this issue there would be removed

19 any jeopardy of reversal on appeal and we would be passed the

20 whole thing.  All you need to do is to tell the parties get me

21 language that says only derivative claims are covered.

22        THE COURT:  Well, whether you get me language or not

23 the order's going to say if the plan's confirmed that only

24 derivative claims are covered.

25        MR. COHN:  Okay.

1              THE COURT:  So, I mean if you can give me language

2    that'd be great, but whether it's in -- if -- whether you give

3    me language or not the order's going to say that because I

4    think the circuit's been very clear.

5              MR. COHN:  Well, terrific.  Then, in that case, Your

6    Honor, I shall move on.  And, really, I think I have nothing to

7    move on to.  I do -- I think that to the extent that there are

8    specific problems that -- or issues that get raised in the

9    replies which, you know, my -- the proponents have decided to

10   wait and make specific comments only in response to my

11   argument.  I would ask, Your Honor, that if it's useful to the

12   Court that I be permitted a short time to rebut what it is they

13   say.  Thank you, Your Honor.

14             THE COURT:  Ms. Casey?

15             MS. CASEY:  Good morning, Your Honor.

16             THE COURT:  Good morning.

17             MS. CASEY:  CNA wears three separate hats and is

18   seeking protection presumably on all three of those hats.  The

19   first one is as an insurer of BNSF.  Attached to the objection

20   filed by BNSF were two copies of insurance policies that BNSF

21   asserts are separate policies that specifically name BNSF as

22   the insured, do not include Grace as the insured, and cover

23   BNSF for activities located at the Libby mine -- the BNSF

24   property located at the Libby mine, owners and contractors

25   insurance.  We also included a confirmation for a third policy

1 that we have not been able to locate, but that confirmation

2 also demonstrates that it is BNSF that is the named insured.

3       In our objection we raised that there is ambiguity

4 with regard to whether the subject policies that are being

5 compromised under the settlement agreement include the BNSF

6 policies.  In the -- both the debtors' and the CNA's response

7 they offered to amend it to clarify that these three specific

8 policies with the policy numbers identified by BNSF would not

9 be covered by the settlement agreement.  BNSF hasn't seen that

10 language, but is certainly appreciative of that language and

11 thinks that that resolves it in part.

12       The other claim, however, is that they now are going

13 to add to Exhibit 5 to the joint plan of reorganization the

14 policies that CNA is now entitled to full protection under.

15 And there are ambiguities created by this strange numbering of

16 the policies.  BNSF's policy number, 2483440, which names BNSF

17 as the named insured under an owner's and contractor's policy

18 is the same policy number as a policy issued to Grace, Policy

19 Number 2483440, that is Grace's primary general liability

20 policy.

21       The Exhibit 5 is now being amended to state that

22 Policy 2483440 is settled and is entitled to complete

23 protection under the asbestos PI channeling injunction.  Not

24 only does the settlement agreement need to be revised, but the

25 potential change to Exhibit 5 to the plan needs to be revised

1  to clarify that the confirmation order and the plan will not

2  independently strip BNSF of its rights under its policy,

3  2483440.

4        THE COURT:  All right.  I agree, but it seems to me

5  that can't some identification in Exhibit 5 simply indicate

6  that this is the policy issued to Grace, not the one issued

7  where BNSF is named?

8        MS. CASEY:  It should be, and that's what we're

9  asking.  That's what we're seeking.

10        THE COURT:  Fine.  I don't -- yes, just take care of

11  that, please, plan proponents.

12        MS. CASEY:  Okay.

13        THE COURT:  Okay.

14        MS. CASEY:  The second hat that CNA is wearing is as

15  Grace's insurers.  BNSF as Your Honor is aware through the

16  pleadings has asserted that through the contractual indemnity

17  endorsement BNSF is an additional insured that has rights that

18  cannot be compromised through Grace.  BNSF will not -- I will

19  not go through the legal argument right now.  We'll rest on the

20  papers.  The reply back was that BNSF has already agreed to

21  release these claims through the modification to the plan, and

22  I just want to point out that that is not correct.

23        The plan at the time that BNSF agreed to language

24  that resulted in the withdraw of its objections to the plan

25  relating to the Grace policies, CNA was only a partially

1  settled asbestos insurance policy and it was only settled as to

2  products coverage.  So, therefore, the language that was added

3  to the plan at the time that BNSF was carved out of the

4  channeling injunction to be able to pursue its claims as an

5  additional insured under an insurance policy or part of a

6  policy that hadn't been identified under Exhibit 5.

7          It's now being identified under Exhibit 5 as the full

8  policy, and therefore it's changing that plan.  So, BNSF's

9  objection to the elimination of its rights as an additional

10  insured under the Grace policies is now at issue.  It is not

11  resolved by the previous language.  As to the merits of that I

12  will rest on the papers.  The third hat that BNSF --

13          THE COURT:  So -- pardon me.

14          MS. CASEY:  Yes.

15          THE COURT:  So, a resolution to that issue -- because

16  I think the debtor contests whether BNSF was, in fact, an

17  additional insured because at least the policies that I've --

18  the couple that I've looked at, I haven't even tried to look at

19  all of the exhibits, don't indicate that BNSF is a named

20  insured.  So, to the extent that BNSF contends that it is

21  included as an insured and the debtor disagrees, you are saying

22  you simply want to preserve that issue for some other court to

23  determine?

24          MS. CASEY:  No, no.  I'm saying that we -- as our

25  papers have pointed out is their -- the legal argument is that

56

1  under the law of Montana as an additional insured for the

2  contractual indemnity BNSF has rights to defense coverage and

3  to defense costs, and that those defense costs do not go

4  towards the policy limit.

5          There is no -- they're unlimited.  It does not -- it

6  is not counted towards the policy limits, and therefore BNSF

7  has this right to receive the defense costs under the

8  contractual indemnity as an additional insured that cannot be

9  compromised to the settlement agreement.  BNSF's position is

10 that that is right for this Court to determine and has asserted

11 that objection.  And the arguments are set forth in the papers,

12 both the debtors' position and BNSF's positions as to their

13 right to -- their right as an additional insured to those

14 defense costs.  It cannot be compromised by the settlement.

15         THE COURT:  But, I don't know that there are rights

16 to defense costs.  I haven't seen BNSF as a named insured on

17 any of these policies, and again, I haven't even tried to look

18 at all of them.

19         MS. CASEY:  And, Your Honor, to be clear, BNSF is not

20 asserting that it is expressly named in the CNA policies.

21 There is, however, an endorsement to the policies that provides

22 insurance to Grace for contractual indemnities that Grace has

23 undertaken to BNSF.  So, it is a Grace policy.  The argument is

24 that under the law of the State of Montana that creates a

25 relationship as an additional insured that they have -- that

1    BNSF has rights to seek defense costs from CNA.

2            THE COURT:  This is clearly a coverage issue.  This

3    is absolutely not something that this Court needs to determine

4    to determine if this settlement is appropriate.  It seems to me

5    that to the extent that there is some liability of CNA directly

6    to BNSF then some coverage court's going to determine that.

7            I'm not going to determine that, not unless you want

8    to go to an evidentiary hearing as to whether you're a named

9    insured.  If you want me to make that determination that -- not

10   named insured, pardon me, an additional insured under the

11   policy then I guess we have to tee that issue up.  But, I don't

12   see how that affects CNA's settlement with Grace as to whatever

13   its obligations are to Grace which is what's --

14           MS. CASEY:  And that's -- well, the question then is

15   whether the channeling injunction would then prevent BNSF as an

16   additional insured from pursuing those claims, and that is

17   exactly what BNSF's position is, that Grace cannot compromise

18   BNSF's rights as an additional insured, and that is a coverage

19   issue.  They can defend that we're not, in fact, an additional

20   insured at the appropriate forum.  The question is whether they

21   can get the protection under the channeling injunction to

22   prevent BNSF from asserting that status in a coverage

23   litigation.

24           THE COURT:  Well, I suppose if the channeling

25   injunction's brought enough to cover that issue because you're

1 not a -- your client is not a named insured it probably can

2 prohibit that type of activity when what you're doing is

3 essentially saying that the claim is derivative of Grace's

4 insurance.

5        I'm having some difficulty understanding how BNSF is

6 an additional insured when it's not named.  It wasn't a

7 subsidiary or an employee.  It had a contract relationship with

8 Grace, but that doesn't give your client an insurance

9 obligation under the policies when it's not named and not

10 included.  The couple I've looked at, I don't see how BNSF has

11 that claim.

12        So, if I need to make that determination without an

13 evidentiary hearing I have a little bit of difficulty seeing

14 BNSF's position on that issue simply because I don't see that

15 it's documented anywhere.  Now, there are some policies on

16 which BNSF is named, and clearly you do have rights under those

17 policies and this discussion has nothing to do with policies in

18 which BNSF is named.  But, as to those in which it isn't named

19 I'm -- the policies don't seem to be broad enough to cover BNSF

20 as a contractor who's dealing with Grace.

21        There may be others out there in which the policy

22 coverage is broader, but at the moment I don't know where they

23 are.  So, if we need a hearing on that score, if it's going to

24 come here then it has to be teed up in a different way than

25 what I've been able to see through the plan confirmation

1  process.

2         MS. CASEY:  Again, BNSF has objected to the

3  compromise of those claims based on a state law rights under

4  those policies, and that is BNSF's position.  The third hat

5  that CNA is wearing and is seeking protection from is the

6  protection of the claims of the Libby claimants for the failure

7  to warn type causes of actions that the Libby claimants have

8  asserted.  And I believe that a bunch of the wind has been

9  taken out of my sails by Your Honor's statement that non-

10 derivative claims will not be channeled to the trust and will

11 not be enjoined.

12        The question is, you know, the -- from what I

13 understand, 524 -- I don't have the number -- the 524(g)

14 permits the insurance companies to potentially obtain

15 protection from claims that arise out of the provision of

16 insurance to the debtors and that it has been the insurer's

17 position that if they undertook activity that gives rise to a

18 state law duty owed to the Libby claimants that they did so

19 only because they provided insurance to the debtor and that

20 that is enough to bring it within the provision of arises by

21 reason -- provision of insurance to the debtor and that they

22 should be entitled to protection against those claims even if

23 those claims by the Libby claimants are claims directly against

24 CNA that can go against CNA's general assets that are not in

25 any way limited by the policy proceeds.

60

1          THE COURT:  Right, and that seems to me to be an

2   issue that's going to be litigated elsewhere.  I think my role

3   in confirming the plan is to indicate what's covered by the

4   injunction, and I think <u>Combustion Engineering</u> is quite clear,

5   what's covered by the injunction or claims that are derivative

6   of the debtor.

7          So, to the extent they're derivative and proven to be

8   derivative they're covered.  To the extent they're not proven

9   to be derivative and are, in fact, shown to be independent

10  claims, they're not.  But, that's not an issue that this

11  Court's going to adjudicate.  That's going to go elsewhere.

12         MS. CASEY:  Well, then, Your Honor, that does raise

13  the question that was asserted by BNSF in objecting to the

14  plan.  The -- in the response to BNSF's objection CNA has taken

15  the, I believe, surprising position that as long as it provides

16  fair and equitable compensation related to the policy and the

17  terms of the policy and the limits of the policy and the

18  potential coverage defenses under the policy, then it is

19  entitled to whatever the full scope of the protection is under

20  the 524(g).  If it arises by the provisions, if it's derivative

21  or non-derivative, then all you have to look at is whether the

22  policy proceeds, the settlement amount is fair and equitable

23  looking at the policy proceeds.

24         If there are, in fact, derivative claims that can be

25  asserted against CNA that go above and beyond those policy

1  proceeds, that the rights of the non-debtor party against the

2  solvent non-debtor CNA is to go against the general assets of

3  CNA and not just against the policy proceeds, it cannot be the

4  standard that they are entitled to the full protection of the

5  scope against those derivative claims without there being some

6  just compensation paid to the holders of those derivative

7  claims.

8       And you see that in each -- whichever of the three

9  standards are applicable.  The In re Martin standards require

10 that you find that the settlement value be fair and equitable

11 in relation to the claims that are being released and it finds

12 that it be within the paramount interest of the creditors.

13      Continental Airlines tells this Court that in order

14 to get relief from a solvent non-debtor for claims that are

15 against the general assets of a solvent non-debtor this Court

16 must find that it be necessary to the reorganization and that

17 just compensation be provided and be provided to the holders of

18 those claims.

19      And 524(g) requires that in order for them to get

20 protection you must find that it's fair and equitable in light

21 of the benefits to be provided.  And if the benefit to be

22 provided by the channeling injunction is protection against

23 derivative claims that are not tied to the policy proceeds and

24 that can be covered by the general assets of CNA there must be

25 a finding that there has been a consideration paid for the

1  release of those claims.

2       So, while there may be an issue as to whether it's

3  derivative or not derivative, and perhaps that's the answer

4  that these failure to warn claims are not derivative, and

5  therefore you don't need to look beyond the policy proceeds

6  because that's all that's being compromised.  But, if there is

7  a chance that these claims are being compromised and that these

8  claims are claims that are not limited to the policy proceeds

9  then this Court must make the determination that there is

10 compensation being paid that is fair and equitable in light of

11 that benefit being provided.

12      THE COURT:  Well, how would a person who shows some

13 entitlement to coverage under a CNA policy have the ability to

14 go against CNA's general assets when it's the provision of the

15 insurance that provided the obligation that CNA had to cover in

16 the first place?  If CNA doesn't have sufficient proceeds under

17 the policies and you get a different independent judgment maybe

18 you can go against those general assets, but I don't see how

19 that's -- I mean that's a leap of faith to say that you go from

20 policy proceeds to assets of the company.

21      MS. CASEY:  But, that's not what the Libby claimants'

22 claims are.  The Libby claimants' claims are that under Montana

23 state law that the CNA companies undertook certain activities,

24 not the provision of insurance but certain activities such as

25 hygienic studies and other type activities that created a tort

1  duty owed to the Libby claimants to warn the Libby claimants or

2  to protect the Libby claimants from the exposure to asbestos

3  and that these claims are not claims under the policies.  These

4  are tort claims that are being asserted against CNA.

5           THE COURT:  Well, all the claims are tort claims.

6           MR. SCHIAVONI:  Your Honor, BNSF really doesn't have

7  the standing to make these objections.

8           THE COURT:  I understand, Mr. Schiavoni, but

9  nonetheless, I agree.  BNSF isn't the proper party to be

10 raising these, but I understand where you're going because to a

11 certain extent BNSF has the same type of issue.  But,

12 regardless of that fact they're all tort claims.  Even the

13 asbestos personal injury claims are tort claim based.

14          MS. CASEY:  But, they're tort claims that are tort

15 claims against Grace that are covered by Grace's insurance

16 policy.  This is a tort claim against CNA.

17          THE COURT:  We've already discussed that.  To the

18 extent that there is proof that that tort claim against CNA is

19 derivative of the debtor it's covered by the channeling

20 injunction if the settlement's approved.  To the extent there

21 is no such proof and it's determined to be independent it's not

22 covered.  That's not something this Court can just sort of, you

23 know, magically determine.  That's an issue for the coverage

24 courts.

25          MS. CASEY:  And I understand that, Your Honor, but

64

1  then I question how if you don't know what claims are being

2  included within it then how do you know that the settlement

3  value is fair and equitable for the benefits that are being

4  provided?

5          THE COURT:  I do know what's covered.  I know that

6  all derivative claims are covered and no derivative -- and no

7  non-derivative claims are covered.  So, I do know the universe

8  of claims.  What I don't know is anymore than I know what the

9  liability of all the asbestos claims are going to be, and that

10 is what's derivative and what isn't, but that's not my

11 function.

12         The code says that I can channel derivative claims

13 under 524.  My obligation is to say fine, derivative claims are

14 channeled.  But, the burden of proof isn't here.  I haven't had

15 an evidentiary hearing on what is and what isn't derivative.  I

16 just simply know -- and of course the word derivative as the

17 circuit pointed out isn't in the statute, but I think we all

18 know what that word means.  It seems to work well in this

19 context, so I'm using it in that general sense, not as though

20 it's a statutory term.  Okay.  Just to clarify.

21         So, to the extent that the liability arises because

22 of something that's related to the debtor or the debtor's

23 product, the debtor's conduct, yes, it can be channeled.  To

24 the extent there's an independent duty that any entity; CNA,

25 Montana, whoever had and didn't exercise, it's not channeled.

1  So, it's an issue for the coverage courts.

2         And to determine that -- and so what CNA can settle

3  here is its derivative liability.  It can't settle its

4  non-derivative liability because that's not going to be

5  channeled.  So, I don't know if that answers the question or

6  not.  To the extent that CNA thinks it's settling its

7  non-derivative liability I better hear that because I don't

8  think I can have CNA settle its non-derivative liability.  It

9  won't be channeled.

10        MS. CASEY:  Well, if you look at the settlement

11 agreement the definition of the asbestos personal injury

12 claims, and therefore the asbestos-related claims, has seven

13 lines related to the failure -- the definition of the failure

14 to warn that says claims that arise out of -- and I don't have

15 it right in front of me, but to paraphrase, claims that arise

16 out of CNA's undertaking of certain studies of the debtors'

17 operations that to the extent those undertakings of the certain

18 of the studies give rise to a duty of CNA to the Libby

19 claimants that those fall within the definition of asbestos

20 claims.  And those are the very claims that they are then

21 seeking indemnification for if the subsequent coverage court

22 finds that they are not derivative of the debtors' liability

23 but are, in fact, independent claims.

24        THE COURT:  Well, okay.  Maybe I didn't read the

25 settlement agreement in that -- in the sense that you're

1  advocating it now.  What I took that to mean was that Libby --

2  not Libby, pardon me, that CNA was attempting to settle any

3  claims that would be determined to be derivative.  I can't make

4  that determination as to whether they're derivative.  I've had

5  no evidentiary hearing.  And if that's what the parties are

6  asking me to do I can't do it, so I better hear from them as to

7  specifically what they're talking about.

8          MR. LOCKWOOD:  Your Honor, the settlement agreement

9  does not purport to settle the claims of anybody except Grace

10  and CNA between themselves.  So, if -- the plan determines what

11  is channeled.  The plan does not contain the language that Ms.

12  Casey is referring to in the settlement agreement.  So, to the

13  extent that that language is broader than the language in the

14  plan, it simply settles claims between Grace and CNA on that

15  broader definition.  It does not amend the plan language as to

16  what's in the injunction.  And it seems to me that Ms. Casey is

17  in effect suggesting to you that somehow or another the plan

18  language is being modified by the settlement agreement and

19  that's simply not the case.

20          MR. COHN:  Your Honor, that's not what I'm saying.  I

21  do understand the way that the settlement is structured.  The

22  definition of the asbestos-related claims being compromised do

23  include these failure to warn claims.  A condition to the

24  effectiveness of the settlement is that a confirmation order be

25  entered that does, in fact, extend the protections to the

1  definition of the asbestos PI claims in the settlement

2  agreement.  And --

3         MR. LOCKWOOD:  That's simply not true, Your Honor.

4  There is no such condition in this agreement that makes it

5  conditional on any plan amendment.

6         THE COURT:  No, I think she's saying that a condition

7  of confirmation is that the injunction encompasses the

8  settlement agreements, and therefore if the settlement

9  agreement is broader than the plan injunction somehow or other

10  the plan injunction is modified to incorporate the settlement.

11         MR. LOCKWOOD:  But, the settlement agreement doesn't

12  involve an injunction, Your Honor.  It simply --

13         THE COURT:  But, definitionally -- look,

14  definitionally I am not confirming a plan that in any way

15  attempts to put direct liability on behalf of some entity other

16  than the debtor into the plan.  I'm not doing it.  So, to the

17  extent that anybody has some idea that an injunction is going

18  to issue that will bar claims that are based on non-derivative

19  liability that's not going to happen, folks.  It's not.  So --

20  and you all know that.

21         MR. LOCKWOOD:  Your Honor, nobody is asking you to do

22  that.

23         THE COURT:  Okay.

24         MR. LOCKWOOD:  Ms. Casey is suggesting that somehow

25  the settlement agreement is going to modify, override, it's

1  going to require some change in the confirmation order.  You've
2  made it quite clear what the confirmation order is going to do,
3  and therefore for her to suggest that somehow or another the
4  confirmation order is going to pick up the settlement
5  definition of the injunction rather than the plan definition of
6  the injunction is, (a) not correct as a reading of the
7  settlement order -- settlement agreement, and (b) Your Honor
8  has already told everybody in the room that you're not going to
9  expand the language of the injunction to go beyond what 524(g)
10  authorizes which is what the plan so provides.

11          THE COURT:  Okay.  If I understood the relationship
12  between these documents the settlement agreement was
13  essentially saying that to the extent that CNA is sued -- and
14  I'll just use Libby -- by Libby for a failure to warn claim the
15  debtor essentially is agreeing that if CNA is found liable the
16  debtor will agree to this indemnity of up to 13 million for
17  anything that CNA has to pay as a result of the fact that that
18  determination would mean that the claim isn't channeled.

19          If CNA is determined to have acted in a fashion that
20  was derivative of the debtor's conduct then the claim goes into
21  the trust and is channeled I should say, not into the trust,
22  the claim is then channeled and there is no independent
23  obligation of CNA to pay.  And it seems to me that if that's
24  the relationship between the documents that's okay.  Is that
25  the relationship between the documents?

1          ATTORNEYS:  Yes, Your Honor.

2          MR. LOCKWOOD:  A Greek chorus in response, Your

3   Honor.

4          MS. CASEY:  And I would agree with that, as well,

5   Your Honor.  The question -- and I'll just say one sentence

6   because I think the question is whether there is evidence that

7   derivative claims that are in excess of the limits of the

8   policy that permit the claimant to seek a derivative claim

9   against CNA, but is not limited to the policy proceeds, that is

10  truly a derivative claim, that -- is there evidence that there

11  is sufficient fair and equitable consideration being provided

12  for that benefit, for that protection against those claims?

13         THE COURT:  How could there be a claim against CNA

14  derivative of the debtor that is based on CNA's contractual

15  obligation to provide insurance that somehow or other goes

16  beyond the policy limits of insurance?  It can't be a

17  derivative claim to that extent.

18         MS. CASEY:  And I agree, Your Honor, but I think that

19  the CNA companies through their failure to warn language in

20  their settlement agreement are hoping that there will be a

21  finding that the failure to warn claims are, in fact,

22  derivative.

23         THE COURT:  Well, they may be.  I mean some court may

24  make that determination.  They may be derivative.  I don't know

25  whether there'll be determined to be derivative or not.  What I

1  know is, if they are determined to be derivative they can be

2  channeled.   If they're determined not to be derivative they

3  can't be channeled and CNA will be independently liable, the

4  trust won't commit one dime to the payment of those claims, and

5  the debtor's settlement doesn't incorporate those claims

6  because the debtor has nothing to do with CNA's direct

7  liability in that circumstance.   So, I think this is an

8  argument about a hypothetical that can't exist.

9        MS. CASEY:   Okay.   Your Honor, I do want to also

10  point out that the -- one of the other objections that was made

11  by BNSF relates to the Montana apportionment of liability

12  statute.   That statute is -- let me find it real quick --

13  Statute 27-1-703.   This statute provides that a settling and

14  released co-liable defendant can be accorded, placed on the

15  jury verdict, and apportioned some liability to it which would

16  then potentially impact BNSF's liability to the debtors.   But,

17  that someone who is immune from suit is not entitled to be put

18  on the jury verdict and cannot have any fault apportioned to

19  it, thus exposing BNSF to a greater potential liability.

20        In this case it is clear that 524(g) and the

21  settlement all require that there be compensation provided to

22  -- that is fair and equitable in light of what is being

23  released.   And although everyone has made a point of the fact

24  that this settlement agreement itself doesn't effectuate the

25  release of the Libby claimants' claims against CNA, the

1  mechanism is that the Libby claimants cannot go against the CNA

2  at any point --

3          THE COURT:  Well, why are you arguing Libby claims?

4          MS. CASEY:  No, this is --

5          THE COURT:  I'm sorry, now this what I don't

6  understand how BNSF is involved.

7          MS. CASEY:  BNSF is a defendant, okay?

8          THE COURT:  Okay.

9          MS. CASEY:  BNSF has been sued by the Libby

10 claimants.  One of its rights under state law is to plead in

11 non-settling co-liable defendants, the potential tortfeasors,

12 and another one of its rights is to say, okay, there is a

13 settling and released co-liable tortfeasor that must have their

14 fault apportioned to it for determining what BNSF's liability

15 is.

16         But, there is a provision of the Montana law that

17 says if there is a potentially co-liable tortfeasor who is

18 immune from suit they cannot be added to the jury verdict.

19 They cannot be -- have any fault apportioned to it.  So,

20 although BNSF does believe that and is requesting this Court to

21 find that, the settlement agreement in conjunction with the

22 plan does require compensation being provided to the holders of

23 the claims that are receiving the protection.

24         And as Your Honor is aware, although the settlement

25 agreement does not require the Libby claimants to release the

1  asbestos protected party, once they recover against the trust

2  they are deemed to have released the asbestos protecting

3  parties, including CNA, BNSF would like it to be clarified that

4  you are not granting CNA immunity from suit, but there is

5  rather a court-mandated settlement of these claims in which the

6  Libby claimants will be receiving compensation through the

7  trust for whatever claims are being enjoined and channeled into

8  the trust.

9       THE COURT:  Well, CNA is not being released from suit

10  to the extent that it has some independent duty.  I mean if

11  that's what the issue is then CNA -- I've already said that the

12  channeling injunction doesn't cover that.  To the extent that

13  it's derivative of the debtor's conduct I think the channeling

14  injunction does prohibit that suit.

15       MR. LOCKWOOD:  Your Honor --

16       MS. CASEY:  Well, it prohibits it, but it prohibits

17  it with payment to the litigants.

18       MR. LOCKWOOD:  -- Ms. Casey is asking you to give an

19  advisory opinion on Montana law basically.  She wants you to

20  rule about what the word immunity means in the context that

21  this settlement when there's maybe subsequent litigation in

22  which BNSF as a co-defendant is being sued by the Libby

23  claimants in Montana.  That's wholly inappropriate.

24       MS. CASEY:  That's not what I'm asking.  I'm asking

25  for a clarification that the channeling injunction is based

1    upon the finding that the party entitled to the channeling

2    injunction is making payment that is fair and equitable to the

3    value of the claims that are being affected by the channeling

4    injunction.  That it is not -- that there is, in fact, a

5    mechanism by which the creditors of the debtor will receive

6    compensation for the claims that are channeled.  And I think

7    that is -- it is what it does.

8         THE COURT:  I think we're arguing apples and oranges,

9    so I'm not sure we're on the same page.  My understanding of

10   the relationship between the insurer and the debtor is that the

11   insurer's liability is capped by whatever the insurance policy

12   itself says.  To the extent that a claim arises from the

13   provision of the insurance policies and is derivative of the

14   debtor, the debtor's conduct, the debtor's products, whatever,

15   which I am just calling the debtor at the moment, then it's

16   channeled.  To the extent it is not derivative of the debtor

17   it's not channeled.  To the extent it's derivative of the

18   debtor they are settling with the debtor that liability.  To

19   the extent it's not channeled they're not settling that

20   liability.  I don't know what more --

21        MS. CASEY:  And that's what, Your Honor, we were

22   looking for.

23        THE COURT:  Okay.

24        MS. CASEY:  Thank you.

25        THE COURT:  Mr. Lockwood?

1         MR. LOCKWOOD:  I'm going to address mostly the

2 certain arguments made by Mr. Cohn for the Libby claimants,

3 Your Honor, and both the debtor and CNA is probably going to

4 speak to some of the other issues as well as covering anything

5 that they don't think I adequately covered.

6         Mr. Cohn in his argument about the non-products issue

7 here has created out of one Fifth Circuit case a sort of -- a

8 new concept as it relates to the settlement of insurance

9 coverage issues in a bankruptcy case involving Section 524(g).

10 He variously labels it -- well, let me back up one sentence.

11 He starts from the premise that insurance coverage is not

12 property of the debtor estate because if it is then all of

13 these other arguments about secondary impact and administration

14 are just adjectives.

15         But, the way he posits it is that non-products

16 coverage which every policy -- comprehensive general liability

17 policy, there's no doubt -- dispute about this or at least as a

18 generalization.  I mean obviously there may be exceptions, but

19 the standard CGL policy has two types of coverage; products

20 coverage or completed operations coverage that has an aggregate

21 limit and non-products or operations coverage which typically

22 doesn't have an aggregate limit but has a per occurrence limit.

23 But, it's the same policy.

24         And he starts from the proposition that because the

25 non-products coverage has no aggregate limit, but only has a

1    per occurrence limit, that somehow or another even though that

2    coverage was purchased by the debtor for the purpose of

3    protecting the debtor's assets and business from claims that

4    somehow or another the only parties that have a property type

5    of right in that coverage in the bankruptcy context are

6    claimants.

7          Now, at one level that's an argument that my

8    constituency would kind of like because it would basically

9    isolate in all bankruptcy cases insurance from any control by

10   the bankruptcy court or the debtor or anybody else.  The

11   problem with -- but he acknowledges that that argument in

12   theory would cover products -- unexhausted products coverage

13   because it's coverage that would go to pay claims brought by

14   tort claimants just like the non-products coverage would pay

15   claims.

16         But, he has to acknowledge that if you couldn't

17   settle products coverage then you would be confronted with a

18   situation in which (a) you couldn't settle any insurance.

19   Essentially what he's -- you would do is write the -- by reason

20   of provision of insurance out of insurance out of Section

21   524(g) of the code because no insurer would ever be able to

22   settle.

23         And so, he creates this artificial distinction which

24   no court despite his cavalier references to the case law

25   providing this, that and the other thing, no court has ever

1 | made this distinction before, that you have in a 524(g) context
2 | one category of insureds that can be "administered by the
3 | Court," and presumably that means covered by a 524(g)
4 | injunction as well as settle because there wouldn't be enough
5 | insurance to pay 100-cent dollars to everybody whereas the
6 | non-products coverage cannot be "administered by the Court"
7 | because it will pay everybody 100-cent dollars, and therefore
8 | it has no secondary impact to use his second term on the
9 | bankruptcy estate, the bankruptcy case, other claimants, what
10 | have you.

11 | THE COURT:  But, the debtor owns the policy.  The
12 | debtor can always settle its own policies.  If it determines
13 | that it's going to settle with the insurer and absorb any
14 | liability that the insurance otherwise would've stood for it
15 | has that right.  And then a claimant -- an unsecured creditor
16 | doesn't have the right to tell the debtor not to settle
17 | insurance policies.  All it has is a claim.  And it's entitled
18 | to payment from whatever assets are available, one of which may
19 | be insurance proceeds.  I don't think we're going anywhere with
20 | this, Mr. Lockwood.

21 | MR. LOCKWOOD:  Well, frankly, we agree with -- that
22 | was the point I was working up to.  Mr. Cohn spent a very long
23 | time saying the exact opposite of what you just said, so if
24 | we're there I don't need to say anything more about it.

25 | THE COURT:  I'm getting there because I have to think

77

1   about Mr. Cohn was saying and taking a look at the briefs.

2   But, it seems to me, and I ruled this way once before, the

3   debtor can always settle its own policies.  It owns the

4   policies.

5          So, whether or not the proceeds end up property of

6   the estate to a certain extent determines whether -- depends on

7   whether or not there are proceeds.  You don't know if there are

8   proceeds until you know if there are claims.  But, it's the

9   debtor's obligation to pay them, not the insurance companies.

10  It's just one asset that the debtor has to look to to pay the

11  claims.  So, it can always settle the policies.  Whether that's

12  a good economic decision, you know, depends on circumstances.

13         MR. LOCKWOOD:  Well, with that, Your Honor, I will

14  move on then.  The second argument that Mr. Cohn makes has to

15  do with the insurer wrongdoing claims in which he and -- aided

16  and abetted by Ms. Casey whose client really cannot possibly

17  have standing to make these arguments simply because they're a

18  co-defendant in a tort system.  By that token any co-defendant

19  could come in here and argue in favor of direct claimants and

20  that just doesn't make any sense.

21         But, essentially the argument boils down to when you

22  apply the Martin factors to a settlement of insurance you

23  essentially have to isolate each and every issue that that

24  settlement resolves.  So, if there's a hundred insurance

25  coverage defenses you have to look at each coverage defense,

1  you have to put on evidence and experts presumably to say,

2  well, your chance of winning coverage defense 1 is ten percent.

3  Your chance on winning coverage defense 2 is 50 percent.  Your

4  chance of winning coverage defense 3 is 30 percent.  Your

5  chance of winning coverage -- and you take all these risks of

6  winning and losing on each individual issue and then you figure

7  out what is the maximum total amount that somebody could

8  recover if you won all the issues and then you applied these

9  individual coverage discounts to each argument and somehow or

10 another you come up with a total argument -- a total discount

11 against the whole value of the coverage and that's what's

12 necessary to have the market factor satisfied.  And that's just

13 not true.

14         Nobody ever does it that way and that's not the way

15 policies are evaluated.  I mean people have in the backs of

16 their minds opinions about what issues are or are not riskier,

17 but the more issues there are, and CNA has made it pretty

18 self-apparent notwithstanding Mr. Cohn's effort to kind of flip

19 all these insurance defenses aside and announce that we've got

20 to quantify each and every one of them, that there are a lot of

21 issues, and any given one of them might result in no recovery

22 for non-products claims as well as products claims, and it

23 would be an impossible task.

24         Suffice it to say that what we've got on the record

25 is -- with the exception of this special group of Libby

1   claimants who are basically interested only in their

2   non-products claims and their insurer wrongdoing claims

3   supposedly, coming here and saying that an overall settlement

4   which is approved by the debtor, CNA, the ACC and who

5   represents unlike the Libby claimants all asbestos claimants,

6   the futures representative who unlike Libby represents all

7   future claimants who have had professionals representing them

8   in these negotiations have inadequately made a showing that

9   this settlement is within the low range of reasonableness by

10  taking into account all of these various defenses and the

11  amount of the excess coverage and the supposedly unlimited

12  products -- non-products coverage which by definition couldn't

13  be quantified if it was unlimited, but which as the CNA

14  declaration points out is subject to numerous defenses aimed

15  specifically at the non-products coverage, that that's an

16  inadequate showing.

17          And I would suggest, Your Honor, that what we're

18  being asked to do here in that regard at least is something

19  that would be impossible which is, as I said before, breakdown

20  each and every other defense and come up with the odds of CNA

21  winning or losing it.

22          Then we have this notion again that because the Libby

23  claimants supposedly are special that we have to in addition to

24  the regular 524(g) requirement which would -- will apply to

25  whether CNA's entitled to be a protected party which is the

1  settlement fair and reasonable to the claimants whose claims

2  are being channeled to the trust which includes a whole lot of

3  people other than the Libby claimants, they would engraft a

4  separate requirement not contained in Section 524(g), not

5  contained in <u>Martin</u> which looks at the settlement of the

6  insurance as a whole, as to whether or not the settlement is

7  fair and equitable to the Libby claimants.

8       And apparently, if I heard him correctly, the only

9  way you could determine it's fair and equitable to the Libby

10 claimants is if there was some piece of it that were carved out

11 and given to the Libby claimants because -- or alternatively

12 this Court would have to rule on what the Court has said it's

13 not going to rule on which is the Libby claimants insurer

14 wrongdoer claims which may or may not be channeled in the

15 trust, have any value, and if so what is that value which is --

16 involves essentially this Court undertaking to be -- the tort

17 judge in Montana to evaluate the strengths and weaknesses of

18 both this fact and the law to the Libby claimants claims here.

19      The fact is that what the Libby claimants

20 persistently ignore is that while there may be non-products

21 liability that's being resolved in this settlement which

22 proceeds of which are going to the trust, the Libby claimants

23 are going to be sharing not only in the non-products proceeds

24 that you could attribute as part of the settlement, but to the

25 products coverage which the Libby claimants basically say we

1  wouldn't be entitled to sharing because we've only gotten

2  non-products claims.

3       So -- except that they're not -- they really haven't

4  shown how you could ever create a trust under 524(g) in which

5  each claimant would come in and not only prove the validity of

6  their claim as against the debtor which is required under the

7  TDPs for the trust to pay anything, but also try and trace

8  their insurance rights into the trust corpus which would depend

9  not only on whether they had non-products versus products

10 claims, but when their exposures were.

11      I mean these CNA policies are between 1973 and 1985.

12 If somebody had exposure prior to 1973 beginning in the 1950s

13 or '60s or something like that, then depending upon how you

14 evaluated the insurance law somebody might or might not be

15 entitled to share in the CNA proceeds, but maybe they wouldn't

16 get a hundred percent because some of their claim would get

17 allocated to earlier periods when they had exposure but CNA

18 didn't have coverage.  It would be a nightmare.  It would be

19 simply a nightmare.

20      There is -- and again, despite references to the case

21 law, there is no case in which in the context of a 524(g) trust

22 anybody has ever suggested that you had to in addition to each

23 claimant proving validity of their claim, they also had to

24 prove their entitlement to whatever their share of the

25 insurance proceeds that got put into the trust as a whole.  So,

1  that argument should not and cannot prevail.

2           With respect to the wrongdoing claims, Your Honor, I

3  think you've made it perfectly clear that this is not the forum

4  to have a debate as to whether those claims are or aren't

5  derivative given the fact that it'll be a factual issue,

6  suggestions that the injunction should be clarified or that the

7  confirmation order should in some way or another clarify the

8  injunction as well are reminiscent of the arguments you've

9  heard in the <u>Pittsburgh Corning</u> case about how we just need to

10 have little tweaks here and there.  I'm sure that Mr. Cohn

11 could draft something up that would make Mr. Cohn very happy by

12 way of a "clarification" of the injunction.  I doubt very much

13 it would make anybody else in the courtroom happy.

14          THE COURT:  That's a non-starter, Mr. Lockwood.  I've

15 already explained on this record innumerable times what I'm

16 going to do about the scope of the injunction and that's what

17 I'm going to do, so let's move on to something --

18          MR. LOCKWOOD:  Thank you, Your Honor.

19          THE COURT:  Anyone else on behalf -- Mr. Giannotto?

20          MR. GIANNOTTO:  Your Honor, I feel like I should

21 apologize for my client putting up $84 million with all the

22 objections that are being made here.  I think Mr. Lockwood

23 addressed most of the points I was going to address.  One of

24 the things I did want to point out is that in our papers we

25 discuss how this non-products coverage, assuming that the Libby

1 claimants' claims are non-products are subject to per

2 occurrence limits, and we believe they would be applicable

3 here.

4        Mr. Cohn cited a case from New York, the <u>Appalachian</u>

5 <u>v. GE</u> case in which he said, well, New York has clearly held

6 that these things would not be solely one occurrence, and

7 that's really inaccurate, Your Honor.  The <u>GE</u> case dealt with

8 claims all across the country, not just claims that were in a

9 discreet locale.

10        And in addition, in a footnote, Footnote 3 to that

11 case, the Court discusses how the parties are free to contract

12 as to what they want covered by per occurrence limits or not,

13 and it mentions that the parties there could've included

14 certain language to make it clear that they were grouping these

15 claims under one occurrence, and that language appears in the

16 CNA policies that are at issue here, the primaries.  It does

17 not appear in the <u>GE</u> policies that were at issue in that case.

18        I mean our policies specifically say no matter how

19 many injuries, you know, exposure to generally the same

20 conditions, you know, repeated or continuous exposure to the

21 same conditions regardless of how many people is one

22 occurrence.  So, it's not here for you to decide whether

23 there's one occurrence or no occurrence, but Mr. Cohn seemed to

24 make it think that we would -- you know, that this was a slam

25 dunk and we were deceiving you.  We weren't.

1          I mean I think at bottom as Mr. Lockwood pointed out

2   what the plaintiffs -- what the Libby claimants really want is

3   that the proceeds not be administered by the trust, and all of

4   the cases they cite, none of the cases they cite involve

5   reorganizations as opposed to liquidations.  They don't involve

6   situations where a court is going to approve a settlement as

7   being made in good faith and fair and reasonable.  There are

8   situations where individuals have a claim and then somebody

9   cancels a policy after the fact or enters into some potentially

10  collusive settlement and the injured worker or the injured

11  person gets nothing.  That's not this case.

12         This is a reorganization.  It's a case where you're

13  going to have to approve this settlement if it's going to go

14  into affect.  The parties have negotiated at length, and that

15  goes to his issue of how do we know, you know, this is a fair

16  and equitable settlement.  Mr. Lockwood discussed that, and I

17  want to say that it's fair and equitable.

18         There were a lot of experienced hard-nosed lawyers

19  here and we all believe having gone through all the defenses

20  and all the potential recoveries that this is very fair, and

21  it's very fair to the trust and people who will be claiming

22  from the trust which is the standard under 524(g).  Thank you,

23  Your Honor.

24         THE COURT:  Ms. Esayian, I think what I don't know is

25  what the debtor's view as to the maximum recovery, I don't know

1   how you make a maximum recovery on the non-products claims, but

2   at least as some products claims on these policies would be.

3           MS. ESAYIAN:  Well, all right, Your Honor.  On the

4   primary policies the products coverage was already settled some

5   time ago under the first of these four previous settlement

6   agreements that I referred to.  So, the asbestos products

7   coverage under the primary policies is no longer at issue and

8   is not part of the settlement calculation at all.

9           I agree that I don't know how it would be possible to

10   place a value on the non-products coverage under the primary

11   policies, coupled with the problem that while there might be

12   some -- while that's supposed to be unlimited in some way there

13   are also costs that Grace has to pay for that coverage.  There

14   are deductibles and retrospective premiums and other costs that

15   Grace would have to pay, so I don't know how anyone would ever

16   reach a determination for that amount.

17           For the excess policies that are part of this

18   settlement, there are 16 excess policies.  There's a total of a

19   hundred and -- I think it's $148 million of excess coverage as

20   our motion shows, and we can put in an affidavit about this if

21   we need to, but as our papers show, and this factual aspect is

22   not contested, the excess coverage all sits at very high

23   layers.  So, if it's like excess of 70 million or excess of 100

24   million for all of the excess policies, and if you look at it

25   this way, at the time that Grace entered bankruptcy it was only

1  at the 20 million level.

2          So, just reaching those excess policies includes --

3  brings in all kinds of issues and difficulties, and actually

4  CNA has placed that evidence in their affidavit.  So, they

5  outline the complications of the debtors or the trust ever

6  reaching the $150 million worth of excess coverage.  So, I

7  believe that's the best that anyone could do in terms of laying

8  the factual predicate for what the value of this coverage is,

9  but if Your Honor needs an affidavit from Grace running through

10  that in some fashion we can provide that.

11          THE COURT:  All right.  Well, let me find out whether

12  that -- what you've just stated with respect to the excess

13  policies is contested.  First of all if I need an affidavit

14  then I'll ask for it, and secondly, with respect to the

15  products coverage having been settled already then I guess

16  that's not part of this calculation on the product side now.

17          I truly don't know how you'd value the non-products.

18  That would depend so much on who made claims at what level and

19  what the defenses were that it seems to me that part of a

20  reason for settlement is that it's not possible to make a

21  reasonable determination as to the likelihood of what any

22  individual could recover or what the debtor collectively could

23  do.  So, settling that liability and -- in the lump sum that

24  then everyone can access seems to make more sense, but I'll

25  hear from Mr. Cohn.  Maybe he's got a suggestion.

1          MS. ESAYIAN:  Thank you, Your Honor.  The only thing

2  -- the only other thing I wanted to add was on the one point

3  that Ms. Casey raised about how the attachment to the plan that

4  identifies the settled polices entitled to 524(g) protection,

5  there's the issue about the number -- the policy number for the

6  Grace policy being the same as the policy number for the BNSF

7  policy.

8          We're certainly willing to clarify that in some way.

9  I think the time for us to do that would be if Your Honor

10  approves this settlement we will have to submit an updated

11  version of that attachment to the plan and it'll say -- it'll

12  list CNA as a settled party not only for the previously settled

13  products covered but now for this newly settled coverage, and

14  that's where we would clarify this one BNSF policy.

15          THE COURT:  Yes, I think that makes sense, and I

16  think you and Ms. Casey can work out some language that will

17  make it clear which policy is being covered and which isn't.

18  If you have to attach the first page of the policy that

19  identifies the recipients or whatever, I mean you can even do

20  that.  But, I don't think you have to go that far, but if you

21  do need to that's fine.  I don't think that should be an issue.

22          MS. ESAYIAN:  Thank you.

23          THE COURT:  Mr. Cohn?

24          MS. DeCRISTOFARO:  Your Honor, if I may be heard just

25  briefly.

1          THE COURT:  Ms. DeCristofaro.

2          MS. DeCRISTOFARO:  Thank you, Your Honor.  Just to

3 supplement Mr. Giannotto on two points.  And generally I've

4 probably been litigating Grace coverage for a very long time

5 and since I was very young.  And I can tell you what everyone

6 is trying to say here about the valuation is, there are a

7 number of moving pieces.  If we were to succeed on our defenses

8 on the excess policies, then we're paying 84 million solely for

9 non-products.

10         If we were ultimately to litigate and succeed on the

11 non-products defense and didn't win on the excess then we're

12 paying $84 million for the excess.  But, there's no way without

13 playing all that out to know which -- how this would end up

14 being litigated.  So, the price arrived at as everyone has been

15 saying is an evaluation of all those pieces.  It's not a

16 separate repaying this for this.  It's we're paying for the

17 risk of all of those things.

18         It is CNA's position that the excess will never be

19 reached and worth zero.  It's CNA's position that the -- there

20 is no coverage for independent -- or for the Libby claims or

21 claims like Libby.  And the other thing that we're paying for

22 that seems to be lost here, this is not about the Libby claims

23 for coverage, there are -- Grace put on at trial they're in

24 potential claims similar to the Libby claims for coverage for

25 non-products all over the country.

1          We're looking for settling all of the coverage, and

2    that's what's in this deal.  And I don't think there's any --

3    could possibly be any objection about lack of pricing giving

4    all the moving pieces that are accomplished and that we set out

5    in our affidavit.  So, I think there's a full and fair record

6    as to how those pricing was arrived.

7          The second point that I wanted to supplement here was

8    the point raised by Ms. Casey on behalf of BNSF, her second

9    point which is about contractual -- that they are a -- that

10   they have these bystander claims to Grace's coverage.  But, I

11   think the relevant document that she didn't refer to, what

12   she's claiming is that they have rights arising out of the

13   contractual indemnification.

14         But, the contractual indemnification which I believe

15   BNSF didn't put it in the record here but which is in the

16   Court's record as BNSF Exhibit 7-A, is the original

17   indemnification provided in the agreement between Grace and

18   BNSF.  And that agreement provides that Grace shall obtain a

19   policy of public liability protecting BNSF for specific

20   properties under this easement, this usage agreement.

21         It doesn't say -- so the issue of whether she obtains

22   rights or whether BNSF obtains rights under the Grace primary

23   policies because there's a contractual indemnification, you

24   can't look at that without looking at the terms of the

25   indemnification.  The indemnification requires Grace to get a

1  policy naming BNSF.

2         So, if that's the agreement and BNSF is asked to be

3  carved out for those alleged policies naming them, why didn't

4  they have a right to overreach and say they have rights against

5  Grace's policies by virtue of indemnification that doesn't give

6  them those rights?  All it does is obligate Grace to obtain the

7  policy naming them.  So, on that basis I don't think the second

8  argument made by BNSF for all the other reasons has any

9  validity whatsoever.  Thank you, Your Honor.

10         THE COURT:  Anyone else before I turn to Mr. Cohn?

11                (No audible response)

12         THE COURT:  All right, Mr. Cohn.

13         MR. COHN:  Your Honor, I'm not going to try to

14  respond to just all of the really mischaracterizations of the

15  Libby claimants' position that have been thrown at you.  I mean

16  I think our papers are perfectly clear as to what we are

17  contending.

18         I did want to make two observations at this point.

19  One of them is that this whole valuation problem that you've

20  referred to and that have been referred to by other parties for

21  the non-products claims stems from the fact that there are no

22  aggregate limits.  If there are aggregate limits we would start

23  off at the -- in the case of the excess policies here, you

24  know, the 148 million or whatever the number is, and you'd kind

25  of work down from there.  But here it's the very lack of

1  aggregate limits that creates the valuation problem, but it

2  also happens to be --

3          THE COURT:  But, that's not actually the case because

4  the problem is that all the claims until they're actually

5  proven are contingent, unliquidated claims, and as a result

6  there is no way to know what the claims are that can be made

7  against those policies and whether or not a claim being made

8  against the policy is really a non-products claim at all at

9  this stage.  There just isn't a way to know that.  So, it's not

10 just the fact that the policy itself may not have aggregate

11 limits, it's the fact that there may not be any claims that

12 arise under those policies in the periods covered.  I don't see

13 how you can value that, Mr. Cohn.

14         MR. COHN:  Well, Your Honor, there are only a

15 thousand or so Libby claimants.

16         THE COURT:  Yes, but Libby's not the only body of

17 claimants that may have claims under these policies.  These

18 claims aren't just -- not all of the policies are strictly

19 limited to a specific facility in Montana.

20         MR. COHN:  Well, Your Honor, we're talking about

21 non-products claims first of all.

22         THE COURT:  Yes.

23         MR. COHN:  I agree that products claims are all over

24 the place.  With non-products claims, Your Honor, the -- there

25 was evidence of, you know, a few of them from elsewhere in the

1  country when -- this is when Grace used its best efforts in the

2  context of confirmation to come up with some record about all

3  the other non-products claims that there were.  And they came

4  out with -- I forget whether it was four or five, but it was

5  some very small number.

6        The testimony of its own expert -- not expert, but

7  Mr. -- their in-house insurance person, and I apologize, but

8  I'm just -- I'm blocking his name, but it's all there in the

9  confirmation record, was that the Libby claimants are the

10 non-products claimants.  If there are a few outliers who are

11 non-products claimants fine, you know, nobody's ever going to

12 say in a case of this magnitude, nobody's every going to say

13 it's zero, but basically he said the Libby claimants are the

14 non-products claimants.

15       And so, it's a group of a thousand claimants, Your

16 Honor, and it is possible to do -- if parties wanted to it was

17 possible for them to do, you know, an estimate.  Obviously

18 nobody's ever going to understand without a full adjudication

19 of each claim, you know, what the exact amount is, but nobody

20 ever settles based on exactitude, Your Honor, as -- you know,

21 and that is actually a fair point that the proponents of the

22 settlement have made, and a mischaracterization, frankly, of

23 the Libby position which is we're not saying exactitude is much

24 required.

25       But, we are saying that if you're really going to

1  take what we contend are not even property of the estate which

2  are the proceeds of non-products coverage and you're going to

3  include it in the settlement you've got to figure out what's

4  being given up at least in round numbers, at least in general

5  terms.  And -- but I would respectfully submit, Your Honor,

6  that the valuation problem and the fact that it's not property

7  of the estate are very much interrelated and --

8          THE COURT:  Well, I can't agree that it's not

9  property of the estate for this reason.  The debtor owns the

10 policies.  The debtor has a contractual right to do whatever it

11 chooses with those policies.  It can settle those policies.  If

12 in its best business judgment, assuming that the Martin factors

13 are met because we're in a bankruptcy context, outside

14 bankruptcy, if the debtor's determination is that it's in the

15 best interest of whoever to settle those policies and absorb

16 the liability on its own it has the right to do that, and no

17 claimant against those insurance proceeds has the state law or

18 any other kind of right to stop the debtor from withdrawing its

19 insurance.

20          So, I don't see how the Libby claimants think that

21 they have an entitlement to specific policy proceeds because

22 those claims aren't out there yet.  They haven't been

23 adjudicated to be rights against insurance.  To the extent

24 there are claims against the debtor, clearly they are claims

25 against the debtor, but how the debtor chooses to pay them is

1 up to the debtor.  The debtor doesn't have to use its insurance

2 proceeds for that.  It can use whatever assets it chooses.

3        MR. COHN:  Well, Your Honor, but for the automatic

4 stay, but for the fact that we've been barred for a period of

5 nine years from litigating those claims, those claims would be

6 adjudicated now.  We can't --

7        THE COURT:  Well, that may be, but that doesn't mean

8 that --

9        MR. COHN:  -- be faulted for not having adjudicated

10 our claims.

11        THE COURT:  No, no, I'm not faulting Libby for

12 adjudicating the claims.  This is the issue of who controls the

13 outcome of the policies, that's all, and whether or not

14 proceeds can come into the estate.  I'm saying it's not the

15 unsecured creditors who control the disposition of the

16 policies, it's the debtor.

17        If the debtor wants to settle the liability under the

18 policies it has the right to do that.  It can't get out of the

19 liability that it owes to the people who would've been covered

20 by the insurance, but it doesn't have to look to its insurance

21 assets.  And they're not covering -- they're not settling

22 direct claims.  So, to the extent you have direct claims you

23 still have direct claims.  They're settling derivative claims

24 and they have the right to settle.

25        So, I don't understand the concept that the

1  "proceeds" which are now going to be settlement proceeds coming

2  from an agreement that the debtor has reached to essentially

3  sell its policies isn't appropriate.  It's done all the time in

4  lots of context.  Heck, you can sell your right to, you know,

5  to the lottery annuities let alone to insurance proceeds.

6       MR. COHN:  Except that for the reasons that we state

7  in our brief with the authority cited there it is -- including,

8  you know, insurance treatises, corpus juris secundum, as well

9  as the specific case law --

10      THE COURT:  These are written by insurance lawyers.

11 They're not written by bankruptcy lawyers --

12      MR. COHN:  No, no, no.

13      THE COURT:  -- looking at whether or not these issues

14 are property of the estate.

15      MR. COHN:  I fully --

16      THE COURT:  And to the extent that the Fifth Circuit

17 somehow can be read to say that it's not property of the

18 estate, quite frankly I think they're wrong.

19      MR. COHN:  Well, then, I'm not sure there's --

20      THE COURT:  Because of the --

21      MR. COHN:  -- what is it -- we understand --

22      THE COURT:  -- settlement issue, Mr. Cohn.  You know,

23 if there were a policy that somehow or other named the specific

24 beneficiary, you know, that policy may not be able to be

25 settled because there may be "a trust concept," but this

1  doesn't.  This simply says the debtor has these proceeds

2  available to settle its own liabilities, and if it chooses to

3  resolve that with CNA I don't see how --

4        MR. COHN:  State law, Your Honor, state law imposes

5  what you have just described as basically a trust concept.  And

6  under the Butner decision and under, you know, legions of

7  cases, the starting point for the rights of the bankruptcy

8  estate are what rights it has under its property and what other

9  people have to property under state law.

10        THE COURT:  Yes, but the starting point for what is

11  property of the estate is a federal determination.  And

12  particularly in a mass context case policies are -- and I don't

13  think there's a case out there that says that the policies

14  themselves aren't property of the estate, so --

15        MR. COHN:  Agreed.

16        THE COURT:  Okay.  So, what --

17        MR. COHN:  No, agreed, Your Honor.

18        THE COURT:  -- the debtor is doing is settling its --

19  is selling, essentially selling its policies back to CNA for a

20  set number, and as a result, instead of having insurance

21  proceeds to look to claimants have settlement proceeds to look

22  to, but that's the debtor's determination.  The debtor still

23  has to reconcile its liabilities to the claimants.  How it

24  chooses to do that is up to the debtor, so --

25        MR. COHN:  Well, Your Honor, we -- you know, we agree

1  that the policies are property of the estate, however, the fact

2  that others can have an interest, and in this case the Libby

3  claimants we assert do have an interest in the proceeds of the

4  insurance coverage, does place limits on what can be settled.

5          THE COURT:  I agree.  I agree.  That's why you have

6  to determine that the settlement is fair and reasonable because

7  there are some limits.  You do have to look to why the

8  insurance was out there and whether or not there were existing

9  claimants and so forth.  And I'm not in any way suggesting that

10 there can be a fraudulent transfer for example, but that isn't

11 any part of this discussion, Mr. Cohn, and I don't -- didn't

12 mean to go that far if that's what -- if what I said could be

13 interpreted that way.

14         What I'm simply saying is, that the debtor has the

15 obligation, particularly in a bankruptcy, to look at all of its

16 assets and do what's in the best interest of all of its

17 creditors.  It has policies out there.  Right now those

18 policies are in serious contention in various courts around the

19 country as to whether the debtor can get anything as a result

20 of those policy proceeds or whether the claimants who claim a

21 beneficial interest in those proceeds can get anything.

22         The debtor's business judgment says, look, we're

23 better off settling this liability for a pretty large dollar

24 sum, bringing those proceeds in, and letting the trust

25 procedures distribute them for the benefit of all creditors

1  rather than taking the risk that any one specific creditor or

2  the debtor litigating is going to lose all of the policies for

3  the benefit of everyone.

4         So, which is it going to be, that we continue to

5  litigate and take the risk of loss of losing everything or do

6  we settle and have $84 million in hand or 71 million, whatever

7  it turns out to be?  And the debtor's business judgment is

8  we're better off selling those policies, bringing the proceeds

9  in, and letting the trust distribute.

10        It's a little hard under the circumstances to see how

11 that's not a fair and reasonable determination under the Martin

12 factors and under 524, although I'm not looking at it for plan

13 confirmation purposes, I'm just looking at the mechanism by

14 which this happened.  So, because the debtor can control the

15 policies, these are not claims against the policies right now.

16 These are policy issues.  The debtor has the right to sell

17 those policies.  As a condition of that it has to make

18 provision for how it's going to pay claims, but it's doing that

19 through this plan.  It's channeling proceeds to a trust.

20        So, it seems to me that there is no construction

21 under which this Court could come up with the idea that the

22 policies are not property of the estate, and if they're

23 property of the estate the debtor-in-possession has the right

24 to deal with them provided that it does it in a fashion that's

25 fair and equitable to its creditors and that's the issue, is it

1 fair and equitable?

2        And I think the -- this particular settlement does
3 meet those <u>Martin</u> factors for those reasons. Adjudicating the
4 liability on the non-products coverage at this point or even
5 estimating it frankly is a work of fiction I think because it's
6 almost impossible to know who would make claims in what amounts
7 and what the liability would be after all the defenses are
8 reconciled.

9        With respect to the products coverage I agree with
10 the debtor and it's in their papers, that accessing at very
11 high levels is going to be a long time coming, if at all.  And
12 I think the trust is well funded through the mechanisms that
13 are established in the plan in addition to policy proceeds.
14 So, I can't -- and the risk of litigation if I haven't
15 addressed that already I think is pretty extreme on both sides.
16 It could amount to an all or nothing issue.  So, I can't see
17 how this isn't a wise decision on behalf of the parties
18 involved.

19        MR. COHN:  Well, Your Honor, we understand that to be
20 your ruling.  We disagree not on the broad issue of whether
21 it's wise to settle or even whether this particular settlement
22 makes sense for products coverage, we simply say that what
23 they're doing is they're settling proceeds of the policy that
24 belong to us and that's not permissible and we'll just -- you
25 may disagree so we'll just leave it at that.

1          THE COURT:  Well, I do for the reasons that I've

2     stated, but okay.

3          MR. COHN:  All right.  So, that brings me then to the

4     second point that I wanted to respond to which is that the --

5     and I'm coming back now to the scope of the Section 524(g)

6     injunction which I -- when I left the lectern last I thought we

7     were in a good place, and then I'm -- and now I'm not so sure,

8     and here's why, Your Honor, and again, this has to do with the

9     fact that the injunction, whatever it is, the injunction has to

10    be clear about what it enjoins and what it doesn't enjoin.

11         And I think that we've become -- that we are clear

12    that at one end of the spectrum there is -- or I shouldn't say

13    one end of the spectrum, but there's a category of claims which

14    are -- which arise under the insurance policies which are

15    basically just insurance companies paying under its insurance

16    policies for Grace's liabilities clearly within -- clearly

17    enjoinable under Section 524(g), and to be enjoined under the

18    plan.  The other category is claims arising not under the

19    insurer's contractual obligation to insure Grace's claims, but

20    the insurer's own breach of its tort liability on the insurer's

21    part.

22         THE COURT:  Right, I understand.

23         MR. COHN:  Right.

24         THE COURT:  To the extent that there's a

25    determination that they're a derivative they're channeled.  To

1  the extent there's a determination they're not derivative

2  they're not channeled.  But, this court isn't the place where

3  that determination's going to be made.

4          MR. COHN:  The case law -- all right, Mr. Lockwood

5  doesn't want me to say case law, so why don't I say the Second

6  Circuit decision in the <u>Travelers</u> case points out that that

7  determination whether something is derivative and thus

8  enjoinable or whether it arises under an independent duty and

9  therefore is not enjoinable is actually a -- it's a clear legal

10  decision.  It's based on a legal factor.  It is not fact-based.

11  You might recall in that case there was a very --

12          THE COURT:  How can it not be fact-based?  I mean --

13          MR. COHN:  Because --

14          THE COURT:  -- there has to be some proof as to what

15  the insurance company did.  There has to be an allegation that

16  the insurance company did X --

17          MR. COHN:  Oh, of course.

18          THE COURT:  -- and that it had an independent duty to

19  do Y, and it didn't do Y, it did X, and that somehow or other

20  that isn't based on anything that is derivative of its

21  provision of insurance to the debtor.

22          MR. COHN:  Well, that's --

23          THE COURT:  That proof could be advanced.

24          MR. COHN:  I'm sorry, Your Honor, I didn't --

25          THE COURT:  Okay.

1        MR. COHN:  The distinction is, of course, any claim

2   has to have a factual basis, so I didn't mean to suggest that

3   you could just sue insurers even if they didn't do anything

4   wrong.  It's simply that it is -- the question whether it's

5   enjoinable or not rests upon whether it is a duty of the

6   insurance company that is alleged to be breached in which case

7   it's not enjoinable, or whether it is the insurer's contractual

8   obligation of the insurance policy to ensure the insurance

9   liability in which case it is enjoinable, and it's a very

10  simple legal distinction.  And so, we're simply asking for you

11  to make it just that clear in your order approving the

12  settlement and the confirmation order.  That's really what

13  we're asking for.

14       THE COURT:  All right.  Well, I will take a look at

15  the _Travelers_ decision to see whether I agree with the language

16  the way it's written.  My view is -- I don't think I can say it

17  anymore clearly than I've said at least ten times so far today,

18  if it's derivative it's enjoined, if it's not derivative it's

19  not.  Who's going to make that determination?  Not me.

20       MR. COHN:  Thank you, Your Honor.

21       MS. CASEY:  Your Honor, just two quick

22  clarifications.  Ms. DeCristofaro came up here and explained

23  her view of the -- some of the -- excuse me -- the contracts

24  between BNSF and Grace, that it only included a requirement

25  that Grace purchase insurance for BNSF.  It is true that all of

1  the contracts -- I believe there's 13 or 14 of those contracts

2  -- is in the record of the confirmation hearing, and BNSF

3  negotiated three separate protections under those agreements.

4  The first was the requirement that Grace purchase insurance

5  that names BNSF and protects BNSF for activity at the location.

6         It also required an indemnification agreement, and

7  there is, in fact, a specific indemnification agreement in

8  those contracts under which Grace undertook to indemnify BNSF

9  for activities at the location.  And that's a rough paraphrase,

10 whatever the language is, but there is, in fact, an

11 indemnification provision.

12        The third protection was the contracts required Grace

13 to obtain insurance naming Grace as the insurer that included

14 the contractual indemnity endorsements and required Grace to

15 provide proof to BNSF of that.  So, it is just factually

16 incorrect that there is no indemnification provided by Grace to

17 BNSF.

18        THE COURT:  No, I don't think that's what she said.

19 I thought she said that the contracts were based on the

20 indemnities and to understand the contracts of insurance I had

21 to look at the indemnity which provides that Grace does have to

22 get insurance for BNSF at the premises which Grace did --

23        MS. CASEY:  Right.

24        THE COURT:  -- and then there is this indemnity.

25 But, the indemnity provisions incorporated into Grace's own

1  insurance policies don't name BNSF as an additional insured.

2  They simply say that Grace has an indemnity.  Well, I don't

3  think anybody's arguing that Grace doesn't have an indemnity.

4          MS. CASEY:  Okay.  Well, that was my understanding of

5  what Ms. DeCristofaro was saying.

6          THE COURT:  Okay.

7          MS. CASEY:  She was saying that the indemnity was

8  just to purchase Grace insurance and not a separate indemnity,

9  and there is, in fact, a separate indemnity.

10          THE COURT:  All right.

11          MS. CASEY:  The second point that I'd like to raise

12  is with regard to the separate policies.  The debtors and CNA

13  have offered to amend either the agreement -- the settlement

14  agreement or the order to clarify that the three policy numbers

15  that BNSF has asserted are not being compromised by that.  It

16  seems as though Your Honor is heading towards approving the

17  settlement.  We just want to be sure that the settlement is so

18  amended to reflect that before it's approved.

19          THE COURT:  I think what I should do is have the

20  debtor provide me with a different order that approves the

21  settlement that incorporates that -- the language that you're

22  looking for Ms. Casey.  And I think also makes it clear that

23  this Court's view is that the settlement agreement between the

24  debtor and CNA is the settlement agreement between the debtor

25  and CNA.

1        But, to the extent that there is a definition of

2   asbestos protected party that is going to be driven by the

3   plan, it's the plan language that will control.  So, if there

4   is a distinction the plan definition will control, not the

5   settlement agreement, and I think that provision should be put

6   right into the order that approves the settlement.  Then we

7   won't have any doubt about it down the road.

8        MS. CASEY:  Thank you, Your Honor.

9        THE COURT:  Okay.  Yes, for the reasons that I've

10  already stated which I don't think I need to go over again, I

11  think the settlement is in the best interest of the parties and

12  this estate and I will approve it, but I think I do need a

13  different order that incorporates the couple of things that

14  have been put on record.  Do I need to go over those again or

15  -- Ms. Baer, are you comfortable with what I've ruled so far?

16       MS. BAER:  We understand, Your Honor.

17       THE COURT:  Okay.  And when can I expect to get the

18  order?  Because you'll have to run it by --

19       MS. BAER:  Your Honor, we'll get it out as soon as

20  possible to the other side with the hope that we can get it

21  here by the end of the week.

22       THE COURT:  Oh, okay.  So, what I was trying to see

23  is whether I needed to continue this till the next hearing day

24  just in case it's not in --

25       MS. CASEY:  No.

1            UNIDENTIFIED ATTORNEY:  No.

2            THE COURT:  No.  Okay.  That's fine.  I'll take a

3   look at the order when I get it then.

4            MS. BAER:  Thank you, Your Honor.

5            THE COURT:  All right.  Thanks.  Is that the end of

6   the Grace --

7            MS. BAER:  Your Honor, there's just one matter I

8   wanted to bring to the Court's attention.  We had a conference

9   call with the Court at the end of last month when it was clear

10  that confirmation order could not be entered by the end of the

11  month, and at that time you had raised the issue of Canada.  I

12  wanted to report that on Canada the parties immediately

13  negotiated a 30-day what I'll call free extension so that the

14  Canadian agreement would not terminate until January 31 in the

15  event that there is no confirmation order.

16           Your Honor, if there is no confirmation order by

17  January 31 the parties further negotiated that Grace at that

18  point would have to contribute an additional $500,000 to the

19  Canadian settlement fund and the parties have agreed to that in

20  writing and will be filing that in Canada and then we will

21  bring it here on notice so the Court is aware of the terms of

22  the provision.

23           THE COURT:  Okay.  Well, I truly very much hope that

24  this is going to be done before then, but it's somewhat of a

25  moving target because of the settlements that keep coming up.

1  And I'm never totally sure that one settlement isn't affecting

2  something else that's in the plan or the plan confirmation

3  order, and it requires sort of going back and reanalyzing

4  things.  So, are you done with settlements for awhile I guess

5  is the big question?  Because if you're not --

6            MS. BAER:  We are, Your Honor.

7            MR. DONLEY:  Yes, Your Honor.

8            MS. BAER:  Yes, Your Honor, we are.

9            MR. DONLEY:  Absolutely.

10            THE COURT:  All right.  Is there going to be any

11  additional plan modification language to the plan,

12  modification, because I think I need all of that before I can

13  actually get to a confirmation order.  I really do need a plan

14  that has everything in it that I'm being asked to confirm.

15            MR. LOCKWOOD:  There's nothing pending that would

16  involve plan modifications, Your Honor.

17            THE COURT:  Except this new exhibit, but that's --

18            MR. LOCKWOOD:  Well, that's just an exhibit, yes.

19            THE COURT:  Yes, that's okay.

20            MS. BAER:  And, Your Honor, the only change that we

21  would make would be a definitional change to include the

22  amendment on Canada that gave us the additional time and puts

23  in the requirement of the additional money if it goes beyond

24  that date.

25            THE COURT:  Okay.  Well, I don't see that that's a

1  problem.

2          MS. BAER:  It doesn't change anything.

3          THE COURT:  No.  Okay.  Thank you for the update, and

4  again, I truly do hope -- I am truly trying to get this done.

5  It's not as though we haven't been working on it, it's just

6  been difficult.

7          MS. BAER:  Thank you, Your Honor.

8          THE COURT:  Okay.  Grace is adjourned.  We're taking

9  a ten-minute recess and then we will -- well, let me ask, does

10 anybody else have any other issues in Grace?

11                  (No audible response)

12         THE COURT:  Okay, hearing none.  Grace is adjourned.

13 We're taking a ten-minute recess and then we will start on

14 Flintkote.

15         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

16         THE COURT:  Thanks.

17                      *  *  *  *  *

18

19

20

21

22

23

24

25

**C E R T I F I C A T I O N**

I, KATHLEEN BETZ, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Kathleen Betz

KATHLEEN BETZ

J&J COURT TRANSCRIBERS, INC.   DATE:  January 17, 2011