# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In the matter of: ) | |
| ) | |
| GARLOCK SEALING TECHNOLOGIES, LLC, ) | No. 10-31607 |
| et al., ) | Jointly Administered |
| ) | Charlotte, NC |
| Debtors. ) | Nov. 18, 2010, 9:33 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE

Vol. V, Pages 928 to 1116

APPEARANCES:

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

John R. Miller, Jr.
C. Richard Rayburn, Jr.
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

| | |
|---|---|
| Electronic Recorder Operator: | Chelsea Sanders/Julia Adams |
| Transcriber: | Patricia Basham
6411 Quail Ridge Drive
Bartlett, TN  38135
901-372-0613 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES:

Travis W. Moon
Hamilton Moon Stephens Steele Martin
2020 Charlotte Plaza
201 S. College Street
Charlotte, NC 28244-2020

Trevor W. Swett III
Leslie M. Kelleher
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Daniel G. Clodfelter
Hillary Crabtree
Ben Hawfield
Moore & Van Allen
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

Linda Simpson
U.S. Bankruptcy Administrator
402 W. Trade St., Suite 200
Charlotte, NC 28202

Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

Joseph W. Grier, III
Grier, Furr & Crisp, P.A.
101 N. Tryon St., Suite 1240
Charlotte, NC 28246

David Salzman
Campbell & Levin, LLC
1700 Grant Building
Pittsburgh, PA

saying it gives you a measure of the net effect. The net effect is Dr. Bates would have to be successful in arguing that the mesothelioma claims have half the value in the future of what they have been paying in the past, less than half, in order for the mesothelioma liability to be less than the stated assets of the trust.

I have no opinion about solvency. It is just an illustrative example.

Q. Okay. Turn the page and let's go on. The next page is headed "Most claims settled by Garlock were law firm inventory deals that used the same fixed amounts across claims." Is that a conclusion that you have drawn from your analysis of the data?

A. It is.

Q. Would you explain both the basis and the significance of that conclusion?

A. Well, first of all, the significance of this is, again, it pertains to Dr. Bates' testimony on redirect, whatever it was the last time he testified, and Mr. Cassada's questioning to me at that time when I was crossed, and the assertion that the real process - they are asserting that the real process that asbestos defendants like Garlock settle claims is they sit down and they figure out what's the trial risk of the case. And they say, okay, if I took this case to trial, what's the - they say the proper analysis of estimation

1  – the process of estimation here and what was done historically
2  is that you look at what's the full value of the claim and then
3  you figure Garlock's share of it and you multiply the full
4  value across all defendants and multiply that by what the
5  Garlock share is, and that gives you the value, and that is
6  what they propose to do here.
7  　　　　　Well, what I testified to is that's not how it is
8  done. It isn't how it was done by Garlock. It is not how it's
9  done by anybody. That neither the plaintiffs, nor the
10 defendants, have the time to make that calculation of what the
11 trial risks are. Rather what they do is there is a market
12 that's been developed where Garlock or any other defendant
13 repeatedly interacts with specific law firms, Baron & Budd,
14 Motley Rice, Weitz & Luxenberg. These are all major law firms.
15 They deal with them all the time. They settle thousands and
16 thousands of claims. Garlock knows the demands those law firms
17 are going to make for mesothelioma claims. They know the
18 demands they are going to make for asbestosis claims. The law
19 firm knows what Garlock's value is, what they have paid
20 historically before for these claims. They know each other.
21 There is a market. They negotiate on that basis. They don't
22 do all of this complex calculation because they have to do
23 discovery in order to know the trial risk and the full value of
24 the claim. And as the debtor has said, discovery is expensive.
25 　　　　　So on the real litigation, the litigation that is

Peterson - Direct                                          1030

1  actually carried out by this defendant and every defendant, it
2  is done by this marketplace.  It is negotiated values.  What
3  will you take to relieve me of the threat of that lawsuit?
4  What will you pay for me to go away?
5       And that is done and, in doing so, the parties have
6  come to certain values that they understand are acceptable, and
7  this table shows that.  This table shows across - I have looked
8  at all of the mesothelioma settlements that Garlock reached in
9  the period 2005 to 2009.  This is their most current
10 experience.
11      And I did what is called a distribution.  I looked at
12 what was the amount of money they got and settled.  And so I
13 saw how many people got paid a thousand dollars, how many
14 people got paid ten thousand dollars, whatever the data shows.
15 This shows that the most frequent settlement value of all of
16 these settlements with four hundred claimants was twenty
17 thousand dollars.  That was the most common number that Garlock
18 settled a mesothelioma claim for.
19      Next was twenty-five thousand dollars, and they
20 settled three hundred and sixty-seven and so forth.  So you can
21 see what are these cases actually settling for.
22      The first thing that is really interesting about it is
23 these are all round numbers. They all end in zero or - zero
24 zero zero or five zero zero.  And what that says is that this
25 settlement process is a shorthand.  If Garlock and the

1  plaintiffs' lawyers are sitting down and figuring out what's
2  the actual settlement value on a case by case basis and then
3  settling the case on that, these numbers wouldn't all be ending
4  in three zeroes.  They would be some more specific number, but
5  these are common numbers.  Four hundred people were offered and
6  accepted two thousand.  If you go down - two hundred and twenty
7  thousand dollars.  If you go down to the first red line, number
8  ten, it shows that over half of the claimants, only ten
9  different values account for over half of the mesothelioma
10 claimants.  Garlock is offering basically fixed standard
11 amounts that the marketplace values, the law firms.  The law
12 firms are taking it.  That's how they settled the claims.
13          When I have talked with people who actually -
14 plaintiffs' lawyers, defense lawyers, insurance people,
15 adjusters, they say this is how it is done.  The parties talk
16 to each other, they know what the going rate is, they pick
17 these numbers and they are done with it.  They move on.  They
18 resolved a half a million cases.  They couldn't have resolved
19 a half a million cases the way that Dr. Bates says they do.
20 The only way they can do it and any defendant can do it is in
21 this way and that's how they all do it.
22          If you look down at the bottom, only twenty-six
23 different values represent three-quarters of all of the
24 mesothelioma settlements that Garlock reached because that's
25 the process.  The process is based on each side knowing what

Peterson - Direct                                                1032

the other is going to take. If the circumstances change, you say in the past you paid me twenty thousand for this case, I now want forty thousand, and they will end up - raising the amount maybe for thirty thousand. They change over time but they change to a different round number. The going rate changes.

Q. Does that pattern hold true across nonmalignant claims in Garlock's database?

A. Well, it is even more vivid for nonmalignant claims. On the next page, it shows - it is the same analysis, the same thing I did on the prior page. It shows that the top ten values that are reached most often in settlement by Garlock represent eighty-six percent. That is seven out of every eight claims almost was settled for one of ten values. The most common of which was a thousand dollars.

Nonmalignant claims aren't very valuable against Garlock. It doesn't surprise me. That's why the whole concentration of the debtor's argument for a proof of claim based on nonmalignant claims is misplaced. Only nine percent of the settlements in the last half of the decade were for nonmalignant claims. Nonmalignant claims have little value. They have dried up as a source. They are not important - they are always important because they are individual claims and persons. I don't want to trivialize it. But in the aggregate sense, an estimation sense, they are far from the most

Peterson - Direct                                                    1033

1  important driver of the liability. And to spend years and
2  effort and come up with an untried method for estimating the
3  liabilities because of nonmalignant claims would be folly.
4         If you looked all the way down to the bottom, there
5  were only fifteen values that are the values that are accepted
6  by ninety-four percent of the nonmalignant claimants in the
7  last five years, and that Garlock is willing to pay for them.
8  Again, they are all rounded numbers. The process doesn't work,
9  as I have repeatedly told Mr. Cassada in testimony in this case
10 and other cases, the process of settlement doesn't work in the
11 way he says it does. It isn't this basic economics that Dr.
12 Bates says it is. It isn't sitting down and calculating the
13 risks and total liabilities, two numbers you don't know. You
14 can't know them, so I don't know how you base a process on
15 knowing - if you can't figure out the total value of a claim,
16 why would you start there?
17        The way it works is the parties reach agreements, they
18 have understandings and they implement it and Garlock's data
19 vividly demonstrates that's what happens.
20 Q.     What's on the next page, Dr. Peterson, and how does
21 it relate -
22        THE COURT: Before you get to that, it doesn't look
23 like you are in danger of finishing in the next minute or two.
24        MR. SWETT: I have to admit that's true.
25        THE COURT: So why don't we break for lunch and come

# Exhibit 1

# Most Claims Settled by Garlock Were Law Firm Inventory Deals That Used The Same Fixed Amounts Across Claims

- Garlock mesothelioma values during 2005 to 2009
    - 10 values account for 50% of settlements
    - 26 values account for 72.4% of settlements

| Rank | Settlement Value | Number Of Claims | Percent Of Claims | Cumulative Percent Of Claims |
|---|---|---|---|---|
| 01 | $20,000 | 400 | 8.4% | 8.4% |
| 02 | 25,000 | 367 | 7.7 | 16.1 |
| 03 | 5,000 | 281 | 5.9 | 22.0 |
| 04 | 50,000 | 265 | 5.5 | 27.5 |
| 05 | 60,000 | 233 | 4.9 | 32.4 |
| 06 | 200,000 | 230 | 4.8 | 37.2 |
| 07 | 10,000 | 215 | 4.5 | 41.7 |
| 08 | 3,500 | 204 | 4.3 | 46.0 |
| 09 | 75,000 | 145 | 3.0 | 49.0 |
| 10 | 40,000 | 137 | 2.9 | 51.9 |
| 11 | 17,500 | 131 | 2.7 | 54.6 |
| 12 | 15,000 | 128 | 2.7 | 57.3 |
| 13 | 100,000 | 116 | 2.4 | 59.7 |
| 14 | 35,000 | 109 | 2.3 | 62.0 |
| 15 | 30,000 | 85 | 1.8 | 63.8 |
| 16 | 45,000 | 68 | 1.4 | 65.2 |
| 17 | 250,000 | 66 | 1.4 | 66.6 |
| 18 | 400 | 47 | 1.0 | 67.6 |
| 19 | 7,500 | 45 | 0.9 | 68.5 |
| 20 | 300,000 | 35 | 0.7 | 69.2 |
| 21 | 3,000 | 32 | 0.7 | 69.9 |
| 22 | 850 | 30 | 0.6 | 70.5 |
| 23 | 1,000 | 26 | 0.5 | 71.0 |
| 24 | 12,500 | 25 | 0.5 | 71.5 |
| 25 | 350,000 | 22 | 0.5 | 72.0 |
| 26 | 400,000 | 20 | 0.4 | 72.4 |

# Most Claims Settled by Garlock Were Law Firm Inventory Deals That Used The Same Fixed Amounts Across Claims

- Garlock asbestosis values during 2005 to 2009
    - 10 values account for 86% of settlements
    - 15 values account for 94% of settlements

| Rank | Settlement Value | Number Of Claims | Percent Of Claims | Cumulative Percent Of Claims |
|---|---|---|---|---|
| 01 | $1,000 | 6,908 | 34.4% | 34.4% |
| 02 | 5,000 | 2,477 | 12.3 | 46.7 |
| 03 | 1,100 | 1,424 | 7.1 | 53.8 |
| 04 | 1,600 | 1,422 | 7.1 | 60.9 |
| 05 | 1,500 | 1,215 | 6.0 | 66.9 |
| 06 | 500 | 1,020 | 5.1 | 72.0 |
| 07 | 2,000 | 931 | 4.6 | 76.6 |
| 08 | 2,500 | 754 | 3.8 | 80.4 |
| 09 | 10,000 | 710 | 3.5 | 83.9 |
| 10 | 1,400 | 459 | 2.3 | 86.2 |
| 11 | 3,000 | 371 | 1.8 | 88.0 |
| 12 | 4,000 | 327 | 1.6 | 89.6 |
| 13 | 750 | 314 | 1.6 | 91.2 |
| 14 | 1,750 | 258 | 1.3 | 92.5 |
| 15 | 1,800 | 240 | 1.2 | 93.7 |

# Garlock Used Standing Disease Values for Law Firms
## Examples of Two Firms' Recent Settlements

| LawFirm | Disease | Settlement Value | Number of Claims |
|---|---|---|---|
| Firm#1 | Meso | $5,000 | 1 |
| Firm#1 | Meso | 10,000 | 1 |
| Firm#1 | Meso | 200,000 | 14 |
| Firm#1 | Meso | 275,000 | 1 |
| Firm#1 | Nonm | $5,000 | 32 |
| Firm#1 | Nonm | 10,000 | 11 |
| Firm#1 | Nonm | 75,000 | 1 |
| Firm#2 | Meso | $50,000 | 11 |
| Firm#2 | Meso | 57,500 | 1 |
| Firm#2 | Meso | 60,000 | 28 |
| Firm#2 | Nonm | $2,500 | 15 |
| Firm#2 | Nonm | 3,000 | 1 |
| Firm#2 | Nonm | 4,000 | 16 |
| Firm#2 | Nonm | 5,000 | 22 |



Note: Grace's 2001 entry based on annualizing filings over the 15 months from January 2000 through March 2001.