**IN THE UNITED STATES BANKRUPTCY COURT
FOR DISTRICT OF DELAWARE**

IN RE:

| | |
|---|---|
| W.R. Grace & Co., *et* al. | Bankruptcy No. 01-1139 (JKF) |
| Debtor(s) | Chapter 11 |

**Related to Doc. No.** 24657, First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., *et al.*, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified through March 19, 2010, through the Sixth Modification to Joint Plan, filed December 16, 2010, at Doc. No. 25931, and Amended §3.1.9, filed December 23, 2010, at Doc. No. 25956

**MEMORANDUM OPINION REGARDING OBJECTIONS TO CONFIRMATION
OF FIRST AMENDED JOINT PLAN OF REORGANIZATION AND RECOMMENDED
SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

## Introduction

Before the court is the confirmation of W.R. Grace & Co.'s (Debtors")[2] First Amended

---

[1]The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law with respect to the remaining objections to confirmation. The Court has jurisdiction under 28 U.S.C. §157 and §1334 in this core proceeding. *See* 28 U.S.C. §157(b)(2). Each Debtor is qualified to be a debtor under 11 U.S.C. §109. Venue is proper under 28 U.S.C. §1408.

[2]The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of

(continued...)

1

Joint Plan of Reorganization, docketed as Exhibit 1 to Doc. No. 24657 (filed April 22, 2010,

with modifications through December 23, 2010 ("Joint Plan").  The Joint Plan was accepted by

each class of creditors except Class 9, General Unsecured Creditors.  *See* note 8, *infra*.  A ballot

summary is docketed at Doc. No. 22020 and an amended summary at Doc. No. 22706.  After

trial, consideration of the objections and responses, stipulations, briefs and arguments, we find

that the Joint Plan meets the requirements of 11 U.S.C. §1129(a)(1) - (13), (16), (b)(1), and

(b)(2)(B).  The following subsections of §1129 have no relevance to this case:  (a)(14) - (15),

(b)(2)(A), (b)(2)(C), (d), and (e).  The Joint Plan also complies, in all respects, with §524(g).

Because the parties in interest object only to certain  provisions in the Joint Plan and Plan

Documents[3] and have raised no issues concerning whether the Joint Plan complies with the

Bankruptcy Code other than as raised in their objections, we do not address each provision of

---

[2](...continued)
Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[3]Section 1.1(172) of the Joint Plan defines "Plan Documents" as "the Plan, the Exhibit Book, the Disclosure Statement, all exhibits in the Exhibit Book, and the Plan Supplement, either in the form approved by each of the Plan Proponents or as each may be amended, supplemented, or otherwise modified from time to time in accordance with its terms."

§1129 or §524(g).  Rather, we address only those alleged not to be satisfied by the Joint Plan and

Plan Documents.  For the reasons which follow, we overrule all remaining objections and

recommend that the District Court confirm the Joint Plan.

The objections to confirmation are summarized on a chart located at Appendix B to Plan

Proponents' Updated and Amended Chart (Revised) Summarizing Confirmation Requirements

and Remaining Objections to the First Amended Joint Plan of Reorganization, Doc. No. 24549,

filed on March 30, 2010.  There was a deadline by which objections to the Joint Plan were

required to be filed.  Approximately 43 objections were filed.  Many were resolved or subject to

rulings before or during the confirmation hearing and several were the subject of settlement

agreements after conclusion of the hearing.  In addition, during the course of the confirmation

hearing parties had every opportunity to be heard and to raise additional objections therein.  *See,

e.g.,* Doc. No. 26018, Tr. 1/10/11 (hearing on settlement with the CNA Companies).  This

Recommendation addresses the remaining unresolved objections.  Our recommendations are

based upon the evidence and testimony adduced in the Plan confirmation hearing and the Plan

modifications and settlements reached thereafter.  We find that the Joint Plan as modified

through December 23, 2010, and inclusive of settlements through the settlement with the CNA

Companies, approved by order of January 22, 2011, Doc. No. 26106, meets the standards and

requirements of 11 U.S.C. §1129 and §524(g).   We find that the Joint Plan is proposed in good

faith, is feasible, and is consistent with the best interests of creditors.

**Good Faith, Disparate/Unequal Treatment of Indirect Asbestos PI Claims**

Most of the objections focus on fair and equitable treatment (11 U.S.C. §1123(a)(4)),

although characterized by the claimants as good faith objections, and on classification.  We

3

address the good faith objections under §1123(a)(4) unless otherwise noted.  The inquiry is

whether the plan will "fairly achieve a result consistent with the objectives and purposes of the

Bankruptcy Code."  *In re Combustion Engineering, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004).

Various entities challenge the good faith of the Plan Proponents in proposing the Joint

Plan.  The Joint Plan before us is the result of years of litigation and arms' length negotiations.[4]

There is no evidence that the Joint Plan was proposed in bad faith.  In fact, it is incredible to

conclude that the Joint Plan, which is intended, *inter alia*, to pay asbestos personal injury

claimants and to resolve what would otherwise be crippling uncertain tort liabilities, was filed in

bad faith.  *See In re Combustion Engineering, Inc.*, 391 F.3d at 247, n.67.   We find that the Joint

Plan has been proposed in good faith and not by any means forbidden by law.

The Joint Plan was proposed after arm's length negotiations for the purpose of

maximizing the value of the Debtor's estates.[5]  The most significant creditor groups in these

---

[4]The bankruptcy case was filed on April 2, 2001.  Negotiations with respect to the current
Plan have been ongoing since at least 2005.  The Bank Lenders and the Creditors' Committee
contend that the Joint Plan was filed in bad faith because "it seeks to maximize the value
retained by its equity holders at the expense of its creditors."  Doc. No. 22441 at 68.  The fact
that the Joint Plan proposes retention of an interest by equity holders is not, in and of itself,
indicative of bad faith.  Moreover, the objecting creditors are being paid 100 percent of their
allowed claims, with interest.  Thus, 11 U.S.C. §1129(a)(7)(A)(ii) has been satisfied.  The
absolute priority rule is discussed in text, *infra*.

[5]The State of Montana complains that the settlement of Asbestos PI Claims did not
involve discussions with the State.  The Crown in Right of Canada also objects because it was
not included in plan negotiations.  There is no requirement in the Bankruptcy Code that all
creditors participate in plan negotiations.  We note that, if these entities' claims are in Class 6
(Asbestos Personal Injury Claims), that Class voted overwhelmingly to accept the plan which
was negotiated by the Asbestos Claimants' Committee and the Future Claims Representative.
*See* Doc. No. 22020, Declaration of Kevin A. Martin Certifying Tabulation of Ballots; Doc. No.
22706, Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots.  Furthermore,
neither Montana nor the Crown has active claims against Debtors, although facing suit for failure
(continued...)

cases are Holders of Asbestos PI Claims and Holders of Asbestos Property Damage ("PD")

Claims.  With respect to the Asbestos PI Claims, the Asbestos Personal Injury Futures Claim

Representative ("FCR"), David Austern, made clear in his testimony that the negotiations

involving the settlement that led to the Joint Plan were arm's length and made in good faith and

we so find.  The settlement negotiations took place between Debtors, the ACC, the FCR, and the

PD Committee.  In addition, there were negotiations and settlements with various insurers.  Most

PD claims have been resolved through settlements or allowance proceedings.  Even the highly

contested Zonolite Attic Insulation ("ZAI") Claims, both in the U.S. and Canada, have settled,

notwithstanding prior objections.

The first objection we address is that of the Bank Lenders whose  underlying complaint is

that the Joint Plan does not pay them the contract default rate of interest to which they contend

they are entitled.  This court previously issued an opinion holding that the Bank Lenders were

not <u>entitled</u>, as a matter of law, to default interest.  *In re W.R. Grace & Co.,* 2009 WL 1469831

(Bankr.D.Del., May 19, 2009).  In that ruling we left open until conclusion of the evidence at the

plan confirmation hearing the question of whether the failure of Plan Proponents to provide

default interest to the Bank Lenders in the Joint Plan impairs the Bank Lenders, notwithstanding

---

[5](...continued)
to warn of the dangers of asbestos.  *See*, *e.g.,* Montana Brief in Opposition to Plan, Doc. No.
21785 at 6.  Under Montana law, the asserted liability based on failure to warn would be the
State's independent responsibility.  *In re W.R. Grace & Co.*, 591 F.3d 164, 173 (3d Cir. 2009).
To the extent Grace has contribution or indemnity liability to Montana or the Crown, the liability
would arise from Debtors' asbestos products or operations and would be channeled to the
Asbestos PI Trust.

the absence of entitlement to default interest.[6]  We also left open the question of whether the

Joint Plan meets the fair and equitable test of §1129(b)(1) and the best interest test of

§1129(a)(7), as applied to the Bank Lenders, if the default rate of interest is not paid.  Having

heard the evidence and considered the arguments and applicable law, we now reject the Bank

Lenders' contention that they are impaired[7] because the Joint Plan does not pay default interest.[8]

At the time of the confirmation hearing, the Bank Lenders' undisputed nondefault contract rate

of interest was not to be paid on the Effective Date pending resolution of their appeal with

---

[6]We will not rehash the reasons for our 2009 finding that Bank Lenders are not entitled to the default rate of interest but address only those aspects of the Bank Lenders' argument that concern plan confirmation.  The 2009 decision is on appeal.  Notice of Appeal, Bankr. Doc. No. 21905, Civ. A. No. 09-CV-644 (Bank Lenders' appeal docketed in District Court August 27, 2009); Notice of Appeal, Bankr. Doc. No. 21922, Civ. A. No. 09-CV-807 (Creditors' Committee's appeal docketed in District Court October 28, 2009).

[7]Bank Lenders argued that this court lost jurisdiction when they appealed the earlier ruling.  However, the issue of impairment was specifically excluded from that ruling and, therefore, cannot properly be the subject of an appeal.

[8]Bank Lenders challenge the Joint Plan's classification scheme as it pertains to them. They cite Debtors' objection to their claim and their opposition to that objection with respect to default interest as proof that their "voting interest . . . is sufficiently distinct and weighty to merit a separate voice" because there are different types of unsecured claims in Class 9 – those arising from prepetition credit facilities, from certain (liquidated) environmental claims, from existing contracts specifying a non-default rate of interest, and all other unsecured claims.  Doc. No. 21789 at 18 -20, ¶¶43 - 44.  We find that there is no merit to the contention that separate classification is required.  All creditors in Class 9 hold general unsecured claims.  *See* 11 U.S.C. §1122(a).  Even if Bank Lenders were separately classified, they are being paid in full with interest on the Effective Date and are not impaired.  Thus, they do not vote and are deemed to accept the Plan.
We note that their vote was provisionally solicited in light of the default interest issue. *See* Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization, Doc. No. 22020 at 13, ¶24; Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots Regarding Vote on First Amended Joint Plan of Reorganization, Doc. No. 22076 at 17, ¶4.  The requisite number of unsecured creditors have voted to accept the Joint Plan.  The Bank Lenders, whose claim, at millions of dollars, far exceeds the total dollar amount of other unsecured creditors in Class 9, rejected it and therefore the necessary dollar amount of accepting votes is not met.  *See* Doc. No. 22706.

respect to the default rate.  The Plan Proponents amended §3.1.9 of the Joint Plan to provide for

payment on the Effective Date of all principal and the undisputed portion of the interest in

accordance with the Plan provisions,[9] pending resolution of the default interest dispute on

appeal.  *See* Doc. No. 25956.

Bank Lenders argue for default interest on the basis that Debtors must be presumed

solvent because equity is retaining an interest and, when there is a solvent debtor, the default

interest rate must be paid if there has been a default.  We previously found no default and

addressed the Bank Lenders' contention in that regard in our May, 2009, ruling.  With respect to

the solvency argument, in the context of a preference action, the Bankruptcy Appellate Panel

("BAP") of the Ninth Circuit noted in *Sierra Steel, Inc. v. Totten Tubes, Inc.*, 96 B.R. 275, 277

(9th Cir. BAP 1989), that determination of solvency is a finding of fact and, because a debtor is

presumed insolvent for the 90 days prepetition, the creditor has to come forward with

"substantial evidence of solvency" to overcome the presumption.  In the matter before us,

although not in a preference context, we agree that a determination of solvency is a question of

fact.  However, we have been presented with no evidence that establishes solvency or insolvency

and there has been no determination of solvency or insolvency.[10]  Litigation on that issue was

---

[9]It is not disputed that the Plan provision for interest until 2005 exceeds Bank Lenders'
nondefault contract rate of interest.

[10]Bank Lenders rely on the Creditors' Committee's expert, Robert Frezza, a Certified
Public Accountant, who performed a solvency analysis, and concluded that Grace was solvent
under various tests (cash flow, balance sheet using market approach).  Doc. No. 23531, Tr.
9/16/09 at 295.  For that conclusion he relied primarily on a cash flow test.  *Id.* at278-80.  Plan
Proponents' expert, Pamela Zilly, qualified as a financial expert with respect to restructuring
matters, did not do a solvency analysis as such but examined certain documents and analyzed
Mr. Frezza's report.  She testified, and we find, that Mr. Frezza did not consider certain critical
(continued...)

voluntarily discontinued by the parties prior to the conclusion of the evidence in the estimation proceeding so there was never a determination of solvency made. Despite repeated threats to resurrect the litigation by different creditors at different times and despite repeated invitations by the court to put on the evidence if relying on solvency, no party in interest sought to reinstate the litigation. Accordingly, there is no basis to support a finding of Debtors' solvency or lack thereof and Bank Lenders' arguments for a presumption of solvency are not supported in the record or by operation of law, under the circumstances before us. Thus, there is no basis for payment of the default rate of interest[11]

---

[10](...continued)
factors and, therefore, his conclusion of solvency is flawed. We credit Ms. Zilly's testimony and find that there is insufficient evidence to conclude that Debtors are solvent or insolvent. *See infra*.

[11]Bank Lenders argue that because Debtors' market capitalization is substantial and the Joint Plan proposes that equity retain an interest, Debtors are solvent and therefore must pay the contract default rate of interest. Bank Lenders cite *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624 (3d Cir. 2007), as, in effect, holding that market price establishes solvency. The court in *VFB LLC* said that market valuation of a company was strong evidence of its solvency. *Id.* at 633. However, Bank Lenders have not backed up their contention that Debtors' market capitalization is conclusively one of solvency; Bank Lenders merely cite a number which, because it is a large number, they conclude translates to solvency. We note that Debtors' current asbestos liabilities were not litigated. Rather, a settlement was reached with the ACC. Debtors' future asbestos liabilities cannot, of course, be determined as they are unknown. However, it is clear that there will be future liabilities and the FCR agreed to the settlement regarding the amount to be set aside to address Debtors' present and future asbestos liabilities in the Trust.
    Ms. Zilly was qualified as a financial advisor with respect to restructuring matters. Doc. No. 23531, Tr. of 9/16/09 at 103-04. With respect to Debtors' solvency she had been charged by Debtors with reviewing a report prepared by Robert Frezza for the Unsecured Creditors Committee. *Id.* at 104. Mr. Frezza is a CPA and financial advisor and is with the Capstone Advisory Group, a nationwide restructuring firm. *Id.* at 255-57. Ms. Zilly testified that she did not do a complete solvency analysis and offered no opinion on Grace's solvency. *Id.* at 15-16. However, she examined the estimates presented in the estimation hearing (which never concluded as parties' agreed to cease pursuit of that issue), the Joint Plan with respect to the assets committed to the Trust, various financial reports and cash flow statements, among other
(continued...)

8

based on solvency.

On the Effective Date the Bank Lenders will be paid the principal amount of their debt plus the amount of interest provided in the Joint Plan (6.09% from the Petition Date through December 31, 2005, and thereafter at floating prime, in each case compounded quarterly through

---

[11](...continued)

things. *Id*. at 115. Based on the different estimates that were available Ms. Zilly testified that a formal opinion regarding Grace's solvency could not be rendered. *Id*. at 106-07. She testified that if Grace's liabilities were established to be the median amount of $468 million as testified to by Dr. B. Thomas Florence, President of Analysis Research Planning Corporation and asbestos claims consultant to Grace, Grace would be solvent; if at the high end testified to by Dr. Mark A. Peterson of Legal Analysis Systems, the ACC's expert, ($6.2 billion), Grace would be insolvent. *Id*. at 108. She further testified that the point at which Grace would transition from solvent to insolvent would be closer to the $468 million figure. *Id*.

In analyzing Mr. Frezza's method Ms. Zilly testified that he "primarily relie[d] on a balance sheet test" using the $468 million estimate of asbestos PI claims, *id*. at 109, but clarified her statement testifying that he did not actually do such a test because he did not "value[] Grace's assets, at all." *Id*. at 140. Under his analysis Grace would have <u>no</u> asbestos liability because that amount would be paid from the Sealed Air (Adv. No. 02-2210) and Fresenius (Adv. No. 02-2211) settlements. *Id*. at 109-10. In her opinion, his method ignored the effect of other figures that would have to be considered. *Id*.

In addition to her report regarding Mr. Frezza's analysis, Ms. Zilly submitted reports regarding that of H. Sean Mathis, CNA's expert, and an affidavit with respect to Debtors' objection to the Bank Lenders' proofs of claim. *Id*. at 115. She further testified with respect to the methods of analyzing a company's enterprise value. *Id*. at 121-24. She did not calculate Grace's enterprise value in her rebuttal to Mr. Mathis' report; rather she evaluated his methodology. For purposes of the disclosure statement she prepared a valuation analysis assuming that the Joint Plan became effective. That analysis was based on Debtors' projections. *Id*. at 129-30. She was very clear that she had not done a solvency analysis and therefore had no opinion as to what the best method of determining solvency would be. *Id*. at 133. She also testified that Mr. Frezza's report failed to value Grace's assets at all. *Id*. at 140.

In determining the enterprise value of Grace for purposes of the disclosure statement Ms. Zilly testified that she used traditional valuation methodologies and that the value ranged from $2.1 billion to $2.5 billion. Doc. No. 23532, Tr. of 9/17/09 at 126. She further testified that she considered administrative and priority claims as well as tax claims and asbestos PI and PD claims. She concluded that Grace's general unsecured claims, exclusive of its asbestos PI and PD claims, would be approximately $1.397 billion. *Id.* at 136-37. In a Chapter 7 the liabilities to the general unsecured creditors would be the same but no interest would be paid to them. *Id*. at 137.

the Effective Date).  The parties agree that 6.09% exceeds the nondefault contract rate and that

the provision regarding floating prime is the nondefault contract rate.  Thus, the Bank Lenders

are not impaired under any scenario as they will be paid in full.  Section 1129(a)(7)(A)(ii) is met

as to the Bank Lenders.  11 U.S.C. §1124.  Indeed, all creditors in this Class (Class 9) will be

paid in full with interest on the Effective Date and are not impaired.  The objection is overruled.

Next, Anderson Memorial Hospital ("AMH") raises the issue of entitlement to interest

for its Class 7A claims (Asbestos PD Claims, excluding U.S. ZAI PD Claims).  AMH argues that

the Joint Plan impairs Class 7A claims (1) by denying payment of interest on such claims and (2)

by denying it the ability to pursue its claim in its chosen forum.  However, the Joint Plan does

not deny payment of interest on Class 7A claims.  The Class 7A Deferred Payment Agreement

provides for payment of interest.  *See* Doc. No. 24657 at Exhibit 27, Class 7A Deferred Payment

Agreement, at 12.[12]  Thus, AMH's objection is not well founded in this regard.

Moreover,  AMH has stated no basis on which it might be entitled to interest.  AMH cites

*In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339 (Bankr.D.Del. 1998), *affirmed* 324 F.3d 197 (3d

Cir. 2003), for the proposition that it is entitled to payment of interest on its claim, if allowed.

However, according to the court in *PPI Enterprises*, payment of interest is only required of

solvent debtors.  As noted, *supra*, solvency of Debtors in this case was never determined.

Although litigation which included the issue of solvency was commenced, the parties chose to

terminate that action before the conclusion of the evidence.  Accordingly, no finding regarding

---

[12]AMH cites a provision of the disclosure statement asserting that it precludes payment of
interest.  The provision in fact simply describes a default term for settlements providing that
settled claims will include interest to the extent the parties to the settlement agree.  The Class 7A
Deferred Payment Agreement, as described, provides for interest once a claim is allowed.

solvency was ever made.[13]  Parties cannot, at this late stage, having repeatedly declined to revisit

the solvency issue, rely on an unsupported presumption of solvency in order to claim a right to

the payment of interest on that basis.

Furthermore, all Class 7A claimants will be paid 100 percent of the allowed amount of

their claims and if the court determines that interest is appropriate the PD Trust will pay it.

Section 5.3 of the Joint Plan, Resolution of Asbestos PD Claims, provides that "Asbestos PD

Claims shall be resolved in accordance with the Asbestos PD Trust Agreement and (a) in the

case of Asbestos PD Claims in Class 7A, the Class 7A Case Management Order setting forth

procedures for determining the allowance or disallowance of the Unresolved Asbestos PD

Claims. . . ."  Doc. No. 24657 at 60, §5.3.[14]  Thus, this objection to confirmation is without merit

and is overruled.

AMH also objects on the basis that the Joint Plan has not been proposed in good faith in

violation of §1129(a)(3), asserting that it has been singled out for disparate treatment in

derogation of §1123(a)(4) because it is deprived of the ability to litigate in its chose forum.  Its

---

[13]As noted, the issue of solvency was raised at various times in the course of this case and this court offered the parties the opportunity to revive the solvency litigation.  No party chose to do so.

[14]AMH asserts that the Asbestos PD Trust is not a "genuine" trust for Class 7A members because it is only a conduit for payment by the Reorganized Debtors, the structure of which, AMH alleges, makes it harder for claimants to recover than if the Reorganized Debtor assumed liability for unresolved PD claims.  That is, it argues, the Asbestos PD Trust will only be funded enough to pay settled PD claims and if additional PD claims are resolved or asserted in the future, the Trust will seek funding from the Reorganized Debtors.  This Trust funding mechanism is addressed further in note 80 and accompanying text, *infra*.  The issues regarding PD Future Demands (as opposed to Claims) is discussed *infra*.  The Class 7A Case Management Order, Doc. No. 24657 at Exhibit 25, provides procedures for determining allowed amounts of PD claims and how such claims will come before the Trust.

arguments are set forth in its trial brief, Doc. No. 22437.  The Joint Plan provides that the claims

in Class 7A, of which AMH is a member, will be resolved in federal court if the claimant has

submitted to federal jurisdiction, and that the allowed amount will be paid in full.   AMH, which,

despite its contention to the contrary, is not the only member of this class of  property damage

claims,[15] clearly has submitted to jurisdiction by filing a claim.[16]  It also participated extensively

---

[15]What has been referred to in this case as "the California claims," those filed by the
California Department of General Services, are also in Class 7A and will be resolved in
accordance with the treatment for claims in that class, according to Debtors' counsel at a hearing
on December 13, 2010.  This court's summary judgment in favor of Debtors and against the
Department of General Services, Doc. No. 19727, on a statute of limitations issue, was reversed
by the district court. *See In re W.R. Grace & Co.*, 418 B.R. 511 (D.Del. 2009).  Therefore, the
California claims remain unresolved and are in Class 7A.

[16]AMH also contends that it has class claims and there was inadequate notice of the bar
date.  Regarding the former, this court ruled that AMH does not have a class claim, that no class
action is appropriate, inasmuch as the only claim in the purported class that still exists is AMH's.
The order was affirmed by the District Court for the District of Delaware and the appeal was
dismissed by the Court of Appeals for the Third Circuit. *See* note 81, *infra.*
      The adequacy of the notice of the bar date was resolved long ago. *See, e.g., In re W.R.
Grace & Co.*, 366 B.R. 302  (Bankr.D.Del. 2007), *affirmed* 316 Fed.Appx. 134 (3d Cir. 2009).
In addressing AMH's motion for reconsideration of the District Court's order affirming the
Bankruptcy Court's order denying class certification, the District Court for the District of
Delaware noted that

> at the request of the Asbestos Property Damage Committee - of
> which [counsel for AMH] is a member - the Bankruptcy Court
> abated "the requirement in the Bar Date Notice that counsel of
> record for asbestos property damage claimants either (1) certify
> that they notified their clients of the bar date by transmitting to
> them the proof of claim package or (2) give names and addresses
> to Grace so Grace could notify them directly."  Despite W.R.
> Grace's objection, the Court approved the PD Committee's opt-out
> proposal.

and that

> [f]ollowing this Order, W.R. Grace "sent a considerable amount of
> money publishing the notice in both national and local

(continued...)

in litigation throughout this bankruptcy case.

AMH complains of disparate treatment because, if its motion for certification of a class action claim had been granted, litigation on the claim would occur in the bankruptcy court rather than state court.[17]  AMH Plan Objection, Doc. No. 21782 at 12, 20.  In essence, AMH repeats matters that have already been adjudicated.  AMH filed its claim and class action claim[18] with

─────────────────────

[16](...continued)
> publications."  Notice was provided to property damage claimants, and actual notice was given to "200,000 known asbestos claimants" [which] includ[ed] "all named parties to the handful of property damage cases pending when Grace filed its bankruptcy petition, and all known personal injury and property damage lawyers."

*In re W.R. Grace & Co.*, 398 B.R. 368, 373 (D.Del. 2008) (emphasis added) (citations omitted). The District Court noted that the validity of the notice program was the law of the case, *id*. at 374, citing *Mission Towers v. W.R. Grace, et al.*, 2007 WL 4333817 (D.Del., Dec. 6, 2007).  It is still the law of the case.  These objections of AMH to confirmation of the Joint Plan are overruled.

[17]AMH contends that it is singled out for treatment not afforded other asbestos creditors all of which have either settled, are subject to alternative resolution procedures (allegedly with lowered proof thresholds) or are permitted to litigate in their chosen forum.  However, AMH is not singled out - it filed a proof of claim and thereby consented to this court's determination of the allowed amount of its claim.
AMH also complains because Debtors made no effort to identify asbestos PD claimants from their records, nor did the Bar Date Notice require it.  However, it was PD claimants' counsel who actively resisted notice being given by the Debtors.  PD counsel <u>insisted</u> that they be the ones to notify their clients of the bar date.  Their request was granted.  AMH's recitation in its objection to confirmation that intimates that notice of the bar date was improper has already been addressed and found lacking by the appellate process.

[18]AMH recites its version of events concerning its motion for certification of a class action, characterizing its motion as having been timely filed.  In this court's opinion of May 29, 2008, 389 B.R. 373, we noted that in 2002 there was a hearing in which the necessity of and requirement for a class action was debated at length and in order to fully address the issue in a timely manner this court ordered that if a motion to certify a class action was going to be filed it should be filed soon.  *See* Doc. No. 1793, Tr. 2/25/02.  It was years after that that AMH filed its class action motion which, for the reasons stated in our opinion, was denied with prejudice.

(continued...)

13

this court thereby submitting to jurisdiction here and waiving its right to a jury trial.[19]  *See*

*Langenkamp v. Culp*, 498 U.S.  42, 45 (1990).  *See also Granfinanciera, S. A. v. Nordberg*, 492

U.S. 33, 57-58 (1989).  To the extent AMH is asserting disparate treatment because Class 7B,

ZAI claims, may have an opportunity for a jury trial, its objection is overruled.  AMH's claim is

---

[18](...continued)
AMH's motion for leave to appeal was denied by the District Court.  2008 WL 42343339
(D.Del., Sept. 4, 2008).  The District Court also denied AMH's motion for reconsideration.  398
B.R. 368 (D.Del. 2008).  AMH appealed to the Third Circuit which dismissed the appeal by
order dated December 14, 2009.  *See* Third Circuit Court of Appeals Case No. 08-4829 where, in
dismissing AMH's appeal, the court ruled that:

> A district court's determination that an action may not be maintained as a class
> action under Rule 23 is not a final decision within the meaning of 28 U.S.C. §
> 1291. . . [because an] order refusing to certify class "does not of its own force
> terminate the entire litigation because plaintiff is free to proceed on his individual
> claim"); Nelson v. County of Allegheny, 60 F.3d 1010, 1013 (3d Cir. 1995)
> (noting denial of class certification by federal court is interlocutory and not
> immediately appealable). . . .  Moreover, the four factors to be considered when
> determining the finality of a bankruptcy court order weigh against a finding that
> the Bankruptcy Court order denying class certification should be final . . . . The
> Bankruptcy Court order is not reviewable under the collateral order doctrine . . .
> Because the Bankruptcy Court's order was interlocutory, the District Court's
> decision whether to exercise jurisdiction to review the order denying class
> certification was discretionary . . . .  This Court cannot review that discretionary
> decision . . . .

[19]The Libby Claimants also assert that they have the right to have their claims allowed in
accordance with nonbankruptcy law, with the result that the Trust Distribution Procedures are
unconstitutional because they deprive the Libby Claimants of their Seventh Amendment right to
a jury trial.  However, the Trust Distribution Procedures ("TDP") permit resort to the tort system
and to a jury trial if the claimant decides to litigate.  *See* Doc. No. 24657, Exhibit 4, Asbestos PI
TDP, at §5.11.  That section provides that "Claimants who elect non-binding arbitration and then
reject their arbitral awards retain the right to institute a lawsuit in the tort system against the PI
Trust pursuant to Section 7.6 . . . .  However, a claimant shall be eligible for payment of a
judgment for monetary damages obtained in the tort system from the PI Trust's available cash
only as provided in Section 7.7 . . . .  *Id*.  Thus, the TDP does not violate the Seventh
Amendment.

14

not in Class 7B, which voted to accept the Joint Plan.[20]  Further, the ZAI claimants settled and

the ZAI Trust Distribution Procedures ("ZAI TDP")  incorporate the terms of that settlement,

including a provision for nonbinding mediation and binding arbitration.[21]  Moreover, all creditors

in this class will receive the same treatment.[22]

AMH next complains that the solicitation process is tainted because a personal injury bar

date has never been set for Class 6 claimants and "any vote by the Class 6 claimants is solely by

those claimants who have voluntarily elected to file proofs of claim."  Doc. No. 21782 at 17, n.3.

 Of course, that is not so.  The voting procedures did not require a proof of claim as a condition

to voting in this class and anyone who met the procedures could vote, not just those who

voluntarily filed a proof of claim.  Additionally, AMH is a property damage claimant, not a Class

---

[20]*See* Doc. No. 22706, Amended Declaration of Kevin A. Martin Certifying Tabulation of Ballots.  Class 7A consisted of 397 voting claims, 393 (98.99 percent) of which voted to accept the plan and 4 (1.01 percent) voted to reject the Plan.  In Class 7B there were 2,073 voting claims of which 1,833 (88.42 percent) voted to accept the Plan and 240 (11.58 percent) voted to reject.

[21]The Asbestos PI Trust TDP, Doc. No. 24657 at Exhibit 4, §5.11, permits personal injury claimants to seek a jury trial under some circumstances.  This does not constitute disparate or unequal treatment of AMH's property damage claim.

[22]AMH also objects on the basis that settling Class 7A Claimants have determined the fate of unresolved claims in that class and asserts that this constitutes artificial impairment. "'Artificial' impairment occurs when a Joint Plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired under §1124.  The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors."  *In re Combustion Engineering, Inc.,* 391 F.3d 190, 243 (3d Cir. 2004).  That is not the situation in this case.  Unlike *Combustion Engineering*, all creditors in Class 7A will be paid in full and, if the court so determines, with interest.  Thus, the argument fails.

AMH complains because it was not placed in its own class for purposes of voting.  AMH asserts an asbestos property damage claim.  It has stated no basis upon which its asbestos property damage claim is not properly classified with all other non-ZAI asbestos PD claims.

6 claimant, and so has no standing to object on the basis of the treatment of Class 6 claimants, who have voted overwhelmingly to accept the plan. Further, the time to object to solicitation and voting procedures was at the time the motion was pending in 2008. *See* Doc. No. 19620. We further note that the case AMH cited in its footnote in support of the assertion that the "universe of claimants" has to be defined before there can be a vote, *In re Amster Yard Assocs.*, 214 B.R. 122 (Bankr.S.D.N.Y. 1997), concerned a secured creditor's request for expedited solicitation of votes upon preliminary approval of its disclosure statement. The case is inapplicable.

AMH's assertion that because the Joint Plan provides for 100 percent payment to property damage claims there is no need for a §524(g) channeling injunction is also without merit. *See* Doc. No. 21782 at 18-19, AMH Objections to Confirmation. In this regard AMH cites, Barliant, Karcazes & Sherry, "From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies," 12 Amer. Bankr. Inst. L. Rev. 441, 453 (Winter 2004), for the proposition that "there is no such justification for channeling future claims to a limited trust when a company can afford to pay 100 cents on the dollar to all future claimants as their claims arise." Doc. No. 21782 at 18-19; 12 Amer. Bankr. Inst. L. Rev. at 453. First, the article was referring to personal injury claimants. Second, there is no evidence to suggest that the Debtors can pay 100 percent to all personal injury claimants, present and future. Third, the personal injury claimants have agreed to their treatment under the Joint Plan. Fourth, we address the need for a property damage trust *infra* at 73.

Next, we address objections of the Libby Claimants who assert that their claims are different from other personal injury claims because the vermiculite mined in Libby, Montana,

16

caused a type of asbestos disease different from asbestos disease in other parts of the country.

Accordingly, the Libby Claimants contend that their claims are not substantially similar to other

asbestos PI claims in Class 6.  *See, e.g.,* Doc. No. 21882, Tr. 5/14/09 at 54-55.  In this case, there

has never been reliable proof of a disease unique to Libby.  The objection is overruled.  Libby

Claimants also assert that their non-malignant asbestos claims should be in a separate class as

they are not substantially similar to others in that the severity and prognosis of pleural disease

caused by exposure to "Libby asbestos" is different than elsewhere.  Libby Post-Trial Brief at

19-20, Doc. No. 23269.  Libby's counsel argued at the plan confirmation hearing that

> The Libby asbestos site is unique with respect to multiplicity of
> exposure roots, unique with respect to the cumulative exposures
> experienced by community members, and unique with respect to
> the adverse health effects from asbestosis exposure already present
> and documented in the residents.

Tr. 9/10/09 at 28-29, Doc. No. 23262.  However, as noted by the court at that hearing:

> the issue is whether or not each individual claimant who will have
> the right to be treated through the trust is – has a similar right to be
> treated by the trust in the same way that everyone else holding the
> same disease has the right to be treated. . . . I've just taken a look
> at this document [Exhibit LC-48].  It does not in any way say that
> there is some different disease in Libby than is elsewhere.  It talks
> about exposures and the fact that there are multiple exposures in
> Libby, but that's not . . . contested.

*Id.* at 29.

The Libby Claimants offered Exhibit LC-48, Determination and Findings of Public

Health Emergency For the Libby Asbestos Site In Lincoln County, Montana, dated June 17,

2009, and published by the Environmental Protection Agency.  The EPA study was based in part

on a study by Dr. Alan Whitehouse,[23] *id*. at 76, an expert witness for the Libby Claimants.  *See*

LC Exhibit 50, EPA Certification of Index of Documents in the Administrative Record for

Determination and Findings of Public Health Emergency for the Libby Asbestos Site in Lincoln

County, Montana.[24]  The testimony and evidence at the plan confirmation hearing established

that Dr. Whitehouse's study was not reliable and did not follow accepted methodology.  Libby

Claimants argued that the EPA findings, Exhibits LC 48 and 49, established that the plan

treatment of Libby Claims was discriminatory.  We rejected that conclusion as the question is

whether the Joint Plan treats asbestos claimants in Libby differently from other asbestos

claimants and the answer is that there is no difference in treatment.  The credible evidence

established that residents of Libby were exposed to Grace's asbestos in multiple places (i.e.,

"exposure roots"), including working in the mine, working in the mill, at home from secondary

dust exposure, on the school premises where a running track had been built of rock containing

asbestos, etc.  The more frequent exposures led to a higher incidence of asbestos diseases in the

population when compared to populations not similarly exposed.  Thus, proportionately, there

may be more claims filed by residents of Libby than by residents of comparably sized population

areas without as many exposure sites.  Even so, that does not mean that there is different

treatment for claimants with the same type of asbestos disease.  The Trust Distribution

Procedures ("TDP") are uniform regarding treatment, regardless of the geographic area in which

the claimant resides.  The severity of the diseases has been addressed in the TDP as will be

---

[23]Dr. Alan Whitehouse's specialty is pulmonology.  Dr. David Weill, Plan Proponents' rebuttal witness, testified that the patient population in Dr. Whitehouse's study was not randomly selected and was, in fact, drawn from Dr. Whitehouse's own patients.

[24]We note that an objection was made to relevance.  *See* Tr. of 9/10/09, Doc. No. 23362.

explained.  *See* notes 25-27, *infra*.

The Libby Claimants assert that:

> the TDP violates Section 1123(a)(4) by providing differential
> treatment of Asbestos PI Claims based on (a) the type of asbestos
> disease, (b) whether the claim is based on a jury verdict, (c) when
> the claim is liquidated by the Asbestos PI Trust, (d) whether the
> claim is for wrongful death, and (e) whether the claim is for
> compensatory or punitive damages.  For purposes of Section
> 1124(a)( 4), the issue is not whether different treatment is legally
> permissible.  Even where different treatment is permitted, different
> treatment of claims *within the same class* is not.

Doc. No. 21811, Libby Claimants' Objection to First Amended Joint Plan of Reorganization, at

58 (emphasis in original).  Libby Claimants base their argument on the premise that the TDP

"does not contain medical criteria reflective of reality for Libby Claimants."  *Id*. at 60.  However,

Libby Claims are asbestos PI claims and, as noted above, their assertions of the existence of a

different disease have not been substantiated by credible evidence and have been rejected by this

court.  The court has reviewed the evidence and the credible expert testimony of Dr. Laura

Welch regarding medical criteria that supported the TDP and finds that it is medically reasonable

as to all personal injury claimants and demand holders, and that it reflects medically reliable

criteria and standards.   There is no reason to separately classify each level of personal injury

claim to be administered through the Trust.  The Trust accounts for these distinctions and the

payments differ, depending on the disease level established by the claimants.  Libby Claimants

have the identical opportunity to establish their diseases as have all other claimants, and the TDP

affords all claimants the opportunity to increase their recovery when they prove higher rates of

exposure to Grace asbestos than to any other asbestos.[25]

We agree with the Plan Proponents that "[t]he claim processing mechanisms embodied in the Grace TDP . . . comply with 11 U.S.C. §524(g), which requires the resolution of asbestos claims and demands on 'substantially the same' basis through a trust, and with §1123(a)(4), which requires that a Chapter 11 plan "provide the same treatment for each claim or interest of a particular class."  Plan Proponents' Phase II Post-Trial Brief in Response to Confirmation Objections of the Libby Claimants, Doc. No. 22731 at 9, ¶1.17.  Furthermore, Plan Proponents explain that

> All Claimants (including the Libby Claimants) have several avenues open to them if they believe a claim is worth more than the scheduled value.  They may pursue Individual Review.  See PP Ex. 277.4 §5.3(b); see also 9/8/09 Tr. at 35, 47-49 (Inselbuch).  For example, in Individual Review, even if a claimant does not meet the medical criteria for category IV-B treatment (severe pleural disease), the claimant might still recover the maximum scheduled value for such a claim.  See 9/8/09 Tr. at 41, 54 (Inselbuch).  If any Claimant is dissatisfied with the outcome of Individual Review, the Grace TDP permits him or her to seek further review through non-binding arbitration and then a jury trial in the tort system.  See PP Ex. 277.4 §§5.10, 5.11, 7.6 & 7.7; see also 9/8/09 Tr. at 35, 47-49 (Inselbuch).  All Claimants, including the Libby Claimants, also may seek extraordinary claims treatment under the Grace TDP, which would . . . increase the payment in certain cases if the claimants can show a higher proportion of Grace exposure.  See PP Ex. 277.4 §5.4(a); see also 9/8/09 Tr. at 52-54 (Inselbuch).

Doc. 22731 at 9-10, ¶1.18.[26]  Regarding the multiple exposure paths, under the Joint Plan

---

[25]Because of the multiple exposure paths in Libby, Libby Claimants' burden of production regarding their diseases is lower than that of other claimants.  Libby Claimants need not establish significant occupational exposure.  *See* note 26, *infra*.

[26]Plan Proponents also made several changes to the TDP to account for greater exposure history by the Libby Claimants.  *See* Doc. 22731 at 10-12, ¶¶2.1 -2.10.  The medical criteria

(continued...)

20

[26](...continued)
were supplemented to include a diagnostic category for "Severe Disabling Pleural Disease" (Disease Level IV-B).  *See* Doc. No. 23282, Tr. 9/8/09 at 54,(Testimony of Elihu Inselbuch, an attorney who was Plan Proponents' witness and who has had much experience as counsel to asbestos creditors' committees).  The Libby Claimants' position was that there was a disease common in Libby (and not elsewhere) that they describe as severe disabling pleural disease and that the original TDP had not accounted or provided for that disease.  *Id*. at 44 (Inselbuch).  The drafters of the TDP consulted with medical experts, who confirmed the existence in the literature of this disease, although it was unusual to observe in practice.  However, because it existed in the medical literature and because the Libby claimants took the position that people from Lincoln County, Montana, suffered from it, the Plan Proponents added disease level IV B to the TDP.  *Id*.  The drafters worked closely with Dr. Laura Welch to develop the medical and exposure criteria for the new category.  Dr. Welch is a medical doctor certified both in occupational environmental medicine and in internal medicine.  *Id*. at 108.  Dr. Welch testified that with respect to disease Level IV B that she

> looked at all the literature I could find relating to severe disabling pleural disease . . . In addition, I looked at all the Libby specific information, government reports, published papers that related to Libby, and testimony and reports from Dr. Whitehouse and Dr. Frank that talk about the impact of pleural disease in that population so I could kind of understand what the questions were and design a TDP that I thought was medically reasonable in that context.

*Id*. at 119.  She also read government reports about asbestos-containing vermiculite shipped to places outside of Montana.  *Id*.  She used this information to help design a TDP that in her opinion was medically reasonable.  *Id*.  Dr. Welch further consulted colleagues in the asbestos medical field about Libby specific issues.  *Id*. at 121-22.

In addition, because severity is an important element of compensation for asbestos disease, Dr. Welch testified that she reviewed medical literature to distinguish between asbestos-related pleural disease that was likely to cause lung function impairment on the one hand, and less serious forms of pleural disease on the other.  She concluded that those who have blunting of the costophrenic angle have more severe lung function impairment.  *Id*. at 135-36.  She described it as "a pretty dramatic difference in that the people . . . who have diffused pleural fibrosis, their pulmonary function tests are uniformly under that 80 percent when . . . the people who have pleural scarring absent blunting of the costophrenic angle [are] close to 80 percent [lung function]."  *Id*.

The Plan Proponents also modified the TDP to permit a claimant at a lower level of disease to assert a subsequent claim, not only for the initial development of a malignant disease, but also for the progression of their disease to severe asbestosis or Severe Disabling Pleural

(continued...)

asbestos PI claims, whether arising in Libby or elsewhere, are subject to the same criteria for

evaluation and payment, as set forth in the Joint Plan and Plan documents.[27]

_____

[26](...continued)
Disease.  See PP Exh. 277.4, §5.9.  This modification was made because the Libby Claimants
contend that their pleural disease is progressive.  Thus, the Plan Proponents provided a second
opportunity to come back and claim at Level IV B (severe disabling pleural disease) even after
first recovering in Level III.  Doc. No. 23282, Tr. 9/8/09 at 55, (Inselbuch).  That is, in response
to the Libby Claimants' concerns, the "comeback" rights were modified even though such a
claimant may not in fact have what is ordinarily considered a "new" disease.
        Third, the Grace TDP was modified to include an additional category of extraordinary
claims treatment, again in response to the Libby Claimants' concerns.  *Id.* at 52-55 (Inselbuch);
PP Ex. 277.4 §5.4.  The extraordinary claims multiplier was adjusted "to address the issue that
the Libby claimants raised about the fact that they had claimants who were exposed exclusively,
or almost exclusively, by W.R. Grace. . . . it was a concession on the part of the ACC to have a
more generous treatment of extraordinary claims in order to give greater compensation to the
Libby claimants."  *See* Doc. No. 23282, Tr. 9/8/09 at 253, (Peterson).  The adjustment (§5.4 of
the TDP) of extraordinary claims multiplier raised from five times the Expedited Review
scheduled value to eight times the scheduled value, so that any claimant whose injuries were
caused almost entirely by exposure to Grace asbestos would receive compensation in line with
what severely injured prepetition claimants from Libby had received in settlement of their
claims. *Id.* (Peterson).   This adjusted extraordinary claims multiplier is available to any claimant
who was exposed exclusively to Grace asbestos, not just to the Libby Claimants.  *Id.*  (Peterson
testimony that the modified multiplier "applies to claims from any location.")
        Finally, the significant occupational exposure requirement was waived for Libby
Claimants.  *Id.* at 152-53 (Welch).  Significant occupational exposure is exposure on the job
working with asbestos fibers or in close proximity to someone who works with asbestos fibers.
However, because much of the Libby exposure is asserted to be not of that nature, the exposure
requirements were modified to accommodate Libby Claimants.  *Id.* at 55 (Inselbuch).
        Libby Claimants assert that their disease is unique because they contract fatal non-
malignant diseases and their exposure has been exclusively, or nearly exclusively, to Grace
asbestos.  Dr. Mark Alan Peterson, Plan Proponents' witness, has a law degree from Harvard,
and a Masters and Ph.D. in Experimental Social Psychology from the University of California,
Los Angeles.  *Id.* at 207.  He testified that there are claimants outside of Libby who have the
same kind of characteristics; i.e., those with fatal non-malignant disease and whose exposure was
solely (or almost solely) to Grace asbestos.  There are also people who have combinations of
both and those characteristics are not unique to Libby.  *Id.* at 291.  PP Exh. 277.4 §§5.3(a)(3) &
5.7(b)(3).

[27]In addition, there are mechanisms by which the scheduled values and the payment
percentages can be adjusted if unforeseen circumstances arise.  Doc. No. 23432, Tr. 9/15/09 at
(continued...)

[27](...continued)

57, testimony of David Austern.  There also is a provision for extraordinary claims so that, if the exposure to Grace's product is at least 75 percent for a particular claimant, the maximum that could be recovered by an individual review, is multiplied by five to provide a higher payment to that claimant.  Doc. No. 23282, Tr. 9/8/10 at 52-53, testimony of Elihu Inselbuch, counsel for ACC.  *See* PI TDP §5.4, Doc. No. 24657, Exhibit 4.  "Extraordinary Claim" is defined therein  as

> a PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels II-VIII, and that is held by a claimant whose exposure to asbestos (I) occurred predominantly as a result of working in a manufacturing facility of Grace during a period in which Grace was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of exposure to asbestos or an asbestos-containing product or to conduct for which Grace has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.3(b)(3)  for claims qualifying for Disease Levels II-V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage; provided, however, that if the claimant's exposure to asbestos was 95% the result of exposure to an asbestos-containing product or to conduct for which Grace has legal responsibility, the maximum extraordinary value shall be eight (8) times the Scheduled Value set forth in Section 5.3(b )(3) for claims qualifying for Disease Levels II-V, VII and VIII and eight (8) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage.
>
> Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel established by the PI Trust with the consent of the TAC and the Futures Representative. All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other PI Trust Claims except Pre-Petition Liquidated Claims, Disease Level I Claims, Existing Claims and Exigent Hardship Claims, which shall be paid first, based on its date of liquidation, subject to the Maximum Available Payment and Claims Payment Ratio

(continued...)

Additional objections were filed regarding the Joint Plan's treatment of claims.  Various

creditors object to their treatment under the Joint Plan, asserting different grounds.  Indirect

Claimants (Maryland Casualty Company, the State of Montana,[28] the Crown, and  Burlington

Northern Santa Fe Railway ("BNSF")), assert that their indemnity, contribution or subrogation

claims resulting from damages paid to an asbestos PI plaintiff are misclassified as Indirect PI

Trust Claims.[29]  Under the Joint Plan, Asbestos PI Claims include Indirect PI Trust Claims,

defined as claims for indemnification, contribution, or subrogation for damages paid to a plaintiff

in an action seeking recovery for "personal injuries allegedly caused by exposure to asbestos or

asbestos-containing products for which the Debtors have liability."  Joint Plan, Doc. No. 25647,

---

[27](...continued)
           described above.

Section 5.4(b) of the PI TDP addresses Exigent Hardship Claims which are those that

> meet the Medical/Exposure Criteria for Severe Asbestosis (Disease
> Level IV -A), Severe Disabling Pleural Disease (Disease Level
> IV-B) or an asbestos-related malignancy (Disease Levels V-VIII),
> and the PI Trust, in its sole discretion, determines (I) that the
> claimant needs financial assistance on an immediate basis based on
> the claimant's expenses and all sources of available income, and
> (ii) that there is a causal connection between the claimant's dire
> financial condition and the claimant's asbestos-related disease.

[28]Montana's contention that the Joint Plan calls for distribution of stock to the State in
violation of its constitution is incorrect.  The Joint Plan provides for stock to be distributed to the
Trusts' Representative.  *See, e.g.,* Joint Plan, Doc. No. 24657, Exhibit 1, at §1.1.37 (referring to
the obligation to issue to the Trusts' Representative, on behalf of the Asbestos PI and PD Trusts,
50.1 percent of Parent Common Stock as of the Effective date of the Joint Plan).  There is no
provision for a distribution of stock to the State in the event the State is determined to have an
allowed claim.  Rather, its claim would be paid just as any other claim – in cash.

[29]Insurer CNA objected to the Joint Plan on various grounds but its objections have been
withdrawn based upon a settlement.  *See* Doc. No. 26106.

24

Exhibit 1, at §1.1(38).  Indirect PI Trust Claims are with respect to the same liabilities as Direct

Claims for asbestos personal injuries asserted against Debtors.  As such, they are subject to

channeling as they derive from "the conduct of, claims against, or demands on the debtor."  11

U.S.C. §524(g)(4)(A)(ii).

An Indirect Claimant's status depends on its relationship with a Direct Claimant.  Section

2.6 of the PI TDP provides that "Indirect PI Trust Claims, if any, shall be subject to the same

categorization, evaluation, and payment provisions of this TDP as all other PI Trust Claims."

Doc. No. 25657, Exhibit 4 at 10.  Section 5.6 of the PI TDP requires that

> Indirect PI Trust Claims asserted against the PI Trust shall be
> treated as presumptively valid and paid by the PI Trust subject to
> the applicable Payment Percentage if the holder of such claim (the
> "Indirect Claimant") establishes to the satisfaction of the Trustees
> that (i) the Indirect Claimant has paid in full the liability and
> obligation of the PI Trust to the individual claimant to whom the
> PI Trust would otherwise have had a liability or obligation under
> this TDP (the "Direct Claimant"), (ii) the Direct Claimant and the
> Indirect Claimant have forever and fully released the PI Trust from
> all liability to the Direct Claimant, and (iii) the claim is not
> otherwise barred by a statute of limitation or repose or by other
> applicable law.  In no event shall any Indirect Claimant have any
> rights against the PI Trust superior to the rights of the related
> Direct Claimant against the PI Trust, including any rights with
> respect to the timing, amount or manner of payment. In addition,
> no Indirect PI Trust Claim may be liquidated and paid in an
> amount that exceeds what the Indirect Claimant has actually paid
> the related Direct Claimant.

Doc. No. 25657, Exhibit 4 at 36.  Section 5.6 further provides that "To establish a presumptively

valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's

claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement

(with an appropriate full release in favor of the PI Trust) or a Final Order . . . ."  *Id*.  Thus, the

Indirect Claimant's right to recover against the Trust depends on how its claim was established.[30]

_____

[30]Section 5.6 of the TDP, Exhibit 4 to Doc. No. 24657, at 36, states how Indirect Claims are presumptively valid.  Peter Lockwood, counsel to the ACC, explained the provision at the request of the court, during a status conference conducted on notice to all parties on December 13, 2010.  *See* Doc. No. 25928, Tr. 12/13/10.  He also explained how, if an Indirect Claimant cannot meet the requirements for a presumptively valid Indirect Claim, the validity of such claim can be established by other means.  *Id*. at 47-50.  We accept the explanation.

In full, §5.6 of the TDP provides:

> Indirect PI Trust Claims asserted against the PI Trust shall be treated as presumptively valid and paid by the PI Trust subject to the applicable Payment Percentage if the holder of such claim (the "Indirect Claimant") establishes to the satisfaction of the Trustees that (I) the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under this TDP (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the PI Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law.  In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant against the PI Trust, including any rights with respect to the timing, amount or manner of payment.  In addition, no Indirect PI Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

> To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI Trust) or a Final Order (as defined in the Plan)  provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a  Direct Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the Trustees.

> If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the

(continued...)

The PI TDP appropriately addresses Indirect PI Trust Claims and the objections are overruled.

Maryland Casualty Company ("MCC") is a Settled Asbestos Insurance Company.  As

such, asbestos PI claims against MCC arising from, or relating to Debtors, their products and/or

[30](...continued)

PI Trust review the Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant as of the Effective Date.  If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage.  However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled.  Further, the liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of  any PI Trust Claim that might be subsequently asserted by the Direct Claimant against the PI Trust.

Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided . . . .  If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 and 7.6 . . . .

The Trustees may develop and approve a separate proof of claim form for Indirect PI Trust Claims.  Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, acceptability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the holders of the underlying valid PI Trust Claims.  Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

their operations will be in Class 6 and channeled to the Asbestos PI Trust.  MCC argues that to

the extent any claims against it arising from or relating to Debtors' products or operations must

be derivative, the initiation or prosecution of any claims against MCC will trigger indemnity

rights under the MCC Settlement Agreements.  This is true, to the extent that such indemnity

claims arise by reason of asbestos claims against Debtors (but not under certain workers'

compensation policies).[31]  Class 6 is the class that addresses these claims.  *See* Doc. No. 23363,

Tr. 9/14/09, at 260-63, Testimony of Jay Hughes, Senior Litigation Counsel for W.R. Grace.

Claims against MCC found not to be based on asbestos PI claims will not be in Class 6.    MCC

also contends that the Joint Plan fails to provide fair and equitable treatment to it because, to the

extent the channeling injunction will not bar "any and all" claims against it, the Joint Plan

thereby misclassifies MCC's claims and otherwise fails to meet the §1129 standards.  MCC is

particularly concerned about claims arising from Debtors' vermiculite mining operations in

Libby, Montana, as to which it has been alleged to have independent tort liability.[32]  Under

---

[31]In *In re W.R. Grace & Co.*  (*Gerard v. W.R. Grace & Co., et al., Maryland Casualty Company*), 115 Fed.Appx. 565, 568-69 (3d Cir., 2004), the Court of Appeals for the Third Circuit noted that claims against MCC arose because its work with Debtors on a dust control system for the Libby mine was as Debtors' worker's compensation carrier.  Thus, any liability of MCC with respect to this derived from Debtors' operations and was for injury to the claimants from asbestos.  Debtors' indemnification obligation to MCC concerning asbestos liabilities does not pertain to workers' compensation claims.

[32]This court had extended a preliminary injunction to MCC, Adv. No. 01-771, because to pursue actions against MCC would require Debtors' involvement in order for MCC to establish that liability was Grace's, not MCC's.  The Court of Appeals upheld our decision at 115 Fed.Appx. 565 (3d Cir. 2004).  Thus, the issue of whether MCC has independent liability for its part in developing Grace's dust control system at the Libby, Montana, mine remains at issue. We concluded, based on argument at the time, that it appeared that MCC's liability was derivative and for purposes of extending the preliminary injunction to MCC, that was sufficient. For purposes of plan confirmation, to the extent MCC's asbestos liability is derivative of

(continued...)

28

§524(g), claims against MCC will be channeled to the extent its liability is derivative of

Debtors'.  To the extent MCC's liabililty is not derived from Debtors', it will not be channeled.

*See In re Combustion Engineering*, *Inc.,* 391 F.3d 190 (3d Cir. 2004).[33]

MCC asserts that Indirect PI Trust Claims[34] are treated differently from Direct PI Trust

---

[32](...continued)
Debtors',
particularly because Debtors may have indemnity liability to MCC under various settlement
agreements, it is in Class 6.

[33]Debtors and MCC agree that the indemnity provisions of the settlements do not extend
to MCC's independent tortious conduct, Doc. No. 24801, if any, but the asbestos-related claims
to which MCC's indemnity claims relate are derivative of Debtors' conduct or operations.  MCC
notes that "if any Third Party Claims against MCC are found to not be asbestos personal injury
claims (Class 6) then they should be "treated at least as favorably as Class 9 claims" (General
Unsecured Claims).  At this time, we are unaware of any such nonasbestos, non-personal injury
related indemnity claims.  (Again, worker's compensation claims are not at issue.)  To the extent
MCC proves that it has a claim that is properly in a Class other than Class 6, such a claim will be
treated as provided in the Joint Plan for such Class.

[34]Indirect PI Trust Claim is defined as
        any Claim or remedy, liability, or Demand against the Debtors,
        now existing or hereafter arising, whether or not such Claim,
        remedy, liability, or Demand is reduced to judgment, liquidated,
        unliquidated, fixed, contingent, matured, unmatured, disputed,
        undisputed, legal, equitable, secured, or unsecured, whether or not
        the facts of or legal bases for such Claim, remedy, liability, or
        Demand are known or unknown, that is (x)(i) held by (A) any
        Entity (other than a director or officer entitled to indemnification
        pursuant to Section 8.8.9 of the Plan) who has been, is, or may be a
        defendant in an action seeking damages for death, bodily injury,
        sickness, disease, or other personal injuries (whether physical,
        emotional, or otherwise) to the extent caused or allegedly caused,
        directly or indirectly, by exposure to asbestos or
        asbestos-containing products for which the Debtors have liability
        or (B) any assignee or transferee of such Entity and (ii) on account
        of alleged liability of the Debtors for payment, repayment,
        reimbursement, indemnification, subrogation, or contribution of
        any portion of any damages such Entity has paid or may pay to the
        plaintiff in such action or (y) held by any Entity that is a claim

(continued...)

Claims,[35] and because the Code prohibits different treatment based on the timing of claims, the

Joint Plan cannot be confirmed.  However, MCC misconstrues the Joint Plan.  In this Plan, the

classification of some claims as direct and others as indirect is not a question of the time the

claims arose but of how they arose, and there is no discriminatory treatment.  Elihu Inselbuch, an

attorney who was a witness for the Plan Proponents and who has had experience as counsel to

asbestos creditors' committees, testified that Indirect PI Claimants will

> . . . submit their claim to the trustees, and the trustees will either
> agree with them or they won't agree with them.  If they agree with
> them, so be it.  The indirect claimant will then liquidate the claim
> in the same manner that the claimant could've liquidated the claim.
> And then the – and be paid at the payment percentage just in the
> same way the claimant would've been paid.
>
> If the trustees do not agree that their claim is an indirect PI
> trust claim, the indirect claimant, the joint tortfeasor, has the
> same appellate right, so to speak, as would a claimant can go to ADR
> and exit to the tort system to resolve the question of whether or not
> they would be entitled to enjoy the status of an indirect PI trust

---

[34](...continued)
> seeking payment, repayment, reimbursement, indemnification,
> subrogation, or contribution from the Debtors with respect to any
> insurance settlement agreement, surety bond, letter of credit or
> other financial assurance issued or entered into by any Entity on
> account of, or with respect to, Asbestos PI Claims; provided,
> however, that for the avoidance of doubt, the term "Indirect PI
> Trust Claim" shall not include or pertain to any Asbestos PD
> Claim, CDN ZAI PD Claim, Environmental Claim, or Workers'
> Compensation Claim; and further provided, however, for the
> avoidance of doubt, Indirect PI Trust Claims shall not be
> disallowed by the Court under section 502(e) of the Bankruptcy
> Code on the grounds that such claims were contingent or
> unliquidated.

Doc. No. 24657, Plan, Exhibit 1 at §1.1.144.

[35]Direct PI Trust Claims are Asbestos PI Claims which include Indirect PI Claims.  Doc.
No. 24657, Plan, Exhibit 1 at §1.1.34.

claim.

Doc. No. 23363, Tr. 9/14/09 at 44-45.  He further testified that there was no difference between

the review processes and payment scheme for Direct and Indirect PI Claims and that that process

would include the indemnity claims about which MCC is concerned (to the extent they derive

from Debtors' asbestos liability).  His explanation fits the construct of this Joint Plan and we

credit it.  The objection is overruled.

Montana and others object because the TDP allegedly will result in adverse disparate

treatment[36] against Indirect PI Trust Claims (including contribution and indemnification claims)

by imposing restrictions or requirements on holders of such claims which are not imposed on

other Asbestos PI Claims in Class 6.[37]  Those additional requirements are, as described by

_____

[36]Montana objects on classification grounds as well.  *See infra*.

[37]BNSF'S plan objection raises the same "restriction on allowed claims" argument that
Montana raises.  Plan Proponents amended the Joint Plan and Plan documents as of March 19,
2010, Doc. No. 24657, filed 4/22/10, to address BNSF's objections on equal treatment grounds.
Section 5.14 was added to the TDP to address BNSF's contractual indemnity claim.  No
objection to the amendment was raised by BNSF and therefore this objection is resolved.
Section 5.14 provides, in essence, that BNSF contractual indemnification claims will be
submitted to the Asbestos PI Trust and individually reviewed to determine their validity and
amount.  Any dispute between BNSF and the Trust regarding the validity and amount of BNSF's
claims is subject to ADR procedures provided in §5.10 of the TDP.  *See also* §2.5 of the
Asbestos PI TDP.
    Upon resolution, the claim goes in the FIFO Payment Queue based on the date of
agreement or arbitration award.  Payment will be made to BNSF in the determined amount
multiplied by the Payment Percentage in effect at the time of payment and subject to the
Maximum Annual Payment and Maximum Available Payment provisions of the TDP.
    If the dispute between the Trust and BNSF is not resolved, BNSF has the option of
litigating the claim by filing suit in any federal or state forum that has jurisdiction.  BNSF may
assert its claim against the Trust there as it could against Grace as if the channeling injunction
had not been issued.  The Trust is entitled to Grace's claims and defenses.  Upon final judgment
the claim will be placed in the FIFO Payment Queue based on the date the judgment became
final.  *See also* notes 46-48 and accompanying text, *infra*.

Montana, that (1) the TDP limits the allowable amount of an Indirect PI Trust Claim to the amount paid to the underlying asbestos plaintiff, without allowance for attorneys' fees or other defense costs;[38] (2) the TDP requires that for a claimant to assert a presumptively valid Indirect PI Trust Claim, it must obtain a full release from the underlying asbestos creditor; and (3) the TDP provides for a "maximum value" for Asbestos PI Claims which could result in negative disparate treatment to holders of Indirect PI Trust Claims in the event that a judgment is entered against it in an amount in excess of the maximum value for the particular category. Doc. No. 22429 at 31-32. We find that the plain language of the TDP shows that the "additional requirements" are in place so that an Indirect PI Trust Claimant has a procedural mechanism to present its claims. There is no disparate impact.

The TDP provides an appropriate mechanism for Indirect PI Trust Claims to be paid. Indirect PI Trust Claimants may recover no more than the Direct Claimant can recover (maximum value at a certain payment percentage). If the Indirect Claimant does not pay the Direct Claimant the maximum value, the Indirect Claimant can recover only what it paid. Doc. No. 23363, Tr. 9/14/09 at 98. The Trust will treat the claims, all derived from underlying tort liability, the same. There is no discrimination. Furthermore, as explained at note 30 and accompanying text, *supra*, the TDP provides an alternative for those Indirect PI Claimants who cannot meet the "presumptively valid" standard for Indirect PI Claims (including inability to give a release to the Trust): the claimants can request review of their claims and the TDP

---

[38]Section 5.6 of the TDP provides that "no Indirect PI Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant."

provides a mechanism to prove the validity of the Indirect Claim.[39]  *See also* Doc. No. 24657,

Exhibit 4, PI TDP.

The Crown in Right of Canada ("the Crown") cites to the objection to the Joint Plan filed

by Garlock Sealing Technologies, LLC,[40] Doc. No. 21795, in support of its argument that the

Joint Plan is unconfirmable because the TDP requires that an Indirect Asbestos PI Claimant pay

---

[39]There are presumptively valid Indirect PI Claims. Doc. No. 23363, Tr. 9/14/09 at 44.
Those indirect claims that do not meet the presumptively valid requirements have other ways to
prove their claims. *See* note 30 and accompanying text, *supra*. Elihu Inselbuch testified, and we
find, that Indirect PI Claimants

> will submit their claim to the trustees, and the trustees will either
> agree with them or they won't agree with them. If they agree with
> them, so be it. The indirect claimant will then liquidate the claim
> in the same manner that the claimant could've liquidated the claim.
> And then the – and be paid at the payment percentage just in the
> same way the claimant would've been paid. If the trustees do not
> agree that their claim is an indirect PI trust claim, the indirect
> claimant, the joint tortfeasor, has the same appellate right, so to
> speak, as would a claimant can go to ADR and exit to the tort
> system to resolve the question of whether or not they would be
> entitled to enjoy the status of an indirect PI trust claim.

> Q With respect to the description that you just gave, what, if any,
> differences between that process and the individual review process
> for direct claims are there?

> A None.

Doc. No. 23363, Tr. 9/14/09 at 44-45.

[40]Garlock objected to the plan but it has filed its own Chapter 11 in the Western District
of North Carolina, Case No 10-31607. *See* note 43 and accompanying text, *infra*. Accordingly,
it will not participate in litigation in the tort system. Any objections raised by Garlock that the
Joint Plan in this case alters its state court rights and remedies is moot because Garlock is no
longer in the tort system and claims against it will not be addressed there. However, to the
extent that other objectors raised similar issues, we address them below.

the Direct Claimant first (i.e., before claiming from the Trust), in violation of "state law."
Crown Plan Objection, Doc. No. 24144, at 22, ¶¶ 54, 55.  Garlock's Plan objection asserts that
the TDP violates the Bankruptcy Code because the Trust cannot "allow and settle an Indirect PI
Trust Claim before the Indirect Claimant pays the Trust's liability to the Direct Claimant, even
though the ability of a co-defendant to obtain adjudication of a joint-tortfeasor's shared liability
for a tort claim before paying such claim is a valuable right under applicable state law."  Doc.
No. 21795 at 3.  Garlock's and the Crown's arguments are misdirected.

For the proposition that "the states that recognize a right of contribution acknowledge
that the defendant has a right to contribution from the moment the plaintiff sues, and need not
wait until after payment," Doc. No. 21795 at 5, Garlock and the Crown refer to *Sheetz, Inc. v.
Bowles Rice McDavid Graff & Love, PLLC*, 547 S.E.2d 256, 267 (W.Va. 2001).  That case noted
the purpose of contribution is to enable all those who contributed to a plaintiff's injuries to be
brought into one suit.  It does not stand for the proposition that the contribution claim is
automatically allowed and payable before adjudication of liability and fault.  *Paul v. Bier,* 758
A.2d 40 (D.C. Ct. App. 2000), noted that "the right to contribution is contingent upon a finding
of joint liability," *id*. at 45, citing *Washington v. Washington Hosp. Center*, 579 A.2d 177, 187
(D.C. Ct.App. 1990), even though the right arises, in inchoate form, at the time the injury occurs.
*See Ciccone v. Dominick's Finer Foods, Inc.,* 731 N.E.2d 312, 318 (Ill.App. 1st Dist. 2000)(sole
issue, however, was whether the contribution cause of action under a state statute arose at the
time of injury).  Although obligations may arise at the time of the tort, *Cole v. Celotex Corp.*,
599 So.2d 1058, 1072 (La. 1992), "the full development of the right to recover contribution . . .
arises only after payment of an unequally large share of the common obligation."  *Gemco-Ware,*

*Inc. v. Rongene Mold & Plastics Corp.*, 360 S.E.2d 342, 344 (Va. 1987);[41] *Minneapolis, St. P. &*

*S. S. M R. Co. v. City of Fond du Lac,* 297 F.2d 583, 585 (7th Cir. 1961) ("The right of

contribution between joint tortfeasors arises at the time of the concurring negligent acts").  Thus,

although the right to contribution may arise as a contingent claim before the third party pays, the

claim is not liquidated or matured until payment is made.  Nothing in the Joint Plan or Trust

documents prohibits or impedes the claimant's ability to liquidate the claim prior to seeking

contribution from the Trust.  The objection is overruled.

     The Crown also objects because it was not part of plan negotiations.  *See* note 5, *supra*.

The underlying facts are these:  the Ontario Superior Court of Justice (Commercial List) (the

"CCAA Court") appointed counsel to represent interests of Canadian ZAI claimants on February

8, 2006.  On September 30, 2008, the CCAA Court, acting pursuant to this Court's Request of

Aid and Assistance, heard argument on whether to approve a Settlement with the Canadian ZAI

Claimants.  At that hearing, the Crown conceded that the CCAA Representative counsel had

authority to negotiate on behalf of Canada in respect of Canada's property damage claim, but

argued that Representative Counsel did not have authority to "negotiate away" the Crown's

Chapter 11 "claims over" against Grace.  The Crown asserts, in essence, that the Joint Plan was

not proposed in good faith because its claims for contribution and indemnity, in the event it is

---

[41]Garlock cites cases from other jurisdictions as well for the proposition that the right of
contribution arises at the time of the tort.  *See  Rowland v. Skaggs Companies, Inc.,* 666 S.W.2d
770, 772 (Mo. 1984); *La Ferry v. Ajax Truck Rentals,* 161 F. Supp. 707, 710 (E.D. Tenn.
1958)("The contingent right of a joint tort-feasor to indemnification or contribution, if any, sets
up at the same time as the right of the plaintiff against the original defendant").  None of these
cases stands for the proposition that a creditor with an asserted right to contribution or
indemnification is permitted payment in an amount that exceeds the creditor's out of pocket
costs, or that the creditor can collect on its "contingent right" until the contingency is removed
by virtue of the creditor's payment of the claim.

held liable with respect to personal injury attributable to Grace asbestos, are not Asbestos PI

Claims, yet the Joint Plan treats them as Indirect Asbestos PI Claims. This is incorrect as a

matter of law. The Joint Plan appropriately places into one class claims based on assertions that

personal injury liability derives, directly or indirectly, from Grace's asbestos. As to Debtors,

there is no distinction between liability for an injury to the person or to the third party who paid

the injured person and is subrogated to the injured person's right to payment.[42]

Garlock objects, alleging that the TDP discriminates against Indirect PI Trust Claims by

abrogating those claimants' state law rights to join Debtors in litigation.[43] Garlock has filed its

own Chapter 11 in the Western District of North Carolina, Case No. 10-31607. Accordingly, it

will not participate in litigation in the tort system. Nonetheless, Garlock contends that its rights

and interests are affected in that asbestos PI claimants will try to recover from it the unpaid

portions of Debtors' liability when both Garlock's and Debtors' products are implicated.

---

[42]To the extent the Crown would be found to be liable on a failure to warn theory and it
was determined that it was the Crown's independent liability based on its own conduct and not
derivative of Debtors', the Crown would not have a claim against these estates. If its liability
would be determined to be derivative of Debtors' asbestos-related conduct, the Crown's claims
(which, at present, are, at best, contingent) will be channeled.
     The Canadian ZAI Settlement was approved by this court and the Canadian court. The
objections to the settlement were overruled in connection with the hearing on the settlement and
the objections to plan confirmation based on the settlement are overruled as well for the same
reasons.

[43]Garlock attributes to Grace's shareholders and to asbestos plaintiffs an intent to "foist
Grace's asbestos liabilities onto the backs of solvent defendants in the tort system." Phase II
Trial Brief of Garlock Sealing Technologies, LLC in Opposition to Confirmation of Proponents'
First Amended Joint Plan of Reorganization, Doc. No. 22428, at 24. Garlock itself is now in
bankruptcy and no longer a defendant in the tort system. Nonetheless, although this contention
appears to be an assertion that the Joint Plan was filed in bad faith, as noted above, there is no
evidence of bad faith. Grace's liabilities to asbestos PI and PD claimants are well established in
this case and its invocation of the Bankruptcy Code to resolve them is appropriate. Grace is
resolving its own liabilities, not those of other tort system defendants, solvent or otherwise.

Garlock fails to explain either how it would have liability for Debtors' products or how it would have a right to recover from the Trust in this case with respect to its own products. Further, assuming, *arguendo*, that Garlock may face more claims for its own conduct or have settled claims against it for more dollars because the pool of companies facing liability for asbestos claims in the tort system is dwindling due to bankruptcy filings, it still has not established party in interest standing in Grace's bankruptcy case.[44] Further, the Joint Plan is not unconfirmable, just because other companies have resorted to bankruptcy in an effort to resolve their asbestos debt. Garlock, itself, has chosen that course of action.

The State of Montana, relying on *In re M. Frenville Co., Inc.*, 744 F.2d 332 (3d Cir. 1984), which has since been overruled by *In re Grossman's, Inc.*, 607 F.3d 114 (3d Cir. 2010), objected, asserting that eventually it may have a nondischargeable claim in the amount of $750 million but contending, further, that it has no claim now. Montana asserted that if and when it has a claim, it will be for contribution or indemnification.[45] *See* Doc. No. 21785, State of

---

[44]Garlock contends that it has party in interest standing because there is no court-appointed representative for Debtors' co-defendants and the TDP is "stacked heavily in favor of bodily injury claimants and against co-defendants." Garlock's Phase II Trial Brief, Doc. No. 22428, at 28. We disagree with Garlock's characterization of the TDP. As stated, if and when Garlock proves entitlement as an Indirect Claimant, the Trust will deal with that claim as it would any other Indirect Claim and all Indirect Claims are treated for distribution purposes just like Direct Claims. There is no merit to Garlock's assertion.

Moreover, §524(g) is clear, in this respect, regarding who may be protected by the channeling injunction and under what circumstances (e.g., those with liability derivative of the debtor). That Garlock may not meet those standards is not a reason to deny confirmation of the Joint Plan. It is unclear and unproven why alleged co-defendants require a court-appointed representative in any event.

[45]Claims against Montana are based on its failure to warn about asbestos-containing vermiculite produced by Debtors which the Court of Appeals for the Third Circuit has noted, in connection with Adv. No. 01-771 and the preliminary injunction entered in that action, are based
(continued...)

Montana Brief in Opposition to Confirmation of the First Amended Joint Plan (Montana Phase II

Brief).  In Phase II Brief, Montana asserts that any contribution and indemnification claim it may

have is not personal injury, property damage or wrongful death and therefore cannot be

channeled under §524(g).  Even if its

> claims were of the nature to which an injunction imposed under
> §524(g) might apply, that section only enjoins "claims" or
> "demands."  Under Montana law, Montana does not yet have a
> right to payment on such claims, and such claims are not yet due,
> because Montana has not yet made any payment for which it seeks
> contribution or indemnification, Montana has not entered into any
> settlement on the underlying failure to warn claims, and no
> judgment has been entered on those underlying claims. Therefore,
> under the controlling law in the Third Circuit, Montana's claims
> are not "claims" or "demands" for purposes of the Bankruptcy
> Code, and consequently do not fall within the scope of section
> 524(g).

Doc. No. 21785 at 3.

Montana reassessed its position in light of the change in the law.  It now asserts that,

under *Grossman's*, it would first have to be found liable for breach of a duty to warn its citizens

of the dangers of Grace asbestos.  Doc. No. 23654 at 10.  The Court of Appeals' decision in

*Grossman's* does not support Montana's view.  Although no judgment for failure to warn has

been entered against Montana, it has a contingent claim (assuming, *arguendo*, a claim based on

failure to warn would be determined, in the context of this asbestos bankruptcy case, to be a

valid claim against these estates).  A contingent claim is a claim for purposes of the Bankruptcy

Code.  *See* 11 U.S.C. §101(5)(A).  *See also In re First Jersey Securities, Inc.*, 180 F.3d 504, 510

---

[45](...continued)
on Montana's independent duty.  *See* note 5, *supra*.  If such claims are at some point are found to
be derivative of Debtors' asbestos-related conduct, the Joint Plan places them in Class 6,
Asbestos PI Claims, and they will be subject to the §524(g) channeling injunction.

(3d Cir. 1999)("The Bankruptcy Code defines a debt as a 'liability on a claim.'  11 U.S.C. §

101(12).  In turn, the Code defines a claim broadly.  A 'claim' means:  (A) right to payment,

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.  11 U.S.C. §

101(5).  Under this broad definition of claim, 'all legal obligations of the debtor, no matter how

remote or contingent, will be able to be dealt with in the bankruptcy case.'  Senate Report at 22,

1978 U.S. Code Cong. & Admin. News 5787, 5808.  In addition, as debt is defined as a liability

on a claim, it is coextensive with the definition of a claim, and both are construed broadly").

The Bankruptcy Code definition of "claim" is broad enough, and is interpreted as covering,

assertions of contingent rights to payment.  Thus, to the extent Montana has a contingent

asbestos personal injury claim, it is appropriately addressed in Class 6.

Further, the Court of Appeals for the Third Circuit, in determining that actions against the

state for failure to warn about the hazards of Grace asbestos were not subject to a §105(a)

injunction issued in this case, noted that "Montana's potential liability [for personal injury

arising from Debtors' products or conduct] is based on an independent legal duty that Montana's

Supreme Court has decided that the State, as sovereign, owes to its people, namely a

governmental duty to warn about hazards at Grace's site."  *In re W.R. Grace & Co.,* 591 F.3d

164, 173 (3d Cir. 2009).  Therefore, it is unlikely that Montana will have an allowed claim

against this estate.  To the extent it would have such a claim, it would arise out of Debtors'

asbestos liability and accordingly be subject to the channeling injunction and properly placed in

Class 6, Asbestos PI Claims.  Montana's objection is overruled.

One of BNSF's complaints[46] is that under the Joint Plan attorneys' fees and expenses it incurs associated with asbestos claims against it based on Debtors' conduct, products or operations will not be paid and therefore it is not being paid the same amount as Direct PI Claimants who are in the same Class (Class 6).  However, Class 6 creditors are not awarded attorneys fees or expenses in this Plan.  There is nothing in the Bankruptcy Code, and BNSF has pointed to no case law, that indicates that a plan must pay attorneys' fees incurred in connection with the underlying tort claims or the  indemnity or contribution claims arising from those torts. BNSF's point seems to be that its claims should not be considered asbestos PI claims because they arise by virtue of various agreements with Grace dating from at least 1950 and based on "applicable state common law for claims asserted against BNSF arising out of Grace's operation of the Libby [Montana] mine together with the transportation of its vermiculite over the BNSF rail network."  Objections of BNSF Railway Company to Confirmation of ... Plan, Doc. No. 21769 at 2-3.[47]  We find that, to the extent any BNSF claim to indemnity or contribution arises

---

[46]BNSF filed an objection, Doc. No. 25954, to Debtors' motion to approve a settlement with CNA, Doc. No. 25776, asserting, *inter alia*, that the settlement is ambiguous as to whether policies under which BNSF claims rights as a named insured are covered by the channeling injunction.  A hearing on Debtors' motion to approve the settlement with CNA was held on January 10, 2011, and BNSF's objections were overruled.

[47]"The relationship between Debtors and BNSF had a long history.   Between 1938 and 1995, BNSF and its predecessor entered into various agreements with the Debtors or their predecessors (collectively, the "Agreements") relating to the Debtors' mining operations in Libby, Montana.  Through these Agreements, BNSF granted Debtors permission to use certain BNSF property or granted the right of way for the Debtors to conduct certain operations across or on BNSF property.  Under some of the agreements Debtors agreed to indemnify BNSF and to hold it harmless for liability with respect to injury or death resulting from certain actions associated with the loading and transport of ore from the mine using the BNSF railroad.  Debtors also agreed to obtain insurance for BNSF and did so.  Specifically, the Debtors mined vermiculite ore from the Libby mine, which was then loaded by Debtors into railroad cars which

(continued...)

from situations that imposed liability on BNSF related to Grace's asbestos, those claims are

properly classified in Class 6.

Although BNSF asserts that Direct PI Claimants in Class 6 are being paid 100 percent of

their claims while BNSF, as an Indirect PI Claimant, is being paid approximately six percent, the

contention is not accurate.  BNSF acknowledges that "the direct asbestos claims will be entitled

to an award that's the rough justice equivalent of 100 percent of its claim in the prepetition,

non-bankruptcy litigation world.  It is just the rough justice, it's subject to a cap and subject to a

---

[47](...continued)
BNSF employees attached to BNSF trains.  The trains transported the ore to various places.
    BNSF's predecessor, The Great Northern Railway Company, and certain of the Debtors'
predecessors, The Zonolite Company or Universal Zonolite Insulation Company, entered into
various agreements between 1938 and 1956.  The Zonolite Company assigned all of its rights,
title, interest and equity in and to these several contracts to W.R. Grace & Co. in 1973.  In 1974,
W.R. Grace & Co. and Burlington Northern, Inc. entered into yet another agreement.  The final
agreement between and among Burlington Northern, W.R. Grace & Co.-Conn., and the City of
Libby was entered into in 1995." *In re W.R. Grace & Co.,* 386 B.R. 17, 23-24  (Bankr.D.Del.
2008).
    *See also* BNSF's Posttrial Brief, Doc. No. 23688, ¶¶ 2-8 at  2-3 ("(2) [b]etween 1938 and
1963, Zonolite and BNSF's predecessors, entered into various quit-claim deeds, right-of-way
agreements and leases relating  to Zonolite's operations at the Libby mine. . . . (3) Pursuant to
the leases, Zonolite leased the property owned by BNSF adjacent to BNSF's railway tracks. . . .
(4) These leases granted Zonolite the authority to construct, maintain and operate a loading dock,
suspension bridge and belt  conveyor, as well as a loading platform, steel water pipe, lumber
shed, storehouse and parking area. . . . (5) Zonolite, and subsequently Grace, mined vermiculite
ore from the Libby mine, processed it into vermiculite concentrate, and then transported the
concentrate over the suspension bridge and conveyor belt located on the Zonolite-leased BNSF
property. Zonolite/Grace then loaded it onto railway cars, and shipped the concentrate
throughout the country initially on BNSF's railway. . . . (6) In 1963, Grace's Dewey & Almy
Division purchased the business and assets of Zonolite.  On April 16, 1963, Zonolite and Grace
entered into an agreement, whereby Grace accepted the assignment of the agreements between
BNSF and  Zonolite. . . . (7) On April 1, 1974, BNSF's predecessor and Grace entered into a
lease for the maintenance and operation of storage tanks, a pumphouse and a loading dock on the
railway's right of way. . . . (8) The terms of the contracts and leases between Grace and BNSF
obligate Grace to indemnify BNSF for asbestos-related claims asserted against BNSF. These
provisions require Grace to provide full indemnity to BNSF, including providing a
defense")(citations omitted).

41

25 to 35 payment percentage." Tr. 1/4/10 at 269, Doc. 24180.  Thus, the entire amount of a

Direct PI Claimant's claim is not being paid under the Joint Plan, despite BNSF's contentions,

and the PI claimants have agreed to this treatment of payment of a percentage of their claims.

BNSF contends that because the Asbestos PI Trust is required to pay only a portion of BNSF's

contribution claims, the requirements of the Bankruptcy Code are not met.   BNSF is incorrect.

The fact that BNSF is paid what the Direct Asbestos PI Claimant would have been paid if the

Direct PI Claimant made the demand rather than BNSF shows that claimants in the same class

are being treated equally in compliance with the Bankruptcy Code.  We note that §5.6 of the

Trust Distribution Procedures ("TDP") addresses Indirect Asbestos PI Claims and provides that

if a co-defendant (with Grace) pays an asbestos PI claimant thereby extinguishing the claimant's

claim against the Asbestos PI Trust, the co-defendant steps into the claimant's shoes and can

pursue the claim against the Trust.  In that situation the co-defendant can recover from the

Asbestos PI Trust the same amount the claimant could have recovered.  *See* notes 30, 38, *supra*.

Thus, the Indirect Asbestos PI Trust Claims will be paid under the TDP in the same fashion and

percentage as what the Direct Asbestos PI Trust Claims are paid.[48]  The objection is without

merit and is overruled.

**Best Interests**

        In light of (1) the nature of the asbestos liabilities at issue in this case, (2) the likelihood

that a Chapter 7 liquidation would provide no adequate mechanism for either resolving those

---

        [48]In the 1/5/10 transcript, Doc. No. 24181, counsel for the FCR explains the TDP and that
§5.6 thereof deals with common law contribution claims; §5.13 insurer indemnity claims.  The
Plan Proponents added §5.14 to the TDP so that BNSF will have the same treatment regarding its
indemnity claims as insurers have.  Doc. No. 24181, Tr. of 1/5/10  at 94, *et seq.*

liabilities on the merits or realizing the full value of Debtors' estates, (3) the vehicle of the Joint

Plan for fixing and paying disputed asbestos liabilities, augmented by the Fresenius Medical

Care holdings, Inc. (Adv. No. 02-2211) and Sealed Air Corporation (Adv. No. 02-2210)

settlements, and (4) the mandate of §524(g) to provide for future demand holders, we find that

each holder of an impaired claim or equity interest who did not vote to accept the Joint Plan will

receive or retain value under the Joint Plan, as of the Effective Date, that is not less than the

value that such holder would receive or retain if the Debtors' estates were liquidated under

Chapter 7 of the Bankruptcy Code.  The Joint Plan therefore satisfies the best interests test of

creditors test under §1129(a)(7)(A)(ii).

The objections, which are all overruled, are as follows:  the Libby Claimants contend that

the best interests of creditors test is not met because they would receive more in a Chapter 7 than

through a reorganization.  The credible evidence is to the contrary.  In this bankruptcy case, in

addition to the current Libby claims that remain to be liquidated, there will be future demands

due to the nature of asbestos disease.  Those demands are not and cannot be known.  *See In re*

*Eagle-Picher Industries, Inc.*, 203 B.R. 256, 275 (S.D. Ohio, 1996)("it is appropriate to take the

value of future Asbestos Personal Injury Claims [demands] into account in determining the

Claims that would be required to be paid in a liquidation under Chapter 7 of the Bankruptcy

Code").  Without confirmation, the Fresenius and Sealed Air contributions would not be made.

That, alone, would remove over $1 billion benefit from this estate.

The Libby Claimants support their argument with the assertion that under Montana law

they can pursue Debtors' non-products liability insurers directly.[49]  However, the cases they cite are automobile accident cases and the liability amount was not at issue.  *Christensen v. Mountain West Farm Bureau Mut. Ins. Co.*, 22 P.3d 624 (Mont. 2000); *Safeco Ins. Co. of Illinois v. Montana Eighth Judicial Dist. Court*, 2 P.3d 834 (Mont. 2000).  Furthermore, Libby Claimants are not named insureds.  Thus, before recovering any insurance proceeds, each Libby Claimant would first have to establish Grace's liability to him or her and the amount of each claim.[50]

Libby Claimants' arguments also do not account for the costs of Chapter 7 administration or for the fact that, if these estates were liquidated, there would be a finite amount available for distribution.  In addition, the Libby Claimants are not the only creditors with asbestos personal injury claims against Debtors.  Thus, their recovery, as a group, is not the proper gauge of the recovery in a Chapter 7 versus a successful reorganization.  *See* Testimony of Pamela Zilly, Doc. No. 23532, Tr. 9/17/09, at 125-50.  Rather, as in any Chapter 7, their claims would be put into a pool of general unsecured creditors to await payment until all the claims in the class were liquidated, all the assets reduced to cash, distribution made, and insurance claims resolved.

---

[49]The evidence establishes that Libby Claimants have no direct right of action against Grace's insurers and are not named insureds under Grace policies.

[50]Libby Claimants also assert rights to non-products insurance coverage and the potential for high jury verdicts to support their contention that they would receive more in Chapter 7 than under the Joint Plan.  First, as noted in text, Libby Claimants do not have a right of direct action against Debtors' insurance carriers; they would have to establish the existence and amount of the claims and that Grace was liable for their injuries.  Furthermore, in Chapter 7 Debtors would simply be liquidated and the assets distributed *pro rata* in accordance with the Bankruptcy Code.  The time delay alone as each of the many thousands of current claimants liquidated their damages would be adverse to claimants' recoveries in Chapter 7.  The possibility that treatment of future demands in Chapter 7 would have to be considered in light of *Grossman's* definition of "claim" would pose its own unique set of issues that may further delay and reduce distribution to current claimants.

44

Because of the nature of asbestos disease and the latency period for some asbestos-related diseases, it is unclear what provisions, if any, might have to be made for future demands, inasmuch as "a prerequisite for recognizing a 'claim' is that the claimant's exposure to a product giving rise to the claim occurred prepetition."  *In re Grossman's, Inc.*, 607 F.3d at 125.  The latency period can be decades and if distribution cannot be made until all claims are liquidated, the entire bankruptcy distribution process could be long-delayed while all claimants and future demand holders proved their claims were liquidated.

The Libby Claimants find fault with the Joint Plan because it does not provide for payment levels consistent with what asbestos PI claimants received in the tort system through verdicts or settlements.  There is no requirement in the case law or the Bankruptcy Code that recoveries through reorganization plans equal those in the tort system.  The requirement is that Debtors pay at least as much as they would pay in a Chapter 7.  11 U.S.C. §1129(a)(7)(A)(ii). Here, there has been no evidence supporting the contention that a liquidation of Grace would generate as much for creditors as the Joint Plan provides.  This Joint Plan satisfies §1129(a)(7)(A)(ii).

The Libby Claimants assert that Grace's value in liquidation would be half its value as an operating company.[51]  We disagree.  Libby's view does not account for the testimony of Debtors' feasibility witness, Pamela Zilly, that it is unlikely that Grace could be sold in a Chapter 7 for, as Libby suggests, a billion dollars, due to the nature and amount of its asbestos liabilities.  Further, one of the factors Ms. Zilly considered was the benefit to the estates provided by the Fresenius

---

[51]In the Libby Claimants' view, a sale of Grace at $1 billion would increase their distributive share in a Chapter 7 liquidation.

and Sealed Air settlements that are conditioned on confirmation.  She also considered the

potential liability that would be faced with respect to allegedly fraudulent transfers involved in

the Fresenius and Sealed Air transactions if the plan is not confirmed and Debtors are

liquidated.[52]  Doc. No. 23432, Tr. 9/17/09, at 131.  David Austern, the FCR, also testified that in

a Chapter 7, the contributions to the Trust by Sealed Air and Fresenius, the value of which

exceeds $1 billion,  would not be made.  *Id*. at 59-60.  The Settlement Agreements themselves

condition the contributions on plan confirmation and receipt of protection under the injunctions

to be issued under the Joint Plan.  We credit the testimony of these two witnesses.  The objection

is overruled.

Bank Lenders argue that creditors' best interests are not served by the Joint Plan because

equity interests are retained while the Bank Lenders are not receiving the default rate of interest

under their contract.  However, Bank Lenders are not entitled to the default rate of interest and,

therefore, the absence of that rate in the Joint Plan is not a basis for finding that creditors' best

interests are not served.  We addressed this issue earlier in this Opinion.  *See* notes 6-11 and

accompanying text, *supra*.  Likewise, for the reasons stated above concerning solvency, Bank

Lenders' premise that Debtors have conceded solvency because equity retains an interest is

without merit.  There is nothing in the Bankruptcy Code that provides for "deemed solvency"

and Debtors' solvency or lack thereof was never determined.  Thus, the objection is overruled.

**Classification**

---

[52]In 1996 W. R. Grace-Conn transferred National Medical Care, Inc. to its then parent, W.R. Grace & Co., n/k/a Fresenius Medical Care Holdings, Inc.  The transfer was alleged to be fraudulent.  Another series of transfers in 1998 removed the assets, liabilities and stock of Grace's packaging business (Sealed Air) from the reach of creditors, again in an allegedly fraudulent conveyance.

Bank Lenders challenged their classification in Class 9 on the ground that there may be other unsecured creditors who do not have provisions in their agreements for default interest. However, as stated, default interest is not in play here and therefore their objection to confirmation on this basis is overruled.  The Joint Plan provides that Class 9 creditors will be paid the allowed amount of their claims in full in cash on the Effective Date, with interest.[53] Thus, the claims in this Class, including the Bank Lenders' claims, are not impaired.[54]  11 U.S.C. §1124; *In re Texas Rangers Baseball Partners*, 434 B.R. 393 (Bankr.N.D.Tex. 2010).  The classification objection of the Bank Lenders is overruled.

Montana also argues alternatively that it should be in Class 9 (general unsecured  claims) or that there should be a separate class for Indirect Claimants, with BNSF and other similarly situated potential Indirect Claimants.  It argues that placing it in Class 6 leaves the State with no assurance of being paid.  To the extent that the State has a contribution or indemnity claim that arises from the asbestos liabilities of Debtors, 11 U.S.C. §524(g)(2)(B)(i)(I), its claim is

---

[53]Section 3.1.9(b) of the Joint Plan provides that if the unsecured claim is not an allowed claim as of the Effective Date, it will be paid on the date it becomes an allowed claim or as the parties agree.  The principal amount of the Bank Lenders' claim and their entitlement to interest are not disputed, only their assertion of entitlement to default interest.

[54]Debtors filed an Agreed Amendment to §3.1.9 of the Joint Plan on December 23, 2010, at Doc. No. 25946.  On the Effective Date, under the amendment, the Bank Lenders will be paid the principal amount of their General Unsecured Claim as well as any outstanding and undisputed prepetition interest owed under the Prepetition Credit Facilities.  In addition, they will be paid postpetition interest calculated at the rate set forth in §3.1.9(b)(i)(A).  This amendment to the Joint Plan resolves the Bank Lenders' plan objections except with respect to default interest.  The default interest issue is on appeal.  The amount of the Bank Lenders' claim is not objected to and will be paid in full on the Effective Date, with interest, as provided in §3.1.9 of the Joint Plan.  Furthermore, they will be paid postpetition interest, through December 31, 2005, which will be calculated as provided in §3.1.9(b)(i)(A) of the Plan.  The Bank Lenders are not impaired.

substantially similar to the Direct Claims and, as an Indirect PI Asbestos Claim, is properly

classified in Class 6. 11 U.S.C. §1122(a). However, if Montana's liability arises from its own

conduct (failure to warn), it would not have any claim of indemnification or contribution against

Debtors [55] and would not be encompassed in any Class. We find that Class 6 is appropriately

funded to administer distributions to all claims in that class when they are proven, in accordance

with the TDP. *See* Joint Plan, Doc. No. 24657, Exhibit 1, §7.2.2 and Asbestos PI Deferred

Payment Agreement, Doc. No. 24657, Exhibit 11.

Objections with respect to the Trust Advisory Committee ("TAC")

      Garlock and Montana assert that the TAC members have conflicts of interest because

they represent asbestos PI claimants as well as serving on the ACC.[56] It is alleged that because

of this dual role[57] they will "often actually advantage or appear to advantage Direct Claimants

over Indirect Claimants, thereby generating actual and apparent conflicts of interest. Garlock

Plan Objection, Doc. No. 21795, at 11-12. The assertions of conflict of interest and the TAC

favoring Direct Claimants over Indirect Claimants are entirely speculative. There is no evidence

---

    [55]We do not determine the nature of Montana's contingent claims at this time as Montana concedes that the contingent event, i.e., any liability of Montana, has not occurred. We note, though, that in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), the debtor argued that the bankruptcy court properly exercised "related to " jurisdiction over independent nonderivative claims of the debtor's affiliates because the estate could be affected by future contribution or indemnification claims. The Court of Appeals rejected the argument because the affiliates had independent liability for their own conduct and products. The Court of Appeals also noted that "[o]ther courts exercising 'related to' jurisdiction over personal injury claims against nondebtors based on the potential for indemnification claims against the debtor have similarly involved either express indemnification obligations not present here, . . . , or derivative liability." 391 F.3d at 230 (citations omitted).

    [56]CNA also objected to the TAC on the basis of conflict of interest but has settled its differences with Plan Proponents and withdrawn its plan objections.

    [57]The ACC dissolves upon confirmation.

whatsoever that the TAC members will engage in improper conduct.  Furthermore, the Trust has specific parameters and requirements with respect to what and how claims are paid.  The Trustees hold fiduciary duties to Trust beneficiaries, including Indirect Claimants.

The testimony of Elihu Inselbuch clarifies the role of the TAC:  (1) to facilitate Trust administration by advising the Trustees with respect to how claims are administered and how to deal with them efficiently; (2) to provide a spokesperson for present asbestos claimants if necessary, a role shared by the FCR (as to demand holders), and (3) to keep the asbestos PI law firm constituency nationwide informed of progress.  Doc. No. 23363, Tr. 9/14/09, at 35-36.  Mr. Inselbuch further testified that the TAC members have no role in the processing and resolution of claims by the Trust but they retain the right to represent individual claimants.  *Id*. at 36-37.  In that they have no role in processing or resolution of those claims, we find no conflict of interest.

We agree with Plan Proponents that (1) TACs have been a feature of asbestos PI trusts since the *Johns Manville* case, (2) they represent only present claimants, (3) their powers are limited, and (4) their actions are subject to judicial review.  Not only is the TAC subject to oversight by the court, the FCR has rights equivalent to those of the TAC members thus balancing the interests of present and future claims.  This structure is imposed so that TAC members could not effect an advantage to present claimants over future claimants.  Furthermore, withholding of consent to actions by the Trustees by the TAC must be reasonable.  The TAC also must provide written explanation to any objections to a course of action recommended by the Trustees and disputes are subject to ADR, with recourse to the Bankruptcy Court.

In performing its duties the TAC represents the interests of all present claimants in the claims liquidation process and its role is to ensure that the interests of all present claimants are

not unreasonably impacted by changes to that process.  PI claims are subject to payment

according to the values set forth in the TDP and the Trustees, not the TAC, determine whether

any particular claim satisfies the criteria for payment.  There is no evidence that there is a

significant or substantial risk that participation in the TAC will materially or adversely affect a

lawyer's obligation to his or her clients[58] and no client has objected on this basis.

---

[58]Garlock complains because there is no separate FCR for those holding future demands
for contribution or indemnification claims.  Doc. No. 22428 at 27.  Garlock does not meet the
requirements for holding a future demand.  If anything, Garlock has a contingent claim; it has
not filed a proof of claim and holds no current claims.  Its contingent claim for contribution or
indemnity will depend on its being found co-liable with Grace and paying Grace's liability to a
future demand holder.  Moreover Garlock has not shown that it will have an obligation to pay a
Grace PI liability in the future.
        To the extent objectors argue that asbestos personal injury claimants have no "demands"
under §524(g) in light of the Court of Appeals' *Grossman's* decision, we disagree.  In
*Grossman's* the court said "a 'claim' arises when an individual is exposed pre-petition to a
product or other conduct giving rise to any injury, which underlies a 'right to payment' under the
Bankruptcy Code."  607 F.3d at 125.  However, the Court of Appeals noted the procedural
safeguards provided for unknown "claimants," i.e., demand holders, in the context of §524(g)
and recognized the distinction between current claims and the concept of demands as addressed
in §524(g).  The court acknowledged that the claimants before it did not fall under §524(g) and
remanded for consideration of whether their claims had been discharged.
        We note that §524(g) supplements the discharge in an asbestos case in which a
channeling injunction issued.  That section provides due process to the "unknown future
claimant," i.e., demand holder, and protects the debtor from what could be, in the asbestos
personal injury context, crippling future "claims," i.e., demands.  Section 524(g)(5) defines
"demand" as

                a demand for payment, present or future, that--
                        (A) was not a claim during the proceedings leading to the
                confirmation of a plan of reorganization;
                        (B) arises out of the same or similar conduct or events that
                gave rise to the claims addressed by the injunction issued under
                paragraph (1); and
                        (C) pursuant to the plan, is to be paid by a trust described in
                paragraph (2)(B)(i).

That is, future demand holders are those who have been exposed to asbestos but whose disease

(continued...)

## Anti-Assignment Provisions of Insurance Policies

Government Employees  Insurance Company ("GEICO"), Republic Insurance Company, and AXA Belgium object to the insurance assignment provisions of the Joint Plan.  The bases for the objection are (1) assignment violates anti-assignment provisions of policies and (2) insurers should be permitted to interpose as a defense that the policies had been assigned without its consent.  Assignment of rights in policies and of the policies[59] themselves was upheld in *In re Federal-Mogul Global, Inc*., 385 B.R. 560 (Bankr.D.Del. 2008), *aff'd* 402 B.R. 625 (D.Del. 2009).[60]  *See also MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89 (2d Cir. 1988), *cert.*

---

[58](...continued)
or other injury, sufficient to prove damages, has not yet manifested.  *Grossman's* recognized that "future claims by presently unknown claimants could cripple the debtor's reorganization," 607 F.3d at 127, and further recognized that the requirements of §524(g) are specifically tailored to protect the due process rights of future claimants.  For example, a court employing a §524(g) channeling injunction must determine that the injunction is "fair and equitable" to future claimants, 11 U.S.C. §524(g)(4)(B)(ii), and must appoint a futures representative to represent their interests.  11 U.S.C. §524(g)(4)(B)(I).  The court must also determine that the plan treats "present claims and future demands that involve similar claims in substantially the same manner."  11 U.S.C. §524(g)(2)(B)(ii)(V).  Finally, the statute requires that a 75 percent super-majority of claimants whose claims are to be addressed by the Trust vote in favor of the plan.  11 U.S.C. §524(g)(2)(B)(ii)(IV)(bb).  607 F.3d at 127.

Here, those due process rights are protected.  The FCR was appointed to represent, and has actively represented, the interests of this group of individuals who do not yet know that they have an injury because that injury has not manifested.  Their treatment by the Trust will be substantially similar to that afforded to current claimants in their class.  The class voted by much more than 75 percent to accept the plan and the channeling injunction, which provides for recognition and payment of their claims well into the future, is fair and equitable as to the future demand holders.  Thus, §524(g) and the analysis in *Grossman's* are satisfied.  All objections on the basis of *Grossman's* are overruled.

[59]Assignment of policy proceeds is not prohibited by anti-assignment provisions of insurance policies, *In re Federal-Mogul Global, Inc*., 385 B.R. at 567, citing *In re Combustion Engineering, Inc.*, 391 F.3d 190 93d Cir. 2004), and assignment of the policy itself is permissible once the event that gives rise to insurer liability under the policy occurs.  385 B.R. at 567.

[60]The matter was appealed to the Court of Appeals for the Third Circuit where it is

(continued...)

*denied* 488 U.S. 868 (1986).  *Cf. In re Kaiser Aluminum Corp.*, 343 B.R. 88, 94 (D.Del.

2006)(bankruptcy court "had jurisdiction to adjudicate the assignment issues related to the

insurance policies as property of the estate").  The objection is overruled.

Insurers argued that the Asbestos PI Trust does not have incentive to fight invalid claims.

We disagree with this premise which was not supported by any evidence whatsoever.  The

Trustees have a fiduciary duty to ensure that only valid claims are paid.  No evidence was

proffered to suggest, let alone prove, that Trustees will violate that duty.  Further, the mere fact

that the Trust pays a claim does not bind the non-settling insurer to reimburse the Trust.  The

insurer retains its rights to object to the claim against it if and when the Trust seeks to recover

from the insurer.

**Exculpation Clause**

AXA Belgium and MCC objected to §11.9 of the Joint Plan.  That section is entitled

"Exculpation" and provides:

> None of the Reorganized Debtors, the Debtors, the
> Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the
> Fresenius Indemnified Parties, the Asbestos PI Committee, the
> Asbestos PD Committee, the Unsecured Creditors' Committee, the
> Equity Committee, the Asbestos PI FCR, the Asbestos PD FCR, or
> any of their respective Representatives are to have or incur any
> liability to any Entity for any act or omission in connection with or

---

[60](...continued)
pending as Case No. 1-09-cv-2230.  On August 6, 2010, the Court of Appeals entered an order
holding proceedings in abeyance in *Federal-Mogul* and other matters before it pending the
court's decision *en banc* in *In re: Global Industrial Technologies, Inc. ("GIT") (Hartford
Accident & Indemnity v. Lawrence Fitzpatrick),* Case No. 08-3650 (Bankr.W.D.Pa.).
Reargument was scheduled in the *GIT* matter for October 13, 2010.  This court decided the *GIT*
plan confirmation issues by order dated  September 24, 2007, Doc. No. 7711, Bankr. No. 02-
21626.  We revised our Memorandum Opinion and Order on November 13, 2007, Doc. Nos.
7886, 7887).

arising out of the Chapter 11 Cases, including the negotiation of
this Plan or the settlements provided in the Sealed Air Settlement
Agreement and the Fresenius Settlement Agreement, the pursuit of
confirmation of this Plan, the consummation of this Plan or the
settlements provided in the Sealed Air Settlement Agreement or
Fresenius Settlement Agreement, or the administration of this Plan
or the property to be distributed under this Plan so long as, in each
case such action, or failure to act, did not constitute gross
negligence or willful misconduct.  In all respects, they will be
entitled to rely upon the advice of counsel with respect to their
duties and responsibilities under this Plan. Any act or omission
taken with the approval of the Bankruptcy Court will be
conclusively deemed not to constitute gross negligence or willful
misconduct.  This section is not intended to preclude a
governmental entity from enforcing its police and regulatory
powers.

Doc. No. 24657, Exhibit 1 at 126, §11.9.  AXA Belgium challenges the propriety of §11.9 as

overly broad in that it includes nondebtors such as the Sealed Air and Fresenius Indemnified

Parties.  Sealed Air and Fresenius are addressed in more detail below in the discussion of

objections to the releases provided by the Plan.  Suffice it to say at this point that this section of

the Joint Plan providing that certain parties will not incur liability for acts or omissions in

connection with confirmation, consummation or administration of the Joint Plan unless such

conduct constitutes gross negligence or willful misconduct is appropriate with respect to the

standard of liability.[61]  We find this standard to be in accord with the standards for releases set

---

[61]We note that §4.4 of the PI Trust Agreement, Doc. No. 24657, Exhibit 2, provides that
the Trustees, TAC members and the FCR will not have liability except for "breach of trust
committed in bad faith or willful misappropriation."  Section 4.6 of that Agreement provides for
defense and indemnification by the Asbestos PI Trust of the Trustees, TAC members and FCR in
the performance of their duties as permitted for statutory trusts under Delaware state law for
conduct pre-Effective Date in connection with formation and funding of the Trust.  However,
there will be no defense or indemnification for bad faith conduct or willful misappropriation.

forth in *In re PWS Holding Corp.,* 228 F.3d 224 (3d Cir. 2000).[62]

MCC also challenges §11.9 under *In re Genesis Health Ventures, Inc.*, 266 B.R. 591

(Bankr.D.Del. 2001). *Genesis* is a release, not an exculpation case. Nonetheless, MCC asserts

that Plan Proponents have not met the factors set forth in *Genesis Health* with respect to those

included in §11.9 Exculpation. *Genesis Health* required a finding of extraordinary

circumstances to approve nonconsensual releases of nonderivative third party claims against

nondebtors. *Id.* at 608. The release in that case, however, applied even to willful misconduct or

gross negligence. Furthermore, the release of third parties as to the debtor's lender was not

limited to its performance of services to further the reorganization. In the case before us, §11.9

is, first, an exculpation clause and, second, applies to acts or omissions "in connection with or

arising out of the Chapter 11 Cases" and does not excuse, or release, those to which it applies[63]

from willful misconduct or gross negligence. The extraordinary circumstance requirement of

---

[62]In *In re Washington Mutual Inc.,* 2011 WL 57111 *26 (Bankr.D.Del, Jan. 7, 2011), the Bankruptcy Court cited *PWS Holding* in connection with a discussion of the exculpation clause in *Washington Mutual*. *PWS Holding*, however, concerned a release. In another *Washington Mutual* opinion of the same date, 2011 WL 81549 *39, the court noted that the original exculpation clause in the debtor's proposed plan did not state the correct standard because it sought to excuse even willful misconduct and gross negligence. The court again cited *PWS Holding* as the standard to be met regarding such clauses. "Exculpate" is defined as "[t]o free from blame or accusation." Black's Law Dictionary at 648 (9th ed. 2009). "Release" is defined as "[l]iberation from an obligation, duty or demand." *Id*. at 1403. Notwithstanding the difference between exculpation and release, in either case willful misconduct and gross negligence are not excused nor is liability for such conduct released.

[63]The exculpation provision applies to Reorganized Debtors, Debtors, Non-Debtor Affiliates, Sealed Air Indemnified Parties, Fresenius Indemnified Parties, the ACC, the Asbestos PD Committee, the creditors' and equity committees, the PI and PD FCRs and their representatives. We note that certain releases are required by the Fresenius and Sealed Air settlements. Section 11.9 implements those releases and, as an exculpation clause with respect to the entities named in §11.9, does so within the bounds of the law and is proper.

*Genesis Health* is not applicable to this provision.[64]

**Releases**

**§8.8.7**

AMH, AXA Belgium and MCC object to §8.8.7 of the Joint Plan, contending that the

release is too broad.  That section provides:

> Without limiting any other provisions of this Joint Plan, each
> Holder of a Claim or Equity Interest who votes in favor of this
> Joint Plan shall be deemed to unconditionally have released the
> Asbestos Protected Parties, the Unsecured Creditors' Committee,
> the Asbestos PI Committee, the Asbestos PD Committee, the
> Equity Committee, Asbestos PI FCR, and the Asbestos PD FCR,
> and each such party's Representatives to the extent such
> Representatives served during the Chapter 11 Cases (except that
> the foregoing limitation shall not apply to Representatives of the
> Sealed Air Indemnified Parties and the Fresenius Indemnified
> Parties), as of the Effective Date, from any and all claims, SA
> Claims, SA Damages, obligations, rights, suits, judgments,
> damages, causes of action, remedies, and liabilities of any nature
> whatsoever, whether known or unknown, foreseen or unforeseen,
> matured or unmatured, existing or hereafter arising, in law, equity,
> or otherwise, that such Holder would have been legally entitled to
> assert in its own right (whether individually or collectively), based
> in whole or in part upon any act or omission, transaction,
> agreement, event, or other occurrence taking place on or before the
> Effective Date in any way relating or pertaining to, the Debtors or
> the Reorganized Debtors, their operations on or before the
> Effective Date, their respective property, the Chapter 11 Cases, or
> the negotiation, formulation, and preparation of this Joint Plan or
> any related agreements, instruments, or other documents.  In
> addition to the foregoing, each Holder of a Claim or Equity
> Interest who receives or retains any property under this Joint Plan
> shall also be deemed to unconditionally release the Fresenius

---

[64]For the same reason, MCC's reliance on *In re Congoleum Corp.*, 362 B.R. 167
(Bankr.D.N.J. 2007), and *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), is misplaced
as those cases provided that third parties were released with respect to claims brought against
them not necessarily related to formulation of the plan and carrying out of statutory duties with
respect to the bankruptcy case.

> Indemnified Parties to the same extent as the release in the
> preceding sentence. This section is not intended to preclude a
> Governmental Unit from enforcing its police and regulatory
> powers.

Doc. No. 24657, Joint Plan, Exhibit 1.  Some background regarding the Sealed Air and Fresenius

settlements is indicated.

Fresenius Medical Care Holdings, Inc., and National Medical Care, Inc., (with certain

other nondefendant entities) (the "NMC Defendants," *see* Adv. No. 02-2211, Doc. No. 19 at 2),

and Sealed Air Corporation (along with Cryovac, Inc.)[65] were the subject of two fraudulent

conveyance adversaries filed by the ACC and the Asbestos PD Committee.  Adversary No. 02-

2211 was filed by the ACC and the Asbestos PD Committee against the NMC Defendants on

March 18, 2002, alleging that in 1996 Grace-Conn transferred National Medical Care, Inc., at the

time the adversary was filed known as Fresenius Medical Care Holdings, Inc., one of its most

valuable and profitable operating businesses, to its then parent, W.R. Grace & Co., for

inadequate consideration in order to place the value of that business beyond creditors' reach.

That action and a related action, Adversary No. 02-2210, filed by the same plaintiffs against

Sealed Air and Cryovac, also alleging fraudulent transfers, were settled.  The Fresenius

settlement was approved by order entered June 25, 2003.  Adv. No. 02-2211 at Adv. Doc. No.

19.  The settlement in the Sealed Air adversary was approved in 2005.  Adv. No. 02-2210 at

Adv. Doc. No. 751.[66]

---

[65]Cryovac was a subsidiary created to receive the assets and liabilities that were the subject of the Sealed Air fraudulent conveyance action.  Adv. No. 02-2210, Adv. Doc. No. 1 at 6.

[66]At a hearing on December 13, 2010, counsel for Debtors represented, and was not
(continued...)

The Fresenius settlement provided that the NMC Defendants[67] would make a lump sum payment of $115 million[68] in exchange for the benefits of the §524(g) channeling injunction regarding asbestos-related claims and certain taxes.  The settlement also provided that the NMC Defendants would release the Sealed Air Companies for all Grace-Related Claims.  Therefore, Debtors would receive the settlement amount of $115 million, reduced by the amount of Indemnified Taxes that the Debtors might otherwise have been able to avoid paying as priority tax claims or as indemnification claims to the NMC Defendants.  Another result of the settlement

---

[66](...continued)
contradicted, that notice of the settlements went to all parties in interest.  The only entity that had objected to the release on notice grounds was One Beacon/Seaton which entered the case after the District Court approved the Fresenius settlement.  One Beacon/Seaton settled and its objection is moot.  Doc. No. 25928, Tr. 12/13/10, at 22.

[67]The motion to approve the Fresenius settlement defines NMC Defendants as "Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc. (collectively, along with certain non-defendant affiliates identified in the Settlement Agreement".  The non-defendant affiliates identified in the Settlement Agreement are "FMCH, NMC, and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including but not limited to Fresenius Medical Care AG and Fresenius AG, but not including the Estate Parties, Sealed Air and Cryovac."  Adv. No. 02-2211, Adv. Doc. No. 16, §1.29 at A-7, Appendix A to Exhibit A.  FMCH is Fresenius Medical Care Holdings, Inc.  Adv. Doc. No. 16, at Exhibit A at 2.  "Estate Parties" are "each of the Debtors, the estate of each Debtor, the post-confirmation estate of each Debtor, each of the reorganized Debtors, and any trustee that may be appointed in any of the Debtors' cases under the Bankruptcy Code."  Adv. Doc. No. 16, §1.12 Appendix A to Exhibit A.

[68]The FCR, David Austern, testified that the settlement value is around $1.1 billion.  Doc. No. 23432, Tr. 9/17/09 at 59.  The order approving the Fresenius settlement made a finding that the release of the Sealed Air Companies and payment by Fresenius of $115 million resulted in a net economic benefit to Debtors' estates.  *See* Adv. No. 02-2211, Doc. No. 19, Order dated June 25, 2003, at ¶¶ KK(d), WW.  Sealed Air agreed to pay $512.5 million in cash plus interest and to transfer 9 million shares of Sealed Air Common Stock.  *See* Adv. No. 02-2210, Doc. No.729 at 14, ¶ 37, and Exhibit A thereto at 14.  *See also* Order dated June 27, 2005, at ¶ O, Adv. Doc. No. 751 (settlement will result in net economic benefit to Debtors' estates and creditors in the amount of $1.2 billion).

was that the Sealed Air adversary was settled without Debtors having to indemnify the Sealed

Air Companies for the contribution and indemnity claims the NMC Defendants would otherwise

pursue against those entities in certain litigation referred to as the Sealed Air Indemnity

Litigation.[69]

The Fresenius settlement required, as conditions precedent to payment by the NMC

Defendants, that the Joint Plan provide that the NMC Defendants would be released from Grace-

Related Claims that could be asserted by the ACC and PD Committee, that the Joint Plan provide

that those voting in favor of the Joint Plan or receiving property under it would be deemed to

have released each NMC Defendant from all Grace-Related Claims, that injunctions under

§105(a) and §524(g) of the Bankruptcy Code be issued enjoining actions against any NMC

Defendants with respect to any Grace-Related Claim.  The Debtors would also hold the NMC

Defendants harmless with respect to attorneys' fees and costs should the NMC Defendants have

claims filed against them arising from any Grace-Related Claim.

The Joint Plan implements the Freseniuis settlement, in relevant part, as follows:

(1) Under §8.8.7 creditors who receive property under the Joint Plan are deemed to

release the Fresenius parties; and (2) under §8.5, the Successor Claims Injunction, any "GR

---

[69]In 2002, Sealed Air commenced a declaratory judgment action against the NMC
Defendants in the Supreme Court of the State of New York, County of New York, asserting that
Sealed Air was not liable to the NMC Defendants for indemnification or otherwise with respect
to claims asserted against the NMC Defendants.  *See* Renewed Motion for an Order Approving,
Authorizing, and Implementing Settlement Agreement, Adv. No. 02-2210, Adv. Doc. No. 729, at
11.  *See also* First Amended Settlement Agreement and Release of Claims, Adv. No. 02-2211,
Adv. Doc. No. 16, Exhibit A at A-9, ¶ 1.40 referring to "Sealed Air Corporation vs. Fresenius
Medical Care AG, Fresenius Medical Care Holdings, Inc.; National Medical Care, Inc.; and
Fresenius USA, Inc., (No. 600300/02 N.Y. Sup. Ct.)."

Claim," i.e., a Grace-Related Claim,[70] defined as one that is a nonasbestos Successor Claim[71]

[70]"Grace-Related Claims" are defined as

> collectively, all claims (including unknown claims), demands,
> rights, liabilities and causes of action of every nature and
> description whatsoever, known or unknown, direct or indirect,
> whether concealed or hidden, from the beginning of time up to and
> including the Settlement Effective Date, asserted or that might
> have been asserted (including without limitation claims for
> fraudulent conveyance, successor liability, piercing of corporate
> veil, negligence, gross negligence, professional negligence, breach
> of duty of care, breach of duty of loyalty, breach of duty of candor,
> fraud, breach of fiduciary duty, mismanagement, corporate waste,
> breach of contract, negligent misrepresentation, contribution,
> indemnification, any other common law or equitable claims, and
> violations of any state or federal statutes, rules or regulations),
> which are either Asbestos-Related Claims or that are based upon or
> arise out of the NMC Transaction, or the conduct or operations of
> any Grace-Conn Business, including without limitation, any
> liability or obligation of a Grace-Conn Business under
> environmental law, but not including any claims based on or
> arising out of the conduct or operations of the NMC Business or
> any act or omission of the NMC Defendants in connection with the
> operation of the NMC Business.

Adv. No. 02-2211, Doc. No. 16, Appendix A to Exhibit A at A-5, §1.21.

"NMC Transaction" is defined in §1.33 of the Fresenius Settlement. Adv. No. 02-2211, Adv. Doc. No. 16, Appendix A to Exhibit A at A-7 to A-8, §1.33. The definition encompasses claims that could be brought against Fresenius based on its relationship to Grace. There is a carve-out for direct claims arising from the NMC business and those are assumed by the Reorganized Debtors. *See* §8.5.2 of the Joint Plan.

[71]Successor Claims are defined in the Joint Plan as "any of the S[ealed]A[ir] Successor Claims and/or the Grace-Related Claims." Doc. No. 24657, Exhibit 1, Plan at §1.1.213. SA Successor Claims, *id*. at §1.1.195, are defined as SA Claims, *id*. at §1.1.189:

> "SA Claims" shall mean "Claim" as defined in the Sealed Air Settlement
> Agreement, including any and all claims, whether direct, indirect, derivative or
> otherwise, including 'claim' as the term is defined in section 101(5) of the
> Bankruptcy Code (except that a right to an equitable remedy shall also be

(continued...)

[71](...continued)
considered an SA Claim whether or not the breach gives rise to a right of payment), remedies, or causes of action, liability, SA Debts, or SA Damages, known or unknown, now existing or hereafter arising, that have been, could have been, may be, or could be alleged or asserted now or in the future by any Entity against the SA Debtors, their predecessors, successors, assigns, or any current or former Affiliate of any of the foregoing, including the Canadian Entities, or the Sealed Air Indemnified Parties, of whatsoever kind or nature, whether alleged or asserted or not, whether founded in law, equity, admiralty, tort, contract, statute, or otherwise, and includes demands, liability, suits, judgments, and all legal or equitable theories of recovery whether arising under the common law or any statute, ordinance, or regulation. Without limiting the generality of the foregoing, SA Claims shall include any and all claims, causes of action, SA Debts, or SA Damages under or attributable to: (I) chapter 5 of the Bankruptcy Code; (ii) successor liability, piercing the corporate veil, alter ego liability, agency liability, transferee liability, or other similar claims or causes of action seeking to hold an Entity liable for the debts or obligations of another Entity; (iii) chapter 176 of title 28 of the United States Code or any other similar statutes; (iv) any debtor-creditor, fraudulent transfer, or fraudulent conveyance statutes; or (v) any other similar claims or causes of action (all such SA Claims, causes of action, SA Debts, or SA Damages under or attributable to (I) through (v), collectively, "SA Successor Claims").

The Sealed Air settlement defines "Claims" as:

 any and all claims, whether direct, indirect, derivative or otherwise, including, without limitation, 'claim' as the term is defined in section 101(5) of the Bankruptcy Code (except that a right to an equitable remedy shall also be considered a claim whether or not the breach gives rise to a right to payment), remedies, or causes of actions, liability, Debts, or Damages, known or unknown, now existing or hereafter arising, that have been, could have been, may be, or could be alleged or asserted now or in the future by any Person against the Debtors, their predecessors, successors, assigns, or any current or former Affiliate of any of the foregoing, or the Released Parties, of whatsoever kind or nature, whether alleged or asserted or not, whether founded in law, equity, admiralty, tort, contract, statute, or otherwise, and includes, without limitation, demands, liability, suits, judgments, and all legal or equitable theories of recovery whether arising under the common law or any statute, ordinance, or regulation. Without limiting the generality of the foregoing, Claims shall include any and all claims, causes of action, Debts, or Damages under or attributable to: (I) chapter 5 of the Bankruptcy Code; (ii) successor liability, piercing the corporate veil, alter ego

(continued...)

against a Fresenius Indemnified Party[72] arising out of the Fresenius Transaction,[73] or a claim for

fraudulent conveyance, successor liability, piercing of the corporate veil; a claim arising under

Chapter 5 of the Bankruptcy Code; or other similar claim or cause of action, i.e., a claim that

predates the alleged fraudulent conveyance, is assumed by the Reorganized Debtors from and

---

[71](...continued)
liability, agency liability, transferee liability, or other similar claims or causes of
action seeking to hold a Person liable for the debts or obligations of another
Person; (iii) chapter 176 of title 28 of the United States Code or any other similar
statutes; (iv) any debtor-creditor, fraudulent transfer or fraudulent conveyance
statutes; or (v) any other similar claims or causes of action (all such Claims,
causes of action, Debts, or Damages under or attributable to (I) through (v),
collectively, "Successor Claims").

Adv. No. 02-2210, Doc. No. 729, at §1.q.

[72]Fresenius Indemnified Party is defined in the Joint Plan as "Fresenius and each of their
respective present and former subsidiaries, parents, Affiliates, officers, directors, employees,
partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and
assigns, including Fresenius Medical Care AG & Co. KGaA. and Fresenius AG, but not
including the Estate Parties and Sealed Air."  Doc. No. 24657, Exhibit 1, Joint Plan at §1.1(125).

[73]Fresenius Transaction is defined as "the series of transactions that became effective on
September 27-30, 1996, whereby, inter alia, (I) NMC distributed approximately $2.3 billion in
cash and assumed debt to Grace-Conn; (ii) Grace-Conn distributed 100% of the common shares
of NMC stock to Grace New York; (iii) Grace New York contributed 100% of the common
shares of Grace-Conn stock to Old Grace Delaware; (iv) Grace New York distributed 100% of
the common shares of Old Grace Delaware stock to its shareholders; and (iv) Grace New York
merged with a subsidiary of Fresenius Medical Care AG & Co. KGaA., all of which are more
fully described in that certain Distribution Agreement dated as of February 4, 1996, among
Grace New York, Grace-Conn and Fresenius AG, and that certain Contribution Agreement dated
as of February 4, 1996, among Fresenius AG, Sterilpharma GmbH (as defined therein), and
Grace-Conn, as that series of transactions is described in, referred to, or contemplated by Form
S-4 Registration Statement filed by Grace New York with the SEC under the Securities Act, on
or about August 2, 1996, SEC File No. 333-09497, including all attachments, exhibits and
schedules thereto."  Doc. No. 24657, Exhibit 1, Joint Plan at §1.1(130).

after the Effective Date.[74]  *See* Doc. No. 25928, Tr. 12/13/10.

The objectors contend that the release in §8.8.7 does not comport with the dictates of *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), where the court said that "[t]he hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions. . . ." *Id*. at 214.  We disagree and find that the settlements are fair and necessary to the reorganization.  The net value of the Sealed Air and Fresenius contributions are substantial - over $1 billion.  The terms of the Sealed Air and Fresenius settlements provide that without the protections afforded Sealed Air and Fresenius under the Joint Plan their contributions would not be made.  By contract,[75] these entities have

---

[74]Those holding GR Claims who have not filed a proof of claim on or before the Effective Date, may file a GR proof of claim on or before the sixtieth day subsequent to the Effective Date (the "GR Claims Bar Date").  §8.5.2(b).  The Reorganized Debtors will be entitled to assert, and will have the benefit of, all defenses of Fresenius, with respect to all GR Claims timely filed by the GR Claims Bar Date.  *Id*. at (c).


[75]From 1993 through September 28, 1996, Fresenius, certain Debtors, and Cryovac were members of the "Grace New York Group."  As a result, the operations (through and including September 28, 1996) of Grace New York, each such Debtor and Cryovac were included in Grace New York's U.S. federal consolidated income tax return for tax years ending December 31, 1993, December 31, 1994, December 31, 1995, and December 31, 1996.  Sealed Air, from the time of its formation in 1996 and ending on September 28, 1996, was also a member of the Grace New York Group and so its operations were included in Grace New York's U.S. federal income tax return for the tax year ending on December 31, 1996.  Adv. No. 02-2210 at Adv. Doc. No. 552, at 6, Renewed Motion for an Order Approving, Authorizing, and Implementing Settlement Agreement.

Under the Internal Revenue Code, Grace New York, as parent of the Grace New York Group, and each subsidiary that was a member of the Grace New York Group, including Cryovac and Sealed Air, were liable severally for tax obligations.  *Id*. at 7.  Pursuant to a Tax Sharing and Indemnification Agreement of 1996 and a Tax Sharing Agreement of 1998, Grace-Conn was required to indemnify Sealed Air and others for certain tax liabilities.  Eventually a settlement was reached with the IRS and approved by the Bankruptcy Court.  *Id*. at 9.  Before 2002, however, NMC Defendants had asserted that Sealed Air Defendants were liable for

(continued...)

62

indemnity rights against Debtors that, if exercised, would deplete assets available to pay

creditors.  *See* Adv. No. 02-2211, Adv. Doc. No. 19 at 19-21.

AMH cites *United Artists Theatre Co. v. Walton*, 315 F.3d 217 (4th Cir. 2003), for the

proposition that specific factual findings are required to support a third party release, which is to

be made only in extraordinary circumstances.  First of all, the issue in *United Artists* was

whether the U.S. Trustee's appeal from an order appointing a financial advisor to the debtor,

which did not become final until after confirmation, was rendered moot by confirmation of the

debtor's plan which contained certain releases.  In considering the release provisions, the court

in that case noted that

> no finding in the confirmation order specifically addressed the
> releases at issue. . . . Releases unbacked by adequate findings of
> fairness, necessity to reorganization and reasonable consideration
> cannot moot a challenge <u>to the retention agreement's indemnity</u>.

315 F.3d at 227.  Here, the District Court made the required findings with respect to the

Fresenius Settlement and this court made such findings with respect to the Sealed Air

Settlement.  *See* Order Granting Motion to Approve Settlement dated June 25, 2003, Adv. No.

02-2211, Adv. Doc. No. 19; Order Approving, Authorizing and Implementing Settlement

Agreement by and Among the Plaintiffs, Sealed Air Corporation and Cryovac, Inc. dated June

27, 2005, Adv. No. 02-2210, Adv. Doc. No. 751.  As relevant to confirmation, those findings

include the following:

---

[75](...continued)
indemnification and contribution with respect to asbestos-related claims and claims related to
any tax deficiencies of the Grace New York Group arising out of certain audits "or otherwise."
*Id*. at 11.  In January of 2002 Sealed Air commenced the New York litigation identified *supra*, at
note 69.  The Fresenius and Sealed Air settlements resolved all issues.

<u>In the Fresenius adversary, Adv. No. 02-2211</u>

NN.    The Settlement Agreement is in the best interests of these bankruptcy estates and the creditors thereof.

. . .

PP.    At best, the likely outcome of the Fresenius Adversary Proceeding is uncertain.  The Plaintiffs candidly admit to this Court and parties that litigation risks abound, including, without limitation, that proof of the Debtors' alleged insolvency and proof of the alleged lack of reasonably equivalent value are especially challenging in respect of the fraudulent transfer claims against the NMC Defendants.

QQ.    The Fresenius Adversary Proceeding indisputably involves complex and factual issues.

RR.    Prosecuting the Fresenius Adversary Proceeding would create substantial expenses for these bankruptcy estates and the other parties to the Fresenius Adversary Proceeding. Although the litigants might achieve some economies through litigation of the Sealed Air Adversary Proceeding, the transactions involving the NMC Defendants and the Sealed Air Companies were sufficiently different in time and nature that any savings would be marginal, if any.

. . .

TT.    Approval of the Settlement Agreement furthers the paramount interest of creditors in the above-captioned cases.

UU.    Approval of the Settlement Agreement could potentially increase the funds available to fund a plan of reorganization, both through the funds provided by the NMC Defendants and by facilitating settlement with the Sealed Air Companies.

. . .

WW.    Approval of the Settlement Agreement will avoid continued expense in the Fresenius Adversary Proceeding and the Sealed Air Adversary Proceeding, thereby resulting

in a net economic benefit to these bankruptcy estates.

XX.    Based on the foregoing, the releases, protections, and other benefits provided to the NMC Defendants are necessary to the reorganization in the above-captioned cases.

YY.    In exchange for the releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement, the NMC Defendants are providing a substantial contribution and reasonably equivalent value to these bankruptcy estates and the creditors thereof.

ZZ.    The releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement are fair to the Plaintiffs, these bankruptcy estates, and the creditors thereof.

Adv. No. 02-2211, Order dated June 25, 2003, Adv. Doc. No. 19.

## In the Sealed Air Adversary

F.    At best, the likely outcome of the SAC Action is uncertain. The Plaintiffs candidly admit to this Court that litigation risks abound, including, without limitation, acknowledgment that proof of the Debtors' alleged insolvency and the applicable standards to be applied to this issue in the Third Circuit are challenging issues . . . .

G.    The SAC Action indisputably involves complex legal and factual issues.

H.    Prosecuting the SAC Action would create substantial expenses for these bankruptcy estates and the other parties to the proceeding.

I.    In light of the amounts involved, even if the Plaintiffs were successful in the prosecution of the SAC Action, there is no assurance as to when and how much the Plaintiffs would be able to collect.

. . .

K.    Approval of the Settlement Agreement furthers the paramount interest of creditors in the above-captioned

cases.

L.    Approval of the Settlement Agreement would increase the
      funds available to fund a plan of reorganization, both
      through the funds provided by the SAC Defendants and by
      facilitating settlement with the NMC Defendants, as
      defined in the Motion.

. . .

O.    Approval of the Settlement Agreement will avoid
      continued expense in the SAC Action, thereby resulting in
      a net economic benefit to these bankruptcy estates and their
      creditors in the range of $1.2 billion.

. . .

Q.    Based on all of the foregoing, this Court concludes that the
      Settlement Agreement is in the best interests of the
      Plaintiffs, the Debtors, their bankruptcy estates, the
      creditors thereof and all parties in interest in these cases.

Adv. No. 02-2210, Order dated June 27, 2005, Adv. Doc. No. 751.

We also note that the District Court Judge explained that, based on the corporate

relationship among Grace, the Sealed Air Companies, and the NMC Defendants, defined on page

2 of his Order, when certain  transfers were made, the asbestos committees filed a complaint

against the NMC Defendants alleging that the NMC Defendants had successor liability for

Debtors' asbestos liabilities and had received fraudulent transfers to avoid that liability.  The

same allegations were made against the Sealed Air Companies.  Because the Sealed Air

Companies were members of Debtors' corporate family, the NMC Defendants asserted that the

Sealed Air Companies were liable to the NMC Defendants for indemnification and contribution

with respect to various claims, including certain tax deficiencies.  The settlement involved an

agreement to deal with the tax issues, i.e., Debtors would retain control of and responsibility for

certain taxes (or to indemnify the NMC Defendants for same), and an agreement by the NMC

Defendants to release the Sealed Air Companies for Grace-Related Claims. The District Court

concluded that as a result of the agreement, Debtors' estates would realize an economic benefit

equal to the amount of the NMC settlement proceeds ($115 million), reduced by certain taxes

that Debtors might have been able to avoid paying. The settlement also enabled Debtors to settle

the Sealed Air adversary without having to indemnify the Sealed Air Companies for the

contribution and indemnity claims that the NMC Defendants would otherwise have pursued

against Sealed Air. *See* Adv. No. 02-2211, Doc. No. 19, Order of June 25, 2003. The resulting

benefit to the estates exceeded $1 billion.

We therefore find that the *Continental* standards have been met - the findings made in the

approval of the settlements pertain to confirmation and are incorporated herein by reference as

well.[76]

**8.7.1**

The Libby Claimants assert that this provision purports to freeze the preliminary

injunctions entered in this case (e.g., the preliminary injunction in the Chakarian adversary, Adv.

No. 01-771, preventing Libby Claimants from pursuing claims against BNSF). Therefore, the

Plan allegedly usurps the court's function with respect to preliminary injunctions and is

accordingly unconfirmable.   We disagree that the court's function is usurped.

Section 8.7.1 provides:

8.7.1 Injunctions and/or Automatic Stays in Existence Immediately

---

[76]We also note that except for insurer OneBeacon/Seaton, all parties in interest were involved in the case at the time and no objections to either settlement were filed. The concerns of OneBeacon/Seaton were resolved after that insurer joined the case.

prior to Confirmation.  All of the injunctions and/or automatic
stays provided for in or in connection with the Chapter 11 Cases,
whether pursuant to Bankruptcy Code §§ 105, 362, or any other
provision of the Bankruptcy Code or other applicable law, in
existence immediately prior to the Confirmation Date shall remain
in full force and effect until the injunctions set forth in this Plan
become effective, and thereafter if so provided by this Plan, the
Confirmation Order, or by their own terms. In addition, on and
after the Confirmation Date, the Reorganized Debtors or the Plan
Proponents, acting together, may seek such further orders as they
may deem necessary or appropriate to preserve the status quo
during the time between the Confirmation Date and the Effective
Date.

While the Joint Plan was being negotiated BNSF sought a ruling from this court that it

could continue to settle claims of Libby Claimants.  On the record on July 21, 2008, BNSF made

clear that its intent was to continue to settle claims so that the severity of the injuries resulting in

the claims would not lead to higher settlement costs later on.  The result alleged was that by

paying such claims BNSF would be creating indemnity claims against Debtors.  This court ruled

that if BNSF wanted to settle on its own behalf for its direct liability it was free to do so but it

was not permitted to settle claims that would lead to indemnity claims against Debtors unless it

would waive any indemnity claims.  Doc. No. 19210, Tr. 7/21/08 at 28-36.  Therefore, any of the

orders imposing injunctions or stays entered during the course of the bankruptcy will remain in

effect through the order confirming the Joint Plan and the channeling and other injunctions

contained therein to the extent those prior orders (1) enjoin claims against Debtors or claims that

are derivative of Debtors' conduct or products and (2) are consistent with the Joint Plan

confirmation order.  In light of rulings of this court, the Libby Claimants' objection is overruled.

**Feasibility**

As a condition for confirmation, the proponents of a plan of reorganization must

demonstrate that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. §1129(a)(11). The testimony of Debtors' financial expert, Pamela Zilly,[77] established that Reorganized Grace will be a financially strong company that will generate steady growth and significant profits for the foreseeable future, and will be able to meet its obligations as they come due. Doc. No. 23531, Tr. of 9/16/09, at 102 *et seq*., Doc. No. 23532, Tr. of 9/17/09, at 123 *et seq*., Doc. No. 23619, Tr. of 10/13/09 at 21 *et seq.* Her testimony established that while in bankruptcy Grace has achieved outstanding performance. Specifically, its sales have approximately doubled between 2000 and 2008, a period that spans most of the time that Grace has spent in bankruptcy and reflects several cycles in the chemical industry. In addition, Grace's Core EBITDA increased by approximately 64 percent between 2003 and 2008, demonstrating the strength of Grace's business and its ability to generate large cash flows. Doc. No. 23619, Tr. 10/13/09 at 66.

Ms. Zilly also testified that Grace has demonstrated that it can obtain exit financing[78] that

---

[77]Ms. Zilly was qualified as a financial advisor with respect to restructuring matters. Doc. No. 23531, Tr. of 9/16/09 at 103-04.

[78]AMH also objects to confirmation because there is insufficient evidence of exit financing but there is no requirement that specific documents be executed by a reorganizing debtor to prove feasibility. As noted below, the evidence established that Grace can obtain any necessary financing prior to the Effective Date. This objection is overruled.

AMH also objects because Debtors have not obtained exit financing that the Joint Plan says Debtors "must secure." The Joint Plan does not require Debtors to obtain exit financing now; paragraph 112 of the Joint Plan states: "Exit Financing" shall mean such financing agreement(s) or commitment(s) as the Debtors may enter into to provide the Reorganized Debtors with appropriate credit availability." Article I, ¶ 112. Further,; Article 7, §7.8(h) provides:

> The Exit Financing, in an amount and on such terms satisfactory to the Debtors, shall be in full force and effect and available

(continued...)

69

will allow it to pay all obligations that will be due on the Effective Date of the Joint Plan.   In July of 2009 during the time the plan confirmation hearing was proceeding, Grace received proposals from lenders for commitment letters.   However, to maintain flexibility in its capital structure and in its timing in accessing the market, Grace has decided to negotiate actual exit finance agreements and not to seek commitment letters.   At the time of the filing of its post-trial brief, Grace was negotiating exit financing that will allow it to pay all of its obligations due under the Joint Plan upon exit from Chapter 11.  Doc. No. 23662 at 12.  *See also* Doc. No. 23619, Tr. 10/13/09 at 68-73 and note 78, *supra*.  Grace estimated that on the plan Effective Date it will have $1.539 billion of liabilities due, which it plans to pay with $589 million of balance sheet cash and $950 million in proceeds from exit financing.  *Id*. at 72.

Ms. Zilly also evaluated Grace's financial projections through 2013 and determined that they are reasonable and conservative in light of Grace's historical performance.  *Id*. at 73.  Grace has had a strong financial track record, demonstrated by its growth in sales and Core EBITDA during its Chapter 11 reorganization.[79]  We credit her testimony.

---

[78](...continued)
immediately upon the occurrence of the Effective Date and after all necessary parties have executed the documentation relating thereto.

We credit Ms. Zilly's testimony that Debtors will be able to secure necessary financing in time to meet liabilities that must be met on the Effective Date.

[79]Ms. Zilly explained: " . . . the company still is projecting a very strong financial track record with respect to 2009 and ongoing.  Frankly, its growth rate of sales is reasonable when compared to what it has achieved over the last eight to ten years.  That same assumption holds true with respect to its core EBITDA, that their expectations with respect to their core EBITDA are reasonable for a number of reason[s].  Number one, what they've managed to achieve in the past; number two, given the productivity programs that have been implemented in the last

(continued...)

In light of Grace's past performance, its ability to obtain exit financing, and its

reasonable and conservative projections, we find that Reorganized Grace will be able to pay its

debts as they come due.  Even assuming little or no growth in the years after 2013, Reorganized

Grace will be able to make the deferred payments to the Asbestos PI Trust[80]  and Asbestos PD

Trust for ZAI.

AMH[81] intimates that Ms. Zilly's feasibility testimony is suspect inasmuch as she has

been Debtors' financial advisor since the year the case was commenced and because her firm

will be able to seek a $5 million success fee if Debtors successfully emerge from bankruptcy.

 The fact that the Debtors' financial advisor testifies does not alone make the testimony suspect.

A financial advisor like Ms. Zilly, who has worked for Debtors in this capacity for ten years, is

in a better position than most to assess a debtor's ability to execute the terms of a plan of

reorganization.  We have considered and weighed Ms. Zilly's testimony in light of the fact that

---

[79](...continued)
several years; number three, with respect to the cost cutting measures that this company took in
2008 and 2009, that both the -- in my view, the financial projections with respect to sales and its
core EBITDA are reasonable projections which would sustain its ability to meet its obligations
under the plan."  Doc. No. 23619, Tr. 10/13/09, at 73.

[80]The Asbestos PI Trust shall be funded in accordance with §7.2.2 of the Plan, Doc. No.
24657, Exhibit 1 (including contribution of cash, stock, warrants, insurance rights, and
contributions pursuant to the Sealed Air and Fresenius settlements) and the Asbestos PI Deferred
Payment Agreement, Doc. No. 24657, Exhibit 11.

[81]AMH has objected on the basis, *inter alia*, that Debtors have not provided an estimate
of their future liability for traditional Asbestos PD Claims and the Joint Plan does not account for
the possibility that Anderson's class claim will be upheld on appeal.  The appeal was dismissed
on December 14, 2009, in case No. 08-4829.  The Bankruptcy Code does not require an estimate
of all possible liabilities, only that the plan have a reasonable probability of success.  With
respect to the second argument, even if Grace's liability for property damage claims would be
$1.6 billion, Ms. Zilly testified that the Joint Plan would be feasible.  Tr.10/13/09, Doc. No.
23619 at 77-79.  We credit her testimony.

her firm is permitted to ask for a success fee.  Ms. Zilly was retained by Debtors shortly before

the bankruptcy was filed, Doc. No. 23531, Tr. 9/16/09 at 111, to review projections, prepare

valuation analyses, advising with respect to acquisitions and divestitures in connection with the

bankruptcy case, to provide advice with respect to some of the settlements reached in this case,

and to work with Debtors regarding exit financing.  *Id*. at 111-12.  Thus, she is well positioned to

understand and communicate Grace's financial position and to factor its on-going business needs

into the future regarding its market share, cash needs, etc.  After working with Debtors during

their ten years in bankruptcy, the possibility that Ms. Zilly's firm may seek court approval for a

$5 million success fee is not a disabling factor to crediting Ms. Zilly's testimony.  We find that

her testimony is credible.

AMH asserts that the Plan Proponents did not quantify certain liabilities that are to "pass

through" the Joint Plan and have not demonstrated that Reorganized Grace will be able to satisfy

those liabilities.  Debtors prepared a five year projection, as required for plan confirmation, but

AMH complains because Ms. Zilly relied on those projections without preparing her own.  Ms.

Zilly testified that the company was in the best position to develop projections.  Doc. No. 23619,

Tr 10/13/09 at 165.  We agree. Despite its objection, AMH did not present any additional

evidence to challenge the accuracy or reliability of Debtors' projections.[82]  We find the

---

[82]The Joint Plan provides that Reorganized Debtors will fund the Asbestos PD Trust
every six months with the amount of the PD claims and demands that become allowed in the
preceding six month period.  AMH presented no evidence to counter Debtors' financial
projections and therefore has failed to establish a basis for a finding that Reorganized Debtors
will be unable to meet this obligation.  AMH cites a 1995 report by Daniel Rourke, a statistical
analysis expert who was engaged by Debtors that year to estimate personal injury and property
damage claims related to asbestos.  That report included an estimate of property damage costs
from the year 2000 on.  The estimate is not persuasive evidence of the amount of PD claims now,
(continued...)

projections to be reasonable and, together with the other evidence of record, sufficient to

establish that the Joint Plan is feasible.

AMH argues that there is little or no evidence that there will be asbestos PD Demands

and without PD demands, there is no basis for an Asbestos PD Trust.   Debtors' witness, Dr.

Denise Martin, testified that, based on historical PD claims against Debtors and what occurred

postpetition up to the bar date, there is a substantial likelihood that Asbestos PD Demands wills

be made.[83]  Doc. No. 23619, Tr. 10/13/2009, at 218-24.  The postpetition events include the

influx of PD claims that were filed right before the bar date (approximately 4,000), the fact that

the amount of product that was sold is unknown as is how much product was used per building,

the number of buildings that would have been affected, how many of those buildings have

removed the product, the degree of owner awareness or concern regarding the presence of the

product in their buildings, when awareness might occur and whether, once aware of the presence

of the product, there would be concern about it.  Thus, depending on these factors and a host of

others, it is unknown whether such claims will be filed but she expects PD claims to be filed in

the future.  Whether they will be allowed is a different question.  The fact that Debtors are likely

to be subject to future property damage demands is the focus of §524(g)(2)(B)(ii)(I).  *See* Doc.

---

[82](...continued)
fifteen years after the report and ten years after the target date of the report, when actual figures
are available and when Grace has settled nearly all of its known PD claims during the course of
its bankruptcy.

[83]For example, as buildings are renovated, asbestos PD claims may be filed.  Whether
they will be found to be meritorious is a different question altogether, but the point is, the
demands will exist.

No. 23619, Tr. 10/13/09, at 222-24.[84]   The objection is overruled.

Montana contends that the Joint Plan violates §524(g)(2)(B)(ii)(V) because the PI TDP

operates on a first-in-first-out ("FIFO") mechanism, with the result that the first to assert claims

could get a higher payout.[85]   This objection is without merit inasmuch as all Asbestos PI Claims

and Demands will be paid according to the procedures established for evaluation and payment,

including the medical, causation or exposure criteria and disease values established by the Joint

Plan and attendant documents.   Moreover, the Trustee is required to reassess the payment

percentage to ensure that present claims and future demands are treated in substantially the same

---

[84]AMH argues that the $37 million reserve for pending and future Asbestos PD Claims means that such claims do not have to be channeled and, in order to obtain the benefits of §524(g), Plan Proponents must show that there are likely to be substantial future demands.  We credit Dr. Martin's testimony regarding the likelihood of demands.  Because Debtors reserve $37 million for PD claims AMH argues that §524(g) requirements are not met.  Because the property damage claims bar dates have passed (2003 for general PD claims, 2008 for U.S. ZAI PD claims), all known claims are either resolved or in Class 7 which consists of two parts:  7A, traditional asbestos PD claims, and 7B, ZAI (Zonolite Attic Insulation) claims, which settled. Any unresolved U.S. ZAI claims will be addressed by the Asbestos PD Trust pursuant to the terms of the ZAI TDP.  *See* Doc. No. 24657, Exhibit 1, Joint Plan at §3.1.7(b)((ii).  *See also id.* at Exhibit 33, ZAI PD Trust Distribution Procedures.  As noted *supra*, if property damage demands are made they will have to be addressed.  Thus, the provision for PD Demands is prudent and enhances Grace's ability to reorganize.  In addition, because the property damage claims and demands must be paid 100 percent, no creditor in this class is adversely affected and the other classes of asbestos creditors voted to accept the Plan.

A *pro se* ZAI claimant objected asserting that the Asbestos PI Claims cap should be lifted to account for "future claims."  Doc. No. 21531.  The claimant's concern was based on the alleged presence of ZAI in his building.  To the extent any claimant has a demand for asbestos personal injury, the demand will be in Class 6 and addressed by the Trust.  However, Class 6 voted to accept the Plan with the cap.  This objection is overruled.

[85] The Crown cites the testimony of the FCR, David Austern, on September 17, 2009, Doc. No. 23532, as supporting the proposition that there is a "possibility" that the Trust will run out of funds before Indirect PI Claimants will be paid.  *See* Doc. No. 21444 at 22-23.  That is a mischaracterization of Mr. Austern's testimony which, while admitting the possibility of the Crown's scenario, clearly and repeatedly stated that it was not likely.  Doc. No. 23532, Tr. 9/17/09, at 70-71.

manner.  11 U.S.C. §524(g)(2)(B)(ii)(V).  This TDP provides for appropriate periodic review, as required by statute.

Montana cites *In re ACANDS, Inc.*, 311 B.R. 36, 42 (Bankr.D.Del. 2004), asserting that confirmation was denied, in part, because the court found that the Joint Plan did not comply with §524(g)(2)(B)(ii)(V) inasmuch as it discriminated between claims based on when they were asserted.  However, the plans are not similar.  The Plan in *ACANDS* gave preferred treatment to those claims that were secured by insurance proceeds.  The security interests were not based on the claimants' medical condition but on the fact that they were first in line and secured.  In the case before us there is no such disparity in payment of asbestos PI claims - whether a claim is first or last, it will be paid on the basis of the criteria (medical, disease level, etc.), not solely on the basis of time.  There is also no secured class issue in this case.  Therefore, Montana's reliance on *ACANDS* is misplaced.

Montana also cites *In re Congoleum Corp.,* 362 B.R. 167 (Bankr.D.N.J. 2007), with respect to disparity of treatment.  In *Congoleum*, however, the debtor had divided asbestos PI claims into four separate classes which were each paid differently.[86]   This Plan has no such division.

**Absolute Priority Rule**

Various parties in interest, the State of Montana, MCC, BNSF, Bank Lenders, and the Crown, objected to confirmation asserting that the Joint Plan violates the absolute priority rule to

---

[86]In *Congoleum* the debtors attempted to distinguish the treatment of asbestos claims from the discriminatory  treatment that *Combustion Engineering* rejected, *inter alia*, based on the fact that in *Combustion Engineering* there were over 100,000 claimants involved while in *Congoleum* there were only 131 claimants receiving different treatment.

the extent Asbestos PI Claimants in Class 6 reject the Joint Plan and are impaired.  Class 6 voted

overwhelmingly[87] to accept the Joint Plan.

We note first that Bank Lenders' objection is based on their assertion of entitlement to

default interest which has been addressed.  Bank Lenders are not in Class 6 and have no standing

to object on the basis of treatment of Class 6 claimants.

To the extent that Montana, MCC, BNSF and the Crown have claims, the claims are

contingent Indirect Claims.  It is impossible to predict whether those contingent claims will ever

ripen into claims payable under the terms of the Joint Plan.  If that does occur, their Indirect

Claims will be treated and paid the same as Direct Claims and, therefore, the Joint Plan is fair

and equitable as to these objectors; they are getting the same treatment as all others in the

Class.[88]  This comports with the due process concerns of *In re Grossman's, Inc.*, 607 F.3d 114

(3d Cir. 2010).

To the extent Libby Claimants object on the basis that in a Chapter 7 they would get

more than under this Plan, there is no evidence supporting that assertion.  The effect of a Chapter

7 on payment of claims is addressed earlier in this Memorandum Opinion.  In addition, we note

that, *inter alia*, the stock being contributed by Sealed Air, the Warrants issued under the Joint

Plan, the funding provision contained in §7.2.2 of the Plan, and the Asbestos PI Deferred

---

[87]In number, 99.51 percent of those submitting ballots in Class 6 voted to accept the Joint
Plan.  Only 0.49 percent in number rejected it.  In dollar amount 99.39 percent
($4,098,207,537.00) accepted the plan and 0.60 percent ($25,019,025.00) rejected it.  Votes in
the amount of $4,235,419,077.00 were counted and only $112,192,515.00 of that amount was
excluded.  Doc. No. 22706 at 6, Amended Declaration of Kevin A. Martin Certifying Tabulation
of Ballots, Ballot Tabulation Report Summary.

[88]The Crown's property damage claims are not in Class 6 and have been addressed
through the Canadian ZAI PD settlement.

Payment Agreement, Doc. No. 24657, Exhibit 11, provide a vehicle for continuing funding of liabilities.[89] Therefore, we find that creditors will get at least as much through the Joint Plan, and, in fact, much more, than in a Chapter 7.[90]  The Joint Plan is therefore fair and equitable as to each and every creditor of the se estates and in all creditors' best interests.  The objections on the basis of the absolute priority rule are overruled.

**Asbestos Insurance Entity Injunction**

Libby Claimants contend that the Asbestos Insurance Entity Injunction in §8.4 of the Joint Plan pursuant to §105(a) protects third parties from claims that cannot be enjoined under §524(g)(4)(A)(ii).  The objection misstates the terms of §8.4 which is limited to claims based on or arising out of Asbestos PI Claims against Debtors or out of any Asbestos Insurance Rights.[91]

---

[89]We also note that the extent stock and the Warrants being contributed can or will result in, in essence, dividends which will inure to the benefit of creditors.  Such a benefit will not exist in a Chapter 7 liquidation.

[90]We also note that the Joint Plan contains additional provisions applicable to Libby Claimants.  As noted, *supra*, at note 26, to address Libby Claimants' assertions that their pleural disease is progressive, the Plan Proponents modified the TDP to permit a claimant at a lower level of disease to assert a subsequent claim, not only for the initial development of a malignant disease, but also for the progression of their disease to severe asbestosis or Severe Disabling Pleural Disease.  See PP Exh. 277.4, §5.9.  *See also* Doc. No. 23282, Tr. 9/8/09 at 55, (Inselbuch).  *See also* note 27, *supra*, discussing provisions for Extraordinary Claims.

[91]Asbestos Insurance Rights are defined in Joint Plan §1.1(15) as "any and all rights, titles, privileges, interests, claims, demands or entitlements of the Insurance Contributors to any proceeds, payments, escrowed funds, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action, and choses in action of any Insurance Contributor with respect to any Asbestos Insurance Policy, Asbestos Insurance Settlement Agreement, Asbestos In-Place Insurance Coverage, or Asbestos Insurance Reimbursement Agreement, including all Asbestos Insurance Actions, whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. . . ."
Insurance Contributor is defined as "any of (a) the Debtors, (b) the Reorganized Debtors, and (c) the Non-Debtor Affiliates identified in the Asbestos Insurance Transfer Agreement."  *Id.*
(continued...)

Therefore, the injunction applies to claims against only those who provide insurance to Debtors or related parties in accordance with §524(g)(4)(A)(ii)(III) and settled with Debtors.  This objection is overruled.

**Miscellaneous**

Tyco Healthcare Group LP, d/b/a Covidien, complains that the Joint Plan should expressly refer to its stipulation with Debtors regarding a Superfund Site in Walpole, Massachusetts, which was approved by the court in 2008.  Tyco wants language added to the Joint Plan that provides that the stipulation is incorporated into the Joint Plan and that its and Debtors' rights are governed by the stipulation notwithstanding any provision of the Joint Plan or order confirming it.  The stipulation, approved by this court at Doc. No. 20241 on December 10, 2008, allows Tyco's claim as a general unsecured claim in a specified amount.  As such, it will be paid in accordance with its terms.  The order approving the stipulation with Tyco resolved all its claims and therefore no additional claims of Tyco remained to be addressed through the Joint Plan.  No further language or order is needed.  This objection is overruled.

Finally, the Creditors' Committee contends that it cannot be dissolved on the Effective Date of the Joint Plan because the Bank Lenders' claims may still be pending and the committee should be able to take an active role in the litigation that is on appeal regarding the default interest rate. There is no statutory basis for continued existence of the Creditors' Committee post-confirmation for this purpose when the Bank Lenders have their own counsel and the Creditors' Committee's services with respect to its appeal benefit the Bank Lenders but not the

---

[91](...continued)
at §1.1(146).

other unsecured creditors the Creditors' Committee was appointed to represent.  This objection is

without merit.[92]

**Conclusion**

All objections not addressed herein having been resolved, and the court finding no merit

to those addressed herein, the court recommends that the District Court confirm Plan

Proponents' Amended Joint Plan.  Additional Recommended Findings of Fact and Conclusions

of Law and a proposed order will be separately issued.

DATED: *Jan. 31, 2011*

*Judith K. Fitzgerald*
Judith K. Fitzgerald
United States Bankruptcy Judge

---

[92]When Debtors objected to the Bank Lenders' claim for default interest, Doc. No. 18922, the Creditors' Committee filed its own response to that objection, Doc. No. 19072, asserting the Bank Lenders' position but, while acknowledging that the Debtors' objection addressed only the Bank Lenders' claim, argued that, to the extent other commercial creditors have prepetition agreements providing for payment of interest, those creditors were not being provided with postpetition interest under their contracts.  The Creditors' Committee also complained because the Joint Plan had no provision for payment of statutory interest rates for those unsecured creditors who may have a right such interest.  Doc. No. 19072, n.6 and accompanying text.  In the Creditors' Committee objection to Plan confirmation, Doc. No. 21970, it reiterated its support of the Bank Lenders' position and argued that the Plan was not confirmable because it was ambiguous with respect to payment of "the full amount" of postpetition interest on 'other' Class 9 Claims whose holders have provisions in their agreements for payment of interest or that may be entitled to state statutory rates of interest in excess of the interest rate provided in the Plan in §3.1.9 of the Plan.  As to the Creditors' Committee arguments on behalf of the Bank Lenders, the Bank Lenders have their own counsel.  With respect to "other" Class 9 claimants, the Creditors' Committee has identified no such claimants, there are no objections to the claims of other members of Class 9 and no other Class 9 claimant has objected to the Plan.  Thus, the Creditors' Committee objection is speculative and is overruled.  Furthermore, modified §3.1.9 of the Plan contains specific provisions for payment of contract rates of interest and for payment of postpetition interest for "all other General Unsecured Claims," §3.1.9(b)(D).  It states procedures for resolution of postpetition interest disputes, §3.1.9(d).  Section 3.1.9(e) of the Joint Plan states procedures for determining nondefault contract rate of postpetition interest for Class 9 claimants, other than Bank Lenders, who want to substantiate that that they have a contract stating a rate of interest.  The Creditors' Committee objection is overruled.