## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-1139(JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

**MOTION OF BNSF RAILWAY COMPANY FOR RECONSIDERATION
OF THE MEMORANDUM OPINION REGARDING OBJECTIONS TO
CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION
AND RECOMMENDED SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS
OF LAW [DOCKET NO. 26154] AND THE RECOMMENDED FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER REGARDING CONFIRMATION OF FIRST
AMENDED JOINT PLAN OF REORGANIZATION AS MODIFIED THROUGH
DECEMBER 23, 2010 [DOCKET NO. 26155]**

BNSF Railway Company ("BNSF") moves this Court to reconsider The Memorandum Opinion Regarding Objections To Confirmation Of First Amended Joint Plan Of Reorganization And Recommended Supplemental Findings Of Fact And Conclusions Of Law (the Memorandum Opinion) [Docket No. 26154] And The Recommended Findings Of Fact, Conclusions Of Law And Order Regarding Confirmation Of First Amended Joint Plan Of Reorganization As Modified Through December 23, 2010 (the Findings) [Docket No. 26155], and states as follows:

### SUMMARY OF MOTION

1.      BNSF requests that this Court reconsider the following:

●      The statement in footnote 46 on page 40 of the Memorandum Opinion that the Court *overruled* BNSF's objection to the motion seeking approval of the settlement with CNA. However, the Court actually *sustained* this objection. Clarifying language was added to the Order approving the settlement as requested by BNSF.

• The statement on page 40 of the Memorandum Opinion that "There is nothing in the Bankruptcy Code, and BNSF has pointed to no case law, that indicates that a plan must pay attorneys' fees in connection with the underlying tort claims or the indemnity or contribution claims arising from those torts." In contrast, BNSF's argument that the Joint Plan must provide for the allowance of its contractual rights to attorneys' fees was recognized and implemented by the Plan Proponents by the addition of Section 5.14 of the TDP, which provides for allowance of such attorneys' fees.

• BNSF's objection concerning the treatment of its state law contribution claims. BNSF did not argue that holders of Direct Claims are being *paid* 100% of the value of their claims, while BNSF is being *paid* 6% of the value of its claims as the Court stated at page 41 of the Memorandum Opinion. Rather, BNSF objected that the *awarded* value of the claim is improperly reduced, in cases where the Direct Claimant was exposed solely, or nearly solely, to Grace asbestos. A third party (such as BNSF) who is required to pay Grace's several share of liability (through a derivative claim) should be entitled to receive an *award* equal to the full value of Grace's share of liability, and not be limited to a highly reduced *award* solely on the grounds that the Direct Claimant was initially able to recover from such third party.

## STANDARDS

2. Federal Civil Rule 60(a) (Bankruptcy Rule 9024), permits a court to correct a mistake in an order arising from an oversight or omission.

3. Federal Civil Rule 59(e) authorizes the filing of a motion to amend or alter the judgment. A motion for reconsideration is authorized by Rule 59(e) *See North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F. 3d 1194, 1218 (3d Cir. 1995).

4.      "A motion for reconsideration will be granted if the moving party establishes: (1) an intervening change in controlling law; (2) new evidence not previously available; or (3) an amendment or alteration of judgment is needed to correct a clear error or prevent manifest injustice." *Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 366 B.R. 292, 293 (Bankr. D. Del. 2007).

## ISSUES FOR RECONSIDERATION

### A.    CNA Settlement Agreement

5.      In footnote 46 of the Memorandum Opinion, the Court states:

> BNSF filed an objection . . . to Debtors' motion to approve a settlement with CNA . . . asserting, *inter alia*, that the settlement is ambiguous as to whether policies under which BNSF claims rights as a named insured are covered by the channeling injunction. A hearing on Debtors' motion to approve the settlement with CNA was held on January 10, 2011, and BNSF's objections were overruled.

Mem. Op. at p. 40, n. 46.

6.      However, BNSF's objection was not overruled – it was sustained.

Transcript of 1/10/11 hearing, at p. 104, ll. 19-22; Approval Order at pp. 8-9, ¶ 5.

7.      Further, the Court directed the parties to agree to language to be included in Exhibit 5 of the Joint Plan, once it is amended to reflect the terms of the settlement agreement, to clarify that the BNSF policies *are not* subject to the Section 524(g) channeling injunction.

Transcript of 1/10/11 hearing, at pp. 53-54.

8.      The order entered by the Court approving the CNA settlement agreement was amended to expressly provide:

> For the avoidance of doubt, the insurance policies identified in Exhibits A, B and C to BNSF's Objection to Approval of the Settlement Agreement [DktNo. 25954] -- Policy No. 2483440 (but not including policies with the identical number issued to Grace,

identified as CNA Trial Exhibits 19B and 19C, which shall be Subject Policies), Policy No. CCP 3227361 and Policy No. 9060456 -- are not Subject Policies for purposes of the Settlement Agreement. All parties reserve their rights regarding such policies, including with respect to the existence and terms of such policies.[1]

Approval Order [Docket No. 26106] at pp. 8-9, ¶ 5.

9.     Federal Civil Rule 60(a) (Bankruptcy Rule 9024), permits a court to correct a mistake in an order arising from an oversight or omission.  While the Court overruled three of the objections interposed by BNSF to the motion to approve the settlement agreement with CNA, the Court sustained the objection based upon the ambiguity contained in the Settlement Agreement.

10.     Accordingly, the Memorandum Opinion should be amended to correct the clear error – specifically, by indicating that the objection discussed in footnote 46 was sustained, and not overruled.

## B.     BNSF's Contractual Right to Attorneys' Fees

11.     BNSF objected to the confirmation of the Joint Plan as discriminatory and unfair because it unilaterally and without justification eliminated BNSF's rights to receive an award for its attorneys' fees and costs incurred in defending asbestos personal injury claims, despite the Debtors' express contractual undertaking to reimburse BNSF for such costs.  The

---

[1] Throughout this case, BNSF has consistently taken the position that the Debtors do not have a property interest in the BNSF policies to bring them within the jurisdiction of this court.  BNSF further has taken the position that, if the Debtors or CNA assert that the Debtors do have a sufficient interest in such policies to both bring them within the jurisdiction of the court and grant the court power to eliminate BNSF's rights in such policies, then this court, and this court alone, must determine (a) what, if any, interest the Debtors have in the policies; and (b) whether such interest is sufficient to enable the court to enter a channeling injunction prohibiting BNSF from pursuing its contractual rights against the insurers.  The provision added to the Order clarifies that the Debtors do not have an interest in the policies sufficient to permit them to unilaterally modify BNSF's rights.

#13823034 v1

original TDPs impermissibly re-wrote the terms of the contracts between BNSF and the Debtors by eviscerating BNSF's non-bankruptcy rights to recover such defense costs.

12.     The Memorandum Opinion, however, states, "There is nothing in the Bankruptcy Code, and BNSF has pointed to no case law, that indicates that a plan must pay attorneys' fees incurred in connection with the underlying tort claims or the indemnity or contribution claims arising from those torts." Mem. Op. at p. 40.

13.     Direct tort claimants are not entitled to recover their defense costs under the terms of the TDP, in accordance with the traditional "American Rule" that, absent contractual or statutory authority, successful litigants cannot recover litigation costs from their opponents. The Debtors, however, entered into a contract with BNSF that *obligates* them to reimburse BNSF for defense costs. At the confirmation hearing, BNSF established that the Bankruptcy Code and applicable case law mandate that BNSF's claim be allowed in its full amount; the Bankruptcy Code does not permit the Debtors to re-write its contracts and eliminate the non-debtor counterparty's rights. *See* Post Trial Brief Of BNSF Railway Company [Docket No. 26348] at pp. 9-10 (*citing* 11 U.S.C. 502(b) & 1123(a)(4); *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 24-25 (2000)).

14.     The Plan Proponents agreed that BNSF established that its contractual rights must be preserved by the Joint Plan, and amended the TDP to so reflect. Transcript of 1/5/10 hearing, at pp. 96-97:

> MR. FRANKEL: . . . But [newly-added Section 5.14] is a BNSF-specific provision, and the purpose of it is to put BNSF as to its contractual indemnity in the same place as the insurers as to their contractual indemnity. And the main point of that is that one of the arguments that BNSF made that frankly had some resonance with us was that why shouldn't they get their attorneys' fees covered if their contract permits their attorneys' fees? And why

-5-

should there be a maximum amount cap if their contract doesn't provide for that?

15.     This amendment resolved BNSF's objection that the Joint Plan was discriminatory and unfair because it eviscerated BNSF's contractual rights, while permitting all other Class 6 Claims (including insurers who also held contractual indemnity rights) to receive an award equal to the non-bankruptcy value of their claims.

16.     Accordingly, this clear error – specifically the conclusion that "There is nothing in the Bankruptcy Code, and BNSF has pointed to no case law, that indicates that a plan must pay attorneys' fees incurred in connection with the underlying tort claims or the indemnity or contribution claims arising from those torts" – must be corrected.  BNSF did so establish, and the Joint Plan was amended to ensure that BNSF's contractual claims will be allowed in full.

**C.     The Joint Plan's Treatment of BNSF's State Law Contribution Claims**

17.     The court misconstrued BNSF's objection concerning the improper, unfair and discriminatory treatment of BNSF's state law contribution claims.

18.     Specifically, the Memorandum Opinion states that BNSF argued "that Direct PI Claimants in Class 6 are being *paid* 100 percent of their claims while BNSF, as an Indirect PI Claimant, is being *paid* approximately six percent," and concludes that BNSF's argument is incorrect.  Mem. Op. at p. 41 (emphasis added).

19.     BNSF, however, asserted that the majority of the Class 6 Claimants were being *awarded* claims equal to the full non-bankruptcy value of their claims.  In contrast, BNSF, and similarly situated Indirect Claimants, are unable to receive an *award* equal to the full value of their claim, but rather are limited to *awards* that are *reduced* by up to 87.5% of their value.  *See* Transcript of 1/4/10 hearing, at pp. 268-281; Transcript of 1/5/10 hearing, at pp. 207-211 & 231-234:

THE COURT: I think you're -- the hypothetical you're asking me to assume, unfortunately, doesn't get me into whether or not you'd be entitled to extraordinary settlement values or not. If the underlying claimant substantiated all of the conditions for extraordinary relief, and BNSF pays that claim, why would BNSF not be subrogated in that same position?

MS. CASEY: This is the exact problem with the TDP. Because one of the requirements to have the underlying claimant get an extraordinary claim is that they establish they have no likelihood of substantial recovery from a third party. . . . So, the fact that they could assert the claim against us and they got a judgment against us for $400,000, automatically precludes them from getting the extraordinary claim treatment and then we, standing in their shoes, are precluded from getting extraordinary claims treatment. [Page 210].

20.     When an Indirect Claimant makes payment to a Direct Claimant, it then, under applicable non-bankruptcy law, is permitted to "stand in the shoes" of the Direct Claimant in order to *recover the Debtors' share of liability actually paid by the Indirect Claimant*; *i.e.* to be subrogated to the full claim the Direct Claimant held before receiving compensation from the Indirect Claimant. Where the Direct Claimant was exposed to multiple sources of asbestos, the TDP so provides. However, where the Direct Claimant was exposed almost solely to Grace asbestos, the TDP prevents the Indirect Claimant from receiving an award equal to the Debtors' share of liability actually paid by the Indirect Claimant. Rather, it subrogates the Indirect Claimant to the Direct Claimants' rights to recover an award *already reduced by the payment made by the Indirect Claimant.*

21.     For illustration, if it is assumed that (a) a Direct Claimant establishes the requirements of the TDP for a claim at Level IV-B (Severe Disabling Pleural Disease); (b) that such Direct Claimant elects Expedited Review, and does not elect to establish any facts that would entitle him to an enhanced award; and (c) the Direct Claimant was exposed to multiple sources of asbestos, then the Direct Claimant would be granted an award at the Scheduled Value

for Level IV-B, *i.e.* an award of $50,000. The Plan Proponents' experts testified that this award is equal to the "rough justice" 100% non-bankruptcy value of the Direct Claimant's claim against the Debtors.

22.     Likewise, if an Indirect Claimant [where the Direct Claimant was exposed to multiple sources of asbestos] pays the Debtors' several share of liability to the Direct Claimant (pursuant to either state law joint and several liability rules, a derivative claim against the Indirect Claimant, or otherwise), the Indirect Claimant would also be entitled to an award of $50,000, *i.e.* an award equal to what the Plan Proponents' experts testified is equal to the rough justice 100% non-bankruptcy value of the claim. There is no reduction in the value of the award granted to the Indirect Claimant merely because the Direct Claimant recovered Grace's share of the liability initially from the Indirect Claimant.

23.     This treatment – permitting the Indirect Claimant to recover the full award necessary to compensate it for paying Grace's several share of liability to the Direct Claimant – is not afforded to an Indirect Claimant where the Direct Claimant was exposed solely to Grace asbestos.

24.     If a Direct Claimant establishes that he was exposed solely, or nearly solely, to Grace asbestos, and qualifies for an Extraordinary Claim at the 95% level, and does not have the ability to recover against any third party, he would be entitled to an Extraordinary Claim, resulting in an award in the amount of $400,000 (eight times the Scheduled Value of $50,000). The Plan Proponents' experts testified that this award is also equal to the rough justice 100% non-bankruptcy value of the claim.

25.     However, if it is assumed that such Direct Claimant has the ability to recover some or all of its claim against a third party non-debtor [such as BNSF], and the Trust

determines that the recovery from the third party is "substantial," then the Direct Claimant is automatically disqualified from receiving an Extraordinary Claim, and the award to which it would be entitled is limited to the Scheduled Value of $50,000.[2] Presumably, this limitation is because the Direct Claimant has actually recovered from such third party, and accordingly, his claim against the Debtors should be reduced.

26. The Indirect Claimant [such as BNSF] in such case (who made full payment of Grace's liability to Direct Claimant] would *also* be prevented from receiving an Extraordinary Claim. Thus, the Indirect Claimant's [*e.g.* BNSF's] *award* is $50,000, even though the Plan Proponents' own experts value Grace's several share of liability in such instances at $400,000. Thus, the Indirect Claimant's *award* is equal to only 12.5% of the rough justice value of the claim.

27. While the Indirect Claimant should "stand in the shoes" of the Direct Claimant, that position should be the Direct Claimant's position *as though it hadn't received payment from the Indirect Claimant.* That is the very purpose of contribution claims: to permit the party who made payment to a direct claimant *on behalf of the Debtors' liability* to recover the full payment made on the Debtors' behalf.

---

[2] This hypothetical assumes a Direct Claimant who does not elect Individual Review and cannot establish additional factors to enhance his award. If he could establish such factors, he would be entitled to an award up to $100,000 (the Maximum Value), an amount that is equal to only 25% of the Extraordinary Claim value.

28.     The *awards* granted to various claimants in Class 6 are as follows:

| Type of Claimant | Award expressed as Percentage of Rough Justice 100% Claim, as testified by Plan Proponents' Expert |
|---|---|
| Direct Claimant, multiple exposure | 100% |
| Indirect Claimant, multiple exposure | 100% |
| Direct claimant, 95% exposure to Grace asbestos; no substantial recovery from third party | 100% |
| Direct claimant, 95% exposure to Grace asbestos; substantial recovery from third party | No more than 12.5% (but recovered from non-debtor third party) |
| Indirect Claimant, 95% exposure to Grace asbestos | 12.5% |

29.     Thus, an Indirect Claimant who is held derivatively liable for Grace's several share of liability in a case where Grace is the sole asbestos actor is unable to receive an *award* from the Trust that is equal to Grace's several share of liability. This is manifest discrimination.

30.     Because the Court misunderstood BNSF's argument, it addressed an "issue" not raised by the Railroad. The Plain is inherently discriminatory since the TDP results in an allowance of an award to BNSF, and similarly situated Indirect Claimants, that is but a small fraction of the actual value of the award, while other Class 6 Claimants are entitled to the full "rough justice" value of their award.

WHEREFORE, the Court should reconsider its Memorandum Opinion and Proposed Order and (a) correct footnote 46 to reflect that the Court sustained BNSF's objection; (b) correct the finding at page 40 of the Memorandum Opinion concerning BNSF's contractual right to attorneys' fees, to reflect that BNSF established such right and the Joint Plan was amended to ensure BNSF would be entitled to receive an award that includes such attorneys'

#13823034 v1

fees, if established; and (c) sustain BNSF's objection to the Joint Plan on the basis that the

treatment of its Indirect Claims is discriminatory.

Dated: February 10, 2011
      Wilmington, Delaware

PEPPER HAMILTON LLP

/s/ James C. Carignan
James C. Carignan (DE No. 4230)
Hercules Plaza, Suite 5100
1313 North Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(Courier No. 19801)
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

Of Counsel:

Edward C. Toole, Jr.
Linda J. Casey
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
Tel: (215) 981-4000
Fax: (215) 981-4750

Counsel for BNSF Railway Company

Counsel for BNSF Railway Company

#13823034 v1