## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al., | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Hearing Date: March 28, 2011, at 9:00 a.m.** |
| | ) **Objection Deadline: March 11, 2011** |

## MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO MAKE CONTRIBUTIONS TO THE GRACE RETIREMENT PLANS

The Debtors respectfully move this Court for the entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Order</u>"), authorizing but not requiring them to make a series of contributions in 2011 totaling up to approximately $236 million (the "<u>2011 Contribution</u>") to the trust (the "<u>Plan Trust</u>") holding and investing assets for the benefit of the Debtors' U.S. defined benefit employee retirement plans (the "<u>Grace Retirement Plans</u>" or the "<u>Plans</u>").[1]

The 2011 Contribution comprises two components:

- The remaining $55.8 million minimum pension contribution (the "<u>2011 Minimum Contribution</u>") that the Debtors are required by statute to make in four payments between April 2011 and January 2012;[2] and

- An additional contribution of up to $180 million (the "<u>Additional Contribution</u>").

As set forth in <u>Exhibit C</u>, the Debtors have concluded that, under all likely scenarios, they will be required by statute to contribute to their Plans an amount equal to the Additional Contribution plus the contributions set forth in <u>Exhibit</u> C during the 2011–17 time period. In

---

[1]   Capitalized terms not defined herein shall have the meaning ascribed to them in the *First Amended Joint Plan of Reorganization* in these Chapter 11 Cases, as amended, Docket nos. 19579, 20666, 20872, 20873, 21594, 24657 & 25881 (the "<u>Chapter 11 Plan</u>").

[2]   The total 2011 minimum pension contribution is approximately $65.8 million.  In January 2011, the Debtors contributed approximately $9.9 million based upon authority granted by the Court. *See* ¶ 4 of this Motion; *see also* <u>Exhibit B</u>.

consultation with their advisors, the Debtors have further concluded in their sound business judgment that they will accrue a number of tangible benefits, including up to approximately $82.4 million in cash savings, if they make the Additional Contribution to the Plan Trust now, in 2011, instead of making those payments piecemeal from now through 2017.

In particular, the Additional Contribution will:

- Generate cash tax savings in 2011 of up to approximately $56 million;

- Reduce over the 2011–17 time period estimated cash pension contributions by approximately $26.4 million, and reduce projected pension expenses by a similar amount;

- Generate an internal rate of return ("IRR") of up to 21% based upon the foregoing cash savings of up to approximately $82.4 million;

- Reduce unfunded pension liabilities by more than 60% in 2011, from approximately $367 million to $133 million;

- Reduce volatility in future pension benefit obligations ("PBO") and associated required cash pension contributions and pension expenses; and

- Create a "pre-funding credit" that will enable the Debtors to better manage their annual free cash flow during the critical years directly following emergence from bankruptcy.

Finally, the Additional Contribution will further optimize the Reorganized Debtors' capital structure at exit and in the years following by exchanging highly volatile and uncertain unfunded pension benefit obligations for a fixed amount of debt at a contractual interest rate. The need to act now to optimize the capital structure has gained fresh urgency with the Court's recent entry of the Confirmation Order on January 31, 2011. Based upon the foregoing, the Debtors have determined in their sound business judgment that it is in the best interests of their estates and all their stakeholders to make the Additional Contribution in 2011 on the terms and conditions set forth in this Motion.

The Additional Contribution may require the Debtors to increase the anticipated size of their exit financing needs. But the Debtors, in consultation with their advisors (as further

discussed in the O'Connell Declaration), have concluded that they have more than ample liquidity and debt capacity to pay all allowed claims contemplated by the Chapter 11 Plan, regardless of whether their exit financing needs increase as a result of having made the Additional Contribution.[3]

The Debtors intend to frontload the 2011 Contribution by making, on or before March 31, 2011, the entire Additional Contribution plus the statutory minimum contribution of approximately $13 million, which must be paid in April 2011, for a total of $193 million. The Debtors intend to contribute the remaining balance of the 2011 Contribution as follows:

| Month | Contribution |
|-----------|----------------|
| July | $13.2 million |
| September | $16.3 million |
| October | $13.2 million |

The Debtors will immediately accrue a number of additional significant benefits from making the $193 million payment on or before March 31, 2011, including immediately:

- Securing the cash tax savings of up to $56 million;

- Investing the proceeds of that contribution to begin generating the returns on investment that will help reduce future pension expenses and minimize volatility in future pension contributions and unfunded PBOs; and

- Reflecting the contribution on their first quarter 2011 financial statements, which the Debtors expect to use as the foundation for discussions with potential exit financing lenders and credit ratings agencies.

On February 9, 2011, the Debtors provided a written overview of the 2011 Contribution to representatives of each of the official committees (collectively, the "Committees") and the future claimants' representatives for asbestos personal injury and asbestos property damage (the

---

[3]    John James O'Connell III, a managing director of Blackstone Advisory Partners, L.P., financial advisors to the Debtors, has submitted a declaration in support of this Motion (the "O'Connell Declaration"), and it is incorporated herein by reference.

DOCS_DE:167970.1

"FCRs"). On February 14, 2011, the Debtors' management and professionals discussed the 2011 Contribution and this Motion with the Committees' and FCRs' professionals. On February 15, 2011, the Debtors shared a draft of this Motion with the Committees' and FCRs' professionals.

In support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2.      The predicates for this Motion are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Fed. R. Bankr. P. 6004(h).

### BACKGROUND

**I.      The Prior Funding Motions**

3.      As set forth in Exhibit B to this Motion, the Debtors have made the statutorily required minimum contributions to the Grace Retirement Plans for the period of January 2007 through January 2011 pursuant to the authority granted by orders of this Court. These contributions include the approximately $9.9 million quarterly contribution made in January 2011 in partial satisfaction of the Debtors' projected $65.8 million minimum pension contribution for 2011.

**II.      The Additional Contribution Has a Sound Business Purpose, and Will Benefit All Stakeholders**

4.      The Debtors are required by statute to make the 2011 Minimum Contribution. They have a sound business purpose in making the Additional Contribution for the following reasons:

**A.    The Additional Contribution Will Produce Cash Savings of up to $82.4 Million, Yielding a Projected IRR of up to 21%.**

*Cash Tax Savings of Up to $56 Million:*

5.    The 2011 Contribution will reduce the Debtors' cash expenditures for 2010 income taxes by approximately $18 million once the Additional Contribution has been made. The Debtors intend to designate a substantial portion of the 2011 Contribution to reduce their 2010 taxable income and apply any carryover to 2011.

6.    The Debtors will be able to use the Additional Contribution to reduce 2011 estimated tax payments by approximately $38 million. The Debtors intend to make the Additional Contribution on or before March 31, 2011, to secure their position that no estimated tax payments are due in 2011. Such payments would otherwise begin to accrue in April 2011.

*Projected Pension Contribution Savings of $26.4 million:*

7.    As illustrated in Exhibit C, making the Additional Contribution in 2011 will reduce cash pension contributions during the 2011–17 time period by approximately $26.4 million. This reduction arises because the Plan Trust will be earning returns from the investments made with the Additional Contribution proceeds throughout the entire 2011–17 time period. As set forth in Exhibit D, pension expenses also will be reduced by a similar amount for the same reason.

**B.    The Additional Contribution Will Reduce Future Risks to the Debtors From Large Unfunded Pension Liabilities**

*The Debtors' Unfunded Pension Liabilities Have Increased and Are Highly Volatile:*

8.    Grace's current PBO is approximately $1.6 billion. Approximately $1.1 billion of these obligations arise from the Plans.[4] The PBO has been highly volatile over the past two

---

[4]    Grace and certain of its non-debtor subsidiaries have an additional $500 million of PBO for pension plans other than the Grace Retirement Plans.

years, having increased or decreased by more than $100 million in four of the last eight quarters, and also having changed by more than $40 million in two additional quarters. Discount rates have also been volatile (ranging from 4.75% to 7.25% over the same period), which has further exacerbated PBO volatility.

9.     Such volatility has adversely affected the Plans' funding status, which declined from approximately 83% in 2007 to approximately 66% in 2010, resulting in their total underfunded PBO increasing to approximately $367 million. This increase has already driven up the Debtors' annual cash funding requirements in 2011 and beyond by more than 75% per year over the 2010 funding requirement.    The Debtors are concerned that without the 2011 Contribution invested pursuant to the "Glide Path" strategy discussed below, these unfunded liabilities could further increase their annual cash contribution obligations.

### The Debtors' Strategy to Cut Unfunded Pension Liabilities and Reduce Their Volatility:

10.     Debtors historically allocated Plan Trust investments in a traditional split of 60% equity and 40% fixed income, based upon the expectation that investment returns (specifically equity returns) would minimize long-term funding requirements. But such expected returns have not materialized in recent years, because of the highly volatile nature of the markets.

11.     Commencing in early 2010, as part of their ongoing analysis of pension strategies, the Debtors' management and advisors (primarily Aon Investment Consulting) developed an alternative long-term strategy for decreasing unfunded pension liabilities and reducing associated volatility.    As a result, they began last year to pursue a "Glide Path" investment strategy, which is designed to systematically increase the Plan Trust's fixed income allocation from 40% to 90% as the Plans' funding percentage approaches 100%.

12.     Such fixed income investments will better match both the PBO's duration and the discount rate used to measure it. Fixed income investment yields and the PBO tend to move in

6

tandem, inverse to changes in interest rates. Therefore, increasing both the funding status and the fixed income asset allocation will allow the Debtors to better hedge against the risk of decreases to the PBO funding status. This should help to mitigate volatility with respect to future funding requirements.

13. The Debtors have increased the Plan Trust's fixed income asset allocation to approximately 47%. The Debtors intend to use the proceeds from the Additional Contribution to increase the Plan Trust's fixed income asset allocation to 70% by the third quarter of 2011. The Additional Contribution will also cut the total unfunded liability for the Plans by more than 60% in 2011, from approximately $367 million to approximately $133 million. This will result in the Plan funding status increasing to over 90% on its largest Plan.

## C.   The Additional Contribution Will Enable Debtors to Better Manage Their Overall Cash Flow

14. The Additional Contribution also will create a "pre-funding" credit that the Debtors intend to amortize over the 2011–14 time period.[5] This will enable the Debtors to reduce pension contributions during the 2012–17 time period by approximately 50%, from an estimated average of $71 million per year if the Additional Contribution were not to be made to an average of approximately $36.7 million per year if it is made. Additionally, reducing out-of-pocket cash costs, coupled with the ability to use the pre-funding credit at any time before it is fully exhausted, will provide the Debtors with additional cash coverage to service their debt obligations and other cash requirements in the critical years immediately following emergence from bankruptcy.

---

[5]   The Debtors have a certain amount of flexibility regarding the period over which to utilize the pre-funding credit. Depending upon a number of factors, including future cash flow requirements, the Debtors could choose to utilize the pre-funding credit over either a shorter or longer period than through 2017.

**III.    The Debtors Have More Than Ample Liquidity and Debt Capacity to Make the Additional Contribution**

15.    As of December 31, 2010, the Debtors had on hand approximately $1.1 billion of cash on a consolidated basis.  The Debtors have estimated on a pro forma basis, that had they emerged from bankruptcy on December 31, 2010, approximately $1.6 billion of allowed claims would have been paid.  The Debtors also have estimated on a pro forma basis, assuming a December 31, 2010, exit from bankruptcy, that in addition to then-existing cash balances, they would have needed an exit financing facility (the "Exit Facility") in the amount of approximately $600 million to fund such projected emergence payments.

16.    The Additional Contribution may require the Debtors to increase the Exit Facility's size.  Any such increase would depend upon a number of factors, including the timing of their exit from bankruptcy.  As set forth in more detail in the O'Connell Declaration, the Debtors have more than ample liquidity and debt capacity to support any additional borrowing that the Debtors determine in their business judgment would be necessary as a result of the Additional Contribution being made.  Regardless of whether the Additional Contribution is made, the Debtors' capital structure, based upon relevant credit statistics, will remain conservative.

17.    Moreover, the major credit rating agencies Moody's and Standard & Poor's treat after-tax underfunded pension obligations as debt for purposes of their credit analysis.[6]  Thus, even if the size of the Exit Facility were to increase as a result of the Debtors having made the Additional Contribution, such an increase would not be viewed as an increase in the Reorganized Debtors' overall debt level.  Instead, to the extent that the Exit Facility does increase in size, the Debtors and their advisors believe that the Additional Contribution would be better viewed as an

---

[6]    See Standard & Poor's *Pension Deficits Pose Risks to Corporate Credit, Despite Funding-Relief Measures,* June 2010 and Moody's *Managing Ratings with Increased Pension Liability,* March 2009.

exchange of highly volatile and uncertain unfunded pension benefit obligations for a fixed amount of debt at a contractual interest rate.

### RELIEF REQUESTED

18.    The Debtors respectfully request the Court enter the Order, authorizing but not requiring them to make the 2011 Contribution on the terms and conditions set forth in this Motion.

### ANALYSIS

19.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Courts in this jurisdiction may approve such use of estate property outside the ordinary course of business if the debtor establishes that:

> (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith.

20.    *In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, 7-8 (D. Del. May 20, 2002), citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).  *See also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test'."); *Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("a debtor's decision must be supported by an articulated business justification"); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386,390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)).

21.     Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992). A party-in-interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." *Montgomery Ward*, 242 B.R. at 155.

22.     It is a matter of sound business judgment for the Debtors to make the 2011 Contribution.   The contribution and the concomitant Glide Path investment strategy satisfy several immediate and longer term interests of the Debtors' estates, their creditors, as well as their other stakeholders by:

- Generating cash tax savings in 2011 of up to approximately $56 million;

- Reducing estimated cash pension contributions and projected pension expenses each by approximately $26.4 million over the 2011–17 time period;

- Generating a projected internal rate of return ("IRR") of up to 21% based upon the foregoing cash savings of up to $82.4 million.

- Reducing unfunded pension liabilities by more than 60% in 2011, from approximately $367 million to $133 million;

- Reducing PBO volatility and concomitantly reducing volatility in associated required cash pension contributions and pension expenses; and

- Significantly improve free cash flow during the 2012–17 time period.

## CONCLUSION

23.     In light of the foregoing, the Debtors submit that the Court should enter the Order authorizing the Debtors to make the 2011 Contribution, because doing so is in the best interest of the Debtors' estates and satisfies the "sound business judgment" test for the use of estate assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code.

<u>**NO PREVIOUS MOTION**</u>

24.    No previous motion for the relief sought herein has been made to this or any other court.

<u>**NO BRIEFING SCHEDULE**</u>

25.    The Debtors respectfully submit that this Motion does not present any novel issues of law requiring briefing.  Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "<u>Local District Court Rules</u>"), incorporated by reference in Del. Bankr. L.R. 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Rules.

<u>**NOTICE**</u>

26.    Notice of this Motion has been given to:  (i) the office of the United States Trustee; (ii) counsel to the L/C Facility Agent and L/C Issuers; (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (iv) counsel to each of the official committees appointed in these Chapter 11 Cases; (v) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (vi) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (vii) the Pension Benefit Guaranty Corporation.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

**[remainder of this page is intentionally left blank]**

WHEREFORE, the Debtors respectfully request the Court enter the Order authorizing but not requiring the Debtors to make the 2011 Contribution and granting such other relief as may be appropriate.

Dated: February 18, 2011

KIRKLAND & ELLIS LLP
Adam Paul
John Donley
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

and

BAER HIGGINS FRUCHTMAN LLC
Janet S. Baer
Roger J. Higgins
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4047

and

PACHULSKI STANG ZIEHL & JONES LLP

/s/ James E. O'Neill
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
(302) 652-4400

Co-Counsel for the Debtors and Debtors-in-Possession