**Hearing Date: March 28, 2011 at 9:00 a.m. (ET)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| IN RE: | |
|---|---|
| ACandS, Inc. | Case No.: 02-12687 |
| Armstrong World Industries, Inc. | Case No.: 00-4471 |
| Combustion Engineering, Inc. | Case No.: 03-10495 |
| The Flintkote Company | Case No.: 04-11300 |
| Kaiser Aluminum Corp. | Case No.: 02-10429 |
| Owens Corning | Case No.: 00-3837 |
| US Mineral Products Company | Case No.: 01-2471 |
| USG Corp. | Case No.: 01-2094 |
| W.R. Grace & Co. | Case No.: 01-1139 |
| Debtors. | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| IN RE: | |
|---|---|
| Mid-Valley, Inc. | Case No.: 03-35592 |
| North American Refractories Co. | Case No.: 02-20198 |
| Pittsburgh Corning Corp. | Case No.: 00-22876 |
| Debtors. | |

## AMENDED[1] MOTION OF GARLOCK SEALING TECHNOLOGIES LLC
## FOR ORDERS AUTHORIZING ACCESS TO 2019 STATEMENTS FILED
## IN THIS COURT AND FOR RELATED RELIEF

---

[1]      Garlock previously filed a substantively identical motion in the above-captioned cases on January 10, 2011, notice of which was previously served upon parties in interest, including the debtors in each of the Closed Cases, statutory committees in each of the closed cases, each known filer of a Bankruptcy Rule 2019 statements in each of the Closed Cases, and the Office of the United States Trustee.  This previously-filed motion remains pending on the dockets of the above-captioned cases at this time.

Garlock Sealing Technologies LLC ("Garlock") hereby moves for access to exhibits to 2019 statements filed in these cases, but omitted from the electronic docket pursuant to orders of the Court requiring a motion to obtain access (the "2019 orders").[2]  In addition, to the extent necessary for this Court to provide Garlock the relief it seeks with respect to the 2019 statements, Garlock also seeks authority to intervene in each of the above-captioned bankruptcy cases and seeks to reopen any of the above-captioned bankruptcy cases that are presently closed.

## INTRODUCTION

The public is presumptively entitled to obtain access to documents filed in federal courts, unless a party objecting to access can demonstrate that disclosure will cause a "clearly defined and serious injury."  *Goldstein v. Forbes (In re Cendant Corp.)*, 260 F.3d 183, 194 (3d Cir.

---

[2] *See* Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019 But Staying Effective Date, *In re ACandS, Inc.*, No. 02-12687, D.I. 1574 (Bankr. D. Del. Oct. 22, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019 But Staying Effective Date, *In re Armstrong World Industries, Inc.*, No. 00-4471, D.I. 7468 (Bankr. D. Del. Oct. 22, 2004); Consent Order Requiring the Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re Combustion Engineering, Inc.*, No. 03-10495, D.I. 2465 (Bankr. D. Del. Sept. 8, 2005); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re The Flintkote Company*, No. 04-11300, D.I. 337 (Bankr. D. Del. Oct. 22, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re Kaiser Aluminum Corp.,* No. 02-10429, D.I. 5255 (Bankr. D. Del. Oct. 25, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re Owens Corning, et al.*, No. 00-3837, D.I. 13091 (Bankr. D. Del. Oct. 22, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re US Mineral Products Company*, No. 01-2471, D.I. 2155 (Bankr. D. Del. Oct. 22, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re USG Corp.*, No. 01-2094, D.I. 6852 (Bankr. D. Del. Oct. 22, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re W.R. Grace & Co., et al.*, No. 01-1139, D.I. 6715 (Bankr. D. Del. Oct. 25, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re North American Refractories Company*, No. 02-20198, D.I. 2515 (Bankr. W.D. Pa. Oct. 22, 2004); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re Pittsburgh Corning Corp.*, No. 00-22876, D.I. 3667 (Bankr. W.D. Pa. Oct. 22, 2004).  Garlock could discover no order entered in *In re Mid-Valley, Inc.* but exhibits to 2019 statements in that case were generally filed off the electronic docket, as in the cases where orders were entered.

Garlock is filing an identical motion simultaneously in each of the above-captioned cases. References to "the Court" in this motion mean the United States Bankruptcy Court for the District of Delaware or the United States Bankruptcy Court for the Western District of Pennsylvania, as applicable.

2001).  At the time it entered the 2019 orders, the Court deferred decision on who would have access to the full 2019 statements, instead providing that the exhibits would be sequestered off the electronic docket, and that members of the public could file a motion to obtain access, at which time the Court would decide the access question.  *In re Pittsburgh Corning Corp.*, 2005 U.S. Dist. LEXIS 46017 at *28-29 (W.D. Pa. Sept. 27, 2005).

Garlock is a member of the public and, furthermore, is likely a party in interest in all the cases, as a company that was routinely sued in asbestos personal injury cases with the debtors. As a member of the public, Garlock has a presumptive right to access the 2019 statements—a right that is all the stronger since it likely is or was a party to the cases.  And, though Garlock need not show cause to obtain access, it has an urgent need to obtain the full 2019 statements for use as evidence in its own pending bankruptcy case.  As no objector could possibly make the weighty showing required to deny access, Garlock is entitled to obtain all 2019 statements filed in these cases forthwith.

## <u>JURISDICTION</u>

1.      The Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

2.      The statutory predicates for the relief requested herein are section 107(a) of the Bankruptcy Code and Rule 2019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

## FACTUAL BACKGROUND

3.      Garlock is a manufacturer of sealing products, headquartered in Palmyra, New

York.[3]  The company formerly manufactured asbestos-containing products, principally gaskets

and packing containing encapsulated asbestos, and has been a defendant in lawsuits alleging

asbestos-related personal injury for over 35 years.  Grant Aff. ¶ 4.

4.      Garlock has a strong defense to liability in every case brought against it.  Because

the asbestos in its products was encapsulated, the products did not release medically significant

amounts of asbestos into the air.  Grant Aff. ¶ 7.  Plaintiffs therefore find it difficult to prove that

Garlock's products were a legal cause of their asbestos-related injuries.  *Id.* ¶¶ 10-11.

5.      An important part of Garlock's trial strategy is to show the jury that the plaintiff

was exposed to products that emitted large numbers of asbestos fibers during normal use

("friable" products).  *Id.* ¶ 12.  These friable products were often used in the vicinity of Garlock's

asbestos-containing products.  *Id.* ¶¶ 8-9.  With the evidence of friable product exposures before

them, juries commonly exculpate Garlock while finding that manufacturers of friable products

were responsible for the plaintiff's injury.  In particular, before 2000, Garlock won the vast

majority of asbestos cases tried to verdict against it.  *Id.* ¶ 11.

6.      In 2000, Garlock's position in asbestos litigation changed significantly, when the

most prominent defendants in asbestos litigation began to file for bankruptcy.  Between 2000 and

2004, dozens of companies filed (the "Bankruptcy Wave").[4]

---

[3] The facts set out in this background section are contained in the Affidavit of Paul Grant filed in
Garlock's bankruptcy case, attached hereto as Ex. A.

[4] The companies included Babcock & Wilcox Co. (2000); Pittsburgh Corning Corp. (2000);
Owens Corning Fiberglas/Fibreboard (2000); Armstrong World Industries (2000); W.R. Grace &
Co. (2001); USG Corp. (2001); Turner & Newell, PLC/Federal-Mogul Corp. (2001); GAF
(2001); Skinner Engine Co. (2001); E.J. Bartells (2001); United States Minerals Products (2001);
Murphy Marine Services (2001); Insul Co. (2001); Swan Transportation (2001); North American
Refractories Corp. (2002); Kaiser Aluminum (2002); Harbison-Walker (2002) ; A.P. Green

7.     The Bankruptcy Wave caused Garlock's resolution costs to increase, for at least

two reasons.  First, to the extent Garlock had any risk at trial, that risk was magnified by the exit

of the bankrupts combined with joint and several liability: Garlock, in the event of a loss, was

now exposed to bearing shares of liability formerly borne by the bankrupts.  This prospect

weakened Garlock's position at the negotiating table.  *Id.* ¶ 19.

8.     The Bankruptcy Wave had another effect: the rate at which plaintiffs identified in

discovery exposures to products for which bankrupt entities were responsible—including

exposures to the friable products that were crucial to Garlock's defense—decreased dramatically.

*Id.* ¶ 20.  Plaintiffs and their lawyers denied knowledge of exposures to friable products, instead

focusing on Garlock as the cause of their asbestos-related injuries.  The absence of the alternative

exposure evidence materially impacted Garlock's defense, which depended on showing that any

asbestos emitted from its products was truly insignificant, especially by comparison to the

exposures generated by the friable products.[5]  *Id.* ¶ 21.

9.     At the time Garlock was experiencing this decline in exposure identification,

asbestos plaintiffs' firms participated in bankruptcy cases—including these cases—claiming to

represent thousands of claimants holding viable claims against the estates.  Eventually, trusts

were funded with tens of billions of dollars to stand in for the bankrupts, on the basis that large

---

(2002); Plibrico Co. (2002); Shook & Fletcher (2002); Porter-Hayden Co. (2002); Artra Group,
Inc. (2002); Special Metals Corp. (2002); Asbestos Claims Management Corp. (2002); ACandS
(2002); JT Thorpe Co. (2002); A-Best Products (2002); Western MacArthur/Western Asbestos
(2002); C.E. Thurston (2003); Combustion Engineering (2003); Congoleum Corp. (2003); Mid-
Valley (Halliburton subsidiaries) (2003); Muralo Co. (2003); Flintkote Co. (2004);  Oglebay
Norton Co. (ONCO) (2004); Special Electric (2004); Quigley Co. (2004); Utex Industries
(2004); API, Inc. (2005); Asarco (2005); Brauer Supply Co. (2005); Dana Corporation (2006);
ABB Lummus Global (2006); and Lloyd E. Mitchell Co. (2006).

[5] The absence of the alternative exposure evidence also made it more difficult for Garlock to
allocate liability to bankrupts in several liability jurisdictions, and later to obtain credit for
payments made or expected to be made by asbestos personal injury trusts, exacerbating the first
problem mentioned above.  *See id.* ¶ 21.

portions of the asbestos claiming population in the United States would be able to successfully assert claims against trusts.

10.     This position of the firms and Asbestos Claimants' Committees in the bankruptcy cases was wholly inconsistent with the representations being made to Garlock at the same time in the tort system.  The inconsistency raises a strong inference that plaintiffs' firms were concealing their clients' exposures to bankrupts' products in order to inflate the plaintiffs' settlement values against Garlock.

11.     The consequences of the Bankruptcy Wave eventually pushed Garlock into bankruptcy.  Garlock filed its own petition on June 5, 2010.  The case is currently pending in the United States Bankruptcy Court for the Western District of North Carolina before the Honorable George R. Hodges.

12.     On six hearing days in October and November 2010, Judge Hodges heard evidence and argument concerning administration of the cases of Garlock and its affiliates also in bankruptcy.  On December 9, 2010, Judge Hodges entered an order directing the parties to "conduct preliminary discovery related to estimation, for purposes of formulating a plan of reorganization, of the Debtors' liability for pending and future asbestos-related claims for personal injury and wrongful death."  Order on Motion of the Official Committee of Asbestos Personal Injury Claimants for Entry of a Scheduling Order and Debtors' Motion for Establishment of Asbestos Claims Bar Date, Etc., *In re Garlock Sealing Technologies LLC, et al.*, No. 10-31607 (Bankr. W.D.N.C. Dec. 9, 2010) (attached hereto as Ex. B).

13.     Garlock brings this motion to obtain access to documents filed in these cases that are relevant to estimation and other matters in its bankruptcy case.  Beginning in 2004, this Court began to require asbestos plaintiffs' firms representing multiple creditors to file statements

pursuant to Bankruptcy Rule 2019 ("2019 statements").  The Court required each such firm to

file "a verified statement identifying the name and address of the entity filing such statement,"

and required in relevant part the following exhibits:

> 1. A blank, but unredacted, exemplar or an actual copy, of each form of
> agreement or instrument, if any, whereby such entity is empowered to act on
> behalf of creditors or equity security holders in this case;
> 2. An Excel spreadsheet in electronic format in substantially the form attached
> hereto as Exhibit A containing the following data:
>> a. name of each creditor or equity security holder represented by the entity
>> filing the 2019 statement;
>> b. the personal address of each such creditor or equity security holder;
>> c. reserved space for the social security number or other identifier as may
>> be required by a further order of the Court;
>> d. identification of the form of exemplar referenced in item #1 above
>> executed by the creditor or equity security holder, and the date such
>> agreement was executed;
>> e. the amount of the claim of any creditor if liquidated, and for
>> unliquidated claims, an indication that such claims are unliquidated;
>> f. the date of acquisition of the creditor's claim unless such claim was
>> acquired beyond one year prior to the filing of the Debtor's petition for
>> relief;
>> g. for personal injury claimants, the type of disease giving rise to the
>> claim; and for all other claimants, the nature of the claim or interest; and
>> h. a recital of the pertinent facts and circumstances in connection with the
>> employment of the entity or indenture trustee, and, in the case of a
>> committee, the name or names of the entity or entities at whose instance
>> directly or indirectly the employment was arranged or the committee was
>> organized or agreed to act . . .

Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re*

*Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. Oct. 22, 2004) ("Pittsburgh Corning

2019 Order," attached hereto as Ex. C).[6]  The Court required the 2019 statements to be

supplemented every 90 days.  *Id.*

---

[6] The other 2019 orders are substantively similar to the Pittsburgh Corning 2019 Order, and
Garlock cites to the latter order for convenience.  The consent order in *In re Combustion
Engineering* did not, however, require an entity to obtain an order of the Court before receiving
access; Garlock includes the *Combustion Engineering* case in this motion in an abundance of
caution and does not concede that it need make a motion to obtain access to statements filed in
that case.  *See* Consent Order Requiring the Filing of Statements Pursuant to Fed. R. Bankr. P.

14.     The 2019 statements show, among other things, firms' knowledge regarding which of their clients had been exposed to the various debtors' products.  The firms verified, under penalty of perjury, that each of the listed clients was a "creditor" represented by the firm. It is not possible for a person to have an asbestos personal injury claim against a debtor, and thus be a "creditor," without having experienced exposure to the debtor's product.  *See, e.g.*, *Kummer v. Allied Signal, Inc.*, 2008 U.S. Dist. LEXIS 88240 (W.D. Pa. Oct. 31, 2008) (holding that mesothelioma plaintiff in many jurisdictions must prove regular and frequent exposure to defendant's product in order to sustain claim).

15.     Making the evidentiary significance of the statements perfectly clear, many attorneys expressly verified in the filed 2019 statements that, in their "personal knowledge," the listed clients "have been injured by asbestos products manufactured, marketed, distributed, sold, or produced by" debtors, and "thus hold claims against, *inter alia*, the Debtor."  *See, e.g.*, Amended Verified Statement of Baron & Budd, P.C. Under Bankruptcy Rule 2019 ¶¶ 2, 4-6, *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. Dec. 17, 2004) (attached hereto as Ex. D); *see also* ¶ 7 (verifying that listed claimants "were exposed to asbestos products manufactured by the Debtor"); Verified Statement of Waters and Kraus, LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019, *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. Dec. 15, 2004) (attached hereto as Ex. E).

16.     By comparing these 2019 exhibits verifying known exposures to the debtors' products, to the discovery Garlock was simultaneously receiving in the tort system, Garlock can determine whether lawyers and claimants were lying in one (or both) forums.

---

2019, *In re Combustion Engineering, Inc.*, No. 03-10495, D.I. 2465 (Bankr. D. Del. Sept. 8, 2005).

17.    The 2019 orders required plaintiffs' firms to file both the 2019 statements and exhibits with the Court.  *Id.*  The Court provided, however, that each filing firm would "electronically file the 2019 Statement without exhibits, and shall provide all exhibits on CD's only to the Clerk, who shall maintain the exhibits without putting them into the electronic database" and would allow access to the exhibits only upon "further Order of Court."

18.    This part of the 2019 orders did not resolve the question of who was entitled to access the statements.  Rather, it deferred the access question and enacted a procedure by which members of the public could seek to obtain access.  *In re Pittsburgh Corning Corp.*, 2005 U.S. Dist. LEXIS 46017 at *28-29 (W.D. Pa. Sept. 27, 2005).  The Court provided that upon closing of any case, the clerk would archive the 2019 statements and supplements with the case file.  Ex. C.

19.    Garlock subsequently objected to confirmation of plans of reorganization in *W.R. Grace* and *Pittsburgh Corning*, in part on the ground that confidentiality provisions and other provisions in the trust distribution procedures ("TDP") proposed as part of the plans violated Garlock's rights as such debtors' current and future co-defendant to evidence and credit for payments that would be made by the trusts because the TDP were designed to allow—and would in fact allow—plaintiffs' firms to continue hiding their clients' exposures to the debtors' products, to the detriment of Garlock and other co-defendants.

20.    To prove that this practice was occurring, Garlock sought access to 2019 statements filed by plaintiffs' firms in *Pittsburgh Corning*.  The Court denied Garlock's motion for access without prejudice, convinced that for purposes of the confirmation hearing, it sufficed for Garlock to have access to master ballots cast in early November 2009, in which plaintiffs' attorneys casting such ballots on behalf of their clients certified under penalty of perjury that

their clients had Pittsburgh Corning claims and Pittsburgh Corning exposure. *See* Order Denying

Expedited Motion of Garlock Sealing Technologies, LLC for Order Authorizing Access to

Certain 2019 Statements Filed in Case, *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr.

W.D. Pa. March 24, 2010) (attached hereto as Ex. F); Transcript of Hearing at 47, *In re*

*Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. Jan. 13, 2010) (excerpt attached

hereto as Ex. G).

21.    The ballots Garlock received did reveal widespread inconsistency between on the

one hand sworn statements in the bankruptcy case attesting to Pittsburgh Corning exposure, and

on the other discovery submitted to Garlock in the tort system. Garlock compared a random

sample of discovery materials, gathered by its local counsel, to the *Pittsburgh Corning* ballots.

Of the mesothelioma plaintiffs in the sample who had sued Garlock, 255 had also voted in

*Pittsburgh Corning*, pursuant to their counsel's certification under penalty of perjury of those

clients' exposure to Pittsburgh Corning asbestos-containing products. Yet the vast majority had

failed to identify exposure to Pittsburgh Corning products in tort system discovery—236, or

92.5%, from 19 different plaintiffs' firms.

22.    Garlock's opponents have periodically asserted that plaintiffs could have

innocently discovered the Pittsburgh Corning exposure after answering the discovery Garlock

propounded. But startlingly, out of 41 different *Pittsburgh Corning* voters in the sample who

answered discovery after voting, 39 (95%) failed to identify exposure to a Pittsburgh Corning

product, despite their lawyers' prior certification to the contrary under penalty of perjury.[7]

---

[7] At the confirmation hearing, Garlock's ability to put on this evidence was limited because the
Court had earlier ruled that Garlock was entitled to offer only one witness in support of its
objection, its defense counsel John Turlik, and Mr. Turlik was not involved in the sampling
beyond providing some of the discovery responses. Garlock therefore was unable to lay a
foundation displaying the full scope of the inconsistency to the Court. Still, the Court admitted

23.     Garlock now requires the 2019 statements and exhibits for use in its own bankruptcy case.  The statements show when plaintiffs' firms knew that their clients were creditors in the cases, and thus when firms knew their clients had been exposed to products for which the bankrupts were responsible.  By comparing these verified statements to discovery Garlock received over the past decade, Garlock can prove the extent to which plaintiffs' firms were concealing evidence of alternative exposures in order to inflate Garlock's settlement values.

24.     This fact is relevant to estimation.  If Garlock's past settlements were inflated by fraud and abuse, they present an unreliable guide to its current and future liability for asbestos claims, unless discounted to account for the fraud and abuse.  *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722-723 (D. Del. 2005) ("As the Banks have convincingly demonstrated, some of the past results have been skewed by factors which can and should be avoided in the future.  The question to be resolved is the extent to which adjustments should be made to historical values to account for these probable changes.").  In addition, Garlock is investigating the possibility of damages actions against plaintiffs' firms or claimants to recoup settlements obtained through the concealment of exposure evidence.  *See, e.g.*, *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 368 (9th Cir. 2005); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1093-4 (S.D.N.Y. 1994); *Raymark Indus. v. Stemple*, 714 F. Supp. 460, 468-475 (D. Kan. 1988); *DiSabatino v. United States Fid. & Guar. Co.*, 635 F. Supp. 350, 355 (D. Del. 1986).

25.     The information contained in the 2019 statements is not duplicative of the information contained in the ballots cast by claimants and law firms in these cases (which Garlock also intends to obtain).  Because 2019 statements were generally filed earlier than the

---

numerous discovery responses that showed on their face the blatant concealment of evidence in cases filed against Garlock.

balloting date—several years before the balloting date in some cases—they provide more information than the ballots do regarding when law firms knew their clients were creditors in the cases, and thus when law firms knew their clients had exposure to the bankrupts' products.

26.    The 2019 statements will thus help to rebut "subsequent discovery" arguments, and other arguments that Garlock's opponents might make about this evidence.

**BASIS FOR RELIEF**

I.    **Garlock Has A Presumptive Right To Access The 2019 Statements Unless Objecting Parties Can Carry Their Burden Of Showing A Clearly Defined And Serious Injury That Will Occur If Garlock Receives Access**

27.    The public's right to access documents filed in court is a well-recognized and fundamental principle of Anglo-American justice.  The right to access has existed for centuries, and has been affirmed by Coke, Hale, Blackstone, Holmes, and Wigmore.  *See Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1068-70 (3d Cir. 1984).

28.    The publicity of court filings serves important purposes and is "inherent in the nature of our democratic form of government."  *Id.* at 1069.  It "promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court"; "diminishes possibilities for injustice, incompetence, perjury, and fraud"; "provide[s] the public with a more complete understanding of the judicial system and a better perception of its fairness"; and "helps assure that judges perform their duties in an honest and informed manner."  *Goldstein v. Forbes (In re Cendant Corp.)*, 260 F.3d 183, 192 (3d Cir. 2001).  The Third Circuit has observed that "[i]n all experience, secret tribunals have exhibited abuses which have been wanting in courts whose procedure was public."  *Publicker*, 733 F.2d at 1070.

29.    The modern right of access applies not only to court proceedings, but also to any document filed with the court. *Goldstein*, 260 F.3d at 192 (filing of document "clearly establishes" it is subject to right of access); *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988) (same).

30.    The right to access court-filed documents is not absolute, but the Third Circuit has developed "settled standards" governing when it may be curtailed, to ensure that it remains a robust guarantee of transparency and accountability in the federal judiciary. *Goldstein*, 260 F.3d at 194.  Namely, "[i]n order to override the common law right of access, the party seeking the closure of a hearing or the sealing of part of the judicial record bears the burden of showing that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id.* (punctuation and citation omitted).

31.    There exists a "strong common law presumption of [public] access"; "[t]he burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption [of access]." *Id.*  In carrying this burden and "delineating the injury to be prevented, specificity is essential.  Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient." *Id.*

32.    Applying these criteria, the Third Circuit has in case after case rejected restrictions on access, in a wide variety of circumstances where the parties and sometimes the trial court would have preferred to keep the filings confidential, holding in each case that the fundamental right to access trumped such desires. *See Goldstein*, 260 F.3d at 197-98 (public had right to access sealed bids in auction for lead class counsel); *Littlejohn*, 851 F.2d at 685 (confidential information that might damage party's commercial standing could not be protected

once filed in court); *Bank of America National Trust and Savings Association v. Hotel*

*Rittenhouse Assocs.*, 800 F.2d 339, 345 (3d Cir. 1986) (confidential settlement agreement filed

with court could not be protected from public); *Publicker*, 733 F.2d at 1074 (facts demonstrating

that company may have violated law could not be protected from public, despite possibility of

substantial commercial detriment).[8]

      33.     For bankruptcy cases, Congress has codified the right to access in section 107 of

the Code, which provides that "[e]xcept as provided in subsections (b) and (c) of this section . . .

a paper filed in a case under this title and the dockets of a bankruptcy court are public records

and open to examination by an entity at reasonable times without charge." 11 U.S.C. § 107(a).

      34.     Subsections (b) and (c) provide the exceptions to access:

> (b) On request of a party in interest, the bankruptcy court shall, and on the
> bankruptcy court's own motion, the bankruptcy court may—
> > (1) protect an entity with respect to a trade secret or confidential research,
> > development, or commercial information; or
> > (2) protect a person with respect to scandalous or defamatory matter
> > contained in a paper filed in a case under this title.
>
> (c)(1) The bankruptcy court, for cause, may protect an individual, with respect to
> the following types of information to the extent the court finds that disclosure of
> such information would create undue risk of identity theft or other unlawful injury
> to the individual or the individual's property:
> > (A) Any means of identification (as defined in section 1028(d) of title 18)
> > contained in a paper filed, or to be filed, in a case under this title.
> > (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(b)-(c)(1). These exceptions to access "are construed narrowly." *Ferm v. United*

*States Trustee (In re Crawford)*, 194 F.3d 954, 960 (9th Cir. 1999).

---

[8] The First Amendment is another source for the right to access public records, and may provide even more robust protection. *See Publicker*, 733 F.2d at 1070; *Goldstein*, 260 F.3d at 198. The Third Circuit, however, has not yet had to define the scope of First Amendment protection of access to civil proceedings because the denials of access before it have all violated the arguably less stringent common law right of access. *See Goldstein*, 260 F.3d at 198.

35.    Some authorities read section 107 to provide the *exclusive* reasons why a bankruptcy court could deny access to filings.  *In re Alterra Healthcare Corp.*, 353 B.R. 66, 74-75 (Bankr. D. Del. 2006).

36.    This reading is consistent with the text of the statute, which sets up a general right to access "except" when the enumerated criteria are satisfied.  It makes sense that Congress would create a right of access that is as broad as possible in bankruptcy cases, which are complex proceedings that involve large numbers of parties and where public monitoring is essential.  *See In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994) (the "policy of open inspection, codified generally in § 107(a) of the Bankruptcy Code, evidences [C]ongress's strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings").  The right of access is even more important in asbestos bankruptcy cases, which often involve exceedingly large numbers of creditors and constituencies.

37.    Other courts, however, appear to believe that a bankruptcy court may also curtail access to court-filed records when the party seeking closure carries its burden of proving that "disclosure will work a clearly defined and serious injury."  *See Copley Press, Inc. v. Peregrine Sys. (In re Peregrine Sys.)*, 311 B.R. 679, 689-91 (D. Del. 2004).

38.    In any event, whatever the relationship between section 107 and the common law right of access, it is clear that no party can protect a bankruptcy court filing from public access without *at least* making the showing required by subsections (b) or (c), or carrying the heavy burden required by the Third Circuit's decisions in cases such as *Goldstein*.

39.    Garlock seeks access to documents that were all filed in this Court: 2019 statements that the Court ordered to be filed, and that were filed with the clerk (although exhibits were not posted on the electronic docket, pursuant to the Court's order).

40.    Because the documents were filed in this Court, Garlock has a presumptive right to access that can be denied only if objecting parties demonstrate either that one of the exceptions to section 107 applies, or that some other clearly defined and serious injury will befall them if Garlock receives access.  *See Goldstein*, 260 F.3d at 194; *Copley Press*, 311 B.R. at 687.

## II.    No Objector Has Demonstrated Or Could Demonstrate That Garlock's Presumptive Right To Access Should Be Denied

41.    In the previous iteration of this dispute, when Garlock sought access to 2019 statements filed in *Pittsburgh Corning*, the objectors fundamentally misstated the law regarding public access to filings with the Court.  They argued pervasively that the burden was on Garlock to show cause for obtaining access to the statements.  *See, e.g.*, Baron & Budd Objection at 11 ("Garlock must articulate a legitimate need for the information that outweighs claimants' privacy concerns") (attached hereto as Ex. H).

42.    As demonstrated above, that is not the law in the Third Circuit.  Rather, the burden is on the objectors to demonstrate a clearly defined and serious injury that will occur if Garlock receives access.  *Goldstein*, 260 F.3d at 194.  No objector has yet carried this burden, nor is it possible for an objector to do so.

### A.    Decisions Upholding This Court's 2019 Orders Did Not Address, Much Less Decide, The Question Of Access

43.    During the *Pittsburgh Corning* access dispute, the objectors neglected to address any specific injury they expected to suffer as a result of disclosure.  Instead, they argued that cases upholding this Court's 2019 order had already resolved the access issue against Garlock.  *See* Ex. H at 10-11.  For example, they called the filed exhibits to the 2019 statements the "Confidential Exhibits," implying that a finding of a need to maintain confidentiality had been made by this or a reviewing Court.  *Id.* at 4.

44.    A review of both the order and the decisions upholding it shows this simply is not

so.  In fact, those reviewing courts relied on the fact that the access question had *not* been

decided to hold that various parties lacked standing to challenge the 2019 order.

45.    This Court's 2019 orders provided simply that exhibits to 2019 statements would

be filed, but left off the electronic docket, until parties seeking access made a motion and

obtained an order from the Court.  *See* Ex. C.  Several parties appealed the Court's orders,

arguing (in relevant part) that the requirement of a motion to obtain access to the exhibits

abridged their right to access under federal common law, Code section 107, and the First

Amendment.

46.    Each reviewing court that considered the argument concluded, however, that the

appellants lacked standing and their appeal was not ripe because they had not yet made a motion

for access, their right to access had not been adjudicated, and their right to access therefore had

not been abridged.  The courts construed this Court's order as setting forth the *procedure* for

obtaining access—not as itself deciding or making any findings whatsoever on the right to access

question.

47.    For example, the district court considering the appeal of the *Pittsburgh Corning*

2019 order expressly declined to consider a First Amendment challenge to the order because

> the bankruptcy court did not deny appellants the right to access the information.
> The bankruptcy court in essence reserved its decision on whether or not access
> would be granted.  The bankruptcy court did not intend to resolve the right of
> access issue by entering the Rule 2019 order.  The bankruptcy court wanted to
> have the Rule 2019 statements filed and then, upon a filing of a motion as
> contemplated by the 2019 Order, the bankruptcy court would review the issue of
> access. . . .  **The bankruptcy court did not resolve issues relating to the right of
> access; rather it created a procedure to determine those issues at another
> time if a motion is filed seeking public access**.

*In re Pittsburgh Corning Corp.*, 2005 U.S. Dist. LEXIS 46017 at *28-29 (W.D. Pa. Sept. 27, 2005) (emphasis added).  Because appellants had not yet been denied access and no findings had been made on the right to access question, the appellants lacked standing to appeal, and the court therefore did not consider the right of access issue.  *Id.*

48.    The district court found the dispute was not yet ripe for the same reason: "The substance of the relief requested by appellants is for access to the materials filed in connection with the Rule 2019 statements.  That right has not yet been denied."  *Id.* at *31.  "The parties rather than appealing the matter should have filed a motion and permitted the bankruptcy court to develop a record with respect to whether section 107 of the Bankruptcy Code and the First Amendment and common law rights of public access mandate a right of public access . . . . If a motion is filed and briefed, the bankruptcy court, after notice and hearing, may well conclude that information initially protected by the 2019 Order should be filed of record for public access."  *Id.* at *31-32.  The Third Circuit affirmed the district court's conclusion that the 2019 orders had not yet denied anyone access.  *In re Pittsburgh Corning Corp.*, 260 Fed. Appx. 463, 465 (3d Cir. 2008).

49.    The Delaware district court reached the same conclusion as the Pennsylvania district court and the Third Circuit: access had not yet been denied, the order simply set forth a procedure for obtaining access.  "In this case, the Bankruptcy Court did not seal the Rule 2019 information as Appellants contend."  *Certain Underwriters at Lloyds v. Future Asbestos Claim Representative (In re Kaiser Alum. Corp.)*, 327 B.R. 554, 560 (D. Del. 2005).  As a result, the appeal was not yet ripe: "Appellants have not moved for and been denied access to the Rule 2019 information," so that "any injury suffered by Appellants is speculative."  *Id.* at 559 n.1.

50.      The court concluded appellants lacked standing for similar reasons, finding that

the appellants' only argument for standing was "a current financial impact from the Revised Rule

2019 Orders, because they must file a motion in the Bankruptcy Court to gain access to the Rule

2019 information submitted," and held that this incidental cost was not "the type of direct,

pecuniary interest contemplated by the 'aggrieved person' test." *Id.* at 558-59.  "These

incidental costs apply to anyone seeking access to the Rule 2019 information, and if this injury

were enough, it would confer standing on anyone to challenge the Rule 2019 Orders." *Id.* at 559.

Because the parties appealing the order had not been denied access, they did not have standing.

51.      Bearing out all these courts' conclusions regarding the status of the access

question, when parties actually sought access to the 2019 statements in the Owens

Corning/Fibreboard case, they obtained it.  *See* Order Granting Motion of Credit Suisse First

Boston, As Agent, For Access to Examine Statements Filed Pursuant to Bankruptcy Rule

2019(a), *In re Owens Corning, et al.*, No. 00-3837 (Bankr. D. Del. Jan. 11, 2005) (attached

hereto as Ex. I).  This showed once again that the 2019 orders denied no-one access, but merely

instituted a procedure for obtaining access.

52.      As a result, no findings have yet been made on the access question.  The objectors

still have the burden of proving that an exception to section 107 applies or, alternatively, that

access will cause a clearly articulated, serious injury to the objectors' legitimate interests.[9]

---

[9] Indeed, even if findings foreclosing access had been made at some point in the past, the right to access does not disappear once documents are sealed.  Upon proper motion, a court is required to determine whether the reason for sealing a document persists, and remove the seal if the reason is no longer applicable.  *See Goldstein*, 260 F.3d at 196; *Copley Press*, 311 B.R. at 688.

**B.      No Objector Can Demonstrate That Garlock's Presumptive Right To Access Should Be Denied**

53.      When Garlock last sought access, objectors offered almost no argument regarding the injury they would suffer if Garlock received access.  They appeared, however, to allege a need to protect from public view the claimant's alleged condition and identifying information, as well as perhaps the exemplar retention agreement between the claimant and law firm.  *See, e.g.*, Ex. H at 4, 15.  None of this information is protectable under the law.

54.      First, none of the exceptions to section 107 apply to the information contained in the 2019 exhibits.  This should not be surprising, given that the information the Court ordered disclosed in the 2019 statements consists of what Congress *required* to be disclosed in Rule 2019.  Since Congress required disclosure of the information, it can hardly be considered sensitive or confidential.

55.      In particular, the claimant's asbestos-related condition and identifying information obviously are not "commercial information" or "trade secret[s]" protected by section 107(b).

56.      Nor are the exemplars of the retention agreements.  Even if retention agreements are not routinely disclosed by law firms, they are not the sort of information protectable under the commercial information exception.  To invoke that exception, the party must show that the information is "so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit that entity's competitors," *see In re Alterra Healthcare Corp.*, 353 B.R. 66, 76 (Bankr. D. Del. 2006), and nothing in an exemplar retention agreement could benefit a plaintiffs' firm's competitors.  Nor is Garlock, in particular, a competitor of asbestos plaintiffs' firms.

57.     Furthermore, the 2019 exhibits obviously contain no "scandalous or defamatory matter." 11 U.S.C. § 107(b)(2).

58.     Finally, disclosure of the exhibits will create no "undue risk of identity theft or other unlawful injury" to any individual, 11 U.S.C. § 107(c)—Garlock will not steal the claimants' identities or cause them any unlawful injury.[10]

59.     The district court that upheld the 2019 order entered in the *Congoleum* case concluded that any argument for protection based on the exceptions to section 107(a) was "decidedly uncompelling." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 168-69 (D.N.J. 2005).

60.     The court held this way even though the 2019 order in *Congoleum* required disclosure of far more information than the orders entered in these cases.  For example, the *Congoleum* order, instead of requiring exemplar retention agreements, required "attachment of the lesser of: (i) 25 executed bankruptcy-specific powers of attorney or other bankruptcy-specific authorizing documents or (ii) all bankruptcy specific powers of attorney or other bankruptcy-specific authorizing instruments, executed by creditors in connection with this bankruptcy case on whose behalf the counsel votes," and "a list and detailed explanation of any type of co-counsel, consultant or fee-sharing relationships and arrangements whatsoever, in connection with this bankruptcy case or claims against any of the Debtors, and attachment of copies of any documents that were signed in conjunction with creating that relationship or arrangement." Order Requiring Compliance With Bankruptcy Rule 2019 and Granting Other Relief, *In re*

---

[10] Indeed, disclosure of claimants' names to the *entire public* would not materially increase the risk of identity theft.  These claimants all undoubtedly filed suit in the tort system, where they were already required to put their names and identifying information on the public record, when they filed their complaints and answered discovery.

*Congoleum Corp.*, No. 03-51524 (Bankr. D.N.J. Sept. 2, 2004) ("Congoleum 2019 Order,"

attached hereto as Ex. J).

61.     Most important, the Congoleum 2019 Order gave firms no option to file the

statements off the electronic docket, with the clerk.  The filed statements reside on the electronic

docket of the case to this day, *see* Ex. K (2019 statement filed by Waters & Kraus firm), which

belies any claim that the far less extensive 2019 statements Garlock seeks here contain any

information protected by section 107.

62.     As noted above, some courts have concluded that a bankruptcy court may deny

access to court filings *only* if the express exceptions to section 107(a) apply.  If this Court agrees,

it need not examine any other reasons for denying access to the 2019 exhibits.  If the Court

disagrees, then it must conduct the analysis called for by *Goldstein* and other Third Circuit cases.

Objectors must demonstrate that "the material is the kind of information that courts will protect

and that disclosure will work a clearly defined and serious injury to the party seeking closure."

*Goldstein*, 260 F.3d at 194.

63.     As a preliminary matter, *Goldstein* indicates that objectors must make an

especially strong showing to deny Garlock access, since Garlock was likely a party-in-interest in

all the bankruptcy cases.

64.     *Goldstein* dealt with a class action in which the district court had kept under seal

bids submitted by plaintiffs' firms in an auction of lead counsel status.  *Id.* at 193.  The Third

Circuit held that "[t]he right of public access is particularly compelling here, because many

members of the 'public' are also plaintiffs in the class action.  Accordingly, all the reasons we

discussed in *Littlejohn* for the right of access to public records apply with even greater force

here."  *Id.*  Because many members of the public were part of the class, public access was

especially important to promote confidence in administration of the case, to reduce "the possibility that injustice, incompetence, perjury or fraud will be perpetrated against those class members who have some stake in the case but are not at the forefront of the litigation," and to ensure that class members would understand the process and accept it as a fair one. *Id.* The court therefore held that "the test for overriding the right of access should be applied in this case with particular strictness." *Id.* at 194.

65.    The same reasoning applies to Garlock's status in these bankruptcy cases. Garlock was sued frequently with each of the debtors, and was thus most likely a party in interest in each of the bankruptcy cases. Like the class members in *Goldstein*, Garlock is no mere member of the public: it is a party to bankruptcy cases that affected and continue to affect its substantial interests.

66.    Indeed, the previous bankruptcy cases played a major role in putting Garlock into bankruptcy. Thus, like the class members in *Goldstein*, Garlock has an especially pronounced interest in obtaining access to these documents, and objectors must overcome an especially strong presumption to bar that access.

67.    None of the information that objectors have relied upon is protectable under the Third Circuit's criteria. First, all of the information is expressly *required* to be disclosed by Bankruptcy Rule 2019—including "the name and address of the creditor," "the nature and amount of the claim or interest and the time of acquisition thereof unless it is alleged to have been acquired more than one year prior to the filing of the petition," " recital of the pertinent facts and circumstances in connection with the employment of the entity or indenture trustee," and "a copy of the instrument, if any, whereby the entity, committee, or indenture trustee is empowered to act on behalf of creditors or equity security holders." Bankr. R. 2019(a). Since

Congress required *all* entities representing multiple parties to disclose this information, it is not remotely plausible that *plaintiffs' firms* representing multiple parties have any legitimate interest in keeping the information confidential.

68.    Nor is any of the information in the statements sensitive in the slightest.  With respect to the claimant information, each claimant puts his or her identity and alleged condition on the public record when he or she files suit in the tort system—as all or nearly all of the claimants listed on the 2019 exhibits undoubtedly did.

69.    No court in the tort system would protect a plaintiff's name or claimed disease. That information is often required in the complaint.  *See* Ex. L (tort system complaint containing plaintiff's name, condition, social security number, and other information).[11]  If not put in the complaint, the plaintiff must provide the information in the first discovery requests.  *See* Ex. M (response to standard Texas interrogatories, containing plaintiff's name, alleged condition, address, social security number and other information).[12]  The claimant's name and alleged condition are obviously bedrock information that asbestos defendants like Garlock assess when they are resolving cases in the tort system.  This information is not confidential in any way.

70.    This claimant information is also the very same kind of information Garlock *already* obtained when it received access to the ballots in *Pittsburgh Corning* (and to which it will have access when it obtains the ballots in all the other cases).  The exhibits to the master

---

[11] Out of an abundance of caution, Garlock has redacted certain information from this exhibit in accordance with Bankruptcy Rule 9037(a), despite the likely applicability of the exceptions in Rule 9037(b)(3) for "the official record of a state-court proceeding" and in Rule 9037(b)(4) for "the record of a court or tribunal, if that record was not subject to the redaction requirement when originally filed."  The plaintiff's social security number, condition, and name were not redacted in the complaint filed in Maryland and served on Garlock.

[12] Also in accordance with Bankruptcy Rule 9037(a), certain information has been redacted from this exhibit, despite the likely applicability of Rule 9037(b)(4).  No redactions were present in the discovery response served on Garlock, including the plaintiff's social security number, condition, and name.

ballots submitted in *Pittsburgh Corning* record each voting claimant's name, claimed disease, and partial social security number—apparently *more* claimant information than was required by the 2019 order. *Compare* Pittsburgh Corning Voting Procedures Order at 9 (attached hereto as Ex. N) *with* Ex. C. Because Garlock already has access to this information, it plainly will cause no "serious injury" for Garlock to receive access to the same kind of information in the exhibits to the 2019 statements.[13]

71.    Finally, the complete lack of sensitivity is demonstrated by the fact that in other cases, 2019 statements filed by asbestos plaintiffs' law firms—with full information on plaintiffs' names and conditions, as well as retention agreements between firms and plaintiffs—were filed on the public electronic docket.

72.    In the *Congoleum* case, Garlock believes *every* 2019 statement was filed electronically and publicly, as the Congoleum 2019 Order provided no procedure for filing statements off the electronic docket, and the electronic docket today contains many 2019 statements, containing far more extensive disclosures than this Court's 2019 orders required. *See, e.g.*, Ex. K (copy of 2019 statement filed by Waters & Kraus firm on electronic docket in *Congoleum*).[14] In other cases too, 2019 statements have been filed on the electronic docket and are available for the public to view today. *See* Ex. O (2019 statement filed by Motley Rice firm in *In re Quigley Co., Inc.*, No. 04-15739 (Bankr. S.D.N.Y.)).

---

[13] The 2019 statements are not duplicative of the ballots, as explained in the Factual Background, because they show *when* law firms knew their claimants had claims against the bankruptcy estates. This information is important to Garlock because it will help rebut any notion that plaintiffs and firms discovered evidence of exposure after answering discovery propounded by Garlock in the tort system.

[14] In accordance with Bankruptcy Rule 9037(a), the first five digits of the claimants' social security numbers have been redacted. They were not redacted in the version of this document that the Waters & Kraus firm filed with the bankruptcy court.

73.     The information Garlock seeks in 2019 statements filed with this Court cannot be considered sensitive, when it and more has been displayed on electronic dockets elsewhere for any member of the public to see.  Plaintiffs' firms should be required to show that concrete harm occurred as a result of disclosure in *Congoleum*; they will be unable to do so.

74.     Like the claimant information, the exemplar retention agreements are not sensitive at all.  Disclosure of the retention agreements is required by Rule 2019(a). Furthermore, in *Congoleum*, plaintiffs' firms were required to file actual retention agreements— not just exemplars—and the agreements were displayed on the electronic docket.  *See* Ex. K.  No one can seriously argue that the exemplars contained in the 2019 exhibits in these cases contain information that should be protected from public view.

75.     Any pleas of "serious injury" are all the weaker because Garlock is not requesting that the 2019 statements be placed upon the electronic docket.  Garlock is requesting that it be granted access to the statements for plainly legitimate evidentiary purposes, and does not plan to disclose the information except as necessary to serve those purposes.

76.     For all of these reasons, any objections lodged against Garlock's access will be entirely pretextual.  They will stand as yet another attempt by the plaintiffs' bar to cordon off from public view the inconsistent statements firms have made in bankruptcy cases and in asbestos litigation against Garlock and others.

77.     Similar attempts have occurred or are occurring in other contexts.  For example, plaintiffs' firms have inserted into TDP for asbestos personal injury trusts extremely broad confidentiality provisions that protect even the fact that a claim has been filed against a trust. *See* United States Gypsum Asbestos Personal Injury Settlement Trust Distribution Procedures § 6.5 (attached hereto as Ex. P).  Now, several trusts and plaintiffs' firms have brought a frivolous

lawsuit against Garlock and others to preclude access to discovery against Trusts that is proper

under the Code, Federal Rules of Civil Procedure, and Bankruptcy Rules. *See* Complaint

(attached hereto as Ex. Q).

78.     The plaintiffs' bar has no genuine interest in protecting "sensitive" information

contained in 2019 statements. Rather, they are anxious that Garlock's access will lay bare

fraudulent and abusive practices, when Garlock compares tort system discovery denying

knowledge of exposure, to the verified statements made in 2019 filings affirming exposure.

79.     The same comparison between the *Pittsburgh Corning* ballots and tort system

discovery has already proved enormously damaging to the plaintiffs' bar, by revealing a

widespread practice of inconsistent statements in bankruptcy cases and tort system cases,

engaged in by a large number of prominent plaintiffs' firms. The 2019 statements have the

potential to be even more damaging, because they show when the plaintiffs' firms knew about

their clients' exposure to the bankrupts' products.

80.     Potential damage to the pecuniary interests of the plaintiffs' bar is, of course, no

reason to deny Garlock access. To the contrary, the elimination of fraud and abuse is one of the

major reasons why judicial records are presumptively open to public examination. *See*

*Goldstein*, 260 F.3d at 192 (public access "diminishes possibilities for injustice, incompetence,

perjury, and fraud"). The plaintiffs' bar's preference that Garlock not receive access does not

come close to trumping Garlock's right, as a member of the public and a likely party to these

bankruptcy cases, to access these records.

**C.      Garlock Need Not Show Cause To Access The Records, But It
          Clearly Does Have Cause**

81.     The law does not require Garlock to show cause to access the 2019 statements

filed on the docket of this Court. Rather, Garlock as a member of the public has a presumptive

right to access, which can be denied only if parties opposing access can provide a clear and particularized account of serious injury that will occur if Garlock receives access. *Goldstein*, 260 F.3d at 194.

82.    If, however, the Court requires Garlock to show cause, it plainly can do so.  The information in the 2019 statements is highly relevant to estimation in Garlock's pending bankruptcy case.  The statements will help show the extent to which plaintiffs' firms concealed exposure evidence in order to inflate Garlock's settlement values during the past decade—a practice that can form no part of an estimation of Garlock's current and future asbestos-related liabilities.

83.    The evidence is also relevant, for the same reason, to causes of action Garlock possesses against plaintiffs' firms and claimants under the RICO statute and under state law. *See, e.g.*, *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 368 (9th Cir. 2005); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1093-4 (S.D.N.Y. 1994); *Raymark Indus. v. Stemple*, 714 F. Supp. 460, 468-475 (D. Kan. 1988); *DiSabatino v. United States Fid. & Guar. Co.*, 635 F. Supp. 350, 355 (D. Del. 1986).

84.    Nor are the 2019 statements duplicative of information Garlock can obtain through the ballots case in each of the cases.  Because the 2019 statements were filed periodically, they help show when plaintiffs' firms learned their clients had claims against the estates.  This will be relevant to Garlock as it rebuts arguments by plaintiffs' firms and the Asbestos Claimants' Committee in Garlock's bankruptcy case that inconsistencies between sworn statements in bankruptcy cases and statements in tort system discovery can be explained by subsequent discovery of evidence.

85.     Any objecting parties have no legitimate interest in protecting the information, as demonstrated above.  Thus, if the Court believes plaintiffs' objections must be balanced against Garlock's need for the information, Garlock's needs should prevail.[15]

**III.    The Court Should Grant Garlock's Related Relief To The Extent Such Relief Is Necessary To Provide Garlock With Access To The Information Contained In The 2019 Statements**

      **A.     To The Extent Intervention Is Required To Grant Relief, Garlock Should Be Permitted To Intervene**

86.     To the extent Garlock needs to intervene in these cases in order to obtain access, Garlock has cause to do so under Bankruptcy Rule 2018(a), to vindicate its right to access documents filed in the Court.  Bankruptcy Rule 2018(a) specifically contemplates such intervention in a bankruptcy case, authorizing intervention by "any interested entity . . . generally or with respect to any specific matter."  Fed. R. Bankr. P. 2018(a).

87.     The Third Circuit has "routinely found . . . that third parties have standing to challenge protective orders and confidentiality orders in an effort to obtain access to information or judicial proceedings."  *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 777 (3d Cir. 1994).  In several of the bankruptcy cases, Garlock is a creditor or potential creditor of the debtors by reason of, among other things, rights of indemnity or contribution it may have against such debtors.  However, even in the absence of any direct claim against such debtors, Garlock would be entitled to relief as a party whose substantive rights are being affected by being denied access to the information contained in the 2019 statements.  As discussed above, Garlock has a

---

[15] Some firms may argue that they relied on an expectation of confidentiality when they filed the 2019 statements.  Any such reliance was entirely misplaced and unreasonable, since this Court provided no confidentiality protection, only a procedure by which members of the public could procure access, and the reviewing courts relied on that lack of protection in denying challenges to the 2019 orders.  *In re Pittsburgh Corning Corp.,* 2005 U.S. Dist. LEXIS 46017 at *28-29 (W.D. Pa. Sept. 27, 2005).  Plaintiffs' firms' mistaken belief that they could keep these filings secret and avoid disclosure of inconsistency with their tort system filings does not provide a reason to deny Garlock access.

compelling need for this information in connection with its own bankruptcy case.  Moreover,

even assuming the absence of such connections, as a member of the public, Garlock has a right

to pursue access to sealed documents.

### B.    To The Extent The Reopening Of Certain Cases Is Required To Grant Relief To Garlock, Such Cases Should Be Reopened

88.    Certain of the above-captioned cases are closed.[16]  To the extent Garlock must

reopen the cases in order to obtain relief with respect to the 2019 statements, Garlock moves to

re-open for the limited purpose of permitting an adjudication of this motion.  Section 350(b) of

the Bankruptcy Code states that "[a] case may be reopened in the court in which such case was

closed to administer assets, to accord relief to the debtor, or for other cause."  Additionally,

Bankruptcy Rule 5010 states that a "case may be reopened on motion of the debtor or other party

in interest pursuant to § 350(b) of the Code . . . ."  Finally, Bankruptcy Rule 3020(d) states that

"[n]otwithstanding the entry of [an] order of confirmation, the court may issue any other order

necessary to administer the estate."  According to the Advisory Committee Notes to the 1991

Amendments to Bankruptcy Rule 3022, "[a] final decree closing the case after the estate is fully

administered does not deprive the court of jurisdiction to enforce or interpret its own orders and

does not prevent the court from reopening the case for cause pursuant to § 350(b) of the Code."

---

[16] The following Delaware venued cases are closed: *In re ACandS, Inc.,* No. 02-12687 (Bankr. D. Del.); *In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.); *In re Combustion Engineering, Inc.,* No. 03-10495 (Bankr. D. Del.); *In re Owens Corning, No.* 00-03837 (Bankr. D. Del.); *In re United States Mineral Products,* No. 01-02471 (Bankr. D. Del.); *In re USG Corp.,* No. 01-2094 (Bankr. D. Del.).  The following case venued in the Western District of Pennsylvania is closed: *In re Mid-Valley*, No. 03-35592 (Bankr. W.D. Pa.).

## CONCLUSION

For the foregoing reasons, Garlock respectfully requests that orders be entered, in the

form of the proposed orders attached hereto, granting Garlock immediate access to all 2019

statements filed in these cases.[17]

Dated: February 18, 2011         MORRIS, NICHOLS, ARSHT & TUNNELL LP

By /s/ Gregory W. Werkheiser
Gregory W. Werkheiser
DE Bar No. 3553
Matthew B. Harvey
DE Bar No. 5186

1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302-658-9200
Fax: 302-658-3989

DEL SOLE CAVANAUGH STROYD LLC

By /s/ Richard A. Swanson
Arthur H. Stroyd, Jr.
PA ID No. 15910
Richard A. Swanson
PA ID No. 83868

The Waterfront Building
200 First Avenue, Suite 300
Pittsburgh, PA  15222
Tel: 412-261-2393
Fax: 412-261-2110

- and -

---

[17] Plaintiffs' firms may propose that Garlock should be limited to receiving access to 2019 entries related to persons who sued Garlock.  The law neither requires nor tolerates such a limitation, however.  Because the information in the 2019 statements is not sensitive, Garlock cannot be subjected to the burden and delay—and, potentially, concealment of evidence—that would be entailed by a redaction procedure.  Garlock is entitled to access all of the 2019 statements, without limitation.

Garland S. Cassada
Richard C. Worf, Jr.
ROBINSON, BRADSHAW & HINSON
101 North Tryon Street, Suite 1900
Charlotte, NC 28246
Tel: 704-377-8317
Fax: 704-373-3917

**Attorneys for Garlock Sealing Technologies, LLC**