# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

IN RE:

GARLOCK SEALING TECHNOLOGIES
LLC[1], et al.

       Debtors.

Case No. 10-31607

Chapter 11

Jointly Administered

### AFFIDAVIT OF PAUL GRANT

I, PAUL GRANT, being first duly sworn, deposes and says:

1.      I am President of Garrison Litigation Management Group, Ltd. ("Garrison"). I have been employed by Garrison since 1996. Prior to becoming President in 2002, I was Senior Vice President. Prior to my employment by Garrison I was staff counsel for Coltec Industries, Inc. I respectfully make this Affidavit in Support of the Debtors' Motion For (A) Establishment Of Asbestos Claims Bar Date, (B) Approval Of Asbestos Proof Of Claim Form, (C) Approval Of Form And Manner Of Notice, (D) Estimation Of Asbestos Claims, And (E) Approval Of Initial Case Management Schedule, filed on August 31, 2010, as well as in support of the Debtors' Response To Motion Of Official Committee Of Asbestos Personal Injury Claimants For Entry Of Scheduling Order For Plan Formulation Purposes, filed on September 24, 2010. I am authorized to make this Affidavit on behalf of the Debtors in these jointly administered bankruptcy cases (the "Cases").

2.      This Affidavit is based on personal knowledge and information learned in the course of my corporate duties.

---

[1]     The Debtors include Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

1

## The Debtors

3.     On June 5, 2010 (the "Petition Date"), The Anchor Packing Company ("Anchor"), Garlock Sealing Technologies LLC ("Garlock"), and Garrison filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

## Garlock's Asbestos Litigation

4.     Garlock produces and sells fluid-sealing products, including gaskets and compression packing.   Some of Garlock's former gasket and packing products contained asbestos.  As a result, since the mid-1970s, Garlock has faced hundreds of thousands of claims from individuals alleging that exposure to Garlock's products contributed to asbestos-related personal injuries.

5.     Anchor formerly was a wholly owned subsidiary of Garlock.   After Garlock acquired Anchor, Anchor distributed Garlock's gaskets and packing as well as sealing products of other producers.  Anchor has received a substantial number of asbestos claims.  Anchor has ceased business operations and exhausted all of its insurance paying asbestos defense and settlement claims.  Anchor still receives hundreds of new asbestos claims each year.  Claims against Debtors by individuals alleging that exposure to products produced or sold by Garlock or Anchor contributed to asbestos-related personal injuries or wrongful death are hereinafter referred to as "Asbestos Claims" and the individuals asserting such claims as "Asbestos Claimants."

6.     Garrison manages the defense and resolution of Asbestos Claims.  I have for 16 years been personally involved in managing the defense and resolution of Asbestos Claims.  In this capacity I have, among other things, hired and supervised local counsel in the defense of Asbestos Claims, assisted local counsel in pre-trial proceedings and at trials of Asbestos Claims,

2

and directly participated in negotiations with plaintiffs' lawyers regarding the settlement of Asbestos Claims. As President of Garrison, I have also supervised other lawyers at Garrison in the same tasks. As part of my role, I keep abreast of contemporary developments in asbestos litigation, through my own involvement in settling cases for Garlock, supplemented by generally available publications, continuing legal education programs and activities, professional conferences, and conversations and correspondence with Garlock's asbestos defense counsel, counsel for plaintiffs, co-defendants, and insurance companies, insurance company representatives, and other lawyers and professionals involved in asbestos and mass tort litigation.

7.     The Debtors have compelling defenses to liability. Asbestos in the products made with asbestos was encapsulated. In the gaskets, the asbestos fibers were mixed with a binder, such as rubber or neoprene. The packing was made with asbestos yarn impregnated and coated with lubricants, such as Teflon or graphite. Normal use of the Garlock products made with asbestos did not result in medically significant exposures and any exposure was well below the Permissible Exposure Limits established by the Occupational Safety and Health Administration. Moreover, the overwhelming majority of the Garlock products at issue were made with chrysotile, which has been shown to be much less potent in causing and/or contributing to the development of mesothelioma.

8.     Garlock products that were made with asbestos were typically used in environments that contained high quantities of thermal insulation and other highly friable asbestos products produced by other manufacturers, including: Johns Manville, Raybestos Manhatten, Eagle Picher, Pittsburgh Corning, Owens Corning, Fibreboard, Babcock & Wilcox, Armstrong World Industries, GAF, U.S. Gypsum, Turner & Newell, and W.R. Grace (the "Friable Defendants"). In addition, many of these products were made with asbestos fiber types

3

with the greatest potential to cause disease. Individuals who installed and removed Garlock's asbestos-containing gaskets and packing in such environments also necessarily handled, or worked in proximity to other workers handling, products produced by at least some of the Friable Defendants or other manufacturers of friable asbestos products. It was not possible to work with a gasket or packing product inside the piping system without first having to remove highly friable thermal insulation products that were covering the piping surface. In litigation prior to 2000, Garlock often successfully argued and proved that its encapsulated products were not a substantial contributing cause of the Asbestos Claimants' injuries, in part, because of the exposures from the myriad friable products used around Garlock's products.

9.     Moreover, even if a jury found that Garlock's products contributed to an Asbestos Claimant's asbestos-related disease, any portion of damages assigned to Garlock was small or paid at a reduced share whether Garlock was sued in jurisdictions which followed principles of joint and several liability or only several liability.

10.     Prior to 2000, based on the nature of Garlock's products, its defenses, and the relative weakness of plaintiffs' cases against Garlock, Garlock was a peripheral defendant and the Friable Defendants paid the lion's share of money to resolve Asbestos Claims. Garlock made relatively *de minimis* settlement payments to large numbers of claimants. Nevertheless, Garlock incurred substantial expenses to defend and resolve tens of thousands of cases each year.

11.     From 1975 to 1999, when Garlock and plaintiffs introduced their respective scientific and medical evidence in trials, Garlock was extraordinarily successful. It was either completely exonerated or paid very little, even after verdicts were rendered. From January 1, 1997 to December 31, 1999, for example, Asbestos Claimants tried cases to verdict against Garlock 61 times. Garlock received 54 defense verdicts or outright dismissals, an 89% success

4

rate. Of the seven lost verdicts, Garlock obtained reversal on appeal of one; settled another before exhausting its appeal for a fraction of the verdict amount; and was found 2% responsible in one of the others.

12.    A key part of Garlock's trial strategy was to offer evidence that its products were safe coupled with evidence that plaintiffs' injuries were caused by exposures to the highly friable, amphibole products of the large Friable Defendants, which plaintiffs freely identified. Juries were prone to find that the insulation companies and other manufacturers of friable products were responsible for plaintiffs' injuries, not Garlock. The success of Garlock's defenses was reflected in the fact that, excluding claims for which Garlock obtained dismissal without payment, Garlock paid on average less than $10,000 to resolve mesothelioma claims (and less than $3,000 and $1,600, respectively, to resolve lung cancer and asbestosis claims).

13.    During the 1990s, Garlock paid approximately 600 mesothelioma claims per year an average of approximately $6,400 per claim; and Garlock's annual mesothelioma settlement payments were approximately $3.7 million.

14.    The vast majority of Garlock's pre-2000 asbestos-related payments were associated with Asbestos Claims generated through mass assembly-line screenings of workers suspected to have had work-related exposures to products containing asbestos. The screenings were massive recruitment programs carried out for personal injury law firms on targeted populations of current and former industrial and construction workers and that generated huge volumes of Asbestos Claimants as clients for these law firms ("Recruited Asbestos Claims"). Personal injury firms for over a decade conducted mass medical screenings and filed tens of thousands of Recruited Asbestos Claims against Garlock annually by persons who had suspect or unreliable evidence of physical impairment or actual disease as defined by the American Medical

5

Association and the American Thoracic Society. These plaintiffs sought damages for fear of future disease, though most would never develop any asbestos-related disease at all. Some plaintiffs alleged they had some level of impairment caused by exposure to asbestos.

15.     Recruited Asbestos Claims were asserted in complaints that used boilerplate allegations against dozens of defendants. Some of these workers had claims of asbestosis so minor that they did not meet the criteria of the American Thoracic Society. Others had pleural plaques or effusions, markers "consistent with" asbestos exposure that usually resulted in no asbestos-related impairment or symptom.

16.     The mass of Recruited Asbestos Claims swamped Garlock, other defendants, and the tort system, rendering individual resolution on merit (through settlement or adjudication) impossible. Garlock and other defendants agreed to mass settlements for *de minimis* amounts per claim as the most practical and cost-effective way to resolve Recruited Asbestos Claims.

17.     Although settlements of individual Recruited Asbestos Claims tended to be small, because there were so many thousands of claims, aggregate annual payments were quite substantial. From 1995 to 1999, Garlock paid on average approximately 27,000 Recruited Asbestos Claims an aggregate average amount of $37 million per year (or $1,370 per claim). Plaintiffs' firms that recruited the claimants typically collected contingency fees of up to 40% of the settlement amounts. Although this was still cheaper than litigating the merits of every single case, in retrospect the *de minimis* payment strategy proved to be unwise as it encouraged more recruiting screenings and more Recruited Asbestos Claims.

6

## The Bankruptcy Wave

18.     From January 1, 2000 to December 31, 2001, surviving Friable Defendants filed Chapter 11 bankruptcy cases[2] and the automatic stay under the Bankruptcy Code stopped asbestos litigation in the tort system against such companies. The Friable Defendants' exit from the tort system was catastrophic for Garlock because in many states recognizing joint and several liability remaining defendants faced the risk of bearing the bankrupts' enormous shares of damages in individual cases where they might be found even minimally liable. During and subsequent to the Friable Defendants' bankruptcies, over 30 additional asbestos defendants (with the Friable Defendants, the "Bankrupts"), many of which produced products containing friable asbestos, also filed for Chapter 11 seeking relief from asbestos litigation.[3]  The automatic stay also stopped asbestos litigation against these defendants in the tort system and such defendants ceased paying asbestos claims. The bankruptcies of the Bankrupts, more than 40 in all, are referred to herein as the "Bankruptcy Wave."

19.     During and after the Bankruptcy Wave, the cost and risk to Garlock associated with individual Asbestos Claims increased materially. Plaintiffs who had sued Garlock and the Bankrupts looked to Garlock (and other solvent defendants) to pay the several shares of the Bankrupts. Most of the settlement payments previously received by individual plaintiffs were made by the Bankrupts. The resulting transfer of liability was enormous. Plaintiffs' lawyers

---

[2]     Johns Manville, Raybestos Manhatten, Eagle Picher had previously sought Chapter 11 protection.

[3]     These bankruptcy cases include Skinner Engine Co. (2001); E.J. Bartells (2001); United States Minerals Products (2001); Murphy Marine Services (2001); Insul Co. (2001); Swan Transportation (2001); North American Refractories Corp. (2002); Kaiser Aluminum (2002); Harbison-Walker (2002); A.P. Green (2002); Plibrico Co. (2002); Shook & Fletcher (2002); Porter-Hayden Co. (2002); Artra Group, Inc. (2002); Special Metals Corp. (2002); Asbestos Claims Management Corp. (2002); ACandS (2002); JT Torpe Co. (2002); A-Best Products (2002); Western MacArthur/Western Asbestos (2002); C.E. Thurston (2003); Combustion Engineering (2003); Congoleum Corp. (2003); Mid-Valley (Halliburton subsidiaries) (2003); Muralo Co. (2003); Flitkote Co. (2004); Oglebay Norton Co. (ONCO) (2004); Special Electric (2004); Quigley Co. (2004); Utex Industries (2004); API, Inc. (2005); Asarco; Brauer Supply Co. (2005); Dana Corporation (2006); ABB Lummus Global (2006); and Lloyd E. Mitchell Co. (2006).

7

advised Garrison and its outside counsel that Garlock and the remaining defendants would have to "make up" for the lost shares. The amount Garlock was required to pay to resolve individual Asbestos Claims, particularly claims by persons suffering from mesothelioma, dramatically increased.

20.     In addition, there was a disturbing trend in new Asbestos Claims asserted against the Debtors—Garrison's local defense counsel reported that many Asbestos Claimants testified that they had no evidence of exposure to products of some or all of the Bankrupts, and that Garlock's products were the only product, or one of only a handful of products, that injured them. This change in testimony was difficult for Garlock to rebut because Asbestos Claimants largely controlled their testimony regarding which products they worked with or around.

21.     The number of co-defendants responsible for an Asbestos Claim is the one of the most important factors in valuing a claim. By taking the position that they were not exposed to some or all of the Bankrupts' products, Asbestos Claimants substantially increased the trial risk for solvent defendants like the Debtors, effectively transferring liability from the Bankrupts to solvent companies, even in several liability and hybrid jurisdictions where the Debtors should have been protected from bearing the risk of the Bankrupts' insolvencies.

22.     In addition to largely not identifying friable products of Bankrupts, Asbestos Claimants sued Garlock in far more mesothelioma cases than ever before.   Garlock paid settlements in approximately 665 such cases in 1999; by 2003, it paid in 1,319. This increase in the number of cases where Garlock was forced to pay settlements had no basis in reason or science.  Mesothelioma has a long latency period, so whether the disease manifested and the claimant sued in 1999 or a few years later, it had to be caused by exposures that took place

8

decades before. Established historical exposures to asbestos and asbestos-containing products should not have changed between 1999 and 2001.

23.    Because evidence of Asbestos Claimants' exposures to products of Friable Defendants and other Bankrupts is crucial to the Debtors' defense, the Debtors for the last decade have sought information in discovery from Asbestos Claimants regarding such exposures. In many cases, however, Garrison's defense counsel encountered Asbestos Claimants who consistently and almost uniformly denied that they had evidence of exposures to products of many (if not all) Friable Defendants and other Bankrupts, crippling defenses that were very effective prior to the Bankruptcy Wave.

24.    Garlock's trial risk for Asbestos Claims increased substantially during and after the Bankruptcy Wave. Garlock not only bore the risk of paying the enormous unpaid several shares of the Bankrupts, but when Asbestos Claimants targeted the Debtors' nonfriable asbestos products while denying exposures to highly friable products of the Bankrupts, it became easier for them to convince juries that trace levels of asbestos released by Garlock's products contributed to Asbestos Claimants' diseases. In addition, without evidence of exposure to the Bankrupts' products, Garlock would not be able to get credit for the Bankrupts' payments to Asbestos Claimants.

25.    As a result of joint and several liability principles and Asbestos Claimants' ceasing to identify exposures to the Bankrupts' products, Garlock's average settlement value for mesothelioma claims increased over eight-fold in cases paid by Garlock from $9,100 in 1999 to $74,000 in 2009 and, because of the higher claims numbers, the total amount required annually by Garlock to resolve such claims increased almost twelve-fold from approximately $6 million in 1999 to approximately $70 million in 2009.

9

### Disappearance of Recruited Asbestos Claims

26.    In 2004 and 2005, revelations of widespread misconduct in the recruiting practices that produced Recruited Asbestos Claims led to the virtual disappearance of such claims. Also in 2004, the states like Texas, Ohio, Florida, and Georgia where many Recruited Asbestos Claims had traditionally been filed enacted legislation that imposed medical criteria requiring medical impairment and real medical reports (as opposed to assembly-line medical screenings) and either relegated existing unimpaired plaintiffs who asserted Recruited Asbestos Claims to inactive dockets until they manifested real symptoms of disease or such claims were simply no longer pursued. Because most plaintiffs with Recruited Asbestos Claims do not have, and never develop, legitimate symptoms that qualify under the new standards, this removed the pressure for defendants to settle these cases, and made screenings an unprofitable business for plaintiffs' firms. Of 1,653 non-malignant claims currently pending in the Texas MDL, for example, only five have been certified for trial, with only one actually receiving a trial date. The number of filings of Recruited Asbestos Claims began to wane.

The business of mass non-malignant filing was further impacted by the discovery of widespread misconduct in the medical screenings process in 2005. Beginning in 2001, some plaintiffs' firms that brought Recruited Asbestos Claims began filing massive numbers of claims against silica companies, alleging that their clients had silicosis. Many of their silica clients had previously filed and settled cases asserting Recruited Asbestos Claims. Many of these silica claims were recruited by three screening companies—N&M Inc., RTS Inc., and Innervisions Inc. (the "Screening Companies")—based on diagnoses by one of the following 12 doctors (the "Texas MDL Doctors"): Dr. James Ballard, Dr. Kevin Cooper, Dr. Todd Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Glynn Hilbun, Dr. Richard Levine, Dr. Barry Levy, Dr. George

10

Martindale, and Dr. W. Allen Oaks. In late 2004, many of the silica claims were consolidated in

a Silica Products Liability Litigation MDL in Corpus Christi, Texas ("MDL 1553") before Judge

Janis Jack. As part of discovery, Judge Jack required each plaintiff to submit detailed sworn fact

sheets setting forth the diagnosis, its basis, and the identity of the diagnosing and treating

physicians. She also compelled production of documents from the Screening Companies and the

Texas MDL Doctors, including x-ray reports and diagnostic reports, and summoned most of the

Texas MDL Doctors into court to testify under oath.. The evidence revealed widespread

discrepancies and wholesale unreliability. For example, one doctor who performed 78 percent of

the alleged examinations relied on exposure histories taken by law firms and screening

companies and did not consider other possible causes of lung dysfunction. *In re Silica Products*

*Liability Litigation*, 398 F. Supp. 2d 563, 603–08 (S.D. Tex. 2005). Numerous instances of

"retreaded" asbestos to silica claims were generated in over 60% of the cases and impossibly

high numbers of rare mixed dust lung disease was claimed. On the basis of this and other

evidence, Judge Jack concluded that "[i]n a majority of cases these diagnoses were more the

creation of lawyers than of doctors." *Id.* at 635. She sharply rebuked the plaintiffs' firms,

screening companies and doctors:

> [T]hese diagnoses were about litigation rather than health care. And yet this statement, while true, overestimates the motives of the people who engineered them. The word "litigation" implies (or should imply) the search for truth and the quest for justice. But it is apparent that truth and justice had very little to do with these diagnoses—otherwise more effort would have been devoted to ensuring they were accurate. Instead, these diagnoses were driven by neither health nor justice: they were manufactured for money.

*Id.*

27.    In addition, in 2007 in the W.R. Grace bankruptcy case, Dr. Steven E. Haber

thoroughly evaluated the reports and diagnostic practices of the doctors who submitted records

or reports in support of Grace asbestos claimants. Dr. Steven E. Haber, Diagnostic Practices in a Litigation Context: Screening Companies and the Doctors they Employed, *In re W.R. Grace & Co.*, No. 01-1139 (Bankr. D. Del. Mar. 26, 2007). Dr. Haber determined that 24 litigation doctors and 7 screening companies were medically unreliable. This group included the 12 doctors evaluated in Judge Jack's opinion as well as: Dr. Jay T. Segarra, Dr. Robert Altmeyer, Dr. Richard Kuebler, Dr. Larry Mitchell, Dr. Gregory Nayden, Dr. Jeffrey Bass, Dr. Dominic Gaziano, Dr. Alvin Schonfeld, Dr. Leo Castiglioni, Dr. Phillip Lucas, Dr. Robert Mezey, Dr. James Krainson, Dr. Paul Venizelos, and Dr. Robert Von McGee (together with the Texas MDL Doctors, the "Screening Doctors").

28.     Later in 2005, following the opinion entered by Judge Jack in Silica MDL 1553, certain defendants proceeded with a joint effort to discredit screened claims in an Asbestos Products Liability Litigation MDL ("MDL 875"). More than 50 subpoenas were served on doctors and screening companies who had participated in mass tort screenings across the country. As a result of those subpoenas, and the subsequent testimony received from several of the lead doctors, on June 8, 2006, a Motion To Exclude Expert Testimony And For Dismissal Of Claims was filed in MDL 875 (the "June 8 Motion"). The June 8 Motion moved for exclusion of expert testimony and dismissal of claims for any plaintiff pending in MDL 875 which relied on screening related diagnoses done by Dr. Ray Harron, Dr. Andrew Harron, Dr. James Ballard, Dr. George Martindale, Dr. Richard Levine and Dr. Jeffrey Bass. *See* Motion To Exclude Expert Testimony And For Dismissal Of Claims, *In re Asbestos Products Liability Litigation (No. VI)*, MDL No. 875 (E.D. Pa. June 8, 2006). Each of these doctors had participated in asbestos screenings and in response to subpoenas relating to their medical diagnosing had either asserted

12

the Fifth Amendment to avoid incriminating themselves or submitted affidavits that disavowed their previous asbestos diagnoses.

29.      Following the filing of the June 8 Motion the MDL Court began to examine the more than 100,000 cases pending there.  On August 15, 2006, Judge James T. Giles entered Administrative Order 11 which began the case management process of transferring all cases from the local district court to the Eastern District of Pennsylvania for management by the MDL Clerk of Court and eventually lead to the severance of each individual plaintiffs' claim into a separate and distinct cause of action in MDL 875.

30.      Finally, on January 31, 2007, the MDL Court conducted a hearing at which time the court addressed certain defendants' pending June 8 Motion.  The court determined that the motion, which was filed on the MDL 875 All Pending Actions docket, should be denied without prejudice as it related to all cases generally.  *See* Transcript of Hearing, *In re Asbestos Products Liability Litigation (No. VI)*, MDL No. 875 (E.D. Pa. Jan. 31, 2007).  The MDL Court specifically noted previous findings relating to the fraudulent nature of screenings in asbestos and silica cases and instructed the defendants to file motions to exclude the testimony of these so-called experts in individual cases rather than on the general MDL docket.  Following this hearing Judge Giles entered Administrative Order 12 on May 31, 2007.  This order reaffirmed his previous oral ruling that all cases should be addressed individually and set out the process for defendants to proceed with filing motions in individual cases.

31.      On December 18, 2008, certain defendants filed a Motion To Exclude Expert Testimony Of Dr. Ray A. Harron And To Dismiss Claims in more than 750 plaintiffs' cases pending in MDL 875.  A hearing took place on January 29, 2009, and the Court agreed that

13

medical diagnoses from Dr. Ray A. Harron should be excluded as unreliable. Orders for dismissal of these claims were entered following this hearing.

32.    Since that time, when the exclusion of one or more of the Screening Doctors is pursued in individual cases, plaintiffs' claims have been voluntarily dismissed, apparently to avoid discovery or a *Daubert* hearing on same. As recently as August of this year, the MDL Court sanctioned plaintiffs' counsel for doing just that in a series of cases in which defendants challenged the credibility of Dr. Jay Segarra, a screening doctor with significant numbers of diagnoses in the Garlock pending cases.

33.    After Judge Jack's discrediting of the screening recruitment process and rebuke of the Screening Companies and Screening Doctors, screenings precipitously dropped and recruited non-malignant asbestos claims began to disappear, drastically reducing the aggregate number of asbestos claims filed each year. Non-malignant claim filings against Garlock ebbed. In 2002, more than 45,000 Recruited Asbestos Claims were filed against Garlock; in 2006, only a few thousand were filed (Figure 1, below). Garlock's aggregate settlement expenditure for Recruited Asbestos Claims was nearly $100 million in 2001; by 2008, it paid only $5 million.

14



34.    Today, Garlock receives only a few thousand non-malignant claims each year. Most of Garlock's pending non-malignant claims are Recruited Asbestos Claims left over from the mass filing period prior to 2006, are not actively litigated, have no merit because they are based on inadmissible medical reports and lack reliable evidence of impairment or injury related to asbestos exposure, and will never receive payment. For example, of the 71,038 pending non-malignant claims against Garlock, 63,034 (89%) were filed before January 1, 2006.

<u>Pending Asbestos Claims</u>

35.    As of the Petition Date, there were approximately 118,000 claims pending against Garlock in state and federal courts across the country, broken down by disease alleged as follows:

| Mesothelioma | Lung Cancer | Other Cancer | Non-malignant | Unspecified | Total |
|---|---|---|---|---|---|
| 5,700 | 7,000 | 2,400 | 70,000 | 33,000 | 118,000 |

After accounting for duplicate claims, cases that have been administratively dismissed, and cases

15

that should have been dismissed under settlement agreements, Garlock estimates that it has approximately 100,000 pending claims. These numbers are rounded to the nearest thousands and differ from the numbers in the Bar Date Motion because they reflect an update of Garlock's database since August 31, 2010.

36.    Most of Garlock's 103,000 pending non-malignant and unspecified disease claims were filed prior to 2006 and are Recruited Asbestos Claims produced through the mass medical screening process described above by the Screening Companies and the Screening Doctors using the same screening practices thoroughly discredited by Judge Jack.

37.    Garlock has good liability defenses in all of these cases. To begin with, many Plaintiffs' asserting Recruited Asbestos Claims are not able to provide medical or product identification evidence to support those claims. This is true in part because the medical evidence on which they are based—medical diagnoses of one of the Screening Doctors—has been completely discredited or found to be unreliable.

38.    Three of the Screening Doctors (Dr. Ray Harron, Dr. Andrew Harron, and Dr. James Ballard) now regularly assert the Fifth Amendment privilege against self-incrimination when questioned about their work in asbestos screenings that produced Recruited Asbestos Claims and two others (Dr. George Martindale and Dr. Richard Levine) have executed affidavits repudiating any alleged "diagnosis" of an asbestos-related disease rendered by them.

39.    In addition, some plaintiffs with Recruited Asbestos Claims should not be able to provide product identification of an asbestos-containing Garlock product because they have never seen a Garlock product and Garlock products were not on their work sites.

40.    Indeed, the attorneys for these plaintiffs sued Garlock (along with dozens of other defendants) without having or articulating any evidence that Garlock in particular had caused

16

their client's alleged condition. They filed form complaints by the thousands against dozens of defendants, providing no particularized basis for the claim against Garlock. Indeed, plaintiffs in the tort system routinely deny that naming specific defendants in their complaints constitutes admissions that such defendants in fact did contribute to their injuries, and courts usually agree.

### The Jaques Asbestos Claims

41.    In addition to Garlock's pending cases, The Maritime Asbestosis Legal Clinic, a Division of The Jaques Admiralty Law Firm ("Jaques") claims to represent up to 25,000 additional unspecified Asbestos Claimants with unspecified asbestos diseases. Although Jaques has yet to provided any information regarding that firm's alleged 25,000 claims that it will assert against Garlock in these Cases, I believe I am familiar with the Jaques claims.

42.    I believe Jaques is referring to the claims of plaintiffs it represents on the Maritime Asbestos Docket of MDL 875 ("MARDOC") which were originally filed over fifteen years ago. In May 1996, however, the MDL Court issued an order administratively dismissing these cases without prejudice. *See In re Asbestos Products Liability Litigation (No. VI)*, No. MDL 875, 1996 WL 239863 (E.D. Pa. May 2, 1996). The order gave Jaques the right to seek reinstatement of these claims individually upon application to the Court and production of, inter alia, evidence of a bona fide asbestos-related disease. Over the next decade, very few of the MARDOC cases were ever re-activated. Indeed, activity with respect to the MARDOC claims was virtually non-existent until the fall of 2009.

43.    Since On November 2, 2009, the MDL Court began re-activating the MARDOC cases from the civil suspense file and requiring plaintiffs to provide basic information regarding their claims including the diagnostic information upon which they are based. With each re-activated group of claims, Jacques was required to dismiss those plaintiffs' claims which they

17

did not intend to pursue and to dismiss those defendants against whom the remaining plaintiff did not have a claim. Thus, by the summer of 2010, hundreds of Jaques claims had been reactivated and then voluntarily dismissed without prejudice due to the plaintiffs' inability to comply with the Court's requirements, specifically that of producing a legitimate diagnosis for each plaintiff. Garlock was among the defendants against whom hundreds of these claims were dismissed.

44.    Finally, on July 22, 2010, rather than wasting court resources re-activating and then accepting voluntary dismissals of plaintiffs' claims, the MDL Court entered an order dismissing the claims of thousands of Jaques clients (identified in a 222 page attachment to the Court's order) against all viable defendants (non-bankrupt defendants) pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. See *In re Asbestos Products Liability Litigation (No. VI)*, No. MDL 875 (E.D. Pa. July 22, 2010). These are the very same claims which the Jaques firm asserts are still alive "for bankruptcy purposes." As in the MDL Court, Jaques would undoubtedly be unable to complete a proof of claim form with credible supporting medical evidence for the vast majority of its 26,000 alleged claims.

**[ signatures follow on next page ]**

Affiant:

_Paul Grant_ (signature)

Paul Grant

        SWORN TO AND SUBSCRIBED before me, a notary public for _____, in
the State of _New York_, on this 23ʳᵈ day of _SEPT_, 2010.

_Kim M. Bamford_ (signature)

Notary Public

My commission expires: 12-8-10

> Kim M. Bamford
> Notary Public, State of New York
> No. 01BA4866340
> Qualified in Monroe County
> Commission Expires December 08, 2010

19

3020549