IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 8 TO EXHIBIT BOOK
## BEST INTERESTS ANALYSIS

**EXHIBIT 8**

Attached.

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## BEST INTERESTS ANALYSIS

### INTRODUCTION

Pursuant to section 1129(a)(7) of the Bankruptcy Code,[1] each Holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test"). In connection with this requirement, the following hypothetical liquidation analysis (the "Liquidation Analysis") has been prepared so that the Bankruptcy Court may determine that the Plan is in the best interests of all classes impaired by the Plan.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS AND NON-DEBTOR AFFILIATES. UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF MANAGEMENT AND ITS ADVISORS. ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' AND NON-DEBTOR AFFILIATES' ASSETS WILL RESULT IN THE PROCEEDS WHICH WOULD BE REALIZED WERE THE DEBTORS AND NON-DEBTOR AFFILIATES TO UNDERGO AN ACTUAL LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AICPA.

### GENERAL ASSUMPTIONS

For purposes of this analysis, the Effective Date is assumed to be December 31, 2009. A summary of the assumptions used by management and its advisors in preparing the Liquidation Analysis follows.

#### Asset Sale Methodology

The Liquidation Analysis assumes that the hypothetical chapter 7 liquidation is effected via the orderly sale of the businesses of the Debtors and Non-Debtor Affiliates as going concerns. Because the Asbestos PI Channeling Injunction and Asbestos PD Channeling Injunction would not be available in a chapter 7 liquidation, the value realized from the orderly sale of the

---

[1]    All capitalized terms used in this Liquidation Analysis that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

businesses in all likelihood would be reduced as a result of a buyer's concern regarding the risk of asbestos liability in the acquisition of the assets. Further, the lack of the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction may preclude an orderly sale of the businesses as going concerns, in which case an actual liquidation of assets would be required. In that case, values realized would be further reduced.

**Estimates of Cost of Liquidation**

Conversion of the Chapter 11 Cases to chapter 7 would likely result in additional costs to the Debtors' estates. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee and other professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; litigation costs related to possible fraudulent transfer actions and the resolution of asbestos and other Claims; all unpaid expenses incurred by the Debtors in the Chapter 11 Cases that are allowed in the chapter 7 cases; and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In addition, liquidation costs could be higher, and the value of any distributions could be lower, if the chapter 7 cases were not completed within the 12-month period assumed in the Liquidation Analysis. In the event that litigation were necessary to resolve claims asserted in the chapter 7 cases, any delay could be further prolonged and administrative expenses further increased. The effects of this potential delay on the value of distributions under the hypothetical liquidation have not been considered.

## DETAILED LIQUIDATION ANALYSIS

The table below provides a comparison of the recoveries under a hypothetical chapter 7 liquidation and under the Chapter 11 Cases reorganization in accordance with the provisions of the Plan. The accompanying footnotes should be read in connection with the table.

*(unaudited, $ in millions)*

| | Note | Chapter 7 Liquidation | | Chapter 11 Cases Reorganization | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **Calculation of Estimated Value Available:** | A | | | | |
| Estimated Value of Reorganized Debtors and Non-Debtor Affiliates | | $ 2,100 | $ 2,500 | $ 2,100 | $ 2,500 |
| Less: Discount Factor | | (1,050) | (1,250) | - | - |
| Estimated Value of Reorganized Debtors and Non-Debtor Affiliates | | 1,050 | 1,250 | 2,100 | 2,500 |
| Plus: | | | | | |
| Cash | B | 787 | 787 | 787 | 787 |
| Fresenius Payment | C | - | 105 | 115 | 115 |
| Cryovac Payment | C | - | 873 | 953 | 953 |
| Insurance Recovery | D | 500 | 500 | 500 | 500 |
| **Estimated Value Before Provision for Chapter 7 Costs, Chapter 11 Costs, Administrative Expenses and Claims** | | 2,337 | 3,515 | 4,456 | 4,856 |
| Less: | | | | | |
| Costs Associated with Chapter 11 Reorganization | | - | - | 100 | 100 |
| Costs Associated with Chapter 7 Liquidation | E | | | | |
| Professional Fees ($2.0 million / month for 12 months) | | 24 | 24 | - | - |
| Trustee Fees (1.5% of cash and estimated proceeds less other fees) | | 27 | 45 | - | - |
| Additional Brokerage Fees (0.5% of estimated proceeds) | | 5 | 6 | - | - |
| Administrative Expenses | | 26 | 26 | 31 | 31 |
| Priority Tax Claims and Priority Claims | | 39 | 39 | 39 | 39 |
| Secured Claims | | 5 | 5 | 5 | 5 |
| **Estimated Value Before Provision for General Unsecured Claims, Asbestos PI and PD Claims and Equity Interests** | | 2,211 | 3,371 | 4,280 | 4,680 |
| Provision for General Unsecured Claims | | 999 [1] | 999 [1] | 1,387 [2] | 1,387 [2] |
| Provision for Asbestos PI and PD Claims | | - [3] | - [3] | 2,773 [4] | 2,424 [4] |

[1] Plus post-petition interest, if any value available
[2] Includes post-petition interest for General Unsecured Claims as set forth in their treatment under the Plan
[3] Assumes Asbestos PI and PD Claims would be in dispute
[4] Represents value of the treatment of Asbestos PI Claims and Asbestos PD Claims under the Plan (obligations under the Deferred Payment Agreements discounted at approximately 5% in the low case and 10% in the high case)

## FOOTNOTES TO LIQUIDATION ANALYSIS

A summary of the assumptions used in the Liquidation Analysis is set forth below.

### NOTE A – PROCEEDS FROM ORDERLY SALE OF BUSINESSES

The Liquidation Analysis assumes the businesses of the Debtors and Non-Debtor Affiliates would be sold as going concerns for cash in one transaction. The proceeds from this sale transaction are assumed to equal the range of the Reorganized Enterprise Value of the Reorganized Debtors and Non-Debtor Affiliates, as further described in Section 2.11 of the Disclosure Statement, less a discount factor of 50%. Unlike a chapter 11 reorganization, chapter 7 does not provide for the issuance of the Asbestos PI Channeling Injunction or Asbestos PD Channeling Injunction. Notwithstanding a presumed ability to sell assets in a sale under Bankruptcy Code §363 or the availability of an injunction under Bankruptcy Code §105, the discount factor quantifies the probability that the businesses could not be sold for fair value or at all because of the perceived risk that the asbestos liability would follow the assets sold.

U.S. taxes due on the gain from the orderly sale of the Debtors' and Non-Debtor Affiliates' businesses are assumed to be offset by existing tax attributes and deductions generated by payments made to Claimants in the chapter 7 cases. To the extent that the payment of claims did not occur within twelve months from the sale of the assets, the estate would incur cash tax obligations subject to future refunds. The orderly sales of businesses in foreign countries are assumed to be structured as stock sales to minimize foreign taxes.

### NOTE B – CASH

Cash represents cash projected to be available at December 31, 2009. Excess cash flow generated from operations during the liquidation sale process is assumed to be reinvested into the operations of the Debtors and Non-Debtor Affiliates.

### NOTE C – FRAUDULENT TRANSFER ACTIONS

Amounts from fraudulent transfer actions reflect the value, in the form of cash and securities, to be realized under litigation settlements with Fresenius and Cryovac, Inc., a subsidiary of Sealed Air (the "Fresenius Settlement Agreement" and the "Sealed Air Settlement Agreement," respectively, and collectively the "Agreements"). Pursuant to the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement, respectively, and the provisions of the Plan, Fresenius shall make the Fresenius Payment and Cryovac shall make the Cryovac Payment. The Agreements specifically require the existence of the Asbestos PI Channeling Injunction and Asbestos PD Channeling Injunction. Because the Asbestos PI and PD Channeling Injunctions are not available in a chapter 7 liquidation, the Liquidation Analysis assumes these settlement payments would not be made. It is assumed, however, that a chapter 7 trustee would pursue similar litigation actions which resulted in the Agreements. Because the outcome of this litigation cannot be known, a range is shown from zero (at the low end) to a level of Sealed Air proceeds equal to the Cryovac Payment and Fresenius proceeds equal to the Fresenius Payment on a present value basis assuming a discount rate of 3% and a three-year time period to collect

4

the proceeds (at the high end). The discount rate is used to capture the time element of the future payment but not the risk of collection.

NOTE D – INSURANCE

At December 31, 2008, taking into account existing settlement agreements with various insurance carriers, excess coverage with other insurers including certain insolvent carriers, and previous reimbursements, there remains approximately $916 million of excess insurance coverage. In a chapter 7 liquidation and the Chapter 11 Cases reorganization, the Insurance Recovery is based on the current book value of the insurance asset ($500 million). The ultimate amount of insurance received will depend on a number of factors that will only be determined at the time claims are paid including the nature of the claim, the relevant exposure years, the timing of the payment, the solvency of insurers and the legal status of policy rights. A more detailed description of these insurance policies can be found in Grace's Annual Report on Form 10-K for the year ended December 31, 2008.

NOTE E – COSTS ASSOCIATED WITH A CHAPTER 7 LIQUIDATION

The costs associated with a chapter 7 liquidation are assumed to include fees and costs for professionals retained by the chapter 7 trustee, including legal, financial and claims processing advisors, estimated at $2.0 million per month for twelve months. In addition, it is assumed the chapter 7 trustee would receive payments equal to 1.5% of the estimated total proceeds from sale of businesses and available cash less other chapter 7 expenses. Additional brokerage fees would be necessary for the orderly sale of the Debtors' businesses and other costs. Brokerage fees are calculated at 0.5% of estimated total proceeds from the sale of businesses.