UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                      .      Case No. 01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .      USX Tower - 54th Floor
                            .      600 Grant Street
                            .      Pittsburgh, PA 15219
            Debtors.        .
                            .      March 2, 2011
. . . . . . . . . . . . ..          9:04 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtor:            Kirkland & Ellis, LLP
                           By: LISA ESAYIAN, ESQ.
                           300 North LaSalle
                           Chicago, IL  60654

For the Asbestos
Claimants Committee:       Caplin & Drysdale, Chartered
                           By:  PETER LOCKWOOD, ESQ.
                           One Thomas Circle, NW
                           Washington, D.C.  20005

For David Austern, the     Orrick, Herrington & Sutcliffe, LLP
Future Claimants           By:  ROGER FRANKEL, ESQ.
Representative:            Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007


Audio Operator:            Miklos Mikita
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609) 587-3599**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  LINDA CASEY, ESQ.<br>3000 Two Logan Square<br>Philadelphia, PA  19103 |
| For CNA: | Ford, Marrin, Esposito, Witmeyer &<br>  Gleser<br>By:  ELIZABETH DeCRISTOFARO, ESQ.<br>Wall Street Plaza<br>23rd Floor<br>New York, NY  10005 |

**TELEPHONIC APPEARANCES:**

| | |
|---|---|
| For the Debtor: | Pachulski, Stang, Ziehl & Jones<br>By:  JAMES E. O'NEILL, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19801 |
| | Kirkland & Ellis, LLP<br>By: JANET BAER, ESQ.<br>     JOHN DONLEY, ESQ.<br>     ADAM PAUL, ESQ.<br>     DEANNA BOLL, ESQ.<br>     ROGER HIGGINS, ESQ.<br>     BRAD WEILAND, ESQ.<br>300 North LaSalle<br>Chicago, IL  60654 |
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel<br>By:  DAVID E. BLABEY, JR., ESQ.<br>        PHILIP BENTLEY, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For the<br>Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>        ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For Maryland Casualty: | Eckert Seamans Cherin & Mellott, LLC<br>By:  EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20006 |

**TELEPHONIC APPEARANCES (cont'd):**

For Maryland Casualty:       Connolly, Bove, Lodge & Hutz, LLP
                             By:  JEFFREY C. WISLER, ESQ.
                             The Nemours Building
                             1007 North Orange Street
                             Wilmington, DE  19899

                             Wiley Rein, LLP
                             By:  RICHARD A. IFFT, ESQ.
                             1776 K Street NW
                             Washington, DC 20006

For Sealed Air:              Skadden, Arps, Slate, Meagher & Flom,
                                LLP
                             By: DAVID TURETSKY, ESQ.
                             One Rodney Square
                             Wilmington, DE  19801

For AXA Belgium:             Tucker Arensberg, P.C.
                             By:  MICHAEL A. SHINER, ESQ.
                             1500 One PPG Place
                             Pittsburgh, PA  15222

For State of Montana         Womble, Carlyle, Sandridge & Rice
and Her Majesty, The         By:  FRANK MONACO, ESQ.
Queen, in Right of                KEVIN J. MANGAN, ESQ.
Canada:                      222 Delaware Avenue
                             Suite 1501
                             Wilmington, DE  19801

For the Property             Bilzin Sumberg Baena Price &
Damage Committee:               Axelrod LLP
                             By:  SCOTT BAENA, ESQ.
                                  MATTHEW KRAMER, ESQ
                                  JAY SAKALO, ESQ.
                                  TERRENCE EDWARDS, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

                             Ferry Joseph & Pearce, P.A.
                             By:  THEODORE TACCONELLI, ESQ.
                             824 Market Street, Suite 19899
                             Wilmington, DE 19899

**TELEPHONIC APPEARANCES (cont'd):**

| | |
|---|---|
| For the Bank Lenders: | Paul Weiss Rifkind Wharton &<br>  Garrison, LLP<br>By:  ANDREW ROSENBERG, ESQ.<br>     MARGARET PHILLIPS, ESQ.<br>     REBECCA ZUBATY, ESQ<br>     STEPHEN SHIMSHAK, ESQ.<br>     SARAH HARNETT, ESQ.<br>     KELLIE CAIRNS, ESQ.<br>1285 Avenue of the Americas<br>New York, NY  10019 |
| | Landis, Rath & Cobb, LLP<br>By:  RICHARD COBB, ESQ.<br>     JAMES S. GREEN, ESQ.<br>919 Market Street, Suite 1800<br>Wilmington, DE  19899 |
| For PD FCR: | Law Office of Alan B. Rich<br>By:  ALAN RICH, ESQ.<br>1201 Main Street, Suite 1910,<br>Dallas, TX  75202 |
| For Official Committee<br>of Asbestos Personal<br>Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For PI FCR: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Anderson Memorial<br>Hospital: | Kozyak, Tropin & Throckmorton, PA<br>By:  DAVID L. ROSENDORF, ESQ.<br>2525 Ponce de Leon, 9th Floor<br>Miami, Florida 33134 |
| For Arrowwood<br>Indemnity: | Bifferato Gentilotti<br>By:  GARVAN F. McDANIEL, ESQ.<br>800 North King Street, Plaza Level<br>Wilmington, DE  19801 |

**TELEPHONIC APPEARANCES (cont'd):**

```
For Arrowwood              O'Melveny & Myers LLP
Indemnity:                 By:  TANCRED V. SCHIAVONI, ESQ.
                                CHARLES NERKO, ESQ.
                                GARY SVIRSKY, ESQ.
                           Times Square Tower
                           7 Times Square
                           New York, NY 10036

For Garlock Sealing        Robinson, Bradshaw & Hinson, P.A.
Technologies:              By:  RICHARD WORF, ESQ.
                           101 North Tryon Street
                           Suite 1900
                           Charlotte, NC  28246

For the Canadian           The Hogan Firm
Zonolite Claimants:        By:  DANIEL K. HOGAN, ESQ.
                           1311 Delaware Avenue
                           Wilmington, DE  19806

For PDFCR:                 By:  ALEXANDER SANDERS

For CNA Companies:         Goodwin Procter, LLP
                           By:  MICHAEL GIANNOTTO, ESQ.
                                DANIEL GLOSBAND, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  DAVID KLAUDER, ESQ.
                           844 King Street, Suite 2313
                           Wilmington, DE  19801

For the PD Committee:      Speights & Runyan
                           By:  DANIEL SPEIGHTS, ESQ.
                                ALAN RUNYAN, ESQ.
                           200 Jackson Avenue, East
                           Hampton, SC  29924

For Travelers:             Simpson Thacher & Bartlett LLP
                           By:  ELISA ALCABES, ESQ.
                           425 Lexington Avenue
                           New York, NY  10017

For Serengeti:             Vinson & Elkins, LLP
                           By:  ARI BERMAN, ESQ.
                           Trammell Crow Center
                           2001 Ross Avenue, Suite 3700
                           Dallas, TX  75201
```

**TELEPHONIC APPEARANCES (cont'd):**

For David T. Austern:        Lincoln International, LLC
                             By:  GEORGE COLES
                                  CLAIRE BURKE
                                  JASON SOLGANICK
                                  JOSEPH RADECKI

For Firemen's Fund           Crowell & Moring LLP
Insurance Co.:               By:  LESLIE A. DAVIS, ESQ.
                                  MARK PLEVIN, ESQ.
                             1001 Pennsylvania Avenue, N.W.
                             Washington, DC  20004

For Official Committee       Lieff, Cabraser, Heimann & Bernstein
of Asbestos Property         By:  ELIZABETH J. CABRASER, ESQ.
Damage Claimants:            Embarcadero Center West
                             275 Battery Street, Suite 3000
                             San Francisco, CA  94111

                             Brandi Law Firm
                             By:  THOMAS J. BRANDI, ESQ.
                             44 Montgomery St., Suite 1050
                             San Francisco, CA 94104

                             Richardson Patrick Westbrook &
                               Brickman, P.C.
                             By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC 29401

                             Scott Law Group
                             By:  DARRELL SCOTT, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864

                             Dies & Hile, LLP
                             By:  MARTIN DIES, ESQ.
                             1601 Rio Grande, Suite 330
                             Austin, TX  78701

                             Hamilton, Rabinovitz & Alshuler
                             By:  DR. FRANCINE RABINOVITZ
                             26384 Carmel Rancho Lane, Suite 202
                             Carmel, CA 93923

**TELEPHONIC APPEARANCES (cont'd):**

| | |
|---|---|
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe,<br>  LLP<br>By:  DEBRA FELDER, ESQ.<br>     RICHARD WYRON, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Everest Reinsurance<br>Company, et al.: | Marks, O'Neill, O'Brien & Courtney LLP<br>By:  BRIAN L. KASPRZAK, ESQ.<br>     MICHAEL F. DUGGAN, ESQ.<br>913 North Market Street<br>Suite 800<br>Wilmington, DE  19801 |
| For CNA: | Ford, Marrin, Esposito, Witmeyer &<br>  Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>23rd Floor<br>New York, NY  10005 |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street,  Suite 2200<br>Dallas, TX  75201 |
| For Maryland Casualty<br>& Zurich Insurance: | Eckert Seamans Cherin & Mellott, LLC<br>By:  GABRIELLA CELLAROSI, ESQ.<br>4 East 8th Street, Suite 200<br>Wilmington, DE  19801 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW K. CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For York Capital<br>Management: | York Capital Management<br>By:  MATTHEW BONANNO, ESQ.<br>767 Fifth Avenue, 17th Floor<br>New York, NY  10153 |
| For Farallon Capital<br>Management: | Farallon Capital Management, LLC<br>By:  MICHAEL LINN, ESQ.<br>One Maritime Plaza, Suite 2100<br>San Francisco, CA 94111 |

**TELEPHONIC APPEARANCES (cont'd):**

| | |
|---|---|
| For Farallon Capital<br>Management: | Dewey & Leboeuf<br>By:  JENNIFER WHITENER, ESQ.<br>1301 Avenue of the Americas<br>New York, NY 10019-6092 |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>    ILAN ROSENBERG, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For W.R. Grace: | W.R. Grace<br>By:  RICHARD FINKE, ESQ.<br>5400 Broken Sound Boulevard, NW<br>Suite 300<br>Boca Raton, FL 33487 |
| For The Hartford: | Wilmer Cutler Pickering Hale & Dorr,<br> LLP<br>By:  NANCY MANZER, ESQ.<br>1875 Pennsylvania Avenue, NW<br>Washington, D.C. 20006 |
| For Barclay's Capital | By: EITAN MELAMED, ESQ.<br><br>DAVID AUSTERN<br>PHILIP BROWN<br>RICHARD LEVY<br>MARK SHEINITZ<br>GIBSON SOLOMONS<br>MICHAEL WALSH |

---

1            THE CLERK:  All rise.

2            THE COURT:  Good morning.  Please be seated.  I don't

3    have a court call list.  Okay.

4            THE CLERK:  Oh, I'm sorry.

5            MALE SPEAKER:  I do.

6            THE COURT:  Okay.  Is it under your -- is -- yes.

7    Thank you.  This is the matter of W.R. Grace, Bankruptcy No.

8    01-1139.  The list of participants by phone is Elisa Alcabes,

9    David Austern, Scott Baena, Janet Baer, Philip Bentley, Ari

10   Berman, David Blabey, Deanna Boll, Matthew Bonanno, Thomas

11   Brandi, Philip Brown, Claire Burke, Elizabeth Cabraser, Kellie

12   Cairns, Gabriella Cellarosi, Richard Cobb, Jacob Cohn, George

13   Coles, Andrew Craig, Leslie Davis, Elizabeth DeCristofaro,

14   Martin Dies, John Donley, Michael Duggan, Terrence Edwards,

15   Lisa Esayian, Debra Felder, Richard Finke, Roger Frankel,

16   Michael Giannotto, Daniel Glosband, James Green, Sarah Harnett,

17   Roger Higgins, Daniel Hogan, Robert Horkovich, Mark Hurford,

18   Richard Ifft, Brian Kasprzak, David Klauder, Matthew Kramer,

19   Arlene Krieger, Richard Levi, Michael Linn, Edward Longosz,

20   Kevin Mangan, Nancy Manzer, Garvan McDaniel, Eitan Melamed,

21   Francis Monaco, Charles Nerko, James O'Neill, David Parsons,

22   Kenneth Pasquale, Adam Paul, Margaret Phillips, John Phillips,

23   Mark Plevin, Francine Rabinovitz, Joseph Radecki, Alan Rich,

24   Andrew Rosenberg, Ilan Rosenberg, David Rosendorf, Alan Runyan,

25   Jay Sakalo, Alexander Sanders, Tancred Schiavoni, Darrel Scott,

1 Mark Shelnitz, Steven Shimshak, Michael Shiner, Jason

2 Solganick, Gibson Solomons, Daniel Speights, Shayne Spencer,

3 Gary Svirsky, Theodore Tacconelli, David Turetsky, Michael

4 Walsh, Brad Weiland, Edward Westbrook, Jennifer Whitener,

5 Jeffrey Wisler, Richard Worf, Richard Wyron and Rebecca Zubaty.

6          I'll take entries in court, please.  Good morning.

7          MS. CASEY:  Good morning, Your Honor.  Linda Casey,

8 on behalf of BNSF Railway Company.

9          MS. ESAYIAN:  Good morning, Your Honor.  Lisa

10 Esayian, for W.R. Grace.

11          MR. FRANKEL:  Morning, Your Honor.  Roger Frankel,

12 for David Austern, the PI future claims representative.

13          MR. LOCKWOOD:  Good morning, Your Honor.  Peter

14 Lockwood, for the asbestos claimants committee.

15          MS. DeCRISTOFARO:  Good morning, Your Honor.

16 Elizabeth DeCristofaro, for the CNA companies.

17          THE COURT:  Ms. Casey, this is BNSF's motion for

18 reconsideration.

19          MS. CASEY:  Good morning, Your Honor.  BNSF has filed

20 a motion to reconsider both the memorandum opinion and the

21 recommended findings.  There are three issues that BNSF has

22 moved for reconsideration, two of which hopefully can be

23 resolved relatively quickly.

24          The first concerns footnote 46 on page 40 where the

25 Court discusses the objection interposed by BNSF to the motion

1  to approve a settlement agreement with the CNA companies.  The

2  footnote discusses particularly the objection that BNSF

3  interposed that the three insurance policies cannot be included

4  and that there was some ambiguity in the settlement agreement

5  and the proposed order as to whether the three BNSF policies

6  were included.

7          In their reply, the plan proponents have conceded

8  that this objection was not overruled, as was stated --

9          THE COURT:  It wasn't overruled, Ms. Casey, and I

10  agree with that.  I didn't take the footnote to be addressing

11  that specifically.  I thought what it was saying is the other

12  objection.  So I agree.  That part was not overruled, but I

13  thought the Exhibit 5, I believe, as amended, included those

14  policies and that resolved the issue.

15          MS. CASEY:  The opposite, Your Honor.  The Exhibit 5

16  as amended also includes the exclusion of those policies from

17  the channeling injunction.

18          THE COURT:  Okay.  That's fine.

19          MS. CASEY:  So --

20          THE COURT:  But I thought Exhibit 5, amended,

21  resolved the issue.

22          MS. CASEY:  It does.  The concern is that an opinion

23  promulgated by the Court says that the objection was overruled

24  and that's what we would like to have corrected.

25          THE COURT:  All right.  Well, I agree that it should

1  be corrected.  To that extent, with respect to those policies,

2  the objection was not overruled.  And I think you're quite

3  correct.  So have you come to an agreed upon language with

4  respect to that issue?

5          MS. CASEY:  We haven't been able to, Your Honor.  The

6  plan proponents have suggested deleting the footnote.  BNSF has

7  concerns that the deletion is not sufficient, as there is a

8  promulgated order by the Court saying it was overruled.  There

9  is an issue as to whether -- you know -- it's BNSF's position

10 that the issue was not resolved by the parties, and we pressed

11 the opinion and Your Court required the amendment to the order.

12         The plan proponents take the position that it was in

13 fact done by resolution of the parties.  It's --

14         THE COURT:  I actually thought it was done by

15 resolution, too, which is the reason why I thought I had

16 overruled objections.  But how about if I simply say that to

17 the -- but for the issue concerning the three insurance

18 policies, which issue was resolved, however it was resolved,

19 the objections to the settlement were overruled?

20         MS. CASEY:  That would be acceptable, Your Honor.

21         THE COURT:  I'll say, but for the issue concerning

22 the three insurance policies, which was resolved, the -- BNSF's

23 -- bleah -- sorry -- BNSF's remaining objections were

24 overruled?

25         MS. CASEY:  Correct, Your Honor.

1          THE COURT:  Any --

2          MS. ESAYIAN:  That's agreeable to the debtors and I

3 believe to the others, as well, Your Honor.

4          THE COURT:  All right.

5          MR. LOCKWOOD:  Yes, Your Honor.

6          THE COURT:  Okay.  That will resolve that one.  I

7 will amend it and include -- Ms. DeCristofaro, you need to use

8 the microphone.

9          MS. DeCRISTOFARO:  Your Honor, I just need look at

10 the language.  That might need some reference to which three

11 policies, but I'll double-check that and speak to Ms. Esayian.

12 We might need a modifying phrase there.  You -- we had one at

13 one point.

14          THE COURT:  Well, the -- isn't it handled in the

15 documents that are referred to in the footnote, that -- that

16 the debtor's motion and CNA's objection -- maybe not.  Maybe it

17 should say -- how about this, but for the issue concerning the

18 three insurance policies, which was resolved by an amendment to

19 Exhibit 5.

20          MS. DeCRISTOFARO:  That's fine, Your Honor.

21          MS. CASEY:  And inclusion in the settlement -- in the

22 -- and provision in the order.  There's the -- the two.

23          THE COURT:  By an amendment to Exhibit 5 to --

24          MS. CASEY:  The plan.

25          THE COURT:  -- I'm -- the plan and --

1      MS. CASEY:  The order approving the settlement

2  agreement.

3      THE COURT:  -- in the order approving the -- the CNA

4  settlement, BNSF's remaining objections were overruled.  Okay.

5  So it will be amended to say, "But for the issue concerning the

6  three insurance policies, which was resolved by an amendment to

7  Exhibit 5 to the plan and in the order approving the CNA

8  settlement, BNSF's remaining objections were overruled."  Is

9  everyone agreeable with that language?

10      MR. LOCKWOOD:  The ACC is, Your Honor.

11      MR. FRANKEL:  Yes, Your Honor.

12      MS. ESAYIAN:  Yes, Your Honor.

13      MS. DeCRISTOFARO:  Yes, Your Honor.

14      MS. CASEY:  Yes, Your Honor.

15      THE COURT:  Okay.  Let me just make a note so I can

16  amend footnote 46.  All right.  I'll have that done today.

17  What's next, Ms. Casey?

18      MS. CASEY:  The second issue revolve -- resolves

19  around the objection discussed by the Court on page 40 of the

20  opinion.  This objection was BNSF's objection that its

21  contractual indemnity claims had to be allowed in their full

22  amount in light of the treatment of other contractual indemnity

23  claims in the -- in the TDP, including BNSF's contractual right

24  to attorneys' fees.

25      This objection was resolved when the plan proponents

1  amended the plan to include a new section that allows BNSF's

2  contractual indemnity claims in full, obviously to the extent

3  they're proven.  The --

4          THE COURT:  That's by section 5.14 of the TDP?

5          MS. CASEY:  Correct.

6          THE COURT:  Okay.  Which is that I thought footnote

7  37 said.

8          MS. CASEY:  It does.

9          THE COURT:  Okay.

10          MS. CASEY:  And therefore, the discussion in page 40,

11  the first three sentences discussing BNSF's right to

12  contractual attorneys' fees, is both unnecessary and

13  inconsistent with the resolution of that objection.

14          THE COURT:  Well, actually, I don't think it is,

15  because what this says is that there isn't in the Code nor in

16  case law a right to attorneys' fees based on the underlying

17  tort claim or the contribution claims, but to the extent that

18  you've got a contractual right and the plan resolves it, I

19  think it's clear under section 5.14 that whatever rights BNSF

20  has, there is a process in place to resolve.

21          So I don't -- I'm not convinced that this is

22  inconsistent.  It may not be sufficient.  Maybe it needs an

23  amendment or something to say, BNSF claims contractual

24  indemnity rights that are addressed by section 5.14 of the TDP.

25          MS. CASEY:  That would be acceptable, Your Honor, or

1  that the objection revolving that was resolved by section 5.14.

2          THE COURT:  Okay.  So let's see.  BNSF's objection

3  that its contractual right to attorneys' fees was resolved by

4  section -- I think that's an amended section, isn't it?  I need

5  to double --

6          MS. CASEY:  It's a a new section.  It was an added

7  section.

8          THE COURT:  It's an added?

9          MR. LOCKWOOD:  It's -- it was an added section to the

10  TDP, Your Honor.

11          THE COURT:  All right.  By the addition of section

12  5.14 to the TDP.  If I insert a footnote -- all right.  I'm

13  looking at page 40.  I'll just start reading --

14          MS. CASEY:  Okay.

15          THE COURT:  -- from the top of page 40 and then stop

16  where I think the footnote would go in.  I'm not going to read

17  the footnotes that are already there.  Okay.  Beginning at the

18  first line on the top of 40, one of BNSF's complaints is that

19  under the joint plan attorneys' fees and expenses it incurs

20  associated with asbestos claims against it, based on debtor's

21  conduct, products or operations, will not be paid, and

22  therefore, it is not being paid the same amount as direct PI

23  claimants who are in the same class, Class 6.

24          However, Class 6 creditors are not awarded attorneys'

25  fees or expenses in this plan.  There is nothing in the

1  Bankruptcy Code and BNSF has pointed to no case law that

2  indicates that a plan must pay attorneys' fees incurred in

3  connection with the underlying tort claims, or the indemnity or

4  contribution claims arising from those torts.

5          Right there, if I insert a footnote that says,

6  "BNSF's objection that its contractual right to attorneys'

7  fees" -- oh, I should say, "BNSF's objection concerning its

8  contractual right to attorneys' fees was resolved by the

9  addition of section 5.14 to the TDP."

10          MS. CASEY:  That would be acceptable, Your Honor.

11          THE COURT:  Mr. Lockwood?

12          MR. LOCKWOOD:  That's fine with the ACC, Your Honor.

13          MR. FRANKEL:  Fine, Your Honor.

14          MS. ESAYIAN:  Fine with the debtors, Your Honor.

15          THE COURT:  I don't -- Ms. DeChristofaro, I don't

16  think this one affects your client?

17          MS. DeCRISTOFARO:  No, that's not my problem, Your

18  Honor.

19          THE COURT:  All right.  One second, then.  Page 40,

20  one, two, three, four, five, six, seven -- that's the end of

21  the seventh line of the text the way I have it written here.

22  That's where it's going to go.  Insert a new -- actually, if I

23  insert a new footnote that's really going to mess everything

24  up.

25          How about if instead I insert a new parenthetical

1 statement, because if I do a new footnote it's going to mess

2 all the footnote numbers up, and that may be more confusing

3 than not.  Would that be acceptable if I just insert a new line

4 of text?

5         MR. LOCKWOOD:  Of course, Your Honor.

6         MS. CASEY:  Yes, Your Honor.

7         MR. FRANKEL:  Yes.

8         MS. ESAYIAN:  Yes.

9         THE COURT:  All right.  Insert a new line of text as

10 follows:  "BNSF's objection concerning its contractual right to

11 attorneys' fees was resolved by the addition of section 5.14 to

12 the TDP."  Okay.

13         MS. CASEY:  Should do it.

14         THE COURT:  Okay, Ms. Casey.

15         MS. CASEY:  The final issue for reconsideration is a

16 request for reconsideration of both the confirmation order and

17 the requested findings.  And this concerns one of BNSF's

18 objections relating to its treatment of its common-law

19 contribution and indemnification claims under the TDP.

20         BNSF has read Your Honor's opinion and believes that

21 Your Honor misconstrued the argument, and the plan proponents

22 have impliedly agreed with them by saying that they would not

23 object to the change to say that BNSF's objection was that the

24 award given to the PI claimants is 100 percent and the award

25 given to BNSF is only six percent.

1        Changing those words and acknowledging that there was

2   a different objection interposed by BNSF than what was

3   addressed by Your Honor does not resolve the issue.  The

4   parties and the plan proponents have consistently said that

5   they want to get this resolved as quickly as possible.  They

6   want this plan to move forward.

7        There is an objection interposed by BNSF that BNSF

8   believes is -- relays to a fundamental flaw in the plan that

9   renders the plan nonconfirmable.  And having this Honor -- this

10  Court's analysis of that objection is critical and having it at

11  this stage rather than having it be resolved at some future

12  date.

13       There seems to be quite a bit of misapprehension as

14  to what this argument is.  The argument that appears to have

15  been analyzed by Your Honor is not the one interposed by BNSF.

16  The arguments that the plan proponents assert in their reply

17  brief that Your Honor addressed at a different page is not the

18  argument interposed by BNSF, and BNSF requires that this Court

19  analyze its objection.

20       The objection interposed by BNSF was that in those

21  situations where Grace was the sole distributor, manufacturer

22  or nearly the sole distributor and manufacturer of the asbestos

23  that caused the harm to the direct claimant, the treatment of

24  the indirect claimants claim in that situation is

25  discriminatory, because without any evidence, without any

1  testimony, without any experts the award granted to the

2  indirect claimant is equal to anywhere between 12 and a half to

3  25 percent of what the debtor's experts testified is Grace's

4  liability in those instances.

5      The objection was not that there is a different

6  payment percentage applied to the indirect claimant versus the

7  direct claimant, which is what I believe that Your Honor

8  addressed in her opinion.  It's not that there should be no cap

9  to the claim, which is the argument that the plan proponents

10 asserted is what BNSF's argument is.

11     BNSF did that -- did make that argument, joined with

12 Montana, and this Court did address the argument that there

13 should be no cap.  The argument is that under the plan a direct

14 claimant whose exposure was 95 percent or more to Grace

15 asbestos is entitled to a claim -- and I'm going to get to the

16 second point first -- is entitled to a claim equal to the -- up

17 to the extraordinary claims value, and the testimony at trial

18 was that the extraordinary claims value, the plan proponent's

19 expert, is equal to Grace's share of the liability in those

20 situations.

21     The TDP then provides that the direct claimant is not

22 entitled to the extraordinary claim value if it can recover --

23 if it can get a substantial recovery from a third party.

24 Therefore, if any of the Libby claimants can come after BNSF

25 and get 100 percent of their payment, they would not be

1  entitled to the extraordinary claim value.

2      They would be limited to either the standard or the

3  maximum value, which is a value 12 and a half to 25 percent of

4  the extraordinary claim value.  Because the TDP -- let me step

5  back a little -- BNSF isn't taking a position as to whether

6  that's discriminatory to the Libby claimants.  That's the Libby

7  claimants' fight.

8      Presumably, the basis for the reduction is that the

9  Libby -- that the direct claimant, be it the Libby claimant or

10  any other direct claimant that has 95 percent exposure -- has

11  been compensated, and therefore, its claim against the estate

12  is reduced by the recovery from the third party.

13      The indirect claimant, however, there is no

14  requirement in the TDP that any of the recovery by the direct

15  claimant be against somebody who doesn't have the right of

16  common-law indemnification, who hasn't been held derivatively

17  liable for the debtor's claims.

18      THE COURT:  Wait.  There's no requirement in the TDP

19  that the what?  I'm sorry.  I --

20      MS. CASEY:  In order to reduce the claim of the Libby

21  claimant, and therefore reduce the claim of the indirect

22  claimant all that is required is that the direct claimant have

23  a right to a substantial recovery from a third party.  There's

24  no limitation that says that that right has to be a claim

25  that's not derivative of the debtor's liability.

1          Therefore, if a direct claimant can assert a

2 derivative claim against a third party such as BNSF, BNSF is

3 limited to the 12 and a half to 25 percent, even though its

4 claim was that it -- the theory of liability against it was

5 derivative, it cannot get the extraordinary claim value, which

6 is the value that the debtor's experts testified is Grace's

7 liability.

8          THE COURT:  Okay.  Maybe I have a fundamental

9 misunderstanding of the plan and maybe I'm still not sure I

10 understand your argument either.  So let me see if I can put it

11 into these words and tell me where I'm off base.

12          MS. CASEY:  Okay.

13          THE COURT:  Okay.  The indirect -- to be able to

14 claim indirect treatment under the plan a claimant has to be

15 able to substantiate that Grace was responsible for -- I'll use

16 the 95 percent of the exposure that the direct claimant had.

17          MS. CASEY:  Correct.

18          THE COURT:  Okay.  If the direct claimant can

19 substantiate that it has that entitlement to an indirect claim,

20 then it's an indirect claimant.  Its recovery is limited in the

21 event that it has the ability to tap into a third party source,

22 but --

23          MS. CASEY:  The direct claimants, correct.

24          THE COURT:  Direct claimant.  I'm only talking about

25 the direct claimants.

1          MS. CASEY:  Right.

2          THE COURT:  But if it has the ability to tap into a

3 third party source that's not related to the debtor then how

4 does it ever substantiate that it met -- meets the 95 percent

5 requirement in the first place?

6          MS. CASEY:  Well, that -- Your Honor, that is the

7 problem with the plan.  The problem with the plan is that this

8 portion of the plan deals with where Grace is the 95 liable.

9 And the testimony is that the extraordinary claim value is the

10 proper value when Grace is 95 percent at fault.

11          It then provides that as long as the direct claimant

12 can assert a claim against any third party and get a

13 substantial recovery, that direct claimant is no longer

14 entitled to get the extraordinary claim value.  Because it's no

15 longer entitled to get the extraordinary claim value, the

16 indirect claimant is no longer entitled to get the

17 extraordinary claim value.

18          THE COURT:  Well --

19          MS. CASEY:  So if in fact it is 95 percent, and we

20 can establish it's 95 percent and we can establish that the

21 claim against the indirect party was a derivative claim

22 asserting against the indirect party Grace's liability, and we

23 have put into the record, Your Honor, the complaints against

24 BNSF which show that they include claims for vicarious

25 liability and strict liability and negligent supervision and

1 all these types of claims that can go back against Grace, we

2 should be entitled to a claim equal to the extraordinary claim

3 value, because we have been held derivatively liable for

4 Grace's share of the liability and Grace's expert testified

5 that that is the extraordinary claim value.  That's not how the

6 plan works.

7         THE COURT:  But the disconnect that I'm not able to

8 get the synapses together for is this.  I don't see how the

9 indirect claimant has the capability of proving that Grace has

10 this 95 percent share if the direct claimant can't prove it.

11         If the direct claimant -- and if the direct claimant

12 has rights to substantial contributions from other parties then

13 I don't see how they can prove the 95 percent exposure to

14 Grace's product.

15         MS. CASEY:  But it -- the plan does not provide that

16 if they can get substantial contribution, assuming that there

17 is some independent liability out there.  It's substantial

18 recovery.  And there was direct testimony at the hearing that

19 if BNSF is held liable to the direct claimant, it cannot get

20 the extraordinary claim value, not because the direct claimant

21 wasn't exposed 95 percent to Grace's asbestos, but because the

22 direct claimant can get substantial recovery from BNSF, and

23 that's the distinction, Your Honor.

24         Clearly, if a -- and it wouldn't be an indirect

25 claimant if they were paying their own liability with no

1 common-law right to contribution or indemnification.  However,

2 the mere fact that the direct claimant has the right to assert

3 a derivative claim against an indirect party, who then pays

4 Grace's share of the liability, should not prevent the indirect

5 claimant from being able to get an award for Grace's share of

6 the liability that they paid, and that is what this TDP does.

7        It -- it says, if an indirect claimant is held liable

8 under circumstances where it can go after Grace because it paid

9 Grace's share of the liability, it is not entitled to get an

10 award equal to what the plan proponent's expert said is Grace's

11 share of the liability, simply because the direct claimant had

12 the ability to assert derivative liability against the indirect

13 claimant.

14        THE COURT:  Okay.  Show me the language in the TDP,

15 because you're -- I think you're making a distinction between

16 exposure and payment, and I didn't read the plan that way.  I

17 thought that the issue was you can prove the exposure, and if

18 you prove the exposure, 95 percent or more, then you're in this

19 class.  If you --

20        MS. CASEY:  No.  There's two requirements.

21        THE COURT:  Okay.  Where --

22        MS. CASEY:  You have to have proved the exposure --

23        THE COURT:  -- where is it in --

24        MS. CASEY:  -- and that you don't have the right to

25 get recovery from a third party.

1          THE COURT:  All right.  Where's the --

2          MS. CASEY:  Let me find it real quick.

3          THE COURT:  I think 5.4 talks about extraordinary

4    claims in the TDP, I think.

5          MS. CASEY:  Page 34, it looks like.  Let me see if I

6    can find it.

7          THE COURT:  Okay.  "Categorizing claims as

8    extraordinary and/or exigent hardship.  5.4(a), extraordinary

9    claim means a PI trust claim that otherwise satisfies the

10   medical criteria for disease levels two to eight, and that is

11   held by a claimant whose exposure to asbestos occurred

12   predominantly as a result of working in a manufacturing

13   facility of Grace during a period in which Grace was

14   manufacturing asbestos-containing products at that facility, or

15   was -- excuse me -- at least 75 percent the result of exposure

16   to asbestos or an asbestos-containing product, or to conduct

17   for which Grace has legal responsibility, and in either case

18   there's little likelihood of a substantial recovery elsewhere.

19          "All such extraordinary claims shall be presented for

20   individual review, and if valid, be entitled to an award up to

21   the maximum extraordinary value," et cetera, et cetera.

22   "Provided, however, that if the claimants' exposure to asbestos

23   was 95 percent the result of an exposure to a Grace product,

24   then the extraordinary claims value is eight times rather than

25   the fives times" -- that I skipped over.

1    "Any dispute concerning the extraordinary status

2  shall be submitted to the claims panel, final and nonbinding

3  decisions, put in the FIFO queue."

4         MS. CASEY:  There -- there --

5         THE COURT:  So it --

6         MS. CASEY:  -- there is a requirement.  They

7  testified and there is a requirement.  I have to find it real

8  quick.  I'm sorry, Your Honor, I don't have it right off the

9  top of my head.  But there is the secondary requirement that --

10 and they testified to it.

11        MR. LOCKWOOD:  Your Honor, you read it.  It's, "And

12 in either case there is little likelihood of a substantial

13 recovery elsewhere."  It's the first sentence of section

14 5.4(a), the final clause.  Ms. Casey is correct.

15        MS. CASEY:  So that's --

16        MR. LOCKWOOD:  You have to have both -- either 75

17 percent exposure and -- or 95 percent exposure, that's

18 requirement number one, and requirement number two is that in

19 either the 75 or the 95 percent exposure case, there -- there

20 is little likelihood of a substantial recovery elsewhere.

21        MS. CASEY:  And that's the clause, Your Honor, that

22 we're objecting to.

23        THE COURT:  Why is that not an issue that's already

24 covered by section 5.14, Ms. Casey, where you're already

25 looking at I'll call it individualized review for BNSF claims

1 anyway?

2      MS. CASEY:  Because section 5.14 deals with BNSF's

3 contractual right to indemnification.  And BNSF, of course, has

4 taken the position that all or most of the claims will fall

5 within its contractual rights.  The plan proponents have

6 consistently taken the position that the contractual

7 indemnification is very limited in scope, and they have taken

8 the position in arguments that no or very few will fall within

9 the contractual indemnity.

10      Therefore, this provision regards common-law

11 indemnification and contribution, and it affects not just BNSF.

12 It affects all of the indirect claimants in the 75 percent to

13 95 percent arena.  And it is exactly that provision, and in

14 either case there is little likelihood of a substantial

15 recovery elsewhere, that is problematic.

16      Even if they were exposed solely to Grace asbestos

17 and even though we can show that Grace was 75 percent for the

18 five times multiplier or 95 percent for the eight times

19 multiplier.  And there's specific testimony that the 95 percent

20 was specifically designed for the Libby situation and that the

21 eight times multiplier was necessary to give the Libby

22 claimants their nonbankruptcy value of their claim.

23      Even if we can establish that, the mere fact that

24 they can assert the claim against us in the first instance

25 disqualifies us from the extraordinary claims treatment, and

1  that is exactly the problem with the plan.

2          THE COURT:  Well, but I don't think the mere fact is

3  enough.  It says there's little likelihood of a substantial

4  recovery elsewhere, and BNSF's liability for Grace asbestos

5  seems to be pretty much derivative of Grace's conduct in many

6  instances, at least from the history that's been presented in

7  this case.  So I'm not --

8          MS. CASEY:  But that's the point, Your Honor, is that

9  the claims against BNSF appear to be derivative.  And there was

10 direct testimony, I believe it was Mr. Inselbuch who said, if

11 they are -- if the Libby claimants are successful against BNSF,

12 the Libby claimants will not be entitled to the extraordinary

13 claim, and therefore, BNSF will not be entitled to

14 extraordinary claim.

15         So if they are successful in asserting a derivative

16 claim and getting recovery from BNSF that's derivative of

17 Grace's liability, this provision prevents BNSF from getting an

18 award equal to Grace's liability as testified by their expert,

19 and limits us to an award that is 12 and a half to 25 percent

20 of the value of Grace's liability, and then we get the payment

21 percentage upon that.

22         And that is this provision.  It says that there is

23 little likelihood of substantial recovery elsewhere, and

24 they've testified that this means including derivative claims.

25 If BNSF is held liable to the Libby claimants and pays the

1  claim, BNSF cannot come back and assert a right to an

2  extraordinary claim simply because it was held liable under a

3  derivative claim, simply because it paid the Libby claimants.

4          MR. LOCKWOOD:  Your Honor, may I respond to these

5  arguments in -- before -- at some point?

6          THE COURT:  Yes.  I need a response, because --

7          MR. LOCKWOOD:  Yes.

8          THE COURT:  Okay.  You're correct.  I don't think I

9  understood your argument the way you're arguing it now.

10          MS. CASEY:  Thank you.

11          MR. MONACO:  Your Honor, this is Frank Monaco.

12  Before the plan proponents respond would it be appropriate for

13  me to chime in with Ms. Casey, since we joined in the -- in the

14  motion for --

15          THE COURT:  Yes, sir.  Go ahead.

16          MR. MONACO:  All right.  Thank you, Your Honor.  Good

17  morning.  For the record, Your Honor, Frank Monaco on behalf of

18  the State of Montana, and Her Majesty, the Queen in right of

19  Canada.  Hopefully, no fire alarms go off in the middle of my

20  argument.

21          Your Honor, we joined in a partial joinder in the

22  motion for reconsideration filed by BNSF, and that specific

23  joinder was limited to the argument made by BNSF with respect

24  to the prejudice suffered by indirect claimants if they are

25  prevented from recovery for the full amount, where the indirect

1   claimants have been exposed solely to Grace asbestos.

2           And Your Honor, our joinder is without prejudice to

3   the other arguments we have been raised by Montana and Canada.

4   Your Honor, I join and echo all the comments that were made by

5   Ms. Casey.  The only thing I really wanted to add was really a

6   response to the plan proponent's objection.

7       I'm happy to do that now or wait till they make their

8   objection on the record and I can respond then, whatever Your

9   Honor prefers.

10          THE COURT:  Oh, go ahead, Mr. Monaco.  Go ahead, Mr.

11  Monaco.  You've got the floor.  Why don't I hear from you, and

12  then --

13          MR. MONACO:   Okay.

14          THE COURT:  -- I'll hear from Mr. Lockwood after

15  that.

16          MR. MONACO:  Thank you, Your Honor.  Like I said, I

17  don't want to repeat all the arguments made by Ms. Casey, but I

18  wanted to focus on the objection raised by the plan proponents

19  to -- in response to this argument regarding the discriminatory

20  effect of the TDP on indirect claimants.

21          They basically state that this Court addressed this

22  argument at pages 31 and 32 of its opinion, but the objections

23  raised by Montana and others, and overruled by this Court were

24  materially different from BNSF's argument today and joined in

25  by Montana and Canada.

1          First of all, Your Honor, Montana argued that there

2    should be no cap on what indirect claimants can be paid, and

3    the argument raised today in the motion for reconsideration

4    assumes that there is a cap.  So again, that is a distinct

5    argument that has -- is not covered by the motion for

6    reconsideration.

7          The other argument made was really discriminatory --

8    made by Montana and others and overruled by the Court was that

9    the criteria to establish a presumptively valid, indirect claim

10   was discriminatory.  Again, that is a distinct argument and

11   different from those raised by BNSF and Montana and Canada in

12   the motion for reconsideration.

13         The bottom line is that the plan proponents have not

14   addressed this argument in any meaningful sense and I wanted to

15   point that out to the Court.  I have nothing further, Your

16   Honor.

17         THE COURT:  Okay.  Well, with respect to the issue

18   about whether or not there should be a cap at all, I think I

19   addressed that issue in the plan.  I don't see any reason why a

20   cap can't be placed on an unsecured creditor through the plan.

21   There is reason why the debtors would choose to classify, I'll

22   call them trade creditors in a different class from the tort

23   creditors, in many instances.

24         I don't think that that causes a discriminatory

25   treatment.  They're still based on asbestos claims; that is,

1  the requirement for the indirect claimants here are still based

2  on indirect claims.  And to the extent that the plan provides

3  for the relief that it does in the section 524(g) injunction

4  process and channels these claims to the trust, it seems to me

5  that the cap is appropriate.

6       With respect to the criteria to prove the

7  extraordinary claim issue, frankly, I don't remember where that

8  came from.

9       MR. LOCKWOOD:  Your Honor -- Your Honor, neither of

10  those issues is the subject of a motion to reconsider by BNSF

11  or State of Montana.  Mr. Monaco, with all due respect, has

12  just confused matters mightily by refer -- by attempting to say

13  that he was responding to our objection by referring you to two

14  subject matters which were not the subject of a motion to

15  reconsider.  As he --

16       MR. MONACO:  Your Honor, I am not attempting to

17  confuse the subject.  My point -- I'm not trying to argue the -

18  - either one of those arguments.  My point was that in the plan

19  proponent's objection they are stating that the Court's

20  overruling of those two separate arguments addresses this

21  argument that BNSF has made in its motion for reconsideration

22  -- that's my point.

23       I'm not trying to reargue this.  All I'm saying is

24  their objection to the motion is really a nonresponse.

25       THE COURT:  Okay.  I understand.

1          MR. MONACO:  That's my point.

2          THE COURT:  All right.  And I understand now, Mr.

3   Monaco.  Thank you.

4          MR. LOCKWOOD:  Well, to the extent --

5          MR. MONACO:  Okay.  I'm sorry if I didn't make myself

6   clear, Your Honor.

7          THE COURT:  Okay.

8          MR. LOCKWOOD:  To the extent that our opposition, not

9   our objection, did not address, in Mr. Monaco's or Ms. Casey's

10  views, their arguments was because their arguments in the

11  original motion were incoherent, as, largely, are their

12  arguments here today.

13         It may -- it might help us look at what's going on

14  here if we started with the TDP and started to try and figure

15  out or let me explain to you what the purpose of extraordinary

16  claim treatment is in the first place.  The reason that there

17  are two requirements for an -- for a direct claimant to have an

18  extraordinary claim, which means that they get five or eight

19  times the value that any other claimant holding an exactly

20  similar claim in terms of medical expenses, pain and suffering,

21  legal liability of Grace, everybody else has that exact, same

22  claim that the extraordinary claimant has.

23         So why does the extraordinary claimant get five to

24  eight times as much money?  Well, first, because if the -- if

25  you take both characteristics that the extraordinary claim

1 requires together -- which is what you have to do, because you

2 have to meet both of them.

3       You've got somebody whose overwhelming predominance

4 of their exposure is to a Grace product, and Grace is

5 effectively the only person from whom they can recover on that

6 claim, unlike the normal run of claimants, who as Your Honor is

7 thoroughly familiar with, having sat through innumerable

8 confirmation processes involving other debtors who manufactured

9 and distributed asbestos-containing products, the normal

10 pattern for asbestos claiming is that because of their

11 occupations, claimants are generally exposed to the products of

12 multiple manufacturers, distributors, fiber sellers and what

13 have you.

14       And so they are not dependent in joint and several

15 liability jurisdictions for recovery against once particular

16 defendant, even though they may have spent the bulk of their

17 working career working in a factory where they were exposed in

18 fact to the product of one defendant.

19       But they've got other sources of recovery, and if

20 they've got other sources of recovery the concept of the TDP is

21 that we don't need to give them a lot more money from Grace,

22 because they can get the recovery from other people.  That's

23 what that's all about.

24       Now, what is Ms. Casey attempting to do here?  Well,

25 she says, effectively -- first, she throws in a lot of stuff

1  about derivative liability.  Derivative liability has

2  absolutely nothing to do with this.  There's nothing in the TDP

3  or anything else that says somehow or another some indirect

4  claimant has to have derivative liability or not have

5  derivative liability.

6         They got to have liability or they wouldn't be an

7  indirect claimant in the first place.  And BNSF may very well,

8  indeed, almost assuredly does, have independent liability.  I

9  mean, it's -- it was an actor.  It carried fiber.  It carried

10 vermiculite through the city, et cetera, et cetera.

11        But whether in some sense or another BNSF could make

12 some argument that somehow or another because it's Grace's

13 vermiculite that it's carrying that its liability is

14 derivative, that would be relevant if we were -- if Grace -- if

15 BNSF had -- was seeking the protection under 524(g), because

16 that's where Combustion Engineering tells us that the issue of

17 "derivative liability," has some relevance, but has nothing to

18 do with indirect claims.

19        The reason BNSF has an indirect claim, and I want to

20 put the contractual indemnity claims apart, because as we've

21 already heard here this morning, section 5.14 in the TDP in

22 fact gives BNSF the opportunity, if it's got a contractual

23 indemnity claim, to present 100 percent of that to the trust,

24 and it isn't subject to even an eight times or five times

25 multiple.  It can be presented in full.

1             So what we're talking about here is contribution

2     claims, effectively.  And in -- those claims are essentially no

3     different from <u>Owens Illinois</u>' contractual -- excuse me --

4     contribution claims or anybody else's.  And so BNSF says it's

5     discriminatory that it doesn't have the right to assert an

6     extraordinary claim.

7             And why doesn't it have a right to assert an

8     extraordinary claim?  It's because the direct claimant doesn't

9     have a right to assert an extraordinary claim.  Why does the

10    direct claimant not have a right?  Because the direct -- well,

11    first, we don't know for sure that the direct claimant doesn't

12    have an extraordinary claim, until the direct claimant shows up

13    on the trust door telling the trust that it has an

14    extraordinary claim.

15            And what does it have to show?  Well, among other

16    things it would have to show the trustees that it has -- the

17    direct claimant does not have a likelihood of a substantial

18    recovery from elsewhere.  Where's elsewhere?  Well, two

19    "elsewheres" are BNSF and Montana.

20            BNSF, of course, helpfully ignores Montana.

21    Montana's joined in with BNSF, but that's two defendants right

22    there who the Libby claimants, of which this is predominantly

23    reflective of, have asserted claims.  We -- Ms. Casey mentions

24    putting in complaints into the record.

25            That's true.  There are complaints in the record

1  whereby the Libby claimants, as punitive, direct claimants,

2  have sued both Montana and BNSF.  Now, if in fact it turns out

3  that the Libby claimants have no cognizable claims against BNSF

4  and/or Montana, then on the one hand they will then be -- have

5  extraordinary claims because they'll be able to show that

6  they've tried to sue those two entities and lost, and can't do

7  it.

8          They will have the extraordinary claim, but by the

9  same token, Montana and BNSF, having successfully defended the

10 claims, won't have any contribution claims at that point,

11 because they won't have any liability.  On the other hand, if

12 BNSF and/or Montana or -- or any other co-defendant --

13 remember, this 75 -- this likelihood of substantial recovery is

14 not limited to BNSF or Montana.

15         It could be any other defendant in the tort system

16 that for whatever reason a direct claimant might have had some

17 exposure to their product that was sufficient to give them a

18 cause of action.  And certainly, if you've got 75 percent

19 exposure to Grace, that leaves 25 percent; there's a lot of

20 other exposure to somebody else's asbestos in there.

21         And even at the 95 percent level under the state laws

22 related to substantial contribution it is possible to show, in

23 mesothelioma cases in particular, as Your Honor is familiar

24 with, that you can get a judgment against a defendant for a

25 relatively minimal amount of exposure.

1          So the direct claimants have all of these potential

2   other sources of recovery.  The TDP has made a decision that if

3   you can get the money somewhere else, you shouldn't be able to

4   get more than everybody else is getting out of the Grace trust.

5   That's the fundamental concept here.

6          Now, why is it that BNSF thinks it's being

7   discriminated against here?  BNSF elsewhere in its papers has

8   said the principle here is that the indirect claimant, "stands

9   in the shoes of the direct claimant."  That's correct.  That's

10  exactly what the principle is.

11          But in fact, if the direct claimant doesn't have an

12  extraordinary claim, then when -- because that direct claimant

13  has a valuable claim against BNSF and/or Montana and/or

14  somebody else, then BNSF, if it's -- wants to have a

15  extraordinary claim is not standing in the shoes of the direct

16  claimant, because that direct claimant doesn't have an

17  extraordinary claim.

18          So what is it that Ms. Casey or Mr. Monaco has

19  possibly done in their papers or their argument here today to

20  explain why, if the direct claimant whose rights they're in

21  effect subrogated to, can't assert an extraordinary claim to

22  the trust, why BNSF should be able to assert an extraordinary

23  claim against the trust.

24          I haven't heard one word, I haven't read one word of

25  why the drafters of the TDP and this Court are incorrect in

1 saying that BNSF is not being discriminated against under the

2 TDP, because it's being treated just like any other indirect

3 claimant where the direct claimant against it had a substantial

4 likelihood of recovery against some third party such as, but

5 not limited to, BNSF, and therefore, wasn't given extraordinary

6 claim treatment.

7         So I think what Ms. Casey has done is just sort of

8 muddied the waters mightily here by not really focusing on the

9 critical component of the relationship between BNSF's indirect

10 claim and the punitive, direct claimant whose claim BNSF has

11 satisfied.

12         And as to why, I'm unaware and I don't think the

13 Court ever heard any evidence from these so-called plaintiff's

14 experts that she keeps referring to, but she referred to them

15 several times in her paper.  You'll notice that nowhere is

16 there a cite to the testimony that she keeps making general

17 statements about.

18         I'm perfectly prepared to believe that some witness,

19 somewhere in the case testified that for a plaintiff who has no

20 substantial chance of recovering from anybody but Grace, that

21 in some rough justice, to quote her, that that claimant should

22 have a bigger claim against Grace to compensate it for the lack

23 of other sources of recovery.

24         But what I'm unaware of is any testimony where a

25 plaintiff's expert or anybody else testified that where a

1  plaintiff does have a substantial chance of recovery elsewhere,

2  it is unfair that that plaintiff can't get an extraordinary

3  claim treatment, and it is further unfair that the indirect

4  claimant can't be in a better position to make an extraordinary

5  claim, than the direct claimant whose claim BNSF has presumably

6  satisfied.

7          And the only other thing I can say is that she -- Ms.

8  Casey talks about BNSF having paid the claim of the direct

9  claimant as somehow or another putting itself in the shoes of

10 the direct claimant.  Well, at one level I agree with that.

11 Once BNSF has paid the claim of direct claimant it does get in

12 the shoes of the direct claimant, but it's got to be -- it's

13 got to be the right pair of shoes.

14          And that direct claimant, in all likelihood, if it

15 has gotten a big recovery from BNSF, would not have been able

16 to get a claim from the trust.  But to the extent that she

17 suggests that somehow or another BNSF, having paid the claim

18 somehow eliminates itself or let me rephrase it.

19          If BNSF has paid the claim that doesn't make BNSF

20 Grace.  If the claimant had a claim -- remember, by hypothesis

21 this claimant has a claim against both Grace and BNSF.  And

22 maybe this is why she got into this derivative liability mish-

23 mash here.

24          There are two claims and the -- what the claimant has

25 done is the claimant has gone after BNSF directly without going

1  to the trust, is that the claimant has made the decision that

2  the separate -- it would rather try and get 100 percent of

3  payment from BNSF or Montana or Owens Illinois or whoever, than

4  present a claim to the trust, at which point the chips fall

5  where they may for that plaintiff.

6         But the rights that the defendant in that situation

7  has cannot be greater against the trust than the rights that

8  the direct claimant would have had against the trust if it had

9  gone against the trust rather than going against the other

10 defendants.

11        And it's that principle that the rights of the direct

12 claimant and the indirect claimant need to be commensurate with

13 one another that the TDP is attempting to reflect here.  Have I

14 thoroughly confused you, Your Honor?

15        THE COURT:  No.

16        MR. LOCKWOOD:  I hope not.

17        THE COURT:  I think maybe what I'm confused about is

18 the -- some of the -- not the language exactly, but maybe the

19 intent of section 5.4.  What you seem to be saying is that 5.4

20 isn't there to deal with contribution claims.  It's there to

21 deal with the fact that there may be sources of recovery on

22 direct claims that would not then give rise to an indirect

23 claim.

24        MR. LOCKWOOD:  5.4 is not intended to deal with

25 indirect claims at all.

1          THE COURT:  That's what -- and I think that's the

2    issue.

3          MR. LOCKWOOD:  5.6, which we haven't talked about, is

4    what deals with indirect claims.  And what 5.6 says is that an

5    indirect claimant steps into the shoes of the direct claimant.

6    5.4 simply talks about the rights of a direct claimant, for the

7    most part.

8          Now, I will say this.  Theoretically, if an indirect

9    claimant could have a -- an extraordinary claim, then

10   obviously, 5.4 would describe what the requirements are.  But

11   as Ms. Casey correctly pointed out as a practical matter, it's

12   kind of hard to imagine how an indirect claimant would have a

13   extraordinary claim, since the only way the indirect claimant

14   becomes an indirect claimant is by paying the direct claimant.

15         And there -- and if they pay the direct claimant then

16   it's hard for them to show that the direct claimant didn't have

17   a likelihood of recovery from somebody other than Grace;

18   namely, the indirect claimant.  But if one could hypothesize

19   that situation I suppose, then, you could have -- an indirect

20   claimant could have an extraordinary claim.

21         THE COURT:  Well, the -- but the indirect claim would

22   arise because -- I'll just pick on BNSF -- because BNSF pays

23   the debtor's share of the liability, not because it pays its

24   own share of the liability.  So the fact that it pays the

25   debtor's share doesn't necessarily mean there's a "substantial

1   likelihood of recovery" from another entity.  They may be a

2   recovery from another entity.

3   　　　　　MR. LOCKWOOD:  Yeah.

4   　　　　　THE COURT:  But --

5   　　　　　MR. LOCKWOOD:  Well, but you --

6   　　　　　THE COURT:  -- but the word is "likelihood of

7   substantial recovery," and not -- you know -- that's a fuzzy

8   word.

9   　　　　　MR. LOCKWOOD:  Well, but let's not get confused about

10  shares here.  The -- to have an indirect claim at all under any

11  circumstances a third party has to pay the debtor's share.

12  　　　　　THE COURT:  Right.  That's what I'm saying.  So --

13  　　　　　MR. LOCKWOOD:  And but -- why is the third party

14  liable to the plaintiff in the first place.  Remember, the way

15  third parties wind up with contribution claims --

16  　　　　　THE COURT:  Yes, is they're liable too.

17  　　　　　MR. LOCKWOOD:  -- is joint and several liability.

18  They're picking up their several liability, plus the other

19  defendant's joint --

20  　　　　　THE COURT:  That's right.

21  　　　　　MR. LOCKWOOD:  -- share of the liability.  And you

22  know, whether the -- it -- the contribution claim is then the

23  measure of the claim against Grace for the Grace share.

24  　　　　　THE COURT:  Right.  So if -- well, so I -- if that's

25  the case I don't think the plan -- I don't think the

1  confirmation order is incorrect, because --

2          MR. LOCKWOOD:  We don't, either.

3          THE COURT:  -- because the -- the indirect claimant

4  has to pay the claim -- has to pay Grace's share of the

5  liability.

6          MR. LOCKWOOD:  Correct.

7          THE COURT:  If Grace's share of the liability has

8  been determined to be an extraordinary claim by a direct

9  claimant somehow, if that happens, there is a trust claim, it's

10 determined to be -- to fit the extraordinary level, and somehow

11 or other BNSF pays it, not the trust, then BNSF could be

12 subrogated to the shoes of the direct claimant to that extent

13 and would have an extraordinary claim.

14         But how that would happen boggles my mind, because to

15 the extent that the claimant is pursuing the claim against the

16 trust, it would seem that the trust would be paying that

17 liability, not BNSF.

18         MR. LOCKWOOD:  If the trust pays the claim -- the

19 extraordinary claim, then --

20         THE COURT:  There's no --

21         MR. LOCKWOOD:  -- there -- then there's no

22 liability --

23         THE COURT:  There's no indirect liability.

24         MR. LOCKWOOD:  -- to the indirect claimant, because

25 the indirect claimant won't be able to show that it's paid

1 | Grace's share.

2 | THE COURT:  You know, the -- it may be a timing

3 | issue.

4 | MS. CASEY:  Your Honor, may I please respond to that?

5 | THE COURT:  Let me think it through first and then

6 | yes, Ms. Casey.  It may be a timing issue because the issue is

7 | that the direct claimant under 5.4 has to substantiate that

8 | there is little likelihood of a substantial recovery elsewhere.

9 | I'm not exactly sure how you do that, unless as you've

10 | postulated, Mr. Lockwood, the direct claimant has first

11 | attempted to recover elsewhere and failed, because otherwise,

12 | that defense always seems to be there.  Now, there could be

13 | exceptions.  You know, somebody may have worked only in the

14 | Libby mine forever.

15 | MR. LOCKWOOD:  Exactly.

16 | THE COURT:  And that may be the kind of case where

17 | the debtor just says, fine -- or the trust says, fine, we'll --

18 | you know -- we'll -- we agree that's the 95 percent liability.

19 | MR. LOCKWOOD:  Well, and the other possibility, Your

20 | Honor, is that, you know, some of the Libby claimants bring

21 | suits against BNSF and Montana and lose them as a matter of

22 | law.  And by that point the trustees on all the subsequent

23 | Libby claimants -- remember, we're talking --

24 | THE COURT:  Oh, I see.

25 | MR. LOCKWOOD:  -- about thousands of Libby claimants

1  here, and you're going to have potentially test cases, in

2  effect.

3          THE COURT:  I see.

4          MR. LOCKWOOD:  And if, for example -- I mean, I

5  don't --

6          THE COURT:  The first 10 lose and --

7          MR. LOCKWOOD:  -- the first 10 lose and it's because

8  there's a -- as a matter of law, for some reason or other under

9  Montana law they can't build -- they can't prove a case against

10  BNSF or -- or Montana, then --

11          THE COURT:  Then the trust would consider it --

12          MR. LOCKWOOD:  -- then the trust would accept the

13  proposition that it's -- you know -- why are we arguing with

14  the Libby claimants; how many cases do they have to lose to

15  show that they don't have a likelihood of a substantial

16  recovery elsewhere.

17          THE COURT:  All right.  Let me look at 5.6 for a

18  minute.  I don't see that 5.6 limits the rights of the indirect

19  claimant under section 5.4  It says, "In no event shall any

20  indirect claimant have any rights against the PI trust superior

21  to the rights of the related, direct claimant against the PI

22  trusts, including any rights with respect to the timing, amount

23  or manner of payment.

24          "In addition to the" -- "in addition, no indirect PI

25  trust claim may be liquidated and paid in an amount that

1  exceeds what the indirect claimant has actually paid the

2  related direct claimant."  It seems to me that that covers the

3  indirect liability, and to the extent that there was payment of

4  an extraordinary claim, the indirect claimant can allege that

5  they're entitled to the recovery for the extraordinary claim

6  value they paid.

7          But I don't see how the indirect claimant can purport

8  to raise an extraordinary claim for a disease when it's not a

9  personal asbestos injured person under section 5.4 to start

10 with, because it wouldn't substantiate the medical criteria at

11 all.

12         MR. LOCKWOOD:  Well --

13         THE COURT:  So 5.6 seems to say that to the extent

14 the direct claimant can prove it and somebody else, somehow

15 pays that liability, then the indirect claimant should be able

16 to be in category 5.4.  But the likelihood that that's going to

17 happen just doesn't seem to be high.

18         MR. LOCKWOOD:  Your Honor, that's exactly correct.

19 Mr. Frankel wanted -- we had a rousing discussion before we

20 came here today as to whether we should make the point that at

21 a theoretical level, the way the documents are drafted, there

22 is nothing in the TDP that says an indirect claimant cannot

23 have an extraordinary claim.

24         There's nothing there that says that can't happen.

25 The problem is a practical problem, which is that since the

1 indirect claimant has to establish that it meets the same

2 criteria that the direct claimant would have had to make,

3 there's a sort of -- it's almost an oxymoron, if you will, for

4 an indirect claimant who just paid a substantial amount of

5 money to a direct claimant to turn around and make an

6 extraordinary claim on -- by asserting that the direct claimant

7 didn't have a substantial likelihood of recovery.

8         But if such a scenario could occur there's nothing in

9 the -- in the TDPs that says that the indirect claimant

10 couldn't have an extraordinary claim.

11         THE COURT:  Yes.  that's -- I think 5.6 protects that

12 right.

13         MS. CASEY:  Your Honor --

14         THE COURT:  Whether it can actually happen, I don't

15 know.

16         MS. CASEY:  -- may I --

17         THE COURT:  But I -- I think --

18         MS. CASEY:  -- may I please address Your Honor?

19         THE COURT:  Yes.

20         MS. CASEY:  Okay.  Your Honor, if the TDP were

21 drafted in such a way that an indirect claimant who pays a

22 substantial recovery to the direct claimant and have the right

23 under common-law indemnification to a claim to recover that

24 payment made and get the award, if that's the way this was

25 drafted then I would agree your -- with Your Honor.

1          It's not.  The -- there's a lot of discussion about,

2    well, it might be the direct -- they might be the direct

3    liability of the indirect claimant.  Well, that can't be

4    because the direct liability of the indirect claimant, there's

5    no claim that can be asserted against the trust in any event.

6          THE COURT:  Exactly.  So if there is a substantial

7    payment made by BNSF that exceeds what the debtor would have

8    paid --

9          MS. CASEY:  No --

10         THE COURT:  -- there is no claim against the debtor

11   for that.

12         MS. CASEY:  But that's where I think Your Honor is

13   misconstruing the plan.  The plan doesn't say if -- if BNSF

14   pays a substantial amount above and beyond the extraordinary

15   claim amount that it can't get an extraordinary claim.  They

16   testified very clearly that -- the plan proponents' witnesses

17   testified clearly that if BNSF pays any portion of the 400,000

18   -- well, I'm using 400,000 for one particular claim -- any

19   portion of the extraordinary claim that they deem to be an -- a

20   substantial recovery, regardless of what theory of liability

21   BNSF paid it, then that disqualifies the direct claimant from

22   extraordinary claim and disqualifies --

23         THE COURT:  Yes.

24         MS. CASEY:  -- BNSF from an extraordinary claim.

25         THE COURT:  But that's not the issue, though.  The

1 issue is, does the plan give you a mechanism to raise that

2 issue with the trust and get it litigated.  And I think the

3 plan does.  5.6 says that to the extent an indirect claimant

4 pays a claim, you've got a claim.  You can be subrogated.  If

5 you pay an extraordinary claim value you can be subrogated.

6 Then 5.14 --

7          MS. CASEY:  No.  We can be --

8          THE COURT:  -- tells you the mechanism by which you

9 go about litigating that issue.

10          MS. CASEY:  And you get subrogated to a claim that's

11 not the extraordinary claim value.

12          THE COURT:  Under five --

13          MS. CASEY:  By definition.

14          THE COURT:  Where?

15          MS. CASEY:  By definition of 5.4, because you can

16 only stand in the shoes of the direct claimant, and the direct

17 claimant isn't entitled to extraordinary claim treatment.  So

18 therefore, under 5.6, since we can only -- and I'm using "stand

19 in the shoes" in the phrase that they're using it under the

20 plan -- stand in the shoes of the direct claimant who's only

21 entitled to, then, the standard or the maximum value and is not

22 entitled to the extraordinary value, you are foreclosed from

23 establishing that your payment of the extraordinary value was a

24 derivative claim that you have the right under common-law

25 indemnity to get recovered for.

1           THE COURT:  Well, I mean, I think the issue really is

2      going to come down to what the determination is, is little

3      likelihood of substantial recovery elsewhere.  I don't know

4      what those words actually mean in legal terms.  I mean, I don't

5      know what a substantial recovery is, and I don't know what

6      little likelihood of getting one is.

7           If in fact a direct claimant already got a

8      substantial recovery, I would think it's, you know, pretty much

9      encompassed within the definition that they can't meet that

10     little likelihood standard.  I agree.  But I don't know what

11     substantial recovery actually means, because there isn't going

12     to be an adjudication, as I understand it, of Grace's share of

13     the liability.

14          So if there is hypothesis, BNSF is sued, there's a

15     judgment against BNSF for, you know, $1 million -- I'll just

16     pick a number -- $1 million, and BNSF pays that $1 million, but

17     then its defense is that Grace can -- Grace is somehow liable,

18     so it's -- it claims a subrogation interest for some or all of

19     that amount, then I think 5.6 says, you get -- and your

20     contractual indemnity provisions, say, you can raise the whole

21     $1 million claim to the extent that you can show that somehow

22     or other Grace was responsible for this judgment.

23          MS. CASEY:  But that's exactly that it --

24          THE COURT:  Whether you get paid --

25          MS. CASEY:  -- that's exactly what the plan -- what

1  TDP doesn't provide.  If BNSF -- let's -- to use the example of

2  the severe pleural --

3          THE COURT:  All right.

4          MS. CASEY:  -- disease category, the direct claimant

5  -- the standard value is 50,000.  The maximum value is 100,000

6  and the extraordinary claim is 400,000.  If BNSF is sued first

7  and a judgment for $400,000 is entered against BNSF and BNSF

8  can establish that the basis of the liability is such that

9  under common-law indemnity we can stand in the shoes of the

10  direct claimant -- not stand in the shoes of Grace -- stand in

11  the shoes of the direct claimant and assert that $400,000 claim

12  against Grace, and that's Grace's liability, the TDP says,

13  uh-huh, you can only get 50 to $100,000 as your award, because

14  by definition paying them the full $400,000 is paying them a

15  substantial recovery.  It's paying them 100 percent, and we are

16  therefore precluded from getting an award at the $400,000

17  level.

18          THE COURT:  If a claimant was able to sue BNSF and

19  recover that amount from BNSF, I'm having a little difficulty

20  in theory or in practice, figuring out how BNSF would have a

21  claim for the whole amount against Grace.  Where are you --

22  where do you raise that issue?

23          MS. CASEY:  Well, but you -- well, Your Honor, you

24  raise that -- that -- that's the TDP -- remember, this is not a

25  claims objection.  This is whether the mechanism allows that.

1          THE COURT:  That's what I'm trying to figure out.

2          MS. CASEY:  You raise that issue in front of the

3    trust, and if it doesn't work then you go to the arbitration.

4    Then you go to the litigation.

5          THE COURT:  Right.

6          MS. CASEY:  But the way it's drafted right now, we

7    don't have that right to raise that.  We are limited to the

8    50,000 to the $100,000 claim solely because we made the payment

9    of the full claim to the direct claimant.

10         THE COURT:  You're limited to the payment percentage,

11   perhaps.

12         MS. CASEY:  No.  No.  We're -- that -- that's --

13   that's the -- that's where we say that the analysis in the

14   opinion is different than our thing.  We are limited to the

15   award at the schedule -- the scheduled or the maximum value,

16   because by definition -- and the testimony -- and I have the --

17   the quotes -- the places where I can show you where the

18   testimony is -- the testimony is, if the claim is worth

19   $400,000 and BNSF pays $400,000, they've testified that that

20   would be a substantial recovery that would eliminate the direct

21   claimant's right to get an extraordinary claim.

22         By eliminating the direct claimant's right to get an

23   extraordinary claim, it then limits BNSF's right to get an

24   extraordinary claim, even though all we're doing is paying

25   Grace's liability.

1          THE COURT:  But the reason I don't -- I can't agree

2    that the plan's structured that way is because that may be how

3    the trust resolves that claim.  I mean, that may be the trust's

4    adjudication, but BNSF isn't stopped with the trust

5    adjudication.

6          Under 5.14 you're permitted to go into arbitration

7    and do whatever else to prove that in fact you have a 5.4

8    category extraordinary claim instead of the normal Class 6

9    claim.

10          MS. CASEY:  No.  Remember, it would not be under

11    5.14.  It'd be under 5.6  We're asserting that the treatment of

12    the common-law indemnification claim is discriminatory.

13          THE COURT:  Oh, not the contractual.  Okay.  Sorry.

14          MS. CASEY:  So -- so we don't have the right.  And

15    remember, 5.6 says, "In no event shall any indirect claimant

16    have any rights against the PI trust superior to the rights of

17    the related direct claimant."  So therefore, because the direct

18    claimant is -- does not have the right to the extraordinary

19    value, the indirect claimant does not have the right to the

20    extraordinary value, even if it can establish that under

21    common-law indemnification, what it paid when it paid the

22    $400,000 was Grace's liability.

23          And to use -- to step back and -- and have an

24    example.  The plan proponents -- because Mr. Lockwood came up

25    here and discussed the fact that there are cases where there

1  are several asbestos manufacturers.  So let's go to those

2  cases.  And those cases --

3            THE COURT:  Wait one second.

4            MS. CASEY:  Um-hum.

5            THE COURT:  I'm still stuck on 5.6.

6            MS. CASEY:  Okay.

7            THE COURT:  5.6, I'm on page 38, and the last

8  paragraph says, "Any dispute between the PI trust and an

9  indirect claimant over whether the indirect claimant has a

10 right to reimbursement for any amount -- any amount paid to a

11 direct claimant, shall be subject to the ADR procedures

12 provided in section 5.10."

13           MS. CASEY:  But if you go to those indirect

14 procedures, which we can go to, the maximum award under either

15 of those procedures is whatever you're entitled to under the

16 TDP.

17           THE COURT:  All right.  Just a minute.  Okay.  Well,

18 that may be the case.  I don't know.  I haven't finished

19 reading the section again, but that may be the case.  But the

20 reality is that it's the arbitrators who will determine what

21 the max -- the interpretation of the TDP at that point.

22           MS. CASEY:  But -- you're correct, Your Honor, but

23 the TDP specifically says -- I mean, it's -- it would be hard

24 for BNSF -- BNSF would be hard pressed to say that when 5.6

25 says we can get no more than what the direct claimant can get

1  under 5.4, and 5.4 says the direct claimant can't get an

2  extraordinary claim as long as it gets a substantial recovery

3  from a third party, there would be no argument that -- but just

4  ignore what the TDP says and rewrite it that says, because our

5  common-law indemnification does in fact give us a right to the

6  extraordinary value, because all we were doing was paying

7  Grace's several share.

8           THE COURT:  But you have to -- but the problem is,

9  you have to prove that.

10          MS. CASEY:  Right.

11          THE COURT:  And if you suffer a judgment, which is

12 your hypothesis, against BNSF, the likelihood that you're going

13 to prove that the entire liability was against Grace isn't very

14 high, because you would have defended on that basis.

15          MS. CASEY:  And Your Honor, we understand.  All we're

16 saying -- we're not saying that we have the right to get

17 whatever our full judgment was.  We're saying that the TDP's

18 mechanism is not fair.  And let's remember who has the burden

19 of proof here.  The plan proponents have the burden of proof of

20 establishing --

21          THE COURT:  Oh, sure.

22          MS. CASEY:  -- that it's fair.  The plan proponents'

23 expert testified and it was Peterson -- and I have the

24 transcript right through here -- on September 9th -- September

25 8th, 2009, and if you'd like me to read off the cites, I can

1    read off the cites -- he testified that the extraordinary value

2    was Grace's -- was the value of the claim in the 95 percent

3    category.

4           Presumably, that means the five percent is still out

5    there for somebody else, but that Grace's value is the

6    extraordinary claim's value.  Absolutely no testimony or

7    evidence was provided that in any single case where that Grace

8    is the 95 percent asbestos manufacturer will the value of the

9    case drop 75 to 87 and a half percent merely because of the

10   existence of third parties.

11          There's no testimony that the scheduled value and the

12   maximum value is the right value in the 95 percent scenario

13   where there are third parties who may also be liable.  None.

14   The testimony was that the scheduled value and the maximum

15   value is the appropriate share of Grace's liability where there

16   is multiple asbestos manufacturers --

17          THE COURT:  Yes.

18          MS. CASEY:  -- out there.  Okay.  No testimony that

19   that -- that that scheduled value in the maximum is --

20          THE COURT:  Well, multiple third party defendants, I

21   think.

22          MS. CASEY:  Excuse me?

23          THE COURT:  I think it's multiple third party

24   defendants, not necessarily asbestos manufacturers, but okay.

25          MS. CASEY:  Okay.  So -- but there was no testimony

1  as to the impact of the potential claims on third parties where

2  Grace is the 95 percent asbestos that the plaintiff was exposed

3  to.  Clearly, if there is no claim there is no claim, and it

4  doesn't matter whether the cap is 10 billion.

5              THE COURT:  Right.

6              MS. CASEY:  The schedule value, extraordinary claims

7  value, if we paid our indirect -- if we paid our direct claim

8  for which we have no common-law indemnification, doesn't matter

9  what the cap is.  There's no claim.  The question is, does the

10 TDP provide a mechanism that is fair and nondiscriminatory

11 where we can assert our claim if we do in fact pay Grace's

12 liability.

13             THE COURT:  All right.  Well --

14             MS. CASEY:  And to contrast that with the situation

15 where there's an indirect claimant in the standard case where

16 Grace is not the 95 percent.  In the standard case the

17 testimony was that Grace's liability is either the scheduled

18 value or the maximum value, somewhere in between there.

19             So let's just use the maximum value.  Let's assume a

20 hypothetical claimant who'd get the full maximum value.  Even

21 if there's a third party who pays 100 percent of that maximum

22 value, that indirect claimant can come in and say, I paid up --

23 I paid up to the maximum value; give me up to the maximum

24 value.

25             The fact that there was a recovery of some amount up

1  to that maximum value does not in any way impact the indirect

2  claimant's right to get a claim of Grace's several share.

3      THE COURT:  But I think the difficulty is that we're

4  talking -- we're mixing apples and oranges.  I think what's

5  happening is BNSF is actually trying to seek a recovery that

6  isn't contemplated in the plan, either for direct or indirect

7  claimants, and therefore, the plan can't be discriminatory

8  because it doesn't treat any individual debt -- a plaintiff of

9  indirect plaintiff differently.

10      What 5.4 is saying is, if the direct claimant can't

11  get this recovery, then the indirect claimant can't get it

12  either.  That's not discriminatory.

13      MS. CASEY:  Well, it -- it is, Your Honor, in this

14  sense, because the reason the direct claimant can't get it --

15  the reason the direct claimant can't get it is because they can

16  get it from the indirect claimant.

17      THE COURT:  Yes.  But they can only -- but there are

18  so many assumptions built in, and I think the problem is this.

19  5.4 has to be used in the circumstances where Grace's liability

20  is so clear that it's not likely that anybody else is going to

21  have that much of a liability.

22      That's why it's built for the 75 percent exposure and

23  95 percent exposure issues.  So if in fact Grace has 95 percent

24  of the exposure responsibility, then it's going to pay a larger

25  share of the claim, because nobody else has that large a share.

1  If BNSF is sued in -- well, I -- when I say independently, I

2  mean in the tort system, BNSF is sued in the tort system and

3  suffers a judgment for your $400,000 number, then the

4  likelihood that Grace is going to be sued in the tort system

5  for that same amount isn't very high, because -- no.  That's

6  not what I mean to say.

7          The likelihood that Grace's share would be 95 percent

8  greater than that amount isn't very high, because in order for

9  BNSF to have sustained that judgment in the first place,

10  Grace's share of the exposure can't have risen to that level,

11  because the liability is all being funneled against BNSF 100

12  percent.

13          MS. CASEY:  But Your Honor, that --

14          THE COURT:  So there's no theoretical possibility

15  where this works.

16          MS. CASEY:  Well, no.  Your Honor, I think -- and

17  I -- I think I'm -- I think there's a misunderstanding here.

18  If BNSF is sued and has a judgment entered against it for

19  $400,000, that judgment could be BNSF's indirect liability, but

20  it could be under a theory where the direct claimant is able to

21  assert Grace's liability against BNSF.  And that's the issue,

22  that's where there needs to be protection.  If -- I mean, we

23  have --

24          MR. LOCKWOOD:  Your Honor, I object to this --

25          MS. CASEY:   -- Your Honor --

 1              THE COURT:  Miss --

 2              MR. LOCKWOOD:  -- argument.  This is an argument that

 3  has never been presented.

 4              THE COURT:  Well --

 5              MR. LOCKWOOD:  This theoretical argument that somehow

 6  BNSF could be liable for Grace, but not be liable for itself.

 7  It's never --

 8              MS. CASEY:  Your Honor, it has.  We --

 9              MR. LOCKWOOD:  -- it's never been presented in any

10  paper --

11              MS. CASEY:  -- we presented the complaint that had

12  vicarious liability.

13              MR. LOCKWOOD:  -- filed with this Court.

14              THE COURT:  Folks, you know --

15              MR. LOCKWOOD:  Amount --

16              THE COURT:  -- you really can't talk with each other

17  at the same time.

18              MR. LOCKWOOD:  I'm talking to Your Honor.

19              THE COURT:  Mr. Lockwood, I got your objection.  It's

20  overruled.  Go ahead, Ms. Casey.

21              MS. CASEY:  Your Honor, again, we have introduced the

22  complaints.  The complaints include counts for things such as

23  vicarious liability and strict liability, asserting Grace's

24  liability against BNSF.

25              THE COURT:  But why would that not be a contractual

1  indemnity claim that would come up under section 5.14?

2          MS. CASEY:  Your Honor, of course we think it is.

3  But the question is not, today, what is the claim.  The

4  question is --

5          THE COURT:  Well, sure it is.

6          MS. CASEY:  -- is there -- well, they have taken the

7  position -- and I don't have the cites with me, unfortunately,

8  but in closing arguments at the confirmation hearing the plan

9  proponents clearly and unequivocally took the position that

10 BNSF's contractual indemnification is extremely narrow, and

11 very few of these claimants are going to fall within that.

12         THE COURT:  Well --

13         MS. CASEY:  And therefore, we need to protect the --

14 if they're right, nobody's made that ruling, we assert that

15 it's broad and it will cover the contractual indemnity, but if

16 it's not and we're -- and there's a ruling that your -- doesn't

17 fall within the scope, there's defenses to the contract but

18 there's a common-law indemnification claim, that that common-

19 law indemnification claim, there must be a mechanism by which

20 we're allowed to get an award equal to the value of the payment

21 that we made.

22         And the discrimination here is -- is against --

23 between indirect claimants and indirect claimants.  Indirect

24 claimants in cases where there isn't a 95 percent exposure or

25 the 75 percent exposure, their payment of Grace's liability

1 does not result in a reduction in their claim.

2          THE COURT:  That's because -- but the reduction in

3 the claim that you're talking about that BNSF would suffer,

4 assuming hypothetically there is one, is to put you back in the

5 same position as the other indirect claimants, because you can

6 still assert the scheduled value of the claims.  You just can't

7 assert the extraordinary value.

8          MS. CASEY:  But there's no --

9          THE COURT:  So there's no discrimination in that.

10          MS. CASEY:  -- there's no -- well, no.  The

11 assumption there is that the indirect claimants in a situation

12 of the 95 percent Grace asbestos is the same position as the

13 indirect claimants where there are other direct wrongdoers.

14          THE COURT:  Oh, no.  I think it's exactly the

15 opposite.  The assumption is that if Grace has 95 percent --

16 I'll use the word "liability."  I realize it's exposure --

17          MS. CASEY:  Um-hum.

18          THE COURT:  -- but liability, then BNSF can't have 95

19 percent liability.  It's physically impossible --

20          MS. CASEY:  Right.

21          THE COURT:  -- to get more than 100 percent

22 liability.

23          MS. CASEY:  Correct.

24          THE COURT:  So it can't be that Grace would have 95

25 percent of the liability and that there would be a substantial

1  contribution coming from BNSF for the other five percent.

2          MS. CASEY:  But -- we're --

3          THE COURT:  It's just not -- it's not physically

4  possible.

5          MS. CASEY:  -- you're focusing on contribution.

6  You're right.  There could not be a place where there's 95

7  percent liability in Grace and 95 percent liability that's

8  independent and nonderivative against BNSF.  Okay.

9          THE COURT:  Well, but that's what you're --

10          MS. CASEY:  I agree with that.  But that doesn't --

11  the payment that BNSF makes is not necessarily on its own

12  liability, and that's where the plan gets discriminatory,

13  because the plan eliminate's BNSF's right to establish that the

14  payment it made was on Grace's liability.

15          THE COURT:  No.  I don't think it does.  You've got

16  five -- the only way that I can understand that BNSF would be

17  making a payment for Grace is there's a joint judgment against

18  the two, which isn't going to happen because Grace isn't in the

19  tort system.  So we take that mix out of the mix.

20          Or it's based on the relationship that BNSF and Grace

21  had, and you've got a contractual indemnity provision that lets

22  you claim up to the whole 100 percent of whatever it is that

23  BNSF paid.  The common-law issue can't arise in these

24  circumstances because Grace isn't going to be out in the tort

25  system with respect to a judgment that BNSF would suffer

1 against itself.

2       The only liability that Grace could have to BNSF

3 would be on the contractual indemnity claim, I think.  Now, if

4 somehow -- I mean, there is the theoretical possibility that

5 somehow BNSF would pay a Grace liability that's not related to

6 the contractual portion.

7       I mean, maybe it happens somehow.  I'm not sure how,

8 but okay.  It happens.  In that circumstance, yes, you're in

9 section 5.6 because you don't have a contractual claim against

10 Grace.  You have a subrogation claim against Grace.  And in

11 that sense, the plan doesn't discriminate, because what it says

12 is that to the extent that the direct claimant had a claim

13 against Grace and you've paid it, you stand in the shoes of

14 that direct claimant and you get paid whatever the scheduled

15 values are.

16       It can't be in that circumstance that there would

17 have been an extraordinary claim value, because the only way

18 you'd get one of those determined in the first place is to

19 present the claim to the trust.  There is no such definition of

20 extraordinary claim out in the tort system.

21       So the only way that this mechanism works is if a

22 direct claimant comes to the trust, shows that in fact they

23 have entitlement to an extraordinary claim and that they

24 haven't had this capability of getting a recovery elsewhere.

25 They can't even prove this type of liability in the tort system

1  because it doesn't exist in the tort system.

2          MS. CASEY:  Well, but Your Honor, it does exist in

3  the tort system and that's the problem.  The problem is that

4  there are potential derivative claims that can be asserted

5  against a third party without -- it's not just contribution

6  where a jury divvies it up amongst the people.  It's derivative

7  claims, claims that --

8          THE COURT:  Then you've got -- but if it's

9  derivative, you've got the contractual indemnity issue.

10         MS. CASEY:  Well, I disagree that we always have the

11 contractual indemnity, but -- and specifically because the plan

12 proponents have taken a position that it's narrow in scope, and

13 therefore, common-law indemnity would be where we lie, and this

14 is not the forum that is to determine whether our common-law

15 indemnification claims are preserved.

16         THE COURT:  How would you have --

17         MS. ESAYIAN:  Your Honor, may I -- I'm sorry to

18 interrupt, Your Honor, but she's raised the -- Ms. Casey has

19 raised this point twice and I'm hoping to say something that

20 would be helpful on this.

21         THE COURT:  All right.

22         MS. ESAYIAN:  The plan proponents never used the

23 words "narrow in scope."  We never said that the contractual

24 indemnity was narrow in scope.  There hasn't been any

25 evidentiary finding as to what the contractual indemnity is and

1  what its scope is.

2         What the plan proponents did say was that there are

3  certain things that the contractual indemnity plainly cannot

4  cover, and one of those things that was given as an example was

5  abnormally dangerous activities of BNSF.  If BNSF engages in

6  abnormally dangerous activities and if those are not covered by

7  the contractual indemnity, they don't have a common-law

8  contribution claim against Grace for that either.

9         That's their own abnormally dangerous activities.

10  It's not derivative.  It's their independent conduct.  So that

11  you have -- there's been no evidence on the record that there's

12  anything that would not be covered by the contractual indemnity

13  that they could in the scenario of the Libby claims recover

14  from Grace under a common-law claim.  Zero evidence.

15         And Ms. Casey should not be able to assert a whole

16  bunch of new arguments today based on zero evidence.  There was

17  plenty of opportunity for this during the confirmation hearing.

18         MS. CASEY:  Your Honor --

19         MS. ESAYIAN:  All her arguments during the

20  confirmation hearing were about the contractual indemnity.  We

21  have Mr. Inselbuch's testimony.  She extensively cross-examined

22  Mr. Inselbuch.  She exclusively asked him about the contractual

23  indemnity and how it would be treated under the plan.

24         Now, she's trying to say there's a gaping hole

25  between the contractual indemnity and the common-law

1 contribution.  Again, there's zero evidence of that, but if we

2 need to say something about that it's -- it's a null set

3 because it would have to be their abnormally dangerous

4 activities.

5      MR. LOCKWOOD:  Your Honor, I would like to add to

6 that.  This -- this is a motion to reconsider.  It is not an

7 opportunity under the -- under the rules that govern these

8 procedure for motions for reconsiderations for Ms. Casey to

9 come in here and make arguments about common-law

10 indemnification that were -- that we -- that were never the

11 subject of briefing or argument in the confirmation process.

12 She -- she keeps asserting --

13      MS. CASEY:  Your Honor, that's absolutely false --

14      MR. LOCKWOOD:  -- this stuff about common-law --

15      MS. CASEY:  -- and I can cite to it.

16      MR. LOCKWOOD:  -- there has never been a case cited

17 under Montana law or any other law about the existence of this

18 phantom common-law indemnification, and it's simply too late

19 for her to try and come in here and ambush us by saying that,

20 really, 5.4 -- what she's really saying is that 5.14 -- should

21 cover common-law indemnification as well as contractual

22 indemnification.

23      We dealt with the arguments that she presented to us

24 and we amended the TDP to deal with them.  Now, she's trying to

25 come in here and -- under a motion to reconsider and raise new

1  issues, and that's fundamentally unfair and --

2          THE COURT:  Well, I think what she's doing is

3  suggesting that I misapprehended her initial argument, and I --

4  and I think I did misapprehend it, but having now apprehended

5  it, I don't think it's correct.

6          MS. CASEY:  Your Honor, if I may.  First of all, just

7  -- just briefly.  I mean, they certainly will have an

8  opportunity to respond if they want to, and being interrupted

9  is -- is -- is problematic here.  But BNSF certainly raised

10  this.  In fact, I can -- we quoted to the provisions in the

11  transcript where after they handed up section 1.4 we

12  specifically said to the Court, Your Honor, that resolves our

13  contractual indemnity, but it doesn't resolve our common-law

14  indemnification argument, and we argued it at the hearing.

15          It's absolutely, positively false to say that we

16  never briefed nor argued the common-law indemnification.  Your

17  Honor, I think the -- that the question here is whether the TDP

18  eliminates the ability of a claimant who has paid Grace's

19  liability to establish that it paid Grace's liability.

20          It is true, and we concede, that the way the TDP

21  stands is the TDP restricts the direct claimant to a scheduled

22  or maximum value, even in situations where there's 95 percent

23  liability, merely because there can be recovery from a third

24  party.

25          And then it asks us to stand in the shoes of the

1  person who has received the payment, and can then only assert

2  the remainder of the claim.  That does in fact discriminate

3  against indirect claimants in the 95 percent world, as opposed

4  to the indirect claimants in the standard claim, because it

5  eliminates the ability to get the extraordinary claim, which is

6  the value that is put on Grace's liability, simply because we

7  made payment, without looking to the reason for why we made

8  payment.

9          If the reason we made payment was some theory of

10 direct -- or of derivative liability, either a contribution

11 claim that required us to pay Grace's liability, because

12 remember in Montana -- and we did cite to this statute -- we

13 can have what we call the settling defendant present for

14 purposes of the jury awarding the -- apportioning fault.

15         So whether we pay directly under a joint and several

16 liability theory, the apportionment of fault that the jury

17 awards to Grace or whether we pay under a derivative liability

18 theory, the plan prohibits us from getting what their expert

19 testified was Grace's several share of liability in the 95

20 percent scenario simply because we made payment.

21         If in fact we made payment on our own liability the

22 TDP says that we can't get it because we don't have a claim.

23 We paid it on our own liability for which we don't have the

24 right to recover.  But it improperly and discriminatorily

25 prevents us from getting an extraordinary claim value simply

1   because we paid, even if what we paid was Grace's liability.

2            THE COURT:  Okay.

3            MR. MONACO:  Your Honor, this is Frank Monaco.  May I

4   add just one other thing?

5            THE COURT:  Yes, sir.

6            MR. MONACO:  It is -- hopefully, this won't confuse

7   the issue any further.  But I think part of what we're

8   contending here is that under Ms. Casey's scenario where

9   there's a $1 million judgment -- whether it's against BNSF or

10  the State of Montana, if that judgment includes an

11  extraordinary claim and a direct claimant limits itself to a

12  standard claim under the trust, we -- the way it is currently

13  drafted, we do not have the ability to get that extraordinary

14  claim value.

15           THE COURT:  Yes.

16           MR. MONACO:  And I think that's part of what we're

17  saying here and --

18           THE COURT:  Okay.  Well, why should that not be the

19  case?  I mean, if the direct claimant is only pursuing the

20  trust for a limited liability, then why should somebody who

21  pays that liability get any more than the direct claimant could

22  get?

23           MR. MONACO:  Well, Your Honor, a very simple, I

24  think, scenario would be where that direct claimant in the tort

25  system looks at deep pockets and decides that they want to go

1  for an extraordinary claim in the tort system and not go

2  through the trouble of trying to get it under the trust.

3       THE COURT:  Well, I mean, again, this concept of

4  extraordinary claim I don't think exists in the tort system.

5  So if I understand what you're saying, you're saying that

6  somehow or other the evidence at trial that led to a judgment

7  would substantiate that Grace's liability was -- just to use a

8  number -- 95 percent and BNSF's was five, but BNSF pays the

9  whole judgment and then can't come back against the debtor for

10  the 95 percent share because the -- it paid the entire

11  judgment, even though its liability was fixed at five percent.

12  Is that sort of where you're going?  Mr. Monaco?

13       MR. MONACO:  Well, it -- there's that and I think

14  there's also the extraordinary claim issue.

15       THE COURT:  Well, I -- okay.  That's what I was

16  trying to get to, is what -- what is the extraordinary claim

17  issue?  The only way that I can see that somebody proves an

18  extraordinary claim is by presenting it to the trust.  I mean,

19  you can't -- the only place that this comes up is in the TDP.

20       There isn't -- there isn't a cause of action based on

21  an extraordinary claim against Grace in the tort system.  The

22  evidence in the tort system would have to substantiate the

23  percentages of liability, and if it does that, if Grace is

24  determined to be 95 percent liable and BNSF is determined to be

25  five percent liable, and if BNSF somehow or other pays the

1 whole judgment rather than telling the claimant to go to the

2 trust for its recovery, then the issue is what can BNSF

3 recover.

4          I don't quite understand how under that scenario BNSF

5 doesn't have a contractual indemnity that it can raise, but

6 assuming it doesn't and it's looking at a common-law claim, I

7 don't know why BNSF would pay that amount.

8          MS. CASEY:  Your Honor, we'd be ordered to pay that

9 amount.  I mean, that's the whole issue.  The whole issue here

10 is if we are in fact obligated to pay Grace's share of the

11 liability under either a derivative claim or under a

12 contribution claim like Your Honor hypothesized, we do not have

13 the ability to establish that that claim -- that what we paid

14 was Grace's liability.

15          THE COURT:  All right.

16          MR. LOCKWOOD:  Your Honor, I think it's becoming

17 clear that what is going on here is really that the

18 extraordinary claim issue is a red herring, because what BNSF

19 and Montana are arguing, really, is that if they go to judgment

20 against a claimant in the tort system and get a huge verdict

21 against them, and Grace's "share" of that judgment, whether

22 it's 95 percent or 75 percent or 50 percent, would be in excess

23 of the scheduled or maximum values in the TDP, i.e., the caps,

24 that it's discriminatory.

25          What Ms. Casey is saying, when you think about it,

1  what Mr. Monaco is saying, I could hit for $1 million in the

2  tort system, and if Grace's share is some appreciable fraction

3  of that, that's going to be way over the cap.

4         And she seized on this extraordinary claim treatment,

5  which is affordable only to a limited class of claimants for

6  the reasons -- direct claimants for the reasons I said earlier,

7  as some sort of acknowledgment or admission on the part of the

8  plan proponents, that if Grace's share is really large, vis-à-

9  vis a direct claimant, that somehow or another that would mean

10 that an indirect claimant who could show that Grace's "share"

11 was really large should not -- should be similarly freed from

12 the caps.

13        But keep in mind what the plaintiffs, the direct

14 claimants are subject to the caps.  The whole purpose of the

15 524(g) structure of the plan with these schedule values and

16 maximum values for individuals -- individual review is to

17 produce a result for claimants which is the historically

18 accepted basis on the evidence of record of what Grace resolved

19 claims for, 98 or 99 percent of which were never the subject of

20 the verdicts that we're debating here this morning.

21        And the whole assumption is that in order to be able

22 to treat present and future claimants the same you have to keep

23 them out of the tort system.  And the way you keep them out of

24 the tort system is you settle everything and you give them

25 settlement values.

1          What Ms. Casey is basically arguing is that it's
2    discriminatory when her client -- and this argument could be
3    made by any indirect claimant.  It's being made by Montana.
4    They've adopted also.  Now, we've got -- already, we've got two
5    indirect claimants who are asserting that they're being asked
6    to pay Grace's share in an amount that's higher than the
7    scheduled value or the maximum individual value, and that's
8    discriminatory.

9          Why's that discriminatory?  Because unlike the trust,
10   we have elected to roll the dice in the tort system and get a
11   big verdict against us, and now we want to come in and argue
12   that Grace's liability share of that big verdict is way large,
13   whether it's 95 percent or 50 percent is really irrelevant for
14   the purpose of this argument, and that we should be able to
15   stick the trust with the results of our gamble of -- to go to
16   the jury and lose.

17         And so it is an attack on the cap.  The extraordinary
18   claims treatment is a limited exception to the cap.  But as
19   Your Honor has repeatedly pointed out to Ms. Casey and she's --
20   she is determined to ignore it, the direct claimants aren't
21   eligible for that exception to the cap if they can recover
22   against BNSF or Montana or Owens, Illinois or Johns Manville or
23   whoever in the tort system and get a reasonable recovery,
24   because the cap had that limited exception to protect the
25   rights of somebody to get a decent recovery on -- from the only

1 person around that's available to pay it.

2        And that principle does not apply to an indirect

3 claimant, because by definition, the indirect claimant is

4 around to pay it.  Thank you, Your Honor.  And I reiterate once

5 more that the -- the -- you will look in vain in any writing

6 that BNSF has ever filed in this case, or for that matter, in

7 any oral argument Ms. Casey has ever made for citations to

8 Montana law that say that there's some sort of common-law

9 indemnity principle that's applicable to Montana in -- in this

10 thing.

11        And so the common-law indemnification issue really is

12 an effort to raise a new issue in an improper procedural

13 context, Your Honor.

14        THE COURT:  Okay.  Ms. Casey, you can wrap up.

15        MS. CASEY:  Obviously, we filed a motion for

16 reconsideration on this issue, and I believe that at a minimum

17 we established today that the objection that we interposed was

18 not addressed by Your Honor, and therefore, we would ask for

19 Your Honor's analysis on that objection, even if it were to

20 overrule.

21        We do think that we have established that there is

22 fundamental discrimination by preventing the indirect claimant

23 in the 95 to ever be able to establish that the appropriate cap

24 should be the 400,000 because that is Grace's several share,

25 and we for some reason had to pay that.

1          And I think that's clear.  Eliminating our ability to

2     establish that under the common-law we have that right because

3     what we did pay was Grace's several share, as their expert

4     testified would be the eight times multiplier is

5     discriminatory, and we would like Your Honor's analysis on that

6     point.  And if Your Honor has any further questions, I would

7     like to address them.

8          THE COURT:  No.  I think I just need to think about

9     it.  Mr. Monaco, anything further from you?

10          MR. MONACO:  Nothing further, Your Honor.

11          THE COURT:  Mr. Frankel?

12          MR. FRANKEL:  Your Honor, Roger Frankel, for Mr.

13     Austern, the PI future claims representative.  As Your Honor

14     knows, we are anxious to get this matter behind us and move on

15     to the next court.  And I would just suggest to Your Honor that

16     there are various areas in the opinion where you have addressed

17     this issue.

18          You may not have been thinking about it as precisely

19     as we have discussed today, but I would just point out to Your

20     Honor footnote 30, for instance, quotes the entire 5.6 of the

21     TDP.  There are references on pages 31 and 32, as we've

22     discussed before, to the rights of indirect claimants, as well

23     as on page 40.

24          And while obviously Your Honor is free to re-analyze

25     this, we would suggest that there's enough in the opinion right

1 now that that's not necessary.  Thank you, Your Honor.

2          THE COURT:  Ms. Esayian.

3          MS. ESAYIAN:  Yes, Your Honor.  We would just -- on

4 behalf of the debtors we just concur with Mr. Frankel that

5 there's enough in the opinion already on this issue, and

6 reinforce what Mr. Frankel said that we were hoping to conclude

7 this issue as -- as promptly as possible.

8          And frankly, on behalf of the debtors I would be

9 remiss if I didn't say we were really hoping to conclude it

10 today.  So if there was any way that Your Honor would be able

11 to issue an order on all of these topics today, that would be

12 greatly appreciated.  Thank you.

13          THE COURT:  Mr. Lockwood, anything more?

14          MR. LOCKWOOD:  No, Your Honor.

15          THE COURT:  Okay.  I don't know whether I'm going to

16 get to this today, Ms. Esayian.  I can't make that promise.  I

17 had a big trial yesterday with some issues that I have to issue

18 rulings on today, and I've got to do those first.  So whether

19 or not I'm going to get this finished today, I don't know.

20          With respect to the two issues that are agreed on, I

21 could issue that order, but I don't think that does any good,

22 because I might as well issue an order that addresses this

23 final issue, too.  And I simply need to go back, look at the

24 opinion, look at the sections in the TDP.

25          I'm just not convinced that there is a discrimination

1  within the meaning of the Bankruptcy Code in the structure of

2  this plan.  It doesn't seem to me that BNSF or any indirect

3  claimant is being discriminated against vis-à-vis other

4  indirect claimants, and I think that's the standard that

5  applies, but I want to go back and check.

6          And I don't think they're being discriminated against

7  vis-à-vis direct claimants, because if a direct claimant

8  doesn't have the claim and they stand in the shoes of the

9  direct claimant, then they don't have a claim either.  But I

10 need to think about it and see whether or not there is -- maybe

11 I'm missing something in that analysis.  So I'll do the best I

12 can, but I'm not going to promise today.

13         MS. ESAYIAN:  Thank you, Your Honor.  The --

14         THE COURT:  When is your next -- or any proceeding

15 before the District Court?

16         MS. ESAYIAN:  That's the difficulty, Your Honor.  The

17 -- Judge Buckwalter has indicated that he would like to set a

18 prompt schedule for briefing, but he's holding off until

19 there's a conclusion of this motion.

20         THE COURT:  Okay.

21         MR. LOCKWOOD:  Well, to be more precise about it,

22 Your Honor, Judge Buckwalter is of the view that until Your

23 Honor rules on this motion he has no jurisdiction over the

24 appeals.

25         (Laughter)

1          THE COURT:  And here I was wondering whether I had

2   jurisdiction over this because of the appeals, so.

3          MR. LOCKWOOD:  Well, he -- everybody has accepted the

4   proposition that a motion to reconsider tolls the appellate

5   time --

6          THE COURT:  Yes.

7          MR. LOCKWOOD:  -- for all parties, not just the party

8   making the motion.  So even though it's only BNSF that's made

9   the motion, everybody else is sitting around waiting.

10          THE COURT:  Well, but there have been a couple of

11   appeals actually filed already, and that's the reason --

12          MR. LOCKWOOD:  That's true, but they're going to be

13   held in abeyance --

14          THE COURT:  Okay.

15          MR. LOCKWOOD:  -- by Judge Buckwalter.

16          THE COURT:  Well --

17          MR. LOCKWOOD:  He hasn't even given a -- we got a

18   miscellaneous docket for I guess some minor procedure, and for

19   the 9033 issue.

20          THE COURT:  Okay.

21          MR. LOCKWOOD:  We set up a -- but the effect of that

22   was simply, he issued a one-page order combining the 9033

23   objections with the --

24          THE COURT:  The appeal.

25          MR. LOCKWOOD:  -- appellate issues.  So everything is

1  still waiting on the trigger of --

2           THE COURT:  Okay.  Well, I Guarantee I'll get to it

3  promptly.  I don't think it's going to take all that long.  I

4  just can't promise today.  So okay, folks, we're adjourned.

5           ALL COUNSEL:  Thank you, Your Honor.

6           (Whereupon, at 10:45 a.m., the hearing in the above-

7  entitled matter concluded.)

8                          --oOo--

9

10                        CERTIFICATE

11          I, ELIZABETH REID-GRIGSBY, a certified electronic

12 transcriber, certify that the foregoing is a correct

13 transcript, to the best of the transcriber's ability, from the

14 official electronic sound recording of the proceedings in the

15 above-entitled matter.

16

17 /s/ Elizabeth Reid-Grigsby                  March 22, 2011

18 Elizabeth Reid-Grigsby - AAERT CET**00145

19 J&J COURT TRANSCRIBERS, INC.

20

21

22

23

24

25