EXECUTION DOCUMENT

## EXHIBIT I

*Settlement Agreement*

EXECUTION DOCUMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) |

## STIPULATION AND SETTLEMENT AGREEMENT RESOLVING CLAIMS OF NEUTOCRETE PRODUCTS, INC., AND ITS AFFILIATES (CLAIMS NOS. 8378, 8379 & 8380)

This stipulation and settlement agreement (the "Agreement") is entered into this 15th day of September, 2011, between W. R. Grace & Co. ("Grace"), W. R. Grace & Co.-Conn., and their affiliates (collectively, the "Debtors") and Neutocrete Products, Inc. ("NPI"), Neutocrete Systems, Inc. ("NSI") and FTF Crawlspaces Specialists, Inc. ("FTF", which collectively with

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

NPI and NSI are the "Claimants") to resolve the Claims (defined collectively to mean Claim No. 8378 (on behalf of NPI); Claim No. 8379 (NSI); and Claim No. 8380 (on behalf of FTF)).[2]

## STATEMENT OF FACTS

WHEREAS, on or about March 28, 2003, Claimant timely filed the proofs of claim documenting each of the Claims (the "Proofs of Claim"), copies of which are attached hereto as Exhibits A, B and C;

WHEREAS, on or about June 22, 2009, The Debtors filed *the Debtors' Objections to Certain Claims Filed by Neutocrete Products, Inc., Neutocrete Systems, Inc., and FTF Crawlspace Specialists, Inc.*, (docket no. 22218) (the "Claim Objection"), which allowed the Debtors and the Claimant to participate in non-binding mediation pursuant to this Court's *Order Pursuant to Sections 105(a), 362, 363, 502 and 503 of the Bankruptcy Code and Federal rules of Bankruptcy Procedure 9019 Establishing Alternative Dispute Program to Permit Debtors to Liquidate Certain Prepetition Claims*, dated November 8, 2004 (docket no. 6853).

WHEREAS, in September 2009, pursuant to procedures set forth in this Court's *Order Establishing an Alternative Dispute Resolution Program and to Permit the Debtors to Liquidate Certain Prepetition Claims*, date November 9, 2004 (Dkt. No. 6853), the parties participated in non-binding mediation; but the parties were unable to consensually resolve their dispute over Claimant's claims;

WHEREAS, on or about July 26, 2010, Claimants filed their *Neutocrete Claimants' Response in Opposition to W.R. Grace's Objection to Claims* (Dkt. No. 25115);

---

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in, the Claims or the *First Amended Joint Plan of Reorganization in their Chapter 11 Cases,* Docket no. 25881, as it may be further amended, supplemented or otherwise further amended from time to time, and the schedules and exhibits to the foregoing, as they may be in effect from time to time (the "Plan").

WHEREAS, on or about October 14, 2010, Claimants served on the Debtors their *First Set of Interrogatories, Requests for Production of Documents and Requests for Admission Directed to Debtors* (Notice of Service thereof filed at Dkt. No. 25586);

WHEREAS, on or about December 16, 2010, the Debtors served on Claimants their *Debtors' Responses and Objections to Claimants Neutocrete, NSI and FTF's First Set of Interrogatories, Requests for Production of Documents and Requests for Admission Directed to Debtors* (Notice of Service thereof filed at Dkt. No. 25933);

WHEREAS, on or about February 22, 2011, the Debtors served upon Claimants their *First Request to Claimants for Documents and Answers to Interrogatories Related to Claims nos. 8378, 8379 and 8380* (Notice of Service thereof filed at Dkt. No. 26382);

WHEREAS, on or about April 29, 2011, Claimants served upon the Debtors their *Claimants Neutocrete, NSI and FTF'S Responses to Debtors' First Request to Claimants for Documents and Answers to Interrogatories Related to Claims Nos. 8378, 8379, and 8380* (Notice of Service thereof filed at Dkt. No. 26854); and

WHEREAS, the Debtors and Claimants agree that resolving the Claims in the best interests of the parties.

## THE SETTLEMENT

NOW, THEREFORE, for good and valuable consideration, the parties hereby stipulate and agree that as of the date on which the Settlement Order becomes final and non-appealable:

1.      Claim no. 8378 (the "NPI Allowed Claim") shall be an Allowed Claim (as that term is defined in the Plan) in the amount of $190,000 (the "Settlement Amount").

2.      Pursuant to the terms of the Plan, the Debtors shall pay the Settlement Amount in full and complete satisfaction of the NPI Allowed Claim on or after the Effective Date.

3.      Notwithstanding the terms of the Plan, no interest shall accrue on the Settlement Amount.

4.      Claim nos. 8379 and 8380 shall be disallowed and expunged for all purposes (the "Disallowed Claims"), and Claimants shall not be entitled to any further claims against the Debtors for any amounts accruing on or before the date of this Agreement.

### NECESSARY ACTIONS

5.      Pursuant to the Omnibus Settlement Procedures Order:

   a.   As soon as reasonably practicable after the Debtors and Claimants execute this Stipulation, the Debtors shall file and serve a notice of settlement (the "Settlement Notice") as provided in ¶ (f) of the Omnibus Settlement Procedures Order;

   b.   The Settlement Notice shall provide for a twenty-day period during which written objections to the proposed terms of the Settlement may be made;

   c.   If no written objections are made, the Debtors shall file a certificate of no objection stating that no written objections to the Settlement had been made; and

   d.   Three days after the filing of the certificate of no objection, this Stipulation and the Debtors' signature(s) hereon shall become binding on the Debtors.

6.      If a written objection to the Settlement is made, the Court shall enter an order resolving that written objection before this Stipulation and the Debtors' signature(s) hereon shall become binding on the Debtors.

7.      The Debtors shall direct their claims agent Rust Consulting, Inc. to record the NPI Allowed Claim as an allowed, contingent, and liquidated claim on the terms and conditions set forth in this Stipulation.

### RELEASES

8.      **Release by Claimants.**   Except for the rights, entitlements and obligations created by, arising under, or available to Claimants under this Agreement: Claimants and their successors and assigns jointly and severally release all claims, and all claims that could be

asserted by or on their behalf against the Debtors arising at any time on or before the date hereof, whether known or unknown, foreseen or unforeseen, liquidated, unliquidated, fixed, contingent, material or immaterial, disputed or undisputed, suspected or unsuspected, asserted or unasserted, direct or indirect, at law or in equity, including but not limited to the NPI Allowed Claim and the Disallowed Claims.

9.    **Release by the Debtors**.  Except for the rights, entitlements and obligations created by, arising under or available to the Debtors under this Agreement: The Debtors jointly and severally release all claims against the Claimants and all claims that could be asserted by or on their behalf against the Claimants arising at any time on or before the date hereof, whether known or unknown, foreseen or unforeseen, liquidated, unliquidated, fixed, contingent, material or immaterial, disputed or undisputed, suspected or unsuspected, asserted or unasserted, direct or indirect, at law or in equity.

### MISCELLANEOUS

10.    **Necessary Actions**.  The Debtors shall take all actions necessary to implement this Agreement, including but not limited to filing the Settlement Notice (which Settlement Notice shall withdraw the Claim Objection)..

11.    **Bankruptcy Court Approval**.  Notwithstanding the foregoing, this Agreement and the Debtors' signature hereon shall not become effective and binding until the objection deadline to the Settlement Notice shall have passed and the Debtors shall have filed a certificate of counsel to that effect.

12.    **Full Power and Authority**.  Each party executing this Agreement represents that such party has the full authority and legal power to do so.

13.    **Counterparts**.  This Agreement may be executed in counterparts and each such counterpart together with the others shall constitute one and the same instrument.  The parties further agree that facsimile signatures hereon shall be deemed to be original signatures.

14.    **Binding Nature**.  This Agreement shall be binding upon and inure to the benefit of each of the parties, and upon their respective assignees, successors and/or partners, including, but not limited to any trustee(s) appointed in the Bankruptcy Cases.

15.    **No Admissions**.  This Agreement is being entered into solely as a settlement of issues and does not represent an admission by any of the parties of the validity of any liability or defense with respect to matters set forth herein.

16.    **Retention of Jurisdiction**.  The Bankruptcy Court shall retain jurisdiction over the Claims and this Agreement.

**[signature page to follow]**

6

Jay Hughes
Senior Litigation Counsel
W.R. Grace & Co.
62 Whittemore Ave
Cambridge, MA 02140

Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
(302) 999-1540
*Attorneys for Neutocrete Claimants*

Date: _September 15, 2011_    Date: ___September 8, 2011___

EXECUTION DOCUMENT

## EXHIBIT A

**Claim no. 8378**

# WR Grace

**Bankruptcy Form 10**

**Index Sheet**

SR00000559

**Claim Number:**     00008378

**Receive Date:**     03/28/2003

## Multiple Claim Reference

Claim Number   _____

☐ MMPOC    Medical Monitoring Claim Form

☐ PDPOC    Property Damage

☐ NAPO    Non-Asbestos Claim Form

☐    Amended

Claim Number   _____

☐ MMPOC    Medical Monitoring Claim Form

☐ PDPOC    Property Damage

☐ NAPO    Non-Asbestos Claim Form

☐    Amended

## Attorney Information

Firm Number:                                   Firm Name:

Attorney Number:                             Attorney Name:

Zip Code:

Cover Letter Location Number:

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| ☐ TBD | ☐ TBD | ☒ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |

| **Other** | | |
|---|---|---|
| | ☐ Non-Standard Form | |
| | ☐ Amended | |
| | ☐ Post-Deadline Postmark Date | |

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware | GRACE NON-ASBESTOS PROOF OF CLAIM FORM |
|---|---|

| Name of Debtor:[1] W.R. Grace & Co. - Conn. | Case Number 01-01139 (JKF) |
|---|---|

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

| Name of Creditor (The person or other entity to whom the Debtor owes money or property):Neutocrete Products, Inc. (NPI) | ☒ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|
| Name and address where notices should be sent:<br>Neutocrete Products, Inc.<br>564 Danbury Road<br>New Milford, CT 06776  Attn:  Anthony<br>Bonaiuto | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the  address differs from the address on the envelope sent to you by the court.<br>See claims filed by Neutocrete Systems, Inc. and FTF Crawlspace Specialists, Inc. | |
| Account or other number by which creditor identifies Debtor:<br>W.R. Grace & Co. Customer No. 58 6297 | Check here ☐ replaces<br>if this claim ☐ amends a previously filed claim, dated:_____ | |

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:
W.R. Grace & Co. - Conn.    W.R. Grace & Company

| 1. Basis for Claim | |
|---|---|
| ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) |
| ☐ Services performed | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ Environmental liability | Your SS #:_____ |
| ☐ Money loaned | Unpaid compensation for services performed |
| ☐ Non-asbestos personal injury/wrongful death | from _____ to _____ (date) |
| ☐ Taxes | |
| ☒ Other  contingent unliquidated pre-petition and post-petition claim for breach of contract, fraud, CUTPA and indemnification | |

| 2. Date debt was incurred: between 9/99 and 5/02 | 3. If court judgment, date obtained: N/A |
|---|---|

4. Total Amount of Claim at Time Case Filed:                                      $ 761,875.00   contingent and
         If all or part of your claim is secured or entitled to priority, also complete Item 5 below.                                unliquidated
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. Classification of Claim. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.)

Brief Description of Collateral:

☐ Real Estate          ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____

Attach evidence of perfection of security interest

☒ UNSECURED NONPRIORITY CLAIM

A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a(_____).

| 6. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. none | This Space is for Court Use Only |
|---|---|
| 7. Supporting Documents: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| 8. Acknowledgement: Upon receipt and processing of this Proof of Claim, you will receive an acknowledgment card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self addressed envelope and copy of this proof of claim form. | |
| Date<br>3/21/03 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Neutocrete Products, Inc.<br>By:  [signature]          Its: PRESIDENT | WR Grace     BF.34.133.6606<br>00008378<br>SR=559 |

REC'D MAR 2 8 2003

[1] See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtors.

SUMMARY OF

NEUTOCRETE PRODUCTS, INC., ET AL.
Claims Against WR Grace

Listed below are the non-performance claims against WR Grace (herein referred to as
Grace) as a supplier of light-weight concrete sold to FTF Crawlspace Specialists,
Neutocrete Products, Inc. and Neutocrete Systems, Inc. (herein referred to as NPI).

1.    The Parties.

    a.    Neutocrete products, Inc. (NPI) is a Connecticut corporation which
        purchased light-weight concrete for emplacement in crawlspaces under
        homes to reduce moisture, mold and pests.

    b.    FTF Crawlspace Specialists, Inc. (FTF) is a Connecticut corporation which
        is a related company to NPI in that there are comon shareholders and
        officers and directors.  FTF is an installer of Neutocrete products in
        crawlspaces.

    c.    Neutocrete Systems, Inc. (NSI) is a Connecticut corporation which is
        another related company to NPI in that there are common shareholders,
        directors and officers.  NSI is an installer of Neutocrete products in
        crawlspaces.

    d.    NPI purchased products for resale to FTF and NSI.  NPI was never an
        installer of the materials.

    e.    Both NSI and FTF have made claims against NPI for damages due to the
        purchase of defective and/or sub-standard products which NPI purchased
        from W.R. Grace.  These products caused NSI and FTF to sustain a) loss
        and damage resulting from lost opportunities, b) loss and damage to its
        reputation and credibility, and (c) and losses due to the need to repair or
        replace cracked and/or odoriforous crawlspace seals for all which NPI
        seeks indemnification.

2.    Contractual Non-Performance Claims.

    Grace did not fulfill the contractual requirements of its long-term supply
agreement with NPI dated 12/14/2000 annexed hereto as **Exhibit A** as amended on
11/1/01 or purchase orders by not supplying NPI with the agreed upon quantity of
material for over 150,000 bags purchased between September 1999 and May (the
exact number will be determined when Grace provides a shipping manifest for each
delivery).

a.  NPI and Grace contracted to purchase bags of material to consist of **two cubic feet of vermiculite, thirty pounds of cement and less than two ounces of a proprietary additive.** The Long-Term Supply Agreement executed as of December 14, 2000 outlines the material composition per bag. Although this agreement was not executed until December, 2000, it was drafted by Grace in May 1999 and honored (from a purchase price, commitment and material composition standpoint) until some of the legal terms and conditions could be finalized. NPI's contract with Grace called for a volumetric purchase. Grace's manufacturing process was based on pounds and not volume. This was discovered on or about 4/10/02.

b.  An audit of the Grace Enoree, SC plant was conducted on April 10, 2002 by Anthony Buonaiuto, Frank Buonaiuto and John Beliveau of NPI along with key Grace personnel (see April 23, 2002 memo from Anthony Buonaiuto to Grace detailing the audit results **Exhibit B**). The audit revealed that the quantity of material <u>bagged by Grace was approximately 1.5 cubic feet per bag</u> or approximately a 25% material shortage per bag. This conclusion is further supported by;

    i.  Eric Moeller of Grace. His memo on May 19, 1999 page 2 **Exhibit C** explained that Grace's 42 lb. bag can only hold 1.5 cubic feet.

    ii.  Numerous e-mails to Grace in 2001 and photographs of delivered bags that obviously show that the bags are not full.

    iii.  NPI reviewed the material yield on every job installed with Grace's formulation from September 1999 through May 2002. The results are included in this report. On average, 8 sq. ft. per bag (the agreed to target based on the formulation from Grace) was not achieved. In fact, over 70% of the installs in 2002 did not achieve the desired yield.

c.  <u>NPI Claims that Grace owes it an estimated sum of $256,275 or more</u> for under-filling the bags or shorting NPI by an average of 25% (150,000 bags delivered x 25% = 37,500 total bags not delivered x $5.65 per bag = $211,875 for a total of material costs of $256,275).

3.  Grace did not provide a superior product and technical support as promised by Eric Moeller (see Grace Memo dated May 19, 1999) **Exhibit C.**

a.  Grace recommended a water/mix ratio that was based on two cubic feet of vermiculite, 30 pounds of cement and less than 2 ounces of an add mixture. Since we were never able to get this amount of material from Grace's 42 pound bag (1.5 cubic feet - volumetrically, which was never filled to start with). The installer unknowingly added too much water to our material. Therefore, the installer experienced excessive cracking problems. The installers performed 1,058 installs that had material yields

less than the 8 sq. ft. per bag target <u>out of 1,578 total installs by NSI and FTF that were installed with Grace's material.  Of those installed jobs, 451 of them required repairs because of a material related issue (cracking). NSI and FTF have charges that they incurred costs in excess of $140,928 related to these repairs</u> (Labor = $77,572, material $6,314 and overhead $57,042).

b.  Based on a root cause repair meeting with Grace, Grace recommended on several occasions that the installers should use Daraweld C as an additive to the mix to reduce cracking.  As per Dave Pickering's recap memo dated May 7, 2002 **Exhibit D**, Grace recommended the use of Daraweld C back in 2001.  NSI started using Daraweld C as its protocol in January 2002.  This use has badly damaged NSI's reputation.  The use of Daraweld C leaves the crawlspace with a cat urine type smell that clients complain constantly about, ruining the Company's references and reputation.  The estimated loss to NSI's and FTF's reputation is $250,000 or more.

4.  NSI and FTF suffered lost opportunity costs as a result of the material shortage and repairs.  Estimates that they lost approximately 295 installing days from repairs.  Its average sale is approximately $5,800 and therefore they have experienced over $1.7 million in lost opportunities.

5.  Summary of damages and losses by party.

| | | | |
|---|---|---|---|
| a. | Shortages of Materials | NPI | $ 211,875 |
| b. | Fraud, and violation of Connecticut Unfair Trade Practices Act | NPI | $ 300,000 |
| c. | Estimated legal fees based upon CUTPA claim | NPI | $ 250,000 |
| d. | Indemnification due to repair costs resulting from material defects | NSI<br>FTF | $ 34,998<br>$ 105,930 |
| e. | Indemnification due to lost sales opportunity | NSI<br>FTF | $ 425,000<br>$1,275,000 |
| f. | Loss of reputation and good will<br>Loss of reputation and good will | NSI<br>FTF | $ 67,500<br>$ 187,500 |
| | | Total | $2,857,803 |

<u>Brief History between Grace and Neutocrete as it relates to supply agreement</u>

5/19/99
Eric Moeller memo to Buonaiutos - Grace can deliver all NPI's material requirements which includes yield and quality and technical support.  Draft of long term supply agreement provided to NPI from Grace.

August 1999
Grace starts shipping product to NPI, all parties working as if long term supply agreement was in effect.

1/25/00
Grace gives NPI credit for bad batch of material (FOD damage).

3/28/00
Grace provides draft for private labeling of bags.

4/21/00
Grace material leaving a white chalk like substance on the surface.  Grace details what it is in a memo.

7/24/00
WR Grace FOD report

11/30/00
Eric Moeller to NPI; we are all in agreement with LTA

12/14/00
LTA is signed by NPI.

1/15/01
CEDAC (Cause and Effect Diagram with the Addition of Cards) meeting with Grace in New Milford to determine numerous cracks (1 in 3 jobs) in product.  Grace recommends Daraweld C into product, NSI will conduct tests with them.

1/30/01
Dave Pickering - Grace, admits to FOD problem and that the formulation is wrong.

2/14/01
John Beliveau and Frank Buonaiuto of NPI noted to Pickering a weight problem with its bags (inconsistent).

3/14/01
Dave Pickering sends memo to John Beliveau recommending the use of Daraweld C

and admits that 8 sq. ft. per bag should be the correct result based on the Grace formulation.

3/26/01
Pickering to John Beliveau admits that a credit is due to NPI for improper material blending and admits that the bag weights were not the correct desired result. Pickering also re-emphasizes our exactly formulation and water ratio and tells us that Daraweld C is Installer's best option to fix cracking.

3/29/01
Beliveau to Pickering - Fallout rates based on random testing of deliveries showed that 9% of all bags delivered did not meet Grace's weight recommendation.

4/10/01
Graces issues $15,000 credit for under-weight bags.

4/11/01
John Beliveau and Frank Buonaiuto go to Enoree, SC plant (where Neutocrete [the product] was being manufactured) and noted out of date work instructions for the operator bagging the Neutocrete.

4/12/01
NPI (John Beliveau) offers industry expertise with respect to quality control to Grace to help fool proof its bagging operation to ensure it would be getting the correct desired result.

8/15/01
Moeller to Beliveau via e-mail - Admits that the photos we provided of material on pallets (different sizes in pallet height) was because they were filling the bags based on weight rather than on volume but insists the material formulation is correct for NPI's application.

10/5/01
Grace sends new LTA agreement because of Chapter 11 filing, adding to the agreement toll manufacturing and costs (Whittimore)

2/14/02
Another FOD report from Grace

3/12/02
Grace/NPI meeting - volume vs. weight

4/10/02
Beliveau and the Buonaiutos go to Enoree, SC to conduct plant tour again. Audit discloses that each bag only contains 1.5 cubic feet of material per bag based on their manufacturing operation (based on weight, in other words, the bags if filled may be able

to hold up to 2 cubic feet but based on their manufacturing process, weight was the control for filling the bag).

4/23/02
Anthony Buonaiuto sends letter to Grace about the conclusion of the audit and asks for over $491,000 of costs (material shortage, repairs and opportunity). **Exhibit B**.

4/25/02
Meeting with Grace in Cambridge, Grace said formulation was correct but perhaps a credit was due.

4/26/02
Phone conversation with Grace, Grace says it will determine what is appropriate to resolve these issues.

4/30/02
Grace offers $18,000 to settle material shortage issues

5/2/02
NPI issues stop payment in the amount of $20,141.25 for 3 checks for deliveries because offer from Grace was unrealistic.

5/7/02
Pickering to Anthony Buonaiuto, Grace recaps events and still instructs NPI to use Daraweld C.

# EXHIBIT A TO - PROOF OF CLAIM

## AMENDMENT
## TO
## LONG-TERM PURCHASE AGREEMENT

This Amendment ("Amendment") to the Long-Term Purchase Agreement ("Purchase Agreement"), dated December 14, 2000, by and between W.R. Grace and Co.- Conn., a Connecticut corporation, acting through its Construction Products business unit and having an office at 62 Whittemore Avenue, Cambridge, Masachusetts 02140 ("Grace") and Neutocrete® Products, Inc., a Connecticut corporation, having an office at 564 Danbury Rd., New Milford, CT 06776 ("Neutocrete"), is made by Grace and Neutocrete effective **November 1, 2001**.    In consideration of the premises and covenants contained herein and other good and valuable consideration, the mutual receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  Section 4 of the Purchase Agreement shall be deleted and the following language substituted in lieu thereof:

    "The prices are provided more particularly in **Exhibit A** and are also subject to the additional provisions of this Section 4 .  With respect to Neutocrete® Product delivered outside the New England Region (defined below), the price is F.O.B. Grace's plant in Enoree, South Carolina, and all freight charges and applicable taxes will be paid by Neutocrete; however, Neutocrete in its discretion may direct the mode of transportation to be used by Grace. With respect to Neutocrete® Product delivered inside the New England Region , the price described in Exhibit A shall be a delivered price out of Grace's toll or contract manufacturer, as determined by Grace.   The term "New England Region" shall mean the several states of " New York, Maine, New Hampshire, Vermont, Connecticut, Massachusetts, and Rhode Island, individually and/or collectively."  Notwithstanding the foregoing, Grace may in its discretion, at any time without notice, ship Neutocrete® Product from its plant in Enoree, South Carolina, and the price for any delivery destination shall be F.O.B. the Enoree plant, and the portions of Exhibit A which apply to pricing for deliveries outside of the New England Region shall apply."

2.  Section 14 (ii) of the Agreement shall be deleted and the  following language substituted in lieu thereof:

Neutocrete.LTPurchase Agreement.AmendmentIII.100501 DGP amended

## EXHIBIT A TO - PROOF OF CLAIM - Continued

"Neutocrete becomes insolvent or becomes a party in a bankruptcy or similar proceeding brought against it;"

3. The following language shall be added into Section 15 at the end of such paragraph as a new paragraph:

"Neutocrete acknowledges that Grace filed a voluntary petition for reorganization relief pursuant to Title 11 of the United States Code, 11 U.S.C. 101 et seq.,(as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 2, 2001 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of Bankruptcy Code) as authorized by Sections 1107 and 1108 of the Bankruptcy Code since the Filing Date, and agrees that neither such filing nor any proceeding or order pertaining thereto shall be grounds for termination of this Agreement."

4. The third sentence of the Section of **Exhibit A** entitled "Price" shall be deleted and the following language substituted in lieu thereof:

"With respect to sales of Neutocrete® Product delivered outside of the New England Region, packaged in Neutocrete® bags provided to Grace for filling, the purchase price will be $5.27 per bag, F.O.B. Enoree as more particularly described in Section 4 of the Agreement as amended hereinabove. With respect to sales of Neutocrete® Product delivered within the New England Region, the purchase price will be $6.45 per bag delivered, not including the price of the bag. In each case, prices shall be subject to the price index as defined below."

5. The following language shall be added at the end of paragraph 9(a):

" Notwithstanding the foregoing, Grace in its discretion may subcontract the manufacturing, packaging, and delivery of Neutocrete® Product in accordance with the terms of this Agreement."

6. Except as set forth herein, all terms in this Amendment shall have the same meaning as in the Purchase Agreement. The parties acknowledge and agree that except as specifically provided for herein, all other terms and conditions of the Purchase Agreement shall remain unchanged and are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment

## EXHIBIT A TO - PROOF OF CLAIM - Continued

in duplicate (each of which duplicates shall be deemed an original) by
their duly authorized representatives as of the effective date first written
above.

**W.R. Grace and Co. – Conn.**                    **Neutocrete® Products Inc.**

By: _____                    By: _____

Name: ___Keith K Bartlett___                      Name: ___Anthony Buonaiuto___

Title: _General Manager, Specialty Vermiculite_   Title: ___President___

# EXHIBIT A TO - PROOF OF CLAIM - Continued

## LONG-TERM PURCHASE AGREEMENT

THIS AGREEMENT dated as of the _14th_ day of Dec., 2000, by and between W. R. Grace & Co. - Conn., a Connecticut corporation, acting through its Grace Construction Products unit and having an office at 62 Whittemore Avenue, Cambridge, Massachusetts 02173 ("Grace") and Neutocrete® Products, Inc., a Connecticut corporation and having an office at 564 Danbury Rd., New Milford, CT 06776 ("Neutocrete").

### WITNESSETH:

WHEREAS, Grace has offered to sell and deliver Neutocrete® product as toll manufactured by Grace (or its contractors and licensees) to Neutocrete in the quantities and in accordance with the terms and conditions set forth herein; and

WHEREAS, Neutocrete has agreed to purchase and receive Neutocrete® Product from Grace.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties agree as follows:

1. Definitions. As used herein the following terms shall have the following representative meanings:

    "Affiliate" means Neutocrete Systems Inc.

    "Trademark" means Neutocrete's trademark and design "Neutocrete".

    "Patent" means Neutocrete's US Patent 5890845.

"Neutocrete® Product" means the formulated product as specified in Exhibit A (and as may be modified) and identified under the Trademark. Both parties agree that formulation changes may be necessary to optimize the Neutocrete® Product, and that such changes may change the cost structure of the finished product. It is mutually agreed that any formulation changes and respective price changes be agreed to by both parties in writing.

2. Quantity. During the term of this Agreement, Neutocrete shall purchase one hundred percent (100%) of its Neutocrete® Product requirements from Grace in accordance with the terms and conditions of this contract. Neutocrete agrees to purchase a minimum of 50,000 bags of Neutocrete® Product each 12 month period of this contract. For any quantities of Neutocrete® Product which Grace does not supply or which Grace cannot supply within 14 working days of Neutocrete's requested delivery date, Neutocrete may purchase such quantities from alternate suppliers and such quantities shall be deducted from Neutocrete's purchase obligation hereunder.

Grace shall sell Neutocrete® Product exclusively to Neutocrete for its Patented use. Grace will not intentionally promote the use of vermiculite in the refurbishment of crawlspaces as defined under the Patent, except as directed in writing by Neutocrete. Neutocrete may but shall not be obligated to purchase Neutocrete® Product for uses other than the only Patented use.

3. Term. This Agreement shall commence on January 1, 2001 and continue for a period of three years. This Agreement may be renewed upon mutual agreement, evidenced by written correspondence at any time prior to the conclusion of its term.

1

## EXHIBIT A TO - PROOF OF CLAIM - Continued

4. <u>Prices</u>. Provided in Exhibit A. The price is F.O.B. Grace's plant in Enoree, South Carolina or its toll manufacturer as mutually agreed to in writing.. All freight charges and applicable taxes will be paid by Neutocrete accordingly. Neutocrete, at its discretion, may direct the mode of transportation to be used by Grace.

5. <u>Delivery.</u> Neutocrete shall use its best efforts to give at least seven (7) days notice to Grace of a requested delivery date for Neutocrete® Product. Should the inability to meet a requested delivery date be anticipated by Grace, Grace shall so advise Neutocrete. If Neutocrete is unable to provide Grace with at least seven (7) days notice of a need for Neutocrete® Product, Grace agrees to use reasonable efforts to meet the requested delivery date.

6. <u>Payment</u>. Payment terms are Net 30 days from date of invoice.

Title and all risk of loss of Neutocrete® Product shall pass to Neutocrete upon delivery F.O.B. Grace's plant. GRACE SHALL NOT BE LIABLE FOR ANY DELAY IN TRANSPORTATION OCCASIONED.

Grace's invoice weights, volumes and sizes shall be treated as prima facie correct.

7. <u>Warranties, Remedies and Limitations.</u>

a) Grace warrants to Neutocrete that at the time of delivery the Neutocrete product sold hereunder will conform substantially to the typical properties attached hereto as Exhibit A. Grace's liability and Neutocrete's remedy under this warranty are limited in Grace's discretion to replacement of Neutocrete® Product returned to Grace which are shown to Grace's reasonable satisfaction to have been non-conforming or to refund or credit of the purchase price. Transportation charges for the return of any non-conforming Neutocrete® Product to Grace and the risk of loss or damage thereto shall be borne by Grace provided such Neutocrete® Product is returned in accordance with Grace's written instructions.

(b) Grace warrants to Neutocrete that it will convey good title to the Neutocrete® Product sold hereunder. Grace's liability and Neutocrete's remedy under this warranty are limited to the removal of any title defect or, at the election of Grace, to the replacement of the Neutocrete® Product or any part thereof which are defective in title.

(c) Grace warrants to Neutocrete that all Neutocrete® Product is well below the permissible exposure limits as defined under current EPA and OSHA regulations for asbestiform tremolite. Upon written request from Neutocrete, Grace will provide a Certificate of Insurance with a General Liability limit not to exceed $1,000,000.

(d) THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE GIVEN AND ACCEPTED IN LIEU OF ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY AND THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. THE REMEDIES OF NEUTOCRETE FOR ANY BREACH OF WARRANTY SHALL BE LIMITED TO THOSE PROVIDED HEREIN AND FOR DELAY OR NONDELIVERY WHICH IS NOT EXCUSABLE TO THE PURCHASE PRICE OF THE NEUTOCRETE® PRODUCT IN RESPECT OF WHICH THE DELAY OR NONDELIVERY IS CLAIMED TO THE EXCLUSION OF ANY

2

# EXHIBIT A TO - PROOF OF CLAIM - Continued

AND ALL OTHER REMEDIES INCLUDING, WITHOUT LIMITATION, INCIDENTAL OR CONSEQUENTIAL DAMAGES. NO AGREEMENT VARYING OR EXTENDING THE FOREGOING WARRANTIES, REMEDIES OR THIS LIMITATION WILL BE BINDING UPON GRACE UNLESS IN WRITING, SIGNED BY A DULY AUTHORIZED OFFICER OF GRACE.

8. <u>Force Majeure.</u>  Neither party shall be charged with any liability for delay in performance or nonperformance when due to delays of suppliers, equipment, or machinery breakdowns, acts of God or the public enemy, compliance with any governmental regulation, order or law, whether or not it proves to be invalid, fires, riots, unusually severe weather, strike, lockout or injunction, inability to obtain raw materials, or any other cause, similar or dissimilar, beyond the reasonable control of either party.  The party affected by the events identified in this paragraph shall invoke this provision by promptly notifying the other party of the affected nature and estimated duration of the delay period and such affected party shall exercise diligence in an endeavor to remove or overcome the cause of the inability to perform.  Grace shall use all reasonable efforts to notify Neutocrete of any labor disputes which could result in Grace's invoking the relief provided for in this Paragraph 8.

9. <u>Assignment and Nonwaiver.</u>

    (a)    This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto. This Agreement is not assignable or transferable by either party whether voluntary or by operation of law, in whole or in part, without the prior written consent of the other party, which consent shall not be unreasonably withheld, provided that (i) Neutocrete may assign this Agreement to its Affiliate and (ii) either party may assign this Agreement to the buyer of all or substantially all of the business or assets of the assigning party to which this Agreement relates.

    (b)    Either party's failure to insist upon strict performance of any provision hereof shall not be deemed to be any waiver of either party's rights or remedies or a waiver of an subsequent default by the other party in the performance of or compliance with any of the terms hereof.

10. <u>Separate Contract.</u>  Each delivery shall stand and may be recovered for as a separate and independent contract.  If Neutocrete fails to fulfill the terms of order, purchase or payment under this or any other contract with Grace, Grace without prejudice to other lawful remedies may at its option defer further shipments hereunder until such default is made good, treat such default as a breach of this entire contract or terminate this contract.

11. <u>Compliance with Fair Labor Standards Act.</u>  Grace hereby certifies that all goods sold hereunder which are produced or manufactured in the United States of America are produced in compliance with Sections 6, 7, or 12 of the Fair Labor Standards Act of 1938, as amended (29 U.S. Code 201-219), or of any order of the Administrator issued under Section 14 of said Act.  All requirements as to the certificate contemplated in the October 26, 1949 amendment to the Fair Labor Standards Act of 1938 shall be considered as satisfied by this certification.

3

## EXHIBIT A TO - PROOF OF CLAIM - Continued

12. <u>Notices.</u>  Notices, demands and communications hereunder, to Neutocrete or Grace, must be delivered personally or by certified mail as follows:

    If to Neutocrete:
        Neutocrete® Products, Inc.
        564 Danbury Rd.
        New Milford, CT  06776

        Attention:    Frank Buonaiuto

    If to Grace:
        Grace Specialty Vermiculite
        W.R. Grace & Co.
        Construction Products Division
        62 Whittemore Avenue
        Cambridge, Massachusetts  02140

        Attention:    General Manager, Specialty Vermiculite

Either party may designate by notice in writing a new address to which any notice, demand or communication may hereafter be so given or sent.

13. <u>Confidentiality.</u>  Grace acknowledges that Neutocrete owns the Patents relating to the processes for the installation of Neutocrete® Product.  Grace and Neutocrete mutually agree that they will maintain during the term of this Agreement and for two (2) years thereafter confidentiality of non-public information provided by each other in writing and marked as "Confidential" concerning the Product and the Patent.

14. <u>Termination.</u>  Either party may terminate this Agreement at any time by written notice if:

    (i) the other fails to observe any of the material terms and conditions of this Agreement and fails to remedy such breach within thirty (30) days of written notice from the terminating party requiring remedy;

    (ii) the other becomes insolvent, or becomes a party in a bankruptcy or similar proceeding brought against it;

    (iii) upon mutual consent and written notice to the other party

Neutocrete, at its discretion, may terminate this Agreement and or source from another supplier if Grace is unable to supply 100% of the ordered Neutocrete® Product within 30 days of Neutocrete's requested delivery date.

Upon termination of this Agreement for any reason whatsoever, Neutocrete shall take delivery and pay for any remaining Neutocrete® Products and bags which Grace may have in stock up to, but not exceeding thirty (30) days average inventory based on prior twelve (12) months purchases and provided such Neutocrete® Products are in usable condition.

15. <u>Entire Agreement.</u>  This Agreement constitutes the full exclusive understanding between the parties hereto with reference to the subject matter hereof and no statements or agreements, oral or written, made prior to or at the signing hereof shall

4

# EXHIBIT A TO - PROOF OF CLAIM - Continued

vary or modify the written terms hereof; and neither party shall claim any amendment, modification or release from any provisions hereto of mutual agreement, acknowledgment or acceptance of purchase order forms, or otherwise, unless such agreement is in writing signed by the other party and specifically stating it is an amendment to this Agreement.

This contract shall be interpreted in accordance with and the construction thereof shall be governed by the laws of the Commonwealth of Massachusetts. Captions as used in these terms and conditions are for convenience or reference only and shall not be deemed or construed as in any way limiting or extending the language of the provisions to which such captions may refer.

Signed and agreed to as of the date first herein above stated.

Neutocrete® Products, Inc.

By: _____

Title: PRESIDENT

Grace Specialty Vermiculite
W. R. Grace & Co. - Conn.
Grace Construction Products

By: _____

Title: General Manager Specialty Vermiculite

Attachments:

Exhibit A

5

## EXHIBIT A TO - PROOF OF CLAIM - Continued

## EXHIBIT A

**Product Definition:**
Each bag of Neutocrete will consist of the following formulation, which may only be changed with written consent by both parties.

Neutocrete® Product Formulation:

| | |
|---|---|
| Zonolite® #4 Vermiculite | 2 cu ft |
| Type I or II Portland Cement | 30 lbs |
| Grace proprietary additive package | <2 oz |

**Packaging:**
As a service to Neutocrete, Grace will purchase under its third party bag purchase agreement the Neutocrete marked bags. Grace will immediately invoice Neutocrete for the cost of these bags to Grace, and Neutocrete will upon receipt of invoice pay for said bags. Grace will maintain stocking and ordering of the bags for Neutocrete and Neutocrete will have title to the bags. Grace shall not use Neutocrete bags other than to supply Neutocrete® Product to Neutocrete hereunder.

**Price:**
Minimum purchase Quantity is 50,000 bags per each 12 month period, for the term of this Agreement. This is a "Take or Pay" Agreement.

Packaged in Neutocrete bags provided to Grace for filling, the purchase price will be $5.27/bag.

Pricing will be fixed for the first twelve months of this Agreement, and will be adjusted up or down each 6 months thereafter by multiplying the current price by the 6 month trailing percent change for the Producer Price Unadjusted Index (PPI) for Commodity Code 13-3 (Concrete Products) as published by the US Department of Labor, Bureau of Labor Statistics.

Calculating PPI Index Changes

Each index measures price changes from a reference period
which equals 100.0 (1982 or some later month). An increase of 5.5
percent from the reference period in the Finished Goods Price Index,
for example, is shown as 105.5. This change can also be expressed
in dollars as follows: "Prices received by domestic producers of a
systematic sample of finished goods have risen from $100 in 1982 to
$105.50 today." Likewise, a current index of 90.0 would indicate

6

## EXHIBIT A TO - PROOF OF CLAIM - Continued

that prices received by producers of finished goods today are 10 percent lower than they were in 1982.

Movements of price indexes from one month to another are usually expressed as percent changes rather than as changes in index points because index point changes are affected by the level of the index in relation to its base period, while percent changes are not. The example below shows the computation of index point and percent changes.

Index point change

| | |
|---|---|
| Finished Goods Price Index | 107.5 |
| Less previous index | 104.0 |
| Equals index point change | 3.5 |

Index percent change

| | |
|---|---|
| Index point change | 3.5 |
| Divided by the previous index | 104.0 |
| Equals | 0.034 |
| Result multiplied by 100 | 0.034 x 100 |
| Equals percent change | 3.4 |

7



*A b*

*Draft —* **EXHIBIT B TO - PROOF OF CLAIM**

*Lets Discuss on Wed.*

NEUTOCRETE

*The Foundation For A Healthy Home*

Sealed · Safe · Secure

April 23, 2002

Mr. David Pickering
W.R. Grace & Co.
62 Whittemore Avenue
Cambridge, MA 02140

Dear Dave,

Based on our plant tour in Enoree, SC on April 10, 2002 we feel that WR Grace has not fulfilled our long term supply agreement in accordance with the terms, conditions and specifications. Specifically, Grace is contracted by us to supply us with 30 pounds of Portland type I or II cement with 2 cubic feet of vermiculite plus less than 2 ounces of Grace's proprietary agent into each Neutocrete bag. Our tour of your facility and test of the Neutocrete bagging operation conclusively indicated that Grace has never delivered what we have contracted for. This statement is conclusive since we poured a bag of Neutocrete completed by operator Young into a 1 cubic foot box and we were only able to extract 1.5 cubic feet of product. Conversely, we asked management (Ron Mercer) to conduct a test by clearing the line and loading 2 cubic feet of vermiculite and 30 pounds plus the Grace additive to the hopper and blended according to your work instructions. We then stopped the line once the bag hit 42 pounds (as per your work instructions) and then were able to manually fill the bag with residual Neutocrete in the hopper. The results were that the bag was filled to capacity, weighed 55 pounds and when poured into the 1 cubic foot box resulted in over 2 cubic feet of Neutocrete (as our contract specified).

We also believe that this process has been inconsistent with our mixing instructions for the material where as Grace recommended 22.5 gallons of water to 4 bags of Neutocrete to help prevent cracking and develop a stronger product. The fact that the water ratio formulation was based on the volumetric formula noted above, we believe we have experienced excessive repairs as a result of following the recommended water to mix ratio when in fact the product did not contain enough volumetric material to properly mix thus resulting in excessive water in our product which resulted in numerous crack repairs.

Our records indicate that since 2001, we have accepted and installed approximately 75,480 bags of Neutocrete. Based on this data and our findings of weight manufacturing versus volumetric, WR Grace has benefited from under filling the bags by 31% (on average, 42 pound bags were delivered when if filled to contract specifications they should weigh ~ 55 pounds for 2 cubic feet of vermiculite and 30 pounds of cement), means a 13 pound variance per bag or 13/42 = 31%). This means that WR Grace owes Neutocrete Products, Inc. $123,312.73 (75,480 delivered bags x 31% = 23,399 bags x $5.27 per bag). In addition, we have had X crack repairs since 2001 totaling $X plus lost opportunity costs of y. Therefore, we believe that WR Grace owes us $xxx,xxx for material shortage, excessive repairs and opportunity costs.

564 Danbury Road
New Milford, CT 06776
Phone: 860.354.8500
          888.799.9997
Fax: 860.354.6501
www.neutocrete.com

# EXHIBIT B TO - PROOF OF CLAIM - Continued

## Neutocrete Products, Inc.

**WR Grace Delivery Analysis - Long Term Supply Agreement**
**23-Apr-02**

**Issues to discuss:**

1. Per agreement, Neutocrete bags need to be filled
on a volumetric basis, not by weight. Each bag needs
30 pounds of Portland Type I or II cement, plus 2 cubic
feet of vermiculite and less than 2 ounces of Grace's
proprietary additive.

2. Grace owes Neutocrete for the delta of material delivered
versus what was contracted.

| | |
|---|---:|
| Bags Delivered from January 2001 through mid-March 2002 | 75,480 |
| Average weight of bags delivered | 42 lb |
| Weight per bag of 30 pounds Portland Type I or II cement plus 2 cubic feet of vermiculite plus Grace additive as conducted during our test on 4/10/02 at the Enoree plant | 55 lb |
| Weight variance per bag | 13 lb |
| Material Shortage % | 31% |
| Total material shortage in bags (delivered x shortage %) | 23,399 |
| Total material shortage credit due Neutocrete Products, Inc (material shortage in bags x contracted price of $5.27) | $ 123,311.68 |

3. Grace owes Neutocrete for carck repairs as a result of
delivering under volumetric filed bags. The water to
volumetric mixing ratio as provided by Grace has added
excessive water to material shortage batches (22.5 gallons
per 4 bags of Neutocrete per batch or 120 pounds of cement,
plus 8 cubic feet of vermiculite and less than 8 ounces of
Grace's proprietary additive) resulting in numerous crack
repairs.

| | |
|---|---:|
| Total number of repairs (1st and 2nd time crack repairs) from 2001 and 2002. | 114 |
| Average cost of repair | |
| Labor ( 2 men on average, 2 repairs per day) | $ 19,608.00 |
| Material (Average 2 bags plus Daraweld C per job) | $ 2,736.00 |
| Overhead allocation (68%) | $ 15,193.92 |
| Total costs of repairs owed to Neutocrete | $ 37,537.92 |

4. Grace owes Neutocrete for lost opportunity costs
On average, we lost 57 sale days (114 repairs/2 per day)
as a result of repairing cracks.

| | |
|---|---:|
| Our average sale is $5,800 * 57 lost opportunities | $ 330,600.00 |
| **Total Loss to Neutocrete as a result of material shortage** | **$ 491,449.60** |

GRACE SV E MUELLER                          PAGE  01

# EXHIBIT C TO - PROOF OF CLAIM

## GRACE

Grace Specialty Vermiculite
Eric Moeller
833 A Piedmont Ave. NE
Atlanta, GA  30308

Phone/FAX  404.607.9962
Eric.M.Moeller@Grace.com

May 19, 1999

*** Sent Via FAX – Original Mailed ***

To:     Mr. Frank Buonaiuto (Neutocrete)  203-740-8844
        Mr. Anthony Buonaiuto
From:   Eric Moeller

Re:     Grace PreMix Proposal

       Thank you for meeting with me last Friday.  I really enjoyed the meeting, and I am quite excited about the opportunities that you have created with Neutocrete.  This will summarize our meeting comments:

1)  Patented use of light weight concrete for emplacement in crawlspaces under homes (as a retrofit) to reduce moisture, molds, and pests.

2)  Current usage rate is about 500+ bags per week of ThermoRock premixed (1:5.2 volume ratio mix) vermiculite, packaged in a 3 cu ft (50 lb) paper bag, no additives, yields about 6-8 square feet per bag (120 to 150 bags per 1000 sq feet) at thickness of 3".  Current pricing from ThermoRock is $4.70/bag SWAP plus freight, plus additives which must be purchased and added separately.

3)  Currently running one crew, booked through July, adding second crew which will increase usage to 1000+ bags per week.

4)  Current problems noted:  cracking and settling of finished concrete, some inconsistency (soft spots) in finished concrete, debris causing pump jams and increased labor costs.

5)  Currently using a Moyno modified pump with 1 ½" out line.  May not be optimum for pumping distances of 100-150 ft.

6)  Longer term, Neutocrete desires to have private label bags of premixed material, and a long term supply agreement.  Their ultimate goal is to license/franchise other installers for this application, collecting royalties and supplying pumps and premixed product.

       Grace can provide you with both technical service as well as a product that will be superior to the premix that you are using now.  I would propose the following:

1)  Purchase a trial truckload of Grace's ProBase® premixed product (designed for the pool industry, but would work very well in this application).  The mix ratio on this product is 1:4, and the product has all of the additives required (Do Not add any additional additives).  Packaging is in 42 lb paper/poly bags, 60 bags per pallet, 1020 bags per truckload.

GRACE SV E MOELLER                                    PAGE 02

# EXHIBIT C TO - PROOF OF CLAIM - Continued

2) The yield on Grace ProBase® will be 5-6 square feet per bag (about 160 – 200 bags per 1000 square feet of coverage). This is slightly less than you are getting now, but the bag is much smaller (only 1.5 cu ft vs. 3 cu ft for the ThermoRock product). The key to using this product is NOT to overmix it.

3) Grace has capacity at its Enoree, SC facility to easily handle 100,000 bags per year (2+ truckloads per week).

4) I am getting the costs and specifications for a private lable bag. As I mentioned, Grace can pass along some of the economies of scale that we have with Union Camp, our bag manufacturer. I will pass these along once I get them.

5) Longer term, once you have had a chance to test Grace's ProBase, I would like your feedback on whether or not we could change the formulations to reduce costs (perhaps less cement, larger bag (50 lbs vs 42), fewer/more additives depending on installed feedback). Once this information is in we could look at reformulating the product to be optimum for your application. There is no sense in trying different things now, until we know that you are happy with the ProBase® product.

6) Once a final formula is set, I can quote toll manufacturing the product for you in private label bags.

7) The pump manufacturer that produces the light weight concrete pumps (Moyno based) is Strong Manufacturing, Pine Bluff, AR (Mr. Robert Rowland, 800-238-5042). Normally on the larger mixers a 3" line is used, with a 2" line on the smaller models. You can probably use the 1 ½" line without degrading the product if your pump rates are slow (which I would imagine that they are considering where the material is going).

8) Finally, I am exploring a third alternative (vs. using ProBase® or having Grace produce a special premixed private lable product), and that is to team with a local ready mix or concrete company in your area to produce the bagged material for you. Grace can provide the vermiculite and additive package and ship that material in rail cars or bulk trucks (thus eliminating the packaging costs altogether) to the ready-mix folks. They in turn could mix this with cement and package it out for you in bags of your choosing. This reduces the costs of shipping cement across the country, and may be the lowest cost solution for you. Grace has extensive contacts in the cement and ready-mix industry and I will advise you once I have located a company that would be suitable in your area.

9) I have submitted the your Confidentiality Agreement to Grace's attorney's in Cambridge. I will advise when I have a response back from them.

As to pricing for Grace's ProBase® I am not able to discount that product. The reason is that the additive package that Grace uses is expensive, and the price of cement is high (about $6.00/bag in truckload quantities). The price is as I had previously quoted you (i.e. $5.65/bag SWAP, fob, Enoree, SC, current freight rates to your location are $1126.50, which Grace can prepay and add as a service to you). Your material costs would be slightly higher, but your installed costs may be the same or lower because of the following:

1) Grace ProBase® will be more consistent in mixing and finished trowling
2) Grace ProBase® does NOT require any additional additives
3) Grace ProBase® will not have the rocks and strings that are now causing pump failures and downtime. This should reduce labor installation costs and pump maintainance costs.

GRACE SV E MUELLER                              PAGE 03

## <u>EXHIBIT C TO - PROOF OF CLAIM</u> - Continued

4)      Grace ProBase® is produced using domestically produced #3 Zonolite
vermiculite produced from Grace's mines in South Carolina. The slightly larger
particle size will produce even mixes, and extend yields; although to be honest I
believe in the long run that the #4 product may work just as well in your
application.

You can call Robert Sullivan at 800-342-2017 to place your truckload order. Your
account is already set up with Grace, as you know.

I believe that you have an exciting product in an untapped market. Grace Specialty
Vermiculite is looking forward to helping you grow it to its full potential. The sales
representative for your account is: Mr. Brian Colbert, W.R. Grace & Co., 294 Clements Road
W., Ajax, Ontario Canada L1S 3C6 (telephone: 800-263-7500 (x267) or 905-791-2715 (phone
and FAX)). I will continue to work with you to make sure that you have the exact product that
will provide you with optimum product performance at minimum price, but please feel free to
contact Brian should you have any questions or need any assistance if I am unavailable.

Thank you for this opportunity. I will call you tomorrow afternoon to further our
discussions.

Kind Regards,

Eric Moeller
Sales Manager – Grace Specialty Vermiculite

Cc:  Chron/ B Colbert

## EXHIBIT D TO - PROOF OF CLAIM

# GRACE

Specialty Vermiculite

$\nu$  5|14|02

**Grace Construction Products**

W R Grace & Co.-Conn.
62 Whittemore Ave.
Cambridge, MA 02140-1692

Tel (617) 498-4891
Fax (617) 547-7663

May 7, 2002

Mr. Anthony Buonaiuto
Neutocrete
564 Danbury Rd
New Milford, CT  06776

Dear Anthony,

I am sorry that the relationship between Grace and Neutocrete has become so strained.  Grace
has spent a great deal of effort working with Neutocrete and I wanted to summarize some of the
issues and actions that have occurred over the past 16 months since Grace and Neutocrete signed
a long-term supply agreement.   I have broken this down into 2 sections.  One deals with
performance/formulation issues.  The other deals with payment issues.

### Performance/formulation Issues

In early 2001, Grace received complaints from Neutocrete regarding problems with cracking as
well as problems with variations in bag weights for the Neutocrete material.  Also at this time
Neutocrete ran into cash flow problems due to internal partnership issues.  Neutocrete's unpaid
balance began to balloon to over $130,000.

Grace looked into the weight variations, and reworked its packaging machinery to provide a
tighter control on weight variations.  It was at Neutocrete's request that we standardized on 42.5
lbs/bag (plus or minus 0.7 lbs/bag).  We also had several conversations and meeting with
Neutocrete to discuss possible sources for the cracking and how it could be solved.  This
included a day long meeting that I attended and led by John Belevou, where we went through all
the possible causes for the cracking problems.  It was noted that cracking was occuring in 50% of
all jobs at this time.

In early April, Eric Moeller and I spent a day at a job site (Kent, CT) working with your people
on how the Neutocrete was mixed and installed.  What we discovered was that your installers
were added much too much water, up to 7-8 gallons per bag as opposed to the 5.6 gallons per
bag Grace recommends.  The material was also being mixed for up to 5 minutes rather than
maximum recommend mix time of 1-2 minutes.  This was being done to produce a wet, soupy
mix that would pump quickly so that the installers could finish more quickly.

# EXHIBIT D TO - PROOF OF CLAIM - Continued

Once the water addition rate and mix times were corrected to the Grace recommended parameters, and the material that was produced showed significant improvement. It "looked like shaving cream". We also experimented with adding Daraweld C to the mix at various addition rates. We concluded that adding high dosages of Daraweld C produced problems with pumping, but that low addition rates could be pumped easily, and could offer advantages for water resistance and lower dusting. During the Kent, CT trials coverage rates were approximately 8 square feet (3" thick) per bag – which was what Neutocrete expected.

Eric Moeller wrote Neutocrete a letter summarizing the work we did that day, and outlined several recommendations from Grace to help prevent cracking. Neutocrete began implementing two of the recommendations soon after this (controlling the amount of water, and minimizing mixing times). From our observations, controlling the water addition and mix times were the key metrics for consistent mixes with maximum coverage and minimum cracking. Also discussed was Neutocrete's customer expectations, which were not properly established. The Neutocrete product will ALWAYS have some degree of cracking (just as structural concrete when poured monolithically will crack). Neutocrete revised their customer contract to reflect this.

Grace also recommended that Neutocrete discontinue the use of whole plastic sheeting under the installations, adding Daraweld C to improve water resistance and reduce dusting, install expansion joints to control cracking, and go to a larger diameter hose (not the 1½" hose Neutocrete currently uses) to improve pumping. While Neutocrete did trial some Daraweld C, none of these recommendations were acted upon.

After the water rates and mix time changes were made, Neutocrete reported that the cracking problems had improved significantly, and that this was no longer a major issue. Grace was not informed that cracking/repairs continued to be a major issue until early in 2002.
Grace introduced Neuotcrete to Whittemore Perlite, which Grace had subcontracted to toll Neutocrete's product in the New England area. Whittemore recommended to Neutocrete that it try a volumetrically filled bag (over 50 lbs/bag (approx 2 cu ft per bag), priced much higher per bag because of the increased material) and produced some test material (which Neutocrete has not paid for). Based on this one test (which was inconclusive as to water usage and/or cracking), Neutocrete demanded the all bags be filled volumetrically to 2+ cu ft.

Grace uses industry standards to produce batch bags of Neutocrete produced to the formula defined in the Supply Agreement (2 cu feet of vermiculite plus 30 lbs of cement plus air entrainer). During the mixing process the vermiculite can break down volumetrically, however each bag starts out with 2 cu feet of vermiculite per bag and 30 lbs of cement per bag.

In March Neutocrete toured the Grace, Enoree manufacturing operations.   The following observations were made:  1)  Batches of Neutocrete were formulated per the contact (see above), 2)  Breakdown of vermiculite occurs during mixing (and Grace has been working since this meeting to quantitify this breakdown), 3)  A single test bag test formula (2 cu ft (approximately 14 lbs) plus 30 lbs of cement plus air entrainer) run through the mixer yielded a bag that weighed 55 lbs (indicating that material had hung up in the mixer during this one bag trial), 4)  Questions

## <u>EXHIBIT D TO - PROOF OF CLAIM</u> - Continued

raised as to material breakdown and possible segregation within each 28 bag batch through the mixer were noted and are being evaluated by Grace.

On April 1, 2002, Neutocrete decided to no longer use plastic in their installations, and to use Daraweld C in every batch. These were recommendations that Grace had made almost 1 year earlier, that Neutocrete had not acted on until that point. A summary of the cracking repair reports provided by Neutocrete indicated that only about 1/3 of all jobs were now showing cracking (a 40% improvement from the prior year).

On Tuesday, April 30 2002, I went with Frank Buonaiuto to visit 6 installed jobs. Three were old installs, and three were new (no plastic). All 3 of the new installs looked very good. None of them had the hollow sound that was seen when plastic was used. It seems likely that the plastic was probably what was causing most of the major problems. Once a crack started, it would totally compromise the structural integrity of the material. It would be unsupported due to trapped air pockets under the plastic, and any weight being put on it would cause it to crack more.

There will almost certainly be some cracking with the new jobs at some point in the future. It is the nature of concrete to crack, as you know. But, since the Neutocrete is now bonded to the ground beneath with no air gap, I think the cracks will not spread as much, and the problem of popping and breaking apart will be minimal if any.

The 3 old jobs that we looked at all had some cracking. One job was almost 2 years old. There was a lot of material stored in the crawl space, so it was difficult to see what cracking had occurred. Most of what I saw were fine cracks such as you would expect.

We visited the Kent location that was done 1 year ago. Again, there were fine cracks in various areas. As I mentioned on the radio, there was a section in the back where there appeared to be a major crack and some settling. The Neutocrete did sound hollow as plastic was used.
The 3rd old job was done about 6-7 months ago. There were a variety of areas, ranging from a large open area, to small, very tight spaces. In the small spaces, the Neutocrete looked fine. There was definite cracking in the open area, especially under some pipes that had been worked on. Larger cracks were evident, and one completely separated section about 2' on a side was visible under where the pipes were worked on. The customer had not complained (we just stopped in to look), but a lot of work was being done on the house, so it was unclear if the customer had really looked at it yet.

At Neutocrete's request (and Grace's expense) in late April Grace produced 3 pallets of material that were produced and filled one bag at a time (per the formula of 30 lbs cement and 2 cu ft vermiculite) without the mixer or handling system. We ran these over the weekend in order to make sure that we could have them available to ship to your CT location. I think that it is important that these materials are run with careful monitoring of both the water usage and mix times, as well as follow up for cracking in order to see how they perform. I am prepared to come down when these 3 pallets are scheduled to be used so that we can all see how this material acts.

## EXHIBIT D TO - PROOF OF CLAIM - Continued

### Payment issues

Neutocrete stopped paying invoices in early 2001 allowing its account to become delinquent by more that $130,000. Grace continued to supply material to Neutocrete even though the Supply Agreement stipulates that if Neutocrete becomes delinquent in its payments, Grace may withhold shipments until the account is made current. Failure to meet the Terms of payment in the Supply Agreement is also grounds for termination of the Supply Agreement. Grace desired to work with Neutocrete to solve the problems and then get the account current.

Grace worked with Neutocrete to solve its cracking problems, as described above. When Neutocrete implemented some of the changes that Grace recommended, there appeared to be a substantial improvement in performance, and Grace believed that cracking was no longer a major issue.

Grace also gave Neutocrete a $15,000 credit in April 2002 for variations in bag weights up to that time. From that point onward, Neutocrete agreed to pay for orders COD, with periodic large payments to bring its account current. A target date of August 1, 2001 was set. Neutocrete failed to make any substantial headway in reducing its outstanding debt by that date. The target date was moved out to September and then October 1, 2001, but again Neutocrete failed to get its account current.

At that point Grace required that Neutocrete pay $10,000 COD with every delivery. In this way, the overdue balance could be paid off on a regular basis. The checks were to be sent to Grace prior to shipment, and a copy of the check (along with documentation that is sent, was to be faxed to Grace to release the order. Neutocrete agreed to this, and the debt began to be reduced.

From late November through the end of December of 2001, Neutocrete received 6 shipments of material from Grace. For each shipment, Neutocrete faxed a copy of the check (for $10,000) that was cut to pay for the orders, and stated that the checks were being sent. In early January 2002, Grace determined that the checks were not being sent as promised. Some of the checks (which had been FAX'd to Grace with advice that the checks were in the mail) were more than 6 weeks overdue.

At this point, Grace suspended shipments until Neutocrete made payment for the $60,000 that Grace was owed for these shipments. We also put new procedures in place to make sure that would not happen again. We then began shipping material again on a COD basis. When Neutocrete complained that it did not have the cash at that point in time to pay more than cost of the materials being shipped, Grace consented with the understanding that Neutocrete would return to making larger payments as soon as it was able. This continued through April of 2002.

On April 25, Neutocrete met with Grace and presented claims for credit that Neutocrete felt it was owed by Grace. A discussion was held on some of the issues, and Grace agreed to review Neutocrete's claims and reply by April 30. It was agreed at this meeting that claims made by Neutocrete for "lost opportunity" were groundless and both parties agreed to dismiss those claims. Grace stated that the potential credit issue was separate from the issue of Neutocrete's past due balance, and that the two issues should be addressed separately.

## EXHIBIT D TO - PROOF OF CLAIM - Continued

Grace informed Neutocrete that in order to release shipments Grace would require COD payment, plus $10,000 additional payment for each load. Neutocrete complained that they urgently needed material, and could not make the additional payments at that point in time. In a phone call with Joe Spiak, General Manager of Specialty Vermiculite, Neutocrete agreed to pay upfront for the required material, as well as provide payment for a previous load they had not yet paid for. It was made clear that future shipments would require additional payments to reduce the outstanding debt. Neutocrete agreed to this.

During this period, Grace bent over backwards to work with Neutocrete and continue to supply Neutocrete with product. Even though Neutocrete had been using Grace as a bank for more than a year, with an average outstanding balance of over $80,000, Grace continued to work with Neutocrete. Grace did received checks for three loads of material on April 30, and all of the ordered materials were shipped.

Grace received a letter last week stating that Neutocrete had stopped payment on the checks that they had just given to Grace. Given this situation, Grace will not supply any more material to Neutocrete until Neutocrete's account is up to date. A demand letter has been sent to Neutocrete from Grace's Credit Department.

Grace has worked diligently to help resolve Neutocrete's issues – from the start Grace and Neutocrete agreed to work together on this new and exciting application. Working together means that both parties provide some flexibility and cooperation in resolving problems.

Moving forward I am hopeful that we can continue this relationship. I am willing to assist with the testing of the 3 pallets of test material that was sent to Connecticut last week – please advise when this can be scheduled. Grace has offered to supply material to a different formulation (i.e. the Whittemore test material where there is more than 2 cu feet of vermiculite and more than 30 lbs of cement per bag, but at a reasonable price). Grace has also agreed to work with Neutocrete to develop testing procedures to minimize bag variability and variation, but this will take time and there will be a cost. From Grace's standpoint it will require that the current account balance be paid before any additional material can be released. I will contact you to discuss this on Thursday.

Sincerely,

David G. Pickering
Technical Sales Representative

**EXHIBIT B**

**Claim no. 8379**

# WR Grace

## Bankruptcy Form 10

### Index Sheet

SR00000559

| Claim Number: | 00008379 | Receive Date: | 03/28/2003 |

## Multiple Claim Reference

Claim Number: _____

- ☐ MMPOC — Medical Monitoring Claim Form
- ☐ PDPOC — Property Damage
- ☐ NAPO — Non-Asbestos Claim Form
- ☐ Amended

Claim Number: _____

- ☐ MMPOC — Medical Monitoring Claim Form
- ☐ PDPOC — Property Damage
- ☐ NAPO — Non-Asbestos Claim Form
- ☐ Amended

## Attorney Information

Firm Number:                     Firm Name:

Attorney Number:                 Attorney Name:

Zip Code:

Cover Letter Location Number:

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| ☐ TBD | ☐ TBD | ☒ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |

| Other | | |
|---|---|---|
| | ☐ Non-Standard Form | |
| | ☐ Amended | |
| | ☐ Post-Deadline Postmark Date | |

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware | GRACE NON-ASBESTOS PROOF OF CLAIM FORM |
|---|---|

| Name of Debtor:[1] W.R. Grace & Co. - Conn. | Case Number 01-01139 (JKF) | |
|---|---|---|

**NOTE:** Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

Name of Creditor (The person or other entity to whom the Debtor owes money or property):
Neutocrete Systems, Inc. (NSI)

☒ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Name and address where notices should be sent:
Neutocrete Systems, Inc.
564 Danbury Road
New Milford, CT 06776   Attn:   Anthony Buonaiuto

See claims filed by Neutocrete Products, Inc. and FTF Crawlspace Specialists, Inc.

Account or other number by which creditor identifies Debtor:

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated:_____

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:

| 1. **Basis for Claim** | |
|---|---|
| ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) |
| ☐ Services performed | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ Environmental liability | Your SS #:_____ _____ _____ |
| ☐ Money loaned | Unpaid compensation for services performed |
| ☐ Non-asbestos personal injury/wrongful death | from _____ to _____ (date) |
| ☐ Taxes | |

☒☒ Other products liability including damages to reputation and lost opportunity - Pre-petition and post-petition claim

| 2. Date debt was incurred: 9/99 through 5/02 | 3. If court judgment, date obtained: N/A |
|---|---|

4. **Total Amount of Claim at Time Case Filed:** $ 527,498.00   contingent and unliquidated

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. **Classification of Claim.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.)

Brief Description of Collateral:

☐ Real Estate   ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____

Attach evidence of perfection of security interest

☒☒ UNSECURED NONPRIORITY CLAIM

_____ A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a_____).

6. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
None

7. **Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. **Acknowledgement:** Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim itself, enclose a self-addressed envelope and copy of this proof of claim form.

This Space is for Court Use Only

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): | |
|---|---|---|
| 3/21/03 | Neutocrete Systems, Inc. By: [signature]   Its: PRESIDENT | WR Grace   BF.34.133.6607 00008379 SR=559 |

REC'D MAR 2 8 2003

[1] See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtors.

SUMMARY OF

NEUTOCRETE PRODUCTS, INC., ET AL.
Claims Against WR Grace

Listed below are the non-performance claims against WR Grace (herein referred to as Grace) as a supplier of light-weight concrete sold to FTF Crawlspace Specialists, Neutocrete Products, Inc. and Neutocrete Systems, Inc. (herein referred to as NPI).

1.    The Parties.

   a.    Neutocrete products, Inc. (NPI) is a Connecticut corporation which purchased light-weight concrete for emplacement in crawlspaces under homes to reduce moisture, mold and pests.

   b.    FTF Crawlspace Specialists, Inc. (FTF) is a Connecticut corporation which is a related company to NPI in that there are comon shareholders and officers and directors.  FTF is an installer of Neutocrete products in crawlspaces.

   c.    Neutocrete Systems, Inc. (NSI) is a Connecticut corporation which is another related company to NPI in that there are common shareholders, directors and officers.  NSI is an installer of Neutocrete products in crawlspaces.

   d.    NPI purchased products for resale to FTF and NSI.  NPI was never an. installer of the materials.

   e.    Both NSI and FTF have made claims against NPI for damages due to the purchase of defective and/or sub-standard products which NPI purchased from W.R. Grace.  These products caused NSI and FTF to sustain a) loss and damage resulting from lost opportunities, b) loss and damage to its reputation and credibility, and (c) and losses due to the need to repair or replace cracked and/or odoriforous crawlspace seals for all which NPI seeks indemnification.

2.    Contractual Non-Performance Claims.

   Grace did not fulfill the contractual requirements of its long-term supply agreement with NPI dated 12/14/2000 annexed hereto as **Exhibit A** as amended on 11/1/01 or purchase orders by not supplying NPI with the agreed upon quantity of material for over 150,000 bags purchased between September 1999 and May (the exact number will be determined when Grace provides a shipping manifest for each delivery).

a.     NPI and Grace contracted to purchase bags of material to consist of **two cubic feet** of vermiculite, thirty pounds of cement and less than **two ounces of a proprietary additive.** The Long-Term Supply Agreement executed as of December 14, 2000 outlines the material composition per bag. Although this agreement was not executed until December, 2000, it was drafted by Grace in May 1999 and honored (from a purchase price, commitment and material composition standpoint) until some of the legal terms and conditions could be finalized. NPI's contract with Grace called for a volumetric purchase. Grace's manufacturing process was based on pounds and not volume. This was discovered on or about 4/10/02.

b.     An audit of the Grace Enoree, SC plant was conducted on April 10, 2002 by Anthony Buonaiuto, Frank Buonaiuto and John Beliveau of NPI along with key Grace personnel (see April 23, 2002 memo from Anthony Buonaiuto to Grace detailing the audit results **Exhibit B**). The audit revealed that the quantity of material <u>bagged by Grace was approximately 1.5 cubic feet per bag</u> or approximately a 25% material shortage per bag. This conclusion is further supported by;

         i.     Eric Moeller of Grace. His memo on May 19, 1999 page 2 **Exhibit C** explained that Grace's 42 lb. bag can only hold 1.5 cubic feet.

         ii.     Numerous e-mails to Grace in 2001 and photographs of delivered bags that obviously show that the bags are not full.

         iii.     NPI reviewed the material yield on every job installed with Grace's formulation from September 1999 through May 2002. The results are included in this report. On average, 8 sq. ft. per bag (the agreed to target based on the formulation from Grace) was not achieved. In fact, over 70% of the installs in 2002 did not achieve the desired yield.

c.     <u>NPI Claims that Grace owes it an estimated sum of $256,275 or more</u> for under-filling the bags or shorting NPI by an average of 25% (150,000 bags delivered x 25% = 37,500 total bags not delivered x $5.65 per bag = $211,875 for a total of material costs of $256,275).

3.     Grace did not provide a superior product and technical support as promised by Eric Moeller (see Grace Memo dated May 19, 1999) **Exhibit C.**

a.     Grace recommended a water/mix ratio that was based on two cubic feet of vermiculite, 30 pounds of cement and less than 2 ounces of an add mixture. Since we were never able to get this amount of material from Grace's 42 pound bag (1.5 cubic feet - volumetrically, which was never filled to start with). The installer unknowingly added too much water to our material. Therefore, the installer experienced excessive cracking problems. The installers performed 1,058 installs that had material yields

less than the 8 sq. ft. per bag target <u>out of 1,578 total installs by NSI and FTF that were installed with Grace's material. Of those installed jobs, 451 of them required repairs because of a material related issue (cracking). NSI and FTF have charges that they incurred costs in excess of $140,928 related to these repairs</u> (Labor = $77,572, material $6,314 and overhead $57,042).

b.    Based on a root cause repair meeting with Grace, Grace recommended on several occasions that the installers should use Daraweld C as an additive to the mix to reduce cracking.  As per Dave Pickering's recap memo dated May 7, 2002 **Exhibit D**, Grace recommended the use of Daraweld C back in 2001.  NSI started using Daraweld C as its protocol in January 2002.  This use has badly damaged NSI's reputation.  The use of Daraweld C leaves the crawlspace with a cat urine type smell that clients complain constantly about, ruining the Company's references and reputation.  The estimated loss to NSI's and FTF's reputation is $250,000 or more.

4.    NSI and FTF suffered lost opportunity costs as a result of the material shortage and repairs.  Estimates that they lost approximately 295 installing days from repairs.  Its average sale is approximately $5,800 and therefore they have experienced over $1.7 million in lost opportunities.

5.    Summary of damages and losses by party.

| | | | |
|---|---|---|---|
| a. | Shortages of Materials | NPI | $  211,875 |
| b. | Fraud, and violation of Connecticut Unfair Trade Practices Act | NPI | $  300,000 |
| c. | Estimated legal fees based upon CUTPA claim | NPI | $  250,000 |
| d. | Indemnification due to repair costs resulting from material defects | NSI<br>FTF | $    34,998<br>$  105,930 |
| e. | Indemnification due to lost sales opportunity | NSI<br>FTF | $  425,000<br>$1,275,000 |
| f. | Loss of reputation and good will<br>Loss of reputation and good will | NSI<br>FTF | $    67,500<br>$  187,500 |
| | | Total | $2,857,803 |

<u>Brief History between Grace and Neutocrete as it relates to supply agreement</u>

5/19/99
Eric Moeller memo to Buonaiutos - Grace can deliver all NPI's material requirements which includes yield and quality and technical support.  Draft of long term supply agreement provided to NPI from Grace.

August 1999
Grace starts shipping product to NPI, all parties working as if long term supply agreement was in effect.

1/25/00
Grace gives NPI credit for bad batch of material (FOD damage).

3/28/00
Grace provides draft for private labeling of bags.

4/21/00
Grace material leaving a white chalk like substance on the surface.  Grace details what it is in a memo.

7/24/00
WR Grace FOD report

11/30/00
Eric Moeller to NPI; we are all in agreement with LTA

12/14/00
LTA is signed by NPI.

1/15/01
CEDAC (Cause and Effect Diagram with the Addition of Cards) meeting with Grace in New Milford to determine numerous cracks (1 in 3 jobs) in product.  Grace recommends Daraweld C into product, NSI will conduct tests with them.

1/30/01
Dave Pickering - Grace, admits to FOD problem and that the formulation is wrong.

2/14/01
John Beliveau and Frank Buonaiuto of NPI noted to Pickering a weight problem with its bags (inconsistent).

3/14/01
Dave Pickering sends memo to John Beliveau recommending the use of Daraweld C

and admits that 8 sq. ft. per bag should be the correct result based on the Grace formulation.

3/26/01
Pickering to John Beliveau admits that a credit is due to NPI for improper material blending and admits that the bag weights were not the correct desired result. Pickering also re-emphasizes our exactly formulation and water ratio and tells us that Daraweld C is Installer's best option to fix cracking.

3/29/01
Beliveau to Pickering - Fallout rates based on random testing of deliveries showed that 9% of all bags delivered did not meet Grace's weight recommendation.

4/10/01
Graces issues $15,000 credit for under-weight bags.

4/11/01
John Beliveau and Frank Buonaiuto go to Enoree, SC plant (where Neutocrete [the product] was being manufactured) and noted out of date work instructions for the operator bagging the Neutocrete.

4/12/01
NPI (John Beliveau) offers industry expertise with respect to quality control to Grace to help fool proof its bagging operation to ensure it would be getting the correct desired result.

8/15/01
Moeller to Beliveau via e-mail - Admits that the photos we provided of material on pallets (different sizes in pallet height) was because they were filling the bags based on weight rather than on volume but insists the material formulation is correct for NPI's application.

10/5/01
Grace sends new LTA agreement because of Chapter 11 filing, adding to the agreement toll manufacturing and costs (Whittimore)

2/14/02
Another FOD report from Grace

3/12/02
Grace/NPI meeting - volume vs. weight

4/10/02
Beliveau and the Buonaiutos go to Enoree, SC to conduct plant tour again. Audit discloses that each bag only contains 1.5 cubic feet of material per bag based on their manufacturing operation (based on weight, in other words, the bags if filled may be able

to hold up to 2 cubic feet but based on their manufacturing process, weight was the control for filling the bag).

4/23/02
Anthony Buonaiuto sends letter to Grace about the conclusion of the audit and asks for over $491,000 of costs (material shortage, repairs and opportunity).  **Exhibit B**.

4/25/02
Meeting with Grace in Cambridge, Grace said formulation was correct but perhaps a credit was due.

4/26/02
Phone conversation with Grace, Grace says it will determine what is appropriate to resolve these issues.

4/30/02
Grace offers $18,000 to settle material shortage issues

5/2/02
NPI issues stop payment in the amount of $20,141.25 for 3 checks for deliveries because offer from Grace was unrealistic.

5/7/02
Pickering to Anthony Buonaiuto, Grace recaps events and still instructs NPI to use Daraweld C.

## EXHIBIT A TO - PROOF OF CLAIM

# AMENDMENT
# TO
# LONG-TERM PURCHASE AGREEMENT

This Amendment ("Amendment") to the Long-Term Purchase Agreement ("Purchase Agreement"), dated December 14, 2000, by and between W.R. Grace and Co.- Conn., a Connecticut corporation, acting through its Construction Products business unit and having an office at 62 Whittemore Avenue, Cambridge, Masachusetts 02140 ("Grace") and Neutocrete® Products, Inc., a Connecticut corporation, having an office at 564 Danbury Rd., New Milford, CT 06776 ("Neutocrete"), is made by Grace and Neutocrete effective **November 1, 2001.**   In consideration of the premises and covenants contained herein and other good and valuable consideration, the mutual receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  Section 4 of the Purchase Agreement shall be deleted and the following language substituted in lieu thereof:

    "The prices are provided more particularly in **Exhibit A** and are also subject to the additional provisions of this Section 4 .  With respect to Neutocrete® Product delivered outside the New England Region (defined below), the price is F.O.B. Grace's plant in Enoree, South Carolina, and all freight charges and applicable taxes will be paid by Neutocrete; however, Neutocrete in its discretion may direct the mode of transportation to be used by Grace. With respect to Neutocrete® Product delivered inside the New England Region , the price described in Exhibit A shall be a delivered price out of Grace's toll or contract manufacturer, as determined by Grace.   The term "New England Region" shall mean the several states of " New York, Maine, New Hampshire, Vermont, Connecticut, Massachusetts, and Rhode Island, individually and/or collectively."  Notwithstanding the foregoing, Grace may in its discretion, at any time without notice, ship Neutocrete® Product from its plant in Enoree, South Carolina, and the price for any delivery destination shall be F.O.B. the Enoree plant, and the portions of Exhibit A which apply to pricing for deliveries outside of the New England Region shall apply."

2.  Section 14 (ii) of the Agreement shall be deleted and the  following language substituted in lieu thereof:

Neutocrete.LTPurchase Agreement.AmendmentIII.100501 DGP amended

## EXHIBIT A TO - PROOF OF CLAIM - Continued

"Neutocrete becomes insolvent or becomes a party in a bankruptcy or similar proceeding brought against it;"

3. The following language shall be added into Section 15 at the end of such paragraph as a new paragraph:

"Neutocrete acknowledges that Grace filed a voluntary petition for reorganization relief pursuant to Title 11 of the United States Code, 11 U.S.C. 101 et seq.,(as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 2, 2001 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of Bankruptcy Code) as authorized by Sections 1107 and 1108 of the Bankruptcy Code since the Filing Date, and agrees that neither such filing nor any proceeding or order pertaining thereto shall be grounds for termination of this Agreement."

4. The third sentence of the Section of **Exhibit A** entitled "Price" shall be deleted and the following language substituted in lieu thereof:

"With respect to sales of Neutocrete® Product delivered outside of the New England Region, packaged in Neutocrete® bags provided to Grace for filling, the purchase price will be $5.27 per bag, F.O.B. Enoree as more particularly described in Section 4 of the Agreement as amended hereinabove. With respect to sales of Neutocrete® Product delivered within the New England Region, the purchase price will be $6.45 per bag delivered, not including the price of the bag. In each case, prices shall be subject to the price index as defined below."

5. The following language shall be added at the end of paragraph 9(a):

" Notwithstanding the foregoing, Grace in its discretion may subcontract the manufacturing, packaging, and delivery of Neutocrete® Product in accordance with the terms of this Agreement."

6. Except as set forth herein, all terms in this Amendment shall have the same meaning as in the Purchase Agreement. The parties acknowledge and agree that except as specifically provided for herein, all other terms and conditions of the Purchase Agreement shall remain unchanged and are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment

Neutocrete.LTPurchase Agreement.AmendmentIII.100501 DGP amended