# **Exhibit A**

*How Fraud and Abuse in the Asbestos Compensation System Affect Victims, Jobs, the Economy, and the Legal System: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 112th Cong. ---- (testimony of James L. Stengel, Esq., Orrick, Herrington & Sutfliffe LLP), available at http://judiciary.house.gov/hearings/pdf/Stengel%2009092011.pdf.

**WRITTEN STATEMENT OF JAMES L. STENGEL, ESQ.**

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

**51 West 52nd Street**
**New York, New York 10019-6124**
**(212) 506-3775**
**jstengel@orrick.com**

**HEARING ON ASBESTOS LITIGATION FRAUD AND ABUSE**

**HOUSE JUDICIARY COMMITTEE:**
**SUBCOMMITTEE ON THE CONSTITUTION**

**SEPTEMBER 9, 2011**

## WRITTEN STATEMENT OF JAMES L. STENGEL - ASBESTOS BANKRUPTCY TRUST TRANSPARENCY

Chairman Franks, Ranking Member Nadler and members of the subcommittee, today's hearing asks an important question: how fraud and abuse in the asbestos compensation system affects victims, jobs, the economy and the legal system. I intend to specifically address that question in the context of how the operation of the asbestos bankruptcy trusts impacts the tort system, and conclude that, as structured and operated, the absence of transparency as to the actions of the trusts has led to a misallocation of liability to solvent defendants in the tort system, a related risk of double recovery on the part of claimants gaming the system, and created an environment ripe for fraud and abuse. This has, in turn, had a negative impact on solvent defendants and, particularly, current and future asbestos victims.

I am James L. Stengel, Senior Partner for Litigation in the law firm of Orrick, Herrington & Sutcliffe LLP, and a member of the New York Bar. My asbestos-related experience arises from two roles. I served as outside counsel to the Manville Personal Injury Settlement Trust from 1992 to 2001, and have represented defendants in the asbestos civil litigation system since 2001. The views offered here are mine alone and are not those of any other firm, entity or organization.

### Introduction

We are on the threshold of the fifth decade of asbestos personal injury litigation. This has been the largest and longest running mass tort litigation in our history. Asbestos litigation had, as of 2002, processed the claims of almost 750,000 individuals and consumed $49 billion in compensation and expenses.[1] While triggered in the first instance by legitimate claims of injury

---

[1]    Lloyd Dixon & Geoffrey McGovern, *Asbestos Bankruptcy Trusts and Tort Compensation*, at xi (RAND Corporation 2011)[hereinafter RAND 2011 Report].

resulting from exposure to asbestos, the litigation has few admirers, having been variously described as an "Elephantine Mass,"[2] or a "festering wound."[3]  The litigation has resulted in 96 bankruptcies so far.  The process is woefully inefficient, with almost two-thirds of the total expenditures going to lawyers and other expenses.[4]  Historically, it has produced irrational results such as the compensation to the tune of billions of dollars of huge numbers of unimpaired claims.[5]

Over time, the growth in the number of bankruptcies filed by asbestos defendants has had a dramatic impact on the litigation.  This presentation is intended to highlight the serious problems that reside in the intersection of the operation of the personal injury settlement trusts formed out of these bankruptcies and litigation involving active, solvent defendants in the tort system.  These problems are rooted in the history of the asbestos trusts.  Over time, the asbestos trust system has become separated and untethered from the tort system.  That structural change has had profound effects on both solvent defendants and claimants within the respective systems.  The separation of trust and tort system results in the potential for misallocations of fault to current tort system defendants and the attendant overpayment to claimants who are made whole in the tort system and then obtain additional recovery from the trusts.  This opacity and lack of information flow between and among the trusts and the tort system creates fertile ground for fraud and abuse.

Through this presentation I seek consideration of actions that would create more transparency in the business that is the asbestos trust system.  Is there any valid reason to object

---

[2]  Ortiz v. Fibreboard, 527 U.S. 815, 821 (1999).

[3]  *In re* Joint E. & S.D.N.Y. Asbestos Litig., 237 F. Supp.2d 297, 300 (E. & S.D.N.Y. 2002).

[4]  Stephen J. Carroll, et al. *Asbestos Litigation* (RAND Corporation 2005), note 7 at 95 [hereinafter RAND 2005 Report].

[5]  Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation:  The Disconnect Between Scholarship and Reality,* 31 Pepp. L. Rev. 33, 133 (2004).

to greater transparency? No. The tort system, the bankruptcy trusts, plaintiffs (particularly those whose claims will arise in the future) and defendant companies will all benefit by transparency, and the corresponding burdens are minimal.

As noted, a fuller understanding of the importance of the trusts to the asbestos litigation process requires a brief recital of history. Before 1982, there was a single litigation system for the resolution of asbestos claims. Then, as now, a plaintiff or claimant has a single injury related to his or her exposure to asbestos.[6] Prior to 1982, that injury was compensated exclusively, apart from Workmen's Compensation, via the tort system. In 1982, the Johns-Manville Corporation, the largest manufacturer and seller of asbestos-containing products in the world and the holder of a substantial liability share in the asbestos litigation system, declared bankruptcy. The declaration of bankruptcy came largely, if not exclusively, because of the threat of future rather than current asbestos claims – claims that are still being processed in the tort system today. At the time Manville filed for bankruptcy, the anticipated structure to address future claims, that is, claims of individuals who had not as of yet manifested asbestos-related illness, was that the trust created in the bankruptcy, the Johns-Manville Personal Injury Settlement Trust, would stand in the shoes of the Johns-Manville Corporation, the debtor corporation, for all purposes in the tort system. That model proved flawed in that the Johns-Manville Personal Injury Settlement Trust was soon overwhelmed by tort litigation and became insolvent itself shortly after commencing operations.[7] As a result, the Johns-Manville Trust was restructured and what was a purely litigation-oriented process became more explicitly administrative in character. But it is

---

[6] In some cases, plaintiffs will have more than one claim for asbestos, for example, and then a subsequent developing malignancy, but a sole satisfaction rule would apply to either. *See generally In re* Joint E. & S. Dist. Asbestos Litig., 1991 U.S. Dist. LEXIS 7527, 90 (D.N.Y. 1991).

[7] Findley v. Falise (*In re* Joint E. & S. Dists. Asbestos Litig.), 878 F. Supp. 473, 485-86 (E. & S.D.N.Y. 1995).

important to note, the Johns-Manville Personal Injury Settlement Trust was not at that time, or

thereafter, removed from the asbestos litigation system.[8]

Since 1982, there have been successive waves of asbestos-related bankruptcies.  Before

2000 they came with some regularity but typically involved the first line asbestos defendants,

those that were centrally involved in manufacturing the majority of the asbestos-containing

materials which gave rise to asbestos-related health claims.  At the end of the 1990s and in the

early 2000s, waves of new claims emerged; and, as a result of that tsunami of asbestos claims,

other corporations joined Manville in availing themselves of the bankruptcy process to address

their liability for asbestos health claims.  The 90-plus companies that have now reorganized

themselves via the bankruptcy process have availed themselves of a special provision of the

Bankruptcy Code called Section 524(g).  Section 524(g) allows a bankrupt entity to channel its

asbestos liability currently and in the future to a trust if certain conditions are met in the

reorganization.  Over time this has resulted in the creation, by 2010, of 54 asbestos settlement

trusts.[9]  Each trust operates independently and without consideration to what other trusts are

doing, and as the administrative process in the trust has gained prominence, the relationship with

the civil litigation system has become more attenuated.  Following the lead of the Manville

Trust, virtually all of the trusts have similar structures and function in a similar way.[10]  The trusts

create a schedule of payments, by diseases, claimants can elect scheduled value, individual

evaluation or a "quick pay," minimal documentation option.  The "rules of the road" for the

trusts are reflected in "Trust Distribution Processes" ("TDP's") regulated in the bankruptcy

---

[8]    *In re* Joint E. & S.D.N.Y. Asbestos Litig., 237 F. Supp.2d at 303.

[9]    Lloyd Dixon, Geoffrey McGovern & Amy Coombe, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts* 29 (RAND Corporation 2010)[hereinafter RAND 2010 Report].

[10]   Frances E. McGovern, *The Evolution of Asbestos Bankruptcy Trust Distribution Plans*, 62 N.Y.U. Ann. Sur. Am. L. 163 (2006).

process.  However, the structure of the TDPs is largely determined by the involved plaintiffs counsel – once debtors have reached agreement as to the funding requirements necessary to "settle" the tort claims in the aggregate in bankruptcy, they have minimal, if any, interest in how the funds are disbursed.[11]  The dominance of the plaintiffs' bar continues to the subsequent operation of the trusts.  They sit on Claimants Advisory Committees or similar structures and have a powerful voice in the selection of trustees.[12]  They are also actively engaged in soliciting trusts claims.  At the same time, the essentially guaranteed recoveries from the trusts have funded an active "harvesting" of claims.  The fact that plaintiffs' counsel can afford to spend $84.02 per click for "mesothelioma" on Google provides evidence of the money available.[13] Perhaps even more incredibly, there are television advertisements soliciting lung cancer victims to retain lawyers to obtain payment from what are described as "compensation trusts" with more than $30 billion in assets – clearly the asbestos trusts.  The ads counsel that smoking history will not preclude recovery; but, amazingly, despite the fact that these claims are being solicited for assertion against the asbestos trusts, the word asbestos is never mentioned in the solicitations.[14]

        After 2000 with the influx of additional bankruptcies of very substantial corporate defendants, this separation became a larger and larger issue for solvent defendants.  As of 2008, the RAND Corporation estimated that the trusts had assets in excess of $30 billion available to compensate claims.  But as this system of trusts became separate, siloed and opaque, the ability of anyone to ascertain what was happening within the trusts became very limited, particularly as

---

[11]  This is an important distinction between the trusts on one hand and solvent defendants.  What the trusts have available for payment and what they will pay for a particular claim is typically well known.  The "settlement" occurred as part of the bankruptcy process.  What a solvent defendant will pay to resolve a given tort claim, however, is typically confidential.

[12]  *See* RAND 2010 Report, *supra* note 9.

[13]  The seven most expensive keywords on Google relate to asbestos.

[14]  *See, e.g.,* http://www.calldavid.com/janice-McQueen.html.

it related to defendants in the tort system. More specifically, despite the very substantial amounts of compensation flowing from the trusts, it has been difficult, if not impossible, for defendants to obtain information as to evidence of exposure to the products or premises of the bankrupt entities represented by the trusts, information as to what claims had been or in the future would be asserted against the trusts, and the payment that plaintiffs would recover from the trusts. Both plaintiffs and trusts have resisted making this information available.[15]

## The Problems

The specific problems[16] flowing from a lack of transparency in the asbestos bankruptcy trust system are:

1) The civil litigation process cannot accurately assess the responsibilities of <u>all</u> the parties that may be responsible for a given plaintiff's allegedly asbestos-related disease. To the extent that accurate evidence of exposure to the products or premises of bankrupt entities is withheld, fault will be disproportionately allocated to solvent and, at this time, increasingly peripheral defendants. The economic effect of this disproportionate allocation will vary depending upon the nature of the allocation regime, if any, which varies from state to state. But in a system which sees more than $7.0 billion spent per year, this misallocation likely drives a substantial economic

---

[15]    Volkswagen of America, Inc. v. Sup. Ct. of S. F., 43 Cal. Rptr. 3d (Cal. Ct. App. 1st Dist. 2006); Negrepont v. A.C.&S., Inc., No. 120894/01 (NY Sup. Ct., Dec. 11, 2003); In re: Motors Liquidation Co., et al., No. 09-50026, S.D.N.Y. Bkcy).

[16]    The fact that a broad consensus has developed around the issues created by the interaction of trust and tort system is demonstrated by the very similar framing provided by an independent research organization, RAND, in its 2011 report:
       ". . . [B]oth plaintiffs and solvent defendants have a great deal at stake with regard to how trusts enter into the determination of tort awards. At issue is whether a lack of coordination between the trusts and the tort system allows plaintiffs to, in effect, recover once again in the tort system and then again from the trusts. Similarly at issue is whether the payments by solvent defendants are being properly adjusted to account for the compensation available from the trusts. Higher trust payments to current plaintiffs mean fewer trust resources for future plaintiffs, so also of concern is whether a lack of coordination between trusts and the tort system advantages today's plaintiffs relative to future plaintiffs." RAND 2011 Report, supra note 1.

effect.  More asbestos bankruptcies and more baseless economic hits to solvent companies mean more job loss which this country and your constituents can ill afford.

2) The Trusts themselves have either by initial design or by subsequent change in operating policy have become resistant to discovery and disclosure.  When the Manville Trust first opened its doors, it was generally cooperative with those seeking discovery.  That has changed.  More recently created Trusts, which is virtually all of them, have restrictive TDP provisions which preclude or substantially limit trust cooperation with the tort system.

3) In the absence of effective statutes of limitation or other time limitations in the trusts,[17] it is possible, indeed preferable from the plaintiffs' point of view to defer preparation and submission of trust claims until such time as the tort system litigation has been concluded.

4) The trusts themselves are irrationally separate and independent.  The trusts are generally indifferent as to which claims of exposure and causation are being made as to other trusts or solvent defendants.  As a result, there is no mechanism to expose inconsistent or false claiming against the trusts.  This apparent mania for separation has also resulted in the creation of 46 distinct and separate trusts, all performing a similar task with a concomitant, but needless, multiplication of costs.

5) When discovery regarding trust claims and relevant material is sought from plaintiffs, they have attempted to assert a number of legal objections, such as settlement privilege, work product protection or relevance.  These efforts have generally failed,

---

[17] To the extent that there are time limits, they are easily tolled; and, in any event, tort system mesothelioma cases are typically resolved within a time span shorter than the most limited time period.

but they have added substantially to delay and increased costs to defendants in the tort system.[18]

These problems create a number of negative outcomes:

1) Overpayment by solvent defendants because of a disproportionate allocation of fault.

2) A risk of overpayment to plaintiffs because of "double dipping," where a plaintiff receives full value in the tort system and then, subsequently, proceeds to obtain trust compensation.

3) The creation of an environment which is not merely conducive of fraud, but which may actively encourage it.

While the first outcome affects primarily solvent defendants, the latter two impact asbestos claimants as well. And not just current claimants, as virtually all trusts pay only a percentage of claim value, so every dollar which goes to compensate a fraudulent claim is gone for purposes of increasing the percentage payout as well as being unavailable in the future for later manifesting claims.

## The Historical Sources

Perhaps the most significant developments in the recent history of asbestos litigation have been the explosion in claims in the first half of this decade and the simultaneous departure of many of the then leading defendants from the scene via bankruptcy filings. As a result of those filings, the bankrupt entities were, in turn, protected from making any contribution to the compensation of asbestos claimants who were forced to find new funding sources among the population of peripheral defendants. These new defendants, to the extent able, were forced to bear the costs which would otherwise have been attributable to the bankrupts. To be sure, the

---

[18]   *See, e.g.*, Volkswagen of America, Inc. v. Sup. Ct. of S.F., 43 Cal. Rptr. 3d 723 (Cal. Ct. App. 1st Dist. 2006).

trusts formed in prior generations of asbestos bankruptcies were on the scene during this period; but, given the relatively modest payments they are capable of making, their overall economic impact has been modest. The recently formed trusts, together with the trusts created in prior asbestos bankruptcies (*e.g.*, Johns-Manville's Manville Personal Injury Settlement Trust), represent virtually all of the primary asbestos defendants with an historical liability share of more than 95%. By virtue of both products produced (*i.e.*, asbestos-containing thermal insulation) and corporate conduct, these entities were the primary defendants in asbestos personal injury litigation until their bankruptcy facilitated exit.

There is a huge and growing disconnect between responsibility and payment, however, with peripheral defendants – "solvent bystanders" – being forced to bear more and more of the asbestos liability burden, despite tenuous claims of causation or culpability.[19] In the 2000's, as a large number of asbestos defendants disappeared into bankruptcy, minor, peripheral defendants and altogether new defendants were drawn more deeply into the litigation. These peripheral players were named in increasingly large numbers of cases and were forced to pay claims at levels without historical precedent. These defendants understood that they were being forced to bear the share of the missing defendants, those in pending bankruptcy cases, which, because of the bankruptcy stays, could not be brought into court to be assessed their fair share of liability. It was anticipated that this would be a temporary and transitory state of affairs. As these bankruptcy cases were resolved and as new trusts were created with billions in assets available, the burden on the solvent defendants would diminish. The emergence has clearly occurred. In 2008, the trusts, with many of the largest new trusts in process, but not yet operational, disbursed over $3.3 billion.[20] This has not, in the view of the solvent defendants, lead to a concomitant

---

[19]    James L. Stengel, *The Asbestos End-Game*, 62 N.Y.U. Ann. Sur. of Am. L. 223, 236-37.

[20]    RAND 2011 Report, *supra* note 1.

reduction in their payment burden. This phenomenon has been cited as a deciding factor in two recent and substantial bankruptcy judgments: Garlock[21] and Specialty Materials. Plaintiffs began to systematically reduce the numbers of other asbestos exposures they had by neglecting to attribute causation to the companies then in bankruptcy. Id., at ¶ 21.

Not only has it been difficult to impossible for defendants to avoid being forced to absorb liability properly attributed to the bankrupts, it has been difficult to obtain appropriate credit even when payments have been made by the trusts to claimants. However, the economic significance of the asbestos trusts and, hopefully, their role in the asbestos litigation system is in the process of dramatic change. The current generation of asbestos bankruptcies is being resolved with the result that new trusts are being created. Unlike prior generations (*e.g.*, Manville) where the trust's available assets were small compared to their projected liabilities, these trusts will have very substantial assets available.

The value of a mesothelioma claim upon payment of all responsible parties, the so-called "whole claim" value, has been a matter of vigorous debate. In 2005 RAND estimated that this

---

[21]    The position of Garlock and the causal link between the burgeoning asbestos bankruptcy wave and its own filing is outlined in an affidavit of Paul A. Grant, filed in its bankruptcy case. That linkage is described as follows:

1. Before 2000, Garlock successfully defended asbestos litigation, winning the vast majority of jury verdicts in case trials against it. Grant Aff. at ¶ 11.
2. That situation changed materially as a result of the wave of bankruptcy filings of asbestos defendants between 2000 and 2004.
3. The departure of the bankruptcies increased the joint and several liability risks for Garlock at trial and, as a result, diminished its negotiating leverage regarding settlement. Id., at ¶ 19.
4. Plaintiffs began to systematically reduce the numbers of other asbestos exposures they had by neglecting to attribute causation to the companies then in bankruptcy. Id., at ¶ 21. This sea change substantially undermined Garlock's defense which was dependent upon alternative causation arguments. Id., at ¶ 21.
5. At the same time, plaintiff's counsel were already involved in the wave of bankruptcy cases as counsel for many of the same plaintiffs. As Garlock concluded in a recent filing: "This position of the firms and Asbestos Claimant's Committees in the bankruptcy cases was wholly inconsistent with the representations being made to Garlock at the same time in the tort system. The inconsistency raises a strong inference that plaintiff's firms were concealing their clients' exposures to bankruptcies' products in order to inflate the plaintiffs' significant values against Garlock. Brief at ¶ 10.
6. As a consequence, Garlock filed for bankruptcy.

value was in the range of $900,000.[22]  Certain plaintiffs' counsel have opined that the whole-claim value is closer to $6.0 million, a number which appears to exceed average trial verdicts, let alone the substantially more common settled claims.  Bates/White has provided an estimate of $1.3 million, which is broadly consistent with the earlier RAND projection.  The precise number is not critical, however, as the relevant point is that with the substantial amounts currently or soon to be available for the trusts, we are entering a world where a substantial amount of the value of a claim can be satisfied from the trust assets.[23]  There seems to be little dispute that the total assets available from these trusts will be in excess, perhaps substantially, of $30 billion.[24] History has demonstrated that by virtue of a combination of a lack of transparency about these payments, the operation of state contribution and indemnity as well as joint and several liability regimes, and gaming and/or misconduct by plaintiffs' lawyers, it has been difficult or impossible for defendants to obtain and effectively utilize information and receive any of the appropriate credit regarding asbestos bankruptcy trust claims and payments.

Why does this matter?  Isn't the additional funding an unalloyed benefit for both claimants and co-defendants who will no longer be forced to pick up the shares of the absent bankrupts?  The answer to those questions is, "it depends."  If, as appears unfortunately likely at this time because of a lack of transparency and manipulation of claim filing timing, the compensation by the trusts proceeds in a parallel universe not fully integrated with the tort system, distortion, waste and unfairness will continue to be the most accurate descriptors of the system.  The lack of transparency will result in some claimants being overpaid, some finding that

---

[22]  RAND 2005 Report, *supra* note 4.

[23]  Bates/White has determined that a typical mesothelioma claim could obtain as much as $1.3 million from the trusts in operation by early 2009 and that this number could grow to about $2.0 million when the pending trusts go online.  Charles E. Bates, Charles H. Mullin, *The Naming Game*, 24 Mealey's Litigation Report:  Asbestos, 1 (Sept. 2, 2009).

[24]  C. Bates and C. Mullin, *Having Your Tort and Eating It Too*, 6 Mealey's Asbestos Bankruptcy Report 1 (Nov. 2006, #4).

their most appropriate funding sources are inadequate or gone altogether, and a continual shift, in this case unnecessarily, of the funding burden to solvent defendants. However, there is a solution: by merely allowing defendants to know whether there are or will be trust claims and to utilize that evidence in their cases, and conversely, providing the same sort of information to the trustees about claims and payments in the tort system, the entire compensation scheme can be rationalized. The goal is to bring the trust and tort systems together so that claimants can receive 100% of the value of their claims, not 200% or 10% depending upon the luck of the draw. Further, the solution or solutions to this very significant problem imposes minimal burdens on claimants. They need only to make clear their intentions to claim against the trusts and the basis for those claims, things that they would have to do, of necessity, as a predicate to advancing those claims.

Transparency regarding claims of asbestos exposure, the entitlement to payments from bankruptcy trusts and tort system defendants and the amounts of payments actually received will benefit not only defendants in the tort system, but the trusts and those claimants whose access to limited funds would be diminished as a result of double recovery by competing claimants. While the asbestos trusts do not typically have explicit set-off or credit rules which would allow them to reduce their payments to a particular claimant because of the payments the claimant has received in the tort system, they all[25] require proof of exposure to a particular set of products or premises[26] and they all have explicit and implicit prohibitions on fraud with respect to claimant materials.

---

[25] With the possible exception of the Manville Trust.

[26] *See, e.g.,* William P. Shelley, Jacob C. Cohn & Joseph A. Arnold, *The Need for Transparency Between the Tort System and Section 524(g) Asbestos Trusts,* Norton J. Bankr. L. & Practice 257, 262 (2008); McGovern, *Evolution, supra* note 10, at 170.

13

## Limitations on Discovery

Many of the trusts' TDPs or other practices reflect an affirmative effort to limit or preclude disclosure.[27]  For example, the [Babcock and Wilcox] TDP provides:

> 6.5    **Confidentiality of Claimants' Submissions.**  All submissions to the PI Trust by a holder of a PI Trust Claim of a proof of claim form and materials related thereto shall be treated as made in the course of settlement discussions between the holder and the PI Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including but not limited to those directly applicable to settlement discussions.  The PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only in response to a valid subpoena of such materials issued by the Bankruptcy Court.  The PI Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court and before those courts having appellate jurisdiction related thereto.[28]

In addition, even those trusts that have historically been cooperative and willing to provide information, such as the Manville Trust, have reversed course in recent years.[29]

Courts have recognized the propriety of discovery of trust materials over the vociferous objections of the plaintiffs' bar.  In New York, the presiding Court ordered production of claims materials, reasoning:

> [W]hile the proofs of claim are partially settlement documents, they are also presumably accurate statements of the facts concerning asbestos exposure of the plaintiffs.  While they may be filed by the attorneys, the attorneys do stand in the shoes of the plaintiffs and an attorney's statement is an admission under New York law.  Therefore, any factual statements made in the proofs of claim about alleged asbestos exposure of the plaintiff to one of the

---

[27]  Shelley, *supra* note 26.

[28]  The Babcock & Wilcox Company, Asbestos Personal Injury Settlement Trust Distribution Procedures, Exhibit B to Plan of Reorganization, at 47-48.

[29]  Shelley, *supra* note 26, at 276.

bankrupt's products should be made available to the defendants who are still in the case.[30]

## Lax Standards

The trust tort intersection is amenable to manipulation in two ways. First, the trust standards are less than demanding. As one commentator has observed:

> Predictably, when asbestos claimants and their attorneys write their own compensation rules; the results are TDPs containing lax medical and experience criteria that pay claims that would not be compensable in the tort system, such as those brought by asymptomatics who likely will never become sick and those whose claims would otherwise be barred by the statute of limitations. Notably absent from the TDPs is any regimen for obtaining or sharing claims information with other trusts or the defendants in the tort system. Of course, such lowered qualifications for payment and medical scrutiny of claims also invites fraudulent 'double dipping' and other abuses.[31]

Second, without transparency between the two systems incentives are created to take inconsistent or conflicting positions. Abuse of this process and the potential impact on both defendants and bankruptcy trusts was demonstrated starkly in the case: <u>Kananian, et al., v. Lorillard Tobacco Company</u> (Case No. CV 442750, Cuyahoga Cty., Ohio) (January 18, 2007). In that case, the defendant in an asbestos personal injury action sought discovery of the plaintiff's claims against various trusts. After extensive litigation and substantial effort by plaintiffs' counsel to avoid discovery, clear efforts to manipulate claims to recover from the trusts was revealed – all of which was focused on maintaining the ability to proceed against defendants in the tort system without any diminution in claim values. In <u>Kananian</u>, the plaintiff had received substantial recoveries from the Manville and Celotex trusts predicated on exposure to those companies' products. The plaintiff then attempted to either avoid acknowledging that

---

[30]    Negrepont v. A.C.&S., Inc., No. 120894/01 (NY Sup. Ct., Dec. 11, 2003).
[31]    Shelley, *supra* note 26, at 262.

inconvenient fact, or, in the alternative, to modify the claim forms so as to diminish their power

as proof of alternative causation.  No effort was made to inform the trusts of this substantial

modification or to return the funds received.[32]  If, as appears to be the case, the Manville Trust

paid for injuries properly attributed to another defendant based on a claim form which plaintiffs'

own counsel described as being inaccurate and which "were just used to pry money out of a

bankrupt" (Exhibit 1 to Lorillard Tobacco Company's Motion to Dismiss, dated 11/13/06, filed

in Kananian v. Lorillard) and that "[T]he client has accepted monies from entities to which he

was not exposed."  (Id., at Ex. 3), funds were diverted from underfunded trusts and deserving

claimants by fraud.  In Kananian,[33] the defendant Lorillard pressed for discovery of Mr.

Kananian's trust submissions; and his lawyers resisted strenuously, going so far as to urge the

Celotex trust to resist discovery while at the same time asserting cooperation before the Court.

When the trust materials were finally produced, they revealed not only evidence inconsistent

with the plaintiff's positions in the Lorillard case, but that there were clear and material factual

inconsistencies between and among Kananian's claim submissions to various trusts.[34]  For

example, in order to qualify under the different exposure criteria of two of the trusts, Kananian's

lawyers provided mutually exclusive recitals of his military service record.[35]  As an alternative

explanation, they belittled the submissions as "mere" trust filings despite the fact that they had

been made under oath and resulted in compensation.  In the astonishingly modest rebuke that

---

[32]  Kananian v. Lorillard Tobacco Co., No. CV-442750 (Ohio Ct. Com. Pl. Cuyahoga Cty, January 18, 2007)(order) at 5.

[33]  Kananian, at 5.

[34]  Id. at 6.

[35]  Id. at 19-23.

followed, revocation of plaintiff's counsel's right to appear in this case, the Judge later observed: "I never expected to see lawyers lie like this . . . it was lies upon lies upon lies."[36]

That this is not an isolated episode is evidenced by recent events in Baltimore. In Warfield,[37] defendants pursued an aggressive strategy of discovery regarding trust claims, but were forced to engage in motions to compel, despite the fact that prior rulings made it clear that such materials must be produced.[38] At a hearing on the matter, plaintiff's counsel explained that he had been slow in producing the trust materials because he had disagreed with the Court's prior ruling, some two years previously, and went on to complain that in ordering this disclosure the Court had "opened Pandora's Box."[39] When production was finally made, on the literal eve of trial, the reasons for counsel's reluctance to produce the trust materials were made clear. There were substantial and inexplicable discrepancies between the positions taken in Court and the trust claims. Despite specific and explicit requests, plaintiff had failed to disclose nine trust claims that had been made. As revealed in the claim forms, the period of exposure alleged in the litigation versus that alleged in the trust submissions was materially different. In Court, Warfield claimed, under oath, that his asbestos exposure took place exclusively between 1965 and the mid-70s, focusing on the products of the solvent defendants and avoiding the application of a Maryland statutory damage cap that would apply to later exposures. In contrast, the trust claim materials claimed exposure from 1947 to 1991, both different in scope, but also clearly triggering

---

[36]  James F. McCarty, *Judge Becomes National Legal Star, Bars Firm From Court Over Deceit*, Clev. Plain Dealer, Jan. 25, 2007, at B1.

[37]  *See, e.g.,* Warfield v. ACS, Inc., Case No. 24X06000460, Consolidated Case No. 24X09000163, January 11, 2011 Mesothelioma Trial Group (M 112).

[38]  Defendant Union Carbide's Emergency Motion for Sanctions and/or Related Relief and to Shorten Time for Response, filed January 10, 2011, in Warfield, Case No. 24X06000460. *See also* April 14, 2009 transcript of hearing in Smith, Consolidated Case No. 24X08000004, at 65:8 – 77:10 (finding that bankruptcy forms and the information contained therein was "clearly" discoverable and relevant to the case).

[39]  January 11, 2011 transcript of hearing in Warfield, at 66:5 – 109.8.

the damage cap.  Of note, eight of the trust forms had been submitted before Warfield testified in Court.[40]

At nearly the same time, in another Baltimore case, <u>Edwards</u>,[41] the plaintiff had, prior to trial, failed to disclose whether or not he had filed any claims with bankruptcy trusts.[42]  In addition, as trial drew near, plaintiff amended his discovery responses to assert that the <u>only</u> asbestos-containing material to which he had been exposed was that of the only remaining solvent defendant.  However, two weeks prior to trial, plaintiff produced claims materials relating to 16 trusts.[43]  Again, there was a clear inconsistency in the alleged exposure. Significantly, most of the trust forms had been filed in 2008, before the initial discovery responses.

These cases suggest the pressing need for transparency, both in the interests of the solvent defendants and of the trusts themselves.  The lack of transparency creates conditions which make it very difficult if not impossible to discover fraud or inconsistent claiming.  The propensity of the asbestos litigation system to both provide economic incentives for misconduct and a conducive environment for that misconduct is demonstrated by the experience of the screened claims.  As a result of what Professor McGovern has called the "Field of Dreams" effect – if you create a system capable of processing huge numbers of relative low return claims – you will get these claims.[44]  The power of transparency in this context was demonstrated by the actions of Judge Janis Jack in the Silica MDL.  When Judge Jack was successful in finally

---

[40]    *See id.*

[41]    Edwards, Case No. 24X08000351

[42]    Plaintiff's Supplemental and Amended Answers to Defendants' Joint Interrogatories, filed on August 6, 2010, in Edwards.

[43]    Union Carbide's Motion to Compel and related exhibits, filed on November 9, 2011, in Edwards.

[44]    Francis E. McGovern, *The Defensive Use of Federal Class Actions in Mass Torts*, 39 Ariz. L. Rev. 595 (1997).

obtaining the information which made the screening process transparent, she effectively shut that system down.[45]

The ability of Judge Jack to ascertain the level of specious diagnostic and medical evidence which was being advanced to support the Silica claims was a direct function of the discovery she had ordered.[46] That discovery created transparency as to the collected "evidence" and allowed the Court to identify that as to the vast bulk of the proffered medical evidence that ". . . these diagnoses were driven by neither health or justice:  they were manufactured for money."[47] Given that we currently lack that level of transparency as to the interaction of tort and trust and the potential for fraud and abuse, we are forced to rely upon anecdotal evidence.

Transparency will diminish the opportunities for this behavior and enable the trusts and defendants to assess claims based on accurate and reliable exposure information.  This conduct occurred in the context of trusts which pay mere cents on the dollar.  With the potential availability of hundreds of thousands of dollars to a given claimant for from the new trusts, the urge to manipulate will likely prove irresistible.

In contrast, the burden on claimants is non-existent.  All that is sought is information and the ability to utilize that information in a meaningful way to avoid duplicate recoveries.

As a threshold matter, it may seem counter-intuitive that this information is not already available through discovery.  As rational as that supposition might be, it is not the case.  There are several reasons.  First, the trusts' operational documents, which have been negotiated with the same plaintiffs' lawyers who represent the bulk of plaintiffs in the tort system, erect a thicket of claims of privacy and privilege.

---

[45] *In re* Silica Products Liab. Litig., 398 F. Supp.2d 563, 635 (S.D. Tex 2005) (MDL No. 1553).

[46] Lester Brickman, *On the Applicability of the Silica MDL Proceeding to Asbestos Litigation*, 12 Conn. Ins. L. J. 289, 313-14 n.95 (2005-2006); *see generally In re* Silica Products Liab. Litig., 398 F. Supp.2d 563.

[47] *In re* Silica Products Liab. Litig., at 635.

Second, as entities which are to a lesser or greater extent beholden to the plaintiffs' bar, the trusts have little incentive to assist defendants. Third, plaintiffs' counsel actively encourages resistance. In <u>Kananian</u>, while claiming to be fully cooperative with defendant's trust discovery efforts, plaintiffs' counsel had, in fact, instructed one of his assistants to "urge Celotex [the Trust] to resist" discovery and stated in private correspondence that "I would love if Celotex gave these (expletive deleted) a hard time." <u>Kananian</u> at 10. Fourth, discovery is expensive and time-consuming, even in the best of circumstances, and as this recital demonstrates, that is hardly what obtains here. Finally, even if claims have been made and not deferred for tactical reasons, once discovery is obtained, courts may or may not honor the various privilege assertions recited in the TDPs, meaning that the ability to actually use those materials in court may be substantially limited.

Why is the disposition of claims with the trusts at all relevant to a solvent defendant that finds itself in the tort system? For a variety of reasons. First, in certain jurisdictions where fault can be allocated to all responsible parties, it is in the interest of a solvent defendant to be able to identify all trusts whose predecessor corporations have had some share of responsibility for the alleged asbestos-related disease of a given plaintiff. That process of placing an entity on the verdict form, proving shares of liability and having the jury or the judge allocate that liability is of critical importance to assure fairness in the system to assure that no defendant pays more than its fair share of the liability. Second, in many jurisdictions, depending on the regime of joint and several liability, credits for settlements and/or verdicts are available. In that context, the ability to ascertain what monies will be received or have been received from the trusts is directly relevant to what a judgment obligation will be as to a particular defendant who has taken a case to verdict. Third, and perhaps most importantly, even in those jurisdictions where the absence of

an allocation process precludes putting trusts on the verdict form for purposes of allocation, reliable exposure evidence will allow the solvent defendant to attempt to prove alternative liability or alternative causation by the asbestos-containing products of those now bankrupt entities.

What sorts of evidence are relevant here?  Let me dispel one red herring.  Many of the objections to transparency in this context are made in the context of an accusation that the solvent defendants are preoccupied with what the trusts are paying or may pay claimants.  The payment amounts, absent a verdict and molding of that verdict post-verdict, are not relevant nor particularly important to the solvent defendants.  What is important and critically so to the solvent defendants is access to the evidence of alleged exposure to the products or premises of the bankrupt entities.  This information is what is relevant and necessary to reunify the tort and trust systems so that one compensation award in total can be realized by a claimant and the share of every responsible party be fairly derived.

The objections to transparency, leaving aside the false issue of money, of dollar amounts, focus on burden, privacy or the notion that this is information that the defendants can more properly obtain for themselves through discovery.  These objections fail to recognize how claims are actually developed and made in a tort and trust system.  Today an individual who suffers the extraordinarily unhappy fate of being diagnosed with mesothelioma will likely not know against whom or he or she may have a claim or a case.  In fact, one of the primary contributions the plaintiffs' trial bar makes to the asbestos claimant population is they have the intellectual property of knowledge of who may be responsible for a given individual's exposure, given work history, occupation, timing, etc.  That intellectual property is typically developed in consultation between the plaintiff and the law firm.  Where the system runs off the rails in the context of the

separation of trust and tort is that, as claimants will have no knowledge or recollection of which entities as to which they may have claims, the current system allows counsel to selectively refresh recollection on the part of the plaintiffs to focus on solvent defendants. Having done so, particularly in jurisdictions where there are extreme limitations on the amount of time that can be spent in discovery of plaintiffs, it is not realistic to expect that the discovery process on its own will lead to full disclosure of trust claims because what plaintiffs' lawyers will do is assert claims in the tort system, settle or try the case in that venue, and once that is resolved then, and only then, undertake the process of refreshing recollections sufficient for claimants to make claims against the relevant trust. This is possible, of course, because very few, if any, of the trusts have effective statutes of limitation. In terms of burden, there is virtually no additional burden on the plaintiff or claimant. The vast majority of the trusts utilize an electronic filing process, sometimes known as e-filing, the materials to be submitted to each trust are similar with the exception of the exposure allegations, which are particularly relevant to this dispute, but the electronic filings when they are prepared can be easily made available to solvent defendants.

The last objection relates to privacy. Obviously, to the extent an individual has brought suit in the tort system alleging a personal injury they can fairly anticipate that there will be some invasion of their privacy as to their health claims and the source of their alleged illness. There is frankly no basis for a privacy-based claim in this context. Now, to be more specific, a secondary concern for the system and for solvent defendants is to make sure not only that solvent defendants receive credit for trust payments where the relevant state regime allows and receive or obtain full disclosure of any and all exposure evidence relating to trust claims. An additional concern arises in the context of inconsistent claims as between the tort system and the trusts. While it is a material disadvantage for the solvent defendants to be unaware of other exposures

22

relating to the bankrupt entities, it is an even greater concern where there are inconsistent claims of exposure being made as to the trusts. This is not a hypothetical or theoretical risk. Two concrete examples will illustrate this problem.

That raises two issues: first, it creates a potential for misrepresentations and fraud directed to the solvent defendants. To the extent their misrepresentations as to exposure to their products is in aid of recovery, it is obviously against the interests of the system in general. Second, to the extent false claims are being made against the trusts, the trusts are paying money to claimants who are undeserving and as they are for the most part, if not entirely, underfunded and have less by way of assets than they believe they need to pay claimants. By making payments based on fallacious evidentiary submissions, they are reducing the funds available to pay future claimants against those entities.

This leads to another evil of the opacity of the trust process: the trusts stand alone. Each operates in isolation in its own silo. The claims process makes inquiry as to a particular claimant's experience with the product of the predecessor bankrupt entity's operations. The trusts do not communicate; they do not compare notes as to who has made which claims as to what allegations of exposure have been made. Nor do they attend to what allegations are being made in the court system. As a result, the minimal policing of the accuracy of exposure allegations made to the trusts is an isolated or *de minimus* problem. Likely not.

Any assurance or faith in the ability of the trusts to self-police is belied by the experience of the trusts with fallacious or suspect medical evidence for unimpaired claims. As early as 1990, concerns were raised as to the validity of diagnostic conclusions being reached by certain doctors based on the examination of X-rays. In 1995, the trustees of the Manville Trust became sufficiently concerned about the quality of evidence by certain doctors being submitted by

23

certain plaintiffs' law firms that they sought permission to conduct both a medical audit and to disqualify certain claims.  The Manville Trust raised concerns about the quality of the purported medical evidence supporting claims against it.  The efforts of the Trustees to conduct an audit of the medical evidence were largely abandoned in the face of overt judicial hostility.[48] Unfortunately, this may have led to the Manville Trusts' payment of more than $190 million for negligence or mesothelioma claims between 1995 and 2001.[49]  These are huge numbers, and they illustrate the magnitude of the risks of fraudulent or defective claims in the asbestos context.[50] Reflecting a somewhat bitter irony, the trust began rejecting much of this medical "evidence" following Judge Jack's ruling in the Silica MDL.[51]  As a result, finally, the trusts began to reject the medical evidence provided by a number of identified doctors, but that rejection did not begin to occur until 2007 and 2008.  As a consequence, it is likely that hundreds of billions of dollars, if not more, was disbursed based on faulty, indeed outright fraudulent, medical evidence.  That experience underscores the fallacy of relying on the trusts to self-police in the absence of full disclosure.

## Solutions

What would I suggest be done?  Transparency can be achieved through a variety of mechanisms.  As a threshold matter, however, impediments to transparency need to be removed. Some states, such as West Virginia, have implemented case management orders which are an effective first step towards trust transparency.  More effective would be a recognition that this information should be available, with whatever reasonable limitations are imposed, to the

---

[48]    Judge Weinstein's views on this issue are described in Brickman, *On the Theory Class, supra*, at 134-35.

[49]    *Id.*, citing Roger Parloff, *Mass Tort Medicine Men*, The American Lawyer, Jan. 3, 2003 at 98.

[50]    Professor Brickman calculated that the system-wide cost of payment of these specious claims during the same time period as $28.5 billion.

[51]    Brickman, *Silica, supra* note 46, at 313.

litigants in the asbestos tort system, as well as the trusts *inter se*. What we need to achieve is a return to the idea and the reality of a single asbestos-related injury being compensated once and being compensated in a fair proportion by all of the responsible parties, whether they are solvent defendants actively engaged in the tort system or asbestos settlement trusts.