# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing** |
| | ) | **Date:** November 28, 2011, at 9:00 a.m. |
| | ) | **Objection** |
| | ) | **Deadline:** November 4, 2011 |

**MOTION FOR ENTRY OF AN ORDER: (A) APPROVING THE FORM OF ASSET
SALE AGREEMENT; (B) AUTHORIZING BUT NOT REQUIRING THE SALE OF
CERTAIN VERMICULITE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (D)
APPROVING PROCEDURES FOR NOTICING AND DETERMINING CURE
AMOUNTS**

The Debtors request the Court enter an order substantially in the form attached hereto as

Exhibit A (the "Sale Order"):[2]

---

[1] The "Debtors" consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

[2] The facts and circumstances set forth in this Motion are supported by the *Declaration of Robert Whitney in Support of the Debtors' Motion for Entry of an Order: (a) Approving the Form of Asset Sale Agreement; (b) Authorizing But Not Requiring the Sale of Certain Vermiculite Assets Free and Clear of all Liens, Claims,*

- Approving the form of Asset Sale Agreement (the "ASA") attached as Exhibit I to the Sale Order and such other ancillary documents attached thereto or reference therein, whether filed with this Motion or subsequently filed (the "Sale Documents");[3]

- Authorizing the sale of certain assets (the "Sale") of the Debtors' business of mining and processing vermiculite and selling vermiculite products (the "Vermiculite Assets") free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Liens"), other than the Permitted Exceptions (as defined herein);

- Approving procedures (the "Cure Procedures"), including but not limited to the form set forth in the notice of sale attached hereto as Exhibit B (the "Sale Notice"), for noticing and determining cure amounts in connection with the assumption and assignment of certain contracts and leases listed in Exhibit 1 to the Sale Notice (collectively, the "Transferred Contracts");

- Approving the assumption and assignment of the Transferred Contracts pursuant to the terms of the ASA;

- Authorizing the Debtors to: (a) undertake all transactions contemplated by the ASA; (b) enter into the ancillary agreements contemplated by the ASA; and (c) undertake all other actions necessary to consummate the Sale; and

- Providing that the Sale Order shall take immediate effect pursuant to Fed. R. Bankr. P. 6004(h), 6006(d) and otherwise.

In support of this Motion, the Debtors respectfully state as follows:[4]

### JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

---

*Encumbrances and Other Interests; (c) Authorizing the Assumption and Assignment of Executory Contracts; and (D) Approving Procedures for Noticing and Determining Cure Amounts* (the "Whitney Declaration") filed contemporaneously herewith and incorporated herein by reference.

[3]    The Debtors have attached the final, signed, ASA. The Debtors will provide copies of the other relevant Sale Documents upon request.

[4]    Capitalized terms not defined herein shall have the meaning ascribed to them in, as the case may be, the ASA, that certain Asset Sale Agreement between a Canadian affiliate of Purchaser's choosing and Grace Canada, Inc. (the "Canadian ASA"), the Whitney Declaration or the *First Amended Joint Plan of Reorganization in their Chapter 11 Cases,* Docket no. 25881, as it may be further amended, supplemented or otherwise further amended from time to time, and the schedules and exhibits to the foregoing, as they may be in effect from time to time (the "Plan").

2.     The predicates for this Motion are sections 105(a), 363(b), (l) and (m), 365, 503 and 507 of title 11 of the United States Code, 11 USC §§ 101 *et seq.*, (the "Bankruptcy Code"), Fed. R. Bankr. P. 2002, 6004, 6006, 9007 and 9014, and Del. Bankr. L.R. 6004-1:

**BACKGROUND**

### A.     The Vermiculite Business

3.     Grace Specialty Vermiculite (the "Vermiculite Business"), headquartered in Enoree, South Carolina, is a division of W. R. Grace & Co.-Conn. ("Grace" or "Seller"). The Vermiculite Business produces branded high-performance vermiculite ore and expanded vermiculite and perlite products. Vermiculite is a natural occurring mineral used in a broad range of applications, such as spray-on fire protection, lightweight insulating concrete, various soil mixes and amendments, and animal feeds. The Vermiculite Business operates owned and leased mines in and around Enoree. The Vermiculite Business also operates a milling and processing facility in Enoree, and five other processing facilities strategically located across the U.S. and Canada.

4.     Management projects that the Vermiculite Business will achieve sales of approximately $22 million in fiscal year 2011.

### B.     Strategic Rationale for Sale of the Vermiculite Business

5.     In 2009, prior to the involvement of Seale & Associates, Inc., ("Seale") in the sale of the Vermiculite Business, Grace's management team determined in their business judgment that it was in the Debtors' best interests to sell the Vermiculite Business. This decision was based on a number of factors, including the lack of strategic fit between the Vermiculite Business and the Debtors' other business lines. Moreover, its revenues contributed less than 0.7% to the Debtors' 2010 consolidated revenues, and did not contribute measurably to its consolidated EBITDA. In addition, managing the Vermiculite Business was demanding a disproportionate

share of senior management's time and attention. Furthermore, the aging facilities would require significant investment over the coming years to maintain efficiencies. Management therefore had determined that selling the Vermiculite Business would generate greater value to the Debtors' estates, particularly on the terms and conditions of the proposed transactions set forth in the ASA and the Motion, than retaining the business would, while at the same time generating funds that could be put to use in higher-return, core activities.

### C. Seller's Previous Attempts to Market the Business

6. In February 2009, following the decision to market the Vermiculite Business, a Grace management team identified and approached approximately twelve strategic buyers regarding the Vermiculite Business. Seven candidate buyers executed non-disclosure agreements, received management presentations and conducted due diligence. Grace thereafter received four offers. Management declined to move forward with any of the offers, because the proposed consideration in each of the offers did not meet Grace's requirements. Grace subsequently undertook a number of strategic initiatives to improve business performance and profitability.

7. In December 2010, Grace contacted one of the potential strategic buyers that had submitted a bid in 2009. In March 2011, that bidder (the "March Bidder") submitted a non-binding indication of interest for the Vermiculite Business.

### D. The March – July 2011 Marketing Process

8. At about the same time that it received the March Bidder's indication of interest, Grace engaged Seale to assist it in marketing the Vermiculite Business. Seale and Grace: (a) identified and contacted potential acquirers (including certain parties interested during the 2009 process); (b) prepared a Confidential Information Presentation dated June 2011 (the "CIP"); (c)

coordinated the sale process and due diligence; and (d) assisted with the negotiation of the final agreements.

9.    During May and June of 2011, Seale approached 57 potential strategic buyers and 130 potential private equity buyers to determine the level of interest in acquiring the Vermiculite Business. With the assistance of Grace's management team, and based upon Seale's marketing efforts, Seale determined that there were no other viable candidates in the marketplace.

10.    Of the companies contacted by Seale, 6 strategic and 18 private equity candidates responded, and they subsequently signed confidentiality agreements and were furnished with the CIP. Grace subsequently received preliminary offers from two strategic bidders, one of whom later withdrew from the process. The remaining bidder received a management presentation, conducted extensive due diligence and incurred considerable expense in participating in site visits to the Enoree Facility and the outlying expanding plants located across North America.

**E.    Purchaser's Bid Was the Highest and Best Offer for the Vermiculite Business**

11.    On or around July 22, 2011, after performing extensive due diligence, the potential bidder, Vermiculite Acquisition Corp. ("Purchaser") agreed to a detailed term sheet that included a purchase price of $10 million dollars.[5] Purchaser made its bid for strategic purposes. It, or related entities, are in the business of producing and marketing expanded Perlite products across North America, and they are actively seeking to add capacity by acquiring expanding facilities such as those owned and operated by the Vermiculite Business.

12.    In evaluating the bids, Grace considered primarily the dollar amount of the bid, Grace's confidence that the bid would not change materially during negotiations, the bid's

---

[5]    In order to protect confidentiality and sensitive commercial information, the Debtors have redacted the name of the March Bidder. Any party wishing to receive the identity of the March Bidder may do so after entering into confidentiality arrangements in form and substance satisfactory to the Debtors.

required closing conditions, and relative ease of transition of the Vermiculite Business to Purchaser's organization. Grace also considered Purchaser's ability to close on a relatively accelerated timeline, as well as its financial wherewithal and the perceived commitment of its senior management team.

### F. Negotiating the ASA

13.     Seller and Purchaser negotiated the ASA and other Sale Documents at arm's-length and in good faith. Both the Debtors and Purchaser are represented by sophisticated counsel and other advisors. Extensive negotiations were held between the parties involving substantial time and energy by the parties and their professionals, and the Sale Documents reflect give-and-take and compromises by both sides.

### G. Under the Facts and Circumstances, a Private Sale Has Obtained the Highest and Best Offer Available

14.     Purchaser's offer of $10 million on the terms and conditions set forth in the ASA is the highest and best offer received for the Vermiculite Business. It is likewise superior to Grace retaining the Vermiculite Business.

15.     The Debtors submit that, based upon a very thorough marketing process, there are no potential candidate buyers that would be willing to pay a substantial enough premium over Purchaser's offer to make it worthwhile for the Debtors to delay the Sale to Purchaser in order to extend the sale process. Such a premium would be critical, because reopening the sale process to explore any such offer opens up the risk that Purchaser might decide to withdraw from the sale process. Therefore, conducting additional marketing, whether by merely extending the private sale process or by instead conducting a public auction, would offer no discernible additional benefit to the Debtors' estates.

**H.    Assumption and Assignment of Transferred Contracts**

16.    The Sale contemplates the assumption and assignment to Purchaser of the Transferred Contracts, because they are integral to operating the Vermiculite Business.[6] Assuming and assigning the Transferred Contracts also will enhance the value of the Sale to the Debtors' estates by curtailing further administrative liability to the estate and eliminating certain rejection claims. The estimated cure payments associated with all of the Transferred Contracts totals $0.

17.    As discussed in the Whitney Declaration, to the extent necessary, Purchaser is able and willing, at the Sale Hearing, to demonstrate to the satisfaction of this Court that adequate assurance of future performance is present.

**I.    Summary of the Terms and Conditions of the ASA**

18.    Seller's obligations under the ASA are subject to this Court's entry of the Sale Order in a form reasonably satisfactory to the Debtors and Purchaser. The Debtors propose to sell the Vermiculite Business to Purchaser on the following terms and conditions as they are set forth in the ASA:[7]

| Term | Relevant ASA Section (§) | Description |
|------|--------------------------|-------------|
| **Seller** | preamble | Grace |
| **Purchaser** | preamble | Vermiculite Acquisition Corp. |
| **Sale of Business** | 2.01 | Transfer of Seller's right, title and interest in and to the Transferred Assets to Purchaser or its designee(s), free and clear of all Liens and imperfections in title (except certain Permitted Exceptions). |

---

[6]    The Transferred Contracts are listed in <u>Exhibit I</u> to the Sale Notice.

[7]    Capitalized terms used in this summary of terms of the ASA and not otherwise defined in this Motion shall have the meanings ascribed to them in the ASA. To the extent of any inconsistency between this summary and the ASA, the ASA's terms and conditions shall govern.

| Term | Relevant ASA Section (§) | Description |
|---|---|---|
| **Consideration** | 2.02 | USD 10,000,000, plus the excess of the Closing I&R Amount over USD 5,414,000, or minus the excess of USD 5,414,000 over the Closing I&R Amount.<br><br>A portion of the Consideration will be allocated to the Canadian Transferred Assets (as that term is defined in the Canadian ASA).[8] |
| **Transferred Assets** | 5.08 | Seller's right, title and interest in and to the assets, properties and rights pertaining directly and exclusively to the conduct of Seller's business of mining, milling, expanding, manufacture, and/or sale of vermiculite, vermiculite concentrate, perlite, and specialty vermiculite products |
| **Excluded Assets** | 1.01 | Seller's right, title and interest in (1) cash; (2) refunds of Taxes, (3) amounts receivable; (4) Insurance, claims with respect to Insurance, and refunds of amounts previously paid or prepaid on account of Insurance; (5) employee benefit plans and funds; (6) certain third-party proprietary information; (7) records to the extent relating to any of the Excluded Assets or the Excluded Liabilities, (8), the names "Grace" and "Davison"; (9) real property of, and all other property located at, the Ajax Facility; (10) bonds and letters of credit; (11) assets of the SCC Business, (12) assets of the fireproofing laboratory currently located at the South Carolina Real Property, (13) Seller's Pompano Beach Assets; and (14) any other assets listed on Exhibit 1.02A. |
| **Transferred Contracts** | 5.11 | Rights under the Vermiculite Leases and the other Subject Business Contracts, including contracts listed in Exhibit D to this Motion and Schedule 1.02E to the ASA. |
| **Transferred Liabilities** | 1.01 | (i) Obligations arising under the Transferred Contracts; (ii) Reclamation Obligations; (iii) Retention Pond liabilities and obligations; (iv) any other liabilities listed in Schedule 4.02 to the ASA; and (iv) certain vacation pay obligations. |
| **Excluded Liabilities** | 1.01 | Seller's liabilities and obligations relating to the Transferred Assets other than the Transferred Liabilities, including but not limited to certain: (i) income, payroll and similar taxes arising prior to Closing; (ii) Seller intercompany payables; (iii) Insurance obligations; (iv) employee benefit plans and funds; (v) accounts payable; (vi) product liability and warranty claims for products sold prior to Closing; (vii) Plan Claims; (viii) any liability for Seller's violation prior to the Closing of any law, governmental rule or order, including but not limited to any violation of Environmental Law; (ix) Workers Compensation claims for periods prior to Closing; and (x) liability or environmental remediation required by applicable law of any condition existing as of the Closing and arising out of the operations of the Subject Business at the Subject Real Property. |

---

[8]  Grace Canada, Inc., is a wholly-owned non-debtor subsidiary of Grace. The Canadian ASA pertains only to the Canadian Transferred Assets, which are not assets of the Debtors' estates. The Canadian ASA is subject to the laws of Canada and the relevant political subdivisions thereof. The Debtors are not requesting the Court's authority to enter into the Canadian ASA, as it will be Grace Canada, Inc., that is the seller, and not Grace or another Debtor.

| Term | Relevant ASA Section (§) | Description |
|---|---|---|
| Permitted Exceptions | Preamble | Includes certain Liens for current Taxes, assessments or other claims by a Governmental Authority, zoning, subdivision, building code, entitlement and other land use, construction and Environmental Laws by a Governmental Authority, certain easements, rights-of-way, licenses, utility agreements, restrictions, and other similar encumbrances of record, and certain other non-material exceptions. |
| Employee Matters | 12 | Purchaser will offer employment to employees listed in Schedule 12.01 to the ASA. Those who accept offers of employment will become Purchaser's employees on the Closing Date. |
| Scheduled Closing Date | 3.01 | Tenth Business Day after the date on which the conditions to Closing have been met or waived. |
| Closing Conditions | 10 & 11 | Sale Order shall have become final and non-appealable. |
| Termination of ASA | 13 | <ul><li>Prior to Closing by written agreement of Seller and Buyer;</li><li>After 180 days after the ASA's date upon written notice of one party to the other;</li><li>By either Seller or Purchaser upon the other's inability to meet its respective closing conditions.</li></ul> |
| Seller's Indemnification | 14.02(a) | Seller shall indemnify Purchaser against any Damages to the Purchaser Group that are caused by or arise out of (i) the breach of or failure of Seller to perform and fulfill any provision or agreement to be performed or fulfilled by it under this ASA or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of such Seller set forth in Article 5 of the ASA, or (iii) any of the Excluded Liabilities or Excluded Assets. |
| Dispute Resolution | 4.06 | If Purchaser objects to the Closing I&R Amount and if the Parties cannot agree, then determination of the Closing I&R Amount shall be subject to arbitration. |

## RELIEF REQUESTED

19.    By this Motion, the Debtors request the Court enter the Sale Order pursuant to sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code:

- Approving the form of the ASA and all other Sale Documents;

- Authorizing the Sale of the Vermiculite Assets free and clear of all Liens (other than the Permitted Exceptions);

- Approving the Cure Procedures (including but not limited to the form set forth in the Sale Notice,), for noticing and determining cure amounts in connection with the assumption and assignment of the Transferred Contracts;

- Approving the assumption and assignment of the Transferred Contracts pursuant to the terms of the ASA;

- Authorizing the Debtors to: (a) undertake all transactions contemplated by the ASA; (b) enter into the ancillary agreements contemplated by the ASA; and (c) undertake all other actions necessary to consummate the Sale; and

- Providing that the Sale Order shall take immediate effect pursuant to Fed. R. Bankr. P. 6004(h), 6006(d) and otherwise.

## ANALYSIS

A.  **Section 363 Permits the Debtors to sell the Vermiculite Business Outside the Ordinary Course of Business**

20.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts in this jurisdiction may approve such use of estate property outside the ordinary course of business if the debtor establishes that:

> (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) buyer has acted in good faith.

*In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, 7-8 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test'."); *Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("a debtor's decision must be supported by an articulated business justification"); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)).

21. Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992). A party-in-interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." *Montgomery Ward*, 242 B.R. at 155.

**B.      The Sale of the Vermiculite Business Should Be Approved Because it Has a Valid Business Purpose and Is a Proper Exercise of the Debtors' Business Judgment**

22. As set forth in the Whitney Declaration, the Sale of the Vermiculite Business is in the Debtors' best interests, as well as those of their estates and other parties-in-interest in these chapter 11 cases. The Debtors properly exercised their business judgment, and they have a sound business purpose, in their determination to sell the Vermiculite Business in order to maximize its value and to free up cash and other resources for other uses. In addition, the lack of strategic fit and the disproportionate amount of management time and energy devoted to this business further adds to the rationale for selling it.

**C.      Section 363(f) Permits the Debtors to Sell the Transferred Assets Free and Clear of Liens, Encumbrances**

23. The Debtors submit that it is appropriate to sell the Transferred Assets free and clear of Liens (except the Permitted Exceptions) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Transferred Assets to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property of an entity other than the estate if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

24.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "(t)he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of (the Bankruptcy Code)." 11 U.S.C. § 105(a).

25.     Section 363(f) is drafted in the disjunctive, which means that satisfaction of any one of its five requirements will suffice to permit the sale of the Transferred Assets "free and clear" of liens and interests. *See, e.g., In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of them interest concerned may occur if anyone of the conditions of § 363(f) have been met."); *In re Elliott*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

26.     Section 2.01 of the ASA provides in relevant part that Seller is selling the Transferred Assets "free and clear of all Liens and imperfections in title (except Permitted Exceptions)." Section 5.08(c) provides in relevant part that, "[e]xcept as otherwise specified in Schedule 5.08(c), the Transferred Assets are not subject to any Lien or imperfection in title except Permitted Exceptions." In other words, Purchaser will be acquiring the Transferred Assets subject only to the Permitted Exceptions. To the best of the debtors' knowledge, there are

no other liens or interests in favor of third parties in the Transferred Assets. Therefore, to the extent that the Transferred Assets are not encumbered by Permitted Exceptions, there are no interests that would implicate section 363(f).

27.     In any case, the Debtors submit that one or more of the tests of section 363(f) are satisfied with respect to the sale of the Transferred Assets pursuant to the ASA.     In particular, the Debtors submit that at least section 363(f)(2) will be met in connection the ASA's proposed transactions, because each of the parties (to the extent that any such parties exist) holding liens or other encumbrances (other than the Permitted Exceptions) on the Transferred Assets will consent, or absent any objection to this Motion, will be deemed to have consented, to the Sale.

28.     Moreover, any such lienholder also will be adequately protected by having its Liens, if any, in each instance against the Debtors or their estates, attach to the cash proceeds of the Sale ultimately attributable to the Transferred Assets in which any such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that any such creditor's liens had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Transferred Assets free and clear of any Liens (other than the Permitted Exceptions).

### D.     Transferred Assets and Transferred Contracts Should Be Sold Free and Clear of Successor Liability

29.     Neither section 363(f) nor any other provision of the Bankruptcy Code defines the term "any interest." *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Court of Appeals for the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit stated that while some courts have "narrowly interpreted that phrase

to mean only *in rem* interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 COLLIER ON BANKRUPTCY ¶ 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger, supra,* the scope of section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger* stated that *Leckie* held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

30.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from any successor liability resulting from pre-existing claims. *See In re Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007) (collecting cases). There are four exceptions to that general rule: (1) Purchaser explicitly or implicitly agrees to assume liability; (2) the transaction amounts to a de facto merger or consolidation; (3) the purchasing corporation is merely a continuation of the seller; or (4) the parties negotiated the transaction fraudulently to escape the liability. *Ninth Ave. Remedial Group*, 195 B.R. at 722 (internal citations omitted). These four exceptions describe corporate reorganizations that ultimately leave the real ownership unchanged. *Ninth Ave. Remedial Group*, 195 B.R. at 722 (internal citation omitted).

31.     None of those four exceptions apply here, because the Sale will result in a change of ownership of the Transferred Assets. First, Purchaser is not assuming any liabilities other than certain Transferred Liabilities. All other liabilities (defined in the ASA as "Excluded Liabilities") remain with Seller. The ASA provides that Seller will indemnify Purchaser for any

Damages (as that term is defined in the ASA) incurred as a result of any of the Excluded Liabilities (within certain limits). The term "any interests" clearly encompasses all of the liabilities encompassed by the ASA's defined term of "Excluded Liabilities", including but not limited to successor liability claims.

32.     Second, the transactions contemplated by the ASA expressly provide for a sale of assets. There are no facts that would even begin to hit at a de facto merger or consolidation. There is no sale of a legal entity. Moreover, these assets comprise only a tiny fraction of Grace's businesses.

33.     Third, Purchaser and Grace are entirely separate and unaffiliated corporations. Additionally, Purchaser is a longstanding business. Purchaser and Grace (and its publicly traded Debtor parent, W. R. Grace & Co. (NYSE: GRA) ("Grace Parent")) also do not have any officers or directors in common with Purchaser. Moreover, Purchaser is not an insider of the Debtors. *See* 11 U.S.C. § 101(30). Thus, Purchaser cannot be characterized as a "mere continuation of" Seller.

34.     Fourth, the transactions contemplated by the ASA have been negotiated at arms-length and in good faith. In addition, as set forth in the Whitney Declaration, no other person or entity (or persons or entities) has offered to enter into an agreement or series of agreements as favorable to the Debtors as the Sale Documents. If the Court were not to authorize the Sale or to approve the Sale Documents, Grace's management would be forced to evaluate options regarding the future of the Vermiculite Business that are not as attractive as the current offer. For obvious reasons, the very purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a buyer arising from a seller's pre-sale conduct.

35.     Furthermore, the Debtors are providing notice of the proposed sale to all known parties-in-interest that may assert claims or interests relating to the Transferred Assets against the Debtors, including, but not limited to, Transferred Contract counterparties, lenders, taxing and other relevant governmental authorities, as well as other parties known to the Debtors to be asserting claims of any kind relating to the Transferred Assets.

36.     For all of the foregoing reasons, the Sale Order should state that Purchaser is not liable as a successor under any theory of successor liability for any Excluded Liabilities (which comprise all liabilities other than the Transferred Liabilities and Permitted Exceptions). *Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764 at *262-67.

### E.     Purchaser Is a Good Faith Purchaser Entitled to the Full Protection of Section 363(m), and the Contemplated Sale Does not Violate Section 363(n)

37.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit has held that:

> (t)he requirement that a buyer act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a buyer's good faith status at a judicial sale involves fraud, collusion between the Proposed Purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted).

38.     At all times, Purchaser has acted in good faith under the *Abbotts Dairy* standards. In addition to a fair and reasonable value offered by Purchaser, the Sale has been intensely

negotiated by two sophisticated business entities, both of which are represented by sophisticated counsel and other advisors, with significant "give and take" and significant time and energies expended by both sides. The Debtors bargained for the maximum possible purchase price for the Vermiculite Business, among other points. In addition, Purchaser is not an "insider" of any of the Debtors, as that term is defined in Bankruptcy Code section 101(31), nor is there any indication whatsoever of fraud.

39.     The Sale ASA also does not constitute an avoidable transaction pursuant to section 363(n). Accordingly, the Debtors request that the Court make a finding at the hearing that Purchaser is entitled to the full protections of Bankruptcy Code section 363(m).

**F.      Section 365 Authorizes the Assumption and Assignment of the Transferred Contracts**

40.     The Sale contemplates the assumption and assignment to Purchaser of the Transferred Contracts listed in Exhibit 1 to the Sale Notice. The Debtors' assumption of the Transferred Contracts and the assignment thereof to Purchaser will generally curtail the Debtors' liability on such contracts on and after the Closing Date. The Debtors are requesting the Court's approval of the proposed assumptions and assignments out an abundance of caution, because most, if not all of the Transferred Contracts were entered into post-petition. Moreover, the Debtors' books and records indicate that they are current on all outstanding obligations under the Transferred Contracts. Exhibit I to the Sale Notice therefore lists a proposed Cure Amount of $0 for each of the Transferred Contracts.

41.     The Debtors request the Court provide for the assumption and assignment of the Transferred Contracts pursuant to section 363(f), notwithstanding any provisions in the Transferred Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

42. Section 365(f)(2) provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if -
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

43. Section 365(a) states that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 US.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ....;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

44. Courts apply the "business judgment" test to determine whether to approve the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a). The "business judgment" test requires a debtor to determine whether the requested assumption or rejection would be beneficial to its estate. *See, e.g., In re Group of Institutional Investors, Inc. v.*

*Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

45.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Paolo Gucci*, 193 B.R. 411, 414 (S.D.N.Y. 1996); *see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enter., Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment-a standard which we have concluded many times is not difficult to meet").

46.     The proposed assumption and assignment of the Transferred Contracts meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Sale Documents will provide significant benefits to the Debtors' estates.  Indeed, the Debtors would be unable to reap the benefits of the transactions contemplated by the ASA without the assumption and assignment of the Transferred Contracts, because it is a critical component of the proposed Sale, and Purchaser would not close without there being such an assumption and assignment.  Therefore, the proposed assumption and assignment of the Transferred Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

47.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Arran (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Significantly though, courts have consistently held that, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., Bygaph, Inc.*, 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

48.     Purchaser has sufficient assets to continue performance under the Transferred Contracts from and after the Closing Date.  To the extent necessary, Purchaser is able and willing, at the Sale Hearing or earlier to a party upon request, to demonstrate to the satisfaction of this Court that adequate assurance of future performance is present.  Although Purchaser's name has been kept confidential, the Debtors will share Purchaser's identity and other data relevant to the provision of adequate assurance of future financial performance to counterparties to Transferred Contracts upon request prior to the objection deadline and execution by any such counterparties of a non-disclosure agreement satisfactory to the Debtors.  Accordingly, the

Debtors submit that the assumption and assignment of the Transferred Contracts as set forth herein should be approved.

49.  To assist in the assumption, assignment and sale of the Transferred Contracts, the Debtors also request that the Sale Order provide that anti-assignment provisions (if any) in the Transferred Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Transferred Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

50.  Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> (N)otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

51.  Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jameswav Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly

barring assignment by debtor; any lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

52.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions"). Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Transferred Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

### G.     Fed. R. Bankr. P. 6004(f)(1) Authorizes a Private Sale of the Transferred Assets

53.     Fed. R. Bankr. P. 6004(f)(1) provides that "(a)ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). Courts often allow chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b). *See, e.g., Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor);

*In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets when the applicable section 363(b) standards were met); *In re Embrace Systems Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a Bankruptcy court in determining whether a private sale should be approved. The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. IL. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

54.    The Debtors submit that proceeding with the private sale of the Vermiculite Business to Purchaser will avoid unnecessary cost, delay and additional risk (particularly of Purchaser's withdrawal from the sale process) associated with conducting a public auction now, after having gone through an exhaustive private marketing and sale process. Moreover, the Debtors submit that conducting a public auction now would not yield any discernible additional benefit to their estates that would offset such unnecessary cost, delay and risk. As a result, the Debtors submit that Purchaser's offer is the highest and best that the Debtors have received, and constitutes fair market value, given the limited market for the Vermiculite Business. The Debtors therefore request this Court approve the proposed private sale of the Vermiculite Business to Purchaser in accordance with the ASA and the other Sale Documents.

**H.    Notice of the Proposed Sale Satisfies the Requirements of Fed. R. Bankr. P. 2002**

55.    Notice of this Motion has been given to: (i) the office of the United States Trustee; (ii) counsel to the L/C Facility Agent and L/C Issuers; (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (iv) counsel to each of the official committees appointed in these Chapter 11 Cases; (v) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (vi) those parties that requested

service and notice of papers in accordance with Fed. R. Bankr. P. 2002; (vii) counterparties to the Transferred Contracts; (viii) Purchaser; (ix) all persons or entities known or reasonably believed to have asserted a Lien in any of the Transferred Assets; (x) federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Motion; (xi) all persons and entities reasonably known to have expressed an interest in acquiring the Vermiculite Business; (xii) the United States Attorneys for the Districts of Delaware, Massachusetts, Maryland, the Southern District of Florida, Arizona and South Carolina; (xiii) the state attorneys general for the states of South Carolina, Florida, Maryland, Massachusetts, Delaware and Arizona; (xiv) the state environmental protection agencies for the states of South Carolina, Florida, Massachusetts and Arizona; (xv) the provincial attorneys general for the Canadian provinces of Alberta, Manitoba and Ontario; (xvi) the provincial environmental protection agencies for the Canadian provinces of Alberta, Manitoba and Ontario; (xvii) the United States Environmental Protection Agency; and (xviii) Environment Canada and the Canadian Environmental Assessment Agency (collectively, the "Notice Parties"). In light of the nature of the relief requested, the Debtors submit that no further notice is required, whether pursuant to Fed. R. Bankr. P. 6004(a), Fed. R. Bankr. P. 2002, Bankruptcy Code section 363(b)(2) or otherwise:

- *Section 363 Notice Requirements*:

56.     Bankruptcy Code section 363 provides that a trustee may sell property "after notice and hearing." Section 102(1) defines the phrase "after notice and hearing" to mean "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, by service of this Motion, all interested parties have been provided notice of the salient details regarding this Motion and the Sale Hearing. Accordingly, notice is sufficient under section 363.

- *Fed. R. Bankr. P. 2002 Notice Requirements:*

57.     Fed. R. Bankr. P. 2002 requires twenty days' notice of proposed sales of property other than in the ordinary course of business. In addition, Fed. R. Bankr. P. 2002 provides that, as to sales, notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. Del. Bankr. L.R. 2002-1(b) specifies the parties on whom a Motion for a sale other than in the ordinary course of business must be served in cases pending before this Court.

58.     The Debtors submit that this Motion and the Sale Notice contain the requisite information to reasonably notify parties-in-interest in satisfaction of the foregoing rules and requirements. The Debtors are providing approximately 35 days' notice of the Sale, and the Motion and Sale Notice contain all required information regarding the hearing and objection deadline.

- *Fed. R. Bankr. P. 6004 and Fed. R. Bankr. P. 6006:*

59.     Fed. R. Bankr. P. 6004 requires that notices of sales of property out of the ordinary course of business comply with Fed. R. Bankr. P. 2002. As set forth above, the Debtor has complied with Fed. R. Bankr. P. 2002.

60.     Fed. R. Bankr. P. 6006 requires notice of a motion to assume or assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties-in-interest as this Court may direct. This requirement is satisfied, because the Debtors will serve the list of Transferred Contracts, including the Cure Amounts and notice of the Motion, on counterparties to the Transferred Contracts.

- *Procedural Due Process:*

61.     The notice of this Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to

object. *See Mullane v. Central Hanover Ban & Trust Co.*, 339 U.S. 306, 314 (1950). Parties-in-interest have been or will be and should be found to have been afforded adequate notice of this Motion and the Sale Hearing. The Debtor submits that the notice that they have provided of this Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

**I.     Relief Under Fed. R. Bankr. P. 6004(h) & 6006(d)**

62.     Fed. R. Bankr. P. 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Sale Documents be effective immediately by providing that the 10-day stay under Fed. R. Bankr. P. 6004(h) is waived.

63.     The purpose of Fed. R. Bankr. P. 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Fed. R. Bankr. P. 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, COLLIER suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10-6004 COLLIER ON BANKRUPTCY ¶ 6004.11 (2011). COLLIER also states that if an objection is filed and overruled and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

64.     To preserve the value of the Vermiculite Business by bringing certainty to the sale process, the Debtors seeks to close the Sale as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby requests that the Court waive the 10-day stay period under Fed. R. Bankr. P. 6004(h) and 6006(d) or, in the alternative, if an objection to

the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the Sale to close.

## NO PREVIOUS MOTION

65.     No previous motion for the relief sought herein has been made to this or any other court.

**[remainder of this page is intentionally left blank]**

WHEREFORE, the Debtors respectfully request the Court enter the Sale Order granting the

relief requested in this Motion and granting such other relief as may be appropriate.

Dated: October 17, 2011

KIRKLAND & ELLIS LLP
Adam Paul
John Donley
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

and

BAER HIGGINS FRUCHTMAN LLC
Janet S. Baer
Roger J. Higgins
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4047

and

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
(302) 652-4400

Co-Counsel for the Debtors and Debtors-in-Possession