## EXHIBIT I

## Vermiculite Asset Sale Agreement

# VERMICULITE ASSET SALE AGREEMENT

October 17, 2011

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **ARTICLE 1** | **Definitions** | 1 |
| 1.01 | General | 1 |
| 1.02 | Defined Terms | 2 |
| **ARTICLE 2** | **Sale of Subject Business, Purchase Price** | 14 |
| 2.01 | Sale of Business | 14 |
| 2.02 | Purchase Price | 15 |
| 2.03 | Purchase Price Allocation | 15 |
| **ARTICLE 3** | **Closing** | 15 |
| 3.01 | Scheduled Closing Date | 15 |
| 3.02 | Time and Place of Closing, Simultaneity | 16 |
| 3.03 | Transfers at the Closing; Payments | 16 |
| 3.04 | Ancillary Agreements | 17 |
| 3.06 | Closing Prorations | 18 |
| 3.07 | Seller Reclamation Payments | 19 |
| 3.08 | Further Assurances | 19 |
| **ARTICLE 4** | **Purchase Price, Post-Closing Adjustments** | 20 |
| 4.01 | Closing of Books | 20 |
| 4.02 | Closing I&R Amount | 20 |
| 4.03 | Computations | 20 |
| 4.04 | Closing Statement | 20 |
| 4.05 | Acceptance | 21 |
| 4.06 | Non-Acceptance, Resolution of Disputes | 21 |
| 4.07 | Payment of Adjustments | 22 |
| **ARTICLE 5** | **Seller's Representations and Warranties** | 23 |
| 5.01 | Corporate Organization and Existence | 23 |
| 5.02 | Corporate Power | 23 |
| 5.03 | Authorization; Consents | 24 |
| 5.04 | Execution and Delivery | 24 |
| 5.05 | No Conflict | 25 |
| 5.06 | Financial Statements; Subsequent Events | 25 |
| 5.07 | Tax Matters | 26 |
| 5.08 | Real Property and Transferred Assets | 26 |
| 5.09 | Litigation; Investigations | 28 |
| 5.10 | Insurance | 28 |
| 5.11 | Contracts | 28 |
| 5.12 | Labor and Employment | 29 |
| 5.13 | Employee Benefit Plans | 29 |
| 5.14 | Environmental Compliance | 29 |
| 5.15 | Government Licenses and Permits | 31 |
| 5.16 | Intellectual Property | 31 |
| 5.17 | Compliance with Laws | 32 |
| 5.18 | Product Warranties | 32 |

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 5.19 | Business Relationships | 33 |
| 5.20 | Asbestiform Minerals | 33 |
| 5.21 | Brokers and Finders | 34 |
| 5.22 | Reclamation Obligations | 34 |
| 5.23 | Material Safety Data Sheets | 34 |
| **ARTICLE 6** | **Purchaser's Representations and Warranties** | 35 |
| 6.01 | Corporate Status | 35 |
| 6.02 | Authorization | 35 |
| 6.03 | Execution and Delivery | 35 |
| 6.04 | No Conflict | 36 |
| 6.05 | Sufficient Funds | 36 |
| 6.06 | Brokers and Finders | 36 |
| **ARTICLE 7** | **Purchaser's Investigation** | 37 |
| 7.01 | Investigation | 37 |
| 7.02 | Financial Information | 37 |
| 7.03 | No Additional Representations | 37 |
| **ARTICLE 8** | **Covenants of Seller and Purchaser** | 37 |
| 8.01 | Bankruptcy Court Approval | 38 |
| 8.02 | Access and Inquiry | 38 |
| 8.03 | Licenses and Permits | 38 |
| 8.04 | Notices to Third Parties | 39 |
| 8.05 | Commercially Reasonable Efforts | 39 |
| 8.06 | Unassigned Contracts and Other Assets | 39 |
| 8.07 | Removal of Seller Pompano Beach Assets | 40 |
| 8.08 | Ajax Real Property Bid Right | 40 |
| 8.09 | Title Insurance and Survey | 41 |
| 8.10 | Waiver of Bulk Sales Law Compliance | 41 |
| **ARTICLE 9** | **Conduct of Business Prior to Closing** | 41 |
| 9.01 | Operation in Ordinary Course | 42 |
| 9.02 | Disposition of Assets | 42 |
| 9.03 | Material Agreements | 42 |
| 9.04 | Relations with Customers and Suppliers | 42 |
| 9.05 | No Shop Provision | 42 |
| 9.06 | Notice of Material Adverse Effect | 43 |
| 9.07 | Announcements to Employees | 43 |
| **ARTICLE 10** | **Conditions Precedent to Purchaser's Obligations** | 43 |
| 10.01 | Accuracy of Representations and Warranties | 43 |
| 10.02 | Performance of Covenants and Agreements | 43 |
| 10.03 | Permits, Consents, etc | 43 |
| 10.04 | Litigation | 44 |
| 10.05 | Certificates of Selling Companies | 44 |
| 10.06 | Title Insurance and Surveys | 45 |

# TABLE OF CONTENTS

10.07 Third Party Consents and Approvals ...................................... 46
10.09 Bankruptcy Court Approval .................................................... 46
**ARTICLE 11      Conditions Precedent to Seller's Obligations** ............... 46
11.01 Accuracy of Representations and Warranties ........................... 46
11.02 Performance of Covenants and Agreements ............................ 47
11.03 Permits, Consents, etc. ......................................................... 47
11.04 Litigation ............................................................................ 47
11.05 Certificates of Purchasing Companies .................................... 47
11.06 Third Party Consents and Approvals ...................................... 48
11.07 Bankruptcy Court Approval .................................................... 48
**ARTICLE 12      Employee Matters** ................................................. 49
12.01 Employment ........................................................................ 49
12.02 Positions Offered to Subject Employees ................................. 49
12.03 Terms of Employment ........................................................... 51
12.04 Employment Related Indemnities ........................................... 51
12.05 Employee Information Sharing ................................................ 52
12.06 Notices, etc. ....................................................................... 52
**ARTICLE 13      Termination** ......................................................... 53
13.01 Rights to Terminate ............................................................. 53
13.02 Consequences of Termination ............................................... 54
**ARTICLE 14      Indemnification** ..................................................... 54
14.01 Definitions .......................................................................... 54
14.02 Seller's Indemnification ........................................................ 55
14.03 Purchaser's Indemnification .................................................. 56
14.04 Limitations .......................................................................... 57
14.05 Defense of Third Party Claims ............................................... 57
14.06 No Consequential or Lost Profit Damages ............................... 59
**ARTICLE 15      Cooperation in Various Matters** ............................... 60
15.01 Mutual Cooperation ............................................................. 60
15.02 Access to Files and Records .................................................. 61
**ARTICLE 16      Post-Closing Matters** ............................................. 61
16.01 Reports .............................................................................. 61
16.02 Names ................................................................................ 61
16.03 Intercompany Agreements ..................................................... 62
16.04 Seller's Covenant Not to Compete .......................................... 62
**ARTICLE 17      Expenses** .............................................................. 63
17.01 Purchaser's Expenses ........................................................... 63
17.02 Seller's Expenses ................................................................. 64
17.03 Transfer Taxes .................................................................... 64
17.04 Other Real Estate Costs ....................................................... 64
**ARTICLE 18      Notices** ................................................................. 65
18.01 Notices ............................................................................... 65

# TABLE OF CONTENTS

Page

**ARTICLE 19    General** .............................................................................................65
19.01 Entire Agreement .............................................................................66
19.02 Governing Law .................................................................................66
19.03 Submission to Jurisdiction ...............................................................66
19.04 Equitable Remedies .........................................................................66
19.05 Assignment; Successors ..................................................................67
19.06 Amendments and Waivers ...............................................................67
19.07 Counterparts ....................................................................................67
19.08 Captions ...........................................................................................67
19.09 Effectiveness ...................................................................................67

# W. R. GRACE & CO.-CONN.
# VERMICULITE ASSET SALE AGREEMENT

## Exhibits and Schedules

### Exhibits

| | |
|---|---|
| 1.02A | Additional Excluded Assets |
| 1.02B | Other Real Property |
| 1.02C | South Carolina Real Property |
| 1.02D-1 | Machinery, Equipment, etc. |
| 1.02D-2 | Ajax Subject Business Assets |
| 1.02E | Subject Business Contracts |
| 1.02F | SCC Business Assets |
| 2.03(b) | Allocation of Consideration to Subject Business Real Property |
| 3.03(b) | Bill of Sale and Assignment and Assumption Agreements |
| 3.04(a) | Canadian Asset Purchase Agreement |
| 3.04(b) | Transition Services Agreement |
| 3.04(c) | Ajax Tolling Agreement |
| 3.04(d) | Other Real Property Tolling Agreements |
| 3.04(e) | SCC Agreement |
| 3.04(f) | Fire Protection Laboratory Lease |
| 3.07 (a) | Seller Reclamation Amounts |

### Schedules

| | |
|---|---|
| 4.01 | Inventory Taking Procedures |
| 4.03 | Accounting Practices and Procedures |
| 5.03 | Authorizations and Consents |
| 5.04 | Execution and Delivery |
| 5.05 | No Conflict |
| 5.06(a) | Financial Statements |
| 5.06(b) | Subsequent Events |
| 5.07 | Tax Matters |
| 5.08(c) | Liens |
| 5.08(d) | Required Asset Exceptions |
| 5.09(a) | Litigation |
| 5.09(b) | Investigations |
| 5.10 | Insurance and Bonds |
| 5.13 | Employee Benefit Plans |
| 5.14(d) | Environmental Remediation |
| 5.14(e) | Environmental Studies, etc. |
| 5.15 | Government Licenses and Permits |

5.16        Intellectual Property.
5.17        Compliance with Laws
5.18        Product Warranties
5.19        Business Relationships

8.07        Seller Pompano Beach Assets
10.07       Consents
12.01       Subject Employees

## VERMICULITE ASSET SALE AGREEMENT

AGREEMENT dated October 17, 2011, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller"), and Vermiculite Acquisition Corp., a Delaware corporation ("Purchaser").

## WITNESSETH:

WHEREAS, Seller and its wholly owned Subsidiary, Grace Canada, Inc., an Ontario corporation ("GCI" and collectively with Seller, the "Selling Companies") wish to sell, and Purchaser wishes to acquire, Selling Companies' vermiculite business by the transfer to and assumption of certain assets and liabilities of Selling Companies to and by Purchaser and/or designated Affiliates of Purchaser ("Purchaser Designees" and collectively with Purchaser, "Purchasing Companies");

NOW THEREFORE, in consideration of the mutual covenants herein contained, Seller and Purchaser hereby agree as follows:

## ARTICLE 1

### Definitions

1.01 <u>General</u>.    All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated.  Any of the terms defined in this Agreement may be used in the singular or the plural.  In this Agreement, unless otherwise specifically stated: "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement

as a whole and not merely to the specific Section, paragraph or clause in which the word appears; words importing any gender include the other genders; and the term "including" shall mean "including but not by way of limitation."

1.02  Defined Terms.  For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

"Affiliate" of any Person shall mean any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person.  A Person shall be deemed to "control," be "controlled by" or be "under common control with" any other Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"Ajax Facility" means the facility of GCI located at 294 Clements Road, West Ajax, Ontario L1S 3C6 Canada.

"Ajax Subject Business Assets" has the meaning given such term in clause (ii) of the definition of Transferred Assets.

"Ajax Tolling Agreement" has the meaning given such term in Section 3.04(c).

"Ancillary Agreements" means the agreements described in Section 3.04.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Proceeding" means In re: *W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are generally closed in New York City.

"Canadian ASA" has the meaning given such term in Section 3.04(a).

"Canadian Real Property" means the Other Real Property located in Canada.

"Chapter 11 Plan" means that certain *First Amended Joint Plan of Reorganization in their Chapter 11 Cases*, Docket no. 25881 in the Bankruptcy Proceeding, as it may be further amended, supplemented or otherwise further amended from time to time , and the schedules and exhibits to the forgoing, as they may be in effect from time to time.

"Closing" means the actions to be taken by or at the direction of the Parties described in Sections 3.03 and 3.04.

"Closing Date" means the date on which the Closing takes place.

"Closing I&R Amount" has the meaning given such term in Section 4.02.

"Closing Statement" has the meaning given such term in Section 4.04.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the confidentiality agreement dated June 23, 2011, between Seller and Dicalite Management Group.

"Continued Employees" has the meaning given such term in Section 12.01(b).

"Contract" means any lease, license, purchase order or other contract or agreement.

"Damages" has the meaning given such term in Section 14.01(a).

"Environmental" means relating to pollution or protection of the environment and

public health and safety.

"Environmental Law" means and includes all laws, rules, regulations, ordinances, and orders of any Governmental Authority, as in effect as of the date hereof, relating to pollution or protection of the environment and public health and safety, including those relating to the use, generation, storage, treatment, handling, release, or threatened release of hazardous or toxic substances, whether such laws, etc. are promulgated at the federal, state or provincial, or local level in the United States or Canada.

"Excluded Assets" means any and all of Selling Companies' right, title and interest in (1) cash and cash items, other than petty cash and deposits with third parties, (2) refunds of Taxes, (3) amounts receivable from any unit of Seller other than the Subject Business or from any other Seller Entity, (4) Insurance, claims with respect to Insurance, and refunds of amounts previously paid or prepaid on account of Insurance, (5) employee benefit plans and funds maintained by, or in conjunction with, any Seller Entity, and refunds of amounts previously paid or prepaid amounts on account of such employee benefit plans and funds, (6) proprietary Information received from a third party that is subject to a confidentiality agreement that does not permit the transfer of such information, (7) records to the extent relating to any of the Excluded Assets or the Excluded Liabilities, (8), the names "Grace" and "Davison", whether alone or in combination with each other or with other words, including in any trade name or trade or service mark, (9) real property of, and all other property located at, the Ajax Facility, except for the Ajax Subject Business Assets; (10) bonds and letters of credit, including any such bonds of letters of credit relating to reclamation obligations and/or mining

4

permits; (11) assets of the SCC Business, (12) assets of the fireproofing laboratory currently located at the South Carolina Real Property, (13) the Seller Pompano Beach Assets; and (14) any other assets listed on **Exhibit 1.02A**.

"Excluded Liabilities" means all liabilities and obligations of Selling Companies with respect to the Subject Business other than the Transferred Liabilities, including (i) Income Taxes, (ii) payroll Taxes (including related withholding Taxes) and similar Taxes for all periods ending on or prior to the Closing Date, (iii) amounts payable to any unit of Seller or to any other Seller Entity, (iv) obligations relating to Insurance, (v) employee benefit plans and funds; (vi) accounts payable; (vii) product liability and warranty claims for products sold prior to Closing; (viii) Plan Claims; (ix) any liability for violation by Selling Companies prior to the Closing of law, governmental rule or order, including any violation of Environmental Law; (x) any Workers Compensation claim by an employee or former employee of the Subject Business either before or after the Closing, to the extent that the injury giving rise to the claim resulted in whole or in part from employment of such employee or former employee by Selling Companies prior to the Closing and (xi) any liability for any Environmental remediation required by applicable law of any condition (other than the presence of asbestiform minerals in or on any of the buildings or other improvements that are part of the Subject Business Real Property) existing on the Closing Date and arising out of the operation of the Subject Business at the Subject Business Real Property, including any such remediation arising from the further evaluation by the USEPA described in the Removal Assessment Report Notification, to the extent that the remediation is of asbestiform minerals contained in

5

vermiculite ore or vermiculite concentrate received from Seller's vermiculite mine in Libby, Montana. Notwithstanding the foregoing, no obligation for remediation that arises out of any change in applicable law after the Closing Date shall be deemed an Excluded Liability.

"GCI" has the meaning given such term in the preamble to this Agreement.

"Governmental Authority" means an entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including agencies, departments, boards, commissions, and other instrumentalities.

"Income Statements" has the meaning given such term in Section 5.06(a).

"Income Tax" means any Tax measured (in whole or in part) or imposed upon income (including any alternative or add-on minimum tax), or franchise tax based on net income, and any interest and penalties assessed on any such tax or assessment.

"Insurance" means insurance policies or other insurance coverage.

"Intellectual Property" or "IP" means any and all of the following:

    (a)    United States and foreign patents, patent applications, and patent disclosures, including all reissues, divisions, continuations, continuations-in part, substitutions, or extensions of any of the foregoing;

    (b)    (i) trademarks, service marks, trade names, brand names, trade dress, logos, and designs, assumed names and other indications of origin, whether registered or unregistered, and any applications or renewals therefor, and (ii) all goodwill symbolized thereby or

associated with clause (i);

(c)     United States and foreign copyrights, whether registered or unregistered, and any applications therefor or renewals thereof; and

(d)     inventions, formulae, processes, designs, know-how, show-how, manufacturing know-how, trade secrets, computer software and technical manuals and documentation which are not embodied within subparagraphs (a), (b) and (c).

"Knowledge" of any individual means the actual knowledge of such individual on the date of this Agreement or on the Closing Date, as applicable.

"Knowledge of Seller" means the Knowledge of the appropriate managerial personnel of the Selling Companies who are in a position to know the information at issue, including the following employees of the Selling Companies: (a) P.W. Hanlon and all other Business Development personnel; (b) M.K. Harvey, R.J. Mercer, S. Boss, D.J. Dowling, R.P. Perez, D.W. Iwaniuk, and all other managerial personnel at the headquarters of Grace Construction Products in Cambridge, MA, and at the facilities at the Subject Business Real Property and Ajax; (c) K.E. Ethier, B.E. O'Connell and all other EH&S personnel; (d) T. Smith and all other Finance personnel; and (e) Kris Venis and all other HR personnel.

"Lien" means any mortgage, pledge, security interest, or other lien or encumbrance.

"Material Adverse Effect" means a material adverse effect upon the Transferred

Assets or the Transferred Liabilities, or on the business, condition (financial or otherwise), operations or results of operations of the Subject Business, taken as a whole, but excluding (a) economic effects or changes that are generally applicable to the industries and markets in which the Subject Business operates; (b) general changes in the United States or Canadian or world financial markets or general economic conditions; (c) general changes in applicable laws; or (d) the failure, in and of itself, to win any particular bid or proposal made to a customer (or any cancellation or revocation of any request for proposal from any customer) or meet any projections.

"Mining Leases" means the leases listed on **Exhibit 1.02E** that are identified as Mining Leases.

"Mining Permits" has the meaning given such term in Section 3.07(a).

"Net Asset Statements" has the meaning given such term in Section 5.06(a).

"Other Real Property" means the real property located in Phoenix, AZ, Pompano Beach, FL, Winnipeg, MB, and Edmonton, AB, identified in **Exhibit 1.02B**, at which the Subject Business operates expanding plants for vermiculite and/or perlite.

"Parties" means Seller and Purchaser.

"Permitted Exceptions" means (a) Liens for current Taxes, assessments or other claims by a Governmental Authority not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings and for which an appropriate escrow or security deposit or reserve is established therefor; (b) zoning, subdivision, building code, entitlement and other land use, construction and Environmental Laws by a Governmental Authority; (c) easements, rights-of-way,

licenses, utility agreements, restrictions, and other similar encumbrances of record, and matters that would be shown on any survey of the Subject Business Real Property, which, in each case, do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Subject Business consistent with past practice; and (d) such other imperfections in title, charges, easements, restrictions and encumbrances in each case which do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Subject Business consistent with past practice.

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Plan Claims" shall have the meaning ascribed to such term in the Chapter 11 Plan.

"Purchase Price" has the meaning given such term in Section 2.02.

"Purchaser" has the meaning given such term in the preamble to this Agreement

"Purchaser Designees" has the meaning given such term in the preamble to this Agreement.

"Purchaser Entity" means any of the Purchaser Group.

"Purchaser Group" means, collectively, Purchaser and its Affiliates.

"Purchasing Companies" has the meaning given such term in the preamble to this Agreement.

"Reclamation Obligations" means any and all reclamation and similar obligations to any Governmental Authority, lessee or other Person with respect to the South Carolina Property or any property subject to or affected by any of the Vermiculite Leases, including the Retention Ponds.

"Removal Assessment Report Notification" means the Removal Assessment Report Notification dated September 6, 2011, from USEPA to Remedium Group, Inc.

"Reorganized Seller" means Seller from and after the effective date of its confirmed Chapter 11 Plan or any other chapter 11 plan of reorganization of Seller that may be confirmed in the Bankruptcy Proceeding.

"Retention Ponds" means the retention ponds located on the South Carolina Real Property.

"Sale Motion" has the meaning given such term in Section 8.01(a).

"Sale Order" has the meaning given such term in Section 10.09.

"SCC Business" means the Seller Entities' Specialty Construction Chemicals business unit.

"Scheduled Closing Date" has the meaning given such term in Section 3.01.

"Seller" has the meaning given such term in the preamble to this Agreement.

"Seller Entity" means any legal entity of the Seller Group.

"Seller Group" means, collectively, WRG, Seller and their Subsidiaries.

"Seller Payment Amount" means one of the amounts specified in **Exhibit 3.07(a)** for the respective Seller Payment Properties.

"Seller Payment Properties" has the meaning given such term in Section 3.07(a).

"Seller Pompano Beach Assets" has the meaning given such term in Section 8.07.

"Selling Companies" means Seller and GCI.

"South Carolina Real Property" means the real property in Enoree and Kearney, South Carolina, identified in **Exhibit 1.02C**.

"Subject Business" means Seller's and/or GCI's business of mining, milling, expanding, manufacture, and/or sale of vermiculite, vermiculite concentrate, perlite, and specialty vermiculite products.

"Subject Business Contract" means a Contract to which one or both Selling Companies is a party relating directly and exclusively to the Subject Business, including the Vermiculite Leases.

"Subject Business Intellectual Property" means all Selling Companies' rights in Intellectual Property that is used or usable exclusively in the Subject Business.

"Subject Business Real Property" means the South Carolina Real Property and the Other Real Property.

"Subject Employees" has the meaning given such term in Section 12.01.

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other equity interests representing more than 50% of the voting power of all such securities or other equity interests.

"Tax" means any national, federal, state, provincial, local or foreign governmental tax or assessment, including Income Tax, any payroll or other similar employment tax,

11

any sales, use, excise, goods and services, harmonized sales, gross receipts or value added tax, or any land transfer, land registration or any other tax in respect of real or personal property, including interest and penalties with respect thereto.

"Transaction Documents" means this Agreement, the documents to be executed and delivered at the Closing pursuant to Section 3.03, the Ancillary Agreements and any other agreements, instruments and documents executed and delivered pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement.

"Transferred Assets" means all right, title and interest of Selling Companies in and to the assets, properties and rights pertaining directly and exclusively to the conduct of the Subject Business, and to certain assets of the SCC Business, including all right, title and interest in and to the following insofar as either pertaining directly and exclusively to the conduct of the Subject Business, or listed in an Exhibit specified in the following:

(i) the Subject Business Real Property, including any appurtenant mineral rights;

(ii) the machinery, equipment, and other personal property located at the Subject Business Real Property, including the items listed in **Exhibit 1.02D-1** hereto, and the machinery, equipment and other property located at the Ajax Facility, including the items listed on **Exhibit 1.02D-2** hereto (the "Ajax Subject Business Assets");

(iii) the Subject Business Intellectual Property, including the items listed

12

on Schedule 5.16 as used exclusively in the Subject Business;

(iv)    inventories of raw materials, work in process, finished goods, spare parts, supplies and packaging;

(v)     accounts receivable;

(vi)    prepayments and deposits;

(vii)   rights under the Vermiculite Leases and the other Subject Business Contracts, including the Contracts which are listed on **Exhibit 1.02E** hereto;

(viii)  transferable software and data (excluding commercially available software whose transfer requires consent of licensee);

(ix)    files, customer lists, accounting records, marketing materials and general intangibles; and

(x)     the assets of the SCC Business listed on **Exhibit 1.02F** hereto;

but excluding the Excluded Assets.

"Transferred Liabilities" means:

(i)     all obligations and liabilities under the Subject Business Contracts that are transferred to Purchaser under this Agreement, but only to the extent that those obligations and liabilities are incurred in connection with the performance or non-performance on and after the Closing Date by Purchaser of such Subject Business Contracts;

(ii)    subject to Seller's obligations under Section 3.07, all Reclamation Obligations;

(iii) all obligations and liabilities with respect to the Retention Ponds other than those obligations specified in clause (xi) of the definition of Excluded Liabilities;

(iv) the obligations and liabilities listed on **Schedule 4.02**; and

(v) obligations regarding vacation and vacation pay as set forth in Section 12.02(iv)(A)(1).

but excluding the Excluded Liabilities.

"USD" means United States dollars.

"USEPA" means Region 4 of the United States Environmental Protection Agency.

"U.S. Subject Business Real Property" means the South Carolina Real Property and the Other Real Property located in the United States.

"Valuation Time" means 12:01 a.m. U.S. Eastern time on the Closing Date.

"Vermiculite Leases" means the leases of mineral rights listed on **Exhibit 1.02E**.

"WRG" means W. R. Grace & Co., a Delaware corporation, of which Seller is a direct wholly-owned Subsidiary.


## ARTICLE 2

### Sale of Subject Business, Purchase Price

2.01 <u>Sale of Subject Business</u>. On the terms and subject to the conditions of this Agreement, Seller shall sell and cause GCI to sell, and Purchaser shall purchase, the Subject Business as follows: Each of Selling Companies shall transfer their right,

14

title and interest in and to the Transferred Assets to Purchaser or its designee(s), free and clear of all Liens and imperfections in title (except Permitted Exceptions) and in exchange therefor, Purchasers shall pay the Purchase Price therefor and assume the Transferred Liabilities.

2.02   Purchase Price.   "Purchase Price" means USD 10,000,000, plus the excess of the Closing I&R Amount over USD 5,414,000, or minus the excess of USD 5,414,000 over the Closing I&R Amount, as the case may be.  The Purchase Price shall be allocated among the Transferred Assets, and between the Selling Companies and the Purchasing Companies, as provided in Section 2.03.

2.03   Purchase Price Allocation.

(a)     Each Party agrees to prepare and timely file U.S. Internal Revenue Service Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Code with respect to the Transferred Assets, and analogous filings under Canadian tax law and to cooperate in every reasonable way with the other Party in the preparation of such forms and in agreeing upon the relevant allocations in such filings.

(b)     The Parties agree that the amount of consideration to be paid to GCI in exchange for the transfer of GCI's right, title and interest in and to the Transferred Assets owned by GCI will be as set forth in the Canadian ASA.


## ARTICLE 3

## Closing

3.01   Scheduled Closing Date.   The "Scheduled Closing Date" shall be

15

December 29, 2011, or such other day as the Parties may agree to in an amendment to this Agreement executed and delivered in accordance with Section 19.06.

3.02   Time and Place of Closing, Simultaneity.  The Closing shall take place at 10:00 a.m. local time on the Scheduled Closing Date at the offices of Purchaser, 1 Bala Avenue, Suite 310, Bala Cynwyd, PA 19004.   All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete.  The Closing shall be deemed to be effective as of December 31, 2011.

3.03   Transfers at the Closing; Payments.  At the Closing:

(a)   Seller shall execute and deliver to Purchaser deeds for the U.S. Subject Business Real Property of substantially the same tenor as the deeds under which Seller holds the U.S. Subject Business Real Property, subject to Permitted Exceptions.

(b)   Pursuant to the Canadian ASA, GCI shall execute and deliver to Purchaser deeds for the Canadian Real Property of substantially the same tenor as the deeds under which GCI holds the Canadian Real Property, subject to Permitted Exceptions.

(c)   Selling Companies and Purchasing Companies shall execute and deliver to each other bills of sale and assignments and assumptions of the Transferred Assets and Transferred Liabilities in the forms of **Exhibit**

16

**3.03(b)** hereto, and as contemplated by the Canadian ASA.

(d)    Purchaser shall pay to Seller and GCI, on account of the Purchase Price and in accordance with Section 2.03 and the Canadian ASA, an aggregate amount equal to USD10,000,000 plus or minus Seller's best estimate of the price adjustment relating to the Closing I&R Amount to be calculated under Section 4.07, plus any applicable Taxes (the "Estimated Purchase Price"). Such payment shall be made by means of wire transfers to Seller's and GCI's accounts as follows:

| **Seller:** | **GCI:** |
|---|---|
| Bank: JPMorgan Chase Bank, NA | Bank: |
| Bank ABA #: 021000021 | Bank [Canadian ID #]: |
| Bank SWIFT code CHASUS33 | Bank SWIFT code |
| Bank account name: W. R. Grace & Co.-Conn. | Bank account name: Grace Canada, Inc. |
| Bank account number: 016001257 | Bank account number: |
| Text message: Funds from [name of Purchasing Company] re: Vermiculite | Text message: Funds from [name of Purchasing Company] re: Vermiculite |

In addition, each of Selling Companies and Purchasing Companies shall execute and deliver, and cause their Affiliates to execute and deliver, such other agreements, instruments and other documents to effect, confirm or evidence the Transactions as the other Party shall reasonably request. Each such document shall be reasonably satisfactory in form and substance to the Person to whom such document is delivered, but shall contain no representations, warranties, covenants or agreements other than those effecting, confirming or evidencing the Transactions.

3.04   Ancillary Agreements. At the Closing, each of the following agreements shall be executed and delivered by the Parties:

(a)     Canadian ancillary asset sale agreement with respect to the Canadian Real Property and the other Transferred Assets owned by GCI, substantially in the form(s) of **Exhibit 3.04(a)** (the "Canadian ASA");

(b)     Transition Services Agreement(s) substantially in the form of **Exhibit 3.04(b)**, under which Seller and GCI will provide certain services to the Purchasing Companies for the Subject Business on a transitional basis after the Closing;

(c)     Tolling Agreement substantially in the form of **Exhibit 3.04(c)**, under which GCI will toll manufacture products for the Subject Business at the Ajax Facility (the "Ajax Tolling Agreement"), which will include a lease of the Ajax Subject Business Assets for a nominal rent;

(d)     SCC Agreement substantially in the form of **Exhibit 3.04(d)**, under which Purchaser Entities will toll manufacture products and provide related services for the SCC Business at the Other Real Property.

(e)     Fire Protection Laboratory Lease Agreement in the form of **Exhibit 3.04(e)**, under which Seller will lease space at the South Carolina Real Property for its Fire Protection Laboratory , including utilities, parking and security.

3.06  <u>Closing Prorations</u>.  At Closing, all real estate taxes for the Subject Business Real Property, and all other water, sewer, gas, other utility services, and other charges and fees customarily prorated and adjusted in connection with the purchase and sale of real estate, shall be prorated as of the Closing Date.  Selling Companies shall reimburse Purchasing Companies or Purchasing Companies shall reimburse Selling Companies, as the case may be, the net amount owed promptly following the

Closing.

3.07   Seller Reclamation Payments.

(a)   With respect to each of the properties covered by the Mining Leases identified on **Exhibit 3.07(a)**(collectively, the "Seller Payment Properties"), promptly after (i) the issuance to Purchaser of the required permit or permits for mining operations at a particular Seller Payment Property (the "Mining Permits"), (ii) the posting of any bonds required in connection with such Mining Permits, and (iii) written notice to Seller of such issuance and posting, Seller shall promptly pay to Purchaser the Seller Reclamation Amount listed on **Exhibit 3.07(a)** for such particular Seller Payment Property (net of any amounts theretofore paid by Seller after the Closing Date for Reclamation Obligations for such particular Seller Payment Property) in immediately available funds by wire transfer to an account designated by Purchaser.  Seller may set off against its obligations under this Section with respect to such particular Seller Payment Property, any indemnity obligations of Purchaser under Section 14.03(a)(v) or (vi)with respect to such particular Seller Payment Property.

(b)   Except for its obligations under this Section 3.07, Seller shall have no obligation with respect to the Reclamation Obligations.

3.08   Further Assurances.  At any time and from time to time after the Closing, at the request and expense of either Party, the other Party shall execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as the requesting Party reasonably deems necessary or advisable in order to complete, perfect or

evidence any of the Transactions. Any material out-of-pocket expenses related to any such request shall be paid by the requesting Party.

## ARTICLE 4

### Purchase Price, Post-Closing Adjustments

4.01   Closing of Books.   Seller shall close the books and related accounting records, on a going concern basis, of Seller and GCI (but only to the extent that they relate to the Subject Business) as of the Valuation Time, and take a physical count of the Subject Business inventories at or within two weeks prior to such time.   Such Inventory count shall be taken in accordance with the inventory-taking procedures described in **Schedule 4.01**.   Representatives of Purchaser may observe the taking of such inventory, and Purchaser shall provide Seller with such assistance as Seller shall reasonably request in connection with such closing of the books and records.

4.02   Closing I&R Amount.   "Closing I&R Amount" means the aggregate amount, as of the Valuation Time, of all inventories and accounts receivable of the Subject Business included in the Transferred Assets, computed in accordance with Section 4.03.

4.03   Computation of Closing I&R Amount.   The Closing I&R Amount shall be determined in U.S. dollars on a going concern basis, in accordance with the accounting practices and procedures (applied consistently) set forth in **Schedule 4.03**.

4.04   Closing Statement.   As soon as reasonably practicable but in no event more than sixty calendar days after the Closing, Seller shall deliver to Purchaser a

statement setting forth Seller's determination of the Closing I&R Amount (the "Closing Statement").

4.05 _Acceptance_. If Purchaser does not object to the Closing I&R Amount shown on the Closing Statement delivered by Seller, by written notice of objection delivered to Seller within thirty calendar days after Purchaser's receipt of such statement, describing in reasonable detail each of its proposed adjustments to Seller's determination thereof, then the Closing I&R Amount shown on the Closing Statement shall be final and binding on the Parties.

4.06 _Non-Acceptance, Resolution of Disputes._

(a) If Purchaser does object to the Closing I&R Amount shown on the Closing Statement, then Purchaser and Seller shall promptly endeavor to agree upon the proper amount of the items in dispute. If a written agreement settling any disputed items has not been reached within thirty calendar days after the date of receipt by Seller from Purchaser of Purchaser's notice of objection thereto, then either Seller or Purchaser may, by notice to the other Party, submit for determination by arbitration in accordance with this Section the question of what adjustments, if any, must be made to Seller's determination of such amount in order for it to be determined in accordance with the provisions of this Agreement. At the time of such submission, the Parties shall propose in writing their respective calculations of the Closing I&R amount.

(b) Any such determination by arbitration shall be made by an accounting firm to be agreed upon by the Parties other than their respective auditors (the "Arbitrator") and shall be final and binding on the Parties and their Affiliates.

(c)     The fees and expenses of the Arbitrator for any determination under this Article shall be shared as follows:  Seller shall bear that portion thereof equal to the total amount of such fees and expenses multiplied by a fraction, the denominator of which shall be the difference between the Closing I&R Amount as proposed by Purchaser and the Closing I&R Amount as proposed by Seller, and the numerator of which shall be the difference between the Closing I&R Amount as determined by the Arbitrator and the Closing I&R Amount as finally proposed by Seller.  Purchaser shall bear the remainder of such fees and expenses.

(d)     Nothing herein shall be construed to authorize or permit the Arbitrator to determine (i) any question or matter whatsoever under or in connection with this Agreement or any other Transaction Document except the determination of what adjustments, if any, must be made in one or more of the items reflected in the Closing Net Asset Amount as shown on the Closing Statement delivered by Seller in order for the Closing Net Asset Amount to be determined in accordance with the provisions of this Agreement and (ii) a Closing Net Asset Amount that is not in the range between and including the final proposals of Seller and Purchaser.  Nothing herein shall be construed to require the Arbitrator to follow any rules or procedures of any arbitration association.

4.07  Payment of Adjustments.     Promptly after the Closing Current Asset Amount has been finally determined, Seller shall deliver to Purchaser a statement of the Purchase Price determined in conformity with the Closing Current Asset Amount as finally determined by the terms of this Agreement.  If the Purchase Price as so

determined exceeds the amount paid at the Closing with respect thereto, Purchaser shall pay the amount of the excess to Selling Companies. If the Purchase Price as so determined is less than the amount paid at the Closing with respect thereto, Selling Companies shall refund the amount of the overpayment to Purchaser. If the net amount of the adjusting payment is in excess of USD 100,000, then interest shall be paid on the entire amount of the net adjusting payment, from and including the Closing Date to but not including the date of payment, at a floating rate per annum equal to the U.S. prime rate, as reported by *The Wall Street Journal*, in effect from time to time during the period from the Closing Date until the date of payment. Such payments to or refunds by Selling Companies, and any such interest paid to or by Selling Companies, shall be paid to or by the Selling Parties in accordance with the extent to which the changes in the assets and liabilities of the respective Selling Companies contributed to such payments or refunds.

## ARTICLE 5

### Seller's Representations and Warranties

Seller represents and warrants to Purchaser as follows:

5.01  Corporate Organization and Existence.  Each Selling Company is a corporation duly organized and validly existing under the laws of its jurisdiction of incorporation as set forth in the preamble to this Agreement.

5.02  Corporate Power.  Each Selling Company has full corporate power to enter into each Transaction Document to which it is or will be a party and perform its

obligations thereunder.

5.03  Authorization; Consents.

(a)  The execution and delivery by each Selling Company of the Transaction Documents to which it is or will be a party and its performance of its obligations thereunder have been duly authorized by all required corporate action.

(b)  Except for Bankruptcy Court approval and consents under the Subject Business Contracts, and except as set forth in Schedule 5.03, no registration, qualification, or filing with, or consent of, any Governmental Authority or other third party is required for Seller's execution and delivery of this Agreement or its consummation of the Transactions.

5.04  Execution and Delivery.  Except as specified in **Schedule 5.04**, and subject to the approval of the Bankruptcy Court in the Bankruptcy Proceeding, (a) Seller has duly and validly executed and delivered this Agreement, and the other Transaction Documents to which each Selling Company is or will be a party, when executed and delivered, will be duly and validly executed and delivered by such Selling Company; and upon such execution and delivery, assuming the due authorization, execution and delivery thereof by the other parties thereto, each Transaction Document to which a Selling Company is a party shall be the legal, valid and binding obligation of such Selling Company, enforceable against such Selling Company in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles (whether in equity or at law) and to general principles

24

affecting the enforceability of indemnities.

5.05 <u>No Conflict</u>. Except as specified in **Schedule 5.05**, and subject to the approval of the Transactions by the Bankruptcy Court in the Bankruptcy Proceeding, the execution and delivery by each Selling Company of the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder, do not and will not (a) conflict with its certificate or articles of incorporation or by-laws; or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order, decree, or Contract to which it is a party or by which it is bound, which violation, breach or default would adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

5.06 <u>Financial Statements; Subsequent Events</u>. .

(a)   **Schedule 5.06(a)** contains (a) unaudited statements of net assets of the Subject Business as of December 31, 2010, and June 30, 2011 (the "Net Asset Statements") and unaudited statements of income of the Subject Business for the year ended December 31, 2010, and the six months ended June 30, 2011 (the "Income Statements"). The Net Asset Statements and Income Statements fairly present, in all material respects, the financial position of the Subject Business with respect to the items contained thereon, as of their respective dates, and the results of operations of the Subject Business for such periods.

(b)   Except as set forth in **Schedule 5.06(b)**, to the best Knowledge of Seller, since June 30, 2011, there has not occurred any event specific to the Subject Business

that materially and adversely affects the financial position or results of operations of the Subject Business taken as a whole.

5.07 _Tax Matters_. With respect to Taxes arising out of or related to the Subject Business or the Transferred Assets, except as set forth in **Schedule 5.07**:

(a) There are no Tax Liens on the Subject Business or the Transferred Assets other than Liens that are Permitted Encumbrances.

(b) At no time during the past three years has a taxing authority, in a jurisdiction in which a Selling Company does not currently file Tax returns, asserted that such Selling Company has an obligation to file a Tax return and pay Taxes with respect to the Subject Business or the Transferred Assets.

(c) No events have occurred relating to the Subject Business or the Transferred Assets that could impose on Purchaser any transferee liability relating to Taxes, other than such liability arising by operation of law.

5.08 _Real Property and Transferred Assets_.

(a) **Exhibit 1.02C** sets forth a true and accurate list of the Subject Business Real Property. The Subject Business Real Property constitutes all the owned real property (other than the Ajax Real Property) used in the mining and manufacturing operations of the Subject Business.

(b) **Exhibit 1.02E** sets forth a true and accurate list of the Vermiculite Leases. The Vermiculite Leases constitute all the leased mineral rights of the Subject Business (excluding any rights under leases as to which mining has been terminated).

(c)     Seller or GCI has good and valid title to each of the Transferred Assets. Except as otherwise specified in **Schedule 5.08(c)** (i) the Transferred Assets are not subject to any Lien or imperfection in title except Permitted Exceptions.

(d)     Except as set forth in **Schedule 5.08(d)** and except for assets used indirectly or non-exclusively in the Subject Business of which the Ancillary Agreements do not provide the benefit, the Transferred Assets, together with the rights and services provided to Purchasers under the Ancillary Agreements, will provide Purchasers with ownership of or, through the Ancillary Agreements, the benefit of assets that will enable the Purchasing Companies to conduct the Subject Business upon the Closing, substantially as it has been conducted prior to the Closing.

(e)     To the best Knowledge of Seller, Seller has good and valid mining rights to mine vermiculite at all of the sites covered by the Vermiculite Leases and on the South Carolina Real Property. GCI owns no mining property, and conducts no mining business, that is used in or part of the Subject Business,

(f)     To the best Knowledge of Seller, there are neither any (i) applications, ordinances, petitions, resolutions, or other matters pending before any governmental authority having jurisdiction to act on zoning changes that would prohibit or make nonconforming the use of any of the Subject Business Real Property as currently used nor (ii) any pending or threatened eminent domain, compulsory purchase, or demolition proceedings, or proposed sale in lieu thereof.

(g)     Other than as disclosed in Section 5.20 or **Schedule 5.08(g)**, to the best Knowledge of Seller, there is no asbestos or any hazardous or toxic materials or

substances in any form present or contained in any of the mines on the Subject Business Real Property or covered by the Vermiculite Leases, or in any of its products that are in process or contained in inventory, or any asbestos contained (whether encapsulated or not) in any form in any buildings located on the Subject Business Real Property.

5.09   Litigation; Investigations.

(a)   Except as set forth in **Schedule 5.09(a)**, to the best Knowledge of the Seller, there are no actions, suits or proceedings pending or threatened against either Selling Company or the Subject Business.

(b)   Except as set forth in **Schedule 5.09(b)**, to the best Knowledge of the Seller, there are no pending or threatened governmental investigations of the Subject Business.

5.10   Insurance.   **Schedule 5.10** summarizes the insurance and bonds maintained by each Selling Company exclusively for the Subject Business.   Such insurance and bonds and rights therein are not part of the Transferred Assets, and the obligations thereunder are not part of the Transferred Liabilities.

5.11   Contracts.   **Exhibit 1.02E** lists among other items the following Subject Business Contracts (excluding purchase orders and Vermiculite Leases) : (a) each Contract that both (1) has a term of more than one year and cannot be canceled by the appropriate Selling Company without penalty upon notice of one year or less, and (2) under which it is reasonably expected that the Subject Business will make expenditures or obtain receipts of more than USD 10,000 per year; (b) each sales representative,

sales agent or distributor Contract; (c) each agreement for barter or exchange of goods or services; (d) employment or consulting Contract (other than standard form employment agreements and Contracts for employment at will); (e) each Contract with former employees of the Subject Business (f) each contract with any Affiliate of Seller or agreement otherwise not negotiated at "arm's length", and (g) each Contract that limits the right of Seller to compete, or to sell or distribute products, in any territory, including exclusive sale agreements.  To the best Knowledge of Seller, each such Contract and each of the Vermiculite Leases is in full force and effect, no party thereto is in material breach thereof, and no party thereto has given notice of, or threatened, termination thereof.  Seller has heretofore delivered or made available to Purchaser complete copies of all such Contracts as currently in effect.The Contracts listed in Exhibit 1.02E lists all the material Subject Business Contracts other than purchase orders..

     5.12   <u>Labor and Employment</u>.

     (a)    There is no collective bargaining agreement or other similar Contract with a labor union or similar organization covering any Subject Employee.  A collective bargaining agreement covers certain workers who devote part of their time to the Subject Business at the Ajax Facility, but who are not Subject Employees.

     5.13   <u>Employee Benefit Plans</u>.  **Schedule 5.13** lists each written employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act) of the Selling Companies, which as of the date hereof covers any Subject Employee.

     5.14   <u>Environmental Compliance</u>.  Except as set forth in **<u>Schedule 5.14</u>**, to the

best Knowledge of the Seller:

(a)    The Subject Business is in compliance in all material respects with all applicable Environmental Laws, including any dealing with air quality, inventory, emissions, wastewater disposal, groundwater contamination or asbestos abatement.

(b)    Neither Seller nor GCI has been identified as a potentially responsible party under the Comprehensive, Environmental Response, Compensation and Liability Act of 1980, as amended, or any comparable state or local law or Canadian law, with respect to the operation of the Subject Business or the Transferred Assets.

(c)    None of the Subject Business Real Property is currently listed on the National Priorities list pursuant to CERCLA or any similar publicly available listing under comparable state law.

(d)    Except as set forth on Schedule 5.14(d), to the best Knowledge of Seller, there is no Environmental remediation or asbestos abatement in progress, currently being ordered or threatened to be ordered by any Governmental Authority under applicable Environmental Law, at the Subject Business Real Property.

(e)    **Schedule 5.14(e)** lists each material Environmental study, survey, assessment, or report (including Phase I and Phase II reports) produced by or on behalf of or provided to the Selling Companies during the last five years relating to the Subject Business, including any of the foregoing relating to the presence of asbestos in or on any of the Transferred Assets, or to air quality, inventory, emissions and wastewater discharge, in or on any of the Transferred Assets. Ongoing periodic environmental monitoring and testing is conducted for the Subject Business, and the existing

30