documentation thereof has been made available to Purchaser.

5.15 <u>Government Licenses and Permits</u>. **Schedule 5.15** lists all licenses, permits, registrations, and authorizations issued by any Governmental Authority (collectively "Government Licenses") that are currently held by Seller or GCI with respect to the Subject Business, and all pending applications of Seller or GCI for Government Licenses relating to the Subject Business. Schedule 5.15 includes all expiration dates, as well as dates by which, by the terms of the Governmental License, any renewal request or application needs to be submitted, which dates will occur within ninety days after the date hereof. Except as set forth in **Schedule 5.15**, no other material Government License is required for the operation of the Subject Business as presently conducted. The Government Licenses are in full force and effect.

5.16 <u>Intellectual Property</u>.

(a) **Part 1 of Schedule 5.16** lists all patents and patent applications included in the Subject Business Intellectual Property. **Part 2 of Schedule 5.16** sets forth a list of all trademarks and trade names and active applications for trademarks included in the Subject Business Intellectual Property. Except as set forth in **Part 3 of Schedule 5.16**, no other Seller Entity owns Intellectual Property used in the Subject Business, and neither Selling Company has granted any third party any license to use any Subject Business Intellectual Property. **Part 4 of Schedule 5.16** lists any Contracts under which the Seller Entities have a license from any Person not its Affiliate under any Intellectual Property that is used in the Subject Business; and Seller has delivered or made available to Purchaser complete copies of such Contracts as currently in effect.

31

Except as set forth in **Part 5 of Schedule 5.16**, insofar as Seller has Knowledge, none of the Subject Business Intellectual Property is the subject of any pending or threatened action, suit or proceeding that would reasonably be expected to have a Material Adverse Effect.

(b)     Any provision of this Agreement to the contrary notwithstanding, Seller makes no representation or warranty with respect to the validity or enforceability of the Subject Business Intellectual Property.

(c) Except as set forth in **Part 6 of Schedule 5.16**, to the best Knowledge of Seller: (i) the operation of the Subject Business and the use of the Transferred Assets do not infringe the Intellectual Property rights of any third party, and (ii) no third party is infringing any of the Subject Business Intellectual Property in relation to the Subject Business.

5.17   Compliance with Laws.  To the best Knowledge of Seller, the operation of the Subject Business complies in all material respects with all applicable orders, laws, orders, ordinances, codes, and regulations of any Governmental Authority.  The Selling Companies have received no written notice of violations of any of the foregoing, or pending investigation of violations of any of the foregoing by any Governmental Authority with respect to the Subject Business, except as set forth in **Schedule 5.17,** and except for such noticed violations (i) as are not continuing on the date of this Agreement, (ii) as have been resolved,  or (iii) as to which the Selling Companies have received no further written notice for more than two years.

5.18   Product Warranties.  **Schedule 5.18** contains a description of (i) the

standard product warranties currently given to customers of the Subject Business and (ii) any warranty currently given to customers of the Subject Business that varies in any material respect from the standard warranty and applies to a material amount of Seller's sales.

5.19   Business Relationships.  Except as set forth in **Schedule 5.19**, since June 30, 2011, Selling Companies have not received any written notice that any customer or group of customers will cease dealing with the Subject Business or reduce the volume of product purchased by it below historical levels, or seek to change the terms of purchase, which cessation, reduction or change is material to the Subject Business.

5.20   Asbestiform Minerals.

(a)   Prior to the termination in 1990 of Seller's vermiculite mining and processing operations in Libby, MT, the expanding plants located at the Subject Business Real Property and the Ajax Facility received and processed vermiculite from the Libby operations that contained or may have contained asbestiform minerals.

(b)   The vermiculite mined by the Subject Business in South Carolina and processed at the Subject Business Real Property, and the vermiculite mined under the Vermiculite Leases purchased by Seller effective in April 2011, from Virginia Vermiculite, L.L.C. and/or processed at the Subject Business Real Property, and residue from the mining or processing of such vermiculite, contained or contain or may have contained or may contain asbestiform minerals; and the unmined vermiculite covered by the Vermiculite Leases contains or may contain or is or may be associated with asbestiform minerals.

(c)    As a result of Seller's addition of commercial asbestos to its products, which ended in 1973, Seller's facilities located at the Subject Business Real Property and the Ajax Facility may have received and processed such commercial asbestos, and some of such asbestos may remain in the Subject Business Real Property.

(d)    Seller has made available to Purchaser copies of all reports, audits, investigations, samplings, and other material documentation that have been prepared by or for Seller regarding the presence of asbestiform minerals that relate to the Subject Business, including any at the South Carolina Real Property or at the properties covered by the Vermiculite Leases.

5.21    Brokers and Finders.  Except for Seale & Associates, Inc., no broker or finder has acted on behalf of Selling Companies in connection with the Transactions.

5.22    Reclamation Obligations.  **Schedule 5.22** sets forth the reclamation plans filed with respect to the South Carolina Real Property and the property covered by the Mining Leases..  Except as described in **Schedule 5.22**, Seller is in full and complete compliance with any Reclamation Obligations that it is currently required to perform under applicable law or under permits or filed plans..

5.23    Material Safety Data Sheets.  Schedule 5.26 contains a true and correct copy of each material safety data sheet ("MSDS") used in the Subject Business at any time since January 1, 2011.  To the best Knowledge of Seller, Seller is in compliance with all applicable legal and regulatory requirements with respect to the preparation, filing, and provision of MSDSs.

34

## ARTICLE 6

## Purchaser's Representations and Warranties

Purchaser represents and warrants to Seller as follows:

6.01 <u>Corporate Status</u>. Purchaser is a corporation duly organized and validly existing under the laws of its jurisdiction of incorporation as set forth in the preamble of this Agreement. Each Purchasing Company has full corporate power to enter into this Agreement, and each of Purchaser and the other Purchasing Companies has full corporate power to enter into the other Transaction Documents to which it is or will be a party, and perform its obligations hereunder and thereunder.

6.02 <u>Authorization</u>. The execution and delivery by each of the Purchasing Companies of the Transaction Documents to which it is or will be a party, and its performance of its obligations thereunder, have been duly authorized by all required corporate action.

6.03 <u>Execution and Delivery</u>. Purchaser has duly and validly executed and delivered this Agreement; and the other Transaction Documents to which each Purchasing Company will be a party, when executed and delivered by such Purchasing Company, will be duly and validly executed and delivered by such Purchasing Company; and upon such execution and delivery by each Purchasing Company of the Transaction Documents to which it is a party, assuming the due authorization, execution, delivery thereof by the other parties thereto, such Transaction Document shall be the legal, valid and binding obligation of such Purchasing Company,

35

enforceable against such Purchasing Company in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles (whether in equity or at law) and to general principles affecting the enforceability of indemnities.

6.04 <u>No Conflict</u>. The execution and delivery by each Purchasing Company of the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not and will not (a) conflict with its certificate or articles or incorporation and by-laws or other organizational documents, or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order, decree, or Contract to which it is a party or by which it is bound, which violation, breach or default would adversely affect its ability to execute and deliver any Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

6.05 <u>Sufficient Funds</u>. Purchaser has on the date hereof and will have on the Scheduled Closing Date sufficient funds to consummate the Transactions.

6.06 <u>Brokers and Finders</u>. No broker or finder has acted on behalf of Purchasing Companies in connection with the Transactions.

## ARTICLE 7

### Purchaser's Investigation

Purchaser hereby acknowledges the following:

7.01    Investigation.    Purchaser has conducted its own investigation and has made its own evaluation of the Subject Business, the Transferred Assets and the Transferred Liabilities.

7.02    Financial Information.    As part of its investigation, in addition to the Net Asset Statements and the Income Statements, Purchaser has been given certain financial statements, forecasts, projections, opinions and similar material prepared or furnished by Selling Companies or their representatives with respect to the Subject Business (the "Financial Information").    Except for the specific representations and warranties in Article 5, neither Seller nor any other Seller Entity shall have any liability of any kind to Purchaser or any other Purchaser Entity with respect to any of the Financial Information.

7.03    No Additional Representations.    Except for the specific representations and warranties in Article 5, neither Seller nor any other Seller Entity is making any representation or warranty, express or implied, of any nature whatsoever with respect to the Subject Business, the Transferred Assets or the Transferred Liabilities.

## ARTICLE 8

### Covenants of Seller and Purchaser

8.01    Bankruptcy Court Approval.

(a)    As soon as practicable after the date of this Agreement, Seller shall file with the Bankruptcy Court a motion for the approval of the Transactions that require such approval (the "Sale Motion"), and make all commercially reasonable efforts for the approval of the Sale Motion.

(b)    The Sale Motion shall include provisions requesting the assumption and assignment of the Subject Business Contracts listed in Exhibit 1.02E, and any other Subject Business Contracts to which Seller is a party that are agreed to be added by Purchaser (collectively, the "Assumption and Assignment Contracts"). Seller shall give notice with respect to the Assumption and Assignment Contracts in accordance with the Bankruptcy Code. Seller shall pay 100% of any payments which are required under section 365 of the Bankruptcy Code for the assumption and assignment of the Assumption and Assignment Contracts.

8.02    Access and Inquiry. Between the date of this Agreement and the Closing, Seller shall give Purchaser and its representatives reasonable access to the facilities of the Subject Business and Purchaser upon request will be permitted to contact and make reasonable inquiry of employees of Selling Companies regarding the Subject Business. Purchaser acknowledges that the terms of the Confidentiality Agreement shall apply to information obtained by Purchaser and its representatives pursuant to this Section.

8.03    Licenses and Permits.   As soon as practicable after the date hereof, the Parties shall co-operate in the preparation and filing with the appropriate licensing and

permitting authorities of applications for the transfer or issuance to Purchaser of all licenses and permits issued by a Governmental Authority and required for operation of the Subject Business or use of any of the Subject Assets after the Closing, including the Mining Permits, whether or not required to be held by Purchaser. Purchaser shall use all commercially reasonable efforts to secure such licenses and permits.

8.04 <u>Notices to Third Parties</u>. The Parties shall cooperate to make all other filings and to give notice to all third parties as may reasonably be required to consummate the Transactions.

8.05 <u>Commercially Reasonable Efforts</u>. In making commercially reasonable efforts as required under this Article 8 or any other provision of this Agreement, no Party shall be required to make any payment (other than for reasonable legal fees) that it is not presently contractually required to make, divest any assets (including but not limited to assets of the Subject Business), make any change in the conduct of its business or that of the Subject Business, accept any limitation on the future conduct of its business or that of the Subject Business, enter into any other Contract or arrangement with any Person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing.

8.06 <u>Unassigned Contracts and Other Assets</u>. Any provision of this Agreement to the contrary notwithstanding, any Subject Business Contract that cannot be or is not assumed and assigned pursuant to section 365 of the Bankruptcy Code or otherwise, and whose assignment to the Purchasing Companies requires a consent that has not been obtained prior to the Closing, and each other asset whose transfer to Purchasing

Companies as contemplated by this Agreement requires a consent that has not been obtained prior to the Closing, shall not be assigned or transferred to Purchasing Companies until such consent is obtained; and the Parties shall obtain such consent or enter into arrangements, to the extent practicable and permitted under applicable law, that will provide Purchaser with the benefits, and relieve Selling Companies of the burdens, of such Subject Business Contract or such other asset.

8.07 <u>Removal of Seller Pompano Beach Assets</u>. As soon as practicable after the Closing Date, Seller shall remove or cause to be removed from the Pompano Beach, FL facility of the Subject Business, at Seller's expense, all assets at the facility listed on **Schedule 8.07** (the "Seller Pompano Beach Assets"). Purchaser shall provide reasonable access and cooperation to enable Seller to expeditiously remove the Seller Pompano Beach Assets, and Seller and its employees and agents shall comply with all reasonable regulations established by Purchaser for the conduct while at the Pompano Beach facility. Seller shall indemnify and hold harmless Purchaser from any and all Damages arising from or out of the activities of Seller and its employees and agents in removing the Seller Pompano Beach Assets from the Pompano Beach facility, excluding Damages to the extent arising from the negligence, willful misconduct or violation of law by Purchaser Group.

8.08 <u>Ajax Real Property Bid Right</u>. If during the term of the Ajax Tolling Agreement, GCI undertakes to sell all or substantially all of the real property located at 294 Clements Rd W, Ajax, ON L1S 3C6 (the "Ajax Real Property"), it shall notify Purchaser, and Purchaser shall have the right to participate in the bidding or other

process for the sale of the Ajax Real Property on a basis substantially equal to other interested Persons.

8.09 <u>Title Insurance and SurveyTitle Insurance and Survey</u>. Purchaser shall use all commercially reasonable efforts to obtain the title insurance commitment and surveys for the Subject Business Real Property described in Section 10.06. The cost of such title insurance and surveys shall be borne by Purchaser. Seller shall provide all commercially reasonable cooperation with Purchaser's efforts to obtain such title insurance and surveys.

8.10 <u>Waiver of Bulk Sales Law Compliance</u>. Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which Transferred Assets are located and all other laws applicable to bulk sales and transfers, including the Bulk Sales Act (Ontario), to the extent applicable to the Transactions. Seller shall indemnify and hold harmless Purchaser from any Damages arising from such waiver, except to the extent that any such Damages arise from Purchasing Companies' failure to satisfy the Transferred Liabilities.

## ARTICLE 9

### Conduct of Business Prior to Closing

Seller agrees that except as otherwise required or contemplated by this Agreement or consented to by Purchaser, from the date of this Agreement until the Closing:

9.01 <u>Operation in Ordinary Course</u>. Selling Companies shall conduct the Subject Business only in the ordinary course of business and consistent with prior practice.

9.02 <u>Disposition of Assets</u>. Other than pursuant to sales in the ordinary course of business or disposition of worn out or obsolete assets, neither Selling Company shall sell, lease (as lessor), transfer, license (as licensor), subject to a Lien, or otherwise dispose of, any Transferred Assets with a book value of USD 10,000 or more.

9.03 <u>Material Agreements</u>. Other than in the ordinary course of business, neither Selling Company shall, in the operation of the Subject Business, enter into any Subject Business Contract that both (1) has a term of more than one year and cannot be canceled by such Selling Company without penalty upon notice of one year or less, and (2) is a Contract under which it is reasonably expected that the Subject Business will make expenditures or obtain receipts of more than USD 10,000 per year.

9.04 <u>Relations with Customers and Suppliers</u>. Selling Companies shall use all commercially reasonable efforts to preserve the relations of the Subject Business with customers and suppliers.

9.05 <u>No Shop Provision</u>. Selling Companies shall not directly or indirectly (through a representative or otherwise), solicit any offer from, furnish any confidential or proprietary information to, commence or conduct negotiations with, or enter into any agreement with any party (other than Purchaser and its representatives) concerning the sale, lease, or other disposition of the Subject Business, the Transferred Assets, or any part thereof other than in the ordinary continuing conduct of the Subject Business.

9.06 <u>Notice of Material Adverse Effect</u>. Between the date of this Agreement and the Closing Date, if to the Knowledge of Seller, a Material Adverse Effect shall have occurred, Seller shall promptly advise Purchaser thereof.

9.07 <u>Announcements to Employees</u>. Seller will make, on a timely basis, to employees of the Subject Business such announcements and notifications as may be required by applicable law.

## ARTICLE 10

### Conditions Precedent to Purchaser's Obligations

All obligations of Purchaser under this Agreement are subject, at Purchaser's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

10.01 <u>Accuracy of Representations and Warranties</u>. Each and every representation and warranty of Seller under this Agreement shall be true and accurate in all material respects as of the Closing as though made as of the Closing, except as may be affected by changes in the ordinary course of business between the date of this Agreement and the Closing, which changes would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

10.02 <u>Performance of Covenants and Agreements</u>. Seller shall have performed in all material respects all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

10.03 <u>Permits, Consents, etc</u>. There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority

required in connection with the Transactions that has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Subject Business.

10.04 <u>Litigation</u>. No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Purchaser Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions and which, if successful, would materially adversely affect the right of Purchaser to consummate the Transactions or to continue the Subject Business after the Closing substantially as currently operated.

10.05 <u>Certificates of Selling Companies</u>.

(a)     Seller shall have delivered to Purchaser a certificate of Seller, dated the Closing Date, signed by the Chief Executive Officer, President or any Vice President of Seller, certifying that: (i) each and every representation and warranty of Seller under this Agreement is true and accurate in all material respects as of the Closing as though made as of the Closing, except as may be affected by changes in the ordinary course of business between the date of this Agreement and the Closing, which changes would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and (ii) Seller has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Seller at or prior to the Closing pursuant to this Agreement.

(b)     Each Selling Company shall have delivered to Purchaser a certificate of

such Selling Company, dated the Closing Date, signed by the Secretary or an Assistant Secretary of such Selling Company, (i) certifying that the execution, delivery and performance of the Transaction Documents to which such Selling Company is a party have been duly authorized by its Board of Directors or the Board's duly authorized delegee, and that such authorization has not been amended but remains in full force and effect on the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of such Selling Company, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of such Selling Company.

10.06 <u>Title Insurance and Surveys</u>.

(a)     Purchaser shall have obtained a commitment for an owner's policy of title insurance in an aggregate amount equal to the portion of the Purchase Price allocable to the Subject Business Real Property located in the United States insuring that Purchaser holds good and indefeasible fee simple title to the Subject Business Real Property.    Such commitment shall provide that the policy will delete all of the requirements listed in ALTA Schedule B-1, only include the Permitted Exceptions as exclusions, have no exception for the gap between Closing and recording and otherwise be in form and substance satisfactory to Purchaser in its reasonable discretion. Purchaser shall have obtained an ALTA survey of the Subject Business Real Property that include Table A items 1, 2, 3, 6, 7(b), 10 and 11(a) and is otherwise reasonably acceptable to Purchaser.

(b)     Purchaser shall have obtained a commitment for the Subject Business

Real Property located in Canada that is analogous to that described in Section 10.06(a), to the extent available on commercially reasonable terms.

10.07 <u>Third Party Consents and Approvals.</u> The consents of third parties to the assignment of the Subject Business Contracts listed on **Schedule 10.07** shall have been obtained, or such Contracts shall have been assumed and assigned pursuant to the Sale Order.

10.08 <u>No Material Adverse Effect</u>. No Material Adverse Effect shall have occurred between the date of execution of this Agreement and the Closing Date.

10.09 <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered an order approving those of the Transactions requiring Bankruptcy Court approval, which also shall provide that both Seller and the Reorganized Seller, as applicable, shall be responsible for the Excluded Liabilities, representations, warranties, covenants, agreements and indemnifications of Seller set forth in this Agreement (the "Sale Order"); and the Sale Order shall have become final and non-appealable.

## ARTICLE 11

### Conditions Precedent to Seller's Obligations

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01 <u>Accuracy of Representations and Warranties</u>. Each and every representation and warranty of Purchaser under this Agreement shall be true and accurate in all material respects as of the Closing.

11.02 <u>Performance of Covenants and Agreements</u>.   Purchaser shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

11.03 <u>Permits, Consents, etc</u>.   There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Seller Group.

11.04 <u>Litigation</u>.  No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Purchaser Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions and which, if successful, would materially adversely affect the right of Purchasing Companies to consummate the Transactions or to continue the Subject Business after the Closing substantially as currently operated or might involve material liability on the part of any Seller Entity.

11.05 <u>Certificates of Purchasing Companies</u>.

(a)    Purchaser shall have delivered to Seller a certificate of Purchaser, dated the Closing Date, signed by the Chief Executive Officer, President or any Vice President of Purchaser, certifying that: (i) each and every representation and warranty of Purchaser under this Agreement is true and accurate in all material respects as of the

Closing as though made as of the Closing; and (i) Purchaser has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by such Purchaser at or prior to the Closing pursuant to this Agreement.

(b)     Each Purchasing Company shall have delivered to Seller a certificate of such Purchasing Company, dated the Closing Date, signed by the Secretary or an Assistant Secretary of such Purchasing Company, (i) certifying that resolutions of the Board of Directors of such Purchasing Company authorizing the Transactions and the execution, delivery and performance of the Transaction Documents to which such Purchasing Company is a party have been duly adopted and have not been amended but remain in full force and effect as of the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of Such Purchasing Company, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of such Purchasing Company.

11.06 Third Party Consents and Approvals.  The consents of third parties to the assignment of the Subject Business Contracts listed on **Schedule 10.07** shall have been obtained, or such Contracts shall have been assumed and assigned pursuant to the Sale Order.

11.07 Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become final and non-appealable.

# ARTICLE 12

## Employee Matters

12.01 <u>Employment</u>.

(a)     Effective as of the Closing, (i) each employee of Seller or GCI at the South Carolina Real Property or the Other Real Property (collectively, the "Subject Employees") shall cease to be an employee of Seller or GCI. All such employees as of the date of this Agreement are listed in **<u>Schedule 12.01</u>**. None of the employees of GCI at the Ajax Facility are or shall be deemed Subject Employees.

(b)     Each Subject Business Employee who accepts an offer of employment from a Purchaser Entity in accordance with Section 12.02 shall become an employee of such Purchaser Entity effective as of the Closing; and all such employees are referred to herein as "Continued Employees". Seller is making no representation or warranty as to which, if any, Subject Employees will accept offers of employment from Purchaser Entities.

12.02 <u>Positions Offered to Subject Employees</u>.   Purchaser shall offer each Subject Employee employment by a Purchaser Entity to commence as of the Closing. With respect to each Subject Employee, the position offered (i) shall be for a job that is equivalent (including with respect to level of responsibility and authority) to the Subject Employee's job with the Subject Business as of the Closing, (ii) shall be as of Closing at no reduction in base salary, wages, commissions and incentive levels effective immediately prior to the Closing, (iii) shall as of Closing not change the location of the Subject Employee's principal place of work to one that is an unreasonable commuting

49

distance from the employee's residence, and (iv) shall provide employee benefit plan coverage as follows:

    (A)    <u>Vacation and Vacation Pay</u>.

        (1)    For purposes of this Clause (A), one-twelfth of Seller's obligation to each Continued Employee for vacation and related vacation pay for calendar year 2011 shall be deemed to accrue on the first day of each month during that year, both before and after the Closing, and Purchaser shall assume all such obligations accruing after the Closing Date.

        (2)    After the Closing Date, Seller shall pay each Continued Employee vacation pay for all vacation days accrued but not used on or before the Closing Date.

        (3)    Purchaser shall pay each Continued Employee vacation pay for all vacation pay accrued but not used from after the Closing Date through December 31, 2011.

        (4)    With respect to each calendar year after 2011, each Continued Employee shall be given credit by the Purchaser Group for the employee's prior service with the Seller Group for purposes of the Purchaser Group's vacation policies, to the extent such service is recognized under Seller's vacation policies.

    (B)    <u>Plan Participation</u>.

    Except as otherwise provided in this Section with respect to vacation benefits, effective as of the day after the Closing Date, Purchaser shall make available to each Continued Employee the defined contribution plans, severance benefits, vacation benefits, defined benefit pension plans, medical plans, dental plans, disability

plans, group insurance plans and all other benefits under the Purchaser's plans, policies and arrangements, which are made available by the Purchaser Group to its similarly situated employees. With respect to any such plan, policy or arrangement that requires an employee to attain any specific length of service with Purchaser in order to participate in, or be eligible for, or to be vested in, any benefits provided thereunder, each Continued Employee shall be given credit for purposes of determining such participation, eligibility and vesting for the Employee's length of service with the Seller Group prior through the Closing Date, but shall only be given credit for such length of service under severance plans for purposes of the accrual of any benefits. Purchaser shall have no liability to Seller under Seller's severance policies with respect to any Subject Employee who is offered but refuses employment by a Purchaser Entity.

12.03 <u>Terms of Employment</u>. As to terms and conditions of employment not specified in this Article, from and after the Closing the Continued Employees (i) shall be treated in a similar manner as the other employees of the Purchaser Group who are similarly situated, (ii) shall be entitled to participate on the same basis as such other employees in all job training, career development and educational programs of the Purchaser Group, and (iii) shall be entitled to fair and equitable consideration together with such other employees in connection with any management or executive job opportunities or any other promotional opportunities with the Purchaser Group.

12.04 <u>Employment Related Indemnities</u>. Each Party shall indemnify the other Party from and against all Damages resulting from the respective obligations of Parties in this Section 12, including any as to (a) the hiring and termination practices and

decisions with respect to the Subject Business of the Seller Group prior to the Closing Date, and of the Purchaser Group after the Closing Date, (b) the Purchaser Group's termination of employment of any Continued Employee, (c) any claim made by any Subject Employee for any severance pay or termination, indemnity or other severance or termination entitlement, including any individual who under applicable law or otherwise is entitled to severance upon termination by Seller Group after refusing an offer to become an employee of the Purchaser Group, (d) any claim made by any Continued Employee that results from the actual or alleged non-continuance, reduction or change of the terms and conditions of employment (including any reduction or change of the employment-related benefits provided to such employee), which occurs after the Closing Date as to the Purchaser Group, or prior to the Closing Date as to the Seller Group, and (e) any claim under the Worker Adjustment and Retraining Notification Act, 29 USC §§ 2101 *et seq.*, or any comparable U.S. state or Canadian federal or provincial law arising out of any actions taken by the relevant Party during the time it operated the Subject Business. Any Third Party Claims arising under this Section shall be subject to the provisions of Section 14.05.

12.05 Employee Information Sharing. After the Closing, each of Seller and Purchaser shall provide to the other Party, from time to time at no cost to the recipient, such information regarding employees of the Subject Business under the ownership of the Selling Companies as may be reasonably requested. This Section shall not compel any Person to maintain records beyond the periods specified in Section 15.02.

12.06 Notices, etc.. With respect to any employees of the Subject Business not

hired by Purchaser, the Selling Companies will timely provide all notices and any continuation of health benefit coverage required to be provided by the Selling Companies to any of such employees as well as their respective spouses, former spouses, dependents, and former dependents under COBRA and applicable state or Canadian federal and provincial law.

## ARTICLE 13

## Termination

13.01 <u>Rights to Terminate</u>.

(a) This Agreement may be terminated at any time prior to the Closing by written agreement of Seller and Purchaser.

(b) If for any reason the Closing shall not take place within 180 days after the date of this Agreement, then either Seller or Purchaser may terminate this Agreement at any time thereafter by giving notice of such termination to the other Party in the manner provided in Section 18.01, provided that the terminating party is not in material breach of the provisions of this Agreement.

(c) By Purchaser if (i) any of the conditions set forth in Article 10 have become incapable of fulfillment on or before the Closing Date (or other specified date), (ii) Purchaser has given Seller 15 days notice of such matter, (iii) Seller have failed to cure or cause to be cured such matter within the 15 days, and (iv) Purchaser is not otherwise in material default.

(d) By Seller if (i) any of the conditions set forth in Article 11 of this Agreement

have become incapable of fulfillment on or before the Closing Date (or other specified date), (ii) Seller has given Purchaser 15 days notice of such matter, (iii) Purchaser has failed to cure such matter within the 15 days, and (iv) Seller is not otherwise in material default.

13.02  Consequences of Termination.

(a)     The termination of this Agreement, whether in accordance with any of the provisions of Section 13.01 or otherwise, shall not affect the rights of any Party with respect to any prior breach of any covenant or agreement contained in this Agreement, except as provided in Section 14.04(c) and except that upon termination in accordance with any of the provisions of Section 13.01, the Parties shall be released from any and all liability for breach of any of the representations and warranties contained in Articles 5 and 6.

(b)     The obligations of the Parties under Sections 17.01 and 17.02 shall survive any termination of this Agreement.

## ARTICLE 14

### Indemnification

14.01  Definitions.  As used in this Article:

(a)     "Purchaser Claim" has the meaning given such term in Section 14.04.

(b)     "Claim" means any claim, demand, suit, action or proceeding.

(c)     "Damages" means any and all penalties, fines, damages, liabilities, losses or costs (including reasonable Litigation Expenses incident to Third Party Claims, but

excluding incidental, indirect or consequential damages, damages for lost profits, and Litigation Expenses incident to Direct Claims).

(d)     "Direct Claims" means Claims other than Third Party Claims.

(e)     "Litigation Expenses" means attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a Claim.

(f)     "Third Party Claims" means any and all Claims by any Person, other than Seller Entities or Purchaser Entities, including Governmental Authorities, which could give rise to a right of indemnification under this Article.

14.02 Seller's Indemnification.

(a)     Subject to the terms and limitations of this Article, Seller shall indemnify Purchaser against any Damages to the Purchaser Group that are caused by or arise out of (i) the breach of or failure of either of the Selling Companies to perform and fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Seller set forth in Article 5 this Agreement, or (iii) any of the Excluded Liabilities or Excluded Assets.  Notwithstanding any other provision of this Agreement, except for liability for breach of Section 5.20(d), Seller shall have no liability whatsoever to Purchaser or the Purchaser Group with respect to the presence of asbestiform minerals in or on any building or other improvement that is part of the Subject Business Real Property.

(b)     The representations and warranties of Seller set forth in Article 5 shall

survive the Closing. Except as otherwise required by applicable law, (i) the representations and warranties set forth in Section 5.05 and subsequent Sections of Article 5 (other than Sections 5.07 and 5.08) shall expire and be of no further force and effect two years after the Closing Date and (ii) the representations and warranties set forth in Sections 5.09(b) and 5.14 shall expire and be of no further force and effect five years after the Closing Date, except with respect to claims Purchaser has previously asserted against Seller in writing, setting forth the nature of such claims with reasonable specificity.

14.03 Purchaser's Indemnification.

(a) Subject to the terms and limitations of this Article, each Purchaser shall indemnify Seller against any Damages to the Seller Group which are caused by or arise out of (i) the failure of Purchaser to perform or fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Purchaser set forth in Article 6, (iii) the failure of any Purchaser Entity subsequent to the Closing to perform or fulfill its obligations under any Contract or obligation included in the Transferred Liabilities for which any Seller Entity is or may be liable, as a guarantor or otherwise, (iv) any of the Transferred Liabilities; (v) subject to Section 3.07, any Reclamation Obligations; or (vi) any other obligations under applicable law or any license or permit issued by a Governmental Authority to a Selling Company to the extent that such Damages relate to the operation of the Subject Business or the Transferred Assets after the Closing.

(b)     The representations and warranties of Purchaser set forth in Article 6 shall survive the Closing.

14.04  Limitations.

(a)     Purchaser may not assert any Claim for indemnification under this Article (a "Purchaser Claim") with respect to the breach of any representation in Section 5.04 or subsequent Sections of Article 5 unless such Purchaser Claim(s) gives rise to Damages (including Litigation Expenses for purposes of the threshold set forth in this clause) which in the aggregate amount shall exceed USD 250,000, and then only with respect to the excess of such aggregate Purchaser's Claims over said USD 250,000. In no event shall the aggregate amount of indemnification with respect to all such Purchaser Claims exceed USD 5,000,000.

(b)     The dollar thresholds set forth in this Section have been negotiated for the special purpose of the provision to which they relate, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the Transactions under which a level of materiality might be an issue.

14.05  Defense of Third Party Claims.

(a)     If either Party (the "Indemnitee") learns of any Third Party Claim for which Indemnitee intends to seek indemnification under this Agreement, or to have taken into account for purposes of the dollar thresholds in Section 14.04, it shall give notice in writing of such Claim to the other Party from whom it intends to seek such indemnification or taking into account (the "Indemnitor"). It shall be a necessary

condition of any claim for indemnification under this Agreement with respect to any Third Party Claim, or for such Third Party Claim to be taken into account for purposes of the dollar thresholds under Section 14.04, that Indemnitee notify Indemnitor prior to the time when Indemnitor's ability to contest the Third Party Claim would be materially impaired by lack of notice.

(b)     Indemnitor may undertake the defense of a Third Party Claim of which Indemnitee has notified Indemnitor, by notice to Indemnitee given not later than 30 calendar days after receipt by Indemnitor of Indemnitee's notice of such Third Party Claim. If Indemnitor undertakes the defense of any Third Party Claim, it shall control the investigation and defense thereof, except that without the prior written consent of Indemnitee, which consent shall not be unreasonably withheld or delayed, Indemnitor may not enter into any settlement that requires Indemnitee to make any payment that is not fully indemnified under this Agreement or taken into account under Section 14.04, or submit to injunctive relief; and subject to Indemnitor's control rights, Indemnitee may participate at its own expense in such investigation and defense. If Indemnitor does not undertake the defense of a Third Party Claim, then Indemnitee shall control the investigation and defense thereof, except that without the prior written consent of Indemnitor, which consent shall not be unreasonably withheld or delayed, Indemnitee may not enter into any settlement; and subject to Indemnitee's control rights, Indemnitor may participate in such investigation and defense, at its own expense.

(c)     The Parties shall make available to each other, their counsel and other representatives, all information and documents reasonably available to them which

relate to any Third Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

(d)     For any Claim whose resolution may require Environmental remediation work, at any of the Subject Business Real Property, the Party controlling the defense pursuant to this Section 14.05 shall control performance of such work, including related disclosures to and dealings with Governmental Authorities; Seller shall consult with Purchaser as to the methods and procedures of such remediation, and to the extent reasonably practicable, shall adopt methods and procedures that will minimize interference with the Subject Business; the Purchaser shall allow access, after reasonable prior written notice, to said property for performance of such work; both Parties shall be entitled to participate, at their own several cost, in all communications and meetings with any Governmental Authority relevant to the resolution of the Claim; and both Parties shall cooperate together to resolve the Claim and achieve a cost-effective environmentally protective remedy. Nothing in this Section 14.05 shall prevent Seller or Purchaser from making any disclosure to or undertaking any dealings with Governmental Authorities that such Party's counsel determines, in such counsel's reasonable opinion, to be required by applicable law; provided that such Party shall give the other Party prompt notice of its intention to make such disclosure or undertake such dealings.

14.06 <u>No Consequential or Lost Profit Damages</u>.  Neither Party shall seek or be entitled to incidental, indirect or consequential damages or damages for lost profits or punitive damages in any claim for indemnification under this Article with respect to a

Direct Claim, nor shall it accept payment of any award or judgment for such indemnification to the extent that such award or judgment includes such Party's incidental, indirect or consequential damages or damages for lost profits or punitive damages.

## ARTICLE 15

### Cooperation in Various Matters

15.01 <u>Mutual Cooperation</u>.

(a)     After the Closing, each Party shall cooperate with the other Party as reasonably requested by such other Party in connection with the prosecution or defense of any claims or other matters relating to the Subject Business.  Such cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees.

(b)     Seller and Purchaser shall use all reasonable efforts to obtain any certificate or other document from any Governmental Authority or other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including any Tax with respect to the Transactions).   Purchaser shall execute and deliver, or cause to be executed and delivered, on a timely basis any Canadian Tax Elections in respect of the Transactions and the purchase and sale of the Transferred Assets  if requested in writing by any Seller Entity at least 30 days prior to the date upon which the requested Canadian Tax Election is to be delivered to the Seller Entity.  "Canadian Tax Elections" means any election, form, notification, or other filing pursuant to subsection or 22(1) of

the *Income Tax Act* (Canada) or proposed section 56.4 of the *Income Tax Act* (Canada), as enacted (including any amended, successor or replacement provisions and any equivalent provisions under provincial or local law).

15.02 <u>Access to Files and Records</u>. For a period of three years after the Closing Date, on reasonable notice and regulations during normal business hours, each Selling Company shall allow the Purchasing Companies, and each Purchasing Company shall allow the Selling Companies, access to any files and records in its possession relating to the Subject Business prior to the Closing, and the right to copy and make extracts therefrom. If at any time during such period, either Selling Company or Purchasing Company wishes to dispose of such any files and records, it shall give Purchasing Companies or Selling Companies, as the case may be, notice of such disposal, and at request of a recipient of such notice given within sixty days after receipt of such notice, deliver to the requesting recipient, at requesting recipient's expense, any of such items as are requested.

## ARTICLE 16

## Post-Closing Matters

16.01 <u>Reports</u>. Purchaser shall provide such information as Seller may reasonably request in connection with Seller's preparation of financial, Tax and other reports and statements relating to the Subject Business for periods prior to the Closing.

16.02 <u>Names</u>. After the Closing, Purchaser Entities shall have no right to use the "Grace" or the "Davison" name, whether alone or in combination with other words and/or symbols, and Purchaser shall not, nor permit any other Purchaser Entity to, refer

(other than in response to unsolicited inquiries or in announcements of the occurrence of the Closing) to their respective businesses as formerly being owned by or associated with Seller, except that for a period of 90 days after the Closing, the Buying Companies shall have the right to use any packaging, catalogues, sales and promotional materials and printed forms (except for MSDSs) that use such names and are included in the Transferred Assets as of the Closing, or have been ordered prior to the Closing for use in the Subject Business, but only to the extent that it is not practicable to remove or cover up the "Grace" name. Purchaser shall use reasonable efforts to minimize such usage and to discontinue it as soon as practicable after the Closing.

16.03 <u>Intercompany Agreements</u>. Any contracts, licenses, agreements, commitments or other arrangements between the Subject Business and any Seller Entity or unit thereof, whether written or oral, and whether express or implied, pursuant to which any Seller Entity provides management, administrative, legal, financial, accounting, data processing, insurance, technical support, or other services to the Subject Business, or the use of any assets of any Seller Entity, or pursuant to which any rights, privileges or benefits are accorded to the Subject Business as a unit of the Seller Group, shall terminate as of the Closing. After the Closing, the Purchaser Group shall have no rights under any similar contract, license, agreement, commitment or arrangement with Seller or any other Seller Entity, except this Agreement and the Ancillary Agreements.

16.04 <u>Seller's Covenant Not to Compete</u>. For a period of three (3) years after the Closing Date, no Seller Entity shall engage, directly or indirectly, anywhere in the

world in the mining, milling, expanding, manufacture, and/or sale of vermiculite, vermiculite concentrate, perlite, and specialty vermiculite products; provided that the foregoing shall not apply to manufacture or sale of such products by a business acquired by a Seller Entity after the Closing Date if, in the year prior to such acquisition, the net sales of such products by the acquired business was less than 50% of the net sales of the entire acquired business. A Seller Entity may also acquire a business that exceeds the threshold set forth in the immediately preceding sentence; provided that the Seller Entity divests the unit of such business manufacturing or selling such products within one year after its acquisition; and provided further that if the Seller Entity shall not have effected such divestment within one year after its acquisition despite its reasonably diligent efforts, Purchaser shall grant the Seller Entity reasonable extension of the divestment period not to exceed six months. If the Seller Entity proposes to sell the unit of the acquired business that manufactures or sells such products, it shall notify Purchaser and give Purchaser the opportunity to participate in the bidding or other process for the sale of such unit on a basis substantially equal to other interested Persons. No portion of the Purchase Price shall be allocated to the provisions of this Section for Canadian Tax or other purposes.

## ARTICLE 17

### Expenses

17.01 Purchaser's Expenses. Purchaser shall pay, and indemnify all Seller Entities against all Damages arising from, expenses incurred by or on behalf of the

Purchaser Group in connection with the preparation, authorization, execution and performance of this Agreement, the other Transaction Documents and the Transactions, including all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants.

17.02 <u>Seller's Expenses</u>.  Seller shall pay, and indemnify the Purchaser Entities against all Damages arising from, expenses incurred by or on behalf of the Seller Group in connection with the preparation, authorization, execution and performance of this Agreement, the other Transaction Documents and the Transactions, including all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants.

17.03 <u>Transfer Taxes</u>.  Purchaser shall pay and indemnify the Seller Group against any stamp duty, sales, transfer, value added, goods and services, harmonized sales, gross receipts, land transfer, land registration, excise, recording, registration or similar Tax applicable to this Agreement, the transfer to Purchaser or its designees of the Transferred Assets pursuant to this Agreement, the other Transaction Documents or the Transactions.

17.04 <u>Other Real Estate Costs</u>.  Purchaser shall pay and indemnify the Seller Group against all expenses the Purchaser Group may incur in connection with obtaining a title commitment, survey or title insurance policy for any of the Subject Business Real Property.

## ARTICLE 18

### Notices

18.01 <u>Notices</u>.   All notices, requests, demands and other communications required or permitted to be given under this Agreement or any of the other Transaction Documents shall be deemed to have been duly given if in writing and delivered personally, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

If to Seller:

> W. R. Grace & Co.-Conn.
> 7500 Grace Drive
> Columbia, Maryland 21044
> Attention: Corporate Secretary
> Fax:   (410) 531-4545
> Confirmation:(410) 531-4362

If to Purchaser:

> Attention:  Jason Guzek
> 1 Bala Avenue, Suite 310
> Bala Cynwyd, PA 19004
> Fax: (610) 660-8817
> Confirmation:  (610) 660-8803

Each Party may change the address to which such communications are to be directed to it by giving written notice to the other Parties in the manner provided above.

## ARTICLE 19

### General

65

19.01 <u>Entire Agreement</u>.   This Agreement sets forth the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating thereto.   No representation, promise, inducement or statement of intention relating to the Transactions has been made by any Party or any related Person which is not set forth in this Agreement.

19.02 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to principles of conflicts of law that would require the application of the law of any other jurisdiction.

19.03 <u>Submission to Jurisdiction</u>.  Each Party hereby irrevocably submits in any suit, action or proceeding arising out of or relating to this Agreement or any of the other Transaction Documents to which it is or will be a party, or any of its obligations hereunder or thereunder, to the jurisdiction of the United States District Court for the District of Delaware and the jurisdiction of any court of the State of Delaware, and waives any and all objections to such jurisdiction that it may have under the laws of the State of Delaware or any other jurisdiction.

19.04 <u>Equitable Remedies</u>.  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity without the necessity of demonstrating the inadequacy of monetary damages or the posting of a bond.

19.05 <u>Assignment; Successors</u>.  This Agreement shall be assignable by Purchaser only with the prior written consent of Seller, and shall be assignable by Seller only with the written prior consent of Purchaser.  Any attempted assignment in violation of this Section shall be null and void *ab initio*.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

19.06 <u>Amendments and Waivers</u>.  This Agreement may be amended, superseded or terminated, and any of the terms hereof may be waived, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or terminates this Agreement or waives any of its terms, executed by the Parties.  Failure of any Party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

19.07 <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by one or more Parties.  Each such counterpart shall be an original, but all such counterparts shall constitute one and only one agreement.

19.08 <u>Captions</u>.  The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

19.09 <u>Effectiveness</u>.  This Agreement shall become effective upon the entry of the Sale Order.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**

By: _Lawrence Shapiro_
Name: *LAWRENCE S. SHAPIRO*
Title: *AUTHORIZED SIGNATORY*

**VERMICULITE ACQUISITION CORP**

By: _Raymond G. Perel_
Name: RAYMOND G. PERELMAN
Title:    CHIEF EXECUTIVE OFFICER