IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Hearing Date: November 28, 2011, at 9:00 a.m. |
| | ) Objection Deadline: November 4, 2011 |

**DECLARATION OF ROBERT WHITNEY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER: (A) APPROVING THE FORM OF ASSET SALE AGREEMENT; (B) AUTHORIZING BUT NOT REQUIRING THE SALE OF CERTAIN VERMICULITE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (D) APPROVING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS**

STATE OF Virginia        )
                         )  ss.
COUNTY OF Fairfax        )

Robert Whitney, after being duly sworn according to law, deposes and says:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

I am over the age of 18 and competent to testify. I am a Vice President of Seale & Associates, Inc., ("Seale"), a financial advisory firm whose principal address is 950 N. Glebe Road, Suite 950, Arlington, VA 22203. The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") have retained Seale to advise them on the sale of their Vermiculite Business (as that term is defined below).

I directed the marketing of the Vermiculite Business.[2] In that capacity, I have reviewed the Motion and the Agreements (as those terms are defined below), and I am, directly or through the Debtors' personnel, attorneys, and other advisors familiar with the information contained therein and in the exhibits annexed thereto. Except as otherwise noted, I have personal knowledge of the matters set forth herein. If called upon to testify, I could and would testify competently to the facts and opinions contained in this declaration.

### A.    The Vermiculite Business

1.    Grace Specialty Vermiculite (the "Vermiculite Business"), headquartered in Enoree, South Carolina, is a division of W. R. Grace & Co.-Conn. ("Grace" or "Seller"). The Vermiculite Business produces branded high-performance vermiculite ore and expanded vermiculite and perlite products. Vermiculite is a natural occurring mineral used in a broad range of applications, such as spray-on fire protection, lightweight insulating concrete, various soil mixes and amendments, and animal feeds. The Vermiculite Business operates owned and leased mines in and around Enoree. The Vermiculite Business also operates a milling and

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in, as the case may be, the Debtors' *Motion for Entry of an Order: (a) Approving the Form of Asset Sale Agreement; (b) Authorizing But Not Requiring the Sale of Certain Vermiculite Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (c) Authorizing the Assumption and Assignment of Executory Contracts; and (D) Approving Procedures for Noticing and Determining Cure Amounts* (the "Motion") or the *First Amended Joint Plan of Reorganization in their Chapter 11 Cases,* Docket no. 25881, as it may be further amended, supplemented or otherwise further amended from time to time, and the schedules and exhibits to the foregoing, as they may be in effect from time to time (the "Plan"), or the Warrant Agreement (Exhibit 24 to the Plan's Exhibit Book).

processing facility in Enoree, and five other processing facilities strategically located across the U.S. and Canada.

2. Management projects that the Vermiculite Business will achieve sales of approximately $22 million in fiscal year 2011.

### B. Strategic Rationale for Sale of the Vermiculite Business

3. Management has informed me that, in 2009, prior to Seale's involvement in the sale of the Vermiculite Business, Grace's management team determined in their business judgment that it was in the Debtors' best interests to sell the Vermiculite Business. This decision was based on a number of factors, including the lack of strategic fit between the Vermiculite Business and the Debtors' other business lines. Moreover, its revenues contributed less than 0.7% to the Debtors' 2010 consolidated revenues, and did not contribute measurably to its consolidated EBITDA. In addition, managing the Vermiculite Business was demanding a disproportionate share of senior management's time and attention to manage. Furthermore, the aging facilities would require significant investment over the coming years to maintain efficiencies. Management therefore has determined that selling the Vermiculite Business will generate greater value to the Debtors' estates, particularly on the terms and conditions of the proposed transactions set forth in the ASA and the Motion, than retaining the business would, while at the same time generating funds that could be put to use in higher-return, core activities.

### C. Seller's Previous Attempts to Market the Business

4. Management has informed me that, in February 2009, following the decision to market the Vermiculite Business, a Grace management team identified and approached approximately twelve strategic buyers regarding the Vermiculite Business. Seven candidate buyers executed non-disclosure agreements, received management presentations and conducted due diligence. Grace thereafter received four offers. Management declined to move forward

with any of the offers, because the proposed consideration in each of the offers did not meet Grace's requirements. Grace subsequently undertook a number of strategic initiatives to improve business performance and profitability.

5. Grace's management has informed me that, in December 2010, Grace contacted one of the potential strategic buyers that had submitted a bid in 2009. In March 2011, that bidder (the "March Bidder") submitted a non-binding indication of interest for the Vermiculite Business.

### D. The March – July 2011 Marketing Process

6. At about the same time that it received the March Bidder's indication of interest, Grace engaged Seale & Associates, Inc. ("Seale") to assist it in marketing the Vermiculite Business. Seale and Grace: (a) identified and contacted potential acquirers (including certain parties interested during the 2009 process); (b) prepared under my supervision a Confidential Information Presentation dated June 2011 (the "CIP"); (c) coordinated the sale process and due diligence; and (d) assisted with the negotiation of the final agreements.

7. During May and June of 2011, Seale approached 57 potential strategic buyers and 130 potential private equity buyers to determine the level of interest in acquiring the Vermiculite Business. With the assistance of Grace's management team, and based upon Seale's marketing efforts, my team at Seale and I determined that there were no other viable candidates in the marketplace.

8. Of the companies contacted by Seale, 6 strategic and 18 private equity candidates responded, and they subsequently signed confidentiality agreements and were furnished with the CIP. Grace subsequently received preliminary offers from two strategic bidders, one of whom later withdrew from the process. The remaining bidder received a management presentation,

conducted extensive due diligence and incurred considerable expense in participating in site visits to the Enoree Facility and the outlying expanding plants located across North America.

### E. Purchaser's Bid Was the Highest and Best Offer for the Vermiculite Business

9. On or around July 22, 2011, after performing extensive due diligence, the potential bidder, Vermiculite Acquisition Corp. ("Purchaser") agreed to a detailed term sheet that included a purchase price of $10 million dollars. I am given to understand that Purchaser made its bid for strategic purposes. It, or related entities, are in the business of producing and marketing expanded Perlite products across North America, and are actively seeking to add capacity by acquiring expanding facilities such as those owned and operated by the Vermiculite Business.

10. In evaluating the bid, Grace considered primarily the dollar amount of the bid, Grace's confidence that the bid would not change materially during negotiations, the bid's required closing conditions, and relative ease of transition of the Vermiculite Business to Purchaser's organization. Grace also considered Purchaser's ability to close on a relatively accelerated timeline, as well as its financial wherewithal and the perceived commitment of its senior management team.

### F. Negotiating the ASA

11. Seller and Purchaser negotiated the ASA and other Sale Documents at arm's-length and in good faith. Both the Debtors and Purchaser are represented by sophisticated counsel and other advisors. Extensive negotiations were held between the parties involving substantial time and energy by the parties and their professionals, and the Sale Documents reflect give-and-take and compromises by both sides.

G. **Under the Facts and Circumstances, a Private Sale Has Obtained the Highest and Best Offer Available**

12. As discussed above in ¶¶ 9-10, I am of the opinion that Purchaser's offer is the highest and best offer received for the Vermiculite Business. Management has informed me that Purchaser's offer is likewise superior to Grace retaining the Vermiculite Business.

13. I am of the opinion based upon a very thorough marketing process that there are no potential candidate buyers that would be willing to pay a substantial enough premium over Purchaser's offer to make it worthwhile for the Debtors to delay the Sale to Purchaser in order to extend the sale process. Such a premium would be critical, because reopening the sale process to explore any such offer opens up the risk that Purchaser might decide to withdraw from the sale process. I have concluded, therefore, that conducting additional marketing, whether by merely extending the private sale process or by also conducting a public auction, would offer no discernible additional benefit to the Debtors' estates.

H. **Assumption and Assignment of Transferred Contracts**

14. The Sale contemplates the assumption and assignment to Purchaser of the Transferred Contracts, because they are integral to operating the Vermiculite Business.[3] Assuming and assigning the Transferred Contracts also will enhance the value of the Sale to the Debtors' estates by curtailing further administrative liability to the estate and eliminating certain rejection claims. The estimated cure payments associated with all of the Transferred Contracts totals $0.

15. I understand that, to the extent necessary, Purchaser is able and willing, at the Sale Hearing, to demonstrate to the satisfaction of this Court that adequate assurance of future performance is present.

---

[3] The Transferred Contracts are listed in Exhibit I to the Sale Notice.

16. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                                        Robert Whitney
                                        Vice President
                                        Seale & Associates, Inc.

SWORN AND SUBSCRIBED before me, this 17 day of October 2011

_____
Notary Public

My Commission Expires: 6/30/2012

MICHAEL D. PAMEPINTO
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JUNE 30, 2012
COMMISSION # 7230840

7