enforceable against such Purchasing Company in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles (whether in equity or at law) and to general principles affecting the enforceability of indemnities.

6.04   No Conflict.  The execution and delivery by each Purchasing Company of the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not and will not (a) conflict with its certificate or articles or incorporation and by-laws or other organizational documents, or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order, decree, or Contract to which it is a party or by which it is bound, which violation, breach or default would adversely affect its ability to execute and deliver any Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

6.05   Sufficient Funds.  Purchaser has on the date hereof and will have on the Scheduled Closing Date sufficient funds to consummate the Transactions.

6.06   Brokers and Finders.   No broker or finder has acted on behalf of Purchasing Companies in connection with the Transactions.

## ARTICLE 7

### Purchaser's Investigation

Purchaser hereby acknowledges the following:

7.01   <u>Investigation</u>.   Purchaser has conducted its own investigation and has made its own evaluation of the Subject Business, the Transferred Assets and the Transferred Liabilities.

7.02   <u>Financial Information</u>.   As part of its investigation, in addition to the Net Asset Statements and the Income Statements, Purchaser has been given certain financial statements, forecasts, projections, opinions and similar material prepared or furnished by Selling Companies or their representatives with respect to the Subject Business (the "Financial Information").   Except for the specific representations and warranties in Article 5, neither Seller nor any other Seller Entity shall have any liability of any kind to Purchaser or any other Purchaser Entity with respect to any of the Financial Information.

7.03   <u>No Additional Representations</u>.   Except for the specific representations and warranties in Article 5, neither Seller nor any other Seller Entity is making any representation or warranty, express or implied, of any nature whatsoever with respect to the Subject Business, the Transferred Assets or the Transferred Liabilities.

## ARTICLE 8

### Covenants of Seller and Purchaser

37

8.01    <u>Bankruptcy Court Approval</u>.

(a)    As soon as practicable after the date of this Agreement, Seller shall file with the Bankruptcy Court a motion for the approval of the Transactions that require such approval (the "Sale Motion"), and make all commercially reasonable efforts for the approval of the Sale Motion.

(b)    The Sale Motion shall include provisions requesting the assumption and assignment of the Subject Business Contracts listed in Exhibit 1.02E, and any other Subject Business Contracts to which Seller is a party that are agreed to be added by Purchaser (collectively, the "Assumption and Assignment Contracts"). Seller shall give notice with respect to the Assumption and Assignment Contracts in accordance with the Bankruptcy Code. Seller shall pay 100% of any payments which are required under section 365 of the Bankruptcy Code for the assumption and assignment of the Assumption and Assignment Contracts.

8.02    <u>Access and Inquiry</u>. Between the date of this Agreement and the Closing, Seller shall give Purchaser and its representatives reasonable access to the facilities of the Subject Business and Purchaser upon request will be permitted to contact and make reasonable inquiry of employees of Selling Companies regarding the Subject Business. Purchaser acknowledges that the terms of the Confidentiality Agreement shall apply to information obtained by Purchaser and its representatives pursuant to this Section.

8.03    <u>Licenses and Permits</u>.    As soon as practicable after the date hereof, the Parties shall co-operate in the preparation and filing with the appropriate licensing and

38

permitting authorities of applications for the transfer or issuance to Purchaser of all licenses and permits issued by a Governmental Authority and required for operation of the Subject Business or use of any of the Subject Assets after the Closing, including the Mining Permits, whether or not required to be held by Purchaser.  Purchaser shall use all commercially reasonable efforts to secure such licenses and permits.

8.04   Notices to Third Parties.    The Parties shall cooperate to make all other filings and to give notice to all third parties as may reasonably be required to consummate the Transactions.

8.05   Commercially Reasonable Efforts.   In making commercially reasonable efforts as required under this Article 8 or any other provision of this Agreement, no Party shall be required to make any payment (other than for reasonable legal fees) that it is not presently contractually required to make, divest any assets (including but not limited to assets of the Subject Business), make any change in the conduct of its business or that of the Subject Business, accept any limitation on the future conduct of its business or that of the Subject Business, enter into any other Contract or arrangement with any Person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing.

8.06   Unassigned Contracts and Other Assets.  Any provision of this Agreement to the contrary notwithstanding, any Subject Business Contract that cannot be or is not assumed and assigned pursuant to section 365 of the Bankruptcy Code or otherwise, and whose assignment to the Purchasing Companies requires a consent that has not been obtained prior to the Closing, and each other asset whose transfer to Purchasing

39

Companies as contemplated by this Agreement requires a consent that has not been obtained prior to the Closing, shall not be assigned or transferred to Purchasing Companies until such consent is obtained; and the Parties shall obtain such consent or enter into arrangements, to the extent practicable and permitted under applicable law, that will provide Purchaser with the benefits, and relieve Selling Companies of the burdens, of such Subject Business Contract or such other asset.

8.07    Removal of Seller Pompano Beach Assets.  As soon as practicable after the Closing Date, Seller shall remove or cause to be removed from the Pompano Beach, FL facility of the Subject Business, at Seller's expense, all assets at the facility listed on **Schedule 8.07** (the "Seller Pompano Beach Assets").  Purchaser shall provide reasonable access and cooperation to enable Seller to expeditiously remove the Seller Pompano Beach Assets, and Seller and its employees and agents shall comply with all reasonable regulations established by Purchaser for the conduct while at the Pompano Beach facility.  Seller shall indemnify and hold harmless Purchaser from any and all Damages arising from or out of the activities of Seller and its employees and agents in removing the Seller Pompano Beach Assets from the Pompano Beach facility, excluding Damages to the extent arising from the negligence, willful misconduct or violation of law by Purchaser Group.

8.08    Ajax Real Property Bid Right.   If during the term of the Ajax Tolling Agreement, GCI undertakes to sell all or substantially all of the real property located at 294 Clements Rd W, Ajax, ON L1S 3C6 (the "Ajax Real Property"), it shall notify Purchaser, and Purchaser shall have the right to participate in the bidding or other

40

process for the sale of the Ajax Real Property on a basis substantially equal to other interested Persons.

8.09   Title Insurance and SurveyTitle Insurance and Survey.   Purchaser shall use all commercially reasonable efforts to obtain the title insurance commitment and surveys for the Subject Business Real Property described in Section 10.06. The cost of such title insurance and surveys shall be borne by Purchaser.  Seller shall provide all commercially reasonable cooperation with Purchaser's efforts to obtain such title insurance and surveys.

8.10   Waiver of Bulk Sales Law Compliance.   Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which Transferred Assets are located and all other laws applicable to bulk sales and transfers, including the Bulk Sales Act (Ontario), to the extent applicable to the Transactions.  Seller shall indemnify and hold harmless Purchaser from any Damages arising from such waiver, except to the extent that any such Damages arise from Purchasing Companies' failure to satisfy the Transferred Liabilities.

## ARTICLE 9

### Conduct of Business Prior to Closing

Seller agrees that except as otherwise required or contemplated by this Agreement or consented to by Purchaser, from the date of this Agreement until the Closing:

41

9.01   Operation in Ordinary Course.   Selling Companies shall conduct the Subject Business only in the ordinary course of business and consistent with prior practice.

9.02   Disposition of Assets.   Other than pursuant to sales in the ordinary course of business or disposition of worn out or obsolete assets, neither Selling Company shall sell, lease (as lessor), transfer, license (as licensor), subject to a Lien, or otherwise dispose of, any Transferred Assets with a book value of USD 10,000 or more.

9.03   Material Agreements.   Other than in the ordinary course of business, neither Selling Company shall, in the operation of the Subject Business, enter into any Subject Business Contract that both (1) has a term of more than one year and cannot be canceled by such Selling Company without penalty upon notice of one year or less, and (2) is a Contract under which it is reasonably expected that the Subject Business will make expenditures or obtain receipts of more than USD 10,000 per year.

9.04   Relations with Customers and Suppliers.   Selling Companies shall use all commercially reasonable efforts to preserve the relations of the Subject Business with customers and suppliers.

9.05   No Shop Provision.   Selling Companies shall not directly or indirectly (through a representative or otherwise), solicit any offer from, furnish any confidential or proprietary information to, commence or conduct negotiations with, or enter into any agreement with any party (other than Purchaser and its representatives) concerning the sale, lease, or other disposition of the Subject Business, the Transferred Assets, or any part thereof other than in the ordinary continuing conduct of the Subject Business.

42

9.06    Notice of Material Adverse Effect.  Between the date of this Agreement and the Closing Date, if to the Knowledge of Seller, a Material Adverse Effect shall have occurred, Seller shall promptly advise Purchaser thereof.

9.07    Announcements to Employees.  Seller will make, on a timely basis, to employees of the Subject Business such announcements and notifications as may be required by applicable law.

## ARTICLE 10

### Conditions Precedent to Purchaser's Obligations

All obligations of Purchaser under this Agreement are subject, at Purchaser's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

10.01  Accuracy of Representations and Warranties.  Each and every representation and warranty of Seller under this Agreement shall be true and accurate in all material respects as of the Closing as though made as of the Closing, except as may be affected by changes in the ordinary course of business between the date of this Agreement and the Closing, which changes would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

10.02  Performance of Covenants and Agreements.  Seller shall have performed in all material respects all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

10.03  Permits, Consents, etc.  There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority

43

required in connection with the Transactions that has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Subject Business.

10.04 <u>Litigation</u>. No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Purchaser Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions and which, if successful, would materially adversely affect the right of Purchaser to consummate the Transactions or to continue the Subject Business after the Closing substantially as currently operated.

10.05 <u>Certificates of Selling Companies</u>.

(a)    Seller shall have delivered to Purchaser a certificate of Seller, dated the Closing Date, signed by the Chief Executive Officer, President or any Vice President of Seller, certifying that: (i) each and every representation and warranty of Seller under this Agreement is true and accurate in all material respects as of the Closing as though made as of the Closing, except as may be affected by changes in the ordinary course of business between the date of this Agreement and the Closing, which changes would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and (ii) Seller has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Seller at or prior to the Closing pursuant to this Agreement.

(b)    Each Selling Company shall have delivered to Purchaser a certificate of

44

such Selling Company, dated the Closing Date, signed by the Secretary or an Assistant Secretary of such Selling Company, (i) certifying that the execution, delivery and performance of the Transaction Documents to which such Selling Company is a party have been duly authorized by its Board of Directors or the Board's duly authorized delegee, and that such authorization has not been amended but remains in full force and effect on the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of such Selling Company, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of such Selling Company.

10.06 <u>Title Insurance and Surveys</u>.

(a)     Purchaser shall have obtained a commitment for an owner's policy of title insurance in an aggregate amount equal to the portion of the Purchase Price allocable to the Subject Business Real Property located in the United States insuring that Purchaser holds good and indefeasible fee simple title to the Subject Business Real Property.   Such commitment shall provide that the policy will delete all of the requirements listed in ALTA Schedule B-1, only include the Permitted Exceptions as exclusions, have no exception for the gap between Closing and recording and otherwise be in form and substance satisfactory to Purchaser in its reasonable discretion. Purchaser shall have obtained an ALTA survey of the Subject Business Real Property that include Table A items 1, 2, 3, 6, 7(b), 10 and 11(a) and is otherwise reasonably acceptable to Purchaser.

(b)     Purchaser shall have obtained a commitment for the Subject Business

45

Real Property located in Canada that is analogous to that described in Section 10.06(a), to the extent available on commercially reasonable terms.

10.07 <u>Third Party Consents and Approvals.</u>  The consents of third parties to the assignment of the Subject Business Contracts listed on <u>**Schedule 10.07**</u> shall have been obtained, or such Contracts shall have been assumed and assigned pursuant to the Sale Order.

10.08 <u>No Material Adverse Effect</u>.  No Material Adverse Effect shall have occurred between the date of execution of this Agreement and the Closing Date.

10.09 <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered an order approving those of the Transactions requiring Bankruptcy Court approval, which also shall provide that both Seller and the Reorganized Seller, as applicable, shall be responsible for the Excluded Liabilities, representations, warranties, covenants, agreements and indemnifications of Seller set forth in this Agreement (the "Sale Order"); and the Sale Order shall have become final and non-appealable.

## ARTICLE 11

## Conditions Precedent to Seller's Obligations

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01 <u>Accuracy of Representations and Warranties</u>.  Each and every representation and warranty of Purchaser under this Agreement shall be true and accurate in all material respects as of the Closing.

46

11.02 <u>Performance of Covenants and Agreements</u>.  Purchaser shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

11.03 <u>Permits, Consents, etc</u>.  There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Seller Group.

11.04 <u>Litigation</u>.  No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Purchaser Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions and which, if successful, would materially adversely affect the right of Purchasing Companies to consummate the Transactions or to continue the Subject Business after the Closing substantially as currently operated or might involve material liability on the part of any Seller Entity.

11.05 <u>Certificates of Purchasing Companies</u>.

(a)    Purchaser shall have delivered to Seller a certificate of Purchaser, dated the Closing Date, signed by the Chief Executive Officer, President or any Vice President of Purchaser, certifying that: (I) each and every representation and warranty of Purchaser under this Agreement is true and accurate in all material respects as of the

47

Closing as though made as of the Closing; and (i) Purchaser has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by such Purchaser at or prior to the Closing pursuant to this Agreement.

(b)    Each Purchasing Company shall have delivered to Seller a certificate of such Purchasing Company, dated the Closing Date, signed by the Secretary or an Assistant Secretary of such Purchasing Company, (i) certifying that resolutions of the Board of Directors of such Purchasing Company authorizing the Transactions and the execution, delivery and performance of the Transaction Documents to which such Purchasing Company is a party have been duly adopted and have not been amended but remain in full force and effect as of the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of Such Purchasing Company, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of such Purchasing Company.

11.06  Third Party Consents and Approvals.  The consents of third parties to the assignment of the Subject Business Contracts listed on Schedule 10.07 shall have been obtained, or such Contracts shall have been assumed and assigned pursuant to the Sale Order.

11.07  Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become final and non-appealable.

48

## ARTICLE 12

### Employee Matters

12.01 <u>Employment</u>.

(a)    Effective as of the Closing, (i) each employee of Seller or GCI at the South Carolina Real Property or the Other Real Property (collectively, the "Subject Employees") shall cease to be an employee of Seller or GCI. All such employees as of the date of this Agreement are listed in <u>Schedule 12.01</u>. None of the employees of GCI at the Ajax Facility are or shall be deemed Subject Employees.

(b)    Each Subject Business Employee who accepts an offer of employment from a Purchaser Entity in accordance with Section 12.02 shall become an employee of such Purchaser Entity effective as of the Closing; and all such employees are referred to herein as "Continued Employees". Seller is making no representation or warranty as to which, if any, Subject Employees will accept offers of employment from Purchaser Entities.

12.02 <u>Positions Offered to Subject Employees</u>.    Purchaser shall offer each Subject Employee employment by a Purchaser Entity to commence as of the Closing. With respect to each Subject Employee, the position offered (i) shall be for a job that is equivalent (including with respect to level of responsibility and authority) to the Subject Employee's job with the Subject Business as of the Closing, (ii) shall be as of Closing at no reduction in base salary, wages, commissions and incentive levels effective immediately prior to the Closing, (iii) shall as of Closing not change the location of the Subject Employee's principal place of work to one that is an unreasonable commuting

49

distance from the employee's residence, and (iv) shall provide employee benefit plan coverage as follows:

(A)    <u>Vacation and Vacation Pay</u>.

(1)    For purposes of this Clause (A), one-twelfth of Seller's obligation to each Continued Employee for vacation and related vacation pay for calendar year 2011 shall be deemed to accrue on the first day of each month during that year, both before and after the Closing, and Purchaser shall assume all such obligations accruing after the Closing Date.

(2)    After the Closing Date, Seller shall pay each Continued Employee vacation pay for all vacation days accrued but not used on or before the Closing Date.

(3)    Purchaser shall pay each Continued Employee vacation pay for all vacation pay accrued but not used from after the Closing Date through December 31, 2011.

(4)    With respect to each calendar year after 2011, each Continued Employee shall be given credit by the Purchaser Group for the employee's prior service with the Seller Group for purposes of the Purchaser Group's vacation policies, to the extent such service is recognized under Seller's vacation policies.

(B)    <u>Plan Participation</u>.

Except as otherwise provided in this Section with respect to vacation benefits, effective as of the day after the Closing Date, Purchaser shall make available to each Continued Employee the defined contribution plans, severance benefits, vacation benefits, defined benefit pension plans, medical plans, dental plans, disability

50

plans, group insurance plans and all other benefits under the Purchaser's plans, policies and arrangements, which are made available by the Purchaser Group to its similarly situated employees. With respect to any such plan, policy or arrangement that requires an employee to attain any specific length of service with Purchaser in order to participate in, or be eligible for, or to be vested in, any benefits provided thereunder, each Continued Employee shall be given credit for purposes of determining such participation, eligibility and vesting  for the Employee's length of service with the Seller Group prior through the Closing Date, but shall only be given credit for such length of service under severance plans for purposes of the accrual of any benefits. Purchaser shall have no liability to Seller under Seller's severance policies with respect to any Subject Employee who is offered but refuses employment by a Purchaser Entity.

12.03 <u>Terms of Employment</u>.   As to terms and conditions of employment not specified in this Article, from and after the Closing the Continued Employees (i) shall be treated in a similar manner as the other employees of the Purchaser Group who are similarly situated, (ii) shall be entitled to participate on the same basis as such other employees in all job training, career development and educational programs of the Purchaser Group, and (iii) shall be entitled to fair and equitable consideration together with such other employees in connection with any management or executive job opportunities or any other promotional opportunities with the Purchaser Group.

12.04 <u>Employment Related Indemnities</u>.   Each Party shall indemnify the other Party from and against all Damages resulting from the respective obligations of Parties in this Section 12, including any as to (a) the hiring and termination practices and

51

decisions with respect to the Subject Business of the Seller Group prior to the Closing Date, and of the Purchaser Group after the Closing Date, (b) the Purchaser Group's termination of employment of any Continued Employee, (c) any claim made by any Subject Employee for any severance pay or termination, indemnity or other severance or termination entitlement, including any individual who under applicable law or otherwise is entitled to severance upon termination by Seller Group after refusing an offer to become an employee of the Purchaser Group, (d) any claim made by any Continued Employee that results from the actual or alleged non-continuance, reduction or change of the terms and conditions of employment (including any reduction or change of the employment-related benefits provided to such employee), which occurs after the Closing Date as to the Purchaser Group, or prior to the Closing Date as to the Seller Group, and (e) any claim under the Worker Adjustment and Retraining Notification Act, 29 USC §§ 2101 *et seq.*, or any comparable U.S. state or Canadian federal or provincial law arising out of any actions taken by the relevant Party during the time it operated the Subject Business. Any Third Party Claims arising under this Section shall be subject to the provisions of Section 14.05.

12.05 Employee Information Sharing. After the Closing, each of Seller and Purchaser shall provide to the other Party, from time to time at no cost to the recipient, such information regarding employees of the Subject Business under the ownership of the Selling Companies as may be reasonably requested. This Section shall not compel any Person to maintain records beyond the periods specified in Section 15.02.

12.06 Notices, etc.. With respect to any employees of the Subject Business not

52

hired by Purchaser, the Selling Companies will timely provide all notices and any continuation of health benefit coverage required to be provided by the Selling Companies to any of such employees as well as their respective spouses, former spouses, dependents, and former dependents under COBRA and applicable state or Canadian federal and provincial law.

## ARTICLE 13

### Termination

13.01 <u>Rights to Terminate</u>.

(a)    This Agreement may be terminated at any time prior to the Closing by written agreement of Seller and Purchaser.

(b)    If for any reason the Closing shall not take place within 180 days after the date of this Agreement, then either Seller or Purchaser may terminate this Agreement at any time thereafter by giving notice of such termination to the other Party in the manner provided in Section 18.01, provided that the terminating party is not in material breach of the provisions of this Agreement.

(c)    By Purchaser if (i) any of the conditions set forth in Article 10 have become incapable of fulfillment on or before the Closing Date (or other specified date), (ii) Purchaser has given Seller 15 days notice of such matter, (iii) Seller have failed to cure or cause to be cured such matter within the 15 days, and (iv) Purchaser is not otherwise in material default.

(d)    By Seller if (i) any of the conditions set forth in Article 11 of this Agreement

53

have become incapable of fulfillment on or before the Closing Date (or other specified date), (ii) Seller has given Purchaser 15 days notice of such matter, (iii) Purchaser has failed to cure such matter within the 15 days, and (iv) Seller is not otherwise in material default.

13.02 <u>Consequences of Termination.</u>

(a)    The termination of this Agreement, whether in accordance with any of the provisions of Section 13.01 or otherwise, shall not affect the rights of any Party with respect to any prior breach of any covenant or agreement contained in this Agreement, except as provided in Section 14.04(c) and except that upon termination in accordance with any of the provisions of Section 13.01, the Parties shall be released from any and all liability for breach of any of the representations and warranties contained in Articles 5 and 6.

(b)    The obligations of the Parties under Sections 17.01 and 17.02 shall survive any termination of this Agreement.

## ARTICLE 14

### Indemnification

14.01 <u>Definitions.</u>  As used in this Article:

(a)    "Purchaser Claim" has the meaning given such term in Section 14.04.

(b)    "Claim" means any claim, demand, suit, action or proceeding.

(c)    "Damages" means any and all penalties, fines, damages, liabilities, losses or costs (including reasonable Litigation Expenses incident to Third Party Claims, but

54

excluding incidental, indirect or consequential damages, damages for lost profits, and Litigation Expenses incident to Direct Claims).

(d)    "Direct Claims" means Claims other than Third Party Claims.

(e)    "Litigation Expenses" means attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a Claim.

(f)    "Third Party Claims" means any and all Claims by any Person, other than Seller Entities or Purchaser Entities, including Governmental Authorities, which could give rise to a right of indemnification under this Article.

14.02 Seller's Indemnification.

(a)    Subject to the terms and limitations of this Article, Seller shall indemnify Purchaser against any Damages to the Purchaser Group that are caused by or arise out of (i) the breach of or failure of either of the Selling Companies to perform and fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Seller set forth in Article 5 this Agreement, or (iii) any of the Excluded Liabilities or Excluded Assets.  Notwithstanding any other provision of this Agreement, except for liability for breach of Section 5.20(d), Seller shall have no liability whatsoever to Purchaser or the Purchaser Group with respect to the presence of asbestiform minerals in or on any building or other improvement that is part of the Subject Business Real Property.

(b)    The representations and warranties of Seller set forth in Article 5 shall

55

survive the Closing.   Except as otherwise required by applicable law, (i) the representations and warranties set forth in Section 5.05 and subsequent Sections of Article 5 (other than Sections 5.07 and 5.08) shall expire and be of no further force and effect two years after the Closing Date and (ii) the representations and warranties set forth in Sections 5.09(b) and 5.14 shall expire and be of no further force and effect five years after the Closing Date, except with respect to claims Purchaser has previously asserted against Seller in writing, setting forth the nature of such claims with reasonable specificity.

14.03 <u>Purchaser's Indemnification</u>.

(a)     Subject to the terms and limitations of this Article, each Purchaser shall indemnify Seller against any Damages to the Seller Group which are caused by or arise out of (i) the failure of Purchaser to perform or fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Purchaser set forth in Article 6, (iii) the failure of any Purchaser Entity subsequent to the Closing to perform or fulfill its obligations under any Contract or obligation included in the Transferred Liabilities for which any Seller Entity is or may be liable, as a guarantor or otherwise, (iv) any of the Transferred Liabilities; (v) subject to Section 3.07, any Reclamation Obligations; or (vi) any other obligations under applicable law or any license or permit issued by a Governmental Authority to a Selling Company to the extent that such Damages relate to the operation of the Subject Business or the Transferred Assets after the Closing.

56

(b)    The representations and warranties of Purchaser set forth in Article 6 shall survive the Closing.

14.04 <u>Limitations</u>.

(a)    Purchaser may not assert any Claim for indemnification under this Article (a "Purchaser Claim") with respect to the breach of any representation in Section 5.04 or subsequent Sections of Article 5 unless such Purchaser Claim(s) gives rise to Damages (including Litigation Expenses for purposes of the threshold set forth in this clause) which in the aggregate amount shall exceed USD 250,000, and then only with respect to the excess of such aggregate Purchaser's Claims over said USD 250,000. In no event shall the aggregate amount of indemnification with respect to all such Purchaser Claims exceed USD 5,000,000.

(b)    The dollar thresholds set forth in this Section have been negotiated for the special purpose of the provision to which they relate, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the Transactions under which a level of materiality might be an issue.

14.05 <u>Defense of Third Party Claims</u>.

(a)    If either Party (the "Indemnitee") learns of any Third Party Claim for which Indemnitee intends to seek indemnification under this Agreement, or to have taken into account for purposes of the dollar thresholds in Section 14.04, it shall give notice in writing of such Claim to the other Party from whom it intends to seek such indemnification or taking into account (the "Indemnitor"). It shall be a necessary

57

condition of any claim for indemnification under this Agreement with respect to any Third Party Claim, or for such Third Party Claim to be taken into account for purposes of the dollar thresholds under Section 14.04, that Indemnitee notify Indemnitor prior to the time when Indemnitor's ability to contest the Third Party Claim would be materially impaired by lack of notice.

(b)    Indemnitor may undertake the defense of a Third Party Claim of which Indemnitee has notified Indemnitor, by notice to Indemnitee given not later than 30 calendar days after receipt by Indemnitor of Indemnitee's notice of such Third Party Claim.  If Indemnitor undertakes the defense of any Third Party Claim, it shall control the investigation and defense thereof, except that without the prior written consent of Indemnitee, which consent shall not be unreasonably withheld or delayed, Indemnitor may not enter into any settlement that requires Indemnitee to make any payment that is not fully indemnified under this Agreement or taken into account under Section 14.04, or submit to injunctive relief; and subject to Indemnitor's control rights, Indemnitee may participate at its own expense in such investigation and defense.  If Indemnitor does not undertake the defense of a Third Party Claim, then Indemnitee shall control the investigation and defense thereof, except that without the prior written consent of Indemnitor, which consent shall not be unreasonably withheld or delayed, Indemnitee may not enter into any settlement; and subject to Indemnitee's control rights, Indemnitor may participate in such investigation and defense, at its own expense.

(c)    The Parties shall make available to each other, their counsel and other representatives, all information and documents reasonably available to them which

58

relate to any Third Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

(d)    For any Claim whose resolution may require Environmental remediation work, at any of the Subject Business Real Property, the Party controlling the defense pursuant to this Section 14.05 shall control performance of such work, including related disclosures to and dealings with Governmental Authorities; Seller shall consult with Purchaser as to the methods and procedures of such remediation, and to the extent reasonably practicable, shall adopt methods and procedures that will minimize interference with the Subject Business; the Purchaser shall allow access, after reasonable prior written notice, to said property for performance of such work; both Parties shall be entitled to participate, at their own several cost, in all communications and meetings with any Governmental Authority relevant to the resolution of the Claim; and both Parties shall cooperate together to resolve the Claim and achieve a cost-effective environmentally protective remedy.  Nothing in this Section 14.05 shall prevent Seller or Purchaser from making any disclosure to or undertaking any dealings with Governmental Authorities that such Party's counsel determines, in such counsel's reasonable opinion, to be required by applicable law; provided that such Party shall give the other Party prompt notice of its intention to make such disclosure or undertake such dealings.

14.06 <u>No Consequential or Lost Profit Damages</u>.  Neither Party shall seek or be entitled to incidental, indirect or consequential damages or damages for lost profits or punitive damages in any claim for indemnification under this Article with respect to a

59

Direct Claim, nor shall it accept payment of any award or judgment for such indemnification to the extent that such award or judgment includes such Party's incidental, indirect or consequential damages or damages for lost profits or punitive damages.

## ARTICLE 15

### Cooperation in Various Matters

15.01 Mutual Cooperation.

(a)    After the Closing, each Party shall cooperate with the other Party as reasonably requested by such other Party in connection with the prosecution or defense of any claims or other matters relating to the Subject Business.  Such cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees.

(b)    Seller and Purchaser shall use all reasonable efforts to obtain any certificate or other document from any Governmental Authority or other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including any Tax with respect to the Transactions).  Purchaser shall execute and deliver, or cause to be executed and delivered, on a timely basis any Canadian Tax Elections in respect of the Transactions and the purchase and sale of the Transferred Assets  if requested in writing by any Seller Entity at least 30 days prior to the date upon which the requested Canadian Tax Election is to be delivered to the Seller Entity. "Canadian Tax Elections" means any election, form, notification, or other filing pursuant to subsection or 22(1) of

60

the *Income Tax Act* (Canada) or proposed section 56.4 of the *Income Tax Act* (Canada), as enacted (including any amended, successor or replacement provisions and any equivalent provisions under provincial or local law).

15.02 <u>Access to Files and Records</u>.  For a period of three years after the Closing Date, on reasonable notice and regulations during normal business hours, each Selling Company shall allow the Purchasing Companies, and each Purchasing Company shall allow the Selling Companies, access to any files and records in its possession relating to the Subject Business prior to the Closing, and the right to copy and make extracts therefrom.  If at any time during such period, either Selling Company or Purchasing Company wishes to dispose of such any files and records, it shall give Purchasing Companies or Selling Companies, as the case may be, notice of such disposal, and at request of a recipient of such notice given within sixty days after receipt of such notice, deliver to the requesting recipient, at requesting recipient's expense, any of such items as are requested.

## ARTICLE 16

### Post-Closing Matters

16.01 <u>Reports</u>.  Purchaser shall provide such information as Seller may reasonably request in connection with Seller's preparation of financial, Tax and other reports and statements relating to the Subject Business for periods prior to the Closing.

16.02 <u>Names</u>.  After the Closing, Purchaser Entities shall have no right to use the "Grace" or the "Davison" name, whether alone or in combination with other words and/or symbols, and Purchaser shall not, nor permit any other Purchaser Entity to, refer

(other than in response to unsolicited inquiries or in announcements of the occurrence of the Closing) to their respective businesses as formerly being owned by or associated with Seller, except that for a period of 90 days after the Closing, the Buying Companies shall have the right to use any packaging, catalogues, sales and promotional materials and printed forms (except for MSDSs) that use such names and are included in the Transferred Assets as of the Closing, or have been ordered prior to the Closing for use in the Subject Business, but only to the extent that it is not practicable to remove or cover up the "Grace" name.  Purchaser shall use reasonable efforts to minimize such usage and to discontinue it as soon as practicable after the Closing.

16.03 <u>Intercompany Agreements</u>.    Any contracts, licenses, agreements, commitments or other arrangements between the Subject Business and any Seller Entity or unit thereof, whether written or oral, and whether express or implied, pursuant to which any Seller Entity provides management, administrative, legal, financial, accounting, data processing, insurance, technical support, or other services to the Subject Business, or the use of any assets of any Seller Entity, or pursuant to which any rights, privileges or benefits are accorded to the Subject Business as a unit of the Seller Group, shall terminate as of the Closing.  After the Closing, the Purchaser Group shall have no rights under any similar contract, license, agreement, commitment or arrangement with Seller or any other Seller Entity, except this Agreement and the Ancillary Agreements.

16.04 <u>Seller's Covenant Not to Compete</u>.  For a period of three (3) years after the Closing Date, no Seller Entity shall engage, directly or indirectly, anywhere in the

62

world in the mining, milling, expanding, manufacture, and/or sale of vermiculite, vermiculite concentrate, perlite, and specialty vermiculite products; provided that the foregoing shall not apply to manufacture or sale of such products by a business acquired by a Seller Entity after the Closing Date if, in the year prior to such acquisition, the net sales of such products by the acquired business was less than 50% of the net sales of the entire acquired business.  A Seller Entity may also acquire a business that exceeds the threshold set forth in the immediately preceding sentence; provided that the Seller Entity divests the unit of such business manufacturing or selling such products within one year after its acquisition; and provided further that if the Seller Entity shall not have effected such divestment within one year after its acquisition despite its reasonably diligent efforts, Purchaser shall grant the Seller Entity reasonable extension of the divestment period not to exceed six months. If the Seller Entity proposes to sell the unit of the acquired business that manufactures or sells such products, it shall notify Purchaser and give Purchaser the opportunity to participate in the bidding or other process for the sale of such unit on a basis substantially equal to other interested Persons.  No portion of the Purchase Price shall be allocated to the provisions of this Section for Canadian Tax or other purposes.


## ARTICLE 17

### Expenses

17.01 <u>Purchaser's Expenses</u>.  Purchaser shall pay, and indemnify all Seller Entities against all Damages arising from, expenses incurred by or on behalf of the

Purchaser Group In connection with the preparation, authorization, execution and performance of this Agreement, the other Transaction Documents and the Transactions, Including all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants.

17.02 Seller's Expenses.  Seller shall pay, and Indemnify the Purchaser Entities against all Damages arising from, expenses Incurred by or on behalf of the Seller Group In connection with the preparation, authorization, execution and performance of this Agreement, the other Transaction Documents and the Transactions, including all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants.

17.03 Transfer Taxes.  Purchaser shall pay and indemnify the Seller Group against any stamp duty, sales, transfer, value added, goods and services, harmonized sales, gross receipts, land transfer, land registration, excise, recording, registration or similar Tax applicable to this Agreement, the transfer to Purchaser or its designees of the Transferred Assets pursuant to this Agreement, the other Transaction Documents or the Transactions.

17.04 Other Real Estate Costs.  Purchaser shall pay and Indemnify the Seller Group against all expenses the Purchaser Group may incur in connection with obtaining a title commitment, survey or title Insurance policy for any of the Subject Business Real Property.

## ARTICLE 18

### Notices

18.01 <u>Notices</u>.    All notices, requests, demands and other communications required or permitted to be given under this Agreement or any of the other Transaction Documents shall be deemed to have been duly given if in writing and delivered personally, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

If to Seller:

> W. R. Grace & Co.-Conn.
> 7500 Grace Drive
> Columbia, Maryland 21044
> Attention: Corporate Secretary
> Fax:   (410) 531-4545
> Confirmation:(410) 531-4362

If to Purchaser:

> Attention:  Jason Guzek
> 1 Bala Avenue, Suite 310
> Bala Cynwyd, PA 19004
> Fax: (610) 660-8817
> Confirmation:  (610) 660-8803

Each Party may change the address to which such communications are to be directed to it by giving written notice to the other Parties in the manner provided above.

## ARTICLE 19

### General

65

19.01 <u>Entire Agreement</u>.   This Agreement sets forth the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating thereto.   No representation, promise, inducement or statement of intention relating to the Transactions has been made by any Party or any related Person which is not set forth in this Agreement.

19.02 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to principles of conflicts of law that would require the application of the law of any other jurisdiction.

19.03 <u>Submission to Jurisdiction</u>.  Each Party hereby irrevocably submits in any suit, action or proceeding arising out of or relating to this Agreement or any of the other Transaction Documents to which it is or will be a party, or any of its obligations hereunder or thereunder, to the jurisdiction of the United States District Court for the District of Delaware and the jurisdiction of any court of the State of Delaware, and waives any and all objections to such jurisdiction that it may have under the laws of the State of Delaware or any other jurisdiction.

19.04 <u>Equitable Remedies</u>.  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity without the necessity of demonstrating the inadequacy of monetary damages or the posting of a bond.

19.05 <u>Assignment; Successors</u>.    This Agreement shall be assignable by Purchaser only with the prior written consent of Seller, and shall be assignable by Seller only with the written prior consent of Purchaser.  Any attempted assignment in violation of this Section shall be null and void *ab initio*.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

19.06 <u>Amendments and Waivers</u>.  This Agreement may be amended, superseded or terminated, and any of the terms hereof may be waived, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or terminates this Agreement or waives any of its terms, executed by the Parties.  Failure of any Party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

19.07 <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by one or more Parties.  Each such counterpart shall be an original, but all such counterparts shall constitute one and only one agreement.

19.08 <u>Captions</u>.  The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

19.09 <u>Effectiveness</u>.  This Agreement shall become effective upon the entry of the Sale Order.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

W. R. GRACE & CO.-CONN.

By: _____
Name: LAWRENCE S. SHAPIRO
Title: AUTHORIZED SIGNATORY

VERMICULITE ACQUISITION CORP.

By: _____
Name: RAYMOND G. PERELMAN
Title: CHIEF EXECUTIVE OFFICER

68

## <u>EXHIBIT B</u>

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) **Hearing** |
| | ) **Date:**       November 28, 2011, at 9:00 a.m. |
| | ) |
| | ) **Objection** |
| | ) **Deadline:**    November 4, 2011 |

### NOTICE OF SALE OF THE VERMICULITE BUSINESS

To:  (i)    The Office of the United States Trustee;

(ii)    Counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders;

(iii)    Counsel to the L/C Facility Agent and L/C Issuers

(iv)    Counsel to each of the official committees appointed in these Chapter 11 Cases;

(v)    Counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives;

(vi)    Those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002;

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

(vii)   Counterparties to the Transferred Contracts;

(viii)  Counsel to Purchaser;

(ix)    All persons or entities known or reasonably believed to have asserted a Lien in any of the Transferred Assets;

(x)     All federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Motion;

(xi)    All persons and entities reasonably known to have expressed an interest in acquiring the Vermiculite Business;

(xii)   The United States Attorneys for the Districts of Delaware, Massachusetts, Maryland, the Southern District of Florida, Arizona and South Carolina;

(xiii)  The state attorneys general for the states of South Carolina, Florida, Maryland, Massachusetts, Delaware and Arizona;

(xiv)   The state environmental protection agencies for the states of South Carolina, Florida, Massachusetts and Arizona;

(xv)    The provincial attorneys general for the Canadian provinces of Alberta, Manitoba and Ontario;

(xvi)   The provincial environmental protection agencies for the Canadian provinces of Alberta, Manitoba and Ontario;

(xvii)  The United States Environmental Protection Agency;

(xviii) Environment Canada; and

(xix)   the Canadian Environmental Assessment Agency.

**PLEASE TAKE NOTICE** that, subject to Court approval, Seller proposes to sell the Transferred Assets to Purchaser on the terms and conditions set forth below and as described in more detail in the Debtors' *Motion for Entry of an Order: (a) Approving the Form of Asset Sale Agreement; (b) Authorizing the Sale of Certain Vermiculite Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (c) Authorizing the Assumption and Assignment of Executory Contracts; and (D) Approving Procedures for Noticing and Determining Cure*

*Amounts* [Docket No. _____ ] (the "Sale Motion).[2]  A copy of the Asset Sale Agreement (the

"ASA") is attached to the Sale Motion as Exhibit B.  Any party wishing to receive a copy of the

Sale Motion or the ASA should contact Debtors' counsel, attention:

> Laura Davis Jones
> Timothy P. Cairns
> Pachulski Stang Ziehl Young & Jones LLP
> 919 North Market Street, 11th Floor
> P.O. Box 8705
> Wilmington, DE 19899-8705 (Courier
> 19801)

**Please take further notice** that the principal terms and conditions of the ASA are

summarized below:[3]

| Term | Relevant ASA Section (§) | Description |
|------|--------------------------|-------------|
| **Seller** | preamble | Grace |
| **Purchaser** | preamble | Vermiculite Acquisition Corp. |
| **Sale of Business** | 2.01 | Transfer of Seller's right, title and interest in and to the Transferred Assets to Purchaser or its designee(s), free and clear of all Liens and imperfections in title (except certain Permitted Exceptions). |
| **Consideration** | 2.02 | USD 10,000,000, plus the excess of the Closing I&R Amount over USD 5,414,000, or minus the excess of USD 5,414,000 over the Closing I&R Amount. |
| | | A portion of the Consideration will be allocated to the Canadian Transferred Assets (as that term is defined in the Canadian ASA).[4] |

---

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them in, as the case may be, the Sale Motion, the ASA, the *Declaration of Robert Whitney in Support of the Debtors' Motion for Entry of an Order: (a) Approving the Form of Asset Sale Agreement; (b) Authorizing But Not Requiring the Sale of Certain Vermiculite Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (c) Authorizing the Assumption and Assignment of Executory Contracts; and (D) Approving Procedures for Noticing and Determining Cure Amounts* (the "Whitney Declaration") or the *First Amended Joint Plan of Reorganization in their Chapter 11 Cases*, Docket no. 25881, as it may be further amended, supplemented or otherwise further amended from time to time, and the schedules and exhibits to the foregoing, as they may be in effect from time to time (the "Plan").

[3]  Capitalized terms used in this summary of terms of the ASA and not otherwise defined in this Motion shall have the meanings ascribed to them in the ASA.  To the extent of any inconsistency between this summary and the ASA, the ASA's terms and conditions shall govern

[4]  Grace Canada, Inc., is a wholly-owned non-debtor subsidiary of Grace.  The Canadian ASA pertains only to the Canadian Transferred Assets, which are not assets of the Debtors' estates.  The Canadian ASA is subject to the laws of Canada and the relevant political subdivisions thereof.  The Debtors are not requesting the Court's

| Term | Relevant ASA Section (§) | Description |
|---|---|---|
| Transferred Assets | 5.08 | Seller's right, title and interest in and to the assets, properties and rights pertaining directly and exclusively to the conduct of Seller's business of mining, milling, expanding, manufacture, and/or sale of vermiculite, vermiculite concentrate, perlite, and specialty vermiculite products |
| Excluded Assets | 1.01 | Seller's right, title and interest in (1) cash; (2) refunds of Taxes, (3) amounts receivable; (4) Insurance, claims with respect to Insurance, and refunds of amounts previously paid or prepaid on account of Insurance; (5) employee benefit plans and funds; (6) certain third-party proprietary information; (7) records to the extent relating to any of the Excluded Assets or the Excluded Liabilities, (8), the names "Grace" and "Davison"; (9) real property of, and all other property located at, the Ajax Facility; (10) bonds and letters of credit; (11) assets of the SCC Business, (12) assets of the fireproofing laboratory currently located at the South Carolina Real Property, (13) Seller's Pompano Beach Assets; and (14) any other assets listed on Exhibit 1.02A. |
| Transferred Contracts | 5.11 | Rights under the Vermiculite Leases and the other Subject Business Contracts, including contracts listed in Exhibit D to this Motion and Schedule 1.02E to the ASA. |
| Transferred Liabilities | 1.01 | (i) Obligations arising under the Transferred Contracts; (ii) Reclamation Obligations; (iii) Retention Pond liabilities and obligations; (iv) any other liabilities listed in Schedule 4.02 to the ASA; and (iv) certain vacation pay obligations. |
| Excluded Liabilities | 1.01 | Seller's liabilities and obligations relating to the Transferred Assets other than the Transferred Liabilities, including but not limited to certain: (i) income, payroll and similar taxes arising prior to Closing; (ii) Seller intercompany payables; (iii) Insurance obligations; (iv) employee benefit plans and funds; (v) accounts payable; (vi) product liability and warranty claims for products sold prior to Closing; (vii) Plan Claims; (viii) any liability for Seller's violation prior to the Closing of any law, governmental rule or order, including but not limited to any violation of Environmental Law; (ix) Workers Compensation claims for periods prior to Closing; and (x) liability or environmental remediation required by applicable law of any condition existing as of the Closing and arising out of the operations of the Subject Business at the Subject Real Property. |
| Permitted Exceptions | Preamble | Includes certain Liens for current Taxes, assessments or other claims by a Governmental Authority, zoning, subdivision, building code, entitlement and other land use, construction and Environmental Laws by a Governmental Authority, certain easements, rights-of-way, licenses, utility agreements, restrictions, and other similar encumbrances of record, and certain other non-material exceptions. |
| Employee Matters | 12 | Purchaser will offer employment to employees listed in Schedule 12.01 to the ASA. Those who accept offers of employment will become Purchaser's employees on the Closing Date. |
| Scheduled Closing Date | 3.01 | Tenth Business Day after the date on which the conditions to Closing have been met or waived. |

authority to enter into the Canadian ASA, as it will be Grace Canada, Inc., that is the seller, and not Grace or another Debtor.

| Term | Relevant ASA Section (§) | Description |
|------|--------------------------|-------------|
| Closing Conditions | 10 & 11 | Sale Order shall have become final and non-appealable. |
| Termination of ASA | 13 | • Prior to Closing by written agreement of Seller and Buyer;<br>• After 180 days after the ASA's date upon written notice of one party to the other;<br>• By either Seller or Purchaser upon the other's inability to meet its respective closing conditions. |
| Seller's Indemnification | 14.02(a) | Seller shall indemnify Purchaser against any Damages to the Purchaser Group that are caused by or arise out of (i) the breach of or failure of Seller to perform and fulfill any provision or agreement to be performed or fulfilled by it under this ASA or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of such Seller set forth in Article 5 of the ASA, or (iii) any of the Excluded Liabilities or Excluded Assets. |
| Dispute Resolution | 4.06 | If Purchaser objects to the Closing I&R Amount and if the Parties cannot agree, then determination of the Closing I&R Amount shall be subject to arbitration. |

**PLEASE TAKE FURTHER NOTICE** that, subject to Court approval, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, and subject to any orders entered by the Court, Seller will sell all right, title, and interest in the Transferred Assets with any liens, claims, encumbrances, and interests attaching to the proceeds of that sale.

**PLEASE TAKE FURTHER NOTICE** that the Debtors propose to assume and assign to Purchaser those Transferred Contracts set forth on Exhibit 1 to this Notice (the "List of Transferred Contracts"). The List of Transferred Contracts also sets forth next to each Transferred Contract the proposed Cure Amount that Seller proposes to pay to each counterparty. If a counterparty to a Transferred Contract does not (i) properly object to the applicable Cure Amounts and/or adequate assurance of future performance by Purchaser on or before November 4, 2011; (ii) set forth a specific default in any executory contract or unexpired lease; or (iii) claim a specific monetary amount that differs from the amount (if any) specified by Seller as the Cure Amount on the List of Transferred Contracts, the Court shall enter an order deeming the Cure Amount set forth on the List of Transferred Contracts to be the actual Cure Amount payable

under section 365 of the Bankruptcy Code and forever barring such counterparty from objecting to adequate assurance of future performance and to the Cure Amounts and from asserting any additional cure or other amounts against the Debtors, their estates, and Purchaser with respect to its executory contract(s) or unexpired lease(s).

---

**OBJECTION DEADLINE**

**PLEASE TAKE FURTHER NOTICE** that objections and other responses to the relief (each, an "Objection") requested in the Motion and objections or other responses to the Cure Amounts set forth in Exhibit I hereto (each, a "Cure Objection"), if any, must be in writing and filed with the Bankruptcy Court no later than **4:00 p.m. prevailing Eastern Time on November 4, 2010** (the "Objection Deadline").

---

**PLEASE TAKE FURTHER NOTICE** that you must also serve any such Objection or Cure Objection on each of the following parties prior to the Objection Deadline:

| Co-counsel for the Debtors: | Laura Davis Jones<br>Timothy P. Cairns<br>Pachulski Stang Ziehl Young & Jones LLP<br>919 North Market Street, 11th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705<br>(Courier 19801)<br><br>Janet S. Baer<br>Roger J. Higgins<br>Baer Higgins Fruchtman LLC<br>111 East Wacker Drive<br>Suite 2800<br>Chicago, IL 60601 | Adam Paul<br>John Donley<br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, IL 60654 |
| Counsel to the Official Committee of Unsecured | Lewis Kruger<br>Arlene Krieger<br>Stroock & Stroock & Lavan<br>180 Maiden Lane, New York, | Michael R. Lastowski<br>Duane, Morris & Heckscher, LLP,<br>1100 N. Market<br>Street, Suite 1200, Wilmington, DE |

| Creditors | NY 10038-4982 | 19801-1246 |
|---|---|---|
| **Counsel to the Official Committee of Property Damage Claimants** | Scott L. Baena<br>Jay Sakalo<br>Bilzin, Sumberg, Dunn, Baena, Price & Axelrod,<br>First Union Financial Center, 200 South Biscayne Boulevard, Suite 2500<br>Miami, FL 33131 | Michael B. Joseph, Ferry & Joseph, P.A.<br>824 Market Street<br>Suite 904<br>P.O. Box 1351,<br>Wilmington, DE 19899 |
| **Counsel to the Official Committee of Personal Injury Claimants** | Peter Van L. Lockwood<br>Caplin & Drysdale, Chartered<br>One Thomas Circle, N.W.<br>Washington, D.C. 20005 | Mark T. Hurford<br>Campbell & Levine, LLC<br>800 N. King Street<br>Suite 300<br>Wilmington, DE 19801 |
| **Counsel to the Official Committee of Equity Holders** | Philip Bentley<br>David Blabey<br>Kramer Levin Naftalis & Frankel LLP, 919 Third Avenue<br>New York, NY 10022 | Teresa K.D. Currer<br>Buchanan, Ingersoll & Rooney, P.C.<br>1000 West Street<br>Suite 1410<br>P.O. Box 1397<br>Wilmington, DE 19899-1397 |
| **Counsel to the Future Claimants' Representative** | Richard H. Wyron<br>Roger Frankel<br>Orrick, Herrington & Sutcliffe, LLP<br>3050 K Street, NW, Suite 300<br>Washington, DC 20007 | John C. Philips, Jr.<br>Phillips, Goldman & Spence, P.A.<br>1200 North Broom Street<br>Wilmington, DE 19806 |
| **The Office of the United States Trustee** | David Klauder<br>844 N. King Street<br>Wilmington, DE 19801 | |

IF NO OBJECTIONS OR CURE OBJECTIONS ARE TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION **WITHOUT FURTHER NOTICE OR HEARING.**

IN THE EVENT THAT ANY OBJECTION OR RESPONSE IS FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, A HEARING ON THE MOTION WILL BE HELD BEFORE THE HONORABLE JUDITH K. FITZGERALD AT **THE UNITED STATES BANKRUPTCY COURT, 824 NORTH MARKET STREET, WILMINGTON, DE 19801, AT 9:00 A.M., November 28, 2011.**

Dated:  October 17, 2011

KIRKLAND & ELLIS LLP
Adam Paul
John Donley
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

and

BAER HIGGINS FRUCHTMAN LLC
Janet S. Baer
Roger J. Higgins
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4047

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
(302) 652-4400

Co-Counsel for the Debtors and Debtors-in-Possession

8

## Exhibit 1

### Transferred Contracts

## EXHIBIT 1

## Transferred Contracts

| Agreement | Counterparty | Cure Amount |
|---|---|---|
| Supply, Distribution and Lease Transfer Agreement effective April 25, 2011 between Virginia Vermiculite, L.L.C. and W. R. Grace & Co.-Conn. | Virginia Vermiculite, L.L.C. | $0.00 |
| Lease Agreement (Donnan Parcel) entered into May 16, 2011, between Virginia Vermiculite, L.L.C. and W. R. Grace & Co.-Conn. | Virginia Vermiculite, L.L.C. | $0.00 |
| Lease Agreement entered into March 17, 2011, between Marsha Young et al. and Virginia Vermiculite, L.L.C. Assignment and Assumption of Lease Agreement (Young Parcel) dated September 20, 2011, between W. R. Grace & Co.-Conn. and Virginia Vermiculite, L.L.C.) | Patricia Young Taylor, Gladys Clay, Carie Young, Leroy Young, Jr., Marsha Young, Dolores Young Shannon, Gerina Young, Terrance Young & Virginia Vermiculite, L.L.C. | $0.00 |
| Exploration Agreement and Lease between H. Kenneth Hanna and Iris Simpson Hanna and Carolina Vermiculite Company, Inc. dated November __, 1984, as amended by that certain Extension of Lease Agreement between Paul Kenneth Hanna and Katie Bell Hanna and Virginia Vermiculite LTD., successor to Carolina Vermiculite Company dated February 28, 2011. (Assigned to W. R. Grace by Assignment and Assumption of Lease Agreement (Hanna Parcel) dated April 25, 2011, between W. R. Grace & Co.-Conn. and Virginia Vermiculite, L.L.C.) | Paul Kenneth Hanna, Katie Bell Hanna & Virginia Vermiculite, L.L.C. | $0.00 |
| Lease Agreement between Jack W. Harrison and Emily M. Harrison, Wife of Joe W. Harrison (Deceased) and Carolina Vermiculite Division of Virginia Vermiculite, LP, dated March 8, 2001, as amended by that certain Extension of Lease Agreement between Jack W. Harrison and Emily W. Harrison, wife of Joe W. Harrison (deceased) and Carolina Vermiculite Company, a division of Virginia Vermiculite, Ltd., dated February 10, 2011. (Assigned to W. R. Grace & Co.-Conn. by Assignment and Assumption Agreement made as of March 25, 2011, between Virginia Vermiculite, L.L.C. and W. R. Grace & Co.-Conn.) | Jack W. Harrison, Emily M. Harrison & Virginia Vermiculite, L.L.C. | $0.00 |
| Lease Agreement between Jack Wingo McKittrick and Carolina Vermiculite Company, a division of Virginia Vermiculite, Ltd., dated June 9, 1994, as amended by that certain Extension of Lease Agreement between Jack Wingo McKittrick and Carolina Vermiculite Company, a division of Virginia Vermiculite, Ltd., dated December 31, 2008. (Assigned to W. R. Grace & Co.-Conn. by Assignment and Assumption Agreement dated May 19, 2011, between Virginia Vermiculite, L.L.C. and W. R. Grace & Co.-Conn.), | Jack McKittrick & Virginia Vermiculite, L.L.C. | $0.00 |

| Agreement | Counterparty | Cure Amount |
|---|---|---|
| Exploration Agreement and Lease between Leonora Anne Verenes and Carolina Vermiculite Company, Inc. Dated July 30, 1984, as amended by that certain Extension of Lease Agreement between Leonora Anne Verenes and Carolina Vermiculite Company, a Division of Virginia Vermiculite, Ltd. dated July 1, 1994, as amended by that certain Extension of Lease Agreement between Leonora Anne Verenes and Carolina Vermiculite Company, a division of Virginia Vermiculite, Ltd., dated October 5, 2007. (Assigned to W. R. Grace & Co.-Conn. by Assignment and Assumption of Lease Agreement (Verenes Parcel) dated May 19, 2011, between Virginia Vermiculite, L.L.C. and W. R. Grace & Co.-Conn.) | Leonora Anne Verenes & Virginia Vermiculite, L.L.C. | $0.00 |
| Lease Agreement (Wingo Parcel) entered into May 16, 2011, between Virginia Vermiculite, L.L.C. and W. R. Grace & Co.-Conn. | Virginia Vermiculite, L.L.C. | $0.00 |
| Calibration Agreement executed November 10, 2010 | Greenville Scale Company, Inc. | $0.00 |
| Service Agreements Non-Hazardous Waste executed February 24, 2010 | Waste Management, Inc. | $0.00 |
| Air System Maintenance and Service Agreement executed August 6, 2008 | I&M Industrials, Inc. | $0.00 |
| Mutual Confidential Non-Disclosure Agreement dated September 20, 2006, extended by extension agreement executed May 13, 2008 | NanoPack Inc. | $0.00 |
| Easement and Right of Way Agreement dated May 22, 2008 | Mary Dula and Margaret Thompson | $0.00 |
| Access Easement Agreement dated July 27, 2010, between FIATP Timber LLC and W. R. Grace & Co.-Conn. | FIATP Timber LLC | $0.00 |
| Railcar Lease Rider No. A133 W.R. Grace & Co. (3 cars) UTLX 220115, 220117, 220171, accepted January 21, 2009 | Union Tank Car Company | $0.00 |
| Railcar Lease Car Leasing Agreement 1822-28, Rider No. 19, Renewal No. 1 7/17/2008 | General Electric Railcar Services Corporation | $0.00 |
| Railcar Lease Schedule 02 dated June 7, 2001 Master Lease Agreement Contract #0406-06 April 24, 2006 | Rocky Mountain Transportation Services, Inc. | $0.00 |
| Securitas Security Agreement | Securitas Security Services, Inc. | $0.00 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
|  | ) |  |
| W. R. GRACE & CO., et al.,[i] | ) | **Case No. 01-01139 (JKF)** |
|  | ) | **(Jointly Administered)** |
| Debtors. | ) |  |
|  | ) | **Hearing Date:** November 28, 2011, at 9:00 a.m. |
|  | ) | **Objection Deadline:** November 4, 2011 |

---

**DECLARATION OF ROBERT WHITNEY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER: (A) APPROVING THE FORM OF ASSET SALE AGREEMENT; (B) AUTHORIZING BUT NOT REQUIRING THE SALE OF CERTAIN VERMICULITE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (D) APPROVING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS**

---

|  |  |  |
|---|---|---|
| STATE OF Virginia | ) |  |
|  | ) | ss. |
| COUNTY OF Fairfax | ) |  |

Robert Whitney, after being duly sworn according to law, deposes and says:

---

[i] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

I am over the age of 18 and competent to testify. I am a Vice President of Seale & Associates, Inc., ("Seale"), a financial advisory firm whose principal address is 950 N. Glebe Road, Suite 950, Arlington, VA 22203. The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") have retained Seale to advise them on the sale of their Vermiculite Business (as that term is defined below).

I directed the marketing of the Vermiculite Business.[2] In that capacity, I have reviewed the Motion and the Agreements (as those terms are defined below), and I am, directly or through the Debtors' personnel, attorneys, and other advisors familiar with the information contained therein and in the exhibits annexed thereto. Except as otherwise noted, I have personal knowledge of the matters set forth herein. If called upon to testify, I could and would testify competently to the facts and opinions contained in this declaration.

## A.    The Vermiculite Business

1.    Grace Specialty Vermiculite (the "Vermiculite Business"), headquartered in Enoree, South Carolina, is a division of W. R. Grace & Co.-Conn. ("Grace" or "Seller"). The Vermiculite Business produces branded high-performance vermiculite ore and expanded vermiculite and perlite products. Vermiculite is a natural occurring mineral used in a broad range of applications, such as spray-on fire protection, lightweight insulating concrete, various soil mixes and amendments, and animal feeds. The Vermiculite Business operates owned and leased mines in and around Enoree. The Vermiculite Business also operates a milling and

---

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in, as the case may be, the Debtors' *Motion for Entry of an Order: (a) Approving the Form of Asset Sale Agreement; (b) Authorizing But Not Requiring the Sale of Certain Vermiculite Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (c) Authorizing the Assumption and Assignment of Executory Contracts; and (D) Approving Procedures for Noticing and Determining Cure Amounts* (the "Motion") or the *First Amended Joint Plan of Reorganization in their Chapter 11 Cases,* Docket no. 25881, as it may be further amended, supplemented or otherwise further amended from time to time, and the schedules and exhibits to the foregoing, as they may be in effect from time to time (the "Plan"), or the Warrant Agreement (Exhibit 24 to the Plan's Exhibit Book).

processing facility in Enoree, and five other processing facilities strategically located across the U.S. and Canada.

2.    Management projects that the Vermiculite Business will achieve sales of approximately $22 million in fiscal year 2011.

**B.    Strategic Rationale for Sale of the Vermiculite Business**

3.    Management has informed me that, in 2009, prior to Seale's involvement in the sale of the Vermiculite Business, Grace's management team determined in their business judgment that it was in the Debtors' best interests to sell the Vermiculite Business. This decision was based on a number of factors, including the lack of strategic fit between the Vermiculite Business and the Debtors' other business lines. Moreover, its revenues contributed less than 0.7% to the Debtors' 2010 consolidated revenues, and did not contribute measurably to its consolidated EBITDA. In addition, managing the Vermiculite Business was demanding a disproportionate share of senior management's time and attention to manage. Furthermore, the aging facilities would require significant investment over the coming years to maintain efficiencies. Management therefore has determined that selling the Vermiculite Business will generate greater value to the Debtors' estates, particularly on the terms and conditions of the proposed transactions set forth in the ASA and the Motion, than retaining the business would, while at the same time generating funds that could be put to use in higher-return, core activities.

**C.    Seller's Previous Attempts to Market the Business**

4.    Management has informed me that, in February 2009, following the decision to market the Vermiculite Business, a Grace management team identified and approached approximately twelve strategic buyers regarding the Vermiculite Business. Seven candidate buyers executed non-disclosure agreements, received management presentations and conducted due diligence. Grace thereafter received four offers. Management declined to move forward

3

with any of the offers, because the proposed consideration in each of the offers did not meet Grace's requirements.    Grace subsequently undertook a number of strategic initiatives to improve business performance and profitability.

5.    Grace's management has informed me that, in December 2010, Grace contacted one of the potential strategic buyers that had submitted a bid in 2009.  In March 2011, that bidder (the "March Bidder") submitted a non-binding indication of interest for the Vermiculite Business.

### D.    The March – July 2011 Marketing Process

6.    At about the same time that it received the March Bidder's indication of interest, Grace engaged Seale & Associates, Inc. ("Seale") to assist it in marketing the Vermiculite Business.  Seale and Grace: (a) identified and contacted potential acquirers (including certain parties interested during the 2009 process); (b) prepared under my supervision a Confidential Information Presentation dated June 2011 (the "CIP"); (c) coordinated the sale process and due diligence; and (d) assisted with the negotiation of the final agreements.

7.    During May and June of 2011, Seale approached 57 potential strategic buyers and 130 potential private equity buyers to determine the level of interest in acquiring the Vermiculite Business.  With the assistance of Grace's management team, and based upon Seale's marketing efforts, my team at Seale and I determined that there were no other viable candidates in the marketplace.

8.    Of the companies contacted by Seale, 6 strategic and 18 private equity candidates responded, and they subsequently signed confidentiality agreements and were furnished with the CIP.  Grace subsequently received preliminary offers from two strategic bidders, one of whom later withdrew from the process.  The remaining bidder received a management presentation,

4

conducted extensive due diligence and incurred considerable expense in participating in site visits to the Enoree Facility and the outlying expanding plants located across North America.

### E.    Purchaser's Bid Was the Highest and Best Offer for the Vermiculite Business

9.    On or around July 22, 2011, after performing extensive due diligence, the potential bidder, Vermiculite Acquisition Corp. ("Purchaser") agreed to a detailed term sheet that included a purchase price of $10 million dollars. I am given to understand that Purchaser made its bid for strategic purposes. It, or related entities, are in the business of producing and marketing expanded Perlite products across North America, and are actively seeking to add capacity by acquiring expanding facilities such as those owned and operated by the Vermiculite Business.

10.    In evaluating the bid, Grace considered primarily the dollar amount of the bid, Grace's confidence that the bid would not change materially during negotiations, the bid's required closing conditions, and relative ease of transition of the Vermiculite Business to Purchaser's organization. Grace also considered Purchaser's ability to close on a relatively accelerated timeline, as well as its financial wherewithal and the perceived commitment of its senior management team.

### F.    Negotiating the ASA

11.    Seller and Purchaser negotiated the ASA and other Sale Documents at arm's-length and in good faith. Both the Debtors and Purchaser are represented by sophisticated counsel and other advisors. Extensive negotiations were held between the parties involving substantial time and energy by the parties and their professionals, and the Sale Documents reflect give-and-take and compromises by both sides.

5