## Exhibit A

**Revised Form of Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re docket no. 27771** |
| | ) **Hearing Agenda item no. 6** |

---

**ORDER: (A) APPROVING THE FORM OF ASSET SALE AGREEMENT; (B) AUTHORIZING THE SALE OF CERTAIN VERMICULITE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (D) APPROVING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS**

---

This matter coming on to be heard on the *Motion for Entry of an Order: (a) Approving the Form of Asset Sale Agreement; (b) Authorizing the Sale of Certain Vermiculite Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (c) Authorizing the Assumption and Assignment of Executory Contracts; and (D) Approving Procedures for Noticing and Determining Cure Amounts* [Docket No. 27771] (the "Sale Motion") filed by W. R. Grace &

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

Co.-Conn. ("Seller", together with the other debtors and debtors-in-possession in these chapter 11 cases, the "Debtors") for entry of an order (the "Sale Order"):[2]

(i)    Approving the form of Vermiculite Asset Sale Agreement (the "ASA") attached hereto as Exhibit I (which together with the ancillary documents attached thereto as exhibits or referred to therein being the "Sale Documents");

(ii)    Authorizing the sale to Purchaser for $10 million, as adjusted pursuant to the ASA (the "Purchase Price") of certain assets (the "Sale") of the Debtors' business of mining and processing vermiculite and selling vermiculite products (the "Vermiculite Assets") free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Liens"), other than the Permitted Exceptions (as defined in the ASA);

(iii)    Approving procedures (the "Cure Procedures"), including but not limited to the form set forth in the form of notice of sale attached to the Motion as Exhibit C (the "Sale Notice"), for noticing and determining cure amounts (the "Proposed Cure Amounts") in connection with the assumption and assignment of certain contracts and leases listed in Exhibit 1 to the Sale Notice (collectively, the "Transferred Contracts");

(iv)    Approving the assumption and assignment of the Transferred Contracts pursuant to the terms of the ASA;

(v)    Authorizing the Debtors to: (a) undertake all transactions contemplated by the ASA; (b) enter into the ancillary agreements contemplated by the ASA; and (c) undertake all other actions necessary to consummate the Sale; and

(vi)    Providing that the Sale Order shall take immediate effect pursuant to Fed. R. Bankr. P. 6004(h), 6006(d) and otherwise.

Seller and Purchaser having executed the ASA; a hearing on the Sale Motion having been held on October 24, 2011 (the "Sale Hearing"); all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and it appearing that the Court has jurisdiction over this matter; the Court having reviewed and

---

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in, as the case may be, the Sale Motion, the ASA, the *Declaration of Robert Whitney in Support of the Debtors' Motion for Entry of an Order: (a) Approving the Form of Asset Sale Agreement; (b) Authorizing But Not Requiring the Sale of Certain Vermiculite Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (c) Authorizing the Assumption and Assignment of Executory Contracts; and (d) Approving Procedures for Noticing and Determining Cure Amounts* (the "Whitney Declaration") or the *First Amended Joint Plan of Reorganization in their Chapter 11 Cases,* Docket no. 25881, as it may be further amended, supplemented or otherwise further amended from time to time, and the schedules and exhibits to the foregoing, as they may be in effect from time to time (the "Plan").

considered (i) the Sale Motion, (ii) the objections thereto, if any, and (iii) the arguments of counsel made and the evidence proffered or adduced at the Sale Hearing; it appearing that the relief requested in the Sale Motion and approval of the Sale to Purchaser of the Transferred Assets, including Seller's assumption of the Transferred Contracts and assignment thereof to Purchaser, is in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and based on the Sale Motion, the statements of counsel, the record of the Sale Hearing and the record in these cases; and after due deliberation thereon; and good cause appearing therefore, it is hereby FOUND AND DETERMINED THAT:[3]

A.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 over the Sale Motion and the Sale. Venue of this proceeding and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Fed. R. Bankr. P.  6004(h) and 6006(d), and to any extent necessary under Fed. R. Bankr. P. 9014 and Fed. R. Civ. P. 54(b), as made applicable by Fed. R. Bankr. P. 7054, the Court expressly finds that there is no just reason for delay in the immediate implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      Actual written notice of the Sale Hearing, the Sale Motion, the Sale and the assumption and assignment of the Transferred Contracts, and a reasonable opportunity to object or to

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested parties and entities, including, but not limited to (i) the office of the United States Trustee; (ii) counsel to the L/C Facility Agent and L/C Issuers; (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (iv) counsel to each of the official committees appointed in these Chapter 11 Cases; (v) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (vi) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; (vii) counterparties to the Transferred Contracts; (viii) Purchaser; (ix) all persons or entities known or reasonably believed to have asserted a Lien in any of the Transferred Assets; (x) federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Motion; (xi) all persons and entities reasonably known to have expressed an interest in acquiring the Vermiculite Business; (xii) the United States Attorneys for the Districts of Delaware, Massachusetts, Maryland, the Southern District of Florida, Arizona and South Carolina; the state attorneys general for the states of South Carolina, Florida, Maryland, Massachusetts, Delaware and Arizona; (xiv) the state environmental protection agencies for the states of South Carolina, Florida, Massachusetts and Arizona; (xv) the provincial attorneys general for the Canadian provinces of Alberta, Manitoba and Ontario; (xvi) the provincial environmental protection agencies for the Canadian provinces of Alberta, Manitoba and Ontario; (xvii) the United States Environmental Protection Agency; and (xviii) Environment Canada and the Canadian Environmental Assessment Agency.

D.     As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and

sufficient notice of the Sale Motion, the Sale Hearing, and the Sale, including, without limitation, the assumption and assignment of the Transferred Contracts, has been provided in accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Sale Motion, the Sale Hearing or the Sale, including, without limitation, the assumption and assignment of the Transferred Contracts and the Proposed Cure Amounts, is or shall be required.

E.      Seller has served notice of the Proposed Cure Amounts in Schedule I to the Sale Notice upon each non-debtor counterparty to the Transferred Contracts that Seller seeks to assume and assign to Purchaser on the Closing Date. The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a Proposed Cure Amount for the respective Transferred Contracts. Non-debtor counterparties to the Transferred Contracts have had an opportunity to object to the Proposed Cure Amount set forth in the Sale Notice.

F.      The disclosures made by Seller concerning the Sale Documents, the Sale, and the Sale Hearing were good, complete and adequate.

### Purchaser's Good Faith

G.      The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

H.      Seller and Purchaser negotiated, proposed and entered into the ASA and each of the other Sale Documents without collusion, in good faith and from arm's length bargaining positions. Neither Seller nor Purchaser has engaged in any conduct that would cause or

permit all or any part of the Sale or any obligation of Seller under the Sale Documents to be avoided under section 363(n) of the Bankruptcy Code.

I.    Purchaser is a good faith Purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (a) Purchaser recognized that Seller was free to deal with the other potential party interested in acquiring the Transferred Assets; (b) all payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale have been disclosed; (c) Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors or controlling stockholders exists between Purchaser and Seller; and (e) the negotiation and execution of the ASA and other Sale Documents related thereto was at arms' length and in good faith. The Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale.

**Highest and Best Offer**

J.    Seller has thoroughly and effectively marketed the Vermiculite Business for sale in an appropriate manner that was designed to maximize the value received by the Debtors for the Vermiculite Business.

K.    The consideration provided by Purchaser pursuant to the terms of the Sale Documents: (i) is fair and reasonable, (ii) is the highest and otherwise best offer for the Transferred Assets, and (iii) will provide a greater recovery for Seller's estate than would be provided by any other available alternative.

L.    Seller's determination that the terms set forth in the Sale Documents constitute the highest and best offer for the Transferred Assets, including the Transferred Contracts,

constitutes a valid and sound exercise of Seller's business judgment pursuant to section 363(b) of the Bankruptcy Code.

M.    Approval at this time of the Sale Motion and the Sale Documents and the consummation of the Sale contemplated thereby are in the best interests of Seller, its affiliates, their creditors, their estates and other parties-in-interest.

N.    Seller has demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, the Plan or any other chapter 11 plan of reorganization that may be confirmed in these chapter 11 cases.

O.    No consents or approvals, other than those expressly provided for in the ASA, are required for Seller to consummate such Sale.

### No Fraudulent Transfer

P.    The Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state territory, possession or the District of Columbia.

### Validity of Transfer

Q.    The Sale has been duly and validly authorized by all necessary corporate action of Seller, who has full corporate power and authority to execute and deliver the ASA and each of the other Sale Documents. Except as expressly set forth therein, no further consents or approvals are required for Seller to consummate the Sale contemplated by the Sale Documents.

R.    On the date of closing of the ASA (the "<u>Closing Date</u>"), Seller's transfer of the Transferred Assets, including its assumption and assignment to Purchaser of the Transferred Contracts, will be a legal, valid and effective transfer that, except for the Transferred Liabilities and any Permitted Exceptions, will vest Purchaser with all of

Seller's rights, title, and interests free and clear of all Liens, claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Interests"), including but not limited to those (i) arising under doctrines of successor liability, (ii) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal or termination of Seller's or Purchaser's interest in such assets or contracts, or any similar rights and/or (iii) that relate to taxes arising under or out of, in connection with, or in any way relating to the operation of the Vermiculite Business prior to the Closing Date.

S.     Purchaser would not have entered into the ASA and would not consummate the Sale contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the transfer of the Transferred Assets were not, except for the Transferred Liabilities and any Permitted Exceptions, free and clear of all Interests of any kind or nature whatsoever, or if Purchaser would, or in the future could, be liable for any of the Interests.

### Section 363(f) Is Satisfied

T.     Seller may sell the Transferred Assets free and clear of all Interests (other than Permitted Exceptions and Transferred Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those non-debtor parties with Interests in the Transferred Assets who did not object, or who withdrew their objections, to the ASA, the Sale or the Sale Motion are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code. Those

non-debtor parties with Interests in the Transferred Assets who did object fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code and are not entitled to adequate protection or are adequately protected by having their Interests, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an Interest.

U.    Except as expressly set forth in the ASA, the transfer of the Transferred Assets to Purchaser shall in no way impose any liability or obligation upon Purchaser for Interests related to Seller's operation of the Vermiculite Business or use of the Transferred Assets. Purchaser shall not be deemed, as a result of any action taken in connection with the purchase or the Transferred Assets or the assignment or the Transferred Contracts, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Transferred Liabilities and any obligations arising under the Transferred Contracts from and after the Closing Date as expressly stated in the ASA); or (ii) have, *de facto* or otherwise, merged with or into any of the Debtors. The Purchaser is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the ASA with respect to the Transferred Liabilities.

V.    Except for the Transferred Liabilities, the transfer of the Transferred Assets to Purchaser, including Seller's assumption and assignment to Purchaser of the Transferred Contracts will not subject Purchaser to any liability whatsoever with respect to the operation of the Vermiculite Business prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, successor or transferee liability.

W.   The transfer of the Transferred Assets to Purchaser, including Seller's assumption and assignment to Purchaser of the Transferred Contracts will not subject Purchaser to any liability whatsoever for any Excluded Liabilities under the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, successor or transferee liability.

### Assumption and Assignment of the Transferred Contracts

X.   Seller has demonstrated that it is an exercise of the Debtors' sound business judgment to assume and assign the Transferred Contracts in connection with the consummation of the Sale, and Seller's assumption and assignment to Purchaser of the Transferred Contracts is in the best interests of the Debtors, their affiliates, their estates and their creditors. The Transferred Contracts being assigned to Purchaser are an integral part of the Vermiculite Business purchased by Purchaser and, accordingly, the assumption and assignment of the Transferred Contracts is reasonable, enhances the value of the Debtors' estates and does not constitute unfair discrimination.

Y.   As of the date hereof, Seller does not owe any amounts ("Cure Amounts") to counterparties of any Transferred Contracts nor does it need to provide further adequate assurance pursuant to section 365(b)(1)(A) of the Bankruptcy Code.

Z.   As of the date hereof, no counterparty to any Transferred Contract has suffered any pecuniary loss under any such Transferred Contract that would require compensation or adequate assurance pursuant to section 365(b)(1)(B) of the Bankruptcy Code.

AA.  Pursuant to and in accordance with the ASA, Purchaser has provided adequate assurance of its future performance of and under the Transferred Contracts, within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

### Compelling Circumstances for an Immediate Sale

BB.     To maximize the value of the assets of the Vermiculite Business and preserve the viability of the Vermiculite Businesses as a going concern, it is essential that the Sale occur within the time constraints set forth in the ASA. Time is of the essence in consummating the Sale.

### No De Facto Plan

CC.     The Sale does not constitute a *de facto* plan of reorganization or liquidation or an element of such a plan for any of the Debtors, as it does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### General Provisions

1.     The relief requested in the Sale Motion is granted and approved in its entirety, and the Sale contemplated thereby is approved as set forth in this Sale Order.

2.     All objections to the entry of this Sale Order or the relief provided herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits, or the interests of such objections have been otherwise satisfied or adequately provided for.

### Approval of the Sale Documents

3.     The Sale Documents, and all of the terms and conditions thereof, are hereby approved.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, Seller is authorized and directed to consummate the Sale in accordance with the terms and conditions of the Sale Documents.

5.      Seller is authorized and directed to execute and deliver, and empowered to perform under, consummate and implement the Sale Documents, including all instruments and documents that may be reasonably necessary or desirable to implement the Sale as contemplated by the ASA, and to take all further actions as may be reasonably requested by Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to Purchaser or reducing to possession, the Transferred Assets, including the Transferred Contracts, or as may be necessary or appropriate to the performance of the obligations as contemplated by the ASA. Any amounts that become payable by Seller pursuant to the Sale Documents shall (a) constitute super-priority administrative expenses of Seller's estates that, except for claims of the Debtors' postpetition lenders, shall be senior to all other administrative expenses in Seller's chapter 11 case or in any subsequent case under chapter 7 of the Bankruptcy Code; (b) be paid by Seller without further order of this Court and in the time and manner provided for in the Sale Documents; and (c) not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation for the Debtors.

6.      The terms and provisions of this Sale Order shall be binding in all respects upon Seller, its affiliates, their estates, all known or unknown creditors of, and all known or unknown holders of equity interests in, Seller or Debtors, any holders of Interests against, in or on all or any portion of the Transferred Assets, all non-debtor parties to the Transferred Contracts, Purchaser and all successors and assigns of Purchaser, and any trustees, if any,

subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Sale Order and the Sale Documents shall inure to the benefit of Seller, its affiliates, their estates, their creditors, Purchaser, all interested parties and their respective successors and assigns. The Sale Documents shall not be subject to rejection.

### The Transferred Assets

7.      Pursuant to sections 105(a), 363(f) and 365 of the Bankruptcy Code, Seller is authorized to transfer the Transferred Assets on the Closing Date (the "Closing"). Such assets shall be transferred to Purchaser and shall constitute a legal, valid, binding and effective transfer of such assets of the Vermiculite Business and, upon Seller's receipt of the Purchase Price, shall be, free and clear of all Interests (other than Permitted Exceptions and Transferred Liabilities), with all such Interests of any kind or nature whatsoever to attach to the net proceeds of the Sale ultimately attributable to the property against or in which such Interests are held with the same validity, priority, force and effect that they now have, subject to any claims and defenses Seller may possess with respect hereto.

8.      Except as expressly permitted or otherwise specifically provided by the ASA or this Sale Order, all persons and entities holding Interests in the Transferred Assets (other than the Permitted Exceptions and Transferred Liabilities), arising under or out of, in connection with, or in any way relating to, Seller, the Transferred Assets, the Transferred Contracts, the operation of the Vermiculite Business prior to the Closing Date, or the transfer of the Vermiculite Business or the Transferred Contracts to Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against Purchaser, its successors or assigns, property or assets, such persons' or entities' Interests. On the Closing Date, each creditor is authorized to execute such documents and take all other

actions as may be necessary to release Interests (other than the Permitted Exceptions and Transferred Liabilities) on the Transferred Assets, if any, as provided for herein.

9.  The transfer of the Transferred Assets, including the Transferred Contracts, to Purchaser pursuant to the ASA constitutes a legal, valid and effective transfer of such assets and contracts, and that transfer shall vest Purchaser with all right, title and interest of Seller in and to such assets and contracts free and clear of all Interests of any kind or nature whatsoever, including but not limited to the Excluded Liabilities.

**Assumption by Selling Debtor and Assignment to Purchaser of the Transferred Contracts**

10. Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, Seller's assumption and assignment to Purchaser of the Transferred Contracts, is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

11. Seller is hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Purchaser, effective upon the Closing, the Transferred Contracts free and clear of all Interests of any kind or nature whatsoever, and (b) execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Transferred Contracts to Purchaser.

12. The Transferred Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, notwithstanding any provision in any such Transferred Contract that prohibits, restricts or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, Seller shall be relieved from any further liability with respect to the Transferred Contracts after such assignment to and assumption by Purchaser.

13.     Seller may assume and assign each of the Transferred Contracts in accordance with sections 363 and 365 of the Bankruptcy Code and any provisions in any of the Transferred Contracts that prohibits, restricts or conditions the assignment of such Transferred Contract, or allow the party to such Transferred Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assumption or assignment of such Transferred Contract constitute unenforceable anti-assignment provisions which are void and of no force and effect.

14.     All other requirements and conditions under section 363 and 365 of the Bankruptcy Code for the assumption and assignment to Purchaser of each of the Transferred Contracts have been satisfied. Upon Closing, in accordance with sections 363 and 365, Purchaser shall be fully and irrevocably vested in all right, title and interest of each of the Transferred Contracts.

15.     As of the Closing Date, each of the Transferred Contracts will be in full force and effect and not subject to termination or cancellation by the non-debtor party thereto based upon any act, omission or failure that may have occurred or arisen prior to the Closing.

16.     All defaults or other obligations of Seller under any Transferred Contract arising or accruing prior to the date of this Sale Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by Purchaser upon Seller's assignment of each such Transferred Contract to Purchaser.   After the Closing Date, neither Seller nor Purchaser shall have any further liabilities to the non-debtor parties to the Transferred Contracts other than Purchaser's obligations under the Transferred Contracts that become due and payable on or after the Closing Date. There shall be no rent accelerations,

assignment fees, increases (including advertising rates) or any other fees charged to Purchaser or Seller as a result of the assumption and assignment of the Transferred Contracts.

17. Except for Seller's obligation to pay the Cure Amounts (if any), each non-debtor party to a Transferred Contract hereby is forever barred, estopped and permanently enjoined from asserting against Seller or Purchaser, or the property of any of them, any default existing as of the date of the Sale Hearing; or, against Purchaser, any counterclaim, defense, setoff or any other claim asserted or assertable against Seller. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all parties to the Transferred Contracts are forever barred and permanently enjoined from raising or asserting against Seller or Purchaser any assignment fee, default, breach or claim or pecuniary loss or condition to assignment, arising under or related to the Transferred Contracts existing as of the Closing Date or arising by reason of the Closing.

**Additional Sale Provisions**

18. On the Closing Date of the Sale, each of Seller's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests, if any, in the Transferred Assets, including the Transferred Contracts, as such Interests may have been recorded or may otherwise exist.

19. This Sale Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing with respect to Seller, the Transferred Assets or the Transferred Contracts prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders

or mortgages, recorders of deeds, registrars of deeds, administrative agencies, govemmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or contracts.

20.     Each and every federal, state and local govemmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the ASA.

21.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens with respect to Seller, the Transferred Assets or the Transferred Contracts shall not have delivered to Seller and Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the person or entity has with respect to Seller, the Transferred Assets, the Transferred Contracts, or otherwise, then (a) Seller is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such assets and contracts, and (b) Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once met, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Transferred Assets and Transferred Contracts of any kind or nature whatsoever.

22.     All entities who are presently, or on the Closing Date may be, in possession of some or all of the Transferred Assets are hereby directed to surrender possession of the Transferred Assets to Purchaser on the Closing Date.

23.     Except for the Transferred Liabilities, Purchaser shall have no liability or responsibility for any liability or other obligation of Seller arising under or related to the Vermiculite Business or the Transferred Contracts. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the ASA, Purchaser shall not be liable for any claims against Seller or any of its predecessors or affiliates, and Purchaser shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to Seller or any obligations of Seller arising prior to the Closing Date, including, but not limited to, (1) liabilities on account of any taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of the Business prior to the Closing Date and (2) liabilities based on any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity.

24.     Under no circumstances shall Purchaser be deemed a successor of or to the Debtors for any Interest against or in Seller or the Vermiculite Business or Transferred Contracts of any kind or nature whatsoever. Except for the Transferred Liabilities, the sale, transfer, assignment and delivery of the Transferred Assets, including the Transferred Contracts, shall not be subject to any Interests, and Interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, Seller.   Except for persons holding Transferred Liabilities, all persons holding Interests against or in Seller or the Transferred

Assets or Transferred Contracts of any kind or nature whatsoever (including, but not limited to, Seller and/or its successors (including any trustees, creditors, employees, unions, former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing)) shall be, and hereby are, forever barred, estopped and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against Purchaser, its property, its successors and assigns or the Transferred Assets or Transferred Contracts, as an alleged successor or otherwise, with respect to any Interest of any kind or nature whatsoever such person or entity had, has or may have against or in the Debtors, their estates, their officers, directors, shareholders or the Transferred Assets or Transferred Contracts.  Following the Closing Date, no holder of an Interest in Seller shall interfere with Purchaser's title to or use and enjoyment of the Vermiculite Business or the Transferred Contracts based on or related to such Interest, or any actions that Seller and the other Debtors may take in their chapter 11 cases.

### Additional Provisions

25.    This Court retains exclusive jurisdiction over any matter or dispute arising from or relating to the implementation of this Sale Order as well as to enforce and implement the terms and provisions of the Sale Documents, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Transferred Assets to Purchaser, (b) resolve any disputes arising under or related to the Sale Documents, except as otherwise provided therein, (c) interpret, implement, and

enforce the provisions of this Sale Order and (d) protect Purchaser against any Interest in Seller, the Transferred Assets or the Transferred Contracts, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

26.     Nothing in this Sale Order or the ASA releases, nullifies, precludes, or enjoins after the date of entry of this Sale Order the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property.   Nothing in this Sale Order or the ASA authorizes transfer to the Purchaser of any licenses, permits, registrations, or other governmental authorizations and approvals without the Purchaser's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

27.     Nothing contained in the Plan (or any other chapter 11 plan of reorganization that may be confirmed in these chapter 11 cases) or any order of this Court continuing such Plan shall conflict with or deviate from the provisions of the ASA or the terms of this Sale Order.

28.     The transactions contemplated by the ASA are undertaken by Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code.   Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale as to Purchaser, except to the extent such authorization is duly stayed pending such appeal prior to such consummation. The Purchaser is a buyer in good faith of the Transferred Assets, including the Transferred Contracts, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

29.     The consideration provided by Purchaser for the assets of the Vermiculite Business under the Sale Documents (a) constitutes, and shall be deemed to constitute, reasonably equivalent value and fair consideration, and (b) is fair and reasonable and may not be

avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

30.     The terms and provisions of the Sale Documents and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, Seller, the remaining Debtors, their estates and their creditors, Reorganized Seller and the other Reorganized Debtors, Purchaser and its affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties including, but not limited to, all persons asserting Interests in such assets and contracts to be sold or assigned to Purchaser pursuant to the Sale Documents, notwithstanding any subsequent appointment of any trustee(s) or similar party under any chapter of the Bankruptcy Code, as to which trustee(s) or similar party such terms and provisions likewise shall be binding.

31.     The failure specifically to include any particular provision of a Sale Document in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the ASA and each of the Sale Documents be authorized and approved in their entirety. Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.

32.     The ASA and any other Sale Document may be modified, amended or supplemented by the parties thereto, in a writing signed by all parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement docs not have a material adverse effect on the Debtors' estates. In the event that a motion is filed to add additional contracts (the "Additional Contracts") to the list of Transferred Contracts pursuant to Section 8.01(b) of the ASA, upon entry of an order approving the assumption and assignment of the Additional

Contracts and payment of the related cure amounts by Purchaser and Seller in accordance with Section 8.01(b) of the ASA, such Additional Contracts shall be considered Transferred Contracts for all purposes under this Order.

33. Notwithstanding Fed. R. Bankr. P. 7062, 9014, 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and it shall not be stayed under any of the preceding Bankruptcy Rules or otherwise.

34. Nothing in this Sale Order or the Sale Documents releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under any environmental statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order. Notwithstanding the foregoing sentence, nothing in this Sale Order shall be interpreted to deem Purchaser as the successor to the Debtors under any state or federal successor liability doctrine. Any action by a governmental unit to enforce a liability of the kind described in the first sentence of this paragraph may be asserted in any forum outside the Bankruptcy Court that has jurisdiction under applicable non-bankruptcy law. Nothing in this Sale Order or the ASA authorizes the transfer or assignment to Purchaser of any license, permit, registration, authorization, or approval of or with respect to a governmental unit without Purchaser's complying with all applicable legal requirements under Nonbankruptcy law governing such transfers or assignments.

**[remainder of this page left intentionally blank]**

36.     The Court shall retain jurisdiction to hear and determine all matters arising from or

relating to the implementation of this Sale Order, the Sale Documents, the transactions

contemplated thereby, the Transferred Assets and the Transferred Contracts and each

other subject addressed by this Sale Order.

Dated: _____, 2011

 

_____

Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

## EXHIBIT I

**Vermiculite Asset Sale Agreement**

The exhibits and schedules attached to the Asset Sale Agreement are not attached due to their voluminous nature.  They are available from the Debtors upon request.

# VERMICULITE ASSET SALE AGREEMENT

October 17, 2011

## TABLE OF CONTENTS

Page

**ARTICLE 1**   **Definitions**...................................................................... 1
   1.01   General ........................................................................... 1
   1.02   Defined Terms ................................................................. 2
**ARTICLE 2**   **Sale of Subject Business, Purchase Price** ..................... 14
   2.01   Sale of Business ............................................................ 14
   2.02   Purchase Price .............................................................. 15
   2.03   Purchase Price Allocation .............................................. 15
**ARTICLE 3**   **Closing** .......................................................................... 15
   3.01   Scheduled Closing Date ................................................ 15
   3.02   Time and Place of Closing, Simultaneity......................... 16
   3.03   Transfers at the Closing; Payments................................ 16
   3.04   Ancillary Agreements .................................................... 17
   3.06   Closing Prorations ......................................................... 18
   3.07   Seller Reclamation Payments........................................ 19
   3.08   Further Assurances ....................................................... 19
**ARTICLE 4**   **Purchase Price, Post-Closing Adjustments**...................... 20
   4.01   Closing of Books ........................................................... 20
   4.02   Closing I&R Amount....................................................... 20
   4.03   Computations................................................................. 20
   4.04   Closing Statement ......................................................... 20
   4.05   Acceptance .................................................................... 21
   4.06   Non-Acceptance, Resolution of Disputes....................... 21
   4.07   Payment of Adjustments ................................................ 22
**ARTICLE 5**   **Seller's Representations and Warranties** ...................... 23
   5.01   Corporate Organization and Existence ........................... 23
   5.02   Corporate Power............................................................ 23
   5.03   Authorization; Consents ................................................. 24
   5.04   Execution and Delivery .................................................. 24
   5.05   No Conflict ..................................................................... 25
   5.06   Financial Statements; Subsequent Events ..................... 25
   5.07   Tax Matters.................................................................... 26
   5.08   Real Property and Transferred Assets............................ 26
   5.09   Litigation; Investigations................................................. 28
   5.10   Insurance ...................................................................... 28
   5.11   Contracts ....................................................................... 28
   5.12   Labor and Employment................................................... 29
   5.13   Employee Benefit Plans ................................................. 29
   5.14   Environmental Compliance ............................................ 29
   5.15   Government Licenses and Permits.................................. 31
   5.16   Intellectual Property ....................................................... 31
   5.17   Compliance with Laws ................................................... 32
   5.18   Product Warranties ........................................................ 32

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 5.19 | Business Relationships | 33 |
| 5.20 | Asbestiform Minerals | 33 |
| 5.21 | Brokers and Finders | 34 |
| 5.22 | Reclamation Obligations | 34 |
| 5.23 | Material Safety Data Sheets | 34 |
| **ARTICLE 6** | **Purchaser's Representations and Warranties** | 35 |
| 6.01 | Corporate Status | 35 |
| 6.02 | Authorization | 35 |
| 6.03 | Execution and Delivery | 35 |
| 6.04 | No Conflict | 36 |
| 6.05 | Sufficient Funds | 36 |
| 6.06 | Brokers and Finders | 36 |
| **ARTICLE 7** | **Purchaser's Investigation** | 37 |
| 7.01 | Investigation | 37 |
| 7.02 | Financial Information | 37 |
| 7.03 | No Additional Representations | 37 |
| **ARTICLE 8** | **Covenants of Seller and Purchaser** | 37 |
| 8.01 | Bankruptcy Court Approval | 38 |
| 8.02 | Access and Inquiry | 38 |
| 8.03 | Licenses and Permits | 38 |
| 8.04 | Notices to Third Parties | 39 |
| 8.05 | Commercially Reasonable Efforts | 39 |
| 8.06 | Unassigned Contracts and Other Assets | 39 |
| 8.07 | Removal of Seller Pompano Beach Assets | 40 |
| 8.08 | Ajax Real Property Bid Right | 40 |
| 8.09 | Title Insurance and Survey | 41 |
| 8.10 | Waiver of Bulk Sales Law Compliance | 41 |
| **ARTICLE 9** | **Conduct of Business Prior to Closing** | 41 |
| 9.01 | Operation in Ordinary Course | 42 |
| 9.02 | Disposition of Assets | 42 |
| 9.03 | Material Agreements | 42 |
| 9.04 | Relations with Customers and Suppliers | 42 |
| 9.05 | No Shop Provision | 42 |
| 9.06 | Notice of Material Adverse Effect | 43 |
| 9.07 | Announcements to Employees | 43 |
| **ARTICLE 10** | **Conditions Precedent to Purchaser's Obligations** | 43 |
| 10.01 | Accuracy of Representations and Warranties | 43 |
| 10.02 | Performance of Covenants and Agreements | 43 |
| 10.03 | Permits, Consents, etc. | 43 |
| 10.04 | Litigation | 44 |
| 10.05 | Certificates of Selling Companies | 44 |
| 10.06 | Title Insurance and Surveys | 45 |

ii

## TABLE OF CONTENTS

Page

10.07 Third Party Consents and Approvals .......................................... 46
10.09 Bankruptcy Court Approval ...................................................... 46
ARTICLE 11    Conditions Precedent to Seller's Obligations ................. 46
11.01 Accuracy of Representations and Warranties.......................... 46
11.02 Performance of Covenants and Agreements........................... 47
11.03 Permits, Consents, etc............................................................ 47
11.04 Litigation................................................................................ 47
11.05 Certificates of Purchasing Companies.................................... 47
11.06 Third Party Consents and Approvals ...................................... 48
11.07 Bankruptcy Court Approval ...................................................... 48
ARTICLE 12    Employee Matters .......................................................... 49
12.01 Employment............................................................................ 49
12.02 Positions Offered to Subject Employees................................. 49
12.03 Terms of Employment............................................................. 51
12.04 Employment Related Indemnities ........................................... 51
12.05 Employee Information Sharing................................................. 52
12.06 Notices, etc............................................................................. 52
ARTICLE 13    Termination .................................................................... 53
13.01 Rights to Terminate ................................................................ 53
13.02 Consequences of Termination ............................................... 54
ARTICLE 14    Indemnification............................................................... 54
14.01 Definitions............................................................................... 54
14.02 Seller's Indemnification .......................................................... 55
14.03 Purchaser's Indemnification.................................................... 56
14.04 Limitations.............................................................................. 57
14.05 Defense of Third Party Claims ............................................... 57
14.06 No Consequential or Lost Profit Damages.............................. 59
ARTICLE 15    Cooperation in Various Matters ..................................... 60
15.01 Mutual Cooperation ................................................................ 60
15.02 Access to Files and Records .................................................. 61
ARTICLE 16    Post-Closing Matters ..................................................... 61
16.01 Reports ................................................................................... 61
16.02 Names .................................................................................... 61
16.03 Intercompany Agreements...................................................... 62
16.04 Seller's Covenant Not to Compete.......................................... 62
ARTICLE 17    Expenses ....................................................................... 63
17.01 Purchaser's Expenses ............................................................ 63
17.02 Seller's Expenses ................................................................... 64
17.03 Transfer Taxes........................................................................ 64
17.04 Other Real Estate Costs ......................................................... 64
ARTICLE 18    Notices ........................................................................... 65
18.01 Notices.................................................................................... 65

iii

## TABLE OF CONTENTS

**Page**

**ARTICLE 19    General** ............................................................................. 65
    19.01  Entire Agreement ................................................................. 66
    19.02  Governing Law .................................................................... 66
    19.03  Submission to Jurisdiction ................................................... 66
    19.04  Equitable Remedies ............................................................. 66
    19.05  Assignment; Successors ....................................................... 67
    19.06  Amendments and Waivers .................................................... 67
    19.07  Counterparts ......................................................................... 67
    19.08  Captions ............................................................................... 67
    19.09  Effectiveness ....................................................................... 67

**W. R. GRACE & CO.-CONN.**
**VERMICULITE ASSET SALE AGREEMENT**

**Exhibits and Schedules**

<u>**Exhibits**</u>

| | |
|---|---|
| 1.02A | Additional Excluded Assets |
| 1.02B | Other Real Property |
| 1.02C | South Carolina Real Property |
| 1.02D-1 | Machinery, Equipment, etc. |
| 1.02D-2 | Ajax Subject Business Assets |
| 1.02E | Subject Business Contracts |
| 1.02F | SCC Business Assets |
| 2.03(b) | Allocation of Consideration to Subject Business Real Property |
| 3.03(b) | Bill of Sale and Assignment and Assumption Agreements |
| 3.04(a) | Canadian Asset Purchase Agreement |
| 3.04(b) | Transition Services Agreement |
| 3.04(c) | Ajax Tolling Agreement |
| 3.04(d) | Other Real Property Tolling Agreements |
| 3.04(e) | SCC Agreement |
| 3.04(f) | Fire Protection Laboratory Lease |
| 3.07 (a) | Seller Reclamation Amounts |

<u>**Schedules**</u>

| | |
|---|---|
| 4.01 | Inventory Taking Procedures |
| 4.03 | Accounting Practices and Procedures |
| 5.03 | Authorizations and Consents |
| 5.04 | Execution and Delivery |
| 5.05 | No Conflict |
| 5.06(a) | Financial Statements |
| 5.06(b) | Subsequent Events |
| 5.07 | Tax Matters |
| 5.08(c) | Liens |
| 5.08(d) | Required Asset Exceptions |
| 5.09(a) | Litigation |
| 5.09(b) | Investigations |
| 5.10 | Insurance and Bonds |
| 5.13 | Employee Benefit Plans |
| 5.14(d) | Environmental Remediation |
| 5.14(e) | Environmental Studies, etc. |
| 5.15 | Government Licenses and Permits |

5.16      Intellectual Property
5.17      Compliance with Laws
5.18      Product Warranties
5.19      Business Relationships

8.07      Seller Pompano Beach Assets
10.07     Consents
12.01     Subject Employees

## VERMICULITE ASSET SALE AGREEMENT

AGREEMENT dated October 17, 2011, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller"), and Vermiculite Acquisition Corp., a Delaware corporation ("Purchaser").

### WITNESSETH:

WHEREAS, Seller and its wholly owned Subsidiary, Grace Canada, Inc., an Ontario corporation ("GCI" and collectively with Seller, the "Selling Companies") wish to sell, and Purchaser wishes to acquire, Selling Companies' vermiculite business by the transfer to and assumption of certain assets and liabilities of Selling Companies to and by Purchaser and/or designated Affiliates of Purchaser ("Purchaser Designees" and collectively with Purchaser, "Purchasing Companies");

NOW THEREFORE, in consideration of the mutual covenants herein contained, Seller and Purchaser hereby agree as follows:

### ARTICLE 1

### Definitions

1.01  <u>General</u>.    All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated.  Any of the terms defined in this Agreement may be used in the singular or the plural.  In this Agreement, unless otherwise specifically stated: "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement

as a whole and not merely to the specific Section, paragraph or clause in which the word appears; words importing any gender include the other genders; and the term "including" shall mean "including but not by way of limitation."

1.02   Defined Terms.  For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

"Affiliate" of any Person shall mean any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person.  A Person shall be deemed to "control," be "controlled by" or be "under common control with" any other Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"Ajax Facility" means the facility of GCI located at 294 Clements Road, West Ajax, Ontario L1S 3C6 Canada.

"Ajax Subject Business Assets" has the meaning given such term in clause (ii) of the definition of Transferred Assets.

"Ajax Tolling Agreement" has the meaning given such term in Section 3.04(c).

"Ancillary Agreements" means the agreements described in Section 3.04.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Proceeding" means In re: *W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

2

"Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are generally closed in New York City.

"Canadian ASA" has the meaning given such term in Section 3.04(a).

"Canadian Real Property" means the Other Real Property located in Canada.

"Chapter 11 Plan" means that certain *First Amended Joint Plan of Reorganization in their Chapter 11 Cases*, Docket no. 25881 in the Bankruptcy Proceeding, as it may be further amended, supplemented or otherwise further amended from time to time , and the schedules and exhibits to the forgoing, as they may be in effect from time to time.

"Closing" means the actions to be taken by or at the direction of the Parties described in Sections 3.03 and 3.04.

"Closing Date" means the date on which the Closing takes place.

"Closing I&R Amount" has the meaning given such term in Section 4.02.

"Closing Statement" has the meaning given such term in Section 4.04.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the confidentiality agreement dated June 23, 2011, between Seller and Dicalite Management Group.

"Continued Employees" has the meaning given such term in Section 12.01(b).

"Contract" means any lease, license, purchase order or other contract or agreement.

"Damages" has the meaning given such term in Section 14.01(a).

"Environmental" means relating to pollution or protection of the environment and

3

public health and safety.

"Environmental Law" means and includes all laws, rules, regulations, ordinances, and orders of any Governmental Authority, as in effect as of the date hereof, relating to pollution or protection of the environment and public health and safety, including those relating to the use, generation, storage, treatment, handling, release, or threatened release of hazardous or toxic substances, whether such laws, etc. are promulgated at the federal, state or provincial, or local level in the United States or Canada.

"Excluded Assets" means any and all of Selling Companies' right, title and interest in (1) cash and cash items, other than petty cash and deposits with third parties, (2) refunds of Taxes, (3) amounts receivable from any unit of Seller other than the Subject Business or from any other Seller Entity, (4) Insurance, claims with respect to Insurance, and refunds of amounts previously paid or prepaid on account of Insurance, (5) employee benefit plans and funds maintained by, or in conjunction with, any Seller Entity, and refunds of amounts previously paid or prepaid amounts on account of such employee benefit plans and funds, (6) proprietary information received from a third party that is subject to a confidentiality agreement that does not permit the transfer of such information, (7) records to the extent relating to any of the Excluded Assets or the Excluded Liabilities, (8), the names "Grace" and "Davison", whether alone or in combination with each other or with other words, including in any trade name or trade or service mark, (9) real property of, and all other property located at, the Ajax Facility, except for the Ajax Subject Business Assets; (10) bonds and letters of credit, including any such bonds of letters of credit relating to reclamation obligations and/or mining

4

permits; (11) assets of the SCC Business, (12) assets of the fireproofing laboratory currently located at the South Carolina Real Property, (13) the Seller Pompano Beach Assets; and (14) any other assets listed on **Exhibit 1.02A**.

"Excluded Liabilities" means all liabilities and obligations of Selling Companies with respect to the Subject Business other than the Transferred Liabilities, including (i) Income Taxes, (ii) payroll Taxes (including related withholding Taxes) and similar Taxes for all periods ending on or prior to the Closing Date, (iii) amounts payable to any unit of Seller or to any other Seller Entity, (iv) obligations relating to Insurance, (v) employee benefit plans and funds; (vi) accounts payable; (vii) product liability and warranty claims for products sold prior to Closing; (viii) Plan Claims; (ix) any liability for violation by Selling Companies prior to the Closing of law, governmental rule or order, including any violation of Environmental Law; (x) any Workers Compensation claim by an employee or former employee of the Subject Business either before or after the Closing, to the extent that the injury giving rise to the claim resulted in whole or in part from employment of such employee or former employee by Selling Companies prior to the Closing and (xi) any liability for any Environmental remediation required by applicable law of any condition (other than the presence of asbestiform minerals in or on any of the buildings or other improvements that are part of the Subject Business Real Property) existing on the Closing Date and arising out of the operation of the Subject Business at the Subject Business Real Property, including any such remediation arising from the further evaluation by the USEPA described in the Removal Assessment Report Notification, to the extent that the remediation is of asbestiform minerals contained in

5

vermiculite ore or vermiculite concentrate received from Seller's vermiculite mine in Libby, Montana. Notwithstanding the foregoing, no obligation for remediation that arises out of any change in applicable law after the Closing Date shall be deemed an Excluded Liability.

"GCI" has the meaning given such term in the preamble to this Agreement.

"Governmental Authority" means an entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including agencies, departments, boards, commissions, and other instrumentalities.

"Income Statements" has the meaning given such term in Section 5.06(a).

"Income Tax" means any Tax measured (in whole or in part) or imposed upon income (including any alternative or add-on minimum tax), or franchise tax based on net income, and any interest and penalties assessed on any such tax or assessment.

"Insurance" means insurance policies or other insurance coverage.

"Intellectual Property" or "IP" means any and all of the following:

    (a)    United States and foreign patents, patent applications, and patent disclosures, including all reissues, divisions, continuations, continuations-in part, substitutions, or extensions of any of the foregoing;

    (b)    (i) trademarks, service marks, trade names, brand names, trade dress, logos, and designs, assumed names and other indications of origin, whether registered or unregistered, and any applications or renewals therefor, and (ii) all goodwill symbolized thereby or

6

associated with clause (i);

(c)     United States and foreign copyrights, whether registered or unregistered, and any applications therefor or renewals thereof; and

(d)     inventions, formulae, processes, designs, know-how, show-how, manufacturing know-how, trade secrets, computer software and technical manuals and documentation which are not embodied within subparagraphs (a), (b) and (c).

"Knowledge" of any individual means the actual knowledge of such individual on the date of this Agreement or on the Closing Date, as applicable.

"Knowledge of Seller" means the Knowledge of the appropriate managerial personnel of the Selling Companies who are in a position to know the information at issue, including the following employees of the Selling Companies: (a) P.W. Hanlon and all other Business Development personnel; (b) M.K. Harvey, R.J. Mercer, S. Boss, D.J. Dowling, R.P. Perez, D.W. Iwaniuk, and all other managerial personnel at the headquarters of Grace Construction Products in Cambridge, MA, and at the facilities at the Subject Business Real Property and Ajax; (c) K.E. Ethier, B.E. O'Connell and all other EH&S personnel; (d) T. Smith and all other Finance personnel; and (e) Kris Venis and all other HR personnel.

"Lien" means any mortgage, pledge, security interest, or other lien or encumbrance.

"Material Adverse Effect" means a material adverse effect upon the Transferred

7

Assets or the Transferred Liabilities, or on the business, condition (financial or otherwise), operations or results of operations of the Subject Business, taken as a whole, but excluding (a) economic effects or changes that are generally applicable to the industries and markets in which the Subject Business operates; (b) general changes in the United States or Canadian or world financial markets or general economic conditions; (c) general changes in applicable laws; or (d) the failure, in and of itself, to win any particular bid or proposal made to a customer (or any cancellation or revocation of any request for proposal from any customer) or meet any projections.

"Mining Leases" means the leases listed on **Exhibit 1.02E** that are identified as Mining Leases.

"Mining Permits" has the meaning given such term in Section 3.07(a).

"Net Asset Statements" has the meaning given such term in Section 5.06(a).

"Other Real Property" means the real property located in Phoenix, AZ, Pompano Beach, FL, Winnipeg, MB, and Edmonton, AB, identified in **Exhibit 1.02B**, at which the Subject Business operates expanding plants for vermiculite and/or perlite.

"Parties" means Seller and Purchaser.

"Permitted Exceptions" means (a) Liens for current Taxes, assessments or other claims by a Governmental Authority not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings and for which an appropriate escrow or security deposit or reserve is established therefor; (b) zoning, subdivision, building code, entitlement and other land use, construction and Environmental Laws by a Governmental Authority; (c) easements, rights-of-way,

8

licenses, utility agreements, restrictions, and other similar encumbrances of record, and matters that would be shown on any survey of the Subject Business Real Property, which, in each case, do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Subject Business consistent with past practice; and (d) such other imperfections in title, charges, easements, restrictions and encumbrances in each case which do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Subject Business consistent with past practice.

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Plan Claims" shall have the meaning ascribed to such term in the Chapter 11 Plan.

"Purchase Price" has the meaning given such term in Section 2.02.

"Purchaser" has the meaning given such term in the preamble to this Agreement

"Purchaser Designees" has the meaning given such term in the preamble to this Agreement.

"Purchaser Entity" means any of the Purchaser Group.

"Purchaser Group" means, collectively, Purchaser and its Affiliates.

"Purchasing Companies" has the meaning given such term in the preamble to this Agreement.

9

"Reclamation Obligations" means any and all reclamation and similar obligations to any Governmental Authority, lessee or other Person with respect to the South Carolina Property or any property subject to or affected by any of the Vermiculite Leases, including the Retention Ponds.

"Removal Assessment Report Notification" means the Removal Assessment Report Notification dated September 6, 2011, from USEPA to Remedium Group, Inc.

"Reorganized Seller" means Seller from and after the effective date of its confirmed Chapter 11 Plan or any other chapter 11 plan of reorganization of Seller that may be confirmed in the Bankruptcy Proceeding.

"Retention Ponds" means the retention ponds located on the South Carolina Real Property.

"Sale Motion" has the meaning given such term in Section 8.01(a).

"Sale Order" has the meaning given such term in Section 10.09.

"SCC Business" means the Seller Entities' Specialty Construction Chemicals business unit.

"Scheduled Closing Date" has the meaning given such term in Section 3.01.

"Seller" has the meaning given such term in the preamble to this Agreement.

"Seller Entity" means any legal entity of the Seller Group.

"Seller Group" means, collectively, WRG, Seller and their Subsidiaries.

"Seller Payment Amount" means one of the amounts specified in **Exhibit 3.07(a)** for the respective Seller Payment Properties.

"Seller Payment Properties" has the meaning given such term in Section 3.07(a).

10

"Seller Pompano Beach Assets" has the meaning given such term in Section 8.07.

"Selling Companies" means Seller and GCI.

"South Carolina Real Property" means the real property in Enoree and Kearney, South Carolina, identified in **Exhibit 1.02C**.

"Subject Business" means Seller's and/or GCI's business of mining, milling, expanding, manufacture, and/or sale of vermiculite, vermiculite concentrate, perlite, and specialty vermiculite products.

"Subject Business Contract" means a Contract to which one or both Selling Companies is a party relating directly and exclusively to the Subject Business, including the Vermiculite Leases.

"Subject Business Intellectual Property" means all Selling Companies' rights in Intellectual Property that is used or usable exclusively in the Subject Business.

"Subject Business Real Property" means the South Carolina Real Property and the Other Real Property.

"Subject Employees" has the meaning given such term in Section 12.01.

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other equity interests representing more than 50% of the voting power of all such securities or other equity interests.

"Tax" means any national, federal, state, provincial, local or foreign governmental tax or assessment, including Income Tax, any payroll or other similar employment tax,

11

any sales, use, excise, goods and services, harmonized sales, gross receipts or value added tax, or any land transfer, land registration or any other tax in respect of real or personal property, including interest and penalties with respect thereto.

"Transaction Documents" means this Agreement, the documents to be executed and delivered at the Closing pursuant to Section 3.03, the Ancillary Agreements and any other agreements, instruments and documents executed and delivered pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement.

"Transferred Assets" means all right, title and interest of Selling Companies in and to the assets, properties and rights pertaining directly and exclusively to the conduct of the Subject Business, and to certain assets of the SCC Business, including all right, title and interest in and to the following insofar as either pertaining directly and exclusively to the conduct of the Subject Business, or listed in an Exhibit specified in the following:

(i)     the Subject Business Real Property, including any appurtenant mineral rights;

(ii)    the machinery, equipment, and other personal property located at the Subject Business Real Property, including the items listed in **Exhibit 1.02D-1** hereto, and the machinery, equipment and other property located at the Ajax Facility, including the items listed on **Exhibit 1.02D-2** hereto (the "Ajax Subject Business Assets");

(iii)   the Subject Business Intellectual Property, including the items listed

12

on Schedule 5.16 as used exclusively in the Subject Business;

(iv)    inventories of raw materials, work in process, finished goods, spare parts, supplies and packaging;

(v)    accounts receivable;

(vi)    prepayments and deposits;

(vii)    rights under the Vermiculite Leases and the other Subject Business Contracts, including the Contracts which are listed on **Exhibit 1.02E** hereto;

(viii)    transferable software and data (excluding commercially available software whose transfer requires consent of licensee);

(ix)    files, customer lists, accounting records, marketing materials and general intangibles; and

(x)    the assets of the SCC Business listed on **Exhibit 1.02F** hereto;

but excluding the Excluded Assets.

"Transferred Liabilities" means:

(i)    all obligations and liabilities under the Subject Business Contracts that are transferred to Purchaser under this Agreement, but only to the extent that those obligations and liabilities are incurred in connection with the performance or non-performance on and after the Closing Date by Purchaser of such Subject Business Contracts;

(ii)    subject to Seller's obligations under Section 3.07, all Reclamation Obligations;

13

(iii)    all obligations and liabilities with respect to the Retention Ponds other than those obligations specified in clause (xi) of the definition of Excluded Liabilities;

(iv)    the obligations and liabilities listed on **Schedule 4.02**; and

(v)    obligations regarding vacation and vacation pay as set forth in Section 12.02(iv)(A)(1).

but excluding the Excluded Liabilities.

"USD" means United States dollars.

"USEPA" means Region 4 of the United States Environmental Protection Agency.

"U.S. Subject Business Real Property" means the South Carolina Real Property and the Other Real Property located in the United States.

"Valuation Time" means 12:01 a.m. U.S. Eastern time on the Closing Date.

"Vermiculite Leases" means the leases of mineral rights listed on **Exhibit 1.02E**.

"WRG" means W. R. Grace & Co., a Delaware corporation, of which Seller is a direct wholly-owned Subsidiary.


## ARTICLE 2

### Sale of Subject Business, Purchase Price

2.01    <u>Sale of Subject Business</u>.  On the terms and subject to the conditions of this Agreement, Seller shall sell and cause GCI to sell, and Purchaser shall purchase, the Subject Business as follows: Each of Selling Companies shall transfer their right,

14

title and interest in and to the Transferred Assets to Purchaser or its designee(s), free and clear of all Liens and imperfections in title (except Permitted Exceptions) and in exchange therefor, Purchasers shall pay the Purchase Price therefor and assume the Transferred Liabilities.

2.02    Purchase Price.    "Purchase Price" means USD 10,000,000, plus the excess of the Closing I&R Amount over USD 5,414,000, or minus the excess of USD 5,414,000 over the Closing I&R Amount, as the case may be.  The Purchase Price shall be allocated among the Transferred Assets, and between the Selling Companies and the Purchasing Companies, as provided in Section 2.03.

2.03    Purchase Price Allocation.

(a)    Each Party agrees to prepare and timely file U.S. Internal Revenue Service Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Code with respect to the Transferred Assets, and analogous filings under Canadian tax law and to cooperate in every reasonable way with the other Party in the preparation of such forms and in agreeing upon the relevant allocations in such filings.

(b)    The Parties agree that the amount of consideration to be paid to GCI in exchange for the transfer of GCI's right, title and interest in and to the Transferred Assets owned by GCI will be as set forth in the Canadian ASA.

## ARTICLE 3

### Closing

3.01    Scheduled Closing Date.    The "Scheduled Closing Date" shall be

December 29, 2011, or such other day as the Parties may agree to in an amendment to this Agreement executed and delivered in accordance with Section 19.06.

3.02   <u>Time and Place of Closing, Simultaneity</u>.  The Closing shall take place at 10:00 a.m. local time on the Scheduled Closing Date at the offices of Purchaser, 1 Bala Avenue, Suite 310, Bala Cynwyd, PA 19004.  All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete.  The Closing shall be deemed to be effective as of December 31, 2011.

3.03   <u>Transfers at the Closing; Payments</u>.  At the Closing:

(a)   Seller shall execute and deliver to Purchaser deeds for the U.S. Subject Business Real Property of substantially the same tenor as the deeds under which Seller holds the U.S. Subject Business Real Property, subject to Permitted Exceptions.

(b)   Pursuant to the Canadian ASA, GCI shall execute and deliver to Purchaser deeds for the Canadian Real Property of substantially the same tenor as the deeds under which GCI holds the Canadian Real Property, subject to Permitted Exceptions.

(c)   Selling Companies and Purchasing Companies shall execute and deliver to each other bills of sale and assignments and assumptions of the Transferred Assets and Transferred Liabilities in the forms of **Exhibit**

16

**3.03(b)** hereto, and as contemplated by the Canadian ASA.

(d)    Purchaser shall pay to Seller and GCI, on account of the Purchase Price and in accordance with Section 2.03 and the Canadian ASA, an aggregate amount equal to USD10,000,000 plus or minus Seller's best estimate of the price adjustment relating to the Closing I&R Amount to be calculated under Section 4.07, plus any applicable Taxes (the "Estimated Purchase Price"). Such payment shall be made by means of wire transfers to Seller's and GCI's accounts as follows:

| Seller: | GCI: |
|---|---|
| Bank: JPMorgan Chase Bank, NA | Bank: |
| Bank ABA #: 021000021 | Bank [Canadian ID #]: |
| Bank SWIFT code CHASUS33 | Bank SWIFT code |
| Bank account name: W. R. Grace & Co.-Conn. | Bank account name: Grace Canada, Inc. |
| Bank account number: 016001257 | Bank account number: |
| Text message: Funds from [name of Purchasing Company] re: Vermiculite | Text message: Funds from [name of Purchasing Company] re: Vermiculite |

In addition, each of Selling Companies and Purchasing Companies shall execute and deliver, and cause their Affiliates to execute and deliver, such other agreements, instruments and other documents to effect, confirm or evidence the Transactions as the other Party shall reasonably request. Each such document shall be reasonably satisfactory in form and substance to the Person to whom such document is delivered, but shall contain no representations, warranties, covenants or agreements other than those effecting, confirming or evidencing the Transactions.

3.04   Ancillary Agreements. At the Closing, each of the following agreements shall be executed and delivered by the Parties:

17

(a)    Canadian ancillary asset sale agreement with respect to the Canadian Real Property and the other Transferred Assets owned by GCI, substantially in the form(s) of **Exhibit 3.04(a)** (the "Canadian ASA");

(b)    Transition Services Agreement(s) substantially in the form of **Exhibit 3.04(b)**, under which Seller and GCI will provide certain services to the Purchasing Companies for the Subject Business on a transitional basis after the Closing;

(c)    Tolling Agreement substantially in the form of **Exhibit 3.04(c)**, under which GCI will toll manufacture products for the Subject Business at the Ajax Facility (the "Ajax Tolling Agreement"), which will include a lease of the Ajax Subject Business Assets for a nominal rent;

(d)    SCC Agreement substantially in the form of **Exhibit 3.04(d)**, under which Purchaser Entities will toll manufacture products and provide related services for the SCC Business at the Other Real Property.

(e)    Fire Protection Laboratory Lease Agreement in the form of **Exhibit 3.04(e)**, under which Seller will lease space at the South Carolina Real Property for its Fire Protection Laboratory , including utilities, parking and security.

3.06    <u>Closing Prorations</u>.    At Closing, all real estate taxes for the Subject Business Real Property, and all other water, sewer, gas, other utility services, and other charges and fees customarily prorated and adjusted in connection with the purchase and sale of real estate, shall be prorated as of the Closing Date.  Selling Companies shall reimburse Purchasing Companies or Purchasing Companies shall reimburse Selling Companies, as the case may be, the net amount owed promptly following the

18

Closing.

3.07    Seller Reclamation Payments.

(a)    With respect to each of the properties covered by the Mining Leases identified on **Exhibit 3.07(a)**(collectively, the "Seller Payment Properties"), promptly after (i) the issuance to Purchaser of the required permit or permits for mining operations at a particular Seller Payment Property (the "Mining Permits"), (ii) the posting of any bonds required in connection with such Mining Permits, and (iii) written notice to Seller of such issuance and posting, Seller shall promptly pay to Purchaser the Seller Reclamation Amount listed on **Exhibit 3.07(a)** for such particular Seller Payment Property (net of any amounts theretofore paid by Seller after the Closing Date for Reclamation Obligations for such particular Seller Payment Property) in immediately available funds by wire transfer to an account designated by Purchaser. Seller may set off against its obligations under this Section with respect to such particular Seller Payment Property, any indemnity obligations of Purchaser under Section 14.03(a)(v) or (vi)with respect to such particular Seller Payment Property.

(b)    Except for its obligations under this Section 3.07, Seller shall have no obligation with respect to the Reclamation Obligations.

3.08    Further Assurances. At any time and from time to time after the Closing, at the request and expense of either Party, the other Party shall execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as the requesting Party reasonably deems necessary or advisable in order to complete, perfect or

19

evidence any of the Transactions.  Any material out-of-pocket expenses related to any such request shall be paid by the requesting Party.

## ARTICLE 4

### Purchase Price, Post-Closing Adjustments

4.01  Closing of Books.  Seller shall close the books and related accounting records, on a going concern basis, of Seller and GCI (but only to the extent that they relate to the Subject Business) as of the Valuation Time, and take a physical count of the Subject Business inventories at or within two weeks prior to such time.  Such inventory count shall be taken in accordance with the inventory-taking procedures described in **Schedule 4.01**.  Representatives of Purchaser may observe the taking of such inventory, and Purchaser shall provide Seller with such assistance as Seller shall reasonably request in connection with such closing of the books and records.

4.02  Closing I&R Amount.  "Closing I&RAmount" means the aggregate amount, as of the Valuation Time, of all inventories and accounts receivable of the Subject Business included in the Transferred Assets, computed in accordance with Section 4.03.

4.03  Computation of Closing I&R Amount.  The Closing I&R Amount shall be determined in U.S. dollars on a going concern basis, in accordance with the accounting practices and procedures (applied consistently) set forth in **Schedule 4.03**.

4.04  Closing Statement.  As soon as reasonably practicable but in no event more than sixty calendar days after the Closing, Seller shall deliver to Purchaser a

20

statement setting forth Seller's determination of the Closing I&R Amount (the "Closing Statement").

4.05   Acceptance.   If Purchaser does not object to the Closing I&R Amount shown on the Closing Statement delivered by Seller, by written notice of objection delivered to Seller within thirty calendar days after Purchaser's receipt of such statement, describing in reasonable detail each of its proposed adjustments to Seller's determination thereof, then the Closing I&R Amount shown on the Closing Statement shall be final and binding on the Parties.

4.06   Non-Acceptance, Resolution of Disputes.

(a)   If Purchaser does object to the Closing I&R Amount shown on the Closing Statement, then Purchaser and Seller shall promptly endeavor to agree upon the proper amount of the items in dispute.  If a written agreement settling any disputed items has not been reached within thirty calendar days after the date of receipt by Seller from Purchaser of Purchaser's notice of objection thereto, then either Seller or Purchaser may, by notice to the other Party, submit for determination by arbitration in accordance with this Section the question of what adjustments, if any, must be made to Seller's determination of such amount in order for it to be determined in accordance with the provisions of this Agreement.  At the time of such submission, the Parties shall propose in writing their respective calculations of the Closing I&R amount.

(b)   Any such determination by arbitration shall be made by an accounting firm to be agreed upon by the Parties other than their respective auditors (the "Arbitrator") and shall be final and binding on the Parties and their Affiliates.

21

(c)     The fees and expenses of the Arbitrator for any determination under this Article shall be shared as follows:  Seller shall bear that portion thereof equal to the total amount of such fees and expenses multiplied by a fraction, the denominator of which shall be the difference between the Closing I&R Amount as proposed by Purchaser and the Closing I&R Amount as proposed by Seller, and the numerator of which shall be the difference between the Closing I&R Amount as determined by the Arbitrator and the Closing I&R Amount as finally proposed by Seller.  Purchaser shall bear the remainder of such fees and expenses.

(d)     Nothing herein shall be construed to authorize or permit the Arbitrator to determine (i) any question or matter whatsoever under or in connection with this Agreement or any other Transaction Document except the determination of what adjustments, if any, must be made in one or more of the items reflected in the Closing Net Asset Amount as shown on the Closing Statement delivered by Seller in order for the Closing Net Asset Amount to be determined in accordance with the provisions of this Agreement and (ii) a Closing Net Asset Amount that is not in the range between and including the final proposals of Seller and Purchaser.  Nothing herein shall be construed to require the Arbitrator to follow any rules or procedures of any arbitration association.

4.07   Payment of Adjustments.     Promptly after the Closing Current Asset Amount has been finally determined, Seller shall deliver to Purchaser a statement of the Purchase Price determined in conformity with the Closing Current Asset Amount as finally determined by the terms of this Agreement.   If the Purchase Price as so

22

determined exceeds the amount paid at the Closing with respect thereto, Purchaser shall pay the amount of the excess to Selling Companies. If the Purchase Price as so determined is less than the amount paid at the Closing with respect thereto, Selling Companies shall refund the amount of the overpayment to Purchaser. If the net amount of the adjusting payment is in excess of USD 100,000, then interest shall be paid on the entire amount of the net adjusting payment, from and including the Closing Date to but not including the date of payment, at a floating rate per annum equal to the U.S. prime rate, as reported by *The Wall Street Journal*, in effect from time to time during the period from the Closing Date until the date of payment. Such payments to or refunds by Selling Companies, and any such interest paid to or by Selling Companies, shall be paid to or by the Selling Parties in accordance with the extent to which the changes in the assets and liabilities of the respective Selling Companies contributed to such payments or refunds.

## ARTICLE 5

### Seller's Representations and Warranties

Seller represents and warrants to Purchaser as follows:

5.01    Corporate Organization and Existence.    Each Selling Company is a corporation duly organized and validly existing under the laws of its jurisdiction of incorporation as set forth in the preamble to this Agreement.

5.02    Corporate Power.    Each Selling Company has full corporate power to enter into each Transaction Document to which it is or will be a party and perform its

23

obligations thereunder.

5.03   <u>Authorization; Consents</u>.

(a)   The execution and delivery by each Selling Company of the Transaction Documents to which it is or will be a party and its performance of its obligations thereunder have been duly authorized by all required corporate action.

(b)   Except for Bankruptcy Court approval and consents under the Subject Business Contracts, and except as set forth in Schedule 5.03, no registration, qualification, or filing with, or consent of, any Governmental Authority or other third party is required for Seller's execution and delivery of this Agreement or its consummation of the Transactions.

5.04   <u>Execution and Delivery</u>.   Except as specified in **<u>Schedule 5.04</u>**, and subject to the approval of the Bankruptcy Court in the Bankruptcy Proceeding, (a) Seller has duly and validly executed and delivered this Agreement, and the other Transaction Documents to which each Selling Company is or will be a party, when executed and delivered, will be duly and validly executed and delivered by such Selling Company; and upon such execution and delivery, assuming the due authorization, execution and delivery thereof by the other parties thereto, each Transaction Document to which a Selling Company is a party shall be the legal, valid and binding obligation of such Selling Company, enforceable against such Selling Company in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles (whether in equity or at law) and to general principles

24

affecting the enforceability of indemnities.

5.05   No Conflict.   Except as specified in **Schedule 5.05**, and subject to the approval of the Transactions by the Bankruptcy Court in the Bankruptcy Proceeding, the execution and delivery by each Selling Company of the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder, do not and will not (a) conflict with its certificate or articles of incorporation or by-laws; or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order, decree, or Contract to which it is a party or by which it is bound, which violation, breach or default would adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

5.06   Financial Statements; Subsequent Events.  .

(a)   **Schedule 5.06(a)** contains (a) unaudited statements of net assets of the Subject Business as of December 31, 2010, and June 30, 2011 (the "Net Asset Statements") and unaudited statements of income of the Subject Business for the year ended December 31, 2010, and the six months ended June 30, 2011 (the "Income Statements"). The Net Asset Statements and Income Statements fairly present, in all material respects, the financial position of the Subject Business with respect to the items contained thereon, as of their respective dates, and the results of operations of the Subject Business for such periods.

(b)   Except as set forth in **Schedule 5.06(b)**, to the best Knowledge of Seller, since June 30, 2011, there has not occurred any event specific to the Subject Business

25

that materially and adversely affects the financial position or results of operations of the Subject Business taken as a whole.

5.07   <u>Tax Matters</u>.  With respect to Taxes arising out of or related to the Subject Business or the Transferred Assets, except as set forth in **<u>Schedule 5.07</u>**:

(a)     There are no Tax Liens on the Subject Business or the Transferred Assets other than Liens that are Permitted Encumbrances.

(b)     At no time during the past three years has a taxing authority, in a jurisdiction in which a Selling Company does not currently file Tax returns, asserted that such Selling Company has an obligation to file a Tax return and pay Taxes with respect to the Subject Business or the Transferred Assets.

(c)     No events have occurred relating to the Subject Business or the Transferred Assets that could impose on Purchaser any transferee liability relating to Taxes, other than such liability arising by operation of law.

5.08   <u>Real Property and Transferred Assets</u>.

(a)     **<u>Exhibit 1.02C</u>** sets forth a true and accurate list of the Subject Business Real Property.  The Subject Business Real Property constitutes all the owned real property (other than the Ajax Real Property) used in the mining and manufacturing operations of the Subject Business.

(b)     **<u>Exhibit 1.02E</u>** sets forth a true and accurate list of the Vermiculite Leases. The Vermiculite Leases constitute all the leased mineral rights of the Subject Business (excluding any rights under leases as to which mining has been terminated).

26

(c)     Seller or GCI has good and valid title to each of the Transferred Assets. Except as otherwise specified in **Schedule 5.08(c)** (i) the Transferred Assets are not subject to any Lien or Imperfection in title except Permitted Exceptions.

(d)     Except as set forth in **Schedule 5.08(d)** and except for assets used indirectly or non-exclusively in the Subject Business of which the Ancillary Agreements do not provide the benefit, the Transferred Assets, together with the rights and services provided to Purchasers under the Ancillary Agreements, will provide Purchasers with ownership of or, through the Ancillary Agreements, the benefit of assets that will enable the Purchasing Companies to conduct the Subject Business upon the Closing, substantially as it has been conducted prior to the Closing.

(e)     To the best Knowledge of Seller, Seller has good and valid mining rights to mine vermiculite at all of the sites covered by the Vermiculite Leases and on the South Carolina Real Property.  GCI owns no mining property, and conducts no mining business, that is used in or part of the Subject Business,

(f)     To the best Knowledge of Seller, there are neither any (i) applications, ordinances, petitions, resolutions, or other matters pending before any governmental authority having jurisdiction to act on zoning changes that would prohibit or make nonconforming the use of any of the Subject Business Real Property as currently used nor (ii) any pending or threatened eminent domain, compulsory purchase, or demolition proceedings, or proposed sale in lieu thereof.

(g)     Other than as disclosed in Section 5.20 or **Schedule 5.08(g)**, to the best Knowledge of Seller, there is no asbestos or any hazardous or toxic materials or

27

substances in any form present or contained in any of the mines on the Subject Business Real Property or covered by the Vermiculite Leases, or in any of its products that are in process or contained in inventory, or any asbestos contained (whether encapsulated or not) in any form in any buildings located on the Subject Business Real Property.

5.09    Litigation; Investigations.

(a)    Except as set forth in **Schedule 5.09(a)**, to the best Knowledge of the Seller, there are no actions, suits or proceedings pending or threatened against either Selling Company or the Subject Business.

(b)    Except as set forth in **Schedule 5.09(b)**, to the best Knowledge of the Seller, there are no pending or threatened governmental investigations of the Subject Business.

5.10    Insurance.    **Schedule 5.10** summarizes the insurance and bonds maintained by each Selling Company exclusively for the Subject Business.    Such insurance and bonds and rights therein are not part of the Transferred Assets, and the obligations thereunder are not part of the Transferred Liabilities.

5.11    Contracts.    **Exhibit 1.02E** lists among other items the following Subject Business Contracts (excluding purchase orders and Vermiculite Leases) : (a) each Contract that both (1) has a term of more than one year and cannot be canceled by the appropriate Selling Company without penalty upon notice of one year or less, and (2) under which it is reasonably expected that the Subject Business will make expenditures or obtain receipts of more than USD 10,000 per year; (b) each sales representative,

28

sales agent or distributor Contract; (c) each agreement for barter or exchange of goods or services; (d) employment or consulting Contract (other than standard form employment agreements and Contracts for employment at will); (e) each Contract with former employees of the Subject Business (f) each contract with any Affiliate of Seller or agreement otherwise not negotiated at "arm's length", and (g) each Contract that limits the right of Seller to compete, or to sell or distribute products, in any territory, including exclusive sale agreements. To the best Knowledge of Seller, each such Contract and each of the Vermiculite Leases is in full force and effect, no party thereto is in material breach thereof, and no party thereto has given notice of, or threatened, termination thereof. Seller has heretofore delivered or made available to Purchaser complete copies of all such Contracts as currently in effect.The Contracts listed in Exhibit 1.02E lists all the material Subject Business Contracts other than purchase orders..

     5.12   <u>Labor and Employment</u>.

     (a)    There is no collective bargaining agreement or other similar Contract with a labor union or similar organization covering any Subject Employee. A collective bargaining agreement covers certain workers who devote part of their time to the Subject Business at the Ajax Facility, but who are not Subject Employees.

     5.13   <u>Employee Benefit Plans</u>. **Schedule 5.13** lists each written employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act) of the Selling Companies, which as of the date hereof covers any Subject Employee.

     5.14   <u>Environmental Compliance</u>. Except as set forth in **Schedule 5.14**, to the

best Knowledge of the Seller:

(a)     The Subject Business is in compliance in all material respects with all applicable Environmental Laws, including any dealing with air quality, inventory, emissions, wastewater disposal, groundwater contamination or asbestos abatement.

(b)     Neither Seller nor GCI has been identified as a potentially responsible party under the Comprehensive, Environmental Response, Compensation and Liability Act of 1980, as amended, or any comparable state or local law or Canadian law, with respect to the operation of the Subject Business or the Transferred Assets.

(c)     None of the Subject Business Real Property is currently listed on the National Priorities list pursuant to CERCLA or any similar publicly available listing under comparable state law.

(d)     Except as set forth on Schedule 5.14(d), to the best Knowledge of Seller, there is no Environmental remediation or asbestos abatement in progress, currently being ordered or threatened to be ordered by any Governmental Authority under applicable Environmental Law, at the Subject Business Real Property.

(e)     **Schedule 5.14(e)** lists each material Environmental study, survey, assessment, or report (including Phase I and Phase II reports) produced by or on behalf of or provided to the Selling Companies during the last five years relating to the Subject Business, including any of the foregoing relating to the presence of asbestos in or on any of the Transferred Assets, or to air quality, inventory, emissions and wastewater discharge, in or on any of the Transferred Assets.  Ongoing periodic environmental monitoring and testing is conducted for the Subject Business, and the existing

30

documentation thereof has been made available to Purchaser.

5.15   Government Licenses and Permits.   **Schedule 5.15** lists all licenses, permits, registrations, and authorizations issued by any Governmental Authority (collectively "Government Licenses") that are currently held by Seller or GCI with respect to the Subject Business, and all pending applications of Seller or GCI for Government Licenses relating to the Subject Business.   Schedule 5.15 includes all expiration dates, as well as dates by which, by the terms of the Governmental License, any renewal request or application needs to be submitted, which dates will occur within ninety days after the date hereof.   Except as set forth in **Schedule 5.15**, no other material Government License is required for the operation of the Subject Business as presently conducted. The Government Licenses are in full force and effect.

5.16   Intellectual Property.

(a)    **Part 1 of Schedule 5.16** lists all patents and patent applications included in the Subject Business Intellectual Property.   **Part 2 of Schedule 5.16** sets forth a list of all trademarks and trade names and active applications for trademarks included in the Subject Business Intellectual Property.   Except as set forth in **Part 3 of Schedule 5.16**, no other Seller Entity owns Intellectual Property used in the Subject Business, and neither Selling Company has granted any third party any license to use any Subject Business Intellectual Property.   **Part 4 of Schedule 5.16** lists any Contracts under which the Seller Entities have a license from any Person not its Affiliate under any Intellectual Property that is used in the Subject Business; and Seller has delivered or made available to Purchaser complete copies of such Contracts as currently in effect.

31

Except as set forth in **Part 5 of Schedule 5.16**, insofar as Seller has Knowledge, none of the Subject Business Intellectual Property is the subject of any pending or threatened action, suit or proceeding that would reasonably be expected to have a Material Adverse Effect.

(b)    Any provision of this Agreement to the contrary notwithstanding, Seller makes no representation or warranty with respect to the validity or enforceability of the Subject Business Intellectual Property.

(c) Except as set forth in **Part 6 of Schedule 5.16**, to the best Knowledge of Seller: (i) the operation of the Subject Business and the use of the Transferred Assets do not infringe the Intellectual Property rights of any third party, and (ii) no third party is infringing any of the Subject Business Intellectual Property in relation to the Subject Business.

5.17   Compliance with Laws.  To the best Knowledge of Seller, the operation of the Subject Business complies in all material respects with all applicable orders, laws, orders, ordinances, codes, and regulations of any Governmental Authority. The Selling Companies have received no written notice of violations of any of the foregoing, or pending investigation of violations of any of the foregoing by any Governmental Authority with respect to the Subject Business, except as set forth in **Schedule 5.17,** and except for such noticed violations (i) as are not continuing on the date of this Agreement, (ii) as have been resolved,  or (iii) as to which the Selling Companies have received no further written notice for more than two years.

5.18   Product Warranties.  **Schedule 5.18** contains a description of (i) the

32

standard product warranties currently given to customers of the Subject Business and (ii) any warranty currently given to customers of the Subject Business that varies in any material respect from the standard warranty and applies to a material amount of Seller's sales.

5.19    Business Relationships.  Except as set forth in **Schedule 5.19**, since June 30, 2011, Selling Companies have not received any written notice that any customer or group of customers will cease dealing with the Subject Business or reduce the volume of product purchased by it below historical levels, or seek to change the terms of purchase, which cessation, reduction or change is material to the Subject Business.

5.20    Asbestiform Minerals.

(a)    Prior to the termination in 1990 of Seller's vermiculite mining and processing operations in Libby, MT, the expanding plants located at the Subject Business Real Property and the Ajax Facility received and processed vermiculite from the Libby operations that contained or may have contained asbestiform minerals.

(b)    The vermiculite mined by the Subject Business in South Carolina and processed at the Subject Business Real Property, and the vermiculite mined under the Vermiculite Leases purchased by Seller effective in April 2011, from Virginia Vermiculite, L.L.C. and/or processed at the Subject Business Real Property, and residue from the mining or processing of such vermiculite, contained or contain or may have contained or may contain asbestiform minerals; and the unmined vermiculite covered by the Vermiculite Leases contains or may contain or is or may be associated with asbestiform minerals.

(c)    As a result of Seller's addition of commercial asbestos to its products, which ended in 1973, Seller's facilities located at the Subject Business Real Property and the Ajax Facility may have received and processed such commercial asbestos, and some of such asbestos may remain in the Subject Business Real Property.

(d)    Seller has made available to Purchaser copies of all reports, audits, investigations, samplings, and other material documentation that have been prepared by or for Seller regarding the presence of asbestiform minerals that relate to the Subject Business, including any at the South Carolina Real Property or at the properties covered by the Vermiculite Leases.

5.21    Brokers and Finders.  Except for Seale & Associates, Inc., no broker or finder has acted on behalf of Selling Companies in connection with the Transactions.

5.22    Reclamation Obligations.  **Schedule 5.22** sets forth the reclamation plans filed with respect to the South Carolina Real Property and the property covered by the Mining Leases..  Except as described in **Schedule 5.22**, Seller is in full and complete compliance with any Reclamation Obligations that it is currently required to perform under applicable law or under permits or filed plans..

5.23    Material Safety Data Sheets.  Schedule 5.26 contains a true and correct copy of each material safety data sheet ("MSDS") used in the Subject Business at any time since January 1, 2011.  To the best Knowledge of Seller, Seller is in compliance with all applicable legal and regulatory requirements with respect to the preparation, filing, and provision of MSDSs.

34

**ARTICLE 6**

**Purchaser's Representations and Warranties**

Purchaser represents and warrants to Seller as follows:

6.01    <u>Corporate Status</u>.  Purchaser is a corporation duly organized and validly existing under the laws of its jurisdiction of incorporation as set forth in the preamble of this Agreement.  Each Purchasing Company has full corporate power to enter into this Agreement, and each of Purchaser and the other Purchasing Companies has full corporate power to enter into the other Transaction Documents to which it is or will be a party, and perform its obligations hereunder and thereunder.

6.02    <u>Authorization</u>.    The execution and delivery by each of the Purchasing Companies of the Transaction Documents to which it is or will be a party, and its performance of its obligations thereunder, have been duly authorized by all required corporate action.

6.03    <u>Execution and Delivery</u>.  Purchaser has duly and validly executed and delivered this Agreement; and the other Transaction Documents to which each Purchasing Company will be a party, when executed and delivered by such Purchasing Company, will be duly and validly executed and delivered by such Purchasing Company; and upon such execution and delivery by each Purchasing Company of the Transaction Documents to which it is a party, assuming the due authorization, execution, delivery thereof by the other parties thereto, such Transaction Document shall be the legal, valid and binding obligation of such Purchasing Company,

35

enforceable against such Purchasing Company in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles (whether in equity or at law) and to general principles affecting the enforceability of indemnities.

6.04    No Conflict.  The execution and delivery by each Purchasing Company of the Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not and will not (a) conflict with its certificate or articles or incorporation and by-laws or other organizational documents, or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order, decree, or Contract to which it is a party or by which it is bound, which violation, breach or default would adversely affect its ability to execute and deliver any Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

6.05    Sufficient Funds.  Purchaser has on the date hereof and will have on the Scheduled Closing Date sufficient funds to consummate the Transactions.

6.06    Brokers and Finders.    No broker or finder has acted on behalf of Purchasing Companies in connection with the Transactions.

36

## ARTICLE 7

### Purchaser's Investigation

Purchaser hereby acknowledges the following:

7.01   Investigation.   Purchaser has conducted its own investigation and has made its own evaluation of the Subject Business, the Transferred Assets and the Transferred Liabilities.

7.02   Financial Information.   As part of its investigation, in addition to the Net Asset Statements and the Income Statements, Purchaser has been given certain financial statements, forecasts, projections, opinions and similar material prepared or furnished by Selling Companies or their representatives with respect to the Subject Business (the "Financial Information").   Except for the specific representations and warranties in Article 5, neither Seller nor any other Seller Entity shall have any liability of any kind to Purchaser or any other Purchaser Entity with respect to any of the Financial Information.

7.03   No Additional Representations.   Except for the specific representations and warranties in Article 5, neither Seller nor any other Seller Entity is making any representation or warranty, express or implied, of any nature whatsoever with respect to the Subject Business, the Transferred Assets or the Transferred Liabilities.

## ARTICLE 8

### Covenants of Seller and Purchaser

37

8.01    <u>Bankruptcy Court Approval</u>.

(a)    As soon as practicable after the date of this Agreement, Seller shall file with the Bankruptcy Court a motion for the approval of the Transactions that require such approval (the "Sale Motion"), and make all commercially reasonable efforts for the approval of the Sale Motion.

(b)    The Sale Motion shall include provisions requesting the assumption and assignment of the Subject Business Contracts listed in Exhibit 1.02E, and any other Subject Business Contracts to which Seller is a party that are agreed to be added by Purchaser (collectively, the "Assumption and Assignment Contracts"). Seller shall give notice with respect to the Assumption and Assignment Contracts in accordance with the Bankruptcy Code. Seller shall pay 100% of any payments which are required under section 365 of the Bankruptcy Code for the assumption and assignment of the Assumption and Assignment Contracts.

8.02    <u>Access and Inquiry</u>. Between the date of this Agreement and the Closing, Seller shall give Purchaser and its representatives reasonable access to the facilities of the Subject Business and Purchaser upon request will be permitted to contact and make reasonable inquiry of employees of Selling Companies regarding the Subject Business. Purchaser acknowledges that the terms of the Confidentiality Agreement shall apply to information obtained by Purchaser and its representatives pursuant to this Section.

8.03    <u>Licenses and Permits</u>.    As soon as practicable after the date hereof, the Parties shall co-operate in the preparation and filing with the appropriate licensing and

38

permitting authorities of applications for the transfer or issuance to Purchaser of all licenses and permits issued by a Governmental Authority and required for operation of the Subject Business or use of any of the Subject Assets after the Closing, including the Mining Permits, whether or not required to be held by Purchaser. Purchaser shall use all commercially reasonable efforts to secure such licenses and permits.

8.04   Notices to Third Parties.   The Parties shall cooperate to make all other filings and to give notice to all third parties as may reasonably be required to consummate the Transactions.

8.05   Commercially Reasonable Efforts.   In making commercially reasonable efforts as required under this Article 8 or any other provision of this Agreement, no Party shall be required to make any payment (other than for reasonable legal fees) that it is not presently contractually required to make, divest any assets (including but not limited to assets of the Subject Business), make any change in the conduct of its business or that of the Subject Business, accept any limitation on the future conduct of its business or that of the Subject Business, enter into any other Contract or arrangement with any Person that it is not presently contractually required to enter into, accept any significant modification in any existing agreement or arrangement, or agree to any of the foregoing.

8.06   Unassigned Contracts and Other Assets.   Any provision of this Agreement to the contrary notwithstanding, any Subject Business Contract that cannot be or is not assumed and assigned pursuant to section 365 of the Bankruptcy Code or otherwise, and whose assignment to the Purchasing Companies requires a consent that has not been obtained prior to the Closing, and each other asset whose transfer to Purchasing

39

Companies as contemplated by this Agreement requires a consent that has not been obtained prior to the Closing, shall not be assigned or transferred to Purchasing Companies until such consent is obtained; and the Parties shall obtain such consent or enter into arrangements, to the extent practicable and permitted under applicable law, that will provide Purchaser with the benefits, and relieve Selling Companies of the burdens, of such Subject Business Contract or such other asset.

8.07    Removal of Seller Pompano Beach Assets.  As soon as practicable after the Closing Date, Seller shall remove or cause to be removed from the Pompano Beach, FL facility of the Subject Business, at Seller's expense, all assets at the facility listed on **Schedule 8.07** (the "Seller Pompano Beach Assets").  Purchaser shall provide reasonable access and cooperation to enable Seller to expeditiously remove the Seller Pompano Beach Assets, and Seller and its employees and agents shall comply with all reasonable regulations established by Purchaser for the conduct while at the Pompano Beach facility.  Seller shall indemnify and hold harmless Purchaser from any and all Damages arising from or out of the activities of Seller and its employees and agents in removing the Seller Pompano Beach Assets from the Pompano Beach facility, excluding Damages to the extent arising from the negligence, willful misconduct or violation of law by Purchaser Group.

8.08    Ajax Real Property Bid Right.  If during the term of the Ajax Tolling Agreement, GCI undertakes to sell all or substantially all of the real property located at 294 Clements Rd W, Ajax, ON L1S 3C6 (the "Ajax Real Property"), it shall notify Purchaser, and Purchaser shall have the right to participate in the bidding or other

40

process for the sale of the Ajax Real Property on a basis substantially equal to other interested Persons.

8.09   Title Insurance and SurveyTitle Insurance and Survey.   Purchaser shall use all commercially reasonable efforts to obtain the title insurance commitment and surveys for the Subject Business Real Property described in Section 10.06. The cost of such title insurance and surveys shall be borne by Purchaser.  Seller shall provide all commercially reasonable cooperation with Purchaser's efforts to obtain such title insurance and surveys.

8.10   Waiver of Bulk Sales Law Compliance.   Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which Transferred Assets are located and all other laws applicable to bulk sales and transfers, including the Bulk Sales Act (Ontario), to the extent applicable to the Transactions.  Seller shall indemnify and hold harmless Purchaser from any Damages arising from such waiver, except to the extent that any such Damages arise from Purchasing Companies' failure to satisfy the Transferred Liabilities.


## ARTICLE 9

### Conduct of Business Prior to Closing

Seller agrees that except as otherwise required or contemplated by this Agreement or consented to by Purchaser, from the date of this Agreement until the Closing:

41

9.01    <u>Operation in Ordinary Course</u>.    Selling Companies shall conduct the Subject Business only in the ordinary course of business and consistent with prior practice.

9.02    <u>Disposition of Assets</u>.    Other than pursuant to sales in the ordinary course of business or disposition of worn out or obsolete assets, neither Selling Company shall sell, lease (as lessor), transfer, license (as licensor), subject to a Lien,  or otherwise dispose of, any Transferred Assets with a book value of USD 10,000 or more.

9.03    <u>Material Agreements</u>.    Other than in the ordinary course of business, neither Selling Company shall, in the operation of the Subject Business, enter into any Subject Business Contract that  both (1) has a term of more than one year and cannot be canceled by such Selling Company without penalty upon notice of one year or less, and (2) is a Contract under which it is reasonably expected that the Subject Business will make expenditures or obtain receipts of more than USD 10,000 per year.

9.04    <u>Relations with Customers and Suppliers</u>.    Selling Companies shall use all commercially reasonable efforts to preserve the relations of the Subject Business with customers and suppliers.

9.05    <u>No Shop Provision</u>.    Selling Companies shall not directly or indirectly (through a representative or otherwise), solicit any offer from, furnish any confidential or proprietary information to, commence or conduct negotiations with, or enter into any agreement with any party (other than Purchaser and its representatives) concerning the sale, lease, or other disposition of the Subject Business, the Transferred Assets, or any part thereof other than in the ordinary continuing conduct of the Subject Business.

42

9.06   Notice of Material Adverse Effect.   Between the date of this Agreement and the Closing Date, if to the Knowledge of Seller, a Material Adverse Effect shall have occurred, Seller shall promptly advise Purchaser thereof.

9.07   Announcements to Employees.   Seller will make, on a timely basis, to employees of the Subject Business such announcements and notifications as may be required by applicable law.

## ARTICLE 10

### Conditions Precedent to Purchaser's Obligations

All obligations of Purchaser under this Agreement are subject, at Purchaser's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

10.01 Accuracy of Representations and Warranties.   Each and every representation and warranty of Seller under this Agreement shall be true and accurate in all material respects as of the Closing as though made as of the Closing, except as may be affected by changes in the ordinary course of business between the date of this Agreement and the Closing, which changes would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

10.02 Performance of Covenants and Agreements.   Seller shall have performed in all material respects all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

10.03 Permits, Consents, etc.   There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority

43

required in connection with the Transactions that has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Subject Business.

10.04 <u>Litigation</u>. No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Purchaser Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions and which, if successful, would materially adversely affect the right of Purchaser to consummate the Transactions or to continue the Subject Business after the Closing substantially as currently operated.

10.05 <u>Certificates of Selling Companies</u>.

(a)    Seller shall have delivered to Purchaser a certificate of Seller, dated the Closing Date, signed by the Chief Executive Officer, President or any Vice President of Seller, certifying that: (i) each and every representation and warranty of Seller under this Agreement is true and accurate in all material respects as of the Closing as though made as of the Closing, except as may be affected by changes in the ordinary course of business between the date of this Agreement and the Closing, which changes would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and (ii) Seller has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Seller at or prior to the Closing pursuant to this Agreement.

(b)    Each Selling Company shall have delivered to Purchaser a certificate of

44

such Selling Company, dated the Closing Date, signed by the Secretary or an Assistant Secretary of such Selling Company, (i) certifying that the execution, delivery and performance of the Transaction Documents to which such Selling Company is a party have been duly authorized by its Board of Directors or the Board's duly authorized delegee, and that such authorization has not been amended but remains in full force and effect on the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of such Selling Company, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of such Selling Company.

10.06 <u>Title Insurance and Surveys</u>.

(a)    Purchaser shall have obtained a commitment for an owner's policy of title insurance in an aggregate amount equal to the portion of the Purchase Price allocable to the Subject Business Real Property located in the United States insuring that Purchaser holds good and indefeasible fee simple title to the Subject Business Real Property.   Such commitment shall provide that the policy will delete all of the requirements listed in ALTA Schedule B-1, only include the Permitted Exceptions as exclusions, have no exception for the gap between Closing and recording and otherwise be in form and substance satisfactory to Purchaser in its reasonable discretion. Purchaser shall have obtained an ALTA survey of the Subject Business Real Property that include Table A items 1, 2, 3, 6, 7(b), 10 and 11(a) and is otherwise reasonably acceptable to Purchaser.

(b)    Purchaser shall have obtained a commitment for the Subject Business

Real Property located in Canada that is analogous to that described in Section 10.06(a), to the extent available on commercially reasonable terms.

10.07 <u>Third Party Consents and Approvals.</u>  The consents of third parties to the assignment of the Subject Business Contracts listed on **Schedule 10.07** shall have been obtained, or such Contracts shall have been assumed and assigned pursuant to the Sale Order.

10.08 <u>No Material Adverse Effect</u>.  No Material Adverse Effect shall have occurred  between the date of execution of this Agreement and the Closing Date.

10.09 <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered an order approving those of the Transactions requiring Bankruptcy Court approval, which also shall provide that both Seller and the Reorganized Seller, as applicable, shall be responsible for the Excluded Liabilities, representations, warranties, covenants, agreements and indemnifications of Seller set forth in this Agreement (the "Sale Order"); and the Sale Order shall have become final and non-appealable.

## ARTICLE 11

### Conditions Precedent to Seller's Obligations

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01 <u>Accuracy of Representations and Warranties</u>.    Each and every representation and warranty of Purchaser under this Agreement shall be true and accurate in all material respects as of the Closing.

46

11.02 <u>Performance of Covenants and Agreements</u>.    Purchaser shall have performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

11.03 <u>Permits, Consents, etc</u>.    There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Seller Group.

11.04 <u>Litigation</u>.    No action, suit or proceeding by any third Person (including any Governmental Authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Purchaser Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the Transactions and which, if successful, would materially adversely affect the right of Purchasing Companies to consummate the Transactions or to continue the Subject Business after the Closing substantially as currently operated or might involve material liability on the part of any Seller Entity.

11.05 <u>Certificates of Purchasing Companies</u>.

(a)    Purchaser shall have delivered to Seller a certificate of Purchaser, dated the Closing Date, signed by the Chief Executive Officer, President or any Vice President of Purchaser, certifying that: (i) each and every representation and warranty of Purchaser under this Agreement is true and accurate in all material respects as of the

47

Closing as though made as of the Closing; and (i) Purchaser has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by such Purchaser at or prior to the Closing pursuant to this Agreement.

(b)     Each Purchasing Company shall have delivered to Seller a certificate of such Purchasing Company, dated the Closing Date, signed by the Secretary or an Assistant Secretary of such Purchasing Company, (i) certifying that resolutions of the Board of Directors of such Purchasing Company authorizing the Transactions and the execution, delivery and performance of the Transaction Documents to which such Purchasing Company is a party have been duly adopted and have not been amended but remain in full force and effect as of the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of Such Purchasing Company, and the authenticity of specimen signatures, of all Persons signing any Transaction Documents on behalf of such Purchasing Company.

11.06 Third Party Consents and Approvals.  The consents of third parties to the assignment of the Subject Business Contracts listed on **Schedule 10.07** shall have been obtained, or such Contracts shall have been assumed and assigned pursuant to the Sale Order.

11.07 Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become final and non-appealable.

48

**ARTICLE 12**

**Employee Matters**

12.01 <u>Employment</u>.

(a)    Effective as of the Closing, (i) each employee of Seller or GCI at the South Carolina Real Property or the Other Real Property (collectively, the "Subject Employees") shall cease to be an employee of Seller or GCI. All such employees as of the date of this Agreement are listed in **<u>Schedule 12.01</u>**. None of the employees of GCI at the Ajax Facility are or shall be deemed Subject Employees.

(b)    Each Subject Business Employee who accepts an offer of employment from a Purchaser Entity in accordance with Section 12.02 shall become an employee of such Purchaser Entity effective as of the Closing; and all such employees are referred to herein as "Continued Employees". Seller is making no representation or warranty as to which, if any, Subject Employees will accept offers of employment from Purchaser Entities.

12.02 <u>Positions Offered to Subject Employees</u>.    Purchaser shall offer each Subject Employee employment by a Purchaser Entity to commence as of the Closing. With respect to each Subject Employee, the position offered (I) shall be for a job that is equivalent (including with respect to level of responsibility and authority) to the Subject Employee's job with the Subject Business as of the Closing, (ii) shall be as of Closing at no reduction in base salary, wages, commissions and incentive levels effective immediately prior to the Closing, (iii) shall as of Closing not change the location of the Subject Employee's principal place of work to one that is an unreasonable commuting

49

distance from the employee's residence, and (iv) shall provide employee benefit plan coverage as follows:

(A)    Vacation and Vacation Pay.

(1)    For purposes of this Clause (A), one-twelfth of Seller's obligation to each Continued Employee for vacation and related vacation pay for calendar year 2011 shall be deemed to accrue on the first day of each month during that year, both before and after the Closing, and Purchaser shall assume all such obligations accruing after the Closing Date.

(2)    After the Closing Date, Seller shall pay each Continued Employee vacation pay for all vacation days accrued but not used on or before the Closing Date.

(3)    Purchaser shall pay each Continued Employee vacation pay for all vacation pay accrued but not used from after the Closing Date through December 31, 2011.

(4)    With respect to each calendar year after 2011, each Continued Employee shall be given credit by the Purchaser Group for the employee's prior service with the Seller Group for purposes of the Purchaser Group's vacation policies, to the extent such service is recognized under Seller's vacation policies.

(B)    Plan Participation.

Except as otherwise provided in this Section with respect to vacation benefits, effective as of the day after the Closing Date, Purchaser shall make available to each Continued Employee the defined contribution plans, severance benefits, vacation benefits, defined benefit pension plans, medical plans, dental plans, disability

50

plans, group insurance plans and all other benefits under the Purchaser's plans, policies and arrangements, which are made available by the Purchaser Group to its similarly situated employees. With respect to any such plan, policy or arrangement that requires an employee to attain any specific length of service with Purchaser in order to participate in, or be eligible for, or to be vested in, any benefits provided thereunder, each Continued Employee shall be given credit for purposes of determining such participation, eligibility and vesting for the Employee's length of service with the Seller Group prior through the Closing Date, but shall only be given credit for such length of service under severance plans for purposes of the accrual of any benefits. Purchaser shall have no liability to Seller under Seller's severance policies with respect to any Subject Employee who is offered but refuses employment by a Purchaser Entity.

12.03 <u>Terms of Employment</u>. As to terms and conditions of employment not specified in this Article, from and after the Closing the Continued Employees (i) shall be treated in a similar manner as the other employees of the Purchaser Group who are similarly situated, (ii) shall be entitled to participate on the same basis as such other employees in all job training, career development and educational programs of the Purchaser Group, and (iii) shall be entitled to fair and equitable consideration together with such other employees in connection with any management or executive job opportunities or any other promotional opportunities with the Purchaser Group.

12.04 <u>Employment Related Indemnities</u>. Each Party shall indemnify the other Party from and against all Damages resulting from the respective obligations of Parties in this Section 12, including any as to (a) the hiring and termination practices and

decisions with respect to the Subject Business of the Seller Group prior to the Closing Date, and of the Purchaser Group after the Closing Date, (b) the Purchaser Group's termination of employment of any Continued Employee, (c) any claim made by any Subject Employee for any severance pay or termination, indemnity or other severance or termination entitlement, including any individual who under applicable law or otherwise is entitled to severance upon termination by Seller Group after refusing an offer to become an employee of the Purchaser Group, (d) any claim made by any Continued Employee that results from the actual or alleged non-continuance, reduction or change of the terms and conditions of employment (including any reduction or change of the employment-related benefits provided to such employee), which occurs after the Closing Date as to the Purchaser Group, or prior to the Closing Date as to the Seller Group, and (e) any claim under the Worker Adjustment and Retraining Notification Act, 29 USC §§ 2101 *et seq.*, or any comparable U.S. state or Canadian federal or provincial law arising out of any actions taken by the relevant Party during the time it operated the Subject Business.   Any Third Party Claims arising under this Section shall be subject to the provisions of Section 14.05.

    12.05 <u>Employee Information Sharing</u>.   After the Closing, each of Seller and Purchaser shall provide to the other Party, from time to time at no cost to the recipient, such information regarding employees of the Subject Business under the ownership of the Selling Companies as may be reasonably requested.  This Section shall not compel any Person to maintain records beyond the periods specified in Section 15.02.

    12.06 <u>Notices, etc.</u>  With respect to any employees of the Subject Business not

52

hired by Purchaser, the Selling Companies will timely provide all notices and any continuation of health benefit coverage required to be provided by the Selling Companies to any of such employees as well as their respective spouses, former spouses, dependents, and former dependents under COBRA and applicable state or Canadian federal and provincial law.

## ARTICLE 13

### Termination

13.01 Rights to Terminate.

(a)     This Agreement may be terminated at any time prior to the Closing by written agreement of Seller and Purchaser.

(b)     If for any reason the Closing shall not take place within 180 days after the date of this Agreement, then either Seller or Purchaser may terminate this Agreement at any time thereafter by giving notice of such termination to the other Party in the manner provided in Section 18.01, provided that the terminating party is not in material breach of the provisions of this Agreement.

(c)     By Purchaser if (i) any of the conditions set forth in Article 10 have become incapable of fulfillment on or before the Closing Date (or other specified date), (ii) Purchaser has given Seller 15 days notice of such matter, (iii) Seller have failed to cure or cause to be cured such matter within the 15 days, and (iv) Purchaser is not otherwise in material default.

(d)     By Seller if (i) any of the conditions set forth in Article 11 of this Agreement

53

have become incapable of fulfillment on or before the Closing Date (or other specified date), (ii) Seller has given Purchaser 15 days notice of such matter, (iii) Purchaser has failed to cure such matter within the 15 days, and (iv) Seller is not otherwise in material default.

13.02  <u>Consequences of Termination</u>.

(a)    The termination of this Agreement, whether in accordance with any of the provisions of Section 13.01 or otherwise, shall not affect the rights of any Party with respect to any prior breach of any covenant or agreement contained in this Agreement, except as provided in Section 14.04(c) and except that upon termination in accordance with any of the provisions of Section 13.01, the Parties shall be released from any and all liability for breach of any of the representations and warranties contained in Articles 5 and 6.

(b)    The obligations of the Parties under Sections 17.01 and 17.02 shall survive any termination of this Agreement.

## ARTICLE 14

### Indemnification

14.01  <u>Definitions</u>.  As used in this Article:

(a)    "Purchaser Claim" has the meaning given such term in Section 14.04.

(b)    "Claim" means any claim, demand, suit, action or proceeding.

(c)    "Damages" means any and all penalties, fines, damages, liabilities, losses or costs (including reasonable Litigation Expenses incident to Third Party Claims, but

excluding incidental, indirect or consequential damages, damages for lost profits, and Litigation Expenses incident to Direct Claims).

(d)    "Direct Claims" means Claims other than Third Party Claims.

(e)    "Litigation Expenses" means attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a Claim.

(f)    "Third Party Claims" means any and all Claims by any Person, other than Seller Entities or Purchaser Entities, including Governmental Authorities, which could give rise to a right of indemnification under this Article.

14.02  Seller's Indemnification.

(a)    Subject to the terms and limitations of this Article, Seller shall indemnify Purchaser against any Damages to the Purchaser Group that are caused by or arise out of (i) the breach of or failure of either of the Selling Companies to perform and fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Seller set forth in Article 5 this Agreement, or (iii) any of the Excluded Liabilities or Excluded Assets.  Notwithstanding any other provision of this Agreement, except for liability for breach of Section 5.20(d), Seller shall have no liability whatsoever to Purchaser or the Purchaser Group with respect to the presence of asbestiform minerals in or on any building or other improvement that is part of the Subject Business Real Property.

(b)    The representations and warranties of Seller set forth in Article 5 shall

survive the Closing.    Except as otherwise required by applicable law, (i) the representations and warranties set forth in Section 5.05 and subsequent Sections of Article 5 (other than Sections 5.07 and 5.08) shall expire and be of no further force and effect two years after the Closing Date and (ii) the representations and warranties set forth in Sections 5.09(b) and 5.14 shall expire and be of no further force and effect five years after the Closing Date, except with respect to claims Purchaser has previously asserted against Seller in writing, setting forth the nature of such claims with reasonable specificity.

14.03 Purchaser's Indemnification.

(a)    Subject to the terms and limitations of this Article, each Purchaser shall indemnify Seller against any Damages to the Seller Group which are caused by or arise out of (i) the failure of Purchaser to perform or fulfill any provision or agreement to be performed or fulfilled by it under this Agreement or any of the other Transaction Documents, (ii) any inaccuracy in any representation or breach of any warranty of Purchaser set forth in Article 6, (iii) the failure of any Purchaser Entity subsequent to the Closing to perform or fulfill its obligations under any Contract or obligation included in the Transferred Liabilities for which any Seller Entity is or may be liable, as a guarantor or otherwise, (iv) any of the Transferred Liabilities; (v) subject to Section 3.07, any Reclamation Obligations; or (vi) any other obligations under applicable law or any license or permit issued by a Governmental Authority to a Selling Company to the extent that such Damages relate to the operation of the Subject Business or the Transferred Assets after the Closing.

56

(b)     The representations and warranties of Purchaser set forth in Article 6 shall survive the Closing.

14.04  Limitations.

(a)     Purchaser may not assert any Claim for indemnification under this Article (a "Purchaser Claim") with respect to the breach of any representation in Section 5.04 or subsequent Sections of Article 5 unless such Purchaser Claim(s) gives rise to Damages (including Litigation Expenses for purposes of the threshold set forth in this clause) which in the aggregate amount shall exceed USD 250,000, and then only with respect to the excess of such aggregate Purchaser's Claims over said USD 250,000.  In no event shall the aggregate amount of indemnification with respect to all such Purchaser Claims exceed USD 5,000,000.

(b)     The dollar thresholds set forth in this Section have been negotiated for the special purpose of the provision to which they relate, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the Transactions under which a level of materiality might be an issue.

14.05  Defense of Third Party Claims.

(a)     If either Party (the "Indemnitee") learns of any Third Party Claim for which Indemnitee intends to seek indemnification under this Agreement, or to have taken into account for purposes of the dollar thresholds in Section 14.04, it shall give notice in writing of such Claim to the other Party from whom it intends to seek such indemnification or taking into account (the "Indemnitor").   It shall be a necessary

condition of any claim for indemnification under this Agreement with respect to any Third Party Claim, or for such Third Party Claim to be taken into account for purposes of the dollar thresholds under Section 14.04, that Indemnitee notify Indemnitor prior to the time when Indemnitor's ability to contest the Third Party Claim would be materially impaired by lack of notice.

(b)    Indemnitor may undertake the defense of a Third Party Claim of which Indemnitee has notified Indemnitor, by notice to Indemnitee given not later than 30 calendar days after receipt by Indemnitor of Indemnitee's notice of such Third Party Claim. If Indemnitor undertakes the defense of any Third Party Claim, it shall control the investigation and defense thereof, except that without the prior written consent of Indemnitee, which consent shall not be unreasonably withheld or delayed, Indemnitor may not enter into any settlement that requires Indemnitee to make any payment that is not fully indemnified under this Agreement or taken into account under Section 14.04, or submit to injunctive relief; and subject to Indemnitor's control rights, Indemnitee may participate at its own expense in such investigation and defense. If Indemnitor does not undertake the defense of a Third Party Claim, then Indemnitee shall control the investigation and defense thereof, except that without the prior written consent of Indemnitor, which consent shall not be unreasonably withheld or delayed, Indemnitee may not enter into any settlement; and subject to Indemnitee's control rights, Indemnitor may participate in such investigation and defense, at its own expense.

(c)    The Parties shall make available to each other, their counsel and other representatives, all information and documents reasonably available to them which

58

relate to any Third Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

(d)    For any Claim whose resolution may require Environmental remediation work, at any of the Subject Business Real Property, the Party controlling the defense pursuant to this Section 14.05 shall control performance of such work, including related disclosures to and dealings with Governmental Authorities; Seller shall consult with Purchaser as to the methods and procedures of such remediation, and to the extent reasonably practicable, shall adopt methods and procedures that will minimize interference with the Subject Business; the Purchaser shall allow access, after reasonable prior written notice, to said property for performance of such work; both Parties shall be entitled to participate, at their own several cost, in all communications and meetings with any Governmental Authority relevant to the resolution of the Claim; and both Parties shall cooperate together to resolve the Claim and achieve a cost-effective environmentally protective remedy.  Nothing in this Section 14.05 shall prevent Seller or Purchaser from making any disclosure to or undertaking any dealings with Governmental Authorities that such Party's counsel determines, in such counsel's reasonable opinion, to be required by applicable law; provided that such Party shall give the other Party prompt notice of its intention to make such disclosure or undertake such dealings.

14.06 <u>No Consequential or Lost Profit Damages</u>.  Neither Party shall seek or be entitled to incidental, indirect or consequential damages or damages for lost profits or punitive damages in any claim for indemnification under this Article with respect to a

59

Direct Claim, nor shall it accept payment of any award or judgment for such indemnification to the extent that such award or judgment includes such Party's incidental, indirect or consequential damages or damages for lost profits or punitive damages.

## ARTICLE 15

### Cooperation in Various Matters

15.01 <u>Mutual Cooperation</u>.

(a)    After the Closing, each Party shall cooperate with the other Party as reasonably requested by such other Party in connection with the prosecution or defense of any claims or other matters relating to the Subject Business.  Such cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees.

(b)    Seller and Purchaser shall use all reasonable efforts to obtain any certificate or other document from any Governmental Authority or other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including any Tax with respect to the Transactions).  Purchaser shall execute and deliver, or cause to be executed and delivered, on a timely basis any Canadian Tax Elections in respect of the Transactions and the purchase and sale of the Transferred Assets  if requested in writing by any Seller Entity at least 30 days prior to the date upon which the requested Canadian Tax Election is to be delivered to the Seller Entity.  "Canadian Tax Elections" means any election, form, notification, or other filing pursuant to subsection or 22(1) of

60

the *Income Tax Act* (Canada) or proposed section 56.4 of the *Income Tax Act* (Canada), as enacted (including any amended, successor or replacement provisions and any equivalent provisions under provincial or local law).

15.02 <u>Access to Files and Records</u>.  For a period of three years after the Closing Date, on reasonable notice and regulations during normal business hours, each Selling Company shall allow the Purchasing Companies, and each Purchasing Company shall allow the Selling Companies, access to any files and records in its possession relating to the Subject Business prior to the Closing, and the right to copy and make extracts therefrom.  If at any time during such period, either Selling Company or Purchasing Company wishes to dispose of such any files and records, it shall give Purchasing Companies or Selling Companies, as the case may be, notice of such disposal, and at request of a recipient of such notice given within sixty days after receipt of such notice, deliver to the requesting recipient, at requesting recipient's expense, any of such items as are requested.

## ARTICLE 16

### Post-Closing Matters

16.01 <u>Reports</u>.  Purchaser shall provide such information as Seller may reasonably request in connection with Seller's preparation of financial, Tax and other reports and statements relating to the Subject Business for periods prior to the Closing.

16.02 <u>Names</u>.  After the Closing, Purchaser Entities shall have no right to use the "Grace" or the "Davison" name, whether alone or in combination with other words and/or symbols, and Purchaser shall not, nor permit any other Purchaser Entity to, refer

(other than in response to unsolicited inquiries or in announcements of the occurrence of the Closing) to their respective businesses as formerly being owned by or associated with Seller, except that for a period of 90 days after the Closing, the Buying Companies shall have the right to use any packaging, catalogues, sales and promotional materials and printed forms (except for MSDSs) that use such names and are included in the Transferred Assets as of the Closing, or have been ordered prior to the Closing for use in the Subject Business, but only to the extent that it is not practicable to remove or cover up the "Grace" name.  Purchaser shall use reasonable efforts to minimize such usage and to discontinue it as soon as practicable after the Closing.

16.03 Intercompany Agreements.    Any contracts, licenses, agreements, commitments or other arrangements between the Subject Business and any Seller Entity or unit thereof, whether written or oral, and whether express or implied, pursuant to which any Seller Entity provides management, administrative, legal, financial, accounting, data processing, insurance, technical support, or other services to the Subject Business, or the use of any assets of any Seller Entity, or pursuant to which any rights, privileges or benefits are accorded to the Subject Business as a unit of the Seller Group, shall terminate as of the Closing.  After the Closing, the Purchaser Group shall have no rights under any similar contract, license, agreement, commitment or arrangement with Seller or any other Seller Entity, except this Agreement and the Ancillary Agreements.

16.04 Seller's Covenant Not to Compete.  For a period of three (3) years after the Closing Date, no Seller Entity shall engage, directly or indirectly, anywhere in the

62

world in the mining, milling, expanding, manufacture, and/or sale of vermiculite, vermiculite concentrate, perlite, and specialty vermiculite products; provided that the foregoing shall not apply to manufacture or sale of such products by a business acquired by a Seller Entity after the Closing Date if, in the year prior to such acquisition, the net sales of such products by the acquired business was less than 50% of the net sales of the entire acquired business. A Seller Entity may also acquire a business that exceeds the threshold set forth in the immediately preceding sentence; provided that the Seller Entity divests the unit of such business manufacturing or selling such products within one year after its acquisition; and provided further that if the Seller Entity shall not have effected such divestment within one year after its acquisition despite its reasonably diligent efforts, Purchaser shall grant the Seller Entity reasonable extension of the divestment period not to exceed six months. If the Seller Entity proposes to sell the unit of the acquired business that manufactures or sells such products, it shall notify Purchaser and give Purchaser the opportunity to participate in the bidding or other process for the sale of such unit on a basis substantially equal to other interested Persons. No portion of the Purchase Price shall be allocated to the provisions of this Section for Canadian Tax or other purposes.

## ARTICLE 17

### Expenses

17.01 <u>Purchaser's Expenses</u>. Purchaser shall pay, and indemnify all Seller Entities against all Damages arising from, expenses incurred by or on behalf of the

63

Purchaser Group in connection with the preparation, authorization, execution and performance of this Agreement, the other Transaction Documents and the Transactions, including all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants.

17.02 <u>Seller's Expenses</u>.  Seller shall pay, and indemnify the Purchaser Entities against all Damages arising from, expenses incurred by or on behalf of the Seller Group in connection with the preparation, authorization, execution and performance of this Agreement, the other Transaction Documents and the Transactions, including all fees and expenses of brokers, finders, agents, representatives, consultants, counsel and accountants.

17.03 <u>Transfer Taxes</u>.  Purchaser shall pay and indemnify the Seller Group against any stamp duty, sales, transfer, value added, goods and services, harmonized sales, gross receipts, land transfer, land registration, excise, recording, registration or similar Tax applicable to this Agreement, the transfer to Purchaser or its designees of the Transferred Assets pursuant to this Agreement, the other Transaction Documents or the Transactions.

17.04 <u>Other Real Estate Costs</u>.  Purchaser shall pay and indemnify the Seller Group against all expenses the Purchaser Group may incur in connection with obtaining a title commitment, survey or title insurance policy for any of the Subject Business Real Property.

64

## ARTICLE 18

### Notices

18.01 <u>Notices</u>.   All notices, requests, demands and other communications required or permitted to be given under this Agreement or any of the other Transaction Documents shall be deemed to have been duly given if in writing and delivered personally, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

If to Seller:

> W. R. Grace & Co.-Conn.
> 7500 Grace Drive
> Columbia, Maryland 21044
> Attention: Corporate Secretary
> Fax:   (410) 531-4545
> Confirmation:(410) 531-4362

If to Purchaser:

> Attention:  Jason Guzek
> 1 Bala Avenue, Suite 310
> Bala Cynwyd, PA 19004
> Fax: (610) 660-8817
> Confirmation:  (610) 660-8803

Each Party may change the address to which such communications are to be directed to it by giving written notice to the other Parties in the manner provided above.

## ARTICLE 19

### General

65

19.01 <u>Entire Agreement</u>.    This Agreement sets forth the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating thereto.    No representation, promise, inducement or statement of intention relating to the Transactions has been made by any Party or any related Person which is not set forth in this Agreement.

19.02 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to principles of conflicts of law that would require the application of the law of any other jurisdiction.

19.03 <u>Submission to Jurisdiction</u>.  Each Party hereby irrevocably submits in any suit, action or proceeding arising out of or relating to this Agreement or any of the other Transaction Documents to which it is or will be a party, or any of its obligations hereunder or thereunder, to the jurisdiction of the United States District Court for the District of Delaware and the jurisdiction of any court of the State of Delaware, and waives any and all objections to such jurisdiction that it may have under the laws of the State of Delaware or any other jurisdiction.

19.04 <u>Equitable Remedies</u>.  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity without the necessity of demonstrating the inadequacy of monetary damages or the posting of a bond.

19.05 <u>Assignment; Successors</u>.    This Agreement shall be assignable by Purchaser only with the prior written consent of Seller, and shall be assignable by Seller only with the written prior consent of Purchaser.  Any attempted assignment in violation of this Section shall be null and void *ab initio*.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

19.06 <u>Amendments and Waivers</u>.  This Agreement may be amended, superseded or terminated, and any of the terms hereof may be waived, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or terminates this Agreement or waives any of its terms, executed by the Parties.  Failure of any Party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

19.07 <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by one or more Parties.  Each such counterpart shall be an original, but all such counterparts shall constitute one and only one agreement.

19.08 <u>Captions</u>.  The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

19.09 <u>Effectiveness</u>.  This Agreement shall become effective upon the entry of the Sale Order.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**

By: _____
Name: LAWRENCE S. SHAPIRO
Title: AUTHORIZED SIGNATORY

**VERMICULITE ACQUISITION CORP**

By: _____
Name: RAYMOND G. PERELMAN
Title: CHIEF EXECUTIVE OFFICER

68