IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| W. R. GRACE & CO., et al.,[1] ) | Case No. 01-01139 (JKF) |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | **Hearing Date: March 28, 2012, at 9:00 a.m.** |
| ) | **Objection Deadline: March 2, 2012** |

## MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT

The Debtors respectfully move this Court for entry of an order authorizing the Debtors'

entry into and performance under (i) a Consent Decree (the "Consent Decree") between the

United States and various parties, including three of the Debtors, and (ii) a Private Parties

Settlement Agreement (the "Private Parties Agreement") (collectively, the "Consent Decree and

the Private Parties Agreement are the "Settlement") among certain Debtors and various parties.[2]

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

[2] The parties to the Consent Decree and /or the Private Parties Agreement are the debtors, W. R. Grace & Co., W. R. Grace & Co-Conn and Grace Energy Corporation (collectively, "Grace"), the United States, including the United States Air Force, the United States Army and other agencies, branches and departments of the federal government (hereafter, collectively, "U.S."), NuStar Pipeline Operating Partnership L.P. (f/k/a Kaneb Pipeline

The Settlement fully and finally resolves longstanding disputes among the Parties with respect to certain alleged environmental contamination and response costs in connection with a site on Cape Cod, Massachusetts. In support of this Motion, the Debtors respectfully state the following:

### Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2. The predicates for this Motion are 11 U.S.C. § 105 and Fed. R. Bank. P. 9019.

### Procedural Background

3. On April 2, 2001, the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases have been consolidated for administrative purposes only. Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Debtors continue to operate their business and manage their properties, affairs and assets as debtors-in-possession.

### Factual Background

4. The underlying dispute concerns certain hydrocarbon-related contaminants in the sole source aquifer for Cape Cod, Massachusetts. The U.S. alleges that a jet fuel and aviation gasoline pipeline ("Otis Pipeline") running from a terminal at the Cape Cod Canal to the Otis Air Force Base on the Massachusetts Military Reservation ("MMR") spilled fuel in at least two locations at the MMR in the late 1960s or early 1970s and that the fuel contaminated the

---

Operating Partnership), NuStar Energy L.P., NuStar Terminals Services (f/k/a Support Terminal Services, Inc.) and NuStar Terminals Operations Partnership L.P. (collectively "NuStar") and Samson Investment Company ("Samson Investment") and SGH Enterprises, Inc. f/k/a Samson Hydrocarbons Company (collectively the "Samson Companies"). All the parties are collectively referred to as the "Parties."

groundwater. The MMR and areas into which contamination has migrated therefrom have been designated a federally-listed Superfund site. The U.S. alleges that two of the plumes of contamination, called FS-12 and FS-13, originated from the pipeline at the MMR and have impacted and/or are impacting groundwater flowing under or off the MMR. The United States military, under the direction of the National Guard Bureau and the Air Force Center for Engineering and the Environment (f/k/a the Air Force Center for Environmental Excellence), have installed expensive air sparging and pump-and-treat systems to extract contaminants, such as ethylene dibromide and benzene, from the groundwater.

5. The pipeline and terminal were built in 1965 and operated by Standard Transmission Corporation. That company was acquired by Cleary Petroleum Corporation in 1971. Through several corporate transactions, Cleary Petroleum Corporation became a subsidiary of W. R. Grace & Co.-Conn. Cleary Petroleum Corporation later became a subsidiary of Grace Energy Corporation, one of the debtors in these bankruptcy cases. In 1978, W. R. Grace & Co. – Conn. allegedly transferred assets relating to the military pipeline business of the Standard Transmission Division of Cleary Petroleum Corporation to Standard Transpipe Corp., a newly formed subsidiary. Cleary Petroleum Corporation later changed its name to Grace Petroleum Corporation.

6. In 1993, Grace Energy Corporation sold Standard Transpipe Corp. to Kaneb Pipeline Operating Partnership, L.P. This 1993 transaction involved the merger of Standard Transpipe Corp. into Support Terminal Services, Inc. and the sale of Support Terminal Services, Inc. to Kaneb Pipeline Operating Partnership, L.P. Support Terminal Services, Inc. is now known as NuStar Terminals Services, Inc. ("NuStar TS") and Kaneb Pipeline Operating Partnership, L.P. is now known as NuStar Pipeline Operating Partnership L.P. Also in 1993,

Grace Energy Corporation sold Grace Petroleum Corporation to Samson Investment Company. Grace Petroleum Corporation changed its name to Samson Natural Gas Company on January 22, 1993. Samson Natural Gas Company changed its name to SNG Production Company on April 21, 1993. SNG Production Company changed its name to Samson Hydrocarbons Company on December 21, 1994. Samson Hydrocarbons Company changed its name to SGH Enterprises, Inc. on July 23, 2009.

7. In the 1990s, the federal government began addressing the contamination allegedly associated with FS-12 and FS-13. The U.S. alleges that the federal government has spent in excess of $54 million to date investigating and remediating the FS-12 groundwater contamination and that the present value of what it will continue to spend in the future is approximately $17 million, for a total of over $70 million attributable to FS-12. The U.S. also alleges that the federal government has incurred substantial costs relating to FS-13. The U.S. alleges that Standard Transmission Corporation "caused" the contamination within the meaning of the Massachusetts Oil and Hazardous Material Release Prevention Act (M.G.L. ch. 21E). The U.S. further alleges that NuStar TS and Samson Hydrocarbons, as successors of Standard Transpipe Corp. and Grace Petroleum Corporation, respectively, are jointly and severally liable for the entire costs of this remedial effort.

8. Samson Hydrocarbons argues that Grace Energy Corporation's contract for the sale of Grace Petroleum Corporation to Samson Investment Company, as well as other agreements, contain indemnity provisions requiring indemnity for the claims made by the U.S. Samson Hydrocarbons filed several proofs of claim against Grace in the Bankruptcy Cases identified by the Debtors' claims agent as claim nos. 13946, 13947, 18518, 18520, 18521, 18526, and 18527 (as amended, collectively known as the "Samson Hydrocarbons Proofs of

Claim"). In the Samson Hydrocarbons Proofs of Claim, among other things, Samson Hydrocarbons asserts indemnity claims against these Debtors for, among other things, the full amount of the U.S.'s Otis Pipeline claim, for any other claim arising out of the Otis Pipeline facilities or operations, and for defense costs (as defined in the Private Parties Agreement, the "Samson Hydrocarbons Otis Pipeline Related Claims"). Samson Hydrocarbons Proofs of Claim also assert claims unrelated to the Otis Pipeline (as defined in the Private Parties Agreement, the "Samson Hydrocarbons Remaining Claims"). The Samson Hydrocarbons Remaining Claims are not the subject of this Motion.

9. Grace Energy Corporation brought a suit styled *Grace Energy Corporation v. Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc.*, cause no. 97-05135-J, in the 191st Judicial District Court of Dallas County, Texas (the "Kaneb suit"), claiming that the liabilities associated with the Otis Pipeline are owned by and the responsibility of Kaneb Pipe Line Operating Partnership, L.P. and its affiliates, as the successors of Standard Transmission Corporation and all of its liabilities. After a partial summary judgment and a successful jury trial in 2000, Grace Energy Corporation obtained a judgment against Kaneb et al. declaring that the Otis Pipeline assets and liabilities, if any, were conveyed to what is now a NuStar entity.

10. Kaneb et al. appealed the judgment in the Kaneb suit to the Court of Appeals for the Fifth Court of Appeals District in Dallas, Texas, in Case No. 05-00-01592-CV (the "Kaneb appeal"). Grace Energy Corporation also filed a notice of appeal to complain about certain aspects of the judgment rendered in the Kaneb suit. The appeal was abated due to the Grace Bankruptcy Proceeding.

11. In 2001-2002, the United States Department of Justice ("DOJ") on behalf of the U.S., sent letters to counsel for Samson Hydrocarbons and NuStar TS stating that the U.S. would file suit against Samson Hydrocarbons and NuStar TS in the United States District Court in Boston, Massachusetts to recover all costs incurred in connection with the cleanup of FS-12 and FS-13 pursuant to M.G.L. ch. 21E and indicating that the U.S. would be willing to engage in settlement negotiations. These letters were supplemented by further letters from DOJ to counsel for Samson Hydrocarbons and NuStar TS in 2008. Section 4A(b) of Chapter 21E of the Massachusetts General Laws requires that parties to a cleanup dispute confer in good faith prior to the plaintiff (in this case, the U.S.) bringing suit. To comply with the good faith requirements of the statute, the Parties agreed to mediate. The U.S., Grace, Samson Hydrocarbons, and NuStar selected a mediator and engaged in mediation involving multiple meetings and a site visit, spanning July, August, September, and October, 2009. Ultimately the Parties were successful in negotiating a settlement, which is embodied in the Consent Decree and the Private Parties Agreement.

## The Proposed Settlement

12. The Settlement is reflected in the Consent Decree and the Private Parties Agreement. The summary of the Settlement provided in this Motion is subject to and qualified by the terms of the Consent Decree and the Private Parties Agreement and parties in interest must review those agreements to understand the terms of the Settlement. In general terms, among other things, the Consent Decree, a copy of which is attached hereto as **Exhibit A**:

    a. Resolves the U.S. claims and potential claims against the Private Parties for the matters addressed in the Consent Decree relating to the Otis Pipeline,[3] by providing a covenant not to sue by the U.S. for those matters

---

[3] The "matters addressed in the Consent Decree" include: (a) all costs the U.S. has paid or will pay for actions taken or that will be taken by the U.S. in response to the release or threatened release of fuel, fuel constituents and/or fuel additives from or allegedly from the Otis Pipeline at the MMR; (b) any claim of the U.S. for

    in exchange for the payment to the U.S. of $21,000,000.00, plus interest from November 15, 2009 through the date of payment;

  b. Resolves Samson Hydrocarbons' claims for indemnification by Grace for claims and potential claims of the U.S. against Samson Hydrocarbons for the matters addressed in the Consent Decree relating to the Otis Pipeline by providing that, upon the effective date of the Consent Decree, Samson Hydrocarbons shall have the Samson Hydrocarbons Allowed Otis Claim (defined in Paragraphs 15 and 16 below) against Grace in the amount $7,440,000.00, plus interest from November 15, 2009 through the date of payment, which Samson Hydrocarbons shall assign to the U. S.; and

  c. Provides for the funding of the settlement payment to the U.S. as follows: NuStar will pay $11,700,000.00, plus applicable interest; Grace will pay $7,440,000.00, plus applicable interest, in fulfillment of the Samson Hydrocarbons Allowed Otis Claim; and Samson Hydrocarbons will pay $1,860,000.00, plus applicable interest, all payments as directed by the Consent Decree and Private Parties Agreement and liability for each payment being several and not joint.

13. In addition to the Consent Decree and conditioned on approval by this Court, the Debtors, the Samson Companies, and NuStar have entered into a Private Parties Agreement, which resolves all differences among them arising out of the claims of the Parties relating to Otis Pipeline liabilities in return for, among other things, the arrangement by which the monetary obligations to the federal government, as set out in the Consent Decree, will be funded by the Debtors, Samson Hydrocarbons, and NuStar. The Private Parties Agreement also contains agreements concerning potential future liabilities, if any, related to the Otis Pipeline. A copy of the Private Parties Agreement is attached hereto as **Exhibit B**, except that the portion of the

---

natural resource damages resulting from any release of fuel, fuel constituents and/or fuel additives from the Otis Pipeline at the MMR; and (c) any claims of the U.S. for performance of actions taken in response to the release or threatened release of fuel, fuel constituents and/or fuel additives from or allegedly from the Otis Pipeline at the MMR.

Private Parties Agreement concerning potential future liabilities, if any, has been redacted, because the Private Parties agreed to keep that provision confidential.[4]

14. Among other things, pursuant to the Private Parties Agreement, Grace Energy Corporation and Kaneb will file a motion with the Texas appellate court asking that the judgment in the Kaneb suit be vacated and the case dismissed, ending a thirteen year-long litigation. NuStar will also withdraw its objection to the Debtors' plan of reorganization. Further, NuStar has agreed that part of the consideration being paid by the Debtors towards the Consent Decree settlement was specifically for NuStar's agreement with respect to the Otis Pipeline and the MMR not to pursue any rights under any insurance policies NuStar had or believed it had as the successor of a former subsidiary of W. R. Grace & Co., which policies NuStar contends might provide defense, indemnity or other rights to NuStar relating to Otis Pipeline liabilities. This is significant because NuStar filed a motion to lift stay in this Court (which was denied without prejudice) to pursue coverage under some 25 insurance policies, many of which have been settled pursuant to agreements containing claw-back provisions which, in the event the insurer pays any claims to NuStar, would entitle the insurer to seek repayment of the amounts paid from the Debtors.

15. All disputes among the Debtors, NuStar and Samson Hydrocarbons pertaining to the claims of the U.S. against NuStar and Samson Hydrocarbons that in general terms relate to (i) the construction, installation, operation of and abandonment of the Otis Pipeline which is located, in part, on a portion of the MMR; (ii) alleged releases from the Otis Pipeline; (iii) remediation of the releases that the U.S. attributes to the Otis Pipeline, and (iv) all U.S. natural

---

[4] Copies of the unredacted Private Parties Agreement will be provided to the Official Committees and the Future Claimants' Representatives under the appropriate confidentiality protections and to the Court in camera upon request.

resource damage claims related to the Otis Pipeline (collectively the claims of the U.S. referenced in items (i) through (iv) and specified in the Consent Decree are referred to hereafter as the "U.S. Claims"), including the disputes relating to the portion of Samson Hydrocarbons Otis Pipeline Related Claims pertaining to the U.S. Claims, and methods for handling future claims, are also settled and resolved, conditioned on the Approval Order (defined in Paragraph 17 below) and the Consent Decree each becoming a "Final Order" as that term is defined in the Consent Decree and the Private Parties Agreement. Samson Hydrocarbons is granted an allowed claim for $7.44 million on account of the portion of the Samson Hydrocarbons Proofs of Claim pertaining to the U.S. Claims (as defined in the Private Parties Agreement, the "Samson Hydrocarbons Allowed Otis Claim") bearing interest from November 15, 2009 through the date of payment, compounded annually, which will be assigned to the U.S. under the terms set forth in the Consent Decree and the Private Parties Agreement. Likewise, all disputes between NuStar and Samson Hydrocarbons relating to the U.S. Claims are resolved, assuming the Approval Order and the Consent Decree become Final Orders, and satisfaction of all conditions in the Private Parties Agreement. Notwithstanding any contrary provision herein, this Motion, the Settlement, the Private Parties Agreement and the Consent Decree are not intended to allow, disallow, fix, estop, release, discharge, acquit, adjudicate, determine, estimate, waive, or prejudice any Samson Hydrocarbons Remaining Claims, the facts giving rise to the Samson Hydrocarbons Remaining Claims, or the claims and defenses of the Debtors with respect to the Samson Hydrocarbons Remaining Claims. Samson Hydrocarbons and Grace reserve and retain all rights, defenses, counterclaims, and assertions with respect to the Samson Hydrocarbons Remaining Claims and may take such actions as they deem necessary in the Grace Bankruptcy Proceeding or otherwise in pursuit of those rights. All of the parties to the Private Parties

Agreement, including Grace, as debtor and as reorganized under any plan of reorganization, must perform the Settlement as described in the Private Parties Agreement and the Consent Decree both before and after confirmation of any plan of reorganization. The Settlement as described in the Private Parties Agreement and Consent Decree are not discharged, impaired, or affected by any plan of reorganization.

16. In part, the Private Parties Agreement provides that subject to and effective upon the Approval Order and the Consent Decree each becoming a Final Order, Samson Hydrocarbons shall assign the Samson Hydrocarbons Allowed Otis Claim to the U.S. subject to and in accordance with the terms of the Consent Decree and the Private Parties Agreement. Attached as **Exhibit C** to the Motion is a notice of transfer of the Samson Hydrocarbons Allowed Otis Claim that shall be signed and filed with the Clerk of the Bankruptcy Court by Samson Hydrocarbons and the U.S. (subject to and in accordance with the terms of the Private Parties Agreement, the Consent Decree and the Approval Order) subject to and effective upon the Approval Order and the Consent Decree each becoming a Final Order. Subject to and in accordance with the terms of the Consent Decree and the Private Parties Agreement, Samson Hydrocarbons also agrees to waive its right to file an objection to the assignment of the Samson Hydrocarbons Allowed Otis Claim pursuant to Bankruptcy Rule 3001(e).

### Relief Requested

17. As required by the Consent Decree and the Private Parties Agreement, the Debtors respectfully request that the Bankruptcy Court enter the proposed Settlement Approval Order ("Approval Order") substantially in the form attached hereto as **Exhibit D** pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019: (i) approving the Settlement; (ii) approving the Private Parties Agreement; (iii) allowing the Samson Hydrocarbons Allowed Otis Claim, subject to and

in accordance with the terms of the Consent Decree and the Private Parties Agreement; (iv) approving the assignment of the Samson Hydrocarbons Allowed Otis Claim to the U.S, subject to and in accordance with the terms of the Consent Decree and the Private Parties Agreement; and (v) authorizing the Debtors to enter into and perform the Settlement, the Private Parties Agreement and the Consent Decree. The entry into and the effectiveness of the Consent Decree, the Private Parties Agreement and the Settlement thereunder are expressly conditioned upon: (i) the approval sought herein from this Bankruptcy Court and the Approval Order becoming a Final Order; and (ii) approval and entry of the Consent Decree by the United States District Court for the District of Massachusetts (the "Massachusetts District Court") and the Consent Decree becoming a Final Order.

## Analysis

18.  Pursuant to Rule 9019(a) of the Bankruptcy Rules, the Court has discretion to approve a compromise of a controversy. *See Protective Committee of Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson (In re TMT Trailer Ferry, Inc.)*, 390 U.S. 414, 424 (1968) (Fed. R. Bankr. P. 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."); *Will v. Northwestern University (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).

19.  Since courts generally favor minimizing litigation and expediting bankruptcy case administration, compromises are favored in bankruptcy. *See In re Nutraquest, Inc.*, 434 F.3d at 644; *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Therefore, settlements and compromises are "a normal part of the process of reorganization." *TMT Trailer Ferry, Inc.*, 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

20. To approve a settlement under Fed. R. Bankr. P. 9019, the proposed compromise must be fair and equitable. *Id.* at 424. A court must determine that the proposed settlement is in the best interest of the debtor's estate. *See Martin,* 91 F.3d at 394. A court must assess the value of the claim that is being settled and compare it against the value to the estate of the approval of the settlement. *See id.* at 393.

21. The following factors should be considered in striking this balance and determining whether to approve a proposed settlement:

    (1)    The probability of success in litigation;

    (2)    The likely difficulties in collection;

    (3)    The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

    (4)    The paramount interest of the debtor's creditors.

*See TMT Trailer Ferry, Inc.,* 390 U.S. at 424-25; *Martin,* 91 F.3d at 393. This does not mean that the proposed settlement needs to be the best result that the debtor could have achieved, but only that the proposed settlement falls within the reasonable range of litigation possibilities. *In re World Health Alternatives, Inc.,* 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citing *In re Penn Central Transportation Co.,* 596 F.2d 1102, 1114 (3d Cir. 1979)). Under this test, a proponent must simply demonstrate that a proposed settlement does not fall "below the lowest point in the range of reasonableness." *World Health,* 344 B.R. at 294; *Newman v. Stein,* 464 F.2d 689, 692-93 (2d Cir.), *cert. denied sub nom., Benson v. Newman,* 490 U.S. 1039 (1972).

    A.    **There is Uncertainty as to the Debtors' Ultimate Success on the Merits**

22. While Grace Energy Corporation, as the indemnitor of Samson Hydrocarbons, sought and successfully obtained a judgment in the Kaneb suit declaring that Kaneb, now NuStar, holds all liabilities associated with the Otis Pipeline, the U.S. was not a party to that

12

judgment and, therefore, Grace's ability to claim the benefit of that judgment is in doubt. The U.S. has stated that it fully intended to pursue joint and several liability against Samson Hydrocarbons (as well as NuStar TS). Moreover, NuStar has made clear its intention to vigorously pursue the Kaneb appeal as soon as the automatic stay is lifted, and NuStar expressed its strong belief that the partial summary judgment declaring that Kaneb holds the liabilities associated with the Otis Pipeline, as made final by the Amended Final Judgment, would be overturned on appeal. Likewise Grace intends to vigorously pursue its appellate rights against Kaneb. Both the Kaneb suit and the Kaneb appeal are complex pieces of litigation resolved in part by summary judgment and in part by jury findings, some of which jury findings were disregarded by the trial court. Though Grace believes it has a reasonable prospect of success on appeal in the Kaneb suit, the outcome of the Kaneb appeal and any retrial cannot be predicted with any certainty. Moreover, the events giving rise to the Kaneb suit occurred in the 1960s and 1970s and most of the witnesses are elderly or deceased, which would make any retrial more challenging and add to the uncertainty of the result.

23.     Regardless of the final outcome of the Kaneb suit or the Kaneb appeal, the U.S. was not a party to that litigation. Absent settlement, both the U.S. and NuStar intend to argue that Samson Hydrocarbons is a liable party or the liable party in any litigation brought by the U.S. in the Massachusetts District Court. Grace believes its final judgment against Kaneb is binding against Kaneb in subsequent litigation, but it may not prevent the U.S. from pursuing its theories of recovery, including that Samson Hydrocarbons is liable (along with NuStar TS). Although the Debtors and Samson Hydrocarbons contend that the decision is binding on the Massachusetts District Court, the Debtors do not know if the Massachusetts District Court would agree that it is binding or would allow the issue to be litigated notwithstanding the judgment in

the Kaneb suit. In addition, the U.S. expressed its belief that its case against Samson Hydrocarbons was easier to prove because in its view there was a direct chain of corporate identities from Standard Transmission Corporation to Samson Hydrocarbons, whereas NuStar TS's liability required proof of the internal transfer and assumption, or "push down," of liabilities from Cleary Petroleum Corporation to Standard Transpipe Corp., which NuStar vigorously disputes.

24.  No one disputes that there is groundwater contamination in Cape Cod's sole-source aquifer. While there is a reasonable basis for disputing the sources of the contamination, the U.S. is expected to present its case that the contamination came at least in part from the Otis Pipeline because the FS-12 plume contained elements of aviation gasoline and jet fuel and the FS-13 plume also contained elements of aviation fuel. The federal government has spent and allegedly continues to spend tens of millions of dollars cleaning up the pollution in the FS-12 area of the MMR. However, Samson Hydrocarbons and NuStar would dispute these arguments and most of the allegations. Absent settlement, the Private Parties would allege and argue that the government grossly overspent what it should have for a prudent cleanup and that the government shares responsibility for the fuel spills from the Otis Pipeline, because, among other reasons, (i) it supervised the installation of the pipeline, (ii) it directed the operation of the pipeline, (iii) it supervised the initial responses to FS-12 and FS-13, and (iv) it chose to wait more than 20 years to begin to assess and clean up the pollution. However, the U.S. would dispute these arguments and most of the allegations. Accordingly, there is some chance that Samson Hydrocarbons could be found to be jointly and severally liable for the entire cleanup cost of over $70 million and that the Debtors would be bound, by indemnity, to pay that judgment.

DOCS_DE:177777.1

25. Through mediation, the Debtors, NuStar and Samson Hydrocarbons were able to negotiate a settlement of U.S.'s $70 million plus claim down to $21 million, subject to the approval of the Bankruptcy Court and the Massachusetts District Court. Of that $21 million, NuStar is paying $11.7 million, Grace is paying $7.44 million, and Samson Hydrocarbons is paying $1.86 million. Thus, subject to the approval of the Bankruptcy Court and the Massachusetts District Court, Grace was able to end this litigation for less than 11% of the potential exposure to Grace, and Grace was able to reach agreement with Samson Hydrocarbons whereby Samson Hydrocarbons will contribute significantly towards the settlement even though Samson Hydrocarbons took the position that Grace was 100% liable for Samson Hydrocarbons' share under the indemnity provisions of the various agreements with Samson Investment. Absent approval by the courts, the U.S. would retain its right to seek the full amount of the $70 million plus from Samson Hydrocarbons and NuStar TS, jointly and severally, and Samson Hydrocarbons would retain its right to seek indemnity of the full amount from Grace.

26. The costs to litigate (i) with Kaneb in the Kaneb appeal and Kaneb suit, and (ii) with Samson Hydrocarbons over their proofs of claim for indemnity, could exceed the $7.44 million needed to resolve this matter entirely. Grace feels strongly that the merits of the several controversies are in Grace's favor; however, Grace recognizes that many legal and factual hurdles would have to be overcome in order to achieve a complete victory by Grace against each of NuStar and Samson Hydrocarbons. Additionally, a Massachusetts jury may be unwilling to find in favor of an alleged polluter of Cape Cod. The risk to Grace in such litigation could be as much as $70 million, plus litigation costs. In short, if the settlement is approved, the Debtors will be able to resolve a liability potentially in excess of $70 million for arguably less than the cost of defense and for far less than a possible litigation outcome of a $70 million loss. This settlement

DOCS_DE:177777.1

is quite possibly the best result that the Debtors could have achieved and is definitely above the lowest point in the range of reasonableness. *See World Health, supra.*

      B.    **The Likely Duration of the Litigation is Indefinite and the Litigation Concerns Complex Legal and Factual Issues that Will Cause the Estate to Incur Substantial Expenses**

27.    The Kaneb suit took more than two years to develop and try. The Kaneb appeal is expected to take at least 18 months and possibly far longer (if review is sought by either party in the Texas Supreme Court, which is likely). A retrial of the Kaneb suit could take another 18 months to 2 years. Likewise, the U.S. case is very complex and will involve considerable discovery from various government entities and numerous third parties. The legal issues are arguably complex and many; for example, the extent of M.G.L. ch. 21E § 5(a)(5) liability for oil and whether certain provisions of the Massachusetts statute can be applied retroactively, are issues that have not yet been decided in Massachusetts. In addition to complex legal and factual issues, there are complex technical issues. All parties have retained environmental consultants or hydrogeologists and it is expected that the technical aspects of the case alone will be lengthy and expensive. There is a high likelihood of protracted litigation lasting many years.

      C.    **Even If the Debtor Were to Succeed On the Merits, It is Questionable Whether the Debtor Would Be Able to Collect a Judgment**

28.    This factor is inapplicable to the present matter.

      D.    **The Paramount Interest of the Debtors' Creditors Favors the Certainty Set Forth By the Settlement**

29.    The creditors of the Debtors will benefit significantly from the certainty of a $7.44 million settlement given that the alternative involves years of litigation, unrecoverable litigation expenses which could exceed $7.44 million, and the possibility of the Debtors becoming liable for a judgment in excess of $70 million.

30. In addition, NuStar has made it clear that, in the absence of a settlement, NuStar will continue its attempts to pursue claims against certain of the Debtors' insurers. NuStar has asserted that it has rights as an additional insured to certain insurance policies that covered Grace Energy Corporation. NuStar has objected to the Debtors' Plan of Reorganization, arguing that the Plan's transfer of Asbestos Insurance Rights to the Asbestos PI Trust unfairly eliminates or prejudices NuStar's rights. NuStar has further asserted that, to the extent it has such rights and to the extent such rights are not transferred to the Trust, NuStar intends to pursue coverage under Grace's insurance policies.

31. In addition to NuStar's objections to the Debtors' Plan of Reorganization, if NuStar were to pursue coverage under the Debtors' insurance policies, Grace's indemnity obligations to certain insurers may be triggered. Grace has indemnity agreements with many of the insurers with whom Grace negotiated pre-petition asbestos insurance settlement agreements. Some of those indemnity obligations arguably require Grace to reimburse insurers not only for asbestos-related claims that third parties assert against such insurers, but also for non-asbestos claims such as NuStar's environmental claims. Indeed, as this Court is well aware, NuStar has already made clear its intention to pursue a claim against the Debtors' insurers Seaton and OneBeacon, among others, and in turn those insurers have tendered Kaneb's claims to Grace for indemnification. As a result of the overall settlement among the United States, Grace, the Samson Companies and NuStar, NuStar is releasing its claims to the Debtors' insurance coverage relating to the Otis Pipeline and the MMR. Absent such a release, the Debtors may well have become liable to make payments to one or more insurers on indemnity claims.

### No Previous Motion

32. No previous motion for the relief sought herein has been made to this or any other court.

## NOTICE

33. Notice of this Motion has been given to: (i) the office of the United States Trustee; (ii) counsel to the L/C Facility Agent and L/C Issuers; (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (iv) counsel to each of the official committees appointed in these Chapter 11 Cases; (v) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (vi) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (vii) counsel to the U.S., Samson Hydrocarbons and NuStar. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully seek approval of the Settlement and the entry of the Approval Order substantially in the form attached hereto as **Exhibit D**, pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019: (i) approving the Settlement, the Private Parties Agreement and the Consent Decree as being in the best interest of the Debtors, their estates and their creditors; (ii) approving and authorizing the Debtors' entry into and performance of the Settlement, the Private Parties Agreement and the Consent Decree; (iii) allowing the Samson Hydrocarbons Allowed Otis Claim subject to and in accordance with the terms of the Consent Decree and the Private Parties Agreement; (iv) approving the assignment of the Samson Hydrocarbons Allowed Otis Claim to the U.S. subject to and in accordance with the terms of the

Consent Decree and the Private Parties Agreement; and (v) granting such other relief as may be appropriate.

Dated: February 13, 2012

KIRKLAND & ELLIS LLP
Adam Paul
John Donley
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

and

BAER HIGGINS FRUCHTMAN LLC
Janet S. Baer, P.C.
Roger J. Higgins, P.C.
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4022

and

PACHULSKI STANG ZIEHL & JONES LLP

_____

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100
(302) 652-4400

Co-Counsel for the Debtors and Debtors-in-Possession

Consent Decree and the Private Parties Agreement; and (v) granting such other relief as may be appropriate.

Dated: February 13, 2012

KIRKLAND & ELLIS LLP
Adam Paul
John Donley
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

and

BAER HIGGINS FRUCHTMAN LLC
Janet S. Baer, P.C.
Roger J. Higgins, P.C.
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4022

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100
(302) 652-4400

Co-Counsel for the Debtors and Debtors-in-Possession

19

DOCS_DE:177777.1