<u>EXHIBIT I</u>

**Administrative Settlement Agreement and Order on Consent for Removal Action for the High Point, North Carolina Site**

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 4

IN THE MATTER OF:
Vermiculite Exfoliation Site GAO 013
High Point, Randolph County, North Carolina

       W. R. Grace & Co.,
       Respondent

ADMINISTRATIVE SETTLEMENT
AGREEMENT AND ORDER ON
CONSENT FOR REMOVAL ACTION

U.S. EPA Region 4
Docket No. _____

Proceeding Under Sections 104, 106(a), 107
and 122 of the Comprehensive
Environmental Response, Compensation,
and Liability Act, as amended, 42 U.S.C. §
9604, 9606(a), 9607 and 9622

I.  JURISDICTION AND GENERAL PROVISIONS ................................................ 1

II.  PARTIES BOUND ................................................................................................ 1

III.  DEFINITIONS ................................................................................................... 2

IV.  FINDINGS OF FACT ........................................................................................ 4

V.  CONCLUSIONS OF LAW AND DETERMINATIONS ................................. 4

VI.  ORDER ............................................................................................................... 5

VII.  DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE
        COORDINATOR .............................................................................................. 5

VIII.  WORK TO BE PERFORMED ........................................................................ 6

IX.  SITE ACCESS .................................................................................................... 10

X.  ACCESS TO INFORMATION ........................................................................... 11

XI.  RECORD RETENTION ..................................................................................... 11

XII.  COMPLIANCE WITH OTHER LAWS ......................................................... 12

XIII. EMERGENCY RESPONSE AND NOTIFICATION RELEASES ............... 12

XIV.  AUTHORITY OF THE EPA ON-SCENE COORDINATOR ..................... 13

XV.  PAYMENT OF RESPONSE COSTS ............................................................... 13

XVI.  DISPUTE RESOLUTION ............................................................................... 14

XVII.  FORCE MAJEURE ....................................................................................... 15

XVIII.  STIPULATED  PENALTIES ........................................................................ 15

XIX.  COVENANT NOT TO SUE BY EPA ............................................................. 17

XX.  RESERVATIONS OF RIGHTS BY EPA ......................................................... 17

**XXI.  COVENANT NOT TO SUE BY RESPONDENT** ........................................................ 18

**XXII.  OTHER CLAIMS** .................................................................................................... 19

**XXIII.  CONTRIBUTION** ................................................................................................... 19

**XXIV.  INDEMNIFICATION** ............................................................................................. 20

**XXV.  INSURANCE** .......................................................................................................... 20

**XXVI.  MODIFICATIONS** ................................................................................................. 21

**XXVII.  NOTICE OF COMPLETION OF WORK** .............................................................. 21

**XXVIII.  SEVERABILITY/INTEGRATION/APPENDICES** ............................................... 21

**XXIX.  EFFECTIVE DATE** ............................................................................................... 22

Appendix A – Action Memorandum

Appendix B – Cost Summary

Appendix C – Map of Site

## I. JURISDICTION AND GENERAL PROVISIONS

1. This Administrative Settlement Agreement and Order on Consent (Settlement Agreement) is entered into voluntarily by the United States Environmental Protection Agency (EPA) and W. R. Grace & Co., (Grace or Respondent). This Settlement Agreement provides for the performance of a removal action by Respondent and the reimbursement of response costs incurred by the United States in connection with the U.S. Government Accountability Office (GAO) 013 Vermiculite Exfoliation Site, EPA Site/Spill Number B408, in High Point, North Carolina (the Site).

2. This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 106(a), 107, and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9604, 9606(a), 9607, and 9622, as amended (CERCLA).

3. The EPA has notified the North Carolina Department of Environment and Natural Resources (NCDENR) of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

4. The EPA and Respondent recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Respondent in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondent does not admit, and retains the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of facts, conclusions of law, and determinations of Section IV and V of this Settlement Agreement. Respondent agrees to comply with and be bound by the terms of this Settlement Agreement and further agrees that it will not contest the basis or validity of this Settlement Agreement or its terms.

5. Respondent Grace has filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court), In re W. R. Grace & Co., et al., No. 01-01139 (JKF). In connection with its reorganization, Grace has entered into a Multi-Site Settlement Agreement with the EPA. The Site meets the requirements of an "Additional Site" under that Agreement, and, following completion of the Work required by this Order, this Site will be a "Liquidated Site" and subject to the terms and conditions pursuant to the Multi-Site Agreement.

## II. PARTIES BOUND

6. This Settlement Agreement applies to and is binding upon the EPA, and upon Respondent, Respondent's successors and assigns. Any change in ownership or corporate status of Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter Respondent's responsibilities under this Settlement Agreement.

7. Respondent shall ensure that its contractors, subcontractors, and representatives receive a copy of this Settlement Agreement and comply with this Settlement Agreement. Respondent shall be responsible for any noncompliance with this Settlement Agreement.

1

## III. DEFINITIONS

8. Unless noted to the contrary, the terms of this Settlement Agreement shall have the meaning assigned to those terms pursuant to CERCLA or any regulation promulgated under CERCLA. Whenever the terms listed below are used in this Settlement Agreement and Appendices attached hereto, the following definitions shall apply:

a. "Action Memorandum" shall mean the EPA Action Memorandum relating to the Site signed on 02/29/2012, by the Regional Administrator, EPA Region 4, or his delegate, and all attachments thereto. The "Action Memorandum" is attached as Appendix A.

b. "Asbestos Fibers" are defined as mineral fibers identified by the analytical laboratory as asbestos.

c. "Asbestos–Containing Soil" shall mean the reproducible presence of Asbestos Fibers in the soil at 0.25% asbestos or greater as determined by Method CARB 435 – 400 count.

d. "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

e. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*

f. "Day" shall mean a calendar day. In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the end of the next working day.

g. "Effective Date" shall be the effective date of this Settlement Agreement as provided in Section XXIX.

h. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

i. "Future Response Costs" shall mean direct and indirect costs that the United States incurs in connection with the Site subsequent to January 13, 2012. Past Response Costs incurred by the United States through January 13, 2012 are attached hereto as Appendix B.

j. "Hazardous Substance" shall mean any substance meeting the definition provided in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

k. "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

l.  "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, including any amendments thereto.

m.  "NCDENR" shall mean the North Carolina Department of Environment and Natural Resources.

n.  "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

o.  "Parties" shall mean the EPA and Respondent.

p.  "Past Response Costs" shall mean direct and indirect costs included in the Cost Summary (Appendix B).  Interest on past costs shall begin to accrue thirty (30) days after the Effective Date.

q.  "Plan of Reorganization" shall mean any plan of reorganization under Chapter 11 of the United States Bankruptcy Code that is confirmed and becomes effective in the Grace Bankruptcy case.

r.  "Respondent" shall mean W. R. Grace & Co.

s.  "Response Costs" shall mean direct and indirect costs that the United States incurs in reviewing or developing plans, reports and other items pursuant to this Settlement Agreement, verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Paragraph 34 (costs and attorneys fees and any monies paid to secure access, including the amount of just compensation).  "Response Costs" shall also include direct and indirect costs that the United States paid or incurred at or in connection with the Site through the Effective Date of this Settlement Agreement, plus interest if applicable.

t.  "Section" shall mean a portion of this Settlement Agreement identified by a roman numeral.

u.  "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent and all appendices attached hereto (listed in Section XXVIII).  In the event of conflict between this Administrative Settlement Agreement and Order on Consent and any appendix, this Administrative Settlement Agreement and Order on Consent shall control.

v.  "Site" shall mean the site of the former vermiculite expansion facility identified as GAO 013 or EPA Site/Spill Number B408, located at 6228 Prospect St., High Point, Randolph County, North Carolina.  Notwithstanding the Site boundaries, for purposes of this Settlement Agreement, the Site includes certain adjacent off-site areas where Asbestos-Containing Soil may be present and that may require excavation of Asbestos-Containing Soil.  A map of the Site is attached as Appendix C.

w.  "State" shall mean the State of North Carolina as represented by NCDENR.

x.  "Waste Material" shall mean: (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6903(27).

y.  "Work" shall mean all activities Respondent is required to perform under this Settlement Agreement.

3

## IV.  FINDINGS OF FACT

For the purposes of this Settlement Agreement, the EPA finds that:

9.  The Site is comprised of approximately 2.65 acres in High Point, Randolph County, North Carolina.

10.  The western portion of the Site is occupied by Southern Custom Shutters.  The remainder of the Site is grass-covered or wooded in the north, east, and south sides of the Site.  Residential properties are located along the southern border of the Site.

11.  Available information indicates that a vermiculite exfoliation plant, probably operated by Zonolite, operated on the property as early as 1955.  Grace operated the facility between 1963 and 1989.

12.  The EPA conducted a removal site evaluation at the Site in response to an initiative to investigate vermiculite exfoliation facilities that received vermiculite concentrate from the Grace vermiculite mine in Libby, Montana.  Grace shipping records indicate that 3,083 tons of vermiculite concentrate from the Grace vermiculite mine in Libby, Montana were shipped to the facility.  Most of the vermiculite expanded at the High Point, NC location came from the Enoree, SC facility and did not contain Libby amphibole asbestos.

13.  On November 30 and December 1, 2009, the EPA and the EPA's Superfund Technical Assistance and Response Team (START) contractor conducted aggressive air sampling, activity-based air sampling (ABS), and bulk material sampling at the Site.  This sampling was conducted in and near the main building on the property.

14.  On March 21, 2011, the EPA made a follow-up visit to the Site to determine if the November and December 2009 sampling event had been sufficient.  Upon arrival at the Site, the EPA and the EPA's START contractor, Tetra Tech, toured the areas of the Site where the ABS activities were conducted.  After viewing the Site, the EPA On-Scene Coordinator (OSC) concluded that the previous ABS activities adequately addressed Site conditions, except for mounds or piles located east of the main building at the Site, in the southeastern portion of the property.  These piles had been observed during the November and December 2009 sampling event, but no samples had been collected.  The piles were in a wooded area and included materials such as building debris and asphalt.  The EPA and START collected two additional bulk material samples from one of the observed piles that appeared to contain unexfoliated (unexpanded) vermiculite concentrate.

15.  The asbestos content in two samples taken from the piles was 12% and 5%.  The levels of asbestos detected in the soil at the Site, if not addressed by implementation of the Work pursuant to this Settlement Agreement, may pose an imminent and substantial threat to users of the Site if the soil is disturbed (see Action Memorandum, Appendix A).

## V.  CONCLUSIONS OF LAW AND DETERMINATIONS

16.  Based on the Findings of Fact set forth above, and the Administrative Record supporting this removal action, EPA has determined that:

    a.   The Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

4

b. The contamination found at the Site, as identified in the Findings of Fact above, include "hazardous substance(s)" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c. Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

d. Respondent is a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Respondent, Grace, was the "operator" of the Site at the time of disposal of hazardous substances at the Site, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

e. The conditions described in the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the Site as defined by Sections 101(22) of CERCLA, 42 U.S.C. § 9601(22).

f. The Work required by this Settlement Agreement is necessary to protect the public health, welfare, or the environment, and if carried out in compliance with the terms of this Settlement Agreement, will be considered consistent with the NCP as provided in 40 C.F.R. Section 300.700(c)(3)(ii) of the NCP.

## VI. ORDER

17. Based upon the foregoing Findings of Fact, Conclusions of Law and Determinations, and the Administrative Record for this Site, it is hereby ordered and agreed that Respondent shall comply with the following provisions, including but not limited to all attachments to this Settlement Agreement, and all documents incorporated by reference into this Settlement Agreement.

## VII. DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR

18. Respondent shall retain one or more contractors to perform the Work and shall notify the EPA of the name(s) and qualifications of such contractor(s) within fourteen (14) days of the Effective Date. Respondent shall also notify the EPA of the name(s) and qualification(s) of any other contractor(s) or subcontractor(s) retained to perform the Work at least fourteen (14) days prior to commencement of such Work. The EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by Respondent. If the EPA disapproves of a selected contractor, Respondent shall retain a different contractor and shall notify the EPA of that contractor's name and qualifications within fourteen (14) days of receipt of the EPA's disapproval. The proposed contractor must demonstrate compliance with ANSI/ASQC E-4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B0-1/002) or equivalent documentation as required by EPA.

19. Within fourteen (14) days after the Effective Date, Respondent shall designate a Project Coordinator who shall be responsible for administration of all actions by Respondent required by this Settlement Agreement and shall submit to the EPA the designated Project Coordinator's name, address, telephone number, and qualifications. To the greatest extent reasonably possible, the Project Coordinator shall be

5

present on Site or readily available during Site work. The EPA retains the right to disapprove of the designated Project Coordinator. If the EPA disapproves of the designated Project Coordinator, Respondent shall retain a different Project Coordinator and shall notify the EPA of that person's name, address, telephone number, and qualifications within fourteen (14) days following receipt of the EPA's disapproval. Receipt by Respondent's Project Coordinator of any notice or communication from the EPA relating to this Settlement Agreement shall constitute receipt by Respondent.

20. The EPA has designated Terry Stilman of the EPA Region 4 Emergency Response and Removal Branch as its OSC. Except as otherwise provided in this Settlement Agreement, Respondent shall direct all submissions required by this Settlement Agreement to the OSC at 61 Forsyth St., S.W., Atlanta, Georgia 30303.

21. The EPA and Respondent shall have the right, subject to the immediately preceding paragraphs, to change their designated OSC or Project Coordinator. Respondent shall notify the EPA fourteen (14) days before such a change is made. The initial notification may be orally made but it shall be promptly followed by a written notice.

## VIII.  WORK TO BE PERFORMED

22. Respondent shall perform, at a minimum, all actions reasonably necessary to implement the Action Memorandum. The actions to be implemented generally include but are not limited to, the following:

a.  Coordinate with the OSC to assess the layout of the Site and determine required Site activities, equipment, personnel, and logistics. Develop a Sampling and Analysis Plan to delineate the debris piles located on the southern, eastern, and northern portions of the site and two off-site residences adjacent to the southern property boundary. Prepare a Removal Action Work Plan that details plans for the removal and disposal of the Asbestos-Containing Soils.

b.  Excavate and remove areas of delineated Asbestos-Containing Soil. In areas with Asbestos-Containing Soil at depths greater than two (2) feet below the natural grade, place an appropriate warning barrier and cover such areas with clean soil.

c.  Erect warning signs and fencing to prevent access to areas where Asbestos-Containing Soil is present.

d.  Suppress dust and control erosion during the removal action.

e.  Monitor and sample, as necessary, personal and ambient air during the removal activities.

f.  Dispose of Asbestos-Containing Soils at an approved facility.

g.  Perform confirmatory sampling after excavation. This will consist of bulk soil sampling analyzed by CARB 435 – 400 count to demonstrate that the asbestos content of the soil is less than 0.25%. Where the asbestos content of soil samples is below 0.25%, perform activity-based sampling to demonstrate that the air samples contain less than the following site-specific risk-based clean-up goals. Two risk-based clean-up goals are established for this removal action, are measured in fibers

6

per cubic centimeter (f/cc), and will apply based on the current use of the property. The two goals are as follows:

> Industrial property:    0.01 f/cc
> Residential property:   0.001 f/cc

h. Backfill excavated areas with clean fill material, as necessary.

i. Restore disturbed areas to its pre-removal action grade to the greatest extent reasonably practicable and in a manner that prevents sediment runoff onto adjacent properties. Restoration shall be coordinated with the landowners to the extent reasonably practicable. Respondent shall not be required to accommodate unreasonable requests.

23. Upon the EPA's approval of the Work Plan, Respondent shall implement the Work Plan in accordance with the schedule of activities provided therein. Soil used for backfill shall be sampled to screen for hazardous substance contamination. A vegetative cover shall be installed to prevent the erosion of the soil backfill, where appropriate. During the response action, Respondent shall erect warning signs and fencing to prevent access to contaminated areas.

24. Work Plan and Implementation

a. Within forty-five (45) days after the Effective Date, Respondent shall submit to the EPA for approval a draft Work Plan for performing the removal action generally described in Paragraph 22 above. The draft Work Plan shall provide a description of, and an expeditious schedule for, the actions required by this Settlement Agreement. A Quality Assurance Project Plan (QAPP) will be prepared for this site. The QAPP will be prepared in accordance with "EPA Requirements for Quality Assurance Project Plans (QA/R-5)" (EPA/240/B-01/003, March 2001), and "EPA Guidance for Quality Assurance Project Plans (QA/G-5)" (EPA/240/R-02/009, December 2002).

b. The EPA may approve, disapprove, require revisions to, or modify the draft Work Plan in whole or in part. If the EPA requires revisions, Respondent shall submit a revised draft Work Plan within twenty (20) days of receipt of the EPA's notification of the required revisions. Respondent shall implement the Work Plan as approved in writing by the EPA in accordance with the schedule approved by the EPA. Once approved, or approved with modifications, the Work Plan, the schedule, and any subsequent modifications shall be incorporated into and become fully enforceable under this Settlement Agreement.

c. Respondent shall not commence any Work except in conformance with the terms of this Settlement Agreement. Respondent shall not commence implementation of the Work Plan developed hereunder until receiving written EPA approval pursuant to Paragraph 24(b).

25. Health and Safety Plan. Respondent shall submit for EPA review and comment a plan that ensures the protection of the public health and safety during performance of on-Site work under this Settlement Agreement in accordance with the schedule in the Work Plan. This plan shall be prepared in accordance with EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992). In addition, the plan shall comply with Occupational Safety and Health Administration (OSHA) regulations found at 29 C.F.R. Part 1910 and 29 C.F.R. 1926.1101 OSHA Asbestos in Construction, if applicable. If EPA

7

determines that it is appropriate, the plan shall also include contingency planning. Respondent shall incorporate all changes to the plan recommended by the EPA and shall implement the plan during the pendency of the removal action.

26. Quality Assurance and Sampling

   a.  All sampling and analyses performed pursuant to this Settlement Agreement shall conform to the EPA's direction, approval, and guidance regarding sampling, quality assurance/quality control (QA/QC), and chain of custody procedures. Respondent shall ensure that the laboratory used to perform the analyses participates in a QA/QC program that complies with the appropriate EPA guidance. Respondent shall follow, as appropriate, "Quality Assurance/Quality Control Guidance for Removal Activities: Sampling QA/QC Plan and Data Validation Procedures" (OSWER Directive No. 9360.4-01, April 1, 1990), as guidance for QA/QC and sampling. Respondent shall only use laboratories that have a documented Quality System that complies with ANSI/ASQC E-4 1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1994), "EPA Requirements for Quality Management Plans" (QA/R-2) (EPA/240/B-01/002, March 2001), and the U.S. EPA Region 4 Environmental Investigations Standard Operating Procedures and Quality Assurance Manual (November 2001), or equivalent documentation as determined by the EPA. The EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program (NELAP) as meeting the Quality System requirements.

   b.  Upon request by the EPA, Respondent shall have such a laboratory analyze samples submitted by EPA for QA monitoring. Respondent shall provide to the EPA the QA/QC procedures followed by all sampling teams and laboratories performing data collection and/or analysis.

   c.  Upon request by the EPA, Respondent shall allow the EPA or its authorized representatives to take split and/or duplicate samples. Respondent shall notify the EPA not less than ten (10) days in advance of any sample collection activity, unless shorter notice is agreed to by the EPA. The EPA shall have the right to take any additional samples that the EPA deems necessary. Upon request, the EPA shall allow Respondent to take split or duplicate samples of any samples it takes as part of its oversight of Respondent's implementation of the Work.

27. Post-Removal Site Control. In accordance with the Work Plan schedule, or as otherwise directed by the EPA, in the event that Asbestos-Containing Soil remains on the Site at the conclusion of the response, Respondent shall, in cooperation with the Owner, submit a proposal for post-removal Site control consistent with Section 300.415(l) of the National Contingency Plan (NCP) and OSWER Directive 9360.2-02. Upon the EPA's approval, Respondent shall implement such controls and shall provide the EPA with documentation of all post-removal Site control arrangements.

28. Reporting

   a.  Respondent shall submit a written progress report to the EPA concerning actions undertaken pursuant to this Settlement Agreement every two (2) weeks after the date of receipt of the EPA's approval of the Work Plan until termination of this Settlement Agreement, unless otherwise directed by the OSC in writing. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data

8

received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

b. Respondent shall submit all plans, reports, or other submissions required by this Settlement Agreement, or any approved work plan in electronic format. Upon request by the EPA, Respondent shall submit paper copies.

29. **Final Report.** Within sixty (60) days after completion of all removal actions required under this Settlement Agreement, the Respondent shall submit for the EPA's review and approval a final report summarizing the actions taken to comply with this Settlement Agreement. The final report shall conform, at a minimum, with the requirements set forth in 40 C.F.R. Section 300.165 of the NCP entitled "OSC Reports." The final report shall include a good faith estimate of total costs or a statement of actual costs incurred in complying with the Settlement Agreement, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination of those materials, a presentation of the analytical results of sampling and analyses performed, and accompanying appendices containing relevant documentation generated during the removal action (*e.g.,* manifests, invoices, bills, contracts, and permits). The final report shall also include the following certification signed by a person who supervised or directed the preparation of that report:

> Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of the report, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

30. **Off-Site Shipments**

a. Respondent shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to the OSC. However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed ten (10) cubic yards.

i. Respondent shall include in the written notification the following information: (1) the name and location of the facility to which the Waste Material is to be shipped; (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Respondent shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

ii. The identity of the receiving facility and state will be determined by Respondent following the award of the contract for the removal action. Respondent shall provide the information required by Paragraph 30(a) and 30(b) as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

b. Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-Site location, Respondent shall obtain the EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondent shall only send hazardous substances, pollutants, or contaminants from the Site to an off-Site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

## IX.  SITE ACCESS

31.  Where any action under this Settlement Agreement is to be performed in areas owned by or in possession of someone other than Respondent, Respondent shall use its best efforts to obtain all necessary access agreements within thirty (30) days after the Effective Date, or as otherwise specified in writing by the OSC. Respondent shall immediately notify the EPA if after using its best efforts it is unable to obtain such agreements.

32. If the EPA determines that to implement this Settlement Agreement, land and/or water use restrictions are needed on property owned or controlled by persons other than Respondent, Respondent shall use best efforts to secure from such persons an agreement, enforceable by Respondent, the EPA, and NCDENR, to refrain from using the Site, or such other property, in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the removal measures to be performed pursuant to this Settlement Agreement.

33. If directed by the EPA, Respondent in cooperation with Owner, shall execute and record the easement, or land/water use restrictions in the Randolph County land records office, as an easement, running with the land, that grants the right to enforce the land/water use restrictions, or other restrictions that the EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the removal measures to be performed pursuant to this Settlement Agreement. The rights to enforce land/water use restrictions shall be granted to: (i) the EPA and its representatives; (ii) the State and its representatives; and/or (iii) other appropriate grantees.

34. If any access or land/water use restriction agreements are not obtained within sixty (60) days of the date of the EPA's request for such a restriction, Respondent shall promptly notify the EPA in writing, and shall include in that notification a summary of the steps that Respondent has taken to attempt to comply with this Settlement Agreement. The EPA may, as it deems appropriate, assist Respondent in obtaining land/water use restrictions, either in the form of contractual agreements or in the form of easements running with the land, or in obtaining the release or subordination of a prior lien or encumbrance. Respondent shall reimburse the EPA in accordance with the procedures in Section XV (Payment of Response Costs) for direct or indirect costs incurred by the EPA in obtaining such land/water use restrictions including, but not limited to, the cost of attorney time and the amount of monetary consideration paid or just compensation.

35. Notwithstanding any provision of this Settlement Agreement, the EPA retains all of its access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## X.  ACCESS TO INFORMATION

36.  Respondent shall provide to the EPA and NCDENR, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Settlement Agreement, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work.  Respondent shall also make available to the EPA and NCDENR, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

37.  Respondent may assert business confidentiality claims covering part or all of the documents or information submitted to the EPA and NCDENR under this Settlement Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b).  Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If no claim of confidentiality accompanies documents or information when they are submitted to the EPA, and NCDENR, or if the EPA has notified Respondent that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondent.

38.  Respondent may assert that certain documents, records and other information are privileged under the attorney-client, attorney work product, or any other privilege recognized by federal law.  If the Respondent asserts such a privilege in lieu of providing documents, it shall provide EPA and NCDENR with the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document, record, or information; and (6) the privilege asserted by Respondent.  However, no documents, reports or other information created or generated as required to be submitted to EPA by this Settlement Agreement shall be withheld on the grounds that they are privileged.

39.  No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

## XI.  RECORD RETENTION

40.  Until ten (10) years after Respondent's receipt of the EPA's notification pursuant to Section XXVII (Notice of Completion of Work), Respondent shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary.  Until ten (10) years after Respondent's receipt of the EPA's notification pursuant to Section XXVII (Notice of Completion of Work), Respondent shall also instruct its contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

41. At the conclusion of this document retention period, Respondent shall notify the EPA, and NCDENR, at least ninety (90) days prior to the destruction of any such records or documents, and, upon request by the EPA, or NCDENR, Respondent shall deliver any such records or documents to the EPA or NCDENR. Respondent may assert that certain documents, records and other information are privileged under the attorney-client, attorney work product, or any other privilege recognized by federal law. If Respondent asserts such a privilege, it shall provide the EPA or NCDENR with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Respondent. However, no documents, reports or other information created or generated as required by this Settlement Agreement shall be withheld on the grounds that they are privileged.

42. Respondent hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the EPA or the State or the filing of suit against it regarding the Site and that it has fully complied with any and all of the EPA's requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XII.  COMPLIANCE WITH OTHER LAWS

43. Respondent shall perform all actions required pursuant to this Settlement Agreement in accordance with all applicable local, state, and federal laws and regulations except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 6921(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j).  In accordance with 40 C.F.R. § 300.415(j), all on-Site actions required pursuant to this Settlement Agreement shall, to the extent reasonably practicable, as determined by the EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements (ARARs) under federal environmental or state environmental or facility siting laws.  Respondent shall identify ARARs in the Work Plan subject to the EPA's approval.

## XIII. EMERGENCY RESPONSE AND NOTIFICATION RELEASES

44. In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondent shall immediately take all appropriate action. Respondent shall take these actions in accordance with all applicable provisions of this Settlement Agreement, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondent shall also immediately notify the OSC at 404-562-8322 or, in the event of his/her unavailability, shall notify the Regional Duty Officer, Emergency Response and Removal Branch, EPA Region 4 at 404-562-8700 of the incident or Site conditions. In the event that Respondent fails to take appropriate response action as required by this Paragraph, and the EPA takes such action instead, Respondent shall reimburse the EPA of all costs of the response action not inconsistent with the NCP pursuant to Section XV (Payment of Response Costs).

12

45. In addition, in the event of any release of a hazardous substance from the Site, Respondent shall immediately notify the OSC at 404-562-8322 and the National Response Center at (800) 424-8802. Respondent shall submit a written report to the EPA within seven (7) days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq.*

## XIV.  AUTHORITY OF THE EPA ON-SCENE COORDINATOR

46. The OSC shall be responsible for overseeing the Respondent's implementation of this Settlement Agreement. The OSC shall have the authority vested in an OSC by the NCP, including the authority to halt, conduct, or direct any Work required by this Settlement Agreement, or to direct any other removal action undertaken at the Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless specifically directed by the OSC.

## XV.  PAYMENT OF RESPONSE COSTS

47. Payments for Response Costs

a. Respondent shall pay the EPA Response Costs not inconsistent with the NCP. On a periodic basis, the EPA will send Respondent a bill requiring payment that includes a cost summary. Respondent shall make all payments within thirty (30) days of receipt of each bill requiring payment, except as otherwise provided in Paragraph 48 or Section XVI (Dispute Resolution) of this Settlement Agreement.

b. Respondent shall make all payments required by this Paragraph by check(s) made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party making payment and EPA Site/Spill Number B408. Respondent shall send the check(s) to:

> US Environmental Protection Agency
> Superfund Payments-Region 4
> Cincinnati Finance Center
> P.O. Box 979076
> St. Louis, MO 63197-9000

c. At the time of payment, Respondent shall send notice that payment has been made to the OSC Terry Stilman, and Ms. Paula Painter, U.S. EPA Region 4, 61 Forsyth St., S.W., Atlanta, GA 30303.

d. The total amount to be paid by Respondent pursuant to Paragraph 47(a) shall be deposited in the EPA Hazardous Substance Superfund.

48. Subject to Paragraph 88, in the event that the payment for Response Costs is not made within thirty (30) days after the effective date of the Plan of Reorganization, (as defined in the Plan of Reorganization) or the payment of Future Response Costs is not made within thirty (30) days of Respondent's receipt of a bill, Respondent shall pay Interest on the unpaid balance. The Interest on Past

13

Response Costs shall begin to accrue thirty (30) days after the Effective Date and shall continue to accrue until the date of payment. The interest on Future Response Costs shall begin to accrue thirty (30) days after the date of the bill and shall continue to accrue until the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondent's failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Section XVIII.

49. Respondent may dispute all or part of a bill for Response Costs submitted under this Settlement Agreement, if Respondent alleges that the EPA has made an accounting error, or if Respondent alleges that a cost item is inconsistent with the NCP. If any dispute over costs is resolved before payment is due, the amount due will be adjusted as necessary. If the dispute is not resolved before payment is due, Respondent shall pay the full amount of the uncontested costs to EPA as specified in Paragraph 47 on or before the due date. Within the same time period, Respondent shall pay the full amount of the contested costs into an interest-bearing escrow account. Respondent shall simultaneously transmit a copy of both checks to the persons listed in Paragraph 47(c) above. Respondent shall ensure that the prevailing party or parties in the dispute shall receive the amount upon which they prevailed from the escrow funds plus interest within ten (10) days after the dispute is resolved.

50. Effective upon the execution of this Agreement by a Settling Party, such Settling Party agrees that the time period after the date of its execution shall not be included in computing the running of any statute of limitations potentially applicable to any action brought by the United States related to the "matters addressed" as defined in Paragraph 75 of this Agreement, and that, in any action brought by the United States related to the "matters addressed" as defined in Paragraph 75 of this Agreement, the Settling Party will not assert, and may not maintain, any defense or claim based upon principles of statute of limitations, waiver, laches, estoppel, or other defense based on the passage of time after its execution of this Agreement. If the EPA gives notice to a Settling Party that it will not make this Agreement effective, the statute of limitations shall begin to run again commencing ninety (90) days after the date such notice is sent by the EPA.

## XVI. DISPUTE RESOLUTION

51. Unless otherwise expressly provided for in this Settlement Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement. The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally.

52. If Respondent objects to any EPA action taken pursuant to this Settlement Agreement, including billings for Response Costs, it shall notify EPA in writing of the objection within fourteen (14) days of receipt or notice of such action, unless the objection has been resolved informally. EPA and Respondent shall have fourteen (14) days from EPA's receipt of Respondent's written objection to resolve the dispute through formal negotiations (the Negotiation Period), which may include exchange of written statements upon request from one Party to another. The Negotiation Period may be extended at the sole discretion of EPA.

53. Any agreement reached by the parties pursuant to this Section shall be in writing and shall, upon signature by both parties, be incorporated into and become an enforceable part of this Settlement Agreement. If the Parties are unable to reach an agreement within the Negotiation Period, the EPA

14

Region 4 Superfund Division Director will issue a written decision on the dispute to Respondent. The EPA's decision shall be incorporated into and become an enforceable part of this Settlement Agreement. Respondent's obligations under this Settlement Agreement shall not be tolled by submission of any objection for dispute resolution under this Section. Following resolution of the dispute, as provided by this Section, Respondent shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with the EPA's decision, whichever occurs.

## XVII. FORCE MAJEURE

54. Respondent agrees to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed or prevented by a force majeure. For purposes of this Settlement Agreement, a force majeure is defined as any event arising from causes beyond the control of Respondent, or of any entity controlled by Respondent, including but not limited to its contractors and subcontractors, which delays or prevents performance of any obligation under this Settlement Agreement despite Respondent's best efforts to fulfill the obligation. Force majeure does not include financial inability to complete the Work, or increased cost of performance, or a failure to attain performance standards/action levels set forth in the Action Memorandum.

55. If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement, whether or not caused by a force majeure event, Respondent shall notify the EPA orally within forty-eight (48) hours of when Respondent knew that the event might cause a delay. Within fourteen (14) days thereafter, Respondent shall provide to the EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondent's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Respondent, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall preclude Respondent from asserting any claim of force majeure for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

56. If the EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Settlement Agreement that are affected by the force majeure event will be extended by the EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. If the EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the EPA will notify Respondent in writing of its decision. If the EPA agrees that the delay is attributable to a force majeure event, the EPA will notify Respondent in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

## XVIII. STIPULATED PENALTIES

57. Respondent shall be liable to the EPA for stipulated penalties in the amounts set forth in Paragraph 58 for failure to comply with the requirements of this Settlement Agreement specified below, unless excused under Section XVII (Force Majeure). "Compliance" by Respondent shall include completion of the activities under this Settlement Agreement or any work plan or other plan approved under this

15

Settlement Agreement identified below in accordance with all applicable requirements of law, this Settlement Agreement, and any plans or other documents approved by the EPA pursuant to this Settlement Agreement and within the specified time schedules established by and approved under this Settlement Agreement.

58.   Stipulated Penalty Amounts.  For each day, or portion thereof, that Respondent fails to perform any requirement of this Settlement Agreement in accordance with the schedule established pursuant to this Settlement Agreement after receipt of written notice from the EPA of such non-compliance, Respondent shall be liable as follows:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $250 |
| 15th through 30th day | $500 |
| 31st day and beyond | $750 |

59.   All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue:

  (1) with respect to a deficient submission under Section VIII (Work to be Performed), during the period, if any, beginning on the 31st day after the EPA's receipt of such submission until the date that the EPA notifies Respondent of any deficiency; and (2) with respect to a decision by the Region 4 Superfund Division Director, under Paragraph 53 of Section XVI (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the EPA Superfund Division Director issues a final decision regarding such dispute.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

60.   Following the EPA's determination that Respondent failed to comply with a requirement of this Settlement Agreement, the EPA may give Respondent written notification of the failure and describe the noncompliance.  The EPA may send Respondent a written demand for payment of the penalties.  However, penalties shall accrue as provided in the preceding Paragraph regardless of whether the EPA has notified Respondent of a violation.

61.   All penalties accruing under this Section shall be due and payable to the EPA within thirty (30) days of Respondent's receipt from EPA of a demand for payment of the penalties, unless Respondent invokes the dispute resolution procedures under Section XVI (Dispute Resolution).  All payments to the EPA under this Section shall be paid by check(s) made payable to "EPA Hazardous Substances Superfund," shall be mailed to EPA Superfund, U.S. EPA, Region 4, Superfund Accounting, P.O. Box 100142, Atlanta, Georgia 30384, Attn: Collection Officer for Superfund, shall indicate that the payment is for stipulated penalties, and shall reference the EPA Region and Site/Spill ID Number B408, the EPA Docket Number _____, and the name and address of the party making payment.  Copies of check(s) paid pursuant to this Section and any accompanying transmittal letter(s) shall be sent to the EPA as provided in Paragraph 47(c), and to Paula Painter, U.S. EPA Region 4, 61 Forsyth St., SW, Atlanta, GA, 30303.

62. The payment of penalties shall not alter in any way Respondent's obligation to complete performance of the Work required under this Settlement Agreement.

63. Penalties shall continue to accrue during any dispute resolution period, but need not be paid until fifteen (15) days after the dispute is resolved by agreement or by receipt of the EPA's decision.

64. If Respondent fails to pay stipulated penalties when due, the EPA may institute proceedings to collect the penalties, as well as Interest. Respondent shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 58. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of the EPA to seek any other remedies or sanctions available by virtue of Respondent's violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(l) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(l), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that the EPA shall not seek civil penalties pursuant to Section 106(b) or 122(l) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Settlement Agreement. Notwithstanding any other provision of this Section, the EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.

## XIX. COVENANT NOT TO SUE BY EPA

65. In consideration of the actions that will be performed and the payments that will be made by Respondent under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, the EPA covenants not to sue or to take administrative action against Respondent pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work and Response Costs. This covenant not to sue shall take effect upon receipt by the EPA of the Response Costs due under Section XV of this Settlement Agreement and any Interest or Stipulated Penalties due for failure to pay Response Costs as required by Sections XV and XVIII of this Settlement Agreement. This covenant not to sue is conditioned upon the complete and satisfactory performance by Respondent of its obligations under this Settlement Agreement, including, but not limited to, payment of Response Costs pursuant to Section XV. This covenant not to sue extends only to Respondent, its affiliates, subsidiaries and successors, and does not extend to any other person.

## XX. RESERVATION OF RIGHTS BY EPA

66. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of the EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing herein shall prevent the EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law.

17

67. The covenant not to sue set forth in Section XIX above does not pertain to any matters other than those expressly identified therein. The EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Respondent with respect to all other matters, including, but not limited to:

    a.    claims based on a failure by Respondent to meet a requirement of this Settlement Agreement;

    b.    liability for costs not included within the definition of Response Costs;

    c.    liability for performance of response action other than the Work;

    d.    criminal liability;

    e.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

    f.    liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

    g.    liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site pursuant to terms of the Multi-Site Agreement.

68. **Work Takeover.** In the event the EPA determines that Respondent has ceased implementation of any portion of the Work, is seriously or repeatedly deficient or late in its performance of the Work, or is implementing the Work in a manner which may cause an endangerment to human health or the environment, the EPA may assume the performance of all or any portion of the Work as the EPA determines necessary. Respondent may invoke the procedures set forth in Section XVI (Dispute Resolution) to dispute the EPA's determination that takeover of the Work is warranted under this Paragraph. Costs incurred by the United States in performing the Work pursuant to this Paragraph shall be considered Response Costs that Respondent shall pay pursuant to Section XV (Payment of Response Costs). Notwithstanding any other provision of this Settlement Agreement, the EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXI. COVENANT NOT TO SUE BY RESPONDENT

69. Respondent covenants not to sue and agrees not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Response Costs, or this Settlement Agreement, including, but not limited to:

    a.    any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

    b.    any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the North Carolina Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

    c.  any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Site.

70.  Except as provided in Paragraph 67, these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 67(b), (c), and (e) - (g), but only to the extent that Respondent's claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

71.  Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

## XXII.  OTHER CLAIMS

72.  By issuance of this Settlement Agreement, the United States and the EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. The United States or the EPA shall not be deemed a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Settlement Agreement.

73.  Except as expressly provided in Section XIX and Section XXI, nothing in this Settlement Agreement constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

74.  No action or decision by the EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXIII.  CONTRIBUTION

75.  The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C.§ 9613(f)(2), and that Respondent, its affiliates, subsidiaries and successors are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for matters addressed in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are the Work, Past Response Costs, and Future Response Costs.

76.  The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(3)(B) of CERCLA, 42 U.S.C.·§ 9613(f)(3)(B), pursuant to which Respondent, its affiliates, subsidiaries and successors have, as of the Effective Date, resolved their liability to the United States for the Work, Past Response Costs, and Future Response Costs.

77.  Except as provided in Section XIX (Covenant not to Sue by EPA) and in Section XXI (Covenant not to Sue by Respondent), nothing in this Settlement Agreement precludes the United States or Respondents from asserting any claims, causes of action, or demands for indemnification, contribution, or cost recovery against any persons not parties to this Settlement Agreement.  Nothing herein

19

diminishes the right of the United States, pursuant to Sections 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

## XXIV. INDEMNIFICATION

78.  Respondent shall indemnify, save, and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Respondent, its officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition, Respondent agrees to pay the United States all costs incurred by the United States, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Respondent, its officers, directors, employees, agents, contractors, subcontractors and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondent in carrying out activities pursuant to this Settlement Agreement. Neither Respondent nor any such contractor shall be considered an agent of the United States.

79.  The United States shall give Respondent notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondent prior to settling such claim.

80.  Respondent waives all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Respondent shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

## XXV. INSURANCE

81.  At least seven (7) days prior to commencing any on-Site work under this Settlement Agreement, Respondent or its contractor or subcontractor shall secure, and shall maintain for the duration of this Settlement Agreement, comprehensive general liability insurance and automobile insurance with limits of one (1) million dollars, combined single limit. Within the same time period, Respondent shall provide EPA with certificates of such insurance and a copy of each insurance policy. In addition, for the duration of the Settlement Agreement, Respondent shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondent in furtherance of this Settlement Agreement. If Respondent demonstrates by evidence satisfactory to the EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Respondent need provide

20

only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## XXVI. MODIFICATIONS

82. The OSC may make modifications to any plan or schedule in writing or by oral direction. Any oral modification will be memorialized in writing by the EPA promptly, but shall have as its effective date the date of the OSC's oral direction. Any other requirements of this Settlement Agreement may be modified in writing by mutual agreement of the parties.

83. If Respondent seeks permission to deviate from any approved work plan or schedule, Respondent's Project Coordinator shall submit a written request to the EPA for approval outlining the proposed modification and its basis. Respondent may not proceed with the requested deviation until receiving oral or written approval from the OSC pursuant to Paragraph 82.

84. No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondent shall relieve Respondent of its obligation to obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXVII. NOTICE OF COMPLETION OF WORK

85. When the EPA determines, after the EPA's review of the Final Report, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, the EPA will provide written notice to Respondent. If the EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, the EPA will notify Respondent, provide a list of the deficiencies, and require that Respondent modify the Work Plan if appropriate in order to correct such deficiencies. Respondent shall implement the modified and approved Work Plan and shall submit a modified Final Report in accordance with the EPA notice. Failure by Respondent to implement the approved modified Work Plan shall be a violation of this Settlement Agreement.

## XXVIII. SEVERABILITY/INTEGRATION/APPENDICES

86. If a court issues an order that invalidates any provision of this Settlement Agreement or finds that Respondent has sufficient cause not to comply with one or more provisions of this Settlement Agreement, Respondent shall remain bound to comply with all provisions of this Settlement Agreement not invalidated or determined to be subject to a sufficient cause defense by the court's order.

87. This Settlement Agreement and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement Agreement. The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The following appendices are attached to and incorporated into this Settlement Agreement: (A) Action Memorandum; (B) Cost Summary; and (C) Map of Site.

21

## XXIX.  EFFECTIVE DATE

88.  Grace has filed a petition for reorganization under Chapter 11 of the U. S. Bankruptcy Code.  On January 31, 2011, the Bankruptcy Court entered an Order confirming Grace's Chapter 11 Plan of Reorganization.  On January 31, 2012, the U.S. District Court for the District of Delaware entered its order affirming the Confirmation Order.  In order to receive authority to carry out its obligations under this Settlement Agreement including, but not limited to, carrying out the Work to be performed, and paying the EPA's Response Costs, Grace shall file a motion for approval of this Settlement Agreement with the Bankruptcy Court within fourteen (14) days after the signature by all Parties in order to obtain permission to perform its obligations under the Settlement Agreement and to allow as an unsecured, Pre-petition, non-priority claim against Grace's Chapter 11 estate the EPA's Response Costs.  The allowed payment of EPA's Response Costs and any other payments due under or made pursuant to this Settlement Agreement shall be made pursuant to and in accordance with the date specified in Grace's confirmed Plan of Reorganization for the payment of allowed claims.  This Settlement Agreement shall not be effective and binding on Grace unless and until the Bankruptcy Court enters an Order approving this Settlement Agreement.

89.  The Effective Date of this Settlement Agreement shall be the date the Bankruptcy Court enters an Order approving this Settlement Agreement.

The undersigned representative of Respondent certifies that they are fully authorized to enter into the terms and conditions of this Settlement Agreement and to bind the party they represent to this document.


Agreed this 15 day of March, 2012.

For Respondent, W. R. Grace & Co.


By: _____
Karen E. Ethier
Vice President, Global Environment Health and Safety



It is so ORDERED and Agreed this 14 day of March, 2012.

By: _____
Shane Hitchcock, Chief
Emergency Response and Removal Branch
Region 4
U.S. Environmental Protection Agency


EFFECTIVE DATE: _____

22

**Appendix A**

**Action Memorandum**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

FEB 2 9 2012

## ENFORCEMENT ACTION MEMORANDUM

**SUBJECT:**  Request for a Removal Action at the High Point Vermiculite Site – GAO 013
6228 Prospect Street, High Point, Randolph County, North Carolina 27263

**FROM:**  Terry Stilman, On-Scene Coordinator
Emergency Response and Removal Branch

**THRU:**  Shane Hitchcock, Chief
Emergency Response and Removal Branch

**TO:**  Franklin E. Hill, Director
Superfund Division

## I.    PURPOSE

The purpose of this Action Memorandum is to request and document approval of the proposed enforcement-lead time-critical removal action described herein for the High Point Vermiculite Site – GAO 013 (the Site) located in High Point, Randolph County, North Carolina. The release of a hazardous substance at the Site poses a threat to public health and the environment pursuant to Section 104 (a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) that meets the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) section 300.415(b) criteria for removal actions.

As a result of Site conditions, CERCLA removal actions are necessary. W.R. Grace is the former operator of the Site. This removal action is anticipated to be enforcement-lead pursuant to an Administrative Order on Consent (AOC) with W.R. Grace.

## II.    SITE CONDITIONS AND BACKGROUND

CERCLIS ID:        NCN000410400
Site ID Number:    B408
Removal Category:  Time-Critical Removal

### A.    Site Description

The Site is located at 6228 Prospect Street, High Point, Randolph County, North Carolina 27263. Vermiculite ore was reportedly processed at the Site. Currently the Site is occupied by an existing business, Southern Custom Shutters, operating within the main building. Southern Custom Shutters manufactures wood products at this Site. The Site consists of one large (main) building, one or more smaller out-buildings, and a vermiculite waste pile at the back of the Site.

1

The Site is partially paved. The remainder of the Site is grass-covered, and wooded sections occupy the northern, eastern, and southern margins of the Site property. A gravel driveway connects the western entrance area of the property to the rear portion to the east.

A removal site evaluation (RSE) has been conducted at the Site by the U.S. Environmental Protection Agency in response to an agency-wide initiative to investigate vermiculite facilities that received vermiculite ore from the W.R. Grace vermiculite mine in Libby, Montana. The Site, also referenced as GAO 013, was the former location of a vermiculite expansion (or exfoliation) plant. According to W.R. Grace and other sources, W.R. Grace leased the property from Ervin R. Davis to operate an expansion plant from 1955 until 1989. W.R. Grace shipping records indicate 3,083 tons of vermiculite concentrate from the W.R. Grace vermiculite mine in Libby, Montana were shipped to the GAO 013 Site in Highpoint, Randolph County, North Carolina.

## 1.  Removal Site Evaluation

On November 30 and December 1, 2009, the EPA and the EPA's Superfund Technical Assessment and Response Team (START) contractor conducted aggressive air sampling, activity-based sampling (ABS), and bulk material sampling at the GAO 013 Site. A follow-up site visit was also conducted on March 21, 2011, during which additional bulk samples were collected. The objective of the field effort was to evaluate potential human exposure risk from disturbance of materials potentially contaminated with asbestos. ABS was conducted to evaluate human exposure potential to asbestos released to the air during activities that may take place at the Site such as raking and sweeping. Sampling at the Site occurred during or in association with the various disturbance-type activities and included collection of the following types of samples: indoor aggressive air samples, ABS air samples and bulk material samples. Air sampling at the Site included collection of background and quality control air samples. Bulk material samples were collected initially in association with the ABS rounds and in one other selected locations based on historical information.

Air sampling was conducted inside the main building at the GAO 013 site on November 30, 2009. Nine sets of collocated high flow rate and low flow rate air samples and a field duplicate sample were placed inside the building. One outdoor, perimeter downwind air sample was also set up at a location downwind of the main building during air sampling. Of the 11 indoor air samples that were analyzed, the results for nine of the samples show nondetects for all Phase Contrast Microscopy Equivalent (PCME) structures. The results for the remaining two samples show positive PCME results and included Libby amphibole, but the maximum detected concentration within the building was below the OSHA Permissible Exposure Limit for occupational standards.

Two rounds of outdoor ABS air sampling were conducted at the Site on December 1, 2009. One round involved raking as the activity, and the other round involved a combination of both raking and sweeping. Each round of ABS air sampling was conducted for a period of 120 minutes. A composite soil sample was collected in each of the ABS areas. An additional bulk material sample was collected on December 1, 2009, from a location within what may have been a former railroad spur adjacent to the northern side of the main building at the Site. The results for Round 1, raking, were reported as follows; the two ABS backpack air samples that were analyzed show

2

nondetects for all PCME structures listed. The results for all five of the ABS perimeter upwind and downwind air samples that were analyzed show nondetects for all PCME structures listed. The results for the bulk material sample were nondetect for asbestos. The results for Round 2, raking and sweeping, were reported as follows; the ABS air sample analyzed show nondetects for all PCME structures listed, of the four ABS perimeter upwind and downwind air samples that were analyzed. The results for the one air sample designated as upwind and for two of the air samples designated as downwind show nondetects for all PCME structures listed. The results for the one remaining ABS perimeter downwind air sample that was analyzed showed positive PCME results for total asbestos (9.7E-04 s/cc), total amphibole (9.7E-04 s/cc), and actinolite (9.7E-04 s/cc). The results for the bulk material sample indicate that asbestos was not detected.

One additional bulk material sample was collected on December 1, 2009, from a location within what may have been a former railroad spur adjacent to the northern side of the main building at the Site. The results for the additional bulk material sample indicate that asbestos was not detected.

A follow-up site visit by the EPA and START was made on March 21, 2011, with the purpose of inspecting the GAO 013 Site to determine if the November and December 2009 sampling event had adequately characterized all areas at the Site. After viewing the Site, the EPA On-Scene Coordinator (OSC) concluded that the activities of the November and December 2009 sampling event adequately addressed site conditions, with the exception of mounds or piles located east of the main building and on the southeastern portion of the Site property. The piles were in a wooded area and included materials such as building debris and asphalt. START collected two additional bulk material samples from one of the observed piles located along the southeastern property line. During sampling, the visible presence of vermiculite was found. The analytical results for the two bulk material samples collected in March 2011 show that asbestos was detected. The results for the two samples analyzed indicate that 12 percent asbestos, identified as tremolite, was detected in one and indicate that 5 percent asbestos, identified as tremolite, was detected in the second.

## 2. Physical Location

The Site is located at 6228 Prospect Street, High Point, Randolph County, North Carolina 27263. The geographic coordinates for the Site are latitude 35.914828 degrees north and longitude 80.029737 degrees west. The Site is located about three miles south-southwest of downtown High Point, Randolph County, North Carolina, in a mostly developed urban area of mixed industrial, commercial, and residential use. The Site is currently unfenced, and residential areas exist nearby. The nearest residence borders the Site property to the south. The Site is bordered to the north by on/off ramps accessing U.S. highway 70 and interstate highway business I-85; to the east the Site is bordered by a mostly undeveloped and wooded area. The nearest church is located less than 1,000 feet west-northwest of the Site, and the nearest school, Childcare Network, is located about a mile southwest of the Site. According to 2000 U.S. Census Population and Housing Summary data the Site is located in a low income area.

The Site consists of one large (main) building, one smaller out-building and the parcel is partially paved with the remainder of the Site grass-covered wooded. A gravel driveway

3

connects the western entrance area of the property to the rear portion to the east. What may have been a former railroad spur runs along the northern perimeter of the Site's main building. The main building has an open porch or loading dock at its west end; the interior of the building is partitioned into offices, production areas, and storage areas, and includes two loft spaces.

### 3. Site Characteristics

The Site occupies approximately 2.65 acres; the former expansion building is still on-site and is occupied by a wood products manufacturer. The western end of the property is located along Prospect Street and serves as the Site entrance, parking lot and gravel drive. The east end of the property has been filled to make the property level and making the eastern end of the property elevated above the surrounding properties. There are berms or piles of soil and building debris lining the southeastern and eastern property bounds. Vermiculite and asbestos have been detected in the piles. The Site is not fenced and trees and vegetation cover the soil and debris piles. Two bulk soil samples were collected from one pile located on the southeast section of the Site. The results for the two samples analyzed indicate that 12 percent asbestos and 5 percent asbestos identified as tremolite was detected. Two residential properties are adjacent to the soil piles where bulk samples were collected.

Figures showing the Site Location and Layout and an Additional Bulk Sampling figure are included in Attachments 2. Attachment 3 includes photographs of the soil piles and bulk materials collected during the Site visit conducted on March 21, 2011.

Based on information from the EPA and W.R. Grace files, the Site is the location of a former vermiculite processing plant that operated between 1955 and 1989. W.R. Grace shipping records indicate that 3,083 tons of vermiculite concentrate from the W.R. Grace vermiculite mine in Libby, Montana were shipped to the GAO 013 site in High Point, Randolph County, North Carolina.

### 4. Release or threatened release into the environment of a hazardous substance, or pollutant or contaminant

Asbestos is a hazardous substance as defined by CERCLA 101 (14) and listed in the Title 40 of the Code of Federal Regulations (CFR), Section 302.4. There has been a release of asbestos at the Site.

The EPA's Framework for Investigating Asbestos-Contaminated Superfund Sites (EPA 2008) provides a step-wise process for evaluating risks associated with asbestos. GAO 013, High Point, Randolph County, North Carolina is known to have used vermiculite concentrate from Libby, Montana. The vermiculite concentrate is known to be contaminated with a distinct form of asbestos. Though air samples collected during the Site investigation contain traces of asbestos, they are not considered to exceed applicable screening levels, but the identification of the "Libby amphibole" form of asbestos in two bulk soil samples at levels of 12 percent and 5 percent pose a potential health risk. The samples were collected from a soil pile located on the southern boundary of the property which is located adjacent to residential properties. Identification of the Libby amphibole in environmental samples and the visual presence of vermiculite beneath the land surface in the debris piles is evidence that a release has occurred.

4

### 5.  National Priorities List (NPL) Status

The Site is not on the NPL, and it is unlikely to be placed on the NPL in the future.

### 6.  Maps, pictures, and other graphic representations

Figures and photographs are attached to this Action Memorandum.

## B.  Other Actions to Date

### 1.  Previous Actions

Prior to Southern Custom Shutters beginning their manufacturing process, file material indicates that the EPA conducted a Site sampling inspection at the Site on December 12, 2000, and a private party demolition and clean-up of the vermiculite plant manufacturing equipment was conducted at the Site.

Other than the activities mentioned above, no other government or private actions have been taken to investigate or mitigate the threats posed by the Site.

### 2.  Current Actions

There are no current actions being taken by any party to address the threats posed by the Site.

## C.  State and Local Authorities' Role

### 1.  State and Local Actions to Date

The EPA continues to coordinate activities with the State of North Carolina Department of Environment and Natural Resources (NCDENR). NCDENR leads oversight and coordination at mining Sites, while the EPA has the lead for vermiculite processing facilities associated with the Libby, Montana mine. NCDENR personnel continue to assist the EPA with the ongoing investigation of the Site.

### 2.  Potential for Continued State and Local Response

It is not anticipated that NCDENR will perform any further response activities at the Site. The Emergency Response and Removal Branch (ERRB) will continue to coordinate with state and local agencies during the removal activities.

## III.  THREATS TO PUBLIC HEALTH OR WELFARE OR THE ENVIRONMENT, AND STATUTORY AND REGULATORY AUTHORITIES

### A.  Threats to Public Health or Welfare

Asbestos present in Site soils pose the following threats to public health or welfare as listed in Section 300.415 (b)(2) of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP):

***Section 300.415 (b)(2)(i) Actual or potential exposure to nearby human populations, or the food chain from hazardous substances pollutants or contaminants;*** A review of the EPA analytical data and the Human Health Risk Assessment for the Vermiculite Exfoliation Plant GAO 013, High Point, North Carolina (September 2011) was conducted by the EPA's Technical Service Section (TSS). Even though ABS air samples were not collected in the area of the soil piles, the two soil samples analytical results were determined to contain asbestos at high levels – 12 percent asbestos identified as tremolite and 5 percent asbestos identified as tremolite. The soil piles were located along the southern unfenced property line where there are three adjacent residential properties.

The relationship between the concentration of asbestos in a source material (soil/asbestos-containing vermiculite) and the concentration of fibers in air that result when the source is disturbed is very complex and depends on a broad range of variables. No method has been found to predict the concentration of asbestos in air reliably as it relates to a measured concentration of asbestos in the source material. A detectable concentration of asbestos in source material may, when disturbed, result in a high concentration of airborne asbestos that could pose a health risk.

***Section 300.415 (b)(2)(iv) High levels of hazardous substances or pollutants or contaminants in the soils largely at or near the surface, that may migrate;*** The analytical results of the two soil samples, G013-BS-49 and G013-BS-50, collected on March 21, 2011, indicated that 12 percent and 5 percent, respectively, was detected as asbestos and identified as tremolite. These soil samples were collected at the surface of the pile. If the soil piles were to be graded or the vegetation in the area was removed it would create the potential for migration to off-site locations.

***Section 300.415 (b)(2)(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;*** Periodic rains and drought conditions may contribute to the potential for migration of asbestos-containing soils. Soil erosion during rain events followed by wind action during particularly during dry conditions, can lead to migration of fine asbestos fibers from contaminated surface soil.

***Section 300.415 (b)(2)(vii) The availability of other appropriate federal or state response mechanisms to respond to the release;*** NCDENR has indicated that the State lacks available funds to implement a cleanup at the Site in a timely manner. If the EPA Region 4 does not respond to this release, no other federal agency, state or local government has the capacity to respond in a time-critical manner.

## IV.    ENDANGERMENT DETERMINATION

Actual or threatened releases of hazardous substances from this Site, if not addressed by implementing the response action selected in this Action Memorandum, may present an imminent and substantial endangerment to public health, welfare or the environment.

## V.    PROPOSED ACTIONS AND ESTIMATED COSTS

### A.    Proposed Actions

#### 1.    Proposed action description

The following actions will be implemented by W.R. Grace under an AOC:

  a.  Coordinate with the OSC to assess the layout of Site and determine required Site activities, equipment, personnel and logistics, and develop a Removal Action Work Plan that details plans for the excavation.
  b.  Determine the extent of asbestos contaminated soil, which includes the existing debris pile and properties adjacent to the debris pile. The debris piles are estimated to be approximately 175 feet by 50 feet.
  c.  Excavate and remove areas of asbestos contaminated soil and debris with confirmatory sampling. Depending on the results of the extent of contamination survey, this activity may include removal of additional contaminated soils along the back edge of the property and on adjacent properties.
  d.  Backfill excavated areas with clean fill material, as necessary. In areas where asbestos is present at depths greater than two feet below the natural grade, place an appropriate warning barrier, cover such areas with clean soil to prevent direct contact with contaminated soils and coordinate with the property owner a plan for post-removal site control.
  e.  Dispose of contaminated soils at an approved facility.
  f.  Suppress dust and control erosion during the removal action.
  g.  Monitor and sample as necessary personal and ambient air during the removal activities.
  h.  Restore disturbed areas in a manner that prevents sediment runoff onto adjacent properties and is consistent with future land-use. Restoration shall be coordinated with the landowners.

#### 2.    Contribution to remedial performance

The proposed removal action is warranted to address the threats discussed in Section III, which meet the NCP Section 300.415 (b) (2) removal criteria. The removal action contemplated in this Action Memorandum would be consistent with any remedial action.

#### 3.    Engineering Evaluation/Cost Analysis (EE/CA)

This proposed action is time-critical and does not require an EE/CA.

#### 4.    Applicable or Relevant and Appropriate Requirements (ARARs)

On-Site removal actions conducted under CERCLA are required to attain ARARs to the extent practicable, considering the exigencies of the situation. Off-site removal activities need only comply with all applicable federal and state laws. This cleanup is being conducted as a time-critical removal action.

<u>Federal ARARs</u>

The following has been identified as a potential Federal ARAR, EPA's NESHAP regulation, 40 CFR Part 61, which discusses reducing off-site migration of asbestos during clean-up activities.

<u>State ARARs</u>

A letter was received from the State of North Carolina on November 17, 2011, indicating potential State ARARs. Based on the OSC's review, the following have been identified as potential State ARARs with regard to control of off-site migration of asbestos and sediment control during the removal action:

- Surface Water and Wetland Quality (1 5A NCAC Subchapter 2B.0 100 and .0200)
- Air Quality (15A NCAC Subchapter 2D and 24)
- Water Quality (1 5A NCAC 2B)
- Erosion and Sedimentation (15A NCAC 4B)
- Asbestos Hazard Management (1 OA NCAC 4 1 C.0600)
- Sedimentation Pollution Control Act (NCGS Chapter 1 13A, Article 4)

The OSC will continue to coordinate with State officials to identify State ARARs and will evaluate such ARARs in accordance with the NCP.

All waste transferred off-site will also comply with the CERCLA Off-Site Rule (40 CFR 300.440).

5.      Project schedule

The EPA is currently negotiating with W.R. Grace to undertake the removal action as outlined in this memorandum. The project schedule will be incorporated in the work plan submitted to the EPA for approval under the AOC.

## VI.    EXPECTED CHANGE IN THE SITUATION SHOULD ACTION BE DELAYED OR NOT TAKEN

If this response action is significantly delayed or not taken, the potential for disturbances that result in additional release will continue, increasing the potential for migration of asbestos and increasing the possibility of exposure to the public and the environment.

## VII.   OUTSTANDING POLICY ISSUES

Asbestos removal actions for "Libby amphibole" type material have been conducted by the EPA at other locations around the nation. This removal action does not set a precedent, but is considered nationally significant based on the EPA's policy regarding CERCLA actions at Asbestos sites. This action is part of an agency-wide initiative to investigate vermiculite facilities that received vermiculite ore from the W.R. Grace vermiculite mine in Libby, Montana. Because of the potentially broad impact of vermiculite ore with high levels of amphibole asbestos mined from the Libby, Montana deposits, the EPA Region 4 is coordinating with the EPA Headquarters and other Regions to assure a consistent approach to

8

vermiculite issues. There are no outstanding policy issues related to the proposed Removal Actions at this Site.

## VIII.  ENFORCEMENT

The EPA anticipates that W.R. Grace will both fund and conduct the removal action. W.R. Grace is the former operator of the Site. The EPA has not identified any other potentially responsible party (PRP), and it is expected that W.R. Grace will be the sole PRP for this Site. The EPA and W.R. Grace are currently negotiating the terms of the AOC for conducting the removal. Should negotiations with W.R. Grace fail to result in an AOC, the EPA may decide to take a fund-lead removal action. See Attachment, "Enforcement Confidential Addendum," for more detailed information.

## IX.    RECOMMENDATION

This decision document represents the selected removal action for the GAO 013 Vermiculite Site located in High Point, Randolph County, North Carolina developed in accordance with CERCLA as amended, and not inconsistent with the National Contingency Plan (NCP). The document is based on the Administrative Record for the Site. Conditions at the Site meet the NCP Section 300.415 (b) criteria for a time-critical removal action.

APPROVED: _____    DATE: 2/29/12
                   Franklin E. Hill, Director
                   Superfund Division

DISAPPROVED: _____    DATE: _____
                   Franklin E. Hill, Director
                   Superfund Division

Attachments

**Appendix B**

**Cost Summary**

Report Date: 01/13/2012                                                    Page 1 of 1

## IFMS Reconciliation Pending
## Table of Contents
### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08
### Costs from 10/01/1980 to 01/13/2012

NARRATIVE COST SUMMARY ...................................................................................... Section 1

ITEMIZED COST SUMMARY ........................................................................................ Section 2

REGIONAL PAYROLL COSTS ..................................................................................... Section 3

REGIONAL TRAVEL COSTS ........................................................................................ Section 4

OTHER EXPENDITURES

    EMSL ANALYTICAL INC. (0R0429NTSA) ............................................................ Section 5

SUPERFUND TECHNICAL ASSISTANCE RESPONSE TEAM (START)

    TETRA TECH EM INC. (EPW05054) ................................................................... Section 6

MISCELLANEOUS (MIS) COSTS .................................................................................. Section 7

EPA INDIRECT COSTS SUMMARY .............................................................................. Section 8

EPA INDIRECT COSTS ................................................................................................. Section 9

Report Date: 01/13/2012                                    Section 1 - Page 1 of 1

IFMS Reconciliation Pending

Narrative Cost Summary

VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

Costs from 10/01/1980 to 01/13/2012

1. The United States Environmental Protection Agency has incurred at least $9,564.92 for Regional Payroll Costs.

2. The United States Environmental Protection Agency has incurred at least $715.10 for Regional Travel Costs.

3. The United States Environmental Protection Agency has incurred costs of at least $1,550.00 for OTHER EXPENDITURES contract expenditures.  The total represents the amount spent under the EMSL ANALYTICAL INC. contract.

4. The United States Environmental Protection Agency has incurred costs of at least $70,366.71 for SUPERFUND TECHNICAL ASSISTANCE RESPONSE TEAM (START) contract expenditures. The total represents the amount spent under the TETRA TECH EM INC. contract.

5. The United States Environmental Protection Agency has incurred costs of at least $11,316.53 for Miscellaneous Expenses.

6. The United States Environmental Protection Agency has incurred at least $38,312.40 for Indirect Costs.


Total Site Costs:                                          $131,825.66

Report Date: 01/13/2012

IFMS Reconciliation Pending

Itemized Cost Summary

VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

Costs from 10/01/1980 to 01/13/2012

| | |
|---|---:|
| **REGIONAL PAYROLL COSTS** ............................................................................ | $9,564.92 |
| **REGIONAL TRAVEL COSTS** ............................................................................ | $715.10 |
| **OTHER EXPENDITURES** | |
| EMSL ANALYTICAL INC. (0R0429NTSA) ............................................................ | $1,550.00 |
| **SUPERFUND TECHNICAL ASSISTANCE RESPONSE TEAM (START)** | |
| TETRA TECH EM INC. (EPW05054) ................................................................ | $70,366.71 |
| **MISCELLANEOUS COSTS (MIS)** ............................................................................ | $11,316.53 |
| **EPA INDIRECT COSTS** ............................................................................ | $38,312.40 |
| **Total Site Costs:** | $131,825.66 |

Report Date: 01/13/2012

### IFMS Reconciliation Pending

### Regional Payroll Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| CERON, LEONARDO | 2010 | 05 | 28.00 | 1,441.46 |
| ENVIRONMENTAL SCIENTIST | | | | |
| | | | 28.00 | $1,441.46 |
| FREDERICK, TIMOTHY A. | 2011 | 26 | 9.00 | 549.99 |
| ENVIRONMENTAL SCIENTIST | 2012 | 02 | 6.00 | 367.21 |
| | | | 15.00 | $917.20 |
| HARPER, GREGORY | 2011 | 25 | 28.00 | 1,336.22 |
| Industrial Hygienist (OSC) | | 26 | 24.00 | 1,145.35 |
| | 2012 | 02 | 4.00 | 191.17 |
| | | 03 | 12.00 | 573.49 |
| | | 04 | 16.00 | 764.66 |
| | | 05 | 12.00 | 571.96 |
| | | 06 | 4.00 | 191.17 |
| | | 07 | 4.00 | 191.10 |
| | | | 104.00 | $4,965.12 |
| JONES, SYLVIA K. | 2011 | 18 | 0.25 | 15.42 |
| ENVIRONMENTAL SCIENTIST | | | | |
| | | | 0.25 | $15.42 |
| STILMAN, TERRY | 2011 | 26 | 17.00 | 1,299.32 |
| ENVIRONMENTAL SCIENTIST | | | | |
| | | | 17.00 | $1,299.32 |
| TURNER, NARDINA | 2010 | 18 | 0.50 | 32.84 |
| ENVIRONMENTAL SCIENTIST | | 21 | 0.25 | 16.37 |
| | | 23 | 0.25 | 16.78 |
| | | 24 | 0.25 | 16.41 |
| | | 26 | 0.25 | 16.40 |
| | 2011 | 07 | 1.25 | 82.43 |
| | | 08 | 0.25 | 16.57 |
| | | 09 | 1.00 | 66.24 |
| | | 10 | 0.75 | 49.67 |
| | | 11 | 0.50 | 33.12 |
| | | 12 | 0.50 | 33.11 |
| | | 13 | 0.50 | 33.11 |

Report Date: 01/13/2012                                          Section 3 - Page 2 of 2

### IFMS Reconciliation Pending

### Regional Payroll Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| TURNER, NARDINA | 2011 | 14 | 3.25 | 215.26 |
| | | 15 | 2.00 | 132.47 |
| | | 16 | 0.50 | 33.11 |
| | | 17 | 0.25 | 16.57 |
| | | 23 | 0.25 | 16.57 |
| | | 24 | 0.75 | 49.69 |
| | | 25 | 0.50 | 33.11 |
| | | 26 | 0.25 | 16.57 |
| | | | 14.00 | $926.40 |
| | | | | |
| Total Regional Payroll Costs | | | 178.25 | $9,564.92 |

Report Date: 01/13/2012                                                                 Page 1 of 1

## IFMS Reconciliation Pending

## Headquarters Payroll Costs

## VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

## Costs from 10/01/1980 to 01/13/2012

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---------------|-------------|------------|---------------|---------------|

Report Date: 01/13/2012                                    Section 4 - Page 1 of 1

## IFMS Reconciliation Pending

### Regional Travel Costs

**VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08**

Costs from 10/01/1980 to 01/13/2012

| Traveler/Vendor Name | Travel Number | Treasury Schedule | Treasury Schedule Date | Travel Costs |
|---|---|---|---|---|
| BANK ONE | 0Q1DOS | ACHC09355 | 12/23/2009 | 372.36 |
| | | | | $372.36 |
| HARPER, GREGORY | 0RZ891 | ACHA11264 | 09/23/2011 | 170.24 |
| Industrial Hygienist (OSC) | | | | |
| | | | | $170.24 |
| STILMAN, TERRY | 0RSUGI | ACHA11264 | 09/23/2011 | 172.50 |
| ENVIRONMENTAL SCIENTIST | | | | |
| | | | | $172.50 |
| Total Regional Travel Costs | | | | $715.10 |

Report Date: 01/13/2012                                                    Page 1 of 1

IFMS Reconciliation Pending

Headquarters Travel Costs

VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

Costs from 10/01/1980 to 01/13/2012

| Traveler/Vendor Name | Travel Number | Treasury Schedule | Treasury Schedule Date | Travel Costs |
|---|---|---|---|---|

Report Date: 01/13/2012

## IFMS Reconciliation Pending

### Contract Costs

## VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

### OTHER EXPENDITURES

| | |
|---|---|
| Contractor Name: | EMSL ANALYTICAL INC. |
| EPA Contract Number: | 0R0429NTSA |
| Project Officer(s): | |
| Dates of Service: | From:          To: |
| Summary of Service: | |
| Total Costs: | $1,550.00 |

| Voucher Number | Voucher Date | Voucher Amount | Treasury Schedule Number and Date | | Site Amount |
|---|---|---|---|---|---|
| 044542 | 07/08/2010 | 0.00 | K2900 | 07/08/2010 | 1,550.00 |
| | | | | Total: | $1,550.00 |

Report Date: 01/13/2012                                         Section 6 - Page 1 of 2

## IFMS Reconciliation Pending

### Contract Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

## SUPERFUND TECHNICAL ASSISTANCE RESPONSE TEAM (START)

| | | | |
|---|---|---|---|
| Contractor Name: | TETRA TECH EM INC. | | |
| EPA Contract Number: | EPW05054 | | |
| Delivery Order Information | DO # | Start Date | End Date |
| | 3 | 09/26/2009 | 09/30/2011 |
| Project Officer(s): | JONES, SYLVIA | | |
| Dates of Service: | From: 09/26/2009    To: 09/30/2011 | | |
| Summary of Service: | TECHNICAL ASSISTANT TEAM PROP-SUB(REDI) | | |
| Total Costs: | $70,366.71 | | |

| Voucher Number | Voucher Date | Voucher Amount | Treasury Schedule Number and Date | | Site Amount | Annual Allocation |
|---|---|---|---|---|---|---|
| T3-06-BY-44 | 10/28/2009 | 67,898.81 | R0215 | 12/14/2009 | 1,322.09 | 90.62 |
| T3-06-BY-45 | 11/25/2009 | 94,648.87 | R0307 | 01/12/2010 | 7,589.25 | 520.18 |
| T3-06-BY-46 | 12/30/2009 | 84,988.60 | R0417 | 02/17/2010 | 21,291.51 | 1,459.37 |
| T3-06-BY-47 | 01/27/2010 | 113,025.07 | R0491 | 03/16/2010 | 8,069.97 | 553.13 |
| T3-06-BY-48 | 02/24/2010 | 131,134.43 | R0574 | 04/09/2010 | 1,492.65 | 102.31 |
| T3-06-BY-49 | 03/31/2010 | 178,349.95 | R0689 | 05/14/2010 | 1,538.67 | 105.46 |
| T3-06-BY-50 | 04/28/2010 | 122,169.31 | R0795 | 06/18/2010 | 1,014.21 | 69.52 |
| T3-06-BY-52 | 06/30/2010 | 168,384.95 | R0997 | 08/19/2010 | 614.20 | 42.10 |
| T3-06-BY-53 | 07/28/2010 | 42,261.62 | R0A81 | 09/14/2010 | 703.51 | 48.22 |
| T3-06-BY-54 | 09/01/2010 | 89,610.68 | R1066 | 10/21/2010 | 2,536.68 | 173.87 |
| T3-06-BY-55 | 10/06/2010 | 104,167.58 | R1154 | 11/22/2010 | 2,112.17 | 144.77 |
| T3-06-BY-56 | 10/03/2010 | 72,598.60 | R1254 | 12/22/2010 | 48.00 | 2.63 |
| T3-06-BY-61 | 04/06/2011 | 296,650.28 | R1766 | 05/18/2011 | 1,827.55 | 100.21 |
| T3-06-BY-62 | 05/04/2011 | 99,868.04 | R1849 | 06/13/2011 | 1,032.15 | 56.60 |
| T3-06-BY-63 | 06/01/2011 | 101,543.76 | R1963 | 07/13/2011 | 73.26 | 4.02 |
| T3-06-BY-64 | 07/06/2011 | 129,245.32 | R1A76 | 08/15/2011 | 2,095.73 | 114.92 |
| T3-06-BY-65 | 08/03/2011 | 111,246.29 | ACHC11258 | 09/19/2011 | 680.72 | 37.33 |
| 5054-T3-06-BY-6 | 08/31/2011 | 93,656.49 | ACHC11270 | 09/29/2011 | 7,756.94 | 425.34 |
| 5054-T3-06-BY-6 | 10/05/2011 | 184,826.58 | AVC110051 | 11/21/2011 | 4,282.05 | 234.80 |
| | | | | Total: | $66,081.31 | $4,285.40 |

Report Date: 01/13/2012                                   Section 6 - Page 2 of 2

## IFMS Reconciliation Pending

### Contract Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

SUPERFUND TECHNICAL ASSISTANCE RESPONSE TEAM (START)

| | |
|---|---|
| Contractor Name: | TETRA TECH EM INC. |
| EPA Contract Number: | EPW05054 |

| Delivery Order Information | DO # | Start Date | End Date |
|---|---|---|---|
| | 3 | 09/26/2009 | 09/30/2011 |

| | |
|---|---|
| Project Officer(s): | JONES, SYLVIA |
| Dates of Service: | From: 09/26/2009   To: 09/30/2011 |
| Summary of Service: | TECHNICAL ASSISTANT TEAM PROP-SUB(REDI) |
| Total Costs: | $70,366.71 |

| Voucher Number | Schedule Number | Rate Type | Annual Allocation Rate |
|---|---|---|---|
| T3-06-BY-44 | R0215 | Final | 0.068542 |
| T3-06-BY-45 | R0307 | Final | 0.068542 |
| T3-06-BY-46 | R0417 | Final | 0.068542 |
| T3-06-BY-47 | R0491 | Final | 0.068542 |
| T3-06-BY-48 | R0574 | Final | 0.068542 |
| T3-06-BY-49 | R0689 | Final | 0.068542 |
| T3-06-BY-50 | R0795 | Final | 0.068542 |
| T3-06-BY-52 | R0997 | Final | 0.068542 |
| T3-06-BY-53 | R0A81 | Final | 0.068542 |
| T3-06-BY-54 | R1066 | Final | 0.068542 |
| T3-06-BY-55 | R1154 | Final | 0.068542 |
| T3-06-BY-56 | R1254 | Provisional | 0.054834 |
| T3-06-BY-61 | R1766 | Provisional | 0.054834 |
| T3-06-BY-62 | R1849 | Provisional | 0.054834 |
| T3-06-BY-63 | R1963 | Provisional | 0.054834 |
| T3-06-BY-64 | R1A76 | Provisional | 0.054834 |
| T3-06-BY-65 | ACHC11258 | Provisional | 0.054834 |
| 5054-T3-06-BY-66 | ACHC11270 | Provisional | 0.054834 |
| 5054-T3-06-BY-67 | AVC110051 | Provisional | 0.054834 |

Report Date: 01/13/2012

IFMS Reconciliation Pending

Financial Cost Summary for the Contract Lab Program

VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

Costs from 10/01/1980 to 01/13/2012

## CONTRACT LAB PROGRAM (CLP) COSTS

Report Date: 01/13/2012

## IFMS Reconciliation Pending

### Miscellaneous (MIS) Costs

## VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

**Miscellaneous (MIS) Costs**

Total Costs:     $11,316.53

| Procurement Number | Voucher Number | Voucher Date | Voucher Amount | Treasury Number | Schedule and Date | Site Amount | Description |
|---|---|---|---|---|---|---|---|
| ***CONTRACT NAME NOT FOUND *** | | | | | | | |
| EP094000116 | 2200018684 | 11/10/2010 | 0.00 | L0349 | 11/10/2010 | 720.00 | |
| EP094000116 | 2200018684 | 11/10/2010 | 0.00 | L0351 | 11/10/2010 | 2,200.00 | |
| EP104000059 | 2200016669 | 01/19/2011 | 0.00 | L0991 | 01/19/2011 | 4,160.00 | |
| EPW10033 | A1 | 02/10/2011 | 1,294.38 | R1497 | 03/08/2011 | 179.01 | QUALITY ASSURANCE SU |
| EPW10033 | A2 | 03/11/2011 | 6,026.89 | R1615 | 04/08/2011 | 1,581.49 | QUALITY ASSURANCE SU |
| EPW10033 | A3 | 04/14/2011 | 7,381.19 | R1726 | 05/11/2011 | 1,012.24 | QUALITY ASSURANCE SU |
| EPW10033 | A4 | 05/12/2011 | 7,532.14 | R1827 | 06/07/2011 | 1,073.64 | QUALITY ASSURANCE SU |
| EPW10033 | A9 | 10/13/2011 | 4,712.13 | AVC110037 | 11/09/2011 | 100.15 | QUALITY ASSURANCE SU |
| F0004T00001 | 2200016669 | 05/16/2011 | 0.00 | L2155 | 05/16/2011 | 290.00 | |

Vendor Total:     $11,316.53

Total Miscellaneous Costs:     $11,316.53

Report Date: 01/13/2012                                      Section 8 - Page 1 of 1

IFMS Reconciliation Pending

EPA Indirect Costs

VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

Costs from 10/01/1980 to 01/13/2012

| Fiscal Year | Direct Costs | Indirect Rate( %) | Indirect Costs |
|---|---|---|---|
| 2010 | 50,089.59 | 40.97% | 20,521.71 |
| 2011 | 35,955.91 | 40.97% | 14,731.16 |
| 2012 | 7,467.76 | 40.97% | 3,059.53 |
| | 93,513.26 | | |

| | |
|---|---|
| Total EPA Indirect Costs | $38,312.40 |

Report Date: 01/13/2012

## IFMS Reconciliation Pending

### EPA Indirect Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

Costs from 10/01/1980 to 01/13/2012

#### PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| CERON, LEONARDO | 2010 | 05 | 1,441.46 | 40.97% | 590.57 |
|  |  |  | 1,441.46 |  | $590.57 |
|  |  |  |  |  |  |
| TURNER, NARDINA | 2010 | 18 | 32.84 | 40.97% | 13.45 |
|  |  | 21 | 16.37 | 40.97% | 6.71 |
|  |  | 23 | 16.78 | 40.97% | 6.87 |
|  |  | 24 | 16.41 | 40.97% | 6.72 |
|  |  | 26 | 16.40 | 40.97% | 6.72 |
|  |  |  | 98.80 |  | $40.47 |
|  |  |  |  |  |  |
| Total Fiscal Year 2010 Payroll Direct Costs: |  |  | 1,540.26 |  | $631.04 |

#### TRAVEL DIRECT COSTS

| Traveler/Vendor Name | Travel Number | Treasury Schedule Date | Travel Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| BANK ONE | 0Q1DOS | 12/23/2009 | 372.36 | 40.97% | 152.56 |
|  |  |  | 372.36 |  | $152.56 |
|  |  |  |  |  |  |
| Total Fiscal Year 2010 Travel Direct Costs: |  |  | 372.36 |  | $152.56 |

#### OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| 0R0429NTSA | 044542 | 07/08/2010 | 1,550.00 | 0.00 | 40.97% | 635.04 |
|  |  |  | 1,550.00 | 0.00 |  | $635.04 |
|  |  |  |  |  |  |  |
| EPW05054 | T3-06-BY-44 | 12/14/2009 | 1,322.09 | 90.62 | 40.97% | 578.79 |
|  | T3-06-BY-45 | 01/12/2010 | 7,589.25 | 520.18 | 40.97% | 3,322.43 |

## IFMS Reconciliation Pending

## EPA Indirect Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

#### OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| EPW05054 | T3-06-BY-46 | 02/17/2010 | 316.84 | 21.72 | 40.97% | 138.71 |
| | | | 20,974.67 | 1,437.65 | 40.97% | 9,182.33 |
| | T3-06-BY-47 | 03/16/2010 | 8,069.97 | 553.13 | 40.97% | 3,532.88 |
| | T3-06-BY-48 | 04/09/2010 | 1,492.65 | 102.31 | 40.97% | 653.46 |
| | T3-06-BY-49 | 05/14/2010 | 1,538.67 | 105.46 | 40.97% | 673.60 |
| | T3-06-BY-50 | 06/18/2010 | 1,014.21 | 69.52 | 40.97% | 444.00 |
| | T3-06-BY-52 | 08/19/2010 | 614.20 | 42.10 | 40.97% | 268.89 |
| | T3-06-BY-53 | 09/14/2010 | 703.51 | 48.22 | 40.97% | 307.98 |
| | | | 43,636.06 | 2,990.91 | | $19,103.07 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Fiscal Year 2010 Other Direct Costs: | | | 45,186.06 | 2,990.91 | | $19,738.11 |
| Total Fiscal Year 2010: | | | 50,089.59 | | | $20,521.71 |

#### PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| FREDERICK, TIMOTHY A. | 2011 | 26 | 549.99 | 40.97% | 225.33 |
| | | | 549.99 | | $225.33 |
| HARPER, GREGORY | 2011 | 25 | 1,336.22 | 40.97% | 547.45 |
| | | 26 | 1,145.35 | 40.97% | 469.25 |
| | | | 2,481.57 | | $1,016.70 |
| JONES, SYLVIA K. | 2011 | 18 | 15.42 | 40.97% | 6.32 |
| | | | 15.42 | | $6.32 |

### IFMS Reconciliation Pending

### EPA Indirect Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

#### PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| STILMAN, TERRY | 2011 | 26 | 1,299.32 | 40.97% | 532.33 |
| | | | 1,299.32 | | $532.33 |
| | | | | | |
| TURNER, NARDINA | 2011 | 07 | 82.43 | 40.97% | 33.77 |
| | | 08 | 16.57 | 40.97% | 6.79 |
| | | 09 | 66.24 | 40.97% | 27.14 |
| | | 10 | 49.67 | 40.97% | 20.35 |
| | | 11 | 33.12 | 40.97% | 13.57 |
| | | 12 | 33.11 | 40.97% | 13.57 |
| | | 13 | 33.11 | 40.97% | 13.57 |
| | | 14 | 215.26 | 40.97% | 88.19 |
| | | 15 | 132.47 | 40.97% | 54.27 |
| | | 16 | 33.11 | 40.97% | 13.57 |
| | | 17 | 16.57 | 40.97% | 6.79 |
| | | 23 | 16.57 | 40.97% | 6.79 |
| | | 24 | 49.69 | 40.97% | 20.36 |
| | | 25 | 33.11 | 40.97% | 13.57 |
| | | 26 | 16.57 | 40.97% | 6.79 |
| | | | 827.60 | | $339.09 |

| | | | | |
|---|---|---|---|---|
| Total Fiscal Year 2011 Payroll Direct Costs: | | 5,173.90 | | $2,119.77 |

#### TRAVEL DIRECT COSTS

| Traveler/Vendor Name | Travel Number | Treasury Schedule Date | Travel Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| HARPER, GREGORY | 0RZ891 | 09/23/2011 | 170.24 | 40.97% | 69.76 |
| | | | 170.24 | | $69.76 |

Report Date: 01/13/2012

IFMS Reconciliation Pending

EPA Indirect Costs

VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

Costs from 10/01/1980 to 01/13/2012

### TRAVEL DIRECT COSTS

| Traveler/Vendor Name | Travel Number | Treasury Schedule Date | Travel Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| STILMAN, TERRY | 0RSUGI | 09/23/2011 | 172.50 | 40.97% | 70.68 |
| | | | 172.50 | | $70.68 |
| Total Fiscal Year 2011 Travel Direct Costs: | | | 342.74 | | $140.44 |

### OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| EP094000116 | 2200018684 | 11/10/2010 | 720.00 | 0.00 | 40.97% | 294.98 |
| | | | 2,200.00 | 0.00 | 40.97% | 901.34 |
| | | | 2,920.00 | 0.00 | | $1,196.32 |
| EP104000059 | 2200016669 | 01/19/2011 | 4,160.00 | 0.00 | 40.97% | 1,704.35 |
| | | | 4,160.00 | 0.00 | | $1,704.35 |
| EPW05054 | T3-06-BY-54 | 10/21/2010 | 2,536.68 | 173.87 | 40.97% | 1,110.51 |
| | T3-06-BY-55 | 11/22/2010 | 2,112.17 | 144.77 | 40.97% | 924.67 |
| | T3-06-BY-56 | 12/22/2010 | 48.00 | 2.63 | 40.97% | 20.74 |
| | T3-06-BY-61 | 05/18/2011 | 1,827.55 | 100.21 | 40.97% | 789.80 |
| | T3-06-BY-62 | 06/13/2011 | 1,032.15 | 56.60 | 40.97% | 446.06 |
| | T3-06-BY-63 | 07/13/2011 | 73.26 | 4.02 | 40.97% | 31.66 |
| | T3-06-BY-64 | 08/15/2011 | 2,095.73 | 114.92 | 40.97% | 905.70 |
| | T3-06-BY-65 | 09/19/2011 | 680.72 | 37.33 | 40.97% | 294.19 |
| | 5054-T3-06-BY-66 | 09/29/2011 | 7,756.94 | 425.34 | 40.97% | 3,352.28 |
| | | | 18,163.20 | 1,059.69 | | $7,875.61 |
| EPW10033 | A1 | 03/08/2011 | 179.01 | 0.00 | 40.97% | 73.34 |
| | | | 179.01 | 0.00 | 40.97% | 73.34 |
| | | | -179.01 | 0.00 | 40.97% | -73.34 |

Report Date: 01/13/2012

## IFMS Reconciliation Pending

## EPA Indirect Costs

## VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

## Costs from 10/01/1980 to 01/13/2012

### OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| EPW10033 | A2 | 04/06/2011 | 1,581.49 | 0.00 | 40.97% | 647.94 |
| | | | 1,581.49 | 0.00 | 40.97% | 647.94 |
| | | | -1,581.49 | 0.00 | 40.97% | -647.94 |
| | A3 | 05/11/2011 | -1,012.24 | 0.00 | 40.97% | -414.71 |
| | | | 1,012.24 | 0.00 | 40.97% | 414.71 |
| | | | 1,012.24 | 0.00 | 40.97% | 414.71 |
| | A4 | 06/07/2011 | 1,073.64 | 0.00 | 40.97% | 439.87 |
| | | | 3,846.38 | 0.00 | | $1,575.86 |
| | | | | | | |
| F0004T00001 | 2200016669 | 05/16/2011 | 290.00 | 0.00 | 40.97% | 118.81 |
| | | | 290.00 | 0.00 | | $118.81 |
| | | | | | | |
| Total Fiscal Year 2011 Other Direct Costs: | | | 29,379.58 | 1,059.69 | | $12,470.95 |
| | | | | | | |
| Total Fiscal Year 2011: | | | 35,955.91 | | | $14,731.16 |

### PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| FREDERICK, TIMOTHY A. | 2012 | 02 | 367.21 | 40.97% | 150.45 |
| | | | 367.21 | | $150.45 |
| | | | | | |
| HARPER, GREGORY | 2012 | 02 | 191.17 | 40.97% | 78.32 |
| | | 03 | 573.49 | 40.97% | 234.96 |
| | | 04 | 764.66 | 40.97% | 313.28 |
| | | 05 | 571.96 | 40.97% | 234.33 |
| | | 06 | 191.17 | 40.97% | 78.32 |

## IFMS Reconciliation Pending

### EPA Indirect Costs

### VERMICULITE EXFO SOUTHERN GAO13, HIGH POINT, NC  SITE ID = B4 08

### Costs from 10/01/1980 to 01/13/2012

#### PAYROLL DIRECT COSTS

| Employee Name | Fiscal Year | Pay Period | Payroll Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|
| HARPER, GREGORY | 2012 | 07 | 191.10 | 40.97% | 78.29 |
| | | | 2,483.55 | | $1,017.50 |
| Total Fiscal Year 2012 Payroll Direct Costs: | | | 2,850.76 | | $1,167.95 |

#### OTHER DIRECT COSTS

| Contract, IAG, SCA, Misc.NO | Voucher Number | Treasury Schedule Date | Site Amount | Annual/SMO Allocation Costs | Ind. Rate (%) | Indirect Costs |
|---|---|---|---|---|---|---|
| EPW05054 | 5054-T3-06-BY-67 | 11/21/2011 | 4,282.05 | 234.80 | 40.97% | 1,850.55 |
| | | | 4,282.05 | 234.80 | | $1,850.55 |
| EPW10033 | A9 | 11/09/2011 | 100.15 | 0.00 | 40.97% | 41.03 |
| | | | 100.15 | 0.00 | | $41.03 |
| Total Fiscal Year 2012 Other Direct Costs: | | | 4,382.20 | 234.80 | | $1,891.58 |
| Total Fiscal Year 2012: | | | 7,467.76 | | | $3,059.53 |

Total EPA Indirect Costs                                                                          $38,312.40

**<u>Appendix C</u>**

**Map of Site**



**Legend**

☐ Approximate Property Boundary

Map Source:
USGS Topographic Quadrangle Map,
High Point West, NC 1979

United States
Environmental Protection Agency

VERMICULITE EXFOLIATION SITE
GAO 013
HIGH POINT,
RANDOLPH COUNTY,
NORTH CAROLINA
TDD No.TTEMI-05-003-0074

FIGURE 1
SITE LOCATION

TETRA TECH

GAO 013
SITE LOCATION
35.914625° N, 80.025737° W

