The following services and supplies **are not covered** under the
Program's Alternative Care coverage:

■ Custodial/Maintenance Care.

■ Charges for services not related to a Covered Condition.

■ Charges for services in excess of the limits described below.

## Limits on  Alternative Care Benefits

The Libby Medical Program will only cover expenses for
Alternative Care for a maximum of 60 days per calendar year for
any Covered Individual.

Expenses for Alternative Care that are incurred prior to the date
that the Claims Administrator (or the Program Administrator)
determines that the care satisfies the criteria listed above, will **not**
be covered by the Libby Medical Program.

In the case of Alternative Care, the Claims Administrator (and
Program Administrator) reserves the right to enter negotiations
with various providers regarding charges for various supplies and
services, and to pay the amount of such services and supplies that
is determined as appropriate pursuant to such negotiation. Also,
the Program will only cover expenses related to Alternative Care
that are Reasonable and Customary.

If the Covered Individual disagrees with the determination of the
Claims Administrator in this regard, he or she is permitted to
appeal that decision in accordance with the provisions specified
under "Questions and Appeals" on page 36.

# *Autopsy Benefits*

In the event that a Covered Individual's attending physician and/or Covered Individual's nearest relative(s), as required under applicable local law or rules, agree to an autopsy of the Covered Individual, the Program will cover Reasonable and Customary expenses related to such autopsy by a pathologist. The results of any such autopsy shall be made available to the family. The Claims Administrator will also receive information regarding such autopsy, for research purposes.

# *If You Receive Other Benefits*

## *Primary and Secondary Plans*

If a Covered Individual is covered under Medicare, Medicaid, or any other governmental, group, or individual health care plan or program, in addition to being covered under the Libby Medical Program, the Libby Medical Program will always be the primary plan for Eligible Medical Expenses that are related to a condition or illness due to previous asbestos exposure. Because the Libby Medical Program is always primary in these cases, claims for Eligible Medical Expenses should be filed first under the Libby Medical Program following the procedures under "Claims for Benefits" (see page 34).

# When Benefits Are Not Paid

Medical Benefits are not paid for expenses that are not covered by the Program. This means that the Libby Medical Program will not pay benefits for expenses related to:

- care and treatment that is not related to a Covered Condition (page 10) or that is not Medically Necessary (page 41).

- care and treatment that is provided to someone who is not a Covered Individual (page 7).

- services and supplies not ordered by a Doctor (page 39).

- charges for any service or supply exceeding what is Reasonable and Customary (page 42).

- charges for services provided by a family member (a parent, spouse, child, brother, sister, grandparent, or any relative who ordinarily lives in the Covered Individual's home).

- cosmetic surgery.

- dental expenses.

- eye refractions, eyeglasses, and hearing aids and their fitting.

- an inpatient stay in a non-licensed hospital.

- charges a Covered Individual (page 3) is not legally obligated to pay.

- treatment or supplies considered Experimental or Investigational (page 40), unless approved by the Claims Administrator.

- transportation or lodging expenses (including, but not limited to, transportation to and from a Doctor's office), except in the case of ambulance services for Covered Conditions.

- charges for any communication, transportation, or travel of Doctors, nurses, or other service providers.

- benefits to replace lost income.

- charges for Doctor or Hospital services during a confinement as an inpatient that is primarily for diagnostic purposes or which could have been performed on an outpatient basis.

- charges for convalescent care.

- charges for nursing home.

- charges for Custodial/Maintenance Care (page 39), except in the case of Home Health Care (page 20) or Hospice Care (page 22).

- charges for home health and/or hospice care, unless pre-approved by the Claims Administrator in accordance with the provisions on pages 20-24.

■ charges for services of an extended care facility or skilled nursing facility, unless pre-approved by the Claims Administrator (or Grace) in accordance with the provisions on pages 25-26.

■ charges in connection with any Hospital confinement or any surgical, medical, or other treatment or services or supplies which are not recommended and approved by a Doctor who is attending the Covered Individual.

■ charges for telephone consultation, failure to keep an appointment, or charges for completion of a claim form.

■ charges for care by a doctor, hospital, or facility that is not authorized to operate by license or certification in the state where services are provided.

■ charges for treatment of a mental or nervous disorder (including, but not limited to, depression).

■ charges for treatment obtained outside the United States or Canada.

■ charges made or authorized by an individual or facility not legally qualified or licensed for the purpose of treatment (for example, the Program will not cover physician-related expenses for care provided by someone who was not a Doctor, as defined on page 39.

■ care provided by a nurse or aid who is not properly licensed.

The preceding list is the list of the expenses that are not covered by the Libby Medical Program. If you have a question about whether or not a medical supply or condition is covered, call the Claims Administrator at 1-888-563-1564.

# *When Coverage Ends*

Generally, once you are covered by the Libby Medical Program, your coverage under the Program continues for your lifetime, subject to the following:

■ Grace has the right to terminate coverage for anyone who intentionally or knowingly engages in conduct, either alone or in conjunction with others, that defrauds (or is intended to defraud) the Libby Medical Program, by inducing (or attempting to induce) the Program to pay expenses for charges that are not covered by the Program. This includes, but is not limited to, charges for services that are not actually provided, charges for treatment that is not directly related to a Covered Condition, charges that have already been paid by another plan or program, and charges exceeding the Reasonable and Customary amount of an expense related to the treatment of a Covered Condition.

■ Grace has the right to terminate the Program for all Covered Individuals if the Program becomes subject to regulation or control by any state or local governmental agency, or if the Program becomes subject to the control, administration, or monitoring of a court.

## *Awards And Settlements That Include Payment For Future Medical Expenses*

You will not be eligible to participate in the Libby Medical Program, or your participation in the Program will terminate, if:

■ You receive a cash settlement for asbestos-related claims from Grace, which includes compensation for future medical expenses that would otherwise be covered by the Libby Medical Program.

■ Grace pays you a cash award, as a result of a judgement in a court case for asbestos-related claims, which includes compensation for future medical expenses that would otherwise be covered by the Libby Medical Program.

If you receive either a cash settlement or a cash award from Grace that does not include compensation for future medical expenses, then you will not be excluded from coverage under the Libby Medical Program.

# Program Audits

Periodically, the Libby Medical Program will retain a third party to audit and review any and all aspects of the Program, including individual claims for benefits. The auditor may, for example, evaluate whether or not claims have been determined and paid properly. The results of any audit will be reported to the Libby Medical Program. Subject to any applicable privacy constraints (see "Privacy" below), the Libby Medical Program may provide information concerning the results of the audit to Grace so that Grace and the Libby Medical Program can cooperate in addressing any issues with the Program, including taking any actions that are appropriate to address any fraud or other sanctions or conditions that are inconsistent with the written terms of the Program.

For example, the Libby Medical Program reserves the right to exclude from claim consideration any Doctor, Hospital, or other provider who defrauds or attempts to defraud the Program (see page 38), and to take other legal action against such a provider to recover any amounts paid to that provider not in accordance with the written terms of the Program. The Libby Medical Program also reserves the right to require that Covered Individuals be examined by Doctors selected by the Claims Administrator. All decisions in this regard will be made exclusively by the Libby Medical Program, and its decision will be final and binding on all parties.

# Privacy

### Protected Health Information (PHI)

The Libby Medical Program may obtain information that relates to your physical or mental health condition, treatment, or payment for your health care. When this information is individually identifiable to you, it is called **"Protected Health Information"** (PHI). Special rules governing the privacy of PHI have been issued under the federal Health Insurance Portability and Accountability Act ("HIPAA"). The HIPAA regulations (which are referred to herein as the "Privacy Regulations") are set forth at 45 CFR Subtitle A, Subchapter C, Part 164.

**The following provisions related to PHI under the Libby Medical Program are effective as of April 14, 2003.**

## Disclosure of PHI to Health Network America and Grace

The Libby Medical Program has engaged Health Network America as its Claims Administrator and expects to disclose PHI to Health Network America in furtherance of that role. The following privacy guidelines will apply:

■ **Permitted and Required Uses and Disclosures.** The Libby Medical Program may disclose PHI to Health Network America, and Health Network America may use or disclose PHI obtained from the Libby Medical Program, only for the following purposes.

- to process claims,
- to assist the Libby Medical Program in the disposition of final appeals,
- to select and monitor the Libby Medical Program's service providers,
- to consult with the Libby Medical Program's service providers regarding administrative functions, including treatment, payment, and health care operations,
- to consult with the Libby Medical Program radiology peer reviewers and pulmonary consultants, and
- as otherwise required by law.

■ **Health Network America's Agreement.** Under a *business associate* agreement executed with the Libby Medical Program, Health Network America has agreed to:

- not use or further disclose the PHI other than as permitted above,
- use appropriate safeguards to prevent use and disclosure of PHI other than as provided under the agreement,
- report to the Libby Medical Program any unsanctioned use or disclosure of PHI of which Health Network America becomes aware,
- ensure that any agents or subcontractors who receive PHI from Health Network America that was obtained from the Libby Medical Program will agree to the same restrictions and conditions that apply to Health Network America,
- make PHI available for response to a participant's request for access to the participant's PHI, as provided by the Privacy Regulations,
- make PHI available for amendment, and incorporate any amendments to PHI, as provided by the Privacy Regulations.
- make available information needed to provide an accounting of disclosure as provided by the Privacy Regulations,

- make its internal practices, books, and records relating to use and disclosure of PHI received from the Libby Medical Program available to the Secretary of the United States Department of Health and Human Services, for purposes of determining the Libby Medical Program's compliance with the Privacy Regulations, and

- if feasible, return or destroy all PHI received from the Libby Medical Program when Health Network America no longer needs the PHI for the purpose for which it was disclosed to Health Network America or, if return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction infeasible.

■ **Separation Between the Libby Medical Program and Grace/Permitted Disclosures.** Any officer or employee of Grace who, from time to time in the ordinary course of business of Grace, performs administration functions related to the Libby Medical Program, may be given access to PHI received from the Libby Medical Program, subject to the following restrictions:

(a) These persons may only have access to, and use and disclose, PHI for Libby Medical Program administration functions that are performed by Grace for or on behalf of the Libby Medical Program (including functions as the Program Administrator, see page 42); and

(b) These persons shall be subject to disciplinary action and sanctions in accordance with Grace's policies, up to and including termination of employment, for any use or disclosure of PHI in breach of, or in violation of, or in noncompliance with, the provisions of applicable law.

Notwithstanding the limitations described above, the Libby Medical Program and Health Network America or other business associates of the Libby Medical Program may also disclose to Grace the following:

(a) Information on whether an individual is participating in the Libby Medical Program; and

(b) Summary health information, provided that Grace requests summary health information for the purpose of: (i) obtaining bids from health service providers with respect to the provision of services under the Libby Medical Program or (ii) modifying, amending, or terminating the Libby Medical Program. (See also page 31, "Program Audits.")

Grace has provided certification to the Libby Medical Program that PHI will be kept confidential under applicable privacy laws.

# Claims for Benefits

The following provides you with information about how and when to file a claim.

## Covered Expenses

If you – as a Covered Individual – incur covered expenses, you are responsible for requesting payment from the Libby Medical Program by filing a claim. However, your doctor or a hospital may also file a claim for you.

A claim must be submitted **within two years after** the date of service. You are responsible for the timeliness of the submission, even if a doctor or hospital files a claim for you. If you do not file a claim within one year after the date of service, benefits for that covered expense will be denied or reduced, as provided under the Libby Medical Program.

If your claim relates to an inpatient stay, the date of service is the date your inpatient stay ends.

If you provide written authorization to allow direct payment to a provider, all or a portion of any covered expenses due to a provider may be paid directly to the provider instead of being paid to you. The Claims Administrator will not reimburse third parties who have purchased or been assigned benefits by doctors or other providers.

## Required Information

When you request benefits from the Libby Medical Program, you must provide the Claims Administrator with all of the following information:

- The name and address of the Covered Individual (even if the claim is for a covered family member).
- The member and group number on your identification card.
- An itemized bill from your provider that includes:
  - patient diagnosis
  - place of service - date(s) of service
  - number of services or units rendered
  - procedure code(s) and descriptions of service(s) provided
  - charge for each service provided
  - name, address, and tax identification number for the provider of the service.

## How Claims Are Handled

If your claim is denied, you'll receive a written notice from the Claims Administrator within 30 days after receipt of the claim, as long as all needed information was provided with the claim. The Claims Administrator will notify you within this 30-day period if additional information is needed to process the claim, and may request a one-time extension not longer than 15 days and suspend making a claim decision until all the requested information is received.

Once notified of the extension, you'll then have 45 days to provide this information. If all of the necessary information is received within the 45-day period and the claim is denied, the Claims Administrator will notify you of the denial within 15 days after the information is received. If you do not provide the needed information within the 45-day period, your claim will be denied. A denial notice will explain the reason for denial, refer to the portion or portions of the Libby Medical Program on which the denial is based, and provide the Libby Medical Program's claim appeal procedures.

## Concurrent Care Claims

If an ongoing course of treatment was previously approved for a specific period or number of treatments, and you request to extend treatment, your request will be considered a new claim and decided according to the time frames that apply to a new claim.

# *Questions and Appeals*

The following provides you with details on what to do if:

■ you have a question or concern about covered expenses or your benefits, or

■ you're notified that a claim has been denied because it has been determined that a service or supply is excluded under the Libby Medical Program and you wish to appeal this decision.

## *What to Do First*

If you have a question or concern about a benefit decision, you may informally contact Claims Administrator at 1-888-563-1564 before requesting a formal appeal.

If the Claims Administrator cannot resolve the issue to your satisfaction over the phone, you may submit your question or concern in writing.

If you are not satisfied with a benefit decision as described under "Claims for Benefits," however, you may appeal it as described below, without first informally contacting the Claims Administrator.

If you informally contact the Claims Administrator first and later wish to request a formal appeal in writing, you should contact the Claims Administrator and request an appeal. If you request a formal appeal, the Claims Administrator will provide you with the appropriate address for filing an appeal.

## *How to Appeal a Claim Decision*

If you disagree with a claim determination after following the above steps, you may contact the Claims Administrator in writing to formally request an appeal. Your first appeal request must be submitted in writing to the Claims Administrator within **180 days after** you receive the claim denial.

## Appeal Process

An individual who was not involved in the initial claim decision will be appointed by the Claims Administrator to decide the appeal.

The Claims Administrator, or the qualified individual, may consult with a health care professional with appropriate expertise in the field who was not involved in the prior decision.

The Claims Administrator or the qualified individual may consult with, or seek the participation of, medical experts as part of the appeal resolution process. You must consent to this referral and the sharing of pertinent medical claim information. Upon request, and free of charge to you, you have the right to reasonable access to and copies of, all documents, records, and other information relevant to your claim for benefits.

You also may name a representative to handle your appeal. You're responsible for any expense related to a paid representative.

## Grace's Role in the Claims and Appeal Process

Although Grace reserves the right to review claim and appeal decisions, it will not generally review those decisions; and when it does review those decisions, it will not change the decision unless the decision, upon review by Grace, is determined to be without any basis.

## Qualified Medical Child Support Orders

Payments under this plan will be made according to the terms of a "qualified medical child support order," which generally includes a judgment, decree, or order by a court requiring a non-custodial divorced or separated employee to provide coverage to a child under the Libby Medical Program. If the Plan Administrator determines that a medical child support order qualifies, benefit payments from the Libby Medical Program may be made according to the qualified order to the child or children named in the order, or to the custodial parent or legal guardian, where appropriate, or to health care providers (if benefits have been properly assigned by the child or children or by the custodial parent or legal guardian).

## Expulsion of Providers from the Program

Any attempt by a Doctor or any other provider of services or supplies to require the Libby Medical Program to cover expenses previously paid by another plan or program, or attempt to otherwise engage in conduct, either alone or in conjunction with others, intended to defraud the Libby Medical Program, by inducing (or attempting to induce) the Program to pay expenses for charges that are not covered by the Program, may result in the Doctor's or provider's expulsion from the Libby Medical Program.

In addition, any Doctor or other provider of services or supplies, who repeatedly submits "erroneous diagnoses" to the Claims Administrator, or any other party performing services for the Libby Medical Program, may be expelled from the Libby Medical Program. For this purpose, "erroneous diagnosis" means any medical diagnosis that cannot be substantiated or confirmed by peer review, tissue pathologic examination, or autopsy findings, to the satisfaction of the Claims Administrator, as determined in its sole discretion, in accordance with the practices or procedures established by the Claims Administrator (again, in its sole discretion).

Covered Individuals will be notified in writing if a Doctor or provider is expelled from the Libby Medical Program. The Libby Medical Program will not reimburse a Covered Individual (or otherwise pay for) any services or supplies that the Covered Individual receives from an expelled Doctor or provider commencing 15 days after the notice was mailed or otherwise sent to Covered Individuals.

## Tax Consequences of Participation

Although Grace believes that payments to Covered Individuals are excludable from gross income for Federal income tax purposes, Grace does not assume any responsibility for the tax consequences of your participation in the Libby Medical Program. Covered Individuals are encourage to consult with their personal tax advisors concerning the federal, state, and local tax consequences of participation in the Libby Medical Program and the taxation of claims paid under the Libby Medical Program.

# Definitions

The following terms are important—they may affect medical benefits.

- *Alternative Care* (page 25).

- *Asbestos-Related Qualified Lung Cancer* (page 6).

- *Asbestos-Related Qualified Mesothelioma* (page 6).

- *Asbestos-Related Qualified Respiratory Condition* (page 5).

- *Asbestos-Related Qualifying Medical Condition or Illness* (page 6).

- *Claims Administrator:* The entity responsible for processing claims submitted under the Program. Grace will appoint the Claims Administrator, and may change the Claims Administrator at any time in the future, without the consent of any other parties. As of July 1, 2005, the Claims Administrator (see page 43) continues to be Health Network America.

- *Covered Condition* (page 10).

- *Covered Individual* (page 4).

- *Custodial/Maintenance Care:* The type of care (including room and board needed to provide that care) given mainly to help a person with personal hygiene or to perform the activities of daily living. Examples of custodial/maintenance care include training or help to get in and out of bed, bathe, dress, prepare special diets, eat, walk, use the toilet, or take oral drugs or medicines (or those which usually can be self-administered). Services are considered to be custodial care regardless of who authorizes, recommends, provides, or directs the care, or where the care is given.

- *Doctor:* Any doctor of medicine who satisfies the following criteria: the individual is legally qualified and licensed to practice medicine or surgery at the time and place such services are performed, and such services are within the scope of the license.

- *Durable Medical Equipment* (page 19).

- *Eligible Individual* (page 5).

- *Eligible Medical Expense:* An expense incurred for the Medically Necessary treatment of a Covered Condition of a Covered Individual, provided the expense does not exceed the amount that is Reasonable and Customary for the services or supplies that are provided during such treatment, and provided that the expense is otherwise covered under the terms of the Libby Medical Program described in this booklet (as may be updated or amended from time to time).

■ *Experimental or Investigational Treatment or Supplies:* The medical, surgical, or other health care services, supplies, treatments, procedures, drug therapies, or devices, which are determined by the Claims Administrator, at the time it makes a determination regarding coverage in a particular case, to be either:

- not generally accepted by informed health care professionals in the United States as effective in treating the condition, illness, or diagnosis for which their use is proposed, or
- not proven by scientific evidence to be effective in treating the condition, illness, or diagnosis for which their treatment is proposed.

**Important!** The Claims Administrator determines whether or not treatment or supplies are Experimental or Investigational based on the advice of experts in the field, and on published studies in recognized medical journals, review of usage patterns by practitioners in the specialty related to the treatment and, if considered appropriate by the Program Administrator or the Claims Administrator (as appropriate), by obtaining recommendations from referrals to professional review boards. A treatment is no longer considered experimental when it is commonly and customarily recognized as appropriate by practitioners specializing in the field of that disease as appropriate for the treatment of that stage of the disease. With respect to drugs or medicines, coverage is provided by the Program for drugs or medicines classified by the U.S. Food and Drug Administration as an Investigational New Drug for Treatment Use (Treatment IND) Group C or modified Group C (certain professionals refer to this class as "Phase III").

■ *Grace:* W. R. Grace & Co. Grace is the "Program Administrator." For purposes of making decisions or exercising its discretion under the Libby Medical Program, the term "Grace" or the "Program Administrator" also includes any employee, committee, or department of Grace that has been delegated the authority to act on behalf of Grace, regarding any aspect of the Program, by the Board of Directors of Grace or its designee.

■ *Health Network America:* See "Claims Administrator" (page 43).

■ *Home Health Care* (page 20).

■ *Hospice Care* (page 22).

■ *Hospital:* A facility licensed by the state in which it operates as a "hospital" and that meets one of the following rules:

1. It is accredited as a Hospital under the Hospital Accreditation Program of the Joint Commission on the Accreditation of Health Care Organizations.

2. It is supervised by a staff of Doctors, has 24-hour-a-day nursing service, and is primarily engaged in providing either general inpatient medical care and treatment through medical, diagnostic and major surgical facilities on its premises or under its control, or specialized inpatient medical care and treatment through medical and diagnostic facilities (including X-ray and laboratory) on its premises, under its control, or through a written agreement with a Hospital (which itself qualifies under number 1 or 2 of this definition) or with a specialized provider of these facilities.

The Program Administrator or the Claims Administrator determines whether or not a facility qualifies as a Hospital under rule number 2.

Notwithstanding the forgoing provisions, St. John's Lutheran Hospital in Libby, Montana will be regarded as a "Hospital" under the Program, for as long as it is licensed as a hospital in Montana.

But in no event will "Hospital" include a nursing home or institution or part of one that is primarily a facility for convalescence, nursing, rest, or the aged, or furnishes primarily domiciliary or custodial care, including training in daily living routines, or is operated primarily as a school.

■ *ICD-9 Code* (page 13).

■ *Latency Period* (page 7).

■ *Medically Necessary:* The use of services or supplies that are "medically reasonable and necessary" (as defined below) to identify or treat a Covered Individual's Covered Condition, as determined by the Program Administrator or the Claims Administrator, through reliance on published medical guidelines (subject to change and review on a prospective basis), including (but not limited to) the U.S. Federal Medicare Guidelines and Volume I of Drug Information For The Health Care Professional (USPDI), as applicable and as such guidelines may be modified over time.

To be considered "medically reasonable and necessary," a medical service or supply must be:
- Established as safe and effective,
- Consistent with the symptoms or diagnoses of the illness under treatment,
- Necessary and consistent with generally accepted professional medical standards of care (i.e., not Experimental or Investigational or grossly inappropriate),
- Not furnished primarily for the convenience of the patient, the attending physician, or another physician or supplier, and
- Furnished at the most appropriate level that can be provided safely and effectively to the patient.

All as determined by the Program Administrator or Claims Administrator.

■ *OTC (Over the Counter):* All smoking deterrents and all respiratory agents with a proper prescription (page 14).

■ *Primary Plan* (page 27).

■ *Participating Pharmacy* (page 16).

■ *Program Administrator:* The Program Administrator of the Libby Medical Program is "Grace" (see pages 40 and 43).

■ *Reasonable and Customary:* A charge not exceeding an amount — determined by the Claims Administrator through reliance on published medical industry standards (subject to change and review on a prospective basis), including (but not limited to) the schedules of the Medical Data Research (MDR) Payment System and of the Health Insurance Association of America (HIAA) Prevailing Healthcare Charges System (as applicable and as such standards may be modified over time) — that is the lowest of:
- the usual charge by the Doctor or other provider of the services or supplies for the same or similar services or supplies,
- the prevailing charge of the majority of Doctors or other providers in the same or a similar geographic area for the same or similar services or supplies, or
- the actual charge for the services or supplies;

All as determined by the Claims Administrator.

■ *Skilled Services:* Services that must be provided by a licensed Doctor, licensed nurse or therapist or licensed nurse practitioner (and such service is not Custodial/Maintenance Care).

# Other Information

The following pages describe other information you should know about the plan and your rights.

## Plan Sponsor

The sponsor of the plan is W. R. Grace & Co., 7500 Grace Drive, Columbia, MD 21044.

## Plan Administration

The Plan Administrator is the "Program Administrator," which is W. R. Grace & Co., 7500 Grace Drive, Columbia, MD 21044, (410) 531-4000 (see page 40 for a definition of "Grace"). Grace is responsible for all aspects of the Program (including, but not limited to, the interpretation of all provisions of the Program), except where such aspects have been specifically delegated to the Claims Administrator.

Grace, as the Claims Administrator, however, may seek the advice of health care professionals to assist Grace with making determinations regarding its responsibilities.

## Claims Administrator

As of July 1, 2005, the Claims Administrator continues to be:

Health Network America
P.O. Box 65
West Long Branch, NJ 07764-0065
1-888-563-1564

The Claims Administrator is responsible for initial claim decisions, resolutions of these decisions, and payment of benefits.

## Determinations and Decisions

The determinations and decisions made by Grace under the Libby Medical Program will be final and binding on all Covered Individuals and other parties. Grace reserves the right to retain and rely upon the advice of other parties, including experts, physicians, and attorneys that it selects.

## Plan Year

Records are kept on a plan-year basis. The first plan year is a short plan year, beginning on April 3, 2000 and ending on December 31, 2000. Remaining plan years will be the same as a calendar year (January 1 - December 31).

## Plan Identification

The official name of the Program is the Libby Medical Program. The Internal Revenue Service and Department of Labor identify Grace by the number 65-0773649 and the Program by the number 528. The Program is classified as a "welfare plan" providing medical benefits.

## The Program's Future

Grace, by action of its Board of Directors (or its designee), reserves the right to update or amend the Program at any time, provided that such update or amendment is consistent with the purpose of the Libby Medical Program (see page 4), as determined by Grace. For example, Grace may determine that it is necessary to change or modify the guidelines that are used to determine what is Medically Necessary or a Reasonable and Customary charge.

## Legal Service

The agent for service of legal process is the General Counsel, W. R. Grace & Co., 7500 Grace Drive, Columbia, MD 21044.

## Plan Documents

This booklet is the plan document of the Libby Medical Program as of July 1, 2005.

## If You Cannot Receive Payments

If Grace or the Claims Administrator determines that a Covered Individual is not able to receive payments — for example, if the Covered Individual is physically or mentally disabled — it may have payments made to the person or institution responsible for the Covered Individual.

## Rights to Benefits

Benefits from the Program may not be assigned, sold, transferred, or pledged to a creditor or anyone else.

# Effective Dates of Program Documents

This Libby Medical Program document (005), effective July 1, 2005, supercedes all prior Program documents, and will govern the terms of the Program until further notice.

## THE LIBBY MEDICAL PLAN QUALIFIED SETTLEMENT FUND TRUST

1.     **Name and Purpose of the Trust.**  The Trust shall be known as the Libby

Medical Plan Qualified Settlement Fund Trust (the "Trust").  The purposes of the Trust are to

administer the Trust in the best interests of beneficiaries of the Trust, and (1) to receive from

W. R. Grace & Co., transfer of the Grace Libby Medical Plan as described in the Term Sheet

dated January 10, 2012, and attached hereto as Exhibit A, after Grace has terminated the Grace

Libby Medical Plan; (2) to administer the Trust, including as it may be modified pursuant hereto;

(3) to receive from W.R. Grace and Co., the sum of $19.5 million in cash to fund the Trust; and

(4) to modify the Libby Medical Plan in any manner as may be in the best interests of the

beneficiaries defined herein.  The Trust is established pursuant to the Term Sheet attached hereto

as Exhibit A (the "Term Sheet"), wherein the Trust is referred to as the "LMP Trust."  The Trust

is being established as a qualified settlement fund ("QSF") in accordance with 26 U.S.C. § 468B

and its corresponding regulations, 26 C.F.R. § 1.486B.  The Trust shall be subject to the

jurisdiction and supervision of the District Court of the 19th Judicial District of the State of

Montana (the "Court").

2.     **Contributions to the Trust.**  The following contribution will be made to the

Trust:  W. R. Grace & Co., shall fund the Trust with a one-time payment of $19.5 million, which

payment shall be made on the Settlement Effective Date per the Term Sheet.

2.1.     *No further obligations for W.R. Grace & Co.,  to contribute to the Trust.*

Following the above contribution to the Trust, W.R. Grace & Co., shall have no further

obligation to the Trust, nor shall W.R. Grace & Co., have any interest in the funds held in the Trust.

2.2.    *Nature of contributions.*  All contributions to the Trust shall be made in immediately available funds.  All such contributions, together with the earning thereon, shall be held as a trust fund for administration of the Trust, as well as costs and expenses to be incurred by the Trustee as herein provided.  Contributions made to the Trust shall not be construed as fines, penalties, monetary sanctions, or punitive damages.

**3.    Beneficiaries of the Trust.**  The beneficiaries of the Trust (the "Beneficiaries") shall consist of: (a) all Covered Individuals, as defined in the Grace Libby Medical Plan dated July 1, 2005, attached as Exhibit A to the Term Sheet, determined as of the Settlement Effective Date (as defined in the Term Sheet); and (b) all individuals and personal representatives of individuals who, within 60 days after the Settlement Effective Date, shall file with the Trustee evidence satisfactory to the Trustee that such individual (a) has suffered from mesothelioma, asbestos related cancer, or asbestos related disease as defined in American Thoracic Society, Official Statement (2004), and (b) suffered exposure in Lincoln County, Montana to asbestos generated by Grace's operations.

**4.    Dispositive Provisions.**

4.1. *Payment of Income and Principal.*  During the term of the Trust, the Trustee shall pay or apply principal and income of the Trust (a) in order to administer the Trust (including payment to the Trustee), as more specifically provided below, (b) in order to pay the fees and costs of the Libby Claimants' attorneys (the law firms of Lewis, Slovak, Kovacich & Marr, PC, McGarvey, Heberling, Sullivan & McGarvey, PC, Cohn Whitesell & Goldberg LLP, Murtha Cullina LLP, and Landis, Rath & Cobb, LLP), and any common fund fees and costs, as approved

by the Court; and (c) for the benefit of the Beneficiaries, according to distribution policies and procedures determined by the Trustee after consultation with the Trust Advisory Committee established under Section 5.2 below.

4.2. *No Authority to Conduct Business.* The purpose of the Trust is limited to the matters set forth herein, and the Trust shall not be construed to confer upon the Trustee any authority to carry on any business or activity for profit.

4.3. *Termination of the Trust.* The Trust shall terminate upon distribution of all trust assets and upon order of the Court.

4.4. *Alterations, Amendments, and Revocation.* The Trust may be altered, amended, or revoked from time to time by an instrument in writing executed by the Trustee, after consultation with the Trust Advisory Committee and ordered by the Court;  provided that thirty (30) days prior to any proposed alteration, amendment or revocation, counsel for the Libby Claimants shall receive written notice.

**5. Trustee**

5.1. *Initial Trustee.* The initial Trustee of the Trust shall be Francis McGovern.

5.2. *Trust Advisory Committee.*        A Trust Advisory Committee shall consult with the Trustee on matters of policy and the performance of trust duties.  The Trust Advisory Committee shall consist of three individuals who are Beneficiaries, elected by a majority vote of the Beneficiaries (*i.e.,* a majority of those Beneficiaries casting ballots).  If a member of the Trust Advisory Committee resigns or becomes unable to perform his duties, his successor shall be designated by the remaining members of the Trust Advisory Committee.

5.3. *Investment and Reinvestment.* The Trustee shall invest and reinvest the principal and income of the Trust and keep the Trust invested in one or more demand deposits,

government funds and/or treasury bills, which shall be treated as a single fund without distinction between principal and income. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated case needs of the Trust. In investing, reinvesting, exchanging, selling and managing the Trust, the Trustee shall discharge its duties with respect to the Trust solely in the interest of the accomplishment of the purposes and objectives of the Trust. Given prevailing economic conditions, the Trustee shall take appropriate steps to preserve the principal, recognizing that this may come at the expense of earnings thereon.

5.4. *Affiliates.* The Trustee shall have the power to engage any corporation, partnership, or other entity whether affiliated or not with the Trustee as an "Affiliated Entity" to render services to the Trust hereunder, including, without limitation, to act as manager, or consultant for the Trust, to act as broker or dealer to execute transactions (including the purchase of any security currently distributed, underwritten or issued by an Affiliated Entity, at standard commission rates, markups or concessions), and to provide other management or investment services with respect to such trust, including the custody of assets; and the Trustee shall pay for any such services from Trust property. The Trustee may exercise said power in its sole and absolute discretion without Court Order or approval.

5.5. *Continuing Jurisdiction of Court.* The Court shall have continuing jurisdiction of the administration of the Trust and the performance of trust duties by the Trustee. In order to enable the Court to exercise its continuing jurisdiction, the Trustee shall report to the Court once per year an accounting of Trust assets and payments. The reports prepared by the Trust for the Court shall also be provided in electronic format to the Libby Claimants' counsel.

**6. Express Powers of Trustee.** Without in any way limiting the power and discretion conferred upon the Trustee by the other provisions of the Trust or by law, the Trustee is expressly authorized and empowered as hereinafter set forth:

6.1. *Payment of Expenses of Administration.* To incur and pay any and all charges, taxes and expenses upon or connected with the Trust in the discharge of his fiduciary obligations under the Trust. All such payments shall be made using the assets of the Trust..

6.2. *Preservation of Principal.* Notwithstanding any other provision in the Trust, to at all times hold, manage, invest, and reinvest the assets of the Trust in a manner designed to preserve the accrued income and principal of the Trust for the purposes of the Trust.

6.3. *Retention of Investment Advisor and Other Consultants.* To engage the services of (and pay compensation to) an investment advisor, accountants, agents, managers, counsel, or other consultants with respect to the management of investments of the Trust, the management of the Trust or any other matters.

6.4. *Execution of Documents of Transfer.* To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

6.5. *Litigation.* To defend and to institute litigation in the name of the Trust.

6.6. *Execution of Contracts and Agreements.* To make, execute, acknowledge and deliver any and all contracts or agreements on behalf of the Trust. Such agreements may include settlement agreements and qualified assignment agreements to effectuate settlements governed by sections 104(a)(2) and 130 of the Internal Revenue Code of 1986, as amended.

6.7. *Discretion in Exercise of Power.* The Trustee has authority to do any other acts that the Trustee deems proper to effectuate the purpose hereof and to exercise the powers specifically conferred upon the Trustee by the Trust.

**7. Advice of Counsel.** The Trustee may from time to time consult with counsel with respect to any question arising as to compliance with this Trust. The Trustee shall be fully protected, to the extent permitted by law, in acting in reliance upon the advice of counsel.

**8. Trustee Compensation & Expenses.** The Trustee, and any successor Trustee, shall receive payment for services in accordance with the Trustee's schedule of rates in effect at the time such compensation becomes payable, without reduction for any other fees or other compensation paid to consultants or others, or any Affiliated Entity, except to the extent required by applicable law. The Trustee shall be reimbursed for expenses, including travel expenses, reasonably required and incurred by the Trustee in the performance of the Trustee's duties as Trustee. The Trustee's compensation and reimbursement of expenses may be paid without Court approval, but shall be disclosed in reports filed with the Court pursuant to Section 5.5 hereof.

**9. Successor Trustees.**

9.1. *Vacancy Caused by Resignation or Removal.* The Trustee may resign as Trustee of the Trust at any time by written notice delivered to the Court with continuing jurisdiction over this Trust. Such resignation shall be effective upon written appointment of the successor Trustee. The Trust Advisory Committee shall designate a successor Trustee, subject to approval by the Court. All of the Trustee's fees and expenses (including reasonable attorneys' fees) attributed to the appointment of a successor Trustee shall be paid by the Trust. No bond or other security shall be required of the Trustee or successor Trustee in any jurisdiction. Any successor

Trustee shall have the same powers, authority and discretion as though originally named as the Trustee.

9.2. *Acceptance of Appointment of Successor Trustees.* Acceptance of appointment of a successor Trustee shall be in writing and shall become effective upon receipt by the Court of notice of such acceptance. Upon the acceptance of appointment of any successor Trustee, title to the Trust shall thereupon be vested in said successor Trustee, without the necessity of any conveyance or instrument. Each successor Trustee shall have all the rights, powers, duties, authority, and privileges as if initially named as a Trustee hereunder.

9.3. *Preservation of Record of Changes to Trustees.* A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of the Trust in the custody of the Court.

**10. Indemnity.** Each Trustee, whether initially named or appointed as successor Trustee, acts as a Trustee only and not personally. With respect to any contract, obligation or liability made or incurred by the Trustee in good faith, all persons shall look solely to the Trust and not the Trustee personally. The Trustee shall not incur any liability, personal or corporate, of any nature in connection with any act or omission of the Trustee in the administration of the Trust or otherwise pursuant to the Trust. The Trustee initially named, or appointed as successor Trustee by the Court, shall be indemnified and held harmless by the Trust. This indemnification and hold harmless provision shall cover all expenses reasonably incurred by such Trustee in defense of the aforementioned acts or omissions of the Trustee, including, but not limited to, reasonable attorney fees and costs. Except for the payment of all expenses reasonably incurred, this indemnification shall not apply to any liability arising from criminal proceedings or acts where the Trustee had reasonable cause to believe that the conduct in question was unlawful.

**11. Interpretation.** As used in the Trust, words in the singular include the plural, words in the plural include the singular, and masculine and neuter genders shall be deemed to include the masculine, feminine and neuter. The description heading for such Section and Subsection of the Trust shall not affect the interpretation or the legal efficacy of the Trust.

**12. Choice of Law**. This Trust shall be administered, construed, and enforced according to the laws of the State of Montana.

**13. Acceptance of Trust Terms.**

13.1. *Acceptance by Trustee.* Francis McGovern accepts his appointment as Trustee of the Trust and the terms thereof as stated above.

13.2. *Acknowledgement of Waivable Conflict of Interest.* The parties hereto acknowledge that the Trustee may have a waivable conflict of interest by first assisting in the creation of this Trust, including the drafting or review of documents to be filed by the parties hereto, and then serving as Trustee of the Trust, which is technically as adversarial role. The parties hereto waive any such conflict of interest that may exist.

DATED this _____ day of _____, 2012.

Trustee

By: _____     By: _____
Jon L. Heberling, of McGarvey,            Francis McGovern
Heberling, Sullivan & McGarvey

By: _____
Tom L. Lewis, of Lewis, Slovak,
Kovacich & Marr

Approved by the 19th Judicial District Court this _____ day of _____, 2012.

By: _____
District Court Judge

# EXHIBIT B

## BNSF Settlement

For Execution

**SETTLEMENT AGREEMENT**
**BETWEEN BNSF AND THE DEBTORS**
**(BNSF Indemnity Claims)**

This SETTLEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of April 20, 2012 (the "<u>Execution Date</u>"), by and among BNSF and the Debtors. Each of BNSF and each of the Debtors are referred to herein as a "<u>Party</u>" and collectively as the "<u>Parties.</u>" Capitalized terms used herein are defined in <u>Article I</u> below.

## RECITALS

WHEREAS, on or about April 2, 2001, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, <u>In re W. R. Grace & Co., et al.,</u> No. 01-1139 (JKF), and they continue to operate their businesses as debtors and debtors-in-possession; and

WHEREAS, the Debtors, the Committee, the FCR and the Official Committee of Equity Security Holders appointed in the Bankruptcy Case, as co-proponents, proposed the Plan, which the Bankruptcy Court confirmed by Order entered in the Bankruptcy Case on January 31, 2011 [Docket No. 28445], as clarified by Order entered on February 15, 2011 [Docket No. 26289] (collectively, the "<u>Confirmation Order</u>"); and

WHEREAS, the District Court affirmed the Confirmation Order, affirmed the CNA Settlement Approval Order, and issued the injunctions provided for in the Plan in an Order dated January 30, 2012, and entered on January 31, 2012 [Docket No. 165], in Case No. 11-199 (RLB), <u>et al.</u> (the "<u>District Court Affirmance Order</u>"); and

WHEREAS, BNSF asserted certain Claims against the Debtors, raised certain objections in the Bankruptcy Case to confirmation of the Plan and other matters, and filed and has pursued certain Appeals; and

WHEREAS, the Parties, subject to the terms and conditions of this Agreement, now wish fully and finally to compromise and resolve the disputes among them, in accordance with this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.01    Certain Definitions**. As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" has the meaning given to such term in the Plan.

"<u>Agreement</u>" has the meaning set forth in the preamble.

For Execution

"Appeals" means BNSF's appeals of (i) the Confirmation Order, noticed in the Bankruptcy Court on March 18, 2011 [Docket No. 26590] and docketed in the District Court as Case No. 11-531 (RLB) (consolidated into lead Case No. 11-199 (RLB)), (ii) the CNA Settlement Approval Order, noticed in the Bankruptcy Court on February 1, 2011 [Docket No. 26168] and docketed in the District Court as Case No. 11-207 (RLB), (iii) the Arrowood Settlement Approval Order, noticed in the Bankruptcy Court on August 28, 2009 [Docket No. 23002] and docketed in the District Court as Case No. 09-763 (RLB), and (iv) any further appeals noted or filed by BNSF relating to confirmation of the Plan or approval of the Insurance Settlements, including any appeal of the District Court Affirmance Order, and all proceedings with respect to all such appeals.

"Approval Motion" has the meaning set forth in Section 4.01.

"Approval Order" means an order of the Bankruptcy Court, to be entered in the Bankruptcy Case, substantially in the form attached hereto as Exhibit A, with only such modifications as to which the Parties have consented in writing, which order shall, among other things, approve this Agreement and the compromise and settlement memorialized herein, authorize the Debtors and the Trust to perform under this Agreement in accordance with its terms, and modify the Preliminary Injunction, only to the extent necessary, to permit BNSF to execute, deliver and perform its obligations under this Agreement and the Libby/BNSF Settlement.

"Arrowood Settlement Approval Order" means the Order of the Bankruptcy Court entered in the Bankruptcy Case August 19, 2009 [Docket No. 22859], approving the insurance settlement agreement entered into by the Debtors and Arrowood Indemnity Company (as defined therein) on or about June 17, 2009.

"Asbestos Protected Party" has the meaning given to such term in the Plan.

"Bankruptcy Case" means In re W. R. Grace & Co., et al., Case No. 01-1139 (JKF) and the other bankruptcy cases that are jointly administered under Case No. 01-1139, including any appeals of decisions in the Bankruptcy Case.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware and, to the extent it exercises jurisdiction over the Bankruptcy Case, the United States District Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"BNSF" means each of BNSF Railway Company, The Great Northern Railway Company, Burlington Northern Railroad Company, Burlington Northern, Inc. and The Burlington Northern & Santa Fe Railway Company, and their past, present and future Affiliates, subsidiaries, agents, representatives, insurers, predecessors, successors and assigns, and any Person claiming through or under any of the foregoing.

For Execution

"BNSF Policies" means the following insurance policies:

    i.    The CNA Companies: Policy No. 2483440 (but not including policies with the identical number issued to Grace), Policy No. CCP 3227361 and Policy No. 9060456;

    ii.    Arrowood Indemnity Company: Policy No. RLH578320, Policy No. RLH703154, Policy No. RLH838467, Policy No. RLH021669, and Policy No. RLH141383; and

    iii.    Maryland Casualty Company: Policy No. 50-523812, Policy No. 50-511902, and Policy No. 50-695902.

"Claim" means any claim (whether past, present, or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, matured or unmatured, liquidated or unliquidated, direct or consequential, and whether in law, equity, admiralty or otherwise), assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, directive, obligation, suit, lawsuit, action, direct action, cause of action, administrative proceeding, governmental claim or action, order, judgment, settlement, mediation, arbitration, lien, and any other assertion of rights or liability of any kind or subject matter whatsoever.

"Committee" means the Official Committee of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case.

"CNA Settlement Approval Order" means the Order of the Bankruptcy Court entered January 22, 2011 [Docket No. 26106], approving the insurance settlement agreement entered into by the Debtors and the CNA Companies (as defined therein) on or about November 18, 2010.

"Confirmation Order" has the meaning set forth in the Recitals.

"Debtors" has the meaning given to such term in the Plan.

"Demand" has the meaning given to such term in the Plan.

"District Court" means the United States District Court for the District of Delaware.

"District Court Affirmance Order" has the meaning set forth in the Recitals.

"Effective Date" means the Effective Date, as defined in the Plan.

"Execution Date" has the meaning set forth in the preamble.

"Final Order" has the meaning given to such term in the Plan.

"FCR" means David Austern, the Asbestos PI Future Claimants' Representative appointed for each Debtor by order of the Bankruptcy Court dated May 24, 2004, and any successor to him.

For Execution

"Global Settlement Effective Date" means the date on which the later of the following events occurs: (i) the Approval Order becomes a Final Order, and (ii) the conditions set out in Section II.C. (1) through (4) of the Libby/BNSF Settlement have been satisfied or waived.

"Insurance Contributor" has the meaning given to such term in the Plan.

"Insurance Settlements" means the settlement entered into by the Debtors and the CNA Companies as approved by the CNA Settlement Approval Order and the settlement entered into by the Debtors and Arrowood Indemnity Company as approved by the Arrowood Settlement Approval Order.

"Libby/BNSF Claimant" means any person who (i) (x) asserted any asbestos-related Claim against BNSF (or against any of its insurers in its capacity as such) based upon, arising out of or relating to alleged exposure to asbestos or vermiculite, for which BNSF alleges any of the Debtors has any liability (including any Claim based upon loss or impairment of the marital relationship, or loss of support, aid, protection, society and/or consortium of any allegedly exposed person), and (y) resolved such Claim with BNSF by way of settlement, judgment or otherwise on or before the Execution Date, or (ii) is included within the definition of "Released BNSF Claimant" in the Libby/BNSF Settlement.

"Libby/BNSF Settlement" means the settlement agreement dated as of April 20, 2012, among Settlement Counsel, BNSF, CNA, Arrowood and MCC (all as defined in such agreement) in the form approved in writing by the Parties and either (i) prior to the Effective Date, approved by the Committee and the FCR, or (ii) after the Effective Date, approved by the Trust.

"Libby/Grace Settlement" means the settlement set forth in the Term Sheet among W. R. Grace & Co., the Asbestos Claimants' Committee, and the Libby Claimants (as defined therein), executed on or about January 10, 2012, which provides, among other things, for termination of the Libby Medical Program as described therein.

"New Plan" has the meaning set forth in Section 4.03.

"Party" and "Parties" have the meanings set forth in the preamble.

"Person" means any individual, corporation, limited liability company, general partnership, limited partnership, venture, trust, business trust, unincorporated association, estate or other entity.

"Plan" means the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative, and the Official Committee of Equity Security Holders As Modified Through December 23, 2010, including all exhibits and schedules thereto, as the same may be amended from time to time.

"Preliminary Injunction" means that certain Order Expanding the Preliminary Injunction to Include Actions Against Burlington Northern and Santa Fe Railroad dated April 11, 2008, and entered on April 14, 2008, in Grace v. Chakarian, et al., Adv. Pro. No. 01-771 (JKF) [Docket No. 498].

For Execution

"Released Claims" has the meaning set forth in Section 3.01(a).

"Released Policies" has the meaning set forth in Section 3.01(b).

"Reorganized Debtors" has the meaning given to such term in the Plan.

"Settlement Payment" has the meaning set forth in Section 2.01.

"TDP" means the Asbestos PI Trust Distribution Procedures, as defined in the Plan.

"Trust" means the Asbestos PI Trust, as defined in the Plan.

**1.02    Construction.**

Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. Each defined term stated in the singular shall include the plural and each defined term stated in the plural shall include the singular. Unless otherwise specified herein, all references to Articles and Sections refer to articles and sections of this Agreement. Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person. The words "includes" or "including" shall mean "including without limitation."

**ARTICLE II**
**TRUST PAYMENT AND OBLIGATIONS**

**2.01    Payment by the Trust.**

Not later than thirty days after the last to occur of (i) the Effective Date, (ii) the Global Settlement Effective Date, and (iii) the Trust's receipt of the $250 million payment described in Section 1.1.47(a) of the Plan, the Trust shall pay to BNSF, by wire transfer of immediately available funds, the sum of Eight Million Dollars (US $8,000,000.00) (the "Settlement Payment"). The Settlement Payment shall be made to the account set forth on Exhibit B attached to this Agreement (or to such other account as BNSF instructs in a written notice delivered to the Trust). The Trust shall send written notice to BNSF in accordance with Section 7.09 that the Settlement Payment has been made; such notice shall also be sent to the person(s) listed on Exhibit C attached to this Agreement.

**2.02    Trust Bound.**

Upon the occurrence of the Effective Date, the Trust shall be bound by, and entitled to enforce, this Agreement as if a party hereto, without any further action of any Party, and the Approval Order shall so provide. This Agreement does not trigger the last sentence of the third paragraph of Section 5.6 of the TDP.

For Execution

# ARTICLE III
# RELEASES

### 3.01    Releases by BNSF.

(a)    Effective as of BNSF's receipt of the Settlement Payment, BNSF irrevocably releases, acquits and forever discharges each of the Debtors, the Asbestos Protected Parties (in their capacities as such) and the Trust from any and all present and future Claims, Demands, obligations and liabilities of any nature whatsoever (including any Claim for contractual or common law indemnity or contribution, or for attorneys fees, costs of litigation, defense costs or similar expenses) based upon, arising out of or arising with respect to (i) any Claim of any Libby/BNSF Claimant, or (ii) any other Claim, Demand, obligation or liability resolved or released pursuant to the Libby/BNSF Settlement (collectively, the "Released Claims"). For the avoidance of doubt, BNSF does not purport to release any Claim or Demand, if any, that any Libby/BNSF Claimant may have in his or her own right directly against the Debtors or the Trust.

(b)    Effective as of BNSF's receipt of the Settlement Payment, BNSF forever terminates, waives, releases and otherwise relinquishes: (i) any and all right, title or interest in or to any insurance policy or insurance coverage (including the proceeds thereof) under which any Insurance Contributor is an insured, including the insurance policies identified in Exhibit 5 or Exhibit 6 to the Plan (including the schedules thereto) (collectively, the "Released Policies"); and (ii) all past, present and future claims, demands, and causes of action of any nature whatsoever, including past, present or future claims or demands for defense costs and expenses (including attorneys fees), whether based in contract, tort, statutory or other legal or equitable theories of recovery, whether known or unknown, suspected or claimed, under, related to or based upon any of the Released Policies, against any insurer under a Released Policy (but only with respect to any such Released Policy). Notwithstanding the foregoing, the term "Released Policies" as used in this Agreement does not include the BNSF Policies.

### 3.02    Waiver under State Statutory Laws.

BNSF knowingly and intentionally waives any protection afforded to it by California Civil Code §1542, or any similar law of any other jurisdiction, which California Civil Code provision provides that:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

BNSF agrees that this Agreement is intended to cover all claims or possible claims arising out of or related to those matters referenced or impliedly covered in the releases set forth in Section 3.01, whether the same are known, unknown or hereafter discovered or ascertained, and the provisions of California Civil Code §1542 (or any other similar applicable state or federal statute or common law principle) are hereby expressly waived. BNSF expressly acknowledges that it has been advised by its counsel of the contents and effect of any such provisions, and with

such knowledge it hereby expressly waives whatever benefits it may have pursuant to any such provisions.

**3.03    Representations and Warranties regarding Released Claims.**

BNSF represents and warrants to the other Parties that it is the sole and lawful owner of all right, title and interest in and to every Claim, demand, cause of action, objection and liability that it purports to release in Section 3.01 of this Agreement and that it has not previously assigned or transferred, either by act or operation of law or otherwise, to any Person, any such Claim, demand, cause of action, objection or liability purported to be released by it under Section 3.01 of this Agreement.

**ARTICLE IV**
**BANKRUPTCY-RELATED OBLIGATIONS**

**4.01    Approval Order.**

As soon as practicable after the Execution Date, the Debtors will file a motion (the "Approval Motion") seeking (i) entry of the Approval Order, and (ii) modification of the Preliminary Injunction only to the extent necessary to permit BNSF to execute, deliver and perform its obligations under this Agreement and the Libby/BNSF Settlement. The Parties agree to use their reasonable best efforts to obtain entry of the Approval Order, and to have the Approval Order become a Final Order, as soon as reasonably possible. BNSF, at its own expense, will cooperate with the Debtors in obtaining the Approval Order and having the Approval Order become a Final Order.

**4.02    Withdrawal.**

Upon the Global Settlement Effective Date, BNSF shall withdraw all of the Appeals, and all of its pending objections to the Plan (including all documents related to the implementation of the Plan), to confirmation of the Plan, to approval of the Insurance Settlements or to any of the Debtors', Committee's or FCR's other motions or applications filed in the Bankruptcy Case as of the Execution Date. BNSF further agrees not to object or oppose (or if filed, to withdraw any objection or opposition to) any other motion or application filed by the Debtors, the Committee or the FCR on or after the Execution Date that (i) relates to Claims resolved by virtue of this Agreement, and (ii) does not materially and adversely affect the settlement embodied in this Agreement.

**4.03    No Plan Objections.**

If the Plan is not confirmed, or if for any reason the Debtors, the Committee or the FCR propose a plan of reorganization that is not the Plan, BNSF agrees that it will not object to such new plan so long as such plan (i) provides for treatment of BNSF's Claims and Demands in a manner that is not materially and adversely different than the treatment of BNSF's Claims and Demands under the Plan, and (ii) does not materially and adversely affect the settlement embodied in this Agreement (apart from any delay in achieving confirmation and effectiveness of such plan). A plan of reorganization which satisfies the requirements of subparts (i) and (ii) of this Section 4.03 is referred to herein as a "New Plan." BNSF shall be entitled to file any

For Execution

objection or opposition to any proposed plan of reorganization which is not the Plan or a New Plan.

**4.04    Reservation of Rights.**

BNSF reserves its rights, notwithstanding any other provision of this Agreement to object and be heard in the Bankruptcy Case in response to any opposition to entry or affirmation of the Approval Order.

## ARTICLE V
## TERMINATION OF AGREEMENT

**5.01    Termination.**

Either (i) the Debtors (with the consent of the Committee and the FCR), or after the Effective Date, the Trust or (ii) BNSF may, by written notice in accordance with Section 7.09, terminate this Agreement upon the occurrence of any of the following events:

(a)    The entry of an order by the Bankruptcy Court denying approval of this Agreement;

(b)    The entry of an order dismissing the Bankruptcy Case prior to the Effective Date of the Plan;

(c)    The entry of an order by the Bankruptcy Court converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(d)    The Debtors, the Committee or the FCR propose a plan of reorganization that is not the Plan or a New Plan;

(e)    The Libby/BNSF Settlement is terminated for any reason;

(f)    The Libby/Grace Settlement is terminated for any reason; or

(g)    Any of the "Settlement Payments" as defined in the Libby/BNSF Settlement is reduced for any reason;

provided, however, that, prior to terminating this Agreement pursuant to §5.01(g), the Debtors (with the consent of the Committee and the FCR), or after the Effective Date, the Trust, and BNSF shall negotiate in good faith for a reasonable time to attempt to reach a resolution that does not require termination of this Agreement.

**5.02    Effect of Termination.**

Upon the termination of this Agreement, no Party shall have any further obligation hereunder; *provided however* that termination shall not relieve any Party then in breach of this Agreement from liability in respect of such breach; and *provided further* that this Section 5.02, Section 6.02 and Section 7.07 shall survive such termination.

*Page 8 of 14*

For Execution

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES; SETTLEMENT

**6.01    Representations and Warranties of Each Party.**

Each Party hereby represents and warrants to each other Party that:

(a)    such Party has full power and authority to enter into this Agreement and to perform its obligations hereunder (subject to Bankruptcy Court approval as to the Debtors);

(b)    the execution, delivery and performance of this Agreement do not conflict with such Party's organizational documents or any other agreement or arrangement to which such Party is a party or by which it is or its assets are bound or any law, regulation or order to which such Party is subject;

(c)    the execution and delivery of, and the performance of the obligations contemplated by, this Agreement have been approved by duly authorized representatives of such Party, and by all other necessary actions of such Party; and

(d)    each individual executing this Agreement has full authority to act for and to bind the Party on whose behalf he or she is signing.

**6.02    Settlement.**

Each Party agrees and acknowledges that this Agreement was negotiated at arm's length and in good faith, and is a fair and reasonable compromise of each Party's disputed claims, and that the Settlement Payment constitutes fair consideration for the release of the Released Claims and the other promises and undertakings in this Agreement.  The agreements and covenants given as consideration in this Agreement, as well as the execution of this Agreement, shall not be construed to be an admission of liability on the part of any Party with respect to the disputed matters set forth above nor shall this Agreement be deemed an admission or concession by any Party of liability, culpability, or wrongdoing.  Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions.  Except as necessary with respect to the Approval Motion, any evidence of the terms of this Agreement or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except in (i) an action or proceeding to enforce the terms of this Agreement, or (ii) as otherwise directed by any court of competent jurisdiction.

For Execution

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

**7.01    Parties to Bear Own Costs and Attorneys' Fees.**

Each Party will bear its own costs and expenses, including attorneys' fees, incurred by it in the negotiation of this Agreement and the transactions and other agreements contemplated hereby.

**7.02    Entire Agreement.**

This Agreement represents and contains the entire agreement and understanding among the Parties with respect to the subject matter of this Agreement, and supersedes any and all prior oral and written agreements and understandings relating thereto. No Person other than the Parties, the Committee, the FCR and the Trust shall have any legally enforceable rights or benefits under this Agreement. The Committee, the FCR, and the Trust are intended third-party beneficiaries of this Agreement. This Agreement may not be amended or modified, and no provision hereof may be waived, except by a written agreement (i) signed by each Party and (ii)(x) prior to the Effective Date, consented to by the Committee and the FCR, or (y) after the Effective Date, consented to by the Trust.

**7.03    Advice of Counsel.**

Each Party acknowledges and represents that it has sought and obtained the legal advice of its own chosen attorneys and that the terms of this Agreement have been completely read and are fully understood and voluntarily accepted by it.

**7.04    Counterparts.**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument.

**7.05    Binding Effect.**

This Agreement will be binding on and inure to the benefit of the Parties and their respective Affiliates, heirs, legal representatives, successors and permitted assigns, including, after the Effective Date, the Reorganized Debtors, the Asbestos Protected Parties (in their capacities as such) and the Trust. This Agreement may not be assigned by any Party (i) prior to the Effective Date, without the prior written consent of the other Party, the Committee and the FCR, or (ii) after the Effective Date, without the prior written consent of the other Party and the Trust.

**7.06    Governing Law.**

This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware, excluding any conflict-of-laws rule or principle (whether under the laws of Delaware or any other jurisdiction) that might refer the governance or the construction of this Agreement to the law of another jurisdiction.

*Page 10 of 14*

For Execution

**7.07    Submission to Jurisdiction.**

(a)    The Parties agree to submit all disputes relating to this Agreement to the Bankruptcy Court.

(b)    If the Bankruptcy Court refuses to exercise jurisdiction over any such dispute, the Parties may submit such dispute to any court of competent jurisdiction and, in such case, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any county, federal or state court located within the State of Delaware over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each Party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**7.08    Construction.**

This Agreement was negotiated among the Parties hereto at arm's length and in good faith, with each Party receiving advice from independent legal counsel. It is the intent of the Parties that no part of this Agreement be construed against any of the Parties hereto because of the identity of the drafter.

**7.09    Notices.**

All notices, demands, or other communications that any Party desires or is required to give shall be given in writing and shall be deemed to have been given if hand delivered, faxed, emailed (as a .pdf attachment), or if mailed by United States first-class mail, postage prepaid, to the Persons, and at the addresses, noted below, or such other address as any such Person may designate in writing from time to time:

If to the Debtors:                    W. R. Grace & Co.
                                      7500 Grace Drive
                                      Columbia, MD  21044
                                      Attn: Mark A. Shelnitz
                                          General Counsel
                                      Telephone:  (410) 531-4000
                                      Facsimile:  (410) 531-4545

*Page 11 of 14*

For Execution

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn: Adam Paul
Telephone: (312) 861-3120
Facsimile: (312) 862-2200

and

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Attn: Laura Davis Jones/James E. O'Neill
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

If to BNSF:

James Roberts
Robert Attridge
2500 Lou Menk Drive, AOB 3
Fort Worth, TX 76131
Telephone: 817-352-2330
Robert.Attridge@bnsf.com
james.roberts3@bnsf.com

Edward C. Toole, Jr.
Linda J. Casey
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
Telephone: (215) 981-4000
caseyl@pepperlaw.com
toolee@pepperlaw.com

Robert J. Phillips
Phillips Haffey P.C.
P.O. Box 8569
Missoula, Montana 59807
Telephone: (406) 721-7880
rjphillips@phillipsmontana.com

For Execution

If to the Committee:                    Caplin & Drysdale, Chartered
                                        One Thomas Circle, NW, Suite 1100
                                        Washington, DC  20005
                                        Attn:  Peter Lockwood
                                        Telephone:  (202) 862-5000
                                        Facsimile: (202) 862-3301

                                        and

                                        Caplin & Drysdale, Chartered
                                        375 Park Avenue, 35th Floor
                                        New York, NY  10152
                                        Attn:  Elihu Inselbuch
                                        Telephone: (212) 319-7125
                                        Facsimile: (212) 644-6755

If to the FCR :                         David T. Austern
                                        3110 Fairview Park Drive
                                        Suite 200
                                        Falls Church, VA 22042-0683
                                        Telephone: (703) 205-0835
                                        Facsimile: (703) 205-6249

With a copy to:                         Orrick, Herrington & Sutcliffe LLP
                                        1152 15th Street, N.W.
                                        Washington, D.C. 20005-1706
                                        Attn:  Roger Frankel
                                             Richard H. Wyron
                                        Telephone: (202) 339-8400
                                        Facsimile:  (202) 339-8500

**7.10    Further Assurances**.

In connection with this Agreement and the transactions contemplated thereby, each Party will execute and deliver any additional documents and instruments and perform any additional acts that may be reasonably necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

**7.11    Consent by the Committee and the FCR.**

The Committee and the FCR consent to this Agreement, as evidenced by the signatures of their counsel below.

*Page 13 of 14*

For Execution

IN WITNESS WHEREOF, the undersigned Parties have executed this Settlement Agreement as of the Execution Date.

**THE DEBTORS (conditioned upon the entry of the Approval Order):**

By: _____

Name: _____

Title: _____

**BNSF (as defined in this Agreement):**

By: _____

Name: _____

Title: _____

Consented to:

The Committee (as defined in this Agreement)

By: _____
    Counsel to the Committee

The FCR (as defined in this Agreement)

By: _____
    Counsel to the FCR

For Execution

## Exhibit A

**Form of Approval Order**

For Execution

## **Exhibit B**

**BNSF's Wiring Instructions**

Phillips Haffey  P.C. Trust Account
Routing Number 092901683
Account Number 1400985105

For Execution

## Exhibit C

**Additional Parties to Receive Notice of the Settlement Payment under Section 2.01**

McGarvey, Heberling, Sullivan
& McGarvey, P.C.
745 South Main
Kalispell, MO 59904-5399
Attn: Jon L. Heberling
Telephone: (406) 752-5566
Facsimile: (406) 752-7124
Email: jheberling@mcgarveylaw.com

Lewis, Slovak, Kovacich & Marr, P.C.
725 Third Avenue North
P.O. Box 2325
Great Falls, MO 59403
Attn:  Tom L. Lewis
Telephone:  (406) 761-5595
Facsimile: (406) 761-5805
Email:  tom@lsklaw.net

Murtha Cullina LLP
99 High Street
Boston, MA  02110
Attn: Daniel C. Cohn
Telephone: (617) 457-4155
Facsimile: (617) 210-7058
Email: dcohn@murthalaw.com

## EXHIBIT C

**Libby Notice of Withdrawal**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| W. R. GRACE & CO., et al., | ) |
| | ) Civil Action Nos. 11-530 (Consolidated into lead Case |
| | ) No. 11-199 (RLB)); 11-208 (RLB); and 09-766 (RLB) |
| Debtors. | ) |
| | ) Bankruptcy Case No. 01-01139 (JKF) |
| | ) |

## LIBBY CLAIMANTS' WITHDRAWAL OF ALL OBJECTIONS AND APPEALS CONCERNING THE JOINT PLAN, THE GRACE-CNA SETTLEMENT, AND THE GRACE-ARROWOOD SETTLEMENT

Pursuant to section II.A. of the *Term Sheet among W. R. Grace & Co., the Asbestos Claimants' Committee, and the Libby Claimants* (the "Libby Settlement Term Sheet"), the Libby Claimants hereby withdraw their appeals of (i) the Bankruptcy Court's January 31, 2011 Order and Memorandum Opinion confirming the Joint Plan of Reorganization (the "Plan"), as clarified on February 15, 2011 [Dkt. Nos. 26154, 26155, 26289], docketed in the District Court as Case No. 11-530 (RLB) (consolidated into lead Case No. 11-199 (RLB)); (ii) the Bankruptcy Court's January 22, 2011 order approving Grace's insurance settlement with the CNA Companies, *et al.* [Dkt No. 26106] ("CNA"), docketed in the District Court as Case No. 11-208 (RLB); and (iii) the Bankruptcy Court's August 19, 2009 order approving Grace's insurance settlement with Arrowood Indemnity Company, *et al.* [Dkt. No. 22859] ("Arrowood"), docketed in the District Court as Case No. 09-766 (RLB); and all other pending appeals and objections relating to the Plan, Plan-related documents, confirmation of the Plan, and Grace's insurance settlements with CNA and Arrowood.

In accordance with the terms and conditions of the Libby Settlement Term Sheet, the withdrawal of the appeals and objections provided for herein shall be with prejudice and without costs.

Dated: May ____, 2012
      Wilmington, Delaware

Respectfully submitted,

LANDIS RATH & COBB LLP

_____

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400

and

Daniel C. Cohn
MURTHA CULLINA LLP
99 High Street, 20th Floor
Boston, Massachusetts 02110
Telephone (617) 457-4000

**EXHIBIT D**

**BNSF Notice of Withdrawal**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
| | ) |
| W. R. GRACE & CO., et al., | ) |
| | ) Civil Action Nos. 11-531(RLB) |
| | ) (Consolidated into lead Case No. 11-199 (RLB)); |
| | ) 11-207 (RLB); and 09-763 (RLB) |
| Debtors. | ) |
| | ) Bankruptcy Case No. 01-01139 (JKF) |
| | ) |

## BNSF RAILWAY COMPANY'S WITHDRAWAL OF ALL OBJECTIONS AND APPEALS CONCERNING THE JOINT PLAN, THE GRACE-CNA SETTLEMENT, AND THE GRACE-ARROWOOD SETTLEMENT

Pursuant to section 4.02 of the *Settlement Agreement between BNSF and the Debtors* (the "BNSF Settlement"), BNSF Railway Company hereby withdraws its appeals of (i) the Bankruptcy Court's January 31, 2011 Order and Memorandum Opinion confirming the Joint Plan of Reorganization (the "Plan"), as clarified on February 15, 2011 [Dkt. Nos. 26154, 26155, 26289], docketed in the District Court as Case No. 11-531 (RLB) (consolidated into lead Case No. 11-199 (RLB)); (ii) the Bankruptcy Court's January 22, 2011 order approving the Debtors' insurance settlement with the CNA Companies, *et al.* [Dkt No. 26106] ("CNA"), docketed in the District Court as Case No. 11-207 (RLB); and (iii) the Bankruptcy Court's August 19, 2009 order approving the Debtors' insurance settlement with Arrowood Indemnity Company, *et al.* [Dkt. No. 22859] ("Arrowood"), docketed in the District Court as Case No. 09-763 (RLB); and all other pending appeals and objections relating to the Plan, Plan-related documents, confirmation of the Plan, the Debtors' insurance settlements with CNA and Arrowood, and any motions or applications filed by the Debtors, the Asbestos Claimants' Committee, or the Asbestos Personal Injury Future Claimants' Representative.

The withdrawal of the appeals and objections provided for herein shall be with prejudice and without costs.

Dated: May _____, 2012                    Respectfully submitted,

 

_____

PEPPER HAMILTON LLP
Edward C. Toole, Jr.
Linda J. Casey
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
Tel: (215) 981-4000
Fax: (215) 981-4750

and

James C. Carignan (DE No. 4230)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Tel: (302) 777-6500

*Counsel for Appellant BNSF Railway Company*