### EXHIBIT A

**Form of Sales Agreement**

## BONDERA ASSET SALE AND PURCHASE AGREEMENT

**W. R. GRACE & CO.-CONN.**
**Seller**

**and**

**AMBEL GROUP, INC.**
**Buyer**

June 13, 2012

## TABLE OF CONTENTS

1. DEFINITIONS ............................................................................. 4
1.01  General.................................................................................. 4
1.02  Defined Terms. ...................................................................... 4
2. SALE AND PURCHASE.............................................................. 8
2.01  Transferred Assets and Assumed Liabilities............................ 8
2.02  Purchase Price; Allocation of Purchase Price.......................... 9
2.03  Closing. ................................................................................ 11
2.05  Further Assurances. .............................................................. 12
3. SELLER'S REPRESENTATIONS AND WARRANTIES ................. 12
3.01  Due Organization, Power and Authority. ................................ 12
3.02  Due Execution. ..................................................................... 13
3.03  No Conflicts. ......................................................................... 13
3.04  Title...................................................................................... 14
3.05  Intellectual Property.............................................................. 14
3.06  Seller Reorganization; Bankruptcy Court Approval.................. 14
4. BUYER'S REPRESENTATIONS AND WARRANTIES .................. 15
4.01  Due Organization, Power and Authority. ................................ 15
4.02  Due Execution. ..................................................................... 16
4.03  No Conflicts. ......................................................................... 16
4.04  Intellectual Property.............................................................. 16
5. NO ADDITIONAL REPRESENTATIONS, ETC. ............................ 17
5.01  No Additional Representations or Warranties.......................... 17
6. CONDITIONS TO BUYER'S OBLIGATIONS ............................... 18
6.01  Accuracy of Representations and Warranties.......................... 18
6.02  Performance of Covenants and Agreements........................... 18
6.03  Permits, Consents, etc. ......................................................... 18
6.04  Litigation. ............................................................................. 18
6.05  Certificates of Seller. ............................................................ 20
6.06  Bankruptcy Court Authorization. ........................................... 20
7. CONDITIONS TO SELLER'S OBLIGATIONS .............................. 21
7.01  Accuracy of Representations and Warranties.......................... 21
7.02  Performance of Covenants and Agreements........................... 21
7.03  Permits, Consents, etc. ......................................................... 21
7.05  Certificates of Buyer. ............................................................ 22
7.06  Bankruptcy Court Authorization. ........................................... 22
8. TERMINATION ......................................................................... 23
8.01  Rights to Terminate. .............................................................. 23
8.02  Consequences of Termination................................................ 23
9. POST-CLOSING MATTERS ....................................................... 24
9.01  "Grace" Name........................................................................ 24
9.02  Copies of Documents. ............................................................ 24
10.   EXPENSES; DAMAGES........................................................... 24

2

10.01  Expenses.........................................................................................24
10.02  Transfer Taxes. ...............................................................................25
10.03  No Consequential or Lost Profit Damages. ...................................25
**11.      NOTICES .........................................................................................25**
**12.      GENERAL ........................................................................................26**
12.01  Entire Agreement.............................................................................26
12.02  Amendments and Waivers. ............................................................26
12.03  Counterparts....................................................................................26
12.04  Captions. .........................................................................................27
12.05  Governing Law. ...............................................................................27
12.06  Submission to Jurisdiction. .............................................................27
12.07  Execution.........................................................................................29

## EXHIBITS

A      Bondera Trademark Foreign Registrations/Applications
B      Substance Injection Patents

## DISCLOSURE SCHEDULES

4.04   Disclosure for Buyer Intellectual Property

## BONDERA® ASSET SALE AND PURCHASE AGREEMENT

Agreement dated June 13, 2012, by and between W. R. GRACE & CO.-CONN., a Connecticut corporation ("Seller"), and AMBEL GROUP, INC., a Florida corporation ("Buyer").

WHEREAS, Buyer wishes to purchase, and Seller wishes to sell, assets of the Bondera business, on the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Seller and Buyer (collectively, the "Parties") hereby agree as follows:

### 1.    Definitions

1.01   General.

All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated. Any of the terms defined in this Agreement may be used in the singular or the plural. In this Agreement, unless otherwise specifically stated: "hereof," "herein," "hereto," "hereunder" and the like mean and refer to this Agreement as a whole and not merely to the specific Section, paragraph or clause in which the word appears; words importing any gender include the other genders; and the term "including" shall mean "including (but not limited to)".

1.02   Defined Terms.

For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

4

"Adhesive Patent" means published PCT patent application WO2012/061032, and any subsequently entered national phase applications based thereon, as selected solely in Seller's discretion, and any patents granted on the aforementioned applications.

"Affiliate" of any specified person or other entity means a person or other entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person or other entity specified. As used in this definition, "control" of a specified entity means the direct or indirect possession of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract, or otherwise, and in any event shall include ownership of voting securities of such entity having a majority of the voting power of the voting securities of such entity.

"Bankruptcy Court" has the meaning given such term in Section 3.06(b).

"Bondera Products" means pressure-sensitive adhesive mats for the installation of tile to various surfaces, which have been sold by Seller under the Bondera Trademark.

"Bondera Trademark" means the mark BONDERA, U.S. registration number 3699501, as well as corresponding foreign registrations/applications listed on **Exhibit A**, and the goodwill associated therewith..

"Buyer" means Ambel Group, Inc., a Florida corporation.

"Buyer Entity" means one of Buyer or its Affiliates, and includes Brian J. Iske and the Iske Family Trust, LLC.

"Iske Intellectual Property Rights" means all right, title and interest in and to the Substance Injection Patents owned by Brian J. Iske and/or the Iske Family Trust, LLC.

"Closing" has the meaning given such term in Section 2.03(a).

"Closing Date" has the meaning given such term in Section 2.03(a).

"De Minimis Asset Order" or "DMAO" has the meaning given such term in Section 3.06(b).

"Insecticidal License Agreement" means a non-exclusive, royalty-free license granted by Seller to Buyer under the Substance Injection Patents limited to the Licensed Field.

"Inventory" means the total stock of Bondera tile matsets as of the Closing Date, consisting of matsets in the following configurations: Bondera Tile Matset Wall 12"x10' roll, Bondera Tile Matset Countertop 16" x 7.5' roll, Bondera Tile Matset Wet Seam Tape 2" x 25' roll, and Bondera Tile Matset Vertical Surface 4" x 10' roll.

"License Agreement" means the License Agreement dated August 21, 2008, between De Neef Construction Chemicals, Inc., Iske Family Trust, LLC, Brian J. Iske, and Seller.

"Licensed Field" shall mean systems, products or processes that fall within the scope of the Substance Injection Patents and the sole function of which is the protection of building and civil engineering structures from insect infiltration by means of injection of an insecticidal substance.

"Parties" means Seller and Buyer.

"Seller" means W. R. Grace & Co.-Conn., a Connecticut corporation.

6

"Seller Entity" means one of Seller or its Affiliates.

"Substance Injection Patents" means the patents and patent applications listed on **Exhibit B.**

"Tax" means any form of taxation, whether domestic or foreign, and whether imposed by a local, municipal, state, provincial, national, federal or other body, together with any related interest, penalties and additions to any such tax, or additional amounts imposed by any domestic or foreign taxing authority.

"Transaction" means the transactions contemplated by this Agreement.

"Transaction Documents" means this Agreement, the documents described in Section 2.03(b), and all other agreements, instruments, certificates and documents executed and delivered or filed by either Party pursuant to this Agreement.

"Transferred Assets" means all of Seller's right, title and interest on the Closing Date in and to the following:  (a) the Inventory; (b) the Bondera Trademark; (c) customer orders for Bondera Products that have not been filled on or before the Closing Date; (d) customer lists for the Bondera Products, and all books and records, files, sales and marketing materials and other documentation relating exclusively to the formulation, manufacture, application and promotion of the Bondera Products; and (e) the Bondera website (http://www.bonderatilematset.com/) and domain names (bonderamatset.com and bonderastyle.com).

7

**2.**     **Sale and Purchase**

2.01   Transferred Assets and Assumed Liabilities.

On the terms and conditions set forth herein:

(a)     Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to acquire from Seller, all of the Transferred Assets, and Buyer hereby agrees to assume and perform all obligations under customer orders for the Bondera Products that have not been filled on or before the Closing Date.

(b)     Prior to the Closing Date, Seller shall place the Inventory in public warehouse space; and effective at the Closing, Seller shall assume all responsibility for and expenses of warehousing the Inventory from and after the Closing Date. The Parties shall cooperate to effect the transition of the performance of such responsibility.

(c)     Seller and Buyer agree to terminate the License Agreement, and Buyer agrees to cause Brian J. Iske and the Iske Family Trust, LLC to terminate the License Agreement, effective on the Closing Date.

(d)     Buyer hereby agrees to cause Brian J. Iske to assign to Seller all of his right, title and interest in the Substance Injection Patents, and to cause the Iske Family Trust, LLC to assign to Seller all of its right, title and interest, to the extent it has any right, title or interest, in the Substance Injection Patents. Buyer shall cause Brian J. Iske and the Iske Family Trust, LLC to execute, individual assignments as required by Seller to give effect to this provision and to enable Seller to record transfer of title and record ownership in all countries where such Substance Injection Patents exist.

(e)     The Parties agree to enter into the Insecticidal License Agreement.

8

(f)    Seller grants Buyer an option to acquire a royalty-free license, with the right to sublicense and assign, under the Adhesive Patent, such license to be strictly limited to and exclusive with respect to the manufacture, use and sale of Bondera Products. This option shall expire five years from the date of this Agreement unless Buyer notifies Seller in writing of its intention to exercise this option prior to such expiration.

2.02    Purchase Price; Allocation of Purchase Price.

(a)    The Purchase Price payable by Buyer to Seller in consideration for the Transferred Assets and for the rights granted to Buyer under the Transaction Documents is (i) $900,000 in cash plus (ii) the assignment by Buyer to Seller of Buyer's rights in the Substance Injection Patents.

(b)    The cash portion of the Purchase Price shall be paid as follows: (i) $350,000 at the Closing, (ii) $100,000 on each of August 1, September 1, October 1, November 1, and December 1, 2012; and (iii) $50,000 on January 1, 2012. Each such payment shall be made in immediately available funds by wire transfer to the following account:

> Bank:  Bank of America, N.A.
> ABA#  026009593
> Acct #  8188203114
> Name:  W. R. Grace & Co.–Conn.
> Ref. Text: Bondera

(c)    Each Party agrees to prepare and timely file U.S. Internal Revenue Service Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Internal Revenue Code, and to cooperate with the other Party for such filing.

9

10

2.03   Closing.

(a)    The Closing of the Transaction (the "Closing") shall take place on the first business day after the authorization of the transaction pursuant to De Minimis Asset Order shall have become effective (the "Closing Date"), at 10:00 a.m. Eastern time. All of the actions to be taken and documents to be delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete. The Closing shall be deemed effective as of the close of business local time on the Closing Date.

(b)    At the Closing:

(i)    The parties will execute and deliver to each other (A) a bill of sale and assignment agreement for the Transferred Assets, (B) an assignment or assignments of the Substance Injection Patents, (C) the Insecticidal License Agreement, and (D) any other agreement or document reasonably requested by either of the Parties in connection with the Transaction, all in form and substance reasonably satisfactory to each of the Parties; and

(ii)    The Parties shall execute and deliver to each other, and Buyer shall cause Brian J. Iske and the Iske Family Trust, LLC to execute and deliver to the Parties, a termination of the License Agreement, effective on the Closing Date, in form and substance reasonably satisfactory to each of the Parties.

11

(c)    At the Closing, on account of the Purchase Price, Buyer is delivering to Seller $350,000 by means of a single payment by wire transfer as provided in Section 2.02(b).

2.04    Introductions.

As soon as practicable after the Closing Date, Seller shall facilitate Seller's introductions to major customers, Avery Dennison and Schneider Associates.

2.05    Further Assurances.

At any time and from time to time after the Closing Date, each Party shall, and shall cause its Affiliates to, execute and deliver such instruments and documents, and take such other and further action, as may be reasonably requested by the other Party to effect, confirm or verify the Transaction. Any material out-of-pocket expenses incurred in the performance of this Section shall be paid by the Party requesting such performance.

## 3.    Seller's Representations and Warranties

Subject to Bankruptcy Court authorization of the Transaction as described in Section 3.06(b), Seller hereby represents and warrants to Buyer as follows:

3.01    Due Organization, Power and Authority.

Seller is a corporation duly organized and validly existing under the laws of the State of Connecticut, with full corporate power to enter into this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is a party, and its performance of its

12

obligations hereunder and thereunder, have been duly authorized by all required corporate action.

3.02    Due Execution.

Seller has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party.

3.03    No Conflicts.

The execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is a party, and its performance of its obligations hereunder and thereunder, will not (a) conflict with its certificate of incorporation documents or by-laws, (b) result in any breach of any provision of, or default under, any judgment, order, decree or agreement to which Seller is a party or by which it is bound, which breach or default would materially adversely affect its ability to execute or deliver this Agreement or the other Transaction Documents to which it is a party or to perform its obligations hereunder or thereunder, (c) result in the acceleration of obligations of Seller under any contracts included in the Transferred Assets, or (d) result in the creation of imposition of any lien or other encumbrance on any of the Transferred Assets. No person other than Buyer has any written or oral agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option for the purchase or acquisition from Seller of any of the Transferred Assets, other than in the ordinary course of the Bondera business.

3.04    Title.

Seller has good title to the Transferred Assets that it purports to own, free and clear of all liens that individually or collectively could reasonably be expected to materially interfere with the continued use or operation of the Transferred Assets in the manner heretofore used or operated in the conduct of the Bondera business.

3.05    Intellectual Property.

No Seller Entity owns any patent or patent application that is used directly and exclusively in the Bondera business. The Bondera Trademark is the only registered trademark or trademark application owned by any Seller Entity and used directly and exclusively in the Bondera business.

3.06    Seller Reorganization; Bankruptcy Court Approval.

(a)    On April 2, 2001 (the "Filing Date") Seller and certain of its Affiliates filed voluntary petitions for reorganization relief pursuant to Title 11 of the United States Code, 11 U.S.C. 101, et. seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case #01-1139 (JKF). Since the Filing Date, Seller has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code) as authorized by Sections 1107 and 1108 of the Bankruptcy Code.

(b)    Pursuant to the Order Establishing Procedures for the Sale or Abandonment of De Minimis Assets dated August 2, 2001, issued by the Bankruptcy Court (herein the "De Minimis Asset Order" or "DMAO", a copy of which has been furnished to Buyer), Seller is not authorized to dispose of assets until it has satisfied

14

certain guidelines, and the appropriate guidelines are determined by the price of the assets being sold. Given the purchase price herein, the De Minimis Asset Order requires Seller to give certain third-parties (the "Notice Parties") notice of the Transaction, along with the opportunity to (i) make an alternative offer or (ii) object to the Transaction (collectively, "Notice Party Veto Rights"). If a Notice Party shall successfully exercise its Notice Party Veto Rights, the terms of this Agreement shall be rendered null and void. If a Notice Party makes a superior offer, Seller shall promptly notify Buyer of the existence and terms of such offer,  If a Notice Party successfully objects to the Transaction, Seller shall notify Buyer within five (5) business days of the Bankruptcy Court's order denying the Transaction. The perfection of full and final authorization for Seller to complete the Transaction pursuant to the De Minimis Asset Order, including the resolution of any appeals filed thereto or the expiration of any appeal periods without the filing of any appeals, shall be and constitute a condition precedent to the obligations of Seller under this Agreement. Seller shall give prompt notice of the proposed sale under this Agreement to all parties entitled to notice thereof under the DMAO. Seller shall furnish Buyer with prompt notice of any objections to the proposed sale filed or served by any party under the DMAO.

### 4.    Buyer's Representations and Warranties

Buyer hereby represents and warrants to Seller as follows:

4.01    Due Organization, Power and Authority.

Buyer is a corporation duly formed and validly existing under the laws of the

15

State of Florida, with full power and authority to enter into this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. Buyer further warrants that it has due authorization to act on behalf of the Iske Family Trust, LLC with regard to termination of the License Agreement. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party, and its performance of its obligations hereunder and thereunder, have been duly authorized by all required action.

4.02    Due Execution.

Buyer has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party.

4.03    No Conflicts.

The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party, and its performance of its obligations hereunder and thereunder, will not (1) conflict with its operating agreement or (2) result in any breach of any provision of, or default under, any judgment, order, decree, agreement, instrument or document to which it is a party or by which it is bound, which breach or default would materially adversely affect its ability to execute or deliver this Agreement or the other Transaction Documents to which it is a party or to perform its obligations hereunder or thereunder.

4.04    Intellectual Property.

Except as set forth in **Schedule 4.04**:

(a) Buyer Entity is the sole owner of the Substance Injection Patents. No Buyer

16

Entity has granted any third party any assignment of or license under or any lien or encumbrance with respect to any of the Substance Injection Patents. None of the Substance Injection Patents is the subject of any pending or threatened actions, suits or proceedings.

(b)    Buyer Entity has received no claim or other advice of infringement by a third party of any of the patents included in the Substance Injection Patents.

**5.    No Additional Representations, etc.**

5.01    No Additional Representations or Warranties.

SELLER IS MAKING NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE BONDERA BUSINESS OR THE TRANSFERRED ASSETS, EXCEPT FOR THE SPECIFIC REPRESENTATIONS AND WARRANTIES MADE IN ARTICLE 3. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PURPOSE OF THE TRANSFERRED ASSETS, AND ANY REPRESENTATION AND WARRANTY REGARDING THE CONDITION OF ANY OF THE TRANSFERRED ASSETS; AND HEREBY ACKNOWLEDGES THAT SELLER IS TAKING THE TRANSFERRED ASSETS WHERE IS AND AS IS, WITH ALL DEFECTS. Buyer acknowledges that it has made its own investigation of the Bondera business and its assets and liabilities. Except for the specific representations and warranties in Article 3, Buyer is not relying on Seller with respect to any matter in connection with Buyer's investigation or evaluation of the Bondera business and its assets and liabilities.

**6.**     **Conditions to Buyer's Obligations**

All obligations of Buyer under this Agreement are subject, at Buyer's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

6.01    Accuracy of Representations and Warranties.

Each and every representation and warranty of Seller under this Agreement shall be true and accurate in all material respects as of the Closing as though made as of the Closing.

6.02    Performance of Covenants and Agreements.

Seller shall have performed in all material respects all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

6.03    Permits, Consents, etc.

There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any governmental authority required in connection with the Transaction that has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to Buyer.

6.04    Litigation.

No action, suit or proceeding by any third person (including any governmental authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Buyer Entity that questions, or reasonably could be expected to lead

to subsequent questioning of, the validity or legality of this Agreement or the Transaction and which, if successful, would materially adversely affect the right of Buyer to consummate the Transaction or to continue the Bondera business after the Closing.

6.05    <u>Certificates of Seller</u>.

(a)    Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the Chief Executive Officer, President or any Vice President of Seller, or such person's delegee, certifying that: (i) each and every representation and warranty of Seller under this Agreement is true and accurate in all material respects as of the Closing as though made as of the Closing, (ii) Seller has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Seller at or prior to the Closing pursuant to this Agreement.

(b)    Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the Secretary or an Assistant Secretary of Seller, (i) certifying that the execution, delivery and performance of the Transaction Documents to which Seller is a party have been duly authorized by its Board of Directors or the Board's duly authorized delegee, and that such authorization has not been amended but remains in full force and effect on the Closing Date, and (ii) certifying the incumbency as officers or authorized signatories of Seller, and the authenticity of specimen signatures, of all persons signing any Transaction Documents on behalf of Seller.

6.06    <u>Bankruptcy Court Authorization</u>.

Bankruptcy Court authorization of the Transaction shall have been obtained as described in Section 3.06(b).

7.    <u>**Conditions to Seller's Obligations**</u>

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

7.01    <u>Accuracy of Representations and Warranties</u>.

Each and every representation and warranty of Buyer under this Agreement shall be true and accurate in all material respects as of the Closing as though made as of the Closing.

7.02    <u>Performance of Covenants and Agreements</u>.

Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by it at or prior to the Closing pursuant to this Agreement.

7.03    <u>Permits, Consents, etc</u>.

There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any governmental authority required in connection with the Transaction that has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to Seller.

7.04    <u>Litigation</u>.

No action, suit or proceeding by any third person (including any governmental authority) shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Buyer Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement or the

21

Transaction and which, if successful, would materially adversely affect the right of Seller to consummate the Transaction.

7.05    Certificates of Buyer.

(a)    Buyer shall have delivered to Seller a certificate of Seller, dated the Closing Date, signed by Brian J. Iske as duly authorized representative of Buyer, certifying that: (i) each and every representation and warranty of Buyer under this Agreement is true and accurate in all material respects as of the Closing as though made as of the Closing, (ii) Buyer has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Buyer at or prior to the Closing pursuant to this Agreement.

(b)    Buyer shall have delivered to Seller a certificate of Buyer, dated the Closing Date, signed by a duly authorized representative of Buyer, (i) certifying that the execution, delivery and performance of the Transaction Documents to which Buyer is a party have been duly authorized, and that such authorization has not been amended but remains in full force and effect on the Closing Date, and (ii) certifying the incumbency and due authorization, and the authenticity of specimen signatures, of all persons signing any Transaction Documents on behalf of Seller.

7.06    Bankruptcy Court Authorization.

Bankruptcy Court authorization of the Transaction shall have been obtained as described in Section 3.06(b).

8.    **Termination**

8.01   Rights to Terminate.

(a)    This Agreement may be terminated at any time prior to the Closing by written agreement of the Parties.

(b)    If within ninety (90) days after the date of this Agreement,  Buyer has not received notice from Seller that Seller is authorized under the DMAO to consummate the Transaction, then Buyer shall have the right to terminate the Agreement by giving notice of such termination to Seller in the manner provided in Section 11.

(c)    Except as otherwise set forth in Section 8.01(b), if for any reason the Closing shall not take place within 90 days after the date of this Agreement, then either Party may terminate this Agreement at any time thereafter by giving notice of such termination to the other Party in the manner provided in Section 11; provided that the terminating Party is not in material breach of the provisions of this Agreement.

8.02   Consequences of Termination.

(a)    Except for the nullification of this Agreement by action of the Bankruptcy Court or termination under Section 8.01, the termination of this Agreement, whether in accordance with any of the provisions of Section 8.01 or otherwise, shall not affect the rights of any Party with respect to any prior breach of any covenant or agreement contained in this Agreement.

(b)    The obligations of the Parties under Section 10.1 shall survive any termination of this Agreement.

## 9.    Post-Closing Matters

9.01    "Grace" Name.

Buyer shall have no right to use the "Grace" name, and shall not, nor permit any of its Affiliates to, refer to its business as formerly being owned by or associated with Seller (other than in response to unsolicited inquiries), in announcements of the occurrence of the Closing, or otherwise for purely informational purposes, except that, and only to the extent that it is not practicable to remove or cover up the "Grace" name, (a) until the Inventory has been sold, Buyer shall have the right to retain references to such name on the Inventory packaging, and (b) for a period of 90 days after the Closing Date, Buyer shall have the right to use any catalogues, sales and promotional materials and printed forms that use such name and are included in the Transferred Assets as of the Closing, or have been ordered prior to the Closing for use in the Bondera business. Buyer shall use reasonable efforts to minimize such usage and to discontinue it as soon as practicable.

9.02    Copies of Documents.

Seller may retain copies of documents included in the Transferred Assets.

## 10.    Expenses; Damages

10.01    Expenses.

Each Party shall pay its own expenses in connection with the preparation, authorization, execution and performance of this Agreement and the Transaction, and indemnify the other Party from any liability in connection therewith.

24

10.02 <u>Transfer Taxes</u>.

Buyer shall pay and indemnify Seller against all sales, transfer and similar Taxes applicable to the transfer to Buyer of the Transferred Assets pursuant to this Agreement.

10.03 <u>No Consequential or Lost Profit Damages</u>.

Neither Party nor any of its Affiliates shall seek or be entitled to incidental, indirect or consequential damages or damages for lost profits in any claim arising from breach or alleged breach of this Agreement or any of the other Transaction Documents.

**11.    Notices**

All notices and other communications required or permitted to be given under this Agreement shall be in writing, shall be effective when received, and shall be delivered personally, by courier service, by telephone facsimile transmission, or by first-class mail, addressed as follows:

If to Seller:

W. R. Grace & Co.-Conn.
7500 Grace Drive
Columbia, Maryland 21044
Attention:      Corporate Secretary
Fax:             (410) 531-4783
Confirmation:  (410) 531-4212

If to Buyer:

Ambel Group, Inc.
c/o Brian J. Iske
300 Prosperity Farms Road
Suite E
North Palm Beach, FL  33408

25

Confirmation:  (508) 269-6363

Either Party may change the address to which such communications are to be directed

to it by giving written notice to other in the manner provided above.

### 12.    General

12.01 Entire Agreement.

This Agreement, including the Exhibits and Schedules hereto, sets forth the entire

agreement and understanding of the Parties and related persons with respect to the

subject matter hereof and supersedes all prior agreements, arrangements and

understandings relating thereto. No representation, promise, inducement or statement of

intention relating to the Transaction has been made by any Party or any related person

which is not set forth in this Agreement.

12.02 Amendments and Waivers.

This Agreement may be amended, superseded or canceled, any of the terms

hereof may be waived, only by a written instrument specifically referring to this

Agreement and specifically stating that it amends, supersedes or cancels this

Agreement or waives any of its terms, executed by both Parties, or in the case of a

waiver, by the party waiving compliance. Failure of any party to insist upon strict

compliance with any of the terms of this Agreement in one or more instances shall not

be deemed to be a waiver of its rights to insist upon such compliance in the future, or

upon compliance with other terms hereof.

12.03 Counterparts.

This Agreement may be executed in two or more counterparts, each of which

26

shall be an original, but all of which shall constitute but one agreement.

12.04 <u>Captions</u>.

The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

12.05 <u>Governing Law</u>.

This Agreement shall be governed by the laws of the State of Delaware as applicable to contracts executed, delivered and to be performed entirely in the State of Delaware, without taking into account principles of choice or conflicts or laws that would require the application of the laws of any other jurisdiction.

12.06 <u>Submission to Jurisdiction</u>.

(a) The Parties acknowledge and agree that until the effective date of Seller's Plan of Reorganization (the "Effective Date") or the dismissal or closing of its bankruptcy case, the Bankruptcy Court shall have exclusive jurisdiction over the arrangements in this Agreement and over any claims or disputes which may arise or result from or be connected with the subject matter of this Agreement, or any breach or default hereunder.

(b) From and after the Effective Date, each Party hereby irrevocably submits in any suit, action or proceeding arising out of or relating to this Agreement or any of the other Transaction Documents to which it is a party, or any of its obligations hereunder or thereunder, to the jurisdiction of the United States District Court for the District of Delaware and the jurisdiction of any court of the State of Delaware, and waives any and all objections to such jurisdiction that it may have under the laws of the

State of Delaware or any other jurisdiction.

12.07 <u>Execution</u>.

This Agreement and the other Transaction Documents may be executed and delivered by the Parties by exchange of executed original counterparts by facsimile transmission, e-mail or other electronic communications medium. All such counterparts taken together shall comprise a single agreement. The Parties agree to exchange original executed counterparts as soon as practicable; provided that failure to make such exchange shall not affect the valid execution and delivery of the Agreement and the other Transaction Documents as provided in the first sentence of this Section 12.07.

IN WITNESS WHEREOF, the parties have executed this instrument on the date first above written.

W. R. GRACE & CO.-CONN.              AMBEL GROUP, INC.


By:_____/s/_____       By:_____/s/_____
    Jeremy Rohen                          Brian J. Iske
    Authorized Signatory                  Authorized Signatory

29

## BONDERA ASSET SALE AND PURCHASE AGREEMENT

### EXHIBIT A

**Bondera Trademarks**
**Foreign Registrations/Applications**

| MARK | COUNTRY | STATUS | APPLN NO. | APPLN DATE | REGN NO. | REGN DATE |
|------|---------|--------|-----------|------------|----------|-----------|
| BONDERA | Benelux | Registered | 1153460 | 18-Feb-2008 | 0844578 | 10-Feb-2008 |
| BONDERA | Brazil | Published | 829604928 | 18-Feb-2008 | | |
| BONDERA | Canada | Registered | 1383660 | 15-Feb-2008 | 1383660 | 19-Oct-2010 |
| BONDERA | China | Registered | 6554206 | 14-Feb-2008 | 6554206 | 28-Mar-2010 |
| BONDERA | European Community | Registered | 009983933 | 20-May-2011 | 009983933 | 24-Oct-2011 |
| BONDERA | France | Registered | 083557977 | 22-Feb-2008 | 083557977 | 22-Feb-2008 |
| BONDERA | Germany | Registered | 302008009728.0/01 | 14-Feb-2008 | 302008009728 | 13-Aug-2008 |
| BONDERA | Italy | Registered | MI2008C1848 | 15-Feb-2008 | 1310753 | 09-Jun-2010 |
| BONDERA | Japan | Registered | 2008-011854 | 20-Feb-2008 | 5277595 | 30-Oct-2009 |
| BONDERA | Mexico | Registered | 914734 | 18-Feb-2008 | 1095163 | 17-Apr-2009 |
| BONDERA | Spain | Registered | 2812970 | 12-Feb-2008 | 2812970 | 11-Sep-2008 |
| BONDERA | US | Registered | 77/262449 | 23-Aug-2007 | 3699501 | 20-Oct-2009 |