B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

### District of Delaware

In re W.R. GRACE & CO., et al.                    ,          Case No.  01-01139 (JKF)

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| | |
|---|---|
| CIM Urban REIT 211 Main St. (SF), LP, as assignee of CIM REIT Acquisition, LLC | Main Plaza, LLC |
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:
Landau Gottfried & Berger LLP
Attn: Peter J. Gurfein
1801 Century Park East, Suite 700
Los Angeles, CA 90067

Court Claim # (if known):  11009    (Subject to settlement order -
Amount of Claim:  $6,137,362.00    dkt. no. 23591)
Date Claim Filed:  03/31/2003

Phone:  (310) 557-0050
Last Four Digits of Acct #: _____

Phone:  (415) 392-2708
Last Four Digits of Acct. #: _____

Name and Address where transferee payments should be sent (if different from above):
Speights & Runyan
c/o Amanda G Steinmeyer (Counsel to Main Plaza, LLC)
200 Jackson Ave E
PO Box 685
Hampton SC 29924

Phone: _____
Last Four Digits of Acct #:_____

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____          Date: 07/12/2012
        Transferee/Transferee's Agent

**Avraham Shemesh**
**Treasurer**
*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 & 3571.

# Exhibit 1



# PURCHASE AND SALE AGREEMENT
# AND JOINT ESCROW INSTRUCTIONS

## Basic Terms

1. **Seller**: MAIN PLAZA, LLC, a California limited liability company ("*Seller*"), whose address for notices is as follows:

> Main Plaza, LLC
> 101 Howard Street, Suite 404
> San Francisco, CA 94105
> Attn: Mr. Christopher Booth
> BoothCP@cci-sf.com
> (415) 392-2708 (Telephone)
> (415) 777-0937 (Telecopy)

With a copy to:

> Cooley Godward Kronish LLP
> 4401 Eastgate Mall
> San Diego, CA 92121
> Attn: Michael S. Levinson, Esq.
> MLevinson@Cooley.com
> (858) 550-6021 (Telephone)
> (858) 550-6420 (Telecopy)

and

> Cooley Godward Kronish LLP
> Five Palo Alto Square
> 3000 El Camino Real
> Palo Alto, CA 94306-2155
> Attn: Ronald L. Jacobson, Esq.
> JacobsonRL@Cooley.com
> (650) 843-5047 (Telephone)
> (650) 849-7400 (Telecopy)

2. **Buyer**: CIM URBAN REIT ACQUISITION, LLC, a California limited liability company ("*Buyer*"), whose address for notices is as follows:

> CIM Urban REIT Acquisition, LLC
> 6922 Hollywood Boulevard, Ninth Floor
> Los Angeles, CA 90028
> Attn: Scott Stafford
> sstafford@cimgroup.com
> (510) 992-6161 (Telephone)
> (510) 992-6150 (Telecopy)

With a copy to:

>CIM Group
>6922 Hollywood Boulevard, Ninth Floor
>Los Angeles, CA  90028
>Attn:  General Counsel
>mfragner@cimgroup.com
>(323) 860-4900 (Telephone)
>(323) 860-4901 (Telecopy)

and

>Fragner Seifert Pace & Winograd, LLP
>601 South Figueroa Street, Suite 2320
>Los Angeles, CA 90017
>Attn: Pamela K. Prickett, Esq.
>pprickett@fspwlaw.com
>(213) 687-2349 (Telephone)
>(213) 406-6065 (Telecopy)

3. **Escrow Holder**: Chicago Title Company (the *"Escrow Holder"*), whose address for notices is as follows:

>Chicago Title Company
>388 Market Street
>San Francisco, CA 94111
>Attn: Ms. Nicole Carr
>carrn@ctt.com
>(415) 291-5153 (Telephone)
>(415) 397-5738 (Telecopy)

4. **Title Company**: Chicago Title Company (the *"Title Company"*), whose address for notices is as follows:

>Chicago Title Company
>388 Market Street, Suite 1300
>San Francisco, CA 94111
>Attn: Mr. Rod Pasion
>Rod.Pasion@ctt.com
>(415) 291-5114 (Telephone)
>(415) 399-0638 (Telecopy)

5. **Description of Improvements**: The building and other improvements located on the Land more particularly described on attached **Exhibit "A"**, commonly known as 211 Main Street, San Francisco, California (the *"Improvements"*).

6. **Purchase Price**: $114,000,000 (the *"Purchase Price"*).

7. **Feasibility Date:** December 21, 2009 (the *"Feasibility Date"*).

8. **Closing Date:** December 29, 2009, unless extended in accordance with the provisions of Section 1.3(b) (as so extended, the *"Closing Date"*), provided that in no event shall the Closing Date be any later than January 29, 2010.

9. **Initial Deposit:** $2,000,000 (the *"Initial Deposit"*).

## TABLE OF CONTENTS

Page

ARTICLE 1    AGREEMENT OF PURCHASE AND SALE ..................................................... 1
   1.1    Purchase Price ........................................................................................... 1
   1.2    Deposit ..................................................................................................... 1
   1.3    Existing Debt ............................................................................................ 2
ARTICLE 2    FEASIBILITY REVIEW ..................................................................... 3
   2.1    Feasibility Period ...................................................................................... 3
   2.2    Approval or Disapproval of Feasibility Studies ........................................ 6
ARTICLE 3    CONDITIONS PRECEDENT TO CLOSE OF ESCROW ................... 6
   3.1    Conditions Benefiting Buyer ..................................................................... 6
   3.2    Conditions Benefiting Seller ..................................................................... 8
   3.3    Failure of Conditions Precedent ............................................................... 8
ARTICLE 4    ADDITIONAL COVENANTS AND AGREEMENTS ........................ 8
   4.1    No Concern ............................................................................................... 8
   4.2    Entry Upon Property ................................................................................. 8
   4.3    Confidentiality ........................................................................................ 10
   4.4    Seller's Management of the Property ....................................................... 11
   4.5    Release by Buyer ..................................................................................... 11
   4.6    Assignment of Plans and Reports ........................................................... 13
ARTICLE 5    ACKNOWLEDGMENTS, REPRESENTATIONS AND WARRANTIES ....... 13
   5.1    Seller's Representations and Warranties ................................................. 13
   5.2    Knowledge and Notice ............................................................................ 15
   5.3    Survival and Limitation of Representations and Warranties ................... 15
   5.4    Buyer's Representation and Warranties ................................................... 16
   5.5    Status of Representations and Warranties ............................................... 19
   5.6    Commissions ........................................................................................... 19
ARTICLE 6    ESCROW ......................................................................................... 19
   6.1    Opening of Escrow .................................................................................. 19
   6.2    Delivery of Documents and Funds to Escrow ......................................... 20
   6.3    Close of Escrow ...................................................................................... 21
   6.4    Recordation of Deed ............................................................................... 21
   6.5    Prorations ................................................................................................ 22

TABLE OF CONTENTS
(CONTINUED)

Page

| | | | |
|---|---|---|---|
| | 6.6 | Fees and Costs | 23 |
| | 6.7 | Documents | 24 |
| | 6.8 | Payment of Funds at Close of Escrow | 24 |
| | 6.9 | 1031 Exchange | 24 |
| ARTICLE 7 | | REMEDIES | 25 |
| | 7.1 | LIQUIDATED DAMAGES | 25 |
| | 7.2 | Seller Default | 26 |
| ARTICLE 8 | | ASSIGNABILITY; BANKRUPTCY | 27 |
| | 8.1 | Assignment by Buyer | 27 |
| | 8.2 | Bankruptcy | 27 |
| ARTICLE 9 | | EMINENT DOMAIN AND MATERIAL LOSS | 27 |
| | 9.1 | Eminent Domain | 27 |
| | 9.2 | Loss to Property | 28 |
| ARTICLE 10 | | GENERAL PROVISIONS | 29 |
| | 10.1 | Notices | 29 |
| | 10.2 | Enforcement and Attorney's Fees | 29 |
| | 10.3 | Choice of Law | 30 |
| | 10.4 | Signer's Warranty | 30 |
| | 10.5 | Amendments | 30 |
| | 10.6 | Waiver | 30 |
| | 10.7 | Rights and Remedies Cumulative | 30 |
| | 10.8 | Time and Days | 30 |
| | 10.9 | Additional Documents and Acts | 30 |
| | 10.10 | Heirs, Successors, and Assigns | 31 |
| | 10.11 | Parties in Interest | 31 |
| | 10.12 | Counterparts | 31 |
| | 10.13 | Severability of Provisions | 31 |
| | 10.14 | Complete Agreement | 31 |
| | 10.15 | Appendices, Schedules, and Exhibits | 31 |
| | 10.16 | Interpretation | 31 |

**TABLE OF CONTENTS**
(CONTINUED)

Page

10.17 Construction ................................................................................................. 31

10.18 Headings ...................................................................................................... 32

10.19 Statutes ........................................................................................................ 32

10.20 Cross-References .......................................................................................... 32

10.21 Agreement Survives Close of Escrow .......................................................... 32

10.22 No Warranties .............................................................................................. 32

10.23 No Partnership or Joint Venture .................................................................. 32

10.24 TIME OF THE ESSENCE ........................................................................... 32

ARTICLE 11     DEFINED TERMS ..................................................................... B-1

11.1 "Act" ............................................................................................................ B-1

11.2 "Affiliate" .................................................................................................... B-1

11.3 "Agreement" ................................................................................................ B-1

11.4 "ALTA" ....................................................................................................... B-1

11.5 "Appurtenances" .......................................................................................... B-1

11.6 "Assignment and Assumption" ..................................................................... B-1

11.7 "Basic Terms" .............................................................................................. B-1

11.8 "Business Day" ............................................................................................. B-1

11.9 "Buyer" ........................................................................................................ B-1

11.10 "Buyer Extension Notice" ............................................................................ B-1

11.11 "Buyer's Election Notice" ............................................................................ B-1

11.12 "Buyer's Representatives" ............................................................................ B-1

11.13 "Cash" .......................................................................................................... B-1

11.14 "Close of Escrow" ........................................................................................ B-2

11.15 "Closing Date" ............................................................................................. B-2

11.16 "Closing Year" ............................................................................................. B-2

11.17 "Deed" .......................................................................................................... B-2

11.18 "Deposit" ...................................................................................................... B-2

11.19 "Effective Date" ........................................................................................... B-2

11.20 "Entity" ........................................................................................................ B-2

11.21 "Environmental Action" ............................................................................... B-2

TABLE OF CONTENTS
(CONTINUED)

11.22 "Escrow" ...................................................................................................... B-2

11.23 "Escrow Holder" .......................................................................................... B-2

11.24 "Escrow Holder Consent" ........................................................................... B-2

11.25 "Estoppel Certificate" .................................................................................. B-2

11.26 "Estoppel Deadline" ..................................................................................... B-2

11.27 "Executive Order" ......................................................................................... B-2

11.28 "Existing Debt" ............................................................................................. B-2

11.29 "Existing Debt Amount" ............................................................................... B-2

11.30 "Existing Deed of Trust" .............................................................................. B-2

11.31 "Existing Lender" .......................................................................................... B-2

11.32 "Existing Note" ............................................................................................. B-2

11.33 "Extended Loan Assumption Approval Date" ............................................. B-2

11.34 "Feasibility Date" .......................................................................................... B-2

11.35 "Feasibility Period" ....................................................................................... B-2

11.36 "FIRPTA Certificate" .................................................................................... B-3

11.37 "Governmental Actions" ............................................................................... B-3

11.38 "Governmental Agencies" ............................................................................. B-3

11.39 "Governmental Regulations" ........................................................................ B-3

11.40 "Hazardous Materials" .................................................................................. B-3

11.41 "Improvements" ............................................................................................. B-4

11.42 "Information" ................................................................................................. B-4

11.43 "Initial Deposit" ............................................................................................ B-4

11.44 "Intangible Personalty" ................................................................................. B-4

11.45 "Land" ............................................................................................................ B-4

11.46 "Leases" ......................................................................................................... B-4

11.47 "Loan Assumption Approval" ....................................................................... B-4

11.48 "Loan Assumption Approval Date" .............................................................. B-4

11.49 "NHDS" ......................................................................................................... B-4

11.50 "Notice of Approval" ..................................................................................... B-4

11.51 "Notice of Disapproval" ............................................................................... B-4

**TABLE OF CONTENTS**
(CONTINUED)

11.52  "Parties" ................................................................................................ B-4

11.53  "Patriot Act" .......................................................................................... B-4

11.54  "Patriot Act Related Laws" .................................................................... B-4

11.55  "Person" ................................................................................................ B-4

11.56  "Personal Property" ............................................................................... B-5

11.57  "Preliminary Report" ............................................................................. B-5

11.58  "Principals" ........................................................................................... B-5

11.59  "Property" .............................................................................................. B-5

11.60  "Property Documents" ........................................................................... B-5

11.61  "Purchase Price" .................................................................................... B-5

11.62  "Real Property" ...................................................................................... B-5

11.63  "Recorder" ............................................................................................. B-5

11.64  "Schwab" ............................................................................................... B-5

11.65  "Seller" .................................................................................................. B-5

11.66  "Seller Assumption Issue" ..................................................................... B-5

11.67  "Seller Liens" ........................................................................................ B-5

11.68  "Seller Release" ..................................................................................... B-6

11.69  "Seller's Broker" .................................................................................... B-6

11.70  "Seller's Repair Notice" ......................................................................... B-6

11.71  "Seller's Representative(s)" .................................................................... B-6

11.72  "Special Payoff Amount" ....................................................................... B-6

11.73  "Supplemental Report" ........................................................................... B-6

11.74  "Supplemental Title Objection Notice" ................................................. B-6

11.75  "Supplemental Title Objections" ........................................................... B-6

11.76  "Supplemental Title Response Period" ................................................... B-6

11.77  "Survey" ................................................................................................. B-6

11.78  "Tenants" ............................................................................................... B-6

11.79  "Title Company" .................................................................................... B-6

11.80  "Title Objection Notice" ........................................................................ B-6

11.81  "Title Objections" .................................................................................. B-6

TABLE OF CONTENTS
(CONTINUED)

11.82  "Title Policy" ................................................................................................... B-6

11.83  "Title Response Period" ................................................................................... B-6

11.84  "Title Review Period" ...................................................................................... B-6

11.85  "Uncured Supplemental Title Objections" ....................................................... B-6

11.86  "Uncured Title Objections" ............................................................................. B-6

11.87  "Unrestricted Period" ...................................................................................... B-6

## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

This PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this *"Agreement"*) is effective as of the date this Agreement has been executed by Seller and Buyer (the *"Effective Date"*) between Seller and Buyer (each of Seller and Buyer, individually, a *"Party"* and, collectively, the *"Parties"*), who hereby agree as follows. The provisions (and defined terms) set forth in the preceding "Basic Terms" (the *"Basic Terms"*) are incorporated into this Agreement as though fully set forth in this Agreement. Each capitalized but undefined term used in this Agreement is defined in Article 11 of attached **Exhibit "B"**.

## ARTICLE 1
## AGREEMENT OF PURCHASE AND SALE

**1.1     Purchase Price.** Subject to the provisions of this Agreement, Seller shall sell, and Buyer shall purchase, the Property for the Purchase Price (as set forth in the Basic Terms), payable as follows.

**(a)     Initial Deposit.** On or before the later of November 30, 2009 or one (1) Business Day following the execution of this Agreement, Buyer shall deposit with Escrow Holder Cash in the amount of the Initial Deposit (as set forth in the Basic Terms).

**(b)     Credit Against Purchase Price.** The Deposit shall be applicable to and credited against the Purchase Price.

**(c)     Assumption of Existing Debt.** Subject to the provisions of Section 1.3, Buyer shall assume, as of the Close of Escrow, the Existing Debt and Buyer shall receive a credit against the Purchase Price equal to the amount of the Existing Debt outstanding as of the Close of Escrow that is so assumed by Buyer (the *"Existing Debt Amount"*). *"Existing Debt"* means the debt encumbering the Property as of the Close of Escrow as evidenced by that certain promissory note (the *"Existing Note"*) made as of June 26, 1998 to the order of The Northwestern Mutual Life Insurance Company in the original principal amount of $60,000,000. *"Existing Lender"* means the holder of the Existing Debt. *"Existing Deed of Trust"* means the deed of trust with respect to the Property that secures the Existing Debt.

**(d)     Balance of Purchase Price.** Not later than such time on the Closing Date as shall be required to enable Escrow Holder to complete the disbursements required to "Close" this transaction as described in Section 6.3, Buyer shall deposit with Escrow Holder Cash in the amount of the balance of the Purchase Price (as adjusted pursuant to this Agreement for prorations and any and all other charges and costs payable by Buyer under this Agreement).

**1.2     Deposit.** For purposes of this Agreement, *"Deposit"* means the Initial Deposit, plus any interest accrued thereon while such Deposit is held by Escrow Holder. At all times while the Deposit is held by Escrow Holder, Escrow Holder shall cause the Deposit to be deposited in interest-bearing accounts that benefit from full FDIC insurance.

(a)     Immediately upon the expiration of the Feasibility Period, provided that Buyer gives to Seller (or is deemed to have given) the Notice of Disapproval in accordance with Section 2.2, Escrow Holder shall refund to Buyer the Deposit without the requirement for further instruction to do so; provided, however, that Seller agrees to promptly execute and deliver such written instructions as may be reasonably required by Escrow Holder directing Escrow Holder to refund the Deposit to Buyer.

(b)     Immediately upon the expiration of the Feasibility Period, provided that Buyer gives to Seller the Notice of Approval in accordance with Section 2.2, the Deposit shall become nonrefundable to Buyer except as expressly provided to the contrary in Section 1.3(b), Section 2.1(d), Section 2.1(e), Section 3.1(c), Section 3.3, Section 5.5, Section 7.2 and/or Article 9.

### 1.3     Existing Debt.

(a)     Buyer shall, immediately upon the execution of this Agreement, make application to the Existing Lender for its consent to Buyer's assumption of the Existing Debt at the Close of Escrow (the "***Loan Assumption Approval***"). Such Loan Assumption Approval must include, for the benefit of Seller, a full release of Seller's obligations and liabilities with respect to the Existing Debt (and/or any documents with respect to the Existing Debt) as to future acts or omissions of Seller (and without any release of Corwin and Caroline Booth, individually, or Corwin and Caroline Booth as Trustees of the Corwin and Caroline H. Booth Family Trust under Agreement dated March 6, 1981 (collectively, the "***Principals***") under the Environmental Indemnity Agreement dated as of June 26, 1998, except as to matters arising after the Close of Escrow), as is customarily provided by institutional lenders in similar transactions and subject to the reasonable approval of Seller (such foregoing release being the "***Seller Release***"). Failure of Buyer to obtain such Seller Release shall be deemed to mean, for purposes of this Agreement, the same as if Buyer had not obtained such Loan Assumption Approval, except that Seller may waive such obligation and condition of a Seller Release in Seller's sole and absolute discretion. Buyer shall provide any information reasonably required by the Existing Lender in connection with such Loan Assumption Approval application, and shall pay all fees, costs and expenses which reasonably might be required by the Existing Lender in connection therewith. Seller shall fully cooperate with Buyer and the Existing Lender in connection with obtaining such Existing Lender's Loan Assumption Approval, except that in no event shall such cooperation obligate Seller to make any payments to Buyer or the Existing Lender other than Seller's share of the transfer fee payable in connection therewith nor shall such cooperation obligate Seller to incur any new or additional liabilities.   Buyer shall execute prior to the Close of Escrow all agreements, documents, guarantees, indemnities and other instruments reasonably required of the Existing Lender in connection with such assumption of the Existing Debt, including without limitation providing credit-worthy owners or guarantors as are required by the Existing Lender. Buyer agrees to: (i) diligently exercise commercially reasonable efforts to obtain the Existing Lender's Loan Assumption Approval, (ii) timely provide all other documentation reasonably and customarily required by the Existing Lender as may be necessary to permit such assumption and timely pay as and when due Buyer's share of the costs and expenses required to be paid to the Existing Lender (and Existing Lender's servicers, counsel and consultants) in connection with obtaining such Loan Assumption Approval as more particularly provided in Section 6.6 hereof; and (iii) comply with the customary conditions required by the Existing Lender in connection

- 2 -

with obtaining such Loan Assumption Approval (including, without limitation, the execution and delivery of such documents required by Existing Lender in connection with the assumption of the Existing Debt as are customarily required by institutional lenders in similar transactions). If the reason Existing Lender does not agree to the Loan Assumption Approval (to become effective upon and subject to the Close of Escrow) is due to (x) the existence of a default under the Existing Debt, (y) the failure of a condition described in clauses (i) or (vii) of the conditions to One-Time Transfer described on pages 12 and 13 of the Existing Deed of Trust, or (z) otherwise related to Seller or Seller's performance under the Existing Debt or the Property (any of the foregoing being a "*Seller Assumption Issue*"), then Seller shall use Seller's commercially reasonable best efforts to cure to the satisfaction of Existing Lender any such Seller Assumption Issue prior to the Loan Assumption Approval Date (as such date may be extended as set forth in paragraph (b), below).

      **(b)**     Notwithstanding anything to the contrary in this Agreement, if Buyer does not obtain the Existing Lender's consent to such assumption prior to December 23, 2009 (the "*Loan Assumption Approval Date*"), notwithstanding Buyer and Seller each having complied with its respective obligations set forth in paragraph (a) above in this Section, then Buyer shall have the right, to be exercised by delivery of written notice to Seller and Escrow Holder (the "*Buyer Extension Notice*"), to extend the Closing Date to January 29, 2010, and the Loan Assumption Approval Date shall be extended to January 26, 2010 (the "*Extended Loan Assumption Approval Date*"). If, notwithstanding Buyer and Seller each having complied with its respective obligations set forth in paragraph (a) above, Buyer does not obtain the Existing Lender's Loan Assumption Approval prior to the Extended Loan Assumption Approval Date, this Agreement shall terminate, in which event the provisions of Section 2.2 shall apply (as if Buyer had delivered a Notice of Disapproval under this Agreement).

## ARTICLE 2
## FEASIBILITY REVIEW

      **2.1**    **Feasibility Period.**  During the period commencing on the Effective Date and terminating at 5:00 p.m. Pacific time on the Feasibility Date (the "*Feasibility Period*"), Buyer shall analyze the feasibility of its ownership, operation, and use of the Property. Buyer acknowledges that Buyer is solely responsible for any and all costs incurred by Buyer in connection with its review and/or investigations of the matters set forth in this Article 2, including without limitation the costs of any studies and investigations performed by Buyer.

      **(a)**     **Delivery of Property Documents.**  Buyer hereby acknowledges that Seller has furnished to Buyer the documents and materials set forth on attached **Exhibit "G"** (the "*Property Documents*") in the form of a CD-ROM. Buyer represents that it is an experienced investor in real estate and, as such, Buyer has the ability to review and analyze the Property Documents. During the Feasibility Period, Buyer shall review and analyze the Property Documents to determine their individual and collective impact on the Property. Buyer acknowledges that Seller has delivered the Property Documents to Buyer for informational purposes only and that, except as expressly provided elsewhere in this Agreement, Seller makes no representations or warranties as to the accuracy or completeness of the Property Documents, nor does Seller represent or warrant to Buyer that the Property Documents are all of the documents affecting the Property.

**(b)      Governmental Actions.**    During the Feasibility Period, Buyer shall review the impact on the Property of any and all applicable Governmental Regulations and the effect of any pending or threatened Governmental Actions.

**(c)      Studies and Investigations.**    Subject to Section 4.2, during the Feasibility Period, Buyer shall conduct such independent investigations, studies and tests as Buyer deems necessary and appropriate concerning Buyer's proposed ownership, operation, use, and development of the Property and the suitability of the Property for Buyer's intended purposes. During the Feasibility Period, Buyer shall determine to its satisfaction the feasibility of its intended use of the Property. Buyer acknowledges that Seller is in no way obligated to correct any conditions or alleged defects discovered by Buyer in the course of such investigations, studies or tests, or thereafter.

**(d)      Preliminary Report.**    Buyer hereby acknowledges that it has received a preliminary title report or commitment for title insurance (the *"Preliminary Report"*) issued by the Title Company for the Real Property showing all matters which may affect title to such Real Property, together with legible copies (to the extent available) of all documents constituting exceptions under the Preliminary Report.

**(i)**      Buyer hereby acknowledges that it has received a copy of the most current survey of the Property that is in Seller's possession (the *"Survey"*). In the event Buyer desires to cause the Survey to be updated it may do so at its own cost and expense.

**(ii)**      On or before December 11, 2009 (the *"Title Review Period"*), Buyer shall give to Seller notice (the *"Title Objection Notice"*) of any matters affecting title to the Real Property contained in the Preliminary Report to which Buyer objects (the *"Title Objections"*). The above notwithstanding, Buyer may not object to any matter set out in the Preliminary Report which is a standard printed exception, each of which shall be deemed approved by Buyer. Buyer's failure to timely deliver a Title Objection Notice shall be deemed to constitute Buyer's approval of all exceptions in the Preliminary Report.

**(iii)**      Seller shall have three (3) Business Days after receipt of the Title Objection Notice (the *"Title Response Period"*) to notify Buyer and Escrow Holder as to any of the Title Objections that Seller elects (in its sole and absolute discretion) to cure, or cause to be eliminated from the Title Policy, on or before the Close of Escrow; provided, however, Seller shall have no obligation to cure or cause to be eliminated any of the Title Objections. In the event Seller fails to deliver such notice to Buyer and Escrow Holder, then Seller shall be deemed to have elected to not cure or cause to be eliminated from the Title Policy all of the Title Objections. Notwithstanding anything to the contrary in this Agreement, and regardless of whether Buyer objected to such as a Title Objection, any deeds of trust, mortgages and/or mechanics and materialmen liens created by Seller with respect to the Property, but expressly excluding the Existing Deed of Trust (such Existing Deed of Trust being the *"Seller Liens"*), must be removed by Seller at or prior to the Close of Escrow as a condition precedent to the Close of Escrow. The Seller Liens shall be deemed to be approved by Buyer as permitted exceptions in the Title Policy. Buyer hereby approves the Seller Liens. *"Uncured Title Objections"* means any Title Objections with respect to which Seller does not elect (or is deemed to have not elected) to cure, or cause to be eliminated, on or before the Close of Escrow,

- 4 -

excluding any Seller Liens. The Parties hereby acknowledge that Seller intends to amend that certain Amended and Restated Grant of Easements and Easement Agreement dated as of September 16, 2008 and recorded in the real property records of San Francisco County, California on September 19, 2008 as Instrument No. 2008-I654755 on Page 143 of Book J730, to modify the maintenance easements as follows: (i) the maintenance easement in favor of the building commonly known as 221 Main Street shall be extended to an elevation of 260 feet; and (ii) the maintenance easement in favor of the building commonly known as 101 Howard Street shall be extended to the North side of the property line of the building commonly known as 221 Main Street. Notwithstanding anything to the contrary in this Agreement, Seller's entering into and recording such amendment, within ten (10) Business Days after the execution of this Agreement, shall not be a breach or default under this Agreement; provided, however, that such amendment shall be subject to Buyer's approval in accordance with the provisions of Section 2.1(e).

(iv)     If, as of the expiration of the Title Response Period, there remain any Uncured Title Objections, then Buyer shall, within two (2) Business Days following the expiration of Title Response Period, notify Seller and Escrow Holder of Buyer's election (in its sole and absolute discretion) to either (A) waive any such Uncured Title Objections and proceed to the Close of Escrow, or (B) terminate this Agreement in which event the Deposit shall be returned to Buyer (less one half (½) of any Escrow cancellation and title charges), and Seller and Buyer shall be released from all obligations under this Agreement, and neither Seller nor Buyer shall have any rights under this Agreement, except for the obligations to (X) pay any Escrow cancellation and title charges, (Y) indemnify as expressly set forth in this Agreement to survive such termination, and (Z) maintain confidentiality as required under this Agreement. If Buyer fails to timely make the election under Clause (A) or Clause (B), then Buyer shall be deemed to have elected to terminate this Agreement in accordance with the preceding Clause (B). Any Uncured Title Objections (excluding any Seller Liens) which Buyer waives under Clause (A) above shall be deemed to be approved by Buyer as permitted exceptions in the Title Policy.

(e)     **Supplemental Report.** If any title exceptions, other than those specified in the Preliminary Report, appear of record against the Property prior to the Close of Escrow, Escrow Holder shall cause the Title Company to issue a supplemental preliminary report (*"Supplemental Report"*) referencing such exceptions.

(i)     On or before five (5) Business Days after delivery of any Supplemental Report, Buyer shall give to Seller and Escrow Holder notice (the *"Supplemental Title Objection Notice"*) of any exceptions contained in the Supplemental Report to which Buyer objects (the *"Supplemental Title Objections"*). Buyer's failure to timely deliver a Supplemental Title Objection Notice shall be deemed to constitute Buyer's approval of all exceptions in the Supplemental Report.

(ii)     Seller shall have three (3) Business Days after receipt of the Supplemental Title Objection Notice (the *"Supplemental Title Response Period"*) to notify Buyer and Escrow Holder as to any of the Supplemental Title Objections that Seller elects (in its sole and absolute discretion) to cure, or cause to be eliminated from the Title Policy, on or before the Close of Escrow; provided, however, Seller shall have no obligation to cure or cause to be eliminated any of the Supplemental Title Objections as a condition precedent to the Close of

- 5 -

Escrow, excluding any Seller Liens. In the event Seller fails to deliver such notice to Buyer and Escrow Holder, then Seller shall be deemed to have elected to not cure or cause to be eliminated from the Title Policy all of the Supplemental Title Objections. *"Uncured Supplemental Title Objections"* means any Supplemental Title Objections with respect to which Seller does not elect (or is deemed to have not elected) to cure, or cause to be eliminated, on or before the Close of Escrow, excluding any Seller Liens.

(iii)   If, as of the expiration of the Supplemental Title Response Period, there remain any Uncured Supplemental Title Objections, then Buyer shall, within three (3) Business Days following the expiration of the Supplemental Title Response Period, notify Seller and Escrow Holder of Buyer's election (in its sole and absolute discretion) to either (A) waive any such Uncured Supplemental Title Objections and proceed to the Close of Escrow, or (B) terminate this Agreement in which event the Deposit shall be returned to Buyer (less one half (½) of any Escrow cancellation and title charges), and Seller and Buyer shall be released from all obligations under this Agreement, and neither Seller nor Buyer shall have any rights under this Agreement, except for the obligations to (X) pay any Escrow cancellation and title charges, (Y) indemnify as expressly set forth in this Agreement to survive such termination, and (Z) maintain confidentiality as required under this Agreement. If Buyer fails to timely make the election under Clause (A) or Clause (B), then Buyer shall be deemed to have elected to terminate this Agreement in accordance with the preceding Clause (B). Any Uncured Supplemental Title Objections which Buyer waives under Clause (A) above shall be deemed to be approved by Buyer as permitted exceptions in the Title Policy. The Closing Date shall be extended as required to accommodate the time periods set forth above with respect to treatment of Supplemental Title Objections.

**2.2**   **Approval or Disapproval of Feasibility Studies.**   If Buyer determines, in Buyer's sole discretion, that it is feasible for Buyer to purchase the Property, Buyer shall deliver to Seller and Escrow Holder written notice of approval (the *"Notice of Approval"*) on or before six p.m. (PST) on the Feasibility Date. If Buyer fails to so deliver to Seller and Escrow Holder by such date the Notice of Approval, or if Buyer delivers to Seller and Escrow Holder (prior to the expiration of the Feasibility Period) a written notice of disapproval (the *"Notice of Disapproval"*), then this Agreement shall terminate, the Deposit shall be returned to Buyer (less one half (½) of any Escrow cancellation and title charges), and Seller and Buyer shall be released from all obligations under this Agreement, except for the obligations to (a) pay any Escrow cancellation and title charges, (b) indemnify as expressly set forth in this Agreement to survive such termination, and (c) maintain confidentiality as required under this Agreement. Buyer acknowledges and agrees that if Buyer fails to so deliver a Notice of Approval or if Buyer delivers a Notice of Disapproval, then Seller intends to sell the Property to other prospective purchasers. Delays beyond the Feasibility Date may affect Seller's ability to sell the Property. Therefore, the time deadline set forth in this Article 2 and strict compliance therewith constitute a material part of the consideration to Seller for this Agreement.

## ARTICLE 3
## CONDITIONS PRECEDENT TO CLOSE OF ESCROW

**3.1**    **Conditions Benefiting Buyer.** In addition to the conditions set forth in Article 2, this Agreement and the obligations of Buyer under this Agreement shall be subject to satisfaction or written waiver by Buyer of the following conditions precedent.

(a)    **Title Policy.** Escrow Holder shall be unconditionally committed to procure from the Title Company, at Seller's expense except as provided in Section 6.6, a 2006 ALTA Owner's Policy for the Property with a liability limit in the amount of the Purchase Price and insuring fee title vested in Buyer (the *"Title Policy"*). Buyer shall take title to the Property subject to the following matters: (i) non-delinquent general, special and supplemental taxes, bonds and assessments; (ii) any matters set forth in the printed form portion of the Title Policy (except to the extent modified by endorsement with the approval of Title Company prior to the end of the Feasibility Period); (iii) all exceptions in the Preliminary Report and all exceptions in any Supplement Report approved or deemed approved by Buyer or permitted pursuant to Section 2.1(d) and/or Section 2.1(e), including without limitation the Seller Liens; and (iv) any items caused or permitted to be placed of record by Buyer as of the Close of Escrow. Buyer shall be solely responsible for obtaining the results of any update to the Survey (or any new survey) and/or inspection so that the Title Company may provide "extended coverage" with respect to the Title Policy.

(b)    **Continued Accuracy of Seller's Warranties.** The accuracy of Seller's representations and warranties under Section 5.1 shall not have materially changed.

(c)    **Estoppel Certificate.** Seller shall use commercially reasonable good faith efforts to obtain for Buyer an executed estoppel certificate from Charles Schwab & Co., Inc. (*"Schwab"*), dated no earlier than thirty (30) calendar days prior to the Closing Date, in the form of attached **Exhibit "C"** (the *"Estoppel Certificate"*). Buyer's failure to approve or disapprove an Estoppel Certificate by written notice to Seller within three (3) Business Days after receipt thereof shall be deemed to constitute Buyer's approval thereof; provided, however, that notwithstanding anything to the contrary contained herein, Buyer shall not have the right to disapprove an Estoppel Certificate unless it materially conflicts with the related Lease or discloses a material breach of such Lease. At least five (5) calendar days prior to the Closing Date (the *"Estoppel Deadline"*), Buyer shall have received the Estoppel Certificate, and, if not, then Buyer may elect to terminate this Agreement by written notice to Seller and Escrow Holder within three (3) Business Days after the earlier of the Estoppel Deadline or the date on which Seller notifies Buyer that Seller is unable to obtain the Estoppel Certificate, in which event this Agreement and Escrow will terminate in the same manner as set forth in Section 3.3, and the failure of Buyer to receive the Estoppel Certificate shall not be deemed to constitute a Seller's default under this Agreement.

(d)    The Existing Lender shall have approved the assumption of the Existing Debt in accordance with Section 1.3 (which shall include the Seller Release as set forth in such Section) and executed and delivered its written Loan Assumption Approval and Seller Release documents (effective upon and subject to the Close of Escrow but otherwise without conditions

- 7 -

which have not been fully satisfied, or which will be satisfied upon the happening of the Close of Escrow in accordance with this Agreement).

        **(e)    Seller's Performance.** Seller shall have duly performed each and every other covenant expressly to be performed by Seller under this Agreement, including without limitation depositing into Escrow the documents and funds described in this Agreement.

    **3.2    Conditions Benefiting Seller.** In addition to the conditions set forth in Article 2, this Agreement and the obligations of Seller subsequent to the Feasibility Period shall be subject to satisfaction or written waiver by Seller of the following condition precedent:

        **(a)** Buyer shall have duly performed each and every undertaking and agreement to be performed by Buyer under this Agreement, including without limitation depositing into Escrow the documents and funds described in this Agreement.

        **(b)** The Existing Lender shall have approved the assumption of the Existing Debt (and Seller Release) in accordance with Section 1.3 (as more particularly described in Section 3.1(d), above) and Buyer shall have assumed the Existing Debt.

    **3.3    Failure of Conditions Precedent.** If any condition precedent set forth above in this Article 3 is neither satisfied nor waived by the Closing Date, then the Party benefited by such condition may terminate the Escrow and this Agreement by giving a written notice of termination to the other Party and Escrow Holder specifying the condition which has not been satisfied. Upon any such termination, any non-defaulting Party shall be released from all obligations under this Agreement, except for obligations to (i) pay any Escrow cancellation and title charges, (ii) indemnify in the manner expressly provided for in this Agreement, and (iii) maintain confidentiality as required under this Agreement. If any condition precedent set forth in Section 3.1 is neither satisfied nor waived by the Closing Date, and provided that the failure of such condition precedent is due to no fault or contributing cause of Buyer, then the Deposit shall be returned to Buyer less one half (½) of any Escrow cancellation and title charges.

### ARTICLE 4
### ADDITIONAL COVENANTS AND AGREEMENTS

    **4.1    No Concern.** Escrow Holder shall have no concern with, liability or responsibility for, this Article 4.

    **4.2    Entry Upon Property.** During the Feasibility Period and, if Buyer timely complies with the requirements of Section 4.2(a), Section 4.2(b) and Section 4.2(c), until the Close of Escrow or earlier termination of this Agreement, Buyer and its designated agents and independent contractors shall have the right to enter upon the Property to conduct surveys, investigations and studies on the following terms and conditions.

        **(a)    Notice of Entry.** At least two (2) Business Days prior to any entry and inspection of any portion of the Property, Buyer shall (i) deliver to Seller written notice of its intention to enter the Property to conduct such inspection, a description of the inspection to be conducted, and the proposed time of such entry (and Seller shall have the right to reasonably approve such timing and shall have the right to have one or more of its agents or representatives

- 8 -

and any applicable Tenant or Tenant's representative accompany Buyer and Buyer's Representatives at all times while Buyer or Buyer's Representatives are on the Property), (ii) with respect to any non-invasive physical testing of the Property, provide Seller with a copy of a work plan for such testing for Seller's prior written approval, which work plan Seller may modify, limit or disapprove in its reasonable discretion, (iii) with respect to any intrusive or destructive tests on the Property, provide Seller at least three (3) Business Days advance written notice describing the nature and extent of such testing and obtain Seller's written approval of such testing, which approval may be withheld in Seller's sole and absolute discretion, and (iv) comply with the provisions of Section 4.2(b) and Section 4.2(c). With respect to any Phase I environmental report obtained by Buyer with respect to the Property (or any portion thereof), Buyer shall cause such report to be certified to Seller and to Seller's current lender (if any) with respect to the Property and Buyer shall furnish to Seller a copy thereof immediately upon issuance. Buyer and its agents shall not contact any governmental or quasi-governmental representative concerning the Property without the prior written consent of Seller, which shall be in Seller's reasonable discretion.

(b) **Restriction and Indemnity.** Any entry by Buyer upon the Property requires that (i) such activities do not unreasonably interfere with Seller's ownership, operation and maintenance of the Property and shall be subject to the rights of the Tenants under the Leases, (ii) such activities must be in accordance with the terms and conditions set forth in the Leases, and must not unreasonably interfere with Tenants' quiet enjoyment of the Property and shall not include access to any of Tenants' restricted or proprietary or secure areas, (iii) Buyer shall not construct, erect or place on the Property any monuments or improvements, (iv) Buyer shall perform all work permitted under this Agreement in a safe manner, (v) Buyer shall not cause any dangerous or hazardous conditions to exist, (vi) Buyer shall comply with all applicable laws and Governmental Regulations, and (vii) Buyer shall obtain, at Buyer's sole cost and expense, any and all permits required to be obtained from any Governmental Agencies. Buyer shall repair any damage caused by Buyer or its agents or independent contractors to the Property. Buyer shall indemnify, protect, defend (with legal counsel reasonably acceptable to Seller) and hold Seller harmless from and against any and all claims, costs, expenses, losses, liabilities, damages, and demands (including without limitation attorneys' fees and costs and claims of mechanic's liens), incurred or sustained by Seller or any third party either prior or subsequent to the Close of Escrow or a termination of this Agreement as a result of the conduct of Buyer, its agents or independent contractors (provided, however, the mere discovery by Buyer of the existence of hazardous materials or any other defect at, on or affecting the Property shall not be deemed to cause Buyer to have any responsibility to indemnify or otherwise hold harmless Seller or any other party relating to the existence or remediation of such hazardous materials or such other defect). The covenants contained in this Section 4.2(b) shall survive the Close of Escrow or earlier termination of this Agreement and shall be binding on the Buyer until all such actions against Seller are absolutely barred by the applicable statute of limitations.

(c) **Insurance.** Prior to and during any entry on the Property, Buyer shall secure and maintain at Buyer's expense the following policies of insurance (from one or more insurance carriers reasonably acceptable to Seller), which are to include coverage of Buyer, its agents and employees' activities on the Property: (i) comprehensive general liability and property damage insurance, including direct contractual and contingent liability, with combined single limit of Two Million Dollars ($2,000,000.00) for bodily injury to, or death of, any person,

- 9 -

or more than one person on an occurrence basis, and Two Million Dollars ($2,000,000.00) for property damage in any one or more accidents, with aggregate operations on an occurrence basis; and (ii) Workers' Compensation and Employer's Liability Insurance in accordance with the provisions of the laws of the State of California. The policies of insurance described in the preceding sentence shall name Seller (and Thornhill Property Services LLC, Seller's property manager, and the Existing Lender) as an additional insured, shall by endorsement or primary coverage extend the term "bodily injury" to include "personal injury," and the certificate issued pursuant to the requirement of this paragraph shall contain a provision that such policy may not be terminated for nonpayment of premium until thirty (30) calendar days written notice of the proposed termination has been delivered to Seller. Certificates of insurance evidencing the insurance policies described in this Section 4.2(c) and copies of such insurance policies will be delivered by Buyer to Seller prior to any entry on the Property by Buyer. Any environmental contractor of Buyer which conducts environmental inspections of the Property shall, in addition to the insurance required of Buyer's agents described above, also provide evidence of environmental liability insurance of not less than One Million Dollars ($1,000,000.00).

        **(d)**    **Survival.** The provisions of this Section 4.2 shall survive the Close of Escrow or earlier termination of this Agreement.

        **4.3**    **Confidentiality.**

        **(a)**    Subject to the exclusions set forth in this Section 4.3, Buyer shall maintain as confidential and not disclose to any other Person without Seller's prior written consent, which shall be in Seller's sole and absolute discretion, (i) the provisions of this Agreement and the transactions contemplated by this Agreement, and (ii) all information and documents disclosed or furnished to Buyer under or in connection with this Agreement, including without limitation the Property Documents (collectively, the *"Information"*). Buyer shall return to Seller the Information immediately upon the termination of this Agreement, except that Buyer may retain one copy of the Information provided that such retained copy of the Information shall remain subject to the provisions of this Section 4.3. Such return shall not abrogate Buyer's continuing obligations under this Section 4.3.

        **(b)**    The Information may be disclosed to partners, affiliated entities, directors, consultants, advisors, employees, accountants, legal counsel and institutional lenders (collectively, *"Buyer's Representatives"*), if and to the extent that each of Buyer's Representatives (i) is advised in advance of the terms of this Section 4.3 applicable to the Information (provided that Buyer shall remain liable for any disclosure of any of the Information by any of Buyer's Representatives that is not expressly permitted by this Section 4.3) and (ii) needs to know the particular Information (or portion thereof) for the sole purpose of evaluating or purchasing the Property in accordance with this Agreement.

        **(c)**    This Section 4.3 shall be inoperative as to particular portions of the Information (and such materials shall not be deemed Information) if and to the extent that such Information (i) was or becomes generally available to the public other than as a result of a disclosure by Buyer or Buyer's Representatives, (ii) was or becomes available to Buyer on a non-confidential basis prior to its disclosure to Buyer by Seller, (iii) was or becomes available to Buyer on a non-confidential basis from a source other than Seller or Seller's Broker when such

- 10 -

source is, to Buyer's knowledge, entitled to make the disclosure to Buyer or (iv) is or was developed by employees or agents of Buyer who had no access to any of the Information.

(d)    Buyer acknowledges that the breach of this Section 4.3 will cause Seller irreparable damage which is not fully compensable by monetary damages, and that Seller therefore may have no adequate remedy at law if Buyer or Buyer's Representatives violate any of the terms of this Section 4.3. Therefore, in addition to any other rights or remedies Seller may have, Seller shall be entitled to seek injunctive relief to restrain any breach or threatened breach and/or specific enforcement of such terms in the event of any breach of the provisions of this Section 4.3. Neither Buyer nor Buyer's agents (or Buyer's Representatives) shall oppose the granting of such relief. If Buyer or Buyer's Representatives are requested or required in any legal or administrative proceeding (by deposition, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Information, then Buyer shall provide Seller with prompt notice of such request(s), to the extent practicable, so that Seller may seek an appropriate protective order. If, failing the entry of a protective order or the receipt of a waiver hereunder, Buyer or Buyer's Representatives are, in the opinion of Buyer's counsel, compelled to disclose Information under risk of liability for contempt or other censure or penalty for failure to do so, Buyer may disclose all or such portion of the Information in accordance with such requirement without liability hereunder.

4.4    **Seller's Management of the Property**.    Subject to the provisions of Article 9, from the date of this Agreement until the Close of Escrow, Seller shall use commercially reasonable good faith efforts to (a) manage the Property in the same manner as currently managed, (b) perform when due, and otherwise comply with, all of Seller's obligations and duties under the Leases, and (c) maintain the Property in accordance with all applicable laws, ordinances, rules and regulations affecting the Property or require Tenants to do so if required by the Leases. During the period from the execution of this Agreement through and including the date that is five (5) Business Days prior to the Feasibility Date (the "*Unrestricted Period*"), Seller shall not enter into any new Lease or agreement (or modify any existing Lease or agreement that affects the Property) that might be binding on the Property or the owner of the Property following the Close of Escrow, without notifying Buyer immediately upon the execution thereof (but in no event later than the expiration of the Unrestricted Period). Following the Unrestricted Period, Seller shall not, without first obtaining Buyer's approval (which approval shall not be unreasonably withheld and which approval shall be deemed given by Buyer if Buyer fails to disapprove within three (3) Business Days of request from Seller) enter into any such agreement or modification (or modify any existing Lease or agreement that affects the Property) that might be binding on the Property or the owner of the Property following the Close of Escrow.

4.5    **Release by Buyer**.

(a)    INTENTIONALLY OMITTED.

(b)    Except for a breach by Seller of any representation, warranty or covenant of Seller in this Agreement, and except as set forth in the last sentence of this Section 4.5(b), Buyer and anyone claiming by, through or under Buyer hereby waives its right to recover from and fully and irrevocably releases Seller and its Affiliates from any and all claims that it may

- 11 -

now have or hereafter acquire against any Seller or any of its Affiliates for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to any defects, errors, omissions or other conditions, latent or otherwise, any environmental matters affecting the Property, and any right of contribution or private right that Buyer may now or hereafter acquire against Seller under Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sec. 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq.; the Toxic Substances Control Act, 15 U.S.C., Section 2601 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901 et seq.; and in the regulations adopted and publications promulgated pursuant to such laws or any other federal, state or local environmental law, rule or regulation (as such laws and statutes may be amended, supplemented or replaced from time to time). This release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release of Seller. Notwithstanding anything to the contrary in this Section 4.5(b) or elsewhere in this Agreement, nothing in this Agreement shall be construed to prevent Buyer from causing Seller to be added as a defendant in an Environmental Action for the sole purpose of allowing the plaintiff in such Environmental Action (but not Buyer) to seek claims against Seller. *"Environmental Action"* means an action (i) brought by a third party or any governmental authorities, (ii) for an environmental matter, hazardous condition or contaminant which existed at or near the Property prior to the Close of Escrow, and (iii) in which Seller may have direct liability to such third party or governmental authority; provided, however, that in no event shall the preceding sentence be deemed to permit Buyer to seek recovery or indemnity directly from Seller in connection with any such Environmental Action.

(c)     Buyer specifically waives the provision of California Civil Code Section 1542. Section 1542 provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(d)     In this connection and to the extent permitted by law and except as limited in this Agreement, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown to Buyer and unanticipated and unsuspected by Buyer, and Buyer further agrees, represents and warrants that the waivers and releases in this Agreement have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit Seller to the extent set forth in subparagraph (b) above from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance under this Agreement but excluding intentional misrepresentation.

- 12 -

(e)    This release does not apply to any claims that Seller may have against, or warranties, express or implied, that Seller has received or may receive from, those contractors, suppliers, materialmen and consultants retained by Seller in connection with the design, construction, grading and installation of improvements on the Property; and Seller hereby assigns and transfers to Buyer, on a non-exclusive basis, any rights of Seller to pursue any such claims or warranties, to the extent they apply to the Property. Seller hereby reserves from this assignment the right, without the obligation, to pursue any such claims or warranties which Seller may have and other work or services performed, but not to the derogation of Buyer's rights pursuant to the assignment contained in this paragraph.

(f)    The provisions of this Section 4.5 shall survive the Close of Escrow or any earlier termination of this Agreement.

(g)    Seller and Buyer have each initialed this Section 4.5 below to further indicate their awareness and acceptance of each and every provision of this Section 4.5.

_____        _____
Buyer's Initials                          Seller's Initials

4.6    **Assignment of Plans and Reports.** If this Agreement terminates and/or Escrow fails to close for any reason, then, if requested in writing by Seller, so long as such disclosure to Seller is permitted by the preparer of the subject report, Buyer shall deliver to Seller copies of any of the following expressly required by Seller: All of Buyer's third-party prepared investigations, studies (including without limitation feasibility studies), economic reports, marketing studies, maps, surveys, environmental reports, civil and soil engineering reports, site plans, condominium plans and specifications relating to improvements on the Property (whether constructed or not), and all other plans, reports and other documents or work relating to the Property but without representation or warranty as to accuracy or completeness and such plans and reports shall be deemed assigned to Seller without consideration or expense to Seller. Buyer shall execute such documents as Seller reasonably requires to evidence the foregoing assignments, and Seller shall be responsible to obtain the signatures of third parties, if necessary, within ten (10) calendar days after Seller's request.

### ARTICLE 5
### ACKNOWLEDGMENTS, REPRESENTATIONS AND WARRANTIES

5.1    **Seller's Representations and Warranties.** The matters set forth in this Section 5.1 constitute representations and warranties by Seller which shall be true and correct as of the Effective Date and, except as otherwise disclosed to Buyer, the Close of Escrow.

(a)    **Organization.** Seller is duly organized, validly existing and in good standing under the laws of the state of its formation, and is qualified to do business in the State of California, with full power to enter into this Agreement.

(b)    **Authority.** The execution and delivery of this Agreement have been duly authorized and approved by all requisite action and the consummation of the transactions contemplated have been duly authorized and approved by all requisite action of Seller, and no other authorizations or approvals will be necessary in order to enable Seller to enter into or to

- 13 -

(e)    This release does not apply to any claims that Seller may have against, or warranties, express or implied, that Seller has received or may receive from, those contractors, suppliers, materialmen and consultants retained by Seller in connection with the design, construction, grading and installation of improvements on the Property; and Seller hereby assigns and transfers to Buyer, on a non-exclusive basis, any rights of Seller to pursue any such claims or warranties, to the extent they apply to the Property.  Seller hereby reserves from this assignment the right, without the obligation, to pursue any such claims or warranties which Seller may have and other work or services performed, but not to the derogation of Buyer's rights pursuant to the assignment contained in this paragraph.

(f)    The provisions of this Section 4.5 shall survive the Close of Escrow or any earlier termination of this Agreement.

(g)    Seller and Buyer have each initialed this Section 4.5 below to further indicate their awareness and acceptance of each and every provision of this Section 4.5.

| _____ | _____ |
| Buyer's Initials | Seller's Initials |

**4.6    Assignment of Plans and Reports**.  If this Agreement terminates and/or Escrow fails to close for any reason, then, if requested in writing by Seller, so long as such disclosure to Seller is permitted by the preparer of the subject report, Buyer shall deliver to Seller copies of any of the following expressly required by Seller:  All of Buyer's third-party prepared investigations, studies (including without limitation feasibility studies), economic reports, marketing studies, maps, surveys, environmental reports, civil and soil engineering reports, site plans, condominium plans and specifications relating to improvements on the Property (whether constructed or not), and all other plans, reports and other documents or work relating to the Property but without representation or warranty as to accuracy or completeness and such plans and reports shall be deemed assigned to Seller without consideration or expense to Seller.  Buyer shall execute such documents as Seller reasonably requires to evidence the foregoing assignments, and Seller shall be responsible to obtain the signatures of third parties, if necessary, within ten (10) calendar days after Seller's request.

## ARTICLE 5
## ACKNOWLEDGMENTS, REPRESENTATIONS AND WARRANTIES

**5.1    Seller's Representations and Warranties**.  The matters set forth in this Section 5.1 constitute representations and warranties by Seller which shall be true and correct as of the Effective Date and, except as otherwise disclosed to Buyer, the Close of Escrow.

(a)    **Organization**.  Seller is duly organized, validly existing and in good standing under the laws of the state of its formation, and is qualified to do business in the State of California, with full power to enter into this Agreement.

(b)    **Authority**.  The execution and delivery of this Agreement have been duly authorized and approved by all requisite action and the consummation of the transactions contemplated have been duly authorized and approved by all requisite action of Seller, and no other authorizations or approvals will be necessary in order to enable Seller to enter into or to

- 13 -

comply with the terms of this Agreement. The person(s) signing this Agreement and any documents and instruments in connection herewith on behalf of Seller have full power and authority to do so, and upon delivery to and execution by Buyer this Agreement shall be a valid and binding obligation of Seller.

(c)    **No Violation.** The execution, delivery and performance by Seller of this Agreement and such other instruments and documents to be executed and delivered in connection herewith does not, and will not, result in any violation of or conflict with any provisions of any agreement of Seller or any mortgage, deed of trust, indenture, lease, security agreement, or other instrument, covenant, obligation, or agreement to which Seller is subject.

(d)    **Seller Not a Foreign Person.** Seller is not, and will not be at the time of Close of Escrow, a "Foreign Person" as defined in Section 1445 of the Internal Revenue Code of 1954, as amended.

(e)    **Material Information.** Seller has made available to Buyer (whether as part of the Property Documents or as made available to Buyer in Seller's office) all written information that is in the possession of Seller, with respect to the Property, which would have a material impact on the decision of Buyer to deliver the Notice of Approval and/or to proceed to the Close of Escrow.

(f)    **Notice of Violations.** Except as disclosed to Buyer in writing (including without limitation as part of the Property Documents and/or as set forth in attached **Schedule 5.1**), Seller has not received written notice of any current violations of applicable environmental, zoning and land use laws, or other applicable local, state and federal laws and regulations.

(g)    **Notice of Condemnation or Litigation.** Except as disclosed to Buyer in writing (including without limitation as part of the Property Documents), Seller has received no written notice of any pending or contemplated condemnation proceeding or other litigation, actions, suits or proceedings which have been filed or threatened in writing and which would affect the use, occupancy or operation of the Property for its intended purpose or Seller's ability to perform under this Agreement or the value of the Property.

(h)    **No Binding Agreements or Commissions.** To the best of Seller's knowledge, there are no agreements concerning the operation and maintenance of the Property (other than Permitted Exceptions or the Leases) binding on the owner of the Property which will continue in effect after the Close of Escrow. All leasing commissions payable in connection with any of the Leases have been fully paid, and no commission remains to be paid after the Close of Escrow, whether in connection with any right to extend the term of any such Lease or otherwise.

(i)    **Leases.** The only Leases demising any portion of the Property are (1) the Lease with Schwab and (2) the Flower Shop Lease (as identified in the Lease with Schwab). To the best of Seller's knowledge and except as set forth in attached **Schedule 5.1**, (a) all Leases are in full force and effect, and Seller is not in default of any material obligation to be performed by Seller under such Leases, (b) Seller has not received written notice of termination or cancellation

- 14 -

of any Lease, and (c) Buyer has been provided with a full, complete and accurate copy of each such Lease (including any and all amendments and modifications thereto) as a part of the Property Documents.

(j) **Violations.** To the best of Seller's knowledge, except as disclosed to Buyer in writing (including without limitation as part of the Property Documents and/or as set forth in attached **Schedule 5.1**), Seller has received no written notice from any governmental authority that the present use and operation of the Property is in violation (which has not been corrected) of: (a) any federal, state or local law, regulation or ordinance relating to environmental matters, (b) the Americans with Disabilities Act or any other similar federal, state or local law, (c) any applicable building code or other law relating to the construction or design of the Improvements on the Property including, without limitation, any code or law respecting fire, safety, handicapped access, or seismic design, or (d) any of the Permitted Exceptions.

(k) **No Sale Agreement.** Except for this Agreement, Seller has not entered into any sale agreement for the sale of the Property (or any portion thereof). No tenant under its Lease, nor any other person or entity, has any right of first refusal to purchase or option to purchase the Property or any portion thereof or any interest therein.

Seller shall have no liability with respect to a breach of the representations and warranties set forth above to the extent that Buyer proceeds with the Close of Escrow with actual knowledge of such breach or if Buyer should have known of such breach, through the exercise of reasonable diligence, prior to the Close of Escrow.

**5.2    Knowledge and Notice.** If a representation, warranty or other statement is made in this Agreement or in any document or instrument to be delivered at Close of Escrow pursuant to this Agreement, on the basis of the "knowledge" or "best of knowledge" (or similar phrases) of Seller, or is qualified by Seller's having received written notice thereof, then such representation, warranty or other statement is made based on the actual, current, conscious express awareness of facts or other information of Christopher Booth and Peter Tymstra (the *"Seller's Representative(s)"*), as distinguished from implied, imputed and/or constructive knowledge, as of the date of this Agreement and as of any time thereafter up to and including the Close of Escrow, and without undertaking any special inquiry or investigation by such person(s) and without searching public records or Seller's files, and without attribution to the Seller's Representative(s) of notices received by, and facts and matters otherwise within the personal knowledge of, any other officers or employees of Seller or third parties, including without limitation to tenants and property managers of the Property. Seller is not under a duty of inquiry or investigation in order to make any such representation, warranty or other statement and Seller has no liability for failing to discover whether a condition as to which a representation as to the knowledge of Seller is made is true or exists, even if the means to know are at hand or could be discovered upon inquiry. So qualifying Seller's knowledge shall in no event give rise to any personal liability on the part of the Seller's Representative(s) or any other officer or employee of Seller or its Affiliates.

**5.3    Survival and Limitation of Representations and Warranties.** The representations and warranties of Seller set forth in this Agreement or any documents executed in connection herewith shall survive the Close of Escrow, but any action, suit or proceeding

- 15 -

brought by Buyer against Seller under this Agreement or under any such documents shall be commenced and served, if at all, on or before December 31, 2010 and, if not commenced and served on or before such date, thereafter shall be void and of no force or effect. The aggregate liability of Seller with respect to all claims under this Agreement shall not exceed $3,000,000, and in no event shall any liability arise in connection therewith unless and except to the extent that the direct damages to Buyer by reason of all such claims, collectively, exceed Twenty Five Thousand Dollars ($25,000). In no event shall Seller be liable to Buyer for any consequential, exemplary, punitive, or any other type of damages (other than direct damages) or for unrealized expectations or other similar claims in respect of any such claims, and in every case Buyer's recovery for any claims shall be net of any insurance proceeds and any indemnity, contribution, or other similar payment recovered or recoverable by Buyer from any insurance company or other third party.

      **5.4**    **Buyer's Representation and Warranties.**    The matters set forth in this Section 5.4 constitute representations and warranties by Buyer which shall be true and correct as of the Effective Date and, except as otherwise disclosed to Seller, the Close of Escrow.

      **(a)**    **Organization.**    Buyer is duly organized, validly existing and in good standing under the laws of the state of its formation, and is qualified to do business in the State of California, with full power to enter into this Agreement.

      **(b)**    **Authority.**    The execution and delivery of this Agreement have been duly authorized and approved by all requisite action and the consummation of the transactions contemplated have been duly authorized and approved by all requisite action of Buyer, and no other authorizations or approvals will be necessary in order to enable Buyer to enter into or to comply with the terms of this Agreement. The person(s) signing this Agreement and any documents and instruments in connection herewith on behalf of Buyer have full power and authority to do so, and upon delivery to and execution by Seller this Agreement shall be a valid and binding obligation of Buyer.

      **(c)**    **No Violation.**    The execution, delivery and performance by Buyer of this Agreement and such other instruments and documents to be executed and delivered in connection herewith does not, and will not, result in any violation of or conflict with any provisions of any agreement of Buyer or any mortgage, deed of trust, indenture, lease, security agreement, or other instrument, covenant, obligation, or agreement to which Buyer is subject.

      **(d)**    **OFAC.**    Buyer and all of its Affiliates (i) are currently and have been at all times in full compliance with all Patriot Act Related Laws, and (ii) are not and have never been a Person (A) that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, (B) owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, (C) with whom a Party is prohibited from dealing or otherwise engaging in any transaction by any anti-money laundering law, (D) who commits, threatens or conspires to commit or support "terrorism" as defined in the Executive Order, (E) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Department of the Treasury, Office of Foreign Assets Control at its official website, http://www.ustreas.gov/offices/enforcement/ofac/ or at any replacement website or other

- 16 -

replacement official publication of such list, or (F) who is an Affiliate of a Person listed above. *"Executive Order"* means Executive Order No. 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001, as amended from time to time. *"Patriot Act"* means Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56). *"Patriot Act Related Laws"* means those laws, regulations, orders and sanctions, state and federal, criminal and civil, that (a) limit the use and/or seek the forfeiture of proceeds from illegal transactions, (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotic dealers or otherwise engaged in activities contrary to the interests of the U.S., (c) require identification and documentation of the parties with whom a financial institution conducts business, or (d) are designed to disrupt the flow of funds to terrorist organizations. For purposes of clarification, Patriot Act Related Laws shall be deemed to include the Executive Order, the Patriot Act, the Bank Secrecy Act (31 U.S.C. §§ 5311 et seq.), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), the Trading with the Enemy Act (50 U.S.C. Appx. 1 et seq.), the Cuban Democracy Act (22 U.S.C.§§ 6001-10), the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act (22 U.S.C. 6021-91), the Iraq Sanctions Act of 1990 (Pub. L. 101-513), the Terrorism Sanctions Regulations (31 C.F.R. Part 595), the Antiterrorism and Effective Death Penalty Act of 1996 (8 U.S.C. § 1189, 18 U.S.C. § 2332b and 18 U.S.C. § 2332d), the Terrorism List Governments Sanctions Regulations (31 C.F.R. Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 C.F.R. Part 597), the United Nations Participation Act (22 U.S.C. § 287c), and the International Security and Development Cooperation Act (22 U.S.C. §§ 2349 aa-9); each as amended, and the sanctions regulations promulgated pursuant to the foregoing by the Office of Foreign Assets Control of the U.S. Department of Treasury, as well as laws relating to prevention and detection of money laundering in Sections 1956 and 1957 of Title 18 of the U.S. Code, as amended.

(e)     **Purchase As-Is.** Buyer represents and warrants that except as is expressly represented and warranted by Seller or otherwise expressly provided in this Agreement, it is relying upon its own inspections, investigations and analyses of the Property in entering into this Agreement and, except as otherwise provided in this Agreement, is not relying in any way upon any representations, statements, agreements, warranties, studies, reports, descriptions, guidelines or other information or material furnished by Seller or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters including without limitation as to the following:

(i)     The condition, value, nature, or quality of the Property, including any construction on the Property and any materials or systems incorporated into the Property.

(ii)     The soil, water or geology relating to the Property.

(iii)     Any income to be derived from the Property.

(iv)     The suitability of the Property for any activities or uses which Buyer may wish to conduct on or relating to the Property.

(v)     The zoning or developability of the Property.

(vi)    Compliance of the Property or its operation with any law, ordinance, rule, regulation, or the status of any permits or approvals relating to or required in connection with the Property, including without limitation the "Americans with Disabilities Act".

(vii)    The presence or absence of any Hazardous Materials on or about the Property or in the vicinity of the Property or the compliance of the Property with any laws relating to Hazardous Materials; and Buyer expressly acknowledges that the Property Documents constitute written notice to Buyer as may be required by California Health and Safety Code Section 25359.7.

(viii)    The occupants, tenants or parties in possession of the Property or any portion of the Property.

Buyer agrees and warrants to Seller that neither Seller, nor any broker, nor any agent or representative of either of them, has made any representation to Buyer inconsistent with the foregoing, except as may be provided in this Agreement. Buyer acknowledges that it is purchasing the Property in an "as-is" condition. Buyer specifically acknowledges and agrees that, to the extent Seller has made or in the future makes any information (including without limitation the Property Documents) regarding any aspect of the Property available to Buyer, Seller has done or will be doing so only as an accommodation to Buyer and that, except as expressly provided elsewhere in this Agreement, Seller has not made, is not making, and shall make no representation or warranty of any nature concerning the accuracy or completeness of Seller's files or concerning the authenticity, source, accuracy or completeness of any information contained in them or furnished or to be furnished by Seller to Buyer (including without limitation the Property Documents). As to certain of the materials furnished to Buyer from Seller's files, Buyer specifically acknowledges that they have been prepared by third parties with whom Seller has no privity and Buyer acknowledges and agrees that no warranty or representation, express or implied, has been made, nor shall any be deemed to have been made, to Buyer either by Seller or by any third parties that prepared the materials in question. Except as otherwise provided in this Agreement, Buyer waives any claim of any nature against Seller if any information, conclusion, projection, or other statement of any nature contained in any of those materials should prove not to be true, complete or accurate for any reason. By its execution of this Agreement, Buyer acknowledges and agrees that a material inducement to Seller's decision to sell the Property to Buyer at the Purchase Price provided in this Agreement was Buyer's agreement to conduct its own feasibility studies and purchase the Property in an "AS-IS" condition. By its approval of its feasibility studies under this Agreement, Buyer acknowledges that it has had full access to the Property and accepts the Property in its condition as of the Close of Escrow.

(f)    **Buyer's Deposits in Escrow.**    The Deposit, and all other monies deposited in Escrow or paid to Seller pursuant to the terms of this Agreement, will either be paid from funds owned by Buyer or borrowed by Buyer pursuant to an arms-length loan. Neither the execution or delivery of this Agreement nor the performance of the transactions contemplated by this Agreement is being consummated by Buyer with the intent to hinder, delay or defraud any person to whom Buyer is now indebted or may become indebted in the future. The payment of any amounts due by Buyer under this Agreement shall not render Buyer insolvent.

- 18 -

(g)    **Waiver Regarding Natural Hazards Disclosure.**  In accordance with the provisions of applicable California law, Seller shall provide, or cause to be provided, to Buyer disclosures respecting certain natural hazards potentially affecting the Property. Consistent with the foregoing, Seller shall deliver, or cause to be delivered, to Buyer a completed Natural Hazards Disclosure Statement respecting the Property substantially in the form of attached **Exhibit "H"** (the "*NHDS*") not less than five (5) calendar days prior to the expiration of the Feasibility Period.  Upon receipt of same, Buyer shall provide written acknowledgment of Buyer's receipt of the NHDS.  Buyer acknowledges that (a) the contents of the NHDS are not intended to be representations or warranties of Seller under this Agreement and (b) the delivery of the NHDS by or on behalf of Seller shall not derogate in any way from the provisions of Section 5.2.

**5.5**    **Status of Representations and Warranties.**  If prior to the Closing Date it is learned that any of the representations or warranties of a Party have ceased to be true, the Party giving such representation shall not be deemed in breach of this Agreement (unless the representation was made by the Party with knowledge that it was not true or the Party making the representation willfully caused or permitted such representation to become untrue), and the Party receiving such representation shall elect in writing within five (5) Business Days of receipt of written notice that such representation has ceased to be true (a) terminate this Agreement in the manner and on the same terms as if there had been a failure of a condition precedent benefiting that Party under Section 3.3; or (b) to proceed with the Close of Escrow with no remedy for the representation which has ceased to be true (except that the Closing Date shall be postponed, if necessary, to the end of such five (5) Business Days period).  If the Party receiving notice fails to make any such election within such five (5) Business Days period, the Party receiving notice shall be deemed to have elected to terminate this Agreement as provided in Clause (a) above.

**5.6**    **Commissions.**  The Parties mutually warrant and covenant that no real estate commissions, brokerage commissions or other commission or fee shall be due or payable on account of this transaction other than a commission to be payable by Seller to CAC Group, Inc. (*"Seller's Broker"*) pursuant to a separate written agreement between Seller and Seller's Broker. Each Party shall indemnify, defend and hold the other harmless from and against any and all claims, actions, costs, expenses (including attorneys fees and costs), damages or liabilities arising out of any other claim for commissions caused by the indemnifying Party.

## ARTICLE 6
## ESCROW

**6.1**    **Opening of Escrow.**  Within two (2) Business Days after the Effective Date, Buyer and Seller shall open Escrow by depositing with Escrow Holder a fully executed original of this Agreement for use as escrow instructions.  Escrow Holder shall execute the Escrow Holder Consent which appears at the end of this Agreement (the "*Escrow Holder Consent*") and deliver an executed Escrow Holder Consent to each of Buyer and Seller.  Buyer and Seller shall execute such reasonable additional and supplementary escrow instructions as may be appropriate to enable the Escrow Holder to comply with the terms of this Agreement; provided, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall control; and further provided Seller and Buyer shall not be required to enter into any additional or supplementary escrow instructions that

purport to require the Parties to release or indemnify the Escrow Holder for its own negligent acts. The Escrow Holder shall not be concerned, liable or responsible for any representations, warranties or indemnities as between Buyer and Seller. For purposes of complying with Internal Revenue Code Section 6045(e), as amended, the Escrow Holder is hereby designated as the "person responsible" and the "reporting person" for purposes of filing any information returns with the Internal Revenue Service concerning this transaction, as may be required by law.

     **6.2**    **Delivery of Documents and Funds to Escrow.** The following documents shall be executed by the Parties and deposited into Escrow in accordance with the provisions set forth below.

     **(a)**    **Seller's Deliveries.** Seller shall, at least one (1) Business Day prior to the Closing Date (unless required to be delivered at an earlier date under the terms of this Agreement), deliver to Escrow Holder each of the following:

     **(i)**    An executed Certificate of Non-Foreign Status in the form of attached **Exhibit "D"** (*"FIRPTA Certificate"*).

     **(ii)**    An executed California Form 593-C Real Estate Withholding Certificate.

     **(iii)**    An executed and acknowledged Grant Deed, in the form of attached **Exhibit "E"**, conveying title to the Real Property to Buyer (the *"Deed"*).

     **(iv)**    An executed Assignment and Assumption and Bill of Sale in the form of attached **Exhibit "F"** (*"Assignment and Assumption"*).

     **(v)**    Seller's certification if required in accordance with Section 3.1(c).

     **(vi)**    An updated rent roll with respect to the Leases, as of the Close of Escrow, certified to be accurate by Seller.

     **(vii)**    Such other documents as Title Company may reasonably request and that are otherwise consistent with Seller's obligations under this Agreement.

     **(b)**    **Buyer's Deliveries.** Buyer shall, at least one (1) Business Day prior to the Closing Date (unless required to be delivered at an earlier date under the terms of this Agreement, and except as to the monies to be delivered pursuant to clauses (i) and (ii), which amount may be delivered on the Closing Date so long as they are delivered sufficiently early on the Closing Date as to allow Escrow Holder to complete the Close of Escrow on the Closing Date), deliver to Escrow Holder each of the following:

     **(i)**    Cash in the amount set forth in Section 1.1(d), constituting a portion of the Purchase Price.

     **(ii)**    The amount, if any, required of Buyer under Section 6.5 and/or Section 6.6 and any other amounts payable by Buyer upon the Close of Escrow under any other provisions of this Agreement.

- 20 -

(iii)     An executed Assignment and Assumption.

(iv)     Except as otherwise provided in Section 1.3, the executed consent and assumption and release documents required to be delivered by the Existing Lender in connection with Buyer's assumption of the Existing Debt.

(v)     Such other documents as Title Company may reasonably request and that are otherwise consistent with Buyer's obligations under this Agreement.

**6.3     Close of Escrow.** The Close of Escrow shall be on or before the Closing Date. If the Close of Escrow fails to occur by the Closing Date, or within one (1) Business Day thereafter, for any reason other than Buyer's or Seller's default, then, either Party may elect to terminate this Agreement by giving written notice to the other and Escrow Holder, in which case, except for the obligations to (a) pay any Escrow cancellation and title charges, (b) indemnify in the manner provided for in this Agreement, and (c) to maintain confidentiality as required under this Agreement, the respective rights, duties and obligations of Buyer and Seller under this Agreement shall forthwith terminate. The Parties shall immediately thereafter sign such instructions and other instruments as may be necessary to effect the cancellation of this Escrow, and each Party shall pay its respective share (if any) of Escrow cancellation and title charges as provided in Section 6.6. BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT TIME IS OF THE ESSENCE TO THIS PROVISION AND THAT THE TIME DEADLINE SET FORTH IN THIS SECTION 6.3 FOR THE CLOSING DATE AND STRICT COMPLIANCE THEREWITH CONSTITUTE A MATERIAL PART OF THE CONSIDERATION TO SELLER AND BUYER FOR THIS AGREEMENT.

**6.4     Recordation of Deed.** Escrow Holder shall close Escrow on or before the Closing Date by delivering funds and documents as set forth in Section 6.7 and Section 6.8 WHEN AND ONLY WHEN each of the conditions set forth below has been satisfied.

(a)     **Funds and Instruments.** All funds and instruments required pursuant to the provisions of this Agreement to be deposited with or delivered to Escrow Holder have been deposited with or delivered to Escrow Holder.

(b)     **Satisfaction of Conditions Precedent.** Each of the conditions precedent set forth in Article 3 has been, or upon such Close of Escrow shall be, satisfied as provided for in such Article 3.

(c)     Escrow Holder is prepared to record with the County Recorder for the City and County of San Francisco, State of California (*"Recorder"*) in the following order (i) the Deed, and (ii) such other documents as may be necessary to procure the Title Policy and to satisfy the terms and conditions of this Agreement. This transaction may close pursuant to a so-called "gap" closing so long as Title Company is irrevocably committed to issue the Title Policy as of the date of such "gap" closing and all actions to accomplish such closing (including without limitation delivery of funds to Seller), save and except only the recordation of the Deed and other documents to be recorded, which recording must occur no later than one (1) Business Day following the date of such "gap" closing.

- 21 -

### 6.5    Prorations.

(a)    **Taxes and Assessments.** Escrow Holder will prorate between the Parties, as of the Close of Escrow, based on the latest information available to Escrow Holder, county, city and special district (if any) taxes, assessments and bonds for the Property. If after the Close of Escrow, supplemental real estate taxes are assessed against the Property by reason of any event occurring prior to the Close of Escrow, Buyer and Seller shall adjust the proration of the real estate taxes following the Close of Escrow. Any delinquent taxes on the Property shall be paid at the Close of Escrow from funds accruing to Seller. Any refund in connection with real estate taxes relating to the Property attributable to the period prior to the Close of Escrow shall be paid to Seller.

(b)    **Rent.** Escrow Holder will prorate between the Parties, as of the Close of Escrow, any rents, revenues and other income from the Property, actually collected as of the Close of Escrow. Seller shall be credited with all rents, revenues and other income accruing and attributable through the day prior to the Close of Escrow and Buyer shall be credited with all rents, revenues and other income accruing and attributable to the Property commencing as of the Close of Escrow. Any prepaid rent paid by a Tenant shall be credited to Buyer. If any rent or other payments under the Leases are in arrears as of the Close of Escrow, Buyer shall use its best efforts following the Close of Escrow to collect such rent or other payments. Nothing in this Section 6.5(b) shall restrict Seller's right to collect delinquent rents directly from a Tenant by any legal means following the Close of Escrow. All rent received by Seller following the Close of Escrow shall be applied first to delinquent rent due Seller and Seller's costs of collection, and the balance, if any, shall be paid to Buyer. All rent received by Buyer following the Close of Escrow shall be applied first to any current or delinquent rent then due Buyer, and then to delinquent rent, if any, due Seller.

(c)    **Operating Expenses.** Escrow Holder will prorate between the Parties, as of the Close of Escrow, operating expenses payable by the owner of the Property and all other customary charges or costs incident to the ownership of the Property (not otherwise payable directly by the Tenants). Seller shall be responsible for all operating expenses accruing and attributable to the Property through the day prior to the Close of Escrow and Buyer shall be responsible for all operating expenses accruing and attributable to the Property commencing as of the Close of Escrow. Seller shall not assign to Buyer any deposits which Seller has with any utility companies servicing the Property. Buyer shall arrange with such companies to have accounts open in Buyer's name beginning at 12:01 a.m. on the day of the Close of Escrow. To the extent possible, Seller and Buyer shall obtain billings and meter readings as of the Close of Escrow and all operating expenses shall be prorated based upon the information then available. Seller and Buyer shall make any adjustments required to be made subsequent to the Close of Escrow in the event the information available at the Close of Escrow is incorrect or incomplete. Specifically, but without limiting the generality of the immediately preceding sentence, following reconciliation of operating expense reimbursements (anticipated to occur as soon as possible following the close of the calendar year during which the Close of Escrow occurs (the *"Closing Year"*)) Seller and Buyer shall make any adjustments (pro rata based on the number of calendar days in the Closing Year during which each of Seller and Buyer own the Property) required to be made in the event that the sum of operating expenses collected from Tenants is less than or greater than the amount properly payable or chargeable under their Leases. Any

- 22 -

amount due from Seller to Buyer or Buyer to Seller shall be promptly paid upon final determination of the amounts due, *provided, however,* that to the extent that any amount is owed to Seller by any tenant in respect of operating expenses payable prior to the Close of Escrow, or Seller is obligated to refund to any tenant any amount overpaid in respect of operating expenses prior to the Close of Escrow, Seller shall collect from or pay to the tenant directly all such amounts, and shall hold Buyer harmless in respect thereof. This obligation shall survive the Close of Escrow. There shall be no proration of any insurance premiums payable by Seller in connection with the Property.

          **(d)**    **Proration of Existing Debt.** Regardless of when payable and when billed, Seller shall be responsible for all payments of interest and principal payable under the Existing Debt that are attributable to the period prior to the Close of Escrow and Buyer shall be responsible for all payments of interest and principal payable under the Existing Debt that are attributable to the period from and after the Close of Escrow.

          **(e)**    **Calculation of Prorations.** All prorations shall be made on the basis of the actual number of days of the month which have elapsed as of 12:01 a.m. on the date on which the Close of Escrow occurs.

          **(f)**    **Pro Forma Closing Statement.** Buyer and Seller shall reasonably cooperate to produce at least one (1) Business Day prior to the Closing Date, a schedule of prorations in accordance with the provisions of this Agreement which is as complete and accurate as is then reasonably possible. All prorations which can be so reasonably estimated shall be made through the Close of Escrow. All other prorations and any adjustments to such schedule shall be made by Buyer and Seller within thirty (30) days following the Close of Escrow or such later time as may be reasonably required, in the exercise of due diligence to obtain the necessary information. Any net credit due one Party from the other as the result of such post-Close of Escrow prorations and adjustments shall be paid to the other in Cash immediately upon the Parties' written agreement to a final schedule of post-Close of Escrow adjustments and prorations.

    **6.6**    **Fees and Costs.** Seller shall pay (i) city and county documentary transfer taxes in the amount Escrow Holder determines to be required by law, (ii) one-half of the Escrow Holder's escrow fee, (iii) the cost of ALTA Owner's standard title insurance premium and (iv) one-half of all other closing costs, except as provided below. Buyer shall pay (i) one-half of the Escrow Holder's escrow fee, (ii) all document recording charges for the Deed and the Existing Debt assumption documents, (iii) the cost of the endorsements to the Title Policy elected by Buyer (as opposed to endorsement required to cure any deficiency required to be cured by Seller pursuant to Section 2.1(d) or (e)) and the additional premium in excess of the ALTA policy premium payable to provide extended coverage to Buyer, including the cost of any update to the Survey (or any new survey) and/or inspections, (iv) one-half of all other closing costs not otherwise expressly provided herein and (v) except as otherwise provided in the following sentence, all of the fees and charges imposed by the Existing Lender with respect to Buyer's assumption of the Existing Debt, including without limitation any legal fees and disbursements. If Buyer assumes the Existing Debt in connection with Buyer's purchase of the Property, then (i) Buyer and Seller shall share equally the one-time transfer fee (described in the "One-Time Transfer" provisions of the Existing Deed of Trust) imposed by the Existing Lender with respect to Buyer's assumption

- 23 -

of the Existing Debt and (ii) to the extent that any costs or fees are incurred arising solely and expressly from the Seller Release, as distinct from the assumption of the Existing Debt by Buyer, Seller shall be responsible for all such costs and fees arising solely and expressly from obtaining the Seller Release from Existing Lender. If Escrow fails to close due to either Party's default, that Party shall pay all Escrow cancellation and title charges. If Escrow fails to close for any reason other than the foregoing, Buyer and Seller shall each pay one-half (½) of all Escrow cancellation and title charges, which means all fees, charges and expenses incurred by Escrow Holder, including all expenses incurred in connection with issuance of the Preliminary Report and other title matters.

      **6.7**    **Documents.** Escrow Holder shall cause the Recorder to mail the Deed (and each other document which is in this Agreement expressed to be, or by general usage is, recorded) after recordation, to the grantee, beneficiary or person (a) acquiring rights under such document or (b) for whose benefit such document was acquired.

      **6.8**    **Payment of Funds at Close of Escrow.** Escrow Holder shall, at the Close of Escrow, (a) disburse to Seller, or order, by wire transfer of immediately available funds (in accordance with Seller's instructions) the Purchase Price (less the Existing Debt Amount, unless the Existing Debt is not being assumed by Buyer as provided in Section 1.3), plus any proration or other credits to which Seller will be entitled, and (b) disburse to Buyer, or order, any excess funds previously delivered to Escrow Holder by Buyer that are not owing to Seller or to be used in any other manner under this Agreement for the payment of costs, fees, or other matters.

      **6.9**    **1031 Exchange.** Either Buyer or Seller may consummate the purchase or sale (as applicable) of the Property as part of a so-called like-kind exchange pursuant to Section 1031 or Section 1033 of the Internal Revenue Code, in which event the other Party shall reasonably cooperate with such like-kind exchange (at no cost to such cooperating Party), provided that (a) the Close of Escrow shall not be delayed or affected by reason of any such exchange nor shall the consummation or accomplishment of any such exchange be a condition precedent or condition subsequent to either Party's obligations under this Agreement, (b) the exchanging Party shall effect its exchange through an assignment of this Agreement to a qualified intermediary, (c) neither Buyer nor Seller shall be required to take an assignment of the purchase agreement for the relinquished or replacement property or be required to acquire or hold title to any real property (other than the Property) for purposes of consummating any such exchange, (d) the exchanging Party shall pay any additional costs that would not otherwise have been incurred by the other Party had the exchanging Party not consummated the transaction through such an exchange, and (e) in no event shall such exchange release any Party from its obligations under this Agreement. Neither Buyer nor Seller shall by this Agreement or acquiescence to any such exchange (whether under Section 1031 or Section 1033 of the Internal Revenue Code) desired by the other Party have its rights under this Agreement affected or diminished in any manner or be responsible for compliance with or be deemed to have warranted to the exchanging Party that its exchange in fact complies with Section 1031 or Section 1033 of the Internal Revenue Code.

## ARTICLE 7
## REMEDIES

**7.1 LIQUIDATED DAMAGES.** IF ESCROW FAILS TO CLOSE DUE TO BUYER'S DEFAULT UNDER THIS AGREEMENT, SELLER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THOSE DAMAGES. SUCH DAMAGES WILL, HOWEVER, BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN FOR THE FOLLOWING REASONS: (1) DAMAGES TO WHICH SELLER WOULD BE ENTITLED IN A COURT OF LAW WILL BE BASED IN PART ON THE DIFFERENCE BETWEEN THE ACTUAL VALUE OF THE PROPERTY AT THE TIME SET FOR THE CLOSE OF ESCROW AND THE PURCHASE PRICE AS SET FORTH IN THIS AGREEMENT; (2) PROOF OF THE AMOUNT OF SUCH DAMAGES WILL BE BASED ON OPINIONS OF VALUE OF THE PROPERTY, WHICH CAN VARY BY SIGNIFICANT AMOUNTS; AND (3) IT IS IMPOSSIBLE TO PREDICT AS OF THE EFFECTIVE DATE WHETHER THE VALUE OF THE PROPERTY WILL INCREASE OR DECREASE AS OF THE DATE SET FOR THE CLOSE OF ESCROW. BUYER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH BUYER MIGHT BE LIABLE SHOULD BUYER BREACH THIS AGREEMENT. BUYER AND SELLER WISH TO AVOID THE COSTS AND LENGTHY DELAYS WHICH WOULD RESULT IF SELLER FILED A LAWSUIT TO COLLECT ITS DAMAGES FOR A BREACH OF THIS AGREEMENT. THEREFORE, IF ESCROW FAILS TO CLOSE DUE TO BUYER'S DEFAULT UNDER THIS AGREEMENT, BUYER'S DEPOSIT, TOGETHER WITH ANY INTEREST THEREON, SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF SELLER'S DAMAGES UNDER THE PROVISIONS OF SECTION 1671 OF THE CALIFORNIA CIVIL CODE AND SELLER'S EXCLUSIVE REMEDY IF ESCROW FAILS TO CLOSE AS A RESULT OF BUYER'S DEFAULT; PROVIDED, HOWEVER, THAT THE PARTIES AGREE THAT, IN NO EVENT, SHALL THIS LIQUIDATED DAMAGES PROVISION APPLY TO ANY BREACH OF BUYER'S OBLIGATIONS UNDER ANY OF THE INDEMNITY PROVISIONS OF THIS AGREEMENT OR TO SELLER'S RIGHT TO ATTORNEYS' FEES AND COSTS IN ENFORCING THIS AGREEMENT.

IF ESCROW FAILS TO CLOSE DUE TO SELLER'S DEFAULT UNDER THIS AGREEMENT WHICH CONSISTS OF SELLER'S WILLFUL TRANSFER OF AN INTEREST IN THE PROPERTY (INCLUDING WITHOUT LIMITATION GRANTING A LIEN) TO A THIRD PARTY IN BREACH OF THIS AGREEMENT AND WITH THE INTENT OF MATERIALLY INTERFERING WITH AND/OR PREVENTING THE CLOSE OF ESCROW, SUCH THAT THE REMEDY OF SPECIFIC PERFORMANCE IS NOT A VIABLE REMEDY, BUYER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THOSE DAMAGES. SUCH DAMAGES WILL, HOWEVER, BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN FOR THE FOLLOWING REASONS: (1) DAMAGES TO WHICH BUYER WOULD BE ENTITLED IN A COURT OF LAW WILL BE BASED IN PART ON THE DIFFERENCE BETWEEN THE ACTUAL VALUE OF THE PROPERTY AT THE TIME SET FOR THE CLOSE OF ESCROW AND THE PURCHASE PRICE AS SET FORTH IN THIS AGREEMENT; (2) PROOF OF THE AMOUNT OF SUCH DAMAGES WILL BE BASED ON OPINIONS OF VALUE OF THE PROPERTY, WHICH CAN VARY BY SIGNIFICANT AMOUNTS; (3) IT IS IMPOSSIBLE TO PREDICT AS OF THE EFFECTIVE DATE WHETHER THE VALUE OF THE

- 25 -

PROPERTY WILL INCREASE OR DECREASE AS OF THE DATE SET FOR THE CLOSE OF ESCROW AND (4) THE REMEDY OF SPECIFIC PERFORMANCE AS SET FORTH IN SECTION 7.2 BELOW MAY BE IMPRACTICABLE OR IMPOSSIBLE. SELLER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH SELLER MIGHT BE LIABLE SHOULD SELLER SO BREACH THIS AGREEMENT AS SET FORTH ABOVE. BUYER AND SELLER WISH TO AVOID THE COSTS AND LENGTHY DELAYS WHICH WOULD RESULT IF BUYER FILED A LAWSUIT TO COLLECT ITS DAMAGES FOR SUCH A BREACH OF THIS AGREEMENT. THEREFORE, IF ESCROW FAILS TO CLOSE DUE TO SELLER'S DEFAULT UNDER THIS AGREEMENT WHICH CONSISTS OF SELLER'S WILLFUL TRANSFER OF AN INTEREST IN THE PROPERTY (INCLUDING WITHOUT LIMITATION GRANTING A LIEN) TO A THIRD PARTY IN BREACH OF THIS AGREEMENT AND WITH THE INTENT OF MATERIALLY INTERFERING WITH AND/OR PREVENTING THE CLOSE OF ESCROW SUCH THAT THE REMEDY OF SPECIFIC PERFORMANCE IS NOT A VIABLE REMEDY, IN ADDITION TO THE RETURN OF BUYER'S DEPOSIT (TOGETHER WITH INTEREST ACCRUED THEREON), ON TERMINATION OF THIS AGREEMENT BY BUYER PURSUANT TO SECTION 7.2 BUYER SHALL BE ENTITLED TO RECEIVE FROM SELLER AN AMOUNT EQUAL TO BUYER'S DEPOSIT (TOGETHER WITH ANY INTEREST THEREON), WHICH SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF BUYER'S DAMAGES UNDER THE PROVISIONS OF SECTION 1671 OF THE CALIFORNIA CIVIL CODE AND BUYER'S REMEDY IF ESCROW FAILS TO CLOSE AS A RESULT OF SUCH A SELLER'S DEFAULT AND BUYER HAS BEEN UNABLE TO PURSUE SPECIFIC PERFORMANCE PURSUANT TO SECTION 7.2; PROVIDED, HOWEVER, THAT THE PARTIES AGREE THAT, IN NO EVENT, SHALL THIS LIQUIDATED DAMAGES PROVISION APPLY TO ANY BREACH OF SELLER'S OBLIGATIONS UNDER ANY OF THE INDEMNITY PROVISIONS OF THIS AGREEMENT OR TO BUYER'S RIGHT TO ATTORNEYS' FEES AND COSTS IN ENFORCING THIS AGREEMENT.

_____          _____
Seller's Initials                         Buyer's Initials

7.2     **Seller Default.** If Seller shall refuse or fail to convey the Property as provided in this Agreement for any reason other than (a) a breach or default by Buyer under this Agreement, or (b) any other provision of this Agreement which permits Seller to terminate this Agreement or otherwise relieves Seller of the obligation to convey the Property, then Buyer shall elect as its sole and exclusive remedy under this Agreement either (1) to terminate this Agreement and recover the Deposit, or (2) to enforce Seller's obligations to convey the Property in accordance with this Agreement, provided that no action in specific performance shall seek to require Seller to do any of the following: (i) change the condition of the Property or restore the same after any fire or other casualty; (ii) except removal of such liens and encumbrances as Seller is required to remove in connection with delivery of the Title Policy as provided in this Agreement, and any liens or claims as by third parties in violation of any representation or warranty made by Seller in this Agreement, expend money or post a bond to remove a title encumbrance or defect or correct any matter shown on a survey of the Property; or (iii) secure any permit, approval, or consent with respect to the Property or Seller's conveyance of the Property, or (3) if Seller's breach or default consists of Seller's willful transfer of an interest in the Property (including without limitation granting a lien) to a third party in breach of this Agreement and with the intent of

PROPERTY WILL INCREASE OR DECREASE AS OF THE DATE SET FOR THE CLOSE OF ESCROW AND (4) THE REMEDY OF SPECIFIC PERFORMANCE AS SET FORTH IN SECTION 7.2 BELOW MAY BE IMPRACTICABLE OR IMPOSSIBLE. SELLER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH SELLER MIGHT BE LIABLE SHOULD SELLER SO BREACH THIS AGREEMENT AS SET FORTH ABOVE. BUYER AND SELLER WISH TO AVOID THE COSTS AND LENGTHY DELAYS WHICH WOULD RESULT IF BUYER FILED A LAWSUIT TO COLLECT ITS DAMAGES FOR SUCH A BREACH OF THIS AGREEMENT. THEREFORE, IF ESCROW FAILS TO CLOSE DUE TO SELLER'S DEFAULT UNDER THIS AGREEMENT WHICH CONSISTS OF SELLER'S WILLFUL TRANSFER OF AN INTEREST IN THE PROPERTY (INCLUDING WITHOUT LIMITATION GRANTING A LIEN) TO A THIRD PARTY IN BREACH OF THIS AGREEMENT AND WITH THE INTENT OF MATERIALLY INTERFERING WITH AND/OR PREVENTING THE CLOSE OF ESCROW SUCH THAT THE REMEDY OF SPECIFIC PERFORMANCE IS NOT A VIABLE REMEDY, IN ADDITION TO THE RETURN OF BUYER'S DEPOSIT (TOGETHER WITH INTEREST ACCRUED THEREON), ON TERMINATION OF THIS AGREEMENT BY BUYER PURSUANT TO SECTION 7.2 BUYER SHALL BE ENTITLED TO RECEIVE FROM SELLER AN AMOUNT EQUAL TO BUYER'S DEPOSIT (TOGETHER WITH ANY INTEREST THEREON), WHICH SHALL BE DEEMED TO CONSTITUTE A REASONABLE ESTIMATE OF BUYER'S DAMAGES UNDER THE PROVISIONS OF SECTION 1671 OF THE CALIFORNIA CIVIL CODE AND BUYER'S REMEDY IF ESCROW FAILS TO CLOSE AS A RESULT OF SUCH A SELLER'S DEFAULT AND BUYER HAS BEEN UNABLE TO PURSUE SPECIFIC PERFORMANCE PURSUANT TO SECTION 7.2; PROVIDED, HOWEVER, THAT THE PARTIES AGREE THAT, IN NO EVENT, SHALL THIS LIQUIDATED DAMAGES PROVISION APPLY TO ANY BREACH OF SELLER'S OBLIGATIONS UNDER ANY OF THE INDEMNITY PROVISIONS OF THIS AGREEMENT OR TO BUYER'S RIGHT TO ATTORNEYS' FEES AND COSTS IN ENFORCING THIS AGREEMENT.

Seller's Initials                    Buyer's Initials

    7.2    **Seller Default.** If Seller shall refuse or fail to convey the Property as provided in this Agreement for any reason other than (a) a breach or default by Buyer under this Agreement, or (b) any other provision of this Agreement which permits Seller to terminate this Agreement or otherwise relieves Seller of the obligation to convey the Property, then Buyer shall elect as its sole and exclusive remedy under this Agreement either (1) to terminate this Agreement and recover the Deposit, or (2) to enforce Seller's obligations to convey the Property in accordance with this Agreement, provided that no action in specific performance shall seek to require Seller to do any of the following: (i) change the condition of the Property or restore the same after any fire or other casualty; (ii) except removal of such liens and encumbrances as Seller is required to remove in connection with delivery of the Title Policy as provided in this Agreement, and any liens or claims as by third parties in violation of any representation or warranty made by Seller in this Agreement, expend money or post a bond to remove a title encumbrance or defect or correct any matter shown on a survey of the Property; or (iii) secure any permit, approval, or consent with respect to the Property or Seller's conveyance of the Property, or (3) if Seller's breach or default consists of Seller's willful transfer of an interest in the Property (including without limitation granting a lien) to a third party in breach of this Agreement and with the intent of

- 26 -

materially interfering with and/or preventing the Close of Escrow, such that the remedy of specific performance is not a viable remedy, then Buyer may recover liquidated damages as provided in Section 7.1 above.

### ARTICLE 8
### ASSIGNABILITY; BANKRUPTCY

**8.1    Assignment by Buyer.**  Buyer may, upon notice provided no later than five (5) Business Days prior to the Closing Date, assign its rights under this Agreement subject to Seller's written consent, which consent may be withheld in Seller's absolute discretion (except that such consent shall not be required with respect to any assignment to an Affiliate of Buyer that is approved by the Existing Lender to assume the Existing Debt as of the Close of Escrow), and provided that in all such assignments the assignee assumes all obligations of Buyer under this Agreement.   No assignment will release Buyer (or any assignee of Buyer) from its obligations under this Agreement.

**8.2    Bankruptcy.**  Buyer agrees that upon the occurrence of any of the following conditions or events (i) Buyer shall be deemed to be in default under this Agreement, (ii) this Agreement shall not become an asset in any of such proceedings, (iii) in addition to all other available remedies, it shall be lawful for Seller to declare this Agreement terminated, and (iv) Buyer shall have no further claim on the Property under this Agreement or otherwise and no right to the return of any payments or expenses incurred pursuant to this Agreement:

(a)    All or substantially all of Buyer's assets are placed in the hands of a receiver or trustee.

(b)    Buyer makes an assignment for the benefit of creditors.

(c)    Buyer is adjudicated a bankrupt Person.

(d)    Buyer institutes any proceeding under the United States Bankruptcy Code or under any amendment thereto which may hereafter be enacted, or under any other act relating to the subject of bankruptcy wherein Buyer seeks to be adjudicated a bankrupt, or to be discharged of its debts, or to effect a plan of liquidation, composition or reorganization.

(e)    Any involuntary proceeding be filed against Buyer under any such bankruptcy laws and Buyer consents thereto or acquiesces therein by pleading or default.

(f)    Substantially all of Buyer's assets are attached or seized by judicial order.

### ARTICLE 9
### EMINENT DOMAIN AND MATERIAL LOSS

**9.1    Eminent Domain.**  If, prior to the Close of Escrow, the Property (or any material portion of the Property) is taken or appropriated by any public or quasi-public authority under the power of eminent domain or Seller receives actual written notice of any pending condemnation proceedings, then Buyer shall be entitled to either (a) terminate this Agreement, in which event the Deposit shall be returned to Buyer (less one half (½) of any Escrow and title

- 27 -

charges), and Seller and Buyer shall be released from all obligations under this Agreement, and neither Seller nor Buyer shall have any rights under this Agreement, except for the obligations to (i) pay any Escrow cancellation and title charges, (ii) indemnify as expressly set forth in this Agreement to survive such termination, and (iii) maintain confidentiality as required under this Agreement, or (b) continue this Agreement in effect and receive the amount of the condemnation award for such taking. The Parties acknowledge and agree that in no event shall the Close of Escrow be extended due to any such taking. The Parties further acknowledge and agree that the rights of the Parties set forth in this Section 9.1 shall be subject to the rights of any lenders on the Property.

**9.2     Loss to Property.**

     **(a)     Uniform Act.** This Agreement (but only with respect to casualty loss and not with respect to eminent domain which shall be governed exclusively by the provisions of Section 9.1) shall be governed by the Uniform Vendor and Purchaser Risk Act as set forth in Section 1662 of the California Civil Code (the "*Act*") as supplemented by this Section 9.2. For purposes of the Act and this Section 9.2, the destruction of a "material part" of the Property shall be deemed to mean only (i) an insured casualty to the Property following the Effective Date and prior to the Close of Escrow having an estimated cost of repair which equals or exceeds One Million Dollars ($1,000,000), or (ii) an uninsured casualty to the Property following the Effective Date and prior to the Close of Escrow, including any uninsured casualty caused by earthquake, having an estimated cost of repair which equals or exceeds One Hundred Thousand Dollars ($100,000.00).

     **(b)     Estimate.** The phrase "estimated cost of repair" shall mean an estimate obtained from an independent contractor selected by Seller and approved by Buyer. Buyer shall not unreasonably withhold, condition or delay Buyer's approval under this Section.

     **(c)     Notice; Damage to Material Part of the Property.** Buyer shall have the right to terminate this Agreement if prior to the Close of Escrow all or a material part of the Property is destroyed without fault of Buyer. If all or a material part of the Property is destroyed without fault of Buyer prior to the Close of Escrow, Seller shall deliver written notice to Buyer advising Buyer of the damage, which notice shall include Seller's good faith estimate of the estimated cost of repair ("*Seller's Repair Notice*"). Within ten (10) business days of receiving Seller's Repair Notice, Buyer shall give written notice to Seller ("*Buyer's Election Notice*") of Buyer's election to either (i) terminate this Agreement, in which event the Deposit shall be returned to Buyer (less one half (½) of any Escrow and title charges), and Seller and Buyer shall be released from all obligations under this Agreement, and neither Seller nor Buyer shall have any rights under this Agreement, except for (x) Buyer's and Seller's respective obligations to (A) indemnify as expressly set forth in this Agreement to survive such termination, and (B) maintain confidentiality as required under this Agreement, and (y) Seller's obligations to pay Seller's one-half of any Escrow cancellation and title charges, or (ii) continue this Agreement in effect with no reduction in the Purchase Price, provided that, in the event of an insured loss, Buyer shall receive an assignment of any insurance proceeds received by Seller with respect to such loss to the Property and the Purchase Price shall be reduced by any applicable deductible(s).

- 28 -

(d)    **Damage to a Non-Material Part.** If damage occurs that does not amount to a material part of the Property, then this Agreement shall remain in full force and effect and there shall be no reduction in the Purchase Price, provided that, if the loss is an insured loss, Buyer shall receive an assignment of any insurance proceeds received by Seller with respect to such loss to the Property and the Purchase Price shall be reduced by any applicable deductible(s).

(e)    **Miscellaneous.** Notwithstanding anything to the contrary in this Section 9.2, the assignment of any insurance proceeds as provided in this Agreement shall not include any proceeds received for items not related to the physical condition of the Property which relate to periods prior to the Close of Escrow, such as proceeds from Seller's business interruption or rental loss insurance, if any for periods prior to the Close of Escrow, but shall include the proceeds of such insurance for the period from and after the Close of Escrow for so long as such proceeds shall be payable to Buyer as Seller's successor in interest in respect of such insurance. The Parties further acknowledge and agree that the rights of the Parties set forth in this Section 9.2 shall be subject to the rights of any lenders on the Property or the rights of the Tenants.

## ARTICLE 10
## GENERAL PROVISIONS

**10.1    Notices.** Notwithstanding anything to the contrary in this Agreement, any notice, approval, consent, waiver, payment, request, instruction, order, determination, vote, decision, direction, demand, requirement, communication, or similar action or conduct required or permitted to be given to or by any Party under this Agreement shall be in writing, shall be sent via one of the following methods of delivery to each of the addresses for notices set forth in the Basic Terms, as amended from time to time, and shall be deemed to have been duly given, made, delivered, and received as of the date of actual delivery or if delivery is refused, then as of the date presented (and if such date is not the same for all of the addressees for a particular Party, then the latest such date): (a) by personal delivery; (b) by Federal Express, UPS, DHL, United States Postal Service Express Mail, or other overnight delivery service that provides written confirmation of delivery and receipt; (c) by certified U.S. Mail, return receipt requested, postage prepaid, or (d) by facsimile or email (provided that the contents of such facsimile or email are delivered also pursuant to preceding clause (b), and in which event notice shall be deemed to have been duly given, made, delivered and received as of the date of actual delivery of the facsimile or email). Any telephone information provided in this Agreement is for informational purposes only and shall not modify or expand the methods of notice delivery set forth in this Section 10.1. Any Party may change its notice address(es) or add additional notice address(es) by notice to each other Party in accordance with the provisions of this Section 10.1, except that in no event shall any notice address include a Post Office Box, any address outside the United States, or any address that precludes personal delivery. Notices given by counsel for any Party, on behalf of such Party, shall be deemed a valid notice under this Section 10.1 if addressed and sent in accordance with the provisions of this Section 10.1.

**10.2    Enforcement and Attorney's Fees.** If a dispute arises concerning the performance, meaning, or interpretation of any provision of this Agreement or any document executed in connection with this Agreement, the prevailing Party in such dispute, shall be awarded any and all costs and expenses incurred by such prevailing Party in enforcing,

- 29 -

defending, or establishing its rights under this Agreement or such document including without limitation court costs and expert witnesses' and attorneys' fees. In addition to the foregoing award of costs and fees, such prevailing Party shall also be entitled to recover its court costs and expert witnesses' and attorneys' fees incurred in any post-judgment proceedings to collect or enforce any judgment. This provision is separate and several and shall survive the merger of this Agreement or any such other document into any judgment on this Agreement or such document.

**10.3   Choice of Law.** This Agreement, and the application or interpretation of this Agreement, shall be governed exclusively by its terms and by the internal laws of the State of California, without regard to principles of conflict of laws.

**10.4   Signer's Warranty.** Each individual executing this Agreement on behalf of an Entity hereby represents and warrants to the other Parties that (a) such individual has been duly and validly authorized to execute and deliver this Agreement and any and all other documents contemplated by this Agreement on behalf of such Entity, and (b) this Agreement and all documents executed by such individual on behalf of such Entity pursuant to this Agreement are and will be duly authorized, executed, and delivered by such Entity.

**10.5   Amendments.** The provisions of this Agreement may be amended only with the written approval of each Party.

**10.6   Waiver.** No waiver by Buyer or Seller of a breach of any of the terms, covenants or conditions of this Agreement by the other Party shall be construed or held to be a waiver of any succeeding or preceding breach of the same or any other term, covenant or condition contained in this Agreement. No waiver of any default by Buyer or Seller under this Agreement shall be implied from any omission by the other Party to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect a default other than as specified in such waiver. The consent or approval by Buyer or Seller to or of any act by the other Party requiring the consent or approval of the first Party shall not be deemed to waive or render unnecessary such Party's consent or approval to or of any subsequent similar acts by the other Party.

**10.7   Rights and Remedies Cumulative.** Except as expressly set forth to the contrary in this Agreement, (a) the rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any Party shall not preclude or waive the right to use any or all other remedies, and (b) such rights and remedies are given in addition to any other rights the Parties may have by law, statute, ordinance, or otherwise.

**10.8   Time and Days.** Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is not a Business Day, in which event the period shall run to and include the next day which is a Business Day.

**10.9   Additional Documents and Acts.** Each Party shall execute and deliver such additional documents and instruments and perform such additional acts as may be necessary or

appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**10.10  Heirs, Successors, and Assigns**.    Each and all of the covenants, terms, provisions, and agreements contained in this Agreement shall be binding upon and inure to the benefit of the Parties and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors, and assigns.

**10.11  Parties in Interest**.    Nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Parties and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third Person to any Party, nor shall any provision give any third Person any right of subrogation or action over or against any Party.

**10.12  Counterparts**.    This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**10.13  Severability of Provisions**.    If any provision of this Agreement or the application of such provision to any Person or circumstance shall be invalid, illegal, or unenforceable to any extent, then the remainder of this Agreement and the application of such remainder shall not be affected and shall be enforceable to the fullest extent permitted by law.

**10.14  Complete Agreement**.    This Agreement, and each exhibit to this Agreement, constitute the complete and exclusive statement of agreement among the Parties with respect to the subject matter of this Agreement and replace and supersede all prior written and oral agreements or statements by and between the Parties or any of them, including without limitation any letter of intent between the Parties (and including without limitation the Confidentiality Agreement dated November 6, 2009 and the Agreement for Entry, Access and Inspection of Property dated as of November 11, 2009).

**10.15  Appendices, Schedules, and Exhibits**.    All references in this Agreement to exhibits, and schedules shall, unless otherwise expressly provided, be deemed to be references to the appendices, exhibits, and schedules attached to this Agreement.    All such appendices, exhibits, and schedules attached to this Agreement are incorporated into this Agreement as though fully set forth in this Agreement.

**10.16  Interpretation**.    When required by the context, the singular number shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa.

**10.17  Construction**.    Each Party has been represented by legal counsel in connection with the negotiation of the transactions in this Agreement and the drafting and negotiation of this Agreement (or has knowingly elected not to be represented by legal counsel). Each Party (and if it elected to be represented by legal counsel, its legal counsel) has or have had an opportunity to review and suggest revisions to the language of this Agreement. Accordingly, it is the intent of the Parties that no provision of this Agreement shall be construed for or against or interpreted to the benefit or disadvantage of any Party by reason of any Party's having or being deemed to have

- 31 -

structured or drafted such provision. If any claim is made by any Party relating to any conflict, omission, or ambiguity in this Agreement, then no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Party or such Party's counsel.

10.18  **Headings.** The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

10.19  **Statutes.** Any reference in this Agreement to any statute, law, ordinance, code, or regulation, or any section or provision thereof, shall be deemed to include any future amendments thereto and any similar provisions of law that may hereafter replace or be substituted for such provision, whether or not designated by the same title or number.

10.20  **Cross-References.** All cross-references in this Agreement, unless specifically directed to another agreement or document, refer to provisions within this Agreement.

10.21  **Agreement Survives Close of Escrow.** Except as expressly set forth to the contrary in this Agreement, all obligations referred to or required to be performed at a time or times after the Close of Escrow, and all warranties, covenants, representations, and indemnities made by Seller and Buyer in this Agreement, shall survive the Close of Escrow.

10.22  **No Warranties.** Except as otherwise specifically provided in this Agreement, neither Buyer nor Seller has made any representations, warranties or agreements by or on behalf of either Party to the other Party as to any matters concerning the Property. Each Party expressly waives any rights of rescission and all claims for damages by reason of any statement, representation, warranty, promise or agreement, if any, not contained in this Agreement.

10.23  **No Partnership or Joint Venture.** Seller or Buyer shall not, by virtue of this Agreement, in any way or for any reason be deemed to have become a partner of the other in the conduct of its business or otherwise, or a joint venturer. In addition, by virtue of this Agreement there shall not be deemed to have occurred a merger of any joint enterprise between Buyer and Seller.

10.24  **TIME OF THE ESSENCE.** TIME IS OF THE ESSENCE OF EACH AND EVERY PROVISION OF THIS AGREEMENT.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

653152 v15/SD

**SELLER:**     MAIN PLAZA, LLC, a California limited liability company

By: Thornhill Property Services LLC, a California limited liability
company, Manager

By: _Christopher P. Booth_

Christopher Booth, Manager

Dated: November **25**, 2009

**BUYER:**     CIM URBAN REIT ACQUISITION, LLC, a California limited liability
company

By: CIM Urban Partners, L. P., its sole member

By: CIM Urban Partners GP, Inc., its general partner

By: _____

Name: _____

Title: _____

Dated: November ___, 2009

653152 v15/SD

**SELLER:**     MAIN PLAZA, LLC, a California limited liability company

By: Thornhill Property Services LLC, a California limited liability company, Manager

By: _____
Christopher Booth, Manager

Dated: November 25, 2009

**BUYER:**     CIM URBAN REIT ACQUISITION, LLC, a California limited liability company

By: CIM Urban Partners, L. P., its sole member

By: CIM Urban Partners GP, Inc., its general partner

By: _____

Name: _____Nicholas V. Morosoff_____
                          Secretary

Title: _____

Dated: November 25, 2009

## CONSENT OF ESCROW HOLDER

The undersigned Escrow Holder hereby agrees to (a) accept the foregoing Agreement, (b) be Escrow Holder under such Agreement and (c) be bound by such Agreement in the performance of its duties as Escrow Holder; provided, however, the undersigned shall have no obligations, liability or responsibility under (i) this Consent of Escrow Holder or otherwise unless and until such Agreement, fully signed by the Parties, has been delivered to the undersigned or (ii) any amendment to such Agreement fully signed by the Parties, has been delivered to the undersigned.

Date of Opening of Escrow: ~~NOVEMBER 25~~, 2009

CHICAGO TITLE COMPANY

By: _____
Nicole Carr, Escrow Officer

Nicole T. Carr
Chicago Title Company
Commercial Escrow Officer

Escrow Holder Consent Page

## EXHIBIT "A"

Property Description

*[SEE ATTACHED LEGAL DESCRIPTION]*

Title No. 09-**36907852**-A-MH
Locate No. CACTI7738-7738-2369-0036907852

## LEGAL DESCRIPTION

### EXHIBIT "A"

The land referred to herein below is situated in the City and County of San Francisco, State of California and is described as follows:

**Parcel One:**

Beginning at the point of intersection of the northeasterly line of Main Street with the southeasterly line of Howard Street; running thence northeasterly along said line of Howard Street, 137 feet and 6 inches, more or less, to a point distant thereon 137 feet and 6 inches southwesterly from the southwesterly line of Spear Street; thence at a right angle southeasterly and parallel with said northeasterly line of Main Street, 183 feet and 4 inches; thence at a right angle southwesterly, 137 feet and 6 inches, more or less, to the northeasterly line of Main Street; thence at a right angle northwesterly along said line of Main Street, 183 feet and 4 inches to the point of beginning.

Being a portion of 100 Vara Block No. 326.

**Parcel Two:**

Beginning at a point on the southwesterly line of Spear Street, distant thereon 137 feet and 6 inches southeasterly from the southeasterly line of Howard Street; running thence southeasterly along said southwesterly line of Spear Street, 45 feet and 10 inches; thence at a right angle southwesterly, 137 feet and 6 inches; thence at a right angle northwesterly, 45 feet and 10 inches; thence at a right angle northeasterly, 137 feet and 6 inches to the point of beginning.

Being a portion of 100 Vara Block No. 326.

**Parcel Three:**

An easement to attach weatherproofing connections between the 211 Main Street Building and 101 Howard Street Building, and an easement for light and air, and access for maintenance, repair and restoration of improvements over, along and across the following described property, as all are described in the Amended and Restated Grant of Easements and Easement Agreement dated September 16, 2008 and recorded September 19, 2008 as Instrument No. 2008-I654755 in Reel J730 at Image 143 of Official Records:

Beginning at a point on the southeasterly line of Howard Street, distant thereon 137.50 feet southwesterly from the southwesterly line of Spear Street; thence from said point of beginning, southeasterly at a right angle to said southeasterly line of Howard Street, 137.50 feet; thence at a right angle northeasterly, 20.00 feet; thence at a right angle northwesterly, 137.50 feet; thence at a right angle southwesterly, 20.00 feet to the point of beginning.

The lower limits of the easement parcel are the level of the penthouse roof on 101 Howard Street at elevation 88 and the levels of the lower windows on 211 Main Street at elevations 85 and 78, as defined on the diagram attached to said document, referred to above. Elevations are based on the City and County of San Francisco datum.

APN: Lot 33 Block 3740

CLTA Preliminary Report Form - Modified (11/17/06)

## EXHIBIT "B"

## ARTICLE 11
## DEFINED TERMS

For the purpose of this Agreement, the following definitions shall apply.

**11.1**   *"Act"* is defined in Section 9.2(a).

**11.2**   *"Affiliate"* means, with respect to any Person, any other Person (a) which is an employee, officer, partner, manager, member, shareholder, director, agent or contractor of such first Person, (b) in which such first Person directly or indirectly owns greater than a fifty percent (50%) interest (whether economic or voting), (c) which directly or indirectly owns a fifty percent (50%) interest (whether economic or voting) in such first Person, or (d) which, directly or indirectly, is in control of, is controlled by, or is under common control with, such first Person. For purposes of this definition of Affiliate, "control" and "controlled" with respect to any Person means the power, directly or indirectly, either to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or equity interests, by contract or otherwise.

**11.3**   *"Agreement"* is defined in the introductory paragraph of this Agreement.

**11.4**   *"ALTA"* means the American Land Title Association.

**11.5**   *"Appurtenances"* is defined in Section 11.59.

**11.6**   *"Assignment and Assumption"* is defined in Section 6.2.

**11.7**   *"Basic Terms"* is defined in the introductory paragraph of this Agreement.

**11.8**   *"Business Day"* means any day other than a Saturday, Sunday, Federal legal holiday, or legal holiday in the State of California.

**11.9**   *"Buyer"* is defined in Item 2 of the Basic Terms.

**11.10**   *"Buyer Extension Notice"* is defined in Section 1.3.

**11.11**   *"Buyer's Election Notice"* is defined in Section 9.2(c).

**11.12**   *"Buyer's Representatives"* is defined in Section 4.3(b).

**11.13**   *"Cash"* means (a) currency of the United States of America, (b) cashier's check(s) currently dated and payable to Escrow Holder or Seller, drawn and paid through a United States banking or savings and loan institution, or (c) an amount credited by wire transfer into Escrow Holder's or Sellers' or Buyer's (as the case may be) bank account.

**11.14** *"Close of Escrow"* means the consummation of the purchase of the Property and the recordation of the Deed for the Property in accordance with the terms and provisions of this Agreement.

**11.15** *"Closing Date"* is defined in Item 8 of the Basic Terms.

**11.16** *"Closing Year"* is defined in Section 6.5(c).

**11.17** *"Deed"* is defined in Section 6.2(a)(iii).

**11.18** *"Deposit"* is defined in Section 1.2.

**11.19** *"Effective Date"* is defined in the introductory paragraph of this Agreement.

**11.20** *"Entity"* means any general partnership, limited partnership, limited liability company, corporation, joint venture, business or statutory trust, cooperative, association, or any other entity or Person that is not a natural person.

**11.21** *"Environmental Action"* is defined in Section 4.5(b).

**11.22** *"Escrow"* means the escrow opened by Escrow Holder pursuant to the terms of this Agreement.

**11.23** *"Escrow Holder"* is defined in Item 3 of the Basic Terms.

**11.24** *"Escrow Holder Consent"* is defined in Section 6.1.

**11.25** *"Estoppel Certificate"* is defined in Section 3.1(c).

**11.26** *"Estoppel Deadline"* is defined in Section 3.1(c).

**11.27** *"Executive Order"* is defined in Section 5.4(d).

**11.28** *"Existing Debt"* is defined in Section 1.1.

**11.29** *"Existing Debt Amount"* is defined in Section 1.1.

**11.30** *"Existing Deed of Trust"* is defined in Section 1.1.

**11.31** *"Existing Lender"* is defined in Section 1.1.

**11.32** *"Existing Note"* is defined in Section 1.1.

**11.33** *"Extended Loan Assumption Approval Date"* is defined in Section 1.3.

**11.34** *"Feasibility Date"* is defined in Item 7 of the Basic Terms.

**11.35** *"Feasibility Period"* is defined in Section 2.1.

653152 v15/SD

**11.36** *"FIRPTA Certificate"* is defined in Section 6.2.

**11.37** *"Governmental Actions"* means (a) any order of a court of competent jurisdiction, and/or (b) any enactment, by the initiative or referendum process of any Governmental Agencies affecting the Property, either directly or indirectly, including without limitation on the number of building, grading or other permits that can be issued, declaration of policy, resolution, ordinance, statute, regulation, or any other enactment of any Governmental Agencies.

**11.38** *"Governmental Agencies"* means any local, county, state and/or federal governmental or quasi-governmental agencies, authorities or regulatory bodies and any public or private utility companies having jurisdiction over the Property.

**11.39** *"Governmental Regulations"* means any regulation, decree, code, ordinance, rule or law of any Governmental Agencies.

**11.40** *"Hazardous Materials"* means any of the following:

**(a)** Any flammables, explosive or radioactive materials, chemical substances, pollutants, contaminants or hazardous or toxic wastes, materials or substances or related materials whether solid, liquid or gaseous in nature, including without limitation substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "solid waste" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601, et seq.; the Superfund Amendments and Reauthorization Act of 1986; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq.; the Toxic Substances Control Act, 15 U.S.C., Section 2601 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901 et seq.; and in the regulations adopted and publications promulgated pursuant to such laws.

**(b)** Those substances listed in the United States Department of Transportation Table (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 C.F.R. Part 302 and amendments thereto).

**(c)** Those substances defined as "hazardous wastes," "hazardous substances" or "toxic substances" in any similar federal, state or local laws or in the regulations adopted and publications promulgated pursuant to any of the foregoing laws or which otherwise are regulated by any governmental authority, agency, department, commission, board or instrumentality of the United States of America, the State of California or any political subdivision of the State of California.

**(d)** Any pollutant or contaminant or hazardous, dangerous or toxic chemicals, materials, or substances within the meaning of any other applicable federal, state, or local law, regulation, ordinance, or requirement (including consent decrees and administrative orders) relating to or imposing liability or standards of conduct concerning any hazardous, toxic, or dangerous waste, substance or material all as amended.

**(e)** Petroleum or any by-products thereof.

EXHIBIT "B"
Page B-3

(f)     Any radioactive material, including any source, special nuclear or by-product material as defined at 42 U.S.C. Section 2011 et seq., as amended, and in the regulations adopted and publications promulgated pursuant to such law.

(g)     Asbestos in any form or condition.

(h)     Polychlorinated biphenyls.

(i)     Radon.

(j)     Mold or fungi which is known to cause harm to human health.

**11.41** *"Improvements"* is defined in Item 5 of the Basic Terms.

**11.42** *"Information"* is defined in Section 4.3(a).

**11.43** *"Initial Deposit"* is defined in Item 9 of the Basic Terms.

**11.44** *"Intangible Personalty"* is defined in Section 11.59.

**11.45** *"Land"* is defined in Section 11.59.

**11.46** *"Leases"* means, collectively, the leases, occupancy agreements, or other agreements demising space in the Property or any portion of the Property as of the Effective Date (or as entered into or modified by Seller on or before the Close of Escrow in accordance with this Agreement) and any modifications to such leases, occupancy agreements or other agreements.

**11.47** *"Loan Assumption Approval"* is defined in Section 1.3.

**11.48** *"Loan Assumption Approval Date"* is defined in Section 1.3.

**11.49** *"NHDS"* is defined in Section 5.4(g).

**11.50** *"Notice of Approval"* is defined in Section 2.2.

**11.51** *"Notice of Disapproval"* is defined in Section 2.2.

**11.52** *"Parties"* means, collectively, Seller and Buyer.  Reference to a *"Party"* means any one of the Parties.

**11.53** *"Patriot Act"* is defined in Section 5.4(d).

**11.54** *"Patriot Act Related Laws"* is defined in Section 5.4(d).

**11.55** *"Person"* means an individual, partnership, limited liability company, trust, estate, association, corporation, pension, profit sharing, or other employee benefit plan, or other Entity, as well as guardian, trustee, executor, administrator, committee, trustee in bankruptcy, receiver, assignee for the benefit of creditors, conservator, or other Person acting in a fiduciary capacity.

EXHIBIT "B"<br>Page B-4

**11.56** *"Personal Property"* means all tangible personal property of any kind owned by Seller and attached to or directly used exclusively in connection with the ownership, maintenance, or operation of the Land or Improvements, including without limitation distribution systems, conduits, telephone systems, heating, ventilating and air conditioning equipment, fire sprinkler systems, security and fire detection systems, carpets, window coverings, wall coverings and other similar items. Buyer acknowledges that Seller is entitled to retain a copy of its business records that are part of the Personal Property and/or the Intangible Personalty.

**11.57** *"Preliminary Report"* is defined in Section 2.1(d).

**11.58** *"Principals"* is defined in Section 1.3.

**11.59** *"Property"* means all of Seller's right, title and interest in and to the following:

      **(a)** The land that is improved with the Improvements, more particularly described on attached **Exhibit "A"** (the *"Land"*).

      **(b)** The Improvements.

      **(c)** All easements, interests, adjacent streets, alleys and right-of-ways, drainage facilities, and other rights and powers appurtenant to the Land and/or the Improvements (the *"Appurtenances"*).

      **(d)** The Personal Property, if any.

      **(e)** All intangible property (such as warranties, guaranties, indemnities, claims, licenses, permits, entitlements, governmental approvals and certificates of occupancy) which is assignable by Seller and owned by Seller as of the Effective Date and which relates exclusively to the ownership, use and/or operation of the Land, the Improvements and/or the Personal Property (the *"Intangible Personalty"*).

      **(f)** The Leases.

**11.60** *"Property Documents"* is defined in Section 2.1(a).

**11.61** *"Purchase Price"* is defined in Item 6 of the Basic Terms.

**11.62** *"Real Property"* means such portion of the Property that is "real property" under the laws of the jurisdiction in which the Property is located.

**11.63** *"Recorder"* is defined in Section 6.4.

**11.64** *"Schwab"* is defined in Section 3.1(c).

**11.65** *"Seller"* is defined in Item 1 of the Basic Terms.

**11.66** *"Seller Assumption Issue"* is defined in Section 1.3.

**11.67** *"Seller Liens"* is defined in Section 2.1(d)(iii).

EXHIBIT "B"
Page B-5

**11.68**  *"Seller Release"* is defined in Section 1.3.

**11.69**   *"Seller's Broker"* is defined in Section 5.6.

**11.70**  *"Seller's Repair Notice"* is defined in Section 9.2(c).

**11.71**  *"Seller's Representative(s)"* is defined in Section 5.2.

**11.72**  *"Special Payoff Amount"* is defined in Section 1.3(b).

**11.73**  *"Supplemental Report"* is defined in Section 2.1(e).

**11.74**  *"Supplemental Title Objection Notice"* is defined in Section 2.1(e)(i).

**11.75**  *"Supplemental Title Objections"* is defined in Section 2.1(e)(i).

**11.76**  *"Supplemental Title Response Period"* is defined in Section 2.1(e)(ii).

**11.77**  *"Survey"* is defined in Section 2.1(d)(i).

**11.78**  *"Tenants"* means, collectively, the tenants under the Leases.

**11.79**  *"Title Company"* is defined in Item 4 of the Basic Terms.

**11.80**  *"Title Objection Notice"* is defined in Section 2.1(d)(ii).

**11.81**  *"Title Objections"* is defined in Section 2.1(d)(ii).

**11.82**  *"Title Policy"* is defined in Section 3.1(a).

**11.83**  *"Title Response Period"* is defined in Section 2.1(d)(iii).

**11.84**  *"Title Review Period"* is defined in Section 2.1(d)(ii).

**11.85**  *"Uncured Supplemental Title Objections"* is defined in Section 2.1(e)(ii).

**11.86**  *"Uncured Title Objections"* is defined in Section 2.1(d)(iii).

**11.87**  *"Unrestricted Period"* is defined in Section 4.4.

**EXHIBIT "C"**

FORM OF
TENANT ESTOPPEL CERTIFICATE

The undersigned, Charles Schwab & Co., Inc., a California corporation (***"Tenant"***) acknowledges that CIM Urban REIT Acquisition. LLC, a California limited liability company ("CIM") has entered into   that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of November __, 2009 (the "Purchase Agreement") with respect to the improved real property located at 211 Main Street, San Francisco, California (the "Property") and hereby certifies to the Benefited Parties (defined below), as follows, with knowledge that the Benefited Parties will rely upon this certificate in connection with the transactions described in the Purchase Agreement.  Capitalized terms not otherwise expressly defined in this certificate shall have the meaning set forth for such terms in the Lease:

1.      Attached hereto is a true, correct and complete copy of that certain Commercial Lease dated August 8, 1997 between Main Plaza, LLC (***"Landlord"***) and Tenant, together with First Amendment to Commercial Office Lease dated as of April 1, 1998 (the "***First Amendment***"), Second Amendment to Commercial Office Lease dated as of June 9, 1998 (the "***Second Amendment***"), Third Amendment to Commercial Office Lease dated as of November 4, 1998 (the "***Third Amendment***"), Fourth Amendment to Commercial Office Lease dated as of July 24, 2000 (the "***Fourth Amendment***"), Fifth Amendment to Commercial Office Lease dated as of May 5, 2008, as supplemented by that certain letter agreement re Amendment #5 dated July 20, 2009 (the "***Fifth Amendment***") (as so amended to date, the ***"Lease"***), which demises Premises which are located at 211 Main Street, San Francisco, California (the ***"Building"***).  The Lease is now in full force and effect and has not been amended, modified or supplemented, except as set forth in Paragraph 6 below.

2.      The term of the Lease commenced on August 7, 1998, with the "Commencement Date" (i) as to specific portions of the Premises being delivered and having occurred, as set forth in Paragraph 2 of the Second Amendment, and (ii) with respect to Chase Space, as set forth in the First Amendment, with respect to the Shower Space, as set forth in the Third Amendment, with respect to the "Retail Premises" as set forth in the Fourth Amendment, and with respect to the "Additional Basement Space," "Additional Garage Space," the "Basement Storage Space" and the "Maintenance Shop" as of July 1, 2008 as set forth in the Fifth Amendment.

3.      The term of the Lease is currently scheduled to expire on April 30, 2018, subject to extension pursuant to Section 36 of the Lease.

4.      Tenant has no option to renew or extend the Term of the Lease except: as set forth in Section 36 of the Lease.

5.      Tenant has no right to purchase the Premises or any portion of the Building, and Tenant has no rights or options to expand into other space in the Building except as provided in Section 37 of the Lease.  Section 38 of the Lease was deleted and is of no further force or effect pursuant to the Fifth Amendment.

653152 v15/SD

6.      The Lease has: (Initial One)

(     ) not been amended, modified, supplemented, extended, renewed or assigned.

( XX   )      been amended, modified, supplemented, extended, renewed or assigned by the following described agreements, copies of which are attached hereto:  First Amendment; Second Amendment; Third Amendment; Fourth Amendment and Fifth Amendment.

7.      Tenant has accepted and is now in possession of the Premises and has not sublet, assigned or encumbered the Lease, the Premises or any portion thereof except as follows:

8.      The current Monthly Basic Rent is $799,487, as set forth on Exhibit B-3 of the Fifth Amendment.

9.      Landlord has no obligation to provide parking for the benefit of the Premises, except such parking as may be available to Tenant in the Garage portions of the Premises demised to Tenant.

10.     Security Deposit (Initial One):

(     ) The amount of any cash security deposit is $_____.  No other security deposits have been made.

(     ) The amount of any letter of credit security deposit is $_____.  No other security deposits have been made.

(     ) None

11.     All rental payments payable by Tenant have been paid in full as of the date hereof.  No rent under the Lease has been paid for more than thirty (30) calendar days in advance of its due date.

12.     All work required to be performed by Landlord under the Lease has been completed and has been accepted by Tenant, and all Tenant Improvement Allowances have been paid in full. As of the date hereof, Tenant has no information that would suggest that Tenant shall not be able to complete the improvements to the Building described in Paragraph 5(d) of the Fifth Amendment by the dates set forth in such Paragraph 5(d) for completion of such work in accordance with the terms of the Fifth Amendment.

13.     To the best of Tenant's knowledge, as of the date hereof, there are no defaults on the part of Landlord or Tenant under the Lease.

14.     To the best of Tenant's knowledge, as of the date hereof, Tenant has no defense as to its obligations under the Lease and claims no set-off or counterclaim against Landlord.

EXHIBIT "C"
Page C-2

The "Benefited Parties" for purposes of this Certificate are CIM, its successors, assigns, designees and lenders, and their successors, assigns or designees.

Dated: December __, 2009                    "TENANT"

                                            Charles Schwab & Co., Inc.                    ,

                                            a California corporation

                                            By: _____
                                            Print Name: _____
                                            Its: _____

EXHIBIT "C"
Page C-3

## EXHIBIT "D"

## [FORM OF FIRPTA CERTIFICATE]

## CERTIFICATION

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____ (*"Transferor"*), the undersigned hereby certifies the following on behalf of Transferor:

1.  Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.  Transferor is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii):

3.  Transferor's U.S. employer identification number is _____; and

4.  Transferor's office address is _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalty of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

_____

By: _____
Name: _____
Title: _____

NOTICE TO TRANSFEREE (BUYER):  You are required by law to retain this Certificate until the end of the fifth tax year following the tax year in which the transfer takes place and make the Certificate available to the Internal Revenue Service if requested to do so during that period.

Source CFR. Section 1.1445-2T(b)(2)(iii)(B)

STATE OF CALIFORNIA       )
                                    )  ss.

COUNTY OF _____ )

On _____, before me, _____, Notary Public, personally appeared _____. who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies). and that by his/her/their signature(s) on the instrument the person(s). or the entity upon behalf of which the person(s) acted. executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____(Seal)

EXHIBIT "D"
Page D-2

## EXHIBIT "E"

### FORM OF GRANT DEED

RECORDING REQUESTED BY:

_____

AND WHEN RECORDED MAIL TO:

_____ [NAME]
_____ [STREET ADDRESS]
_____ [CITY, STATE, ZIP]
_____ [ATTN:]

AND MAIL TAX STATEMENTS TO:

_____ [NAME]
_____ [STREET ADDRESS]
_____ [CITY, STATE, ZIP]
_____ [ATTN:]

---

Space Above for Recorder's Use

### GRANT DEED

The undersigned Grantor declares that the documentary transfer tax is not shown pursuant to Section 11932 of the Revenue and Taxation Code, as amended.

FOR VALUE RECEIVED, _____,
a _____ ("Grantor"),
hereby grants to _____,
a _____ ("Grantee"), that certain real property (the "Property") situated in or about the City of San Francisco, County of San Francisco, California, described on Exhibit "A" attached hereto and by this reference incorporated herein.

The Property is conveyed to Grantee subject to all matters of record and all matters that would be revealed or disclosed in an accurate survey of the Property.

EXHIBIT "E"
Page E-1

IN WITNESS WHEREOF, the undersigned has executed this Grant Deed as of _____ _____, 200\_\_.

_____.

a _____

By: _____

Its: _____

STATE OF CALIFORNIA            )
                               )  ss.
COUNTY OF _____   )

On _____, before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____(Seal)

EXHIBIT "E"
Page E-2

EXHIBIT A
TO
GRANT DEED

LEGAL DESCRIPTION OF THE PROPERTY

That certain real property situated in the City and County of San Francisco, State of California, described as follows:

EXHIBIT "E"
Page E-3

## SEPARATE STATEMENT
### OF
## DOCUMENTARY TRANSFER TAX

San Francisco County Recorder

Dear Sir:

In accordance with Section 11932 of the California Revenue and Taxation Code, it is requested that this Statement of Documentary Transfer Tax not be recorded with the attached Grant Deed, but be affixed to the Grant Deed after recordation thereof and before return as directed on the Grant Deed.

The Grant Deed names _____,
a _____, as Grantor,
and _____,
a _____, as Grantee.  The property being transferred is located in or about the City of San Francisco, County of San Francisco, State of California.  The amount of documentary transfer tax due on the attached Grant Deed is $_____, computed on the full value of the property (less the value of any liens and encumbrances remaining on the property at the time of the sale).

_____ [NAME]

By:_____

Its: _____

EXHIBIT "E"
Page E-4

653152 v15/SD

## EXHIBIT "F"

## ASSIGNMENT AND ASSUMPTION
## AND BILL OF SALE

This Assignment and Assumption and Bill of Sale (this *"Assignment"*) is made and entered into _____, 20__, between _____, a _____ (*"Assignor"*), and [FOLLOWING TO BE COMPLETED BY ESCROW HOLDER PURSUANT TO BUYER'S INSTRUCTIONS]

_____ (*"Assignee"*). This Assignment is made with reference to the Purchase and Sale Agreement and Joint Escrow Instructions dated _____, 200___ between Assignor and Assignee (or Assignee's predecessor-in-interest) (the *"Purchase and Sale Agreement"*) with respect to the real property described on attached **Schedule "1"** (the *"Property"*).

For good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby assign, transfer, set over and deliver unto Assignee all of Assignor's interest as landlord under the leases (the *"Leases"*) listed on attached **Schedule "2"**.

For good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, to the extent assignable by Assignor, Assignor does hereby assign, transfer, set over and deliver unto Assignee all of Assignor's interest (if any) as the owner under the following (together with the Leases, collectively, the *"Assigned Items"*): the personal property, if any, of Assignor located at the Property (collectively, the *"Other Property"*). Except as otherwise set forth in the Purchase and Sale Agreement, all such assignment, transfer, setting over and/or delivery by Assignor is on a where-is and as is basis, without warranty or representation of any kind, whether expressed or implied.

Except as otherwise expressly provided in the Purchase and Sale Agreement, by accepting this Assignment and by its execution of this Assignment, Assignee assumes the payment and performance of, and agrees to pay, perform and discharge, all the debts, duties and obligations to be paid, performed or discharged from and after the Close of Escrow (as defined in the Purchase and Sale Agreement) by the "landlord" or the "lessor" under the terms, covenants and conditions of the Leases.

Assignor shall indemnify, hold harmless, and defend Assignee from and against any and all claims, losses, liabilities, damages, costs and expenses (including without limitation court costs and reasonable attorneys' fees and disbursements) resulting by reason of the failure of Assignor to pay, perform or discharge any of the debts, duties or obligations to be performed by Assignor at or prior to the Close of Escrow.

Assignee shall indemnify, hold harmless, and defend Assignor from and against any and all claims, losses, liabilities, damages, costs and expenses (including without limitation court costs and reasonable attorneys' fees and disbursements) resulting by reason of the failure of

653152 v15/SD

Assignee to pay, perform or discharge any of the debts, duties or obligations assumed or agreed to be assumed by Assignee under this Assignment arising after the Close of Escrow.

All of the covenants, terms and conditions set forth in this Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

**ASSIGNOR:**

_____, a _____

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**[FOLLOWING TO BE COMPLETED BY ESCROW
HOLDER PURSUANT TO BUYER'S INSTRUCTIONS]**

_____, a _____

By: _____
Name: _____
Title: _____

## Schedule "1"

### Description of Property

## Schedule "2"

### Description of Leases

653152 v15/SD

## EXHIBIT "G"

### LIST OF PROPERTY DOCUMENTS

| Folder | File Name |
|---|---|
| *Structural Drawings* | 1971 - Multiple structural drawings (31 total) |
| | 1998 - Multiple structural drawings (40 total) |
| | |
| *Asbestos* | Asbestos Abatement Report 8-24-98 |
| | Bulk Sample Report 11-02 |
| | 211 Main NOTICE (asbestos notice to tenants dated 3-5-08) |
| | 211 Asbestos Abatement Report dated 8-24-98; updated 3-10-09 |
| | 211 Asbestos O&M Plan 9-2-98 |
| | |
| *Certificate of Occupancy* | Certificate of Final Completion and Occupancy 7-31-73 |
| | |
| *Environmental* | COMPLETE FINAL 2 PHASE I REPORT 211 Main (dated 1-15-08) |
| | JCP NHD Report (dated 9-02-08) |
| | 211 Main Street - JCP NHD Report 11-12-2009 |
| | |
| *Financial* | 211 Main Street - 2006, 2007 Operating Statements |
| | 211 Main Street - 2008 Revised Pro Forma Budget |
| | 211 Main - 2008 YTD Operating Statement with Budget Variance |
| | 211 Main - Aged Accounts Receivable 09-09-08 |
| | 211 Main - Historical TI and Capital Expenditures |
| | 211 Main Operating Results 2005-2008; 2009 Budget |
| | |
| *Floor Plans and Area* | |
| *Calculations* | 211 Main - Floor Plans.pdf |
| | 211 Main - Full Building Area Calculations 02-06-08.pdf |
| | 16th Floor Plans - Architectural, Mechanical, Electrical,  AV |
| | 17th Floor Plans - Architectural, Mechanical, Electrical, Plumbing, AV, Structural |
| | 18th Floor Plans - Architectural, Mechanical, Electrical, Plumbing |
| | 211 Main - Building Elevations ( 7 files) |
| | 211 Main - CAD Files (13 files) |
| | Auditorium Ceiling Plan |
| | Auditorium Floor Plan |
| | 16, 17 & 18 Sheet Index |
| | |
| *Insurance* | Schwab Certificate of Insurance (dated 5-09-07) |
| | Insurance Policy Schedule (March 08-09) |
| | |
| *Leases* | Anthony & Agnes Au (multiple documents) |
| | Charles Schwab (multiple documents) |
| | Schwab - letter agreement re Amendment #5 |
| | |
| *Loan Documents* | Fully Executed NWML Loan Docs (Folder) |
| | Environmental Indemnity Agreement (dated 3-06-81) |
| | Financing Statement (dated 7-2-98) |
| | Guarantee of Recourse Obligations (dated 3-6-81) |

Exhibit "G"

Page G-1

|  | Promissory Note (dated 6-26-98) |
|---|---|
|  | Absolute Assignment of Leases and Rents (dated 7-02-98) |
|  | Certificate of Borrower (dated 6-26-98) |
|  | Deed of Trust and Security Agreement (dated 7-02-98) |
|  | Subordination, Nondisturbance and Attornment Agreement (dated 7-2-98) |
|  | Northwestern Statement 10-15-08 |
|  | NWML Financing Statement #1 |
|  | NWML Financing Statement #2 |
|  | NWML Statement 09-15-2008 |
|  | Loan Balance Statement (dated 10-31-07) |
| *Physical Due Diligence Docs* | Pile Capacity Reeval 1996_0319 |
|  | 5-Year Sprinkler-Standpipe-Pump Test (dated 7-08-08) |
|  | High Rise Sprinkler Ordinance Approved Jobcards (dated 7-7-08) |
|  | Thermotest 4-10-08 1 of 2 (dated 4-10-08) |
|  | Thermotest 4-10-08 2 of 2 (dated 4-10-08) |
|  | 211 Main_HVAC_CC_REV1_110909 (2) (Cooling tower replacement proposal - Revision No. 1) |
|  | 2009_0511_SGH211 Plaza Report (Plaza deck waterproofing leak investigation) |
| *PreLim* | Prelim Amended 6.03.08 |
|  | Epre-D dated 9-2-08 |
|  | Prelim-D dated 9-2-08 |
|  | Prelim-A_dated 11-3-09 |
|  | E-Prelim-A_dated 11-3-09 |
| *Property Condition Reports* | COMPLETE FINAL REPORT 211 Main Street (3-12-08) |
|  | Additional Disclosures (re: garage leak, basement restrooms, roof garden membrane) |
|  | Additional Disclosures (re: parking level restrooms) |
| *Property Taxes* | 2008-2009 Property Tax Bill |
|  | Current Tax Assessment 7-25-08 |
|  | Historical Tax Records |
| *Utility Bills* | Multiple Invoices (151 total) |
| *Miscellaneous* | Booth - List of Personnel and Management Employees |
|  | Booth - Playground Easement Amended & Restated 9-19-08 |
|  | Booth - Reciprocal Easements Amended & Restated 9-19-08 |
|  | Booth - Union Agreement Local 39 |
|  | Booth - Union Agreement Local 1877 Div87 |
|  | Parcel Map - Block 3740 |
|  | Parking Tax - monthly Jan-Oct 09 |
|  | Parking Tax - 1st - 3rd qtrs 09 |
| *From Schwab DD CD 1-14-08* | 1971 Structural - Multiple drawings (31 total) |
|  | 1972 Architectural - multiple drawings (16 files) |
|  | 1996 Architectural - multiple drawings (62 files) |

Exhibit "G"
Page G-2

1996 Electrical - multiple drawings (56 files)
1997 Sprinkler - multiple drawings (21 files)
1998 Structural - Mutiple drawings (40 total)
1998 Mechanical - multiple drawings (37 files)
1997 StudioSchwabFloorPlans (14 files)
211 ACCO HVAC Service Agreement
211 BILCOR Service Agreement
211 Elevator Summary
211 G.S. Edwards Street Box Agreement 9-84
211 Otis Service Agreement
211 Roofing Material Warranty
Alta Survey 211 Main April 1 1997
Foundation Investigation 1970_1109
LandTitleSurvey
Pile Capacity Reeval 1996_0319
Pile Driving Vibration Report 1971_1021
Pile Installation Inspection 1971_1115
Proposed Easement Survey_211_April 1.1997
Site Permit Add 1 Specification
Supplemental Soils Report 1971_0401

*Walton Street DD*

211_Main_roofing (WJE evaluation and recommendation)
211 Main Roof Pricing 101308
ALCAL ARCADE Contracting Roof Pricing 9-26-09

*Roof Replacement*

2009_0203_A141ExhibitA - Lawson Final - (1) (terms and conditions)
2009_0227_A141 Lawson Final - (2) (Agreement between Owner and Design-Builder)
2009_0227_Exhibit B_C_D_F (exhibits to Agreement between Owner and Design-Builder)
2009_0303_S-1 (structural drawing)
2009_0505_Lawson Warranty
2009_0505_Sarnafil Warranty
2009_0508_CEL load test report
SGH Roof close-out letter 11-12-09

Exhibit "G"
Page G-3

653152 v15/SD

## EXHIBIT "H"

### NATURAL HAZARD DISCLOSURE STATEMENT

This Statement applies to the Property located at _____ [INSERT PROPERTY ADDRESS], San Francisco, California.

Seller discloses the following information with the knowledge that even though this is not a warranty prospective buyers may rely on this information in deciding whether and on what terms to purchase the Property.

The following are disclosures made by Seller based on information provided by a third-party service provider who has reviewed maps drawn by the State of California. Seller has made no independent investigation concerning the information disclosed herein. This information is a disclosure and is not intended to be part of the Purchase and Sale Agreement and Joint Escrow Instructions between the Buyer and Seller.

THIS REAL PROPERTY LIES WITHIN THE FOLLOWING HAZARDOUS AREA(S):

1.    A SPECIAL FLOOD HAZARD AREA (any type zone "A" or "V") designated by the Federal Emergency Management Agency.

| Yes _____ | No _____ | Do not know and information not available from local jurisdiction _____ |
|---|---|---|

2.    AN AREA OF POTENTIAL FLOODING shown on a dam failure inundation map pursuant to Section to Section 8589.5 of the Government Code.

| Yes _____ | No _____ | Do not know and information not available from local jurisdiction _____ |
|---|---|---|

3.    A VERY HIGH FIRE HAZARD SEVERITY ZONE pursuant to Section 51178 or 51179 of the Government Code. The owner of this property is subject to the maintenance requirements of Section 51182 of the Government Code.

| Yes _____ | No _____ |
|---|---|

4.    A WILDLAND AREA THAT MAY CONTAIN SUBSTANTIAL FOREST FIRE RISKS AND HAZARDS pursuant to Section 4125 of the Public Resources Code. The owner of this property is subject to the maintenance requirements of Section 4291 of the Public Resources Code. Additionally, it is not the state's responsibility to provide fire protection services to any building or structure located within the wildlands unless the Department of Forestry and Fire Protection has entered into a cooperative agreement with a local agency for those purposes pursuant to Section 4142 of the Public Resources Code.

Yes _____   No _____

Exhibit "H"
Page H-1

5.    AN EARTHQUAKE FAULT ZONE pursuant to Section 2622 of the public Resources Code.

| Yes _____ | No _____ |
| --- | --- |

6.    A SEISMIC HAZARD ZONE pursuant to Section 2696 of the Public Resources Code.

| Yes (Landslide Zone) _____ | Yes (Liquefaction Zone) _____ |
| --- | --- |
| No _____ | Map not yet released by State _____ |

THESE HAZARDS MAY LIMIT YOUR ABILITY TO DEVELOP THE REAL PROPERTY, TO OBTAIN INSURANCE, OR TO RECEIVE ASSISTANCE AFTER A DISASTER.

THE MAPS ON WHICH THESE DISCLOSURES ARE BASED ESTIMATE WHERE NATURE HAZARDS EXISTS.   THEY ARE NOT DEFINITIVE INDICATORS OF WHETHER OR NOT A PROPERTY WILL BE AFFECTED BY A NATURE DISASTER. BUYER(S) AND SELLER(S) MAY WISH TO OBTAIN PROFESSIONAL ADVICE REGARDING THOSE HAZARDS AND OTHER HAZARDS THAT MAY AFFECT THE PROPERTY.

653152 v15/SD

## SCHEDULE 5.1

### EXCEPTIONS TO REPRESENTATIONS AND WARRANTIES

<u>Window Washing Rig</u>.  Schwab alleged that a window washing platform "doesn't meet code" and couldn't be certified in accordance with California OSHA requirements and regulations.

<u>Garage Drains</u>.  Seller is aware of certain malfunctions with respect to the garage floor drainage system.  Schwab's management company. Jones Lang LaSalle. asked AR&B Plumbing to investigate. and AR&B Plumbing found a section of pipe was collapsed under the slab. and recommended removing the slab over the failed pipe. repairing the damage. and replacing the slab.  Schwab and Seller have disagreed as to whether any work with respect to such garage floor drainage system (or related improvements) is "maintenance and repair" or "capital" within the meaning of the Lease with Schwab.

<u>Plaza leaks</u>.  There are three areas where the plaza leaks into the 211 Main garage - on either side of the breezeway, at an expansion joint running north to south just east of the easterly building facade, and over the interconnecting door (now locked from both sides) that goes from the 211 Main garage into the 221 Main garage.  221 Main LLC has undertaken to repair the leak over the interconnection.  Seller hired Simpson Gumpertz & Heger. a consulting engineering firm, to investigate the other two leaks.  It determined that there were failed expansion joints in each location, and recommended a repair.  This report has been given to Buyer, and is listed in **Exhibit "G"** to the Purchase and Sale Agreement (to which this Schedule is attached) as "2009_0511_SGH211 Plaza Report (Plaza deck waterproofing leak investigation)".

<u>Cooling Towers</u>.  The two main cooling towers are at the end of their useful life and need to be replaced.

<u>Emergency Generator Exhaust</u>.  (a) There are two emergency generators for the building.  The smaller generator serves the life safety functions of the building (e.g. emergency lighting, limited elevator use. fire pump. and alarm and paging system).  This generator was installed by Seller (or its predecessor-in-interest) after the 1989 earthquake and the exhaust from this generator is connected to the garage exhaust system.  This was permitted when the generator was originally installed, but might not be permitted if it were installed today.  Schwab has brought up this issue.  (b) The garage exhaust exits the building on the Southeast corner of the garage, just above the ramp.  This is adjacent to the Day Care play area that is the subject of the Playground Easement.  Schwab has raised the concern that if the smaller generator were to run for an extended period, then the children might be subject to unhealthy exhaust fumes.

653152 v15/SD

# Index of Defined Terms

*Act*, 28, *B-1*
*Affiliate*, *B-1*
*Agreement*, 1, *B-1*
*ALTA*, *B-1*
*Appurtenances*, *B-1*, *B-5*
*Assignment and Assumption*, 20, *B-1*
*Basic Terms*, 1, *B-1*
*Business Day*, *B-1*
*Buyer*, i, *B-1*
*Buyer Extension Notice*, 3, *B-1*
*Buyer's Election Notice*, 28, *B-1*
*Buyer's Representatives*, 10, *B-1*
*Cash*, *B-1*
*Close of Escrow*, *B-2*
*Closing Date*, iii, *B-2*
*Closing Year*, 22, *B-2*
*Deed*, 20, *B-2*
*Deposit*, 1, *B-2*
*Effective Date*, 1, *B-2*
*Entity*, *B-2*
*Environmental Action*, 12, *B-2*
*Escrow*, *B-2*
*Escrow Holder*, ii, *B-2*
*Escrow Holder Consent*, 19, *B-2*
*Estoppel Certificate*, 7, *B-2*
*Estoppel Deadline*, 7, *B-2*
*Executive Order*, 17, *B-2*
*Existing Debt*, 1, *B-2*
*Existing Debt Amount*, 1, *B-2*
*Existing Deed of Trust*, 1, *B-2*
*Existing Lender*, *B-2*
*Existing Note*, 1, *B-2*
*Extended Loan Assumption Approval Date*, 3, *B-2*
*Feasibility Date*, iii, *B-2*
*Feasibility Period*, 3, *B-2*
*FIRPTA Certificate*, 20, *B-3*
*Governmental Actions*, *B-3*
*Governmental Agencies*, *B-3*
*Governmental Regulations*, *B-3*
*Hazardous Materials*, *B-3*
*Improvements*, ii, *B-4*
*Information*, 10, *B-4*
*Initial Deposit*, iii, *B-4*
*Intangible Personalty*, *B-4*, *B-5*

*Land*, *B-4*, *B-5*
*Leases*, *B-4*
*Loan Assumption Approval*, 2, *B-4*
*Loan Assumption Approval Date*, 3, *B-4*
*NIIDS*, 19, *B-4*
*Notice of Approval*, 6, *B-4*
*Notice of Disapproval*, 6, *B-4*
*Parties*, 1, *B-4*
*Party*, 1, *B-4*
*Patriot Act*, 17, *B-4*
*Patriot Act Related Laws*, 17, *B-4*
*Person*, *B-4*
*Personal Property*, *B-5*
*Preliminary Report*, 4, *B-5*
*Principals*, 2, *B-5*
*Property*, *B-5*
*Property Documents*, 3, *B-5*
*Purchase Price*, ii, *B-5*
*Real Property*, *B-5*
*Recorder*, 21, *B-5*
*Schwab*, 7, *B-5*
*Seller*, i, *B-5*
*Seller Assumption Issue*, 3, *B-5*
*Seller Liens*, 4, *B-5*
*Seller Release*, 2, *B-6*
*Seller's Broker*, 19, *B-6*
*Seller's Repair Notice*, 28, *B-6*
*Seller's Representative(s)*, 15, *B-6*
*Special Payoff Amount*, *B-6*
*Supplemental Report*, 5, *B-6*
*Supplemental Title Objection Notice*, 5, *B-6*
*Supplemental Title Objections*, 5, *B-6*
*Supplemental Title Response Period*, 5, *B-6*
*Survey*, 4, *B-6*
*Tenants*, *B-6*
*Title Company*, ii, *B-6*
*Title Objection Notice*, 4, *B-6*
*Title Objections*, 4, *B-6*
*Title Policy*, 7, *B-6*
*Title Response Period*, 4, *B-6*
*Title Review Period*, 4, *B-6*
*Uncured Supplemental Title Objections*, 6, *B-6*
*Uncured Title Objections*, 4, *B-6*
*Unrestricted Period*, 11, *B-6*

Exhibit 2

**FIRST AMENDMENT TO**
**PURCHASE AND SALE AGREEMENT AND**
**JOINT ESCROW INSTRUCTIONS**

THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this *"Amendment"*), is executed on and effective as of December 21, 2009 (the *"Effective Date"*), between MAIN PLAZA, LLC, a California limited liability company (*"Seller"*), and CIM Urban REIT 211 Main St. (SF), LP, a California limited partnership ("CUR 211 Main"), (hereinafter referred to as *"Buyer"*). Seller and CIM REIT Acquisition, LLC, a California limited liability company ("CIM") have heretofore entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated as of November 25, 2009, relating to the purchase of that certain improved real property located at 211 Main Street, San Francisco, California and other real and personal property as more particularly described as the "Property" therein (the *"Purchase and Sale Agreement"*). CIM has assigned its rights under the Purchase Agreement to CUR 211 Main, which has assumed the obligations of "Buyer" under the Purchase Agreement. Seller and Buyer hereby amend the Purchase and Sale Agreement as follows. Each capitalized but undefined term used in this Amendment is defined in the Purchase and Sale Agreement.

1. **Purchase Price.** Section 6 of the Basic Terms is hereby amended and restated in its entirety to read as follows:

"6. **Purchase Price:** $113,300,000.00 (the *"Purchase Price"*)."

2. **Closing Date.** Section 8 of the Basic Terms and Section 1.3 of the Purchase and Sale Agreement are hereby amended as follows:

2.1 Section 8 of the Basic Terms is hereby amended to add the following as the first sentence thereto:

"8. **Closing Date:** "The parties each shall use their respective commercially reasonable best efforts to cause the Close of Escrow to occur on December 23, 2009, and if not on that date, the next succeeding Business Day to, but not beyond December 29, 2009 (the *"Closing Date"*)."

2.2 The last sentence of Section 1.3(a) of the Purchase and Sale Agreement is hereby revised such that (a) the term "Loan Assumption Approval Date" is replaced by the term "Closing Date", and (b) the parenthetical at the end of the sentence is deleted in its entirety.

2.3 The first sentence of Section 1.3(b) of the Purchase and Sale Agreement is hereby deleted in its entirety, and the last sentence of Section 1.3(b) is hereby amended such that the term "Extended Loan Assumption Approval Date" is replaced by the term "Closing Date."

3. **Acknowledgements and Approvals.** By the execution of this Amendment, the Parties hereby make the following acknowledgements and approvals with respect to various matters under the Purchase and Sale Agreement:

3.1 **Feasibility.** Buyer's Notice of Approval is hereby deemed delivered to Seller pursuant to Section 2.2 of the Purchase and Sale Agreement.

3.2 **Estoppel Certificate.** The Estoppel Certificate delivered by Seller to Buyer via email on December 16, 2009, is hereby deemed approved by Buyer pursuant to Section 3.1(c) of the Purchase and Sale Agreement.

3.3 **Title.** Buyer hereby (a) waives any Uncured Title Objections pursuant to Section 2.1(d)(iv) of the Purchase and Sale Agreement, (b) the ProForma ALTA Owner's 1992 Title Policy No. 36907852, revised 12/17/2009, with the Amount of Insurance revised to reflect the Purchase Price as amended pursuant to this Amendment and otherwise revised as shown on the attached Exhibit "A" (the *"Title Commitment"*) is deemed approved as the form of Title Policy to be issued at Closing in satisfaction of Section 3.1(a), and does not give Buyer any rights to raise Supplemental Title Objections thereunder, (c) waives any rights it may have under the

Purchase and Sale Agreement to object to any matters disclosed by survey Job No. 4716 dated December 1, 2009, prepared by JMH Weiss, Inc., including without limitation those matters described in exception #11, Schedule B – Section II of the Title Commitment, and (d) acknowledges that any endorsements Buyer desires to obtain in connection with the Title Policy shall not be a condition precedent to the Close of Escrow.

     **3.4**    **Natural Hazard Disclosure Statement.**  Buyer hereby acknowledges its receipt of the NHDS and agrees that Seller has complied with all of its obligations under Section 5.4(g) of the Purchase and Sale Agreement.

    **4.**    **Counterparts.**  This Amendment may be executed in multiple counterparts, each of which shall constitute an original, but all of which together shall constitute but one instrument.  Delivery of this Amendment may be made by Fax or other electronic facsimile transmission of a signed counterpart, but the Party so delivering shall also promptly deliver an original signed counterpart to the other Party.

    **5.**    **Authority.**  Each individual executing and delivering this Amendment on behalf of a Party hereby warrants and represents to the other Party the he or she is duly authorized to do so.

    **6.**    **Full Force and Effect.**  Except as modified by the terms of this Amendment, the Purchase and Sale Agreement shall remain in full force and effect.

    IN WITNESS WHEREOF, Seller and Buyer have executed this Amendment as of the day and year first written above.

    **SELLER:**      MAIN PLAZA, LLC, a California limited liability company

               By:  Thornhill Property Services LLC, a California limited liability company, Manager

               By: _____
                   Christopher Booth, Manager


    **BUYER:**      CIM Urban REIT 211 Main St. (SF), LP, a California limited partnership

               By:  CIM Urban REIT 211 Main St. (SF) GP, LLC, a California limited   liability company, its General Partner

                   By:_____
                   Name: _____
                   Title: _____

Exhibit 3

## ASSIGNMENT AND ASSUMPTION
## AND BILL OF SALE

This Assignment and Assumption and Bill of Sale (this *"Assignment"*) is made and entered into December 23, 2009, between MAIN PLAZA, LLC, a California limited liability company (*"Assignor"*), and CIM URBAN REIT 211 MAIN ST. (SF), LP, a California limited partnership (*"Assignee"*). This Assignment is made with reference to the Purchase and Sale Agreement and Joint Escrow Instructions dated November 25, 2009 between Assignor and CIM Urban REIT Acquisition, LLC (Assignee's predecessor in interest), as amended by the First Amendment to Purchase and Sale Agreement and Joint Escrow Instructions dated December 21, 2009 between Assignor and Assignee (the *"Purchase and Sale Agreement"*), with respect to the real property described on attached **Schedule "1"** (the *"Property"*).

For good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby assign, transfer, set over and deliver unto Assignee all of Assignor's interest as landlord under the leases (the *"Leases"*) listed on attached **Schedule "2"**.

For good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, to the extent assignable by Assignor, Assignor does hereby assign, transfer, set over and deliver unto Assignee all of Assignor's interest (if any) as the owner under the following (together with the Leases, collectively, the *"Assigned Items"*): the personal property, if any, of Assignor located at the Property (collectively, the *"Other Property"*). Except as otherwise set forth in the Purchase and Sale Agreement, all such assignment, transfer, setting over and/or delivery by Assignor is on a where-is and as is basis, without warranty or representation of any kind, whether expressed or implied.

Except as otherwise expressly provided in the Purchase and Sale Agreement, by accepting this Assignment and by its execution of this Assignment, Assignee assumes the payment and performance of, and agrees to pay, perform and discharge, all the debts, duties and obligations to be paid, performed or discharged from and after the Close of Escrow (as defined in the Purchase and Sale Agreement) by the "landlord" or the "lessor" under the terms, covenants and conditions of the Leases.

Assignor shall indemnify, hold harmless, and defend Assignee from and against any and all claims, losses, liabilities, damages, costs and expenses (including without limitation court costs and reasonable attorneys' fees and disbursements) resulting by reason of the failure of Assignor to pay, perform or discharge any of the debts, duties or obligations to be performed by Assignor at or prior to the Close of Escrow.

Assignee shall indemnify, hold harmless, and defend Assignor from and against any and all claims, losses, liabilities, damages, costs and expenses (including without limitation court costs and reasonable attorneys' fees and disbursements) resulting by reason of the failure of Assignee to pay, perform or discharge any of the debts, duties or obligations assumed or agreed to be assumed by Assignee under this Assignment arising after the Close of Escrow.

All of the covenants, terms and conditions set forth in this Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

**ASSIGNOR:**

MAIN PLAZA, LLC, a California limited liability company

By:  Thornhill Property Services LLC, a California limited liability company, Manager

By: _____
      Christopher Booth, Manager

**ASSIGNEE:**

CIM URBAN REIT 211 MAIN ST. (SF), LP, a California limited partnership

By:  CIM Urban REIT 211 Main St. (SF) GP, LLC

By: _____

Name: _____

Title: _____

**ASSIGNOR:**

MAIN PLAZA, LLC, a California limited liability company

By: Thornhill Property Services LLC, a California limited liability company, Manager

By: _____
          Christopher Booth, Manager

**ASSIGNEE:**

CIM URBAN REIT 211 MAIN ST. (SF), LP, a California limited partnership

By: CIM Urban REIT 211 Main St. (SF) GP, LLC

By: _____

Name: _____
       Avraham Shemesh
       Treasurer

Title: _____

Schedule "1"

**Description of Property**

**(Attached)**

Title No. 09-**36907852**-A-MH
Locate No. CACTI7738-7738-2369-0036907852

## LEGAL DESCRIPTION

### EXHIBIT "A"

The land referred to herein below is situated in the City and County of San Francisco, State of California and is described as follows:

**Parcel One:**

Beginning at the point of intersection of the northeasterly line of Main Street with the southeasterly line of Howard Street; running thence northeasterly along said line of Howard Street, 137 feet and 6 inches, more or less, to a point distant thereon 137 feet and 6 inches southwesterly from the southwesterly line of Spear Street; thence at a right angle southeasterly and parallel with said northeasterly line of Main Street, 183 feet and 4 inches; thence at a right angle southwesterly, 137 feet and 6 inches, more or less, to the northeasterly line of Main Street; thence at a right angle northwesterly along said line of Main Street, 183 feet and 4 inches to the point of beginning.

Being a portion of 100 Vara Block No. 326.

**Parcel Two:**

Beginning at a point on the southwesterly line of Spear Street, distant thereon 137 feet and 6 inches southeasterly from the southeasterly line of Howard Street; running thence southeasterly along said southwesterly line of Spear Street, 45 feet and 10 inches; thence at a right angle southwesterly, 137 feet and 6 inches; thence at a right angle northwesterly, 45 feet and 10 inches; thence at a right angle northeasterly, 137 feet and 6 inches to the point of beginning.

Being a portion of 100 Vara Block No. 326.

**Parcel Three:**

An easement to attach weatherproofing connections between the 211 Main Street Building and 101 Howard Street Building, and an easement for light and air, and access for maintenance, repair and restoration of improvements over, along and across the following described property, as all are described in the Amended and Restated Grant of Easements and Easement Agreement dated September 16, 2008 and recorded September 19, 2008 as Instrument No. 2008-1654755 in Reel J730 at Image 143 of Official Records:

Beginning at a point on the southeasterly line of Howard Street, distant thereon 137.50 feet southwesterly from the southwesterly line of Spear Street; thence from said point of beginning, southeasterly at a right angle to said southeasterly line of Howard Street, 137.50 feet; thence at a right angle northeasterly, 20.00 feet; thence at a right angle northwesterly, 137.50 feet; thence at a right angle southwesterly, 20.00 feet to the point of beginning.

The lower limits of the easement parcel are the level of the penthouse roof on 101 Howard Street at elevation 88 and the levels of the lower windows on 211 Main Street at elevations 85 and 78, as defined on the diagram attached to said document, referred to above. Elevations are based on the City and County of San Francisco datum.

APN: Lot 33 Block 3740

CLTA Preliminary Report Form - Modified (11/17/06)

<u>Schedule "2"</u>

**Description of Leases**

**(Attached)**

**Main Plaza, LLC**
**211 Main Street, San Francisco**

**Rent Roll**
**December 23, 2009**

| | Area Occupied | Date of Lease | Expiration Date | Base Rent per Month | Management Fee per Month | Estimated Operating Expenses per Month |
|---|---|---|---|---|---|---|
| Charles Schwab & Co., Inc. | 416,657 | 08/08/97 | 04/30/18 | $799,487 | $34,546 | $77,440 |
| Anthony Chi Wai Au and Agnes Kam Pik Au | 609 | 07/29/08 | 07/31/18 | 1,827 | | |
| | 417,266 | | | $801,314 | $34,546 | $77,440 |