## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 Case No. |
|  | ) |  |
| W.R. GRACE & CO., <u>et al.</u>, | ) | 01-01139 (JKF) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) | Related to D.I. 29256 |
|  | ) |  |

### OBJECTION OF MAIN PLAZA, LLC TO NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY FILED BY CIM URBAN REIT 211 MAIN ST. (SF), LP, AS ASSIGNEE OF CIM REIT ACQUISITION, LLC

Main Plaza, LLC ("<u>Main Plaza</u>"), by its undersigned counsel, hereby submits this objection (the "<u>Objection</u>") to the Transfer of Claim Other than for Security (the "<u>Notice of Transfer</u>," Docket No. 29256) filed by CIM Urban REIT 211 Main St. (SF), LP, as assignee of CIM REIT Acquisition, LLC, dated July 12, 2012. In support of the Objection, Main Plaza respectfully represents as follows:

### PRELIMINARY STATEMENT

Main Plaza submits the instant Objection to the Notice of Transfer because Main Plaza did not transfer the Bankruptcy Claim and CIM / CIM SF[1] have failed to offer any evidence to establish that the Bankruptcy Claim was transferred. Indeed, the Notice of Transfer does not establish the necessary written consent of the Debtors, as required by a Settlement Agreement entered into by the Debtors and Main Plaza with respect to the Bankruptcy Claim. In addition, the clear language of the Purchase Agreement attached to the Notice of Transfer unambiguously demonstrates that the Bankruptcy Claim was not transferred when Main Plaza, the owner of the Bankruptcy Claim, sold the property at which the actions giving rise to the

---

[1]     Capitalized terms used in the Preliminary Statement, shall have the meanings ascribed to them herein.

Bankruptcy Claim occurred to CIM / CIM SF.  As such, CIM / CIM SF have not met their burden

under Bankruptcy Rule of Procedure 3001(e)(2), and the Objection should be sustained.

## BACKGROUND

1.      On April 20, 2001 (the "Petition Date"), WR Grace & Co. and various affiliates

(the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the District of Delaware (the "Court").

2.      Prior to the Petition Date and though December 2009, Main Plaza owned real

property, including a building located at 211 Main Street, San Francisco, California 94105 (the

"Building").

3.      Upon discovering asbestos-related damage to the Building, which Main Plaza

discovered was attributable to the Debtors' manufacture, use, or sale of products containing

asbestos, Main Plaza conducted remediation of the Building in the mid-1990's, incurring

substantial costs in connection with this remediation.  See Main Plaza, LLC, Proof of Claim No.

11009, attached hereto as Exhibit A.

4.      As a result of the remediation costs incurred, Main Plaza filed proof of claim

number 11009 (the "Bankruptcy Claim"), dated March 30, 2003, asserting that the Debtors were

liable for certain property damage alleged to be caused by the Debtors' manufacture, use, or

sale of products containing asbestos.  Id.

5.      To settle and resolve the Bankruptcy Claim, the Debtors and Main Plaza entered

into a Settlement Agreement dated April 14, 2009 (the "Settlement Agreement"), which was

approved by the Court on October 28, 2009.  See Exhibit A to Order Authorizing the Settlement

of an Asbestos Property Damage Claim Filed by Main Plaza, LLC (D.I. 23591), attached hereto

as Exhibit B.

6.      Pursuant to the Settlement Agreement, the Bankruptcy Claim was liquidated in

an amount equal to $6,137,362.  See Exhibit B, Settlement Agreement, ¶ 1 and Exhibit A

thereto.

7.      The Settlement Agreement specifically provides that "[a]ny payment made on account of the [Bankruptcy] Claim under a Chapter 11 plan shall be paid in total, without condition, to Claimant's Counsel[2] at its address of record and solely in its capacity as Claimant's Counsel.  Claimant's Counsel, in turn, shall be solely responsible to allocate and disburse the amount received between the amount due the Claimant[3] and the amount due Claimant's Counsel."  Id. ¶ 3.

8.      Further, under the Settlement Agreement, "no Party may assign, convey, transfer, delegate or encumber any right, interest, duty or obligation arising hereby or created herein without the express written prior consent of all of the parties hereto, which consent shall not be unreasonably withheld."  Id. ¶ 30.

9.      Subsequent to Main Plaza and the Debtors' entry into the Settlement Agreement, and several years after Main Plaza's remediation of the Building, on December 29, 2009, Main Plaza closed on a sale and transfer (the "Sale") of the Building and land to CIM Urban REIT Acquisition, LLC ("CIM"), pursuant to the terms of a Purchase and Sale Agreement and Joint Escrow Instructions (the "Purchase Agreement").   A copy of the Purchase Agreement is attached hereto as Exhibit C.

10.      Under the Purchase Agreement, the "Seller shall sell, and Buyer[4] shall purchase, the Property for the Purchase Price ...."  See Exhibit C, Purchase Agreement, § 1.1.

11.      The definition of "Property" in the Purchase Agreement includes the land, improvements, easements, personal property and "intangible personalty," which is defined as: "All intangible property (such as warranties, guaranties, indemnities, claims, licenses, permits, entitlements, governmental approvals and certificates of occupancy) which is assignable by

---

[2]      The Settlement Agreement defines "Claimant Counsel" as Speights & Runyan, Main Plaza's counsel in connection with entering into the Settlement Agreement.

[3]      The Settlement Agreement defines "Claimant" as "the asbestos property damage claimant identified on Exhibit A hereto [to the Settlement Agreement], which timely filed a proof of claim in this Bankruptcy."  Exhibit A to the Settlement Agreement reflects Main Plaza, LLC, as the claimant for claim number 11009.

[4]      The Purchase Agreement defines "Seller" as Main Plaza, LLC, and "Buyer" as CIM Urban REIT Acquisition, LLC.  See Purchase Agreement, Basic Terms, §§ 1 and 2.

Seller and owned by Seller as of the Effective Date **and which relates exclusively to the ownership, use and/or operation of the Land, the Improvements and/or the Personal Property.**" Id., § 11.59 (emphasis added).

12.     On June 20, 2012, CIM Urban REIT 211 Main St. (SF), LP ("CIM SF"), as assignee of CIM, filed a Transfer of Claim Other than for Security (D.I. 29175) attempting to transfer the Bankruptcy Claim to CIM SF and to have payments made on account of the Bankruptcy Claim to CIM SF instead of Main Plaza.

13.     However, on July 9, 2012, a Notice of Defective Transfer of Claim re: Docket 29175 (D.I. 29207) was entered because the Settlement Agreement, which was approved by Court order, specified that payments on account of the Bankruptcy Claim "shall be paid in total, without condition, to Claimant's Counsel," and without further court order amending the Settlement Agreement and directing a change, the payment address cannot be changed.  See Notice of Defective Transfer (D.I. 29207).

14.     CIM SF, as purported assignee of CIM, then filed the amended Notice of Transfer (D.I. 29256) to which Main Plaza now objects, requesting transfer of the Bankruptcy Claim to CIM SF as assignee of CIM, with payments to be sent to Speights & Runyan, Claimant Counsel, as required by the Settlement Agreement.  See Notice of Transfer (D.I. 29256).

## OBJECTION

### CIM / CIM SF Have Failed to Establish that the Bankruptcy Claim Was Transferred, As Required by Bankruptcy Rule 3001(e)(2)

15.     Federal Rule of Bankruptcy Procedure 3001(e)(2) governs the transfer of a bankruptcy claim other than for security after a proof of claim is filed, and provides:

> (2)  *Transfer of Claim Other than for Security after Proof Filed*. If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, **evidence of the transfer shall be filed by the transferee.** The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 21 days of the mailing of the notice or within any additional time allowed by

4

the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

Fed.R.Bankr.P. 3001(e)(2).

16.      Pursuant to Bankruptcy Rule 3001(e)(2), evidence of the transfer must be attached to the notice of transfer, and the ultimate burden to establish the validity of the transfer rests upon the claimant.   See Fed.R.Bankr.P. 3001(e)(2); see also In re Oxford Royal Mushroom Prods., Inc., 93 B.R. 390, 394 (Bankr. E.D. Pa. 1988) ("the ultimate burden of proof rests upon the claimant, Frezzo Brothers, to prove the validity of the assignment, and thus its entitlement to the sum....").

17.      Here, CIM / CIM SF failed to meet this burden.  CIM / CIM SF attached only the Purchase Agreement to the Notice of Transfer and failed to offer any other evidence of the purported transfer of the Bankruptcy Claim.   This single document is not sufficient to demonstrate that the Bankruptcy Claim was transferred for two primary reasons: (1) it does not demonstrate the Debtors' prior written consent to the transfer as required by the Settlement Agreement; and (2) the clear language of the Purchase Agreement establishes that the Bankruptcy Claim was not transferred.

**A.      CIM / CIM SF Did Not Set Forth any Evidence that the Debtors Consented to the Purported Assignment of the Bankruptcy Claim.**

18.      Under the Settlement Agreement, "no Party may assign, convey, transfer, delegate or encumber any right, interest, duty or obligation arising hereby or created herein without the express written prior consent of all of the parties hereto, which consent shall not be unreasonably withheld."  See Exhibit B, Settlement Agreement, ¶ 30.  Under this provision, prior written consent of the Debtors was necessary to effectuate a valid transfer of the Bankruptcy Claim.

19.    The Notice of Transfer makes no reference that such prior written consent was obtained and fails to attach any such documentation, and without such consent, any alleged assignment of the Bankruptcy Claim fails.

**B.    Under the Unambiguous Terms of the Purchase Agreement and Applicable California Law, the Bankruptcy Claim was Not Transferred.**

20.    "Once a timely objection [to a notice of transfer of a claim] is filed, it becomes the court's role … to determine whether a transfer has been made that is enforceable under nonbankruptcy law." See e.g., In re Lifestyle 80's, Inc., 187 B.R. 156, 157 (Bankr. D.N.J. 1995); In re Enron Corp., No. 01-16034, 2005 WL 3873890, *4 (Bankr. S.D.N.Y. June 16, 2007) (same).  The Purchase Agreement requires the application of California law (Exhibit C, Purchase Agreement, § 10.3), and in California, the clear terms of the contract must be enforced.  Am. Alternative Ins. Corp. v. Superior Court, 135 Cal. App. 4th 1239, 1245 (2006) ("If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs").

21.    CIM / CIM SF cannot point to any provision in the Purchase Agreement that provides for the transfer of the Bankruptcy Claim from Main Plaza to CIM / CIM SF.  Rather, a review of the relevant provisions reveals that, under the clear and unambiguous language of the Purchase Agreement, the Bankruptcy Claim was not transferred.

**i.    Under the Unambiguous Language of the Purchase Agreement, the Bankruptcy Claim was Not Transferred**

22.    Pursuant to the Purchase Agreement, the "Seller shall sell, and Buyer[5] shall purchase, the Property for the Purchase Price …." See Exhibit C, Purchase Agreement, § 1.1.

23.    The definition of "Property" in the Purchase Agreement includes the land, improvements, easements, personal property, and intangible personalty, defined as: "All intangible property (such as warranties, guaranties, indemnities, claims, licenses, permits, entitlements, governmental approvals and certificates of occupancy) which is assignable by

---

[5]    The Purchase Agreement defines "Seller" as Main Plaza, LLC, and "Buyer" as CIM Urban REIT Acquisition, LLC.  See Purchase Agreement, Basic Terms, §§ 1 and 2.

Seller and owned by Seller as of the Effective Date **and which relates exclusively to the ownership, use and/or operation of the Land, the Improvements and/or the Personal Property.**" Id., § 11.59 (emphasis added).

24.    The "intangible property" definition is explicitly limited by this qualifying language, which requires that any intangible property transferred "relate[] exclusively to the ownership, use and/or operation of the Land." Id.  The Bankruptcy Claim does not fit this limited definition. Rather, the Bankruptcy Claim – filed in 2003, more than six years prior to the Sale – relates only to reimbursing Main Plaza for asbestos remediation in the Building, which Main Plaza completed years before it even contemplated the Sale.  See Exhibit A, Proof of Claim.

25.    Indeed, the Bankruptcy Claim is wholly unrelated to CIM / CIM SF's ownership of or go-forward ability to use, occupy, or operate the Building or the property.   In fact, since the remediation was completed, CIM / CIM SF have had full ownership, use, and ability to occupy and operate the Building.

26.    The Bankruptcy Claim, in short, was money owed to Main Plaza for improvements already made to the Building.  If paid over to CIM / CIM SF, it would constitute both a windfall and a double recovery.

27.    Thus, pursuant to the unambiguous language of the Purchase Agreement, the Bankruptcy Claim was not transferred to CIM / CIM SF in connection with the Sale.

> **ii.    Under the Purchase Agreement's Proration Provisions, the Bankruptcy Claim should be Credited to Main Plaza as Income and Revenue.**

28.    Under the clear terms of the Purchase Agreement, Main Plaza retained the Bankruptcy Claim as credited "income" and "revenue" attributable to Main Plaza that accrued prior to closing.  Specifically, Section 6.5 of the Agreement, which outlines prorations, states: "Seller shall be credited with all rents, revenues and other income accruing and attributable through the day prior to the Close of Escrow." See Exhibit C, Purchase Agreement § 6.5.

29.     According to the plain, ordinary meaning of these terms, the Bankruptcy Claim constitutes revenue and income that was accrued by, and attributable to, Main Plaza prior to the close of escrow.  See Hayter Trucking, Inc. v. Shell Western E & P, Inc., 18 Cal. App. 4th 1, 15 (Cal. Ct. App. 1993) ("words in a contract are to be construed according to their plain, ordinary, popular or legal meaning"); see also Cal. Civ. Code § 1644 (2012) ("The words of a contract are to be understood in their ordinary and popular sense").[6]  Especially in light of the Court approved Settlement Agreement, which liquidated the Bankruptcy Claim prior to execution of the Purchase Agreement, the Bankruptcy Claim constitutes accrued revenue and income, attributable to Main Plaza.

30.     Under ordinary definitions, an enforceable claim, such as Main Plaza's allowed and liquidated Bankruptcy Claim, constitutes "income" or "revenue" that has "accrued."  See e.g., Black's Law Dictionary, at 831 (9th ed. 2009) (defining "accrued income" as "money earned but not yet received"); see also Mahoney v. Depuy Orthopaedics, Inc., No. F07-1321-AWI-SMS, 2007 WL 3341389, *5 n.5 (E.D. Cal. Nov. 8, 2007) (noting that Black's defines "revenue" as "gross income or receipts.").  Here, Main Plaza's Bankruptcy Claim was enforceable and is thus "revenue" and "income" that had accrued within the meaning of the Purchase Agreement.

31.     Payment from investments also constitutes "income."  See Blausey v. U.S. Trustee, 552 F.3d 1124, 1133 (9th Cir. 2009) (stating that Black's defines "income" as "the money or other form of payment one receives, usually periodically, from employment, investments, royalties, gifts, and the like.") (emphasis added).  This Bankruptcy Claim plainly derives from Main Plaza's investment in the maintenance and improvement of the Building, an investment that occurred years before the Purchase Agreement was executed.

32.     Main Plaza had the right to receive payment on account of the Bankruptcy Claim at the time of closing, especially in view of the Order Approving the Settlement Agreement.  Thus, the Bankruptcy Claim was recognizable as income and revenue prior to closing, which,

---

[6]     The Purchase Agreement does not define "revenue," "income," or "other income."

under the clear terms of the Purchase Agreement, was retained by Main Plaza and not transferred to the purchaser.

### iii.    The Purchase Agreement did not Assign the Bankruptcy Claim to CIM

33.    The Purchase Agreement also contains an "Assignment and Assumption and Bill of Sale," attached to the Purchase Agreement as Exhibit F.    See Exhibit C, Purchase Agreement, Exhibit F thereto.  Notably, the Assignment did not include Main Plaza's Bankruptcy Claim.    Without inclusion in the Assignment, the Bankruptcy Claim could not be validly transferred to CIM because claims are intangible property that must be conveyed through assignment under California law.  See Cal. Practice Guide: Real Property Transactions, ¶ 4:2, 4:38 (2011); see id. ¶ 4:41 ("intangible property is conveyed by an 'assignment.'").

34.    The Assignment assigned only Main Plaza's leases and "the personal property, if any, of Assignor located *at the Property* (collectively, the **"Other Property"**)."  See Exhibit C, Purchase Agreement, Exhibit F thereto, at F-1 (bold emphasis in original, italics added). Importantly, the Assignment did not include or reference the Bankruptcy Claim, which could only be validly transferred via an assignment under California law.

35.    Accordingly, the omission of the Bankruptcy Claim from the Assignment makes clear that the Bankruptcy Claim was not assigned to CIM.

### C.    Evidence Demonstrates that Neither CIM / CIM SF Nor Main Plaza Intended to Include the Bankruptcy Claim in the Purchase Agreement

36.    Neither CIM nor Main Plaza intended to transfer the Bankruptcy Claim by entry into the Purchase Agreement, as evidenced by the fact that it contains no mention or reference to the Bankruptcy Claim.  See Cal. Civ. Code § 1639 (2012) ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone").

37.    Main Plaza believes this Court will not need to resort to a review of parol evidence to decide this matter, especially given the plain and unambiguous language of the Purchase Agreement, as described above.  However, in the event that the Court determines

that there is any ambiguity in the Purchase Agreement and that parol evidence is needed to demonstrate the parties' intent,[7] Main Plaza would seek to admit evidence at trial to establish that the parties did not intend to transfer the Bankruptcy Claim under the Purchase Agreement. Such evidence may include, without limitation, the following:

- Main Plaza never discussed the Bankruptcy Claim with CIM at any point during negotiations for the Sale of the Building.  See Decl. of Christopher P. Booth, ¶ 3. Christopher Booth, the Managing Member of Main Plaza, never even considered the notion that the Bankruptcy Claim would be transferred to CIM as part of the Sale of the Building.  Id. ¶ 4.

- The documentation provided to CIM during due diligence prior to execution of the Purchase Agreement contained no information regarding the Bankruptcy Claim.  Id. ¶ 5.

- The only time at which CIM might have discovered the Bankruptcy Claim's existence was during one or two brief visits to review Main Plaza's building files, which Main Plaza made available to CIM during the due diligence period.  Id. ¶ 6.  Even then, CIM did not mention the Bankruptcy Claim once during any period leading up to execution of the Purchase Agreement.  Id. ¶ 7.

- Main Plaza never discussed the Bankruptcy Claim with its broker for the Sale of the Building, CAC Group ("CAC"), which oversaw the due diligence process, and CAC was unaware of the existence of Main Plaza's Bankruptcy Claim during all periods related to the Sale of the Building.  Id. ¶ 8.

- Main Plaza considered the Bankruptcy Claim as an asset even after execution of the Purchase Agreement.  Specifically, in considering whether to dissolve the Main

---

[7]   The overarching goal of contract interpretation under California law is to reflect the parties' intent in entering and executing the agreement.  See TRB Invs., Inc. v. Fireman's Fund Ins. Co., 40 Cal. 19, 27 (2006); AIU Ins. Co. v. Superior Court of Santa Clara Cnty., 51 Cal. 3d 807, 821 (1990); see also Cal. Civ. Code § 1636 (2012) ("Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.").

Plaza LLC given that it no longer held the Building, Main Plaza decided against dissolution after recalling that its Bankruptcy Claim was an asset held by the LLC. Id. ¶ 10.

**D.**     **Conclusion**

38.     CIM / CIM SF have attached no evidence other than Purchase Agreement itself to demonstrate the purported transfer of the Bankruptcy Claim or the requisite Debtors' consent. The Purchase Agreement establishes, by its plain language, that Main Plaza's ownership of the Bankruptcy Claim was – and remains – uninterrupted by the Sale of the Building.  CIM / CIM SF have failed to meet their burden under Bankruptcy Rule 3001(e)(2) to establish that the Bankruptcy Claim was in fact validly transferred.  As such, the Objection should be sustained and the Notice of Transfer should be denied in its entirety.

**WHEREFORE**, Main Plaza respectfully requests that the Court sustain the objection and:  (i) deny the Notice of Transfer; and (ii) grant such other relief as is just and proper.

Dated:   August 9, 2012
          Wilmington, Delaware

/s/ Garvan F. McDaniel
Bifferato Gentilotti LLC
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: 302.429.1900
Facsimile: 302.429.8600
Garvan F. McDaniel

and

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: 212.479.6000
Facsimile: 212.479.6275
Robert L. Eisenbach III
Michael A. Klein
Dana S. Katz

*Counsel to Main Plaza LLC*