**Exhibit I**

*Administrative Settlement Agreement and Order on Consent for a Removal Action for the Weedsport, New York, Site*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 2

IN THE MATTER OF
WR GRACE SUPERFUND SITE
WEEDSPORT, NY

W. R. GRACE & CO.,

       Respondent,

Proceeding under Sections 106(a)
and 122 of the Comprehensive
Environmental Response, Compensation,
and Liability Act of 1980, as amended,
42 U.S.C. §§ 9606(a) and 9622.

Index Number
CERCLA-02-2012-2003

ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
FOR A REMOVAL ACTION

## I. JURISDICTION AND GENERAL PROVISIONS

1. This Administrative Settlement Agreement and Order on Consent ("Settlement Agreement") is entered into voluntarily by W. R. Grace & Co. ("Respondent") and the United States Environmental Protection Agency ("EPA") and requires Respondent to perform a removal action and pay certain response costs in connection with the WR Grace Superfund Site, Village of Weedsport, Town of Brutus, Cayuga County, New York (the "Site").

2. The Settlement Agreement is issued to Respondent by EPA pursuant to the authority vested in the President of the United States under Section 106(a) and 122(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606(a) and 9622(a), and delegated to the Administrator of EPA on January 23, 1987, by Executive Order No. 12580 (52 Fed. Reg. 2926, January 29, 1987). This authority was further delegated to the EPA Regional Administrators by EPA Delegation Nos. 14-14-C and 14-14-D and redelegated within Region 2 to the Director of the Emergency and Remedial Response Division by Regional Order No. R-1200, dated November 23, 2004.

3.  Respondent's participation in this Settlement Agreement shall neither constitute nor be construed as an admission of liability or an admission of the Findings of Fact or Conclusions of Law contained in this Settlement Agreement. To effectuate the mutual objectives of EPA and Respondent, Respondent agrees to comply with and be bound by the terms of this Settlement Agreement.  Respondent agrees not to contest the authority or jurisdiction of the Director of the Emergency and Remedial Response Division or his delegate to issue this Settlement Agreement, and further agrees that it will not contest the validity of this Settlement Agreement or its terms in any proceeding to enforce the terms of this Settlement Agreement.

4.  On April 2, 2001, Respondent filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), In re W. R. Grace & Co., et al., No. 01-01139 (JKF).  In connection with its reorganization, Respondent entered into a Multi-Site Settlement Agreement with EPA ("Multi-Site Agreement").  The WR Grace Site is an "Additional Site" under the Multi-Site Agreement and may therefore be addressed in an administrative settlement with EPA. Respondent has also filed a Joint Plan of Reorganization ("Plan"), which was confirmed by the Bankruptcy Court on January 30, 2012, but which is not yet effective.  Following EPA certification pursuant to Paragraph 107, of the completion of the Work required by this Settlement Agreement, this Site will be treated and liquidated as an allowed general unsecured claim subject to the terms and conditions under the Multi-Site Agreement.

## II. PARTIES BOUND

5.  This Settlement Agreement applies to and is binding upon EPA and Respondent and its successors and assigns.  Any change in the ownership or corporate status of Respondent, including, but not limited to, any transfer of assets or real or personal property, shall not alter the responsibilities of Respondent under this Settlement Agreement.

2

## III. DEFINITIONS

6.  Unless otherwise expressly provided herein, terms used in this Settlement Agreement which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or its implementing regulations. Whenever terms listed below are used in this Settlement Agreement or in an attachment to this Settlement Agreement, the following definitions shall apply:

    a.  "Day" means a calendar day unless otherwise expressly stated. "Working Day" shall mean a day other than a Saturday, Sunday, or Federal holiday. In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business on the next working day.

    b.  "Effective Date" means the date specified in Paragraph 111.

    c.  "Future Response Costs" means all direct and indirect costs that the United States has paid or will pay in connection with the Site that are not included in the Cost Summary dated March 29, 2012, attached hereto as Appendix B.

    d.  "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U. S. C. § 9507, compounded annually, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

    e.  "Party" or "Parties" means EPA and/or Respondent.

    f.  "Past Response Costs" means the costs paid by EPA through December 31, 2011, and that are included in the Cost Summary dated March 29, 2012, attached hereto as Appendix B.

    g.  "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent, Index

3

Number CERCLA-02-2012-2003, and all appendices
attached hereto.  In the event of conflict between the
Administrative Settlement Agreement and Order on
Consent and any appendix, the Administrative
Settlement Agreement and Order on Consent shall
control.

h.    "Site" shall mean the WR Grace Superfund Site,
including 4-5 acres within two parcels of land
encompassing approximately 78 acres, located on Dunn
Road in the Town of Brutus, Cayuga County, New York,
bounded on the west by State Route 34, to the east by
undeveloped property, to the south by railroad tracks,
and to the north by a few residential homes and a
farm.  See Appendix A for a general depiction of the
Site.

i.    "Waste" means (1) any "hazardous substance" under
Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2)
any "pollutant or contaminant" under Section 101(33)
of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste"
under Section 1004(27) of the Resource Conservation
and Recovery Act ("RCRA"), 42 U.S.C. § 6903(27); and
(4) any mixture containing any of the constituents
noted in (1), (2), or (3) above.

j.    "Work" means all work and other activities that
Respondent is required to perform pursuant to this
Settlement Agreement.


IV.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

7.  Between the 1870's and 1955, the Site property was owned by
Lehigh Valley Railroad Company.  The Site was purchased by
C. Frank Estelle in 1955.  In 1963, Respondent entered into
an agreement with Mr. Estelle to lease the Site, which
included a processing building that was erected by Mr.
Estelle, and four silos that were erected on the Site by
Respondent.

8.  From 1963 through 1989, Respondent conducted operations at
the Site building to exfoliate vermiculite concentrate, some
of which may have contained asbestos, originating from a
mine in Libby, Montana.  During its operations at the Site,

4

Respondent processed between 81,000 and 145,000 tons of vermiculite concentrate which came from Libby, Montana, some of which contained asbestos, including the movement of vermiculite from an outdoor railroad siding.  No other asbestos operations took place at the Site. Following closure of Respondent's operations in 1989, the four silos were removed, but the processing building was cleaned and left intact. Since 1989, one company has used the Site to manufacture coconut mulch. As of today, the building at the Site is vacant.

9.   In June 2006, EPA conducted air sampling inside the former processing building at the Site.  Asbestos was present inside the building at concentrations above 0.002 fibers per cubic centimeter ("f/cc").

10.  In September 2008, EPA's Office of Solid Waste and Emergency Response ("OSWER") developed a national framework for evaluating asbestos at Superfund sites (OSWER DIRECTIVE #9200.0-68).

11.  In October 2010, EPA collected outdoor air and soil samples at the Site which were analyzed for the presence of asbestos.  The air samples were collected at seven stationary sample locations and one activity-based location involving brush-hogging (i.e., the mechanical cutting of brush to release dust particles into the air).  The soil samples were collected from shallow (0-1 foot) and deeper (1-2 feet) depths.

12.  Three of the stationary air sampling results had concentrations that exceeded the Site screening value of 0.0009 f/cc, with values ranging from 0.0009 f/cc to 0.008 f/cc.  The samples collected at the activity-based locations showed asbestos concentrations in air ranging from 1.31 f/cc to 7.87 f/cc.

13.  Using polarized light microscopy and a 400 point count analysis, the Site soil sampling results showed asbestos ranging from non-detect to above 1% in the shallow depths and two deep soil samples showing asbestos above 0.75%. Asbestos in the soil at this Site, if disturbed, could result in levels of asbestos in air at the Site in excess of the EPA air screening level.

14. Asbestos is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

15. The Site constitutes a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

16. Respondent is a corporation organized in Delaware, and is therefore a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

17. Respondent operated at the Site at a time of disposal of a hazardous substance at the Site. Respondent is thus a responsible party within the meaning of Sections 107(a) (2) of CERCLA, 42 U.S.C. § 9607(a) (2).

18. The presence of asbestos, both in the air and in the soils at the Site, constitutes a "release" or threat of "release" of a hazardous substances into the environment, as the term "release" is defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

19. Respondent has been given the opportunity to discuss with EPA the basis for issuance of this Settlement Agreement and its terms.

## V.    DETERMINATIONS

20. The conditions present at the Site constitute a threat to public health, welfare, or the environment based upon factors set forth in Section 300.415(b)(2) of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300.415(b)(2). These factors include, but are not limited to, the following conditions:

a. actual or potential exposure to nearby human populations, animals or the food chain from a hazardous substance or pollutant or contaminant;

b. high levels of a hazardous substance or pollutant or contaminant in soils largely at or near the surface, that may migrate; or

c. the unavailability of other appropriate federal or state response mechanisms to respond to the release.

6

21. EPA has determined that a removal action at this Site is necessary to address the release or threat of release of a hazardous substance or pollutant or contaminant at the Site.

22. The actions required by this Settlement Agreement are necessary to protect the public health or welfare or the environment, are in the public interest, and, if carried out in compliance with the terms of this Settlement Agreement, will be considered to be consistent with the NCP.

23. Based upon the Findings of Fact and Conclusions of Law set forth above, and the administrative record supporting this removal action, EPA has determined that the actual or threatened release of a hazardous substance from the Site may present an imminent and substantial endangerment to the public health, welfare or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), and it is hereby agreed and ordered that Respondent shall undertake a removal action at the Site, as set forth in Section VI (Work To Be Performed), below.

## VI. WORK TO BE PERFORMED

### A. Designation Of Contractor and Designated Project Coordinator

24. Within ten (10) days after the Effective Date of this Settlement Agreement, Respondent shall select a coordinator, to be known as the Project Coordinator, and shall submit the name, address, qualifications, and telephone number of the Project Coordinator to EPA. The Project Coordinator shall be responsible on behalf of Respondent for oversight of the implementation of this Settlement Agreement. The Project Coordinator shall not be an attorney engaged in the practice of law. He or she shall have the technical expertise sufficient to adequately oversee all aspects of the Work contemplated by this Settlement Agreement. Respondent shall ensure that all Work requiring certification by a professional engineer licensed in the State shall be reviewed and certified by such. The Project Coordinator shall be knowledgeable at all times about all matters relating to the Work being performed under this Settlement Agreement.

7

25. Selection of the Project Coordinator shall be subject to approval by EPA in writing.  If EPA disapproves a proposed Project Coordinator, Respondent shall propose a different person and notify EPA of that person's name, address, telephone number and qualifications within seven (7) days following EPA's disapproval.  Respondent may change its Project Coordinator provided that EPA has received written notice at least seven (7) days prior to the desired change. All changes of the Project Coordinator shall be subject to EPA approval.

26. EPA correspondence related to this Settlement Agreement will be sent to the Project Coordinator on behalf of Respondent. To the extent possible, the Project Coordinator shall be present on-Site or readily available for EPA to contact during all working days and be retained by Respondent at all times until EPA issues a notice of completion of the Work in accordance with Paragraph 107.  Notice by EPA in writing to the Project Coordinator shall be deemed notice to Respondent for all matters relating to the Work under this Settlement Agreement and shall be deemed effective upon receipt.

27. All activities required of Respondent under the terms of this Settlement Agreement shall be performed only by well-qualified persons possessing all necessary permits, licenses, and other authorizations required by Federal, State, and/or local governments consistent with Section 121 of CERCLA, 42 U.S.C. § 9621, and all Work conducted pursuant to this Settlement Agreement shall be performed in accordance with prevailing professional standards.

28. Respondent shall retain at least one contractor to perform the Work.  Respondent shall notify EPA of the name and qualifications of a proposed contractor within ten (10) days of the Effective Date of this Settlement Agreement. Respondent shall also notify EPA of the name and qualifications of any other contractor or subcontractor proposed to perform Work under this Settlement Agreement at least ten (10) days prior to commencement of such Work.

29. EPA retains the right to disapprove of any, or all, of the contractors and/or subcontractors proposed by Respondent to conduct the Work.  If EPA disapproves in writing of any of Respondent's proposed contractors to conduct the Work,

8

Respondent shall propose a different contractor within seven (7) days of receipt of EPA's disapproval.

30. Respondent shall provide a copy of this Settlement Agreement to each contractor and subcontractor approved and retained to perform the Work required by this Settlement Agreement. Respondent shall include in all contracts or subcontracts entered into for Work required under this Settlement Agreement provisions stating that such contractors or subcontractors, including its agents and employees, shall perform activities required by such contracts or subcontracts in compliance with this Settlement Agreement and all applicable laws and regulations. Respondent shall be responsible for ensuring that its contractors and subcontractors perform the Work contemplated herein in accordance with this Settlement Agreement.

B. Description of Work

31. Respondent shall perform, at a minimum, all actions necessary to implement the Work set forth in this paragraph. The actions to be implemented include, but may not be limited to, the following:

a. installation and maintenance of a chain link security fence along the northern border of the Site near Dunn Road until the Work is completed;

b. excavation within the approximate 4-5 acre area of the Site generally depicted in Appendix A, of all soil containing amphibole asbestos fibers (hereinafter referred to as "asbestos fibers"), greater than or equal to 0.25% using "Standard Operating Procedures of CARB 435 Analysis", 400 point count, incorporating field of view in the analysis. Once the cleanup standard of less than 0.25% is achieved, activity-based sampling shall be conducted in the excavation area using a clearance standard of 0.01 f/cc in air to confirm that the cleanup level of 0.25% has been effective;

c. post-removal Site controls, including institutional controls, shall be implemented based on the results of the activity-based

9

sampling if such sampling shows that the Site
does not allow for unlimited use and unrestricted
exposure;

d.  building decontamination, which shall include but
not be limited to, cleaning the inside of the
building and capturing all rinsate, if rinsate is
utilized (with proper off-Site disposal of rinse
water), in order to remove asbestos fibers and
materials containing such asbestos fibers from
the building;

e.  post-decontamination clearance sampling to ensure
that indoor air within the building meets risk-
based criterion of 0.01 f/cc utilizing aggressive
air sampling procedures and using methods
specifically designed for counting asbestos
structures classified as Phase Contrast
Microscopy Equivalent fibers;

f.  proper characterization, transportation and off-
Site disposal of the contaminated soil and any
waste generated during building decontamination;

g.  post-excavation soil sampling and analysis at the
Site to ensure the asbestos contamination in the
soil is less than 0.25% in samples collected and
analyzed using the methods described in
subparagraph b., above;

h.  backfilling of excavation areas and Site
restoration; and

i.  any other investigations, studies, and response
actions as Respondent may propose and EPA may
approve in accordance with this Settlement
Agreement.

32. Within thirty (30) days of the Effective Date of this
Settlement Agreement, Respondent shall submit to EPA for
review and approval a detailed Site Operating Plan ("SOP")
for the Work in accordance with this Settlement Agreement,
CERCLA, the NCP, EPA's relevant guidance documents and other
applicable Federal and State laws and regulations. This SOP
shall include the following:

10

applicable Federal and State laws and regulations. This SOP shall include the following:

a.   Site Work Plan;

b.   Transportation and Disposal Plan;

c.   Site Health and Safety Plan;

d.   A Decontamination Plan; and

e.   Quality Assurance Project Plan ("QAPP"), which shall include a plan for sampling and analysis.

33. The Site Work Plan shall discuss the proper characterization, excavation, staging, handling, sampling and analysis of all materials containing asbestos at the Site, and at a minimum, address the following:

a.   Mobilization, including set-up of office, laboratory, and decontamination trailers as necessary to properly support field activities under this Settlement Agreement and establishment of work zones including, but not limited to a support zone, contamination reduction zone, and exclusion zone. Maps must be prepared to depict all work and safety zones including staging and sampling areas, waste segregation areas, command posts and decontamination areas all located from fixed points and plotted to scale.

b.   Proposed Time Line for the completion of all on-Site activities and all other requirements of this Settlement Agreement. The schedule shall provide for completion of all soil excavation work no later than ninety (90) days from the date of EPA approval of the SOP, and all other field work no later than one hundred and twenty days (120) days from the date of EPA approval of the SOP.

c.   Procedures for excavating, handling and storing of decontamination water, contaminated soil, and other wastes, to prevent the release of hazardous substances to the environment including runoff control, proper water management and containment, emissions management and erosion control.

11

d.  A description of any potential dewatering activities, should it prove necessary. The description must include a description of how the water will be stored during the excavation activities as well as a description of the final disposition of the water.

e.  A plan for restoring the Site.  Soil brought to the site for use as backfill shall meet the requirements specified in NYCRR Subpart 375-6.7(d).

f.  A plan for providing Site security including, but not limited to, orange construction fencing approximately 3 feet high and secured using steel posts around the outer perimeter of the excavation area, and any other measures to be taken to keep unauthorized personnel from entering restricted work areas and the Site for the duration of the cleanup.

34. The Transportation and Disposal Plan shall outline procedures for the proper transporting and disposing of all hazardous substances, pollutants and contaminants, hazardous waste and any solid waste generated during the Work.  The Plan will include the identification of the proposed disposal facilities for all waste streams and include waste profile information, facility acceptance documentation, and analytical characterization of each waste stream.  In addition the Plan will include the following information to be determined and documented by Respondent:

a.  the valid RCRA transporter and disposal identification numbers for each proposed transporter and disposal company;

b.  the most recent six-month State or EPA regulatory inspection results of each disposal company;

c.  documentation of the current permit status of proposed transporters and disposal facilities; and

d.  the date of the most recent State or EPA regulatory inspection of each proposed disposal company, and any special provisions or conditions attached to the RCRA disposal permits as a result of the most recent inspection.

12

Respondent shall provide all of the information required in a. -
d. above to EPA's On-Scene Coordinator ("OSC") 7 days prior to
shipping any waste off the Site.

After permitted disposal facilities have been identified, all
wastes shall be properly manifested and shipped off-Site via
permitted transporters.  All final signed manifests, bills of
lading and certificates of destruction or disposal will be
provided to the OSC upon receipt by Respondent.

35. The Site Health and Safety Plan ("H&S Plan") shall ensure
    the protection of the public health and safety during
    performance of on-Site work under this Settlement Agreement.
    This plan shall be prepared in accordance with the "EPA
    Standard Operating Safety Guide" (PUB 9285.1-03, PB 92-
    963414, June 1992).  In addition, the plan shall comply with
    all currently applicable OSHA regulations found at 29 C.F.R.
    Part 1910 and New York State Department of Labor ("NYSDOL")
    Asbestos regulations (12 NYCRR Part 56).  The plan shall
    also include contingency planning.  Respondent shall
    incorporate all changes to the plan required by EPA and
    shall implement the plan during the duration of the removal
    action.  The Site H&S Plan, at a minimum, shall address the
    following:

    a.  Delineation of the work zones;

    b.  Personnel monitoring requirements, paying particular
        attention to monitoring specific job functions in
        compliance with OSHA requirements;

    c.  Personal protective equipment requirements, including
        but not limited to, Level C personal protection as
        required for asbestos removal, during any mowing or
        brush-hogging and collecting of vegetation as well as
        removing any obstacles that will hinder excavation, and
        upgrade thresholds based on real-time perimeter air
        monitoring throughout the entire vegetation and soil
        removal process;

    d.  Demonstration that all personnel, including
        subcontractor personnel, have current certifications as
        per applicable OSHA and NYSDOL regulations;

13

e.  A dust control plan to be submitted by Respondent and
    approved by EPA prior to the commencement of work; and

f.  Compliance with OSHA requirements for Health and Safety
    Plans.

If performance of any subsequent phase of the work required by
this Settlement Agreement requires alteration of the H&S Plan,
Respondent shall submit to EPA for review any proposed
amendments to the H&S Plan.  Respondent shall incorporate all
changes to the H&S Plan required by EPA and shall implement such
changes to the H&S Plan.

36. The Decontamination Plan shall include detailed procedures
    for construction of the decontamination area and the final
    decontamination of all personnel and equipment used at the
    Site during all field activities including exiting the hot
    zone.

37. The QAPP shall contain the following:

    a.  All sampling and analyses performed pursuant to this
        Settlement Agreement shall conform to EPA policy and
        guidance regarding sampling, quality assurance, quality
        control, data validation, and chain of custody
        procedures.  Respondent shall incorporate these
        procedures in accordance with the Uniform Federal Policy
        for Implementing Quality Systems ("UFP-QS"), EPA-505-F-
        03-001, March 2005; Uniform Federal Policy for Quality
        Assurance Project Plans ("UFP-QAPP"), Parts 1, 2, and 3,
        EPA-505-B-04-900A, B, and C, March 2005 or newer; and
        other guidance documents referenced in the
        aforementioned guidance documents.  Subsequent
        amendments to the above, upon notification by EPA to
        Respondent of such amendments, shall apply only to
        procedures conducted after such notification.

    b.  If performance of any subsequent phase of the work
        required by this Settlement Agreement requires
        alteration of the QAPP, Respondent shall submit to EPA
        for review and approval proposed amendments to the QAPP.

    c.  Respondent shall conduct the appropriate level of data
        verification/validation and provide the specified data
        deliverables as provided in the EPA-approved QAPP.

14

d.  The QAPP shall require that any laboratory utilized by Respondent is certified for the matrix/analyses which are to be conducted for any work performed pursuant to this Order, by the National Voluntary Laboratory Accreditation Program certification accredited for asbestos analysis, or a certification issued by a program conducted by a state, and acceptable to EPA, for the analytic services to be provided.  The QAPP shall require the Respondent to submit laboratory certificates from such accreditation programs that are valid at the time samples are analyzed.  If a specific analytical service is unavailable from a certified laboratory, EPA may within its discretion, approve Respondent's utilization of a laboratory that is not certified.  EPA approval shall be based on Respondent's submittal of a written request, submittal of the laboratory quality assurance plan, and the laboratory's demonstration of capability through the analysis of Performance Evaluation samples for the constituents of concern.

e.  In its contract(s) with laboratories utilized for the analyses of samples, Respondent shall require granting access to USEPA personnel and authorized representatives of the USEPA to the laboratories for the purpose of ensuring the accuracy of laboratory results related to the Site.

f.  For any analytical work performed under this Agreement and Order, including but not limited to that performed in a fixed laboratory, in a mobile laboratory, or in on-site screening analyses, Respondent shall submit to EPA, within thirty (30) days after acceptance of the analytical results, a "Non-CLP Superfund Analytical Services Tracking System" form with respect to each laboratory utilized during a sampling event.  Each such form shall be submitted to the EPA OSC, and a copy of the form and transmittal letter shall also be sent to:

Regional Sample Control Center Coordinator (RSCC)
USEPA, Division of Environmental Science &
Assessment, MS-215
2890 Woodbridge Avenue
Edison, New Jersey 08837.

38. The QAPP shall include detailed procedures, methods and
    sampling parameters to be implemented to sample and analyze
    the contaminants found in Site soils that are required for
    off-Site transport and disposal, and to insure proper
    staging of containerized materials into compatible waste
    groups for disposal.  The QAPP will also include detailed
    procedures, methods, and sampling parameters to be utilized
    for post-excavation sampling of soil and infiltrating
    groundwater in the areas of excavation to establish criteria
    for determining completion of the waste and contaminated
    soil removal. The QAPP will include maps depicting proposed
    sampling locations. Appropriate sampling and analysis
    methods (e.g., sample frequency, compositing techniques,
    etc.), as necessary shall be utilized for the proper
    disposal of contaminated soil and containers.

39. Upon request by EPA, Respondent shall allow EPA or its
    authorized representatives to take split and/or duplicate
    samples of any samples collected by Respondent while
    performing Work under this Settlement Agreement.  Respondent
    shall notify EPA not less than seven (7) days in advance of
    any sample collection activity.

40. EPA either will approve the SOP, or will require
    modifications thereto pursuant to Section VII (Plans and
    Reports Requiring EPA Approval), below.  Upon its approval
    by EPA, the SOP shall be deemed to be incorporated into and
    an enforceable part of this Settlement Agreement.

41. Within fifteen (15) days after EPA's approval of the SOP,
    Respondent shall commence the Work described in the EPA-
    approved SOP.  Respondent shall fully implement the EPA-
    approved SOP in accordance with the terms and schedule
    therein and in accordance with this Settlement Agreement.
    All Work requirements of this Settlement Agreement shall be
    completed within six (6) months of the Effective Date of
    this Settlement Agreement.

42. Respondent shall notify EPA of the names and addresses of
    all off-Site Waste treatment, storage, or disposal
    facilities selected by Respondent to receive Wastes from the
    Site.  Respondent shall provide such notification to EPA for
    approval at least five (5) days prior to off-Site shipment
    of such Wastes.

16

43. At the time of completion of all field activities required by this Settlement Agreement, demobilization shall include sampling if deemed necessary by EPA, and proper disposal or decontamination of protective clothing, remaining laboratory samples taken pursuant to this Settlement Agreement, and any equipment or structures constructed to facilitate the cleanup. Respondent shall insure that the Site is restored to conditions similar to those that existed prior to the commencement of the Work.

44. Respondent shall conduct the Work required hereunder in accordance with CERCLA and the NCP, and in addition to guidance documents referenced above, the following guidance documents:

> EPA Region 2's "Clean and Green Policy" which may be found at http://www.epa.gov/region02/superfund/green_remed iation/policy.html, and Guide to Management of Investigation-Derived Wastes (OSWER Publication 9345.3-03FS, January 1992), as they may be amended or modified by EPA.

   C.   On-Scene Coordinator, Other Personnel, and Modifications to EPA-Approved SOP

45. All activities required of Respondent under the terms of this Settlement Agreement shall be performed only by qualified persons possessing all necessary permits, licenses, and other authorizations required by the Federal government and the State of New York, and all work conducted pursuant to this Settlement Agreement shall be performed in accordance with prevailing professional standards.

46. The current EPA OSC for the Site is: Michael Solecki, Response and Prevention Branch, Emergency and Remedial Response Division, U.S. Environmental Protection Agency, Region 2, 2890 Woodbridge Avenue, Building 205 (MS-211), Edison, New Jersey 08837, telephone number (732) 906-6918. EPA will notify Respondent's Project Coordinator if EPA designates a different OSC for this Site.

47. EPA, including the OSC, or his authorized representative, will conduct oversight of the implementation of this Settlement Agreement. The OSC shall have the authority

17

vested in an OSC by the NCP, including the authority to
halt, conduct, or direct any Work required by this
Settlement Agreement, or to direct any other response action
undertaken by EPA or Respondent at the Site consistent with
this Settlement Agreement.  Absence of the OSC from the Site
shall not be cause for stoppage of Work unless specifically
directed by the OSC.

48. As appropriate during the course of implementation of the
actions required of Respondent pursuant to this Settlement
Agreement, Respondent or its consultants or contractors,
acting through the Project Coordinator, may confer with EPA
concerning the required actions.  Based upon new
circumstances or new information not in the possession of
EPA on the Effective Date of this Settlement Agreement, the
Project Coordinator may request, in writing, EPA approval of
modification(s) to the EPA-approved SOP.  Only modifications
approved by EPA in writing shall be deemed effective.  Upon
approval by EPA, such modifications shall be deemed
incorporated into this Settlement Agreement and shall be
implemented by Respondent.

## VII.  PLANS AND REPORTS REQUIRING EPA APPROVAL

49. If EPA disapproves or otherwise requires any modifications
to any plan, report or other item required to be submitted
to EPA for approval pursuant to this Settlement Agreement,
Respondent shall have fourteen (14) days from the receipt of
notice of such disapproval or the required modifications to
correct any deficiencies and resubmit the plan, report, or
other written document to EPA for approval, unless a shorter
or longer period is specified in the notice.  Any notice of
disapproval will include an explanation of why the plan,
report, or other item is being disapproved.  Respondent
shall address each of the comments and resubmit the plan,
report, or other item with the required changes within the
time stated above.  At such time as EPA determines that the
plan, report, or other item is acceptable, EPA will transmit
to Respondent a written statement to that effect.

50. If any plan, report, or other item required to be submitted
to EPA for approval pursuant to this Settlement Agreement is
disapproved by EPA, even after being resubmitted following
Respondent's receipt of EPA's comments on the initial
submittal, Respondent shall be deemed to be out of

compliance with this Settlement Agreement.  If any
resubmitted plan, report, or other item, or portion thereof,
is disapproved by EPA, EPA may again direct Respondent to
make the necessary modifications thereto, and/or EPA may
amend or develop the item(s) and recover the costs of doing
so from Respondent.  Respondent shall implement any such
item(s) as amended or developed by EPA.

51. EPA shall be the final arbiter in any dispute regarding the
sufficiency or acceptability of all documents submitted and
all activities performed pursuant to this Settlement
Agreement.  EPA may modify those documents and/or perform
additional work unilaterally.

52.  All plans, reports and other submittals required to be
submitted to EPA pursuant to this Settlement Agreement, upon
approval by EPA, shall be deemed to be incorporated into and
an enforceable part of this Settlement Agreement.

## VIII. REPORTING AND NOTICE TO EPA

53. Commencing on the tenth day of the month after the Effective
Date of this Settlement Agreement, unless there is field
work at the Site, Respondent shall provide monthly progress
reports.  Whenever, during the implementation of this
Settlement Agreement, Respondent is engaged in active field
work, Respondent shall provide EPA with daily oral progress
reports, as well as written progress reports every two
weeks.  The first written progress report during active
field work shall be submitted within seven (7) days of the
commencement of field work.  All progress reports shall
fully describe all actions and activities undertaken
pursuant to this Settlement Agreement.  Such progress
reports shall, among other things: (a) describe the actions
taken toward achieving compliance with this Settlement
Agreement during the previous week; (b) include all results
of sampling and tests and all other data received by
Respondent after the most recent progress report submitted
to EPA; (c) describe all actions which are scheduled for the
next week; (d) provide other information relating to the
progress of Work as is customary in the industry; and (e)
include information regarding estimated percentage of
completion, all delays encountered or anticipated that may
affect the future schedule for completion of the Work

19

required hereunder, and a description of all efforts made to mitigate those delays or anticipated delays.

54. Respondent shall provide EPA with at least one (1) week advance notice of any change in the schedule.

55. The Final Report referred to in Paragraph 57, below, and other documents submitted by Respondent to EPA which purport to document Respondent's compliance with the terms of this Settlement Agreement shall be signed by a responsible official of Respondent or by the Project Coordinator designated pursuant to Paragraph 24. For purposes of this paragraph, a responsible official is an official who is in charge of a principal business function.

56. Respondent shall submit copies of the SOP, the Final Report, and any other plans, reports, or other submissions required by this Settlement Agreement as set forth below. Any electronic submissions must be in a format that is compatible with EPA software and in database files and sizes to be specified by EPA. Reports should be submitted to the following:

3 copies:

    1 bound, 1 unbound, 1 electronic to:

    U.S. Environmental Protection Agency Region 2
    2890 Woodbridge Avenue
    Building 209 (MS-211)
    Edison, New Jersey 08837
    Attention:   WR Grace Site On-Scene Coordinator
    solecki.michael@epa.gov

1 electronic copy:

    New York/Caribbean Superfund Branch
    Office of Regional Counsel
    United States Environmental Protection Agency Region 2
    290 Broadway, 17th Floor New York, New York 10007-1866
    Attention: Attorney for WR Grace Site
    davis.leilani@epa.gov

1 electronic copy:

> Environmental Engineer
> Section B - Remedial Bureau B
> New York State Department of Environmental Conservation
> Division of Environmental Remediation
> 625 Broadway, 12th Floor
> Albany, NY 12233-7016
> djfarrar@gw.dec.state.ny.us

57. Within sixty (60) days after completion of the work required by the SOP, Respondent shall submit for EPA review and approval a Final Report summarizing the actions taken to comply with this Settlement Agreement. The Final Report shall include:

    a. A synopsis of all Work performed under this Settlement Agreement;

    b. A detailed description of all EPA-approved modifications to the SOP which occurred during Respondent's performance of the Work required under this Settlement Agreement;

    c. A listing of quantities and types of materials removed from the Site or handled on-Site;

    d. A discussion of removal and disposal options considered for those materials;

    e. A listing of the ultimate destination of those materials;

    f. A presentation of the analytical results of all sampling and analyses performed, including QAPP data and chain of custody records;

    g. Accompanying appendices containing all relevant documentation generated during the Work (e.g. manifests, bills of lading, invoices, bills, contracts, certificates of destruction and permits;

    h. An accounting of expenses incurred by Respondent in performing the work; and

i. The following certification signed by a person who supervised or directed the preparation of the Final Report:

"I certify that the information contained in and accompanying this document is true, accurate, and complete."

58. EPA either will approve the Final Report or will require modifications thereto pursuant to Paragraphs 49-52, above.

## IX. OVERSIGHT

59. During the implementation of the requirements of this Settlement Agreement, Respondent and its contractor(s) and subcontractors shall be available for such conferences with EPA and inspections by EPA or its authorized representatives as EPA may determine are necessary to adequately oversee the Work being carried out or to be carried out by Respondent, including inspections at the Site and at laboratories where analytical work is being done hereunder.

60. Respondent and its employees, agents, contractor(s) and consultant(s) shall cooperate with EPA in its efforts to oversee Respondent's implementation of this Settlement Agreement.

## X. COMMUNITY RELATIONS

61. Respondent shall cooperate with EPA in providing information relating to the Work required hereunder to the public. As requested by EPA, Respondent shall participate in the preparation of all appropriate information disseminated to the public; participate in public meetings which may be held or sponsored by EPA to explain activities at or concerning the Site; and provide a suitable location for public meetings, as needed.

## XI. ACCESS TO PROPERTY AND INFORMATION

62. EPA, NYSDEC, and their designated representatives, including, but not limited to, employees, agents, contractor(s), and consultant(s) thereof, shall be permitted to observe the Work carried out pursuant to this Settlement Agreement. Respondent shall at all times permit EPA,

22

NYSDEC, and its designated representatives full access to and freedom of movement at the Site and any other premises where Work under this Settlement Agreement is to be performed for purposes of inspecting or observing Respondent's progress in implementing the requirements of this Settlement Agreement, verifying the information submitted to EPA by Respondent, conducting investigations relating to contamination at the Site, or for any other purpose EPA determines to be reasonably related to EPA oversight of the implementation of this Settlement Agreement.

63. In the event that action under this Settlement Agreement is to be performed in areas owned by or in possession of someone other than Respondent, Respondent shall use its best efforts to obtain access agreements from the present owners within twenty (20) days of the Effective Date of this Settlement Agreement for purposes of implementing the requirements of this Settlement Agreement.  Such agreements shall provide access not only for Respondent, but also for EPA and its designated representatives or agents, as well as NYSDEC and its designated representatives or agents.  Such agreements shall specify that Respondent is not EPA's representative with respect to liability associated with Site activities.  If such access agreements are not obtained by Respondent within the time period specified herein, Respondent shall immediately notify EPA of its failure to obtain access and shall include in that notification a summary of the steps Respondent has taken to attempt to obtain access.  Subject to the United States' non-reviewable discretion, EPA may use its legal authorities to obtain access for Respondent, may perform those response actions with EPA contractors at the property in question, or may terminate the Settlement Agreement if Respondent cannot obtain access agreements.  If EPA performs those tasks or activities with EPA contractors and does not terminate the Settlement Agreement, Respondent shall perform all other activities not requiring access to that property.  Respondent shall integrate the results of any such tasks undertaken by EPA into its reports and deliverables.

64. Upon request, Respondent shall provide EPA with access to all records and documentation related to the conditions at the Site, hazardous substances found at or released from the Site, and the actions conducted pursuant to this Settlement

Agreement except for those items, if any, subject to the attorney-client or attorney work product privileges. Nothing herein shall preclude Respondent from asserting a business confidentiality claim pursuant to 40 C.F.R. Part 2, Subpart B. All data, information, and records created, maintained, or received by Respondent or its contractor(s) or consultant(s) in connection with implementation of the Work under this Settlement Agreement, including, but not limited to, contractual documents, invoices, receipts, work orders, and disposal records shall, without delay, be made available to EPA upon request, subject to the same privileges specified above in this paragraph. EPA shall be permitted to copy all such documents. Respondent shall submit to EPA upon receipt the results of all sampling or tests and all other technical data generated by Respondent or its contractor(s), or on Respondent's behalf, in connection with the implementation of this Settlement Agreement.

65. Upon request by EPA, Respondent shall provide EPA or its designated representatives with duplicate and/or split samples of any material sampled in connection with the implementation of this Settlement Agreement.

66. Notwithstanding any other provision of this Settlement Agreement, EPA hereby retains all of its information gathering, access, and inspection authority under CERCLA, RCRA, and any other applicable statutes or regulations.

## XII. RECORD RETENTION, DOCUMENTATION, AVAILABILITY OF INFORMATION

67. Respondent shall preserve all documents and information relating to Work performed under this Settlement Agreement, or relating to Waste materials found on or released from the Site, for six (6) years after completion of the Work required by this Settlement Agreement. At the end of the six (6) year period, Respondent shall notify EPA at least thirty (30) days before any such document or information is destroyed that such documents and information are available for inspection. Upon request, Respondent shall provide EPA with the originals or copies of such documents and information.

68. All documents submitted by Respondent to EPA in the course of implementing this Settlement Agreement shall be available to the public unless identified as confidential by Respondent pursuant to 40 C.F.R. Part 2, Subpart B, and determined by EPA to merit treatment as confidential business information in accordance with applicable law. In addition, EPA may release all such documents to NYSDEC, and NYSDEC may make those documents available to the public unless Respondent conforms with applicable New York law and regulations regarding confidentiality. Respondent shall not assert a claim of confidentiality regarding any monitoring or hydrogeologic data, any information specified under Section 104(e)(7)(F) of CERCLA, or any other chemical, scientific, or engineering data relating to the Work performed hereunder.

### XIII. OFF-SITE SHIPMENTS

69. All hazardous substances and pollutants or contaminants removed from the Site pursuant to this Settlement Agreement for off-Site treatment, storage, or disposal shall be treated, stored, or disposed of in compliance with (a) Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), (b) Section 300.440 of the NCP, (c) the Clean Air Act ("CAA"), 42 U.S.C. § 7401, et seq., (d) RCRA, and (e) all other applicable Federal and State requirements.

70. If hazardous substances from the Site are to be shipped outside of New York, Respondent shall provide prior notification of such Waste shipments in accordance with the EPA Memorandum entitled "Notification of Out-of-State Shipments of Superfund Site Wastes" (OSWER Directive 9330.2-07, September 14, 1989). At least five (5) working days prior to such Waste shipments, Respondent shall notify the environmental agency of the accepting state of the following: (a) the name and location of the facility to which the Wastes are to be shipped; (b) the type and quantity of Waste to be shipped; (c) the expected schedule for the Waste shipments; (d) the method of transportation and name of transporter; and (e) the treatment and/or disposal method of the Waste streams.

71. Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-Site location, Respondents shall obtain EPA's determination that the

25

proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondents shall only send hazardous substances, pollutants, or contaminants from the Site to an off-Site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

## XIV. COMPLIANCE WITH OTHER LAWS

72. All actions required pursuant to this Settlement Agreement shall be performed in accordance with all applicable Federal and State laws and regulations except as provided in CERCLA § 121(e)(1), 42 U.S.C. § 9621(e)(1), and 40 C.F.R. § 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-Site actions required pursuant to this Settlement Agreement shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements ("ARARs") under Federal environmental or State environmental or facility siting laws. (See "Superfund Removal Procedures: Guidance on the Consideration of ARARs During Removal Actions," OSWER Directive No. 9360.3-02, August 1991).

73. Except as provided in Section 121(e)(1) of CERCLA, 42 U.S.C. § 9621(e)(1), and the NCP, no permit shall be required for any portion of the Work required hereunder that is conducted entirely on-Site. Where any portion of the Work requires a Federal or State permit or approval, Respondent shall submit timely applications and shall take all other actions necessary to obtain and to comply with all such permits or approvals. This Settlement Agreement is not, nor shall it be construed to be, a permit issued pursuant to any Federal or State statute or regulation.

## XV. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

74. Upon the occurrence of any event during performance of the Work required hereunder which, pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, requires reporting to the National Response Center, telephone number (800) 424-8802, Respondent shall immediately orally notify the Chief of the Response and Prevention Branch of the Emergency and Remedial Response Division of EPA, Region 2, at (732) 321-6656 of the incident

or Site conditions. Respondent shall also submit a written
report to EPA within seven (7) days after the onset of such
an event, setting forth the events that occurred and the
measures taken or to be taken, if any, to mitigate any
release or endangerment caused or threatened by the release
and to prevent the reoccurrence of such a release. The
reporting requirements of this paragraph are in addition to,
not in lieu of, reporting under CERCLA Section 103, 42
U.S.C. § 9603, and Section 304 of the Emergency Planning and
Community Right-To-Know Act of 1986, 42 U.S.C. § 11004.

75. In the event of any action or occurrence during Respondent's
performance of the requirements of this Settlement Agreement
which causes or threatens to cause a release of a hazardous
substance or which may present an immediate threat to public
health or welfare or the environment, Respondent shall
immediately take all appropriate action to prevent, abate,
or minimize the threat and shall immediately notify EPA as
provided in the preceding paragraph. Respondent shall take
such action in accordance with applicable provisions of this
Settlement Agreement including, but not limited to, the Site
Health and Safety Plan. In the event that EPA determines
that: (a) the activities performed pursuant to this
Settlement Agreement; (b) significant changes in conditions
at the Site; or (c) emergency circumstances occurring at the
Site pose a threat to human health or the environment, EPA
may direct Respondent to stop further implementation of any
actions pursuant to this Settlement Agreement or to take
other and further actions reasonably necessary to abate the
threat.

76. Nothing in the preceding paragraph shall be deemed to limit
any authority of the United States to take, direct, or order
all appropriate action to protect human health and the
environment or to prevent, abate, or minimize an actual or
threatened release of hazardous substances on, at, or from
the Site.

XVI. REIMBURSEMENT OF COSTS

77. Respondent hereby agrees to reimburse EPA for Past Response
Costs and Future Response Costs in connection with the Site.

a. Within thirty (30) days of the effective date of the
Plan, as the term effective date is defined in the Plan,

Respondent shall pay $234,038.94 for Past Response Costs and Interest on such costs from the Effective Date until the date of payment.

b.  EPA will periodically send billings to Respondent for Future Response Costs. The billings will be accompanied by a printout of cost data in EPA's financial management system. Respondent shall remit all payments to EPA via electronic funds transfer ("EFT") within thirty (30) days of receipt of each such billing or thirty (30) days of the effective date of the Plan, whichever is later.

78. To effect payment via EFT, Respondent shall instruct its bank to remit payment in the required amount via EFT using the following information, or such other updated EFT information that EPA may subsequently provide to Respondent:

. Amount of payment:
. Bank: **Federal Reserve Bank of New York**
. Account code for Federal Reserve Bank account receiving the payment: **68010727**
. Federal Reserve Bank ABA Routing Number: **021030004**
. SWIFT Address: **FRNYUS33**
  33 Liberty Street
  New York, NY 10045
. Field Tag 4200 of the Fedwire message should read: D **68010727 Environmental Protection Agency**
. Name of remitter:
. Settlement Agreement Index number: **CERCLA-02-2012-2003**
. Site/spill identifier: **02-XM**

At the time of payment, Respondent shall send notice that such payment has been made by email to acctsreceivable.cinwd@epa.gov, rice.richard@epa.gov and to:

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, OH 45268

and:

Michael Solecki, On-Scene Coordinator
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2

2890 Woodbridge Avenue
Building 205 (MS-211)
Edison, New Jersey 08837

as well as to:

Elizabeth Leilani Davis
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway, 17th Floor
New York, New York 10007-1866

Such notice shall reference the date of the EFT, the payment amount, the name of the Site, the Settlement Agreement index number, and Respondent's names and addresses.

79. The total amount to be paid by Respondent pursuant to this Paragraph shall be deposited into the WR Grace Superfund Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

80. Respondent shall pay Interest on any amounts overdue under Paragraph 77.b. above. Such Interest shall begin to accrue on the first day that payment is overdue and shall continue to accrue until the date of payment.

XVII. FORCE MAJEURE

81. Respondent agrees to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed by a *force majeure*. "Force majeure," for purposes of this Settlement Agreement, is defined as any event arising from causes beyond the control of Respondent and of any entity controlling, controlled by, or under common control with Respondent, including its contractors and subcontractors, that delays the timely performance of any obligation under this Settlement Agreement notwithstanding Respondent's best efforts to avoid the delay. The requirement that Respondent exercise "best efforts to avoid the delay" includes using best efforts to anticipate any potential force majeure event and best efforts to address

29

the effects of any potential force majeure event: (a) as it
is occurring; and (b) following the potential force majeure
event, such that the delay is minimized to the greatest
extent practicable. Examples of events that are not force
majeure events include, but are not limited to, increased
costs or expenses of any Work to be performed under this
Settlement Agreement or the financial difficulty of
Respondent to perform such Work.

82. If any event occurs or has occurred that may delay the
performance of any obligation under this Settlement
Agreement, whether or not caused by a force majeure event,
Respondent shall notify by telephone the EPA OSC or, in his
absence, the Chief of the Removal Action Branch of the
Emergency and Remedial Response Division of EPA Region 2 at
732-321-6658 within forty-eight (48) hours of when
Respondent knew or should have known that the event might
cause a delay. In addition, Respondent shall notify EPA in
writing within seven (7) days after the date when Respondent
first becomes aware or should have become aware of the
circumstances which may delay or prevent performance. Such
written notice shall be accompanied by all available and
pertinent documentation, including third-party
correspondence, and shall contain the following: (a) a
description of the circumstances, and Respondent's rationale
for interpreting such circumstances as being beyond its
control (should that be Respondent's claim); (b) the actions
(including pertinent dates) that Respondent has taken and/or
plans to take to minimize any delay; and (c) the date by
which or the time period within which Respondent proposes to
complete the delayed activities. Such notification shall
not relieve Respondent of any of its obligations under this
Settlement Agreement. Respondent's failure to timely and
properly notify EPA as required by this paragraph shall
constitute a waiver of Respondent's right to claim an event
of force majeure. The burden of proving that an event
constituting a force majeure has occurred shall rest with
Respondent.

83. If EPA determines that a delay in performance of a
requirement under this Settlement Agreement is or was
attributable to a force majeure, the time period for
performance of that requirement shall be extended as deemed
necessary by EPA. Such an extension shall not alter
Respondent's obligation to perform or complete other tasks

30

required by the Settlement Agreement which are not directly affected by the force majeure. Respondent shall use its best efforts to avoid or minimize any delay or prevention of performance of its obligations under this Settlement Agreement.

## XVIII. STIPULATED AND STATUTORY PENALTIES

84. If Respondent fails, without prior EPA approval, to comply with any of the requirements or time limits set forth in or established pursuant to this Settlement Agreement, and such failure is not excused under the terms of Paragraphs 81 through 83 above (Force Majeure), Respondent shall, upon demand by EPA, pay a stipulated penalty to EPA in the amount indicated below:

    a. For all requirements of this Settlement Agreement, other than the timely provision of progress reports required by Paragraph 53, stipulated penalties shall accrue in the amount of $1,000 per day, per violation, for the first seven days of noncompliance, $1,500 per day, per violation, for the 8th through 15th day of noncompliance, $3,000 per day, per violation, for the 16th through 25th day of noncompliance, and $5,000 per day, per violation, for the 26th day of noncompliance and beyond.

    b. For the progress reports required by Paragraph 53, stipulated penalties shall accrue in the amount of $500 per day, per violation, for the first seven days of noncompliance, $1,000 per day, per violation, for the 8th through 15th day of noncompliance, $1,500 per day, per violation, for the 16th through 25th day of noncompliance, and $2,500 per day, per violation, for the 26th day of noncompliance and beyond.

85. Any such penalty shall accrue as of the first day after the applicable deadline has passed and shall continue to accrue until the noncompliance is corrected or EPA notifies Respondent that it has determined that it will perform the tasks for which there is non-compliance. Such penalty shall be due and payable within thirty (30) days following receipt of a written demand from EPA, or the effective date of the

Plan, whichever is later.  Payment of any such penalty to
EPA shall be made via EFT in accordance with the payment
procedures in Paragraph 77 above.  Respondent shall pay
Interest on any amounts overdue under this paragraph.  Such
Interest shall begin to accrue on the first day that the
respective payment is overdue.

86. Even if violations are simultaneous, separate penalties
    shall accrue for separate violations of this Settlement
    Agreement.  Penalties accrue and are assessed per violation
    per day.  Penalties shall accrue regardless of whether EPA
    has notified Respondent of a violation or act of
    noncompliance.  The payment of penalties shall not alter in
    any way Respondent's obligation to complete the performance
    of the Work required under this Settlement Agreement.

87. Notwithstanding any other provision of this Settlement
    Agreement, failure of Respondent to comply with any
    provision of this Settlement Agreement may subject
    Respondent to civil penalties of up to thirty-seven thousand
    five hundred dollars ($37,500) per violation per day, as
    provided in Sections 109 and 122(l) of CERCLA, 42 U.S.C.
    §§ 9609 and 9622(l), and the Debt Collection and Improvement
    Act of 1996 (see Civil Monetary Penalty Inflation Adjustment
    Rule, 74 Fed. Reg. 626 (January 7, 2009)), unless such
    failure to comply is excused by EPA under the terms of
    Paragraphs 81 through 83 above.  Respondent may also be
    subject to punitive damages in an amount at least equal to
    but not more than three times the amount of any costs
    incurred by the United States as a result of such failure to
    comply with this Settlement Agreement, as provided in
    Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).  Should
    Respondent violate this Settlement Agreement or any portion
    thereof, EPA may carry out the required actions
    unilaterally, pursuant to Section 104 of CERCLA, 42 U.S.C.
    § 9604, and/or may seek judicial enforcement of this
    Settlement Agreement pursuant to Sections 106 and 122 of
    CERCLA, 42 U.S.C. §§ 9606 and 9622.

## XIX. OTHER CLAIMS

88. By issuance of this Settlement Agreement, the United States
    and EPA assume no liability for injuries or damages to
    persons or property resulting from any acts or omissions of
    Respondent or Respondent's employees, agents, contractors,

or consultants in carrying out any action or activity pursuant to this Settlement Agreement. The United States or EPA shall not be held out as or deemed a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Settlement Agreement.

89. Except as expressly provided in Section XXII (Covenant Not to Sue by EPA), below, nothing in this Settlement Agreement constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

90. No action or decision by EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XX. INDEMNIFICATION

91. Respondent agrees to indemnify, save, and hold harmless the United States, its agencies, departments, officials, agents, contractors, subcontractors, employees, and representatives from any and all claims or causes of action arising from or on account of acts or omissions of Respondent, its employees, officers, directors, agents, servants, receivers, trustees, successors, assigns, or any other persons acting on behalf of Respondent or under its control, as a result of the fulfillment or attempted fulfillment of the terms and conditions of this Settlement Agreement by Respondent.

92. Respondent waives all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Respondent shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement

33

arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the Site, including but not limited to, claims on account of construction delays.

93. Further, Respondent agrees to pay the United States all costs it incurs including, but not limited to, attorneys fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on acts or omissions of Respondent, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Settlement Agreement.

## XXI. INSURANCE

94. At least seven (7) days prior to commencing any Work at the Site, Respondent shall submit to EPA a certification that Respondent or its contractors and subcontractors have adequate insurance coverage or have indemnification for liabilities for injuries or damages to persons or property which may result from the activities to be conducted by or on behalf of Respondent pursuant to this Settlement Agreement. Respondent shall ensure that such insurance or indemnification is maintained for the duration of the Work required by this Settlement Agreement.

## XXII. COVENANT NOT TO SUE BY EPA

95. In consideration of the actions that will be performed and the payments that will be made by Respondent under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, EPA covenants not to sue or to take administrative action against Respondent pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for performance of the Work and for recovery of Past Response Costs and Future Response Costs. This covenant not to sue shall take effect upon the Effective Date of this Settlement Agreement and is conditioned upon the complete and satisfactory performance by Respondent of all its obligations under this Settlement Agreement, including, but not limited to, payment of Past Response Costs and Future Response Costs pursuant to Section

34

XVI (Reimbursement of Costs), above.  This covenant not to sue extends only to Respondent and does not extend to any other person.

## XXIII.    RESERVATION OF RIGHTS BY EPA

96. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site.  Further, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law.

97. The covenant not to sue set forth in Section XXII (Covenant Not to Sue by EPA), above, does not pertain to any matters other than those expressly identified therein.  EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Respondent with respect to all other matters, including, but not limited to:

   a.    claims based on a failure by Respondent to meet a requirement of this Settlement Agreement;

   b.    liability for costs not included within the definition of Past Response Costs and Future Response Costs;

   c.    liability for performance of response action other than the Work;

   d.    criminal liability;

   e.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

    f.   liability arising from the past, present, or future
disposal, release or threat of release of Waste outside
of the Site; and

    g.   liability for costs incurred or to be incurred by the
Agency for Toxic Substances and Disease Registry
related to the Site.

98. <u>Work Takeover</u>.  In the event EPA determines that Respondent
has ceased implementation of any portion of the Work, is
seriously or repeatedly deficient or late in its performance
of the Work, or is implementing the Work in a manner which
may cause an endangerment to human health or the
environment, EPA may assume the performance of all or any
portion of the Work as EPA determines necessary.  Costs
incurred by the United States in performing the Work
pursuant to this paragraph shall be considered Future
Response Costs that Respondent shall pay pursuant to Section
XVI (Reimbursement of Costs).  Notwithstanding any other
provision of this Settlement Agreement, EPA retains all
authority and reserves all rights to take any and all
response actions authorized by law.

XXIV.   <u>COVENANT NOT TO SUE BY RESPONDENT</u>

99. Respondent covenants not to sue and agrees not to assert any
claims or causes of action against the United States, or its
contractors or employees, with respect to the Work, Past
Response Costs, Future Response Costs, or this Settlement
Agreement, including, but not limited to:

    a.   any direct or indirect claim for reimbursement from the
Hazardous Substance Superfund established by 26 U.S.C.
§ 9507, based on Sections 106(b)(2), 107, 111, 112, or
113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611,
9612, or 9613, or any other provision of law;

    b.   any claim arising out of response actions at or in
connection with the Site, including any claim under the
United States Constitution, the New York State
Constitution, the Tucker Act, 28 U.S.C. § 1491, the
Equal Access to Justice Act, 28 U.S.C. § 2412, as
amended, or at common law; or

36

c.   any claim against the United States pursuant to
     Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and
     9613, relating to the Site.

These covenants not to sue shall not apply in the event the
United States brings a cause of action or issues an order
pursuant to the reservations set forth in Paragraphs 97
(b), (c), and (e)-(g), but only to the extent that
Respondent's claims arise from the same response action,
response costs, or damages that the United States is
seeking pursuant to the applicable reservation.

100. Nothing in this Settlement Agreement shall be deemed to
     constitute approval or preauthorization of a claim within
     the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or
     40 C.F.R. § 300.700(d).

## XXV. CONTRIBUTION PROTECTION AND RIGHTS

101. The Parties agree that this Settlement Agreement
     constitutes an administrative settlement for purposes of
     Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and
     that Respondent is entitled, as of the Effective Date, to
     protection from contribution actions or claims as provided
     by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§
     9613(f)(2) and 9622(h)(4), for "matters addressed" in this
     Settlement Agreement.  The "matters addressed" in this
     Settlement Agreement are the Work, Past Response Costs, and
     Future Response Costs.

102. The Parties agree that this Settlement Agreement
     constitutes an administrative settlement for purposes of
     Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B),
     pursuant to which Respondent has resolved its liability to
     the United States for the Work performed under this
     Settlement Agreement, for Past Response Costs and for
     Future Response Costs.

Except as provided in Section XXIV (Covenant Not to Sue by
Respondent), above, nothing in this Settlement Agreement
precludes the United States or Respondent from asserting
any claims, causes of action or demands against any persons
not parties to this Settlement Agreement for
indemnification, contribution or cost recovery.  Nothing
herein diminishes the right of the United States, pursuant

37

to Sections 113(f)(2) and (3) of CERCLA, 42 U.S.C.
§ 9613(f)(2)-(3), to pursue any such persons to obtain
additional response costs or response action and to enter
into settlements that provide contribution protection to
such persons.

### XXVI. MODIFICATIONS

103. The OSC may make modifications to any plan or schedule in
writing or by oral direction. Any oral modification will
be memorialized in writing by EPA promptly, but shall have
as its effective date the date of the OSC's oral direction.
Any other requirements of this Settlement Agreement may be
modified in writing by mutual agreement of the Parties.

104. If Respondent seeks permission to deviate from any approved
work plan or schedule, Respondent's Project Coordinator
shall submit a written request to EPA for approval
outlining the proposed modification and its basis.
Respondent may not proceed with the requested deviation
until receiving oral or written approval from the OSC
pursuant to Paragraph 105.

105. No informal advice, guidance, suggestion, or comment by the
OSC or other EPA representatives regarding reports, plans,
specifications, schedules, or any other writing submitted
by Respondent shall relieve Respondent of its obligation to
obtain any formal approval required by this Settlement
Agreement, or to comply with all requirements of this
Settlement Agreement, unless it is formally modified.

### XXVII. ADDITIONAL REMOVAL ACTION

106. Notwithstanding any other provision of this Settlement
Agreement, if EPA determines that additional removal
actions not included in any plan approved hereunder are
necessary under applicable law to protect public health,
welfare, or the environment, EPA will notify Respondent of
that determination. If Respondent agrees with such
determination, within thirty (30) days of receipt of notice
from EPA that additional removal actions are necessary to
protect public health, welfare, or the environment,
Respondent shall submit for approval by EPA an appropriate
revision to the SOP for the additional removal actions.
The SOP shall conform to the applicable requirements of

38

Section VI (Work to Be Performed) of this Settlement Agreement. Upon EPA's approval of the SOP pursuant to Section VI, Respondent shall implement the SOP for additional removal actions in accordance with the provisions and schedule contained therein. This Section does not alter or diminish the OSC's authority to make oral modifications to any plan or schedule pursuant to Section XXVI (Modifications). If Respondent does not agree with EPA's determination, then EPA and Respondent may enter into a separate agreement and order for performance of additional removal actions.

## XXVIII. <u>TERMINATION AND SATISFACTION</u>

107. Upon a determination by EPA (following its receipt of the Final Report referred to in Paragraph 57, above) that the Work required pursuant to this Settlement Agreement has been fully carried out in accordance with this Settlement Agreement, EPA will so notify Respondent in writing. Such notification shall not affect any continuing obligations of Respondent. If EPA determines that any removal activities have not been completed in accordance with this Settlement Agreement, EPA may so notify Respondent, provide a list of the deficiencies, and require that Respondent corrects such deficiencies.

## XXIX. <u>SEVERABILITY/INTEGRATION/APPENDICES</u>

108. If a court issues an order that invalidates any provision of this Settlement Agreement or finds that Respondent has sufficient cause not to comply with one or more provisions of this Settlement Agreement, Respondent shall remain bound to comply with all provisions of this Settlement Agreement not invalidated or determined to be subject to a sufficient cause defense by the court's order.

109. This Settlement Agreement and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement Agreement. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The following appendices are attached to and incorporated into this Settlement Agreement:

39

Appendix A –Map of Site
Appendix B –Cost Summary dated 03/29/2012
Appendix C –Cost Estimate for the Work to be Performed
Appendix D –"Standard Operating Procedures of CARB 435
         Analysis"

## XXX. EFFECTIVE DATE

110. In order to receive authority to carry out its obligations
     under this Settlement Agreement including, but not limited
     to, carrying out the Work to be performed, Respondent shall
     file a motion for approval of this Settlement Agreement
     with the Bankruptcy Court within fourteen (14) days after
     signature by the Parties.  Such motion for approval shall
     include a request for permission to perform the Work
     obligations under this Settlement Agreement, as well as
     allowance by Respondent to pay, as an unsecured, pre-
     petition, non-priority claim against Respondent's Chapter
     11 estate, EPA's Past Response Costs and any other payments
     due under or made pursuant to this Settlement Agreement.
     This Settlement Agreement shall not be effective and
     binding on Respondent unless and until the Bankruptcy Court
     enters an Order approving this Settlement Agreement.

111. This Settlement Agreement shall become effective five (5)
     days after the Bankruptcy Court enters an order approving
     this Settlement.  All times for performance of actions or
     activities required herein will be calculated from said
     Effective Date.

U.S. ENVIRONMENTAL PROTECTION AGENCY


_____          _July_20,_2012_
Walter E. Mugdan                        Date
Director
Emergency and Remedial Response Division
U.S. Environmental Protection Agency
Region 2


40

In the Matter of the WR Grace Site, EPA Index No. CERCLA-02-2012-2003

### CONSENT

The Respondent named below has had an opportunity to confer with EPA to discuss the terms and the issuance of this Settlement Agreement.  Subject to the Bankruptcy Court's entry of an order approving this Settlement Agreement, the Respondent hereby consents to the issuance of this Settlement Agreement and to its terms.  Furthermore, the individual signing this Settlement Agreement on behalf of Respondent certifies that he or she is fully and legally authorized to agree to the terms and conditions of this Settlement Agreement and to bind Respondent.

W. R. GRACE + Co.
(Name of Respondent)

Karen E. Ethier
(Signature)

7/20/2012
(Date)

KAREN E ETHIER
(Printed Name of Signatory)

VICE PRESIDENT ENV. HEALTH + SAFETY
(Title of Signatory)

**APPENDIX A**



Figure 1:
Sample Location Map

W.R. GRACE VERMICULITE
WEEDSPORT, NEW YORK

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY

**APPENDIX B**

# APPENDIX B

Certified By Financial Management Office

Table of Contents

W R GRACE, BRUTUS, NY, WEEDSPORT, NY  SITE ID = 02 XM

All costs through 12/31/2011

**NARRATIVE COST SUMMARY** ........................................................................................ Section 1

**ITEMIZED COST SUMMARY** .......................................................................................... Section 2

**REGIONAL PAYROLL COSTS** ....................................................................................... Section 3

**HEADQUARTERS PAYROLL COSTS** ............................................................................. Section 4

**REGIONAL TRAVEL COSTS** ......................................................................................... Section 5

**HEADQUARTERS TRAVEL COSTS** ............................................................................... Section 6

**ENVIRONMENTAL MONITORING SYSTEMS LABORATORY (EMSL)**

      LOCKHEED MARTIN (EPD05088) ........................................................... Section 7

**OTHER EXPENDITURES (OTH)**

      LOCKHEED MARTIN SERVICES (EPW09031) ...................................... Section 8

**SUPERFUND TECH ASSESSMENT AND RESPONSE TEAM**

      ROY F WESTON, INC. (68-W0-0113) ..................................................... Section 9

**SUPERFUND TECH ASSESSMENT AND RESPONSE TEAM - 3**

      WESTON SOLUTIONS (EPW06072) .................................................... Section 10

**MISCELLANEOUS (MIS) COSTS** ................................................................................... Section 11

**EPA INDIRECT COSTS SUMMARY** .............................................................................. Section 12

**EPA INDIRECT COSTS** ................................................................................................. Section 13

Certified By Financial Management Office

Narrative Cost Summary

W R GRACE, BRUTUS, NY, WEEDSPORT, NY  SITE ID = 02 XM

All costs through 12/31/2011

1.  The United States Environmental Protection Agency has incurred at least $44,112.16 for Regional Payroll Costs.

2.  The United States Environmental Protection Agency has incurred at least $3,629.74 for Headquarters Payroll Costs.

3.  The United States Environmental Protection Agency has incurred at least $3,340.16 for Regional Travel Costs.

4.  The United States Environmental Protection Agency has incurred at least $1,174.36 for Headquarters Travel Costs.

5.  The United States Environmental Protection Agency has incurred costs of at least $6,039.92 for ENVIRONMENTAL MONITORING SYSTEMS LABORATORY (EMSL) contract expenditures.  The total represents the amount spent under the LOCKHEED MARTIN contract.

6.  The United States Environmental Protection Agency has incurred costs of at least $10,853.43 for OTHER EXPENDITURES (OTH) contract expenditures.  The total represents the amount spent under the LOCKHEED MARTIN SERVICES contract.

7.  The United States Environmental Protection Agency has incurred costs of at least $31,786.69 for SUPERFUND TECH ASSESSMENT AND RESPONSE TEAM contract expenditures.  The total represents the amount spent under the ROY F WESTON, INC. contract.

8.  The United States Environmental Protection Agency has incurred costs of at least $82,104.45 for SUPERFUND TECH ASSESSMENT AND RESPONSE TEAM - 3 contract expenditures.  The total represents the amount spent under the WESTON SOLUTIONS contract.

9.  The United States Environmental Protection Agency has incurred costs of at least $48.61 for Miscellaneous Expenses.

10. The United States Environmental Protection Agency has incurred at least $50,949.32 for Indirect Costs.

**Total Site Costs:**                                    $234,038.84

Report Date: 03/29/2012

Certified By Financial Management Office

Itemized Cost Summary

W R GRACE, BRUTUS, NY, WEEDSPORT, NY  SITE ID = 02 XM

All costs through 12/31/2011

**REGIONAL PAYROLL COSTS** .......................................................................... $44,112.16

**HEADQUARTERS PAYROLL COSTS** ............................................................... $3,629.74

**REGIONAL TRAVEL COSTS** ............................................................................ $3,340.16

**HEADQUARTERS TRAVEL COSTS** ................................................................ $1,174.36

**ENVIRONMENTAL MONITORING SYSTEMS LABORATORY (EMSL)**
       LOCKHEED MARTIN (EPD05088) ...................................................... $6,039.92

**OTHER EXPENDITURES (OTH)**
       LOCKHEED MARTIN SERVICES (EPW09031) ................................... $10,853.43

**SUPERFUND TECH ASSESSMENT AND RESPONSE TEAM**
       ROY F WESTON, INC. (68-W0-0113) ................................................. $31,786.69

**SUPERFUND TECH ASSESSMENT AND RESPONSE TEAM - 3**
       WESTON SOLUTIONS (EPW06072) ................................................... $82,104.45

**MISCELLANEOUS COSTS (MIS)** ..................................................................... $48.61

**EPA INDIRECT COSTS** .................................................................................... $50,949.32

**Total Site Costs:**                                                                                          $234,038.84

Report Date: 03/29/2012

Certified By Financial Management Office

Regional Payroll Costs

W R GRACE, BRUTUS, NY, WEEDSPORT, NY  SITE ID = 02 XM

All costs through 12/31/2011

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| BERNS, CAROL Y. | 2012 | 03 | 2.00 | 170.78 |
|  |  |  | 2.00 | $170.78 |
| BRANDON-BAZILE, KIM | 2011 | 02 | 0.25 | 17.62 |
|  |  |  | 0.25 | $17.62 |
| CAPON, VIRGINIA F. | 2011 | 17 | 2.68 | 268.58 |
|  |  | 21 | 0.50 | 47.49 |
|  |  | 24 | 6.00 | 569.86 |
|  |  |  | 9.18 | $885.93 |
| CHONG, MARGARET | 2006 | 20 | 29.50 | 1,913.05 |
|  |  |  | 29.50 | $1,913.05 |
| COAKLEY, ROY W. | 2008 | 08 | 2.00 | 123.71 |
|  | 2010 | 16 | 1.00 | 67.64 |
|  |  |  | 3.00 | $191.35 |
| DAVIS, ELIZABETH | 2010 | 16 | 16.25 | 1,284.79 |
|  |  | 17 | 2.00 | 158.13 |
|  |  | 18 | 24.50 | 1,937.08 |
|  |  | 19 | 28.50 | 2,253.33 |
|  |  | 20 | 14.75 | 1,166.20 |
|  |  | 21 | 10.75 | 849.95 |
|  |  | 22 | 0.25 | 20.05 |
|  | 2011 | 04 | 2.50 | 188.91 |
|  |  | 07 | 0.50 | 39.67 |
|  |  | 12 | 3.50 | 278.14 |
|  |  | 14 | 3.75 | 298.01 |
|  |  | 15 | 1.25 | 99.33 |
|  |  | 16 | 10.25 | 814.54 |
|  |  | 17 | 31.00 | 2,463.51 |
|  |  | 18 | 19.00 | 1,551.08 |
|  |  | 19 | 7.00 | 571.45 |
|  |  | 20 | 0.75 | 61.22 |
|  |  | 21 | 18.75 | 1,530.65 |
|  |  | 22 | 10.00 | 820.65 |
|  |  | 23 | 16.25 | 1,326.57 |

Certified By Financial Management Office

Regional Payroll Costs

W R GRACE, BRUTUS, NY, WEEDSPORT, NY  SITE ID = 02 XM

All costs through 12/31/2011

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| DAVIS, ELIZABETH | 2011 | 24 | 20.25 | 1,653.12 |
| | | 25 | 4.50 | 367.36 |
| | | 26 | 4.25 | 346.95 |
| | | 27 | 1.25 | 101.79 |
| | 2012 | 02 | 1.50 | 119.22 |
| | | 03 | 13.50 | 1,051.12 |
| | | 04 | 2.50 | 194.65 |
| | | 05 | 1.00 | 77.86 |
| | | | 270.25 | $21,625.33 |
| HARKAY, JAMES D. | 2010 | 12 | 3.00 | 232.55 |
| | | | 3.00 | $232.55 |
| LEUNG, CHRISTINA | 2010 | 25 | 36.00 | 1,942.33 |
| | | 26 | 69.00 | 3,659.18 |
| | 2011 | 01 | 4.00 | 214.53 |
| | | 02 | 20.00 | 1,083.28 |
| | | 03 | 62.00 | 3,284.81 |
| | | 04 | 7.00 | 377.28 |
| | | 18 | 4.00 | 218.00 |
| | | | 202.00 | $10,779.41 |
| MUGDAN, WALTER E. | 2010 | 12 | 0.50 | 49.01 |
| | | | 0.50 | $49.01 |
| ROTOLA, JOSEPH D. | 2011 | 20 | 2.00 | 194.99 |
| | | | 2.00 | $194.99 |
| SHERIDAN, PATRICIA A. | 2010 | 25 | 5.00 | 356.44 |
| | | 26 | 5.50 | 392.10 |
| | | | 10.50 | $748.54 |
| SOLECKI, MICHAEL F. | 2010 | 26 | 54.00 | 3,214.26 |
| | | | 54.00 | $3,214.26 |
| TRUONO-WIGGETT, MARISSA | 2010 | 14 | 1.00 | 65.81 |
| | | 16 | 15.50 | 1,020.02 |
| | | 17 | 2.00 | 131.61 |
| | | 18 | 1.50 | 98.73 |

Report Date: 03/29/2012                                        Section 3 - Page 3 of 3

Certified By Financial Management Office

Regional Payroll Costs

W R GRACE, BRUTUS, NY, WEEDSPORT, NY  SITE ID = 02 XM

All costs through 12/31/2011

| Employee Name | Fiscal Year | Pay Period | Payroll Hours | Payroll Costs |
|---|---|---|---|---|
| TRUONO-WIGGETT, MARISSA | 2010 | 19 | 1.00 | 67.64 |
| | 2011 | 03 | 2.00 | 135.81 |
| | | 12 | 3.50 | 237.67 |
| | | 17 | 2.50 | 169.76 |
| | 2012 | 03 | 1.00 | 68.02 |
| | | | 30.00 | $1,995.07 |
| WALL, STEVEN | 2011 | 02 | 14.00 | 725.96 |
| | | | 14.00 | $725.96 |
| WILSON, ERIC | 2010 | 12 | 1.00 | 76.33 |
| | 2011 | 18 | 1.00 | 78.77 |
| | | 25 | 9.00 | 728.68 |
| | | 26 | 1.00 | 80.97 |
| | 2012 | 02 | 2.00 | 162.18 |
| | | 03 | 3.00 | 241.38 |
| | | | 17.00 | $1,368.31 |
| Total Regional Payroll Costs | | | 647.18 | $44,112.16 |