# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case No. |
| W.R. GRACE & CO., et. al., | ) | 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Related to D.I. 29256 |
| | ) | Hearing Date: 10/15/12 at 9:00 am |

**REPLY TO OBJECTION OF MAIN PLAZA, LLC TO NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY FILED BY CIM URBAN REIT 211 MAIN ST. (SF), LP, AS ASSIGNEE OF CIM REIT ACQUISITION, LLC**

On July 12, 2012, CIM URBAN REIT 211 MAIN ST. (SF), LP, as assignee of CIM REIT ACQUISITION, LLC, ("CIM") filed a Transfer of Claim Other than for Security (the "Notice of Transfer," Docket No. 29256). Main Plaza, LLC ("Main Plaza") filed an Objection to the Notice of Transfer on August 9, 2012. CIM, by its undersigned counsel, hereby submits this reply to Main Plaza's Objection and respectfully represents as follows:

**PRELIMINARY STATEMENT**

CIM purchased a building located at 211 Main Street in San Francisco, together with related tangible and intangible personal property interests from Main Plaza on December 29, 2009, pursuant to the terms of a Purchase and Sale Agreement and Joint Escrow Instructions (the "Purchase Agreement"). As part of this purchase, and as evidenced by the Purchase Agreement, CIM purchased all claims that relate to the ownership, use and/or operation of the Land, the Improvements and/or the Personal Property, including a claim Main Plaza has against

1

#16808820 v1

W.R. Grace & Co. (the "Bankruptcy Claim"). CIM filed a Notice of Transfer that was supported by a copy of the Purchase Agreement. Therefore, CIM has met its burden under Federal Rule of Bankruptcy Procedure 3001(e)(2) and Main Plaza's Objection should be overruled.

## BACKGROUND

1. On April 20, 2001 (the "Petition Date"), W.R. Grace & Co. and various affiliates (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

2. Prior to the Petition Date and through December 2009, Main Plaza owned a building located at 211 Main Street in San Francisco (the "Building").

3. On March 30, 2003, Main Plaza filed the Bankruptcy Claim as proof of claim number 11009, asserting that the Debtors were liable for certain property damage to the Building alleged to be caused by the Debtors' manufacture, use, or sale of products containing asbestos that were supplied by Debtors to the contractor which built the Building. See Main Plaza, LLC, Proof of Claim No. 11009, attached to the Objection as Ex. A.

4. To settle the Bankruptcy Claim, the Debtors and Main Plaza entered into a Settlement Agreement dated April 14, 2009 (the "Settlement Agreement"). The Settlement Agreement was approved by the Court on October 28, 2009 (D.I. 23591). See Settlement of an Asbestos Property Damage Claim Filed by Main Plaza, LLC, attached to the Objection as Ex. B.

5. Thereafter, on November 25, 2009, CIM and Main Plaza entered into an agreement for CIM to purchase all of Main Plaza's right, title, and interest in and to the Land, the Improvements, all Appurtenances, all Intangible Personality, and the Leases (the

#16808820 v1

"Property") pursuant to the terms of a the Purchase Agreement, attached to the Objection as Ex. C,[1] which closed on December 29, 2009.

6. Pursuant to the Purchase Agreement, CIM acquired all Intangible Personalty, defined to include all "intangible property (such as . . . claims . .) which is assignable by Seller and owned by Seller as of the Effective Date and which relates exclusively to the ownership, use and/or operation of the Land, the Improvements and/or Personal Property." Purchase Agreement § 11.59(e). Personal Property is defined in the Purchase Agreement to include "all tangible personal property of any kind owned by Seller and attached to or directly used exclusively in connection with the ownership, maintenance, or operation of the Land or Improvements." Purchase Agreement § 11.56. Thus, the Property sold to CIM includes the Personal Property and the Intangible Personalty.

7. Section 4.5 of the Purchase Agreement provides for a release by the Buyer of the Seller. However, the release did not "apply to any *claims* that Seller may have against or *warranties, express or implied*, that Seller has received or may receive from, those contractors, *suppliers*, materialmen and consultants retained by Seller in connection with the design, *construction*, grading and installation of improvements on the Property; and *Seller hereby assigns and transfers to Buyer, on a non-exclusive basis, any rights of Seller to pursue any such claims or warranties, to the extent they apply to the Property*. . . ." (Purchase Agreement § 4.5(e), emphasis added.)

8. During the due diligence process leading up to the closing in December 2009, Main Plaza did not disclose that it had instituted litigation against the Debtors arising from the

---

[1] Capitalized terms not otherwise defined herein are used as defined in the Purchase Agreement.

3

#16808820 v1

Debtors' supplying hazardous materials that were used in the construction of the Building, nor did it disclose that it had settled that breach of warranty claim against the Debtors.

9. On July 12, 2012, CIM filed a Transfer of Claim Other than for Security (the "Notice of Transfer") (D.I. 29256) requesting acknowledgement of the transfer of the Bankruptcy Claim to CIM. Main Plaza filed an Objection to the Notice of Transfer on August 9, 2012.

**ARGUMENT**

**CIM Acquired the Bankruptcy Claim When it Purchased "All ... Claims" Through the Purchase Agreement.**

10. In its Opposition, Main Plaza concedes that under the Purchase Agreement, CIM acquired "[a]ll intangible property" that was "assignable by Seller and owned by Seller as of the Effective Date" and that related "exclusively to the ownership, use and/or operation of the Land, the improvements and/or the Personal Property." (Purchase Agreement § 11.59; Opp. ¶ 23-28.) Main Plaza also admits that the Agreement unambiguously includes all "claims" within the definition of "intangible property." *Id.*

11. The fact that "claims" are unambiguously included in the Purchase Agreement is made even clearer by the plain language of Purchase Agreement Section 4.5(e), which specifically assigns to the Buyer Seller's warranty claims against suppliers.

12. Main Plaza completely ignores Purchase Agreement Section 4.5(e) and instead argues that the Bankruptcy Claim was not included in the Purchase Agreement because it does not "relate" to "the ownership, use and/or operation of the Land, the Improvements and/or the Personal Property." (Opp. ¶¶ 24-26.) Main Plaza's argument ignores the clear and specific assignment of claims in Section 4.5(e), and neglects the breadth of the transfer of rights

4

#16808820 v1

evidenced by the phrase "relating to." By using the phrase "relating to," the Agreement invokes the broadest possible connection between the claim and ownership, use and/or operation of the Property. *See, e.g.*, Commercial Contracts: Strategies for Drafting and Negotiating, Volume 1, § 5.04(D)(available at http://books.google.com/books?id=nEw1y34pX-UC&lpg=SA5-PA29&ots=rQ293jBc66&dq&pg=SA5-PA29#v=onepage&q&f=false) (noting that "the phrase 'arising out of or relating to' has become the model for broad arbitration clauses" and that omitting the phrase "relating to" creates "the risk that a court will conclude that the parties did not intend the clause to be broad."). In this case, the Bankruptcy Claim easily meets the test of having a connection to the ownership, use and/or operation of the Building, broadly considered and understood.

13. As Main Plaza admits, the Bankruptcy Claim arose directly from the asbestos remediation that took place in the Building it sold to CIM. (Opp. ¶ 24.) It follows that the Bankruptcy Claim is a claim "relating to" Main Plaza's ownership, use and/or operation of the Building. If Main Plaza had not owned the Building, the Bankruptcy Claim would never have arisen. The Bankruptcy Claim, which is a warranty claim against the Debtors, had already arisen at the time of the sale to the Buyer.

14. If Main Plaza wished to exclude the Bankruptcy Claim, it could easily have done so by either choosing a phrase more narrow and restrictive than "relating to" (such as "arising out of"), by excluding "claims" from the definition of the intangible property transferred under the Agreement, or even by excluding the Bankruptcy Claim from the definition of "all … claims." Main Plaza failed to take any of these obvious and simple steps. As a consequence, CIM was

5

#16808820 v1

justified in relying upon the plain language of the purchase Agreement that it was acquiring "all … claims."

15. It should be a simple matter to conclude that Main Plaza's Bankruptcy *Claim* is a "claim." Nevertheless, Main Plaza contends that its Bankruptcy Claim is not a claim but rather constitutes accrued income or revenue because the right to the money "had accrued" at the time of the sale. (Opp. ¶ 30.) Main Plaza, however, ignores the plain meaning of the word "claim." According to the Merriam-Webster dictionary, a "claim" is "a demand for something due or believed to be due <an insurance *claim*>" or, alternatively, "a right to something; *specifically*: a title to a debt, privilege, or other thing in the possession of another." *See* http://www.merriam-webster.com/dictionary/claim. Therefore, the essence of claim is a right that is already "due," such as a debt like the one represented by the Bankruptcy Claim. The Bankruptcy Code definition of "claim" is even broader, encompassing a right to payment, "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5). Here, of course, the "claim" was liquidated, fixed, matured, and undisputed at the time of the parties' entry into the Purchase Agreement.

16. Indeed, the Bankruptcy Claim holds no relationship to "income" as that term is commonly understood. According to the Merriam-Webster dictionary, "income" is "a gain or recurrent benefit usually measured in money *that derives from capital or labor*." (http://www.merriam-webster.com/dictionary/income.) Here, the Bankruptcy Claim did not derive from Main Plaza's capital or labor. It is not rent. It is not wages. It is a *claim* that arose

entirely from damages sustained as a result of the Debtor's supply of hazardous material for the construction of the Building.

17. Main Plaza attempts to evade the plain meaning of the word "claim" and its obvious application to the Bankruptcy Claim by arguing that the "Bankruptcy Claim plainly derives from Main Plaza's investment in the maintenance and improvement of the Building, an investment that occurred years before the Purchase Agreement was executed." (Opp. ¶ 31.) Main Plaza, however, is making CIM's point. Main Plaza effectively concedes that the Bankruptcy Claim arose directly out of its ownership of the Building, the "investment" that Main Plaza sold to CIM. As the purchaser of the Building (a purchase which explicitly included **all** intangible assets, including all "claims"), CIM is entitled to all the benefits of ownership that before the sale belonged to Main Plaza, including all the benefits derived from "maintenance and improvement of the Building."[2]

18. Main Plaza next argues that the Purchase Agreement did not effectively convey the rights to the intangible property (including all claims) because such a conveyance can only be accomplished by an "assignment." (Opp. ¶¶ 33-36.) This argument is contradicted by the Agreement itself which transferred "all intangible property ... which is **assignable** by Seller." (Purchase Agreement § 11.59.) To be valid, no particular form of assignment is required. *Cockerell v. Title Ins. & Trust Co.*, 42 Cal. 2d 284, 291 (Cal. 1954). In any event, the plain language of Purchase Agreement Section 4.5(e) specifically *assigns* "to CIM any rights of Seller to pursue any such claims or warranties" against "suppliers" such as the Debtors.

---

[2] In fact, Main Plaza would derive a windfall if it held this claim – once from the increased price paid by CIM as a result of the asbestos abatement and once in reimbursement for having performed the abatement.

7

#16808820 v1

19. Main Plaza argues that it would not have assigned the Bankruptcy Claim to CIM because the claim was never listed in their financial records "given its contingent nature." (*See* Booth Declaration, ¶ 5.) The fact is, however, that the Settlement Agreement under which the Bankruptcy Claim was settled was approved by the Court two months **before** the closing of the sale of the Building to CIM. Thus, at the time of closing the Bankruptcy Claim was not contingent; rather, it was fixed and liquidated during the due diligence period when such matters should have been disclosed in the seller's financial records. Main Plaza effectively is arguing that by hiding the claim from its financial disclosures, it is justified in retaining a claim notwithstanding that its Purchase Agreement recites that "all … claims" have been transferred. Such deception should not be rewarded.

20. Main Plaza further argues that the assignment of the Bankruptcy Claim from Main Plaza to CIM is not valid because the Debtors' prior written consent to the transfer has not been obtained. (Opp. ¶¶ 18-19.) The Debtors appear to echo this sentiment in the Debtors' Limited Joinder to Main Plaza LLC's Objection. (See Joinder, ¶ 5.) This argument is a non-starter. In the first instance, Main Plaza did not disclose this claim to CIM. (Booth Declaration, ¶ 5.) Accordingly, Main Plaza deprived CIM of any opportunity to obtain the Debtors' "*prior* written consent."

21. More to the point, the Debtors' written consent to any assignment "shall not be unreasonably withheld." (Settlement Agreement, Ex. B, ¶ 30.) There is no reason for the Debtors to withhold their consent. This transfer will have no impact on the estate. The Debtors' obligation to pay the Bankruptcy Claim under the Settlement Agreement is satisfied by payment of the settlement sum to the counsel to the Claimant regardless of who holds the

Bankruptcy Claim. No one is arguing that the Debtors should have to pay anyone other than the counsel to the Claimant – exactly as provided in the Settlement Agreement. (Settlement Agreement, ¶ 3) Payment by the Debtors consistent with the Settlement Agreement will satisfy the Debtors' obligation under the Settlement Agreement. Thereafter, the issue may be to whom Claimant's counsel must make payment. If Claimant's counsel has concerns about which party that may be, Claimant's counsel can file an interpleader action, after deducting counsel's fee, in order to let a court that has jurisdiction over the dispute between CIM and Main Plaza determine who holds the right to payment of the proceeds of the claim. Pursuant to the Purchase Agreement, that dispute between CIM and Main Plaza, is to be settled under the laws of the State of California. (Purchase Agreement § 10.3.) Two California entities (Main Plaza and CIM) can settle that appropriately between them in a California venue without further burdening this Court. Thus, it would not be reasonable for the Debtors to withhold their consent.

22. Additionally, California courts have long held that a contract provision prohibiting the assignment of the rights thereunder is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor. *See, e.g., Johnston v. Landucci*, 21 Cal. 2d 63, 67 (1942); *Rosenthal v. Landau*, 90 Cal. App. 2d 310, 316-17 (1949) (prohibition in statute against assignment was for the benefit of the Veterans Administration and in no way affected the rights of the assignee and assignor between themselves); *E-P Constructors, Inc. v. Peterson Tractor Co.*, 192 Cal. App. 2d 518, 523-24. (1961) (prohibition on assignment in sales contract was for benefit of vendor and in no way affected the validity of an

assignment without consent as between the assignor and assignee). The Restatement of Contracts Second is in accord:

> A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested . . . is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his duty as if there were no such prohibition.

Restatement of Contracts 2d § 322(2). Here, the provision in the Settlement Agreement requiring the Debtors' written consent prior to assignment of rights was intended to protect the Debtors from being forced to pay the claim twice, an issue not present here. It does not impact the validity of a fully enforceable assignment as between Main Plaza and CIM.

23.  Finally, Main Plaza argues that parol evidence would support its assertion that the Bankruptcy Claim is not a claim. (Opp., ¶¶ 36-37.) Parol evidence is not necessary to establish that CIM intended to purchase the Bankruptcy Claim. The unambiguous language of the Purchase Agreement makes clear that CIM intended to purchase "all . . . claims." In the event that the Court determines that there is ambiguity in the Purchase Agreement and that parol evidence is needed to demonstrate the parties' intent, CIM would seek to admit evidence at trial to establish that CIM intended to purchase all claims – whether disclosed or undisclosed – that relate to the ownership, use and/or operation of the Land, the Improvements and/or the Personal Property, and closed on the acquisition believing that it had done so. (See Declaration of John Bruno, ¶ 4.)

For these reasons, Main Plaza's objections to CIM's Notice of Transfer should be overruled.

Dated: October 1, 2012

Respectfully Submitted,

**Pepper Hamilton LLP**

By: /s/ John H. Schanne, II
David B. Stratton (DE No. 960)
John H. Schanne, II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19801-1709
Tel: (302) 777-6500

and

**Landau Gottfried & Berger LLP**

Peter J. Gurfein, Esq. (*pro hac vice* pending)
1801 Century Park East, Ste 700
Los Angeles, CA 90067
Tel: (310) 691-7374

Attorneys for CIM Urban REIT 211 Main St. (SF), LP, as Assignee of CIM REIT Acquisition, LLC

11