```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

IN RE:                          .    Case No.  01-1139(JKF)
                                .
W.R. GRACE & CO.,               .
et al.,                         .    824 Market Street
                                .    Wilmington, DE 19801
            Debtors.            .
                                .    October 15, 2012
. . . . . . . . . . . . . . .        9:02 a.m.


                         TRANSCRIPT OF HEARING
                BEFORE HONORABLE JUDITH K. FITZGERALD
                 UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:           Pachulski, Stang, Ziehl & Jones, LLP
                           By:  KATHLEEN P. MAKOWSKI, ESQ.
                           919 North Market Street, 17th Floor
                           Wilmington, DE 19801

                           Roger Higgins, LLC
                           By:  ROGER HIGGINS, ESQ.
                           111 East Wacker Drive, Suite 2800
                           Chicago, IL 60601-4277

For Main Plaza, LLC:       Bifferato Gentilotti LLC
                           By:  GARVAN McDANIEL, ESQ.
                           800 North King Street
                           Wilmington, DE  19801

                           Cooley, LLP
                           By:  ROBERT EISENBACH, ESQ.
                           101 California Street, 5th Floor
                           San Francisco, CA 94111-5800

Audio Operator:            Al Lugano

Proceedings recorded by electronic sound recording, transcript
         produced by transcription service.
```
___

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

(609)586-2311     Fax No. (609) 587-3599

APPEARANCES (Cont'd):

| | |
|---|---|
| For CIM: | Landau Gottfried & Berger, LLP<br>By:  PETER J. GURFEIN, ESQ.<br>1801 Century Park East, Suite 600<br>San Francisco, CA 94104 |
| | Pepper Hamilton, LLP<br>By:  DAVID B. STRATTON, ESQ.<br>Hercules Plaza, Suite 5100<br>1313 Market Street<br>Wilmington, DE 19899-1709 |
| For the Canadian ZAI: | The Hogan Firm<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the Property<br>Damage Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By:  DAVID KLAUDER, ESQ.<br>844 King Street, Suite 2207<br>Wilmington, DE 19801 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Official Committee<br>of Equity Holders: | Kramer Levin Naftalis & Frankel<br>By:  DAVID E. BLABEY, JR., ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  LINDA J. CASEY, ESQ.<br>3000 Two Logan Square<br>Philadelphia, PA  19103 |

```
TELEPHONIC APPEARANCES (Cont'd):

For Maryland Casualty      Eckert, Seamans, Cherin & Mellott, LLC
Co.:                       By:  GABRIELLA CELLAROSI, ESQ.
                           4 East 8th Street
                           Suite 200
                           Wilmington, DE 19801

For Official Committee     Dies & Hile, LLP
of Asbestos Property       By:  MARTIN DIES, ESQ.
Damage Claimants:          1601 Rio Grande, Suite 330
                           Austin, TX 78701

                           Bilzin Sumberg Baena Price & Axelrod,
                           LLP
                           By:  JAY SAKALO, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL 33131

                           Speights & Runyan
                           By:  DANIEL SPEIGHTS, ESQ.
                           200 Jackson Avenue, East
                           Hampton, SC  29924

For the Debtors:           Kirkland & Ellis, LLP
                           By:  JOHN DONLEY, ESQ.
                                ADAM PAUL, ESQ.
                           300 North LaSalle
                           Chicago, IL 60654

For David Austern,         Orrick, Herrington & Sutcliffe, LLP
the Future Claimants       By:  ROGER FRANKEL, ESQ.
Representative:                 DEBRA FELDER. ESQ.
                                RICHARD H. WYRON, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C. 20007

                           Phillips, Goldman & Spence, P.A.
                           By:  JOHN C. PHILLIPS, ESQ.
                           1200 North Broom Street
                           Wilmington, DE 19806
```

TELEPHONIC APPEARANCES (Cont'd):

```
For the Committee        Caplin & Drysdale
of Asbestos Personal     By:  PETER LOCKWOOD, ESQ.
Injury Claimants:        One Thomas Circle, NW
                         Washington, D.C. 20005

                         Anderson Kill & Olick, P.C.
                         By:  ROBERT M. HORKOVICH, ESQ.
                         1251 Avenue of the Americas
                         New York, NY 10021-1186

For Various Claimant     Stutzman, Brombert, Esserman & Plifka
Firms:                   By:  DAVID J. PARSONS, ESQ.
                         2323 Bryan Street, Suite 2200
                         Dallas, TX 75201

For Property Damage      Law Office of Alan B. Rich
FCR:                     By:  ALAN B. RICH, ESQ.
                         1201 Elm Street, Suite 1910
                         Dallas, TX  75202

For Arrowwood Indemnity  O'Melveny & Myers, LLP
Co.:                     By:  TANCRED V. SCHIAVONI, ESQ.
                         Times Square Tower
                         7 Times Square
                         New York, NY 10036

For Alexander            By:  ALEXANDER SANDERS, JR.
Sanders, Jr.:
```

- - -

**WWW.JJCOURT.COM**

1      COURTROOM DEPUTY: All rise.
2      THE COURT: Good morning. Please be seated. First
3 matter is W.R. Grace, Bankruptcy Number 01-1139. I have
4 parties participating by phone, David Blabey, Linda Casey,
5 Gabriella Cellarosi, Martin Dies, John Donley, Robert
6 Eisenbach, Debra Felder, Roger Frankel, Robert Horkovich, Peter
7 Lockwood, David Parsons, Adam Paul, John Phillips, Alan Rich,
8 Jay Sakalo, Alexander Sanders, Tancred Schiavoni, Daniel
9 Speights, Richard Wyron, Roy -- oh, that's all. Sorry. Hello?
10     (No audible response)
11     THE COURT: There -- it's -- I, yes, I hear somebody
12 talking.
13     (Court/Operator conversation)
14     THE COURT: I'll take entries in court. Good
15 morning.
16     MS. MAKOWSKI: Good morning, Your Honor. For the
17 debtors, Kathleen Makowski from Pachulski, Stang, Ziehl &
18 Jones.
19     THE COURT: Good morning.
20     MR. McDANIEL: Good morning, Your Honor. Garvan
21 McDaniel, Bifferato Gentilotti, for Main Plaza. With me today
22 is Robert Eisenbach of the Cooley firm.
23     THE COURT: Thank you.
24     MR. STRATTON: Good morning, Your Honor.
25     THE COURT: Good morning.

1          MR. STRATTON:  David Stratton, Pepper Hamilton.  With
2  me this morning is Peter Gurfein of Landau, Gottfried & Berger
3  for CIM Realty.
4          THE COURT:  Thank you.  Good morning.
5          MR. HIGGINS:  Good morning, Your Honor.  Roger
6  Higgins for W.R. Grace.
7          THE COURT:  Anyone else entering appearances?
8                  (No audible response)
9          THE COURT:  All right.  Ms. Makowski?
10         MS. MAKOWSKI:  Thank Your Honor.  The agenda today,
11 the first matter is the -- it's a continued matter.  It's the
12 amended 25th omnibus objection to claims.  The one contested
13 matter we have, Your Honor, is the transfer of claim, other
14 than for security, filed by CIM Urban with an objection filed
15 by Main Plaza and a limited joinder filed by the debtors.  The
16 parties are in the courtroom and I'll cede the podium.
17         THE COURT:  All right.
18         MR. EISENBACH:  Good morning, Your Honor.  Robert
19 Eisenbach from the Cooley firm on behalf of Main Plaza.  As the
20 -- in this case -- I'll call them CIM -- CIM has failed to
21 established that Main Plaza's asbestos property damage claim,
22 which was filed in 2003, has been transferred and Main Plaza's
23 objection to that purported transfer should be sustained.  And
24 the debtor has failed to or has not provided its consent, which
25 was required by a prior order of this Court, that approved the

1 settlement back in 2009. CIM did not obtain or even ask for
2 that consent and --
3     THE COURT: Was it aware of it?
4     MR. EISENBACH: Excuse --
5     THE COURT: Was it aware of the need to get that
6 consent?
7     MR. EISENBACH: It was, Your Honor. It first filed a
8 -- an attempt to transfer the claim and then was advised of a
9 requirement in the Court's order that claimants' counsel be
10 listed, so it was referred to the order that otherwise required
11 that consent. But I think, you know, so that alone is, I
12 think, a basis for sustaining the objection to the claim. But
13 I want to move on though to the actual context for this because
14 it's, I think, critical in understanding the -- what's really
15 going on here.
16     In the early 1970s this property was built. It's at
17 211 Main Street in San Francisco. In the mid-1990s or more
18 than a dozen years before the property was even sold to CIM
19 Main Plaza, at great expense, removed the asbestos containing
20 material, that was W.R. Grace material, from the building at
21 211 Main Street.
22     In 2003, six years before the property was sold, Main
23 Plaza filed its asbestos property damage claim, which I'll call
24 the bankruptcy claim, in this case to recover the damages it
25 incurred as a result of the asbestos containing material and

1  the remediation work that was done in the 1990s.  In 2009 in
2  April, Main Plaza and the debtors entered into the settlement
3  agreement that I was alluding to earlier that was approved by
4  court order in October of 2009 settling the bankruptcy claim at
5  approximately $6.1 million.
6  　　　　　In November of 2009, Main Plaza and CIM entered into
7  a purchase and sale agreement for CIM to buy the office
8  building in San Francisco and the purchase agreement, as one
9  would expect, spans more than 30 pages, has lengthy exhibits
10 and covers all the typical provisions in an agreement to
11 purchase an office building in California.  It does not
12 anywhere in there say that the bankruptcy claim is part of the
13 transfer.
14 　　　　　In June, and then again in July, I would --
15 　　　　　THE COURT:  Doesn't it say that all the claims were
16 part of the transfer?
17 　　　　　MR. EISENBACH:  No, Your Honor, it doesn't.  As I'll
18 point out later, that is a mischaracterization of the contract.
19 There are several that have been made in CIM's reply papers.
20 　　　　　In the summer of this year, without prior notice to
21 Main Plaza, at all, CIM filed its notice of transfer of claim.
22 So as I mentioned, the bankruptcy claim, the -- there's no
23 reference and it's not disputed.  There's no reference to the
24 bankruptcy claim in the purchase agreement at all.  There's no
25 dispute that it wasn't ever identified by the parties as

1  something to include in the purchase -- excuse me, in the 2009
2  purchase agreement, so it tried to overcome the lack of any
3  mention of the bankruptcy claim in the purchase agreement.
4  CIM contends that there are two sections of the purchase
5  agreement, that one is Section 4.5(e), a release section, and
6  11.59(e), the definition of intangible personalty that somehow
7  nevertheless assigned the bankruptcy claim.  Their argument, as
8  I mentioned a minute ago, purports to quote language that is
9  not in the agreement, and mischaracterizes other parts of the
10 agreement and neither of those sections support their claim.
11         The reality is that the claim stopped applying to
12 this real property the day Main Plaza fixed it and that day --
13         THE COURT:  I'm sorry, say that again.
14         MR. EISENBACH:  This claim and -- stopped having
15 application to the real property that CIM purchased the claim,
16 the day that Main Plaza incurred the damages to fix it, which
17 was in the 1990s.
18         The first section I'd like to talk about is this
19 intangible personalty definition in 11.59.  And it basically
20 says a limited set of intangible personalty was to be sold
21 along with the building.  And the definition is in that
22 section.  I'll quote from a part of it.  But it says all
23 intangible property and the it has a parenthetical, such as
24 warranties, guarantees, indemnities, claims -- there is a
25 mention of claims, but I'll explain that in a moment --

 1  licenses, et cetera, government approvals, certificates of
 2  occupancy that are assignable by the seller and which relate
 3  exclusively to the ownership, use and/or operation of the land,
 4  the improvements and/or the personal property.  So that's the
 5  definition.
 6          The plain -- as this plain language indicates, the
 7  purpose of this provision in a purchase agreement like this is
 8  to provide the buyer of the building those intangible property
 9  rights that it has to have in order to enjoy full ownership,
10  use and operation of the building.  So that would be licenses,
11  you know, government licenses or approvals, certificates of
12  occupancy, that type of thing.
13          It is not designed to transfer assets that do not
14  relate exclusively to the property.  And among those kinds of
15  assets that wouldn't be transferred and weren't transferred
16  would be overpayments to a contractor that accrued pre-closing,
17  but hadn't been resolved, insurance reimbursements for other
18  pre-closing issues and the like.
19          So they base their argument, CIM does, attempting to
20  overcome this and the common sense limitations on the limited
21  set of intangibles that would go along with a office building
22  purchase by putting in quotes language that's not in the
23  agreement.
24          THE COURT:  How much of this claim is yet to be
25  recovered from the debtor?

1  MR. EISENBACH: None of it is. There's been no
2 payment from the debtor. It's been allowed and settled as to
3 its amount only.
4  THE COURT: And what was the purchase price of the
5 building?
6  MR. EISENBACH: I believe it was over a $100 million.
7 I think about 118 million, but I'm not exactly sure of the --
8  THE COURT: And it closed in 2009?
9  MR. EISENBACH: It did, Your Honor.
10  THE COURT: And the settlement agreement was when?
11  MR. EISENBACH: The settlement agreement was earlier
12 in 2009. It was in April and it was approved by court order in
13 October.
14  THE COURT: And when was the sale?
15  MR. EISENBACH: The sale was in November and I
16 believe it closed in December of 2009.
17  THE COURT: All right.
18  MR. EISENBACH: So the definition that I was just
19 referring to in 11.59 does not extend to all dot, dot, dot
20 claims, end quote. That argument CIM makes in its papers in
21 five different paragraphs and that's not what the agreement
22 says.
23  THE COURT: All right. I get the point.
24  MR. EISENBACH: It was expressly restricted. They
25 also --

1           THE COURT:  I got the point.

2           MR. EISENBACH:  Okay.  Yes, Your Honor.  They also used the argument that the agreement used the phrase, and they put it in quotes, "relating to."  The agreement does not use the phrase "relating to."  They say that if Main Plaza wished to exclude the bankruptcy claim, and I'm quoting from their papers, it could easily have done so by either choosing a phrase more narrow and restrictive than "relating to" (such as arising out of) or excluding the claims all together or excluding the bankruptcy claim.  Main Plaza did exactly that.

11          It did not, as CIM argues, use the broadest term, "relating to."  That term is not in the agreement.  And CIM's repeating assertion is incorrect.

14          Instead, Main Plaza made sure that this section used a highly restrictive clause, not a broad clause.  It used which relates exclusively to the ownership, use and/or operation of the land improvements and/or personal property.  CIM had conceded in its argument that if a provision omits the phrase, "relating to," it creates the risk that a Court will conclude that the parties did not intend a broad clause.  And they're correct.  This purchase agreement didn't intend --

22          THE COURT:  Look, but --

23          MR. EISENBACH:  -- a broad clause and didn't provide it.

25          THE COURT:  This all comes down to whether or not

1  this is a bargained for exchange.  Would the building have sold
2  for 118 million if the remediation hadn't already been done?
3  The answer's probably no.  So I'm not at all sure how it is
4  that without Main Plaza's agreement and the debtors' consent,
5  this claim was transferred when the document does not provide
6  it.  So why don't I hear from the other side to see what the
7  position is?
8              MR. EISENBACH:  Thank you, Your Honor.
9              MR. GURFEIN:  Thank you, Your Honor.
10             THE COURT:  Good morning.
11             MR. GURFEIN:  Good morning. Peter Gurfein.  Your
12 Honor, first, the purchase price was $113 million.  The
13 building closed on December 29, 2009.
14             Let me start, Your Honor, if I may, with drawing your
15 attention to a couple of things.  First, if you look at the
16 specific language in 4.5(e), which CIM says is the basis for
17 the assignment of all claims, there's a parallel construction
18 between the use of the words claims and warranties in 11.59 and
19 in 4.5(e).  This was a bargained for agreement because this
20 building was purchased as-is.  And so warranty claims became a
21 very important point for CIM.
22             THE COURT:  But this isn't a warranty claim.  This is
23 the settlement agreement with the debtor because Main filed a
24 claim against the debtors' estate for the remediation that it
25 had performed and the debtors settled that claim for the 6.1

1  million.  Main obviously incurred the expense.  It was entitled
2  at this point to get the settlement agreement through the court
3  process, and it did.  So where is the bargained for exchange?
4         If, in fact, your client had expected to somehow or
5  other recover money in addition to the building, it would have
6  put that in.  This is a recovery of money and it's not included
7  in the agreement from what I can see.
8         MR. GURFEIN:  The purchase price, Your Honor, for
9  this building was increased by the fact of the remediation and
10 the claim that's being filed in this court is a damage claim
11 for damage resulting from the asbestos.
12        THE COURT:  Wait, the -- when was the remediation
13 concluded?
14        MR. GURFEIN:  The remediation was concluded in 2003.
15        THE COURT:  Okay.  So then that's -- then, yes, the
16 purchase price would not have been as high had the remediation
17 not been done.  Definitely, that's the case.  I think we can
18 all agree if you had to do the remediation.
19        But if you had to do the -- your client had to do the
20 remediation, it would have had the claim against the debtor.
21 It didn't do the remediation.  It purchased a remediated
22 building.  And there is nothing that I can see in the document
23 -- if there is -- that gives you a contract right to a claim
24 that it was settled in bankruptcy.  If it's there, show me.  I
25 don't see how it fits within the 11.59 section and I don't see

1  how it's a release in the 4.5 section.
2          MR. GURFEIN:  Well, the 4.5 section, Your Honor, if I
3  may, the most important part of that, I think, is the last
4  phrase which provides that this assignment of warranty claims
5  is non-exclusive.
6          THE COURT:  All right.
7          MR. GURFEIN:  All right.  But it's not to be used by
8  the debtor to -- rather, by Main Plaza to the derogation of
9  buyer's rights pursuant to the assignment contained in this
10 paragraph.
11         THE COURT:  All right.  But it's talking about
12 warranty claims.
13         MR. GURFEIN:  And, Your Honor, it's -- CIM understood
14 and intended that it was purchasing all such claims at the time
15 that it purchased this building.
16         THE COURT:  Well, apparently it made a mistake.  I
17 mean, I don't know how -- do I need an evidentiary hearing on
18 whether there's a unilateral mistake?  And, if so, who suffers
19 the consequences of that unilateral mistake?
20         MR. GURFEIN:  Your Honor, at the time that the due
21 diligence was being conducted, according to -- in fact, Mr.
22 Eisenbach just noted that this claim was fixed at the time of
23 the closing, but if you look at Mr. Booth's declaration in
24 Paragraph 5, he says the reason they did not raise this claim
25 was because it was too contingent to be included in the due

1 diligence.  It was clearly something that CIM had intended be
2 included in the due diligence, and it wasn't.
3         THE COURT:  Well, whose fault's that?  I mean, how is
4 -- everything that CIM did or didn't do doesn't inure to the
5 detriment of the seller of the property?  You know, you bear
6 your own risk in the due diligence.
7         MR. GURFEIN:  The only other thing I would ask Your
8 Honor is, in connection with the consent of the debtor of -- to
9 the sale, we note in our paper --
10         THE COURT:  Not to the sale.  To the transfer of the
11 claim.
12         MR. GURFEIN:  To the transfer of the claim --
13         THE COURT:  Okay.
14         MR. GURFEIN:  -- I'm sorry.  We noted in our argument
15 that the consent is not a condition precedent with respect to
16 the transfer in between Main Plaza and CIM.  In fact, there's
17 no detriment to the debtor here because the payment will be
18 made exactly as the settlement agreement requires and the
19 claimant would have to step into the shoes of that settlement
20 and be able to fulfill all of the arguments thereunder.
21         We note in the proof of claim, Your Honor, that the
22 proof of claim itself was not in the name of Main Plaza, LLC.
23 In fact, Main Plaza, LLC appears nowhere in the proof of claim.
24 The proof of claim was in the name of the 211 Main Street
25 building.  That's the building that CIM acquired and it should

1  have acquired those claims when it acquired the claims.

2  THE COURT:  Okay.  The -- I don't recall, I'm sorry,
3  and I didn't look at the settlement agreement again to see who
4  the parties to the actual settlement were.  But if Main Plaza
5  owned the Main Street building and it's an in rem claim that
6  it's seeking for remediation of the building it's not uncommon
7  to put the proof of claim in the name of the building that was
8  remediated.

9  So I just don't see where you're going with this.  I
10 really don't see how this particular document transferred the
11 claim.  It's -- and it's a significant enough issue, it's $6.1
12 million, that if it were an account or a contract right or
13 something it would have been specified, I think, between the
14 parties in some capacity, other than claim, because by the time
15 it's settled in terms of bankruptcy parlance it probably wasn't
16 that kind of a claim any more.  It now becomes a contract right
17 that entitled the parties to payment, but it's still, you know,
18 the use of the word claim I realize is somewhat flexible in
19 that context

20 MR. GURFEIN:  I understand, Your Honor.  CIM thought
21 it had purchased a claim.  Your Honor disagrees.

22 THE COURT:  I do disagree.

23 MR. GURFEIN:  But that was the intent of the parties.

24 THE COURT:  Well, apparently it wasn't.  I'm not
25 hearing it's the intent of the parties.  I'm hearing it's the

1  intent of CIM, but only now.  And this happened in 2009.  I
2  mean, if it were the intent of the parties in 2009, why is this
3  transfer of claim only happening now?
4           MR. GURFEIN:  Because CIM just found out about the
5  claim, Your Honor.
6           THE COURT:  Well, then how could it have intended to
7  purchase a claim it just found out about?
8           MR. GURFEIN:  Because it was intending to purchase
9  all such claims.
10          THE COURT:  Well, I don't see it and I don't see it
11 in the document.  I think that this transfer notice is improper
12 for the circumstances that I've just identified on the record
13 and I agree with the objecting parties, that the debtors'
14 consent was necessary.  It was a condition precedent to the
15 Court entering into the transaction by approving the
16 transaction pursuant to an order.  It was not obtained.  And
17 that alone, I think, defeats the issue, but because at the time
18 the debtors' plan confirmation process was still alive and it
19 needed to know who its creditors were.
20          So the fact that the debtor wanted to be able to
21 consent to the transfer is clearly relevant to this process.  I
22 have had other cases where the transfer of claims have caused
23 significant problems for debtors getting plans confirmed and
24 this is absolutely something that was proper for the debtor to
25 bargain for.  So if I look back at the time and what was going

1  on at the time, it was material to the debtor's estate to be
2  able to determine who its creditors would be and to ascertain
3  that a settlement that it had entered into with a party would
4  be carried out according to the intent of the parties to that
5  settlement.

6          So I see absolutely no basis, at this point, for CMI
7  (sic) to say that it intended to purchase a claim it didn't
8  know about at the time that its due diligence somehow or other
9  didn't know about it, let it know about it, when there's a
10 claim filed in a bankruptcy proceeding and a court order that
11 authorizes the claim.  I simply don't find any merit to those
12 assertions.  So I don't think I have an order.  Do you have an
13 order?

14         MR. McDANIEL:  Your Honor, Garvan McDaniel.  We do
15 not, but we'll submit it under certification of counsel and
16 we'll consult with the other side --

17         THE COURT:  All right.

18         MR. McDANIEL:  -- if that's acceptable to Your Honor.

19         THE COURT:  When can I expect it?

20         MR. McDANIEL:  Get it done this week, I'm assuming.

21         THE COURT:  Okay.  That's fine.  Just make sure you
22 show it --

23         MR. McDANIEL:  Absolutely.

24         THE COURT:  -- to the other side first and that they
25 agree with the content.  I'm not asking, obviously --

1    MR. McDANIEL: Sure.

2    THE COURT: -- that you agree with my ruling, but
3 with the phrasing in the order. Okay. Thank you.

4    MR. McDANIEL: Thank you, Your Honor. I believe
5 that's it for W.R. Grace.

6    THE COURT: All right. Thank you.

7    MR. McDANIEL: Thank Your Honor.

8                    * * * * *

9                  **C E R T I F I C A T I O N**

10   I, AMY L. RENTNER, court approved transcriber,
11 certify that the foregoing is a correct transcript from the
12 official electronic sound recording of the proceedings in the
13 above-entitled matter, and to the best of my ability.

14

15 /s/ Amy L. Rentner
16 AMY L. RENTNER
17 J&J COURT TRANSCRIBERS, INC.   DATE:   October 16, 2012