# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.,[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Hearing Date: December 17, 2012, at 9:00 a.m. |
| | ) Objection Deadline: November 30, 2012 |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING PLAN PROPONENTS' ENTRY INTO CASH-SETTLED COLLAR AGREEMENT

The above-captioned debtors (collectively, the "Debtors") hereby file this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as Exhibit A, approving the Plan Proponents'[2] entry into the Cash-Settled Collar Agreement (defined below). In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

[2] Capitalized terms not defined herein shall have the meaning given to them in the *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace and Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the*

**PRELIMINARY STATEMENT**

1. The Plan Proponents (*i.e.*, the Debtors, the Asbestos PI Committee, the Asbestos PI FCR, and the Equity Committee), jointly filed the Plan, which was confirmed by the Court on January 31, 2011. Following confirmation of the Plan, the Plan Proponents have considered how best to bring about the Effective Date of the Plan and to implement the various provisions of the Plan, including the Warrant Agreement and delivery of the Warrant (defined below) to the Trust.

2. The Plan provides that the Debtors issue a Warrant to the Asbestos PI Trust (the "Trust") on the Effective Date. This Motion requests that the Court approve the Plan Proponents' entry into an agreement to settle the Warrant in cash after the Effective Date and to set a maximum and minimum value for settlement.[3] For the Debtors, given their stated intention to repurchase the underlying shares of the Warrant, the Cash-Settled Collar Agreement will substantially increase certainty with respect to the Debtors' financing requirements at the Effective Date and thereafter, and prevent dilution of the Debtors' common stock. For the Trust, this agreement will eliminate the requirement that the Trust pay the Exercise Price (defined below) of $170 million in cash, avoid the substantial transaction costs likely payable to realize the value of the Warrant, and increase certainty with respect to the ultimate value of the Warrant available to the Trust to pay claims.

3. The relief sought by this Motion serves simply to streamline the implementation of the Warrant Agreement and the Plan by permitting an alternative method for monetizing the Warrant that the Debtors are required to deliver to the Trust pursuant to the Plan. By approving the Cash-Settled Collar Agreement the Court will allow the Plan Proponents to implement their

---

*Official Committee of Equity Security Holders Dated February 27, 2009* [Docket No. 20872] (as modified and amended from time to time, the "Plan").

[3] This agreement is memorialized in a warrant implementation agreement letter, attached hereto as Exhibit B (the "Cash-Settled Collar Agreement").

respective rights and duties under the Plan while offering significant benefits for both the beneficiaries of the Trust and the Debtors' estates. The Plan expressly provides the Debtors with the authority to implement the Plan and Plan Documents (including the Warrant Agreement).[4]

## JURISDICTION

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The statutory bases for the relief requested herein are sections 105, 363, and 1142 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

7. On April 2, 2001 (the "Petition Date"), in the wake of drastically increasing asbestos-related liabilities, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated for administrative purposes only and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

8. On February 27, 2009, the Plan Proponents filed the Plan.

9. On January 31, 2011, the Court issued its *Memorandum Opinion Regarding Objections to Confirmation of First Amended Joint Plan of Reorganization and Recommended*

---

[4] Plan, § 11.1 ("On the Confirmation Date, the Debtors shall be directed and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively the provisions of this Plan, the other Plan Documents . . . and to cooperate with the Plan Proponents as provided herein and with respect to matters related to the Plan generally."); *see also* Plan, §§ 10.4 and 10.4(k); *cf.* 11 U.S.C. § 1142(b) (bankruptcy court "may direct the debtor and any other necessary party to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan").

3

K&E 23831522

*Supplemental Findings of Fact and Conclusions of Law* [Docket No. 26154] and *Recommended Findings of Fact, Conclusions of Law and Order Regarding Confirmation of First Amended Joint Plan of Reorganization as Modified Through December 23, 2010* [Docket No. 26155]. On February 15, 2011, the Court issued its *Order Clarifying Memorandum Opinion and Order Confirming Joint Plan as Amended Through December 23, 2010* [Docket No. 26289] (collectively with Docket Nos. 26154 and 26155, the "Confirmation Order").

10.  The Confirmation Order was appealed to the District Court for the District of Delaware, Case No. 11-199 (lead case). On January 30, 2012, the District Court issued its *Memorandum Opinion* [Docket No. 165] and *Order* [Docket No. 166] denying or overruling all objections, affirming the Grace-CNA Settlement, and confirming the Plan in its entirety.

11.  On June 11, 2012, the District Court issued its *Consolidated Order Regarding Motions for Reconsideration* [Docket No. 215] granting the motions of several parties to clarify or amend its *Memorandum Opinion*. In conjunction with its consolidated order, the District Court issued its *Amended Memorandum Opinion* [Docket No. 217] and *Amended Order* [Docket No. 218] clarifying and expanding the discussion in its prior opinion and, once more, denying or overruling all objections and confirming the Plan in its entirety.

## THE WARRANT AGREEMENT

12.  The Debtors' Plan specifies that the Debtors will deliver to the Trust a warrant (the "Warrant") for ten million shares of the common stock of Debtor W. R. Grace & Co. (the "Company") on the Effective Date of the Plan.[5] The Warrant expires one year after the Effective

---

5  See Plan, §§ 1.1(228) and 7.1.4; Warrant Agreement, § 3.1.

4

Date (the "Expiration Date") and has an exercise price of $17.00 (as may be adjusted from time to time pursuant to Article V of the Warrant Agreement, the "Exercise Price").[6]

13.     The value of the Warrant has increased significantly since the Plan was confirmed. During the period between August 1, 2012, and October 26, 2012, the Company's stock price has ranged from $55.71 to $64.66.[7]

14.     In light of the affirmation of the Plan by the District Court and the recent resolution of a number of appeals of the Confirmation Order, the Plan Proponents have turned to consideration of the Effective Date and the implementation of the Plan. The Cash-Settled Collar Agreement makes the exercise of the Warrant, and the method by which the Trust realizes the economic value of the Warrant, more efficient, thereby providing substantial benefits to both the Debtors and the Trust.

15.     Given the Debtors' stated intention to repurchase the underlying shares of the Warrant, the relief requested herein would allow the Debtors to increase certainty with respect to the amount of their financing requirements at the Effective Date and thereafter. It also eliminates the requirement for the Trust to pay the Exercise Price and would allow the Trust to avoid the underwriting and other transaction costs associated with exercise of the Warrant.[8] All parties seek to substantially increase certainty with respect to the ultimate value of the Warrant. To achieve these collective objectives, the Debtors seek approval of the Plan Proponents' entry into the Cash-Settled Collar Agreement.

---

[6]  See *Declaration of John James O'Connell III in Support of Debtors' Motion for Entry of an Order Approving Plan Proponents' Entry Into Cash-Settled Collar Agreement* (the "O'Connell Declaration"), attached hereto as Exhibit C, ¶ 6.

[7]  See id. ¶ 7.

[8]  See id. ¶ 8.

16. As set forth below, entering into the Cash-Settled Collar Agreement is a sound exercise of the Debtors' business judgment.

## THE CASH-SETTLED COLLAR AGREEMENT[9]

17. The Cash-Settled Collar Agreement has two principal provisions.[10] One provision specifies that the Warrant will be settled in cash rather than physically settled (the "Cash-Settlement Provision"). The other provision sets a minimum and maximum price for the settlement, respectively the "floor price" and the "ceiling price" (the "Collar Provision"). Following extensive negotiations, the parties agreed on a floor price ("Floor Price") of $54.50 per share and a ceiling price ("Ceiling Price") of $66.00 per share.

### The Cash-Settlement Provision

18. The Warrant Agreement presently calls for physical settlement of the Warrant. Upon exercise of the Warrant, the Trust would pay $170 million in cash to the Company and the Company would issue ten million shares of common stock to the Trust.[11] Alternatively, cash settlement of the Warrant would allow the Company to simply make a cash payment to the Trust on the earlier of (a) the date on which the Trust delivers to the Company a written notice of its election to require payment for the Warrant pursuant to the terms of the Cash-Settled Collar Agreement (the "Election Notice") or (b) the Expiration Date of the Warrant. No shares of common stock physically change hands.

---

[9] This summary of the terms of the Cash-Settled Collar Agreement is for illustrative purposes only. To the extent that there is an inconsistency between the Cash-Settled Collar Agreement and this summary, the Cash-Settled Collar Agreement shall control in all respects.

[10] In the event there is a public announcement of a transaction that would result in a change in control of the Company prior to the Expiration Date (before the Trust delivers an Election Notice (as defined in the Cash-Settled Collar Agreement) to exercise the Warrant), the Trust will have the option of either (1) exercising its rights under the Cash-Settled Collar Agreement, or (2) exercising the Warrant pursuant to the Warrant Agreement or transferring the Warrant to the acquirer.

[11] See Warrant Agreement, §§ 4.3-5.

19. As set forth in the O'Connell Declaration, attached hereto as Exhibit C, the Cash-Settlement Provision provides substantial benefits to the Debtors and the Trust, and the Debtors have sufficient liquidity after the Effective Date to cash settle the Warrant:[12]

    a. ***Reduced cash outlay.*** The Cash-Settlement Provision will reduce the Trust's need to expend a large amount of cash upon exercise of the Warrant. Instead of paying $170 million to purchase the Company's shares and then selling those ten million shares into the open market to realize the value of the Warrant, the Trust will simply receive a cash payment from the Company equal to the intrinsic value of the Warrant.

    b. ***Reduced transaction and compliance costs.*** The Cash-Settlement Provision will eliminate the underwriting costs and other transaction costs associated with the Warrant Agreement. If the Trust were to exercise the Warrant and sell the underlying shares into the market, the Company would be required to register those shares by filing a registration statement with the SEC, and the resulting sale would require the Trust to incur underwriter fees and likely take a discount on the sale given the size of the transaction.

    c. ***Avoidance of dilution.*** The Cash-Settlement Provision eliminates the need to issue ten million more shares, avoiding dilution of the Company's earnings per share.[13]

### The Collar Provision

20. In addition to the benefits of the Cash-Settlement Provision described above, the Collar Provision reduces the risk exposure to significant changes in the price of the Company's

---

[12] See O'Connell Declaration, ¶ 10 (attesting to these benefits of the Cash-Settled Collar Agreement).

[13] See id.

stock by setting a maximum and minimum price (i.e., "placing a collar" on the Warrant).  The mechanics for settling the Warrant, pursuant to the Cash-Settled Collar Agreement, are as follows:[14]

    a.    ***Reference price and quantity.***  The Cash-Settled Collar Agreement provides that the Warrant will be cash settled based on a reference price (the "Reference Price") equal to the published average daily closing price of the Company's common stock on the New York Stock Exchange for a period beginning one trading day after the Effective Date and concluding either one trading day before the date on which the Election Notice is delivered or the Expiration Date.  The cash payment that the Company will make to the Trust will be calculated using the Reference Price.

    b.    ***Settlement price within the collar.***  When the Reference Price is between the Floor Price and the Ceiling Price, the payment to settle the Warrant will be calculated by subtracting the $17.00 Exercise Price from the Reference Price.

    c.    ***Settlement price outside the collar.***  If the Reference Price is below the Floor Price, the payment will be calculated by subtracting the $17.00 Exercise Price from the Floor Price instead of the Reference Price, a calculation that will always yield a payment of $37.50 per share.  If the Reference Price is above the Ceiling Price, the payment will be calculated by subtracting the $17.00 Exercise Price from the Ceiling Price instead of the Reference Price, a calculation that will always yield a settlement price of $49.00 per share.  Thus, the Collar Provision ensures that the total settlement value of the Warrant will be not less than $375 million or more than $490 million.

---

[14]    See id. ¶ 9 (describing the mechanics of the Cash-Settled Collar Agreement).

21. Together, the Cash-Settlement Provision and the Collar Provision significantly improve the Debtors' ability to forecast their liquidity needs and allow the Debtors to plan more effectively for their exit financing.[15] The Cash-Settled Collar Agreement substantially reduces the market risks associated with the Warrant Agreement, consistent with the Debtors' practice of using financial instruments (like collars) to reduce market risk where possible.[16] With the Cash-Settled Collar Agreement, the Debtors set the cost to settle the Warrant within a range around the current market price of the Company's stock, which amount is well within the Debtors' financing capacity.

## RELIEF REQUESTED

22. By this Motion, the Debtors respectfully request entry of an order pursuant to sections 105 and 363 of the Bankruptcy Code, substantially in the form attached hereto as Exhibit A, approving the Plan Proponents' entry into the Cash-Settled Collar Agreement.

23. The Asbestos PI Committee, the Asbestos PI FCR, and the Equity Committee have all consented to the relief requested herein, as evidenced by their execution of the Cash-Settled Collar Agreement.

## BASIS FOR RELIEF

**A. Section 363 of the Bankruptcy Code Authorizes the Debtors to Enter the Cash-Settled Collar Agreement Because Doing So Is Within the Debtors' Sound Business Judgment.**

24. It is at least arguable that the Plan Proponents do not need court approval to enter into the Cash-Settled Collar Agreement because entry into the agreement does not entail the use of property of the estate or the incurrence by the estate of debt and, by its terms, the agreement

---

[15] See id. ¶ 10.

[16] See id. ¶ 11. The Debtors may seek to further reduce market risk, as they do in other circumstances, with respect to the Cash-Settled Collar Agreement using over-the-counter financial instruments commonly used to reduce equity market risks.

pertains only to events that are to take place after the Effective Date of the Plan. The Bankruptcy Code does not require court authorization for the use of property after the Effective Date of the Plan, at which point the property of the estate vests in the debtor. See 11 U.S.C. § 1141(c) (property of the estate vests in a debtor at confirmation); Plan § 7.8 (delaying effectiveness of the Plan until the Effective Date); Plan § 11.10 (on the Effective Date, the estate's property and interests in property vest in the Debtors). Nevertheless, out of an abundance of caution, the Debtors hereby request that the Court approve the Plan Proponents' entry into the Cash-Settled Collar Agreement.

25.     Section 363(b) of the Bankruptcy Code authorizes a debtor to use, sell, or lease property of the estate outside the ordinary course of business after notice and hearing. See 11 U.S.C. § 363(b)(1). Courts have typically approved a debtor's non-ordinary course transaction under section 363(b) where, as here, a sound business purpose exists, the debtor has provided adequate notice of the proposed transaction, the transaction is the result of good faith negotiations, and the proposed consideration is fair and reasonable. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149-50 (3d Cir. 1986); Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d. Cir. 1983); Computer Sales Int'l v. Fed. Mogul (In re Fed. Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 881-82 (Bankr. S.D.N.Y. 1990); In re New Era Resorts, LLC, 238 B.R. 381, 387 (Bankr. E.D. Tenn. 1999).

26.     Moreover, bankruptcy courts routinely defer to a debtor's business judgment as long as the decision is not arbitrary and capricious. See In re Lionel Corp., 722 F.2d at 1070-71 (sale of assets pursuant section 363(b) simply requires some articulated business justification); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim

10

loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [and were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); cf. Group of Institutional Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); In re Simasko Prods. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

27.  In addition, to the extent that the Bankruptcy Code does not expressly authorize a particular transaction that is necessary to preserve the assets of the estate, the court has authority to do so pursuant to its power to fashion those orders necessary to enforce the Bankruptcy Code. Section 105 of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Although there are limits to the section 105 power, it is uncontroversial that this section allows the court to issue orders that carry out the express purpose of a provision of the Bankruptcy Code. See In re United Health Care Org., 210 B.R. 228, 232 (S.D.N.Y. 1997) ("As this language indicates, section 105 is intended to assure that bankruptcy courts may take whatever actions are necessary to further the purposes of the substantive provisions of the Bankruptcy Code.").

28. As discussed above, the Cash-Settled Collar Agreement provides substantial benefits to the Debtors. By eliminating the need to physically settle the Warrant, the Cash-Settled Collar Agreement avoids an approximately 12 percent dilution of the Company's common stock, thereby enhancing the Company's earnings per share.[17] In addition, the Collar Provision fixes the amount required to settle the Warrant within a predetermined range, thereby allowing the Debtors to negotiate for a more tailored exit financing facility and to take on an appropriate level of leverage. The Trust also receives significant benefits by entering into the Cash-Settled Collar Agreement because it allows the Trust to avoid both the $170 million Exercise Price as well as substantial transaction costs associated with physically settling the Warrant. As such, entry into the Cash-Settled Collar Agreement is well within the discretion afforded the Debtors by the business judgment standard. Thus, the Court should approve the Plan Proponents' entry into this transaction pursuant to section 105 and 363(b) of the Bankruptcy Code.

29. The Order provides that the Trust be bound by the Cash-Settled Collar Agreement. This is appropriate because implementation of the Warrant, as described in the Cash-Settled Collar Agreement, is to take place after the Effective Date and both the Asbestos PI Committee and the Asbestos PI FCR, who collectively represent the interests of all of those who will be beneficiaries of the Trust, have consented to the relief requested in this Motion and have executed the Cash-Settled Collar Agreement.[18]

---

[17] See O'Connell Declaration, ¶ 10.

[18] See Cash-Settled Collar Agreement, ¶ 6 (attached hereto as Exhibit B) ("Upon the Effective Date, the Trust and the Warrant Agent shall, automatically and without the need for further action, become parties to this Implementation Letter and shall be bound hereto, and thereupon each shall be entitled to enforce this Implementation Letter and have this Implementation Letter enforced against it.").

**CONCLUSION**

30. Because devising a method to reduce exposure to changes in the Company's share price is well within the Debtors' sound business judgment, section 363 authorizes the Debtors to enter into the transaction. This is especially true given the recent affirmation of the Confirmation Order by the District Court and the progress the Debtors have made to move closer to the Effective Date under the Plan and the Debtors' ultimate emergence from bankruptcy. Likewise, the Debtors have authority to enter the Cash-Settled Collar Agreement because it merely implements the Plan and concerns only transactions that will occur after the Effective Date. Further, the Cash-Settled Collar Agreement is a mutually beneficial transaction and the only parties possibly affected by it have agreed to its terms. In requesting this relief, the Debtors have received the approval of all directly affected parties—the Asbestos PI Committee, the Asbestos PI FCR, and the Equity Committee.

**WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

31. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**NOTICE**

32. Notice of this Motion has been given to: (i) the Office of the United States Trustee; (ii) counsel to each of the official committees appointed in these Chapter 11 Cases; (iii) counsel to the Asbestos Personal Injury and Asbestos Property Damage FCR; and (iv) those parties that requested service and notice of papers in accordance with Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## **NO PRIOR REQUEST**

33. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

K&E 23831522

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, and granting such other and further relief as is just and proper.

Dated:  October 30, 2012

KIRKLAND & ELLIS LLP
Adam C. Paul
John Donley, P.C.
Jeffrey W. Gettleman
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

And

THE LAW OFFICE OF ROGER HIGGINS, LLC
Roger J. Higgins
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
Telephone:  (312) 836-4047

And

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400

Co-Counsel for the Debtors and Debtors-in-Possession