# EXHIBIT C

**O'Connell Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date:** December 17, 2012, at 9:00 a.m. |
| | ) | **Objection Deadline:** November 30, 2012 |

**DECLARATION OF JOHN JAMES O'CONNELL III IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER APPROVING PLAN PROPONENTS' ENTRY
INTO CASH-SETTLED COLLAR AGREEMENT**

Pursuant to 28 U.S.C. § 1746, I, John James O'Connell III, hereby declare as follows under penalty of perjury:

1. I am a Managing Director in the Restructuring & Reorganization Group of The Blackstone Group LP ("<u>Blackstone</u>"), a financial advisory and investment firm whose principal address is 345 Park Avenue, New York, New York 10154. Founded in 1991, the Restructuring

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

& Reorganization Group specializes in providing financial advisory services to clients in out-of-court restructurings and bankruptcies. Its professionals have advised on over 300 restructurings, many of which have been prominent and complex bankruptcy cases.

2. Blackstone has served as the court-approved financial advisor to W. R. Grace & Co. (the "Company") in the Company's bankruptcy proceedings since June 2001. I have advised the Company since July 2004 and am familiar with the Company's business operations, financial condition, the terms of the Plan,[2] and the nature and progress of the Company's Chapter 11 Cases. More specifically, in my role as financial advisor, I have, among other activities, attended numerous operating plan meetings with the Company's management, advised on acquisitions and divestitures, overseen the development and ongoing management of a comprehensive financial forecast, evaluated various settlement structures, assisted in the development of several proposed plans of reorganization including the Plan, prepared financial analyses incorporated in the Plan and related thereto, valued the Company as an enterprise and the warrants to be issued under the Plan, provided advice to senior management on exit financing structures, participated in the process of selecting lead banks for the exit financing, and supported counsel in resolving objections to the Plan.

3. I hold a Bachelor of Business Administration degree (magna cum laude) in Accountancy from the University of Notre Dame and a Master of Business Administration degree (with honors) in Finance and Strategic Management from the Wharton School of the University of Pennsylvania.

4. I have approximately thirteen years of corporate restructuring experience and have been involved in numerous out-of-court restructurings and chapter 11 reorganizations.

---

[2] Capitalized terms not defined herein shall have the meaning given them in the Motion.

2

Representative matters include American General Finance, Inc.; American International Group, Inc. (AIG); The Babcock & Wilcox Company; Flextronics International Ltd. (re: Nortel Networks Corp.); Harris County-Houston Sports Authority; International Lease Finance Corporation (ILFC); Jefferson County (Birmingham, Ala.); Mrs. Fields Original Cookies, Inc.; New World Pasta Co.; Sea Research Foundation, Inc.; Simmons Bedding Company; Solutia, Inc.; Specialty Products Holding Corp.; the State of Kansas; and Winn-Dixie Stores, Inc. I have spoken on restructuring topics at various seminars and conferences.

5.  This declaration is in support of the *Debtors' Motion for Entry of an Order Approving Plan Proponents' Entry Into Cash-Settled Collar Agreement* (the "Motion").

6.  Pursuant to the Plan, the Debtors are to enter into an agreement with the Trust (the "Warrant Agreement"), which dictates that, no later than five days after the effective date of the Plan (the "Effective Date"), the Company must deliver to the Trust a warrant (the "Warrant") for ten million shares of the Company's common stock with an exercise price (the "Exercise Price") of $17.00 per share. The Warrant is a call option on the Company's shares; it gives the Trust the right, but not the obligation, to purchase ten million of the Company's shares for $17.00 per share. The Warrant expires one year after the Effective Date of the Plan (the "Expiration Date").

7.  The value of the Warrant has increased significantly since the Plan was confirmed. During the period between August 1, 2012, and October 26, 2012, the Company's stock price has ranged from $55.71 to $64.66.

8.  The increase in the value of the Warrant has led the Debtors to reassess their priorities with respect to the Warrant. The Debtors now seek (a) to avoid the dilution of the Company's shares associated with issuance of ten million shares, thereby enhancing its earnings per share, and (b) given the Debtors' stated intention to repurchase the underlying shares of the

3

K&E 23223854.13

Warrant, to increase certainty with respect to the amount of their financing requirements at the Effective Date and thereafter.  The Trust would also benefit by (x) eliminating the requirement to pay the $170 million Exercise Price in cash, and (y) minimizing transaction costs by avoiding both the downward pressure on the stock price as a result of a large block sale, as well as the fees and costs associated with executing and monetizing a physical settlement of the Warrant.  To give effect to these objectives, the Debtors seek approval of a mutually beneficial arrangement providing for cash settlement of the Warrant and placing a collar on the cost of the Warrant (the "Cash-Settled Collar Agreement").

9. The Cash-Settled Collar Agreement works as follows:

a. ***The cash-settlement provision.***  Instead of issuing shares to the Trust when it exercises the Warrant, the Company will make a single cash payment to the Trust on the earlier of (i) the date on which the Trust delivers to the Company a written notice of its election to require payment for the Warrant pursuant to the terms of the Cash-Settled Collar Agreement (the "Election Notice") or (ii) the Expiration Date of the Warrant (the "Cash-Settlement Provision"). The cash payment will be equal to ten million multiplied by the result of the settlement price discussed below minus the $17.00 Exercise Price.

b. ***Reference price and quantity.***  The Cash-Settled Collar Agreement provides that the Warrant will be cash settled based on a reference price (the "Reference Price") that is equal to the published average daily closing price of the Company's common stock on the New York Stock Exchange for a period beginning one trading day after the Effective Date and concluding either one trading day before the date on which

4

the Election Notice is delivered or the Expiration Date. The cash payment that the Company will make to the Trust will be calculated using the Reference Price.

   c. ***Settlement price within the collar.*** When the Reference Price is between the Floor Price and the Ceiling Price, the payment to settle the Warrant will be calculated by subtracting the $17.00 Exercise Price from the Reference Price.

   d. ***Settlement price outside the collar.*** If the Reference Price is below the Floor Price, the payment will be calculated by subtracting the $17.00 Exercise Price from the Floor Price instead of the Reference Price, a calculation that will always yield a payment of $37.50 per share. If the Reference Price is above the Ceiling Price, the payment will be calculated by subtracting the $17.00 Exercise Price from the Ceiling Price instead of the Reference Price, a calculation that will always yield a settlement price of $49.00 per share. This is the collar provision of the Cash-Settled Collar Agreement (the "<u>Collar Provision</u>"). Thus, the Collar Provision ensures that the total settlement value of the Warrants will be not less than $375 million or more than $490 million.

10. The Collar Provision provides substantial benefits to the Debtors and the Trust.

   a. ***Reduced cash outlay.*** The Cash-Settlement Provision will eliminate the Trust's need to expend a large amount of cash upon exercise of the Warrant. Instead of paying $170 million to purchase the Company's shares and then selling those ten million shares into the open market to realize the value of the Warrant, the Trust will simply receive a cash payment from the Company based on the collar structure discussed above.

   b. ***Reduced transaction and compliance costs.*** The Cash-Settlement Provision will eliminate the underwriting costs and other transaction costs associated

5

with the Warrant Agreement. If the Trust were to exercise the Warrant and sell the underlying shares into the market, the Company would be required to register those shares by filing a registration statement with the SEC, and the resulting sale would require the Trust to incur underwriter fees and likely take a discount on the sale given the size of the transaction.

    c.    ***Avoidance of dilution.*** The Cash-Settlement Provision eliminates the need to issue ten million more shares, avoiding dilution of the Company's earnings per share. Dilution of the Company's common stock upon physical settlement of the Warrant would be approximately 12 percent as of September 30, 2012.

    d.    ***Liquidity and exit financing forecasting.*** The Cash-Settlement and Collar Provisions fix, within a range, the Debtors' obligations under the Warrant Agreement, allowing them to more accurately forecast their liquidity needs and to plan more effectively with respect to exit financing.

11.    The Debtors have a practice of using financial instruments to hedge financial exposure. The Debtors often incur incidental exposure to fluctuations in commodities pricing and foreign exchange rates as a result of their normal business operations. The Debtors generally seek to convert the variable costs associated with such effects into fixed costs.

12.    The Cash-Settled Collar Agreement was negotiated at arm's length and in good faith.

[*Remainder of Page Intentionally Left Blank*]

K&E 23223854.13

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 30, 2012                             By:  */s/ John James O'Connell III*
                                                                          John James O'Connell III
                                                                          Managing Director
                                                                          The Blackstone Group LP