UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .      Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .      USX Tower - 54th Floor
                              .      600 Grant Street
                              .      Pittsburgh, PA 15219
              Debtors.  .
                              .      January 14, 2009
. . . . . . . . . . . . ..      9:13 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               JANET BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For W.R. Grace:           W.R. Grace & Co.
                          By:  RICHARD C. FINKE, ESQ.
                          7500 Grace Drive
                          Columbia, MD 21044



Audio Operator:           Dayna Kanary

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (cont'd)

For the Debtors:                Pachulski, Stang, Ziehl & Jones
                                By:  JAMES O'NEILL, ESQ.
                                919 North Market Street
                                17th Floor
                                Wilmington, DE  19899-8705

For the Asbestos               Caplin & Drysdale, Chartered
Creditors Committee:           By:  PETER LOCKWOOD, ESQ.
                                One Thomas Circle, NW
                                Washington, D.C.  20005

                                Campbell & Levine
                                By:  MARK T. HURFORD, ESQ.
                                800 North King Street
                                Suite 300
                                Wilmington, DE  19701

For the Property               Bilzin Sumberg Baena Price &
Damage Committee:                  Axelrod LLP
                                By:  JAY SAKALO, ESQ.
                                200 South Biscayne Boulevard
                                Suite 2500
                                Miami, FL  33131

For the Future                 Orrick, Herrington & Sutcliffe
Claimants                          LLP
Representatives:               By:  ROGER FRANKEL, ESQ.
                                Washington Harbour
                                3050 K Street, N.W.
                                Washington, D.C.  20007

For the                        Stroock & Stroock & Lavan
Unsecured Creditors'           By:  KENNETH PASQUALE, ESQ.
Committee:                      180 Maiden Lane
                                New York, NY  10038-4982

For Sealed Air:                Skadden, Arps, Slate, Meagher & Flom,
                                   LLP
                                By: DAVID TURETSKY, ESQ.
                                One Rodney Square
                                Wilmington, DE  19801

For Bank Lender Group:         Landis, Rath & Cobb
                                By:  JAMES GREEN, ESQ.
                                919 Market Street
                                Wilmington, DE 19801

APPEARANCES (cont'd)

| | |
|---|---|
| For Libby Claimants: | Cohn Whitesell & Goldberg, LLP<br>By:  DANIEL COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For Maryland Casualty/<br>Zurich: | Connolly Bove Lodge & Hutz, LLP<br>By:  JEFFREY C. WISLER, ESQ.<br>1007 North Orange Street<br>Wilmington, DE 19899 |
| | Eckert, Seamans, Cherin & Mellott, LLC<br>By:  EDWARD J. LONGOSZ, ESQ.<br>1747 Pennsylvania Avenue, NW<br>Washington, DC 20006 |
| For PD FCR: | The Law Office of Alan B. Rich<br>By:  ALAN B. RICH, ESQ.<br>1201 Main Street<br>Dallas, TX 75202 |
| For Various Law Firms:<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID KLINGLER, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For MMWR Firm: | Montgomery, McCracken, Walker &<br>  Rhoads LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For David T. Austern: | Orrick, Herrington & Sutcliffe, LLP<br>By:  RICHARD H. WYRON, ESQ.<br>     JONATHAN, GUY, ESQ.<br>     DEBRA FELDER, ESQ. |
| | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |

TELEPHONIC APPEARANCES: (cont'd)

For David T. Austern:      Tre Angelli, LLC
                           By:  JOSEPH RADECKI, ESQ.

                           Piper Jaffray & Co.
                           By:  JASON SOLGANICK

For the State of           Hahn & Hessen
California:                By:  CHRISTINA J. KANG, ESQ.
                           488 Madison Avenue
                           New York, NY  10022

For Federal Insurance      Cozen & O'Connor
                           By:  JACOB C. COHN, ESQ.
                           1900 Market Street
                           Philadelphia, PA 19107

For Libby Claimants:       Cohn Whitesell & Goldberg, LLP
                           By:  CHRISTOPHER M. CANDON, ESQ.
                           101 Arch Street
                           Boston, MA  02110

                           Landis, Rath & Cobb
                           By:  KERRI K. MUMFORD, ESQ.
                           919 Market Street
                           Wilmington, DE 19801

For W.R. Grace:            W.R. Grace & Co.
                           By:  WILLIAM SPARKS, ESQ.

                           Kirkland & Ellis, LLP
                           By:  RASHAD W. EVANS, ESQ.
                                MARK LEWINSTEIN, ESQ.
                                DAVID M. BERNICK, ESQ.
                                DEANNA BOLL, ESQ.
                                CHRISTOPHER GRECO, ESQ.
                                BARBARA HARDING, ESQ.
                                CRAIG BRUENS, ESQ.
                                LISA ESAYIAN, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For the Asbestos           Ferry Joseph & Pearce, P.A.
Creditors Committee:       By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street, Suite 19899
                           Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES: (cont'd):

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For Babson Capital          Babson Capital Management, Inc.
Management                  By:  MARTI MURRAY

For Federal Insurance       Cozen O'Connor
Company:                    By:  JEFFREY WAXMAN, ESQ.
                            1201 North Market Street
                            Wilmington, DE  19801

For Vinson & Elkins:        Vinson & Elkins, LLP
                            By:  ARI BERMAN, ESQ.
                            666 Fifth Avenue, 26th Floor
                            New York, NY  10123

For Allstate Insurance:     Cuyler Burk, LLP
                            By:  ANDREW CRAIG, ESQ.
                            4 Century Drive
                            Parsippany, NJ  07054

For Interested Party        Mendes & Mount
Axa Belgium:                By:  ANNA NEWSOM, ESQ.
                            750 Seventh Avenue
                            New York, NY  10019

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:              Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                                 SCOTT L. BAENA, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

                            Pryor, Cashman, LLP
                            By:  RICHARD LEVY, ESQ.
                            410 Park Avenue
                            New York, NY  10022

                            Speights & Runyan
                            By:  DANIEL SPEIGHTS, ESQ.
                                 ALAN RUNYAN, ESQ.
                                 MARION FAIREY, ESQ.
                            200 Jackson Avenue, East
                            Hampton, SC  29924

TELEPHONIC APPEARANCES: (cont'd):

For the Asbestos            Brandi Law Firm
Creditors Committee:        By:  TERENCE D. EDWARDS, ESQ.
                                 THOMAS A. BRANDI, ESQ.
                            354 Pine Street, 3rd Floor
                            San Francisco, CA  94104

                            Dies & Hile LLP
                            By:  MARTIN DIES, ESQ.
                            1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            Lieff, Cabraser, Heimann & Bernstein
                            By:  ELIZABETH J. CABRASER, ESQ.
                            275 Battery Street, Suite 3000
                            San Francisco, CA  94111

                            Richardson Patrick Westbrook &
                              Brickman, P.C.
                            By:  EDWARD J. WESTBROOK, ESQ.
                            1037 Chuck Dawley Blvd., Bldg. A
                            Mount Pleasant, SC  29464

                            LECG
                            By:  ELIZABETH DEVINE, ESQ.

                            Scott Law Group
                            By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864

For the Unsecured           Stroock & Stroock & Lavan
Creditors' Committee:       By:  ARLENE KRIEGER, ESQ.
                            180 Maiden Lane
                            New York, NY  10038-4982

                            Duane Morris LLP
                            By:  MICHAEL LASTOWSKI, ESQ.
                            1100 North Market Street, Ste 1200
                            Wilmington, DE  19801-1246

For Fireman's Fund:         Stevens & Lee, P.C.
                            By:  JOHN DEMMY, ESQ.
                            1105 North Market Street, 7th Fl.
                            Wilmington, DE  19801

For CNA:                    Goodwin Procter, LLP
                            By:  DANIEL GLOSBAND, ESQ.
                                 BRIAN MUKHARJEE, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

TELEPHONIC APPEARANCES: (cont'd):

For Official Committee         Anderson Kill & Olick
of Asbestos Personal           By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:              1251 Avenue of the Americas
                               New York, NY  10020-1186

                               Motley Rice, LLC
                               By:  JOSEPH RICE, ESQ.
                               28 Bridgeside Boulevard
                               Mount Pleasant, SC  29464

                               Caplin & Drysdale
                               By:  WALTER SLOCOMBE, ESQ.
                                    JEFFREY A. LIESEMER, ESQ.
                               One Thomas Circle, NW
                               Washington, D.C.  20005

For Ford, Marrin,              Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer              Gleser
& Gleser:                      By:  SHAYNE SPENCER, ESQ.
                               Wall Street Plaza, 23rd Floor
                               New York, NY  10005-1875

For Scott Company:             Vorys, Sater, Seymour & Pease, LLP
                               By:  TIFFANY COBB, ESQ.
                               52 East Gay Street
                               Columbus, OH  43216

For ZAI Claimants:             Sullivan, Hazeltime, Allinson, LLC.
                               By:  WILLIAM SULLIVAN, ESQ.
                               4 East Eighth Street, Suite 400
                               Wilmington, DE  19801

For Thomas Deene:              Cooney & Conway
                               KATHY BYRNE, ESQ.
                               120 N. LaSalle Street, Suite 3000
                               Chicago, IL  60602

For Travelers Indemnity:       Simpson, Thacher & Bartlett
                               By:  ELISA ALCABES, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017

For Various Claimant           Stutzman, Bromberg, Esserman & Plifka
Firms:                         By:  DAVID J. PARSONS, ESQ.
                                    SANDY L. ESSERMAN, ESQ.
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201

TELEPHONIC APPEARANCES: (cont'd):

For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  ROBERT GUTTMANN, ESQ.
                                 MICHAEL DAVIS, ESQ.
                           575 Lexington Avenue
                           New York, NY  10022


For Bank Debit Holders:     Landis, Rath & Cobb
                           By:  RICHARD S. COBB, ESQ.
                           919 Market Street
                           Wilmington, DE  19801


                           Paul Weiss Rifkind Wharton & Garrison
                           By:  REBECCA ZUBATY, ESQ.
                                MARGARET PHILLIPS, ESQ.
                           1285 Avenue of the Americas
                           New York, NY  10019


For BNSF Railway Co.        Pepper, Hamilton, LLP
                           By:  LINDA J. CASEY, ESQ.
                           3000 Two Logan Square
                           Eighth and Arch Streets
                           Philadelphia, PA  19103


For One Beacon              Drinker, Biddle & Reath
America Insurance:          By:  MICHAEL F. BROWN, ESQ.
                                JEFFREY BOERGER, ESQ.
                           One Logan Square
                           18th & Cherry Streets
                           Philadelphia, PA  19103


For Official Committee      Kramer Levin Naftalis & Frankel
of Equity Holders:            LLP
                           By:  DOUGLAS H. MANNAL, ESQ.
                           1177 Avenue of the Americas
                           New York, NY  10036


For Hartford Financial      Wilmer Cutler Pckering Hale & Dorr
Service Group:              By:  MELANIE DRITZ, ESQ.
                           399 Park Avenue
                           New York, NY  10022


For Oliver Butt:            JP Morgan Chase & Co.
                           By:  OLIVER BUTT


For Interested Party        Mendes & Mount
London Market Company:      By:  ALEX MUELLER, ESQ.
                           750 Seventh Avenue
                           New York, NY  10019

TELEPHONIC APPEARANCES: (cont'd):

For Arrowwood Indemnity:  Bifferato Gentilotti Biden & Balick
                          By:  GARVAN McDANIEL, ESQ.
                          800 N. King Street
                          Wilmington, DE  19899

For the U.S. on behalf    U.S. Department of Justice - Civil
Of The Forest Services:   By:  BETH COOK, ESQ.

For Her Majesty the       Office of the Attorney General
Queen in Right of         By:  JACQUELINE DAIS-BISCA, ESQ.
Canada:

                          Womble Carlyle Sandridge & Rice
                          By:  KEVIN J. MANGAN, ESQ.
                          222 Delaware Avenue
                          Suite 1501
                          Wilmington, DE  19801

For D. E. Shaw:           D. E. Shaw
                          By:  BRANDON BAER, ESQ.

For Bank of America:      Richards Layton & Finger, PA
                          By:  MARCOS RAMOS, ESQ.
                          One Rodney Square
                          920 N. King Street
                          Wilmington, DE 19899

For Dow Jones News        Dow Jones News Wire
Wires:                    By:  PEG BRICKLEY, ESQ.

For Cetus Capital:        Cetus Capital
                          By:  GENTRY KLEIN, ESQ.

For JD Capital:           JD Capital
                          By:  RYAN DUFFY, ESQ.

For Royal Insurance:      Wilson Elser Moskowitz Edelman
                            & Dicker, LLP
                          By:  CARL PERNICONE, ESQ.
                          150 East 42nd Street
                          New York, NY 10019

For Burlington            Burns, White & Hickton
Northern & Sante Fe       By:  LINDSEY HOELZLE, ESQ.
Railroads:

For DebtWire              DebtWire
                          By:  SETH BRUMBY, ESQ.

1            THE COURT:  Good morning.  Please be seated.  This is
2    the matter of W.R. Grace, Bankruptcy Number 01-1139.  This is
3    the continued time set for the disclosure statement hearing.
4    The list of participants I have by phone Richard Wyron,
5    Christina Kang, Jacob Cohn, William Sparks, Rashad Evans,
6    Theodore Tacconelli, Mark Lewinstein, Marti Murray, Jeff
7    Waxman, Anna Newsom, David Bernick, Jennifer Whitener, Ari
8    Berman, Andrew Craig, Janet Baer, Peter Lockwood, Nathan Finch,
9    Michael Lastowski, Daniel Speights, John Demmy, Deanna Boll,
10   Elizabeth Cabraser, Melanie Dritz, Oliver Butt, Richard Levy,
11   Matthew Kramer, Marion Fairey, Shayne Spencer, David Parsons,
12   Theodore Freedman, Robert Horkovich, Kathy Byrne, Alan Runyan,
13   Terence Edwards, Elisa Alcabes, Sandy Esserman, John Phillips,
14   Michael Davis, Christopher Greco, Barbara Harding, Joseph
15   Radecki, Jason Solganick, Daniel Hogan, Jonathan Guy, Daniel
16   Glosband, Richard Cobb, Linda Casey, Michael Brown, Garvan
17   McDaniel, Lisa Esayian, Beth Cook, Mark Hurford, Arlene
18   Krieger, James O'Neill, James Green, Alex Mueller, Jeffrey
19   Boerger, Scott Baena, Tiffany Cobb, Jacqueline Dais-Visca,
20   Edward Westbrook, Douglas Mannal, Rebecca Zubaty, Brandon
21   Baer, Elizabeth Devine, Marcos Ramos, Peg Brickley, Gentry
22   Klein, Darrell Scott, Ryan Duffy, Christopher Candon, Robert
23   Guttmann, Joseph Rice, Debra Felder, Brian Mukherjee, Kerri
24   Mumford, Carl Pernicone, Craig Burens, Walter Slocombe,
25   Margaret Phillips, Thomas Brandi, Jay Sakalo, Lindsey Hoelzle,

1  William Sullivan, Jeffrey Liesemer, David Klingler, Seth

2  Brumby, Martin Dies, Kevin Mangan, and Natalie Ramsey.  I'll

3  take entries in court.  Good morning.

4         MR. FREEDMAN:  Good morning, Your Honor, Theodore

5  Freedman for the Debtors.

6         MS. BAER:  Good morning, Your Honor, Janet Baer on

7  behalf of the Debtors.

8         MR. O'NEILL:  Good morning, Your Honor, James O'Neill

9  on behalf of the Debtors.

10         MR. LOCKWOOD:  Good morning, Your Honor, Peter

11  Lockwood on behalf of the ACC.

12         MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

13  on behalf of the Personal Injury FCR.

14         MR. RICH:  Good morning, Your Honor, Alan Rich on

15  behalf of the Property Damage FCI.

16         MR. SAKALO:  Good morning, Your Honor, Jay Sakalo on

17  behalf of the Property Damage Committee.

18         MR. PASQUALE:  Good morning, Your Honor, Ken

19  Pasquale, Strook, Strook & Lavan for the Unsecured Creditors'

20  Committee.

21         MR. HURFORD:  Good morning, Your Honor, Mark Hurford,

22  Campbell & Levine for the ACC.

23         MS. RAMSEY:  Good morning, Your Honor, Natalie Ramsey

24  on behalf of certain plaintiffs' law firms known here as the

25  MMWR Firms.

1          MR. COHN:  Good morning, Your Honor, Daniel Cohn for

2     the Libby Claimants.

3          MR. GREEN:  Good morning, Your Honor, James Green of

4     Landis, Rath & Cobb on behalf of certain lenders on the

5     prepetition bank credit facilities.

6          MR. CLAMER:  Good morning, Your Honor, David Clamer

7     with Mr. Esserman's office for various law firms.

8          MR. TURETSKY: Good morning, Your Honor, David

9     Turetsky of Skaddens, Arps for Sealed Air Corporation.

10          MR. WISLER:  Good morning, Your Honor, Jeffrey Wisler

11     on behalf of Maryland Casualty in Zurich.

12          MR. LONGOSZ:  Good morning, Your Honor, Ed Longosz on

13     behalf of Maryland Casualty in Zurich.

14          THE COURT:  I'm sorry, for?

15          MR. LONGOSZ:  Maryland Casualty in Zurich.

16          THE COURT:  Ms. Baer.

17          MS. BAER:  Good morning, Your Honor, Janet Baer on

18     behalf of W.R. Grace.  Your Honor, on the agenda today we

19     actually have a couple different items, not just disclosure.

20     And in fact on the disclosure statement matters which are Items

21     2 and 3 but for the case management order for the confirmation

22     which we will go through shortly all disclosure statement other

23     matters are continued and the solicitation matters are

24     continued to our omnibus hearing on January 26th.  So if

25     anybody is on the phone with respect to specific issues about

1  the disclosure statement itself those matters are continued as

2  indicated in the amended agenda to the January 26th hearing.

3         That takes us back, Your Honor, to agenda Item Number

4  1 which is the motion of the ZAI Claimants for preliminary

5  approval of the class settlement and certification of the U.S.

6  ZAI class.  I understand that Mr. Westbrook and Mr. Scott are

7  on the telephone and this is their motion.

8         THE COURT:  All right, who's going to address this,

9  please?

10        MR. WESTBROOK:  Your Honor, good morning.  Ed

11 Westbrook in Charleston for the ZAI Claimants.

12        THE COURT:  Thank you.

13        MR. WESTBROOK:  Your Honor, I'd planned to be present

14 in person when the hearing was scheduled for yesterday, but

15 when the hearing got moved for the convenience of a lot of

16 counsel it conflicted with an obligation I have in Charleston.

17 So I appreciate the opportunity to participate by phone.  Your

18 Honor, our motion is unopposed so I'm going to be quite brief.

19 I want to make just a few comments to set the motion in the

20 context of the overall bankruptcy and where we're headed.

21        Your Honor, we're pleased to be taking the next step

22 in the process of resolving ZAI claims in this bankruptcy this

23 morning with the Court's approval.  As the Court knows we have

24 had a long hard road with many battles between Grace and the

25 ZAI claimants.  Our papers lay out the details of the

1 resolution and how it was achieved so I'm not going to go

2 through those in detail but I do want to make just a few

3 observations.  The stage we're at today, Your Honor, is asking

4 the Court to provisionally certify a ZAI class and

5 preliminarily approve the proposed settlement which will allow

6 the settlement to go out to the class members for comment.  The

7 question for today is whether the settlement is in the ball

8 park of reasonable resolutions, not the final approval question

9 of whether the settlement is fair, reasonable and adequate.  We

10 think the settlement certainly is in the ball park of

11 reasonable resolutions and when the time comes we will be able

12 to show the Court that the settlement certainly is fair,

13 reasonable and adequate.  But the settlement certainly is

14 within the range of possible approved settlements.

15        When we started to represent the ZAI claimants, Your

16 Honor, we learned really three things about the ZAI problem.

17 First, most homeowners with ZAI don't know they have it.  They

18 encounter it in the most unexpected way like drilling into

19 their ceilings or running computer cables through their attics.

20 So we sought a solution that would address this fact and a

21 solution in the class action to include a comprehensive long

22 term education program about ZAI.  The second thing we learned

23 from our homeowner clients is that they are mostly largely --

24 they are largely middle or low-middle class folks.  So

25 realistically we needed a meaningful contribution from Grace

1 towards ZAI removal costs when those costs become necessary.

2      Third, Your Honor, because homeowners encounter ZAI

3 on an unplanned basis we sought a long term solution which

4 would neither force homeowners to rush to remove ZAI, nor

5 penalize them for failing to discover right away that they had

6 ZAI.  The settlement that we have reached with W.R. Grace and

7 proposed for preliminary approval today addresses each of these

8 main concerns.  First it has a comprehensive multi-year

9 educational campaign component to get information about ZAI out

10 to homeowners where they're likely to see it through outlets

11 like lumber and home improvement stores, contractors

12 associations.  And we will work with EPA guidance and with

13 input from Grace to make communication of reasonable

14 information about ZAI effective to the homeowners.

15      Second, Your Honor, with respect to funding

16 assistance settlement provides a 55 percent contribution by

17 Grace to homeowners who remove ZAI.  This also gives homeowners

18 a substantial stake in the removal project that was not

19 undertaken frivolously.  The program has a cap on removal costs

20 which we believe is reasonable which in fact is above the cap

21 that most homeowners are encountering today when they remove

22 ZAI, and there'll be a cost of living increase in that cap

23 after five years.

24      Third, Your Honor, to address the situation where we

25 don't want homeowners rushing to remove ZAI unnecessarily in

1 order to take advantage of a lump sum settlement the settlement

2 sets up a long term facility under Section 524(g) which will

3 meet that major concern.  Homeowners will have a facility which

4 will have a life of at least 20 or 25 years which will be there

5 when they encounter ZAI and they have to remove it for some

6 legitimate reason.  It will have adequate periodic funding,

7 funding that could potentially reach $140 million depending on

8 the pace at which homeowners remove ZAI.  This contingent

9 funding, that is $30 million immediately on confirmation, $30

10 million three years thereafter, and then contingent funding of

11 up to $80 million over the next 20 years meets Grace's concern

12 that people may never come forward and the money will never

13 have to be used.  If it isn't needed it won't have to be paid.

14          Your Honor, the settlement certainly does not give us

15 everything we wanted for the class, but it gives us a

16 substantial part of what we were seeking and it recognizes the

17 reality that ZAI litigation has been difficult, its outcome is

18 certainly uncertain, the defense has been tenacious, and

19 further litigation is likely to be costly and to go on for

20 years.  This settlement is a result of good faith, hard

21 bargaining over an extended amount of time, and I've laid out

22 some further details about that in my declaration.  The

23 settlement has been greatly assisted by Mr. Scott's involvement

24 with numerous ZAI claimants over the years and the respect that

25 he has brought to it.  And Your Honor, when Your Honor

1  appointed Judge Sanders as the Futures rep for ZAI and Alan

2  Rich as its counsel they brought some valuable insights to the

3  table improved the settlement and enabled us to craft a

4  comprehensive resolution which will take care of all ZAI

5  problems in the Grace bankruptcy.  We made progress with very

6  frank discussions with Grace and we had good faith and very

7  hard bargaining, but arms length bargaining.

8           Your Honor, we are asking the Court today therefore

9  to certify the class and our proposed order of USZAI claimant

10  to file claims by the bar date except in the United States.  As

11  you know, Your Honor, from the papers the United States can

12  only be represented by the Justice Department.  So by agreement

13  we excepted them from the class definition.  Asking the Court

14  also to give preliminary approval to the settlement to allow

15  the settlement -- information about the settlement to go out to

16  the class in the class notice that we provided to the Court and

17  then to schedule a hearing for final approval at which we will

18  go into more detail about any aspects of the settlement as

19  illuminated by comments from the class members.

20           Your Honor, at the risk of becoming one of those

21  lawyers who loses on uncontested motion by talking too long I'm

22  going to shut up and let anyone else who wishes to comment to

23  do so.  Thank you, Your Honor.

24           THE COURT:  All right, anyone?  Mr. Freedman.

25           MR. FREEDMAN:  Your Honor, for Grace, Theodore

1  Freedman.  I'm simply say that Grace absolutely supports this

2  motion and we would request the Court to enter the order and

3  put in place the schedule as requested by Mr. Westbrook.

4         THE COURT:  Mr. Rich.

5         MR. RICH:  Thank you, Your Honor.  I just wanted to

6  echo what counsel for the class said.  This was a --

7         COURT CLERK:  Please submit your name.

8         MR. RICH:  Oh, I'm sorry.  Alan Rich.  R-i-c-h.  This

9  was a hard bargain at arms length.  There were many meetings,

10  lots before I got involved, and several afterwards.  And the

11  Judge, my Judge, the FCR believes that this settlement is fair

12  to the class and should be approved.  Thank you.

13         THE COURT:  Anyone else?  Are there any changes that

14  are necessary to the orders that have been submitted?

15         MR. WESTBROOK:  Your Honor, this is Ed Westbrook.

16  The only thing that is not in the proposed notice or the order

17  that we have discussed with Grace that we feel that a 45 day

18  period for the class to comment after the notice is mailed is

19  sufficient because the notice is to go out by first class mail.

20  So that date is not in the order.  And also a date for the

21  final approval hearing is not in the order because it depends

22  on the dates for the notice, when the notice is set.

23         THE COURT:  Okay.  How much time are you going to

24  need to effectuate service?

25         MR. WESTBROOK:  Your Honor, the order provides that

1  the service would be mailed in ten days and I would inquire of

2  Grace since we were going to use the services of Rust which has

3  the names and addresses whether that is practical or whether we

4  should -- need a little more time on that.

5          MR. FREEDMAN:  Your Honor, we have not discussed that

6  matter with Rust.  Frankly we're not in a position to give Mr.

7  Westbrook feedback on that.

8          MS. BAER:  Your Honor, I hadn't heard this before.

9  Nobody discussed it with me so I hadn't had to ask Rust.  They

10 do have all the names.  I believe we're talking 16,000 names.

11 I simply don't know if ten days is enough for them to turn it

12 around.  I just don't know.

13         THE COURT:  Why don't I get either Ms. Baer or Mr.

14 Westbrook, one of you, to submit a revised order when you have

15 an opportunity to talk to Rust that will provide an appropriate

16 period of time for service.  Provide the comment period by date

17 as opposed to saying 45 days.  I think you should set a date by

18 which comments are due so that someone doesn't inadvertently

19 miss the comment period.  So you can make it 45 days, but put

20 the date in.  And then I think it would be appropriate to

21 simply put it for a final hearing on the next omnibus after the

22 expiration of that 45 day period.  So you could key all of

23 those dates to your service date.

24         MS. BAER:  Your Honor, with respect to the order

25 actually the only blank in there is the final hearing date.

1  It's the notice that has the others.  We had talked about

2  trying to have this on the April 1st hearing.  I think that

3  still works.  I haven't gone backwards, but I believe that that

4  will work, and I'm wondering whether we should get the order

5  entered today with the April 1st hearing date and then if it

6  turns up that Rust needs much more time for service than

7  anticipated we could come back and have that hearing date

8  revised.  That way we can kind of get the ball rolling

9  immediately assuming that we can make that date work.

10         MR. WESTBROOK:  Your Honor, Ed Westbrook.  That is

11 certainly acceptable to the ZAI claimants.

12         THE COURT:  Actually the order doesn't have a blank

13 for the hearing date either.

14         MS. BAER:  Your Honor, the order is a four page

15 order, it was submitted on a certification of counsel so

16 perhaps you're looking at the old order.

17         THE COURT:  I am.  I don't have one submitted on a

18 COC.

19         MS. BAER:  I will hand that up, Your Honor.  We

20 submitted a COC with a revised order, a revised notice and a

21 revised agreement.

22         THE COURT:  Oh.  Maybe I do have it.  I'm sorry.

23         MR. WESTBROOK:  Your Honor, this is Ed Westbrook.  I

24 would point out that on Page 4, Paragraph 5 of the order --

25         THE COURT:  No, I don't.

1          MR. WESTBROOK:  -- does say that the notice would

2  have been sent within ten days of the entry of this order.

3          THE COURT:  I think I should get a revised order from

4  you.

5          MS. BAER:  Okay.  We will do so, Your Honor.  I will

6  speak with Rust and we'll submit that shortly or Mr. Westbrook

7  will submit it shortly.

8          THE COURT:  Who is going to submit it so I know who

9  to look for it?

10          MR. WESTBROOK:  Your Honor, Ed Westbrook.  We'll

11  submit it.

12          THE COURT:  All right.  I'll expect it on a different

13  certification of counsel, Mr. Westbrook.

14          MR. WESTBROOK:  Yes, Your Honor.

15          THE COURT:  Okay.  It'll be entered.  If you would,

16  Mr. Westbrook, how about calling my office here in Pittsburgh.

17  Let me know when it's been filed.  I know that you folks have

18  been very good about sending these to the JKF box, but I think

19  this one so that you can make sure that service is effectuated

20  I'd like to simply to make sure that I know that this one has

21  in fact been filed so that I can get it printed and signed and

22  entered.

23          MR. WESTBROOK:  We will do that, Your Honor.

24          THE COURT:  Okay.  Thank you.  All right, I'll sign

25  that one as soon as I get it.  Okay. Ms. Baer.

1          MS. BAER:  Your Honor, the next matter on the agenda

2    is in fact the disclosure statement matter and the only

3    remaining portion of that that we'd like to take up is a

4    revised case management order.  Your Honor, the parties have

5    all been working very diligently to complete the disclosure

6    statement process, get it approved and get it sent out for

7    solicitation.  The ZAI settlement is an excellent step in

8    getting this thing done and having much fewer objections when

9    we get to the confirmation hearing.  But the ZAI settlement and

10   the related asbestos property damage issues that it raises is

11   simply something that is taking some time for everyone to get

12   through.  Corporate documents that need to be put together to

13   document the ZAI deal, the ZAI TDP and other documents like

14   that, Your Honor, are all in process, but the ZAI folks and the

15   asbestos property damage folks simply have not had time to

16   review and comment upon everything.  There's also negotiations

17   with respect to the traditional asbestos property damage CMO.

18          Under the circumstances, Your Honor, the parties

19   concluded that we were not in a position to get a disclosure

20   statement approved today, and therefore we're not going to be

21   in a position to get a disclosure statement and plan out for

22   solicitation in order to make the Phase I hearing in April.

23   This is unfortunate.  We had wanted to move this forward

24   quickly and get this confirmation done in June.  Again, not

25   realistic because we simply don't have all the pieces together

1 on property damage at this point.  Under those circumstances,

2 Your Honor, we contacted your chambers to discuss this scenario

3 and put together a case management order which effectively now

4 moves the Phase I hearing to the June dates that we originally

5 had for Phase II, reserves the two dates in July for carryover

6 to the extent necessary as well as setting the pretrial

7 conference for Phase II, and then provides that Phase II would

8 be held hopefully in early September.  We could have done it in

9 August, August or September.  We know that that's a very

10 difficult time in terms of scheduling so we had hoped for dates

11 in early September which we do understand there could have been

12 -- there may be some available.

13          The CMO which I will go through, Your Honor,

14 essentially pushes back most of the dates by 60 days.  Not all

15 of them.  Some of them are at different times just to

16 accommodate what makes sense.  Your Honor, we circulated the

17 second amended CMO to all parties on Friday of last week.  We

18 had a meet and confer with all parties on Monday.  We then,

19 based on that meet and confer, circulated a revised second

20 amended case management order which is the document we

21 submitted to the Court on certification of counsel yesterday.

22 Your Honor, I'm not sure if you've seen that.

23          THE COURT:  I have.

24          MS. BAER:  Great.  In going through the second

25 amended CMO after we circulated it with the certification of

1 counsel yesterday we received a number of comments from parties

2 some of which are still outstanding, some of which I think

3 we've resolved.  First of all, Your Honor, the insurers raised

4 an issue as to what exactly Phase I is going to be.  Your

5 Honor, in our designation of Phase I issues we simply say that

6 there will be issues with respect to insurance neutrality.  The

7 insurers were concerned about what that meant and yesterday

8 they submitted some language to us to expand Paragraph 1 of the

9 CMO to further describe Phase I issues.

10      Your Honor, we looked at that last night and this

11 morning, spoke with our colleagues and have a proposed sort of

12 revision to their revision.  I'd like to read it into the

13 record, Your Honor.  We've shared it with insurers' counsel,

14 some who are here today.  However, most of them have not seen

15 it.  Therefore, we will not be able to actually have a CMO

16 signed today, but the hope is that they can see this language

17 when I circulate it tomorrow, respond back within 24 hours and

18 we'll be in a position to submit the CMO for entry.

19      Your Honor, the language in Paragraph 1 that would be

20 revised begins with the second sentence of Paragraph 1 which

21 begins, "The first phase shall address."  And the language

22 would be revised to state the following.  "The first phase

23 shall address, I whether the plan improperly affects the rights

24 of debtors' insurers (in their capacity as insurers, but not

25 creditors); II The standing of the debtors' insurers (in their

1 capacity as insurers, but not creditors) to litigate

2 confirmation objections that do not involve issues covered by I

3 herein and, III the confirmation objections raised by and

4 specific to lenders under the prepetition credit facilities and

5 other Class 9 creditors with respect to impairment.

6      "The second phase shall address, I The objections of

7 parties classified under the plan as holders of indirect PI or

8 PD trust claims (including insurers as holders of indirect PI

9 or PD trust claims with respect to such claims), and II The

10 objections of the Libby Claimants, and III Any other

11 confirmation objections not addressed and resolved in Phase I."

12      Your Honor, the debtor is in agreement with that

13 language as revised.  I believe it does more specifically

14 outline what the issues are that are to be addressed in Phase

15 I.  And again, we know that the insurers have looked at the

16 language, but at this point they have not had a chance to

17 digest it to see whether or not they're in agreement on it.

18 That was the first issue that was raised with respect to the

19 CMO that was circulated.

20      Your Honor, we also received some comments from the

21 lenders about a reservation of rights with respect to solvency.

22 And as it turns out the reservation of rights already in the

23 CMO is acceptable to them and it simply had sort of been missed

24 by the parties in looking at the documentation.  Paragraph 14

25 of the CMO at Sentence 3 states, "Such supplements may be

1  appropriate to address without limitation, discovery regarding

2  insolvency," et cetera.  That was their concern that they have

3  a reservation of rights with respect to those issues and it is

4  in fact in the order.  And I believe that addressed their

5  concern.

6      Your Honor, I received communication from the state

7  of Montana.  They were concerned and confused about what was in

8  Phase I versus Phase II.  Your Honor, I don't think there

9  should have been or is any confusion.  Phase I relates to the

10 insurer issues as now described more specifically in what I've

11 read with respect to insurance neutrality essentially.  And

12 they also then relate to these issues with respect to Class 9

13 of impairment.  That's it.  The state of Montana's concerns are

14 all Phase II issues and I don't think there's any confusion

15 about that.

16     Your Honor, the fourth issue that was raised came

17 from the asbestos property damage folks.  They, last week,

18 provided -- actually on Friday before it went out -- actually,

19 no, I'm sorry, I think it was on Monday before it went out --

20 provided me with some language for the first time that expanded

21 what is Paragraph 13 of the order.  And the first couple of

22 sentences of their expanded language was fine, but their last

23 sentence of the expanded language I felt was too expansive and

24 I modified it slightly.  And Your Honor, if you'd turn to

25 Paragraph 13 of the CMO the last sentence of that reads as

1    follows.  "Nothing herein shall serve to preclude, waive, or

2    abrogate any objection, right or claim that may be asserted by

3    any member of the PD constituency in respect of PD related

4    issues in the plan or disclosure statement."

5        Your Honor, the debtor added in the words, "in

6    respect of PD related issues."  The original language from the

7    PD constituency did not have that modification in there.  Your

8    Honor, we wanted to make it clear that obviously there's

9    nothing currently in the disclosure statement and plan that

10   addresses the ZAI settlement, that the PD CMO that is called

11   for under the plan is not yet provided, and certainly all

12   rights and reservations with respect to all of those matters

13   exists.  And we have always had language in the CMO that says

14   basically property damage issues aren't dealt with yet and

15   therefore of course the CMO doesn't relate to property damage

16   issues.

17       But, Your Honor, to the extent that, for example the

18   property damage claimants had an issue with respect to Class 9

19   impairment -- I don't know why they would since it doesn't

20   affect them, but to the extent that there are other issues that

21   are not related to property damage the CMO does apply to all

22   parties.  And therefore we felt that the language that they had

23   provided was simply too broad, because it effectively as I

24   would describe it gave them the second bite at the apple at

25   anything, not just property damage related issues.  And under

1 those circumstances, Your Honor, we felt that the additional

2 language we added in was necessary.  I have not had a chance to

3 speak with the property damage committee about this, the

4 language came in very late.  And in fact the communication that

5 the language was not acceptable came in very late last night.

6 So I was not able to speak with the property damage folks as I

7 was on an airplane when the language came in.  So I believe Mr.

8 Sakalo is here today to address that.

9          THE COURT:  Mr. Sakalo.

10          MR. SAKALO:  Good morning, Your Honor, Jay Sakalo on

11 behalf of the property damage committee.  First, I'd like to

12 address Ms. Baer's comments regarding where things stand,

13 because I think there's been a misimpression left with the

14 Court and other parties in this case particularly with respect

15 to the debtors' certificate of counsel as to where things

16 stand.

17          The debtors have made statements that we're not as

18 far along on PD as they wish to be with respect to the review

19 of documents and the like.  Regarding timing it wasn't until

20 last night as late as 11:00 at night that for the first time in

21 this case the PD committee was provided with a draft of

22 documents related to PD issues beyond the property damage case

23 management order which was submitted a couple of weeks back on

24 certification of counsel.  There may be discussions and reviews

25 going on with other parties in this case, but the suggestion

1  that I think is clear from the debtors' certificate of counsel
2  is that we need additional time to review.  That's obvious.  We
3  got the documents last night and it's only a piece of the
4  document.  So I want the Court to understand that I don't want
5  the blame to be laid at the feet of the PD committee for
6  waylaying this.  We haven't received documents to review let
7  alone been delayed in getting comments back to the debtors.  I
8  just want to start with that premise.

9          And that's important because that affects our
10  comments as to the CMO.  Back in November when the initial CMO
11  was laid out there was an all hands call between the debtors,
12  the relevant committees and the insurers to go over the issues
13  laid out in the initial CMO.  During that call we raised the
14  issue that because PD had not been resolved in all respects,
15  and the timing of that was uncertain at that time -- it was
16  before the ZAI settlement was reached, and as we know things
17  are still uncertain on timing.  It didn't make sense to have PD
18  bound by the deadlines set out in the CMO on all issues because
19  we didn't have a basis to formulate what our position was from
20  the committee, what the PD FCR's position would be, what the
21  Zonolite claimants' position would be.  That was the position,
22  I believe, was agreed to by counsel to the PD FCR.  In fact,
23  Mr. Bernick on that call agreed that all issues related to PD
24  -- and it's the parties, the constituency of PD, the committee,
25  the PD FCR, Zonolite, individual PD claimants would be on a

1  separate schedule.  And that was the basis for the language

2  that we suggested to Ms. Baer earlier this week.  Her

3  modification that they're trying to limit it to asbestos

4  related issues we think constrains the rights of the committee

5  too greatly.  It restrains the rights of other PD-related

6  parties.  By their language they might suggest that we are not

7  entitled to object to feasibility issues and that we're on this

8  same schedule.

9       THE COURT:  I agree with you, Mr. Sakalo.  Until the

10  disclosure statement and the plan are finished I don't know how

11  anybody's going to know what rights and what positions you're

12  going to take.  So frankly I agree.  I don't think you need to

13  finish this argument.  I don't know how you can object to

14  anything until you see what issues you're going to raise, until

15  we have a completed document.  And frankly I don't even want to

16  go through this process until the disclosure statement is done.

17  I don't even want to consider it, I'm not going to give new

18  dates.  I need a completed document.  This is silly.  We've

19  been through this what, three times, four times now?  It just

20  doesn't make any sense.  I keep reserving dates, I keep pushing

21  other cases off for this case.  We don't get anywhere.  So I'm

22  not -- I'm just not doing it.

23       MR. FREEDMAN:  Your Honor --

24       THE COURT:  No.  I'm not doing it, Mr. Freedman, I'm

25  sorry.  I'm just not doing it.  I want to know when the

1 disclosure statement is going to be done.  I'm giving a fixed

2 deadline and I expect that it's going to be done.  And then I

3 will key dates.  I'm simply not doing this anymore.  It doesn't

4 make any sense.  So you tell me when the documents are going to

5 be done, when everything will be finished and then I will key a

6 schedule.  This makes no sense.  And then everybody can be

7 bound.

8         MR. FREEDMAN:  Your Honor, I understand your

9 comments, but I think that your comments have been framed in

10 the context of a statement by Mr. Sakalo which was frankly

11 disingenuous.

12        THE COURT:  No.  My comments are framed in this

13 context, Mr. Freedman, because I can't tell, you know, who

14 wears the white hat and who wears the black hat, and frankly,

15 it's irrelevant.  What's relevant is everybody needs completed

16 documents because we can't get to a final hearing without the

17 completed documents.  And I understand that this is complex and

18 that the debtor and all the parties have been working very hard

19 to put the pieces together.  This case has had some very unique

20 issues.  And it's just the way it is.  It's had some very

21 unique issues, and frankly, I congratulate the parties in

22 trying to knock them down and resolve them.  I think you've

23 done a marvelous job, and I'm very happy about the fact that

24 you're knocking them all down.  But what doesn't make sense is

25 to continue to schedule things that aren't going to come to

1   fruition.  That's what doesn't make sense.  I simply think we

2   need dates to say look, this is when the documents will be

3   done, and here's a schedule that everybody is bound by.

4   Because trying to do this piecemeal doesn't -- it's to the

5   point where it simply doesn't make sense.  I know from the

6   debtors' perspective and frankly the committee's perspective

7   internally you folks have to deal separately with personal

8   injury and separately with property damage.  But from the

9   Court's point of view I've got to get to a point where you have

10  time on my calendar that we're actually going to have a

11  disclosure statement hearing.  That's what I need.  I need to

12  know when are you going to use the time that you can schedule

13  on my calendar and I reserve these days that I can't do

14  anything else with and so I've got two other major cases, two

15  other major asbestos cases and a huge trial on the Virgin

16  Islands that are begging me for time and I keep pushing them

17  off for this case.  I could have been trying a case today and

18  yesterday and the day before -- well, not the day before for

19  other reasons, but that really need time that I didn't try

20  because of this case.  And I could have used that time.  But,

21  you know, from my point of view in that sense it's wasted and

22  I'm not doing it again.  So I want to know when the disclosure

23  statement will be done and then we will do a case management

24  order that will apply to everyone because that makes sense.  So

25  you folks huddle.  You tell me when the disclosure statement's

1 going to be done, when all these property damage issues will be

2 resolved, when I'm going to get a final document, and then

3 we'll build an order that will apply to everybody.  The Phase I

4 concept makes sense because the issues will be somewhat

5 different and that's fine.  We'll put the time frames in,

6 whatever work, I will commit the planned hearing dates whenever

7 you like, but this time they're not getting moved.  This time

8 when you tell me you're going to be here in September you're

9 going to be here in September.  And if you're not then you'll

10 get whatever days on my calendar come next.  And if that's next

11 year that's next year.  That's what's going to happen.  You're

12 getting bumped to the bottom of my list, not the top of my list

13 the next time through.  So you folks huddle.  I'll go take a 15

14 minute recess, you figure out what your game plan is and I'll

15 come back and you tell me when the disclosure statement's going

16 to be done.  We're in recess for 15 minutes.

17                         (Recess)

18          THE COURT:  Mr. Freedman.

19          MR. FREEDMAN:  Yes.  Your Honor, I want to thank you

20 for your comments before.  They were actually quite helpful.

21 And to that end the debtors would like to propose the following

22 schedule.  And the debtors would propose -- will file a final

23 and complete plan and disclosure statement with all the

24 necessary plan documents on February 3rd.  We would propose

25 that February 17th be the deadline for disclosure statement

1  objections.   Frankly the only parties that will be interested

2  in filing objections at that point are the property damage

3  claimants, we believe, because all other objections have been

4  substantially resolved.

5          We would commence the final disclosure statement

6  hearing on February 23rd which is an omnibus date.  The

7  objective would be to have the debtors solicit mail

8  solicitation packages on March 15th.  And the debtors believe

9  that that agenda would be consistent with the confirmation

10 hearing dates that the Court has set in the current CMO which

11 the debtors very much seek to abide by.  To be clear, the

12 debtors were not happy and did not want the 60 day push back

13 that was involved.  We've been trying to get a deal worked out

14 with the property damage claimants.  It's clear that as the

15 Court quite properly said deadlines simply have to be set, and

16 this is the deadlines that we would seek to set.

17         Ms. Baer will elaborate on how the current CMO as

18 proposed is very consistent, entirely consistent with this

19 record -- with this agenda that I've just laid out.  The only

20 change that's obvious to me is that we had started frankly this

21 whole discussion with Paragraph 13 of the current CMO which

22 related to some carve out that was deferential to the property

23 damages claimants.  Given this agenda there is no longer any

24 need for that carve out and we would propose to remove that

25 Paragraph 13 and the property damage claimants can live with

1  the schedule just like every other claimant in this case.  So

2  that would be our proposal for a schedule and agenda to move

3  forward, and I'll leave it to Ms. Baer to further elaborate on

4  how that all comes together.

5                          (Pause)

6          MR. FREEDMAN:  Your Honor, Mr. Sakalo is advising the

7  Court that they have a trial commencing on February 23rd.

8  That's unfortunate and under most circumstances one tries to be

9  accommodating to counsel, but as the Court pointed out this has

10  gone on long enough.  We have a multibillion dollar case to get

11  resolved and we think we simply have to go forward.

12          MR. SAKALO:  Your Honor, actually it's a two week

13  trial that commences on February 17th.  Mr. Baena and I are

14  both trying that case.  It's in front of Judge Hyman in

15  bankruptcy court in West Palm Beach.  It's not a multibillion

16  dollar case it's a multimillion dollar case, but given the

17  delay that we've encountered here what we would request is if

18  the Court has availability at the beginning of March for a non-

19  omnibus date to hear any issues to the extent that we have

20  them.  We don't know whether we're going to have them.  It's

21  part of what I said before, until we have all the documents and

22  see the whole package.  But Mr. Baena and I are both tied up in

23  that trial, trial period the 17th through the end of February.

24          THE COURT:  Well, don't I already have dates set up

25  for hearing these additional issues?  Weren't there already

1  dates set?

2          MS. BAER:  Your Honor, there are no dates in March.

3  The Phase I dates were in April, and there are no omnibus dates

4  in March either.

5          THE COURT:  Then that probably means I don't have any

6  dates in March.  But don't I already have dates set in the

7  current CMO for dealing with these issues?

8          MR. FREEDMAN:  I think, Your Honor, that's precisely

9  the point.  That is, we're talking about approving the

10 disclosure statement as opposed to any objections that the

11 property damage claimants would seek to assert with respect to

12 confirmation of the plan.  So the schedule that we've laid out

13 we think is entirely appropriate for approving the disclosure

14 statement, and then if there are confirmation objections that

15 property damage claimants would seek to assert those dates are

16 not implicated by a February 23rd hearing on approving the

17 disclosure statement, and we ought to be able to go ahead with

18 the disclosure statement getting approved and allow them to

19 work under the current CMO as the debtors are proposing it to

20 assert any confirmation objections.

21         THE COURT:  All right.  My calendar is saying that we

22 have Grace dates scheduled from the 9th through the 12th of

23 March.

24         MS. BAER:  That was, Your Honor, several hearings ago

25 when we had earlier confirmation dates.  Those were in fact

1  set, I think, for confirmation at one point.  Now if there's

2  still reserve then there's some time, I guess.

3          THE COURT:  Right.  And so rather than -- what was

4  the date, February 23rd?

5          MS. BAER:  Right.

6          THE COURT:  Why can't we use March 9th?

7          MR. FREEDMAN:  My only concern, Your Honor, is that

8  our schedule in order to meet the confirmation dates that we've

9  laid out does look to a March 15th solicitation hearing --

10 solicitation date.  And I suppose that there may be some

11 flexibility to push that back a bit.

12         THE COURT:  You mean a mailing date?

13         MS. BAER:  Yes.

14         MR. FREEDMAN:  Mailing date.  Yes.

15         THE COURT:  Okay.  Because that's a Sunday.

16         MS. BAER:  Yes.

17         MR. FREEDMAN:  Right.  But --

18         THE COURT:  I don't see why, I mean, I don't --

19 personally I don't see why if we use March 9th -- well, maybe

20 we can do two things.  First of all we could build in your

21 March 15th or 16th date in the event that there are no

22 objections to the disclosure statement.  We don't need a

23 hearing necessarily if in fact property damage has no

24 objections.  I think we've beaten the personal injury issues to

25 death.

1        MR. FREEDMAN:  Right.

2        THE COURT:  So I don't think I need to go through

3   those issues again assuming that you're not making any further

4   changes.  I mean, at some point if there are more changes

5   people may need to take a look at this.  But that's why I want

6   to see a final document.  We could set March 9th in the event

7   that there are issues, but what that means is you're going to

8   get rulings from me on March 9th.  I expect that you're going

9   to come in and we're actually going to have a hearing on March

10  9th and you're going to get rulings March 9th.  It will not be

11  a kind of thing where you come in and say we want another three

12  days.  No.  It'll be a day where March 9th's the day and you'll

13  get rulings on the disclosure statement and you'll revise it

14  March 10th or 11th, whatever, and then you'll get an order that

15  says fine, you make the solicitation by the 16th.  Now, I

16  understand it's tough to get a package that big together that

17  soon.

18       MR. FREEDMAN:  That's the concern with this printing

19  and there's all those kinds of administrative things.

20       THE COURT:  Well, is that what you're going to do?

21  Are you going to print or are you going to post it on a web

22  site and simply, you know, send a notice out to people that

23  says this is where it is and reserve for mailing -- for mail in

24  for the people who simply can't --

25       MR. FREEDMAN:  Your Honor, we'll be -- we'll seek to

1 be as efficient and creative about those points so that we can

2 start a solicitation on the 15th.  But if what the Court is

3 suggesting is that we commence the disclosure statement hearing

4 on March 9th with the objective of getting a final disclosure

5 statement approved on March 9th that's acceptable to the

6 debtors.

7 　　　　　THE COURT:  I think that would possibly work.  I

8 mean, if they're already in a trial before another bankruptcy

9 judge I don't see that there's much I can do to change that

10 reality when I have not already committed the time to this case

11 for that purpose.  And I do have the March 9th date set aside

12 for it.  So why don't we just use March 9th for that purpose?

13 　　　　　MR. FREEDMAN:  Fine.

14 　　　　　THE COURT:  Okay.  That will be here.

15 　　　　　MR. SAKALO:  Okay.  A couple of follow ups then, Your

16 Honor.  What would the objection deadline be then for you then

17 -- for any objections that the parties may have to the PD

18 related documents?

19 　　　　　THE COURT:  Well, I don't know.  Let me start again

20 if we're working out date.  The final disclosure statement and

21 plan will be filed by February 3rd?

22 　　　　　MR. FREEDMAN:  That's our intention, Your Honor.

23 　　　　　THE COURT:  Okay.  So objections will be due --

24 　　　　　MR. FREEDMAN:  We had proposed February 17th.

25 　　　　　THE COURT:  Well, that doesn't -- well, I suppose for

1  the property damage -- well, let me ask, are you making

2  modifications to anything regarding a personal injury issues or

3  insurer related noncreditor related insurer issues other than

4  things that you've negotiated with the insurers?

5          MR. FREEDMAN:  There -- we expect that there will be

6  a very minor tweak, if you will, to the TDP to address certain

7  issues raised by some of the settled insurers.  Other than that

8  we don't expect to do any modifications.

9          THE COURT:  Okay.  Well, I guess I could push the

10 date back just a little.  How about to let's say the -- if we

11 said the 20th that would still, I guess, give the debtor a

12 little time to negotiate any changes.

13         MR. FREEDMAN:  That's Friday the 20th.

14         THE COURT:  Friday the 20th?

15         MR. SAKALO:  Judge, given that we will be knee deep

16 in trial that week as well if we could have to the following

17 Monday.

18         THE COURT:  Absolutely not.  February 20th is plenty

19 of time, because I want the debtor to be able to have time to

20 negotiate changes, and I think until February 27th is plenty of

21 time to get the changes done and modifications filed.  So

22 February 27th any modifications would be due.  That would, I

23 think, allow the parties that whole week of March the 2nd

24 essentially to get anything together that you need to get

25 together and make comments.  And that way if a hearing is not

1  necessary on March 9th you'll let me know.  And you can save a

2  whole lot of expense for everyone if in fact you're agreed on

3  whatever the changed documents are going to be.  And a

4  disclosure statement hearing on March 9 at 9:00 a.m. in

5  Pittsburgh.  So I guess -- well, maybe I should ask -- maybe

6  I'm saying absolutely not too soon.  Maybe it works for you

7  folks over the weekend if in fact the property damage committee

8  is in trial are you going to need the weekend to talk?

9        MR. FREEDMAN:  Your Honor, we've been talking,

10  notwithstanding Mr. Sakalo's comments, for several months.  I

11  think that February 20th is an appropriate date.

12        THE COURT:  Okay.  What about the 27th, too?

13        MR. FREEDMAN:  That would be fine with the Court --

14  with us.

15        THE COURT:  All right.  Okay.  I don't expect any

16  push back on these dates.  These are fixed dates in cement.

17        MR. FREEDMAN:  Thank you, Your Honor.

18        MR. SAKALO:  One last point, Your Honor.

19        THE COURT:  Okay.

20        MR. SAKALO:  I thought I heard Mr. Freedman to say

21  that as a result of the Court's comments Paragraph 13 of the

22  CMO -- the proposed CMO would be deleted.  But I thought I

23  heard the Court say earlier that the entire CMO and the

24  schedule under it with respect to confirmation issues is

25  essentially abated at this point.  And I heard Mr. Freedman to

1  suggest that we can operate under the existing deadlines.

2  Well, a number of those deadlines have already passed.  And so

3  I just want to get some --

4        THE COURT:  I think we're going to need a CMO.  Yes,

5  that will set deadlines for people who have not yet

6  participated that will track this new schedule.  Frankly I

7  don't know what those deadlines are.  I just -- I don't follow

8  deadlines.

9        MR. SAKALO:  Okay.  That's what I thought I heard you

10  to say before the break.  I just want to make sure that was

11  indeed the case.

12        MR. FREEDMAN:  Your Honor, we're prepared to stay

13  tonight.  But in the same spirit as the Court asked us to set

14  these deadlines we think it's critical that this CMO gets

15  entered as soon as the Court is prepared to do that and that

16  that be very soon.  And I think Ms. Baer will demonstrate to

17  the Court that the number of modifications to the CMO which

18  would address deadlines that have passed that would have

19  affected the PD Committee are very minor and can be discussed

20  right now that the rest of those deadlines are perfectly

21  consistent with the schedule that the Court has laid out and

22  that we ought to proceed along the deadlines and the dates that

23  the Court -- that we presented to the Court.

24        THE COURT:  Well, let's talk about them.  I guess my

25  first question is are you still looking at -- because I'm a

1 little confused -- are you still looking at the current

2 confirmation schedule or are you looking at dates in September?

3          MS. BAER:  Your Honor, this what -- when Mr. Freedman

4 said the schedule this new CMO, the second amended CMO

5 contemplates Phase I in June and Phase II in September.  That's

6 what we are hoping for and this CMO will work with a few minor

7 adjustments with those dates.

8          THE COURT:  Okay, then before we get into those

9 details about the new CMO let's talk about the confirmation

10 hearing dates in September and then work backwards from that.

11 Okay.

12                    (Pause)

13          THE COURT:  Labor Day is September 7th.  How many

14 days are you looking at for confirmation hearing?

15          MR. FREEDMAN:  Your Honor, I can't give you a precise

16 number of days.  The expectation is that all of the insurance

17 issues that have to do with insurance neutrality as a concept

18 and standing will have been resolved in the Phase I well before

19 that so that the kinds of issues that we'll be talking about go

20 to compliance with Section 524(g) proper classification of

21 certain kinds of creditors and feasibility and things of that

22 sort.  My guess is that just from past experience we'll see a

23 whole catalogues of objections along those lines and that there

24 will be the potential for several days to do that, but at this

25 point it's really difficult to be more specific than that.

1          THE COURT:  Well, if I give you four?

2          MR. FREEDMAN:  I think that that would be reasonable.

3   I think that the very important date is that we get a

4   confirmation order entered by the end of October in order to be

5   consistent with the Canadian settlement which has some

6   deadlines that are related to the end of October.  And so what

7   I would not like to see is four days and then pushing it into

8   October and the Court then finding itself pressed to enter a

9   confirmation order with a looming very critical deadline

10  related to the Canadian settlement.

11         THE COURT:  Well, I don't know.  It's going to depend

12  on the issues and what the -- that I just don't know, Mr.

13  Freedman.  What I can tell you now is I talked to my staff

14  about moving two dates the week of September 7th.  Now, the 7th

15  is Labor Day.  I can commit the 8th, 9th, 10th, and 11th if you

16  want that week for confirmation.

17         MR. FREEDMAN:  The debtors will certainly take that

18  and be prepared to work all hours to make it happen.

19         THE COURT:  Anybody have any conflicts?  Okay.

20  Confirmation then will start on September 8th and go through

21  September 11th.

22         MR. FRANKEL:  Your Honor, is it possible maybe that

23  on the 8th we start a little bit later so that we don't travel

24  on Labor Day?

25         COURT CLERK:  Could you say your name for the record?

1            MR. FRANKEL:  Sorry.  Roger Frankel for the Future

2   Claims Representative.

3            THE COURT:  I live here.  I'll do whatever you folks

4   like.

5            MR. FRANKEL:  I guess I'm asking Mr. Freedman as much

6   as --

7            MR. FREEDMAN:  Eleven?

8            MR. FRANKEL:  Eleven would be fine.

9            MR. FREEDMAN:  Eleven.  And ask the Court if we could

10  work with (indiscernible).

11           THE COURT:  That I don't know.

12           MR. FREEDMAN:  Okay.

13           UNIDENTIFIED ATTORNEY:  Yeah.  For those of us in

14  other time zones.

15           THE COURT:  Mona, do you know Michael Rhodes'

16  extension?  Okay.

17           MR. FREEDMAN:  I mean, Your Honor, frankly, the

18  debtors will be here on Labor Day preparing for the

19  confirmation hearing.

20           THE COURT:  Oh, thank you.  Excuse me one second.

21                (Pause - telephone call by Judge)

22           THE COURT:  I will try to have someone stay until

23  seven.

24           MR. FREEDMAN:  Thank you.

25           THE COURT:  Okay, let me make a note.  I have to get

1  confirmation of that, but I'll try.

2                    (Pause)

3         THE COURT:  All right, Ms. Baer, I guess with that

4  schedule in mind the CMO.

5         MS. BAER:  Your Honor, if you look at the second

6  amended CMO which we have submitted I went through all of the

7  comments I received from everyone other than the Libby folks.

8  I believe the Libby folks had one issue with respect to the

9  deadline for a written fact discovery being served.  The second

10 amended CMO currently proposes that the deadline for written

11 fact discovery be served on January 23rd.  And I believe that

12 the PD Committee wanted to address that issue.  And then in

13 terms of -- I'm sorry, the personal injury committee.  In terms

14 of property damage our proposal would be to again, strike

15 Paragraph 13 and put them within this schedule.  And as I see

16 it the only two days that have passed that need to be dealt

17 with is the written fact discovery service date when they would

18 need to serve written discovery or we would need to serve

19 written discovery on them.  That's been completed for Phase I

20 and again, it's not completed for Phase II and we have an issue

21 as to that.  We're proposing that's the 23rd of January.  So we

22 need a date for that.  And then we also are going to need a

23 date for expert reports -- the initial expert reports with

24 respect to property damage because again, actually that date --

25 that date only passed with respect to Libby.  So we're okay on

1 that date actually for property damage.  So, Your Honor, I

2 would propose that for written fact discovery we speak with the

3 property damage committee about an appropriate date and then I

4 believe the rest of the dates will work.

5          THE COURT:  Okay.  Mr. Sakalo.

6                    (Pause)

7          MS. BAER:  Your Honor, thank you, and I apologize.  I

8 think we have agreement that this schedule will in fact work.

9 We need to just give the written fact discovery deadline an

10 adjustment to give the property damage folks to the 16th of

11 March, and then I think all the other dates work, because

12 essentially they're concerned about Phase II.  They're going to

13 revisit and make sure that they don't have any concerns about

14 Phase I and we'll talk if there's a problem.  Again, my

15 proposal, Your Honor, would be to circulate a revised version

16 of this CMO tomorrow with any dates that need to be adjusted,

17 eliminating Paragraph 13, have everybody take a look, and then

18 submit -- hopefully submit it on the COC to the Court.

19          THE COURT:  But they're going to be doing written

20 fact discovery and submitting expert reports at the same time?

21          MS. BAER:  Yes.

22          THE COURT:  Mr. Sakalo.

23          MR. SAKALO:  Actually as I'm looking at that, Your

24 Honor, sitting back down I think we need additional time on the

25 submission of expert reports.

1          THE COURT:  No, I think you need less time on fact

2  discovery.

3          MR. SAKALO:  Okay.  The reason why I was asking for

4  March 16th was I wanted to post the disclosure statement issues

5  so we know where those wind up.  That may shape our discovery.

6          MS. BAER:  But, Your Honor, once they have the

7  disclosure statement they know what to say.

8          THE COURT:  Right.  I don't know

9          MR. SAKALO:  Okay.

10          THE COURT:  -- that's what I was going to say.  I

11  don't know why you need six weeks after you get the disclosure

12  statement to serve fact discovery.

13          MS. BAER:  Your Honor, I think maybe a mid-February

14  date would make it all work.

15          MR. SAKALO:  I'm just looking at a calendar on Mr.

16  Rich's computer.

17          THE COURT:  The disclosure statement's supposed to be

18  filed by February 3rd.

19          MS. BAER:  Correct.

20                      (Pause)

21          MS. SAKALO:  Your Honor, how about if we move it to

22  February 13th service of written fact discovery.  My only

23  concern is the responses are 60 days after, and we'd like to

24  see the responses perhaps if necessary for the expert report.

25  So if we can shorten the response deadline then on -- for the

1  written fact discovery by the debtors to 30 days --

2          THE COURT:  Okay.

3          MR. SAKALO:  -- give us at least a little bit of

4  time.

5          THE COURT:  All right.  I think some shortening of

6  that time frame may be necessary in order to make the schedule

7  work.

8          MS. BAER:  Just with respect to property damage, Your

9  Honor.

10          THE COURT:  Well, everybody else has had the

11  disclosure statement and knows what's going on.

12          MS. BAER:  Right.

13          THE COURT:  So I think the property damage really is

14  the issue.

15          MS. BAER:  Okay, we can do that, Your Honor.  So

16  we'll have for property damage while written fact discovery

17  served by February 13th, and responses due 30 days thereafter.

18          THE COURT:  All right.

19          MS. BAER:  Then, Your Honor, I believe that the

20  schedule as outlined herein works.  I think that there was --

21  again, I believe that the Libby Claimants may still have one

22  objection which we'll address in a moment.  And then I'm not

23  sure if the state of Montana had another issue with respect to

24  something.  I don't believe so.  I think that was it.

25          THE COURT:  Mr. Green.

1          MR. GREEN:  May it please the Court, James Green on

2    behalf of the bank lenders.  Your Honor, the bank lenders had

3    two issues with the proposed amended case management order that

4    the debtors seek to enter today.  The first bank lender sought

5    from the debtors incorporation of a separate paragraph in the

6    CMO reserving the party's rights with respect to discovery

7    related to and any dispute regarding solvency or however Ms.

8    Baer addressed this issue this morning that Paragraph 14 does

9    in fact reserve the right with respect to discovery regarding

10   insolvency.  However, to the extent that it does not it could

11   be clear the bank lenders again state for the record that they

12   further wish to reserve all the right with respect to discovery

13   related insolvency and any other issues related thereto.

14          And, Your Honor, the second issue that the bank

15   lenders have is more of a general objection.  And this is in

16   line with Your Honor's comments this morning that the bank

17   lenders have a fundamental problem with allowing the debtors to

18   continue to delay the confirmation process.  And we appreciate

19   that the Court addressed these concerns this morning.  Still

20   the bank lenders would like to reserve all rights with respect

21   to a more substantive objection in the future.  And this is in

22   addition to the objection that was filed yesterday.  Thank you,

23   Your Honor.

24          THE COURT:  Substantive objection to?

25          MR. GREEN:  To continuing the confirmation process

1  and in generally continuing the case -- the bankruptcy case.

2          THE COURT:  Oh.  Well, okay, I mean, if you have an

3  objection you'll file one.  But right now I don't see any undue

4  delay.  I think the parties are making substantial progress.

5  It's just that I think the issue is as I've stated it that the

6  problem is the convenience problem for the other cases that are

7  on this Court's docket.  I'm not seeing undue delay within this

8  case at this time.  I'm seeing a problem with the fact that

9  dates get scheduled and then they're not used.

10          MR. GREEN:  Well, the bank lenders don't completely

11 agree with that, and we did file an objection.  And it was more

12 of a general objection, as I said, and it wasn't specifically

13 saying that this CMO should not be entered because we

14 understand that it may need to be in this case.  However, any

15 further delay we do have an objection to that and we reserve

16 the right to file a specific objection.

17          THE COURT:  You always have rights to file objections

18 and if and when they get filed they get scheduled.  So I'll

19 hear them, Mr. Green.  If you file something I'm sure I'll be

20 seeing you here.

21          MR. GREEN:  Thank you, Your Honor.

22          THE COURT:  Okay.

23          MR. FREEDMAN:  Your Honor, I just want to make one

24 comment for the record.  The pleading that the bank lenders

25 filed which comes close to being scandalous is that the delay

1 here is because the debtors are concerned about getting exit

2 financing.  The delay has to do with what we've told the Court

3 the delay has to do with which is trying to negotiate a

4 settlement on the PD issues.  And with the Court's help we've

5 now gotten past that issue.

6          THE COURT:  Okay.

7          MR. GREEN:  Just a brief follow up, Your Honor.  And

8 I guess -- when the debtors want to proceed expeditiously

9 they're able to do so.  For example, in a little over two

10 months they took their objection to the bank lender's proof of

11 claim from a status conference all the way through a full

12 evidentiary hearing.  Now there doesn't appear to be any exit

13 financing for the debtors and they seem content to remain in

14 bankruptcy.  Thank you.

15          THE COURT:  Bankruptcy's sometimes a nice place to

16 be, Mr. Green, and sometimes it's not, and I, you know, so,

17 we'll see.  Right now the lay of the land and the financing

18 issues are troubling a whole lot of entities.  And if it's

19 troubling this one too then I hope that's not the case.  I

20 certainly hope that financing won't be the reason that this

21 debtor can't exit bankruptcy after all these years, and the

22 progress that this case has made, because this case has made

23 substantial progress.  I certainly hope that some lenders are

24 out there who will see it that way, too.  But, we'll see.

25 Okay.  Mr. Freedman, what else?  Or Ms. Baer.

1          MS. BAER:  Your Honor, I believe that we have

2    resolved everything with respect to the CMO.  We will revise a

3    CMO to reflect these dates as well as build in, Your Honor, the

4    disclosure statement final dates into the CMO.

5          THE COURT:  All right.

6          MS. BAER:  So I think the only issue remains one of

7    Mr. Cohn's with respect to the Libby Claimants.

8          THE COURT:  All right.  Mr. Cohn.

9          MR. COHN:  Thank you, Your Honor.  And I don't know

10   having participated in the meet and confer, I don't know how

11   this has been reduced to what issue, Your Honor, but why don't

12   I just outline the Libby Claimants' position on this revised

13   CMO?  It comes down to several issues.  The first one, Your

14   Honor, is the deadline for written fact discovery.  You'll note

15   that that is stated here as January 23rd, 2009.  Contrary to

16   Ms. Baer's description of the CMO as generally pushing back

17   dates by 60 days this date is remaining frozen.  We'd like that

18   push back by 60 days also consistent with the rest of what's

19   being done here so that we have time to do a follow up written

20   fact discovery after we get the responses to the first round,

21   if necessary.  So we would propose the date of March 23rd,

22   2009.  That still means that written fact discovery would be --

23   would all have been served six months prior to the Phase II

24   confirmation date and that would not seem to us to be an undue

25   delay or extension of that.

1          THE COURT:  Libby's not involved in Phase 1.

2          MR. COHN:  Correct.

3          THE COURT:  Okay.  Why is the fact discovery for

4   Libby that early?  I know I got a reason before, I just don't

5   remember.

6          MR. LOCKWOOD:  Your Honor, the fact discovery for

7   everybody written -- we're talking interrogatories, we're

8   talking document reduction requests, and we're talking requests

9   for admission.  The fact discovery for everybody has been

10  completed, written fact discovery for Phase I, and it was on

11  January 23rd '09 in the last CMO.  It is January 14th, Libby

12  should have been operating on a schedule that they would have

13  to get done their written fact discovery in nine days up until

14  this hearing.  Libby has already sent out written fact

15  discovery.  In deed, the next two issues on the agenda are

16  Libby Claimants' motions to compel responses to written fact

17  discovery that they've already sent.  The property damage

18  committee just got until February the 13th, they haven't even

19  been a participant.  The Libby Claimants are simply

20  opportunistically saying well, you've moved a bunch of other

21  dates 60 days so give us 60 days more without any explanation

22  at all as to why other than the fact that it would be nice that

23  they should get 60 days, except Mr. Cohn's suggestion that they

24  would need the extra 60 days to submit additional written

25  discovery based on the answers that they get to the first set

1  of written discovery in the context in which no other party to

2  this case is being given extended discovery periods to have

3  follow up discovery.  Point one.

4          Point two, as you will see when we get to the next

5  two issues the type of written discovery Libby appears to be

6  seeking is -- to put it mildly -- objectionable.  We would like

7  to have a period of time, among other things, to, if we get

8  additional objectionable written discovery from Libby by

9  January the 23rd, '09 to have time for objections and hearings

10 on that.  If you push back that 60 -- their second round of

11 written discovery for 60 days then -- and they file similarly

12 objectionable discovery then we have another extended period in

13 which we litigate with them about their second set of written

14 discovery.

15         The bottom line is there's no reason, none, why they

16 can't file their written discovery on the same time table that

17 everybody else in the case has lived by and which they were

18 ordered to be lived by up until now.

19         THE COURT:  Okay.  So the Phase II discovery for

20 everyone is January 23rd except for the property damage

21 committee that -- the property damage that hasn't been involved

22 because the documents haven't been done.

23         MR. LOCKWOOD:  That's correct.  And virtually

24 everybody else has already filed.  And indeed, as I said, the

25 Libby Claimants have already filed substantial written

1   discovery which is why we're going to be hearing it in a few

2   more minutes arguing about it.

3           THE COURT:  Okay.  Mr. Cohn, I'm not sure why, if

4   everyone's on the same schedule what's the issue?

5           MR. COHN:  The issue is, Your Honor, that we -- one

6   of the things that you'll hear when we get to the motions that

7   we're about to argue is that despite the fact that this case

8   has been placed on an expedited time frame that that requires

9   cooperation among counsel.  What's happening is that instead

10  what we're getting is a --

11          THE COURT:  Pardon me.  Who's speaking?  I'm sorry,

12  someone's talking and all I can hear is your speaking.  Turn

13  your microphones off, please.

14          UNIDENTIFIED ATTORNEY:  I apologize.

15          THE COURT:  Go ahead.

16          UNIDENTIFIED ATTORNEY:  I didn't realize it.

17          THE COURT:  I'm sorry, Mr. Cohn.

18          MR. COHN:  That's all right, Your Honor.  What I was

19  saying is that when you do an expedited process like this one

20  to get the confirmation it requires a certain amount of

21  cooperation among counsel which we had hoped to achieve.  And

22  what we're getting instead is the plan proponents really trying

23  to block us and delay at every juncture, Your Honor.  We're

24  anticipating that we will not get responses to our discovery.

25  And the reason for the extra time is to have the ability to ask

1  to propound follow up discovery to the extent that that's

2  what's necessary because we didn't receive full cooperation the

3  first time around.

4        THE COURT:  Okay.  Well, I think that the CMO builds

5  in, did it not, the opportunity to approach the Court for that

6  additional time in the event that that's necessary.  It

7  indicates in Paragraph 7 that it's -- that all parties are to

8  work together to complete the expeditious production of the

9  documents and do other discovery.  And I thought there was

10 something in the original order anyway, I don't know about this

11 one, that indicated that the dates were subject to

12 modification.  I don't remember --

13       MS. BAER:  It does, Your Honor.  Paragraphs 14 and 15

14 both do that sort of thing.

15       THE COURT:  Okay.  So I think, Mr. Cohn, at this

16 point I'm going to leave these dates fixed.  If in fact you

17 don't get the discovery and it's ordered after a hearing on

18 your objections then I think obviously I'd build time in

19 whereby you're going to get whatever is ordered to be produced.

20 And if that production indicates that some follow up is

21 necessary I'd certainly hear -- request and I think if it's

22 necessary on an expedited basis then file an expedited motion.

23 For the most part I don't generally hear arguments on discovery

24 motions.  I expect that if you need discovery you're going to

25 tell me what it was that you didn't get, you're going to give

me, for example, an interrogatory, what it said, why you need

it, what you either got if it was sufficient or was

insufficient, and why it was insufficient.  Or if you didn't

get anything the response that you got and why you think you're

entitled to something more than what you got.  So that I don't

want everything, I just want the relevant pieces to what you're

looking for.  And I generally make rulings in chambers on those

things.  So I think it could be done on an expedited basis in

that respect and I think that should be better than changing

the dates for service of these what I'll call initial and

hopefully final, but at least initial rounds.

          MR. COHN:  We're willing to try it that way, Your

Honor.

          THE COURT:  All right.

          MR. COHN:  Based on what you've said.

          THE COURT:  Okay.

          MR. COHN:  So.  All right, our next concern, Your

Honor, appears two lines down on the CMO.  The time for

responding to written discovery is proposed to be lengthened to

60 days.  And once again, Your Honor, against the backdrop of

our being concerned about whether we're going to get responsive

responses what we'd like to do is leave it at 30 days the way

it's been and of course the way the rules provide, but

obviously counsel can work together in the event that there is

a partial response that can be done in 30 days or staged

1  production of documents or whatever it is that's necessary in

2  order to have it proceed as quickly as it can within reason.

3  But to simply roll the period back by 30 days strikes us as a

4  bad idea because we simply then won't even know what responses

5  we're getting for an additional 30 days.

6           THE COURT:  Okay.  Ms. Baer.  Mr. --

7           MS. BAER:  Your Honor, we did that because frankly

8  we've seen the written discovery and some of it we know we

9  can't possibly respond to in 30 days, specifically some of the

10 Libby stuff which we will get to when we get to the arguments

11 on the Libby's motion to compel.  It's substantial.  In

12 addition, Your Honor, we've got some -- we've got -- we had

13 changes in the Phase I and Phase II descriptions which included

14 some other parties.  And you'll see if you look on the schedule

15 other parties are now doing certain things and they need time.

16 I've already been contacted by a couple parties who we served

17 with the discovery who have said they didn't realize they were

18 in Phase I or they didn't realize they were in Phase II and

19 they need additional time, they want to have a discussion with

20 the debtor about exactly what kind of information we're

21 looking.  So simply, Your Honor, we did this because we already

22 know, and we've already been contacted by people who cannot

23 make the 30 day deadline.

24           THE COURT:  Well, how about indicating that it's 60

25 days to complete discovery, but that it's to be produced on a

1 rolling basis?

2        MS. BAER:  We can certainly do that.  We've been

3 doing that on the insurer discovery for quite a while.

4        THE COURT:  I think that may make more sense.  At

5 least that way the parties can begin to get production as soon

6 as the other parties have it ready and the outside time frame

7 for production is 60 days.  That way everyone won't get a whole

8 massive production at one time.  Mr. Cohn, would that be

9 acceptable?

10        MR. COHN:  I didn't realize my nods are not appearing

11 on the record, Your Honor.  Yes, that would be acceptable.

12        THE COURT:  All right.

13        MR. COHN:  That's very good resolution.

14        MR. LOCKWOOD:  Again, Your Honor, this 60 day period

15 is for everybody.  It's for us, it's for all the other

16 objectors.  There's nothing unique about the Libby Claimants

17 that they should somehow or another have a shortened period of

18 time to respond to their discovery.  The one thing we don't yet

19 know, because we haven't seen it, is what their January 23rd

20 written discovery would be like.  But, for example, we've

21 gotten discovery -- I got one from one single insurer that had

22 94 requests for admission.  It had 55 interrogatories not

23 including subparts.

24        THE COURT:  Oh, I'm sorry, I was talking about

25 document production on a rolling basis.

1         MR. LOCKWOOD:  Well, this is written discovery.  This

2 applies to all forms of written discovery --

3         THE COURT:  Yes.

4         MR. LOCKWOOD:  -- not just document production.

5         THE COURT:  Well, I was asking for document on a

6 rolling basis.

7         MR. LOCKWOOD:  On documents we could produce on a

8 rolling basis.  That's not an issue.

9         THE COURT:  Yes.

10        MR. LOCKWOOD:  But I don't want anybody to think that

11 we're necessarily going to produce RFA responses and

12 interrogatory responses on a rolling basis unless they are

13 pretty straightforward and simple.  I mean, then routinely

14 ignore -- people ignoring the limits on the number of

15 interrogatories including subparts in the Federal Rules which

16 are supposed to be 25.  I have yet to receive a set of

17 interrogatories that complies with the rules on that score.

18 And when you consider we're getting multiple sets from multiple

19 insurers and multiple other parties the burden -- I mean, Mr.

20 Cohn acts as though the Libby Claimants are the only

21 participants in this case, and that's just not, with all due

22 respect to his self sense of the importance of his client's

23 interest, not true.

24        THE COURT:  Well, I appreciate that.  I thought we

25 did an order at some point in time that indicated how many

1  interrogatories were permitted, or did we -- I know we

2  discussed it.

3      MS. BAER:  Your Honor, you denied the Libby

4  Claimants' request that it be increased, and ordered that

5  people comply with the Federal Rules.

6      MR. LOCKWOOD:  But everybody else has ignored it.

7  The Libby Claimants may actually --

8      THE COURT:  Then file an objection.  Answer the first

9  25 and file an objection to the rest.

10     MR. LOCKWOOD:  Well, I understand that.  I was just

11  using that as illustrative of the kinds of volume of stuff

12  that's involved in this particular item.

13     THE COURT:  Well, that's fine.  But answer the first

14  25 and file an objection to the rest.  I'm pretty sure you'll

15  probably get an order that sustains objections to the rest.  I

16  mean, the rules are the rules, folks.

17     MR. COHN:  Well, Your Honor, just to recall the

18  discussion, the discussion was not that there was an absolute

19  enforcement of the limit of 25.  The discussion was that there

20  would be no wholesale lifting of the limit of 25, but that

21  counsel should try to work these things out amongst themselves

22  and if they --

23     THE COURT:  Correct.

24     MR. COHN:  -- and if they weren't able to then come

25  before the Court.

1          THE COURT:  That's right.

2          MR. COHN:  Well, so --

3          THE COURT:  But that doesn't mean that you can just

4  serve 139 interrogatories without calling in advance and trying

5  to work it out either.  Working it out means talking, I think.

6          MR. LOCKWOOD:  Well, and the rule is the rule.  I

7  mean, the default position as Your Honor just acknowledged is

8  25 interrogatories.  I mean, if Mr. Cohn or anybody else wants

9  to discuss why we would voluntarily agree not to have the rule

10 apply they have telephone numbers, they have email addresses,

11 and they have snail mail addresses.

12          THE COURT:  Well, in any event, with respect to

13 documents let's add into this the documents are to be produced

14 on a rolling basis, and 60 days is the outside limit for

15 production.

16          MR. COHN:  Well, Your Honor, in the case of

17 interrogatories and requests for admission I do understand Mr.

18 Lockwood's point that he has to deal with multiple parties.  It

19 would seem to me that the equivalent of a rolling response when

20 you're talking about multiple parties would be to not just

21 leave everybody to the 60th day, but would be to, you know, to

22 produce on a stage basis.  I can't make a case for Libby to go

23 to the front of the line, but I would at least like assurance

24 that the 60 day deadline's not simply going to be an excuse to

25 wait until the 60th day for everybody.

1           THE COURT:  It says 60 days after receipt.  So

2  whatever day they get them it's going to be in a cue.  I mean,

3  hopefully people are going to be acting in good faith in not

4  delaying discovery.

5           MR. COHN:  Well, that's -- I just -- I will say that

6  from our perspective it's a concern.  And we think that if you

7  enter this order then it will not be until the 60th day after

8  any of our written discovery requests for interrogatories or

9  requests for admission that we will receive back anything.

10 That's the nature of the way that this seems to be going.  And

11 I just want to put that out there, Your Honor, just so that you

12 -- just to let you know.  And on the issue of exceeding the 25

13 interrogatories, to the extent that there needs to be prior

14 agreement among parties among including the recipients of

15 discovery to agree that they will answer more than 25

16 interrogatories before those interrogatories can be served, in

17 that context, Your Honor, the deadline of January 23rd is

18 absolutely impossible.  It just doesn't work, because there's

19 no time to obtain a court adjudication of their --

20           THE COURT:  I'm not adjudicating those issues in

21 advance, folks.  My perspective is this, the rules are the

22 rules.  That's my pretty much long and short of it.  The rules

23 are there for a reason.  Congress has determined, and the

24 Supreme Court first, and -- first of all the Rules Committee

25 which is comprised of a lot of lawyers.  Secondly, the Supreme

1  Court, third, congress have determined that for the most part

2  25 interrogatories including subparts ought to do it.  That

3  ought to get you started with the other type of discovery that

4  you need.  That's what they've determined.  If you can make a

5  case for more then you make a case for more.  But you've got a

6  host and a wealth of different tools, discovery tools that you

7  can undertake, and it shouldn't be such a massive undertaking

8  that interrogatories are the means and end all of discovery.

9  That's what they've determined.  So that's what they've said.

10 For the most part the rules are the rules, they should be

11 complied with.  That's kind of how I view the rules.  That's

12 why they're there.  And determining in advance I'm not giving

13 you advisory rulings.

14         MR. LOCKWOOD:  Under those rules people make

15 objections and then before you file a motion to compel you have

16 a meet and confer.  That's the way it works.  And if Mr. Cohn

17 doesn't like the fact that the meet and confer occurs after the

18 objections rather than before the objections then I guess he

19 should take it up with the Rules Committee.

20         THE COURT:  Well, I think you should all be

21 reasonable and not force objections when they're not necessary.

22 So be reasonable.  Twenty-five interrogatories may not be

23 enough in these cases.  So, be reasonable.

24         MR. LOCKWOOD:  Your Honor, I have sat here and

25 listened to Mr. Cohn now say three different times that his

1  legitimate discovery efforts are being unreasonably impeded by,

2  among others, my clients.  As you will see when we get to Mr.

3  Cohn's first efforts at discovery, his discovery requests are

4  patently unreasonable on a whole variety of grounds and I'm

5  simply not going to sit here and listen to these sort of vague

6  self-protestations of virtue from him with the idea that Your

7  Honor should sort of accept them as gospel and set rules based

8  on the premise that we are unreasonably responding to his

9  discovery.  We -- you will get to hear the reality.

10          THE COURT:  I have learned one thing in this case,

11  Mr. Lockwood, and that is I don't generally as a matter of

12  principle I'm not accepting most of what I hear from anybody in

13  this case.  Okay.  So having said that, be reasonable about how

14  many of these things you're going to answer.

15          MR. LOCKWOOD:  You will get an opportunity very

16  shortly to determine who's being reasonable and who's not, Your

17  Honor.

18          THE COURT:  Okay.  Documents on a rolling basis.

19          MS. BAER:  Yes, Your Honor.

20          MR. COHN:  Your Honor, if you go down about six lines

21  or so you'll find supplemental expert reports.

22          THE COURT:  Yes.

23          MR. COHN:  That deadline is currently -- in the

24  current CMO that deadline is February 13th, '09.  Now, the

25  context for this, Your Honor, is that the Libby Claimants went

1 along with a very tight time frame for producing initial expert

2 reports.  Those were due December 31st of '08.  And we worked

3 over the holidays and got those reports done and served.  We

4 got no initial expert reports at all from the plan proponents.

5          MS. BAER::  That's not true.

6          MR. LOCKWOOD:  That's absolutely not true, Your

7 Honor.  We just filed two reports for Dr. Longo and Dr. Wells.

8          MR. COHN:  December 31st?

9          MS. BAER:  Yes.

10          MR. LOCKWOOD:  No.  With -- yeah, on the 31st.

11          MS. BAER:  Yes, on the exact same day.

12          MR. COHN:  Well, then I apologize, Your Honor,

13 because -- were we served with those?

14          MR. LOCKWOOD:  Let me ask.  My local counsel assures

15 me that they were, Your Honor.

16          MR. COHN:  All right, thank you.  Then those -- so,

17 you know, the parties worked very hard and I would now assume

18 that this goes for the others to get those reports done over

19 the holiday season.  And this is in the context of having the

20 supplemental reports be due within a reasonable time

21 thereafter.  And that current deadline as I say is February

22 13th.  Why this date would be ruled back by two months thus

23 putting us in a real time crunch in terms of dealing with those

24 rebuttals, you know, puts us in a very difficult position.

25          MR. LOCKWOOD:  Excuse me, the CMO says April 13th.

1        THE COURT:  Right.  He's saying the initial -- the

2   current one says February 13th.

3        MR. COHN:  Right.  And what I'm saying -- yes, Your

4   Honor.  And what I'm saying is we would like to see that

5   deadline adhered to because we are going to need the time once

6   we've gotten those reports, the supplemental reports, we're

7   going to need that time to react to those and to prepare for

8   the expert depositions that are going to take place thereafter.

9   So we would respectfully request that that deadline of the 13th

10  -- February 13th, '09 remain the same.  I would quote back to

11  Mr. Lockwood his words that that's the deadline that's in the

12  current CMO.  The experts are all presumably, you know, hard at

13  work getting ready to respond by the 13th of February.  And

14  there's no reason why that deadline can't remain the same thus

15  providing plenty of time thereafter for the rest of the process

16  to take place.

17       THE COURT:  Well, that is an issue that may -- for

18  the personal injury that may be appropriate.  It would not be

19  appropriate for property damage.  That would be one where the

20  dates would have to change.

21       MR. COHN:  I'm not -- I'm just -- I'm entirely

22  addressing personal injury, Your Honor.

23       THE COURT:  Ms. Baer.

24       MS. BAER:  Your Honor, I have to remind everybody

25  that the deadlines don't just apply to one side.  The

1 supplemental expert reports apply to everybody including Libby.

2 Your Honor, it makes no sense at this point with the push back

3 in the entire schedule to rush everybody to prepare the

4 supplemental expert reports, including Libby, and it not only

5 applies to property damage, Your Honor, but as you'll note on

6 the expert report deadline there are other parties who aren't

7 even going to be filing their expert reports until March 16th.

8 So this accommodates both supplemental expert reports with

9 respect to those parties as well as supplemental expert reports

10 from the plan proponents and the supplemental expert reports

11 from Libby.  The expert depositions, Your Honor, don't commence

12 until the end of April and they go all the way to June.  Rather

13 than have people come back and ask for more time because of

14 something that's occurred it makes no sense whatsoever to rush

15 that.  Now there is time for everybody to look, because as

16 you'll see, Your Honor, supplemental expert reports, the

17 footnote we dropped was at the request of a number of parties

18 to make it clear that the failure of a party to file an initial

19 expert report does not preclude them from filing a supplemental

20 expert report including an expert report by an expert who did

21 not file an initial expert report.  Again, a number of parties

22 were very concerned that they did not file an initial report,

23 we now have all these initial reports, and they need time to

24 react and time to get experts up to speed.  So it's a one for

25 all sort of deadline, Your Honor.  It was actually a compromise

1  from a later date that some people asked for, and again, it
2  still gives plenty of time for the expert depositions.  And
3  this has nothing to do with rebuttal.  There is no date for
4  rebuttal.  People want to file rebuttal reports, they can still
5  come in and ask for time to file rebuttal reports.  Mr.
6  Lockwood, anything?
7          MR. LOCKWOOD:  I have nothing to add on that, Your
8  Honor.
9          THE COURT:  Well, okay.  If the supplemental reports
10 are due April 13th and expert depositions are starting April
11 15th?
12         MS. BAER:  April 27th, Your Honor.  It's two items
13 down.
14         THE COURT:  Two weeks.  Oh, I see, two lines.  April
15 --
16         MS. BAER:  We're looking at Phase II.  This is all
17 Phase II concerns.  And the depositions go all the way through
18 June 15th.
19         THE COURT:  Okay.  But the problem is that if you're
20 not requiring everybody to file initial reports some of these
21 folks may be filing supplemental reports as the initial reports
22 so you may not actually get an expert report until April 13th
23 and then depositions start two weeks later.  So why have a
24 supplemental report at all?  What's the point to having an
25 initial expert report period in there if you're not requiring

1  anybody to file an initial report?

2          MS. BAER:  Your Honor, it was to do exactly what it

3  did which is to get the major players to file their reports,

4  which they did.  The initial expert reports were filed as Mr.

5  Cohn has indicated over the holidays.  We all know who are the

6  major players.  We all know who are the major experts.  And we

7  all know -- we have those.  Not it's time for everybody to look

8  at what else is there and react.  And there may be some

9  supplemental expert reports as a result.  And again, Your

10  Honor, we've also -- if you look at expert reports there's a

11  few parties who haven't even filed initial expert reports yet.

12          THE COURT:  Well, okay.  Since you're talking

13  compromise, what about this?  What about changing the

14  supplemental expert report deadline only as to the parties who

15  have already filed initial expert reports and making that, that

16  March 16th date, where the initial expert reports are due for

17  the insurers and Scotts and I guess property damage.  Then the

18  supplemental reports for everybody else can be due April 13th.

19  That would give Mr. Cohn an extra month for most reports.

20          MS. BAER:  So, Your Honor, the 3/16 supplemental

21  expert report deadline would apply to who?

22          THE COURT:  Everybody who's already filed an initial

23  report.

24          MS. BAER:  Okay.

25          MR. MANGAN:  Your Honor, this is Kevin Mangan on

1  behalf of the state of Montana.  We would be one of those

2  parties that would have fallen into the category with regard to

3  the footnote 2 filing a supplemental which did not file

4  initial.  My request would be that the state of Montana be

5  included with the insurers and Scotts with regard to the

6  initial expert report for Phase II.

7         THE COURT:  I'm sorry, your request is that your

8  report -- are you on a speaker phone?

9         MR. MANGAN:  Your Honor, --

10         THE COURT:  Folks, how many times --

11         MR. MANGAN:  -- I'm sorry.  No, I am on -- I thought

12  I picked up.

13         THE COURT:  I'm sorry.  Your request is what?

14         MR. MANGAN:  Your Honor, this is Kevin Mangan on

15  behalf of the state of Montana.  We had requested -- we were

16  part of the category that would have been involved in the

17  footnote filing a supplemental report April 13th.  We are now

18  -- would request that we be put in on the March 16th initial

19  report as with the insurers and Scott.

20         MS. BAER:  Your Honor, that was the one issue I

21  thought Montana had said something else.  On the expert report

22  deadline it says completed except for insurers and Scotts.  He

23  wants me to add in Montana, and we have no problem with that.

24         THE COURT:  Okay.  That's fine, Mr. Mangan, you'll be

25  added there.

1          MR. MANGAN:  With that we're fine with the order,

2 Your Honor.

3          THE COURT:  Okay.

4          MS. BAER:  All right.  I understand, Your Honor.

5 We'll make these revisions.

6          THE COURT:  All right.  That'll give you an extra

7 month, Mr. Cohn.

8          MR. COHN:  Thank you, Your Honor.  Then the one final

9 issue I needed to address.

10          THE COURT:  Yes.

11          MR. COHN:  The one final issue that I needed to

12 address is that footnote 2 which seems to basically say that

13 the initial deadline didn't count.  And we would strongly

14 object to that.  If we are now going to see a bunch of expert

15 reports that are -- that should have been filed as initial

16 expert reports, Your Honor, but somebody just decided oh, well,

17 why not, why don't we just wait until the supplemental

18 deadline, then it would seem to us that that's an abuse of the

19 provision of the CMO as entered, and we would propose that that

20 footnote not generally operate.  There may be particular

21 parties, for example, PD for whom it has to be that way, and

22 we're certainly not going to try to stand in the way of that.

23 And conceivably there could be other parties as well.  But to

24 the extent that we're talking about the plan proponents and the

25 Libby Claimants, Your Honor, it would seem to me that those are

1  parties who are bound by December 31st deadline and --

2        THE COURT:  Well, they've already filed expert

3  reports, though.

4        MR. COHN:  Well, exactly.  And there should be no

5  more reports that are permitted under the -- no initial reports

6  that are permitted under the guise of calling it a supplemental

7  expert report.

8        THE COURT:  Well, that's what I'm a little confused

9  about, too.  I don't understand why if you've already filed

10  initial reports and you're not filing supplementals you're

11  filing initial initials, but Ms. Baer said that there were not

12  plan proponent parties, but other parties out there who, I

13  guess, may have been confused as to whether they're in Phase I

14  or Phase II or may have missed deadlines and therefore need to

15  file -- or may need to file an initial report that missed the

16  deadline.  So this is to cover them, I guess.  But I'm not sure

17  why they shouldn't be bound to an expert report deadline as

18  opposed to a supplemental expert report deadline.

19        MR. COHN:  And I guess what I would suggest, Your

20  Honor, is that if footnote 2 does not apply to the plan

21  proponents, in other words, is not permission to file initial

22  reports by the plan proponents then that's fine with us.

23  That's all that we're getting at.

24        THE COURT:  Okay.  That's my understanding.

25        MR. LOCKWOOD:  Well, it certainly didn't apply to us.

1  We filed ours and I don't know -- and I believe the futures

2  representative did --

3         MR. COHN:  That's fine with us, Your Honor.

4         MR. LOCKWOOD:  -- so I -- and I think it applies to

5  Grace so I don't -- as I understand it this is some sort of

6  other category of objectors.

7         MS. BAER:  This was requested specifically on our

8  meet and confer on Monday and I believe it was the insurers who

9  had made that request on our meet and confer.

10        THE COURT:  Well, I don't know why they need that

11  time, either.  I mean, they've certainly been active --

12        MS. BAER:  I don't know why they'd file an expert

13  report.

14        THE COURT:  -- well I don't either.  It seems to me

15  if they miss a deadline they miss a deadline just like any

16  other party.  They shouldn't have any other special privileges.

17  They've certainly been here and active and participating, and

18  it seems to me if they haven't filed an initial report they

19  shouldn't be filing supplementals.  If you want to build in --

20        MR. BROWN:  Your Honor, this is Michael Brown.  Could

21  I just briefly comment on that footnote?

22        THE COURT:  Yes, sir.

23        MR. BROWN:  The reason it was requested, Your Honor,

24  is because the proposed CMO shifted some items that were

25  originally supposed to be in Phase I into Phase II at a point

1 after which the deadline for Phase II expert reports had

2 already passed.  And that was the reason we requested that

3 footnote.

4          THE COURT:  Well, then I think it should simply set a

5 new expert report deadline so that everybody knows if you got

6 an expert report what it is.  I can't -- it's going to be very

7 confusing to have supplementals without initials.  I think if

8 you want to file an initial expert report there should be a

9 deadline for it.

10          MS. BAER:  Your Honor, it does that.  We've already

11 done that.  The expert report --

12          MR. BROWN:  Yeah, I think it may have been solved in

13 two ways, Your Honor, but the cell that deals with expert

14 reports now for Phase II because it has an exception for the

15 insurers, Scotts and now Montana probably solves the problem of

16 footnote 2, and footnote 2 may be redundant at this point.

17          THE COURT:  Okay.  I think it is because the deadline

18 of March 16th, I think, fixes it.  So I think footnote 2 should

19 simply be deleted and expert reports for Phase II maybe should

20 simply be fixed at March 16th for anybody who hasn't yet filed

21 one.

22          MS. BAER:  We will do so, Your Honor.

23          THE COURT:  All right.

24          MS. BAER:  I mean, I think that solves it.

25          MR. RICH:  Your Honor, our understanding with the PD

1  issues was that it was going to be that April deadline, April

2  13th, not March 16th.  I think Ms. Baer --

3         THE COURT:  No, those are supplementals.

4         MS. BAER:  That was supplementals.

5         THE COURT:  Supplementals.

6         MR. RICH:  It may be a misunderstanding.  And I've

7  had with Ms. Baer, I was under the impression that our expert

8  reports whatever nature were initially due then, but I could be

9  mistaken.

10         THE COURT:  I think from the discussion we had

11  earlier your expert reports were due March 16th.  That's the

12  reason I was asking about fact discovery being concluded March

13  16th at the same time that your expert reports were due.

14         MR. BROWN:  Okay.

15         THE COURT:  So I think your reports are due March

16  16th, and supplementals April 13th just like everybody else's.

17         MR. BROWN:  Okay.

18         THE COURT:  So I think footnote 2 can come out and

19  simply set a new deadline as March 16th for any party who has

20  now got a Phase II issue who hasn't yet filed an initial.

21                    (Pause)

22         THE COURT:  Okay, what else?

23         MR. LOCKWOOD:  Excuse us, Your Honor.

24                    (Pause)

25         MS. BAER:  Your Honor, we believe there's some

1  confusion with respect to what is a supplemental expert report
2  and who it may come from.  And I think the confusion relates to
3  parties versus experts.  We want to make it very clear that
4  what we're talking about here is parties.  In other words, the
5  supplemental expert reports and the deadlines you've set
6  suggest various parties.  But the fact of the matter is nobody
7  is precluded from filing a supplemental expert report by an
8  expert other than -- let me see if I'm saying this backwards.
9  Let me try this again.  Certain experts have prepared initial
10 expert reports.  Supplemental expert reports are not
11 necessarily rebuttals or they may be, but supplemental expert
12 reports may be filed by experts other than those who filed
13 initial reports.  We don't mean by limiting -- by the term
14 supplemental expert reports to suggest that if someone has an
15 expert who is now filing a report that addresses issues that
16 were raised in the initial report they are not precluded from
17 filing that report because their expert didn't file an initial
18 expert report.  Supplemental is similar to rebuttal.  It's an
19 expert report being filed by an expert that addresses things
20 that were raised in the initial reports, but it's not limited
21 to just the people who filed initial reports.  Maybe put
22 another way, we have two expert reports filed by the plan
23 proponents and I think three expert reports filed by the Libby
24 folks.  If people are filing supplemental reports with respect
25 to those reports and those issues it's not limited to those

1  five experts.  In other words, just because there are two from

2  the plan proponents and three from Libby the plan proponents

3  are not limited to only filing supplemental reports from those

4  two.  They may have supplemental reports from other experts

5  that address the issues raised by the Libby reports.

6          THE COURT:  How do you supplement something that

7  wasn't filed before?

8          MS. BAER:  They're supplementing based on what's been

9  said by the other side's experts.

10         THE COURT:  That's not a supplement, that's a

11  rebuttal.

12         MS. BAER:  Then I think, Your Honor, we probably need

13  to define what supplemental means and address rebuttal, too.

14  And as I stand here I don't necessarily have a proposal,

15  because I think there is some confusion as to what's there and

16  what people are planning to file.

17         THE COURT:  I thought when you're talking

18  supplemental report you're talking about having your initial

19  expert file a supplement to that report based on whatever other

20  discovery you have undertaken that may inform that expert's

21  view of that expert's own report, which is usually what happens

22  in the course of a case and an expert takes a look at that --

23  at whatever the circumstances are and files a supplement.

24  That's what, I think, what supplement means.  It means

25  addition.  I doesn't mean extra or new.  It means supplement.

1  I means -- well, that's a good word.  Define the word using the

2  same word.

3          MS. BAER:  Then, Your Honor, I think we may need to

4  discuss among the parties the issue of rebuttal reports.

5          THE COURT:  Well, that's -- right now you don't have

6  any process for filing rebuttal reports.

7          MS. BAER:  Right.  And I would think that the plan

8  proponents as well as Libby need to talk about that, because

9  I'm not quite sure how to address this right now, and I don't

10 want to preclude certain people from filing reports that they

11 were planning on filing by what we've done in these things.

12 Especially with respect to eliminating footnote 2.  I mean,

13 when you eliminate footnote 2 we cause that problem.

14         THE COURT:  Well, I don't think you do, because if

15 you put the deadline for expert reports except feasibility in

16 as March 16th for everybody who hasn't yet filed an initial

17 report you don't need footnote 2.

18         MS. BAER:  Again, Your Honor, what we don't have in

19 here is we don't address then rebuttal reports.

20         THE COURT:  Right.  That's correct.

21         MS. BAER:  And I think we need to address rebuttal

22 reports.

23         THE COURT:  I think you do, too.

24         MS. BAER:  So what I would suggest, Your Honor, is we

25 will try to discuss it and build it into this.

1          THE COURT:  Well, the issue is whether the

2  supplemental expert reports and rebuttal reports can be filed

3  on the same day.

4          MS. BAER:  That may affect the schedule.  That may in

5  fact make it more difficult for us to meet the deadlines that

6  are said here which I guess would now be March 16th for the

7  plan proponents and April 13th for everybody else.  I would

8  just like the opportunity to talk to the plan proponents about

9  that and see whether or not that is doable.

10          THE COURT:  Okay.  I -- my concern is making sure

11  that I get the trial briefs, the binders, all the reports, and

12  your exhibits in a schedule in advance.  These other dates you

13  folks can juggle until your hearts' content.  I really don't

14  have a dog in that fight.  My only dog is making sure that I

15  have everything in time to review it in advance of the hearing.

16          MS. BAER:  Thank you, Your Honor.  Again, we just

17  need some time to talk about it so we're not -- we don't

18  preclude anybody from doing something they were planning on

19  doing.

20          THE COURT:  All right.  I will expect to get a new

21  order on a CMO that you will submit, Ms. Baer, that will build

22  these deadlines in including rebuttal reports.

23          MS. BAER:  Thank you, Your Honor.

24          THE COURT:  All right.  Now, having raised that issue

25  though we might as well raise the real hairy issue which is are

1  you talking about surrebuttal reports?  Because frankly I want

2  to cut this off at some point.  And if you're going to do both

3  supplemental and rebuttal I really don't see why you need

4  surrebuttal reports.  And but what I don't want to get is some

5  motion that says please let me file one, because if I do get

6  that motion, I'm telling you now, if it's not built into this

7  schedule it's going to be denied.

8          MS. BAER:  Your Honor, I'm the wrong person to talk

9  to.  We've never reached that term ever.  So I just --

10         MR. LOCKWOOD:  Your Honor, I'm not aware of any

11 procedure in any of the cases that we've been through with you

12 or elsewhere for surrebuttal reports, experts.

13         THE COURT:  Oh, Mr Lockwood, I can probably point you

14 to some on various dockets.

15         MR. LOCKWOOD:  Well, I would defer to your

16 recollection on that.  In any event I would not encourage them.

17 I don't think we want to build them in.  There is a provision

18 that would allow somebody ask for relief from the CMO in the

19 case of demonstrated needs.  So if somehow or other somebody

20 felt like a rebuttal report had really raised new issues and

21 they've been sandbagged and they have no -- their expert is

22 ready --

23         THE COURT:  That's what they all say.

24         MR. LOCKWOOD:  -- to testify about it, but is somehow

25 limited.  I mean, one way to handle, for example, theoretically

1  something like that is rather than surrebuttal reports if

2  somebody raises new matter in a rebuttal report then when you

3  put the expert on the stand the expert can address in his

4  testimony that rather than having this endless stream of

5  surrebuttals and sur-surrebuttals and what have you.  But at

6  least at the moment it seems to me we don't need to sort of

7  build those hypotheticals into the schedule and would just

8  leave it at somebody can make an emergency motion or whatever

9  if it looks like that's necessary.  And one would hope that it

10  wouldn't be necessary.  And I rather suspect the Court would

11  sort of tend to advise people to try and avoid that.

12        THE COURT:  My denied stamp is going to be ready.

13  Okay.  Yes, that's a fair process that if someone thinks you

14  need one you can file a motion.  But it's going to have to be a

15  very strenuously argued and highlighted to show me where there

16  is really new material.

17        MR. LOCKWOOD:  A cogent motion, right, Your Honor?

18        THE COURT:  Thank you.  That's a very good word.

19  Thank you.  Yes.  Okay.  You can build in the rebuttal issues

20  then and I'll sign this order when I get it.

21        MS. BAER:  Thank you, Your Honor.  I think that was

22  it.  Mr. Cohn, did you have anything else?

23        MR. COHN:  Well, I just did want to express the

24  concern.  We will talk with Grace about and the plan proponents

25  about these rebuttal reports.  It's news to us that that's

1 going to be part of the process.  But we'll talk and we'll try

2 to work out something reasonable.

3          THE COURT:  Okay.  Well, you don't have to file them,

4 you know.  If everything's been appropriately addressed by your

5 experts which hopefully it is then there is no need for

6 rebuttal reports.  It just creates more work for everyone.  And

7 frankly if there isn't something that's really rebutted I

8 really don't want to get both a supplemental and a rebuttal

9 report that doesn't rebut anything.

10          MR. COHN:  What I'm reacting to, Your Honor, is the

11 suggestion that there are going to be new experts that we

12 haven't heard from yet who are going to be now trundled out by

13 the plan proponents.  But we'll discuss that with them.

14          THE COURT:  Okay.

15          MR. COHN:  Thank you.

16          THE COURT:  All right.  Ms. Baer.

17          MS. BAER:  Your Honor, I think that moves us onto

18 agenda Item Number 4.  Agenda Item Number 3, Your Honor, was

19 solicitation.  That will be heard at the same time as the final

20 disclosure statement hearing.

21          THE COURT:  All right.

22          MS. BAER:  And, Your Honor, actually going back to

23 Items Number 3 and Items Number 4 are the disclosure statement

24 matters.  We have them continued to the January 26th hearing.

25 We now have agreed that we're going to have a final disclosure

1 statement hearing on -- it was March 9th.

2          THE COURT:  9th.

3          MS. BAER:  Do we need the 23rd?

4          MR. FREEDMAN:  Your Honor, I think that we'll

5 probably want to take advantage of the 23rd to report to the

6 Court on what I expect to be progress with respect to the open

7 issues on settled insurance claims and things of that sort.

8 PD, I think, will wait until the later dates.  But we'll be

9 able to talk about them some.  So I'd like to keep the 23rd --

10          MS. BAER:  It's actually the 26th.

11          MR. FREEDMAN:  Oh, the 26th, to be able to report to

12 the Court on those things.

13          THE COURT:  That's fine.

14          MS. BAER:  So, Your Honor, we'll keep it as continued

15 to January 26th, but we all know the final hearing will be

16 March 9th.

17          THE COURT:  All right, that's fine.

18          MS. BAER:  Your Honor, the fourth matter on the

19 agenda is -- actually it's two matters.  The Libby Claimants 4

20 and 5 have filed two motions to compel.  The first motion to

21 compel, Your Honor, is with respect to production of the

22 debtors.  Your Honor, the Libby Claimants have asked the

23 debtors to produce all of the PIQs, all of the POCs, and the

24 Rust database.  And, Your Honor, from the debtors' perspective

25 this is simply not ours to give.  And I want to explain what

1   the Libby Claimants are asking for here, Your Honor.  They have

2   not really said why they need this, but here's what they're

3   asking for.  They're asking for essentially four million pieces

4   of paper.  There are over 100,000 POCs and PIQs.  The volume of

5   the documents is because of the attachments.  These documents

6   are housed at Rust Consulting and the real pieces of paper are

7   there.  And then what we have is we have electronic versions of

8   the documents.  And we have an electronic database.  The

9   electronic database has, if you will, all of the answers that

10  are on the forms.  It does not have anything with respect to

11  the attachments.  If you asked for proof of claim for Mr. John

12  Smith you would get the PIQ and all of the attachments

13  electronically.  That's the way the information is kept.

14          So when the Libby Claimants asked for all of this

15  they're asking for a huge, huge amount of information.

16  Frankly, Your Honor, if they got all of that information we

17  would not have a confirmation hearing for three years if they

18  were actually going to review all that information.  They

19  simply need to narrow, and specifically, address what they need

20  and why they need it.  And that yet has not really been done.

21  And furthermore, Your Honor, I mean, the debtors have no

22  general objection to providing relevant information.  But it's

23  not ours to give.  And that's the key end related issue here.

24  These documents are all subject to many protective orders.

25  Much of this information was provided with orders that say it

1  was provided for the estimation hearing only.  And we now have

2  a number of responses from the various personal injury

3  claimants who of course object to us now providing all of that

4  information to the Libby Claimants.

5        It's the debtors' position that the Libby Claimants

6  need to ask for relevant information and narrow this request

7  and then we need to also resolve the issues with respect to how

8  this information is to be protected.  And I will say one thing,

9  Your Honor, and then I'm going to turn it over to the Personal

10 Injury Claimants counsel because they're really the one with

11 the biggest dog in this fight, so to speak.  Your Honor, we

12 can't redact four million pages of paper.  That is not

13 possible.  You cannot simply redact all of the personal

14 identifying information off of PIQs, because that means going

15 through page by page by page physically.  It simply -- again,

16 Your Honor, we would not be here for another three or four

17 years before we had a confirmation hearing if that sort of

18 information needed to be provided in that sort of way and then

19 reviewed by the Libby Claimants.  So there has got to be some

20 sort of a resolution here that narrows this information to what

21 is really relevant for confirmation.

22        THE COURT:  Well, did the debtor not somehow whether

23 it was from a sample or the whole database, I don't know, did

24 the debtor not create some use for personal injury estimation

25 purposes from the PIQs without the identifying information?

1          MS. BAER:  What the debtor did is the debtor did in

2     fact take various samplings.  They had several of their expert

3     -- they had a couple different experts go into the information

4     and select certain claims.  They had certain criteria and I

5     think Elizabeth Anderson actually testified in great detail

6     about the sampling process and how it worked.  In order to

7     digest the information to do their estimation expert reports,

8     yes, they did that.  And that's how we had to handle the great

9     volume of information.  But, of course, you have to have the

10    information to be able to sort of figure that all out.  So, I

11    mean, again, we had to do that because for us to review the

12    backup documents for every single claim would have been

13    impossible to make the estimation hearing.

14          THE COURT:  But there is a database somewhere that

15    has at least a variety of samples of information without the

16    personal identifying information.

17          MS. BAER:  The personal identifying information is

18    there.  The personal identifying information was not shown in

19    the court, was not testified in the court, was not produced in

20    the court.  The personal identifying information was in those

21    databases, those sample databases.  It's there.

22          THE COURT:  Okay.  Thank you.  Mr. Cohn.

23          MR. COHN:  Thank you, Your Honor.  By the way, we

24    freely acknowledge that it is not -- we are not going to end up

25    looking at everyone of those, you know, questionnaires plus

1  attachments.  We, ourselves may need to do sampling.  The

2  problem is in order to do a sample you have to have the whole

3  thing.  And so we need the database and then we need the

4  underlying documents.  We understand they are producible in

5  electronic form.  We're not proposing to have somebody stand

6  there with a photocopy machine for months producing this stuff.

7  So there is no, I think, physical burden upon Grace to produce

8  this volume of material.  But let me address -- let me go to

9  the more basic point.

10         First, which is what's the relevance of this

11  material?  As you know, Your Honor, central to the Libby

12  Claimants' objection to the plan is that the Libby Claimants

13  are being discriminated against contrary to Combustion

14  Engineering and discrimination in this context means not being

15  provided with a fair rateable share of that which is available

16  to the personal injury claimants as a whole through the PI

17  trust.  There are two dimensions to that discrimination.  What

18  you've seen in a common theme in the objections to this

19  discovery is why don't the Libby Claimants focus only on the

20  Libby claims?  And the answer is that yes, it would be

21  sufficient, and we do intend to demonstrate at confirmation

22  that the Libby Claimants themselves are not being -- or the

23  Libby claims themselves are not being allowed at their proper

24  tort system value for purposes of the PI trust.  And we will

25  demonstrate that, and to the extent that you accept that and so

1   find then this plan in its current form cannot be confirmed,

2   because the Libby Claimants are entitled to have their claims

3   treated rateably with other claims in accordance with their

4   tort system values.

5            THE COURT:  I don't know that that's the -- I'm not

6   sure that's the legal proposition that's correct under the

7   524(g) standards.  I mean, that's a legal issue that probably

8   ought to be briefed if that's the purpose of for the discovery.

9   I'm not sure that's true as a matter of 524(g) confirmation

10  standards.

11           MR. COHN:  Well, Your Honor, it was -- it's what the

12  Court in Combustion Engineering said.  But of course we'll

13  brief it at the appropriate time.

14           THE COURT:  I don't think that's what Combustion

15  said.  I don't think -- you can point me to the language that

16  you're relying on, but I don't think that's at all what

17  Combustion said.  What Combustion went off on is the fact that

18  in that particular case the debtor had made arrangements with a

19  pre-confirmation group of creditors and not -- that allowed

20  that pre-confirmation group of creditors to have a stub claim

21  that although in a contract situation would be perfectly

22  appropriate and is done all the time to allow claims to be

23  voted in plan contexts.  The Court determined wasn't

24  appropriate in the tort context under the 524(g) standards and

25  therefore said that in the 524(g) context that stub vote was

1 not appropriate for a variety of reasons that it would somehow

2 violate the -- essentially the fair and equitable treatment

3 allowed to other tort creditors in the case.  It didn't go off

4 on the tangent that their claims had to be allowed as they

5 would be allowed in the tort system.  If that were the standard

6 you'd never get an asbestos case confirmed because the debtor

7 would never have enough money to pay the claims.

8          MR. COHN:  No, no, not that it's treated rateably in

9 accordance with court system value.  You could pay everybody 25

10 percent of tort system value, but you can't say that we're

11 paying one group of claimants their full tort system value or a

12 percentage of their full tort system value and say to some

13 other claimant no, we're just paying you some small fraction of

14 your tort system value.

15          THE COURT:  I don't think that's how bankruptcy

16 confirmation standards work.  You pay a class a percentage of

17 the distribution of a pot of a class.  And everybody who has an

18 allowed claim within that class gets paid a percentage of an

19 allowed claim.  The question is what's the allowed value of the

20 claim?

21          MR. COHN:  Yes.

22          THE COURT:  And the standard here is that we're going

23 to set an allowed value.  If you have a mesothelioma claim your

24 claim is worth -- I'll just pick a number -- $100,000.  And

25 you'll get paid -- again, I'll just pick a number -- 30 percent

1 of $100,000.

2        MR. COHN:  Right.  But how does it get determined

3 that the starting point for the mesothelioma claim is the

4 $100,000 and the starting point for a -- let's say a severe

5 pleural disease claim is $10,000?

6        THE COURT:  It gets determined the way the trust

7 distribution procedure determines that it's going to get set

8 up.

9        MR. COHN:  Well, but just --

10        THE COURT:  Not by reference to a specific process in

11 a state court system.

12        MR. COHN:  So there's no legal standard for what the

13 plan proponents can do.  They just have absolute discretion to

14 write whatever TDP they want?

15        THE COURT:  I don't know that it's absolute

16 discretion, but it's wide discretion.  As long as it comports

17 with the standards of 524(g) and 1129, yes, there's a lot of

18 discretion.

19        MR. COHN:  Well, our position, Your Honor, is that

20 you need -- there needs to be a consistent standard across the

21 various disease classes.  That in this case the TDP has

22 actually adopted what purports to be the standard, because it

23 says that the purpose of the TDP is to allow claims at their

24 value in the tort system.

25        THE COURT:  It does?

1              MR. COHN:  Yes.  Allow claims.  Liquidate claims,

2    Your Honor, and then pay a percentage of those claims of those

3    allowed values.

4              THE COURT:  Oh, that's different.

5              MR. COHN:  Well, no, no, that's -- right.

6              THE COURT:  That's different than saying that it's

7    going to rateably pay claims according to their values as

8    allowed in the tort system.  That means you'd have to liquidate

9    each claim in the tort system first.  Surely this trust isn't

10   doing that.  If it is I don't know why we're in bankruptcy.

11             MR. COHN:  No, Your Honor.  What the trust purports

12   to be doing is first, liquidating claims according to how the

13   trustees determine the tort system value, and then -- and

14   paying everybody the same percentage of that liquidated tort

15   system value.

16             THE COURT:  No.  I don't think -- I'm sorry, maybe I

17   misread this trust, but that's not what I thought this trust

18   was doing.  I thought the trust was saying, for example, and

19   this is painting with a very broad brush, so I don't mean to

20   misspeak, and maybe this is too broad.  But in essence the

21   trust is saying claimant, you file a claim -- and again, I'll

22   just pick a mesothelioma claim.  So a claimant files a claim

23   that says I have mesothelioma.  Attached is the appropriate

24   documentation.  The trustees agree that the claimant has

25   supported the claim and shows that the claimant has

1  mesothelioma, and therefore the trustee say fine, you have

2  mesothelioma, it falls within this classification in the trust,

3  the trust therefore says your claims is worth $100,000, you're

4  getting paid 30 percent of that amount, here's your

5  distribution.

6          MR. COHN:  Well, there are -- what the trust says is

7  that its goal -- it has a multilevel procedure for dealing with

8  it.

9          THE COURT:  Correct.

10         MR. COHN:  It says the goal of that multilevel

11 procedure is to provide people with the tort system value of

12 the claim.  People can get it either through that expedited

13 review which is I think what you're thinking of.

14         THE COURT:  Correct.

15         MR. COHN:  To say we the grid value, we'll take it.

16         THE COURT:  Right.

17         MR. COHN:  Alternatively they can seek individual

18 review which is designed and the standard of individual review

19 is supposed to be what's the tort system value of this claim.

20 And so we have -- to use your example if the tort system value

21 of this meso is more than $100,000 you get a chance to show the

22 trustees that it's more than $100,000.

23         THE COURT:  You do?

24         MR. COHN:  Yes.  That's the way that this thing is --

25         THE COURT:  That's right.  I agree.

1          MR. COHN:  -- is set up to work.  Okay.  So the

2    general -- and the only reason that this works is because the

3    TDP is trying to -- should be trying to -- pay everybody

4    according to a uniform standard which is what's the tort system

5    value of the claim?

6          THE COURT:  No.  In fact, that's exactly the

7    opposite.  The trust is trying to pay everybody according to

8    the parameters that the trust sets up which is to take the

9    massive claims and convince everyone that the expedited process

10   is both faster, cheaper, more economical, pays them a fixed

11   distribution in a more expedited fashion, eliminates the risk

12   of going into the tort system and does the other things that

13   524(g) provides.  Therefore is set up with the idea that 524(g)

14   is a better resolution than returning back into the tort system

15   for litigation mode.  That's the purpose of 524(g).  So the

16   purpose is exactly the opposite of what you're saying.  It's to

17   get the resolution through 524(g) not with reference to an

18   individual process.  So assuming for whatever reason that there

19   are exceptional cases that would not fall within the parameters

20   of this expedited review then for those exceptional cases there

21   is the individual review process.  And if that fails then

22   there's probably -- I don't recall in this trust, I'm sorry,

23   but there's probably even a level beyond the expedited -- or

24   pardon me, beyond the individual review process.  I'm getting

25   nods, yes.  Beyond that individual review process that again

1  would allow for a trial or an arbitration proceeding and trial

2  in the event that the individual review process doesn't

3  successfully resolve the claim.  That's how the trust is

4  written so that there are multiple protections and multiple

5  levels built in so that any particular claimant and the trust

6  have the opportunity to determine the value of the claimant,

7  the claim in the event that the expedited review process is

8  insufficient for the particular exceptional cases.  But the

9  purpose is to get the massive problems resolved through the

10  trust procedures.

11          MR. COHN:  Right.  Well, let's stay with that, Your

12  Honor.

13          THE COURT:  Okay.

14          MR. COHN:  So those values, the grid values, let's

15  call them.

16          THE COURT:  Grid.

17          MR. COHN:  Those grid values need to bear a

18  reasonable relationship to each other.  In other words, you

19  can't just say, you know, meso are 10 million and, you know,

20  severe asbestosis is $1000.

21          THE COURT:  No, they need to bear some reasonable

22  relationship to what the claimants will agree that the values

23  are that they will accept for confirmation purposes and voting

24  on the plan.  That's what they need to bear a relationship to.

25  This is a confirmation.  This is a negotiated agreement.

1        MR. COHN:  Well, I dare say, Your Honor, in the case

2    of the Libby Claimants it was not and a provision has not been

3    made, there's been no attempt made to establish some level at

4    which Libby claims can be allowed.

5        THE COURT:  They're only part of a class.  They're

6    only part of in the case of a person from Libby who has

7    mesothelioma they are part of a class of mesothelioma claimants

8    who will be treated as part of a mesothelioma distribution in

9    the trust.

10        MR. COHN:  Mesos, Your Honor, we understand.  Because

11    that's -- because a meso in Libby and a meso elsewhere are

12    basically the same.  The problem that we have in Libby is that

13    we have a type of pleural disease which you don't find

14    elsewhere, you don't find it from exposure to non-Libby

15    asbestos, if you will, Your Honor.  We have severe pleural

16    disease.  People die of pleural disease in Libby and not

17    elsewhere.  People can -- will be severely impaired.  That

18    means you have, you know, 65 percent lung function, Your Honor.

19    I mean, that means you're on the verge of death or on oxygen

20    and you're suffering very badly.  And you can -- and people in

21    Libby have that with just pleural disease.  Not interstitial

22    disease, not anything else, but just pleural.  And that's a

23    unique characteristic of Libby disease.  And our objection to

24    confirmation of the plan to the TDP in particular is that it

25    does not make fair provision for that type of claim.  Those --

1  the standard that <u>Combustion Engineering</u> announces for that is

2  that you can't -- there cannot be discrimination within the

3  class of personal injury claims as a whole against a particular

4  type of claim.  And so that's the case that we're trying to

5  prepare for our confirmation.  That there is discrimination

6  within the class against the particular types of claims that

7  the Libby -- that the non-malignant Libby Claimants have.

8  That's why I said, you know, set aside meso and set aside the

9  other cancers.  So there are two ways in which --

10       THE COURT:  What you're really arguing is that the

11  Libby pleural should be their own separate class.  Because if

12  they're arguing -- if you're arguing that there can't be

13  discrimination, if I were to buy your argument that they have a

14  different type of pleural disease that automatically

15  discriminates against them if they're given superior

16  distribution over other members in the class.

17       MR. COHN:  Well, they should be -- one way to deal

18  with it, and we've suggested this is would be to put the Libby

19  Claimants in a separate class.  But another way to deal with it

20  is the same way you deal with mesos and with, you know, with

21  just non-malignant asbestos claims which is you could -- you

22  set appropriate disease levels.  So you could set an

23  appropriate disease level within the TDP for Libby pleural

24  claims.  And if you did that, and if it was fair based on

25  medical criteria and how much those claims get in the tort

1 system then you would, you know, fair in relation to other

2 claimants, not paying Libby Claimants too much in relation to

3 other claimants, but not paying them too little.  And that

4 would be a reasonable outcome.  Our argument s that that was

5 not even attempted much less succeeded at and that for that

6 reason the TDP must fail as it relates to the Libby Claimants.

7          THE COURT:  Okay.  Well, I think that this is an

8 issue that may take some evidentiary support because --

9          MR. COHN:  Absolutely.

10          THE COURT:  -- number one, I'm simply unfamiliar

11 because I've never seen any evidence, just I'm not familiar

12 with any evidence that establishes that there is a different

13 type of pleural disease for people from Libby as opposed to

14 anywhere else in the world, or that the type of disease that

15 people from Libby -- who live in Libby have can't also be

16 contracted by someone who isn't from Libby.  So I don't know

17 that -- I don't know as a matter of law that there can be this

18 -- I'll call it subclass -- for Libby so that there is an

19 appropriate disease level that can simply be isolated for Libby

20 Claimants.  That's number one.

21          MR. COHN:  Your Honor, absolutely.  That's where the

22 medical evidence comes in and we fully intend to demonstrate

23 that at confirmation.  So that's on the agenda.

24          THE COURT:  Okay.  Number two, -- I lost number two,

25 I'm sorry.  I was thinking about the disease level and I lost

1  whatever number two was.  I don't know.  It's gone.  There was

2  something else about the plan confirmation that was troubling

3  me in your statement, but I just don't recall what it was.  But

4  the bottom line is I don't know why whatever the information is

5  that's in the PIQs is going to inform this issue.  Because if

6  it's a medical criteria issue and a matter of evidentiary

7  support then Libby Claimants either have this separate type of

8  disease or they don't.  And if that's a medical issue then you

9  need experts to tell me how that evidence is going to be

10 supported and what difference does it make what information is

11 in the PIQs.  I need some medical evidence.

12        MR. COHN:  Right, Your Honor, yes.  And I agree.  But

13 then the next step is okay, fine, so the Libby Claimants have

14 this separate disease.  Now, how are they being compensated for

15 that disease in relation to other claimants.

16        THE COURT:  Oh, that was the other issue.  Yes.  Go

17 ahead.

18        MR. COHN:  Okay.  So that we also need to address.

19 And there are two ways to address it and we think that the

20 Libby Claimants are being discriminated against really in two

21 ways.  One is that their claims are being underpaid relative to

22 other claims in the sense that whereas other claims are being

23 -- and the TDP itself says this, Your Honor, -- that they are

24 being paid in accordance with their tort system values.  I

25 shouldn't say paid.  I should say allowed and then paid a

1  percentage of tort system value.  But the Libby claims as this

2  TDP currently operates, Your Honor, would be paid far less than

3  their tort system value.  So we will introduce evidence on that

4  topic also.  But the other piece of it, Your Honor, and the

5  piece that this discovery relates to is that we think that

6  other claimants are being overpaid relative to the tort system

7  value.  And here's why, Your Honor.  You start off with the

8  premise that Grace is paying 100 cents on the dollar to its

9  general unsecured claims, all of its general unsecured claims

10  except for asbestos PI claims.  So why is it that you have a 25

11  percent or so, you know, estimate of what the pay rate will be

12  on asbestos PI claims and you have a 100 percent pay rate of

13  other claims?  And the answer -- now, there could be reasons,

14  Your Honor, why someone might compromise just to get a plan

15  done.  So maybe if asbestos PI were being paid 80 cents or 90

16  cents we might all shrug our shoulders and say well, that's the

17  nature of compromise.  But where they're being paid at 25 cents

18  the suspicion must arise, Your Honor, that that 25 cent -- that

19  25 percent must relate to an inflated value, because that's how

20  you get to in fact the real pay rate being much higher and much

21  closer indeed to what other creditors are getting.  Other

22  creditors are getting 100 cents, maybe these people are really

23  getting their 80 cents or 90 cents it's just that they're get

24  -- the way they're 80 cents or 90 cents is they're getting 25

25  percent of an inflated number.  Am I being clear, or do I need

1  to start again?

2          THE COURT:  No, I understand what you're saying.

3          MR. COHN:  Okay.  And in fact, Your Honor, the prima

4  facie evidence bears this out.  I mean, it's not just the

5  figures that I -- the comparison that I threw out.  It's also

6  if you look in the estimation proceeding, Your Honor, even the

7  highest estimation reports that you got for what is Grace's

8  aggregate personal injury exposure numbers, you know, three

9  billion, four billion, you know, that kind of range.  Well, if

10 there were even four billion of claims that would be allowed

11 against the asbestos PI trust and this deal purported to be,

12 you know, 2.9 billion -- let me just round it to three billion

13 because the math is easier -- so three billion of value is

14 going into the trust and there's about four billion of claims

15 you'd expect a pay rate of 75 percent, right?  Three billion

16 over four billion.  And what you're instead getting is a

17 projected pay rate of 25 percent which must mean that they're

18 expecting that claims are going to get allowed against this

19 trust in the face amount, if you will of, you know, eight

20 billion, nine billion, ten billion.  Far higher than even the

21 asbestos communities' estimates of what a reasonable assessment

22 of Grace's aggregate liability would be.  And, of course, you

23 know, and out of the ball park as it relates to Grace's own

24 estimate of the asbestos liability.  So this is an issue that

25 we wish to explore, Your Honor.  Are other claimants being

1  overpaid?  And conveniently, Your Honor, Grace has assembled

2  the data that will let us explore that issue.  And that's the

3  Rust database, the personal injury questionnaires, the

4  underlying documentation.  That's why it is relevant to our

5  case, very directly relevant to our case having to do with

6  discrimination against the Libby Claimants and that's why we

7  would respectfully submit that we are entitled to this

8  discovery.  It is relevant.

9          THE COURT:  Well, the Rust database, though cutoff

10 the existing claims against the debtor as of the date of the

11 petition filing.  It didn't do anything to -- well, I mean it

12 is an estimation -- it permitted an estimation to a certain

13 extent going forward of claims into the future, but it did

14 nothing to find claims that were not already filed against the

15 debtor as of the petition date.

16         MR. COHN:  That's true.

17         THE COURT:  Okay.

18         MR. COHN:  Those are claims -- yes.  And so more

19 specifically, Your Honor, it had to do with claims where

20 litigation had been commenced.

21         THE COURT:  Exactly.

22         MR. COHN:  Yes.  So we acknowledge that that's --

23 it's a sample.

24         THE COURT:  Or a claim filed.  Claims filed against

25 the debtor.  It wasn't necessarily all litigation claims as I

1  recall.

2         MR. COHN:  Well, I'm not -- I thought it was

3  litigation claims, but Your Honor, the point in any of that is

4  that the Rust database is itself a sample.  It's a subset of

5  the total of asbestos claims.  In fact, the total of asbestos

6  claims include, you know, Mr. Frankel's constituency of future

7  claims as to which, you know, there is no such data.  There are

8  no medical records, there are no, you know, there's no

9  settlement information, no information about how much people

10 have collected from other claimants, from other defendants.

11 There's none of that for the future claimants.  So we

12 acknowledge that all of this is a subset of the total amount of

13 personal injury claims, and we're not going to attempt to argue

14 -- to present you with aggregate information.  The aggregate

15 liability should be allowed at this level rather than some

16 other level.

17        Rather, Your Honor, we do want the opportunity to

18 look at the data to see whether on a sampling basis it would be

19 possible to demonstrate that claims are being overpaid, that

20 types of claims are being overpaid.  The Libby claims as a type

21 of claim are being underpaid and other people are being

22 overpaid.  We only need to win on one point or the other.  But

23 we are entitled to pursue those alternative theories of

24 discrimination, Your Honor.  And this discovery is directly

25 relevant to that.

1          Now, the two objections that have been -- besides
2  relevancy, Your Honor, the two objections or the themes that
3  appear in the objections that have been received to the motion
4  to compel are one, that this information was just produced for
5  the estimation proceeding and should be so limited.  And then
6  the second objection is that it's very sensitive personal
7  information.  And so I'd like to address each of those in turn.
8          Concerning it having been produced for the estimation
9  proceeding well, of course, Your Honor, that was the proceeding
10 in which the information was being collected.  At the time that
11 discovery is, you know, was being conducted of course everybody
12 would limit it to the proceeding in which it was being produced
13 and particularly where it's sensitive information of that type,
14 you know, and had accompanying confidentiality provisions.  One
15 would expect to see that and that's what was indeed done.  That
16 should not preclude us from now seeking discovery of that
17 information with -- for another specified and limited purpose,
18 namely a confirmation objection, provided that we live by the
19 very strict confidentiality requirements that are appropriate
20 for highly sensitive personal information like this.  There is
21 no suggestion that the Libby Claimants have ever -- and bear in
22 mind in this case we have been -- we've had access to all sorts
23 of confidential information, and there is no suggestion that
24 the Libby Claimants had ever breached that confidentiality.  In
25 fact, you might recall, Your Honor, that when we were

1  originally dealing with this issue in the context of the

2  estimation proceeding Libby Claimants were among those parties

3  concerned to make sure that there were appropriate safeguards

4  to assure the confidentiality of this information.  And we are

5  willing to obtain this discovery under the strictest provisions

6  of confidentiality including that to the extent that it's going

7  to get used in some -- at trial, for example, that it only be

8  used after appropriate provision is made so that personal

9  identifying information or anything else that would be

10 sensitive to some particular individual is kept only on an

11 anonymous basis.  So those issues can and indeed already have

12 -- there are templates for this elsewhere in the case, Your

13 Honor.  Those issues have been addressed, can be addressed,

14 we're willing to address them.  But the fact that this is

15 highly sensitive, you know, confidential information does not

16 -- is not a ground to deny us discovery of it given that it is

17 -- that the information is relevant to the case that we are

18 trying to build in opposition to confirmation.  Thank you.

19          THE COURT:  Mr. Lockwood.

20          MR. LOCKWOOD:  Your Honor, I'm going to defer to the

21 counsel for the individual claimants whose information is being

22 sought by Mr. Cohn for the issues that he just addressed at the

23 end, privacy, et cetera.  And I'll focus on the relevance

24 issue.  As Your Honor has, I believe, correctly -- let me back

25 up; I'm sorry.  The Libby Claimants have stated that their plan

1   objections consist, as best I can tell, of three categories.

2   One is improper classification.  They say they should be in a

3   separate class.  That's a legal issue.  They have personal

4   injury claims arising out of asbestos.  I think this Court has

5   decided that issue against them in a number of cases, but in

6   any event it's a legal issue.

7         The second issue is unequal treatment under

8   1123(a)(4) as I understand it.  Again, that's a legal issue.

9   And as Your Honor pointed out they're arguing that the problem

10  isn't that there's unequal treatment, the problem is that

11  there's equal treatment and they don't like it.  They want

12  unequal treatment.  They say the Libby Claimants are being,

13  "underpaid."  That means they want to get better payment,

14  better treatment.  So again, that's a legal issue, but it is to

15  some extent based on a factual predicate.

16        And the third argument which I think somehow

17  dovetails with the second is that somehow or another they're

18  being discriminated against in some more generalized bankruptcy

19  thou shalt not discriminate against one group of creditors in

20  favor of another group of creditors, and they cite <u>CE</u> for the

21  proposition which as Your Honor pointed out involved comparing

22  prepetition trusts with post-petition trusts.  There were two

23  different trusts and nothing even remotely resembling the fact

24  pattern that we've got in this case.

25        So all of this, however, is to some extent legal

1  issues.  What we're here on however, is discovery, documents,

2  in particular.  What is it that the -- what among those

3  arguments, the legal arguments is the document discovery that

4  they seek from Grace going to help prove?  Well, first Mr. Cohn

5  says he has two arguments.  Libby Claimants are underpaid,

6  other claimants are overpaid.  Argument number one he concedes

7  is something that he doesn't need the PIQs and the Rust data

8  and everything else as to what non-Libby Claimants are getting.

9  He's going to make that case based on what he thinks the Libby

10 Claimants are entitled to.  And for this purpose he's made up

11 the term -- he hasn't made it up.  He is utilizing a term,

12 "tort system value," which has -- is not a term of law.  I mean

13 it doesn't come from a statute or a case or anything like that.

14 It's just a convenient term, and it is used aspirationally in

15 the TDP.  And he's saying they're not getting their fair tort

16 system value.  And as I heard him he is conceding that he's

17 going to show the underpayment through producing information

18 about his own claims, and why they're worth more than what they

19 would allegedly get in the TDP.

20         Now, I want to stop briefly here on that point.  As

21 Your Honor pointed out the TDP expedited review values are a

22 single set of values for claims that are averages over a

23 national claimant database, and they're simply a standing offer

24 to settle by the trust to save all of the individualized costs

25 that would be associated with individual review arbitration

1  tort system value.  And a claimant could take it or not claim

2  it -- or not take it in that claimant's sole discretion.  So

3  from the perspective of the Libby Claimants what they're really

4  claiming about when it comes to expedited review is they want a

5  separate category of expedited review for Libby Claimants so

6  that the Libby Claimants would have a standing settlement offer

7  to pay higher values to the so-called Libby asbestos disease

8  which as Mr. Cohn concedes has never been heard of before

9  anywhere until Mr. Cohn's clients and their clinic in Libby,

10 Montana and their sole expert who runs that clinic has

11 identified this new and heretofore undiscovered disease that

12 has various severe characteristics.

13         And he also acknowledges that he's not complaining

14 about a lot of the things in the regular expedited review such

15 as mesothelioma claims.  A Libby mesothelioma claim is just

16 like any other claim.  Presumably that means a Libby lung

17 cancer claim, and Libby other cancer claim may well be similar.

18 All of these distinctions, of course, can be drawn by reading

19 the TDP.  You don't need PIQs to figure out, you know, what it

20 is you think is different about your claims and attempt to

21 prove that it's different.  And indeed we've already got expert

22 reports filed by the Libby Claimants that purport to

23 substantiate this.

24         With respect to the values of various kinds of claims

25 the Libby Claimants have, I believe, already been given Grace's

1   historical settlement values, database.  And from that database

2   you can tell what Grace was settling, the kinds of claims that

3   the TDP expedited review process is set up to pay nationwide

4   over the years.  And you can do whatever statistical analysis

5   you want to to determine whether or not those values that Grace

6   was paying over the years do or do not conform to the TDP for

7   the purpose of determining whether those claims are,

8   "overpaid," which is the second category that Mr. Cohn says he

9   wants to attempt to prove.  Overpayment of claims.  You can

10  compare them.

11          You can also put on expert testimony, if you see fit,

12  to say that apart from the value of the expedited review claims

13  in the TDP the medical or exposure criteria that go to the

14  validity of accepting those claims as entitled to payment is

15  improper.  And indeed some of Mr. Cohn's expert report suggests

16  that that's what his experts are proposing to do.  But again,

17  to determine whether medical criteria in TDP or exposure

18  criteria in TDP are or are not appropriate you don't need to

19  look at individual claim files that underlie PIQs or PLCs or

20  anything else.

21          So what is it that we're going to —- that Mr. Cohn

22  and his experts that he's going to have do this sampling are

23  actually going to be looking at when they look at the PIQs and

24  the POCs and the Rust data?  What those documents reflect is

25  the claimants' information in support of each particular

1  individualized claim that that claimant had at the time that

2  they filed the POC and/or answered the PIQ.  So is Mr. Cohn and

3  his client going to undertake then to replicate what Grace was

4  in the process of doing in the estimation case, or at least

5  attempting to do which is to go claim by claim and argue that

6  based on the information in these claims files the claim wasn't

7  valid, it didn't have enough proof?  Because that's the only --

8  the only purpose for which such a claims review could possibly

9  be done.  I mean, you're looking at the evidence as to whether

10 or not the claim actually, that particular claim, actually has

11 whatever criteria associated with it, you and your expert think

12 make it a legitimate subject of a settlement under the TDP.  So

13 we're talking about looking at what, 100,000 of these?  And he

14 says he's going to sample them because he concedes that the

15 Libby Claimants aren't going to review all of them the way

16 Grace was undertaking to do.  So let's assume he takes some

17 random sample.  I don't know -- I mean, I would remind Your

18 Honor that Mr. Cohn has come in here repeatedly, and I have

19 some internal documentation to bolster this if I have to,

20 repeatedly and said his clients aren't being funded by the

21 Grace estate and they can't afford to do a whole variety of

22 different things including, I might add in some instances, give

23 discovery.  But notwithstanding this alleged poverty they're

24 going to go out and now hire some sort of a claims reviewer

25 that's going to take a look at these 100,000 claims, going to

1 set up some statistical program for determining what an

2 appropriate random sample would be both in number and in

3 selection criteria.  They're then going to look at the number

4 of files whether it's 100 or 1000 or 10,000 I don't know, and

5 from those files they're going to draw conclusions about what?

6 They're going to draw -- apparently, according to Mr. Cohn

7 they're going to draw the conclusion that those claims, if they

8 were submitted to the trust and if the trust accepted all of

9 them for payment because they met the criteria would be,

10 "overpaid".  I mean, until the claims are submitted to the

11 trust you don't know whether the trust will determine whether

12 they meet the criteria.  And whether or not they meet the

13 criteria at the time the PIQ was filed or the POC was filed

14 isn't necessarily as you heard argument during the estimation

15 isn't necessarily determinative of whether or not they would

16 meet the criteria at some later date when the claim was

17 submitted to the trust.  But in substance they're trying to do

18 what amounts to a miniature replay of the Grace estimation for

19 the purpose of attempting to show that the expedited review

20 provisions of the TDP overvalue claims which are not Libby

21 pleural disease claims, and in which many -- I mean, if you

22 look at the TDPs on file in this case, I mean, they're paying

23 for sort of not severe asbestosis claims, I don't know $1000

24 they value at them, or $500.  I mean, there's a lot of very low

25 values in there for these claims.  Now, apart from the literal

1 incredibility of the assertion that they are going to A) spend

2 the money and effort to look at these claims, and B) be able to

3 come up with anything useful on the, "overpayment theory," the

4 question is where do they think they're going to get in terms

5 of this discrimination thing?  The answer is well, we're --

6 this trust, we think is only going to pay 25 to 35 percent on

7 the payment percentage.  A payment percentage which will be, I

8 might add, rateably and equally applied to all claims, not just

9 to the Libby Claimants.  They're going to say well, in reality

10 while the Libby Claimants might be only getting 25 or 35

11 percent here because their claims are worth at least as much as

12 the TDP provides and according to Mr. Cohn much more, the other

13 claimants are actually getting 80 or 90 cents on the dollar.

14 Because.  Because why?  Well, there's only two ways that you

15 could prove that the other claimants were getting 80 or 90

16 percent of the value.  One of them is that something like

17 three-quarters of the claims shouldn't get paid anything at

18 all, and won't, and therefore the remaining claimants somehow

19 or another notwithstanding the payment percentage would be

20 getting 100 percent.  Well, that's not going to happen because

21 the payment percentage applies without regard to how many

22 claims the trust does or doesn't accept.  So the alternative

23 has to be that all the claims that the trust is going to allow

24 are worth roughly one-quarter of what the TDP would permit them

25 to be valued and paid by the trust.  Again, for openers if

1  that's true you can prove that from using Grace's historic

2  settlement data to compare what the values are in the TDP to

3  what those are.  But the second piece of it was he said the way

4  you can show that that's what's really going on is because

5  there was only three to $4 billion estimate in the bankruptcy

6  case and you compare that with the two billion plus that the

7  trust is getting and that shows that everybody ought to be

8  really getting 75 percent and why is there only a claim value

9  of 25 to 35 percent if you're notionally getting 80 or 90

10 percent already?  Well, one thing he neglects to point out is

11 that the three to $4 billion is a present value.  It's what the

12 claims were worth on the date of bankruptcy.  And for the

13 purpose of putting in the front end of the trust the purpose of

14 a payment percentage is to allow the claims to be paid at their

15 nominal value as they come in over 30 and 40 years.  And the

16 nominal value of a three to $4 billion present value -- I don't

17 have it at the tip, but it's somewhere in the range of the ten

18 to $11 billion that Mr. Cohn is talking about.  But again, if

19 he thinks that the payment percentage is too low he can hire an

20 expert to come show up at the confirmation hearing and make in

21 testimonial form the kind of statistical analysis that he kind

22 of tossed off here for Your Honor a few minutes ago.  But

23 reviewing PIQs and POCs is not going to show that all of the

24 claimants who could otherwise qualify under the expedited

25 review provisions of the TDP and satisfy the trust that they

1 have in fact so qualified are really being overpaid.  It just

2 isn't going to happen.  So the bottom line is what he's trying

3 to do here is both implausible in the sense that there's no way

4 according to his own client's words that they have the

5 financial resources to undertake to replicate what Grace spent

6 millions of dollars trying to do in the estimation, nor is it

7 persuasive that if I'm wrong about that and they actually do

8 have the resources to do it that they could do any better with

9 it than Grace did which is at the end of the day have a dispute

10 which would be largely conducted through experts because that

11 was how Grace was litigating it, it was through experts.  And

12 he's got the ability to put whatever set of experts he wants on

13 it and he's got the claim settlement history database that

14 shows what Grace did historically, what kind of claims they

15 paid, and how much they paid them.  And that ought to be more

16 than enough for him to make his, "overpayment," argument which

17 is the only argument that he has asserted that this information

18 might conceivably be relevant to.  Thank you.

19          THE COURT:  Okay.  Ms. Ramsey.

20          MS. RAMSEY:  Thank you, Your Honor.  I want to start

21 with the use --

22          COURT CLERK:  Please say your full name.

23          MS. RAMSEY:  I'm sorry.  Natalie Ramsey representing

24 the MMWR law firms.  I want to start with the use restriction

25 which kind of got short shrift at the end of Mr. Cohn's

1  argument.  The use restriction was not simply temporal.  The

2  use restriction was heavily litigated.  And to quote this Court

3  on September 25th of 2006 the Court said, "This process is to

4  help anybody's expert that the information that they need to

5  try to convince me of what the existing and future asbestos

6  personal injury claims will be, and how it's going to cost to

7  resolve them.  That's what it's for, and nothing else."

8          Statements like that are replete in the estimation

9  transcripts and they are all over this Court's protective

10 orders and there were six or seven of them entered in

11 connection with the information that was provided in the PIQs.

12 That information was specifically and explicitly relied on by

13 the law firms in deciding that rather than continue to seek

14 review of those decisions and contest the disclosure which they

15 strongly oppose as the Court is aware that instead that they

16 would respond to and provide the information under the

17 protections that were provided the most important of which was

18 the use restriction.  And we have submitted affidavits by

19 Steven Cason and Mr. Krause on behalf of their law firms, Mr.

20 Herrick has filed an affidavit on behalf of his law firm and I

21 can represent to the Court on behalf of the other firms that I

22 represent that they were all of like mind.  It was very crucial

23 to them that the Court made very clear to the parties that the

24 use restriction was going to be imposed on this and that there

25 would be no effort allowed by any party to conduct any kind of

1  merits determination with respect to any claim, any group of

2  claims, any category of claims.

3         The second point I want to make, Your Honor, is the

4  one about confidentiality.  Some of the most important personal

5  rights we have relate to the confidentiality of our medical

6  information.  There are federal laws, there are state laws.

7  Here the claimants' lawyers were permitted to turn over this

8  highly sensitive confidential data because it was in

9  prosecution of a claim against Grace.  So that information had

10  a specific authorization for turnover.  The Libby Claimants

11  don't have -- we don't have that same reason, that same

12  justification, that same permission to make that information

13  aware -- available to the Libby Claimants if the Libby

14  Claimants had instead sought discovery directly against the

15  claimants.  That information, again, the Court imposed very

16  strong confidentiality restrictions on that information with

17  respect to who could see it, and how the personal information

18  was to be protected.  And that information again, was only

19  disclosed because of those protections.

20         The third point I wanted to make is that this is a

21  really extraordinary request.  Everyday in regular litigation

22  I'm sure that some claimant making a claim against a nondebtor

23  company would love to obtain a copy of their database with

24  respect to all of the settlements they had reached with every

25  other claimant because they would love to have the opportunity

1  to say you know this person look at their criteria, we should

2  get paid more than they do, you know, my law firm's just as

3  good.  That sort of thing.  That simply is not done.  That's

4  not allowed.  This information is protected, it's sensitive.

5  It's a truly extraordinary request, and I want to make sure

6  that that is reflected in the record.  And, finally, to get to

7  the point of relevance it's absolutely clear, I agree with just

8  about everything that Mr. Lockwood said on this point, that the

9  presentation today makes clear that there is no need or

10 relevance for this information in the context in which it is

11 sought.  The only -- first of all, it appeared that the Libby

12 Claimants don't need any of the information with respect to any

13 of the cancer claims.  They seem to concede that in the

14 presentation.  But moreover, the only point was in proving an

15 argument or allegation that the claims are being overpaid, you

16 cannot prove that based upon undeveloped claims that were

17 frozen in time as of the petition date, have not been

18 developed, and the Court again, throughout the record made very

19 clear its understanding and recognition of the concerns of the

20 plaintiffs in turning over this information that it was a very

21 undeveloped claim pool.  You can't make that determination, the

22 historical claim values which last hearing we agreed could be

23 turned over to the Libby Claimants are a basis of information

24 from which they can make those arguments.  The estimation

25 reports, they can make the arguments that they made today from

1  those reports which they also have access to.  They can make

2  those arguments based upon expert testimony concerning what's

3  going on in the tort system generally with respect to values

4  and claims.  But they do not need, and they can't in fact use,

5  the database information for that, Your Honor, so we do not

6  believe that they can overcome the very strict protections

7  given to confidentiality orders and protective orders in the

8  Third Circuit.  This is simply not that kind of need and they

9  can't articulate a reason for the Court to reconsider those

10  decisions which were made after extensive litigation and which

11  were the subject of so much reliance and what happened going

12  forward.  Thank you, Your Honor.

13         MR. KLINGLER:  Your Honor, very briefly, I'm David

14  Klingler, Stetson, Bromberg, Esserman & Plifka for various law

15  firms.  I want to let the Court know that we are in near total

16  agreement with Mr. Lockwood's refutation of the asserted

17  relevancy of this information.  We are likewise in like step

18  with Ms. Ramsey's discussion concerning the basis upon which

19  the PIQ data was provided in the first instance.  We think it's

20  irrefutable by the record that all of the parties to the

21  estimation proceeding, every claimant who answered the PIQs at

22  the direction of the Court was relying on the confidentiality

23  embodied in numerous protective orders that are four, five,

24  6000 docket numbers ago that this matter -- that these matters

25  would be maintained in the strictest confidentiality.  And one

1  observation that I can add to what Ms. Ramsey said is this is

2  the very essence of the law of the case.  The Court made or

3  entered these orders establishing a law of the case with

4  respect to the use of this information, and the parties to whom

5  access would be afforded to it.  The Third Circuit cautions

6  that the law of the case doctrine while not precluding

7  reconsideration Courts are obliged to not render injustice to

8  parties who relied on prior rulings issued in a case.  That's

9  the very essence of what we've got going here.  And it's a

10 practical concern, too.  This case has depended in significant

11 measure on parties voluntarily doing things with assurances

12 having been obtained and it would be regrettable in our view to

13 see the reliance placed on those assurances undercut by what we

14 regard as a rather disingenuous appeal by the Libby Claimants

15 here.  Thank you.

16       THE COURT:  Anyone on the phone wish to address this?

17       MS. BYRNE:  Yes, Your Honor.  This is Kathy Byrne at

18 Cooney & Conway in Chicago.  I'd like to apologize for not

19 being there this morning.  My flight got canceled.  O'Hare is a

20 mess.  We're having yet another blizzard.

21       THE COURT:  Ms. Byrne, are you on a speaker phone?

22       MS. BYRNE:  No, Judge, I'm not.

23       THE COURT:  Okay.  I'm sorry, you're just a little

24 difficult to hear.  If you could just try to speak up then,

25 please.

1              MS. BYRNE:  Okay, I will.  Is this better?

2              THE COURT:  I can't tell yet.  Go ahead.

3              MS. BYRNE:  Okay.  We'd like to join in with

4    everything that Mr. Lockwood and Ms. Ramsey have said and add

5    that this Court provided protection to my clients when they

6    filled out these questionnaires and submitted this information,

7    and never in a million years would they have simply dropped

8    their objections to this had they had relied upon the Court's

9    ruling as to the confidentiality and the use restriction.  I

10   can't think of anywhere in the tort system that plaintiffs in a

11   different case represented by a different attorney could obtain

12   my clients' privileged information against a mutual defendant.

13   It is simply not done, and it would be objectionable, and it

14   would simply ruled against.  And I think that to allow an

15   inspection of my clients' claim by the Libby Claimants in order

16   to show that my clients are being overpaid is really

17   ridiculous.  You know, they're putting us into an adversarial

18   position when the whole point of this is to knock down the

19   values of my claim by a coal claimant.  And that was not the

20   intention of revealing this information to Grace.  It was not

21   the Court's ruling at the time.  The Court's ruling is indeed

22   the law of this case.  We were and are entitled to rely upon

23   the protections that this Court provided to our clients and we

24   would simply ask that this not be permitted.

25             THE COURT:  All right.  Thank you.

1          MS. BYRNE:  Thank you.

2          THE COURT:  Anyone else?  Okay, Mr. Cohn.

3          MR. COHN:  I think, Your Honor, if you took a vote

4 among the personal injury community I think that Libby would

5 lose.  I think we've established that very clearly in this

6 hearing.  But there is some rewriting of history going on here,

7 Your Honor.  We're getting the impression from some of these

8 arguments that these claimants willingly came forward and

9 turned over this information to Grace because they understood

10 that Grace was such a wonderful institution that would put it

11 only to use that was completely friendly to them.  In fact,

12 Your Honor, this was the result of an adversary process which

13 culminated in this Court ordering that Grace was going to

14 receive -- had a right to discovery in the form of these

15 personal injury questionnaires.  And as Grace was entitled to

16 that discovery when the issues were relevant so are the Libby

17 Claimants.  There would be no warrant for this Court having

18 determined that that is an appropriate type of discovery to

19 obtain when the issue is a bankruptcy issue of having to do

20 with the nature of personal injury claims against the debtor to

21 say that Grace could have that kind of discovery, but the Libby

22 Claimants can't.

23          It's wonderful to have these people telling us, you

24 know, how we should try our case.  That's not what discovery is

25 all about, Your Honor.  Discovery is not about what the

1  adversaries want to -- the information they want to provide.

2  It's not about how they would like the Libby Claimants to

3  conduct their case.  It's about how the Libby Claimants want to

4  obtain information that is reasonably calculated to lead to

5  discoverable evidence, lead to evidence that they can present

6  in the form of expert testimony or whatever kind of testimony

7  at the confirmation hearing.  This is our discovery request and

8  we'd respectfully submit that no ground has been advanced to

9  deny it other than, Your Honor, the confidentiality concern

10 which is not a ground to deny it, but is a ground to condition

11 it.  And we would respectfully submit that it would be

12 appropriate to condition it.  Bear in mind, Your Honor, the

13 Libby Claimants had access to this data in the context of the

14 estimation proceeding.  We signed confidentiality agreements,

15 we were involved in that effort up until the point where you

16 might recall we were kind of stipulated out of the estimation

17 proceeding, but up until then we were a full party to that

18 proceeding and there's no claim that any confidentiality was

19 breached, there's no claim that this information was any way

20 misused, and now what's happening really is that these people

21 are upset because we're now going to -- we now propose to use

22 this information in a way that's adversarial to them.  But it's

23 adversarial to them in a legitimate way raising legitimate

24 issues about whether this plan is confirmable.

25          Oh, I did want to add -- I wanted to add one more

1  point.  I think one of the attorneys said that the information

2  is not relevant as to mesothelioma claimants, and that would --

3  that's probably true, Your Honor, as to the medical side of the

4  information that's included in those questionnaires.  But the

5  other information that's included there is what settlements

6  there have been with other defendants.  And part of what

7  distinguishes Libby Claims from other claimants or from most

8  other claimants in this case is that most other claimants have

9  a whole bunch of asbestos producers that they can go after --

10 can and have gone after and in some cases gotten substantial

11 recoveries.  And that of course affects what they have a right

12 to recover from Grace.  And so that information is also on the

13 personal injury questionnaires, also goes directly to the issue

14 of whether others are being overpaid while Libby is being

15 underpaid.  And so we would like that information even as to

16 the mesothelioma claimants where there will probably not be any

17 kind of medical issues.  Thank you, Your Honor.

18         THE COURT:  Why would that information affect whether

19 those claims are being overpaid or underpaid?  I mean, they

20 still have to substantiate the tort criteria and you're not

21 going to know whether the tort -- the trust criteria, pardon me

22 -- and you won't know whether the trust criteria is satisfied

23 until the claims are submitted and the trust evaluates it.  I

24 mean, you still have to substantiate that Grace's asbestos

25 caused an asbestos related disease.

1          MR. COHN:  Correct.  And yet if they have -- well,

2    take an extreme example, Your Honor, if their damages -- in the

3    tort system if their damages were a million dollars and they've

4    been paid a million dollars by their claimants they have no

5    claim against Grace because they only have a right to one

6    recovery.  There are also issues of relative fault which will

7    limit the amount that you're entitled to get in the tort

8    system.  So people are being paid without regard to the fact

9    they've gotten full recovery elsewhere or gotten paid without

10   regard to the fact that there are others who bear most of the

11   fault albeit Grace also bears some fault.  But if they're being

12   paid a -- they're getting an inappropriately large amount from

13   Grace then those are examples of ways in which claims are being

14   overpaid under the TDP.

15          THE COURT:  But that's making the assumption that the

16   trust is going to pay improperly filed claims.  And that's not

17   an assumption this Court's going to make.  This Court's going

18   to make the assumption that the trust will disallow claims that

19   have already been paid the maximum that they have been -- that

20   they're entitled to be paid.  That is --

21          MR. COHN:  Well, there's nothing in the TDP that so

22   requires that.  Someone could submit a claim for mesothelioma

23   and get the mesothelioma amount on expedited review despite the

24   fact they've been paid in full.

25          THE COURT:  Of course they -- I mean, they could.

1  Anybody could, I submit, submit a false claim and get paid.

2  But that's assuming that the trustees are not going to exercise

3  their discretion properly.  This Court's not going to make an

4  assumption that the trustees won't carry out a fiduciary duty

5  and disallow improper claims.

6         MR. COHN:  Your Honor, there's nothing -- we would

7  submit in the TDP there is nothing that permits the trustees to

8  reduce or disallow claims based on the fact that others are

9  mostly at fault, let's say, for the claim.  That's just not --

10  that's not part of the way that it's set up.  And there's

11  probably good reasons for that because that could be a very

12  complicated --

13         THE COURT:  It could be.

14         MR. COHN:  -- determination.  But the cumulative

15  result of that, Your Honor, is that we submit maybe, Your

16  Honor, you know, after we check this out in discovery, you

17  know, when we come to you with an actual case to present, Your

18  Honor, we strongly suspect based on the numbers that we quoted

19  you earlier that the cumulative result of that is that other

20  claims are being overpaid in this case.

21         THE COURT:  But the problem is the place to determine

22  whether the claimant has been paid from another source isn't

23  from the PIQ and the proof of claim, it's from the entity that

24  paid the other source.  So, for example, from the Combustion

25  trust or from the Manville trust or from another trust.  It's

1  not from the PIQ.

2         MR. COHN:  Well, the PIQ asks people to disclose that

3  information.

4         THE COURT:  Well, it asks them to disclose whether

5  they worked for another company that was an asbestos

6  manufacturer.

7         MR. COHN:  No, I believe that it asks for other

8  information besides, Your Honor, about other settlements.

9  Whether that information was necessarily provided by everyone,

10  I'm not sure.  But that was one of the -- we are told by Grace

11  that one of the entries in the Rust database is in fact

12  information on that topic of what other settlements there were.

13  We haven't seen it, we can't tell whether that information is

14  there or consistent or useable, but we're told it's there.

15         THE COURT:  But the debtor itself requested

16  information from other sources not just from the PIQ.  The

17  debtor got information from several other trusts and added

18  information into the Rust database because I signed a number of

19  orders subject to confidentiality agreements from other trusts.

20         MS. BAER:  Your Honor, that would not be in the Rust

21  database.  The PIQ had a question on it, "Have you settled with

22  any other companies, and how much did you settle for?"  And

23  some people did answer on the face of the PIQ, yes, I settled

24  with Federal Mogul and they paid me $1000.  Most did not answer

25  that question.  Some of them submitted an attachment which

1  answered the question.  That would be in the Rust database and

2  therefore on -- it was on the PIQ and therefore in the Rust

3  database.  If in subsequent requests for production and in

4  subsequent interrogatory responses the information was provided

5  that is not in the Rust database and not on the PIQs.

6          THE COURT:  Okay.  But I don't think I'm mixing up

7  the case.  This debtor, I believe, requested information from

8  other trusts regarding payments that it had made to claimants.

9          MS. BAER:  We did get information from other trusts,

10 but I don't recall if that was one of the topics.  But that is

11 not in -- that's not on the PIQ.

12         THE COURT:  Okay.  So there's another source without

13 looking at personal information directly from the claimants.

14 That's where I was going.

15         MR. COHN:  Well, the problem is the other asbestos

16 trusts are only one potential source of recovery.  There are

17 also many other defendants who haven't been through bankruptcy

18 or weren't paid through a trust, but were paid earlier.  And,

19 you know, there are any number of reasons why that information

20 won't -- or that source of information won't be complete.

21         THE COURT:  But even then, even assuming that there

22 are just say, a particular defendant has been paid from, you

23 know, pick a number, ten other sources that still is an issue

24 that the trust is permitted to deal with in the context of a

25 524(g) expedited review process.  I mean, this is a plan

1 confirmation process which permits negotiation that allows

2 settlements of claims.  That is the nature of the bankruptcy

3 resolution.  It allows parties to bargain for resolutions of

4 claims.

5           MR. COHN:  Well, Your Honor, let me -- I would

6 respectfully submit that the TDP would need to be amended in

7 order to provide that, because that is not my understanding of

8 what TDP now says.

9           THE COURT:  What is that, I'm sorry?  I was talking

10 about the voting process.  The TDP could simply provide that

11 any creditor who had any exposure to a Grace product of

12 whatever nature provided that that creditor can substantiate

13 exposure to a Grace product and meets whatever the standard is

14 going to be will be paid $1000.

15           MR. COHN:  Right.

16           THE COURT:  Okay.  As a condition of attempting to go

17 out to solicit the votes of that particular creditor body in

18 order to meet the voting standards for 524(g).  I mean, that's

19 what bargaining to get the confirmation standards in the

20 bankruptcy process is all about.  So provided that the creditor

21 has a claim, the trust determines that there is a claim and it

22 meets the criteria set up under the trust distribution

23 processes after the trust of course is set up.  If that is how

24 the trust operates those types of trusts are permitted in the

25 bankruptcy process.  So the fact that a creditor also had a

1  claim against <u>Manville</u> and was paid is not meaningful, because

2  the plan permits creditors to have claims provided that they

3  meet the criteria under the trust.

4        MR.   COHN:  Well, Your Honor, that's circular.

5  You're saying it's okay because the plan provides it.  Well,

6  we're saying no, it's not okay for a plan to in effect overpay

7  people in relation to what they are entitled to in the tort

8  system.

9        THE COURT:  And I'm saying the tort system is

10 absolutely not -- I don't want to say it's absolutely not

11 relevant, that's going too far, but it doesn't have the

12 relevance -- the level of relevance that you are attempting to

13 associate with it.  This is a bankruptcy, federal bankruptcy

14 process that preempts the state tort system in that regard.

15 There is a relationship to the tort system because you have to

16 look at the allowance of claims process.  And there is a

17 reference back to the tort system because obviously at some

18 point you're going to look to state law to determine how a

19 claim is going to have an allowance process and what that

20 allowed claim would be in quotes, worth, in a tort system.  But

21 the process by which 524(g) allows those claims can, rather

22 than looking at a claim by claim, state by state basis

23 nationalize that process through this expedited review process.

24       MR. COHN:  So long as it's nondiscriminatory.

25       THE COURT:  Well, it isn't discriminatory because it

1  has to pay all those claims the same way.  That's what the

2  statute says.  Then what it does is say to claimants who don't

3  want that process you've got the right to opt out of that

4  process by claiming individualized review and then the other

5  levels above it.  But we'll just stop at the individualized

6  review.  At the individualized review process you've basically

7  bypassed that matrix process that we've talked about and gone

8  to a different level.  So how is there discrimination in the

9  matrix level, because it's required by statute that you pay all

10  claims within that matrix level the same.  Substantially

11  similarly.

12          MR. COHN:  Similarly based on disease level.

13  Obviously you can pay a meso more than you'd pay --

14          THE COURT:  Of course.

15          MR. COHN:  -- more than you pay an unimpaired, you

16  know, --

17          THE COURT:  Sure.

18          MR. COHN:  Okay.  So the -- how you measure the

19  fairness of different disease levels amongst each other is you

20  have to determine that it's not discriminatory against any

21  particular disease level either because it so far departs from

22  the standards of the tort system which is brought into

23  bankruptcy law by the -- by their decision in the -- all the

24  supreme court jurisprudence that says state law provides the

25  standard.  Don't just make up standards for allowing claims in

1 bankruptcy cases.  You have to follow state law.

2          THE COURT:  Actually that's not what _Buttoner_ says

3 either, but, okay, I understand your argument.  But that's not

4 where _Buttoner_ goes either.  But what section of 524(g) are you

5 relying on, because I don't think I'm following the argument

6 under 524(g) with respect to the standards that you're trying

7 to get me to look at?

8          MR. COHN:  The discrimination arguments, Your Honor,

9 is from _Combustion Engineering_.  That is how _Combustion_

10 _Engineering_ interpreted the fair and equitable requirement of

11 Section 524(g).  Section 524(g) permits the issuance of a

12 channeling injunction only if it is fair and equitable.  And

13 the fair and equitable requirement according to _Combustion_

14 _Engineering_ requires that there not be discrimination within

15 the asbestos personal injury class.

16          THE COURT:  You know what --

17          MR. COHN:  I will be the first to acknowledge, Your

18 Honor, that _Combustion Engineering_ involved different facts.

19 Obviously we have to bring our facts within that legal

20 standard, Your Honor.  But --

21          THE COURT:  You know, I need a recess anyway.  I'm

22 going to go read _Combustion Engineering_.  Let's take a 15

23 minute recess.

24          MR. LOCKWOOD:  Your Honor, before you do that, I

25 mean, I -- with all due respect for both Your Honor and Mr.

1  Cohn I think that this argument is really beside the point for

2  reasons that I can explain very quickly.

3          THE COURT:  Very quickly.

4          MR. LOCKWOOD:  The TDP is supposed to pay Grace's

5  several share of liability not joint and several liability

6  which you get in the tort system.

7          THE COURT:  Right.

8          MR. LOCKWOOD:  Mr. Cohn is positing that somehow or

9  another he's going to show overpayments to -- of Grace's

10 several share by going to PIQs that will show that people got

11 money from other defendants.  Well, of course, they got money

12 from other defendants because they were trying to get the

13 several share of the other defendants.  That's what you do when

14 you settle cases.  Remember, we are talking here in the

15 expedited review process about settlement offers.  Grace is

16 offering these values to settle its cases.  The best evidence

17 of what Grace's several share in the tort system in the

18 settlement context of is Grace's settlement history database

19 which Mr. Cohn has.  The PIQs you would -- let's assume a PIQ

20 hypothetically says I have a claim against Grace and I settled

21 with the following ten defendants for 50,000, 2000, 8000, 9000,

22 whatever.  Okay, that's what you settle for.  What do you

23 compare those -- you add them all up and what do you compare

24 them to?  Well, presumably you'd compare them to a trial

25 judgment or verdict because that would be what your 100 percent

1  of the value of your case would be.  So what Mr. Cohn posits is

2  that somehow or another he's going to show through looking at

3  some incomplete PIQ forms because the cases are still in

4  process that he's -- using a sampling methodology that he's

5  going to be able to show that not only all of the people that

6  filed PIQs in fact got total settlements from other sources

7  that exceed Grace's several share of what their tort system

8  judgment value, not settlement value, judgment value would have

9  been which I submit to you is a facial impossibility on its

10 face, but he's then going to say that he will extrapolate those

11 samples to all the future claimants, et cetera.  I mean, A) it

12 makes no sense.  B) what he is conveniently ignoring is that

13 the TDP contemplates that the Libby Claimants by and large

14 won't use expedited review.  Why won't they?  Not merely

15 because the values according to Mr. Cohn are too low, but

16 because there are two other TDP provisions that give the Libby

17 Claimants exactly the kind of bump up in value that he's

18 talking about.  What are they?  The so called extraordinary

19 claim provisions.  What do they do?  One of them says if you

20 can show that your exposure to Grace was 75 percent or more

21 than your total asbestos exposure to all defendants you can get

22 five times the maximum value for your claim through individual

23 review.  Five times.

24        What's the second one say?  If you can show that your

25 Grace exposure is 95 percent or more you can get eight times

1  the maximum value of your claim.  Not the schedule.

2          And so what the Libby Claimants would be doing as

3  compared with the other claimants who according to Mr. Cohn's

4  hypothetical have gotten money from all these other defendants

5  and who therefore by definition would not qualify for the five

6  times or the eight times bump up.  So this provision is in

7  there and it's addressed precisely at the problem that Mr. Cohn

8  suggest.  And if he thinks it ought to be ten times or 12 times

9  or whatever he can put on whatever expert testimony he thinks

10  there ought to be on that.  But the notion that finding out

11  what the meso claimants put in their PIQs about how much they

12  settled with other people for is just fanciful.  He's just

13  making that up.

14          The second point and the final point that I would

15  like to make here is that I spent a fair amount of time

16  demonstrating in my initial remarks why this information wasn't

17  relevant.  Mr. Cohn's total response to that was it's wonderful

18  how my adversaries want to tell the Libby Claimants how to try

19  their case.  I don't have the slightest interest in telling the

20  Libby Claimants how to try their case, but I do have an

21  interest in asking this Court to consider whether the

22  information they're seeking is under the discovery standards

23  applicable to federal cases and bankruptcy cases.  The

24  information they're seeking is discoverable.  I.e. it is likely

25  to lead to the discovery of admissible evidence.  And Mr. Cohn

1 has not said one word in rebuttal of my arguments to

2 demonstrate that any of these discovery that he is seeking is

3 likely to lead to the discovery of admissible evidence on the

4 issues that he has identified his clients have with this plan.

5          THE COURT:  Okay.  We're going to take a recess for

6 15 minutes.  We're taking a recess for 15 minutes.  I'm sorry.

7 Mr. Green.

8          MR. GREEN:  Your Honor, I have no further interest

9 before the Court.  May I be excused?

10          THE COURT:  Yes.  Anybody who wants to leave is free

11 to leave.  We're taking a recess for 15 minutes.

12                    (Recess)

13          THE COURT:  Did everybody go to lunch?

14                    (Pause)

15          THE COURT:  Well, all right, I'm going to make my

16 rulings on the record so that we can take a lunch recess if

17 that's the issue, I guess.  I have had an opportunity to take a

18 look at the Combustion Engineering case.  I think the provision

19 that Mr. Cohn is referring to is on -- actually I'm not sure

20 what page I'm looking at -- Page 133 to 134.  And it starts

21 with, in the middle of the paragraph, with, "The certain cancer

22 claimants challenge the disparate treatment of current and

23 future asbestos claimants under the two trust structure and

24 also whether the most seriously injured asbestos claimants

25 received fair treatment under the plan.

1          "Again, the record is insufficient to rule on these

2     contentions.  Neither the bankruptcy court nor the district

3     court evaluated the CE settlement trusts' treatment of current

4     future malignant and nonmalignant asbestos claimants or

5     evaluated the overall plan from the perspective of settlement

6     participants versus nonparticipants and malignant versus

7     nonmalignant asbestos claimants.  Even absent the plan's other

8     defects the two trust structure requires a remand for further

9     findings on these issues."

10         And there is a footnote 57 that precedes that

11    provision that I just read that says that says, "See generally

12    Ortiz," with a cite, "emphasizing that a limited fund asbestos

13    settlement must provide for equity among -- I'm sorry, for,

14    "equity among members of the class," and, "fairness of the

15    distribution of the fund among class members."  Although Ortiz

16    was decided under Federal Rule of Civil Procedure 23(d)(1(B)

17    the Court's requirement of fair treatment for all claimants, a

18    principle at the core of equity also applies in the context of

19    this case.  Oh, Mr. Cohn, you're back.  I believe those are the

20    provisions that Mr. Cohn has been essentially arguing to the

21    Court basing the argument on as to the applicability of

22    Combustion Engineering.

23         The Court -- the Third Circuit remanded for

24    determinations of those issues and made no findings with

25    respect to those issues in the Combustion Engineering context.

1  It seems to me that the discovery in the case that Mr. Cohn is

2  seeking now does not advance the issues related to that type of

3  analysis that would apply in the context of the case at hand.

4  To the extent that the issue is whether or not there is fair

5  treatment under this plan between malignant and nonmalignant

6  claimants that's a matter for medical analysis and has

7  virtually nothing to do with whether any particular claimant

8  does or doesn't have a mesothelioma or a malignancy claim

9  versus a nonmalignancy claim.  That is a comparison that can be

10 made from either a medical criteria and/or from the settlement

11 criteria as Mr. Lockwood's argument, I think, highlighted and

12 which I adopt for purposes of these findings that I'm making

13 now on the record.

14            With respect to the concept that Mr. Cohn raises that

15 somehow Libby Claimants may have a different disease that too

16 is something that would have to be evaluated by this Court

17 based on medical criteria that is not informed by the type of

18 discovery that would be available in the Rust database, the

19 PIQs or the POCs.  And as a result if in fact it turns out that

20 the Libby Claimants have a different disease that is not

21 recognized somehow in the plan or the trust structure then the

22 plan will fail and that will be the outcome.  But that's a plan

23 confirmation issue -- or plan may fail.  That would be a plan

24 confirmation issue that is perhaps a legal argument with

25 factual underpinnings.  That is not the appropriate focus of

1 this type of discovery because this discovery won't lead to

2 discoverable evidence along those lines.

3      So on balance I don't see how the evidence that Mr.

4 Cohn is seeking is relevant to the issues on which Mr. Cohn has

5 based the arguments that you are trying at this point to

6 elucidate before the Court.  I understand the issues, I don't

7 see the relevance of the discovery to those issues.  So I'm

8 going to deny the request to compel the debtors to produce

9 those documents.

10      With respect to the Court's prior rulings that

11 limited the production to the estimation process I tried at the

12 time that we were going through this to be very adamant about

13 the fact that the limitation would be enforced by this Court to

14 limit the production to the estimation process.  That was a

15 very hard fought battle.  I did believe the debtor was entitled

16 to the information for use in the estimation and all parties

17 who are entitled to the information for use in the estimation.

18 I still think that was the appropriate ruling, but I also

19 believe that those orders induced reliance by all parties

20 frankly including Libby Claimants and that the reliance was

21 appropriately induced by this Court.

22      To the extent that there is confidential information

23 I think an appropriate order could be entered that would redact

24 the use of the privacy information.  And so, Mr. Cohn, I do

25 agree that the information could be appropriately redacted if

1  it were otherwise discoverable in this case.  That would be an

2  intense burden and I would impose that burden on you if I were

3  to grant the motion at all.  Because it would be, I think,

4  appropriate in that instance for you to bear that expense under

5  this -- in these provisions, not for the debtor who is simply

6  at this point a custodian of some of that information to have

7  to bear that expense.  But I don't think it's discoverable

8  anyway so I'm not going to go that far.

9       I agree that the confidentiality limitations would

10 apply and I would not permit the discovery without imposing

11 further confidentiality provisions.  But as you've stated your

12 clients, too, are subject to the same limitations.  They

13 themselves are personal injury claimants and their own

14 information in that regard is subject to confidentiality

15 provisions and the privileges that they would otherwise invoke.

16 They're no different in that respect from wanting to protect

17 the information than the other personal injury claimants.  So I

18 don't see why from that perspective, Mr. Cohn, they'd have any

19 reason to wish to jeopardize the privacy rights of any other

20 personal injury claimant.  I'm certain they understand the need

21 to keep that information private just as other personal injury

22 claimants would appreciate that need.  And as you yourself have

23 articulated you would expect that you and your experts would be

24 bound by the confidentiality provision.

25       So I want to state on the record that I do believe

1  that an appropriate order could be fashioned along those lines,

2  but I'm not fashioning it, because I don't think that the

3  information is otherwise discoverable because it is not

4  calculated to lead to relevant and admissible evidence for the

5  reasons that I've just explained.

6         So I will enter an order that denies this motion for

7  the reasons that I have just articulated.  Let me see if I have

8  an order here.  I thought I had an order attached to this

9  motion, but I'm not finding one.  Ms. Baer, you want to submit

10 an order that simply denies this motion for the reasons

11 expressed on the record.  Just run it by Mr. Cohn.

12         MS. BAER:  Sure.

13         THE COURT:  All right.  Thank you.  I understand the

14 next motion the parties think is going to take some time.  Do

15 you want to take a lunch recess before we -- Mr. Cohn.

16         MR. COHN:  I had a recess.  Perhaps I overstayed the

17 recess, and I apologize for that, Your Honor.

18         THE COURT:  Okay.

19         MR. COHN:  But we prefer to keep going if the other

20 parties would.

21         MR. LOCKWOOD:  I'm perfectly happy to keep going and

22 hopefully it won't take all that long.

23         MS. BAER:  Your Honor, I think the only question was

24 whether your staff is content -- is willing to keep going and

25 Your Honor.

1          THE COURT:  Well, I'm fine.  If my staff needs a

2  recess they're free to take it.  I'm sure the court reporter

3  will have a sub -- in fact, here she comes now.  So that's

4  fine.  And if Ms. Baker needs to leave she certainly can leave

5  for a while and come back in.  All right, we'll just continue

6  then.  Okay, Mr. Cohn.  We'll take up Item 5 then.

7          MR. COHN:  Thank you, Your Honor.  This is the Libby

8  Claimants' motion to compel answers to certain interrogatories

9  that were propounded to the asbestos PI committee.  In fact, I

10 think the discussion that took place with respect to the last

11 motion is a little bit helpful here because we had a chance to

12 discuss what it is that we're trying to prove.  And one of the

13 things that we're trying to prove is that the Libby Claimants

14 have a form of pleural disease which is -- I'm not going to

15 call it a different disease, but it has different

16 characteristics, different levels of severity.  You can

17 actually die from it which people don't do from exposure to

18 non-Libby asbestos.  And in that regard the medical criteria of

19 the TDP discriminate against the Libby Claimants because they

20 are not designed to properly allow those Libby claims that have

21 this severe pleural disease.

22          Now, there is a category of the TDP called severe

23 pleural disease.  And it has medical criteria that the Libby

24 Claimants respectfully submit are inappropriate, because, among

25 other things they would exclude people who have died of pleural

1 disease.  And we'll offer evidence of that and also of the fact

2 that there are severely ill Libby Claimants who would fail.

3 Who would not meet the criteria for severe pleural disease.  In

4 fact, most of the Libby Claimants who are severely ill with

5 pleural disease will not meet these medical criteria because

6 the medical criteria are not in conformity with standard

7 medical practice.

8          So that's the backdrop of the objection that we're

9 talking about.  Now, one of the -- one aspect of this that's

10 important is to understand what other claimants are out there

11 who would or would not qualify under this severe pleural

12 disease category.  It is our understanding that there are a few

13 or none who would so qualify under the category as it's been

14 developed in the TDP, and that there are few or none who would

15 qualify outside Libby if the criteria were redone in accordance

16 with what the Libby Claimants submit are appropriate medical

17 criteria.  In other words, this kind of severe pleural disease

18 is basically a Libby phenomenon.  I'm not going to say there's

19 nobody -- there's not some outlier someplace in the country,

20 but we respectfully submit this is a Libby phenomenon.

21          And so in that regard we're seeking discovery to find

22 out, okay, are there other people out there who qualify under

23 this TDP definition of severe pleural disease or for that

24 matter would qualify if the Libby Claimants designated medical

25 criteria were to be adopted.  That's what these interrogatories

1  are all about.  You know, really, Your Honor, you can really in

2  some sense divide them.  I mean, the key is one, two, and

3  three.  I don't know if you happen to have those in front of

4  you.

5              THE COURT:  Yes.

6              MR. COHN:  Okay.  The basic ones are, you know, one,

7  how many claims defined as claims against Grace do you have

8  knowledge of?  Two, what kind of computerized databases do you

9  have.  And then three is identify all claims, and it's the key

10  one, that qualifies claims for severe disabling pleural disease

11  under the TDP.  The rest of the interrogatories which ask a

12  bunch of medical data type questions are all designed

13  essentially to flesh out, you know, what the claims are that

14  are -- that supposedly qualify as claims for severe disabling

15  pleural disease and also as I said to get at whether there are

16  claims that would qualify if the criteria were refocused as the

17  Libby Claimants have said in their objection.  We went into

18  this in considerable detail as to what the criteria for severe

19  disabling pleural disease should be.

20              So we want to find out what other claims are out

21  there.  And that's what this discovery is all about.  Well,

22  what objections do we get?  Well, the first objection that we

23  get is that we have gone about this the wrong -- well, the

24  entire objection seems to be we've gone about this the wrong

25  way.  The first reason is that the asbestos PI committee does

1  not represent individual claimants.  And that's true, Your

2  Honor, we acknowledge the asbestos committee is a corporate

3  entity, does not represent the individual claimants.  But

4  that's not what -- we're not asking for information about their

5  clients, we're asking for their knowledge.  And so really the

6  proper issue is what is it that the committee has knowledge of?

7            And in this regard that leads to their second

8  position which is that all we're entitled to is what the

9  committee -- information that the committee either has in its

10 possession or within its control.  And we agree with that as a

11 general principle, Your Honor.  But we respectfully submit that

12 this information as it relates to the law firms that are --

13 that have claimants who are on the committee we respectfully

14 submit that that information is within the control of the

15 committee.  All the committee counsel has to do is ask.  And in

16 this regard, Your Honor, and we got to apply some commonsense

17 here, the way that these TDP criteria get developed, and I have

18 to say that in the Grace case because so much of the TDP just

19 comes from other cases there may not have been much interplay

20 in the actual Grace case.  But way back when when these

21 criteria were being developed in other cases the way that they

22 got there was because the members of these committees who are

23 largely the same from case to case reviewed the TDP criteria,

24 matched them against their own client base and said yeah, fine,

25 these are fair.  We'll compensate our clients.  And so that's

1 the ultimate, you know, here you're talking about the central

2 issue in the case, how is the TDP structured so as to pay

3 asbestos PI claimants?  This is the group that's determined

4 that, yeah, these criteria are fair.  And how they determine it

5 is to match it against their own clients.  And now when we ask

6 well, okay, you know, so tell us about all this, tell us about

7 the -- whether you have any of these clients who will meet the

8 criteria for severe disabling pleural disease we are told that

9 the asbestos PI committee is under no obligation to answer,

10 because they don't have possession or control of that

11 information.

12          Now, this -- the question of whether it's reasonable

13 to -- I'm sorry, excuse me.  The third objection that has been

14 made in this regard has been that this is oppressive and

15 burdensome and you've got -- this may involve -- this is

16 quoting Mr. Lockwood's objection -- tens of thousands of

17 claims.  Well, if it does that's news to us, Your Honor, that

18 there would be tens of thousands of these claims.  He may have

19 meant that the databases that would be involved of these client

20 firms have tens of thousands of claims in them.  But, Your

21 Honor, it's well known, and of course the interrogatory goes to

22 that as to whether there are these databases.  But we believe

23 very strongly that all of these firms couldn't function.  You

24 can't represent tens of thousands of personal injury claimants

25 without having a very well developed database.  And so we would

1 respectfully submit that it's not burdensome or oppressive for

2 these firms to answer these questions based on their database.

3 And why do we know that it's not unreasonable?  Because the

4 plan proponents themselves have required as part of the

5 solicitation procedures, they've required everybody to declare

6 on their ballot to certify as to what disease category they

7 fall under.  So basically these -- if you want to vote your

8 claim you have to check the box and you have to check that box

9 accompanied by a certification that that really is the disease

10 that you have.  And the ballot form, I don't know if you recall

11 it, Your Honor, I've got one here if you want me to hand it up,

12 but it recites all the criteria including the footnotes from

13 the TDP.  It's got all the medical criteria.  So when you fill

14 out that ballot you certify that this is the disease level that

15 my client has.  So people are going to have to make that

16 declaration anyway within a couple of months.  We're asking for

17 it as part of discovery to just find out how many of these

18 people there are, and how many people there would be who would

19 qualify if the Libby Claimants' proposed criteria were to be

20 adopted.  We'd respectfully submit that's a reasonable request

21 going right to the heart of what it is that we need to prove at

22 confirmation.

23           THE COURT:  All right.  Mr. Lockwood.

24           MR. LOCKWOOD:  Actually I thought this was going to

25 be a lot quicker than the last one and it will be.  There's a

1  certain ships passing-in-the-night quality, I think, not what

2  Mr. Cohn just recited and what we're concerned about.  Let me

3  see if I can articulate it.  But by way of context let me make

4  some initial observations.  Some of his factual premises are

5  incorrect and their incorrectness unfortunately will have to be

6  demonstrated definitively in discovery as opposed to my

7  reciting it at an argument.  But the fact of the matter is that

8  this provision that he focused on, TDP Section 4(b), this

9  enabling asbestos pleural disease, has never appeared in any

10 other TDP before.  It's brand new.  Why did we put it in?

11 Because the Libby Claimants told us that they had severe

12 disabling pleural disease.  That's why we put it in, the only

13 reason.

14          Now, the problem isn't that we put it in because

15 Libby Claimants wanted us to.  The problem is they think we did

16 a bad job of it when we wrote it.  Well, we, with all due

17 respect, relied in very large part in the drafting of this on

18 experts.  And indeed we relied in particular on Laura Welch who

19 has been identified as an expert, has given a report, and whose

20 supplemental/rebuttal report however we get that nomenclature

21 et cetera worked out will address the topic.  We know from the

22 Libby Claimants' expert Dr. Whitehouse that the Libby Claimants

23 know of think they know or assert that they know exactly what's

24 wrong with this definition.  Dr. Whitehouse has got a hundred

25 pages of expert report on what's wrong with this definition.

1  We did not put this in here for the purpose of window dressing.

2  We didn't put it here for the purpose of creating a category

3  that nobody could qualify under.  The problem here is that --

4  well, there's a couple of problems.  First, Mr. Cohn has sort

5  of mooted his own interrogatory by pointing out that the ballot

6  will require identification of these people so that he'll get,

7  through the ballot process, voluntarily the self-identification

8  of all law firm clients who think they've got this disease.

9  And if nobody filles out -- checks that ballot box then he will

10 have established what he says he really wants to establish

11 which is not to find out how many people have it, but to prove

12 that nobody's got it.  Or at least he'll prove that nobody

13 knows they've got it enough to fill out a ballot.

14        But if you read the interrogatories as drafted which

15 they're directed at you.  You tell us this.  Who is you?  Well,

16 initially it's the committee.  But the committee is also

17 defined to be the committee's members.  And it's also to be

18 defined the lawyers for the committee's members.  And it's

19 quite clear from what Mr. Cohn just said that by lawyers he

20 means law firms that represent the committees.  And then it

21 asks questions of fact such as how many -- tell me all the

22 people that have these kinds of claims.  It doesn't say tell me

23 how many people you know off the top of your head have these

24 kinds of claims.  Or tell me how many people are going to fill

25 out a ballot that say they have these types of claim.  And

1 moreover, most of the questions are couched in terms of -- if

2 you've read the interrogatories after he gets through the first

3 couple that are sort of general which we haven't objected to

4 all of them involve sort of saying for each person that you

5 have found out has such a claim tell me various information

6 about that person.  The way we read that each of the law firms

7 who represents a committee member would have to go through

8 their entire firm claims files searching to see whether there

9 were any such people in their files.  To determine that they'd

10 have to do two things.  First they'd have to get all the

11 factual information, they'd have to review it all relating to

12 the claims, and secondly they'd have to make a judgment about

13 whether the factual information in the file qualified that

14 claimant under this TDP provision.  And they would decide, I

15 guess, either yea or nay.  And if they decided that it did

16 qualify them they would identify this person and provide the

17 requested information.

18         That is clearly on the face of it extraordinarily

19 burdensome.  I mean, you're talking -- that's where he was

20 corrected.  When we talk about tens of thousands of claimants

21 we're not talking about tens of thousands of claimants who

22 qualify under this provision of TDP.  We're talking about

23 having to root through the files of tens of thousands of

24 claimants to find out how many, if any, qualify under this

25 provision.  And apart from that the committee isn't the law

1  firms.  We've cited the <u>Kensington</u> case, we've cited a whole

2  bunch of cases none of which Mr. Cohn addressed in his opening

3  remarks here that say you can't get discovery against a bunch

4  of law firms who happen to represent committee members about

5  what's in the law firm's files by telling the committee of

6  which their clients are members go out and make these law firms

7  review all their files for this purpose.  I mean, the committee

8  simply doesn't have the power to do that among other things.  I

9  mean the lawyers could perfectly well, if the committee sends a

10 letter to the lawyers and says, you know, please review your

11 files and tell us the answer the law firms are perfectly

12 entitled to tell the committee pound sand, because they haven't

13 been subjected to any proper discovery demands.  And the

14 committee doesn't represent them for that purpose.  So the

15 bottom line is it is at the -- while I believe that the issue

16 will turn out to be an expert issue, in other words, does this

17 category comport with medical standards, he's got an expert,

18 and we've got an expert and the Court will decide, because as I

19 said before this isn't intended to be just a bogus sort of

20 window dressing exercise here.  That's really not the basis for

21 the objection that is before Your Honor today.  The basis for

22 the objection today is that A) they can't obtain this discovery

23 on the law firms through the committee, and B) as a corollary

24 of that while the committee could sort of ask, I guess, if it

25 was no burden on the committee just to ask the law firms we

1 wouldn't object to asking them.  But we can't compel them and

2 it clearly would be a huge amount of work for the law firms and

3 we don't think the committee should reasonably be expected to

4 say to the law firms for its members how would you like to

5 volunteer to do a lot of discovery on something that we don't

6 think is probably terribly relevant anyway and which to the

7 extent that you have these clients and you choose to

8 investigate their files they'll show up on a ballot in a couple

9 of months anyway and you'll be able to make whatever use of the

10 ballot information you think you can on that basis.  So on that

11 basis we would urge that the motion to compel be denied because

12 it's directed essentially at the wrong person.

13          THE COURT:  Ms. Ramsey.

14          MS. RAMSEY:  Good afternoon, Your Honor, Natalie

15 Ramsey on behalf of the MMWR firms.  We support in full Mr.

16 Lockwood's arguments with respect to the case, the McClain firm

17 they have a client Roberta Jeffery who sits on the committee.

18 Because she serves on the committee does not give the asbestos

19 claimants' committee the right or the power to come to our law

20 firm and seek information from us concerning clients and

21 claimants who are not part of the committee.  And it would not

22 be our intention to respond to that information if requested by

23 the ACC.  But I wanted to make one more point which is that

24 it's clear from the presentation that what the Libby Claimants

25 are seeking to obtain is information that's contained in the

1  law firm databases.  And it is very clear that that information

2  is replete with work product of the law firms.  The very

3  construct of it reflects their mental impressions and strategic

4  thinking and the cases that have looked at whether or not a

5  database can be protected on the basis of work product

6  privilege have concluded that it is protected by the work

7  product privilege and we cite those cases in the papers that

8  are filed with the Court.  And for that reason as well we

9  object to the very broad definition of knowledge that's

10 contained in the interrogatories and it's for that reason that

11 we're appearing in support of the ACC.

12         THE COURT:  Mr. Klingler.

13         MR. KLINGLER:  Your Honor, we second the concerns

14 that Ms. Ramsey expressed about the work product character of

15 databases.  There are a number of the interrogatory subparts

16 that specifically ask about what databases embody information

17 pertinent to a substantive medical issue.  And there's nothing

18 more paradigmatically work product than what fields a lawyer

19 decides to incorporate into a database maintained of client

20 matters.  And the interrogatories are getting at the fields

21 which is the very essence of work product.  So we're very

22 concerned about that improper intrusion and we also share with

23 Mr. Lockwood the concerns about the impropriety of the

24 mechanics of this process.

25         There is a body of law that provides that a litigant

1  cannot compel his adversary to go to work for him.  And while

2  that's significantly Mr. Lockwood's issue it's some of our

3  clients as well.  If you're a law firm that has a member of a

4  committee and you're being asked to engage resources to respond

5  to the minute distinctions embodied in these interrogatories

6  the burdensomeness is so vast as to beggar the imagination,

7  frankly.  Particularly when one considers where we are in the

8  process right now and the fact that we're looking at

9  confirmation proceedings getting underway in a matter of

10  months.  So we are strongly opposed to the relief sought and

11  join in the arguments of the committee and Ms. Ramsey.

12         THE COURT:  Anyone on the phone wish to be heard?

13  Mr. Cohn.

14         MR. COHN:  Your Honor, as you know discovery has

15  both, I'll call it an offensive and a defensive component to

16  it.  Offensive is to try to prove your own case, and defensive

17  is to understand what the other side is going to be doing in

18  terms of proving its own case.  And in this case do we have any

19  doubt that if Mr. Lockwood sent out an email not saying the

20  Libby Claimants want this, would you please provide it, but

21  rather it's urgent from my standpoint in preparing my case for

22  confirmation that you please identify for me all claimants you

23  have that meet criteria X, Y, and Z, is there any doubt that

24  these people would go scurrying off to their databases and

25  without a whole lot of effort be able to respond, yeah, here's

1 what we've got.  Can and would.

2        Now, this discovery request illustrates something

3 that has been a -- an aspect of this case that I've referred to

4 already which is the lack of sufficient cooperativeness on the

5 part of other counsel.  Because the fact is that if people

6 wanted to develop a reasonable solution to this problem rather

7 than just say okay, we're not responding at all, you're not

8 entitled to it at all, but had wanted to try to address our

9 concerns in this regard there are any number of ways in which

10 that, you know, could or still could have been or still could

11 be done.  You know, for example, if it is the case that so far

12 as what Mr. Lockwood said is concern that this criteria, this

13 disease category was developed on the basis that it was, you

14 know, for Libby, maybe it's their belief that there are no or

15 that there's no material number of people outside Libby or

16 other than exposed to Libby's asbestos who would qualify under

17 this criteria.  Could stipulate to that and that would

18 eliminate a major aspect of this discovery request.

19        It would be possible, if they didn't want to do that,

20 it would be possible to ask the law firms to just respond based

21 on their database.  In other words, people are talking about

22 the burdensomeness of looking through files, people could just

23 -- we could limit the burden in that regard.  There are any

24 number of ways in which this could be crafted so that by

25 agreement of the parties we would achieve what is our

1  legitimate purpose in pursuing this discovery and they would

2  also be protected from any undue burden.

3        THE COURT:  But the asbestos committee doesn't

4  represent the law firms.  And, you know, I think the issue is

5  who are you trying to reach?  If you're trying to reach the law

6  firms you need to serve the law firms.  If you're trying to

7  reach the asbestos committee then the asbestos committee can

8  answer the questions.  If their answer is how many claims do

9  you -- if this is addressed to the committee -- and that means

10 an individual committee member, first of all, you need to

11 define who you is.  If it's to the lawyers and you're asking

12 them of their personal knowledge how many claims they have

13 knowledge of against the debtor and the answer is none they'll

14 tell you none.  I mean, if they -- that fit this category.

15        If it's directed to the members of the committee and

16 the committee members have knowledge of a particular claim

17 they'll tell you.  If they have knowledge of none they'll tell

18 you none.  And if the answer's none the rest of the answers are

19 going to be pretty easy.  So it may be an answer for one.  But

20 the problem is I don't know who you is.  Because it says --

21        MR. COHN:  But we defined you.

22        THE COURT:  -- it says at the outset the Libby

23 Claimants request that the asbestos PI committee.  But the

24 committee isn't an entity in and of itself that can answer

25 interrogatories.  It's a fictional body.  So who is this

1  directed to?

2          MR. COHN:  Well, it is -- as we have -- as we drafted

3  it, Your Honor, it is directed to the personal injury law firms

4  who have representatives on the committee as well as the

5  committee.

6          THE COURT:  The law firms do not have representatives

7  on the committee.  The United States Trustee's Office appoints

8  the committee, the committee is the committee.  So if you want

9  these addressed to members of the committee then I will

10 instruct Mr. Lockwood to tell the members of the committee that

11 they need to answer the interrogatories.  So if you want the

12 members of the committee to respond to interrogatories I will

13 take these back to the members of the committee and they will

14 answer the interrogatories.  But I'm not directing them to

15 their law firms.  That is not appropriate.  The law firms are

16 not the members of the committee.  The members of the committee

17 are the members of the committee.

18         MR. COHN:  Yep.  Well, all right.  You know, the

19 other -- one of the reasons why we framed the interrogatories

20 the way that we did, Your Honor, is admittedly as a shortcut

21 because we're facing an expedited process here and we had hoped

22 that with some degree of cooperation from the committee and the

23 law firms that we could work out some way for us to get the

24 information that we need.  However, we can -- there are methods

25 to get this directly from the law firms and if what you're

1  saying is that that's what we have to do then we'll go and

2  pursue those methods.  But, Your Honor, I just want to caution

3  that that's a process that's time consuming and could well, you

4  know, could well lead to motions under the CMO --

5            THE COURT:  It will lead to this --

6            MR. COHN:  -- for further time.

7            THE COURT:  -- it will lead to the same type of

8  motion and probably lead to the same type of result because I'm

9  not sure why the law firms have to produce this type of

10  response to these questions.  I'm not sure how you're going to

11  get their databases.

12            MR. LOCKWOOD:  Your Honor, I might have a suggestion

13  that if Mr. Cohn can be taken literally at what he said he was

14  concerned about which is he's really using these defensively

15  his paper and his argument suggests that he's afraid that the

16  committee is going to spring on him the identification of

17  particular claimants that qualify under these criteria to say

18  here's the following X number of people that do that.  It seems

19  to me that it would not be improper for an interrogatory being

20  directed to the committee asking them to identify those

21  claimants who they expect or anticipate to identify at any

22  point in the confirmation process as persons meeting these

23  criteria.  And at that point if the answer was none he wouldn't

24  be sandbagged because he got exactly what he says he's asking

25  for which is assurance that the committee doesn't have a stable

1    of these clients that it's concealing somewhere or that it's

2    going to get from the law firms at the last minute.

3            Plus as I said earlier to the extent that there's

4    going to be self-identification the ballot forms are going to

5    be sent to all the law firms and all of the individual

6    claimants that we know of that aren't represented by law firms

7    and they'll fill them out.  And if the answer is that nobody

8    fills out that they have a Class 4(b) claim that will

9    presumably be a fact and provable as such.  So the notion -- I

10   mean, if Mr. Cohn wants to undertake this exercise of trying to

11   get the firms to go through their databases and see if somehow

12   they got somebody that they're not presently aware of that

13   meets the qualification obviously he's at liberty to do that.

14   Whether that would be a fruitful exercise in light of Your

15   Honor's comments I doubt, but in any event it seems to me just

16   asking us what we're going to do, what evidence we have that we

17   plan on using on this subject ought to cover what he claims is

18   his legitimate needs for this.

19           And the other point I would also make is that the

20   issue may very well, indeed I think rather suspect it's a

21   likely based on what I presently know to turn out to be one in

22   which we say well, look there may be people out there because

23   these criteria are generic and you say that these are the

24   characteristics of people that were exposed to Libby tremolite

25   and there were expansion plants all over the country that dealt

1  with Libby tremolite and therefore even though we don't know as

2  we sit here today that there are anybody that meet these

3  criteria since the same mineral gave rise to exposure to other

4  people outside of Libby we could certainly hypothesize that

5  there might very well be such people and we don't know of any

6  basis other than Dr. Whitehouse's medical expert testimony that

7  anybody could sort of negate that possibility.  Again, that

8  argument would have nothing to do with whether anybody

9  presently had in their file somewhere some person that might

10 possibly meet these criteria.

11          THE COURT:  Well, when of the ballots under the --

12 what is the current expectation -- when are the ballots going

13 to be due back?

14          MR. FREEDMAN:  If we get it out on March 15th it

15 would be 90 days from then.  June.

16          MR. LOCKWOOD:  Your Honor, for what it's worth I

17 think I can make a sort of tentative representation that we

18 could confirm later on after I check that as we sit here today

19 the committee does not know of a single person outside of the

20 self-identified Libby Claimants who professes to meet the

21 qualifications of this.  And that might, I mean, the 90 days is

22 kind of a long and it's late in the period and that would

23 presumably give Mr. Cohn some concern, but if the idea is he's

24 trying to find out what the committee is a plan proponent is up

25 to, what we're going to spring on him or what our expert is

1  going to spring on him maybe if I made that representation and

2  didn't send out an email saying it was wrong and here's what we

3  do know, I mean, it would be sort of an informal discovery, if

4  you will, on this topic.  And I'd be certainly willing to

5  undertake A) to make the representation that I just did in its

6  preliminary form, and B) verify that that's correct and correct

7  it if it isn't.

8          MR. FREEDMAN:  Your Honor, just to clarify.  I may

9  have, as Ms. Baer is pointing out, I may have misspoke.  It may

10 be I just can't recall what we presently are proposing.  It may

11 be 60 days or something like that.

12         MR. LOCKWOOD:  Ninety days seem long, Ted.

13         MR. FREEDMAN:  Yeah.

14         MR. LOCKWOOD:  I would think it's either 45 or 60

15 days, it would be more likely.  I don't have the --

16         MR. FREEDMAN:  Say sometime between May 1st and May

17 15th.

18         THE COURT:  All right, well that should be surely be

19 sufficient time to get the ballots back and still do additional

20 discovery if you need to for a confirmation hearing that's

21 starting in September.

22         MR. COHN:  Well, yes, well, it may well turn out to

23 be outside of the periods that are in the CMO, but we can, you

24 know, we can come back and make the adjustments necessary.  But

25 I also, Your Honor, want to pick up on what Mr. Lockwood just

1  said, because fact is that his comments for the last several

2  minutes have, I thought, been very constructive and I'd like to

3  pursue them and it may be that they combine with what you just

4  suggested, Your Honor, might well offer a solution.

5        THE COURT:  Okay.  Mr. Lockwood, what about a

6  continuing obligation that in the event that something does

7  come to the committee's attention that would -- well, first of

8  all a date by which to make a representation as to whether the

9  committee does or doesn't know of claimants in category 4(b)

10  other than Libby.  Secondly, continuing obligation in the event

11  that prior to the ballot due date something changes that the

12  nature of that representation that a supplemental disclosure

13  would be made.  And then after the ballot due date Mr. Cohn

14  would have whatever information is out there because the

15  claimants themselves would have an obligation to disclose that

16  information on the ballot.  So after that the committees'

17  obligation to supplement would be meaningless because the

18  claimants themselves would be disclosing the information on the

19  ballots.

20        MR. COHN:  Well, conceivably there could be somebody

21  who didn't submit a ballot, but who came to the committees'

22  attention.  So I would think that we would want the committees'

23  obligation to supplement to continue.

24        MR. LOCKWOOD:  As I heard Mr. Cohn, Your Honor, I

25  thought the concern was basically the avoidance of sandbagging

1 --

2           THE COURT:  Right.

3           MR. LOCKWOOD:  -- by the committee.  So if the

4 committee somehow after the balloting of some lawyer for some

5 member of the committee becomes aware that he's got some client

6 that would qualify but nobody's proposing to identify that

7 client as part of the confirmation proceedings I don't see why

8 Mr. Cohn would care about that --

9           THE COURT:  Yes.

10          MR. LOCKWOOD:  -- based on his profession of why he

11 needs this.

12          MR. COHN:  I think, Your Honor, based on the

13 discussion on the record I think that Mr. Lockwood and I could

14 probably reach an agreement that would dispose of this area of

15 discovery including the potential need to seek discovery from

16 individual law firms.  And so I think I'd like the opportunity

17 to try, Your Honor.

18          THE COURT:  All right.  I'll expect to get an order

19 submitted by you, Mr. Cohn, on a COC and if I don't then this

20 will just simply be continued until the February 26th?

21          MS. BAER:  Your Honor, January 26th.

22          THE COURT:  I'm sorry, January 26th omnibus then.

23          MR. COHN:  Okay, terrific.  Thank you, Your Honor.

24          THE COURT:  Okay, Ms. Baer.

25          MS. BAER:  Your Honor, that concludes the agenda.

1          THE COURT:  Anything by anybody else?  Okay, we're

2    adjourned.  Thank you.

3          THE ATTORNEYS:  Thank you, Your Honor.

4                          * * * * *

## C E R T I F I C A T I O N

          I, KIMBERLY UPSHUR, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of my ability.


/s/ Kimberly Upshur                DATE:  January 22, 2009
KIMBERLY UPSHUR
J&J COURT TRANSCRIBERS, INC.