**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO.**, *et al.*, | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| **Debtors.** | § | |
| | § | |

**FEE AUDITOR'S FINAL REPORT REGARDING THE FIRST QUARTERLY FEE
APPLICATION OF GRANT THORNTON LLP FOR THE INTERIM
PERIOD OF JULY 1, 2012, THROUGH SEPTEMBER 30, 2012**

This is the final report of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the First Quarterly Fee Application of Grant Thornton LLP for the Period of July 1, 2012, through September 30, 2012 (the "Application").

**BACKGROUND**

1.      Grant Thornton LLP ("Grant Thornton") was retained as tax and accounting advisor to the Debtors.  In the Application, Grant Thornton seeks approval of fees totaling $510,804.50 and expenses totaling $41,603.33 for its services from July 1, 2012, through September 30, 2012 (the "Application Period").[1]  Grant Thornton was retained by order of the Court dated August 14, 2012, effective July 1, 2012.  This is the first quarterly fee application which Grant Thornton has filed in the case.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time and expense entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330,

---

[1]Although this is Grant Thornton's first quarterly fee application, it covers the Forty-Sixth Interim Period.

Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of

Delaware, Amended Effective February 1, 2013, and the United States Trustee Guidelines for

Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C.

§ 330, Issued January 30, 1996 (the "U.S. Trustee Guidelines"), as well as for consistency with

precedent established in the United States Bankruptcy Court for the District of Delaware, the United

States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We

served an initial report on Grant Thornton based upon our review, and we received a response from

Grant Thornton, portions of which response are quoted herein.

## DISCUSSION

### General Issues

3.      We noted that although Grant Thornton listed the amounts of all of the expenses

included in its Application, it failed to provide the requisite detail to support these expenses.[2]  Grant

Thornton supplied its expense detail in response to our request.  See Response Exhibit A.

---

[2]Pursuant to Local Rule 2016-2(e)(ii):  "... [T]he motion shall itemize each expense within each category, including the date the expense was incurred, the charge and the individual incurring the expense, if available."  Paragraph E of the U.S. Trustee Guidelines provides in pertinent part:

.... Factors relevant to a determination that the expense is proper include the following:

3.      Whether applicant has provided a detailed itemization of all expenses including the date incurred, description of expense (e.g., type of travel, type of fare, rate, destination), method of computation, and, where relevant, name of the person incurring the expense and purpose of the expense.  Itemized expenses should be identified by their nature (e.g., long distance telephone, copy costs, messengers, computer research, airline travel, etc.) and by the month incurred.  Unusual items require more detailed explanations and should be allocated, where practicable, to specific projects.

4.      We noted that Grant Thornton billed the time of partner Melbert E. Schwartz at $715.00 an hour commencing in September 2012.  Mr. Schwartz billed 5.3 hours at this rate, for a total of $3,789.50 in fees.  Pursuant to Paragraph 12 of Grant Thornton's retention application, the hourly rate range in effect for partners on July 1, 2012, was $500 to $700.  It seemed early in the case for a rate increase.  We asked Grant Thornton whether or not Mr. Schwartz's time was billed correctly, and Grant Thornton responded: "Melbert E. Schwartz's billing rate should be $700.00, not $715.00.  We agree to the $15.00/hour fee reduction."  We appreciate Grant Thornton's response and recommend a reduction of $79.50 in fees.

5.      We noted that Grant Thornton billed the time of senior manager Joseph Stoddard at $600.00 an hour.  Mr. Stoddard billed 2.4 hours at this rate, for a total of $1,440.00 in fees.  Pursuant to Paragraph 12 of Grant Thornton's retention application, the hourly rate range in effect for senior managers on July 1, 2012 was $350 to $500.  As it seemed early in the case for a rate increase, we asked Grant Thornton whether or not Mr. Stoddard's time was billed correctly.  Grant Thornton responded: "Joseph Stoddard is part of our Washington National Tax group, a specialty practice, which charges a higher rate than our traditional tax team when consulting on engagements."  We accept Grant Thornton's response and have no objection to these fees.

6.      We noted that although Grant Thornton requested total expenses of $41,603.33, we

calculate Grant Thornton's total expenses at $41,718.31, for a difference of $114.98.[3]  We asked

Grant Thornton about this discrepancy, and Grant Thornton provided the following explanation:

> Upon a second review of the expenses, we agree that the amount of $41,603.33 in our monthly billings were understated.   Additionally, there were two other individuals on the engagement team, David Vorrath and Andrew Wetcher, who also incurred expenses, although minimal.  Expense detail for each individual is as follows:

> • David Vorrath: $187.56 lunch expense incurred on July 30, 2012 in Boca Raton, FL; 7 participants; primary purpose was to discuss the Section 199 project after meeting at the debtor's place of business.

> • Andrew Wetcher: $21.00 parking fee incurred by Mr. Wetcher on August 31, 2012 to park at the Miami Grant Thornton office.  Mr. Wetcher's primary work office is Fort Lauderdale, FL.  Grant Thornton employees are allowed to charge their parking expenses to engagements if incurred to accommodate the project. Mr. Wetcher was requested to work in the Miami office on August 31, 2012.

> Upon factoring these two expense items noted above, the revised expense figure that Grant Thornton is requesting is $41,951.47 ($41,718.31 plus $208.56).  The breakout by individual is as follows:

> | | |
> |---|---|
> | Abraham, Mathew | $1,114.79 |
> | Levin, Rob | $9,818.90 |
> | Lynes, Daniel A. | $16,458.38 |
> | Vorrath, David Allen | $187.56 |

---

[3]We calculated the total expenses listed on the detail, plus Grant Thornton's $1,850.00 background check charges (see Paragraph 15), to be $41,718.31, for a difference of $114.98. After deducting certain expense entries dated after the end of the Application Period, we calculated the expenses for each professional as follows:

| | | |
|---|---|---|
| Stargel | $4,347.65 | |
| Wagner | $4,996.32 | |
| Watson | $3,132.27 | |
| Abraham | $1,114.79 | |
| Lynes | $16,458.38 | |
| Levin | $9,818.90 | |
| | | |
| Subtotal | $39,868.31 | |
| | | |
| Plus | $1,850.00 | Client Acceptance Procedures |
| | | |
| TOTAL | $41,718.31 | |

| | |
|---|---|
| Wetcher, Andrew D. | $21.00 |
| Watson, Sara B. | $3,132.27 |
| Wagner, Catherine E. | $5,020.92 |
| Stargel, Andrew L. | $4,347.65 |
| | |
| Client Acceptance | $1,850.00 |
| | |
| TOTAL | $41,951.47 |

We have no objection to the two additional expenses totaling $208.56 which Grant Thornton is submitting for approval. However, we note that when added to Grant Thornton's expense total of $41,718.31, these additional expenses bring the total to $41,926.87, not $41,951.47. We recommend giving credit to Grant Thornton for the additional $208.56 in expenses, plus the underbilling of $114.98, and we will credit these amounts against reductions recommended elsewhere in this report.

<u>Specific Time and Expense Entries</u>

7.    We noted the following time entries in which the amount of time billed exceeds the amount of time recorded within the work description:

a.    On August 1, 2012, MES ($700) billed under one time entry 0.50 hours for total fees of $350.00. The subparts of the time entry totaled 0.10 hours for total fees of $70.00. Thus, there appeared to be an overbilling of $280.00.

| | | | | |
|---|---|---|---|---|
| MES | 8/1/2012 | 0.50 | 350.00 | Participated on conference call with Levin to discuss section 199 approach (.1) |

b.    On September 13, 2012, RL ($550) billed under one time entry 4.00 hours for total fees of $2,200.00. The subparts of the time entry totaled 3.75 hours for total fees of $2,062.50. Thus, there appeared to be an overbilling of $137.50.

| | | | | |
|---|---|---|---|---|
| Levin, Rob | 9/13/2012 | 4.0 | 2,200.00 | 2011 Section 199 review of the costing model. Time spent reviewing the pension adjustment, the legal fee adjustment to QPAI, and overall calculation review (2.75 hours). Additional time spent researching the inclusion of ART LLC into the calculation and |

reviewing the Form 8903 that was provided to WR Grace (1 hour).

We asked Grant Thornton whether it agreed that fee reductions were appropriate for these time entries. With respect to the time entry dated August 1, 2012, Grant Thornton responded: "The subpart of the time entry should be .5 instead of .1 hours." With respect to the time entry dated September 13, 2012, Grant Thornton responded: "The subpart of the time entry should only be 3.75 hours." We accept Grant Thornton's response and, to correct the overbilling on the September 13 time entry, we recommend a reduction of $137.50 in fees.

       8.     We noted certain instances in which multiple Grant Thornton professionals attended the same meeting or conference. *See* <u>Exhibit 1</u>. Paragraph II.D.5. of the U.S. Trustee Guidelines provides: "If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees." We asked Grant Thornton to explain why it was necessary for each of its professionals to attend these conferences. Grant Thornton's response is attached as <u>Response Exhibit B</u>. We appreciate this explanation and have no objection to these fees.

       9.     We noted the following sets of similar time entries:

| SBW | 8/6/2012 | 1.50 | 600.00 | Matter 18: Plan site visit to Columbia for the R&D Tax Credit study with Grant Thornton team. |
|---|---|---|---|---|
| SBW | 8/8/2012 | 1.50 | 600.00 | Matter 18: Plan site visit to Columbia for the R&D Tax Credit study with Grant Thornton team. |
| RL | 8/20/2012 | 10.00 | 5500.00 | R&D interviews w/ the Construction team for the 2005-2011 R&D tax credit in Cambridge. Meetings all day with Alex Kruglov and Betty Height to discuss projects, R&D cost center time by project, time tracking, SAP information, and project documentation. Time included presentations by Grace of the type of information the Company will be providing (6 hours). Review of information provided by Alex Kruglov and Felek Jachimowicz, as well as, reconciliation to the SAP downloads for the 2008 and 2009 years (4 hours). |

RL    8/21/2012    10.00   5500.00    R&D interviews w/ the Construction team for the 2005-2011 R&D tax credit in Cambridge. Meetings all day with Alex Kruglov and Betty Height to discuss projects, R&D cost center time by project, time tracking, SAP information, and project documentation. Time included presentations by Grace of the type of information the Company will be providing (6 hours). Review of information provided by Alex Kruglov and Felek Jachimowicz, as well as, reconciliation to the SAP downloads for the 2008 and 2009 years. Additional time spent discussing the 2005 & 2006 information that will be required to be provided. Time allocation was not used in those years. Additional time spent researching alternative methodologies. (4 hours).

We asked Grant Thornton whether any of these time entries were duplicates, and Grant Thornton responded:

> These are not duplicate time entries.

> Regarding the SBW entries, each entry relates to the information received prior to the site visits for the Construction Product Division. As such, time was spent reviewing 2005-2011 data for the CPD group on two different days (8/6/2012 and 8/8/2012) due to the information coming in at different times.

> Regarding the RL entries, the time was spent at CPC performing R&D tax credit interviews. As such, the initial sentences were the same, but the entry for 8/20/2012 and 8/21/2012 provides additional detail as to the activities provided.

We accept Grant Thornton's response and have no objection to these fees.

10.    We noted several time entries which contained travel time. *See* Exhibit 2. Pursuant to Local Rule 2016-2(d)(viii): "Travel time during which no work is performed shall be separately described and may be billed at no more than 50% of regular hourly rates." We asked Grant Thornton whether the required 50% discount had been applied to this time, and Grant Thornton responded:

> We were not aware of this rule. This time relates to actual travel and thus it is reasonable that Grant Thornton should only be compensated for 50% of the time for this time. We will apply this rule going forward on future fee applications.

We appreciate Grant Thornton's response and recommend a reduction of one-half the fees billed for

non-working travel time ($10,122.50), for a reduction of $5,061.25 in fees.

      11.    We noted that on September 5 and 7, 2012, associate ALS ($245) billed 0.75 hours

for total fees of $183.75 for making travel arrangements:

| 9/6/2012 | Stargel, Andrew L | ............; Planned travel details and necessary pre-trip preparation (.5);........ | 1.5 | 367.50 |
|----------|-------------------|------------------------------------------------------------------|-----|--------|
| 9/7/2012 | Stargel, Andrew L | Booked travel and stay for trip to Baltimore and Chicago, air, rental car, and hotel (.25).............. | 3 | 735.00 |

It appears to us that the task of making travel arrangements is administrative in nature and, therefore

noncompensable. We asked Grant Thornton to explain why the estate should compensate this time,

and Grant Thornton responded:

> This time relates to making travel arrangements and thus it is reasonable that Grant
> Thornton should not be compensated for this time. We will ensure that we follow
> the proper methodology on future fee applications.

We appreciate Grant Thornton's response and recommend a reduction of $183.75 in fees.

      12.    We noted that on September 9 and 27, 2012, partners DAV ($600) and MAM ($600)

billed a total of 1.30 hours for fees of $780.00 on time recording issues:

| 9/9/2012 | Vorrath, David Allen | Provide detailed descriptions of time charges for use in bankruptcy court filing (.3) | 0.3 | 180.00 |
|----------|----------------------|---------------------------------------------------------------------------------------|-----|--------|
| 9/27/2012 | Margulies, Mark A. | I had conversations with team on billing matters for the Company; (1.0) | 1 | 600.00 |

While preparation of fee applications for bankruptcy courts is customarily compensable, simply

keeping descriptive, useful time records for edification of the client, creditors and court is typically

not compensable. *In re Gillett Holdings, Inc.*, 137 B.R. 475, 482 (Bankr.D.Colo. 1992). We asked

Grant Thornton to explain why the estate should compensate this time, and Grant Thornton

responded:

      This time relates to administrative matters and it is reasonable that Grant Thornton

should not be compensated for this time.  We will ensure that we follow the proper methodology on future fee applications.

We appreciate Grant Thornton's response and recommend a reduction of $780.00 in fees.

13.    We noted that between September 25 and 28, 2012, associate ALS ($245) billed 39.20 hours for fees of $9,924.00 on data entry.

| | | | | |
|---|---|---|---|---|
| 9/25/2012 | Stargel, Andrew L | Entered client data for January (4.5) and February (3.5) | 8 | 1,960.00 |
| 9/26/2012 | Stargel, Andrew L | Entered client data for March (3.75), April (3.75), and begin May (1). | 8.5 | 2,082.50 |
| 9/27/2012 | Stargel, Andrew L | Continuation of updating the costing model with expense information (4.0) | 4 | 1,300.00 |
| 9/27/2012 | Stargel, Andrew L | Finished May (2.5), June (3.5), and July (3). | 9 | 2,205.00 |
| 9/28/2012 | Stargel, Andrew L | Completed August, September, and October (9.7) | 9.7 | 2,376.50 |

We asked Grant Thornton to explain the purpose of this work and the skills required to perform it.

Grant Thornton provided the following response:

> Due to the time period of data requested (2005-2008), Grant Thornton received a hard copy format of client data, and therefore the engagement team member had to transcribe, analyze, and format client data into our R&D tax credit calculation tool. A member of the engagement tax team with Research & Development tax skills with an understanding of the R&D credit model is needed to properly complete these tasks.

We accept Grant Thornton's response and have no objection to these fees.

14.    We noted per diem expenses totaling $789.00 for the Application Period. See Exhibit 3.  Pursuant to Section 330(a)(1)(B) of the Bankruptcy Code, expenses must be both "actual" and "necessary" in order to be reimbursed.  Per diems are normally allowances provided to employees based upon the city in which they are working and do not necessarily correlate to the expenses

actually incurred by the employee.   We asked Grant Thornton to explain why the bankruptcy estate

should reimburse these per diems, and Grant Thornton responded as follows:

> Per Grant Thornton time and expense policy, employees who travel out of town to
> work on engagements are entitled to a daily per diem allowance to cover expenses
> relating to meals and incidental expenses.   We believe our per diem policy
> reimburses our employees at a reasonable rate and is a reasonable proxy for actual
> expenses incurred.

We asked Grant Thornton if any records existed of the actual meal or incidental expenses incurred

by the professionals to whom per diems were paid, and Grant Thornton responded:

> Pursuant to Grant Thornton's travel and expense policy, a per diem amount may be
> used to reimburse personnel for the cost of meal and incidental expenses incurred
> when traveling overnight on firm business.   When traveling during the work week,
> meals reimbursed include breakfast and dinner.   The per diem used is determined by
> the destination where the employee is traveling.
>
> Each expense submitted, on Exhibit ... (3), by Grant Thornton professionals was in
> lieu of actual expenses incurred.   Even though the per diem was in lieu of actual
> expenses, the reimbursable amount was subsequently spent on meals.   Information
> would be unavailable to substantiate (Grant Thornton's per diem policy was
> instituted so as to reduce the burden of collecting and remitting small dollar receipts).

We understand Grant Thornton's policy on per diems.   Nevertheless, it appears to us that this policy

fails to comport with the requirements of Section 330(a) that such expenses be actual expenses.

Moreover, Local Rule 2016-2(e)(iv) requires that "[r]eceipts or other support for each disbursement

or expense item for which reimbursement is sought must be retained and be available on request."

Accordingly, we must recommend disallowance of these per diems, for a reduction of $789.00 in

expenses.

    15.    We noted the following expense for which more information was needed:

    7/18/2012  $1,850.00  Client Acceptance Procedures – Background check charges

We asked Grant Thornton to explain why these charges should be reimbursed by the estate, and

Grant Thornton responded:

> It is customary that Grant Thornton undertakes necessary steps and performs a

background check to ensure that a company and its corporate officers are in good standing with the Securities and Exchange Commission.

In response to our request, Grant Thornton provided the following additional information:

This charge was incurred in-house by Grant Thornton personnel. It is standard Grant Thornton policy to perform a background check on all new clients. Typically, this amount is billed to the client if the project moves forward; however, if Grant Thornton is unsuccessful at securing the bid on the project, it is considered a cost of doing business and Grant Thornton absorbs the cost. It should be noted that this expense is routinely incurred by Grant Thornton and charged to our clients.

The purpose is to carry out standard due diligence upon accepting a new client to Grant Thornton. As a matter of prudence in a complex, often litigious business environment, we routinely seek assurance that the people and enterprises that we serve have not previously been involved in serious legal or community controversy that would imply that they are lacking in integrity or competence, which will help Grant Thornton avoid future liabilities of many types, should they arise.

As to what is involved, the methods are quite conventional. These procedures are performed by Grant Thornton's Investigative Research Group ("IRG"). The team does not access personal financial records, does not conduct interviews, and does not use third-party or "gray market" information providers. Through a team of trained and experienced researchers at the manager rank - all of whom are full-time employees of Grant Thornton - they make aggressive use of a broad array of databases that are in the public domain. These include the Internet and public and commercially-available databases that embrace media content, litigation records, public filings, regulatory agency decisions, and securities industry disciplinary proceedings, etc.

The team specifically looks to determine anything of concern in terms of:

1.      Civil litigation/allegations
•      Criminal litigation/allegations
•      Bankruptcies
•      Identification/analysis of prior employment
•      Education
•      Sex offender list (if jurisdiction covered)
•      Terrorist list
•      Accounting or financial reporting issues
•      Reputation
•      Securities violations/SEC inquiries
•      Regulatory sanctions/investigations
•      Internal control issues
•      Anything else that appears to be a potential red flag in public records

Their work product - generally a brief written summary with several attachments -

is for internal use only.  The only ones with access to this information are the engagement partner and manager and other leadership partners responsible for client acceptance decisions.  The $1,850 fee is a flat fee for a standard investigation, which normally takes an average of 8 hours to do depending on the number of subjects.  We have been told by our IRG that this type of work would cost approximately $10K in the open market.

We accept Grant Thornton's response and have no objection to this expense.

16.    We noted several meal expenses for which more information was needed.  See Exhibit 4.  In each instance, the meal expense is described as a "per diem" meal, either in the category column or in the expense description itself.  In response to our request, Grant Thornton provided the following information concerning these expenses:

> Pursuant to Grant Thornton's travel and expense policy, a per diem amount may be used to reimburse personnel for the cost of meal and incidental expenses incurred when traveling overnight on firm business.  When traveling during the work week, meals reimbursed include breakfast and dinner.  The per diem used is determined by the destination where the employee is traveling.

> Each expense submitted on Exhibit ... (4), by Grant Thornton professionals related to the daily per diem, per the Grant Thornton policy.  Amounts are in lieu of actual expenses incurred.  Even though the per diem was in lieu of actual expenses, the reimbursable amount was subsequently spent on meals.  Although information would be unavailable to substantiate, amounts should be reimbursable since they are travel related and within firm guidelines.

Based upon Grant Thornton's representation that actual meal expenses were  incurred for each "per diem" meal expense listed, we recommend approval of a portion of the expenses listed on Exhibit 4.  Because we do not have any information as to which meal of the day was incurred or the number of people dining, we will assume that in each instance the charge was for breakfast for one person.  We recommend a breakfast cap of $30 per person for Chicago and $25 per person for the rest of the cities listed.  Accordingly, we recommend that reimbursement of these charges be reduced to $230.00 (8 charges of $25, plus one charge for $30), for a reduction of $265.00 in expenses.

17.    We noted the following working lunch expense:

10/8/2012   Wagner, Catherine E    MEALS $24.60   Catie Wagner; 1 dining; Atlanta; lunch while working in the office on the R&D calculation

This lunch expense did not appear to be travel-related.  We asked Grant Thornton to explain why the estate should reimburse Ms. Wagner's lunch, and  Grant Thornton responded:

> Ms. Wagner incurred an expense of $24.60 related to lunch because of a client deadline, and thus a "business purpose" expenditure was incurred.  As outlined in the Bankruptcy Court's allowable meals, "business purpose" lunches are acceptable. This expense should be reimbursable.

The fact that Ms. Wagner was working on a particular client's file at lunch time does not, in our view, create a business purpose.  If it did, then professionals could charge lunch to whatever case they were working on at lunch time and never have to come out of pocket for lunch.[4]  Presumably, Ms. Wagner would have had to buy or bring her lunch to work anyway, regardless of the client on whose project she was working.  Thus, we recommend disallowance of this expense, for a reduction of $24.60 in expenses.

18.    We noted the following meal expense for which more information was needed:

9/10/2012    Lynes, Daniel A.    MEALS    $37.34    Self Meal at hotel while traveling out of town for business, Baltimore, MD. Purpose of trip was to conduct R&D interviews in Columbia, MD for the Refining Technologies, Materials Technology, and Specialty Catalysts divisions.

In response to our request, Grant Thornton provided the following information:

> Mr. Lynes incurred a $37.34 expense while out of town on business related to the 2005-2011 Refining Technologies R&D interviews.  The amount is included in the hotel portfolio and it cannot be determined to which meal (i.e., breakfast, lunch or dinner) this relates.  Since the meal was incurred while out of town, this expense should be reimbursable.

---

[4]We have been recommending reimbursement of lunch expenses only if one of the following conditions are met: (1) they are incurred for luncheon meetings concerning the case which include parties outside the office; (2) lunch is brought in so that firm employees can meet together about an issue or issues in the case; or (3) the lunch expense is incurred while on travel pertaining to the case.

Since it cannot be determined whether the meal expense was for breakfast, lunch, or dinner, we will assume that the expense was for breakfast for one person and recommend that reimbursement be reduced to $25.00, for a reduction of $12.34 in expenses.

19.    We noted several meal expenses which appeared somewhat excessive.[5]  See Exhibit 5.  We asked Grant Thornton to explain why reimbursement of each of the meal expenses listed on Exhibit 5 should not be reduced.  Grant Thornton responded as follows:

> Grant Thornton's travel and expense policy states that client related meals must be charged to the applicable client.  Reimbursement is allowable up to $100 per person. Accordingly, Grant Thornton employees expensed meals in accordance with the Grant Thornton policy. Total amount expensed under the Grant Thornton policy equals $3,933.88.

> Grant Thornton also understands that the Bankruptcy Court generally applies a cap, per person, per city.  If this policy was applied to the expenses incurred in Exhibit ... (5), the amount allowable equals $3,000. The difference equals $933.88.

> Grant Thornton feels these expenses were actual and reasonable and should be reimbursable under the Grant Thornton policy.  It is important to note that Grant Thornton was never provided the Bankruptcy Court's expense policy related to business expenses, specifically meals and caps per city, and was thus unaware that Grant Thornton's policies differed from the Bankruptcy Court. Accordingly, expenses were incurred under Grant Thornton's policy and should be reimbursed. If the Bankruptcy Court's policy is to be followed in lieu of the Grant Thornton policy, we understand, and will adjust our policy in future filings.

We understand Grant Thornton's response but do not believe Grant Thornton has carried its burden of proof with respect to the reasonableness of these expenses.  Nor are we persuaded to deviate from the caps which we are currently using to evaluate the reasonableness of meal expenses in these

---

[5]We generally apply the following caps (per person) when reviewing meal expenses:

For New York City and London:  $35 for breakfast, $55 for lunch, and $70 for dinner
For Washington, DC:   $30 for breakfast, $45 for lunch, and $65 for dinner
For Chicago:              $30 for breakfast, $35 for lunch, and $55 for dinner
For Los Angeles and San Francisco:  $30 for breakfast, $40 for lunch, and $60 for dinner
For all other U.S. cities: $25 for breakfast, $35 for lunch, and $50 for dinner

cases.  Thus, we recommend a reduction equal to the amount by which the expenses exceed our recommended caps, for a total reduction of $933.88 in expenses.[6]

20.     We noted that Mr. Levin had dinner expenses of $88.68 and $54.32, both of which were posted on 9/13/2012.  We asked Grant Thornton about these expenses, and Grant Thornton responded:

  a.     The $88.68 dinner was incurred on 9/13/12 by Mr. Levin for himself while he was out of town related to the Debtor's business (i.e., tax project Grant Thornton was engaged to do)

  b.     For the $54.32 meal expense, we are unable to substantiate that amount

We appreciate this information, and we recommend that the $88.68 dinner expense be reduced to $50.00, for a reduction of $38.68.  In addition, since Grant Thornton is unable to substantiate the $54.32 meal expense, we must recommend disallowance of same.  Thus, we recommend a total reduction of $93.00 in expenses.

## CONCLUSION

21.     Thus, we recommend approval of $504,562.50 in fees ($510,804.50 minus $6,242.00) and $39,809.05 in expenses ($41,603.33 plus adjustments totaling $323.54[7] minus $2,117.82) for Grant Thornton's services for the Application Period.

---

[6]*See* the spreadsheet at Exhibit 5A for an explanation of how this reduction was calculated.

[7]*See* Paragraph 6.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By: _____
          Warren H. Smith
          Texas State Bar No. 18757050

          2235 Ridge Road, Suite 105
          Rockwall, Texas  75087
          214-698-3868
          214-722-0081 (fax)
          whsmith@whsmithlaw.com

          **FEE AUDITOR**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served by First Class United States mail to the attached service list on this 19th day of February, 2013.

_____
          Warren H. Smith

## SERVICE LIST
<u>Notice Parties</u>

**The Applicant**
Mark Margulies
Grant Thornton LLP
1301 International Parkway
Suite 300
Fort Lauderdale, FL  33323

mark.margulies@us.gt.com

**The Debtors**
Richard Finke
Assistant General Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**
John Donley
Adam Paul
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones
James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**
Lewis Kruger
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**United States Trustee**
David Klauder
Office of the United States Trustee
844 King Street, Lockbox 35, Room 2207
Wilmington, DE 19801

**Counsel to the Official Committee of Property Damage Claimants**
Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
Wilmington, DE 19801

**Counsel to the Official Committee of Personal Injury Claimants**
Elihu Inselbuch
Rita C. Tobin
Caplin & Drysdale
600 Lexington Avenue, 21st Floor
New York, NY  10022-6000

Marla R. Eskin
Mark T. Hurford
Kathleen Campbell Davis
Campbell & Levine, LLC
222 Delaware Avenue, Suite 1620
Wilmington, DE  19801

**Official Committee of Equity Holders**
Philip Bentley
David E. Blabey, Jr.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Teresa K.D. Currier
Saul Ewing LLP
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899

# EXHIBIT 1

a.     We noted that on August 14, 2012, SBW ($400) (Manager), CEW ($325) (Sr. Assoc.), ALS ($245) (Assoc.), DAL ($400) (Manager), and RL ($550) (Managing Dir.) attended a meeting at W.R. Grace.  The total time spent, including travel time, was 38.50 hours for total fees of $13,530.00.

| | | | | |
|---|---|---|---|---|
| ALS | 8/13/2012 | 4.00 | 980.00 | Travel to client site (4) |
| SBW | 8/14/2012 | 4.00 | 1,600.00 | Participate in kick off meeting with Rob Harding (1.0), Materials Technology discussion with Rob Harding related to the R&D costing model (2.0), met with Wu-Cheng Cheng to discuss the R&D tracking system that is in place and how we can use that information in our costing model (1.0).................. |
| CEW | 8/14/2012 | 7.00 | 2,275.00 | Kick off meeting with Rob Harding (1), Materials Technology discussion with Rob Harding related to R&D costing (2), Refining Technologies discussion with Wu-Cheng Cheng related to R&D costing (4).................... |
| ALS | 8/14/2012 | 10.00 | 2,450.00 | 2005-2011 R&D tax credit interviews with Robert Harding to discuss Catalyst projects and documentation (6). Includes travel time (4). |
| DAL | 8/14/2012 | 8.00 | 3,200.00 | R&D Kick off meeting with Rob Harding (R&D Director of Material Technology- WR Grace), to discuss the purpose and organization of his division as well as understand how his employees track their time (4.0 hours); R&D Kick off meeting with Wu-Cheng Cheng (R&D Director of Refining Technologies- WR Grace), to discuss the purpose and organization of his division as well as understand how his employees track their time (4.0 hours) |
| RL | 8/14/2012 | 5.50 | 3,025.00 | 2005-2011 R&D tax credit interviews w/ Robert Harding, SVP of development, for the Catalyst groups. Discussions related to specific project information including time allocation of each of his people, and costs incurred by project, specifically prototypes, supply, and contractor costs. Mr. Harding provided an overview of the group and presentations on the R&D budget for the Company.  Time |

was also spent reviewing the SAP download to
understand the R&D cost centers for Engineered
Materials, Packaging, and Discovery Science. Time spent
with Material Technology finance to determine the
accounting for project costs and the mapping into the
R&D cost center (5.5hours)......................

b.    We noted that on August 16, 2012, DAL ($400) (Manager), DAV ($600) (Partner),

and RL ($550) (Managing Dir.) attended a meeting with the IRS.  The total time spent including any

preparation time was 9.00 hours for total fees of $4,800.00.

| DAV | 8/15/2012 | 0.50 | 300.00 | Participate in meeting with client (Paider & Hurvitz) to discuss status of project and strategy to communicate with the IRS |
| DAL | 8/16/2012 | 2.00 | 800.00 | Prep meeting with Rob Levin and Dave Vorrath from Grant Thornton to discuss the issues to be discussed in the upcoming meeting with the IRS as it relates to the R&D tax credit (1.0 hours); Update Meeting the IRS Agents Shawn Deutschman, Mark Kaeppel, and Richard Otier to discuss the status of the R&D tax credit project (1.0 hours). |
| DAV | 8/16/2012 | 2.50 | 1500.00 | Attend pre-meeting with engagement team and meeting with the IRS to provide a status update on the R&D study |
| RL | 8/16/2012 | 4.00 | 2200.00 | Meeting at W.R. Grace with the IRS team including Shawn Deutschman, Mark Kaeppel, and Richard Otier related to the 2011 R&D tax credit to update the IRS team on progress for the audited years 2008 & 2009. Discussions related to project methodology, documentation, and timing (2 hours). Additional time spent preparing for the meeting including samples of documentation related to refining technologies that will be part of our deliverables, as well as, review of the Company's controlled group as it relates to ART LLC. (2 hours). |

      c.      We noted that on September 10-13, 2012, ALS ($245) (Associate), CEW ($325) (Sr. Associate), and DAL ($400) (Manager) attended a meeting in Columbia, Maryland, at the debtors' offices.  The total time spent including travel time was 106.50 hours for total fees of $34,600.00.

| Date | Name | Description | Hours | Fee |
|---|---|---|---|---|
| 9/10/2012 | Stargel, Andrew L | Travel to Columbia, MD. Meeting with Greg Pollock and Kiran Chodavarapu to discuss documentation of Research and Development Projects (10.5) | 10.5 | 2572.50 |
| 9/10/2012 | Wagner, Catherine E | Arrival and set up in Columbia offices, GT internal preparation for upcoming interviews (1.5); R&D Project interview with Greg Pollock (WR Grace- R&D manager in Material Technology), to discuss the "TR+" project from 2011 as it related to the R&D tax credit (1.0); Review of documentation received surrounding the technical merits (1.0); | 3.5 | 1137.50 |
| 9/10/2012 | Wagner, Catherine E | R&D project interview with Kiran Chodavarapu (R&D Manager- WR Grace, Discovery Sciences) to discuss relevant project pertaining to credit (2.0) | 2 | 650.00 |
| 9/10/2012 | Wagner, Catherine E | Follow up GT meeting with Andrew Stargel and Dan Lynes to recap the interviews, documentation, and memos (2.5) | 2.5 | 812.50 |
| 9/10/2012 | Lynes, Daniel A. | R&D Project interviews with Kiran Chodavarapu (R&D Manager - WR GRACE, Discovery science Group) to discuss relevant projects pertaining to the R&D tax credit (2.0) | 2 | 800.00 |
| 9/10/2012 | Lynes, Daniel A. | Follow-up meeting with Andrew Stargel and Catie Wagner to re-cap the interviews we performed today (2.5) | 2.5 | 1000.00 |
| 9/10/2012 | Lynes, Daniel A. | R&D Project interview with Greg Pollock (WR Grace- R&D manager in Material Technology), to discuss the "TR+' project from 2011 as it related to the R&D tax credit (1.0); Review of documentation received surrounding the technical merits | 2 | 800.00 |

of the "TR+" project (1.0).

| 9/10/2012 | Lynes, Daniel A. | Preparation for R&D interviews at WR Grace in Columbia, MD surrounding the interviews with Greg Daniel A. Pollock and Kiran Chodavarapu of WR Grace (1.0). | 1 | 400.00 |
| 9/11/2012 | Stargel, Andrew L | Meeting with Jim Miller and Rob Harding to discuss documentation including Incubator Technologies. (8.0) | 8 | 1960.00 |
| 9/11/2012 | Wagner, Catherine E | Status update meeting with Dan Lynes and Andrew Stargel to discuss the status of R&D project and next steps for project interviews and memos- beginning and end of work day (2.0) | 2 | 650.00 |
| 9/11/2012 | Wagner, Catherine E | Meeting with Jim Miller (WR Grace- Manager- Materials Technology) to discuss R&D project related to the R&D credit (3.0) | 3 | 975.00 |
| 9/11/2012 | Wagner, Catherine E | Meeting with Rob Harding (WR Grace- Director- Materials Technology) to discuss R&D project related to the Incubator Technologies, also to discuss how tech services is utilized in R&D activities (1.5) | 1.5 | 487.50 |
| 9/11/2012 | Wagner, Catherine E | Meeting with David Graf (WR Grace- Manager- Specialty Catalyst) to discuss R&D project related to the Specialty Catalyst and the legal nature of the R&D projects of his group as it relates to the R&D credit (1.0) | 1 | 325.00 |
| 9/11/2012 | Wagner, Catherine E | Meeting with Al Hummel (WR Grace- Technology Manager- Specialty Catalyst) to discuss Borealis project and the legal nature of the R&D projects of his group as it relates to the R&D credit (.8) | 0.8 | 260.00 |
| 9/11/2012 | Lynes, Daniel A. | Meeting with David Graf (R&D Director, WR Grace, Specialty Catalyst) to discuss the basic legal nature of the R&D projects his group undertakes as it relates to the R&D tax credit (1.5). | 1.5 | 600.00 |

| 9/11/2012 | Lynes, Daniel A. | Meeting with Rob Harding (WR Grace, R&D Director - Materials Technology Group) to discuss how the "tech services" group plays into his time allocations for the R&D tax credit (1.2) | 1.2 | 480.00 |
|---|---|---|---|---|
| 9/11/2012 | Lynes, Daniel A. | R&D Meeting with Jim Miller (WR Grace - Manager- Materials Technology) to discuss R&D projects he over saw related to the R&D tax credit (3.0) | 3.0 | 1200.00 |
| 9/11/2012 | Lynes, Daniel A. | R&D Tax Credit Discussion with Al Hummel (WR Grace, Technology Manager, Specialty catalyst group) to talk about the Borelus R&D project and the technical/legal merits of the project (1.0). | 1.0 | 400.00 |
| 9/11/2012 | Lynes, Daniel A. | Multiple follow up emails with Rob Harding of WR Grace to obtain the missing information necessary to calculate the R&D tax credit as it pertains to the materials and technology group (1.0) | 1 | 400.00 |
| 9/11/2012 | Lynes, Daniel A. | Status update meeting with Catie Wagner and Andrew Wagner of Grant Thornton to discuss the status of the R&D project and next steps related to project interviews (1.5). | 1.5 | 600.00 |
| 9/11/2012 | Lynes, Daniel A. | Conversation with Rob Levin (Grant Thornton) surrounding "performance of R&D" issues surrounding the specialty catalyst projects (.6) | 0.6 | 240.00 |
| 9/12/2012 | Stargel, Andrew L | Meeting with Wu-Cheng Cheng to discuss Research and Development documentation relating to Refining Technologies (6.0). Travel to Deerfield, IL (3.0) | 9 | 2205.00 |
| 9/12/2012 | Wagner, Catherine E | R&D tax credit meeting with Wu-Cheng Cheng, Mike Ziebarth, Ruizhong Hu of WR Grace to discuss R&D projects of the Refining Technologies group as it relates to the R&D credit (4.0) | 4 | 1300.00 |

| 9/12/2012 | Wagner, Catherine E | Chicago travel from Baltimore during the day to prepare for meeting with Jim Anderson of WR Grace, Discovery Sciences Manager to discuss R&D projects (3.0) | 3 | 975.00 |
|---|---|---|---|---|
| 9/11/2012 | Wagner, Catherine E | Additional follow up and analysis of divisions for W2 request sent to Colleen Brill (1.0) | 1 | 325.00 |
| 9/11/2012 | Wagner, Catherine E | Information requests and follow up with interviewees as it related to the projects discussed during the week (1.0) | 1 | 325.00 |
| 9/12/2012 | Lynes, Daniel A. | R&D Tax Credit meeting with Wu-Cheng Cheng, Mike Ziebarth, and Ruizhong Hu of WR Grace, and Catie Wagner and Andrew Stargel of Grant Thornton, to discuss R&D projects of the Refining Technologies Group of WR Grace for relevant tax years for the R&D tax credit Study (4.5). | 4.5 | 1800.00 |
| 9/12/2012 | Lynes, Daniel A. | Travel to Chicago to Baltimore during the normal business day to meet with Jim Anderson of WR Grace, Discovery Sciences group to discuss R&D projects (3.0). | 3 | 1200.00 |
| 9/12/2012 | Lynes, Daniel A. | Information request for the Refining | 1.2 | 480.00 |
| 9/13/2012 | Stargel, Andrew L | Meeting with Jim Anderson and travel back to Andrew L Atlanta (8.0) | 8 | 1960.00 |
| 9/13/2012 | Wagner, Catherine E | R&D project meeting with Jim Anderson (R&D Director WR Grace, Discovery Sciences) to discuss R&D project undertaken by his group relevant to the credit (6.0) | 6 | 1950.00 |
| 9/13/2012 | Wagner, Catherine E | Internal wrap up meeting with Dan Lynes and Andrew Stargel to discuss our findings from meeting with Jim Anderson and determine next steps (2.0) | 2 | 650.00 |
| 9/13/2012 | Lynes, Daniel A. | R&D Project Meeting with Jim Anderson (R&D Director- WR Grace - Discover | 6 | 2400.00 |

|            |                  | Sciences Group) to discuss R&D projects undertaken by his group for the tax years in question for the R&D tax credit study (6.0). |     |         |
| ---------- | ---------------- | --- | --- | --- |
| 9/13/2012  | Lynes, Daniel A. | Wrap-Up meeting with Catie Wagner and Andrew Lynes, Stargel of Grant Thornton to discuss our finding from our meeting with Jim Anderson of WR Grace and determine what our next steps would be to document Mr. Anderson's R&D projects. (2.2). | 2.2 | 880.00 |
| 9/14/2012  | Lynes, Daniel A. | Travel time during normal course of business day back from Chicago, IL after performing R&D interviews at the Discover Sciences group of WR Grace. (3.5). | 3.5 | 1400.00 |

**EXHIBIT 2**

| | | | | |
|---|---|---|---|---|
| 8/13/2012 | Stargel, Andrew L. | Travel to client site (4) | 4.00 | 980.00 |
| 8/14/2012 | Stargel, Andrew L. | ..... Includes travel time (4). | 4.00 | 980.00 |
| 8/19/2012 | Stargel, Andrew L. | Travel to Boston (4.5) | 4.50 | 1,102.50 |
| 9/10/2012 | Stargel, Andrew L | Travel to Columbia, MD;..... | $10.5^8$ | 2,572.50 |
| 9/12/2012 | Stargel, Andrew L | ....;Travel to Deerfield, IL (3.0) | 3 | 735.00 |
| 9/12/2012 | Wagner, Catherine E | Chicago travel from Baltimore during the day to prepare for meeting with Jim Anderson of WR Grace, Discovery Sciences Manager to discuss R&D projects (3.0) | 3 | 975.00 |
| 9/12/2012 | Lynes, Daniel A. | Travel to Chicago to Baltimore during the normal business day to meet with Jim Anderson of WR Grace, Discovery Sciences group to discuss R&D projects (3.0). | 3 | 1,200.00 |
| 9/13/2012 | Stargel, Andrew L | Meeting with Jim Anderson and travel back to Atlanta (8.0) | $8^9$ | 1,960.00 |
| 9/14/2012 | Lynes, Daniel A. | Travel time during normal course of business day back from Chicago, IL after performing R&D interviews at the Discover Sciences group of WR Grace. (3.5). | 3.5 | 1,400.00 |
| 9/20/2012 | Lynes, Daniel A. | Travel time during normal business hours to go to Baltimore, MD to meet with Dan O'Connell of WR Grace related to the R&D tax credit at the Development Center in Curtis Bay, MD (3.2) | 3.2 | 1,280.00 |

---

[8]*Fee Auditor's Note:* Grant Thornton subsequently advised us that it estimates the non-working travel portion of this time entry to be 3.0 hours, which computes to $735.00 in fees.

[9]*Fee Auditor's Note:* Grant Thornton subsequently advised us that it estimates the non-working travel portion of this time entry to be 3.0 hours, which computes to $735.00 in fees.

# EXHIBITS 3 THROUGH 5A

*(See attached spreadsheet.)*

# RESPONSE EXHIBIT A

*(See attached pdf attachment.)*

## RESPONSE EXHIBIT B

As is customary in service organizations, Grant Thornton utilizes a project team approach to best service its clients. This approach allows for the proper delegation of tasks and provides the client with the expertise needed to sustain the project benefits. Furthermore, it is important for each person to hear the information first-hand at meetings, which will enable them to use professional judgment when performing tasks based on information gathered at these meetings. Below is a summary re-cap of the time entries of each of the days:

> August 14, 2012 meeting – Initial Kickoff meeting for the project to determine project population, financial information, and tour of facilities for Davison. Initial meetings were with Robert Harding and finance personnel. Mr. Harding was the WR Grace R&D leader for the project and was able to provide a demonstration of the Company's Research and Development process to the Grant team. Accordingly, the Grant team was required to be in attendance to understand the years 2005 – 2011 and to meet with the appropriate WR Grace team members. Grant Thornton team included: Engagement partner, 2 managers, senior, and a manager. All levels were required to delegate work to the appropriate level.

> August 16, 2012 – Time spent preparing for R&D tax credit meeting with the IRS. Attendees included the Grant Thornton Tax Partner, David Vorrath, the engagement partner Rob Levin, and the project manager Dan Lynes. Each attendee provided project insight and specifics to the Internal Revenue Service.

> September 10-13, 2012 – Time spent interviewing WR Grace personnel on Davison's 2005 – 2011 R&D tax credit. Grant Thornton team included the project manager, a senior and a staff so that proper delegation of duties could be maintained.

*(Pursuant to our request, Grant Thornton provided the following additional information to explain*

*the roles of each of its professionals at these meetings.)*

As noted in Grant Thornton's Fee Auditor Response Letter dated January 28, 2013, Grant Thornton utilizes a project team approach, which integrates all levels, from staff through partner, onto the team in order to provide the highest quality of service to our clients. This approach allows for the appropriate level of expertise to be involved in the planning, monitoring and conducting the work of projects in order to achieve a successful project. Accordingly, each team member is invaluable and critical to the ultimate success of the project.

As requested in the supplement to the initial report of Warren H. Smith & Associates, P.C., the following provides additional explanations related to each of the following meetings:

a.    August 14, 2012 – Initial Kick-off Meeting with Robert Harding, Head of Davison R&D:  At the outset of the WR Grace R&D tax credit study, Grant Thornton and WR Grace initiated a kick-off meeting with the Company to establish project scope, expectations, timing, and co-develop a workplan.  This critical meeting occurred on August 14, 2012, with Mr. Harding and the Grant Thornton WR Grace R&D tax credit team.

The WR Grace and Grant Thornton R&D kick-off meeting entailed the following discussions:  2005-2011 R&D efforts for both Davison and Construction; types of quantitative and qualitative information available for the 2005-2011 tax years; 2005-2011 R&D project analysis; patent discussions; Company R&D practice and procedures; and project milestones.  The Grant Thornton team, and roles, included the following:

Rob Levin, Managing Director – Engagement Partner ("EP"):  As EP, Mr. Levin is responsible for all aspects of the project from project management, economics, and technical sign-off.  Mr. Levin serves as Grant Thornton's South East Area R&D leader.  Specifically, Mr. Levin was in-charge of the team, overall sign-off on the quality and results of the project, discussions with Company management regarding project status and results, and interactions with the IRS.

Sara Beth Watson, Manager – Engagement Manager – Construction:  Mrs. Watson served as the project manager on the WR Grace's Construction division, which includes the overall project management of the 2005-2011 Construction R&D efforts. Mrs. Watson's role includes, conducting project interviews, applying IRC Section 41 technical law to WR Grace's specific projects/facts, review of all documentation provided by the Company, review of all substantive documentation prepared by Grant Thornton's WR Grace R&D team (i.e. IRC Section 41 project write-ups/support), overall management of project deadlines, and coordination of the WR Grace and Grant Thornton team.

Dan Lynes Manager – Engagement Manager – Davison:  Mr. Lynes served as the project manager on the WR Grace's Davison division, which includes the overall project management of the 2005-2011 Davison R&D efforts.  Mr. Lynes' role includes, conducting project interviews, applying IRC Section 41 technical law to WR Grace's specific projects/facts, review of all documentation provided by the Company, review of all substantive documentation prepared by Grant Thornton's WR Grace R&D team (i.e. IRC Section 41 project write-ups/support), overall management of project deadlines, and coordination of the WR Grace and Grant Thornton team.  Mr. Lynes also served as a liaison between the IRS, the Company, and Grant Thornton.

Catie Wagner, Senior - Engagement Senior:  Ms. Wagner served as the main senior associate on the engagement, which included both the Davison and Construction divisions.  Ms. Wagner was in-charge of the detailed R&D cost data related to all field work, as well as, organization of document control.  Ms. Wagner reviewed all work products prepared by the Grant Thornton staff, organized all detail

deliverables, and was integral in the performance of all R&D tax credit discussions with WR Grace employees.

Andrew Stargel, Staff – Engagement Staff – Mr. Stargel served as the main staff on the engagement, which included both the Davison and Construction divisions. Mr. Stargel's main roles were to prepare R&D tax credit workpapers supporting the R&D credit claimed, prepare project write-ups that substantiate the R&D tax credit claimed and provide support to the IRS, and prepare project deliverables that can be provided to the IRS upon audit, if applicable.

The initial kick-off meeting was integral to the success of the project. Each attendee was required in order to establish project protocol, to learn about the Company's R&D tax credit efforts, understand the types of documentation maintained by the Company, and overall project roles and responsibilities. Grant Thornton establishes the appropriate level of hierarchy in order to delegate work to the appropriate levels. The delegation of duties is imperative in order to provide the appropriate level of technical expertise, as well as, the highest level of quality. This type of meeting is customary for all bankruptcy and non-bankruptcy clients.

b.    August 16, 2012 –IRS meeting:  Throughout the WR Grace R&D tax credit study, Grant Thornton, WR Grace, and the IRS met to discuss the project methodology, types of substantive documentation, progress, and potential results.  These collaborative and working session meetings were instrumental in the success of the project since the IRS was informed up-front of all aspects of the project.  The attendees and roles of each Grant Thornton employee at this meeting was as follows:

David Vorrath, Partner – Grant Thornton's WR Grace Partner – Mr. Vorrath serves as the primary Partner on WR Grace, including all aspects of taxation and each engagement Grant Thornton is involved.  Mr. Vorrath was present at the August 16, 2012 meeting with the IRS as the lead partner on the client.  Mr. Vorrath maintains the most historical knowledge of the client, and acted as business advisor to the Company during the IRS proceedings.  His overall responsibilities to the client are to understand the Company's business, their tax posture, and to provide tax advice, if required.

Rob Levin, Managing Director EP:  Mr. Levin's role on the engagement is discussed above.  Mr. Levin was involved in the August 16, 2012 meeting with the IRS as the IRC Section 199 technical Partner.  Discussions with the IRS revolved around IRC Section 41 and the application to WR Grace's facts, which Mr. Levin was heavily involved.  Mr. Levin worked with the IRS to discuss each IRC Section 41 detail (i.e. controlled group, W-2 wage, and business component issues).

Dan Lynes Manager – Engagement Manager – Davison:  Mr. Lynes' role on the engagement is discussed above.  Mr. Lynes was involved in the August 16, 2012 meeting with the IRS because of his intimate knowledge of the field work performed on the WR Grace R&D study.  At this meeting, the IRS wanted detailed discussions of the types of R&D being performed, how each project was being tracked and why

it qualified, and how Grant Thornton would document this.  Since Mr. Lynes served as the project manager on the engagement, his intimate knowledge of the Company and the R&D process was required.

At the conclusion of IRS meeting, next steps were established.  Grant Thornton was able to appropriately delegate the workload to the right levels in order to assure quality and timeliness.

c.      September 10-13, 2012 – Davison 2005-2011 R&D Tax Credit interviews:  On-site field work to quantify and qualify Davison's Qualified Research Expenditures.

Dan Lynes, Manager – Engagement Manager – Davison:  Mr. Lynes' role on the engagement is discussed above.  Mr. Lynes was involved in the September 10-13, 2012 meetings with the WR Grace R&D groups to serve as the main technical liaison and individual in charge from Grant Thornton while on site at the WR Grace facilities.  Mr. Lynes' attendance was necessary as he had the most knowledge of the client as well as the necessary experience to make determinations while on-site.  Mr. Lynes led R&D project discussions with engineers at WR Grace to gain an understanding of the various projects, as well as determine whether these projects would qualify under IRC Section 41 for the R&D tax credit.  Additionally, Mr. Lynes worked with WR Grace Legal Counsel, to obtain and review certain R&D contracts with 3rd parties to determine if these arrangements accorded WR Grace the opportunity to take eligible R&D expenses associated with them.

Catie Wagner, Senior - Engagement Senior:  As stated above, Ms. Wagner served as the main senior associate on the engagement, which included both the Davison and Construction divisions.  Ms. Wagner was in-charge of the detailed R&D cost data related to all field work, as well as, organization of document control.  Ms. Wagner needed to be at the meetings on September 10-13, 2012 to have additional in-depth discussions with the R&D groups at WR Grace to understand various aspects of the R&D cost related data, as well as to help Mr. Lynes conduct the R&D project discussions.  Being part of these conversations allowed Ms. Wagner to better understand how R&D costs were tracked and whether various costs were eligible for inclusion in the R&D tax credit computation.

Andrew Stargel, Staff – Engagement Staff – Mr. Stargel's role on the engagement is discussed above.  His main role at the meetings from September 10-13, 2012 was to take extensive notes, ask questions to the engineers to understand their R&D processes, and gather documentation from the various engineering groups to support the R&D tax credit claimed.  In addition, while on site, Mr. Stargel began outlining R&D project write ups with the Grant Thornton team.  In order to properly leverage certain tasks down and make the most use of Grant's time at these meetings, it was imperative for Mr. Stargel to attend.