UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA
and DISTRICT OF DELAWARE

IN RE                              . Case No. 00-22876 (JKF)
                                   .
 PITTSBURGH CORNING                .
 CORPORATION,                      .
                  Debtor.          .
. . . . . . . . . . . . . . . . .
IN RE                              . Case No. 03-35592 (JKF)
                                   .
 MID-VALLEY, INC., et al.,         .
                                   .
                  Debtor.          .
. . . . . . . . . . . . . . . . .
IN RE:                             . Case No. 02-20198 (JKF)
                                   .
 NORTH AMERICAN REFRACTORIES       .
 COMPANIES,                        .
                                   .
                  Debtor.          .
. . . . . . . . . . . . . . . . .
IN RE:                             . Case No. 02-12687 (JKF)
                                   .
 ACandS, Inc.,                     .
                  Debtor.          .
. . . . . . . . . . . . . . . . .
IN RE:                             . Case No. 00-04471(JKF)
                                   .
 ARMSTRONG WORLD                   .
 INDUSTRIES, INC.                  .
                                   .
                  Debtor.          .
. . . . . . . . . . . . . . . . .
IN RE:                             . Case No. 03-10495(JKF)
                                   .
 COMBUSTION ENGINEERING, INC.,.
                                   .
                  Debtor.          .
. . . . . . . . . . . . . . . . .
IN RE:                             . Case No. 04-11300 (JKF)
                                   .
 THE FLINTKOTE COMPANY             .
                                   .
                  Debtor.          .
. . . . . . . . . . . . . . . . .

```
IN RE:                          . Case No. 02-10429 (JFK)
                                .
 KAISER ALUMINUM CORPORATION, .
                   Debtor,    .
. . . . . . . . . . . . . . . .

IN RE:                          . Case No. 00-03837 (JKF)
                                .
 OWENS CORNING,               .
                   Debtor.    .
. . . . . . . . . . . . . . . .
IN RE:                          . Case No. 01-2471 (JFK)
                                .
 US MINERAL PRODUCTS COMPANY, .
                                .
                   Debtor.    .
. . . . . . . . . . . . . . . .
                                .
IN RE:                          . Case No. 01-02094 (JFK)
                                .
 USG CORPORATION,             .
                   Debtor,    .
. . . . . . . . . . . . . . . .
IN RE:                          . Case No. 01-1139 (JKF)
                                . 5414 U.S. Steel Tower
 W.R. GRACE & CO.,            . 600 Grant Street
                                . Pittsburgh, PA  15219
                   Debtor.    .
. . . . . . . . . . . . . . . . April 4, 2013
```

TRANSCRIPT OF STATUS CONFERENCES
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:              Claire Susi

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311  Fax No.  (609) 587-3599**

**TELEPHONIC APPEARANCES:**

| | |
|---|---|
| For Debtor, Pittsburgh<br>Corning Corp.: | Reed, Smith, Shaw & McClay<br>By:  DOUGLAS E. CAMERON, ESQ.<br>      ANDREW J. MUHA, ESQ.<br>      JAMES J. RESTIVO, JR., ESQ.<br>      DAVID ZIEGLER, ESQ.<br>Reed Smith Centre<br>225 Fifth Avenue<br>Pittsburgh, PA 15222 |
| Representative for<br>Pittsburgh Corning Corp.: | Pittsburgh Corning Corporation<br>By:  JOSEPH NESE<br>800 Presque Isle Drive<br>Pittsburgh PA 15239-2799 |
| For Respondent, Corning,<br>Inc.: | Ward, Greenberg, Heller &<br>Reidy, LLP<br>By:  DAVID M. KNAPP, ESQ.<br>      CHERYL A. HELLER, ESQ.<br>      KEVIN T. MERRIMAN, ESQ.<br>300 State Street<br>Rochester, NY 14614<br><br>Thorp Reed & Armstrong<br>By:  KIMBERLY WAKIM, ESQ.<br>301 Grant Street<br>Pittsburgh, PA 15219 |
| For Creditor, Everest<br>Insurance: | Walker, Wilcox, Matousek, LLP<br>By:  FRED L. ALVAREZ, ESQ.<br>One North Franklin Street<br>Suite 3200<br>Chicago, IL 60606<br><br>By:  TONY L. DRAPER, ESQ.<br>1001 McKinney Street<br>Suite 2000<br>Houston, TX 77002 |
| For Interested Party<br>NorthStar Reinsurance Corp: | Skadden, Arps, Slate, Meagher &<br>Flom<br>By:  MICHAEL J. BALCH, ESQ.<br>4 Times Square<br>New York, New York 10036 |

**TELEPHONIC APPEARANCES (Cont'd):**

For Creditor, Travelers          The Travelers Indemnity Co.
Casualty and Surety Co.:         By:  LEONARD M. BIERING, ESQ.
                                 One Tower Square, 8-MS
                                 Hartford, CT 06183

                                 Debevoise & Plimpton, LLP
                                 By:  ROBERT D. GOODMAN, ESQ.
                                      MIRANDA H. TURNER, ESQ.
                                 919 Third Avenue
                                 New York, NY 10022

For Interested Party,            Rivkin, Radler, LLP
Allstate Insurance Co.:          By:  MICHAEL E. BUCKLEY, ESQ.
                                 926 RXR Plaza
                                 Uniondale, NY 11556-0926

For Creditor, Garlock            Robinson, Bradshaw & Hinson
Sealing Technologies:            By:  GARLAND S. CASSADA, ESQ.
                                      RICHARD C. WORF, JR., ESQ.
                                 101 North Tryon Street, Ste. 1900
                                 Charlotte, NC 28246

                                 Del Sole Cavanaugh Stroyd, LLC
                                 By:  ARTHUR H. STROYD, ESQ.
                                 200 1st Avenue, Suite 300
                                 Pittsburgh, PA 15222

                                 Morris, Nichols, Arsht &
                                 Tunnell, LLP
                                 By:  MATTHEW B. HARVEY, ESQ.
                                      GEORGE W. WERKHEISER, ESQ.
                                 1201 N Market Street, #1800
                                 Wilmington, DE 19801

For Interested Party,            Parcels, Inc.
Parcels, Inc.:                   By:  IRIZ COLON
                                      BRYAN DAVIS
                                      JOSEPH KING
                                 32 W. Loockerman Street, Ste. 109
                                 Dover, DE 19901

For Interested Parties,          Stutzman, Bromberg, Esserman &
Various Claimant Firms:          Plifka
                                 By:  SANDER L. ESSERMAN, ESQ.
                                      DAVID A. KLINGLER, ESQ.
                                      DAVID J. PARSONS, ESQ.
                                 2323 Bryan Street, Suite 2200
                                 Dallas, TX 75201-2689

**TELEPHONIC APPEARANCES (Cont'd):**

| | |
|---|---|
| For Lawrence Fitzpatrick: | Dinsmore & Shohl, LLP<br>By:  JOEL M. HELMRICH, ESQ.<br>One Oxford Centre<br>301 Grant Street, Suite 2800<br>Pittsburgh, PA 15219 |
| For Creditor, Owens Corning: | Saul Ewing, LLP<br>By:  ADAM H. ISENBERG, ESQ.<br>Centre Square West<br>1500 Market Street, 38th Floor<br>Philadelphia, PA 19102-2186 |
| For Defendant, Certain<br>Underwriters at Lloyd<br>London: | Duane Morris, LLP<br>By:  JEFFREY D. KAHANE, ESQ.<br>865 South Figueroa Street<br>Suite 3100<br>Los Angeles, CA 90017-5450 |
| For Creditor, Official<br>Committee of Asbestos<br>Creditors: | Campbell & Levine<br>By:  PHILLIP E. MILCH, ESQ.<br>1700 Grant Building<br>Pittsburgh, PA 15219 |
| For Certain Pittsburgh<br>Corning Cancer Claimants: | Montgomery, McCracken, Walker &<br>Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>123 South Broad Street<br>Philadelphia, PA 19109 |
| For Creditor, Certain<br>Underwriters and Certain<br>London Market Insurance<br>Companies: | Tucker Arensberg<br>By:  MICHAEL J. SHINER, ESQ.<br>1500 One PPG Place<br>Pittsburgh, PA 15222 |
| For Creditor, Continental<br>Insurance: | Stonecipher Law Firm<br>By:  GEORGE T. SNYDER, ESQ.<br>125 First Avenue<br>Pittsburgh, PA 15222-1590 |
| For Creditor, Trade<br>Creditors Committee: | Leech Tishman Fuscaldo & Lampl<br>By:  CRYSTAL THORNTON-LIAR, ESQ.<br>525 William Penn Place<br>Pittsburgh, PA 15219 |

**TELEPHONIC APPEARANCES (Cont'd):**

For Debtor, Armstrong World          Weil Gotshal & Manges, LLP
Industries:                          By:  DEBRA DANDENEAU, ESQ.
                                          ABIGAIL L. ZIGMAN, ESQ.
                                     1201 N. Market Street, #1402
                                     Wilmington, DE 19801

                                     Richards Layton & Finger, PA
                                     By:  JASON M. MADRON, ESQ.
                                     920 N. King Street
                                     Wilmington, DE 19801

For Debtor, W.R. Grace & Co.:        Kirkland & Ellis, LLP
                                     By:  RANA BARAKAT, ESQ.
                                     300 North LaSalle
                                     Chicago, IL 60654

                                     Pachulski Stang Ziehl & Jones
                                     By:  JAMES E. O'NEILL, ESQ.
                                     919 N. Market Street
                                     Wilmington, DE 19801

For Creditor, Official               Dies & Hile, LLP
Committee of Asbestos                By:  MARTIN DIES, ESQ.
Property Damage Claimants:           1601 Rio Grande Street
                                     Austin, TX 78701

                                     Bilzin Sumberg Baena Price
                                     Axelrod, LLP
                                     By:  JASON Z. JONES, ESQ.
                                     1450 Brickell Avenue, 23rd Floor
                                     Miami, Fl 33131-345

                                     Speights & Runyan
                                     By:  DANIEL SPEIGHTS, ESQ.
                                     2015 Boundary Street, Suite 239
                                     Beaufort, SC 29902

                                     Ferry, Joseph & Pearce, P.A.
                                     By:  THEODORE J. TACCONELLI, ESQ.
                                     824 N. Market Street
                                     Wilmington, DE 19801

**TELEPHONIC APPEARANCES (Cont'd):**

| | |
|---|---|
| For Creditor, Official Committee of Unsecured Creditors: | Campbell & Levine<br>By:  MARK T. HUFORD, ESQ.<br>222 Delaware Avenue, Ste. 1620<br>Wilmington, DE 19801 |
| | Caplin & Drysdale<br>By:  KEVIN MACLAY, ESQ.<br>One Thomas Circle, N.W.<br>Suite 1100<br>Washington, DC 20005 |
| For Interested Party, Property Damage: | Law Office of Alan B. Rich<br>By:  ALAN B. RICH<br>1201 Elm Street, Suite 4244<br>Dallas, TX 75270 |
| For Interested Party, Alexander Sanders, Jr.: | Alexander Sanders, Jr. |
| For Interested Party, Property Damage Committee: | Speights & Runyan<br>By:  GIBSON SOLOMONS, ESQ.<br>2015 Boundary Street, Suite 239<br>Beaufort, SC 29902 |
| For the Debtor, AC&S, Inc. and United States Mineral Products Co.: | Keating Muething & Klekamp<br>By:  BETHANY PALMER RECHT, ESQ.<br>One East Fourth Street, Ste. 1400<br>Cincinnati OH 45202 |
| For Creditor, Hain Capital Group, LLC: | Hain Capital Group, LLC<br>By:  Brian L. Brager<br>301 New Jersey 17<br>Rutherford, NJ 07070 |
| For Creditor, AIG: | Zeichner Elman & Krause, LLP<br>By:  MICHAEL S. DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY 10022 |
| For Creditor, Asbestos Claimants Committee: | Anderson Kill & Olick, P.C.<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY 10020 |

**TELEPHONIC APPEARANCES (Cont'd):**

| | |
|---|---|
| For Interested Party,<br>Pahigian: | Sherrard German & Kelly, P.C.<br>By:  GARY PHILIP NELSON, ESQ.<br>28th Floor, Two PNC Plaza<br>620 Liberty Avenue<br>Pittsburgh, PA 15222 |
| For Creditor, AIG/National<br>Union Fire Insurance of<br>Pennsylvania: | Tucker Arensberg<br>By:  BEVERLY WEISS MANNE, ESQ.<br>1500 One PPG Place<br>Pittsburgh, PA 15222 |
| For Interested Party, Trust<br>Advisory Committee: | FrankGecker LLP<br>By:  JOSEPH FRANK, ESQ.<br>325 N. LaSalle Street, Suite 625<br>Chicago, IL 60654 |
| For Creditor, David Austern: | Orrick, Herrington & Sutcliffe<br>By:  RICHARD H. WYRON, ESQ.<br>Columbia Center<br>1152 15th Street, N.W.<br>Washington, D.C. 20005-1706 |
| For Debtor, Reorganized<br>Debtor, Mid-Valley, Inc.: | K&L Gates, LLP<br>By:  MICHAEL G. ZANIC, ESQ.<br>K&L Gates Center<br>210 Sixth Avenue<br>Pittsburgh, PA 15222-2613 |
| For Debtor, The Flintkote<br>Company: | Sidley Austin, LLP<br>By:  CHRISTINA M. CRAIGE, ESQ.<br>555 West Fifth Street<br>Los Angeles, CA 90013 |
| For Creditor, Imperial<br>Tobacco: | Morris James, LLP<br>By:  STEPHEN M. MILLER, ESQ.<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE 19801-1494 |
| | King & Spalding, LLP<br>By:  THADDEUS D. WILSON<br>1180 Peachtree Street<br>Atlanta, GA 30309 |

- - -

1             THE COURT:  Good afternoon.  This is a status

2    conference that the Court scheduled in order to address a

3    protocol for disclosure of certain 2019 statements to Garlock.

4    This matter is pending in Pittsburgh Corning, Mid-Valley and

5    North American Refractories in Pittsburgh; ACandS, Armstrong

6    World Industries, Combustion Engineering, Flintkote, Kaiser

7    Aluminum, Owens Corning, US Mineral, USG and W.R. Grace in the

8    District of Delaware.

9             I have participants listed by phone:  David Knapp,

10   Fred Alvarez, Michael Balch, Keith Barbarosh, Leonard

11   Bieringer, Michael Buckley, Douglas Cameron, Garland Cassada,

12   Iriz Colon, Bryan Davis, Tony Draper, Sander Esserman, Robert

13   Goodman, Cheryl Heller, Joel Helmrich, Adam Isenberg, Jeffrey

14   Kahane, Joseph King, David Klingler, David Lampl, Kevin

15   Merriman, Philip Milch, Andrew Muha, Joseph Nese, David

16   Parsons, Natalie Ramsey, James Restivo, Michael Shiner, George

17   Snyder, Arthur Stroyd, Crystal Thornton-Illar, Miranda Turner,

18   Kimberly Wakim, Richard Worf and David Ziegler all for

19   Pittsburgh Corning.

20            In Owens:  Garland Cassada, Iriz Colon, Bryan Davis,

21   Matthew Harvey, Daniel Hogan, Joseph King, Gregory Werkheiser,

22   Richard Worf.

23            In Armstrong:  Garland Cassada, Iriz Colon, Debra

24   Dandeneau, Bryan Davis, Matthew Harvey, Joseph King, Jason

25   Madron, Gregory Werkheiser, Richard Worf, Abigail Zigman.

1    In W.R. Grace:  Rana Barakat, Garland Cassada, Iriz

2  Colon, Bryan Davis, Martin Dies, Matthew Harvey, Mark Hurford,

3  Jason Jones, Joseph King, Kevin Maclay, James O'Neill, Alan

4  Rich, Alexander Sanders, Gibson Solomons, Daniel Speights,

5  Theodore Tacconelli, Gregory Werkheiser, Richard Worf, Elisa

6  Alcabes.

7    In USG:  Garland Cassada, Iriz Colon, Bryan Davis,

8  Matthew Harvey, Joseph King, Gregory Werkheiser, Richard Worf.

9    In US Minerals:  Garland Cassada Iriz Colon, Bryan

10  Davis, Matthew Harvey, Joseph King, Gregory Werkheiser, Richard

11  Worf.

12    In Kaiser:  Garland Cassada, Iriz Colon, Bryan Davis,

13  Matthew Harvey, Joseph King, Gregory Werkheiser, Richard Worf.

14    In ACandS:  Garland Cassada, Iriz Colon, Bryan Davis,

15  Matthew Harvey, Joseph King, Bethany Recht, Gregory Werkheiser

16  and Richard Worf.

17    In NARCO:  Brian Brager, Garland Cassada, Iriz Colon,

18  Bryan Davis, Michael Davis, Robert Horkovich, Joseph King,

19  Phillip Milch, Gary Phillip Nelson, Richard Worf, Beverly Weiss

20  Manne.

21    In Combustion:  Garland Cassada, Iriz Colon, Bryan

22  Davis, Joseph Frank, Matthew Harvey, Joseph King, Gregory

23  Werkheiser, Richard Worf, Richard Wyron.

24    In Mid-Valley:  Garland Cassada, Iriz Colon, Bryan

25  Davis, Joseph King, Richard Worf, Michael Zanic, Garland -- I'm

1 | sorry, Michael Zanic was the last one in Mid-Valley.

2 |         In Flintkote:  Garland Cassada, Iriz Colon, Christina

3 | Craige, Bryan Davis, Matthew Harvey, Joseph King, Stephen

4 | Miller, Michael Shiner, Gregory Werkheiser, Thaddeus Wilson and

5 | Richard Worf.

6 |         And that is the list of participants that I have by

7 | phone.

8 |         All right.  I have received a response from Garlock

9 | indicating that the protocol is unnecessary.  In fact, it is

10 | necessary for the reason that depending on how many of the

11 | disks that Mr. Cassada, on behalf of his client, wants to see,

12 | or his client wants to see, the estimate through the bankruptcy

13 | court is that if we devoted staff to produce the documents, it

14 | would take three years of staff time, and it will be longer in

15 | Delaware because there are more cases pending.  So that's the

16 | first thing.

17 |         The second thing is I ran the protocol past Judge

18 | Hodges, he's fine with it.  And I've also ran the concept,

19 | although not the specifics, past Judge Conti who deals with our

20 | discovery master program, and Judge Nora Barry Fischer who

21 | entered the orders in the three Pittsburgh cases, and they're

22 | also fine with it.  In fact, endorsed the concept because of

23 | the issues that will come up in terms of turning over original

24 | court documents to any copy service, or anyone else.  So we are

25 | going to have a protocol, and we are going to use the

1  e-discovery special masters as a result, because it's simply

2  necessary in order for the Court to do the production.

3        So to the extent that the objection is it's

4  unnecessary without even hearing any argument, I'm overruling

5  that.  It is quite necessary in order to assure an orderly

6  production process.

7        Now, having said that, I'm willing to hear whatever

8  anybody wants to say with respect of the details of that

9  production.  And Mr. Cassada, I'll start with you, or whoever

10 on behalf of Garlock wishes to be heard.

11       MR. CASSADA:  Thank you, Your Honor.  This is Garland

12 Cassada.  As we indicated in the filing that we made, Garlock's

13 concern at this point is further expense and further delay.

14 And our understanding has been that the provisions that we

15 negotiated with the law firms and the Asbestos Claimants

16 Committees in the various cases were adequate, at least to

17 address concerns that the Court may have about Garlock getting

18 retention agreements, which were not part of what Garlock was

19 given access to, and full Social Security numbers.  Those two

20 issues were specifically addressed in negotiations between the

21 parties and the provisions in implementing orders reflect the

22 agreements of the parties on how to handle that.

23       And, specifically, we agreed to retain a mutually

24 agreeable document retrieval and copying company.  And we, in

25 fact, did agree with the law firms and the ACCs to engage

1 Parcels, Inc., who I believe has a representative participating

2 in the telephonic hearing.  And the idea would be that Parcels

3 would receive copies of the disks and copy the 2019 exhibits.

4 We talked about making copies --

5      THE COURT:  Mr. Cassada, I need to stop you right

6 there.  The Court doesn't have the personnel to make copies,

7 that's why we're using the special master.  So that is not

8 going to happen.  We don't have the resources, we don't have

9 the disks, and we don't have the personnel.  And we're not

10 going to turn over original records to a copy service without

11 some systematic method of determining what they are.

12      Now, I have a suggestion for you.  If you want to get

13 these same 2019 statements that debtors' counsel supposedly

14 have on hand using whatever process you folks have agreed to so

15 that the Court isn't involved in it, that's one thing, and then

16 you can agree to whatever confidentiality provisions you like.

17 But if it's going to be court records that are going to be

18 turned over, we're going to do it through a protocol.

19      MR. CASSADA:  I'm not certain that the debtors'

20 counsel have copies of the 2019.

21      THE COURT:  They were ordered to keep them.  Now,

22 whether they've kept them in closed cases, I don't know.

23      MR. CASSADA:  Yes.  I guess our understanding was

24 that the actual disks are included in a file cabinet, at least

25 the ones that hadn't been sent to storage were in a file

1    cabinet.

2    THE COURT:  They're in probably "need to file"

3    cabinets that stretch from the floor to the ceiling.  And it

4    would take, as I indicated, three years worth of work to

5    segregate this information, the ones in Pittsburgh.  That

6    doesn't include Delaware.  Delaware has substantially more than

7    Pittsburgh has, although, my understanding is still that many

8    of the Delaware ones, the files have not yet been brought back

9    from archives.

10    MR. CASSADA:  Yes.  The way that we had envisioned it

11    and hoped that it could happen would be that Parcels would come

12    to the court in the same way that a party would come, or any

13    member of the public to view a court document, and would copy

14    disks onsite with minimal burden on the clerk's office.  Now,

15    that would have to be coordinated with a clerk, but our hope

16    was that the Court would be willing to allow that procedure to

17    go forward, which, as I indicated, is the procedure that we had

18    agreed to with the interested parties in the appeals.

19    THE COURT:  Well, as I said, if you want to try that

20    with counsel, fine.  If you want to do it through the court

21    process, we're going to have a controlled mechanism, and the

22    e-discovery master is the way we're going to do it.  Because

23    otherwise we have no assurance that what -- that the disks are

24    not damaged; that we're getting back what we've turned over.

25    To the extent that these documents are now considered by a

1   district court to be part of the court file, we have to

2   preserve them the way we would any other disks, or any other

3   docketed material.  And since they are not on the CMECF system,

4   the only copies we have are the originals that are in our

5   files, we have to preserve them.  So we're going to have to

6   preserve them.

7          Now, if you want to work something out with counsel

8   to the extent that they have what you're looking for, then I

9   don't know that the Court cares so much.  But I do care about

10  the requirement that the law says that the Court is not to

11  disclose Social Security numbers, so we're not going to

12  disclose Social Security numbers.  And the district court

13  opinions say you can't get the retention agreement, so we're

14  not going to disclose those.  Not to Parcels; not to anyone.

15  So we need a process by which that's going to work out, and

16  that's what I see part of the process for the e-discovery

17  master is doing.

18          MR. CASSADA:  Let me address the Court's concerns

19  about Social Security numbers and the retention agreements.

20  Actually, the protective order that we put in place, as well as

21  the implementing order protects the Social Security numbers.

22  And that was an issue that was adjudicated in connection with

23  Garlock's motion to access.  That the disk would contain

24  personal identifying information, including Social Security

25  numbers that might be the subject of, or be subject to the risk

1 of identity theft.

2       Judge Stark dealt with that issue in the opinion, and
3 he said that while the appellees are concerned about the
4 possibility of misuse of potential asbestos claimants personal
5 information leading to identity theft, or other abuses, they
6 failed to show any clearly defined and serious injury,
7 particularly given the restrictions the Court will place on
8 Garlock's use of the 2019 exhibits.  So that issue was part of
9 what Judge Stark adjudicated.  And the protections that he put
10 in his opinion and the implementing order were designed to
11 protect Social Security numbers.

12       And as the Court may know, if you've read the North
13 Carolina protective order, we've gone even further and provided
14 further protection for Social Security numbers.  And not only
15 would any party to whom we would produce 2019 exhibits, and
16 that would include the Asbestos Committee in our case, as well
17 as the Futures representative, not only would they be bound to
18 keep the 2019 exhibits confidential, but we've agreed that
19 before we even produce to those parties, we would redact all
20 but the last four digits of the Social Security number.

21       THE COURT:  But my understanding is -- Mr. Cassada,
22 my understanding is that a very simple program can be run on
23 these disks by whoever takes the disks -- not the Court's copy,
24 but the copy of the Court's copy, there's a very simple program
25 that can be run that will eliminate everything but the last

1  four digits of the Social Security number.  There is no need

2  for anybody to have production of those Social Security numbers

3  if, in fact, the information that I've been presented is

4  correct.  So I think running a sample test to find out whether

5  that works is easy, and I don't think that that's going to be a

6  huge expense with respect to the copying and delays.

7          So, frankly, I really don't see this as an issue.

8  This Court cannot produce personal identifies.  We cannot do

9  it.  We are bound by the rules that say we cannot, and we will

10 not produce them.  We will turn them over to whoever it is who

11 has to make copies so that they can be appropriately redacted

12 from copies, not the original court documents, but that's all I

13 can do.

14         MR. CASSADA:  Well, I am not familiar with the

15 software and the expense that that may entail.  And I would

16 hope that if the Court is inclined to let Parcels do the

17 copying, as the parties had agreed, that maybe Parcels can run

18 that program.  But there is precedent for Social Security

19 numbers in the 2019 statements and in ballots.  And that the

20 Court has on other occasions granted access to 2019 statements

21 and the ballots that included full Social Security numbers, and

22 the remedy in those cases has been that the party receiving

23 that has agreed to protect those full numbers and not to --

24         THE COURT:  That is correct, but the purposes for

25 which those disclosures were made is much different from this.

1 And in this instance, it seems to me that with the massive

2 information that is being sought by Garlock, it has to be done

3 in a fashion that does, indeed, do what the law requires in

4 terms of protecting this.  Garlock has never been able to get

5 copies of those documents.  You've had access, but not copies.

6 This is a whole different ball of wax, from my point of view.

7 　　　　　MR. CASSADA:  Well, Your Honor, we did get access in

8 part due to your orders to ballots by most of these same

9 claimants in all of the bankruptcy cases.

10 　　　　　THE COURT:  Yes, I know.

11 　　　　　MR. CASSADA:  In each of those cases we've

12 stipulated, entered into agreements in a separate protective

13 order in North Carolina that the full Social Security numbers

14 that may have been inadvertently included in those documents

15 would not be divulged.

16 　　　　　THE COURT:  That's right.  And that same protective

17 order will apply here.  To the extent that there is something

18 that is inadvertently disclosed, it won't be divulged, but not

19 everything is going to be disclosed.  Some modifier to make

20 sure that what is not required to be turned over by the law,

21 that it is not turned over is going to be in place.

22 　　　　　Mr. Cassada, I am going to use a special e-discovery

23 master.  I've already run it by Judge Fischer, she's wholly in

24 support.  She thinks it's a good idea given the constraints

25 that the courts face right now with respect to staffing and

1  everything else.  So it's going to happen.  So can we just

2  figure out how we're going to implement it.

3       MR. CASSADA:  Let me just say one thing and then we

4  can move on to discussing implementation.  And that is that we

5  did -- Judge Stark was sensitive to the timing issues and we

6  had a hearing where he wanted to understand the need for --

7  when we could -- needed to receive these documents in order to

8  be able to use them in our estimation proceeding here,

9  particularly since it's been over two years since we requested

10  access.  And we have a trial that's set to start on July 22.

11       THE COURT:  Well, you're not going to make it if we

12  don't get a special e-discovery master in place, because it

13  will take three years from Pittsburgh alone to do this

14  production.  And I haven't gotten an estimate from Delaware, I

15  haven't even seen all the documents.  But given the number of

16  cases and my own familiarity with them, I think it's going to

17  be a lot longer there.  So you got a problem.  To meet this

18  deadline, we've got to do something to expedite it.  And I

19  don't want to hold up Garlock's case either, but the way to not

20  hold Garlock's case up is not to -- it is to -- let me put it

21  affirmatively -- put somebody in place who can effectuate this

22  plan.  The clerk's office cannot.

23       And I don't know what estimate, as I said, Judge

24  Stark was given, if any.  He didn't contact me about

25  Pittsburgh, so I don't know what his expectation is with

1  respect to Delaware.  I haven't been able to get an estimate

2  from the clerk's office in Delaware yet as to how much time it

3  will take, so I'm not sure they know.

4         MR. CASSADA:  Just so I understand, Your Honor, when

5  you said that it's a three-year time period, are you talking

6  about with a special master it will take three years?

7         THE COURT:  No, no, no.  I'm talking about if we

8  don't use a special master, how long it will take the clerk's

9  office to be able to do the production.  That's the reason why

10 we got into the concept of the special master in the first

11 place.

12        MR. CASSADA:  I understand.  Well -- and just to fill

13 out further, the timing, Your Honor, when we had originally

14 talked with Judge Stark, he understood, I believe, from our

15 conference call that we had a deadline for rebuttal expert

16 reports on April 19th, and it was about a month-and-a-half ago

17 when we had that call.  Now, obviously, we're not going to get

18 these statements in time for our expert to use them in his

19 rebuttal report.  We're hoping that our judge will allow us to

20 supplement reports.

21        But in any event, I won't waste the Court's time

22 further.  We do object to the protocol because we think that

23 the means that had been negotiated by the parties was adequate,

24 and protected the information and protected the Court's

25 original files.

1          THE COURT:  Well, I disagree, and as a result, I'm

2  going to make sure that our records are adequately protected,

3  both in here and in Delaware, and this is how we're going to do

4  it, Mr. Cassada, unless, as I said, you ought to talk to the

5  debtor's counsel.  Perhaps they've got the same documents, and

6  if they do, then, you know, to the extent that they are not

7  concerned about producing Social Security numbers, that's up to

8  them.  To the extent that they're not concerned about producing

9  retention agreements that aren't to be produced, that's up to

10  them.  And if you want to work out an agreement with them,

11  that's fine, but this Court is not approving that agreement

12  because I don't think it works.  I don't think it protects what

13  the Court needs to have protected.

14          MR. CASSADA:  Well, I don't think that would work

15  because all of the debtors' law firms hold those documents

16  pursuant to your order, which says they can't provide them

17  unless you order them to.

18          THE COURT:  Well, that's easy.  I can order them to

19  be provided, as opposed to working through the clerk's office.

20  I don't think that's the issue, Mr. Cassada.  The issue is --

21  look, I would like to try to expedite this process.  This is

22  not an intent to try to hold up Garlock.  It's an intent to try

23  to get done what we need to do to comply with the court order

24  and to make sure that Garlock gets the information from these

25  2019s that, (a), have been authorized, and, (b), as quickly as

1  possible.

2         So my intent is not to be obstructive, but to assist

3  in getting this done.  And I'm sure, based on the fact that

4  you're aware of the fact that the clerk's office, at my

5  request, developed a special report that could be given to

6  Garlock to expedite the process at the outset that this Court

7  is acting, if the words can be literally interpreted, in good

8  faith in attempting to get this process done as quickly and as

9  expeditiously as possible.  We cannot do it in any kind of time

10 frame that would assist Garlock in its estimation hearing

11 without getting some outside help to do it.  We can't do it.

12 It's just not physically possible.  We don't have the staff.

13 We don't have the resources.  We can't do it.  So we have to

14 have someone else.

15        Now, to the extent that everybody has agreed that

16 Parcels can do the copying, then I don't see why Parcels can't

17 do the copying, but it's going to have to be under the

18 supervision of someone.  And I think that's going to have to be

19 a special master.  Garlock's going to have to bear that cost.

20 This court can't.

21        MR. CASSADA:  Well, the special master, then, as I

22 understood it, would be responsible for making sure the

23 retention agreements weren't produced and for redacting Social

24 Security numbers?

25        THE COURT:  Among other things.  And to keep a record

1  of what it is that's being requested and produced and then

2  returned, to make sure that the Court gets a copy of whatever

3  was produced and returned so that if there's ever an issue as

4  to what was done, we have a record of what was done.   So

5  there's more than one task involved.

6        MR. CASSADA:  Did I understand your earlier comments

7  to be that if Garlock can determine that debtors' counsel has

8  copies of 2019 statements, the Court would permit Garlock to

9  get copies of those without doing any of the redaction that you

10 would require a special master to do?

11       THE COURT:  Well, you're going to have to do the

12 redaction.  The court order says you have to do the redaction.

13 I mean, someone is going to have to do it.

14       MR. CASSADA:  Well, the Social Security numbers --

15       THE COURT:  And the retention agreements.

16       MR. CASSADA:  Okay.  I thought I had understood you

17 to say that that wouldn't be your concern.

18       Let me comment --

19       THE COURT:  No.  What I'm saying -- I'm sorry.  Mr.

20 Cassada, let me clarify.  Maybe I misunderstood.  From my point

21 of view, if the parties have come to some agreement with

22 respect to production that, you know, satisfies the parties who

23 were involved in the information that's in the 2019 statements,

24 that it's going to be appropriately protected.  And you get

25 that information from CDs that are not in the Court's

1 possession, but are in the possession of another party, then, I

2 mean, you folks can work out whatever confidentiality agreement

3 is acceptable to you and Judge Hodges.  And Judge Hodges has

4 already approved a confidentiality agreement that will work in

5 your bankruptcy case.

6       The problem I still have is these records are not in

7 your bankruptcy case.  So I have to do what I believe is

8 appropriate for this Court to protect our own documents, and

9 that's what the issue is.  So to the extent that you want to

10 get them from another source and the parties have agreed to

11 operate pursuant to the confidentiality agreement, then I think

12 that's up to you, and I'm fine with that.  I'll order the

13 debtors, or I assume it's going to be the debtors, to produce

14 what it is that Garlock is asking for and not worry about the

15 special master because they won't be court records at that

16 point in time.  But if they're court records, I need to impose

17 these safeguards.

18       MR. CASSADA:  Let me change subjects, then, Your

19 Honor, to focus on another part of the protocol --

20       THE COURT:  Okay.

21       MR. CASSADA:  -- that we discussed in the suggestions

22 and comments we made, and that's in Part E there's a

23 requirement that Garlock would submit a certification to the

24 Court, and then the certifications, they are very specific.

25 Implicit in each of those certifications is a restriction on

1  Garlock's use that goes beyond any restriction ordered by Judge

2  Stark and by the protective order that we've negotiated with

3  the interested parties in our North Carolina case.

4          I've discussed the inconsistencies in the paper we

5  filed, but I'll briefly mention them now.  First, Your Honor,

6  in 45(a) it provides that Garlock's sole use of the 2019

7  exhibits was in preparation for the liability estimation.  I

8  don't know if that's really -- the language is really to be so

9  restrictive.  But we've been granted the ability to use them in

10 connection with the estimating proceedings in general.

11         THE COURT:  Well, that's what I understood, Mr.

12 Cassada.  To the extent that that needs to be broadened, I

13 completely understand that you want the information to be able

14 to produce whatever report you're producing in the estimation.

15 So, yes, it's not just preparation, it's also at the hearing

16 itself to the extent necessary.  And I apologize if the order

17 is too restrictive -- or the protocol is too restrictive.  I

18 wholly agree with that.

19         MR. CASSADA:  Yes.  And in 45(b) and (c), it doesn't

20 permit us to share or disclose the information with other

21 parties, which would prevent us from using it in the estimation

22 proceeding.  In the protective order we've negotiated, we will

23 share the information with the parties to the estimation

24 proceeding, which at least initially include the Asbestos

25 Claimants Committee and the Future's rep.

1          THE COURT:  That's quite fine.

2          MR. CASSADA:  So they would get this information, and

3    then they would be able to provide this information to their

4    experts and other people who would need it.  Now, we did agree

5    that before we provided it, that we would redact all but the

6    last four digits of any Social Security numbers.

7          There's a provision here on destruction of copies and

8    timing on that, and those are matters that have already been

9    agreed to in North Carolina in the protective order.  And it

10   wasn't a restriction that the opinion in the Delaware court

11   placed on us.  It was something that we put in the protective

12   order that we negotiated.  So I don't think the provision is

13   necessary, and the timing here is different from the timing

14   that we had agreed on with the interested parties in North

15   Carolina.

16         THE COURT:  Well, with respect to --

17         MR. CASSADA:  And then there's just --

18         THE COURT:  Wait, please.  With respect to sharing

19   the information with the parties to the estimation, yes, of

20   course you're going to do that, and, yes, of course if they

21   need to use it in preparation for their own estimation, that's

22   also appropriate, but subject to the same restrictions in the

23   confidentiality order and to the destruction of documents.

24   Don't forget, I did this protocol before I got Judge Hodge's

25   protective order, so the timing is somewhat different because I

1 didn't have his timing at the time it was drafted.  So I'm

2 perfectly happy with whatever timing Judge Hodges wants to set

3 up in your case for returning and destroying documents.  But

4 the destruction will apply to all parties and all experts, and

5 I will expect the same certification from all parties and all

6 experts.  So the timing issue is an easy one.

7         MR. CASSADA:  So what the Court is saying is that the

8 certification required by 45 would be required by every party

9 in our case that receives access to the 2019 statements?

10         THE COURT:  Yes, sir.

11         MR. CASSADA:  Okay.  And then the final point is that

12 it provides in 45(c) that Garlock would not -- has not and will

13 not disclose the identity of any individual listed in any 2019

14 exhibit, and that would be contrary, we think, to any

15 restrictions placed on us by the Delaware court.  And that we

16 will be, obviously, when we're turning over the 2019

17 statements, identities will be revealed.  And when we file 2019

18 statements either in providing aggregate data, we obviously

19 wouldn't identify any individual, but we might focus on

20 individual claimants.  And in that case, we would identify an

21 individual claimant who had filed a 2019 statement in one of

22 these cases.

23         THE COURT:  Well, I think, Mr. Cassada, you can deal

24 with that by simply indicating, you know, I'm going to make up

25 a name.  One of the claimants, lets say, is John Smith.  You

1  can indicate in whatever information that you actually have to

2  put on the public record that that person is, just to use

3  another name, A.  So you will have a list of who the actual

4  claimants are, but they won't be identified by that name in any

5  proceedings, but that doesn't mean the parties can't know who

6  they are.  We've used that process in other cases; it works

7  fine.

8          MR. CASSADA:  Yes.  Okay.  But maybe we're

9  misunderstanding each other.  We agree and understand that

10 there won't be public disclosure of any individual, or any

11 individual's identifying information.  What we're talking about

12 is just disclosure in the case.  Obviously, we'd be disclosing

13 to the Court and to other parties subject to the protective

14 order, which would put that information under seal.

15         THE COURT:  Right.  And it is public disclosure that

16 I was concerned about, and also disclosure to parties who are

17 not -- not parties, but to entities that are not involved in

18 the case.  I understand that the whole purpose is for Garlock's

19 estimation and the purpose of Garlock's bankruptcy.  And I'm

20 not in any way attempting to interfere with that process.

21 Judge Hodges is obviously the assigned judge.  He's quite

22 competent to determine how and when he will accept evidence.

23 I'm only trying to protect the information that I think this

24 Court is required to protect.  So, to the extent that you want

25 to say public disclosure that's really what I was focusing on.

1          MR. CASSADA:  Okay, well those are our comments.  I

2    think that they're all documented in our filing today.  And our

3    concern with the protocol and the special master, as I've

4    indicated, is that we are concerned about the timing and that

5    it would prevent us from getting the information in time to use

6    it.  And we were hoping that the Court would view as adequate

7    having the document retrieval and copy and service that the

8    parties agreed on to appear in the courts and the Clerk's

9    Office and simply copy the disks as indicated in the

10    implementing order.

11          THE COURT:  I said, I'm not opposed to --

12          MR. CASSADA:  And I understand from the Court that

13    you're not going to do that.  I understand.  I didn't mean to

14    rehash that issue.

15          THE COURT:  No.  Mr. Cassada, I -- maybe I'm -- I did

16    not understand the District Court order to essentially say that

17    Parcels has, I'll just use free reign, with court records.

18    What I understood the order to say is that you folks can agree

19    on who the copy service is going to be.  And I have no problem

20    with you agreeing on who the copy service is going to be, but

21    how that copy service gets involved in the case and  access to

22    the documents is something this Court has to control and that's

23    what the purpose of the protocol and the special master is.  If

24    you want to use Parcels to do the copying I don't have any

25    concern with Parcels doing the copying.

1          MR. CASSADA  Yes.  And I agree, that's not the issue.

2     The issue is whether the clerk would make the documents --

3     would provide access to Parcels directly so that Parcels can

4     copy the documents as opposed to doing that through an

5     intermediary.

6          THE COURT:  Okay.  Let me find out whether anybody

7     else on the phone has any concerns.  Our clerk of court and our

8     chief deputy are here.  After I hear everyone else's concerns

9     I'll just take a very brief recess to discuss what you've --

10    what you're suggesting with them.  But I think from having

11    talked with them earlier that providing the originals in that

12    format probably won't work, but I will double-check since

13    they've heard this discussion, too.  So, let me turn to anyone

14    else who wishes to be heard on this -- the matter of the

15    protocol before I take a short recess.

16         MR. CASSADA:  Okay.  Thank you, Your Honor.  I'm

17    going to use the feature that I'm told puts me on mute and

18    hopefully I'll be bale to undo that when it comes time for me

19    to be heard again.

20         THE COURT:  Okay, thank you.

21         MR. PARSONS:  Your Honor, this is David Parsons from

22    the law firm of Stutzman, Bromberg.  As you may know, we

23    represent several of the law firm respondents in this appeal.

24    As for the orders that we negotiated with Mr. Cassada on

25    Garlock's behalf, we were doing what we felt was necessary to

1 protect the interests of our clients and we were satisfied with

2 those orders, of course.  We didn't have at the forefront of

3 our mind because that was really not something that we could

4 have at the forefront of our mind the Court's interest in

5 supervising its own records in the smooth administration of the

6 clerk's offices.

7        But we are utterly in deference to Your Honor's

8 concerns about how the -- how Garlock gets access to these

9 records and we hear your concerns and we have really nothing to

10 add to that point.  From a point of view of getting access --

11 what to do with the records after access is obtained, we were

12 fine with that.  But Your Honor's concerns are well stated and

13 we stand in deference to those comments in regards of how

14 Garlock gets access to it.

15        The only other point I would like to mention on the

16 protocol is when it comes to the destruction provisions, I'd

17 just like to point out that although we agreed to language that

18 was inserted into the Northern Carolina protective order it

19 actually contains specific clause that says that any  more

20 stringent requirements that are in this protocol should govern

21 over that order, and therefore, any sort of perceived

22 inconsistency is not really an inconsistency.  There was a

23 mechanism built into the negotiation of that order to ensure

24 that there wouldn't be any conflicting provisions.  But other

25 than that, on behalf of the law firms that we represent I have

1 no further comment on the protocol.

2 THE COURT:  Okay.  Well, any concerns with the timing

3 issues, as I indicated, you know, I'm fine with whatever the

4 parties want to work out in Garlock's bankruptcy case.  I just

5 want too make sure that we, in fact, get the documents either

6 returned or destroyed, whatever is going to be worked out, at

7 the appropriate time.  I'm not trying to define really what the

8 appropriate time is.  I think that's up to Judge Hodges and the

9 parties in that case.

10 MR. PARSONS:  We were obviously okay with the

11 provisions that we negotiated, so to the extent that Judge

12 Hodges -- we really -- as long as Garlock destroys them.  We do

13 think that Your Honor's affidavit is a good idea to sort of

14 ensure to the Court's satisfaction that those documents have

15 been properly disposed of as they are court records after all.

16 THE COURT:  All right.

17 MR. PARSONS:  But the timing, we were happy with the

18 order that we negotiated and we have no real opinion on that.

19 THE COURT:  Okay, thank you.  Anyone else wish to be

20 heard?

21 MS. RAMSEY:  Your Honor, Natalie Ramsey from

22 Montgomery, McCracken, Walker & Rhoads on behalf of several of

23 the other law firms that have participated.  We would just join

24 in Mr. Parsons' statements.  We have no further comment.

25 THE COURT:  All right.  Anyone else?

1          MR. ZANIC:  Your Honor, Michael Zanic from K&L Gates

2    on behalf of the reorganized debtors in the Mid-Valley

3    bankruptcy.

4          THE COURT:  Yes, sir.

5          MR. ZANIC:  Just for the avoidance of doubt, we do

6    not have the statements preserved given the -- how long ago our

7    bankruptcy luckily and happily for us has been closed.  So, to

8    the extent that that was a path that people were going to go

9    down we're not able to assist in that particular regard.

10         THE COURT:  All right.  Any other debtors represented

11   on the phone who are in a similar position with Mid-Valley,

12   that is that you no longer have the 2019 statements?

13         MS. ZIGMAN:  This is Abigail Zigman from Weil Gotshal

14   representing Armstrong World Industries.  Like Mr. Zanic, I --

15   we tried when this practice started to determine even if we

16   could access our records and it isn't clear.  I can't state for

17   certain whether we have them or we don't have tem, but it's

18   probably more likely that we do not have them than we do.  So I

19   just wanted to mention that to the Court and the other parties.

20         THE COURT:  Okay.  So that's Mid-Valley and

21   Armstrong.  Who else?

22         UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

23         MS. RECHT:  Your Honor, this is Bethany Recht on

24   behalf of AC&S and U.S. Minerals.  we are in a similar position

25   as AWI.  I can't represent whether or not we do or do not have

1  them, but I suspect that we don't.

2       THE COURT:  All right.

3       MR. ISENBERG:  Your Honor, Adam Isenberg, Saul Ewing,

4  on behalf of reorganized Owens Corning.  Just I'll really echo

5  the comments of my colleagues of a moment ago.  On behalf of

6  Owens Corning and Saul Ewing I don't know whether we still have

7  that information.  I would have to check.  But I cannot

8  represent today that we do have it.

9       MR. MADRON:  And, Your Honor, good afternoon.  Jason

10  Madron from Richards, Layton & Finger.  We represent Armstrong

11  World Industries.  My firm is also co-counsel in the USG and

12  Kaiser Aluminum cases.  Although Kaiser and USG have not

13  participated in these appeals, I just would like for clarity of

14  the record to add similar reservation as my able colleagues

15  have before me that I am unable to represent to the Court

16  whether Kaiser or USG would have these materials, as well.

17       THE COURT:  Well, Kaiser certainly should because I

18  just closed that case last week.  So, Kaiser of all of the

19  debtors at this point in time should certainly have the

20  statements.  USG and AWI have been closed for quite some time

21  and whether they've been retained or not I don't know.  But

22  Kaiser, it seems to me, would have no reason to have destroyed

23  records in a case that was just closed last week, so --

24       MR. MADRON:  Your Honor, I do agree.  Obviously the

25  case was just final decreed last Friday.  I'm not representing

1 to the Court that Kaiser does not have them, just stating that

2 I cannot verify as I sit here today -- and again, because I --

3 you know, again, Kaiser and USG are not active parties to these

4 appeals I have not discussions with either client regarding

5 these matters.  I'm just unable to represent that they do.

6 Again, I'm not foreclosing the possibility that they do or they

7 may.

8          THE COURT:  Okay.  Well, it seems based on this

9 litany that I'm hearing from debtor's counsel's firm that the

10 first thing that ought to happen is the debtor's attorney

11 should find out whether the records do still exist and if so

12 how long it will take to access them.  I don't know how long it

13 will take to get back the records from the cases in Delaware.

14 I'm told that it may be several weeks and it depends on what is

15 requested.

16          I know in one of the boxes or several, I think,

17 hundred boxes that came back in one of the cases that the

18 documents have apparently not been put into the boxes in docket

19 number order and as a result some of the statements that you're

20 looking for are not where they should be in the boxes, so I

21 don't know whether they've been located yet in the various, in

22 quotes, miscellaneous boxes, or not, but the search for these

23 documents is not going to be easy.  That alone is going to be

24 pretty time consuming for the Court.

25          Now, the Pittsburgh files are in relatively decent

1  shape.  We either have them in filing cabinets or in boxes

2  still here on the premises.  So, to the extent that Garlock

3  wants to start with Pittsburgh disclosure I think that's

4  possible.  How we're going to get the records out of the -- or

5  into the disclosure process in Delaware is perhaps a bit more

6  time cumbersome, and that's something else we ought to address.

7          I think that the -- if there is a special master in

8  place then we can do one of two things, either have the

9  documents from Delaware sent directly to the special master for

10 logging in and recording purposes and then returned by the

11 special master to the court in Delaware or they can come here

12 to the clerk for the -- in Pittsburgh for the same purpose,

13 then turned over to the special master and then returned here.

14 It seems to me that it may be simpler to have the special

15 master take that type of custody directly, but I'm going to

16 check with my clerk here and also in Delaware to make sure that

17 that won't cause some problem that I'm not thinking about at

18 the moment, too.

19          So, all counsel for debtors who are on the phone

20 please check with your clients, find out whether these

21 documents or records -- they're not really documents -- do

22 exist and if so, where they are and how long it may take to get

23 them back from storage in the event that that's necessary.  I'm

24 not asking you to get them back.  I just want the information

25 right now.  Okay.  Anyone else?

1                    (No audible response)

2          THE COURT:  Okay.  Mr. Cassada, is there anything

3    else you want to discuss before I take a very short recess?

4          MR. CASSADA:  I believe, Your Honor, that we've been

5    heard.  We did do some due diligence before Your Honor entered

6    the order setting the status conference regarding the

7    transmittal of the 2019 exhibits from the national archive.

8    And Mr. Werkheiser, who's participating in the call, is

9    familiar with the progress that we have made on that.  But we

10   had looked into that and we thought that those documents could

11   be transmitted to the clerk's office and then they could be

12   made available to Garlock through Parcels during normal

13   business hours.

14         THE COURT:  Okay.  I --

15         MR. WERKHEISER:  Your --

16         THE COURT:  I'm sorry.  Go ahead.

17         MR. WERKHEISER:  I'm sorry, Your Honor.  This is Mr.

18   Werkheiser.  I simply was going to follow up on Mr. Cassada's

19   comments and we did have a number of communications with a

20   representative of the Delaware Clerk's Office before Your

21   Honor's status conference order was entered and did understand

22   that they thought that there was some ability to expedite

23   retrieval of the documents from archives and have them brought

24   back to the Delaware Clerk's Office.  Again, this was all in

25   anticipation of the possibility that we might bring Parcels on

1  site there and simply scan and copy the appropriate documents

2  there at that time.

3             THE COURT:  Okay.

4             MR. WERKHEISER:  I'm not sure what the timing would

5  be under the protocol.

6             THE COURT:  Mr. Werkheiser, most -- many of these

7  documents are actually not on paper.  It's not a matter of

8  scanning.  It's going to be a matter of copying CDs.  So, I

9  mean, there are --

10            MR. WERKHEISER:  Understood.

11            THE COURT:  Okay.

12            MR. WERKHEISER:  Understood, Your Honor.  I'm sorry.

13 We didn't get that granular in our discussion of it today, but

14 I think what we had contemplated was that working with the

15 clerk's office, representatives of Parcels would be on site

16 with computers to copy the files that are on the CDs into some

17 sort of electronic media, such as an external hard drive.  And

18 then so that we kept a contemporaneous record of any paper

19 record that went with it they would scan the copies of the 2019

20 statements or if anything was submitted not on CD they would

21 scan that, as well.

22            THE COURT:  Okay.  I understand.  Thank you.

23            MR. WERKHEISER:  Thank you, Your Honor.

24            THE COURT:  All right, anyone else?

25                      (No audible response)

1          THE COURT:  All right.  Let's take a ten minute

2    recess.  Let me confer with the clerk's office here and then I

3    will be back.  And if everyone will please just stay on the

4    phone it will be a short recess.

5          UNIDENTIFIED ATTORNEY:  Thank you.

6                    (Recess)

7          THE COURT:  I'm back on the record.  I've spoken with

8    the clerk and the chief deputy here in Pittsburgh and I

9    understand that Stacey is on the phone from Delaware, so I'll

10   run by what I think may work and solve some of the

11   discrepancies in what we're dealing with today and then I'll

12   ask Stacey to make sure that what I'm proposing would work in

13   Delaware, as well.  Mr. Cassada, apparently we can provide the

14   access to Parcels here in Pittsburgh to make copies of the

15   disks.  So, it would seem that here and in Delaware Parcels

16   could show up.  If they've got two branches they can be working

17   simultaneously in both courts.  I don't think we -- anyone has

18   a concern about that.

19          And what would happen is we would essentially produce

20   a chain of custody document.  And I'll just for purposes of

21   this say that it's going to be on a spreadsheet.  So, whatever

22   we turn over to Parcels to be copied right here on the

23   premises, they will receipt for and then when we get it back

24   from them later that same day we will put it back in -- we will

25   receipt for it and put it back.  Then once Parcels has the

1    copy, the copy should be turned over to the special master for

2    the redaction.

3            So, because the issue for Parcels will be they may

4    not really know what they're looking at, the special master can

5    certainly run the program that will eliminate the social

6    security numbers, but for the last four digits and can also

7    take a look at the documents that have been produced to make

8    sure that the exemplars and retention agreements that are not

9    part of the production are deleted before anything is produced

10   to Garlock.  And in addition, the special master will have the

11   capability of keeping an electronic file of what is being

12   produced and what is not being produced so that if there is

13   ever any need to go into that information it will be available

14   on the special master's records.  Then Garlock can get the -- a

15   copy, the redacted copy, and the Court can get a redacted copy

16   so that we'll all be on the same page with what's available.

17           I think if you -- that way the records in Delaware

18   can stay in Delaware.  The records in Pittsburgh can stay in

19   Pittsburgh.  But the special master will be the control to make

20   sure that the information that is not to be turned over is, in

21   fact, not turned over and that what is a 2019 statement is

22   produced.  You know, both hands, to make sure that Garlock is

23   getting everything to which it's entitled pursuant to these

24   orders.  So, let me ask Stacey first whether that process would

25   work in Delaware.

1          STACEY:  Judge, that would work for us.

2          THE COURT:  Okay.  So, Mr. Cassada?

3          MR. CASSADA:  Yes, Your Honor?

4          THE COURT:  Does that process work?

5          MR. CASSADA:  Yes.  Well, that is better than the

6  protocol as originally proposed.  It's -- I do think that the

7  special master in that case would be protecting information

8  that has otherwise been dealt with by the parties in their

9  agreements, but I understand that the Court's determined to do

10 that and so we prefer the protocol you just mentioned over the

11 original.

12          THE COURT:  All right.  I will have a revised

13 protocol that I will enter as an order then done which will

14 broaden in scope the use at the estimation proceedings.  And,

15 Mr. Cassada, if for some reason I still don't have it to the

16 point where everybody is in agreement that it says what you

17 need then please contact my offices.

18          As I indicated, I am attempting to make sure that

19 Judge Hodges' order is implemented with respect to your

20 estimation process.  I'm not trying to change it in any way.

21 So, I don't mean to -- I don't intend and I don't mean to be

22 setting aside any portion of his order with respect to the

23 estimation, and also with respect to the timing for the return

24 or destruction of the documents.  But I will have a

25 certification process that will be put in place as part of the

1  protocol.  And anyone who gets access to the 2019 statements,

2  either originals or revised, will have to sign that

3  certification at the -- at whatever the appropriate time is.

4  Can you tell me what the time is in Judge Hodges' order for

5  either destruction or return?

6           MR. CASSADA:  Yes, I believe it's -- it was the

7  anniversary date of the consummation of a plan or

8  reorganization.  That would be the outside time period.

9  Obviously we could determine before then.  We could certify and

10 destroy before then if there was no reason to keep them up

11 until that date.

12          THE COURT:  All right.  Plan consummation or plan

13 confirmation?

14          MR. CASSADA:  Consummation.  Consummation.

15          THE COURT:  Oh my, that doesn't --

16          MR. CASSADA:  Substantial consummation, yes.

17          THE COURT:  Okay.  That could be a very long time and

18 I'm not sure why the parties would need it that long.  Once the

19 plan has actually been affirmed by final order that seems to me

20 to be long enough.  At that point within 30 days, I mean, the

21 parties ought to be turning it back over.  Now, if consummation

22 happens before then that's fine, but otherwise it seems to me

23 that if -- you know, consummation could take 50 years.

24          MR. CASSADA:  Yes.  And I guess we were -- without

25 thinking through of all the imponderable ways that something

1  might happen we picked a date that the other parties agreed to

2  and just felt like we were protected with that date.

3       THE COURT:  Okay.  I think a final confirmation order

4  or substantial consummation, whichever comes first, and 30 days

5  after that date should be sufficient.

6       MR. WERKHEISER:  Your Honor --

7       MR. CASSADA:  Go ahead.

8       MR. WERKHEISER:  Your Honor, this is Gregory

9  Werkheiser.  I was just thinking about the procedure that is

10 afforded in the Bankruptcy Rules to attack a confirmation order

11 if there's an assertion of fraud or something like that.  And I

12 believe -- I don't have the rule right  in front of me, but is

13 that 180 days?

14      THE COURT:  Well, but the -- but by the time this

15 case gets through final confirmation I don't think the issue

16 with respect to Garlock's estimation of its asbestos

17 liabilities is going to be subject to attack for fraud.  I

18 mean, if that's going to come up it's going to come up as part

19 of the estimation process in the determination of the Court in

20 the first place.  I mean, I'm not -- these are only the 2019

21 statements.  The only purpose they can serve is for Garlock's

22 estimation, isn't it?

23      MR. WERKHEISER:  I understood that that's certainly

24 the primary purpose, Your Honor.  We're just trying to, again,

25 anticipate the imponderables and do something that seems to be

1 consistent with the Bankruptcy Rules.                THE

2 COURT:  Okay.  Well, I think final confirmation or substantial

3 consummation, whichever is first, would be sufficient for that

4 purpose.  In fact, I don't see why after the estimation is

5 determined it isn't sufficient.  But for some reason -- if for

6 some reason it gets reopened or whatever during the course of

7 the case that's fine.  Once the case is not in bankruptcy any

8 more I don't see any need for the documents to be retained and

9 I think that's an appropriate time to kick in the certification

10 process.

11         MR. CASSADA:  Your Honor, when you say a final

12 confirmation order you mean after -- final after the exhaustion

13 of appeals?

14         THE COURT:  Yes, sir.  Yes, because if the issue of

15 the estimation comes up you may need the documents then, but by

16 the time there's a final order on appeal you don't need them

17 any more.

18         MR. MACLAY:  Your Honor, this is Kevin Maclay, for

19 the four appellant ACCs.  May I be heard?

20         THE COURT:  Yes, sir.

21         MR. MACLAY:  I just have one comment to make, Your

22 Honor.  We agree with Garlock that this process should be

23 expedited and I think Your Honor has done a great job of

24 accomplishing that.  We would note that one of the things Your

25 Honor just said was that Garlock could contact your chambers

1  with respect to further changes to the protocol and we would

2  just ask that if that sort of ex parte process occurs that we

3  be involved so that we know whatever changes may be being made

4  to the protocol before they're actually implemented as an

5  order.

6          THE COURT:  Oh, Mr. Maclay, I didn't mean ex parte.

7  I meant that they could file something that tells me where I --

8  what I need to modify and I will be happy to consider modifying

9  it.  I don't -- I'm not talking about an ex parte contact.

10         MR. MACLAY:  Thank you, Your Honor.

11         THE COURT:  Okay.  Anyone else?  Mr. Cassada, what's

12 your view -- I think I am a little confused still about what

13 Garlock is asking for.  Are you going to have every one of

14 these disks copied?  Because in some instances the disks were

15 originals, but then amended, and so amended disks -- we -- I

16 believe the clerk's office here has them all.  I don't know

17 whether the clerk's office in Delaware has them all.

18         My understanding way back when, before any of these

19 issues came up, we're talking probably ten years ago, was that

20 when the clerk's office was getting amended documents they

21 were, I think, throwing out the old ones.  I'm not sure, but I

22 think that may have been the case.  So, we'll obviously produce

23 what we have.  But the issue is do you want to start by

24 identifying certain CDs or are you simply going to send Parcels

25 here and say, start from A to Z and copy everything?

1          MR. CASSADA:  Our plan, Your Honor, was to do the

2  latter and the reason is that getting all of a series of disks

3  that may have been submitted by a law firm provides information

4  about the timing of the appearance of the firm for a specific

5  creditor and that is -- that timing is important as it relates

6  to the -- Garlock's position in its estimation proceeding.

7          THE COURT:  Okay.  So, perhaps it would be advisable

8  if you contact somebody in the clerk's office.  John, who --

9  should he contact, Mike?

10          UNIDENTIFIED SPEAKER:  Yes.

11          THE COURT:  Our Chief Deputy Mike Rhodes, to let him

12  know where and when you wish to start the copy process so that

13  we can, you know, get the documents -- I'm calling them

14  documents -- the CDs in some form of usable process.  It would

15  be helpful probably to have Parcels come and talk to Mike to

16  see what's here and how to begin.  And meanwhile, are you -- do

17  you want me to simply appoint a special master or do you folks

18  want to look at the Pittsburgh list and pick someone?

19          I know that Judge Fischer had a view that there were

20  several firms on the list who could provide backup assistance

21  to the extent that it was necessary and she felt that that

22  might be, given the volume of work that you're looking at,

23  advisable.  So, I have a recommendation from her.  So, let me

24  know, which do you want to do, do you want to pick somebody off

25  that list or do you want me to appoint someone?

1          MR. CASSADA:  Do you have her recommendation?  Can

2   you share that with us now?

3          THE COURT:  I could if I had it here, but I don't

4   have her e-mail.  I don't have my e-mails open at the moment.

5   Would you like to hold on again until I go find it?

6          MR. CASSADA:  No, that's not necessary.  I'll --

7   we'll confer and likely be happy to let you chose a special

8   master.

9          THE COURT:  Okay.  Then I will get the protocol

10  revised.  I'll expect somebody from your office, Mr. Cassada,

11  to get in touch with Mike Rhodes.  Mike, what phone number do

12  you want them --

13         MR. RHODES:  I'm extension 259.  The main court

14  number is 412-644-4067.

15         THE COURT:  All right.  And to have someone from

16  Parcels make an arrangement to get together to see this, as

17  well.  Mr. Cassada, you'll contact us to tell us where you want

18  to start and I guess to send Parcels here to be sure that where

19  you want to start is something that Parcels can do.  And

20  meanwhile I'll get a special master appointed so that we can

21  have a discussion with the special master about how to transmit

22  the copies and what the special master's duties will be, to

23  make sure that the master is able to redact social security

24  numbers and the retention agreements and also to assure that

25  the 2019 statements are produced as required.

1          MR. CASSADA:  Okay.  So, we'll look -- we're to look

2    for a revised final protocol?

3          THE COURT:  Yes, it will be in a final protocol.  And

4    again, you know, if anyone has a concern about the language

5    please just file a request for reconsideration with your

6    proposed language for me, serve it on everyone, so I can see

7    it.  The same protocol will be entered in Pittsburgh and in

8    Delaware.

9          I want to go back to these amended 2019 statements,

10   Mr. Cassada.  In some instances -- well, I think all of the

11   orders may say that when the 2019 statements were amended they

12   were only to include the supplemental information and material

13   changes, but, in fact, that's not how everybody did them.  So,

14   you're going to find, I think, a lot of duplicate effort, a lot

15   of duplicate records.

16         MR. CASSADA:  Yes.  That sounds like with each disk,

17   maybe it just added new clients.

18         THE COURT:  No.  That's what it was supposed to do,

19   but that's not what it did.

20         MR. CASSADA:  Oh, okay.

21         THE COURT:  In many instance people were actually

22   resubmitting an entire disk.  So, again, to use John Smith,

23   John Smith may appear in Owens, for example, on 15 different

24   disks because he appears in the original one and then on all of

25   the amended disks.  So, the supplementals are not just

1  supplemental in every case.

2          MR. CASSADA:  I understand.

3          THE COURT:  They were supposed to be, but they're

4  not.  So, you're going to end up with a mass of data.  I guess

5  that's what I'm suggesting.

6          MR. CASSADA:  Okay, thank you for that information.

7          THE COURT:  Okay.  I will get this protocol done.

8  Mr. Cassada, if you could, I guess, file something by Monday

9  with respect to the special master.  If you folks have agreed

10  on someone, fine, let me know, otherwise I'm going to pick

11  somebody on Monday and do an appointment so that we can get

12  this process underway.

13          MR. CASSADA:  Okay.  In the meantime we can -- we're

14  free to go ahead and have -- make arrangements for Parcels to

15  contact Mr. Rhodes and set up the --

16          THE COURT:  Yes, here in Pittsburgh and Stacey in

17  Delaware.

18          MR. CASSADA:  Yes.

19          THE COURT:  Okay.  Stacey, maybe I could get this

20  piece of information from you, too, before we leave.  What

21  records have come back and do you have an expectation of how

22  long it's going to take to get the rest of the files back from

23  storage in Delaware?

24          STACEY:  We don't have them back yet.  Julie -- I

25  haven't been in the office all week.  Julie, there's nothing

1  back yet, is there, from archives?

2        SHERRY:  This is Sherry.  And actually, yes, we just

3  received back all of Owens and all of Kaiser and all of

4  Armstrong.

5        STACEY:  Okay.

6        SHERRY:  So we have those.  We have Grace, Kaiser and

7  Flintkote here and we just need the other four to order.  And

8  it's been a quick turnaround it seems like.

9        STACEY:  Okay.  Yes, they told us about a week to ten

10  days to receive anything back from archives, so we asked for

11  that a week ago and we received it, so anything else we need

12  should be about a week.

13        THE COURT:  Okay.  So, there are -- it sounds as

14  though there are five files that can be accessed in Delaware,

15  too.  The open files, Sherry or Stacey, are the disks in the

16  safe so that they're readily accessible or are they mixed in

17  with the paper files somewhere?

18        STACEY:  (Indiscernible)

19        SHERRY:  The cases that are -- sorry.

20        STACEY:  Go ahead, Sherry.

21        SHERRY:  The cases that are still open, Grace,

22  Flintkote, and actually Kaiser, since that just closed, we have

23  all the CDs in a safe, but if we know when someone is coming we

24  can pull the out for Parcels to do what they need to do.

25        THE COURT:  Okay.  It's the ones that were in storage

51

1  that's the problem where they're not necessarily in docket

2  order.

3         SHERRY:   That's correct.   There's like 50 to 60 boxes

4  that came back that haven't been opened yet, so they're all

5  mixed in.

6         THE COURT:   Okay.   So, Mr. Cassada, for purposes of

7  getting Parcels started it sounds as though the three

8  Pittsburgh cases and the three cases for which the files still

9  exist in Delaware or the documents are in the court system in

10 Delaware may be the best place to start.

11        MR. CASSADA:   That sounds right.

12        THE COURT:   Okay.   All right.   You folks can have a

13 discussion.   To the extent you need any further orders I will

14 expect to hear from the clerk's office that some further order

15 is necessary to implement the process.   I will have Mike Rhodes

16 work with Stacey to make sure that the same form of record

17 keeping is maintained both for the Pittsburgh and Delaware

18 cases and also for what's transmitted to the special master and

19 then back to the Court so that all the documents will be

20 essentially kept in the same fashion for posterity purposes.

21 Anything else to address today?

22        MR. CASSADA:   Your Honor, for Garlock, thank you for

23 listening to our concerns and taking account of them.

24        THE COURT:   Okay.   I will be doing a revised

25 protocol.   Thank you.   We're adjourned.

52

1          MR. CASSADA:  Thank you.

2          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

3                    * * * * *

4              **C E R T I F I C A T I O N**

5          We, KAREN DELUCIA AND LORI AULETTA, court approved

6  transcribers, certify that the foregoing is a correct

7  transcript from the official electronic sound recording of the

8  proceedings in the above-entitled matter, and to the best of

9  our ability.

10

11  /s/ Karen DeLucia

12  KAREN DELUCIA

13

14  /s/ Lori Auletta

15  LORI AULETTA

16  J&J COURT TRANSCRIBERS, INC.        DATE:  April 9, 2013

17

18

19

20

21

22

23

24

25