## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Re docket no. 30517, 30598 |
| | ) | Hearing Agenda item no. __ |
| | ) | |

## ORDER AUTHORIZING THE PRIVATE SALE OF REAL PROPERTY AND APPROVING THE PURCHASE AND SALE AGREEMENT

This matter coming on to be heard on the *Motion for an Order Authorizing the Private Sale of Real Property and Approving the Purchase and Sale Agreement* [Docket No. 30517 (the "Motion") filed by W. R. Grace & Co.-Conn. ("Seller") and the other debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors") for entry of an order (the "Sale Order"):[2]

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company and H-G Coal Company.

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or the Sale Agreement, as the case may be.

(i)  Approving the form of the purchase and sale agreement dated April 4, 2013, and attached hereto as Exhibit I (the "Sale Agreement");

(ii)  Authorizing the sale to Buyer of certain real property described in the Sale Agreement (the "Property") for $13 million, as adjusted pursuant to the Sale Agreement (the "Purchase Price") free and clear of all liens, claims and encumbrances (collectively, the "Liens") and all other claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Interests"), other than the Permitted Exceptions (as defined in the Sale Agreement);

(iii)  Authorizing the Debtors to: (a) undertake all transactions contemplated by the Sale Agreement; (b) enter into the ancillary agreements contemplated by the Sale Agreement; and (c) undertake all other actions necessary to consummate the Sale; and

(iv)  Providing that the Sale Order shall take immediate effect pursuant to Fed. R. Bankr. P. 6004(h), 6006(d) and otherwise.

no hearing was held inasmuch as Certificate of No Objection was filed

Seller and Buyer having executed the Sale Agreement; a hearing on the Motion having been held on [May 20, 2013] (the "Sale Hearing"); all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and it appearing that the Court has jurisdiction over this matter; the Court having reviewed and considered: (i) the Motion; (ii) the objections thereto, if any; and (iii) the arguments of counsel made and the evidence proffered or adduced at the Sale Hearing; it appearing that the relief requested in the Motion and approval of the Sale to Buyer of the Property is in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and based on the Motion, the statements of counsel, the record of the Sale Hearing and the record in these cases; and after due deliberation thereon; and good cause appearing therefore, it is hereby FOUND AND DETERMINED THAT:[3]

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following

A.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 over the Motion and the Sale. Venue of this proceeding and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Fed. R. Bankr. P.  6004(h) and 6006(d), and to any extent necessary under Fed. R. Bankr. P. 9014 and Fed. R. Civ. P. 54(b), as made applicable by Fed. R. Bankr. P. 7054, the Court expressly finds that there is no just reason for delay in the immediate implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.    Actual written notice of the Sale Hearing, the Motion and the Sale and a reasonable opportunity to object or to be heard with respect to the Motion and the relief requested therein has been afforded to all interested parties and entities, including, but not limited to:

(i)    The Office of the United States Trustee;

(ii)    Counsel to the L/C Facility Agent and L/C Issuers;

(iii)    Counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders;

(iv)    Counsel to each of the official committees appointed in these Chapter 11 Cases;

(v)    Counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives;

(vi)    Those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002;

(vii)    Buyer and counsel to Buyer;

findings of fact constitute conclusions of law, they are adopted as such, To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(viii)  Federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Motion;

(ix)  All persons or entities known or reasonably believed to have asserted a lien on or interest in the Property (including Permitted Exceptions);

(x)  All persons or entities known or reasonably believed to have expressed a serious interest in acquiring the Property;

(xi)  The United States Attorneys for the Districts of Delaware and Maryland;

(xii)  The state attorneys general for the states of Delaware and Maryland;

(xiii)  The Maryland Department of Environment; and

(xiv)  The United States Environmental Protection Agency.

D.  As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, and the Sale has been provided in accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing or the Sale is or shall be required.

E.  The disclosures made by Seller concerning the Sale Agreement, the Sale, and the Sale Hearing were good, complete and adequate.

**Buyer's Good Faith**

F.  Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

G.  Seller and Buyer negotiated, proposed and entered into the Sale Agreement and each of the other Sale Agreement without collusion, in good faith and from arms-length bargaining positions. Neither Seller nor Buyer has engaged in any conduct that would

cause or permit all or any part of the Sale or any obligation of Seller under the Sale
Agreement to be avoided under section 363(n) of the Bankruptcy Code.

H.      Buyer is a good faith Buyer within the meaning of section 363(m) of the Bankruptcy
Code and, as such, is entitled to all of the protections afforded thereby, and otherwise has
proceeded in good faith in all respects in connection with this proceeding in that: (i)
Buyer recognized that Seller was free to deal with any other potential party interested in
acquiring the Property; (ii) all payments to be made by Buyer and other agreements or
arrangements entered into by Buyer in connection with the Sale have been disclosed; (iii)
Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction;
(iv) no common identity of directors or controlling stockholders exists between Buyer
and Seller; and (v) the negotiation and execution of the Sale Agreement and other Sale
Agreement related thereto was at arms' length and in good faith.  Buyer will be acting in
good faith within the meaning of section 363(m) of the Bankruptcy Code in
consummating the Sale.

**Highest and Best Offer**

I.      Seller has thoroughly and effectively marketed the Property for sale in an appropriate
manner that was designed to maximize the value received by the Debtors for the
Property.

J.      The consideration provided by Buyer pursuant to the terms of the Sale Agreement: (i) is
fair and reasonable; (ii) is the highest and otherwise best offer for the Property; and (iii)
will provide a greater recovery for Seller's estate than would be provided by any other
available alternative.

K.    Seller's determination that the terms set forth in the Sale Agreement constitute the highest and best offer for the Property constitutes a valid and sound exercise of Seller's business judgment pursuant to section 363(b) of the Bankruptcy Code.

L.    Approving the Motion and the Sale Agreement and consummating the Sale contemplated thereby are in the best interests of Seller, its affiliates, their creditors, their estates and other parties-in-interest.

M.    Seller has demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale outside of the Plan or any other chapter 11 plan of reorganization that may be confirmed in these chapter 11 cases.

N.    No consents or approvals, other than those expressly provided for in the Sale Agreement, are required for Seller to consummate such Sale.

**No Fraudulent Transfer**

O.    The Purchase Price constitutes fair consideration under the Bankruptcy Code and under the laws of the United States, any state territory, possession or the District of Columbia.

**Validity of Transfer**

P.    The Sale has been duly and validly authorized by all necessary corporate action of Seller, who has full corporate power and authority to execute and deliver the Sale Agreement and each of the other Sale Agreement. Except as expressly set forth therein, no further consents or approvals are required for Seller to consummate the Sale contemplated by the Sale Agreement.

Q.    The Sale will be a legal, valid and effective transfer that, except for the Permitted Exceptions, will vest Buyer with all of Seller's rights, title, and interests free and clear of all Liens and Interests, including but not limited to those: (i) arising under doctrines of successor liability; (ii) that purport to give to any party a right or option to effect any

forfeiture, modification, right of first refusal or termination of Seller's or Buyer's interest in the Property, or any similar rights; and/or (iii) that relate to taxes arising under or out of, in connection with, or in any way relating to the operation of the Property prior to the Closing Date.

R.   Buyer would not have entered into the Sale Agreement and would not consummate the Sale contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the transfer of the Property were not, except for the Permitted Exceptions, free and clear of all Liens and Interests, or if Buyer would, or in the future could, be liable for any Liens or Interests asserted against the Property.

### Section 363(f) Is Satisfied

S.   Seller may sell the Property free and clear of all Liens and Interests (other than Permitted Exceptions) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those non-debtor parties with Liens on or Interests in the Property who did not object, or who withdrew their objections, to the Sale Agreement, the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those non-debtor parties with Liens on or Interests in the Property who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are not entitled to adequate protection or are adequately protected by having their Liens and Interests, if any, attach to the cash proceeds of the Sale.

T.   Except as expressly set forth in the Sale Agreement, the transfer of the Property to Buyer shall in no way impose any liability or obligation upon Buyer for interests arising from or related to Seller's operation of the Property or use of the Property.  Buyer shall not be deemed, as a result of any action taken in connection with the purchase or the Property

to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Permitted Exceptions as expressly stated in the Sale Agreement); or (ii) have, *de facto* or otherwise, merged with or into any of the Debtors. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the Sale Agreement with respect to the Permitted Exceptions.

U.    Except for the Permitted Exceptions, the transfer of the Property to Buyer will not subject Buyer to any liability whatsoever with respect to the operation of the Property prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, successor or transferee liability.

V.    The transfer of the Property to Buyer will not subject Buyer to any liability whatsoever for any Excluded Liabilities under the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, successor or transferee liability.

## No De Facto Plan

W.    The Sale does not constitute a *de facto* plan of reorganization or liquidation or an element of such a plan for any of the Debtors, as it does not propose to:  (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or

(iv) classify claims or equity interests, compromise controversies or extend debt maturities.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### General Provisions

1.  The relief requested in the Motion is granted and approved in its entirety, and the Sale contemplated thereby is approved as set forth in this Sale Order.

2.  All objections to the entry of this Sale Order or the relief provided herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

### Approval of the Sale Agreement

3.  The Sale Agreement, and all of the terms and conditions thereof, are hereby approved.

4.  Pursuant to sections 363(b) and (f) of the Bankruptcy Code, Seller is authorized and directed to consummate the Sale in accordance with the terms and conditions of the Sale Agreement.

5.  Seller is authorized and directed to execute and deliver, and empowered to perform under, consummate and implement the Sale Agreement, including all instruments and documents that may be reasonably necessary or desirable to implement the Sale and the transfer of the Property as contemplated by the Sale Agreement or as may be necessary or appropriate to the performance of the obligations as contemplated by the Sale Agreement. Any amounts that become payable by Seller pursuant to the Sale Agreement shall: (a) be paid by Seller without further order of this Court and in the time and manner provided for in the Sale Agreement; and (c) not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation for the Debtors.

6.     The terms and provisions of this Sale Order shall be binding in all respects upon Seller and the other Debtors and their affiliates and estates, all known or unknown creditors of, and all known or unknown holders of equity interests in, Seller or Debtors, any holders of Lien on or Interests in all or any portion of the Property, Buyer and all of Buyer's successors and assigns and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 eases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases.  This Sale Order and the Sale Agreement shall inure to the benefit of Seller and the other Debtors and their affiliates and estates, their creditors, Buyer, all interested parties and their respective successors and assigns.  The Sale Agreement shall not be subject to rejection by the Debtors.

### The Property

7.     Pursuant to sections 105(a), 363(f) and 365 of the Bankruptcy Code, Seller is authorized to consummate the Sale on the Closing Date.  The Sale shall constitute a legal, valid, binding and effective transfer of the Property and, upon Seller's receipt of the Purchase Price, shall be free and clear of all Liens and other Interests (other than Permitted Exceptions), with all such Liens and Interests to attach to the net proceeds of the Sale with the same validity, priority, force and effect that they now have, subject to any claims and defenses Seller and the other Debtors may possess with respect hereto.

8.     Except as expressly permitted or otherwise specifically provided by the Sale Agreement or this Sale Order, all holders of Liens on or Interests in the Property (other than the Permitted Exceptions) as of the Closing Date are hereby forever barred, estopped and permanently enjoined from asserting their Liens or Interests against Buyer, its successors or assigns, property or assets.  On the Closing Date, each creditor is authorized and directed to execute all such documents and take all other actions as may be necessary to

release Liens on or Interests in the Property (other than the Permitted Exceptions), if any, as provided for herein.

9.     The Sale constitutes a legal, valid and effective transfer of the Property, and that transfer shall vest Buyer with all rights, title and interests of Seller in the Property pursuant to the terms and conditions of the Sale Agreement.

### Additional Sale Provisions

10.    On the Closing Date, each holder of a Permitted Exception is authorized and directed to execute any such documents and take any and all other actions as may be necessary for Seller and Buyer to effectuate the Sale.

11.    This Sale Order: (a) shall be effective as a determination that, on the Closing Date, all Liens on or Interests in the Property prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders or mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in the Property.

12.    Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Agreement.

13.   If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens on or Interests in the Property shall not have delivered to Seller and Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens on and Interests in the Property (other than Permitted Exceptions), then (a) Seller is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of any such person or entity with respect to the Property, and (b) Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens on or Interests in the Property.

14.   Except for the Permitted Exceptions, Buyer shall have no liability or responsibility for any Lien on or Interest in the Property.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Sale Agreement, Buyer shall not be liable for any claims against Seller or any of its predecessors or affiliates, and Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to Seller or any obligations of Seller arising prior to the Closing Date, including, but not limited to:  (a) liabilities on account of any taxes arising, accruing or payable under, out of, in connection with or in any way relating to the Property prior to the Closing Date; and (b) liabilities based on any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity.

15.    Under no circumstances shall Buyer be deemed a successor of or to the Debtors as to any

Lien on or Interest in the Property.   Except for the Permitted Exceptions, the sale,

transfer, assignment and delivery of the Property shall not be subject to any Liens or

Interests, and all such Liens or Interests shall remain with, and continue to be obligations

of, Seller.   Except for persons holding Permitted Exceptions, all persons holding Liens on

or Interests in the Property (including, but not limited to any trustees, creditors,

employees, unions, former employees and shareholders, administrative agencies,

governmental units, secretaries of state, federal, state and local officials, including those

maintaining any authority relating to any environmental, health and safety laws, and the

successors and assigns of each of the foregoing) shall be, and hereby are, forever barred,

estopped and permanently enjoined from asserting, prosecuting, or otherwise pursuing

such Liens or Interests against the Property or against Buyer, its property, its successors

and assigns.   Following the Closing Date, no holder of a Lien on or Interest in the

Property (other than a Permitted Exception) shall interfere with Buyer's title to or use and

enjoyment of the Property based on or related to any such Lien or Interest, or upon any

actions that Seller and the other Debtors may take in their chapter 11 cases.

**Additional Provisions**

16.    This Court retains exclusive jurisdiction over any matter or dispute arising from or

relating to the implementation of this Sale Order as well as to enforce and implement the

terms and provisions of the Sale Agreement, all amendments thereto, any waivers and

consents thereunder, and each of the agreements executed in connection therewith in all

respects, including, but not limited to, retaining jurisdiction to:  (a) compel delivery of the

Property to Buyer; (b) resolve any disputes arising under or related to the Sale

Agreement, except as otherwise provided therein; (c) interpret, implement, and enforce

the provisions of this Sale Order; and (d) protect Buyer against any Lien on or Interest in the Property attaching to the proceeds of the Sale.

17.    Nothing in this Sale Order or the Sale Agreement releases, nullifies, precludes, or enjoins after the date of entry of this Sale Order the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property. Nothing in this Sale Order or the Sale Agreement authorizes transfer to the Buyer of any licenses, permits, registrations, or other governmental authorizations and approvals without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

18.    Nothing contained in the Plan (or any other chapter 11 plan of reorganization that may be confirmed in these chapter 11 cases) or any order of this Court confirming such plan of reorganization shall conflict with or deviate from the provisions of the Sale Agreement or the terms of this Sale Order.

19.    The transactions contemplated by the Sale Agreement are undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale as to Buyer, except to the extent such authorization is duly stayed pending such appeal prior to such consummation. The Buyer is a buyer in good faith of the Property and is therefore entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

20.    The consideration provided by Buyer for the Property under the Sale Agreement: (a) constitutes, and shall be deemed to constitute, reasonably equivalent value and fair

consideration; and (b) is fair and reasonable. The Sale may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

21.    The terms and provisions of the Sale Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, Seller, the remaining Debtors, their estates and their creditors, Reorganized Seller and the other Reorganized Debtors, Buyer and its affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties, notwithstanding any subsequent appointment of any trustee(s) or similar party under any chapter of the Bankruptcy Code, as to which trustee(s) or similar party such terms and provisions likewise shall be binding.

22.    The failure specifically to include any particular provision of the Sale Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement be authorized and approved in its entirety. Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.

23.    The Sale Agreement may be modified, amended or supplemented by the parties thereto, in a writing signed by all parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement docs not have a material adverse effect on the Debtors' estates.

24.    Notwithstanding Fed. R. Bankr. P. 7062, 9014, 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and it shall not be stayed under any of the preceding Bankruptcy Rules or otherwise.

**[remainder of this page left intentionally blank]**

26.     The Court shall retain jurisdiction to hear and determine all matters arising from or

relating to the implementation of this Sale Order, the Sale Agreement, the transactions

contemplated thereby, the Property and each other subject addressed by this Sale Order.

Dated: ___May 6_____, 2013


                              _Judith K. Fitzgerald_____
                              Honorable Judith K. Fitzgerald<sup>nab</sup>
                              United States Bankruptcy Judge

<u>**EXHIBIT I**</u>

**Purchase & Sale Agreement**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of this 4ᵗʰ day April, 2013 (the "Effective Date") by and between W.R. GRACE & CO. - CONN., a Connecticut corporation, having an address at 7500 Grace Drive, Columbia, Maryland 21044 ("**Seller**"), and GAP VI PROPERTIES, LLC, a Delaware limited liability company, having an address at 50 North Water Street, South Norwalk, Connecticut, 06854 or its permitted assigns ("**Purchaser**").

### WITNESSETH:

In consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, Seller and Purchaser hereby covenant and agree as follows:

### ARTICLE I

### AGREEMENT TO PURCHASE AND SELL

1.01    **Property.** Seller hereby covenants and agrees to sell and Purchaser hereby covenants and agrees to purchase, upon the terms and subject to the conditions hereinafter set forth, the following (hereinafter referred to, collectively, as the "**Property**"):

> that certain parcel of land containing approximately 66.8 +/- acres located at 7600 Grace Drive, Columbia, Maryland 21044, as more particularly described in **Exhibit A** attached hereto and made a part hereof (the "**Land**"), including without limitation any and all easements, rights, or rights-of-way relating to or benefiting such parcel of land, and all right, title, and interest, if any, of Seller in and to the land lying within any street or roadway adjoining such parcel of land or any vacated or hereafter vacated street or alley adjoining such parcels of land to the center line thereof, and any and all rights-of-way, open or proposed streets (public or private), alleys, strips or gores of land adjacent thereto, together with all improvements located thereon, and any and all right, title and interest of Seller in and to any appurtenances to the Land.

### ARTICLE II

### PURCHASE PRICE AND DEPOSIT; CLOSING DATE

2.01    **Purchase Price and Payment of Purchase Price; Closing Date.**

(a)    On the terms and subject to the conditions set forth in this Agreement, Purchaser hereby covenants and agrees to pay the base purchase price of Thirteen Million, One Hundred Thousand Dollars ($13,100,000.00) (the "**Base Purchase Price**") in lawful money of the United States at Closing.

(b)    Purchaser intends to seek required governmental approvals to develop a residential real estate project on the Property containing attached and detached residential dwelling units, together with potential accessory retail and office space (if so required in connection with obtaining required governmental approvals)(the "**Project**"). In the event that prior to Closing or at any time within one (1) year after the date of Closing, Purchaser obtains final approval for: (i) more than 450 single family attached or detached residential

1

dwelling units, in addition to the Base Purchase Price, Purchaser shall pay Twenty Five Thousand and No/100 Dollars for each additional single family attached or detached residential dwelling unit in excess of 450 approved; and (ii) if any commercial office or retail space is required to be built by Howard County in connection with obtaining governmental approvals for the Project, in addition to the Base Purchase Price, Purchaser shall pay Ten and No/100 Dollars ($10.00) per square foot of such required space (the amounts referred to in this Section 2.01(b)(i) and (ii) being the **"Additional Purchase Price"**; and the Base Purchase Price and the Additional Purchase Price collectively hereinafter referred to as the **"Purchase Price"**). In the event that at the time of Closing Purchaser has not obtained final, unappealable approval by applicable governmental authorities of Howard County that establishes the final development density for the Property, such as a Development Concept Plan, a Documented Site Development Plan, a Preliminary Development Plan, or similar approval, then at the time of Closing Purchaser shall pay the Base Purchase Price; and if any Additional Purchase Price becomes payable after Closing, such Additional Purchase Price shall be paid to Seller by Purchaser within thirty (30) days after the date upon which Purchaser obtains such final and non-appealable approval. In no event shall the Purchase Price be less than the Base Purchase Price, regardless of approved density achieved.

(c)   If Purchaser does not terminate this Agreement prior to the expiration of the Initial Study Period (as hereinafter defined) the Purchase Price shall be paid on or before the thirtieth (30th) day after the expiration of the **"Due Diligence Period"** (as hereinafter defined) (the **"Closing Date"**) by federal wire transfer of immediately available funds into a designated account of Seller.

**2.02    Deposit.**

(a)   Initial Deposit. Within two (2) business days after the execution and delivery of this Agreement by Seller and Purchaser, Purchaser shall deliver to Chicago Title Insurance Company, Washington DC Commercial Center, 2000 M Street, NW, Suite 610, Washington, DC 20036 (the "Escrow Agent") a deposit in the amount of One Hundred Thousand Dollars ($100,000.00 (the "Initial Deposit"). Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall be of no force and effect and shall automatically terminate if the Escrow Agent does not receive the Initial Deposit within two (2) business days after the execution and delivery of this Agreement in immediately available U.S. funds. If Purchaser terminates this Agreement during the first ninety (90) days of the Due Diligence Period (the **"Initial Study Period"**) in accordance with the terms of this Agreement, Purchaser shall be entitled to the immediate return of the Initial Deposit together with all interest accrued thereon. If Purchaser terminates this Agreement prior to the expiration of the Initial Study Period Purchaser shall comply with its obligations under Section 5.04(c) below respecting the delivery or return, respectively, of due diligence materials. If Purchaser does not terminate this Agreement during the Initial Study Period, then the Initial Deposit shall no longer be refundable to Purchaser except as otherwise expressly set forth in this Agreement.

(b)   Making of Additional Deposits.

Unless this Agreement has previously been terminated in accordance with the provisions of Section 2.02(a) above or Section 5.05 or Section 6.05 below, if Purchaser desires to elect to extend the Due Diligence Period beyond the Initial Study Period (any such election to be in the sole discretion of Purchaser), as more specifically provided in Section 5.01 hereof, Purchaser shall pay and remit up to seven (7) additional deposits hereunder, each in the

2

amount of One Hundred Thousand Dollars ($100,000.00) (the **"Additional Deposits"**) in immediately available U.S. funds to the Escrow Agent not later than 5:00 p.m. eastern time within two (2) Business Days after the last day of the Initial Study Period, and within two (2) Business Days after the last day of every successive three (3) month extension thereafter (for a total of up to seven (7) three-month extensions). Notwithstanding anything to the contrary contained in this Agreement, in the event that Purchaser fails to deposit an Additional Deposit with the Escrow Agent by 5:00 p.m. eastern time on the day that is two (2) business days after the Initial Study Period and on the day that is two (2) business days after the expiration of each three (3) month extension period thereafter, then the Due Diligence Period shall not be further extended and the Closing Date shall be established pursuant to the provisions of Section 2.01 above.

(c)    <u>Holding of Deposit</u>. The Initial Deposit and the Additional Deposits (collectively, the **"Deposit"**) shall be held by the Escrow Agent and disbursed in accordance with the terms of the escrow agreement dated as of even date herewith by and between Seller, Purchaser and the Escrow Agent, a copy of which is attached hereto as **<u>Exhibit B</u>** (the "**Escrow Agreement**"), and the further provisions hereof. All accrued interest or other earnings on the Deposit shall become part of the Deposit. Except as otherwise expressly provided herein, the Deposit shall be non-refundable to Purchaser.

(d)    <u>Disposition of Deposit</u>.

(i)    The Initial Deposit shall be refundable as provided in Section 2.02(a) above. Except for the foregoing, and except as otherwise expressly provided in this Agreement, the Deposit shall be non-refundable to Purchaser.

(ii)    If the closing of the transactions contemplated by this Agreement (the **"Closing"**) occurs, Purchaser shall receive a credit at the Closing against the Purchase Price and any other amounts payable by Purchaser on the Closing Date in an amount equal to the Deposit and all interest accrued thereon, and the Escrow Agent shall pay over to Seller at the Closing as part of the Purchase Price the Deposit, together with all interest accrued thereon.

(iii)    If this Agreement is terminated by reason of the occurrence of a "Purchaser's Default" or a "Seller's Default" (as such terms are hereinafter defined), Seller's and Purchaser's respective rights concerning the Deposit shall be governed by the terms and provisions of Article VIII below and the Escrow Agreement.

## ARTICLE III

## "AS IS" SALE; LIMITED REPRESENTATIONS AND WARRANTIES OF SELLER

**3.01**    <u>No Representations or Warranties by Seller.</u>

(a)    Except as expressly otherwise provided in Section 3.02 hereof, Purchaser specifically acknowledges and agrees that Seller is selling and Purchaser is purchasing the Property on an "AS IS WITH ALL FAULTS" basis and that, except with respect to the representations and warranties set forth in Section 3.02 below, Purchaser is not relying on any oral or written representations or warranties of any kind whatsoever, express or implied, from Seller, its employees, directors, officers, agents, consultants, contractors, subcontractors, attorneys or brokers as to any matters concerning the Property including, without limitation, any information contained in any report, plan, specification, study,

3

analysis, document, or other written material given by or on behalf of Seller to Purchaser with respect to the Property.

(b)    Purchaser acknowledges that it is a sophisticated real estate investor who has had (or who will have pursuant to the provisions of this Agreement) access to and sufficient time to review all information, documents, agreements, studies and tests relating to the Property which Purchaser deems necessary or desirable, and that it has conducted or will conduct to its satisfaction a complete evaluation of the Property, including but not limited to environmental issues, if any. Purchaser is fully aware of or will investigate, pursuant to the provisions of this Agreement, the condition of the Property as well as all facts, circumstances and information which may affect the development, use, operation or profitability of the Property, and has relied and will rely on its own due diligence investigation in determining to purchase the Property rather than on any information that may have been provided by Seller other than the representations and warranties contained in Section 3.02 hereof, and reports referenced in Schedule 3.02(j). To the extent that Seller, or its employees, directors, officers, agents, consultants, contractors, subcontractors, attorneys or brokers, has provided to Purchaser or hereafter provides to Purchaser any reports, plans, specifications, studies, analyses, documents or other materials, or any other information whatsoever, relating to the Property, Seller makes no representations or warranties with respect to the accuracy or completeness of the same or otherwise concerning such documents, materials or information.

(c)    Without in any way limiting the generality of the preceding paragraphs, in entering into this Agreement and purchasing the Property, Purchaser hereby acknowledges that, except as set forth in Section 3.02 and Schedule 3.02(j) hereof, Seller, its employees, directors, officers, agents, consultants, contractors, subcontractors, attorneys and brokers have not made, do not hereby make and will not hereafter be deemed to have made any representations or warranties or guarantees, whether express or implied, with respect to the Property or the physical condition or profitability thereof, including without limitation:

    (I)    THE QUALITY, NATURE, ADEQUACY AND PHYSICAL CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION THE SOILS, GEOLOGY AND GROUNDWATER.

    (II)    THE EXISTENCE, QUALITY, NATURE, ADEQUACY AND PHYSICAL CONDITION OF UTILITIES SERVICING THE PROPERTY.

    (III)    THE DEVELOPMENT POTENTIAL OF THE PROPERTY, AND THE PROPERTY'S USE, HABITABILITY, MERCHANTABILITY, FITNESS, SUITABILITY, VALUE OR ADEQUACY OF THE PROPERTY FOR ANY PARTICULAR PURPOSE.

    (IV)    THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTY OR ANY OTHER PUBLIC OR PRIVATE RESTRICTIONS ON THE USE OF THE PROPERTY.

    (V)    THE COMPLIANCE OF THE PROPERTY WITH ANY APPLICABLE CODES, LAWS, AND RESTRICTIONS OF ANY GOVERNMENTAL OR QUASI-GOVERNMENTAL ENTITY OR OF ANY OTHER PERSON OR ENTITY.

     (VI)    THE PRESENCE OF HAZARDOUS SUBSTANCES ON, UNDER, IN, OR ABOUT THE PROPERTY OR THE ADJOINING OR NEIGHBORING PROPERTY OR THE EXISTENCE OF ANY UNDERGROUND TANKS, CONTAINERS, OR CONDUITS IN, ON, OR ABOUT THE PROPERTY.

     (VII)   SUBJECT TO SELLER'S DELIVERY OF A SPECIAL WARRANTY DEED, THE QUALITY OF SELLER'S TITLE TO THE PROPERTY, AND THE EXISTENCE OF ANY LIENS, ENCUMBRANCES, CHARGES, ASSESSMENTS, RESTRICTIONS OR CLAIMS RELATING THERETO.

(d)     As used in this Agreement, (i) the term **"Hazardous Substances"** shall mean, collectively, any and all chemicals, substances, wastes, materials, gases or emissions which are deemed hazardous, toxic, a pollutant or a contaminant under applicable "Environmental Laws", or which have been shown to have significant adverse effects on human health or the environment, including, but not limited to, petroleum and petroleum products, asbestos, chlorofluorocarbons, radon gas and PCB's; and (ii) the term **"Environmental Laws"** shall mean, collectively, any and all statutes, ordinances, by-laws, rules and regulations, executive orders and other administrative orders, judgments, decrees, injunctions and other judicial orders of or by any governmental authority, together with their implementing regulations, now or hereafter in effect, relating to pollution or protection of human health or the environment, including, without limitation, emissions, discharges, releases or threatened releases of Hazardous Substances, or the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

(e)     The provisions of this Section 3.01 shall survive the Closing or the earlier termination of this Agreement.

**3.02**     <u>**Limited Representations and Warranties of Seller.**</u>  Notwithstanding the provisions of Section 3.01 hereof, Seller hereby makes, as of the date of this Agreement and as of the date of Closing, the following limited representations and warranties to Purchaser in connection with the sale of the Property and the transactions contemplated by this Agreement with the understanding that said representations and warranties constitute a material inducement to and are being relied upon by Purchaser:

(a)     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut, and duly qualified to do business in the State of Maryland, and has full right, power and authority to execute and deliver this Agreement and to perform its covenants and obligations under this Agreement;

(b)     this Agreement has been duly and validly authorized, executed and delivered by Seller;

(c)     subject to Seller's obtaining a final and non-appealable order of the "Bankruptcy Court" (as hereinafter defined) approving this Agreement and the sale of the Property in accordance herewith, this Agreement and each and every document and instrument to be executed and delivered by Seller pursuant to this Agreement, when fully executed and delivered by all intended signatories thereto, shall constitute the valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, subject to general equitable principles and applicable provisions of law related to bankruptcy, insolvency and creditors' rights generally;

(d)     Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Internal

Revenue Code of 1986, as amended;

(e)    the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder on the part of Seller does not and will not conflict with or result in the breach of any material terms or provisions of, or constitute a material default under, any contract, agreement, mortgage, indenture or judgment to which Seller is a party;

(f)    to the best of Seller's actual knowledge, Seller has not received any written notice of any pending or threatened condemnation, eminent domain or similar proceeding with respect to all or any portion of the Property;

(g)    Seller has not entered into any leases, licenses, or other occupancy agreements which are presently in effect affecting the Property, and Seller has not granted to any person or entity any option to acquire, lease or occupy all or any portion of the Property, except pursuant to matters which are of record;

(h)    there are no contracts or agreements currently in effect with respect to the Property to which Seller is a party other than a brokerage agreement with Cushman & Wakefield;

(i)    the Property does not constitute all or substantially all of the assets of Seller in the State of Maryland; and

(j)    there is not now pending, and to the best of Seller's actual knowledge, Seller has not received written notice of any threatened, suit, action, litigation or administrative proceeding against Seller which affects the Property or which may affect Seller's performance hereunder or which could give rise to a lien against the Property, except as set forth on Schedule 3.02(j); and

(k)    Seller is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986, as amended (of the "Code"), and the regulations promulgated thereunder; and

(l)    Neither Seller nor any of its affiliates, is a person or entity whom U.S. persons or entities are restricted from doing business under regulations of the OFAC of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

The representations and warranties of Seller hereunder shall survive Closing and shall not be merged in any deed for a period of twelve (12) months following the date of Closing.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**4.01    Representations and Warranties of Purchaser.**

Purchaser hereby represents and warrants to Seller, as of the date of this Agreement, with the understanding that said representations and warranties constitute a material inducement to and are being relied upon by Seller, as follows:

6

(a)     Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and has full right, power and authority to execute and deliver this Agreement and to perform its covenants and obligations under this Agreement;

(b)     Purchaser's federal tax I.D. number is

(c)     this Agreement has been duly and validly authorized, executed and delivered on behalf of Purchaser;

(d)     this Agreement and each and every document and instrument to be executed and delivered by Purchaser pursuant to this Agreement, when fully executed and delivered by all intended signatories thereto, shall constitute the valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to general equitable principles and applicable provisions of law related to bankruptcy, insolvency and creditors' rights generally;

(e)     Purchaser is not the subject of any Insolvency Event and Purchaser has no knowledge of any threatened or contemplated Insolvency Event. As used in this Agreement, the term **"Insolvency Event"** shall mean, as it pertains to any party, any proceeding by or against said party under any federal or state law or statute regarding bankruptcy, insolvency, fraudulent transfers, receivership, conservatorship, custodianship, trusteeship, moratorium or creditors' rights or debtors' obligations generally; any assignment for the benefit of creditors by said party; any failure of said party to pay its obligations as they come due; the insolvency of said party; or entry by said party into a composition agreement; and

(f)     Purchaser directly or indirectly possesses the financial resources to perform all of its covenants and obligations contained in this Agreement and to be contained in the documents and instruments to be executed and delivered pursuant to this Agreement, and the performance of said covenants and obligations will not render Purchaser the subject of an Insolvency Event; and

(g)     Purchaser is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986, as amended (of the "Code"), and the regulations promulgated thereunder; and

(h)     Neither Purchaser nor any of its affiliates, is a person or entity whom U.S. persons or entities are restricted from doing business under regulations of the OFAC of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

The representations and warranties of Purchaser hereunder shall survive Closing and shall not be merged in any deed for a period of twelve (12) months following the date of Closing.

## ARTICLE V

## PURCHASER'S INVESTIGATIONS; DUE DILIGENCE PERIOD;

7

## PURCHASER'S RIGHT TO TERMINATE

**5.01**   **Purchaser's Investigations; Due Diligence Period.**

(a)   Subject to the provisions of this Agreement, during the **"Due Diligence Period"** (as hereinafter defined), Purchaser shall have the right, as Purchaser deems necessary or desirable, to conduct or cause to be conducted, at Purchaser's sole cost and expense, such non-invasive tests, studies, review of plans and other documents (including those provided under Section 5.04(a) hereof), and performance of such investigations, inspections and analysis of the Property as Purchaser deems necessary or desirable to investigate and evaluate the Property (collectively, **"Purchaser's Investigations"**). With respect to the performance of any geotechnical tests or studies of the Property involving invasive sampling, testing or analyzing samples of soil conditions, Purchaser shall not obtain any such tests or studies until Purchaser shall have first obtained the prior written approval of Seller as to the identity of the company or persons designated to conduct or perform such tests or studies and a written proposal outlining the proposed scope of such tests and studies, which approval may be given or withheld by Seller in its sole discretion. Purchaser shall not perform any tests or studies of the Property which exceed the scope of work approved by Seller.

(b)   As used herein, the term **"Due Diligence Period"** shall mean and refer to a period commencing on the Effective Date and continuing for up to twenty-four months total, comprising the Initial Study Period of ninety (90) days and up to seven (7) three-month extensions.

**5.02**   **Conduct of Purchaser's Investigations.**

(a)   All of Purchaser's Investigations which may be conducted upon the Property shall be conducted at reasonable times, and after not less than twenty-four hours' prior notice (which may be verbal or via email) to W. Brian McGowan, (**"Seller's Representative"**), telephone no. (443) 831-3497; e-mail address of Brian.McGowan@grace.com, or his designee. Seller may impose reasonable restrictions on the timing of all of Purchaser's Investigations as necessary in Seller's reasonable judgment. At any time, and from time to time, as may be requested by Seller's Representative in response to any notice from Purchaser, any entry upon the Property or performance by Purchaser, its employees, agents, contractors, subcontractors, invitees, consultants and other representatives (collectively, **"Purchaser's Consultants"**) of any of Purchaser's Investigations shall occur only with Seller's Representative or an authorized designee present. Purchaser and Purchaser's Consultants shall take all reasonable precautions to minimize the impact of all Purchaser's Investigations on the Property. All Purchaser's Investigations shall be conducted in accordance with all applicable laws, codes, ordinances, orders, rules regulations, by-laws, ordinances, and all approvals, permits, or other governmental determinations issued with respect to the Property pursuant to any of the foregoing, and in accordance with the Seller's site-specific environmental, health, and safety policies and procedures. Purchaser shall, in a timely manner, restore the Property at its sole cost to its pre-existing condition, including, without limitation, all paving, landscaping and vegetation. In connection with the conduct of Purchaser's Investigations, except as expressly stated in this Agreement, Purchaser shall not contact any of Seller's agents, employees, contractors or other representatives, except for Seller's Representative, without the prior written consent of Seller.

8

(b)     Purchaser assumes all risks associated with the performance of Purchaser's Investigations, including, without limitation, all damage to property (including, without limitation, the Property) and all injuries and loss to Purchaser and Purchaser's Consultants, and agrees to defend, indemnify and hold harmless Seller and all of its officers, directors, employees, agents, consultants, invitees, contractors and subcontractors of, from and against any and all costs, losses, claims, defenses, demands, damages, liabilities, expenses and other obligations (including, without limitation, reasonable attorneys' fees and court costs) arising from, out of or in connection with or otherwise relating to, the entry onto the Property by, or the actual performance of Purchaser's Investigations by, Purchaser or any of Purchaser's Consultants.

(c)     Purchaser agrees to maintain, and/or to cause each of Purchaser's Consultants to maintain, at all times during their entry upon the Property, the following insurance coverages, with companies reasonably acceptable to Seller with a Best's Rating of not less than "A-:VII" or the financial equivalent thereof, covering the activities to be conducted by Purchaser and Purchaser's Consultants: Comprehensive General Liability: for Bodily Injury and Property Damage, including Premises/Operations, Products/Completed Operations, Contractual Liability, and Personal/Advertising Injury Coverages, in a combined single limit of $2,000,000 per occurrence and $2,000,000 General Aggregate. Seller shall be shown as an additional insured on this coverage with respect to the Property and this Agreement. Purchaser and/or any Purchaser's Consultant may use an Excess or Umbrella Liability Policy to satisfy these requirements. Prior to entry, Purchaser shall deliver to Seller's Representative certificates of insurance evidencing the insurance coverages noted above, and naming Seller as an additional insured. The policies shall not be materially changed so as not to comply with the foregoing insurance requirements, or terminated, without at least thirty (30) days' prior written notice to Seller's Representative.

(d)     The foregoing restoration and indemnity obligations of Purchaser contained in this Section 5.02 shall survive the Closing or the earlier termination of this Agreement.

5.03    **Rezoning and Development Approvals.** During the Due Diligence Period, Purchaser shall have the right, subject to the further provisions hereof, to pursue the rezoning of the Property (including, but not limited to through a rezoning, a Zoning Text Amendment, or by seeking to apply a new mixed use zone as part of the General Plan) to permit its contemplated Project (the "**Rezoning**"). Purchaser shall further have the right to pursue all necessary federal, state, local or other development approvals for the Project, including, without limitation, approval of its development plan, subdivision approvals, curb cut permits and other permits necessary for access to the Property. Purchaser shall copy Seller on all written correspondence and submittals to governmental authorities or agencies with respect to the rezoning and development approvals, and shall otherwise endeavor in good faith to keep Seller fully apprised of its efforts, and the status, with respect to such matters. Seller agrees that it shall, promptly at the Purchaser's request and expense, join in any and all required applications with respect to the foregoing matters to the extent such applications require the joinder of the owner of the Property and to otherwise endeavor in good faith to cooperate, at the Purchaser's request and expense, with the Purchaser's efforts with respect to the Rezoning. Seller agrees to endeavor in good faith to attend and participate in public hearings and important meetings and conferences with governmental officials associated with the Rezoning request if Purchaser reasonably requests Seller's attendance at any such hearing, meeting or conference reasonably in advance of the time and date thereof.

5.04    **Confidentiality and Return of Due Diligence Information.**

9

(a)    Seller will use all commercially reasonable efforts to locate and make available to Purchaser, promptly after the execution of this Agreement by both parties and the payment of the Deposit, for inspection and copying by Purchaser at a mutually acceptable location, to the extent they are in the files ordinarily maintained by Seller, copies of: engineering reports; title insurance policies issued to Seller with respect to the Property; real estate tax bills for the current fiscal year; and perimeter surveys and subdivision plans. Environmental reports shall be made available for inspection and copying at the office of Seller's environmental consultant. Purchaser acknowledges that Seller makes no representation or warranty as to the accuracy or completeness of any materials so provided. Seller and Seller's environmental consultants and advisers shall promptly meet and confer with Purchaser and Purchaser's environmental consultants and advisers to review and summarize the current environmental condition of the Property; provided, however, that Seller makes no representation or warranty as to the accuracy or completeness of any such review or summary.

(b)    Purchaser agrees that all written materials and information provided by Seller with respect to the Property, and all materials and information obtained by Purchaser from sources other than Seller with respect to the Property (including, without limitation, reports, studies, analyses and other materials prepared by, or provided to Purchaser by, Purchaser's Consultants) that is not already public information or that is obtained pursuant to any agreement of confidentiality shall be held in strict confidence and shall not be disclosed to any third party except as provided in this subsection (b). All such written materials and information shall be held in strict confidence and shall not be disclosed to any third party except (i) in connection only with the transaction specifically contemplated by this Agreement, to Purchaser's employees, agents, contractors, subcontractors, consultants, attorneys, accountants, appraisers, and other representatives, in which event Purchaser shall direct each such recipient of such information to maintain the confidentiality of such information, or (ii) as required by law or court order.

(c)    If for any reason the Closing does not occur, Purchaser (i) shall return to Seller all written and other tangible materials, and shall delete all electronic materials regarding the Property that Seller has provided to Purchaser and all copies thereof, and (ii) shall deliver immediately to Seller (at no cost to Seller) copies of all non-privileged studies, analyses, reports and assessments (both final and interim versions) prepared by third-parties relating to any of Purchaser's Investigations of the Property.

(d)    The provisions of this Section shall survive the termination of this Agreement but shall not survive the Closing.

5.05    **Purchaser's Right to Terminate.** Subject to the provisions of this Section 5.05, Purchaser may, at any time on or before 5:00 p.m. Eastern time on the last day of the Due Diligence Period, as its sole and exclusive remedy, terminate this Agreement by giving a written notice to Seller ("**Purchaser's Termination Notice**") setting forth Purchaser's election to terminate this Agreement pursuant to this Section 5.05, if the results of Purchaser's Investigations are unsatisfactory to Purchaser in its sole and absolute judgment and discretion. If Purchaser terminates this Agreement in accordance with the provisions of this Section 5.05, Purchaser shall comply with its obligations under Section 5.04(c) above respecting the delivery or return, respectively, of the due diligence materials, and the disposition of the Deposit and all interest accrued thereon shall be as set forth in Section 2.02 above. In such event, except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder. If Purchaser does not terminate

10

this Agreement pursuant to this Section 5.05 by giving Purchaser's Termination Notice to Seller by 5:00 p.m. Eastern time on the last day of the Due Diligence Period, then Purchaser shall be conclusively presumed to have waived its right to terminate contained in this Section 5.05.

## ARTICLE VI

## TITLE EXAMINATION AND SURVEY MATTERS

6.01    **Title to be Conveyed.**  Seller shall transfer a good and clear record and marketable fee simple title to the Property by a Maryland special warranty deed (the **"Deed"**) on the Closing Date, running to Purchaser (or Purchaser's permitted assignee), subject to the following (collectively, the **"Permitted Exceptions"**):

(a)    The Deed shall specifically exclude from the Property to be conveyed to Purchaser the ground water monitoring wells, recovery wells, and associated equipment located on the Land as of the Effective Date.  In addition, at Closing the parties shall enter into a commercially reasonable contract or other written agreement to be recorded at the time of Closing that shall contain an express temporary easement or other temporary right of entry upon the Property (the **"Temporary Easement"**)on the part of Seller, its agents or assigns, and/or regulatory agency representatives as may be designated by Seller, for purposes of inspecting, repairing, maintaining, and abandoning the ground water monitoring wells, recovery wells, and associated equipment existing on the Land (the **"Retained Equipment"**) for so long as required by the United States Environmental Protection Agency, the Maryland Department of the Environment, and/or the Howard County Bureau of Environmental Services, and for performing such other activities as may be required of Seller by such agencies.  Seller shall retain all right, title and interest in and to the Retained Equipment and the Retained Equipment shall be used, maintained, operated, insured, replaced, repaired and removed at the sole risk, cost and expense of Seller and Seller shall defend, indemnify and hold harmless Purchaser, any and all of Purchaser's officers, directors, employees, agents, consultants, invitees, contractors and subcontractors and successors in title, of, from and against any and all costs, losses, claims, defenses, demands, damages, liabilities, expenses and other obligations (including, without limitation, reasonable attorneys' fees and court costs) arising from, out of or in connection with or otherwise relating to, the entry onto the Property in connection with, or the use, maintenance, operation, replacement, repair or removal of, the Retained Equipment.  The Temporary Easement shall set forth the area of the Property subject to Seller's retained right of entry and shall expressly provide for the termination thereof at such time as Seller no longer requires the use and benefit thereof, as may be reasonably determined by Seller.  The course, distance, location, scope, and terms and conditions of the Temporary Easement shall not materially adversely impact the Purchaser's proposed development, use, construction, or improvement of the Property, or materially increase the cost or expense associated therewith;

(b)    Subject to Purchaser's right under Section 6.02 below, such state of facts as would be shown on an accurate ALTA/ACSM survey of the Property (regardless of whether or not Purchaser obtains a survey);

(c)    Zoning regulations, applicable building restrictions, and all other laws, ordinances, regulations and restrictions of any duly constituted public authority enacted prior to the Closing Date;

11

(d)    Real estate taxes and betterment assessments levied or assessed on the Property for the year during which Closing occurs that are not yet due and payable; and

(e)    All matters of title or affecting title which constitute "Permitted Exceptions" in accordance with Sections 6.02 or 6.04 below, including, without limitation, any such matters which are not made the subject of a **"Title Defect Notice"** (as hereinafter defined).

6.02    **Title Examination Prior to Closing; Waiver by Purchaser.**  During the Initial Study Period, Purchaser may, at its sole cost and expense, (i) have the title to the Property examined through a date not earlier than the date of this Agreement, and (ii) have a survey made of the Property. Purchaser shall give written notice to Seller (a **"Title Defect Notice"**) not later than 5:00 p.m. Eastern time on the last day of the Initial Study Period if such title examination or survey discloses any title defect (other than a matter described in clause (d) of Section 6.01) or encroachment upon the Property which Purchaser deems or otherwise determines to be unacceptable (collectively called the **"Unpermitted Exceptions"**), which notice shall contain a description of each Unpermitted Exception together with copies of all documents evidencing such Unpermitted Exceptions.    Any matter of record title as of the effective date of such title examination, or matter in existence which appeared on or could have appeared on such a survey, which is not the subject of a Title Defect Notice shall be conclusively deemed waived by Purchaser and shall constitute a Permitted Exception.

6.03    **Curing and Removal of Title Objections.**  If Purchaser gives a Title Defect Notice to Seller in accordance with the provisions of the preceding Section 6.02, then:

(a)    With respect to any Unpermitted Exception that is a mortgage, deed of trust, mechanics lien, judgment, monetary lien or similar encumbrance against all or any portion of the Property (collectively, the **"Monetary Encumbrances"**), Seller shall notify Purchaser within ten (10) "Business Days" (as hereinafter defined) after receipt of such Title Defect Notice, either (i) that Seller has paid the amount necessary to remove the same from the record title to the Property and will, as soon as reasonably practicable but in any event not less than thirty (30) days prior to the Closing Date, obtain recordable instruments or other documentation sufficient to cause a nationally recognized title insurance company to delete such matters from an owner's title insurance policy to be issued to Purchaser at standard rates, or (ii) that Seller agrees to pay on the Closing Date the sum required to remove the same from the record title out of the Purchase Price to be received at the Closing, pursuant to arrangements reasonably acceptable to Seller and Purchaser, and will on the Closing Date, obtain recordable instruments or other documentation sufficient to cause a nationally recognized title insurance company to delete such matters from an owner's title insurance policy to be issued to Purchaser for no additional premium; and

(b)    With respect to any Unpermitted Exception that is not a Monetary Encumbrance (collectively called **"Nonmonetary Encumbrances"**), Seller shall have the option, in its sole discretion, either:

(i)    to use reasonable efforts to remove or cure the same, provided that (1) Seller shall not be required to incur more than $25,000.00 in costs and expenses (including, without limitation, attorneys' fees) in the aggregate to cure all Nonmonetary Encumbrances, (2) Seller shall not be required to commence any effort to remove or cure the same if Seller reasonably determines that the cost of such removal or cure is likely to cost more than $25,000.00 in costs and expenses (including, without limitation, attorneys' fees in the aggregate, and (3) Seller shall not be obligated to commence any litigation or other proceeding in any court to effectuate

12

such cure. If Seller elects and diligently pursues reasonable efforts to remove or cure the Unpermitted Exceptions but Seller is unable to complete such removal or cure by the Closing Date, Seller shall so notify Purchaser and Purchaser shall, as its sole and exclusive remedy, on or before the tenth (10th) Business Day after Purchaser's receipt of Seller's notice, give notice to Seller, that Purchaser either:

(x)     elects to proceed with the Closing, in which event all Nonmonetary Encumbrances identified in the Title Defect Notice which Seller has not cured or removed despite Seller's diligent and good faith efforts to cure or remove such Nonmonetary Encumbrances shall be conclusively presumed thereafter to constitute Permitted Exceptions and the Closing shall occur on the later of the Closing Date or the tenth (10th) Business Day after Purchaser gives such notice to Seller, without any credit against or abatement of the Purchase Price on account thereof; or

(y)     elects to terminate this Agreement, in which event Purchaser shall be entitled to the immediate return of the Deposit, together with all interest accrued thereon and, except as expressly provided otherwise in this Agreement, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder.   If Purchaser elects to terminate this Agreement in accordance with this subsection Purchaser shall comply with its obligations under Section 5.04(c) above respecting the delivery or return, respectively, of due diligence materials.

Unless Purchaser gives notice to Seller within such 10 Business Day period that Purchaser has elected to proceed to Closing pursuant to the foregoing clause (x), Purchaser shall be conclusively presumed to have elected to terminate this Agreement pursuant to the foregoing clause (y); or

(ii)    to take no action in connection with the existence of such Unpermitted Exception, in which event all of the Unpermitted Exceptions would be deemed waived by Purchaser unless Purchaser terminates this Agreement as provided in the next succeeding paragraph.

Seller shall give written notice to Purchaser not later than ten (10) Business Days after Seller's receipt of the Title Defect Notice as to which of the foregoing options under clause (b)(i) or (b)(ii) Seller elects.  Unless Seller states in such notice that it has elected to proceed pursuant to the preceding clause (b)(i) to attempt to remove or cure the Unpermitted Exceptions, Purchaser shall have the right to terminate this Agreement by giving written notice of termination to Seller within ten (10) Business Days after receipt of such notice from Seller or the expiration of such 10-Business Day period without Seller having given such a notice, in which event Purchaser shall be entitled to the immediate return of the Deposit, together with all interest accrued thereon and, except as expressly provided otherwise in this Agreement, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder.  In the event Purchaser elects to terminate this Agreement Purchaser shall comply with its obligations under Section 5.04(c) above respecting the delivery or return, respectively, of due diligence materials.

(c)     The Closing Date shall be extended for such period of time as necessary to give Seller and Purchaser the benefit of the time periods stated in this Section.

**6.04    Change of Conditions.**  If, between the expiration of the Initial Study Period and the Closing

Date, an updated title report shows any new Unpermitted Exceptions which did not appear on the record title to the Property as of the date of the initial title examination performed during the Initial Study Period, or an updated survey shows any new encroachments or other survey matters not in existence as of the date of the survey prepared for Purchaser during the Initial Study Period, then in either case Purchaser shall have the right to give Seller written notice of any such new Unpermitted Exception and in such instance the parties shall have the same· rights and obligations as to such new Unpermitted Exceptions as stated in Section 6.03 above *except* that Seller shall have a period of one (1) week to respond to Purchaser's notice under Section 6.03(a). If Purchaser does not give notice of any such new Unpermitted Exceptions to Seller on or before the Closing Date, Purchaser shall be conclusively presumed to have waived such Unpermitted Exceptions and to have agreed to accept title subject to such new Unpermitted Exceptions (which shall thereupon be deemed to be Permitted Exceptions), and the Closing shall occur without any credit or abatement of the Purchase Price.

6.05    **Bankruptcy Court Approval.** Purchaser acknowledges that Seller is currently a debtor in possession pursuant to a consolidated voluntary bankruptcy petition filed with the United States Bankruptcy Court for the District of Delaware, Case # 01-1139 (JKF) (the "**Bankruptcy Court**"), and that the effectiveness of this Agreement is conditioned upon obtaining the approval by the Bankruptcy Court of this Agreement and the sale of the Property in accordance herewith. Promptly after the full execution and delivery of this Agreement, Seller diligently and in good faith shall apply to the Bankruptcy Court for its approval of this Agreement and the sale of the Property in accordance herewith. In the event that Seller is not able to obtain a final and non-appealable order of the Bankruptcy Court approving this Agreement and the sale of the Property in accordance herewith, then either: (i) Purchaser may, by written notice to Seller given at any time after the last day of the Initial Study Period and on or before 5:00 p.m. Eastern time on the last day of the Due Diligence Period, as its sole and exclusive remedy, terminate this Agreement; or (ii) Seller may terminate this Agreement by written notice to Purchaser given at any time after 5:00 p.m. Eastern time on the day that is the earlier of: (A) ten (10) Business Days after the Bankruptcy Court enters an order affirmatively denying approval of this Agreement and the sale of the Property, and the expiration of any applicable appeal period without an appeal of such order having been properly taken; or (B) eighteen (18) months after the expiration of the Initial Study Period. If this Agreement is terminated by either Purchaser or Seller in accordance with the provisions of this Section 6.05, Purchaser shall be entitled to the immediate return of the Deposit together with all interest accrued thereon. In such event, Purchaser shall comply with its obligations under Section 5.04(c) above respecting the delivery or return, respectively, of due diligence materials, and upon such compliance, except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder.

## ARTICLE VII

## CLOSING

7.01    **Time and Place of Closing.** The Closing shall take place on the Closing Date at 10:00 a.m. at the offices of the Escrow Agent, or at such other time and place as may be mutually agreed to by the Seller and Purchaser.

7.02    **Conditions Precedent to Purchaser's Obligations.** The Purchaser's obligations to consummate the transactions contemplated by this Agreement shall be subject to satisfaction, on or prior to the Closing Date (or such shorter period of time as stated in this Agreement), of each of the following conditions precedent, any one or more of which may be waived by Purchaser:

14

(a)     all of the representations of Seller contained in Section 3.02 of this Agreement shall be true and correct in all material respects on and as of the Closing Date, as though republished and remade on and as of the Closing Date;

(b)     Seller shall have performed, observed and complied in all material respects with all of the covenants, agreements and conditions required by this Agreement to be performed, observed and complied with on its part on or before the Closing Date;

(c)     Seller shall have obtained a final and non-appealable order of the Bankruptcy Court approving this Agreement and the sale of the Property in accordance herewith;

(d)     this Agreement shall not have been terminated previously in accordance with its terms;

(e)     the Property shall be free of all tenants and other occupants.

7.03    **Conditions Precedent to Seller's Obligations.**  The Seller's obligations to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or prior to the Closing Date (or such shorter period of time as stated in this Agreement), of each of the following conditions precedent, any one or more of which may be waived by Seller:

(a)     all of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, as though republished and remade on and as of the Closing Date;

(b)     Purchaser shall have performed, observed and complied in all material respects with all of the covenants, agreements and conditions required by this Agreement to be performed, observed and complied with on its part on or before the Closing Date;

(c)     Seller shall have obtained a final and non-appealable order of the Bankruptcy Court approving this Agreement and the sale of the Property in accordance herewith; and

(d)     this Agreement shall not have been terminated previously in accordance with its terms.

7.04    **Seller's Closing Deliveries.**  On the Closing Date, and in addition to any other documents or instruments required to be delivered by Seller by the express provisions of this Agreement, Seller shall deliver or cause to be delivered to or at the direction of Purchaser, and duly and validly executed, attested, notarized and acknowledged, as appropriate, the following:

(a)     the Deed;

(b)     a certified copy of the order of the Bankruptcy Court approving this Agreement and the sale of the Property in accordance herewith;

(c)     an affidavit of Seller stating Seller's U.S. taxpayer identification number and that Seller is not a "foreign person" within the meaning of Section 1445 (f)(3) of the Internal Revenue Code of 1986, as amended;

(d)     an affidavit relating to mechanics' liens and parties in possession in form customarily provided by sellers of vacant commercial land in the State of Maryland;

(e)     a certificate as to the authority and incumbency of Seller's representatives executing the documents and instruments delivered at the Closing; and

(f)     a certification by Seller that all representations and warranties made by Seller in Section 3.02 of this Agreement are true and correct in all material respects on the Closing Date; and

(g)     such other documents as may be reasonably required by the Escrow Agent or as may be reasonably requested by Purchaser to consummate the purchase of the Property as contemplated by this Agreement.

**7.05    Purchaser's Closing Deliveries**.  On the Closing Date, and in addition to any other documents and instruments required to be delivered by Purchaser by the express provisions of this Agreement, Purchaser shall deliver or cause to be delivered to or at the direction of Seller, and duly and validly executed, attested, notarized and acknowledged, as appropriate, the following:

(a)     the Purchase Price, plus or minus prorations and adjustments as provided in Section 7.07 below, payable in the manner prescribed in Section 2.01 above;

(b)     a certificate as to the authority and incumbency of Purchaser's representatives executing the documents and instruments delivered at the Closing; and

(c)     a certification by Purchaser that all representations and warranties made by Purchaser in Section 4.01 of this Agreement are true and correct in all material respects on the Closing Date; and

(d)     such other documents as may be reasonably required by the Escrow Agent or as may be reasonably requested by Seller to consummate the purchase of the Property as contemplated by this Agreement.

**7.06    Joint Deliveries**.   On the Closing Date, the parties hereto will jointly execute (and attest, acknowledge and notarize as appropriate) and deliver the following:

(a)     a closing and settlement statement; and

(b)     the Temporary Easement; and

(c)     any other documents and instruments that are reasonably necessary to consummate the transactions contemplated by this Agreement.

**7.07    Prorations and Adjustments.**

(a)     All real estate taxes and betterment assessments levied, imposed or assessed against the Property for the tax year in which the Closing occurs, which are not yet due and payable, shall be prorated and adjusted between the parties as of 5:00 p.m. on the day immediately preceding the Closing Date (the **"Proration Date"**).  In the event that the final actual real estate tax bill for such tax year is not available or the tax rate not set at the time of the Closing, the proration shall be based upon the final actual tax bill (as same may have been abated) for the immediately preceding year and shall be adjusted retroactively when the final actual tax bill for the tax year in which the Closing occurs is available.  All real estate taxes, betterments and personal property taxes for all years prior to the tax year in which the Closing occurs shall be paid by Seller.

(b)     The parties are not currently aware of any other costs or expenses that must be adjusted between them on the Proration Date, and if any such costs or expenses arise or become known to them on or before the Closing Date, they shall be equitably adjusted between the parties in accordance with customary practice in the State of Maryland.

(c)     The provisions of this Section 7.07 shall survive the Closing.

**7.08    Fees and Closing Costs.**

(a)     Seller and Purchaser shall each pay one half (1/2) of the costs of documentary stamps and transfer taxes in connection with the transfer of the Property and recordation of the Deed.

(b)     Seller shall pay the recording fee for the recordation of all documents and instruments necessary to remove any Monetary Encumbrances pursuant to the provisions of Section 6.03 of this Agreement or to remove any Unpermitted Exceptions from title to the Property, if any are removed by Seller pursuant to the provisions of Section 6.03 of this Agreement.

(c)     Purchaser shall be solely responsible for all title insurance premiums and charges, title search charges, survey charges, and all fees, charges and expenses of any kind whatsoever arising out of or relating to the performance of Purchaser's Investigations.

(d)     Each of Seller and Purchaser shall pay the fees and expenses of its counsel and other consultants retained in connection with the purchase or sale of the Property.  Seller and Purchaser shall share equally the fees and expenses of the Escrow Agent in connection with this transaction.

(e)     Seller and Purchaser shall each pay such other Closing costs as are customarily paid by each such party in the State of Maryland.

## ARTICLE VIII

## DEFAULTS AND REMEDIES

**8.01    Purchaser's Defaults and Seller's Remedies.**

(a)     Purchaser's Defaults.  It shall be a default by Purchaser under this Agreement (a "Purchaser's Default") if any one or more of the following shall occur:

(i)     Purchaser shall fail to pay any sum of money under this Agreement when due and payable and such failure shall continue for three (3) Business Days after the date on which such payment is to be made, except that if such failure relates to the payment of the Deposit or the amounts to be paid at the Closing, there shall be no requirement that Seller give Purchaser any notice of such failure to pay;

(ii)     Purchaser shall fail to perform any of its other covenants and agreements contained in this Agreement when required to be performed hereunder and such failure shall continue for ten (10) Business Days after Seller gives Purchaser written notice of such failure; or

(iii)     any representation or warranty of Purchaser contained in this Agreement shall

prove to have been materially false or incorrect when made.

(b) <u>Seller's Remedies for Purchaser's Default</u>. If a Purchaser's Default occurs, then subject to any applicable notice and cure period, Seller shall have the right to terminate this Agreement immediately by giving written notice to Purchaser, in which event Seller shall be entitled to the immediate receipt of the Deposit together with all interest accrued thereon, as Seller's agreed liquidated damages. The remedy set forth in the preceding provisions of this Section 8.01(b) shall be Seller's sole and exclusive remedy hereunder, at law or in equity, for a Purchaser's Default. The parties acknowledge that Seller's actual damages in the event of a Purchaser's Default will be difficult to ascertain and that such liquidated damages represent the parties' best estimate of such damages. In the event that Seller terminates this Agreement, then except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and neither Purchaser nor Seller shall have any further rights, obligations or liabilities hereunder.

Notwithstanding anything to the contrary contained herein, under no circumstances shall Seller be entitled to recover any damages, direct, consequential, punitive, or otherwise, for a Purchaser's Default.

## 8.02   <u>Seller's Default and Purchaser's Remedies</u>.

(a) <u>Seller's Defaults</u>. It shall be a default by Seller under this Agreement (a "Seller's Default") if either or both of the following shall occur:

(i) Seller shall fail to perform any of its covenants and agreements under this Agreement when required to be performed hereunder and such failure shall continue for ten (10) Business Days after Purchaser gives Seller notice of such failure, <u>except</u> that if such failure relates to any covenant or agreement to be performed at the Closing, there shall be no notice required; and

(ii) any representation or warranty of Seller contained in Section 3.02 of the Agreement shall prove to have been materially false or incorrect when made.

(b) <u>Purchaser's Remedies for Seller's Default</u>. If a Seller's Default occurs, then subject to any applicable notice and cure period, Purchaser shall have the right to elect either: (i) to terminate this Agreement and receive the return of the Deposit together with all interest accrued thereon, (ii) to waive any such failure and proceed with the Closing, or (iii) to seek to enforce specific performance of this Agreement. Purchaser's termination of this Agreement and receipt of the amounts described in clause (i) above, together with the cost and expense reimbursement required below, shall terminate this Agreement, and except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and neither Purchaser nor Seller shall have any further rights, obligations or liabilities hereunder. If Purchaser elects to terminate this Agreement as described in clause (i) above then Purchaser shall also be entitled to recover from Seller the amount of Purchaser's verified out-of-pocket costs and expenses incurred in connection with Purchaser's negotiation of this Agreement, Purchaser's study, examination, engineering and due diligence with respect to the Property, Purchaser's Rezoning efforts and efforts to seek and pursue other requisite governmental approvals with respect to the Property, and Purchaser's application for and pursuit of financing for the acquisition of the Property.

Notwithstanding anything to the contrary contained herein, under no circumstances shall

Purchaser be entitled to recover any damages, direct, punitive, consequential or otherwise, for a Seller's Default.

## ARTICLE IX

## CONDEMNATION/DAMAGE AND DESTRUCTION/OPERATIONS

9.01    **Eminent Domain and Condemnation.** If, at any time prior to the Closing, ten (10%) percent or more of the area of the Land is taken or condemned or becomes the subject of any eminent domain or condemnation proceeding, or if any portion of the Land becomes subject to any eminent domain or condemnation proceeding and the taking or loss of use of such portion would materially adversely impact Purchaser's proposed development, use, construction, or improvement of the Property, or materially increase the cost or expense associated therewith (each of the foregoing being a "**Material Taking**"), or Seller receives notice from any governmental entity with the right to exercise the power of eminent domain that it desires or intends to subject the Land to a Material Taking, then Seller shall promptly notify Purchaser of such taking, condemnation or proceeding, and Purchaser may, at its sole discretion, elect by written notice to Seller within ten (10) Business Days after the giving of Seller's notice, as its sole and exclusive remedy, either (i) to terminate this Agreement, in which event Purchaser shall be entitled to the immediate return of the Deposit together with all interest accrued thereon and, except as expressly provided otherwise herein, this Agreement shall be of no further force and effect and the parties shall have no further rights, obligations or liabilities hereunder; or (ii) to accept the Property subject to said Material Taking or in the condition in which it is left following such Material Taking and receive either the full amount of the condemnation award that Seller received for the Property (less the reasonable costs, including without limitation attorneys' fees, incurred by Seller in obtaining such award) or, if Seller has not received said award on or before the Closing Date, accept an assignment from Seller, in form and content reasonably acceptable to Seller and Purchaser, of Seller's rights in and to said award, and the Closing shall occur without an adjustment to the Purchase Price. If Purchaser elects to give a notice pursuant to subsection (i) above on or before ten (10) Business Days after giving such notice Purchaser shall comply with its obligations under Section 5.04(c) above respecting the delivery or return, respectively, of due diligence materials. If Purchaser does not give a notice pursuant to subsection (i) above on or before ten (10) Business Days after the giving of Seller's notice of the eminent domain or condemnation proceeding, Purchaser shall be conclusively presumed to have elected to proceed in accordance with subsection (ii) above. The Closing Date shall be extended for the period of time necessary to allow Purchaser to make the election stated in this Section 9.01.

9.02    **Damage and Destruction.** The obligations of the parties hereunder shall not be affected by any damage or destruction caused by fire or other casualty.

## ARTICLE X

## BROKER

10.01    **Broker.** Seller and Purchaser each hereby represents and warrants to the other that it has not dealt with any broker, finder or other intermediary in connection with the transactions contemplated hereby other than Cushman & Wakefield (the "**Broker**") and that no fees or commissions are due or payable to any third party other than the Broker by reason of any of the said transactions. Seller and Purchaser each agrees further to indemnify, defend and hold the other harmless of, from and against any and all costs, losses, claims, damages, liabilities, expenses and other obligations (including, without limitation, reasonable attorneys' fees and costs) arising from or in connection with or otherwise resulting from a breach of their respective representations and warranties contained in this Section 10.01 or any claim by any broker, finder,

19

intermediary or other third party other than the Broker claiming to have been employed by or at the direction of the indemnifying party. Seller shall be responsible for the payment of the commission due to the Broker pursuant to a separate agreement, if and when the Closing occurs, the Deed is recorded and the full Purchase Price is paid. The provisions of this Section 10.01 shall survive the Closing.

**ARTICLE XI**

**GENERAL PROVISIONS**

11.01   **Notices.** Except for the notice to Seller's Representative referenced in Section 5.02 above, all notices, demands, requests, consents, waivers, approvals and other communications shall be in writing and shall be deemed given (i) upon the hand delivery thereof during business hours provided a receipt is obtained, or (ii) upon the earlier of delivery or tender for delivery if sent by certified mail, return receipt requested, postage charges prepaid, or (iii) on the next Business Day following delivery to a recognized overnight delivery service such as Federal Express or Express Mail, freight charges prepaid, or (iv) upon transmission by facsimile or email prior to 6:00 p.m. (local time of the recipient) on a Business Day, with confirmation of transmission received, provided that a copy is also sent on the same day by one of the methods described in the preceding three clauses, in each case addressed or delivered to the respective parties at their respective addresses set forth below (or at such other addresses designated by any party at any time by notice to the other parties in the manner set forth herein):

SELLER:

W.R. GRACE & CO.-CONN.
7500 Grace Drive
Columbia, Maryland 21044
Attention:  W. Brian McGowan, Consultant
Telephone No.: (443) 831-3497
Email: brian.mcgowan@grace.com

with copy to:

W.R. Grace & Co.-Conn.
7500 Grace Drive
Columbia, Maryland 21044
Attention:  Vicki B. Finkelstein,
Assistant General Counsel – Real Estate
Telephone No.: (410) 531-4795
Facsimile No.: (410) 531-4783
Email: vicki.b.finkelstein@grace.com

PURCHASER:

GAP VI PROPERTIES, LLC
Attn: Barry P. Marcus
50 North Water Street
South Norwalk, CT 06854
Telephone: 203.354.5022
Facsimile: 203.354.5060
Email: marcusb@greenfieldpartners.com

20

with copy to:

GAP VI PROPERTIES, LLC
Attn: Michael Bradley
50 North Water Street
South Norwalk, CT 06854
Telephone: 203.354.5030
Facsimile: 203.354.5060
Email: bradleym@greenfieldpartners.com

and to:

Venable LLP
Attn: Henry F. Brandenstein, Jr.
8010 Towers Crescent Drive, Suite 300
Tysons Corner, Virginia 22182
Telephone: 703.760.1632
Facsimile: 703.821.8949
Email: hfbrandenstein@venable.com

All costs and expenses for the delivery of notices hereunder shall be paid by the delivering party. Any notice provided for in this Agreement may be given by an attorney for a party.

**11.02** **Limitations on Liability.** In no event shall any officer, director, shareholder, trustee, beneficiary, member, manager, partner, employee, agent or affiliate of Seller or Purchaser have any personal liability hereunder, nor shall any of them be named personally in any suit, action or proceeding concerning any matter hereunder (other than in their capacity as such trustee), nor shall any of their personal assets be attached, liened or levied upon or in any other way held liable for any of the obligations of Seller or Purchaser, respectively. Notwithstanding anything to the contrary contained in this Agreement, in no event shall either party be entitled to recover from the other party in connection with any claim arising out of or relating to this Agreement or any representation made herein, any lost profits or any direct, compensatory, punitive, indirect, consequential or other damages.

**11.03** **Use of Sale Proceeds to Clear Record Title.** Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge pursuant to the terms of this Agreement, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing, provided that the documents required to clear record title of any such liens or encumbrances are available for recording at the Closing or arrangements for the delivery thereof have been made to the mutual satisfaction of the parties. Upon Seller's request made before the Closing, Purchaser or the Escrow Agent shall provide separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance.

**11.04** **Amendments.** This Agreement may not be amended, modified, extended, revised or otherwise altered, nor may any party hereto be relieved of any of its liabilities or obligations hereunder, except by a written instrument duly executed by Purchaser and Seller, except that any extensions of time may be executed by the respective attorneys for the parties.

**11.05** **Governing Law.** This Agreement is made pursuant to and shall be governed by and construed in

21

accordance with the internal laws of the State of Maryland without reference to conflicts of laws principles.

**11.06    Headings.** The title of this Agreement and the article, section and other headings used in this Agreement have been inserted for convenience of reference only, are not part of the parties' agreement, shall not be deemed in any manner to modify, expand, explain or restrict any of the provisions of this Agreement and are not intended to have any legal effect.

**11.07    Binding Effect.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors in interest, heirs, legal representatives, and any permitted assigns; *provided, however,* that Purchaser shall not assign this Agreement or its interest herein without the prior written consent of Seller, which consent may be withheld by Seller in its sole and absolute discretion; provided, however, that nothing contained in this Section shall impair or limit Purchaser's right to designate a nominee or assignee affiliated with Purchaser to take title to the Property, but no such designation of a nominee or assignee shall release the named Purchaser from any of its obligations or liabilities hereunder.

**11.08    Integration.** This Agreement, including the exhibits attached to this Agreement and references contained in this Agreement, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, proposals, offers, counteroffers, agreements and understandings of the parties regarding said subject matter, whether written or oral, all of which are hereby merged into and superseded by this Agreement.

**11.09    Number and Gender.** All words used herein in singular number shall extend to and include the plural number, where the context so requires. All words used herein in the plural number shall extend to and include the singular number, where the context so requires. All words used herein in any gender, whether male, female or neuter, shall extend to and include any and all genders as may be applicable in any particular context.

**11.10    Construction.** This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties, it being recognized that both Seller and Purchaser have contributed with the advice of counsel to the preparation of this Agreement.

**11.11    Waiver.** Except as expressly provided herein, no waiver by any party of any failure or refusal of the other party to comply with its obligations under this Agreement shall be deemed a waiver of any subsequent failure or other refusal to so comply by such other party. No waiver shall be valid unless in writing signed by the party to be charged and then only to the extent therein set forth.

**11.12    Severability.** If any term or provision of this Agreement or application thereof to any person or circumstance shall, to any extent, be found by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each other term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

**11.13    Parties Not Partners.** Nothing contained in this Agreement or any of the documents or instruments to be executed pursuant hereto shall constitute any one or more of Purchaser and its officers, directors, successors, and any permitted assigns pursuant to Section 11.07 hereof, as partners with, agents for, or principals of, any one or more of Seller and its officers, directors, successors and assigns.

22

**11.14  Business Day.**  As used in this Agreement, the term **"Business Day"** shall mean, collectively, any day other than a Saturday, Sunday or official Federal or State of Maryland holiday.  If any payment to be made or obligation to be performed hereunder is to be made or performed on a day other than a Business Day, it shall be deemed to be made or performed in a timely manner if done on the next succeeding Business Day.

**11.15  No Third Party Beneficiaries.**  This Agreement and the representations, warranties, covenants and agreements contained herein are made and entered into for the sole protection and benefit of the parties hereto, their successors in interest and their permitted assigns, if any, and no other person, persons, entity or entities shall have any right of action hereon or right to claim any right or benefit from the terms contained herein or be deemed a third party beneficiary hereunder.

**11.16  Time.**  Time is of the essence in the performance of each of the parties' respective obligations contained herein.

**11.17  Survival.**  All terms and provisions of this Agreement regarding the disposition of the Deposit shall survive the termination hereof until such disposition has been accomplished in accordance with this Agreement.  The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every agreement, representation, warranty and obligation of Seller and Purchaser herein contained or expressed, except as otherwise expressly provided in this Agreement.

**11.18  IRS Real Estate Sales Reporting.**  Purchaser and Seller hereby agree that Purchaser's attorneys shall act as "the person responsible for closing" the transaction which is the subject of this Agreement pursuant to Section 6045(e) of the Internal Revenue Code of 1986, as amended, and that Purchaser's attorneys shall cause to be prepare and file the informational return (IRS Form 1099-B) required by said Section 6045(e).

**11.19  Disclosure.**  Prior to the Closing, in no event shall Purchaser or Seller issue any public statement, public announcement or media release regarding this Agreement or the terms hereof or the transactions contemplated hereby, or, except as otherwise expressly permitted herein, otherwise make any general public disclosure or comment upon the existence of this Agreement or the fact that discussions are taking place between Purchaser and Seller with respect to the Property (except as required by law or court order), unless Seller or Purchaser, as applicable, has approved in advance the form and substance of any such public statement, public announcement, media release, or other disclosure by the other.  The foregoing is not intended and should not be construed as limiting or restricting Purchaser's right to seek to rezone or otherwise apply for and pursue requisite governmental approvals for the Project and/or the Property.

**11.20  References.**  All references in this Agreement to particular articles or sections shall, unless expressly otherwise provided or unless the context otherwise requires, be deemed to refer to the specific articles or sections in this Agreement.  In addition, the words, "hereof", "herein", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular section or article.

**11.21  Counterparts.**  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement.  For purposes of the execution of this Agreement, any amendment or modification hereto, and any communications delivered pursuant to this Agreement (as it may be so amended or modified), the signature of a party on a counterpart hereof transmitted by facsimile or electronic mail shall be binding with the same force and effect as if it was manually affixed to a hard copy original of this Agreement.

**11.22**   <u>Seller's Interim Operating and Insurance Covenant</u>.  From the Effective Date and until the earlier to Closing or the rightful termination of this Agreement, Seller covenants, warrants and agrees that Seller shall (i) continue to own, operate, manage and maintain the Property in the ordinary course of Seller's business and substantially in accordance with Seller's present practice and not make any material alterations, additions or improvements to condition, use or operation of the Property; (ii) maintain general commercial liability coverage insurance on the Property which is substantially similar in all material respects to the insurance policies covering the Property as of the Effective Date; (iii) not take or knowingly permit any action that would render any of Seller's representations or warranties as set forth in Section 3.02 above to become false, inaccurate or untrue in any material respect; (iv) promptly provide Purchaser with written notice of, and a copy of, (A) any agreements or other contracts related to the Property entered into by or on behalf of Seller, and (B) any demand, notice, communication or other written information received from any governmental agency or authority related to ownership, use occupancy or condition of the Property; and (v) not execute, enter into or consent to any deed, mortgage, deed of trust, lease, lien, conveyance, transfer, assignment, easement or encumbrance of any legal or beneficial interest in or to all or any portion of the Property.

(The next page is the signature page)

24

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed on their behalf under seal as of the day and year first above written.

SELLER:                    W.R. GRACE & CO., CONN.,
                           a Connecticut corporation

                           By: _____
                               Name: Hudson La Force
                               Title: Senior Vice President and Chief Financial Officer

PURCHASER:                 GAP VI PROPERTIES, LLC,
                           a Delaware limited liability company

                           By: _____
                               Name:
                               Title:

Exhibits
A – Legal Description of the Land
B – Form of Deposit Escrow Agreement

Schedules
3.02(j)

25

**EXHIBIT A**
**DESCRIPTION OF THE LAND**

**PARCEL 'B'**

Across a part of
Tax Map 35, Parcel 145
Fifth (5th) Election District, Howard County, Maryland

**BEING** Parcel 'B' as shown a Subdivision Plat entitled "Grace Tech Park, Parcels 'A' & 'B' recorded August 12, 2010 among the Land Records of Howard County, Maryland as MDR Plat No's. 21234 through 21239, said Parcel 'B' being part of the property described in a deed from Lawrence O'Donnel and Genevieve E. O'Donnel to W.R. Grace & Co. dated October 4, 1955 and recorded among the Land Records of Howard County, Maryland in  Liber 273 folio 186 and all of the property described in a deed from the State Highway Administration of the Department of Transportation and the Board of Public Works of Maryland to W.R. Grace & Co. - Conn. dated September 21, 1994 and recorded among the aforesaid Land Records in Liber 3368 folio 380, and being more particularly described as follows:

**BEGINNING** for the same at the southeast corner of said Parcel 'B' at the beginning of the North 50°24'22" West 91.36 feet line as shown on the aforesaid Subdivision Plat, said point being on a northerly right of way line of Grace Drive (formerly Mill Road) as shown on the State of Maryland, State Highway Administration Plat No. 52408, thence leaving said point, and running with said northerly right of way lines and with the outlines of said Parcel 'B', with all courses of this description referred to the meridian of the Maryland State Plane Coordinate System (NAD 83/07):

1. North 50°24'22" West 91.36 feet to an iron bar and cap found at a point of curvature,
2. By a tangent curve to the left with a radius of 3849.00 feet and an arc length of 144.27 feet, said curve being subtended by a chord bearing North 51°28'48" West 144.26 feet to a to an iron bar and cap found at a point of tangency,
3. North 52°33'13" West 436.89 feet to an iron bar and cap found,
4. North 14°20'07" East 44.45 feet to an iron bar and cap found,
5. North 68°43'42" West 35.47 feet to an iron bar and cap found,
6. North 52°33'13" West 173.45 feet to concrete monument found, thence leaving said northerly right of way lines and continuing with said Parcel 'B',
7. North 14°20'37" East 389.46 feet to concrete monument found,
8. North 14°11'01" East 925.45 feet to concrete monument found,
9. North 67°18'54" East 1069.19 feet to concrete monument found,
10. North 29°23'01" East 760.60 feet to concrete monument found,
11. North 74°22'03" East 135.65 feet,
12. South 03°41'08" East 80.49 feet,
13. South 35°28'39" East 243.01 feet,
14. South 68°04'48" East 355.96 feet,
15. South 28°24'39" East 259.47 feet to an iron pipe found,
16. South 54°51'33" West 217.07 feet to a stone found,
17. South 37°55'50" West 679.03 feet to a stone found,

26

18. South 29°48'30" East 439.92 feet,
19. South 75°44'52" West 423.35 feet,
20. North 79°50'45" West 104.06 feet,
21. South 75°44'52" West 180.95 feet,
22. South 54°15'24" West 254.04 feet,
23. South 37°12'09" West 102.29 feet,
24. South 54°15'24" West 292.52 feet,
25. South 14°12'45" West 343.19 feet,
26. South 07°19'17" East 289.62 feet,
27. South 39°35'39" West 166.92 feet, to the place of beginning.

CONTAINING 66.808 acres of land, more or less.

**SUBJECT** to any and all rights of way, easements, covenants and restriction of record or imposed by law located across said land.

**EXHIBIT B**
**FORM OF DEPOSIT ESCROW AGREEMENT**

## Schedule 3.02(j)

The Property and Seller's adjacent property located at 7500 Grace Drive are subject to a Corrective Action Permit issued by the United States Environmental Protection Agency under its RCRA program, consistent with 40 CFR Part 264 and 270. The current Permit was renewed effective November 30, 2007, and defines remedies applicable to the site.   As part of the corrective action process, extensive environmental investigation has been done and a remedy has been implemented, as described in reports available to Purchaser under Section 5.04(a).   On-going monitoring of groundwater remains a requirement of the Permit on a periodic basis (currently once every nine months).