## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 01-01139 (KJC) |
| W. R. Grace & Co., *et al.*[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Hearing Date: January 29, 2014 at 10:00 a.m.** |
| | ) | **Objection Deadline: January 22, 2014 at 4:00 p.m. (prevailing Eastern Time)** |

## MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) ENTER INTO THE EXIT FINANCING COMMITMENT AND ENGAGEMENT LETTER AND THE FEE LETTERS, (B) PAY CERTAIN FEES, INDEMNITIES, COSTS AND EXPENSES IN CONNECTION THEREWITH, AND (C) FILE THE COMMITMENT AND ENGAGEMENT LETTER AND THE FEE LETTERS UNDER SEAL

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, authorizing the Debtors to (a) enter into the exit financing commitment and engagement letter attached hereto as Exhibit B-1 (the "Commitment and Engagement Letter") as

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.) ("Holdings"), W. R. Grace & Co.-Conn. (the "Company"), A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

well as the Structuring Fee Letter, the Facilities Fee Letter, and the Mandate Letter attached hereto as Exhibits B-2, B-3 and B-4, respectively (collectively, the "Fee Letters," and together with the Commitment and Engagement Letter, the "Letters"); (b) pay certain fees and expenses in connection with the exit financing as provided for in the Fee Letters; (c) indemnify the Engagement Parties[2] according to the terms of the Letters; and (d) file the Letters under seal.  In support of this Motion, the Debtors submit the Declaration of John James O'Connell III (the "O'Connell Declaration"), a Managing Director of Blackstone Advisory Partners L.P. ("Blackstone"), an affiliate of The Blackstone Group L.P., the Debtors' financial advisor, a copy of which is attached hereto as Exhibit C.  In further support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 107(b), 363(b), 503(b), and 507(a)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Commitment and Engagement Letter, the Fee Letters, or the Plan (as defined herein), as applicable.  This Motion summarizes certain provisions of the Letters as a convenience to this Court and parties-in-interest.  The failure to explicitly describe any provision of any of the Letters in this Motion shall not be construed to limit the scope, effectiveness or the enforceability thereof.  The summary of the Letters in this Motion  is qualified in its entirety by reference to the provisions of the Letters.  To the extent there is any discrepancy between the terms described in this Motion and those set forth in the Letters, the terms of the Letters shall control.

## Relief Requested

4.       By this Motion, the Debtors seek entry of an order: (a) authorizing and approving the Debtors' entry into, and performance under, the Letters; (b) authorizing the use of estate funds to pay the fees and expenses set forth in the Letters, including the Bank Alternate Transaction Fee (the "Break-up Fee"), if applicable; (c) authorizing the Debtors' indemnification of the Engagement Parties and their affiliates in accordance with the terms and conditions set forth in Annex A to the Commitment and Engagement Letter and in the Mandate Letter; (d) authorizing the Debtors to file copies of the Letters under seal pursuant to section 107(b) of the Bankruptcy Code; (e) directing that the Letters remain under seal and confidential and not be made available to anyone other than the Limited Notice Parties (as defined herein) without the written consent of the Debtors and the Engagement Parties, respectively; and (f) granting such other and further relief as the Court deems just and proper.[3]

## Background

5.       On April 2, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated for administrative purposes only and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

6.       On February 21, 2011, the Debtors filed their *First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace and Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants'*

---

[3]       Out of an abundance of caution, the Debtors further request that the Court modify the automatic stay to the extent necessary to enable the Engagement Parties to perform under the Letters and, in each case, to exercise any and all of their contractual rights thereunder, and to provide that neither the Debtors nor any other party in interest may enforce the automatic stay against the Engagement Parties with respect to these rights.

*Representative, and the Official Committee of Equity Security Holders As Modified Through*

*December 23, 2010* [Docket No. 26368] (the "Plan").

7.        On January 31, 2011, the Court issued its *Memorandum Opinion Regarding*

*Objections to Confirmation of First Amended Joint Plan of Reorganization and Recommended*

*Supplemental Findings of Fact and Conclusions of Law* [Docket No. 26154] and *Recommended*

*Findings of Fact, Conclusions of Law and Order Regarding Confirmation of First Amended*

*Joint Plan of Reorganization as Modified Through December 23, 2010* [Docket No. 26155].  On

February 15, 2011, the Court issued its *Order Clarifying Memorandum Opinion and Order*

*Confirming Joint Plan as Amended Through December 23, 2010* [Docket No. 26289]

(collectively with Docket Nos. 26154 and 26155, the "Confirmation Order").

8.        The Confirmation Order was timely appealed to the District Court for the District

of Delaware (the "District Court"), Case No. 11-199.  On January 30, 2012, the District Court

issued its *Memorandum Opinion* [Docket No. 165] and *Order* [Docket No. 166] denying or

overruling all objections to the Plan and Confirmation Order and confirming the Plan in its

entirety.

9.        On June 11, 2012, the District Court issued its *Consolidated Order Regarding*

*Motions for Reconsideration* [Docket No. 215] granting the motions of several parties to clarify

or amend its *Memorandum Opinion*.  In conjunction with its consolidated order, the District

Court issued its *Amended Memorandum Opinion* [Docket No. 217] and *Order* [Docket No. 218]

clarifying and expanding the discussion in its prior opinion and, once more, denying or

overruling all objections to the Plan and Confirmation Order and confirming the Plan in its

entirety.

### The Process to Obtain Exit Financing

10.     Section 7.8(h) of the Plan provides as a condition precedent to the Effective Date:

"[t]he Exit Financing, in an amount and on such terms satisfactory to the Debtors, shall be in full

force and effect and available immediately upon the occurrence of the Effective Date and after

all necessary parties have executed the documentation relating thereto."

11.     Section IV.D.1 of the Confirmation Order provides:

[i]f exit facilities are required to make the Joint Plan effective, an appropriate
motion shall be filed prior to the Effective Date. If exit facilities are not needed to
effectuate the Joint Plan, then, without further action by this Court or the
directors, managers, trustees, partners, members and stockholders of any
Reorganized Debtor or further notice to any entities, each applicable Reorganized
Debtor is authorized, on and after the Effective Date, to (i) execute, deliver, file,
record and implement (a) one or more senior secured term loan facilities * * (b) a
senior secured revolving credit facility * * (c) debt securities in the form of notes
issued pursuant to a registered public offering or a private placement under Rule
144A or otherwise * * and (d) such other contracts, instruments, agreements,
guaranties or other documents executed or delivered in connection with the Exit
Facilities * * , (ii) perform all of its obligations under the Term Facility and the
Other Exit Facility Documents, and (iii) take all such other actions as any of the
Responsible Officers of such Reorganized Debtor may determine are necessary,
appropriate, or desirable in connection with the consummation of the transactions
contemplated by the Exit Facilities and the Other Exit Facility Documents.[4]

12.     Based on their analysis of the requirements of the Plan and the Debtors' post-

emergence working capital and liquidity needs, the Debtors and Blackstone have concluded that

any appropriate exit financing package is likely to include the following components: (a) a

$700 million senior secured term loan facility, (b) a $200 million Euro equivalent senior secured

term loan facility, (c) a $250 million senior secured delayed draw term loan facility, (d) up to a

$250 million senior secured revolving credit facility and (e) up to a $150 million (or its foreign

currency equivalent) senior secured multi-currency revolving credit facility.  The proceeds from

---

[4]     Many, if not all, of the payment obligations of the Debtors under the Letters will not be incurred until after
the Effective Date.  The Debtors file this Motion out of an abundance of caution and because the Commitment and
Engagement Letter requires an approval order from this Court.

the Term Facilities will be used to pay in full all outstanding claims, make cash contributions to the Asbestos PI Trust and Asbestos PD Trust, and provide working capital to the Reorganized Debtors for their business operations and other general corporate purposes, including payment of certain amounts in full satisfaction of the Debtors' prepetition lenders' claims for certain post-petition interest pursuant to the terms of a settlement, which is the subject of a pending motion for Court approval under Bankruptcy Rule 9019. The proceeds from the Revolving Facilities will likely remain undrawn on the Effective Date (except that certain letters of credit will be issued under the Revolving Facilities in support, or as a replacement, of existing letters of credit) and will be available thereafter to support the Reorganized Debtors' operating needs. *See* O'Connell Declaration at ¶ 8. All Facilities contemplated by, and as defined in, the Commitment and Engagement Letter shall hereinafter be referred to as the "Exit Facilities."

13.     In May 2009, the Debtors, with the assistance of Blackstone, launched an extensive search for an exit financing facility. The Debtors and Blackstone contacted eleven potential lenders, and eight of these lenders executed confidentiality agreements. These eight lenders then performed due diligence in order to submit initial indications of interest. Certain lenders were then invited to a second round of discussions based on the terms of their initial indications of interest. After further due diligence, this smaller group of lenders submitted final proposals.

14.     In early 2010, after arm's-length negotiations, the Debtors entered into engagement letters with the Engagement Parties to provide a best efforts financing pending a confirmation order from the Court. On January 15, 2010, the Debtors filed a motion, similar to the present Motion, seeking approval from the Court to enter into the engagement letters, pay fees and expenses in connection with those letters, and to file the letters under seal. [Docket No.

24154]. On February 16, 2010, the Court entered an order granting the motion. [Docket No. 24299]. These engagement letters expired on or about December 31, 2010.

15.    Since that time, the Engagement Parties have periodically provided the Debtors with their views on financing conditions and advice on financing options. In November 2013, following the rejection by the United States Court of Appeals for the Third Circuit (the "Third Circuit") of certain appeals to the Confirmation Order, the Debtors renewed their substantive, arm's-length and good faith negotiations with the Engagement Parties about the terms of an exit financing facility.

16.    After further review and analysis as well as consultation with their financial advisors, the Debtors have decided to engage the Engagement Parties to provide the Exit Facilities. The exact terms and conditions of the engagement and the amount of fees to be owed by the Debtors are contained in the Letters. The salient terms of the Letters are as follows:

- Engagement Parties:  The Engagement Parties consist of Goldman Sachs Bank USA ("Goldman Sachs"), Deutsche Bank Securities Inc. ("DBSI," and together with Goldman Sachs, the "Global Coordinators"), Deutsche Bank AG New York Branch ("DBNY"), Bank of America, N.A. (or its designated affiliate, "Bank of America"), Merrill Lynch, Pierce, Fenner & Smith Incorporated (or its designated affiliate, "MLPFS"), HSBC Securities (USA) Inc. ("HSBC Securities" and, together with Goldman Sachs, DBSI and MLPFS, the "Arrangers"), HSBC Bank USA, N.A. ("HSBC"), Citigroup Global Markets Inc. ("CGMI") on behalf of Citi (as defined below, Commerzbank AG, New York Branch ("Commerzbank"), KeyBanc Capital Markets, Inc. ("KeyBanc", KeyBank National Association ("KeyBank"), PNC Bank ("PNC"), Sumitomo Mitsui Banking Corporation ("SMBC and, together with Citi, Commerzbank, KeyBank and PNC, the "Senior Managing Agents") and SMBC, together with Goldman Sachs, DBNY, Bank of America, HSBC, Citi, Commerzbank, KeyBank and PNC, the "Initial Lenders"). For purposes of the Letters, "Citi" shall mean CGMI, Citibank, N.A. Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates.

- Confidentiality:  The Engagement Parties have requested that the Debtors file the Letters under seal and that the amount of the fees attributable to the individual Engagement Parties thereunder not be revealed in open court. The Engagement Parties have consented to the Letters being shared on a confidential basis with the Office of the U.S. Trustee, any ad-hoc or statutorily appointed committees of

creditors or equity holders, the Asbestos PD Future Claimants' Representative, the Asbestos PI Future Claimants' Representative, and to the above parties' respective representatives and professional advisors who have agreed to treat such information confidentially or are otherwise bound by a confidentiality agreement with Holdings or the Company, the scope of which includes the Letters (collectively, the "Limited Notice Parties").

- <u>Structuring and Agency Fees:</u>  The Structuring Fee Letter provides that the Debtors will pay (i) each of the Global Coordinators a non-refundable structuring fee payable on the Closing Date and (ii) the Administrative Agent for the Exit Facilities an agency fee per annum, payable annually in advance on the Closing Date of the Exit Facilities and on each anniversary thereof.

- <u>Revolving Facilities Fees:</u>  The Facilities Fee Letter provides that the Debtors will pay an arranging fee equal to a percentage of the maximum amount of the Revolving Facilities as of the date of the execution of the Facilities Fee Letter (the "Revolving Facilities Arrangement Fee"), which Revolving Facilities Arrangement Fee shall be due and payable on the Closing Date.

- <u>Term Facilities Fee and Delayed Draw Term Loan Ticking Fee:</u>  The Facilities Fee Letter provides that the Debtors will pay an arranging fee equal to a percentage of the greater of (x) the amount of the Term Facilities as of the Closing Date and (y) an agreed amount that is less than the maximum amount of the Term Facilities as of the date of the execution of the Facilities Fee Letter (the "Term Facilities Arrangement Fee"), which Term Facilities Arrangement Fee shall be due and payable on the Closing Date.  In addition to the Term Facilities Arrangement Fee, the Debtors have agreed to pay (i) closing fees to each Lender party to the definitive Loan Documents for the Exit Facilities on the Closing Date, which closing fees shall be due and payable on the Closing Date, and (ii) a delayed draw term loan ticking fee equal to a percentage of the undrawn portion of the Delayed Draw Term Loan Commitments, payable to non-defaulting Lenders quarterly in arrears after the Closing Date and until the earlier of twelve months following the Closing Date or the date on which the Delayed Draw Term Loan Facility is fully funded.

- <u>Break-up Fee:</u>  Under the Commitment and Engagement Letter, if the Closing Date does not occur, the Debtors also agree to pay the Engagement Parties a fee in an aggregate amount equal to a percentage of each of the Term Facilities Arrangement Fee and the Revolving Facilities Arrangement Fee, in the event that, at any time prior to one year after the date of the Debtors' acceptance of the Commitment and Engagement Letter, any Debtor completes any "exit" or other financing provided in connection with the consummation of the Plan that is a bank term loan or debt securities financing in which the Engagement Parties (or any of their respective affiliates) do not (x) act as joint lead arrangers, bookrunners and/or senior managing agents, as applicable, with the same "Title" placement set forth in Section 1 thereto and (y) receive at least the percentage of economics that such Engagement Party would have received with respect to the

Revolving Facilities pursuant to Section 1 thereof (as defined in the Commitment and Engagement Letter, the "Alternate Financing"); *provided*, that no Break-up Fee shall be payable to an Engagement Party if (i) such Engagement Party has been given a bona fide opportunity to arrange such Alternate Financing on substantially the same terms and conditions as other lenders acting in such roles and has turned down such opportunity or failed to respond to the offered opportunity or (ii) such Engagement Party declines to arrange the Term Facilities on the terms and conditions provided for in the Commitment and Engagement Letter and the Fee Letters; *provided, further*, that, if the amount of any Alternate Financing is less than the maximum amount of the Exit Facilities under the Commitment and Engagement Letter, then the Break-up Fee shall be an aggregate amount equal to the same specified percentage of the Term Facilities Arrangement Fee and the Revolving Facilities Arrangement Fee as calculated on such lesser amount.

- Expense Reimbursement:  Under the Facilities Fee Letter, whether or not the Exit Facilities are funded, the Debtors agree to reimburse the Engagement Parties periodically following receipt of a written request for their reasonable and documented out-of-pocket expenses arising in connection with the Exit Facilities, including expenses associated with syndication of the Exit Facilities and the fees and disbursements of one primary counsel to the Engagement Parties and, if necessary, local counsel to the Engagement Parties in any relevant jurisdiction (and, in the case of an actual or perceived conflict of interest where any Engagement Party affected by such conflicts informs the Debtors of the existence of a conflict, of another firm of counsel for such affected Engagement Party).  In addition, the Debtors agree to reimburse each Lender for any loss or expense that such Lender sustains or incurs as a consequence of the failure by the Debtors to borrow under the Revolving Facilities or the Term Facilities bearing interest at a Eurodollar-based rate on any date identified by the Debtors to the Administrative Agent for the Exit Facilities as the expected Closing Date.

- Administrative Priority of Fees and Expenses:  The Commitment and Engagement Letter requires that the Debtors will obtain an order from this Court providing, in part, that the payment obligations of the Debtors arising under the Letters shall be entitled to priority as administrative claims under sections 503(b) and 507(a)(1) of the Bankruptcy Code, whether or not the Loan Documents are executed or any of the Exit Facilities are funded.

- Indemnification:  The Debtors agree to indemnify the Engagement Parties in accordance with Annex A of the Commitment and Engagement Letter and the Mandate Letter.[5]  Specifically, the Debtors are required to indemnify and hold harmless the Engagement Parties and their respective affiliates, partners,

---

[5]      Out of an abundance of caution, the Engagement Parties (as defined herein) required the Debtors to sign the Mandate Letter prior to this Motion being heard.  The Debtors now request the Court's approval of the Debtors' entry into the Mandate Letter.

members, officers, directors, employees, agents or controlling persons (each, an "Indemnified Party") against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of the arrangement contemplated by the Letters or any matter referred to in the Letters. However, the Debtors shall not indemnify any Indemnified Party for losses, claims, damages or liabilities to the extent they have (i) resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party (or any of such Indemnified Party's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing) in performing the services that are the subject of the Letters, (ii) arisen out of or in connection with any claim, litigation, loss or proceeding not involving an act or omission of any Indemnified Party and that is brought by an Indemnified Party against another Indemnified Party (other than claims against an Engagement Party in its capacity as administrative agent, arranger, syndication agent, or any other similar role in connection with any exit financing transaction) or (iii) resulted from a material breach by such Indemnified Party (or any of such Identified Party's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing) of the terms of the Letters (in the case of clauses (i) and (iii), as determined by a court of competent jurisdiction in a final, non-appealable judgment).

- Exclusivity:  The Commitment and Engagement Letter provides that Goldman Sachs and DBSI are exclusively authorized by the Debtors to act as global coordinators, that each Arranger is authorized to act as a joint lead arranger and joint bookrunner, and that each of the Senior Managing Agents is authorized to act as a senior managing agent in connection with the provision of the Exit Facilities.

- No Commitment:  The Debtors acknowledge that, except as expressly set forth in the Commitment and Engagement Letter with respect to the Revolving Facilities, the Commitment and Engagement Letter is neither an expressed nor an implied commitment by the Global Coordinators, the Arrangers, the Senior Managing Agents or any of their respective affiliates to provide any financing or to provide or purchase loans or act in any roles in connection with the Exit Facilities, which commitment, if any, will only be set forth in a separate commitment letter or other applicable type of agreement.

- Termination of Commitment and Engagement Letter:  Each Engagement Party's commitment and agreements under the Commitment and Engagement Letter will terminate upon the earliest of: (i) at any time by Holdings or the Company with or without cause effective upon receipt by the Engagement Parties of notice to that effect from Holdings or the Company; (ii) the fourth month anniversary of the execution and delivery of the Commitment and Engagement Letter by all of the parties thereto; (iii) upon the termination or withdrawal of the Plan by the Debtors; and (iv) upon the emergence of the Debtors from the Chapter 11 Cases, unless the closing of the Exit Facilities, on the terms and subject to the conditions

contained in the Commitment and Engagement Letter, has been consummated on or before such date.

17.    As noted above, due to confidentiality concerns, the Engagement Parties have requested that the Debtors file the Letters under seal because the Letters contain sensitive commercial information.  However, the Engagement Parties have agreed to disclose herein the aggregate fees, without any breakdown in calculation of the fees attributable to the Engagement Parties, potentially due and owing to the Engagement Parties or their affiliates in connection with the Letters.  The Debtors note that if the Break-up Fee is paid, certain other fees associated with the Exit Facilities will not be paid.  At this time, the Debtors estimate that the total aggregate fees potentially due and owing to the Engagement Parties on account of the Letters for a financing of up to $1.55 billion is up to approximately $21.25 million, exclusive of any original issue discount at issuance.

## Basis For Relief

**A.    The Debtors' Entry Into the Letters is Warranted Under The Circumstances.**

18.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363(b)(1) of the Bankruptcy Code, a court generally should approve a non-ordinary course transaction if the proposed use of estate assets is within the debtor's reasonable business judgment.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

19.     Once the Debtors have articulated a valid business purpose for use of estate property, a presumption arises that the Debtors' decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."); *In re Johns Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). There is a presumption that "in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (internal citations omitted).

20.     It is customary for debtors in large chapter 11 cases to seek and obtain approval to enter into commitment or engagement letters and to pay related fees and expenses. In addition to the relief granted previously to the Debtors in this Court as noted above,[6] such relief has been routinely granted by courts in this District. *See, e.g., In re Rotech Healthcare Inc.*, Case No. 13-10741 (PJW) (Bankr. D. Del. July 29, 2013) [Docket No. 762]; *In re Newpage Corp.*, Case No. 11-12804 (KG) (Bankr. D. Del. Nov. 6, 2012) [Docket No. 2626]; *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Mar. 29, 2011) [Docket No. 514]; *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. Aug. 31, 2010) [Docket No. 4100]; *In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) [Docket No. 732]; *In re Flying J Inc.*, Case No. 08-13384 (MFW) (Bankr. D. Del. Oct. 15, 2009) [Docket No. 2100]; *In re Sea Containers Ltd.*, Case No. 06-11156 (KJC) (Bankr. D. Del. Nov. 6,

---

6       *See* [Docket No. 24299].

2008) [Docket No. 2315]; *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 8, 2007) [Docket No. 2229]; *In re Owens Corning*, Case No. 00-03837 (JKF) (Bankr. D. Del. Jul. 14, 2006) [Docket No. 18476].

21.     The Debtors believe there are sound business justifications for their entry into the Letters. The Exit Facilities will supply the Reorganized Debtors with the necessary capital to make payments under the Plan and to fund the Reorganized Debtors' day-to-day operations and working capital needs after the Effective Date. *See* O'Connell Declaration at ¶ 7-8.

22.     Further, the Debtors and representatives of the Engagement Parties conducted extensive arm's-length negotiations in good faith regarding the terms of the original engagement proposals during the second round of negotiations that resulted in modifications favorable to the Debtors. *See* O'Connell Declaration at ¶ 6. In view of the positive outcome of these negotiations, the Debtors, in their business judgment and on the advice of their financial advisors and counsel, concluded that the Engagement Parties' proposals as set forth in the Letters represent reasonable terms.

23.     Based on the foregoing, the Debtors respectfully submit that it is in the best interest of the Debtors' estates, their creditors and other parties in interest for the Court to authorize the Debtors to enter into and effectuate the Letters.

**B.      The Fees and Expenses, Including the Break-up Fee, are Reasonable and Necessary.**

24.     As noted above, the Letters require the Debtors to incur and pay certain obligations. These obligations constitute "necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Without payment of the relevant fees, reimbursements and indemnities, the Debtors would be unable to secure the Engagement Parties' commitment to provide the Exit Facilities. The Exit Facilities will facilitate consummation of the Plan and will provide the Reorganized Debtors with adequate liquidity following emergence.

25.    The Debtors have determined that the proposal from the Engagement Parties contains reasonable market terms and would meet the Debtors' anticipated working capital needs when they emerge from the Chapter 11 Cases. *See* O'Connell Declaration at ¶ 7-9.

26.    The legal standard governing the payment obligations of the Debtors under the Letters as administrative expenses, such as fees, reimbursements, and indemnities, including the Break-up Fee, is whether these payments are necessary to preserve the value of the estate. *See* § 11 U.S.C. 503(b)(1)(A).  The standard for break-up fees has been set forth by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir.1999); *see also In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009) (citing *O'Brien* as outlining relevant legal standard governing break-up fees in the Third Circuit).

27.    In *O'Brien*, the Third Circuit surveyed different approaches to break-up fees and expenses and concluded that none of the different approaches taken by other courts "offer[ed] a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." *Id.* at 535.  The Third Circuit went on to state:

> We therefore conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context.  Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.

*Id.*

28.     Thus, the inquiry into whether a break-up fee is necessary to preserve the value of the estate "stems directly from § 503(b)(1)(A), which requires that the expense provide some benefit to the debtor's estate." *Id.* at 536.

29.     The Break-up Fee, just the like the other fees and expenses to be paid by the Debtors under the Letters, is a necessary condition to the Engagement Parties' willingness to enter into the Letters and to provide necessary exit financing to the Debtors.[7] The Engagement Parties would not have agreed to enter into the Letters without the required conditions stated in the Letters including, among other things, the Break-up Fee, expense reimbursement and indemnification obligations. In addition, all of the fees, including the amount of the Break-up Fee, were the subject of extensive negotiations between the Debtors and the Engagement Parties.

30.     Finally, the percentage of the total Exit Facilities represented by the proposed Break-up Fee, while not specifically disclosed herein, is well within the acceptable range approved by this Court and others. The "rule of thumb" is that permissible break-up type fees and expense reimbursements should not exceed more than 3 to 5 percent of the proposed deal value.[8] Here, the proposed Break-Up Fee is under any circumstance less than 1 percent of the overall size of the Exit Facilities, and is similar in magnitude to the exit financing break-up fees

---

[7]     The Engagement Parties have already committed substantial resources to completing their diligence process and negotiating and finalizing the Loan Documents, and will continue to incur expenses and professional fees in connection with finalizing and documenting the Exit Facilities prior to the Debtors' emergence from chapter 11.

[8]     *See, e.g., In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) [Docket No. 732] (approving a 3.5 percent break-up fee and an undisclosed expense reimbursement); *In re Fairchild Corp.*, Case No. 09-10899 (CSS) (Bankr. D. Del. Apr. 17, 2009) [Docket No. 169] (approving a combined 4.5 percent break-up and expense reimbursement, including a 1.5 percent expense reimbursement); *In re Tallygenicom, L.P.*; Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) [Docket No. 130] (approving a combined 4.1 percent break-up fee and expense reimbursement, including a 2.0 percent expense reimbursement); *In re Monaco Coach Corp.*, Case No. 09-10750 (KJC) (Bankr. D. Del. Apr. 20, 2009) [Docket No. 240] (approving a combined 5.8 percent break-up fee and expense reimbursement, including a 2.4 percent expense reimbursement); *In re Nortel Networks Inc.*, Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) [Docket No. 386] (approving a combined 5.9 percent break-up fee and expense reimbursement, including a 2.3 percent expense reimbursement); *In re Hines Horticulture Inc.*, Case No. 08-11922 (KJC) (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355] (approving a combined 3.9 percent break-up fee and expense reimbursement, including a 1.3 percent expense reimbursement).

approved in this jurisdiction in the *Visteon* and *NewPage* cases. *See In re Visteon Corporation,*

Case No. 09-11786 (CSS) (Bankr. D. Del. Aug. 31, 2010) [Docket No. 4100] (approving a

break-up fee of approximately 2.1% of a total exit financing commitment; *In re NewPage*

*Corporation, et al.,* Case No. 11-12804 (KG) (Bankr. D. Del. Nov. 6, 2012). The Debtors

believe that the Break-up Fee represents an appropriately low percentage of the total Exit

Facilities, while also adequately compensating the Engagement Parties for their time and effort

spent in providing the Exit Facilities in accordance with the Commitment and Engagement Letter

in the event that the Debtors seek an alternative (and necessarily more attractive) exit financing

package. As noted above, if the Break-up Fee is paid, certain other fees associated with the Exit

Facilities will not be paid.

      31.     Thus, because the Engagement Parties require the Break-up Fee and other fees,

reimbursements, and indemnities to enter into the Letters, and because such financing will

facilitate the Debtors' emergence from chapter 11 and provide sufficient liquidity for the

Reorganized Debtors following such emergence, the Debtors respectfully submit that the Break-

up Fee as well as the other costs and fees to be paid by the Debtors under the Letters are

"necessary to preserve the value of the estate" and are entitled priority under section 507(a)(2) of

the Bankruptcy Code.

**C.     Filing the Letters Under Seal is Warranted.**

      32.     Section 107(b) of the Bankruptcy Code authorizes courts to issue orders that will

protect entities from potential harm that may result from the disclosure of certain confidential

information. This section provides, in relevant part:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy
> court's own motion, the bankruptcy court may: (1) protect an entity with respect
> to a trade secret or confidential research, development, or commercial
> information....

11 U.S.C. § 107(b). Bankruptcy Rule 9018 defines the procedure by which a party may move

for relief under section 107(b) of the Bankruptcy Code, and provides, in part:

> On motion or on its own initiative, with or without notice, the court may make
> any order which justice requires (1) to protect the estate or any entity in respect of
> a trade secret or other confidential research, development, or commercial
> information....

Fed. R. Bankr. P. 9018.

33.     Commercial information is information that, if disclosed, would result in "an

unfair advantage to competitors by providing them information as to the commercial operations

of the debtor." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006) (citing

*Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24,

27-8 (2d Cir. 1994)). Commercial information, however, need not rise to the level of a trade

secret to be protected under section 107(b) of the Bankruptcy Code. *See, e.g. Orion Pictures*, 21

F.3d at 28 (holding that a license agreement authorizing a licensee to reproduce, manufacture,

distribute, and sell videocassettes contained confidential commercial information); *In re

Barney's, Inc.*, 201 B.R. 703, 708-09 (Bankr. S.D.N.Y. 1996) ("*Orion* mandates that we seal

documentary information filed in a court that does not rise to the level of a trade secret but that is

so critical to the operations of the entity seeking the protective order that its disclosure will

unfairly benefit that entity's competitors").

34.     Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure,

section 107(b) of the Bankruptcy Code does not require an entity seeking such protection to

demonstrate "good cause." *See, e.g., Orion Pictures*, 21 F.3d at 28. Rather, once the bankruptcy

court determines that a party in interest is seeking protection of information that falls within one

of the categories enumerated in section 107(b) of the Bankruptcy Code, "the court is required to

protect a requesting interested party and has no discretion to deny the application." *Id.* at 27.

35.     Granting a sealing order is well within this Court's discretion. Under the plain language of section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, and in light of the Court's broad equitable powers under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," the Debtors seek authorization to file the Letters under seal and to limit their disclosure to the Limited Notice Parties.

36.     As noted above, the Court has previously authorized the Debtors to file similar letters under seal in order to protect the confidential information of the Engagement Parties. [Docket No. 24299]. More recently, *In re Rotech Healthcare Inc.*, Case No. 13-10741 (PJW) (Bankr. D. Del. July 29, 2013) [Docket No. 762], the Court implemented the protection afforded by section 107(b) of the Bankruptcy Code to authorize a chapter 11 debtor to file a fee letter under seal in connection with the debtor's motion for approval of entry into exit financing commitment letters. *See also In re Newpage Corp.*, Case No. 11-12804 (KG) (Bankr. D. Del. Nov. 6, 2012) [Docket No. 2626]; *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Mar. 29, 2011) [Docket No. 514]; *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. Aug. 31, 2010) [Docket No. 4100]; *In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) [Docket No. 732].

37.     In light of the foregoing, the Debtors submit that good cause exists to authorize the Debtors to file the Letters under seal and to limit notice of the same. The Letters contain detailed proprietary fee information that is indisputably "confidential" and "commercial" in nature, and that alone justifies their protection from public disclosure, *Orion Pictures*, 21 F.3d at 28. Indeed, the fees set forth in the Letters represent the negotiated price of the services being provided by the Engagement Parties, and as such constitute the most confidential commercial

information of financial institutions, like the Engagement Parties, that are engaged in the business of arranging syndicated financings. In accordance with custom and practice in the finance industry, such proprietary pricing information is generally not made publicly available. Given the highly competitive nature of the investment banking and finance lending industries, disclosure of such pricing information would give competitors an unfair strategic advantage and thereby impair the ability of financial institutions to bid and compete for other financings. Ultimately, such disclosure, if required in bankruptcy cases, would discourage the participation of financial institutions in debtor-in-possession and exit financings, to the detriment of all parties in interest.

38.     The Debtors also submit that notice of the Letters, and service of such exhibits, should be limited to the Limited Notice Parties, unless otherwise agreed to in writing by the Debtors and the Engagement Parties. The Limited Notice Parties have the greatest interest in the Letters, and so limiting notice to these entities will subject the Letters to sufficient scrutiny on their merits, while at the same time, minimizing the harmful impact of disclosure on the Engagement Parties.

39.     Moreover, to mitigate any concerns regarding the fees requested and authorized pursuant to the Letters, the Debtors, with the consent of the Engagement Parties, have disclosed herein the total aggregate fees due and owing to the Engagement Parties or their affiliates in connection with the Letters.

### Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)

40.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

41.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property...is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6004(h). A court may waive the stay period, however, "when there is a sufficient business need to close the transaction." *In re Boscov's, Inc.*, Case No. 08-11637 (KG), 2008 WL 4975882 at *2 (Bankr. D. Del. Nov. 21, 2008).

42.     There is no reason to delay the effectiveness of the proposed order. Working in good faith with the Debtors, the Engagement Parties have already incurred diligence and professional expenses with respect to negotiating the Loan Documents. Furthermore, the Engagement Parties will incur further pre-effective date expenses and professional fees in finalizing the documentation for, and syndicating, the Exit Facilities— all of which is necessary to allow the Debtors to emerge as expeditiously as possible. Thus, it is important that the Loan Documents become effective immediately to give the Engagement Parties the certainty that they can move forward with their processes, assured that they will be compensated for incurring the related costs. This will allow the parties to focus on completing the definitive documentation for the Exit Facilities and help ensure the Debtors' expeditious exit from chapter 11. Accordingly, waiver of the 14-day stay period under Bankruptcy Rule 6004(h) is appropriate.

### No Prior Request

43.     No prior motion for the relief requested herein has been made to this or any other court.

### Notice

44.     Notice of this Motion has been given to: (a) the office of the U.S. Trustee; (b) counsel to the L/C Facility Agent and L/C Issuers; (c) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (d) counsel to each of the official committees

appointed in these Chapter 11 Cases; (e) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (f) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (g) counsel to each of the Engagement Parties.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A: (a) authorizing and approving the Debtors' entry into, and performance under, the Letters; (b) authorizing the use of estate funds to pay the fees and expenses set forth in the Fee Letters, including the Break-up Fee, if applicable; (c) authorizing the Debtors' indemnification of the Engagement Parties and their affiliates in accordance with the terms and conditions set forth in Annex A to the Commitment and Engagement Letter and in the Mandate Letter; (d) authorizing the Debtors to file copies of the Letters under seal pursuant to section 107(b) of the Bankruptcy Code; (e) directing that the Letters remain under seal and confidential and not be made available to anyone other than the Limited Notice Parties without the written consent of the Debtors and the Engagement Parties, respectively; and (f) granting such other and further relief as the Court deems just and proper.

Dated: January 7, 2014
Wilmington, Delaware

KIRKLAND & ELLIS LLP
Adam Paul
John Donley, P.C.
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

and

THE LAW OFFICES OF ROGER HIGGINS
Roger J. Higgins
111 East Wacker Drive
Suite 2800
Chicago, IL 60601
(312) 836-4047

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
(302) 652-4400

*Co-Counsel for the Debtors and Debtors in Possession*