# EXHIBIT B-1

## Redacted Commitment and Engagement Letter

| GOLDMAN SACHS BANK USA | DEUTSCHE BANK AG NEW YORK BRANCH | BANK OF AMERICA, N.A. | HSBC SECURITIES (USA) INC. |
|---|---|---|---|
| 200 West Street | DEUTSCHE BANK SECURITIES INC. | MERRILL LYNCH, PIERCE, FENNER & | HSBC BANK USA, N.A. |
| New York, NY 10282-2198 | 60 Wall Street | SMITH INCORPORATED | 452 Fifth Avenue |
| | New York, NY 10005 | One Bryant Park | New York, NY 10018 |
| | | New York, NY  10036 | |

| CITIGROUP GLOBAL MARKETS INC. | COMMERZBANK AG, NEW YORK BRANCH | KEYBANK NATIONAL ASSOCIATION | PNC BANK, NATIONAL ASSOCIATION | SUMITOMO MITSUI BANKING CORPORATION |
|---|---|---|---|---|
| 390 Greenwich Street | 2 World Financial Center | KEYBANC CAPITAL MARKETS, INC. | 1 East Pratt Street, 4th Floor | 277 Park Avenue, 6th Floor |
| New York, NY  10013 | New York, NY 10281 | 127 Public Square | Baltimore, MD 21202 | New York, NY 10172 |
| | | Cleveland, OH 44114 | | |

**PERSONAL AND CONFIDENTIAL**

**January 7, 2014**

**W. R. Grace & Co.**
**W. R. Grace & Co.-Conn.**
**7500 Grace Drive**
**Columbia, MD 21044**
**Attention:  Hudson La Force III**

<u>Commitment and Engagement Letter</u>

Ladies and Gentlemen:

Goldman Sachs Bank USA ("**Goldman Sachs**"), Deutsche Bank Securities Inc. ("**DBSI**", and together with Goldman Sachs, the "**Global Coordinators**"), Deutsche Bank AG New York Branch ("**DBNY**"), Bank of America, N.A. (or its designated affiliate, "**Bank of America**"), Merrill Lynch, Pierce, Fenner & Smith Incorporated (or its designated affiliate, "**MLPFS**"), HSBC Securities (USA) Inc. ("**HSBC Securities**" and, together with Goldman Sachs, DBSI and MLPFS, the "**Arrangers**"), HSBC Bank USA, N.A. ("**HSBC**"), CGMI (as defined below) on behalf of Citi (as defined below), Commerzbank AG, New York Branch ("**Commerzbank**"), KeyBanc Capital Markets, Inc. ("**KeyBanc**"), KeyBank National Association ("**KeyBank**"), PNC Bank, National Association ("**PNC**"), Sumitomo Mitsui Banking Corporation ("**SMBC**"and, together with Citi, Commerzbank, KeyBanc and PNC, the "**Senior Managing Agents**"; and SMBC, together with Goldman Sachs, DBNY, Bank of America, HSBC, Citi, Commerzbank, KeyBank and PNC, the "**Initial Lenders**") are pleased to confirm the arrangements under which (a) Goldman Sachs and DBSI are authorized by W. R. Grace & Co. ("**Holdings**") and W. R. Grace & Co.-Conn. (the "**Company**" and, together with Holdings, "**you**") to act as global coordinators, (b) each Arranger is authorized by Holdings and the Company to act as a joint lead arranger and joint bookrunner, and (c) each of the Senior Managing Agents is authorized by Holdings and the Company to act as a senior managing agent, in each case, in connection with certain transactions described herein and on the terms and subject to the conditions set forth in this letter and the attached Annexes A, B and C hereto

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 2

(collectively, the "**Commitment and Engagement Letter**"). Annex B is referred to herein as the "**Term Sheet**". The Global Coordinators, the Arrangers, the Senior Managing Agents and the Initial Lenders are referred to herein, collectively, as the "**Engagement Parties**", "**we**" or "**us**".

For purposes of this Commitment and Engagement Letter, "**Citi**" shall mean Citigroup Global Markets Inc. ("**CGMI**"), Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein.

You have informed us that (a) the Company, together with Holdings and its direct and indirect wholly owned United States subsidiaries (collectively, the "**Debtors**"), have filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and (b) the Debtor's cases in the Bankruptcy Court (the "**Bankruptcy Cases**") have been consolidated for purposes of joint administration of each of the Debtors under Case No. 01-1139. You have further informed us that the Debtors intend to emerge from the Bankruptcy Cases pursuant to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010 Docket No. 26368 (including all exhibits thereto, the "**Plan**"). In connection with, and subject to the confirmation and effectiveness of, the Plan, Holdings intends to refinance certain of its and its subsidiaries' existing indebtedness, substantially on the terms set forth in the Plan (as it may be amended or waived in accordance with paragraph 1 in Annex C hereto) (the "**Refinancing**") and obtain the following exit financing:

- up to $250 million under a senior secured revolving credit facility (the "**U.S. Revolving Facility**") and up to $150 million or its foreign currency equivalent under a senior secured multi-currency revolving credit facility (the "**Multicurrency Revolving Facility**" and, together with the U.S. Revolving Facility, the "**Revolving Facilities**") having the terms set forth on Annex B; and

- approximately $700 million under a senior secured term loan facility (the "**U.S. Term Facility**"), approximately €[ ]¹ under a senior secured term loan facility (the "**Euro Term Facility**" and, together with the U.S. Term Facility, the "**Closing Date Term Facilities**") and approximately $250 million under a senior secured delayed draw term loan facility (the "**Delayed Draw Term Facility**" and, together with the Closing Date Term Facilities, the "**Term Facilities**"; and the Term Facilities, together with the Revolving Facilities, the "**Facilities**"), each having the terms set forth on Annex B.

The date on which the Facilities are consummated and the initial borrowing thereunder occurs is referred to herein as the "**Closing Date**".

1.    **Titles and Roles; Commitments.**

In connection with the foregoing, (a) each of Goldman Sachs and DBSI is pleased to confirm its willingness to act as a global coordinator, a joint lead arranger and a joint bookrunner to provide Holdings and the Company with structuring and syndication assistance in connection with the Facilities, (b) DBSI

---

¹       Euro equivalent of $200 million.

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 3

is pleased to confirm its willingness to act as syndication agent in connection with the Facilities, (c) each of MLPFS and HSBC Securities is pleased to confirm its willingness to act as a co-documentation agent, a joint lead arranger and a joint bookrunner in connection with the Facilities, (d) each of Citi, Commerzbank, KeyBanc, PNC and SMBC is pleased to confirm its willingness to act as a senior managing agent in connection with the Facilities and (e) Goldman Sachs is pleased to confirm its willingness to designate one of its affiliates to act as administrative agent for the Facilities (the "**Administrative Agent**"), in each case on the terms and subject to the conditions contained in this Commitment and Engagement Letter.  Each Arranger agrees to use commercially reasonable efforts to arrange a syndicate of banks, financial institutions and other institutional lenders reasonably acceptable to Holdings and the Company that will participate in the Term Facilities (collectively, the "**Lenders**"); provided that the Arrangers will not syndicate to (x) any financial institutions and entities identified by the Company to the Lead Arrangers by name in writing on or prior to the close of business on January 5, 2014, (y) any competitors of the Company or their respective affiliates, in the case of this clause (y), identified by the Company to the Administrative Agent and Lenders by name in writing on or prior to the close of business on January 5, 2014 or from time to time after the Closing Date or (z) any affiliates of the foregoing that are readily identifiable according to their names, but excluding (in the case of clauses (y) and (z)) bona fide debt funds (such persons or entities collectively, the "**Disqualified Institutions**"). Each of Holdings, the Company and the Engagement Parties agree that (i) Goldman Sachs shall have lead "left" placement in any and all marketing materials with respect to the Facilities and shall perform the duties and exercise the authority (including, without limitation, maintaining sole physical books in connection with the syndication of the Facilities) customarily associated with such placement and (ii) DBSI shall have immediate "right" placement in any and all marketing materials with respect to the Facilities and shall perform the duties and exercise the authority customarily associated with such placement.  You agree that no other agents, co-agents or arrangers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by this Commitment and Engagement Letter) will be paid in connection with the Facilities, unless each of Holdings, the Company and the Arrangers shall agree.  **Each of Holdings and the Company acknowledges that, except as expressly set forth below with respect to the Revolving Facilities, this Commitment and Engagement Letter is neither an expressed nor an implied commitment by the Engagement Parties or any of their respective affiliates to provide any financing or to provide or purchase loans or act in any roles in connection with the Facilities, which commitment, if any, will only be set forth in a separate commitment letter or other applicable type of agreement entered into in connection with the Transactions.**

Notwithstanding the foregoing, (i) Goldman Sachs agrees to provide $37.875 million of the commitments in respect of the U.S. Revolving Facility and $22.725 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, (ii) DBNY agrees to provide $37.875 million of the commitments in respect of the U.S. Revolving Facility and $22.725 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, (iii) Bank of America agrees to provide $32.4375 million of the commitments in respect of the U.S. Revolving Facility and $19.4625 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, (iv) HSBC agrees to provide $32.4375 million of the commitments in respect of the U.S. Revolving Facility and $19.4625 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, (v) Citi agrees to provide $21.875 million of the commitments in respect of the U.S. Revolving Facility and $13.125 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, (vi) Commerzbank agrees to provide $21.875 million of the commitments in respect of the U.S. Revolving Facility and $13.125 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, (vii) KeyBank agrees to provide $21.875 million of the commitments in respect of the U.S. Revolving Facility and $13.125 million of the commitments in

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 4

respect of the Multicurrency Revolving Facility on the Closing Date, (viii) PNC agrees to provide $21.875 million of the commitments in respect of the U.S. Revolving Facility and $13.125 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, and (ix) SMBC agrees to provide $21.875 million of the commitments in respect of the U.S. Revolving Facility and $13.125 million of the commitments in respect of the Multicurrency Revolving Facility on the Closing Date, in each case, subject to the following: (a) the negotiation, execution and delivery by the Borrower and the other Guarantors (as defined in Annex B) of the definitive documentation for the Facilities, including guarantees by the applicable Guarantors (the "**Loan Documents**"), in each case, consistent with the terms of this Commitment and Engagement Letter and the Term Sheet (as such terms may be modified by the Arrangers and the Company to achieve a full syndication of the Term Facilities in a manner not materially adverse to the interests of the Lenders under the Revolving Facilities), (b) on or prior to the Closing Date, the successful syndication and funding of up to $700 million of the U.S. Term Facility and the €[ ] million[2] of the Euro Term Facility and the successful syndication of up to $250 million of the Delayed Draw Term Facility, (c) the conditions set forth in the section entitled "Conditions Precedent to Initial Borrowing" in Annex B hereto and (d) the conditions set forth in Annex C hereto. The commitments of the Initial Lenders in respect of the Revolving Facilities shall be several and not joint.

Our fees for services related to the Facilities are set forth in a separate fee letter (the "**Facilities Fee Letter**") entered into by the Borrower and the Engagement Parties on the date hereof. Certain fees payable to Goldman Sachs and DBSI are set forth in a separate fee letter (the "**Structuring Fee Letter**" and, together with the Facilities Fee Letter, the "**Fee Letters**"). This Commitment and Engagement Letter and the Fee Letters are collectively referred to herein as the "**Letters**".

Holdings and the Company have obtained an order in the Bankruptcy Court (the "**Authorization Order**"), in form and substance reasonably satisfactory to the Engagement Parties, authorizing the Debtors to enter into the Letters, to pay the reasonable fees and expenses set forth in the Fee Letters and to undertake and perform the indemnity obligations referred to herein and in Annex A hereto, which Authorization Order specifically provides that the payment obligations of Holdings and the Company hereunder shall be entitled to priority as administrative claims under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, whether or not the Loan Documents are executed or any of the Facilities are funded.

2.    **Syndication**.

In connection with their syndication of the Facilities to the Lenders, the Arrangers will select the Lenders with the consent of Holdings and the Company. The Arrangers will manage all aspects of the syndication, including, in each case with the consent of Holdings and the Company, determining the timing of all offers to potential Lenders, the acceptance of commitments, the amounts offered and the compensation allocated to each Lender. The Arrangers, with the consent of Holdings and the Company, will determine the final commitment allocations. Holdings and the Company agree to use their commercially reasonable efforts to ensure that the Arrangers' syndication efforts benefit from the existing lending relationships of Holdings, the Company and their respective subsidiaries. To facilitate an orderly and successful syndication of the Facilities, you agree that, from the date hereof until the initial funding under the Facilities, neither Holdings nor the Company will syndicate or issue, attempt to syndicate or issue, announce or authorize the announcement of the syndication or issuance of any debt facility or any debt security of Holdings or any of its subsidiaries (other than the Facilities and any intercompany

---

[2]       Equivalent of $200 million.

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 5

indebtedness) including any renewals or refinancings of any existing debt facility or debt security (other than any incurrence, issuance, extension or replacement of any line of credit or other credit facility of any foreign subsidiary with respect to which the Company has provided at least 5 business days' prior written notice to the Arrangers) if such syndication or issuance could reasonably be expected to have an adverse impact on the primary syndication of the Facilities, without the prior written consent of the Arrangers. You acknowledge that the Arrangers provide no assurance that a successful syndication of any of the Term Loan Facilities will be achieved.

Each of Holdings and the Company agrees to cooperate with the Arrangers in connection with (i) the preparation of a customary confidential information memoranda regarding the business, operations, financial projections and prospects of Holdings and the Company (the "**Confidential Information Memorandum**") customary for transactions of this type and other customary and readily available marketing materials to be used in connection with the syndication of the Facilities and using commercially reasonable efforts to obtain prior to the launch of general syndication (a) a public corporate family rating from Moody's Investor Services, Inc. ("**Moody's**"), (b) a public corporate credit rating from Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation ("**S&P**") and (c) a public credit rating for each of the Term Facilities from each of Moody's and S&P and (ii) the hosting, with the Arrangers, of one meeting of prospective Lenders (and additional meetings which may be held by conference calls) all at times and locations to be agreed by the Arrangers, Holdings and the Company in connection with the syndication of the Facilities (including, without limitation, participation by senior management and representatives of the Company in such meetings) and the presentation of one or more customary information packages reasonably acceptable in format and content to the Arrangers (collectively, the "**Lender Presentation**") in such meetings. Each of Holdings and the Company will be solely responsible for the contents of any such Confidential Information Memorandum and Lender Presentation and all other information, documentation or materials delivered to the Arrangers in connection therewith (collectively, the "**Information**") and acknowledges that each Arranger will be using and relying upon the Information without independent verification thereof. Each of Holdings and the Company agrees that Information regarding the Facilities and Information provided by each of Holdings, the Company, their respective subsidiaries or their respective representatives to any Arranger in connection with the Facilities (including, without limitation, draft and execution versions of the Loan Documents, the Confidential Information Memorandum, the Lender Presentation, publicly filed financial statements, and draft or final offering materials relating to contemporaneous issuances by Holdings or the Company) may be disseminated on a confidential basis to potential Lenders and other persons through one or more internet sites (including an IntraLinks, SyndTrak or other electronic workspace (the "**Platform**")) created for purposes of syndicating the Facilities or otherwise, in accordance with such Arranger's standard syndication practices, and you acknowledge that none of the Engagement Parties or any of their respective affiliates will be responsible or liable to you or any other person or entity for damages arising from the use by others of any Information or other materials obtained on the Platform except to the extent any such damages arise from the gross negligence, bad faith or willful misconduct of such Engagement Party or any of its respective controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing (as determined by a court of competent jurisdiction in a final and non-appealable judgment); *provided*, *however*, that in no event will any Engagement Party or any of its respective affiliates have any liability for any indirect, consequential, special or punitive damages.

Notwithstanding the Arrangers' right to syndicate the Facilities and receive commitments with respect thereto (but subject to the terms and conditions set forth in Section 1 and Section 8 of this Commitment and Engagement Letter), (i) no Initial Lender shall be relieved, released or novated from its obligations to fund the Revolving Facilities on the Closing Date in connection with any syndication, assignment or

CH\1661865.21

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 6

participation of the Revolving Facilities until after the initial funding of the Facilities on the Closing Date has occurred, (ii) no assignment or novation by any Initial Lender shall become effective with respect to all or any portion of any Initial Lender's commitments in respect of the Revolving Facilities until the initial funding of the Facilities and (iii) unless you otherwise agree in writing, each Initial Lender shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Revolving Facilities, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Closing Date has occurred; provided that (a) the provisions of this paragraph shall not apply with respect to any assignment by Goldman Sachs to Goldman Sachs Lending Partners LLC, subject to (x) prior written notice to you and (y) execution of a joinder agreement and, thereafter, Goldman Sachs Lending Partners LLC shall constitute an "Engagement Party", "Initial Lender" and "Arranger" and (b) any Initial Lender may elect to provide its commitment in respect of the Multicurrency Revolving Facility through a lending affiliate, subject to prior written notice to you.

Each of Holdings and the Company acknowledges that certain of the Lenders may be "public side" Lenders (i.e. Lenders that do not wish to receive material non-public information with respect to Holdings, the Company or their respective affiliates or securities) (each, a **"Public Lender"**). At the request of the Arrangers, Holdings and the Company agree to prepare an additional version of each of the Confidential Information Memorandum and the Lender Presentation to be used by Public Lenders that does not contain material non-public information (within the meaning of United States federal securities laws) concerning Holdings, the Company, their respective subsidiaries or their respective securities. It is understood that in connection with your assistance described above, you will provide customary authorization letters to the Arrangers authorizing the distribution of the Information to prospective Lenders, containing a representation to the Arrangers that the public-side version does not include material non-public information (within the meaning of United States federal securities laws) concerning Holdings, the Company, their respective subsidiaries or their respective securities. In addition, Holdings and the Company will designate all written Information provided to any Arranger by or on behalf of Holdings or the Company to indicate whether such Information is suitable to make available to Public Lenders. Each of Holdings and the Company acknowledges and agrees that the following documents may be distributed to Public Lenders (unless you promptly notify the Arrangers otherwise and provided that you have been given a reasonable opportunity to review such documents): (a) drafts and final versions of the Loan Documents (excluding, if applicable, any specifically identified confidential schedules thereof); (b) administrative materials prepared by the Arrangers for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda); and (c) term sheets and notification of changes in the terms of the Facilities.

3.    **Information**.

Each of Holdings and the Company represents and warrants that (i) all written Information (other than financial projections, forward looking information, budgets, estimates  and information of a general economic or general industry nature) provided directly by, or on behalf of, Holdings or the Company to any Arranger or the Lenders in connection with the transactions contemplated hereunder is and will be, at the time it was (or hereafter is) furnished, when taken as a whole, complete and correct in all material respects and does not and will not contain, as of the time it was (or hereafter is) furnished, any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (ii) the financial projections that have been or will be made available to the Arrangers or the Lenders by or on behalf of Holdings or the Company have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time such financial projections are furnished to the Arrangers or the

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 7

Lenders, it being understood and agreed that financial projections are not a guarantee of financial performance and actual results may differ from financial projections and such differences may be material. You agree that if at any time prior to the closing date of the Facilities any of the representations in the preceding sentence would be incorrect in any material respect if the Information and financial projections were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information and financial projections so that such representations will be correct in all material respects under those circumstances.

4.    **Indemnification and Related Matters.**

In connection with arrangements such as this, it is our policy to receive indemnification. Each of Holdings and the Company agrees on a joint and several basis to the provisions with respect to our indemnity and other matters set forth in Annex A, which is incorporated by reference into this Commitment and Engagement Letter; *provided* that, for the avoidance of doubt, in no event will the indemnification for any losses, claims, damages or liabilities or other matters set forth in Annex A extend to any Engagement Party or any of their respective affiliates solely and exclusively as a result of such entities acting in their capacities as lenders under the Company's pre-petition credit facilities.

5.    **Assignments.**

This Commitment and Engagement Letter may not be assigned by any party hereto without the prior written consent of each other party hereto (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the Engagement Parties and the other parties hereto and, except as set forth in Annex A, is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto; *provided* that each Engagement Party may assign its commitments and agreements hereunder, in whole or in part, to any affiliate or any other Lender (other than a Disqualified Institution) prior to the Closing Date, subject in each case to the limitations set forth in Section 2 above. This Commitment and Engagement Letter (including the Annexes hereto) may not be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto, and any term or provision hereof may be amended or waived only by a written agreement executed and delivered by all parties hereto.

6.    **Confidentiality.**

Please note that the Letters and any written communications provided by, or oral discussions with, any Engagement Party in connection with this engagement are exclusively for the information of Holdings and the Company and may not be disclosed to any third party or circulated publicly without the Engagement Parties' prior written consent except pursuant to a subpoena or order issued by a court of competent jurisdiction or by a judicial, administrative or legislative body or committee (including the Bankruptcy Court) (in which case you agree to inform each Engagement Party promptly thereof to the extent legally permitted to do so); *provided* that we hereby consent to your disclosure of (i) the Letters and such communications and discussions to your officers, directors, agents, employees, representatives, affiliates, legal counsel, auditors and advisors on a confidential basis, (ii) the Letters (a) to the office of the U.S. Trustee, to any ad-hoc or statutorily appointed committees of creditors or equity holders, to the future claimants' representative for the asbestos personal injury claimants, to the future claimants' representative for the asbestos property damage claimants, and to their respective representatives and professional advisors who have agreed to treat such information confidentially or are otherwise bound by a confidentiality agreement with Holdings or the Company, the scope of which includes the Letters and (b) to the extent required in motions (provided that the Letters are filed with the Bankruptcy Court with a

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 8

request that they be filed under seal), in form and substance reasonably satisfactory to the Arrangers, to be filed with the Bankruptcy Court in connection with obtaining the Authorization Order or an order of the Bankruptcy Court approving Holdings' and the Company's execution, delivery and performance of the Letters, the Loan Documents and the Authorization Order, (iii) the Letters as required by applicable law or compulsory legal process (in which case you agree to inform each Engagement Party promptly thereof to the extent legally permitted to do so), (iv) to the extent not otherwise permitted by clauses (i) through (iii), the aggregate fees, without any breakdown in calculation of the fees attributable to the Engagement Parties, in any pleadings filed with the Bankruptcy Court in an effort to obtain the Authorization Order, publicly filed financial statements or statements of sources and uses relating to the Facilities, (v) in connection with the exercise of any remedy or enforcement of any right under the Letters, and (vi) to the extent any such information becomes publicly available other than by reason of disclosure by you, your affiliates or your representatives in violation of this Commitment and Engagement Letter. You further agree that if the Bankruptcy Court denies your request to file the Letters under seal and requires a redacted version of the Letters to be filed and/or disclosed, you shall provide a redacted version of the Letters reasonably acceptable to the Arrangers and the Bankruptcy Court.

Each Engagement Party agrees that it will treat as confidential all information provided to it hereunder by or on behalf of you or any of your subsidiaries or affiliates; _provided_, _however_, that nothing herein will prevent such Engagement Party from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such person agrees to inform you promptly thereof to the extent not prohibited by law), (b) upon the request or demand of any regulatory authority having jurisdiction over such person or any of its affiliates, (c) to the extent that such information is publicly available or becomes publicly available other than by reason of improper disclosure by such person, its affiliates or representatives, (d) to such person's affiliates and their respective officers, directors, partners, members, employees, legal counsel, independent auditors and other experts or agents who need to know such information and on a confidential basis, (e) to potential and prospective Lenders, assignees, participants and any direct or indirect contractual counterparties to any swap or derivative transaction relating to the borrower or its obligations under the Facilities (other than Disqualified Institutions), in each case, subject to such recipient's agreement (which agreement may be in writing or by "click through" agreement  or other affirmative action on the part of the recipient to access such information and acknowledge its confidentiality obligations in respect thereof pursuant to customary syndication practice) to keep such information confidential on substantially the terms set forth in this paragraph, (f) received by such person on a non-confidential basis from a source (other than you or any of your affiliates, advisors, members, directors, employees, agents or other representatives) not known by such person to be prohibited from disclosing such information to such person by a legal, contractual or fiduciary obligation, (g) to the extent that such information was already in such Engagement Party's possession from a source other than you or any of your affiliates, advisors, members, directors, employees, agents or other representatives or is independently developed by such Engagement Party without the use of or reference to any such confidential information, (h) to ratings agencies who have agreed to keep such information confidential on terms no less restrictive than this paragraph in any material respect or otherwise on terms acceptable to you in connection with obtaining ratings of the Facilities or (i) for purposes of establishing a "due diligence" defense.

The obligations under the preceding paragraph shall remain in effect until the earlier of (i) one year from the date hereof and (ii) the Closing Date, at which time any confidentiality undertaking in the Loan Documents shall supersede this provision.

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 9

7.    **Absence of Fiduciary Relationship; Affiliates; Etc.**

As you know, each Engagement Party and/or its respective affiliates (each, collectively, a "**Financial Institution**") is a full service financial institution engaged, either directly or through affiliates, in a broad array of activities, including commercial and investment banking, financial advisory, market making and trading, investment management (both public and private investing), investment research, principal investment, financial planning, benefits counseling, risk management, hedging, financing, brokerage and other financial and non-financial activities and services globally.  In the ordinary course of their various business activities, each Financial Institution, and funds or other entities in which such Financial Institution invests or with which such Financial Institution co-invests, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers.  In addition, each Financial Institution may at any time communicate independent recommendations and/or publish or express independent research views in respect of such assets, securities or instruments.  Any of the aforementioned activities may involve or relate to assets, securities and/or instruments of the Company, as well as of Holdings and/or other entities and persons which may (i) be involved in transactions arising from or relating to this Commitment and Engagement Letter or (ii) have other relationships with Holdings or the Company or their affiliates.  In addition, each Financial Institution may provide investment banking, commercial banking, underwriting and financial advisory services to such other entities and persons.  The arrangement contemplated by this Commitment and Engagement Letter may have a direct or indirect impact on the investments, securities or instruments referred to in this paragraph, and employees working on the financing contemplated hereby may have been involved in originating certain of such investments and those employees may receive credit internally therefor.  Although each Financial Institution, in the course of such other activities and relationships, may acquire information about the transaction contemplated by this Commitment and Engagement Letter or other entities and persons which may be the subject of the financing contemplated by this Commitment and Engagement Letter, no Financial Institution shall have any obligation to disclose such information, or the fact that it is in possession of such information, to Holdings or the Company or to use such information on Holdings' or the Company's behalf.

Consistent with each Financial Institution's policies to hold in confidence the affairs of its customers, no Financial Institution will furnish confidential information obtained from you by virtue of the transactions contemplated by this Commitment and Engagement Letter to any of its other customers.  Furthermore, you acknowledge that none of the Financial Institutions or any of their respective affiliates has an obligation to use in connection with the transactions contemplated by this Commitment and Engagement Letter, or to furnish to you, confidential information obtained or that may be obtained by them from any other person.

Each Financial Institution may have economic interests that conflict with those of Holdings, the Company, their respective equity holders and/or their affiliates.  You agree that each Engagement Party will act under this Commitment and Engagement Letter as an independent contractor and that nothing in the Letters or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Engagement Party on the one hand, and Holdings, the Company, their respective equity holders or their affiliates, on the other hand.  You acknowledge and agree that the transactions contemplated by the Letters (including the exercise of rights and remedies hereunder and under the Fee Letters) are arm's-length commercial transactions between the Engagement Parties, on the one hand, and Holdings and the Company, on the other, and in connection therewith and with the process leading thereto, (i) no Engagement Party has assumed an advisory or fiduciary responsibility in favor of Holdings, the Company, their respective equity holders or their affiliates with

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 10

respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Financial Institution has advised, is currently advising or will advise Holdings, the Company, their respective equity holders or their affiliates on other matters) or any other obligation to Holdings or the Company except the obligations expressly set forth in the Letters and (ii) each Engagement Party is acting solely as a principal and not as the agent or fiduciary of Holdings, the Company, their respective management, equity holders, affiliates, creditors or any other person. Each of Holdings and the Company acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each of Holdings and the Company agrees that it will not claim (and hereby waives any claim) that any Engagement Party has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Holdings or the Company, in connection with such transactions or the process leading thereto. In addition, each Engagement Party may employ the services of their respective affiliates in providing services and/or performing its obligations hereunder and may exchange with such affiliates who agree to be subject to the confidentiality provisions herein information concerning Holdings, the Company and other companies that may be the subject of this arrangement, and such affiliates will be entitled to the benefits afforded to each Engagement Party hereunder.

In addition, please note that no Financial Institution provides accounting, tax or legal advice. Notwithstanding anything herein to the contrary, Holdings and the Company (and each employee, representative or other agent of Holdings and the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Facilities and all materials of any kind (including opinions or other tax analyses) that are provided to Holdings and the Company relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their and their respective affiliates' directors and employees to comply with applicable securities laws. For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Commitment and Engagement Letter but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

8.    **Miscellaneous**.

Each Initial Lender's commitment and each Engagement Party's agreements hereunder will terminate upon the earliest of: (a) at any time by Holdings or the Company with or without cause effective upon receipt by the Engagement Parties of notice to that effect from Holdings or the Company, (b) May 7, 2014, (c) upon the termination or withdrawal of, the Plan by the Debtors, and (d) upon the emergence of the Debtors from the Bankruptcy Cases, unless the closing of the Facilities, on the terms and subject to the conditions contained herein, has been consummated on or before such date.



W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 11



The provisions set forth under Sections 4 (including Annex A), 6 and 7 hereof and this Section 8 hereof (other than any provision therein that expressly terminates upon execution of the Loan Documents) will remain in full force and effect regardless of whether Loan Documents are executed and delivered. The provisions set forth under Sections 4 (including Annex A), 6 and 7 hereof and this Section 8 hereof will remain in full force and effect notwithstanding the expiration or termination of this Commitment and Engagement Letter or our engagement hereunder and shall terminate in accordance with their terms.

**The parties hereto agree that any suit or proceeding arising in respect to any of the Letters or our engagement or commitments hereunder will be tried in the Bankruptcy Court, or in the event the Bankruptcy Court does not exercise jurisdiction, in the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and the parties hereto submit to the exclusive jurisdiction of, and to venue in, such court. Any right to trial by jury with respect to any action or proceeding, claim or counterclaim (whether based on tort, contract or otherwise) arising in connection with or as a result of either our engagement and commitments or any matter referred to in any of the Letters is hereby waived by the parties hereto. The parties hereto agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses above shall be effective service of process against such party for any suit, action or proceeding brought in any such court. The Letters will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.**

The Engagement Parties hereby notify Holdings and the Company that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it, and each Lender, may be required to obtain, verify and record information that identifies Holdings, the Company and each Guarantor (as defined in Annex B), which information includes the name and address of Holdings, the Company and each such Guarantor and other information that will allow each Engagement Party and each Lender to identify Holdings, the Company and each such Guarantor in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective for each Engagement Party and each Lender.

W.R. Grace & Co.
W.R. Grace & Co.-Conn.
January 7, 2014
Page 12

This Commitment and Engagement Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment and Engagement Letter by facsimile transmission or electronic transmission (in pdf format) will be effective as delivery of a manually executed counterpart hereof.  The Letters are the only agreements that have been entered into among the parties hereto with respect to the Facilities and set forth the entire understanding of the parties with respect thereto and supersede any prior written or oral agreements among the parties hereto with respect to the Facilities.

[Remainder of page intentionally left blank]

Please confirm that the foregoing is in accordance with your understanding by signing and returning to the Global Coordinators the enclosed copy of this Commitment and Engagement Letter (together, if not previously executed and delivered, with each Fee Letter), on or before the close of business on February 14, 2014 whereupon the Letters will become binding agreements among us.  If the Letters have not been signed and returned as described in the preceding sentence by such date, this offer will terminate on such date.  We look forward to working with you on this transaction.

Very truly yours,

**GOLDMAN SACHS BANK USA**

By:  _____
                    Authorized Signatory

Charles D. Johnston
Authorized Signatory

CH\1661865

**DEUTSCHE BANK SECURITIES INC.**

By: _____
Name:  Jackson Merchant
Title:  Director

By: _____
Name:
Title:  Christopher Blum
        Managing Director

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name:  **Enrique Landaeta**
Title:  **Director**

By: _____
Name:  Robert M. Wood, Jr.
Title:  **Director**

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

By: _____
    Name: John C. McMenamin
    Title: Director

BANK OF AMERICA, N.A.

By: _____
    Name:
    Title:

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

By: _____

    Name:

    Title:


**BANK OF AMERICA, N.A.**

By: *George Hlentzas*

    Name: George Hlentzas

    Title: Director

**HSBC SECURITIES (USA) INC.**

By: _____
    Name:  Michael Bieber
    Title:   Managing Director


**HSBC BANK USA, N.A.**


By: _____
    Name:
    Title:

**HSBC SECURITIES (USA) INC.**

By: _____

     Name:
     Title:

**HSBC BANK USA, N.A.**

By: _____

     Name: David A. Mandell
     Title:   Managing Director

CITIGROUP GLOBAL MARKETS INC.

By: _____
    Name:  David Jaffe
    Title:   Vice President

[Commitment and Engagement Letter – Signature Page]

**COMMERZBANK AG, NEW YORK BRANCH**

By: _____

Name:
Title:      Diane L. Pockaj
            Managing Director

_____

Name:
Title:      Ryan Flohre
            Director

[Commitment and Engagement Letter – Signature Page]

CH\1661865

**KEYBANC CAPITAL MARKETS, INC.**

By: _____
Name: J. E. Fowler
Title: Director

**KEYBANK NATIONAL ASSOCIATION**

By: _____
Name: J. E. Fowler
Title: Director

[Commitment and Engagement Letter – Signature Page]

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

Name: JOHN E. HEHR

Title: SR. VICE PRESIDENT

[Commitment and Engagement Letter – Signature Page]

CH\1661865

**SUMITOMO MITSUI BANKING CORPORATION**

By: _____

Name:    James D. Weinstein
Title:    Managing Director

CH\1661865

ACCEPTED AND AGREED AS OF JANUARY __7__, 2014:

**W. R. GRACE & CO.**

By: _____
Name:
Title:

Hudson La Force
SVP, CFO

**W. R. GRACE & CO.—CONN.**

By: _____
Name:
Title:

Hudson La Force
SVP, CFO

CH\1661865.21

[see attached]



**ANNEX B**

**W. R. Grace & Co. and W.R. Grace & Co. – Conn.**

**Summary of the Facilities**

*This Summary outlines certain terms of the Facilities referred to in the Commitment and Engagement Letter, of which this Annex B is a part.  Certain capitalized terms used herein are defined in the Commitment and Engagement Letter.*

| | |
|---|---|
| <u>Borrowers:</u> | W.R. Grace & Co.-Conn. (the "***Borrower***"), a wholly-owned subsidiary of W.R. Grace & Co. ("***Holdings***"); <u>provided</u> that the Multicurrency Revolving Facility (as defined below) may be drawn by [_____] (the "***German Borrower***"). |
| <u>Transaction:</u> | The Borrower, together with Holdings and its direct and indirect wholly owned United States subsidiaries (collectively, the "***Debtors***"), have filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), and the Debtors' cases in the Bankruptcy Court (the "***Bankruptcy Cases***") have been consolidated for purposes of joint administration of each of the Debtors under Case No. 01-1139.  The Debtors intend to emerge from the Bankruptcy Cases pursuant to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010 [Docket No. 26368] (including all exhibits thereto, the "***Plan***").  In connection with, and subject to the confirmation and effectiveness of, the Plan, Holdings intends to refinance certain of its and its subsidiaries' existing indebtedness, substantially on the terms set forth in the Plan (as it may be amended or waived in accordance with paragraph 1 in Annex C to the Commitment and Engagement Letter) (the "***Refinancing***"), and the Refinancing and related working capital requirements of Holdings and certain of its subsidiaries, together with fees and expenses in connection with the foregoing, will be financed with the Facilities described herein (and the Facilities, together with the Refinancing, the "***Transactions***"). |
| <u>Administrative Agent:</u> | Goldman Sachs Bank USA or one of its affiliates ("***Goldman Sachs***") will act as sole and exclusive administrative agent and collateral agent (in such capacity, the "***Administrative Agent***") for a syndicate of banks, financial institutions and other institutional lenders reasonably acceptable to the Borrower and excluding any Disqualified Lenders (as defined below) (the "***Lenders***"), and will perform the duties customarily associated with such roles. |
| <u>Syndication Agent:</u> | Deutsche Bank AG New York Branch will act as sole and exclusive syndication agent (in such capacity, the "***Syndication Agent***") and will perform the duties customarily associated with such role. |
| <u>Co-Documentation</u> | Merrill Lynch, Pierce, Fenner & Smith Incorporated (or its designated affiliate) and HSBC Securities (USA) Inc. will act as co-documentation agents (in such capacities, the "***Co-Documentation Agents***" and, together with the Administrative Agent and the |

[Term Sheet]

| | |
|---|---|
| Agents: | Syndication Agent, the "***Agents***") and will perform the duties customarily associated with such role. |
| Joint Bookrunners and Lead Arrangers: | (i) Each of Goldman Sachs and Deutsche Bank Securities Inc. ("***DBSI***") will act as a global coordinator (each in such capacity, a "***Global Coordinator***") and (ii) each of the Global Coordinators, Merrill Lynch, Pierce, Fenner & Smith Incorporated (or its designated affiliate) and HSBC Securities (USA) Inc. (each in such capacity, a "***Lead Arranger***") will act as a joint lead arranger and joint bookrunner and will perform the duties customarily associated with such roles. Goldman Sachs and its affiliates will have lead "left" placement in any and all marketing materials and will perform the duties and exercise the authority customarily associated with such placement. DBSI and its affiliates will have immediate "right" placement in any and all marketing materials and will perform the duties and exercise the authority customarily associated with such placement. |
| Lenders: | The Lenders shall not include (a) any financial institutions and entities identified by the Borrower to the Lead Arrangers by name in writing on or prior to the date of the Commitment and Engagement Letter, (b) any competitors of the Borrower or their respective affiliates, in the case of this clause (b), identified by the Borrower to the Administrative Agent and Lenders by name in writing on or prior to the close of business on January 5, 2014 or following the Closing Date or (c) any affiliates of the foregoing that are readily identifiable according to their names, but excluding bona fide debt funds (it being agreed that such disclosure will be made available to the Lenders) (the "**Disqualified Lenders**"). |
| Senior Secured Facilities: | (A) A senior secured term loan facility in an aggregate principal amount of up to $700 million (the "***U.S. Term Loan Facility***"; the loans thereunder, the "***U.S. Term Loans***"; the Lenders thereunder, the "***U.S. Term Loan Lenders***"). |
| | (B) A senior secured term loan facility in an aggregate principal amount of up to €[__] million[1] (the "***Euro Term Loan Facility***"; the loans thereunder the "***Euro Term Loans***"; the Lenders thereunder, the "***Euro Term Loan Lenders***"). |
| | (C) A senior secured delayed-draw term loan facility in an aggregate principal amount of up to $250 million (the "***Delayed Draw Term Loan Facility***", and together with the U.S. Term Loan Facility and the Euro Term Loan Facility, the "***Term Loan Facilities***"; the commitments thereunder, the "***Delayed Draw Term Loan Commitments***"; the loans thereunder, the "***Delayed Draw Term Loans***", and together with the Euro Term Loans and the U.S. Term Loans, the "***Term Loans***"; the Lenders thereunder, the "***Delayed Draw Term Loan Lenders***", and together with the U.S. Term Loan Lenders and the Euro Term Loan Lenders, the "***Term Loan Lenders***"). |
| | (D) A senior secured revolving credit facility in an aggregate principal amount of $250 million (the "***U.S. Revolving Facility***"; the commitments thereunder, the "***U.S. Revolving Commitments***"; the loans thereunder, the "***U.S. Revolving Loans***"; the Lenders thereunder, the "***U.S. Revolving Lenders***"), of which up to $150 million shall be available in the form of Letters of Credit (as defined below) for the benefit of the Borrower and its subsidiaries; <u>provided</u>, that Letters |

---

[1]    Equivalent of $200 million USD.

[Term Sheet]

of Credit issued pursuant to subsection (E) below shall reduce Letter of Credit availability under the U.S. Revolving Facility on a dollar-for-dollar basis.

(E)   A senior secured revolving credit facility in an aggregate principal amount of $150 million or its foreign currency equivalent (the "*Multicurrency Revolving Facility*", together with the U.S. Revolving Facility, the "*Revolving Facilities*", and together with the Term Loan Facilities, the "*Facilities*"; the commitments thereunder, the "*Multicurrency Revolving Commitments*" and together with the U.S. Revolving Commitments, the "*Revolving Commitments*"; the loans thereunder, the "*Multicurency Revolving Loans*", together with the U.S. Revolving Loans, the "*Revolving Loans*", and together with the Term Loans, the "*Loans*"; the Lenders thereunder, the "*Multicurrency Revolving Lenders*", together with the U.S. Revolving Lenders, the "*Revolving Lenders*", and together with the Term Loan Lenders, the "*Lenders*"), of which up to $150 million shall be available in the form of Letters of Credit (as defined below) for the benefit of the Borrower and its subsidiaries; provided, that Letters of Credit issued pursuant to subsection (D) above shall reduce Letter of Credit availability on a dollar-for-dollar basis (for such purposes, taking the aggregate U.S. dollar equivalent of any Letters of Credit denominated in an alternative currency).

The U.S. Term Loan Facility and the Delayed Draw Term Loan Facility shall be available to the Borrower to be drawn in U.S. Dollars. The Euro Term Loan Facility shall be available to the Borrower to be drawn in Euro.

The U.S. Revolving Facility shall be available to the Borrower, subject to borrowing mechanics to be agreed, to be drawn in U.S. Dollars.  The Multicurrency Revolving Facility shall be available to the Borrower and the German Borrower, subject to borrowing mechanics to be agreed, to be drawn in U.S. Dollars, Euro, British Pounds Sterling, Canadian Dollars and other currencies to be mutually agreed.

Swingline:          In connection with the Revolving Facilities, Goldman Sachs Bank USA (in such capacity, the "*Swingline Lender*") will make available to the Borrower a swingline facility (the "*Swingline Facility*") under which the Borrower may make short-term borrowings (on same-day notice) of up to $50 million.  Except for purposes of calculating the commitment fee described on Annex I to this Exhibit B, any swingline borrowings under the Swingline Facility will reduce availability under the U.S. Revolving Facility on a dollar-for-dollar basis.  Swingline loans under the Swingline Facility shall be available to the Borrower, subject to borrowing mechanics to be agreed, to be drawn in U.S. Dollars.

Upon notice from the Swingline Lender, the U.S. Revolving Lenders will be unconditionally obligated to purchase participations in any swingline loan pro rata based upon their U.S. Revolving Commitments.

The Facilities Documentation will include customary provisions to protect the Swingline Lender, in the event any Lender under the U.S. Revolving Facility is a "Defaulting Lender" (to be defined in the Facilities Documentation).

Incremental Facilities:    The Facilities will permit the Borrower to add (or increase) one or more incremental term loan facilities (including any incremental term A facility (an "*Incremental Term A Facility*"; the loans thereunder, the "*Incremental Term A Loans*")) to the Facilities

[Term Sheet]

(each, an "*Incremental Term Loan Facility*") and/or increase commitments under the Revolving Commitments (any such increase, an "*Incremental Revolving Increase*"; the Incremental Term Facilities and the Incremental Revolving Increases are collectively referred to as "*Incremental Facilities*") in an aggregate principal amount of up to (a) $500 million, plus (b) the amount of Delayed Draw Term Loan Commitments that have been cancelled without the funding of Delayed Draw Term Loans thereunder, plus (c) all voluntary prepayments and voluntary commitment reductions of the Facilities prior to the date of any such incurrence, plus (d) an additional amount if, after giving effect to the incurrence of such additional amount, any acquisition consummated in connection therewith and all other appropriate pro forma adjustments, the First Lien Leverage Ratio (as defined below) is equal to or less than 1.50:1.00 (or, if such additional amounts are unsecured or secured on a junior lien basis, whether or not so secured, the Total Leverage Ratio (as defined below) is equal to or less than a ratio to be agreed), and including for this purpose the full amount of any Incremental Revolving Increase; *provided* that (i) no existing Lender will be required to participate in any such Incremental Facilities, (ii) no Event of Default exists or would exist after giving effect thereto (other than in connection with permitted acquisitions or investments, subject to customary SunGard limitations), (iii) the final maturity date and the weighted average maturity of any such Incremental Term Loan Facility (other than an Incremental Term A Facility) shall not be earlier than, or shorter than, as the case may be, the maturity date or the remaining weighted average life, as applicable, of the existing Term Loan Facilities, (iv) the pricing, interest rate margins, discounts, premiums, rate floors, fees and amortization schedule applicable to any Incremental Term Loan Facility shall be determined by the Borrower and the lenders thereunder (provided that (x) with respect to any U.S. Dollar denominated Incremental Term Loan Facility incurred during the first 18 months following the Closing Date, the yield applicable to such Incremental Term Loan Facility shall not be more than 0.50% higher than the corresponding yield applicable to the existing U.S. Term Loan Facility, unless the interest rate margins with respect to the existing U.S. Term Loan Facility is increased by an amount equal to the difference between the yield with respect to such Incremental Term Loan Facility and the corresponding interest rate on the existing U.S. Term Loans minus 0.50% and (y) with respect to any Euro denominated Incremental Term Loan Facility incurred during the first 18 months following the Closing Date, the yield applicable to such Incremental Term Loan Facility shall not be more than 0.50% higher than the corresponding yield applicable to the existing Euro Term Loan Facility, unless the interest rate margins with respect to the existing Euro Term Loan Facility is increased by an amount equal to the difference between the yield with respect to such Incremental Term Loan Facility and the corresponding interest rate on the existing Euro Term Loans minus 0.50%); (v) any Incremental Revolving Increase shall be on the same terms and pursuant to the same documentation applicable to the applicable Revolving Facility; and (vi) any Incremental Term Loan Facility shall be on terms and pursuant to documentation to be determined by the Borrower, *provided* that, to the extent such terms and documentation are not consistent with, in the case of an Incremental Term Loan Facility (other than an Incremental Term A Facility), the Term Loan Facilities (except to the extent permitted by clause (iii) or (iv) above) in a manner that is more favorable to the Lenders of such Incremental Term Loan Facility, they shall be reasonably satisfactory to the Administrative Agent (except for covenants or other provisions applicable only to the periods after the latest maturity date of any Facility or any existing Incremental Facility existing at the time such Incremental Facility is incurred) (it being understood to the extent that any financial

[Term Sheet]

maintenance covenant is added for the benefit of any such Incremental Facility, no consent shall be required from any Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of any corresponding existing Facility).

Incremental Term A Loans may be incurred so long as (a) the aggregate principal amount of all Incremental Term A Facilities outstanding at such time, when taken together with the aggregate principal amount of Earlier Maturity Indebtedness (as defined below) then outstanding, does not exceed $300 million and (b) the weighted average life to maturity of such Incremental Term A Loans is not less than three years.

As used herein, the "*First Lien Leverage Ratio*" means the ratio of total first lien secured net debt for borrowed money secured by a first priority lien on the Collateral, including capital leases and purchase money obligations (calculated net of unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries other than the proceeds of Incremental Facilities to be drawn at such time) to trailing four-quarter EBITDA (as defined below).

The Facilities will permit availability under the Incremental Facilities to be used to issue first lien secured notes or junior lien secured indebtedness (in each case, subject to customary intercreditor terms to be mutually agreed by the Administrative Agent and the Borrower) or unsecured indebtedness, with the amount of such secured or unsecured indebtedness reducing the aggregate principal amount available for the Incremental Facilities (including any such indebtedness (x) issued by a Person that subsequently becomes a Guarantor or (y) issued as unsecured indebtedness that subsequently become secured by a Lien) that is either issued or assumed by the Borrower or a Guarantor (including as a result of the guarantee of existing indebtedness issued by a Person who was not a Guarantor at the time such indebtedness was issued); *provided* that such secured or unsecured indebtedness (i) does not mature on or prior to the maturity date of, or have a shorter weighted average life than, loans under the Term Loan Facilities (provided that the requirements of this clause (i) shall not apply to Indebtedness assumed by the Borrower or a Guarantor, or issued by a person who was not a Guarantor at the time such debt securities were issued, or otherwise issued by a Borrower or a Guarantor (any such indebtedness, "*Earlier Maturity Indebtedness*") in an aggregate principal amount outstanding at any time, when taken together with the aggregate principal amount of Incremental Term A Facilities then outstanding, not to exceed $300 million); (ii) (other than assumed Indebtedness) reflects market terms for similar financings at the time of incurrence or issuance (as determined by the Borrower), (iii) there shall be no borrower or guarantor in respect of any such indebtedness that is not the Borrower or a Guarantor, (iv) if secured, such indebtedness shall not be secured by any assets of the Borrower or its subsidiaries that do not constitute collateral for the Facilities; (v) after giving effect to the incurrence thereof, no Event of Default under the Facilities shall have occurred or be continuing (in connection with permitted acquisitions or investments, subject to customary Sungard limitations); (vi) Borrower shall give Administrative Agent at least 3 business days' (or such shorter period as the Administrative Agent may agree) prior written notice of the intent to incur such additional secured or unsecured indebtedness; and (vii) with respect to secured indebtedness, the lender, the agent, the noteholder or the trustee, as applicable, therefor enters into a customary intercreditor agreement on terms to be mutually agreed.

[Term Sheet]

| | | |
|---|---|---|
| Purpose/Use of Proceeds: | (A) | The proceeds of borrowings under the U.S. Term Loan Facility and the Euro Term Loan Facility will be used by the Borrower for working capital and for other general corporate purposes (including to finance the Transactions, restricted payments and any other transactions not prohibited by the Facilities Documentation). |
| | (B) | The Letters of Credit and proceeds of Revolving Loans and Delayed Draw Term Loans will be used by the Borrower and its subsidiaries for working capital and for other general corporate purposes (including to finance the Transactions, restricted payments and any other transactions not prohibited by the Facilities Documentation, including payment of the Warrant (as defined below)). |
| Availability: | (A) | The U.S. Term Loan Facility and the Euro Term Loan Facility will be available in a single drawing on the date of the initial borrowing under the Facilities (the "***Closing Date***"). Amounts borrowed under the U.S. Term Loan Facility and the Euro Term Loan Facility that are repaid or prepaid may not be reborrowed. |
| | (B) | The Delayed Draw Term Loan Facility will be available to be made after the Closing Date, in no more than two draws (with the aggregate principal amount of each such draw being no less than $100 million), until the earlier of twelve months following the Closing Date or the date on which the Delayed Draw Term Loan Facility is fully funded (such period, the "***Delayed Draw Availability Period***"). The availability of the Delayed Draw Term Loan Facility will be conditioned upon delivery of a borrowing notice, accuracy of representations and warranties in all material respects (provided that any such representations and warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects), other than the Material Adverse Change and litigation representations, and other representations to be mutually agreed, and there being no Event of Default in existence at the time of, or after giving effect to the making of, such extension of credit (in connection with permitted acquisitions or investments, subject to customary Sungard protections). |
| | (C) | Revolving Loans (exclusive of Letter of Credit usage) may be made available on the Closing Date to finance the Transactions and working capital and any amount needed to fund any OID or upfront fees required to be funded on the Closing Date. Additionally, Letters of Credit may be issued on the Closing Date, including in order to backstop or replace letters of credit outstanding on the Closing Date under the facilities no longer available to the Borrower or any of its affiliates as of the Closing Date [(and such existing letters of credit may be deemed Letters of Credit outstanding under the applicable Revolving Facility)][2]. Otherwise, Revolving Loans will be available at any time prior to the final maturity of the Revolving Facilities, in minimum principal amounts to be agreed upon. Amounts repaid under the Revolving Facilities may be reborrowed. |

---

[2] To the extent that the issuer of such letter of credit is an Issuing Lender.

[Term Sheet]

| Interest Rates and Fees: | As set forth on Annex I to this Exhibit B. |
|---|---|

**Default Rate:** With respect to overdue principal, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount, including overdue interest, the interest rate applicable to ABR loans (as defined in Annex I) plus 2.00% per annum.

**Letters of Credit:** Up to $150 million (or the foreign currency equivalent) of the Revolving Facilities will be available to the Borrower and any of its subsidiaries for the purpose of issuing letters of credit (together with any existing letters of credit to be rolled into the Revolving Credit Facility, the "*Letters of Credit*"), available in U.S. Dollars, Euro, British Pounds Sterling, Canadian Dollars and other currencies to be mutually agreed. Letters of Credit will be issued by Bank of America, N.A. and other Revolving Lenders acceptable to the Borrower, the Administrative Agent and such additional issuers of Letters of Credit (each, an "*Issuing Lender*"). Each Letter of Credit shall expire not later than the earlier of (a) 12 months after its date of issuance or such longer period of time as may be agreed by the applicable Issuing Lender and (b) the fifth business day prior to the final maturity of the applicable Revolving Facility; *provided* that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to 12 months or such longer period of time as may be agreed by the applicable Issuing Lender (which in no event shall extend beyond the date referred to in clause (b) above, except to the extent cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the relevant Issuing Lender, provided that no Lender shall be required to fund participations in Letters of Credit after the maturity date applicable to its commitments); and provided, further, notwithstanding the foregoing, the Borrower shall be permitted to request Letters of Credit which have a termination date after the final maturity date of the applicable Revolving Facility, provided that on or prior to such final maturity date, the Borrower shall cash collateralize at 100% of face amount or back-stop at 100% of face amount (with back-to-back letters of credit from an issuer reasonably acceptable to the Issuing Lender of such Letters of Credit) such Letters of Credit.

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of borrowings under the Revolving Facilities) within one business day after notice of such drawing is received by the Borrower from the relevant Issuing Lender. To the extent the Borrower does not reimburse the applicable Issuing Lender within the time period specified above, the applicable Revolving Lenders shall be irrevocably obligated to reimburse such Issuing Lender pro rata based on their respective applicable Revolving Commitments.

In the case of loans and Letters of Credit denominated in currencies other than U.S. dollars, the Issuing Lender and the Administrative Agent may at periodic intervals (no more frequently than monthly, or more frequently during the continuance of an Event of Default) recalculate the aggregate exposure under such loans and Letters of Credit denominated in such currencies and outstanding under the Multicurrency Revolving Facility to account for fluctuations in exchange rates affecting the currencies in which any such non-U.S. dollar Letters of Credit are denominated. All calculations by the Administrative Agent of any foreign currency equivalents will be based on the applicable Reuters screen for such currency, any other publicly available service as may agreed between the Administrative Agent and the Borrower or at the Administrative Agent's spot foreign exchange rates. All calculations by the Issuing

[Term Sheet]

Lender of any foreign currency equivalents will be based on the Issuing Lender's spot foreign exchange rates. If, as a result of such recalculation, (i) the aggregate exposure in respect of loans and Letters of Credit outstanding under the Multicurrency Revolving Facility exceeds an amount equal to 105% of the Multicurrency Revolving Facility, the Borrower will prepay loans and, if necessary, cash collateralize the outstanding amount of Letters of Credit in the amount necessary to eliminate such excess or (ii) the aggregate exposure in respect of Letters of Credit outstanding under the Revolving Facilities exceeds an amount equal to 105% of the sublimit of $150 million for Letters of Credit, the Borrower will repay loans and, if necessary, cash collateralize the outstanding amount of Letters of Credit in the amount necessary to eliminate such excess.

|                                         |     |                                                      |
|-----------------------------------------|-----|------------------------------------------------------|
| Final Maturity and Amortization:        | (A) | U.S. Term Loan Facility and Euro Term Loan Facility  |

Each of the U.S. Term Loan Facility and Euro Term Loan Facility will mature on the date that is seven years after the Closing Date and, commencing at least one full fiscal quarter after the Closing Date, will amortize in equal quarterly installments in aggregate annual amounts equal to 1.00% of the original principal amount of the U.S. Term Loan Facility and Euro Term Loan Facility respectively, with the balance payable on the seventh anniversary of the Closing Date; *provided* that the Facilities Documentation shall provide the right of individual U.S. Term Loan Lenders and Euro Term Lenders to agree to extend the maturity of their U.S. Term Loans or Euro Term Loans, as applicable, upon the request of the Borrower and without the consent of any other Lender (as further described below).

(B)    Delayed Draw Term Loan

The Delayed Draw Term Loan Facility will mature on the date that is seven years after the Closing Date and, commencing at least one full fiscal quarter after the date of funding of the Delayed Draw Term Loans, will amortize in equal quarterly installments in aggregate annual amounts equal to 1.00% of the original principal amount of the Delayed Draw Term Loan Facility, with the balance payable on the seventh anniversary of the Closing Date; *provided* that the Facilities Documentation shall provide the right of individual Delayed Draw Term Loan Lenders to agree to extend the maturity of their Delayed Draw Term Loans upon the request of the Borrower and without the consent of any other Lender (as further described below).

(C)    Revolving Facilities

The Revolving Facilities will mature, and Revolving Commitments will terminate, on the date that is five years after the Closing Date; *provided* that the Facilities Documentation shall provide the right of individual Revolving Lenders to agree to extend the maturity of their Revolving Commitments and Revolving Loans upon the request of the Borrower and without the consent of any other Lender (as further described below).

The Facilities Documentation shall contain customary "amend and extend" provisions pursuant to which any individual Lender may agree to extend (which may include, among other things, an increase in the interest rates payable with respect to such extended loans, changes in amortization and call protection and payment of fees, which extensions shall not be subject to any "default stopper", financial tests or "most

[Term Sheet]

favored nation pricing provisions") the maturity date of its outstanding commitments in respect of any Revolving Facility or in respect of any Term Loan Facility or any class of Term Loans (including any Incremental Term Loans), in each case, upon the request of the Borrower and without the consent of any other Lender (it is understood that (i) no existing Lender will have any obligation to commit to any such extension, (ii) each Lender under the Facility or class being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender under such class), and (iii) any Term Loans so extended will have a weighted average life to maturity outside the weighted average life to maturity of the then remaining applicable Term Loans being extended.

Guarantees:    All obligations of the Borrower (the "*Obligations*") under (i) the Facilities, (ii) at the written request of the Borrower, interest rate protection, commodity trading or hedging, currency exchange or other non-speculative hedging or swap arrangements (other than any obligation of any Guarantor to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act (a "*Swap*"), if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Credit Party of a security interest to secure, such Swap (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof)) entered into by the Borrower or any subsidiaries with any Lender, any Agent or any affiliate of a Lender or Agent (the "*Hedging Arrangements*"), (iii) at the written request of the Borrower, cash management and treasury arrangements entered into by the Borrower or any subsidiary with any Lender, any Agent or any affiliate of a Lender or Agent ("*Treasury Arrangements*") and (iv) at the written request of the Borrower, up to an amount to be agreed under certain foreign credit lines ("*Designated Credit Lines*") will be unconditionally guaranteed jointly and severally on an equal priority senior secured basis (the "*Guarantees*") by each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. restricted subsidiary of the Borrower (other than any such subsidiary (a) that is a subsidiary of a non-U.S. subsidiary of the Borrower or a CFC Holding Company, (b) that is a U.S. subsidiary all of the assets of which (except for an immaterial amount) consist of the equity or debt of one or more direct or indirect non-U.S. subsidiaries that are "controlled foreign corporations" for purposes of Section 957(a) of the Code (each, a "*CFC*") (a "*CFC Holding Company*"), (c) that has been designated as an unrestricted subsidiary, (d) that accounts for not more than 5% of consolidated total assets of Holdings in the aggregate for all such subsidiaries (each, an "*Immaterial Subsidiary*"), (e) that is not permitted by law, regulation or contract to provide such guarantee, or would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee, (unless such consent, approval, license or authorization has been received), or for which the provision of such guarantee would result in adverse tax consequence to the Borrower or one of its subsidiaries (as reasonably determined by the Borrower in consultation with the Administrative Agent), (f) that is a special purpose entity or not for profit entity or captive insurance subsidiary or (g) any restricted subsidiary acquired pursuant to a Permitted Acquisition (to be defined in the Facilities Documentation) financed with secured indebtedness permitted to be incurred pursuant to the Facilities Documentation as assumed indebtedness (and not incurred in contemplation of such Permitted Acquisition) and any restricted subsidiary thereof that guarantees such indebtedness, in each case to the extent such secured indebtedness prohibits such

[Term Sheet]

subsidiary from becoming a Guarantor) (the "**Subsidiary Guarantors**"; and together with the Borrower and Holdings, the "**Credit Parties**") and by Holdings (together with the Subsidiary Guarantors, the "**Guarantors**"). In addition, certain subsidiaries may be excluded from the guarantee requirements under the Facilities Documentation in circumstances where the Borrower and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby. All obligations of the German Borrower will be guaranteed by the Borrower and the Guarantors. The German Borrower shall not be liable for any Obligations of the Borrower and the Guarantors.

Subject to the restricted payment covenant in the Facilities Documentation and no continuing Event of Default, the Borrower may designate any subsidiary as an "unrestricted subsidiary" and subsequently redesignate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will be excluded from the guarantee requirements and will not be subject to the representations and warranties, covenants, events of default or other provisions of the Facilities Documentation and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating any financial metric contained in the Facilities Documentation except to the extent of distributions received therefrom, consistent with the Documentation Precedent. In addition, joint ventures that are 50% or less owned by the Borrower and its Subsidiaries will not constitute "Subsidiaries" of the Borrower for purposes of the Facilities Documentation, regardless of whether such joint ventures are consolidated with Holdings.

Security:    Subject to the limitations set forth below in this section (i) the Obligations, the Guarantees in respect of the Obligations, the Hedging Arrangements, the Treasury Arrangements and (subject to the cap to be agreed) the Designated Credit Lines (collectively, the "**Secured Obligations**") will be secured on a senior basis, by substantially all of the present and after acquired assets of each of the Credit Parties (collectively, but excluding the Excluded Assets (as defined below), the "**Collateral**"), including (a) a perfected pledge of all the capital stock of each direct, wholly owned material domestic restricted subsidiary held by any Credit Party, (b) a perfected pledge of 65% of the voting capital stock and 100% of the non-voting capital stock of (x) [Lux Holdco] and (y) each CFC Holding Company and each foreign subsidiary that, in each case, is a direct, restricted subsidiary of any Credit Party and that exceeds a materiality threshold to be agreed (*provided* that, with the exception of a pledge of stock in [Lux Holdco] on the Closing Date, no pledge of the stock of any foreign subsidiaries existing on the Closing Date shall be required until a period to be agreed following the Closing Date) and (c) a perfected security interest in substantially all other tangible and intangible assets of the Credit Parties (including but not limited to accounts receivable, inventory, equipment, general intangibles, investment property, owned real property, intellectual property and the proceeds of the foregoing). The German Borrower shall not be required to grant any security interest in any of its assets to secure its Obligations.

Notwithstanding anything to the contrary, the Collateral shall exclude the following: (i) (x) any immaterial (as reasonably determined by the Administrative Agent) fee owned real property as of the Closing Date (with all required mortgages being permitted to be delivered post-closing), (y) any fee owned real property acquired after the Closing Date with a fair market value of less than $20 million individually and (z)

all leasehold interests in real property (including requirements to deliver landlord lien waivers, estoppels and collateral access letters), (ii) motor vehicles and other assets subject to certificates of title, letter of credit rights (other than to the extent such rights can be perfected by filing a UCC-1) and commercial tort claims, (iii) except to the extent a security interest therein can be perfected by filing a UCC-1, any assets specifically requiring perfection through control, control agreements or other control arrangements, including deposit accounts, securities accounts and commodities accounts (other than delivery of certificated pledged capital stock and promissory notes and entry into uncertificated securities control agreements with respect to uncertificated equity interests constituting securities under Article 8 of the UCC, if any), (iv) those assets over which the granting of security interests in such assets would be prohibited by permitted contract (including permitted liens, leases and licenses, but with respect to any contract, only to the extent of assets that are the subject of such contract), applicable law or regulation (in each case, except to the extent such prohibition is unenforceable after giving effect to applicable provisions of the Uniform Commercial Code, other than proceeds thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code notwithstanding such prohibitions) or to the extent that such security interests would require obtaining the consent of any governmental authority or would result in adverse tax consequences as reasonably determined by the Borrower in consultation with the Administrative Agent, (v) margin stock and, to the extent requiring the consent of one or more third parties or prohibited by the terms of any applicable organizational documents, joint venture agreement or shareholders' agreement, equity interests in any person other than wholly-owned material restricted subsidiaries, (vi) those assets as to which the Administrative Agent reasonably determines in writing that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit to the Lenders of the security to be afforded thereby, (vii) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (viii) any lease, license or other agreement or any property subject to a purchase money security interest, capital lease obligation or similar arrangement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Guarantor) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code notwithstanding such prohibition, (ix) except as required pursuant to clause (b) in the immediately preceding paragraph, any foreign collateral or credit support and (x) other exceptions to be mutually agreed. The foregoing described in clauses (i) through (x) are, collectively, the "*Excluded Assets*".

Except as set forth in clause (ix) of the immediately preceding paragraph, no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to perfect or make enforceable any security interests in any assets (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non U.S. jurisdiction).

All the above-described pledges, security interests and mortgages shall be created and perfected on terms in the Facilities Documentation, and none of the Collateral or other assets of the Credit Parties shall be subject to other pledges, security interests or

[Term Sheet]

B-12

mortgages, subject to customary exceptions for financings of this kind.

| Mandatory Prepayments: | The Term Loans shall be prepaid with (a) commencing with the first full fiscal year of the Borrower to occur after the Closing Date, 50% of Excess Cash Flow (to be defined in the Facilities Documentation (and, in any event, to include deductions for (i) all cash restructuring charges, (ii) all cash restricted payments and investments, to the extent permitted under the Facilities Documentation and not funded with indebtedness or equity proceeds and (iii) all cash payments of certain pension and DPO obligations)) of the Borrower, with a reduction to 25% based upon achievement of First Lien Leverage Ratio of [ ]:1.00 and elimination upon the achievement of a First Lien Leverage Ratio of [ ]:1.00; *provided* that any voluntary prepayments or commitment reductions of loans (including prepayments at a discount to par offered to all Lenders under any Term Loan Facility or under any Incremental Term Loan Facility, as applicable, with credit given for the actual amount of cash payment) shall be credited against excess cash flow prepayment obligations of any fiscal year on a dollar-for-dollar basis (other than to the extent such prepayments are funded with the proceeds of long-term indebtedness (other than revolving loans)); (b) 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower or any of its restricted subsidiaries (other than indebtedness permitted under the applicable Facilities (other than Refinancing Debt) (to be defined in the Facilities Documentation)); and (c) 100% of the net cash proceeds of all non-ordinary course asset sales or other dispositions of Collateral by the Borrower and its restricted subsidiaries (including insurance and condemnation proceeds in respect of Collateral) in excess of an amount to be agreed for each individual asset sale or disposition and an amount to be agreed in the aggregate for any fiscal year (with only the amount in excess of such limit required to be offered to prepay) and subject to the right of the Borrower to reinvest such proceeds if such proceeds are reinvested (or committed to be reinvested) within 365 days and, if so committed to reinvestment, reinvested within 180 days thereafter, and other exceptions to be agreed upon. |
| --- | --- |

All prepayments referred to in <u>clause (a)</u> (to the extent attributable to the Excess Cash Flow of a foreign subsidiary) or <u>(c)</u> (to the extent attributable to asset sales or a casualty event of a foreign subsidiary) above are subject to permissibility under (i) local law (e.g., financial assistance, corporate benefit, restrictions on upstreaming of cash intra-group and the fiduciary and statutory duties of the directors of the relevant subsidiaries) and (ii) material organizational document restrictions (including as a result of minority ownership). Further, to the extent that the Borrower has determined in good faith that any mandatory prepayment would either (i) result in adverse tax consequences related to the repatriation of funds in connection therewith by foreign subsidiaries or (ii) be prohibited or delayed by applicable law, then, to the extent such result is not directly attributable to actions taken by the Borrower or any of its subsidiaries with the intent of avoiding or reducing any mandatory prepayment otherwise required, the Borrower shall not be required to make a prepayment with such amount; *provided* that the Borrower shall have used its commercially reasonable efforts to overcome or eliminate any such restrictions and/or minimize any such costs of prepayment and/or use the other cash resources of the Borrower and subsidiaries (subject to the considerations above) to make such mandatory prepayment. Notwithstanding the foregoing, any prepayments required after application of the above provision shall be net of any costs, expenses or taxes incurred by the Borrower

[Term Sheet]

B-13

and its subsidiaries and arising exclusively as a result of compliance with the preceding sentence.

Mandatory prepayments required under the Facilities Documentation may, if required pursuant to the terms of any other indebtedness secured pari passu with the applicable Facility, be applied to the Term Loans outstanding under the Facilities and such other pari passu indebtedness, in each case on a ratable basis based on the outstanding principal amounts thereof.

Mandatory prepayments shall be applied first, on a ratable basis based on the outstanding principal amounts thereof, to accrued interest and fees due on the amount of the prepayment under the Term Loan Facilities and second, directly, on a ratable basis based on the outstanding principal amounts thereof, to the scheduled installments of principal of the Term Loan Facilities in direct order of maturity.

Any Term Loan Lender may elect not to accept any mandatory prepayment made pursuant to clause (a) or (c) above (each a "*Declining Lender*"). Any prepayment amount declined (such amount, a "*Declined Amount*") by a Declining Lender under any Term Loan Facility or under any Incremental Term Loan Facility may be retained by the Borrower and shall be added to the builder amount.

|  |  |
|---|---|
| Voluntary Prepayments and Reductions in Commitments: | Voluntary reductions of the unutilized portion of the Revolving Commitments and prepayments of borrowings under any of the Facilities will be permitted at any time, in minimum principal amounts to be agreed upon, without premium or penalty (except as provided below under "Prepayment Premium"), subject to reimbursement of the Lenders' redeployment costs actually incurred in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period. Any voluntary prepayments of the U.S. Term Loan Facility, the Euro Term Loan Facility, the Delayed Draw Term Loan Facility and any Incremental Term Loan Facility, as applicable, will be applied to the remaining amortization payments under such Term Loan Facility or such Incremental Term Loan Facility, as directed by the Borrower (and absent such direction, in direct order of maturity thereof), including to any class of extending or existing Loans in such order as the Borrower may designate, and shall be applied to any Term Loan Facility or any Incremental Term Loan Facility as determined by the Borrower. |
| Prepayment Premium | In the event that all or any portion of the U.S. Term Loan Facility, the Euro Term Loan Facility or the Delayed Draw Term Loan Facility is repaid voluntarily, mandatorily repaid with proceeds of the incurrence of indebtedness or repriced (or effectively refinanced) in connection with any Repricing Transaction (as defined below), each Lender holding loans under such Term Loan Facility shall be paid a premium equal to 1.00% of such Lender's pro rata share of the amount of such loans so repaid, repriced or effectively refinanced, if such repayment, repricing or refinancing is effected prior to the six-month anniversary of the Closing Date. A "*Repricing Transaction*" means the prepayment, repricing or refinancing of all or a portion of any Term Loans with the incurrence by the Borrower or any of its restricted subsidiaries of term loan debt financing reducing the effective interest cost or weighted average yield (as reasonably determined by the Administrative Agent consistent with generally accepted financial practice) to less than the interest rate for or weighted average yield (as determined by the Administrative Agent on the same basis) of such Term Loans, including without limitation, as may be effected through any amendment to such Term Loan Facility relating to the interest rate for such Term Loans. |
| Documentation: | The Facilities will be documented under a single credit agreement (the "*Facilities* |

[Term Sheet]

B-14

*Documentation*").

| | |
|---|---|
| <u>Conditions Precedent to Initial Borrowing:</u> | The availability of the initial borrowing and other extensions of credit under the Facilities will be subject solely to (w) the applicable conditions set forth in Exhibit C to the Commitment and Engagement Letter, (x) accuracy of the representations and warranties in all material respects (provided that any such representations and warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects), (y) absence of defaults or events of default and (z) delivery of a customary borrowing notice. |
| <u>Conditions Precedent to All Subsequent Borrowings:</u> | After the Closing Date, each extension of credit will be conditioned upon: delivery of a borrowing notice, accuracy of representations and warranties in all material respects (provided that any such representations and warranties which are qualified by materiality, material adverse effect or similar language shall be true and correct in all respects) and absence of defaults or events of default. |
| <u>Representations and Warranties:</u> | Limited to the following (to be applicable to the Credit Parties and their restricted subsidiaries, consistent with the Documentation Precedent): organizational status; power and authority and qualification with respect to the execution, delivery and performance of the Facilities Documentation; enforceability of the Facilities Documentation; no violation of, or conflict with, law, charter documents or material agreements; litigation; use of proceeds; margin regulations; material governmental approvals with respect to the execution, delivery and performance of the Facilities; compliance with laws and contractual obligations; Investment Company Act; PATRIOT Act, OFAC, the FCPA and other anti-terrorism and anti-money laundering laws; accuracy of disclosure; since the date of the last audit, no Material Adverse Effect (as defined below); taxes; ERISA; subsidiaries; intellectual property; creation, validity and perfection of security interests; environmental laws; labor relations; properties; consolidated closing date solvency; subject, in the case of each of the foregoing representations and warranties, to qualifications and limitations for materiality to be agreed. |
| | "*Material Adverse Effect*" shall mean a circumstance or condition that, individually or in the aggregate, would reasonably be expected to materially adversely affect (a) the business, assets, results of operations, properties or financial condition of the Borrower and its restricted subsidiaries taken as a whole, (b) the ability of the Borrower and the other Credit Parties, taken as a whole, to perform their payment obligations under the applicable Facilities Documentation or (c) the rights and remedies of the applicable Administrative Agent and the applicable Lenders under the applicable Facilities Documentation. |
| <u>Affirmative Covenants:</u> | Limited to the following (to be applicable to the Credit Parties and their restricted subsidiaries, consistent with the Documentation Precedent): delivery of annual and quarterly financial statements (within 90 days for delivery of the annual financial statements and 45 days for the first three quarterly financial statements of each year), and with annual financial statements to be accompanied by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit other than solely with respect to, or resulting solely from an upcoming maturity date under any Facility occurring within one year from the time such opinion is delivered; delivery of notices of defaults and certain material events; inspections (including books and records and subject to frequency (so long as there is |

[Term Sheet]

B-15

no ongoing event of default) and cost reimbursement limitations); maintenance of organizational existence and rights and privileges; maintenance of insurance; commercially reasonable efforts to maintain ratings (but not to maintain a specific rating); payment of taxes; corporate franchises; compliance with laws (including environmental laws); ERISA; good repair; additional guarantors and collateral; use of proceeds; and further assurances on collateral matters; subject, in the case of each of the foregoing covenants, to exceptions and qualifications to be agreed.  All of the Facilities shall be subject to the same affirmative covenants.

Negative
Covenants:



[Term Sheet]

B-16



[Term Sheet]

NY\6117974.13



[Term Sheet]

B-18



**Financial
Covenant:**

**Events of
Default:** Limited to the following (to be applicable to the Borrower and its restricted subsidiaries, consistent with the Documentation Precedent): nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross default and cross acceleration to material indebtedness; bankruptcy and insolvency of the Borrower or any of its restricted subsidiaries (other than Immaterial Subsidiaries); material monetary judgments; ERISA events; actual or asserted invalidity of material guarantees or security documents; and Change of Control, subject to threshold, notice and grace period provisions to be agreed. "Change of Control" shall be defined as any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than a Qualified Parent Company (to be defined), acquiring beneficial ownership or control, directly or indirectly, of more than 40% of the voting Equity Interests of the Borrower.

For the avoidance of doubt, a requirement to make a mandatory offer to repurchase

[Term Sheet]

under the terms of any Indebtedness as a result of a "change of control" (or equivalent term) shall not constitute a Default or an Event of Default so long as (A) on or prior to the date the events constituting such "change of control" (or equivalent term) occur, either (I) the terms of such Indebtedness have been amended to eliminate the requirement to make such offer or, (II) such Indebtedness has been defeased or discharged so that such requirement shall no longer apply (and, in the event such "change of control" is subject to a requirement that a specific credit ratings event or similar condition subsequent occur, no Event of Default shall exist until such time as the specific credit ratings event or similar condition subsequent has also occurred resulting in the obligor under such Indebtedness to become unconditionally obligated to make such offer) or (III) solely in the case of Indebtedness of any Person acquired by the Borrower or any of its Subsidiaries where such "change of control" (or equivalent term) under such Indebtedness resulted from the Borrower or one of its Subsidiary's acquisition of such Person, (x) the sum of available liquidity (to be defined as the sum of the available revolving commitments, any undrawn commitments in respect of Incremental Term Loans, the Delayed Draw Term Loan Facility and unrestricted cash and cash equivalents of Borrower and its subsidiaries) plus any available debt financing commitments from any Revolving Lender or any Affiliate of a Revolving Lender or any other financial institution of nationally recognized standing available to the Borrower or its Subsidiaries for purposes of refinancing such Indebtedness is at least equal to the aggregate amount that would be required to repay such Indebtedness pursuant to any required "change of control offer" (or equivalent term) pursuant to the terms of such Indebtedness at all times prior to the expiration of the rights of the holders of such Indebtedness to require the repurchase or repayment of such Indebtedness as a result of such acquisition and (y) the Borrower or the applicable Subsidiary complies with the provisions of such Indebtedness that are applicable as a result of such acquisition (including by consummating any required "change of control offer" (or equivalent term) for such Indebtedness).

Notwithstanding the foregoing, (x) only lenders holding at least a majority of the Revolving Commitments and Revolving Loans (across both the U.S. Revolving Facility and the Multicurrency Revolving Facility on an aggregate basis) shall have the ability to (and be required in order to) amend the Financial Covenant and waive a breach of the Financial Covenant, and (y) a breach of the Financial Covenant shall not constitute an Event of Default with respect to the Term Loan Facilities or trigger a cross-default under the Term Loan Facilities until the date on which the Revolving Loans (if any) have been accelerated or the Revolving Commitments have been terminated, in each case, by the Revolving Lenders in accordance with the terms of the Revolving Facility.

Voting:                Amendments and waivers of the Facilities Documentation will require the approval of Lenders (other than Defaulting Lenders) holding more than 50% of the aggregate amount of the loans, letter of credit exposure and unused commitments under the Facilities (the "**Required Lenders**"), <u>provided</u> that, in addition to the approval of the Required Lenders, (i) the consent of each Lender directly and adversely affected thereby shall be required with respect to: (A) increases in the commitment of such Lender, (B) reductions of principal, interest, fees or premiums owing to such Lender, (C) extensions or postponement of final maturity of such Lender's Loans or Commitments or the scheduled date of payment of any principal, interest, fee or premium owing to such Lender, and (D) releases of all or substantially all the value

[Term Sheet]

of the Guarantees or releases of liens on all or substantially all of the Collateral, (ii) the consent of 100% of the Lenders, will be required with respect to modifications of the voting provisions or to any of the voting percentages that result in a decrease of voting rights for any Lenders, (iii) certain amendments will require the approval of holders of more than 50% of a particular class of loans and (iv) customary protections for the Administrative Agent, the Swingline Lender and the Issuing Lenders will be provided.

Notwithstanding the foregoing, amendments and waivers of the Financial Covenant will be subject to the second paragraph under "Events of Default" above.

The Facilities shall contain provisions permitting the Borrower to replace (i) non-consenting Lenders in connection with amendments and waivers requiring the consent of all such class of Lenders or of all such class of Lenders directly affected thereby so long as the Required Lenders shall have consented thereto and (ii) Defaulting Lenders. The Facilities shall also contain usual and customary provisions regarding Defaulting Lenders.

| | |
|---|---|
| Cost and Yield Protection: | Usual for facilities and transactions of this type, with provisions (a) protecting the Lenders from increased costs, capital adequacy and capital requirements, illegality, unavailability and other requirements of law and from the imposition of withholding and other tax liabilities in form and substance reasonably satisfactory to the Borrower and the Administrative Agent and (b) indemnifying the Lenders for actual "breakage costs" in respect of LIBOR rate loans incurred in connection with, among other things, any prepayment of a LIBOR rate loan on a day other than the last day of an interest period with respect thereto and determined without giving effect to any interest rate "floor". For all purposes of the Facilities Documentation, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives promulgated thereunder and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case, pursuant to Basel III, shall be deemed introduced or adopted after the date of the Facilities Documentation; *provided* that any increased costs associated with a change in law based on the foregoing clauses (i) and/or (ii) may only be imposed to the extent the applicable Lender is generally imposing the same charges or additional amounts on other similarly situated borrowers in similar credit facilities. The Facilities shall contain provisions regarding the timing for asserting a claim under these provisions and permitting the Borrower to replace a Lender who asserts such claim without premium or penalty. |
| Assignments and Participations: | The Lenders will be permitted to assign (a) Term Loans with the consent of the Borrower (not to be unreasonably withheld or delayed) and (b) Revolving Loans and Revolving Commitments with the consent of the Borrower (not to be unreasonably withheld or delayed, and which consent shall be deemed to have been given if the Borrower has not responded within ten Business Days of receipt by the Borrower of a written assignment request), the Swingline Lender and each Issuing Lender; *provided* that no consent of the Borrower shall be required (i) after the occurrence and during the continuance of a payment or bankruptcy Event of Default (with respect to the Borrower) or (ii) for assignments of Term Loans to any existing Lender or an affiliate of an existing Lender or an approved fund. All assignments of Loans will require the consent of the Administrative Agent unless such assignment is an assignment of Term |

[Term Sheet]

Loans to another Lender, an affiliate of a Lender or an approved fund, not to be unreasonably withheld or delayed. Assignments to natural persons shall be prohibited. Each assignment will be in an amount of an integral multiple of $1.0 million with respect to the Term Loan Facilities and $2.5 million with respect to the Revolving Facilities or, in each case, if less, all of such Lender's remaining loans and commitments of the applicable class. Assignments will not be required to be pro rata among the Facilities. The Administrative Agent shall receive a processing and recordation fee of $3,500 for each assignment (unless waived by the Administrative Agent).

The Lenders will be permitted to sell participations in the Facilities without restriction, other than as set forth in the next sentence, and in accordance with applicable law. Voting rights of participants shall be limited to matters in respect of (a) increases in commitments participated to such participants, (b) reductions of principal, interest, fees or premiums, (c) extensions of final maturity or the scheduled date of payment of any principal, interest, fees or premiums, and (d) releases of all or substantially all of the value of the Guarantees or all or substantially all of the Collateral.

The Facilities Documentation shall provide that (a) Term Loans may be purchased by the Borrower on a non-pro rata basis through (i) open market purchases and (ii) Dutch auction or similar procedures to be agreed that are offered to all Lenders on a pro rata basis in accordance with customary procedures to be agreed and subject to customary restrictions to be agreed and (b) the Borrower and any other affiliates of the Borrower shall be eligible assignees with respect to Term Loans only; provided that (i) any such Term Loans acquired by the Borrower or any of its respective subsidiaries shall be retired and cancelled promptly upon acquisition thereof (or contribution thereto), (ii) Borrower will not be required to make a no "MNPI" representations, (iii) the Facilities Documentation shall include customary "big boy" provisions applicable to assignors, (iii) no Event of Default shall exist or result immediately (including after giving effect to any grace or cure periods) therefrom, and (iv) loans may not be purchased with the proceeds of loans under the Revolving Facilities.

| | |
|---|---|
| Expenses and Indemnification: | Whether or not the Closing Date occurs, the Borrower shall pay all reasonable and documented out-of-pocket expenses of the Administrative Agent, the Lead Arrangers and the Issuing Lenders in connection with the syndication of the Facilities and the preparation, execution, delivery, administration, amendment, waiver or modification of the Facilities Documentation (including the reasonable fees and expenses of one primary counsel (other than any allocated costs of in-house counsel) and, if necessary, a single firm of local counsel in each relevant jurisdiction, or other counsel retained with the Borrower's consent (such consent not to be unreasonably withheld or delayed)). In addition, after the occurrence of a Default or an Event of Default, the Borrower shall pay all reasonable costs and expenses, including the reasonable fees and expenses of one primary counsel (other than any allocated costs of internal counsel) and, if necessary, a single firm of local counsel in each relevant jurisdiction (and, in the case of an actual or perceived conflict of interest where the person affected by such conflict notifies the Borrower of the existence of such conflict, of another firm of counsel for such affected person), incurred by any Agent and Lenders in connection with the enforcement or preservation of any rights under any of the Facilities. |

[Term Sheet]

B-22

The Borrower will indemnify and hold harmless the Administrative Agent, the Lead Arrangers, the Issuing Lenders and the Lenders (without duplication) and their respective affiliates, and the officers, directors, employees, agents, controlling persons, members and the successors and assigns of the foregoing (each, an "*Indemnified Person*") from and against any and all losses, claims, damages and liabilities of any kind or nature (regardless of whether any such Indemnified Person is a party thereto and whether any such proceeding is brought by the Borrower or any other person) and reasonable and documented out-of-pocket fees and expenses incurred in connection with investigating or defending any of the foregoing by one firm of counsel for all Indemnified Persons, taken as a whole, and, if necessary, by a single firm of local counsel in each appropriate jurisdiction for all such Indemnified Persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnified Person affected by such conflict notifies the Borrower of the existence of such conflict, of another firm of counsel for such affected Indemnified Person) of any such Indemnified Person arising out of or relating to any claim, litigation, investigation or other proceeding (including any inquiry or investigation of the foregoing) (regardless of whether such Indemnified Person is a party thereto or whether or not such action, claim, litigation or proceeding was brought by the Borrower, its equity holders, affiliates or creditors or any other third person) that relates to the Transactions, including the financing contemplated hereby; *provided* that no Indemnified Person will be indemnified for any losses, claims, damages, liabilities or related expenses to the extent that they have (i) resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of such Identified Person's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing (as determined by a court of competent jurisdiction in a final and non-appealable decision), (ii) resulted from a material breach of the obligations under the Facilities Documentation of such Indemnified Person or any of such Identified Person's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (iii) arisen out of or in connection with any claim, litigation, investigation or other proceeding not involving any act or omission by the Borrower or its affiliates that is brought by an Indemnified Person against any other Indemnified Person (other than disputes involving claims against the Swingline Lender or any Lead Arranger, Administrative Agent or Issuing Lender in their capacity as such).

| Governing Law and Forum: | New York. |
| Counsel to the Agents: | Latham & Watkins LLP |

[Term Sheet]

B-23

**Interest Rates:**

The interest rates under the Facilities will be as follows:

U.S. Revolving Facility

At the option of the Borrower, initially, at the adjusted LIBOR Rate plus [  ]% or ABR plus [  ]%.

Multicurrency Revolving Facility

At the adjusted LIBOR Rate plus [  ]%.

U.S. Term Loans and Delayed Draw Term Loans

At the option of the Borrower, initially, at the adjusted LIBOR Rate plus [  ]% or ABR plus [  ]%.

Euro Term Loans

At the adjusted LIBOR Rate plus [  ]%.

All Facilities

The Borrower may elect interest periods of 1, 3 or 6 months (or, if available to all relevant Lenders, 12 months or a shorter period) for LIBOR borrowings.

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable at the end of each interest period and, in any event, at least every 3 months and on the applicable maturity date.

As used herein, the terms **"ABR"** and **"adjusted LIBOR Rate"** will have meanings customary for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest at the adjusted LIBOR Rate will be customary for financings of this type, and, with respect to the Term Loans only, subject to an adjusted LIBOR Rate "floor" of [___]% and an ABR "floor" of [___]% solely with respect to the Term Facilities. In no event shall the ABR be less than the sum of (i) the one-month adjusted LIBOR Rate (after giving effect to any adjusted LIBOR Rate "floor") plus (ii) the difference between the applicable stated margin for adjusted LIBOR Rate loans and the applicable stated margin for ABR loans.

**Letter of Credit Fees:**



[Term Sheet]

B-24



**Revolving Commitment Fees:**

**Delayed Draw Term Loan Ticking Fees:**

[Term Sheet]

**ANNEX C**

**W. R. Grace & Co. and W. R. Grace & Co.-Conn.**

**Summary of Additional Conditions Precedent to the Facilities**

*This Summary of Additional Conditions Precedent sets forth the conditions precedent to the Facilities referred to in the Commitment and Engagement Letter, of which this Annex C is a part (in addition to those expressly set forth in the Commitment and Engagement Letter and the Term Sheet attached thereto). Certain capitalized terms used herein are defined in the Commitment and Engagement Letter.*

A.    ADDITIONAL CONDITIONS PRECEDENT TO THE FACILITIES

1.    Concurrent Transactions:  In connection with the Plan and the transactions contemplated thereby: (a) any documents executed in connection with the implementation of the Plan, to the extent they contain provisions differing from in any material respect or not described in the Plan, that are material to the rights or interests of any or all of the Global Coordinators, Arrangers, Senior Managing Agents and Lenders (collectively, the "**Finance Parties**") shall be in form and substance satisfactory to the Arrangers in their good faith judgment; (b) there shall have been no supplement, modification, waiver or amendment to the Plan (as in effect on the date of the Commitment and Engagement Letter) that, in the good faith judgment of the Arrangers, is adverse in any material respect to the rights or interests of the Finance Parties or the creditworthiness of Holdings or the Company unless, in each case, the Arrangers shall have consented thereto; (c) unless the Arrangers shall have consented thereto in writing, the Authorization Order shall not have been vacated, stayed, reversed or modified or amended in any respect that adversely affects the rights or interests of any or all of the Finance Parties as determined by the Arrangers in good faith; and (d) all conditions precedent to the effectiveness of the Plan, as it may be amended, supplemented, modified or waived in accordance with clause (b) above, other than the closing and funding of the Facilities, shall have occurred or been waived (to the extent such waiver is material to the rights or interests of any or all of the Finance Parties, with the consent of the Arrangers).  There will not exist (pro forma for the Transactions and the financing thereof) any default or event of default under any of the Loan Documents or under any other indebtedness of Holdings or its subsidiaries that would result in a cross-default to the Facilities under the Loan Documents.  Substantially concurrently with the initial funding of the Facilities, the Borrower's debtor-in-possession letter of credit facility and certain pre-petition debt of Holdings and its subsidiaries shall have been repaid or repurchased in full (*provided, however,* that regarding the debt under the pre-petition credit facilities, certain amounts shall be paid to the lender group in full satisfaction of the Debtors' pre-petition lenders' claims for certain post-petition interest pursuant to the terms of a settlement, which is the subject of a pending motion for Bankruptcy Court approval under Bankruptcy Rule 9019), all commitments relating thereto shall have been terminated, and all liens or security interests related thereto shall have been terminated or released, in each case to the extent set forth in or contemplated by the Plan (as the same may be amended, supplemented, modified or waived in accordance with clause (b) above) and the Loan Documents; *provided, however,* that any changes to such discharge that are adverse to the rights or interests of any or all of the Finance Parties, as determined by the Arrangers in good faith, shall be on terms satisfactory to the Arrangers, and Holdings and its subsidiaries will have no indebtedness for borrowed money other than (i) indebtedness under the Facilities, (ii) indebtedness set forth in or contemplated by the Plan, as the same may be amended, supplemented, modified or waived in accordance with clause (b) above, (iii) letters of credit and surety bonds, (iv) intercompany indebtedness, (v) all existing lines of credit and credit facilities of foreign subsidiaries set forth on Schedule 1 hereto, as they may be extended, refinanced or

replaced prior to the Closing Date, and the incurrence of new credit facilities of foreign subsidiaries (in the case of each such extension, refinancing, replacement or incurrence, to the extent the Company has provided at least 5 business days' prior written notice to the Arrangers thereof and the Arrangers have consented thereto (such consent not to be unreasonably withheld)) and (vi) other indebtedness specifically approved by the Arrangers in their sole discretion.

2.     <u>Financial Statements</u>.  The Arrangers shall have received (i) audited financial statements of Holdings and the Company for each of the fiscal years ended at December 31, 2010, December 31, 2011 and December 31, 2012; (ii) unaudited financial statements for any of the first three fiscal quarters of Holdings and the Company of any fiscal year ended after the date of the most recent audited financial statements and more than 45 calendar days prior to the Closing Date; and (iv) customary pro forma balance sheet as of the date of the financial statements most recently delivered pursuant to clause (ii) above, giving pro forma effect to the consummation of the Transactions.

3.     <u>Material Adverse Effect</u>.  There shall not have occurred, since December 31, 2012, a Material Adverse Effect; <u>*provided*</u>, <u>*however*</u>, that the existence of the Bankruptcy Cases shall not be deemed to be a Material Adverse Effect.

4.     <u>Payment of Fees and Expenses</u>.  All costs, fees and expenses required by the Letters to be paid to the Finance Parties on the Closing Date, to the extent invoiced at least three business days prior to the Closing Date, shall have been paid or shall be paid simultaneously with the initial borrowing under the Facilities (which amounts may be offset against the proceeds of the Facilities).

5.     <u>Customary Closing Documents</u>.  The Arrangers shall be satisfied that Holdings has complied with the following customary closing conditions: (i) the delivery of customary legal opinions, customary evidence of authorization, customary officer's certificates and good standing certificates (to the extent applicable) in the jurisdiction of organization of the Borrower and each Guarantor; (ii) satisfactory confirmation of repayment of indebtedness required to be repaid in accordance with the Plan; (iii) notices of borrowing; (iv) obtaining material third party and governmental consents necessary in connection with the Transactions (to the extent required by the Plan, as it may be amended or waived in accordance with paragraph 1 above); (v) absence of litigation affecting the Transactions (other than the Bankruptcy Cases) that would be material to the Lenders; (vi) all documents and instruments required to create and perfect the Collateral Agent's security interests in the Collateral for the benefit of the Secured Parties shall have been executed and delivered by the Borrower and the Guarantors to the extent required under the Term Sheet and, if applicable, be in proper form for filing (and arrangements reasonably satisfactory to the Collateral Agent shall have been made for the filing, where applicable, of such documents and instruments); (vii) customary evidence of insurance and (viii) delivery of a solvency certificate from the chief financial officer of Holdings with respect to Holdings and its subsidiaries on a consolidated basis.

6.     <u>Know-Your-Customer Information</u>.  The Arrangers will have received at least three business days prior to the Closing Date all documentation and other information with respect to the Borrower and the Guarantors that shall have been reasonably requested by the Administrative Agent or the Arrangers in writing at least 10 business days prior to the Closing Date and that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act.

# **EXHIBIT B-4**

## **Redacted Mandate Letter**

*Execution Version*

**GOLDMAN SACHS BANK USA**
200 West Street
New York, New York 10282-2198

**DEUTSCHE BANK SECURITIES INC.**
60 Wall Street
New York, New York 10005

**PERSONAL AND CONFIDENTIAL**

January 6, 2014

**W. R. Grace & Co.**
**W. R. Grace & Co.-Conn.**
**7500 Grace Drive**
**Columbia, MD 21044**
**Attention: Hudson La Force III**

Ladies and Gentlemen:

We are delighted to be working with you on the possible senior secured financing of W.R. Grace & Co. ("Holdings") and W.R. Grace & Co. – Conn. ("Company" and together with Holdings, "you"). You have informed us that (a) the Company, together with Holdings and its direct and indirect wholly owned United States subsidiaries (collectively, the "Debtors"), have filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and (b) the Debtor's cases in the Bankruptcy Court (the "Bankruptcy Cases") have been consolidated for purposes of joint administration of each of the Debtors under Case No. 01-1139. You have further informed us that the Debtors intend to emerge from the Bankruptcy Cases pursuant to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified Through December 23, 2010 [Docket No. 26368] (including all exhibits thereto, the "Plan"). In connection with, and subject to the confirmation and effectiveness of, the Plan, Holdings intends to recapitalize certain of its and its subsidiaries' existing indebtedness, substantially on the terms set forth in the Plan and obtain exit financing.

This letter (this "Letter") is to confirm that you and we agree that the Company will offer Goldman Sachs Bank USA. ("Goldman Sachs") and Deutsche Bank Securities, Inc. ("DBSI" and, together with Goldman Sachs, the "Engagement Parties," "we" or "us") the exclusive right to act in such exit financing transaction as the global coordinators, joint lead arrangers and joint bookrunners, and if Goldman Sachs and DBSI each agrees to act in such capacity, the Company, Goldman Sachs and DBSI will enter into an appropriate form of engagement and/or commitment letter relating to exit financing. We anticipate conducting certain syndication efforts prior to the execution of any such engagement and/or commitment letter.

In connection with arrangements such as this, it is our policy to receive indemnification. By execution of this Letter, each of Holdings and the Company agrees on a joint and several basis to the provisions with respect to our indemnity and other matters set forth in *Annex A* attached hereto, which is incorporated by reference into this Letter; *provided* that, for the avoidance of doubt, in no event will the indemnification for any losses, claims, damages or liabilities or other matters set forth in Annex A extend to each Engagement Party and to any of their respective affiliates solely and exclusively as a result of such entities acting in their capacities as lenders under the Company's pre-petition credit facilities.

NY\6117969.4

W.R. Grace & Co.
W.R. Grace & Co. – Conn.
January 6, 2014
Page 2

Please note that any written or oral advice provided by Goldman Sachs or DBSI in connection with the proposed transaction is exclusively for the information of the Company and its Board of Directors and senior management and may not be disclosed to any third party or circulated or referred to publicly without our prior written consent; *provided* that we hereby consent to your disclosure of (i) this Letter and such communications and discussions to your officers, directors, agents, employees, representatives, affiliates, legal counsel, auditors and advisors on a confidential basis, (ii) this Letter (a) to the office of the U.S. Trustee, to any ad-hoc or statutorily appointed committees of creditors or equity holders, to the future claimants' representative for the asbestos personal injury claimants, to the future claimants' representative for the asbestos property damage claimants, and to their respective representatives and professional advisors who have agreed to treat such information confidentially or are otherwise bound by a confidentiality agreement with Holdings or the Company, the scope of which includes this Letter and (b) to the extent required in motions (provided that this Letter is filed with the Bankruptcy Court with a request that it be filed under seal), in form and substance reasonably satisfactory to the Goldman Sachs and DBSI, to be filed with the Bankruptcy Court in connection with obtaining an order of the Bankruptcy Court approving Holdings' and the Company's execution, delivery and performance of a commitment/engagement letter, the fees associated therewith, and the definitive documentation for any exit financing, (iii) this Letter as required by applicable law or compulsory legal process (in which case you agree to inform each Engagement Party promptly thereof to the extent legally permitted to do so), (iv) in connection with the exercise of any remedy or enforcement of any right under this Letter, and (v) to the extent any such information becomes publicly available other than by reason of disclosure by you, your affiliates or your representatives in violation of this Letter. You further agree that if the Bankruptcy Court denies your request to file this Letter under seal and requires a redacted version of this Letter to be filed and/or disclosed, you shall provide a redacted version of this Letter reasonably acceptable to us and the Bankruptcy Court.

The Company acknowledges that this Letter is neither an expressed nor an implied commitment by Goldman Sachs or DBSI, jointly or individually, to act in any capacity described above or to purchase or place any financing in connection with the proposed transaction, which commitment shall only be set forth in a separate commitment agreement. As you know, our participation in this transaction also remains subject to further internal review and approvals, satisfactory completion of our due diligence investigation and market conditions.

Please confirm that the foregoing is in accordance with our understanding by signing the enclosed copy of this Letter and returning it to us. We look forward to our work together on this important transaction.

[Signature pages follow]

Very truly yours,

**GOLDMAN SACHS BANK USA**

By: _____
                        Authorized Signatory

**DEUTSCHE BANK SECURITIES INC.**

By: _____
Name: Jackson Merchant
Title: Director

By: _____
Name: Michael Busam
Title: Director

Agreed and acknowledged as
of the date set forth above:

**W. R. GRACE & CO.**

By: _____
Name:
Title: HUDSON LA FORCE
       SVP, CFO

**W. R. GRACE & CO. — CONN.**

By: _____
Name:
Title: HUDSON LA FORCE
       SVP, CFO

[W. R. Grace & Co. Mandate Letter – Signature Page]

### *Annex A*

In the event that any Engagement Party or any of its affiliates, or any of its or their respective partners, members, officers, directors, employees, agents or controlling persons (each such party, an "**Indemnified Party**") becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including shareholders, partners, members or other equity holders of Holdings or the Company in connection with or as a result of either this arrangement or any matter referred to in the Letter, Holdings and the Company jointly and severally agree to reimburse such Indemnified Party for its reasonable and documented out-of-pocket legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith, limited in the case of legal counsel to one firm of counsel for all Indemnified Parties, taken as a whole, and, if necessary, by a single firm of local counsel in each appropriate jurisdiction for all such Indemnified Parties, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnified Party affected by such conflict notifies Holdings and the Company of the existence of such conflict, of another firm of counsel for such affected Indemnified Party). Holdings and the Company also jointly and severally agree to indemnify and hold each Indemnified Party harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of either this arrangement or any matter referred to in the Letter (whether or not such investigation, litigation, claim or proceeding is brought by you, your equity holders or creditors or an Indemnified Party and whether or not any such Indemnified Party is otherwise a party thereto); provided, that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages or liabilities to the extent they have (i) resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party (or any of such Indemnified Party's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing) in performing the services that are the subject of the Letter, (ii) arisen out of or in connection with any claim, litigation, loss or proceeding not involving an act or omission of you or any of your related parties and that is brought by an Indemnified Party against another Indemnified Party (other than claims against an Engagement Party in its capacity as administrative agent, arranger, syndication agent, or any other similar role in connection with any exit financing transaction) or (iii) resulted from a material breach by such Indemnified Party (or any of such Indemnified Party's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing) of the terms of the Letter (in the case of clauses (i) and (iii), as determined by a court of competent jurisdiction in a final, non-appealable judgment (collectively, the "**Excluded Damages**"). The reimbursement, indemnity and contribution obligations of Holdings and the Company under this paragraph will be in addition to any liability which Holdings or the Company may otherwise have, will extend upon the same terms and conditions to any affiliate of any Indemnified Party and the partners, members, directors, agents, employees, and controlling persons (if any), as the case may be, of any Indemnified Party and any such affiliate, and will be binding upon and inure to the benefit of any successors and assigns of Holdings, the Company, any Indemnified Party, any such affiliate, and any such person. In no event will any Indemnified Party, Holdings, or the Company have any liability for any indirect, consequential, special or punitive damages in connection with or as a result of such Indemnified Party's, Holdings', or the Company's activities related to the Letter; provided that nothing contained in this sentence shall limit Holdings' or the Company's indemnification obligations set forth in this Annex A to the extent such indirect, consequential, special or punitive damages are included in any third party claim in connection with which such Indemnified Party is entitled to indemnification hereunder. The provisions of this Annex A will survive any termination or completion of the arrangement provided by the Letter; provided, that, upon the execution and delivery of the definitive documentation for the exit financing, the relevant provisions of such definitive documentation shall supersede the provisions of this Annex A (to the extent covered by such provisions) and the terms of this Annex A shall terminate and be of no further effect.