## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-01139 (KJC) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

# MOTION OF ZAI CLASS COUNSEL
# FOR A COMMON FUND FEE AWARD

Dated: February 7, 2014
      Wilmington, Delaware

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (No. 2820)
Elihu E. Allinson, III (No. 3476)
901 North Market Street, Suite 1300
Wilmington, Delaware  19801

THE SCOTT LAW GROUP, P.S.
Darrell W. Scott
926 W. Sprague Avenue
Chronicle Building, Suite 680
Spokane, Washington  99201

RICHARDSON, PATRICK,
WESTBROOK  & BRICKMAN, LLC
Edward J. Westbrook
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, South Carolina  29464

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, L.L.P.
Elizabeth Cabraser
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339

*Counsel for ZAI Claimants*

## TABLE OF CONTENTS

I.   **INTRODUCTION** ................................................................................. 1

II.  **FACTUAL BACKGROUND** .................................................................. 1

   A. **The ZAI Litigation** ........................................................................ 1

   B. **The ZAI Settlement Discussions** ................................................. 5

   C. **The ZAI Settlement Agreement** ................................................... 8

   D. **Post-Settlement Activities** ........................................................... 9

III. **THE REQUESTED CLASS COUNSEL FEE IS HIGHLY JUSTIFIED** ............... 12

   A. **Legal Standard** ............................................................................ 12

   B. **A Contingency Fee of 25% of the First Two Settlement
      Payments Falls Well Within the Reasonableness
      Standard of the Percentage-of-Recovery Method** ......................... 13

      1. The Size of the Fund Created and Number of Beneficiaries .................. 16

      2. The Presence or Absence of Substantial Objections By
         Members of the Class to the Settlement Terms or Fees
         Requested by Counsel ...................................................................... 19

      3. The Skill and Efficiency of the Attorneys Involved ............................... 20

            A. Richardson, Patrick, Westbrook & Brickman, LLC ................. 21

            B. The Scott Law Group, P.S. ...................................................... 23

            C. Lieff Cabraser Heimman & Bernstein, LLP ............................. 26

      4. The Complexity and Duration of the Litigation ..................................... 30

      5. The Risk of Non-Payment ................................................................... 33

      6. The Amount of Time Devoted to the Case by ZAI Class
         Counsel ............................................................................................. 34

      7. Awards in Similar Cases ...................................................................... 37

8.  The Value of the Benefits Attributable to the Efforts of Class
    Counsel Relative to the Efforts of Other Groups ..................................... 40

9.  The Percentage Fee that Would Have Been Negotiated Had
    The Case Been Subject to a Private Contingent Fee
    Arrangement At The Time Counsel was Retained ................................. 42

10. Innovative Terms of the Settlement ....................................................... 43

**CONCLUSION** ......................................................................................................... 46

# TABLE OF AUTHORITIES

## Cases

*Allapattah Services, Inc. v. Exxon Corporation*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ........................................................... 38

*Barbanti v. W.R. Grace & Co. – Conn.*,
No. 00-2-01756-6 (Wash. Super. Ct. Dec. 20, 2000) ............................................... 2, 31

*Bergstrom v. Dalkon Shield Claimants Trust (In re A. H. Robins Co.)*,
86 F.3d 364 (4th Cir. 1996) ........................................................... 43

*Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*,
778 F.2d 890 (1st Cir. 1985) ........................................................... 35

*Bradburn Parent Teacher Store, Inc. v. 3M*,
513 F. Supp. 2d 322 (E.D. Pa. 2007) ........................................................... 20, 37, 40

*Camden I Condominium Association, Inc. v. Dunkle*,
946 F.2d 768 (11th Cir. 1991) ........................................................... 14

*Central Railroad & Banking Co. of Georgia. v. Pettus*,
113 U.S. 116 (1885) ........................................................... 12

*Central Wesleyan College. v. W.R. Grace & Co.*,
No. 2:87-1860-8, (D.S.C. Oct. 22, 2008) ........................................................... 39

*Cosgrove v. Sullivan*,
759 F. Supp. 166 (S.D.N.Y. 1991) ........................................................... 35

*Cullen v. Whitman Medical Corp.*,
197 F.R.D. 136 (E.D. Pa. 2000) ........................................................... 28

*Dewey v. Volkswagen of America*,
728 F. Supp.2d 546 (D.N.J. 2010) ........................................................... 35

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012) ........................................................... 35

*Farrar v. Hobby*,
506 U.S. 103 (1992) ........................................................... 16

*Gunter v. Ridgewood Energy Corp.*,
223 F.3d 190 (3d Cir. 2000) ........................................................... 13, 14, 15, 37

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ................................................................................ 13

*In re AT & T Corp.,*
455 F.3d 160 (3d Cir. 2006) ................................................... 13, 35, 36, 40

*In re Aetna Inc. Securities Litigation,*
MDL 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) .................................... 19

*In re Automotive Refinishing Paint Antitrust Litigation,*
MDL Dkt. No. 1426, 2008 WL 63269 (E.D. Pa Jan. 3, 2008) ........................ 19

*In re Beverly Hills Fire Litigation,*
639 F. Supp. 915 (E.D. Ky. 1986) .............................................................. 35

*In re Cendant Corp. PRIDES Litigation,*
243 F.3d 722 (3d Cir. 2001) ................................................................ 14, 37

*In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation,*
Case No. 3:09-md-02032 MMC (JSC) (N.D. Cal. Nov. 19, 2012) .......... 15, 36

*In re Checking Account Overdraft Litigation,*
830 F. Supp. 2d 1330 (S.D. Fla. 2011) .............................. 15, 34, 35, 36, 38

*In re Continental Illinois Securities Litigation,*
962 F.2d 566 (7th Cir. 1992) .................................................................... 42

*In re Diet Drugs Prod. Liability Litigation,*
582 F.3d 524 (3d Cir. 2009) ............................................................ 12, 35, 40

*In re Fernald Litigation,*
No. C-1-85-149, 1989 WL 267038 (S.D. Ohio Sept. 29, 1989) .................... 35

*In re Ikon Office Solutions, Inc. Securities Litigation,*
194 F.R.D. 166 (E.D. Pa. 2000) ............................................. 15, 20, 38, 43

*In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions,*
148 F.3d 283 (3d Cir. 1998) .......................................... 12, 15, 33,38, 40, 43

*In re Remeron Direct Purchaser Antitrust Litigation,*
No. Civ. 03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ........... 39, 43

*In re Rent-Way Securities Litigation,*
305 F. Supp. 2d 491 (W.D. Pa. 2003) ....................................................... 19

*In re Rite Aid Corporation Securities Litigation,*
396 F.3d 294 (3d Cir. 2005) ................................................................. 13, 14

*In re Rite Aid Corporation Securities Litigation,*
146 F. Supp. 2d 706 (E.D. Pa. 2001) .................................................... 35, 43

*In re RJR Nabisco, Inc. Securities Litigation.,*
MDL No. 818 (MBM), 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) ............... 35

*In re Synthroid Marketing Litigation,*
264 F.3d 712 (7th Cir. 2001) ..................................................................... 42

*In re W.R. Grace & Co.,*
355 B.R. 462 (D. Del. 2006) ........................................................................ 3

*In re Warfarin Sodium Antitrust Litigation,*
212 F.R.D. 231 (D. Del. 2002) ................................................................... 37

*Lanni v. New Jersey,*
259 F.3d 146 (3d Cir. 2001) ...................................................................... 36

*Lenahan v. Sears, Roebuck and Co.,*
Civ. No. 02-0045, 2006 WL 2085282 (D.N.J. July 24, 2006) ......................... 15

*McCoy v. Health Net, Inc.,*
569 F. Supp. 2d 448 (D.N.J. 2008) ............................................................. 38

*Meshel v. Nutri/System, Inc.,*
102 F.R.D. 135 (E.D. Pa. 1984) ................................................................. 34

*Milliron v. T-Mobile USA, Inc.,*
423 Fed. Appx. 131 (3d Cir. 2011) ............................................................. 36

*Muchnick v. First Federal Savings & Loan Association of Philadelphia,*
Civ.A. No. 86-1104, 1986 WL 10791 (E.D. Pa. Sept. 30, 1986) ................... 35.

*Municipal Authority of Town of Bloomsburg v. Commonwealth,*
527 F. Supp. 982 (M.D. Pa. 1981) ............................................................. 35

*Murray v. Sullivan,*
132 S. Ct. 1876 (2012) .............................................................................. 12

*Nichols v. SmithKline Beecham Corp.,*
No. Civ.A. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ................... 38

*Perera v. Chiron Corp.*,
(N.D. Cal. May 8, 1996) ................................................................................. 35

*Pozzi v. Smith*,
952 F. Supp. 218 (E.D. Pa. 1997) ................................................. 14, 15, 37

*Richlin Security Service Co. v. Chertoff*,
553 U.S. 571 (2008) ...................................................................................... 36

*Roberts v. Texaco, Inc.*,
979 F. Supp. 185 (S.D.N.Y. 1997) .............................................................. 35

*Serrano v. Sterling Testing Systems, Inc.*,
711 F. Supp. 2d 402 (E.D. Pa. 2010) ........................................................ 46

*Sprague v. Ticonic Nat. Bank*,
307 U.S. 161 (1939) ...................................................................................... 12

*State of California Department of General Services v. W.R. Grace & Co.*,
418 B.R. 511 (D. Del. 2009) .......................................................................... 3

*Student Public Interest Research Group. v. AT & T Bell Laboratories*,
842 F.2d 1436 (3d Cir. 1988) ....................................................................... 36

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011) ............................................ 12, 13, 14, 20, 35

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ..................................................................... 14

*Weiss v. Mercedes-Benz of North America, Inc.*,
899 F. Supp. 1297 (D.N.J. 1995) ................................................................ 35

*Wilson v. Bank of Am. National Trust & Savings Association*,
No. 643872, (Cal. Super. Ct. 1992) ........................................................... 35

*Zonolite Attic Insulation Property Damage Claimants v. W.R. Grace & Co.*,
No. 07-MC-0005 RLB, 01-1139, 2007 WL 1074094 (D. Del. Mar. 26, 2007) ................. 3

## Statutes & Rules of Civil Procedure

31 USC § 3730 ................................................................................................. 40

**<u>Other Sources</u>**

*Court Awarded Attorneys' Fees*, *Report of the Third Circuit Task Force*,
108 F.R.D. 237 (1986) ............................................................................................. 12

Thomas E. Willging & Shannon  R. Wheatman,
*An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation*,
(Federal Judicial Center 2005) .................................................................................. 37

I.    **INTRODUCTION**

After almost thirteen years before this Court, Grace is preparing to emerge from bankruptcy.  Under the Plan of Reorganization, the hard-fought Zonolite Attic Insulation ("ZAI") litigation will soon end and the ZAI class settlement will take effect.  Accordingly, ZAI Class counsel now respectfully move to recover their unreimbursed costs and receive a contingency fee award of 25% from the first two of twelve potential ZAI settlement payments.  This common fund fee request falls well within the guidelines of Third Circuit precedent.  The request is unopposed by: those for whom the settlement was achieved (the ZAI Class); those who will pay the settlement (the Grace Debtors); others who will substantially benefit from the settlement (the ZAI Future Claimants); and those who have a residual interest in any unspent settlement funds (the PI Future Claimants).  This request is amply supported by the record which shows an innovative settlement achieved after years of effort that overcame substantial legal and procedural obstacles.

II.    **FACTUAL BACKGROUND**

A. **The ZAI Litigation**

By the time W.R. Grace ("Grace") filed for bankruptcy in April 2001, ZAI Class counsel had been litigating property damage claims involving ZAI for several years.[1]  By 2001, they were actively pursuing discovery and had achieved a statewide ZAI class

---

[1] ZAI is a type of expanded vermiculite formerly sold by W.R. Grace and its predecessor companies under several different trade names.  Because the Court's files contain an extensive record of the underlying ZAI litigation, counsel will reference that litigation only when relevant to the fee issue.

certification.[2]  Numerous pretrial skirmishes were in progress when Grace's Chapter 11 filing stayed the litigation.

Although ZAI Claimants were represented by experienced asbestos and class action counsel, ZAI claims plowed new ground in asbestos property damage litigation. Unlike "traditional" asbestos property damage claims, which involved commercial products where asbestos was intentionally added, ZAI property damage claims involved a consumer product contaminated with asbestos and sold to ordinary homeowners for "do-it-yourself" installation.   The type of asbestos (Libby amphibole) in ZAI further distinguished ZAI claims from "traditional" asbestos building cases which involved other asbestos (chrysotile).

These differences weighed heavily on the complexity, expense, and duration of ZAI litigation.  From the outset of the bankruptcy, ZAI Class counsel sought to advance the ZAI Claimants' interests amid numerous competing claimants.  Their efforts were ably met by Grace's efforts to downplay the role of ZAI in the bankruptcy.  For example, Grace's counsel told the district court during the exclusivity hearings that "ZAI may not be worth anything at all."[3]  Grace contended that ZAI contained a minimal percentage of asbestos, was not regarded by the EPA as an asbestos-containing product, was typically isolated in attics, and had none of the record of disease that characterized traditional asbestos-containing products.

In an effort to address what it saw as the threshold issue of what science said about ZAI, the Court ordered a "Science Trial" proceeding.  ZAI Class counsel argued from the outset that the Science Trial proceeding was directed at the wrong question.

---

[2] *Barbanti v. W.R. Grace & Co. – Conn.*, No. 00201756-6 (Wash. Super. Ct. Dec. 20. 2000).

[3] Hr'g Tr. 44-45, Jan. 22, 2006 (Attach. 1).

Rather than asking (as Grace proposed) whether ZAI presented an "unreasonable risk of harm" to individuals, ZAI Class counsel contended the appropriate question was whether ZAI contaminated buildings with hazardous asbestos fibers.[4]  Following a multi-day hearing, the Court issued what has become known as its "Science Trial Opinion" on December 14, 2006.   While the Court agreed with the ZAI Claimants that ZAI was contaminated with asbestos that could be released upon disturbance, the Opinion agreed with Grace on what Grace contended was the ultimate question:

> Without any scientifically reliable evidence indicating that ZAI poses an unreasonable risk of harm, this court must grant Grace's motion for summary judgment in part and deny Claimants' motion for summary judgment in part, limited to the threshold issue of unreasonable risk of harm as it pertains to all proofs of claim.  <u>While the determination made herein may prove to be fatal to the property damage claims</u>, several different theories of liabilities were proposed in the individual proofs of claim and may still need to be addressed.

*In re W.R. Grace & Co.*, 355 B.R. 462, 493-94 (D. Del. 2006).

Undaunted by the foreboding language in the Science Trial Opinion, ZAI Class counsel continued to press ZAI claims vigorously.  They sought immediate review of the Science Trial Opinion, which the district court denied.[5]  They asked this Court to dismiss a ZAI claim on the basis of the Science Trial Opinion so an appeal could be taken,

---

[4] While the ZAI settlement mooted this controversy for the ZAI Class, Class counsel's view that contamination is the actionable injury in asbestos property damage cases was vindicated in the district court's order in an appeal involving certain California property damage claimants. *See Cal. Dep't of Gen. Servs. v. W.R. Grace & Co.*, 418 B.R. 511, 532 (D. Del. 2009) ("As set forth above, the statute of limitations could not begin running in this case until the injury – *i.e.* contamination of the buildings by asbestos – occurred.").

[5] *Zonolite Attic Insulation Prop. Damage Claimants v. W.R. Grace & Co.*, No. 07-MC-0005 RLB, 01-1139, 2007 WL 1074094 (D. Del. Mar. 26, 2007).

which this Court denied.[6]  They sought release from the automatic stay so that ZAI issues could be adjudicated in state court tort litigation, which this Court denied.[7]

Following the Science Trial ruling and the denial of their multiple attempts at immediate appellate review, the ZAI Claimants faced the reality of delayed appeals through normal appellate channels in subsequent phases of the bankruptcy.  They also prepared for the continuing litigation and likely appeals following the Court's anticipated rulings on various ZAI theories of liability, including unfair and deceptive business practices.

For its part, Grace understandably embraced the position that ZAI claims were determined worthless by the Science Trial Opinion.  In opposing immediate review of the Science Trial Opinion, Grace told the district court that the only people who believed ZAI was important in the bankruptcy were "the ZAI people themselves."[8] Grace further minimized ZAI as a concern, urging the district court to "look at all the hurdles that they have to sustain before they become important."[9]  Grace's counsel then enumerated these "hurdles," including: producing scientific evidence to overturn the Science Trial findings; satisfying Rule 23 to get class certification; satisfying the bankruptcy requirement that a class would advance resolution of the case; surviving an automatic appeal of any class ruling; and then actually litigating a ZAI claim "to be able to belly up

---

[6] ZAI Claimants' Mot. for Dismissal of an Individual ZAI Claim or for a Rule 54(b) Determination to Permit Appellate Review of the ZAI Op., No. 18325 (Bankr. D. Del. Mar. 18, 2008); Order Denying ZAI Claimants' Mot. for Dismissal of an Individual ZAI Claim or for a Rule 54(b) determination to Permit Appellate Review of the ZAI Op., No. 18942 (Bankr. D. Del. June 18, 2008) (Attach. 4).

[7] Expedited Mot. of the ZAI Claimants to Lift Stay and Return ZAI to the Tort System, No. 18462 (Bankr. D. Del. Apr. 7, 2008); Order Denying Expedited Mot. of the ZAI Claimants to Lift Stay and Return ZAI to the Tort System, No. 18937 (Bankr. D. Del June 17, 2008) (Attach. 5).

[8] Hr'g Tr. 50, Mar. 5, 2007 (Attach. 6).

[9] *Id.* at 51.

to the table as people who really count."[10]   Grace's stellar defense team was clearly operating in overdrive to diminish the value of ZAI in the bankruptcy.  A combination of experience, expertise, tenacity, and creativity was required on the part of ZAI Claimants' counsel to preserve and optimize the value of the ZAI claims, and to fashion appropriate relief for the ZAI Class.

## B. The ZAI Settlement Discussions

While ZAI Class counsel recognized that the Science Trial outcome was not favorable, they continued to press ahead on all fronts seeking to vindicate the legitimacy of ZAI claims in this bankruptcy.  Both before and after the Science Trial proceedings, ZAI Class counsel were involved in sensitive and confidential settlement discussions. These discussions took place directly with Grace, with other constituencies in the bankruptcy, and in mediations.  Such efforts in 2003, 2006, and thereafter did not lead to resolution.[11]   But they served to educate Grace and the other bankruptcy constituencies about ZAI Class counsel's resolve and conviction that ZAI presented legitimate property contamination claims that had to be addressed in any reorganization.

From the inception of this bankruptcy, ZAI Class counsel had advocated that ZAI claims lent themselves most efficiently to collective treatment through a class action with resolution in a claims facility.  For years Grace opposed that approach, believing that a typical ZAI claimant with a $6,000 or $7,000 claim could not realistically hire a lawyer to prosecute an individual claim.  Grace understandably sought to harness the

---

[10] *Id.* at 51-52.

[11] During the confirmation hearings, the Personal Injury Future Representative recounted the "seemingly endless number of meetings that took place" involving ZAI and the Property Damage Committee before the initial Grace Confirmation Plan Agreement.  Hr'g Tr. 78; *see generally* 77-90, Sept. 17, 2009 (Attach. 7).

powerful forces of delay and attrition to reduce the number and value of ZAI claims. Throughout the numerous unsuccessful discussions that took place over the years, ZAI Class counsel consistently urged that Grace could not satisfactorily emerge from bankruptcy unless it dealt with the ZAI Claimants on a unified basis. ZAI Class counsel pointed to the lack of knowledge by the vast majority of ZAI Claimants that they had ZAI in their homes, much less that it presented a contamination problem.

This absence of knowledge posed a potential danger to homeowners. But it was also a problem for Grace that would prevent it from emerging from bankruptcy free of ZAI claims unless there was a resolution supported by adequate representation and providing for later-appearing claimants. Because ZAI Class counsel had litigated asbestos property damage cases with Grace for many years before its bankruptcy, they believed that Grace would respect their views even if Grace disagreed with them. Throughout the period of 2006-2008, ZAI Class counsel consistently emphasized to each of the other interested bankruptcy constituencies that counsel intended to persevere in their position, to seek appellate review when available to vindicate that position, and to continue their efforts until ZAI was dealt with fairly in the bankruptcy.

As the years passed, Grace tried first one and then another potential reorganization plan. Eventually, in April 2008, Grace arrived at a consensual plan with the PI Claimants and certain other creditors, but not with ZAI Claimants. ZAI Class counsel had additional discussions with representatives of the PI constituency in an effort to see if a reasonable ZAI resolution was possible, but these discussions were unsuccessful. ZAI Class counsel also participated in an unsuccessful May 2008 mediation session. In the meantime, ZAI Class counsel continued to press in court for

recognition of ZAI Class claims.  In March 2008, ZAI Class counsel filed their motion asking that the Court recognize the *Barbanti* statewide class certification in this bankruptcy.  Grace vigorously opposed the motion during argument in July 2008.

While this and other ZAI matters were under consideration in the summer of 2008, ZAI Class counsel were contacted confidentially by a representative of the PI Claimants' interests and asked whether ZAI Class counsel would agree to a direct meeting with Grace's owners – The Equity Committee.  At a series of highly confidential meetings, initially involving Equity Committee representatives and then others, exploratory talks proceeded concerning the possibility of resolving ZAI and avoiding the many years of litigation that both sides recognized lay ahead without a settlement. These meetings and follow-up communications eventually led to further preliminary meetings with additional Grace representatives, including those at the highest levels of the company.

For the first time after years of on-and-off negotiations, it appeared that the parties might come close enough on their respective views of ZAI that a potential settlement was conceivable.  Further meetings attended by representatives of the PI constituency, PI Futures Representative, Grace corporate representatives, and Grace inside and outside counsel produced additional progress.  After much discussion, Grace accepted in principle the concept that a ZAI facility could be a vehicle to resolve the claims.  ZAI Class counsel accepted in principle the fact that Grace would not agree to pay a lump sum on confirmation that ZAI Class counsel would otherwise require as a reasonable settlement in their professional judgment.   Accordingly, the parties worked toward the creative resolution ultimately embodied in the Class Settlement Agreement

consisting of a claims facility and staggered funding, with some of the funding dependent on the pace at which claims were filed.

Though the parties had made conceptual progress, they realized that for a ZAI facility to be truly effective, it must address the needs of future ZAI Claimants. This required a ZAI Futures Representative. Once the ZAI Futures Representative was appointed and had hired counsel, negotiations resumed with them at the table. The ZAI Futures Representative and his counsel brought valuable insight and made helpful suggestions that improved the conceptual resolution ZAI Class counsel had been working toward. After additional, extensive negotiations and exchange of numerous ideas, comments, drafts, and counter-drafts, ZAI Class counsel and the ZAI Futures Representative reached an agreement in principle with Grace on November 21, 2008, to be followed by a comprehensive class action settlement agreement that would resolve ZAI claims.

### C. **The ZAI Settlement Agreement**

On December 15, 2008, after three weeks of further negotiations, ZAI Class counsel executed the ZAI Class Settlement Agreement. This agreement provided an innovative solution to a previously intractable problem--how to ensure reasonable compensation for ZAI property damage claimants while addressing Grace's concern that it not overpay for claims that may never be presented. Toward that end, the settlement provides for a ZAI claims facility to be funded by the debtors with $30 million at confirmation, an additional $30 million three years thereafter, and up to $80 million of additional funding over the next twenty years as claims activity warrants, as demonstrated by the claims fund falling below $10 million in any particular year

beginning on the fifth anniversary of the plan's effective date.[12]  A ZAI Trustee, advised by ZAI Class counsel, will administer the trust funds which will be used for: (1) a comprehensive ZAI educational program for homeowners and others who may encounter ZAI; (2) reimbursement for ZAI remedial action of 55% of a claimant's approved remediation costs, up to a maximum reimbursement of $4,125 (55% of a $7,500 expenditure);[13] (3) discretionary payments by the Trustee of up to $100,000 per year for extraordinary ZAI claims; and (4) Trust fees and expenses.

The Trust is designed to have a simple and direct claims procedure so that claimants will not need to hire counsel to file claims.  In order to allow claimants sufficient time to file claims over the course of normal homeowner purchase, sale, and renovation activity, the Trust will have a minimum life of twenty years and will be extended thereafter for as long as ZAI claims continue to be filed in any twenty-four month period or until all ZAI trust assets have been paid out.

### D. Post-Settlement Activities

Following preliminary approval of the settlement, ZAI Class counsel arranged for individual notice to approximately 16,000 class members.  During this extensive notice campaign, numerous class members contacted ZAI Class counsel with questions about settlement participation, but no class member objected to the settlement.  On April 1, 2009, following an extensive presentation by ZAI Class counsel on the merits of the settlement, the Court granted final settlement approval.

---

[12] This Trust Fund will replenish at the rate of $8 million per year for up to ten years (total $80 million) when the $10 million trigger is reached.

[13] Beginning on the fifth anniversary of the effective date, the reimbursement amount will be adjusted for inflation.

After the ZAI Class Settlement was approved, ZAI Class counsel then worked with Grace counsel and counsel for the ZAI Futures Representative on the various Grace Plan confirmation documents that impacted ZAI, including the ZAI Property Damage Trust Agreement, the Cross-Collateral Agreement, the Disclosure Statement, and the Reorganization Plan. ZAI Class counsel attended the confirmation hearings relevant to ZAI and monitored other parts of those hearings.

During the past several years, ZAI Class counsel have monitored the numerous proceedings, motions, and activities in the bankruptcy to be certain that nothing occurs to jeopardize the ZAI Claimants. ZAI Class counsel have also been involved in monitoring the appellate proceedings, first in the district court and then in the court of appeals. They have reviewed numerous appellate briefs to evaluate the likelihood that the appeals could upset the Bankruptcy Plan and the ZAI Class Settlement Agreement, which depends on the Plan. Throughout this time, ZAI Class counsel have conferred with Grace, the ZAI Trustee, the ZAI Futures Representative, and other PD and PI counsel where appropriate on various aspects of the appellate procedure. ZAI Class counsel have also been consulted on Grace's business decisions that may impact ZAI settlement funding.

ZAI Class counsel have also worked with Grace's counsel and expert scientists on issues relevant to the eventual operation of the ZAI Trust, including work toward developing an inexpensive method to identify ZAI, as opposed to other types of expanded vermiculite that do not contain asbestos. If this proves successful, and indications are that it will, homeowners will be able to avoid unnecessary removal of non-ZAI vermiculite and the Trust will avoid unnecessary payment for such removal.

This will benefit the homeowners, who will not have to deal with their expanded vermiculite as an asbestos-containing product, as well as the Trust and other ZAI Claimants by preserving ZAI trust funds for those who truly have ZAI.

Most recently, ZAI Class counsel have been involved in review and revisions of the numerous Grace Bankruptcy Plan documents that affect ZAI. They have selected a ZAI Trustee and begun work with him on the substantial initial tasks required to set up the ZAI Trust Fund claims process. These activities are critically important, as they construct the framework for an entity that will endure for decades and administer millions of dollars.

Looking to the future, the commitment of ZAI Class counsel endures. They have agreed to continue to work with the ZAI Trust for one year post-confirmation without any payment beyond their ZAI Class counsel fee. Their goal is to assure that the ZAI Trust is up and operating in a fair and efficient manner, and are willing to undertake these additional responsibilities as part of their class action representation. These duties will be complex and time consuming, including working with the ZAI Trustee on a streamlined claims form and procedure, and working with the Trustee and Grace to fashion a ZAI educational program. That educational program is designed to avoid unnecessary exposure to asbestos in ZAI, to teach homeowners how to live with ZAI when appropriate, and to determine when ZAI remediation is advisable. These duties are estimated to require hundreds of hours of additional work in the coming year.

III.    **THE REQUESTED CLASS COUNSEL FEE IS HIGHLY JUSTIFIED**

A. Legal Standard

A court's power over attorneys' fees in common fund cases has long been recognized. *See Sprague v. Ticonic Nat. Bank*, 307 U.S. 161 (1939); *Cent. R.R. & Banking Co. of Ga. v. Pettus*, 113 U.S. 116 (1885). In this circuit, "[t]he percentage-of-recovery method is favored in common fund cases, such as the settlement here." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005); *accord, Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 330 (3d Cir. 2011), *cert. denied sub nom. Murray v. Sullivan*, 132 S. Ct. 1876 (2012). The percentage-of-recovery method is designed to reward or penalize attorneys based on the results (or lack thereof) achieved on behalf of their clients. *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333-34 (3d Cir. 1998) ("The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure.") (internal quotations omitted); *Sullivan*, 667 F.3d at 330.

In common fund cases, the percentage-of-recovery method is far superior to the lodestar method which the Third Circuit Task Force called a "cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions...." *Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 255 (1986). The percentage-of-recovery method incentivizes efficiency by penalizing Class counsel for unnecessary or excessive hours on a case. The lodestar method, by contrast, incentivizes inefficiency. The percentage-of-recovery method aligns class

counsels' interest with that of the class because an attorney whose paycheck is dependent on the amount of class recovery is motivated to maximize that recovery, as contrasted with an attorney whose compensation is governed by hours logged. *Sullivan*, 667 F.3d at 330.

### B. A Contingency Fee of 25% of the First Two Settlement Payments Falls Well Within the Reasonableness Standard of the Percentage-of-Recovery Method

The standard for evaluating fee awards is reasonableness.   *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  In common fund cases where fees are based on a percentage of the class settlement, the Third Circuit has set forth a multi-factor analysis to help analyze whether a percentage award is reasonable.  *Sullivan*, 667 F.3d at 330 n.62; *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). These *Gunter* factors include:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Id.; see also In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006).

The *Gunter* factors are not intended to be exhaustive.  Among other factors that a court may consider are:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.

*AT & T*, 455 F.3d at 166 (internal citations omitted).

The *Gunter* factors should not be applied as a formula. *Gunter*, 223 F.3d at 195 n.1. In certain cases, one factor may outweigh the rest. *Id.*

There is no steadfast rule for a reasonable common fund attorneys' fee percentage. The fee must be determined by the facts of each case. *Camden I Condo. Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 775 (11th Cir. 1991). The Third Circuit's decisions have relied on multiple studies of attorneys' fee awards to find a wide range of reasonableness in percentage-of-recovery fees in settlements of $100 million or more. These percentages can exceed 30%. *See, e.g.*, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3d Cir. 2001); *Rite Aid*, 396 F.3d at 303; *Sullivan*, 667 F.3d at 332-33. A review of this precedent shows that ZAI Class counsel's request falls well within the Third Circuit's range of reasonableness.

An award of 25% of the recovery is not unusual in class actions. A 25% award is often considered the "benchmark" percentage from which adjustments, upward or downward, must be justified. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002). Courts in the Third Circuit have adopted this approach. *See Pozzi v. Smith*, 952 F. Supp. 218, 225 (E.D. Pa. 1997) ("[T]he Court concludes that ordinarily attorneys' fees in a securities common fund case should be 25% of the amount of fund."). The Third Circuit's recent *Sullivan* decision affirmed a class counsel fee award of 25% of a $295 million class settlement. 667 F.3d at 333 (noting that the Third Circuit had determined that fees ranging up to 36% of common funds in settlements of this order of magnitude could be reasonable).

The majority of attorneys' fees awards fall between 20% and 30% of the common fund, although recoveries of up to 50% have been awarded. *See Camden I*, 946 F.2d

at 774-75 (noting that the majority of fee awards are between 20% and 30%). Some courts have noted that fee awards can have a wider range of approximately 20% to 50% of the recovery. *See, e.g., In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("Percentages awarded have varied considerably, but most fees appear to fall in the range of nineteen to forty-five percent."); *Pozzi*, 952 F. Supp. at 225 ("[C]ourts have found fee awards ranging from 19 to 45 percent of the settlement fund to be fair and reasonable."). And, as one Third Circuit court has noted, "Attorneys' fees of 30 percent are common in this Circuit." *Lenahan v. Sears, Roebuck & Co.*, Civ. No. 02-0045, 2006 WL 2085282, at *21 (D.N.J. July 24, 2006). Contemporary fee awards in other class action settlements bear this out. The court-awarded class counsel's fees in *In re Checking Account Overdraft Litig.*, approved by Judge Kin in a class settlement valued at $410 million in cash, was 30%. 830 F. Supp. 2d 1330 (S.D. Fla. 2011).[14]

As discussed below, the requested 25% contingency fee based on only the first two payments of a potential twelve-payment settlement is eminently reasonable.[15] Understanding that the *Gunter* and *Prudential* factors are just that—factors—not a formula, and that some factors outweigh others in a particular case, ZAI Class counsel address them below. As discussed, these factors greatly favor approval of the fee request.

---

[14]  In another recent bankruptcy practices settlement, *In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation*, Case No. 3:09-md-02032 MMC (JSC) (N.D. Cal. Nov. 19, 2012), a common fund fee of 25% was awarded to class counsel on a $100 million settlement.

[15] ZAI Class counsel have also agreed to take their contingent fee payments from the first two settlement payments when these payments are received by the Class. This means that they will not receive the second half of their fee for three years – another factor favoring the reasonableness of the amount.

1.  The Size of the Fund Created and Number of Beneficiaries

The Supreme Court has noted that success is a paramount fee award consideration.  "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (internal quotations omitted).  This factor weighs heavily in favor of the requested fee here.

Negotiating with the knowledge that the Court believed its Science Trial ruling might "prove fatal" to ZAI claims, Class counsel nevertheless persevered and achieved a substantial ZAI settlement with a total potential payout of $140 million.  The first two payments of $30 million each ($60 million total) are guaranteed and not dependent on the number of claimants.[16]  Grace has agreed to pay an additional $80 million in ten equal payments, with the only condition being that sufficient ZAI Claimants come forth to claim these funds.  In a very real sense, the ultimate size of the settlement fund is in the ZAI Claimants' hands.  And the settlement gives ZAI Claimants, present and future, ample time to achieve the maximum payment.  It provides that the Trust will remain open for a minimum of 20 years and thereafter, as long as claims continue to be filed, or until the $140 million has been spent.[17]

By the time of the ZAI bar date of October 31, 2008, approximately 16,000 ZAI proofs of claim had been filed.  Even if those claimants were to incur the settlement's maximum abatement cost of $7,500, the settlement could pay each of them the

---

[16] An additional benefit to the Class and counsel is that through the negotiating skill of Class counsel, the first payment bears interest, increasing it by approximately $4 million.

[17] The PD FCR, whose constituents will benefit most from the contingent future funding, wholeheartedly supports ZAI Class counsel's fee petition. *See* Attach. 2.

maximum settlement value (55% of $7,500 or $4,125 x 16,000 = $66 million), with over $60 million remaining, even after attorneys' fees.

Of course, not all homes will have the maximum ZAI abatement cost.  If, for example, homeowners spend an average of $5,000 per home, qualifying each for abatement assistance of $2,750, the $140 million settlement fund would assist over 50,000 homeowners.[18]  This is approximately three times as many ZAI homeowners as had filed claims by the bar date.  Under Grace's theory of the case, this is three times as many homeowners as will ever come forward, since Grace believes that the 16,000 who filed claims by the bar date are all who will ever appear.  Under any reasonable scenario, the settlement holds the promise of meaningful assistance for a large number of ZAI homeowners.

The settlement also acknowledges that Grace had many significant defenses to ZAI claims and was entitled to a settlement discount for dropping those defenses.  The settlement relieves ZAI Claimants from Grace's potential defenses that claims are barred by the statute of limitations, statute of repose, the "economic loss" doctrine, and other legal obstacles that Grace often raised (and sometimes won) in asbestos property damage litigation.    Indeed, Grace moved repeatedly to dismiss asbestos property

---

[18] $140 million divided by $2,750 equals 50,909 claimants.

damage claims in this bankruptcy on limitations grounds[19] and succeeded in getting many such claims dismissed.[20]

When evaluating the achievement of a 55% recovery to ZAI Claimants, it is instructive to compare that percentage figure to the recoveries projected by Grace for other constituencies in its confirmation hearing presentation. A chart prepared by Grace for that hearing showed asbestos personal injury claimants receiving a 25-35% recovery and Grace's equity holders receiving 20-33%.[21] By this yardstick as well, ZAI Claimants received a very favorable resolution.

While it is impossible to know exactly how many claimants will eventually come forward, some things can be said with certainty about the settlement. First, it gives claimants an ample period (minimum of 20 years) to come forward. Second, if as many as 14,000 additional claimants come forward (30,000 total claimants), the Class Settlement fund of $140 million would provide each of them with the maximum abatement assistance even after attorneys' fees are deducted.[22] Thus, the Class

---

[19] See, e.g., Debtors' Mot. and Mem. For An Order Pursuant To F.R.B.P. 7056 Disallowing and Expunging Sixteen (16) Time-Barred Asbestos Property Damage Claims, No. 14598 (Bankr. D. Del Feb. 16, 2007); Debtors' Mot. and Mem. For An Order Pursuant to F.R.B.P. 7056 Disallowing and Expunging Eleven (11) Property Damage Claims Barred By Statutes Of Repose In Minn., N.C., Iowa and Tenn., No. 14596 (Bankr. D. Del. Feb. 16, 2007); and Debtors' Mot. and Mem. In Support Of An Order Pursuant To F.R.B.P. 7056 Disallowing And Expunging One Hundred Twenty (120) Time-Barred La. Asbestos Property Damage Claims, No. 14595 (Bankr. D. Del. Feb. 16, 2007) (Attach. 8).

[20] See, e.g., Order Granting Summ. J. In Favor of Debtors, No. 19473 (Bankr. D. Del. Oct. 10, 2008) (dismissing asbestos property damage claims on statute of limitations, laches and assumption of risk); Mem. Op. Disallowing and Expunging Eighty Eight (88) Time-Barred Canadian Asbestos Property Damage Claims, No. 21270 (Bankr. D. Del. Apr. 4, 2009); Order Disallowing and Expunging Asbestos Property Damage Claim Numbers 011627 and 012476 as Barred by British Columbia's Ultimate Limitation Period, No. 24735 (Bankr. D. Del. May 4, 2010) (Attach. 9).

[21] Chart, "Constituency Recoveries", Ex. PP CL040 (Attach. 10).

[22] 30,000 claimants at $4,125 each equals $123,750,000.00, leaving over $16 million in the Fund which more than covers the $16 million total fee. Moreover, because of ZAI Class counsel's foresight, the initial $30 million

Settlement benefits not only those who filed claims by the bar date, but other and future ZAI Claimants who may come forward at any time over the next twenty years.

### 2. The Presence or Absence of Substantial Objections By Members of the Class to the Settlement Terms or Fees Requested by Counsel

The notice sent to class members advised them of the terms of the Settlement Agreement including ZAI Class counsel's intention to seek a contingency fee of 25% of the first two payments to the ZAI Trust.[23]   The notice also advised class members of their right to object to the settlement agreement.[24]

Following this extensive notice campaign, none of the 16,000 class members objected to the reasonableness of the fee request.  A lack of objections demonstrates that the class views the settlement as a success and the request for counsel fees as reasonable. *In re Auto. Refinishing Paint Antitrust Litig.*, MDL Dkt. No. 1426, 2008 WL 63269, at *4 (E.D. Pa. Jan. 3, 2008); *see also In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 515 (W.D. Pa. 2003) ("[T]he absence of substantial objections by other class members to the fee application supports the reasonableness of [counsels'] request."); *In re Aetna Inc. Sec. Litig.*, MDL 1219, 2001 WL 20928, at *15 (E.D. Pa. Jan. 4, 2001) ("[T]he Class members' view of the attorneys' performance, inferred from the lack of objections to the fee petition, supports the fee award.").

---

settlement payment bears interest from April 1, 2009 until paid.  This will result in a larger initial payment for the Class and for Class counsel who negotiated this additional benefit for the Class.

[23] "Notice is expressly given that, subject to judicial approval, the settlement funds may be disbursed in part to Class Counsel for their efforts in creating the settlement fund in an amount of up to 25% of the non-contingent payment by W. R. Grace to the Trust.  Subject to Bankruptcy Court approval, Class Counsel may also be paid from the settlement fund for their unreimbursed out-of-pocket ZAI litigation costs."  Notice of Class Certification and Proposed Settlement with W. R. Grace & Co. and Affiliated Debtors, No. 20842 ¶ 20 (Bankr. D. Del. Feb. 25, 2009) Attach. 2 (Attach. 11).

[24] *Id.* ¶ 17.

Objections to attorneys' fees requests are quite common, regardless of the amount or percentage requested. Indeed, the Third Circuit jurisprudence on percentage awards exists because objectors to fee awards pursued appeals. Here, there are no such objectors and no prospect of appeals. Accordingly, the lack of objections to the requested fees weighs in favor of finding the 25% fee request reasonable, especially in light of the recent *Sullivan en banc* decision approving a 25% fee.

### 3.  The Skill and Efficiency of the Attorneys Involved

The skill and efficiency of counsel are "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 338 (E.D. Pa. 2007) (citing *In re Ikon*, 194 F.R.D. at 194).

Mass tort litigation is a specialty within the law. Within mass tort litigation, asbestos property damage litigation is a sub-specialty practiced by relatively few attorneys. And within asbestos property damage litigation, ZAI property damage litigation is perhaps the ultimate sub-specialty, requiring not only the skills of a traditional asbestos property damage and mass tort attorney, but also the ability to adapt those skills to the unique challenges of ZAI litigation. Unlike traditional mass torts, ZAI litigation was in its infancy when Grace filed for bankruptcy. ZAI Class counsel had to confront and overcome challenges never before faced in asbestos property damage litigation. The three firms compromising ZAI Class counsel were well suited to perform these tasks.

## A. Richardson, Patrick, Westbrook & Brickman, LLC

Class counsel (Westbrook) of Richardson, Patrick, Westbrook & Brickman, LLC is well known in the field of asbestos property damage and mass tort litigation. For almost thirty years, Mr. Westbrook has represented property owners in asbestos contamination cases. Over a quarter of a century ago, he argued and won the appeal in the landmark case establishing asbestos contamination as a viable tort claim. *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987), *reh'g denied*, 840 F.2d 219 (4th Cir. 1988). Without this victory, asbestos property damage litigation would have been shut down in its infancy. He also tried and won numerous asbestos property damage cases over the years including: *Rowan County. Bd. of Educ. v. U.S. Gypsum Co.*, 407 S.E.2d 860 (N.C. Ct. App. 1991), *aff'd*, 418 S.E.2d 648 (N.C. 1992) (affirming actual and punitive damage award); *Kershaw County. Bd. of Educ. v. U.S. Gypsum Co.*, 302 S.C. 390, 396 S.E.2d 369 (1990); *State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co.*, 834 F. Supp. 1052 (C.D. Ill. 1993), *aff'd*, 24 F.3d 955 (7th Cir. 1994). He was lead counsel in the largest single asbestos property damage verdict in the litigation's history. *Port Authority v. Allied Corp.*, No. 91 Civ. 0310 (CLB), 1998 U.S. Dist. LEXIS 23507 (S.D.N.Y. Oct. 6, 1998) ($65 million verdict, settled post-trial).

In addition to these and other trials, Mr. Westbrook was responsible for many millions of dollars in pre-trial settlements in asbestos property damage cases. Because of his expertise, he was appointed as Special Assistant Attorney General by the State of West Virginia to assist in the prosecution of its asbestos property damage claim which he subsequently settled.

In addition to his reputation in asbestos property damage matters, Mr. Westbrook has played a significant role in other mass torts. In the state tobacco litigation he served as lead national counsel in one of the early cases set for trial (Oklahoma) which was settled by the nationwide tobacco settlement on the eve of the Oklahoma trial. Mr. Westbrook and his firm at the time represented over twenty states in their efforts to recover tobacco-related costs. Until Mr. Westbrook and his firm had become involved, the tobacco industry had never paid a penny in any settlement or verdict on any health-related claim. As a result of the work of Mr. Westbrook, many others in his firm, and their co-counsel, the states achieved a settlement of over $250 billion payable by the tobacco industry over twenty-five years. As part of that settlement, an independent panel of arbitrators was appointed to evaluate the caliber of counsels' work and set a reasonable fee. In its decision in *Florida v. American Tobacco Co.*, No. CL95-1466AH (Fla. Cir. Ct. Sept. 16, 1996), the arbitration panel awarded Mr. Westbrook's firm and its co-counsel $3.4 billion in fees, which was 26% of Florida's $13.2 billion recovery. The panel noted that the fee award was a reasonable percentage of the state's recovery and had been achieved through "a combination of hard work, creativity, innovation, dedication, diligence, persistence and extraordinary legal acumen ...". Panel Decision at 6.[25] In the Mississippi tobacco fee arbitration, the panel awarded $1.43 billion in fees which amounted to 35% of the state's $4.1 billion recovery.[26]

Mr. Westbrook has also successfully handled other nationwide asbestos property damage class actions. In a decision with many similarities to the instant matter (the

---

[25] Attach. 12.

[26] Attach. 13.

nationwide College and University asbestos class action), the United States District Court analyzed the expertise of lead counsel Mr. Westbrook and his co-counsel and awarded 28.75% of the recovery.  In its opinion, the court recognized the value of having a firm experienced in toxic torts, federal procedure, and class actions prosecuting such a complex action:

> Here, class counsel possessed all the toxic tort, federal procedure and class action expertise needed to handle the matter.  The reputation and experience of class counsel clearly signaled to the defendants that if they did not settle they would be facing an expertly presented trial on behalf of the class.  Class counsel's reputation and ability undoubtedly played a significant role in convincing the defendants to settle.[27]

### B. The Scott Law Group, P.S.

Darrell W. Scott is the founder and President of The Scott Law Group, P.S., a law firm composed of a team of experienced complex litigation attorneys whose practice focuses on representation of consumers, typically in the context of class action proceedings.  Prior to entering the practice of law, Darrell Scott, Ph.D. was a tenured professor of argumentation and Department Chair at Gonzaga University in Spokane, Washington.

In the past twenty-three years, Darrell Scott has served as lead Class counsel or co-lead Class counsel in thirty matters certified as class actions by various federal and state courts.  Mr. Scott has been heavily involved in the representation of homeowners with ZAI claims from the inception of ZAI litigation in early 2000.

Along with co-counsel Elizabeth Cabraser and Edward Westbrook, Darrell Scott was appointed as Class counsel in the vanguard ZAI action, *Barbanti v. W.R. Grace*, No. 00-2-01756-6 (Wash. Super. Ct. Wash. Dec. 20, 2000). Class Representative

---

[27] *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, No. 2:87-1860-8, *slip. op.* at 18 (D.S.C. Dec. 21, 2001) (Attach. 14).

Marco Barbanti was subsequently appointed to the Official Property Damage Committee following W.R. Grace's bankruptcy and Darrell Scott, as Mr. Barbanti's agent, has served as co-chair of that committee throughout the course of W.R. Grace's bankruptcy.

Darrell Scott has played a key role in developing and advancing innovative statutory consumer protection grounds for W.R. Grace's ZAI liability and in pressing and ultimately securing sensible prospective remedial solutions to potential economic burdens that ZAI homeowners may suffer.

Darrell Scott's experience in class action proceedings includes:

*Carlsen v. Global Client Solutions*, No. CV-09-246-LRS, 2010 WL 786254 (E.D. Wash. Mar. 4, 2010): Represented 11,000 consumers in claims against the debt settlement industry's principal ACH service provider. This action involved federal court certification of novel questions of law to the Washington Supreme Court, and resulted in the landmark opinion, *Carlsen v. Global Client Solutions, LLC*, 256 P.3d 321 (2011). Class settlements were achieved in that action and in the companion class proceedings in which Darrell Scott served as Class counsel, *Carlsen v. Freedom Debt Relief, LLC*, No. CV-09-55-LRS, 2010 WL 1286616 (E.D. Wash. Mar. 26, 2010).

*Wheeler v. Noteworld*, No. CV-10-202-LRS (E.D. Wash.): Represented 7,000 consumers in claims against the debt settlement industry's second largest ACH service provider. Class settlement achieved in 2012.

*Smith v. Legal Helpers Debt Resolution*, No. 3:11-CV-05054-RJB (W.D. Wash.): Represented consumers in deceptive business practices claims against the nation's largest debt settlement law firm. This action secured opinions applying for the first time state debt adjuster statutes to law firms engaged in debt settlement activities. Class settlement was achieved in 2012 and in related class actions in which Darrell Scott also served as Class counsel: *Bronzich v. Persels & Assoc.*, No. 10-CV-0364-TOR (E.D. Wash.). Class settlement approved in 2012; *Brown v. Consumer Law Assoc.*, No. CV-11-0194-TOR (E.D. Wash.). Class settlement approved in 2013.

*In Re Cadet Heater Litig.*: Appointed Class counsel in *Toner v. I.R.C.A. S.P.A*, No. 98-2-10876-2-SEA (King County Super. Ct., Wash.): Represented homeowners nationwide in consumer protection/product liability actions involving hazardous in-wall electrical heaters. Appointed by Bankruptcy Judge Snyder as Special Counsel to the Unsecured Creditors Committee to pursue related claims against product retailers, resulting in appointment as Class counsel in *Dean v. Platt Elec. Supply, et al.*, No. 99-2-06741-0-SEA (King County Super. Ct., Wash). These proceedings culminated in three related class action settlements achieved in 2001 and 2002.

*Rob'N I, Inc., v. Uniform Code Council, Inc.*, No. 03-2-03796-1 (Spokane County Super. Ct., Wash.): Represented 250,000 businesses nationwide in class litigation arising out of unfair bar-code billing practices. Resolved in 2004 through consolidated class settlement proceedings involving related New Jersey state court class proceedings.

*St. John v. Am. Home Prods.*, No. 97-2-06368-4 (Spokane County Super. Ct. Wash.): Served as co-lead Class counsel representing approximately 125,000 Washington residents exposed to the dangerous diet drugs, Fen Phen. Resolved through class settlement in coordination with nationwide MDL proceedings, *In re Fen Phen Diet Drugs Prods. Liab. Litig.*, MDL 1203 (E.D. Pa.).

*In re the Matter of Firestorm 1991*, No. 94-2-05256-4 (Spokane County Super. Ct., Wash.): Lead Class counsel in six administratively coordinated class actions, representing over one-thousand property owners harmed by utility-caused wild land fires. Resolved through coordinated class settlement proceedings in 1997 in what was then described as the largest settlements in the Spokane Superior Court history.

*Delay v. Hurd Millwork Co.*, No. 97-2-07471-0 (Spokane County Super. Ct., Wash.): Served as co-Class counsel in multi-state class action representing homeowners having misrepresented and defective argon-filled windows. Class settlement approved in 1998.

*Ferguson v. Riverside School District*, No. CS-00-0097-FVS (E.D. Wash.): Represented public school teachers in mold contamination action. Class settlement approved in 2002.

### C. Lieff Cabraser Heimman & Bernstein, LLP

Elizabeth J. Cabraser is a founding partner of the 60+ attorney firm of Lieff Cabraser Heimman & Bernstein, LLP. She has 35 years of experience representing plaintiffs in securities, antitrust/unfair competition, product liability, consumer fraud, mass tort, civil rights, and employment discrimination litigation in federal and state courts. Ms. Cabraser has served as court-appointed lead/co-lead Class counsel in over 85 federal multidistrict and state proceedings, and is currently serving as Plaintiffs' Co-Lead Counsel in *In re Toyota Unintended Acceleration Litigation* (MDL No. 215), and as a PSC member and Class counsel *In re Deepwater Horizon* (MDL No. 2179). *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 8:10ML2151 JVS (FMOx), 2012 WL 6733023 (C.D. Cal. Dec. 28, 2012); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*, MDL No. 2179, 2012 WL 6652608 (Dec. 21, 2012). The *Deepwater Horizon* case features the largest ever mass-disaster class action settlement, valued at approximately $8 billion, under which over $2 billion in claims have already been paid or approved for payment.

Ms. Cabraser and her firm have represented certified plaintiff classes in a number of significant, successfully concluded Third Circuit cases, including *Sullivan v. DB Investments* (antitrust), *Diet Drugs* (mass tort), and *Mercedes-Benz Tele Aid Contract Litigation* (credit card/consumer fraud). *See, e.g., Sullivan*, 667 F.3d 273; *In re Diet Drugs*, 582 F.3d 524; *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J. 2009).

Ms. Cabraser teaches complex litigation, class actions, and mass torts classes at Berkeley and Columbia Law Schools, and regularly writes on class action complex litigation and due process topics for law reviews and practitioners' publications. In 2010, Ms. Cabraser was appointed to serve on the Federal Rules Advisory Committee. In 2011, she was inducted into the American Academy of Arts and Sciences, and is one of the few attorneys in private practice to be elected to the Academy. She is a member of the Council of the American Law Institute, and served as an Advisor on its *Principles of the Law of Aggregate Litigation* (ALI 2010). She serves as Editor-in-Chief of LEXIS/NEXIS *California Class Actions and Coordinated Proceedings* and as an editor of the ABA's annual Fifty State Survey, *The Law of Class Action*. Her recent publications include: *The Essentials of Democratic Mass Litigation,* 45 Colum. J.L. & Soc. Probs. 499 (2012); *Apportioning Due Process: Preserving The Right to Affordable Justice,* 87 Denv. U. L. Rev. 437 (2010); *When Worlds Collide: The Supreme Court Confronts Federal Agencies with Federalism in Wyeth v. Levine*; 84 Tul. L. Rev. 1275 (2010); and *The Manageable Nationwide Class:  A Choice-of-Law Legacy of Phillips Petroleum v. Shutts,* 74 UMKC L. Rev. 543 (2006).

Ms. Cabraser was a recipient of the 2010 Margaret Brant Women Lawyers of Achievement Award, conferred by the ABA Commission on Women in the Profession, and was recently awarded the most prestigious award of the American Association for Justice—the Lifetime Achievement Award—which is given for a body of work over a lifetime demonstrating a profound commitment to the pursuit of justice.[28]

---

[28] Attach. 15.

Ms. Cabraser's experience successfully representing class action claimants in litigation and bankruptcy,[29] combined with Mr. Westbrook's unparalleled asbestos litigation and bankruptcy experience, and Mr. Scott's abilities as a tenacious and principled class advocate, synthesized skills and experience that generated a substantial benefit for ZAI Claimants in the most adverse and discouraging of circumstances. The ZAI result is truly the culmination of years of coordinated, steadfast efforts by these counsel.[30]

Counsel demonstrated their ability, not only by their multifaceted prosecution of this action against great odds, but also by convincing Grace of the need to pay a significant settlement despite the Science Trial Opinion. Courts have recognized that "the single clearest factor reflecting the quality of class counsels' services to the class" is achieving "the largest recovery ever obtained" in a particular type of case. *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 149 (E.D. Pa. 2000). ZAI Class counsel achieved the largest single recovery ever for an asbestos property damage class, and did so against a history of Grace never paying anything for ZAI claims.

---

[29] Ms. Cabraser served as lead Class Counsel in *In re American Family Publishers Business Practices Litig.*, MDL No. 1235, which was centralized in the District of New Jersey in 2000, after which American Family sought bankruptcy protection. *See In re Am. Family Enters.*, 256 B.R. 377 (D.N.J. 2000). The class action settlement was negotiated, approved, and implemented by the MDL Transferee Judge, serving and presiding over American Family's bankruptcy proceedings in the District of New Jersey. *Id.* She also served as lead class counsel in *In re FundAmerica, Inc.*, in which the post-class certification commencement of bankruptcy proceedings culminated in the distribution of assets, via plan of reorganization, to the certified claimant class. *See Nguyen v. FundAmerica, Inc.*, No. C 90 2090 MHP, 1990 WL 165257 (Aug. 21, 1990). She served as class counsel and on the tort claims Creditors Committee in the Dow Corning bankruptcy, where a decade-long struggle to deliver the benefits of a $4 billion-plus class action settlement to breast implant recipients was ultimately successful.

[30] In addition to the three ZAI Class counsel firms sharing in the fee award, class counsel have agreed to allocate a portion of the fee to the two firms who remain active in this Bankruptcy today and worked on ZAI matters over the years – Ness, Motley, Loadholt, Richardson & Poole and McGarvey, Heberling, Sullivan & McGarvey. A third firm (Lukins & Annis) is claiming a share of the fee, but its situation has not been resolved as of the date of filing this motion.

Perhaps the best objective assessment of ZAI Class counsel's achievement came during the Confirmation Hearings in the presentation by counsel for the Property Damage Futures Representative.  In evaluating the ZAI settlement, counsel stated he would give:

> the class counsel for ZAI a tremendous amount of the credit and there should be, because they snatched a significant victory from the jaws of a devastating defeat.  The Science trial was a devastating loss for ZAI claimants, both current and future.  Armed with this Court's decision, if assuming it were upheld -- most decisions are upheld – it was – the fate for most of the Futures would have been summary judgment.  And so, instead of going home with nothing, there is a fund that was created that if things go the way we think they're going to go is approaching $200 million.[31]  That is a lot of money versus nothing.  And so, we think that the ZAI folks are getting an excellent deal under this plan as well.

Confirmation Hr'g Tr. 259, Jan. 5, 2010 (Attach. 16).

Courts have recognized that the caliber of representation provided to a class can also be informed by examining the quality of counsel opposing the class efforts.  In this case, ZAI Class counsel were opposed by preeminent defense lawyers in asbestos, class action, and bankruptcy litigation nationwide.  Mr. Restivo and his colleagues at Reed Smith are among the most esteemed asbestos defense lawyers in the nation, having represented Grace since the 1980s with great success.  Their knowledge of the company, its products, and its defenses made Reed Smith a most formidable ZAI opponent.  Likewise, ZAI Class counsel faced Grace's premier corporate litigation and bankruptcy law firm (Kirkland & Ellis) in many of the ZAI litigation battles.  Everyone in this bankruptcy acknowledges the excellent service provided to Grace by Mr. Bernick and his colleagues at Kirkland & Ellis.  Without belaboring the point, it is fair to say that ZAI Class counsel faced the best defense lawyers the country has to offer.  Throughout

---

[31] With investment interest and a twenty-plus year life, the ultimate ZAI settlement fund could indeed approach $200 million.

the process, ZAI Class counsel conducted themselves with the highest standards of professionalism and courtesy that fostered an atmosphere conducive to a successful, negotiated resolution.

### 4.  The Complexity and Duration of the Litigation

A review of the massive ZAI record in this Court's file gives a clear picture of the complexity and duration of the ZAI litigation.  In giving preliminary approval to the ZAI settlement, Judge Fitzgerald spoke about the "difficulties encountered and likely to be encountered in further prosecution of the ZAI claims, the scientific and other controversies surrounding ZAI, and the difficulties of proof that would likely face ZAI Claimants[.]"[32]  In its ZAI Class Settlement Final Approval Order the Court noted, "It is apparent that the U.S. ZAI Class has faced and continues to face formidable obstacles in proving liability and damage, absent settlement."[33]  In upholding the Plan, the district court likewise recognized that "The ZAI property damage litigation has proven to be extremely time-consuming and expensive[.]"[34]

The ZAI claims were among the most complex and protracted issues in this complex and protracted bankruptcy.  These claims broke new ground in the field of asbestos property damage litigation.  Unlike traditional asbestos property damage claims, ZAI claims had no track record of value to guide their resolution.  Up until the time of the ZAI Class Settlement here, Grace had never paid a penny to resolve any ZAI claim.

---

[32] Revised Order and Notice re ZAI Mot. for Prelim. Approval of ZAI Class Settlement and Provisional Class Certification 4, No. 20535 (Bankr. D. Del. Jan. 16, 2009) (Attach. 17).

[33] Order 2, No. 21174 (Bankr. D. Del. Apr. 1, 2009 ) (Attach. 18).

[34] Am. Mem. Op. 8, No. 20942 (Bankr. D. Del. July 11, 2012) (Attach. 19).

ZAI Class counsel realized there would be no quick resolution to ZAI litigation after the Court's statement that its Science Trial Order "may prove to be fatal to the property damage claims." 355 B.R. 462, 494. Grace's counsel understandably touted the Science Trial ruling as a death knell for ZAI stating, "Indeed, Your Honor's determination suggests that there will be no liability with respect to it."[35]  Without the ability to achieve immediate appellate review, ZAI Class counsel knew they would have to dig in for the long run. They recognized that their vindication might not come until appeal of the bankruptcy plan itself without an earlier settlement. Throughout the long process that ensued, ZAI Class counsel kept their focus on their goal—eventual vindication in an appellate court or by a reasonable settlement.

In order to keep the ZAI ball rolling despite the Science Trial setback, ZAI Class counsel filed motions to bring to the Court's attention the utility of the class action device as a resolution mechanism for ZAI. In March 2008, ZAI Class counsel filed a motion requesting that the Court recognize the pre-existing *Barbanti* Washington state court ZAI class action and use that case as a potential proving ground for resolving ZAI claims.[36]  ZAI Class counsel were well aware that without a class certification, ZAI claims would be almost impossible to prosecute. The risk of failing to achieve class certification was very real, as illustrated by this Court's denial of class certification to

---

[35] Hr'g Tr. 65, July 22, 2008 (Attach. 20).

[36] ZAI Claimants' Mot. for Order Recognizing and Permitting Filing of a Wash. Class Proof of Claim, No. 18323 (Bankr. D. Del. Mar. 18, 2008) (Attach. 21).

another proposed asbestos property damage class, and the district court's agreement with that denial.[37]

As with virtually everything ZAI Class counsel proposed, Grace vigorously objected. Nevertheless, this class recognition effort emphasized ZAI Class counsel's resolve and ingenuity to other bankruptcy constituencies. It is not unreasonable to assume that because of ZAI Class counsel's continued efforts to keep ZAI in the forefront of the bankruptcy, settlement discussions were proposed in earnest by representatives of Grace's owners (Equity Committee) contemporaneously with ZAI Class counsel's efforts in court. The Class Settlement ultimately achieved was the product of mature discussion between well-informed counsel who made reasonable compromises to avoid a certain future of complex litigation with seemingly no end in sight.

It is important to emphasize that ZAI Class counsel's responsibilities to the class did not end with the settlement. Settlement approval, subject to Plan confirmation, authorized the ZAI Trust but left its implementation and operation for the future. In recent years, Counsel have worked on the PD Trust Agreement, Cross Collateral Agreement, and other plan documents to address many of the operational issues involved in the ZAI Trust. They are currently working with the ZAI Trustee, the PD FCR, Grace, and others on initial Trust formation and operational issues. There will obviously be issues that arise as the Trust begins operations. Some of the issues that will confront ZAI Class counsel as members of the ZAI Trust Advisory Committee may be difficult and complex. Nevertheless, they are committed to work with the ZAI Trustee

---

[37]Mem., Misc. No. 08-118, Dkt. No. 20031 (D. Del. Nov. 14, 2008) (refusing to reconsider denial of Anderson Memorial Hospital's class certification motion) (Attach. 22).

and Grace to achieve a streamlined operating facility.   ZAI Class counsel have committed themselves to a year of additional effort on behalf of the class with no additional fee beyond the Class counsel fee they seek herein.  This factor also weighs in favor of finding the 25% fee request is appropriate.

  5.  The Risk of Non-Payment

    As previously noted, in many cases Class counsel fees of 33⅓% or up to 45% have been awarded, partly in recognition that counsel undertook their representation without any assurance of payment.  The situation here is somewhat different.  While one of the Class counsel firms undertook ZAI representation without any guarantee of payment (Cabraser), two Class counsel (Westbrook and Scott) did receive some hourly compensation as specially-appointed Science Trial counsel, not as Class counsel.[38]  In recognition of this fact, and despite the uniqueness, complexity, and unprecedented result they have achieved for the class, ZAI Class counsel have limited their fee request to just 25% of the first two settlement payments.[39]   By contrast, it is usual in class actions for Class counsel to receive a fee based on the entire results, including the value of any contingent settlement payments.  *In re Prudential Ins. Co.*, 148 F.3d 283, 334 (3d Cir. 1998).  ZAI Class counsel are seeking no fees on $80 million in future potential payments—a tremendous additional benefit to the class.

---

[38] This Court recognized that the Science Trial work "affected only the enumerated claims and not all of the members of the class who had already opted in[.]"  Hr'g Tr. 46, Apr. 1, 2009  (Attach. 23).

[39] In a case of this extraordinary complexity and difficulty, class counsel would normally have requested a 33⅓% fee.  But, in light of the Special Counsel fees paid to two of the class counsel for some of the work on ZAI, they have reduced their request by 8%, to 25%.  This 8% of the two guaranteed payments equals approximately $4.8 million, which is a bigger reduction than the $3.47 million the firms received in hourly fees.

If ZAI Claimants come forward in sufficient numbers over the next twenty years to maximize the payment under the settlement, as Class counsel expect they will, ZAI Class counsel will have achieved an additional $80 million for the class from which they will take no payment. Looked at another way, 25% of the first two $30 million payments is approximately 11% of the total potential award Class counsel have achieved for the class. From this additional perspective, ZAI Class counsel believe that their modest fee request properly takes into account the modified risk of the non-payment factor here.

The "risk" factor essentially looks to the probability of ultimate success—that is, the chance that counsels' investment of time, effort, and expense will generate a fund from which a fee can equitably be paid. Efforts in low-risk litigation yield modest fees. By contrast, cases like this one with "long odds on success," must be "properly incentivized" to assure the prolonged commitment of other counsel to an undesirable task. *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1363 (S.D. Fla. 2011). The *Overdraft* court concluded that "the proper incentive here is a 30% fee." *Id.* at 1364. In this case, a more modest percentage, pegged at the prevailing benchmark of 25%, serves this judicially recognized incentive purpose.

### 6.  The Amount of Time Devoted to the Case by ZAI Class Counsel

As reflected in this petition, ZAI Class counsel used their considerable expertise to achieve a significant result in an efficient manner. They did not run up hours for the sake of hourly billing. Efficiency is a laudable goal in class action work. "One thousand plodding hours may be far less productive than one imaginative, brilliant hour." *Meshel v. Nutri/System, Inc.*, 102 F.R.D. 135, 138 (E.D. Pa. 1984) (citation omitted).

While the paramount factor in a common fund contingency case is the result achieved, the Third Circuit does recommend a lodestar cross-check based on the hours expended. *Sullivan*, 667 F.3d at 330. However, "This cross-check calculation does not require mathematical precision, a full-blown lodestar inquiry, or a review of actual time sheets." *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 592 (D.N.J. 2010), *rev'd on other grounds, Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) (internal quotations omitted). "The lodestar crosscheck 'is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier.' The multiplier endeavors 'to account for the contingent nature or risk involved in a particular case,' and may be adjusted 'to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, [and] the complexity and novelty of the issues presented.'" *Sullivan*, 667 F.3d at 330 n.61 (quoting *AT & T*, 455 F.3d at 164 n.4). The lodestar crosscheck does not trump the primary reliance on the percentage of the common fund method. The cross-check should not be used to impose a lodestar analysis "through the back door." *Overdraft*, 830 F. Supp. 2d at 1362. The Third Circuit has found lodestars in the range of 1–4 presumptively reasonable,[40] *In re Diet Drugs*, 582 F.3d 524, 545 (3d Cir. 2009), and has noted, "we

---

[40] Higher multipliers have also been approved by various courts in difficult cases like this one. *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) (multiplier of 4.5); *Mun. Auth. of Town of Bloomsburg v. Commonwealth*, 527 F. Supp. 982 (M.D. Pa. 1981) (multiplier of 4.5); *In re Beverly Hills Fire Litig.*, 639 F. Supp. 915 (E.D. Ky. 1986) (multiplier of up to 5); *In re Fernald Litig.*, No. C-1-85-149, 1989 WL 267038 (S.D. Ohio Sept. 29, 1989) (multiplier of 5); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997) (multiplier of 5.5); *Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890 (1st Cir. 1985) (multiplier of 6); *In re RJR Nabisco, Inc. Sec. Litig.*, MDL No. 818 (MBM), 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) (multiplier of 6); *Muchnick v. First Fed. Sav. & Loan Ass'n of Philadelphia*, Civ. A. No. 86-1104, 1986 WL 10791 (E.D. Pa. Sept. 30, 1986) (multiplier of 8); *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) (multiplier of 8); *Perera v. Chiron Corp.*, (N.D. Cal. May 8, 1996) (multiplier of 9.14); *Weiss v. Mercedes-Benz of N.A., Inc.*, 899 F. Supp. 1297 (D.N.J. 1995) (3d Cir. 1995) (multiplier of 9.3); *Wilson v. Bank of Am. Nat'l Trust & Sav. Ass'n*, No. 643872, (Cal. Super. Ct. 1992) (multiplier of 10).

have approved a multiplier of 2.99 in a relatively simple case." *Milliron v. T-Mobile USA, Inc.*, 423 Fed. Appx. 131, 135 (3d Cir. 2011).

In making the lodestar check it is appropriate to use current hourly rates in the market in which the attorneys are competing. *See Lanni v. New Jersey*, 259 F.3d 146, 149-50 (3d Cir. 2001). ZAI Class counsel competed against the finest attorneys the debtor could retain. In deciding a reasonable hourly rate, courts consider the rate of comparable lawyers. *Student Pub. Interest Research Group. v. AT & T Bell Labs.*, 842 F.2d 1436, 1448 (3d Cir. 1988). ZAI Class counsel often appeared and argued against Grace's lead bankruptcy counsel, Kirkland & Ellis, specifically Mr. Bernick. It is therefore appropriate to use his firm's recent hourly fee billings to the Court of $950 per hour for partners,[41] $600 per hour for associates and $200 per hour for paralegals/litigation support.[42] As reflected in the time summaries attached hereto, ZAI Class counsel have logged 8,992 partner hours; 3,829 associate hours; and 6,360 paralegal/support personnel hours.[43] Applying the prevailing hourly rates to those

---

[41] Other lawyers at Grace's national bankruptcy firm currently charge up to $1,045 per hour in this bankruptcy, Oct. 30, 2012, ECF No. 29821, but because ZAI Class counsel appeared opposite Mr. Bernick on many occasions, they use his lower rate for the lodestar check. As noted by another court, this hourly rate equivalent is low for at least one ZAI Class counsel who has been awarded the equivalent of $6,700 per hour in a contingent fee award. *See* Attach. 14 at 20 n.8. The $950 rate is in line with what many other experienced attorneys are charging in this bankruptcy. *See, e.g.*, Counsel to the Unsecured Creditors Committee ($1,025), (Bankr. D. Del. Nov. 14, 2012) No. 29896; Counsel to the Asbestos Personal Injury Committee ($1,000), (Bankr. D. Del. Nov. 14, 2012) No. 29903 (Attach. 24). It is also comparable to Class counsel Elizabeth Cabraser's $900 hourly rate that courts have used to calculate her lodestar in other class actions, including the *Overdraft* 30% fee award and the *Chase* 25% fee award, referred to hereinabove.

[42] It is appropriate to use prevailing market rates for paralegals as well. *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571 (2008).

[43] For the lodestar crosscheck, ZAI Class counsel have submitted summaries of their hours as instructed by the cases. (Attach. 3). The detailed records are available if the Court wishes to review them.

hourly figures yields a lodestar of $12,111,400.[44]  The requested 25% contingent fee on the first two ZAI settlement payments (totaling an anticipated $64 million) will be $16 million, which gives a modest multiplier of 1.32, a number at the very low end of the presumptively reasonable range of 1-4.  Indeed, even if ZAI Class counsel used half the hourly rate of their adversaries, the multiplier would only be 2.64, still low for this groundbreaking result against great odds.

     7.  Awards in Similar Cases

     This final *Gunter* factor requires the Court to compare the requested fee in this case against fees awarded in other common fund cases.  *Bradburn*, 513 F. Supp. 2d at 339; *In re Cendant Corp.*, 243 F.3d at 737.  A Federal Judicial Center Study examining class action contingency fees found:

> Attorney fees typically were 27% of the class recovery in remanded cases and 29% of the class recovery in cases retained in the federal courts, about the same percentage as in the prior FJC Study of class actions. Twenty-five percent of the cases involved fees of 36% or more.[45]

Many courts in the Third Circuit and elsewhere have considered 25% to be the "benchmark" figure for attorneys' fee awards in class actions, adjusting up or down for significant case-specific factors.  *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D. Del. 2002); *see Pozzi*, 952 F. Supp. at 225 ("[T]he Court concludes that ordinarily attorneys' fees in a securities common fund case should be 25% of the amount of the fund.").

---

[44] Partner hours (8,992 x $950 = $8,542,000); Associate hours (3,829 x $600 = $2,297,400); and Paralegal/Support hours (6,360 x $200 = $1,272,000) total $12,111,400.  ZAI Class counsel are not including in the lodestar their Special Counsel compensated hours, but only the uncompensated hours.

[45] Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation*, at 12 (Federal Judicial Center 2005) (Attach. 25).

When a case presents unusual difficulties or complexity, however, many class action settlements in the Third Circuit and elsewhere award a higher percentage.[46] *See, e.g., McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008) (ERISA and RICO case awarding 28-32% of a settlement valued at $215-$249 million); *In re Ikon*, 194 F.R.D. 166 (awarding 30% fee award on a $111 million settlement); *Nichols v. SmithKline Beecham Corp.*, No. Civ.A. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) (awarding 30% on a $65 million settlement). In light of these and other decisions, a 25% fee award on just the first two payments of this significant settlement is reasonable. In cases with guaranteed and contingent benefits such as this, courts are justified in awarding fees on both parts of the recovery provided they value the contingent benefits reasonably. *In re Prudential Ins. Co.*, 148 F.3d at 334 (approving fee award on both fixed and contingent payments where settlement provided future payments based on class participation). As noted, counsel are waiving any contingent fees on the future Grace payments of up to $80 million.

In comparing awards in similar cases, it is instructive to look to this Court for similar situations. In the US Gypsum bankruptcy, one of the same class counsel who represents the ZAI class (Westbrook) negotiated a class wide asbestos property damage settlement which this Court referred to the originating federal court for review.[47]

---

[46] *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (collecting cases and awarding fees of 33 1/3% of $1.06 billion); *Overdraft*, 830 F. Supp. 2d at 1335-36 (30% fee on $410 million, reflecting recent awards of 30% and 33 1/3% in common benefit class settlements).

[47] Order Modifying The Discharge Inj. For A Limited Purpose in *In re USG Corp.*, No. 01-2094 (JKF), Dkt. No. 12337 (Bankr. D. Del. Dec. 8, 2006) (Attach. 26).

On review, the federal district court approved the settlement and awarded class counsel a 30% fee.[48]

Even more relevant is the Canadian ZAI Class Settlement in this bankruptcy. In that instance, this Court awarded counsel 25% of the entire settlement sum and also permitted them to seek fees for their post-settlement work in the bankruptcy.[49] They have appropriately been doing so since that time.[50] Considering that the Canadian ZAI settlement merited a 25% contingent fee on the entire amount plus post-settlement hourly payments, the 25% fee on only the first two settlement payments requested here is eminently reasonable. The U.S. ZAI settlement, further, achieved a higher guaranteed recovery in total ($60 million v. $9 million) and per claimant ($4,125 v. $600) than the Canadian ZAI settlement.[51] And ZAI Class counsel have agreed to continue to work on the ZAI settlement for one year after the effective date without any compensation beyond their contingent fee.[52] By this additional metric, ZAI Class counsel certainly deserve the 25% fee they seek.

---

[48] *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, No. 2:87-1860-8, *slip. op.*, (D.S.C. Oct. 22, 2008) (Attach. 27).

[49] *See* Modified Order Granting the Canadian ZAI Claimants' Application for Appointment of Special Counsel, No. 24508 (Bankr. D. Del. Mar. 19, 2010); Modified Order Granting Application Authorizing Retention of Daniel K. Hogan, Esq., as Counsel to the Representative Counsel for the Canadian ZAI Claimants, No. 24509 (Bankr. D. Del. Mar. 19, 2010) (Attach. 28).

[50] *See, e.g.*, Thirty-First Monthly Application of Scarfone Hawkins LLP as Special Counsel for the Canadian ZAI Claimants, No. 29819 (Bankr. D. Del. Oct. 26, 2012) (Attach. 29).

[51] This disparity led some Canadian ZAI Claimants to complain they would have been better off in the US ZAI settlement. The District Court took note of the difference, but found that since US and Canadian ZAI claims were in different classes, "equal treatment of these claims is not required." *See* Attach. 19 at 123.

[52] Courts recognize the additional burden on class counsel of working on a case post-settlement without any future fee. *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 FSH, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005).

In approving the ZAI Class Settlement, Judge Fitzgerald noted that a 25% Class counsel fee was the benchmark in this circuit.[53]  In limiting their fee request to 25% of just the first two settlement payments, ZAI Class counsel are requesting a fee well below this benchmark if applied, as it usually would be, to the entire settlement amount. *See In re Prudential Ins. Co.*, 148 F.3d at 334.[54]

### 8. The Value of the Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups

This first *Prudential* factor is intended to measure whether "the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel" or if some of those benefits are more properly attributed to "the efforts of other groups, such as government agencies conducting investigations." *Bradburn*, 513 F. Supp. 2d at 340 (quoting *In re AT & T*, 455 F.3d at 165-66).  This inquiry is intended to prevent Class counsel from receiving excessive fees for "piggybacking" on prior government investigations that produce much of the evidence the class relies on and often "soften up" the defendant for a swift settlement.  The factor is implicated "where government prosecutions frequently lay the groundwork for private litigation[.]"  *In re Diet Drugs*, 582 F.2d at 544.

No such situation is present here.  On the contrary, government activities concerning ZAI were, if anything, impediments to ZAI Class counsel's efforts. First, as pointed out by Grace, the EPA did not classify ZAI as an "asbestos-containing product" because it usually contained less than 1% asbestos by weight.  While ZAI Class

---

[53] *See* Attach. 18 at 4.

[54] A 25% fee award is also in line with federally approved percentages in other types of actions generating significant awards, such as False Claims Act cases. *See* 31 USC § 3730(d)(2) (specifying a minimum 25% fee and up to 30% when the claimant prosecutes a False Claims Act case without government assistance).

counsel vigorously argued that a weight percentage assessment of ZAI was misleading because there are millions of asbestos fibers in a tiny weight percentage of asbestos, they nevertheless recognized that the EPA's position was not helpful. Further, while the Department of Justice did bring a criminal investigation against Grace with respect to its vermiculite activities in Libby, the government <u>lost</u> its case when faced with the excellent defense efforts mounted by Grace's lead counsel in this bankruptcy.

Thus, when ZAI Class counsel approached the negotiating table with Grace, the government activities concerning ZAI had been of no help whatsoever. If this factor has any relevance at all, it is as support for Class counsel's fee because they overcame these government impediments to recovery.

Moreover, this factor favors the requested fee for an additional reason. Once ZAI Class counsel had negotiated a basic framework for ZAI resolution for the class, they agreed with Grace that the negotiations should be expanded so that future ZAI Claimants could benefit from the ZAI Trust being set up as part of the class settlement. Toward that end, a Future Claims Representative was appointed who participated in further negotiations that expanded the reach of the settlement and further improved it.[55] Thus, ZAI Class counsel's efforts benefitted those who were not class members by making the settlement benefits available to them. The Property Damage Future Claims Representative has recognized the value of Class counsel's efforts to his constituents:

> My observation of the efforts of ZAI class counsel leaves no doubt that they have performed to the highest standards of professionalism and competence. Through their hard work, diligence and perseverance, they

---

[55] Although the total amount of the settlement ($140 million) remained the same after the Future's Representative's involvement, the Future's Representative provided valuable input into the settlement terms, including getting the percentage reimbursement raised from 50% to 55%, indexing the homeowner reimbursement to inflation after five years of trust operations, and getting the term of the trust extended.

transferred a claim that Grace had long regarded as having little or no value into a claim with a potential settlement payment of $140 million.

… The structure of the settlement, which provides for contingent funding well into the future, will ensure that my constituency, the future ZAI claimants, will have a sizable fund to access when and as their claims for ZAI abatement mature over the life cycle of the buildings involved.

I am convinced that without the efforts of class counsel, the ZAI settlement they achieved would not have occurred.   I therefore wholeheartedly support their application for a 25% common fund fee.[56]

9.  <u>The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Arrangement at the Time Counsel Was Retained</u>

Under this factor, the court should consider the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case.  *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).  In the case of *In re Continental Illinois Securities Litigation*, Judge Posner articulated this point:

The judicial task might be simplified if the judge and the lawyers bent their efforts on finding out what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character … <u>The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.</u>

962 F.2d 566, 572 (7th Cir. 1992) (emphasis added).

In this case, the fee that counsel would have received based on their fee agreement with the class representatives was established years ago.   The requested 25%

---

[56] Affidavit of Alexander M. Sanders, Jr. (Attach. 2).

percentage-of-recovery is actually less than the 33⅓ percentage fee that was negotiated with the class representatives early in this bankruptcy.[57]

A one-third fee comports with the contingent fee that plaintiffs in a free market typically agree to pay for legal representation. *See Bergstrom v. Dalkon Shield Claimants Trust (In re A. H. Robins Co.)*, 86 F.3d 364, 377 (4th Cir. 1996) (stating the "court could reasonably assume ... a one-third contingent fee" by private counsel representing person injured by a device); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (discussing review of 289 settlements demonstrating the average attorney's fees were 31.71% with a median value that turns out to be one-third); *In re Ikon*, 194 F.R.D. at 194 (noting that in private contingency fee cases, particularly in cases involving torts, plaintiffs' counsel regularly contract for contingent fees between 30% and 40% of any recovery); s*ee also In re Remeron*, 2005 WL 3008808, at *48 (*Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation.").

ZAI Class counsel's 33⅓% negotiated fee with the ZAI Class representatives is consistent with generally accepted contingent fee percentages. Accordingly, a fee limited to 25% of the first two payments to the common fund is eminently reasonable under the second *Prudential* factor.

### 10.  Innovative Terms of the Settlement

The final *Prudential* factor examines whether the settlement reflects innovation that benefits the class or society as a whole. An examination of the Settlement Agreement's innovative terms also supports approval of the requested fee. First, in

---

[57] *See* Agreement and Authorization to Represent Zonolite Attic Insulation Creditors in W. R. Grace Chapter 11 Reorganization Case (Oct. 1, 2004) ("[I]n the event that Attorney is successful at obtaining recovery for Claimant, in which event, Attorney's fees shall be one-third of Claimant's recovery[.]")  (Attach. 30).

negotiating the settlement, Counsel achieved a multi-year comprehensive educational program regarding ZAI. This comprehensive program is intended to educate homeowners and others who may encounter ZAI. It is intended to reflect any material scientific or regulatory developments that pertain to ZAI. In the long run, the program may well serve to reduce unnecessary exposure to asbestos in ZAI (and resultant risk of disease). This may be the settlement's greatest legacy. With asbestos disease taking up to fifty years to develop after exposure, any reduction in such exposure is a public health service.

In addition, the Settlement Agreement gives the ZAI Trustee the flexibility to address unusual abatement projects by permitting the Trustee to spend up to $100,000 per year for "extraordinary claims."[58] This will allow the Trustee to respond to unusual situations that may not be adequately addressed by the normal claim limits. This provision's inclusion shows foresight by ZAI Class counsel and Grace in not straightjacketing the Trustee who will be addressing situations that may arise over twenty-plus years.

Further, as discussed herein, the Settlement Agreement provides for creative funding through additional contingent payments to the Trust of up to $80 million (in $8 million tranches) over twenty (20) years, depending on the pace at which the initial funds are used. Each contingent payment is triggered when the Trust dips below $10 million. This refunding mechanism will help to ensure that remediation assistance is available for both current and future ZAI Claimants.

---

[58] Class Settlement Agreement Term Sheet, No. 20275, ¶ I.B.5, Attach. A, (Dec. 15, 2008) (Attach. 31).

Moreover, the unique structure of the ZAI Trust's funding ensures that the ZAI fund will not be diminished by Class counsel's fee for many years, if ever. Because the fund is replenished by Grace whenever it falls below $10 million, Class counsel's fee will have the effect of accelerating the Grace replenishment. The money paid to Class counsel will be replaced by Grace as the $10 million threshold is reached. As a result, all foreseeable ZAI Claimants will continue to be reimbursed to the fullest extent allowed by the settlement.[59] If there is any reduction in funds available to the class because of the Class counsel fee, it will only affect the settlement fund at the end of its funding when and if Grace's total $80 million contingent funding obligation is paid out in years 15 – 25.[60] Before that time, the class will feel no effect whatsoever from the ZAI Class counsel fee. This is yet another benefit to the class.

Finally, any funds remaining in the ZAI Trust on its termination will not be returned to Grace, but will "pour over" to the PI Trust.[61] Thus, the settlement may eventually benefit yet another bankruptcy constituency. These innovative terms in the settlement that ZAI Class counsel achieved further underscore the reasonableness of the requested attorneys' fees.

---

[59] In the unlikely event that the ZAI fund runs out of money before Year 5 (when the annual replenishment begins), all ZAI claims in the queue will be made whole when the replenishment occurs. *See* ZAI Trust Distribution Procedures, ¶4.4 (Attach. 32).

[60] The Grace replenishment begins after year 5 and runs for the next 20 years. If the additional funding begins in Year 5 and continues for each of the next ten years (which assumes great claims activity in each of those years), millions of dollars would still be available in Year 15. If the replenishment threshold is not reached in any of those years, Grace's obligation extends for up to an additional ten years of the twenty year period. *See* Attach. 18 at 2.

[61] Class Settlement Agreement Term Sheet, No. 20275, ¶ I.A.5, Attach. A, (Dec. 15, 2008) (Attach. 31).

Moreover, the unique structure of the ZAI Trust's funding ensures that the ZAI fund will not be diminished by Class counsel's fee for many years, if ever.  Because the fund is replenished by Grace whenever it falls below $10 million, Class counsel's fee will have the effect of accelerating the Grace replenishment.  The money paid to Class counsel will be replaced by Grace as the $10 million threshold is reached.  As a result, all foreseeable ZAI Claimants will continue to be reimbursed to the fullest extent allowed by the settlement.[59]  If there is any reduction in funds available to the class because of the Class counsel fee, it will only affect the settlement fund at the end of its funding when and if Grace's total $80 million contingent funding obligation is paid out in years 15 – 25.[60]  Before that time, the class will feel no effect whatsoever from the ZAI Class counsel fee.  This is yet another benefit to the class.

Finally, any funds remaining in the ZAI Trust on its termination will not be returned to Grace, but will "pour over" to the PI Trust.[61]  Thus, the settlement may eventually benefit yet another bankruptcy constituency.  These innovative terms in the settlement that ZAI Class counsel achieved further underscore the reasonableness of the requested attorneys' fees.

---

[59] In the unlikely event that the ZAI fund runs out of money before Year 5 (when the annual replenishment begins), all ZAI claims in the queue will be made whole when the replenishment occurs. *See* ZAI Trust Distribution Procedures, ¶4.4 (Attach. 32).

[60] The Grace replenishment begins after year 5 and runs for the next 20 years.  If the additional funding begins in Year 5 and continues for each of the next ten years (which assumes great claims activity in each of those years), millions of dollars would still be available in Year 15.  If the replenishment threshold is not reached in any of those years, Grace's obligation extends for up to an additional ten years of the twenty year period. *See* Attach. 18 at 2.

[61] Class Settlement Agreement Term Sheet, No. 20275, ¶ I.A.5, Attach. A, (Dec. 15, 2008) (Attach. 31).

## CONCLUSION

For all the reasons set forth previously, ZAI Class counsel respectfully request that the Court award a common fund contingency fee of 25% of the first two payments of the Class Settlement and permit them to be reimbursed for their out-of-pocket expenses in the amount of $387,520.00.[62]


Dated: February 7, 2014
     Wilmington, Delaware

                                          SULLIVAN HAZELTINE ALLINSON LLC

THE SCOTT LAW GROUP, P.S.                 /s/ William D. Sullivan
Darrell W. Scott                          William D. Sullivan (No. 2820)
926 W. Sprague Avenue                     Elihu E. Allinson, III (No. 3476)
Chronicle Building, Suite 680             901 North Market Street, Suite 1300
Spokane, Washington  99201                Wilmington, Delaware  19801

RICHARDSON, PATRICK, WESTBROOK &          LIEFF, CABRASER, HEIMANN & BERNSTEIN, L.L.P.
BRICKMAN, LLC                             Elizabeth Cabraser
Edward J. Westbrook                       Embarcadero Center West
1037 Chuck Dawley Blvd., Bldg. A          275 Battery Street, 30th Floor
Mt. Pleasant, South Carolina  29464       San Francisco, CA  94111-3339

                         *Counsel for ZAI Claimants*

---

[62] The cost summaries for ZAI Class counsel are attached hereto.  (Attach. 33).  Class counsel in common fund cases are entitled to reimbursement of their reasonable litigation costs.  *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 423-24 (E.D. Pa. 2010).